WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C. (*pro hac vice*)
(ray.schrock@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>**Debtors.** | Bankruptcy Case No. 19-30088 (DM)<br>Chapter 11<br>(Lead Case) (Jointly Administered)<br><br>[Related Docket Ref: Docket No.: 3841]<br><br>**SUMMARY OF KEY ELEMENTS OF DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION DATED SEPTEMBER 9, 2019** |
| ☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Date:  September 24, 2019<br>Time:  9:30 a.m. (Prevailing Pacific Time)<br>Place:  United States Bankruptcy Court<br>        Courtroom 17, 16th Floor<br>        San Francisco, CA 94102 |

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Pending the filing of a formal Disclosure Statement under section 1125 of the Bankruptcy Code with respect to the *Debtors' Joint Chapter 11 Plan of Reorganization*, dated September 9, 2019 (the "**Plan**"), the Court requested that PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**" and, together with PG&E Corp., the "**Debtors**") file with the Plan a brief summary of the principal Plan provisions. That summary is annexed hereto as **Exhibit A** and, as indicated therein, is qualified in its entirety by the actual terms and provisions of the Plan that is being filed contemporaneously herewith.

In view of the current uncertainty of the Debtors' aggregate liability with respect to both Subrogation Wildfire Claims and Wildfire Claims held by individuals and public entities that have not settled with the Debtors and the upcoming hearings with respect to the estimation of such claims, the Plan and the funding associated therewith necessarily will be subject to amendment to address the outcome of such proceedings or any consensual resolution of such liabilities.

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

**Exhibit A**

**Outline of Key Elements of Debtors' Joint Chapter 11 Plan of Reorganization**[1]

The Debtors' Joint Chapter 11 Plan of Reorganization (the "**Plan**") is structured and designed to enable the Debtors to (a) fairly and expeditiously treat prepetition wildfire claims in full compliance with California Assembly Bill 1054 ("**AB 1054**"), (b) achieve a rate-neutral solution, on average, for customers, (c) meet the AB 1054 June 30, 2020 timeline for confirmation of the Plan, (d) achieve required CPUC approvals, (e) support California's clean energy goals, and (f) ensure that the Reorganized Debtors have access to sufficient liquidity upon emergence from chapter 11.

**As noted below, the Plan will not become effective unless (a) the Debtors' aggregate liability with respect to Wildfire Claims**[2] **held by individuals (and public entities that have not settled with the Debtors), as estimated by the Court, does not exceed $8.4 billion, and (b) the Debtors' aggregate liability with respect to Subrogation Wildfire Claims, as estimated by the Court, does not exceed $8.5 billion.**

**A.      Treatment of Allowed Claims and Equity Interests.**[3]

1.  Administrative Expense Claims.
    a. Description: Costs and expenses of administering the chapter 11 cases, including claims related to debtor-in-possession financing.
    b. Treatment: Paid in full on the Plan Effective Date.

2.  Priority Tax and Other Priority Claims.
    a. Description: Tax and other claims entitled to priority in payment under the Bankruptcy Code.
    b. Treatment: Paid in full on the Plan Effective Date, including any applicable postpetition interest.

---

[1] This summary is qualified in its entirety by the actual terms and provisions of the Plan.
[2] Capitalized terms used herein but not otherwise defined have the meanings ascribed to such terms in the Plan.
[3] The following categories of claims and equity interests are presented in a summary form for ease of reference, and do not correspond exactly to the more detailed classes of claims and equity interests contained in the Plan.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

3. <u>Funded Debt Claims</u>.

   a.<u>Description</u>: All prepetition claims based on loans, bonds, or similar borrowed money claims outstanding as of the Petition Date.

   b.<u>Treatment</u>: All Funded Debt Claims will be paid in full, in cash on the Plan Effective Date, including the payment of accrued and unpaid prepetition interest at the non-default contract rate, plus postpetition interest at the federal judgment rate. The Debtors believe that under the documents governing the Funded Debt Claims and applicable law, no make-whole premiums or similar amounts are payable upon payment of the Funded Debt Claims as provided in the Plan. Accordingly, payment of the Funded Debt Claims does not include the payment of any make-whole premiums or similar amounts. Notwithstanding the foregoing, if it is determined that any holder of a Funded Debt Claim is entitled to payment of a make-whole premium or similar amount or that postpetition interest is payable at a rate other than the federal judgment rate, the treatment of such claim shall be modified in a manner to render the claim unimpaired.

   c.<u>Impairment and Voting</u>: Unimpaired; Not entitled to vote on the Plan.

4. <u>General Unsecured Claims</u>.

   a.<u>Description</u>: All prepetition unsecured claims (other than Funded Debt Claims, unliquidated Wildfire Claims held by individuals and certain limited public entities, Subrogation Wildfire Claims, settled Public Entities Wildfire Claims referred to below in paragraph 7, claims related to the Ghost Ship Fire, Workers' Compensation Claims, and 2001 Utility Exchange Claims). Includes all prepetition trade claims, prepetition litigation claims (other than Wildfire-based litigation claims), and unpaid and liquidated Wildfire Claims that are the subject of prepetition settlement agreements.

   b.<u>Treatment</u>: Paid in full on the Plan Effective Date, including any applicable postpetition interest at the federal judgment rate.

   c.<u>Impairment and Voting</u>: Unimpaired; Not entitled to vote on the Plan.

5. <u>Wildfire Claims</u>.

   a.<u>Description</u>: All Wildfire Claims, including claims for personal injury, wrongful death, or property damage, arising out of the Butte Fire (2015), the North Bay Wildfires (2017), and the Camp Fire (2018) (other than Subrogation Wildfire Claims and Wildfire Claims held by the Public Entities that have settled with the Debtors, each as described below).

This includes all Wildfire Claims by both uninsured and underinsured claimants.[4]

b. <u>Treatment</u>: In accordance with AB 1054, on the Plan Effective Date, the Debtors will fund a trust with cash, bonds, or equity securities (or any combination of such cash, bonds, and equity securities) having a value equal to the amount estimated by the Court as the Debtors' aggregate liability with respect to such Wildfire Claims.

c. <u>Channeling Injunction</u>: All such Wildfire Claims shall be assumed, resolved, and paid solely by the trust and from the trust's assets in accordance with claims resolution procedures to be adopted by the trust (and which will be described in the Disclosure Statement). Holders of such Wildfire Claims shall have no recourse to the Debtors, the Reorganized Debtors, or their assets and properties.

d. <u>Impairment and Voting</u>: Impaired; Holders of such Wildfire Claims are entitled to vote on the Plan.

6. <u>Subrogation Wildfire Claims</u>.

a. <u>Description</u>: All Wildfire Claims arising out of the Butte Fire (2015), the North Bay Wildfires (2017), and the Camp Fire (2018) held by insurers or similar entities in connection with payments made to others on account of damages or losses arising from such wildfires.

b. <u>Treatment</u>: In accordance with AB 1054, on the Plan Effective Date, the Debtors will fund a trust with cash, bonds, or equity securities (or any combination of such cash, bonds, and equity securities) having a value equal to the amount estimated by the Court as the Debtors' aggregate liability with respect to the Subrogation Wildfire Claims.

c. <u>Channeling Injunction</u>: All Subrogation Wildfire Claims shall be assumed, resolved, and paid solely by the trust and from the trust's assets in accordance with claims resolution procedures to be adopted by the trust (and which will be described in the Disclosure Statement). Holders of Subrogation Wildfire Claims shall have no recourse to the Debtors, the Reorganized Debtors, or their assets and properties.

d. <u>Impairment and Voting</u>: Impaired; Holders of Subrogation Wildfire Claims are entitled to vote on the Plan.

7. <u>Public Entities Wildfire Claims</u>.

a. <u>Description</u>: Claims held by those Public Entities that entered into Plan Support Agreements with the Debtors that, among other things, settled

_____

[4] These claims are classified and treated as "Other Wildfire Claims" under the Plan. *See* Plan §§ 4.7, 4.20.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

their claims relating to the Butte Fire (2015), the North Bay Wildfires (2017), and the Camp Fire (2018).

b. Treatment: Payment of the settlement amount of $1 billion in cash, plus the establishment of a fund in the amount of $10 million to reimburse the Public Entities for legal fees and costs associated with any third party claims relating to the wildfires that may be brought against the Public Entities.

c. Impairment and Voting: Impaired; Public Entities are entitled to vote on the Plan.

8. Ghost Ship Fire Claims.

a. Description: Any claims arising from the Ghost Ship Fire.

b. Treatment: Each holder of a Ghost Ship Fire Claim shall be entitled to pursue its claim against the Reorganized Debtors.

c. Impairment and Voting: Unimpaired; Not entitled to vote on the Plan.

9. Subordinated Debt Claims.

a. Description: Any claims subordinated under section 510(b) of the Bankruptcy Code arising from rescission of a purchase or sale of a debt security of the Debtors, or for damages arising from the purchase or sale of such a debt security, including any related claims for reimbursement, contribution or indemnification.

b. Treatment: Paid in full on the Plan Effective Date.

c. Impairment and Voting: Unimpaired; Not entitled to vote on the Plan.

10. PG&E Corporation Common Stock.

a. Description: The publicly traded common stock of PG&E Corporation (parent, holding company), and claims subordinated under section 510 of the Bankruptcy Code arising from rescission of a purchase or sale of such common stock, or for damages arising from the purchase or sale of such common stock, including any related claims for reimbursement, contribution or indemnification (collectively, **PG&E Common Interests**").

b. Treatment: Each holder of a PG&E Common Interest shall retain such PG&E Common Interest, subject to dilution from any common stock or securities linked to common stock issued under the Plan. If a rights offering is implemented in connection with the implementation of the Plan, holders of PG&E Common Interests shall have the right to participate in the rights offering.

c. Impairment and Voting: Impaired; Holders of PG&E Common Interests are entitled to vote on the Plan.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

**B.**     <u>Certain Plan Implementation Provisions</u>.

1. <u>AB 1054</u>. The Reorganized Debtors will participate in the go-forward wildfire fund established under AB 1054, and will make the following required contributions to the fund on the Plan Effective Date:
   a. Approximately $4.8 billion initial contribution; and
   b. Approximately $193 million initial annual contribution.

2. <u>Assumption of Certain Executory Contracts; Employee Obligations</u>.
   a. On the Plan Effective Date, all power purchase agreements and community choice aggregation servicing agreements will be assumed;
   b. On the Plan Effective Date, all collective bargaining agreements will be assumed;
   c. All allowed pension and employee claims and obligations will be paid in full; and
   d. All allowed workers' compensation claims will be paid in full in the ordinary course.

3. <u>CPUC Approvals</u>. Confirmation of the Plan is conditioned on obtaining all CPUC approvals required under AB 1054 and section 1129(a)(6) of the Bankruptcy Code, including:
   a. Satisfactory provisions pertaining to authorized return on equity and regulated capital structure;
   b. A disposition of proposals for certain potential changes to PG&E's corporate structure and authorizations to operate as a utility;
   c. Satisfactory resolution of claims for monetary fines or penalties for prepetition conduct;
   d. Approval (or exemption from approval) of the financing structure and securities to be issued under the Plan;
   e. Approval of any hedges executed by the Utility in consultation with the CPUC staff;
   f. The Utility's governance structure; and
   g. Any approvals or determination with respect to the Plan and related documents that may be required by AB 1054.

4. <u>Conditions to Occurrence of Plan Effective Date</u>. In addition to certain other conditions, the occurrence of the Plan Effective Date is conditioned on the following:
   a. The Debtors' aggregate liability with respect to Wildfire Claims held by individuals and public entities that have not settled with the Debtors as estimated by the Court shall not exceed $8.4 billion; and
   b. The Debtors' aggregate liability with respect to Subrogation Wildfire Claims as estimated by the Court shall not exceed $8.5 billion.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

It shall not be a condition to the occurrence of the Plan Effective Date that wildfire recovery or similar bonds be available to fund the Plan or that legislation authorizing such bonds shall have been enacted.

**C.      Summary of Plan Funding.**

1.   The Plan contemplates that the Debtors will emerge from chapter 11 with sufficient liquidity to support their ongoing operations.

2.   The Plan will be funded through various sources, including:
     a. A new equity offering or offerings;
     b. The issuance or incurrence of new debt at both the PG&E Corp. and Utility levels; and
     c. If available (but not required), wildfire recovery or similar bonds.

In connection with the foregoing, the Debtors intend to enter into Backstop Commitment Letters with various financial institutions to backstop, if necessary, an equity offering of up to $14 billion on the terms set forth therein. Executed Backstop Commitment Letters from certain financial institutions are annexed hereto as **Schedule 1**, and the Debtors intend to solicit and expect to receive additional Backstop Commitment Letters aggregating up to $14 billion.

In addition, as previously disclosed, the Debtors have engaged in discussions with several money center banks that have indicated that the Debtors have ample access to deep pools of both debt and equity capital in order to finance their emergence from chapter 11. Several of these financial institutions have expressed high levels of confidence in their ability to raise in excess of $30 billion of both debt and equity capital to satisfy claims, refinance indebtedness, and address other bankruptcy related and post emergence uses. Copies of highly confident letters from certain of these financial institutions are annexed hereto as **Schedule 2**.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Dated: September 9, 2019

<div style="margin-left: 40%;">

**WEIL, GOTSHAL & MANGES LLP**

**KELLER & BENVENUTTI LLP**


*/s/ Stephen Karotkin*
 Stephen Karotkin

*Attorneys for Debtors and Debtors in Possession*

</div>

<div style="writing-mode: vertical; font-weight: bold;">
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119
</div>

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Schedule 1

### Backstop Commitment Letters

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

September 9, 2019

PG&E Corporation
77 Beale Street
P.O. Box 770000
San Francisco, California 94177

Re: Chapter 11 Plan Backstop Commitment Letter

Ladies and Gentlemen:

Reference is hereby made to the chapter 11 bankruptcy cases, lead case no. 19-30088 (the "***Chapter 11 Cases***"), currently pending before the United States Bankruptcy Court for the Northern District of California (the "***Bankruptcy Court***"), in which PG&E Corporation ("***PG&E***" or the "***Company***") and Pacific Gas and Electric Company (the "***Utility***" and together with PG&E, the "***Debtors***") are debtors in possession. Reference is further made to the Chapter 11 plan of reorganization attached hereto as Exhibit A (the "***Plan***") to implement the terms and conditions of the reorganization of the Debtors as provided therein. Capitalized terms used in this backstop commitment letter (this "***Backstop Commitment Letter***") or in the exhibits hereto but not otherwise defined shall have the meanings ascribed to them in the Plan. The word "including" means "including, without limitation".

In order to facilitate the Debtors' emergence from Chapter 11, pursuant to this Backstop Commitment Letter, and subject to the terms, conditions and limitations set forth herein and in consideration for the Backstop Commitment Premium, the undersigned Backstop Party (the "***Backstop Party***") is willing to purchase, on the Effective Date, an amount of New HoldCo Common Stock up to its Backstop Commitment Amount (as defined herein) at the Backstop Price (as defined herein).

In addition, PG&E has separately solicited and negotiated and expects to enter into substantially similar backstop commitment letters ("***Other Backstop Commitment Letters***") with other funding sources ("***Other Backstop Parties***") pursuant to which such Other Backstop Parties will commit to purchase New HoldCo Common Stock on the Effective Date (such commitments, "***Other Backstop Commitments,***" and together with this Backstop Commitment, the "***Aggregate Backstop Commitments***").

1. Equity Offerings.

a. Structure. The Plan, among other things, shall provide that, on the Effective Date, Reorganized HoldCo shall issue shares of New HoldCo Common Stock for up to $14 billion of aggregate net cash proceeds to Reorganized Holdco (the "***Equity Offering Cap***"). PG&E shall structure the offering of any such shares of New HoldCo Common Stock (or rights pursuant to which any such shares may be issued or other securities convertible into any such shares) (the "***Equity Offering***") in accordance with the terms of this Section 1, including the following parameters:

(i) if the Implied P/E Multiple with respect to such Equity Offering equals or exceeds the greater of (A) 13.5 and (B) 13.5 *times* one *plus* any percentage change of the Applicable Utility Index Multiple (as defined herein) as measured on the date of this Backstop Commitment Letter and the Determination Date (as defined herein), then PG&E shall be permitted to conduct the Equity Offering in any form of primary equity offering (including any public offering, regular way offering, at-the-market equity offering, block trade, modified Dutch auction or other auction pricing mechanism, rights offering, private placement, "PIPE" sale or other registered or unregistered transaction) upon such terms and conditions as may be determined by the Board (a "***Permitted Equity Offering***"), including such terms and conditions that are reasonably advisable (based on the advice of the Debtors' tax advisors after consultation

with Jones Day) in order to avoid an "ownership change" within the meaning of Section 382 and the Treasury Regulations promulgated thereunder or to otherwise preserve the ability of the Debtors to utilize their net operating loss carryforwards and other tax attributes (collectively, the "*NOLs*");

(ii)     if the Implied P/E Multiple with respect to the Equity Offering is less than the Implied P/E Multiple required for a Permitted Equity Offering in Section 1(a)(i) above, but equals or exceeds the lesser of (A) 12 and (B) 12 *times* one *plus* the percentage change of the Applicable Utility Index Multiple as measured on the date of this Backstop Commitment Letter and the Determination Date (the "*Rights Offering Threshold Multiple*"), then PG&E shall structure the Equity Offering such that (Y) at least 80%, determined assuming the exercise in full of all of the Rights, of the aggregate cash proceeds of the Equity Offering is to be raised through the exercise of purchase rights (the "*Rights*") distributed to holders of PG&E common stock ("*Existing Shareholders*") as of a record date to be determined by the Board (the "*Record Date*") to purchase shares of New HoldCo Common Stock for cash at a price set forth below (the "*Rights Offering*") and (Z) the balance of the aggregate cash proceeds of the Equity Offering is to be raised through any other form of primary equity offering (including any public offering, regular way offering, at-the-market equity offering, block trade, modified Dutch auction or other auction pricing mechanism, private placement, "PIPE" sale or other registered or unregistered transaction), provided, that entities holding a majority of the Aggregate Backstop Commitments have not objected to the identity of the purchasers and ultimate purchasers, as applicable, in such Equity Offering, to the extent such Equity Offering is not a broadly syndicated underwritten public offering, within three business days of receipt of notice from PG&E;

(iii)     in both of paragraphs (i) and (ii) above, Reorganized Holdco may also raise equity capital (subject to the Equity Offering Cap) by calling on the Backstop Commitments (after giving effect to any reduction of the Backstop Commitments in connection with a Permitted Equity Offering or a Rights Offering, as applicable); and

(iv)     if the Implied P/E Multiple with respect to the Equity Offering would be less than the Rights Offering Threshold Multiple or if for any other reason Reorganized Holdco is unable to execute an Equity Offering, then Reorganized Holdco shall not utilize either a Permitted Equity Offering or a Rights Offering and shall issue shares at the Backstop Price pursuant to the Backstop Commitments up to the Equity Offering Cap *less* the proceeds of any Additional Capital Sources.

"*Implied P/E Multiple*" means, with respect to any Equity Offering, (A) the price per share at which shares of New Holdco Common Stock are offered to be sold in such Equity Offering (which price (x) in the case of an Equity Offering of rights, shall be the exercise price to acquire a share of New HoldCo Common Stock pursuant to such rights or (y) in the case of an Equity Offering of a security convertible into or exchangeable for shares of New Holdco Common Stock, shall be the per share price implied by the conversion ratio used to convert the principal amount, liquidation preference or other face amount of such security into a number of shares of New Holdco Common Stock) (the "*Per Share Price*"), *times* (B) the number of fully diluted shares of PG&E (calculated using the treasury stock method) that will be outstanding as of the Effective Date (assuming such Equity Offering and all other equity transactions contemplated by the Plan are consummated and settled on the Effective Date), *divided by* (C) the Normalized Estimated Net Income as of the Determination Date.

b.     Additional Capital Sources.  PG&E shall conduct the Equity Offering in accordance with the Plan.  The net cash proceeds to PG&E of the Equity Offering shall not exceed the Equity Offering Cap, *less* the sum of (i) the principal amount of debt that is issued by PG&E in excess of $7 billion in connection with the Plan; (ii) the aggregate liquidation preference of preferred stock

Case: 19-30088     Doc# 3844     Filed: 09/09/19     Entered: 09/09/19 15:14:13     Page 12 of 135

("**Mandatory Convertible Preferred Stock**") that is distributed pursuant to the Plan to holders of Wildfire Claims, on the terms and conditions set forth on <u>Exhibit B</u> pursuant to the Plan; (iii) the principal amount of any Wildfire Victim Recovery Bonds issued in connection with the Plan; (iv) the proceeds of any preferred stock issued by the Utility (excluding any Utility Preferred Interests that are Reinstated pursuant to the Plan); (v) the proceeds of any third-party transactions based upon the monetization of any NOLs; and (vi) the principal amount of any other debt that is issued or reinstated by the Utility, excluding any debt that may be issued under clause (v) above, in excess of $27.35 billion in connection with the Plan (the "**Additional Capital Sources**").

        c.    <u>Rights Offering</u>.  With respect to the Rights Offering:

        (i)    the Rights will have a fixed exercise price equal to (a) the Rights Offering Threshold Multiple *times* (b) the Normalized Estimated Net Income as of the Determination Date, *divided by* (c) the number of fully diluted shares of PG&E (calculated using the treasury stock method) that will be outstanding as of the Effective Date (assuming all equity is raised by the exercise of all Rights);

        (ii)    the Rights shall be transferable;

        (iii)    the Board shall provide that holders of Rights who fully exercise their Rights will have over-subscription privileges to subscribe for additional shares of New HoldCo Common Stock to the extent other Rights are not exercised, with over-subscription procedures (including pro-ration rules) determined by the Board;

        (iv)    the Board may provide that the Rights or Rights Offering include such terms and conditions that are reasonably advisable (based on the advice of the Debtors' tax advisors after consultation with Jones Day) in order to avoid an "ownership change" within the meaning of Section 382 and the Treasury Regulations promulgated thereunder or to otherwise preserve the ability of the Debtors to utilize their NOLs, including limitations on the amount of Rights that are exercisable by holders who, together with persons who have a formal or informal understanding with such holders to make a coordinated acquisition of stock within the meaning of Treasury Regulations 1.382-3(a) (an "**Entity**"), beneficially own in excess of a specified percentage (e.g., 4.75%) of the outstanding shares of PG&E common stock, subject to exceptions to be determined by the Board; provided, however, that such terms and conditions shall not restrict existing holders of PG&E common stock (including any Entity) from acquiring shares that do not increase their aggregate beneficial ownership to more than 4.75% of the outstanding shares of PG&E common stock immediately after the completion of the Rights Offering; and

        (v)    the Rights will have such other terms and conditions as may be determined by the Board, as long as such other terms and conditions are consistent with the Plan and with every other provision of this Backstop Commitment Letter.

        d.    <u>Subordinated Claims</u>.  To the extent provided in the Plan, the Debtors may issue Rights or New HoldCo Common Stock to holders of Claims against a Debtor that are subject to subordination pursuant to section 510(b) of the Bankruptcy Code and that arise from or are related to any equity security of the Debtor.

        e.    <u>Documentation</u>.  The definitive documentation for any Permitted Equity Offering or any Rights Offering shall be consistent with the Plan.  For the avoidance of doubt, the organizational documents of the Reorganized HoldCo (including its charter) may include limitations and other terms that are reasonably advisable (based on the advice of the Debtors' tax advisors after consultation with Jones Day) in order to avoid an "ownership change" within the meaning of Section 382 and the Treasury Regulations promulgated thereunder or to otherwise preserve the ability of the Debtors to utilize their

NOLs; provided, however, that the organizational documents shall not be modified or amended in a manner that would restrict existing holders of PG&E common stock (including any Entity) from acquiring shares that do not increase their aggregate beneficial ownership to more than 4.75% of the outstanding shares of PG&E common stock immediately after the completion of the Rights Offering.

       f.     Use of Proceeds. The Debtors shall only use the proceeds of an Equity Offering to fund obligations to holders of Wildfire Claims under the Plan.

       g.     Notices. Promptly, and in any event, within two days of the Board's determination of final pricing of any Equity Offering, PG&E shall publicly disclose the form, structure, amount and terms of such Equity Offering, including the Implied P/E Multiple for such Equity Offering. PG&E shall give the Backstop Party, as soon as reasonably practicable, but in no event later than two business days prior to the Effective Date, (i) written notification setting forth (A) the amount to be funded pursuant to the Backstop Commitment, (B) an estimate of the Backstop Price and (C) the targeted Effective Date and (ii) a subscription form to be completed by the Backstop Party, or other instructions, to facilitate the Backstop Party's subscription for the New HoldCo Common Stock.

       h.     Cooperation. As reasonably requested by the Debtors, the Backstop Party shall reasonably cooperate with the Debtors with respect to providing information relevant to the preservation of the Debtors' Tax Attributes, including information regarding (i) the number of shares of PG&E common stock owned by such party (on a holder-by-holder basis) prior to the Rights Offering and (ii) the amount of Rights exercised and shares of New HoldCo Common Stock purchased pursuant to the Backstop Commitment by such persons.

    2.     Backstop.

       a.     Subject to the terms and conditions set forth herein and to the payment and provision of premium to the Backstop Party as provided in Section 2(c), the Backstop Party, solely on behalf of itself, hereby commits to purchase on the Effective Date an amount of shares of New HoldCo Common Stock at the Backstop Price (the "***Backstop Commitment***") up to the dollar amounts set forth on Exhibit B hereto (the "***Backstop Commitment Amount***").

       b.     PG&E and the Backstop Party shall cooperate in good faith to prepare and deliver a subscription agreement and any other documentation necessary to effect the private placement of New HoldCo Common Stock to the Backstop Party in accordance with the terms of this Backstop Commitment Letter, which documentation shall be consistent with this Backstop Commitment Letter and the Plan.

       c.     The Debtors agree to pay the Backstop Party the Backstop Commitment Premium to the extent provided on Exhibit B and to reimburse on a regular basis the Backstop Party for the reasonable fees and expenses of Jones Day and a financial advisor incurred prior to termination of this Backstop Commitment Letter in connection with the Plan, the Backstop Commitment Letter, and the transactions contemplated herein, provided that such reimbursement shall not exceed $17 million for Jones Day in the aggregate and $19 million for the financial advisor in the aggregate. The provisions for the payment of the Backstop Commitment Premium and the other provisions provided herein are an integral part of the transactions contemplated by this Backstop Commitment Letter and without these provisions the Backstop Party would not have entered into this Backstop Commitment Letter, and the Backstop Commitment Premium shall, pursuant to an order of the Bankruptcy Court approving this Backstop Commitment Letter, constitute allowed administrative expenses of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code.

       d.     Reorganized Holdco will enter into a registration rights agreement with the Backstop Party in respect of the shares of New HoldCo Common Stock that the Backstop Party may acquire in accordance with the Plan and this Backstop Commitment Letter, which registration rights agreement shall be in form and substance reasonably acceptable to the holders of a majority of the Aggregate Backstop Commitments.

Case: 19-30088   Doc# 3844   Filed: 09/09/19   Entered: 09/09/19 15:14:13   Page 14 of 135

e. To the extent that PG&E agrees to terms that are more favorable to an Other Backstop Party in an Other Backstop Commitment Letter (excluding terms relating to the size of such Other Backstop Party's backstop commitment), PG&E shall provide notice of such terms to the Backstop Party no later than 10 days after the Allocation Date and, absent a written objection from the Backstop Party no later than 10 days after the date of such notice, such terms shall be deemed without further action to be incorporated into this Backstop Commitment Letter.

3. <u>Backstop Party Representations</u>. The Backstop Party hereby represents and warrants, solely as to itself, that (a) it has all limited partnership, corporate or other power and authority necessary to execute, deliver and perform this Backstop Commitment Letter, (b) the execution, delivery and performance of this Backstop Commitment Letter by it has been duly and validly authorized and approved by all necessary limited partnership, corporate or other organizational action by it, (c) this Backstop Commitment Letter has been duly and validly executed and delivered by it and, assuming due execution and delivery by the other parties hereto, constitutes a valid and legally binding obligation of it, enforceable against it in accordance with the terms of this Backstop Commitment Letter, (d) the execution, delivery and performance by the Backstop Party of this Backstop Commitment Letter do not (i) violate the organizational documents of the Backstop Party or (ii) violate any applicable law or judgment applicable to it, (e) as of the date of this Backstop Commitment Letter, its Backstop Commitment is, and as of the date of commencement of any Rights Offering and as of the Effective Date its Backstop Commitment will be, less than the maximum amount that it is permitted to invest in any one portfolio investment pursuant to the terms of its constituent documents or otherwise, (f) it has, as of the date of this Backstop Commitment Letter, and will have, as of the Effective Date, in the aggregate available undrawn commitments and liquid assets at least in the sum of its Backstop Commitment Amount hereunder, and (g) as of September 2, 2019, it and its affiliates (excluding any affiliate that is an Other Backstop Party) beneficially owned, directly or indirectly, 2,064,629 shares of PG&E common stock and had a "put equivalent position" (as defined in Rule 16a-1 under the Securities Exchange Act of 1934, as amended) of zero shares of PG&E common stock (the number of shares beneficially owned less the number of shares in the put equivalent position being the "***Backstop Party's Shares***").

In addition, the Backstop Party hereby represents and warrants, solely as to itself, as of the date of this Backstop Commitment Letter and as of the Effective Date, that the Backstop Party (i) is acquiring the shares of New HoldCo Common Stock for its own account, solely for investment and not with a view toward, or for sale in connection with, any distribution thereof in violation of any foreign, federal, state or local securities or "blue sky" laws, or with any present intention of distributing or selling such shares in violation of any such laws, (ii) has such knowledge and experience in financial and business matters and in investments of this type that it is capable of evaluating the merits and risks of its investment in the shares of New HoldCo Common Stock and of making an informed investment decision, and (iii) is an "accredited investor" within the meaning of Rule 501 of Regulation D under the Securities Act of 1933, as amended (the "***Securities Act***"). The Backstop Party understands that Reorganized HoldCo will be relying on the statements contained herein to establish an exemption from registration under the Securities Act and under foreign, federal, state and local securities laws and acknowledges that the shares of New HoldCo Common Stock will not be registered under the Securities Act or any other applicable law and that such shares may not be transferred except pursuant to the registration provisions of the Securities Act (and in compliance with any other applicable law) or pursuant to an applicable exemption therefrom.

4. <u>Conditions to Backstop Party Commitment</u>. The obligations of the Backstop Party to fund its Backstop Commitment to PG&E in accordance with this Backstop Commitment Letter are further expressly conditioned upon and subject to the satisfaction or written waiver by the Backstop Party, in its sole discretion, at or prior to the Effective Date of each of the following conditions, which PG&E acknowledges are an integral part of the transactions contemplated by this Backstop Commitment Letter and without these conditions the Backstop Party would not have entered into this Backstop Commitment Letter.

a. by November 7, 2019, the Debtors shall have received valid and enforceable Other Backstop Commitments on substantially the same terms and conditions as set forth in this Backstop Commitment Letter that in the aggregate with this Backstop Commitment result in Aggregate Backstop Commitments of no less than the Equity Offering Cap;

b. other than the consummation of any Permitted Equity Offering or the Rights Offering, the satisfaction of all of the other conditions to the Effective Date provided for in the Plan or the waiver of any such conditions by the Debtors in accordance with the Plan (to the extent the Plan expressly provides for the possibility of such a waiver);

c. the Bankruptcy Court shall have entered the Confirmation Order, which shall confirm the Plan with such amendments, modifications, changes and consents as are approved by those entities having no less than a majority of the Aggregate Backstop Commitments (such approval not to be unreasonably withheld, conditioned or delayed), and such Confirmation Order shall be in full force and effect, and no stay thereof shall be in effect;

d. this Backstop Commitment Letter shall have been approved by an order of the Bankruptcy Court and such order shall be in full force and effect, and no stay thereof shall be in effect;

e. the transactions contemplated herein shall have been authorized by an order of the Bankruptcy Court (which may be the Confirmation Order) such order shall be in full force and effect, and no stay thereof shall be in effect;

f. total PG&E weighted average earning rate base (including electric generation, electric transmission, electric distribution, gas distribution, gas transmission and storage) for estimated 2021 shall be no less than 95% of $48 billion; and

g. no result, occurrence, fact, change, event, effect, violation, penalty, inaccuracy or circumstance (whether or not constituting a breach of a representation, warranty or covenant set forth in the Plan) that, individually or in the aggregate with any such other results, occurrences, facts, changes, events, effects, violations, penalties, inaccuracies, or circumstances, (i) would have or would reasonably be expected to have a material adverse effect on the business, operations, assets, liabilities, capitalization, financial performance, financial condition or results of operations, in each case, of the Debtors, taken as a whole, or (ii) would reasonably be expected to prevent or materially delay the ability of the Debtors to consummate the transactions contemplated by this Backstop Commitment Letter or the Plan or perform their obligations hereunder or thereunder (each a "***Material Adverse Effect***") shall have occurred; *provided*, *however*, that none of the following results, occurrences, facts, changes, events, effects, violations, penalties, inaccuracies, or circumstances shall constitute or be taken into account in determining whether a Material Adverse Effect has occurred, is continuing or would reasonably be expected to occur: (A) the filing of the Chapter 11 Cases, and the fact that the Debtors are operating in bankruptcy (B) results, occurrences, facts, changes, events, effects, violations, inaccuracies, or circumstances affecting (1) the electric or gas utility businesses in the United States generally or (2) the economy, credit, financial, capital or commodity markets, in the United States or elsewhere in the world, including changes in interest rates, monetary policy or inflation, (C) changes or prospective changes in law (other than any law or regulation of California or the United States that is applicable to any electrical utility) or in GAAP or accounting standards, or any changes or prospective changes in the interpretation or enforcement of any of the foregoing, (D) any decline in the market price, or change in trading volume, of any securities of the Debtors, (E) any failure to meet any internal or public projections, forecasts, guidance, estimates, milestones, credit ratings, budgets or internal or published financial or operating predictions of revenue, earnings, cash flow or cash position, (F) any wildfire occurring after the Petition Date and prior to January 1, 2020, and (G) one or more wildfires, occurring on or after January 1, 2020, that destroys or damages fewer than 500 dwellings or commercial structures ("***Structures***") in the aggregate (it being understood that (I) the exceptions in clauses (D) and (E) shall not prevent or otherwise affect a determination that the underlying cause of any such change, decline or failure referred to therein is a Material Adverse Effect and

6

(II) a Material Adverse Effect shall include the occurrence of one or more wildfires on or after January 1, 2020 destroying or damaging at least 500 Structures within PG&E's service area where none of the following are true with respect any such wildfire (a) the portion of PG&E's system at the location of such wildfire was not de-energized; (b) there has been no determination by a final order that such wildfire was caused by a person or entity other than the Utility; and (c) there has been no determination that such wildfire was not caused by the negligence or intentional misconduct of the Utility by a final order of a court having jurisdiction).

5.    <u>Termination by the Backstop Party</u>.  Subject to the last paragraph of this Section 5, the Backstop Party may terminate this Backstop Commitment Letter, solely as to itself, by written notice (which shall describe the basis for such termination), on or after the occurrence of any of the following:

a.    the Plan has not been filed with the Bankruptcy Court by 11:59 p.m. Pacific Time on September 9, 2019 or the Plan filed with the Bankruptcy Court on or after such date differs from the draft of the Plan attached hereto as Exhibit A;

b.    the condition set forth in Section 4(a) is not satisfied as of November 7, 2019;

c.    the Bankruptcy Court has not entered an order approving this Backstop Commitment Letter on or before November 20, 2019;

d.    subject to Section 11, (i) the Plan has been amended modified or changed, in each case without the consent of the entities holding a majority of the Aggregate Backstop Commitments (such consent not to be unreasonably withheld, conditioned or delayed) or (ii) any Plan Supplement or any Plan Document shall have been filed or finalized without the consent of entities holding a majority of the Aggregate Backstop Commitments (such consent not to be unreasonably withheld, conditioned or delayed);

e.    the Confirmation Order has not been entered by the Bankruptcy Court on or before June 30, 2020 (the "***Outside Date***");

f.    the Effective Date has not occurred on or before 60 days after entry of the Confirmation Order;

g.    the Debtors have failed to perform any of their obligations set forth in this Backstop Commitment Letter, which failure to perform (i) would give rise to the failure of a condition set forth in Section 4(b) or 4(c) and (ii) is incapable of being cured or, if capable of being cured by the Outside Date, the Debtors have not cured within 10 calendar days following receipt by the Debtors of written notice of such failure to perform from the Backstop Party stating the Backstop Party's intention to terminate this Backstop Commitment Letter pursuant to this Section 5(g) and the basis for such termination;

h.    the occurrence of a Material Adverse Effect;

i.    the occurrence of one or more wildfires in the Debtors' service territory after the Petition Date and prior to January 1, 2020 that is asserted by any person to arise out of the Debtors' activities and that destroys or damages more than 500 Structures; *provided, however,* that any notice of termination under this clause (i) must be given on or before January 15, 2020;

j.    the Debtors' aggregate liability with respect to Wildfire Claims is determined (whether (i) by the Bankruptcy Court (or the District Court to which the reference has been partially withdrawn for estimation purposes), (ii) pursuant to an agreement between the Debtors and the holders of Wildfire Claims, or (iii) through a combination thereof) to exceed $17.9 billion (the "***Wildfire Claims Cap***"); *provided, however,* that for purposes of this clause (j), (A) any Wildfire Claim that the CPUC has approved or agreed to approve for recovery or pass through by the Utility shall not count in determining the Wildfire Claims Cap, and (B) the Wildfire Claims Cap shall be increased by an amount equal to the amount of Wildfire Claims consisting of professional fees that the Bankruptcy Court (or the District Court to which the reference has been partially withdrawn for estimation purposes) determines to be reasonable;

Case: 19-30088    Doc# 3844    Filed: 09/09/19    Entered: 09/09/19 15:14:13    Page 17 of 135

k. the CPUC fails to issue all necessary approvals, authorizations and final orders to implement the Plan prior to the Outside Date, and to participate in the Go-Forward Wildfire Fund, including: (i) provisions satisfactory to entities holding a majority of the Aggregate Backstop Commitments (such approval not to be unreasonably withheld, conditioned or delayed) pertaining to authorized return on equity and regulated capital structure, (ii) a disposition, satisfactory to entities holding a majority of the Aggregate Backstop Commitments (such approval not to be unreasonably withheld, conditioned or delayed), of proposals for certain potential changes to PG&E's corporate structure and authorizations for the Utility to operate as a utility, (iii) a resolution, satisfactory to entities holding a majority of the Aggregate Backstop Commitments (such approval not to be unreasonably withheld, conditioned or delayed), of claims for monetary fines or penalties under the California Public Utilities Code for conduct prior to the Petition Date, and (iv) approval (or exemption from approval) of the financing structure and securities to be issued under the Plan;

l. if at any time after the first day of the Confirmation Hearing, asserted Administrative Expense Claims exceed $250 million, excluding all (i) ordinary course Administrative Expense Claims, (ii) Professional Fee Claims, and (iii) Disallowed Administrative Expense Claims;

m. there is in effect an order of a governmental authority of competent jurisdiction permanently restraining, enjoining or otherwise prohibiting the consummation of any of the transactions contemplated by the Plan, or any law, statute, rule, regulation or ordinance is adopted that makes consummation of the transactions contemplated by the Plan illegal or otherwise prohibited.

