Robert A. Julian (SBN 88469)
Cecily A. Dumas (SBN 111449)
BAKER & HOSTETLER LLP
1160 Battery Street, Suite 100
San Francisco, CA 94111
Telephone: 628.208.6434
Facsimile: 310.820.8859
Email: rjulian@bakerlaw.com
Email: cdumas@bakerlaw.com

Eric E. Sagerman (SBN 155496)
Lauren T. Attard (SBN 320898)
BAKER & HOSTETLER LLP
11601 Wilshire Blvd., Suite 1400
Los Angeles, CA 90025-0509
Telephone: 310.820.8800
Facsimile: 310.820.8859
Email: esagerman@bakerlaw.com
Email: lattard@bakerlaw.com

*Counsel to the Official Committee of Tort Claimants*

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:** <br><br> **PG&E CORPORATION** <br><br> -and- <br><br> **PACIFIC GAS AND ELECTRIC COMPANY,** <br>                                   **Debtors.** <br><br> ☐ Affects PG&E Corporation <br> ☐ Affects Pacific Gas and Electric Company <br> ■ Affects both Debtors <br><br> *All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | Bankruptcy Case No. 19-30088 (DM) <br><br> Chapter 11 <br> (Lead Case) <br> (Jointly Administered) <br><br> **STATUS CONFERENCE STATEMENT OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS** <br><br> Date: September 24, 2019 <br> Time: 9:30 a.m. (Pacific Time) <br> Place: United States Bankruptcy Court <br>          Courtroom 17, 16th Floor <br>          San Francisco, CA 94102 |

The Official Committee of Tort Claimants ("**TCC**") in the chapter 11 cases of PG&E Corporation ("**Holdco**") and Pacific Gas and Electric Company (the "**Utility**," and collectively with Holdco, the "**Debtors**"), hereby submits its Status Conference Statement in connection with the Status Conference currently scheduled for September 24, 2019, at 9:30 a.m., in the above-captioned court (the "**Bankruptcy Court**"), and respectfully represents as follows:

### A. The Debtors' Progress Toward a Confirmable Plan is Illusory.

The Debtors' bankruptcy cases (the "**Bankruptcy Cases**" or "**Cases**") are not about restructuring business debts. The Debtors' statements from the commencement of the Bankruptcy Cases have indicated that the purpose of the proceedings is to address tort claims arising from the 2017 and 2018 wildfires. Their actions in the Cases are consistent with the statements. Under the Joint Chapter 11 Plan of Reorganization filed by the Debtors on September 9, 2019 ("**Plan**"), claims other than claims arising from wildfires are unimpaired. The Debtors also have announced that they do not intend to reject power purchase agreements ("**PPAs**") notwithstanding the disputes before the Federal Energy Regulatory Commission ("**FERC**") and this Court.

So, the measure of progress toward confirmation of a plan must be evaluated by the Debtors' progress toward treatment of tort claims. Here, the Debtors have relied on smoke and mirrors instead of meaningful progress.

### B. Public Entity Settlement Provides Disparate Treatment of Similarly Situated Tort Claimants.

First, the Debtors announced to the Court and the media their settlement with public entities (the "**PE Settlement**") for $1 billion. As it turns out, however, the public entities included in the settlement are based on the happenstance of having been represented by the Stutzman firm and its co-counsel. The settlement includes 18 public entities. It does not include many, many other similarly situated public entities. For example, the TCC has been informed that both the Paradise Irrigation District and the Paradise School District that sustained losses in the Camp Fire have substantial claims (upwards of $100 million) that were not included in the $1 billion settlement.

There are many other local public entities that were not included in the PE settlement.[1] For the Debtors to have announced a "public entity" settlement is disingenuous.

Also, the Debtors openly recognize that substantial claims may be asserted by the State of California (Cal Fire remediation costs and other claims) and the United States (FEMA claims and other claims), that collectively may be in the billions of dollars, are not included in the announced PE Settlement.

The Debtors' apparent treatment all these public entity claims that they have not resolved under the Plan is to include them in a class with fire victims and channeled to a resolution trust. This proposed treatment has the effect of diluting the funds available to pay victims. The disparity between the Stutzman settling parties and the other public entities makes it impossible to determine whether those parties will receive comparable compensation for their losses.

### C. The Settlement with Subrogation Claimants Violates the Absolute Priority Rule.

The Debtors recently announced a settlement with the holders of subrogation claims ("**Subrogation Claimants**") in the aggregate amount of $11 billion ("**Subrogation Claims**"), subject to Bankruptcy Court approval. The Debtors propose to allow these Subrogation Claims and liquidate the claims. Under the Plan as described in the Debtors' press release, the Subrogation Claimants will receive on the effective date $11 billion in cash.

The problem with the Subrogation Claimants' settlement is that the treatment under the Plan violates the absolute priority rule. Subrogation is an equitable doctrine that permits an insurer to assert the rights and remedies of an insured against a third-party tortfeasor. *Chandler v. State Farm Mut. Auto Ins. Co.*, 598 F.3d 1115, 1117 (9th Cir. 2010). The Subrogation Claims are derivative of the claims of wildfire victims. When the insurers paid policy benefits to their insureds, they acquired the right (whether by contract provision or equity) to pursue recovery of the subrogated claims against the Debtors.

