| | |
|---|---|
| BAKER & HOSTETLER LLP | AKIN GUMP STRAUSS HAUER & FELD LLP |
| Robert A. Julian (SBN 88469)<br>Cecily A. Dumas (SBN 111449)<br>160 Battery Street, Suite 100<br>San Francisco, CA 94111<br>Telephone: (628) 208-6434<br>Facsimile: (310) 820-8859<br>Email: rjulian@bakerlaw.com<br>cdumas@bakerlaw.com | Michael S. Stamer (*pro hac vice*)<br>Ira S. Dizengoff (*pro hac vice*)<br>David H. Botter (*pro hac vice*)<br>Abid Qureshi (*pro hac vice*)<br>One Bryant Park<br>New York, New York 10036<br>Telephone: (212) 872-1000<br>Facsimile: (212) 872-1002<br>Email: mstamer@akingump.com<br>idizengoff@akingump.com<br>dbotter@akingump.com<br>aqureshi@akingump.com |
| Eric E. Sagerman (SBN 155496)<br>Lauren T. Attard (SBN 320898)<br>11601 Wilshire Boulevard<br>Suite 1400<br>Los Angeles, CA 90025<br>Telephone: (310) 820-8800<br>Facsimile: (310) 820-8859<br>Email: esagerman@bakerlaw.com<br>lattard@bakerlaw.com | Ashley Vinson Crawford (SBN 257246)<br>580 California Street<br>Suite 1500<br>San Francisco, CA 94104<br>Telephone: (415) 765-9500<br>Facsimile: (415) 765-9501<br>Email: avcrawford@akingump.com |
| *Counsel to the Official Committee of Tort Claimants* | *Counsel to the Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company* |

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>    -and-<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>**DEBTORS** | Bankruptcy Case No. 19-30088 (DM)<br><br>Chapter 11<br><br>(Lead Case)<br><br>(Jointly Administered)<br><br>**JOINT MOTION OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS AND AD HOC COMMITTEE OF SENIOR UNSECURED NOTEHOLDERS TO TERMINATE THE DEBTORS' EXCLUSIVE PERIODS PURSUANT TO SECTION 1121(d)(1) OF THE BANKRUPTCY CODE** |

☐ Affects PG&E Corporation

☐ Affects Pacific Gas and Electric Company

☒ Affects both Debtors

*All papers shall be filed in the Lead Case, No. 19-30088 (DM).*

**Hearing**
Date: September 24, 2019, or to be determined
Time: 9:30 a.m. (Pacific Time)
Place: Courtroom 17
　　　　450 Golden Gate Ave, 16th Floor
　　　　San Francisco, CA 94102

**Objection Deadline:** Parties intend to move for shortened time to have this Motion heard on September 24, 2019 with an objection deadline to be set by the Court.

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................... 5

JURISDICTION AND VENUE ........................................................................................... 8

BACKGROUND ................................................................................................................... 8

RELIEF REQUESTED ......................................................................................................... 9

BASIS FOR RELIEF ............................................................................................................. 9

CONCLUSION .................................................................................................................... 15

NOTICE ............................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
  352 B.R. 578 (Bankr. S.D.N.Y. 2006) ................................................................................. 8

*Chandler v. State Farm Mut. Auto Ins. Co.*,
  598 F.3d 1115 (9th Cir. 2010) ........................................................................................... 14

*In re Dow Corning Corp.*,
  208 B.R. 661 (Bankr. E.D. Mich. 1997) ............................................................................. 8

*In re L&J Anaheim Assocs.*,
  995 F.2d 940 (9th Cir. 1993) ............................................................................................ 13

**Statutes**

28 U.S. C. § 157 ............................................................................................................................ 8

28 U.S. C. § 1334 .......................................................................................................................... 8

28 U.S.C. § 1408 ........................................................................................................................... 8

28 U.S.C. § 1409 ........................................................................................................................... 8

United States Code title 11 ......................................................................................... 5, 8, 10, 13, 14

**Other Authorities**

Bankruptcy Local Rules for the United States District Court for the Northern District of
  California Rule 5011-1(a) ................................................................................................... 8

Bankruptcy Rule 2002 ................................................................................................................ 15

Federal Rules of Bankruptcy Procedure Rule 2019 ..................................................................... 5

