AKIN GUMP STRAUSS HAUER & FELD LLP

Michael S. Stamer (*pro hac vice*)
Ira S. Dizengoff (*pro hac vice*)
David H. Botter (*pro hac vice*)
Abid Qureshi (*pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone:     (212) 872-1000
Facsimile:     (212) 872-1002
Email:        mstamer@akingump.com
               idizengoff@akingump.com
               dbotter@akingump.com
               aqureshi@akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP

Ashley Vinson Crawford (SBN 257246)
580 California Street
Suite 1500
San Francisco, CA 94104
Telephone:     (415) 765-9500
Facsimile:     (415) 765-9501
Email:        avcrawford@akingump.com

*Counsel to the Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>　　　**-and-**<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>☐ Affects PG&E Corporation<br><br>☐ Affects Pacific Gas and Electric Company<br><br>☒ Affects both Debtors<br><br>*All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case<br>No. 19-30088 (DM)<br><br>Chapter 11<br><br>(Lead Case)<br><br>(Jointly Administered)<br><br><br>**NOTICE OF FILING OF AMENDED AND RESTATED COMMITMENT LETTER OF CERTAIN MEMBERS OF THE AD HOC COMMITTEE OF SENIOR UNSECURED NOTEHOLDERS** |

**PLEASE TAKE NOTICE** that on September 19, 2019, the Official Committee of Tort Claimants (the "TCC") in the above-captioned chapter 11 cases and the Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company (the "Ad Hoc Committee") filed the *Joint Motion of the Official Committee of Tort Claimants and Ad Hoc Committee of Senior Unsecured Noteholders to Terminate the Debtors' Exclusive Periods Pursuant to Section 1121(d)(1) of the Bankruptcy Code* [Docket No. 3940] (the "Joint Exclusivity Termination Motion"). The TCC and Ad Hoc Committee's joint plan term sheet (the "Joint Plan Term Sheet") was attached as Exhibit B to the Joint Exclusivity Termination Motion.

**PLEASE TAKE FURTHER NOTICE** that attached hereto as **Exhibit A** is the commitment letter, dated September 22, 2019 (the "Amended and Restated Commitment Letter"), executed by certain members of the Ad Hoc Committee committing to fund the PG&E Corp. New Money Investment, the New PG&E Corp. Senior Unsecured Notes Investment and the New Utility Secured Notes Investment, each as defined and described in the Joint Plan Term Sheet. A blackline version of the Amended and Restated Commitment Letter, which identifies modifications made to the version of the commitment letter that was filed on August 7, 2019, is attached hereto as **Exhibit B**.

Dated: September 23, 2019
**AKIN GUMP STRAUSS HAUER & FELD LLP**

By: */s/ Ashley Vinson Crawford*
    Ashley Vinson Crawford (SBN 257246)
    David H. Botter (*pro hac vice*)
    Michael S. Stamer (*pro hac vice*)
    Ira S. Dizengoff (*pro hac vice*)
    Abid Qureshi (*pro hac vice*)

*Counsel to the Ad Hoc Committee of Senior*
*Unsecured Noteholders of Pacific Gas and Electric*
*Company*

**<u>Exhibit A</u>**

Amended and Restated Commitment Letter

September 22, 2019

PG&E Corporation
77 Beale Street
P.O. Box 770000
San Francisco, California 94177

Re: <u>Amended and Restated Commitment</u>

Ladies and Gentlemen:

Reference is hereby made to the chapter 11 bankruptcy cases, lead case no. 19-30088 (the "***Chapter 11 Cases***"), currently pending before the United States Bankruptcy Court for the Northern District of California (the "***Bankruptcy Court***"), in which PG&E Corporation ("***PG&E***") and Pacific Gas and Electric Company (the "***Utility***" and together with PG&E, the "***Debtors***") are debtors in possession. Reference is further made to (i) a Chapter 11 plan of reorganization (the "***Plan***") to be filed with the Bankruptcy Court to implement the terms and conditions of the reorganization of the Debtors contemplated by the plan term sheet attached hereto as <u>Exhibit A</u> (the "***Plan Term Sheet***") and (ii) a disclosure statement that will accompany the Plan (the "***Disclosure Statement***"). Reference is further made to that certain commitment letter dated August 7, 2019 from the Commitment Parties (as defined below) (the "***August Commitment Letter***"). This commitment letter (this "***Commitment Letter***") amends and restates the August Commitment Letter in its entirety. Capitalized terms used in this Commitment Letter but not otherwise defined shall have the meanings ascribed to them in the Plan Term Sheet.

The Plan, among other things, shall provide that (i) Reorganized PG&E Corp. issue shares of Reorganized PG&E Corp. Common Stock to the Commitment Parties set forth on <u>Schedule 1(a)</u> in consideration for $14,886,190,507 in cash (the "***Common Stock Issuance***"), (ii) Reorganized PG&E Corp. issue $5,500,000,000 in new senior unsecured notes with the terms described in the Plan Term Sheet and on <u>Exhibit B</u> hereto to the Commitment Parties set forth on <u>Schedule 1(b)</u> hereto in consideration for an equivalent amount in cash (the "***Senior Unsecured Notes Issuance***") and (iii) the Reorganized Utility may, subject to the terms hereof, issue $7,978,610,000 in new secured notes with the terms described on <u>Exhibit C</u> hereto to the Commitment Parties set forth on <u>Schedule 1(c)</u> hereto in consideration for the equivalent amount in cash (the "***New Utility Secured Notes Issuance***").

1. To provide assurances that the Common Stock Issuance, the Senior Unsecured Notes Issuance and the New Utility Secured Notes Issuance will be fully funded, the undersigned (each a "***Commitment Party***" and, collectively, the "***Commitment Parties***") hereby agree as follows:

a. Subject to the terms and conditions herein and the Plan Term Sheet (including without limitation the payment of fees to the Commitment Parties described herein and therein), each Commitment Party, solely on behalf of itself or certain of its affiliates hereby severally, and not jointly and severally, agrees to commit to purchase on the Effective Date (i) the number of shares of Reorganized PG&E Common Stock representing a fully diluted ownership percentage of 58.8% of Reorganized PG&E Corp. for $14,886,190,507, in accordance with the respective percentages and dollar amounts set forth opposite such Commitment Party's name on <u>Schedule 1(a)</u> hereto, (ii) the amount of New PG&E Senior Unsecured Notes set forth opposite such Commitment Party's name on <u>Schedule 1(b)</u> hereto and (iii) in the event that the Reorganized Utility fails to issue all or a portion of the New Utility Secured Notes to third party investors on the Effective Date after using commercially reasonable efforts to issue such notes to third party investors, up to the amount of New Utility Secured Notes set forth opposite such Commitment Party's name on <u>Schedule 1(c)</u> hereto (which shall be allocated to the Commitment Parties

on a pro rata basis based upon the commitment percentages set forth on Schedule 1(c)) to fund any such shortfall (collectively, with respect to each Commitment Party, the "***Commitment***"). Notwithstanding anything in this Commitment Letter to the contrary, the aggregate Commitment of all of the Commitment Parties hereunder shall not exceed $28,364,800,507. For the avoidance of doubt, each component of the Commitment described in Sections 1(a)(i)-(iii) is conditioned upon each other component of the Commitment (except to the extent that all of the New Utility Secured Notes are issued to third party investors as contemplated herein) and in no event shall any Commitment Party be required to fund a component of the Commitment on a stand-alone basis.

   b.   Each Commitment Party, on behalf of itself or certain of its affiliates, will satisfy its respective Commitment by funding its respective Commitment obligations in accordance with the terms and subject to the conditions to be set forth in the Plan Documents (as defined below) governing the Common Stock Issuance, the Senior Unsecured Notes Issuance and the New Utility Secured Notes Issuance (if applicable) as described below.

   c.   The Debtors shall use commercially reasonable efforts to have the Reorganized Utility issue on the Effective Date the New Utility Secured Notes to third party investors on terms that are acceptable to the Commitment Threshold (as defined below) and at least as favorable to the Reorganized Utility as the terms described on Exhibit C hereto. The Commitment Parties agree to use commercially reasonable efforts to structure the Common Stock Issuance and the Senior Unsecured Notes Issuance in a manner that will facilitate the issuance of the New Utility Secured Notes on customary market terms, including with respect to the fees payable by the Utility in connection therewith.

   2.   The consummation of the Common Stock Issuance, the Senior Unsecured Notes Issuance and the New Utility Secured Notes Issuance (if applicable), will occur pursuant to definitive written agreements consistent with the Plan Term Sheet and approved by Commitment Parties representing at least two-thirds of the aggregate Commitment hereunder (the "***Commitment Threshold***"), in the sole discretion of the Commitment Parties constituting the Commitment Threshold, and will be subject to, among other things, (x) the negotiation, execution and delivery of such definitive agreements for the Common Stock Issuance, the Senior Unsecured Notes Issuance, the New Utility Secured Notes Issuance (if applicable) and the Plan, including, without limitation, all commitment agreements, purchase agreements, indentures, security documents, mortgages, registration rights agreements, revised certificates of incorporation and bylaws of Reorganized PG&E (which shall contain customary terms and conditions and customary ownership limitations in order to preserve the tax attributes of the Debtors after the Effective Date) and other similar agreements and documentation required to be entered into on the Effective Date under the terms of the Plan (collectively, the "***Plan Documents***"), in form and substance satisfactory to the Commitment Threshold, in the sole discretion of the Commitment Parties constituting the Commitment Threshold, and (y) receipt of any necessary or advisable governmental, contractual, regulatory or other requisite consents or approvals in connection with the Common Stock Issuance, the Senior Unsecured Notes Issuance, the New Utility Secured Notes Issuance and the other transactions contemplated by the Plan; provided, that, each Commitment Party's consent shall be required for any provision included in the Plan Documents that increases such Commitment Party's Commitment hereunder or would have a materially adverse and disproportionate effect on such Commitment Party. Upon approval of the Plan Documents by the Commitment Threshold, notice of such approval will be provided to each of the Commitment Parties along with copies of the Plan Documents. The agreements and obligations of the Commitment Parties pursuant to this Commitment Letter, including each Commitment Party's respective Commitment, are further expressly conditioned upon and subject to the satisfaction or written waiver by the Commitment Threshold, in the sole discretion of the Commitment Parties constituting the Commitment Threshold, at or prior to the Effective Date of each of the following conditions, which are acknowledged to be an integral part of the transactions contemplated by this Commitment Letter and without these conditions each Commitment Party would not have entered into this Commitment Letter:

a. the satisfaction of the conditions set forth in the Plan Term Sheet and, other than the funding of the Common Stock Issuance, the Senior Unsecured Notes Issuance and the New Utility Secured Notes Issuance (if such notes are issued to the Commitment Parties), the satisfaction of all of the other conditions to the Effective Date provided for in the Plan and the Plan Documents;

b. all of the covenants and obligations that the Debtors are required to comply with or to perform pursuant to the Plan Documents at or prior to the Effective Date shall have been complied with and performed in all material respects, including the payment by the Debtors of all fees contemplated therein;

c. the Plan Documents shall have been executed and delivered by each of the parties thereto;

d. the Bankruptcy Court shall have entered the Confirmation Order, such Confirmation Order shall be a final order (the Plan in the form confirmed by the Bankruptcy Court, the "***Confirmed Plan***"), and such Confirmation Order shall authorize and approve the transactions contemplated herein and in the Plan Term Sheet and all other consideration and fees contemplated herein and in the Plan Term Sheet;

e. this Commitment Letter shall have been approved by an order of the Bankruptcy Court and such order shall be in full force and effect, and no stay thereof shall be in effect;

f. no result, occurrence, fact, change, event, effect, violation, penalty, inaccuracy, or circumstance (whether or not constituting a breach of a representation, warranty or covenant set forth in the Plan or any Plan Document) that, individually or in the aggregate with any such other results, occurrences, facts, changes, events, effects, violations, penalties, inaccuracies, or circumstances, (i) would have or would reasonably be expected to have a material adverse effect on the business, operations, assets, liabilities, capitalization, financial performance, condition (financial or otherwise) or results of operations, in each case, of the Debtors, taken as a whole, or (ii) would reasonably be expected to prevent or materially impair or delay the ability of the Debtors or the Commitment Parties to consummate the transactions contemplated by this Commitment Letter, the Plan Term Sheet, the Plan or the other Plan Documents or perform their obligations hereunder or thereunder (each a "***Material Adverse Effect***") shall have occurred; *provided, however*, that none of the following results, occurrences, facts, changes, events, effects, violations, penalties, inaccuracies, or circumstances shall constitute or be taken into account in determining whether a Material Adverse Effect has occurred, is continuing or would reasonably be expected to occur: (A) the filing of the Chapter 11 Cases, and the fact that the Debtors are operating in bankruptcy (B) results, occurrences, facts, changes, events, effects, violations, inaccuracies, or circumstances affecting (1) the electric or gas utility businesses in the United States generally or (2) the economy, credit, financial, capital or commodity markets, in the United States or elsewhere in the world, including changes in interest rates, monetary policy or inflation, (C) changes or prospective changes in law (other than any law or regulation of California or the United States that is applicable to any electrical utility) or in GAAP or accounting standards, or any changes or prospective changes in the interpretation or enforcement of any of the foregoing, (D) any decline in the market price, or change in trading volume, of any securities of the Debtors, (E) any failure to meet any internal or public projections, forecasts, guidance, estimates, milestones, credit ratings, budgets or internal or published financial or operating predictions of revenue, earnings, cash flow or cash position (it being understood that the exceptions in clauses (D) and (E) shall not prevent or otherwise affect a determination that the underlying cause of any such change, decline or failure referred to therein is a Material Adverse Effect);

g. the Debtors shall have each operated its business in the ordinary course of business and consistent with its historical practices, other than any deviations from operations in the ordinary course of business pursuant to an order issued by the Bankruptcy Court; and

h.     the Debtors shall have maintained and held in good standing all of their operating licenses, certificates and other regulatory authorizations and approvals necessary to operate the Utility's business with no pending revocations of any such license, certificate, approval or authorization or open proceedings contemplating such revocation.

3.     Each Commitment Party may terminate this Commitment Letter, solely as to itself, by written notice to legal counsel to the Ad Hoc Committee, on or after the occurrence of any of the following:

a.     the Plan, on terms and conditions materially consistent with the Plan Term Sheet, and the Disclosure Statement shall not have been filed on or before October 31, 2019;

b.     the Confirmation Order, in form and substance reasonably acceptable to the Commitment Threshold, has not been entered by the Bankruptcy Court on or before June 30, 2020;

c.     the Effective Date shall not have occurred on or before sixty (60) days after entry of the Confirmation Order;

d.     the Plan Documents, as approved by the Commitment Threshold pursuant to the terms of Section 2 above, (i) are not consistent with the material terms and conditions of this Commitment Letter, including the Plan Term Sheet or (ii) include one or more provisions that would have a materially adverse and disproportionate effect on such Commitment Party and the applicable Commitment Party has not consented to the inclusion of such provision(s);

e.     the occurrence of a Material Adverse Effect;

f.     the failure of either of the Debtors to operate its business in the ordinary course of business and consistent with its historical practices;

g.     there is in effect an order (whether permanent or preliminary) of a governmental authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of any of the transactions contemplated by the Plan Term Sheet or the Plan, or any law, statute, rule, regulation or ordinance is adopted that makes consummation of the transactions contemplated by the Plan Term Sheet or the Plan illegal or otherwise prohibited;

h.     the occurrence or discovery of any state of facts, change, event, development, circumstance or condition that causes any of the conditions precedent set forth in the Plan Term Sheet, the Plan or the Plan Documents to not be capable of being satisfied; or

i.     if at any time after the first day of the confirmation hearing, asserted Administrative Expense Claims exceed $250 million, excluding all (i) ordinary course Administrative Expense Claims, (ii) Professional Fee Claims, and (iii) Disallowed Administrative Expense Claims (as such terms were defined in the Debtors plan of reorganization filed with the Bankruptcy Court on September 9, 2019).

Upon termination of this Commitment Letter as to a Commitment Party (such terminating Commitment Party, a "***Terminating Commitment Party***") pursuant to any of Section 3(a) through (h), this Commitment Letter shall be void and of no further force or effect solely with respect to such Terminating Commitment Party, such Terminating Commitment Party shall be released from its commitments, undertakings and agreements under or related to this Commitment Letter, including its Commitment, except as explicitly provided herein and there shall be no liability or obligation on the part of such Terminating Commitment Party hereunder, except as explicitly provided herein.   Upon notice from a Terminating Commitment Party of such termination, each non-terminating Commitment Party (a "***Non-Terminating Commitment Party***") may, by written notice within thirty (30) days of receipt of such notice, notify the other Non-Terminating Commitment Parties in writing of such Non-Terminating Commitment Party's election to assume such Terminating Commitment Party's Commitment on the terms and conditions hereof (such Commitment to be allocated on a pro rata basis based on each such

Non-Terminating Commitment Party's existing Commitment in the event that more than one Non-Terminating Commitment Party exercises its right to assume such Commitment). In the event that the Non-Terminating Commitment Parties do not elect to assume, in the aggregate, all of a Terminating Commitment Party's Commitment hereunder, the Commitment Parties included in the Commitment Threshold shall use their respective commercially reasonable efforts to have the remaining portion of such Commitment assumed by a third-party investor on the terms and conditions hereof. In the event that there is a Terminating Commitment Party hereunder and the Commitment of such Terminating Commitment Party has not been assumed by a Non-Terminating Commitment Party or a third-party investor within forty-five (45) days of the applicable termination, the Commitment Parties shall provide prompt notice of such termination to the Debtors and the TCC.

This Commitment Letter shall automatically terminate in the event the Plan Documents have not been approved by the Commitment Threshold subject to Section 2 above and executed and delivered by the applicable parties thereto on or before the date that is the voting deadline for the Plan. This Commitment Letter shall be automatically superseded by the Plan Documents governing the Common Stock Issuance, the Senior Unsecured Notes Issuance and the New Utility Secured Notes Issuance upon the execution and delivery of such Plan Documents by the Commitment Parties and the other applicable parties thereto. Upon any supersession or termination of this Commitment Letter pursuant to this Section 3, this Commitment Letter shall be void and of no further force or effect, each Commitment Party shall be released from its commitments, undertakings and agreements under or related to this Commitment Letter, including the Commitment, and there shall be no liability or obligation on the part of any Commitment Party hereunder.

4. In the event that (a) the Commitment Threshold approves the Plan Documents as contemplated in Section 2 or waives, pursuant to Section 3, any condition set forth in Section 2 (each a, "***Commitment Threshold Action***") and (b) within five (5) business days after such Commitment Threshold Action, one or more Commitment Parties have not approved or consented to such Commitment Threshold Action, but have not terminated this Commitment Letter as to itself pursuant to Section 3 above, at the discretion of the Commitment Threshold each such non-consenting Commitment Party may be designated a "Terminating Commitment Party" hereunder following receipt of notice of such proposed designation at least five (5) business days prior to such designation. Upon such designation the applicable non-consenting Commitment Party's Commitment shall be automatically terminated as described in Section 3 above and such Commitment shall be available for assumption pursuant to the terms of Section 3 above. For the avoidance of doubt, if a Commitment Party is designated as a Terminating Commitment Party pursuant to this Section 4, this Commitment Letter shall be void and of no further force or effect as to such Commitment Party, such Commitment Party shall be released from its commitments, undertakings and agreements under or related to this Commitment Letter, including the Commitment, and there shall be no liability or obligation on the part of such Commitment Party hereunder.

5. Each Commitment Party hereby represents and warrants, on a several (not joint and several) basis and solely as to itself, that (a) it has all limited partnership, corporate or other power and authority necessary to execute, deliver and perform this Commitment Letter, (b) the execution, delivery and performance of this Commitment Letter by it has been duly and validly authorized and approved by all necessary limited partnership, corporate or other organizational action by it, (c) this Commitment Letter has been duly and validly executed and delivered by it and, assuming due execution and delivery by the other parties hereto, constitutes a valid and legally binding obligation of it, enforceable against it in accordance with the terms of this Commitment Letter, (d) the execution, delivery and performance by such Commitment Party of this Commitment Letter do not (i) violate the organizational documents of such Commitment Party or (ii) violate any applicable law or judgment, (e) as of the Effective Date, its Commitment is less than the maximum amount that it or any of its affiliates that may provide the Commitment is permitted to invest in any one portfolio investment pursuant to the terms of its constituent documents or otherwise and (f) it will have, or its affiliates that may provide the Commitment will have,

in the aggregate, as of the Effective Date, available funds at least in the sum of its Commitment hereunder.

In addition, each Commitment Party hereby represents and warrants, solely as to itself, as of the date of this Commitment Letter and as of the Effective Date, that the Commitment Party or any of its affiliates that may provide the Commitment (as applicable) (i) is acquiring the shares of Reorganized PG&E Common Stock for its own account, solely for investment and not with a view toward, or for sale in connection with, any distribution thereof in violation of any foreign, federal, state or local securities or "blue sky" laws, or with any present intention of distributing or selling such shares in violation of any such laws, (ii) has such knowledge and experience in financial and business matters and in investments of this type that it is capable of evaluating the merits and risks of its investment in the shares of Reorganized PG&E Common Stock and of making an informed investment decision, and (iii) is an "accredited investor" within the meaning of Rule 501 of Regulation D under the Securities Act of 1933, as amended (the "***Securities Act***").  Each Commitment Party understands that Reorganized PG&E Corp. will be relying on the statements contained herein to establish an exemption from registration under the Securities Act, and under foreign, federal, state and local securities laws and acknowledges that the shares of Reorganized PG&E Common Stock will not be registered under the Securities Act  or any other applicable law and that such shares may not be transferred except pursuant to the registration provisions of the Securities Act (and in compliance with any other applicable law) or pursuant to an applicable exemption therefrom.

6.    This Commitment Letter (a) is not assignable by any of the Commitment Parties without the prior written consent of a majority of the Commitment Parties and any purported assignment without such consent shall be null and void *ab initio*; *provided*, *however*, each Commitment Party may assign its Commitment, in whole or in part, to another Commitment Party or such Commitment Party's affiliate to the extent such assignee Commitment Party agrees in writing to assume all obligations hereunder of such Commitment Party in connection with such Commitment, and (b) is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person or entity other than the parties hereto.  Notwithstanding the foregoing, a Commitment Party may assign all or any portion of its obligations hereunder to (i) an affiliate of such Commitment Party, (ii) an investment fund or separately managed account the primary investment advisor or sub-advisor to which is a Commitment Party or an affiliate thereof or (iii) a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act of 1933, as amended), without the consent of any party; *provided, however*, that the Commitment Party shall not be relieved of its obligations hereunder in the event that such assignee(s) under clause (i) or (ii) above does not fulfill the obligations hereunder so assigned.

7.    This Commitment Letter, including all exhibits and schedules hereto, constitutes the entire understanding among the parties hereto with respect to the subject matter hereof and replaces and supersedes all prior agreements and understandings, both written and oral (including the August Commitment Letter), between the parties hereto with respect to the subject matter hereof and shall become effective and binding upon the mutual exchange of fully executed counterparts by each of the parties hereto.

8.    This Commitment Letter shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction.  By its execution and delivery of this Commitment Letter, each of the parties hereto irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Commitment Letter or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought only in the Bankruptcy Court. By execution and delivery of this Commitment Letter, each of the parties hereto irrevocably accepts and submits itself to the exclusive jurisdiction of the Bankruptcy Court with respect to any such action, suit or proceeding.

EACH PARTY HERETO UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO ABOVE.

9.   This Commitment Letter may not be amended or waived except in writing signed by each of the parties hereto. This Commitment Letter may be executed in any number of counterparts, each of which will be an original, and all of which, when taken together, will constitute one agreement.  Delivery of an executed counterpart of this Commitment Letter by e-mail or portable document format (PDF) will be effective as delivery of a manually executed counterpart of this Commitment Letter.

10.   Notwithstanding anything that may be expressed or implied in this Commitment Letter, each party hereto acknowledges and agrees that no person other than the Commitment Parties (and their permitted assigns) shall have any obligation hereunder (subject to the limitations provided herein) or in connection with the transactions contemplated hereby and that (a) notwithstanding that any Commitment Party may be a partnership, limited partnership or limited liability company, no recourse (whether at law, in equity, in contract, in tort or otherwise) hereunder or under any document or instrument delivered in connection herewith, or in respect of any oral representations made or alleged to be made in connection herewith or therewith, shall be had against any former, current or future direct or indirect equity holder, controlling person, general or limited partner, shareholder, member, investment manager or adviser, manager, director, officer, employee, agent, affiliate, assignee, representative or financing source of any of the foregoing) (any such person or entity, other than such Commitment Party, a "***Related Party***") or any Related Party of any such Related Party, including, without limitation, any liabilities arising under, or in connection with, the Plan Term Sheet, the Plan or this Commitment Letter and the transactions contemplated thereby and hereby, or in respect of any oral representations made or alleged to be made in connection therewith or herewith), whether by the enforcement of any judgment or assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law and (b) no personal liability whatsoever will attach to, be imposed on or otherwise be incurred by any Related Party of any of the Commitment Parties or any Related Party of any such Related Party under this Commitment Letter or any document or instrument delivered in connection herewith or with the Plan Term Sheet or the Plan (or in respect of any oral representation made or alleged to be made in connection herewith or therewith) or for any action (whether at law, in equity, in contract, in tort or otherwise) based on, in respect of, or by reason of such obligations hereunder or by their creation.

11.   Notwithstanding anything to the contrary contained herein, the obligations of each Commitment Party hereunder are several, and not joint and several, and consequently each Commitment Party shall have no liability or obligation with respect to any breach by any other party.  No Commitment Party shall be required to acquire or purchase for any securities or indebtedness in connection with the Common Stock Issuance and the Senior Unsecured Notes Issuance which under this Commitment Letter is to be acquired or subscribed by any other party nor shall any Commitment Party be required to pay any money, consideration, or exchange any claims whatsoever which are owing from, or to be transferred from or by, any other party. Nothing in this Commitment Letter shall be deemed to constitute a joint venture or partnership between any of the parties nor constitute any party as the agent of any other party for any purpose.  For the avoidance of doubt, no Commitment Party shall, nor shall any action taken by a Commitment Party hereunder, be deemed to be acting in concert or as any group with any other Commitment Party with respect to the Commitment nor shall the Commitments hereunder create a presumption that the Commitment Parties are in any way acting as a group hereunder and the use of a single document is for the convenience of the parties.

12.   Each party hereto confirms that it has made its own decision to execute this Commitment Letter based upon its own independent assessment of documents and information available to it, as it has deemed appropriate.

13.   Except as expressly provided in this Commitment Letter, (a) nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each party hereto to protect and

preserve its rights, remedies and interests, including, without limitation, any Long-Term Utility Unsecured Notes Claims, and any other claims against or interests in any of the Debtors or other parties, or its full participation in any bankruptcy proceeding, and (b) the parties hereto each fully preserve any and all of their respective rights, remedies, claims and interests as of the date hereof and upon a termination of this Commitment Letter. Further, nothing in this Commitment Letter shall be construed to prohibit any party hereto from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are consistent with this Commitment Letter, the Plan Term Sheet and the Plan, and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying or preventing the consummation of the transactions contemplated by the Plan Term Sheet and the Plan.

