WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C. (*pro hac vice*)
(ray.schrock@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

CRAVATH, SWAINE & MOORE LLP
Paul H. Zumbro (*pro hac vice*)
(pzumbro@cravath.com)
Kevin J. Orsini (*pro hac vice*)
(korsini@cravath.com)
Omid H. Nasab (*pro hac vice*)
(onasab@cravath.com)
825 Eighth Avenue
New York, NY 10019
Tel: 212 474 1000
Fax: 212 474 3700

*Attorneys for Debtors
and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>**Debtors.**<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Ch. 11 Lead Case No. 19-30088 (DM) (Jointly Admin.)<br><br>**DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 363(b) AND 105(a) AND FED. R. BANKR. P. 6004 AND 9019 FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO ENTER INTO RESTRUCTURING SUPPORT AGREEMENT WITH THE CONSENTING SUBROGATION CLAIMHOLDERS, (II) APPROVING THE TERMS OF SETTLEMENT WITH SUCH CONSENTING SUBROGATION CLAIMHOLDERS, INCLUDING THE ALLOWED SUBROGATION CLAIM AMOUNT, AND (III) GRANTING RELATED RELIEF**<br><br>**(THE "SUBROGATION SETTLEMENT AND RSA MOTION")**<br><br>Date & Time: October 23, 2019, at 10:00 a.m. (PT)<br>Place:  U.S. Bankruptcy Court, Courtroom 17, 16th Fl.<br>  San Francisco, CA 94102<br>**Objection Deadline: October 16, 2019, 4:00 p.m. (PT)** |

PG&E Corporation ("**PG&E Corp**.") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession (collectively, "**PG&E**" or the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this Motion (the "**Motion**"), pursuant to sections 363(b) and 105(a) of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 6004 and 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for entry of an order (i) authorizing the Debtors to enter into and perform under that certain Restructuring Support Agreement, dated as of September 22, 2019 (the "**RSA**"), among the Debtors and the Consenting Creditors (as defined in the RSA) parties thereto, a copy of which is annexed hereto as **Exhibit A**, (ii) approving the terms of the Subrogation Claims Settlement (as defined below), including approval of the Allowed Subrogation Claim Amount (as defined below) and the payment of certain fees and expenses of the professionals of the Ad Hoc Group of Subrogation Claimants (the "**Ad Hoc Subrogation Group**") as set forth below, and (iii) granting related relief.

In support of the Motion, the Debtors submit the Declaration of Jason P. Wells (the "**Wells Declaration**"), filed contemporaneously herewith. A proposed form of order granting the relief requested herein is annexed hereto as **Exhibit B** (the "**Proposed Order**").

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

**TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT ...................................................................6

II.     JURISDICTION ...........................................................................................8

III.    BACKGROUND ...........................................................................................8

IV.     MATERIAL TERMS OF THE RSA AND SUBROGATION CLAIMS SETTLEMENT.........9

V.      BASIS FOR RELIEF REQUESTED ..........................................................17

    **1.**    The RSA Represents a Substantial Achievement and Milestone in the Chapter 11 Cases, Is a Sound Exercise of the Debtors' Business Judgment, and Should be Approved Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code.................17

    **2.**    The Subrogation Claims Settlement is in the Best Interests of the Debtors' Estates and Should be Approved Pursuant to Bankruptcy Rule 9019. ............................................22

        a.     Approval of the Allowed Subrogation Claim Amount as Provided in the RSA is Reasonable and in the Best Interests of the Debtors, their Estates, and their Other Stakeholders.................................................26

        b.     Payment of the Fees and Expenses of the Ad Hoc Professionals is Reasonable and Warranted under the Circumstances. ...........................................27

VI.     REQUEST FOR WAIVER OF BANKRUPTCY RULE 6004(h) ...........................................28

VII.    NOTICE.........................................................................................................28

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

# <u>TABLE OF AUTHORITIES</u>

**Cases** Page(s)

*Air Line Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.),*
156 B.R. 414 (S.D.N.Y. 1993), *aff'd* 17 F.3d 600 (2d Cir. 1993) ....................................24

*In re AMR Corp.,*
Case No. 11-15463 (SHL) (Bankr. S.D.N.Y. Sept. 21, 2012).........................................28

*In re ASARCO, L.L.C.,*
650 F.3d 593 (5th Cir. 2011) ............................................................................................18

*In re AWTR Liquidation Inc.,*
*548 B.R. 300 (Bankr. C.D. Cal. 2016)*............................................................................18

*In re CHC Grp. Ltd.,*
Case No. 16-31854 (BJH) (Bankr. N.D. Tex. Dec. 20, 2016)....................................24, 27

*In re City of Detroit, Michigan,*
Case No. 13-53846 (SWR) (Bankr. S.D. Mich. Apr. 15, 2014)......................................27

*Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.),*
60 B.R. 612 (Bankr. S.D.N.Y. 1986)...............................................................................18

*In re Drexel Burnham Lambert Group, Inc.,*
134 B.R. 499 (Bankr. S.D.N.Y. 1991)........................................................................22, 24

*In re Edison Mission Energy,*
Case No. 12-49219 (JC) (Bankr. N.D. Ill. Jan. 17, 2013)...............................................28

*In re Energy Future Holdings Corp.,*
Case No. 14-10979 (CSS) (Bankr. D. Del. Sept. 19, 2016)............................................19

*Energy Future Holdings Corp. v. Del. Trust Co.,*
648 Fed. Appx. 277 (3d Cir. 2016)..................................................................................24

*In re Exide Techs,*
Case No. 13-11482 (KJC) (Bankr. D. Del. Feb. 4, 2015)................................................19

*In re Federal-Mogul Global Inc., T&N Limited,*
Case No. 01-10578 (JFK) (Bankr. D. Del. Feb. 7, 2007)................................................24

*In re Fiddler's Creek, LLC,*
Case No. 10-3846 (CPM) (Bankr. M.D. Fla. Feb. 25, 2011) ..........................................24

*In re Halcón Resources Corporation,*
Case No. 16-11724 (BLS) (Bankr. D. Del., Aug. 19, 2016)............................................27

*In re Hercules Offshore, Inc.,*
Case No. 15-11685 (KJC) (Bankr. D. Del. Aug. 24, 2015).............................................28

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

*In re Integrated Resources, Inc.*,
147 B.R. 650 (Bankr. S.D.N.Y. 1992) ........................................................................18

*In re Laser Realty, Inc. v. Fernandez (In re Fernandez)*,
2009 Bankr. LEXIS 2846 (Bankr. D.P.R. Mar. 31, 2009) ..........................................25

*In re Lionel Corp.*,
722 F.2d 1063 (2d Cir. 1983) ....................................................................................18

*In re Magnum Hunter Resources Corp.*,
No. 15-12533 (KG) (Bankr. D. Del. Feb. 9, 2016) ....................................................27

*In re Manuel Mediavilla, Inc.*,
568 B.R. 551 (1st Cir. B.A.P. 2017) ..........................................................................25

*Martin v. Kane (In re A&C Properties)*,
784 F.2d 1377 (9th Cir. 1986) ..................................................................................22

*In re Montgomery Ward Holding Corp.*,
242 B.R. 147 (D. Del. 1999) ......................................................................................18

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*,
478 F.3d 452 (2d Cir. 2007) ......................................................................................25

*Myers v. Martin (In re Martin)*,
91 F.3d 389 (3d Cir. 1996) ........................................................................................22

*In re Nautilus Holdings Ltd.*,
Case No. 14-22885 (RDD) (Bankr. S.D.N.Y. Oct. 3, 2014) ......................................24

*Nellis v. Shugrue*,
165 B.R. 115 (S.D.N.Y. 1994) ....................................................................................23

*In re Pacific Gas and Elec. Co.*,
304 B.R. 395 (Bankr. N. D. Cal. 2004) ................................................................23, 24

*In re Pacific Gas and Electric Company*,
Case No. 01-30923 (DM) (Bankr. N.D. Cal. Mar. 5, 2002) ......................................20

*In re Pacific Gas and Electric Company*,
Case No. 01-30923 (DM) (Bankr. N.D. Cal. Mar. 27, 2002) ..........................19, 24, 25

