| | |
|---|---|
| WEIL, GOTSHAL & MANGES LLP<br>Stephen Karotkin (*pro hac vice*)<br>(stephen.karotkin@weil.com)<br>Ray C. Schrock, P.C. (*pro hac vice*)<br>(ray.schrock@weil.com)<br>Jessica Liou (*pro hac vice*)<br>(jessica.liou@weil.com)<br>Matthew Goren (*pro hac vice*)<br>(matthew.goren@weil.com)<br>767 Fifth Avenue<br>New York, NY 10153-0119<br>Tel: 212 310 8000<br>Fax: 212 310 8007<br><br>KELLER & BENVENUTTI LLP<br>Tobias S. Keller (#151445)<br>(tkeller@kellerbenvenutti.com)<br>Jane Kim (#298192)<br>(jkim@kellerbenvenutti.com)<br>650 California Street, Suite 1900<br>San Francisco, CA 94108<br>Tel: 415 496 6723<br>Fax: 650 636 9251<br><br>*Attorneys for Debtors*<br>*and Debtors in Possession* | CRAVATH, SWAINE & MOORE LLP<br>Paul H. Zumbro (*pro hac vice*)<br>(pzumbro@cravath.com)<br>Kevin J. Orsini (*pro hac vice*)<br>(korsini@cravath.com)<br>Omid H. Nasab (*pro hac vice*)<br>(onasab@cravath.com)<br>825 Eighth Avenue<br>New York, NY 10019<br>Tel: 212 474 1000<br>Fax: 212 474 370 |

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>**Debtors.**<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case No. 19-30088 (DM)<br>Chapter 11 (Lead Case) (Jointly Administered)<br><br>**DECLARATION OF JASON P. WELLS IN SUPPORT OF DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 363(b) AND 105(a) AND FED. R. BANKR. P. 6004 AND 9019 FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO ENTER INTO RESTRUCTURING SUPPORT AGREEMENT WITH THE CONSENTING SUBROGATION CLAIMHOLDERS, (II) APPROVING THE TERMS OF SETTLEMENT WITH SUCH CONSENTING SUBROGATION CLAIMHOLDERS, INCLUDING THE ALLOWED SUBROGATION CLAIM AMOUNT, AND (III) GRANTING RELATED RELIEF**<br><br>Date: October 23, 2019<br>Time: 10:00 a.m. (Pacific Time)<br>Place: United States Bankruptcy Court,<br>Courtroom 17, 16th Floor<br>San Francisco, CA 94102<br>**Objection Deadline**: **October 16, 2019, 4:00 p.m. (PT)** |

I, Jason P. Wells, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

I am the Senior Vice President and Chief Financial Officer of PG&E Corporation ("**PG&E Corp.**"). Pacific Gas and Electric Company (the "**Utility**" and, together with PG&E Corp., the "**Debtors**") is a wholly-owned subsidiary of PG&E Corp. In 2007, I joined PG&E Corp. as the Director of Technical Accounting and was promoted to Senior Director of Corporate Accounting and Assistant Controller in 2008. I became Vice President, Finance of PG&E Corp. in October 2011, and became Vice President, Business Finance of PG&E Corp. in August 2013. I was appointed to my current position at PG&E Corp. in January, 2016. I have a bachelor's degree and a master's degree in accounting from the University of Florida and I am a Certified Public Accountant in the State of Florida.

I am authorized to submit this Declaration (the "**Declaration**") on behalf of the Debtors in support of the *Debtors' Motion Pursuant to 11 U.S.C. §§ 363(b) and 105(a) and Fed. R. Bankr. P. 6004 and 9019 for Entry of an Order(I) Authorizing the Debtors to Enter into Restructuring Support Agreement with the Consenting Subrogation Claimholders, (II) Approving the Terms of Settlement with Such Consenting Subrogation Claimholders, Including the Allowed Subrogation Claim Amount, and (III) Granting Related Relief* (the "**Motion**"), filed contemporaneously hereto.[1] The facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, and information reviewed by me in the course of my duties and responsiblities. If called upon to testify, I would testify to the facts set forth in this Declaration.

As described in the Motion, the Debtors have reached a second fundamental settlement (the "**Subrogation Claims Settlement**") of their wildfire liabilities as set forth in that certain Restructuring Support Agreement, dated as of September 22, 2019 (the "**RSA**"), among the Debtors and the Consenting Creditors (as defined in the RSA) parties thereto, and to be implemented pursuant to the *Debtors' First Amended Joint Chapter 11 Plan of Reorganization*, filed on September 23, 2019 [Docket

---

[1] Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the Motion.

