1                  UNITED STATES BANKRUPTCY COURT

2                NORTHERN DISTRICT OF CALIFORNIA

3                        -oOo-

```
 4   In Re:                        ) Case No. 19-30088
                                   ) Chapter 11
 5   PG&E CORPORATION AND PACIFIC  )
     GAS AND ELECTRIC COMPANY      ) San Francisco, California
 6                                 ) Tuesday, September 24, 2019
                         Debtors.  ) 9:30 AM
 7   _____  )
                                     STATUS CONFERENCE RE:
 8                                   DEBTOR'S PLAN

 9                                   FIFTH OMNIBUS MOTION OF THE
                                     DEBTORS PURSUANT TO 11 U.S.C.
10                                   SECTION 365(A), FED. R.
                                     BANKR. P. 6006, AND B.L.R.
11                                   6006-1 FOR AN ORDER APPROVING
                                     ASSUMPTION OF CERTAIN REAL
12                                   PROPERTY LEASES ("LEASE
                                     ASSUMPTION MOTION") [3726]
13
                      TRANSCRIPT OF PROCEEDINGS
14              BEFORE THE HONORABLE DENNIS MONTALI
                  UNITED STATES BANKRUPTCY JUDGE
15
     APPEARANCES:
16   For the Debtors:            STEPHEN KAROTKIN, ESQ.
                                 JESSICA LIOU, ESQ.
17                               Weil, Gotshal & Manges LLP
                                 767 Fifth Avenue
18                               New York, NY 10153
                                 (212)310-8000
19
     For Official Committee of   DENNIS F. DUNNE, ESQ.
20   Unsecured Creditors:        Milbank LLP
                                 55 Hudson Yards
21                               New York, NY 10001
                                 (212)530-5000
22
     For Official Committee of   CECILY A. DUMAS, ESQ.
23   Tort Claimants:             Baker & Hostetler LLP
                                 11601 Wilshire Boulevard
24                               Suite 1400
                                 Los Angeles, CA 90025
25                               (310)820-8800
```

```
 1

 2   For Ad Hoc Committee of      ABID QURESHI, ESQ.
     Bondholders:                 MICHAEL S. STAMER, ESQ.
                                  DAVID H. BOTTER, ESQ.
 3                                ASHLEY VINSON CRAWFORD, ESQ.
                                  Akin Gump Strauss Hauer &
 4                                Feld LLP
                                  One Bryant Park
 5                                New York, NY 10036
                                  (212)872-8027
 6
     For Ad Hoc Group of          MATTHEW A. FELDMAN, ESQ.
 7   Subrogation Claim Holders:   BENJAMIN P. MCCALLEN, ESQ.
                                  Willkie Farr & Gallagher LLP
 8                                787 Seventh Avenue
                                  New York, NY 10019
 9                                (212)728-8000

10   For California Department    PAUL J. PASCUZZI, ESQ.
     of Toxic Control:            Felderstein Fitzgerald Willoughby
11                                Pascuzzi & Rios LLP
                                  500 Capitol Mall
12                                Suite 2250
                                  Sacramento, CA 95814
13                                (916)329-7400

14   For California Public        ALAN W. KORNBERG, ESQ.
     Utilities Commission:        SEAN MITCHELL, ESQ.
15                                Paul, Weiss, Rifkind, Wharton &
                                  Garrison LLP
16                                1285 Avenue of the Americas
                                  New York, NY 10019
17                                (212)373-3000

18   For Indenture Trustee,       ANDREW I. SILFEN, ESQ.
     BOKF, NA:                    Arent Fox LLP
19                                1301 Avenue of the Americas
                                  42nd Floor
20                                New York, NY 10019
                                  (212)484-3900
21
     For North Bay Cases:         FRANK M. PITRE, ESQ.
22                                Cotchett Pitre & McCarthy LLP
                                  840 Malcolm Road
23                                Suite 200
                                  Burlingame, CA 94010
24                                (650)697-6000

25
```

(973) 406-2250 | operations@escribers.net | www.escribers.net

| | | |
|---|---|---|
| 1 | For PG&E Shareholders: | BRUCE BENNETT, ESQ. |
| | | Jones Day |
| 2 | | 555 South Flower Street |
| | | Fiftieth Floor |
| 3 | | Los Angeles, CA 90071 |
| | | (213)489-3939 |
| 4 | | |
| | For SLF Fire Victim | RICHARD A. MARSHACK, ESQ. |
| 5 | Claimants: | Marshack Hays LLP |
| | | 870 Roosevelt |
| 6 | | Irvine, CA 92620 |
| | | (949)333-7777 |
| 7 | | |
| | For United States of | MATTHEW J. TROY, ESQ. |
| 8 | America: | U.S. Department of Justice, Civil |
| | | Division |
| 9 | | P.O. Box 875 |
| | | Ben Franklin Station |
| 10 | | Washington, DC 20044 |
| | | (202)514-7451 |
| 11 | | |
| | For Adventist Health: | REBECCA J. WINTHROP, ESQ. |
| 12 | | Norton Rose Fulbright US LLP |
| | | 555 South Flower Street |
| 13 | | Forty-First Floor |
| | | Los Angeles, CA 90071 |
| 14 | | (213)892-9200 |
| 15 | For The Utility Reform | ROBERT G. HARRIS, ESQ. |
| | Network (TURN): | Law Offices of Binder and Malter |
| 16 | | 2775 Park Avenue |
| | | Santa Clara, CA 95050 |
| 17 | | (408)295-1700 |
| 18 | For Sonoma Clean Power | G. LARRY ENGEL, ESQ. |
| | Authority: | Engel Law, PC |
| 19 | | 12116 Horseshoe Lane |
| | | Nevada City, CA 95959 |
| 20 | | (415)370-5943 |
| 21 | For Department of Finance | MATTHEW L. HINKER, ESQ. |
| | for the State of | O'MELVENY & MYERS LLP |
| 22 | California: | 7 Times Square |
| | | New York, NY 10036 |
| 23 | | (212) 326-2000 |
| 24 | | |
| 25 | | |

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18    Court Recorder:              LORENA PARADA
                                  United States District Court
19                                450 Golden Gate Avenue
                                  San Francisco, CA 94102
20
      Transcriber:               SUSAN PATTERSON
21                                eScribers, LLC
                                  7227 N. 16th Street
22                                Suite #207
                                  Phoenix, AZ 85020
23                                (973)406-2250

24    Proceedings recorded by electronic sound recording;
      transcript provided by transcription service.
25

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

SAN FRANCISCO, CALIFORNIA, TUESDAY, SEPTEMBER 24, 2019, 9:31 AM

2                              -oOo-

3       (Call to order of the Court.)

4           THE COURT:  Good morning, everyone.  Please be seated.

5   Mr. Karotkin, good morning.

6           THE CLERK:  Matter of PG&E Corporation.

7           MR. KAROTKIN:  Good morning, sir.

8           THE COURT:  So by my calculation, we have two motions

9   on -- two matters:  a status conference and the assumption

10  motion, right?

11          MR. KAROTKIN:  That's correct.

12          THE COURT:  Ms. Liou, are you going to take care of

13  the assumption motion?

14          MS. LIOU:  That's correct, Your Honor.

15          THE COURT:  Let's get that out of the way.  There's no

16  opposition, as I recall.

17          MS. LIOU:  No, no.  We have received a number of

18  informal --

19          THE COURT:  Wait, one second.  Excuse me?

20          THE CLERK:  I need an appearance.

21          THE COURT:  Oh, yeah.  We need an appearance for the

22  record.

23          MS. LIOU:  Sure.  Jessica Liou from Weil, Gotshal &

24  Manges, counsel for the debtors.

25          We've received a number of parties who have reached

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    out to us informally, with comments --

2         THE COURT:  Okay.

3         MS. LIOU:  -- to the proposed order.  You may have

4    seen that we filed a revised proposed order with the Court

5    yesterday --

6         THE COURT:  I did see that.

7         MS. LIOU:  -- which reflects all the agreed upon

8    changes.  It is a matter that's moving forward on a fully

9    consensual basis.

10         THE COURT:  Okay.  Anyone in court want to be heard on

11    the debtors' motion for, I guess, it's the broad lease

12    assumption motion?  Okay.  We'll go ahead and submit that.

13         MS. LIOU:  Excellent.  Thank you, Your Honor.

14         THE COURT:  That'll take -- resolve that part of the

15    order.  Thank you.

16         MS. LIOU:  Great, thank you.

17         THE COURT:  So Mr. Karotkin, I appreciate your status

18    conference statement.  And I do have a couple of minor

19    questions.  But if you have some issues you want to raise

20    first, that's fine with me, and then I'll -- maybe we'll

21    overlap in terms of my questions.

22         MR. KAROTKIN:  I have a brief statement I can make --

23         THE COURT:  Okay.

24         MR. KAROTKIN:  -- if Your Honor --

25         THE COURT:  Please.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          MR. KAROTKIN:  -- unless you want to have questions
2    you'd like to raise first?
3          THE COURT:  No, you're up.
4          MR. KAROTKIN:  First of all --
5          THE COURT:  We need your appearance for the record,
6    even though --
7          MR. KAROTKIN:  Yes, I'm sorry.  Stephen --
8          THE COURT:  -- I know who you are.
9          MR. KAROTKIN:  Stephen Karotkin, Weil, Gotshal &
10   Manges, for the debtors.
11         As Your Honor indicated, today is a status conference
12   on the debtors' plan, and I'm hopeful it won't devolve into a
13   hearing on the motion to terminate exclusivity.
14         THE COURT:  What if I just make a ruling on it.  Will
15   that solve the problem?
16         MR. KAROTKIN:  It depends how you rule, sir.
17         I would just -- as a brief statement, solely with
18   respect to the status conference, I'm sure Your Honor knows,
19   and it's been widely reported, that the debtors have reached a
20   comprehensive settlement with the ad hoc group of subrogation
21   claimants.
22         That agreement has been fully documented in a
23   restructuring support agreement, and we expect to file a motion
24   later today seeking court approval of that agreement.
25         THE COURT:  That was one of my questions.  That's

PG&E Corp., Pacific Gas and Electric Co.

1   going to be a standalone motion?

2        MR. KAROTKIN:  That is correct, sir.

3        THE COURT:  Okay.

4        MR. KAROTKIN:  We expect to file that later this

5   afternoon.

6        THE COURT:  And the underlying documents, then, will

7   be supportive of that motion?  I mean, they might be part of

8   the plan package, but --

9        MR. KAROTKIN:  Yes, they'll be an exhibit to that

10  motion.

11       THE COURT:  Okay.  Thanks.  And you want to just do

12  that on the regular calendar?

13       MR. KAROTKIN:  Yes.  I believe there is a calendar on

14  October 23rd that we would set that for hearing.

15       THE COURT:  I think that's the date we have, right?

16  Ms. Parada?

17       THE CLERK:  Yes.

18       THE COURT:  We're trying to avoid these two-day

19  settings of minor matters, but then what's the definition of a

20  minor matter, right?

21       MR. KAROTKIN:  Right.

22       THE COURT:  Okay.

23       MR. KAROTKIN:  So that's what we are currently

24  anticipating, setting that for hearing on October 23rd, which

25  is one of your regular --

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    THE COURT:  Okay.

2    MR. KAROTKIN:  -- omnibus hearing dates.  As we have

3 announced, that settlement provides for the resolution of all

4 subrogation claims asserted in the approximate amount of twenty

5 billion dollars, to be satisfied and discharged pursuant to --

6    THE COURT:  But am I correct, it doesn't settle a

7 hundred percent of them.  It settles with a --

8    MR. KAROTKIN:  No, it settles a hundred percent of

9 them.

10    THE COURT:  Well, every single subrogation claim?

11    MR. KAROTKIN:  Every single subrogation claim to be

12 treated under the plan.

13    THE COURT:  Okay.

14    MR. KAROTKIN:  Yes.

15    THE COURT:  I thought when I read before, you --

16    MR. KAROTKIN:  Yes.

17    THE COURT:  -- had about eighty-five percent.

18    MR. KAROTKIN:  Eighty-five percent of the holders of

19 claims that are represented on the steering committee have

20 signed the RSA.  It provides for the treatment of those claims

21 under the plan.  And we believe it will be binding, assuming

22 they accept the plan, which is our expectation.

23    Moreover, Your Honor, based on our conversations with

24 the Willkie Farr firm, who represents the subrogation

25 claimants, we expect that in excess of ninety-five to ninety-

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1   eight percent --

2       THE COURT:  Well, but my question is, if there's even

3   one claimant who doesn't accept, and we have to do an impaired

4   class, right, or not?

5       MR. KAROTKIN:  They are in an impaired class, in any

6   event, and they --

7       THE COURT:  Well, I understand.  But if you've got

8   them all signing up, it's a little easy.  The point is, am I

9   correct, there could be a dissenting member of the class.

10      MR. KAROTKIN:  There could be a member who voted "no"

11  on the plan.

12      THE COURT:  Correct.

13      MR. KAROTKIN:  That's correct.

14      THE COURT:  But voting means disclosure and --

15      MR. KAROTKIN:  Absolutely, sir.

16      THE COURT:  Okay.

17      MR. KAROTKIN:  We expect that -- it's our view they

18  are clearly -- that class is clearly impaired under the plan,

19  and they will vote --

20      THE COURT:  Oh, I don't doubt that, either.

21      MR. KAROTKIN:  Okay.

22      THE COURT:  My point is that -- and you made it clear

23  in the original plan -- I can't keep track of all your

24  classes -- but clearly it was an impaired class before the

25  settlement.  Now, it's still an impaired class.

PG&E Corp., Pacific Gas and Electric Co.

1          MR. KAROTKIN:  Yes, sir.

2          THE COURT:  You just, from what you've said, you have

3     a very high percentage of acceptance, but --

4          MR. KAROTKIN:  We expect a very high percentage of

5     acceptance.

6          THE COURT:  Yeah.

7          MR. KAROTKIN:  But it is an impaired class that will

8     vote under the plan.  That settlement is for value of cash, and

9     perhaps equity, in the amount of eleven billion dollars,

10    representing a forty-five percent reduction in the amount of

11    the asserted claims.  Obviously, Your Honor, this is a major

12    achievement in these cases.

13         And I'll point out, Your Honor -- and I really don't

14    want to get into too much of this; we can certainly get into

15    this at another time -- this was achieved despite efforts by

16    the ad hoc bondholders and in particularly, Elliot (phonetic),

17    to do everything in their powers to undermine --

18         THE COURT:  Well, let's not get into it.  You've made

19    the -- because then it'll just invite the argument, and --

20         MR. KAROTKIN:  Okay.

21         THE COURT:  -- I'm not going to resolve that today.

22         MR. KAROTKIN:  Very well.

23         THE COURT:  You got your votes; you got your -- and

24    that's fine with me.

25         MR. KAROTKIN:  Very well.

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  That's progress.

2          MR. KAROTKIN:  And as Your Honor knows, yesterday, we

3    did file an amended plan --

4          THE COURT:  Right.

5          MR. KAROTKIN:  -- that incorporates that settlement

6    in --

7          THE COURT:  I heard from the Oxford Dictionary that

8    you have now out-definitioned them.  And it is the --

9          MR. KAROTKIN:  I think we have -- I think that's

10   right.  I think we have the world's record number of --

11         THE COURT:  Yes.

12         MR. KAROTKIN:  -- defined terms in a plan of

13   reorganization.

14         THE COURT:  You have.  And it's --

15         MR. KAROTKIN:  And I'm glad you appreciate that, sir.

16         THE COURT:  There's an app to be able to understand

17   where the definitions all tie up together.  Okay.

18         MR. KAROTKIN:  And I'd also note, as the debtors

19   announce that they've received equity commitments in excess of

20   fourteen billion dollars.  That was the fourteen billion dollar

21   target.  Commitments have come in well in excess of that

22   amount, which will serve as the foundation for all of the plan

23   funding necessary to have these debtors exit Chapter 11 on a

24   timely basis, to take advantage of the go forward wildfire fund

25   under AB 1054.

PG&E Corp., Pacific Gas and Electric Co.

1    It is also my understanding, Your Honor, that the CPUC

2  has commenced its review process with respect to the debtors'

3  plan.

4    THE COURT:  That was right.  That's one of my

5  questions, because that was -- TURN told us -- told me that --

6    MR. KAROTKIN:  Right.

7    THE COURT:  -- and I'm sure you saw what they filed.

8    MR. KAROTKIN:  Yes.  And Mr. Kornberg, of course, is

9  here, who can elaborate on that.  And we believe, with that,

10  things are on track to meet the June 30, 2020 date.

11    With the settlement of the subrogation claimants being

12  achieved and the equity financing commitments, the last

13  remaining item -- and of course I don't mean to minimize this,

14  Your Honor -- is establishing the amount of the claims held by

15  the constituency represented by the tort claimant's committee

16  for plan purposes.  In that regard, as Your Honor, again, well

17  knows, estimations of the proceedings are pending before Judge

18  Donato, as well as in the related state court proceedings --

19    THE COURT:  Right.

20    MR. KAROTKIN:  -- with respect to the Tubbs trial.

21  It's my understanding that those proceedings are moving

22  forward, on schedule and on track to assure that the

23  reorganized debtors can confirm their plan, again, in time to

24  take advantage of the go forward wildfire fund under AB 1054.

25    In terms of next steps in this court, Your Honor, we

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1  think it still makes sense -- of course subject to your

2  judgment -- to continue to defer the filing of a formal

3  disclosure statement until we have more clarity on the

4  magnitude of the individual tort claims to be addressed under

5  the plan.  Obviously, if you feel differently, we can move

6  forward and file a formal disclosure statement:  not a

7  telephone book, but a formal disclosure statement within a

8  reasonable period of time.  Hopefully, Your Honor, we will have

9  some additional information with respect to the tort claims

10 with the upcoming bar date of October 21st.

11      THE COURT:  Okay.  Well, I'll stop you by saying, I

12 don't want a disclosure statement early either, so.

13      MR. KAROTKIN:  Okay.

14      THE COURT:  And that's two of us that support that.

15 If there's someone in court that thinks, somehow, there should

16 be one early, I'll listen to a comment when it's time to take

17 other comments.

18      MR. KAROTKIN:  I'll go with your view on that, sir.

19      THE COURT:  Okay.

20      MR. KAROTKIN:  As I said, the purpose of today's

21 hearing is not to address the motion filed to terminate

22 exclusivity, and we hope that this hearing doesn't devolve into

23 arguments with respect to that motion.  We will, of course,

24 fully address that motion in our responsive pleadings.

25      I would like, however, to note some scheduling issue

PG&E Corp., Pacific Gas and Electric Co.

1   that certain people have, including myself, with the October

2   8th date.  That, Your Honor, is the evening of the Jewish

3   holiday.

4          THE COURT:  Yeah, and we try to adjust for those dates

5   and sometimes forget them, so.  Okay.  Well, we can fix that.

6          MR. KAROTKIN:  So I think we need, again, subject to

7   your availability, to choose a different date that week or the

8   following week.  Again --

9          THE COURT:  Wait, what's that noise I'm getting?

10         THE CLERK:  It might be a cell phone.

11         THE COURT:  Somebody got a cell phone in the court or

12  on the phone?  Operator, can you do anything about that noise

13  on the speaker?  Or if it's someone in the court --

14         UNIDENTIFIED SPEAKER:  It's Steve's.

15         THE COURT:  -- answer the call and put it on the

16  speaker.

17         Well, Mr. Karotkin, how convenient or inconvenient

18  would it be just to move it even one day, or if necessary, a

19  second day.  The following week is the only four days in this

20  calendar year that I'm planning to be absent.  And so --

21         MR. KAROTKIN:  That's just not acceptable, Your Honor.

22         THE COURT:  Yeah, I know.  Would it be an imposition

23  on you and others who are traveling, to do it on either the 9th

24  or the 10th?

25         MR. KAROTKIN:  We can't do the 9th.  The 9th actually

PG&E Corp., Pacific Gas and Electric Co.

1   is the holiday.

2         THE COURT:  Yeah, of course.  Okay.

3         MR. KAROTKIN:  So we could --

4         THE COURT:  Well, again, I'm sorry; I didn't keep

5   track of the dates.

6         MR. KAROTKIN:  We could do the 11th.  We could -- I

7   think other people are advocating for the 7th.

8         THE COURT:  Ms. Dumas, do you have an opinion?

9         MR. KAROTKIN:  Ms. Dumas had indicated originally that

10  she was available, and then I heard from her the other night

11  that she was not available on the 11th.

12        THE COURT:  Not on 11th.  What's your schedule?

13        MS. DUMAS:  Good morning, Your Honor.

14        THE COURT:  Hi.

15        MS. DUMAS:  Cecily Dumas.

16        THE COURT:  Good morning.

17        MS. DUMAS:  BakerHostetler, appearing on behalf of the

18  official committee of tort claimants.  Just with a little

19  reminder to the Court that it's not Mr. Karotkin's motion that

20  we're --

21        THE COURT:  I know, but it's my hearing.  And I set

22  it.  And I denied the shortened time and set it on the next

23  date up, so.

24        MS. DUMAS:  So the tort committee believes that delay

25  of the motion to terminate exclusivity is the debtors' purpose.

PG&E Corp., Pacific Gas and Electric Co.

1   We would strongly object to any date later than the 9th.  And

2   there is a district court --

3           THE COURT:  Well, what days are you, personally, not

4   available?

5           MS. DUMAS:  I am not available the 10th, 11th, and the

6   following week.  However, all of these people are -- the vast

7   majority will be in court, upstairs, on the 7th --

8           THE COURT:  So you're --

9           MS. DUMAS:  -- at 10 a.m. for a district court

10  proceeding.  So we request that if the Court is inclined to

11  respect the Jewish holiday on the 8th --

12          THE COURT:  Well, first of all -- first of all I'm

13  inclined to move it off of a conflict --

14          MS. DUMAS:  Right.

15          THE COURT:  -- with a holiday.

16          MS. DUMAS:  Absolutely.

17          THE COURT:  I wouldn't have set it in the first place.

18  As I say, you made a push for a speeded-up hearing and I said,

19  no, we're going to go to the next hearing.  I should have

20  looked at the calendar with my courtroom deputy.

21          MS. DUMAS:  We would request the 7th.

22          THE COURT:  And Judge Donato has a hearing in the

23  morning, right?

24          MS. DUMAS:  At 10.

25          THE COURT:  Okay.  Well, I'll come back to that later.

PG&E Corp., Pacific Gas and Electric Co.

1          MS. DUMAS:  Thank you, sir.

2          THE COURT:  I'll get -- and we'll pick a date to make

3     it work.

4          MR. KAROTKIN:  I will note, in that regard, Your

5     Honor, significant discovery has already been served in

6     connection with that motion which would require all of the many

7     depositions to be conducted between now and whatever date you

8     set the hearing.

9          THE COURT:  And your side is initiating the discovery?

10         MR. KAROTKIN:  We have initiated it, and I believe

11    that the ad hoc committee of bondholders is initiating

12    discovery as well.

13         THE COURT:  Okay.  Before we adjourn, I'll figure out

14    when to move it and how to make it work.  Now, I want to get

15    back to the checklist of status conference items.

16         MR. KAROTKIN:  Okay.  The other thing, Your Honor,

17    that I would suggest, and I'm sure that the first thing Ms.

18    Dumas, as well as the ad hoc bondholders will say, is that I'm

19    seeking a delay here, which is obviously not my purpose.  And

20    we are perfectly willing to go forward with the motion to

21    terminate exclusivity; I'm not seeking to delay that, whenever

22    Your Honor sets that.

23             But I think, Your Honor, we're at a crossroads in this

24    case.  We have an agreement with the public entities and the

25    subrogation claimants.  The tort claimants committee has come

PG&E Corp., Pacific Gas and Electric Co.

1    down significantly from its fifty billion dollar claim

2    assertions in these cases.

3          THE COURT:  Well, you're saying that by virtue of

4    their --

5          MR. KAROTKIN:  Of their motion.

6          THE COURT:  -- their motion.

7          MR. KAROTKIN:  Their motion to it -- they're claiming

8    twenty-four billion which, obviously, must include something

9    for the subrogation claimants if their plan is going to comply

10   with AB 1054, which they say it will be.

11         THE COURT:  Well, the term sheets seem to say it to

12   me; I looked at their term sheet --

13         MR. KAROTKIN:  Right.  So it can't -- it certainly

14   can't be zero for the subrogation claimants.  And as you know,

15   Your Honor, under AB 1054, they have to be paid in full in

16   order to take advantage of the wildfire fund.

17         Under these circumstances, Your Honor, we think it

18   would be appropriate for the Court to appoint a mediator, one

19   with bankruptcy experience.  Get the parties together, see if a

20   global consensus can be achieved.  This will not delay

21   anything.  And as I'm sure Your Honor knows more than anybody,

22   that was key to resolving the prior case.

23         THE COURT:  It was.

24         MR. KAROTKIN:  And we think that it would be

25   appropriate here and would invite the Court to consider that.

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Okay.

2          MR. KAROTKIN:  Thank you, sir.

3          THE COURT:  All right.  Let me -- stay here, Mr.

4   Karotkin, because I just want to go through a couple of

5   housekeeping chores.  The first one is something I never even

6   thought about until last night when I was looking at your

7   amended plan, and I simply couldn't absorb ninety-five pages of

8   blackline or a redline plan.  But I looked at -- I looked at

9   the critical changes that, for the most part, as it looked to

10  me that it's everything you have to do to reflect the

11  subrogation --

12          MR. KAROTKIN:  That was it.

13          THE COURT:  -- settlement, right?

14          Pure mechanics.  I have a pet peeve about plans having

15  cumbersome names.  And after a first amended plan, you normally

16  get a second amended plan and keep counting.

17          So in our other world here, when we do the simple

18  Chapter 11s, we don't have anything called plan of

19  reorganization with a date right below it.  So unless you're

20  troubled by that, I would like to see -- and this will be the

21  same if there are any competing plans -- that the plan simply

22  be the name, "plan of reorganization" or whatever the proper

23  term is, with the date right in parenthesis under the title.

24  Then there's no confusion of which one are we looking at.

25  So --

PG&E Corp., Pacific Gas and Electric Co.

1      MR. KAROTKIN:  Certainly.

2      THE COURT:  -- unless you don't want to do that --

3      MR. KAROTKIN:  No, no.

4      THE COURT:  -- that's what I'd like you to do.  Don't

5  change it now, obviously.  In other words, the document that

6  you filed, I believe is called first amended, right?

7      MR. KAROTKIN:  Yes, sir.

8      THE COURT:  Yeah, well, I mean, chances are it will be

9  amended again, no matter what.

10      MR. KAROTKIN:  No doubt.

11      THE COURT:  Okay.  So I was looking through my notes

12  from the last hearing, and I have a couple of, sort of, just

13  clarification points and a couple of question points.

14      So the first one, I just reviewed my own schedule, and

15  you tell me if there's any change.  The schedule that we set on

16  previously for the inverse condemnation issue was opening

17  briefs from the debtor by October 25, oppositions by November

18  15th, reply by November 22nd.  And I realize -- and I decided

19  on my own, without thinking about it until now is that I think

20  it would be helpful to schedule an argument on those two, and

21  looking at the calendar, a date that would work would be

22  December 11th, so -- because that's a regular date we have

23  blocked out for PG&E.

24      So unless you or anyone who's going to be active on

25  that motion has a problem either with the existing dates that

PG&E Corp., Pacific Gas and Electric Co.

1  were already discussed or the hearing date for an argument on

2  the motion, then I'll leave it at that. So I'll come back to

3  it and, when I finish this short list with you, Mr. Karotkin,

4  I'll invite comments from anyone else.

5          The second question has to do with the revised plan,

6  and in particular, the settlement with the public entities.

7  And so the way I read the revised plan, Section 4.18, class

8  5(b)(1), is the eighteen public entities that you settled with

9  for eighteen (sic) billion dollars, right?

10         MR. KAROTKIN: Correct.

11         THE COURT: Now, am I correct still that other public

12  entities are --

13         MR. KAROTKIN: I'm sorry, one billion dollars.

14         THE COURT: What did I say? Did I say something else?

15         IN UNISON: You said eighteen.

16         THE COURT: Oh. Well, eighteen billion dollars for

17  one creditor. No. One billion dollars for eighteen creditors.

18  Sorry.

19         But Mr. Karotkin, am I correct, you still are of the

20  view that other public entities must be estimated? And you

21  aren't -- and you have not accepted my discussion that, you'll

22  recall, Mr. Pascuzzi was here and I raised the question. So am

23  I right; you're still of the opinion that any other public

24  entity is -- the way I see the definition is in the broad

25  category of other wildfire claim?

                    PG&E Corp., Pacific Gas and Electric Co.

1           MR. KAROTKIN:  I agree with everything you just said.

2           THE COURT:  Well, have you made peace with Mr.

3    Pascuzzi and his client?

4           MR. KAROTKIN:  No.  No, we have not, and we're --

5           THE COURT:  Well, then again, I'll ask for him.  I

6    don't necessarily -- are you here, Mr. Pascuzzi, somewhere?

7           MR. PASCUZZI:  Yes, I am, Your Honor.

8           THE COURT:  Okay.  Well, I mean, you don't have to

9    come up yet.  You can come up in a minute.  What I was going to

10   ask is should we set a briefing schedule on that question

11   because --

12          MR. KAROTKIN:  Sure.

13          THE COURT:  Right?

14          MR. KAROTKIN:  Yes.

15          THE COURT:  Okay.  Because it would seem to me that

16   the pure legal question is, if there are claims filed by public

17   entities that liquidate amounts, they are, by definition, not

18   estimatable; I know you differ with that.  And we could

19   either -- I could invite the two of you to meet and confer and

20   come up with an agreed schedule --

21          MR. KAROTKIN:  Um-hum.

22          THE COURT:  -- but I don't want to leave any other

23   representatives of public entities out of the discussion.  Or I

24   could just decree some dates, but I'd rather let you work it

25   out on something that works to your convenience and be

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    consistent with our calendar.

2          MR. KAROTKIN:  Yes.  I'm happy to meet and confer with

3    Mr. Pascuzzi.  I don't think they filed claims yet.

4          THE COURT:  Well, if the claims bar date and they

5    don't --

6          MR. KAROTKIN:  Well, no, no.  I know we have --

7    there's time.

8          THE COURT:  -- and they don't file, then you're on a

9    roll.

10          MR. KAROTKIN:  No, no.  I realize that.  I'm sure

11   that -- I'm sure Mr. Pascuzzi's not going to not file claims,

12   but why don't -- if it's okay with him, we can meet and confer.

13   And I think the briefing schedule is going to have to follow

14   when they file claims.

15          THE COURT:  Yeah.

16          MR. KAROTKIN:  I don't know why they --

17          THE COURT:  Well, Mr. Pascuzzi, I'll come back to you

18   and every other person in the room here who wants to be heard.

19   I just want to go through this short list of things and,

20   frankly, Mr. Karotkin's response and your response are not

21   surprising.

22          Okay.  Next, I agree with you, Mr. Karotkin, I don't

23   want to turn this into a pre-hearing on the exclusivity motion.

24   But as I read the exclusivity motion and the term sheet, again,

25   perhaps more specifically, the position of the TCC and the

PG&E Corp., Pacific Gas and Electric Co.

1  senior noteholders, is that the senior noteholders -- I mean,

2  excuse me, the senior noteholders may not agree that they're

3  unimpaired, and secondly, if I understand, it looks like the

4  TCC and the senior noteholders believe that the subrogation

5  claimants should be subordinated in some fashion.

6           So the question is, aren't those two other additional

7  legal questions that should be teed up and briefed?  Am I

8  right?  Do you agree the plan that your opponents want to file

9  would put the subrogation claims in a lower class?

10          MR. KAROTKIN:  I agree that they're trying to

11  subordinate the subrogation claims.

12          THE COURT:  Right.

13          MR. KAROTKIN:  Yes.

14          THE COURT:  And subordinate would be, perhaps,

15  inconsistent, certainly, with the language of your plan and

16  perhaps --

17          MR. KAROTKIN:  That's correct.

18          THE COURT:  Right.

19          MR. KAROTKIN:  And if our plan moves forward, that

20  would certainly be a confirmation objection.

21          THE COURT:  Well, that's right.  So the question is

22  should we tee up these big ticket legal confirmation questions,

23  even if there is no competing plan?  It seems to me we should.

24          MR. KAROTKIN:  We're more than happy to do that.

25  We're very comfortable in our position on that.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    THE COURT:  And how about -- how about the question of

2  whether the -- and this is one of those defined terms that I

3  think is a defined term -- the funded debt claims; I believe

4  their position is their impaired; your position is they're not

5  impaired.  That's a legal question, right?

6    MR. KAROTKIN:  That's correct, and we're more than

7  happy to tee that up right away as well.

8    THE COURT:  But do you think it would be helpful and

9  efficient, in the context of a great, big ocean liner that is

10  leaving the dock without a disclosure statement yet, to deal

11  with some of these pivotal legal questions at a time when there

12  could be rulings but there also could be challenges later on by

13  others.

14    In other words, I can't bar a party from opposing a

15  position that the debtor does.  I'm not setting a deadline for

16  objections to confirmation.  But in effect, it's like an early

17  designation of confirmation issues.

18    MR. KAROTKIN:  Again, we have no objection to teeing

19  up those two issues.  I think the two issues relate to the

20  federal judgment rate of interest and the make whole --

21    THE COURT:  Right.  They do.

22    MR. KAROTKIN:  -- on those claims, and --

23    THE COURT:  That's exactly I understand them to be.

24    MR. KAROTKIN:  Yes.  And we're more than happy to

25  confer with counsel and set a schedule on that as well.

PG&E Corp., Pacific Gas and Electric Co.

1        THE COURT:  Well, they also --

2        MR. KAROTKIN:  I think --

3        THE COURT:  -- I mean, they're ripe issues even if

4   there's no competing plan.

5        MR. KAROTKIN:  I agree.

6        THE COURT:  Okay.

7        MR. KAROTKIN:  I agree.  I will note, however, that

8   our plan is very specific that if we are wrong on those issues,

9   we will unimpair them.

10        THE COURT:  Well --

11        MR. KAROTKIN:  Okay?

12        THE COURT:  I mean, is this something we just do in

13   the middle of the confirmation hearing?  I mean --

14        MR. KAROTKIN:  But I'm saying, we're more than

15   happy -- again, we're very comfortable on our position on those

16   two issues as well.

17        THE COURT:  I think that the problem with that is, you

18   can't --

19        MR. KAROTKIN:  And we don't want to delay it.  We

20   don't delay.  We're very happy to have those adjudicated.

21        THE COURT:  Well, wait.  You mean you'll unimpair them

22   or you'll treat them impaired?  I mean, your view from the plan

23   is they're unimpaired.

24        MR. KAROTKIN:  My view -- if I may?

25        THE COURT:  Go ahead.

PG&E Corp., Pacific Gas and Electric Co.

1    MR. KAROTKIN:  My view is, the way we propose to treat

2  that class under the plan, based on applicable law and the

3  contractual provisions in their agreements, they are

4  unimpaired.

5    THE COURT:  Right.  Agreed.

6    MR. KAROTKIN:  Okay?  They disagree with that.

7    THE COURT:  Right.

8    MR. KAROTKIN:  And we are more than happy to bring

9  those issues before the Court prior to the confirmation

10  hearing.

11    THE COURT:  No, but I thought you were saying the

12  reverse.

13    MR. KAROTKIN:  And then I'm also saying, that if we

14  lose, if we lose, which I'm confident we will not, we will

15  amend the plan to unimpair them.

16    THE COURT:  Okay.  But we've gone through the drill

17  of, perhaps, creating an impaired class and going to the

18  trouble of voting.

19    MR. KAROTKIN:  I'm sure they'll vote no.

20    THE COURT:  Well, so am I.

21    MR. KAROTKIN:  Okay.  We have other impaired classes

22  that we believe will vote yes and satisfy the requirements of

23  Section 1129.

24    THE COURT:  Mr. Karotkin, we know that all you need is

25  one impaired noninsider class to vote.  The question is, what

PG&E Corp., Pacific Gas and Electric Co.

1   do you do about an impaired class that votes no.  It's very

2   nice to say, on the fly, we'll unimpair them.  But the question

3   is, should we not deal with it ahead of time?

4          Look, I'm going to offer the following:  we've now

5   identified three legal issues today --

6          MR. KAROTKIN:  Um-hum.

7          THE COURT:  -- one for the public entities; two for

8   these two groups -- that you are agreeing with me should be

9   dealt with early.  And I think they should be, but I'll invite

10  comments from other counsel here in a little while.

11         MR. KAROTKIN:  We agree with you.

12         THE COURT:  Okay.  The next question is really more of

13  an information, and that is TURN filed a position on

14  exclusivity but includes a copy of the CPUC OII.  And my

15  question to you is, I think that's a nonaction item for this

16  Court, do you agree?

17         MR. KAROTKIN:  Yes.

18         THE COURT:  It's really informational, and Mr.

19  Kornberg, or someone, will tell us if there's something the

20  bankruptcy court ought to be doing other than what we're doing.

21         MR. KAROTKIN:  I'm sure he will say there is nothing

22  you should be doing on that.

23         THE COURT:  Okay.  The next question on my short list

24  is -- at least in something that the TCC filed, they make the

25  contention that, whether the debtor is doing it intentionally

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    or not, they're discouraging the filing of claims, which again,

2    seems to be a serious allegation, if proven.  But it doesn't

3    seem like an action item for today.  And again, I'll assume --

4              MR. KAROTKIN:  Your Honor?

5              THE COURT:  -- you'll tell me otherwise.

6              MR. KAROTKIN:  I have no idea what they're talking

7    about.

8              THE COURT:  Okay.

9              MR. KAROTKIN:  There is no evidence of what they're

10   talking about.

11             THE COURT:  Right.

12             MR. KAROTKIN:  As you know, the noticing protocol was

13   the biggest and most widespread noticing protocol that I,

14   certainly, have ever been involved with.  I have no idea what

15   Mr. Julian or Ms. Dumas is talking about.

16             THE COURT:  Okay.

17             MR. KAROTKIN:  Okay?  As Your Honor knows, most claims

18   are filed when we get close to the bar date.  And I am very,

19   very confident, Your Honor, that the plaintiff lawyers are

20   very, very aware of when the claims must be filed.

21             THE COURT:  I'm sure they are.

22             MR. KAROTKIN:  That's one thing I'm sure of.

23             THE COURT:  That being said, you wouldn't be

24   heartbroken if somebody misses the claims deadline?

25             MR. KAROTKIN:  Actually, Your Honor, I --

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1       THE COURT:  I mean, as a personal matter you might.

2       MR. KAROTKIN:  -- hope that if people believe they

3  have claims, that they file them timely.

4       THE COURT:  No, I understand.

5       MR. KAROTKIN:  I hope, and so does the company.

6       THE COURT:  I wasn't suggesting that you had some

7  devious thought about it.  What I meant is that, no lawyer

8  representing a debtor is going to be upset if a creditor

9  doesn't file a claim.  Obviously, we're dealing with a much

10  different issue here.

11       MR. KAROTKIN:  We are.

12       THE COURT:  Look, as far as I'm concerned, the

13  allegation is nothing more than an allegation, and it's not an

14  action item.  And if the TCC wants action, they know how to ask

15  me to take action.

16       MR. KAROTKIN:  And they haven't to date.

17       THE COURT:  Okay.  So one other question.  So when

18  I -- in looking back to the timeline, you filed a timeline way

19  back before we were dealing with terminating the original -- I

20  mean, denying the request to terminate exclusivity and the

21  estimation and the timeline that you had in mind before the

22  Tubbs fire trial was going on down the street -- before Judge

23  Donato was involved.  Obviously, those have all changed.  But

24  do you think it's time to come up with a revised timeline

25  beyond what we're talking about now?  In other words, what --

PG&E Corp., Pacific Gas and Electric Co.

1    and maybe the answer is no because there's too many big issues.

2            MR. KAROTKIN:  Excuse me, I haven't looked at the

3    timeline we originally filed.  I think that was back in the

4    August.

5            THE COURT:  Well, it was optimistic, but it was --

6            MR. KAROTKIN:  I think it reflected a disclosure

7    statement being filed a lot sooner than we're talking about

8    now.

9            THE COURT:  Well, it had me -- I was doing the Tubbs

10   estimation and the --

11           MR. KAROTKIN:  Yes.

12           THE COURT:  -- liability issue.

13           MR. KAROTKIN:  Exactly.

14           THE COURT:  And there was no referral to the district

15   court and lots of things.

16           MR. KAROTKIN:  So if it's okay with Your Honor, I'd

17   like to have the opportunity to take a look at it, and perhaps

18   we can file an amended timeline if you would like?

19           THE COURT:  It's not even that I need one.  I'm the

20   one that said to you -- and I'm not taking credit, a lot of us

21   have said, we have to make -- we have to be creative in how to

22   deal with this complex issue of state law deadlines, CPUC

23   procedures, which are certainly overwhelmingly complicated, the

24   Bankruptcy Code, et cetera.

25           And so one of things that you'll recall we talked

PG&E Corp., Pacific Gas and Electric Co.

1    about before is, why can't we simplify the disclosure

2    statement?  And we're trying to do that.  And I'm going to

3    stick with that.  But the question is, can we also sort of

4    stagger the confirmation process?  This is really getting --

5    what I was touching on before.

6              MR. KAROTKIN:  Um-hum.

7              THE COURT:  I mean, I go back to a colloquy that I

8    think I had with, perhaps you and Mr. Kornberg, is there a way

9    to tee up the bankruptcy issues that are critical to the CPUC

10   earlier rather than later.  So kind of like as a tentative, the

11   Court can say well, the debtors jumped through all the hoops,

12   the classification's right, the treatment is okay, et cetera,

13   et cetera.  The plan is ready to be confirmed if the following

14   things occur.  And obviously, the major thing is that the

15   impaired classes either vote for it or there's a cramdown that

16   is properly considered.

17             So what I had in mind is a way of looking at the

18   calendar and thinking about when to tee up these critical

19   confirmation issues.  We already identified several of them

20   this morning.

21             MR. KAROTKIN:  We did.

22             THE COURT:  So look, I'll just leave this with you

23   to -- not to do something because I'm asking you that I need it

24   but rather to think about, as these issues are crystalized,

25   whether we should try, then, to simplify the process so at

                PG&E Corp., Pacific Gas and Electric Co.

1    least the major player, certainly the formal committee, the ad

2    hoc committees -- I'm not suggesting that outliers who are on

3    their own are not going to have their day in court, but the

4    major players can be treated up or down on a legal issue, in

5    part; they might want to take interlocutory appeals if there --

6    or you might want to if there are rulings that you disagree

7    with.

8            So it's just an invitation --

9            MR. KAROTKIN:  Okay.

10           THE COURT:  -- to do that.

11           MR. KAROTKIN:  Thank you, sir.

12           THE COURT:  Okay.  So let's go through -- those are my

13   short items, and there are a number of issues that I want to

14   hear from various counsel.

15           But let's start with the normal procedure.  I'll ask

16   and see if the official unsecured creditors' committee counsel

17   wants to be heard.  Then I'll ask the tort committee.  Then

18   I'll ask Mr. Pascuzzi and the others for the public entities,

19   in that -- and then anyone else who wants to be heard.

20           Good morning.

21           MR. DUNNE:  Good morning, Your Honor.  For the record,

22   Dennis Dunne from Milbank on behalf of the official committee

23   of unsecured creditors.

24           At the outset, I think we should just take a step back

25   to see with what I think are truly kind of stunning

PG&E Corp., Pacific Gas and Electric Co.

1    developments over the past few weeks. We were all here four

2    weeks ago or so, Your Honor, and we didn't have a settlement

3    with the subrogation committee. We didn't have a number or a

4    structure that worked for the TCC. And here we are, now at the

5    end of September, and we have that.

6        Now, they happen to be tied to different plan

7    proponents, and we'll have to deal with that. But I do think

8    that the plan that was filed by the bondholders and the TCC is

9    a positive development. There's a lot in that plan that are

10   positives for many of the unsecured creditors. But with both

11   the subrogation settlement, we haven't seen the underlying

12   documents, need to kind of go through that. I heard today that

13   it will be filed today; good, so that we can review it and

14   comment on it. And we have similar questions for the

15   bondholder TCC plan.

16       With respect to mediation that Mr. Karotkin raised,

17   it's the first we're hearing about it.

18       THE COURT: Well, I had raised the question last time

19   just to think about it. I hadn't been more specific, but

20   just --

21       MR. DUNNE: Well, I agree. There's always mediation

22   hovering over any kind of --

23       THE COURT: Right. Right.

24       MR. DUNNE: -- potential dispute. But as a result, I

25   don't have a formal committee position on mediation, though --

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Right.

2          MR. DUNNE:  -- as I was saying at the outset, it does

3   look like some of the important building blocks for what could

4   be a global consensual deal are beginning to fall into place --

5          THE COURT:  Um-hum.

6          MR. DUNNE:  -- with the subrogation settlement, the

7   TCC bondholder plan.  We have a number of parties that are

8   willing to write substantial checks, now albeit on different

9   capital structures.  And so mediation at the right time I think

10  would be important.  Now I'm just musing, because I'm ahead of

11  my client.

12         What I struggle with a little bit is that what we have

13  is a motion to terminate exclusivity, not to be heard today.

14  Clearly that's not what he means to mediate.  If you were

15  mediating the motion to terminate exclusivity, it would be

16  what --

17         THE COURT:  No, I think I know what it means.

18         MR. DUNNE:  Yeah.  So but I also don't think Mr.

19  Karotkin is presupposing that that plan is going forward.  So

20  it's either remediating the motion that's not yet heard --

21         THE COURT:  Well, then, but even if it were -- I mean,

22  look, do you think if I announced to him that I'm not going to

23  terminate exclusivity, then he would say well, then, we don't

24  want to mediate.  I mean, he'd be crazy to say that, because

25  I'd order him to mediation anyway if I wanted to.

PG&E Corp., Pacific Gas and Electric Co.

1          MR. DUNNE:  I think he'd go -- anyway.  I don't want

2   to guess what Mr. Karotkin would do in that scenario.

3          All I'm saying, Your Honor, is it may be that we're at

4   a status conference today.  I don't have a position for the

5   committee on mediation.  We do know that we need to pick a date

6   for the motion for termination of exclusivity, and maybe we see

7   how the chips fall on that and then mediate.

8          But I do want to underscore that that's probably what

9   happens at some point, is the mediation -- to see if we can

10  avoid having the two plans go -- is there a way to build

11  consensus and have one path forward.

12         With respect to the briefing that Your Honor raised,

13  pulling up and out of confirmation hearing some of the legal

14  issues, including with respect to post-petition interest and

15  make-wholes, we support that.  We think that's a fine idea to

16  do that sooner rather than later.

17         THE COURT:  Well, I presume you don't have a position,

18  but you're not opposed to trying to straighten this question of

19  estimating liquidated claims or not.  I mean, again --

20         MR. DUNNE:  Correct.

21         THE COURT:  -- that to me is a pure issue that there's

22  a finite group of folks that are affected by that

23  determination, but they're important players also, right.

24         MR. DUNNE:  I agree.  And we believe it's kind of

25  prudent to do that sooner rather than later so that we can all

PG&E Corp., Pacific Gas and Electric Co.

1   factor in the rulings into confirmation.

2          THE COURT:  Right.

3          MR. DUNNE:  And I also think with respect to the

4   debtors' plan with respect to unimpairment, I understand what

5   Mr. Karotkin's saying.  He's saying -- I think he's saying,

6   Judge, we'll take the risk that we're wrong that we don't have

7   to pay contract rate interest.  He says he's going to win.  We

8   may say he's going to lose.  But let's assume he does lose.

9   That just means they have to fund more dollars under the plan

10  in order to unimpair that.  So I think that's what he said.

11         THE COURT:  Well, yeah.  I know.  But it also means

12  that if I did it -- I said we're going to have this argument

13  next week before we ever think about disclosures, and I rule

14  next week that Mr. Karotkin is incorrect and bondholders are

15  right, they are impaired, he could go back to his client and

16  maybe unimpair them with a stroke of the pen.

17         MR. DUNNE:  Exactly.  Exactly.

18         THE COURT:  But it goes both ways.

19         MR. DUNNE:  Well, it could go --

20         THE COURT:  I hadn't even thought about it until I

21  read the arguments that were in the exclusivity motion.  And

22  again it's in the exclusivity papers, but it's not an

23  exclusivity issue.  It's a confirmation issue, right?

24         MR. DUNNE:  Correct.

25         THE COURT:  Yeah, okay.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          MR. DUNNE:  Correct.

2          THE COURT:  Okay.

3          MR. DUNNE:  And I do agree with Your Honor on

4    impairment, that if we were impaired -- if the unsecured

5    creditors were unimpaired, one of the arguments for a

6    post-petition interest is if they voted down -- and Mr.

7    Karotkin was assuming that the bondholders would -- then you

8    have the issues of whether post-petition interest is an element

9    of the fair and equitable rule under the cramdown scenario.

10          THE COURT:  Yeah.

11          MR. DUNNE:  I think Mr. Karotkin's trying to avoid

12   that by simply saying we're going to deal with what it takes to

13   unimpair them.  And if you say I need to pay these amounts to

14   unimpair them, we'll pay them.  That's what I'm hearing.  But

15   we're happy to deal with all of that sooner rather than later.

16   It's all another reason why we should address these things

17   sooner rather than at confirmation.

18          THE COURT:  Well, you'll also -- I'm sure you're

19   speaking to the choir here.  We can tee up the legal issues,

20   and the parties could still settle that issue, like any other

21   issue.

22          MR. DUNNE:  Correct.

23          THE COURT:  All these things are settleable.

24          MR. DUNNE:  Correct.

25          THE COURT:  Okay.

PG&E Corp., Pacific Gas and Electric Co.

1        MR. DUNNE:  Correct.

2        THE COURT:  Okay.  All right, so don't worry about the

3   question of mediator.  I'm hearing you state the obvious:  that

4   resolving some of these legal issues earlier rather later makes

5   sense.  Again, it's not that I have the final say.  If I make a

6   ruling, that's my job.  If my ruling is appealed on an

7   interlocutory basis, that's an option for the parties and

8   something else to deal with.  But we can't even get there if we

9   don't start by teeing it up here.  So three issues.  Okay.

10       MR. DUNNE:  And Your Honor, unless you have further

11  questions, that's the committee's position.

12       THE COURT:  No.  Thank you.  I appreciate it --

13       MR. DUNNE:  Thank you.

14       THE COURT:  -- Mr. Dunne.

15       Ms. Dumas, presumably you're going to speak for the

16  committee today?

17       MS. DUMAS:  I am, Your Honor.  Good morning.  Cecily

18  Dumas, on behalf of the official committee of tort claimants.

19       The debtor has requested, and we agree, that our

20  comments today will be limited to plan process, and we will not

21  jump ahead to the 9019 motion.  We won't jump ahead to the

22  motion to terminate exclusivity.

23       THE COURT:  Good.

24       MS. DUMAS:  So in that regard, I want to make three

25  points.

PG&E Corp., Pacific Gas and Electric Co.

1    Your Honor, we didn't need to get to this place, but

2    regrettably we are in this place.

3    THE COURT:  Which place?

4    MS. DUMAS:  The place where the victims, the reason

5    this bankruptcy case was filed, are lining up behind a creditor

6    plan.

7    THE COURT:  Okay.

8    MS. DUMAS:  That's where we are.  We didn't need to

9    get here, but it seems that getting here was a fait accompli

10   from day one of these cases.

11   So what do I mean by that?  My first point:  plan

12   process.  I'm limiting my comments to plan process.

13   So I'd like to tell Your Honor how many drafts of the

14   debtors' plan the TCC saw before it was filed; the answer would

15   be zero.  How many meetings the TCC had with the debtors to

16   discuss the plan; the answer would be zero.  It would also be

17   zero if Your Honor asked me how many meetings the debtors had

18   with the TCC in the entirety of the case.  That's how they're

19   playing it.

20   They are playing it like we are an irritant, like a

21   rock in your shoe.  We are not an irritant.  We are the

22   communities you burned.  We are the loved ones of those whose

23   lives you took.  We deserve respect.  This is not a chess game.

24   And forgive my initial scowl at the jocularity in the

25   courtroom, Your Honor.  I deal with thousands of constituents

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1   who don't understand why we're all friendly in bankruptcy

2   court, and they're suffering.  That's just an aside.

3           So plan process.  This has been the most unusual

4   nonplan process I have seen in over thirty years.  Nobody gets

5   talked to.  Nobody gets consulted.  And we're treated with

6   complete dismissiveness.  And I'm not even going to go to

7   discovery and Cravath at all today.  So this is where we are in

8   plan process.

9           My second point relative to this plan.  The debtors'

10  plan says that the tort claims and other identified public

11  entity claims, unidentified whether it's Mr. Pascuzzi's clients

12  or others, we just heard by happenstance that there are two

13  local entities in Paradise who haven't been approached.  There

14  are undoubtedly other public entities, but --

15          THE COURT:  Oh, there are.  Mr. Pascuzzi alone has

16  listed several of them.

17          MS. DUMAS:  FEMA, which may be in the billions.  But

18  my point is that in the debtors' plan, the value of our claims,

19  the victims' claims, and those other question-mark public

20  entities are capped at 8.4 billion dollars.  Capped.  They are

21  capped, because the debtors' intent from the beginning of this

22  case was to protect equity value at all costs.

23          So I ask you, Your Honor, why are you reading up on

24  inverse condemnation?  Why is Judge Donato struggling to assist

25  us in estimation?  Why is Judge Jackson clearing her calendar

PG&E Corp., Pacific Gas and Electric Co.

1  to have a preference trial in San Francisco Superior Court when

2  the debtors have already determined that whatever these courts

3  collectively say is the value of tort claims, they're cap is

4  8.4 billion.

5          THE COURT:  Well, how do you claim -- what am I

6  supposed to make of that?  I mean, look, I appreciate all the

7  fervor that you're speaking with and the people you speak for,

8  but in a stroke of a pen, that 8.4 could be 12.4 or 18.4 or

9  22.6 --

10         MS. DUMAS:  Yes, it could.  And that would --

11         THE COURT:  -- because Judge Jackson's court may make

12  a ruling, one way or the other.

13         MS. DUMAS:  Yes.

14         THE COURT:  Judge Donato may make a ruling.  I may

15  make a ruling.  This is not unusual process.  I'm not going

16  back to what you complained about.  But why are you acting like

17  it's in concrete -- final concrete today at 8.4 million (sic)

18  when it isn't.

19         MS. DUMAS:  Billion.

20         THE COURT:  Billion.  There I go again.  Sorry.

21         MS. DUMAS:  It's all right.  They're awfully big

22  numbers.  So the point is --

23         THE COURT:  No, but it's not.  It's a position, but it

24  doesn't mean it's inflexible.

25         MS. DUMAS:  Yes, it is, Your Honor.

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Okay.

2          MS. DUMAS:  And the reason I'm telling you --

3          THE COURT:  But then what happens if a jury comes in

4   in the billions, or Judge Donato estimates them in the

5   billions?  The debtors' got no choice at that point, right,

6   except to work from that number upwards.

7          MS. DUMAS:  That's correct, Your Honor.  And what we

8   believe, based on everything we've been told, which isn't much,

9   is that the intention of this plan -- you can follow the

10  breadcrumbs -- is to protect equity value.

11         THE COURT:  Oh, I understand.

12         MS. DUMAS:  So the financing, 14 billion, that is

13  calculated on the base of 8.4 billion cap, they think it's

14  lower.  That's fair.  They think it's lower.  Here's my point:

15  a fair and honest broker of these bankruptcy cases would've

16  started with the enterprise value of the company.

17         THE COURT:  Well, you've said that before.

18         MS. DUMAS:  I have said that before.

19         THE COURT:  And I don't know why that's so absolute.

20  It's just a method of style.  They can start with zero if they

21  want, as you can start with fifty-five billion if you want.

22         But the fact of the matter is there are positions that

23  are staked out, and I don't defend people that have treated

24  your clients with dismissiveness.

25         But Ms. Dumas, since September 9th when Mr. Karotkin

PG&E Corp., Pacific Gas and Electric Co.

1  promised to follow a plan, it is now September 24th, and there

2  has been major progress made for one major constituency, if not

3  two, and not your client, I agree.  But in your experience, you

4  can't deny that moving from a cap of 8.-whatever it was in the

5  plan to 11 billion in four days isn't going backwards.  It's

6  progress.  So why do you assume that --

7      MS. DUMAS:  We'd strongly disagree with that

8  assumption, Your Honor.

9      THE COURT:  Well, I don't know how you can disagree

10  with moving up two and half billion dollars for a constituency.

11  It's not your constituency.  I concede the point.

12      But why do you say that that's still not progress?

13      MS. DUMAS:  I can explain, Your Honor.

14      THE COURT:  Okay.

15      MS. DUMAS:  So to my point on estimation and why are

16  three judges going to all this effort, I would love to hear the

17  debtors stand up and say to Your Honor we have the financing

18  commitments for whatever number a court decides is the claim

19  amount of the tort claims, because they have never said that;

20  they are not saying that.

21      THE COURT:  But Ms. Dumas, they're going to --

22      MS. DUMAS:  The plan is conditioned on 8.4 billion.

23      THE COURT:  They won't get their plan confirmed if one

24  or the other or the third court pegs that number and they want

25  to confirm a plan.  So whether it's Judge Jackson's court or

PG&E Corp., Pacific Gas and Electric Co.

1    Judge Donato -- I don't think I'm a major player here, except

2    to the extent of the inverse condemnation issue perhaps.  But

3    if Judge Donato decrees next week that I estimate the tort

4    victims' claims at twenty-five billion dollars, what do you

5    think the debtors' going to do about it?

6              MS. DUMAS:  So --

7              THE COURT:  They're stuck with it; aren't they --

8              MS. DUMAS:  All to my --

9              THE COURT:  -- unless they appeal it.

10             MS. DUMAS:  All to my point.  My friend Mr. Kornberg

11   is here.  You talked about the PUC.  The debtors' plan in

12   capping at 8.4, until we find out that it needs to be a

13   different number and we need to scramble for different

14   financing commitments or we need to go to existing equity

15   security holders and tell them, oops, we are going to dilute

16   you, the bondholders at least treated it fairly.  They are

17   diluted.  The value isn't there.

18             When the debtors come to you and say oh, yeah, we've

19   gone down in our number.  No, we haven't gone down in our

20   number.  We've decided that to move the case forward in a

21   constructive way; we will compromise our claims based on a

22   reasonable assumption --

23             THE COURT:  Okay.  Well, I --

24             MS. DUMAS:  -- regarding the distributable value of

25   the company.

PG&E Corp., Pacific Gas and Electric Co.

1      THE COURT:  And I understand.  You have --

2      MS. DUMAS:  So the bondholder plan is the one that

3  speeds the way with the PUC.

4      THE COURT:  But now you're arguing for your plan that

5  we're not going to take up today.

6      MS. DUMAS:  No, I'm not.  No, I'm not.  I'm taking

7  the --

8      THE COURT:  Well, I think you are, but that's okay.

9      MS. DUMAS:  I'm taking the Court's comment at face

10  value that the debtors can change their mind when, in December

11  or January, a court tells them that their number is not --

12      THE COURT:  They can change their mind on September

13  30th if they choose to.  This is the process.

14      MS. DUMAS:  I think --

15      THE COURT:  I can't order them to change their mind.

16      MS. DUMAS:  Right.  I --

17      THE COURT:  You know that I can't.  I can't say

18  Dumas's got a great argument.  Mr. Karotkin, would you please

19  amend the plan to put thirty-five billion dollars in there.  Be

20  wonderful if he did it.  But --

21      MS. DUMAS:  It would be wonderful if he did it, Your

22  Honor.

23      THE COURT:  -- I can't make him do that.  But I still

24  don't --

25      MS. DUMAS:  No, but lifting exclusivity could.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  -- understand your point.  You complained

2   that progress by getting rid of a major player doesn't exist,

3   even though your clients are bigger players in terms of their

4   losses and their personal tragedies.

5          But you're saying -- what do you want me to do?

6          MS. DUMAS:  So --

7          THE COURT:  To order the debtors to up their offer?

8          MS. DUMAS:  No, Your Honor.

9          THE COURT:  Okay.

10         MS. DUMAS:  Let me just make my third point --

11         THE COURT:  Okay.

12         MS. DUMAS:  -- since the Court seemed to think that it

13  was major progress in the case to increase the insurance

14  companies from eight and a half to eleven.

15         THE COURT:  It certainly seems like it to me.

16         MS. DUMAS:  Well, here's why it isn't.

17         THE COURT:  Okay.

18         MS. DUMAS:  Here's why it isn't.  It isn't, because

19  for another day, there is a relationship between insureds and

20  their subrogating insurers --

21         THE COURT:  I know.

22         MS. DUMAS:  -- under state law --

23         THE COURT:  You've made that --

24         MS. DUMAS:  -- for another day.

25         THE COURT:  You've made that -- that's your position.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1       MS. DUMAS:  But let's talk about how this eleven

2  billion settlement was set up.

3       Months ago, the debtors announced a settlement with

4  certain public entities for a billion dollars.  That settlement

5  was going to be incorporated into a plan.  This settlement, for

6  some reason that we're all not smart enough to understand, is

7  going to be a standalone 9019 settlement and allowed eleven

8  billion dollar claim payable in cash outside the context of a

9  plan.

10       What does that mean?

11       THE COURT:  Well, I don't know --

12       MS. DUMAS:  Does that mean --

13       THE COURT:  -- because I haven't seen the motion.

14       MS. DUMAS:  Exactly.

15       THE COURT:  Well, what do you think it means if --

16       MS. DUMAS:  Is it a sub rosa plan?

17       THE COURT:  What do you think --

18       MS. DUMAS:  Is it a cornerstone of it?  Is it a super

19  blocking vote?

20       THE COURT:  Well, you have a --

21       MS. DUMAS:  Your Honor --

22       THE COURT:  You can make the argument when you see the

23  motion.  I don't --

24       MS. DUMAS:  I agree with you, but that's why this is

25  not progress.  This is not progress.  It is an admittedly

PG&E Corp., Pacific Gas and Electric Co.

1    extremely clever way, by trying to put a 9019 in there.  And

2    I'm not even talking about priority at this point.  I'm talking

3    about why have a 9019 motion and an allowed eleven billion

4    dollar cash claim sitting there.  Is it binding on a Chapter 7

5    trustee?  What does it even mean?  Why isn't it in the plan?

6    It's a buying the votes of the insurance companies --

7              THE COURT:  Well, wait, wait.

8              MS. DUMAS:  -- with whatever was required.

9              THE COURT:  Ms. Dumas, it is in the plan.

10             MS. DUMAS:  It is --

11             THE COURT:  It is in the plan.  And lots --

12             MS. DUMAS:  It will evaporate if it's not approved

13   under 9019 --

14             THE COURT:  Well, that may be.

15             MS. DUMAS:  -- by a date certain.

16             THE COURT:  Well, what do you think happens if it's

17   approved under 9019 and the plan is supported?  You don't know

18   the answer, do you, because I don't know the answer?

19             MS. DUMAS:  I don't know the answer to that.

20             THE COURT:  Well, then let's cross that bridge when

21   you see the motion.  And if, indeed, that there's a lock-in at

22   eleven billion dollars, even if there's no plan, then that's

23   worth raising at that point.  But you're getting upset about a

24   document that doesn't exist yet, that you haven't seen, I

25   haven't seen.  Maybe the debtors haven't even drafted it yet, I

PG&E Corp., Pacific Gas and Electric Co.

1    don't know.

2            MS. DUMAS:  Yes, and hiding the ball seems to be --

3            THE COURT:  Well --

4            MS. DUMAS:  -- his specialty.  But Your Honor, I

5    just --

6            THE COURT:  Okay.

7            MS. DUMAS:  -- let's just go back to --

8            THE COURT:  Okay.

9            MS. DUMAS:  -- similarly situated tort claimants are

10   entitled to similar treatment under a plan.

11           THE COURT:  Correct.

12           MS. DUMAS:  We have no idea whether the -- we have no

13   information at this point.  We are taking it on faith in

14   allowing this debtor to go forward with his hodgepodge.  They

15   say --

16           THE COURT:  What --

17           MS. DUMAS:  -- there's a discount.  They say

18   there's a --

19           THE COURT:  What do you want me to do, tell them they

20   can't do anything?

21           MS. DUMAS:  No.

22           THE COURT:  I don't have --

23           MS. DUMAS:  No.

24           THE COURT:  -- that option.

25           MS. DUMAS:  No, Your Honor.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  So --

2          MS. DUMAS:  Set a hearing on October 7th.

3          THE COURT:  Give me a suggested game plan, and a

4    competing plan is an option.  What is the -- what if the

5    competing plan is not filed, or what if the proponents back

6    off, or what if I don't approve it, the filing of it?  You

7    still have every tool in the toolbox as representing a major

8    constituency to challenge the debtors' plan in every respect.

9          MS. DUMAS:  That's right, Your Honor, and --

10          THE COURT:  So you -- and no one's taking any of that

11    away.  And so that's why, other than your position about this,

12    I don't know what you want me to do today.

13          MS. DUMAS:  It's a status conference, Your Honor.

14          THE COURT:  Okay.

15          MS. DUMAS:  And I --

16          THE COURT:  It's a status conference.

17          MS. DUMAS:  I simply want to point out that, since

18    we're all thinking of AB 1054, we're all looking at the very

19    complex process the PUC has to go through to approve a plan,

20    the debtors' smoke and mirrors say, oh, two plans, that's going

21    to be too complicated; they can't do it.  And what I'm

22    suggesting is when we get to the 7th or the 8th, whenever we

23    hear that motion, we hope the Court will conclude that the

24    competing plan is actually a clearer path forward to all

25    constituents, not this mastermind gamesmanship, super blocking

PG&E Corp., Pacific Gas and Electric Co.

1    vote, sub rosa plan, this settlement, that settlement, we won't

2    let you see it yet.  The insurance companies get releases from

3    the victims, but the victims don't get rel -- I mean, it's

4    all -- it's all way too cute.  It is all way too mastermindy

5    (sic) cute.

6         Why not treat the people whose lives they ruined

7    fairly and up front, clearly?  We haven't had a single meeting,

8    and every time we communicate with them, it's with

9    dismissiveness.  And I'm sorry, Your Honor, but this Court is

10   the court in which we are usually talking in Code sections and

11   talking with the familiarity we all have because we work with

12   each other in every case.

13        I have constituents here who are in tears every time I

14   leave this courtroom because they can't believe the injustice

15   that's happening here.  How is PG&E getting away with it?  I'm

16   getting carried away again, but this is the world in which the

17   tort victims are living.  They are put behind the insurance

18   companies, which it's not my world, but in their world is

19   unfathomable.

20        This is a status conference.  We are glad we're

21   finally going to see this restructuring support agreement.

22   We're going to find out whether the debtors have required the

23   insurance companies to tie up their hands, their documents,

24   their experts, and not participate in estimation at Tubbs.  We

25   will find out what releases they've been giving.  We will find

PG&E Corp., Pacific Gas and Electric Co.

1  out what claims that -- I mean, we'll find all that out.  So

2  having a status conference where we talk about whether the

3  bondholders get made whole yet, and how do we schedule that is

4  the cart before the horse in every sense of the word.

5          THE COURT:  Well, why do you think that?

6          MS. DUMAS:  We need to see that motion.

7          THE COURT:  Why do you think it's the cart before the

8  horse in terms of the pure legal questions, like, for example,

9  funded bond classes, is it impaired or not?  Isn't that

10  purely --

11          MS. DUMAS:  It's one, but it's most certainly not the

12  most important issue --

13          THE COURT:  I understand.

14          MS. DUMAS:  -- in going forward in these cases.

15          THE COURT:  Ms. Dumas, we can agree on what's the most

16  important.  But what's the most important doesn't mean the

17  second or third or fourth or fifth most important still have to

18  be dealt with.  So yes, your constituency getting paid fairly

19  is the highest priority on your list, and perhaps on my list,

20  and perhaps on everybody's list, despite what you say.

21          But there are still a number of other major items that

22  have to be dealt with, and we've identified them.  I've

23  identified at least three of them.  Now, are you advocating

24  that we not deal with these legal questions?  Because they're

25  legal questions as long as the debtor has the right to file a

PG&E Corp., Pacific Gas and Electric Co.

1    plan, which it does.  Even if there are one, or two, or ten

2    competing plans, the debtor has the right to propose its

3    reorganization.

4              And I've differed with Mr. Karotkin about whether you

5    can estimate liquidated claims.  So he said let's tee that up.

6    I've raised the question, and others have, as to whether the

7    funded debt is impaired or not.  That's a legal question, a

8    pure legal question on their plan.  The same with whether you

9    can subordinate subrogation claims.

10             MS. DUMAS:  Your Honor, those are --

11             THE COURT:  All legal claims.

12             MS. DUMAS:  Mr. Karotkin basically just told you,

13   look, if I lose, I'll take care of it anyway.

14             THE COURT:  Well, he had said it as to one of them.

15             MS. DUMAS:  He said it doesn't matter.

16             THE COURT:  He didn't --

17             MS. DUMAS:  Well --

18             THE COURT:  He didn't say it as to the other.

19             MS. DUMAS:  Oh, so --

20             THE COURT:  But Ms. Dumas, let's get back to the real

21   world.  That's what negotiation is all about, because that's

22   what offering 8.4 billion means if somebody says, well, I might

23   estimate this at 30 billion, and guess what happens?  Sometimes

24   people may up the offer, and they make deals.  You're not

25   asking me not --

PG&E Corp., Pacific Gas and Electric Co.

1          MS. DUMAS:  Negotiation requires two sides, Your

2    Honor.

3          THE COURT:  I accept that you are making the statement

4    that, to date, you have not been invited, and your clients have

5    not been invited to the table.  And I'm sorry that that's been

6    so, but that doesn't mean it won't happen.  And if it doesn't

7    happen, then that's unfortunate, but our system -- we have

8    systems.  We have mandatory mediation; we have rules that

9    protect people against the consequences of opponents who are

10   not as cooperative as they think.

11          I'm not -- I don't want to turn this into that kind of

12   a personality contest.  You are capable, and you know the law

13   well, and I know it's difficult for you to explain these

14   complicated bankruptcy issues to your clients, but they are

15   issues that we have to deal with, so.  Okay.  You --

16          MS. DUMAS:  Your Honor --

17          THE COURT:  I appreciate the way you have identified a

18   number of issues that will have to be dealt with coming down

19   the road, like the 9019 motion, if that's what it is --

20          MS. DUMAS:  We --

21          THE COURT:  -- and so on.

22          MS. DUMAS:  We believe that the -- whether a competing

23   plan should be permitted to go forward, and whether the 9019

24   motion should be granted are two issues that are far more

25   important than whether Mr. Pascuzzi's claims are above the line

PG&E Corp., Pacific Gas and Electric Co.

1   or below the line and made whole.

2         THE COURT:  That doesn't mean that his problems aren't

3   important.

4         MS. DUMAS:  That is true.

5         THE COURT:  We don't have a rule that says you rank

6   priorities and issues and problems in order of which is the

7   most important.

8         MS. DUMAS:  Except that --

9         THE COURT:  They're all --

10        MS. DUMAS:  Except that --

11        THE COURT:  They're all important.

12        MS. DUMAS:  -- the two issues that I've identified

13  address whether the debtors' plan is confirmable in any event,

14  and Mr. Karotkin can fix the others.

15        I don't mean to be contentious today, Your Honor.

16  It's been a very, very disappointing plan process with the

17  debtors.

18        THE COURT:  Okay.  Let's switch gears.  How adamant

19  are you about not being available on the 10th or the 11th?  Is

20  that something that you have any availability to adjust?  I'm

21  not going to mess up with religious holidays, and maybe the 7th

22  is doable; but how much of an imposition would you or your

23  clients suffer if I move the hearing to the 10th?

24        MS. DUMAS:  I'm not available on the 10th or the 11th,

25  Your Honor, and I can explain --

PG&E Corp., Pacific Gas and Electric Co.

1       THE COURT:  You don't have to.  I'll take --

2       MS. DUMAS:  -- in camera with Mr. Karotkin --

3       THE COURT:  You don't have to Ms. Dumas.

4       MS. DUMAS:  -- if Your Honor would like to know.

5       THE COURT:  I don't make it a practice of imposing on

6  counsels' schedules if I can avoid it, so I don't want to know.

7  I take your word for it.  I don't care what you're doing on

8  that day.  It's the date that you have a priority.  Okay.  I'm

9  going to see if we can make it work.  Okay?

10      MS. DUMAS:  We would like to have the hearing, if the

11 Court can possibly schedule it, on the same day --

12      THE COURT:  Maybe we can --

13      MS. DUMAS:  -- as the district court.

14      THE COURT:  -- but again, I'm not going to mess up the

15 religious holidays that people observe --

16      MS. DUMAS:  Of course.

17      THE COURT:  -- if we have to be faithful to that any

18 more than anything else, so we'll make it work one way or the

19 other.

20      MS. DUMAS:  Of course.  Thank you, Your Honor.

21      THE COURT:  Okay.  Mr. Pascuzzi, I had asked you to --

22 well, let's see, who -- yeah, Mr. Pascuzzi, I already asked

23 you, but we're going to take everybody who wants to be heard.

24 Again, appearance for the record.

25      MR. QURESHI:  Good morning, Your Honor.  For the

PG&E Corp., Pacific Gas and Electric Co.

1    record, Abid Qureshi, Akin Gump Strauss Hauer & Feld --

2              THE COURT:  Mr. Qureshi, yes.

3              MR. QURESHI:  -- on behalf of the ad hoc bondholder

4    committee.  Your Honor, if I could start with this scheduling

5    issue?

6              THE COURT:  Okay.

7              MR. QURESHI:  Your Honor, what we would propose is

8    that the hearing take place on October 7th in the afternoon to

9    allow for the status conference and those that need to attend

10   the status conference at the district court --

11             THE COURT:  Um-hum.

12             MR. QURESHI:  -- to go ahead beforehand.  We think

13   that makes a lot of sense.

14             THE COURT:  Well, it does.  There's some efficiencies

15   there.

16             MR. QURESHI:  There's efficiencies there.

17             THE COURT:  I don't disagree with that.

18             MR. QURESHI:  I also want to address, in connection

19   with the scheduling issue, Mr. Karotkin's comment on discovery.

20   The discovery that has been served in connection with our

21   motion to terminate has been entirely one way.  If the hearing

22   is to go forward on October 7th, I would imagine, Your Honor,

23   that any discovery that we might serve upon the debtors or the

24   equity holders will be very limited.  We do think that we will

25   be able to give them the depositions that they have asked for,

PG&E Corp., Pacific Gas and Electric Co.

1    give them the document production that they have asked for, on

2    a schedule that allows the hearing to take place on the October

3    the 7th.  Of course, it will be tight; it always in in

4    bankruptcy, but we think we can make that work.  And there

5    certainly wouldn't be, in that scenario, Your Honor, any

6    discovery coming from our group that would derail that in any

7    way.  So we do think that going forward on the 7th would be

8    appropriate.

9         THE COURT:  Do you agree with the need to tee up the

10   impairment issue?

11        MR. HINKER:  I do.  That's where I was going next.  We

12   absolutely think that that question needs to be teed up, Your

13   Honor.  There are billions of dollars at stake, depending on

14   the outcome of that issue.  We think that is an issue that

15   needs to be determined before --

16        THE COURT:  And that's --

17        MR. HINKER:  -- any disclosure statement goes out.

18        THE COURT:  You agree, don't you, that that's true

19   whether or not there's a competing plan?

20        MR. HINKER:  Yes.

21        THE COURT:  Okay.

22        MR. HINKER:  That issue absolutely needs to be teed

23   up, and we're happy to do so.

24        Next, Your Honor, I wanted to raise -- Your Honor had

25   asked the question about the OII that was filed and whether

                PG&E Corp., Pacific Gas and Electric Co.

1    there was anything the Court needed to do with respect to that.

2              THE COURT:  Yeah.

3              MR. HINKER:  And I think the answer is no, other than,

4    Your Honor, to point out that what is important about the OII

5    is that it does contemplate, it does expressly state, that the

6    PUC can handle multiple plans at one time.  So I just wanted to

7    make sure --

8              THE COURT:  Well, it looks like they handle lots of

9    things at one time.

10             MR. HINKER:  Right.

11             THE COURT:  Well, you know what, so can the bankruptcy

12   court.

13             MR. HINKER:  Next, Your Honor, mediation.  So like the

14   Official Creditors' Committee, we did not have any

15   conversations with the debtors prior to this hearing about

16   mediation and whether we would be willing to participate in

17   mediation or even whether we are invited to the mediation that

18   Mr. Karotkin is requesting.

19             Our view, Your Honor, is as follows.  Mediation

20   absolutely can be helpful, but there's a time and place for

21   mediation, and we think right now, in advance of the hearing on

22   our motion to terminate exclusivity to allow for a competing

23   plan, there is no issue to mediate.

24             And why do I say that, Your Honor?  Because under the

25   ad hoc bondholder plan, which, again, I'm not here to argue it,

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1   but just in connection with the mediation question, we have a

2   settlement with the individual claimants.  With respect to the

3   subrogation holders --

4           THE COURT:  Well, just pause there for a minute.

5           MR. HINKER:  Sure.

6           THE COURT:  What does that mean in fact?  In other

7   words, you're not adverse to them to begin with, so what is

8   being settled between the bondholders and Department of

9   Finance?

10          MR. HINKER:  So what we have offered, Your Honor, what

11  is contemplated in our plan, is an aggregate cap of twenty-four

12  billion dollars for all wildfire liability.

13          THE COURT:  Right.

14          MR. HINKER:  Now, importantly --

15          THE COURT:  I know that.

16          MR. HINKER:  -- with respect to the mediation issue --

17  so we have an agreement with the TCCs, with the individual

18  claimants.  The eleven-billion-dollar subrogation settlement

19  that is part of the debtors' plan, Your Honor, we offered the

20  same treatment to the subrogation holders.

21          THE COURT:  Well, but --

22          MR. HINKER:  It --

23          THE COURT:  Listen.  The one thing I don't want to do

24  is have a discussion about offers that haven't been accepted.

25  What I'm asking you is, really, the flipside of what I heard

PG&E Corp., Pacific Gas and Electric Co.

1    Ms. Dumas argue about.  Ms. Dumas says that the debtors are

2    trying to run through their 9019 procedure with the ad hoc

3    subrogation group as a discrete settlement.  So whether they

4    can do that or not remains to be seen.

5              My question to you is what is the discrete settlement

6    between the bondholders and the TCC?  There's nothing to

7    settle, is there?  There's no dispute to begin with.  They're

8    different creditor groups with the same common debtor.

9              MR. HINKER:  Which --

10             THE COURT:  So what are you settling?

11             MR. HINKER:  Which gets to my point, Your Honor.

12   There is nothing to mediate at this stage.  What needs

13   mediation is if there are competing plans.

14             THE COURT:  You must not have been listening when

15   Ms. --

16             MR. HINKER:  But --

17             THE COURT:  -- Dumas was speaking because I heard a

18   plea about why isn't the TCC being invited to sit down and talk

19   to the debtor?  Why isn't that the most critical mediation in

20   this entire case?

21             MR. HINKER:  Your Honor, because --

22             THE COURT:  You don't have to answer that.  But it's a

23   question.

24             MR. HINKER:  We don't think mediation makes sense when

25   there is a completely unlevel playing field.  What ultimately

PG&E Corp., Pacific Gas and Electric Co.

1    needs to be -- again, when the individual tort claimants have

2    agreed upon, with the bondholders, an amount in recoveries that

3    would satisfy them, and when the subrogation holders have

4    agreed to a similar amount that would also be available to them

5    under a bondholder plan, then the issue of what the recovery

6    should be on account of the wildfire claims is no longer an

7    issue that's in contention.

8            THE COURT:  No, I understand.

9            MR. HINKER:  Right?

10           THE COURT:  I understand.

11           MR. HINKER:  And therefore, what is left to mediate is

12   if there are two competing plans.

13           THE COURT:  No, I -- well, again, we can debate that,

14   but listen, if there are competing plans, there should be

15   mediation, perhaps.  But you know what, if there aren't

16   competing plans, there probably still should be mediation.  But

17   that's not for today.  The board mediation was, other than the

18   fact that I raised it at a prior hearing, the first time it's

19   come back up again today.  So it's on the table as something to

20   consider.  And I understand your point.

21           Just tell me one more thing, though --

22           MR. HINKER:  Sure.

23           THE COURT:  -- I'm still unclear.  Should I anticipate

24   that the bondholders on the one hand and the TCC on the other

25   will be teeing up a 9019 motion?

PG&E Corp., Pacific Gas and Electric Co.

1          MR. HINKER:  Well, in --

2          THE COURT:  Is there a -- is there a dispute being

3    settle between two creditor groups or not?

4          MR. HINKER:  So step one, of course, is to terminate

5    exclusivity, Your Honor.  And once we terminate exclusivity and

6    then actually file our plan, a component of which would be a

7    settlement with the TCCs and potentially also with the

8    subrogation holders, if they are willing to accept the same

9    treatment as has been offered under the debtors' plan, then I

10   think we still need to think through the procedures, but it may

11   well be that we would tee up a 9019 --

12         THE COURT:  But normally --

13         MR. HINKER:  -- under our plan as well.

14         THE COURT:  -- when you go back to the book, 9019

15   motion is teed up by the representative of the estate.

16         MR. HINKER:  Correct.

17         THE COURT:  You're describing a 9019 motion that

18   doesn't involve the representative of the estate and it's kind

19   of a --

20         MR. HINKER:  Right.

21         THE COURT:  -- it's kind of a strange animal here.

22   I'm not saying you can't do it; I'm saying I don't know why --

23         MR. HINKER:  Well, step one, Your Honor, is --

24         THE COURT:  -- it's being done that way.

25         MR. HINKER:  -- is --

(973)406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1      THE COURT:  Step one is to break exclusivity --

2      MR. HINKER:  Right.

3      THE COURT:  -- and get your own plan.

4      MR. HINKER:  Right.

5      THE COURT:  I understand.  Which is another way of

6  saying if I don't terminate exclusivity, there'll be no

7  settlement with your groups.  Is that what you're telling me?

8      MR. HINKER:  If exclusivity is not terminated, then

9  there is not to settle, Your Honor.

10      THE COURT:  Okay.

11      MR. HINKER:  That is correct.

12      THE COURT:  Save that for the hearing at the next time

13  around.

14      MR. HINKER:  Sure.  Your Honor, I want to make just

15  two points with respect to the debtors' plan.  One --

16      THE COURT:  Is it an action item or is it just an

17  argument?  I mean, because if --

18      MR. HINKER:  This is in connection with the status

19  conference.

20      THE COURT:  Okay.

21      MR. HINKER:  And I suppose it is an action item, Your

22  Honor, in this sense, that we stood up at the last hearing and

23  asked of Mr. Karotkin to please share with us the financing

24  commitments as they come in.  We've heard Mr. Karotkin stand up

25  again and again.  It's like the cashometer (sic).  This is how

PG&E Corp., Pacific Gas and Electric Co.

1    much we have today.  Banks and financial institutions are

2    tripping over themselves to offer financing.  The plan

3    documents that were filed, Your Honor, show that there are

4    commitments from the same two institutions that aggregate

5    something around 1.5 billion dollars that existed about a month

6    ago, and nothing more than that.

7           THE COURT:  Well, there's a statement that they filed

8    yesterday.  Does that not tell me fourteen billion?  Is that --

9           MR. HINKER:  Well, you --

10           THE COURT:  Am I to ignore that?

11           MR. HINKER:  The only commitment letters are the

12    commitment letters that were previously filed with the Court

13    that, in the aggregate, total approximately one-and-a-half

14    billion dollars --

15           THE COURT:  I'm just reading something --

16           MR. HINKER:  -- from two institutions.

17           THE COURT:  -- that I read that was written yesterday.

18           MR. HINKER:  Yes, and --

19           THE COURT:  Commitments in excess of fourteen billion.

20           MR. HINKER:  Right.

21           THE COURT:  That's false?

22           MR. HINKER:  I'm not saying it's false, Your Honor.

23    I'm saying that we have no underlying documentation whatsoever.

24           THE COURT:  Okay.

25           MR. HINKER:  All we have been provided are two

PG&E Corp., Pacific Gas and Electric Co.

1  commitment letters from the same two parties that have

2  committed about a billion-and-a-half dollars a long time ago.

3  The debtors attached highly confident letters.  If that's all

4  they have, then that's all they have.  But it is important, as

5  their plan process moves forward, that there be complete

6  transparency with respect to the financing commitments.

7          Now, why is that important?  Your Honor asked the

8  question of Mr. Karotkin:  what happens if the debtors are

9  wrong about whether the bondholders are impaired?  If they lose

10  that issue, Mr. Karotkin lightly says, well, then we'll just

11  unimpair them.  Well, Your Honor, it's multibillion dollars of

12  issues and it's not that simple because you can't just wave a

13  magic wand and unimpair them; you need the financing.

14          THE COURT:  Well --

15          MR. HINKER:  And --

16          THE COURT:  -- I mean, I know that and --

17          MR. HINKER:  Right.

18          THE COURT:  I know that.  It's called, is your plan

19  feasible.  But what do you want me to do today?  Look, I've got

20  twenty people behind you --

21          MR. HINKER:  Sure.

22          THE COURT:  -- and this is supposed to be a status.

23  So what do you want me to do today?

24          MR. HINKER:  Nothing other, Your Honor, than to ask of

25  the debtors what we have asked of them, which is to share

PG&E Corp., Pacific Gas and Electric Co.

1    promptly with the parties and to be completely transparent with

2    respect to commitments that they have and that they don't.

3            Your Honor, the last point I will raise -- again, it's

4    just to flag an issue in the debtors' plan, and that is with

5    respect to the subrogation settlement.  Again, not an action

6    item for today, but there is a provision in that settlement

7    that we found to be very troubling, which is that is requires a

8    release by the individual tort claimants of any claims they may

9    have against the insurers in order to recover any amount out of

10   the trust.  Again, we don't think that's appropriate.  It's not

11   an issue for today, it's just one that we're --

12           THE COURT:  Well, I think --

13           MR. HINKER:  -- flagging for the Court.

14           THE COURT:  Listen, I think it's a fair point, at

15   least, to put the word out there, the R word.  And releases go

16   with exculpation clauses, and those of us who grow up and love

17   the Ninth Circuit know exactly what the Ninth Circuit has

18   taught us about third-party releases and some of these other

19   things.  And I'll assume that Mr. Karotkin and his team will

20   keep those legal principles in mind, and we'll deal with it

21   downstream.  I'm not going to turn the first status conference

22   on a plan that was filed yesterday into a definitive

23   discussion, but those are obviously red flags in a document

24   that any bankruptcy judge in the Ninth Circuit has to approve,

25   including this one.  So we'll just put it on the checklist.

PG&E Corp., Pacific Gas and Electric Co.

1    Okay.

2            MR. HINKER:  Merely flagging the issue, Your Honor.

3            THE COURT:  Okay.

4            MR. HINKER:  That's all I had.  Thank you.

5            THE COURT:  Thanks.

6            Okay.  Mr. Pascuzzi, I singled you out to be heard.

7    You've been competing with all these people behind you that are

8    trying to muscle you out of the way.

9            MR. PASCUZZI:  Well, thank you, Your Honor.

10           THE COURT:  So has peace broken out, or not?

11           MR. PASCUZZI:  Peace has not broken out, Your Honor.

12   Paul Pascuzzi, we're cocounsel with the California Attorney

13   General's Office for various California state agencies with

14   fire-related claims in connection with this, Your Honor.  CAL

15   FIRE, Department of Toxic Substances Control, Office of

16   Emergency Services --

17           THE COURT:  You don't have to name them all.  You're

18   on the record.

19           MR. PASCUZZI:  Thank you, Your Honor.

20           I think that what you're asking is, as far as

21   scheduling the briefing for the determination of the liquidated

22   or unliquidated status of the claims, we should meet and confer

23   with the debtor on that, I agree with Mr. Karotkin.

24           THE COURT:  But you agree with me, right, that the

25   plan is drafted, it doesn't separate it out.

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          MR. PASCUZZI:  I agree.

2          THE COURT:  So one of your agencies, whether they

3   filed a claim by the twenty-first to the penny or not, at least

4   the debtors' plan would have them in the estimation process.

5          MR. PASCUZZI:  Right.

6          THE COURT:  Okay.

7          MR. PASCUZZI:  Right.  Which we object to, Your Honor,

8   and --

9          THE COURT:  And you did before, and we raised the

10  preliminary discussion.

11         MR. PASCUZZI:  Right.

12         THE COURT:  Okay.

13         MR. PASCUZZI:  So once we file the claims, then we

14  will talk to the debtors about scheduling that to tee it up

15  before Your Honor.  And the --

16         THE COURT:  Yeah.  Well, I would -- I would like you,

17  because you've been active for so many agencies -- not to

18  discount FEMA or any other federal or state agencies that have

19  separate representation.  I just want you to be the point

20  person and gather up the views of similarly situated counsel

21  and work with Mr. Karotkin on an agreed schedule.  And anything

22  that is agreeable in terms of a timing is fine with me.  I

23  mean, we'll make it work.  I don't necessarily want to have it

24  exactly on the -- on the inverse condemnation schedule, but I'm

25  willing to make it work.  I'm the one that has to read the

PG&E Corp., Pacific Gas and Electric Co.

1    briefs and listen to the arguments, so we'll just make it work.

2          MR. PASCUZZI:  Understood, Your Honor.

3          THE COURT:  Okay.

4          MR. PASCUZZI:  And I did want to mention, the United

5    States lawyer is here, Mr. Troy --

6          THE COURT:  Right.

7          MR. PASCUZZI:  -- and he's -- they've made the similar

8    argument on the liquidated, unliquidated issue.  So we'll

9    include them, and I'd be happy to be the point person.

10          THE COURT:  Okay.  And I don't recognize Mr. Troy,

11    but -- oh, okay.  So Mr. Troy, then.  Well, I don't know

12    everybody in this case, and I'm trying to keep track.

13          But I mean, are you in the same position, right?

14          MR. TROY:  Yes.

15          THE COURT:  You agree?  Begin.

16          MR. TROY:  For the Record, Matthew Troy, Civil

17    Division, United States Department of Justice, on behalf of

18    various federal agencies including, but not limited to FEMA.

19    I'll stop there.

20          THE COURT:  Well, you would just work with Mr. --

21    okay.  So can you coordinate with respect to --

22          MR. TROY:  I'm one of the people that Mr. Pascuzzi has

23    to corral, yes.  But just to drive home the point, Your Honor,

24    Ms. Dumas is correct.  And not to impugn or diminished the

25    State's claims, but the federal government's claims are

PG&E Corp., Pacific Gas and Electric Co.

1  significantly greater -- I believe will turn out to be,

2  significantly greater than the State's claims.  And Ms. Dumas

3  is correct, it will be in the billions.  So we are not an

4  insignificant player.  I know I probably -- thinking you hadn't

5  recognized me, I hadn't appeared much --

6        THE COURT:  That doesn't matter.

7        MR. TROY:  -- but we are a significant player in this

8  claim --

9        THE COURT:  I know you are.

10       MR. TROY:  -- and in this case.

11       THE COURT:  of course I know.

12       MR. TROY:  And just to drive home the point, I am

13  happy to talk to any other constituency in this case about our

14  claims so that it's not a mystery about what we're going to

15  assert.

16       THE COURT:  Well, presumably by the 21st, you're going

17  to -- you're going to assert your claims, right?  I mean --

18       MR. TROY:  Absolutely.  And I'm happy --

19       THE COURT:  And the --

20       MR. TROY:  -- to have conversations before then, too.

21       THE COURT:  There's no -- going back in recollection,

22  the 21st is a deadline even for government claims, right?

23       MR. TROY:  Absolutely, yes.

24       THE COURT:  So on 10/21, the docket will reflect

25  somewhere the liquidated claims that your agency and all the

PG&E Corp., Pacific Gas and Electric Co.

1    other State agencies are serving, and then we have a number.

2         Okay.  That's fine.  I appreciate that.

3         MR. TROY:  Yeah.  Thank you, Your Honor.

4         THE COURT:  Thank you, Mr. Troy.

5         All right.  So I will then expect that the two of you

6    will work with Mr. Karotkin on a schedule, okay?

7         Good morning.

8         MS. WINTHROP:  Good morning, Your Honor.  Rebecca

9    Winthrop of Norton Rose Fulbright, on behalf of Adventist

10   Health.  Adventist Health owns and operates the hospital in

11   Paradise, was the largest employer in the region, and has

12   suffered multiple millions of dollars in property damage and

13   business losses.

14        THE COURT:  And tell me, then, the name of the

15   hospital.

16        MS. WINTHROP:  Adventist Health.

17        THE COURT:  Okay.

18        MS. WINTHROP:  It owns and operates Feather River

19   Hospital.  It employed 1,200 people in the area and has

20   multiple million dollars of business losses and property

21   damage.

22        It, too, is working very hard to liquidate its claims.

23   It, too, should be -- we would invite the Court to -- or we

24   would like to accept the Court's suggestion that debtor tee up

25   this estimation issue, and whether they can estimate liquidated

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1   claims for more than just public entities, but for those of us

2   who have the fully liquidated damage claims.

3          THE COURT:  But the hospital is not a public entity?

4   Is it a private --

5          MS. WINTHROP:  No.  It is a private entity.

6          THE COURT:  It's not an entity -- so again, it's a big

7   one and it's a hospital, but it's not legally different from --

8          MS. WINTHROP:  It's a religious -- it's a

9   California --

10         THE COURT:  Yeah, and I --

11         MS. WINTHROP:  -- religious nonprofit organization.

12         THE COURT:  -- and I recognize the name.  But legally,

13  it's not an individual who suffered a loss of a home or family,

14  but it's a --

15         MS. WINTHROP:  Correct.

16         THE COURT:  -- it's a corporate entity that lost

17  property --

18         MS. WINTHROP:  Yes.  Property damage, business losses;

19  fully liquidated claims.

20         THE COURT:  But is it fully liquidated?  Are you sure?

21         MS. WINTHROP:  We are -- we are working very hard to

22  liquidate those claims, Your Honor.

23         THE COURT:  Okay.

24         MS. WINTHROP:  Therefore, we would -- we would like to

25  suggest a fourth area of legal issue to be addressed, and would

PG&E Corp., Pacific Gas and Electric Co.

1   be happy to meet and confer with debtors' counsel.

2           THE COURT:  And what would -- how would you label

3   that?  In other words, how does it differ from the federal --

4   the State and federal agencies?

5           MS. WINTHROP:  As with the liquidated damage claims of

6   those insurers and those public entities, we, too, have

7   liquidated damages that do not need to be estimated as part of

8   the estimation proceeding going on at District Court.  They

9   should just simply be -- they may well dispute them, and they

10  can establish a disputed claims reserve for us.

11          THE COURT:  Well, that's right.  And they have every

12  right to dispute them.  And were you at the prior hearing when

13  I had this discussion?

14          MS. WINTHROP:  Yeah, I was listening, Your Honor, yes.

15          THE COURT:  So I mean -- so disputes are what we deal

16  with, but 502(c) isn't there, in my mind, for disputed claims.

17  It's --

18          MS. WINTHROP:  Correct, correct.

19          THE COURT:  It's you file your claim, somebody

20  objects.

21          MS. WINTHROP:  Right.  But as the plan is now stated,

22  Your Honor, it seems to lump in even fully liquidated disputed

23  claims into the claims estimation proceeding.

24          THE COURT:  Well, it seems to me that, then, much like

25  FEMA and the State agencies, we have to wait until the claims

PG&E Corp., Pacific Gas and Electric Co.

1    deadline and then somebody has to say, okay, what's the tally

2    of claimants?  And I would assume, for example, there are a

3    small number of humans and individual people who have

4    liquidated claims based upon the 2015 Butte fire.  And those

5    are probably not even disputed, but they are liquidated,

6    therefore not estimatable, claims.

7         And the difference might be, for an individual who

8    settled with PG&E in 2005, it's not only liquidated, it's

9    undisputed.  In your case, there may be disputes or not

10   disputes.  That's for another day.

11        MS. WINTHROP:  Yes, Your Honor, but what we're seeing

12   here is, as more and more claims -- or the classes of claims

13   are evolving, you now have two classes of creditors that are

14   wildfire-related claimants that are getting disparate treatment

15   from the class of tort fire claimants.

16        THE COURT:  Well, but suppose the debtor agrees that

17   Adventist Hospital's liquidated claim is X million dollars --

18   let's pick a number, X -- that's different from what class this

19   is in for plan purposes.  So what class is your client in for

20   the draft of this plan?  I mean, there are only two classes

21   of -- no, three.  No, we'll leave aside the eighteen entities

22   that have settled with PG&E, and that's a separate group.  So

23   aren't you in the other wildfire claim class?

24        MS. WINTHROP:  One would assume, but you can't tell

25   that specifically from the language in the current plan, Your

PG&E Corp., Pacific Gas and Electric Co.

1  Honor.

2  THE COURT:  Okay.  Well, all right.  So I will -- I

3  will let Mr. Karotkin tell me if he agrees or disagrees, but at

4  least for now, I'm going to assume that, you know, maybe

5  there's a separate subset of people that claims have to be

6  considered.  To me, it seems like it's just part of -- it

7  either is or isn't estimatable, and I'm not -- it doesn't

8  strike me that the fact that your client is a private entity

9  and Mr. Pascuzzi's are public entities that that's different,

10 that that's a different analysis, but maybe I haven't thought

11 about it.  It seems to me it's the same analysis, but --

12 MS. WINTHROP:  Well, Your Honor, we are concerned that

13 these issues are not being fully addressed in the plan, and are

14 hoping there would be an opportunity to do as you invited the

15 debtor before, was to set up this issue for further briefing.

16 THE COURT:  No, but all I'm -- and I don't want to

17 beat this to death because I want to get this going --

18 MS. WINTHROP:  Yes, Your Honor.

19 THE COURT:  -- but why would you think, Ms. Winthrop,

20 that -- let's assume that if the debtors believe that your

21 claim is subject to estimation and I say -- and then I disagree

22 or I rule on a proper motion that it is not subject to

23 estimation, why, then, would it be any different from a FEMA

24 claim or a State agency claim?

25 MS. WINTHROP:  It --

PG&E Corp., Pacific Gas and Electric Co.

1        THE COURT:  Wouldn't it -- wouldn't it be a

2   liquidated, disputed claim --

3        MS. WINTHROP:  Right.

4        THE COURT:  -- like the gardener who trimmed the hedge

5   at the corporate offices, or the victim who lost a life or a

6   home?  And then there are -- there are claims that either are

7   allowed or aren't, and --

8        MS. WINTHROP:  Yes, Your Honor.

9        THE COURT:  Right?

10        MS. WINTHROP:  Right.  And as we understand it, there

11   should be disputed claims reserves set aside, so that these

12   parties are not --

13        THE COURT:  But setting aside a reserve is a different

14   issue.  Any time -- I mean, that's a separate issue.  And for

15   example, if you see what the latest plan does about the Ghost

16   Ship fire.  As I see it, it treats it as a pass through.  And

17   again, I don't want to speak --

18        MS. WINTHROP:  Separately classified, disparately

19   treated fire victims, Your Honor.

20        THE COURT:  Okay.  But the point is, without getting

21   into a debate, just looking at the document, they aren't

22   treated with the same as the other groups, but they are --

23   they're not -- whether they're reserved for is another story.

24   And any creditor who differs with the adequacy of a reserve,

25   that's a separate issue.  Much to -- it's not different -- it's

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    not one of these Bankruptcy Code issues.

2           Okay.  I got you.  Thank you, Ms. Winthrop.

3           MS. WINTHROP:  Thank you, Your Honor, for your time.

4           THE COURT:  Okay.  Good morning.

5           MR. MARSHACK:  Good morning, Your Honor.  Richard

6    Marshack, Marshack Hays, on behalf of the SLF Fire Victims --

7           THE COURT:  Mr. Marshack.

8           MR. MARSHACK:  -- 5500.

9           I'm going to address two issues today, and I'm going

10   to make it quick.  One, the next hearing date.  October 7th

11   works great.  And my experience with Judge Donato, we all came

12   up here for a big hearing in front of Judge Donato --

13          THE COURT:  He got rid of you in fifty minutes, right?

14          MR. MARSHACK:  Yeah.  And so I got a feeling there's

15   going to be plenty of time for us.

16          THE COURT:  Yeah.  Maybe I'll take a lesson from him.

17          MR. MARSHACK:  Oh.  That was one of the quickest

18   hearings --

19          THE COURT:  This hearing's over.

20          MR. MARSHACK:  Yeah.  I got a feeling we're not going

21   to be spending much time with him on the 7th.  So if -- and

22   that works out well.  This allows us to travel on Sunday night.

23   So if that works for the Court, I would request that --

24          THE COURT:  Well, it works for the Court.  I don't

25   know if it will work for the principal counsel, but okay.

PG&E Corp., Pacific Gas and Electric Co.

1    Thank you.

2          MR. MARSHACK:  Thank you.

3          THE COURT:  And you had two points, Mr. Marshack?

4          MR. MARSHACK:  I do.  Second point, Your Honor, why's

5    the debtor asking for mediation?  They can walk over -- five

6    feet?  They can walk over five feet and have a conversation

7    with TCC, but apparently, they haven't.  If the conversation

8    fails, then maybe they should ask for mediation.  But you

9    normally start with having a conversation.

10         Is asking for a mediation simply giving them an

11   argument for the 7th or 8th or 10th, where they're going to

12   come before this Court and say to this Court:  wait, don't

13   terminate exclusivity.  We have a mediator, and we're talking.

14   And you would totally cut the legs out underneath a mediator if

15   you -- cut the legs out under the mediator if you terminate

16   exclusivity.

17         I think they're being disingenuous.  I think they

18   asked for mediation because TCC has a pretty good plan.  And I

19   won't say that they're afraid, but I will say they don't want

20   to compete.  They're going to -- so they don't want to

21   terminate exclusivity.  They're using a mediator to delay and

22   make progress -- and prevent TCC from making progress.

23         If this Court is inclined to appoint a mediator, I

24   know this is unusual, but I think the Court should do it in

25   conjunction with Judge Donato.  I don't mean to be offensive.

PG&E Corp., Pacific Gas and Electric Co.

1      THE COURT:  No, you're not being offensive.

2      MR. MARSHACK:  Okay.  Because isn't really --

3      THE COURT:  Well, isn't it the same issue?

4      MR. MARSHACK:  Right.

5      THE COURT:  I mean, the same issue is how to

6  compensate the fire victims.

7      MR. MARSHACK:  Right.  Well, I don't want to suggest

8  to this Court that you don't have the capability or ability.

9      THE COURT:  Well, I do.

10      MR. MARSHACK:  Okay.

11      THE COURT:  But so does Judge Donato --

12      MR. MARSHACK:  No.

13      THE COURT:  -- and so does the Superior Court.

14      MR. MARSHACK:  But we're trying to run this case in

15  harmony.

16      THE COURT:  Yeah.  You don't have to apologize for

17  suggesting what you're suggesting.  But whether it's Judge

18  Donato or Judge Montali or both, what about -- your point is

19  that -- it sounds like what you want is you want me to make a

20  ruling on the exclusivity motion before I even address the

21  mediator.

22      MR. MARSHACK:  Absolutely.

23      THE COURT:  And --

24      MR. MARSHACK:  Absolutely, Your Honor.  Because allow

25  us -- allow all of us in this room that don't necessarily agree

PG&E Corp., Pacific Gas and Electric Co.

1    with the debtor, allow us to put on paper our thoughts.  Allow

2    us to make the full argument.  Allow you to appreciate every

3    last issue of exclusivity.

4            THE COURT:  Well, I do.  I mean, I'm trying my best to

5    appreciate it.  I've been through the exclusivity drill already

6    once.

7            MR. MARSHACK:  You have.

8            THE COURT:  And it's not that I don't understand the

9    legal principle.  And I --

10           MR. MARSHACK:  You definitely understand.

11           THE COURT:  And I don't want the lawyers who are going

12   to brief the exclusivity issue to reinvent the wheel.  I know

13   the legal principles.  The question is how to make it the right

14   result in this case.  And I made a decision all of four weeks

15   ago not to terminate exclusivity, and so I have to think about,

16   well, why would I revisit that now?  But anyway, that's --

17           MR. MARSHACK:  Because you know --

18           THE COURT:  -- for another day.

19           MR. MARSHACK:  Because you know that the really final,

20   last issue in this case, the real big issue in this case, is:

21   how much are we going to allocate for the fire victims?

22           THE COURT:  Correct.  I know.

23           MR. MARSHACK:  And --

24           THE COURT:  I do know that.

25           MR. MARSHACK:  And we -- and I think when the Court

PG&E Corp., Pacific Gas and Electric Co.

1    sits back in chambers and reads the pleadings on exclusivity,

2    the Court's going to realize that the chances of fire victims

3    getting fully, fully, fully compensated is going to come

4    through a competitive process. That's the only chance we have

5    at this point, Your Honor.

6         You don't see the -- if the debtor can unilaterally

7    run this case and unilaterally set the amounts, then --

8         THE COURT: Why do you say that? Mr. Marshack, why is

9    the debtor unilaterally setting the amount? Is the debtor

10   going to pick the number for Judge Donato --

11        MR. MARSHACK: The debtor is not going to --

12        THE COURT: -- or the jury, for the Tubbs trial jury?

13        MR. MARSHACK: You're correct, Your Honor, they're

14   not. But TCC and bond holders may put up more money than Judge

15   Donato does, and it may -- if they put up enough money, to a

16   certain extent, it may moot out estimation.

17        THE COURT: Well, but that's true. I agree. That's

18   true. But --

19        MR. MARSHACK: So --

20        THE COURT: -- that's true --

21        MR. MARSHACK: So let --

22        THE COURT: -- even with exclusivity.

23        MR. MARSHACK: Let the process -- well, it can't

24   happen with exclusivity because you're not giving TCC or any --

25   or any other third --

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Mr. Marshack, again, I would -- we're

2  going around in circles.

3          MR. MARSHACK:  We're not going to argue.

4          THE COURT:  If I say --

5          MR. MARSHACK:  You know, you've asked this Court

6  about -- okay.

7          THE COURT:  -- no termination of exclusivity, go to

8  mediation or not, talk to one another, the gamble still has to

9  be:  What if the Tubbs jury comes in favorable to the debtor?

10  What if Judge Donato comes in with a huge number?  What if --

11  what if a lot of -- there are -- there are two great, big

12  unknowns from those two different places.  And that's -- so

13  I'm -- so you can -- we can revisit this in --

14          MR. MARSHACK:  We can --

15          THE COURT:  -- the next hearing about whether that's

16  relevant, but --

17          MR. MARSHACK:  We can't, Your Honor.

18          THE COURT:  I think I went through this drill last

19  time.

20          MR. MARSHACK:  You did, but there's a game changer.

21  And the game changer is the amount of money in play, starting

22  with the TCC plan.

23          THE COURT:  Okay.

24          MR. MARSHACK:  Your Honor, we -- you asked us, and Mr.

25  Karotkin asked us, not to debate exclusivity today, but I only

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    bring it in because of their request for a mediator.  And their

2    request for a mediator seems to be a way to defer or to weaken

3    TCCs argument for determining exclusivity.

4              THE COURT:  Okay.  I appreciate your comment.

5              MR. MARSHACK:  And thank you.

6              THE COURT:  Next question, thanks.

7              MR. MARSHACK:  Thank you, Your Honor.

8              THE COURT:  Yes.

9              Okay.  Yes, sir.

10             You gentlemen who are standing are welcome to sit.  I

11   won't take offense.  You'll get your place in line.

12             Mr. Harris, you're next up, and Mr. Engel, you're

13   after that, and Mr. Bennett after that.

14             Appearance, please.

15             MR. FELDMAN:  Your Honor, for the record, Matthew

16   Feldman, Willkie Farr & Gallagher, on behalf of the ad hoc

17   group of subrogation claimants.

18             THE COURT:  Good morning, Mr. Feldman.

19             MR. FELDMAN:  Good morning, Your Honor.  Just I know

20   Mr. Karotkin made this point, but I'm going to just reiterate

21   the clarification.  The eleven-billion-dollar class resolves

22   all subrogation claims, regardless of whether they're in the ad

23   hoc group or not in the ad hoc group.  We have a mechanic that

24   will be more evident once the papers are filed, and --

25             THE COURT:  But --

PG&E Corp., Pacific Gas and Electric Co.

1          MR. FELDMAN:  -- we'll happy to discuss it.

2          THE COURT:  But today, you don't have unanimity,

3     right?

4          MR. FELDMAN:  We do not have unanimity, Your Honor --

5          THE COURT:  Okay.

6          MR. FELDMAN:  -- although I would reiterate what Mr.

7     Karotkin said.  I think we'll be north of ninety-five percent

8     of --

9          THE COURT:  Well, but you --

10         MR. FELDMAN:  -- the class, and close to one hundred

11    percent.

12         THE COURT:  -- but you also agree that if there's even

13    one subrogation claimant who hasn't signed up, there's an

14    impairment.  I mean, excuse me, there's an impairment and there

15    will have to be at least some kind of a disclosure and an

16    opportunity to be heard, even though --

17         MR. FELDMAN:  Correct.  But that will be paid out of

18    the eleven billion, is my point.

19         THE COURT:  Yeah, no, I --

20         MR. FELDMAN:  It doesn't change the economics --

21         THE COURT:  -- that's what I --

22         MR. FELDMAN:  -- for the company and the creditors.

23         THE COURT:  -- that's what I understood.  To me, when

24    I read the plan -- and you correct me if I'm wrong.  When I --

25    when I read the prior proposal, whenever it was, and I think it

PG&E Corp., Pacific Gas and Electric Co.

1   was at eighty-five percent, it occurred to me that that meant

2   even fifteen percent would be bound by the plan under the

3   confirmation rules.

4           Obviously, it's better if you get everybody on board,

5   but isn't that right?  I mean, even if you had a holdout of

6   fifteen percent, leaving aside the number, the amount, you'd

7   have your acceptance?

8           MR. FELDMAN:  That is correct, Your Honor.

9           THE COURT:  Okay.  I agree.

10          MR. FELDMAN:  On to other issues.  Your Honor, I do

11  want to touch on Your Honor's invitation to litigate or have

12  the Court consider the made-whole doctrine early as a

13  confirmation issue.  I both agree with Your Honor and disagree

14  with Your Honor.

15          THE COURT:  Okay.

16          MR. FELDMAN:  And here -- and here's why:  The TCC

17  bondholder plan purports to impose class-on-class made-whole,

18  which then provides for subordination of these subrogation

19  claims.

20          THE COURT:  Right.

21          MR. FELDMAN:  I think if the Court wants to consider

22  whether class-on-class made-whole, which would be an entirely

23  new doctrine, is applicable, that ought to be resolved early.

24  When I first -- but ultimately, made-whole as a state law claim

25  is an -- is an insured versus insurer claim individually

PG&E Corp., Pacific Gas and Electric Co.

1    brought by an individual against its insurance company.

2         THE COURT:  No, I understand.  You made that --

3         MR. FELDMAN:  Which is a --

4         THE COURT:  -- in your paper.

5         MR. FELDMAN:  -- which is a state law circumstance,

6    Your Honor.  And I'm not even sure the Court has jurisdiction

7    over that issue because, in fact, that's an issue that can be

8    brought, and should be brought, in State Court by two

9    non-debtor parties.  So I don't understand why the Court would

10   weigh in on that dispute.  The subordination issue, I do --

11        THE COURT:  Well, excuse me --

12        MR. FELDMAN:  -- think the Court should weigh in on.

13        THE COURT:  -- because I -- because when I -- well,

14   first of all, this wasn't fully briefed, all right?  I got a

15   short response from -- well, I shouldn't say short.  The TCC

16   made a motion to terminate exclusivity with your fellow -- the

17   other ad hoc group, not your client, and there were a number of

18   things said in that motion, but one of them was the argument

19   about the Ninth Circuit case, and which I promptly read and

20   read the doctrines.

21        And then when I saw the term sheet for their competing

22   plan, it looked to me like, that they're -- whether it's

23   conflating or not, I won't put labels on it, but the whole

24   issue of made-whole and subordination of subrogation claimants

25   seemed to be the whole issue.  And it's hard for me to think

PG&E Corp., Pacific Gas and Electric Co.

1   that the Bankruptcy Court doesn't have jurisdiction to resolve

2   what is, effectively -- even if it is -- even if it's an

3   intercreditor issue.  So --

4           MR. FELDMAN:  As a class-on-class subrogation, I agree

5   with Your Honor.

6           THE COURT:  Okay.

7           MR. FELDMAN:  I think Your Honor does have the

8   jurisdiction --

9           THE COURT:  But can you --

10          MR. FELDMAN:  -- to rule on that.

11          THE COURT:  -- can you side class-on-class without

12  thinking about the made-whole Doctrine?

13          MR. FELDMAN:  You'll have to think about it, Your

14  Honor, I would agree with that, but I don't think you would

15  have to make any determinations as to whether made-whole is

16  right or right in a particular circumstance in determining --

17          THE COURT:  Yeah.

18          MR. FELDMAN:  -- whether class-on-class --

19          THE COURT:  Yeah, that pretty --

20          MR. FELDMAN:  -- subrogation.

21          THE COURT:  But it --

22          MR. FELDMAN:  That's the point --

23          THE COURT:  -- but it --

24          MR. FELDMAN:  -- I'm making.

25          THE COURT:  -- but it also -- I mean, one of the

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    things, just to do exactly what I don't want to do, is get into

2    the merits.  I found it strange to read the TCCs papers to have

3    them citing a case that is so pivotal that went the wrong way.

4    Normally, I was told, don't cite a case that went the wrong way

5    if you think it's making your point.  And I don't, so -- but

6    Mr. Feldman, help me.  Should I have Mr. Karotkin coordinate

7    with the other parties --

8              MR. FELDMAN:  Well, here --

9              THE COURT:  -- to tee up the legal issues, or not?

10             MR. FELDMAN:  Well, here is what I was going to say,

11   Your Honor.  I think this legal issue is teed up, and I think

12   it's teed up in connection with the soon-to-be-filed motion to

13   approve our settlement.  So I think the Court is going to have

14   to deal with this issue in connection with that motion.

15   But what I would also say, which I did not intend to say as I

16   was sitting in the courtroom today, until Mr. Qureshi got up,

17   is that, frankly, Your Honor, I'm not sure how you can rule on

18   the exclusivity motion without having resolved this issue

19   because it's fundamental to their plan that they be able to

20   subordinate the subrogation claims.

21        THE COURT:  Well --

22        MR. FELDMAN:  And Mr. Qureshi suggested, through

23   announcing settlement proposals, that maybe it's not

24   fundamental, but I'm not going to go down that road.  I'm going

25   to -- I'm going to -- I'm going to comment only on what's in

PG&E Corp., Pacific Gas and Electric Co.

1    the record today, which is a plan that seeks to subordinate us.

2    Which if it's dead in the water --

3            THE COURT:  Well, but --

4            MR. FELDMAN:  -- before we start --

5            THE COURT:  But that's --

6            MR. FELDMAN:  -- why are you terminating exclusivity

7    for?

8            THE COURT:  Well, that's my point.  If it's dead in

9    the water as a matter of law, I wouldn't terminate, so --

10           MR. FELDMAN:  Correct, Your Honor.

11           THE COURT:  I --

12           MR. FELDMAN:  Well, then we have to tee it up between

13   now and whatever date Your Honor decides we ought to hear

14   exclusivity.  But I think it's more appropriately teed up in

15   connection with the company's 9019 motion related to our

16   settlement, which I expect --

17           THE COURT:  What --

18           MR. FELDMAN:  -- will be filed today.

19           THE COURT:  Well, when do you -- well, so I had talked

20   to Mr. Karotkin before about --

21           MR. FELDMAN:  I believe he told you it was going to be

22   teed up for the 23rd.

23           THE COURT:  The 23rd.  So I mean, this is not going to

24   sit well with your opponents, here, but --

25           MR. FELDMAN:  But I think they've given --

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  -- should I --

2          MR. FELDMAN:  -- you this, Your Honor.  I wasn't

3    planning to stand up and say this, but I don't see how it could

4    be done otherwise.

5          THE COURT:  Well, I didn't -- I didn't think about a

6    separate 9019 motion until I read a little bit more on the

7    documents that were filed yesterday.  So I read -- I know

8    that -- I knew that there was this eleven-billion-dollar

9    settlement and wasn't surprised to see it make it to the

10   revised plan.  But what struck me as different was to hear it

11   is also coming as a 9019 motion.  It didn't -- I don't get

12   worried about it, I don't think it's the wrong thing to do,

13   it's just something I didn't anticipate because I thought it

14   would be a plan issue.

15         So but your point is a good point.  If it's relevant

16   to exclusivity, then the question is, should I tier exclusivity

17   and the 9019 motion all together, and you're making a good

18   argument that maybe I should do that, which is not what the

19   exclusivity -- opponents of exclusivity want to hear.  But it

20   would be unfortunate to have everybody rush discovery, rush

21   briefing, rush an argument, only to have me come out here on

22   the 7th and say, continue to --

23         MR. FELDMAN:  Can't decide it, right.

24         THE COURT:  Can't decide it.

25         MR. FELDMAN:  Right.

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  But I'll tell Ms. Dumas and Mr. Qureshi

2     that that sounds like not a deal breaker, but a scheduling,

3     just, issue.

4          So before we end up today, maybe you need to come back

5     and address that with me, but I want to let the other counsel

6     appear, okay?

7          MR. FELDMAN:  The last point, Your Honor --

8          THE COURT:  Yeah.

9          MR. FELDMAN:  -- and then I'll step aside, is that I

10    think Mr. Dunne said it best, which is it does feel like people

11    are circling around numbers that work, deals that work, and how

12    the Court decides to move that forward, we would encourage

13    building on the momentum.

14         One of the benefits of settling, from our client's

15    perspective, is that we do get out of the way and make it a

16    more binary circumstance, and we believe --

17         THE COURT:  You don't need to go to mediation.  You've

18    already cut your deal.

19         MR. FELDMAN:  We believe and we hope that there is

20    plenty of value available to pay in full, as required, the

21    victims, who we do want to see get done.  It is often the case

22    that the subrogation holders settle first, outside of Chapter

23    11, for this exact purpose, to leave the room so that there can

24    be a fair and full settlement for the victims.

25         THE COURT:  Okay, Mr. Feldman.

PG&E Corp., Pacific Gas and Electric Co.

1          MR. FELDMAN:  Thank you.

2          THE COURT:  Leave the room.

3          MR. FELDMAN:  I will leave the room.

4          THE COURT:  Mr. Harris?

5          MR. HARRIS:  Good morning, Your Honor.  Robert Harris,

6     Binder & Malter, appearing for TURN.

7          I'm not going to repeat what's in the status

8     conference statement that we filed, but I do want to focus the

9     Court and the parties on one critical issue, and that is plan

10    funding and the extent to which what is proposed may not comply

11    with AB 1054.

12         Your Honor, the reality is that AB 235 has not passed,

13    the wildfire victims recovery bond measure, and yet it's still

14    in the amended plan.  TURN believes that the issuance of the

15    wildfire victim recovery bonds, were some future iteration of

16    AB 235 to pass, would violate AB 1054.  It's simply this --

17         THE COURT:  Well, no, how can the legislature violate

18    its own rules?  If it passes a law that deals with something,

19    won't it implicitly amend the prior one by doing it?  Does the

20    California --

21         MR. HARRIS:  Well, it would have --

22         THE COURT:  -- legislature issue conflicting rules --

23         MR. HARRIS:  It would have to do that.

24         THE COURT:  -- laws?

25         MR. HARRIS:  There would have to be an amendment.

                    PG&E Corp., Pacific Gas and Electric Co.

1    Because the problem is, it's not neutral to ratepayers, on

2    average.  This is not the time to go into that.  I am prepared

3    to.  I'm also prepared, Your Honor --

4             THE COURT:  No, I don't want you to now.  It's not an

5    item.

6             MR. HARRIS:  No.

7             THE COURT:   I mean, the point is that you're -- if

8    you're telling me that the latest iteration of the PG&E plan

9    failed because there is no AB 235, then that's a legal

10   argument, that's a legitimate one to make.

11            MR. HARRIS:  It is.

12            THE COURT:  But I don't have the knowledge to agree or

13   disagree with you.

14            MR. HARRIS:  Well, the point is, one, AB 235 has not

15   passed --

16            THE COURT:  Yeah.

17            MR. HARRIS:  -- and two, I have multiple reasons why,

18   as proposed before the legislature, were it to be brought back,

19   it would not be neutral to ratepayers, on average.  I'm happy

20   to explain that in a letter to Mr. Karotkin and the committee

21   counsel.

22            THE COURT:  But just tell me this:  the legislature

23   who makes the rules for Californians can make its own decision

24   on how to make something not rate neutral.  So if it chooses to

25   do what AB 235 intends, and to do so it must amend AB 1054,

PG&E Corp., Pacific Gas and Electric Co.

1   that's its job, not my job.  That is what it is, right?

2   Including if it affects rates, right?

3          MR. HARRIS:  Yes, Your Honor.

4          THE COURT:  And again, it's out --

5          MR. HARRIS:  It can choose to --

6          THE COURT:  -- it's outside of this courtroom.

7          MR. HARRIS:  It can certainly choose to put the burden

8   on ratepayers, but as of right now, the controlling statute,

9   the law, is AB 1054, and I would urge the debtor to be cautious

10  not to rely on wildfire tax-free bonds --

11         THE COURT:  Okay.

12         MR. HARRIS:  -- that would place a greater burden on

13  the ratepayers.

14         THE COURT:  Okay.  And I -- and I expect --

15         MR. HARRIS:  -- because it's going to be opposed.

16         THE COURT:  I expect you to be right at that podium if

17  you believe that when it comes time to consider whether we do

18  it in one fell swoop or in chunks, the legal sufficiency of the

19  plan, if it violates California law, I suspect you'll tell me.

20         MR. HARRIS:  Yes, Your Honor, I shall.

21         THE COURT:  Okay.

22         MR. HARRIS:  Here and before the CPUC.

23         THE COURT:  Well, you tell me.  I don't care what you

24  tell them.  You tell me.  And I'll listen to you.

25         MR. HARRIS:  That's all I have, Your Honor.

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Okay.  Thanks, Mr. Harris.

2          MR. HARRIS:  Thank you.

3          THE COURT:  Mr. Engel?

4          MR. ENGEL:  Good morning, Your Honor.  Larry Engel for

5     Sonoma Clean Power Authority.

6          And I encourage Your Honor to make even more focus on

7     legal issues that affect broader parties.  There are many.  I

8     want to mention just one, another two-line definition that you

9     were focused on, perhaps, at the -- at the beginning.

10          There's a definition in 1.151, public entities

11     releasing parties.  And what they've done is they've -- and

12     I'll read it to you in a second, but they've taken the eighteen

13     public entities that have signed up, this PSA, and they've

14     expanded it to include, "any subsidiary, affiliate, department,

15     agency, political subdivision, or instrumentality thereof".  My

16     client, perhaps, may be an instrumentality.  Certainly, every

17     city in Sonoma County is, even though they are not aware of

18     this, a, I suppose, political subdivision of the county that

19     signed the PSA.

20          So we have in this provision, which is tied into the

21     definition of releasing parties, people that are being required

22     to release claims when they were never parties to the

23     transaction, they never -- they signed nothing, they were told

24     nothing, they get nothing.  This is both contrary to the

25     California constitution and illegal, it's a gift of public

PG&E Corp., Pacific Gas and Electric Co.

1    funds.

2             THE COURT:  Well, again, this is why --

3             MR. ENGEL:  So there were -- I submit to Your Honor --

4             THE COURT:  This is why Mr. Harris was commenting.  If

5    you believe that there's a flaw in the law, in the plan --

6             MR. ENGEL:  Yeah.

7             THE COURT:  -- then you raise it, but just to be --

8             MR. ENGEL:  When, is the problem.  There's going to be

9    an end game squeeze.

10            THE COURT:  But not now, other than just what you're

11   saying.

12            MR. ENGEL:  Yeah.

13            THE COURT:  You're just giving me a heads up.

14            MR. ENGEL:  I'm giving you a heads up, and I'm

15   encouraging in your process to -- where you started the day was

16   you were going to tee up critical legal issues that were simple

17   questions of law.  I submit to you this is a simple question of

18   law that could be resolved well in advance of the end game

19   squeeze.  There's going to be a big squeeze here at the end

20   game, Your Honor, and I don't know that anybody wants to get

21   caught in it, including a lot of little parties, like us, that

22   have specific issues like this.  So I just encourage your

23   process, because this is a process point.

24            THE COURT:  Well, but the problem -- the problem, from

25   my point of view, is I sit in my little, private room in there

PG&E Corp., Pacific Gas and Electric Co.

1    and I look at this hundred-page document --

2            MR. ENGEL:  Yeah.

3            THE COURT:  -- and I see long paragraphs with lots of

4    definitions --

5            MR. ENGEL:  Yes.

6            THE COURT:  -- about releases, and I think about my,

7    you know, Ninth Circuit law --

8            MR. ENGEL:  Right.

9            THE COURT:  -- and I go, okay, I need to make sure

10   we -- the thing is --

11           MR. ENGEL:  Right.

12           THE COURT:  -- complies with law.  But I can't just

13   announce that it does or doesn't.  It seems to me, you've got

14   to -- you've got to identify the issues for your opponents, --

15           MR. ENGEL:  Yeah.

16           THE COURT:  -- and be prepared to raise it as a proper

17   legal challenge at some point.

18           MR. ENGEL:  Right.

19           THE COURT:  And not to -- I mean, to say squeeze in

20   the end game, I mean, I don't know whether it's a squeeze at

21   the end game or in the front.  I don't know how to identify it.

22   To me, I've -- to me, I've identified three very significant

23   legal issues that cut across this plan any way you cut it, and

24   maybe you've identified a fourth one.  But I don't know how to

25   frame it.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    MR. ENGEL:  Well, if Your Honor were to allow people

2  to -- in this process that is novel that we're creating as we

3  go, here -- to raise issues, I expect you would find that there

4  are many interesting legal issues that would get raised by

5  various parties who are impacted in some way or another by

6  those very Machiavellian definitions that you're talking about.

7    THE COURT:  Right.  But -- and the point is, what's

8  wrong with asking you to lay out your theories, put it to the

9  debtor, and have them at least hear it from you?  And if they

10  disagree with you, that's fine, and we can identify it as

11  something to brief.

12    I -- what I'm trying to avoid is having an endless

13  list of issues today that I want to put a schedule on.  I've

14  got four of them already and they're big ticket.

15    MR. ENGEL:  I understand.

16    THE COURT:  Okay.

17    MR. ENGEL:  And I'm not asking you for a schedule and

18  I'm not asking for embarrassment, what I -- or excuse me, your

19  complicated -- getting this complicated further.  What I am --

20  what I am asking is that the idea have some support from Your

21  Honor so that, in fact, the debtor has some reason to listen to

22  it.

23    THE COURT:  Well, let's start with Ninth Circuit

24  authority on what --

25    MR. ENGEL:  Right.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    THE COURT:  -- releases are permissible under a plan.

2    MR. ENGEL:  All right.

3    THE COURT:  Period.

4    MR. ENGEL:  All right.

5    THE COURT:  And if we start there and we say, well, if

6  someone else who isn't a proponent of the plan and isn't a

7  participant and isn't a sponsor is being asked to do something,

8  and maybe it's an issue or not.  I just don't know.  I can't --

9  I can't answer the question, at this point.

10    MR. ENGEL:  All right.

11    THE COURT:  So if I'm giving -- if I'm not giving you

12  the right answer today, I'll do my best when it's more

13  precisely defined for me.

14    MR. ENGEL:  Well, we'll figure out a way to see if we

15  can tee it up for Your Honor better.  Thank you.

16    THE COURT:  Okay.

17    Mr. Kornberg, good morning.

18    MR. KORNBERG:  Good morning, Your Honor.  Alan

19  Kornberg of Paul, Weiss, Rifkind, Wharton & Garrison.

20    Is it still -- yeah, it is still morning.

21    THE COURT:  Sure it's morning -- here.

22    MR. KORNBERG:  Your Honor, a number of people have

23  spoken about the PUC process, so I thought I would take a brief

24  minute and just tell you where we are.

25    The commission has taken the preliminary steps to

PG&E Corp., Pacific Gas and Electric Co.

1    begin its approval process in respect of these Chapter 11

2    cases.

3                THE COURT:  Yeah.  And I saw the OAI that Mr. Harris

4    attached to his paper, so --

5                MR. KORNBERG:  Correct, Your Honor.

6    THE COURT:  -- that's sort of the framework, right?  And,

7    again, the deadlines there are October 7.  The company will

8    respond to the OII -- well, first I should say, that the

9    proposed order will be presented to the commission for

10   consideration on Thursday of this week.  If adopted, the

11   schedule would be as follows:  October 7 is the deadline for

12   the debtors to respond to the OII, and file their then most

13   current plan, and anticipated timelines for estimation

14   proceedings in the Tubbs fire trial.  Interested parties will

15   have an opportunity to serve a reply on October 14.  There will

16   be a pre-hearing conference on October 23, and that's described

17   in the OII.  And the outside date for the commencement of

18   hearings is February 2020.

19               Your Honor, the OII does not specifically say that the

20   commission can consider multiple plans.  What it says is that

21   the proceeding will resolve rate-making implications of PG&E's

22   or any relevant alternative plan of reorganization.  And there

23   was also a suggestion --

24               THE COURT:  Well, excuse me, doesn't that mean that if

25   I terminate exclusivity and give the proponents of the

PG&E Corp., Pacific Gas and Electric Co.

1  competing plan an opportunity, they file it and then that sets

2  in motion something at the CPUC as the alternative plan, right?

3          MR. KORNBERG:  Your Honor, exactly right.

4          THE COURT:  Yeah.

5          MR. KORNBERG:  We will then have to figure out what

6  that proc -- what it does to the existing --

7          THE COURT:  Right.

8          MR. KORNBERG:  -- process in the OII.

9          THE COURT:  Right.  Right.

10          MR. KORNBERG:  I just wanted to clarify that.

11          But there was also a suggestion in the pleading filed

12  by TURN, that the OII was somehow premature.  We don't believe

13  that to be the case.  There are many, many issues that will go

14  into the PUC approval process.  And the PUC is eager to get to

15  work on that process.  We are ever mindful of the June

16  deadline.

17          THE COURT:  So going back to our prior discussion, and

18  trying to keep in mind what has to be done here versus what has

19  to be done there, you heard me discuss with the other counsel

20  about some of these dating issues.  I take it to the extent

21  that any of them relate to CPUC concerns, that that's helpful

22  to get that out of the way, is that right?

23          MR. KORNBERG:  Your Honor --

24          THE COURT:  Maybe the CPUC doesn't care about the

25  502(c) process, or maybe it doesn't care about some of the

                    PG&E Corp., Pacific Gas and Electric Co.

1    Chapter 11 classification issues, but it seems to me it's still

2    constructive to get those things pinned down.  Do you agree

3    or --

4                MR. KORNBERG:  I do agree.

5                THE COURT:  Okay.

6                MR. KORNBERG:  The sooner there is more certainty

7    about the plan that's under consideration, the better chance we

8    have of meeting the statutory deadline.

9                THE COURT:  Okay, good.  Thank you.

10               MR. KORNBERG:  Thank you, Your Honor.

11               THE COURT:  All right.  Mr. Bennett, good morning.

12               MR. BENNETT:  Thank you, Your Honor.  Bruce Bennett,

13   Jones Day, on behalf of equity holders.

14               Couple of things.  First of all, just a very short

15   point.  When TURN got up here they said they were concerned

16   about their assertion that the plan was still dependent on

17   wildfire victim recovery bonds.  I know it's a long document,

18   but in Section 9.2 is a paragraph at the end under subsection

19   (L), and it says the following --

20               THE COURT:  9.2 of what, of the plan?

21               MR. BENNETT:  Of the plan.

22               THE COURT:  Oh, okay.

23               MR. BENNETT:  "It shall not be a condition to the

24   occurrence of the effective date that wildfire victim recovery

25   bonds shall be available for the plan funding, or that wildfire

PG&E Corp., Pacific Gas and Electric Co.

1    victim recovery bonds legislation shall have been enacted."

2         There are probably some sentences in this plan

3    document that could be clearer and that will become clearer,

4    but this isn't one of them.

5         I want to --

6         THE COURT:  Actually, for what it's worth, I thought I

7    saw that concept, and then I didn't -- I just can't keep track

8    of all these things.  And so when Mr. Harris said what he said,

9    I just -- I'm glad you answered the way you did, and I'm sure

10   he'll take note of what you said and agree or disagree with

11   you.

12        MR. BENNETT:  Okay.

13        THE COURT:  Okay.

14        MR. BENNETT:  Coming back to, I guess, where this

15   hearing started, was Mr. Karotkin reporting that there'd been

16   significant progress made.  And I'm here to echo that's exactly

17   true.  And I don't want to go into details about that, because

18   this will come in pleadings that will be filed in connection

19   with the exclusivity hearing.  But I do want to focus on two

20   things.

21        One, there was extensive arm's length negotiations

22   between equity holders and the company.  And the commitment

23   letters when Your Honor sees them and compares them with the

24   commitment forms that were generated unilaterally by the

25   bondholder group you'll see the difference.  They're tighter

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    documents, there's clear evidence of arm's length bargaining

2    and what that results in.

3            The second point I'm going to make is basically to

4    support something that I think you started to say.  Which is

5    the debtors' plan is, in fact, the product of arm's length

6    negotiations, where parties on the opposite side of important

7    disputes were called upon to, and did, make compromises.

8            Your Honor, that's the process I think you wanted to

9    see happen.  And in -- the process run by the debtors resulted

10   in that.

11           As Your Honor already noticed -- and by the way, it

12   will turn out to be in many more respects, the bondholder TCC

13   so-called plan is a very different document.  Again, there'll

14   be more about that in papers that you will see.  It's not the

15   result of arm's -- of compromises between people who are

16   genuine adversaries.

17           Now, more to the point of, again, things here today.

18           One, we strongly support the idea that some of these

19   legal issues should get briefed, argued, teed-up, decided as

20   rapidly as possible.  We were, in fact, planning to do it

21   ourselves in the event that others didn't.  And I want to say

22   that with respect to this problem of potentially liquidated

23   claims, it might be that a response to this, and not the only

24   response to this, is that the Court's going to have to start

25   ruling on some claims, because maybe it will set patterns that

(973) 406-2250 | operations@escribers.net | www.escribers.net

                    PG&E Corp., Pacific Gas and Electric Co.

1    will generate opportunities for settlement and compromises

2    going forwards.

3                THE COURT:  And I'm going to do that --

4                MR. BENNETT:  You do that for a living.

5                THE COURT:  -- if nobody's filed an objection.

6                MR. BENNETT:  I appreciate that, Your Honor, because I

7    think that is a possible solution.

8                Okay, second point.  And I didn't plan to talk about

9    this.  But Ms. Dumas was relatively explicit.  In fact, in

10   phones conversations and also in emails, I asked to meet with

11   principals with the TCC, with the full knowledge and approval

12   of the debtors.  Made the request on Saturday.  We got initial

13   positive response, then heard nothing.  So nothing's scheduled.

14   I'm hoping that something will be scheduled.  I am sure that we

15   can be available almost any day next week if the TCC gets back

16   to us.

17               THE COURT:  Is this on behalf of your group, or on

18   behalf of the debtor, or both?

19               MR. BENNETT:  I made it on behalf of our group, but I

20   did it in coordination with the debtor.  So I would regard it

21   as both.

22               I also want to say one last thing.  And I want to say

23   it extraordinarily carefully, but it's important.  There is

24   actually a problem with discussions with the TCC right now,

25   which we're feeling, and I suspect the debtors are feeling, and

PG&E Corp., Pacific Gas and Electric Co.

1    I'm surprised the bondholders didn't feel it.  And that is

2    there's a fundamental credibility problem with the lawyers

3    involved for the wildfire plaintiffs.  And in this connection

4    I'm really glad that in courts we take transcripts, because

5    when we go back and look at them, we're going to see that when

6    the TCC stood up in early hearings in this court, and I think

7    it was Mr. Julian, but I'm not positive, we were told to expect

8    100,000 claims, we were told the liability, just the uninsured

9    part, the victim's not considering the payments they've already

10   received from the insurers, was going to be thirty-six billion

11   dollars.  We even know I think to a certainty on October 21st

12   that those numbers aren't close to right.  So there's a problem

13   starting with very high aggressive numbers if they're divorced

14   from what turn out to be the actual facts.  We will try very

15   hard to get over it.  But one of the things mediators do

16   frequently help with, and some mediators as Your Honor

17   certainly knows from your practice are more helpful than

18   others, is that they are usually pretty good at eliminating

19   credibility problems and forcing out real information where

20   real information is required.

21        I don't know that I have a strong preference as to

22   whether or not mediation is started now or started ten days

23   from now.  I would like to give our chance for invitation of a

24   dialogue to work out first.

25        I am concerned that Mr. Qureshi's view that there will

PG&E Corp., Pacific Gas and Electric Co.

1  be no negotiations could poison them, and so it might make

2  sense that a class that is unimpaired might not be

3  appropriately included.  But we can sort that out some other

4  time as well.

5          THE COURT:  Might not be appropriately what?

6          MR. BENNETT:  Might not be appropriately included in a

7  mediation, particularly when they've said there's no

8  discussions anyway.

9          In any event, I'm hopeful that there will be a meeting

10  sometime relatively soon between TCC principals and principals

11  of my clients.  We will be trying really hard to make that

12  happen.  But, again, this doesn't take away at all from --

13  there's been enormous amount of work by a number of

14  constituencies, including my clients, to get together a plan

15  that has more parties agreeing to it than anything we've seen

16  so far in the case.  And there really is no way to disparage

17  that, that's a huge accomplishment.

18          THE COURT:  Okay.

19          MR. BENNETT:  Thank you, Your Honor.

20          THE COURT:  Thanks, Mr. Bennett.

21          I'm going to take a ten-minute break for everyone.

22  I'll let -- I'm not going to exclude any of you who want to

23  speak, but it's been two hours.  And I know from the prior

24  hearing that we need to take a break for everyone's personal

25  convenience.  So ten minutes, see you back.

of 168
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          (Recess from 11:27 a.m., until 11:43 a.m.)

2                THE CLERK:  All rise.

3                THE COURT:  Okay, please remain seated.  You're all

4     standing up anyway.

5                So I took a minute before -- a little longer than I

6     expected, because we were checking our calendars.  And I

7     checked with my staff, and I'm sorry about that mix-up on the

8     holiday -- the Jewish holiday.  We cleared dates -- all the

9     PG&E dates in advance, and so maybe that slipped through.  But

10    again, after we hear from the other counsel, I'll figure out

11    what to do about rescheduling what we need to reschedule, so,

12    let's go --

13               MR. STAMER:  Good afternoon, Your Honor.  For the

14    record, Mike Stamer from Akin Gump, on behalf of the ad hoc

15    noteholder group.

16               Your Honor, I am not going to be responding to Mr.

17    Bennett's comments, including his comments about the

18    credibility of the tort victims' lawyers.  I assume there'll be

19    a few people in the courtroom that will be responding to that.

20               THE COURT:  Well, I'm not going to take any action on

21    that anyway, but --

22               MR. STAMER:  Understood.  Your Honor, what I'm

23    standing up to do, hopefully, is take a legal issue -- a legal

24    issue off your plate.

25               Mr. Feldman, in his presentation, talked about the

PG&E Corp., Pacific Gas and Electric Co.

1   issue associated with subordination between the tort claims and

2   the subrogation claimants.  I can announce to the Court, and

3   I've conferred with counsel for the TCC, that we anticipate, in

4   advance of the hearing on the 7th that we will be modifying our

5   term sheet, that we will be increasing the twenty-four number

6   to a larger number, and we will be providing the full eleven

7   billion dollars to the subrogation claimants, the same amount

8   that is being offered or settled by the company.

9           We believe that this renders the subordination issue

10  academic.

11          THE COURT:  Well, are they pari passu or similar?  I

12  mean, are they going to be treated equally?

13          MR. STAMER:  They'll be treated such that eleven

14  billion dollars will be carved out for the benefit of the

15  subrogation claimants.

16          THE COURT:  But pro rata or pari passu or some other

17  legal term that doesn't --

18          MR. STAMER:  We can use whatever Latin you need to,

19  Judge.  That --

20          THE COURT:  Any language will do.

21          MR. STAMER:  -- but the bottom line is that they have

22  asked for and negotiated with the company for an eleven-

23  billion-dollar pool of capital:  cash, potentially some other

24  noncash items.

25          As Mr. Qureshi said before, we actually offered that

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1 to the subrogation claimants over the weekend. And Your Honor,

2 we will put that offer in a modified term sheet --

3 THE COURT: But listen --

4 MR. STAMER: Yes, sure.

5 THE COURT: -- my question is -- because I'll have to

6 look at this document. And will it tell the eleven-billion-

7 dollar class members that they are going to be paid in the same

8 priority which the tort victims will be paid?

9 MR. STAMER: Your Honor, the answer is yes.

10 THE COURT: Okay.

11 MR. STAMER: I believe the way it will work is there

12 will be segregated pools of capital.

13 THE COURT: That's fine.

14 MR. STAMER: And therefore they will be treated the

15 same as the other tort victims.

16 Your Honor, as I think you heard from Mr. Qureshi,

17 what we have done is we have agreed with the TCC to a pool of

18 capital that will be available to settle all of the tort

19 claims.

20 THE COURT: So --

21 MR. STAMER: And that number is twenty-four billion

22 dollars.

23 THE COURT: But it's going up.

24 MR. STAMER: And I'm happy to stand up and say, Your

25 Honor, it's going up. Competition is a good thing.

of 168
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    THE COURT:  Okay, but my point is, I don't care

2    whether it's going up or not, you've made it clear to me -- I

3    take it you believe, Mr. Stamer, that if we're having this

4    exclusivity hearing on the 7th or some other day, I won't be

5    told that the plan is dead as a matter of law because of an

6    improper or impermissible subordination --

7    MR. STAMER:  That is correct, Your Honor.

8    THE COURT:  -- of a class?

9    MR. STAMER:  That is --

10   THE COURT:  Okay.

11   MR. STAMER:  -- it took me a little while to get

12   there, but that's exactly why I'm standing up, Your Honor.

13   THE COURT:  Well, you --

14   MR. STAMER:  We are taking that legal issue off of

15   your plate.  We anticipate the subrogation claimants -- it's

16   the eleven billion dollars they're focused on, not focused on

17   whose money that is.  So we anticipate this will completely

18   remove that issue from contention, and therefore, we should be

19   clear to go forward on the 7th.

20   THE COURT:  It won't get rid of the make-whole

21   argument, if that's a part -- a separate issue.

22   MR. STAMER:  The made-whole argument -- you're talking

23   about the argument that is assertible by the tort claimants --

24   THE COURT:  I --

25   MR. STAMER:  -- to be made whole --

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Yes.

2          MR. STAMER:  -- for amounts not covered by insurance?

3    Correct, Your Honor.

4          THE COURT:  Yeah.

5          MR. STAMER:  This does not address that issue.

6          THE COURT:  It's a different issue.

7          MR. STAMER:  That is an issue that will likely come up

8    in connection with the motion to approve the settlement with

9    the subros; and leading that charge, I anticipate, will be the

10   tort claimants committee and individual tort claimants.

11         THE COURT:  Okay.  And the proposal that you're now

12   talking about is not -- you're not going to make a separate

13   9019-type motion, or you are?

14         MR. STAMER:  Your Honor, the -- and maybe I can

15   clarify the comments that Mr. Qureshi made before about the

16   settlement and the question that you asked.

17         As Your Honor knows, you can settle claims in

18   connection with a plan of reorganization --

19         THE COURT:  Yes, of course.

20         MR. STAMER:  -- under 9019.  As a plan proponent, if

21   we're fortunate enough to be given the right to file a plan, we

22   will be proposing to settle all of the tort claims, subros and

23   the like, for an aggregate amount of twenty-four billion plus

24   whatever we put in the next round.

25         THE COURT:  But that's -- I mean, that's the nature of

PG&E Corp., Pacific Gas and Electric Co.

1    a plan by anyone other than a debtor, to offer or to change the

2    rights and obligations of the debtor.  That's different from an

3    intercreditor difference.  So two creditors can schedule -- or

4    settle differences between the two, and to me it's just not

5    typically a 9019 motion.

6              MR. STAMER:  Your Honor --

7              THE COURT:  Okay?

8              MR. STAMER:  -- we'll talk to the TCC about the

9    appropriate way to get it in front of the Court.  I'm actually

10   not certain it's a 9019 motion to be filed --

11             THE COURT:  Okay.

12             MR. STAMER:  -- or whether this will happen in

13   connection with a plan.

14             THE COURT:  And --

15             MR. STAMER:  But just to be clear, Your Honor, the

16   bondholders have a dog in this fight.

17             THE COURT:  I know.  I understand.

18             MR. STAMER:  So the TCC are asserting claims that

19   would render the company insolvent, that would render the

20   bondholders impaired, that would be detrimental to everyone

21   involved.  The virtue of the settlement is we have agreed --

22   and I think people were discounting anyone's ability to do

23   this -- we have agreed to an all-in cap for all of the tort

24   claims.

25             In addition, Your Honor, what I'm standing up now to

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    talk about, which I think I've done, is now we are seeking to

2    settle the inter-claimant issue between the subros and the

3    TCC --

4                 THE COURT:  I got it.

5                 MR. STAMER:  -- as it relates to subordination.  The

6    made-whole issues, this won't address that.  And it's our view,

7    for whatever it's worth, those are between the insurance

8    companies that hold the subro claims and the -- and the tort

9    claimants.

10                THE COURT:  And where do the public entities come in,

11   or the liquidated entities?  Are they in part of the -- they're

12   still part of the eleven million (sic)?

13                MR. STAMER:  I believe the public entities are in the

14   balance of the eleven.

15                THE COURT:  Excuse me.  I don't mean the eleven -- the

16   eighteen people or eighteen entities that settled for a

17   billion.  I'm talking about Mr. Pascuzzi's clients, FEMA, the

18   hospital, all the others up there.  Where do they fit in this

19   hierarchy?  Are they in the eleven or in the --

20                MR. STAMER:  They're in the --

21                THE COURT:  -- in delta?

22                MR. STAMER:  -- in the twenty-four-plus -- whatever

23   we're going to add --

24                THE COURT:  Okay.

25                MR. STAMER:  -- and I believe separate from the

(973)406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1   eleven.  The eleven is just for the subrogation claimants.

2          THE COURT:  Are they estimated or not?

3          MR. STAMER:  Your --

4          THE COURT:  Or I guess not.  Your proposal, if it

5   flies, moots the estimation process.

6          MR. STAMER:  Your Honor, that's exactly right.

7          THE COURT:  Well, I read it -- I read it in the prior

8   version of it.  Yeah, no, I --

9          MR. STAMER:  From --

10         THE COURT:  -- I got it.

11         MR. STAMER:  -- from our perspective, and I think from

12  the tort claimants' perspective, and hopefully from the

13  subrogation claimants' perspective, it should moot the

14  estimation process.

15         THE COURT:  Okay.

16         MR. STAMER:  What I think you heard foreshadowing of

17  from Mr. Bennett is they believe that the tort claims are

18  significantly less.  We think they're going to have a hard time

19  proving that, whether it's an estimation or otherwise.  But

20  I'll stay within my lane, Judge.

21         THE COURT:  Well, no, but you're not.  You're up.

22  October 21, there'll be a -- the window will close, and there

23  will be an aggregate amount of claims that must be accounted

24  for.  And whether Mr. Bennett was correct in quoting Mr. Julian

25  or someone else that says it's a hundred billion dollars or

(972) 494-0000 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1  it's some single-digit billion, it will be what it is.  And

2  there may be some add-ons or some amendments.  But the point

3  is, it'll be somewhat isolated.  There'll be a circle around

4  that as a target.

5          And if I follow you, Mr. Stamer, what you're saying is

6  that the plan that you're proposing will say there's eleven

7  billion going over here for the subrogation folks, and there is

8  X -- which is going to be thirteen minus whatever's being set

9  aside for the --

10          MR. STAMER:  Plus --

11          THE COURT:  -- Wildfire Fund, plus whatever you added

12  on, then that is the pot for the other -- what Mr. Karotkin's

13  plan calls "the other wildfire claims".

14          And there's no need to -- that is the estimation.  I

15  mean, in fact, it -- there's nothing to estimate, because

16  that's the figure.  Right?

17          MR. STAMER:  Your Honor, that's right.

18          THE COURT:  That's the figure.

19          MR. STAMER:  That's the -- one of the -- one of the

20  focal points, one of the prerequisites for the company getting

21  out of bankruptcy -- there were a number of them.  We needed

22  legislation.

23          THE COURT:  Oh, sure, of course.

24          MR. STAMER:  You needed to line up a bunch of money,

25  which we've talked about.  And you need -- in order to attract

(973) 406-2250 | operations@escribers.net | www.escribers.net

                    PG&E Corp., Pacific Gas and Electric Co.

1   financing, you need to put a collar around -- you need to cap

2   the wildfire claims.

3            THE COURT:  Okay.  No, of course.

4            MR. STAMER:  And we have --

5            THE COURT:  And I got it.

6            MR. STAMER:  -- negotiated a cap of those claims.

7            THE COURT:  Yeah, I got it.  Okay, Mr. Stamer.

8   Thanks.

9            MR. STAMER:  And the only thing I'll add, Your Honor,

10  again, in the nature of foreshadowing;  we anticipate the

11  motion to approve the settlement with respect to the subros --

12  there will be some issues.  And we'll, in advance, advise the

13  Court that to the extent that the restructuring support

14  agreement, the settlement, whatever the document is, which we

15  haven't seen yet -- it restricts the subrogation claimants from

16  actually negotiating, accepting some other treatment, a better

17  treatment, we're going to object to that.

18            Your Honor, as you saw, we've talked about this

19  before, in the public entity -- the municipality settlement --

20            THE COURT:  Yeah, I remember.  We came up on the Butte

21  one billion.

22            MR. STAMER:  -- there's a big ugly provision in there

23  that says you -- by signing this, you don't get to talk to

24  anybody else; you don't get to negotiate; you can't take more

25  or less money.

PG&E Corp., Pacific Gas and Electric Co.

1          We think that's completely inappropriate.  It's anti-
2     competitive.  And it's actually bad for everybody in the case.
3          THE COURT:  Okay.  But what you're telling me is that
4     you will undoubtedly challenge that aspect, among other things,
5     of the debtors' 2019 --
6          MR. STAMER:  9019.
7          THE COURT:  -- 9019 -- 2019 is another number that --
8     you all know what 2019 is, too.  9019.  And I got it.  So
9     that's fine.
10          MR. STAMER:  Thank you very much, Your Honor.
11          THE COURT:  Go it.  Thanks, Mr. Stamer.
12          It's still good morning.
13          MR. SILFEN:  Good morning, Your Honor.  Andrew Silfen
14     with Arent Fox, counsel for BOKF, the indenture trustee for the
15     senior notes in the principal amount in excess of 17.5 billion
16     dollars.
17          And I just want to respond to what your question were
18     with what you called "the action items".  And we're supportive
19     of breaking out and accelerating the consideration of what some
20     folks have called the ripe issues, which is whether the
21     bondholders are impaired; the make-whole -- with a K, not a
22     D -- which is a bondholder make-whole redemption issue.
23          THE COURT:  Well, but from what I just heard, the
24     impaired issue is -- well, the impaired --
25          MR. SILFEN:  The tort issue is taken care of.

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  -- the impaired issue is discrete.  Okay.

2          MR. SILFEN:  And the third issue being the post-filing

3     interest rate for the treatment --

4          THE COURT:  Right, right.

5          MR. SILFEN:  -- of creditors, including the

6     bondholders.

7          Those issues need to be addressed by the Court

8     independent of whether there's a competing plan process --

9          THE COURT:  Right.

10         MR. SILFEN:  -- or one plan or another goes forward.

11         THE COURT:  Right.

12         MR. SILFEN:  The only thing I will say is that we

13    reserve our rights as to the details, because we don't know

14    what folks are teeing up as far as procedure and so forth.  But

15    we will be a party to it, obviously, as the indenture trustee,

16    to the litigation that pertains to the noteholders.

17         The other question you asked about was the scheduling

18    on Yom Kippur.  We're supportive of moving it up to the

19    afternoon of October 7th, subject to Your Honor's schedule and

20    Your Honor's availability.

21         We think it's important to hear the exclusivity motion

22    sooner rather than later.  This case cannot move forward until

23    that motion is resolved, and therefore --

24         THE COURT:  Well, I mean, that's -- but that's another

25    argument for why I need to grant it.  Of course, in your mind,

escribers
(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    there might be other views that say I should deny it so the

2    case moves forward.

3           But your point is you're supporting that it -- that it

4    be -- well, most importantly, what Mr. Stamer just said

5    suggests to me that -- and I'm going to believe him -- that it

6    will take away the silver bullet that Mr. Feldman believes the

7    competing plan has, in effect, that it has an improper

8    subordination of the subrogation claims.

9           And if that -- if I understand -- if that's correct,

10   if Mr. Stamer is right, and the modified term sheet that's

11   coming from the TCC and senior bonds is such that it treats the

12   subrogation claimants on a -- I used the term "pari passu" --

13   that might be the wrong term -- but it doesn't violate some

14   subordination principle, then maybe that's not a -- it's not a

15   fatal flaw.

16          MR. SILFEN:  I mean, obviously everyone heard that you

17   seized on Mr. Feldman's comments.  And obviously there was

18   tremendous progress during the break that came forth.

19          THE COURT:  Well, I don't want any credit, but I'll

20   take whatever I can get.

21          MR. SILFEN:  But I will note that -- and Your Honor

22   knows this, and we went through this exercise last time at the

23   first motion -- you don't have to have a confirmation hearing

24   on the competing plan in order to terminate --

25          THE COURT:  Right; that's right.

PG&E Corp., Pacific Gas and Electric Co.

1    MR. SILFEN:  -- exclusivity and allow it to go

2  forward.  It's obviously our view that it should.  And we're

3  just saying that earlier rather than later is probably more

4  beneficial and more helpful to moving this case in a positive

5  direction.

6    THE COURT:  Okay.

7    MR. SILFEN:  Thank you.

8    THE COURT:  Good, thank you very much.

9    Mr. Pitre.

10    MR. PITRE:  Good morning, Your Honor.  Frank Pitre --

11    THE COURT:  I didn't know I'd see you here today.

12    MR. PITRE:  Well, I don't want to be here, Judge,

13  but --

14    THE COURT:  Well --

15    MR. PITRE:  -- in light of some comments --

16    THE COURT:  -- go back -- go over to superior court

17  and where -- they're waiting for you.

18    MR. PITRE:  You know what, Judge, in light of some

19  comments that were made, I need to speak.

20    I represent individuals that were referred to by Mr.

21  Bennett as -- I was referred to as a tort lawyer.  What that

22  means is I represent a group of people who were killed,

23  severely injured, lost everything they owned, and had

24  businesses destroyed.  My job, as well as the job of my fellow

25  lawyers, is to ensure that no victim who is entitled to just

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1   compensation is left behind.

2          Unlike Mr. Bennett who represents equity holders that

3   also can hedge their bets by purchasing insurance claims and

4   profiting in the market, these victims cannot hedge their bets.

5   They have no ability to go out on Wall Street and make up for

6   losses and indeed profit.  Our job was to recognize each

7   individual using recognized statistical models.

8          And just to give the Court an idea, when the word

9   100,000 was used by Mr. Julian, I just want to give the Court

10  some perspective.  There were 14,000 residences that were

11  destroyed in the Camp Fire.  Most of those residences, based on

12  statistics, excuse me, had three to five people who lived in

13  those homes.  If you do some simple math, that's about 70,000

14  individuals who were potentially impacted.  And that's Camp

15  Fire alone.

16         There's another 8- to 9,000 for North Bay Fires.  And

17  when you use two to three people and you do the math, you get

18  to 100,000 easily.  And that doesn't count businesses.

19         So, Your Honor, when people are using numbers and

20  they're trying to estimate and make sure that the estimation

21  does not exclude people -- and, Your Honor, when the numbers

22  that are used come from direct settlements that I, Mr. Campora,

23  Ms. Riddle, Mr. Kelly have directly had with PG&E in other

24  cases like San Bruno and Butte Fire, so you use the very same

25  numbers that were negotiated by PG&E, you get to the numbers

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    that were quoted.

2         Now, I don't know, Judge, because I don't have a

3    crystal ball.  And I can't predict whether or not the notice

4    program was effective or not.  But to the extent that claims

5    may not materialize doesn't mean that there are not individuals

6    who are impacted and doesn't mean that they have value and

7    doesn't mean that whatever we do here should not account for

8    them to the extent they come in late or through other means

9    deserve compensation.

10        THE COURT:  Well, what does that means?  I mean,

11   again --

12        MR. PITRE:  I don't --

13        THE COURT:  -- I don't make the rules.

14        MR. PITRE:  Your Honor, all I'm saying is I don't know

15   how people -- I know there have been numerous returned claims

16   forms that were inappropriately mailed and for which my office

17   has had to deal with so we can get people mailed the correct

18   forms.  I know that there are numerous people, despite the fact

19   that they are represented -- and I can tell you the people who

20   are represented are getting notice.  But there are a lot of

21   people who are not represented.

22        THE COURT:  But what do you want to do?  What should

23   we do about it?

24        MR. PITRE:  I --

25        THE COURT:  I mean, I --

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    MR. PITRE:  Judge --

2    THE COURT:  I want some help because --

3    MR. PITRE:  I'm -- well, we may be coming before you

4  and asking for an extension of time for the claims process.  I

5  want to see, everybody wants to see how well this process is

6  working.  But I'm very concerned.  I'm very concerned that we

7  are not getting in the requisite claims that should come in

8  based on what we believed, in good faith, are the number of

9  people --

10    THE COURT:  Well, I --

11    MR. PITRE:  -- who have been impacted.

12    THE COURT:  Mr. Pitre, I'm not questioning your good

13  faith.  But we also house -- and you said before, you're not

14  familiar with bankruptcy.

15    MR. PITRE:  Correct.

16    THE COURT:  And at least to the extent that some of

17  the victims, large numbers of the victims, have the benefit of

18  counsel, counsel tends to file near the deadline.  And I think

19  it's probably extremely predictable that the filing will ramp

20  up as we approach the 21st.

21    The problem is, on the 22nd, what to do about even one

22  victim who could have filed a proof of claim and didn't.  And

23  if there's something that should be done now, I encourage you

24  or any of the tort committee lawyers to come up with a

25  suggestion.  And I know Ms. Cabraser was the first person who

PG&E Corp., Pacific Gas and Electric Co.

1  was one of several who argued about a later deadline.  For a

2  variety of reasons, I declined that option.

3          But the point is that there has to be this concerted

4  effort now rather than after the fact because, like it or not,

5  the timely filed claims are entitled to the benefit of having

6  filed their claims and are inherently at odds, perhaps, with

7  the late filed claims.  The Ninth Circuit has some very liberal

8  rules about permitting informal claims late.  But beyond that,

9  there's not a lot of options.

10         So I guess what I'm saying is I'm not saying don't

11 come in if you believe the law permits extending the time, but

12 come in earlier even though there isn't much time.  There is

13 over three weeks, almost four.  I mean, I have to do something

14 if -- look, I authorized twenty million dollars to be spent in

15 trying to make sure the word gets out.  And I think about all

16 the people that got multiple notices in their bill.  And that

17 doesn't solve the problem of one victim who didn't get the

18 notice.

19         But anyway, my speech -- it has nothing to do with

20 what Mr. Bennett said.  It has to do with the facts of the

21 deadline that we're dealing with.

22         MR. PITRE:  Your Honor, I appreciate those words.  I

23 believe that I have some of the best bankruptcy lawyers that

24 exist.  I will work with them.  To the extent that we do have a

25 problem that is perceived by not only me but many other

PG&E Corp., Pacific Gas and Electric Co.

1    members, that we will be coming to you through the proper

2    channels or bankruptcy lawyers to see what is the best vehicle

3    to ensure that all those people who are entitled to just claims

4    are heard.  And we don't take advantage of the fact that we've

5    had a deadline that Mr. Bennett may want to take advantage of.

6         THE COURT:  No.  Mr. Bennett -- you shouldn't

7    personalize it.  I understand you took issue with some of the

8    things Mr. Bennett said.  But there was a full discussion and a

9    full consideration of what was very unusual in this case was a

10   late claims deadline.  And it was late by traditional standards

11   for a variety of reasons.  And I'm not suggesting that it

12   should have been an earlier date.  But the point is, it's a

13   very well-established procedure that was considered, debated,

14   and acted on.

15        But want to -- Mr. Pitre, I want to raise one other

16   question with you.  And that --

17        MR. PITRE:  Yes, Your Honor.

18        THE COURT:  -- because I think of prior times when

19   you've been in the court.  And we've talked about you and your

20   colleagues in the state court litigation world or federal

21   district court litigation world not familiar with 502(c).

22        Remember, we just heard Mr. Stamer tell us that

23   there's going to be a proposal that's going to peg a number

24   which, as of this morning, is twenty-four million minus eleven

25   for the subrogation group.  And it sounds like from what he

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1  said, it's going to be higher.  And that's going to moot the

2  estimation.  The estimation is gone if that plan is filed and

3  ultimately prevails.  Again, the debtor has a contrary view.

4  But I want to make sure you don't leave the podium

5  misunderstanding that.

6          So all the discussion about going before the jury in

7  Tubbs Fire and going before Judge Donato, because I know you

8  were there and I know he thoughtfully considered the views of

9  everybody about the estimation process, but what I heard Mr.

10  Stamer tell me is coming down the road from his side, which is

11  really your side, is going to moot that estimation process.

12          Now, make sure you either understand and agree with

13  me, or, if you disagree, take it up with your bankruptcy

14  colleagues so they don't --

15          MR. PITRE:  Your Honor, I understand completely.

16          THE COURT:  Okay.

17          MR. PITRE:  And the difference between discussions

18  that at least I have had, I'm talking about me now, and the

19  bondholders is that there's been complete transparency --

20          THE COURT:  Okay.

21          MR. PITRE:  -- as to what is available to resolve

22  claims --

23          THE COURT:  Okay.

24          MR. PITRE:  -- so that we have a good understanding.

25  What is missing is the same conversation on the other side with

PG&E Corp., Pacific Gas and Electric Co.

1  the debtors.  So we have to accept you cannot get blood out of

2  a turnip.  We have to accept that there is something called

3  reality.  And within reality we're prepared to deal.  What we

4  cannot deal with is when things are kept a mystery.  And that's

5  been the big difference, Judge.

6  THE COURT:  Okay.  I got it.

7  MR. PITRE:  Thank you.

8  THE COURT:  All right.  All right.  So let's take care

9  of a couple of things.

10  Mr. Karotkin, I want to come back to you and others.

11  But I think, based upon everything we've said, I

12  should stick -- I should move the --

13  MR. KAROTKIN:  Can I make a few remarks?

14  THE COURT:  Yes.

15  MR. KAROTKIN:  First of all, contrary to what Mr.

16  Stamer said, it doesn't in any way do away with the estimation

17  hearing.  I am sure that the existing equity will take issue

18  with whatever they're proposing.  And they are entitled to have

19  those claims estimated for purposes of determining whether too

20  much is being paid to claimants under the plan.

21  THE COURT:  Well, but, I mean, it's -- what I said to

22  Mr. Pitre is that if the competing plan is filed and becomes

23  the plan, do you agree -- you don't disagree with, do you?

24  If -- and --

25  MR. KAROTKIN:  I do disagree with that.  As a matter

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1   of confirmation and cramming that plan down on the existing

2   equity, a determination has to be made as to how much is being

3   paid to both the subrogation claims and to the personal injury

4   claims to determine whether they are being paid too much.

5        THE COURT:  I don't disagree with that, but I don't

6   know that it's a 502(c) estimation.  That's all we're debating.

7        MR. KAROTKIN:  I, frankly, don't know how else you

8   would do it, Your Honor.  And I think that's how it's been done

9   in other cases.  So --

10       THE COURT:  Well, that might be how it's done in other

11  cases.  But if there's a competing plan that says this plan

12  says twenty billion dollars goes to pay the victims, that's the

13  number.  And if the -- if it violates the absolute priority

14  rule or pays too much or can be challenged by equity, I'll

15  agree with you that can be done.  But I don't think you go --

16  necessarily go back and revisit the 502(c) process.  But we can

17  defer that to another day.

18       MR. KAROTKIN:  We can defer that.

19       In terms of scheduling, now apparently, we're going to

20  have a new motion to terminate exclusivity based on a new plan

21  which we -- a new plan term sheet which we haven't seen.  I

22  don't know when they intend to file that.  But we're entitled

23  to evaluate that.  Other parties are entitled to evaluate that

24  and to respond in due course.  And I think that October 7th is

25  too early for that type of a hearing.

PG&E Corp., Pacific Gas and Electric Co.

1     THE COURT:  So what do you suggest?  You don't want

2  the 8th for the reasons we stated.  So what are you suggesting

3  that you want me to do?  I mean, I don't disagree in theory if

4  they don't file it until later.  I mean, that's why I gave you

5  the extension of time and gave myself the extension of time

6  past today.  I didn't even ask you.  I needed more time for the

7  four days that the TCC gave both of us and moved it to the 8th.

8  Now, for reasons that we're saying, we're discussing, we have

9  to move it from the 8th.

10     Are you saying that the reason why I can't do it on

11  the 7th is not to do with religious holidays; it has to do with

12  you don't even know what you're up against?

13     MR. KAROTKIN:  That's correct, Your Honor.  We

14  don't -- we haven't seen it.  It's changing.  We don't know

15  what it says.  And I think we're entitled to have an

16  opportunity to review that and respond to it.  And I, frankly,

17  don't see the prejudice, Your Honor, to delaying it for some

18  period of time.  There is no disclosure statement going forward

19  yet.  And I think if it's deferred until the week following the

20  week that you're not going to be here, I think that's more than

21  sufficient time.  That will not hold up the June 30th, 2020

22  date in any respect based on where things stand in this case

23  and the amount of time left.  And there is certainly enough

24  time.

25     If you are inclined to grant the motion, which, of

PG&E Corp., Pacific Gas and Electric Co.

1    course, we will oppose, for things to move forward apace.

2            THE COURT:  Well, Mr. Karotkin, I'm inclined just to

3    try to keep up with all the changes.  So we have a very rapidly

4    changing landscape.  And I've already made a ruling on

5    exclusivity once.  And I'm being asked to -- essentially to

6    revisit that, again, but it's with some different events.

7    Things have happened.  We all know that.

8            So you're right.  If you persuade me not to allow a

9    competing plan, then we deal with what's on the table from your

10   side.

11           So do you want to say anything about -- and you don't

12   have to -- about the complaints from the TCC about no

13   communication, no discussion?  Is there -- I mean, I don't feel

14   like --

15           MR. KAROTKIN:  Your Honor --

16           THE COURT:  -- I need to take experienced lawyers and

17   order them to go talk to one another, so I'm not inclined to do

18   that.

19           MR. KAROTKIN:  You don't, Your Honor.

20           We have participated in the mediation.  We have asked

21   them for information.  We tried to schedule meetings with them

22   and ask them in advance to provide information as to their

23   claims.  They declined to do that.

24           And I know you don't want to get into it.  But the ad

25   hoc group, by intervening in the negotiation process during the

PG&E Corp., Pacific Gas and Electric Co.

1   exclusive period, effectively has precluded us from having

2   substantive negotiations with the tort claimants committee.

3   They've been up in Sacramento, trying to stymie the

4   legislation.  They've taken a concerted effort since these

5   cases have commenced to promote their effort to take over the

6   company.  And they've done everything in their power to

7   preclude us from engaging in negotiations with both the subro

8   group -- fortunately, we overcame that -- and the trot

9   claimants committee.

10          THE COURT:  Well, but, again, I don't want to

11  oversimplify it because it's very complicated.  But why can't

12  you and your representatives simply call a face-to-face meeting

13  with the TCCs lawyers and its representatives and no one else

14  and just at least shake hands and communicate on basics and

15  hear from them?

16          MR. KAROTKIN:  We're more than delighted to try to do

17  that.  I think we'll get a cold shoulder from them, based on

18  the agreement they've reached with the bondholders who, I would

19  imagine, are effectively precluding them from engaging in those

20  negotiations.

21          And I just want to make one last point about the

22  claims that Mr. Pitre alluded to.  Look, to the extent there

23  were notice issues or he believes there were notice issues, we

24  were -- would have hoped that they would have raised those

25  issues prior to today.  As Your Honor said, we went to

(973) 406-2250 | operations@escribers.net | www.escribers.net

                    PG&E Corp., Pacific Gas and Electric Co.

1    extraordinary lengths to give notice.  And again, there is

2    no -- let me emphasize -- absolutely no intention on the part

3    of the debtors to try to preclude people from filing claims.

4    That is the last thing we want to do.

5           And as you said, we came up with a plan that cost

6    twenty million dollars to make sure that every possible way to

7    give effective notice was given.

8           THE COURT:  Okay.  Don't go away.

9           So do you agree -- even though you may believe that

10   there might be an estimation process, notwithstanding the

11   competing plan, do you believe at least for now it's not

12   something we need to pre-brief?  I mean, when we started, we

13   had -- we identified three issues.  And Mr. Stamer seemed to

14   imply that at least the subordination of the subrogation group

15   doesn't appear to be an issue anymore.  Do you agree with that

16   at least?

17          MR. KAROTKIN:  It depends on what their plan says.

18          THE COURT:  Okay.  And you also heard from the counsel

19   for the Adventist Hospital.  Do you have an opinion as to this

20   issue, if we divide the world into disputed claims and on

21   liquidated claims?  It would strike me that a liquidated claim

22   is a liquidated claim, whether it's filed by non-profit private

23   organization or a federal entity or a state entity.  Do you --

24          MR. KAROTKIN:  I agree there's no difference.

25          THE COURT:  Well, but, I mean, again, we don't want

(971) 406-5488 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    to -- we're not going to have you negotiate a schedule with

2    each and every --

3             MR. KAROTKIN:  No.

4             THE COURT:  -- claimant.

5             MR. KAROTKIN:  No.

6             THE COURT:  But just an aggregate.

7             MR. KAROTKIN:  I agree that --

8             THE COURT:  Okay.

9             MR. KAROTKIN:  -- they should be treated similarly.

10            THE COURT:  Okay.  So then I'll go back to what I

11   think the proper thing for you to do would be to -- for you to

12   meet with Mr. Pascuzzi and the others who are aligned with him

13   and agree on a relatively near term sequence of briefing and

14   argument -- I mean, briefing, and then we'll pick a date for

15   argument, on that issue, what we'll call the can you 502(c)

16   estimate liquidated claims.

17            And secondly, the question of whether the debtors'

18   plan impairs the funded debt claims, those are two separate,

19   discrete legal questions.  Again, I think you agreed with me

20   before.  So you still agree with me?

21            MR. KAROTKIN:  Yes, sir.

22            THE COURT:  Okay.  Then we're going to have some

23   further hearings.  Why don't I suggest that, between today and

24   whatever the next hearing is, that your job is to work with the

25   other counsel and come up with an agreed -- mutually agreeable

PG&E Corp., Pacific Gas and Electric Co.

1    sequence of who's going to brief when?  I mean, I'll be

2    flexible to accommodate all of you.  As I say, I'm not -- I'd

3    ask that it not be on the same schedule as the inverse

4    condemnation process, assuming that's going to go forward, but

5    anything that accommodates you that lets me consider the

6    arguments and we go from there.

7           MR. KAROTKIN:  We will do that, sir.

8           THE COURT:  Okay.  Also, while you're there, I know

9    Mr. Orsini probably more than you is going to be principal

10   player before Judge Donato.  But what do you think about the

11   afternoon of the 7th?  Can you handle that?  I mean, again,

12   everybody has to give a little bit here.  That does seem to

13   accommodate the travel plans for people that want to be back

14   east for the holidays.

15          MR. KAROTKIN:  Your Honor, as I said, we would like

16   more time.  But if you --

17          THE COURT:  Well, I realize that.

18          MR. KAROTKIN:  -- are to insist --

19          THE COURT:  But, I mean, I --

20          MR. KAROTKIN:  -- I'm not going to fight you on it.

21          THE COURT:  Well, I'm going to hear from Mr. Stamer to

22   see when that's going to get filed.  I mean, I really -- I'm

23   not -- having previously agreed not to shorten time, I'm not

24   going to then flip it and do the same thing back to you and

25   say, well, you've got five days to deal with is.  So if have to

(973) 406-2250 | operations@escribers.net | www.escribers.net

                PG&E Corp., Pacific Gas and Electric Co.

1    move this out, we're going to -- we'll move it out to the next

2    calendar.

3              MR. KAROTKIN:  All right.  I would prefer the 11th or

4    the week after you return, or you could cancel your week off.

5    That would be --

6              UNIDENTIFIED SPEAKER:  Your Honor, it's really

7    important to figure out when Mr. Stamer is going to file the

8    plan.

9              THE COURT:  Okay.  Yeah.  Mr. Stamer, why don't you

10   tell us your -- and keep in mind, again, I don't know how much

11   you stayed on top of things.  But your side asked me to shorten

12   time down to four days, and I said no.  And so I can't tell

13   them, yeah, we're going to do it to you four days.  So when

14   will we see this new plan?

15             MR. STAMER:  Your Honor, I don't have all of my

16   clients in the room.  I anticipate we'll have revised documents

17   filed within twenty-four to forty-eight hours.

18             THE COURT:  So that means like --

19             MR. STAMER:  Actually, they're saying they think it'll

20   be filed today.  So I was giving us, the lawyers, a little

21   flexibility.  But it will be filed very quickly.

22             And, Your Honor, we've laid out in open court what the

23   changes are going to be.  There will be some specific numbers.

24   But we're not anticipating a huge redraft of our term sheet.

25   Mr. Karotkin doesn't need any more time.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Well, I'm sure he'll appreciate that

2     comment.  Look --

3          MR. STAMER:  It's my next comment that he's not going

4     to appreciate.

5          THE COURT:  But I want to repeat what I said.  I don't

6     need to be reinventing -- have people reinvent that, by the

7     way, exclusivity is a given right under Section 1121, blah blah

8     blah blah blah.  We need to focus on the issue.  And I know the

9     pros and cons about whether or not to terminate it.  The

10    question is, should I terminate it now for that particular

11    plan?

12         So today is the 24th.  You're telling me you can file

13    it by Thursday.

14         MR. STAMER:  Your Honor, I think there's a genuine

15    chance it'll be filed tonight.

16         THE COURT:  I don't care.

17         MR. STAMER:  If not tonight --

18         THE COURT:  I'm not going to read it tonight.

19         MR. STAMER:  No later than -- it'll be filed tomorrow,

20    no later than tomorrow.

21         THE COURT:  Okay.  Mr. Karotkin and Mr. Bennett, if

22    the plan is filed by close of business tomorrow, I'm going to

23    go ahead and stick with the hearing on 1:30 on October 7th.

24    And I will -- it's very tight for me also, but I'm going to do

25    it because of the importance of it.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    If Mr. Stamer and people aligned with him can't make

2  that deadline of tomorrow, I'm not going to hold you all to the

3  hearing on the 7th.  But I'm going to say that, with the filing

4  on the 25th, the debtor and anyone on the debtor's side can

5  respond by the 4th, by noon.  And I will do my best to prepare.

6  And I will hear all matters.

7    I'll over the PG&E 8th -- the October 8th calendar.

8  There are a couple of small matters.  I'll move it to the 7th

9  at 1:30.

10    And I know we have a fee motion, a fee examiner's

11  motion.  And I believe there's one other matter that's not so

12  important.  But it's important because it's not so significant

13  in terms of timing.  So we'll take care of that.  So that'll be

14  the schedule.

15    MR. STAMER:  Your Honor, I don't want to end the

16  hearing on a sour note, but I do -- Mr. Karotkin said something

17  that I think can't be left unaddressed.

18    So my notes seem to reflect that Mr. Karotkin believes

19  that the reason they haven't engaged with the TCC is it's

20  either the TCCs fault or it's the bondholder's fault.

21    Your Honor, let me make very clear.  There is

22  nothing -- there's no document, there's no nothing between the

23  TCC and the ad hoc noteholder group preventing anyone from

24  talking to the TCC.  The reason the company is not talking to

25  the TCC is because they've chosen not to.

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    And, Your Honor, this is a familiar song that everyone

2    in this case is singing.  And if you'll recall, Your Honor,

3    when Mr. Karotkin stood up at the exclusivity hearing and said

4    that they're the honest broker, spontaneous laughter came forth

5    by everyone.

6        So this is -- no one is doing anything to interfere

7    with the company's ability to talk to its constituencies.  The

8    only one they're talking to is the equity which is very clear.

9        And, Your Honor, we want to move this case forward in

10   an open and transparent way.  Thank you, Your Honor.

11       THE COURT:  Okay.  So I'm going to decline the

12   invitation today, at least, to designate someone or to recruit

13   someone -- I have some thoughts in mind -- to take on the role

14   of being a mediator.  I have not had any discussions at all and

15   don't intend to have substantive discussions with Judge Donato.

16   And I don't think that's appropriate.

17       On the other hand, I know him well enough to know he,

18   like I, probably believes that, at some point, mediation will

19   be appropriate.  So I don't think there should be any concern

20   or worry of whether we would be at cross-purposes.  And at some

21   point, if I feel that I believe it's appropriate for me to

22   direct the involvement of an independent mediator, I probably

23   will keep him informed.

24       Or again, I don't need to ask his permission, but he

25   is the district judge.  And he doesn't to ask my permission.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1   But I suspect that the decision of directing a third-party

2   mediator would not be a problem for either one of us.  And at

3   least for now, I'm not going to do it.

4           Again, for those of you that -- Mr. Engel is here.

5   Mr. Kornberg's here.  In the prior case, without any warning to

6   anybody, I directed the appointment of a mediator right from

7   the bench.  And guess what happened?  It worked.  So I -- at

8   least I think it worked.  So I'm not bashful about doing it

9   again, but I don't know that I want to do it at this point for

10  a variety of reasons.

11          So here's where we are.  Mr. Karotkin, my homework

12  assignment to you to repeat is you're going to try to get an

13  agreed schedule for briefing of the two issues that we've

14  identified.  And I'd like to you to see if you can get that in

15  place and on file by the 7th.  And I say that only because I

16  will presumably have you in court on that day.

17          And if there are any issues, problems that come up, I

18  might discuss it with you.  It's not critical.  These are

19  briefing schedules that certainly lawyers can work out on their

20  own.  They don't need to be told by me how to do it.  You all

21  know how to do it.

22          But again, to repeat, it will be to deal with the

23  issue of can the estimation under 502(c) include liquidated

24  claims, whether they be held by agencies or private entities.

25          And secondly, whether the company's plan -- and again,

PG&E Corp., Pacific Gas and Electric Co.

1    keep track of the numbers, but the plan filed yesterday -- does

2    it impair what the plan calls the funded debt claims, and if

3    so, what to do about it, how that should be teed up.  That

4    seems to be a legal issue.

5         I will not need -- I'm not scheduling any briefing

6    today on the question or -- or, I mean, ask anybody to schedule

7    any briefing on the subject of whether PG&E's plan -- I'm

8    sorry, excuse me, the respective impeding plan improperly

9    subordinates the subrogation claimholder's claim.

10        And I started the conversation several hours ago with

11   some nonaction items.  And I'm going -- I don't have to repeat

12   them.  And I'll leave it at that.

13        So unless anybody wants to raise anything, we think

14   we've forgotten something, I'll ask for anyone who has a

15   comment.

16        You coming up?

17        UNIDENTIFIED SPEAKER:  No comment.

18        THE COURT:  Okay.  Just for those of you keeping track

19   of the schedule generally then, my courtroom deputy will

20   renotice on the docket -- we won't be noticing it out, but the

21   docket will reflect that the hearings that are presently on the

22   calendar for October 8th are also being moved one day back to

23   October 7th at 1:30.

24        Okay.  Thank you all for your time, everyone.

25        IN UNISON:  Thank you, Your Honor.

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Happy travels.

2      (Whereupon these proceedings were concluded at 12:26 PM)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

(973) 406-2250 | operations@escribers.net | www.escribers.net

1          C E R T I F I C A T I O N

2

3    I, Susan Patterson, certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5

6

7

8    _____

9    /s/ SUSAN PATTERSON, CDLT-174

10

11   eScribers

12   7227 N. 16th Street, Suite #207

13   Phoenix, AZ 85020

14

15   Date:  September 25, 2019

16

17

18

19

20

21

22

23

24

25

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

# A

**AB (14)**
12:25;13:24;19:10,
15;52:18;95:11,12,16,
16;96:9,14,25,25;97:9
**Abid (1)**
59:1
**ability (4)**
82:8;116:22;125:5;
142:7
**able (3)**
12:16;59:25;91:19
**above (1)**
56:25
**absent (1)**
15:20
**absolute (2)**
44:19;132:13
**Absolutely (10)**
10:15;17:16;60:12,
22;61:20;73:18,23;
82:22,24;136:2
**absorb (1)**
20:7
**academic (1)**
112:10
**accelerating (1)**
121:19
**accept (7)**
9:22;10:3;56:3;65:8;
74:24;131:1,2
**acceptable (1)**
15:21
**acceptance (3)**
11:3,5;88:7
**accepted (2)**
22:21;62:24
**accepting (1)**
120:16
**accommodate (2)**
138:2,13
**accommodates (1)**
138:5
**accompli (1)**
41:9
**accomplishment (1)**
110:17
**account (2)**
64:6;126:7
**accounted (1)**
118:23
**achieved (3)**
11:15;13:12;19:20
**achievement (1)**
11:12
**across (1)**
100:23
**acted (1)**
129:14
**acting (1)**
43:16

**action (9)**
30:3;31:14,14,15;
66:16,21;69:5;111:20;
121:18
**active (2)**
21:24;71:17
**actual (1)**
109:14
**actually (11)**
15:25;30:25;52:24;
65:6;106:6;108:24;
112:25;116:9;120:16;
121:2;139:19
**ad (15)**
7:20;11:16;18:11,18;
34:1;59:3;61:25;63:2;
86:16,22,23;89:17;
111:14;134:24;141:23
**adamant (1)**
57:18
**add (2)**
117:23;120:9
**added (1)**
119:11
**addition (1)**
116:25
**additional (2)**
14:9;25:6
**add-ons (1)**
119:2
**address (10)**
14:21,24;39:16;
57:13;59:18;80:9;
82:20;94:5;115:5;
117:6
**addressed (4)**
14:4;75:25;78:13;
122:7
**adequacy (1)**
79:24
**adjourn (1)**
18:13
**adjudicated (1)**
27:20
**adjust (2)**
15:4;57:20
**admittedly (1)**
49:25
**adopted (1)**
103:10
**advance (6)**
61:21;99:18;111:9;
112:4;120:12;134:22
**advantage (5)**
12:24;13:24;19:16;
129:4,5
**Adventist (5)**
74:9,10,16;77:17;
136:19
**adversaries (1)**
107:16
**adverse (1)**
62:7

**advise (1)**
120:12
**advocating (2)**
16:7;54:23
**affect (1)**
98:7
**affected (1)**
37:22
**affects (1)**
97:2
**affiliate (1)**
98:14
**afraid (1)**
81:19
**afternoon (5)**
8:5;59:8;111:13;
122:19;138:11
**again (53)**
13:16,23;15:6,8;
16:4;21:9;23:5;24:24;
26:18;27:15;30:1,3;
37:19;38:22;40:5;
43:20;53:16;58:14,24;
61:25;64:1,13,19;
66:25,25;69:3,5,10;
75:6;79:17;85:1;97:4;
99:2;103:7;107:13,17;
110:12;111:10;120:10;
126:11;130:3;134:6;
135:10;136:1,25;
137:19;138:11;139:10;
142:24;143:4,9,22,25
**against (4)**
56:9;69:9;89:1;
133:12
**agencies (9)**
70:13;71:2,17,18;
72:18;74:1;76:4,25;
143:24
**agency (3)**
73:25;78:24;98:15
**aggregate (6)**
62:11;67:4,13;
115:23;118:23;137:6
**aggressive (1)**
109:13
**ago (6)**
35:2;49:3;67:6;68:2;
83:15;144:10
**agree (42)**
23:1;24:22;25:2,8,
10;27:5,7;29:11,16;
35:21;37:24;39:3;
40:19;45:3;49:24;
54:15;60:9,18;70:23,
24;71:1;72:15;82:25;
84:17;87:12;88:9,13;
90:4,14;96:12;105:2,4;
106:10;130:12;131:23;
132:15;136:9,15,24;
137:7,13,20
**agreeable (2)**
71:22;137:25

**agreed (13)**
6:7;23:20;28:5;64:2,
4;71:21;113:17;
116:21,23;137:19,25;
138:23;143:13
**agreeing (2)**
29:8;110:15
**agreement (8)**
7:22,23,24;18:24;
53:21;62:17;120:14;
135:18
**agreements (1)**
28:3
**agrees (2)**
77:16;78:3
**ahead (8)**
6:12;27:25;29:3;
36:10;40:21,21;59:12;
140:23
**Akin (2)**
59:1;111:14
**Alan (1)**
102:18
**albeit (1)**
36:8
**aligned (2)**
137:12;141:1
**allegation (3)**
30:2;31:13,13
**all-in (1)**
116:23
**allocate (1)**
83:21
**allow (10)**
59:9;61:22;82:24,25;
83:1,1,2;101:1;124:1;
134:8
**allowed (3)**
49:7;50:3;79:7
**allowing (1)**
51:14
**allows (2)**
60:2;80:22
**alluded (1)**
135:22
**almost (2)**
108:15;128:13
**alone (2)**
42:15;125:15
**alternative (2)**
103:22;104:2
**although (1)**
87:6
**always (2)**
35:21;60:3
**amend (2)**
28:15;47:19;95:19;
96:25
**amended (8)**
12:3;20:7,15,16;
21:6,9;32:18;95:14
**amendment (1)**
95:25

**amendments (1)**
119:2
**among (1)**
121:4
**amount (18)**
9:4;11:9,10;12:22;
13:14;45:19;64:2,4;
69:9;84:9;85:21;88:6;
110:13;112:7;115:23;
118:23;121:15;133:23
**amounts (4)**
23:17;39:13;84:7;
115:2
**analysis (2)**
78:10,11
**Andrew (1)**
121:13
**animal (1)**
65:21
**announce (3)**
12:19;100:13;112:2
**announced (3)**
9:3;36:22;49:3
**announcing (1)**
91:23
**answered (1)**
106:9
**anti- (1)**
121:1
**anticipate (8)**
64:23;93:13;112:3;
114:15,17;115:9;
120:10;139:16
**anticipated (1)**
103:13
**anticipating (2)**
8:24;139:24
**anymore (1)**
136:15
**apace (1)**
134:1
**apologize (1)**
82:16
**app (1)**
12:16
**apparently (2)**
81:7;132:19
**appeal (1)**
46:9
**appealed (1)**
40:6
**appeals (1)**
34:5
**appear (2)**
94:6;136:15
**appearance (5)**
5:20,21;7:5;58:24;
86:14
**appeared (1)**
73:5
**appearing (2)**
16:17;95:6
**applicable (2)**

Min-U-Script®

Case: 19-30088    Doc# 4003    Filed: 09/25/19    Entered: 09/25/19 14:46:19    Page 147
of 168

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(1) AB - applicable

28:2;88:23
**appoint (2)**
  19:18;81:23
**appointment (1)**
  143:6
**appreciate (13)**
  6:17;12:15;40:12;
  43:6;56:17;74:2;83:2,
  5;86:4;108:6;128:22;
  140:1,4
**approach (1)**
  127:20
**approached (1)**
  42:13
**appropriate (8)**
  19:18,25;60:8;69:10;
  116:9;142:16,19,21
**appropriately (4)**
  92:14;110:3,5,6
**approval (4)**
  7:24;103:1;104:14;
  108:11
**approve (5)**
  52:6,19;69:24;91:13;
  115:8;120:11
**approved (2)**
  50:12,17
**approximate (1)**
  9:4
**approximately (1)**
  67:13
**area (2)**
  74:19;75:25
**Arent (1)**
  121:14
**argue (3)**
  61:25;63:1;85:3
**argued (2)**
  107:19;128:1
**arguing (1)**
  47:4
**argument (21)**
  11:19;21:20;22:1;
  38:12;47:18;49:22;
  66:17;72:8;81:11;83:2;
  86:3;89:18;93:18,21;
  96:10;114:21,22,23;
  122:25;137:14,15
**arguments (5)**
  14:23;38:21;39:5;
  72:1;138:6
**arm's (4)**
  106:21;107:1,5,15
**around (4)**
  66:13;67:5;85:2;
  94:11;119:3;120:1
**aside (7)**
  42:2;77:21;79:11,13;
  88:6;94:9;119:9
**aspect (1)**
  121:4
**assert (1)**
  73:15,17

**asserted (2)**
  9:4;11:11
**assertible (1)**
  114:23
**asserting (1)**
  116:18
**assertion (1)**
  105:16
**assertions (1)**
  19:2
**assignment (1)**
  143:12
**assist (1)**
  42:24
**associated (1)**
  112:1
**assume (9)**
  30:3;38:8;45:6;
  69:19;77:2,24;78:4,20;
  111:18
**assuming (3)**
  9:21;39:7;138:4
**assumption (5)**
  5:9,13;6:12;45:8;
  46:22
**assure (1)**
  13:22
**attached (2)**
  68:3;103:4
**attend (1)**
  59:9
**Attorney (1)**
  70:12
**attract (1)**
  119:25
**August (1)**
  32:4
**Authority (2)**
  98:5;101:24
**authorized (1)**
  128:14
**availability (3)**
  15:7;57:20;122:20
**available (12)**
  16:10,11;17:4,5;
  57:19,24;64:4;94:20;
  105:25;108:15;113:18;
  130:21
**average (2)**
  96:2,19
**avoid (5)**
  8:18;37:10;39:11;
  58:6;101:12
**aware (2)**
  30:20;98:17
**away (8)**
  26:7;52:11;53:15,16;
  110:12;123:6;131:16;
  136:8
**awfully (1)**
  43:21

**B**

**back (32)**
  17:25;18:15;22:2;
  24:17;31:18,19;32:3;
  33:7;34:24;38:15;
  43:16;51:7;52:5;55:20;
  64:19;65:14;73:21;
  84:1;94:4;96:18;
  104:17;106:14;108:15;
  109:5;110:25;124:16;
  131:10;132:16;137:10;
  138:13,24;144:22
**backwards (1)**
  45:5
**bad (1)**
  121:2
**BakerHostetler (1)**
  16:17
**balance (1)**
  117:14
**ball (2)**
  51:2;126:3
**bankruptcy (18)**
  19:19;29:20;32:24;
  33:9;41:5;42:1;44:15;
  56:14;60:4;61:11;
  69:24;80:1;90:1;
  119:21;127:14;128:23;
  129:2;130:13
**Banks (1)**
  67:1
**bar (4)**
  14:10;24:4;26:14;
  30:18
**bargaining (1)**
  107:1
**base (1)**
  44:13
**based (11)**
  9:23;28:2;44:8;
  46:21;77:4;125:11;
  127:8;131:11;132:20;
  133:22;135:17
**bashful (1)**
  143:8
**basically (2)**
  55:12;107:3
**basics (1)**
  135:14
**basis (3)**
  6:9;12:24;40:7
**Bay (1)**
  125:16
**beat (1)**
  78:17
**become (1)**
  106:3
**becomes (1)**
  131:22
**beforehand (1)**
  59:12

**begin (4)**
  62:7;63:7;72:15;
  103:1
**beginning (3)**
  36:4;42:21;98:9
**behalf (13)**
  16:17;34:22;40:18;
  59:3;72:17;74:9;80:6;
  86:16;105:13;108:17,
  18,19;111:14
**behind (5)**
  41:5;53:17;68:20;
  70:7;125:1
**believes (6)**
  16:24;95:14;123:6;
  135:23;141:18;142:18
**below (2)**
  20:19;57:1
**bench (1)**
  143:7
**beneficial (1)**
  124:4
**benefit (3)**
  112:14;127:17;128:5
**benefits (1)**
  94:14
**Bennett (23)**
  86:13;105:11,12,12,
  21,23;106:12,18;108:4,
  6,19;110:6,19,20;
  118:17,24;124:21;
  125:2;128:20;129:5,6,
  8;140:21
**Bennett's (1)**
  111:17
**best (5)**
  83:4;94:10;102:12;
  128:23;129:2;141:5
**bets (2)**
  125:3,4
**better (4)**
  88:4;102:15;105:7;
  120:16
**beyond (2)**
  31:25;128:8
**big (12)**
  25:22;26:9;32:1;
  43:21;75:6;80:12;
  83:20;85:11;99:19;
  101:14;120:22;131:5
**bigger (1)**
  48:3
**biggest (1)**
  30:13
**bill (1)**
  128:16
**billion (48)**
  9:5;11:9;12:20,20;
  19:1,8;22:9,13,16,17;
  42:20;43:4,19,20;
  44:12,13,21;45:5,10,
  22;46:4;47:19;49:2,4,
  8;50:3,22;55:22,23;

  62:12;67:5,8,14,19;
  87:18;109:10;112:7,
  14;113:21;114:16;
  115:23;117:17;118:25;
  119:1,7;120:21;
  121:15;132:12
**billion-and-a-half (1)**
  68:2
**billion-dollar (1)**
  112:23
**billions (5)**
  42:17;44:4,5;60:13;
  73:3
**binary (1)**
  94:16
**Binder (1)**
  95:6
**binding (2)**
  9:21;50:4
**bit (3)**
  36:12;93:6;138:12
**blackline (1)**
  20:8
**blah (5)**
  140:7,7,8,8,8
**blocked (1)**
  21:23
**blocking (2)**
  49:19;52:25
**blocks (1)**
  36:3
**blood (1)**
  131:1
**board (2)**
  64:17;88:4
**BOKF (1)**
  121:14
**bond (3)**
  54:9;84:14;95:13
**bondholder (10)**
  35:15;36:7;47:2;
  59:3;61:25;64:5;88:17;
  106:25;107:12;121:22
**bondholders (20)**
  11:16;18:11,18;35:8;
  38:14;39:7;46:16;54:3;
  62:8;63:6;64:2,24;
  68:9;109:1;116:16,20;
  121:21;122:6;130:19;
  135:18
**bondholder's (1)**
  141:20
**bonds (6)**
  95:15;97:10;105:17,
  25;106:1;123:11
**book (2)**
  14:7;65:14
**both (10)**
  35:10;38:18;82:18;
  88:13;98:24;108:18,
  21;132:3;133:7;135:7
**bottom (1)**
  112:21

Min-U-Script®
Case: 19-30088    Doc# 4003    Filed: 09/25/19    Entered: 09/25/19 14:46:19    Page 148
of 168
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(2) appoint - bottom

**bound (1)**
88:2
**breadcrumbs (1)**
44:10
**break (4)**
66:1;110:21,24;
123:18
**breaker (1)**
94:2
**breaking (1)**
121:19
**bridge (1)**
50:20
**brief (6)**
6:22;7:17;83:12;
101:11;102:23;138:1
**briefed (3)**
25:7;89:14;107:19
**briefing (12)**
23:10;24:13;37:12;
70:21;78:15;93:21;
137:13,14;143:13,19;
144:5,7
**briefs (2)**
21:17;72:1
**bring (2)**
28:8;86:1
**broad (2)**
6:11;22:24
**broader (1)**
98:7
**broken (2)**
70:10,11
**broker (2)**
44:15;142:4
**brought (4)**
89:1,8,8;96:18
**Bruce (1)**
105:12
**Bruno (1)**
125:24
**build (1)**
37:10
**building (2)**
36:3;94:13
**bullet (1)**
123:6
**bunch (1)**
119:24
**burden (2)**
97:7,12
**burned (1)**
41:22
**business (4)**
74:13,20;75:18;
140:22
**businesses (2)**
124:24;125:18
**Butte (3)**
77:4;120:20;125:24
**buying (1)**
50:6

**C**

**Cabraser (1)**
127:25
**CAL (1)**
70:14
**calculated (1)**
44:13
**calculation (1)**
5:8
**calendar (11)**
8:12,13;15:20;17:20;
21:21;24:1;33:18;
42:25;139:2;141:7;
144:22
**calendars (1)**
111:6
**CALIFORNIA (7)**
5:1;70:12,13;75:9;
95:20;97:19;98:25
**Californians (1)**
96:23
**Call (4)**
5:3;15:15;135:12;
137:15
**called (7)**
20:18;21:6;68:18;
107:7;121:18,20;131:2
**calls (2)**
119:13;144:2
**came (5)**
80:11;120:20;
123:18;136:5;142:4
**camera (1)**
58:2
**Camp (2)**
125:11,14
**Campora (1)**
125:22
**can (85)**
6:22;11:14;13:9,23;
14:5;15:5,12;19:20;
23:9;24:12;38:18;33:3,
11;34:4;35:13;37:9,25;
39:19;44:9,20,21;45:9,
13;47:10,12;49:22;
54:15;55:5,9;57:14,25;
58:6,9,11,12;60:4;61:6,
11,20;63:4;64:13;
72:21;74:25;76:10;
81:5,6;84:6;85:13,13,
14;89:7;90:9,11;91:17;
94:23;95:17;96:23;
97:5,7;101:10;102:15;
103:20;108:15;110:3;
112:2,18;115:14,17;
116:3;123:20;125:3;
126:17,19;131:13;
132:14,15,16,18;
137:15;138:11;140:12;
141:4;143:14,19,23
**cancel (1)**
139:4
**cap (7)**
43:3;44:13;45:4;
62:11;116:23;120:1,6
**capability (1)**
82:8
**capable (1)**
56:12
**capital (4)**
36:9;112:23;113:12,
18
**capped (3)**
42:20,20,21
**capping (1)**
46:12
**care (11)**
5:12;55:13;58:7;
97:23;104:24,25;
114:1;121:25;131:8;
140:16;141:13
**carefully (1)**
108:23
**carried (1)**
53:16
**cart (2)**
54:4,7
**carved (1)**
112:14
**case (33)**
18:24;19:22;41:5,18;
42:22;46:20;48:13;
53:12;63:20;72:12;
73:10,13;77:9;82:14;
83:14,20,20;84:7;
89:19;91:3,4;94:21;
104:13;110:16;121:2;
122:22;123:2;124:4;
129:9;133:22;142:2,9;
143:5
**cases (10)**
11:12;19:2;41:10;
44:15;54:14;103:2;
125:24;132:9,11;135:5
**cash (4)**
11:8;49:8;50:4;
112:23
**cashometer (1)**
66:25
**category (1)**
22:25
**caught (1)**
99:21
**cautious (1)**
97:9
**Cecily (2)**
16:15;40:17
**cell (2)**
15:10,11
**certain (5)**
15:1;49:4;50:15;
84:16;116:10
**certainly (16)**
11:14;19:13;21:1;

25:15,20;30:14;32:23;
34:1;48:15;54:11;60:5;
97:7;98:16;109:17;
133:23;143:19
**certainty (2)**
105:6;109:11
**cetera (3)**
32:24;33:12,13
**challenge (3)**
52:8;100:17;121:4
**challenged (1)**
132:14
**challenges (1)**
26:12
**chambers (1)**
84:1
**chance (4)**
84:4;105:7;109:23;
140:15
**chances (2)**
21:8;84:2
**change (7)**
21:5,15;47:10,12,15;
87:20;116:1
**changed (1)**
31:23
**changer (2)**
85:20,21
**changes (4)**
6:8;20:9;134:3;
139:23
**changing (2)**
133:14;134:4
**channels (1)**
129:2
**Chapter (6)**
12:23;20:18;50:4;
94:22;103:1;105:1
**charge (1)**
115:9
**checked (1)**
111:7
**checking (1)**
111:6
**checklist (2)**
18:15;69:25
**checks (1)**
36:8
**chess (1)**
41:23
**chips (1)**
37:7
**choice (1)**
44:5
**choir (1)**
39:19
**choose (4)**
15:7;47:13;97:5,7
**chooses (1)**
96:24
**chores (1)**
20:5
**chosen (1)**

**141:25**
**chunks (1)**
97:18
**circle (1)**
119:3
**circles (1)**
85:2
**circling (1)**
94:11
**Circuit (7)**
69:17,17,24;89:19;
100:7;101:23;128:7
**circumstance (1)**
89:5;90:16;94:16
**circumstances (1)**
19:17
**cite (1)**
91:4
**citing (1)**
91:3
**city (1)**
98:17
**Civil (1)**
72:16
**claim (24)**
9:10,11;19:1;22:25;
31:9;43:5;45:18;49:8;
50:4;71:3;73:8;76:19;
77:17,23;78:21,24,24;
79:2;88:24,25;127:22;
136:21,22;144:9
**claimant (3)**
10:3;87:13;137:4
**claimants (35)**
7:21;9:25;13:11;
16:18;18:25,25;19:9,
14;25:5;40:18;51:9;
62:1,2,18;64:1;69:8;
77:2,14,15;86:17;
89:24;112:2,7,15;
113:1;114:15,23;
115:10,10;117:9;
118:1;120:15;123:12;
131:20;135:2,9
**claimants' (2)**
118:12,13
**claimant's (1)**
13:15
**claimholder's (1)**
144:9
**claiming (1)**
19:7
**claims (109)**
9:4,19,20;11:11;
13:14;14:4,9;23:16;
24:3,4,11,14;25:9,11;
26:3,22;30:1,17,20,24;
31:3;37:19;42:10,11,
18,19;43:3;45:19;46:4,
21;54:1;55:5,9,11;
56:25;64:6;69:8;70:14,
22;71:13;72:25,25;
73:2,14,17,22,25;

Case: 19-30088    Doc# 4003    Filed: 09/25/19    Entered: 09/25/19 14:46:19    Page 149
of 168

74:22;75:1,2,19,22;
76:5,10,16,23,23,25;
77:4,6,12,12;78:5;79:6,
11;86:22;88:19;91:20;
98:22;107:23,25;
109:8;112:1;113:19;
115:17,22;116:18,24;
117:8;118:17,23;
119:13;120:2,6;123:8;
125:3;126:4,15;127:4,
7;128:5,6,7,8;129:3,10;
130:22;131:19;132:3,
4;134:23;135:22;
136:3,20,21;137:16,18;
143:24;144:2

**clarification (2)**
21:13;86:21

**clarify (2)**
104:10;115:15

**clarity (1)**
14:3

**class (22)**
10:4,5,9,18,24,25;
11:7;22:7;25:9;28:2,
17,25;29:1;77:15,18,
19,23;86:21;87:10;
110:2;113:7;114:8

**classes (7)**
10:24;28:21;33:15;
54:9;77:12,13,20

**classification (1)**
105:1

**classification's (1)**
33:12

**classified (1)**
79:18

**class-on-class (5)**
88:17,22;90:4,11,18

**clauses (1)**
69:16

**Clean (1)**
98:5

**clear (7)**
10:22;107:1;114:2,
19;116:15;141:21;
142:8

**cleared (1)**
111:8

**clearer (3)**
52:24;106:3,3

**clearing (1)**
42:25

**clearly (5)**
10:18,18,24;36:14;
53:7

**CLERK (5)**
5:6,20;8:17;15:10;
111:2

**clever (1)**
50:1

**client (8)**
23:3;36:11;38:15;
45:3;77:19;78:8;89:17;

98:16

**clients (10)**
42:11;44:24;48:3;
56:4,14;57:23;110:11,
14;117:17;139:16

**client's (1)**
94:14

**close (5)**
30:18;87:10;109:12;
118:22;140:22

**cocounsel (1)**
70:12

**Code (3)**
32:24;53:10;80:1

**cold (1)**
135:17

**collar (1)**
120:1

**colleagues (2)**
129:20;130:14

**collectively (1)**
43:3

**colloquy (1)**
33:7

**comfortable (2)**
25:25;27:15

**coming (9)**
56:18;60:6;93:11;
106:14;123:11;127:3;
129:1;130:10;144:16

**commenced (2)**
13:2;135:5

**commencement (1)**
103:17

**comment (10)**
14:16;35:14;47:9;
59:19;86:4;91:25;
140:2,3;144:15,17

**commenting (1)**
99:4

**comments (12)**
6:1;14:17;22:4;
29:10;40:20;41:12;
111:17,17;115:15;
123:17;124:15,19

**commission (1)**
102:25;103:9,20

**commitment (5)**
67:11,12;68:1;
106:22,24

**commitments (10)**
12:19,21;13:12;
45:18;46:14;66:24;
67:4,19;68:6;69:2

**committed (1)**
68:2

**committee (22)**
9:19;13:15;16:18,24;
18:11,25;34:1,16,17,
22;35:3,25;37:5;40:16,
18;59:4;61:14;96:20;
115:10;127:24;135:2,9

**committees (1)**

34:2

**committee's (1)**
40:11

**common (1)**
63:8

**communicate (2)**
53:8;135:14

**communication (1)**
134:13

**communities (1)**
41:22

**companies (6)**
48:14;50:6;53:2,18,
23;117:8

**company (13)**
31:5;44:16;46:25;
87:22;89:1;103:7;
106:22;112:8,22;
116:19;119:20;135:6;
141:24

**company's (3)**
92:15;142:7;143:25

**compares (1)**
106:23

**compensate (1)**
82:6

**compensated (1)**
84:3

**compensation (2)**
125:1;126:9

**compete (1)**
81:20

**competing (24)**
20:21;25:23;27:4;
52:4,5,24;55:2;56:22;
60:19;61:22;63:13;
64:12,14,16;70:7;
89:21;104:1;122:8;
123:7,24;131:22;
132:11;134:9;136:11

**Competition (1)**
113:25

**competitive (2)**
84:4;121:2

**complained (2)**
43:16;48:1

**complaints (1)**
134:12

**complete (3)**
42:6;68:5;130:19

**completely (3)**
63:25;69:1;114:17;
121:1;130:15

**complex (2)**
32:22;52:19

**complicated (6)**
32:23;52:21;56:14;
101:19,19;135:11

**complies (1)**
100:12

**comply (2)**
19:9;95:10

**component (1)**

65:6

**comprehensive (1)**
7:20

**compromise (1)**
46:21

**compromises (3)**
107:7,15;108:1

**concede (1)**
45:11

**concept (1)**
106:7

**concern (1)**
142:19

**concerned (6)**
31:12;78:12;105:15;
109:25;127:6,6

**concerns (1)**
104:21

**concerted (2)**
128:3;135:4

**conclude (1)**
52:23

**concluded (1)**
145:2

**concrete (2)**
43:17,17

**condemnation (5)**
21:16;42:24;46:2;
71:24;138:4

**condition (1)**
105:23

**conditioned (1)**
45:22

**conducted (1)**
18:7

**confer (6)**
23:19;24:2,12;26:25;
70:22;76:1

**conference (16)**
5:9;6:18;7:11,18;
18:15;37:4;52:13,16;
53:20;54:2;59:9,10;
66:19;69:21;95:8;
103:16

**conferred (1)**
112:3

**confident (3)**
28:14;30:19;68:3

**confirm (2)**
13:23;45:25

**confirmable (1)**
57:13

**confirmation (16)**
25:20,22;26:16,17;
27:13;28:9;33:4,19;
37:13;38:1,23;39:17;
88:3,13;123:23;132:1

**confirmed (2)**
33:13;45:23

**conflating (1)**
89:23

**conflict (1)**
17:13

**conflicting (1)**
95:22

**confusion (1)**
20:24

**conjunction (1)**
81:25

**connection (14)**
18:6;59:18,20;62:1;
66:18;70:14;91:12,14;
92:15;106:18;109:3;
115:8,18;116:13

**cons (1)**
140:9

**consensual (2)**
6:9;36:4

**consensus (2)**
19:20;37:11

**consequences (1)**
56:9

**consider (7)**
19:25;64:20;88:12,
21;97:17;103:20;138:5

**consideration (4)**
103:10;105:7;
121:19;129:9

**considered (4)**
33:16;78:6;129:13;
130:8

**considering (1)**
109:9

**consistent (1)**
24:1

**constituencies (2)**
110:14;142:7

**constituency (7)**
13:15;45:2,10,11;
52:8;54:18;73:13

**constituents (3)**
41:25;52:25;53:13

**constitution (1)**
98:25

**constructive (2)**
46:21;105:2

**consulted (1)**
42:5

**contemplate (1)**
61:5

**contemplated (1)**
62:11

**contention (3)**
29:25;64:7;114:18

**contentious (1)**
57:15

**contest (1)**
56:12

**context (2)**
26:9;49:8

**continue (2)**
14:2;93:22

**contract (1)**
38:7

**contractual (1)**
28:3

Case: 19-30088    Doc# 4003    Filed: 09/25/19    Entered: 09/25/19 14:46:19    Page 150
of 168

**contrary (3)**
98:24;130:3;131:15
**Control (1)**
70:15
**controlling (1)**
97:8
**convenience (2)**
23:25;110:25
**convenient (1)**
15:17
**conversation (5)**
81:6,7,9;130:25;
144:10
**conversations (4)**
9:23;61:15;73:20;
108:10
**cooperative (1)**
56:10
**coordinate (2)**
72:21;91:6
**coordination (1)**
108:20
**copy (1)**
29:14
**cornerstone (1)**
49:18
**corporate (2)**
75:16;79:5
**Corporation (1)**
5:6
**corral (1)**
72:23
**cost (1)**
136:5
**costs (1)**
42:22
**counsel (18)**
5:24;26:25;29:10;
34:14,16;71:20;76:1;
80:25;94:5;96:21;
104:19;111:10;112:3;
121:14;127:18,18;
136:18;137:25
**counsels' (1)**
58:6
**count (1)**
125:18
**counting (1)**
20:16
**County (2)**
98:17,18
**couple (7)**
6:18;20:4;21:12,13;
105:14;131:9;141:8
**course (16)**
13:8,13;14:1,23;
16:2;58:16,20;60:3;
65:4;73:11;115:19;
119:23;120:3;122:25;
132:24;134:1
**Court (668)**
5:3,4,8,12,15,19,21;
6:2,4,6,10,10,14,17,23;

25;7:3,5,8,14,24,25;
8:3,6,11,15,18,22;9:1,
6,10,13,15,17;10:2,7,
12,14,16,20,22;11:2,6,
18,21,23;12:1,4,7,11,
14,16;13:4,7,18,19,25;
14:11,14,15,19;15:4,9,
11,11,13,15,22;16:2,4,
8,12,14,16,19,21;17:2,
3,7,8,9,10,12,15,17,22,
25;18:2,9,13;19:3,6,11,
18,23,25;20:1,3,13;
21:2,4,8,11;22:11,14,
16;23:2,5,8,13,15,22;
24:4,8,15,17;25:12,14,
18,21;26:1,8,21,23;
27:1,3,6,10,12,17,21,
25;28:5,7,9,11,16,20,
24;29:7,12,16,18,20,
23;30:5,8,11,16,21,23;
31:1,4,6,12,17;32:5,9,
12,14,15,19;33:7,11,
22;34:3,10,12;35:18,
23;36:1,5,17,21;37:17,
21;38:2,11,18,20,25;
39:2,10,18,23,25;40:2,
12,14,23;41:3,7;42:2,
15;43:1,5,11,11,14,20,
23;44:1,3,11,17,19;
45:9,14,18,21,23,24,
25;46:7,9,23;47:1,4,8,
11,12,15,17,23;48:1,7,
9,11,12,15,17,21,23,25;
49:11,13,15,17,20,22;
50:7,9,11,14,16,20;
51:3,6,8,11,16,19,22,
24;52:1,3,10,14,16,23;
53:9,10;54:5,7,13,15;
55:11,14,16,18,20;
56:3,17,21;57:2,5,9,11,
18;58:1,3,5,11,12,13,
14,17,21;59:2,6,10,11,
14,17;60:9,16,18,21;
61:1,2,8,11,12;62:4,6,
13,15,21,23;63:10,14,
17,22;64:8,10,13,23;
65:2,12,14,17,21,24;
66:1,3,5,10,12,16,20;
67:7,10,12,15,17,19,21,
24;68:14,16,18,22;
69:12,13,14;70:3,5,10,
17,24;71:2,6,9,12,16;
72:3,6,10,15,20;73:6,9,
11,16,19,21,24;74:4,
14,17,23;75:3,6,10,12,
16,20,23;76:2,8,11,15,
19,24;77:16;78:2,16,
19;79:1,4,9,13,20;80:4,
7,13,16,19,23,24,24;
81:3,12,12,23,24;82:1,
3,5,8,9,11,13,15,16,23;
83:4,8,11,18,22,24,25;
84:8,12,17,20,22;85:1,

4,5,7,15,18,23;86:4,6,8,
18,25;87:2,5,9,12,19,
21,23;88:9,12,15,20,
21;89:2,4,6,8,9,11,12,
13;90:1,6,9,11,17,19,
21,23,25;91:9,13,21;
92:3,5,8,11,17,19,23;
93:1,5,24;94:1,8,12,17,
25;95:2,4,9,17,22,24;
96:4,7,12,16,22;97:4,6,
11,14,16,21,23;98:1,3;
99:2,4,7,10,13,24;
100:3,6,9,12,16,19;
101:7,16,23;102:1,3,5,
11,16,21;103:3,6,24;
104:4,7,9,17,24;105:5,
9,11,20,22;106:6,13;
108:3,5,17;109:6;
110:5,18,20;111:3,20;
112:2,11,16,20;113:3,
5,10,13,20,23;114:1,8,
10,13,20,24;115:1,4,6,
11,19,25;116:7,9,11,
14,17;117:4,10,15,21,
24;118:2,4,7,10,15,21;
119:11,18,23;120:3,5,
7,13,20;121:3,7,11,23;
122:1,4,7,9,11,24;
123:19,25;124:6,8,11,
14,16,16;125:8,9;
126:10,13,22,25;127:2,
10,12,16;129:6,18,19,
20,21;130:16,20,23;
131:6,8,14,21;132:5,
10;133:1;134:2,16;
135:10;136:8,18,25;
137:4,6,8,10,22;138:8,
17,19,21;139:9,18,22;
140:1,5,16,18,21;
142:11;143:16;144:18;
145:1
**courtroom (7)**
17:20;41:25;53:14;
91:16;97:6;111:19;
144:19
**courts (2)**
43:2;109:4
**Court's (4)**
47:9;74:24;84:2;
107:24
**covered (1)**
115:2
**CPUC (8)**
13:1;29:14;32:22;
33:9;97:22;104:2,21,
24
**cramdown (2)**
33:15;39:9
**cramming (1)**
132:1
**Cravath (1)**
42:7
**crazy (1)**

36:24
**creating (2)**
28:17;101:2
**creative (1)**
32:21
**credibility (3)**
109:2,19;111:18
**credit (2)**
32:20;123:19
**creditor (6)**
22:17;31:8;41:5;
63:8;65:3;79:24
**creditors (8)**
22:17;34:23;35:10;
39:5;77:13;87:22;
116:3;122:5
**creditors' (2)**
34:16;61:14
**critical (7)**
20:9;33:9,18;63:19;
95:9;99:16;143:18
**cross (1)**
50:20
**cross-purposes (1)**
142:20
**crossroads (1)**
18:23
**crystal (1)**
126:3
**crystalized (1)**
33:24
**cumbersome (1)**
20:15
**current (2)**
77:25;103:13
**currently (1)**
8:23
**cut (5)**
81:14,15;94:18;
100:23,23
**cute (2)**
53:4,5

**D**

**damage (5)**
74:12,21;75:2,18;
76:5
**damages (1)**
76:7
**date (28)**
8:15;13:10;14:10;
15:2,7;16:23;17:1;
18:2,7;20:19,23;21:21,
22;22:1;24:4;30:18;
31:16;37:5;50:15;56:4;
58:8;80:10;92:13;
103:17;105:24;129:12;
133:22;137:14
**dates (7)**
9:2;15:4,16;5;21:25;
23:24;111:8,9
**dating (1)**

36:24
104:20
**day (17)**
15:18,19;34:3;41:10;
48:19,24;58:8,11;
77:10;83:18;99:15;
105:13;108:15;114:4;
132:17;143:16;144:22
**days (8)**
15:19;17:3;45:5;
109:22;133:7;138:25;
139:12,13
**dead (3)**
92:2,8;114:5
**deadline (13)**
26:15;30:24;73:22;
77:1;103:11;104:16;
105:8;127:18;128:1,
21;129:5,10;141:2
**deadlines (2)**
32:22;103:7
**deal (22)**
26:10;29:3;32:22;
35:7;36:4;39:12,15;
40:8;41:25;54:24;
56:15;69:20;76:15;
91:14;94:2,18;126:17;
131:3,4;134:9;138:25;
143:22
**dealing (3)**
31:9,19;128:21
**deals (3)**
55:24;94:11;95:18
**dealt (4)**
29:9;54:18,22;56:18
**death (1)**
78:17
**debate (3)**
64:13;79:21;85:25
**debated (1)**
129:13
**debating (1)**
132:6
**debt (4)**
26:3;55:7;137:18;
144:2
**debtor (30)**
21:17;26:15;29:25;
31:8;40:19;51:14;
54:25;55:2;63:8,19;
70:23;74:24;77:16;
78:15;81:5;83:1;84:6,
9,9,11;85:9;97:9;
101:9,21;108:18,20;
116:1,2;130:3;141:4
**debtors (32)**
5:24;7:10,19;12:18,
23;13:23;33:11;41:15,
17;43:2;45:17;46:18;
47:10;48:7;49:3;50:25;
53:22;57:17;59:23;
61:15;63:1;68:3,8,25;
71:14;78:20;103:12;
107:9;108:12,25;

Min-U-Script®

Case: 19-30088    Doc# 4003    Filed: 09/25/19    Entered: 09/25/19 14:46:19    Page 151
of 168

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(5) contrary - debtors

131:1;136:3
**debtors' (24)**
6:11;7:12;13:2;
16:25;38:4;41:14;42:9,
18,21;44:5;46:5,11;
52:8,20;57:13;62:19;
65:9;66:15;69:4;71:4;
76:1;107:5;121:5;
137:17
**debtor's (1)**
141:4
**December (2)**
21:22;47:10
**decide (2)**
93:23,24
**decided (3)**
21:18;46:20;107:19
**decides (3)**
45:18;92:13;94:12
**decision (3)**
83:14;96:23;143:1
**decline (1)**
142:11
**declined (2)**
128:2;134:23
**decree (1)**
23:24
**decrees (1)**
46:3
**defend (1)**
44:23
**defer (4)**
14:2;86:2;132:17,18
**deferred (1)**
133:19
**defined (4)**
12:12;26:2,3;102:13
**definitely (1)**
83:10
**definition (6)**
8:19;22:24;23:17;
98:8,10,21
**definitions (3)**
12:17;100:4;101:6
**definitive (1)**
69:22
**delay (7)**
16:24;18:19,21;
19:20;27:19,20;81:21
**delaying (1)**
133:17
**delighted (1)**
135:16
**delta (1)**
117:21
**denied (1)**
16:22
**Dennis (1)**
34:22
**deny (2)**
45:4;123:1
**denying (1)**
31:20

**Department (4)**
62:8;70:15;72:17;
98:14
**dependent (1)**
105:16
**depending (1)**
60:13
**depends (2)**
7:16;136:17
**depositions (2)**
18:7;59:25
**deputy (2)**
17:20;144:19
**derail (1)**
60:6
**described (1)**
103:16
**describing (1)**
65:17
**deserve (2)**
41:23;126:9
**designate (1)**
142:12
**designation (1)**
26:17
**despite (1)**
11:15;54:20;126:18
**destroyed (2)**
124:24;125:11
**details (2)**
106:17;122:13
**determination (3)**
37:23;70:21;132:2
**determinations (1)**
90:15
**determine (1)**
132:4
**determined (2)**
43:2;60:15
**determining (3)**
86:3;90:16;131:19
**detrimental (1)**
116:20
**development (1)**
35:9
**developments (1)**
35:1
**devious (1)**
31:7
**devolve (2)**
7:12;14:22
**dialogue (1)**
109:24
**Dictionary (1)**
12:7
**differ (2)**
23:18;76:3
**differed (1)**
55:4
**difference (6)**
77:7;106:25;116:3;
130:17;131:5;136:24
**differences (1)**

116:4
**different (20)**
15:7;31:10;35:6;
36:8;46:13,13;63:8;
75:7;77:18;78:9,10,23;
79:13,25;85:12;93:10;
107:13;115:6;116:2;
134:6
**differently (1)**
14:5
**differs (1)**
79:24
**difficult (1)**
56:13
**dilute (1)**
46:15
**diluted (1)**
46:17
**diminished (1)**
72:24
**direct (2)**
125:22;142:22
**directed (1)**
143:6
**directing (1)**
143:1
**direction (1)**
124:5
**directly (1)**
125:23
**disagree (15)**
28:6;34:6;45:7,9;
59:17;78:21;88:13;
96:13;101:10;106:10;
130:13;131:23,25;
132:5;133:3
**disagrees (1)**
78:3
**disappointing (1)**
57:16
**discharged (1)**
9:5
**disclosure (11)**
10:14;14:3,6,7,12;
26:10;32:6;33:1;60:17;
87:15;133:18
**disclosures (1)**
38:13
**discount (2)**
51:17;71:18
**discounting (1)**
116:22
**discouraging (1)**
30:1
**discovery (9)**
18:5,9,12;42:7;
59:19,20,23;60:6;
93:20
**discrete (4)**
63:3,5;122:1;137:19
**discuss (4)**
41:16;87:1;104:19;
143:18

**discussed (1)**
22:1
**discussing (1)**
133:8
**discussion (10)**
22:21;23:23;62:24;
69:23;71:10;76:13;
104:17;129:8;130:6;
134:13
**discussions (5)**
108:24;110:8;
130:17;142:14,15
**disingenuous (1)**
81:17
**dismissiveness (3)**
42:6;44:24;53:9
**disparage (1)**
110:16
**disparate (1)**
77:14
**disparately (1)**
79:18
**dispute (6)**
35:24;63:7;65:2;
76:9,12;89:10
**disputed (7)**
76:10,16,22;77:5;
79:2,11;136:20
**disputes (4)**
76:15;77:9,10;107:7
**dissenting (1)**
10:9
**distributable (1)**
46:24
**district (8)**
17:2,9;32:14;58:13;
59:10;76:8;129:21;
142:25
**divide (1)**
136:20
**Division (1)**
72:17
**divorced (1)**
109:13
**doable (1)**
57:22
**dock (1)**
26:10
**docket (3)**
73:24;144:20,21
**doctrine (1)**
88:12,23;90:12
**doctrines (1)**
89:20
**document (12)**
21:5;50:24;60:1;
69:23;79:21;100:1;
105:17;106:3;107:13;
113:6;120:14;141:22
**documentation (1)**
67:23
**documented (1)**
7:22

**documents (7)**
8:6;35:12;53:23;
67:3;93:7;107:1;
139:16
**dog (1)**
116:16
**dollar (5)**
12:20;19:1;49:8;
50:4;113:7
**dollars (33)**
9:5;11:9;12:20;22:9,
13,16,17;38:9;42:20;
45:10;46:4;47:19;49:4;
50:22;60:13;62:12;
67:5,14;68:2,11;74:12,
20;77:17;109:11;
112:7,14;113:22;
114:16;118:25;121:16;
128:14;132:12;136:6
**Donato (19)**
13:18;17:22;31:23;
42:24;43:14;44:4;46:1,
3;80:11,12;81:25;
82:11,18;84:10,15;
85:10;130:7;138:10;
142:15
**done (13)**
65:24;93:4;94:21;
98:11;104:18,19;
113:17;117:1;127:23;
132:8,10,15;135:6
**doubt (2)**
10:20;21:10
**down (3)**
19:1;31:22;34:4;
39:6;46:19,19;56:18;
63:18;91:24;105:2;
130:10;132:1;139:12
**downstream (1)**
69:21
**draft (1)**
77:20
**drafted (2)**
50:25;70:25
**drafts (1)**
41:13
**drill (3)**
28:16;83:5;85:18
**drive (2)**
72:23;73:12
**due (1)**
132:24
**Dumas (117)**
16:8,9,13,15,15,17,
24;17:5,9,14,16,21,24;
18:1,18;30:15;40:15,
17,18,24;41:4,8;42:17;
43:10,13,19,21,25;
44:2,7,12,18,25;45:7,
13,15,21,22;46:6,8,10,
24;47:2,6,9,14,16,21,
25;48:6,8,10,12,16,18,
22,24;49:1,12,14,16,

Min-U-Script®

Case: 19-30088    Doc# 4003    Filed: 09/25/19    Entered: 09/25/19 14:46:19    Page 152
of 168

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(6) debtors' - Dumas

18,21,24;50:8,9,10,12,
15,19;51:2,4,7,9,12,17,
21,23,25;52:2,9,13,15,
17;54:6,11,14,15;
55:10,12,15,17,19,20;
56:1,16,20,22;57:4,8,
10,12,24;58:2,3,4,10,
13,16,20;63:1,1,17;
72:24;73:2;94:1;108:9
**Dumas's (1)**
47:18
**DUNNE (24)**
34:21,22;35:21,24;
36:2,6,18;37:1,20,24;
38:3,17,19,24;39:1,3,
11,22,24;40:1,10,13,
14;94:10
**during (2)**
123:18;134:25

**E**

**eager (1)**
104:14
**earlier (5)**
33:10;40:4;124:3;
128:12;129:12
**early (8)**
14:12,16;26:16;29:9;
88:12,23;109:6;132:25
**easily (1)**
125:18
**east (1)**
138:14
**easy (1)**
10:8
**echo (1)**
106:16
**economics (1)**
87:20
**effect (2)**
26:16;123:7
**effective (3)**
105:24;126:4;136:7
**effectively (3)**
90:2;135:1,19
**efficiencies (2)**
59:14,16
**efficient (1)**
26:9
**effort (4)**
45:16;128:4;135:4,5
**efforts (1)**
11:15
**eight (2)**
10:1;48:14
**eighteen (9)**
22:8,9,15,16,17;
77:21;98:12;117:16,16
**eighty-five (3)**
9:17,18;88:1
**either (12)**
10:20;14:12;15:23;

21:25;23:19;33:15;
36:20;78:7;79:6;
130:12;141:20;143:2
**elaborate (1)**
13:9
**element (1)**
39:8
**eleven (18)**
11:9;48:14;49:1,7;
50:3,22;87:18;112:6,
13;114:16;117:12,14,
15,19;118:1,1;119:6;
129:24
**eleven- (1)**
112:22
**eleven-billion- (1)**
113:6
**eleven-billion-dollar (3)**
62:18;86:21;93:8
**eliminating (1)**
109:18
**Elliot (1)**
11:16
**else (10)**
22:4,14;34:19;40:8;
58:18;102:6;118:25;
120:24;132:7;135:13
**emails (1)**
108:10
**embarrassment (1)**
101:18
**Emergency (1)**
70:16
**emphasize (1)**
136:2
**employed (1)**
74:19
**employer (1)**
74:11
**enacted (1)**
106:1
**encourage (4)**
94:12;98:6;99:22;
127:23
**encouraging (1)**
99:15
**end (9)**
35:5;94:4;99:9,18,
19;100:20,21;105:18;
141:15
**endless (1)**
101:12
**engaged (1)**
141:19
**engaging (2)**
135:7,19
**Engel (24)**
86:12;98:3,4,4;99:3,
6,8,12,14;100:2,5,8,11,
15,18;101:1,15,17,25;
102:2,4,10,14;143:4
**enormous (1)**
110:13

**enough (5)**
49:6;84:15;115:21;
133:23;142:17
**ensure (1)**
124:25;129:3
**enterprise (1)**
44:16
**entire (1)**
63:20
**entirely (2)**
59:21;88:22
**entirety (1)**
41:18
**entities (24)**
18:24;22:6,8,12,20;
23:17,23;29:7;34:18;
42:13,14,20;49:4;75:1;
76:6;77:21;78:9;98:10,
13;117:10,11,13,16;
143:24
**entitled (8)**
51:10;124:25;128:5;
129:3;131:18;132:22,
23;133:15
**entity (10)**
22:24;42:11;75:3,5,
6,16;78:8;120:19;
136:23,23
**equally (1)**
112:12
**equitable (1)**
39:9
**equity (14)**
11:9;12:19;13:12;
42:22;44:10;46:14;
59:24;105:13;106:22;
125:2;131:17;132:2,
14;142:8
**essentially (1)**
134:5
**establish (1)**
76:10
**establishing (1)**
13:14
**estate (2)**
65:15,18
**estimatable (3)**
23:18;77:6;78:7
**estimate (7)**
46:3;55:5,23;74:25;
119:15;125:20;137:16
**estimated (4)**
22:20;76:7;118:2;
131:19
**estimates (1)**
44:4
**estimating (1)**
37:19
**estimation (26)**
31:21;32:10;42:25;
45:15;53:24;71:4;
74:25;76:8,23;78:21,
23;84:16;103:13;

118:5,14,19;119:14;
125:20;130:2,2,9,11;
131:16;132:6;136:10;
143:23
**estimations (1)**
13:17
**et (3)**
32:24;33:12,13
**evaluate (2)**
132:23,23
**evaporate (1)**
50:12
**even (38)**
7:6;10:2;15:18;20:5;
25:23;27:3;32:19;
36:21;38:20;40:8;42:6;
48:3;50:2,5,22,25;
55:1;61:17;73:22;
76:22;77:5;82:20;
84:22;87:12,16;88:2,5;
89:6;90:2,2;98:6,17;
109:11;127:21;128:12;
133:6,12;136:9
**evening (1)**
15:2
**event (4)**
10:6;57:13;107:21;
110:9
**events (1)**
134:6
**everybody (8)**
58:23;72:12;88:4;
93:20;121:2;127:5;
130:9;138:12
**everybody's (1)**
54:20
**everyone (7)**
5:4;110:21;116:20;
123:16;142:1,5;144:24
**everyone's (1)**
110:24
**evidence (2)**
30:9;107:1
**evident (1)**
86:24
**evolving (1)**
77:13
**exact (1)**
94:23
**exactly (12)**
26:23;32:13;38:17,
17;49:14;69:17;71:24;
91:1;104:3;106:16;
114:12;118:6
**examiner's (1)**
141:10
**example (3)**
54:8;77:2;79:15
**Excellent (1)**
6:13
**except (4)**
44:6;46:1;57:8,10
**excess (5)**

9:25;12:19,21;67:19;
121:15
**exclude (2)**
110:22;125:21
**exclusive (1)**
135:1
**exclusivity (54)**
7:13;14:22;16:25;
18:21;24:23,24;29:14;
31:20;36:13,15,23;
37:6;38:21,22,23;
40:22;47:25;61:22;
65:5,5;66:1,6,8;81:13,
16,21;82:20;83:3,5,12,
15;84:1,22,24;85:7,25;
86:3;89:16;91:18;92:6,
14;93:16,16,19,19;
103:25;106:19;114:4;
122:21;124:1;132:20;
134:5;140:7;142:3
**exculpation (1)**
69:16
**Excuse (1)**
5:19;25:2;32:2;
87:14;89:11;101:18;
103:24;117:15;125:12;
144:8
**exercise (1)**
123:22
**exhibit (1)**
8:9
**exist (3)**
48:2;50:24;128:24
**existed (1)**
67:5
**existing (5)**
21:25;46:14;104:6;
131:17;132:1
**exit (1)**
12:23
**expanded (1)**
98:14
**expect (11)**
7:23;8:4;9:25;10:17;
11:4;74:5;92:16;97:14,
16;101:3;109:7
**expectation (1)**
9:22
**expected (1)**
111:6
**experience (3)**
19:19;45:3;80:11
**experienced (1)**
134:16
**experts (1)**
53:24
**explain (4)**
45:13;56:13;57:25;
96:20
**explicit (1)**
108:9
**expressly (1)**
61:5

Min-U-Script®

Case: 19-30088    Doc# 4003    Filed: 09/25/19    Entered: 09/25/19 14:46:19    Page 153
of 168

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(7) Dumas's - expressly

**extending (1)**
128:11
**extension (3)**
127:4;133:5,5
**extensive (1)**
106:21
**extent (10)**
46:2;84:16;95:10;
104:20;120:13;126:4,
8;127:16;128:24;
135:22
**extraordinarily (1)**
108:23
**extraordinary (1)**
136:1
**extremely (2)**
50:1;127:19

**F**

**face (1)**
47:9
**face-to-face (1)**
135:12
**fact (13)**
44:22;62:6;64:18;
78:8;89:7;101:21;
107:5,20;108:9;
119:15;126:18;128:4;
129:4
**factor (1)**
38:1
**facts (2)**
109:14;128:20
**failed (1)**
96:9
**fails (1)**
81:8
**fair (5)**
39:9;44:14,15;69:14;
94:24
**fairly (3)**
46:16;53:7;54:18
**fait (1)**
41:9
**faith (3)**
51:13;127:8,13
**faithful (1)**
58:17
**fall (2)**
36:4;37:7
**false (2)**
67:21,22
**familiar (3)**
127:14;129:21;142:1
**familiarity (1)**
53:11
**family (1)**
75:13
**far (5)**
31:12;56:24;70:20;
110:16;122:14
**Farr (2)**

9:24;86:16
**fashion (1)**
25:5
**fatal (1)**
123:15
**fault (2)**
141:20,20
**favorable (1)**
85:9
**feasible (1)**
68:19
**Feather (1)**
74:18
**February (1)**
103:18
**federal (8)**
26:20;71:18;72:18,
25;76:3,4;129:20;
136:23
**fee (2)**
141:10,10
**feel (5)**
14:5;94:10;109:1;
134:13;142:21
**feeling (4)**
80:14,20;108:25,25
**feet (2)**
81:6,6
**Feld (1)**
59:1
**FELDMAN (48)**
86:15,16,18,19;87:1,
4,6,10,17,20,22;88:8,
10,16,21;89:3,5,12;
90:4,7,10,13,18,20,22,
24;91:6,8,10,22;92:4,6,
10,12,18,21,25;93:2,
23,25;94:7,9,19,25;
95:1,3;111:25;123:6
**Feldman's (1)**
123:17
**fell (1)**
97:18
**fellow (2)**
89:16;124:24
**FEMA (8)**
42:17;71:18;72:18;
76:25;78:23;117:17
**fervor (1)**
43:7
**few (3)**
35:1;111:19;131:13
**field (1)**
63:25
**fifteen (2)**
88:2,6
**fifth (1)**
54:17
**fifty (2)**
19:1;80:13
**fifty-five (1)**
44:21
**fight (2)**

116:16;138:20
**figure (7)**
18:13;102:14;104:5;
111:10;119:16,18;
139:7
**file (24)**
7:23;8:4;12:3;14:6;
24:8,11,14;25:8;31:3,
9;32:18;54:25;65:6;
71:13;76:19;103:12;
104:1;115:21;127:18;
132:22;133:4;139:7;
140:12;143:15
**filed (47)**
6:4;13:7;14:21;21:6;
23:16;24:3;29:13,24;
30:18,20;31:18;32:3,7;
35:8,13;41:5,14;52:5;
60:25;67:3,7,12;69:22;
71:3;86:24;92:18;93:7;
95:8;104:11;106:18;
108:5;116:10;127:22;
128:5,6,7;130:2;
131:22;136:22;138:22;
139:17,20,21;140:15,
19,22;144:1
**filing (6)**
14:2;30:1;52:6;
127:19;136:3;141:3
**final (3)**
40:5;43:17;83:19
**finally (1)**
53:21
**Finance (1)**
62:9
**financial (1)**
67:1
**financing (9)**
13:12;44:12;45:17;
46:14;66:23;67:2;68:6,
13;120:1
**find (6)**
46:12;53:22,25,25;
54:1;101:3
**fine (8)**
6:20;11:24;37:15;
71:22;74:2;101:10;
113:13;121:9
**finish (1)**
22:3
**finite (1)**
37:22
**fire (15)**
31:22;70:15;77:4,15;
79:16,19;80:6;82:6;
83:21;84:2;103:14;
125:11,15,24;130:7
**fire-related (1)**
70:14
**Fires (1)**
125:16
**firm (1)**
9:24

**first (24)**
6:20;7:2,4;17:12,12,
17;18:17;20:5,15;21:6,
14;35:17;41:11;64:18;
69:21;88:24;89:14;
94:22;103:8;105:14;
109:24;123:23;127:25;
131:15
**fit (1)**
117:18
**five (4)**
81:5,6;125:12;
138:25
**fix (2)**
15:5;57:14
**flag (1)**
69:4
**flagging (2)**
69:13;70:2
**flags (1)**
69:23
**flaw (2)**
99:5;123:15
**flexibility (1)**
139:21
**flexible (1)**
138:2
**flies (1)**
118:5
**flip (1)**
138:24
**flipside (1)**
62:25
**fly (1)**
29:2
**focal (1)**
119:20
**focus (4)**
95:8;98:6;106:19;
140:8
**focused (3)**
98:9;114:16,16
**folks (4)**
37:22;119:7;121:20;
122:14
**follow (4)**
24:13;44:9;45:1;
119:5
**following (7)**
15:8,19;17:6;29:4;
33:13;105:19;133:19
**follows (2)**
61:19;103:11
**forcing (1)**
109:19
**foreshadowing (2)**
118:16;120:10
**forget (1)**
15:5
**forgive (1)**
41:24
**forgotten (1)**
144:14

**formal (5)**
14:2,6,7;34:1;35:25
**forms (3)**
106:24;126:16,18
**forth (3)**
122:14;123:18;142:4
**fortunate (1)**
115:21
**fortunately (1)**
135:8
**forty-eight (1)**
139:17
**forty-five (1)**
11:10
**forward (27)**
6:8;12:24;13:22,24;
14:6;18:20;25:19;
36:19;37:11;46:20;
51:14;52:24;54:14;
56:23;59:22;60:7;68:5;
94:12;114:19;122:10,
22;123:2;124:2;
133:18;134:1;138:4;
142:9
**forwards (1)**
108:2
**found (2)**
69:7;91:2
**foundation (1)**
12:22
**four (9)**
15:19;35:1;45:5;
83:14;101:14;128:13;
133:7;139:12,13
**fourteen (4)**
12:20,20;67:8,19
**fourth (3)**
54:17;75:25;100:24
**Fox (1)**
121:14
**frame (1)**
100:25
**framework (1)**
103:6
**FRANCISCO (2)**
5:1;43:1
**Frank (1)**
124:10
**frankly (4)**
24:20;91:17;132:7;
133:16
**frequently (1)**
109:16
**friend (1)**
46:10
**friendly (1)**
42:1
**front (4)**
53:7;80:12;100:21;
116:9
**Fulbright (1)**
74:9
**full (8)**

Case: 19-30088    Doc# 4003    Filed: 09/25/19    Entered: 09/25/19 14:46:19    Page 154
of 168

19:15;83:2;94:20,24;
108:11;112:6;129:8,9
**fully (12)**
6:8;7:22;14:24;75:2,
19,20;76:22;78:13;
84:3,3,3;89:14
**fund (5)**
12:24;13:24;19:16;
38:9;119:11
**fundamental (3)**
91:19,24;109:2
**funded (5)**
26:3;54:9;55:7;
137:18;144:2
**funding (3)**
12:23;95:10;105:25
**funds (1)**
99:1
**further (4)**
40:10;78:15;101:19;
137:23
**future (1)**
95:15

**G**

**Gallagher (1)**
86:16
**gamble (1)**
85:8
**game (9)**
41:23;52:3;85:20,21;
99:9,18,20;100:20,21
**gamesmanship (1)**
52:25
**gardener (1)**
79:4
**Garrison (1)**
102:19
**gather (1)**
71:20
**gave (3)**
133:4,5,7
**gears (1)**
57:18
**generally (1)**
144:19
**General's (1)**
70:13
**generate (1)**
108:1
**generated (1)**
106:24
**gentlemen (1)**
86:10
**genuine (2)**
107:16;140:14
**gets (4)**
42:4,5;63:11;108:15;
128:15
**Ghost (1)**
79:15
**gift (1)**

98:25
**given (4)**
92:25;115:21;136:7;
140:7
**giving (8)**
53:25;81:10;84:24;
99:13,14;102:11,11;
139:20
**glad (4)**
12:15;53:20;106:9;
109:4
**global (2)**
19:20;36:4
**goes (4)**
38:18;60:17;122:10;
132:12
**Good (36)**
5:4,5,7;16:13,16;
34:20,21;35:13;40:17,
23;58:25;74:7,8;80:4,
5;81:18;86:18,19;
93:15,17;95:5;98:4;
102:17,18;105:9,11;
109:18;111:13;113:25;
121:12,13;124:8,10;
127:8,12;130:24
**Gotshal (2)**
5:23;7:9
**government (1)**
73:22
**government's (1)**
72:25
**grant (2)**
122:25;133:25
**granted (1)**
56:24
**Great (5)**
6:16;26:9;47:18;
80:11;85:11
**greater (3)**
73:1,2;97:12
**group (19)**
7:20;37:22;60:6;
63:3;77:22;86:17,23,
23;89:17;106:25;
108:17,19;111:15;
124:22;129:25;134:25;
135:8;136:14;141:23
**groups (2)**
29:8;63:8;65:3;66:7;
79:22
**grow (1)**
69:16
**guess (7)**
6:11;37:2;55:23;
106:14;118:4;128:10;
143:7
**Gump (2)**
59:1;111:14

**H**

**half (2)**

45:10;48:14
**hand (2)**
64:24;142:17
**handle (3)**
61:6,8;138:11
**hands (2)**
53:23;135:14
**happen (7)**
35:6;56:6,7;84:24;
107:9;110:12;116:12
**happened (2)**
134:7;143:7
**happening (1)**
53:15
**happens (5)**
37:9;44:3;50:16;
55:23;68:8
**happenstance (1)**
42:12
**happy (17)**
24:2;25:24;26:7,24;
27:15,20;28:8;39:15;
60:23;72:9;73:13,18;
76:1;87:1;96:19;
113:24;145:1
**hard (6)**
74:22;75:21;89:25;
109:15;110:11;118:18
**harmony (1)**
82:15
**Harris (24)**
86:12;95:4,5,5,21,23,
25;96:6,11,14,17;97:3,
5,7,12,15,20,22,25;
98:1,2;99:4;103:3;
106:8
**Hauer (1)**
59:1
**Hays (1)**
80:6
**heads (2)**
99:13,14
**Health (3)**
74:10,10,16
**hear (12)**
34:14;45:16;52:23;
92:13;93:10,19;101:9;
111:10;122:21;135:15;
138:21;141:6
**heard (26)**
6:10;12:7;16:10;
24:18;34:17,19;35:12;
36:13,20;42:12;58:23;
62:25;63:17;66:24;
70:6;87:16;104:19;
108:13;113:16;118:16;
121:23;123:16;129:4,
22;130:9;136:18
**hearing (47)**
7:13;8:14,24;9:2;
14:21,22;16:21;18:18,
19,22;18:8;21:12;22:1;
27:13;28:10;35:17;

37:13;39:14;40:3;52:2;
57:23;58:10;59:8,21;
60:2;61:15,21;64:18;
66:12,22;76:12;80:10,
12;85:15;106:15,19;
110:24;112:4;114:4;
123:23;131:17;132:25;
137:24;140:23;141:3,
16;142:3
**hearings (5)**
80:18;103:18;109:6;
137:23;144:21
**hearing's (1)**
80:19
**heartbroken (1)**
30:24
**hedge (3)**
79:4;125:3,4
**held (2)**
13:14;143:24
**help (3)**
91:6;109:16;127:2
**helpful (6)**
21:20;26:8;61:20;
104:21;109:17;124:4
**Here's (5)**
44:14;48:16,18;
88:16;143:11
**Hi (1)**
16:14
**hiding (1)**
51:2
**hierarchy (1)**
117:19
**high (3)**
11:3,4;109:13
**higher (1)**
130:1
**highest (1)**
54:19
**highly (1)**
68:3
**HINKER (48)**
60:11,17,20,22;61:3,
10,13;62:5,10,14,16,
22;63:9,11,16,21,24;
64:9,11,22;65:1,4,13,
16,20,23,25;66:2,4,8,
11,14,18,21;67:9,11,
16,18,20,22,25;68:15,
17,21,24;69:13;70:2,4
**hoc (15)**
7:20;11:16;18:11,18;
34:2;59:3;61:25;63:2;
86:16,23,23;89:17;
111:14;134:25;141:23
**hodgepodge (1)**
51:14
**hold (3)**
117:8;133:21;141:2
**holders (12)**
9:18;46:15;59:24;
62:3,20;64:3;65:8;

84:14;94:22;105:13;
106:22;125:2
**holdout (1)**
88:5
**holiday (6)**
15:3;16:1;17:11,15;
111:8,8
**holidays (4)**
57:21;58:15;133:11;
138:14
**home (4)**
72:23;73:12;75:13;
79:6
**homes (1)**
125:13
**homework (1)**
143:11
**honest (2)**
44:15;142:4
**Honor (209)**
5:14;6:13,24;7:11,
18;9:23;11:11,13;12:2;
13:1,14,16,25;14:8;
15:2,21;16:13;18:5,16,
22,23;19:15,17,21;
23:7;30:4,17,19,25;
32:16;34:21;35:2;37:3,
12;39:3;40:10,17;41:1,
13,17,25;42:23;43:25;
44:7;45:8,13,17;47:22;
48:8;49:21;51:4,25;
52:9,13;53:9;55:10;
56:2,16;57:15,25;58:4,
20,25;59:4,7,22;60:5,
13,24,24;61:4,13,19,
24;62:10,19;63:11,21;
65:5,23;66:9,14,22;
67:3,22;68:7,11,24;
69:3;70:2,9,11,14,19;
71:7,15;72:2,23;74:3,
8;75:22;76:14,22;
77:11;78:1,12,18;79:8,
19;80:3,5;81:4;82:24;
84:5,13;85:17,24;86:7,
15,19;87:4;88:8,10,13,
14;89:6;90:5,7,14;
91:11,17;92:10,13;
93:2;94:7;95:5,12;
96:3;97:3,20,25;98:4,
6;99:3,20;101:1,21;
102:15,18,22;103:5,19;
104:3,23;105:10,12;
106:23;107:8,11;
108:6;109:16;110:19;
111:13,16,22;113:1,9,
16,25;114:7,12;115:3,
14,17;116:6,15,25;
118:6;119:17;120:9,
18;121:10,13;123:21;
124:10;125:19,21;
126:14;128:22;129:17;
130:15;132:8;133:13,
17;134:15,19;135:25;

Min-U-Script®

Case: 19-30088   Doc# 4003   Filed: 09/25/19   Entered: 09/25/19 14:46:19   Page 155
of 168

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(9) fully - Honor

138:15;139:6,15,22;
140:14;141:15,21;
142:1,2,9,10;144:25
**Honor's (3)**
88:11;122:19,20
**hoops (1)**
33:11
**hope (5)**
14:22;31:2,5;52:23;
94:19
**hoped (1)**
135:24
**hopeful (2)**
7:12;110:9
**Hopefully (3)**
14:8;111:23;118:12
**hoping (2)**
78:14;108:14
**horse (2)**
54:4,8
**hospital (7)**
74:10,15,19;75:3,7;
117:18;136:19
**Hospital's (1)**
77:17
**hours (3)**
110:23;139:17;
144:10
**house (1)**
127:13
**housekeeping (1)**
20:5
**hovering (1)**
35:22
**huge (3)**
85:10;110:17;139:24
**humans (1)**
77:3
**hundred (4)**
9:7,8;87:10;118:25
**hundred-page (1)**
100:1

**I**

**idea (7)**
30:6,14;37:15;51:12;
101:20;107:18;125:8
**identified (11)**
29:5;33:19;42:10;
54:22,23;56:17;57:12;
100:22,24;136:13;
143:14
**identify (3)**
100:14,21;101:10
**ignore (1)**
67:10
**illegal (1)**
98:25
**imagine (2)**
59:22;135:19
**impacted (4)**
101:5;125:14;126:6;

127:11
**impair (1)**
144:2
**impaired (24)**
10:3,5,18,24,25;
11:7;26:4,5;27:22;
28:17,21,25;29:1;
33:15;38:15;39:4;54:9;
55:7;68:9;116:20;
121:21,24,24;122:1
**impairment (4)**
39:4;60:10;87:14,14
**impairs (1)**
137:18
**impeding (1)**
144:8
**impermissible (1)**
114:6
**implications (1)**
103:21
**implicitly (1)**
95:19
**imply (1)**
136:14
**importance (1)**
140:25
**important (20)**
36:3,10;37:23;54:12,
16,16,17;56:25;57:3,7,
11;61:4;68:4,7;107:6;
108:23;122:21;139:7;
141:12,12
**importantly (2)**
62:14;123:4
**impose (1)**
88:17
**imposing (1)**
58:5
**imposition (2)**
15:22;57:22
**improper (2)**
114:6;123:7
**improperly (1)**
144:8
**impugn (1)**
72:24
**inappropriate (1)**
121:1
**inappropriately (1)**
126:16
**inclined (6)**
17:10,13;81:23;
133:25;134:2,17
**include (4)**
19:8;72:9;98:14;
143:23
**included (2)**
110:3,6
**includes (1)**
29:14
**including (9)**
15:1;37:14;69:25;
72:18;97:2;99:21;

110:14;111:17;122:5
**inconsistent (1)**
25:15
**inconvenient (1)**
15:17
**incorporated (1)**
49:5
**incorporates (1)**
12:5
**incorrect (1)**
38:14
**increase (1)**
48:13
**increasing (1)**
112:5
**indeed (2)**
50:21;125:6
**indenture (2)**
121:14;122:15
**independent (2)**
122:8;142:22
**indicated (2)**
7:11;16:9
**individual (11)**
14:4;62:2,17;64:1;
69:8;75:13;77:3,7;
89:1;115:10;125:7
**individually (1)**
88:25
**individuals (3)**
124:20;125:14;126:5
**inflexible (1)**
43:24
**informal (2)**
5:18;128:8
**informally (1)**
6:1
**information (7)**
14:9;29:13;51:13;
109:19,20;134:21,22
**informational (1)**
29:18
**informed (1)**
142:23
**inherently (1)**
128:6
**initial (2)**
41:24;108:12
**initiated (1)**
18:10
**initiating (2)**
18:9,11
**injured (1)**
124:23
**injury (1)**
132:3
**injustice (1)**
53:14
**insignificant (1)**
73:4
**insist (1)**
138:18
**insolvent (1)**

116:19
**institutions (3)**
67:1,4,16
**instrumentality (2)**
98:15,16
**insurance (9)**
48:13;50:6;53:2,17,
23;89:1;115:2;117:7;
125:3
**insured (1)**
88:25
**insureds (1)**
48:19
**insurer (1)**
88:25
**insurers (4)**
48:20;69:9;76:6;
109:10
**intend (3)**
91:15;132:22;142:15
**intends (1)**
96:25
**intent (1)**
42:21
**intention (2)**
44:9;136:2
**intentionally (1)**
29:25
**inter-claimant (1)**
117:2
**intercreditor (2)**
90:3;116:3
**interest (6)**
26:20;37:14;38:7;
39:6,8;122:3
**Interested (1)**
103:14
**interesting (1)**
101:4
**interfere (1)**
142:6
**interlocutory (2)**
34:5;40:7
**intervening (1)**
134:25
**into (20)**
7:12;11:14,14,18;
14:22;24:23;36:4;38:1;
49:5;56:11;69:22;
76:23;79:21;91:1;96:2;
98:20;104:14;106:17;
134:24;136:20
**inverse (5)**
21:16;42:24;46:2;
71:24;138:3
**invitation (4)**
34:8;88:11;109:23;
142:12
**invite (6)**
11:19;19:25;22:4;
23:19;29:9;74:23
**invited (5)**
56:4,5;61:17;63:18;

78:14
**involve (1)**
65:18
**involved (4)**
30:14;31:23;109:3;
116:21
**involvement (1)**
142:22
**irritant (2)**
41:20,21
**isolated (1)**
119:3
**issuance (1)**
95:14
**issue (79)**
14:25;21:16;31:10;
32:12,22;34:4;37:21;
38:23,23;39:20,21;
46:2;54:12;59:5,19;
60:10,14,14,22;61:23;
62:16;64:5,7;68:10;
69:4,11;70:2;72:8;
74:25;75:25;78:15;
79:14,14,25;82:3,5;
83:3,12,20,20;88:13;
89:7,7,10,24,25;90:3;
91:11,14,18;93:14;
94:3;95:9,22;102:8;
111:23,24;112:1,9;
114:14,18,21;115:5,6,
7;117:2;121:22,24,25;
122:1,2;129:7;131:17;
136:15,20;137:15;
140:8;143:23;144:4
**issues (53)**
6:19;26:17,19,19;
27:3,8,16;28:9;29:5;
32:1;33:9,19,24;34:13;
37:14;39:8,19;40:4,9;
56:14,15,18,24;57:6,
12;68:12;78:13;80:1,9;
88:10;91:9;98:7;99:16,
22;100:14,23;101:3,4,
13;104:13,20;105:1;
107:19;117:6;120:12;
121:20;122:7;135:23,
23,25;136:13;143:13,
17
**item (8)**
13:13;29:15;30:3;
31:14;66:16,21;69:6;
96:5
**items (6)**
18:15;34:13;54:21;
112:24;121:18;144:11
**iteration (2)**
95:15;96:8

**J**

**Jackson (1)**
42:25
**Jackson's (2)**

Min-U-Script®
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(10) Honor's - Jackson's

Case: 19-30088    Doc# 4003    Filed: 09/25/19    Entered: 09/25/19 14:46:19    Page 156
of 168

43:11;45:25
**January (1)**
  47:11
**Jessica (1)**
  5:23
**Jewish (3)**
  15:2;17:11;111:8
**job (7)**
  40:6;97:1,1;124:24,
  24;125:6;137:24
**jocularity (1)**
  41:24
**Jones (1)**
  105:13
**Judge (33)**
  13:17;17:22;31:22;
  38:6;42:24,25;43:11,
  14;44:4;45:25;46:1,3;
  69:24;80:11,12;81:25;
  82:11,17,18;84:10,14;
  85:10;112:19;118:20;
  124:12,18;126:2;
  127:1;130:7;131:5;
  138:10;142:15,25
**judges (1)**
  45:16
**judgment (2)**
  14:2;26:20
**Julian (4)**
  30:15;109:7;118:24;
  125:9
**jump (2)**
  40:21,21
**jumped (1)**
  33:11
**June (3)**
  13:10;104:15;133:21
**jurisdiction (3)**
  89:6;90:1,8
**jury (5)**
  44:3;84:12,12;85:9;
  130:6
**Justice (1)**
  72:17

**K**

**Karotkin (187)**
  5:5,7,11;6:17,22,24;
  7:1,4,7,9,9,16;8:2,4,9,
  13,21,23;9:2,8,11,14,
  16,18;10:5,10,13,15,
  17,21;11:1,4,7,20,22,
  25;12:2,5,9,12,15,18;
  13:6,8,20;14:13,18,20;
  15:6,17,21,25;16:3,6,9;
  18:4,10,16;19:5,7,13,
  24;20:2,4,12;21:1,3,7,
  10;22:3,10,13,19;23:1,
  4,12,14,21;24:2,6,10,
  16,22;25:10,13,17,19,
  24;26:6,18,22,24;27:2,
  5,7,11,14,19,24;28:1,6,

8,13,19,21,24;29:6,11,
17,21;30:4,6,9,12,17,
22,25;31:2,5,11,16;
32:2,6,11,13,16;33:6,
21;34:9,11;35:16;
36:19;37:2;38:14;39:7;
44:25;47:18;55:4,12;
57:14;58:2;61:18;
66:23,24;68:8,10;
69:19;70:23;71:21;
74:6;78:3;85:25;86:20;
87:7;91:6;92:20;96:20;
106:15;131:10,13,15,
25;132:7,18;133:13;
134:2,15,19;135:16;
136:17,24;137:3,5,7,9,
21;138:7,15,18,20;
139:3,25;140:21;
141:16,18;142:3;
143:11
**Karotkin's (6)**
  16:19;24:20;38:5;
  39:11;59:19;119:12
**keep (11)**
  10:23;16:4;20:16;
  69:20;72:12;104:18;
  106:7;134:3;139:10;
  142:23;144:1
**keeping (1)**
  144:18
**Kelly (1)**
  125:23
**kept (1)**
  131:4
**key (1)**
  19:22
**killed (1)**
  124:22
**kind (9)**
  33:10;34:25;35:12,
  22;37:24;56:11;65:18,
  21;87:15
**Kippur (1)**
  122:18
**knew (1)**
  93:8
**knowledge (2)**
  96:12;108:11
**knows (8)**
  7:18;12:2;13:17;
  19:21;30:17;109:17;
  115:17;123:22
**Kornberg (17)**
  13:8;29:19;33:8;
  46:10;102:17,18,19,22;
  103:5;104:3,5,8,10,23;
  105:4,6,10
**Kornberg's (1)**
  143:5

**L**

**label (1)**

76:2
**labels (1)**
  89:23
**laid (1)**
  139:22
**landscape (1)**
  134:4
**lane (1)**
  118:20
**language (3)**
  25:15;77:25;112:20
**large (1)**
  127:17
**larger (1)**
  112:6
**largest (1)**
  74:11
**Larry (1)**
  98:4
**last (14)**
  13:12;20:6;21:12;
  35:18;66:22;69:3;83:3,
  20;85:18;94:7;108:22;
  123:22;135:21;136:4
**late (5)**
  126:8;128:7,8;
  129:10,10
**later (16)**
  7:24;8:4;17:1,25;
  26:12;33:10;37:16,25;
  39:15;40:4;122:22;
  124:3;128:1;133:4;
  140:19,20
**latest (2)**
  79:15;96:8
**Latin (1)**
  112:18
**laughter (1)**
  142:4
**law (17)**
  28:2;32:22;48:22;
  56:12;88:24;89:5;92:9;
  95:18;97:9,19;99:5,17,
  18;100:7,12;114:5;
  128:11
**laws (1)**
  95:24
**lawyer (3)**
  31:7;72:5;124:21
**lawyers (12)**
  30:19;83:11;109:2;
  111:18;124:25;127:24;
  128:23;129:2;134:16;
  135:13;139:20;143:19
**lay (1)**
  101:8
**leading (1)**
  115:9
**lease (1)**
  6:11
**least (18)**
  29:24;34:1;46:16;
  54:23;69:15;71:3;78:4;

87:15;101:9;127:16;
130:18;135:14;136:11,
14,16;142:12;143:3,8
**leave (10)**
  22:2;23:22;33:22;
  53:14;77:21;94:23;
  95:2,3;130:4;144:12
**leaving (2)**
  26:10;88:6
**left (4)**
  64:11;125:1;133:23;
  141:17
**legal (36)**
  23:16;25:7,22;26:5,
  11;29:5;34:4;37:13;
  39:19;40:4;54:8,24,25;
  55:7,8,11;69:20;75:25;
  83:9,13;91:9,11;96:9;
  97:18;98:7;99:16;
  100:17,23;101:4;
  107:19;111:23,23;
  112:17;114:14;137:19;
  144:4
**legally (2)**
  75:7,12
**legislation (3)**
  106:1;119:22;135:4
**legislature (4)**
  95:17,22;96:18,22
**legitimate (1)**
  96:10
**legs (2)**
  81:14,15
**length (3)**
  106:21;107:1,5
**lengths (1)**
  136:1
**less (2)**
  118:18;120:25
**lesson (1)**
  80:16
**lets (1)**
  138:5
**letter (1)**
  96:20
**letters (5)**
  67:11,12;68:1,3;
  106:23
**liability (3)**
  32:12;62:12;109:8
**liberal (1)**
  128:7
**life (1)**
  79:5
**lifting (1)**
  47:25
**light (2)**
  124:15,18
**lightly (1)**
  68:10
**likely (1)**
  115:7
**limited (3)**

40:20;59:24;72:18
**limiting (1)**
  41:12
**line (5)**
  56:25;57:1;86:11;
  112:21;119:24
**liner (1)**
  26:9
**lining (1)**
  41:5
**Liou (9)**
  5:12,14,17,23,23;6:3,
  7,13,16
**liquidate (3)**
  23:17;74:22;75:22
**liquidated (24)**
  37:19;55:5;70:21;
  72:8;73:25;74:25;75:2,
  19,20;76:5,7,22;77:4,5,
  8,17;79:2;107:22;
  117:11;136:21,21,22;
  137:16;143:23
**list (7)**
  22:3;24:19;29:23;
  54:19,19,20;101:13
**listed (1)**
  42:16
**listen (8)**
  14:16;62:23;64:14;
  69:14;72:1;97:24;
  101:21;113:3
**listening (2)**
  63:14;76:14
**litigate (1)**
  88:11
**litigation (3)**
  122:16;129:20,21
**little (11)**
  10:8;16:18;29:10;
  36:12;93:6;99:21,25;
  111:5;114:11;138:12;
  139:20
**lived (1)**
  125:12
**lives (2)**
  41:23;53:6
**living (2)**
  53:17;108:4
**local (1)**
  42:13
**lock-in (1)**
  50:21
**long (4)**
  54:25;68:2;100:3;
  105:17
**longer (2)**
  64:6;111:5
**Look (15)**
  29:4;31:12;32:17;
  33:22;36:3,22;43:6;
  55:13;68:19;100:1;
  109:5;113:6;128:14;
  135:22;140:2

Case: 19-30088   Doc# 4003   Filed: 09/25/19   Entered: 09/25/19 14:46:19   Page 157
of 168

**looked (7)**
17:20;19:12;20:8,8,
9;32:2;89:22
**looking (8)**
20:6,24;21:11,21;
31:18;33:17;52:18;
79:21
**looks (2)**
25:3;61:8
**lose (6)**
28:14,14;38:8,8;
55:13;68:9
**loss (1)**
75:13
**losses (5)**
48:4;74:13,20;75:18;
125:6
**lost (3)**
75:16;79:5;124:23
**lot (8)**
32:7,20;35:9;59:13;
85:11;99:21;126:20;
128:9
**lots (4)**
32:15;50:11;61:8;
100:3
**love (2)**
45:16;69:16
**loved (1)**
41:22
**lower (3)**
25:9;44:14,14
**lump (1)**
76:22

## M

**Machiavellian (1)**
101:6
**made-whole (9)**
88:12,17,22,24;
89:24;90:12,15;
114:22;117:6
**magic (1)**
68:13
**magnitude (1)**
14:4
**mailed (2)**
126:16,17
**major (11)**
11:11;33:14;34:1,4;
45:2,2;46:1;48:2,13;
52:7;54:21
**majority (1)**
17:7
**makes (5)**
14:1;40:4;59:13;
63:24;96:23
**make-whole (3)**
114:20;121:21,22
**make-wholes (1)**
37:15
**making (5)**

56:3;81:22;90:24;
91:5;93:17
**Malter (1)**
95:6
**mandatory (1)**
56:8
**Manges (2)**
5:24;7:10
**many (13)**
18:6;32:1;35:10;
41:13,15,17;71:17;
98:7;101:4;104:13,13;
107:12;128:25
**market (1)**
125:4
**MARSHACK (40)**
80:5,6,6,7,8,14,17,
20;81:2,3,4;82:2,4,7,
10,12,14,22,24;83:7,
10,17,19,23,25;84:8,
11,13,19,21,23;85:1,3,
5,14,17,20,24;86:5,7
**mastermind (1)**
52:25
**mastermindy (1)**
53:4
**materialize (1)**
126:5
**math (2)**
125:13,17
**Matter (12)**
5:6;6:8;8:20;21:9;
31:1;44:22;55:15;73:6;
92:9;114:5;131:25;
141:11
**matters (4)**
5:9;8:19;141:6,8
**Matthew (2)**
72:16;86:15
**may (25)**
6:3;25:2;27:24;37:3;
38:8;42:17;43:11,14,
14;50:14;55:24;65:10;
69:8;76:9;77:9;84:14,
15,16;95:10;98:16;
119:2;126:5;127:3;
129:5;136:9
**maybe (22)**
6:20;32:1;37:6;
38:16;50:25;57:21;
58:12;78:4,10;80:16;
81:8;91:23;93:18;94:4;
100:24;102:8;104:24,
25;107:25;111:9;
115:14;123:14
**mean (72)**
8:7;13:13;21:8;23:8;
25:1;27:3,12,13,21,22;
31:1,20;33:7;36:24;
37:19;41:11;43:6,24;
49:10,12;50:5;53:3;
54:1,16;56:6;57:2,15;
62:6;66:17;68:16;

71:23;72:13;73:17;
76:15;77:20;79:14;
81:25;82:5;83:4;87:14;
88:5;90:25;92:23;96:7;
100:19,20;103:24;
112:12;115:25;117:15;
119:15;122:24;123:16;
126:5,6,7,10,25;
128:13;131:21;133:3,
4;134:13;136:12,25;
137:14;138:1,11,19,22;
144:6
**means (11)**
10:14;36:14,17;38:9,
11;49:15;55:22;
124:22;126:8,10;
139:18
**meant (2)**
31:7;88:1
**measure (1)**
95:13
**mechanic (1)**
86:23
**mechanics (1)**
20:14
**mediate (6)**
36:14,24;37:7;61:23;
63:12;64:11
**mediating (1)**
36:15
**mediation (32)**
35:16,21,25;36:9,25;
37:5,9;56:8;61:13,16,
17,17,19,21;62:1,16;
63:13,19,24;64:15,16,
17;81:5,8,10,18;85:8;
94:17;109:22;110:7;
134:20;142:18
**mediator (14)**
19:18;40:3;81:13,14,
15,21,23;82:21;86:1,2;
142:14,22;143:2,6
**mediators (2)**
109:15,16
**meet (8)**
13:10;23:19;24:2,12;
70:22;76:1;108:10;
137:12
**meeting (4)**
53:7;105:8;110:9;
135:12
**meetings (3)**
41:15,17;134:21
**member (2)**
10:9,10
**members (2)**
113:7;129:1
**mention (2)**
72:4;98:8
**Merely (1)**
70:2
**merits (1)**
91:2

mess (2)
57:21;58:14
**method (1)**
44:20
**middle (1)**
27:13
**might (18)**
8:7;15:10;31:1;34:5,
6;55:22;59:23;77:7;
107:23;110:1,2,5,6;
123:1,13;132:10;
136:10;143:18
**Mike (1)**
111:14
**Milbank (1)**
34:22
**million (7)**
43:17;74:20;77:17;
117:12;128:14;129:24;
136:6
**millions (1)**
74:12
**mind (11)**
31:21;33:17;47:10,
12,15;69:20;76:16;
104:18;122:25;139:10;
142:13
**mindful (1)**
104:15
**minimize (1)**
13:13
**minor (3)**
6:18;8:19,20
**minus (2)**
119:8;129:24
**minute (4)**
23:9;62:4;102:24;
111:5
**minutes (2)**
80:13;110:25
**mirrors (1)**
52:20
**misses (1)**
30:24
**missing (1)**
130:25
**misunderstanding (1)**
130:5
**mix-up (1)**
111:7
**models (1)**
125:7
**modified (2)**
113:2;123:10
**modifying (1)**
112:4
**momentum (1)**
94:13
**money (6)**
84:14,15;85:21;
114:17;119:24;120:25
**Montali (1)**
82:18

**month (1)**
67:5
**Months (1)**
49:3
**moot (4)**
84:16;118:13;130:1,
11
**moots (1)**
118:5
**more (41)**
14:3;19:21;24:25;
25:24;26:6,24;27:14;
28:8;29:12;31:13;
35:19;38:9;56:24;
58:18;64:21;67:6;75:1;
77:12,12;84:14;86:24;
92:14;93:6;94:16;98:6;
102:12;105:6;107:12,
14,17;109:17;110:15;
120:24;124:3,4;133:6,
20;135:16;138:9,16;
139:25
**Moreover (1)**
9:23
**morning (28)**
5:4,5,7;16:13,16;
17:23;33:20;34:20,21;
40:17;58:25;74:7,8;
80:4,5;86:18,19;95:5;
98:4;102:17,18,20,21;
105:11;121:12,13;
124:10;129:24
**most (14)**
20:9;30:13,17;42:3;
54:11,12,15,16,17;
57:7;63:19;103:12;
123:4;125:11
**motion (67)**
5:10,13;6:11,12;
7:13,23;8:1,7,10;14:21,
23,24;16:19,25;18:6,
20;19:5,6,7;21:25;
22:2;24:23,24;36:13,
15,20;37:6;38:21;
40:21,22;49:13,23;
50:3,21;52:23;54:6;
56:19,24;59:21;61:22;
64:25;65:15,17;78:22;
82:20;89:16,18;91:12,
14,18;92:15;93:6,11,
17;104:2;115:8,13;
116:5,10;120:11;
122:21,23;123:23;
132:20;133:25;141:10,
11
**motions (1)**
5:8
**move (15)**
14:5;15:18;17:13;
18:14;46:20;57:23;
94:12;122:22;131:12;
133:9;134:1;139:1,1;
141:8;142:9

Min-U-Script®
Case: 19-30088   Doc# 4003   Filed: 09/25/19   Entered: 09/25/19 14:46:19   Page 158
of 168
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(12) looked - move

moved (2)
133:7;144:22
moves (3)
25:19;68:5;123:2
moving (6)
6:8;13:21;45:4,10;
122:18;124:4
much (18)
11:14;31:9;44:8;
57:22;67:1;73:5;76:24;
79:25;80:21;83:21;
121:10;124:8;128:12;
131:20;132:2,4,14;
139:10
multibillion (1)
68:11
multiple (6)
61:6;74:12,20;96:17;
103:20;128:16
municipality (1)
120:19
muscle (1)
70:8
musing (1)
36:10
must (6)
19:8;22:20;30:20;
63:14;96:25;118:23
mutually (1)
137:25
myself (2)
15:1;133:5
mystery (2)
73:14;131:4

**N**

name (4)
20:22;70:17;74:14;
75:12
names (1)
20:15
nature (2)
115:25;120:10
near (2)
127:18;137:13
necessarily (4)
23:6;71:23;82:25;
132:16
necessary (2)
12:23;15:18
need (41)
5:20,21;7:5;15:6;
28:24;32:19;33:23;
35:12;37:5;39:13;41:1,
8;46:13,14;54:6;59:9;
60:9;65:10;68:13;76:7;
94:4,17;100:9;110:24;
111:11;112:18;119:14,
25;120:1,1;122:7,25;
124:19;134:16;136:12;
139:25;140:6,8;
142:24;143:20;144:5

needed (4)
61:1;119:21,24;
133:6
needs (6)
46:12;60:12,15,22;
63:12;64:1
negotiate (2)
120:24;137:1
negotiated (3)
112:22;120:6;125:25
negotiating (1)
120:16
negotiation (3)
55:21;56:1;134:25
negotiations (6)
106:21;107:6;110:1;
135:2,7,20
neutral (1)
96:1,19,24
new (5)
88:23;132:20,20,21;
139:14
next (22)
13:25;16:22;17:19;
24:22;29:12,23;38:13,
14;46:3;60:11,24;
61:13;66:12;80:10;
85:15;86:6,12;108:15;
115:24;137:24;139:1;
140:3
nice (1)
29:2
night (3)
16:10;20:6;80:22
ninety- (1)
9:25
ninety-five (3)
9:25;20:7;87:7
Ninth (7)
69:17,17,24;89:19;
100:7;101:23;128:7
Nobody (1)
42:4,5
nobody's (1)
108:5
noise (2)
15:9,12
nonaction (2)
29:15;144:11
noncash (1)
112:24
non-debtor (1)
89:9
noninsider (1)
28:25
nonplan (1)
42:4
nonprofit (1)
75:11
non-profit (1)
136:22
noon (1)
141:5

normal (1)
34:15
normally (4)
20:15;65:12;81:9;
91:4
north (2)
87:7;125:16
Norton (1)
74:9
note (7)
12:18;14:25;18:4;
27:7;106:10;123:21;
141:16
noteholder (2)
111:15;141:23
noteholders (5)
25:1,1,2,4;122:16
notes (3)
21:11;121:15;141:18
nothing's (1)
108:13
notice (7)
126:3,20;128:18;
135:23,23;136:1,7
noticed (1)
107:11
notices (1)
128:16
noticing (3)
30:12,13;144:20
notwithstanding (1)
136:10
novel (1)
101:2
November (2)
21:17,18
number (32)
5:17,25;12:10;34:13;
35:3;36:7;44:6;45:18,
24;46:13,19,20;47:11;
54:21;56:18;74:1;77:3,
18;84:10;85:10;88:6;
89:17;102:22;110:13;
112:5,6;113:21;
119:21;121:7;127:8;
129:23;132:13
numbers (11)
43:22;94:11;109:12,
13;125:19,21,25,25;
127:17;139:23;144:1
numerous (1)
126:15,18

**O**

OAI (1)
103:3
object (3)
17:1;71:7;120:17
objection (3)
25:20;26:18;108:5
objections (1)
26:16

objects (1)
76:20
obligations (1)
116:2
observe (1)
58:15
obvious (1)
40:3
Obviously (14)
11:11;14:5;18:19;
19:8;21:5;31:9,23;
33:14;69:23;88:4;
122:15;123:16,17;
124:2
occur (1)
33:14
occurred (1)
88:1
occurrence (1)
105:24
ocean (1)
26:9
October (22)
8:14,24;14:10;15:1;
21:17;52:2;59:8,22;
60:2;80:10;103:7,11,
15,16;109:11;118:22;
122:19;132:24;140:23;
141:7;144:22,23
odds (1)
128:6
off (5)
17:13;52:6;111:24;
114:14;139:4
offense (1)
86:11
offensive (2)
81:25;82:1
offer (6)
29:4;48:7;55:24;
67:2;113:2;116:1
offered (3)
62:10,19;65:9;112:8,
25
offering (1)
55:22
offers (1)
62:24
Office (3)
70:13,15;126:16
offices (1)
79:5
official (5)
16:18;34:16,22;
40:18;61:14
often (1)
94:21
OII (9)
29:14;60:25;61:4;
103:8,12,17,19;104:8,
12
omnibus (1)
9:2

once (5)
65:5;71:13;83:6;
86:24;134:5
one (88)
5:19;7:25;8:25;10:3;
13:4;14:16;15:18;
19:18;20:5,24;21:14;
22:13,17,17;26:2;
28:25;29:7;30:22;
31:17;32:19,20,25;
37:11;39:5;41:10;
43:12;45:2,23;47:2;
54:11;55:1,14;58:18;
59:21;61:6,9;62:23;
64:21,24;65:4,23;66:1,
15;69:11,25;71:2,25;
72:22;75:7;77:24;80:1,
10,17;85:8;87:10,13;
89:18;90:25;94:14;
95:9,19;96:10,14;
97:18;98:8;100:24;
106:4,21;107:18;
108:22;109:15;119:19,
19,20;120:21;122:10;
127:21;128:1,17;
129:15;134:17;135:13,
21;141:11;142:6,8;
143:2;144:22
one-and-a-half (1)
67:13
ones (1)
41:22
one's (1)
52:10
only (14)
15:19;67:11;77:8,20;
84:4;85:25;91:25;
93:21;107:23;120:9;
122:12;128:25;142:8;
143:15
oOo- (1)
5:2
oops (1)
46:15
open (2)
139:22;142:10
opening (1)
21:16
operates (2)
74:10,18
Operator (1)
15:12
opinion (3)
16:8;22:23;136:19
opponents (5)
25:8;56:9;92:24;
93:19;100:14
opportunities (1)
108:1
opportunity (6)
32:17;78:14;87:16;
103:15;104:1;133:16
oppose (1)

Min-U-Script®
Case: 19-30088    Doc# 4003    Filed: 09/25/19    Entered: 09/25/19 14:46:19    Page 159
of 168
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(13) moved - oppose

134:1
**opposed (2)**
37:18;97:15
**opposing (1)**
26:14
**opposite (1)**
107:6
**opposition (1)**
5:16
**oppositions (1)**
21:17
**optimistic (1)**
32:5
**option (4)**
40:7;51:24;52:4;
128:2
**options (1)**
128:9
**order (15)**
5:3;6:3,4,15;19:16;
36:25;38:10;47:15;
48:7;57:6;69:9;103:9;
119:25;123:24;134:17
**organization (2)**
75:11;136:23
**original (2)**
10:23;31:19
**originally (2)**
16:9;32:3
**Orsini (1)**
138:9
**others (11)**
15:23;26:13;34:18;
42:12;55:6;57:14;
107:21;109:18;117:18;
131:10;137:12
**otherwise (3)**
30:5;93:4;118:19
**ought (3)**
29:20;88:23;92:13
**ourselves (1)**
107:21
**out (55)**
5:15;6:1;11:13;
18:13;21:23;23:23,25;
37:13;44:23;46:12;
52:17;53:22,25;54:1,1;
60:17;61:4;69:9,15;
70:6,8,10,11,25;73:1;
80:22;81:14,15;84:16;
87:17;93:21;94:15;
97:4;101:8;102:14;
104:5,22;107:12;
109:14,19,24;110:3;
111:10;112:14;119:21;
121:19;125:5;128:15;
131:1;139:1,1,7,22;
143:19;144:20
**outcome (1)**
60:14
**out-definitioned (1)**
12:8
**outliers (1)**

34:2
**outset (1)**
34:24;36:2
**outside (4)**
49:8;94:22;97:6;
103:17
**over (15)**
35:1,22;42:4;67:2;
80:19;81:5,6;89:7;
109:15;113:1;119:7;
124:16;128:13;135:5;
141:7
**overcame (1)**
135:8
**overlap (1)**
6:21
**oversimplify (1)**
135:11
**overwhelmingly (1)**
32:23
**own (7)**
21:14,19;34:3;66:3;
95:18;96:23;143:20
**owned (1)**
124:23
**owns (2)**
74:10,18
**Oxford (1)**
12:7

**P**

**package (1)**
8:8
**pages (1)**
20:7
**paid (8)**
19:15;54:18;87:17;
113:7,8;131:20;132:3,
4
**paper (3)**
83:1;89:4;103:4
**papers (4)**
38:22;86:24;91:2;
107:14
**Parada (1)**
8:16
**Paradise (2)**
42:13;74:11
**paragraph (1)**
105:18
**paragraphs (1)**
100:3
**parenthesis (1)**
20:23
**pari (3)**
112:11,16;123:12
**part (12)**
6:14;8:7;20:9;34:5;
62:19;76:7;78:6;109:9;
114:21;117:11,12;
136:2
**participant (1)**

102:7
**participate (2)**
53:24;61:16
**participated (1)**
134:20
**particular (3)**
22:6;90:16;140:10
**particularly (2)**
11:16;110:7
**parties (21)**
5:25;19:19;36:7;
39:20;40:7;68:1;69:1;
79:12;89:9;91:7;95:9;
98:7,11,21,22;99:21;
101:5;103:14;107:6;
110:15;132:23
**party (2)**
26:14;122:15
**Pascuzzi (25)**
22:22;23:3,6,7;24:3,
17;34:18;42:15;58:21,
22;70:6,9,11,12,19;
71:1,5,7,11,13;72:2,4,
7,22;137:12
**Pascuzzi's (5)**
24:11;42:11;56:25;
78:9;117:17
**pass (2)**
79:16;95:16
**passed (2)**
95:12;96:15
**passes (1)**
95:18
**passu (3)**
112:11,16;123:12
**past (2)**
35:1;133:6
**path (2)**
37:11;52:24
**patterns (1)**
107:25
**Paul (2)**
70:12;102:19
**pause (1)**
62:4
**pay (5)**
38:7;39:13,14;94:20;
132:12
**payable (1)**
49:8
**payments (1)**
109:9
**pays (1)**
132:14
**peace (3)**
23:2;70:10,11
**peeve (1)**
20:14
**peg (1)**
129:23
**pegs (1)**
45:24
**pen (2)**

38:16;43:8
**pending (1)**
13:17
**penny (1)**
71:3
**people (41)**
15:1;16:7;17:6;31:2;
43:7;44:23;53:6;55:24;
56:9;58:15;68:20;70:7;
72:22;74:19;77:3;78:5;
94:10;98:21;101:1;
102:22;107:15;111:19;
116:22;117:16;124:22;
125:12,17,19,21;
126:15,17,18,19,21;
127:9;128:16;129:3;
136:3;138:13;140:6;
141:1
**perceived (1)**
128:25
**percent (11)**
9:7,8,17,18;10:1;
11:10;87:7,11;88:1,2,6
**percentage (2)**
11:3,4
**perfectly (1)**
18:20
**perhaps (14)**
11:9;24:25;25:14,16;
28:17;32:17;33:8;46:2;
54:19,20;64:15;98:9,
16;128:6
**period (4)**
14:8;102:3;133:18;
135:1
**permissible (1)**
102:1
**permission (2)**
142:24,25
**permits (1)**
128:11
**permitted (1)**
56:23
**permitting (1)**
128:8
**person (4)**
24:18;71:20;72:9;
127:25
**personal (4)**
31:1;48:4;110:24;
132:3
**personality (1)**
56:12
**personalize (1)**
129:7
**personally (1)**
17:3
**perspective (5)**
94:15;118:11,12,13;
125:10
**persuade (1)**
134:8
**pertains (1)**

122:16
**pet (1)**
20:14
**PG&E (10)**
5:6;21:23;53:15;
77:8,22;96:8;111:9;
125:23,25;141:7
**PG&E's (2)**
103:21;144:7
**phone (3)**
15:10,11,12
**phones (1)**
108:10
**phonetic (1)**
11:16
**pick (5)**
18:2;37:5;77:18;
84:10;137:14
**pinned (1)**
105:2
**Pitre (24)**
124:9,10,10,12,15,
18;126:12,14,24;127:1,
3,11,12,15;128:22;
129:15,17;130:15,17,
21,24;131:7,22;135:22
**pivotal (2)**
26:11;91:3
**place (4)**
17:17;36:4;41:1,2,3,
4;59:8;60:2;61:20;
86:11;97:12;143:15
**places (1)**
85:12
**plaintiff (1)**
30:19
**plaintiffs (1)**
109:3
**plan (177)**
7:12;8:8;9:12,21,22;
10:11,18,23;11:8;12:3,
12,22;13:3,16,23;14:5;
19:9;20:7,8,15,16,18,
21,22;22:5,7;25:8,15,
19,23;27:4,8,22;28:2,
15;33:13;35:6,8,9,15;
36:7;19;38:4,9;40:20;
41:6,11,12,14,16;42:3,
8,9,10,18;44:9;45:1,5,
22,23,25;46:11;47:2,4,
19;49:5,9,16;50:5,9,11,
17,22;51:10;52:3,4,5,8,
19,24;53:1;55:1,8;
56:23;57:13,16;60:19;
61:23,25;62:11,19;
64:5;65:6,9,13;66:3,
15;67:2;68:5,18;69:4,
22;70:25;71:4;76:21;
77:19,20,25;78:13;
79:15;81:18;85:22;
87:24;88:2,17;89:22;
91:19;92:1;93:10,14;
95:9,14;96:8;97:19;

Case: 19-30088    Doc# 4003    Filed: 09/25/19    Entered: 09/25/19 14:46:19    Page 160
of 168

99:5;100:23;102:1,6;
103:13,22;104:1,2;
105:7,16,20,21,25;
106:2;107:5,13;108:8;
110:14;114:5;115:18,
20,21;116:1,13;119:6,
13;122:8,10;123:7,24;
130:2;131:20,22,23;
132:1,11,11,20,21;
134:9;136:5,11,17;
137:18;139:8,14;
140:11,22;143:25;
144:1,2,7,8
**planning (3)**
15:20;93:3;107:20
**plans (12)**
20:14,21;37:10;
52:20;55:2;61:6;63:13;
64:12,14,16;103:20;
138:13
**plate (2)**
111:24;114:15
**play (1)**
85:21
**player (6)**
34:1;46:1;48:2;73:4,
7;138:10
**players (3)**
34:4;37:23;48:3
**playing (3)**
41:19,20;63:25
**plea (1)**
63:18
**pleading (1)**
104:11
**pleadings (3)**
14:24;84:1;106:18
**Please (6)**
5:4;6:25;47:18;
66:23;86:14;111:3
**plenty (2)**
80:15;94:20
**plus (3)**
115:23;119:10,11
**PM (1)**
145:2
**podium (2)**
97:16;130:4
**point (60)**
10:8;22;11:13;37:9;
41:11;42:9,18;43:22;
44:5,14;45:11,15;
46:10;48:1,10;50:2,23;
51:13;52:17;61:4;
63:11;64:20;69:3,14;
71:19;72:9,23;73:12;
79:20;81:4;82:18;84:5;
86:20;87:18;90:22;
91:5;92:8;93:15,15;
94:7;96:7,14;99:23,25;
100:17;101:7;102:9;
105:15;107:3,17;
108:8;114:1;119:2;

123:3;128:3;129:12;
135:21;142:18,21;
143:9
**points (6)**
21:13,13;40:25;
66:15;81:3;119:20
**poison (1)**
110:1
**political (2)**
98:15,18
**pool (2)**
112:23;113:17
**pools (1)**
113:12
**position (15)**
24:25;25:25;26:4,4,
15;27:15;29:13;35:25;
37:4,17;40:11;43:23;
48:25;52:11;72:13
**positions (1)**
44:22
**positive (4)**
35:9;108:13;109:7;
124:4
**positives (1)**
35:10
**possible (3)**
107:20;108:7;136:6
**possibly (1)**
58:11
**post-filing (1)**
122:2
**post-petition (3)**
37:14;39:6,8
**pot (1)**
119:12
**potential (1)**
35:24
**potentially (4)**
65:7;107:22;112:23;
125:14
**Power (2)**
98:5;135:6
**powers (1)**
11:17
**practice (2)**
58:5;109:17
**pre-brief (1)**
136:12
**precisely (1)**
102:13
**preclude (2)**
135:7;136:3
**precluded (1)**
135:1
**precluding (1)**
135:19
**predict (1)**
126:3
**predictable (1)**
127:19
**prefer (1)**
139:3

**preference (2)**
43:1;109:21
**pre-hearing (2)**
24:23;103:16
**prejudice (1)**
133:17
**preliminary (2)**
71:10;102:25
**premature (1)**
104:12
**prepare (1)**
141:5
**prepared (4)**
96:2,3;100:16;131:3
**prerequisites (1)**
119:20
**presentation (1)**
111:25
**presented (1)**
103:9
**presently (1)**
144:21
**presumably (3)**
40:15;73:16;143:16
**presume (1)**
37:17
**presupposing (1)**
36:19
**pretty (3)**
81:18;90:19;109:18
**prevails (1)**
130:3
**prevent (1)**
81:22
**preventing (1)**
141:23
**previously (3)**
21:16;67:12;138:23
**principal (3)**
80:25;121:15;138:9
**principals (3)**
108:11;110:10,10
**principle (2)**
83:9;123:14
**principles (2)**
69:20;83:13
**prior (13)**
19:22;28:9;61:15;
64:18;76:12;87:25;
95:19;104:17;110:23;
118:7;129:18;135:25;
143:5
**priorities (1)**
57:6
**priority (5)**
50:2;54:19;58:8;
113:8;132:13
**private (6)**
75:4,5;78:8;99:25;
136:22;143:24
**pro (1)**
112:16
**probably (10)**

37:8;64:16;73:4;
77:5;106:2;124:3;
127:19;138:9;142:18,
22
**problem (15)**
7:15;21:25;27:17;
96:1;99:8,24,24;
107:22;108:24;109:2,
12;127:21;128:17,25;
143:2
**problems (4)**
57:2,6;109:19;
143:17
**proc (1)**
104:6
**procedure (4)**
34:15;63:2;122:14;
129:13
**procedures (2)**
32:23;65:10
**proceeding (4)**
17:10;76:8,23;
103:21
**proceedings (5)**
13:17,18,21;103:14;
145:2
**process (40)**
13:2;33:4,25;40:20;
41:12,12;42:3,4,8;
43:15;47:13;52:19;
57:16;68:5;71:4;84:4,
23;99:15,23,23;101:2;
102:23;103:1;104:8,
14,15,25;107:8,9;
118:5,14;122:8;127:4,
5;130:9,11;132:16;
134:25;136:10;138:4
**product (1)**
107:5
**production (1)**
60:1
**profit (1)**
125:6
**profiting (1)**
125:4
**program (1)**
126:4
**progress (12)**
12:1;45:2,6,12;48:2,
13;49:25,25;81:22,22;
106:16;123:18
**promised (1)**
45:1
**promote (1)**
135:5
**promptly (2)**
69:1;89:19
**proof (1)**
127:22
**proper (5)**
20:22;78:22;100:16;
129:1;137:11
**properly (1)**

33:16
**property (4)**
74:12,20;75:17,18
**proponent (2)**
102:6;115:20
**proponents (3)**
35:7;52:5;103:25
**proposal (2)**
87:25;115:11;118:4;
129:23
**proposals (1)**
91:23
**propose (3)**
28:1;55:2;59:7
**proposed (5)**
6:3,4;95:10;96:18;
103:9
**proposing (3)**
115:22;119:6;131:18
**pros (1)**
140:9
**protect (3)**
42:22;44:10;56:9
**protocol (2)**
30:12,13
**proven (1)**
30:2
**provide (1)**
134:22
**provided (1)**
67:25
**provides (3)**
9:3,20;88:18
**providing (1)**
112:6
**proving (1)**
118:19
**provision (3)**
69:6;98:20;120:22
**provisions (1)**
28:3
**prudent (1)**
37:25
**PSA (2)**
98:13,19
**public (24)**
18:24;22:6,8,11,20,
23;23:16,23;29:7;
34:18;42:10,14,19;
49:4;75:1,3;76:6;78:9;
98:10,13,25;117:10,13;
120:19
**PUC (7)**
46:11;47:3;52:19;
61:6;102:23;104:14,14
**pulling (1)**
37:13
**purchasing (1)**
125:3
**Pure (5)**
20:14;23:16;37:21;
54:8;55:8
**purely (1)**

Case: 19-30088    Doc# 4003    Filed: 09/25/19    Entered: 09/25/19 14:46:19    Page 161
of 168

54:10
**purports (1)**
88:17
**purpose (4)**
14:20;16:25;18:19;
94:23
**purposes (3)**
13:16;77:19;131:19
**pursuant (1)**
9:5
**push (1)**
17:18
**put (17)**
15:15;25:9;47:19;
50:1;53:17;69:15,25;
83:1;84:14,15;89:23;
97:7;101:8,13;113:2;
115:24;120:1

**Q**

**question-mark (1)**
42:19
**quick (1)**
80:10
**quickest (1)**
80:17
**quickly (1)**
139:21
**quoted (1)**
126:1
**quoting (1)**
118:24
**QURESHI (14)**
58:25;59:1,2,3,7,12,
16,18;91:16,22;94:1;
112:25;113:16;115:15
**Qureshi's (1)**
109:25

**R**

**raise (9)**
6:19;7:2;60:24;69:3;
99:7;100:16;101:3;
129:15;144:13
**raised (9)**
22:22;35:16,18;
37:12;55:6;64:18;71:9;
101:4;135:24
**raising (1)**
50:23
**ramp (1)**
127:19
**rank (1)**
57:5
**rapidly (2)**
107:20;134:3
**rata (1)**
112:16
**rate (4)**
26:20;38:7;96:24;
122:3

**rate-making (1)**
103:21
**ratepayers (4)**
96:1,19;97:8,13
**rates (1)**
97:2
**rather (11)**
23:24;33:10,24;
37:16,25;39:15,17;
40:4;122:22;124:3;
128:4
**reached (3)**
5:25;7:19;135:18
**read (17)**
9:15;22:7;24:24;
38:21;67:17;71:25;
87:24,25;89:19,20;
91:2;93:6,7;98:12;
118:7,7;140:18
**reading (2)**
42:23;67:15
**reads (1)**
84:1
**ready (1)**
33:13
**real (4)**
55:20;83:20;109:19,
20
**reality (3)**
95:12;131:3,3
**realize (4)**
21:18;24:10;84:2;
138:17
**really (13)**
11:13;29:12,18;33:4;
62:25;82:2;83:19;
109:4;110:11,16;
130:11;138:22;139:6
**reason (8)**
39:16;41:4;44:2;
49:6;101:21;133:10;
141:19,24
**reasonable (2)**
14:8;46:22
**reasons (6)**
96:17;128:2;129:11;
133:2,8;143:10
**Rebecca (1)**
74:8
**recall (4)**
5:16;22:22;32:25;
142:2
**received (4)**
5:17,25;12:19;
109:10
**Recess (1)**
111:1
**recognize (3)**
72:10;75:12;125:6
**recognized (2)**
73:5;125:7
**recollection (1)**
73:21

**record (11)**
5:22;7:5;12:10;
34:21;58:24;59:1;
70:18;72:16;86:15;
92:1;111:14
**recover (1)**
69:9
**recoveries (1)**
64:2
**recovery (6)**
64:5;95:13,15;
105:17,24;106:1
**recruit (1)**
142:12
**red (1)**
69:23
**redemption (1)**
121:22
**redline (1)**
20:8
**redraft (1)**
139:24
**reduction (1)**
11:10
**referral (1)**
32:14
**referred (2)**
124:20,21
**reflect (4)**
20:10;73:24;141:18;
144:21
**reflected (1)**
32:6
**reflects (1)**
6:7
**regard (4)**
13:16;18:4;40:24;
108:20
**regarding (1)**
46:24
**regardless (1)**
86:22
**region (1)**
74:11
**regrettably (1)**
41:2
**regular (3)**
8:12,25;21:22
**reinvent (2)**
83:12;140:6
**reinventing (1)**
140:6
**reiterate (2)**
86:20;87:6
**rel (1)**
53:3
**relate (2)**
26:19;104:21
**related (2)**
13:18;92:15
**relates (1)**
117:5
**relationship (1)**

48:19
**relative (1)**
42:9
**relatively (3)**
108:9;110:10;137:13
**release (2)**
69:8;98:22
**releases (1)**
53:2,25;69:15,18;
100:6;102:1
**releasing (2)**
98:11,21
**relevant (3)**
85:16;93:15;103:22
**religious (5)**
57:21;58:15;75:8,11;
133:11
**rely (1)**
97:10
**remain (1)**
111:3
**remaining (1)**
13:13
**remains (1)**
63:4
**remarks (1)**
131:13
**remediating (1)**
36:20
**remember (2)**
120:20;129:22
**reminder (1)**
16:19
**remove (1)**
114:18
**render (2)**
116:19,19
**renders (1)**
112:9
**renotice (1)**
144:20
**reorganization (6)**
12:13;20:19,22;55:3;
103:22;115:18
**reorganized (1)**
13:23
**repeat (5)**
95:7;140:5;143:12,
22;144:11
**reply (2)**
21:18;103:15
**reported (1)**
7:19
**reporting (1)**
106:15
**represent (2)**
124:20,22
**representation (1)**
71:19
**representative (2)**
65:15,18
**representatives (3)**
23:23;135:12,13

**represented (5)**
9:19;13:15;126:19,
20,21
**representing (3)**
11:10;31:8;52:7
**represents (2)**
9:24;125:2
**request (7)**
17:10,21;31:20;
80:23;86:1,2;108:12
**requested (1)**
40:19
**requesting (1)**
61:18
**require (1)**
18:6
**required (5)**
50:8;53:22;94:20;
98:21;109:20
**requirements (1)**
28:22
**requires (2)**
56:1;69:7
**requisite (1)**
127:7
**reschedule (1)**
111:11
**rescheduling (1)**
111:11
**reserve (4)**
76:10;79:13,24;
122:13
**reserved (1)**
79:23
**reserves (1)**
79:11
**residences (1)**
125:10,11
**resolution (1)**
9:3
**resolve (5)**
6:14;11:21;90:1;
103:21;130:21
**resolved (4)**
88:23;91:18;99:18;
122:23
**resolves (1)**
86:21
**resolving (2)**
19:22;40:4
**respect (25)**
7:18;13:2,20;14:9,
23;17:11;35:16;37:12,
14;38:3,4;41:23;52:8;
61:1;62:2,16;66:15;
68:6;69:2,5;72:21;
103:1;107:22;120:11;
133:22
**respective (1)**
144:8
**respects (1)**
107:12
**respond (6)**

Min-U-Script®

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(16) purports - respond

Case: 19-30088    Doc# 4003    Filed: 09/25/19    Entered: 09/25/19 14:46:19    Page 162
of 168

103:8,12;121:17;
132:24;133:16;141:5
**responding (2)**
111:16,19
**response (6)**
24:20,20;89:15;
107:23,24;108:13
**responsive (1)**
14:24
**restricts (1)**
120:15
**restructuring (3)**
7:23;53:21;120:13
**result (3)**
35:24;83:14;107:15
**resulted (1)**
107:9
**results (1)**
107:2
**return (1)**
139:4
**returned (1)**
126:15
**reverse (1)**
28:12
**review (3)**
13:2;35:13;133:16
**reviewed (1)**
21:14
**revised (6)**
6:4;22:5,7;31:24;
93:10;139:16
**revisit (4)**
83:16;85:13;132:16;
134:6
**Richard (1)**
80:5
**rid (3)**
48:2;80:13;114:20
**Riddle (1)**
125:23
**Rifkind (1)**
102:19
**right (124)**
5:10;8:15,20,21;
10:4;12:4,10;13:4,6,
19;17:14,23;19:13;
20:3,13,19,23;21:6;
22:9,23;23:13;25:8,12,
18,21;26:5,7,21;28:5,7;
30:11;33:12;35:23,23;
36:1,9;37:23;38:2,15,
23;40:2;43:21;44:5;
47:16;52:9;54:25;55:2;
61:10,21;62:13;64:9;
65:20;66:2,4;67:20;
68:17;70:24;71:5,7,11;
72:6,13;73:17,22;74:5;
76:11,12,21;78:2;79:3,
9,10;80:13;82:4,7;
83:13;87:3;88:5,20;
89:14;90:16,16;93:23,
25;97:1,2,8,16;100:8,

11,18;101:7,25;102:2,
4,10,12;103:6;104:2,3,
7,9,9,22;105:11;
108:24;109:12;115:21;
118:6;119:16,17;
122:4,4,9,11;123:10,
25,25;131:8,8;134:8;
139:3;140:7;143:6
**rights (2)**
116:2;122:13
**ripe (2)**
27:3;121:20
**rise (1)**
111:2
**risk (1)**
38:6
**River (1)**
74:18
**road (3)**
56:19;91:24;130:10
**Robert (1)**
95:5
**rock (1)**
41:21
**role (1)**
142:13
**roll (1)**
24:9
**room (7)**
24:18;82:25;94:23;
95:2,3;99:25;139:16
**rosa (2)**
49:16;53:1
**Rose (1)**
74:9
**round (1)**
115:24
**RSA (1)**
9:20
**ruined (1)**
53:6
**rule (8)**
7:16;38:13;39:9;
57:5;78:22;90:10;
91:17;132:14
**rules (7)**
56:8;88:3;95:18,22;
96:23;126:13;128:8
**ruling (6)**
7:14;40:6,6;43:12,
14,15;82:20;107:25;
134:4
**rulings (3)**
26:12;34:6;38:1
**run (4)**
63:2;82:14;84:7;
107:9
**rush (3)**
93:20,20,21

**S**

**Sacramento (1)**

135:3
**same (20)**
20:21;55:8;58:11;
62:20;63:8;65:8;67:4;
68:1;72:13;78:11;
79:22;82:3,5;112:7;
113:7,15;125:24;
130:25;138:3,24
**SAN (3)**
5:1;43:1;125:24
**satisfied (1)**
9:5
**satisfy (2)**
28:22;64:3
**Saturday (1)**
108:12
**Save (1)**
66:12
**saw (6)**
13:7;41:14;89:21;
103:3;106:7;120:18
**saying (27)**
14:11;19:3;27:14;
28:11,13;36:2;37:3;
38:5,5,5;39:12;45:20;
48:5;65:22,22;66:6;
67:22,23;99:11;119:5;
124:3;126:14;128:10,
10;133:8,10;139:19
**scenario (3)**
37:2;39:9;60:5
**schedule (27)**
13:22;16:12;21:14,
15,20;23:10,20;24:13;
26:25;54:3;58:11;60:2;
71:21,24;74:6;101:13,
17;103:11;116:3;
122:19;134:21;137:1;
138:3;141:14;143:13;
144:6,19
**scheduled (2)**
108:13,14
**schedules (2)**
58:6;143:19
**scheduling (9)**
14:25;59:4,19;70:21;
71:14;94:2;122:17;
132:19;144:5
**scowl (1)**
41:24
**scramble (1)**
46:13
**seated (2)**
5:4;111:3
**second (10)**
5:19;15:19;20:16;
22:5;42:9;54:17;81:4;
98:12;107:3;108:8
**secondly (1)**
25:3;137:17;143:25
**Section (4)**
22:7;28:23;105:18;
140:7

**sections (1)**
53:10
**security (1)**
46:15
**seeing (1)**
77:11
**seeking (4)**
7:24;18:19,21;117:1
**seeks (1)**
92:1
**seem (5)**
19:11;23:15;30:3;
138:12;141:18
**seemed (3)**
48:12;89:25;136:13
**seems (13)**
25:23;30:2;41:9;
48:15;51:2;76:22,24;
78:6,11;86:2;100:13;
105:1;144:4
**sees (1)**
106:23
**segregated (1)**
113:12
**seized (1)**
123:17
**senior (6)**
25:1,1,2,4;121:15;
123:11
**sense (7)**
14:1;40:5;54:4;
59:13;63:24;66:22;
110:2
**sentences (1)**
106:2
**separate (11)**
70:25;71:19;77:22;
78:5;79:14,25;93:6;
114:21;115:12;117:25;
137:18
**Separately (1)**
79:18
**SEPTEMBER (5)**
5:1;35:5;44:25;45:1;
47:12
**sequence (1)**
137:13;138:1
**serious (1)**
30:2
**serve (3)**
12:22;59:23;103:15
**served (2)**
18:5;59:20
**Services (1)**
70:16
**serving (1)**
74:1
**set (15)**
8:14;16:21,22;17:17;
18:8;21:15;23:10;
26:25;49:2;52:2;78:15;
79:11;84:7;107:25;
119:8

**sets (2)**
18:22;104:1
**setting (4)**
8:24;26:15;79:13;
84:9
**settings (1)**
8:19
**settle (11)**
9:6;39:20;63:7;65:3;
66:9;94:22;113:18;
115:17,22;116:4;117:2
**settleable (1)**
39:23
**settled (6)**
22:8;62:8;77:8,22;
112:8;117:16
**settlement (38)**
7:20;9:3;10:25;11:8;
12:5;13:11;20:13;22:6;
35:2,11;36:6;49:2,3,4,
5,7;53:1,1;62:2,18;
63:3,5;65:7;66:7;69:5,
6;91:13,23;92:16;93:9;
94:24;108:1;115:8,16;
116:21;120:11,14,19
**settlements (1)**
125:22
**settles (2)**
9:7,8
**settling (2)**
63:10;94:14
**several (4)**
33:19;42:16;128:1;
144:10
**severely (1)**
124:23
**shake (1)**
135:14
**shall (4)**
97:20;105:23,25;
106:1
**share (2)**
66:23;68:25
**sheet (8)**
19:12;24:24;89:21;
112:5;113:2;123:10;
132:21;139:24
**sheets (1)**
19:11
**Ship (1)**
79:16
**shoe (1)**
41:21
**short (7)**
22:3;24:19;29:23;
34:13;89:15,15;105:14
**shorten (2)**
138:23;139:11
**shortened (1)**
16:22
**shoulder (1)**
135:17
**show (1)**

Min-U-Script®

Case: 19-30088   Doc# 4003   Filed: 09/25/19   Entered: 09/25/19 14:46:19   Page 163
of 168

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(17) responding - show

67:3

**sic (5)**
22:9;43:17;53:5;
66:25;117:12

**side (9)**
18:9;90:11;107:6;
130:10,11,25;134:10;
139:11;141:4

**sides (1)**
56:1

**signed (5)**
9:20;87:13;98:13,19,
23

**significant (5)**
18:5;73:7;100:22;
106:16;141:12

**significantly (4)**
19:1;73:1,2;118:18

**signing (2)**
10:8;120:23

**Silfen (11)**
121:13,13,25;122:2,
5,10,12;123:16,21;
124:1,7

**silver (1)**
123:6

**similar (5)**
35:14;51:10;64:4;
72:7;112:11

**similarly (3)**
51:9;71:20;137:9

**simple (5)**
20:17;68:12;99:16,
17;125:13

**simplify (2)**
33:1,25

**simply (8)**
20:7,21;39:12;52:17;
76:9;81:10;95:16;
135:12

**singing (1)**
142:2

**single (3)**
9:10,11;53:7

**singled (1)**
70:6

**single-digit (1)**
119:1

**sit (4)**
63:18;86:10;92:24;
99:25

**sits (1)**
84:1

**sitting (2)**
50:4;91:16

**situated (2)**
51:9;71:20

**SLF (1)**
80:6

**slipped (1)**
111:9

**small (2)**
77:3;141:8

**smart (1)**
49:6

**smoke (1)**
52:20

**so-called (1)**
107:13

**solely (1)**
7:17

**solution (1)**
108:7

**solve (2)**
7:15;128:17

**Somebody (5)**
15:11;30:24;55:22;
76:19;77:1

**somehow (2)**
14:15;104:12

**someone (7)**
14:15;15:13;29:19;
102:6;118:25;142:12,
13

**sometime (1)**
110:10

**sometimes (2)**
15:5;55:23

**somewhat (1)**
119:3

**somewhere (2)**
23:6;73:25

**song (1)**
142:1

**Sonoma (2)**
98:5,17

**soon (1)**
110:10

**sooner (7)**
32:7;37:16,25;39:15,
17;105:6;122:22

**soon-to-be-filed (1)**
91:12

**sorry (7)**
7:7;16:4;22:13,18;
43:20;53:9;56:5;111:7;
144:8

**sort (4)**
21:12;33:3;103:6;
110:3

**sounds (3)**
82:19;94:2;129:25

**sour (1)**
141:16

**speak (5)**
40:15;43:7;79:17;
110:23;124:19

**speaker (5)**
15:13,14,16;139:6;
144:17

**speaking (3)**
39:19;43:7;63:17

**specialty (1)**
51:4

**specific (4)**
27:8;35:19;99:22;

139:23

**specifically (3)**
24:25;77:25;103:19

**speech (1)**
128:19

**speeded-up (1)**
17:18

**speeds (1)**
47:3

**spending (1)**
80:21

**spent (1)**
128:14

**spoken (1)**
102:23

**sponsor (1)**
102:7

**spontaneous (1)**
142:4

**squeeze (5)**
99:9,19,19;100:19,
20

**staff (1)**
111:7

**stage (1)**
63:12

**stagger (1)**
33:4

**stake (1)**
60:13

**staked (1)**
44:23

**STAMER (69)**
111:13,14,22;
112:13,18,21;113:4,9,
11,14,21,24;114:3,7,9,
11,14,22,25;115:2,5,7,
14,20;116:6,8,12,15,
18;117:5,13,20,22,25;
118:3,6,9,11,16;119:5,
10,17,19,24;120:4,6,7,
9,22;121:6,10,11;
123:4,10;129:22;
130:10;131:16;136:13;
138:21;139:7,9,15,19;
140:3,14,17,19;141:1,
15

**stand (5)**
45:17;66:24;93:3;
113:24;133:22

**standalone (2)**
8:1;49:7

**standards (1)**
129:10

**standing (5)**
86:10;111:4,23;
114:12;116:25

**start (10)**
34:15;40:9;44:20,21;
59:4;81:9;92:4;101:23;
102:5;107:24

**started (8)**
44:16;99:15;106:15;

107:4;109:22,22;
136:12;144:10

**starting (2)**
85:21;109:13

**state (16)**
13:18;32:22;40:3;
48:22;61:5;70:13;
71:18;74:1;76:4,25;
78:24;88:24;89:5,8;
129:20;136:23

**stated (2)**
76:21;133:2

**statement (15)**
6:18,22;7:17;14:3,6,
7,12;26:10;32:7;33:2;
56:3;60:17;67:7;95:8;
133:18

**States (2)**
72:5,17

**State's (2)**
72:25;73:2

**statistical (1)**
125:7

**statistics (1)**
125:12

**status (17)**
5:9;6:17;7:11,18;
18:15;37:4;52:13,16;
53:20;54:2;59:9,10;
66:18;68:22;69:21;
70:22;95:7

**statute (1)**
97:8

**statutory (1)**
105:8

**stay (2)**
20:3;118:20

**stayed (1)**
139:11

**steering (1)**
9:19

**step (5)**
34:24;65:4,23;66:1;
94:9

**Stephen (2)**
7:7,9

**steps (2)**
13:25;102:25

**Steve's (1)**
15:14

**stick (3)**
33:3;131:12;140:23

**still (23)**
10:25;14:1;22:11,19,
23;39:20;45:12;47:23;
52:7;54:17,21;64:16,
23;65:10;85:8;95:13;
102:20,20;105:1,16;
117:12;121:12;137:20

**stood (3)**
66:22;109:6;142:3

**stop (2)**
14:11;72:19

**story (1)**
79:23

**straighten (1)**
37:18

**strange (2)**
65:21;91:2

**Strauss (1)**
59:1

**street (2)**
31:22;125:5

**strike (2)**
78:8;136:21

**stroke (2)**
38:16;43:8

**strong (1)**
109:21

**strongly (3)**
17:1;45:7;107:18

**struck (1)**
93:10

**structure (1)**
35:4

**structures (1)**
36:9

**struggle (1)**
36:12

**struggling (1)**
42:24

**stuck (1)**
46:7

**stunning (1)**
34:25

**style (1)**
44:20

**stymie (1)**
135:3

**sub (2)**
49:16;53:1

**subdivision (2)**
98:15,18

**subject (6)**
14:1;15:6;78:21,22;
122:19;144:7

**submit (3)**
6:12;99:3,17

**subordinate (5)**
25:11,14;55:9;91:20;
92:1

**subordinated (1)**
25:5

**subordinates (1)**
144:9

**subordination (10)**
88:18;89:10,24;
112:1,9;114:6;117:5;
123:8,14;136:14

**subro (2)**
117:8;135:7

**subrogating (1)**
48:20

**subrogation (48)**
7:20;9:4,10,11,24;
13:11;18:25;19:9,14;

Min-U-Script®

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(18) sic - subrogation

Case: 19-30088    Doc# 4003    Filed: 09/25/19    Entered: 09/25/19 14:46:19    Page 164
of 168

20:11;25:4,9,11;35:3,
11;36:6;55:9;62:3,18,
20;63:3;64:3;65:8;
69:5;86:17,22;87:13;
88:18;89:24;90:4,20;
91:20;94:22;112:2,7,
15;113:1;114:15;
118:1,13;119:7;
120:15;123:8,12;
129:25;132:3;136:14;
144:9
**subros (4)**
115:9,22;117:2;
120:11
**subsection (1)**
105:18
**subset (1)**
78:5
**subsidiary (1)**
98:14
**Substances (1)**
70:15
**substantial (1)**
36:8
**substantive (2)**
135:2;142:15
**suffer (1)**
57:23
**suffered (2)**
74:12;75:13
**suffering (1)**
42:2
**sufficiency (1)**
97:18
**sufficient (1)**
133:21
**suggest (5)**
18:17;75:25;82:7;
133:1;137:23
**suggested (2)**
52:3;91:22
**suggesting (7)**
31:6;34:2;52:22;
82:17,17;129:11;133:2
**suggestion (4)**
74:24;103:23;
104:11;127:25
**suggests (1)**
123:5
**Sunday (1)**
80:22
**super (2)**
49:18;52:25
**Superior (3)**
43:1;82:13;124:16
**support (8)**
7:23;14:14;37:15;
53:21;101:20;107:4,
18;120:13
**supported (1)**
50:17
**supporting (1)**
123:3

**supportive (3)**
8:7;121:18;122:18
**suppose (3)**
66:21;77:16;98:18
**supposed (2)**
43:6;68:22
**Sure (34)**
5:23;7:18;13:7;
18:17;19:21;23:12;
24:10,11;28:19;29:21;
30:21,22;39:18;61:7;
62:5;64:22;66:14;
68:21;75:20;89:6;
91:17;100:9;102:21;
106:9;108:14;113:4;
119:23;125:20;128:15;
130:4,12;131:17;
136:6;140:1
**surprised (2)**
93:9;109:1
**surprising (1)**
24:21
**suspect (3)**
97:19;108:25;143:1
**switch (1)**
57:18
**swoop (1)**
97:18
**system (1)**
56:7
**systems (1)**
56:8

**T**

**table (3)**
56:5;64:19;134:9
**talk (12)**
49:1;54:2;63:18;
71:14;73:13;85:8;
108:8;116:8;117:1;
120:23;134:17;142:7
**talked (8)**
32:25;42:5;46:11;
92:19;111:25;119:25;
120:18;129:19
**talking (18)**
30:6,10,15;31:25;
32:7;50:2,2;53:10,11;
81:13;101:6;114:22;
115:12;117:17;130:18;
141:24,24;142:8
**tally (1)**
77:1
**target (2)**
12:21;119:4
**taught (1)**
69:18
**tax-free (1)**
97:10
**TCC (40)**
24:25;25:4;29:24;
31:14;35:4,8,15;36:7;

41:14,15,18;63:6,18;
64:24;81:7,18,22;
84:14,24;85:22;88:16;
89:15;107:12;108:11,
15,24;109:6;110:10;
112:3;113:17;116:8,
18;117:3;123:11;
133:7;134:12;141:19,
23,24,25
**TCCs (6)**
62:17;65:7;86:3;
91:2;135:13;141:20
**team (1)**
69:19
**tears (1)**
53:13
**tee (14)**
25:22;26:7;33:9,18;
39:19;55:5;60:9;65:11;
71:14;74:24;91:9;
92:12;99:16;102:15
**teed (9)**
25:7;60:12,22;65:15;
91:11,12;92:14,22;
144:3
**teed-up (1)**
107:19
**teeing (4)**
26:18;40:9;64:25;
122:14
**telephone (1)**
14:7
**telling (5)**
44:2;66:7;96:8;
121:3;140:12
**tells (1)**
47:11
**ten (3)**
55:1;109:22;110:25
**tends (1)**
127:18
**ten-minute (1)**
110:21
**tentative (1)**
33:10
**term (15)**
19:11,12;20:23;
24:24;26:3;89:21;
112:5,17;113:2;
123:10,12,13;132:21;
137:13;139:24
**terminate (25)**
7:13;14:21;16:25;
18:21;31:20;36:13,15,
23;40:22;59:21;61:22;
65:4,5;66:6;81:13,15,
21;83:15;89:16;92:9;
103:25;123:24;132:20;
140:9,10
**terminated (1)**
66:8
**terminating (2)**
31:19;92:6

**termination (2)**
37:6;85:7
**terms (7)**
6:21;12:12;13:25;
26:2;48:3;54:8;71:22;
132:19;141:13
**Thanks (7)**
8:11;70:5;86:6;98:1;
110:20;120:8;121:11
**That'll (2)**
6:14;141:13
**theories (1)**
101:8
**theory (1)**
133:3
**there'd (1)**
106:15
**therefore (6)**
64:11;75:24;77:6;
113:14;114:18;122:23
**there'll (5)**
66:6;107:13;111:18;
118:22;119:3
**thereof (1)**
98:15
**thinking (4)**
21:19;33:18;52:18;
73:4;90:12
**third (5)**
45:24;48:10;54:17;
84:25;122:2
**third-party (2)**
69:18;143:1
**thirteen (1)**
119:8
**thirty (1)**
42:4
**thirty-five (1)**
47:19
**thirty-six (1)**
109:10
**though (8)**
7:6;35:25;48:3;
64:21;87:16;98:17;
128:12;136:9
**thought (9)**
9:15;20:6;28:11;
31:7;38:20;78:10;
93:13;102:23;106:6
**thoughtfully (1)**
130:8
**thoughts (2)**
83:1;142:13
**thousands (1)**
41:25
**three (11)**
29:5;40:9,24;45:16;
54:23;77:21;100:22;
125:12,17;128:13;
136:13
**Thursday (2)**
103:10;140:13
**ticket (2)**

25:22;101:14
**tie (2)**
12:17;53:23
**tied (2)**
35:6;98:20
**tier (1)**
93:16
**tight (2)**
60:3;140:24
**tighter (1)**
106:25
**timeline (6)**
31:18,21;24;32:3,
18
**timelines (1)**
103:13
**timely (3)**
12:24;31:3;128:5
**times (1)**
129:18
**timing (2)**
71:22;141:13
**title (1)**
20:23
**today (41)**
7:11,24;11:21;29:5;
30:3;35:12,13;36:13;
37:4;40:16,20;42:7;
43:17;47:5;52:12;
57:15;64:17,19;67:1;
68:19,23;69:6,11;80:9;
85:25;87:2;91:16;92:1,
18;94:4;101:13;
102:12;107:17;124:11;
133:6;135:25;137:23;
139:20;140:12;142:12;
144:6
**today's (1)**
14:20
**together (4)**
12:17;19:19;93:17;
110:14
**told (11)**
13:5,5;44:8;55:12;
91:4;92:21;98:23;
109:7,8;114:5;143:20
**tomorrow (4)**
140:19,20,22;141:2
**tonight (3)**
140:15,17,18
**took (4)**
41:23;111:5;114:11;
129:7
**tool (1)**
52:7
**toolbox (1)**
52:7
**top (1)**
139:11
**tort (34)**
13:15;14:4,9;16:18,
24;18:25;34:17;40:18;
42:10;43:3;45:19;46:3;

Min-U-Script®

Case: 19-30088   Doc# 4003   Filed: 09/25/19   Entered: 09/25/19 14:46:19   Page 165
of 168

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(19) subros - tort

51:9;53:17;64:1;69:8;
77:15;111:18;112:1;
113:8,15,18;114:23;
115:10,10,22;116:23;
117:8;118:12,17;
121:25;124:21;127:24;
135:2
**total (1)**
67:13
**totally (1)**
81:14
**touch (1)**
88:11
**touching (1)**
33:5
**Toxic (1)**
70:15
**track (8)**
10:23;13:10,22;16:5;
72:12;106:7;144:1,18
**traditional (1)**
129:10
**tragedies (1)**
48:4
**transaction (1)**
98:23
**transcripts (1)**
109:4
**transparency (2)**
68:6;130:19
**transparent (2)**
69:1;142:10
**travel (2)**
80:22;138:13
**traveling (1)**
15:23
**travels (1)**
145:1
**treat (3)**
27:22;28:1;53:6
**treated (11)**
9:12;34:4;42:5;
44:23;46:16;79:19,22;
112:12,13;113:14;
137:9
**treatment (9)**
9:20;33:12;51:10;
62:20;65:9;77:14;
120:16,17;122:3
**treats (2)**
79:16;123:11
**tremendous (1)**
123:18
**trial (5)**
13:20;31:22;43:1;
84:12;103:14
**tried (1)**
134:21
**trimmed (1)**
79:4
**tripping (1)**
67:2
**trot (1)**

135:8
**trouble (1)**
28:18
**troubled (1)**
20:20
**troubling (1)**
69:7
**Troy (15)**
72:5,10,11,14,16,16,
22;73:7,10,12,18,20,
23;74:3,4
**true (6)**
57:4;60:18;84:17,18,
20;106:17
**truly (1)**
34:25
**trust (1)**
69:10
**trustee (3)**
50:5;121:14;122:15
**try (7)**
15:4;33:25;109:14;
134:3;135:16;136:3;
143:12
**trying (17)**
8:18;25:10;33:2;
37:18;39:11;50:1;63:2;
70:8;72:12;82:14;83:4;
101:12;104:18;110:11;
125:20;128:15;135:3
**Tubbs (8)**
13:20;31:22;32:9;
53:24;84:12;85:9;
103:14;130:7
**TUESDAY (1)**
5:1
**TURN (12)**
13:5;24:23;29:13;
56:11;69:21;73:1;95:6,
14;104:12;105:15;
107:12;109:14
**turnip (1)**
131:2
**twenty (5)**
9:4;68:20;128:14;
132:12;136:6
**twenty-first (1)**
71:3
**twenty-five (1)**
46:4
**twenty-four (7)**
19:8;62:11;112:5;
113:21;115:23;129:24;
131:7
**twenty-four-plus (1)**
117:22
**two (43)**
5:8,9;14:14;21:20;
23:19;25:6;26:19,19;
27:16;29:7,8;37:10;
42:12;45:3,10;52:20;
55:1;56:1,24;57:12;
64:12;65:3;66:15;67:4,

16,25;68:1;74:5;77:13,
20;80:9;81:3;85:11,12;
89:8;96:17;106:19;
110:23;116:3,4;
125:17;137:18;143:13
**two-day (1)**
8:18
**two-line (1)**
98:8
**type (1)**
132:25
**typically (1)**
116:5

**U**

**ugly (1)**
120:22
**ultimately (3)**
63:25;88:24;130:3
**Um-hum (5)**
23:21;29:6;33:6;
36:5;59:11
**unaddressed (1)**
141:17
**unanimity (2)**
87:2,4
**unclear (1)**
64:23
**under (30)**
9:12,21;10:18;11:8;
12:25;13:24;14:4;
19:15,17;20:23;28:2;
38:9;39:9;48:22;50:13,
17;51:10;61:24;64:5;
65:9,13;81:15;88:2;
102:1;105:7,18;
115:20;131:20;140:7;
143:23
**underlying (3)**
8:6;35:11;67:23
**undermine (1)**
11:17
**underneath (1)**
81:14
**underscore (1)**
37:8
**Understood (3)**
72:2;87:23;111:22
**undisputed (1)**
77:9
**undoubtedly (2)**
42:14;121:4
**unfathomable (1)**
53:19
**unfortunate (1)**
56:7;93:20
**UNIDENTIFIED (4)**
15:14;42:11;139:6;
144:17
**unilaterally (1)**
84:6,7,9;106:24
**unimpair (10)**

27:9,21;28:15;29:2;
38:10,16;39:13,14;
68:11,13
**unimpaired (5)**
25:3;27:23;28:4;
39:5;110:2
**unimpairment (1)**
38:4
**uninsured (1)**
109:8
**UNISON (2)**
22:15;144:25
**United (2)**
72:4,17
**unknowns (1)**
85:12
**unless (7)**
7:1;20:19;21:2,24;
40:10;46:9;144:13
**unlevel (1)**
63:25
**Unlike (1)**
125:2
**unliquidated (2)**
70:22;72:8
**unsecured (4)**
34:16,23;35:10;39:4
**unusual (4)**
42:3;43:15;81:24;
129:9
**up (95)**
7:3;10:8;12:17;
16:23;23:9,9,20;25:7,
22;26:7,19;31:24;33:9,
18;34:4;37:13;39:19;
40:9;41:5;42:23;45:10,
17;47:5;48:7;49:2;
53:7,23;55:5,24;57:21;
58:14;60:9,12,23;
64:19,25;65:11,15;
66:22,24;69:16;71:14,
20;74:24;78:15;80:12;
84:14,15;86:12;87:13;
91:9,11,12,16;92:12,
14,22;93:3;94:4;98:13;
99:13,14,16;102:15;
105:15;109:6;111:4,
23;113:23,24,25;114:2,
12;115:7;116:25;
117:18;118:21;119:24;
120:20;122:14,18;
125:5;127:20,24;
130:13;133:12,21;
134:3;135:3;136:5;
137:25;142:3;143:17;
144:3,16
**upcoming (1)**
14:10
**upon (6)**
6:7;59:23;64:2;77:4;
107:7;131:11
**upset (2)**
31:8;50:23

**upstairs (1)**
17:7
**upwards (1)**
44:6
**urge (1)**
97:9
**use (3)**
112:18;125:17,24
**used (3)**
123:12;125:9,22
**using (3)**
81:21;125:7,19
**usually (2)**
53:10;109:18

**V**

**value (11)**
11:8;42:18,22;43:3;
44:10,16;46:17,24;
47:10;94:20;126:6
**variety (3)**
128:2;129:11;143:10
**various (4)**
34:14;70:13;72:18;
101:5
**vast (1)**
17:6
**vehicle (1)**
129:2
**version (1)**
118:8
**versus (2)**
88:25;104:18
**victim (8)**
79:5;95:15;105:17,
24;106:1;124:25;
127:22;128:17
**victims (18)**
41:4;53:3,3,17;
79:19;80:6;82:6;83:21;
84:2;94:21,24;95:13;
113:8,15;125:4;
127:17,17;132:12
**victims' (3)**
42:19;46:4;111:18
**victim's (1)**
109:9
**view (12)**
10:17;14:18;22:20;
27:22,24;28:1;61:19;
99:25;109:25;117:6;
124:2;130:3
**views (3)**
71:20;123:1;130:8
**violate (3)**
95:16,17;123:13
**violates (2)**
97:19;132:13
**virtue (2)**
19:3;116:21
**vote (8)**
10:19;11:8;28:19,22,

Case: 19-30088    Doc# 4003    Filed: 09/25/19    Entered: 09/25/19 14:46:19    Page 166
of 168

25;33:15;49:19;53:1
**voted (2)**
10:10;39:6
**votes (3)**
11:23;29:1;50:6
**voting (2)**
10:14;28:18

## W

**Wait (7)**
5:19;15:9;27:21;
50:7,7;76:25;81:12
**waiting (1)**
124:17
**walk (2)**
81:5,6
**Wall (1)**
125:5
**wand (1)**
68:13
**wants (9)**
24:18;31:14;34:17,
19;58:23;88:21;99:20;
127:5;144:13
**warning (1)**
143:5
**water (2)**
92:2,9
**wave (1)**
68:12
**way (38)**
5:15;22:7,24;28:1;
31:18;33:8,17;37:10;
43:12;46:21;47:3;50:1;
53:4,4;56:17;58:18;
59:21;60:7;65:24;66:5;
70:8;86:2;91:3,4;
94:15;100:23;101:5;
102:14;104:22;106:9;
107:11;110:16;113:11;
116:9;131:16;136:6;
140:7;142:10
**ways (1)**
38:18
**weaken (1)**
86:2
**week (13)**
15:7,8,19;17:6;
38:13,14;46:3;103:10;
108:15;133:19,20;
139:4,4
**weekend (1)**
113:1
**weeks (4)**
35:1,2;83:14;128:13
**weigh (2)**
89:10,12
**Weil (2)**
5:23;7:9
**Weiss (1)**
102:19
**welcome (1)**

86:10
**well-established (1)**
129:13
**Wharton (1)**
102:19
**whatever's (1)**
119:8
**what's (10)**
8:19;15:9;16:12;
54:15,16;77:1;91:25;
95:7;101:7;134:9
**whatsoever (1)**
67:23
**wheel (1)**
83:12
**whenever (3)**
18:21;52:22;87:25
**Whereupon (1)**
145:2
**whole (6)**
26:20;54:3;57:1;
89:23,25;114:25
**who's (2)**
21:24;138:1
**whose (3)**
41:22;53:6;114:17
**why's (1)**
81:4
**widely (1)**
7:19
**widespread (1)**
30:13
**wildfire (17)**
12:24;13:24;19:16;
22:25;62:12;64:6;
77:23;95:13,15;97:10;
105:17,24,25;109:3;
119:11,13;120:2
**wildfire-related (1)**
77:14
**willing (5)**
18:20;36:8;61:16;
65:8;71:25
**Willkie (2)**
9:24;86:16
**win (1)**
38:7
**window (1)**
118:22
**WINTHROP (27)**
74:8,9,16,18;75:5,8,
11,15,18,21,24;76:5,
14,18,21;77:11,24;
78:12,18,19,25;79:3,8,
10,18;80:2,3
**within (4)**
14:7;118:20;131:3;
139:17
**without (6)**
21:19;26:10;79:20;
90:11;91:18;143:5
**wonderful (2)**
47:20,21

word (6)
54:4;58:7;69:15,15;
125:8;128:15
**words (6)**
21:5;26:14;31:25;
62:7;76:3;128:22
**work (25)**
18:3,14;21:21;23:24;
44:6;53:11;58:9,18;
60:4;71:21,23,25;72:1,
20;74:6;80:25;94:11,
11;104:15;109:24;
110:13;113:11;128:24;
137:24;143:19
**worked (3)**
35:4;143:7,8
**working (3)**
74:22;75:21;127:6
**works (5)**
23:25;80:11,22,23,
24
**world (8)**
20:17;53:16,18,18;
55:21;129:20,21;
136:20
**world's (1)**
12:10
**worried (1)**
93:12
**worry (2)**
40:2;142:20
**worth (3)**
50:23;106:6;117:7
**write (1)**
36:8
**written (1)**
67:17
**wrong (9)**
27:8;38:6;68:9;
87:24;91:3,4;93:12;
101:8;123:13

## Y

**year (1)**
15:20
**years (1)**
42:4
**yesterday (7)**
6:5;12:2;67:8,17;
69:22;93:7;144:1
**Yom (1)**
122:18

## Z

**zero (5)**
19:14;41:15,16,17;
44:20

## 1

**1,200 (1)**

74:19
**1.151 (1)**
98:10
**1.5 (1)**
67:5
**1:30 (3)**
140:23;141:9;144:23
**10 (2)**
17:9,24
**10/21 (1)**
73:24
**100,000 (3)**
109:8;125:9,18
**1054 (9)**
12:25;13:24;19:10,
15;52:18;95:11,16;
96:25;97:9
**10th (6)**
15:24;17:5;57:19,23,
24;81:11
**11 (5)**
12:23;45:5;94:23;
103:1;105:1
**11:27 (1)**
111:1
**11:43 (1)**
111:1
**1121 (1)**
140:7
**1129 (1)**
28:23
**11s (1)**
20:18
**11th (8)**
16:6,11,12;17:5;
21:22;57:19,24;139:3
**12.4 (1)**
43:8
**12:26 (1)**
145:2
**14 (2)**
44:12;103:15
**14,000 (1)**
125:10
**15th (1)**
21:18
**17.5 (1)**
121:15
**18.4 (1)**
43:8

## 2

**2005 (1)**
77:8
**2015 (1)**
77:4
**2019 (4)**
5:1;121:5,7,8
**2020 (3)**
13:10;103:18;133:21
**21 (1)**
118:22

**21st (5)**
14:10;73:16,22;
109:11;127:20
**22.6 (1)**
43:9
**22nd (2)**
21:18;127:21
**23 (1)**
103:16
**235 (5)**
95:12,16;96:9,14,25
**23rd (4)**
8:14,24;92:22,23
**24 (1)**
5:1
**24th (2)**
45:1;140:12
**25 (1)**
21:17
**25th (1)**
141:4

## 3

**30 (2)**
13:10;55:23
**30th (2)**
47:13;133:21

## 4

**4.18 (1)**
22:7
**4th (1)**
141:5

## 5

**502c (7)**
76:16;104:25;
129:21;132:6,16;
137:15;143:23
**5500 (1)**
80:8
**5b1 (1)**
22:8

## 7

**7 (3)**
50:4;103:7,11
**70,000 (1)**
125:13
**7th (26)**
16:7;17:7,21;52:2,
22;57:21;59:8,22;60:3,
7;80:10,21;81:11;
93:22;112:4;114:4,19;
122:19;132:24;133:11;
138:11;140:23;141:3,
8;143:15;144:23

Case: 19-30088    Doc# 4003    Filed: 09/25/19    Entered: 09/25/19 14:46:19    Page 167
of 168

## 8

**8- (1)**
  125:16
**8.4 (8)**
  42:20;43:4,8,17;
  44:13;45:22;46:12;
  55:22
**8th (10)**
  15:2;17:11;52:22;
  81:11;133:2,7,9;141:7,
  7;144:22
**8-whatever (1)**
  45:4

## 9

**9,000 (1)**
  125:16
**9.2 (2)**
  105:18,20
**9:31 (1)**
  5:1
**9019 (23)**
  40:21;49:7;50:1,3,
  13,17;56:19,23;63:2;
  64:25;65:11,14,17;
  92:15;93:6,11,17;
  115:20;116:5,10;
  121:6,7,8
**9019-type (1)**
  115:13
**9th (5)**
  15:23,25,25;17:1;
  44:25

Case: 19-30088    Doc# 4003    Filed: 09/25/19    Entered: 09/25/19 14:46:19    Page 168
of 168