TIMOTHY S. LAFFREDI (WI SBN 1055133)
Assistant United States Trustee
MARTA E. VILLACORTA (NY SBN 4918280)
Trial Attorney
United States Department of Justice
Office of the U.S. Trustee
450 Golden Gate Avenue, Suite 05-0153
San Francisco, CA 94102
Telephone: (415) 705-3333
Facsimile: (415) 705-3379
Email: marta.villacorta@usdoj.gov

Attorneys for Andrew R. Vara,
Acting United States Trustee for Region 3[1]

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:** | Bankruptcy Case No. 19-30088 (DM) |
| **PG&E CORPORATION,** | |
| **- and -** | Chapter 11 |
| **PACIFIC GAS AND ELECTRIC COMPANY,** | (Lead Case) |
| **Debtors**. | (Jointly Administered) |
| ☐ Affects PG&E Corporation | Date: October 7, 2019 |
| ☐ Affects Pacific Gas and Electric Company | Time: 1:30 p.m. (Pacific Time) |
| ☑ Affects both Debtors | Place: Hon. Dennis Montali |
| *\* All papers shall be filed in the lead case, No. 19-30088 (DM)* | 450 Golden Gate Avenue 16th Floor, Courtroom 17 San Francisco, CA 94102 |

## UNITED STATES TRUSTEE'S RESPONSE TO MOTION TO APPROVE FEE PROCEDURES AND COMMENTS REGARDING FIRST INTERIM FEE APPLICATIONS

Andrew R. Vara, Acting United States Trustee for Region 3 (the "United States

Trustee"), by and through his undersigned counsel, submits this response (the "Response") in

support of the Motion to Approve Fee Procedures (the "Fee Procedures Motion") (ECF. No.

3950), filed by Bruce A. Markell, as fee examiner (the "Fee Examiner").[2]  In accordance with

---

[1] Andrew R. Vara, Acting United States Trustee for Region 3, is acting in this appointment for Tracy Hope Davis, United States Trustee for Region 17, who has recused herself.

[2] Unless otherwise indicated, all capitalized terms in this Response have the meanings defined in the Fee Procedures Motion

Case: 19-30088   Doc# 4025   Filed: 09/27/19   Entered: 09/27/19 10:48:00   Page 1 of 21

the Court's September 17, 2019 order directing briefing on the Fee Procedures Motion, and pursuant to 28 U.S.C. § 586(a)(3)(A), the United States Trustee also offers his response and comments regarding general problems observed in certain interim fee applications filed in these cases (the "Interim Applications") and his recommended solutions to those problems.[3]

## I.    RESPONSE TO FEE PROCEDURES MOTION

The United States Trustee strongly supports the relief sought in the Fee Procedures Motion. Approval of that motion is especially critical here because an estimated $140 million in professional fees have already been billed in these cases, which are likely to rank eventually among the most expensive bankruptcy cases ever filed. For this reason, along with the strong public interest in the Debtors and their reorganization, there is need for a fee review process that is not only thorough, but that is also transparent, fair, cost-effective, and that complies with the Bankruptcy Code and all applicable fee guidelines. By ensuring that professionals file their fee applications under a uniform schedule and under uniform procedures, the Fee Procedures Motion is an important step in that direction.

The substantive provisions of the Fee Procedures Motion are no less critical. These cases involve an unusually high number of professionals who will be paid from the estate, and as discussed below, many of the deficiencies that have been observed in the Interim Application involve issues that are common to most, if not all, professionals. It would be wasteful and highly inefficient to require the Fee Examiner to negotiate or litigate each of these issues separately with each professional, particularly since doing so could result in each professional being subject to different billing standards. Those standards, moreover, should not be controversial. Although the United States Trustee understands that certain professionals have opposed the exclusion of various fees and expenses under the Fee Procedures Motion and the earlier Fee Protocol, in every

---

[3] For purposes of comparison, and in order to illustrate the scope of some of the problems that have been observed, the United States Trustee's specific comments will be limited to the attorney professionals who have filed interim applications so far in these cases, consisting of: Weil, Gotshal & Manges LLP ("Weil") (ECF No. 2988); Baker & Hostetler LLP ("Baker") (ECF No. 2995); Munger Tolles & Olson LLP ("Munger") (ECF No. 2996); Keller & Benvenutti LLP ("Keller") (ECF No. 3099); Milbank LLP ("Milbank") (ECF Nos. 3107, 3117); Simpson Thacher & Bartlett LLP ("Simpson") (ECF No. 3157); Jenner & Block LLP ("Jenner") (ECF No. 3465), and Cravath, Swaine & Moore LLP ("Cravath") (ECF No. 3683). Notwithstanding this, the United States Trustee notes that many of these concerns will also be applicable to the non-attorney professionals in these cases, as well as to the attorney professionals who have not yet filed interim fee applications.

Case: 19-30088   Doc# 4025   Filed: 09/27/19   Entered: 09/27/19 10:48:00   Page 2 of 21

case those exclusions are firmly grounded in the Bankruptcy Code, the Local Guidelines,[4] or the UST Guidelines.[5]  And while it should hardly be necessary for this Court to issue an order confirming the effect of the Local Guidelines, approval of the Fee Procedures Motion will benefit these cases by removing a potential source of wasteful and time-consuming litigation. For all of these reasons, the United States Trustee supports the Fee Examiner's motion for approval of the Fee Protocol.

