1  Bruce S. Bennett (SBN 105430)
   Joshua M. Mester (SBN 194783)
2  James O. Johnston (SBN 167330)
   JONES DAY
3  555 South Flower Street
   Fiftieth Floor
4  Los Angeles, CA  90071.2300
   Telephone:    (213) 489-3939
5  Facsimile:    (213) 243-2539
   E-mail:        bbennett@jonesday.com
6                 jmester@jonesday.com
                  jjohnston@jonesday.com
7
   *Attorneys for PG&E Shareholders*
8
9            UNITED STATES BANKRUPTCY COURT

10           NORTHERN DISTRICT OF CALIFORNIA

11              SAN FRANCISCO DIVISION

12

13  In re:                              Bankruptcy Case
                                        No. 19-30088 (DM)
14  PG&E CORPORATION
                                        Chapter 11
15        - and -                       (Lead Case)
                                        (Jointly Administered)
16  PACIFIC GAS AND ELECTRIC
    COMPANY,                            **OBJECTION OF CERTAIN PG&E**
17                                      **SHAREHOLDERS TO MOTION OF**
                                        **THE OFFICIAL COMMITTEE OF**
18               Debtors.               **TORT CLAIMANTS AND AD HOC**
                                        **COMMITTEE OF SENIOR**
19                                      **UNSECURED NOTEHOLDERS TO**
                                        **TERMINATE THE DEBTORS'**
20                                      **EXCLUSIVE PERIODS**

21  ☐ Affects PG&E Corporation          Date:    October 7, 2019
    ☐ Affects Pacific Gas and Electric  Company   Time:  1:30 p.m. (Pacific Time)
22  ☒ Affects both Debtors              Place:   United States Bankruptcy Court
                                                 Courtroom 17, 16th Floor
23  *\* All papers shall be filed in the Lead Case,*  450 Golden Gate Avenue
    *No. 19-30088 (DM).*                             San Francisco, CA 94102
24
                                        Re: Docket No. 3940
25

26

27

28

# TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT .................................................................. 1

II.     THE BONDHOLDER/TCC BID IS NOT A GOOD FAITH SETTLEMENT ........... 7

III.    A PLAN BASED ON THE BONDHOLDER/TCC BID CANNOT

        BE CONFIRMED .................................................................................. 10

IV.     TERMINATION OF EXCLUSIVITY WILL NOT ELIMINATE

        CLAIMS ESTIMATION OR TUBBS LITIGATION .................................... 14

V.      TERMINATION OF EXCLUSIVITY WILL NOT PROMOTE

        "COMPETITION" OR SETTLEMENT ....................................................... 17

VI.     ATTACKS ON PG&E'S PLAN ARE UNFOUNDED ................................. 18

VI.     CONCLUSION..................................................................................... 19

# TABLE OF AUTHORITIES

**Page**

CASES

In re A&C Properties,
    784 F.2d 1377 (9th Cir. 1986)..................................................................................10

In re Adelphia Commc'ns Corp.,
    361 B.R. 337 (S.D.N.Y. 2007)..................................................................................12

In re Age Refining, Inc.,
    801 F.3d 530 (5th Cir. 2015)....................................................................................10

In re Cardelucci,
    285 F.3d 1231 (9th Cir. 2002)..................................................................................11

In re Lighthouse Lodge, LLC,
    No. 09-52610-RLE, 2010 WL 4053984 (Bankr. N.D. Cal. Oct. 14, 2010)..............10

In re Smart World Techs., LLC,
    423 F.3d 166 (2d Cir. 2005).....................................................................................10

Turney v. F.D.I.C.,
    18 F.3d 865 (10th Cir. 1994)....................................................................................10

In re Trans Max Techs., Inc.,
    349 B.R. 80 (Bankr. D. Nev. 2006) ..........................................................................15

In re Victory Constr. Co.,
    42 B.R. 145 (Bankr. C.D. Cal. 1984)........................................................................15

In re Washington Mut., Inc.,
    442 B.R. 314 (Bankr. D. Del. 2011) .........................................................................12

In re Whispering Pines Estates, Inc.,
    370 B.R. 452 (BAP 1st Cir. 2007).............................................................................10

STATUTES

11 U.S.C. § 502.....................................................................................................11, 15

11 U.S.C. § 1123...................................................................................................12, 13

11 U.S.C. § 1129.........................................................................................................13

CAL. PUB. UTIL. CODE § 854......................................................................................14

CAL. PUB. UTIL. CODE § 3292(b)(1)(B)......................................................................16

OTHER AUTHORITIES

7 COLLIER ON BANKRUPTCY ¶ 1129.03[4][a][i] (16th ed. rev. 2019) ......................15

Certain owners of common stock of PG&E Corporation (the "PG&E Shareholders")[1] hereby object to the *Joint Motion To Terminate The Debtors' Exclusive Periods Pursuant To Section 1121(d)(1) Of The Bankruptcy Code* [ECF 3940] (the "Motion") filed by the Official Committee of Tort Claimants (the "TCC") and the Ad Hoc Committee of Senior Unsecured Noteholders (the "Bondholder Group"). The PG&E Shareholders also respond below to the statements and joinders filed with respect to the Motion by the Official Committee of Unsecured Creditors (the "UCC") [ECF 4049], creditors BOKF, N.A. [ECF 4051] and SLF Fire Victim Claimants [ECF 4056], and non-parties The Utility Reform Network [ECF 4048], The Public Advocate's Office [ECF 4052], and the International Brotherhood of Electrical Workers [ECF 4046].

## I. PRELIMINARY STATEMENT

The Motion is the third effort by the Bondholder Group to limit or terminate exclusivity in order to draft and file a plan that would pay unsecured bondholder claims vastly more than their allowed amounts and result in Elliot Management Company and its hand-picked group of bondholders owning most of PG&E, displacing existing shareholders despite PG&E's acknowledged solvency.

