WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C. (*pro hac vice*)
(ray.schrock@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors*
*and Debtors in Possession*

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>    - and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>                    **Debtors.**<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☑ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Case No. 19-30088 (DM) Chapter 11 (Lead Case) (Jointly Administered)<br><br>Related Dkt. Ref Nos.: 3940 and 4006<br><br>**DEBTORS' OBJECTION TO JOINT MOTION OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS AND AD HOC COMMITTEE OF UNSECURED NOTEHOLDERS TO TERMINATE THE DEBTORS' EXCLUSIVE PERIODS PURSUANT TO SECTION 1121(d)(1) OF THE BANKRUPTCY CODE**<br><br>Date:   October 7, 2019<br>Time:  10:00 a.m. (Pacific Time)<br>Place:  United States Bankruptcy Court<br>          Courtroom 17, 16th Floor<br>          San Francisco, CA 94102<br>**Obj. Deadline**: Oct. 4, 2019, noon (PT) |

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this objection (the "**Objection**") to the *Joint Motion of the Official Committee of Tort Claimants and Ad Hoc Committee of Senior Unsecured Noteholders to Terminate the Debtors' Exclusive Periods Pursuant to Section 1121(d)(1) of the Bankruptcy Code* [Dkt. No. 3940] (the "**Termination Motion**").[1]

---

[1]    Capitalized terms used but not herein defined shall have the meanings ascribed to such terms in the Termination Motion.

# **Table of Contents**

Table of Contents ................................................................................................................ 1

Table of Authorities .......................................................................................................... 1

Preliminary Statement ....................................................................................................... 1

The Termination Motion Should be Denied ..................................................................... 9

I.     The Debtors Have Made Significant Progress towards Confirmation of Their Plan and a Successful and Timely Emergence from Chapter 11 ............................................ 11

II.    The Elliott Plan Does Not Represent a Settlement or Good Faith Resolution of the Wildfire Claims, is Designed Solely to Enrich the Members of the Ad Hoc Committee, and is Not Viable. ................................................................................. 16

    A.     The Elliott Plan Is Not a Settlement or Good Faith Resolution of the Wildfire Claims .. 16

    B.     The Elliott Plan is Designed to Enrich Elliott and the Other Noteholders and to Allow the Members of the Ad Hoc Committee to Seize Control of the Debtors at a Substantial Discount to Current Values. ................................................................. 20

    C.     The Elliott Plan Discriminates Unfairly in Violation of Section 1123(a)(4) of the Bankruptcy Code and, Therefore, Fails to Satisfy the Requirements of Section 1129(a)(1) of the Bankruptcy Code. ..................................................................... 22

    D.     The Elliott Plan Faces Substantial Obstacles to Securing CPUC Approval as Required under AB 1054. ................................................... 23

    E.     The Elliott Plan Raises Significant Questions Regarding the Timing and Attainability of Required FERC Approvals. .......................................... 25

    F.     The Elliott Plan Will Result in a Change in Control and the Potential Loss of the Debtors' Valuable Net Operating Losses ................................ 26

III.   The Court Should Order Mediation. ...................................................................... 26

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

# **Table of Authorities**

**Page(s)**

**Cases**

*In re Arnold*,
    471 B.R. 578 (Bankr. C.D. Cal. 2012)...........................................................................15

*In re Cardelucci*,
    285 F.3d 1231 (9th Cir. 2002) ................................................................................4, 14, 22

*In re Energy Conversion Devices, Inc.*,
    474 B.R. 503 (Bankr. E.D. Mich. 2012) ............................................................10, 16

*In re Express One Intern., Inc.*,
    194 B.R. 98 (Bankr. E.D. Tex. 1996) ..............................................................................16

*Matter of Fansteel, Inc.*,
    No. 16-01823-ALS11, 2017 WL 782865 (Bankr. S.D. Iowa Feb. 28, 2017)........................10, 11

*In re Fountain Powerboat Indust., Inc.*,
    2009 WL 4738202 (Bankr. E.D.N.C. Dec. 4, 2009).............................................10, 11, 16

*Funderburg v. United States*,
    No. C 02-05461 JW, 2004 WL 3080343 (N.D. Cal. Dec. 6, 2004)............................17

*Healthpoint, Ltd. v. Comm'r*,
    102 T.C.M. (CCH) 379 (T.C. 2011) ..............................................................................17

*In re Lichtin/Wade, L.L.C.*,
    478 B.R. 204 (Bankr. E.D.N.C. 2012) ..........................................................................10

*In re New Meatco Provisions*,
    No. 2:13-BK-22155-PC, 2014 WL 917335 (Bankr. C.D. Cal. Mar. 10, 2014)............................10

*Peter Culley & Assocs. v. Superior Court*,
    10 Cal. App. 4th 1484, 13 Cal. Rptr. 2d 624 (1992) ..............................................17

*In re Pine Run Tr., Inc.*,
    67 B.R. 432 (Bankr. E.D. Pa. 1986) ........................................................................15, 16

*Scottsdale Ins. Co. v. Dickstein Shapiro LLP*,
    389 F. Supp. 3d 794 (C.D. Cal. 2019) ..........................................................................17

*In re Situation Mgmt. Systems, Inc.*,
    252 B.R. 859 (Bankr. D. Mass. 2000) ..........................................................................11

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

*In re Smart World Technologies*,
   423 F.3d 166 (2d Cir. 2005)..................................................................................18, 19

*In re Standard Mill Ltd. P'ship*,
   No. BKY 4-96-2656, 1996 WL 521190 (Bankr. D. Minn. Sept. 12, 1996) ...............................11

*In re Texaco, Inc.*,
   81 B.R. 806 (Bankr. S.D.N.Y. 1988) ..................................................................11

*Wolf v. Weinstein*,
   372 U.S. 633, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963) ..........................................19

**Statutes**

11 U.S.C. § 1121 .................................................................................. *passim*

11 U.S.C. § 1123(a)(4) ..........................................................................22, 23

11 U.S.C. § 1124 ........................................................................................14

11 U.S.C. § 1129 ..........................................................................................6

11 U.S.C. § 1129(a)(1) ...........................................................................22, 23

11 U.S.C. § 1129(b)(2)(B) ...........................................................................15

Cal. Pub. Util. Code § 854(b)(1) ...............................................................24

Cal. Pub. Util. Code § 854(c) .....................................................................24

Cal. Pub. Util. Code § 3292(a)(1)(C) .........................................................24

Cal. Pub. Util. Code § 8389(e)(4) ..............................................................24

Cal. Pub. Util. Code § 8389(e)(6) ..............................................................24

ERISA ....................................................................................................6, 23

**Other Authorities**

Assembly Bill 1054.............................................................................. passim

Bankruptcy Rule 9019............................................................................18, 19

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Preliminary Statement**

As this Court appropriately recognized at the status conference on September 24, 2019 (the "**September 24 Status Conference**"), the Debtors have made substantial progress in these cases towards a timely and confirmable plan of reorganization. Indeed, in one of the largest and most complex chapter 11 cases in history, the Debtors have accomplished in eight months what debtors in other mass tort chapter 11 cases have taken years to accomplish.

Notwithstanding this undeniable progress and a mere five weeks after the Court issued its decision denying their first motion to terminate exclusivity, the Ad Hoc Committee of Senior Unsecured Noteholders (the "**Ad Hoc Committee**") through Elliott Management ("**Elliott**"), a well-known corporate activist hedge fund, and the Official Committee of Tort Claimants (the "**TCC**") having agreed among themselves as to how to divide the Debtors' estates, filed their joint motion [Dkt. No. 3940] (the "**Termination Motion**") seeking to immediately terminate the Debtors' exclusive periods to file their own chapter 11 plan (as thereafter amended on September 25, 2019, the "**Elliott Plan**") as outlined in their Term Sheet for Plan of Reorganization [Dkt. No. 4006] (the "**Elliott Plan Term Sheet**"). For the reasons set forth herein, the Termination Motion should be denied.