PG&E shall promptly provide notice to the Backstop Party of (i) the occurrence of any fact, event, or omission that is not publicly disclosed that gives rise or reasonably can be expected to give rise to a termination right under this Section 5 and (ii) the receipt of any termination notice from any Other Backstop Party, including the asserted basis for such termination, whether or not PG&E concurs therewith.

Upon valid termination of this Backstop Commitment Letter by the Backstop Party (such terminating Backstop Party, a "***Terminating Backstop Party***") pursuant to Section 5(a) through (m), this Backstop Commitment Letter shall be void and of no further force or effect solely with respect to such Terminating Backstop Party is obligated herein, such Terminating Backstop Party shall be released from its Backstop Commitments, undertakings and agreements under or related to this Backstop Commitment Letter, including its Backstop Commitment, except as explicitly provided herein and there shall be no liability or obligation on the part of such Terminating Backstop Party hereunder, except as expressly provided herein. Notwithstanding any termination by a Terminating Backstop Party, PG&E shall remain liable for the payment of all earned Backstop Commitment Premiums and expense reimbursement obligations in this Backstop Commitment Letter.

The Backstop Party's obligations under this Backstop Commitment Letter shall automatically terminate in the event that PG&E has not returned a counter-signed copy of this Backstop Commitment Letter agreeing to its terms on or before the date that is two weeks from the day the Backstop Party furnished a signed copy of this Backstop Commitment Letter to PG&E.

The Backstop Party may not seek to (i) assert the failure of any condition precedent to any of its obligations or agreements under this Backstop Commitment Letter or (ii) terminate this Backstop Commitment Letter (including pursuit of any other remedies), in each case unless the Backstop Party has given written notice to PG&E of such assertion or termination.

Notwithstanding anything in this Backstop Commitment Letter to the contrary, any notice of termination under clauses (d), (g), (h), (i), (k), (l) and (m) shall not be effective unless PG&E has received notices of termination from entities constituting a majority of the outstanding Aggregate Backstop Commitments with respect to the event or circumstance that is the basis for such notice of termination. PG&E shall provide the Backstop Party with a notice of such effective termination within two business days of the effectiveness of the termination.

Case: 19-30088    Doc# 3844    Filed: 09/09/19    Entered: 09/09/19 15:14:13    Page 18 of 135

In the event that any fact or circumstance would give the Backstop Party the right to terminate under more than one clause in this Section 5, the exercise of a termination right under any one clause shall not prejudice the Backstop Party from exercising a termination right under any other clause based on the same event or circumstance.

6.  Termination by PG&E; Defaulting Backstop Party; Extension Options.  PG&E may terminate this Backstop Commitment Letter (including all Backstop Commitments hereunder) (a) at any time prior to countersigning such Backstop Commitment Letter, (b) if, on any date after November 7, 2019, the condition set forth in Section 4(a) would not be satisfied if tested on such date, (c) in the event of a material breach of a representation or warranty of the Backstop Party set forth in Section 3, (d) in the event that the Backstop Party repudiates this Backstop Commitment Letter, purports to terminate this Backstop Commitment Letter if such purported termination is not a valid termination of this Backstop Commitment Letter as determined in a final order of a court with jurisdiction or fails to fund its Backstop Commitment when required to do so in accordance with this Backstop Commitment Letter, (e) if the Backstop Commitment Amount has been reduced to zero in accordance with Section 7, (f) if the Backstop Party has the right to terminate this Backstop Commitment Letter under clause (h), (i), (j) or (m) of Section 5, or (g) if (i) a third party makes a binding proposal to acquire at least 50% of the outstanding PG&E common stock (including by means of a merger, joint venture, partnership, consolidation, dissolution, liquidation, tender offer, recapitalization, reorganization, share exchange, business combination or similar transaction), (ii) either (x) the implementation of such proposal would require the approval of holders of a majority of the PG&E common stock or (y) the price contemplated by such proposal would exceed 125% of the Equity Offering Cap, and (iii) the Board determines in good faith, after consultation with PG&E's outside legal counsel, that the failure to terminate this Backstop Commitment Letter in response to such proposal would be inconsistent with the exercise of its fiduciary duties to the stockholders of PG&E under applicable law. In the event of a breach, repudiation, purported termination or failure to fund contemplated by the foregoing clause (c) or (d), the Backstop Party shall be deemed to be a "*Defaulting Backstop Party*".  In the event that the Backstop Party becomes a Defaulting Backstop Party, then PG&E may, upon notice to such Defaulting Backstop Party, require the Backstop Party to assign and delegate, without recourse, all its interests, rights (other than any Backstop Commitment Premiums earned prior to the date of such assignment and delegation) and obligations under this Backstop Commitment Letter to a third party that shall assume such obligations (which assignee may be an Other Backstop Party, if an Other Backstop Party accepts such assignment and delegation).  Notwithstanding any termination by PG&E under Sections 6(b), (e), (f) or (g), PG&E shall remain liable for the payment of all earned Backstop Commitment Premiums and expense reimbursement obligations in this Backstop Commitment Letter.

In the event that any fact or circumstance would give PG&E the right to terminate under more than one clause in this Section 6, the exercise of a termination right under any one clause shall not prejudice PG&E from exercising a termination right under any other clause based on the same event or circumstance.

Notwithstanding anything to the contrary herein, this Backstop Commitment Letter shall automatically terminate on January 20, 2020 (the "*Initial Termination Date*").  Provided that this Backstop Commitment Letter remains in full force and effect and has not been otherwise terminated, PG&E may extend the Initial Termination Date to April 30, 2020 (the "*First Extension Date*") upon providing written notice to the Backstop Party of its intent to exercise this option (the "*First Extension Notice*") no later than three days prior to the Initial Termination Date.  In the event that PG&E has provided the Backstop Party a timely and proper First Extension Notice and this Backstop Commitment Letter remains in full force and effect, PG&E may extend the First Extension Date to the Outside Date (the "*Second Extension Date*") upon providing written notice to the Backstop Party of its intent to exercise this option (the "*Second Extension Notice*") no later than three days prior to the First Extension Date.  In the event that PG&E has provided the Backstop Party a timely and proper Second Extension Notice and this Backstop Commitment Letter remains in full force and effect, PG&E may extend the Second Extension Date to the 60th day following the Outside Date (the "*Third Extension Date*") upon providing written notice to the Backstop

Case: 19-30088    Doc# 3844    Filed: 09/09/19    Entered: 09/09/19 15:14:13    Page 19 of 135

Party of its intent to exercise this option (the "***Third Extension Notice***") no later than three days prior to the Second Extension Date.

       7.      <u>Reduction of Commitments by PG&E</u>.

       a.      In the event that on or prior to November 7, 2019, PG&E receives Aggregate Backstop Commitments that exceed the Equity Offering Cap (such excess, the "***Overallotment Amount***"), then, on November 8, 2019 (the "***Allocation Date***"), the Backstop Commitment Amount shall be automatically reduced by an amount equal to (i) the Overallotment Amount, *times* (ii) a fraction, (A) the numerator of which is the Backstop Party's Shares and (B) the denominator of which is the aggregate number of shares of PG&E common stock held by the Backstop Party and the Other Backstop Parties, collectively, as of September 6, 2019 (without double counting any shares beneficially owned, directly or indirectly, by more than one Backstop Party). Notwithstanding the foregoing, on the Allocation Date, in the event there is an Overallotment Amount and for the purpose of curing such Overallotment Amount, PG&E may reduce the Backstop Commitment Amount as to any Backstop Party to the extent such reduction is reasonably advisable (based on the advice of the Debtors' tax advisors after consultation with Jones Day) in order to avoid an "ownership change" within the meaning of Section 382 and the Treasury Regulations promulgated thereunder or to otherwise preserve the ability of the Debtors to utilize their NOLs; *provided* that such reduction may not be below the amount of Backstop Commitments at which such Backstop Party would maintain its existing percentage ownership of the total outstanding shares of PG&E common stock. Within three business days of the Allocation Date, PG&E shall provide the Backstop Party with a notice of any adjustment to its Backstop Commitment Amount under this Section 7(a).

       b.      In the event that, after November 7, 2019, the Debtors (i) receive binding commitments providing for funding from any Additional Capital Sources that (A) have conditions to funding and commitment termination rights that are no less favorable to PG&E than those in this Backstop Commitment Letter and (B) are approved by an order of the Bankruptcy Court, or (ii) actually obtain funding from any Additional Capital Sources, then (x) in the case of clause (i), PG&E may reduce the Backstop Commitment Amount, and (y) in the case of clause (ii), the Backstop Commitment Amount shall be automatically reduced (if not already reduced pursuant to clause (i)), in each case by an amount equal to (A) the amount of such funding, times (B) a fraction, (1) the numerator of which is the Backstop Commitment Amount immediately prior to such reduction and (2) the denominator of which is the Aggregate Backstop Commitments as of immediately prior to such reduction. Any reduction in the Backstop Commitment pursuant to this Section 7(b) shall not reduce any Backstop Commitment Premium earned prior to the date of such reduction.

       c.      In the event that the Debtors consummate any Permitted Equity Offering or Rights Offering, the Backstop Commitment Amount shall be automatically reduced by an amount equal to (i) the net cash proceeds of such Permitted Equity Financing or such Rights Offering plus the proceeds of any Additional Capital Sources, as applicable, *times* (ii) a fraction, (A) the numerator of which is the Backstop Commitment Amount immediately prior to such reduction and (B) the denominator of which is the Aggregate Backstop Commitments as of immediately prior to such reduction.

       d.      The Debtors shall provide notice to the Backstop Party in the event that the Backstop Commitment Amount is reduced as provided above. References herein to "Backstop Commitment Amount" or "Backstop Commitment" mean such amounts as adjusted in accordance with the terms of this Backstop Commitment Letter. Any Backstop Commitments that have been terminated or reduced shall be terminated or reduced, as applicable, permanently.

       8.      <u>Assignment</u>. This Backstop Commitment Letter (a) is not assignable by the Backstop Party, and any purported assignment shall be null and void *ab initio*; *provided*, *however*, Backstop Party may assign its Backstop Commitment, in whole or in part, to (i) another Backstop Party, (ii) an affiliate of the Backstop Party, or (iii) an investment fund or separately managed account the primary investment advisor or sub advisor to which is a Backstop Party or an affiliate thereof, to the extent such assignee

Case: 19-30088   Doc# 3844   Filed: 09/09/19   Entered: 09/09/19 15:14:13   Page 20 of 135

Backstop Party agrees in writing to assume all obligations hereunder of such Backstop Party in connection with such Backstop Commitment, and any assignment under this proviso shall not relieve the Backstop Party from its obligations under this Backstop Commitment Letter, and (b) is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person or entity other than the parties hereto. Notwithstanding the foregoing, a Backstop Party may assign all or any portion of its obligations hereunder to a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act of 1933, as amended), without the consent of any party, *provided*, *however*, that (i) absent the prior written consent of PG&E, such assignee (including any Entity) does not, and as a result of such assignment will not, beneficially own more than 4.75% of the Aggregate Backstop Commitments and (ii) any assignment under this sentence shall not relieve the Backstop Party from its obligations under this Backstop Commitment Letter.

9.      Entire Agreement.   This Backstop Commitment Letter, including all exhibits hereto, constitutes the entire understanding among the parties hereto with respect to the subject matter hereof and replaces and supersedes all prior agreements and understandings, both written and oral, between the parties hereto with respect to the subject matter hereof and, subject to the terms hereof, shall become effective and binding upon the mutual exchange of fully executed counterparts by each of the parties hereto.

10.      Governing Law; Consent to Jurisdiction; Waiver of Jury Trial.   This Backstop Commitment Letter shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction. By its execution and delivery of this Backstop Commitment Letter, each of the parties hereto irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Backstop Commitment Letter or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought only in the Bankruptcy Court. By execution and delivery of this Backstop Commitment Letter, each of the parties hereto irrevocably accepts and submits itself to the exclusive jurisdiction of the Bankruptcy Court with respect to any such action, suit or proceeding. EACH PARTY HERETO UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO ABOVE.

11.      Amendment; Waiver; Counterparts.   This Backstop Commitment Letter may not be amended or waived by or on behalf of the Backstop Party, and no consent may be given hereunder by or on behalf of the Backstop Party (including to an amendment or waiver of any provision of the Plan), except in writing signed by the holders of a majority of the Aggregate Backstop Commitments (whether or not the Backstop Party signs such amendment or waiver), and confirmed in writing by the Company; *provided, however,* that without the prior written consent of the Backstop Party, this Backstop Commitment Letter may not be amended to (a) increase the amount of the Backstop Commitment Amount or Backstop Commitment, (b) decrease the Backstop Commitment Premium, (c) extend the Backstop Commitment beyond the Third Extension Date, (d) amend the definition of "Backstop Price" or any component thereof, and (e) amend, modify, or waive the condition in Section 4(d). This Backstop Commitment Letter may be executed in any number of counterparts, each of which will be an original, and all of which, when taken together, will constitute one agreement. Delivery of an executed counterpart of this Backstop Commitment Letter by e-mail or portable document format (PDF) will be effective as delivery of a manually executed counterpart of this Backstop Commitment Letter.

12.      Notices.   All notices required or permitted to be given under this Backstop Commitment Letter, unless otherwise stated herein, shall be given by overnight courier at the addresses specified below, or at such other address or addresses as a party may designate for itself in writing, or by email (if confirmed) at the email addresses specified below:

If to the Backstop Party, to the name, address and email address located on the Backstop Party's signature page to this Backstop Commitment Letter.

Case: 19-30088    Doc# 3844    Filed: 09/09/19    Entered: 09/09/19 15:14:13    Page 21 of 135

If to the Debtors:

> PG&E Corporation
> 77 Beale Street
> P.O. Box 770000
> San Francisco, California 94177
> Attention: Janet Loduca, Senior Vice President and General Counsel
> Email: J1Lc@pge.com
>
> with a copy to:
>
> Cravath, Swaine & Moore LLP
> 825 Eighth Avenue
> New York, New York 10019
> Attention: Richard Hall; Paul Zumbro
> Email: RHall@cravath.com; PZumbro@cravath.com
>
> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York 10153
> Attention: Stephen Karotkin
> Email: Stephen.karotkin@weil.com

13.    <u>No Liability</u>.  Notwithstanding anything that may be expressed or implied in this Backstop Commitment Letter, each party hereto acknowledges and agrees that no person other than the Backstop Party (and it permitted assigns) shall have any obligation hereunder (subject to the limitations provided herein) or in connection with the transactions contemplated hereby and that (a) notwithstanding that any Backstop Party may be a partnership, limited partnership or limited liability company, no recourse (whether at law, in equity, in contract, in tort or otherwise) hereunder or under any document or instrument delivered in connection herewith, or in respect of any oral representations made or alleged to be made in connection herewith or therewith, shall be had against any former, current or future direct or indirect equity holder, controlling person, general or limited partner, shareholder, member, investment manager or adviser, manager, director, officer, employee, agent, affiliate, assignee, representative or financing source of any of the foregoing) (any such person or entity, other than such Backstop Party, a "***Related Party***") or any Related Party of any such Related Party, including, without limitation, any liabilities arising under, or in connection with, the Plan or this Backstop Commitment Letter and the transactions contemplated thereby and hereby, or in respect of any oral representations made or alleged to be made in connection therewith or herewith), whether by the enforcement of any judgment or assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law and (b) no personal liability whatsoever will attach to, be imposed on or otherwise be incurred by any Related Party of the Backstop Party or any Related Party of any such Related Party under this Backstop Commitment Letter or any document or instrument delivered in connection herewith or with the Plan Term Sheet or the Plan (or in respect of any oral representation made or alleged to be made in connection herewith or therewith) or for any action (whether at law, in equity, in contract, in tort or otherwise) based on, in respect of, or by reason of such obligations hereunder or by their creation.

14.    <u>Plan Support</u>.  For as long as this Backstop Letter Agreement is in effect, the Backstop Party shall (i) use all reasonable efforts to support the Plan with respect to the treatment of HoldCo Common Interests and to act in good faith to consummate the Plan with respect to any Equity Offering and the

<div align="center">12</div>

Backstop Commitments, (ii) to the extent the Backstop Party is entitled to vote on the Plan, timely vote (or cause to be voted) all of its HoldCo Common Interests and Claims to accept the Plan (and not to change or withdraw any such vote), and (iii) timely vote (or cause to be voted) its HoldCo Common Interests and Claims to reject any plan of reorganization other than the Plan.

15.     The Backstop Party shall not be required, pursuant to the terms of this Backstop Commitment Letter, to acquire or purchase any securities or indebtedness in connection with any Equity Offering that, pursuant to the terms of a Backstop Commitment Letter or other agreement, are to be acquired or subscribed for by any other party, nor shall the Backstop Party be required, pursuant to the terms of this Backstop Commitment Letter, to pay any money or other consideration, or exchange any claims whatsoever, which are owing from, or to be transferred from or by, any other party pursuant to the terms of another Backstop Commitment Letter or other agreement.  Nothing in this Backstop Commitment Letter shall be deemed to constitute an agreement or a joint venture or partnership with or between any other person or entity nor constitute any party as the agent of any other person or entity for any purpose.  For the avoidance of doubt, no Backstop Party shall, nor shall any action taken by a Backstop Party hereunder, be deemed to be acting in concert with any other person or entity with respect to the Backstop Commitment or any other matter nor shall the Backstop Commitments hereunder create a presumption that the Backstop Party is in any way acting in concert or as a group with any other person or entity whether as a result of this commitment or otherwise.

16.     Each party hereto confirms that it has made its own decision to execute this Backstop Commitment Letter based upon its own independent assessment of documents and information available to it, as it has deemed appropriate.

17.     Except as expressly provided in this Backstop Commitment Letter, (a) nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each party hereto to protect and preserve its rights, remedies and interests, including, without limitation, any claims against or interests in any of the Debtors or other parties, or its full participation in any bankruptcy proceeding, and (b) the parties hereto each fully preserve any and all of their respective rights, remedies, claims and interests as of the date hereof and upon a termination of this Backstop Commitment Letter.  Further, nothing in this Backstop Commitment Letter shall be construed to prohibit any party hereto from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are consistent with this Backstop Commitment Letter and the Plan, and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying or preventing the consummation of the transactions contemplated by the Plan.

[signature page follows]

Case: 19-30088     Doc# 3844     Filed: 09/09/19     Entered: 09/09/19 15:14:13     Page 23 of 135

Sincerely,

Backstop Party:

**ABRAMS CAPITAL PARTNERS I, L.P.**

By: Abrams Capital Management, L.P.,
   its investment manager

By: Abrams Capital Management, LLC,
   its general partner

By: _____
Name: David Abrams
Title: Managing Member

Notice Information:
Alison Bomberg
222 Berkeley Street, 21st Floor
Boston, MA 02116
abomberg@abramscapital.com

14

Accepted and agreed this 9th day of September, 2019, by:

PG&E CORPORATION

By: _____

Name: Janet C. Loduca
Title: Senior Vice President and General Counsel

15

**Exhibit A**
**Plan of Reorganization**

See the *Debtors' Joint Chapter 11 Plan of Reorganization* filed at Docket No. 3841.

**Exhibit B**
**Mandatory Preferred Stock Term Sheet**

Case: 19-30088    Doc# 3844    Filed: 09/09/19    Entered: 09/09/19 15:14:13    Page 28 of 135

**Term Sheet for**
**5.00% Mandatory Convertible Preferred Stock**

| | |
|---|---|
| Issuer: | PG&E Corporation ("***PG&E***") |
| Title of Securities: | 5.00% Mandatory Convertible Preferred Stock of PG&E (the "***Mandatory Convertible Preferred Stock***") |
| Shares of Mandatory Convertible Preferred Stock Offered by PG&E: | Up to [●] shares |
| Offering Price: | $1,000 per share of the Mandatory Convertible Preferred Stock |
| Issue Date: | The Effective Date of the Plan |
| Liquidation Preference: | $1,000 per share |
| Dividends: | 5.00% of the Liquidation Preference of $1,000 per share of the Mandatory Convertible Preferred Stock per year (equivalent to $50 per annum per share), when, as and if declared by the Board, payable in cash or, by delivery of additional shares of Mandatory Convertible Preferred Stock or any combination of cash and shares of Mandatory Convertible Preferred Stock, as determined by PG&E in its sole discretion |
| Floor Price: | 100% of the Initial Price, subject to standard anti-dilution adjustments |
| Dividend Payment Dates: | If declared, January 1, April 1, July 1 and October 1 of each year, commencing on (TBD) |
| Dividend Record Dates: | The March 15, June 15, September 15 and December 15 immediately preceding the next dividend payment date |
| Redemption: | The Mandatory Convertible Preferred Stock will be redeemable on terms and conditions to be determined |
| Initial Price: | A per share price equal to (a) the greater of (i) an Implied P/E Multiple of 13.5 or (ii) the Implied P/E Multiple of a Permitted Equity Offering, *times* (b) the Normalized Estimated Net Income as of the Determination Date, *divided by* (c) the number of fully diluted shares of PG&E (calculated using the treasury stock method) that will be outstanding as of the Effective Date. |
| Threshold Appreciation Price: | 110% of the Initial Price, subject to standard ant-dilution adjustments |
| Mandatory Conversion Date: | 1/8th of the Mandatory Convertible Preferred Stock will convert into PG&E common stock 90, 180, 270, 360, 450, 540, 630, and 720 days from Issue Date |

Case: 19-30088   Doc# 3844   Filed: 09/09/19   Entered: 09/09/19 15:14:13   Page 29 of 135

| Conversion Rate: | Upon conversion on the Mandatory Conversion Date, the conversion rate for each share of the Mandatory Convertible Preferred Stock will be not more than [●] shares of PG&E common stock (the "***Maximum Conversion Rate***") and not less than [●] shares of PG&E common stock (the "***Minimum Conversion Rate***"), depending on the Applicable Market Value of the PG&E common stock subject to standard anti-dilution adjustments. The following table illustrates the conversion rate per share of the Mandatory Convertible Preferred Stock (in each case, subject to standard anti-dilution adjustments): |
|---|---|

| Applicable Market Value of the PG&E Common Stock | Conversion rate (number of shares of PG&E Common Stock to be received upon conversion of each share of the Mandatory Convertible Preferred Stock) |
|---|---|
| Greater than 110% of the Initial Price (which is the Threshold Appreciation Price) | [●] shares (approximately equal to $1,000 divided by the Threshold Appreciation Price) |
| Equal to or less than the Threshold Appreciation Price but greater than or equal to the Floor Price | Between [●] and [●] shares, determined by dividing $1,000 by the Applicable Market Value of the PG&E common stock |
| Less than the Floor Price | [●] shares (approximately equal to $1,000 divided by the Floor Price) |

| Applicable Market Value: | The "***Applicable Market Value***" shall be the 10-trading day VWAP immediately preceding the applicable Mandatory Conversion Date |
|---|---|
| Conversion at the Option of the Holder: | At any time prior to final Mandatory Conversion Date, holders of the Mandatory Convertible Preferred Stock have the option to elect to convert their shares of the Mandatory Convertible Preferred Stock in whole or in part (but in no event less than one share of the Mandatory Convertible Preferred Stock), into shares of PG&E common stock at the Minimum Conversion Rate of shares of PG&E common stock per share of the Mandatory Convertible Preferred Stock. This Minimum Conversion Rate is subject to standard anti-dilution adjustments. |
| Limitation on Ownership | No holder, together with persons who have a formal or informal understanding with such assignee to make a coordinated acquisition of stock, shall acquire beneficial ownership (within the meaning of Section 382 and the Treasury Regulations) of more than 4.75% of the outstanding Mandatory Convertible Preferred Stock without the prior written consent of PG&E. |

**Exhibit C**
**Backstop Terms**

| Backstop Party | Backstop Commitment Amount |
|---|---|
| Abrams Capital Partners I, L.P. | $22,461,000.00 |

## Payments

The Backstop Commitment Premium shall be earned as follows:

- 75 basis points of the Backstop Commitment Premium shall be earned on the later to occur of (a) the date that the Backstop Party and PG&E have fully executed this Backstop Commitment Letter and (b) Bankruptcy Court approval of this Backstop Commitment Letter, unless this Backstop Commitment Letter shall have earlier been terminated;

- 125 basis points of the Backstop Commitment Premium shall be earned on the date on which the Backstop Party receives the First Extension Notice;

- 250 basis points of the Backstop Commitment Premium shall be earned on the date on which the Backstop Party receives the Second Extension Notice; and

- 50 basis points of the Backstop Commitment Premium shall be earned on the date on which the Backstop Party receives the Third Extension Notice

In addition, if PG&E terminates this Backstop Commitment Letter pursuant to Section 6(g), 100% of the Backstop Commitment Premium shall be fully earned and become due and payable in cash three business days after the date of such termination.

Except as provided in the immediately preceding paragraph, the Backstop Commitment Premium shall be payable in shares of New HoldCo Common Stock to be issued on the Effective Date, based on the Backstop Price.

## Certain Defined Terms

"*Applicable Utility Index Multiple*" shall mean the average normalized 2021 estimated price-to-earnings ratio of the U.S. regulated utilities in the S&P 500 Utilities (Sector) Index (after excluding AES, AWK, EXC, NRG, PEG, and PPL) over the 20-day trading period before the applicable measurement date per Capital IQ Consensus Estimates.

"*Backstop Commitment Premium*" shall mean a commitment premium equal to 500 basis points on the total amount of Backstop Commitment Amount. If and when any portion of the Backstop Commitment Premium is earned in accordance with the foregoing provisions of this Exhibit C, (a) it shall be calculated by reference to the Backstop Commitment Amount in effect at the time of such earning, and (b) the amount of the Backstop Commitment Premium so earned shall not be subject to reduction based upon any subsequent reduction of the Backstop Commitment Amount or termination of this Backstop Commitment Letter, other than termination pursuant to Section 6(c) or 6(d) of this Backstop Commitment Letter.

"*Backstop Multiple*" shall mean the lesser of (a) 10 and (b) 10 *times* one *plus* the percentage change of the Applicable Utility Index Multiple as measured on the date of this Backstop Commitment Letter and

the fifth business day prior to the Effective Date. For the avoidance of doubt, the Backstop Multiple shall never exceed 10.

"*Backstop Price*" means (a) the Backstop Multiple *times* (b) the Normalized Estimated Net Income as of the Determination Date, *divided by* (c) the number of fully diluted shares of PG&E (calculated using the treasury stock method) that will be outstanding as of the Effective Date (assuming all equity is raised by funding all Aggregate Backstop Commitments).

"*Board*" means the Board of Directors of PG&E. With respect to any matter, references to the Board include a committee of the Board that is duly authorized to act with respect to such matter.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Determination Date*" shall mean the earlier of (a) the first day of the Confirmation Hearing and (b) if (i) the Per Share Price for a Permitted Equity Offering is to be finally determined prior to such first day, the date of such determination or (ii) if the exercise price of the Rights is finally determined prior to such first day, the date of such determination.

"*Normalized Estimated Net Income*" shall mean, in each case with respect to the estimated year 2021, (a) on a component-by-component basis (e.g., distribution, generation, gas transmission and storage, and electrical transmission), the sum of (i) the Utility's estimated earning rate base for such component, *times* (ii) the equity percentage of the Utility's authorized capital structure, *times* (iii) the Utility's authorized rate of return on equity for such component, *less* (b) the projected post-tax difference in interest expense or preferred dividends for the entire company and the authorized interest expense or preferred dividends expected to be collected in rates, *less* (c) without duplication of any amount included in clause (b), the amount of any post-tax offset or credit to any charge imposed in connection with the issuance of Wildfire Victims Recovery Bonds, if any, *less* (d) the amount of the Utility's post-tax annual contribution to the Go-Forward Wildfire Fund.

"*Section 382*" means Section 382 of the Code, or any successor provision or replacement provision.

"*Treasury Regulations*" means final, temporary and proposed tax regulations promulgated under the Code, as amended.

Case: 19-30088    Doc# 3844    Filed: 09/09/19    Entered: 09/09/19 15:14:13    Page 32 of 135

September 9, 2019

PG&E Corporation
77 Beale Street
P.O. Box 770000
San Francisco, California 94177

　　　　Re: Chapter 11 Plan Backstop Commitment Letter

Ladies and Gentlemen:

　　　　Reference is hereby made to the chapter 11 bankruptcy cases, lead case no. 19-30088 (the "***Chapter 11 Cases***"), currently pending before the United States Bankruptcy Court for the Northern District of California (the "***Bankruptcy Court***"), in which PG&E Corporation ("***PG&E***" or the "***Company***") and Pacific Gas and Electric Company (the "***Utility***" and together with PG&E, the "***Debtors***") are debtors in possession.  Reference is further made to the Chapter 11 plan of reorganization attached hereto as Exhibit A (the "***Plan***") to implement the terms and conditions of the reorganization of the Debtors as provided therein.  Capitalized terms used in this backstop commitment letter (this "***Backstop Commitment Letter***") or in the exhibits hereto but not otherwise defined shall have the meanings ascribed to them in the Plan. The word "including" means "including, without limitation".

　　　　In order to facilitate the Debtors' emergence from Chapter 11, pursuant to this Backstop Commitment Letter, and subject to the terms, conditions and limitations set forth herein and in consideration for the Backstop Commitment Premium, the undersigned Backstop Party (the "***Backstop Party***") is willing to purchase, on the Effective Date, an amount of New HoldCo Common Stock up to its Backstop Commitment Amount (as defined herein) at the Backstop Price (as defined herein).

　　　　In addition, PG&E has separately solicited and negotiated and expects to enter into substantially similar backstop commitment letters ("***Other Backstop Commitment Letters***") with other funding sources ("***Other Backstop Parties***") pursuant to which such Other Backstop Parties will commit to purchase New HoldCo Common Stock on the Effective Date (such commitments, "***Other Backstop Commitments,***" and together with this Backstop Commitment, the "***Aggregate Backstop Commitments***").

　　　　1.　　　　Equity Offerings.

　　　　　　　　a.　　　　Structure.  The Plan, among other things, shall provide that, on the Effective Date, Reorganized HoldCo shall issue shares of New HoldCo Common Stock for up to $14 billion of aggregate net cash proceeds to Reorganized Holdco (the "***Equity Offering Cap***").  PG&E shall structure the offering of any such shares of New HoldCo Common Stock (or rights pursuant to which any such shares may be issued or other securities convertible into any such shares) (the "***Equity Offering***") in accordance with the terms of this Section 1, including the following parameters:

　　　　　　　　　　　　(i)　　　　if the Implied P/E Multiple with respect to such Equity Offering equals or exceeds the greater of (A) 13.5 and (B) 13.5 *times* one *plus* any percentage change of the Applicable Utility Index Multiple (as defined herein) as measured on the date of this Backstop Commitment Letter and the Determination Date (as defined herein), then PG&E shall be permitted to conduct the Equity Offering in any form of primary equity offering (including any public offering, regular way offering, at-the-market equity offering, block trade, modified Dutch auction or other auction pricing mechanism, rights offering, private placement, "PIPE" sale or other registered or unregistered transaction) upon such terms and conditions as may be determined by the Board (a "***Permitted Equity Offering***"), including such terms and conditions that are reasonably advisable (based on the advice of the Debtors' tax advisors after consultation

1

with Jones Day) in order to avoid an "ownership change" within the meaning of Section 382 and the Treasury Regulations promulgated thereunder or to otherwise preserve the ability of the Debtors to utilize their net operating loss carryforwards and other tax attributes (collectively, the "**NOLs**");

(ii)    if the Implied P/E Multiple with respect to the Equity Offering is less than the Implied P/E Multiple required for a Permitted Equity Offering in Section 1(a)(i) above, but equals or exceeds the lesser of (A) 12 and (B) 12 *times* one *plus* the percentage change of the Applicable Utility Index Multiple as measured on the date of this Backstop Commitment Letter and the Determination Date (the "**Rights Offering Threshold Multiple**"), then PG&E shall structure the Equity Offering such that (Y) at least 80%, determined assuming the exercise in full of all of the Rights, of the aggregate cash proceeds of the Equity Offering is to be raised through the exercise of purchase rights (the "**Rights**") distributed to holders of PG&E common stock ("**Existing Shareholders**") as of a record date to be determined by the Board (the "**Record Date**") to purchase shares of New HoldCo Common Stock for cash at a price set forth below (the "**Rights Offering**") and (Z) the balance of the aggregate cash proceeds of the Equity Offering is to be raised through any other form of primary equity offering (including any public offering, regular way offering, at-the-market equity offering, block trade, modified Dutch auction or other auction pricing mechanism, private placement, "PIPE" sale or other registered or unregistered transaction), provided, that entities holding a majority of the Aggregate Backstop Commitments have not objected to the identity of the purchasers and ultimate purchasers, as applicable, in such Equity Offering, to the extent such Equity Offering is not a broadly syndicated underwritten public offering, within three business days of receipt of notice from PG&E;

(iii)    in both of paragraphs (i) and (ii) above, Reorganized Holdco may also raise equity capital (subject to the Equity Offering Cap) by calling on the Backstop Commitments (after giving effect to any reduction of the Backstop Commitments in connection with a Permitted Equity Offering or a Rights Offering, as applicable); and

(iv)    if the Implied P/E Multiple with respect to the Equity Offering would be less than the Rights Offering Threshold Multiple or if for any other reason Reorganized Holdco is unable to execute an Equity Offering, then Reorganized Holdco shall not utilize either a Permitted Equity Offering or a Rights Offering and shall issue shares at the Backstop Price pursuant to the Backstop Commitments up to the Equity Offering Cap *less* the proceeds of any Additional Capital Sources.

"**Implied P/E Multiple**" means, with respect to any Equity Offering, (A) the price per share at which shares of New Holdco Common Stock are offered to be sold in such Equity Offering (which price (x) in the case of an Equity Offering of rights, shall be the exercise price to acquire a share of New HoldCo Common Stock pursuant to such rights or (y) in the case of an Equity Offering of a security convertible into or exchangeable for shares of New HoldCo Common Stock, shall be the per share price implied by the conversion ratio used to convert the principal amount, liquidation preference or other face amount of such security into a number of shares of New HoldCo Common Stock) (the "**Per Share Price**"), *times* (B) the number of fully diluted shares of PG&E (calculated using the treasury stock method) that will be outstanding as of the Effective Date (assuming such Equity Offering and all other equity transactions contemplated by the Plan are consummated and settled on the Effective Date), *divided by* (C) the Normalized Estimated Net Income as of the Determination Date.

b.    Additional Capital Sources.    PG&E shall conduct the Equity Offering in accordance with the Plan. The net cash proceeds to PG&E of the Equity Offering shall not exceed the Equity Offering Cap, *less* the sum of (i) the principal amount of debt that is issued by PG&E in excess of $7 billion in connection with the Plan; (ii) the aggregate liquidation preference of preferred stock

2

("**Mandatory Convertible Preferred Stock**") that is distributed pursuant to the Plan to holders of Wildfire Claims, on the terms and conditions set forth on <u>Exhibit B</u> pursuant to the Plan; (iii) the principal amount of any Wildfire Victim Recovery Bonds issued in connection with the Plan; (iv) the proceeds of any preferred stock issued by the Utility (excluding any Utility Preferred Interests that are Reinstated pursuant to the Plan); (v) the proceeds of any third-party transactions based upon the monetization of any NOLs; and (vi) the principal amount of any other debt that is issued or reinstated by the Utility, excluding any debt that may be issued under clause (v) above, in excess of $27.35 billion in connection with the Plan (the "**Additional Capital Sources**").

        c.     <u>Rights Offering</u>.  With respect to the Rights Offering:

        (i)     the Rights will have a fixed exercise price equal to (a) the Rights Offering Threshold Multiple *times* (b) the Normalized Estimated Net Income as of the Determination Date, *divided by* (c) the number of fully diluted shares of PG&E (calculated using the treasury stock method) that will be outstanding as of the Effective Date (assuming all equity is raised by the exercise of all Rights);

        (ii)     the Rights shall be transferable;

        (iii)     the Board shall provide that holders of Rights who fully exercise their Rights will have over-subscription privileges to subscribe for additional shares of New HoldCo Common Stock to the extent other Rights are not exercised, with over-subscription procedures (including pro-ration rules) determined by the Board;

        (iv)     the Board may provide that the Rights or Rights Offering include such terms and conditions that are reasonably advisable (based on the advice of the Debtors' tax advisors after consultation with Jones Day) in order to avoid an "ownership change" within the meaning of Section 382 and the Treasury Regulations promulgated thereunder or to otherwise preserve the ability of the Debtors to utilize their NOLs, including limitations on the amount of Rights that are exercisable by holders who, together with persons who have a formal or informal understanding with such holders to make a coordinated acquisition of stock within the meaning of Treasury Regulations 1.382-3(a) (an "**Entity**"), beneficially own in excess of a specified percentage (e.g., 4.75%) of the outstanding shares of PG&E common stock, subject to exceptions to be determined by the Board; provided, however, that such terms and conditions shall not restrict existing holders of PG&E common stock (including any Entity) from acquiring shares that do not increase their aggregate beneficial ownership to more than 4.75% of the outstanding shares of PG&E common stock immediately after the completion of the Rights Offering; and

        (v)     the Rights will have such other terms and conditions as may be determined by the Board, as long as such other terms and conditions  are consistent with the Plan and with every other provision of this Backstop Commitment Letter.

        d.     <u>Subordinated Claims</u>.  To the extent provided in the Plan, the Debtors may issue Rights or New HoldCo Common Stock to holders of Claims against a Debtor that are subject to subordination pursuant to section 510(b) of the Bankruptcy Code and that arise from or are related to any equity security of the Debtor.

        e.     <u>Documentation</u>.  The definitive documentation for any Permitted Equity Offering or any Rights Offering shall be consistent with the Plan.  For the avoidance of doubt, the organizational documents of the Reorganized HoldCo (including its charter) may include limitations and other terms that are reasonably advisable (based on the advice of the Debtors' tax advisors after consultation with Jones Day) in order to avoid an "ownership change" within the meaning of Section 382 and the Treasury Regulations promulgated thereunder or to otherwise preserve the ability of the Debtors to utilize their

Case: 19-30088    Doc# 3844    Filed: 09/09/19    Entered: 09/09/19 15:14:13    Page 35 of 135

NOLs; provided, however, that the organizational documents shall not be modified or amended in a manner that would restrict existing holders of PG&E common stock (including any Entity) from acquiring shares that do not increase their aggregate beneficial ownership to more than 4.75% of the outstanding shares of PG&E common stock immediately after the completion of the Rights Offering.

       f.    <u>Use of Proceeds</u>.  The Debtors shall only use the proceeds of an Equity Offering to fund obligations to holders of Wildfire Claims under the Plan.

       g.    <u>Notices</u>.  Promptly, and in any event, within two days of the Board's determination of final pricing of any Equity Offering, PG&E shall publicly disclose the form, structure, amount and terms of such Equity Offering, including the Implied P/E Multiple for such Equity Offering.  PG&E shall give the Backstop Party, as soon as reasonably practicable, but in no event later than two business days prior to the Effective Date, (i) written notification setting forth (A) the amount to be funded pursuant to the Backstop Commitment, (B) an estimate of the Backstop Price and (C) the targeted Effective Date and (ii) a subscription form to be completed by the Backstop Party, or other instructions, to facilitate the Backstop Party's subscription for the New HoldCo Common Stock.

       h.    <u>Cooperation</u>.  As reasonably requested by the Debtors, the Backstop Party shall reasonably cooperate with the Debtors with respect to providing information relevant to the preservation of the Debtors' Tax Attributes, including information regarding (i) the number of shares of PG&E common stock owned by such party (on a holder-by-holder basis) prior to the Rights Offering and (ii) the amount of Rights exercised and shares of New HoldCo Common Stock purchased pursuant to the Backstop Commitment by such persons.