---

[1] The PE settlement includes an arbitrary twist. The Debtors contest liability for losses in connection with the Tubbs fire in Santa Rosa, California. However, under the settlement the settling North Bay public entities may "share" settlement proceeds with Santa Rosa even though it is not officially entitled to settlement proceeds. In this way, the Debtors hope to eliminate a challenge from Santa Rosa, while still contesting liability for the Tubbs fire with victims. This sleight of hand is typical of the Debtors' arbitrary handling of similarly situated claimants.

- 3 -

The insurers' right of subrogation is subject to a common law exception. The "made whole" doctrine "precludes an insurer from recovering any third-party funds unless and until the insured has been made whole for the loss." *Chandler*, 598 F.3d at 1117.[2] "The applicability of the doctrine generally depends on whether the insured has been completely compensated for all the elements of damages, not merely those for which the insurer has indemnified the insured." *Id.* at 1118. The doctrine is implicated in these Bankruptcy Cases in the following way: Wildfire victims suffered two types of losses—property damages based on their homes or businesses being completely or partially destroyed, and personal injury claims based on the trauma of fleeing wildfires bearing down on their homes or businesses and dealing with the aftermath of mass disasters the Debtors inflicted on their communities. Property damages are covered by insurance; personal injuries, such as emotional distress and physical injury are not.

What this means is that most if not all wildfire victims who fled from fires have **uninsured** emotional distress damages claims against the Debtors, even if they received insurance payments under their policies. Therefore, the made-whole doctrine subordinates most if not all Subrogation Claims to the claims of wildfire victims who have not been made whole for all their losses in the Bankruptcy Cases. The Subrogation Claims may not be allowed and treated on equal priority with victim claims under the Plan without violating the absolute priority rule of Bankruptcy Code section 1129(b).

The Debtors hope to circumvent the consequence of this well-established equitable doctrine. What they are counting on is that hundreds if not thousands of insured victims will not file any claims in the Bankruptcy Cases, even claims based on their emotional distress and personal injuries. If these victims do not file claims, the corresponding subrogation claim of the insurer would not be subject to bar under the made-whole rule because the victim is not asserting his or her own uninsured claim against the tortfeasor. Therefore, the Debtors are hoping for a low number of claims being filed, or low "participation." If there are enough victims who received insurance

---

[2] California recognizes two exceptions to the applicability of the made-whole rule, neither of which is applicable in these Bankruptcy Cases. First, the insured may disclaim the made whole rule through clear and specific language in the insurance policy. Second, the rule does not apply if the insurer participates in the prosecution of the insured's claim against the third-party tortfeasor. *Chandler*, 598 F.3d at 1118.

payments for some or all of their insured losses who do not file claims in the Bankruptcy Case, the Debtors hope to elevate the Subrogation Claims to equal priority with the victim claims without violating the absolute priority rule.

### D. Misconceptions as to the Right to File Uninsured Claims May Have Adversely Affected the Claims Solicitation Process.

The TCC has uncovered a misconception among insured wildfire victims that may have enormous due process implications for claims allowance and made-whole if the misconception proves to be widespread. Here is the issue: We know the wildfire losses affected tens of thousands of people, and the losses are extremely high. This is shown by the settlement of Subrogation Claims at $11 billion. Prime Clerk's claims noticing program included, among other notices, mailings to 16 million customers. Yet, only a handful of wildfire claims—under 1,500—have been filed to date.[3]

Based on sampling of interviews of a few victims in wildfire-affected areas, the TCC has preliminarily concluded that victims who received insurance benefits may believe that they are not permitted to file claims against the Debtors because they received payments from their insurance companies. The TCC fears that hundreds if not thousands of victims who hold valid uninsured and underinsured claims are not asserting the claims against the Debtors based on the belief, however mistaken, that they would be violating their insurance policies and the terms of the payment of their benefits. Once the Subrogation Claims settlement is filed, the names of insureds will be publicly available. At that point the TCC will conduct more comprehensive discovery of insurers and insureds to find out whether victims are confused and believe that they are prohibited from filing emotional distress claims because they received insurance payments. Until the TCC has more information concerning the discrepancy between the dollar amount of Subrogation Claims and what should be concomitant underinsured or uninsured claims against the Debtors, it must assume that the made-whole rule applies to subordinate the entire amount of settled Subrogation Claims.

---

[3] The TCC is not suggesting that victims who retained lawyers to prosecute their claims against the Debtors hold this misconception.

- 5 -

Case: 19-30088    Doc# 3931    Filed: 09/18/19    Entered: 09/18/19 15:44:22    Page 5 of 6

Therefore, the Plan as currently proposed does not comply with Section 1129 of the Bankruptcy Code and may not be confirmed.

The TCC, by raising these preliminary issues in this Status Conference Statement, is not waiving, and shall not be construed to have waived, other objections to the Debtors' proposed Plan, all of which are expressly reserved.

Dated: September 18, 2019                   Respectfully submitted,

BAKER & HOSTETLER LLP

By:   */s/ Cecily A. Dumas*
       Cecily A. Dumas

*Counsel to the Official Committee of Tort Claimants*