Mark Chediak and Scott Deveau, *PG&E's $11 Billion Settlement with Insurers Sets up
  Clash with Fire Victims*, Los Angeles Times (Sept. 13, 2019) ........................................ 13

*Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General
  Order 24 ............................................................................................................................. 8

*Third Amended Verified Statement of the Ad Hoc Group of Subrogation Claim Holders
  Pursuant to Bankruptcy Rule 2019* [Docket No. 3020], Exhibit A ................................. 12

The Official Committee of Tort Claimants (the "TCC") and the Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company (the "Ad Hoc Committee")[1] in the above-captioned chapter 11 cases of Pacific Gas and Electric Company (the "Utility") and PG&E Corporation ("PG&E" and, together with the Utility, the "Debtors"), by their respective undersigned counsel, Baker & Hostetler LLP and Akin Gump Strauss Hauer & Feld LLP, hereby submit this motion (the "Motion") pursuant to section 1121(d)(1) of title 11 of the United States Code (the "Bankruptcy Code") for entry of an order, substantially in the form attached as **Exhibit A** hereto, terminating the Debtors' exclusive periods to file and solicit acceptances of a plan of reorganization (the "Exclusive Periods"). Termination would allow the TCC and the Ad Hoc Committee to jointly propose the Alternative Plan (as defined herein) attached hereto as Exhibit 1. In support of this Motion, the TCC and the Ad Hoc Committee respectfully state the following:

**PRELIMINARY STATEMENT**

1. In its memorandum decision [Docket No. 3568] (the "Memorandum Decision") denying the Ad Hoc Committee's prior request to terminate exclusivity, the Court made clear that the top priority in this case is "compensating victims of enormous and unimaginable tragedies." Memorandum Decision at 3. As a result, the Court permitted the Debtors to maintain exclusivity, but warned the Debtors at the status conference held on August 27, 2019, that if the plan filed was "bogus" or not "legally permissible or couldn't be confirmed without" consent of the objecting parties, the Court "probably would be receptive to terminating exclusivity very quickly." Hr'g Tr. 42:21-43:4, August 27, 2019. Despite these clear statements from the Court, on September 9, 2019 [Docket No. 3841] the Debtors filed a plan (the "Placeholder Plan") not supported by any of the wildfire victims and without substantial financing commitments.[2]

---

[1] The Ad Hoc Committee filed a statement pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure on July 18, 2019 [Docket No. 3083]. Members of the Ad Hoc Committee hold in excess of $10 billion of funded debt claims against the Debtors.

[2] The Debtors will undoubtedly claim to have made progress based on their announcement on September 13, 2019 of a settlement with the Ad Hoc Group of Subrogation Claim Holders (the "Subrogation Group") to increase the plan treatment for Subrogation Wildfire Claims to $11 billion. For reasons that will be explained in greater detail below, this

5

2. During this same period, however, the representatives of the two largest stakeholders in this case—the TCC and the Ad Hoc Committee—have been negotiating an alternative to the Debtors' Placeholder Plan (the "Alternative Plan") that focuses on resolving and fully funding the payment of the claims held by the victims of these tragic wildfires, rather than returns to equity holders and secondary market buyers of subrogation claims. The TCC and the Ad Hoc Committee are now prepared to present the Alternative Plan that incorporates a comprehensive settlement (the "Wildfire Claims Settlement") of all wildfire claims against the Debtors, including subrogation claims, valued at $24 billion, paid with a mix of cash and equity of the Reorganized PG&E Corp., which both the TCC and the Ad Hoc Committee believe has the best chance to fully and fairly compensate wildfire victims. As important, the payments to victims under the Wildfire Claims Settlement and Alternative Plan will be satisfied from, among other sources, fully committed financing provided by the members of the Ad Hoc Committee—in stark contrast to the highly conditional and illusory "financing" that the Debtors hope will materialize to back the Placeholder Plan. Under the Alternative Plan, wildfire victims will be paid through a trust that will be acceptable to the TCC and overseen by those selected by the TCC to manage the process. By placing the governance of the mechanism by which wildfire victims will be paid in the hands of the representatives of those victims, the Alternative Plan ensures a quick and fair process for victims to receive their recoveries.