14. The words "hereof," "herein" and "hereunder" and words of like import used in this Commitment Letter shall refer to this Commitment Letter as a whole and not to any particular provision of this Commitment Letter. References to any Articles, Sections, Exhibits and Schedules are to such Articles, Sections, Exhibits and Schedules of this Commitment Letter unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein (including any exhibits, schedules or attachments thereto) are hereby incorporated in and made a part of this Commitment Letter as if set forth in full herein. Any singular term in this Commitment Letter shall be deemed to include the plural, and any plural term the singular. Whenever the words "include," "includes" or "including" are used in this Commitment Letter, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import. "Writing," "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. Any reference to "business day" means any day, other than a Saturday, a Sunday or any other day on which banks located in New York, New York are closed for business as a result of federal, state or local holiday and any other reference to day means a calendar day.

15. Notwithstanding anything to the contrary herein, nothing in this Commitment Letter shall create any additional fiduciary obligations on the part of any of the parties hereto or any members, managers or officers of any of the parties hereto or their affiliated entities, in such person's or entity's capacity as a member, manager or officer of any of the parties hereto or their affiliated entities that such entities did not have prior to the execution of this Commitment Letter. None of the Commitment Parties shall have any fiduciary duty or other duties or responsibilities to each other, either of the Debtors, or any of the Debtors' creditors or other stakeholders.

16. This Commitment Letter, including the transactions contemplated herein, is the product of negotiations among the parties hereto, together with their respective representatives. Notwithstanding anything herein to the contrary, this Commitment Letter is not, and shall not be deemed to be, a solicitation of votes for the acceptance of the Plan or any other plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. None of the parties hereto will solicit acceptances of the Plan from any party until such party has been provided with copies of a Disclosure Statement containing adequate information as required by section 1125 of the Bankruptcy Code.

17. None of the Commitment Parties shall have any liability (whether in contract, tort or otherwise) to the Debtors or any other person, including, without limitation, any of the Debtors' or any other person's respective security holders or creditors, for or in connection with the delivery of this Commitment Letter other than with respect to a Commitment Party's express Commitment in Section 1. In addition, none of the Commitment Parties shall be liable on any theory of liability for any special, indirect, consequential or punitive damages (including, without limitation, any loss of profits, business or anticipated savings).

18. All notices and other communications in connection with this Commitment Letter shall be in writing and shall be deemed given if delivered personally, sent via electronic facsimile (with confirmation), mailed by registered or certified mail (return receipt requested), delivered by an express

courier (with confirmation) or sent via e-mail to each Commitment Party at the addresses or e-mail addresses set forth below the Commitment Party's signature in its signature page to this Commitment Letter.

**[Remainder of Page Left Intentionally Blank]**

Sincerely,

Commitment Party: **Oaktree Opportunities Fund X Holdings (Delaware), L.P.**

By: Oaktree Fund GP, LLC
Its: General Partner

By: Oaktree Fund GP I, L.P.
Its: Managing Member

By: _____
Name: **Rajath Shourie**
Title: Authorized Signatory

By: _____
Name: **Emily Stephens**
Title: Authorized Signatory

Commitment Party: **Oaktree Opportunities Fund Xb Holdings (Delaware), L.P.**

By: Oaktree Fund GP, LLC
Its: General Partner

By: Oaktree Fund GP I, L.P.
Its: Managing Member

By: _____
Name: **Rajath Shourie**
Title: Authorized Signatory

By: _____
Name: **Emily Stephens**
Title: Authorized Signatory

Notice Information:
Oaktree Capital Management
333 S Grand Ave, 28th Floor
Los Angeles, CA 90071
Attn: Emily Stephens, Dante Quazzo
Email: estephens@oaktreecapital.com
dquazzo@oaktreecapital.com

Sincerely,

Commitment Party:

By: _____

Name:

Title:

Michael G. Linn
Managing Member

Notice Information:

Farallon Capital Management LLC
mlinn@farcap.com
One Maritime Plaza Suite 2100
SF, CA  94118
USA.

Sincerely,

Commitment Party:

CAPITAL RESEARCH AND MANAGEMENT
COMPANY, as investment adviser for various funds it
manages

By: _____
Name: Walter R. Burkley (knn)
Title:    Authorized Signatory


Notice Information:

333 South Hope Street
Los Angeles, CA 90071
Attention:  Kristine Nishiyama
knn@capgroup.com

Sincerely,

Commitment Party:

**VÄRDE PARTNERS, INC.,**
On behalf of certain affiliated private funds and
investment vehicles

By: _____

Name: Scott Hartman
Title: Principal


Notice Information:

Värde Partners, Inc.
Attn: Scott Hartman
901 Marquette Avenue South
Suite 3300
Minneapolis, Minnesota 55402

Email: legalnotices@varde.com;
shartman@varde.com; dma@varde.com

Sincerely,

Commitment Party:  Elliott Management Corporation

By: _____

Name: Elliot Greenberg
Title: Vice President

Notice Information:
Elliott Management Corporation
40 West 57th Street
New York, New York  10019
Attn:  Jeff Rosenbaum, Lee Grinberg, and
Elliot Greenberg
Email:  JRosenbaum@elliottmgmt.com
LGrinberg@elliottmgmt.com
EGreenberg@elliottmgmt.com

Sincerely,

Commitment Party:

CERTAIN INVESTMENT FUNDS OR ACCOUNTS
FOR WHICH PACIFIC INVESTMENT
MANAGEMENT COMPANY LLC SERVES AS
INVESTMENT ADVISER OR MANAGER

By: Pacific Investment Management Company LLC, as
investment adviser or manager

By: _____

Name: T. Christian Stracke
Title: Managing Director

Notice Information:

c/o Pacific Investment Management Company LLC
650 Newport Center Drive
Newport Beach, CA 92660
Attention: Legal Counsel
Telephone: (949) 720-6000
Facsimile: (949) 720-1376
Email: thevault@pimco.com

The obligations arising out of this instrument are several and not joint with respect to each participating fund and account, in accordance with its proportionate commitment hereunder, and the parties agree not to proceed against any fund or account for the obligations of another. To the extent a fund or account is a registered investment company ("Trust") or a series thereof, a copy of the Declaration of Trust of such Trust is on file with the Secretary of State of The Commonwealth of Massachusetts or Secretary of State of the State of Delaware. The obligations of or arising out of this instrument are not binding upon any of such Trust's trustees, officers, employees, agents or shareholders individually, but are binding solely upon the assets and property of the Trust in accordance with its proportionate commitment hereunder. If this instrument is executed by or on behalf of a Trust on behalf of one or more series of the Trust, the assets and liabilities of each series of the Trust are separate and distinct and the obligations of or arising out of this instrument are binding solely upon the assets or property of the series on whose behalf this instrument is executed. If this agreement is being executed on behalf of more than one series of a Trust, the obligations of each series hereunder shall be several and not joint, in accordance with its proportionate commitment hereunder, and the parties agree not to proceed against any series for the obligations of another.

Sincerely,

Commitment Party:

Third Point LLC
On behalf of funds it manages and/or advises

By: _____
Name: Josh Targoff
Title: Chief Operating Officer and General Counsel

Notice Information: 390 Park Avenue
New York, NY 10022
Attention: General Counsel
Email: Legal@thirdpoint.com

Sincerely,

Commitment Party:

Davidson Kempner Capital Management LP, on behalf
of certain of its affiliates

By: _____
Name: Morgan P. Blackwell
Title: Managing Member


Notice Information:
520 Madison Avenue, 30th Floor
New York, NY 10022
Attention: Kunal Shah, Louis Littman
Email:
kshah@dkpartners.com
llittman@dkp.com
ttroyer@dkp.com

Sincerely,

Commitment Party: **Citadel Advisors LLC**

By: _____
Name: Noah Goldberg
Title: Authorized Signatory

Notice Information:

Citadel Advisors LLC
601 Lexington Avenue
New York, New York 10022
Attention: LegalAgreementNotice@citadel.com;
noah.goldberg@citadel.com;
david.bernfeld@citadel.com; jeff.psaki@citadel.com

Sincerely,

Commitment Party:
**CANYON CAPITAL ADVISORS LLC**
(on behalf of its designated affiliates)

By: _____
Name:  Jonathan M. Kaplan
Title:  Authorized Signatory

Notice Information:
Attention:  Legal Department
2000 Avenue of the Stars, 11th Floor
Los Angeles, CA 90067

Email:
rviyer@canyonpartners.com
jbarzideh@canyonpartners.com
legal@canyonpartners.com

Sincerely,

Commitment Party: Theater Investor LLC

By: _____

Name: Wayne Cohen

Title: Authorized Person

Notice Information:
Sculptor Capital
9 W 57th Street, 40th Floor
New York, NY 10019
Email. Michael.Barnett@sculptor.com and
Norman.Greenberg@sculptor.com

Sincerely,

Commitment Party:

APOLLO CAPITAL MANAGEMENT, L.P.
on behalf of certain funds and managed accounts

By: APOLLO CAPITAL MANAGEMENT GP, LLC,
its general partner

By: _____
Name: Joseph D. Glatt
Title: Vice President

Notice Information:
Apollo Capital Management, L.P.
c/o Apollo Management, L.P.
9 West 57th Street, 41st Floor
New York, NY 10019
Attention: Joseph Glatt – jglatt@apollo.com

**Schedule 1(a)**

**Common Stock Issuance Commitment Amounts**

| **Commitment Party** | **Commitment Percentage** | **Commitment Amount**[1] |
|---|---|---|
| Apollo | | |
| Canyon Capital Advisors LLC | | |
| CapRe | | |
| Citadel | | |
| Davidson Kempner | | |
| Elliott | | |
| Farallon | | |
| OakTree | | |
| PIMCO | | |
| Theater Investor LLC (wholly owned by funds managed by Sculptor Capital LP) | | |
| Third Point | | |
| Varde | | |
| **Total** | **100%** | **$14,886,190,507** |

---

[1] Commitment amounts have been rounded to the nearest dollar.

**Senior Unsecured Notes Issuance Commitment Amounts**

| Commitment Party | Commitment Percentage | Commitment Amount[2] |
|---|---|---|
| Apollo | | |
| Canyon Capital Advisors LLC | | |
| CapRe | | |
| Citadel | | |
| Davidson Kempner | | |
| Elliott | | |
| Farallon | | |
| OakTree | | |
| PIMCO | | |
| Theater Investor LLC (wholly owned by funds managed by Sculptor Capital LP) | | |
| Third Point | | |
| Varde | | |
| **Total** | **100%** | **$5,500,000,000** |

---

[2] Commitment amounts have been rounded to the nearest dollar.

**Schedule 1(c)**

**New Utility Secured Notes Issuance Backstop Commitment Amounts**

| Commitment Party | Commitment Percentage | Commitment Amount[3] |
|---|---|---|
| Apollo | | |
| Canyon Capital Advisors LLC | | |
| CapRe | | |
| Citadel | | |
| Davidson Kempner | | |
| Elliott | | |
| Farallon | | |
| OakTree | | |
| PIMCO | | |
| Theater Investor LLC (wholly owned by funds managed by Sculptor Capital LP) | | |
| Third Point | | |
| Varde | | |
| **Total** | **100%** | **$7,978,610,000** |

---

[3] Commitment amounts have been rounded to the nearest dollar.

**Exhibit A**
**Plan Term Sheet**

See attached.

***THIS IS NOT A SOLICITATION OF A VOTE ON A PLAN OF REORGANIZATION.  SUCH A SOLICITATION MAY ONLY OCCUR FOLLOWING APPROVAL BY THE BANKRUPTCY COURT OF A DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE***

*In re PG&E Corporation* **and** *Pacific Gas and Electric Company*

**Term Sheet for Plan of Reorganization**

September 19, 2019

This term sheet (the "**Term Sheet**") is proposed by the Official Committee of Tort Claimants (the "**TCC**") and the Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company (the "**Ad Hoc Committee**") and sets forth certain of the principal terms and conditions for the proposed reorganization (the "**Reorganization**") of PG&E Corporation and Pacific Gas and Electric Company, each of which commenced cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Northern District of California (the "**Bankruptcy Court**") on January 29, 2019 (the "**Petition Date**").  The Reorganization contemplated herein shall be implemented pursuant to a proposed joint chapter 11 plan of reorganization (the "**Plan**").

**THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF ALL APPLICABLE LAW.  THIS TERM SHEET DOES NOT ADDRESS ALL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH ANY POTENTIAL TRANSACTIONS REFERENCED HEREIN, AND THE ENTRY INTO OR THE CREATION OF ANY BINDING AGREEMENT IS SUBJECT TO THE EXECUTION OF DEFINITIVE DOCUMENTATION IN FORM AND SUBSTANCE CONSISTENT WITH THIS TERM SHEET AND OTHERWISE ACCEPTABLE TO THE AD HOC COMMITTEE AND/OR THE PG&E CORP. NEW MONEY COMMITMENT GROUP (AS DEFINED HEREIN).**

**THIS TERM SHEET IS BASED SOLELY ON PUBLICLY AVAILABLE INFORMATION.**

| PLAN OVERVIEW[1] | |
|---|---|
| **Debtors** | PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**" and together with PG&E Corp., the "**Debtors**"). Following the occurrence of the effective date of the Plan (the "**Effective Date**"), PG&E Corp. and the Utility will be referred to herein as "**Reorganized PG&E Corp.**" and the "**Reorganized Utility**," respectively, and collectively as the "**Reorganized Debtors**." |
| **Transaction Overview** | As set forth in greater detail herein, the Plan shall provide for: <br><br> • $28.4 billion in new money investments in exchange for common stock of Reorganized PG&E Corp. (representing approximately 58.8% of the outstanding common stock of Reorganized PG&E Corp. on a fully diluted basis), new debt of Reorganized PG&E Corp. and new debt of the Reorganized Utility, in each case as described herein; <br> • The proceeds of the new money investments shall be used to (a) pay in full outstanding DIP Financing Facility Claims (as defined below), (b) pay in full all Utility bond, term loan and revolving debt maturing prior to December 31, 2022[2], (c) fund the creation of a trust (the "**Fire Claims Trust**") for the purpose of paying fire claims related to those Northern California fires listed in **Schedule 1** attached hereto, equal to $24 billion in cash and shares of common stock of Reorganized PG&E Corp. (representing approximately 39.5% of the outstanding common stock of Reorganized PG&E Corp. on a fully diluted basis) issued to the Fire Claims Trust and certain other fire consideration as set forth herein ("**Aggregate Fire Consideration**") and (d) fund the Debtors' contribution of $5.0 billion, which amount consists of both the Debtors' initial and first annual contributions, to the long-term California statewide wildfire fund created for purposes of paying future utility-related wildfires in California (the "**Wildfire Fund**"); <br> • Reinstatement in full of the Long-Term Utility Unsecured Notes; and <br> • Payment of all trade claims in the ordinary course of business and assumption and/or continuation of pension-related obligations. |

| PLAN TREATMENT OF PG&E CORP. AND UTILITY CLAIMS | |
|---|---|
| **Unclassified Claims** | |
| **Claim** | **Treatment** |

---

[1] This document is based on publicly available information regarding the Debtors as of June 25, 2019. Certain of the terms for the Plan included herein are subject to change depending upon the Debtors' financial performance over the remainder of the Chapter 11 Cases including, but not limited, to its cash generation and borrowings under the DIP Financing Facility.

[2] Includes the Utility Unsecured Revolving Credit Facility Claims, Utility Unsecured Term Loan Claims, Short-Term Utility Unsecured Notes Claims and Utility Pollution Control Bond-Related Claims, each as defined below.

4822-9860-1126.1

| | |
|---|---|
| **DIP Financing Facility Claims** | Each holder of a claim under the Senior Secured Superpriority Debtor-in-Possession Credit, Guaranty and Security Agreement, dated as of February 1, 2019 (the "DIP Financing Facility," and the claims arising thereunder, the "DIP Financing Facility Claims") shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such DIP Financing Facility Claim, payment in full in cash on the Effective Date. |
| **Administrative Expense Claims** | Each holder of an allowed administrative expense claim against the Debtors under section 507(a)(2) of the Bankruptcy Code (other than DIP Financing Facility Claims) (the "**Administrative Expense Claims**") shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Administrative Expense Claim, cash equal to the allowed amount of such Administrative Expense Claim on the later of (i) the Effective Date or as soon thereafter as is reasonably practicable, and (ii) the date such Administrative Expense Claim becomes an allowed Administrative Expense Claim or as soon thereafter as is reasonably practicable. |
| **Priority Tax Claims** | Each holder of an allowed claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) of the type specified in section 507(a)(8) of the Bankruptcy Code against any Debtor (the "**Priority Tax Claims**") shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Priority Tax Claim, (a) cash equal to the amount of such allowed Priority Tax Claim on the later of (i) the Effective Date or as soon thereafter as is reasonably practicable and (ii) the date such Priority Tax Claim becomes an allowed Priority Tax Claim or as soon thereafter as is reasonably practicable, or (b) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |

| PG&E Corp. Claims | | | |
|---|---|---|---|
| **Claim** | **Classification/Treatment/Voting** | **Estimated Allowed Claims** | **Estimated % Recovery** |
| **Class 1A: Other PG&E Corp. Priority Claims** | ***Classification***: Holders of allowed claims against PG&E Corp. entitled to priority under section 507(a) of the Bankruptcy Code (other than DIP Financing Facility Claims, Administrative Expense Claims and Priority Tax Claims) (the "**Other PG&E Corp. Priority Claims**"). <br><br> ***Treatment***: Each holder of an allowed Other PG&E Corp. Priority Claim against PG&E Corp. shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Other PG&E Corp. Priority Claim, (i) cash in an amount equal to such allowed claim on the Effective Date or as soon thereafter as is reasonably practicable, or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. <br><br> ***Voting***: Unimpaired – deemed to accept. | [TBD] | 100% |

Case: 19-30088    Doc# 3962    Filed: 09/23/19    Entered: 09/23/19 04:56:04    Page 31 of 119

| | | | |
|---|---|---|---|
| **Class 2A: Other PG&E Corp. Secured Claims** | **Classification:** Holders of claims (other than DIP Financing Facility Claims) (the "**Other PG&E Corp. Secured Claims**") that are secured by valid, perfected and enforceable liens on property in which PG&E Corp. has an interest or that are subject to setoff pursuant to section 553 of the Bankruptcy Code.<br><br>**Treatment:** Each holder of an allowed Other PG&E Corp. Secured Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Other PG&E Corp. Secured Claim, (i) retention of its Other PG&E Corp. Secured Claim and any properly perfected and valid liens; (ii) payment in full in cash, including the payment of any interest allowed and payable under section 506(b) of the Bankruptcy Code, on the Effective Date or as soon thereafter as is reasonably practicable, or (iii) treatment of such allowed Other PG&E Corp. Secured Claim in any other manner that renders the claim unimpaired, including reinstatement under section 1124(2) of the Bankruptcy Code.<br><br>**Voting:** Unimpaired – deemed to accept. | [TBD] | 100% |
| **Class 3A: PG&E Corp. Unsecured Revolving Credit Facility Claims** | **Classification:** Holders of claims arising under the Second Amended and Restated Credit Agreement, dated as of April 27, 2015, by and between PG&E Corp. and Citibank, N.A., as administrative agent (the "**PG&E Corp. Unsecured Revolving Credit Agreement**"), in the aggregate principal amount of up to $300 million (the "**PG&E Corp. Unsecured Revolving Credit Facility Claims**").<br><br>**Treatment:** On the Effective Date or as soon thereafter as is reasonably practicable, each holder of an allowed PG&E Corp. Unsecured Revolving Credit Facility Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed PG&E Corp. Unsecured Revolving Credit Facility Claim, cash in an amount equal to (i) the outstanding principal and accrued and unpaid interest as of the Petition Date under the PG&E Corp. Unsecured Credit Agreement and (ii) accrued and unpaid interest from the Petition Date through the Effective Date at the contract rate.<br><br>**Voting:** Unimpaired – deemed to accept. | Appx. $300 million | 100% |

| | | | |
|---|---|---|---|
| **Class 4A: PG&E Corp. Unsecured Term Loan Claims** | *Classification*: Holders of claims arising under the Term Loan Agreement, dated as of April 16, 2018, by and between PG&E Corp. and Mizuho Bank, Ltd., as administrative agent (the "**PG&E Corp. Unsecured Term Loan Credit Agreement**"), in the aggregate principal amount of $350 million (the "**PG&E Corp. Unsecured Term Loan Claims**").<br><br>*Treatment*: On the Effective Date or as soon thereafter as is reasonably practicable, each holder of an allowed PG&E Corp. Unsecured Term Loan Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed PG&E Corp. Unsecured Term Loan Claim, cash in an amount equal to (i) the outstanding principal and accrued and unpaid interest as of the Petition Date under the PG&E Corp. Unsecured Term Loan Credit Agreement and (ii) accrued and unpaid interest from the Petition Date through the Effective Date at the contract rate.<br><br>*Voting*: Unimpaired – deemed to accept. | Appx. $350 million | 100% |
| **Class 5A: PG&E Corp. General Unsecured Claims** | *Classification*: Holders of general unsecured claims (other than Other PG&E Corp. Priority Claims, PG&E Corp. Unsecured Revolving Credit Facility Claims and PG&E Corp. Unsecured Term Loan Claims) against PG&E Corp. (the "**PG&E Corp. General Unsecured Claims**")<br><br>*Treatment*: Each holder of an allowed PG&E Corp. General Unsecured Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed PG&E Corp. General Unsecured Claim, cash in an amount equal to the allowed PG&E Corp. General Unsecured Claim, together with accrued and unpaid interest from the Petition Date through the Effective Date at the applicable contract rate or, in the absence of a contract rate, the Federal Judgement Rate, on the earlier of (i) the Effective Date or as soon thereafter as is reasonably practicable or (ii) as soon as reasonably practicable following the date such PG&E Corp. General Unsecured Claim becomes an allowed PG&E Corp. General Unsecured Claim.<br><br>*Voting*: Unimpaired – deemed to accept. | [TBD] | 100% |

4822-9860-1126.1

Case: 19-30088    Doc# 3962    Filed: 09/23/19    Entered: 09/23/19 04:56:04    Page 33 of 119

| | | | |
|---|---|---|---|
| **Class 6A: PG&E Corp. Intercompany Claims** | ***Classification:*** Claims held by the Utility or any non-Debtor affiliate of PG&E Corp. against PG&E Corp. (the "**PG&E Corp. Intercompany Claims**").<br><br>***Treatment:*** All allowed PG&E Corp. Intercompany Claims, if any, shall be reinstated, compromised or cancelled at the election of the Debtors (with the consent of the Ad Hoc Committee, not to be unreasonably withheld), such that the PG&E Corp. Intercompany Claims are treated in a tax-efficient manner.<br><br>***Voting***: Unimpaired – deemed to accept. | [TBD] | 100% |
| **Class 7A: PG&E Corp. Preferred Interests** | ***Classification***: Holders of outstanding preferred interests in PG&E Corp. (the "**PG&E Corp. Preferred Interests**").<br><br>***Treatment***: Holders of allowed PG&E Corp. Preferred Interests shall retain ownership of all PG&E Preferred Interests in Reorganized PG&E Corp. (including any associated liquidation preference).<br><br>***Voting***: Unimpaired – deemed to accept. | N/A | 100% |
| **Class 8A: PG&E Corp. Common Interests** | ***Classification***: Holders of outstanding common interests in PG&E Corp. (the "**PG&E Corp. Common Interests**")<br><br>***Treatment***: Holders of allowed PG&E Corp. Common Interests shall retain ownership of all PG&E Corp. Common Interests in Reorganized PG&E Corp. (the "**Reorganized PG&E Corp. Common Stock**"), subject to dilution on account of the Reorganized PG&E Corp. Common Stock issued pursuant to the New Money Reorganized PG&E Corp. Common Stock Issuance.<br><br>***Voting***: Impaired – entitled to vote.<br><br>Each holder of a PG&E Corp. Common Interest shall have the opportunity to commit for its pro rata share of 5% of the PG&E Corp. New Money Investment (as defined herein). | N/A | [TBD]% |

6

| Utility Claims | | | |
|---|---|---|---|
| **Claim** | **Classification/Treatment/Voting** | **Estimated Allowed Claims** | **Estimated % Recovery** |
| **Class 1B: Other Utility Priority Claims** | *Classification*: Holders of allowed claims against the Utility entitled to priority under section 507(a) of the Bankruptcy Code (other than DIP Financing Facility Claims, Administrative Expense Claims and Priority Tax Claims) (the "**Other Utility Priority Claims**").<br><br>*Treatment*: Each holder of an allowed Other Utility Priority Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Other Utility Priority Claim, (i) cash in an amount equal to such allowed Other Utility Priority Claim on the Effective Date or as soon as practicable thereafter, or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.<br><br>*Voting*: Unimpaired – deemed to accept. | [TBD] | 100% |
| **Class 2B: Other Utility Secured Claims** | *Classification*: Holders of claims (other than DIP Financing Facility Claims) that are secured by valid, perfected and enforceable liens on property in which the Utility has an interest or that are subject to setoff pursuant to section 553 of the Bankruptcy Code (the "**Other Utility Secured Claims**").<br><br>*Treatment*: Each holder of an allowed Other Utility Secured Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Other Utility Secured Claim, (i) retention of its Other Utility Secured Claim and any properly perfected and valid liens, (ii) payment in full in cash, including the payment of any interest allowed and payable under section 506(b) of the Bankruptcy Code, on the Effective Date or as soon thereafter as is reasonably practicable, or (iii) treatment of such allowed Other Utility Secured Claim in any other manner that renders the Other Utility Secured Claim unimpaired, including reinstatement under section 1124(2) of the Bankruptcy Code.<br><br>*Voting*: Unimpaired – deemed to accept. | [TBD] | 100% |

Case: 19-30088    Doc# 3962    Filed: 09/23/19    Entered: 09/23/19 04:56:04    Page 35 of 119

| | | | |
|---|---|---|---|
| **Class 3B: Utility Unsecured Revolving Credit Facility Claims** | ***Classification***: Holders of claims arising under the Second Amended and Restated Credit Agreement, dated as of April 27, 2015, by and between the Utility and Citibank, N.A., as administrative agent (the "**Utility Unsecured Revolving Credit Agreement**"), in the aggregate principal amount of up to $3 billion (the "**Utility Unsecured Revolving Credit Facility Claims**"). | Appx. $2.885 billion | 100% |
| | ***Treatment***: On the Effective Date or as soon thereafter as is reasonably practicable, each holder of an allowed Utility Unsecured Revolving Credit Facility Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Utility Unsecured Revolving Credit Facility Claim, cash in an amount equal to (i) the outstanding principal and accrued and unpaid interest as of the Petition Date under the Utility Unsecured Revolving Credit Agreement and (ii) accrued and unpaid interest from the Petition Date through the Effective Date at the contract rate. | | |
| | ***Voting***: Unimpaired – deemed to accept. | | |
| **Class 4B: Utility Unsecured Term Loan Claims** | ***Classification***: Holders of claims arising under the Term Loan Agreement, dated as of February 23, 2018, by and between the Utility and The Bank of Tokyo-Mitsubishi UFJ, Ltd., as administrative agent (the "**Utility Unsecured Term Loan Agreement**"), in the aggregate principal amount of $250 million (the "**Utility Unsecured Term Loan Claims**"). | Appx. $250 million | 100% |
| | ***Treatment***: On the Effective Date or as soon thereafter as is reasonably practicable, each holder of an allowed Utility Unsecured Term Loan Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Utility Unsecured Term Loan Claim, cash in an amount equal to (i) the outstanding principal and accrued and unpaid interest as of the Petition Date under the Utility Unsecured Term Loan Agreement and (ii) accrued and unpaid interest from the Petition Date through the Effective Date at the contract rate. | | |
| | ***Voting***: Unimpaired – deemed to accept. | | |

| | | | |
|---|---|---|---|
| **Class 5B: Short-Term Utility Unsecured Notes Claims** | ***Classification***: Holders of claims arising under the notes (or the applicable indenture relating thereto) (the "**Short-Term Utility Unsecured Notes**" and the indentures, the "**Short-Term Utility Unsecured Notes Indentures**") maturing on or before December 1, 2022 (the "**Short-Term Utility Unsecured Notes Claims**"), identified in **Schedule 2** hereto.[3]<br><br>***Treatment***: On the Effective Date or as soon thereafter as is reasonably practicable, each holder of an allowed Short-Term Utility Unsecured Notes Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Short-Term Utility Unsecured Notes Claim, cash in an amount equal to the sum of (i) outstanding principal and accrued and unpaid interest as of the Petition Date at the contract rate under the applicable Short-Term Utility Unsecured Notes or Short-Term Utility Unsecured Notes Indentures, (ii) accrued and unpaid interest from the Petition Date through the Effective Date at the contract rate under the applicable Short-Term Utility Unsecured Notes or Short-Term Utility Unsecured Notes Indentures and (iii) any prepayment premium, makewhole or other similar call protection under the applicable Short-Term Utility Unsecured Notes or Short-Term Utility Unsecured Notes Indentures.<br><br>***Voting***: Unimpaired – deemed to accept. | Appx. $1.75 billion | 100% |
| **Class 6B: Long-Term Utility Unsecured Notes Claims** | ***Classification***: Holders of claims arising under any notes (or the applicable indenture relating thereto) (the "**Long-Term Utility Unsecured Notes**" and the indentures, the "**Long-Term Utility Unsecured Notes Indentures**") maturing on or after January 1, 2023 (the "**Long-Term Utility Unsecured Notes Claims**"), identified in **Schedule 3** hereto.[4]<br><br>***Treatment***: On the Effective Date or as soon thereafter as is reasonably practicable, all Long-Term Utility Unsecured Notes shall be reinstated in full. All Long-Term Utility Unsecured Notes Claims relating to (i) accrued and unpaid interest as of the Petition Date and (ii) accrued and unpaid interest from the Petition Date through the Effective Date, shall be paid in full in cash | Appx. $15.8 billion | 100% |

---

[3] If required, the Plan will provide subclasses for claims arising from each separate issuance of the Short-Term Utility Unsecured Notes.