*In re Planned Protective Servs., Inc.*,
130 B.R. 94 (Bankr. C.D. Cal. 1991) ........................................................................24

*Port O'Call Invest. Co. v. Blair (In re Blair)*,
538 F.2d 849 (9th Cir. 1976) ....................................................................................24

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
390 U.S. 414 (1968) ..................................................................................................23

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

*In re Residential Capital, LLC*,
   2013 Bankr. LEXIS 2601 (Bankr. S.D.N.Y. Jun. 27, 2013)........................24

*Smith v. Van Gorkom*,
   488 A.2d 858 (Del. 1985) ...............................................................................18

*In re Thompson*,
   965 F.2d 1136 (1st Cir. 1992)........................................................................23

*In re TK Holdings Inc.*,
   Case No. 17-11375 (BLS) (Bankr. D. Del. Dec. 13, 2017) ............................19

*In re Tronox Inc.*,
   Case No. 09-10156 (ALG) (Bankr. S.D.N.Y. Dec. 23, 2009) ........................19

*In re Walter*,
   83 B.R. 14 (B.A.P. 9th Cir. 1988)..................................................................18

*In re WCI Cable, Inc.*,
   282 B.R. 457 (Bankr. D. Or. 2002).................................................................23

*Woodson v. Fireman's Fund Ins. Co. (In re Woodson)*,
   839 F. 2d 610 (9th Cir. 1988) ........................................................................23

**Statutes**

*11 U.S.C. § 105(a)* ...............................................................................1, 17, 18, 19

*11 U.S.C. § 363(b)* ...........................................................................1, 17, 18, 19, 24

*11 U.S.C. § 1104* .........................................................................................................15

*11 U.S.C. § 1107(a)* .....................................................................................................8

*11 U.S.C. § 1108* ...........................................................................................................8

*28 U.S.C. § 157* ..............................................................................................................8

*28 U.S.C. § 1334* ............................................................................................................8

*28 U.S.C. § 1408* ............................................................................................................8

*28 U.S.C. § 1409* ............................................................................................................8

**Other Authorities**

*Fed. R. Bankr. P. 1015(b)* ...........................................................................................8

*Fed. R. Bankr. P. 2002* ...............................................................................................29

*Fed. R. Bankr. P. 6004* ...........................................................................................1, 28

*Fed. R. Bankr. P. 9019* ...................................................................................... *passim*

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. PRELIMINARY STATEMENT

In accordance with their commitment to achieve a fair and equitable resolution of these Chapter 11 Cases, the Debtors have reached a second fundamental settlement (the "**Subrogation Claims Settlement**") of their wildfire liabilities to be implemented pursuant to the *Debtors' First Amended Joint Chapter 11 Plan of Reorganization*, filed on September 23, 2019 [Docket No. 3966] (as may be further amended, modified, or supplemented, the "**Plan**").[1] The Subrogation Claims Settlement, entered into with the holders of in excess of 85% of the insurance subrogation claims (the "**Subrogation Claims**," as defined in the RSA) that may be asserted in these Chapter 11 Cases, settles more than $20 billion of potential liabilities for $11 billion to be distributed in accordance with the terms of the Plan, subject to confirmation by the Court. The Subrogation Claims Settlement significantly advances the Debtors' path to confirmation of their Plan and their successful emergence from chapter 11 on a schedule that will meet the June 30, 2020 deadline established under AB 1054.

With this second critical milestone achieved by the Debtors, the only principal obstacle to confirmation of the Plan and meeting the June 30, 2020 deadline is the determination, either consensually or through the currently pending estimation proceedings, of the Debtors' aggregate liability to the uninsured or underinsured claimants and certain limited public entities represented by the Official Committee of Tort Claimants (the "**TCC**"). As the Debtors have stated repeatedly, they are committed to working with the TCC, its professionals, and attorneys for individual groups of claimants to reach a fair and satisfactory resolution of their constituencies' claims to further advance the administration of these Chapter 11 Cases and expedite recoveries and distributions to all wildfire claimants.

The Subrogation Claims Settlement embodied in the RSA, which incorporates the Settlement Term Sheet attached to the RSA as Exhibit A (the "**Settlement Term Sheet**"), is the product of extensive, good faith, arms' length negotiations between the Debtors, the Consenting Creditors, and their respective retained professionals. Notably, the Consenting Creditors include all of the members of the Ad Hoc Subrogation Group steering committee which has actively appeared in these cases since their inception, and hold approximately 85% of all Subrogation Claims that have been asserted against

---

[1] While the Plan is attached to the RSA as Exhibit B, for the avoidance of doubt, the Debtors are not requesting approval of the Plan as part of approval of the RSA.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

the Debtors related to or in any way arising from the 2017 and 2018 Northern California wildfires that arise from subrogation, assignment, or otherwise in connection with payments made or to be made by the applicable insurer to insured tort victims, and whether arising as a matter of state or federal law. Based on information provided by members and attorneys for members of the Ad Hoc Subrogation Group, the Debtors understand that the lion's share of the Ad Hoc Subrogation Group members that are not on the steering committee collectively hold nearly all of the remaining Subrogation Claims and are expected to become Consenting Creditors and fully support the Subrogation Claims Settlement.

As demonstrated below, entry into the RSA and the Subrogation Claims Settlement represent a sound exercise of the Debtors' business judgment, and approval of the RSA and the Subrogation Claims Settlement, including the allowance of the Subrogation Claims in the amount of $11 billion on the terms and conditions provided in the RSA, as a compromise and settlement pursuant to Bankruptcy Rule 9019, easily satisfies all of the standards and requirements for a compromise and settlement under Bankruptcy Rule 9019. Simply by way of example:

- The RSA settles and resolves in excess of approximately $20 billion in Subrogation Claims under the Plan for $11 billion, representing a substantial reduction of such claims;

- The Consenting Creditors party to the RSA have agreed to support the Debtors' Plan, as set forth in the RSA, thereby greatly facilitating the Debtors' ability to successfully and timely emerge from chapter 11 by the June 30, 2020 deadline established in AB 1054;

- The RSA resolves and dispenses with the pending estimation proceedings with respect to the Subrogation Claims, thereby significantly limiting the scope, cost, and expense of those proceedings and furthering the ability of those proceedings to move forward on a timely basis; and

- The RSA eliminates the risks and uncertainties attendant to the proceedings related to the estimation of the Subrogation Claims, pending in the United States District Court, California State Supreme Court, and this Court, including the potential impact on the Debtors' other economic stakeholders, the claims and interests of which must also be addressed in these Chapter 11 Cases.

As the Court recently noted, the principal unresolved contingencies in these Chapter 11 Cases are the magnitude of the Subrogation Claims and the magnitude of the claims held by the TCC's constituency to be addressed in the Plan. With the Subrogation Claims Settlement, the Debtors have successfully resolved one of these two major contingencies, have amended their Plan to incorporate the

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

settlement, and have the funding necessary to implement the Plan, notwithstanding the arguments raised by those seeking to disrupt the process. The Subrogation Claims Settlement and the RSA constitute a pivotal development and accomplishment in these Chapter 11 Cases. They are a major achievement critical to advancing these Chapter 11 Cases to a timely and successful conclusion. The RSA and the Subrogation Claims Settlement should be approved.

## II.    JURISDICTION

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal. Feb. 22, 2016), and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California (the "**Bankruptcy Local Rules**"). This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.    BACKGROUND

On January 29, 2019 (the "**Petition Date**"), the Debtors commenced with the Court voluntary cases under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in either of the Chapter 11 Cases. The Debtors' Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

On February 12, 2019, the United States Trustee (the "**U.S. Trustee**") appointed an Official Committee of Unsecured Creditors (the "**Creditors Committee**"). On February 15, 2019, the U.S. Trustee appointed the TCC (together with the Creditors Committee, the "**Committees**").

Additional information regarding the circumstances leading to the commencement of the Chapter 11 Cases and information regarding the Debtors' businesses and capital structure is set forth in the *Amended Declaration of Jason P. Wells in Support of First Day Motions and Related Relief* [Docket No. 263] (the "**Wells First Day Declaration**").