No. 3966] (as may be further amended, modified, or supplemented, the "**Plan**").[2] The RSA is attached as Exhibit A to the Motion. I believe that the Subrogation Claims Settlement with a major constituency in these Chapter 11 Cases significantly advances the Debtors' path to confirmation of their Plan and their successful emergence from chapter 11 on a schedule that will meet the June 30, 2020 deadline established under AB 1054.

The aggregate amount of Subrogation Claims that may be asserted in these Chapter 11 Cases are likely in excess of $20 billion, and pursuant to the Subrogation Claims Settlement, all Subrogation Claims will be settled for $11 billion to be distributed pursuant to, and in accordance with, the terms of the Plan, subject to confirmation of the Plan by the Court. The Consenting Creditors that are currently party to the RSA represent all of the members of the Ad Hoc Subrogation Group which has appeared in these cases since their inception. The Consenting Creditors hold approximately 85% of all Subrogation Claims that have been or could be asserted against the Debtors related to or in any way arising from the 2017 and 2018 Northern California wildfires that arise from subrogation, assignment, or otherwise in connection with payment made or to be made by the applicable insurer to insured tort victims, and whether arising as a matter of state or federal law. Based on information provided by members and attorneys for members of the Ad Hoc Subrogation Group, I understand that the lion's share of the Ad Hoc Subrogation Group members that are not on the steering committee collectively hold nearly all of the remaining Subrogation Claims and are expected to become Consenting Creditors and fully support the Subrogation Claims Settlement.

The principal terms of the RSA and the Subrogation Claims Settlement are summarized in the Motion and I am familiar with such terms and provisions. In addition, during the period that the Subrogation Claims Settlement was negotiated, I actively participated in discussions with the Debtors' management, the Board of Directors, and the Debtors' retained professionals in evaluating the issues pertinent to the Subrogation Claims Settlement and the RSA, and ultimately the Debtors' decision to enter into the RSA.

The Subrogation Claims Settlement embodied in the RSA, which incorporates the

---

[2] While the Plan is attached to the RSA as Exhibit B, for the avoidance of doubt, the Debtors are not requesting approval of the Plan as part of approval of the RSA.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Settlement Term Sheet attached to the RSA as Exhibit A (the "**Settlement Term Sheet**"), is the product of extensive good faith, arms' length negotiations between the Debtors, the Consenting Creditors, and their respective retained professionals. I believe that entry into the RSA and the Subrogation Claims Settlement represent a sound exercise of the Debtors' business judgment. Furthermore, I believe that the terms of the Subrogation Claims Settlement are fair and reasonable and in the best interest of the Debtors, their estates, creditors, and other stakeholders. For example:

- The RSA settles and resolves in excess of approximately $20 billion in Subrogation Claims under the Plan for $11 billion, representing a substantial reduction of such claims;

- The Consenting Creditors party to the RSA have agreed to support the Debtors' Plan, as set forth in the RSA, thereby greatly facilitating the Debtors' ability to successfully and timely emerge from chapter 11 by the June 30, 2020 deadline established in AB 1054;

- The RSA resolves and dispenses with the pending estimation proceedings with respect to the Subrogation Claims, thereby significantly limiting the scope, cost, and expense of those proceedings and furthering the ability of those proceedings to move forward on a timely basis; and

- The RSA eliminates the risks and uncertainties attendant to the proceedings related to the estimation of the Subrogation Claims, pending in the United States District Court, California State Supreme Court, and this Court, including the potential impact on the Debtors' other economic stakeholders, the claims and interests of which must also be addressed in these Chapter 11 Cases.

Prior to entering into the RSA, the Debtors' management and their Board evaluated and assessed the Subrogation Claims using a variety of sources, including claims information provided to the Debtors by the Ad Hoc Subrogation Group during and after formal mediations between the two parties. The claims information provided by the Ad Hoc Subrogation Group indicates that to date, total claims had been paid in excess of $15 billion with respect to the 2017 and 2018 Northern California wildfires. The information further showed a reserve amount of approximately $3.7 billion, and allocations for Incurred but Not Reported and Incurred but Not Enough Reserved amounts of $2 billion based on the insurers' estimation of anticipated claims that had not yet been filed or reported.

These amounts, along with legal fees and prejudgment interest that could be asserted against the Debtors, represent potential exposure of over $20 billion. The Debtors weighed this potential

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

exposure against the costs, burdens, and uncertainties of further litigation and determined that settling the Subrogation Claims at approximately 55 cents on the dollar, a settlement rate that I understand falls within the range of historical averages for wildfire-related events, is a prudent exercise of business judgment on behalf of the Debtors. The Debtors' Board and management were presented with data, information, and analysis pertaining to the Debtors' estimation of its potential liability with respect to the Subrogation Claims on multiple occasions and thoroughly evaluated, with the assistance of outside counsel and advisors, the Subrogation Claims Settlement. The result of those deliberations was the decision to enter into the Subrogation Claims Settlement pursuant to the terms of the RSA.