## II.    COMMENTS AND RECOMMENDATIONS ON INTERIM FEE APPLICATIONS

### A.  Background

Under 28 U.S.C. § 586(a)(3)(A), the United States Trustee is authorized, in every chapter 11 bankruptcy case, to "revie[w] . . . applications for compensation and reimbursement filed under section 330 of title 11," and to "fil[e] with the court comments to such application, and, if the United States Trustee considers it to be appropriate, objections to such application."  11 U.S.C. § 586(a)(3)(A)(i),(ii).  The United States Trustee performs this statutory duty in all cases, even when a fee examiner or other fee review entity has been appointed.

The United States Trustee has an independent duty to review fees that complements, but is not duplicative of, the work of the Fee Examiner.  In this case, the United States Trustee and the Fee Examiner have consulted closely with each other as part of their separate reviews.  On the whole, the United States Trustee's general conclusions about the Interim Applications are consistent with those of the Fee Examiner.  In particular, the United States Trustee concurs with the Fee Examiner's comments and recommendations regarding the redaction of time entries and time billed for billing activities.  On certain other issues, the United States Trustee has identified

---

[4] Effective February 19, 2014, the United States Bankruptcy Court for the Northern District of California promulgated the Guidelines for Compensation and Expense Reimbursement of Professionals and Trustees (the "Local Guidelines"), which "apply in their entirety" to professionals seeking compensation under section 330 of the Bankruptcy Code.

[5] The Appendix B Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed under 11 U.S.C. § 330 for Attorneys in Larger Chapter 11 Cases (the "UST Guidelines") are published in 28 C.F.R. part 58, and are applicable in all chapter 11 cases with at least $50 million in both assets and liabilities.  The UST Guidelines are internal directives to ensure that the United States Trustee Program reviews and objects to fee applications using the same criteria in different cases in different districts.  The UST Guidelines are used to evaluate whether attorneys have met their burden of proof for fee awards under 11 U.S.C. § 330 and whether the United States Trustee has a basis to object.  The UST Guidelines may supplement, but do not supersede, the Court's local rules and orders, including the Local Guidelines.

Case: 19-30088    Doc# 4025    Filed: 09/27/19    Entered: 09/27/19 10:48:00    Page 3 of 21

concerns and proposed recommendations in addition to those raised by the Fee Examiner, which are set forth below for the benefit of the Court.

### B. Summary Conclusions

At the outset, the United States Trustee acknowledges the difficult challenges facing the Debtors and the Committees. But even in a large, complex case, professionals are expected to maintain the same billing judgment and efficiency that they would in any other chapter 11 case. In particular, under 11 U.S.C. § 330, professionals should ensure that they only bill for services and expenses that are "reasonable," "necessary," and "beneficial" to the client; that they exercise billing judgment that is comparable to what would be expected of them by a client outside of bankruptcy; and that their requests for fees and expenses are consistent with all applicable fee guidelines and orders.

The United States Trustee has identified several major areas of concern based on his review of the Interim Applications. In addition to the specific matters discussed by the Fee Examiner, the Interim Applications reflect numerous instances of questionable billing judgment and overstaffing, and in many cases professionals appear to have simply disregarded the Local Guidelines, in particular Local Guidelines 15 (Conferences), 16 (Multiple Professionals), 17 (Airplane Travel Time), 22 (Office Overhead), 38 (Meals-Travel), and 38 (Meals-Working). Among other things and as further explained below, the Interim Applications include charges for:

- Internal meetings and conference calls that were billed by as many as 22 attorneys from the same firm, with no explanation or justification—including several firm-wide "case update" meetings attended (and billed) by attorneys with minimal other involvement in the case;
- Numerous instances of large numbers of attorneys billing for attending or observing the same hearing, again without any explanation or justification for the attendance of so many timekeepers;
- Implausibly high numbers of billable hours recorded by individual timekeepers in a single day, including at least one instance in which a timekeeper billed for 24 hours in one day (which suggests that some timekeepers have either been recording their time inaccurately, or have improperly been billing for time when they were not actively working);
- Expenses that have been charged to the estate despite the fact that they were incurred before the bankruptcy cases were filed or otherwise predate the firm's employment;

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- Fees for non-working air travel time that have been billed to the estate in violation of the Local Guidelines;
- Non-travel working meals and overtime meals that have been charged to the estate, despite that such expenses are also non-reimbursable under the Local Guidelines;
- In a number of instances, "overtime" meals and transportation expenses that have been charged to the estate on days when the charging timekeeper did little or no work on PG&E matters; and
- Fees billed by recent law school graduates who had not yet been admitted to the bar of any jurisdiction, but who were billed at the same rate as admitted attorneys.

On the basis of these issues alone, there are at least $4 million in improper, excessive, or otherwise objectionable fees and expenses in the Interim Applications, representing approximately 6% of all fees and expenses that have been sought.

The blended hourly rates in this case are markedly higher than the rates that have been reported by the same firms in non-bankruptcy matters. These discrepancies do not appear to be due to a difference in individual billing rates, but rather due to the top-heavy manner in which this case has been staffed by many professionals and the unusually low proportion of work delegated to paraprofessionals or lower-rate junior attorneys.

None of these concerns are limited to a single firm, and all raise issues that apply generally to all professionals in these cases, for both existing and future fee applications. For these reasons, the Court and the professionals should be informed of these concerns now, and not at a later date, when it may be too late to correct certain deficient practices.

The issues discussed here are not intended to be a comprehensive listing of all objections that might be asserted with respect to the Interim Applications. In addition to these general issues, many of the Interim Applications contain what might be thought of as more routine deficiencies, such as the occasional arithmetic error, accidentally duplicated fee entries, or other line-item errors. These errors are not addressed here, but the United States Trustee expects that they will be raised in due course during the Fee Examiner's individual reviews of the Interim Applications.