The Court previously – and correctly – characterized those efforts as "the bankruptcy equivalent of a proxy fight or a hostile takeover." ECF 3568 at 3. Just seven weeks ago, the Court concluded that "there is no purpose in" terminating exclusivity because "[t]he Debtors have placed before all a proposal that, if coaxed and guided to maturity[,] should result in a proper outcome for all creditors without needing to deal with all of these other issues." *Id.* at 4.

In the short period of time since the last hearing on exclusivity, PG&E put itself well on the way toward achieving that "proper outcome." PG&E's plan of reorganization dated

---

[1] The PG&E Shareholders are the entities identified on Exhibit A to the *Third Amended Verified Statement Of Jones Day Pursuant To Federal Rule Of Bankruptcy Procedure 2019* [ECF 3964]. The PG&E Shareholders are acting in their individual capacities but authorized the filing of this single submission for the purpose of administrative efficiency. Each of the PG&E Shareholders is expressing its independent views, and counsel does not have the actual or apparent authority to obligate any one entity to act in concert with any other entity with respect to PG&E equity securities. The PG&E Shareholders have not agreed to act in concert with respect to their respective interests in PG&E equity securities.

September 23, 2019 [ECF 3966 (the "Plan")] provides for all creditors to be paid in full with postpetition interest at the legal (federal judgment) rate, is backed by binding financing commitments, and satisfies all of the criteria necessary for PG&E to resolve these cases by June 30, 2020, and participate in California's new wildfire fund.

Much hard work and genuine compromise has been necessary to get to this point. Just since the Court denied the Bondholder Group's prior motion to terminate exclusivity less than two months ago:

(1) PG&E filed its first plan of reorganization, embodying a $1 billion settlement of public agency wildfire claims reached after hard-fought, arms-length negotiations;

(2) after hard-fought, arms-length negotiations, PG&E settled with one of its largest creditor groups – the insurance subrogation claimants – for $11 billion and filed the amended Plan to incorporate that settlement;

(3) after hard-fought, arms-length negotiations, PG&E obtained more than $14 billion in equity financing commitments from dozens of financial institutions to help fund the Plan;

(4) PG&E obtained debt financing commitments for obligations contemplated by the Plan, including the refinancing of PG&E's high-coupon bonds with new debt at substantially lower interest rates in order to achieve billions of dollars of future savings for stakeholders and ratepayers;

(5) proceedings to estimate wildfire liabilities commenced in the District Court before District Judge Donato and are on track for the estimation hearing to begin in mid-January 2020;

(6) litigation of claims regarding the Tubbs fire commenced in the state court before Judge Jackson, with the first day of trial scheduled for January 7, 2020;

(7) the CPUC issued its Order Instituting Investigation opening proceedings by which the CPUC will consider regulatory approvals necessary to enable PG&E to exit chapter 11 with a confirmed plan; and

(8) briefing of issues relating to inverse condemnation, the potential for estimation of government fire-related claims, and treatment of bondholder claims for postpetition interest and prepayment (make-whole) premiums is scheduled to begin shortly.

PG&E's settlements with the insurers and public entities damaged by the wildfires are fair. The PG&E Shareholders supported those settlements because the goal, first and foremost, always has been to fairly compensate for wildfire losses and pay all allowed claims in full, without a windfall for those seeking excessive or inappropriate amounts. To that end, the PG&E Shareholders stand ready and willing to support a fair compromise with those who have not yet settled, including the wildfire plaintiffs represented by the TCC. PG&E similarly seeks compromise, as evidenced by its requests for mediation.

Unfortunately, the Bondholder Group and TCC have chosen a different path. Despite all of the progress outlined above (or perhaps because of it), the Bondholder Group is back with another hostile takeover bid, this time with the support of the TCC, pushing a plan term sheet that purports to describe a "settlement" of wildfire claims while transferring away 99.9% of the equity held by current shareholders (with a current market value of well over $5 billion). That so-called "alternative proposal" is not progress and not remotely cause for terminating PG&E's exclusivity.

As the Court aptly noted at the last status conference, there is no "settlement" underlying the Bondholder/TCC bid. Sept. 24, 2019 Tr. ("Tr.") at 63:5-8 ("THE COURT: My question to you is what is the discrete settlement between the bondholders and the TCC? There's nothing to settle, is there? There's no dispute to begin with. They're different creditor groups with the same common debtor."). Unlike the negotiations that led to PG&E's settlements with the insurance and public entity claimants, there were no arms-length negotiations between adversaries on opposite sides of the table. There was no give-and-take resulting in compromises by both the Bondholder Group and the TCC in furtherance of a deal. There was no one negotiating to protect the interests of the estate itself or any other constituency. Instead, the Bondholder/TCC bid embodies exactly what one would expect when "different creditor groups with the same common debtor" get together to divvy up someone else's money (in this case, the value of a solvent bankruptcy estate): bondholders pay themselves what they desire, wildfire plaintiffs pay

-2-

themselves what they desire, and the estate and tens of thousands of shareholders lose. The reality is that the Bondholder/TCC term sheet is just two demands for plan treatment not agreed to by any genuinely adverse party, surrounded by mostly non-controversial bankruptcy boilerplate included to create a false impression that meaningful plan terms have been negotiated. This is not progress.

For example, on the bondholder side of the ledger, the Bondholder Group would:

(1) Reinstate $15.8 billion in unsecured bonds with above-market interest rates as high as 6.35% (at a time when the 30-year Treasury note yields 2%) *and* convert them to secured status. In so doing, the Bondholder Group would pay $600 million in postpetition interest above the legal (federal judgment) rate mandated by the Ninth Circuit and cause PG&E to forgo the opportunity to refinance the debt at much lower interest rates. This proposed treatment would overpay unsecured bondholders by more than $3 billion.

(2) Pay an additional $1.75 billion in unsecured bonds more than in full by providing for postpetition interest at the contract rate instead of the federal judgement rate and prepayment (make-whole) premiums that are not due under the governing indentures and would be disallowed as unmatured interest under the Bankruptcy Code in any event.