Notably, the Ad Hoc Committee is not seeking to file the Elliott Plan for the purpose of recovering on their prepetition funded debt claims, because, as the Court knows, all prepetition funded debt will be paid in cash, in full, under the *Debtors' First Amended Joint Chapter 11 Plan of Reorganization* [Dkt No. 3966] (as may be further amended, modified, or supplemented, the "**Debtors' Plan**"). Elliott and the Ad Hoc Committee can neither ask for nor are they entitled to anything more. Undeterred by their 100% recovery under the Debtors' Plan, and in complete disregard of the interests of PG&E's customers and California policy goals, Elliott and the Ad Hoc Committee press on, revealing their true, impermissible objectives: to acquire the equity of the Reorganized Debtors at a substantial discount and to receive an unjustifiable windfall on their prepetition funded debt claims, to the tune of several billion dollars, by needlessly reinstating their

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

high coupon, above market long-term debt, and paying postpetition interest at the contract rate, all at the expense of other economic stakeholders and the Debtors' 15 million customers and ratepayers.

To accomplish this goal, Elliott has partnered with the TCC to do a deal to overpay each other with the Debtors' assets and to compromise and settle the Debtors' liabilities with estate assets in direct contravention of applicable law. Further, Elliott and the TCC seek to impose their self-negotiated and self-centered "bargain" on all other stakeholders before the claims bar date and in the absence of the TCC or its constituency presenting any evidence to support the magnitude of claims Elliott has taken upon itself to settle, including, undoubtedly vast sums of the proposed settlement amount being allocated to attorneys' fees and not to the victims themselves.[2] It is not difficult to understand the TCC's attraction to what Elliott has proposed with the Debtors' assets – $14.5 billion being transferred to a trust without any proof of the magnitude of liability – with the entire $14.5 billion to be managed by a trustee handpicked by the TCC who is to be supervised by an "oversight" committee also handpicked by the TCC.

The UCC's support for the Termination Motion hardly is surprising. The Elliott Plan, as stated, proposes to needlessly pay the UCC's constituency postpetition interest at the contract rate (instead of the lower federal judgment rate as provided by settled Ninth Circuit authority) and to reinstate its constituency's above-market debt. In addition, the UCC's unfounded assertion that the Debtors have not engaged with the UCC rings hollow. As this Court itself has appropriately noted, there is no compelling reason for the Debtors to engage in plan negotiations with the UCC when the Debtors' Plan always has provided for the payment of the claims of the UCC's constituency in full.

Elliott's and the TCC's desire to trample the interests of other parties to pursue their parochial goals is aptly demonstrated by the response of Mr. Frank Pitre, one of the lead plaintiffs'

---

[2]   Notably, the Ad Hoc Committee's prior plan term sheet allocated $1.15 billion of the approximately $7.2 billion total amount to be distributed to the TCC's constituencies for attorneys' fees. With the total amount to be distributed to the trust now increased to $14.5 billion as provided in the Elliott Plan, one can only logically assume that the amount to be paid for attorneys' fees has increased by orders of magnitude.

2

attorneys, to Elliott when being advised of the Debtors' recent settlement with the Ad Hoc Committee of Subrogation Claimants (the "**Ad Hoc Subrogation Group**"), in which Mr. Pitre stated "Let's get our deal done *and screw them all*!". *See* Email from Frank Pitre to Jeff Rosenbaum of Elliott (Sept. 13, 2019, 10:12:51 am) (emphasis added), a copy of which is attached hereto as **Exhibit A**.

The substantial progress that the Debtors have made in the administration of these Chapter 11 Cases and towards the timely and successful confirmation of the Debtors' Plan is undeniable. Simply by way of example:

- The Debtors effected a smooth transition into chapter 11, avoiding any significant business disruptions or dislocations that are normally attendant to the commencement of any chapter 11 case;

- The Debtors promptly restored their trade credit and their relationships with their suppliers and business partners, at a substantial savings to their estates;

- Despite objections by the TCC and the UCC, the Debtors established a $100 million fund for those fire victims with immediate need of housing assistance;

- The Debtors replaced substantially all of the members of their respective Boards of Directors with individuals having significant safety, industry, and restructuring expertise;

- The Debtors retained a new Chief Executive Officer of PG&E Corp. and a new Chief Executive Officer of the Utility, each with decades of safety and industry experience, and have made several other senior leadership changes with respect to their gas and electric businesses;

- The Debtors have implemented one of the most robust and comprehensive noticing campaigns in chapter 11 history to provide wildfire claimants with more than adequate notice of the deadline and procedures for filing claims in the Chapter 11 Cases;

- The Debtors reached a comprehensive settlement with 18 public entities (the "**Public Entities**"), resolving all of their respective wildfire claims for an aggregate sum of $1 billion to be implemented pursuant to the Debtors' Plan;

- The Debtors reached a comprehensive settlement (the "**Subrogation Claims Settlement**") with the Ad Hoc Subrogation Group resolving the approximately $20 billion in asserted subrogation claims that relate to the 2017 and 2018 wildfires (the "**Subrogation Claims**" and the holders of Subrogation

3

Claims, the "**Subrogation Claimants**") for $11 billion, a 45% discount, to be implemented pursuant to the Debtors' Plan;[3] and

- As detailed below, the Debtors have obtained commitments for $14 billion in new equity capital, and recently received debt financing commitments for $34.35 billion from leading money center banks to implement the Debtors' Plan on terms far superior to the financing related to the Elliott Plan.

Moreover, just seven months after the inception of these Chapter 11 Cases, on September 9, 2019, the Debtors filed their initial *Joint Chapter 11 Plan of Reorganization* [Dkt. No. 3841]. The Debtors quickly built on that plan, and on September 23, 2019, after fully documenting their settlement with the Ad Hoc Subrogation Group, the Debtors filed the Debtors' Plan.

As noted, the Debtors' Plan incorporates the two settlements, one with the Public Entities and the other with the Ad Hoc Subrogation Group. In addition, the Debtors' Plan renders all funded debt unimpaired, despite the misleading and incorrect assertions in the Termination Motion to the contrary. As expressly set forth in the Debtors' Plan, even in the unlikely event that the Debtors do not prevail on the applicability of postpetition interest at the federal judgment rate to refinance funded debt as this Court recognized and as is plainly dictated by controlling Ninth Circuit precedent (*see In re Cardelucci*, 285 F.3d 1231, 1234 (9th Cir. 2002)), and even if the Debtors do not prevail on the fact that no make-whole amounts are payable under applicable law or under the express terms of the relevant indentures, the Debtors' Plan nevertheless provides that it will be amended to render the funded debt claims unimpaired. And in that very unlikely event, the Debtors have the funds to do so.

As previously announced, the Debtors have received fully-executed equity commitments in excess of their $14 billion target amount from a broad array of investors, including current shareholders, for the equity portion of the Debtors' Plan exit financing package. *See* Debtors' Form 8-K, dated September 30, 2019. Additionally, as reflected in **Exhibit B** annexed hereto, the Debtors have obtained debt-financing commitments to fully fund the Debtors' Plan,

---

[3] Ironically, while initially criticizing the Subrogation Claims Settlement, Elliott and the TCC have adopted it wholesale in their proposed plan term sheet. *See* Elliott Plan Term Sheet, at p. 2, 12, 16-17. Accordingly, the Debtors expect that the Ad Hoc Committee and the TCC will not be objecting to the RSA Motion (as defined below).