     2.    <u>Backstop</u>.

       a.    Subject to the terms and conditions set forth herein and to the payment and provision of premium to the Backstop Party as provided in Section 2(c), the Backstop Party, solely on behalf of itself, hereby commits to purchase on the Effective Date an amount of shares of New HoldCo Common Stock at the Backstop Price (the "***Backstop Commitment***") up to the dollar amounts set forth on <u>Exhibit B</u> hereto (the "***Backstop Commitment Amount***").

       b.    PG&E and the Backstop Party shall cooperate in good faith to prepare and deliver a subscription agreement and any other documentation necessary to effect the private placement of New HoldCo Common Stock to the Backstop Party in accordance with the terms of this Backstop Commitment Letter, which documentation shall be consistent with this Backstop Commitment Letter and the Plan.

       c.    The Debtors agree to pay the Backstop Party the Backstop Commitment Premium to the extent provided on <u>Exhibit B</u> and to reimburse on a regular basis the Backstop Party for the reasonable fees and expenses of Jones Day and a financial advisor incurred prior to termination of this Backstop Commitment Letter in connection with the Plan, the Backstop Commitment Letter, and the transactions contemplated herein, provided that such reimbursement shall not exceed $17 million for Jones Day in the aggregate and $19 million for the financial advisor in the aggregate.  The provisions for the payment of the Backstop Commitment Premium and the other provisions provided herein are an integral part of the transactions contemplated by this Backstop Commitment Letter and without these provisions the Backstop Party would not have entered into this Backstop Commitment Letter, and the Backstop Commitment Premium shall, pursuant to an order of the Bankruptcy Court approving this Backstop Commitment Letter, constitute allowed administrative expenses of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code.

       d.    Reorganized Holdco will enter into a registration rights agreement with the Backstop Party in respect of the shares of New HoldCo Common Stock that the Backstop Party may acquire in accordance with the Plan and this Backstop Commitment Letter, which registration rights agreement shall be in form and substance reasonably acceptable to the holders of a majority of the Aggregate Backstop Commitments.

Case: 19-30088    Doc# 3844    Filed: 09/09/19    Entered: 09/09/19 15:14:13    Page 36 of 135

e.        To the extent that PG&E agrees to terms that are more favorable to an Other Backstop Party in an Other Backstop Commitment Letter (excluding terms relating to the size of such Other Backstop Party's backstop commitment), PG&E shall provide notice of such terms to the Backstop Party no later than 10 days after the Allocation Date and, absent a written objection from the Backstop Party no later than 10 days after the date of such notice, such terms shall be deemed without further action to be incorporated into this Backstop Commitment Letter.

3.        <u>Backstop Party Representations</u>.  The Backstop Party hereby represents and warrants, solely as to itself, that (a) it has all limited partnership, corporate or other power and authority necessary to execute, deliver and perform this Backstop Commitment Letter, (b) the execution, delivery and performance of this Backstop Commitment Letter by it has been duly and validly authorized and approved by all necessary limited partnership, corporate or other organizational action by it, (c) this Backstop Commitment Letter has been duly and validly executed and delivered by it and, assuming due execution and delivery by the other parties hereto, constitutes a valid and legally binding obligation of it, enforceable against it in accordance with the terms of this Backstop Commitment Letter, (d) the execution, delivery and performance by the Backstop Party of this Backstop Commitment Letter do not (i) violate the organizational documents of the Backstop Party or (ii) violate any applicable law or judgment applicable to it, (e) as of the date of this Backstop Commitment Letter, its Backstop Commitment is, and as of the date of commencement of any Rights Offering and as of the Effective Date its Backstop Commitment will be, less than the maximum amount that it is permitted to invest in any one portfolio investment pursuant to the terms of its constituent documents or otherwise, (f) it has, as of the date of this Backstop Commitment Letter, and will have, as of the Effective Date, in the aggregate available undrawn commitments and liquid assets at least in the sum of its Backstop Commitment Amount hereunder, and (g) as of September 2, 2019, it and its affiliates (excluding any affiliate that is an Other Backstop Party) beneficially owned, directly or indirectly, 21,225,501 shares of PG&E common stock and had a "put equivalent position" (as defined in Rule 16a-1 under the Securities Exchange Act of 1934, as amended) of zero shares of PG&E common stock (the number of shares beneficially owned less the number of shares in the put equivalent position being the "***Backstop Party's Shares***").

In addition, the Backstop Party hereby represents and warrants, solely as to itself, as of the date of this Backstop Commitment Letter and as of the Effective Date, that the Backstop Party (i) is acquiring the shares of New HoldCo Common Stock for its own account, solely for investment and not with a view toward, or for sale in connection with, any distribution thereof in violation of any foreign, federal, state or local securities or "blue sky" laws, or with any present intention of distributing or selling such shares in violation of any such laws, (ii) has such knowledge and experience in financial and business matters and in investments of this type that it is capable of evaluating the merits and risks of its investment in the shares of New HoldCo Common Stock and of making an informed investment decision, and (iii) is an "accredited investor" within the meaning of Rule 501 of Regulation D under the Securities Act of 1933, as amended (the "***Securities Act***").  The Backstop Party understands that Reorganized HoldCo will be relying on the statements contained herein to establish an exemption from registration under the Securities Act and under foreign, federal, state and local securities laws and acknowledges that the shares of New HoldCo Common Stock will not be registered under the Securities Act or any other applicable law and that such shares may not be transferred except pursuant to the registration provisions of the Securities Act (and in compliance with any other applicable law) or pursuant to an applicable exemption therefrom.

4.        <u>Conditions to Backstop Party Commitment</u>.  The obligations of the Backstop Party to fund its Backstop Commitment to PG&E in accordance with this Backstop Commitment Letter are further expressly conditioned upon and subject to the satisfaction or written waiver by the Backstop Party, in its sole discretion, at or prior to the Effective Date of each of the following conditions, which PG&E acknowledges are an integral part of the transactions contemplated by this Backstop Commitment Letter and without these conditions the Backstop Party would not have entered into this Backstop Commitment Letter.

<div align="center">5</div>

a. by November 7, 2019, the Debtors shall have received valid and enforceable Other Backstop Commitments on substantially the same terms and conditions as set forth in this Backstop Commitment Letter that in the aggregate with this Backstop Commitment result in Aggregate Backstop Commitments of no less than the Equity Offering Cap;

b. other than the consummation of any Permitted Equity Offering or the Rights Offering, the satisfaction of all of the other conditions to the Effective Date provided for in the Plan or the waiver of any such conditions by the Debtors in accordance with the Plan (to the extent the Plan expressly provides for the possibility of such a waiver);

c. the Bankruptcy Court shall have entered the Confirmation Order, which shall confirm the Plan with such amendments, modifications, changes and consents as are approved by those entities having no less than a majority of the Aggregate Backstop Commitments (such approval not to be unreasonably withheld, conditioned or delayed), and such Confirmation Order shall be in full force and effect, and no stay thereof shall be in effect;

d. this Backstop Commitment Letter shall have been approved by an order of the Bankruptcy Court and such order shall be in full force and effect, and no stay thereof shall be in effect;

e. the transactions contemplated herein shall have been authorized by an order of the Bankruptcy Court (which may be the Confirmation Order) such order shall be in full force and effect, and no stay thereof shall be in effect;

f. total PG&E weighted average earning rate base (including electric generation, electric transmission, electric distribution, gas distribution, gas transmission and storage) for estimated 2021 shall be no less than 95% of $48 billion; and

g. no result, occurrence, fact, change, event, effect, violation, penalty, inaccuracy or circumstance (whether or not constituting a breach of a representation, warranty or covenant set forth in the Plan) that, individually or in the aggregate with any such other results, occurrences, facts, changes, events, effects, violations, penalties, inaccuracies, or circumstances, (i) would have or would reasonably be expected to have a material adverse effect on the business, operations, assets, liabilities, capitalization, financial performance, financial condition or results of operations, in each case, of the Debtors, taken as a whole, or (ii) would reasonably be expected to prevent or materially delay the ability of the Debtors to consummate the transactions contemplated by this Backstop Commitment Letter or the Plan or perform their obligations hereunder or thereunder (each a "***Material Adverse Effect***") shall have occurred; *provided*, *however*, that none of the following results, occurrences, facts, changes, events, effects, violations, penalties, inaccuracies, or circumstances shall constitute or be taken into account in determining whether a Material Adverse Effect has occurred, is continuing or would reasonably be expected to occur: (A) the filing of the Chapter 11 Cases, and the fact that the Debtors are operating in bankruptcy (B) results, occurrences, facts, changes, events, effects, violations, inaccuracies, or circumstances affecting (1) the electric or gas utility businesses in the United States generally or (2) the economy, credit, financial, capital or commodity markets, in the United States or elsewhere in the world, including changes in interest rates, monetary policy or inflation, (C) changes or prospective changes in law (other than any law or regulation of California or the United States that is applicable to any electrical utility) or in GAAP or accounting standards, or any changes or prospective changes in the interpretation or enforcement of any of the foregoing, (D) any decline in the market price, or change in trading volume, of any securities of the Debtors, (E) any failure to meet any internal or public projections, forecasts, guidance, estimates, milestones, credit ratings, budgets or internal or published financial or operating predictions of revenue, earnings, cash flow or cash position, (F) any wildfire occurring after the Petition Date and prior to January 1, 2020, and (G) one or more wildfires, occurring on or after January 1, 2020, that destroys or damages fewer than 500 dwellings or commercial structures ("***Structures***") in the aggregate (it being understood that (I) the exceptions in clauses (D) and (E) shall not prevent or otherwise affect a determination that the underlying cause of any such change, decline or failure referred to therein is a Material Adverse Effect and

(II) a Material Adverse Effect shall include the occurrence of one or more wildfires on or after January 1, 2020 destroying or damaging at least 500 Structures within PG&E's service area where none of the following are true with respect any such wildfire (a) the portion of PG&E's system at the location of such wildfire was not de-energized; (b) there has been no determination by a final order that such wildfire was caused by a person or entity other than the Utility; and (c) there has been no determination that such wildfire was not caused by the negligence or intentional misconduct of the Utility by a final order of a court having jurisdiction).

5. <u>Termination by the Backstop Party</u>. Subject to the last paragraph of this Section 5, the Backstop Party may terminate this Backstop Commitment Letter, solely as to itself, by written notice (which shall describe the basis for such termination), on or after the occurrence of any of the following:

a. the Plan has not been filed with the Bankruptcy Court by 11:59 p.m. Pacific Time on September 9, 2019 or the Plan filed with the Bankruptcy Court on or after such date differs from the draft of the Plan attached hereto as Exhibit A;

b. the condition set forth in Section 4(a) is not satisfied as of November 7, 2019;

c. the Bankruptcy Court has not entered an order approving this Backstop Commitment Letter on or before November 20, 2019;

d. subject to Section 11, (i) the Plan has been amended modified or changed, in each case without the consent of the entities holding a majority of the Aggregate Backstop Commitments (such consent not to be unreasonably withheld, conditioned or delayed) or (ii) any Plan Supplement or any Plan Document shall have been filed or finalized without the consent of entities holding a majority of the Aggregate Backstop Commitments (such consent not to be unreasonably withheld, conditioned or delayed);

e. the Confirmation Order has not been entered by the Bankruptcy Court on or before June 30, 2020 (the "***Outside Date***");

f. the Effective Date has not occurred on or before 60 days after entry of the Confirmation Order;

g. the Debtors have failed to perform any of their obligations set forth in this Backstop Commitment Letter, which failure to perform (i) would give rise to the failure of a condition set forth in Section 4(b) or 4(c) and (ii) is incapable of being cured or, if capable of being cured by the Outside Date, the Debtors have not cured within 10 calendar days following receipt by the Debtors of written notice of such failure to perform from the Backstop Party stating the Backstop Party's intention to terminate this Backstop Commitment Letter pursuant to this Section 5(g) and the basis for such termination;

h. the occurrence of a Material Adverse Effect;

i. the occurrence of one or more wildfires in the Debtors' service territory after the Petition Date and prior to January 1, 2020 that is asserted by any person to arise out of the Debtors' activities and that destroys or damages more than 500 Structures; *provided, however,* that any notice of termination under this clause (i) must be given on or before January 15, 2020;

j. the Debtors' aggregate liability with respect to Wildfire Claims is determined (whether (i) by the Bankruptcy Court (or the District Court to which the reference has been partially withdrawn for estimation purposes), (ii) pursuant to an agreement between the Debtors and the holders of Wildfire Claims, or (iii) through a combination thereof) to exceed $17.9 billion (the "***Wildfire Claims Cap***"); *provided, however,* that for purposes of this clause (j), (A) any Wildfire Claim that the CPUC has approved or agreed to approve for recovery or pass through by the Utility shall not count in determining the Wildfire Claims Cap, and (B) the Wildfire Claims Cap shall be increased by an amount equal to the amount of Wildfire Claims consisting of professional fees that the Bankruptcy Court (or the District Court to which the reference has been partially withdrawn for estimation purposes) determines to be reasonable;

k. the CPUC fails to issue all necessary approvals, authorizations and final orders to implement the Plan prior to the Outside Date, and to participate in the Go-Forward Wildfire Fund, including: (i) provisions satisfactory to entities holding a majority of the Aggregate Backstop Commitments (such approval not to be unreasonably withheld, conditioned or delayed) pertaining to authorized return on equity and regulated capital structure, (ii) a disposition, satisfactory to entities holding a majority of the Aggregate Backstop Commitments (such approval not to be unreasonably withheld, conditioned or delayed), of proposals for certain potential changes to PG&E's corporate structure and authorizations for the Utility to operate as a utility, (iii) a resolution, satisfactory to entities holding a majority of the Aggregate Backstop Commitments (such approval not to be unreasonably withheld, conditioned or delayed), of claims for monetary fines or penalties under the California Public Utilities Code for conduct prior to the Petition Date, and (iv) approval (or exemption from approval) of the financing structure and securities to be issued under the Plan;

l. if at any time after the first day of the Confirmation Hearing, asserted Administrative Expense Claims exceed $250 million, excluding all (i) ordinary course Administrative Expense Claims, (ii) Professional Fee Claims, and (iii) Disallowed Administrative Expense Claims;

m. there is in effect an order of a governmental authority of competent jurisdiction permanently restraining, enjoining or otherwise prohibiting the consummation of any of the transactions contemplated by the Plan, or any law, statute, rule, regulation or ordinance is adopted that makes consummation of the transactions contemplated by the Plan illegal or otherwise prohibited.

PG&E shall promptly provide notice to the Backstop Party of (i) the occurrence of any fact, event, or omission that is not publicly disclosed that gives rise or reasonably can be expected to give rise to a termination right under this Section 5 and (ii) the receipt of any termination notice from any Other Backstop Party, including the asserted basis for such termination, whether or not PG&E concurs therewith.

Upon valid termination of this Backstop Commitment Letter by the Backstop Party (such terminating Backstop Party, a "***Terminating Backstop Party***") pursuant to Section 5(a) through (m), this Backstop Commitment Letter shall be void and of no further force or effect solely with respect to such Terminating Backstop Party is obligated herein, such Terminating Backstop Party shall be released from its Backstop Commitments, undertakings and agreements under or related to this Backstop Commitment Letter, including its Backstop Commitment, except as explicitly provided herein and there shall be no liability or obligation on the part of such Terminating Backstop Party hereunder, except as expressly provided herein. Notwithstanding any termination by a Terminating Backstop Party, PG&E shall remain liable for the payment of all earned Backstop Commitment Premiums and expense reimbursement obligations in this Backstop Commitment Letter.

The Backstop Party's obligations under this Backstop Commitment Letter shall automatically terminate in the event that PG&E has not returned a counter-signed copy of this Backstop Commitment Letter agreeing to its terms on or before the date that is two weeks from the day the Backstop Party furnished a signed copy of this Backstop Commitment Letter to PG&E.

The Backstop Party may not seek to (i) assert the failure of any condition precedent to any of its obligations or agreements under this Backstop Commitment Letter or (ii) terminate this Backstop Commitment Letter (including pursuit of any other remedies), in each case unless the Backstop Party has given written notice to PG&E of such assertion or termination.

Notwithstanding anything in this Backstop Commitment Letter to the contrary, any notice of termination under clauses (d), (g), (h), (i), (k), (l) and (m) shall not be effective unless PG&E has received notices of termination from entities constituting a majority of the outstanding Aggregate Backstop Commitments with respect to the event or circumstance that is the basis for such notice of termination. PG&E shall provide the Backstop Party with a notice of such effective termination within two business days of the effectiveness of the termination.

In the event that any fact or circumstance would give the Backstop Party the right to terminate under more than one clause in this Section 5, the exercise of a termination right under any one clause shall not prejudice the Backstop Party from exercising a termination right under any other clause based on the same event or circumstance.

6.     Termination by PG&E; Defaulting Backstop Party; Extension Options.    PG&E may terminate this Backstop Commitment Letter (including all Backstop Commitments hereunder) (a) at any time prior to countersigning such Backstop Commitment Letter, (b) if, on any date after November 7, 2019, the condition set forth in Section 4(a) would not be satisfied if tested on such date, (c) in the event of a material breach of a representation or warranty of the Backstop Party set forth in Section 3, (d) in the event that the Backstop Party repudiates this Backstop Commitment Letter, purports to terminate this Backstop Commitment Letter if such purported termination is not a valid termination of this Backstop Commitment Letter as determined in a final order of a court with jurisdiction or fails to fund its Backstop Commitment when required to do so in accordance with this Backstop Commitment Letter, (e) if the Backstop Commitment Amount has been reduced to zero in accordance with Section 7, (f) if the Backstop Party has the right to terminate this Backstop Commitment Letter under clause (h), (i), (j) or (m) of Section 5, or (g) if (i) a third party makes a binding proposal to acquire at least 50% of the outstanding PG&E common stock (including by means of a merger, joint venture, partnership, consolidation, dissolution, liquidation, tender offer, recapitalization, reorganization, share exchange, business combination or similar transaction), (ii) either (x) the implementation of such proposal would require the approval of holders of a majority of the PG&E common stock or (y) the price contemplated by such proposal would exceed 125% of the Equity Offering Cap, and (iii) the Board determines in good faith, after consultation with PG&E's outside legal counsel, that the failure to terminate this Backstop Commitment Letter in response to such proposal would be inconsistent with the exercise of its fiduciary duties to the stockholders of PG&E under applicable law. In the event of a breach, repudiation, purported termination or failure to fund contemplated by the foregoing clause (c) or (d), the Backstop Party shall be deemed to be a "*Defaulting Backstop Party*".   In the event that the Backstop Party becomes a Defaulting Backstop Party, then PG&E may, upon notice to such Defaulting Backstop Party, require the Backstop Party to assign and delegate, without recourse, all its interests, rights (other than any Backstop Commitment Premiums earned prior to the date of such assignment and delegation) and obligations under this Backstop Commitment Letter to a third party that shall assume such obligations (which assignee may be an Other Backstop Party, if an Other Backstop Party accepts such assignment and delegation).   Notwithstanding any termination by PG&E under Sections 6(b), (e), (f) or (g), PG&E shall remain liable for the payment of all earned Backstop Commitment Premiums and expense reimbursement obligations in this Backstop Commitment Letter.

In the event that any fact or circumstance would give PG&E the right to terminate under more than one clause in this Section 6, the exercise of a termination right under any one clause shall not prejudice PG&E from exercising a termination right under any other clause based on the same event or circumstance.

Notwithstanding anything to the contrary herein, this Backstop Commitment Letter shall automatically terminate on January 20, 2020 (the "*Initial Termination Date*").   Provided that this Backstop Commitment Letter remains in full force and effect and has not been otherwise terminated, PG&E may extend the Initial Termination Date to April 30, 2020 (the "*First Extension Date*") upon providing written notice to the Backstop Party of its intent to exercise this option (the "*First Extension Notice*") no later than three days prior to the Initial Termination Date.   In the event that PG&E has provided the Backstop Party a timely and proper First Extension Notice and this Backstop Commitment Letter remains in full force and effect, PG&E may extend the First Extension Date to the Outside Date (the "*Second Extension Date*") upon providing written notice to the Backstop Party of its intent to exercise this option (the "*Second Extension Notice*") no later than three days prior to the First Extension Date.   In the event that PG&E has provided the Backstop Party a timely and proper Second Extension Notice and this Backstop Commitment Letter remains in full force and effect, PG&E may extend the Second Extension Date to the 60th day following the Outside Date (the "*Third Extension Date*") upon providing written notice to the Backstop

Case: 19-30088    Doc# 3844    Filed: 09/09/19    Entered: 09/09/19 15:14:13    Page 41 of 135

Party of its intent to exercise this option (the "***Third Extension Notice***") no later than three days prior to the Second Extension Date.

7.     <u>Reduction of Commitments by PG&E</u>.

a.     In the event that on or prior to November 7, 2019, PG&E receives Aggregate Backstop Commitments that exceed the Equity Offering Cap (such excess, the "***Overallotment Amount***"), then, on November 8, 2019 (the "***Allocation Date***"), the Backstop Commitment Amount shall be automatically reduced by an amount equal to (i) the Overallotment Amount, *times* (ii) a fraction, (A) the numerator of which is the Backstop Party's Shares and (B) the denominator of which is the aggregate number of shares of PG&E common stock held by the Backstop Party and the Other Backstop Parties, collectively, as of September 6, 2019 (without double counting any shares beneficially owned, directly or indirectly, by more than one Backstop Party). Notwithstanding the foregoing, on the Allocation Date, in the event there is an Overallotment Amount and for the purpose of curing such Overallotment Amount, PG&E may reduce the Backstop Commitment Amount as to any Backstop Party to the extent such reduction is reasonably advisable (based on the advice of the Debtors' tax advisors after consultation with Jones Day) in order to avoid an "ownership change" within the meaning of Section 382 and the Treasury Regulations promulgated thereunder or to otherwise preserve the ability of the Debtors to utilize their NOLs; *provided* that such reduction may not be below the amount of Backstop Commitments at which such Backstop Party would maintain its existing percentage ownership of the total outstanding shares of PG&E common stock. Within three business days of the Allocation Date, PG&E shall provide the Backstop Party with a notice of any adjustment to its Backstop Commitment Amount under this Section 7(a).

b.     In the event that, after November 7, 2019, the Debtors (i) receive binding commitments providing for funding from any Additional Capital Sources that (A) have conditions to funding and commitment termination rights that are no less favorable to PG&E than those in this Backstop Commitment Letter and (B) are approved by an order of the Bankruptcy Court, or (ii) actually obtain funding from any Additional Capital Sources, then (x) in the case of clause (i), PG&E may reduce the Backstop Commitment Amount, and (y) in the case of clause (ii), the Backstop Commitment Amount shall be automatically reduced (if not already reduced pursuant to clause (i)), in each case by an amount equal to (A) the amount of such funding, times (B) a fraction, (1) the numerator of which is the Backstop Commitment Amount immediately prior to such reduction and (2) the denominator of which is the Aggregate Backstop Commitments as of immediately prior to such reduction. Any reduction in the Backstop Commitment pursuant to this Section 7(b) shall not reduce any Backstop Commitment Premium earned prior to the date of such reduction.

c.     In the event that the Debtors consummate any Permitted Equity Offering or Rights Offering, the Backstop Commitment Amount shall be automatically reduced by an amount equal to (i) the net cash proceeds of such Permitted Equity Financing or such Rights Offering plus the proceeds of any Additional Capital Sources, as applicable, *times* (ii) a fraction, (A) the numerator of which is the Backstop Commitment Amount immediately prior to such reduction and (B) the denominator of which is the Aggregate Backstop Commitments as of immediately prior to such reduction.

d.     The Debtors shall provide notice to the Backstop Party in the event that the Backstop Commitment Amount is reduced as provided above. References herein to "Backstop Commitment Amount" or "Backstop Commitment" mean such amounts as adjusted in accordance with the terms of this Backstop Commitment Letter. Any Backstop Commitments that have been terminated or reduced shall be terminated or reduced, as applicable, permanently.

8.     <u>Assignment</u>. This Backstop Commitment Letter (a) is not assignable by the Backstop Party, and any purported assignment shall be null and void *ab initio*; *provided*, *however*, Backstop Party may assign its Backstop Commitment, in whole or in part, to (i) another Backstop Party, (ii) an affiliate of the Backstop Party, or (iii) an investment fund or separately managed account the primary investment advisor or sub advisor to which is a Backstop Party or an affiliate thereof, to the extent such assignee

Case: 19-30088   Doc# 3844   Filed: 09/09/19   Entered: 09/09/19 15:14:13   Page 42 of 135

Backstop Party agrees in writing to assume all obligations hereunder of such Backstop Party in connection with such Backstop Commitment, and any assignment under this proviso shall not relieve the Backstop Party from its obligations under this Backstop Commitment Letter, and (b) is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person or entity other than the parties hereto. Notwithstanding the foregoing, a Backstop Party may assign all or any portion of its obligations hereunder to a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act of 1933, as amended), without the consent of any party, *provided, however*, that (i) absent the prior written consent of PG&E, such assignee (including any Entity) does not, and as a result of such assignment will not, beneficially own more than 4.75% of the Aggregate Backstop Commitments and (ii) any assignment under this sentence shall not relieve the Backstop Party from its obligations under this Backstop Commitment Letter.

9. <u>Entire Agreement</u>. This Backstop Commitment Letter, including all exhibits hereto, constitutes the entire understanding among the parties hereto with respect to the subject matter hereof and replaces and supersedes all prior agreements and understandings, both written and oral, between the parties hereto with respect to the subject matter hereof and, subject to the terms hereof, shall become effective and binding upon the mutual exchange of fully executed counterparts by each of the parties hereto.

10. <u>Governing Law; Consent to Jurisdiction; Waiver of Jury Trial</u>. This Backstop Commitment Letter shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction. By its execution and delivery of this Backstop Commitment Letter, each of the parties hereto irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Backstop Commitment Letter or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought only in the Bankruptcy Court. By execution and delivery of this Backstop Commitment Letter, each of the parties hereto irrevocably accepts and submits itself to the exclusive jurisdiction of the Bankruptcy Court with respect to any such action, suit or proceeding. EACH PARTY HERETO UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO ABOVE.

11. <u>Amendment; Waiver; Counterparts</u>. This Backstop Commitment Letter may not be amended or waived by or on behalf of the Backstop Party, and no consent may be given hereunder by or on behalf of the Backstop Party (including to an amendment or waiver of any provision of the Plan), except in writing signed by the holders of a majority of the Aggregate Backstop Commitments (whether or not the Backstop Party signs such amendment or waiver), and confirmed in writing by the Company; *provided, however,* that without the prior written consent of the Backstop Party, this Backstop Commitment Letter may not be amended to (a) increase the amount of the Backstop Commitment Amount or Backstop Commitment, (b) decrease the Backstop Commitment Premium, (c) extend the Backstop Commitment beyond the Third Extension Date, (d) amend the definition of "Backstop Price" or any component thereof, and (e) amend, modify, or waive the condition in Section 4(d). This Backstop Commitment Letter may be executed in any number of counterparts, each of which will be an original, and all of which, when taken together, will constitute one agreement. Delivery of an executed counterpart of this Backstop Commitment Letter by e-mail or portable document format (PDF) will be effective as delivery of a manually executed counterpart of this Backstop Commitment Letter.

12. <u>Notices</u>. All notices required or permitted to be given under this Backstop Commitment Letter, unless otherwise stated herein, shall be given by overnight courier at the addresses specified below, or at such other address or addresses as a party may designate for itself in writing, or by email (if confirmed) at the email addresses specified below:

If to the Backstop Party, to the name, address and email address located on the Backstop Party's signature page to this Backstop Commitment Letter.

Case: 19-30088   Doc# 3844   Filed: 09/09/19   Entered: 09/09/19 15:14:13   Page 43 of 135

If to the Debtors:

> PG&E Corporation
> 77 Beale Street
> P.O. Box 770000
> San Francisco, California 94177
> Attention: Janet Loduca, Senior Vice President and General Counsel
> Email: J1Lc@pge.com

> with a copy to:

> Cravath, Swaine & Moore LLP
> 825 Eighth Avenue
> New York, New York 10019
> Attention: Richard Hall; Paul Zumbro
> Email: RHall@cravath.com; PZumbro@cravath.com

> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York 10153
> Attention: Stephen Karotkin
> Email: Stephen.karotkin@weil.com

13. <u>No Liability</u>. Notwithstanding anything that may be expressed or implied in this Backstop Commitment Letter, each party hereto acknowledges and agrees that no person other than the Backstop Party (and it permitted assigns) shall have any obligation hereunder (subject to the limitations provided herein) or in connection with the transactions contemplated hereby and that (a) notwithstanding that any Backstop Party may be a partnership, limited partnership or limited liability company, no recourse (whether at law, in equity, in contract, in tort or otherwise) hereunder or under any document or instrument delivered in connection herewith, or in respect of any oral representations made or alleged to be made in connection herewith or therewith, shall be had against any former, current or future direct or indirect equity holder, controlling person, general or limited partner, shareholder, member, investment manager or adviser, manager, director, officer, employee, agent, affiliate, assignee, representative or financing source of any of the foregoing) (any such person or entity, other than such Backstop Party, a "***Related Party***") or any Related Party of any such Related Party, including, without limitation, any liabilities arising under, or in connection with, the Plan or this Backstop Commitment Letter and the transactions contemplated thereby and hereby, or in respect of any oral representations made or alleged to be made in connection therewith or herewith), whether by the enforcement of any judgment or assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law and (b) no personal liability whatsoever will attach to, be imposed on or otherwise be incurred by any Related Party of the Backstop Party or any Related Party of any such Related Party under this Backstop Commitment Letter or any document or instrument delivered in connection herewith or with the Plan Term Sheet or the Plan (or in respect of any oral representation made or alleged to be made in connection herewith or therewith) or for any action (whether at law, in equity, in contract, in tort or otherwise) based on, in respect of, or by reason of such obligations hereunder or by their creation.

14. <u>Plan Support</u>. For as long as this Backstop Letter Agreement is in effect, the Backstop Party shall (i) use all reasonable efforts to support the Plan with respect to the treatment of HoldCo Common Interests and to act in good faith to consummate the Plan with respect to any Equity Offering and the

<div align="center">12</div>

Backstop Commitments, (ii) to the extent the Backstop Party is entitled to vote on the Plan, timely vote (or cause to be voted) all of its HoldCo Common Interests and Claims to accept the Plan (and not to change or withdraw any such vote), and (iii) timely vote (or cause to be voted) its HoldCo Common Interests and Claims to reject any plan of reorganization other than the Plan.

15. The Backstop Party shall not be required, pursuant to the terms of this Backstop Commitment Letter, to acquire or purchase any securities or indebtedness in connection with any Equity Offering that, pursuant to the terms of a Backstop Commitment Letter or other agreement, are to be acquired or subscribed for by any other party, nor shall the Backstop Party be required, pursuant to the terms of this Backstop Commitment Letter, to pay any money or other consideration, or exchange any claims whatsoever, which are owing from, or to be transferred from or by, any other party pursuant to the terms of another Backstop Commitment Letter or other agreement. Nothing in this Backstop Commitment Letter shall be deemed to constitute an agreement or a joint venture or partnership with or between any other person or entity nor constitute any party as the agent of any other person or entity for any purpose. For the avoidance of doubt, no Backstop Party shall, nor shall any action taken by a Backstop Party hereunder, be deemed to be acting in concert with any other person or entity with respect to the Backstop Commitment or any other matter nor shall the Backstop Commitments hereunder create a presumption that the Backstop Party is in any way acting in concert or as a group with any other person or entity whether as a result of this commitment or otherwise.

16. Each party hereto confirms that it has made its own decision to execute this Backstop Commitment Letter based upon its own independent assessment of documents and information available to it, as it has deemed appropriate.

17. Except as expressly provided in this Backstop Commitment Letter, (a) nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each party hereto to protect and preserve its rights, remedies and interests, including, without limitation, any claims against or interests in any of the Debtors or other parties, or its full participation in any bankruptcy proceeding, and (b) the parties hereto each fully preserve any and all of their respective rights, remedies, claims and interests as of the date hereof and upon a termination of this Backstop Commitment Letter. Further, nothing in this Backstop Commitment Letter shall be construed to prohibit any party hereto from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are consistent with this Backstop Commitment Letter and the Plan, and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying or preventing the consummation of the transactions contemplated by the Plan.

[signature page follows]

Case: 19-30088    Doc# 3844    Filed: 09/09/19    Entered: 09/09/19 15:14:13    Page 45 of 135

Sincerely,

Backstop Party:

**ABRAMS CAPITAL PARTNERS II, L.P.**

By:     Abrams Capital Management, L.P.,
          its investment manager

By:     Abrams Capital Management, LLC,
          its general partner

By:     _____
Name:  David Abrams
Title:   Managing Member

Notice Information:
Alison Bomberg
222 Berkeley Street, 21st Floor
Boston, MA 02116
abomberg@abramscapital.com

14

Accepted and agreed this 9th day of September, 2019, by:

PG&E CORPORATION

By: _____

Name: Janet C. Loduca
Title: Senior Vice President and General Counsel

15

**Exhibit A**
**Plan of Reorganization**

See the *Debtors' Joint Chapter 11 Plan of Reorganization* filed at Docket No. 3841.

**Exhibit B**
**Mandatory Preferred Stock Term Sheet**

**Term Sheet for**
**5.00% Mandatory Convertible Preferred Stock**

| | |
|---|---|
| Issuer: | PG&E Corporation ("**PG&E**") |
| Title of Securities: | 5.00% Mandatory Convertible Preferred Stock of PG&E (the "*Mandatory Convertible Preferred Stock*") |
| Shares of Mandatory Convertible Preferred Stock Offered by PG&E: | Up to [●] shares |
| Offering Price: | $1,000 per share of the Mandatory Convertible Preferred Stock |
| Issue Date: | The Effective Date of the Plan |
| Liquidation Preference: | $1,000 per share |
| Dividends: | 5.00% of the Liquidation Preference of $1,000 per share of the Mandatory Convertible Preferred Stock per year (equivalent to $50 per annum per share), when, as and if declared by the Board, payable in cash or, by delivery of additional shares of Mandatory Convertible Preferred Stock or any combination of cash and shares of Mandatory Convertible Preferred Stock, as determined by PG&E in its sole discretion |
| Floor Price: | 100% of the Initial Price, subject to standard anti-dilution adjustments |
| Dividend Payment Dates: | If declared, January 1, April 1, July 1 and October 1 of each year, commencing on (TBD) |
| Dividend Record Dates: | The March 15, June 15, September 15 and December 15 immediately preceding the next dividend payment date |
| Redemption: | The Mandatory Convertible Preferred Stock will be redeemable on terms and conditions to be determined |
| Initial Price: | A per share price equal to (a) the greater of (i) an Implied P/E Multiple of 13.5 or (ii) the Implied P/E Multiple of a Permitted Equity Offering, *times* (b) the Normalized Estimated Net Income as of the Determination Date, *divided by* (c) the number of fully diluted shares of PG&E (calculated using the treasury stock method) that will be outstanding as of the Effective Date. |
| Threshold Appreciation Price: | 110% of the Initial Price, subject to standard ant-dilution adjustments |
| Mandatory Conversion Date: | 1/8th of the Mandatory Convertible Preferred Stock will convert into PG&E common stock 90, 180, 270, 360, 450, 540, 630, and 720 days from Issue Date |

Case: 19-30088    Doc# 3844    Filed: 09/09/19    Entered: 09/09/19 15:14:13    Page 51 of 135

| | Conversion Rate: | Upon conversion on the Mandatory Conversion Date, the conversion rate for each share of the Mandatory Convertible Preferred Stock will be not more than [●] shares of PG&E common stock (the "***Maximum Conversion Rate***") and not less than [●] shares of PG&E common stock (the "***Minimum Conversion Rate***"), depending on the Applicable Market Value of the PG&E common stock subject to standard anti-dilution adjustments.  The following table illustrates the conversion rate per share of the Mandatory Convertible Preferred Stock (in each case, subject to standard anti-dilution adjustments): |

| **Applicable Market Value of the PG&E Common Stock** | **Conversion rate (number of shares of PG&E Common Stock to be received upon conversion of each share of the Mandatory Convertible Preferred Stock)** |
|---|---|
| Greater than 110% of the Initial Price (which is the Threshold Appreciation Price) | [●] shares (approximately equal to $1,000 divided by the Threshold Appreciation Price) |
| Equal to or less than the Threshold Appreciation Price but greater than or equal to the Floor Price | Between [●] and [●] shares, determined by dividing $1,000 by the Applicable Market Value of the PG&E common stock |
| Less than the Floor Price | [●] shares (approximately equal to $1,000 divided by the Floor Price) |

Applicable Market Value:      The "***Applicable Market Value***" shall be the 10-trading day VWAP immediately preceding the applicable Mandatory Conversion Date

Conversion at the Option of the Holder:      At any time prior to final Mandatory Conversion Date, holders of the Mandatory Convertible Preferred Stock have the option to elect to convert their shares of the Mandatory Convertible Preferred Stock in whole or in part (but in no event less than one share of the Mandatory Convertible Preferred Stock), into shares of PG&E common stock at the Minimum Conversion Rate of shares of PG&E common stock per share of the Mandatory Convertible Preferred Stock. This Minimum Conversion Rate is subject to standard anti-dilution adjustments.