3. Put simply, the Alternative Plan is the only "clear path to reach the goal of compensation for the fire victims who are involuntary creditors of these debtors as well as for the contractual claims of their voluntary creditors." Memorandum Decision at p. 2. It is the only plan construct that is supported by the individual wildfire victims, and the only plan that can plausibly make these victims whole. Moreover, the Alternative Plan may avoid the need for a lengthy and uncertain estimation process to determine the Debtors' aggregate wildfire liability, as well as the state court trial with respect to the Tubbs Fire,

---

settlement does not constitute true progress and in fact shifts $1.5 billion of already inadequate recoveries from individual victims to the insurance companies and financial institutions that hold Subrogation Wildfire Claims. Thus, rather than moving parties closer, this "settlement" moves the Debtors further away from a resolution with the TCC and individual victims.

6

providing the Debtors with a clear path to resolution of these cases well before the June 30, 2020 deadline to qualify for the go-forward wildfire fund under AB 1054.

4. Thus, it is clear that while the TCC and the Ad Hoc Committee have been focused on finding a way to compensate fairly wildfire victims and expeditiously moving these cases out of bankruptcy, the Debtors have used their Exclusive Periods to serve only the interests of their equity holders and have done so at the expense of wildfire victims and other stakeholders. The Debtors have used this time (i) negotiating for illusory financing commitments with equity holders, (ii) negotiating with additional equity holders who are now major holders of Subrogation Wildfire Claims to settle those claims, and (iii) unsuccessfully lobbying the California state legislature during August and September to authorize the issuance of equity securitization bonds, and as a result have ended up with only the Placeholder Plan, which provides unacceptable risks and uncertainties to the wildfire victims. Even if this Court believed that the Placeholder Plan satisfied the low "bogus" standard and provides a path, *which it does not*, the Alternative Plan plainly satisfies the Court's requirements. The Court now has before it two paths—the Debtors' Placeholder Plan, which has the embedded risk that the tort claimants will prove claims far beyond the Debtors' (or equity's) ability to fund; and the Alternative Plan, which takes both the uncertainty as to the maximum tort claim amount, and uncertainty as to the ability to satisfy that agreed amount promptly, off the table. This Court should eliminate the risk to all claimants (and the risk to California ratepayers), by ensuring that the Alternative Plan is firmly in place as an alternative means to a speedy exit from bankruptcy.

5. The TCC and the Ad Hoc Committee submit that the Alternative Plan presents the only available path to a fair and equitable outcome for victims and a path to resolution of these cases prior to June 30, 2020. Therefore, we respectfully request that the Court terminate the Exclusive Periods so that they may jointly file and solicit acceptances of the Alternative Plan, for only then is there a backstop, should the Placeholder Plan fail, which the TCC and the Ad Hoc Committee believe is inevitable. The primary consideration for a court in determining whether to maintain or terminate exclusivity is whether

7

termination will "move the case forward."[3] Allowing the TCC and the Ad Hoc Committee to file and solicit acceptances of the Alternative Plan is the most certain way to move these cases forward and satisfy the claims of all creditors, including, most importantly, the wildfire victims.

## JURISDICTION AND VENUE

6. The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.), and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California (the "Bankruptcy Local Rules").

7. This is a core proceeding pursuant to 28 U.S.C. §157(b).

8. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

9. The statutory basis for the relief requested in this Motion is section 1121(d) of the Bankruptcy Code.

## BACKGROUND

10. On June 25, 2019, the Ad Hoc Committee filed its motion to terminate the Debtors' Exclusive Periods [Docket No. 2741] (the "Original Termination Motion"). On August 13, 2019, the Court conducted a hearing to consider the Original Termination Motion (the "Exclusivity Hearing"). On August 16, 2019, this Court entered the Memorandum Decision denying the Original Termination Motion, despite finding that the Ad Hoc Committee satisfied the standard set forth by the Court.

11. The Memorandum Decision stated that that the Court was attempting to find a "clear path to reach the goal of compensation for the fire victims who are involuntary creditors of these debtors as well as for the contractual claims of their voluntary creditors[.]" Memorandum Decision at 2. The Court went on to warn the Debtors that the Court "probably would be very receptive to terminating exclusivity very quickly" if the Debtors' plan was "bogus" and invited the Ad Hoc Committee to renew its motion if the

---

[3] *In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 590 (Bankr. S.D.N.Y. 2006); *In re Dow Corning Corp.*, 208 B.R. 661, 670 (Bankr. E.D. Mich. 1997).