[4] If required, the Plan will provide subclasses for claims arising from each separate issuance of the Long-Term Utility Unsecured Notes.

4822-9860-1126.1

| | | | |
|---|---|---|---|
| | at the contract rate under the applicable Long-Term Utility Unsecured Notes or Long-Term Utility Unsecured Notes Indentures.<br><br>***Voting***: Unimpaired – deemed to accept. | | |
| **Class 7B: Utility Pollution Control Bond-Related Claims** | ***Classification:*** Holders of claims arising under (a) the Pollution Control Bonds issued by the California Pollution Control Financing Authority and the California Infrastructure and Economic Development Bank (the "**Utility Pollution Control Bonds**") or (b) related reimbursement obligations from certain letter of credit facilities (the "**PCB Revolving Facilities**") or reimbursement agreements with the Utility (the "**Reimbursement Agreements**") in the aggregate outstanding principal amount of $863 million (the "**Utility Pollution Control Bond-Related Claims**").<br><br>***Treatment:*** On the Effective Date or as soon thereafter as is reasonably practicable, each holder of an allowed Utility Pollution Control Bond-Related Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Utility Pollution Control Bond-Related Claim, cash in an amount equal to the sum of (i) outstanding principal and accrued and unpaid interest as of the Petition Date at the contract rate under the applicable Utility Pollution Control Bond, PCB Revolving Facility or Reimbursement Agreement, and (ii) accrued and unpaid interest from the Petition Date through the Effective Date at the contract rate under the applicable Utility Pollution Control Bond, PCB Revolving Facility, or Reimbursement Agreement.<br><br>***Voting***: Unimpaired – deemed to accept. | $863 million | 100% |
| **Class 8B: Utility Intercompany Claims** | ***Classification:*** Claims held by the PG&E Corp. or any non-Debtor affiliate of PG&E Corp. against the Utility (the "**Utility Intercompany Claims**").<br><br>***Treatment:*** All allowed Utility Intercompany Claims, if any, shall be reinstated, compromised or cancelled at the election of the Debtors (with the consent of the Ad Hoc Committee, not to be unreasonably withheld), such that the Utility Intercompany Claims are treated in a tax-efficient manner.<br><br>***Voting***: Unimpaired – deemed to accept. | [TBD] | 100% |

| Class 9B: Fire Victim Claims | ***General Procedures:*** With respect to all unsecured claims arising out of the prepetition Northern California wildfires and the Ghost Ship fire, including, but not limited to, any accrued and unasserted unsecured claims as of the Effective Date related to the Fires (as defined below), of individuals, businesses, insurance subrogation claimants, nonprofits, charities, and any federal, state and local entities (including governmental and regulatory authorities and agencies) for damages, losses, fines, penalties, punitive and/or exemplary damages, restitution, reimbursement, attorney's fees, costs and/or interest, declaratory and/or injunctive relief (the "**Fire Claims**"), the aggregate maximum amount of consideration to be paid in respect of all Fire Claims will be the Aggregate Fire Consideration.<br><br>The Reorganized Debtors will establish the Fire Claims Trust which will be funded with: (i) $12 billion in cash; (ii) $12 billion in shares of common stock of the Reorganized PG&E Corp. (at plan value); and (iii) the assignment of rights, claims, and causes of action as described in the Means for Implementation section, including rights under certain 2015/2016 insurance policies of the Debtors (collectively, the "**Aggregate Fire Consideration**"). Notwithstanding any other provision herein, the rights in and/or proceeds of the Debtors' 2016 insurance policies that provide coverage to the Debtors in connection with the Ghost Ship fire shall be transferred to the Fire Claims Trust solely for the benefit of victims of the Ghost Ship fire and shall not be used to pay any other allowed claims; provided, however, the parties shall work together to ensure that coverage under the Debtors' 2016 insurance policies shall be available to the Reorganized Debtors to pay claims not related to Ghost Ship.<br><br>**Fire Victim Claims** – Any Fire Claim that is not a Subrogation Fire Claim (as defined below) or Governmental Fire Claim (as defined below).<br><br>***Treatment***: On the Effective Date, each holder of a Fire Victim Claim that has been allowed in accordance with the procedures for allowance and payment of such claims as set forth in the Means for Implementation section (an "**Allowed Fire Victim Claim**") shall be entitled to a claim against the Fire Claims Trust in full and final satisfaction, compromise, settlement, release, and discharge of such claim. | $Unknown | Unknown % |

11

| | | | |
|---|---|---|---|
| | Treatment under Class 9B shall exclude Subrogation Fire Claims and Governmental Fire Claims which shall be treated in Classes 10B and 11B respectively.<br><br>*Voting:* Impaired – entitled to vote. | | |
| **Class 10B: Subrogated Fire Claims** | *General Procedures:* same as apply to Class 9B above.<br><br>**Subrogation Fire Claims** – Any Fire Claim arising by way of subrogation under applicable law or contract on account of amounts incurred (paid and reserved) by an insurer under and pursuant to the terms and coverage provisions of a property & casualty insurance policy (a "**Subrogation Fire Claim**").<br><br>*Treatment:* On the Effective Date, each holder of a Subrogation Fire Claim that has been allowed in accordance with the procedures for allowance and payment of such claims as set forth in the Means for Implementation section (an "**Allowed Subrogation Fire Claim**") shall be entitled to a claim against the Fire Claims Trust in full and final satisfaction, compromise, settlement, release, and discharge of such claim.<br><br>*Voting:* Impaired – entitled to vote. | $Unknown | Unknown % |
| **Class 11B: Governmental Fire Claims** | *General Procedures:* same as apply to Class 9B above.<br><br>**Governmental Fire Claims** – Any Fire Claim arising in any way from and asserted by a federal, state or local government entity under applicable law or contract.<br><br>*Treatment:* On the Effective Date, each holder of a Governmental Fire Claim that has been allowed in accordance with the procedures for allowance and payment of such claims as set forth in the Means for Implementation section (an "**Allowed Governmental Fire Claim**") shall be entitled to a claim against the Fire Claims Trust in full and final satisfaction, compromise, settlement, release, and discharge of such allowed claim.<br><br>*Voting:* Impaired – entitled to vote. | $Unknown | Unknown % |
| **Class 12B: Other Utility General** | *Classification:* Holders of general unsecured claims (other than Other Utility Priority Claims, Utility Unsecured Revolving Credit Facility Claims, Utility | [TBD] | 100% |

| | | | |
|---|---|---|---|
| **Unsecured Claims** | Unsecured Term Loan Claims, Short-Term Utility Unsecured Notes Claims, Long-Term Utility Unsecured Notes Claims, Fire Claims, and Utility Workers' Compensation Claims) against the Utility (the "**Other Utility General Unsecured Claims**"). *Treatment***:** Each holder of an allowed Other Utility General Unsecured Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Other Utility General Unsecured Claim, cash in an amount equal to the allowed Other Utility General Unsecured Claim, together with accrued and unpaid interest from the Petition Date through the Effective Date at the applicable contract rate or, in the absence of a contract rate, the Federal Judgement Rate, on the earlier of (i) the Effective Date or as soon thereafter as is reasonably practicable or (ii) the date such Other Utility General Unsecured Claim becomes an allowed Other Utility General Claim or as soon thereafter as is reasonably practicable. *Voting***:** Unimpaired – deemed to accept. | | |
| **Class 13B: Utility Workers' Compensation Claims** | *Classification***:** Holders of claims against the Utility by employees of the Utility for the payment of workers' compensation benefits under applicable law (the "**Utility Workers' Compensation Claims**"). *Treatment***:** Each allowed Utility Workers' Compensation Claim shall be satisfied in full in the ordinary course of business at such time and in such manner as the Utility is obligated to satisfy such Utility Workers' Compensation Claim under applicable law. *Voting***:** Unimpaired – deemed to accept. | [TBD] | 100% |
| **Class 14B: Utility Preferred Interests** | *Classification***:** Holders of outstanding preferred Interests in the Utility (the "**Utility Preferred Interests**") *Treatment***:** Holders of allowed Utility Preferred Interests shall retain ownership of all Utility Preferred Interests in the Reorganized Utility (including any associated liquidation preference). *Voting***:** Unimpaired – deemed to accept. | N/A | 100% |
| **Class 15B: Utility** | *Classification***:** PG&E Corp. as holder of all outstanding common Interests in the Utility (the "**Utility Common Interests**"). | N/A | 100% |

13

| Common Interests | **Treatment:** The Reorganized PG&E Corp., as holder of the Utility Common Interests, shall retain ownership of all Utility Common Interests in the Reorganized Utility.<br><br>**Voting:** Unimpaired – deemed to accept. | | |
|---|---|---|---|

| MEANS FOR IMPLEMENTATION | |
|---|---|
| **Fire Claims Trust** | On the Effective Date, the Reorganized Debtors will establish the Fire Claims Trust. The Fire Claims Trust will be funded with the Aggregate Fire Consideration will include (i) $12 billion in cash, (ii) $12 billion of shares of common stock of Reorganized PG&E Corp. (at plan value), and (iii) the assignment of rights, claims, and causes of action as described below in the Means for Implementation section, including rights under certain 2015/2016 insurance policies of the Debtors.<br><br>As part of the Aggregate Fire Consideration, the Debtors shall also assign to the Fire Claims Trust any and all rights, claims, causes of action, and defenses related thereto related directly or indirectly to any of the prepetition fires listed in Schedule 1 (the "**Fires**") that the Debtors may have against any third party, including, without limitation, against vendors, suppliers, third party contractors and consultants (including those who provided services regarding PGE's electrical system, system equipment, inspection and maintenance of the system, and vegetation management), and current and former directors and officers of the Debtors (to be mutually agreed upon by the TCC and the Ad Hoc Committee and included as an annex to the Plan).<br><br>The Fire Claims Trust shall be administered by a trustee (the "**Fire Claims Trustee**") and governed by an oversight committee (the "**Fire Claims Trust Oversight Committee**") selected by the TCC. An agreement (the "**Fire Claims Trust Agreement**") shall establish and set forth the provisions of the Fire Claims Trust. The Fire Claims Trust Agreement shall be in form and substance reasonably acceptable to the TCC.<br><br>The Fire Claims Trustee shall be selected by the TCC. The Fire Claims Trust Oversight Committee shall consist of three members, which shall be selected by TCC. The Fire Claims Trustee and the Fire Claims Trust Oversight Committee shall have the authority to retain any advisors for the purpose of carrying out their respective duties under the Fire Claims Trust Agreement.<br><br>Allowance of Claims: The Trust Agreement will provide procedures for the holders of Fire Claims to resolve their claims, at their respective option, via a settlement matrix or allowed claim requirements and procedures approved by the TCC and the Court as part of plan confirmation, including mediation, streamlined binding arbitration procedures, or a jury trial to the extent a holder of Fire Claims is entitled to such a trial. The Court would retain jurisdiction over the Trust, Trustee, Oversight Committee, and administration of the Fire Claims Trust, subject to the terms of the Trust Agreement, until the Trust is terminated. |

14

| | |
|---|---|
| | Payment of Claims and Reserve: Given that the amount of the Trust is limited, the Trustee shall provide for an appropriate payment reserve, in his reasonable business judgment, to ensure equal payment for all holders of Fire Claims in accordance with applicable law. Neither the Plan nor the Trust Agreement shall elevate the priority of claims of holders of Subrogation Fire Claims over the claims of holders of Fire Victim Claims regardless of their status as allowed claims. The Trustee shall release reserves only when appropriate and it is clear that claimants will receive equitable distributions as described below. |
| | Unless otherwise ordered by the Court, in order to maintain an appropriate reserve, the Trustee shall pay one or more interim distributions on Allowed Fire Victim Claims, reserving a final distribution on such claims until the end of Trust administration after equal percentage payments have been made on Allowed Fire Victim Claims. At that time, at the end of Trust administration, after each Allowed Fire Victim Claim has been paid in full, the Trustee may then and only then pay an Allowed Subrogation Fire Claim(s) that corresponds to the paid in full Allowed Fire Victim Claim. |
| | In the event that there are remaining funds after payment of all claims of the Fire Claims Trust, the excess funds remaining in the Fire Claims Trust (the "**Excess Fire Claims Trust Funds**") shall be paid to the Wildfire Fund. |
| **Channeling Injunction** | The Fire Claims Trust shall be the sole source of recovery for the Fire Claims against the Debtors. The Plan and order confirming the Plan (the "**Confirmation Order**") shall channel all Fire Claims against the Debtors to the Fire Claims Trust for payment in accordance with the terms and procedures provided therein. The Plan and the Confirmation Order shall bar and enjoin holders of Fire Claims from seeking to recover on account of their Fire Claims against the Reorganized Debtors or any assets of the Reorganized Debtors, except with respect to any and all rights under and the proceeds of the Debtors' insurance policies that provide coverage for the Fires (the "**Channeling Injunction**"). |
| **Contributions to the Wildfire Fund** | On the Effective Date, the Debtors will contribute $5.0 billion, which amount consists of both the Debtors' initial and first annual contributions, to the Fund in order to address future wildfire liability. |
| **SOURCES OF PLAN FUNDING** | |
| **Insurance Rights** | The parties shall work in good faith to determine whether and how to treat the Debtors' insurance policies consistent with this term sheet. Up to $2.209 billion of the proceeds of 2017/2018 insurance policies of the Debtors will be used as a source of cash funding under the Plan. |
| **Cash on Hand** | $[●] billion of the Debtors' cash on hand on the Effective Date. |

15

| | |
|---|---|
| **New Money Investment in PG&E Corp.** | On the Effective Date, Reorganized PG&E Corp. shall issue shares of Reorganized PG&E Corp. Common Stock (the "**New Money Reorganized PG&E Corp. Common Stock Issuance**") to the new money investors identified below (the "**PG&E Corp. New Money Investor Group**"), in exchange for $14,886,190,507 in cash (the "**PG&E Corp. New Money Investment**"). <br><br> The commitments for the PG&E Corp. New Money Investment shall be provided as follows: <br><br>    1. 50% by the consortium of large Utility bondholders identified in **Schedule 4** attached hereto (the "**PG&E Corp. New Money Commitment Group**"); <br>    2. 45% by the members of the Ad Hoc Committee; and <br>    3. 5% by the holders of PG&E Common Interests in Class 8A. <br><br> To the extent that the members of the Ad Hoc Committee and/or holders of PG&E Common Interests in Class 8A do not provide the commitments described above for the PG&E Corp. New Money Investment, the PG&E Corp. New Money Commitment Group will provide commitments covering any such remaining amount. |
| **New PG&E Corp. Senior Unsecured Notes** | On the Effective Date, Reorganized PG&E Corp. shall issue $5.5 billion in new senior unsecured notes (the "**New PG&E Corp. Senior Unsecured Notes**") to the new money investors identified below (the "**New PG&E Corp. Senior Unsecured Notes Investor Group**") in exchange for $5.5 billion in cash (the "**New PG&E Corp. Senior Unsecured Notes Investment**"). The New PG&E Corp. Senior Unsecured Notes shall have terms materially consistent with the terms contained in the term sheet (the "**New PG&E Corp. Senior Unsecured Notes Term Sheet**") attached hereto as **Exhibit 1**. <br><br> The commitments for the New PG&E Corp. Senior Unsecured Notes Investment shall be provided as follows: <br><br>    1. 50% by a consortium of large Utility bondholders identified in **Schedule 5** attached hereto (the "**New PG&E Corp. Senior Unsecured Notes Commitment Group**"); <br>    2. 50% by the members of the Ad Hoc Committee. <br><br> To the extent that the members of the Ad Hoc Committee do not provide the commitments described above for the New PG&E Corp. Senior Unsecured Notes Investment, the PG&E Corp. New Money Commitment Group will provide commitments covering any such remaining amount. |
| **New Utility Secured Notes** | The Debtors shall use commercially reasonable efforts to have the Reorganized Utility issue, on the Effective Date, $7,978,610,000 in new secured notes (collectively, the "**New Utility Secured Notes**") to third party investors in exchange for $7,978,610,000 in cash, with the proceeds being used to pay down all existing Utility Unsecured Term Loan Claims, Utility Unsecured Revolving Credit Facility Claims and Short-Term Utility Unsecured Notes Claims. The New Utility Secured Notes issued to third party investors shall have terms that are acceptable to the Ad Hoc Committee and at least as favorable to the Reorganized Utility as the terms contained in the term sheet (the "**New Utility Secured Notes Term Sheet**") attached hereto as **Exhibit 2**. |

16

|  | In the event that the Reorganized Utility fails to issue all or a portion of the New Utility Secured Notes to third party investors on the Effective Date after using commercially reasonable efforts to do so as described above, on the Effective Date, the Reorganized Utility shall issue New Utility Secured Notes (on terms materially consistent with those contained in the New Utility Secured Notes Term Sheet) in the amount of any such shortfall to the new money investors identified below (the "**Reorganized Utility Secured Notes Investor Group**" and together with the PG&E Corp. New Money Investor Group and the New PG&E Corp. Senior Unsecured Notes Investor Group, the "**Investor Group**") (on pro rata basis as described in the Amended and Restated Commitment Letter to be executed in connection with this Plan Term Sheet (the "**Commitment Letter**")) in exchange for the equivalent amount of cash (the "**New Utility Secured Notes Investment**").

The commitments for the New Utility Secured Notes Investment shall be provided as follows:

1. 50% by a consortium of large Utility bondholders identified in **Schedule 6** attached hereto (the "**New Utility Secured Notes Commitment Group**");
2. 50% by the members of the Ad Hoc Committee.

To the extent that the members of the Ad Hoc Committee do not provide the commitments described above for the New Utility Secured Notes Investment, the PG&E Corp. New Money Commitment Group will provide commitments covering any such remaining amount.

The PG&E Corp. New Money Commitment Group and the New PG&E Corp. Senior Unsecured Notes Commitment Group agree to use commercially reasonable efforts to structure the New Money Reorganized PG&E Corp. Common Stock Issuance and the New PG&E Corp. Senior Unsecured Notes in a manner that will facilitate the issuance of the New Utility Secured Notes on customary market terms, including with respect to the fees payable by the Utility in connection therewith. |
|---|---|
| **Backstop Commitment Fees** | In consideration of the agreement to backstop the commitments described above, the following backstop commitment fees (the "**Backstop Commitment Fees**") shall be payable:

1. 3.0% of the PG&E Corp. New Money Investment to the PG&E Corp. New Money Commitment Group; and
2. 1.5% of the New PG&E Corp. Senior Unsecured Notes Investment to the New PG&E Corp. Senior Unsecured Notes Commitment Group.
3. 1.5% of the maximum amount of New Utility Secured Notes issuable pursuant to this term sheet ($7,978,610,000) to the New Utility Secured Notes Commitment Group.

The Backstop Commitment Fees shall be payable by Reorganized PG&E Corp. in cash or Reorganized PG&E Corp. Common Stock at the election of each backstop commitment party. |

| REGULATORY REQUIREMENTS | |
|---|---|
| **FERC** | Prior to the Effective Date, the Debtors and Reorganized Debtors shall receive, as necessary or appropriate, all of the following approvals from the Federal Energy Regulatory Commission ("**FERC**") (collectively, the "**FERC Approvals**"). The Debtors and Reorganized Debtors shall receive a final order, satisfactory to the Ad Hoc Committee, from the FERC granting authorization under Section 203 of the Federal Power Act (the "**FPA**") to implement the Plan. In addition, if the reorganization results in the transfer of FERC-jurisdictional natural gas assets or hydroelectric assets, the Debtors and Reorganized Debtors shall receive, as necessary or appropriate, approval satisfactory to the Ad Hoc Committee under Section 7 of the Natural Gas Act ("**NGA**") and FPA Section 8, respectively, to transfer those assets. Prior to the Effective Date, the Debtors and Reorganized Debtors shall also receive, if and to the extent necessary or appropriate, a final order from FERC, satisfactory to the Ad Hoc Committee granting authorization under Section 204 of the FPA to issue new securities as provided under the Plan. Finally, prior to the Effective Date, the Debtors and Reorganized Debtors shall receive FERC acceptance, satisfactory to the Ad Hoc Committee, with respect to any new or modified service tariffs under the FPA or NGA necessary or appropriate to implement the Plan, and shall receive approval or acceptance under FPA Section 305 with respect to the creation of any interlocking directorates. |
| **CPUC** | Prior to the Effective Date the Debtors and Reorganized Debtors shall receive all necessary or appropriate approvals, authorizations and final orders from the California Public Utilities Commission ("**CPUC**") required to implement the Plan, to participate in the Wildfire Fund, and to be eligible for the presumption of reasonableness provided in Public Utilities Code section 451.1, in each case satisfactory to the Ad Hoc Committee, including, but not limited to: (a) successful conclusion of the ROE/Cap Structure Proceedings (as defined below); (b) approval of transfer of control over the Utility and any changes to PG&E's corporate structure and authorizations for the Utility to operate as a utility, if required; (c) resolution of claims for monetary fines or penalties under the California Public Utilities Code for conduct prior to the Petition Date, (d) approval (or exemption from approval) of the overall financing structure and securities to be issued under the Plan; (e) approvals and determinations pursuant AB 1054 necessary for participation in the Wildfire Fund, including, but not limited to, a determination that the Plan fully and finally compensates ratepayers in full compliance with Public Utilities Code section 3292(b)(1)(E) throughout the existence of the Wildfire Fund, and (f) approval that the Plan, including in regards to compensation for executive officers, complies with the requirements of Public Utilities Code section 8389 (collectively, the "**CPUC Determinations**").<br><br>The "**ROE/Cap Structure Proceeding**" shall mean the proceeding(s) before the CPUC governing the authorized return on equity and regulated capital structure of the Utility. A successful conclusion of the ROE/Cap Structure Proceeding for purposes of this proceeding shall mean, either (x) a determination that the current authorized capital structure and a minimum of 10.25% ROE shall be fixed for three (3) years, or (y) a mutually agreed deferral of the Utility's 2020 general rate case and/or cost of capital proceeding before the CPUC for a period of 24 months from the Effective Date of the Plan, with the current authorized capital structure and/or a |

18

|  | minimum of 10.25% ROE, as relevant, to remain unchanged until expiration of the deferral period. |
|---|---|
| **NRC** | If required, prior to the Effective Date, the Debtors and Reorganized Debtors shall receive approval from the Nuclear Regulatory Commission for the transfer of the license for the Diablo Canyon Power Plant (the "**NRC Approval**"). |
| | **OTHER TERMS** |
| **Releases** | The Plan shall provide for customary release of all claims and causes of action against (i) the Debtors, (ii) each of the members of the Ad Hoc Committee, (iii) the Creditors' Committee and each of its members, (iv) the TCC and each of its members, (v) the Fire Claims Trustee, (vi) the Fire Claims Trust Oversight Committee and each of its members and (vii) with respect to each of the foregoing entities in clauses (i) through (vi), such entities' Related Persons[5] (each such entity in foregoing clauses (i) through (vii), a "**Released Party**"). |
| | Releases shall be provided by (i) the Debtors, (ii) each of the members of the Ad Hoc Committee, (iii) the Creditors' Committee and each of its members, (iv) the TCC and each of its members, (v) the Fire Claims Trustee, (vi) the Fire Claims Trust Oversight Committee and each of its members and (vii) with respect to each of the foregoing entities in clauses (i) through (vi), such entities' Related Persons, and (viii) all holders of claims and interests against the Debtors, as provided in more detail below (each such entity in foregoing clauses (i) through (viii), a "**Releasing Party**"). |
| | The releases to be set forth in the Plan shall include consensual releases from each holder of a claim or interest (as set forth in the "Plan Treatment of PG&E and Utility Claims" section above) that (i) votes to accept the Plan or (ii) is deemed to accept the Plan, of each Released Party from any claims or causes of action, including any derivative claims asserted or assertable on behalf of any of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates or affiliates or that each other Releasing Party, as applicable, would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any claims or interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring discussions, intercompany transactions between or among the Debtors and/or their Affiliates, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the formulation, preparation, dissemination, negotiation, |