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

# IV. MATERIAL TERMS OF THE RSA AND SUBROGATION CLAIMS SETTLEMENT

The key terms and provisions of the RSA and the Subrogation Claims Settlement are summarized below.[2]  The allowance of the Subrogation Claims in the aggregate amount of $11 billion shall be effective upon granting this Motion and is included in the Proposed Order, but treatment and satisfaction of the Subrogation Claims shall be effectuated pursuant to the Plan and, of course, the Plan is subject to confirmation and consummation in accordance with the provisions of the Bankruptcy Code.

| | |
|---|---|
| **Allowed Subrogation Claim Amount and Plan Treatment** | The Subrogation Claims shall be allowed in the aggregate amount of $11 billion pursuant to Bankruptcy Rule 9019 (the "**Allowed Subrogation Claim Amount**").  The Allowed Subrogation Claim shall be satisfied, released, and discharged on the effective date of the Plan (the "**Plan Effective Date**") upon the Debtors' making a payment of $11 billion in cash (subject to replacing a portion of the cash with Non-cash Recovery as provided in the RSA) (the "**Aggregate Subrogation Recovery**") to a trust to be established pursuant to the Plan (the "**Subrogation Trust**") for the benefit of holders of Subrogation Claims, as provided in the Plan.  The Allowed Subrogation Claim Amount shall be binding in the Chapter 11 Cases, except as expressly set forth in the RSA.  No postpetition interest shall be paid with respect to the Allowed Subrogation Claim Amount. |
| **Allocation Agreement** | Members of the Ad Hoc Subrogation Group will enter into a separate agreement (the "**Allocation Agreement**"), which agreement shall govern the distribution of the Aggregate Subrogation Recovery to holders of Subrogation Claims in accordance with relative recovery percentages assigned to individual wildfires or groups of wildfires. The Debtors will not be party to the Allocation Agreement and will not have any input regarding the terms thereof and shall not be bound or otherwise prejudiced by the Allocation Agreement or any terms thereof.  Any breach, default, or invalidity of the terms of the Allocation Agreement shall have no impact on the Debtors', breaching party's, or any other party's obligations under the RSA. |
| **Currency** | The Aggregate Subrogation Recovery shall be paid in cash, unless otherwise agreed by individual holders of Subrogation Claims and the Debtors prior to the Plan Effective Date.  The Debtors agree to negotiate in good faith to provide each holder of Subrogation Claims the opportunity to receive on account of its Subrogation Claim any equity distribution (other than a rights offering) offered under the Plan on the same terms and at the same valuation as offered to any holder of an unsecured claim (including, |

---

[2] This summary is qualified in its entirety by reference to the provisions of the RSA and the Settlement Term Sheet.  To the extent that any discrepancies exist between the summary described in this Motion and the terms of the RSA or the Settlement Term Sheet, the RSA and the Settlement Term Sheet shall

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

an unsecured IP Claim or unsecured IP Claims[3] as a class) in satisfaction of such Subrogation Claim in lieu of cash (the "**Non-cash Recovery**"). In the event an individual holder of a Subrogation Claim agrees to any equity distribution on any part of its Subrogation Claims, the cash component of the Aggregate Subrogation Recovery shall be reduced by the amount such holder would have received from the Trust had it not elected such equity distribution. All holders of Subrogation Claims shall be afforded the same option to elect equity distributions on the same terms as any other holder of Subrogation Claims.

| | |
|---|---|
| **Distributions** | On the Plan Effective Date, the Subrogation Trust shall immediately pay (in cash or Non-cash Recovery, at the election of individual Subrogation Claim holders) subrogation claimants their allocable share for Subrogation Claims on account of amounts paid to insureds prior to the Plan Effective Date (the "**Initial Distribution**").<br><br>The remainder of the Aggregate Subrogation Recovery that is not part of the Initial Distribution (*i.e.* the portion of the recovery on account of Subrogation Claims arising from reserved or IBNR amounts to individual insureds as of the Plan Effective Date) (the "**Subrogation Recovery Reserve**") shall be held by the Subrogation Trust for the benefit of holders of Subrogation Claims. The Subrogation Trust shall periodically pay (in cash or Non-cash Recovery, at the election of individual Subrogation Claim holders) subrogation claimants their allocable share for Subrogation Claims on account of amounts paid to insureds after the Plan Effective Date in accordance with the Allocation Agreement. Upon the earlier of (i) 5 years after the Plan Effective Date, or (ii) the Trustee's reasonable determination that no more reserves will be paid to insureds, any remaining Subrogation Recovery Reserve shall be distributed pro rata to holders of Subrogation Claims in accordance with the Allocation Agreement. |
| **Commitments of the Consenting Creditors to Support the Plan and the Subrogation Claims Settlement** | <u>Affirmative Covenants of the Consenting Creditors</u>. Subject to the terms and conditions set forth in the RSA, each Consenting Creditor shall:<br><br>    (i)    Support and cooperate with the Debtors to obtain confirmation of the Plan, <u>provided that</u> notwithstanding anything to the contrary in the RSA, nothing in the RSA shall be deemed to (A) create an obligation to (1) take any actions outside the Chapter 11 Cases, or in the Chapter 11 Cases unrelated to the treatment of Subrogation Claims, (2) take actions inconsistent with any legal or contractual obligation or duty that the Consenting Creditor reasonably believes that it has under the law, or (3) assist the Debtors in connection with any regulatory or legislative action, or (B) limit the right of a Consenting Creditor to object to a provision of the Plan unrelated to the Subrogation Claims Settlement or implementation of the Subrogation Claims Settlement, which objection shall be limited and not seek to preclude or delay confirmation of the Plan; |

---

[3] As set forth in the RSA, "**IP Claims**" means any Wildfire Claim that is not a Public Entities Wildfire Claim or a Subrogation Claim.

(ii) timely vote or cause to be voted (when solicited to do so in accordance with the RSA after receipt of a Disclosure Statement approved by the Bankruptcy Court and by the applicable deadline for doing so) all of its Subrogation Claims to accept the Plan, and not to change or withdraw such vote prior to the voting deadline to accept or reject the Plan; provided that such vote may, upon written notice to the Debtors and the other Parties, be revoked by any Consenting Creditor at any time following termination of the RSA with respect to such Consenting Creditor;

(iii) timely vote (or cause to be voted) its Subrogation Claims against any plan, plan proposal, restructuring proposal, offer of dissolution, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Company other than the Plan (each, an "**Alternative Restructuring**");

(iv) cooperate in good faith with respect to any subpoena served on the holders of Subrogation Claims or their counsel (whether prior to or after the effectiveness of the RSA) in connection with or related to Estimation Proceedings; and

(v) enter into a joint stipulation with the Debtors in any Estimation Proceedings that (A) informs the relevant court that the Debtors are no longer moving to estimate the Subrogation Claims and (B) withdraws the Consenting Creditors and the Ad Hoc Professionals (as defined below) from any such proceeding (as applicable), without prejudice, when the RSA Approval Order is entered by the Bankruptcy Court.

Negative Covenants of the Consenting Creditors. Subject to the terms and conditions set forth in the RSA, each Consenting Creditor shall not:

(i) delay, impede, or take any other action to interfere with the acceptance or implementation of the Plan, including to vote any RSA Claims to reject, the Plan; provided that (A) objecting to a provision of the Plan unrelated to the Subrogation Claims Settlement or implementation of the Subrogation Claims Settlement (which objection shall be limited and not seek to preclude or delay confirmation of the Plan), and (B) participating in any ordinary course governmental processes in a manner unrelated to the treatment of Subrogation Claims and the terms of the Subrogation Claims Settlement, in each case, shall not be deemed to delay, impede, or interfere with confirmation of the Plan; provided that taking any action under either clause (A) or (B) above shall not in any way be a basis for a Consenting Creditor to not vote RSA Claims to accept the Plan (it being agreed by the Debtors that the vote of a Consenting Creditor to accept the Plan shall not be deemed to waive or otherwise limit its right to object to a provision of the Plan under clause (A));

(ii) directly or indirectly, file, propose, support, solicit, assist, encourage, or participate in the formulation of or vote for any Alternative Restructuring or settlement of the Subrogation Claims other than as set forth in the RSA;

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

(iii) take any action to delay, impede, or contest any Estimation Proceedings; or

(iv) directly or indirectly, encourage any entity to undertake any action prohibited by the foregoing.