Absent approval of the RSA and the underlying Subrogation Claims Settlement, the Subrogation Claims would be subject to the pending estimation proceedings before the United States District Court, the California State Superior Court, and this Court. Estimation of the Subrogation Claims is likely to be a time consuming, expensive, and highly uncertain process involving complicated issues of state and federal law and fact specific issues relating to causation, liability, and damages involving not less than twenty-two separate wildfires and literally thousands of underlying individual loss claims. With respect to the Tubbs fire, the most severe 2017 fire, although the Debtors believe, as confirmed by Cal Fire, that their equipment was not involved, there can be no certainty that a jury in California Superior Court may not reach a different conclusion. I believe, and the Debtors' Board also concluded, that the resolution of the Subrogation Claims pursuant to the RSA eliminates this cost, expense, and uncertainty as to all Subrogation Claims in a fair and reasonable manner.

Additionally, entry into the RSA avoids the risks and uncertainties of the estimation proceedings to the Debtors and their other economic stakeholders with respect to a major claims constituency, providing greater certainty to the Plan process and the Debtors' timely emergence from chapter 11. In view of the magnitude of the asserted Subrogation Claims, the risks, uncertainties and expense attendant to litigation of such claims, and, perhaps most importantly, the substantial reduction in the asserted claims reflected in the settlement, I believe, and the Debtors' Board also concluded, the Subrogation Claims Settlement is fair and reasonable and represents a sound exercise of the Debtors' business judgment.

Additionally, I believe, and the Debtors' Board also concluded, that approval of the Allowed Subrogation Claim Amount at this time as provided in the RSA, separate and apart from Plan confirmation, is also reasonable and should be approved as a key element of the Subrogation Claims Settlement. Subject to Court approval, it is my understanding that the $11 billion Allowed Subrogation Claim Amount will be binding in these cases (including following conversion cases under chapter 7 of the Bankruptcy Code or appointment of a chapter 7 or chapter 11 trustee) in all instances except (i) in the event of an Insolvency Termination; (ii) following delivery of an Allowance Termination Notice in accordance with the RSA (Requisite Consenting Creditors Termination Events), and (iii) in the event of termination of the RSA by the Debtors pursuant to Section 5(e)(i) of the RSA (Breach by Consenting Creditors Holding At Least 5% of RSA Claims). The allowance of the Subrogation Claims as provided in the RSA and the circumstances under which the Allowed Subrogation Claim Amount remains binding or not in these cases is the product of extensive negotiations that took into account and balanced, among other things, the agreement by the Consenting Creditors to forego participating in the estimation proceedings based on the ability to receive under the Plan the treatment they bargained for that is provided for in the RSA. Indeed, both the $11 billion settlement amount and the allowance of the Subrogation Claims as provided in the RSA were fundamental elements of the Subrogation Claims Settlement without which the Subrogation Claims Settlement would not have occurred. It is my understanding that, if the RSA is terminated under circumstances where the Debtors, because of their breach or because it is apparent that the Debtors are unable to consummate the Subrogation Claims Settlement under the Plan, the Consenting Creditors no longer will be bound to the compromised claim amount and, if the Consenting Creditors elect to seek a higher claim amount, all parties' rights would be reserved. In the other circumstances under the RSA and described in the Motion, where the Allowed Subrogation Claim Amount remains binding, I believe it is appropriate for the allowed claim to remain in effect.

Further, I believe, and the Debtors' Board also concluded, that the payment of fees and expenses of the Ad Hoc Professionals in accordance with the RSA is also a reasonable exercise of the Debtors' business judgment. It is my understanding that the Ad Hoc Professionals were instrumental in

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

the negotiation of the RSA and the Subrogation Claims Settlement. Given that the RSA and Subrogation Claims Settlement are clearly beneficial to the Debtors' estates and to the successful resolution of these cases, it is reasonable for the Debtors' estates as part of the settlement to cover such professional fees and expenses.

As stated above, the Subrogation Claims Settlement and the RSA constitute a pivotal development and accomplishment in these Chapter 11 Cases. They are a major achievement critical to advancing these Chapter 11 Cases to a timely and successful conclusion. Accordingly, I believe that the RSA and the Subrogation Claims Settlement should be approved.

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury, that the foregoing is true and correct.

Dated: September 24, 2019
San Francisco, California

By: /s/ Jason P. Walsh
Jason P. Wells

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119