5

## C. Problems Observed in Interim Applications

### 1. Conference and Meeting Overstaffing

A significant contributor to the high cost of these cases has been the routine practice of many firms to assign routinely large numbers of professionals to attend the same meetings or teleconferences. Based on the United States Trustee's review of the Interim Applications, there were no fewer than 155 occasions in which a firm billed for five or more professionals to attend the same meeting (including 26 instances in which a meeting was attended by more than 12 professionals from the same firm)—with a total cost to the estate of more than one million dollars.[6]

| Firm | Conferences with 5-8 billers | Conferences with 9-12 billers | Conferences with 12+ billers | All large conferences | Total cost |
|---|---|---|---|---|---|
| Weil | 9 | 4 | 13 | 26 | $228,582.00 |
| Milbank | 36 | 10 | 0 | 46 | $295,573.50 |
| Baker | 10 | 8 | 0 | 18 | $117,917.00 |
| Cravath | 15 | 4 | 12 | 31 | $263,475.00 |
| Jenner | 10 | 1 | 0 | 11 | $23,670.30 |
| Keller | 2 | 0 | 0 | 2 | $3,980.00 |
| Munger | 14 | 4 | 1 | 19 | $85,108.50 |
| Simpson | 2 | 0 | 0 | 2 | $6,088.50 |
| **TOTALS** | **98** | **31** | **26** | **155** | **$1,024,394.80** |

The United States Trustee believes that these figures are very likely understated. None of the Applicants specifically listed or disclosed each large meeting, and the United States Trustee was able to identify many of these meetings only by an exhaustive cross-comparison of the narrative descriptions of time entries submitted by individual timekeepers. This is often an inexact process, due to the vague manner in which many professionals record their time (such as by recording time entries for "attention to" a matter that do not state whether a meeting was involved, time entries for meetings that do not identify the topic or the other participants, and time entries that merge multiple conferences into a single description). Because of this, it was

---

[6] This and the following tables were calculated by the United States Trustee from the electronic data submitted in connection with the Interim Applications, which are presumed to be a true and accurate reflection of the billing data included in the Interim Applications submitted to the Court. These tables are presented for illustrative purposes only in order to show the amounts potentially at issue for each of the topics discussed here. They should not be understood as final objection amounts, which will be determined as part of the individual review process for each professional.

Case: 19-30088    Doc# 4025    Filed: 09/27/19    Entered: 09/27/19 10:48:00    Page 6 of 21

not always possible to determine conclusively whether a time entry referred to a particular conference, and any ambiguous time entries were not included in the above totals.

Although Local Guidelines 15 and 16 require professionals to justify each instance of multiple attendance at an office conference or meeting, this rule does not appear to have been followed by any of the professionals. Rather, in nearly all cases, these meetings have been described in a way that makes it impossible to evaluate the efficiency or necessity of each timekeeper's participation. A typical example is a 24-minute conference call held by Cravath on April 2 to discuss the results of a hearing earlier that day in the PG&E criminal case (a matter which was handled by Jenner & Block). At least 11 Cravath attorneys billed time for this call, eight of whom are junior associates admitted in 2017 or later:

| Timekeeper | Title | Description | Hours | Fee |
|---|---|---|---|---|
| Beshara, Christopher | Associate, 2015 | Non-Bankruptcy Litigation -Call with K. Orsini (CSM); L. Grossbard (CSM) and CSM associate team regarding federal probation proceedings. | 0.4 | $356.00 |
| Bui, S | Associate, 2017 | Non-Bankruptcy Litigation -PG&E team meeting call regarding Judge Alsup Order to Show cause hearing. | 0.4 | $336.00 |
| Fahner, Michael | Associate, 2018 | Non-Bankruptcy Litigation -CSM team call regarding Judge Alsup Hearing. | 0.6 | $450.00 |
| Fleming, Margaret | Associate, 2019 | General Case Strategy -Internal Cravath meeting with K. Orsini, C. Beshara, P. Fountain and others to discuss Judge Alsup hearing. | 0.4 | $238.00 |
| Kariyawasam, Kalana | Associate, 2019 | Non-Bankruptcy Litigation -PG&E team counsel meeting regarding response to Judge Alsup order. | 0.4 | $238.00 |
| Kempf, Allison | Associate, 2018 | Non-Bankruptcy Litigation -Attended internal call regarding hearing before Judge Alsup and reviewed filings. | 0.8 | $600.00 |
| North, J A | Partner | Non-Bankruptcy Litigation -Call with team re Judge Alsup hearing. | 0.4 | $600.00 |
| Orsini, K J | Partner | Non-Bankruptcy Litigation -Telephone call with team re: probation hearing. | 0.4 | $600.00 |
| Phillips, Lauren | Associate, 2019 | Non-Bankruptcy Litigation -Attend meeting with CSM, MTO and legal team to discuss Judge Alsup hearing. | 0.6 | $357.00 |

| Robertson, Caleb | Associate, 2019 | Non-Bankruptcy Litigation -Call with K. Orsini and others to discuss second order to show cause hearing. | 0.4 | $238.00 |
|---|---|---|---|---|
| Tilden, Allison | Associate, 2018 | Non-Bankruptcy Litigation -Call with team re: Judge Alsup hearing. | 0.4 | $300.00 |
| **TOTAL** | | | | **$4,313.00** |

It is not clear why it would have been necessary to include so many professionals in a call to discuss the results of a hearing not primarily handled by Cravath, particularly when so many of them were inexperienced associates. But under Local Rule 15, Cravath "should be prepared to explain time spent in conferences with other professionals or paraprofessionals in the same firm." None of the fee entries for this meeting contain any information that would meet this burden, and there is no reason why the Debtors should have been charged over $4,000 for a routine litigation update on a matter for which Cravath was not principally responsible.