(3) Expropriate for itself the right to buy equity in reorganized PG&E for roughly 5¢ per share (far below the current share price and the $14.05 share price underlying the $14 billion in backstop commitments obtained by PG&E in arms-length negotiations with market participants) and $5.75 billion in new unsecured notes with above-market terms worth hundreds of millions of dollars more than the Bondholder Group proposes to pay.

(4) Pay itself $670 million in fees.

All told, this treatment would overpay the Bondholder Group and other unsecured bondholders by billions of dollars while diluting the equity stake of most current shareholders down to 0.1%. Notably, in order to curry favor with a politically influential constituency that occupies a seat on the UCC, a special discriminatory exception would be made for PG&E employees and retirees, whose accounts will be "trued-up for any dilution on account of the Plan."

1    On the wildfire plaintiffs' side of the ledger, $14.5 billion would be transferred to a trust

2    from which wildfire claims are to be paid. That trust would be administered and governed by

3    persons selected by the TCC, with PG&E having no oversight or ability to object to any payments

4    from the trust. This fox-guarding-the-henhouse dynamic virtually ensures that every single dollar

5    transferred to the trust would be spent. In the unlikely event that funds remained, the excess

6    would be gifted to the California wildfire fund and none would be returned to PG&E, regardless

7    of the actual amount of wildfire liabilities.

8    Notable here is that the $14.5 billion funding of the trust is not a "settlement" of any sort,

9    and it has nothing to do with any assessment of PG&E's actual liability for wildfire damages. At

10   the TCC's urging, the Court set a very "late" bar date and authorized claimants to file proofs of

11   claim without listing or identifying their alleged damages. That bar date has not yet occurred and

12   the TCC recently expressed concern that relatively few proofs of claim have been filed to date,

13   meaning that filed claims provide no indication of even the *asserted* wildfire liabilities, much less

14   the actual allowed amount of those liabilities. The TCC simply does not yet know how many

15   claims will be filed, how many claimants exist, or what the quantum of their damages might be.

16   As a consequence, it has resorted to crude approximations (claiming, for example, that uninsured

17   and underinsured damages somehow are equal to twice the amount of insurance payments made).

18   Just as importantly, the Bondholder Group had similarly inadequate information with which to

19   make any reasoned assessment of PG&E's wildfire liabilities.

20   But this information vacuum did not stop the Bondholder Group and TCC from

21   purporting to "settle" wildfire claims. How did they do it? Not through a negotiation in which

22   each side makes concessions in favor of the other. Instead, the Bondholder Group and TCC

23   simply worked backwards from their assessment of PG&E's "distributable value," allocating it

24   amongst themselves until nothing was left. As the TCC's counsel (Ms. Dumas) put it at the

25   recent status conference, the TCC "compromised" wildfire claims "based on a reasonable

26   assumption . . . regarding the distributable value of the company." Tr. 46:21-25. Or as Mr. Pitre

27   more bluntly declared, "Let's get our deal done and screw them all!"[2]

28   _____
     [2]   PGE-EXC-AHC-00002529.

1    As a consequence, the Bondholder/TCC bid will not advance this case and does not justify

2    termination of exclusivity. A plan based on the Bondholder/TCC bid would violate the

3    Bankruptcy Code and could not be confirmed for multiple, independent reasons: reinstatement

4    and securitization of billions of dollars of above-market unsecured debt, payment of hundreds of

5    millions of dollars of postpetition interest over the legal rate, sale of equity in the reorganized

6    PG&E for billions of dollars less than it is worth, payment of hundreds of millions of dollars in

7    fees to the Bondholder Group, the outright transfer of $14.5 billion to a wildfire trust with no

8    estimation, and the trust's unfettered discretion to disburse that entire sum without claims

9    adjudication or judicial oversight. Any such plan will be hotly contested and, because it will be

10   contested, cannot eliminate the ongoing estimation proceedings or the Tubbs fire litigation.

11   Rather, it would only engender additional massive litigation, complicate and delay the ongoing

12   proceedings before the CPUC, imperil the critical objective of a bankruptcy exit by June 30,

13   2020, and significantly increase the already enormous cost of these bankruptcy cases. This is not

14   the sort of plan that should serve as the basis for terminating exclusivity, whether as a "back up"

15   or otherwise.

16   Termination of exclusivity also will not promote "competition" or compromise. The

17   major settlements to date were negotiated during the exclusive period and without threat of its

18   termination. The Bondholder Group's motions to terminate exclusivity were filed after and in

19   reaction to PG&E's announcements of those settlements, not vice versa. The existence of

20   exclusivity has not remotely prevented or chilled settlement discussions among any interested

21   parties (as evidenced by the negotiations between the TCC and the Bondholder Group).

22   Moreover, competing plans – when authorized – are supposed to offer stakeholders a

23   choice between differing proposed treatments. But the Bondholder/TCC bid is not about claim

24   *treatment*. It is a naked attempt by two constituents to support each other in asserting positions

25   on claim *allowance* divorced from the facts and law. Unlike in PG&E's prior bankruptcy case,

26   termination of exclusivity here will not give creditors a choice between two legitimate plan

27   proposals offering different but valid claim treatments. And there is no issue of treatment in this

28   case because PG&E's Plan will pay all claims in full, including the claims of bondholders and

wildfire claimants, and judicial mechanisms already are in place to resolve to resolve any disagreements regarding that treatment: the Court has ordered briefing on issues respecting the Bondholder Group's claim to postpetition interest at rates exceeding the federal judgment rate and make-whole premiums not contemplated by the governing debt documents; and the Tubbs trial and estimation proceedings before the District Court provide a platform for estimating the amount necessary to pay wildfire claims in full. Termination of exclusivity is not necessary to resolve those disagreements.

For all of these reasons, the Debtors should be permitted to continue progressing their Plan and the Motion should be denied, with an order compelling mediation of all remaining plan-related disputes.

## II.     THE BONDHOLDER/TCC BID IS NOT A GOOD FAITH SETTLEMENT

The Motion touts the Bondholder/TCC bid as a "comprehensive settlement" of wildfire and other liabilities. Motion ¶ 2. It is nothing of the sort. It is a collection of demands in an effort to require PG&E to pay alleged claims of the "settling parties" (bondholders, the TCC, and their allies on the UCC) with shareholder value and without judicial scrutiny of the nature, extent, and allowability of the liabilities.