4

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

including the refinancing of their existing high-coupon funded debt, at a substantially lower cost.[4] As demonstrated below, the Debtors' debt and equity financing is substantially superior to the purported commitments and debt reinstatement referenced in the Elliott Plan Term Sheet, and does not strip value from the Debtors' other stakeholders or impose undue and unnecessary expenses on ratepayers.

And, as noted at the September 24 Status Conference, the CPUC has commenced its review process with respect to the Debtors' Plan; and with estimation proceedings as to the Debtors' Plan now limited to only one remaining wildfire claims class and proceeding on schedule, the Debtors' Plan is on track for confirmation prior to the June 30, 2020 deadline mandated in AB 1054.

Remarkably, the Debtors have achieved these results and made this substantial progress despite Elliott's interference, including the destabilizing effect this interference has had on the Debtors' employees. Both prior to and after the commencement of these Chapter 11 Cases, the Ad Hoc Committee led by Elliott has engaged in a calculated and deliberate effort to undermine the Debtors' ability to engage in constructive negotiations with their constituencies and to frustrate the Debtors' efforts to obtain legislative approval for low cost capital to fund their wildfire liabilities, all for one singular purpose – not to assure or protect a recovery on their prepetition claims – but to advance their strategic interests as potential investors to acquire the equity of the Reorganized Debtors at a huge discount to market, at the expense of ratepayers and other stakeholders. These activities include:

- Engaging in chapter 11 plan negotiations with a variety of constituencies despite the Debtors' Exclusive Periods being in effect;

- Making long-term commitments to the Debtors' union representatives, including committing to extending contract terms and wage increases in exchange for support for the Elliott Plan;

---

[4]  The Debtors have commitments from leading money center banks to provide financing upon the Debtors' emergence from chapter 11 in the amount of $34.35 billion, consisting of $27.35 billion of debt at the Utility and $7.0 billion at PG&E Corp. at pricing well-below that contemplated by the Elliott Plan.

5

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

- Engaging in a concerted lobbying effort in Sacramento to defeat any effort by the Debtors to obtain legislation for the issuance of equity-financed bonds to fund wildfire liabilities. *See* **Exhibit C** annexed hereto as merely one example; and

- Attempting to derail the settlement the Debtors achieved with the Ad Hoc Subrogation Group by seeking to purchase Subrogation Claims up until the time the ink was dry on the execution pages of the Subrogation Claims Settlement.

Quite simply, Elliott and the Ad Hoc Committee have run roughshod over the Debtors' exclusivity rights and are now asking the Court to bless the last step – the filing and solicitation of the Elliott Plan. These activities, undertaken for the sole purpose of advancing Elliott's and the Ad Hoc Committee's economic interests and takeover scheme, should not be countenanced by the Court, much less sanctioned by terminating the Debtors' Exclusive Periods. Such a result would be directly antithetical to the intent and purpose of chapter 11 and section 1121 of the Bankruptcy Code.

Further, fundamental flaws in the Elliott Plan also mandate that the Termination Motion be denied. These flaws include:

- Reinstating high-coupon long-term debt so bondholders receive postpetition interest at the contract rate, and above-market returns, when such debt could easily be refinanced at substantially lower rates. This not only results in a several billion dollar windfall to Elliott and the other bondholders, but also a needless imposition of billions of dollars on PG&E ratepayers and other parties in interest;

- Proposing to "true-up" existing equity held by employees and retirees (and not other shareholders) to avoid the massive dilution the Elliott Plan would impose on all shareholders in direct violation of section 1129 of the Bankruptcy Code, which requires that a plan not unfairly discriminate, and seemingly in violation of ERISA and other applicable law;

- Enabling Elliott and the Ad Hoc Committee to acquire the equity of the Reorganized Debtors at a substantial discount (approximately 17%) to the Elliott Plan's implied equity value and to the value it attributes to the stock to be distributed to fund the two wildfire trusts; and

- Elliott and the Ad Hoc Committee misappropriating the role of the Debtors as estate representatives in seeking to settle claims against the Debtors without having obtained court authority, and effectively doing so entirely with "other people's money" (*i.e.*, the public market equity value held by the Debtors'

6

current shareholders, including CalPERS, CalSTRS, T. Rowe Price, Vanguard, PG&E employees, and thousands of retail investors), all to further Elliott's and the Ad Hoc Committee's strategic investment interests.

The foregoing does not take into account the Debtors' substantial net operating losses ("**NOLs**") the Elliott Plan will jeopardize by reason of a change in control. It also does not take into account the obstacles the Elliott Plan will present to the CPUC approval process, including approval requirements by reason of a change in control, and the difficulty of Elliott's ability to address the many pending issues before the CPUC that must be resolved prior to confirmation. The Debtors' Plan does not present any of these risks or uncertainties, any one of which could jeopardize a timely and successful emergence from chapter 11.

Indeed, the unjustifiable economic windfall to the Ad Hoc Committee and the other bondholders under the Elliott Plan is plainly demonstrated by the following:

| Elliot Plan Provision | Economic Benefit |
|---|---|
| Purchase of Reorganized PG&E Equity at 17% Discount to Elliott Plan Value | $3.1 billion |
| Postpetition Interest at Contract Rate vs. Federal Judgment Rate | $500 million |
| Present Value of Excess Payments Resulting From Reinstatement vs. Refinancing | $1.3 billion |
| Backstop Fees | $670 million |
| **Total:** | **$5.570 billion** |

Further, the assertions made in the Termination Motion that granting the motion will dispense with the estimation proceedings are simply wrong. As an initial matter, even if exclusivity were terminated, the Debtors have the absolute right to continue to prosecute the Debtors' Plan, as the Court has appropriately recognized. The Debtors' Plan has the support of the Public Entities and the Subrogation Claimants, and absent a global settlement, requires that the claims of the TCC's constituency be estimated. Those estimation proceedings are moving forward on a timely basis.

The Elliott Plan, even if allowed to proceed, also will still require estimation. The Debtors' existing equity holders undoubtedly will contest the proposed treatment of the claims of the TCC's constituency under the Elliott Plan, thereby requiring an estimation of those claims.

7

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Rather than advancing these cases to a successful conclusion, a termination of exclusivity will have precisely the opposite result. It will galvanize the parties to their own plan proposals and frustrate any ability to achieve a comprehensive consensual resolution.

One key fact has become abundantly clear. The TCC's constituency has made it quite apparent that it is viewing these cases solely from the perspective of the Debtors' *ability to pay their claims*, rather than providing any evidence to support the billions they are seeking. This, obviously, is good enough for Elliott and the Ad Hoc Committee, each of which are more than willing to give away other people's money to enhance their own position. The Debtors, the only parties with fiduciary duties to all constituencies, however, cannot and are not prepared to do the same.

As the Debtors have made clear since the inception of these Chapter 11 Cases, they are ready, willing, and able to fairly and fully compensate the wildfire victims for their losses. As fiduciaries for all constituencies, however, that cannot be done in the absence of legitimate evidence being presented to support the billions of dollars that are being demanded, particularly where a significant portion of those dollars will go to attorneys' fees.

The last outstanding obstacle to moving swiftly to confirmation of the Debtors' Plan is determining the magnitude of the Debtors' liability to the TCC's constituency to be addressed in that plan. The appropriate mechanism to resolve this issue is not competing plans that will serve only to polarize the parties. Rather, the status quo should be maintained until, at the very least, the TCC and its constituents can provide actual evidence as to the magnitude of its constituency's claims, and that evidence can be appropriately evaluated.

In denying the Ad Hoc Committee's recent attempt to terminate the Debtors' Exclusive Periods, even prior to the filing of the Debtors' initial plan of reorganization on September 9, 2019, the Court stated as follows:

> The Debtors have placed before all a proposal that, if coaxed and guided to maturity should result in a proper outcome for all creditors without needing to deal with all of these other issues.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Memorandum Decision Regarding Motions to Terminate Exclusivity, August 16, 2019 [Dkt. No. 3569], at 4.