Limitation on Ownership      No holder, together with persons who have a formal or informal understanding with such assignee to make a coordinated acquisition of stock, shall acquire beneficial ownership (within the meaning of Section 382 and the Treasury Regulations) of more than 4.75% of the outstanding Mandatory Convertible Preferred Stock without the prior written consent of PG&E.

Case: 19-30088    Doc# 3844    Filed: 09/09/19    Entered: 09/09/19 15:14:13    Page 52 of 135

## Exhibit C
## Backstop Terms

| Backstop Party | Backstop Commitment Amount |
|---|---|
| Abrams Capital Partners II, L.P. | $337,868,000.00 |

**Payments**

The Backstop Commitment Premium shall be earned as follows:

- 75 basis points of the Backstop Commitment Premium shall be earned on the later to occur of (a) the date that the Backstop Party and PG&E have fully executed this Backstop Commitment Letter and (b) Bankruptcy Court approval of this Backstop Commitment Letter, unless this Backstop Commitment Letter shall have earlier been terminated;

- 125 basis points of the Backstop Commitment Premium shall be earned on the date on which the Backstop Party receives the First Extension Notice;

- 250 basis points of the Backstop Commitment Premium shall be earned on the date on which the Backstop Party receives the Second Extension Notice; and

- 50 basis points of the Backstop Commitment Premium shall be earned on the date on which the Backstop Party receives the Third Extension Notice

In addition, if PG&E terminates this Backstop Commitment Letter pursuant to Section 6(g), 100% of the Backstop Commitment Premium shall be fully earned and become due and payable in cash three business days after the date of such termination.

Except as provided in the immediately preceding paragraph, the Backstop Commitment Premium shall be payable in shares of New HoldCo Common Stock to be issued on the Effective Date, based on the Backstop Price.

**Certain Defined Terms**

"*Applicable Utility Index Multiple*" shall mean the average normalized 2021 estimated price-to-earnings ratio of the U.S. regulated utilities in the S&P 500 Utilities (Sector) Index (after excluding AES, AWK, EXC, NRG, PEG, and PPL) over the 20-day trading period before the applicable measurement date per Capital IQ Consensus Estimates.

"*Backstop Commitment Premium*" shall mean a commitment premium equal to 500 basis points on the total amount of Backstop Commitment Amount. If and when any portion of the Backstop Commitment Premium is earned in accordance with the foregoing provisions of this Exhibit C, (a) it shall be calculated by reference to the Backstop Commitment Amount in effect at the time of such earning, and (b) the amount of the Backstop Commitment Premium so earned shall not be subject to reduction based upon any subsequent reduction of the Backstop Commitment Amount or termination of this Backstop Commitment Letter, other than termination pursuant to Section 6(c) or 6(d) of this Backstop Commitment Letter.

"*Backstop Multiple*" shall mean the lesser of (a) 10 and (b) 10 *times* one *plus* the percentage change of the Applicable Utility Index Multiple as measured on the date of this Backstop Commitment Letter and

the fifth business day prior to the Effective Date. For the avoidance of doubt, the Backstop Multiple shall never exceed 10.

"*Backstop Price*" means (a) the Backstop Multiple *times* (b) the Normalized Estimated Net Income as of the Determination Date, *divided by* (c) the number of fully diluted shares of PG&E (calculated using the treasury stock method) that will be outstanding as of the Effective Date (assuming all equity is raised by funding all Aggregate Backstop Commitments).

"*Board*" means the Board of Directors of PG&E. With respect to any matter, references to the Board include a committee of the Board that is duly authorized to act with respect to such matter.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Determination Date*" shall mean the earlier of (a) the first day of the Confirmation Hearing and (b) if (i) the Per Share Price for a Permitted Equity Offering is to be finally determined prior to such first day, the date of such determination or (ii) if the exercise price of the Rights is finally determined prior to such first day, the date of such determination.

"*Normalized Estimated Net Income*" shall mean, in each case with respect to the estimated year 2021, (a) on a component-by-component basis (e.g., distribution, generation, gas transmission and storage, and electrical transmission), the sum of (i) the Utility's estimated earning rate base for such component, *times* (ii) the equity percentage of the Utility's authorized capital structure, *times* (iii) the Utility's authorized rate of return on equity for such component, *less* (b) the projected post-tax difference in interest expense or preferred dividends for the entire company and the authorized interest expense or preferred dividends expected to be collected in rates, *less* (c) without duplication of any amount included in clause (b), the amount of any post-tax offset or credit to any charge imposed in connection with the issuance of Wildfire Victims Recovery Bonds, if any, *less* (d) the amount of the Utility's post-tax annual contribution to the Go-Forward Wildfire Fund.

"*Section 382*" means Section 382 of the Code, or any successor provision or replacement provision.

"*Treasury Regulations*" means final, temporary and proposed tax regulations promulgated under the Code, as amended.

Case: 19-30088    Doc# 3844    Filed: 09/09/19    Entered: 09/09/19 15:14:13    Page 54 of 135

September 9, 2019

PG&E Corporation
77 Beale Street
P.O. Box 770000
San Francisco, California 94177

      Re:  <u>Chapter 11 Plan Backstop Commitment Letter</u>

Ladies and Gentlemen:

      Reference is hereby made to the chapter 11 bankruptcy cases, lead case no. 19-30088 (the "***Chapter 11 Cases***"), currently pending before the United States Bankruptcy Court for the Northern District of California (the "***Bankruptcy Court***"), in which PG&E Corporation ("***PG&E***" or the "***Company***") and Pacific Gas and Electric Company (the "***Utility***" and together with PG&E, the "***Debtors***") are debtors in possession. Reference is further made to the Chapter 11 plan of reorganization attached hereto as Exhibit A (the "***Plan***") to implement the terms and conditions of the reorganization of the Debtors as provided therein. Capitalized terms used in this backstop commitment letter (this "***Backstop Commitment Letter***") or in the exhibits hereto but not otherwise defined shall have the meanings ascribed to them in the Plan. The word "including" means "including, without limitation".

      In order to facilitate the Debtors' emergence from Chapter 11, pursuant to this Backstop Commitment Letter, and subject to the terms, conditions and limitations set forth herein and in consideration for the Backstop Commitment Premium, the undersigned Backstop Party (the "***Backstop Party***") is willing to purchase, on the Effective Date, an amount of New HoldCo Common Stock up to its Backstop Commitment Amount (as defined herein) at the Backstop Price (as defined herein).

      In addition, PG&E has separately solicited and negotiated and expects to enter into substantially similar backstop commitment letters ("***Other Backstop Commitment Letters***") with other funding sources ("***Other Backstop Parties***") pursuant to which such Other Backstop Parties will commit to purchase New HoldCo Common Stock on the Effective Date (such commitments, "***Other Backstop Commitments***," and together with this Backstop Commitment, the "***Aggregate Backstop Commitments***").

      1.    <u>Equity Offerings</u>.

           a.    <u>Structure</u>. The Plan, among other things, shall provide that, on the Effective Date, Reorganized HoldCo shall issue shares of New HoldCo Common Stock for up to $14 billion of aggregate net cash proceeds to Reorganized Holdco (the "***Equity Offering Cap***"). PG&E shall structure the offering of any such shares of New HoldCo Common Stock (or rights pursuant to which any such shares may be issued or other securities convertible into any such shares) (the "***Equity Offering***") in accordance with the terms of this Section 1, including the following parameters:

               (i)    if the Implied P/E Multiple with respect to such Equity Offering equals or exceeds the greater of (A) 13.5 and (B) 13.5 *times* one *plus* any percentage change of the Applicable Utility Index Multiple (as defined herein) as measured on the date of this Backstop Commitment Letter and the Determination Date (as defined herein), then PG&E shall be permitted to conduct the Equity Offering in any form of primary equity offering (including any public offering, regular way offering, at-the-market equity offering, block trade, modified Dutch auction or other auction pricing mechanism, rights offering, private placement, "PIPE" sale or other registered or unregistered transaction) upon such terms and conditions as may be determined by the Board (a "***Permitted Equity Offering***"), including such terms and conditions that are reasonably advisable (based on the advice of the Debtors' tax advisors after consultation

with Jones Day) in order to avoid an "ownership change" within the meaning of Section 382 and the Treasury Regulations promulgated thereunder or to otherwise preserve the ability of the Debtors to utilize their net operating loss carryforwards and other tax attributes (collectively, the "*NOLs*");

(ii)      if the Implied P/E Multiple with respect to the Equity Offering is less than the Implied P/E Multiple required for a Permitted Equity Offering in Section 1(a)(i) above, but equals or exceeds the lesser of (A) 12 and (B) 12 *times* one *plus* the percentage change of the Applicable Utility Index Multiple as measured on the date of this Backstop Commitment Letter and the Determination Date (the "*Rights Offering Threshold Multiple*"), then PG&E shall structure the Equity Offering such that (Y) at least 80%, determined assuming the exercise in full of all of the Rights, of the aggregate cash proceeds of the Equity Offering is to be raised through the exercise of purchase rights (the "*Rights*") distributed to holders of PG&E common stock ("*Existing Shareholders*") as of a record date to be determined by the Board (the "*Record Date*") to purchase shares of New HoldCo Common Stock for cash at a price set forth below (the "*Rights Offering*") and (Z) the balance of the aggregate cash proceeds of the Equity Offering is to be raised through any other form of primary equity offering (including any public offering, regular way offering, at-the-market equity offering, block trade, modified Dutch auction or other auction pricing mechanism, private placement, "PIPE" sale or other registered or unregistered transaction), provided, that entities holding a majority of the Aggregate Backstop Commitments have not objected to the identity of the purchasers and ultimate purchasers, as applicable, in such Equity Offering, to the extent such Equity Offering is not a broadly syndicated underwritten public offering, within three business days of receipt of notice from PG&E;

(iii)      in both of paragraphs (i) and (ii) above, Reorganized Holdco may also raise equity capital (subject to the Equity Offering Cap) by calling on the Backstop Commitments (after giving effect to any reduction of the Backstop Commitments in connection with a Permitted Equity Offering or a Rights Offering, as applicable); and

(iv)      if the Implied P/E Multiple with respect to the Equity Offering would be less than the Rights Offering Threshold Multiple or if for any other reason Reorganized Holdco is unable to execute an Equity Offering, then Reorganized Holdco shall not utilize either a Permitted Equity Offering or a Rights Offering and shall issue shares at the Backstop Price pursuant to the Backstop Commitments up to the Equity Offering Cap *less* the proceeds of any Additional Capital Sources.

"*Implied P/E Multiple*" means, with respect to any Equity Offering, (A) the price per share at which shares of New Holdco Common Stock are offered to be sold in such Equity Offering (which price (x) in the case of an Equity Offering of rights, shall be the exercise price to acquire a share of New HoldCo Common Stock pursuant to such rights or (y) in the case of an Equity Offering of a security convertible into or exchangeable for shares of New HoldCo Common Stock, shall be the per share price implied by the conversion ratio used to convert the principal amount, liquidation preference or other face amount of such security into a number of shares of New HoldCo Common Stock) (the "*Per Share Price*"), *times* (B) the number of fully diluted shares of PG&E (calculated using the treasury stock method) that will be outstanding as of the Effective Date (assuming such Equity Offering and all other equity transactions contemplated by the Plan are consummated and settled on the Effective Date), *divided by* (C) the Normalized Estimated Net Income as of the Determination Date.

b.      <u>Additional Capital Sources</u>.  PG&E shall conduct the Equity Offering in accordance with the Plan. The net cash proceeds to PG&E of the Equity Offering shall not exceed the Equity Offering Cap, *less* the sum of (i) the principal amount of debt that is issued by PG&E in excess of $7 billion in connection with the Plan; (ii) the aggregate liquidation preference of preferred stock

2

("***Mandatory Convertible Preferred Stock***") that is distributed pursuant to the Plan to holders of Wildfire Claims, on the terms and conditions set forth on Exhibit B pursuant to the Plan; (iii) the principal amount of any Wildfire Victim Recovery Bonds issued in connection with the Plan; (iv) the proceeds of any preferred stock issued by the Utility (excluding any Utility Preferred Interests that are Reinstated pursuant to the Plan); (v) the proceeds of any third-party transactions based upon the monetization of any NOLs; and (vi) the principal amount of any other debt that is issued or reinstated by the Utility, excluding any debt that may be issued under clause (v) above, in excess of $27.35 billion in connection with the Plan (the "***Additional Capital Sources***").

        c.      <u>Rights Offering</u>.  With respect to the Rights Offering:

        (i)      the Rights will have a fixed exercise price equal to (a) the Rights Offering Threshold Multiple *times* (b) the Normalized Estimated Net Income as of the Determination Date, *divided by* (c) the number of fully diluted shares of PG&E (calculated using the treasury stock method) that will be outstanding as of the Effective Date (assuming all equity is raised by the exercise of all Rights);

        (ii)      the Rights shall be transferable;

        (iii)      the Board shall provide that holders of Rights who fully exercise their Rights will have over-subscription privileges to subscribe for additional shares of New HoldCo Common Stock to the extent other Rights are not exercised, with over-subscription procedures (including pro-ration rules) determined by the Board;

        (iv)      the Board may provide that the Rights or Rights Offering include such terms and conditions that are reasonably advisable (based on the advice of the Debtors' tax advisors after consultation with Jones Day) in order to avoid an "ownership change" within the meaning of Section 382 and the Treasury Regulations promulgated thereunder or to otherwise preserve the ability of the Debtors to utilize their NOLs, including limitations on the amount of Rights that are exercisable by holders who, together with persons who have a formal or informal understanding with such holders to make a coordinated acquisition of stock within the meaning of Treasury Regulations 1.382-3(a) (an "***Entity***"), beneficially own in excess of a specified percentage (e.g., 4.75%) of the outstanding shares of PG&E common stock, subject to exceptions to be determined by the Board; provided, however, that such terms and conditions shall not restrict existing holders of PG&E common stock (including any Entity) from acquiring shares that do not increase their aggregate beneficial ownership to more than 4.75% of the outstanding shares of PG&E common stock immediately after the completion of the Rights Offering; and

        (v)      the Rights will have such other terms and conditions as may be determined by the Board, as long as such other terms and conditions  are consistent with the Plan and with every other provision of this Backstop Commitment Letter.

        d.      <u>Subordinated Claims</u>.  To the extent provided in the Plan, the Debtors may issue Rights or New HoldCo Common Stock to holders of Claims against a Debtor that are subject to subordination pursuant to section 510(b) of the Bankruptcy Code and that arise from or are related to any equity security of the Debtor.

        e.      <u>Documentation</u>.  The definitive documentation for any Permitted Equity Offering or any Rights Offering shall be consistent with the Plan.  For the avoidance of doubt, the organizational documents of the Reorganized HoldCo (including its charter) may include limitations and other terms that are reasonably advisable (based on the advice of the Debtors' tax advisors after consultation with Jones Day) in order to avoid an "ownership change" within the meaning of Section 382 and the Treasury Regulations promulgated thereunder or to otherwise preserve the ability of the Debtors to utilize their

Case: 19-30088    Doc# 3844    Filed: 09/09/19    Entered: 09/09/19 15:14:13    Page 57 of 135

NOLs; provided, however, that the organizational documents shall not be modified or amended in a manner that would restrict existing holders of PG&E common stock (including any Entity) from acquiring shares that do not increase their aggregate beneficial ownership to more than 4.75% of the outstanding shares of PG&E common stock immediately after the completion of the Rights Offering.

 f. <u>Use of Proceeds</u>.  The Debtors shall only use the proceeds of an Equity Offering to fund obligations to holders of Wildfire Claims under the Plan.

 g. <u>Notices</u>.  Promptly, and in any event, within two days of the Board's determination of final pricing of any Equity Offering, PG&E shall publicly disclose the form, structure, amount and terms of such Equity Offering, including the Implied P/E Multiple for such Equity Offering.  PG&E shall give the Backstop Party, as soon as reasonably practicable, but in no event later than two business days prior to the Effective Date, (i) written notification setting forth (A) the amount to be funded pursuant to the Backstop Commitment, (B) an estimate of the Backstop Price and (C) the targeted Effective Date and (ii) a subscription form to be completed by the Backstop Party, or other instructions, to facilitate the Backstop Party's subscription for the New HoldCo Common Stock.

 h. <u>Cooperation</u>.  As reasonably requested by the Debtors, the Backstop Party shall reasonably cooperate with the Debtors with respect to providing information relevant to the preservation of the Debtors' Tax Attributes, including information regarding (i) the number of shares of PG&E common stock owned by such party (on a holder-by-holder basis) prior to the Rights Offering and (ii) the amount of Rights exercised and shares of New HoldCo Common Stock purchased pursuant to the Backstop Commitment by such persons.

 2. <u>Backstop</u>.

 a. Subject to the terms and conditions set forth herein and to the payment and provision of premium to the Backstop Party as provided in Section 2(c), the Backstop Party, solely on behalf of itself, hereby commits to purchase on the Effective Date an amount of shares of New HoldCo Common Stock at the Backstop Price (the "***Backstop Commitment***") up to the dollar amounts set forth on <u>Exhibit B</u> hereto (the "***Backstop Commitment Amount***").

 b. PG&E and the Backstop Party shall cooperate in good faith to prepare and deliver a subscription agreement and any other documentation necessary to effect the private placement of New HoldCo Common Stock to the Backstop Party in accordance with the terms of this Backstop Commitment Letter, which documentation shall be consistent with this Backstop Commitment Letter and the Plan.

 c. The Debtors agree to pay the Backstop Party the Backstop Commitment Premium to the extent provided on <u>Exhibit B</u> and to reimburse on a regular basis the Backstop Party for the reasonable fees and expenses of Jones Day and a financial advisor incurred prior to termination of this Backstop Commitment Letter in connection with the Plan, the Backstop Commitment Letter, and the transactions contemplated herein, provided that such reimbursement shall not exceed $17 million for Jones Day in the aggregate and $19 million for the financial advisor in the aggregate.  The provisions for the payment of the Backstop Commitment Premium and the other provisions provided herein are an integral part of the transactions contemplated by this Backstop Commitment Letter and without these provisions the Backstop Party would not have entered into this Backstop Commitment Letter, and the Backstop Commitment Premium shall, pursuant to an order of the Bankruptcy Court approving this Backstop Commitment Letter, constitute allowed administrative expenses of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code.

 d. Reorganized Holdco will enter into a registration rights agreement with the Backstop Party in respect of the shares of New HoldCo Common Stock that the Backstop Party may acquire in accordance with the Plan and this Backstop Commitment Letter, which registration rights agreement shall be in form and substance reasonably acceptable to the holders of a majority of the Aggregate Backstop Commitments.

Case: 19-30088    Doc# 3844    Filed: 09/09/19    Entered: 09/09/19 15:14:13    Page 58 of 135

e.      To the extent that PG&E agrees to terms that are more favorable to an Other Backstop Party in an Other Backstop Commitment Letter (excluding terms relating to the size of such Other Backstop Party's backstop commitment), PG&E shall provide notice of such terms to the Backstop Party no later than 10 days after the Allocation Date and, absent a written objection from the Backstop Party no later than 10 days after the date of such notice, such terms shall be deemed without further action to be incorporated into this Backstop Commitment Letter.

3.      <u>Backstop Party Representations</u>.  The Backstop Party hereby represents and warrants, solely as to itself, that (a) it has all limited partnership, corporate or other power and authority necessary to execute, deliver and perform this Backstop Commitment Letter, (b) the execution, delivery and performance of this Backstop Commitment Letter by it has been duly and validly authorized and approved by all necessary limited partnership, corporate or other organizational action by it, (c) this Backstop Commitment Letter has been duly and validly executed and delivered by it and, assuming due execution and delivery by the other parties hereto, constitutes a valid and legally binding obligation of it, enforceable against it in accordance with the terms of this Backstop Commitment Letter, (d) the execution, delivery and performance by the Backstop Party of this Backstop Commitment Letter do not (i) violate the organizational documents of the Backstop Party or (ii) violate any applicable law or judgment applicable to it, (e) as of the date of this Backstop Commitment Letter, its Backstop Commitment is, and as of the date of commencement of any Rights Offering and as of the Effective Date its Backstop Commitment will be, less than the maximum amount that it is permitted to invest in any one portfolio investment pursuant to the terms of its constituent documents or otherwise, (f) it has, as of the date of this Backstop Commitment Letter, and will have, as of the Effective Date, in the aggregate available undrawn commitments and liquid assets at least in the sum of its Backstop Commitment Amount hereunder, and (g) as of September 2, 2019, it and its affiliates (excluding any affiliate that is an Other Backstop Party) beneficially owned, directly or indirectly, 700,113 shares of PG&E common stock and had a "put equivalent position" (as defined in Rule 16a-1 under the Securities Exchange Act of 1934, as amended) of zero shares of PG&E common stock (the number of shares beneficially owned less the number of shares in the put equivalent position being the "***Backstop Party's Shares***").

In addition, the Backstop Party hereby represents and warrants, solely as to itself, as of the date of this Backstop Commitment Letter and as of the Effective Date, that the Backstop Party (i) is acquiring the shares of New HoldCo Common Stock for its own account, solely for investment and not with a view toward, or for sale in connection with, any distribution thereof in violation of any foreign, federal, state or local securities or "blue sky" laws, or with any present intention of distributing or selling such shares in violation of any such laws, (ii) has such knowledge and experience in financial and business matters and in investments of this type that it is capable of evaluating the merits and risks of its investment in the shares of New HoldCo Common Stock and of making an informed investment decision, and (iii) is an "accredited investor" within the meaning of Rule 501 of Regulation D under the Securities Act of 1933, as amended (the "***Securities Act***").  The Backstop Party understands that Reorganized HoldCo will be relying on the statements contained herein to establish an exemption from registration under the Securities Act and under foreign, federal, state and local securities laws and acknowledges that the shares of New HoldCo Common Stock will not be registered under the Securities Act or any other applicable law and that such shares may not be transferred except pursuant to the registration provisions of the Securities Act (and in compliance with any other applicable law) or pursuant to an applicable exemption therefrom.

4.      <u>Conditions to Backstop Party Commitment</u>.  The obligations of the Backstop Party to fund its Backstop Commitment to PG&E in accordance with this Backstop Commitment Letter are further expressly conditioned upon and subject to the satisfaction or written waiver by the Backstop Party, in its sole discretion, at or prior to the Effective Date of each of the following conditions, which PG&E acknowledges are an integral part of the transactions contemplated by this Backstop Commitment Letter and without these conditions the Backstop Party would not have entered into this Backstop Commitment Letter.

Case: 19-30088    Doc# 3844    Filed: 09/09/19    Entered: 09/09/19 15:14:13    Page 59 of 135

a. by November 7, 2019, the Debtors shall have received valid and enforceable Other Backstop Commitments on substantially the same terms and conditions as set forth in this Backstop Commitment Letter that in the aggregate with this Backstop Commitment result in Aggregate Backstop Commitments of no less than the Equity Offering Cap;

b. other than the consummation of any Permitted Equity Offering or the Rights Offering, the satisfaction of all of the other conditions to the Effective Date provided for in the Plan or the waiver of any such conditions by the Debtors in accordance with the Plan (to the extent the Plan expressly provides for the possibility of such a waiver);

c. the Bankruptcy Court shall have entered the Confirmation Order, which shall confirm the Plan with such amendments, modifications, changes and consents as are approved by those entities having no less than a majority of the Aggregate Backstop Commitments (such approval not to be unreasonably withheld, conditioned or delayed), and such Confirmation Order shall be in full force and effect, and no stay thereof shall be in effect;

d. this Backstop Commitment Letter shall have been approved by an order of the Bankruptcy Court and such order shall be in full force and effect, and no stay thereof shall be in effect;

e. the transactions contemplated herein shall have been authorized by an order of the Bankruptcy Court (which may be the Confirmation Order) such order shall be in full force and effect, and no stay thereof shall be in effect;

f. total PG&E weighted average earning rate base (including electric generation, electric transmission, electric distribution, gas distribution, gas transmission and storage) for estimated 2021 shall be no less than 95% of $48 billion; and

g. no result, occurrence, fact, change, event, effect, violation, penalty, inaccuracy or circumstance (whether or not constituting a breach of a representation, warranty or covenant set forth in the Plan) that, individually or in the aggregate with any such other results, occurrences, facts, changes, events, effects, violations, penalties, inaccuracies, or circumstances, (i) would have or would reasonably be expected to have a material adverse effect on the business, operations, assets, liabilities, capitalization, financial performance, financial condition or results of operations, in each case, of the Debtors, taken as a whole, or (ii) would reasonably be expected to prevent or materially delay the ability of the Debtors to consummate the transactions contemplated by this Backstop Commitment Letter or the Plan or perform their obligations hereunder or thereunder (each a "***Material Adverse Effect***") shall have occurred; *provided*, *however*, that none of the following results, occurrences, facts, changes, events, effects, violations, penalties, inaccuracies, or circumstances shall constitute or be taken into account in determining whether a Material Adverse Effect has occurred, is continuing or would reasonably be expected to occur: (A) the filing of the Chapter 11 Cases, and the fact that the Debtors are operating in bankruptcy (B) results, occurrences, facts, changes, events, effects, violations, inaccuracies, or circumstances affecting (1) the electric or gas utility businesses in the United States generally or (2) the economy, credit, financial, capital or commodity markets, in the United States or elsewhere in the world, including changes in interest rates, monetary policy or inflation, (C) changes or prospective changes in law (other than any law or regulation of California or the United States that is applicable to any electrical utility) or in GAAP or accounting standards, or any changes or prospective changes in the interpretation or enforcement of any of the foregoing, (D) any decline in the market price, or change in trading volume, of any securities of the Debtors, (E) any failure to meet any internal or public projections, forecasts, guidance, estimates, milestones, credit ratings, budgets or internal or published financial or operating predictions of revenue, earnings, cash flow or cash position, (F) any wildfire occurring after the Petition Date and prior to January 1, 2020, and (G) one or more wildfires, occurring on or after January 1, 2020, that destroys or damages fewer than 500 dwellings or commercial structures ("***Structures***") in the aggregate (it being understood that (I) the exceptions in clauses (D) and (E) shall not prevent or otherwise affect a determination that the underlying cause of any such change, decline or failure referred to therein is a Material Adverse Effect and

(II) a Material Adverse Effect shall include the occurrence of one or more wildfires on or after January 1, 2020 destroying or damaging at least 500 Structures within PG&E's service area where none of the following are true with respect any such wildfire (a) the portion of PG&E's system at the location of such wildfire was not de-energized; (b) there has been no determination by a final order that such wildfire was caused by a person or entity other than the Utility; and (c) there has been no determination that such wildfire was not caused by the negligence or intentional misconduct of the Utility by a final order of a court having jurisdiction).

5.    Termination by the Backstop Party.  Subject to the last paragraph of this Section 5, the Backstop Party may terminate this Backstop Commitment Letter, solely as to itself, by written notice (which shall describe the basis for such termination), on or after the occurrence of any of the following:

a.    the Plan has not been filed with the Bankruptcy Court by 11:59 p.m. Pacific Time on September 9, 2019 or the Plan filed with the Bankruptcy Court on or after such date differs from the draft of the Plan attached hereto as Exhibit A;

b.    the condition set forth in Section 4(a) is not satisfied as of November 7, 2019;

c.    the Bankruptcy Court has not entered an order approving this Backstop Commitment Letter on or before November 20, 2019;

d.    subject to Section 11, (i) the Plan has been amended modified or changed, in each case without the consent of the entities holding a majority of the Aggregate Backstop Commitments (such consent not to be unreasonably withheld, conditioned or delayed) or (ii) any Plan Supplement or any Plan Document shall have been filed or finalized without the consent of entities holding a majority of the Aggregate Backstop Commitments (such consent not to be unreasonably withheld, conditioned or delayed);

e.    the Confirmation Order has not been entered by the Bankruptcy Court on or before June 30, 2020 (the "**Outside Date**");

f.    the Effective Date has not occurred on or before 60 days after entry of the Confirmation Order;

g.    the Debtors have failed to perform any of their obligations set forth in this Backstop Commitment Letter, which failure to perform (i) would give rise to the failure of a condition set forth in Section 4(b) or 4(c) and (ii) is incapable of being cured or, if capable of being cured by the Outside Date, the Debtors have not cured within 10 calendar days following receipt by the Debtors of written notice of such failure to perform from the Backstop Party stating the Backstop Party's intention to terminate this Backstop Commitment Letter pursuant to this Section 5(g) and the basis for such termination;

h.    the occurrence of a Material Adverse Effect;

i.    the occurrence of one or more wildfires in the Debtors' service territory after the Petition Date and prior to January 1, 2020 that is asserted by any person to arise out of the Debtors' activities and that destroys or damages more than 500 Structures; *provided, however,* that any notice of termination under this clause (i) must be given on or before January 15, 2020;

j.    the Debtors' aggregate liability with respect to Wildfire Claims is determined (whether (i) by the Bankruptcy Court (or the District Court to which the reference has been partially withdrawn for estimation purposes), (ii) pursuant to an agreement between the Debtors and the holders of Wildfire Claims, or (iii) through a combination thereof) to exceed $17.9 billion (the "**Wildfire Claims Cap**"); *provided, however,* that for purposes of this clause (j), (A) any Wildfire Claim that the CPUC has approved or agreed to approve for recovery or pass through by the Utility shall not count in determining the Wildfire Claims Cap, and (B) the Wildfire Claims Cap shall be increased by an amount equal to the amount of Wildfire Claims consisting of professional fees that the Bankruptcy Court (or the District Court to which the reference has been partially withdrawn for estimation purposes) determines to be reasonable;

Case: 19-30088    Doc# 3844    Filed: 09/09/19    Entered: 09/09/19 15:14:13    Page 61 of 135

k. the CPUC fails to issue all necessary approvals, authorizations and final orders to implement the Plan prior to the Outside Date, and to participate in the Go-Forward Wildfire Fund, including: (i) provisions satisfactory to entities holding a majority of the Aggregate Backstop Commitments (such approval not to be unreasonably withheld, conditioned or delayed) pertaining to authorized return on equity and regulated capital structure, (ii) a disposition, satisfactory to entities holding a majority of the Aggregate Backstop Commitments (such approval not to be unreasonably withheld, conditioned or delayed), of proposals for certain potential changes to PG&E's corporate structure and authorizations for the Utility to operate as a utility, (iii) a resolution, satisfactory to entities holding a majority of the Aggregate Backstop Commitments (such approval not to be unreasonably withheld, conditioned or delayed), of claims for monetary fines or penalties under the California Public Utilities Code for conduct prior to the Petition Date, and (iv) approval (or exemption from approval) of the financing structure and securities to be issued under the Plan;

l. if at any time after the first day of the Confirmation Hearing, asserted Administrative Expense Claims exceed $250 million, excluding all (i) ordinary course Administrative Expense Claims, (ii) Professional Fee Claims, and (iii) Disallowed Administrative Expense Claims;

m. there is in effect an order of a governmental authority of competent jurisdiction permanently restraining, enjoining or otherwise prohibiting the consummation of any of the transactions contemplated by the Plan, or any law, statute, rule, regulation or ordinance is adopted that makes consummation of the transactions contemplated by the Plan illegal or otherwise prohibited.

PG&E shall promptly provide notice to the Backstop Party of (i) the occurrence of any fact, event, or omission that is not publicly disclosed that gives rise or reasonably can be expected to give rise to a termination right under this Section 5 and (ii) the receipt of any termination notice from any Other Backstop Party, including the asserted basis for such termination, whether or not PG&E concurs therewith.

Upon valid termination of this Backstop Commitment Letter by the Backstop Party (such terminating Backstop Party, a "***Terminating Backstop Party***") pursuant to Section 5(a) through (m), this Backstop Commitment Letter shall be void and of no further force or effect solely with respect to such Terminating Backstop Party is obligated herein, such Terminating Backstop Party shall be released from its Backstop Commitments, undertakings and agreements under or related to this Backstop Commitment Letter, including its Backstop Commitment, except as explicitly provided herein and there shall be no liability or obligation on the part of such Terminating Backstop Party hereunder, except as expressly provided herein. Notwithstanding any termination by a Terminating Backstop Party, PG&E shall remain liable for the payment of all earned Backstop Commitment Premiums and expense reimbursement obligations in this Backstop Commitment Letter.

The Backstop Party's obligations under this Backstop Commitment Letter shall automatically terminate in the event that PG&E has not returned a counter-signed copy of this Backstop Commitment Letter agreeing to its terms on or before the date that is two weeks from the day the Backstop Party furnished a signed copy of this Backstop Commitment Letter to PG&E.

The Backstop Party may not seek to (i) assert the failure of any condition precedent to any of its obligations or agreements under this Backstop Commitment Letter or (ii) terminate this Backstop Commitment Letter (including pursuit of any other remedies), in each case unless the Backstop Party has given written notice to PG&E of such assertion or termination.

Notwithstanding anything in this Backstop Commitment Letter to the contrary, any notice of termination under clauses (d), (g), (h), (i), (k), (l) and (m) shall not be effective unless PG&E has received notices of termination from entities constituting a majority of the outstanding Aggregate Backstop Commitments with respect to the event or circumstance that is the basis for such notice of termination. PG&E shall provide the Backstop Party with a notice of such effective termination within two business days of the effectiveness of the termination.

In the event that any fact or circumstance would give the Backstop Party the right to terminate under more than one clause in this Section 5, the exercise of a termination right under any one clause shall not prejudice the Backstop Party from exercising a termination right under any other clause based on the same event or circumstance.

6. <u>Termination by PG&E; Defaulting Backstop Party; Extension Options</u>.  PG&E may terminate this Backstop Commitment Letter (including all Backstop Commitments hereunder) (a) at any time prior to countersigning such Backstop Commitment Letter, (b) if, on any date after November 7, 2019, the condition set forth in Section 4(a) would not be satisfied if tested on such date, (c) in the event of a material breach of a representation or warranty of the Backstop Party set forth in Section 3, (d) in the event that the Backstop Party repudiates this Backstop Commitment Letter, purports to terminate this Backstop Commitment Letter if such purported termination is not a valid termination of this Backstop Commitment Letter as determined in a final order of a court with jurisdiction or fails to fund its Backstop Commitment when required to do so in accordance with this Backstop Commitment Letter, (e) if the Backstop Commitment Amount has been reduced to zero in accordance with Section 7, (f) if the Backstop Party has the right to terminate this Backstop Commitment Letter under clause (h), (i), (j) or (m) of Section 5, or (g) if (i) a third party makes a binding proposal to acquire at least 50% of the outstanding PG&E common stock (including by means of a merger, joint venture, partnership, consolidation, dissolution, liquidation, tender offer, recapitalization, reorganization, share exchange, business combination or similar transaction), (ii) either (x) the implementation of such proposal would require the approval of holders of a majority of the PG&E common stock or (y) the price contemplated by such proposal would exceed 125% of the Equity Offering Cap, and (iii) the Board determines in good faith, after consultation with PG&E's outside legal counsel, that the failure to terminate this Backstop Commitment Letter in response to such proposal would be inconsistent with the exercise of its fiduciary duties to the stockholders of PG&E under applicable law. In the event of a breach, repudiation, purported termination or failure to fund contemplated by the foregoing clause (c) or (d), the Backstop Party shall be deemed to be a "***Defaulting Backstop Party***".  In the event that the Backstop Party becomes a Defaulting Backstop Party, then PG&E may, upon notice to such Defaulting Backstop Party, require the Backstop Party to assign and delegate, without recourse, all its interests, rights (other than any Backstop Commitment Premiums earned prior to the date of such assignment and delegation) and obligations under this Backstop Commitment Letter to a third party that shall assume such obligations (which assignee may be an Other Backstop Party, if an Other Backstop Party accepts such assignment and delegation).  Notwithstanding any termination by PG&E under Sections 6(b), (e), (f) or (g), PG&E shall remain liable for the payment of all earned Backstop Commitment Premiums and expense reimbursement obligations in this Backstop Commitment Letter.

In the event that any fact or circumstance would give PG&E the right to terminate under more than one clause in this Section 6, the exercise of a termination right under any one clause shall not prejudice PG&E from exercising a termination right under any other clause based on the same event or circumstance.

Notwithstanding anything to the contrary herein, this Backstop Commitment Letter shall automatically terminate on January 20, 2020 (the "***Initial Termination Date***").  Provided that this Backstop Commitment Letter remains in full force and effect and has not been otherwise terminated, PG&E may extend the Initial Termination Date to April 30, 2020 (the "***First Extension Date***") upon providing written notice to the Backstop Party of its intent to exercise this option (the "***First Extension Notice***") no later than three days prior to the Initial Termination Date.  In the event that PG&E has provided the Backstop Party a timely and proper First Extension Notice and this Backstop Commitment Letter remains in full force and effect, PG&E may extend the First Extension Date to the Outside Date (the "***Second Extension Date***") upon providing written notice to the Backstop Party of its intent to exercise this option (the "***Second Extension Notice***") no later than three days prior to the First Extension Date.  In the event that PG&E has provided the Backstop Party a timely and proper Second Extension Notice and this Backstop Commitment Letter remains in full force and effect, PG&E may extend the Second Extension Date to the 60th day following the Outside Date (the "***Third Extension Date***") upon providing written notice to the Backstop

Party of its intent to exercise this option (the "***Third Extension Notice***") no later than three days prior to the Second Extension Date.