8

Debtors' plan was not "legally permissible or couldn't be confirmed without" consent. Hr'g Tr. 42:21-23, August 27, 2019.

12. On September 9, 2019, the Debtors filed the Placeholder Plan. On September 13, 2019, the Debtors announced they had reached a settlement with the Subrogation Group. PG&E Corp., Current Report (Form 8-K) (Sept. 13, 2019).[4]

**RELIEF REQUESTED**

13. By this Motion, the TCC and the Ad Hoc Committee seek entry of an order terminating the Debtors' Exclusive Periods to permit the TCC and the Ad Hoc Committee to jointly file and solicit acceptances of a plan of reorganization based on the terms set forth in the Alternative Plan term sheet attached hereto. A proposed form of order approving the relief requested herein is annexed hereto as Exhibit A.

**BASIS FOR RELIEF**

14. There is ample cause to terminate the Debtors' Exclusive Periods. The Placeholder Plan was filed by the Debtors solely to maintain exclusivity. The Placeholder Plan has a multitude of deficiencies, the most serious of which are detailed below, including the fact that the Placeholder Plan is drastically underfunded and it proposes to severely undercompensate key impaired constituencies, most notably the wildfire victims and the holders of the Funded Debt Claims, without whose support the Placeholder Plan cannot be confirmed because of the absolute priority rule.[5] Critically, the Placeholder Plan lacks the support of the representatives of the wildfire victims—the TCC, who now support termination of exclusivity to pursue the Alternative Plan. That alone should serve as a basis to terminate the Debtors' Exclusive Periods to enable the TCC and the Ad Hoc Committee to pursue the Alternative

---

[4] Other than providing a settlement amount for holders of subrogation claims, the Debtors have announced no details regarding this settlement and have not sought Court approval of such settlement.

[5] 11 U.S.C. 1129(b)(2)(B)(ii). *See* Placeholder Plan at p. 37 (acknowledging that Other Wildfire Claims are impaired as against both debtors but providing value to all four classes of interests and Subrogation Wildfire Claims, which are subordinate to their insureds.)

9

Plan. Given the intense time strictures in these cases, this Court should not wait for the Debtor's plan to inevitably fail in order to permit the only confirmable plan to move forward.

15. First, despite what the Debtors told the Court previously, the Debtors' filings indicate they do not have the committed financing to fund the Placeholder Plan. At the Exclusivity Hearing, counsel for the Debtors told the Court that funding commitments had "been coming in quite rapidly" and were "now well in excess of $13 billion." Hr'g Tr. 57:7-9, August 13, 2019. However, contrary to the express representation made to the Court, the 8-K filed by the Debtors on September 9, 2019 indicated that the Debtors have only secured $1.5 billion in funding from the exact same parties that had been involved since early August.[6] *See* PG&E Corp., Current Report (Form 8-K) (Sept. 9, 2019). The Debtors appear to have, at the very least, intentionally overstated their position to this Court in a desperate attempt to maintain exclusivity in August.

16. Further, the limited commitments that the Debtors appear to have secured are entirely contingent on the Debtors securing a total of $14 billion in substantially similar commitments by November 7, 2019.[7] As discussed below, the commitments from Knighthead and Abrams will also terminate in the event that the aggregate wildfire claims against the Debtors are in excess of $18.9 billion, which the TCC and the Ad Hoc Committee believe remains a strong possibility. *Id*. Instead of hard commitments for additional financing, the Debtors refer to so-called "highly confident letters" from several banks stating, subject to numerous conditions, that they believe they will be able to arrange equity and debt financing and place equity financing for the Debtors' reorganization. *Id*. at Schedule 2. There is nothing, however, binding these banks to arrange any financing nor any consequences for their failure to do so. Rather than the $13 billion in additional financing promised by the Debtors at the August 13 hearing, the Debtors appear to have nothing more than questionable commitments for $1.5 billion from

---

[6] The Debtors previously entered into an agreement to act in concert with Knighthead Funds and Abrams Capital Management, L.P. to develop a proposal to provide capital commitments in support of a potential plan of reorganization. PG&E Corp., Schedule 13D (Item 4)(Aug. 7, 2019).