---

[5] "**Related Persons**" with respect to an entity shall mean that entity's current and former affiliates, and such entities' and their current and former affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

| | |
|---|---|
| | filing, or consummation of the Plan, the disclosure statement to the Plan, or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the foregoing, or upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date. |
| | The Plan shall provide for consensual releases to the Released Parties of all claims and causes of action that could be asserted against, or in any way relating to, or arising out of (i) any Debtor, the Reorganized Debtors, their businesses, or their property, (ii) the Chapter 11 Cases, (iv) the formulation, preparation, negotiation, dissemination, implementation, administration, or consummation of the Plan, or (v) any other act or omission in connection with the Chapter 11 Cases. |
| **Exculpation** | The Plan shall provide certain customary exculpation provisions, which shall include a full exculpation from liability in favor of the Debtors, the Ad Hoc Committee and each of its members and their professionals, the Creditors' Committee and each of its members and their professionals, the TCC and each of its members and their professionals, and the Related Persons of all of the foregoing parties from any and all claims and causes of action arising on or after the Petition Date and any and all claims and causes of action relating to any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, soliciting, confirming or consummating the Plan, the disclosure statement to the Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other act taken or omitted to be taken in connection with or in contemplation of the Chapter 11 Cases or the restructuring of the Debtors, with the sole exception of willful misconduct or gross negligence. |
| **Corporate Governance** | Upon the Effective Date and for a period of two (2) years thereafter, the board of directors of Reorganized PG&E Corp. (the "**New PG&E Corp. Board**") shall consist of nine (9) members. From the second anniversary of the Effective Date through the fifth anniversary of the Effective Date, the New PG&E Board Corp. Board shall consist of at least nine (9) and no more than eleven (11) members. The chief executive officer of Reorganized PG&E Corp. (the "**New PG&E Corp. CEO**") shall be a director on the New PG&E Corp. Board. The New PG&E Corp. CEO shall not be the chairperson of the New PG&E Corp. Board. The remaining directors of the New PG&E Corp. Board shall be appointed on the Effective Date, and thereafter elected annually, in the following manner: |
| | 1. One (1) director shall be nominated by IBEW Local 1245, on behalf of the employees of Reorganized PG&E Corp.;<br>2. One (1) director shall be nominated by TURN, on behalf of ratepayers;<br>3. One (1) director shall be nominated by the Wildfire Fund; and<br>4. Each other director shall be nominated by the shareholders of Reorganized PG&E Corp. |
| | The board of directors of the Reorganized Utility (the "**New Utility Board**" and together with the New PG&E Corp., the "**New Boards**") will consist of the same nine (9) members of the New PG&E Corp. Board. The chairperson of the New PG&E Corp. Board shall not be the chairperson of the New Utility Board. |
| | The New Boards shall consist of a diverse set of individuals (including, among |

4822-9860-1126.1

|  | other things, complying with the requirements of California State Bill-826). The majority of the directors of each of the New Boards shall consist of Californians and individuals who have credentialed experience in the areas of utility operations, engineering, safety, regulation and/or clean energy. |
|---|---|
| **Renaming / Rebranding** | For the first 60 days following the Effective Date, all employees of the Reorganized Utility will have the opportunity to submit recommendations for renaming or rebranding the Reorganized Utility. If, after a period of 90 days following the Effective Date, no employee recommendation is selected for renaming or rebranding the Reorganized Utility, the Reorganized Utility shall effect a change of name to "Golden State Power Light & Gas Co.," and the Reorganized PG&E Corp. shall effect a change of name to "GSPL&G Corp." |
| **Prohibition Against Rate Increases** | The Debtors and the Reorganized Debtors will not seek to recover the contributions made to the Wildfire Claims Trust or the Wildfire Fund, either directly or indirectly, through rate increases. |
| **Utility Rates to Consumers** | The Plan shall be rate-neutral to end-market consumers in California on a net basis. The Plan will rely on securitization amounts up to similar levels of the securitization bonds issued in 2001. The proceeds of such new securitization bonds will be used for future statewide Wildfire Fund purposes. The proceeds of any new securitization bonds will not be used for the Debtors' or Reorganized Debtors' benefit for plan purposes. |
| **Utility Consumer Rate Credit** | Plan to include sale of certain key real estate assets of the Debtors to previously identified party or parties to allow for up to $1 billion rate credit for the benefit of all PG&E customers, to be applied equally over a period of 10 years from the Effective Date. |
| **Post-Effective Date Management** | The Utility will seek to enter into a long-term management, oversight, O&M or similar contract(s)/agreement(s) with a qualified management team and/or top-tier U.S.-domiciled utility/energy holding company (all previously identified) to oversee and run the Utility beginning on the Effective Date. Such entity or management team may be provided the opportunity to participate in the PG&E Corp. New Money Investment in connection therewith. |
| **Key Corporate Operating Businesses** | PG&E agrees not to sell, and will oppose any attempt to municipalize, any portion of the operating business or assets, for a period of (5) years after the Effective Date of the Plan; *provided*, however, this provision does not apply to any owned, including currently occupied real estate. For the avoidance of doubt, this restriction will not limit any change in control transaction relating to Reorganized PG&E Corp., including, without limitation, a merger, tender offer or similar transaction. |
| **Key Employee Matters** | All PG&E Corp. common stock currently held by employees and retirees in pension accounts, 401(k) accounts and company-sponsored plans will be trued-up for any dilution on account of the Plan with new equity issuances within 90 days after the Effective Date. Such equity interests will be structured to comply with all applicable securities laws.<br><br>Subject to the support of the International Brotherhood of Electrical Workers |

4822-9860-1126.1

| | |
|---|---|
| | ("**IBEW**") for the Plan, contingent upon and after confirmation of the Plan, the Reorganized Debtors shall enter into an agreement with Local Union No. 1245 of the International Brotherhood of Electrical Workers ("**Local 1245**") with such agreement to apply only to the period starting on the Effective Date, extending the two (2) Collective Bargaining Agreements currently in place between Pacific Gas and Electric Company and Local 1245 (the IBEW Physical Agreement and the IBEW Clerical Agreement, collectively the "**IBEW CBAs**"), until December 31, 2023 with such extension to include (i) a reasonable and appropriate general wage increase for each of the extension years (2022 and 2023) deemed to be appropriate, reasonable, consistent with past practice and included in go-forward allowed rates; (ii) a prohibition on any involuntary layoffs during the term of the extended IBEW CBAs; provided, however such prohibition will not limit any individual employee terminations or displacements and will not apply to contract workforce or non-bargaining unit members; and (iii) reemphasize the Reorganized Debtors' and Local 1245's commitment to maintaining a spirit of cooperation between labor and management. |
| **Other Employee Matters** | Compensation-related agreements between any of the Debtors and any directors, officers and employees of the Debtors existing as of the Effective Date, including any indemnification and severance obligations, short term incentive plan and other incentive plans, with the exception of the revisions set forth herein, existing as of the Effective Date, shall be assumed by the Reorganized Debtors.<br><br>The New Boards shall revise the long term incentive compensation programs of Reorganized PG&E Corp. and the Reorganized Utility by increasing the proportion of LTIP awards subject to performance-based vesting criteria. Performance criteria for LTIP awards will be modified by increasing/implementing performance weightings that are based on achievement of public safety, infrastructure hardening and other related strategic long term objectives. |
| **Pension Matters** | Upon the Effective Date, the Reorganized Debtors shall assume and continue to maintain the PG&E Retirement Plan under its current terms, except to the extent any amendment is required by law, and shall make any and all contributions necessary to satisfy the minimum funding requirements under ERISA Section 302 and Internal Revenue Code Section 430. |
| **Executory Contracts and Unexpired Leases** | All executory contracts and unexpired leases not expressly listed for rejection on an exhibit to the Plan or previously assumed or rejected by order of the Bankruptcy Court shall be deemed assumed as of the Effective Date.<br><br>The Debtors or Reorganized Debtors, as applicable, may alter, amend, modify, or supplement the list of assumed executory contracts and unexpired leases and the schedules of executory contracts and unexpired leases with respect to the Debtors or Reorganized Debtors, as applicable, at any time, through and including 45 days after the Effective Date. |
| **Renewable Energy Power Purchase Agreements** | Notwithstanding anything to the contrary in this Term Sheet, the Debtors and Reorganized Debtors shall not reject any renewable energy power purchase agreement. |

| Tax Matters | The Debtors and the Ad Hoc Committee will work together in good faith and will use commercially reasonable efforts to structure and implement the Reorganization in a tax efficient and cost-effective manner for the Reorganized Debtors and creditors. |
| --- | --- |
| | Post-Effective Date ownership of PG&E Corp. shall be structured to maximize the usage of go-forward tax attributes. |
| **Timing / Key Dates** | Emergence from chapter 11 is to be achieved as soon as reasonably practicable, with specific deadlines as follows: <br><br> 1. A plan of reorganization materially consistent with the terms provided in this Term Sheet and disclosure statement corresponding to such plan to be filed no later than October 31, 2019; <br> 2. Order confirming such plan of reorganization entered no later than June 30, 2020; and <br> 3. Effective date of the plan of reorganization to occur no later than 60 days after the entry of the Confirmation Order. |
| **Conditions Precedent to Effective Date of Plan** | The following conditions must be satisfied in order for the Effective Date to occur: <br><br> 1. A plan of reorganization that provides a binding cap on the recoveries to the holders of Fire Claims (including fines, penalties, reimbursement and other similar obligations) that shall not be greater than the Aggregate Fire Consideration shall have been confirmed; <br> 2. the Confirmation Order shall have been entered by the Court in form and substance acceptable to the Ad Hoc Committee and TCC, be in full force and effect and not be subject to any stay or injunction and shall have become a final order; <br> 3. all definitive documents relating to the Plan shall be in form and substance acceptable to the Ad Hoc Committee; <br> 4. the Fire Claims Trust shall be have been established in accordance with the terms provided herein and the procedures in connection therewith shall be in form and substance acceptable to the TCC; <br> 5. the Fire Claims Trustee shall have been appointed in accordance with the terms provided herein; <br> 6. the members of the Fire Claims Trust Oversight Committee shall have been appointed in accordance with the terms provided herein; <br> 7. a Wildfire Fund has been established pursuant to Public Utilities Code section 3292, and the Utility has satisfied (i) the conditions to participate in the Wildfire Fund pursuant to Public Utilities Code sections 3292 and 3293, (ii) the conditions to obtain a safety certification pursuant to Public Utilities Code section 8389, and (iii) any other conditions that are required to participate in the Wildfire Fund and be eligible for the presumption of reasonableness provided in Public Utilities Code section 451.1; <br> 8. the New PG&E Corp. Common Stock, New PG&E Corp. Senior Unsecured Notes and the New Utility Secured Notes shall have been issued in accordance with the terms provided herein and in a manner acceptable to the Ad Hoc Committee and the TCC; |

4822-9860-1126.1

| | |
|---|---|
| | 9. all actions, documents, certificates and agreements necessary or appropriate to implement the Plan shall have been effected or executed or deemed executed and delivered, as the case may be, to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws; and<br><br>10. all authorizations, consents, regulatory approvals, rulings or documents that are necessary or appropriate to implement and effectuate the Plan (including, but not limited to, the FERC Approvals, the CPUC Determinations, and the NRC Approval) shall have been received. |
| **Conditions Precedent to Funding** | The following conditions must be met in order for the PG&E Corp. New Money Investment, New PG&E Corp. Senior Unsecured Notes Investment, and New Utility Secured Notes Investment to be funded:<br><br>1. A plan of reorganization that provides a binding cap on the recoveries to the holders of Fire Claims (including fines, penalties, reimbursement and other similar obligations) that shall not be greater than the Aggregate Fire Consideration shall have been confirmed and the Effective Date shall have occurred;<br><br>2. There shall not have occurred one or more fires in the Debtors' service territory after the Petition Date and prior to January 1, 2020 that is asserted by any person to arise out of the Debtors' activities and that destroys or damages more than 500 dwellings or commercial structures (individually or in the aggregate);<br><br>3. There shall not have occurred one or more fires on or after January 1, 2020 destroying or damaging at least 500 dwellings or commercial structures (individually or in the aggregate) within PG&E's service area at a time when the portion of PG&E's system at the location of such fires was not de-energized;<br><br>4. The form of all common equity documents and the plan of reorganization and confirmation order are in form and substance acceptable to the Investor Group; and<br><br>5. Customary closing conditions for an equity and unsecured debt financing including, but not limited to, no material adverse change to PG&E Corp.<br><br>6. All Conditions Precedent to the Effective Date of the Plan, as set forth above, shall have been satisfied.<br><br>7. The Debtors shall have maintained and held in good standing all of their operating licenses, certificates and other regulatory authorizations and approvals necessary to operate the Utility's business with no pending revocations of any such license, certificate, approval or authorization or open proceedings contemplating such revocation.<br><br>8. Each of the conditions to funding under the Commitment Letter shall have been satisfied or waived by all applicable parties thereto. |

*THIS IS NOT A SOLICITATION OF A VOTE ON A PLAN OF REORGANIZATION. SUCH A SOLICITATION MAY ONLY OCCUR FOLLOWING APPROVAL BY THE BANKRUPTCY COURT OF A DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE*

## SCHEDULE 1

List of Northern California Fires Covered by Fire Claims Trust

1. Butte Fire (2015)
2. 2017 North Bay Fires
    a. LaPorte (La Porte)
    b. McCourtney
    c. Lobo
    d. Honey
    e. Redwood / Potter Valley
    f. Sulphur
    g. Cherokee
    h. 37
    i. Blue
    j. Pocket
    k. Atlas
    l. Cascade
    m. Nuns
    n. Adobe
    o. Norrbom
    p. Pressley
    q. Patrick
    r. Pythian / Oakmont
    s. Maacama
    t. Tubbs
    u. Point
3. Camp Fire (2018)
4. Ghost Ship (2016)

***THIS IS NOT A SOLICITATION OF A VOTE ON A PLAN OF REORGANIZATION. SUCH A SOLICITATION MAY ONLY OCCUR FOLLOWING APPROVAL BY THE BANKRUPTCY COURT OF A DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE***

## SCHEDULE 2

Short-Term Utility Unsecured Notes

1. $550 million principal amount of 3.50% senior notes due October 1, 2020

2. $250 million principal amount of 3.50% senior notes due October 1, 2020

3. $300 million principal amount of 4.25% senior notes due May 15, 2021

4. $250 million principal amount of 3.25% senior notes due September 15, 2021

5. $400 million principal amount of 2.45% senior notes due August 15, 2022

4822-9860-1126.1

## **SCHEDULE 3**

### Long-Term Utility Unsecured Notes

1. $375 million principal amount of 3.25% senior notes due June 15, 2023

2. $500 million principal amount of 4.25% senior notes due August 1, 2023

3. $300 million principal amount of 3.85% senior notes due November 15, 2023

4. $450 million principal amount of 3.75% senior notes due February 15, 2024

5. $350 million principal amount of 3.40% senior notes due August 15, 2024

6. $400 million principal amount of 3.50% senior notes due June 15, 2025

7. $200 million principal amount of 3.50% senior notes due June 15, 2025

8. $600 million principal amount of 2.95% senior notes due March 1, 2026

9. $400 million principal amount of 3.30% senior notes due March 15, 2027

10. $1,150 million principal amount of 3.30% senior notes due December 1, 2027

11. $300 million principal amount of 4.65% senior notes due August 1, 2028

12. $3,000 million principal amount of 6.05% senior notes due March 1, 2034

13. $700 million principal amount of 5.80% senior notes due March 1, 2037

14. $250 million principal amount of 5.80% senior notes due March 1, 2037

15. $400 million principal amount of 6.35% senior notes due Feb 15, 2038

16. $550 million principal amount of 6.25% senior notes due March 1, 2039

17. $550 million principal amount of 5.40% senior notes due January 15, 2040

18. $250 million principal amount of 5.40% senior notes due January 15, 2040

19. $250 million principal amount of 4.50% senior notes due December 15, 2041

20. $400 million principal amount of 4.45% senior notes due April 15, 2042

21. $350 million principal amount of 3.75% senior notes due August 15, 2042

22. $375 million principal amount of 4.60% senior notes due June 15. 2043

23. $500 million principal amount of 5.125% senior notes due November 15, 2043

24. $450 million principal amount of 4.75% senior notes due February 15, 2044

25. $225 million principal amount of 4.75% senior notes due February 15, 2044

26. $500 million principal amount of 4.30% senior notes due March 15, 2045

27. $100 million principal amount of 4.30% senior notes due March 15, 2045

28. $450 million principal amount of 4.25% senior notes due March 15, 2046

29. $400 million principal amount of 4.00% senior notes due December 1, 2046

30. $200 million principal amount of 4.00% senior notes due December 1, 2046

31. $850 million principal amount of 3.95% of senior notes due December 1, 2047

## SCHEDULE 4

PG&E Corp. New Money Commitment Group

1. Apollo Capital Management, L.P.
2. Canyon Capital Advisors LLC
3. Capital Research and Management Company
4. Citadel Advisors LLC
5. Davidson Kempner Capital Management LP
6. Elliott Management Corporation
7. Farallon Capital Management, L.L.C.
8. Oaktree  Fund GP, LLC
9. Pacific Investment Management Company LLC
10. Theater Investor LLC (wholly owned by funds managed by OZ Management LP)
11. Third Point LLC
12. Varde Partners, Inc.

4845-4084-7782.1

## **SCHEDULE 5**

New PG&E Corp. Senior Unsecured Notes Commitment Group

1. Apollo Capital Management, L.P.
2. Canyon Capital Advisors LLC
3. Capital Research and Management Company
4. Citadel Advisors LLC
5. Davidson Kempner Capital Management LP
6. Elliott Management Corporation
7. Farallon Capital Management, L.L.C.
8. Oaktree  Fund GP, LLC
9. Pacific Investment Management Company LLC
10. Theater Investor LLC (wholly owned by funds managed by OZ Management LP)
11. Third Point LLC
12. Varde Partners, Inc.

## **SCHEDULE 6**

New Utility Secured Notes Commitment Group

1. Apollo Capital Management, L.P.
2. Canyon Capital Advisors LLC
3. Capital Research and Management Company
4. Citadel Advisors LLC
5. Davidson Kempner Capital Management LP
6. Elliott Management Corporation
7. Farallon Capital Management, L.L.C.
8. Oaktree  Fund GP, LLC
9. Pacific Investment Management Company LLC
10. Theater Investor LLC (wholly owned by funds managed by OZ Management LP)
11. Third Point LLC
12. Varde Partners, Inc.

# **EXHIBIT 1**

New PG&E Corp. Senior Unsecured Notes Term Sheet

4822-9860-1126.1

## EXHIBIT 2

New Utility Secured Notes Term Sheet

4845-4084-7782.1

<u>**Exhibit B**</u>

Terms of the Senior Unsecured Notes:

| | |
|---|---|
| Issuer: | Reorganized PG&E Corp. |
| Initial Issue Date: | Effective Date of Plan of Reorganization |
| Issue Amount: | $5.5 billion |
| Interest Rate: | 7.5% cash payable semi-annually |
| Interest Rate Step-Down Feature: | Interest rate steps down 50 basis points upon the first date following the Initial Issue Date upon which the Issuer has received and maintained Investment Grade credit rating status from both S&P, Moody's and Fitch for 90 days |
| OID: | 1.0% |
| Ranking: | Senior Unsecured obligation of the Issuer |
| Final Maturity: | Seven (7) years from the date of issuance |
| Call Schedule: | Non-call five years<br>Callable after year five at 107.50% of par<br>Callable after year six at 103.75% of par |
| Other Key Terms: | In event of a change of control of the Issuer and/or the Reorganized Utility, Senior Notes puttable at 101% at each holder's option |
| Other Customary Terms: | Documentation to include covenants and other terms customary for senior unsecured financing |

## Exhibit C

Terms of the New Utility Secured Notes:

| | |
|---|---|
| Issuer: | Reorganized Utility |
| Initial Issue Date: | Effective Date of Plan of Reorganization |

Issue Amount:  $7,978,610,000 in the aggregate, with maturity dates as follows:
- 5 year notes - $1,994,652,500
- 7 year notes - $1,994,652,500
- 10 year notes - $1,994,652,500
- 30 year notes - $1,994,652,500

Interest Rate:

| Term | Spread to treasury given rating | | |
|---|---|---|---|
| | BBB | BBB- | Sub IG |
| 5 years | 175 bps | +25 bps | +25 bps |
| 7 years | 200 bps | +25 bps | +25 bps |
| 10 years | 250 bps | +25 bps | +25 bps |
| 30 years | 275 bps | +25 bps | +25 bps |

| | |
|---|---|
| OID: | 1.0% |
| Security: | Secured by a first mortgage on all "Principal Property" of the Debtors as described in the Plan Term Sheet |
| Final Maturity: | Five (5), seven (7), ten (10) and thirty (30) years from the date of issuance as described above |
| Call Schedule: | Non-call for life with make whole equal to treasury rate plus 20 bps (on terms materially consistent with existing Utility notes) |
| Other Customary Terms: | Documentation to include covenants and other terms customary for secured utility financings including loan to value ratios and collateral coverage and protection |

## **Exhibit B**

Blackline of Amended and Restated Commitment Letter

~~August 7~~September 22, 2019

PG&E Corporation
77 Beale Street
P.O. Box 770000
San Francisco, California 94177

Re: <u>Amended and Restated Commitment</u>

Ladies and Gentlemen:

Reference is hereby made to the chapter 11 bankruptcy cases, lead case no. 19-30088 (the "***Chapter 11 Cases***"), currently pending before the United States Bankruptcy Court for the <u>Northern</u> District of ~~Northern~~ California (the "***Bankruptcy Court***"), in which PG&E Corporation ("***PG&E***") and Pacific Gas and Electric Company (the "***Utility***" and together with PG&E, the "***Debtors***") are debtors <u>in possession</u>. Reference is further made to (i) a Chapter 11 plan of reorganization (the "***Plan***") to be filed with the Bankruptcy Court to implement the terms and conditions of the reorganization of the Debtors contemplated by the plan term sheet attached hereto as <u>Exhibit A</u> (the "***Plan Term Sheet***") and (ii) a disclosure statement that will accompany the Plan (the "***Disclosure Statement***"). Reference is further made to that certain commitment letter dated ~~July 16~~<u>August 7</u>, 2019 from the Commitment Parties (as defined below) (the "***~~July~~August Commitment Letter***"). This commitment letter (this "***Commitment Letter***") amends and restates the ~~July~~August Commitment Letter in its entirety. Capitalized terms used in this Commitment Letter but not otherwise defined shall have the meanings ascribed to them in the Plan Term Sheet.

The Plan, among other things, shall provide that (i) Reorganized PG&E Corp. issue shares of Reorganized PG&E Corp. Common Stock to the Commitment Parties set forth on <u>Schedule 1(a)</u> in consideration for ~~at least $19,000,000,000 and up to $20,000,000,000~~<u>$14,886,190,507</u> in cash (the "***Common Stock Issuance***"), (ii) Reorganized PG&E Corp. issue ~~at least $4,000,000,000 and up to $5,400,000,000~~<u>$5,500,000,000</u> in new senior unsecured notes with the terms described in the Plan Term Sheet and on <u>Exhibit B</u> hereto to the Commitment Parties set forth on <u>Schedule 1(b)</u> hereto in consideration for ~~at least $4,000,000,000 and up to $5,400,000,000~~<u>an equivalent amount</u> in cash (the "***Senior Unsecured Notes Issuance***") and (iii) the Reorganized Utility may, subject to the terms hereof, issue $~~5,500,000,000~~<u>7,978,610,000</u> in new secured notes with the terms described on <u>Exhibit C</u> hereto to the Commitment Parties set forth on <u>Schedule 1(c)</u> hereto in consideration for $~~5,500,000,000~~<u>the equivalent amount</u> in cash (the "***New Utility Secured Notes Issuance***"). ~~The percentage of the fully diluted Reorganized PG&E Corp. Common Stock represented by the Common Stock Issuance and the Senior Unsecured Notes Issuance will be as set forth on Exhibit D hereto.~~

1. To provide assurances that the Common Stock Issuance, the Senior Unsecured Notes Issuance and the New Utility Secured Notes Issuance will be fully funded, the undersigned (each a "***Commitment Party***" and, collectively, the "***Commitment Parties***") hereby agree as follows:

a. Subject to the terms and conditions herein and the Plan Term Sheet (including without limitation the payment of fees to the Commitment Parties described herein and therein), each Commitment Party, solely on behalf of itself or certain of its affiliates hereby severally, and not jointly and severally, agrees to commit to purchase on the Effective Date (i) the number of shares of Reorganized PG&E Common Stock representing a fully diluted ownership percentage of ~~85% for $19,000,000,000 and 95% for $20,000,000,000 as described on Exhibit D hereto,~~<u>58.8% of Reorganized PG&E Corp. for $14,886,190,507,</u> in accordance with the respective percentages and dollar amounts set forth opposite

such Commitment Party's name on Schedule 1(a) hereto, (ii) the amount of New PG&E Senior Unsecured Notes set forth opposite such Commitment Party's name on Schedule 1(b) hereto and (iii) in the event that the Reorganized Utility fails to issue all or a portion of the New Utility Secured Notes to third party investors on the Effective Date after using commercially reasonable efforts to issue such notes to third party investors, up to the amount of New Utility Secured Notes set forth opposite such Commitment Party's name on Schedule 1(c) hereto (which shall be allocated to the Commitment Parties on a pro rata basis based upon the commitment percentages set forth on Schedule 1(c)) to fund any such shortfall (collectively, with respect to each Commitment Party, the "***Commitment***"). Notwithstanding anything in this Commitment Letter to the contrary, the aggregate Commitment of all of the Commitment Parties hereunder shall not exceed $~~30,900,000,000~~28,364,800,507. For the avoidance of doubt, each component of the Commitment described in Sections 1(a)(i)-(iii) is conditioned upon each other component of the Commitment (except to the extent that all of the New Utility Secured Notes are issued to third party investors as contemplated herein) and in no event shall any Commitment Party be required to fund a component of the Commitment on a stand-alone basis.

b.        Each Commitment Party, on behalf of itself or certain of its affiliates, will satisfy its respective Commitment by funding its respective Commitment obligations in accordance with the terms and subject to the conditions to be set forth in the Plan Documents (as defined below) governing the Common Stock Issuance, the Senior Unsecured Notes Issuance and the New Utility Secured Notes Issuance (if applicable) as described below.

c.        The Debtors shall use commercially reasonable efforts to have the Reorganized Utility issue on the Effective Date the New Utility Secured Notes to third party investors on terms that are acceptable to the Commitment Threshold (as defined below) and at least as favorable to the Reorganized Utility as the terms described on Exhibit C hereto. The Commitment Parties agree to use commercially reasonable efforts to structure the Common Stock Issuance and the Senior Unsecured Notes Issuance in a manner that will facilitate the issuance of the New Utility Secured Notes on customary market terms, including with respect to the fees payable by the Utility in connection therewith.