Nothing in the RSA shall prohibit any Consenting Creditor from (A) taking any action with regard to any Claims or interests it holds that are not RSA Claims, (B) appearing as a party-in-interest in any matter arising in the Chapter 11 Cases, and (C) taking or directing any action to be taken relating to maintenance, protection, preservation or defense of any Claims and interests; provided that, in each case, any such action is not inconsistent with such Consenting Creditor's obligations under the RSA; and nothing in the RSA shall prohibit any Consenting Creditor from (X) enforcing any right, remedy, condition, consent, or approval requirement under the RSA or any Definitive Documents, or (Y) taking any action to oppose any Alternative Restructuring. Nothing shall prohibit any Consenting Creditor from taking any action with regard to any administrative expense claims that it holds against the Debtors, or the Debtors from taking any action with respect thereto.

| **Commitments of the Debtors** | Affirmative Covenants of the Debtors. Subject to the terms and conditions of the RSA, the Debtors shall:

(i) use commercially reasonable efforts to propose and pursue the Plan and seek the entry of a Confirmation Order, which incorporate the terms of the Subrogation Claims Settlement;

(ii) use commercially reasonable efforts to support, implement, and complete the Subrogation Claims Settlement and all transactions contemplated under the RSA;

(iii) upon entry into any settlement with any holder or holders of IP Claims that fixes the amount or terms for satisfaction of an IP Claim, including with respect to rights against a post-Plan Effective Date trust established for the resolution and payment of such Claims, require, as a condition to payment or other distribution to or for the benefit of such holder pursuant to such settlement or other agreement, that the holder of the IP Claim contemporaneously execute and deliver a release and waiver of any and all claims to the fullest extent permitted by law against all parties in interest in the Chapter 11 Cases, including any potential made-whole claims against present and former holders of Subrogation Claims, which release shall be in form and substance reasonably acceptable to the Debtors and Requisite Consenting Creditors (as defined below) (the "**Settlement Payment Condition**");

(iv) use commercially reasonable best efforts to seek confirmation of the Plan on or prior to automatic termination of the RSA;

(v) propose and pursue the Plan and seek entry of a Confirmation Order that contain the following provisions, findings and orders in substantially the form set forth below (the "**Findings and Orders**"): |

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

*(A)      the Bankruptcy Court "has determined that the resolution of the insolvency proceeding provides funding or establishes reserves for, provides for assumption of, or otherwise provides for satisfying any prepetition wildfire claims asserted against the electrical corporation in the insolvency proceeding in the amounts agreed upon in any pre-insolvency proceeding settlement agreements or any post-insolvency settlement agreements, authorized by the court through an estimation process or otherwise allowed by the court;" and*

*(B)      any settlement or other agreement with any holder or holders of an IP Claim that fixes the amount or terms for satisfaction of an IP Claim, including with a post-Plan Effective Date trust established for the resolution and payment of such claims, shall contain the Settlement Payment Condition;*

(vi)      use commercially reasonable efforts to promptly notify or update counsel to the Ad Hoc Subrogation Group upon becoming aware of any of the following occurrences:  (A) a Creditor Termination Event (as defined in the RSA) has occurred, or (B) any material event that would reasonably be expected to materially impede or prevent implementation of the Subrogation Claims Settlement;

(vii)      negotiate in good faith to provide each holder of Subrogation Claims the opportunity to receive on account of its Subrogation Claim any equity distribution (other than a rights offering) offered under the Plan on the same terms and at the same valuation as offered to any holder of an unsecured claim (including, an unsecured IP Claim or unsecured IP Claims as a class) in satisfaction of the Allowed Subrogation Claim in lieu of cash; and

(viii)      enter into a joint stipulation with the Consenting Creditors in any Estimation Proceedings that (A) informs the relevant court that the Debtors are no longer moving to estimate the Subrogation Claims and (B) withdraws the Consenting Creditors and the Ad Hoc Professionals from any such proceeding (as applicable), without prejudice, when the RSA Approval Order is entered by the Bankruptcy; and

(ix)      cause each of its direct and indirect subsidiaries, whether a Party to this Agreement or not, to comply with the terms of the RSA as if such entity were a Debtor entity party to the RSA.

Negative Covenants of the Company.  Subject to the terms and conditions of the RSA, the Debtors shall not, directly or indirectly:

(i)      propose, pursue, or support any Plan or Confirmation Order that does not incorporate the terms of the Subrogation Claims Settlement, including the Findings and Orders, and is not otherwise consistent with the terms of the RSA;

(ii)      propose, support, solicit, encourage, or participate in any chapter 11 plan or settlement of the Subrogation Claims other than as set forth in the RSA;

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

| | |
|---|---|
| | (iii)    enter into any settlement with any party or include any provisions in a Plan or Confirmation Order that (A) incorporates any priority of payments or waterfall provision that prioritizes recoveries on any other non-priority unsecured claims ahead of Subrogation Claims, (B) otherwise materially impairs the Debtors' ability to pay the Aggregate Subrogation Recovery in cash on the Plan Effective Date, or (C) expressly reserves the right of any holder of IP Claims to pursue made-whole claims against holders of Subrogation Claims; |
| | (iv)    directly or indirectly, take any actions, or fail to take any actions, where such taking or failing to take actions would be, in either case, (A) inconsistent with the RSA or (B) otherwise inconsistent with, or reasonably expected to prevent, interfere with, delay or impede the implementation or consummation of, the Plan or the Subrogation Claims Settlement; or |
| | (v)    directly or indirectly, encourage any entity to undertake any action prohibited by the foregoing. |
| **Termination Rights and Circumstances under which the Allowed Subrogation Claim Amount Survives Termination** | <u>Individual Consenting Creditor Termination</u>.  Any individual holder of Subrogation Claims shall be entitled to terminate the RSA as to itself if the Aggregate Subrogation Recovery is modified. <br><br> <u>Automatic Termination</u>.  The RSA will terminate automatically if, (i) the Plan is not confirmed by June 30, 2020 (or such later date as may be authorized by any amendment to AB 1054), or (ii) the Plan Effective Date does not occur prior to December 31, 2020 (or six months following the deadline for confirmation of the Plan if such deadline is extended by any amendment to AB 1054); <u>provided</u>, such deadlines may be extended by mutual written consent of the Debtors and Consenting Creditors holding at least 51% of the dollar amount of the RSA Claims then party to the RSA. Following such a termination, the Allowed Subrogation Claim Amount shall be binding in the Chapter 11 Cases, and shall survive termination of the RSA. <br><br> <u>Insolvency Termination</u>.  Consenting Creditors holding at least 66 $^2/_3$% of the claims held by Consenting Creditors at the time of determination (the "**Requisite Consenting Creditors**") may terminate the RSA if, upon the advice of the Ad Hoc Professionals (after consultation with the Debtors' professionals), they reasonably determine in good faith at any time prior to confirmation of the Plan, that the Debtors are (i) insolvent (whether as a result of judicial findings arising from the Estimation Proceedings, litigation related to the IP Claims, the incurrence of post-petition wildfire liabilities, or otherwise), or (ii) unable to raise sufficient capital to pay the Aggregate Subrogation Recovery in cash and any agreed upon Non-Cash Recovery on the Plan Effective Date; <u>provided</u> that the Debtors shall retain the right to promptly contest any such determination in the Bankruptcy Court whose determination shall be binding for purposes of the RSA.  If the Requisite Consenting Creditors elect to terminate the RSA following either of the foregoing determinations, subject to the Bankruptcy Court's ruling if such determination is disputed by the Debtors (an "**Insolvency Termination**"), then the Allowed Subrogation Claim Amount shall no |

longer be binding in the Chapter 11 Cases, and the holders of Subrogation Claims, the Debtors and other parties in interest shall have all rights reserved, including with respect to the amount, future allowability and treatment of all Subrogation Claims.