Although the April 2 meeting discussed above involved a specific topic, many more of the large multi-professional meetings in the Interim Applications did not refer it to a specific topic, but instead were described as "all hands," "case update," "work in progress," or "coordination" meetings. These may be periodic internal conferences that do not deal specifically with any particular issue or matter in the case but that are used to communicate general case developments and manage associate workloads and assignments. Among all firms, 99 meetings of this kind were held during the first interim period, and for some firms, they were held more frequently than once per week:

| Firm | Number of team meetings | Average attendance | Frequency (days between meetings) | Total cost |
|---|---|---|---|---|
| Weil | 23 | 13.22 | 4.00 | $214,159.50 |
| Milbank | 22 | 6.95 | 4.95 | $97,322.50 |
| Baker | 13 | 9.23 | 8.15 | $101,655.00 |
| Cravath | 15 | 16.67 | 8.20 | $171,972.50 |
| Jenner | 5 | 5.80 | 24.60 | $8,085.10 |
| Keller | 2 | 5.00 | 61.50 | $3,980.00 |
| Munger | 18 | 7.83 | 6.83 | $80,241.50 |
| Simpson | 1 | 5.00 | 92.00 | $1,852.50 |
| **TOTALS** | **99** | **10.22** | **9.00** | **$679,268.60** |

If these meetings were primarily intended to manage assignments and share news, they are in the nature of firm overhead and therefore not compensable at all. *See Clawson v. Mountain Coal Co.*, No. 01-cv-02199-MSK-MEH, 2007 WL 4225578 (D. Colo. Nov. 28, 2007) (finding that "meetings that are conducted simply to assign a task, or to ensure that a task is progressing as requested, do little to advance the substance of the litigation and should not give rise to a fee award"). But even assuming that these meetings served some valuable purpose for the client, there is no explanation why many of them were held at such short intervals or included as many professionals as they did. This is particularly true for several timekeepers who billed for attending team update meetings despite performing very little other billable work in the case:

| Firm | Name | Total Hours Billed, Interim Application | Team Meetings Attended | Amount Billed for Team Meetings |
|------|------|------|------|------|
| Weil | Green, Austin Joseph | 15.1 | 1 | $560.00 |
| Weil | Nikic, Nicholas G. | 5.0 | 6 | $2,291.00 |
| Weil | Shulzhenko, Oleksandr | 15.9 | 4 | $2,835.00 |
| Weil | Zangrillo, Anthony | 23.4 | 4 | $1,242.00 |
| Milbank | Adeyosoye, Adeola O. | 25.4 | 1 | $294.00 |
| Milbank | Beebe, James M. | 20.3 | 1 | $597.00 |
| Milbank | Skaliks, Christina M. | 22.1 | 1 | $437.50 |
| Baker | Bekier, James | 6.5 | 3 | $1,732.50 |
| Baker | Layden, Andrew | 24.8 | 1 | $660.00 |
| Munger | Li, Luis | 18.6 | 6 | $6,370.00 |
| Munger | Martin, Nicholas | 12.0 | 1 | $162.50 |
| Munger | McLean, Lisa M. | 24.8 | 1 | $190.00 |
| Munger | Reid, Jarett D. | 7.7 | 1 | $283.50 |

The example of one Weil associate illustrates the kind of waste and inefficiency that may result from indiscriminately including professionals in large staff meetings. Over the three months covered by Weil's interim application, this Weil associate submitted nine time entries for a total of six hours, as follows:

| Date | Description | Hours | Fee |
|---|---|---|---|
| 1/30/2019 | ATTEND WEEKLY TEAM MEETING. | 0.4 | $316.00 |
| 2/4/2019 | ATTEND TEAM MEETING. | 0.5 | $395.00 |
| 2/6/2019 | ATTEND WEEKLY TEAM MEETING. | 0.5 | $395.00 |
| 2/13/2019 | ATTEND WEEKLY TEAM MEETING. | 0.3 | $237.00 |
| 2/14/2019 | ATTENTION TO LIEN SEARCHES. | 0.5 | $395.00 |
| 2/19/2019 | PREPARE FOR CONFERENCE CALL (.2); CONFERENCE CALL RE: DIP ORDER (.8). | 1.0 | $790.00 |
| 2/20/2019 | ATTEND WEEKLY TEAM MEETING. | 0.7 | $553.00 |
| 2/28/2019 | ATTEND WEEKLY TEAM MEETING | 0.5 | $395.00 |
| 2/28/2019 | CONDUCT UCC BRING-DOWN SEARCHES AND ANALYSIS | 0.6 | $474.00 |

Notably, six of the nine activities for which this Weil associate billed were "weekly team meetings"—four of which occurred before he performed any other billable work on the case. The client work product generated by this Weil associate during this period appears to have been limited to about one hour of UCC lien searches—a discrete project that presumably would not have required him to be familiar with every facet of the PG&E bankruptcy. But in spite of this, the estate was billed more than $2,000 for this Weil associate's attendance at staff meetings— meetings that were almost certainly unnecessary to his own work and where his presence could hardly have been of meaningfully benefit to the client.

The Court should not impose an absolute cap on the number of professionals who may bill for a single meeting. This is a large and complex case, and coordination between attorneys working on different parts of this case may often be necessary. But this does not mean that large meetings should be held and billed routinely or that fees for those meetings should be allowed automatically without regard to each timekeeper's role in the case or their contribution to the meeting. And while there may well be occasions where there is a legitimate justification for conferences involving five or more billing timekeepers, those occasions should be rare exceptions, not the rule, and it should remain the applicant's burden to justify those rare exceptions.