The Court recognized this dynamic at the last status conference and repeatedly pressed the Bondholder Group's counsel to explain how the Bondholder/TCC bid could be characterized as a settlement. Counsel refused to answer that simple question, repeatedly changing the subject. Tr. 63:5-13, 64:23-66:10. This evasion revealed the truth in the Court's observation that "there's nothing to settle" between the Bondholder Group and the TCC. Tr. 63:6-7.

Indeed, discovery has shown that the Bondholder Group and the TCC couldn't have engaged in arms-length negotiations because they had no material information about the alleged claims of the other. The Bondholder Group, for example, did not have documents and files from the insurers who paid wildfire claims (a good source of information that will show the limited extent to which insurance was inadequate to satisfy wildfire claims) or any other reliable data regarding the nature and extent of compensable wildfire losses. And, as the bar date has not

1  passed, the Bondholder Group could not have made any reasonable assessment of liabilities from

2  filed claims.  Rather, it apparently just kept "bidding up the torts" until the TCC accepted.

3      Similarly, the TCC apparently did no analysis of the Bondholder Group's disallowable

4  claims for postpetition interest at the contract rate and for make-whole premiums.  It did no

5  analysis of the savings PG&E could realize by satisfying outstanding bonds with above-market

6  interest rates instead of reinstating them.  It did not consider whether the reinstated above-market

7  bonds also would have to be secured due to the proposed incurrence of new secured debt by

8  reorganized PG&E.  And it did not investigate whether equity in reorganized PG&E could be sold

9  for more than the five cents a share at which it will be sold to the Bondholder Group under the

10  Bondholder/TCC bid.

11      The record is clear that the Bondholder Group and TCC simply worked backward from

12  their assessment of PG&E's "distributable value," allocating it amongst themselves until nothing

13  but a 0.1% interest in reorganized PG&E was left for non-employee shareholders.  As the TCC's

14  counsel frankly admitted:  "We've decided that to move the case forward in a constructive way[,]

15  we will compromise our claims based on a reasonable assumption . . . regarding the distributable

16  value of the company."  Tr. 46:20-25 (comments of Ms. Dumas); *see* Tr. 130:17-22 ("MR.

17  PITRE:  And the difference between discussions that at least I have had, I'm talking about me

18  now, and the bondholders is that there's been complete transparency . . . as to what is available to

19  resolve claims.").  In other words, the TCC's demands are based on what it believes PG&E can

20  pay rather than the amount of wildfire claims entitled to payment in full.  The UCC – whose

21  constituents are beneficiaries of the massive overpayment of claims under the Bondholder/TCC

22  bid – put it well:  "the TCC has accepted what the parties believe is the maximum amount that

23  can be paid by the Debtors' estates, while still ensuring that the estates remain solvent."

24  ECF 4049 ¶ 2.

25      By reverse engineering "solvency" in this way, the Bondholder Group and TCC

26  "negotiated" to distribute virtually every dollar of value to creditors, without regard to the actual

27  allowable amount of claims, in order to prevent shareholders from receiving any material value.

28  This is an embodiment of a "screw them all!" approach, and it is an utterly inappropriate way to

negotiate for the allowed amount of claims against an entity the TCC must concede to be solvent (or else it would not have agreed to support a plan that pays postpetition interest at amounts even higher than the rate dictated by governing Ninth Circuit law).

The recent revisions to the Bondholder/TCC bid further demonstrate that there is no true "settlement" that would be put before the Court if exclusivity is terminated. Consider that the term sheet filed with the Motion purported to subordinate recoveries on insurance subrogation claims to the wildfire claims of other plaintiffs. Motion, Ex. A, *Fire Claims Trust* ("[A]t the end of Trust administration, after each Allowed Fire Victim Claim has been paid in full, the Trustee may then and only then pay an Allowed Subrogation Fire Claim(s) that corresponds to the paid in full Allowed Fire Victim Claim."). At the status conference, after the Court questioned the legality of such subordination and proposed to set a briefing schedule on the issue, the Bondholder Group and TCC immediately agreed to remove the insurer subordination from the Plan *and* increase the amount payable to wildfire plaintiffs. Tr. 122:2-8. Two days later, the Bondholder Group and TCC did just that, filing the Amended Term Sheet to *increase* funds to be paid to wildfire claimants (individual, government, and insurer) by \$1.5 billion. Amended Term Sheet, *Transaction Overview*. At the same time, the proposed treatment of bondholder claims did not change at all. Notably absent was any agreement by the constituency called upon to pay that additional \$1.5 billion – namely, PG&E shareholders. Indeed, shareholders were not even consulted. This cannot possibly be the kind of "negotiation" contemplated by the Court and the Bankruptcy Code. It also cannot fairly be described as progress.[3]

---

[3] The Amended Term Sheet also incorporates the same releases of insurers that the TCC had just characterized as "too cute" and "too mastermindy". *Compare* Tr. 53:2-5 ("MS. DUMAS: The insurance companies get releases from the victims, but the victims don't get rel – I mean, it's all – it's all way too cute. It is all way too mastermindy cute.") and Tr. 69:6-10 ("MR. QURESHI: [T]here is a provision in that settlement [between PG&E and the insurers] that we found to be very troubling, which is that i[t] requires a release by the individual tort claimants of any claims they may have against the insurers in order to recover any amount out of the trust. Again, we don't think that's appropriate.") *with* Amended Plan Term Sheet, *Releases* ("the Plan shall provide for consensual mutual releases of all claims and causes of action by and between each holder of a Fire Victim Claim (i) who votes to accept the Plan or (ii) is deemed to accept the Plan and each holder of a Subrogation Fire Claim (i) who votes to accept the Plan or (ii) is deemed to accept the Plan, based on or relating to, or in any manner arising from, the fires described in Schedule 1").