As the Court recognized, since that Decision, the Debtors have made substantial progress towards that "proper outcome," and that effort and progress should not be derailed by a competing plan that will surely frustrate any chance to achieve a global consensus.

As the Debtors requested at the September 24 Status Conference, in view of the current circumstances of these cases and the opportunity to achieve a fully consensual plan, the Court should appoint a mediator to facilitate that process. This is particularly appropriate now, where the TCC and its constituency have reduced their demand from a level well in excess of $20 billion to a level where perhaps differences can be bridged with the assistance of a skilled mediator with expertise in restructurings in chapter 11 cases. As this Court is well-aware, mediation was successful in the prior PG&E chapter 11 case and it can be successful here. This is not an effort to delay nor will it prejudice any party in interest. Rather, it is a request that the Court undertake every reasonable effort to assist the parties in achieving a fully consensual plan rather than dooming any chance of accomplishing that goal by allowing competing plans and the litigation morass that will undoubtedly unfold.

### The Termination Motion Should be Denied

Like the Ad Hoc Committee's prior efforts to terminate the Debtors' Exclusive Periods, the Termination Motion similarly fails to demonstrate cause to grant the extraordinary relief requested as it ignores the considerable good faith progress – "***major progress***" as the Court recently described – made by the Debtors to date with respect to the advancement of these Chapter 11 Cases. Hr'g Tr. (Sept. 24, 2019) at 45:2 (emphasis added). As stated, in addition to achieving the two fundamental settlements of their wildfire liabilities, the Debtors' Plan is fair, equitable, rate neutral to customers, complies with all of the requirements of the Bankruptcy Code and other applicable law, and ensures that the Debtors remain on track for timely confirmation and emergence from chapter 11 by June 30, 2019, as required under AB 1054.

9

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

The Ad Hoc Committee and the TCC have not sustained and cannot sustain their heavy burden required for the relief they are seeking. Indeed, based upon the facts and circumstances of these extraordinarily complex cases and the results the Debtors have achieved since these Chapter 11 Cases were commenced, terminating the Debtors' Exclusive Periods not only would be unprecedented in cases of this nature, it would be counterproductive to reaching a global resolution among the stakeholders and a substantial step backwards in the administration of these cases, to the detriment and prejudice of all parties in interest, including the State of California. The Court should not let this scenario unfold, particularly where it would facilitate Elliott and the other members of the Ad Hoc Committee obtaining an unjustified windfall.

The party seeking to terminate or modify a debtor's exclusive periods bears the burden of proof because it is the moving party who seeks the extraordinary relief to change the status quo. The burden of proof is a "heavy one" and termination of a debtor's exclusive periods should be granted "neither routinely nor cavalierly." *In re Energy Conversion Devices, Inc.*, 474 B.R. 503, 508 (Bankr. E.D. Mich. 2012) ("Therefore, 'cause' to reduce the exclusivity period should only be found in extraordinary circumstances."); *see also In re Lichtin/Wade, L.L.C.*, 478 B.R. 204, 215 (Bankr. E.D.N.C. 2012) (the Court "maintains the position that considering termination of an exclusivity period is a 'serious matter' and termination 'should be granted neither routinely nor cavalierly'") (quoting *In re Fountain Powerboat Indust., Inc.*, 2009 WL 4738202, *6 (Bankr. E.D.N.C. Dec. 4, 2009)); *Matter of Fansteel, Inc.*, No. 16-01823-ALS11, 2017 WL 782865, at *3 (Bankr. S.D. Iowa Feb. 28, 2017) ("A survey of case law reveals that finding cause to reduce or terminate exclusivity is the exception, not the rule.").

Although Courts often discuss much of the same criteria that is examined in connection with requests to extend exclusivity, *see, e.g.*, *In re New Meatco Provisions*, No. 2:13-BK-22155-PC, 2014 WL 917335 at *2 (Bankr. C.D. Cal. Mar. 10, 2014) (citing the nine *Dow Corning* factors to determine whether there is cause to extend or reduce exclusivity), Courts typically have found cause to terminate a debtor's exclusive periods *only* where the following circumstances exist: (a) gross mismanagement of the debtor's operations; (b) acrimonious relations

10

between the debtors' principals; and (c) use of the exclusive periods to force creditors to accept an unsatisfactory or unconfirmable plan. *See In re Texaco, Inc.*, 81 B.R. 806, 812 (Bankr. S.D.N.Y. 1988) ("In those cases where the exclusivity periods were reduced, factors such as gross mismanagement of the debtor's operations or acrimonious feuding between the debtor's principals were major obstacles to a successful reorganization and were regarded as 'cause' for the reduction of the exclusivity periods.") (internal citations omitted); *see also In re Situation Mgmt. Systems, Inc.*, 252 B.R. 859, 863 (Bankr. D. Mass. 2000) (same); *Matter of Fansteel, Inc.*, No. 16-01823-ALS11, 2017 WL 782865, at *3 (denying creditors committee's motion to terminate exclusive periods where there was no evidence that the time period since filing had been used by the debtors to coerce creditors to accept a plan, no delay in filing a plan as required by the Bankruptcy Code, no allegations of mismanagement or evidence of such conduct, and no evidence of an acrimonious relationship between the debtors' principals); *In re Fountain Powerboat Indust., Inc.*, 2009 WL 4738202, at *6 (denying creditor's motion to terminate exclusivity due to, among other things, a lack of any showing or allegations of gross mismanagement of the debtors or feuding between the debtor's principals); *In re Standard Mill Ltd. P'ship*, No. BKY 4-96-2656, 1996 WL 521190, at *1 (Bankr. D. Minn. Sept. 12, 1996) ("For example, factors such as the gross mismanagement of the debtor's operations, the debtor's failure to negotiate with creditors in good faith, the debtor's use of the exclusivity period to force creditors to accept a patently unconfirmable plan, and acrimonious feuding between the debtor's principals have constituted 'cause' to reduce the exclusivity period when they amounted to 'major obstacles to a successful reorganization.'"). None of these circumstances are present here.

I.      **The Debtors Have Made Significant Progress towards Confirmation of Their Plan and a Successful and Timely Emergence from Chapter 11.**

The amount of progress that the Debtors have achieved towards confirmation of the Debtors' Plan and their timely emergence from chapter 11 cannot be overstated. As the Court is aware, the Debtors have achieved two critical settlements of their wildfire liabilities to be satisfied and discharged pursuant to the Debtors' Plan. The first settlement fully resolves all of

11

the wildfire claims held by the 18 settling Public Entities for the aggregate amount of $1 billion. The second settlement, which is to be presented for approval to the Court at the hearing on October 23, 2019 [Dkt. No. 3992] (the "**RSA Motion**"), fully resolves all of the claims held by Subrogation Claimants in the asserted amount of approximately $20 billion for consideration in the amount of $11 billion, representing a 45% reduction. In addition, the Subrogation Claims Settlement – a true settlement and compromise by the Debtors of the Debtors' liabilities, that was the product of months of arms' length and good faith negotiations between adverse parties – dispenses with the pending estimation proceedings with respect to the Subrogation Claims, thereby significantly limiting the scope, cost, and expense of those proceedings and furthering the ability of those proceedings to move forward on a timely basis. These settlements significantly advance the Debtors' path to confirmation of the Debtors' Plan and their successful emergence from chapter 11 on a schedule that will meet the June 30, 2020 deadline established under AB 1054. The Debtors' Plan includes the following:

- Compensation of wildfire victims and certain limited public entities from a trust funded for their benefit in an amount to be determined in an estimation proceeding not to exceed $8.4 billion;

- Compensation of insurance subrogation claimants from a trust funded for their benefit in the amount of $11 billion in accordance with the terms of the Subrogation Claims Settlement and Restructuring Support Agreement (as defined in the RSA Motion);

- Payment of $1 billion in full settlement of the claims of the Public Entities relating to the wildfires;

- Payment in full, with interest at the federal judgment rate, of all prepetition funded debt obligations, all prepetition trade claims and all employee-related claims;

- Assumption of all power purchase agreements and community choice aggregation servicing agreements;

- Assumption of all pension obligations, other employee obligations, and collective bargaining agreements with labor;

- Future participation in the state wildfire fund established by Assembly Bill 1054; and

12

- Satisfaction of the requirements of Assembly Bill 1054.