7.    <u>Reduction of Commitments by PG&E</u>.

a.    In the event that on or prior to November 7, 2019, PG&E receives Aggregate Backstop Commitments that exceed the Equity Offering Cap (such excess, the "***Overallotment Amount***"), then, on November 8, 2019 (the "***Allocation Date***"), the Backstop Commitment Amount shall be automatically reduced by an amount equal to (i) the Overallotment Amount, *times* (ii) a fraction, (A) the numerator of which is the Backstop Party's Shares and (B) the denominator of which is the aggregate number of shares of PG&E common stock held by the Backstop Party and the Other Backstop Parties, collectively, as of September 6, 2019 (without double counting any shares beneficially owned, directly or indirectly, by more than one Backstop Party). Notwithstanding the foregoing, on the Allocation Date, in the event there is an Overallotment Amount and for the purpose of curing such Overallotment Amount, PG&E may reduce the Backstop Commitment Amount as to any Backstop Party to the extent such reduction is reasonably advisable (based on the advice of the Debtors' tax advisors after consultation with Jones Day) in order to avoid an "ownership change" within the meaning of Section 382 and the Treasury Regulations promulgated thereunder or to otherwise preserve the ability of the Debtors to utilize their NOLs; *provided* that such reduction may not be below the amount of Backstop Commitments at which such Backstop Party would maintain its existing percentage ownership of the total outstanding shares of PG&E common stock. Within three business days of the Allocation Date, PG&E shall provide the Backstop Party with a notice of any adjustment to its Backstop Commitment Amount under this Section 7(a).

b.    In the event that, after November 7, 2019, the Debtors (i) receive binding commitments providing for funding from any Additional Capital Sources that (A) have conditions to funding and commitment termination rights that are no less favorable to PG&E than those in this Backstop Commitment Letter and (B) are approved by an order of the Bankruptcy Court, or (ii) actually obtain funding from any Additional Capital Sources, then (x) in the case of clause (i), PG&E may reduce the Backstop Commitment Amount, and (y) in the case of clause (ii), the Backstop Commitment Amount shall be automatically reduced (if not already reduced pursuant to clause (i)), in each case by an amount equal to (A) the amount of such funding, times (B) a fraction, (1) the numerator of which is the Backstop Commitment Amount immediately prior to such reduction and (2) the denominator of which is the Aggregate Backstop Commitments as of immediately prior to such reduction. Any reduction in the Backstop Commitment pursuant to this Section 7(b) shall not reduce any Backstop Commitment Premium earned prior to the date of such reduction.

c.    In the event that the Debtors consummate any Permitted Equity Offering or Rights Offering, the Backstop Commitment Amount shall be automatically reduced by an amount equal to (i) the net cash proceeds of such Permitted Equity Financing or such Rights Offering plus the proceeds of any Additional Capital Sources, as applicable, *times* (ii) a fraction, (A) the numerator of which is the Backstop Commitment Amount immediately prior to such reduction and (B) the denominator of which is the Aggregate Backstop Commitments as of immediately prior to such reduction.

d.    The Debtors shall provide notice to the Backstop Party in the event that the Backstop Commitment Amount is reduced as required above. References herein to "Backstop Commitment Amount" or "Backstop Commitment" mean such amounts as adjusted in accordance with the terms of this Backstop Commitment Letter. Any Backstop Commitments that have been terminated or reduced shall be terminated or reduced, as applicable, permanently.

8.    <u>Assignment</u>. This Backstop Commitment Letter (a) is not assignable by the Backstop Party, and any purported assignment shall be null and void *ab initio*; *provided*, *however*, Backstop Party may assign its Backstop Commitment, in whole or in part, to (i) another Backstop Party, (ii) an affiliate of the Backstop Party, or (iii) an investment fund or separately managed account the primary investment advisor or sub advisor to which is a Backstop Party or an affiliate thereof, to the extent such assignee

Case: 19-30088   Doc# 3844   Filed: 09/09/19   Entered: 09/09/19 15:14:13   Page 64 of 135

Backstop Party agrees in writing to assume all obligations hereunder of such Backstop Party in connection with such Backstop Commitment, and any assignment under this proviso shall not relieve the Backstop Party from its obligations under this Backstop Commitment Letter, and (b) is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person or entity other than the parties hereto. Notwithstanding the foregoing, a Backstop Party may assign all or any portion of its obligations hereunder to a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act of 1933, as amended), without the consent of any party, *provided, however*, that (i) absent the prior written consent of PG&E, such assignee (including any Entity) does not, and as a result of such assignment will not, beneficially own more than 4.75% of the Aggregate Backstop Commitments and (ii) any assignment under this sentence shall not relieve the Backstop Party from its obligations under this Backstop Commitment Letter.

9. <u>Entire Agreement</u>. This Backstop Commitment Letter, including all exhibits hereto, constitutes the entire understanding among the parties hereto with respect to the subject matter hereof and replaces and supersedes all prior agreements and understandings, both written and oral, between the parties hereto with respect to the subject matter hereof and, subject to the terms hereof, shall become effective and binding upon the mutual exchange of fully executed counterparts by each of the parties hereto.

10. <u>Governing Law; Consent to Jurisdiction; Waiver of Jury Trial</u>. This Backstop Commitment Letter shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction. By its execution and delivery of this Backstop Commitment Letter, each of the parties hereto irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Backstop Commitment Letter or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought only in the Bankruptcy Court. By execution and delivery of this Backstop Commitment Letter, each of the parties hereto irrevocably accepts and submits itself to the exclusive jurisdiction of the Bankruptcy Court with respect to any such action, suit or proceeding. EACH PARTY HERETO UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO ABOVE.

11. <u>Amendment; Waiver; Counterparts</u>. This Backstop Commitment Letter may not be amended or waived by or on behalf of the Backstop Party, and no consent may be given hereunder by or on behalf of the Backstop Party (including to an amendment or waiver of any provision of the Plan), except in writing signed by the holders of a majority of the Aggregate Backstop Commitments (whether or not the Backstop Party signs such amendment or waiver), and confirmed in writing by the Company; *provided, however,* that without the prior written consent of the Backstop Party, this Backstop Commitment Letter may not be amended to (a) increase the amount of the Backstop Commitment Amount or Backstop Commitment, (b) decrease the Backstop Commitment Premium, (c) extend the Backstop Commitment beyond the Third Extension Date, (d) amend the definition of "Backstop Price" or any component thereof, and (e) amend, modify, or waive the condition in Section 4(d). This Backstop Commitment Letter may be executed in any number of counterparts, each of which will be an original, and all of which, when taken together, will constitute one agreement. Delivery of an executed counterpart of this Backstop Commitment Letter by e-mail or portable document format (PDF) will be effective as delivery of a manually executed counterpart of this Backstop Commitment Letter.

12. <u>Notices</u>. All notices required or permitted to be given under this Backstop Commitment Letter, unless otherwise stated herein, shall be given by overnight courier at the addresses specified below, or at such other address or addresses as a party may designate for itself in writing, or by email (if confirmed) at the email addresses specified below:

If to the Backstop Party, to the name, address and email address located on the Backstop Party's signature page to this Backstop Commitment Letter.

Case: 19-30088    Doc# 3844    Filed: 09/09/19    Entered: 09/09/19 15:14:13    Page 65 of 135

If to the Debtors:

> PG&E Corporation
> 77 Beale Street
> P.O. Box 770000
> San Francisco, California 94177
> Attention: Janet Loduca, Senior Vice President and General Counsel
> Email: J1Lc@pge.com

> with a copy to:

> Cravath, Swaine & Moore LLP
> 825 Eighth Avenue
> New York, New York 10019
> Attention: Richard Hall; Paul Zumbro
> Email: RHall@cravath.com; PZumbro@cravath.com

> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York 10153
> Attention: Stephen Karotkin
> Email: Stephen.karotkin@weil.com

13. <u>No Liability</u>. Notwithstanding anything that may be expressed or implied in this Backstop Commitment Letter, each party hereto acknowledges and agrees that no person other than the Backstop Party (and it permitted assigns) shall have any obligation hereunder (subject to the limitations provided herein) or in connection with the transactions contemplated hereby and that (a) notwithstanding that any Backstop Party may be a partnership, limited partnership or limited liability company, no recourse (whether at law, in equity, in contract, in tort or otherwise) hereunder or under any document or instrument delivered in connection herewith, or in respect of any oral representations made or alleged to be made in connection herewith or therewith, shall be had against any former, current or future direct or indirect equity holder, controlling person, general or limited partner, shareholder, member, investment manager or adviser, manager, director, officer, employee, agent, affiliate, assignee, representative or financing source of any of the foregoing) (any such person or entity, other than such Backstop Party, a "***Related Party***") or any Related Party of any such Related Party, including, without limitation, any liabilities arising under, or in connection with, the Plan or this Backstop Commitment Letter and the transactions contemplated thereby and hereby, or in respect of any oral representations made or alleged to be made in connection therewith or herewith), whether by the enforcement of any judgment or assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law and (b) no personal liability whatsoever will attach to, be imposed on or otherwise be incurred by any Related Party of the Backstop Party or any Related Party of any such Related Party under this Backstop Commitment Letter or any document or instrument delivered in connection herewith or with the Plan Term Sheet or the Plan (or in respect of any oral representation made or alleged to be made in connection herewith or therewith) or for any action (whether at law, in equity, in contract, in tort or otherwise) based on, in respect of, or by reason of such obligations hereunder or by their creation.

14. <u>Plan Support</u>. For as long as this Backstop Letter Agreement is in effect, the Backstop Party shall (i) use all reasonable efforts to support the Plan with respect to the treatment of HoldCo Common Interests and to act in good faith to consummate the Plan with respect to any Equity Offering and the

12

Backstop Commitments, (ii) to the extent the Backstop Party is entitled to vote on the Plan, timely vote (or cause to be voted) all of its HoldCo Common Interests and Claims to accept the Plan (and not to change or withdraw any such vote), and (iii) timely vote (or cause to be voted) its HoldCo Common Interests and Claims to reject any plan of reorganization other than the Plan.

15. The Backstop Party shall not be required, pursuant to the terms of this Backstop Commitment Letter, to acquire or purchase any securities or indebtedness in connection with any Equity Offering that, pursuant to the terms of a Backstop Commitment Letter or other agreement, are to be acquired or subscribed for by any other party, nor shall the Backstop Party be required, pursuant to the terms of this Backstop Commitment Letter, to pay any money or other consideration, or exchange any claims whatsoever, which are owing from, or to be transferred from or by, any other party pursuant to the terms of another Backstop Commitment Letter or other agreement. Nothing in this Backstop Commitment Letter shall be deemed to constitute an agreement or a joint venture or partnership with or between any other person or entity nor constitute any party as the agent of any other person or entity for any purpose. For the avoidance of doubt, no Backstop Party shall, nor shall any action taken by a Backstop Party hereunder, be deemed to be acting in concert with any other person or entity with respect to the Backstop Commitment or any other matter nor shall the Backstop Commitments hereunder create a presumption that the Backstop Party is in any way acting in concert or as a group with any other person or entity whether as a result of this commitment or otherwise.

16. Each party hereto confirms that it has made its own decision to execute this Backstop Commitment Letter based upon its own independent assessment of documents and information available to it, as it has deemed appropriate.

17. Except as expressly provided in this Backstop Commitment Letter, (a) nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each party hereto to protect and preserve its rights, remedies and interests, including, without limitation, any claims against or interests in any of the Debtors or other parties, or its full participation in any bankruptcy proceeding, and (b) the parties hereto each fully preserve any and all of their respective rights, remedies, claims and interests as of the date hereof and upon a termination of this Backstop Commitment Letter. Further, nothing in this Backstop Commitment Letter shall be construed to prohibit any party hereto from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are consistent with this Backstop Commitment Letter and the Plan, and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying or preventing the consummation of the transactions contemplated by the Plan.

[signature page follows]

Case: 19-30088    Doc# 3844    Filed: 09/09/19    Entered: 09/09/19 15:14:13    Page 67 of 135

Sincerely,

Backstop Party:

**RIVA CAPITAL PARTNERS V, L.P.**

By:     Abrams Capital Management, L.P.,
          its investment manager

By:     Abrams Capital Management, LLC,
          its general partner

By:     _____
Name:  David Abrams
Title:   Managing Member

Notice Information:
Alison Bomberg
222 Berkeley Street, 21st Floor
Boston, MA 02116
abomberg@abramscapital.com

14

Accepted and agreed this 9th day of September, 2019, by:

PG&E CORPORATION

By: _Janet C. Loduca_____
Name: Janet C. Loduca
Title: Senior Vice President and General Counsel

**Exhibit A**
**Plan of Reorganization**

See the *Debtors' Joint Chapter 11 Plan of Reorganization* filed at Docket No. 3841.

**Exhibit B**
**Mandatory Preferred Stock Term Sheet**

**Term Sheet for**
**5.00% Mandatory Convertible Preferred Stock**

| | |
|---|---|
| Issuer: | PG&E Corporation ("***PG&E***") |
| Title of Securities: | 5.00% Mandatory Convertible Preferred Stock of PG&E (the "***Mandatory Convertible Preferred Stock***") |
| Shares of Mandatory Convertible Preferred Stock Offered by PG&E: | Up to [●] shares |
| Offering Price: | $1,000 per share of the Mandatory Convertible Preferred Stock |
| Issue Date: | The Effective Date of the Plan |
| Liquidation Preference: | $1,000 per share |
| Dividends: | 5.00% of the Liquidation Preference of $1,000 per share of the Mandatory Convertible Preferred Stock per year (equivalent to $50 per annum per share), when, as and if declared by the Board, payable in cash or, by delivery of additional shares of Mandatory Convertible Preferred Stock or any combination of cash and shares of Mandatory Convertible Preferred Stock, as determined by PG&E in its sole discretion |
| Floor Price: | 100% of the Initial Price, subject to standard anti-dilution adjustments |
| Dividend Payment Dates: | If declared, January 1, April 1, July 1 and October 1 of each year, commencing on (TBD) |
| Dividend Record Dates: | The March 15, June 15, September 15 and December 15 immediately preceding the next dividend payment date |
| Redemption: | The Mandatory Convertible Preferred Stock will be redeemable on terms and conditions to be determined |
| Initial Price: | A per share price equal to (a) the greater of (i) an Implied P/E Multiple of 13.5 or (ii) the Implied P/E Multiple of a Permitted Equity Offering, *times* (b) the Normalized Estimated Net Income as of the Determination Date, *divided by* (c) the number of fully diluted shares of PG&E (calculated using the treasury stock method) that will be outstanding as of the Effective Date. |
| Threshold Appreciation Price: | 110% of the Initial Price, subject to standard ant-dilution adjustments |
| Mandatory Conversion Date: | 1/8th of the Mandatory Convertible Preferred Stock will convert into PG&E common stock 90, 180, 270, 360, 450, 540, 630, and 720 days from Issue Date |

Case: 19-30088   Doc# 3844   Filed: 09/09/19   Entered: 09/09/19 15:14:13   Page 73 of 135

| | Conversion Rate: | Upon conversion on the Mandatory Conversion Date, the conversion rate for each share of the Mandatory Convertible Preferred Stock will be not more than [●] shares of PG&E common stock (the "***Maximum Conversion Rate***") and not less than [●] shares of PG&E common stock (the "***Minimum Conversion Rate***"), depending on the Applicable Market Value of the PG&E common stock subject to standard anti-dilution adjustments. The following table illustrates the conversion rate per share of the Mandatory Convertible Preferred Stock (in each case, subject to standard anti-dilution adjustments): |

| Applicable Market Value of the PG&E Common Stock | Conversion rate (number of shares of PG&E Common Stock to be received upon conversion of each share of the Mandatory Convertible Preferred Stock) |
| --- | --- |
| Greater than 110% of the Initial Price (which is the Threshold Appreciation Price) | [●] shares (approximately equal to $1,000 divided by the Threshold Appreciation Price) |
| Equal to or less than the Threshold Appreciation Price but greater than or equal to the Floor Price | Between [●] and [●] shares, determined by dividing $1,000 by the Applicable Market Value of the PG&E common stock |
| Less than the Floor Price | [●] shares (approximately equal to $1,000 divided by the Floor Price) |

| | |
| --- | --- |
| Applicable Market Value: | The "***Applicable Market Value***" shall be the 10-trading day VWAP immediately preceding the applicable Mandatory Conversion Date |
| Conversion at the Option of the Holder: | At any time prior to final Mandatory Conversion Date, holders of the Mandatory Convertible Preferred Stock have the option to elect to convert their shares of the Mandatory Convertible Preferred Stock in whole or in part (but in no event less than one share of the Mandatory Convertible Preferred Stock), into shares of PG&E common stock at the Minimum Conversion Rate of shares of PG&E common stock per share of the Mandatory Convertible Preferred Stock. This Minimum Conversion Rate is subject to standard anti-dilution adjustments. |
| Limitation on Ownership | No holder, together with persons who have a formal or informal understanding with such assignee to make a coordinated acquisition of stock, shall acquire beneficial ownership (within the meaning of Section 382 and the Treasury Regulations) of more than 4.75% of the outstanding Mandatory Convertible Preferred Stock without the prior written consent of PG&E. |

Case: 19-30088    Doc# 3844    Filed: 09/09/19    Entered: 09/09/19 15:14:13    Page 74 of 135

**Exhibit C**
**Backstop Terms**

| Backstop Party | Backstop Commitment Amount |
|---|---|
| Riva Capital Partners V, L.P. | $100,000,000.00 |

**Payments**

The Backstop Commitment Premium shall be earned as follows:

- 75 basis points of the Backstop Commitment Premium shall be earned on the later to occur of (a) the date that the Backstop Party and PG&E have fully executed this Backstop Commitment Letter and (b) Bankruptcy Court approval of this Backstop Commitment Letter, unless this Backstop Commitment Letter shall have earlier been terminated;

- 125 basis points of the Backstop Commitment Premium shall be earned on the date on which the Backstop Party receives the First Extension Notice;

- 250 basis points of the Backstop Commitment Premium shall be earned on the date on which the Backstop Party receives the Second Extension Notice; and

- 50 basis points of the Backstop Commitment Premium shall be earned on the date on which the Backstop Party receives the Third Extension Notice

In addition, if PG&E terminates this Backstop Commitment Letter pursuant to Section 6(g), 100% of the Backstop Commitment Premium shall be fully earned and become due and payable in cash three business days after the date of such termination.

Except as provided in the immediately preceding paragraph, the Backstop Commitment Premium shall be payable in shares of New HoldCo Common Stock to be issued on the Effective Date, based on the Backstop Price.

**Certain Defined Terms**

"*Applicable Utility Index Multiple*" shall mean the average normalized 2021 estimated price-to-earnings ratio of the U.S. regulated utilities in the S&P 500 Utilities (Sector) Index (after excluding AES, AWK, EXC, NRG, PEG, and PPL) over the 20-day trading period before the applicable measurement date per Capital IQ Consensus Estimates.

"*Backstop Commitment Premium*" shall mean a commitment premium equal to 500 basis points on the total amount of Backstop Commitment Amount. If and when any portion of the Backstop Commitment Premium is earned in accordance with the foregoing provisions of this Exhibit C, (a) it shall be calculated by reference to the Backstop Commitment Amount in effect at the time of such earning, and (b) the amount of the Backstop Commitment Premium so earned shall not be subject to reduction based upon any subsequent reduction of the Backstop Commitment Amount or termination of this Backstop Commitment Letter, other than termination pursuant to Section 6(c) or 6(d) of this Backstop Commitment Letter.

"*Backstop Multiple*" shall mean the lesser of (a) 10 and (b) 10 *times* one *plus* the percentage change of the Applicable Utility Index Multiple as measured on the date of this Backstop Commitment Letter and

20

the fifth business day prior to the Effective Date. For the avoidance of doubt, the Backstop Multiple shall never exceed 10.

"*Backstop Price*" means (a) the Backstop Multiple *times* (b) the Normalized Estimated Net Income as of the Determination Date, *divided by* (c) the number of fully diluted shares of PG&E (calculated using the treasury stock method) that will be outstanding as of the Effective Date (assuming all equity is raised by funding all Aggregate Backstop Commitments).

"*Board*" means the Board of Directors of PG&E. With respect to any matter, references to the Board include a committee of the Board that is duly authorized to act with respect to such matter.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Determination Date*" shall mean the earlier of (a) the first day of the Confirmation Hearing and (b) if (i) the Per Share Price for a Permitted Equity Offering is to be finally determined prior to such first day, the date of such determination or (ii) if the exercise price of the Rights is finally determined prior to such first day, the date of such determination.

"*Normalized Estimated Net Income*" shall mean, in each case with respect to the estimated year 2021, (a) on a component-by-component basis (e.g., distribution, generation, gas transmission and storage, and electrical transmission), the sum of (i) the Utility's estimated earning rate base for such component, *times* (ii) the equity percentage of the Utility's authorized capital structure, *times* (iii) the Utility's authorized rate of return on equity for such component, *less* (b) the projected post-tax difference in interest expense or preferred dividends for the entire company and the authorized interest expense or preferred dividends expected to be collected in rates, *less* (c) without duplication of any amount included in clause (b), the amount of any post-tax offset or credit to any charge imposed in connection with the issuance of Wildfire Victims Recovery Bonds, if any, *less* (d) the amount of the Utility's post-tax annual contribution to the Go-Forward Wildfire Fund.

"*Section 382*" means Section 382 of the Code, or any successor provision or replacement provision.

"*Treasury Regulations*" means final, temporary and proposed tax regulations promulgated under the Code, as amended.

Case: 19-30088   Doc# 3844   Filed: 09/09/19   Entered: 09/09/19 15:14:13   Page 76 of 135

September 9, 2019

PG&E Corporation
77 Beale Street
P.O. Box 770000
San Francisco, California 94177

Re: Chapter 11 Plan Backstop Commitment Letter

Ladies and Gentlemen:

Reference is hereby made to the chapter 11 bankruptcy cases, lead case no. 19-30088 (the "***Chapter 11 Cases***"), currently pending before the United States Bankruptcy Court for the Northern District of California (the "***Bankruptcy Court***"), in which PG&E Corporation ("***PG&E***" or the "***Company***") and Pacific Gas and Electric Company (the "***Utility***" and together with PG&E, the "***Debtors***") are debtors in possession. Reference is further made to the Chapter 11 plan of reorganization attached hereto as Exhibit A (the "***Plan***") to implement the terms and conditions of the reorganization of the Debtors as provided therein. Capitalized terms used in this backstop commitment letter (this "***Backstop Commitment Letter***") or in the exhibits hereto but not otherwise defined shall have the meanings ascribed to them in the Plan. The word "including" means "including, without limitation".

In order to facilitate the Debtors' emergence from Chapter 11, pursuant to this Backstop Commitment Letter, and subject to the terms, conditions and limitations set forth herein and in consideration for the Backstop Commitment Premium, the undersigned Backstop Party (the "***Backstop Party***") is willing to purchase, on the Effective Date, an amount of New HoldCo Common Stock up to its Backstop Commitment Amount (as defined herein) at the Backstop Price (as defined herein).

In addition, PG&E has separately solicited and negotiated and expects to enter into substantially similar backstop commitment letters ("***Other Backstop Commitment Letters***") with other funding sources ("***Other Backstop Parties***") pursuant to which such Other Backstop Parties will commit to purchase New HoldCo Common Stock on the Effective Date (such commitments, "***Other Backstop Commitments,***" and together with this Backstop Commitment, the "***Aggregate Backstop Commitments***").

1. Equity Offerings.

a. Structure. The Plan, among other things, shall provide that, on the Effective Date, Reorganized HoldCo shall issue shares of New HoldCo Common Stock for up to $14 billion of aggregate net cash proceeds to Reorganized Holdco (the "***Equity Offering Cap***"). PG&E shall structure the offering of any such shares of New HoldCo Common Stock (or rights pursuant to which any such shares may be issued or other securities convertible into any such shares) (the "***Equity Offering***") in accordance with the terms of this Section 1, including the following parameters:

(i) if the Implied P/E Multiple with respect to such Equity Offering equals or exceeds the greater of (A) 13.5 and (B) 13.5 *times* one *plus* any percentage change of the Applicable Utility Index Multiple (as defined herein) as measured on the date of this Backstop Commitment Letter and the Determination Date (as defined herein), then PG&E shall be permitted to conduct the Equity Offering in any form of primary equity offering (including any public offering, regular way offering, at-the-market equity offering, block trade, modified Dutch auction or other auction pricing mechanism, rights offering, private placement, "PIPE" sale or other registered or unregistered transaction) upon such terms and conditions as may be determined by the Board (a "***Permitted Equity Offering***"), including such terms and conditions that are reasonably advisable (based on the advice of the Debtors' tax advisors after consultation

1

with Jones Day) in order to avoid an "ownership change" within the meaning of Section 382 and the Treasury Regulations promulgated thereunder or to otherwise preserve the ability of the Debtors to utilize their net operating loss carryforwards and other tax attributes (collectively, the "*NOLs*");

(ii)     if the Implied P/E Multiple with respect to the Equity Offering is less than the Implied P/E Multiple required for a Permitted Equity Offering in Section 1(a)(i) above, but equals or exceeds the lesser of (A) 12 and (B) 12 *times* one *plus* the percentage change of the Applicable Utility Index Multiple as measured on the date of this Backstop Commitment Letter and the Determination Date (the "*Rights Offering Threshold Multiple*"), then PG&E shall structure the Equity Offering such that (Y) at least 80%, determined assuming the exercise in full of all of the Rights, of the aggregate cash proceeds of the Equity Offering is to be raised through the exercise of purchase rights (the "*Rights*") distributed to holders of PG&E common stock ("*Existing Shareholders*") as of a record date to be determined by the Board (the "*Record Date*") to purchase shares of New HoldCo Common Stock for cash at a price set forth below (the "*Rights Offering*") and (Z) the balance of the aggregate cash proceeds of the Equity Offering is to be raised through any other form of primary equity offering (including any public offering, regular way offering, at-the-market equity offering, block trade, modified Dutch auction or other auction pricing mechanism, private placement, "PIPE" sale or other registered or unregistered transaction), provided, that entities holding a majority of the Aggregate Backstop Commitments have not objected to the identity of the purchasers and ultimate purchasers, as applicable, in such Equity Offering, to the extent such Equity Offering is not a broadly syndicated underwritten public offering, within three business days of receipt of notice from PG&E;

(iii)     in both of paragraphs (i) and (ii) above, Reorganized Holdco may also raise equity capital (subject to the Equity Offering Cap) by calling on the Backstop Commitments (after giving effect to any reduction of the Backstop Commitments in connection with a Permitted Equity Offering or a Rights Offering, as applicable); and

(iv)     if the Implied P/E Multiple with respect to the Equity Offering would be less than the Rights Offering Threshold Multiple or if for any other reason Reorganized Holdco is unable to execute an Equity Offering, then Reorganized Holdco shall not utilize either a Permitted Equity Offering or a Rights Offering and shall issue shares at the Backstop Price pursuant to the Backstop Commitments up to the Equity Offering Cap *less* the proceeds of any Additional Capital Sources.

"*Implied P/E Multiple*" means, with respect to any Equity Offering, (A) the price per share at which shares of New Holdco Common Stock are offered to be sold in such Equity Offering (which price (x) in the case of an Equity Offering of rights, shall be the exercise price to acquire a share of New HoldCo Common Stock pursuant to such rights or (y) in the case of an Equity Offering of a security convertible into or exchangeable for shares of New HoldCo Common Stock, shall be the per share price implied by the conversion ratio used to convert the principal amount, liquidation preference or other face amount of such security into a number of shares of New HoldCo Common Stock) (the "*Per Share Price*"), *times* (B) the number of fully diluted shares of PG&E (calculated using the treasury stock method) that will be outstanding as of the Effective Date (assuming such Equity Offering and all other equity transactions contemplated by the Plan are consummated and settled on the Effective Date), *divided by* (C) the Normalized Estimated Net Income as of the Determination Date.

b.     Additional Capital Sources.  PG&E shall conduct the Equity Offering in accordance with the Plan.  The net cash proceeds to PG&E of the Equity Offering shall not exceed the Equity Offering Cap, *less* the sum of (i) the principal amount of debt that is issued by PG&E in excess of $7 billion in connection with the Plan; (ii) the aggregate liquidation preference of preferred stock

2

("**_Mandatory Convertible Preferred Stock_**") that is distributed pursuant to the Plan to holders of Wildfire Claims, on the terms and conditions set forth on Exhibit B pursuant to the Plan; (iii) the principal amount of any Wildfire Victim Recovery Bonds issued in connection with the Plan; (iv) the proceeds of any preferred stock issued by the Utility (excluding any Utility Preferred Interests that are Reinstated pursuant to the Plan); (v) the proceeds of any third-party transactions based upon the monetization of any NOLs; and (vi) the principal amount of any other debt that is issued or reinstated by the Utility, excluding any debt that may be issued under clause (v) above, in excess of $27.35 billion in connection with the Plan (the "**_Additional Capital Sources_**").

      c.     <u>Rights Offering</u>.  With respect to the Rights Offering:

      (i)     the Rights will have a fixed exercise price equal to (a) the Rights Offering Threshold Multiple *times* (b) the Normalized Estimated Net Income as of the Determination Date, *divided by* (c) the number of fully diluted shares of PG&E (calculated using the treasury stock method) that will be outstanding as of the Effective Date (assuming all equity is raised by the exercise of all Rights);

      (ii)     the Rights shall be transferable;

      (iii)     the Board shall provide that holders of Rights who fully exercise their Rights will have over-subscription privileges to subscribe for additional shares of New HoldCo Common Stock to the extent other Rights are not exercised, with over-subscription procedures (including pro-ration rules) determined by the Board;

      (iv)     the Board may provide that the Rights or Rights Offering include such terms and conditions that are reasonably advisable (based on the advice of the Debtors' tax advisors after consultation with Jones Day) in order to avoid an "ownership change" within the meaning of Section 382 and the Treasury Regulations promulgated thereunder or to otherwise preserve the ability of the Debtors to utilize their NOLs, including limitations on the amount of Rights that are exercisable by holders who, together with persons who have a formal or informal understanding with such holders to make a coordinated acquisition of stock within the meaning of Treasury Regulations 1.382-3(a) (an "**_Entity_**"), beneficially own in excess of a specified percentage (e.g., 4.75%) of the outstanding shares of PG&E common stock, subject to exceptions to be determined by the Board; provided, however, that such terms and conditions shall not restrict existing holders of PG&E common stock (including any Entity) from acquiring shares that do not increase their aggregate beneficial ownership to more than 4.75% of the outstanding shares of PG&E common stock immediately after the completion of the Rights Offering; and

      (v)     the Rights will have such other terms and conditions as may be determined by the Board, as long as such other terms and conditions  are consistent with the Plan and with every other provision of this Backstop Commitment Letter.

      d.     <u>Subordinated Claims</u>.  To the extent provided in the Plan, the Debtors may issue Rights or New HoldCo Common Stock to holders of Claims against a Debtor that are subject to subordination pursuant to section 510(b) of the Bankruptcy Code and that arise from or are related to any equity security of the Debtor.

      e.     <u>Documentation</u>.  The definitive documentation for any Permitted Equity Offering or any Rights Offering shall be consistent with the Plan.  For the avoidance of doubt, the organizational documents of the Reorganized HoldCo (including its charter) may include limitations and other terms that are reasonably advisable (based on the advice of the Debtors' tax advisors after consultation with Jones Day) in order to avoid an "ownership change" within the meaning of Section 382 and the Treasury Regulations promulgated thereunder or to otherwise preserve the ability of the Debtors to utilize their

Case: 19-30088   Doc# 3844   Filed: 09/09/19   Entered: 09/09/19 15:14:13   Page 79 of 135

NOLs; provided, however, that the organizational documents shall not be modified or amended in a manner that would restrict existing holders of PG&E common stock (including any Entity) from acquiring shares that do not increase their aggregate beneficial ownership to more than 4.75% of the outstanding shares of PG&E common stock immediately after the completion of the Rights Offering.

        f.     <u>Use of Proceeds</u>.  The Debtors shall only use the proceeds of an Equity Offering to fund obligations to holders of Wildfire Claims under the Plan.

        g.     <u>Notices</u>.  Promptly, and in any event, within two days of the Board's determination of final pricing of any Equity Offering, PG&E shall publicly disclose the form, structure, amount and terms of such Equity Offering, including the Implied P/E Multiple for such Equity Offering.  PG&E shall give the Backstop Party, as soon as reasonably practicable, but in no event later than two business days prior to the Effective Date, (i) written notification setting forth (A) the amount to be funded pursuant to the Backstop Commitment, (B) an estimate of the Backstop Price and (C) the targeted Effective Date and (ii) a subscription form to be completed by the Backstop Party, or other instructions, to facilitate the Backstop Party's subscription for the New HoldCo Common Stock.

        h.     <u>Cooperation</u>.  As reasonably requested by the Debtors, the Backstop Party shall reasonably cooperate with the Debtors with respect to providing information relevant to the preservation of the Debtors' Tax Attributes, including information regarding (i) the number of shares of PG&E common stock owned by such party (on a holder-by-holder basis) prior to the Rights Offering and (ii) the amount of Rights exercised and shares of New HoldCo Common Stock purchased pursuant to the Backstop Commitment by such persons.

      2.     <u>Backstop</u>.

        a.     Subject to the terms and conditions set forth herein and to the payment and provision of premium to the Backstop Party as provided in Section 2(c), the Backstop Party, solely on behalf of itself, hereby commits to purchase on the Effective Date an amount of shares of New HoldCo Common Stock at the Backstop Price (the "***Backstop Commitment***") up to the dollar amounts set forth on <u>Exhibit B</u> hereto (the "***Backstop Commitment Amount***").

        b.     PG&E and the Backstop Party shall cooperate in good faith to prepare and deliver a subscription agreement and any other documentation necessary to effect the private placement of New HoldCo Common Stock to the Backstop Party in accordance with the terms of this Backstop Commitment Letter, which documentation shall be consistent with this Backstop Commitment Letter and the Plan.

        c.     The Debtors agree to pay the Backstop Party the Backstop Commitment Premium to the extent provided on <u>Exhibit B</u> and to reimburse on a regular basis the Backstop Party for the reasonable fees and expenses of Jones Day and a financial advisor incurred prior to termination of this Backstop Commitment Letter in connection with the Plan, the Backstop Commitment Letter, and the transactions contemplated herein, provided that such reimbursement shall not exceed $17 million for Jones Day in the aggregate and $19 million for the financial advisor in the aggregate.  The provisions for the payment of the Backstop Commitment Premium and the other provisions provided herein are an integral part of the transactions contemplated by this Backstop Commitment Letter and without these provisions the Backstop Party would not have entered into this Backstop Commitment Letter, and the Backstop Commitment Premium shall, pursuant to an order of the Bankruptcy Court approving this Backstop Commitment Letter, constitute allowed administrative expenses of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code.

        d.     Reorganized Holdco will enter into a registration rights agreement with the Backstop Party in respect of the shares of New HoldCo Common Stock that the Backstop Party may acquire in accordance with the Plan and this Backstop Commitment Letter, which registration rights agreement shall be in form and substance reasonably acceptable to the holders of a majority of the Aggregate Backstop Commitments.

e.	To the extent that PG&E agrees to terms that are more favorable to an Other Backstop Party in an Other Backstop Commitment Letter (excluding terms relating to the size of such Other Backstop Party's backstop commitment), PG&E shall provide notice of such terms to the Backstop Party no later than 10 days after the Allocation Date and, absent a written objection from the Backstop Party no later than 10 days after the date of such notice, such terms shall be deemed without further action to be incorporated into this Backstop Commitment Letter.

3.	<u>Backstop Party Representations</u>.  The Backstop Party hereby represents and warrants, solely as to itself, that (a) it has all limited partnership, corporate or other power and authority necessary to execute, deliver and perform this Backstop Commitment Letter, (b) the execution, delivery and performance of this Backstop Commitment Letter by it has been duly and validly authorized and approved by all necessary limited partnership, corporate or other organizational action by it, (c) this Backstop Commitment Letter has been duly and validly executed and delivered by it and, assuming due execution and delivery by the other parties hereto, constitutes a valid and legally binding obligation of it, enforceable against it in accordance with the terms of this Backstop Commitment Letter, (d) the execution, delivery and performance by the Backstop Party of this Backstop Commitment Letter do not (i) violate the organizational documents of the Backstop Party or (ii) violate any applicable law or judgment applicable to it, (e) as of the date of this Backstop Commitment Letter, its Backstop Commitment is, and as of the date of commencement of any Rights Offering and as of the Effective Date its Backstop Commitment will be, less than the maximum amount that it is permitted to invest in any one portfolio investment pursuant to the terms of its constituent documents or otherwise, (f) it has, as of the date of this Backstop Commitment Letter, and will have, as of the Effective Date, in the aggregate available undrawn commitments and liquid assets at least in the sum of its Backstop Commitment Amount hereunder, and (g) as of September 2, 2019, it and its affiliates (excluding any affiliate that is an Other Backstop Party) beneficially owned, directly or indirectly, 3,110,096 shares of PG&E common stock and had a "put equivalent position" (as defined in Rule 16a-1 under the Securities Exchange Act of 1934, as amended) of zero shares of PG&E common stock (the number of shares beneficially owned less the number of shares in the put equivalent position being the "***Backstop Party's Shares***").

In addition, the Backstop Party hereby represents and warrants, solely as to itself, as of the date of this Backstop Commitment Letter and as of the Effective Date, that the Backstop Party (i) is acquiring the shares of New HoldCo Common Stock for its own account, solely for investment and not with a view toward, or for sale in connection with, any distribution thereof in violation of any foreign, federal, state or local securities or "blue sky" laws, or with any present intention of distributing or selling such shares in violation of any such laws, (ii) has such knowledge and experience in financial and business matters and in investments of this type that it is capable of evaluating the merits and risks of its investment in the shares of New HoldCo Common Stock and of making an informed investment decision, and (iii) is an "accredited investor" within the meaning of Rule 501 of Regulation D under the Securities Act of 1933, as amended (the "***Securities Act***").  The Backstop Party understands that Reorganized HoldCo will be relying on the statements contained herein to establish an exemption from registration under the Securities Act and under foreign, federal, state and local securities laws and acknowledges that the shares of New HoldCo Common Stock will not be registered under the Securities Act or any other applicable law and that such shares may not be transferred except pursuant to the registration provisions of the Securities Act (and in compliance with any other applicable law) or pursuant to an applicable exemption therefrom.