[7] Summary of Key Elements of Debtors' Joint Chapter 11 Plan of Reorganization Dated September 9, 2019 [Docket No. 3844], Schedule 1 at 6.

10

the same parties the Debtors had previously announced and several nonbinding letters from financial institutions which fail to guarantee a single dollar in financing for the Debtors' reorganization.

17. Second, the aggregate caps on wildfire claims proposed in the Placeholder Plan are entirely inadequate, and instead of encouraging a consensual resolution with the TCC and individual victims, will assuredly encourage these parties to continue litigating and seeking a significantly higher estimation for the Debtors' wildfire liabilities in the pending estimation proceeding. The Debtors have proposed a cap of $8.4 billion on what they describe as "Other Wildfire Claims." Plan at 21. The Debtors' Aug. 9, 2019 10Q states the Utility has determined it is probable the Utility will incur a loss liability for the wildfire claims arising from 22 of the 2017 and 2018 wildfires in the accrued amount of $17.9 billion,[8] which reflects the "low end of the range of reasonably estimated losses";[9] it is reasonably possible that the amount of the loss will be greater than the amount accrued;[10] and the amount of the Utility's possible loss liability could exceed $30 billion.[11] The Debtors' own SEC admissions of their probable liability for the wildfire claims establishes the $8.4 billion cap for the Other Wildfire Claims is not appropriate for the TCC and individual victim claims. By capping recoveries for individual victims at such a low level, the Placeholder Plan guarantees that rather than consensually resolve the crucial issue of payment to victims, the Placeholder Plan will lead to hard-fought and protracted litigation which will likely extend these cases far beyond the June 30, 2020 deadline.

18. While the Debtors will likely tout the settlement with the Subrogation Group as substantial progress in these cases, in reality, they are enriching a major equity holder at the expense of individual wildfire victims. To illustrate, the Placeholder Plan initially contained a cap of $8.5 billion on Subrogation Wildfire Claims, but after the announced deal with the Subrogation Group, that cap has been increased to $11 billion, a $2.5 billion increase. Plan at 14; PG&E Corp. Current Report (Form 8-

---

[8] This amount was subsequently increased to $18.9 billion. PG&E Corp. Current Report (Form 8-K) (Sept. 13, 2019).

[9] PG&E Corp., Quarterly Report (Form 10-Q) (Aug. 9, 2019).

[10] *Id.* at 53-54.

[11] *Id.* at 76.

K) (Sept. 13, 2019). However, pursuant to the announcement of the deal, the total cap for wildfire liability in the Debtors' financing commitment letters is increased by only $1 billion. PG&E Corp. Current Report (Form 8-K) (Sept. 13, 2019). In other words, the Debtors intend to shift approximately $1.5 billion of recoveries previously allocated for individual wildfire victims to the Debtors' allies in the Subrogation Group. The two goals of this settlement are clear: (i) to protect the interests of the Debtors' equity holders by "boxing in" individual wildfire victims' recoveries and (ii) to enable the Debtors to argue that they have made sufficient progress to maintain exclusivity. Since this Court's denial of the Original Termination Motion, the Debtors have engaged in negotiations *only* with the equity group represented by the Jones Day firm and the Subrogation Group, which is itself dominated by The Baupost Group, L.L.C. ("Baupost"), one of the Debtors' largest equity holders.[12] The settlement of the Subrogation Wildfire Claims will enrich Baupost enormously at the expense of individual wildfire victims that have suffered actual loss. Baupost is reported to hold more than $3.3 billion in Subrogation Wildfire Claims,[13] much of which, upon information and belief, was purchased at approximately 35% of face value.[14] The Placeholder Plan would pay Baupost's claims at roughly 59% of face value, allowing it to reap hundreds of millions of dollars in profit from the Debtors' plan, at the expense of actual wildfire victims.[15] Far from reaching common ground with a new constituency, the settlement reflects the Debtors again acting for the benefit of a large equity holder and creating the illusion that progress is being made in these cases. Any "progress" is, however, at the expense and to the detriment of individual wildfire victims and the certainty and adequacy of their recoveries.