2.        The consummation of the Common Stock Issuance, the Senior Unsecured Notes Issuance and the New Utility Secured Notes Issuance (if applicable), will occur pursuant to definitive written agreements consistent with the Plan Term Sheet and approved by Commitment Parties representing at least two-thirds of the aggregate Commitment hereunder (the "***Commitment Threshold***"), in the sole discretion of the Commitment Parties constituting the Commitment Threshold, and will be subject to, among other things, (x) the negotiation, execution and delivery of such definitive agreements for the Common Stock Issuance, the Senior Unsecured Notes Issuance, the New Utility Secured Notes Issuance (if applicable) and the Plan, including, without limitation, all commitment agreements, purchase agreements, indentures, security documents, mortgages, registration rights agreements, revised certificates of incorporation and bylaws of Reorganized PG&E (which shall contain customary terms and conditions and customary ownership limitations in order to preserve the tax attributes of the Debtors after the Effective Date) and other similar agreements and documentation required to be entered into on the Effective Date under the terms of the Plan (collectively, the "***Plan Documents***"), in form and substance satisfactory to the Commitment Threshold, in the sole discretion of the Commitment Parties constituting the Commitment Threshold, and (y) receipt of any necessary or advisable governmental, contractual, regulatory or other requisite consents or approvals in connection with the Common Stock Issuance, the Senior Unsecured Notes Issuance, the New Utility Secured Notes Issuance and the other transactions contemplated by the Plan; provided, that, each Commitment Party's consent shall be required for any provision included in the Plan Documents that increases such Commitment Party's Commitment hereunder or would have a materially adverse and disproportionate effect on such Commitment Party. Upon approval of the Plan Documents by the Commitment Threshold, notice of such approval will be provided to each of the Commitment Parties along with copies of the Plan Documents. The agreements and obligations of the Commitment Parties pursuant to this Commitment Letter, including each

Commitment Party's respective Commitment, are further expressly conditioned upon and subject to the satisfaction or written waiver by the Commitment Threshold, in the sole discretion of the Commitment Parties constituting the Commitment Threshold, at or prior to the Effective Date of each of the following conditions, which are acknowledged to be an integral part of the transactions contemplated by this Commitment Letter and without these conditions each Commitment Party would not have entered into this Commitment Letter:

a.      the satisfaction of the conditions set forth in the Plan Term Sheet and, other than the funding of the Common Stock Issuance, the Senior Unsecured Notes Issuance and the New Utility Secured Notes Issuance (if such notes are issued to the Commitment Parties), the satisfaction of all of the other conditions to the Effective Date provided for in the Plan and the Plan Documents;

b.      all of the covenants and obligations that the Debtors are required to comply with or to perform pursuant to the Plan Documents at or prior to the Effective Date shall have been complied with and performed in all material respects, including the payment by the Debtors of all fees contemplated therein;

c.      the Plan Documents shall have been executed and delivered by each of the parties thereto;

d.      the Bankruptcy Court shall have entered the Confirmation Order, such Confirmation Order shall be a final order (the Plan in the form confirmed by the Bankruptcy Court, the "***Confirmed Plan***"), and such Confirmation Order shall authorize and approve the transactions contemplated herein and in the Plan Term Sheet and all other consideration and fees contemplated herein and in the Plan Term Sheet;

e.      this Commitment Letter shall have been approved by an order of the Bankruptcy Court and such order shall be in full force and effect, and no stay thereof shall be in effect;

ef.      no result, occurrence, fact, change, event, effect, violation, penalty, inaccuracy, or circumstance (whether or not constituting a breach of a representation, warranty or covenant set forth in the Plan or any Plan Document) that, individually or in the aggregate with any such other results, occurrences, facts, changes, events, effects, violations, penalties, inaccuracies, or circumstances, (i) would have or would reasonably be expected to have a material adverse effect on the business, operations, assets, liabilities, capitalization, financial performance, condition (financial or otherwise) or results of operations, in each case, of the Debtors, taken as a whole, or (ii) would reasonably be expected to prevent or materially impair or delay the ability of the Debtors or the Commitment Parties to consummate the transactions contemplated by this Commitment Letter, the Plan Term Sheet, the Plan or the other Plan Documents or perform their obligations hereunder or thereunder (each a "***Material Adverse Effect***") shall have occurred; *provided, however*, that none of the following results, occurrences, facts, changes, events, effects, violations, penalties, inaccuracies, or circumstances shall constitute or be taken into account in determining whether a Material Adverse Effect has occurred, is continuing or would reasonably be expected to occur: (A) the filing of the Chapter 11 Cases, and the fact that the Debtors are operating in bankruptcy and the effects reasonably expected to result therefrom, shall not constitute(B) results, occurrences, facts, changes, events, effects, violations, inaccuracies, or circumstances affecting (1) the electric or gas utility businesses in the United States generally or (2) the economy, credit, financial, capital or commodity markets, in the United States or elsewhere in the world, including changes in interest rates, monetary policy or inflation, (C) changes or prospective changes in law (other than any law or regulation of California or the United States that is applicable to any electrical utility) or in GAAP or accounting standards, or any changes or prospective changes in the interpretation or enforcement of any of the foregoing, (D) any decline in the market price, or change in trading volume, of any securities of the Debtors, (E) any failure to meet any internal or public projections, forecasts, guidance, estimates, milestones, credit ratings, budgets or internal or published financial or operating predictions of revenue, earnings, cash flow or cash position (it being understood that the exceptions in clauses (D) and (E) shall

not prevent or otherwise affect a determination that the underlying cause of any such change, decline or failure referred to therein is a Material Adverse Effect);

~~f~~g.    the Debtors shall have each operated its business in the ordinary course of business and consistent with its historical practices, other than any deviations from operations in the ordinary course of business pursuant to an order issued by the Bankruptcy Court; and

~~g~~h.    the Debtors shall have maintained and held in good standing all of their operating licenses, certificates and other regulatory authorizations and approvals necessary to operate the Utility's business with no pending revocations of any such license, certificate, approval or authorization or open proceedings contemplating such revocation.

3.    Each Commitment Party may terminate this Commitment Letter, solely as to itself, by written notice to legal counsel to the Ad Hoc Committee, on or after the occurrence of any of the following:

a.    the Plan, on terms and conditions materially consistent with the Plan Term Sheet, and the Disclosure Statement shall not have been filed on or before ~~September 16~~October 31, 2019;

b.    the Confirmation Order, in form and substance reasonably acceptable to the Commitment Threshold, has not been entered by the Bankruptcy Court on or before ~~May 15~~June 30, 2020;

c.    the Effective Date shall not have occurred on or before ~~June 30, 2020~~sixty (60) days after entry of the Confirmation Order;

d.    the Plan Documents, as approved by the Commitment Threshold pursuant to the terms of Section 2 above, (i) are not consistent with the material terms and conditions of this Commitment Letter, including the Plan Term Sheet or (ii) include one or more provisions that would have a materially adverse and disproportionate effect on such Commitment Party and the applicable Commitment Party has not consented to the inclusion of such provision(s);

e.    the occurrence of a Material Adverse Effect;

f.    the failure of either of the Debtors to operate its business in the ordinary course of business and consistent with its historical practices;

g.    there is in effect an order (whether permanent or preliminary) of a governmental authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of any of the transactions contemplated by the Plan Term Sheet or the Plan, or any law, statute, rule, regulation or ordinance is adopted that makes consummation of the transactions contemplated by the Plan Term Sheet or the Plan illegal or otherwise prohibited; ~~or~~

h.    the occurrence or discovery of any state of facts, change, event, development, circumstance or condition that causes any of the conditions precedent set forth in the Plan Term Sheet, the Plan or the Plan Documents to not be capable of being satisfied~~.~~; or

i.    if at any time after the first day of the confirmation hearing, asserted Administrative Expense Claims exceed $250 million, excluding all (i) ordinary course Administrative Expense Claims, (ii) Professional Fee Claims, and (iii) Disallowed Administrative Expense Claims (as such terms were defined in the Debtors plan of reorganization filed with the Bankruptcy Court on September 9, 2019).

Upon termination of this Commitment Letter as to a Commitment Party (such terminating Commitment Party, a "***Terminating Commitment Party***") pursuant to any of Section 3(a) through (h), this Commitment Letter shall be void and of no further force or effect solely with respect to such Terminating Commitment Party, such Terminating Commitment Party shall be released from its commitments, undertakings and agreements under or related to this Commitment Letter, including its Commitment,

except as explicitly provided herein and there shall be no liability or obligation on the part of such Terminating Commitment Party hereunder, except as explicitly provided herein. Upon notice from a Terminating Commitment Party of such termination, each non-terminating Commitment Party (a "***Non-Terminating Commitment Party***") may, by written notice within thirty (30) days of receipt of such notice, notify the other Non-Terminating Commitment Parties in writing of such Non-Terminating Commitment Party's election to assume such Terminating Commitment Party's Commitment on the terms and conditions hereof (such Commitment to be allocated on a pro rata basis based on each such Non-Terminating Commitment Party's existing Commitment in the event that more than one Non-Terminating Commitment Party exercises its right to assume such Commitment). In the event that the Non-Terminating Commitment Parties do not elect to assume, in the aggregate, all of a Terminating Commitment Party's Commitment hereunder, the Commitment Parties included in the Commitment Threshold shall use their respective commercially reasonable efforts to have the remaining portion of such Commitment assumed by a third-party investor on the terms and conditions hereof. In the event that there is a Terminating Commitment Party hereunder and the Commitment of such Terminating Commitment Party has not been assumed by a Non-Terminating Commitment Party or a third-party investor within forty-five (45) days of the applicable termination, the Commitment Parties shall provide prompt notice of such termination to the Debtors and the TCC.

This Commitment Letter shall automatically terminate in the event the Plan Documents have not been approved by the Commitment Threshold subject to Section 2 above and executed and delivered by the applicable parties thereto on or before the date that is the voting deadline for the Plan. This Commitment Letter shall be automatically superseded by the Plan Documents governing the Common Stock Issuance, the Senior Unsecured Notes Issuance and the New Utility Secured Notes Issuance upon the execution and delivery of such Plan Documents by the Commitment Parties and the other applicable parties thereto. Upon any supersession or termination of this Commitment Letter pursuant to this Section 3, this Commitment Letter shall be void and of no further force or effect, each Commitment Party shall be released from its commitments, undertakings and agreements under or related to this Commitment Letter, including the Commitment, and there shall be no liability or obligation on the part of any Commitment Party hereunder.

4. In the event that (a) the Commitment Threshold approves the Plan Documents as contemplated in Section 2 or waives, pursuant to Section 3, any condition set forth in Section 2 (each a, "***Commitment Threshold Action***") and (b) within five (5) business days after such Commitment Threshold Action, one or more Commitment Parties have not approved or consented to such Commitment Threshold Action, but have not terminated this Commitment Letter as to itself pursuant to Section 3 above, at the discretion of the Commitment Threshold each such non-consenting Commitment Party may be designated a "Terminating Commitment Party" hereunder following receipt of notice of such proposed designation at least five (5) business days prior to such designation. Upon such designation the applicable non-consenting Commitment Party's Commitment shall be automatically terminated as described in Section 3 above and such Commitment shall be available for assumption pursuant to the terms of Section 3 above. For the avoidance of doubt, if a Commitment Party is designated as a Terminating Commitment Party pursuant to this Section 4, this Commitment Letter shall be void and of no further force or effect as to such Commitment Party, such Commitment Party shall be released from its commitments, undertakings and agreements under or related to this Commitment Letter, including the Commitment, and there shall be no liability or obligation on the part of such Commitment Party hereunder.

5. Each Commitment Party hereby represents and warrants, on a several (not joint and several) basis and solely as to itself, that (a) it has all limited partnership, corporate or other power and authority necessary to execute, deliver and perform this Commitment Letter, (b) the execution, delivery and performance of this Commitment Letter by it has been duly and validly authorized and approved by all necessary limited partnership, corporate or other organizational action by it, (c) this Commitment

Letter has been duly and validly executed and delivered by it and, assuming due execution and delivery by the other parties hereto, constitutes a valid and legally binding obligation of it, enforceable against it in accordance with the terms of this Commitment Letter, (d) the execution, delivery and performance by such Commitment Party of this Commitment Letter do not (i) violate the organizational documents of such Commitment Party or (ii) violate any applicable law or judgment, (e) as of the Effective Date, its Commitment is less than the maximum amount that it or any of its affiliates that may provide the Commitment is permitted to invest in any one portfolio investment pursuant to the terms of its constituent documents or otherwise and (f) it will have, or its affiliates that may provide the Commitment will have, in the aggregate, as of the Effective Date, available funds at least in the sum of its Commitment hereunder.

In addition, each Commitment Party hereby represents and warrants, solely as to itself, as of the date of this Commitment Letter and as of the Effective Date, that the Commitment Party or any of its affiliates that may provide the Commitment (as applicable) (i) is acquiring the shares of Reorganized PG&E Common Stock for its own account, solely for investment and not with a view toward, or for sale in connection with, any distribution thereof in violation of any foreign, federal, state or local securities or "blue sky" laws, or with any present intention of distributing or selling such shares in violation of any such laws, (ii) has such knowledge and experience in financial and business matters and in investments of this type that it is capable of evaluating the merits and risks of its investment in the shares of Reorganized PG&E Common Stock and of making an informed investment decision, and (iii) is an "accredited investor" within the meaning of Rule 501 of Regulation D under the Securities Act of 1933, as amended (the "***Securities Act***"). Each Commitment Party understands that Reorganized PG&E Corp. will be relying on the statements contained herein to establish an exemption from registration under the Securities Act, and under foreign, federal, state and local securities laws and acknowledges that the shares of Reorganized PG&E Common Stock will not be registered under the Securities Act or any other applicable law and that such shares may not be transferred except pursuant to the registration provisions of the Securities Act (and in compliance with any other applicable law) or pursuant to an applicable exemption therefrom.

6. This Commitment Letter (a) is not assignable by any of the Commitment Parties without the prior written consent of a majority of the Commitment Parties and any purported assignment without such consent shall be null and void *ab initio*; *provided*, *however*, each Commitment Party may assign its Commitment, in whole or in part, to another Commitment Party or such Commitment Party's affiliate to the extent such assignee Commitment Party agrees in writing to assume all obligations hereunder of such Commitment Party in connection with such Commitment, and (b) is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person or entity other than the parties hereto. Notwithstanding the foregoing, a Commitment Party may assign all or any portion of its obligations hereunder to (i) an affiliate of such Commitment Party, (ii) an investment fund or separately managed account the primary investment advisor or sub-advisor to which is a Commitment Party or an affiliate thereof or (iii) a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act of 1933, as amended), without the consent of any party; *provided, however*, that the Commitment Party shall not be relieved of its obligations hereunder in the event that such assignee(s) under clause (i) or (ii) above does not fulfill the obligations hereunder so assigned.

7. This Commitment Letter, including all exhibits and schedules hereto, constitutes the entire understanding among the parties hereto with respect to the subject matter hereof and replaces and supersedes all prior agreements and understandings, both written and oral (including the August Commitment Letter), between the parties hereto with respect to the subject matter hereof and shall become effective and binding upon the mutual exchange of fully executed counterparts by each of the parties hereto.

8. This Commitment Letter shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that

would require the application of the law of any other jurisdiction. By its execution and delivery of this Commitment Letter, each of the parties hereto irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Commitment Letter or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought only in the Bankruptcy Court. By execution and delivery of this Commitment Letter, each of the parties hereto irrevocably accepts and submits itself to the exclusive jurisdiction of the Bankruptcy Court with respect to any such action, suit or proceeding. EACH PARTY HERETO UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO ABOVE.

9.   This Commitment Letter may not be amended or waived except in writing signed by each of the parties hereto. This Commitment Letter may be executed in any number of counterparts, each of which will be an original, and all of which, when taken together, will constitute one agreement. Delivery of an executed counterpart of this Commitment Letter by e-mail or portable document format (PDF) will be effective as delivery of a manually executed counterpart of this Commitment Letter.

10.   Notwithstanding anything that may be expressed or implied in this Commitment Letter, each party hereto acknowledges and agrees that no person other than the Commitment Parties (and their permitted assigns) shall have any obligation hereunder (subject to the limitations provided herein) or in connection with the transactions contemplated hereby and that (a) notwithstanding that any Commitment Party may be a partnership, limited partnership or limited liability company, no recourse (whether at law, in equity, in contract, in tort or otherwise) hereunder or under any document or instrument delivered in connection herewith, or in respect of any oral representations made or alleged to be made in connection herewith or therewith, shall be had against any former, current or future direct or indirect equity holder, controlling person, general or limited partner, shareholder, member, investment manager or adviser, manager, director, officer, employee, agent, affiliate, assignee, representative or financing source of any of the foregoing) (any such person or entity, other than such Commitment Party, a "***Related Party***") or any Related Party of any such Related Party, including, without limitation, any liabilities arising under, or in connection with, the Plan Term Sheet, the Plan or this Commitment Letter and the transactions contemplated thereby and hereby, or in respect of any oral representations made or alleged to be made in connection therewith or herewith), whether by the enforcement of any judgment or assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law and (b) no personal liability whatsoever will attach to, be imposed on or otherwise be incurred by any Related Party of any of the Commitment Parties or any Related Party of any such Related Party under this Commitment Letter or any document or instrument delivered in connection herewith or with the Plan Term Sheet or the Plan (or in respect of any oral representation made or alleged to be made in connection herewith or therewith) or for any action (whether at law, in equity, in contract, in tort or otherwise) based on, in respect of, or by reason of such obligations hereunder or by their creation.

11.   Notwithstanding anything to the contrary contained herein, the obligations of each Commitment Party hereunder are several, and not joint and several, and consequently each Commitment Party shall have no liability or obligation with respect to any breach by any other party.   No Commitment Party shall be required to acquire or purchase for any securities or indebtedness in connection with the Common Stock Issuance and the Senior Unsecured Notes Issuance which under this Commitment Letter is to be acquired or subscribed by any other party nor shall any Commitment Party be required to pay any money, consideration, or exchange any claims whatsoever which are owing from, or to be transferred from or by, any other party. Nothing in this Commitment Letter shall be deemed to constitute a joint venture or partnership between any of the parties nor constitute any party as the agent of any other party for any purpose.  For the avoidance of doubt, no Commitment Party shall, nor shall any action taken by a Commitment Party hereunder, be deemed to be acting in concert or as any group with any other Commitment Party with respect to the Commitment nor shall the Commitments hereunder create a

presumption that the Commitment Parties are in any way acting as a group hereunder and the use of a single document is for the convenience of the parties.

12. Each party hereto confirms that it has made its own decision to execute this Commitment Letter based upon its own independent assessment of documents and information available to it, as it has deemed appropriate.

13. Except as expressly provided in this Commitment Letter, (a) nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each party hereto to protect and preserve its rights, remedies and interests, including, without limitation, any Long-Term Utility Unsecured Notes Claims, and any other claims against or interests in any of the Debtors or other parties, or its full participation in any bankruptcy proceeding, and (b) the parties hereto each fully preserve any and all of their respective rights, remedies, claims and interests as of the date hereof and upon a termination of this Commitment Letter. Further, nothing in this Commitment Letter shall be construed to prohibit any party hereto from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are consistent with this Commitment Letter, the Plan Term Sheet and the Plan, and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying or preventing the consummation of the transactions contemplated by the Plan Term Sheet and the Plan.

14. The words "hereof," "herein" and "hereunder" and words of like import used in this Commitment Letter shall refer to this Commitment Letter as a whole and not to any particular provision of this Commitment Letter. References to any Articles, Sections, Exhibits and Schedules are to such Articles, Sections, Exhibits and Schedules of this Commitment Letter unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein (including any exhibits, schedules or attachments thereto) are hereby incorporated in and made a part of this Commitment Letter as if set forth in full herein. Any singular term in this Commitment Letter shall be deemed to include the plural, and any plural term the singular. Whenever the words "include," "includes" or "including" are used in this Commitment Letter, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import. "Writing," "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. Any reference to "business day" means any day, other than a Saturday, a Sunday or any other day on which banks located in New York, New York are closed for business as a result of federal, state or local holiday and any other reference to day means a calendar day.

15. Notwithstanding anything to the contrary herein, nothing in this Commitment Letter shall create any additional fiduciary obligations on the part of any of the parties hereto or any members, managers or officers of any of the parties hereto or their affiliated entities, in such person's or entity's capacity as a member, manager or officer of any of the parties hereto or their affiliated entities that such entities did not have prior to the execution of this Commitment Letter. None of the Commitment Parties shall have any fiduciary duty or other duties or responsibilities to each other, either of the Debtors, or any of the Debtors' creditors or other stakeholders.

16. This Commitment Letter, including the transactions contemplated herein, is the product of negotiations among the parties hereto, together with their respective representatives. Notwithstanding anything herein to the contrary, this Commitment Letter is not, and shall not be deemed to be, a solicitation of votes for the acceptance of the Plan or any other plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. None of the parties hereto will solicit acceptances of the Plan from any party until such party has been provided with copies of a Disclosure Statement containing adequate information as required by section 1125 of the Bankruptcy Code.

17. None of the Commitment Parties shall have any liability (whether in contract, tort or otherwise) to the Debtors or any other person, including, without limitation, any of the Debtors' or any other person's respective security holders or creditors, for or in connection with the delivery of this

Commitment Letter other than with respect to a Commitment Party's express Commitment in <u>Section 1</u>. In addition, none of the Commitment Parties shall be liable on any theory of liability for any special, indirect, consequential or punitive damages (including, without limitation, any loss of profits, business or anticipated savings).

18.    All notices and other communications in connection with this Commitment Letter shall be in writing and shall be deemed given if delivered personally, sent via electronic facsimile (with confirmation), mailed by registered or certified mail (return receipt requested), delivered by an express courier (with confirmation) or sent via e-mail to each Commitment Party at the addresses or e-mail addresses set forth below the Commitment Party's signature in its signature page to this Commitment Letter.

**[Remainder of Page Left Intentionally Blank]**

Sincerely,

Commitment Party:


By: _____
Name: _____
Title: _____


Notice Information:

**Schedule 1(a)**

**Common Stock Issuance Commitment Amounts**

~~$19 billion Common Stock Issuance~~

| **Commitment Party** | **Commitment Percentage** | **Commitment Amount**[1] |
|---|---|---|
| Apollo | | |
| Canyon Capital Advisors LLC | | |
| CapRe | | |
| Citadel | | |
| Davidson Kempner | | |
| Elliott | | |
| Farallon | | |
| OakTree | | |
| PIMCO | | |
| Theater Investor LLC (wholly owned by funds managed by ~~Oz Management~~ Sculptor Capital LP) | | |
| Third Point | | |
| Varde | | |
| **Total** | **100%** | **$~~19,000,000,000~~14,886,190,507** |

~~$20 billion Common Stock Issuance~~

| ~~**Commitment Party**~~ | ~~**Commitment Percentage**~~ | ~~**Commitment Amount**[1]~~ |
|---|---|---|
| ~~Apollo~~ | | |
| ~~Canyon Capital Advisors LLC~~ | | |
| ~~CapRe~~ | | |
| ~~Citadel~~ | | |
| ~~Davidson Kempner~~ | | |
| ~~Elliott~~ | | |
| ~~Farallon~~ | | |
| ~~OakTree~~ | | |
| ~~PIMCO~~ | | |
| ~~Theater Investor LLC (wholly owned by funds managed by Oz Management LP)~~ | | |
| ~~Third Point~~ | | |
| ~~Varde~~ | | |
| ~~**Total**~~ | ~~**100%**~~ | ~~**$20,000,000,000**~~ |

---

[1] Commitment amounts have been rounded to the nearest dollar.

**Schedule 1(b)**

**Senior Unsecured Notes Issuance Commitment Amounts**

~~$4 billion Senior Unsecured Notes Issuance~~

| **Commitment Party** | **Commitment Percentage** | **Commitment Amount[2]** |
|---|---|---|
| Apollo | | |
| Canyon Capital Advisors LLC | | |
| CapRe | | |
| Citadel | | |
| Davidson Kempner | | |
| Elliott | | |
| Farallon | | |
| OakTree | | |
| PIMCO | | |
| Theater Investor LLC (wholly owned by funds managed by ~~Oz Management~~Sculptor Capital LP) | | |
| Third Point | | |
| Varde | | |
| **Total** | **100%** | **$~~4,000,000,000~~5,500,000,000** |

~~$5.4 billion Senior Unsecured Notes Issuance~~

| ~~**Commitment Party**~~ | ~~**Commitment Percentage**~~ | ~~**Commitment Amount[2]**~~ |
|---|---|---|
| ~~Apollo~~ | | |
| ~~Canyon Capital Advisors LLC~~ | | |
| ~~CapRe~~ | | |
| ~~Citadel~~ | | |
| ~~Davidson Kempner~~ | | |
| ~~Elliott~~ | | |
| ~~Farallon~~ | | |
| ~~OakTree~~ | | |
| ~~PIMCO~~ | | |
| ~~Theater Investor LLC (wholly owned by funds managed by Oz Management LP)~~ | | |
| ~~Third Point~~ | | |
| ~~Varde~~ | | |
| ~~**Total**~~ | ~~**100%**~~ | ~~**$5,400,000,000**~~ |

---

[2] Commitment amounts have been rounded to the nearest dollar.

**Schedule 1(c)**

**New Utility Secured Notes Issuance Backstop Commitment Amounts**

| **Commitment Party** | **Commitment Percentage** | **Commitment Amount**[3] |
|---|---|---|
| Apollo | | |
| Canyon Capital Advisors LLC | | |
| CapRe | | |
| Citadel | | |
| Davidson Kempner | | |
| Elliott | | |
| Farallon | | |
| OakTree | | |
| PIMCO | | |
| Theater Investor LLC (wholly owned by funds managed by ~~Oz Management~~Sculptor Capital LP) | | |
| Third Point | | |
| Varde | | |
| **Total** | **100%** | **$~~5,500,000,000~~7,978,610,000** |

---

[3] Commitment amounts have been rounded to the nearest dollar.

**Exhibit A**
**Plan Term Sheet**

See attached.