<u>Requisite Consenting Creditors Termination Events</u>. The Requisite Consenting Creditors may terminate the RSA upon delivery of written notice to the Company at any time after the occurrence of or during the continuation of any of the following events (each, a "**Creditor Termination Event**"):

      (i)    the breach by the Company of any of its obligations, representations, warranties, or covenants set forth in the RSA;

      (ii)    the Debtors at any time either (A) fail to propose and pursue a Plan and Confirmation Order that contain the terms of the Subrogation Claims Settlement, including the Findings and Orders, and are otherwise consistent with the terms of the RSA, or (B) propose, pursue or support or announce in writing or in court an intention to propose, pursue or support a Plan or Confirmation Order inconsistent with the terms of the Subrogation Claims Settlement, the Findings and Orders, or the terms of the RSA;

      (iii)    the Plan proposed and pursued by the Debtors does not treat the IP Claims consistent with the provisions of AB 1054;

      (iv)    the Bankruptcy Court allows a plan proponent other than the Debtors to commence soliciting votes on a plan other than the Plan incorporating the Subrogation Claims Settlement, and the Debtors have not already solicited, or are not simultaneously soliciting, votes on the Plan incorporating the Subrogation Claims Settlement;

      (v)    the Bankruptcy Court confirms a plan other than the Plan incorporating the Subrogation Claims Settlement;

      (vi)    the Plan is, or is modified to be, inconsistent with the Subrogation Claims Settlement;

      (vii)    the issuance, promulgation, or enactment by any governmental entity, including any regulatory or licensing authority or court of competent jurisdiction (including, without limitation, an order of the Bankruptcy Court which has not been stayed), of any statute, regulation, ruling or order declaring the Plan or any material portion thereof (in each case, to the extent it relates to the Subrogation Claims Settlement or the terms of the RSA) to be unenforceable or enjoining or otherwise restricting the consummation of any material portion of the Plan (to the extent it relates to the Subrogation Claims Settlement) or the Subrogation Claims Settlement, and such ruling, judgment, or order has not been stayed, reversed, or vacated, within fifteen (15) calendar days after issuance;

      (viii)  a trustee under section 1104 of the Bankruptcy Code or an examiner with expanded powers shall have been appointed in the Chapter 11 Cases; or

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

(ix)    an order for relief under chapter 7 of the Bankruptcy Code shall have been entered in the Chapter 11 Cases, or the Chapter 11 Cases shall have been dismissed, in each case by order of the Bankruptcy Court.

The Debtors shall have ten (10) days from the receipt of any written notice of termination from the Requisite Consenting Creditors to cure any purported default or Creditor Termination Event.

The Requisite Consenting Creditors may elect to pursue a higher claim amount by written notice to the Debtors of such election within ten (10) days of termination following a Creditor Termination Event (the "**Allowance Termination Notice**"). Following the delivery of an Allowance Termination Notice, the Allowed Subrogation Claim Amount shall no longer be binding in the Chapter 11 Cases, and the holders of Subrogation Claims, the Debtors and other parties in interest shall have all rights reserved, including with respect to the amount, future allowability and treatment of all Subrogation Claims.

Debtors' Termination. The Debtors may terminate the RSA by written notice to the Ad Hoc Professionals upon (each, a "**Debtor Termination Event**"):

(i)    the breach by Consenting Creditors holding at least 5% of the RSA Claims then party to the RSA (measured either by dollar amount or number of holders) of any of their undertakings, obligations, representations, warranties, or covenants set forth in the RSA. In the event the Debtors terminate on this basis, the Allowed Subrogation Claim Amount shall no longer be binding in the Chapter 11 Cases, and the holders of Subrogation Claims, the Debtors and other parties in interest shall have all rights reserved, including with respect to the amount, future allowability and treatment of all Subrogation Claims; or

(ii)    (A) the Bankruptcy Court confirms a plan other than the Plan incorporating the Subrogation Claims Settlement, or (B) the issuance, promulgation, or enactment by any governmental entity, including any regulatory or licensing authority or court of competent jurisdiction (including, without limitation, an order of the Bankruptcy Court which has not been stayed), of any statute, regulation, ruling or order declaring the Plan or any material portion thereof (in each case, to the extent it relates to the Subrogation Claims Settlement or the terms of the RSA) to be unenforceable or enjoining or otherwise restricting the consummation of any material portion of the Plan (to the extent it relates to the Subrogation Claims Settlement) or the Subrogation Claims Settlement, and such ruling, judgment, or order has not been stayed, reversed, or vacated, within fifteen (15) calendar days after issuance. Following a termination on either of the bases in this subsection, unless otherwise ordered by a court of competent jurisdiction or governmental entity, the Allowed Subrogation Claim Amount shall be binding in the Chapter 11 Cases, and shall survive such termination of the RSA, subject to the right of the Requisite Consenting Creditors to deliver an Allowance Termination Notice.

(x)    Notwithstanding the foregoing, the Consenting Creditors shall have ten (10) days from the receipt of any such written notice of

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

| | |
|---|---|
| | termination from the Debtors to cure any purported default or Debtor Termination Event. The Debtor Termination Event set forth in clause (i) above shall be deemed cured if, ten (10) days after receipt of the termination notice, non-breaching Consenting Creditors party to the RSA (A) hold at least 95% of the RSA Claims (in dollar amount), and (B) out number RSA Claim holders breaching this Agreement by a ratio of 19-1. |
| **Payment of Ad Hoc Subrogation Group Professional Fees** | Following Bankruptcy Court approval of the RSA ("**RSA Approval**") and, for so long as the RSA remains in full force and effect, the Debtors shall pay the reasonable, documented and contractual professional fees and expenses of (i) Willkie Farr & Gallagher LLP, (ii) Rothschild & Co., (iii) Diemer & Wei LLP, (iv) Kekst and Company Incorporated d/b/a Kekst CNC, and (v) Wilson Public Affairs (collectively the "**Ad Hoc Professionals**") on a monthly basis promptly following receipt of summary invoices. |
| | Upon the Plan Effective Date, and in the event that the Subrogation Claims Settlement has not been terminated prior to the Plan Effective Date, the Debtors shall pay or reimburse the members of the Ad Hoc Subrogation Group for the reasonable, documented and contractual professional fees and expenses invoiced through RSA Approval by the Ad Hoc Professionals up to an aggregate amount of $55 million (including fees and expenses invoiced before and after RSA Approval and which shall include success fees, transaction fees, or similar fees). |
| **Restrictions on Transfers of RSA Claims** | Each Consenting Creditor agrees that it shall not sell, assign, grant, transfer, convey, hypothecate or otherwise dispose of (each, a "**Transfer**") any of its Subrogation Claims, except to a party that (i) is a Consenting Creditor, or (ii), as a condition subsequent to the effectiveness of any such Transfer, executes and delivers a Transfer Agreement in the form attached to the RSA as <u>Exhibit C</u>, and any such RSA Claim automatically shall be deemed to be subject to the terms of the RSA. |

## V. BASIS FOR RELIEF REQUESTED

1. **The RSA Represents a Substantial Achievement and Milestone in the Chapter 11 Cases, Is a Sound Exercise of the Debtors' Business Judgment, and Should be Approved Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code.**

The RSA encompasses a comprehensive settlement resulting from extensive, good faith negotiations among the Debtors, the Consenting Creditors, and their respective retained professionals. The RSA reflects a substantial compromise of the Subrogation Claims, resolves a key element necessary for the successful resolution of these Chapter 11 Cases, dispenses with a substantial portion of the pending estimation proceedings and the costs, expenses, and uncertainty associated therewith, and paves the way towards confirmation of the Debtors' Plan in keeping with the June 2020 deadline established

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

under AB 1054. Indeed, it is difficult to overstate the importance of this achievement in the context of these Chapter 11 Cases.