For these reasons, the Court should require compliance with Local Guidelines 15 and 16 and disallow fees attributable to large multi-professional conferences until and unless the applicant has (i) disclosed all timekeepers from the same firm billing for the conference; and (ii)

for each timekeeper, explained the specific role and responsibilities of the timekeeper for the conference and how that timekeeper's participation related to a compensable service to the client. Under a strict interpretation of these rules, professionals would be required to make this showing for every two-person conversation that was billed in the Interim Application, potentially affecting thousands of time entries. But even if the Court concludes that rigid compliance with the Local Guidelines would be infeasible here, there is no reason to excuse compliance with respect to the narrower category of the larger conferences listed here.

For large conferences that are not satisfactorily explained, the appropriate remedy may be to reduce the total fees for the conference based on the number of professionals billing in excess of the number that would reasonably have been required. For example, if the Court determines that the presumptive maximum number in attendance for a conference is four professionals, the total fee for an unexplained six-person conference would be reduced by 33% (number of timekeepers billed minus number of timekeepers allowed, divided by number billed), representing the pro rata share of fees billed by the fifth and sixth timekeepers.

## 2. Hearing Overstaffing

Attendance for court hearings reflected a similar pattern of overstaffing. Although many of these hearings involved multiple firms representing the same clients—which, if nothing else, should have reduced the number of attorneys per firm attending the hearing—there were 20 instances recorded in the Interim Applications where a single firm billed for five or more attorneys to attend the same hearing:

| Firm | Total hearings attended | Hearings with more than 4 billers | Largest | Cost |
|------|------|------|------|------|
| Weil | 15 | 6 | 7 | $188,596.50 |
| Milbank | 22 | 6 | 9 | $203,556.50 |
| Baker | 20 | 5 | 11 | $134,829.00 |
| Cravath | 8 | 2 | 9 | $106,220.00 |
| Jenner | 4 | 0 | 3 | $13,351.60 |
| Keller | 18 | 1 | 5 | $57,135.00 |
| Munger | 5 | 0 | 2 | $15,867.00 |
| Simpson | 1 | 0 | 2 | $9,091.50 |
| **TOTAL** | 93 | 20 | | **$728,647.10** |

Case: 19-30088    Doc# 4025    Filed: 09/27/19    Entered: 09/27/19 10:48:00    Page 11 of 21

One example of apparently excessive hearing staffing occurred at the May 22, 2019, interim hearing, where two Baker attorneys, Cecily Dumas and Robert Julian, entered appearances on the record and presented oral argument on behalf of the TCC. But that hearing would ultimately be billed by 11 Baker professionals, including four Baker attorneys with billing rates in excess of $1,000/hour:

| Baker Professionals Billing for May 22, 2019, Hearing | | | | |
|---|---|---|---|---|
| Name | Title | Hourly Rate | Hours Billed | Fees Billed |
| Attard,Lauren | Associate | $600.00 | 2.7 | $1,620.00 |
| Bloom,Jerry | Of Counsel | $1,145.00 | 2.5 | $2,862.50 |
| Dumas,Cecily | Partner | $950.00 | 2.5 | $2,375.00 |
| Goodman,Eric | Partner | $800.00 | 3.0 | $2,400.00 |
| Julian,Robert | Partner | $1,175.00 | 3.1 | $3,642.50 |
| Kates,Elyssa | Associate | $760.00 | 3.5 | $2,660.00 |
| Kinne,Tanya | Paralegal | $365.00 | 5.5 | $2,007.50 |
| Payne Geyer,Tiffany | Partner | $455.00 | 2.6 | $1,183.00 |
| Rose,Jorian | Partner | $1,010.00 | 2.5 | $2,525.00 |
| Sagerman,Eric | Partner | $1,145.00 | 2.5 | $2,862.50 |
| Workman,Donald | Partner | $930.00 | 2.5 | $2,325.00 |
| TOTAL | | | | $26,463.00 |

Neither the transcript of the May 22 hearing nor the associated time entries included in Baker's Interim Application offer any explanation for why nine other professionals were required to be in the courtroom or on the phone to observe the argument of Ms. Dumas and Mr. Julian. Yet these additional attendees cost the estate thousands of dollars in fees for their time, not including whatever additional costs were incurred for their travel.

The same procedure proposed to address overstaffed meetings could also be effective for addressing overstaffed hearings. Specifically, the Court should set a presumptive maximum attendance of four billing professionals per firm per hearing, and that professional firm should explicitly identify all hearings in their fee application where they exceeded this limit and should justify the attendance of each billing timekeeper for those hearings. For any hearings where excessive attendance has not been justified, a proportion of the total fees attributable to excess professionals should be disallowed.

### 3. Questionably High Daily Hours

The Interim Applications also contain numerous instances of individual professionals who recorded extremely high, and in some cases implausible, numbers of billable hours in a single day. Excluding timekeepers who spent part of their day travelling, there were 537 days in which a non-travelling timekeeper recorded at least 12 billable hours, of which 143 occurred after the same timekeeper also recorded 12 or more hours the previous day. In addition, there were 44 instances of timekeepers recording 16-hour days of billable work, and four (4) days in which non-travelling timekeepers managed to record 20 or more billable hours:

| Firm | Days in which timekeeper billed more than 12 hours | Consecutive 12+ hour days | 16+ hour days | 20+ hour days | Fees billed after 12 hours |
|---|---|---|---|---|---|
| Weil | 42 | 9 | 4 | 0 | $16,324.50 |
| Milbank | 13 | 0 | 0 | 0 | $16,160.00 |
| Baker | 34 | 10 | 2 | 0 | $42,881.50 |
| Cravath | 361 | 101 | 29 | 4 | $422,864.50 |
| Jenner | 25 | 6 | 4 | 0 | $21,955.10 |
| Keller | 6 | 2 | 0 | 0 | $4,835.00 |
| Munger | 52 | 15 | 5 | 0 | $73,418.50 |
| Simpson | 4 | 0 | 0 | 0 | $5,688.50 |
| **TOTAL** | 537 | 143 | 44 | 4 | **$604,127.60** |