1    Accordingly, the Bondholder/TCC bid is not entitled to the deference and consideration

2    typically afforded to compromises reached between two adversaries after good-faith, arms-length

3    negotiations. *E.g.*, *In re Lighthouse Lodge, LLC*, No. 09-52610-RLE, 2010 WL 4053984, *8

4    (Bankr. N.D. Cal. Oct. 14, 2010) ("[T]he 'settlement' here is not put forth by a fiduciary acting

5    for the estate, is not negotiated in an arm's length transaction, and is proposed unilaterally by the

6    party who receives the benefit of the release.  Thus, to the extent the law favors compromise and

7    provides for a wide deference to the wisdom of the proponent's view of the settlement, such

8    deference will not be given here on these facts"); *In re Whispering Pines Estates, Inc.*, 370 B.R.

9    452, 461 (BAP 1st Cir. 2007) ("Where, as here, the 'settlement' is not put forth by a fiduciary

10   having authority and responsibility to act for the estate and who negotiated it in an arm's length

11   transaction, but unilaterally by the very party who would be receiving the benefit of the release,

12   there is no cause for deference in the matter."); *see also In re Smart World Techs., LLC*, 423 F.3d

13   166, 179-80 (2d Cir. 2005) ("[T]his case is a poster child for why the Code and Rule 9019

14   authorize only the debtor-in-possession to pursue or settle the estate's legal claims and why the

15   derivative-standing exception to that policy is narrow:  As a general matter, other parties to a

16   bankruptcy proceeding have interests that differ from those of the estate and thus are not suited to

17   act as the estate's legal representative.").[4]

18   **III.    A PLAN BASED ON THE BONDHOLDER/TCC BID CANNOT BE CONFIRMED**

19           The Bondholder/TCC bid also contemplates a plan that cannot possibly be confirmed.

20           Bondholder Treatment.  To start, the proposed treatment of PG&E's unsecured

21   bondholders violates the Bankruptcy Code in several ways.  *First*, the Bondholder Group

22   proposes to reinstate $15.8 billion in unsecured notes with high rates of interest instead of

23   refinancing them with lower-coupon debt now available in the marketplace.  Amended Term

24   Sheet, *Treatment Of Class 6B*.  This would result in the overpayment of more than $600 million

25   in postpetition interest "at the contract rate" (compared to postpetition interest at the federal

---

26   [4]   *See generally In re A&C Properties*, 784 F.2d 1377, 1381 (9th Cir. 1986) ("good faith
       negotiation" required for court approval of a compromise); *In re Age Refining, Inc.*, 801 F.3d
27     530, 540 (5th Cir. 2015) (considering "the extent to which the settlement is truly the product
       of arms-length bargaining, and not of fraud or collusion") (quotations omitted); *Turney v.
28     F.D.I.C.*, 18 F.3d 865, 867 n.2 (10th Cir. 1994) (same).

judgment rate), contrary to governing Ninth Circuit authority,[5] *and* lock PG&E (and its ratepayers) into substantially above-market interest rates for decades to come.  To make matters worse, the Bondholder Group would cause PG&E to incur $8 billion in new secured debt, which in turn would trigger clauses in the unsecured note indentures that require conversion of the reinstated unsecured debt into secured debt.  The end result of this maneuver would be to convert the Bondholder Group's above-market unsecured debt into secured debt with interest rates vastly in excess of available market rates of interest.  *This treatment would overpay the Bondholder Group and other unsecured bondholders by more than $3 billion.*

*Second*, with respect to an additional $1.75 billion in unsecured notes to be paid on the effective date, the Bondholder Group not only proposes to pay postpetition interest at the contract rate but also "any prepayment premium, makewhole or other similar call protection" on those notes.  Amended Term Sheet, *Treatment Of Class 5B*.  However, there is no right to any such premium under the governing indentures and, even if there was, such make-whole amounts would be disallowed unmatured interest in any event.  11 U.S.C. § 502(b)(2).  *This treatment therefore would overpay the Bondholder Group and other unsecured bondholders by additional tens of millions of dollars.*

*Third*, the Bondholder Group would claim for itself the right to buy equity in reorganized PG&E for roughly 5¢ per share (Amended Term Sheet, *New Money Investment In PG&E Corp.*), far below the current share price and the $14.05 share price underlying the $14 billion in backstop commitments obtained by PG&E after arms-length negotiations with market participants.  Incredibly, the Bondholder Group would acquire that equity at a $3 billion discount to the equity value implied under its own plan proposal.[6]  The Bondholder Group also would give itself the

---

[5]   The Ninth Circuit definitively has held that postpetition interest on claims against a solvent debtor accrues and is to be paid at the federal judgment rate as of the petition date.  *In re Cardelucci*, 285 F.3d 1231, 1234-36 (9th Cir. 2002).

[6]   The Bondholder Group proposes to acquire 59.3% of the equity for $15.5 billion.  Amended Term Sheet, *Transaction Overview* and *New Money Investment In PG&E Corp.*  This implies an equity value of $26 billion.  But the Bondholder/TCC bid also values the 40.6% of the equity to be transferred to wildfire plaintiffs at $12.75 billion, implying an equity value of $31.4 billion.  Amended Term Sheet, *Transaction Overview*.  Thus, the Bondholder Group seeks to acquire equity at a $3 billion discount (17%) to its own plan value.

right to buy $5.75 billion in new senior unsecured notes with rich terms unattainable in today's markets.[7]

Notably, unlike the *backstop* financing commitments negotiated by PG&E – which enable PG&E to obtain financing in the capital markets on better terms than those negotiated with the backstop parties – the Bondholder Group's equity and debt financing is almost entirely limited to members of the Bondholder Group. Amended Term Sheet, *New Money Investment In PG&E Corp.* The Bondholder Group would force PG&E to take the financing even if it can obtain better terms elsewhere (which it can, as demonstrated by the equity backstop commitments and debt financing letters PG&E already has obtained). In contrast, PG&E's negotiated commitments afford it flexibility to raise debt and equity in the capital markets while ensuring that necessary financing remains in place if more favorable terms are not available elsewhere.