The Debtors' Plan also is backed by equity commitments of $14 billion from a broad array of investors, including current shareholders, bondholders, and parties not currently invested in the Debtors' equity or debt securities. *See* Debtors' Form 8-K, dated September 30, 2019. These equity commitments serve as the foundation for the equity portion of a comprehensive financing package that will fund the Debtors' Plan and the Debtors' timely emergence from chapter 11. In addition, as noted, the Debtors have received commitments from several leading money center banks in the aggregate amount of $34.35 billion to provide the debt portion of the Debtors' Plan funding. These equity and debt commitments are substantially superior to those described in connection with the Elliott Plan. For example, the Debtors' equity commitments provide them with the flexibility to raise market-priced equity in the public and private debt markets while still ensuring that the needed capital will be available if those offerings are not able to be effected. Moreover, with the Debtors' committed financing, the Debtors' current shareholders at a minimum retain approximately 33% of the post-emergence equity (as compared to 0.1% under the Elliott Plan). That is the consequence of Elliott effectively transferring the public market equity value to the TCC's trust to buy their support for Elliott's proposed takeover of the Debtors. Additionally, with the CPUC review process now underway, the Debtors' Plan is on track to meet the June 30, 2020 deadline imposed by AB 1054.

With the filing of the Debtors' Plan and the achievement of the Subrogation Claims Settlement, the only principal obstacle to confirmation of the Debtors' Plan is the determination, either consensually or through the currently pending estimation proceedings, of the Debtors' aggregate liability to the uninsured and underinsured claimants and certain limited public entities represented by the TCC. As the Debtors have stated repeatedly, and despite the TCC's representations to the contrary, the Debtors are committed to working with the TCC, its professionals, and attorneys for individual groups of claimants to reach a fair and satisfactory

13

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

resolution of their constituencies' claims to further advance the administration of these Chapter 11 Cases and expedite recoveries and distributions to all wildfire claimants.[5]

Contrary to the mischaracterizations in the Termination Motion, the Debtors' Plan hardly is a placeholder; rather it is a fully-funded, confirmable plan, the product of extensive negotiations by the Debtors with adverse constituencies, and it represents a viable path forward for the successful conclusion of these cases. As an initial matter, the TCC and Ad Hoc Committee appear to deliberately misconstrue what constitutes impairment under a chapter 11 plan, or have a fundamental misunderstanding of the law and what constitutes impairment. It is absolutely clear that under all circumstances the unsecured funded debt claims in Class 3B of the Debtors' Plan are unimpaired within the meaning of section 1124 of the Bankruptcy Code. Simply put, because Ninth Circuit law plainly prescribes postpetition interest at the federal judgment rate as this Court itself appropriately noted in citing to *In re Cardelucci*, 285 F.3d 1231 (9th Cir. 2002),[6] and because neither the applicable prepetition funded debt agreements nor applicable law require the payment of make-whole premiums on a refinancing as provided in the Debtors' Plan, the unsecured funded debt claims are unimpaired – there can be no other conclusion. Indeed, under these circumstances, there is no economic justification to treat funded debt claims otherwise, and particularly no reason to reinstate those claims as set forth in the Elliott Plan, which would provide the Ad Hoc Committee and other bondholders with an unjustified windfall and would impose billions of dollars of costs on ratepayers and others.[7]

---

[5] Notwithstanding their assertions to the contrary, the Debtors and their advisors have participated in literally dozens of meetings and discussions with the TCC throughout the Chapter 11 Cases, which the TCC's own advisors confirmed in depositions and described the overall level of engagement of the Debtors and their advisors as "positive". *See* Tr. Brent C. Williams (Oct. 3, 2019), a copy of which is attached hereto as **Exhibit D**, at 9:24-11:21.

[6] *See* Hr'g Tr. (Aug. 13, 2019) at 85:23-25, 86: 1-24.

[7] The Debtors do not comprehend how TURN, with an express mission to represent the interests of individual, small business, and other ratepayers, and to protect customers, could rationally support termination of the Exclusive Periods to allow the Elliott Plan to move forward.

14

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Nevertheless, the Debtors' Plan makes it clear that, in the unlikely event the Court determines that a holder of a funded debt claim is entitled to the payment of a make-whole premium or similar amount, or that postpetition interest is payable at a rate other than the federal judgment rate, the Debtors will amend their plan to render funded debt claims unimpaired as a result of those determinations. Debtors' Plan, at § 4.16. The Court has made it clear that it will resolve these issues well in advance of confirmation, thereby obviating any possible concern that these issues could be an impediment to confirmation of the Debtors' Plan.

Further, the Debtors' Plan does not in any way violate or run afoul of the absolute priority rule. The assertions made to the contrary in the Termination Motion that conveniently, or perhaps deliberately, neglect to refer to the complete provisions of section 1129(b)(2)(B) of the Bankruptcy Code, are wrong as a matter of fact and law. Under the Debtors' Plan, all Wildfire Claims, including those in Class 5B-III held by the TCC's constituency, will be paid in full, either by consensual resolution or as estimated in connection with the currently pending proceedings, all as required by AB 1054. Under these circumstances, the issue of impairment is irrelevant, and there is absolutely no prohibition on existing equity receiving a distribution under the Debtors' Plan, whether or not the classes of wildfire claims vote to accept the Debtors' Plan. Section 1129(b)(2)(B)(i), which the Termination Motion simply ignores, makes it abundantly clear that where, as here, all Wildfire Claims are being paid in full, a distribution to junior classes, including existing equity, is entirely permissible. *See In re Arnold*, 471 B.R. 578, 594 (Bankr. C.D. Cal. 2012) ("In other words, a plan may not give 'property' to the holders of any junior claims or interests 'on account of' those claims or interests, unless all classes of senior claims either receive full value of their claims or give their consent.").

With now two of the three wildfire claim constituencies supporting confirmation of the Debtors' Plan, committed equity and debt financing assured, the CPUC approval process underway, and the estimation proceedings moving forward expeditiously, the Debtors have clearly demonstrated the type of progress that this Court and others have found to warrant a continuation of the Exclusive Periods. *In re Pine Run Tr., Inc.*, 67 B.R. 432, 435 (Bankr. E.D. Pa. 1986)

15

(extending the debtor's exclusive periods because "substantial progress has been made in negotiations that, all concede, are critical to a successful reorganization."); *In re Express One Intern., Inc.*, 194 B.R. 98, 101 (Bankr. E.D. Tex. 1996) ("The issue to be determined, however, is not whether some other plan may exist which provides greater recovery; the issue is whether debtor has been diligent in its attempts to reorganize.").[8] *Here it is not an issue of greater creditor recoveries, as the Debtors' Plan will pay both the noteholders and the wildfire claimants represented by the TCC in full; rather, it is a question of whether the Court will countenance one creditor group – led by Elliott – recovering more than what it is entitled to under the law, to the detriment of other stakeholders.* Accordingly, the Termination Motion should be denied.

## II. The Elliott Plan Does Not Represent a Settlement or Good Faith Resolution of the Wildfire Claims, is Designed Solely to Enrich the Members of the Ad Hoc Committee, and is Not Viable.