4.	<u>Conditions to Backstop Party Commitment</u>.  The obligations of the Backstop Party to fund its Backstop Commitment to PG&E in accordance with this Backstop Commitment Letter are further expressly conditioned upon and subject to the satisfaction or written waiver by the Backstop Party, in its sole discretion, at or prior to the Effective Date of each of the following conditions, which PG&E acknowledges are an integral part of the transactions contemplated by this Backstop Commitment Letter and without these conditions the Backstop Party would not have entered into this Backstop Commitment Letter.

a.      by November 7, 2019, the Debtors shall have received valid and enforceable Other Backstop Commitments on substantially the same terms and conditions as set forth in this Backstop Commitment Letter that in the aggregate with this Backstop Commitment result in Aggregate Backstop Commitments of no less than the Equity Offering Cap;

b.      other than the consummation of any Permitted Equity Offering or the Rights Offering, the satisfaction of all of the other conditions to the Effective Date provided for in the Plan or the waiver of any such conditions by the Debtors in accordance with the Plan (to the extent the Plan expressly provides for the possibility of such a waiver);

c.      the Bankruptcy Court shall have entered the Confirmation Order, which shall confirm the Plan with such amendments, modifications, changes and consents as are approved by those entities having no less than a majority of the Aggregate Backstop Commitments (such approval not to be unreasonably withheld, conditioned or delayed), and such Confirmation Order shall be in full force and effect, and no stay thereof shall be in effect;

d.      this Backstop Commitment Letter shall have been approved by an order of the Bankruptcy Court and such order shall be in full force and effect, and no stay thereof shall be in effect;

e.      the transactions contemplated herein shall have been authorized by an order of the Bankruptcy Court (which may be the Confirmation Order) such order shall be in full force and effect, and no stay thereof shall be in effect;

f.      total PG&E weighted average earning rate base (including electric generation, electric transmission, electric distribution, gas distribution, gas transmission and storage) for estimated 2021 shall be no less than 95% of $48 billion; and

g.      no result, occurrence, fact, change, event, effect, violation, penalty, inaccuracy or circumstance (whether or not constituting a breach of a representation, warranty or covenant set forth in the Plan) that, individually or in the aggregate with any such other results, occurrences, facts, changes, events, effects, violations, penalties, inaccuracies, or circumstances, (i) would have or would reasonably be expected to have a material adverse effect on the business, operations, assets, liabilities, capitalization, financial performance, financial condition or results of operations, in each case, of the Debtors, taken as a whole, or (ii) would reasonably be expected to prevent or materially delay the ability of the Debtors to consummate the transactions contemplated by this Backstop Commitment Letter or the Plan or perform their obligations hereunder or thereunder (each a "***Material Adverse Effect***") shall have occurred; *provided*, *however*, that none of the following results, occurrences, facts, changes, events, effects, violations, penalties, inaccuracies, or circumstances shall constitute or be taken into account in determining whether a Material Adverse Effect has occurred, is continuing or would reasonably be expected to occur: (A) the filing of the Chapter 11 Cases, and the fact that the Debtors are operating in bankruptcy (B) results, occurrences, facts, changes, events, effects, violations, inaccuracies, or circumstances affecting (1) the electric or gas utility businesses in the United States generally or (2) the economy, credit, financial, capital or commodity markets, in the United States or elsewhere in the world, including changes in interest rates, monetary policy or inflation, (C) changes or prospective changes in law (other than any law or regulation of California or the United States that is applicable to any electrical utility) or in GAAP or accounting standards, or any changes or prospective changes in the interpretation or enforcement of any of the foregoing, (D)  any decline in the market price, or change in trading volume, of any securities of the Debtors, (E) any failure to meet any internal or public projections, forecasts, guidance, estimates, milestones, credit ratings, budgets or internal or published financial or operating predictions of revenue, earnings, cash flow or cash position, (F) any wildfire occurring after the Petition Date and prior to January 1, 2020, and (G) one or more wildfires, occurring on or after January 1, 2020, that destroys or damages fewer than 500 dwellings or commercial structures ("***Structures***") in the aggregate (it being understood that (I) the exceptions in clauses (D) and (E) shall not prevent or otherwise affect a determination that the underlying cause of any such change, decline or failure referred to therein is a Material Adverse Effect and

Case: 19-30088    Doc# 3844    Filed: 09/09/19    Entered: 09/09/19 15:14:13    Page 82 of 135

(II) a Material Adverse Effect shall include the occurrence of one or more wildfires on or after January 1, 2020 destroying or damaging at least 500 Structures within PG&E's service area where none of the following are true with respect any such wildfire (a) the portion of PG&E's system at the location of such wildfire was not de-energized; (b) there has been no determination by a final order that such wildfire was caused by a person or entity other than the Utility; and (c) there has been no determination that such wildfire was not caused by the negligence or intentional misconduct of the Utility by a final order of a court having jurisdiction).

5.      <u>Termination by the Backstop Party</u>.  Subject to the last paragraph of this Section 5, the Backstop Party may terminate this Backstop Commitment Letter, solely as to itself, by written notice (which shall describe the basis for such termination), on or after the occurrence of any of the following:

a.      the Plan has not been filed with the Bankruptcy Court by 11:59 p.m. Pacific Time on September 9, 2019 or the Plan filed with the Bankruptcy Court on or after such date differs from the draft of the Plan attached hereto as Exhibit A;

b.      the condition set forth in Section 4(a) is not satisfied as of November 7, 2019;

c.      the Bankruptcy Court has not entered an order approving this Backstop Commitment Letter on or before November 20, 2019;

d.      subject to Section 11, (i) the Plan has been amended modified or changed, in each case without the consent of the entities holding a majority of the Aggregate Backstop Commitments (such consent not to be unreasonably withheld, conditioned or delayed) or (ii) any Plan Supplement or any Plan Document shall have been filed or finalized without the consent of entities holding a majority of the Aggregate Backstop Commitments (such consent not to be unreasonably withheld, conditioned or delayed);

e.      the Confirmation Order has not been entered by the Bankruptcy Court on or before June 30, 2020 (the "***Outside Date***");

f.      the Effective Date has not occurred on or before 60 days after entry of the Confirmation Order;

g.      the Debtors have failed to perform any of their obligations set forth in this Backstop Commitment Letter, which failure to perform (i) would give rise to the failure of a condition set forth in Section 4(b) or 4(c) and (ii) is incapable of being cured or, if capable of being cured by the Outside Date, the Debtors have not cured within 10 calendar days following receipt by the Debtors of written notice of such failure to perform from the Backstop Party stating the Backstop Party's intention to terminate this Backstop Commitment Letter pursuant to this Section 5(g) and the basis for such termination;

h.      the occurrence of a Material Adverse Effect;

i.      the occurrence of one or more wildfires in the Debtors' service territory after the Petition Date and prior to January 1, 2020 that is asserted by any person to arise out of the Debtors' activities and that destroys or damages more than 500 Structures; *provided, however,* that any notice of termination under this clause (i) must be given on or before January 15, 2020;

j.      the Debtors' aggregate liability with respect to Wildfire Claims is determined (whether (i) by the Bankruptcy Court (or the District Court to which the reference has been partially withdrawn for estimation purposes), (ii) pursuant to an agreement between the Debtors and the holders of Wildfire Claims, or (iii) through a combination thereof) to exceed $17.9 billion (the "***Wildfire Claims Cap***"); *provided, however,* that for purposes of this clause (j), (A) any Wildfire Claim that the CPUC has approved or agreed to approve for recovery or pass through by the Utility shall not count in determining the Wildfire Claims Cap, and (B) the Wildfire Claims Cap shall be increased by an amount equal to the amount of Wildfire Claims consisting of professional fees that the Bankruptcy Court (or the District Court to which the reference has been partially withdrawn for estimation purposes) determines to be reasonable;

7

k.       the CPUC fails to issue all necessary approvals, authorizations and final orders to implement the Plan prior to the Outside Date, and to participate in the Go-Forward Wildfire Fund, including: (i) provisions satisfactory to entities holding a majority of the Aggregate Backstop Commitments (such approval not to be unreasonably withheld, conditioned or delayed) pertaining to authorized return on equity and regulated capital structure, (ii) a disposition, satisfactory to entities holding a majority of the Aggregate Backstop Commitments (such approval not to be unreasonably withheld, conditioned or delayed), of proposals for certain potential changes to PG&E's corporate structure and authorizations for the Utility to operate as a utility, (iii) a resolution, satisfactory to entities holding a majority of the Aggregate Backstop Commitments (such approval not to be unreasonably withheld, conditioned or delayed), of claims for monetary fines or penalties under the California Public Utilities Code for conduct prior to the Petition Date, and (iv) approval (or exemption from approval) of the financing structure and securities to be issued under the Plan;

l.       if at any time after the first day of the Confirmation Hearing, asserted Administrative Expense Claims exceed $250 million, excluding all (i) ordinary course Administrative Expense Claims, (ii) Professional Fee Claims, and (iii) Disallowed Administrative Expense Claims;

m.       there is in effect an order of a governmental authority of competent jurisdiction permanently restraining, enjoining or otherwise prohibiting the consummation of any of the transactions contemplated by the Plan, or any law, statute, rule, regulation or ordinance is adopted that makes consummation of the transactions contemplated by the Plan illegal or otherwise prohibited.

PG&E shall promptly provide notice to the Backstop Party of (i) the occurrence of any fact, event, or omission that is not publicly disclosed that gives rise or reasonably can be expected to give rise to a termination right under this Section 5 and (ii) the receipt of any termination notice from any Other Backstop Party, including the asserted basis for such termination, whether or not PG&E concurs therewith.

Upon valid termination of this Backstop Commitment Letter by the Backstop Party (such terminating Backstop Party, a "***Terminating Backstop Party***") pursuant to Section 5(a) through (m), this Backstop Commitment Letter shall be void and of no further force or effect solely with respect to such Terminating Backstop Party is obligated herein, such Terminating Backstop Party shall be released from its Backstop Commitments, undertakings and agreements under or related to this Backstop Commitment Letter, including its Backstop Commitment, except as explicitly provided herein and there shall be no liability or obligation on the part of such Terminating Backstop Party hereunder, except as expressly provided herein.  Notwithstanding any termination by a Terminating Backstop Party, PG&E shall remain liable for the payment of all earned Backstop Commitment Premiums and expense reimbursement obligations in this Backstop Commitment Letter.

The Backstop Party's obligations under this Backstop Commitment Letter shall automatically terminate in the event that PG&E has not returned a counter-signed copy of this Backstop Commitment Letter agreeing to its terms on or before the date that is two weeks from the day the Backstop Party furnished a signed copy of this Backstop Commitment Letter to PG&E.

The Backstop Party may not seek to (i) assert the failure of any condition precedent to any of its obligations or agreements under this Backstop Commitment Letter or (ii) terminate this Backstop Commitment Letter (including pursuit of any other remedies), in each case unless the Backstop Party has given written notice to PG&E of such assertion or termination.

Notwithstanding anything in this Backstop Commitment Letter to the contrary, any notice of termination under clauses (d), (g), (h), (i), (k), (l) and (m) shall not be effective unless PG&E has received notices of termination from entities constituting a majority of the outstanding Aggregate Backstop Commitments with respect to the event or circumstance that is the basis for such notice of termination. PG&E shall provide the Backstop Party with a notice of such effective termination within two business days of the effectiveness of the termination.

In the event that any fact or circumstance would give the Backstop Party the right to terminate under more than one clause in this Section 5, the exercise of a termination right under any one clause shall not prejudice the Backstop Party from exercising a termination right under any other clause based on the same event or circumstance.

6. <u>Termination by PG&E; Defaulting Backstop Party; Extension Options</u>. PG&E may terminate this Backstop Commitment Letter (including all Backstop Commitments hereunder) (a) at any time prior to countersigning such Backstop Commitment Letter, (b) if, on any date after November 7, 2019, the condition set forth in Section 4(a) would not be satisfied if tested on such date, (c) in the event of a material breach of a representation or warranty of the Backstop Party set forth in Section 3, (d) in the event that the Backstop Party repudiates this Backstop Commitment Letter, purports to terminate this Backstop Commitment Letter if such purported termination is not a valid termination of this Backstop Commitment Letter as determined in a final order of a court with jurisdiction or fails to fund its Backstop Commitment when required to do so in accordance with this Backstop Commitment Letter, (e) if the Backstop Commitment Amount has been reduced to zero in accordance with Section 7, (f) if the Backstop Party has the right to terminate this Backstop Commitment Letter under clause (h), (i), (j) or (m) of Section 5, or (g) if (i) a third party makes a binding proposal to acquire at least 50% of the outstanding PG&E common stock (including by means of a merger, joint venture, partnership, consolidation, dissolution, liquidation, tender offer, recapitalization, reorganization, share exchange, business combination or similar transaction), (ii) either (x) the implementation of such proposal would require the approval of holders of a majority of the PG&E common stock or (y) the price contemplated by such proposal would exceed 125% of the Equity Offering Cap, and (iii) the Board determines in good faith, after consultation with PG&E's outside legal counsel, that the failure to terminate this Backstop Commitment Letter in response to such proposal would be inconsistent with the exercise of its fiduciary duties to the stockholders of PG&E under applicable law. In the event of a breach, repudiation, purported termination or failure to fund contemplated by the foregoing clause (c) or (d), the Backstop Party shall be deemed to be a "***Defaulting Backstop Party***". In the event that the Backstop Party becomes a Defaulting Backstop Party, then PG&E may, upon notice to such Defaulting Backstop Party, require the Backstop Party to assign and delegate, without recourse, all its interests, rights (other than any Backstop Commitment Premiums earned prior to the date of such assignment and delegation) and obligations under this Backstop Commitment Letter to a third party that shall assume such obligations (which assignee may be an Other Backstop Party, if an Other Backstop Party accepts such assignment and delegation). Notwithstanding any termination by PG&E under Sections 6(b), (e), (f) or (g), PG&E shall remain liable for the payment of all earned Backstop Commitment Premiums and expense reimbursement obligations in this Backstop Commitment Letter.

In the event that any fact or circumstance would give PG&E the right to terminate under more than one clause in this Section 6, the exercise of a termination right under any one clause shall not prejudice PG&E from exercising a termination right under any other clause based on the same event or circumstance.

Notwithstanding anything to the contrary herein, this Backstop Commitment Letter shall automatically terminate on January 20, 2020 (the "***Initial Termination Date***"). Provided that this Backstop Commitment Letter remains in full force and effect and has not been otherwise terminated, PG&E may extend the Initial Termination Date to April 30, 2020 (the "***First Extension Date***") upon providing written notice to the Backstop Party of its intent to exercise this option (the "***First Extension Notice***") no later than three days prior to the Initial Termination Date. In the event that PG&E has provided the Backstop Party a timely and proper First Extension Notice and this Backstop Commitment Letter remains in full force and effect, PG&E may extend the First Extension Date to the Outside Date (the "***Second Extension Date***") upon providing written notice to the Backstop Party of its intent to exercise this option (the "***Second Extension Notice***") no later than three days prior to the First Extension Date. In the event that PG&E has provided the Backstop Party a timely and proper Second Extension Notice and this Backstop Commitment Letter remains in full force and effect, PG&E may extend the Second Extension Date to the 60th day following the Outside Date (the "***Third Extension Date***") upon providing written notice to the Backstop

9

Party of its intent to exercise this option (the "***Third Extension Notice***") no later than three days prior to the Second Extension Date.

7.     Reduction of Commitments by PG&E.

a.     In the event that on or prior to November 7, 2019, PG&E receives Aggregate Backstop Commitments that exceed the Equity Offering Cap (such excess, the "***Overallotment Amount***"), then, on November 8, 2019 (the "***Allocation Date***"), the Backstop Commitment Amount shall be automatically reduced by an amount equal to (i) the Overallotment Amount, *times* (ii) a fraction, (A) the numerator of which is the Backstop Party's Shares and (B) the denominator of which is the aggregate number of shares of PG&E common stock held by the Backstop Party and the Other Backstop Parties, collectively, as of September 6, 2019 (without double counting any shares beneficially owned, directly or indirectly, by more than one Backstop Party).  Notwithstanding the foregoing, on the Allocation Date, in the event there is an Overallotment Amount and for the purpose of curing such Overallotment Amount, PG&E may reduce the Backstop Commitment Amount as to any Backstop Party to the extent such reduction is reasonably advisable (based on the advice of the Debtors' tax advisors after consultation with Jones Day) in order to avoid an "ownership change" within the meaning of Section 382 and the Treasury Regulations promulgated thereunder or to otherwise preserve the ability of the Debtors to utilize their NOLs; *provided* that such reduction may not be below the amount of Backstop Commitments at which such Backstop Party would maintain its existing percentage ownership of the total outstanding shares of PG&E common stock.  Within three business days of the Allocation Date, PG&E shall provide the Backstop Party with a notice of any adjustment to its Backstop Commitment Amount under this Section 7(a).

b.     In the event that, after November 7, 2019, the Debtors (i) receive binding commitments providing for funding from any Additional Capital Sources that (A) have conditions to funding and commitment termination rights that are no less favorable to PG&E than those in this Backstop Commitment Letter and (B) are approved by an order of the Bankruptcy Court, or (ii) actually obtain funding from any Additional Capital Sources, then (x) in the case of clause (i), PG&E may reduce the Backstop Commitment Amount, and (y) in the case of clause (ii), the Backstop Commitment Amount shall be automatically reduced (if not already reduced pursuant to clause (i)), in each case by an amount equal to (A) the amount of such funding, times (B) a fraction, (1) the numerator of which is the Backstop Commitment Amount immediately prior to such reduction and (2) the denominator of which is the Aggregate Backstop Commitments as of immediately prior to such reduction.  Any reduction in the Backstop Commitment pursuant to this Section 7(b) shall not reduce any Backstop Commitment Premium earned prior to the date of such reduction.

c.     In the event that the Debtors consummate any Permitted Equity Offering or Rights Offering, the Backstop Commitment Amount shall be automatically reduced by an amount equal to (i) the net cash proceeds of such Permitted Equity Financing or such Rights Offering plus the proceeds of any Additional Capital Sources, as applicable, *times* (ii) a fraction, (A) the numerator of which is the Backstop Commitment Amount immediately prior to such reduction and (B) the denominator of which is the Aggregate Backstop Commitments as of immediately prior to such reduction.

d.     The Debtors shall provide notice to the Backstop Party in the event that the Backstop Commitment Amount is reduced as required above.  References herein to "Backstop Commitment Amount" or "Backstop Commitment" mean such amounts as adjusted in accordance with the terms of this Backstop Commitment Letter. Any Backstop Commitments that have been terminated or reduced shall be terminated or reduced, as applicable, permanently.

8.     Assignment.  This Backstop Commitment Letter (a) is not assignable by the Backstop Party, and any purported assignment shall be null and void *ab initio*; *provided*, *however*, Backstop Party may assign its Backstop Commitment, in whole or in part, to (i) another Backstop Party, (ii) an affiliate of the Backstop Party, or (iii) an investment fund or separately managed account the primary investment advisor or sub advisor to which is a Backstop Party or an affiliate thereof, to the extent such assignee

Case: 19-30088    Doc# 3844    Filed: 09/09/19    Entered: 09/09/19 15:14:13    Page 86 of 135

Backstop Party agrees in writing to assume all obligations hereunder of such Backstop Party in connection with such Backstop Commitment, and any assignment under this proviso shall not relieve the Backstop Party from its obligations under this Backstop Commitment Letter, and (b) is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person or entity other than the parties hereto. Notwithstanding the foregoing, a Backstop Party may assign all or any portion of its obligations hereunder to a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act of 1933, as amended), without the consent of any party, *provided, however*, that (i) absent the prior written consent of PG&E, such assignee (including any Entity) does not, and as a result of such assignment will not, beneficially own more than 4.75% of the Aggregate Backstop Commitments and (ii) any assignment under this sentence shall not relieve the Backstop Party from its obligations under this Backstop Commitment Letter.

9.      Entire Agreement.  This Backstop Commitment Letter, including all exhibits hereto, constitutes the entire understanding among the parties hereto with respect to the subject matter hereof and replaces and supersedes all prior agreements and understandings, both written and oral, between the parties hereto with respect to the subject matter hereof and, subject to the terms hereof, shall become effective and binding upon the mutual exchange of fully executed counterparts by each of the parties hereto.

10.      Governing Law; Consent to Jurisdiction; Waiver of Jury Trial.  This Backstop Commitment Letter shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction.  By its execution and delivery of this Backstop Commitment Letter, each of the parties hereto irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Backstop Commitment Letter or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought only in the Bankruptcy Court.  By execution and delivery of this Backstop Commitment Letter, each of the parties hereto irrevocably accepts and submits itself to the exclusive jurisdiction of the Bankruptcy Court with respect to any such action, suit or proceeding.  EACH PARTY HERETO UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO ABOVE.

11.      Amendment; Waiver; Counterparts.  This Backstop Commitment Letter may not be amended or waived by or on behalf of the Backstop Party, and no consent may be given hereunder by or on behalf of the Backstop Party (including to an amendment or waiver of any provision of the Plan), except in writing signed by the holders of a majority of the Aggregate Backstop Commitments (whether or not the Backstop Party signs such amendment or waiver), and confirmed in writing by the Company; *provided, however,* that without the prior written consent of the Backstop Party, this Backstop Commitment Letter may not be amended to (a) increase the amount of the Backstop Commitment Amount or Backstop Commitment, (b) decrease the Backstop Commitment Premium, (c) extend the Backstop Commitment beyond the Third Extension Date, (d) amend the definition of "Backstop Price" or any component thereof, and (e) amend, modify, or waive the condition in Section 4(d).  This Backstop Commitment Letter may be executed in any number of counterparts, each of which will be an original, and all of which, when taken together, will constitute one agreement.  Delivery of an executed counterpart of this Backstop Commitment Letter by e-mail or portable document format (PDF) will be effective as delivery of a manually executed counterpart of this Backstop Commitment Letter.

12.      Notices.  All notices required or permitted to be given under this Backstop Commitment Letter, unless otherwise stated herein, shall be given by overnight courier at the addresses specified below, or at such other address or addresses as a party may designate for itself in writing, or by email (if confirmed) at the email addresses specified below:

If to the Backstop Party, to the name, address and email address located on the Backstop Party's signature page to this Backstop Commitment Letter.

Case: 19-30088    Doc# 3844    Filed: 09/09/19    Entered: 09/09/19 15:14:13    Page 87 of 135

If to the Debtors:

> PG&E Corporation
> 77 Beale Street
> P.O. Box 770000
> San Francisco, California 94177
> Attention: Janet Loduca, Senior Vice President and General Counsel
> Email: J1Lc@pge.com
>
> with a copy to:
>
> Cravath, Swaine & Moore LLP
> 825 Eighth Avenue
> New York, New York 10019
> Attention: Richard Hall; Paul Zumbro
> Email: RHall@cravath.com; PZumbro@cravath.com
>
> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York 10153
> Attention: Stephen Karotkin
> Email: Stephen.karotkin@weil.com

    13.    <u>No Liability</u>.  Notwithstanding anything that may be expressed or implied in this Backstop Commitment Letter, each party hereto acknowledges and agrees that no person other than the Backstop Party (and it permitted assigns) shall have any obligation hereunder (subject to the limitations provided herein) or in connection with the transactions contemplated hereby and that (a) notwithstanding that any Backstop Party may be a partnership, limited partnership or limited liability company, no recourse (whether at law, in equity, in contract, in tort or otherwise) hereunder or under any document or instrument delivered in connection herewith, or in respect of any oral representations made or alleged to be made in connection herewith or therewith, shall be had against any former, current or future direct or indirect equity holder, controlling person, general or limited partner, shareholder, member, investment manager or adviser, manager, director, officer, employee, agent, affiliate, assignee, representative or financing source of any of the foregoing) (any such person or entity, other than such Backstop Party, a "***Related Party***") or any Related Party of any such Related Party, including, without limitation, any liabilities arising under, or in connection with, the Plan or this Backstop Commitment Letter and the transactions contemplated thereby and hereby, or in respect of any oral representations made or alleged to be made in connection therewith or herewith), whether by the enforcement of any judgment or assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law and (b) no personal liability whatsoever will attach to, be imposed on or otherwise be incurred by any Related Party of the Backstop Party or any Related Party of any such Related Party under this Backstop Commitment Letter or any document or instrument delivered in connection herewith or with the Plan Term Sheet or the Plan (or in respect of any oral representation made or alleged to be made in connection herewith or therewith) or for any action (whether at law, in equity, in contract, in tort or otherwise) based on, in respect of, or by reason of such obligations hereunder or by their creation.

    14.    <u>Plan Support</u>.  For as long as this Backstop Letter Agreement is in effect, the Backstop Party shall (i) use all reasonable efforts to support the Plan with respect to the treatment of HoldCo Common Interests and to act in good faith to consummate the Plan with respect to any Equity Offering and the

Case: 19-30088   Doc# 3844   Filed: 09/09/19   Entered: 09/09/19 15:14:13   Page 88 of 135

Backstop Commitments, (ii) to the extent the Backstop Party is entitled to vote on the Plan, timely vote (or cause to be voted) all of its HoldCo Common Interests and Claims to accept the Plan (and not to change or withdraw any such vote), and (iii) timely vote (or cause to be voted) its HoldCo Common Interests and Claims to reject any plan of reorganization other than the Plan.

15.     The Backstop Party shall not be required, pursuant to the terms of this Backstop Commitment Letter, to acquire or purchase any securities or indebtedness in connection with any Equity Offering that, pursuant to the terms of a Backstop Commitment Letter or other agreement, are to be acquired or subscribed for by any other party, nor shall the Backstop Party be required, pursuant to the terms of this Backstop Commitment Letter, to pay any money or other consideration, or exchange any claims whatsoever, which are owing from, or to be transferred from or by, any other party pursuant to the terms of another Backstop Commitment Letter or other agreement. Nothing in this Backstop Commitment Letter shall be deemed to constitute an agreement or a joint venture or partnership with or between any other person or entity nor constitute any party as the agent of any other person or entity for any purpose. For the avoidance of doubt, no Backstop Party shall, nor shall any action taken by a Backstop Party hereunder, be deemed to be acting in concert with any other person or entity with respect to the Backstop Commitment or any other matter nor shall the Backstop Commitments hereunder create a presumption that the Backstop Party is in any way acting in concert or as a group with any other person or entity whether as a result of this commitment or otherwise.

16.     Each party hereto confirms that it has made its own decision to execute this Backstop Commitment Letter based upon its own independent assessment of documents and information available to it, as it has deemed appropriate.

17.     Except as expressly provided in this Backstop Commitment Letter, (a) nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each party hereto to protect and preserve its rights, remedies and interests, including, without limitation, any claims against or interests in any of the Debtors or other parties, or its full participation in any bankruptcy proceeding, and (b) the parties hereto each fully preserve any and all of their respective rights, remedies, claims and interests as of the date hereof and upon a termination of this Backstop Commitment Letter. Further, nothing in this Backstop Commitment Letter shall be construed to prohibit any party hereto from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are consistent with this Backstop Commitment Letter and the Plan, and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying or preventing the consummation of the transactions contemplated by the Plan.

[signature page follows]

Case: 19-30088    Doc# 3844    Filed: 09/09/19    Entered: 09/09/19 15:14:13    Page 89 of 135

Sincerely,

Backstop Party:

**WHITECREST PARTNERS, LP**

By:    Abrams Capital Management, L.P.,
       its investment manager

By:    Abrams Capital Management, LLC,
       its general partner

By:    _____
Name:  David Abrams
Title:   Managing Member

Notice Information:
Alison Bomberg
222 Berkeley Street, 21st Floor
Boston, MA 02116
abomberg@abramscapital.com

14

Accepted and agreed this 9th day of September, 2019, by:

PG&E CORPORATION

By: _____

Name: Janet C. Loduca
Title: Senior Vice President and General Counsel

**Exhibit A**
**Plan of Reorganization**

See the *Debtors' Joint Chapter 11 Plan of Reorganization* filed at Docket No. 3841.

**Exhibit B**
**Mandatory Preferred Stock Term Sheet**

**Term Sheet for**
**5.00% Mandatory Convertible Preferred Stock**

| | |
|---|---|
| Issuer: | PG&E Corporation ("***PG&E***") |
| Title of Securities: | 5.00% Mandatory Convertible Preferred Stock of PG&E (the "***Mandatory Convertible Preferred Stock***") |
| Shares of Mandatory Convertible Preferred Stock Offered by PG&E: | Up to [●] shares |
| Offering Price: | $1,000 per share of the Mandatory Convertible Preferred Stock |
| Issue Date: | The Effective Date of the Plan |
| Liquidation Preference: | $1,000 per share |
| Dividends: | 5.00% of the Liquidation Preference of $1,000 per share of the Mandatory Convertible Preferred Stock per year (equivalent to $50 per annum per share), when, as and if declared by the Board, payable in cash or, by delivery of additional shares of Mandatory Convertible Preferred Stock or any combination of cash and shares of Mandatory Convertible Preferred Stock, as determined by PG&E in its sole discretion |
| Floor Price: | 100% of the Initial Price, subject to standard anti-dilution adjustments |
| Dividend Payment Dates: | If declared, January 1, April 1, July 1 and October 1 of each year, commencing on (TBD) |
| Dividend Record Dates: | The March 15, June 15, September 15 and December 15 immediately preceding the next dividend payment date |
| Redemption: | The Mandatory Convertible Preferred Stock will be redeemable on terms and conditions to be determined |
| Initial Price: | A per share price equal to (a) the greater of (i) an Implied P/E Multiple of 13.5 or (ii) the Implied P/E Multiple of a Permitted Equity Offering, *times* (b) the Normalized Estimated Net Income as of the Determination Date, *divided by* (c) the number of fully diluted shares of PG&E (calculated using the treasury stock method) that will be outstanding as of the Effective Date. |
| Threshold Appreciation Price: | 110% of the Initial Price, subject to standard ant-dilution adjustments |
| Mandatory Conversion Date: | 1/8[th] of the Mandatory Convertible Preferred Stock will convert into PG&E common stock 90, 180, 270, 360, 450, 540, 630, and 720 days from Issue Date |

Case: 19-30088    Doc# 3844    Filed: 09/09/19    Entered: 09/09/19 15:14:13    Page 95 of 135

| Conversion Rate: | Upon conversion on the Mandatory Conversion Date, the conversion rate for each share of the Mandatory Convertible Preferred Stock will be not more than [●] shares of PG&E common stock (the "***Maximum Conversion Rate***") and not less than [●] shares of PG&E common stock (the "***Minimum Conversion Rate***"), depending on the Applicable Market Value of the PG&E common stock subject to standard anti-dilution adjustments. The following table illustrates the conversion rate per share of the Mandatory Convertible Preferred Stock (in each case, subject to standard anti-dilution adjustments): |
|---|---|

| **Applicable Market Value of the PG&E Common Stock** | **Conversion rate (number of shares of PG&E Common Stock to be received upon conversion of each share of the Mandatory Convertible Preferred Stock)** |
|---|---|
| Greater than 110% of the Initial Price (which is the Threshold Appreciation Price) | [●] shares (approximately equal to $1,000 divided by the Threshold Appreciation Price) |
| Equal to or less than the Threshold Appreciation Price but greater than or equal to the Floor Price | Between [●] and [●] shares, determined by dividing $1,000 by the Applicable Market Value of the PG&E common stock |
| Less than the Floor Price | [●] shares (approximately equal to $1,000 divided by the Floor Price) |

| Applicable Market Value: | The "***Applicable Market Value***" shall be the 10-trading day VWAP immediately preceding the applicable Mandatory Conversion Date |
|---|---|
| Conversion at the Option of the Holder: | At any time prior to final Mandatory Conversion Date, holders of the Mandatory Convertible Preferred Stock have the option to elect to convert their shares of the Mandatory Convertible Preferred Stock in whole or in part (but in no event less than one share of the Mandatory Convertible Preferred Stock), into shares of PG&E common stock at the Minimum Conversion Rate of shares of PG&E common stock per share of the Mandatory Convertible Preferred Stock. This Minimum Conversion Rate is subject to standard anti-dilution adjustments. |
| Limitation on Ownership | No holder, together with persons who have a formal or informal understanding with such assignee to make a coordinated acquisition of stock, shall acquire beneficial ownership (within the meaning of Section 382 and the Treasury Regulations) of more than 4.75% of the outstanding Mandatory Convertible Preferred Stock without the prior written consent of PG&E. |

19

## Exhibit C
## Backstop Terms

| Backstop Party | Backstop Commitment Amount |
|---|---|
| Whitecrest Partners, LP | $39,671,000.00 |

### Payments

The Backstop Commitment Premium shall be earned as follows:

- 75 basis points of the Backstop Commitment Premium shall be earned on the later to occur of (a) the date that the Backstop Party and PG&E have fully executed this Backstop Commitment Letter and (b) Bankruptcy Court approval of this Backstop Commitment Letter, unless this Backstop Commitment Letter shall have earlier been terminated;

- 125 basis points of the Backstop Commitment Premium shall be earned on the date on which the Backstop Party receives the First Extension Notice;

- 250 basis points of the Backstop Commitment Premium shall be earned on the date on which the Backstop Party receives the Second Extension Notice; and

- 50 basis points of the Backstop Commitment Premium shall be earned on the date on which the Backstop Party receives the Third Extension Notice

In addition, if PG&E terminates this Backstop Commitment Letter pursuant to Section 6(g), 100% of the Backstop Commitment Premium shall be fully earned and become due and payable in cash three business days after the date of such termination.

Except as provided in the immediately preceding paragraph, the Backstop Commitment Premium shall be payable in shares of New HoldCo Common Stock to be issued on the Effective Date, based on the Backstop Price.

### Certain Defined Terms

"*Applicable Utility Index Multiple*" shall mean the average normalized 2021 estimated price-to-earnings ratio of the U.S. regulated utilities in the S&P 500 Utilities (Sector) Index (after excluding AES, AWK, EXC, NRG, PEG, and PPL) over the 20-day trading period before the applicable measurement date per Capital IQ Consensus Estimates.

"*Backstop Commitment Premium*" shall mean a commitment premium equal to 500 basis points on the total amount of Backstop Commitment Amount. If and when any portion of the Backstop Commitment Premium is earned in accordance with the foregoing provisions of this Exhibit C, (a) it shall be calculated by reference to the Backstop Commitment Amount in effect at the time of such earning, and (b) the amount of the Backstop Commitment Premium so earned shall not be subject to reduction based upon any subsequent reduction of the Backstop Commitment Amount or termination of this Backstop Commitment Letter, other than termination pursuant to Section 6(c) or 6(d) of this Backstop Commitment Letter.

"*Backstop Multiple*" shall mean the lesser of (a) 10 and (b) 10 *times* one *plus* the percentage change of the Applicable Utility Index Multiple as measured on the date of this Backstop Commitment Letter and

the fifth business day prior to the Effective Date. For the avoidance of doubt, the Backstop Multiple shall never exceed 10.

"**Backstop Price**" means (a) the Backstop Multiple *times* (b) the Normalized Estimated Net Income as of the Determination Date, *divided by* (c) the number of fully diluted shares of PG&E (calculated using the treasury stock method) that will be outstanding as of the Effective Date (assuming all equity is raised by funding all Aggregate Backstop Commitments).

"**Board**" means the Board of Directors of PG&E. With respect to any matter, references to the Board include a committee of the Board that is duly authorized to act with respect to such matter.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Determination Date**" shall mean the earlier of (a) the first day of the Confirmation Hearing and (b) if (i) the Per Share Price for a Permitted Equity Offering is to be finally determined prior to such first day, the date of such determination or (ii) if the exercise price of the Rights is finally determined prior to such first day, the date of such determination.

"**Normalized Estimated Net Income**" shall mean, in each case with respect to the estimated year 2021, (a) on a component-by-component basis (e.g., distribution, generation, gas transmission and storage, and electrical transmission), the sum of (i) the Utility's estimated earning rate base for such component, *times* (ii) the equity percentage of the Utility's authorized capital structure, *times* (iii) the Utility's authorized rate of return on equity for such component, *less* (b) the projected post-tax difference in interest expense or preferred dividends for the entire company and the authorized interest expense or preferred dividends expected to be collected in rates, *less* (c) without duplication of any amount included in clause (b), the amount of any post-tax offset or credit to any charge imposed in connection with the issuance of Wildfire Victims Recovery Bonds, if any, *less* (d) the amount of the Utility's post-tax annual contribution to the Go-Forward Wildfire Fund.

"**Section 382**" means Section 382 of the Code, or any successor provision or replacement provision.

"**Treasury Regulations**" means final, temporary and proposed tax regulations promulgated under the Code, as amended.

Case: 19-30088    Doc# 3844    Filed: 09/09/19    Entered: 09/09/19 15:14:13    Page 98 of 135

September 9, 2019

PG&E Corporation
77 Beale Street
P.O. Box 770000
San Francisco, California 94177

      Re: Chapter 11 Plan Backstop Commitment Letter

Ladies and Gentlemen:

      Reference is hereby made to the chapter 11 bankruptcy cases, lead case no. 19-30088 (the "***Chapter 11 Cases***"), currently pending before the United States Bankruptcy Court for the Northern District of California (the "***Bankruptcy Court***"), in which PG&E Corporation ("***PG&E***" or the "***Company***") and Pacific Gas and Electric Company (the "***Utility***" and together with PG&E, the "***Debtors***") are debtors in possession. Reference is further made to the Chapter 11 plan of reorganization attached hereto as Exhibit A (the "***Plan***") to implement the terms and conditions of the reorganization of the Debtors as provided therein. Capitalized terms used in this backstop commitment letter (this "***Backstop Commitment Letter***") or in the exhibits hereto but not otherwise defined shall have the meanings ascribed to them in the Plan. The word "including" means "including, without limitation".

      In order to facilitate the Debtors' emergence from Chapter 11, pursuant to this Backstop Commitment Letter, and subject to the terms, conditions and limitations set forth herein and in consideration for the Backstop Commitment Premium, the undersigned Backstop Party (the "***Backstop Party***") is willing to purchase, on the Effective Date, an amount of New HoldCo Common Stock up to its Backstop Commitment Amount (as defined herein) at the Backstop Price (as defined herein).

      In addition, PG&E has separately solicited and negotiated and expects to enter into substantially similar backstop commitment letters ("***Other Backstop Commitment Letters***") with other funding sources ("***Other Backstop Parties***") pursuant to which such Other Backstop Parties will commit to purchase New HoldCo Common Stock on the Effective Date (such commitments, "***Other Backstop Commitments,***" and together with this Backstop Commitment, the "***Aggregate Backstop Commitments***").

      1.    Equity Offerings.

      a.    Structure. The Plan, among other things, shall provide that, on the Effective Date, Reorganized HoldCo shall issue shares of New HoldCo Common Stock for up to $14 billion of aggregate net cash proceeds to Reorganized Holdco (the "***Equity Offering Cap***"). PG&E shall structure the offering of any such shares of New HoldCo Common Stock (or rights pursuant to which any such shares may be issued or other securities convertible into any such shares) (the "***Equity Offering***") in accordance with the terms of this Section 1, including the following parameters:

      (i)    if the Implied P/E Multiple with respect to such Equity Offering equals or exceeds the greater of (A) 13.5 and (B) 13.5 *times* one *plus* any percentage change of the Applicable Utility Index Multiple (as defined herein) as measured on the date of this Backstop Commitment Letter and the Determination Date (as defined herein), then PG&E shall be permitted to conduct the Equity Offering in any form of primary equity offering (including any public offering, regular way offering, at-the-market equity offering, block trade, modified Dutch auction or other auction pricing mechanism, rights offering, private placement, "PIPE" sale or other registered or unregistered transaction) upon such terms and conditions as may be determined by the Board (a "***Permitted Equity Offering***"), including such terms and conditions that are reasonably advisable (based on the advice of the Debtors' tax advisors after consultation

1

with Jones Day) in order to avoid an "ownership change" within the meaning of Section 382 and the Treasury Regulations promulgated thereunder or to otherwise preserve the ability of the Debtors to utilize their net operating loss carryforwards and other tax attributes (collectively, the "**NOLs**");

        (ii)     if the Implied P/E Multiple with respect to the Equity Offering is less than the Implied P/E Multiple required for a Permitted Equity Offering in Section 1(a)(i) above, but equals or exceeds the lesser of (A) 12 and (B) 12 *times* one *plus* the percentage change of the Applicable Utility Index Multiple as measured on the date of this Backstop Commitment Letter and the Determination Date (the "***Rights Offering Threshold Multiple***"), then PG&E shall structure the Equity Offering such that (Y) at least 80%, determined assuming the exercise in full of all of the Rights, of the aggregate cash proceeds of the Equity Offering is to be raised through the exercise of purchase rights (the "***Rights***") distributed to holders of PG&E common stock ("***Existing Shareholders***") as of a record date to be determined by the Board (the "***Record Date***") to purchase shares of New HoldCo Common Stock for cash at a price set forth below (the "***Rights Offering***") and (Z) the balance of the aggregate cash proceeds of the Equity Offering is to be raised through any other form of primary equity offering (including any public offering, regular way offering, at-the-market equity offering, block trade, modified Dutch auction or other auction pricing mechanism, private placement, "PIPE" sale or other registered or unregistered transaction), provided, that entities holding a majority of the Aggregate Backstop Commitments have not objected to the identity of the purchasers and ultimate purchasers, as applicable, in such Equity Offering, to the extent such Equity Offering is not a broadly syndicated underwritten public offering, within three business days of receipt of notice from PG&E;

        (iii)    in both of paragraphs (i) and (ii) above, Reorganized Holdco may also raise equity capital (subject to the Equity Offering Cap) by calling on the Backstop Commitments (after giving effect to any reduction of the Backstop Commitments in connection with a Permitted Equity Offering or a Rights Offering, as applicable); and

        (iv)    if the Implied P/E Multiple with respect to the Equity Offering would be less than the Rights Offering Threshold Multiple or if for any other reason Reorganized Holdco is unable to execute an Equity Offering, then Reorganized Holdco shall not utilize either a Permitted Equity Offering or a Rights Offering and shall issue shares at the Backstop Price pursuant to the Backstop Commitments up to the Equity Offering Cap *less* the proceeds of any Additional Capital Sources.