19. Third, the Debtors play fast and loose in the Placeholder Plan with the concept of "impairment," as evidenced by their proposed treatment of the Funded Debt Claims, another major

---

[12] Baupost holds approximately 23% of the Subrogation Wildfire Claims held by the Subrogation Group and 24.5 million shares of PG&E common stock, or 4.6% of the total outstanding PG&E common stock. *See Third Amended Verified Statement of the Ad Hoc Group of Subrogation Claim Holders Pursuant to Bankruptcy Rule 2019* [Docket No. 3020] (the "Subrogation 2019"), Exhibit A at 4

[13] Subrogation 2019, Exhibit A at 4.

[14] Mark Chediak and Scott Deveau, *PG&E's $11 Billion Settlement with Insurers Sets up Clash with Fire Victims*, Los Angeles Times (Sept. 13, 2019).

[15] *Id*.

12

creditor constituency. Under section 1124 of the Bankruptcy Code, "any alteration" of creditors' rights under a plan of reorganization constitutes impairment for voting purposes. *In re L&J Anaheim Assocs.*, 995 F.2d 940, 942-943 (9th Cir. 1993). Thus, the TCC and the Ad Hoc Committee believe that in order to be unimpaired, the terms of the Funded Debt Claims must be respected, including requiring payments of make-whole premiums and postpetition interest at the contract rate, neither of which are provided for in the Placeholder Plan. Given that the Placeholder Plan does not leave unaltered the contractual rights relating to these claims, the holders of the Funded Debt Claims are impaired. *See* Placeholder Plan, Section 4.16(a). At a minimum, this entitles the holders of the Funded Debt Claims to vote and to receive disclosure with respect to their claims in advance of voting.

20. In any event, because the treatment of the Funded Debt Claims will be the subject of litigation, the Debtors will need to reserve billions of dollars to protect the interests of the holders of Funded Debt Claims in case this Court or an appellate court determines that they are entitled to make-whole premiums and interest at the contract rate. Thus, the Placeholder Plan will inevitably face significant challenges as to its feasibility absent reserving funds for such a contingency. The Placeholder Plan does not currently provide for the escrowing of funds necessary to pay additional amounts to confirm the Placeholder Plan should this Court or an appellate court determine that the Funded Debt Claims are entitled to better treatment that the Placeholder Plan currently provides.

21. Fourth, the Placeholder Plan violates the absolute priority rule and thus cannot be confirmed without the consent of the classes containing the constituents of the TCC and the Ad Hoc Committee. The absolute priority rule of section 1129(b)(2)(B)(ii) of the Bankruptcy Code provides that without an impaired class' consent, no junior class shall "receive or retain" "any property" on account of their junior claim or interest. The Funded Debt Claims classes are impaired as set forth above, and the Debtors acknowledge that the Other Wildfire Claims classes are impaired. Yet the Placeholder Plan permits every class of interests to be retained (subject to dilution); three of which are not impaired at all.[16] Moreover, the Placeholder Plan permits the Subrogation Wildfire Claims to participate despite the

---

[16] *See* Placeholder Plan, Dkt. 3841 at p. 37 (summary chart), §§ 4.12, 4.13, 4.26, 4.27 (describing treatment).

13

fact that insurers' subrogation claims are subordinated to their insured's claims under California's made whole doctrine and the Bankruptcy Code. *See, e.g.*, *Chandler v. State Farm Mut. Auto Ins. Co*., 598 F.3d 1115, 1117-1118 (9th Cir. 2010) (stating that the made whole doctrine generally "precludes an insurer from recovering any third-party funds unless and until the insured has been made whole for the loss" and extends to "all the elements of damages, not merely those for which the insurer has indemnified the insured.")

22. Even if this Court cannot discard the Placeholder Plan on its face, exclusivity should be terminated. There is no need to make the Debtors' emergence from bankruptcy subject to the satisfaction of every condition to the Placeholder Plan (including the requirement of favorable litigation outcomes on disputed tort claims in multiple fora). Second, the Alternative Plan not only eliminates those contingencies, it allows emergence without potentially burdening ratepayers with the cost of past wildfire liability for decades. And unlike when the Court previously considered termination, there is now not even a remote or hypothetical prospect of a "free for all" or "chaos" over multiple plans. The subrogation claimants have cast their lot with the Debtor/Equity plan, and the TCC and Ad Hoc Committee have locked arms on an alternative.