*THIS IS NOT A SOLICITATION OF A VOTE ON A PLAN OF REORGANIZATION. SUCH A SOLICITATION MAY ONLY OCCUR FOLLOWING APPROVAL BY THE BANKRUPTCY COURT OF A DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE*

*In re PG&E Corporation* and *Pacific Gas and Electric Company*

**Term Sheet for Plan of Reorganization**

~~August 7~~September 19, 2019

This term sheet (the "**Term Sheet**") is proposed by the Official Committee of Tort Claimants (the "**TCC**") and the Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company (the "**Ad Hoc Committee**") and sets forth certain of the principal terms and conditions for the proposed reorganization (the "**Reorganization**") of PG&E Corporation and Pacific Gas and Electric Company, each of which commenced cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Northern District of California (the "**Bankruptcy Court**") on January 29, 2019 (the "**Petition Date**"). The Reorganization contemplated herein shall be implemented pursuant to a proposed joint chapter 11 plan of reorganization (the "**Plan**").

**THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF ALL APPLICABLE LAW. THIS TERM SHEET DOES NOT ADDRESS ALL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH ANY POTENTIAL TRANSACTIONS REFERENCED HEREIN, AND THE ENTRY INTO OR THE CREATION OF ANY BINDING AGREEMENT IS SUBJECT TO THE EXECUTION OF DEFINITIVE DOCUMENTATION IN FORM AND SUBSTANCE CONSISTENT WITH THIS TERM SHEET AND OTHERWISE ACCEPTABLE TO THE AD HOC COMMITTEE AND/OR THE PG&E CORP. NEW MONEY COMMITMENT GROUP (AS DEFINED HEREIN).**

**THIS TERM SHEET IS BASED SOLELY ON PUBLICLY AVAILABLE INFORMATION.**

| PLAN OVERVIEW[1] | |
|---|---|
| **Debtors** | PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**" and together with PG&E Corp., the "**Debtors**").  Following the occurrence of the effective date of the Plan (the "**Effective Date**"), PG&E Corp. and the Utility will be referred to herein as "**Reorganized PG&E Corp.**" and the "**Reorganized Utility**," respectively, and collectively as the "**Reorganized Debtors**." |
| **Transaction Overview** | As set forth in greater detail herein, the Plan shall provide for: <br><br> • ~~Up to $31.0~~$28.4 billion ~~²~~ in new money investments in exchange for common stock of Reorganized PG&E Corp. (representing approximately 58.8% of the outstanding common stock of Reorganized PG&E Corp. on a fully diluted basis), new debt of Reorganized PG&E Corp. and new debt of the Reorganized Utility, in each case as described herein; <br><br> • The proceeds of the new money investments shall be used to (a) pay in full outstanding DIP Financing Facility Claims (as defined below), (b) pay in full all Utility bond, term loan and revolving debt maturing prior to December 31, 2022~~³~~, ³ (c) fund the creation of a trust (the "**WildfireFire Claims Trust**") for the purpose of paying ~~wildfire~~fire claims related to those Northern California ~~wildfires~~fires listed in **Schedule 1** attached hereto, ~~not to exceed the sum of $16 billion,⁴ in the manner provided below~~equal to $24 billion in cash and shares of common stock of Reorganized PG&E Corp. (representing approximately 39.5% of the outstanding common stock of Reorganized PG&E Corp. on a fully diluted basis) issued to the Fire Claims Trust and certain other consideration as set forth herein ("**Aggregate Fire Consideration**") and (d) fund the Debtors' contribution of $5.0 billion, which amount consists of both the Debtors' initial and first annual contributions, to the long-term California statewide wildfire fund created for purposes of paying future utility-related wildfires in California (the "**Wildfire Fund**"); <br><br> • ~~Distributions of Long-Term Utility Replacement Notes (as defined below) to holders of the Utility notes maturing on January 1, 2023 or later; and~~ <br><br> • Reinstatement in full of the Long-Term Utility Unsecured Notes; and <br><br> • Payment of all trade claims in the ordinary course of business and assumption and/or continuation of pension-related obligations. |

[1] This document is based on publicly available information regarding the Debtors as of June 25, 2019.  Certain of the terms for the Plan included herein are subject to change depending upon the Debtors' financial performance over the remainder of the Chapter 11 Cases including, but not limited, to its cash generation and borrowings under the DIP Financing Facility.

~~² Assuming full upward adjustment based upon outcome of estimation proceeding as described in footnote 4 below.~~

[2] Includes the Utility Unsecured Revolving Credit Facility Claims, Utility Unsecured Term Loan Claims, Short-Term Utility Unsecured Notes Claims and Utility Pollution Control Bond-Related Claims, each as defined below.

~~³ Includes the Utility Unsecured Revolving Credit Facility Claims, Utility Unsecured Term Loan Claims, Short-Term Utility Unsecured Notes Claims, each as defined below.~~

~~⁴ Subject to upward adjustment of up to 15% based upon outcome of estimation proceeding.~~

Case: 19-30088   Doc# 3962   Filed: 09/23/19   Entered: 09/23/19 04:56:04   Page 80 of 119

| PLAN TREATMENT OF PG&E CORP. AND UTILITY CLAIMS | |
|---|---|
| **Unclassified Claims** | |
| **Claim** | **Treatment** |
| **DIP Financing Facility Claims** | Each holder of a claim under the Senior Secured Superpriority Debtor-in-Possession Credit, Guaranty and Security Agreement, dated as of February 1, 2019 (the "DIP Financing Facility," and the claims arising thereunder, the "DIP Financing Facility Claims") shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such DIP Financing Facility Claim, payment in full in cash on the Effective Date. |
| **Administrative Expense Claims** | Each holder of an allowed administrative expense claim against the Debtors under section 507(a)(2) of the Bankruptcy Code (other than DIP Financing Facility Claims) (the "**Administrative Expense Claims**") shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Administrative Expense Claim, cash equal to the allowed amount of such Administrative Expense Claim on the later of (i) the Effective Date or as soon thereafter as is reasonably practicable, and (ii) the date such Administrative Expense Claim becomes an allowed Administrative Expense Claim or as soon thereafter as is reasonably practicable. |
| **Priority Tax Claims** | Each holder of an allowed claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) of the type specified in section 507(a)(8) of the Bankruptcy Code against any Debtor (the "**Priority Tax Claims**") shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Priority Tax Claim, (a) cash equal to the amount of such allowed Priority Tax Claim on the later of (i) the Effective Date or as soon thereafter as is reasonably practicable and (ii) the date such Priority Tax Claim becomes an allowed Priority Tax Claim or as soon thereafter as is reasonably practicable, or (b) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |

| PG&E Corp. Claims | | | |
|---|---|---|---|
| **Claim** | **Classification/Treatment/Voting** | **Estimated Allowed Claims** | **Estimated % Recovery** |
| **Class 1A: Other PG&E Corp. Priority Claims** | *Classification*: Holders of allowed claims against PG&E Corp. entitled to priority under section 507(a) of the Bankruptcy Code (other than DIP Financing Facility Claims, Administrative Expense Claims and Priority Tax Claims) (the "**Other PG&E Corp. Priority Claims**"). <br><br> *Treatment*: Each holder of an allowed Other PG&E Corp. Priority Claim against PG&E Corp. shall | [TBD] | 100% |

Case: 19-30088    Doc# 3962    Filed: 09/23/19    Entered: 09/23/19 04:56:04    Page 81 of 119

| | | | |
|---|---|---|---|
| | receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Other PG&E Corp. Priority Claim, (i) cash in an amount equal to such allowed claim on the Effective Date or as soon thereafter as is reasonably practicable, or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.<br><br>***Voting***: Unimpaired – deemed to accept. | | |
| **Class 2A: Other PG&E Corp. Secured Claims** | ***Classification***: Holders of claims (other than DIP Financing Facility Claims) (the "**Other PG&E Corp. Secured Claims**") that are secured by valid, perfected and enforceable liens on property in which PG&E Corp. has an interest or that are subject to setoff pursuant to section 553 of the Bankruptcy Code.<br><br>***Treatment***: Each holder of an allowed Other PG&E Corp. Secured Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Other PG&E Corp. Secured Claim, (i) retention of its Other PG&E Corp. Secured Claim and any properly perfected and valid liens; (ii) payment in full in cash, including the payment of any interest allowed and payable under section 506(b) of the Bankruptcy Code, on the Effective Date or as soon thereafter as is reasonably practicable, or (iii) treatment of such allowed Other PG&E Corp. Secured Claim in any other manner that renders the claim unimpaired, including reinstatement under section 1124(2) of the Bankruptcy Code.<br><br>***Voting***: Unimpaired – deemed to accept. | [TBD] | 100% |
| **Class 3A: PG&E Corp. Unsecured Revolving Credit Facility Claims** | ***Classification***: Holders of claims arising under the Second Amended and Restated Credit Agreement, dated as of April 27, 2015, by and between PG&E Corp. and Citibank, N.A., as administrative agent (the "**PG&E Corp. Unsecured Revolving Credit Agreement**"), in the aggregate principal amount of up to $300 million (the "**PG&E Corp. Unsecured Revolving Credit Facility Claims**").<br><br>***Treatment***: On the Effective Date or as soon thereafter as is reasonably practicable, each holder of an allowed PG&E Corp. Unsecured Revolving Credit Facility Claim shall receive, in full and final | Appx. $300 million | 100% |

| | | | |
|---|---|---|---|
| | satisfaction, compromise, settlement, release, and discharge of such allowed PG&E Corp. Unsecured Revolving Credit Facility Claim, cash in an amount equal to (i) the outstanding principal and accrued and unpaid interest as of the Petition Date under the PG&E Corp. Unsecured Credit Agreement and (ii) accrued and unpaid interest from the Petition Date through the Effective Date at the contract rate. *Voting*: Unimpaired – deemed to accept. | | |
| **Class 4A: PG&E Corp. Unsecured Term Loan Claims** | *Classification*: Holders of claims arising under the Term Loan Agreement, dated as of April 16, 2018, by and between PG&E Corp. and Mizuho Bank, Ltd., as administrative agent (the "**PG&E Corp. Unsecured Term Loan Credit Agreement**"), in the aggregate principal amount of $350 million (the "**PG&E Corp. Unsecured Term Loan Claims**"). *Treatment*: On the Effective Date or as soon thereafter as is reasonably practicable, each holder of an allowed PG&E Corp. Unsecured Term Loan Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed PG&E Corp. Unsecured Term Loan Claim, cash in an amount equal to (i) the outstanding principal and accrued and unpaid interest as of the Petition Date under the PG&E Corp. Unsecured Term Loan Credit Agreement and (ii) accrued and unpaid interest from the Petition Date through the Effective Date at the contract rate. *Voting*: Unimpaired – deemed to accept. | Appx. $350 million | 100% |
| **Class 5A: PG&E Corp. General Unsecured Claims** | *Classification*: Holders of general unsecured claims (other than Other PG&E Corp. Priority Claims, PG&E Corp. Unsecured Revolving Credit Facility Claims and PG&E Corp. Unsecured Term Loan Claims) against PG&E Corp. (the "**PG&E Corp. General Unsecured Claims**") *Treatment*: Each holder of an allowed PG&E Corp. General Unsecured Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed PG&E Corp. General Unsecured Claim, cash in an amount equal to the allowed PG&E Corp. General Unsecured Claim, together with accrued and unpaid interest from the Petition Date through the Effective Date at the applicable contract rate or, in the absence of a | [TBD] | 100% |

Case: 19-30088    Doc# 3962    Filed: 09/23/19    Entered: 09/23/19 04:56:04    Page 83 of 119

| | | | |
|---|---|---|---|
| | contract rate, the Federal Judgement Rate, on the earlier of (i) the Effective Date or as soon thereafter as is reasonably practicable or (ii) as soon as reasonably practicable following the date such PG&E Corp. General Unsecured Claim becomes an allowed PG&E Corp. General Unsecured Claim.<br><br>*Voting*: Unimpaired – deemed to accept. | | |
| **Class 6A: PG&E Corp. Intercompany Claims** | *Classification:* Claims held by the Utility or any non-Debtor affiliate of PG&E Corp. against PG&E Corp. (the "**PG&E Corp. Intercompany Claims**").<br><br>*~~Treament~~Treatment:* All allowed PG&E Corp. Intercompany Claims, if any, shall be reinstated, compromised or cancelled at the election of the Debtors (with the consent of the Ad Hoc Committee, not to be unreasonably withheld), such that the PG&E Corp. Intercompany Claims are treated in a tax-efficient manner.<br><br>*Voting*: Unimpaired – ~~not entitled to vote~~deemed to accept. | [TBD] | 100% |
| **Class 7A: PG&E Corp. Preferred Interests** | *Classification*: Holders of outstanding preferred interests in PG&E Corp. (the "**PG&E Corp. Preferred Interests**").<br><br>*Treatment*: Holders of allowed PG&E Corp. Preferred Interests shall retain ownership of all PG&E Preferred Interests in Reorganized PG&E Corp. (including any associated liquidation preference).<br><br>*Voting*: Unimpaired – ~~not entitled to vote~~deemed to accept. | N/A | 100% |
| **Class 8A: PG&E Corp. Common Interests** | *Classification*: Holders of outstanding common interests in PG&E Corp. (the "**PG&E Corp. Common Interests**")<br><br>*Treatment*: Holders of allowed PG&E Corp. Common Interests shall retain ownership of all PG&E Corp. Common Interests in Reorganized PG&E Corp. (the "**Reorganized PG&E Corp. Common Stock**"), subject to dilution on account of the Reorganized PG&E Corp. Common Stock issued pursuant to the New Money Reorganized PG&E Corp. Common Stock Issuance.<br><br>*Voting*: Impaired – entitled to vote. | N/A | [TBD]% |

6

|  |  |  |  |
|---|---|---|---|
| | Each holder of a PG&E Corp. Common Interest shall have the opportunity to commit for its pro rata share of 5% of the PG&E Corp. New Money Investment (as defined herein). | | |

| Utility Claims | | | |
|---|---|---|---|
| **Claim** | **Classification/Treatment/Voting** | **Estimated Allowed Claims** | **Estimated % Recovery** |
| **Class 1B: Other Utility Priority Claims** | ***Classification***: Holders of allowed claims against the Utility entitled to priority under section 507(a) of the Bankruptcy Code (other than DIP Financing Facility Claims, Administrative Expense Claims and Priority Tax Claims) (the "**Other Utility Priority Claims**").<br><br>***Treatment***: Each holder of an allowed Other Utility Priority Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Other Utility Priority Claim, (i) cash in an amount equal to such allowed Other Utility Priority Claim on the Effective Date or as soon as practicable thereafter, or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.<br><br>***Voting***: Unimpaired – deemed to accept. | [TBD] | 100% |
| **Class 2B: Other Utility Secured Claims** | ***Classification***: Holders of claims (other than DIP Financing Facility Claims) that are secured by valid, perfected and enforceable liens on property in which the Utility has an interest or that are subject to setoff pursuant to section 553 of the Bankruptcy Code (the "**Other Utility Secured Claims**").<br><br>***Treatment***: Each holder of an allowed Other Utility Secured Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Other Utility Secured Claim, (i) retention of its Other Utility Secured Claim and any properly perfected and valid liens, (ii) payment in full in cash, including the payment of any interest allowed and payable under section 506(b) of the Bankruptcy Code, on the Effective Date or as soon thereafter as is reasonably practicable, or (iii) | [TBD] | 100% |

Case: 19-30088   Doc# 3962   Filed: 09/23/19   Entered: 09/23/19 04:56:04   Page 85 of 119

| | | | |
|---|---|---|---|
| | treatment of such allowed Other Utility Secured Claim in any other manner that renders the Other Utility Secured Claim unimpaired, including reinstatement under section 1124(2) of the Bankruptcy Code.<br><br>***Voting***: Unimpaired – deemed to accept. | | |
| **Class 3B: Utility Unsecured Revolving Credit Facility Claims** | ***Classification***: Holders of claims arising under the Second Amended and Restated Credit Agreement, dated as of April 27, 2015, by and between the Utility and Citibank, N.A., as administrative agent (the "**Utility Unsecured Revolving Credit Agreement**"), in the aggregate principal amount of up to $3 billion (the "**Utility Unsecured Revolving Credit Facility Claims**").<br><br>***Treatment***: On the Effective Date or as soon thereafter as is reasonably practicable, each holder of an allowed Utility Unsecured Revolving Credit Facility Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Utility Unsecured Revolving Credit Facility Claim, cash in an amount equal to (i) the outstanding principal and accrued and unpaid interest as of the Petition Date under the Utility Unsecured Revolving Credit Agreement and (ii) accrued and unpaid interest from the Petition Date through the Effective Date at the contract rate.<br><br>***Voting***: Unimpaired – deemed to accept. | Appx. $2.885 billion | 100% |
| **Class 4B: Utility Unsecured Term Loan Claims** | ***Classification***: Holders of claims arising under the Term Loan Agreement, dated as of February 23, 2018, by and between the Utility and The Bank of Tokyo-Mitsubishi UFJ, Ltd., as administrative agent (the "**Utility Unsecured Term Loan Agreement**"), in the aggregate principal amount of $250 million (the "**Utility Unsecured Term Loan Claims**").<br><br>***Treatment***: On the Effective Date or as soon thereafter as is reasonably practicable, each holder of an allowed Utility Unsecured Term Loan Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Utility Unsecured Term Loan Claim, cash in an amount equal to (i) the outstanding principal and accrued and unpaid interest as of the Petition Date under the Utility Unsecured Term Loan Agreement | Appx. $250 million | 100% |

Case: 19-30088    Doc# 3962    Filed: 09/23/19    Entered: 09/23/19 04:56:04    Page 86 of 119

| | | | |
|---|---|---|---|
| | and (ii) accrued and unpaid interest from the Petition Date through the Effective Date at the contract rate.<br><br>*Voting*: Unimpaired – deemed to accept. | | |
| **Class 5B: Short-Term Utility Unsecured Notes Claims** | *Classification*: Holders of claims arising under the notes (or the applicable indenture relating thereto) (the "**Short-Term Utility Unsecured Notes**" and the indentures, the "**Short-Term Utility Unsecured Notes Indentures**") maturing on or before December 1, 2022 (the "**Short-Term Utility Unsecured Notes Claims**"), identified in **Schedule 2** hereto.[53]<br><br>*Treatment*: On the Effective Date or as soon thereafter as is reasonably practicable, each holder of an allowed Short-Term Utility Unsecured Notes Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Short-Term Utility Unsecured Notes Claim, cash in an amount equal to the sum of (i) outstanding principal and accrued and unpaid interest as of the Petition Date at the contract rate under the applicable Short-Term Utility Unsecured Notes or Short-Term Utility Unsecured Notes Indentures, (ii) accrued and unpaid interest from the Petition Date through the Effective Date at the contract rate under the applicable Short-Term Utility Unsecured Notes or Short-Term Utility Unsecured Notes Indentures and (iii) any prepayment premium, makewhole or other similar call protection under the applicable Short-Term Utility Unsecured Notes or Short-Term Utility Unsecured Notes Indentures.<br><br>*Voting*: Unimpaired – ~~not entitled to vote~~deemed to accept. | Appx. $1.75 billion | 100% |
| **Class 6B: Long-Term Utility** | *Classification*: Holders of claims arising under any notes (or the applicable indenture relating thereto) (the "**Long-Term Utility Unsecured Notes**" and the | Appx. $15.8 billion | ~~98-99~~100% |

---

[53] If required, the Plan will provide subclasses for claims arising from each separate issuance of the Short-Term Utility Unsecured Notes.

9

| | | | |
|---|---|---|---|
| **Unsecured Notes Claims** | indentures, the "**Long-Term Utility Unsecured Notes Indentures**") maturing on or after January 1, 2023 (the "**Long-Term Utility Unsecured Notes Claims**"), identified in **Schedule 3** hereto.[64] <br><br> ***Treatment***: On the Effective Date or as soon thereafter as is reasonably practicable, ~~each holder of an allowed~~all Long-Term Utility Unsecured Notes ~~Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed~~shall be reinstated in full.  All Long-Term Utility Unsecured Notes ~~Claim, (i) cash in an amount equal to (a~~Claims relating to (i) accrued and unpaid interest as of the Petition Date and (ii) accrued and unpaid interest from the Petition Date through the Effective Date, shall be paid in full in cash at the contract rate under the applicable Long-Term Utility Unsecured Notes or Long-Term Utility Unsecured Notes Indentures~~, (b) accrued and unpaid interest from the Petition Date through the Effective Date at the contract rate under the applicable Long-Term Utility Unsecured Notes or Long-Term Utility Unsecured Notes Indentures and (ii) a replacement note in the same principal amount and maturity date, and otherwise on the same terms as, the existing applicable Long-Term Utility Unsecured Note (the "Long-Term Utility Replacement Notes"); provided, that the Reorganized Utility's obligations under each Long-Term Utility Replacement Note and the applicable Long-Term Utility Unsecured Notes Indenture shall (A) be secured by a first mortgage on all "Principal Property" of the Debtors, as that term is defined in the applicable Long-Term Utility Unsecured Notes Indentures and consistent with the provisions of each of the applicable Long-Term Utility Unsecured Notes providing for "equal and ratable" liens," that is of a status/ranking consistent with utility bonds of other investor-owned California utility operating companies and (B) bear interest at a blended rate of 10 basis points less than the current interest rates (the "Adjusted Rates") on the applicable Long-Term Utility Unsecured Notes, as set forth in more detail in Schedule 4 attached hereto.~~. <br><br><br> ***Voting***: ~~Impaired — entitled to vote~~Unimpaired — deemed to accept. | | |

---

[64] If required, the Plan will provide subclasses for claims arising from each separate issuance of the Long-Term Utility Unsecured Notes.

| | | | |
|---|---|---|---|
| **Class 7B: Utility Pollution Control Bond-Related Claims** | ***Classification:*** Holders of claims arising under (a) the Pollution Control Bonds issued by the California Pollution Control Financing Authority and the California Infrastructure and Economic Development Bank (the "**Utility Pollution Control Bonds**") or (b) related reimbursement obligations from certain letter of credit facilities (the "**PCB Revolving Facilities**") or reimbursement agreements with the Utility (the "**Reimbursement Agreements**") in the aggregate outstanding principal amount of $863 million (the "**Utility Pollution Control Bond-Related Claims**"). <br><br> ***Treatment:*** On the Effective Date or as soon thereafter as is reasonably practicable, each holder of an allowed Utility Pollution Control Bond-Related Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Utility Pollution Control Bond-Related Claim, cash in an amount equal to the sum of (i) outstanding principal and accrued and unpaid interest as of the Petition Date at the contract rate under the applicable Utility Pollution Control Bond, PCB Revolving Facility or Reimbursement Agreement, and (ii) accrued and unpaid interest from the Petition Date through the Effective Date at the contract rate under the applicable Utility Pollution Control Bond, PCB Revolving Facility, or Reimbursement Agreement. <br><br> ***Voting:*** Unimpaired – deemed to accept. | $863 million | 100% |
| **Class 8B: Utility Intercompany Claims** | ***Classification:*** Claims held by the PG&E Corp. or any non-Debtor affiliate of PG&E Corp. against the Utility (the "**Utility Intercompany Claims**"). <br><br> ***Treatment:*** All allowed Utility Intercompany Claims, if any, shall be reinstated, compromised or cancelled at the election of the Debtors (with the consent of the Ad Hoc Committee, not to be unreasonably withheld), such that the Utility Intercompany Claims are treated in a tax-efficient manner. <br><br> ***Voting:*** Unimpaired – ~~not entitled to vote~~deemed to accept. | [TBD] | 100% |
| **Class 9B: ~~Wildfire~~Fire Victim Claims** | ***General Procedures:*** With respect to ~~each category of prepetition~~all unsecured claims arising out of the prepetition Northern California wildfires and the | ~~$16 billion~~[8] Unknown | ~~100~~Unknown% |

Ghost Ship fire (the "**Wildfire**, including, but not limited to, any accrued and unasserted unsecured claims as of the Effective Date related to the Fires (as defined below), of individuals, businesses, insurance subrogation claimants, nonprofits, charities, and any federal, state and local entities (including governmental and regulatory authorities and agencies) for damages, losses, fines, penalties, punitive and/or exemplary damages, restitution, reimbursement, attorney's fees, costs and/or interest, declaratory and/or injunctive relief (the "**Fire Claims**"), the aggregate maximum amount of allowed Wildfire Claims in each such category of Wildfire Claims (the "**Agreed Capped Amount**")[7] shall be as provided below. Funding of the Wildfire Claims Trust in the amounts of the Agreed Capped Amount for each category of Wildfire Claims shall constitute payment in full of all allowed Wildfire Claims in each such category of Wildfire Claims. Each holder of a Wildfire Claim that votes in favor of the Plan agrees to receive payment in full of the allowed amount of such Wildfire Claim as determined in accordance with the procedures of the Wildfire Claims Trust, which shall be subject to the Agreed Capped Amount and which shall constitute payment in full of such claim. consideration to be paid in respect of all Fire Claims will be the Aggregate Fire Consideration.

Each holder of a Wildfire Claim that does not vote to accept the Plan ("**Opt-Out Wildfire Claimant**") shall have the allowed amount of its Wildfire Claim determined in accordance with the procedures of the Wildfire Claims Trust, as outlined below.