The Court may authorize the Debtors to enter into, and perform under, the RSA pursuant to sections 363(b) and 105(a) of the Bankruptcy Code. Section 363(b) provides, in pertinent part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 105(a) further provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Together, these sections of the Bankruptcy Code provide the Court with ample authority and discretion to grant the requested relief herein. *See In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Walter*, 83 B.R. 14, 17 (B.A.P. 9th Cir. 1988) ("The bankruptcy court has considerable discretion in deciding whether to approve or disapprove the use of estate property by a debtor in possession, in the light of sound business justification."); *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011) ("The business judgment standard in section 363 is flexible and encourages discretion."); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (use of assets outside the ordinary course of business permitted if "sound business purpose justifies such actions"); *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

Once a debtor articulates a valid business justification under section 363 of the Bankruptcy Code, a presumption arises that the debtor's decision was made on an informed basis, in good faith, and in the honest belief, the action was in the best interest of the company. *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). *See also, In re AWTR Liquidation Inc.,* 548 B.R. 300, 314 (Bankr. C.D. Cal. 2016) (referencing the Cal. Prac. Guide: Corps. (The Rutter Group 2015) Ch. 6–C); *Integrated Resources, Inc.*, 147 B.R. at 656; *In re Johns-Manville Corp.*, 60 B.R. at 615–16 ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions"). Thus, if, as here, a debtor's actions satisfy the business judgment

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

Courts have relied on both sections 363(b) and 105(a) when approving plan support agreements such as the RSA, routinely finding that such relief is entirely consistent with the applicable provisions of the Bankruptcy Code. *See, e.g., In re Pacific Gas and Electric Company*, Case No. 01-30923 (DM) (Bankr. N.D. Cal. Mar. 27, 2002) [Docket No. 5558] (order approving proposed settlement of approximately $2 billion in asserted unsecured claims against the debtor as part of plan support agreement under sections 363(b) and 105(a) of the Bankruptcy Code); *In re TK Holdings Inc.*, Case No. 17-11375 (BLS) (Bankr. D. Del. Dec. 13, 2017) [Docket No. 1359] (order approving postpetition plan support agreement pursuant to sections 363(b) and 105(a) of the Bankruptcy Code); *In re Energy Future Holdings Corp.*, Case No. 14-10979 (CSS) (Bankr. D. Del. Sept. 19, 2016) [Docket No. 9584] (order granting debtors' motion pursuant to sections 363(b) and 105(a) of the Bankruptcy Code to enter into and perform under plan support agreement); *In re Energy Future Holdings Corp.*, Case No. 14-10979 (CSS) (Bankr. D. Del. Sept. 18, 2015) [Docket No. 6097] (same); *see also In re Exide Techs*, Case No. 13-11482 (KJC) (Bankr. D. Del. Feb. 4, 2015) [Docket No. 3087] (order authorizing debtor to enter into plan support agreement pursuant to sections 363(b) and 105(a) of the Bankruptcy Code); *In re Tronox Inc.*, Case No. 09-10156 (ALG) (Bankr. S.D.N.Y. Dec. 23, 2009) [Docket No. 1030] (same).

Indeed, in the 2001 Pacific Gas and Electric chapter 11 case, this Court approved a settlement and plan support agreement pursuant to Bankruptcy Code sections 363(b) and 105(a) and Bankruptcy Rule 9019, between the Utility and a group of senior debtholders holding approximately $2 billion in prepetition general unsecured claims on terms similar to those at issue here in the RSA and the Subrogation Claims Settlement. *In re Pacific Gas and Electric Company*, Case No. 01-30923 (DM) (Bankr. N.D. Cal. Mar. 27, 2002) [Docket No. 5558]. In that case, this Court approved a postpetition settlement and support agreement pursuant to which the parties agreed, among other things, that: (i) the debtholders would support and, subject to receipt of a court-approved disclosure statement, vote their claims, which would be treated as impaired general unsecured claims, in favor of confirmation of the Utility's chapter 11 plan; (ii) as a part of the settlement, the senior debtholders' allowed claims would be fixed in the principal amount outstanding under their applicable prepetition debt instruments, plus

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

agreed upon rates of interest; (iii) the Utility would make payment during the chapter 11 case of accrued and unpaid pre- and postpetition interest commencing immediately following approval of the settlement agreement by the Court; and (iv) the Utility would pay certain reasonable costs and expenses of the supporting debtholders during the case, including the reasonable fees and expenses of counsel. *In re Pacific Gas & Electric Company*, Case No. 01-30923 (DM) (Bankr. N.D. Cal. Mar. 5, 2002) [Docket No. 5013].

As is the case here, the parties to that settlement and support agreement approved by the Court agreed that the allowed amount of the senior debtholders' claims would survive termination of the plan support agreement in certain circumstances. *Id*. Also as is the case with the Subrogation Claims Settlement, the parties to that settlement and support agreement further agreed that certain of their respective obligations under the settlement agreement, including the debtholders' commitment to support the Utility's plan, could be terminated following a determination of the debtor's insolvency by the Bankruptcy Court. *Id*. Accordingly, approval of the terms of the RSA and the Subrogation Claims Settlement is in line with precedents previously approved by this and other Courts.

The RSA and the settlement embodied therein are the product of months of arms' length, good faith negotiations that were successful in building a consensus with a one of the Debtors' largest creditor constituencies and resolving unliquidated and contested liabilities that are critical to the chapter 11 plan process and the successful administration of these cases. The Subrogation Claims represent an estimated $20 billion in asserted claims against the Debtors, which, pursuant to the RSA and the Plan, will be satisfied and discharged subject to confirmation of the Plan for $11 billion, a significant reduction and substantial achievement for the estates and these Chapter 11 Cases, given the magnitude and complexity of the asserted Subrogation Claims and the obvious risks attendant to the estimation process. Pursuant to the RSA, the Consenting Creditors have agreed to vote for, and support the Debtors' Plan, subject to receipt of a Disclosure Statement approved by the Bankruptcy Court and the other provisions of the RSA. This represents substantial additional consensus and support for the Debtors' Plan, with now two of the three wildfire claim constituencies supporting confirmation of the Debtors' Plan. Notably, the RSA has the support of in excess of 85% of the claims held by the Subrogation Claimants and the Debtors expect this percentage to increase significantly prior to the hearing on this Motion.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

After assessing the Subrogation Claims, in the context of these cases, the Debtors concluded that the Subrogation Claims Settlement is in the best interests of the Debtors and their estates. The Debtors have evaluated and assessed the Subrogation Claims considering, among other things, claims information provided to the Debtors by the Ad Hoc Subrogation Group during and after formal mediations between the two parties. The claims information provided by the Ad Hoc Subrogation Group indicates that to date, total claims had been paid in excess of $15 billion with respect to the 2017 and 2018 Northern California wildfires. The information further showed a reserve amount of $3.7 billion, and allocations for Incurred but Not Reported and Incurred but Not Enough Reserved amounts of $2 billion based on the insurers' estimation of anticipated claims that had not yet been filed or reported.

These amounts, along with legal fees and prejudgment interest that could be asserted against the Debtors, represent potential exposure of over $20 billion. The Debtors have weighed this potential exposure against the costs, burdens, and uncertainties of further litigation and determined that settling the Subrogation Claims at approximately 55 cents on the dollar, a settlement rate that falls within the range of historical averages for wildfire-related events, is a prudent exercise of business judgment on behalf of the Debtors.

The negotiations culminating in the Subrogation Claims Settlement were presented and discussed with management and the Debtors' Board of Directors (the "**Board**") throughout the entirety of the negotiation process. The Board and management were presented with data, information, and analysis pertaining to the Debtors' estimation of their potential liability with respect to the Subrogation Claims on multiple occasions and thoroughly evaluated, with the assistance of outside counsel and advisors, all aspects of the Subrogation Claims Settlement. The result of those deliberations was the decision to enter into the Subrogation Claims Settlement pursuant to the terms of the RSA.

Absent approval of the RSA and the underlying Subrogation Claims Settlement, the Subrogation Claims would be subject to the pending estimation proceedings before the United States District Court, the California State Superior Court, and this Court. As the Court is aware, estimation of the Subrogation Claims is likely to be a time consuming, expensive, and highly uncertain process involving complicated issues of state and federal law and fact specific issues relating to causation, liability, and damages involving not less than twenty-two separate wildfires and literally thousands of

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

underlying individual loss claims. The resolution of the Subrogation Claims pursuant to the RSA eliminates this cost, expense, and uncertainty as to all Subrogation Claims in a fair and reasonable manner, and facilitates the ability of the estimation proceedings to move forward with respect to the remaining wildfire claimants on a timely basis. Additionally, as stated, the RSA avoids the risks and uncertainties of the estimation proceedings to the Debtors and their other economic stakeholders with respect to a major claims constituency, providing greater certainty to the Plan process and the Debtors' timely emergence from chapter 11. As a consequence of the Subrogation Claims Settlement, only one principal impediment remains outstanding – determining the claims of those parties represented by the TCC to be addressed in the Plan. The Debtors are hopeful that those claims can be consensually resolved as well. If not, these cases are nevertheless on track to address that issue in the estimation process on a timely basis, and for the Debtors to confirm their Plan by the June 30, 2020 deadline provided in AB 1054.