These hourly totals raise questions about both billing accuracy and billing efficiency. Professionals are expected to bill only for time that they actively work for the client—and as a practical matter, it should be impossible any attorney, no matter how efficient and hardworking, to bill all or even most of every minute that is spent in the office.[7] *See In re New Boston Coke Corp.*, 299 B.R. 432, 448 (Bankr. E.D. Mich. 2003) ("While it is certainly possible that an attorney could bill ten–, nineteen– or twenty-hour days, it is unlikely that all of that billed time is compensable"). Secondly, professionals who have billed for a twelve-hour day (or longer) may not be performing at peak mental efficiency—especially if they have done so for multiple days in a row.

---

[7] Notably, the Interim Applications include one example of a 24-hour billable day, recorded on April 23, 2019, by a Cravath legal assistant (part of which was spent in travel).

Like the twelve-person meeting, the alleged twelve-hour billable workday may raise questions about the professional's billing judgment and require additional scrutiny before fees from that workday can be allowed. While there may be occasions where these billing totals would be justified, professionals bear a heightened burden of showing that these long workdays were actual, necessary, and beneficial. Accordingly, the United States requests that professionals be ordered to provide a detailed justification for each instance in which timekeepers billed more than twelve hours in a single day, and that absent such justification, fees over twelve hours billed by that timekeeper be disallowed.

### 4. Non-working Time for Air Travel

The Local Guidelines expressly prohibit compensation for non-working time spent during air travel, and no professional has sought or obtained a waiver from this rule. Despite this, all professionals other than Jenner appear to have included extensive charges for non-working air travel time in their Interim Applications:

| Firm | Entries for air travel billed | Discount Applied | Cost |
|---|---|---|---|
| Weil | 81 | Yes | $332,560.25 |
| Milbank | 46 | Yes | $132,631.75 |
| Baker | 80 | After March 1 | $159,148.75 |
| Cravath | 252 | Yes | $600,486.25 |
| Keller | 4 | Yes | $8,085.00 |
| Munger | 141 | Yes | $163,545.00 |
| Simpson | 1 | Yes | $1,260.00 |
| **TOTAL** | 605 | | **$1,397,717.00** |

Although the question of non-working travel time was discussed extensively in the Fee Procedures Motion, and the Fee Examiner's analysis and argument will not be repeated here, the United States Trustee will briefly address a point that appears to have caused some confusion among the professionals in these cases. As the professionals correctly note, it is the practice in many jurisdictions to allow compensation for non-working travel time (including air travel) at a 50% discount from the timekeeper's usual rate. As stated in the UST Guidelines, the United States Trustee will monitor fees for compliance with those policies and may question travel fees that have been charged at a non-discounted rate. *See* UST Guidelines ¶ B.2.7(k).

14

Unlike the Local Guidelines, the UST Guidelines are not law, and they do not create a safe harbor that would allow professionals to charge fees that are otherwise prohibited. In particular, the UST Guidelines "do not supersede local rules, court orders, or other controlling authority." *Id.* at 4.

Thus, notwithstanding the controlling law or prevailing practice in other districts, the Local Guidelines control, and the United States Trustee concurs with the Fee Examiner's position here that fees for non-working air travel are not generally compensable under the Local Guidelines. The Local Guidelines apply only to air travel and not to other forms of transportation, and this rule is modified by the published *Practices and Procedures in Judge Montali's Court*, which authorizes air travelers to bill up to two hours of non-working travel time to account for security delays. For these reasons, there may be a small amount of non-working travel time billed in this case that may not be subject to the Local Guideline 17 exclusion. If any such travel time is billed, it would be subject to the usual 50% discount applied in nearly all other jurisdictions, and the United States Trustee expects that any allowable travel time billed at an undiscounted rate will be reduced.[8]

### 5. Prepetition Expenses Billed as Postpetition Expenses

Because section 330 only authorizes compensation for services to the estate, professionals may only bill for fees and expenses incurred on or after the petition date (or the effective date of the professional's employment, if later). Despite this, the Interim Applications reflect numerous expenses that appear to have been incurred before January 29, 2019, or the employment date of the professional:

| Firm | Effective date of employment | Pre-petition /pre-employment expenses billed | Cost |
|---|---|---|---|
| Weil | 1/29/2019 | 202 | $44,155.59 |
| Milbank | 2/12/2019 | 1 | $30.00 |
| Baker | 2/15/2019 | 8 | $542.30 |
| Cravath | 1/29/2019 | 9 | $27,509.75 |
| Munger | 1/29/2019 | 1 | $489.30 |
| **TOTAL** | | 221 | **$72,726.94** |

---

[8] All professionals other than Baker applied a 50% discount to fees for non-working travel (including air travel). Baker appears to have billed all travel time at its full rate for the month of February, 2019, and at half-rate thereafter.

In many of these cases, the fee entry was coded with a date after the firm's employment (and later than the date stated in the expense narrative), this later date was the date that the expense voucher was processed. But it is the date an expense was incurred, not recorded, that determines whether it was prepetition or postpetition (and therefore payable by the estate). For this reason, any expenses incurred prepetition or pre-employment should be disallowed regardless of how they are dated in the Interim Applications.