In exchange for the exclusive right to purchase these bargain-priced securities, together with a commitment to backstop the issuance of $8 billion in new PG&E secured debt, the Bondholder Group would pay itself approximately *$670 million in fees*. Amended Term Sheet, *New Money Investment In PG&E Corp.* This would further overpay the Bondholder Group and potentially violate section 1123(a)(4) of the Bankruptcy Code, which requires that a plan "provide the same treatment for each claim or interest of a particular class." 11 U.S.C. § 1123(a)(4); *see, e.g.*, *In re Washington Mut., Inc.*, 442 B.R. 314, 360-61 (Bankr. D. Del. 2011) (plan violates section 1123(a)(4) by preventing smaller class members from participating in a rights offering available to larger class members); *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 363-64 (S.D.N.Y. 2007) ("[T]here is a substantial possibility that Appellants will succeed in their argument that the distribution of certain benefits to some claimants but not others within a class violates section 1123(a)(4).").

Wildfire Claim Treatment. At the same time, a plan based on the Bondholder/TCC bid would irrevocably transfer $14.5 billion away from PG&E and into a trust dedicated to payment

---

[7] For example, the new notes would carry an interest rate of 7.5% and prohibit PG&E from repaying them at any time in the first five years after the effective date, with prepayments after five years possible only with payment of a very large premium (7.5% premium after year five and 3.75% after year six). Amended Term Sheet, *New PG&E Corp. Senior Unsecured Notes*, and ECF 3962, Exhibit B.

of individual wildfire claims.  Neither PG&E nor the Court would have oversight over the payment of claims from the trust.  Instead, the trust would be administered and governed by persons selected by the TCC, who would consider and determine not only the claims of wildfire plaintiffs but also of their attorneys.  *See* Amended Plan Term Sheet, *Fire Victims Claim Trust*.  In the unlikely event any funds remain after claims are paid, the excess would be donated to the California wildfire fund and none would be returned to PG&E.  *Id.*

As a consequence, the Bondholder/TCC bid would dedicate an enormous sum of money ($14.5 billion) to the payment of wildfire claims that no one – not the TCC, not the Bondholder Group – has quantified or analyzed in any meaningful way.  Indeed, the deadline for claimants simply to assert claims has not even occurred yet.  This would be objectionable if the trust or entity overseeing the liquidation and payment of those claims was concerned with the merits of the claims.  It is especially objectionable here, where the TCC would appoint the very people who would determine whether and to what extent the claims of its own members (and the claims of other plaintiffs represented by the attorneys who represent the members of the TCC) get paid.

All of this would be accomplished at the expense of current shareholders, including thousands of individuals who purchased PG&E shares as a conservative investment for retirement accounts and college funds, as well as large pension funds like CalPERS and CalSTRS entrusted with the retirement security of millions.  There is, however, one notable exception.  The Bondholder Group and TCC propose to protect PG&E employee and retiree shareholders – but only those shareholders and no others – from the massive dilution contemplated by the Bondholder/TCC bid.  Amended Term Sheet, *Other Employee Matters* ("all PG&E Corp. common stock currently held by employees and retirees in pension accounts, 401(k) accounts and company-sponsored plans will be trued-up for any dilution on account of the Plan with new equity issuances within 90 days after the Effective Date").  This overt discrimination and disparate treatment among PG&E shareholders independently renders any plan based on the Bondholder/TCC bid unconfirmable.  11 U.S.C. §§ 1123(a)(4), 1129(b).

Finally, if implemented, a plan based on the Bondholder/TCC bid – and its contemplated dilution of non-employee shareholders by 99.9% – almost certainly would result in a change of

control, thereby destroying PG&E's net operating losses. Those NOLs could serve as an important source of value for satisfaction of claims, ongoing operations, and partial recovery of shareholder losses incurred as a result of unreimbursed wildfire damages.[8] The willingness of the Bondholder Group and TCC to forgo that value speaks to the lack of good faith associated with their bid.

## IV.   TERMINATION OF EXCLUSIVITY WILL NOT ELIMINATE CLAIMS ESTIMATION OR TUBBS LITIGATION

One underlying premise of the Motion is that termination of exclusivity to enable a plan based on the Bondholder/TCC bid to proceed "may avoid the need for a lengthy and uncertain estimation process to determine the Debtors' aggregate wildfire liability, as well as the state court trial with respect to the Tubbs fire, providing the Debtors with a clear path to resolution of these cases." Motion ¶ 3; Tr. 118:11-14 ("MR. STAMER:  from our perspective, and I think from the tort claimants' perspective, and hopefully from the subrogation claimants' perspective, it should moot the estimation process.").

It is easy to see why the TCC and wildfire plaintiffs would want this to be the case.  They want to avoid litigation over whether PG&E is liable for the Tubbs fire notwithstanding CalFire's thorough investigation and determination to the contrary.  They want to avoid judicial estimation – after fulsome discovery and litigation – of the actual amount of PG&E's wildfire exposure. Instead, they want to put the issue of wildfire liabilities up for bid.  As counsel for the Singleton plaintiffs bluntly put it, "the chances of fire victims getting fully, fully, fully compensated is going to come through a competitive process. . . .  TCC and bond holders may put up more money than Judge Donato does, and it may – if they put up enough money, to a certain extent, it may moot out estimation." Tr. 84:2-16 (comments of Mr. Marshack); ECF 4056 at 4 ("Wildfire

---

[8]   A potential change of control also introduces significant regulatory risk, as the CPUC cannot approve a transaction resulting in a change of control unless it determines, among many other things, that it will "[p]rovide[] short-term and long-term economic benefits to ratepayers" and "[e]quitably allocate[], where the commission has ratemaking authority, the total short-term and long-term forecasted economic benefits, as determined by the commission, of the proposed merger, acquisition, or control, between shareholders and ratepayers[, such that] [r]atepayers shall receive not less than 50 percent of those benefits." CAL. PUB. UTIL. CODE § 854.

1  Victims will probably not support the plan knowing that TCC is offering $14.5 billion to non-
2  subro Wildfire Victims as compared to $8.4 billion offered by the Debtor.").