### A. The Elliott Plan Is Not a Settlement or Good Faith Resolution of the Wildfire Claims.

It is apparent that the Elliott Plan does not represent a true settlement or resolution of the claims of individual Wildfire claimants and will not expedite or advance these cases forward in any meaningful or beneficial way.

As the Court appropriately observed, the supposed "settlement" between the Ad Hoc Committee and the TCC is not a settlement of any dispute between parties that are genuinely adverse to each other. Hr'g Tr. (Sept. 24, 2019) at 63:5-7 (Court: "My question to you is what is

---

[8]  In the Termination Motion, the parties state that because the TCC now supports termination of exclusivity to pursue the Elliott Plan that alone should serve as a basis to terminate the Debtors' Exclusive Periods. The case law, however, is clear that the promise of a plan from a creditor that is dissatisfied with the debtor's plan is not cause to terminate the Exclusive Periods. *See In re Energy Conversion Devices, Inc.*, 474 B.R. 503, 508 (Bankr. E.D. MI 2012) ("Where creditors and parties in interest argue for termination of the exclusivity period on the basis that they are prepared to offer more favorable plans if the court were to terminate the exclusivity period, that does not constitute sufficient cause to cut short the debtor's window of opportunity opened by Congress 11 U.S.C. § 1121(b) and (c)."); *In re Fountain Powerboat Indust., Inc.,* 2009 WL 4738202, *7 (Bankr. E.D.N.C. Dec. 4, 2009) ("[Section 1121(d)] was specifically legislated by Congress and the Court should not without sufficient cause, reduce the time limits *based solely on the largest creditor's dissatisfaction with the proposed plan*.") (emphasis added).

16

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

the discrete settlement between the bondholders and the TCC? There's nothing to settle, is there? There's no dispute to begin with."). Rather, this purported settlement is nothing more than an agreement between the Ad Hoc Committee and the TCC to distribute the Debtors' estates' assets to enrich their own constituencies. It should not be respected or given any weight. *See e.g., Funderburg v. United States*, No. C 02-05461 JW, 2004 WL 3080343, at *1 (N.D. Cal. Dec. 6, 2004) (denying motion to approve settlement holding that "the Court is sensitive to the fact that the proposed settlement is not the product of a typical arms-length negotiation between parties with adverse interests."); *Scottsdale Ins. Co. v. Dickstein Shapiro LLP*, 389 F. Supp. 3d 794, 829 (C.D. Cal. 2019) ("An allocation that is collusive, and not the result of adverse negotiations between parties with competing interests, is suspect under California law, and the settlement and allocation should be rejected."); *Healthpoint, Ltd. v. Comm'r*, 102 T.C.M. (CCH) 379 (T.C. 2011) ("The requirement that parties involved in settlement negotiations be adverse is a factor in determining whether the final agreement reflected the true intentions of the parties involved."); *Peter Culley & Assocs. v. Superior Court*, 10 Cal. App. 4th 1484, 1498, 13 Cal. Rptr. 2d 624 (1992*), as modified on denial of reh'g* (Dec. 16, 1992) ("Where the parties have purported to settle an imaginary dispute over allocation, that allocation should be given no special treatment in an indemnity action.").

Furthermore, there is no explanation in the Termination Motion or the Elliott Plan as to how the Ad Hoc Committee and the TCC reached their agreement on the total amount of the Debtors' estates to be distributed for the benefit of individual Wildfire Claimants or why the funded debt claims should be reinstated at a cost of billions of dollars. *See* Tr. Brent C. Williams (Oct. 3, 2019) at 44:11-46:25, 51:7-53:3, 60:24-63:6. As described in the RSA Motion, the Debtors entered into the Subrogation Claims Settlement after months of good faith and arms' length negotiations and after having evaluated and assessed the underlying claims information provided to the Debtors by the Ad Hoc Subrogation Group during and after formal mediations between the two parties. The Debtors, as estate fiduciaries, then weighed this potential exposure against the costs, burdens, and uncertainties of further litigation and determined that settling the

17

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Subrogation Claims was a prudent exercise of business judgment on behalf of the Debtors and all parties in interest in these cases. The Termination Motion and the Elliott Plan are devoid of any information as to what claims information and data was reviewed by the Ad Hoc Committee before they agreed to distribute approximately $14.5 billion in estate assets to satisfy individual Wildfire Claims and to put those billions of dollars of assets under the complete control of the TCC's designees. There is also no information as to how much of those funds are allocated to attorneys' fees.

What has become clear, however, is that no substantive evidence was reviewed by the Ad Hoc Committee as part of their purported assessments of the wildfire claims and in connection with their negotiations with the TCC. *See* Tr. Brent C. Williams (Oct. 3, 2019) at 17:8-18:1, 21:13-23; 23:1-35:12, 37:8-43:24, 60:5-64:16, 87:16-24, 130:4-25. Rather, the Ad Hoc Committee and the TCC simply decided how much distributable value was available and allocated as they saw fit, and in a way that would ensure the bondholders received postpetition contract rate interest and reinstatement of their high coupon debt. *Id.* at 51:7-53:3, 60:5-64:16, 67:24-68:22. And similarly, the TCC, in agreeing to this compromise, did not consider the make-whole issues, refinancing, or postpetition interest at the contract rate, obviously being satisfied to provide the bondholders with unjustifiable returns at the expense of others in exchange for their $14.5 billion. *See Id.* 44:16-46:6.

The United States Court of Appeals for the Second Circuit's opinion in *In re Smart World Technologies*, 423 F.3d 166 (2d Cir. 2005), is particularly instructive here. In *Smart World*, the Second Circuit reversed a decision of the Bankruptcy Court and the District Court that had authorized creditors to settle an adversary proceeding commenced against the debtor despite the debtor's objection to the settlement. In ruling on the appeal, the Second Circuit noted that the express language of Bankruptcy Rule 9019 authorizes only the trustee or debtor in possession to bring a motion for settlement and further stated:

> That [Bankruptcy Rule 9019] vests authority to settle or compromise solely in the debtor-in-possession is hardly surprising in light of the numerous

18

provisions in the Bankruptcy Code establishing the debtor's authority to manage the estate and its legal claims.

443 F.2d at 174.

The Second Circuit went on to note that the debtor is the only fiduciary for all parties in interest:

Similarly, the debtor's duty to wisely manage the estate's legal claims is implicit in the debtor's role as the estate's only fiduciary. *See Wolf v. Weinstein,* 372 U.S. 633, 649–50, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963) (observing that debtor-in-possession has fiduciary duty to the estate).

443 F.3d at 175.

In rejecting the settlement proffered by the creditors, the *Smart World* Court concluded:

In short, Rule 9019, which by its terms permits only the debtor-in-possession to move for settlement, is in complete harmony with the provisions of the Bankruptcy Code delineating the chapter 11 debtor's role. It is the debtor-in-possession who controls the estate's property, including its legal claims, and it is the debtor-in-possession who has the legal obligation to pursue claims or to settle them, based upon the best interests of the estate.

*Id.*

Despite what has been asserted by the Ad Hoc Committee, the Elliott Plan will not eliminate the pending estimation proceedings. First, even if exclusivity were terminated to permit the filing of the Elliott Plan, the Debtors' Plan will continue to be prosecuted. The Debtors' Plan, assuming a consensual resolution cannot be achieved with the TCC, requires estimation of the Debtors' liability to the TCC's constituency and those estimation proceedings are ongoing. Secondly, the Elliott Plan also would require estimation of the Debtors' liability to the TCC's constituency. As the Court noted, existing equity holders will challenge the Elliott Plan's treatment of the TCC's constituency, requiring estimation in the context of, at the very least, a contested cramdown hearing.[9] Permitting the Elliott Plan to go forward will eliminate nothing

---

[9] *See* Hr'g Tr. (Aug. 12, 2019) 7:1-13 (Court: "Don't you think there's one risk, though, and that is that we end up with a skirmish going on between equity factions? In other words, if we

19

with respect to estimation, and also will exacerbate litigation and the costs, expenses, and delay necessarily attendant thereto.