    "***Implied P/E Multiple***" means, with respect to any Equity Offering, (A) the price per share at which shares of New Holdco Common Stock are offered to be sold in such Equity Offering (which price (x) in the case of an Equity Offering of rights, shall be the exercise price to acquire a share of New HoldCo Common Stock pursuant to such rights or (y) in the case of an Equity Offering of a security convertible into or exchangeable for shares of New Holdco Common Stock, shall be the per share price implied by the conversion ratio used to convert the principal amount, liquidation preference or other face amount of such security into a number of shares of New HoldCo Common Stock) (the "***Per Share Price***"), *times* (B) the number of fully diluted shares of PG&E (calculated using the treasury stock method) that will be outstanding as of the Effective Date (assuming such Equity Offering and all other equity transactions contemplated by the Plan are consummated and settled on the Effective Date), *divided by* (C) the Normalized Estimated Net Income as of the Determination Date.

       b.    <u>Additional Capital Sources</u>.  PG&E shall conduct the Equity Offering in accordance with the Plan. The net cash proceeds to PG&E of the Equity Offering shall not exceed the Equity Offering Cap, *less* the sum of (i) the principal amount of debt that is issued by PG&E in excess of $7 billion in connection with the Plan; (ii) the aggregate liquidation preference of preferred stock

("**_Mandatory Convertible Preferred Stock_**") that is distributed pursuant to the Plan to holders of Wildfire Claims, on the terms and conditions set forth on Exhibit B pursuant to the Plan; (iii) the principal amount of any Wildfire Victim Recovery Bonds issued in connection with the Plan; (iv) the proceeds of any preferred stock issued by the Utility (excluding any Utility Preferred Interests that are Reinstated pursuant to the Plan); (v) the proceeds of any third-party transactions based upon the monetization of any NOLs; and (vi) the principal amount of any other debt that is issued or reinstated by the Utility, excluding any debt that may be issued under clause (v) above, in excess of $27.35 billion in connection with the Plan (the "**_Additional Capital Sources_**").

  c.  Rights Offering.  With respect to the Rights Offering:

    (i)  the Rights will have a fixed exercise price equal to (a) the Rights Offering Threshold Multiple *times* (b) the Normalized Estimated Net Income as of the Determination Date, *divided by* (c) the number of fully diluted shares of PG&E (calculated using the treasury stock method) that will be outstanding as of the Effective Date (assuming all equity is raised by the exercise of all Rights);

    (ii)  the Rights shall be transferable;

    (iii)  the Board shall provide that holders of Rights who fully exercise their Rights will have over-subscription privileges to subscribe for additional shares of New HoldCo Common Stock to the extent other Rights are not exercised, with over-subscription procedures (including pro-ration rules) determined by the Board;

    (iv)  the Board may provide that the Rights or Rights Offering include such terms and conditions that are reasonably advisable (based on the advice of the Debtors' tax advisors after consultation with Jones Day) in order to avoid an "ownership change" within the meaning of Section 382 and the Treasury Regulations promulgated thereunder or to otherwise preserve the ability of the Debtors to utilize their NOLs, including limitations on the amount of Rights that are exercisable by holders who, together with persons who have a formal or informal understanding with such holders to make a coordinated acquisition of stock within the meaning of Treasury Regulations 1.382-3(a) (an "**_Entity_**"), beneficially own in excess of a specified percentage (e.g., 4.75%) of the outstanding shares of PG&E common stock, subject to exceptions to be determined by the Board; provided, however, that such terms and conditions shall not restrict existing holders of PG&E common stock (including any Entity) from acquiring shares that do not increase their aggregate beneficial ownership to more than 4.75% of the outstanding shares of PG&E common stock immediately after the completion of the Rights Offering; and

    (v)  the Rights will have such other terms and conditions as may be determined by the Board, as long as such other terms and conditions  are consistent with the Plan and with every other provision of this Backstop Commitment Letter.

  d.  Subordinated Claims.  To the extent provided in the Plan, the Debtors may issue Rights or New HoldCo Common Stock to holders of Claims against a Debtor that are subject to subordination pursuant to section 510(b) of the Bankruptcy Code and that arise from or are related to any equity security of the Debtor.

  e.  Documentation.  The definitive documentation for any Permitted Equity Offering or any Rights Offering shall be consistent with the Plan.  For the avoidance of doubt, the organizational documents of the Reorganized HoldCo (including its charter) may include limitations and other terms that are reasonably advisable (based on the advice of the Debtors' tax advisors after consultation with Jones Day) in order to avoid an "ownership change" within the meaning of Section 382 and the Treasury Regulations promulgated thereunder or to otherwise preserve the ability of the Debtors to utilize their

Case: 19-30088   Doc# 3844   Filed: 09/09/19   Entered: 09/09/19 15:14:13   Page 101 of 135

NOLs; provided, however, that the organizational documents shall not be modified or amended in a manner that would restrict existing holders of PG&E common stock (including any Entity) from acquiring shares that do not increase their aggregate beneficial ownership to more than 4.75% of the outstanding shares of PG&E common stock immediately after the completion of the Rights Offering.

    f.  Use of Proceeds.  The Debtors shall only use the proceeds of an Equity Offering to fund obligations to holders of Wildfire Claims under the Plan.

    g.  Notices.  Promptly, and in any event, within two days of the Board's determination of final pricing of any Equity Offering, PG&E shall publicly disclose the form, structure, amount and terms of such Equity Offering, including the Implied P/E Multiple for such Equity Offering.  PG&E shall give the Backstop Party, as soon as reasonably practicable, but in no event later than two business days prior to the Effective Date, (i) written notification setting forth (A) the amount to be funded pursuant to the Backstop Commitment, (B) an estimate of the Backstop Price and (C) the targeted Effective Date and (ii) a subscription form to be completed by the Backstop Party, or other instructions, to facilitate the Backstop Party's subscription for the New HoldCo Common Stock.

    h.  Cooperation.  As reasonably requested by the Debtors, the Backstop Party shall reasonably cooperate with the Debtors with respect to providing information relevant to the preservation of the Debtors' Tax Attributes, including information regarding (i) the number of shares of PG&E common stock owned by such party (on a holder-by-holder basis) prior to the Rights Offering and (ii) the amount of Rights exercised and shares of New HoldCo Common Stock purchased pursuant to the Backstop Commitment by such persons.

    2.  Backstop.

    a.  Subject to the terms and conditions set forth herein and to the payment and provision of premium to the Backstop Party as provided in Section 2(c), the Backstop Party, solely on behalf of itself, hereby commits to purchase on the Effective Date an amount of shares of New HoldCo Common Stock at the Backstop Price (the "***Backstop Commitment***") up to the dollar amounts set forth on Exhibit B hereto (the "***Backstop Commitment Amount***").

    b.  PG&E and the Backstop Party shall cooperate in good faith to prepare and deliver a subscription agreement and any other documentation necessary to effect the private placement of New HoldCo Common Stock to the Backstop Party in accordance with the terms of this Backstop Commitment Letter, which documentation shall be consistent with this Backstop Commitment Letter and the Plan.

    c.  The Debtors agree to pay the Backstop Party the Backstop Commitment Premium to the extent provided on Exhibit B and to reimburse on a regular basis the Backstop Party for the reasonable fees and expenses of Jones Day and a financial advisor incurred prior to termination of this Backstop Commitment Letter in connection with the Plan, the Backstop Commitment Letter, and the transactions contemplated herein, provided that such reimbursement shall not exceed $17 million for Jones Day in the aggregate and $19 million for the financial advisor in the aggregate.  The provisions for the payment of the Backstop Commitment Premium and the other provisions provided herein are an integral part of the transactions contemplated by this Backstop Commitment Letter and without these provisions the Backstop Party would not have entered into this Backstop Commitment Letter, and the Backstop Commitment Premium shall, pursuant to an order of the Bankruptcy Court approving this Backstop Commitment Letter, constitute allowed administrative expenses of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code.

    d.  Reorganized Holdco will enter into a registration rights agreement with the Backstop Party in respect of the shares of New HoldCo Common Stock that the Backstop Party may acquire in accordance with the Plan and this Backstop Commitment Letter, which registration rights agreement shall be in form and substance reasonably acceptable to the holders of a majority of the Aggregate Backstop Commitments.

e.     To the extent that PG&E agrees to terms that are more favorable to an Other Backstop Party in an Other Backstop Commitment Letter (excluding terms relating to the size of such Other Backstop Party's backstop commitment), PG&E shall provide notice of such terms to the Backstop Party no later than 10 days after the Allocation Date and, absent a written objection from the Backstop Party no later than 10 days after the date of such notice, such terms shall be deemed without further action to be incorporated into this Backstop Commitment Letter.

3.     <u>Backstop Party Representations</u>.  The Backstop Party hereby represents and warrants, solely as to itself, that (a) it has all limited partnership, corporate or other power and authority necessary to execute, deliver and perform this Backstop Commitment Letter, (b) the execution, delivery and performance of this Backstop Commitment Letter by it has been duly and validly authorized and approved by all necessary limited partnership, corporate or other organizational action by it, (c) this Backstop Commitment Letter has been duly and validly executed and delivered by it and, assuming due execution and delivery by the other parties hereto, constitutes a valid and legally binding obligation of it, enforceable against it in accordance with the terms of this Backstop Commitment Letter, (d) the execution, delivery and performance by the Backstop Party of this Backstop Commitment Letter do not (i) violate the organizational documents of the Backstop Party or (ii) violate any applicable law or judgment applicable to it, (e) as of the date of this Backstop Commitment Letter, its Backstop Commitment is, and as of the date of commencement of any Rights Offering and as of the Effective Date its Backstop Commitment will be, less than the maximum amount that it is permitted to invest in any one portfolio investment pursuant to the terms of its constituent documents or otherwise, (f) it has, as of the date of this Backstop Commitment Letter, and will have, as of the Effective Date, in the aggregate available undrawn commitments and liquid assets at least in the sum of its Backstop Commitment Amount hereunder, and (g) as of September 2, 2019, it and its affiliates (excluding any affiliate that is an Other Backstop Party) beneficially owned, directly or indirectly, 17,131,521 shares of PG&E common stock and had a "put equivalent position" (as defined in Rule 16a-1 under the Securities Exchange Act of 1934, as amended) of zero shares of PG&E common stock (the number of shares beneficially owned less the number of shares in the put equivalent position being the "***Backstop Party's Shares***").

In addition, the Backstop Party hereby represents and warrants, solely as to itself, as of the date of this Backstop Commitment Letter and as of the Effective Date, that the Backstop Party (i) is acquiring the shares of New HoldCo Common Stock for its own account, solely for investment and not with a view toward, or for sale in connection with, any distribution thereof in violation of any foreign, federal, state or local securities or "blue sky" laws, or with any present intention of distributing or selling such shares in violation of any such laws, (ii) has such knowledge and experience in financial and business matters and in investments of this type that it is capable of evaluating the merits and risks of its investment in the shares of New HoldCo Common Stock and of making an informed investment decision, and (iii) is an "accredited investor" within the meaning of Rule 501 of Regulation D under the Securities Act of 1933, as amended (the "***Securities Act***").  The Backstop Party understands that Reorganized HoldCo will be relying on the statements contained herein to establish an exemption from registration under the Securities Act and under foreign, federal, state and local securities laws and acknowledges that the shares of New HoldCo Common Stock will not be registered under the Securities Act or any other applicable law and that such shares may not be transferred except pursuant to the registration provisions of the Securities Act (and in compliance with any other applicable law) or pursuant to an applicable exemption therefrom.

4.     <u>Conditions to Backstop Party Commitment</u>.  The obligations of the Backstop Party to fund its Backstop Commitment to PG&E in accordance with this Backstop Commitment Letter are further expressly conditioned upon and subject to the satisfaction or written waiver by the Backstop Party, in its sole discretion, at or prior to the Effective Date of each of the following conditions, which PG&E acknowledges are an integral part of the transactions contemplated by this Backstop Commitment Letter and without these conditions the Backstop Party would not have entered into this Backstop Commitment Letter.

Case: 19-30088    Doc# 3844    Filed: 09/09/19    Entered: 09/09/19 15:14:13    Page 103 of 135

a.　　　by November 7, 2019, the Debtors shall have received valid and enforceable Other Backstop Commitments on substantially the same terms and conditions as set forth in this Backstop Commitment Letter that in the aggregate with this Backstop Commitment result in Aggregate Backstop Commitments of no less than the Equity Offering Cap;

b.　　　other than the consummation of any Permitted Equity Offering or the Rights Offering, the satisfaction of all of the other conditions to the Effective Date provided for in the Plan or the waiver of any such conditions by the Debtors in accordance with the Plan (to the extent the Plan expressly provides for the possibility of such a waiver);

c.　　　the Bankruptcy Court shall have entered the Confirmation Order, which shall confirm the Plan with such amendments, modifications, changes and consents as are approved by those entities having no less than a majority of the Aggregate Backstop Commitments (such approval not to be unreasonably withheld, conditioned or delayed), and such Confirmation Order shall be in full force and effect, and no stay thereof shall be in effect;

d.　　　this Backstop Commitment Letter shall have been approved by an order of the Bankruptcy Court and such order shall be in full force and effect, and no stay thereof shall be in effect;

e.　　　the transactions contemplated herein shall have been authorized by an order of the Bankruptcy Court (which may be the Confirmation Order) such order shall be in full force and effect, and no stay thereof shall be in effect;

f.　　　total PG&E weighted average earning rate base (including electric generation, electric transmission, electric distribution, gas distribution, gas transmission and storage) for estimated 2021 shall be no less than 95% of $48 billion; and

g.　　　no result, occurrence, fact, change, event, effect, violation, penalty, inaccuracy or circumstance (whether or not constituting a breach of a representation, warranty or covenant set forth in the Plan) that, individually or in the aggregate with any such other results, occurrences, facts, changes, events, effects, violations, penalties, inaccuracies, or circumstances, (i) would have or would reasonably be expected to have a material adverse effect on the business, operations, assets, liabilities, capitalization, financial performance, financial condition or results of operations, in each case, of the Debtors, taken as a whole, or (ii) would reasonably be expected to prevent or materially delay the ability of the Debtors to consummate the transactions contemplated by this Backstop Commitment Letter or the Plan or perform their obligations hereunder or thereunder (each a "***Material Adverse Effect***") shall have occurred; *provided*, *however*, that none of the following results, occurrences, facts, changes, events, effects, violations, penalties, inaccuracies, or circumstances shall constitute or be taken into account in determining whether a Material Adverse Effect has occurred, is continuing or would reasonably be expected to occur: (A) the filing of the Chapter 11 Cases, and the fact that the Debtors are operating in bankruptcy (B) results, occurrences, facts, changes, events, effects, violations, inaccuracies, or circumstances affecting (1) the electric or gas utility businesses in the United States generally or (2) the economy, credit, financial, capital or commodity markets, in the United States or elsewhere in the world, including changes in interest rates, monetary policy or inflation, (C) changes or prospective changes in law (other than any law or regulation of California or the United States that is applicable to any electrical utility) or in GAAP or accounting standards, or any changes or prospective changes in the interpretation or enforcement of any of the foregoing, (D) any decline in the market price, or change in trading volume, of any securities of the Debtors, (E) any failure to meet any internal or public projections, forecasts, guidance, estimates, milestones, credit ratings, budgets or internal or published financial or operating predictions of revenue, earnings, cash flow or cash position, (F) any wildfire occurring after the Petition Date and prior to January 1, 2020, and (G) one or more wildfires, occurring on or after January 1, 2020, that destroys or damages fewer than 500 dwellings or commercial structures ("***Structures***") in the aggregate (it being understood that (I) the exceptions in clauses (D) and (E) shall not prevent or otherwise affect a determination that the underlying cause of any such change, decline or failure referred to therein is a Material Adverse Effect and

(II) a Material Adverse Effect shall include the occurrence of one or more wildfires on or after January 1, 2020 destroying or damaging at least 500 Structures within PG&E's service area where none of the following are true with respect any such wildfire (a) the portion of PG&E's system at the location of such wildfire was not de-energized; (b) there has been no determination by a final order that such wildfire was caused by a person or entity other than the Utility; and (c) there has been no determination that such wildfire was not caused by the negligence or intentional misconduct of the Utility by a final order of a court having jurisdiction).

5.    Termination by the Backstop Party. Subject to the last paragraph of this Section 5, the Backstop Party may terminate this Backstop Commitment Letter, solely as to itself, by written notice (which shall describe the basis for such termination), on or after the occurrence of any of the following:

a.    the Plan has not been filed with the Bankruptcy Court by 11:59 p.m. Pacific Time on September 9, 2019 or the Plan filed with the Bankruptcy Court on or after such date differs from the draft of the Plan attached hereto as Exhibit A;

b.    the condition set forth in Section 4(a) is not satisfied as of November 7, 2019;

c.    the Bankruptcy Court has not entered an order approving this Backstop Commitment Letter on or before November 20, 2019;

d.    subject to Section 11, (i) the Plan has been amended modified or changed, in each case without the consent of the entities holding a majority of the Aggregate Backstop Commitments (such consent not to be unreasonably withheld, conditioned or delayed) or (ii) any Plan Supplement or any Plan Document shall have been filed or finalized without the consent of entities holding a majority of the Aggregate Backstop Commitments (such consent not to be unreasonably withheld, conditioned or delayed);

e.    the Confirmation Order has not been entered by the Bankruptcy Court on or before June 30, 2020 (the "***Outside Date***");

f.    the Effective Date has not occurred on or before 60 days after entry of the Confirmation Order;

g.    the Debtors have failed to perform any of their obligations set forth in this Backstop Commitment Letter, which failure to perform (i) would give rise to the failure of a condition set forth in Section 4(b) or 4(c) and (ii) is incapable of being cured or, if capable of being cured by the Outside Date, the Debtors have not cured within 10 calendar days following receipt by the Debtors of written notice of such failure to perform from the Backstop Party stating the Backstop Party's intention to terminate this Backstop Commitment Letter pursuant to this Section 5(g) and the basis for such termination;

h.    the occurrence of a Material Adverse Effect;

i.    the occurrence of one or more wildfires in the Debtors' service territory after the Petition Date and prior to January 1, 2020 that is asserted by any person to arise out of the Debtors' activities and that destroys or damages more than 500 Structures; *provided, however,* that any notice of termination under this clause (i) must be given on or before January 15, 2020;

j.    the Debtors' aggregate liability with respect to Wildfire Claims is determined (whether (i) by the Bankruptcy Court (or the District Court to which the reference has been partially withdrawn for estimation purposes), (ii) pursuant to an agreement between the Debtors and the holders of Wildfire Claims, or (iii) through a combination thereof) to exceed $17.9 billion (the "***Wildfire Claims Cap***"); *provided, however,* that for purposes of this clause (j), (A) any Wildfire Claim that the CPUC has approved or agreed to approve for recovery or pass through by the Utility shall not count in determining the Wildfire Claims Cap, and (B) the Wildfire Claims Cap shall be increased by an amount equal to the amount of Wildfire Claims consisting of professional fees that the Bankruptcy Court (or the District Court to which the reference has been partially withdrawn for estimation purposes) determines to be reasonable;

k.      the CPUC fails to issue all necessary approvals, authorizations and final orders to implement the Plan prior to the Outside Date, and to participate in the Go-Forward Wildfire Fund, including: (i) provisions satisfactory to entities holding a majority of the Aggregate Backstop Commitments (such approval not to be unreasonably withheld, conditioned or delayed) pertaining to authorized return on equity and regulated capital structure, (ii) a disposition, satisfactory to entities holding a majority of the Aggregate Backstop Commitments (such approval not to be unreasonably withheld, conditioned or delayed), of proposals for certain potential changes to PG&E's corporate structure and authorizations for the Utility to operate as a utility, (iii) a resolution, satisfactory to entities holding a majority of the Aggregate Backstop Commitments (such approval not to be unreasonably withheld, conditioned or delayed), of claims for monetary fines or penalties under the California Public Utilities Code for conduct prior to the Petition Date, and (iv) approval (or exemption from approval) of the financing structure and securities to be issued under the Plan;

l.      if at any time after the first day of the Confirmation Hearing, asserted Administrative Expense Claims exceed $250 million, excluding all (i) ordinary course Administrative Expense Claims, (ii) Professional Fee Claims, and (iii) Disallowed Administrative Expense Claims;

m.      there is in effect an order of a governmental authority of competent jurisdiction permanently restraining, enjoining or otherwise prohibiting the consummation of any of the transactions contemplated by the Plan, or any law, statute, rule, regulation or ordinance is adopted that makes consummation of the transactions contemplated by the Plan illegal or otherwise prohibited.

PG&E shall promptly provide notice to the Backstop Party of (i) the occurrence of any fact, event, or omission that is not publicly disclosed that gives rise or reasonably can be expected to give rise to a termination right under this Section 5 and (ii) the receipt of any termination notice from any Other Backstop Party, including the asserted basis for such termination, whether or not PG&E concurs therewith.

Upon valid termination of this Backstop Commitment Letter by the Backstop Party (such terminating Backstop Party, a "***Terminating Backstop Party***") pursuant to Section 5(a) through (m), this Backstop Commitment Letter shall be void and of no further force or effect solely with respect to such Terminating Backstop Party is obligated herein, such Terminating Backstop Party shall be released from its Backstop Commitments, undertakings and agreements under or related to this Backstop Commitment Letter, including its Backstop Commitment, except as explicitly provided herein and there shall be no liability or obligation on the part of such Terminating Backstop Party hereunder, except as expressly provided herein.  Notwithstanding any termination by a Terminating Backstop Party, PG&E shall remain liable for the payment of all earned Backstop Commitment Premiums and expense reimbursement obligations in this Backstop Commitment Letter.

The Backstop Party's obligations under this Backstop Commitment Letter shall automatically terminate in the event that PG&E has not returned a counter-signed copy of this Backstop Commitment Letter agreeing to its terms on or before the date that is two weeks from the day the Backstop Party furnished a signed copy of this Backstop Commitment Letter to PG&E.

The Backstop Party may not seek to (i) assert the failure of any condition precedent to any of its obligations or agreements under this Backstop Commitment Letter or (ii) terminate this Backstop Commitment Letter (including pursuit of any other remedies), in each case unless the Backstop Party has given written notice to PG&E of such assertion or termination.

Notwithstanding anything in this Backstop Commitment Letter to the contrary, any notice of termination under clauses (d), (g), (h), (i), (k), (l) and (m) shall not be effective unless PG&E has received notices of termination from entities constituting a majority of the outstanding Aggregate Backstop Commitments with respect to the event or circumstance that is the basis for such notice of termination. PG&E shall provide the Backstop Party with a notice of such effective termination within two business days of the effectiveness of the termination.

Case: 19-30088    Doc# 3844    Filed: 09/09/19    Entered: 09/09/19 15:14:13    Page 106 of 135

In the event that any fact or circumstance would give the Backstop Party the right to terminate under more than one clause in this Section 5, the exercise of a termination right under any one clause shall not prejudice the Backstop Party from exercising a termination right under any other clause based on the same event or circumstance.

6. **Termination by PG&E; Defaulting Backstop Party; Extension Options**. PG&E may terminate this Backstop Commitment Letter (including all Backstop Commitments hereunder) (a) at any time prior to countersigning such Backstop Commitment Letter, (b) if, on any date after November 7, 2019, the condition set forth in Section 4(a) would not be satisfied if tested on such date, (c) in the event of a material breach of a representation or warranty of the Backstop Party set forth in Section 3, (d) in the event that the Backstop Party repudiates this Backstop Commitment Letter, purports to terminate this Backstop Commitment Letter if such purported termination is not a valid termination of this Backstop Commitment Letter as determined in a final order of a court with jurisdiction or fails to fund its Backstop Commitment when required to do so in accordance with this Backstop Commitment Letter, (e) if the Backstop Commitment Amount has been reduced to zero in accordance with Section 7, (f) if the Backstop Party has the right to terminate this Backstop Commitment Letter under clause (h), (i), (j) or (m) of Section 5, or (g) if (i) a third party makes a binding proposal to acquire at least 50% of the outstanding PG&E common stock (including by means of a merger, joint venture, partnership, consolidation, dissolution, liquidation, tender offer, recapitalization, reorganization, share exchange, business combination or similar transaction), (ii) either (x) the implementation of such proposal would require the approval of holders of a majority of the PG&E common stock or (y) the price contemplated by such proposal would exceed 125% of the Equity Offering Cap, and (iii) the Board determines in good faith, after consultation with PG&E's outside legal counsel, that the failure to terminate this Backstop Commitment Letter in response to such proposal would be inconsistent with the exercise of its fiduciary duties to the stockholders of PG&E under applicable law. In the event of a breach, repudiation, purported termination or failure to fund contemplated by the foregoing clause (c) or (d), the Backstop Party shall be deemed to be a "*Defaulting Backstop Party*". In the event that the Backstop Party becomes a Defaulting Backstop Party, then PG&E may, upon notice to such Defaulting Backstop Party, require the Backstop Party to assign and delegate, without recourse, all its interests, rights (other than any Backstop Commitment Premiums earned prior to the date of such assignment and delegation) and obligations under this Backstop Commitment Letter to a third party that shall assume such obligations (which assignee may be an Other Backstop Party, if an Other Backstop Party accepts such assignment and delegation). Notwithstanding any termination by PG&E under Sections 6(b), (e), (f) or (g), PG&E shall remain liable for the payment of all earned Backstop Commitment Premiums and expense reimbursement obligations in this Backstop Commitment Letter.

In the event that any fact or circumstance would give PG&E the right to terminate under more than one clause in this Section 6, the exercise of a termination right under any one clause shall not prejudice PG&E from exercising a termination right under any other clause based on the same event or circumstance.

Notwithstanding anything to the contrary herein, this Backstop Commitment Letter shall automatically terminate on January 20, 2020 (the "*Initial Termination Date*"). Provided that this Backstop Commitment Letter remains in full force and effect and has not been otherwise terminated, PG&E may extend the Initial Termination Date to April 30, 2020 (the "*First Extension Date*") upon providing written notice to the Backstop Party of its intent to exercise this option (the "*First Extension Notice*") no later than three days prior to the Initial Termination Date. In the event that PG&E has provided the Backstop Party a timely and proper First Extension Notice and this Backstop Commitment Letter remains in full force and effect, PG&E may extend the First Extension Date to the Outside Date (the "*Second Extension Date*") upon providing written notice to the Backstop Party of its intent to exercise this option (the "*Second Extension Notice*") no later than three days prior to the First Extension Date. In the event that PG&E has provided the Backstop Party a timely and proper Second Extension Notice and this Backstop Commitment Letter remains in full force and effect, PG&E may extend the Second Extension Date to the 60th day following the Outside Date (the "*Third Extension Date*") upon providing written notice to the Backstop

Party of its intent to exercise this option (the "***Third Extension Notice***") no later than three days prior to the Second Extension Date.

      7.    <u>Reduction of Commitments by PG&E</u>.

      a.    In the event that on or prior to November 7, 2019, PG&E receives Aggregate Backstop Commitments that exceed the Equity Offering Cap (such excess, the "***Overallotment Amount***"), then, on November 8, 2019 (the "***Allocation Date***"), the Backstop Commitment Amount shall be automatically reduced by an amount equal to (i) the Overallotment Amount, *times* (ii) a fraction, (A) the numerator of which is the Backstop Party's Shares and (B) the denominator of which is the aggregate number of shares of PG&E common stock held by the Backstop Party and the Other Backstop Parties, collectively, as of September 6, 2019 (without double counting any shares beneficially owned, directly or indirectly, by more than one Backstop Party). Notwithstanding the foregoing, on the Allocation Date, in the event there is an Overallotment Amount and for the purpose of curing such Overallotment Amount, PG&E may reduce the Backstop Commitment Amount as to any Backstop Party to the extent such reduction is reasonably advisable (based on the advice of the Debtors' tax advisors after consultation with Jones Day) in order to avoid an "ownership change" within the meaning of Section 382 and the Treasury Regulations promulgated thereunder or to otherwise preserve the ability of the Debtors to utilize their NOLs; *provided* that such reduction may not be below the amount of Backstop Commitments at which such Backstop Party would maintain its existing percentage ownership of the total outstanding shares of PG&E common stock. Within three business days of the Allocation Date, PG&E shall provide the Backstop Party with a notice of any adjustment to its Backstop Commitment Amount under this Section 7(a).

      b.    In the event that, after November 7, 2019, the Debtors (i) receive binding commitments providing for funding from any Additional Capital Sources that (A) have conditions to funding and commitment termination rights that are no less favorable to PG&E than those in this Backstop Commitment Letter and (B) are approved by an order of the Bankruptcy Court, or (ii) actually obtain funding from any Additional Capital Sources, then (x) in the case of clause (i), PG&E may reduce the Backstop Commitment Amount, and (y) in the case of clause (ii), the Backstop Commitment Amount shall be automatically reduced (if not already reduced pursuant to clause (i)), in each case by an amount equal to (A) the amount of such funding, times (B) a fraction, (1) the numerator of which is the Backstop Commitment Amount immediately prior to such reduction and (2) the denominator of which is the Aggregate Backstop Commitments as of immediately prior to such reduction. Any reduction in the Backstop Commitment pursuant to this Section 7(b) shall not reduce any Backstop Commitment Premium earned prior to the date of such reduction.

      c.    In the event that the Debtors consummate any Permitted Equity Offering or Rights Offering, the Backstop Commitment Amount shall be automatically reduced by an amount equal to (i) the net cash proceeds of such Permitted Equity Financing or such Rights Offering plus the proceeds of any Additional Capital Sources, as applicable, *times* (ii) a fraction, (A) the numerator of which is the Backstop Commitment Amount immediately prior to such reduction and (B) the denominator of which is the Aggregate Backstop Commitments as of immediately prior to such reduction.

      d.    The Debtors shall provide notice to the Backstop Party in the event that the Backstop Commitment Amount is reduced as provided above. References herein to "Backstop Commitment Amount" or "Backstop Commitment" mean such amounts as adjusted in accordance with the terms of this Backstop Commitment Letter. Any Backstop Commitments that have been terminated or reduced shall be terminated or reduced, as applicable, permanently.

      8.    <u>Assignment</u>. This Backstop Commitment Letter (a) is not assignable by the Backstop Party, and any purported assignment shall be null and void *ab initio*; *provided*, *however*, Backstop Party may assign its Backstop Commitment, in whole or in part, to (i) another Backstop Party, (ii) an affiliate of the Backstop Party, or (iii) an investment fund or separately managed account the primary investment advisor or sub advisor to which is a Backstop Party or an affiliate thereof, to the extent such assignee

Case: 19-30088   Doc# 3844   Filed: 09/09/19   Entered: 09/09/19 15:14:13   Page 108 of 135

Backstop Party agrees in writing to assume all obligations hereunder of such Backstop Party in connection with such Backstop Commitment, and any assignment under this proviso shall not relieve the Backstop Party from its obligations under this Backstop Commitment Letter, and (b) is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person or entity other than the parties hereto. Notwithstanding the foregoing, a Backstop Party may assign all or any portion of its obligations hereunder to a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act of 1933, as amended), without the consent of any party, *provided, however*, that (i) absent the prior written consent of PG&E, such assignee (including any Entity) does not, and as a result of such assignment will not, beneficially own more than 4.75% of the Aggregate Backstop Commitments and (ii) any assignment under this sentence shall not relieve the Backstop Party from its obligations under this Backstop Commitment Letter.

9.  <u>Entire Agreement</u>.  This Backstop Commitment Letter, including all exhibits hereto, constitutes the entire understanding among the parties hereto with respect to the subject matter hereof and replaces and supersedes all prior agreements and understandings, both written and oral, between the parties hereto with respect to the subject matter hereof and, subject to the terms hereof, shall become effective and binding upon the mutual exchange of fully executed counterparts by each of the parties hereto.

10.  <u>Governing Law; Consent to Jurisdiction; Waiver of Jury Trial</u>.  This Backstop Commitment Letter shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction.  By its execution and delivery of this Backstop Commitment Letter, each of the parties hereto irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Backstop Commitment Letter or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought only in the Bankruptcy Court.  By execution and delivery of this Backstop Commitment Letter, each of the parties hereto irrevocably accepts and submits itself to the exclusive jurisdiction of the Bankruptcy Court with respect to any such action, suit or proceeding.  EACH PARTY HERETO UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO ABOVE.

11.  <u>Amendment; Waiver; Counterparts</u>.  This Backstop Commitment Letter may not be amended or waived by or on behalf of the Backstop Party, and no consent may be given hereunder by or on behalf of the Backstop Party (including to an amendment or waiver of any provision of the Plan), except in writing signed by the holders of a majority of the Aggregate Backstop Commitments (whether or not the Backstop Party signs such amendment or waiver), and confirmed in writing by the Company; *provided, however,* that without the prior written consent of the Backstop Party, this Backstop Commitment Letter may not be amended to (a) increase the amount of the Backstop Commitment Amount or Backstop Commitment, (b) decrease the Backstop Commitment Premium, (c) extend the Backstop Commitment beyond the Third Extension Date, (d) amend the definition of "Backstop Price" or any component thereof, and (e) amend, modify, or waive the condition in Section 4(d).  This Backstop Commitment Letter may be executed in any number of counterparts, each of which will be an original, and all of which, when taken together, will constitute one agreement.  Delivery of an executed counterpart of this Backstop Commitment Letter by e-mail or portable document format (PDF) will be effective as delivery of a manually executed counterpart of this Backstop Commitment Letter.

12.  <u>Notices</u>.  All notices required or permitted to be given under this Backstop Commitment Letter, unless otherwise stated herein, shall be given by overnight courier at the addresses specified below, or at such other address or addresses as a party may designate for itself in writing, or by email (if confirmed) at the email addresses specified below:

If to the Backstop Party, to the name, address and email address located on the Backstop Party's signature page to this Backstop Commitment Letter.

If to the Debtors:

> PG&E Corporation
> 77 Beale Street
> P.O. Box 770000
> San Francisco, California 94177
> Attention: Janet Loduca, Senior Vice President and General Counsel
> Email: J1Lc@pge.com
>
> with a copy to:
>
> Cravath, Swaine & Moore LLP
> 825 Eighth Avenue
> New York, New York 10019
> Attention: Richard Hall; Paul Zumbro
> Email: RHall@cravath.com; PZumbro@cravath.com
>
> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York 10153
> Attention: Stephen Karotkin
> Email: Stephen.karotkin@weil.com

13. <u>No Liability</u>. Notwithstanding anything that may be expressed or implied in this Backstop Commitment Letter, each party hereto acknowledges and agrees that no person other than the Backstop Party (and it permitted assigns) shall have any obligation hereunder (subject to the limitations provided herein) or in connection with the transactions contemplated hereby and that (a) notwithstanding that any Backstop Party may be a partnership, limited partnership or limited liability company, no recourse (whether at law, in equity, in contract, in tort or otherwise) hereunder or under any document or instrument delivered in connection herewith, or in respect of any oral representations made or alleged to be made in connection herewith or therewith, shall be had against any former, current or future direct or indirect equity holder, controlling person, general or limited partner, shareholder, member, investment manager or adviser, manager, director, officer, employee, agent, affiliate, assignee, representative or financing source of any of the foregoing) (any such person or entity, other than such Backstop Party, a "***Related Party***") or any Related Party of any such Related Party, including, without limitation, any liabilities arising under, or in connection with, the Plan or this Backstop Commitment Letter and the transactions contemplated thereby and hereby, or in respect of any oral representations made or alleged to be made in connection therewith or herewith), whether by the enforcement of any judgment or assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law and (b) no personal liability whatsoever will attach to, be imposed on or otherwise be incurred by any Related Party of the Backstop Party or any Related Party of any such Related Party under this Backstop Commitment Letter or any document or instrument delivered in connection herewith or with the Plan Term Sheet or the Plan (or in respect of any oral representation made or alleged to be made in connection herewith or therewith) or for any action (whether at law, in equity, in contract, in tort or otherwise) based on, in respect of, or by reason of such obligations hereunder or by their creation.

14. <u>Plan Support</u>. For as long as this Backstop Letter Agreement is in effect, the Backstop Party shall (i) use all reasonable efforts to support the Plan with respect to the treatment of HoldCo Common Interests and to act in good faith to consummate the Plan with respect to any Equity Offering and the

Backstop Commitments, (ii) to the extent the Backstop Party is entitled to vote on the Plan, timely vote (or cause to be voted) all of its HoldCo Common Interests and Claims to accept the Plan (and not to change or withdraw any such vote), and (iii) timely vote (or cause to be voted) its HoldCo Common Interests and Claims to reject any plan of reorganization other than the Plan.

15. The Backstop Party shall not be required, pursuant to the terms of this Backstop Commitment Letter, to acquire or purchase any securities or indebtedness in connection with any Equity Offering that, pursuant to the terms of a Backstop Commitment Letter or other agreement, are to be acquired or subscribed for by any other party, nor shall the Backstop Party be required, pursuant to the terms of this Backstop Commitment Letter, to pay any money or other consideration, or exchange any claims whatsoever, which are owing from, or to be transferred from or by, any other party pursuant to the terms of another Backstop Commitment Letter or other agreement. Nothing in this Backstop Commitment Letter shall be deemed to constitute an agreement or a joint venture or partnership with or between any other person or entity nor constitute any party as the agent of any other person or entity for any purpose. For the avoidance of doubt, no Backstop Party shall, nor shall any action taken by a Backstop Party hereunder, be deemed to be acting in concert with any other person or entity with respect to the Backstop Commitment or any other matter nor shall the Backstop Commitments hereunder create a presumption that the Backstop Party is in any way acting in concert or as a group with any other person or entity whether as a result of this commitment or otherwise.