23. The Placeholder Plan puts the Debtors' ability to meet the June 30, 2020 deadline in grave jeopardy by inviting contentious and protracted litigation on a number of key issues. The impaired or unimpaired status of the Funded Debt Claims will need to be determined by the Court before a solicitation process can commence in earnest, because, as noted above, this issue will determine if a massive creditor constituency is entitled to vote. If the Ad Hoc Committee prevails and the holders of Funded Debt Claims are impaired and it is the Debtors' intent to cramdown the Placeholder Plan over the dissent of the holders of these claims, this would lead to additional litigation surrounding plan confirmation regarding fair and equitable treatment of the Funded Debt Claims. The result of this litigation would be subject to appeal and could easily escalate to the Court of Appeals for the Ninth Circuit. As noted above, there is already likely to be hard-fought litigation surrounding confirmation with respect to the treatment of claims of the individual victims in the Placeholder Plan. The Placeholder Plan also does nothing to eliminate the need for a lengthy estimation process scheduled to run through

14

January in the District Court or the state court trial with respect to the Tubbs Fire. Rather than doing anything to streamline these cases or bring the company closer to emergence, the Debtors have focused solely on protecting the interests of existing equity holders and have proposed a Placeholder Plan doomed to languish in litigation. By contrast, the Alternative Plan eliminates the need for all of the costly and drawn-out litigation described herein, increasing the likelihood that these cases will be resolved prior to June 30, 2020, enabling the Debtors to participate in the go-forward wildfire fund.

24. The TCC and the Ad Hoc Committee submit that the framework embodied in the Alternative Plan represents the only viable path to move these cases forward and fully and fairly compensate the individual victims of wildfires. Therefore ample "cause" exists to terminate the Exclusive Periods to allow the TCC and the Ad Hoc Committee to file and solicit acceptances of the Alternative Plan.

## CONCLUSION

25. For the foregoing reasons, the TCC and the Ad Hoc Committee respectfully request that this Court enter an order terminating the Debtors' Exclusive Periods to permit the TCC and the Ad Hoc Committee to file and solicit acceptances of the Alternative Plan contemplated by the attached term sheet for the Alternative Plan.

## NOTICE

Notice of this Motion will be provided to (i) counsel to the Debtors; (ii) the Office of the U.S. Trustee for Region 17 (Attn: Andrew R. Vara, Esq. and Timothy Laffredi, Esq.); (iii) counsel to the Creditors Committee; (iv) the Securities and Exchange Commission; (v) the Internal Revenue Service; (vi) the Office of the California Attorney General; (vii) the California Public Utilities Commission; (viii) the Nuclear Regulatory Commission; (ix) the Federal Regulatory Commission; (x) the Office of the United States Attorney for the Northern District of California; (xi) counsel for the agent under the Debtors' debtor in possession financing facility; and (xii) those persons who have formally appeared in these chapter 11 cases and requested service pursuant to Bankruptcy Rule 2002. The TCC and the Ad Hoc Committee respectfully submit that no further notice is required.

15

**WHEREFORE** the TCC and the Ad Hoc Committee respectfully request entry of an order granting (i) the relief requested herein for cause shown and as being in the best interests of the Debtors and their estates and (ii) such other and further relief as the Court may deem just and proper.

Dated: September 19, 2019

**BAKER & HOSTETLER LLP**

By: /s/ *Cecily A. Dumas*
Robert A. Julian (SBN 88469)
Cecily A. Dumas (SBN 111449)
Eric E. Sagerman (SBN 155496)
Lauren T. Attard (SBN 320898)

*Counsel to the Official Committee of Tort Claimants*

**AKIN GUMP STRAUSS HAUER & FELD LLP**

By: /s/ *Ashley Vinson Crawford*
Ashley Vinson Crawford (SBN 257246)
Michael S. Stamer (*pro hac vice*)
Ira S. Dizengoff (*pro hac vice*)
David H. Botter (*pro hac vice*)
Abid Qureshi (*pro hac vice*)

*Counsel to the Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company*