The Reorganized Debtors will establish the Fire Claims Trust which will be funded with: (i) $12 billion in cash; (ii) $12 billion in shares of common stock of the Reorganized PG&E Corp. (at plan value); and (iii) the assignment of rights, claims, and causes of action as described in the Means for Implementation section, including rights under certain 2015/2016 insurance policies of the Debtors

---

[7] The Agreed Capped Amount for each category of Wildfire Claims shall be subject to downward adjustment by the Wildfire Claims Trustee to account for claim values of Opt-Out Wildfire Claimants in each category, if necessary, after the Estimated Wildfire Liability (as defined herein) is determined.

| | | | | |
|---|---|---|---|---|
| | | (collectively, the "**Aggregate Fire Consideration**"). Notwithstanding any other provision herein, the rights in and/or proceeds of the Debtors' 2016 insurance policies that provide coverage to the Debtors in connection with the Ghost Ship fire shall be transferred to the Fire Claims Trust solely for the benefit of victims of the Ghost Ship fire and shall not be used to pay any other allowed claims; provided, however, the parties shall work together to ensure that coverage under the Debtors' 2016 insurance policies shall be available to the Reorganized Debtors to pay claims not related to Ghost Ship. | | |
| | | **Fire Victim Claims** – Any Fire Claim that is not a Subrogation Fire Claim (as defined below) or Governmental Fire Claim (as defined below). ~~Each category of Wildfire Claim shall constitute a subclass within Class 9B.~~ *Treatment*: On the Effective Date, each holder of a Fire Victim Claim that has been allowed in accordance with the procedures for allowance and payment of such claims as set forth in the Means for Implementation section (an "**Allowed Fire Victim Claim**") shall be entitled to a claim against the Fire Claims Trust in full and final satisfaction, compromise, settlement, release, and discharge of such claim. | | |
| | | Treatment under Class 9B shall exclude Subrogation Fire Claims and Governmental Fire Claims which shall be treated in Classes 10B and 11B respectively. | | |
| | | *Voting*: Impaired – entitled to vote. | | |
| | | ~~**Tubbs Wildfire Claim** – A Wildfire Claim, other than an Insurance Subrogation Wildfire Claim or Public Entity Wildfire Claim (each as defined below), for which the California Department of Forestry and Fire Protection ("**Cal Fire**") has determined, following an investigation, that the Utility was not the ignition source, including the Tubbs fire.~~ ~~*Agreed Capped Amount*: $570 million~~ | | |
| | | ~~**Non-Tubbs Wildfire Claim** – A Wildfire Claim, other than an Insurance Subrogation Wildfire Claim, Public Entity Wildfire Claim, Tubbs Wildfire Claim or Ghost Ship Fire Claim, (a "**Non-Tubbs Wildfire**~~ | | |

13

| | | | |
|---|---|---|---|
| | ~~Claim~~").<br><br>*~~Agreed Capped Amount~~*: ~~$5.45 billion.~~ | | |
| | ~~Ghost Ship Fire Claim – A Wildfire Claim arising out of the 2016 Ghost Ship fire.~~<br><br>*~~Agreed Capped Amount~~*: ~~$25 million~~ | | |
| | ~~Public Entity Wildfire Claim – A Wildfire Claim the holder of which is a public entity (a "**Public Entity Wildfire Claim**").~~<br><br>*~~Agreed Capped Amount~~*: ~~$1.0 billion~~ | | |
| **Class 10B: Subrogated Fire Claims** | *General Procedures:* same as apply to Class 9B above.<br><br>**Subrogation** ~~Tubbs Wildfire~~**Fire Claims** – ~~A Wildfire~~Any Fire Claim arising by way of subrogation under applicable law or contract on account of amounts incurred (paid and reserved) by an insurer under and pursuant to the terms and coverage provisions of a property & casualty ~~policy for losses for which Cal Fire has determined, following an investigation, that the Utility was not the ignition source, including the Tubbs fire (an "Insurance Subrogation Tubbs Wildfire~~insurance policy (a "**Subrogation Fire Claim**").<br><br>*Treatment:* On the Effective Date, each holder of a Subrogation Fire Claim that has been allowed in accordance with the procedures for allowance and payment of such claims as set forth in the Means for Implementation section (an "**Allowed Subrogation Fire Claim**") shall be entitled to a claim against the Fire Claims Trust in full and final satisfaction, compromise, settlement, release, and discharge of such claim.<br>*~~Agreed Capped Amount~~*: ~~$975 million~~<br>*Voting*: Impaired – entitled to vote. | $Unknown | Unknown % |
| **Class 11B: Governmental Fire Claims** | *General Procedures:* same as apply to Class 9B above.<br><br>~~Subrogation Non-Tubbs Wildfire~~Governmental **Fire Claims** – ~~A Wildfire~~Any Fire Claim arising ~~by~~in any way ~~of subrogation~~from and asserted by a federal, state or local government entity under applicable law or contract~~on account.~~ | $Unknown | Unknown % |

| | | | |
|---|---|---|---|
| | ~~of amounts incurred (paid and reserved) by an insurer under and pursuant to the terms and coverage provisions of a property & casualty policy for losses that is not a Subrogation Tubbs Wildfire Claim (an "**Insurance Subrogation Non-Tubbs Wildfire Claim**" and together with the Insurance Subrogation Non-Tubbs Wildfire Claim, the "**Insurance Subrogation Wildfire Claim**").~~*Treatment:* On the Effective Date, each holder of a Governmental Fire Claim that has been allowed in accordance with the procedures for allowance and payment of such claims as set forth in the Means for Implementation section (an "**Allowed Governmental Fire Claim**") shall be entitled to a claim against the Fire Claims Trust in full and final satisfaction, compromise, settlement, release, and discharge of such allowed claim. <br><br> *Agreed Capped Amount*: ~~$6.82 billion~~ <br> *Voting*: Impaired – entitled to vote. | | |
| | ~~**Agreed Attorneys' Fees and Costs** — an agreed distribution amount for attorneys' fees and costs incurred by holders of Tubbs Wildfire Claims, Non-Tubbs Wildfire Claims and the Ghost Ship Fire Claims to be paid to their attorneys in amounts to be determined by the beneficiaries thereof (the "**Agreed Attorneys' Fees and Costs**").~~ <br><br> ~~*Agreed Capped Amount:* $1.15 billion~~ | | |
| **Class ~~10~~12B: Other Utility General Unsecured Claims** | *Classification*: Holders of general unsecured claims (other than Other Utility Priority Claims, Utility Unsecured Revolving Credit Facility Claims, Utility Unsecured Term Loan Claims, Short-Term Utility Unsecured Notes Claims, Long-Term Utility Unsecured Notes Claims, ~~Wildfire~~Fire Claims, and Utility Workers' Compensation Claims) against the Utility (the "**Other Utility General Unsecured Claims**"). <br><br> *Treatment*: Each holder of an allowed Other Utility General Unsecured Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Other Utility General Unsecured Claim, cash in an amount equal to the allowed Other Utility General Unsecured Claim, together with accrued and unpaid interest from the Petition Date through the Effective Date at the applicable contract rate or, in the absence of a | [TBD] | 100% |

| | | | |
|---|---|---|---|
| | contract rate, the Federal Judgement Rate, on the earlier of (i) the Effective Date or as soon thereafter as is reasonably practicable or (ii) the date such Other Utility General Unsecured Claim becomes an allowed Other Utility General Claim or as soon thereafter as is reasonably practicable.<br><br>***Voting***: Unimpaired – deemed to accept. | | |
| **Class 11~~13~~B: Utility Workers' Compensation Claims** | ***Classification***: Holders of claims against the Utility by employees of the Utility for the payment of workers' compensation benefits under applicable law (the "**Utility Workers' Compensation Claims**").<br><br>***Treatment***: Each allowed Utility Workers' Compensation Claim shall be satisfied in full in the ordinary course of business at such time and in such manner as the Utility is obligated to satisfy such Utility Workers' Compensation Claim under applicable law.<br><br>***Voting***: Unimpaired – deemed to accept. | [TBD] | 100% |
| **Class 12~~14~~B: Utility Preferred Interests** | ***Classification***: Holders of outstanding preferred Interests in the Utility (the "**Utility Preferred Interests**")<br><br>***Treatment***: Holders of allowed Utility Preferred Interests shall retain ownership of all Utility Preferred Interests in the Reorganized Utility (including any associated liquidation preference).<br><br>***Voting***: Unimpaired – deemed to accept. | N/A | 100% |
| **Class 13~~15~~B: Utility Common Interests** | ***Classification***: PG&E Corp. as holder of all outstanding common Interests in the Utility (the "**Utility Common Interests**").<br><br>***Treatment***: The Reorganized PG&E Corp., as holder of the Utility Common Interests, shall retain ownership of all Utility Common Interests in the Reorganized Utility.<br><br>***Voting***: Unimpaired – deemed to accept. | N/A | 100% |

| | |
|---|---|
| **MEANS FOR IMPLEMENTATION** | |
| ~~Estimation~~ | ~~Estimation proceedings will be initiated pursuant to which the Bankruptcy Court~~ |

16

| | |
|---|---|
| ~~**Proceeding**~~ | ~~and/or the District Court will estimate the Debtors' liability on all personal injury, wrongful death, property damage, insurance subrogation, and any other Wildfire Claims for purposes of confirming the Plan and for purposes of distribution thereunder, in accordance with the Bankruptcy Code and applicable law. Such estimation proceedings shall conclude prior to the hearing on Plan confirmation. The estimated amount of the Debtors' aggregate wildfire liability as determined by Bankruptcy Court and/or District Court order is referred to herein as the "**Estimated Wildfire Liability**." A condition precedent to the Effective Date shall be the Estimated Wildfire Liability not exceeding $16 billion.⁹~~ |
| ~~**Wildfire**~~**Fire Claims Trust** | On the Effective Date, the Reorganized Debtors will establish the ~~Wildfire~~Fire Claims Trust ~~with $16 billion of the proceeds of the PG&E Corp. New Money Investment (as defined below).¹⁰~~ The Fire Claims Trust will be funded with the Aggregate Fire Consideration will include (i) $12 billion in cash, (ii) $12 billion of shares of common stock of Reorganized PG&E Corp. (at plan value), and (iii) the assignment of rights, claims, and causes of action as described below in the Means for Implementation section, including rights under certain 2015/2016 insurance policies of the Debtors. |
| | As part of the Aggregate Fire Consideration, the Debtors shall also assign to the Fire Claims Trust any and all rights, claims, causes of action, and defenses related thereto related directly or indirectly to any of the prepetition fires listed in Schedule 1 (the "**Fires**") that the Debtors may have against any third party, including, without limitation, against vendors, suppliers, third party contractors and consultants (including those who provided services regarding PGE's electrical system, system equipment, inspection and maintenance of the system, and vegetation management), and current and former directors and officers of the Debtors (to be mutually agreed upon by the TCC and the Ad Hoc Committee and included as an annex to the Plan). |
| | The ~~Wildfire~~Fire Claims Trust shall be administered by a trustee (the "**~~Wildfire~~Fire Claims Trustee**") and governed by an oversight committee (the "**~~Wildfire~~Fire Claims Trust Oversight Committee**") selected by the TCC. An agreement (the "**~~Wildfire~~Fire Claims Trust Agreement**") shall establish and set forth the provisions of the ~~Wildfire~~Fire Claims Trust. The ~~Wildfire~~Fire Claims Trust Agreement shall be in form and substance reasonably acceptable to the ~~Ad Hoc Committee~~TCC. |
| | The ~~Wildfire~~Fire Claims Trustee shall be selected by the ~~[TBD]~~TCC. The ~~Wildfire~~Fire Claims Trust Oversight Committee shall consist of three members, which shall be selected by ~~[TBD]~~.TCC. |
| | The ~~Wildfire~~Fire Claims Trustee and the ~~Wildfire~~Fire Claims Trust Oversight Committee shall have the authority to retain any advisors for the purpose of carrying out their respective duties under the ~~Wildfire~~Fire Claims Trust Agreement. |
| | ~~The Wildfire Claims Trust Agreement shall set forth procedures that will permit an Opt-Out Wildfire Claimant to (i) enter into a settlement with the Wildfire Claims~~ |

⁹ ~~Subject to upward adjustment of up to 15% based upon outcome of estimation proceeding.~~

¹⁰ ~~Subject to upward adjustment of up to 15% based upon outcome of estimation proceeding.~~

Case: 19-30088   Doc# 3962   Filed: 09/23/19   Entered: 09/23/19 04:56:04   Page 95 of 119

| | |
|---|---|
| | ~~Trust as to the allowed amount of its Wildfire Claim, (ii) submit to binding arbitration with the Wildfire Claims Trust to determine the allowed amount of its Wildfire Claim, or (iii) solely with respect to Wildfire Claims that are personal injury tort or wrongful death claims, have the allowed amount of such Wildfire Claim determined pursuant to 28 U.S.C. §157(b)(5), all of which shall be subject to the cap determined by the estimation proceeding outlined above.~~ <u>Allowance of Claims: The Trust Agreement will provide procedures for the holders of Fire Claims to resolve their claims, at their respective option, via a settlement matrix or allowed claim requirements and procedures approved by the TCC and the Court as part of plan confirmation, including mediation, streamlined binding arbitration procedures, or a jury trial to the extent a holder of Fire Claims is entitled to such a trial. The Court would retain jurisdiction over the Trust, Trustee, Oversight Committee, and administration of the Fire Claims Trust, subject to the terms of the Trust Agreement, until the Trust is terminated.</u> <br><br> <u>Payment of Claims and Reserve: Given that the amount of the Trust is limited, the Trustee shall provide for an appropriate payment reserve, in his reasonable business judgment, to ensure equal payment for all holders of Fire Claims in accordance with applicable law. Neither the Plan nor the Trust Agreement shall elevate the priority of claims of holders of Subrogation Fire Claims over the claims of holders of Fire Victim Claims regardless of their status as allowed claims. The Trustee shall release reserves only when appropriate and it is clear that claimants will receive equitable distributions as described below.</u> <br><br> <u>Unless otherwise ordered by the Court, in order to maintain an appropriate reserve, the Trustee shall pay one or more interim distributions on Allowed Fire Victim Claims, reserving a final distribution on such claims until the end of Trust administration after equal percentage payments have been made on Allowed Fire Victim Claims. At that time, at the end of Trust administration, after each Allowed Fire Victim Claim has been paid in full, the Trustee may then and only then pay an Allowed Subrogation Fire Claim(s) that corresponds to the paid in full Allowed Fire Victim Claim.</u> <br><br> In the event that ~~the aggregate amount paid in consideration of Wildfire Claims from the Wildfire~~<u>there are remaining funds after payment of all claims of the Fire</u> Claims Trust ~~is less than the Estimated Wildfire Liability~~, the excess funds remaining in the ~~Wildfire~~<u>**Fire**</u> Claims Trust (the "**Excess ~~Wildfire~~<u>Fire</u> Claims Trust Funds**") shall be ~~refunded to Reorganized PG&E Corp. to be utilized in the following manner:~~ <u>paid to the Wildfire Fund.</u> ~~1. 50% of the Excess Wildfire Claims Trust Funds shall be used to pay down the New PG&E Corp. Senior Unsecured Notes (as defined below); and~~ ~~2. 50% of the Excess Wildfire Claims Trust Funds shall be used by Reorganized PG&E Corp. for general corporate purposes, including, but not limited to, investing in the Reorganized Utility.~~ |
| **Channeling Injunction** | The ~~Wildfire~~<u>Fire</u> Claims Trust shall be the sole source of recovery for the ~~Wildfire~~<u>Fire</u> Claims against the Debtors. The Plan and order confirming the Plan (the "**Confirmation Order**") shall channel all ~~Wildfire~~<u>Fire</u> Claims against the Debtors to the ~~Wildfire~~<u>Fire</u> Claims Trust for payment in accordance with the terms and procedures provided therein. The Plan and the Confirmation Order shall bar |

Case: 19-30088    Doc# 3962    Filed: 09/23/19    Entered: 09/23/19 04:56:04    Page 96 of 119

|  | and enjoin holders of ~~Wildfire~~Fire Claims from seeking to recover on account of their ~~Wildfire~~Fire Claims against the Reorganized Debtors or any assets of the Reorganized Debtors, except with respect to any and all rights under and the proceeds of the Debtors' insurance policies that provide coverage for the Fires (the "**Channeling Injunction**"). |
|---|---|
| **Contributions to the Wildfire Fund** | On the Effective Date, the Debtors will contribute $5.0 billion, which amount consists of both the Debtors' initial and first annual contributions, to the ~~Wildfire~~ Fund in order to address future wildfire liability. |
| SOURCES OF PLAN FUNDING | |
| **Insurance ~~Proceeds~~Rights** | ~~$2.2 billion in insurance proceeds owed to the Debtors in respect of 2017 and 2018 wildfire related losses.~~The parties shall work in good faith to determine whether and how to treat the Debtors' insurance policies consistent with this term sheet. <br><br> Up to $2.209 billion of the proceeds of 2017/2018 insurance policies of the Debtors will be used as a source of cash funding under the Plan. |
| **Cash on Hand** | $[●] billion of the Debtors' cash on hand on the Effective Date. |
| **New Money Investment in PG&E Corp.** | On the Effective Date, Reorganized PG&E Corp. shall issue shares of Reorganized PG&E Corp. Common Stock (the "**New Money Reorganized PG&E Corp. Common Stock Issuance**") to the new money investors identified below (the "**PG&E Corp. New Money Investor Group**"), in exchange for ~~at least $19 billion and up to $20 billion~~$14,886,190,507 in cash (the "**PG&E Corp. New Money Investment**"). <br><br> The commitments for the PG&E Corp. New Money Investment shall be provided as follows: <br><br> 1. 50% by the consortium of large Utility bondholders identified in **Schedule ~~5~~4** attached hereto (the "**PG&E Corp. New Money Commitment Group**"); <br> 2. 45% by the members of the Ad Hoc Committee; and <br> 3. 5% by the holders of PG&E Common Interests in Class 8A. <br><br> To the extent that the members of the Ad Hoc Committee and/or holders of PG&E Common Interests in Class 8A do not provide the commitments described above for the PG&E Corp. New Money Investment, the PG&E Corp. New Money Commitment Group will provide commitments covering any such remaining amount. |
| **New PG&E Corp. Senior Unsecured Notes** | On the Effective Date, Reorganized PG&E Corp. shall issue ~~at least $4.0 billion and up to $5.4~~$5.5 billion in new senior unsecured notes (the "**New PG&E Corp. Senior Unsecured Notes**") to the new money investors identified below (the "**New PG&E Corp. Senior Unsecured Notes Investor Group**") in exchange for ~~at least~~ $~~4.0~~5.5 billion ~~and up to $5.4 billion~~ in cash (the "**New PG&E Corp. Senior Unsecured Notes Investment**"). The New PG&E Corp. Senior Unsecured Notes shall have terms materially consistent with the terms contained in the term sheet (the "**New PG&E Corp. Senior Unsecured Notes Term Sheet**") attached hereto as **Exhibit 1**. |

|  | |
| --- | --- |
|  | The commitments for the New PG&E Corp. Senior Unsecured Notes Investment shall be provided as follows: |
|  | 1. 50% by a consortium of large Utility bondholders identified in **Schedule 65** attached hereto (the "**New PG&E Corp. Senior Unsecured Notes Commitment Group**"); <br> 2. 50% by the members of the Ad Hoc Committee. |
|  | To the extent that the members of the Ad Hoc Committee do not provide the commitments described above for the New PG&E Corp. Senior Unsecured Notes Investment, the PG&E Corp. New Money Commitment Group will provide commitments covering any such remaining amount. |
| **New Utility Secured Notes** | The Debtors shall use commercially reasonable efforts to have the Reorganized Utility issue, on the Effective Date, $~~5.5 billion~~7,978,610,000 in new secured notes (collectively, the "**New Utility Secured Notes**") to third party investors in exchange for $~~5.5 billion~~7,978,610,000 in cash, with the proceeds being used to pay down all existing Utility Unsecured Term Loan Claims, Utility Unsecured Revolving Credit Facility Claims and Short-Term Utility Unsecured Notes Claims. The New Utility Secured Notes issued to third party investors shall have terms that are acceptable to the Ad Hoc Committee and at least as favorable to the Reorganized Utility as the terms contained in the term sheet (the "**New Utility Secured Notes Term Sheet**") attached hereto as **Exhibit 2**. |
|  | In the event that the Reorganized Utility fails to issue all or a portion of the New Utility Secured Notes to third party investors on the Effective Date after using commercially reasonable efforts to do so as described above, on the Effective Date, the Reorganized Utility shall issue New Utility Secured Notes (on terms materially consistent with those contained in the New Utility Secured Notes Term Sheet) in the amount of any such shortfall to the new money investors identified below (the "**Reorganized Utility Secured Notes Investor Group**" and together with the PG&E Corp. New Money Investor Group and the New PG&E Corp. Senior Unsecured Notes Investor Group, the "**Investor Group**") (on  pro rata basis as described in the Amended and Restated Commitment Letter~~, dated as of August 7, 2019~~ to be executed in connection with this Plan Term Sheet (the "**Commitment Letter**")) in exchange for the equivalent amount of cash (the "**New Utility Secured Notes Investment**"). |
|  | The commitments for the New Utility Secured Notes Investment shall be provided as follows: |
|  | 1. 50% by a consortium of large Utility bondholders identified in **Schedule 76** attached hereto (the "**New Utility Secured Notes Commitment Group**"); <br> 2. 50% by the members of the Ad Hoc Committee. |
|  | To the extent that the members of the Ad Hoc Committee do not provide the commitments described above for the New Utility Secured Notes Investment, the PG&E Corp. New Money Commitment Group will provide commitments covering |

| | |
|---|---|
| | any such remaining amount.<br><br>The PG&E Corp. New Money Commitment Group and the New PG&E Corp. Senior Unsecured Notes Commitment Group agree to use commercially reasonable efforts to structure the New Money Reorganized PG&E Corp. Common Stock Issuance and the New PG&E Corp. Senior Unsecured Notes in a manner that will facilitate the issuance of the New Utility Secured Notes on customary market terms, including with respect to the fees payable by the Utility in connection therewith. |
| **Backstop Commitment Fees** | In consideration of the agreement to backstop the commitments described above, the following backstop commitment fees (the "**Backstop Commitment Fees**") shall be payable:<br><br>1. 3.0% of the PG&E Corp. New Money Investment to the PG&E Corp. New Money Commitment Group; and<br>2. 1.5% of the New PG&E Corp. Senior Unsecured Notes Investment to the New PG&E Corp. Senior Unsecured Notes Commitment Group.<br>3. 0.751.5% of the maximum amount of New Utility Secured Notes Investmentissuable pursuant to this term sheet ($7,978,610,000) to the New Utility Secured Notes Commitment Group, with such amount being reduced to 0.50% of the New Utility Secured Notes Investment in the event that all of the New Utility Secured Notes are issued to third party investors (i.e., not the Reorganized Utility Secured Notes Investor Group pursuant to the backstop commitment hereunder)..<br><br>The Backstop Commitment Fees shall be payable by Reorganized PG&E Corp. in cash or Reorganized PG&E Corp. Common Stock at the election of each backstop commitment party. |

| | |
|---|---|
| **REGULATORY REQUIREMENTS** | |
| **FERC** | Prior to the Effective Date, the Debtors and Reorganized Debtors shall receive a final order, as necessary or appropriate, all of the following approvals from the Federal Energy Regulatory Commission ("**FERC**") (collectively, the "**FERC Approvals**").  The Debtors and Reorganized Debtors shall receive a final order, satisfactory to the Ad Hoc Committee, from the FERC granting authorization under Section 203 of the Federal Power Act (the "FPA") to implement the Plan.  In addition, if the reorganization results in the transfer of FERC-jurisdictional natural gas assets or hydroelectric assets, the Debtors and Reorganized Debtors shall receive, as necessary or appropriate, approval satisfactory to the Ad Hoc Committee under Section 7 of the Natural Gas Act ("**NGA**") and FPA Section 8, respectively, to transfer those assets.  Prior to the Effective Date, the Debtors and Reorganized Debtors shall also receive, if and to the extent necessary or appropriate, a final order from FERC, satisfactory to the Ad Hoc Committee granting authorization under Section 204 of the FPA to issue new securities as provided under the Plan.  Finally, prior to the Effective Date, the Debtors and Reorganized Debtors shall receive FERC acceptance, satisfactory to the Ad Hoc Committee, with respect to any new or modified service tariffs under the FPA or NGA necessary or appropriate to implement the Plan, and shall receive approval or acceptance under FPA Section 305 with respect to the creation of any interlocking |

| | |
|---|---|
| | directorates. |
| **CPUC** | Prior to the Effective Date, the Debtors and Reorganized Debtors shall receive ~~approval, if required,~~all necessary or appropriate approvals, authorizations and final orders from the California Public Utilities Commission ("**CPUC**") ~~under Public Utilities Code Sections 851-854. Prior to the Effective Date, the Debtors and Reorganized Debtors also shall receive the issuance of a financing order, if required, from the CPUC for the overall financing structure of the Plan, including the issuance of new securities as provided under the Plan, and shall receive final CPUC approval for all other rates, tariffs, and agreements necessary to implement the Plan.~~required to implement the Plan, to participate in the Wildfire Fund, and to be eligible for the presumption of reasonableness provided in Public Utilities Code section 451.1, in each case satisfactory to the Ad Hoc Committee, including, but not limited to: (a) successful conclusion of the ROE/Cap Structure Proceedings (as defined below); (b) approval of transfer of control over the Utility and any changes to PG&E's corporate structure and authorizations for the Utility to operate as a utility, if required; (c) resolution of claims for monetary fines or penalties under the California Public Utilities Code for conduct prior to the Petition Date, (d) approval (or exemption from approval) of the overall financing structure and securities to be issued under the Plan; (e) approvals and determinations pursuant AB 1054 necessary for participation in the Wildfire Fund, including, but not limited to, a determination that the Plan fully and finally compensates ratepayers in full compliance with Public Utilities Code section 3292(b)(1)(E) throughout the existence of the Wildfire Fund, and (f) approval that the Plan, including in regards to compensation for executive officers, complies with the requirements of Public Utilities Code section 8389 (collectively, the "**CPUC Determinations**"). <br><br> The "**ROE/Cap Structure Proceeding**" shall mean the proceeding(s) before the CPUC governing the authorized return on equity and regulated capital structure of the Utility. A successful conclusion of the ROE/Cap Structure Proceeding for purposes of this proceeding shall mean, either (x) a determination that the current authorized capital structure and a minimum of 10.25% ROE shall be fixed for three (3) years, or (y) a mutually agreed deferral of the Utility's 2020 general rate case and/or cost of capital proceeding before the CPUC for a period of 24 months from the Effective Date of the Plan, with the current authorized capital structure and/or a minimum of 10.25% ROE, as relevant, to remain unchanged until expiration of the deferral period. |
| **NRC** | If required, prior to the Effective Date, the Debtors and Reorganized Debtors shall receive approval from the Nuclear Regulatory Commission (~~"**NRC**"~~) for the transfer of the license for the Diablo Canyon Power Plant (the "**NRC Approval**"). |
| **OTHER TERMS** ||
| **Releases** | The Plan shall provide for customary release of all claims and causes of action against (i) the Debtors, (ii) each of the members of the Ad Hoc Committee, (iii) the Creditors' Committee and each of its members, (iv) the ~~Tort Claimants Committee~~TCC and each of its members, (v) the ~~Wildfire~~Fire Claims Trustee, (vi) the ~~Wildfire~~Fire Claims Trust Oversight Committee and each of its members and (vii) with respect to each of the foregoing entities in clauses (i) through (vi), such entities' Related Persons[115] (each such entity in foregoing clauses (i) through (vii), |

[115] "**Related Persons**" with respect to an entity shall mean that entity's current and former affiliates, and such entities' and their current and former affiliates' current and former directors, managers, officers, equity holders

| | |
|---|---|
| | a "**Released Party**"). |
| | Releases shall be provided by (i) the Debtors, (ii) each of the members of the Ad Hoc Committee, (iii) the Creditors' Committee and each of its members, (iv) the ~~Tort Claimants Committee~~TCC and each of its members, (v) the ~~Wildfire~~Fire Claims Trustee, (vi) the ~~Wildfire~~Fire Claims Trust Oversight Committee and each of its members and (vii) with respect to each of the foregoing entities in clauses (i) through (vi), such entities' Related Persons, and (viii) all holders of claims and interests against the Debtors, as provided in more detail below (each such entity in foregoing clauses (i) through (viii), a "**Releasing Party**"). |
| | The releases to be set forth in the Plan shall include consensual releases from each holder of a claim or interest (as set forth in the "Plan Treatment of PG&E Corp. and Utility Claims" section above) that (i) votes to accept the Plan or (ii) is deemed to accept the Plan, of each Released Party from any claims or causes of action, including any derivative claims asserted or assertable on behalf of any of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates or affiliates or that each other Releasing Party, as applicable, would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any claims or interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring discussions, intercompany transactions between or among the Debtors and/or their Affiliates, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Plan, the disclosure statement to the Plan, or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the foregoing, or upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date. |
| | The Plan shall provide for consensual releases to the Released Parties of all claims and causes of action that could be asserted against, or in any way relating to, or arising out of (i) any Debtor, the Reorganized Debtors, their businesses, or their property, (ii) the Chapter 11 Cases, (iv) the formulation, preparation, negotiation, dissemination, implementation, administration, or consummation of the Plan, or (v) any other act or omission in connection with the Chapter 11 Cases. |
| **Exculpation** | The Plan shall provide certain customary exculpation provisions, which shall include a full exculpation from liability in favor of the Debtors, ~~each of the members of~~ the Ad Hoc Committee and each of its members and their |

entities' and their current and former affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