In view of the magnitude of the asserted Subrogation Claims, the risks, uncertainties and expense attendant to litigation of such claims, and, perhaps most importantly, the substantial reduction in the asserted claims reflected in the settlement, the Debtors believe the Subrogation Claims Settlement certainly is fair and reasonable and represents a sound exercise of the Debtors' business judgment.

**2.      The Subrogation Claims Settlement is in the Best Interests of the Debtors' Estates and Should be Approved Pursuant to Bankruptcy Rule 9019.**

The Debtors further submit that the Subrogation Claims Settlement, including approval of the Allowed Subrogation Claim Amount and the payment of professional fees and expenses of the Ad Hoc Professionals as provided in the RSA and as described above, is in the best interests of the Debtors' estates and all stakeholders and should be approved under Bankruptcy Rule 9019.

Bankruptcy Rule 9019(a) provides "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise and settlement." Fed. R. Bankr. R. 9019(a). This rule empowers Bankruptcy Courts to approve settlements "if they are in the best interests of the estate." *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991); *see also Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996). Compromises and settlements are normal and welcomed occurrences in chapter 11 because they allow a debtor and its creditors to avoid the financial and other burdens associated with litigation over contentious issues and expedite the administration of

the bankruptcy estate. *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *Martin v. Kane (In re A&C Properties)*, 784 F.2d 1377, 1380-81 (9th Cir. 1986). The decision to approve a particular compromise lies within the sound discretion of the Court. *See Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994); *Woodson v. Fireman's Fund Ins. Co. (In re Woodson),* 839 F. 2d 610, 620 (9th Cir. 1988). A proposed compromise and settlement implicates the issue of whether it is "fair and equitable" and "in the best interest of the [debtor's] estate." *In re A&C Properties*, 784 F.2d at 1381. The court must apprise itself "of all relevant facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." *Prot. Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc.*, 390 U.S. at 424.

Courts in this jurisdiction typically consider the following factors in determining whether a settlement should be approved: (i) the probability of success in litigation, with due consideration for the uncertainty in fact and law; (ii) the difficulties, if any, to be encountered in the matter of collecting any litigated judgment; (iii) the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay; and (iv) the paramount interest of the creditors and the proper deference to their reasonable views in the premises. *See In re Woodson,* 839 F. 2d at 620 (quoting *A&C Props.*, 784 F.2d at 1380). It is not necessary that the conclusions reached in the consideration of each of the above factors support the settlement, but taken as a whole, those conclusions must favor the approval of the settlement. *See In re Pacific Gas and Elec. Co.*, 304 B.R. 395, 417 (Bankr. N. D. Cal. 2004) (citing *In re WCI Cable, Inc.*, 282 B.R. 457, 473-74 (Bankr. D. Or. 2002)).

The standard courts apply for approval of settlements under Bankruptcy Rule 9019 is deferential to the debtor's judgment and merely requires the Court to ensure that the settlement does not fall below the lowest point in the range of reasonableness in terms of benefits to the debtor. *See Allied Waste Serves. Of Mass., LLC (In re Am. Cartage, Inc.)*, 656 F.3d 82, 92 (1st Cir. 2011) ("The task of both the bankruptcy court and any reviewing court is to canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness . . . If a trustee chooses to accept a less munificent sum for a good reason (say, to avoid potentially costly litigation), his judgment is entitled to some deference.") (*citing In re Thompson*, 965 F.2d 1136, 1145 (1st Cir. 1992)); *Shugrue*, 165 B.R. at 123 (a court need not be aware of or decide the particulars of each individual claim resolved by the

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

settlement or "assess the minutia of each and every claim"; rather, a court "need only canvass the issues and see whether the settlement falls 'below the lowest point in the range of reasonableness.'"); *see also, In re Pacific Gas and Elec. Co.*, 304 B.R. at 417; *In re Planned Protective Servs., Inc.*, 130 B.R. 94, 99 n.7 (Bankr. C.D. Cal. 1991) (same).

While a court must "evaluate . . . all . . . factors relevant to a fair and full assessment of the wisdom of the proposed compromise," *Anderson*, 390 U.S. at 424-25, a court need not conduct a "mini-trial" of the merits of the claims being settled, *Port O'Call Invest. Co. v. Blair (In re Blair),* 538 F.2d 849, 851 (9th Cir. 1976), or conduct a full independent investigation. *Drexel Burnham Lambert Group*, 134 B.R. at 496. As one court explained in assessing a global settlement of claims, "[t]he appropriate inquiry is whether the Settlement Agreement *in its entirety* is appropriate for the . . . estate." *Air Line Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 430 (S.D.N.Y. 1993), *aff'd* 17 F.3d 600 (2d Cir. 1993) (emphasis added).

In line with these principles, many courts have approved settlements and support agreements similar to the Subrogation Claims Settlement and RSA under Bankruptcy Rule 9019. *See, e.g., In re Pacific Gas and Electric Company*, Case No. 01-30923 (DM) (Bankr. N.D. Cal. Mar. 27, 2002) [Docket No. 5558] (approving a settlement, as part of plan support agreement with senior debtholders, pursuant to Bankruptcy Rule 9019); *Energy Future Holdings Corp. v. Del. Trust Co.*, 648 Fed. Appx. 277, 285 (3d Cir. 2016) (affirming approval under Bankruptcy Rule 9019 of holistic settlement of secured creditors' claims); *In re Residential Capital, LLC*, 2013 Bankr. LEXIS 2601 (Bankr. S.D.N.Y. Jun. 27, 2013) (order approving plan support agreement under section 363 of the Bankruptcy Code and Bankruptcy Rule 9019); *In re CHC Grp. Ltd.*, Case No. 16-31854 (BJH) (Bankr. N.D. Tex. Dec. 20, 2016) [Docket No. 1381] (order approving plan support agreement under Bankruptcy Rule 9019); *In re Federal-Mogul Global Inc., T&N Limited*, Case No. 01-10578 (JFK) (Bankr. D. Del. Feb. 7, 2007) [Docket No. 11508] (same); *In re Fiddler's Creek, LLC*, Case No. 10-3846 (CPM) (Bankr. M.D. Fla. Feb. 25, 2011) [Docket No. 702] (order approving plan support agreement and related settlement under Bankruptcy Rule 9019); *In re Nautilus Holdings Ltd.*, Case No. 14-22885 (RDD) (Bankr. S.D.N.Y. Oct. 3, 2014) [Docket No. 165] (approving a restructuring support agreement pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019); *Motorola, Inc. v. Official Comm. of*

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

*Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 467 (2d Cir. 2007) (approving settlement of lien challenge and claims of secured creditors pursuant to Bankruptcy Rule 9019 as it "cleared the way for implementation of a reorganization plan.").

Here, as stated above, the terms of the Subrogation Claims Settlement are fair and reasonable and in the best interest of the Debtors, their estates, creditors and other stakeholders, and should be approved. The Subrogation Claims Settlement is the result of protracted, good faith, arms' length negotiations among sophisticated principals and competent and experienced retained professionals who effectively and efficiently represented the interests of their respective clients.

As set forth above, the Subrogation Claims Settlement eliminates the costs, litigation, and risks associated with the estimation of the Subrogation Claims currently pending before three separate Courts. These proceedings involve complex and uncertain areas of state and federal law as well as highly fact specific issues involving twenty-two separate fires and thousands of underlying individual claims. Indeed, with respect to the Tubbs fire, the most severe 2017 fire, although the Debtors believe, as confirmed by Cal Fire, that their equipment was not involved, there can be no certainty that a jury in California Superior Court may not reach a different conclusion. As to the Subrogation Claims, the Subrogation Claims Settlement completely mitigates this risk. Courts have routinely acknowledged that uncertainty of litigation and federal policy weigh in favor of approval of settlements. *See In re Laser Realty, Inc. v. Fernandez (In re Fernandez)*, 2009 Bankr. LEXIS 2846 at *9-10 (Bankr. D.P.R. Mar. 31, 2009) ("The Court concludes that the uncertainty of the litigation between the debtors and Citibank weighs heavily in favor of the approval of the Settlement Agreement . . ."); *In re Manuel Mediavilla, Inc.*, 568 B.R. 551, 567 (1st Cir. B.A.P. 2017) (recognizing "federal policy encouraging settlement of bankruptcy litigation.").