### 6. Overtime Meals and Transportation

A number of professionals appear to have followed a practice common in other jurisdictions of permitting attorneys to charge meals to the client on nights when they work late. But this practice appears to conflict with the Local Guidelines, under which overtime meals are treated as firm overhead and are therefore non-compensable no matter how many hours were billed. In addition, many professionals have charged for transportation expenses on nights when they worked late, an expense that would also appear to constitute overhead.

The Local Guidelines also appear to disallow certain other meal expenses that were frequently billed in the Interim Applications. In particular, Local Guideline 38 authorizes parties to be reimbursed for the cost of their breakfast and dinner, but not their lunch, when travelling. And under Local Guideline 39, working meals are only reimbursable "where food is catered to the professional's office in the course of a meeting with clients . . . for the purpose of allowing the meeting to continue through a normal meal period."

Under those standards, the United States Trustee has identified numerous expense entries for meals and transportation that appear to be non-reimbursable under the Local Guidelines:

| Firm | Non-reimbursable meals and transportation | Cost |
|------|-------------------------------------------|------|
| Weil | 473 | $14,892.04 |
| Milbank | 162 | $3,956.83 |
| Baker | 4 | $194.11 |
| Cravath | 135 | $4,066.53 |
| Jenner | 4 | $39.43 |
| Munger | 36 | $833.16 |
| Simpson | 112 | $2,934.65 |
| **TOTAL** | 926 | **$26,916.75** |

16

Many of these expenses would be objectionable even if this Court were to adopt the practice of other districts regarding overtime meals, under which professionals may be reimbursed for overtime meals and transportation if they have worked at least four billable hours for the client that day and remained in the office past 9 pm. Here, in some cases, the Applicants seek reimbursement for an overtime meal or transportation without identifying the professional who claimed the expense—making it impossible to verify whether they worked at least four hours that day. In other cases, overtime expenses were charged by attorneys who worked fewer than four hours on PG&E matters—and in some cases, by attorneys who billed no work whatsoever for their client that day.

| Firm | Timekeeper Not Identified | Cost | Fewer than 4 hours billed | Cost |
|---|---|---|---|---|
| Weil | 0 | $0.00 | 67 | $2,615.13 |
| Milbank | 86 | $2,176.21 | 11 | $302.68 |
| Baker | 3 | $134.11 | 0 | $0.00 |
| Cravath | 16 | $641.88 | 15 | $373.76 |
| Jenner | 0 | $0.00 | 1 | $8.93 |
| Munger | 0 | $0.00 | 1 | $25.59 |
| Simpson | 1 | $13.06 | 11 | $385.13 |
| **TOTAL** | 106 | **$2,965.26** | 106 | **$3,711.22** |

### 7. Fees of Non-Admitted Attorneys

The Cravath Interim Application includes numerous fees billed by associates who were not yet admitted to the bar of any jurisdiction (although all appear to have been admitted subsequently):

| Name | Admission Date | Pre-Adm. Hours | Pre-Adm. Fees | Rate |
|---|---|---|---|---|
| Archibald, Seann | 4/22/2019 | 124.5 | $74,077.50 | $595.00 |
| Bodner, Sara | 4/22/2019 | 493.9 | $293,870.50 | $595.00 |
| Bottini, Aishlinn R. | 3/18/2019 | 142.2 | $84,609.00 | $595.00 |
| Fleming, Margaret | 5/13/2019 | 437.6 | $260,372.00 | $595.00 |
| Gans, Courtney | 4/22/2019 | 11.0 | $6,545.00 | $595.00 |
| Huang, Ya | 3/18/2019 | 247.5 | $147,262.50 | $595.00 |
| Kahn, Michael | 2/25/2019 | 15.7 | $9,341.50 | $595.00 |
| Kariyawasam, Kalana | 2/4/2019 | 24.7 | $14,696.50 | $595.00 |
| Lawoyin, Feyi | 6/3/2019 | 551.3 | $328,023.50 | $595.00 |
| Mahaffey, Sylvia | 3/18/2019 | 86.0 | $51,170.00 | $595.00 |

| | | | | |
|---|---|---|---|---|
| Phillips, Lauren | 4/8/2019 | 534.9 | $318,265.50 | $595.00 |
| Robertson, Caleb | 5/13/2019 | 762.5 | $453,687.50 | $595.00 |
| Schwarz, Rebecca | 2/25/2019 | 124.1 | $73,839.50 | $595.00 |
| Sila, Ryan | 5/13/2019 | 449.5 | $267,452.50 | $595.00 |
| Tomlinson, E | 6/26/2019 | 173.2 | $103,054.00 | $595.00 |
| **TOTAL** | | 4178.6 | **$2,486,267.00** | |

While the non-admitted status of these attorneys did not categorically prohibit them from working on this case, it did prohibit them from performing services that would have constituted the practice of law. *See Z.A. v. San Bruno Park Sch. Dist.*, 165 F.3d 1273, 1276 (9th Cir. 1999) (noting that a "person is or is not licensed to practice law in a particular forum. There is no halfway. If not licensed, one cannot practice in that forum, and cannot charge, or receive attorney's fees for such services under penalty of criminal law"). As a result, during the period before their admission, these attorneys should have performed only the same tasks as Cravath's non-attorney professionals and not the same tasks as Cravath's admitted attorneys.

Despite this, it appears that in every case, the non-admitted Cravath attorneys billed at the exact same rates pre-admission as post-admission, and at the same rate as admitted first- and second-year associates. These attorneys certainly were not engaged in the unauthorized practice of law, and as a result their pre-admission services should have been billed at the prevailing rate for Cravath's non-attorney professionals—a rate approximately half of that actually charged.