3       But this is absurd.  This case is not about "putting up more money than Judge Donato" or
4  "offering" more for wildfire claims.  It is not about "bidding up the torts" as the Bondholder
5  Group's lead representative – Elliott Capital Management – has threatened.  It is about
6  determining the appropriate amount of money necessary to satisfy PG&E's wildfire liabilities in
7  full.  The fact is that, absent an arms-length settlement with PG&E, the wildfire liabilities *must* be
8  estimated or adjudicated prior to or as a part of confirmation.  11 U.S.C. § 502(c)(1) ("There *shall*
9  be estimated for purpose of allowance under this section any contingent or unliquidated claim, the
10  fixing or liquidation of which, as the case may be, would unduly delay the administration of the
11  case.") (emphasis added).  Wildfire claimants cannot unilaterally liquidate their unliquidated
12  claims by decree.

13       And without estimation or adjudication, the Court cannot possibly determine whether a
14  plan based on the Bondholder/TCC bid would satisfy the absolute priority rule of section 1129(b)
15  or whether $14.5 billion (with no possibility that any funds are returned to the estate) will exceed
16  the allowed amount of wildfire claims:

17       The second major component of the "fair and equitable" requirement is that no
         creditor or interest holder be paid a "premium" over the allowed amount of its
18       claim.  Once the participant receives or retains property equal to its claim, it may
         receive no more.  The reason for this rule is obvious, and goes back to the basic
19       understanding between debt and equity.  Holders of debt traditionally contract for
         repayment of principal and interest, but no more; after that, the residual goes to
20       equity.

21  7 COLLIER ON BANKRUPTCY ¶ 1129.03[4][a][i] (16th ed. rev. 2019); *see, e.g.*, *In re Trans Max*
22  *Techs., Inc.*, 349 B.R. 80, 89 (Bankr. D. Nev. 2006) ("One component of fair and equitable
23  treatment is that a plan may not pay a premium to a senior class.") (valuation of the debtor
24  "ensures that no class surviving confirmation will be paid more than in full through the capture of
25  value that rightly belongs to the eliminated class"); *In re Victory Constr. Co.*, 42 B.R. 145, 155
26  (Bankr. C.D. Cal. 1984) ("It is clear that the drafters intended the court to deny confirmation
27  where the plan proposes to pay more than 100 percent to a senior class without the consent of a
28  junior.").

Unsurprisingly, the Bondholder Group and TCC have cited no authority – and the PG&E Shareholders are aware of none – authorizing a large scale transfer of estate funds in satisfaction of purported estate liabilities that have not been adjudicated, estimated, or settled by the debtor or another representative of the bankruptcy estate. Whether there is one plan, two plans, or more, the Court cannot proceed to confirmation of any plan that provides for such a transfer absent either an informed arms-length settlement or judicial resolution through adjudication or estimation. The estimation process – conducted by the District Court after fulsome discovery and evidentiary proceedings – is necessary to ensure that PG&E is not forced to overfund a wildfire claims trust based on "bids" by the Bondholder Group with shareholders' equity.

That is precisely why the California Legislature required, as a condition to participation in the new statewide wildfire insurance fund, that the Court determine that PG&E's plan of reorganization "provides funding or establishes reserves for, provides for the assumption of, or otherwise provides for satisfying any prepetition wildfire claims . . . *in the amounts agreed upon in . . . any post-insolvency settlement agreements, authorized by the court through an estimation process or otherwise allowed by the court*." CAL. PUB. UTIL. CODE § 3292(b)(1)(B) (emphasis added). Because it lacks a true settlement or a mechanism for court estimation or allowance, the Bondholder/TCC bid cannot satisfy that requirement and imperils PG&E's ability to participate in the new insurance fund.

The risk of plaintiff overpayment under the Bondholder/TCC construct is no idle concern. At the TCC's urging, the Court set a very "late" bar date (Tr. 129:10) and authorized claimants to file proofs of claim without listing or identifying their alleged damages. That bar date has not yet occurred and the TCC recently expressed concern that relatively few proofs of claim have been filed to date. ECF 3931 at 5 ("only a handful of wildfire claims – under 1,500 – have been filed to date"); Tr. 127:3-11 ("MR. PITRE: "[W]e may be coming before you and asking for an extension of time for the claims process. I want to see, everybody wants to see how well this process is working. But I'm very concerned. I'm very concerned that we are not getting in the requisite claims that should come in based on what we believed, in good faith, are the number of people . . . who have been impacted."). As a result, the claims filed to date provide virtually no

indication of even the *asserted* wildfire liabilities, much less the actual allowed amount of those liabilities.

It is clear from the claims filed to date that a scrupulous review process in fact will be necessary.  According to the official claims agent (Prime Clerk), of the 725 wildfire proofs of claim asserting a specified damage amount filed through September 26, 2019, approximately 85 claims (more than 10%) seek amounts of $2 million or more.  The claims include one seeking $280 million in damages and another seven seeking $10 million or more.  Without further information, the Court must assume that at least a sizable number of wildfire proofs of claim will be filed in inflated amounts.  Moreover, the wildfire claims register already is riddled with duplicative claims, which are likely to multiply as the bar date approaches.  This is an additional reason why estimation will remain a critical part of any confirmation process going forward.

## V. TERMINATION OF EXCLUSIVITY WILL NOT PROMOTE "COMPETITION" OR SETTLEMENT

Many supporters of the Motion claim that exclusivity should be terminated in order to promote "competition."  ECF 4049 (UCC) ¶ 5 ("competition may result in the Debtors becoming more transparent and cooperative, and will continue to generate improvements in both plans that serve to increase the likelihood of a successful outcome in these cases"); ECF 4051 (BOKF) at 2 ("a competitive, two-plan process"); ECF 4048 (TURN) at 2 ("Competition among plans"); ECF 4046 (IBEW) at 2 ("The IBEW continues to support plan competition").