### B. The Elliott Plan is Designed to Enrich Elliott and the Other Noteholders and to Allow the Members of the Ad Hoc Committee to Seize Control of the Debtors at a Substantial Discount to Current Values.

Despite the Ad Hoc Committee's altruistic rhetoric, the Elliott Plan is nothing more than a transparent attempt to effect a hostile takeover of the Debtors at a substantial discount to the value the Elliott Plan itself ascribes to the equity of the Reorganized Debtors, and to receive an excessive and unjustified windfall on the Ad Hoc Committee's prepetition claims – all at a cost of billions of dollars to ratepayers and other parties in interest. This is in addition to the approximate $670 million of commitment fees that would be payable to the members of the Ad Hoc Committee if exclusivity is terminated.

*Ad Hoc Committee Equity Investment.* As set forth in the Elliott Plan, the Ad Hoc Committee proposes to acquire 59.3% of the equity of the Reorganized Debtors for $15.5 billion. This implies a total equity value of $26 billion. However, the Elliott Plan also values the 40.6% of the equity to be issued to the two wildfire trusts at $12.75 billion, implying a "plan value" of $31.4 billion. Thus, Elliott is proposing to acquire its equity at a 17% discount, or greater than a $3 billion discount, to its *own* plan value and to the value of the equity the Elliott Plan proposes to distribute to Subrogation Claimants and the TCC's constituency.[10] To put that in perspective, the in excess of $3 billion discount that Elliott and the Ad Hoc Committee are seeking to divert to their own coffers represents almost 60% of the Debtors' current equity market capitalization. Moreover, if the Elliott Plan provided for the new equity in the Reorganized Debtors to be

---

– if your proposal or the debtors' proposal is generally acceptable to the fire victims…and that we're stuck because there's a confirmation battle over cramdown and equity?...And that does open up – *that is more likely, it seems to me, than less likely if we have a competing plan*.") (emphasis added).

[10] Elliott has admitted to this in the deposition of Mr Rosenbaum, the portfolio manager of Elliott responsible for Elliott's PG&E investment, conducted yesterday. *See* Tr. of Jeff Rosenbaum (Oct. 3, 2019) at 27:3-11, 34:11-25, 40:13-23, the relevant pages of which are attached hereto as **Exhibit E**.

20

Case: 19-30088    Doc# 4119    Filed: 10/04/19    Entered: 10/04/19 11:59:22    Page 25 of 33

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

purchased by the Ad Hoc Committee at its "plan value" then the value available for existing shareholders under the Elliott Plan would be 100 times greater than what is presently proposed by the TCC and the Ad Hoc Committee.

When compared to the equity financing commitments the Debtors have received, the disparity in value is even more egregious. The Debtors' commitments for equity in the Reorganized Debtors are priced at $14 per share, with the Debtors not being locked in, and having the ability to sell that equity at even higher amounts in the market or through a rights offering.

***Needless Reinstatement of Above Market High Interest Rate Long-Term Notes.*** The Elliott Plan also proposes to reinstate, rather than refinance, approximately $15.8 billion of long-term unsecured notes, the lion's share of which are held by the Ad Hoc Committee. By proposing to reinstate their existing, above-market long-term notes, instead of refinancing them as easily can be accomplished at current, significantly lower interest rates and more advantageous terms as proposed under the Debtors' Plan, the Elliott Plan will enrich the members of the Ad Hoc Committee and other bondholders by approximately $170 million per year over the life of those notes, resulting in nearly $1.5 billion (on a net present value basis) unnecessarily and unjustifiably being borne by ratepayers. The Bankruptcy Code does not require reinstatement of the funded debt claims in order to be rendered unimpaired or to satisfy the absolute priority rule. Further, as noted, the Debtors will demonstrate that under applicable law and the express provisions of the applicable indentures, no make-whole payments are required with respect to the funded debt the Debtors' Plan proposes to refinance.

***Payment of Unwarranted Contract Interest Rates.*** Not surprisingly, the unnecessary reinstatement of funded debt as provided in the Elliott Plan also requires the payment of postpetition interest at the contract rate, at a cost of approximately $500 million, again to be borne by ratepayers and other stakeholders. Conversely, as stated, the Debtors' Plan provides for refinancing of the funded debt claims with new debt at substantially lower interest rates and, consistent with controlling Ninth Circuit law, provides for the payment of postpetition interest at the federal judgment rate. *In re Cardelluci*, 285 F.3d at 1231.

21

The Elliott Plan proposes to reinstate the Ad Hoc Noteholders' funded debt claims for obvious reasons and again as part of the self-serving bargain the TCC and the Ad Hoc Committee have concocted. It will enable noteholders to needlessly receive nearly $1.5 billion in post-effective date interest and approximately $500 million in postpetition interest, all at the expense of PG&E ratepayers and the Debtors' other economic stakeholders.

### C. The Elliott Plan Discriminates Unfairly in Violation of Section 1123(a)(4) of the Bankruptcy Code and, Therefore, Fails to Satisfy the Requirements of Section 1129(a)(1) of the Bankruptcy Code.

Section 1123(a)(4) of the Bankruptcy Code provides that a chapter 11 plan *shall*:

Provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest.

11 U.S.C. § 1123(a)(4).

Section 1129(a)(1) of the Bankruptcy Code provides that the Court shall confirm a plan only if the plan complies with all of the provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(1). The Elliott Plan plainly violates section 1123(a)(4) of the Bankruptcy Code in its proposed treatment of PG&E Corp. common stockholders, and is thus unconfirmable.

As noted in the Classification/Treatment/Voting section on page 6 of the Elliott Plan Term Sheet, holders of existing PG&E common stock are to retain their ownership "subject to dilution on account of the Reorganized PG&E Corp. Common Stock issued pursuant to the New Money Reorganized PG&E Common Stock Issuance." Page 24 of the Elliott Plan Term Sheet, however, provides that a select portion of existing PG&E common stock held only by employees and retirees will be completely protected from any such dilution. More specifically, the Section of the Elliott Plan Term Sheet entitled "Other Employee Matters" on page 24 provides as follows:

[F]ollowing the Effective Date, the new PG&E Corp. Board shall further revise the applicable employee compensation programs such that all PG&E

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Corp. common stock currently held by employees and retirees in pension accounts, 401(k) accounts and company-sponsored plans will be trued-up for any dilution on account of the [Elliott] Plan with new equity issuances within 90 days after the Effective Date.

The Debtors, of course, desire to treat their employees and retirees as favorably as the law allows, but this type of plan provision designed to gain the support of the Unions is simply not permitted under the Bankruptcy Code. The Debtors further understand that the Elliott Plan's proposed discriminatory treatment of employee and retiree held equity may be impermissible under applicable tax and ERISA law, which, among other things, impose limitations on contributions to tax qualified pension plans. This unfair discrimination within the existing equity class plainly does not comply with section 1123(a)(4) and other applicable non-bankruptcy law, thereby rendering the Elliott Plan unconfirmable under section 1129(a)(1) of the Bankruptcy Code.