16. Each party hereto confirms that it has made its own decision to execute this Backstop Commitment Letter based upon its own independent assessment of documents and information available to it, as it has deemed appropriate.

17. Except as expressly provided in this Backstop Commitment Letter, (a) nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each party hereto to protect and preserve its rights, remedies and interests, including, without limitation, any claims against or interests in any of the Debtors or other parties, or its full participation in any bankruptcy proceeding, and (b) the parties hereto each fully preserve any and all of their respective rights, remedies, claims and interests as of the date hereof and upon a termination of this Backstop Commitment Letter. Further, nothing in this Backstop Commitment Letter shall be construed to prohibit any party hereto from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are consistent with this Backstop Commitment Letter and the Plan, and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying or preventing the consummation of the transactions contemplated by the Plan.

[signature page follows]

Case: 19-30088    Doc# 3844    Filed: 09/09/19    Entered: 09/09/19 15:14:13    Page 111 of 135

Sincerely,

Backstop Party:

Knighthead Capital Management, LLC, solely
on behalf of certain funds and accounts it
managed and/or advises

By: _____
Name: Thomas A. Wagner
Title: Managing Member

Notice Information:

Knighthead Capital Management, LLC, solely
on behalf of certain funds and accounts it
managed and/or advises
Attention:  General Counsel
1140 Avenue of the Americas
12th Floor
New York, NY  10036

Accepted and agreed this 9th day of September, 2019, by:

PG&E CORPORATION

By: _____
Name: Janet C. Loduca
Title: Senior Vice President and General Counsel

15

**Exhibit A**
**Plan of Reorganization**

See the *Debtors' Joint Chapter 11 Plan of Reorganization* filed at Docket No. 3841.

**Exhibit B**
**Mandatory Preferred Stock Term Sheet**

Case: 19-30088    Doc# 3844    Filed: 09/09/19    Entered: 09/09/19 15:14:13    Page 116 of 135

**Term Sheet for**
**5.00% Mandatory Convertible Preferred Stock**

| | |
|---|---|
| Issuer: | PG&E Corporation ("**PG&E**") |
| Title of Securities: | 5.00% Mandatory Convertible Preferred Stock of PG&E (the "**Mandatory Convertible Preferred Stock**") |
| Shares of Mandatory Convertible Preferred Stock Offered by PG&E: | Up to [●] shares |
| Offering Price: | $1,000 per share of the Mandatory Convertible Preferred Stock |
| Issue Date: | The Effective Date of the Plan |
| Liquidation Preference: | $1,000 per share |
| Dividends: | 5.00% of the Liquidation Preference of $1,000 per share of the Mandatory Convertible Preferred Stock per year (equivalent to $50 per annum per share), when, as and if declared by the Board, payable in cash or, by delivery of additional shares of Mandatory Convertible Preferred Stock or any combination of cash and shares of Mandatory Convertible Preferred Stock, as determined by PG&E in its sole discretion |
| Floor Price: | 100% of the Initial Price, subject to standard anti-dilution adjustments |
| Dividend Payment Dates: | If declared, January 1, April 1, July 1 and October 1 of each year, commencing on (TBD) |
| Dividend Record Dates: | The March 15, June 15, September 15 and December 15 immediately preceding the next dividend payment date |
| Redemption: | The Mandatory Convertible Preferred Stock will be redeemable on terms and conditions to be determined |
| Initial Price: | A per share price equal to (a) the greater of (i) an Implied P/E Multiple of 13.5 or (ii) the Implied P/E Multiple of a Permitted Equity Offering, *times* (b) the Normalized Estimated Net Income as of the Determination Date, *divided by* (c) the number of fully diluted shares of PG&E (calculated using the treasury stock method) that will be outstanding as of the Effective Date. |
| Threshold Appreciation Price: | 110% of the Initial Price, subject to standard ant-dilution adjustments |
| Mandatory Conversion Date: | 1/8th of the Mandatory Convertible Preferred Stock will convert into PG&E common stock 90, 180, 270, 360, 450, 540, 630, and 720 days from Issue Date |

Case: 19-30088    Doc# 3844    Filed: 09/09/19    Entered: 09/09/19 15:14:13    Page 117 of 135

| Conversion Rate: | Upon conversion on the Mandatory Conversion Date, the conversion rate for each share of the Mandatory Convertible Preferred Stock will be not more than [●] shares of PG&E common stock (the "*Maximum Conversion Rate*") and not less than [●] shares of PG&E common stock (the "*Minimum Conversion Rate*"), depending on the Applicable Market Value of the PG&E common stock subject to standard anti-dilution adjustments.  The following table illustrates the conversion rate per share of the Mandatory Convertible Preferred Stock (in each case, subject to standard anti-dilution adjustments): |
|---|---|

| Applicable Market Value of the PG&E Common Stock | Conversion rate (number of shares of PG&E Common Stock to be received upon conversion of each share of the Mandatory Convertible Preferred Stock) |
|---|---|
| Greater than 110% of the Initial Price (which is the Threshold Appreciation Price) | [●] shares (approximately equal to $1,000 divided by the Threshold Appreciation Price) |
| Equal to or less than the Threshold Appreciation Price but greater than or equal to the Floor Price | Between [●] and [●] shares, determined by dividing $1,000 by the Applicable Market Value of the PG&E common stock |
| Less than the Floor Price | [●] shares (approximately equal to $1,000 divided by the Floor Price) |

| Applicable Market Value: | The "*Applicable Market Value*" shall be the 10-trading day VWAP immediately preceding the applicable Mandatory Conversion Date |
|---|---|
| Conversion at the Option of the Holder: | At any time prior to final Mandatory Conversion Date, holders of the Mandatory Convertible Preferred Stock have the option to elect to convert their shares of the Mandatory Convertible Preferred Stock in whole or in part (but in no event less than one share of the Mandatory Convertible Preferred Stock), into shares of PG&E common stock at the Minimum Conversion Rate of shares of PG&E common stock per share of the Mandatory Convertible Preferred Stock. This Minimum Conversion Rate is subject to standard anti-dilution adjustments. |
| Limitation on Ownership | No holder, together with persons who have a formal or informal understanding with such assignee to make a coordinated acquisition of stock, shall acquire beneficial ownership (within the meaning of Section 382 and the Treasury Regulations) of more than 4.75% of the outstanding Mandatory Convertible Preferred Stock without the prior written consent of PG&E. |

Case: 19-30088    Doc# 3844    Filed: 09/09/19    Entered: 09/09/19 15:14:13    Page 118 of 135

**Exhibit C**
**Backstop Terms**

| Backstop Party | Backstop Commitment Amount |
|---|---|
| Knighthead Capital Management, LLC solely on behalf of certain funds and accounts it managed and/or advises | $1,000,000,000 |

**Payments**

The Backstop Commitment Premium shall be earned as follows:

- 75 basis points of the Backstop Commitment Premium shall be earned on the later to occur of (a) the date that the Backstop Party and PG&E have fully executed this Backstop Commitment Letter and (b) Bankruptcy Court approval of this Backstop Commitment Letter, unless this Backstop Commitment Letter shall have earlier been terminated;

- 125 basis points of the Backstop Commitment Premium shall be earned on the date on which the Backstop Party receives the First Extension Notice;

- 250 basis points of the Backstop Commitment Premium shall be earned on the date on which the Backstop Party receives the Second Extension Notice; and

- 50 basis points of the Backstop Commitment Premium shall be earned on the date on which the Backstop Party receives the Third Extension Notice

In addition, if PG&E terminates this Backstop Commitment Letter pursuant to Section 6(g), 100% of the Backstop Commitment Premium shall be fully earned and become due and payable in cash three business days after the date of such termination.

Except as provided in the immediately preceding paragraph, the Backstop Commitment Premium shall be payable in shares of New HoldCo Common Stock to be issued on the Effective Date, based on the Backstop Price.

**Certain Defined Terms**

"*Applicable Utility Index Multiple*" shall mean the average normalized 2021 estimated price-to-earnings ratio of the U.S. regulated utilities in the S&P 500 Utilities (Sector) Index (after excluding AES, AWK, EXC, NRG, PEG, and PPL) over the 20-day trading period before the applicable measurement date per Capital IQ Consensus Estimates.

"*Backstop Commitment Premium*" shall mean a commitment premium equal to 500 basis points on the total amount of Backstop Commitment Amount. If and when any portion of the Backstop Commitment Premium is earned in accordance with the foregoing provisions of this Exhibit C, (a) it shall be calculated by reference to the Backstop Commitment Amount in effect at the time of such earning, and (b) the amount of the Backstop Commitment Premium so earned shall not be subject to reduction based upon any subsequent reduction of the Backstop Commitment Amount or termination of this Backstop Commitment Letter, other than termination pursuant to Section 6(c) or 6(d) of this Backstop Commitment Letter.

"**Backstop Multiple**" shall mean the lesser of (a) 10 and (b) 10 *times* one *plus* the percentage change of the Applicable Utility Index Multiple as measured on the date of this Backstop Commitment Letter and the fifth business day prior to the Effective Date. For the avoidance of doubt, the Backstop Multiple shall never exceed 10.

"**Backstop Price**" means (a) the Backstop Multiple *times* (b) the Normalized Estimated Net Income as of the Determination Date, *divided by* (c) the number of fully diluted shares of PG&E (calculated using the treasury stock method) that will be outstanding as of the Effective Date (assuming all equity is raised by funding all Aggregate Backstop Commitments).

"**Board**" means the Board of Directors of PG&E. With respect to any matter, references to the Board include a committee of the Board that is duly authorized to act with respect to such matter.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Determination Date**" shall mean the earlier of (a) the first day of the Confirmation Hearing and (b) if (i) the Per Share Price for a Permitted Equity Offering is to be finally determined prior to such first day, the date of such determination or (ii) if the exercise price of the Rights is finally determined prior to such first day, the date of such determination.

"**Normalized Estimated Net Income**" shall mean, in each case with respect to the estimated year 2021, (a) on a component-by-component basis (e.g., distribution, generation, gas transmission and storage, and electrical transmission), the sum of (i) the Utility's estimated earning rate base for such component, *times* (ii) the equity percentage of the Utility's authorized capital structure, *times* (iii) the Utility's authorized rate of return on equity for such component, *less* (b) the projected post-tax difference in interest expense or preferred dividends for the entire company and the authorized interest expense or preferred dividends expected to be collected in rates, *less* (c) without duplication of any amount included in clause (b), the amount of any post-tax offset or credit to any charge imposed in connection with the issuance of Wildfire Victims Recovery Bonds, if any, *less* (d) the amount of the Utility's post-tax annual contribution to the Go-Forward Wildfire Fund.

"**Section 382**" means Section 382 of the Code, or any successor provision or replacement provision.

"**Treasury Regulations**" means final, temporary and proposed tax regulations promulgated under the Code, as amended.

Case: 19-30088   Doc# 3844   Filed: 09/09/19   Entered: 09/09/19 15:14:13   Page 120 of 135

## Schedule 2

**Highly Confident Letters**

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

PG&E Corporation
Pacific Gas and Electric Company
77 Beale Street
P.O. Box 770000
San Francisco, California 94177

Senior Management and Members of the Board:

Barclays Capital Inc. ("Barclays") has been advised of the intention of PG&E Corporation ("PG&E") and Pacific Gas and Electric Company (the "Utility" and, together with PG&E, the "Company") to explore financing alternatives in support of the reorganization and emergence of the Company from its bankruptcy cases (the "Cases") in the United States Bankruptcy Court for the District of Northern California (the "Bankruptcy Court").

We understand that the cash proceeds necessary to effect the Company's reorganization will be approximately $35-$40 billion. We anticipate that the exit financing supporting such reorganization could include (x) $10-$15 billion of debt financing at the Utility and $5-$10 billion of debt financing at PG&E (collectively, the "Debt Financing") and (y) the issuance by PG&E of up to $15 billion of equity and equity-linked securities (the "Equity Financing" and, together with the Debt Financing, the "Exit Financing"). We understand that in addition to the Exit Financing, the Company may have the ability to re-instate or keep in place certain existing indebtedness of the Utility. We are pleased to confirm that, based upon current market conditions and our present understanding of the Exit Financing, as of the date hereof we are highly confident of our ability to arrange the Debt Financing and place the Equity Financing.

Barclays' view as to our ability to arrange the Debt Financing and place the Equity Financing is based upon the assumption that each of the following conditions will be satisfied:

(i) Barclays obtaining all required internal approvals;

(ii) Barclays' satisfaction in its sole discretion with the documentation and terms of the Company's plan(s) of reorganization and the satisfaction of all conditions thereto;

(iii) the Company having received a Confirmation Order in the Cases from the Bankruptcy Court as well as any other required regulatory or governmental approvals required to effectuate any plan(s) of reorganization related thereto on or before June 30, 2020;

(iv) Barclays and its representatives having completed and being satisfied with the results of their continuing financial, business, environmental and legal due diligence investigations of the Company, the plan(s) of reorganization and the Exit Financing, including but not limited to, the Company's ability to participate in and seek reimbursement from the wildfire insurance fund as provided under California AB-1054;

(v) there not having occurred any material adverse change in the financial condition, results of operations, business or prospects of the Company since the June 30, 2019 Monthly Operating Report filed with the Bankruptcy Court on August 15, 2019;

(vi) the completion of all documentation relating to the Exit Financing, including but not limited to the preparation of a confidential information memorandum for any credit facilities and a prospectus or offering circular for any debt, equity or equity-linked securities, each containing

the required audited and unaudited historical and pro forma financial statements of PG&E and the Utility, a credit agreement for any credit facilities and an indenture or other applicable agreement governing any debt, equity or equity-linked securities, in each case in form and substance satisfactory to Barclays in its sole discretion;

(vii) in the sole judgment of Barclays there not having occurred any disruption or change in the market for syndicated loans or new issues of investment grade or high yield debt or equity or equity-linked securities, or the financial or capital markets in general;

(viii) in the sole judgment of Barclays there not having occurred any disruption or change in the regulatory relationship between the California Public Utilities Commission and the Utility; and

(ix) Barclays having a reasonable period of time to market the Exit Financing based on Barclays' experience in comparable transactions.

This letter is rendered to the Company solely for its use in connection with its decision to submit a plan(s) of reorganization to the Bankruptcy Court and does not confer any rights or remedies on any party, including any other party in interest in the Cases or any financing sources for the Company. This letter is confidential and is delivered to you on the understanding that neither this letter nor any of its terms or substance has been or shall be disclosed, directly or indirectly, by you to any other person without our prior written consent except you may disclose this letter: (i) to your directly involved officers, financial advisors, accountants and lawyers or (ii) as may be compelled in a judicial or administrative proceeding or as otherwise required by law (in which case you agree to inform us promptly in advance of disclosure thereof), in each case on a confidential and need-to-know basis only.

This letter does not constitute a legally binding obligation or commitment by Barclays or any of its affiliates to act as underwriter, initial purchaser or placement agent for the Exit Financing or any other financing or any representations or warranties in respect of the foregoing. Any such obligation on the part of Barclays will exist only upon the execution of a final, written underwriting, purchase or placement agent agreement, or commitment letter or loan agreement, as the case may be, in form and substance satisfactory to Barclays, and then only in accordance with the terms and conditions thereof.

This letter is not intended as and shall not be construed as proposal of a plan of reorganization or solicitation of votes thereunder.

This letter shall be governed by, and construed in accordance with, New York law.

We value our long standing relationship with PG&E Corporation and we look forward to working with you on this transaction.

Very truly yours,

BARCLAYS CAPITAL INC.

By:_____
Name: John C. Plaster
Title: Managing Director

September 9, 2019

PG&E Corporation
Pacific Gas and Electric Company
77 Beale Street
San Francisco, CA 94177

Ladies and Gentlemen:

You have advised Citigroup Global Markets Inc. ("**CGMI**") that PG&E Corporation ("**PG&E**", the "**Company**", "**HoldCo**", or "**you**") and its regulated utility, Pacific Gas & Electric Company ("**PacGas**", the "**Utility**", the "**OpCo**"), collectively, (the "**Debtors**") intend to file a Plan of Reorganization outlining its financing strategy for the Debtors' exit from bankruptcy (the "**Restructuring**"). We understand that the Debtors are required to exit bankruptcy prior to June 30, 2020, to avail themselves of the Wildfire Insurance Fund, put in place as part of California Assembly Bill 1054 ("**AB 1054**"). You have requested that CGMI provide this letter confirming the ability of the Company to raise approximately $35 billion of financing ("**Financing**"), upon confirmation of your Plan of Reorganization and successful exit from bankruptcy (the "**Exit**"). For purposes of this letter, "**Citi**," "**we**" or "**us**" means CGMI and/or any of its affiliates as may be appropriate to consummate the transactions contemplated hereby.

In evaluating the Restructuring, we have made certain assumptions and analyzed publicly available information and certain other due diligence materials. We note Citi has not had access to the Company's financial model and projections, and our analysis is based, in part, on an internally-developed utility rate base model, review of relevant equity analyst reports, review of relevant credit rating agency reports, review of Senate Bill 901 ("**SB 901**") and AB 1054, and review of financing proposals made by ad hoc equity shareholders, ad hoc bondholders, and wildfire subrogation claims holders. We have assumed and relied, without assuming any responsibility for independent verification, upon the accuracy and completeness of all such information reviewed by us for the purpose of this letter. With respect to financial forecasts and projections which have not been created by us, we have assumed that such financial forecasts and projections have been reasonably prepared on a basis reflecting the best currently available estimates and judgments of the person(s) creating such forecasts and projections.

In analyzing the request, we have assumed the absence of any adverse change in general economic conditions and the absence of adverse capital market conditions from those existing on the date hereof. This is not a financing commitment or a commitment to underwrite securities. If we were to provide such a financing or securities underwriting commitment, we would go through normal and customary credit approval and capital commitment processes. As a result of our analysis, we have assumed the Debtors exit bankruptcy on June 30, 2020 and would need to raise the aforementioned Financing concurrent with the Exit. We have considered various financing alternatives comprised of all or some of the following: new HoldCo debt issuance, new OpCo debt issuance, new equity issuance, estimated collection under the Utility's insurance coverage and Wildfire Victim Recovery Bonds ("WVRBs").

CGMI is pleased to inform you, based on and subject to the terms and conditions of this letter and assuming that Citi were to be appointed the lead book-runner and lead underwriter or placement agent for the Financing, that Citi is highly confident of its ability to underwrite, privately place, arrange on a best efforts basis or syndicate, as applicable, the Financing. Actual underwriting or placement of the Financing would occur pursuant to separate written agreements acceptable to Citi in its sole discretion and would be subject to, among other things, (a) final agreement on the pricing, terms and conditions for the Financing; (b) the receipt of audited financial statements for most recently ended fiscal year and the subsequent most recently ended quarters for the Debtors, in all respects satisfactory to Citi; (c) satisfactory completion of Citi's customary due diligence review; (d) the execution and delivery of documentation for the financing referred to above, including the underwriting or

purchase and registration agreements, and credit documentation, as applicable, for the Financing in form and substance satisfactory to Citi and its counsel; (e) receipt of any necessary governmental, contractual, regulatory, board of directors or security holders' consents or approvals in connection with the Financing; (f) the receipt of ratings from Moody's Investors Service, Inc. and Standard & Poor's Ratings Services for the applicable portions of the Financing, in all respects satisfactory to Citi; (g) the consummation of the Restructuring pursuant to documentation satisfactory to Citi; and (h) the pro forma capitalization of the Company, satisfactory to Citi.

It should be noted that Citi's expression of its confidence in its ability to underwrite, privately place, or arrange on a best efforts basis, as applicable, the Financing is further contingent upon (i) there not having occurred any material adverse change in the business, condition (financial or otherwise), operations, performance, properties or prospects of (A) the Debtors, taken as a whole since the date of their respective most recently audited financial statements; (ii) there not having occurred any circumstance, change or condition (including the continuation of any existing condition) in loan syndication, financial, banking or capital markets that, in Citi's judgment, could make it inadvisable or impractical to proceed with the Restructuring or any portion of the financing thereof; and (iii) there not having occurred any material adverse change in the legal or regulatory environment of the Company or the Company and its subsidiaries, taken as a whole, in each case since the date of their respective most recently audited financial statements.

This letter is not intended to be, and shall not constitute, a commitment or undertaking by Citi to place or purchase or commit to place or purchase any securities on a principal or agency basis, or a commitment or undertaking to provide or arrange or commit to provide or arrange any portion of the Financing. By accepting delivery of this letter, the Company acknowledges that Citi may provide financing, equity capital, financial advisory and/or other services to parties whose interests may conflict with the Company's interests and agrees that this letter is for the Debtors' confidential use only and that neither its existence nor its terms may be disclosed by it to any person other than the Debtors' officers, directors, employees, accountants, attorneys and other advisors, agents and representatives (the "**Company Representatives**"), and then only on a confidential and "need to know" basis; provided, however, that the Debtors may (i) disclose this letter in connection with the Restructuring (with our prior written consent) and (ii) make such other public disclosures of the existence and terms of this letter to the extent required by applicable law, in the opinion of its counsel. Notwithstanding any other provision in this letter, Citi hereby confirms that the Debtors and the Company Representatives shall not be limited from disclosing the U.S. tax treatment or U.S. tax structure of the transactions contemplated hereby.

Citi shall not have any liability (whether in contract, tort or otherwise) to any Debtor or any other person, including, without limitation, any of the Debtors' security holders or creditors, for or in connection with the delivery of this letter. In addition, Citi shall not be liable on any theory of liability for any special, indirect, consequential or punitive damages (including, without limitation, any loss of profits, business or anticipated savings).

This letter will be construed in accordance with the law of the State of New York.

We appreciate this opportunity to work with you on this important financing.

Case: 19-30088    Doc# 3844    Filed: 09/09/19    Entered: 09/09/19 15:14:13    Page 125 of 135

Very truly yours,

CITIGROUP GLOBAL MARKETS INC.

By: _____
     Name: Joseph Sauvage
     Title: Authorized Signatory

Goldman
Sachs

**PERSONAL AND CONFIDENTIAL**

30 July, 2019

PG&E Corporation
77 Beale Street
San Francisco, California 94105
Attn: Jason Wells

Ladies and Gentlemen:

You have advised Goldman Sachs & Co. LLC ("GS&Co." and together with its affiliates, "Goldman Sachs") that PG&E Corporation (the "Company") is submitting a proposal detailing the financings which will facilitate its exit from bankruptcy (the "Exit"). You have advised us that the Exit will require approximately $33 billion of financing, to be obtained from a combination of cash equity proceeds and proceeds of indebtedness to be incurred by the Company or a securitization vehicle (i) through the sale or placement of equity and/or senior and/or subordinated debt securities (the "Securities") and/or (ii) under an interim credit facility (the "Credit Facility"). You have consulted with Goldman Sachs concerning the sale of the Securities and the structuring and syndication of the Credit Facility.

In connection with this letter, we have relied without independent verification upon the accuracy and completeness of all of the financial, accounting, tax and other information reviewed by us for purposes of this letter. Based on the information that you have provided to us to date and publicly available information, our analysis of the current market for loans and securities issued by entities engaged in the regulated utility industry and assuming satisfactory market conditions for new issuances of bank loans, equity, or debt securities in the loan syndication and capital markets, as applicable, and subject to the immediately succeeding two paragraphs and such other matters as we consider relevant, we are pleased to inform you that, as of the date hereof, we are highly confident that (i) as lead underwriter, lead initial purchaser and/or lead placement agent, the sale and placement of the Securities can be accomplished by Goldman Sachs and (ii) as lead arranger, lead bookrunner and lead syndication agent, the structuring and syndication of the Credit Facility can be accomplished by Goldman Sachs, in each case, as part of the financing for the Exit as described above. We are also pleased to inform you that we have received the appropriate internal approvals to issue this letter to you.

Our ability to consummate the sale or placement of the Securities and the structuring and syndication of the Credit Facility is subject to satisfaction of conditions customary for financings of the type contemplated hereby or otherwise deemed appropriate by Goldman Sachs for this transaction, including, without limitation, (i) the satisfactory completion of our due diligence investigation with respect to the Company and the Company's proposed bankruptcy exit plan

and such due diligence investigation not disclosing any facts that would alter our current view with respect to any aspect of the Company or the exit plan, (ii) our having been provided reasonably acceptable offering documents and reasonable time to market the Securities and the Credit Facility with the assistance of management of the Company, and (iii) the passage of legislation and/or regulatory action enabling and supporting certain types of financing transactions of the Company, including securitization transactions for the purpose of financing existing wildfire claims through securitization of future incremental rate payments from Company customers.

Obtaining financing for the Exit is inherently subject to uncertainties and contingencies beyond our control; accordingly, this letter is not a commitment by GS&Co. or any of its affiliates to place or purchase the Securities or to place, purchase or provide any loans under the Credit Facility, and there can be no assurance that the sale and placement of the Securities and/or the structuring and syndication of the Credit Facility will in fact be accomplished. Any such commitment or participation by Goldman Sachs in any such transaction would be subject to (i) receipt of internal Goldman Sachs committee approvals, which will take into account, among other things, our regulatory risk rating in light of various factors including without limitation the structure and terms of any leveraged loan (if applicable) and the plan and model for the Company, (ii) the terms and conditions of the Securities and Credit Facility and all related documentation with respect to (x) the Securities and the sale and placement thereof and (y) the Credit Facility and the structuring and syndication thereof, in each case, being executed and delivered and satisfactory in form and substance to Goldman Sachs, (iii) the terms and conditions of the Exit (including the receipt of necessary governmental, regulatory or other third party consents and approvals, as well as the entry of a final, nonappealable order by the bankruptcy court approving the Exit and the financings, in form and substance satisfactory to Goldman Sachs), and (iv) satisfaction of other conditions customary for financings of the type contemplated hereby or otherwise deemed appropriate by Goldman Sachs for this transaction. The structure, covenants and terms of the Securities and the Credit Facility will be determined by Goldman Sachs, respectively, in consultation with the Company, based on market conditions at the time of the sale and placement or syndication and on the terms and documentation of the Exit. Furthermore, you understand that the terms on which a private placement of the Securities could be arranged may differ from the terms of a public offering of such Securities.

This letter and any written or oral communications provided by us are exclusively for your information and assistance in evaluating the financing of the Exit and may not be used, circulated, quoted or otherwise referred to with any other person or for any other purpose; nor is this letter or any such communications or information contained therein to be filed with, included in or referred to in whole or in part in any registration statement, proxy statement or any other document, except in each case in accordance with the prior written consent of GS&Co..

The parties hereto agree that any suit or proceeding arising in respect of this letter or the matters discussed herein will be tried exclusively in any Federal court of the United States of America sitting in the Borough of Manhattan or, if that court does not have subject matter jurisdiction, in any state court located in the City and County of New York, and the Company hereby submits to the exclusive jurisdiction of, and to venue in, such court.

In addition, please note that Goldman Sachs does not provide accounting, tax or legal advice. Notwithstanding anything herein to the contrary, you are authorized to disclose to any person the U.S. federal and state income tax treatment and tax structure of the potential transaction

and all materials of any kind (including tax opinions and other tax analyses) provided to you relating to that treatment and structure, without Goldman Sachs imposing any limitation of any kind. However, any information relating to the tax treatment and tax structure shall remain confidential (and the foregoing sentence shall not apply) to the extent necessary to enable any person to comply with securities laws. For this purpose, "tax structure" is limited to any facts that may be relevant to that treatment.

Very truly yours,

GOLDMAN SACHS & CO. LLC

By: _____

Name:
Title:

Charles D. Johnston
Authorized Signatory

<div align="center">

J.P. MORGAN SECURITIES LLC
383 Madison Avenue
New York, New York 10179

</div>

**PERSONAL AND CONFIDENTIAL**

<div align="right">

August 20, 2019

</div>

PG&E Corporation
Pacific Gas and Electric Company
77 Beale Street
P.O. Box 770000
San Francisco, California 94177

Ladies and Gentlemen:

PG&E Corporation, a California corporation, and Pacific Gas and Electric Company, a California corporation (collectively, "you" or the "Company"), have advised J.P. Morgan Securities LLC ("J.P. Morgan") that the Company is seeking proposals for financing in connection with the confirmation of a proposed chapter 11 plan of reorganization to be filed by the Company as authorized by its existing Board of Directors (the "Chapter 11 Plan").

Based upon the information that you have provided to us to date, our current understanding of the business, operations, property, condition (financial or otherwise) and prospects of the Company, our assumptions with respect to the potential tort liability of the Company, publicly available information, the current corporate debt and equity markets generally (including the bond and loan syndication markets and the securitization markets), our understanding regarding the proposed Chapter 11 Plan, and subject to the foregoing and such other matters as we consider relevant, we are pleased to inform you that, as of the date hereof, we are highly confident that, in connection with the Chapter 11 Plan proposed by the Company, we (and/or one of our affiliates, as applicable) can structure, arrange, raise and syndicate secured and unsecured debt financing (in the form of loans and bonds) and equity financing, at prevailing market prices, raising up to $42 billion of proceeds in line with the presentation provided to the Company by JPM (as defined below) on August 6, 2019 (the "Exit Financing") as "lead left" arranger and "lead left" bookrunning manager and act as administrative agent in connection therewith.

The ultimate terms and structure of, and documentation for, the Exit Financing will be determined by J.P. Morgan (and, as applicable, its affiliates) in consultation with you, will be mutually acceptable to J.P. Morgan (and, as applicable, its affiliates) and you, and will be based on market conditions at the time of the arrangement of the Exit Financing.

Our view above is based on the preliminary outline of the Chapter 11 Plan provided by the Company's advisors and to be proposed by the Company, and our understanding of the business, tax status, operations, property, condition (financial or otherwise) and prospects of the Company, including our assumptions regarding the potential tort liability of the Company. Our view above is also

subject to (i) there not occurring or becoming known to us any event, development or circumstance since December 31, 2018 that has had or could reasonably be expected to have a material adverse effect on the business, operations, property, condition (financial or otherwise) or prospects of you and your subsidiaries, taken as a whole, as determined by J.P. Morgan in its sole discretion (other than the filing by the Company of the voluntary chapter 11 cases being jointly administered under the caption *In re: PG&E Corporation, et al.*, Case No. 19-30088 and the events leading thereto), (ii) our satisfactory completion of due diligence, including but not limited to business, legal, accounting, financial, tax and structural matters as to the Company, and such investigation not disclosing any facts that would materially alter our current view of the Company, (iii) our not becoming aware of any information or any other matter affecting the Exit Financing, the Chapter 11 Plan or the Company that in our judgment is inconsistent in a material and adverse manner with any such information or other matter disclosed to us prior to the date hereof or could reasonably be expected to materially impair the syndication of the Exit Financing, (iv) that, prior to and during the syndication of any Exit Financing, there shall be no competing offering, placement or arrangement of any debt securities or bank financing, including with respect to the Chapter 11 Plan, and our having reasonable time to syndicate the Exit Financing with the assistance of management of the Company based on our experience in comparable transactions sold in comparable markets, (v) our satisfaction with the structure, terms and documentation for the Exit Financing and the Chapter 11 Plan, including acceptable forms of orders approving the Exit Financing and the solicitation and confirmation of the Chapter 11 Plan, (vi) the receipt of all required governmental, regulatory and third party consents and approvals in connection with the Exit Financing and the Chapter 11 Plan, (vii) there not having occurred a material disruption of or material adverse change in financial, banking or capital markets that, in our sole judgment, could materially impair the arrangement or syndication of any Exit Financing or the Chapter 11 Plan becoming effective in accordance with its terms, (viii) the Company satisfying (a) the conditions to participate in the Wildfire Fund pursuant to California Public Utilities Code sections 3292 and 3293, (b) the conditions to obtain a safety certification pursuant to California Public Utilities Code section 8389 and (c) any other conditions that are required to participate in the Wildfire Fund established under California Public Utilities Code section 3284 and be eligible for the presumption of reasonableness provided in California Public Utilities Code section 451.1, (ix) the Chapter 11 Plan proposed by the Company providing that all claims against the Company arising out of wildfires, including claims arising by way of subrogation under applicable law or contract on account of amounts incurred by an insurer, shall be settled and/or capped at an amount satisfactory to us and (x) our satisfaction with other customary aspects of these types of financings. Furthermore, our view is based on conditions in the financial markets generally, including, without limitation, the equity and debt markets (including the bond and loan syndication markets and the securitization markets), and assumes that there will be no material adverse change in the existing conditions in such markets.

This letter does not constitute a commitment by J.P. Morgan or any of its affiliates to arrange or provide any loans or any other financing under the Exit Financing or any other financing facility and there can be no assurance that the structuring, arrangement and syndication of the Exit Financing will in fact be accomplished and will expire if the Company's proposed Chapter 11 Plan is not the exclusive Chapter 11 Plan circulated to its creditors, interest holders and other parties in interest. Any such commitment would be made pursuant to one or more written agreements satisfactory to J.P. Morgan, in its sole discretion, and after receipt of all necessary internal approvals.

-2-

In connection with this letter, we have relied without independent verification upon the accuracy and completeness of all of the information reviewed by us for purposes of this letter. In addition, please note that we do not provide, and nothing herein shall be construed to be, accounting, tax or legal advice.

By your acceptance of this letter, you acknowledge that J.P. Morgan and its affiliates (for the purposes of this paragraph, "JPM") may be providing debt financing, equity capital or other services (including financial advisory services) to other companies in respect of which you may have conflicting interests regarding the transactions described herein and otherwise. By your acceptance of this letter, you also acknowledge that JPM has no obligation to use in connection with the transactions contemplated by this letter, or to furnish to you, confidential information obtained from other companies.

This letter has been delivered to you for your information and is not to be distributed or disclosed to, or otherwise relied upon by, any other person or entity without J.P. Morgan's prior written consent, except as required by law or compulsory legal process (in which case you agree to notify us prior to any such disclosure). Nothing herein, express or implied, is intended or shall confer upon any third party any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this letter. By your acceptance of this letter, you agree and acknowledge that none of J.P. Morgan nor any of its affiliates shall have any liability to you, any of your affiliates or any third party in connection with this letter.

This letter shall be governed by, and construed in accordance with, the laws of the state of New York. By your acceptance of this letter, you agree to submit to the exclusive jurisdiction and venue of the United States Bankruptcy Court for the Northern District of California, San Francisco Division. In addition, by your acceptance of this letter, you agree to irrevocably waive to the fullest extent permitted by applicable law, (a) any right you may have to a trial by jury in any legal proceeding arising out of or relating to this letter (whether based on contract, tort or any other theory) and (b) any objection that you may now or hereafter have to the laying of venue of any such legal proceeding in the United States Bankruptcy Court for the Northern District of California, San Francisco Division.

Very truly yours,

J.P. MORGAN SECURITIES LLC

By:

Name: Catherine O'Donnell

Title: Managing Director

3

**Morgan Stanley & Co. LLC**
**1585 Broadway**
**New York, New York 10036**

September 5, 2019

PG&E Corporation
77 Beale Street
San Francisco, CA 94105
Attention: Jason Wells, Senior Vice President and Chief Financial Officer

<u>Highly Confident Letter</u>

Mr. Wells:

PG&E Corporation ("**you**" or the "**Company**") has advised Morgan Stanley & Co. LLC ("**MS&Co.**," "**we**" or "**us**") that it anticipates filing its proposed plan of reorganization from Chapter 11 on or around September 9, 2019, as discussed between the Company and Morgan Stanley (such proposed plan of reorganization as previously discussed with you on August 6, 2019, the "**Proposed Plan of Reorganization**").

You have advised us that a total of approximately $35 - $40 billion of capital is required under the Proposed Plan of Reorganization. We understand that the sources of such funds will be comprised of a combination of investment grade debt, high yield debt and equity issuances (the "**Offerings**") in amounts previously suggested to Morgan Stanley by the Company.

In evaluating the Offerings, we have preliminarily reviewed and relied upon (without independent verification of the accuracy or completeness thereof) certain guidance from the Company's management as referenced above and publicly available information concerning the Company and the Proposed Plan of Reorganization. In addition, our view is based upon the following: (i) our analysis of the current markets for investment grade debt, high yield debt and equity issuances, (ii) the general market outlook and sentiment around your Company and your industry as of the date hereof, (iii) the Proposed Plan of Reorganization and no other proposed plans of reorganization and/or financing structures, and (iv) the assumption that the Offerings would be structured in a manner consistent with, and resulting documentation thereof would contain covenants, terms and conditions (including pricing and conditions precedent) comparable with relevant precedent, and otherwise satisfactory to us in all respects.

Subject to the foregoing, we are pleased to inform you that, as of the date hereof, we are highly confident that the Offerings contemplated for the Proposed Plan of Reorganization can be arranged. Please be advised that this view speaks only as of the date hereof, while such view may change subsequent to the date of this letter, we do not have any obligation to inform you of any change in such view or to withdraw or reaffirm

such view in this letter. Please also note that we are not expressing any view or the likelihood of success of the Proposed Plan of Reorganization.

This letter is not intended to be and should not be construed as a commitment to, now or in the future, provide, arrange, underwrite, purchase or place all or any portion of any Offering (including but not limited to any investment grade debt or high yield debt or any equity financing), or confer any benefits upon, or create any rights in favor of, any person or entity and may not be relied upon by any person or entity, and we express no view as to our willingness to hold any portion of any Offering (including but not limited to any investment grade debt or high yield debt or any equity financing). No legal relationship shall arise because of this letter, other than your obligations in relation to confidentiality and exculpation hereunder.

This letter is solely for confidential use by you and neither its existence nor the terms hereof may be disclosed to any person without our prior written consent, other than to your directors, officers and advisors, in each case on a "need to know" basis in connection with the transactions contemplated hereby, and provided further that you agree, and your directors, officers and advisors understand as a condition to receiving this letter, (i) to keep this letter confidential and to not further disclose this letter or the matters described herein including, except as required by law, use the name of, or refer to, MS&Co. or any of its affiliates or joint venture partners in any correspondence, discussions, advertisement, press release or disclosure made in connection with the financings or the Transaction without the prior written consent of MS&Co, (ii) not to definitively rely upon this letter in its decision to take any action or refrain from taking any action and (iii) MS&Co. or any of its affiliates or joint venture partners will not have any liability to you or any third party (including, without limitation, any person to whom this has been disclosed as provided in this paragraph) relating to this letter or the matters described herein.

This letter shall be governed by, and construed in accordance with, the laws of the State of New York.

*[Remainder of page intentionally left blank]*

PG&E Corporation
September 5, 2019
Page 3

We look forward to working with you in connection with the aforementioned.

Very truly yours,

MORGAN STANLEY & CO. LLC

By: _____

Name: David J. Nastro
Title: Managing Director