23

| | |
|---|---|
| | professionals, the Creditors' Committee and each of its members and their professionals, the ~~Tort Claimants Committee~~TCC and each of its members and their professionals, and the Related Persons of all of the foregoing parties from any and all claims and causes of action arising on or after the Petition Date and any and all claims and causes of action relating to any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, soliciting, confirming or consummating the Plan, the disclosure statement to the Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other act taken or omitted to be taken in connection with or in contemplation of the Chapter 11 Cases or the restructuring of the Debtors, with the sole exception of willful misconduct or gross negligence. |
| **Corporate Governance** | Upon the Effective Date and for a period of two (2) years thereafter, the board of directors of Reorganized PG&E Corp. (the "**New PG&E Corp. Board**") shall consist of nine (9) members. From the second anniversary of the Effective Date through the fifth anniversary of the Effective Date, the New PG&E Board Corp. Board shall consist of at least nine (9) and no more than eleven (11) members. The chief executive officer of Reorganized PG&E Corp. (the "**New PG&E Corp. CEO**") shall be a director on the New PG&E Corp. Board. The New PG&E Corp. CEO shall not be the chairperson of the New PG&E Corp. Board. The remaining directors of the New PG&E Corp. Board shall be appointed on the Effective Date, and thereafter elected annually, in the following manner: <br><br> 1. One (1) director shall be nominated by IBEW Local 1245, on behalf of the employees of Reorganized PG&E Corp.; <br> 2. One (1) director shall be nominated by TURN, on behalf of ratepayers; <br> 3. One (1) director shall be nominated by the Wildfire Fund; and <br> 4. Each other director shall be nominated by the shareholders of Reorganized PG&E Corp. <br><br> The board of directors of the Reorganized Utility (the "**New Utility Board**" and together with the New PG&E Corp., the "**New Boards**") will consist of the same nine (9) members of the New PG&E Corp. Board. The chairperson of the New PG&E Corp. Board shall not be the chairperson of the New Utility Board. <br><br> The New Boards shall consist of a diverse set of individuals (including, among other things, complying with the requirements of California State Bill-826). The majority of the directors of each of the New Boards shall consist of Californians and individuals who have credentialed experience in the areas of utility operations, engineering, safety, regulation and/or clean energy. |
| **Renaming / Rebranding** | For the first 60 days following the Effective Date, all employees of the Reorganized Utility will have the opportunity to submit recommendations for renaming or rebranding the Reorganized Utility. If, after a period of 90 days following the Effective Date, no employee recommendation is selected for renaming or rebranding the Reorganized Utility, the Reorganized Utility shall effect a change of name to "Golden State Power Light & Gas Co.," and the Reorganized PG&E Corp. shall effect a change of name to "GSPL&G Corp." |
| **Prohibition Against Rate Increases** | The Debtors and the Reorganized Debtors will not seek to recover the contributions made to the Wildfire Claims Trust or the Wildfire Fund, either directly or indirectly, through rate increases. |

| | |
|---|---|
| **Utility Rates to Consumers** | The Plan shall be rate-neutral to end-market consumers in California on a net basis. The Plan will rely on securitization amounts up to similar levels of the securitization bonds issued in 2001. The proceeds of such new securitization bonds will be used for future statewide Wildfire Fund purposes. The proceeds of any new securitization bonds will not be used for the Debtors' or Reorganized Debtors' benefit for plan purposes. |
| **Utility Consumer Rate Credit** | Plan to include sale of certain key real estate assets of the Debtors to previously identified party or parties to allow for up to $1 billion rate credit for the benefit of all PG&E customers, to be applied equally over a period of 10 years from the Effective Date. |
| **Post-Effective Date Management** | The Utility will seek to enter into a long-term management, oversight, O&M or similar contract(s)/agreement(s) with a qualified management team and/or top-tier U.S.-domiciled utility/energy holding company (all previously identified) to oversee and run the Utility beginning on the Effective Date. Such entity or management team may be provided the opportunity to participate in the PG&E Corp. New Money Investment in connection therewith. |
| **Key Corporate Operating Businesses** | PG&E Corp. agrees not to sell, and will oppose any attempt to municipalize, any portion of the operating business or assets, for a period of (5) years after the Effective Date of the Plan; *provided*, however, this provision does not apply to any owned, including currently occupied real estate. For the avoidance of doubt, this restriction will not limit any change in control transaction relating to Reorganized PG&E Corp., including, without limitation, a merger, tender offer or similar transaction. |
| **Key Employee Matters** | All PG&E Corp. common stock currently held by employees and retirees in pension accounts, 401(k) accounts and company-sponsored plans will be trued-up for any dilution on account of the Plan with new equity issuances within 90 days after the Effective Date. Such equity interests will be structured to comply with all applicable securities laws.<br><br>Subject to the support of the International Brotherhood of Electrical Workers ("**IBEW**") for the Plan, contingent upon and after confirmation of the Plan, the Reorganized Debtors shall enter into an agreement with Local Union No. 1245 of the International Brotherhood of Electrical Workers ("**Local 1245**") with such agreement to apply only to the period starting on the Effective Date, extending the two (2) Collective Bargaining Agreements currently in place between Pacific Gas and Electric Company and Local 1245 (the IBEW Physical Agreement and the IBEW Clerical Agreement, collectively the "**IBEW CBAs**"), until December 31, 2023 with such extension to include (i) a reasonable and appropriate general wage increase for each of the extension years (2022 and 2023) deemed to be appropriate, reasonable, consistent with past practice and included in go-forward allowed rates; (ii) a prohibition on any involuntary layoffs during the term of the extended IBEW CBAs; provided, however such prohibition will not limit any individual employee terminations or displacements and will not apply to contract workforce or non-bargaining unit members; and (iii) reemphasize the Reorganized Debtors' and Local 1245's commitment to maintaining a spirit of cooperation between labor and management. |
| **Other Employee** | Compensation-related agreements between any of the Debtors and any directors, officers and employees of the Debtors existing as of the Effective Date, including |

Case: 19-30088    Doc# 3962    Filed: 09/23/19    Entered: 09/23/19 04:56:04    Page 103 of 119

| | |
|---|---|
| **Matters** | any indemnification and severance obligations, short term incentive plan and other incentive plans, with the exception of the revisions set forth herein, existing as of the Effective Date, shall be assumed by the Reorganized Debtors. |
| | The New Boards shall revise the long term incentive compensation programs of Reorganized PG&E Corp. and the Reorganized Utility by increasing the proportion of LTIP awards subject to performance-based vesting criteria. Performance criteria for LTIP awards will be modified by increasing/implementing performance weightings that are based on achievement of public safety, infrastructure hardening and other related strategic long term objectives. |
| **Pension Matters** | Upon the Effective Date, the Reorganized Debtors shall assume and continue to maintain the PG&E Retirement Plan under its current terms, except to the extent any amendment is required by law, and shall make any and all contributions necessary to satisfy the minimum funding requirements under ERISA Section 302 and Internal Revenue Code Section 430. |
| **Executory Contracts and Unexpired Leases** | All executory contracts and unexpired leases not expressly listed for rejection on an exhibit to the Plan or previously assumed or rejected by order of the Bankruptcy Court shall be deemed assumed as of the Effective Date. |
| | The Debtors or Reorganized Debtors, as applicable, may alter, amend, modify, or supplement the list of assumed executory contracts and unexpired leases and the schedules of executory contracts and unexpired leases with respect to the Debtors or Reorganized Debtors, as applicable, at any time, through and including 45 days after the Effective Date. |
| **Renewable Energy Power Purchase Agreements** | Notwithstanding anything to the contrary in this Term Sheet, the Debtors and Reorganized Debtors shall not reject any renewable energy power purchase agreement. |
| **Tax Matters** | The Debtors and the Ad Hoc Committee will work together in good faith and will use commercially reasonable efforts to structure and implement the Reorganization in a tax efficient and cost-effective manner for the Reorganized Debtors and creditors. |
| | Post-Effective Date ownership of PG&E Corp. shall be structured to maximize the usage of go-forward tax attributes. |
| **Timing / Key Dates** | Emergence from chapter 11 is to be achieved as soon as reasonably practicable, with specific deadlines as follows:<br><br>1. A plan of reorganization materially consistent with the terms provided in this Term Sheet and disclosure statement corresponding to such plan to be filed no later than ~~September 16~~October 31, 2019;<br>2. Order confirming such plan of reorganization entered no later than ~~May 15~~June 30, 2020; and<br>3. Effective date of the plan of reorganization to occur no later than ~~June 30, 2020~~60 days after the entry of the Confirmation Order. |
| **Conditions Precedent to** | The following conditions must be satisfied in order for the Effective Date to occur: |

| Effective Date of Plan | 1. ~~the Estimated Wildfire Liability shall not exceed $16 billion.[12]~~ A plan of reorganization that provides a binding cap on the recoveries to the holders of Fire Claims (including fines, penalties, reimbursement and other similar obligations) that shall not be greater than the Aggregate Fire Consideration shall have been confirmed; |
|---|---|
| | 2. the Confirmation Order shall have been entered by the Court in form and substance acceptable to the Ad Hoc Committee and TCC, be in full force and effect and not be subject to any stay or injunction and shall have become a final order; |
| | 3. all definitive documents relating to the Plan shall be in form and substance acceptable to the Ad Hoc Committee; |
| | 4. the ~~Wildfire~~ Fire Claims Trust shall be have been established in accordance with the terms provided herein and the procedures in connection therewith shall be in form and substance acceptable to the TCC; |
| | 5. the ~~Wildfire~~ Fire Claims Trustee shall have been appointed in accordance with the terms provided herein; |
| | 6. the members of the ~~Wildfire~~ Fire Claims Trust Oversight Committee shall have been appointed in accordance with the terms provided herein; |
| | 7. a Wildfire Fund has been established pursuant to Public Utilities Code section 3292, and the Utility has satisfied (i) the conditions to participate in the Wildfire Fund pursuant to Public Utilities Code sections 3292 and 3293, (ii) the conditions to obtain a safety certification pursuant to Public Utilities Code section 8389, and (iii) any other conditions that are required to participate in the Wildfire Fund and be eligible for the presumption of reasonableness provided in Public Utilities Code section 451.1; |
| | 8. ~~the CPUC has determined that the Plan fully and finally compensates ratepayers in full compliance with Public Utilities Code section 3292(b)(1)(E) throughout the existence of the Wildfire Fund in a manner acceptable to the Ad Hoc Committee;~~ |
| | ~~9~~8. the New PG&E Corp. Common Stock, New PG&E Corp. Senior Unsecured Notes and the New Utility Secured Notes shall have been issued in accordance with the terms provided herein and in a manner acceptable to the Ad Hoc Committee and the TCC; |
| | ~~10~~9. all actions, documents, certificates and agreements necessary or appropriate to implement the Plan shall have been effected or executed or deemed executed and delivered, as the case may be, to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws; and |
| | ~~11~~10. all authorizations, consents, regulatory approvals, rulings or documents that are necessary or appropriate to implement and effectuate the Plan (including, but not limited to, the FERC Approvals, the CPUC Determinations, and the NRC Approval) shall have been received. |
| Conditions Precedent to Funding | The following conditions must be met in order for the PG&E Corp. New Money Investment, New PG&E Corp. Senior Unsecured Notes Investment, and New Utility Secured Notes Investment to be funded: |
| | 1. A plan of reorganization that provides a binding cap on the ~~Wildfire Claims~~ |

---

[12] ~~Subject to upward adjustment of up to 15% based upon outcome of estimation proceeding.~~

|  |  | equal to the Estimated Wildfire Liability, not to exceed $16.0 billion plus a maximum 15% upward adjustment, recoveries to the holders of Fire Claims (including fines, penalties, reimbursement and other similar obligations) that shall not be greater than the Aggregate Fire Consideration shall have been confirmed and the Effective Date shall have occurred; |
|  | 2. | Satisfactory conclusion of the Utility's 2020 general rate case and cost of capital proceedings before the CPUC, which shall mean, either (x) a determination that the current authorized capital structure and 10.25% ROE shall be fixed for three (3) years, or (y) a mutually agreed deferral of the Utility's 2020 general rate case and/or cost of capital proceeding before the CPUC for a period of 24 months from the Effective Date of the Plan, with the current authorized capital structure and/or 10.25% ROE, as relevant, to remain unchanged until expiration of the deferral period; There shall not have occurred one or more fires in the Debtors' service territory after the Petition Date and prior to January 1, 2020 that is asserted by any person to arise out of the Debtors' activities and that destroys or damages more than 500 dwellings or commercial structures (individually or in the aggregate) |
|  | 3. | There shall not have occurred one or more fires on or after January 1, 2020 destroying or damaging at least 500 dwellings or commercial structures (individually or in the aggregate) within PG&E's service area at a time when the portion of PG&E's system at the location of such fires was not de-energized; |
|  | 3. | CPUC approval, including issuance of a financing order, if required, of the overall financing structure, including issuance of new securities under the Plan; |
|  | 4. | No material wildfire claims exposure to the Debtors due to postpetition fires during the pendency of the chapter 11 cases; |
|  | 54. | The form of all common equity documents and the plan of reorganization and confirmation order are in form and substance acceptable to the Investor Group; and |
|  | 65. | Customary closing conditions for an equity and unsecured debt financing including, but not limited to, no material adverse change to PG&E Corp. |
|  | 76. | All Conditions Precedent to the Effective Date of the Plan, as set forth above, shall have been satisfied. |
|  | 87. | The Debtors shall have maintained and held in good standing all of their operating licenses, certificates and other regulatory authorizations and approvals necessary to operate the Utility's business with no pending revocations of any such license, certificate, approval or authorization or open proceedings contemplating such revocation. |
|  | 8. | Each of the conditions to funding under the Commitment Letter shall have been satisfied or waived by all applicable parties thereto. |

28

## SCHEDULE 1

List of Northern California ~~Wildfires~~Fires Covered by ~~Wildfire~~Fire Claims Trust

1. Butte Fire (2015)
2. 2017 North Bay ~~Wildfires~~Fires
   a. LaPorte (La Porte)
   b. McCourtney
   c. Lobo
   d. Honey
   e. Redwood / Potter Valley
   f. Sulphur
   g. Cherokee
   h. 37
   i. Blue
   j. Pocket
   k. Atlas
   l. Cascade
   m. Nuns
   n. Adobe
   o. Norrbom
   p. Pressley
   q. Patrick
   r. Pythian / Oakmont
   s. Maacama
   t. Tubbs
   u. Point
3. Camp Fire (2018)
4. Ghost Ship (2016)

29

## SCHEDULE 2

Short-Term Utility Unsecured Notes

1. $550 million principal amount of 3.50% senior notes due October 1, 2020

2. $250 million principal amount of 3.50% senior notes due October 1, 2020

3. $300 million principal amount of 4.25% senior notes due May 15, 2021

4. $250 million principal amount of 3.25% senior notes due September 15, 2021

5. $400 million principal amount of 2.45% senior notes due August 15, 2022

## **SCHEDULE 3**

### Long-Term Utility Unsecured Notes

1. $375 million principal amount of 3.25% senior notes due June 15, 2023

2. $500 million principal amount of 4.25% senior notes due August 1, 2023

3. $300 million principal amount of 3.85% senior notes due November 15, 2023

4. $450 million principal amount of 3.75% senior notes due February 15, 2024

5. $350 million principal amount of 3.40% senior notes due August 15, 2024

6. $400 million principal amount of 3.50% senior notes due June 15, 2025

7. $200 million principal amount of 3.50% senior notes due June 15, 2025

8. $600 million principal amount of 2.95% senior notes due March 1, 2026

9. $400 million principal amount of 3.30% senior notes due March 15, 2027

10. $1,150 million principal amount of 3.30% senior notes due December 1, 2027

11. $300 million principal amount of 4.65% senior notes due August 1, 2028

12. $3,000 million principal amount of 6.05% senior notes due March 1, 2034

13. $700 million principal amount of 5.80% senior notes due March 1, 2037

14. $250 million principal amount of 5.80% senior notes due March 1, 2037

15. $400 million principal amount of 6.35% senior notes due Feb 15, 2038

16. $550 million principal amount of 6.25% senior notes due March 1, 2039

17. $550 million principal amount of 5.40% senior notes due January 15, 2040

18. $250 million principal amount of 5.40% senior notes due January 15, 2040

19. $250 million principal amount of 4.50% senior notes due December 15, 2041

20. $400 million principal amount of 4.45% senior notes due April 15, 2042

21. $350 million principal amount of 3.75% senior notes due August 15, 2042

22. $375 million principal amount of 4.60% senior notes due June 15. 2043

23. $500 million principal amount of 5.125% senior notes due November 15, 2043

24. $450 million principal amount of 4.75% senior notes due February 15, 2044

25. $225 million principal amount of 4.75% senior notes due February 15, 2044

26. $500 million principal amount of 4.30% senior notes due March 15, 2045

27. $100 million principal amount of 4.30% senior notes due March 15, 2045

28. $450 million principal amount of 4.25% senior notes due March 15, 2046

29. $400 million principal amount of 4.00% senior notes due December 1, 2046

30. $200 million principal amount of 4.00% senior notes due December 1, 2046

31. $850 million principal amount of 3.95% of senior notes due December 1, 2047

# SCHEDULE 4

Adjusted Rates for the Long-Term Utility Replacement Notes

| Name | Maturity | Principal | Old Rate | New Rate | Change |
|------|----------|-----------|----------|----------|--------|
| Senior Unsecured Notes due Jun 2023 | 6/15/23 | $375.0 | 3.25% | 3.18% | 0.07% |
| Senior Unsecured Notes due Aug 2023 | 8/1/23 | 500.0 | 4.25% | 4.16% | 0.09% |
| Senior Unsecured Notes due Nov 2023 | 11/15/23 | 300.0 | 3.85% | 3.77% | 0.08% |
| Senior Unsecured Notes due Feb 2024 | 2/15/24 | 450.0 | 3.75% | 3.67% | 0.08% |
| Senior Unsecured Notes due Aug 2024 | 8/15/24 | 350.0 | 3.40% | 3.33% | 0.07% |
| Senior Unsecured Notes due Jun 2025 | 6/15/25 | 600.0 | 3.50% | 3.43% | 0.07% |
| Senior Unsecured Notes due Mar 2026 | 3/1/26 | 600.0 | 2.95% | 2.89% | 0.06% |
| Senior Unsecured Notes due Mar 2027 | 3/15/27 | 400.0 | 3.30% | 3.23% | 0.07% |
| Senior Unsecured Notes due Dec 2027 | 12/1/27 | 1,150.0 | 3.30% | 3.23% | 0.07% |
| Senior Unsecured Notes due Aug 2028 | 8/1/28 | 300.0 | 4.65% | 4.55% | 0.10% |
| Senior Unsecured Notes due Mar 2034 | 3/1/34 | 3,000.0 | 6.05% | 5.92% | 0.13% |
| Senior Unsecured Notes due Mar 2037 | 3/1/37 | 950.0 | 5.80% | 5.68% | 0.12% |
| Senior Unsecured Notes due Feb 2038 | 2/15/38 | 400.0 | 6.35% | 6.21% | 0.14% |
| Senior Unsecured Notes due Mar 2039 | 3/1/39 | 550.0 | 6.25% | 6.12% | 0.13% |
| Senior Unsecured Notes due Jan 2040 | 1/15/40 | 800.0 | 5.40% | 5.28% | 0.12% |
| Senior Unsecured Notes due Dec 2041 | 12/15/41 | 250.0 | 4.50% | 4.40% | 0.10% |
| Senior Unsecured Notes due Apr 2042 | 4/15/42 | 400.0 | 4.45% | 4.35% | 0.10% |
| Senior Unsecured Notes due Aug 2042 | 8/15/42 | 350.0 | 3.75% | 3.67% | 0.08% |
| Senior Unsecured Notes due Jun 2043 | 6/15/43 | 375.0 | 4.60% | 4.50% | 0.10% |
| Senior Unsecured Notes due Nov 2043 | 11/15/43 | 500.0 | 5.13% | 5.02% | 0.11% |
| Senior Unsecured Notes due Feb 2044 | 2/15/44 | 675.0 | 4.75% | 4.65% | 0.10% |
| Senior Unsecured Notes due Mar 2045 | 3/15/45 | 600.0 | 4.30% | 4.21% | 0.09% |
| Senior Unsecured Notes due Mar 2046 | 3/15/46 | 450.0 | 4.25% | 4.16% | 0.09% |
| Senior Unsecured Notes due Dec 2046 | 12/1/46 | 600.0 | 4.00% | 3.91% | 0.09% |
| Senior Unsecured Notes due Dec 2047 | 12/1/47 | 850.0 | 3.95% | 3.87% | 0.08% |
| **Total** | - | **$15,775.0** | **4.67%** | **4.57%** | **0.10%** |

**SCHEDULE 5**

PG&E Corp. New Money Commitment Group

1. Apollo Capital Management, L.P.
2. Canyon Capital Advisors LLC
3. Capital Research and Management Company
4. Citadel Advisors LLC
5. Davidson Kempner Capital Management LP
6. Elliott Management Corporation
7. Farallon Capital Management, L.L.C.
8. Oaktree  Fund GP, LLC
9. Pacific Investment Management Company LLC
10. Theater Investor LLC (wholly owned by funds managed by OZ Management LP)
11. Third Point LLC
12. Varde Partners, Inc.

## SCHEDULE 65

New PG&E Corp. Senior Unsecured Notes Commitment Group

1. Apollo Capital Management, L.P.
2. Canyon Capital Advisors LLC
3. Capital Research and Management Company
4. Citadel Advisors LLC
5. Davidson Kempner Capital Management LP
6. Elliott Management Corporation
7. Farallon Capital Management, L.L.C.
8. Oaktree  Fund GP, LLC
9. Pacific Investment Management Company LLC
10. Theater Investor LLC (wholly owned by funds managed by OZ Management LP)
11. Third Point LLC
12. Varde Partners, Inc.

## SCHEDULE ~~7~~6

New Utility Secured Notes Commitment Group

1. Apollo Capital Management, L.P.
2. Canyon Capital Advisors LLC
3. Capital Research and Management Company
4. Citadel Advisors LLC
5. Davidson Kempner Capital Management LP
6. Elliott Management Corporation
7. Farallon Capital Management, L.L.C.
8. Oaktree  Fund GP, LLC
9. Pacific Investment Management Company LLC
10. Theater Investor LLC (wholly owned by funds managed by OZ Management LP)
11. Third Point LLC
12. Varde Partners, Inc.

## **EXHIBIT 1**

New PG&E Corp. Senior Unsecured Notes Term Sheet

## EXHIBIT 2

New Utility Secured Notes Term Sheet

**Exhibit B**

Terms of the Senior Unsecured Notes:

| | |
|---|---|
| Issuer: | Reorganized PG&E Corp. |
| Initial Issue Date: | Effective Date of Plan of Reorganization |
| Issue Amount: | $~~4.0~~5.5 billion ~~(or up to $5.4 billion if 15% upside cap for past Wildfire Claimants' Trust is utilized)~~ |
| Interest Rate: | 7.5% cash payable semi-annually |
| Interest Rate Step-Down Feature: | Interest rate steps down 50 basis points upon the first date following the Initial Issue Date upon which the Issuer has received and maintained Investment Grade credit rating status from both S&P, Moody's and Fitch for 90 days |
| OID: | 1.0% |
| Ranking: | Senior Unsecured obligation of the Issuer |
| Final Maturity: | Seven (7) years from the date of issuance |
| Call Schedule: | Non-call five years<br>Callable after year five at 107.50% of par<br>Callable after year six at 103.75% of par |
| Other Key Terms: | In event of a change of control of the Issuer and/or the Reorganized Utility, Senior Notes puttable at 101% at each holder's option |
| Other Customary Terms: | Documentation to include covenants and other terms customary for senior unsecured financing |

**Exhibit C**

Terms of the New Utility Secured Notes:

| | |
|---|---|
| Issuer: | Reorganized Utility |

Initial Issue Date:     Effective Date of Plan of Reorganization

Issue Amount:     $~~5.5 billion~~7,978,610,000 in the aggregate, with maturity dates as follows:
- 5 year notes - $~~1.375 billion~~1,994,652,500
- 7 year notes - $~~1.375 billion~~1,994,652,500
- 10 year notes - $~~1.375 billion~~1,994,652,500
- 30 year notes - $~~1.375 billion~~1,994,652,500

Interest Rate:

|  | Spread to treasury given rating | | |
|---|---|---|---|
| Term | BBB | BBB- | Sub IG |
| 5 years | 175 bps | +25 bps | +25 bps |
| 7 years | 200 bps | +25 bps | +25 bps |
| 10 years | 250 bps | +25 bps | +25 bps |
| 30 years | 275 bps | +25 bps | +25 bps |

OID:     1.0%

Security:     Secured by a first mortgage on all "Principal Property" of the Debtors as described in the Plan Term Sheet

Final Maturity:     Five (5), seven (7), ten (10) and thirty (30) years from the date of issuance as described above

Call Schedule:     Non-call for life with make whole equal to treasury rate plus 20 bps (on terms materially consistent with existing Utility notes)

~~Commitment Fee:~~     ~~0.75% of the aggregate commitment amount for the New Utility Secured Notes ($5.5 billion) with such amount being reduced to 0.50% of the aggregate commitment amount for the New Utility Secured Notes in the event that all of the New Utility Secured Notes are issued to third party investors (i.e., not the Commitment Parties pursuant to the Commitment Letter). Commitment fee shall be paid by Reorganized PG&E Corp. and shall be payable in cash or Reorganized PG&E Corp. Common Stock at the election of each Commitment Party~~

Other Customary Terms:     Documentation to include covenants and other terms customary for secured utility financings including loan to value ratios and collateral coverage and protection

Exhibit D

| Dollar Amount of Common Stock Issued[4] | Dollar Amount of Senior Unsecured Notes Issued | Fully Diluted Ownership Percentage Represented By Common Stock Issuance[3] |
|---|---|---|
| $19,000,000,000 | $4,000,000,000 | 85% |
| $20,000,000,000 | $5,400,000,000 | 95% |

[4] Actual amounts of percentages in between the levels set forth in the table above will be prorated based on linear interpolation.