Further, in absolute dollar terms, the settlement under any scenario clearly does not fall below the lowest point in the range of reasonableness. As stated, the assertible Subrogation Claims likely exceed $20 billion. The settled and compromised amount of $11 billion, although a very substantial sum, represents a significant reduction by approximately 45%. Again, in view of the uncertainties and risks attendant to any litigation, the Debtors' decision to accept a compromise of this magnitude plainly is reasonable and in the best interests of the Debtors' estates. And, in terms of the

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

interests of other creditors, the same factors apply. The Subrogation Claims Settlement avoids the risks of an adverse litigated outcome that could be severely detrimental to the recoveries of other creditor constituencies and serves to expedite the administration of these cases and distributions to holders of allowed claims.

> ### a. Approval of the Allowed Subrogation Claim Amount as Provided in the RSA is Reasonable and in the Best Interests of the Debtors, their Estates, and their Other Stakeholders.

Approval of the Allowed Subrogation Claim Amount at this time as provided in the RSA, separate and apart from Plan confirmation, is also reasonable and should be approved as a key element of the Subrogation Claims Settlement. As set forth above and in the RSA, the $11 billion Allowed Subrogation Claim Amount, which represents a significant reduction of the total asserted Subrogation Claims, will be binding in these cases (including following conversion to cases under chapter 7 of the Bankruptcy Code or appointment of a chapter 7 or chapter 11 trustee) in all instances except (i) in the event of an Insolvency Termination; (ii) following delivery of an Allowance Termination Notice in accordance with the RSA (Requisite Consenting Creditors Termination Events), and (iii) in the event of termination of the RSA by the Debtors pursuant to Section 5(e)(i) of the RSA (Breach by Consenting Creditors Holding At Least 5% of RSA Claims).

The allowance of the Subrogation Claims as provided in the RSA and the circumstances under which the Allowed Subrogation Claim Amount remains binding or not in these cases is the product of extensive negotiations that took into account and balanced, among other things, the agreement by the Consenting Creditors to forego participating in the estimation proceedings based on the ability to receive under the Plan the treatment they bargained for that is provided for in the RSA. If the RSA is terminated under circumstances where the Debtors, because of their breach or because it is apparent that the Debtors are unable to consummate the Subrogation Claims Settlement under the Plan, the Consenting Creditors no longer will be bound to the compromised claim amount and, if the Consenting Creditors elect to seek a higher claim amount, all parties' rights would be reserved. In the other circumstances under the RSA and described above, where the Allowed Subrogation Claim Amount remains binding, the Debtors believe it is appropriate for the allowed claim to remain in effect.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Other courts have approved the allowance of claims in connection with settlements and plan support agreements. *See, e.g., In re CHC Group Ltd.*, Case No. 16-31854 (BJH) (Bankr. N.D. Tex. Dec. 20, 2016) [Docket No. 1381] (allowing as administrative expense claims certain fees and expenses related to the settlement and support agreement); *In re City of Detroit, Michigan*, Case No. 13-53846 (SWR) (Bankr. S.D. Mich. Apr. 15, 2014) [Docket No. 4094] (approving the allowance of certain prepetition swap claims against the Debtor upon the approval of settlement and plan support agreement); *see also, In re Pacific Gas and Electric Company*, Case No. 01-30923 (DM) (Bankr. N.D. Cal. Mar. 27, 2002) [Docket No. 5558] (approving settlement and plan support agreement that fixed the principal claim amounts of supporting senior debtholders holding approximately $2 billion in unsecured claims against the debtor).

### b. Payment of the Fees and Expenses of the Ad Hoc Professionals is Reasonable and Warranted under the Circumstances.

The payment of fees and expenses of the Ad Hoc Professionals in accordance with the RSA is also a reasonable exercise of the Debtors' business judgment and likewise should be approved in connection with the RSA and Subrogation Claims Settlement. The Ad Hoc Professionals, who have been active participants in these Chapter 11 Cases since the outset, were instrumental in the negotiation of the RSA and the Subrogation Claims Settlement, that clearly is beneficial to the Debtors' estates and the successful resolution of these cases. Under these circumstances, it is reasonable for the Debtors' estates as part of the settlement to cover such professional fees and expenses as provided in the RSA. Similar provisions have been approved in connection with support agreements in other cases. *See, e.g., In re Pacific Gas and Electric Company*, Case No. 01-30923 (DM) (Bankr. N.D. Cal. Mar. 27, 2002) [Docket No. 5558] (approving settlement and support agreement that included payment of the fees and expenses of supporting parties on a current and ongoing basis); *In re Halcón Resources Corp.*, Case No. 16-11724 (BLS) (Bankr. D. Del., Aug. 19, 2016) [Docket No. 138] (approving assumption of restructuring support agreement that included payment of professional fees of certain supporting unsecured noteholders); *In re Magnum Hunter Resources Corp.*, No. 15-12533 (KG) (Bankr. D. Del. Feb. 9, 2016) [Docket No. 503] (approving assumption of restructuring support agreement that provided for payment of unsecured noteholders' postpetition professionals' fees and expenses); *In re Hercules Offshore, Inc.*, Case No. 15-11685 (KJC) (Bankr. D. Del. Aug. 24, 2015) [Docket No. 95] (same).

Similarly, courts have approved payment of unsecured creditor constituency professional fees and expenses even without binding commitments to support or fund a transaction. *See, e.g., In re Edison Mission Energy*, Case No. 12-49219 (JC) (Bankr. N.D. Ill. Jan. 17, 2013) [Docket No. 317] (approving the assumption of an unsecured noteholder group professional's engagement letter and payment of fees and expenses thereunder); *In re AMR Corp.*, Case No. 11-15463 (SHL) (Bankr. S.D.N.Y. Sept. 21, 2012) [Docket No. 4651] (approving a fee letter providing for payment of an unsecured creditor group's professional fees and expenses).

Based on the foregoing, the Debtors respectfully request that the Court approve the Subrogation Claims Settlement, including approval of the Allowed Subrogation Claim Amount and the payment of fees and expenses of the Ad Hoc Professionals as provided therein, as such action is a reasonable exercise of the Debtors' business judgment and is supported by valid business justifications.

## VI.    REQUEST FOR WAIVER OF BANKRUPTCY RULE 6004(h)

The Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). The Debtors request that any order approving the Motion be effective immediately upon entry by providing that the 14-day stay shall not apply. Immediate implementation of the RSA is in the best interests of the Debtors and all parties in interest.

## VII.    NOTICE

Notice of this Motion will be provided to (i) the Office of the United States Trustee for Region 17 (Attn: Andrew Vara, Esq. and Timothy Laffredi, Esq.); (ii) counsel to the Creditors Committee; (iii) counsel to the Tort Claimants Committee; (iv) the Securities and Exchange Commission; (v) the Internal Revenue Service; (vi) the Office of the California Attorney General; (vii) the California Public Utilities Commission; (viii) the Nuclear Regulatory Commission; (ix) the Federal Energy Regulatory Commission; (x) the Office of the United States Attorney for the Northern District of California; (xi) counsel for the agent under the Debtors' debtor in possession financing facility; (xii) the Consenting Creditors as set forth in the RSA; and (xiii) those persons who have

formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002. The Debtors respectfully submit that no further notice is required.

No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request entry of an order granting (i) the relief requested herein as a sound exercise of the Debtors' business judgment, appropriate under section 363(b) and 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, and in the best interests of their estates, creditors, shareholders, and all other parties in interest, and (ii) the Debtors such other and further relief as the Court may deem just and appropriate.

Dated: September 24, 2019

**WEIL, GOTSHAL & MANGES LLP**

**KELLER & BENVENUTTI LLP**

By: _/s/ Stephen Karotkin_
　　　Stephen Karotkin

*Attorneys for Debtors and Debtors in Possession*

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119