### 8. Discrepancies Between Actual and Comparable Blended Rates

In large chapter 11 cases, the UST Guidelines provide that attorney professionals should demonstrate their compliance with section 330's comparability requirement by preparing a chart that compares their blended billing rates (that is, total fees for all categories of professionals divided by total hours) in the application with their blended rates in non-bankruptcy cases over the past year. *See* UST Guidelines ¶ C.3. The disclosed, non-bankruptcy blended rates are not a hard cap. But a comparison of blended rates can often highlight billing abnormalities or staffing inefficiencies, and the United States Trustee may question whether bankruptcy-billing rates that are significantly higher than what the same firm charges in non-bankruptcy engagements are an impermissible bankruptcy premium.

Case: 19-30088   Doc# 4025   Filed: 09/27/19   Entered: 09/27/19 10:48:00   Page 18 of 21

Here, the Interim Applications reveal several unusually large discrepancies between the blended rates charged in this case and the firms' overall blended rates in non-bankruptcy cases over the past 12 months:[9]

| Firm | Blended Rate First Interim App. | Blended Rate, Non-Bankruptcy Cases | Difference (Pct.) |
|------|-------------------------------|-----------------------------------|-------------------|
| Weil | $953.00 | $807.00 | 18.09% |
| Milbank | $1,032.44 | $867.72 | 18.98% |
| Baker | $760.04 | $542.51 | 40.10% |
| Cravath | $686.81 | $726.00 | -5.52% |
| Jenner | $580.33 | $567.00 | 2.35% |
| Munger | $720.00 | $640.00 | 12.50% |
| Simpson | $952.53 | $805.00 | 18.33% |

All firms other than Cravath and Jenner reported material discrepancies between their blended rates in this case and their blended rates in non-bankruptcy matters, and for several firms, the discrepancy is substantial. Based on the United States Trustee's preliminary analysis, this difference does not appear due to the individual timekeepers charging higher rates in this case than in other cases, but rather appears due to the unusually top-heavy manner in which these cases have been staffed by several of these firms, with partners and other high-rate professionals accounting for a disproportionate number of the total hours billed.

In particular, the average hourly rate billed by all Milbank timekeepers in this case, paralegals included, is more than a thousand dollars. Based on the individual billing rates reported by Milbank, the rate for this average hour is roughly equivalent to what would be charged by an individual attorney with 28 years' experience (Lena Mandel, $1,080). But even in a complex chapter 11 case such as this, the average bankruptcy task should not require the services of a thousand-dollar-an-hour attorney, and the United States Trustee is troubled by the fact that (other than Cravath and Jenner) the firms are relying on costly senior attorneys for such a high proportion of their work.

---

[9] Of the law firms that filed Interim Applications, Keller did not disclose its non-bankruptcy blended rates. Cravath disclosed its blended rates only on a disaggregated basis by category (partner, associate, non-attorney) but not on an aggregated basis. For purposes of this table, Cravath's non-bankruptcy aggregate blended rate is taken from the Customary and Comparable Compensation Disclosure it filed in its Third Interim Fee Application in *In re The Weinstein Company Holdings LLC,* Case No. 18-10601 (MFW) (Bankr. D. Del.), which was filed on February 14, 2019, and which is based on firmwide billings for the calendar year 2017.

The United States Trustee does not recommend any remedies for this problem at this time but expects that the Fee Examiner and the professionals themselves will be especially vigilant going forward to possible instances of mis-staffing (such as partners performing legal research or other routine tasks that could be delegated to junior attorneys). In addition, the United States Trustee expects that, to the extent similar billing discrepancies appear in future applications, those firms will provide the Court, the United States Trustee, and the Fee Examiner with a detailed justification of their staffing model.

## III.     UNITED STATES TRUSTEE'S RECOMMENDATIONS

The United States Trustee is confident that the Fee Examiner's recommendations will greatly facilitate the fee review process by imposing uniform and objective criteria for several categories of fees and expenses and by eliminating the need for wasteful and repetitive litigation on a number of issues. Based on the seriousness of the deficiencies discussed above, there are several other procedures that might aid this process even further.

Accordingly, the United States Trustee further recommends that, in addition to the relief requested by the Fee Examiner, the Court order that:

1.      All fee applications should include a statement identifying: (a) all meetings and conferences (including external meetings attended by multiple timekeepers) that were billed by five or more timekeepers from the same firm; (b) all hearings attended and billed by five or more timekeepers from the firm; and (c) all instances in which an individual timekeeper recorded more than 12 billable hours in a single calendar day. In connection with each of these disclosures, the firm should provide a detailed statement explaining the necessity for each attendee's presence and/or the necessity for the high hours billed. To the extent these items are not disclosed, or have not been justified, the Fee Examiner shall seek to disallow them.

2.      In accordance with Local Guidelines 22, 38, and 39, expenses for all overtime meals, overtime transportation expenses, travel lunches, and working meals other than in connection with client meetings will be disallowed.

3.      In the case of attorneys who work on the case prior to their admission to the bar of any state, fees billed for such attorneys during the pre-admission period shall be capped at the average rate charged by the firm for non-attorney professionals.

4.      Firms that report a blended aggregate rate that is more than 10% higher than the rate reported in their non-bankruptcy engagements should explain the discrepancy in their fee applications, including whether it would have been possible to delegate any of the work performed by high-rate attorneys to lower-rate attorneys.

20

The United States Trustee further requests that the Fee Examiner be authorized to apply these standards and procedures immediately to any Interim Applications that have already been filed in these cases and to request additional disclosures as necessary without regard to the passage of any purported objection period for those applications.

Dated: September 27, 2019

Andrew R. Vara
Acting United States Trustee, Region 3

By: /s/ Timothy S. Laffredi
Timothy S. Laffredi
Attorney for United States Trustee

21