But, as explained above, the "competition" presented by the Bondholder/TCC bid – in the form of inflated "offers" to pay more than the allowed amount of claims – is not the sort of "competition" the Bankruptcy Code seeks to foster.  And the suggestion that the true progress in this case, in the form of PG&E's multi-billion dollar settlements with the public entity and insurance claimants, is the product of "competition" is simply false.  Consider that PG&E announced its settlement with the public entities on June 19, 2019.  Six days *later*, on June 25, the Bondholder Group filed its first motion seeking to terminate exclusivity.  After exclusivity had been extended, PG&E announced its settlement with the insurers on September 13, 2019.  Six

1  days *later*, on September 19, the Bondholder Group and TCC filed the Motion seeking yet again

2  to terminate exclusivity.

3        It is not "competition" or the threat of "competition" driving progress in the case.  Rather,

4  the Bondholder Group is reacting to legitimate progress by attempting to up the ante in its

5  increasingly desperate attempt to take over PG&E.  Despite the Bondholder Group's repeated

6  attempts to undermine and terminate exclusivity, with all of the distraction and litigation those

7  attempts have engendered, PG&E has made substantial progress.  It is reasonable to expect that

8  the pace of progress will accelerate once the Court makes clear that PG&E will have a full and

9  fair shot at confirming its Plan.

10  **VI.  ATTACKS ON PG&E'S PLAN ARE UNFOUNDED**

11        In the Motion, the Bondholder Group and TCC attack PG&E's Plan as "drastically

12  underfunded" and "severely undercompensat[ing] key impaired constituencies, most notably the

13  wildfire victims and the holders of Funded Debt Claims."  Motion ¶ 14.  These contentions are

14  easily dispensed.

15        First, the Bondholder Group and TCC assert that PG&E "do[es] not have committed

16  financing to fund" the Plan.  Motion ¶ 15.  To the contrary, as PG&E previously announced, it

17  has "received aggregate equity commitments in excess of the[] $14 billion target amount from a

18  broad array of investors, including current shareholders."  ECF 3980 at 1.  PG&E also now has

19  obtained commitments for the debt financing component of the Plan.

20        Next, the Bondholder Group and TCC assert that "the aggregate caps on wildfire claims

21  proposed in the [] Plan are entirely inadequate, and instead of encouraging a consensual

22  resolution with the TCC and individual victims, will assuredly encourage these parties to continue

23  litigating and seeking a significantly higher estimation for the Debtors' wildfire liabilities in the

24  pending estimation proceeding."  Motion ¶ 17.  But that is the point of the estimation proceeding.

25  If the parties are unable to reach a settlement, the District Court will determine the appropriate

26  aggregate amount of wildfire liabilities for purposes of PG&E's Plan.  The purported concern that

27  estimation litigation "will likely extend these cases far beyond the June 30, 2020 deadline," *id.*, is

28  unfounded given that Judge Donato already has indicated that he will be prepared to commence

1    estimation hearings by mid-January, at the latest.[9]  If Judge Donato's estimated amount of

2    wildfire liabilities exceeds $8.4 billion – the current condition to effectiveness of the Plan –

3    PG&E can amend the Plan to accommodate the higher amount if it determines it is appropriate to

4    do so.

5         The Bondholder Group and TCC also decry the Plan's treatment of bondholder claims for

6    postpetition interest and alleged make-whole premiums.  Motion ¶¶ 19-20.  The Court has now

7    ordered those issues to be litigated well before confirmation (Tr. 137:17-138:6), meaning that

8    disputes over bondholder entitlements pose no risk to confirmation of the Plan by June 30, 2020.

9    Notably, PG&E's Plan is drafted to accommodate whatever findings the Court makes in this

10   regard.  Plan § 4.16(a) ("if it is determined that any holder of a Utility Funded Debt Claim is

11   entitled to payment of a make-whole or similar amount or that postpetition interest is payable at a

12   rate other than the Federal Judgment Rate, the treatment of such Claim shall be modified in a

13   manner to render the Claim Unimpaired").  This hardly is "play[ing] fast and loose . . . with the

14   concept of 'impairment'" as the Bondholder Group and TCC allege.  Motion ¶ 19.

15        Finally, the Bondholder Group and TCC argue that the Plan "violates the absolute priority

16   rule" because it entitles shareholders to a distribution.  Motion ¶ 21.  But this is just a rehash of

17   the arguments respecting estimation of wildfire liabilities and impairment of bondholder claims.

18   The Plan is designed to reserve for or satisfy in full every allowed or estimated claim.  As shown

19   above, holders of those claims (including the Bondholder Group and the TCC's constituents)

20   cannot invoke the absolute priority rule in the face of Plan treatment that will completely satisfy

21   every dollar of their allowed claims.

22   **VII.   CONCLUSION**

23        For all of these reasons, there is no cause to terminate exclusivity.  PG&E has made

24   tremendous progress towards confirmation and a chapter 11 exit by June 30, 2020, most recently

25   through its $11 billion settlement of insurance subrogation claims and negotiation of $14 billion

26   in Plan financing backstop commitments.  The Bondholder/TCC bid is an attempt to use estate

---

27   [9]   The professed concern over the June 30, 2020, deadline is ironic given that, as explained
28        above, the Bondholder/TCC bid would cause PG&E to lose access to the statewide wildfire
         insurance fund, which is the only reason that the June 30 legislative "deadline" is relevant.

value to pay bondholders more than they are owed and enable wildfire plaintiffs to avoid a full and fair assessment of PG&E's wildfire liabilities through the judicial process. Far from advancing these cases, it would destroy billions of dollars of value, create significant additional litigation, imperil PG&E's exit, and foreclose its ability to participate in the statewide wildfire insurance fund.

The PG&E Shareholders thus respectfully submit that the Court should deny the Motion and give PG&E the opportunity to pay allowed claims in full and maximize value for all stakeholders. The PG&E Shareholders support mediation of the existing disputes in the case and join PG&E's request that the Court order mediation at the earliest possible date.


Dated: October 4, 2019                    JONES DAY


                                          By: */s/ James O. Johnston*
                                              James O. Johnston

                                          *Attorneys for PG&E Shareholders*