### D. The Elliott Plan Faces Substantial Obstacles to Securing CPUC Approval as Required under AB 1054.

Under the terms of the Elliott Plan, new equity representing approximately 59.3% of the outstanding equity in the Reorganized Debtors is to be allocated as follows: (i) 50% to the consortium of Noteholders identified on Schedule 4 to the Elliott Plan Term Sheet; (ii) 45% to the members of the Ad Hoc Committee; and (iii) 5% to the holders of PG&E common stock, only if they elect to participate in the proposed investment. There is substantial overlap between the members of the Ad Hoc Committee and the Noteholders listed on Schedule 4 to the Elliott Plan Term Sheet. As a result, the Debtors believe that the Elliott Plan would result in a change of control event for the Debtors requiring CPUC approval under Public Utilities Code section 854.[11] In addition, the Elliott Plan involves an outsourcing of PG&E's management to an unspecified third party. This extraordinary proposal itself appears to constitute a change of control, and it presents numerous troubling issues for the CPUC, such as with respect to the California statutory

---

[11] Similarly, the awarding of about 40.6% of the new common stock in the Reorganized Debtors to the two wildfire trusts as proposed under the Elliott Plan could also independently constitute a change of control in the Debtors.

23

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

requirements on executive compensation and the need to ensure alignment with California's safety and clean energy goals.

The Elliot Plan's change of control presents a significant and potentially insurmountable hurdle for securing CPUC approval of that plan as required under AB 1054. Pursuant to section 854 of the California Public Utilities Code, before approving a change of control of a utility such as the Debtors, the CPUC must conclude, among other things, that the proposal is not only rate neutral to ratepayers (as is the case with the Debtors' Plan) but that it *results in both short-term and long-term economic benefits to ratepayers*. Cal. Pub. Util. Code § 854(b)(1) (emphasis added). Section 854 further provides that the total short-term and long-term forecasted economic benefits, as determined by the CPUC, must be equitably allocated between shareholders and ratepayers with ratepayers receiving not less than 50 percent of those benefits. *Id.* In addition, prior to approving such a change of control, the CPUC is required to consider a number of criteria and find, on balance, that the change of control proposal is in the public interest. These criteria include, among other things, that the change of control transaction maintain or improve the utility's financial condition, quality of service, quality of management, be beneficial to state and local economies and the communities served by the utility, and be fair and reasonable to the majority of all affected public utility shareholders. Cal. Pub. Util. Code § 854(c). Elliott and the other members of the Ad Hoc Committee will bear the burden of proof before the CPUC to satisfy the section 854 requirements before their proposed plan can be approved. *Id.* § 854(e). The Debtors believe that the Elliott Plan, which plainly enriches the members of the Ad Hoc Committee at the expense of other parties, including the Debtors' existing equity holders and ratepayers, will not satisfy section 854, and is not in the public interest.

In addition to the section 854 concerns, the Elliott Plan's amorphous provision for transfer of PG&E management to a third party would present difficult CPUC issues with respect to approvals of PG&E's governance structure and executive compensation that are critical for successful emergence, participation in the go-forward Wildfire Fund, and renewal of PG&E's safety certification. *See e.g.* Cal. Pub. Util. Code §§ 8389(e)(4) & (e)(6) (CPUC must certify

24

executive compensation structure promotes safety as a priority, and contains various requirements for and limits on incentive compensation), § 3292(a)(1)(C) (CPUC must certify that the utility governance structure resulting from any plan of reorganization is acceptable).  Indeed, these statutory findings by the CPUC with respect to PG&E's governance and executive compensation structures are conditions precedent to the effective date of the Elliott Plan.  Yet, at best, it is unclear how the Ad Hoc Committee would establish that the Elliott Plan will satisfy these necessary conditions, particularly when the provision for third party management of PG&E appears fundamentally at odds with applicable statutory requirements.  Similarly, the Elliott Plan also is conditioned on acceptable (to the plan proponents) treatment of unresolved CPUC issues, such as potential fines and penalties for pre-petition conduct, and relies on an anticipated securitization of wildfire costs.  In sum, there are serious questions as to whether the Elliott Plan will be able to secure the necessary CPUC approvals in a timely manner, if at all.

**E.  The Elliott Plan Raises Significant Questions Regarding the Timing and Attainability of Required FERC Approvals.**

In light of the ownership and management features discussed above, the Elliott Plan also raises significant questions about the timing and attainability of approvals from the Federal Energy Regulatory Commission ("**FERC**").  The Debtors believe that the Elliott Plan would create at least two, and potentially three or more, new shareholders that each would hold 10% or more of Reorganized PG&E Corp.'s common stock.  That would constitute a change of control that would require approval from FERC under Section 203(a)(1) of the Federal Power Act (the "**FPA**").  These new shareholders include the two wildfire trusts and potentially one or more members of the Ad Hoc Committee or the consortium of Noteholders identified on Schedule 4 to the Elliott Plan Term Sheet.  In addition, the Debtors believe that outsourcing PG&E's management to an unspecified third party (potentially another electric utility) might separately require approval under Section 203 of the FPA.  It is not possible to fully evaluate these issues due to the lack of specific information in the Elliot Plan regarding the proposed ownership levels of the individual members of the Ad Hoc Committee or the consortium of Noteholders, the relative

25

ownership between the two wildfire trusts, the ongoing relationships between the individual members of the Ad Hoc Committee, the identity of the various persons who will control the two wildfire trusts or the identity of the third party manager, but the Debtors expect that each of these discrete approvals will raise complex factual inquiries and potentially novel legal questions for the FERC, including issues related to the effect on competition, the effect on rates and potential conflicts of interest. In the absence of that specific information, it is impossible to conclude that the Elliott Plan will receive necessary FERC approvals in a timely manner.

### F. The Elliott Plan Will Result in a Change in Control and the Potential Loss of the Debtors' Valuable Net Operating Losses.

As set forth above, the Elliott Plan is likely to result in a change of control event for the Debtors. Accordingly, the Elliot Plan jeopardizes the Debtors' ability to access or utilize their valuable NOLs, which are estimated to be worth in excess of $7 billion. These NOLs represent significant assets of substantial value to the Debtors and these estates, which is why the Debtors' Plan seeks to preserve future use of the NOLs thereby offering the Debtors additional capital sources to consider in resolving claims and financing following their emergence from chapter 11.

### III. The Court Should Order Mediation.

As set forth above, the Debtors have made significant progress in these Chapter 11 Cases and have filed a confirmable plan that keeps these cases on track for a successful and timely confirmation. Accordingly, cause does not exist to terminate the Debtors' Exclusive Periods, and the Termination Motion should be denied.

As stated, the only principal obstacle to confirmation of the Debtors' Plan and meeting the June 30, 2020 deadline is the determination of the Debtors' aggregate liability to the constituency represented by the TCC. The Debtors believe the time is ripe to appoint a mediator to facilitate a consensual resolution of this issue. The maintenance of the exclusive periods to pursue

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

26

this opportunity will prejudice no one and will avoid the polarization of positions and the substantial costs, expenses, and disruptions that necessarily will ensue from competing plans.

### Conclusion

As recognized by the Court, the Debtors have made substantial progress in these large and extremely complex Chapter 11 Cases. Under these circumstances and consistent with the intent and purpose of section 1121 of the Bankruptcy Code, the Debtors should be permitted to steward these cases to a successful conclusion. The Ad Hoc Committee and the TCC, which have taken it upon themselves to concoct a plan that unduly enriches their own constituencies at the expense of ratepayers and other economic stakeholders, have not and cannot sustain their burden for the extraordinary relief that they are seeking.

The Termination Motion should be denied.

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

27

WHEREFORE the Debtors respectfully request entry of an order denying the Termination Motion, and granting the Debtors such other and further relief as the Court may deem just and appropriate.

Dated: October 4, 2019

**WEIL, GOTSHAL & MANGES LLP**

**KELLER & BENVENUTTI LLP**


/s/  *Stephen Karotkin*
Stephen Karotkin

*Attorneys for Debtors and Debtors in Possession*