1          UNITED STATES BANKRUPTCY COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3                    -oOo-

4   In Re:                    ) Case No. 19-30088
                              ) Chapter 11
5   PG&E CORPORATION AND PACIFIC   )
    GAS AND ELECTRIC COMPANY   ) San Francisco, California
6                              ) Monday, October 7, 2019
                     Debtors.  ) 10:00 AM
7   _____
                                 JOINT MOTION OF THE OFFICIAL
8                                COMMITTEE OF TORT CLAIMANTS
                                 AND AD HOC COMMITTEE OF
9                                SENIOR UNSECURED NOTEHOLDERS
                                 TO TERMINATE THE DEBTORS'
10                               EXCLUSIVE PERIODS PURSUANT TO
                                 SECTION 1121(D)(1) OF THE
11                               BANKRUPTCY CODE [3940]

12                               MOTION TO APPROVE FEE
                                 PROCEDURES FILED BY BRUCE
13                               MARKELL [3950]

14              TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE DENNIS MONTALI
15            UNITED STATES BANKRUPTCY JUDGE

16  APPEARANCES:
    For the Debtors:          PAUL H. ZUMBRO, ESQ.
17                            KEVIN J. ORSINI, ESQ.
                              Cravath, Swaine & Moore LLP
18                            825 Eighth Avenue
                              New York, NY 10019
19                            (212)474-1000

20  For the Debtors:          STEPHEN KAROTKIN, ESQ.
                              Weil, Gotshal & Manges LLP
21                            767 Fifth Avenue
                              New York, NY 10153
22                            (212)310-8000

23  For Bruce A. Markell:     SCOTT H. MCNUTT, ESQ.
                              McNutt Law Group LLP
24                            219 9th Street
                              San Francisco, CA 94103
25                            (415)995-8475

(973)406-2250 | operations@escribers.net | www.escribers.net

```
 1   For the United States      TIMOTHY S. LAFFREDI, AUST
     Trustee:                   Office of the United States
 2                              Trustee
                                450 Golden Gate Avenue
 3                              5th Floor, Suite 05-0153
                                San Francisco, CA 94102
 4                              (415)705-3333

 5   For The Utility Reform     ROBERT G. HARRIS, ESQ.
     Network (TURN):            Binder & Malter LLP
 6                              2775 Park Avenue
                                Santa Clara, CA 95050
 7                              (408)295-1700

 8   For Official Committee of  DENNIS F. DUNNE, ESQ.
     Unsecured Creditors:       Milbank, LLP
 9                              55 Hudson Yards
                                New York, NY 10001
10                              (212)530-5000

11                              GREGORY A. BRAY, ESQ.
                                Milbank LLP
12                              2029 Century Park East
                                33rd Floor
13                              Los Angeles, CA 90067
                                (424)386-4000
14
     For the Ad Hoc             ABID QURESHI, ESQ.
15   Bondholders:               Akin Gump Strauss Hauer & Feld LLP
                                One Bryant Park
16                              New York, NY 10036
                                (212)872-1000
17
     For Official Committee of  ROBERT A. JULIAN, ESQ.
18   Tort Claimants:            CECILY A. DUMAS, ESQ.
                                Baker & Hostetler LLP
19                              11601 Wilshire Boulevard
                                Suite 1400
20                              Los Angeles, CA 90025

21                              ELIZABETH A. GREEN, ESQ.
                                Baker & Hostetler LLP
22                              SunTrust Center, Suite 2300
                                200 South Orange Avenue
23                              Orlando, FL 32801
                                (407)649-4000
24

25
```

(973) 406-2250 | operations@escribers.net | www.escribers.net

| | | |
|---|---|---|
| 1 | For SLF Fire Victim Claimants: | RICHARD A. MARSHACK, ESQ. |
| 2 | | Marshack Hays LLP |
| | | 870 Roosevelt |
| | | Irvine, CA 92620 |
| 3 | | (949)333-7777 |
| 4 | For International Brotherhood of Electrical | BRADLEY C. KNAPP, ESQ. |
| 5 | Workers Local Union 1245: | Locke Lord LLP |
| | | 601 Poydras Street |
| | | Suite 2660 |
| 6 | | New Orleans, LA 70130 |
| | | (504)558-5100 |
| 7 | | |
| 8 | For Public Advocates Office at the California | ALISA C. LACEY, ESQ. |
| | Public Utilities | Stinson LLP |
| | | 1850 North Central Avenue |
| 9 | Commission: | Suite 2100 |
| | | Phoenix, AZ 85004 |
| 10 | | (602)279-1600 |
| 11 | For Ad Hoc Committee of Subrogation Claims | MATTHEW A. FELDMAN, ESQ. |
| 12 | Holders: | Willkie Farr & Gallagher LLP |
| | | 787 Seventh Avenue |
| | | New York, NY 10019 |
| 13 | | (212)728-8000 |
| 14 | For the Equity Holders: | BRUCE BENNETT, ESQ. |
| | | Jones Day |
| 15 | | 555 South Flower Street |
| | | Fiftieth Floor |
| 16 | | Los Angeles, CA 90071 |
| | | (213)489-3939 |
| 17 | | |
| 18 | For the North Bay Fire Victims: | FRANK PITRE, ESQ. |
| | | Cotchett Pitre and McCarthy LLP |
| | | 840 Malcolm Road |
| 19 | | Suite 200 |
| | | Burlingame, CA 94010 |
| 20 | | (650)697-6000 |
| 21 | | STEVEN J. SKIKOS, ESQ. |
| | | Skikos Attorneys at Law |
| 22 | | One Sansome Street |
| | | Suite 2830 |
| 23 | | San Francisco, CA 94104 |
| | | (707)327-2310 |
| 24 | | |
| 25 | | |

```
1   For the Ghost Ship          ESTELA O. PINO, ESQ.
    Warehouse Victims:          Pino & Associates
2                               1520 Eureka Road
                                Suite 101
3                               Roseville, CA 95661
                                (916)641-2288
4
                                MARY E. ALEXANDER, ESQ.
5                               Mary Alexander & Associates, P.C.
                                44 Montgomery Street
6                               Suite 1303
                                San Francisco, CA 94104
7                               (415)433-4440

8
    Also Present:               BRUCE MARKELL (Telephonically)
9                               Fee Examiner

10

11

12

13

14

15

16

17  Court Recorder:             LORENA PARADA
                                United States Bankruptcy
18                              Court
                                450 Golden Gate Avenue
19                              San Francisco, CA 94102

20  Transcriber:                Amanda G. Stockton
                                eScribers, LLC
21                              7227 N. 16th Street
                                Suite #207
22                              Phoenix, AZ 85020
                                (973)406-2250

23

24  Proceedings recorded by electronic sound recording;
    transcript provided by transcription service.
25
```

eScribers
(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1      SAN FRANCISCO, CALIFORNIA, MONDAY, OCTOBER 7, 2019, 10:01 AM

2                              -oOo-

3         (Call to order of the Court.)

4            THE BAILIFF:  All rise.  The court is now in session.

5      The Honorable Dennis Montali presiding.

6            THE COURT:  Good morning, everyone.

7            IN UNISON:  Good morning.

8            THE BAILIFF:  Matter of PG&E Corporation.

9            THE COURT:  This crowd for the fee hearing?  Oh.  All

10     right.  Are we ready to go?

11           UNIDENTIFIED SPEAKER:  Yes, sir.

12           THE COURT:  All right.  Let's start with the fee

13     procedure motion.

14           Mr. Karotkin, did you want to do something ahead of

15     time?  You want to take something out of order?

16           MR. KAROTKIN:  No, fee motion's first.

17           UNIDENTIFIED SPEAKER:  Oh, no.  I thought it was -- I

18     thought something was before that.  I'm sorry.

19           THE COURT:  There's room in the overflow court room

20     for those of you standing.  You can stand there if you want,

21     but there are seats over there next door around the corner.

22           Mr. McNutt, did you think you're up first?

23           MR. MCNUTT:  I thought that was it, yes.

24           THE COURT:  Okay.  Let's go.

25           MR. MCNUTT:  Scott McNutt --

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1        THE COURT:  Go ahead and make your appearance.

2        MR. MCNUTT:  -- representing Prof. Bruce Markell, the

3   fee examiner in this matter.

4        THE COURT:  So is he here today, by any chance?

5        MR. MCNUTT:  He is appearing by phone today.

6        THE COURT:  Okay.  Are we ever --

7        MR. MCNUTT:  And I --

8        THE COURT:  We ever going to see him here?

9        MR. MCNUTT:  You will see him here.  I thought, given

10  the crush today, that it'd be -- that he shouldn't fly out from

11  Chicago for this --

12       THE COURT:  Okay.  Well, go head.  You have time on

13  the --

14       MR. MCNUTT:  And blessedly --

15       THE COURT:  -- dock time, so you've got the time.  Do

16  you want to reserve time, or do you want to --

17       MR. MCNUTT:  Blessedly, I'm here to hand it off to

18  Prof. Markell.

19       THE COURT:  Okay.

20       MR. MCNUTT:  Who I hope we hear shortly.

21       THE COURT:  Prof. Markell, are you --

22       MR. MARKELL:  Yeah?

23       THE COURT:  -- on the phone?

24       MR. MARKELL:  Yes, I am, Your Honor.  Thank you very

25  much --

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    THE COURT:  Okay.

2    MR. MARKELL:  -- and good morning.

3    THE COURT:  Good morning.

4    MR. MARKELL:  Okay.  Once again --

5    THE COURT:  Okay.  Wait, have --

6    MR. MARKELL:  -- Bruce Markell --

7    THE COURT:  You saw my order about time allocation,

8    right?

9    MR. MARKELL:  Yes, I did.  For our twenty minutes,

10   I'll probably speak for about two to three minutes.

11   THE COURT:  Okay.

12   MR. MARKELL:  I yield to the U.S.D. in turn for no

13   more than eight, and any remaining time I'll reserve for

14   rebuttal.

15   THE COURT:  Okay.  Thank you.  Go ahead, then.  I'm

16   ready and would like to hear from you.

17   MR. MARKELL:  Wait.  I have read the tentative.  I

18   have no point of disagreement, obviously --

19   THE COURT:  Do you want to stay?

20   MR. MARKELL:  I'm pleased to report that it will help

21   me finalize at least five settlements I've already reached

22   through various professional, with the respect to the first

23   interim fee application.  These settlements involve reductions

24   of over eight-hundred thousand dollars in claim fees and

25   expenses, exclusive and separate from any additional reductions

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1   to claim nonworking travel. And each of these settlements the

2   professionals and I have reserved as a right to increase the

3   reductions by amounts required by today's ruling, so the

4   800,000 dollar figure will increase and increase significantly.

5           I agree with -- as I said before, agree with all

6   matters with respect to the tentative, although I will note the

7   tentative did not directly address the estoppel issue with

8   respect to duplication of effort, and we have nothing --

9           THE COURT: No. Well, I want --

10          MR. MARKELL: -- to add to our motion at this point --

11          THE COURT: Professor, I want to explain this to you,

12   and also everyone else. For reasons that I won't go into,

13   suddenly my time allocations go squished for today, and so I

14   didn't take -- I wasn't able to take the time that I wanted to

15   to address some other issues. And that's why in my docket text

16   I just picked what I thought were the big ticket items.

17   Perhaps, after you make your opening comments, I can hear

18   from -- well, hear with U.S. Trustee and certainly hear what

19   the other side says about the main issues, and I'll at least

20   identify the other points that you have.

21          So you're not excluded from talking about them. It's

22   just that this is what I had to do. I might have set aside a

23   lot more time, if we weren't pressed for time on other matters.

24          MR. MARKELL: I appreciate it, Your Honor.

25          I just want to say with respect to the reasonable

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    effort that that in one sense goes hand in hand with the

2    scheduling notion that we had in terms of the ability to kind

3    of compare across professional efforts during the same time

4    that they're energies with respect to the case.

5              Okay.  Again, finally both the United Stated Trustee

6    and varying professionals have requested additional rulings, as

7    you know, and additional points to the protocol.  Because the

8    Court didn't permit us to permit a reply today, I did not

9    answer those.  I'm certainly willing to speak in rebuttal on

10   those to the extent that you wish, but many of the issues that

11   have been raised by the U.S.D. and the professionals have been

12   the subject of negotiations with all professionals.  But since

13   I conduct those under Federal Rule of Evidence 408, I'm

14   precluded at this point from going into any details.

15             THE COURT:  No, that's fine.

16             MR. MARKELL:  If it's --

17             THE COURT:  That's fine.

18             MR. MARKELL:  Yeah.

19             THE COURT:  What about have you had any follow-up with

20   I guess Mr. Zumbro -- he seems to have taken the lead -- about

21   the protocol, and is there hope that maybe there could be an

22   agreement on the remaining issues on the protocol?

23             MR. MARKELL:  To be realistic, no.  I think we can

24   come to some understanding on some of the points, but some of

25   the points -- for example, I wanted to know if anybody from a

PG&E Corp., Pacific Gas and Electric Co.

1  professional was certified, which is, as you know, a Provision

2  Section 330.  They crossed that out.  And when you get to that

3  level of nonunderstanding of what I'm asking for, it becomes

4  very difficult to come to a conclusion.  So I do not --

5          One of the reasons we had proceeded in the way in

6  which proceeded is that, based on some calls -- or at least one

7  call that we had and responses I have gotten, I did not think

8  that the time that would be necessary to come to closure on all

9  points would be done in time for us to kind of engage in the

10 negotiations with the fees that were ongoing.  If the Court

11 wishes us to try that, obviously we will do that.  But at this

12 point, most of the points and the issues I think are understood

13 by the parties, and as I have tried to say the provisions in

14 the protocol are, for the most part, not -- I mean, they're

15 opening negotiating positions, if you will.  They're positions

16 that I have and what I believe, and in short you would believe,

17 are reasonable compensations for Section 330.  But as indicated

18 by the five settlements, I'm willing to listen to what people

19 have to say.

20          Based on that, unless you have any other questions, I

21 will yield to the United States Trustee.

22          THE COURT:  Well, I'll just make a comment, and again,

23 further to my own personal discomfort with the way the timing

24 had to be allowed today, and I know there are capable lawyers

25 in this case on all issues that love to file further briefs.  I

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1  can only absorb so much, and that's why I didn't want any

2  further briefs.  My thinking is, however, after I listen to all

3  the counsel this morning is to take the matter under advisement

4  rather than make a ruling and ask for a few days maybe for you

5  either to respond in writing to what the other side said, or

6  make one more pass at seeing if you can reach an accommodation

7  with the professionals who are there.  Again, we're going to --

8  Mr. Zumbro will call on the liaison.  I don't care if you deal

9  with other counsel, but my point is that I was going to give

10 you a period of time to do that, and then take the matter under

11 advisement.

12         Let me hear close on that issue at the end of the

13 hearing, and I'll wait and see what the professionals want to

14 say about that.

15         So maybe I'll turn to the U.S. Trustee then at this

16 point.

17         MR. MARKELL:  Okay.  Thank you, Your Honor.

18         THE COURT:  Okay.  Mr. Laffredi?

19         MR. LAFFREDI:  Thank you, Your Honor.  Tim Laffredi

20 for the U.S. Trustee.

21         We only have about five minutes.  We leave the other

22 remaining three minutes for TURN, but we wanted to first

23 express our support for the Court's tentative ruling.  Second,

24 we wanted to really go into the four recommendations that made

25 in the response to the fee examiner's motion.  As the Court

PG&E Corp., Pacific Gas and Electric Co.

1　saw --

2　　　　THE COURT:　But some of your responses are very

3　thorough.　It's very specific.　It's not a general protocol

4　type stuff, and so I presume your view as to particular lawyers

5　or particular time entries that would be picked up later in the

6　subsequent time, right?

7　　　　MR. LAFFREDI:　Exactly.　And we would --

8　　　　THE COURT:　Okay.

9　　　　MR. LAFFREDI:　-- address each specific issue with

10　that particular law firm or --

11　　　　THE COURT:　Right.

12　　　　MR. LAFFREDI:　-- firm.

13　　　　The four recommendations really were first.　After the

14　U.S. Trustee did its own review of the fee applications, we

15　noted, as the Court saw, several issues that did kind of span

16　the spectrum of all the fee applications.　And so the four

17　recommendations really were designed to make it easier and more

18　transparent and more predictable for the fee examining process.

19　　　　The first recommendation was that, with regard to

20　hearing, meeting overstaffing, and overly high billable hours

21　for particular timekeepers, we would recommend that -- for

22　example, if more than four professionals were attending any

23　particular hearing or conference, or if any particular

24　timekeeper was billing more than twelve billable hours per day,

25　the firm should be required to provide justification and to

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    specifically identify those instances, so that's it not really

2    a needle in the haystack --

3           THE COURT:  Well, that's consistent with our --

4           MR. LAFFREDI:  Exactly.

5           THE COURT:  -- long-standing guidelines, isn't it?

6           MR. LAFFREDI:  Exactly, yes.  Guidelines 15 and 16,

7    which it doesn't look like any of the professionals adhere to,

8    already require this.

9           Second, the recommendation with regard to overtime

10   meals, overtime transportation, travel lunches, working meals,

11   those are also already addressed in the local guidelines.

12   Guidelines 22, 38, 39 would disallow those expenses, and so

13   really we would just ask that the order incorporate those

14   guidelines.

15          The third recommendation is with regard to attorneys

16   who have not been admitted to the bar but are charging full

17   attorney rates.  We would recommend that those preadmitted

18   attorneys charge rates that would be the average for a

19   nonattorney professionals at their firm.

20          THE COURT:  And I can tell the professionals that, as

21   far as I'm concerned, that's a nonstarter at this point.

22   You're either admitted, or you aren't.  And it's a slippery

23   slope, and I don't mean to single out any particular law firm

24   or any particular bar graduate who hasn't been admitted.  It

25   just is a guideline that has to be the rule in my opinion.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    So --

2              MR. LAFFREDI:  Thank you, Your Honor.

3              THE COURT:  -- if they really want to hang on that and

4    make any further argument, I'll listen, but that to me is not

5    even worth debating.

6              MR. LAFFREDI:  Thank you, Your Honor.

7              And finally, the recommendation with regard to blended

8    rates, if the blended rates for this particular case deviate

9    from blended rates of nonbankruptcy cases more than ten

10   percent, we would just ask that the firms be required to

11   provide an explanation and justification for that deviance, so

12   that the fee examiner and the --

13             THE COURT:  Well, don't refresh my memory of our own

14   guidelines and the national rules.  Normally, a lawyer on an

15   application -- on a fee application is supposed to disclose

16   that the rates charged are not higher than other normal rates,

17   and that would I think include standard discounted rates.  No,

18   or not?  Maybe it doesn't say --

19             MR. LAFFREDI:  Well, Section 330 actually explicitly

20   includes the comparison to nonbankruptcy rate, so yes, there

21   must be a discussion about --

22             THE COURT:  Well, that if a law firm that has a varied

23   practice, as many of the firms do here, if they have

24   arrangements with certain significant clients and have a

25   discount against whatever --

PG&E Corp., Pacific Gas and Electric Co.

1      MR. LAFFREDI:  Right.

2      THE COURT:  -- the going rate is, I believe our rules

3  require some disclosure of that.

4      MR. LAFFREDI:  I believe that as well.

5      THE COURT:  Isn't that right?  So what's your view on

6  that?

7      MR. LAFFREDI:  Our recommendation is that of course

8  that would be included, but we're sort of setting a ten

9  percent -- that ten percent number, we're not wedded to that

10  particular number.  But based on the charged that we included

11  and based on our review of the fee applications, a lot of them

12  are way over that.  And so when there is that deviance from

13  what nonbankruptcy charges or fees would be, we would just ask

14  that that be justified.

15      THE COURT:  So this is something that maybe Prof.

16  Markell should answer, but I want your view also.  I'm a little

17  confused about where things stand in the protocol about time

18  correcting erroneous entries.  To me, if there's an erroneous

19  entry, it should be corrected at no charge.  What, in your

20  view, can -- are you suggesting that if the lawyer or the firm

21  writes off an erroneous entry they can still charge the

22  corrected entry?

23      MR. LAFFREDI:  I would defer to Prof. Markell on this,

24  but I would think they should not be able to charge for

25  correcting the originally erroneous entry.

PG&E Corp., Pacific Gas and Electric Co.

1    THE COURT:  Well, but if they made a correct entry to

2    begin with presumably, it would be billable.

3    MR. LAFFREDI:  Right.

4    THE COURT:  So I guess -- I mean, I'm not trying to

5    punish them.  I think the lawyers are well served by persuading

6    the judge how generous they are by voluntary write-offs.

7    MR. LAFFREDI:  Right.

8    THE COURT:  And I always think it's a good practice to

9    hand a judge a fee app that shows some write-offs.

10    MR. LAFFREDI:  Right.  Exactly.

11    THE COURT:  Because it --

12    MR. LAFFREDI:  No charge, right.

13    THE COURT:  Well, it makes the judge think that he or

14    she isn't the first one reviewing --

15    MR. LAFFREDI:  Exactly.

16    THE COURT:  -- the entries.

17    MR. LAFFREDI:  Right.  And that's another point, Your

18    Honor.  We also wanted to reiterate to the Court, that the U.S.

19    Trustee has its independent duty to do the review of the fee

20    application, so we would be coordinating with the fee examiner

21    Prof. Markell and making sure that we're not duplicating any

22    efforts, but we do take our 330 review and 331 review very

23    seriously.

24    THE COURT:  Okay.

25    MR. LAFFREDI:  So with that, Your Honor, we would

PG&E Corp., Pacific Gas and Electric Co.

1   request that the Court enter an order on the fee examiner's

2   motion consistent with the tentative ruling --

3           THE COURT:  Would you --

4           MR. LAFFREDI:  -- and include these additional --

5           THE COURT:  Would you want any further time to respond

6   at all to what was submitted, because --

7           MR. LAFFREDI:  I think we would concede to the fee

8   examiner, with regard to any of the rebuttal.

9           THE COURT:  No, I don't mean on rebuttal.  I mean --

10          MR. LAFFREDI:  Oh.

11          THE COURT:  -- because I didn't allow further

12  filings --

13          MR. LAFFREDI:  Oh.

14          THE COURT:  -- and you were given a very comprehensive

15  response, as was the examiner, do you want a further time to

16  file anything more on the point, more in the nature of a reply?

17          MR. LAFFREDI:  The professionals didn't really address

18  the specific concerns that we raised, and they said that

19  several times.  So I'm not sure if the Court is intending to

20  give them additional opportunity --

21          THE COURT:  No.

22          MR. LAFFREDI:  Okay.

23          THE COURT:  No, I wasn't.  I mean, no, I wasn't

24  intending to do that, but we'd have never-ending briefs and

25  briefs and briefs --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1      MR. LAFFREDI:  Right.

2      THE COURT:  -- of replies.

3      MR. LAFFREDI:  I don't think, then, we need any

4  further --

5      THE COURT:  Okay.

6      MR. LAFFREDI:  -- briefing on that, Your Honor.  Thank

7  you.

8      THE COURT:  All right.  Well, so Prof. Markell, you

9  said that --

10      Oh, wait.  You said that or one of you said that TURN

11  wants to be heard.

12      Mr. Harris, are you there?  You want to be heard?

13      MR. HARRIS:  Briefly, Your Honor.  I'll cede the

14  balance of my time to Prof. Markell as well.

15      Your Honor --

16      THE COURT:  It's like we're in Congress here with

17  people ceding their time.  What a thought.

18      MR. HARRIS:  Your Honor, Robert Harris with Binder &

19  Malter appearing for TURN.

20      PG&E, one, resulted in costs of over fifteen-hundred

21  dollars per rate payer, to the rate payers of this state, and

22  this case promises to do something potentially similar, subject

23  of course to the rate requirement of neutrality on average.

24  These are --

25      THE COURT:  But that's the CPUC?  I mean, the cost of

(973)406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1  the Chapter 11 isn't going to be eaten by the equity, is it?

2  Isn't that a legitimate expense that the CPUC will take into

3  account?

4        MR. HARRIS:  Well, yes, Your Honor.  But again, given

5  that these fees are added on to end of the bankruptcy rates,

6  will we predict increase?  And to the extent that costs are a

7  part of it, we have a duty to require and request that this

8  Court ensure reasonableness.

9        We support what the fee examiner is doing.  We support

10  Your Honor's tentative ruling.  I just want to say that this

11  room is filled with wonderful professionals.  But they came to

12  this district knowing what the rules are, and they didn't ask

13  for employment conditional upon getting an --

14        THE COURT:  But they had --

15        MR. HARRIS:  -- exemption from those rules.

16        THE COURT:  But no one, to my knowledge, has

17  questioned the rates -- the rates generally.  I mean, we can

18  talk about can you bill while you're on the airplane, and

19  that's a -- I mean, by itself, that's perhaps a seven-figure

20  number.  But in the grand order of things, it's a very small

21  percentage of the total cost, right?

22        MR. HARRIS:  Yeah.

23        THE COURT:  So if the total billed rates are an

24  enormous amount, which they will be, that's something that -- I

25  can't control that.

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1     MR. HARRIS:  I was referring to professional fee

2  totals and rates, in terms of what --

3     THE COURT:  Right.

4     MR. HARRIS:  -- rates will pay in the future, Your

5  Honor.

6     THE COURT:  Okay.  But --

7     MR. HARRIS:  So --

8     THE COURT:  -- my point is if I simply tell the

9  attorneys that all of your suggestions are horrible, I'm

10  throwing them all out, and I adopt everything that the U.S.

11  Trustee and Prof. Markell and TURN advocated, it's still a very

12  relatively small percentage of the total professional costs of

13  this bankruptcy, right?

14     MR. HARRIS:  That is absolutely true, Your Honor, but

15  whatever we can do to limit that cost is what TURN supports.

16     THE COURT:  Okay.

17     MR. HARRIS:  That's all I have, Your Honor.  Thank

18  you.

19     THE COURT:  Okay.  Thank you.

20     All right.  I'll assume that the examiner is going to

21  reserve about ten minutes.

22     And Mr. Zumbro, are you going to be the --

23     MR. MARKELL:  Thank you.

24     THE COURT:  You're here to take the heat here?  Right?

25     Good morning.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1      MR. ZUMBRO:  Good morning, Your Honor.  Paul Zumbro

2  from Cravath, Swaine & Moore.

3      THE COURT:  I have one very preliminary question.  I

4  should know the answer to this, but am I correct that, whether

5  it's your firm or the Weil firm or any other firm, all the

6  professional time being spent either in Tubbs Fire litigation

7  or in Judge Donato's court or in this court or in the FERC

8  litigation or in the CPUC, OAI, it's all being billed through

9  the bankruptcy court, right?

10      MR. ZUMBRO:  That's correct, sir.  That was one of the

11  points I wanted to raise.  I mean, the professionals obviously

12  are sensitive to the fact that they are significant fees being

13  generated in these cases.  I think it's important not only for

14  the Court to understand that but for the public to understand

15  that there are a lot of things going on in this case.  It's not

16  only the bankruptcy matters before Your Honor.  There's the

17  criminal investigations --

18      THE COURT:  I counted the number of judges who were

19  involved last week.

20      MR. ZUMBRO:  Correct. It's three, Judge --

21      THE COURT:  And I've got four --

22      MR. ZUMBRO:  Three or four judges.

23      THE COURT:  -- three in this building.

24      MR. ZUMBRO:  That's correct.

25      THE COURT:  Okay.

PG&E Corp., Pacific Gas and Electric Co.

1        MR. ZUMBRO:  So the criminal investigations, the Tubbs

2   fire that's set for trial at the State court --

3        THE COURT:  Right.

4        MR. ZUMBRO:  -- the ongoing worker relate to the

5   matters before Judge Alsup, the regulatory investigations with

6   the CPUC, and of course the wildfire claims estimation

7   proceedings --

8        THE COURT:  Right.

9        MR. ZUMBRO:  -- before Judge Donato.

10       THE COURT:  But it's all being billed through the 330

11  and the procedures that we're talking about, right?

12       MR. ZUMBRO:  That is correct.

13       THE COURT:  Okay.  No, but I mean if there may be

14  special counsel billing for other things that are on a

15  contingency or on some other arrangement, but you've confirmed

16  it.  That's what I thought, but I wanted to make sure.

17       MR. ZUMBRO:  Yeah, no, we appreciate you clarifying

18  that.  That was one of the points that I wanted to make sure

19  that you and the public were aware of.

20       I will say, before procedurally, I'll do the argument

21  today, but Ms. Green on behalf of the TCC and Mr. Bray on

22  behalf of the UCC have each requested five minutes.

23       THE COURT:  Sure.

24       MR. ZUMBRO:  I don't expect to take my full ten

25  minutes, but I just wanted the Court to be aware of that.

PG&E Corp., Pacific Gas and Electric Co.

1    We do, of course, understand the Court's tentative

2    rulings, and I won't have too much to say about those, other

3    than on two points which I would like to raise with the Court.

4    The two-hour rule and time spent on preparing fee applications,

5    which the second of those I don't believe Your Honor addressed

6    in the tentative rulings and for which we are going to just

7    request that the Court follow the applicable Northern District

8    of California guidance.

9    THE COURT:  Well, I pointed out simply the distinction

10   that seems to have been blurred between retention applications

11   and fee applications.

12   MR. ZUMBRO:  Correct.

13   THE COURT:  In the latter, the case law and

14   (indiscernible) and the Dincirca cases that are very favorable

15   to professionals are all on fee applications, right?

16   MR. ZUMBRO:  Correct.

17   THE COURT:  So what are you referring to beyond that?

18   MR. ZUMBRO:  Well, all I'm referring to is I think the

19   fee examiner had proposed a forty-hour cap for retention

20   applications, and then there was some confusion where there was

21   some reference to conflict strikes.  We understand the

22   conflicts generally aren't compensable.  We understand that,

23   and we also understand the fee applications and retention

24   applications are different --

25   THE COURT:  Right.

(973)406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    MR. ZUMBRO:  -- and that there's an ongoing

2 requirement for 2014 disclosures.  We understand all that.

3    Fundamentally what we're proposing, rather than the

4 twenty-hour a month limit on fee apps and the forty-hour limit

5 on the retention apps, what we're proposing, Your Honor, is so

6 that we follow the Northern District of California guideline on

7 this point, which is Guideline Number 6 which has a cap of five

8 percent.

9    THE COURT:  The five percent cap.

10    MR. ZUMBRO: Yes, sir.  And we understand that that's

11 not a presumptive rate --

12    THE COURT:  No, well, I -- silly me to say it in this

13 case, but it's a very punitive percentage in very small cases.

14    MR. ZUMBRO:  I understand, and some of the counsel who

15 are billing various small amounts in the case have requested

16 that they have the option of filing either the twenty-hour rule

17 or the five-percent rule.  We thinks that's a -- the five-

18 percent rule, we're nowhere near that.  Speaking for ourselves,

19 we're much closer to one percent than five percent.

20    THE COURT:  Well, that proves my point in the bigger

21 case.

22    MR. ZUMBRO:  In a big case.  But we do think it's

23 appropriate, Your Honor -- 330 is it (a)(6) of the code

24 specifically contemplates that fee apps are compensable and

25 it's supposed to be tied --

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    THE COURT:  Well, this is why I need to pin you down

2    and get retention applications, not fee applications.  So your

3    firm, prominent firm, national reputation; tomorrow you go back

4    to your office and suddenly somebody calls to your attention,

5    hey, we've taken on a new client.  That doesn't disqualify us,

6    but we have to make a disclosure.  So you amend your 2014(b)

7    statement, or whatever the number is.  I get my numbers mixed

8    up.  Yeah, 2014(a), do you get to bill for that?  I mean --

9    MR. ZUMBRO:  I don't really talk about --

10    THE COURT:  -- I think I know the answer.

11    MR. ZUMBRO:  We were really focused, and I think the

12    Milbank Firm on (indiscernible) DCC was really focused on the

13    initial retention application, and there was I think are 215-

14    page conflicts with us and ten-thousand people.

15    All I'm proposing, no, going forward I don't think

16    that has to be billable.  All I'm saying is that for the

17    initial retention application, which hopefully will be behind

18    us soon, the cap should be five percent coupled with the amount

19    of fee applications and interim fee applications in the same

20    period.  That's all we're proposing, one cap.

21    I don't think the Northern District Guideline -- it

22    only really relates to fee applications, monthly and --

23    THE COURT:  Well, no, that's true, and again I've been

24    around long enough.  I was here when not actually when those

25    compensation guidelines were first created, but nobody -- we

PG&E Corp., Pacific Gas and Electric Co.

1   didn't focus on all the 2014 type stuff that the case law's

2   come out with.  And again, I'm sure you and all the bankruptcy

3   professionals know the bad news, if you don't comply and you

4   get your fees cut in half or reduced by an appellate court.

5           MR. ZUMBRO:  And let me understand --

6           THE COURT:  But I don't think it was on the table when

7   we discussed those.

8           MR. ZUMBRO:  I understand, and I'm fine to stipulate

9   that we're not going to continue to bill the estate for ongoing

10  conflicts, Judge.  That's not what I'm trying to say.  I'm just

11  saying for the initial fee application -- I'm sorry.  The

12  initial retention application I just don't want it to unduly

13  capped by the amount that the professor is requesting.

14          THE COURT:  But are you --

15          MR. ZUMBRO:  We think that that's not appropriate.

16          THE COURT:  Are you saying that the professionals that

17  think they're willing to go back to the five percent, even for

18  the retention?

19          MR. ZUMBRO:  Correct.  One fee or five percent that

20  covers both retention application and the relevant periods

21  monthly and intern fee statements.

22          THE COURT:  Okay.

23          MR. ZUMBRO:  So just apply the Northern District Rule

24  6 to everything.

25          THE COURT:  All right.

(972) 503-2232  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    MR. ZUMBRO:  And then the other point that I just
2    wanted to address, Your Honor, we understand the Court's
3    default two-hour rule, but we would respectfully ask the Court
4    to reconsider the fifty percent discount approach proposed by
5    the professionals in light of the nature of this case and
6    Guideline 17 of the Northern District Guidelines.  We recognize
7    that that guideline states that airplane travel time is
8    generally not compensable, but it does go on to explain that if
9    a significant airplane travel time is expected in the case,
10   specific guidelines should be obtained for that case.  And,
11   Your Honor, that that is this case definitely --

12       THE COURT:  I think what you're saying is please make
13   it, if not retroactive, at least make it prospective now as
14   anticipated.

15       MR. ZUMBRO:  We would ask that applied throughout the
16   case --

17       THE COURT:  No, I know you do.  I know you do, but
18   remember that those guidelines, the district-wide guidelines,
19   were in place forever.  It was in the early months after 911,
20   after --

21       MR. ZUMBRO:  Okay.

22       THE COURT:  -- the first PG&E case that I added the
23   five -- I mean the two hours --

24       MR. ZUMBRO:  Oh.

25       THE COURT:  -- to what we'll call my local guidelines.

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    MR. ZUMBRO:  I understand.  I wasn't aware of that

2   history, Your Honor, but I --

3    THE COURT:  Well, I looked at it.  All you had to do

4   was try to fly from here to Los Angeles, and it --

5    MR. ZUMBRO:  Right.

6    THE COURT:  -- would take longer to go through

7   security than it would to be on the plane.

8    MR. ZUMBRO:  Right.

9    THE COURT:  And so --

10    MR. ZUMBRO:  We understand.  And look, I know, Your

11   Honor, we would like to point out, and I know it's not

12   controlling on Your Honor, but that is the approach that's

13   taken in a lot of large Chapter 11 cases --

14    THE COURT:  Right, and I'm aware of that.

15    MR. ZUMBRO:  -- in other districts, Texas and

16   Delaware.  And that's our request, that we respectfully ask

17   that you consider the fifty percent approach --

18    THE COURT:  Well, if you did it disrespectfully, I

19   probably wouldn't -- I'd probably have a different response,

20   but that's what you're asking that I do.

21    MR. ZUMBRO:  Would disrespect cause a better outcome,

22   or --

23    THE COURT:  I don't know.  Maybe so.

24    MR. ZUMBRO:  On redactions, Your Honor, we take your

25   point, and we accept that Guideline 13 should be the governing

escribers
(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    principle, so I don't think there's any issue there.

2         THE COURT:  Yeah, well, I understand that there may be

3    redactions already, and I'm willing to give people some leeway

4    to correct it, and not to get punished.  But again, I want to

5    just make sure you're clear -- because you're an experienced

6    lawyer, a lot of the lawyers here are very experienced -- when

7    you write down a time entry and you follow the standard who-

8    what-where-when, you don't have to act like somebody on CNN at

9    night that's telling about all the secret texts that have come

10   out and all this law -- be good judgement on what you put on

11   the time entry.

12        MR. ZUMBRO:  We understand, Your Honor.  Like a lot of

13   these things, there's a little bit of a tension between what

14   you just described and the fee examiner wanting sort of very

15   descriptive entries, and vague entries are sort of assumed to

16   be uncomped, that's the tension.  We're happy to follow --

17        THE COURT:  It's the tension and particularly perhaps

18   lawyers who are newer in the practice and not as experienced

19   might feel obliged to tell the whole story.  But I can tell you

20   more than once on occasion an indiscrete fee entry and a time

21   entry has led to some adverse consequences, having nothing to

22   do with fees being disallowed, but rather disclosing things

23   that shouldn't have been disclosed.

24        MR. ZUMBRO:  Correct.

25        THE COURT:  And I'm like, why did anybody do that?

(973)406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    But we don't call for that.

2              MR. ZUMBRO:  No, we --

3              THE COURT:  That's not the rule.

4              MR. ZUMBRO:  We appreciate the Court's guidance on

5    that point.

6              On the hearing schedule, we understand, and we accept

7    the Court's rule on the omnibus hearings for all professionals

8    will be held on the four-month intervals.

9              THE COURT:  See, I'm of the optimistic that they will

10   be hearings that will take no time, because it will all be

11   taken care of.  That's why we have the fee examiner.  That's

12   why we have the process of meet and confer, and obviously, if

13   there are still objections.  We'll hear them.  And hear them on

14   time made available for that subject without conflicts on other

15   matters.

16             MR. ZUMBRO:  Correct, and we understood your ruling to

17   say that the eighty percent rule would still apply in the

18   meantime.

19             The one point of difference, I do think and it sounds

20   like Your Honor alluded to it.  There was some confusion in the

21   motion, but our position is any issue that's not raised at one

22   of these interim fee app hearings should be raised again only

23   in the final fee app, so we're not relitigating interim fee

24   application issues over --

25             THE COURT:  Mr. Zumbro, would you tell me when the

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    final hearing is going to happen?

2         MR. ZUMBRO:  We're hoping --

3         THE COURT:  You know that we haven't had a final

4    hearing in PG&E 1 yet?  Are you around to help me review the

5    fees or will you be retired for several years?

6         MR. ZUMBRO:  Those are two -- you've gotten me on two

7    historical items.  I was not aware of that either.  I did -- I

8    do know that the PG&E 1 case is still open.

9         THE COURT:  Well, that's -- well, I mean, the point is

10   though functionally the fee apps are behind us, of course, but

11   what I'm getting at is that this notion of finality is -- you

12   know, it's a -- it's a dangerous thing.  I do understand that

13   it might well be here if we get to a confirmed plan.  That

14   that's the time to recognize that the Court's jurisdiction and

15   oversight should be curtailed as they are in most cases.  And

16   none of the fees are being reviewed in PG&E 1

17   post-confirmation, but the point is it's not a final hearing in

18   a technical sense.

19        MR. ZUMBRO:  We understand.  We were just -- there was

20   some language in the motion that suggested the fee examiner

21   would have sort of a unilateral right to set hearings, which we

22   would think should be the Court doing that.  And that we also

23   just wanted to make it clear that we understand and accept his

24   position that he needs to have sort of all of the applications

25   in front of him to adequately review them, but we just don't

PG&E Corp., Pacific Gas and Electric Co.

1    want there to be, kind of, in seriatim disputes on interim fee

2    applications to the extent we can avoid.

3              THE COURT:  Well, I mean, seriously, I -- no matter

4    what happens on the other motion on calendar today or what

5    happens in other courts or in other administrative proceedings,

6    I hope we'll get to a confirmed plan in the reasonable near

7    future.  And it may well be that for these purposes, that's the

8    finality in terms of -- and what is the role of the Court, and

9    the committees, and the U.S. Trustee and stuff.

10             MR. ZUMBRO:  Understood.

11             THE COURT:  Going forward we're all on the same page

12   about that.

13             MR. ZUMBRO:  Yes, sir.  Thank you.

14             THE COURT:  Okay.

15             MR. ZUMBRO:  So I think those are the only specific

16   issues that we're raising --

17             THE COURT:  Well, there seemed to be --

18             MR. ZUMBRO:  -- the fee examiner motions.

19             THE COURT:  -- there seemed to be a willingness or

20   unwillingness on the part of some of the professionals to ex --

21   to disclose budgets.  In other words, if there's a budget that

22   has been prepared, either at the request of the client, or

23   voluntarily, or the Court, which I don't think I've done, why

24   shouldn't there be some acknowledgment by the professional:

25   I'm under budget or I'm over budget or here's what the budget

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    was?

2           MR. ZUMBRO:  I didn't realize that was an issue for

3    today.  Yes.  We're happy to do -- the U.S. Trustee's

4    guidelines, I believe, require that to be done.  And we've done

5    that in ours.  And I believe Weil had done it in his.

6           THE COURT:  Well, when I went through Mr. -- Prof.

7    Markell's protocols and his response -- or maybe it was the

8    U.S. Trustee, I've forgotten a little bit.  I've read them

9    both, but I thought there was a resistance on the part of the

10   professionals to have to provide budget information in their

11   applications.  And my point is that if you have them and

12   they're already in existence, then it seems to me you should do

13   it, but -- and again, is it a sore point or?

14          MR. ZUMBRO:  No.  I don't think it's a sore point.  I

15   thing that it was just a lot of -- a lot of things in the

16   protocol were written in ways that were slightly inconsistent

17   with practice or the guidelines.  For example, the guideline

18   requires the budget to be filed with your interim fee

19   application.  All we were saying is if -- we'd like to follow

20   that proposal, but I don't think there's any -- there's no

21   issue there between us and the professor.

22          THE COURT:  Okay.

23          MR. ZUMBRO:  I would like to point out -- well, I

24   guess one point on the U.S. Trustee.  We didn't really respond

25   to their points because it was not their motion and they were

(970) 712-  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1   raising new substantive points in a -- in a response.  We'll

2   work out any issues we have with them, I think, in the ordinary

3   course.  The one point, I guess, Your Honor, had picked up on

4   today, I just wanted to make sure that the record was clear.

5   We take your point that you view it as a bright-line rule, but

6   I also just -- we have looked at this very carefully and under

7   the rules of professional responsibility we're confident that

8   everything we've done on the unadmitted first year is as

9   perfectly appropriate under both New York and California law.

10          THE COURT:  I don't -- I don't question that.  The

11  question is bright line in terms of if you're not admitted as

12  an attorney before the Court, you shouldn't be billing as an

13  attorney before the Court.  That's all.

14          MR. ZUMBRO:  We understand that that's different in

15  practices, but we understand Your Honor's position.  I don't

16  think it's zero, though, as Mr. -- as the fee examiner had

17  proposed.  And I just didn't want to go on the record --

18          THE COURT:  No.  I don't -- I don't disagree.

19          MR. ZUMBRO:  -- because the U.S. Trustee in its papers

20  had implied that there was some unauthorized practice of law.

21  We felt that was important to address.

22          And then, finally, Your Honor --

23          THE COURT:  Well, Mr. Zumbro, let's not kid ourselves,

24  the brightest new lawyer in your firm who hasn't yet been

25  admitted to the bar shouldn't be, "practicing law" in the --

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1  before this Court.

2          MR. ZUMBRO:  We understand.

3          THE COURT:  That doesn't mean he or she can't do, you

4  know, lots of other things that are compensable, and valuable,

5  and value added.

6          MR. ZUMBRO:  Correct.  That's -- we're not saying

7  anything different, Your Honor.  We understand.

8          THE COURT:  Okay.

9          MR. ZUMBRO:  The last point I would just like to

10 mention -- we do have -- they're very specific issues with the

11 fee examiner and a lot of the individuals as Mr. Markell --

12 Prof. Markell referred to.  He's in settlement discussions with

13 everybody.  I'm confident we're going to work those things out

14 without having to get the Court involved.

15          But as a backdrop to those discussions, for issues

16 that go beyond what we've addressed today, what Your Honor will

17 enter, I would like to know for the record that the fee

18 protocol is just, as I think Prof. Markell said, is just the

19 fee examiner's views on certain topics.  And it's not approved

20 or so ordered by the Court.  I don't think there's any dispute

21 on that, but I wanted to make sure the record was clear that --

22          THE COURT:  Well, I've reviewed the protocol as

23 permitted -- submitted and blacklined, and had some thoughts

24 about it, but this is why we're having this discussion today.

25          MR. ZUMBRO:  Right.  It's a bit --

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1     THE COURT:  And this -- that's why I want a further
2   effort to see if they can come to an agreement.
3     MR. ZUMBRO:  And we would appreciate that, Your Honor.
4   We did have one call with Prof. Markell, and as he admitted in
5   his papers, he effectively didn't take any of our changes so we
6   would appreciate if -- if he would maybe revisit our markup and
7   we could try one more time on that if that's what the Court is
8   indicating we should do.
9     THE COURT:  No harm.
10     MR. ZUMBRO:  All right.
11     THE COURT:  No harm in trying.
12     MR. ZUMBRO:  Yeah.  Okay.
13     THE COURT:  Okay.
14     MR. ZUMBRO:  Thank you very much.
15     THE COURT:  Thank you, Mr. Zumbro.  All right.
16     So Ms. Green are you here and Mr. Bray?  And I'm going
17   to hear from those two counsel, then Mr. -- Prof. Markell for
18   re -- closing comments, and then we're done for this one.
19     MS. GREEN:  Good morning, Your Honor.  Elizabeth Green
20   from Baker Hostetler --
21     THE COURT:  All right.
22     MS. GREEN:  -- and, as you know, we represent the TCC.
23     THE COURT:  I do.
24     MS. GREEN:  I actually agree with most of what Mr.
25   Zumbro said ex -- I wanted to make something clear for the

PG&E Corp., Pacific Gas and Electric Co.

1    Court though.  The fee examiner has put in his guidelines that

2    we should spend twenty hours a month preparing fee

3    applications.  And that a firm should be able to do that in

4    that period of time.

5          As to the TCC, we have forty-six TAS codes.  And they

6    include all of those things that you talked about earlier with

7    Mr. Zumbro -- the Tubbs litigation, the estimation proceedings,

8    the CPUC proceedings -- and in doing that, we are required, of

9    course, to describe what it is that we're doing in the fee

10   application.  And twenty hours a month is really untenable to

11   be able be able to do that.  I -- as long as we are going to go

12   with guideline 6, the TCC is fine with that.

13         THE COURT:  With the five percent?

14         MS. GREEN:  The five percent.  That will work, but in

15   terms of trying to comply with all of the descriptive

16   requirements, and also with the suggestions of the U.S.

17   Trustee, it's going to be a lot more difficult to be able to do

18   that in a twenty-hour period of time.  And as you know, the

19   Ninth Circuit BAP and the Ninth Circuit itself, and Baker Botts

20   allows for expenses related to the preparation of fee

21   applications.

22         And of course, that's benefit to the estate for

23   everybody to know what it is the professionals are doing and to

24   support their applications.  And so as long as we're with

25   guideline 6, we're fine with that.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Okay.

2          MS. GREEN:  Okay.  Thank you.

3          THE COURT:  Thank you, Ms. Green.

4          Mr. Bray, are you up for the OCC?

5          MR. BRAY:  Good morning, Your Honor.  Gregory Bray,

6   Milbank, counsel for the creditors committee.  I don't really

7   have much to add other than just, when I heard the U.S. Trustee

8   say, and I think I've got right, is that they want us to comply

9   with the applicable local guidelines and the U.S. Trustee

10  guidelines, which we have every intention of doing unless

11  circumstances suggest otherwise, and you give us an exception.

12         And -- but both the fee examiner and the U.S. Trustee,

13  there's a lot of ink spilled in there and it's very dense about

14  exactly what it is we're supposed to be doing, but as long as

15  it's understood what we're supposed to do, what the

16  well-established case law says, what the local guidelines say,

17  and what the U.S. Trustee guidelines say, I think -- I think

18  we're all in agreement.

19         I'm a little concerned that we're going to get into a

20  level of nuance and substance that -- I think Ms. Green

21  articulated it too, that attempts to say you can bill X number

22  of hours for X particular task, and this and that.  And unless

23  those are within the already established guidelines, or the

24  Court for some reason, is inclined to layer on additional

25  guidelines here, we would hope that what comes out of this is

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1   that we follow the rules that are in place --

2          THE COURT:  Well, but some of the provisions in the

3   protocol, even if they're not consensual, they may be other

4   than, or in addition to either the other kind of guidelines.

5          MR. BRAY:  I agree.  And you may decide that --

6          THE COURT:  Right.

7          MR. BRAY:  -- some of those are appropriate.  Some of

8   them may not be, but I would just again, there is

9   well-established case law.  The Ninth Circuit all the way back

10  from Nucor (ph.) going forward hasn't been very clear, in many

11  of these instances about what's allowable, what's not.  There's

12  Supreme Court case --

13         THE COURT:  I know.

14         MR. BRAY:  I mean, there's a lot of law.

15         THE COURT:  But I mean, Nucor was a blessing to --

16         MR. BRAY:  I understand.

17         THE COURT:  -- every lawyer in the world loved Nucor,

18  right?

19         MR. BRAY:  Well, but there -- but since then then

20  there's also been, you know, the Supreme Court -- it's just

21  there's a lot of law.  There's local guidelines.  There's U.S.

22  Trustee guidelines.  And just our final request is that, to the

23  extent we can stay within those and those guardrails, we think

24  we're all better off.  To the extent the Court feels it really

25  is necessary to modify those then, then that's -- of course, we

                PG&E Corp., Pacific Gas and Electric Co.

1   will abide by that.

2           THE COURT:  Well, I mean, I don't recall,

3   specifically.  I mean, I remember the basic principal of Nucor.

4   I wonder how -- I remember how it broke from the rule.  The

5   rule was never to appeal an adverse fee hearing, you're going

6   to do worse, right?  But that didn't happen in Nucor.  It was

7   the one time the lawyers did better.

8           But you know, some of the specific things that the

9   U.S. Trustee's objected to was number of lawyers and the

10  huge -- you know, the population, the large groups of people

11  that are attending hearings when they could be on the phone.  I

12  mean, the case law doesn't address that.

13          MR. BRAY:  No --

14          THE COURT:  And the -- but protocols, to me, are

15  helpful in a case of this magnitude.

16          MR. BRAY:  And as I said, you, Your Honor, you may

17  conclude in this case that type of an embellishment is

18  appropriate, but again, we're just -- our request is again, the

19  extent we can stay within the existing guidelines and

20  guardrails, we would request to do that.  Of course, if you

21  believe that's additional guidance, or you think it would be

22  helpful for the process, we will of course, do that.

23          But it's ultimately the Court's, subject to or guided

24  by the rules and --

25          THE COURT:  By the law, maybe?

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          MR. BRAY:  Yeah.  Guided by the law.  Well said.

2          THE COURT:  Oh, heck.  I don't why I have to follow

3    that.

4          MR. BRAY:  To make the decision here.  Yes.  And we

5    just -- we -- I've said enough.

6          THE COURT:  I got you.

7          MR. BRAY:  Thank you, Your Honor.

8          THE COURT:  All right.  Professor, since I used to

9    call you Judge, but now you're Professor, you have the closing

10   comments.

11         MR. MARKELL:  Thank you, Judge Montali.  You can call

12   me Mr., you know, as my mother used to say, you can call me

13   anything but late for dinner.

14         THE COURT:  I've called you other --

15         MR. MARKELL:  Respect --

16         THE COURT:  -- things in the past, but I'm going to --

17   but I'm not going to do it now.

18         MR. MARKELL:  And I will not return the favor.  So a

19   lot -- a lot has been said about the protocol, and before I

20   kind of get into, kind of, some of the details, I would, as you

21   thought -- as you suggested earlier, like the opportunity to

22   respond in writing to some of the concerns of the U.S. Trustee

23   and the retained professionals.  Timeline, I will leave up to

24   you because I think, especially, given, kind of where I am,

25   with respect to the various professionals, I would like to have

PG&E Corp., Pacific Gas and Electric Co.

1    the opportunity to put that in writing in a way in which I can

2    make sure that I'm honoring my confidentiality agreements with

3    various people.

4         THE COURT:  Well, I certainly want you to do that.

5    And I don't want you to renege on an agreement you made.  I

6    mean if you -- you know, if we -- if I end up making a rule

7    that is different from what you might have already reached by

8    way of a compromise with a particular professional, we're not

9    going to mess that up.  I mean, the sanctity of that agreement

10   is more important.

11        MR. MARKELL:  I understand that.  And a lot of what

12   has been talked about today actually has been rolled into some

13   of the negotiation.  I mean, you mentioned earlier that you

14   haven't heard anybody has questioned the rates.  I've not done

15   that publicly.  I have done that privately.  We are talking

16   about a wide range of things when we sit down and talk to the

17   various professionals.

18        And in some cases, you know, the professionals have

19   been very responsive and very helpful.  Some cases, not so

20   much.  And so it's -- as with all things, it's a little bit

21   unruly.  I would simply say that one, with respect to the

22   travel aversion, as I said earlier, I agree with your tentative

23   ruling.

24        THE COURT:  But even my tentative ruling -- my

25   tentative ruling is even that, is a -- is a departure from your

PG&E Corp., Pacific Gas and Electric Co.

1  recommendation, so.  Right?

2       MR. MARKELL:  Well, yes.

3       THE COURT:  Okay.  Okay.  That's all right.

4       MR. MARKELL:  I mean, my -- in many cases, my

5  recommendation is such that I saw guideline 17 and I saw your

6  two-hour rule.  And I also saw that both of them indicated

7  that, you know, courts -- excuse me, firms, if they wish to do

8  so, could request difference and no one here, as was said

9  before, requested anything different.  Again --

10      THE COURT:  Well, you've just heard -- but the request

11  was just made from the podium, though, consistent with the --

12      MR. MARKELL:  And I would -- and I would -- and I

13  would oppose -- I mean, for example, I think is perfectly

14  reasonable to have a two-hour rule, as you say.  I mean, my

15  role in this to be -- and you please do correct me, as you've

16  done before, with respect to this.  In this matter, as fee

17  examiner, I am in many respects your proxy.  I am trying to

18  alleviate work that would come to you in terms of assessing

19  whether or not the professionals have complied with Section

20  330.

21      And so my role in this is to -- is to expedite the

22  process, as you said, hopefully to have hearings in which there

23  is no hearing, that people just kind of, oh, see if there's any

24  objections and we go forward.  But at the same time -- and the

25  protocol was based on protocols in many other cases.  I

PG&E Corp., Pacific Gas and Electric Co.

1    consulted with other key professionals.  There are some, but

2    not a lot in there, that is different than other cases.  And

3    unfortunately, lawyers sometimes, when given a guideline, think

4    that it's an ironclad rule.  And kind of the reverse of that is

5    for example, the discussion with respect to fee applications

6    and retention.  Everyone loves the five percent cap.  I'm okay

7    with that, but I'd like it understood that that's a cap, and

8    what may be reasonable may be much less than that.

9          And all I have been doing is I have been looking at

10   what people have been charging is not so much, did you hit the

11   five percent cap and go over it, because I don't think that's

12   what that rule is intended to do.  I've been looking at whether

13   or not what the time in is reasonable of -- and have not taken

14   the five percent as that to which they could go to without any

15   other restrictions.

16         THE COURT:  Okay.  In other words, it's not

17   commission.  It's not a --

18         MR. MARKELL:  Yeah.

19         THE COURT:  -- five percent like jacked on your

20   restaurant bill, right?

21         MR. MARKELL:  Right?

22         THE COURT:  There were six people at your table, so

23   we're adding --

24         MR. MARKELL:  That's --

25         THE COURT:  -- twenty percent.  Right?

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    MR. MARKELL:  Right, it's not service.  Yes.  And in

2  fact -- and I think Mr. Zumbro got it -- got close to the mark.

3  The protocol is a series of my understanding of what reasonable

4  compensation is under Section 330(a)(1).  I am not doctrinaire

5  on that.  I mean, you know, the context is most times

6  everything.  And I've certainly been, in my negotiations, I

7  think, willing to listen to different concerns with respect to

8  some of them, but on many of these aspects, again -- let's take

9  redactions.  I have not said, and do not say that if any part

10  of a time entry is redacted, it's not allowed.  What I have

11  said, is I can't review what I don't know.  And unless there's

12  enough information to assess it, I would have to say it's not

13  permissible.

14         I've also given the professionals some guidance about

15  how to get around that.  Give the information so that they

16  protect their privilege, which I understand they should.  But

17  at the same time, there are situations and times under which

18  you could take a look a time entry and you can't figure out

19  what's going on or it's too vague.  You know, our job is to --

20  is to object.

21         So I'm more than -- I'm willing to enter into other

22  discussions with respect to the protocol.  I will tell you that

23  the one call that we had on this, which occurred in June, was

24  not very productive and not very helpful.  I would hopefully

25  have another attempt at it, but I think some of the things that

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1  have been requested, I think, maybe they're negotiating in a

2  way in which people might think I'm negotiating, which is start

3  high and then hope for something in the middle.

4      If that's the case, presumably we could come up with

5  something, but I think -- and I guess my concluding comment

6  would be I would separate out reaching agreement on a protocol

7  from any order that would come out of this hearing because I'm

8  not exactly sure their necessarily tied to one another.  And

9  indeed, I think the professionals need some direction with

10  respect to the issues that I have raised in the motion.

11      THE COURT:  Okay.  Well --

12      MR. MARKELL:  With that, unless you have any quick

13  questions.

14      THE COURT:  Well, I have a -- I have a comment and a

15  question.  My comment is you made the observation that, to some

16  extent, you're a proxy for the Court and I guess I agree with

17  you, in part, because you're getting -- you have to put in a

18  lot of effort to do something.  I simply don't have the time or

19  the ability to do what you and your software provider can do

20  for you.

21      But to some extent you're not a proxy because I am not

22  a trial judge who can take off my robe and sit down at the

23  table with litigants and mediate at the same time, at least in

24  this case.  I can mediate in some other case, but to the extent

25  that --

escribers
(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1        MR. MARKELL:  Right.

2        THE COURT:  -- but to the extent that you play a

3   mediator role, such as, perhaps, you've done with the firms

4   that you've reached a tentative understanding, then I think

5   that's a very important act.  And I think for the same reason,

6   this isn't the hearing in June, the meeting in June.  This is

7   the first time we've had a hearing of this nature.  I've gotten

8   such --

9        There's been a lot of attention from a lot of highly

10  experienced professionals, and I, for one, have taken at least

11  a little bit of time to lay out my thinking on some of the big

12  ticket items; some of the smaller items I've -- almost every

13  one of them -- we've already covered, just in the course of

14  this colloquy.  About the only one that's on my list as sort of

15  the -- not as big is the question of whether any of the

16  professionals should be recording or reporting time spent on

17  other matters.  And I think I agree with them.  I believe

18  that's your protocol provision 5.1.2, that -- and I don't think

19  it's appropriate for Lawyer X to say, by the way I spent

20  fifteen hours or twenty hours or twenty minutes on a matter for

21  another client that's unrelated to PG&E.  So that, I come out

22  on their side on that one.

23       So here's what I'm going to do.  I -- I mean, I do one

24  thing that's a bit unusual --

25       MR. MARKELL:  Yeah, can I -- can I speak to that just

(979) operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1   for one second --

2           THE COURT:  Yes.

3           MR. MARKELL:  -- Judge Montali?

4           THE COURT:  Yes sir.

5           MR. MARKELL:  Real briefly on that.  My concern is

6   that I don't want to know specifically.  I want to know in the

7   aggregate.  Because one of the concerns that I have, and it

8   comes in the twelve-hour billing, and it comes in other things,

9   that many times professionals are, if you will, overworked.

10  And when they're overworked, if you accept that, then I'm not

11  sure they're worth their hourly rate.  And I had asked that in

12  5.1.2, to get a better sense of how -- I mean, someone may work

13  two hundred hours a month on PG&E, and that's fine, but if

14  they're working two hundred hours on another case, then I want

15  to know a little bit more about whether or not what they have

16  billed is reasonable.

17          THE COURT:  They may --

18          MR. MARKELL:  But that's all.

19          THE COURT:  They may -- they may -- they may be --

20          MR. MARKELL:  As you point out --

21          THE COURT:  They may be spending three hundred hours a

22  month taking care of an aging parent.  I don't want to go

23  there.  I think it's a bad --

24          MR. MARKELL:  Fair enough.

25          THE COURT:  -- precedent.  And they're -- so you can

PG&E Corp., Pacific Gas and Electric Co.

1   look at the time and -- and this gets back to the point.  If

2   you say, why did attorney so and so have five hours for the

3   entire month; what was going on?  An offline conversation with

4   the professional one-on-one is how the system ought to work.  I

5   don't want to make it public and --

6           MR. MARKELL:  Right.

7           THE COURT:  -- make a big deal.

8           All right, here's what I'm going to do.

9           MR. MARKELL:  Okay.  Thank you.

10          THE COURT:  Thank you for your time.

11          I'm going to take the matter under advisement.  I'm

12  going to give Professor Markell and Mr. Zumbro -- I'm looking

13  at you, but I'm -- Ms. Green, Mr. Bray, anyone else, I'm going

14  to say ten days -- in the next ten days make an attempt at

15  least, meet and confer by telephone or Skype or however you

16  want to do it, but you don't have to -- no traveling first

17  class cross-country to have a face-to-face meeting unless you

18  eat the time -- ten days to see if you can come up with any

19  improvements or adjustments to the protocol.  And at the same

20  ten-day deadline, Mr. -- Professor Markell, I'll give you no

21  more than ten pages of a response, and then the matter will be

22  submitted.

23          I'm going to make one other direction to you, Mr.

24  Zumbro, and it's not something I've done before, but I'm going

25  to do it anyway; I want in that -- at the end of the ten days,

PG&E Corp., Pacific Gas and Electric Co.

1    after you've had a discussion from -- with Mr. Markell,

2    Professor Markell, I want a statement from a senior officer,

3    either the CEO or the general counsel or Mr. Wells are the

4    three people that -- I want someone from the company to tell me

5    what he or she -- his or her position on these matters.  Not

6    line by line, not you know, detailed, just a statement of what

7    from the corporate -- executive office's point of view is what

8    is their response and position on this kind of expense -- these

9    kind of expenses being paid to the professionals.  And I don't

10   want it to turn into a puff piece on my lawyers are the best

11   lawyers in town.  I'll assume that they believe that.  I just

12   want to have a corporate officer tell me what he or she thinks

13   about these items, such as the ones that we've been talking

14   about.  And I will take it into account.  And with that, I'm

15   going to treat this matter as submitted.

16            MR. ZUMBRO:  Your Honor --

17            THE COURT:  Is there a --

18            MR. ZUMBRO:  -- could I make one comment.

19            THE COURT:  Yeah.

20            MR. ZUMBRO:  We will diligently work toward some sort

21   of consensus, but there are twenty-four retained professionals

22   in this case.

23            THE COURT:  I know.

24            MR. ZUMBRO:  What I am hearing is we're going to try

25   to build some consensus with the U.S. Trustee's Office,

PG&E Corp., Pacific Gas and Electric Co.

1     Cravath, Milbank, Baker Hostetler; that's four entities, not

2     twenty-four entities.

3            THE COURT:  Well, that's right.

4            MR. ZUMBRO:  Okay.

5            THE COURT:  That's right.  But that doesn't mean -- I

6     mean, if you file something and -- look, the matter's

7     submitted.  I heard from Mr. Zumbro for a group of people.  I

8     heard from Mr. Bray, specifically.  I believe his firm was the

9     only firm that filed a separate response.  TURN filed a

10    response, and the U.S. Trustee filed a response.  So those are

11    the people that thought enough to respond.

12           MR. ZUMBRO:  Excellent.

13           THE COURT:  And that's what I'm going to do and take

14    the matter under advisement.

15           MR. ZUMBRO:  All right.  We're front in line.  Thank

16    you, Your Honor.

17           THE COURT:  All right, matter submitted -- I mean,

18    along the lines we talked.

19           Professor --

20           MR. MARKELL:  Thank you.

21           THE COURT:  -- Markell, thank you for your time.  Are

22    you going to stay on for the rest of the hearing?

23           MR. MARKELL:  No, unfortunately I'm in between

24    classes.  I have to go teach now, so.

25           THE COURT:  Teach well.

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          MR. ZUMBRO:  Thank you, Your Honor.

2          THE COURT:  Okay.

3          MR. MARKELL:  Thank you.

4          THE COURT:  Mr. Karotkin, are you going to give me a

5  update on the other matters, our briefing matters?

6          MR. KAROTKIN:  Yes, Your Honor.  Stephen Karotkin,

7  Weil, Gotshal, and Manges for the debtors.  Just that, as a

8  point of order, I don't know about you, but by the time you get

9  to the final fee hearing in PG&E one, I will assure you that

10  Mr. Kornberg and I will be retired.

11          THE COURT:  Well, I won't be.  Sorry.

12          MR. KAROTKIN:  With respect to the scheduling, we're

13  still trying to work that out.  And could we put that to the

14  end of the hearing?

15          THE COURT:  Oh, sure.

16          MR. KAROTKIN:  Okay.

17          THE COURT:  Yeah, I mean I -- I -- yes, but what's the

18  answer to the Cum -- Cum -- you know the --

19          MR. ZUMBRO:  Cantu.

20          THE COURT:  -- the name I'm forgetting.

21          MR. ZUMBRO:  Cantu.

22          THE COURT:  Huh?

23          MR. ZUMBRO:  Cantu.

24          THE COURT:  The issue on the -- on the --

25          MR. KAROTKIN:  I'll let Mr. --

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  -- brief.

2          MR. KAROTKIN:  -- Orsini address that.

3          THE COURT:  Yeah, Mr. Orsini.  Sorry, I forgot the

4     name.  You know what I mean.

5          MR. ORSINI:  Cantu, Your Honor.

6          THE COURT:  Cantu, Cantu.

7          MR. ORSINI:  Good morning.

8          THE COURT:  Cantu.

9          MR. ORSINI:  Kevin Orsini for Cravath, on behalf of

10    the debtors.

11         THE COURT:  So -- so, I mean, it seemed like it

12    belonged here rather than upstairs.

13         MR. ORSINI:  We're happy to brief it anywhere, Your

14    Honor.  I think our expectation was -- just going back, there

15    are two different issues with respect in this combination.

16         THE COURT:  What kind of issues?

17         MR. ORSINI:  There's a threshold challenge which says,

18    doesn't apply to us because we're in a restaurant utility.

19    That applies irrespective of the fact --

20         THE COURT:  Right.

21         MR. ORSINI:  -- of any particular fire.

22         THE COURT:  Now that's clear.

23         MR. ORSINI:  That's clearly before Your Honor.  The

24    Cantu argument is fact specific.  It will apply to some fires

25    and not others.

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    THE COURT:  But they're not facts that are likely to
2  be --
3    MR. ORSINI:  But I don't believe they are facts in
4  dispute, which is why we will submit a non-summary judgment.
5    THE COURT:  Well, and -- Mr. Orsini, more
6  specifically, it doesn't seem to me to implicate the personal
7  injury wrongful death piece that is why --
8    MR. ORSINI:  That is --
9    THE COURT:  -- why you were sent upstairs.
10    MR. ORSINI:  That's a hundred percent correct, Your
11  Honor.
12    THE COURT:  Okay, that's all.
13    MR. ORSINI:  Since by definition, inverse is property
14  damage.
15    THE COURT:  Yeah.  So I mean if any of the personal
16  injury lawyers or the TCC lawyers have a different view, maybe
17  they better be heard before we end up today.  But what I'll do
18  is, we'll move to the exclusivity issue as Mr. Karotkin
19  suggested, and by the end of the hearing, if there's an
20  agreement on the timing for briefs, I'll take it.
21    And I'm not going to hold you to it, Mr. Karotkin.  If
22  there -- if it takes more time, that's okay with me.  I just
23  want to know what the time is, and if you guys file a
24  stipulation that says you're going to brief it tomorrow and
25  we're supposed to make a ruling on Thursday, that won't work.

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          MR. ORSINI:  I'll let Mr. Karotkin propose that, Your

2     Honor.

3          THE COURT:  Yeah, okay.  Okay, so Mr. Karotkin, are we

4     ready to go to the exclusivity issue?  Or you want -- that's

5     where I think we are.

6          MR. KAROTKIN:  Yes, sir, I believe so.

7          THE COURT:  Okay, well, I -- I'm not going to take a

8     break.  Let's do it.  And we have given you the time on that,

9     so here we go.

10          MR. QURESHI:  Good morning, Your Honor.  For the

11    record, Abid Qureshi, Akin, Gump, Strauss, Hauer, Feld on

12    behalf of the Ad Hoc Noteholder Committee.  Before we start the

13    stopwatch, Your Honor, if I could just give you the allocation

14    on our side?

15          THE COURT:  Sure.

16          MR. QURESHI:  So I will lead off on behalf of the

17    Bondholders for approximately fourteen minutes, followed by the

18    TCC for eight minutes.  The TCC is going to yield some of their

19    time to the Singleton Firm, followed by the UCC for eight

20    minutes, and then TURN and the IBEW for a total of five

21    minutes.  That leaves roughly ten minutes that I would like to

22    reserve for rebuttal.

23          THE COURT:  Okay, thank you.

24          MR. QURESHI:  Okay.  So with that, Your Honor, why

25    don't I jump right in and start with the question Your Honor

PG&E Corp., Pacific Gas and Electric Co.

1  posed which is what has changed?  A tremendous amount has

2  changed since the last hearing.

3      Let me start with the debtors and their equity holders

4  and the plan that they have filed.  Your Honor, that plan is an

5  extraordinarily risky one.  It is a one-way bet on the outcome

6  of the TUBS trial, of the estimation proceedings, and

7  resolution of the yet-to-be-filed government claims for both

8  federal and state agencies.  If exclusivity is maintained, Your

9  Honor --

10      THE COURT:  Well, and I have to stop you there.

11      MR. QURESHI:  Sure.

12      THE COURT:  If the government claims come in and I

13  take the view that that gets to be treated separately, then

14  it's going to be treated separately.  I mean, in other words,

15  if in my view it can't be estimated because of the reasons that

16  we stated, then I'm not sure where we go with the PG&E plan.

17      MR. QURESHI:  Right, well, the issue Your Honor, is

18  those --

19      UNIDENTIFIED SPEAKER:  Your Honor.  I apologize.  I

20  don't mean to interrupt.  We're having difficulty hearing you.

21  Can I make a request --

22      THE COURT:  Sorry.

23      UNIDENTIFIED SPEAKER:  Thank you, sir.

24      THE COURT:  I do my best, and you didn't interrupt.  I

25  appreciate the interruption.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1        UNIDENTIFIED SPEAKER:  Thank you.

2        MR. QURESHI:  So Your Honor, the yet-to-be-filed

3   government entity claims, FEMA, other California state

4   agencies, those claims are not part of the estimation

5   proceedings.  Our understanding, Your Honor, is that with the

6   debtor's plan, there is an aggregate cap, 18.9 billion dollars,

7   on all wildfire liabilities, inclusive of those claims.  And so

8   the point I am making, Your Honor, is that when one takes the

9   pieces that build up to that wildfire liability cap, TUBS, the

10   estimation proceeding, the yet-to-be-filed claims -- Your

11   Honor, this is an extraordinarily risky plan.  The Creditor

12   plan --

13        THE COURT:  Well, tell me why you call it risky.

14        MR. QURESHI:  Sure.  Because of the financing, Your

15   Honor.  So let's review the breakdown right now of the 18.9

16   billion dollars.  So let's start with, Your Honor, 18.9 billion

17   representing in their financing commitments, both the equity

18   financing and the debt financing, a cap on wildfire liability

19   claims.  So what that means is, if the total wildfire

20   liabilities come in above that number, there is no more

21   committed financing for their plan.  So what is the breakdown

22   for the eighteen --

23        THE COURT:  Well, that -- okay, let me stop there.

24        MR. QURESHI:  Sure.

25        THE COURT:  There's no more committed financing today,

escribers
(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    but like any other plan, when it comes time to either disclose

2    in a disclosure statement or more likely, to pre-trial or brief

3    your -- how you're going to meet your confirmation standards,

4    there's going to be a proof of -- by the way, here's how I'm

5    going to prove feasibility.  And if they can't -- if they can't

6    close the loop, they will lose, but that doesn't mean the plan

7    is fatally flawed at the moment.

8         MR. QURESHI:  Your Honor, here is the issue.  And this

9    is why exclusivity must be terminated today, respectfully.

10   Under their plan, because those financing commitments, both the

11   debt and the equity, are premised upon a cap on liability, the

12   first point is to understand that those financing commitments

13   cannot be changed at the stroke of a pen.  And the reason for

14   that, Your Honor, is that the financing that the equity

15   holders -- and that is who it is coming from -- the equity

16   financing from the equity holders is premised upon a recovery

17   on account of their existing equity.  And in their plan --

18        THE COURT:  Right.

19        MR. QURESHI:  -- when they cap liability at 18.9

20   billion dollars, that leaves approximately a seven-billion-

21   dollar recovery to the equity holders on account of their

22   current equity.  But Your Honor, when that liability goes up --

23   so in addition to the financing commitments going away

24   completely -- when that liability goes up -- so let's take as

25   an example, the 25.5-billion-dollar-aggregate number that is

PG&E Corp., Pacific Gas and Electric Co.

1    the settlement in the Creditor plan; if we have estimation and

2    the TUBS trial and the government claims get resolved, and all

3    of that comes out to 25 billion dollars, the value that is

4    remaining for equity on account of their current equity

5    interests all but disappears.  There is virtually nothing left.

6    At the 25-billion-dollar level, it's a few hundred million

7    dollars.  So the point, Your Honor, is that the equity holders

8    will have no more economic incentive at that point to put up

9    more financing, in addition, to no contractual obligation on

10   either the equity or the debt side to do it.  And that is why,

11   Your Honor, there needs to be an alternative.  And the

12   alternative is the Creditor plan.  And the Creditor plan has a

13   25.5-billion-dollar settlement?

14            THE COURT:  Well you call it -- the other side doesn't

15   quite call it a settlement.

16            MR. QURESHI:  Well --

17            THE COURT:  But leave it aside there -- it's a figure.

18            MR. QURESHI:  It -- it, well, it --

19            THE COURT:  It's a number.  I'll take it as the

20   number.  That's --

21            MR. QURESHI:  Well, but -- but Your Honor, I think

22   it's more than a number, because what it represents is an

23   agreement as to what an aggregate cap on wildfire liabilities

24   will be.

25            THE COURT:  But what -- what happens if your plan goes

escribers
(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1  forward --

2          MR. QURESHI:  Sure.

3          THE COURT:  -- and in January or February, TUBS plus

4  Judge Donato, estimates the liability claims at sixteen

5  billion, seventeen billion dollars, eighteen billion?  What

6  happens?

7          MR. QURESHI:  So I --

8          THE COURT:  Your plan's dead, right?

9          MR. QURESHI:  I concede that if the claims come in at

10 that level, yes.  Our plan, unless it is modified for where a

11 claim is --

12         THE COURT:  Well, claims come in -- claims come in or

13 the estimation?  I mean the --

14         MR. QURESHI:  Again, it's the combination, Your Honor,

15 of --

16         THE COURT:  Well, I understand but the --

17         MR. QURESHI:  -- all wildfire liabilities.

18         THE COURT:  But Mr. Qureshi, when the claims deadline

19 occurs, that doesn't mean we know what the claims are.  We know

20 what the asserted claims maxim is, but chances are there's some

21 fluff in some of those claims, right?

22         MR. QURESHI:  Correct.

23         THE COURT:  Okay.  So my point is, though, your plan

24 is out if -- is dead if the estimation plus TUBS -- well,

25 that's just another form of estimation --

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          MR. QURESHI:  Sure.

2          THE COURT:  -- exceeds your figure, right?

3          MR. QURESHI:  Not exceeds, Your Honor.  If estimation

4    plus TUBS plus the government claims --

5          THE COURT:  I'm backing your eleven billion for the

6    (indiscernible) and just focusing on the fire victims.  So

7    that's fourteen and a half billion, right?  Right?

8          MR. QURESHI:  So you --

9          THE COURT:  Right?

10         MR. QURESHI:  Correct, so --

11         THE COURT:  So if the estimation is sixteen billion

12   for fire damage, what does that do to your plan?

13         MR. QURESHI:  Our plan in that circumstance is not

14   dead, Your Honor, because we have an agreement, a settlement,

15   with the TCC for an aggregate cap of 25.5.  So let's talk about

16   a world where ours is the only plan -- not suggesting that

17   that's the case, but just to test the --

18         THE COURT:  Well, you'd like there to be, but at the

19   moment, that isn't the case.

20         MR. QURESHI:  And we're not suggesting today, Your

21   Honor, that the debtor shouldn't be permitted to proceed with

22   their plan.  But just to illustrate this point.  So our plan,

23   we do not believe requires estimation.

24         THE COURT:  No, I know that.  I know that.

25         MR. QURESHI:  Right?

escribers
(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    THE COURT:  But that's not, but that --

2    MR. QURESHI:  Right.

3    THE COURT:  -- but until your plan is in and their

4  plan is withdrawn, there's got to be an estimation if we want a

5  compromise, right?

6    MR. QURESHI:  We agree.

7    THE COURT:  So you still haven't explained --

8    MR. QURESHI:  We -- we --

9    THE COURT:  I'll shut up and let you tell me, but

10  explain to me --

11    MR. QURESHI:  Sure.

12    THE COURT:  -- what happens if the estimation exceeds

13  14.5 for the victims.

14    MR. QURESHI:  Our plan is still confirmable in that

15  eventuality.  Again, we have an agreement with the TCCs to have

16  the aggregate liabilities to be 25.5 billion dollars,

17  irrespective of what might happen in estimation.  So we would

18  then proceed to confirmation with our plan --

19    THE COURT:  But -- but why -- but suppose -- wait a

20  minute.  If the estimation comes in more than the twenty-five

21  and a half -- and again, it's easier for me to focus on the --

22    MR. QURESHI:  Sure.

23    THE COURT:  -- take the subrogation out.  So if -- if

24  magically I could tell Judge Donato plus TUBS jury says 18

25  billion, how -- what -- well, your 14.5 is off the table.  Who

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1   would ever vote for it?

2          MR. QURESHI:  Well, Your Honor, the point is in that

3   circumstance, unlike the equity holders, if it comes in above

4   that number, we will have the ability, if it is necessary, to

5   increase the recoveries in our plan.  So the point --

6          THE COURT:  And wouldn't PG&E have the similar ability

7   to do it?

8          MR. QURESHI:  Theoretically, Your Honor, that is

9   right.  But the point with the equity plan is they're not going

10  to have an economic incentive to do that.

11         THE COURT:  Why would your plans have an economic

12  incentive?

13         MR. QURESHI:  Because --

14         THE COURT:  Well, it's the same numbers, right?  The

15  same residual value.

16         MR. QURESHI:  No, Your Honor.

17         THE COURT:  No?

18         MR. QURESHI:  Because of the absolute priority rule.

19  Equity comes last.  So the first thing that happens when claims

20  start coming in about -- remember, in their plan, they are

21  giving existing equity a seven-billion-dollar recovery.  So

22  when claims -- and that's premised upon an 18.9-billion-dollar

23  cap on wildfire liabilities.

24         THE COURT:  Yes, I understand.

25         MR. QURESHI:  So if those liabilities come in above

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    18.9 billion -- set to the side commitments, okay?

2          THE COURT:  Or stated differently, if the estimation

3    comes in higher.

4          MR. QURESHI:  Correct.  If estimation comes in higher,

5    then that eats into the recovery on account of their existing

6    equity.

7          THE COURT:  But I guess what I'm missing, I'm sorry

8    to --

9          MR. QURESHI:  Yeah.

10          THE COURT:  -- beat this to death.  Why isn't that the

11    same consequence under your plan?  If the -- I mean, if

12    everything else is the same -- what you've pointed out is that

13    there's seven billion dollars reserved for equity under the

14    PG&E plan.  But if the -- if the claims go higher, that equity

15    goes lower.  Why isn't the same result for you?

16          MR. QURESHI:  In the circumstance of the equity, Your

17    Honor, when estimation comes in at approximately a twenty-five-

18    billion-dollar number, their interest is wiped out.  It's gone.

19    Okay?  So their existing equity becomes worthless, and in that

20    eventuality, they don't have an economic incentive to put up

21    the financing.

22          In our case, there absolutely can come a point,

23    depending on where estimation comes in, where we become

24    impaired, where this is no longer a solvent to state.

25          THE COURT:  Um-hum.

PG&E Corp., Pacific Gas and Electric Co.

1          MR. QURESHI:  But when we become impaired, Your Honor,

2     the bondholders still have an approximately fifteen- or

3     seventeen-billion-dollar position that they are here to

4     protect.  And it may be in that circumstance, Your Honor, that,

5     when we no longer have a solvent to state, that the bondholders

6     are no longer entitled to a recovery in full.  But, Your Honor,

7     we still have, at that point in time, an economic incentive to

8     protect the bond position.

9          THE COURT:  Well, I think what you're telling me in

10    simple words is that, if the estimation is higher than 14.5 or

11    whatever the breakpoint is to eliminate equity under the PG&E

12    plan, you will simply eat it, absorb it, at the --

13         MR. QURESHI:  Well --

14         THE COURT:  -- senior debt level.

15         MR. QURESHI:  -- so -- so --

16         THE COURT:  Right?

17         MR. QURESHI:  But not right away, Your Honor.

18         THE COURT:  Yes.

19         MR. QURESHI:  Because the first thing that happens

20    under our plan -- again, we have a settlement with the TCC.

21    That settlement is not conditioned upon the outcome of the

22    estimation proceedings.

23         THE COURT:  No, I understand that.

24         MR. QURESHI:  Right?  And that settlement has an

25    aggregate cap of the 25.25 -- 25.5 billion --

PG&E Corp., Pacific Gas and Electric Co.

1        THE COURT:  Okay, but I'm going to -- I -- I --

2        MR. QURESHI:  Sure.

3        THE COURT:  I gave you time and then I'm taking it

4  away.  What happens if the estimation comes in below your

5  figure?

6        MR. QURESHI:  The T --

7        THE COURT:  Is your plan confirmable?

8        MR. QURESHI:  Yes.

9        THE COURT:  Well, why?  Doesn't it --

10       MR. QURESHI:  Because --

11       THE COURT:  -- violate the absolute priority rule by

12  overpaying the victims?  In other words, again, I want to put

13  the subrogation to the side, because that -- unless I'm missing

14  something, that's a constant in both plans.  So --

15       MR. QURESHI:  It --

16       THE COURT:  -- to me -- to me, your plan pays the

17  victims fourteen and half billion, the PG&E plan that your

18  challenging today offers them eight billion or 8.4 billion.  So

19  there's about a six-billion-dollar delta.  But if the

20  combination of district court estimation plus TUB fire jury

21  comes up lower than your figure, it seems to me that's good for

22  the victims, but it makes for an uncomfortable plan because

23  they're over -- just as -- as the stockholders have argued, it

24  overpays the claim -- the class.

25       MR. QURESHI:  Let me try to be clear, Your Honor.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Okay.

2          MR. QURESHI:  I agree.

3          THE COURT:  Okay.

4          MR. QURESHI:  If claims -- if estimation comes in

5    lower than what the debtors are saying, right, under our

6    plan --

7          THE COURT:  Lower --

8          MR. QURESHI:  -- the would be getting paid --

9          THE COURT:  Lower than what you're saying.

10         MR. QURESHI:  Then under our plan they would be

11   getting paid more than in full, and our plan would not work,

12   unless it is modified.

13         THE COURT:  Well, I mean, every plan in the world

14   might work if it's modified.

15         MR. QURESHI:  Correct.

16         THE COURT:  The question is whether it's appropriate

17   to open the door again and for the second --

18         MR. QURESHI:  Yeah.

19         THE COURT:  -- to let your plan be vetted.  That's

20   all.

21         MR. QURESHI:  Understood.

22         THE COURT:  Okay.

23         MR. QURESHI:  And -- and -- but let me go back to the

24   other scenario.  The other scenario is what happens if

25   estimation comes in higher.

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Yeah.

2          MR. QURESHI:  Right?

3          THE COURT:  Fair enough.

4          MR. QURESHI:  And if estimation comes in higher, the

5    point I'm trying to make, Your Honor, is that our plan includes

6    an agreement with the TCC to vote in favor of our plan,

7    irrespective of the outcome of estimation.  And so we would

8    then proceed to confirmation, irrespective of estimation coming

9    in, at a higher level with an agreement by the TCC to vote in

10   favor of a plan that provides an aggregate cap of 25.5 billion

11   dollars.  And Ms. Dumas will confirm that on behalf of the TCC.

12   So you --

13         THE COURT:  So where does the extra amount go?

14         MR. QURESHI:  In that scenario, there is no extra

15   amount, Your Honor.  That's a scenario where estimation comes

16   higher.

17         THE COURT:  Yeah, I got it.  And that's my point.

18   Let's stick with hypotheticals.

19         MR. QURESHI:  Sure.

20         THE COURT:  Let's suppose the estimation is eighteen

21   billion dollars, but the TCC has just committed to vote for a

22   plan that pays them fourteen and a half billion.

23         MR. QURESHI:  If the estimation is --

24         THE COURT:  So where does the other two and half

25   billion go?

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1      MR. QURESHI:  If the estimation is, in the aggregate,

2  eighteen billion dollars, our plan is not confirmable.  We

3  concede that.

4      THE COURT:  Okay.

5      MR. QURESHI:  Okay?  Now let me explain why Your Honor

6  should terminate exclusivity in order for their -- for our plan

7  to proceed.  The reason is because we think there is a very

8  high likelihood that estimation and the yet-to-be-filed

9  government claims and TUBS will aggregate significantly north

10  of what the debtors are contemplating in their plan.  If that

11  happens Your Honor and if we are right that in that

12  circumstance the equity holders are not able to raise the

13  financing to satisfy those claims, then their plan fails.

14      THE COURT:  No, I -- I agree with you that --

15      MR. QURESHI:  And if their plan fails, we don't have

16  time in this case for any kind of an alternative, unless Your

17  Honor terminates exclusivity today.  If this were a different

18  circumstance, Your Honor, where we did not have the June 30th

19  deadline, then perhaps it would make sense to let the equity

20  holders swing for the fences, because that's what they're

21  doing.  Let them try to aggressively litigate against the

22  victims here, and if it doesn't go their way, then we could

23  pick it up again in February or March and follow with another

24  plan.  But Your Honor, here, we simply don't have the luxury of

25  that kind of --

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Well, this --

2          MR. QURESHI:  -- time.

3          THE COURT:  -- this gets back to the point that I

4   raised in setting the hearing.  Is it a backup plan or a

5   competing plan?

6          MR. QURESHI:  It --

7          THE COURT:  I mean, it sounds to me as you describe

8   it, you don't want to go and have to reinvent the wheel and

9   start over.

10          Whoever's coughing near the microphone, just cover the

11  microphone when you cough.  That's all.  I don't mind if you

12  cough.

13          So are you saying that we -- Mr. Qureshi, that if I

14  allow your plan to be filed and get ready to go, we still --

15  we're finished and we don't get to your plan if the debtor's

16  plan is confirmed?

17          MR. QURESHI:  No.

18          THE COURT:  Or you really are back to the parallel

19  track -- competing plans -- and if they're both accepted, then

20  I have to make the decision?

21          MR. QURESHI:  Correct.

22          THE COURT:  Okay.

23          MR. QURESHI:  So -- so the way we think of it, Your

24  Honor, is an alternative plan --

25          THE COURT:  Right.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          MR. QURESHI:  -- rather than a backup plan.

2          THE COURT:  Well, the terms in the briefing, it was

3     argued that it was kind of --

4          MR. QURESHI:  Right.

5          THE COURT:  -- when -- we need our plan because the

6     other one is going to fail.

7          MR. QURESHI:  And that absolutely is how we view it.

8     Again, Your Honor, if the world comes to pass the way the

9     equity holders hope that it will, which is underneath that

10    18.9-billion-dollar number, then as drafted, our plan would not

11    work and we concede that.  What we are saying is, because there

12    is a tremendous risk that estimation and TUBS and the

13    government claims are going to come in well above that --

14         THE COURT:  Right.

15         MR. QURESHI:  -- it is just not a sensible risk for

16    this estate to take, to find ourselves, at the conclusion of

17    that process, in a place where the financing isn't there to

18    satisfy those claims.

19         THE COURT:  Okay.  So --

20         MR. QURESHI:  And the only --

21         THE COURT:  So that's -- so that's the change that

22    you've said.  You -- that -- then when I ask for the change,

23    your saying they haven't -- they haven't got a financeable plan

24    at this point if the numbers come in higher.

25         MR. QURESHI:  That's one of the changes.  Absolutely

(971) 770-2200 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    right.

2           Another change, Your Honor, is that every creditor

3    constituency in the case that has taken a position on whether

4    to terminate exclusivity, with one exception in the subrogation

5    holders that I will come to, is in favor of terminating

6    exclusivity.  The TCC, obviously the fiduciaries for what Your

7    Honor has referred to as the involuntary Creditors here -- and

8    you're going to here from Ms. Dumas -- the Official Creditor's

9    Committee, another estate fiduciary, is in favor of terminating

10   exclusivity, the debtor's largest union.  The IBEW is in favor.

11          THE COURT:  No, I know the list.  I've got the list.

12          MR. QURESHI:  Right.  And so -- and the subrogation

13   holders, Your Honor, the only reason they're objecting, under

14   either plan they get an eleven-billion-dollar-allowed claim.

15   They don't like the form of consideration in our plan, but they

16   also signed an RSA in which the debtors preclude them from

17   negotiating with us.  When those shackles are lifted, Your

18   Honor, we're confident that we can reach an agreement on the

19   form of consideration with the subrogation holders.

20          And so -- and the public entities, by the way, that

21   have the one-billion-dollar settlement with the debtors, that's

22   adopted in our plan as well.

23          THE COURT:  No, I'm aware of that.

24          MR. QURESHI:  Okay.  Right.  So the way that all

25   shakes out, Your Honor, is you have the equity owners, who

PG&E Corp., Pacific Gas and Electric Co.

1    control the board, and everybody else in the case.  That's the

2    battle line.  And everybody else in the case wants exclusivity

3    terminated.  And the reason, Your Honor --

4            THE COURT:  So -- okay.  I know the reason.  Of course

5    I know the reason.  But what if the estimation comes in at a

6    number that the company believes it can finance?  Then why

7    should -- why should we, in effect, you know, have a corporate

8    control battle when we really ought to be taking care of the

9    victims?

10           MR. QURESHI:  So let's hypothesize a circumstance,

11   Your Honor, where claims come in at thirty billion dollars.

12           THE COURT:  Um-hum.

13           MR. QURESHI:  Your Honor has terminated exclusivity.

14   All right, we're -- our plan is there to satisfy the victims at

15   the twenty-five-and-a-half-billion-dollar level, in full, with

16   committed financing, no risk.  And the debtor, in that

17   circumstance, tries to cobble together the financing to satisfy

18   a higher liability.  So is it going to need new legislation so

19   that they can have ECBs or -- or --

20           THE COURT:  Well, they've said not.

21           MR. QURESHI:  They've said not.  Are they going to be

22   able to cobble together that financing in a form that is

23   feasible?  We think the answer to that question is no.  But the

24   point today, Your Honor, in connection with terminating

25   exclusivity, is that we think it is not a sensible approach to

(973)770-7777   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1  put all of the stakeholders at risk when there is only one plan

2  that they will not be able to get there.

3          THE COURT:  Okay.  I think we're going to move to the

4  other counsel, and I'll come back to your reserve time later

5  because I've gone a little bit over, I think, by my count.

6          Is your count the same?

7          MR. QURESHI:  A little bit, Your Honor.

8          Your Honor, if I can -- if I may, just one more thing.

9          THE COURT:  Sure.

10          MR. QURESHI:  As Your Honor knows, we did not have the

11  opportunity to file a reply.

12          THE COURT:  I didn't have the ability to read another

13  reply.

14          MR. QURESHI:  Understood.  I just want to very briefly

15  hit three points that they raise --

16          THE COURT:  Okay.

17          MR. QURESHI:  -- in their objection that I don't think

18  are accurate.

19          The first is they say that the interest expense in the

20  creditor plan is somehow way more expensive for the company

21  than the equity plan.  It's not right, Your Honor.  When we

22  focus on the interest expense for this pass through to rate

23  payers, under the creditor plan, that annual number is 946

24  million dollars.  Under the equity plan, it's somewhere between

25  954 million dollars and over 1.1 billion dollars, depending on

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    the credit rating at issuance.  So the interest expense that

2    gets passed through to rate payers is not more under the

3    creditor plan.

4            MR ORSINI:  Your Honor, is Mr. Qureshi testifying now?

5            THE COURT:  I thought he was arguing from the papers.

6    I don't know what he's doing.  I don't know.  I don't know what

7    he's doing.  If he's arguing at the moment --

8            MR ORSINI:  Well --

9            THE COURT:  -- I'm not making findings.

10           Go ahead.  Let's move forward.

11           MR. QURESHI:  Your Honor, I'm responding to the

12   arguments that are made and the debtor's objection, and into

13   which we have not had the opportunity to respond.

14           The other is the financing fees that are in both

15   plans.  Again, the allegation is made in the objections that

16   there are 670 million dollars in fees that the bond holders are

17   paying to themselves.  But Your Honor, the fees in the debtor's

18   plan, which are disclosed in the term sheets -- in the

19   financing commitments that have been filed with the Court, are

20   more than 1.4 billion dollars.  There's 772 million in -- I'm

21   sorry -- approximately seven hundred million in equity

22   financing fees, and on the debt under their plan, 772 million

23   dollars.  And an important point on the debt, Your Honor, their

24   plan has a 34.4 billion dollars, it's a revolver -- I'm sorry,

25   not a revolver -- it's a bridge loan of one-year facility.  So

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1  for a loan for one year, after which, in their plan, the

2  debtors will again face rate risk and all the other risks

3  attendant with getting new financing, they're going to have to

4  take out that facility, and a year later, incur a whole bunch

5  of fees a second time.

6         THE COURT:  Do you agree that your plan has all the

7  other costs, though, like the make-well provisions and the

8  contract rate of interest that are extra costs on your side for

9  your plan?  You concede that point?

10         MR. QURESHI:  So I certainly concede, Your Honor --

11         THE COURT:  Okay.

12         MR. QURESHI:  -- that under our plan, there is debt

13  that is being reinstated.  And when debt is reinstated, it, of

14  course, continues to carry the contract --

15         THE COURT:  Right.

16         MR. QURESHI:  -- rate of interest throughout.

17         THE COURT:  Right.

18         MR. QURESHI:  There's no question about that.  With

19  respect to optional redemption premiums, Your Honor, under our

20  plan they are very minimal.  I believe a total of approximately

21  eleven million dollars is payable in those sorts of premiums.

22  Again, because most of the notes are being reinstated, those

23  premiums are not triggered.  So I do not view that, under our

24  plan, to be a significant issue, Your Honor.

25         And the last point that I wanted to make, that is

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1 raised in their objections that I think is simply incorrect, is

2 they suggest that our proposed treatment of employees and of

3 retirees renders our plan unconfirmable.

4 THE COURT: Well, they say it's a separate treatment

5 within the class, so I mean it's just -- right?

6 MR. QURESHI: And Your Honor, it's not. So what we --

7 THE COURT: And why is that?

8 MR. QURESHI: What we propose under our plan is there

9 is no difference in plan treatment between employees and

10 retirees that have equity, and any other equity holders. It's

11 identical. What we say in our term sheet, Your Honor, is that

12 the post-reorganization board of PG&E, after the effective date

13 of the plan, will modify the relevant employment agreements in

14 a manner that makes those employees whole.

15 THE COURT: But listen. If Mr. A is a retired

16 employee and Ms. B is a retired school teacher, but they both

17 have a certain amount of PG&E stock, under the plan that you're

18 pushing, Mr. A will do much better than Ms. B; do you agree?

19 MR. QURESHI: Not in the plan, Your Honor.

20 THE COURT: Well, as a result of being diluted under

21 the plan, right?

22 MR. QURESHI: The dilution under --

23 THE COURT: At the end of the day, the plain old

24 every-day shareholders are going to get virtually wiped out

25 under your plan; isn't that true?

PG&E Corp., Pacific Gas and Electric Co.

1          MR. QURESHI:  Yes.

2          THE COURT:  Okay.  But the plain old every-day

3   shareholders who happen to be employed or retirees, aren't

4   going to be wiped out, are they?

5          MR. QURESHI:  Under the plan they will be wiped out,

6   but --

7          THE COURT:  Well, come on.  Let's not be technical.

8   At the end of the day, the retired guy who worked for PG&E is

9   not going to have his stock wiped out.  The retired school

10  teacher is going to have hers wiped out.  And that's not

11  discrimination?

12         MR. QURESHI:  We don't think it is, Your Honor.

13         THE COURT:  Okay.

14         MR. QURESHI:  For employees that are going to continue

15  to work for the company --

16         THE COURT:  I said retiree, but let's move on.

17         MR. QURESHI:  Okay.

18         THE COURT:  You made the point clearly that these are

19  issues that you believe why I should break exclusivity and not

20  why I should confirm the plan.  We're not here to confirm your

21  plan today.

22         MR. QURESHI:  That is correct, Your Honor.

23         THE COURT:  Okay.

24         MR. QURESHI:  So --

25         THE COURT:  Fair enough.

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          MR. QURESHI:  So to sum up, Your Honor, the

2    fundamental issue here is that there is a tremendous amount of

3    risk, and Ms. Dumas will get into it more --

4          THE COURT:  Okay.

5          MR. QURESHI:  -- that claims are going to come in

6    very, very high, and there should be an alternative, given the

7    June 30th deadline.  And the only way, Your Honor, that there

8    is an alternative that can protect all of the creditors who are

9    in favor of terminating exclusivity, is if exclusivity is

10   terminated now in order that the creditor plan can start to go

11   through the CPUC process, which the CPUC has agreed they can

12   handle multiple plans, so that we have an alternative to

13   protect everybody in these estates in that eventuality.

14         THE COURT:  Got it.  Thank you.

15         MR. QURESHI:  Okay.  Thank you, Your Honor.

16         THE COURT:  Okay.  So Ms. Dumas, Mr. Qureshi said you

17   were going to have about -- you wanted about eight minutes, so

18   I'll afford you that if that's what you'd like.

19         MS. DUMAS:  Thank you, Your Honor.

20         THE COURT:  Good morning.

21         MS. DUMAS:  I would like to reserve -- Cecily Dumas,

22   Baker Hostetler, on behalf of the Official Committee of Tort

23   Claimants.

24         I'd like to reserve a minute and a half, and I hope my

25   eight minutes is actually eight minutes, since Mr. Qureshi's

PG&E Corp., Pacific Gas and Electric Co.

1    ten minutes was not ten minutes, it was a lot longer.

2            THE COURT:  This isn't jeopardy.  I'm just doing my

3    best on the timing here.  Go ahead.

4            MS. DUMAS:  Thank you, sir.

5            I want to first clarify a point -- I'm sorry I was

6    about to cough.

7            THE COURT:  You want a cough drop?

8            MS. DUMAS:  No.  That's probably better.

9            Let me just clarify something that I don't think we

10   realized until we read the briefs over the weekend, and saw

11   argument related to overpayment in the fox guarding the

12   henhouse and the like, which is something that, honestly, never

13   occurred to us.  So let me make clear right now, that under no

14   circumstances do the tort claimants intend to seek payment

15   that's in excess of what's allowable under the law, that is

16   what is estimated by Judge Donato.  So what the term sheet

17   needs to be corrected to clarify that, we will do so.

18           THE COURT:  But now how does that work?

19           MS. DUMAS:  So if --

20           THE COURT:  If Judge Donato decrees that the --

21           MS. DUMAS:  Yes.

22           THE COURT:  -- victim's claim is eighteen million --

23   billion -- excuse me -- billion, what do we do with that

24   fourteen and a half in the plan?

25           MS. DUMAS:  So let me run through the numbers like I

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1  run through the numbers.  They get a bit mucky, but they've got

2  an 18.9 billion cap on wildfire claims in the debtor's plan.

3        THE COURT:  Well, it's easier for you if we -- do the

4  same thing I did with Mr. Qureshi, take that eleven billion for

5  sub realism --

6        MS. DUMAS:  Yeah, yeah.

7        THE COURT:  -- put it aside, and let's just talk

8  about --

9        MS. DUMAS:  So let's take that aside so we've got --

10        THE COURT:  So it's 8.4 on theirs and eleven --

11        MS. DUMAS:  But there's not.

12        THE COURT:  Okay.

13        MS. DUMAS:  That's why it's kind of tricky.

14        THE COURT:  Okay, go ahead.

15        MS. DUMAS:  The 18.9 cap, or you take away a billion

16  in PE, and eleven billion in sub row, and those are two buckets

17  of cash due on the effective date.  That's a whopping amount of

18  money.  So that leaves 6.9 billion left of the eighteen billion

19  cap, right?  6.9 billion, so there's a little bit of

20  discrepancy between eight-four and six-nine but the 6.9 billion

21  cap, under Section 1.220, Definition of a Plan, applies to the

22  victims, FEMA, CAL FIRE, PUC Funds, and I guess any other

23  unaccounted for public entities, what we'll find out before the

24  bar date.  So let me make clear that as Mr. Qureshi said, even

25  though CAL FIRE and the United States don't want to be

PG&E Corp., Pacific Gas and Electric Co.

1    estimated, they are under the debtor's plan included within

2    this cap.  So we've got 6.9 --

3            THE COURT:  So if they're not estimated, but in fact,

4    they're --

5            MS. DUMAS:  They're still in this cap.

6            THE COURT:  If they're liquidated --

7            MS. DUMAS:  Yeah.

8            THE COURT:  -- your point is that that eats into the

9    whether it's 6.9 or 8.4 --

10           MS. DUMAS:  Exactly.  Yeah.

11           THE COURT:  -- and for the moment it eats into it.

12           MS. DUMAS:  That's right.  So I mean, Mr. Troy is here

13   in the courtroom.  He can tell you, but just say hypothetically

14   that FEMA's claim is three billion dollars.  Even if it's a

15   liquidated claim -- even if they establish to Your Honor that

16   it's a liquidated claim, that's just three billion that goes

17   into the 6.9 billion dollar bucket, so --

18           THE COURT:  Okay.  For today --

19           MS. DUMAS:  -- and CAL FIRE, but it's just

20   illustrative of the point.

21           THE COURT:  -- for our purposes, it doesn't matter

22   what the amount is.  Your point is that --

23           MS. DUMAS:  My point --

24           THE COURT:  -- liquidated claims to those governmental

25   agencies comes out of the 6.9.

operations@escribers.net | www.escribers.net
(973) 406-2250

PG&E Corp., Pacific Gas and Electric Co.

1          MS. DUMAS:  Yes.  Exactly right.

2          THE COURT:  Okay.

3          MR. QURESHI:  Exactly right.  So when we were thinking

4   about how to address supporting a plan, the TCC, we were

5   perhaps naive, because in our minds, there actually is truly

6   discounting under the bond holder plan at -- so the bond holder

7   plan leaves 13.5 -- the difference is 6.9 billion to 13.5

8   billion.  Under the bond holder plan, 13.5 billion is the cap

9   for the same categories:  Victims, CAL FIRE penalties, FEMA --

10  I'm sorry -- CPUC penalties, FEMA.  So we think -- we don't

11  know because the claims bar date hasn't happened yet, but we

12  think those claims, in and of themselves, may aggregate

13  possibly five, six billion dollars.  So if my assumption is

14  correct, and again, we're all operating with imperfect

15  information, but if that assumption is correct, then that's

16  leaving, six billion or six and a half billion for victim

17  claims under the bond holder cap.

18          So we thought that under any circumstance we were

19  taking a discount to what we can prove.  If we're wrong, if

20  after all this time, and Tubbs, and estimation that Mr.

21  Orsini's right and we've been completely wrong, we'll cap that

22  and we can make that clear in the term sheet.  We're not, under

23  any circumstances, were the victims trying to take more than

24  they're entitled to under what the Court determines.

25          THE COURT:  Well, but aren't you saying -- but

PG&E Corp., Pacific Gas and Electric Co.

1    you're --

2            MS. DUMAS:  We'll amend the term sheet, Your Honor.

3    We haven't considered -- so again, this is just whether you run

4    one plan or two plans.  So I'm not saying whether the debtor's

5    plan is confirmable right now, I'm saying we need to clarify

6    for the record that the victims are not going to hold this

7    Court and all the other parties to a thirteen-and-a-half

8    billion dollar settlement amount if Judge Donato says, and Your

9    Honor says, the aggregate of victims, FEMA, CAL FIRE, CPUC, and

10   other governmental entities is less than 13.5 billion.

11           THE COURT:  But what if it's more?

12           MS. DUMAS:  We've agreed to the cap.  That's the

13   point.

14           THE COURT:  You're locked into the cap?

15           MS. DUMAS:  We're locked into the cap.

16           THE COURT:  What if he says it's twenty billion?

17           MS. DUMAS:  We're locked into the cap.

18           THE COURT:  Thirty billion?

19           MS. DUMAS:  We're locked into the cap.

20           THE COURT:  Well, how is that a good deal?

21           MS. DUMAS:  It's a good deal because we need to get

22   this company out of bankruptcy by next June.  Maybe it's a good

23   deal because AB 1054 -- and this is a point I've been making to

24   Your Honor a number of times -- we believe that these tort

25   claims, these wildfire related claims will end up being more

PG&E Corp., Pacific Gas and Electric Co.

1    than what's left after you pay all contract claims.

2                THE COURT:  I know.  You've said that before.

3                MS. DUMAS:  So -- yeah.

4                THE COURT:  And you've said again.

5                MS. DUMAS:  So --

6                THE COURT:  But then that was before you are now lined

7    up with the plan that you're now explaining.

8                MS. DUMAS:  Yes.  Well, Your Honor, that's the maximum

9    this debtor can pay unless we go into an insolvency situation,

10   which we don't want to cross that Rubicon.

11               THE COURT:  Well, what --

12               MS. DUMAS:  So we're saying if everybody else gets

13   paid, we are willing to accept the 13.5 billion cap on all

14   these wildfire related liabilities.

15               THE COURT:  So does that fix the cap for PG&E's plan?

16   I mean, do they just say, fine, we'll do this and we'll match

17   you?  I mean, is that --

18               MS. DUMAS:  So -- that'd be super.  Yeah.  That'd be

19   great.

20               THE COURT:  Well, okay, but I want to understand.  So

21   then if that happened, and Mr. Karotkin stood up and said we'll

22   take the thirteen-and-a-half, there's no need to have any

23   estimation.  We've got a -- it's a done deal, right?

24               MS. DUMAS:  Yes.  If Mr. Karotkin said we'll match the

25   thirteen-and-a-half, it wouldn't resolve all of our problems

PG&E Corp., Pacific Gas and Electric Co.

1    today --

2            THE COURT:  I know.

3            MS. DUMAS:  -- with regard to exclusivity, but yes.

4    For purposes of --

5            THE COURT:  Yeah.

6            MS. DUMAS:  -- your question, absolutely right.

7            THE COURT:  But if you're committing the committee, at

8    least, you're not committing every single victim because a

9    particular victim might argue that in the best interest test,

10   would defeat the plan --

11           MS. DUMAS:  Well, that's true, Your Honor.

12           THE COURT:  Okay.

13           MS. DUMAS:  And when we get to voting --

14           THE COURT:  All right.

15           MS. DUMAS:  I mean, we do have seventy some law

16   firms --

17           THE COURT:  But let's not worry -- let's not worry

18   about that.

19           MS. DUMAS:  -- in the executive committee but yeah.

20   Yeah, yeah, yeah.

21           THE COURT:  I mean it seems to me that what you're

22   saying is that right now, there's a low number of 8.4 and a

23   high number of 13.5.

24           MS. DUMAS:  Exactly right.

25           THE COURT:  Okay.

(973) operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    MS. DUMAS:  And for other reasons, my only other point

2  is for other reasons, unrelated to that difference, that's a

3  big difference --

4    THE COURT:  Uh-huh.

5    MS. DUMAS:  -- and I've said before that we think --

6  and we could be wrong, but we think that the debtors and it's

7  equity security holders are incented to sort of back into that

8  number.  But that's a swing, but for other reasons, we're

9  supporting the bond holder plan.

10    THE COURT:  Well, I understand your reasons, and there

11  are different opinions expressed very --

12    MS. DUMAS:  Well --

13    THE COURT:  -- sparsely in the papers as to what

14  motivates people.  I'm not dealing with that now.  I'm --

15    MS. DUMAS:  But they are important.

16    THE COURT:  I know they are important.  But I'm trying

17  to decide whether to listen to the pleas that you and everybody

18  else have lined up and is against my prior decision, and the

19  debtor.  By even letting that other plan in -- because to be

20  blunt about it, my fear is -- and I tried to express it

21  before -- is having the competing plan turns what was designed

22  to protect the victims into a battle over corporate control

23  between two people -- two different money interests --

24    MS. DUMAS:  Yeah.

25    THE COURT:  -- and has nothing to do with paying

PG&E Corp., Pacific Gas and Electric Co.

1    victims.

2         MS. DUMAS:  Yeah.  No, you made that point before --

3         THE COURT:  You know?

4         MS. DUMAS:  -- and I think I was at the podium when

5    you made it.

6         THE COURT:  And why is that wrong?

7         MS. DUMAS:  Well, it's not wrong.

8         THE COURT:  Why do you want to be sitting there

9    waiting to get your victim's paid, watching a corporate battle

10   that has nothing to do with paying the victims?

11        MS. DUMAS:  Unfortunately, because of the ability to

12   access resources, financially, the debtors are in a less

13   advantageous position than the bond holder plan presents.  The

14   debtor's plan has to thread a number of needles just right.

15   Their plan is premised on a cap on wildfire obligations, their

16   plan is premised on a sort of best --

17        THE COURT:  But that -- excuse me, but excuse me.  But

18   that means their plan is DOA if the district judge upstairs

19   fixes the number that kills their plan.

20        MS. DUMAS:  Yeah, and --

21        THE COURT:  But Mr. Qureshi said what'll happen if

22   their numbers change, why wouldn't PG&E's numbers change?

23        MS. DUMAS:  Well --

24        THE COURT:  If the district judge puts a number that

25   is bigger --

(970) 666-0303  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          MS. DUMAS:  Sure.

2          THE COURT:  -- than they expect.

3          MS. DUMAS:  And again, I'd like to get away from --

4   yes, just the swing in the number.  Okay, that's material, and

5   Judge Donato is going to tell us where he comes out on that.

6          But there are other aspects of the debtor's plan that

7   make it a more financially risky plan.  So there's risks

8   associated with the debtor's plan that are made easier by the

9   bond holder plan, frankly, because they have more resources to

10  throw at it.

11         THE COURT:  Okay.

12         MS. DUMAS:  So the risk of not allowing a second plan

13  to run parallel is that we get to February and Judge Donato

14  says my number is a high number.  Because I don't think the

15  debtors have -- again, this is me, and there's nonpublic

16  information that we're taking into account and decision making.

17         So speaking to Your Honor, we don't believe that

18  there's much more gas left in the debtor's tank.  In terms of

19  ability, they've got -- right now, they've got twelve billion

20  in wildfire obligations payable in cash on the effective date,

21  plus other obligations they need to finance.  They have made

22  certain assumptions about the CPUCs pass-through of certain

23  costs that may or may not prove to be accurate.

24         And just one asterisk on that:  we think, just

25  objectively, we think it's unlikely that Camp Fire costs will

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1   be allowed to passed through just because of the factual

2   circumstances surrounding the hundred-year-old tower and the

3   broken sea hook.  We think just using that fire as an example,

4   is a higher possibility that the utility will have been found

5   to be negligent, therefore, kind of eliminating the ability to

6   pass those costs through to rate payers.

7            THE COURT:  I need to stop here, just so you can

8   reserve and --

9            MS. DUMAS:  Yeah, yeah, yeah.

10           THE COURT:  -- Haysfirm wants to be heard so --

11           MS. DUMAS:  One more point?

12           THE COURT:  Yes.

13           MS. DUMAS:  Rate neutral, we have evaluated both plans

14   under AB 1054's regimen, and we believe that the bond holder

15   plan is more likely than the debtor plan to comply with AB

16   1054.  And we may be wrong on that.  And as you said, facts may

17   develop, but we don't have the time like a typical bankruptcy

18   case, to find out next spring if we're right or we're wrong.

19   This case is the -- one of the few unique cases where we do

20   need to have a second plan by a well-funded plan proponent out

21   there.

22           THE COURT:  Okay.

23           MS. DUMAS:  Thank you.

24           THE COURT: You can reserve a couple minutes for that.

25           Mr. Marshack, good morning.

(973) operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    MR. MARSHACK:  Good morning, Your Honor.  Your Honor,

2  just a suggestion -- if we're running out of time, and as you

3  and I have both agreed upon in the past, Judge Donato's pretty

4  quick, if you would like to bring us all back this afternoon?

5    THE COURT:  No.

6    MR. MARSHACK:  Okay.

7    THE COURT:  I don't.

8    MR. MARSHACK:  We'll make it happen.  PG&E says in

9  their pleadings that they are ready, willing, and able to

10  fairly and fully compensate wildfire victims for their losses.

11  They say the amount is 8.4 billion dollars and -- but they are

12  capping it at 8.4 billion.  They will pay us in full, but they

13  will give us a cap.

14    THE COURT:  Well, that's the plan that's on the table.

15    MR. MARSHACK:  That's the plan.  But their words --

16    THE COURT:  But Mr. Marshack, if Judge Donato hits

17  them with a larger number, they have two choices, right:  fold

18  their tent or put the -- plug in the number.  And from what Ms.

19  Dumas says, the top of that number is thirteen and a half.

20    MR. MARSHACK:  You say that, but the TCC's numbers and

21  their financial advisors say they don't have any, to quote Ms.

22  Dumas, gas in the tank.

23    THE COURT:  Okay.

24    MR. MARSHACK:  That's one.  And two, if they had more

25  money, why aren't they putting it up?  A lot of this, Your

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    Honor, is just pure credibility.  Hate to be the one that

2    really brings this to light, but once upon a time, they said

3    that subro was only owed 8.5 billion dollars, but now they say

4    it's 11 billion.

5            THE COURT:  But what did subro say they were owed,

6    once upon a time, twenty billion, right?

7            MR. MARSHACK:  Right.

8            THE COURT:  Well, wasn't there a compromise from both

9    sides?  Both sides, both camps here compromised, essentially,

10   the subro figure.

11           MR. MARSHACK:  Correct.

12           THE COURT:  That's a constant; that's for both plans.

13           MR. MARSHACK:  Correct.  But did the debtor give up

14   all the last -- did they give up the last money they had?  To

15   make the subro agreement, to get them to vote for their plan,

16   did they give up a last money they had to do so?

17           And my point is this, Your Honor:  They say, once upon

18   a time, that we were only owed 8.43 billion dollars, and that's

19   what they say today.  We are going to be owed more money.

20           THE COURT:  Mr. Marshack, you might recall Mr. Orsini

21   has said more than once that they haven't even, in some

22   respects, haven't even admitted to that, because there had been

23   no determination.  But they obviously can't back out of a plan

24   they've proposed, and the briefing that cites them in their

25   public filings, they say what they say, but --

PG&E Corp., Pacific Gas and Electric Co.

1          MR. MARSHACK:  That's correct, Your Honor.  But if you

2     believe that the debtor puts in their plan, and you believe Mr.

3     Orsini, that the cap is 8.4 billion dollars, then you have to

4     believe they don't have any more money and you have to believe

5     they're not going to put any more money up.

6          THE COURT:  I have to believe that the first plan a

7     party puts on the table is its final number?  That's not the

8     way I've learned how negotiation goes, and I'm sure you don't

9     negotiate that way.  But leave it aside.

10          MR. MARSHACK:  Why are they --

11          THE COURT:  Let's stick with what your point is.

12          MR. MARSHACK:  Okay.  But then why does --

13          THE COURT:  The issue today is whether I allow a

14     competing plan --

15          MR. MARSHACK:  You're right.

16          THE COURT:  -- and so let's stick with that.

17          MR. MARSHACK:  But why are they negotiating?  TCC has

18     put up a terrific plan.  TCC is a plan that the wildfire

19     victims will vote in favor of, and there's a couple things that

20     come with that.

21          THE COURT:  But why do want me to open up to other

22     plans, then, under those circumstances?  I mean, you've made

23     that pitch all along, and I'm wondering why.  How is that

24     constructive?

25          MR. MARSHACK:  Wildfire victims will support TCC.

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  I got it.

2          MR. MARSHACK:  But if somebody wants to show up

3   tomorrow and offer twenty billion dollars and give us even more

4   of a cushion for our claims, in case our claims are a little --

5   are higher, then we greet them with open arms.  But right now,

6   we are very pleased with the TCC plan.

7          THE COURT:  Okay.

8          MR. MARSHACK:  So Your Honor, the debtor's trying to

9   oppose a second plan.  What would be the best way?  The best

10  way to oppose it would be to say, we're paying everybody in

11  full.  What's the best way to prove you're paying everybody in

12  full?  Per -- in their opposition to the motion to allow a

13  second plan, why didn't they put evidence before this Court?

14  This is the way we do business in the bankruptcy court in

15  California.  We have declarations.  We prove facts through

16  declarations.

17         Why didn't the debtor put before Your Honor

18  declarations of financial advisors that say, I have worked on

19  this case for 7,000 hours; this is the model; this is the

20  matrix; and claims can't exceed 8.4 billion dollars?  If they

21  did that, that would be persuasive.  That would be, hey, the

22  debtor is proposing a plan that will pay everybody in full.

23  They chose not to.

24         So the consequences of their inability or their

25  failure to give this Court evidence of the cap on the debt is,

PG&E Corp., Pacific Gas and Electric Co.

1    if TCC's offering 14.5 billion dollars, let that plan go

2    forward and let's see who wins, and let's make sure that the

3    wildfire victims are protected.

4              THE COURT:  Okay.

5              MR. MARSHACK:  Let me make a point.

6              THE COURT:  Yeah.

7              MR. MARSHACK:  One final point.

8              THE COURT:  Okay.

9              MR. MARSHACK:  If PG&E's counsel says to me the best

10   turkey sandwich you're going to get in this city is across the

11   street and they're wrong, I'm out one meal.  If PG&E says 8.4

12   billion dollars is enough to pay creditors in full and they're

13   wrong, lives can't be rebuilt.  Lives can't be -- and there's a

14   second problem with that.  If they're wrong, we've lost all the

15   opportunity to take the benefits of AB 1054.  If you allow TCC

16   to go on a parallel track with the debtor, then you're upping

17   the odds that we will be able to access all the money and all

18   the benefits of AB 1054.

19             THE COURT:  Mr. Marshack, what's going to happen if I

20   let the bond holders' plan in and then we end up bogged down

21   with a valuation fight and a fight over issues that your

22   clients and Ms. Dumas's clients don't care about, don't need to

23   get involved with; that is, confirmation issues, cram down

24   issues, absolute priority issues?  I've said it before:  Do the

25   victims want to get bogged down on that kind of a battle?

PG&E Corp., Pacific Gas and Electric Co.

1          If you can persuade me that I should say, that's fine.

2    Everybody ought to watch that, or watch while they -- these two

3    giant people, giant groups -- the entrenched equity and the

4    outside equity, two equity wannabes -- while they have this

5    huge fight, it's not going to -- tell me how it's going to move

6    the ball forward to get the victims paid.

7          MR. MARSHACK:  Judge, my --

8          THE COURT:  And I understand.  I understand the point

9    that Mr. Qureshi made about letting another plan in keeps them

10   in track so that CPUC and AB 1054 can be honored.  But how does

11   this corporate control fight help your client?  Just tell me

12   that.

13         MR. MARSHACK:  I will.

14         THE COURT:  Okay.

15         MR. MARSHACK:  Why?  I'm a victim.  I'm a wildfire

16   victim.

17         THE COURT:  Okay.

18         MR. MARSHACK:  I've lost my house.  Why do I care who

19   owns PG&E at the end of the day?

20         THE COURT:  You don't.  I agree, you don't.

21         MR. MARSHACK:  I don't care.

22         THE COURT:  But when does -- do you want to wait while

23   we find that out, while we have the valuation fight?

24         MR. MARSHACK:  Yes.

25         THE COURT:  Okay.

PG&E Corp., Pacific Gas and Electric Co.

1      MR. MARSHACK:  If it gets me five billion more

2  dollars --

3      THE COURT:  Okay.

4      MR. MARSHACK:  -- I will wait.

5      THE COURT:  Fair enough.  Got it.

6      MR. MARSHACK:  And Your Honor, one more point.

7      THE COURT:  Okay.

8      MR. MARSHACK:  I'm going to make this real quick.  I

9  don't know that the law allows for this -- going out on a limb

10  here -- but does this Court -- if you're going to not grant

11  TCC's motion, is there flexibility to conditionally terminate

12  exclusivity to allow two plans?  If the debtor's going to pay

13  all creditors and the wildfire victims in full, then TCC's plan

14  doesn't get voted on.  I don't know how --

15      THE COURT:  I don't know what you mean.

16      MR. MARSHACK:  I don't know how we do that; I have to

17  give that some thought.

18      THE COURT:  Well, you convince the gentleman to your

19  left to up the plan up to Ms. Dumas's figure.

20      MR. MARSHACK:  We will do so.

21      THE COURT:  And Mr. Marshack --

22      MR. MARSHACK:  We will try to do so.

23      THE COURT:  -- more specifically.

24      MR. MARSHACK:  Yeah.

25      THE COURT:  More specifically, you have been very much

PG&E Corp., Pacific Gas and Electric Co.

1  an advocate for your client's cause, and I compliment you for

2  that.  But those lawyers to your left also know what AB 1054

3  says.  And AB 1054 says this Court has to, in order to confirm

4  a plan -- I mean, I'm summarizing because the State legislature

5  presumably can't tell the Bankruptcy Court what to do, but in

6  fact, the State legislature can say what PG&E has to do to

7  survive and go forward as an IOU in this state.  And it has to

8  do what AB 1054 says:  pay them in full, or get them to agree,

9  or have a court make a valuation.  That's why I asked the

10 matter to go to Judge Donato; that's what his job will be if it

11 goes there.  And if he picks a number, whether it's lower than

12 you would have or higher than PG&E would have, that's the

13 number that they're stuck with, and frankly, so are the other

14 side stuck with, leaving aside what we've heard.  And that's

15 the way it is.

16        So their 8.4 will vaporize if Judge Donato has a

17 higher number.  And you know what?  If he hits a lower number,

18 you might see a lower number, too.

19        MR. MARSHACK:  But two responses to that -- one, if it

20 vaporizes -- if their plan vaporizes, the victims, the wildfire

21 victims are the losers when we could have been the winners.

22 That's one.

23        Two, Your Honor --

24        THE COURT:  So do you think -- do you know -- and I'm

25 not going to let you off.  Suppose Judge Donato makes a finding

PG&E Corp., Pacific Gas and Electric Co.

1  based upon the estimates, and let's, for simplicity's sake,

2  let's converge Tubbs and the District Court estimation and say

3  at the end of the day there's a figure of -- let's just pick a

4  number -- ten billion dollars.  PG&E would satisfy, I believe,

5  AB 1054 with ten billion.  How could I confirm a plan that the

6  bondholders want me to do by giving them more?  I couldn't do

7  that, as matter of bankruptcy law, could I?  Because it would

8  overpay the class, to the detriment of the junior class, right?

9          MR. MARSHACK:  Agreed.  That's why you're going to

10 have two plans in front of you.  And when that particular fact

11 scenario exists, you've got clarity on what you would do.

12          But let me give you another fact scenario real quick.

13 This Court granted an order to estimate claims.  We took the

14 position, the TCC/SLF (phonetic) group, took the position that

15 that violates the due process clause of the U.S. Constitution

16 because to figure out liability of twenty -- causation of

17 twenty-two fires and the amount of claims of 40,000 victims is

18 doable in a year, two years, three years --

19          THE COURT:  No, I know; you said that before.

20          MR. MARSHACK:  But Your Honor, if your order

21 estimating claims gets reversed and we --

22          THE COURT:  Well, which order of mine are you talking

23 about?

24          MR. MARSHACK:  The one that you authorized us to go to

25 Judge Donato to have the claims estimated.

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Okay.  Well, that's hardly a final order.

2          MR. MARSHACK:  Right.

3          THE COURT:  You can take that up with Judge Donato.

4          MR. MARSHACK:  Right.  But no, no, but you granted a

5     motion to estimate claims.

6          If that is reversed, given the time --

7          THE COURT:  Mr. Marshack, you got the story wrong.  I

8     made a statement in this courtroom that, if the major players

9     consented, I could do that estimation here.  There was not in

10    anonymity.  I simply recommended --

11         MR. MARSHACK:  No, no, no.

12         THE COURT:  -- the District Court refer -- have an

13    Article III judge take over, and that's why he did.

14         MR. MARSHACK:  Sorry, you're missing my point.  You

15    granted the motion to estimate -- to authorize the debtor to

16    estimate claims, and then we worried -- then we tried to figure

17    out which courtroom.  But you did grant a motion to estimate

18    claims over our objections.  And our objection was that it

19    violates due process of the U.S. Constitution to do it in four

20    months.

21         My point, Your Honor, is this:  If a court finds that

22    granting the motion to estimate claims was improper, given we

23    only had four or five months to estimate those claims, then we

24    have nothing.  If they grant TCC's right to file a plan, we

25    have a confirmable plan that can get creditors and wildfire

(972) 702-6550   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    victims paid in full.

2            So this hedges our bets.  This makes sure that, if

3    that order to estimate claims is reversed, that we still have a

4    backup where wildfire victims will get paid in full.

5            THE COURT:  Okay.  I understand your point.  Thank

6    you.

7            MR. MARSHACK:  Thank you.

8            THE COURT:  All right.  We're going to hear from the

9    Official Creditors' Committee.

10           Mr. Bray?  Or Mr. Dunne's here today, with us, so --

11           So Mr. Dunne, one second.  I'm going to hear from you

12   and then I'm going to hear from the other attorneys I want to

13   hear from, the IBU (sic) and so on, and then I'm going to take

14   about a ten- or fifteen-minute convenience break for everybody.

15   Then we'll resume, and I'll hear the debtors' arguments and the

16   rebuttal arguments, and then we'll be done.  Okay?

17           MR. DUNNE:  Thanks, Your Honor.  For the record,

18   Dennis Dunne from Milbank LLP, on behalf of the Official

19   Committee of Unsecured Creditors.  I just want to take a step

20   back, and then we're going to get into the points Your Honor

21   has been raising with each of my predecessors at the podium.

22           From the creditors' committee's perspective, our

23   constituency is going to get paid in full in either plan.  We

24   can debate what payment in full is, and Your Honor will decide

25   what payment in full is, but that's the goal of each of the

(970)786-7880 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    plans.

2              THE COURT:  Right.

3              MR. DUNNE:  And we haven't yet decided which plan to

4    throw our kind of full-throated support behind, but yet we're

5    standing in front of Your Honor saying, let's have two of them.

6    And I want to explain why we're taking that position.  And it's

7    basically for some of the reasons Your Honor had said.

8              There are so many variables.  There are so many

9    outcomes that are unpredictable standing here today, that the

10   question is, how do we protect ourselves against that suite of

11   uncertainties.  And let's just drill down on that for a second

12   because Your Honor, I think, is putting the outcomes in a

13   number of buckets, which is correct.

14             Let's assume you have two competing plans, Your Honor,

15   and there's a chance that estimation comes out and the debtors

16   are correct with their number.  That's easy.  You're going to

17   confirm their plan.  We're done.  Because you can't confirm the

18   other one because you'd be overpaying, as you've said, at that

19   level.

20             THE COURT:  Well, you agree with that, don't you?

21             MR. DUNNE:  Yes.

22             THE COURT:  Yeah.

23             MR. DUNNE:  So then the question is, let's assume it

24   lands slightly north of the debtor and equity's plan number,

25   below the bondholder/TCC number in the estimation.  Two things

PG&E Corp., Pacific Gas and Electric Co.

1    happen then.  One is, either they, the debtor and the equity,

2    step up and pay that amount or they don't.  And Your Honor has

3    mentioned several times, they may fold.  That's what we care

4    about.  We don't want to be in a position where we find out,

5    like everybody thinks it is economically rational that they

6    have a lower inflection point because they own the equity than

7    the bondholders do, in terms of their point of indifference and

8    when they walk away.  Whatever that is, we don't know today,

9    right?

10            THE COURT:  Well, who's -- the "they" meaning whom,

11   the equity holder?

12            MR. DUNNE:  The equity, yep.

13            THE COURT:  The shareholders.

14            MR. DUNNE:  The shareholders.

15            THE COURT:  The people like Mr. Bennett's clients.

16            MR. DUNNE:  Mr. Bennett's clients.

17            THE COURT:  I mean, the corporate officers have a job

18   to do to --

19            MR. DUNNE:  And I'll come back to the corporate

20   governance.

21            THE COURT:  Okay.

22            MR. DUNNE:  I'm not focused on the corporate

23   governance.

24            THE COURT:  Okay.

25            MR. DUNNE:  I actually don't care who wins that fight,

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    Your Honor.  I'm trying to focus on getting victims paid and

2    getting my clients paid and not missing the June 30th deadline.

3           THE COURT:  Okay.

4           MR. DUNNE:  Let's assume that the estimation lands

5    above the equity and the debtor plan number and below the TCC

6    bondholder plan number and they fold.  Your Honor's saying,

7    well, we can't do the bondholder/TCC plan because we'd be

8    overpaying them.  What I'm saying is, we need a plan that's

9    alive, i.e., it's marched down the confirmation path.  Because

10   if equity checks out, if they tap out at that point, I want the

11   bondholders and the TCC to say, you know what, legally I can't

12   get paid more than in full, but I want to get paid in full and

13   I need somebody to fund that plan today.  And to get that done

14   by June 30th, we need to have that committed amount of capital

15   alive and being capable of being funded when that moment comes.

16          Now, Your Honor's right; maybe it won't come.  Maybe

17   it doesn't happen.  But it might.  And for me, the question

18   isn't today whether Mr. Bennett and Mr. Karotkin are right on

19   everything they say.  It's what happens if they're wrong.  What

20   happens if they're wrong and we don't have the ability or the

21   time to run things consecutively?  We have to run them

22   concurrently.

23          Another change, Your Honor, that we've had is the

24   CPUC.  In the OII that they filed, I think it's in pages 5 to

25   9, they clearly contemplate competing plans.

PG&E Corp., Pacific Gas and Electric Co.

1    THE COURT:  Yes, I saw that.

2    MR. DUNNE:  Yep.  And but what that means, it's right

3    before they go through the timeline for their review and

4    consideration of the plan.  Why wouldn't we --

5    THE COURT:  Well, I mean, they were just being

6    realistic because it's a possibility, obviously, that probably

7    they and others probably predicted it a few weeks ago and I

8    fooled them.  Not that I did it as intentional.  The result was

9    a surprise.  But here we are again.  Okay.

10    MR. DUNNE:  So now that we're standing here today with

11    that knowledge, why would we not avail ourselves of lining up a

12    competing plan?  Even if in Your Honor's mind you're viewing it

13    as a fallback plan, why wouldn't we line that up, lift

14    exclusivity, let it go to the CPUC, because we know that

15    timeline works in the OII?

16    What we don't know is, if the equity plan falls down

17    in December, January, or February, we go back to Mr. Kornberg's

18    client and says, can you get this done by the June 30th

19    deadline.  That's what I'm trying to avoid, Your Honor.  And

20    I'm hoping it resonates with you because I think it's a

21    collective problem that we're trying to solve for because

22    failure of the June 30th deadline really shouldn't be an

23    option.  I know I'm now channeling Ed Harris with the

24    subjunctive, no less, but it's the real issue.

25    And there are a number of -- I'm going to use my last

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    minutes to say, what I think we should not do today -- or two

2    things -- is to get into the corporate governance battle,

3    because I think it is about paying creditors, both my

4    constituents --

5              THE COURT:  Um-hum.

6              MR. DUNNE:  -- and the torts in full.  The corporate

7    governance issue I think is really going to fall into place

8    based on where the estimation comes in.

9              THE COURT:  Right, right.

10             MR. DUNNE:  I could answer your question before about

11   plan valuation and feasibility, and I can answer two ways.

12   That's going to come up whether you have one plan or two plans.

13   And the other one is -- and it's going to be decided based on

14   everything we just talked about, where the estimation number

15   falls.

16             THE COURT:  That's right.  Right.

17             MR. DUNNE:  Because if it falls at a level they can

18   fund, then we know that that's going to be that horse that gets

19   rode off to the exit, and if it doesn't, then we have somebody

20   else that can deal with it.  And the corporate governance will

21   ride along with that.  It's not going to be anything you have

22   to deal with.

23             Said another way, let's assume you only do one plan,

24   it fails, and we have to then go to the bondholder/TCC plan.

25   Well, the corporate governance -- we know what that's going to

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    look like once that estimation number is set.

2         I'd say two other pieces before I say my concluding

3    remarks, Your Honor.

4         I also think lifting exclusivity conduces a global

5    settlement, meaning what we'd all like to -- or what I'd like

6    to be in --

7         THE COURT:  No, I know.  Yeah, I know that.  I mean,

8    that's a given.  I know that.

9         MR. DUNNE:  And shouldn't we want to actually --

10        THE COURT:  But you can say it again.  I'm not trying

11   to --

12        MR. DUNNE:  Right.  No, just that if we lift

13   exclusivity on two plans, we can send those two plans to

14   mediation.  We can try to get one plan that the debtor supports

15   and has the bondholder/TCC support to it as well, and then we

16   can moot estimation and be on a glide path to confirmation.

17   That's ultimately where we'd like to be.  We submit that that

18   requires terminating exclusivity, Your Honor.

19        The last couple points -- because you're going to hear

20   a lot about the infirmities in the plan.  I think that those

21   discussions are misplaced, so -- but we haven't picked a horse

22   yet.  And I can talk about issues on both of the plans, but I

23   think for purposes of today, they're both viable for purposes

24   of lifting exclusivity.  They're subject to challenges and may

25   or may not be confirmable at the end of the day, but what's

PG&E Corp., Pacific Gas and Electric Co.

1    been helpful is to see the two different structures, the

2    funding limits, and the supporters.  And there are issues on

3    the debtors' side, with respect to their bridge financing.

4    Loans that become due within a year after emergence -- how is

5    that feasible?  You have the arguments about the reinstatement

6    of the secured debt on the other side.

7         But what I view those is, yeah, that's noise, but that

8    doesn't signal that one of these plans doesn't get ventilated

9    through the usual process.  What it means is that we're going

10   to have the usual rhythms of objections, negotiations, rulings,

11   and inevitable plan amendments.  And it will occur in this

12   case, too, and it would occur with respect to both plans.  All

13   I'm saying at the end of the day, Your Honor, is we need both

14   plans to go forward to maximize the chance that when they fold,

15   there's somebody there that's going to write the check and get

16   this done.  Because we all want this done by June 30th.  And we

17   submit that any other plan, any other path, is too risky.

18        Your Honor, on the PPI make whole issue that you're

19   going to hear, I view that as a red herring for today.  Your

20   Honor has teed it up in advance.

21        THE COURT:  Oh, yeah.  I wasn't going to hear it

22   today.  I mean, I just wanted to get the schedule.

23        MR. DUNNE:  Or that it militates in favor of don't

24   lift exclusivity because they're -- they actually have a plan

25   that pays at a contract rate; we have it at FJR.  We're going

PG&E Corp., Pacific Gas and Electric Co.

1    to find out the answer to that in a few weeks and one plan or

2    the other will have to be amended accordingly.

3         And the same with the secured debt on both sides,

4    where that's something that we're going to have to run out, in

5    terms feasibility, the CPUC review.  I'd echo, again, that we

6    should get the CPUC two plans so that we know what their views

7    are, with respect to the bondholder level of debt and the way

8    that they're financing it.

9         And I'll conclude by saying there has been a lot of

10   change, Your Honor, since your prior ruling.  We have the TCC

11   now not just with a settled number, but a plan proponent.  And

12   when Your Honor asks well, what about corporate governance?

13   The TCC's the fiduciary for the victims, they put that in the

14   mix, that I'm actually concerned about equity falling down more

15   so than a corporate governance fight.  And they balanced that

16   and said, I'm still going to be a plan proponent and try to do

17   the settlement because it maximizes our path forward.

18        The CPUC is allowing and contemplating, at least,

19   competing plans.  We have the ratepayers, both in the form of

20   TURN and the public advocate's office for the CPUC, that have

21   looked at the amount of debt on the bondholder/TCC plan and the

22   form of it and the amount of it, and recognizing that that cost

23   of capital is likely to get passed through to the rate base and

24   are nevertheless supporting termination of exclusivity.

25        Your Honor, I'll conclude with one technical point,

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    because I often can't help myself on the technicalities, which

2    is, I think it's also important to terminate exclusivity

3    because, as you'll hear from Mr. Karotkin, I suspect, only the

4    debtors have the ability to do a settlement under Rule 9019,

5    and the debtors are not a party to the settlement between the

6    bondholders and the tort committee.  If you're a plan

7    proponent, that changes.  If you're a non-debtor plan proponent

8    and you move forward with the plan that's -- and that plan

9    embodies the settlement --

10            THE COURT:  Well, it's not -- technically it's not a

11   9019 motion.  It's a plan.

12            MR. DUNNE:  Correct, but --

13            THE COURT:  I mean --

14            MR. DUNNE:  -- in In re Orton in the Ninth Circuit, it

15   set the same standard --

16            THE COURT:  No, I know that.

17            MR. DUNNE:  -- of review for a 9019 settlement would

18   govern.

19            THE COURT:  I just said it was a technicality.

20            MR. DUNNE:  Yeah.  No, I agree.  All I'm saying is,

21   let's not make too much of that point that the debtors are not

22   a party to the settlement because it can be approved as a

23   settlement but only in a plan.

24            THE COURT:  But that's the nature of a plan, a cram

25   down plan.  And this is just a reverse cram down.  If this plan

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    is promoted and carries the day, it will be what I call a

2    reverse cram down.  It will be a plan that -- imposed upon a

3    debtor who didn't invite it; but that's okay.

4            MR. DUNNE:  Well, that's the nature of competing

5    plans.

6            THE COURT:  That's the nature of competing plans.  I

7    agree.

8            MR. DUNNE:  All I'm saying is in order to preserve the

9    benefit of having that number, we need to move forward with a

10   plan because it's only through the plan vehicle that you're

11   going to be able to kind of review or approve that settlement.

12           THE COURT:  Okay.

13           MR. DUNNE:  Thank you, Your Honor.

14           THE COURT:  All right.  I said that I would hear from

15   the union and TURN for the last couple of minutes, and I want

16   to move quickly.

17           So counsel for the IBEW here?

18           Good afternoon.

19           MR. KNAPP:  Good -- now afternoon, Your Honor.

20           THE COURT:  Good afternoon.

21           MR. KNAPP:  Brad Knapp with Locke Lord on behalf of

22   the International Brotherhood of Electrical Workers, Local

23   Union number 1245.

24           The IBEW represents the interests of more than 15,000

25   PG&E employees and contractors who are tasked with the work of

PG&E Corp., Pacific Gas and Electric Co.

1    operating and maintaining PG&E's infrastructure.  Our members

2    are concerned about their livelihoods and the uncertainty

3    surrounding the future of their long-time employer.

4            In the IBEW's view, allowing both the PG&E plan and

5    the creditor plan to proceed in tandem provides the best path

6    to mitigate this uncertainty.

7            THE COURT:  Do you think the bondholders' plan

8    violates the discrimination rule among equity holders --

9            MR. KNAPP:  I think that's a conversation down the

10   road. --

11           THE COURT:  -- or your clients --

12           MR. KNAPP:  I don't think it does, Your Honor, because

13   I see it more as a post-confirmation employment issue less

14   than --

15           THE COURT:  Well, the statute says you've got to --

16   you can't have discrimination within a class, right?

17           MR. KNAPP:  Well, the class gets diluted, as I

18   understand it.  And then based on their status as employees or

19   retirees, there's a management decision made to -- sort of like

20   the management incentive program.

21           THE COURT:  I'm talking about truing up the equity

22   position.

23           MR. KNAPP:  Well, exactly.  Exactly.

24           THE COURT:  Not who stays on in the job, but rather go

25   back to my hypothetical:  union member A, retired school

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1   teacher B.  Retired school teacher B stock is wiped out, union

2   member A's stays in place, right?

3          MR. KNAPP:  I think that could be -- first of all,

4   it's determined for down the road, but the question is whether

5   it unfairly discriminates and whether it's fair and equitable.

6   And so those are considerations that will have to be taken in.

7   And if the Court determines it violates the absolute priority

8   rule, then, you know, we'll have to address that down the road.

9          But the more important aspect is, we need to have a

10  viable exit because I think what the Court will hear, when it

11  comes time for confirmation, is that AB 1054 is a big part of

12  the feasibility consideration.

13         THE COURT:  I'm well aware of that.

14         MR. KNAPP:  And so if we can have both plans going

15  now, then we have a better chance of meeting those requirements

16  of AB 1054 on the timelines that have to meet and in a great

17  position we're in, in an 1129(c) situation, and there's a

18  decision to be made.  But it all depends on how the estimation

19  comes out.

20         And so our view is, the best chance to get to that

21  exit that takes advantage of the funds that are needed for a

22  healthy exit are to allow both to move forward.  It's just a

23  precautionary measure that --

24         THE COURT:  Okay.

25         MR. KNAPP:  -- should be considered.

(971) 224-operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  I got it.  Thanks, Mr. Knapp.

2          MR. KNAPP:  Thank you.

3          THE COURT:  Mr. Harris?  Or Mr. Harris, are you the

4     closer or your colleague?

5          MS. LACEY:  Good morning, Your Honor.  Alisa Lacey on

6     behalf of Public Advocates Office.

7          MR. HARRIS:  We're splitting two minutes, Your Honor.

8          MS. LACEY:  I'll be very, very brief.

9          Your Honor, I would just follow up on the comments if

10    IBEW, which is AB 1054 and ratepayer neutrality is a

11    gatekeeping issue.  At this point, Public Advocates Office has

12    had its analysts go through the debtors' term sheet and has

13    concluded that it is not ratepayer neutral.  As a result, Your

14    Honor, we do not believe that you have a plan pending before

15    you presently which, in its current form, could satisfy AB

16    1054.

17         THE COURT:  Well, the CPUC will kill it if it's not

18    rate neutral, won't it?

19         MS. LACEY:  It will, Your Honor, but believing in Your

20    Honor's early warning system, which you have mentioned at a

21    couple of hearings that you like to get early warning of these

22    things, Public Advocates Office wanted to bring to your

23    attention that at this point, the plan, as proposed, is not

24    ratepayer neutral.

25         THE COURT:  Okay.

PG&E Corp., Pacific Gas and Electric Co.

1          MS. LACEY:  Thank you.

2          THE COURT:  Mr. Harris?

3          MR. HARRIS:  Your Honor, I agree with Ms. Lacey.  TURN

4    doesn't see the plan as ratepayer neutral either.  We've seen

5    information supplied by the bondholders.  We expect that we

6    presented it to this Court.  We were gratified to see in the

7    debtors' objection a statement that, for the first time,

8    there's a need to assess the short- and long-term economic

9    benefits of the bondholders' plan.  We think that analysis,

10   along with an analysis of the detriments of the bondholders'

11   plan and the debtors' plan, needs to be put forth at the

12   earliest possible time.  Knowing if this plan is neutral, on

13   average, to ratepayers will be an essential determination as to

14   feasibility, and we therefore support any exclusivity now, so

15   that two plans can be developed and evaluated at the same time.

16         Thank you, Your Honor.

17         THE COURT:  All right.  Consistent with what I said

18   during -- a few minutes ago, I'm going to call a fifteen-minute

19   break, and when we resume, I'll hear from the debtor and the

20   shareholder parties.  I have forty-five minutes, and then we'll

21   have a brief rebuttal, and then I'll send you all up to Judge

22   Donato for the 2 o'clock calendar.

23         (Recess from 12:08 p.m., until 12:23 p.m.)

24         THE CLERK:  All rise.  Parties leave.

25         THE COURT:  Okay.  Are you up to bat, Mr. Karotkin?

(972) 406-2206   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          MR. KAROTKIN:  Yes, sir.

2          THE COURT:  Ready?

3          MR. KAROTKIN:  Stephen Karotkin --

4          THE COURT:  Good afternoon.

5          MR. KAROTKIN:  Good afternoon, Your Honor.  Stephen

6    Karotkin, Weil, Gotshal & Manges for the debtors.

7          In terms of allocating the time, I'll take about

8    twenty or twenty-five minutes, I believe, and Mr. Bennett would

9    like about fifteen minutes.

10         THE COURT:  Okay.

11         MR. KAROTKIN:  But I guess considering how long the

12   other people go, I assume we can go a lot longer if need be.

13         THE COURT:  I thought I'd get you started again at 2

14   o'clock.  And maybe Mr. Orsini will have to stay here with you,

15   too.  I'll ship him up on our magic carpet.

16         MR. KAROTKIN:  Okay.

17         THE COURT:  I'm sure you can --

18         MR. KAROTKIN:  No, we'll be --

19         THE COURT:  -- do what you need.

20         MR. KAROTKIN:  No problem, Your Honor.

21         THE COURT:  Do what you need.

22         MR. KAROTKIN:  No worries.  Thank you.

23         THE COURT:  Do the right thing.

24         MR. KAROTKIN:  I'm going to do the right thing; that's

25   for sure.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    So Your Honor, let's focus, again, on what your docket

2  order said the other day.  And I think you put your finger on

3  it, like, what has happened since August 13th, when you issued

4  your prior opinion, that has changed which would warrant you

5  today, Your Honor, doing a 180-degree reversal of your views

6  when you said at that time -- at that time, Your Honor, when

7  you said, before the debtors had even filed their first plan,

8  when you said, and I quote, "The debtors have placed before all

9  a proposal that, if coxed and guided to maturity, should result

10  in a proper outcome for all creditors without needing to deal

11  with all the other issues."  And those other issues, of course,

12  Your Honor, being the litigation, the expense, the hostile

13  takeover fight to which you referred earlier this morning that

14  will inevitably arise in the context of competing plans; you

15  know that better than anyone.

16    But what has occurred?  What progress have the debtors

17  made since that time?  Again, to quote Your Honor the other day

18  at the status conference, you said "substantial progress," and

19  those were your words.  The debtors have fulfilled all of their

20  commitments that they told to the Court back in August at the

21  prior exclusivity hearing.

22    So let's quickly summarize what has happened since

23  then, Your Honor:  On September 9th, as promised, the debtors

24  filed their initial Chapter 11 plan, incorporating the one-

25  billion-dollar settlement that the debtors negotiated.  The

(970) 406-2209 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    debtors negotiated in arm's length negotiations with the public

2    entities.

3             THE COURT:  With eighteen particular entities.

4             MR. KAROTKIN:  Eighteen, which is the lion's share, by

5    far, of all the public entity claims, Your Honor.

6             On September 13th, the debtors announced their

7    agreement in principal with the subrogation claimants,

8    compromising in settling twenty billion dollars of claims for

9    eleven billion dollars, a forty-five percent discount.  Again,

10   a settlement achieved by the debtors as fiduciaries after hard-

11   fought negotiations with the subrogation claimants and, again,

12   another settlement that our friends over here have elected to

13   adopt into their plan, obviously recognizing the benefit of

14   that settlement that the debtors achieved.

15            The debtors filed their amended plan on September

16   23rd, 2019, incorporating that settlement with the subrogation

17   claimants, notwithstanding a concerted effort by the ad hoc

18   committee to frustrate that settlement, including calling

19   members of the subrogation claimants committee up until the

20   time the ink was dry on the signature pages for those

21   settlements.

22            THE COURT:  Well, some of those facts are not in the

23   record, I don't think, are they?  I don't think they're in the

24   record.  So you complained about your opponent making

25   argument -- or testifying, so don't testify, please.

(979) 571-2900  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1      MR. KAROTKIN:  Okay.

2      THE COURT:  I understand.  Look, you got your amended

3  plan on file, consistent with the subrogation settlement.

4      MR. KAROTKIN:  Yes, sir.

5      And what else have we done?  We've gotten fourteen

6  billion dollars of equity capital and we've gotten thirty-four

7  billion dollars of committed debt capital, enough to fund the

8  debtors' plan as it currently is proposed.  Estimation

9  proceedings are proceeding before Judge Donato in the Federal

10  District Court, and in the State Court the Tubbs trial is

11  proceeding in accordance with schedule to assure confirmation

12  is achieved by the June 30th deadline.  The CPUC has issued its

13  order instituting its proceedings with respect to the debtors'

14  plan to consider all regulatory approvals, again on schedule to

15  meet the June 30, 2019, deadline.

16      And the debtors' plan, Your Honor -- again, the

17  debtors, recognizing their fiduciary duties to all parties,

18  does not grossly overpay the bondholders by needlessly

19  reinstating their debt when it can be easily refinanced at

20  lower rates and not paying, as a result of that -- of not

21  reinstating that interest at the contract rate, which as you

22  recognized, Your Honor, is not required under well-settled

23  precedent in this district.

24      And what have the bondholders and the TCC done?

25      THE COURT:  Well, stop for a minute.  Do you think

PG&E Corp., Pacific Gas and Electric Co.

1  that the overpayment of the interest, for example, makes their

2  plan fatal, fatally unconfirmable?  Or simply, if they want to

3  overpay someone, they can overpay someone?  Why is it

4  fatally -- I mean, is it unconfirmable as a matter of law?

5       MR. KAROTKIN:  I don't know that it's unconfirmable as

6  a matter of law, but if Your Honor wants to endorse a three-

7  billion-dollar imposition on the ratepayers of this state

8  that's not necessary, you certainly can make that decision.

9       THE COURT:  Well, no.  It's not a question of

10 endorsing.  It's a question of giving the voters a choice.

11      MR. KAROTKIN:  As I said, Your Honor, if you think

12 it's in the interests -- and that's a good-faith proposal to

13 impose three billion dollars of excessive costs on the

14 ratepayers of this state, I assume you can make that

15 determination.

16      The debtors, as fiduciaries, don't think that's the

17 right thing to do.

18      THE COURT:  Okay.

19      MR. KAROTKIN:  And I'm actually astonished that TURN

20 thinks that's the right thing to do.

21      THE COURT:  Well, you said that and I was surprised at

22 that also, but you know.

23      MR. KAROTKIN:  Okay.  So what did the TCC and the ad

24 hoc committee do?  And it's very clear from Ms. Dumas' remarks

25 the other day when we were here.  It's very clear from the

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    remarks that were made today by counsel who are supporting

2    exclusivity being terminated.  What did they do?  Did the TCC

3    present evidence -- evidence as to the validity of their

4    claims?  Was that presented to anyone?  We've been asking that

5    for weeks and months:  Give us evidence of the validity of your

6    claims so that we can come to you with a legitimate proposal of

7    how assets of these estates should be dedicated to pay those

8    claims.  Did they come to us and present that information?  No.

9         What did Ms. Dumas say a few minutes ago?  I'll tell

10   you what she said, if I can just get my notes.  She said, and

11   these are --

12        THE COURT:  Well, she said you're -- well, okay.  You

13   go ahead from your notes.

14        MR. KAROTKIN:  She said, in her words, "We're all

15   operating on imperfect information."  She said, we believe the

16   claims are high.  We believe the claims are high; that's the

17   same thing that Mr. Qureshi says.  We believe that claims are

18   high.  But was any evidence presented?  Has any evidence

19   presented to any party in this case to prove the magnitude of

20   that liability?  No.  What was presented at the negotiations

21   between the TCC and the ad hoc committee?  What was presented

22   that caused the ad hoc committee to offer 14.5 billion dollars

23   of this estate's money to the TCC in settlement of their

24   claims?  I'll tell you what was presented:  a one-page sheet of

25   paper prepared by Mr. Pitre, a plaintiff lawyer whom you've

(970) 804-8200 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1   met, setting forth his calculation of what he thinks the

2   liability is.  And that was good enough, Your Honor, for the ad

3   hoc committee in passing out other people's money to the TCC?

4           As I said, Your Honor, the debtors are fiduciaries.

5           THE COURT:  Well, wait.  I mean, I'll concede the

6   obvious, that when somebody else decided to tell you how

7   they're going to spend your money, there's a problem.  But

8   you're making much about how it came to pass.  Why does it

9   matter?  The sponsors of the competing plan have said, we will

10  go home if we get fourteen and a half billion dollars.  You're

11  being the debtors' advocate by saying, well, wait.  I haven't

12  committed to commit that money.  I mean, no one's said that we

13  owe that money, and that's a legitimate point.  But that

14  doesn't mean that they can't reach an agreement the way they

15  did, does it?

16          MR. KAROTKIN:  I think actually it does, Your Honor.

17  I think you were one of the first people to say in this case

18  that no money is leaving this estate unless people prove their

19  claims.

20          THE COURT:  Well, I understand.

21          MR. KAROTKIN:  Okay?

22          THE COURT:  I understand.

23          MR. KAROTKIN:  That's what you said.  We don't have a

24  bar date.  We don't have evidence of the validity of the

25  claims.  Notwithstanding that, what they did was they decided

escribers
(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    what is the distributable value available.

2         THE COURT:  Right.

3         MR. KAROTKIN:  What is it?  Not, are the claims worth

4    this?  Should they be paid this?  Should seven billion dollars

5    of equity value be taken away from the shareholders of this

6    corporate?

7         THE COURT:  But you also heard Ms. Dumas concede that,

8    if the estimation by the District Court and/or Tubbs fire comes

9    in higher, they're not going to try to get the higher number.

10   So I mean, do you believe that?

11        MR. KAROTKIN:  Do I believe it?

12        THE COURT:  Well, do you believe that they're locked

13   in?  In other words --

14        MR. KAROTKIN:  I don't know, Your Honor.  Every day we

15   get a new plan with different provisions from them.

16        THE COURT:  Well, okay.  But let's stick with the plan

17   that they want to file.  If Judge Donato makes a determination

18   after the estimation trial and fixes a number that's higher

19   than -- again, I'm going to back out the subro --

20        MR. KAROTKIN:  Um-hum.

21        THE COURT:  -- because that's a constant -- higher

22   than thirteen and a half billion, I heard Ms. Dumas say the TCC

23   will not try to get a higher number.

24        MR. KAROTKIN:  And is Ms. Dumas, as you said, voting

25   on this plan?

(973) operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1        THE COURT:  No, but I mean, no one --

2        MR. KAROTKIN:  And do they control the votes of

3   30,000, as they say, or 40,000 claimants who, Your Honor, are

4   going to say, oh, notwithstanding that Judge Donato found the

5   liability to be well in excess of fourteen billion dollars,

6   nevertheless we'll accept that plan?

7        THE COURT:  Well, I mean --

8        MR. KAROTKIN:  And has FEMA agreed --

9        THE COURT:  Well --

10       MR. KAROTKIN:  -- to accept the plan?

11       THE COURT:  But I mean, what am I --

12       MR. KAROTKIN:  And have the other --

13       THE COURT:  What am I supposed to do about it at this

14   point?  Anybody who proposes a plan is -- whether it's a debtor

15   who proposes a plan or somebody on a hostile situation with a

16   creditor's plan, says, this is what I think I want.  This is

17   what I want to go through the pipeline to these other folks,

18   and the recipients, through their representatives, say, we'll

19   accept that.  I mean, that is a process, in and of itself.

20       MR. KAROTKIN:  Your Honor, again, if you think under

21   those -- you raised it yourself.  You said, again, a little

22   while ago, and you really think that plan will be voted

23   successfully?  You raised the issue, and I think you're

24   absolutely right on that issue.

25       So let me tell you what will happen.  Your Honor,

PG&E Corp., Pacific Gas and Electric Co.

1    under AB 1054, in order to get the benefit of the go forward

2    wildfire funds, there are specific provisions that basically

3    say the wildfire claimants have to be paid in full --

4            THE COURT:  Right.

5            MR. KAROTKIN:  -- either by estimation or by

6    agreement --

7            THE COURT:  Or agreement, right.

8            MR. KAROTKIN:  -- or otherwise.

9            THE COURT:  Right.

10           MR. KAROTKIN:  And what the debtors' plan says is that

11   we will do that.  And if it turns out, Your Honor, that Judge

12   Donato estimates the liability higher than what our plan

13   provides, as you said, the plan will be amended.  We've

14   demonstrated that there are plenty of alternative sources of

15   capital out there to fund the plan.  It doesn't have to come

16   from the equity holders.  It can come from somebody else.

17           THE COURT:  Well, no, it can.

18           MR. KAROTKIN:  And I --

19           THE COURT:  But Mr. Qureshi makes the argument that --

20   or Ms. Dumas used the metaphor about gas in the tank.  I mean,

21   I think the argument that I heard was, the numbers may be such

22   where there's no economic incentive for anybody to stay in.

23           MR. KAROTKIN:  I will tell you, that applies to the ad

24   hoc committee as well.

25           THE COURT:  I know.  I know.  Of course, it does.

escribers
(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    MR. KAROTKIN:  They only have so much gas in the tank

2 to put an equity investment in here.

3    THE COURT:  Right.

4    MR. KAROTKIN:  And I'll tell you something, Your

5 Honor, there's plenty of capital available in the market that

6 will invest in this company and fund the plan and not at a

7 seventeen percent discount.  A seventeen percent discount to

8 their own plan value, not to our plan value, but to their own

9 plan value.  There's plenty of capital out there to address

10 that.

11    And if there is evidence, Your Honor -- and again,

12 evidence provided, which causes Judge Donato to make that

13 decision, then we will amend our plan to address it and make

14 sure that this debtor gets the benefit of AB 1054.

15    THE COURT:  But your opponents make the point about

16 what if you are unable to do that.  And I raised the question

17 to you in my order.  What's the downside?  And I know the

18 obvious downside, the expense and the delay and the fighting

19 and the corporate control struggle, but --

20    MR. KAROTKIN:  Don't minimize that, Your Honor.

21    THE COURT:  Believe me, I'm not.  I'm just one judge

22 for this case, you know?  And so if -- but the fact of the

23 matter is, if for whatever reason the debtor can't pass muster

24 and get a confirmable plan and we don't have an alternative,

25 then you can kiss AB 1054 goodbye anyway, right?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    MR. KAROTKIN:  Your Honor, at the levels we're talking

2  about, they'll be gone, too, okay?  And it's interesting what

3  Mr. Dunne said before.  First of all, there is a limit, as I

4  said, as to how much equity capital anyone will put in this --

5    THE COURT:  Right.

6    MR. KAROTKIN:  -- in this debtor, including the ad

7  hocs.  As I'm sure you know, they're not charitable

8  institutions.

9    THE COURT:  I know.

10    MR. KAROTKIN:  Okay?

11    THE COURT:  That's true.

12    MR. KAROTKIN:  They're not doing this for their

13  health.  Okay?  And let's go back to what Mr. Dunne said.  I

14  think he said that, if it's determined that they're not

15  entitled to the federal judgement rate of interest and they're

16  not entitled to Make Wholes, what will happen?  I think you

17  asked that question.

18    THE COURT:  I did.

19    MR. KAROTKIN:  And he said, oh, don't worry.  They'll

20  amend the plan to cover that.  That's nice of him to say, but

21  at a deposition that took place last week, it was very clear

22  from the ad hoc advisors, his testimony, that this is a package

23  deal for them.  The seventeen percent discount, reinstatement

24  of their claims, with a contractual rate of interest, and

25  continuing to receive the high coupon under the debt.  This is

PG&E Corp., Pacific Gas and Electric Co.

1  not -- this is not pick and choose what you want and I'll still

2  be there.

3      And let me get -- let me address the issue that you

4  said, Your Honor:  What's the downside of competing plans?  The

5  downside is all of the things you mentioned:  a hostile

6  takeover, the litigation, all of that that will be attendant to

7  that scenario.  It happens in other cases.  It's not

8  beneficial.  It's not going to create competition.

9      THE COURT:  Well, that's what I said in my oral -- my

10  written ruling last time around, that it's a sideshow for what

11  we're here for, right?

12      MR. KAROTKIN:  Exactly.  And let me address that.  So

13  let's focus on what actually happened in this case.

14      Your Honor, they came in here in August and they --

15  all of these people here, they said the same thing.  Your

16  Honor, terminating exclusivity will cause competition.  It will

17  move this case forward.  It was a mantra.  But what happened?

18  You didn't terminate exclusivity.  And what was the next thing

19  that happened?  The debtors negotiated the settlement with the

20  subrogation claimants.  That's what happened.

21      THE COURT:  Well, how long did it take for the second

22  motion to terminate exclusivity?  Two more weeks?  I mean, you

23  know?

24      MR. KAROTKIN:  Two more -- because that's -- I mean,

25  they're serial filers.  What can I tell you?

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1      But that's what will happen, and that's why, Your

2  Honor.  The right answer here -- the right answer is not

3  terminating exclusivity.  The right answer is to maintain the

4  status quo, appoint a mediator --

5      THE COURT:  Well, no, I know, you've said that before.

6  And believe me, I haven't ignored your suggestion.

7      MR. KAROTKIN:  But let me put that into context.  And

8  you did -- and we did reflect this in our papers.

9      At the outset of this case, you heard from the tort

10  claimants committee they were entitled to fifty billion; they

11  were entitled to thirty billion.  Now, they are at thirteen and

12  a half billion.  They said they're willing to take thirteen and

13  a half billion.  The delta has shrunk considerably.  Eight and

14  a half to thirteen and a half billion cries out for mediation.

15  And Your Honor, we believe that, with an experienced mediator

16  with experience in mass tort cases, that gap can be bridged.

17  And that ought to have a chance of moving forward to see if it

18  can be successful.  And as you said, if that's successful, this

19  case marches on to confirmation like a freight train; no one

20  will oppose it.

21      And what's the prejudice, Your Honor, that's going to

22  be suffered if, for thirty days or forty days, you say, okay,

23  let's maintain the status quo; let's try mediation.  No plan is

24  going to be solicited until at the very, very, earliest, after

25  the 1st of the year.

escribers
(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1       THE COURT:  Um-hum.

2       MR. KAROTKIN:  How will they be prejudiced?  There is

3  no prejudice.  And Your Honor, mediation -- mediation worked

4  the last time.  You know that better than anybody.  And we are

5  at a crossroads here.  At this point in time, we are at a

6  crossroads in this case.  We have a settlement with the public

7  entities.

8       THE COURT:  Well, but even if I terminate exclusivity,

9  there still can be mediation.

10      MR. KAROTKIN:  No -- there can.  But Your Honor, once

11  you've --

12      THE COURT:  There's perhaps more to mediate.

13      MR. KAROTKIN:  No.  When you terminate, the position

14  of the parties will be galvanized.  They will be emboldened to

15  pursue their own plan and will be much less likely to achieve a

16  compromise.  Look exactly what -- do you think we would have

17  achieved a compromise with the subrogation claimants if you had

18  let them pursue their own plan?  I don't think so.

19      THE COURT:  I don't know.

20      MR. KAROTKIN:  I don't think so.  But that's where we

21  are.

22      And you had raised -- just want to make one or two

23  other points.  You had raised the issue with the retirees and

24  the employees.  Obviously, that plan violates the

25  discriminatory treatment --

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    THE COURT:  Well, but I mean, the reason I did -- I

2    mean, you're focusing on it, but to me, if there's anything out

3    there having to do -- I don't care whether it's the -- at the

4    script after the prior rule to the existing equity or the

5    discrimination within a class of equity or some of these other,

6    more esoteric things that bankruptcy lawyers get all excited

7    about, they still seem to be getting and standing in the way of

8    getting to the goal of getting the victims paid, and all of the

9    other creditors.  But nobody's -- you know, the other creditors

10   are going to get paid.  You made it clear.

11        But Mr. Karotkin, what happens -- what happens -- what

12   do I do if I don't allow the competing plan and your

13   predications aren't fulfilled?  That it's January or February

14   or -- it's February and Judge Donato says thirty billion, and

15   what do I do?

16        MR. KAROTKIN:  First of all, if Judge Donato says

17   thirty billion, these people are --

18        THE COURT:  I know.

19        MR. KAROTKIN:  -- they're history.

20        THE COURT:  You've said that before.

21        MR. KAROTKIN:  Okay?

22        THE COURT:  But --

23        MR. KAROTKIN:  But there are other sources of --

24        THE COURT:  -- what happens?

25        MR. KAROTKIN:  Okay.  There are other sources of

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

                PG&E Corp., Pacific Gas and Electric Co.

1   capital to fund the plan.

2            THE COURT:  Um-hum.

3            MR. KAROTKIN:  It doesn't have to be existing equity,

4   Your Honor.

5            THE COURT:  No, I know that.

6            MR. KAROTKIN:  Doesn't -- you know that better than

7   anybody.

8            THE COURT:  Of course, I know that.

9            MR. KAROTKIN:  And if we get to that position, then we

10  have a completely different plan scenario for everybody.

11  That's where everybody is impaired.

12           THE COURT:  Yeah.

13           MR. KAROTKIN:  Mr. Dunne's clients are impaired.

14           THE COURT:  Correct.

15           MR. KAROTKIN:  Everybody is impaired.  And at that

16  point, neither of these plans will be moving forward.

17           All I'm telling you, Your Honor, is give us a chance

18  to get a global consensus.  Create the atmosphere to achieve a

19  global consensus, and that's how these cases will move forward

20  successfully.

21           THE COURT:  Well, you know, at one of the prior

22  hearings you might recall -- we covered a lot of hearings and a

23  lot of subjects -- but at one point -- I'm going to think it's

24  about three hearings ago -- I asked for any affirmative

25  feedback about the specifics of the mediator, a mediator, or

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1  the process.  And you personally, or your client, the only one

2  that responded in any way.

3          So I'm sort of like, is there anybody else that wants

4  me to do this?  And I know -- and I can, but it's not something

5  that's easy to do because you've got to figure out who and when

6  and what, and I don't think it's just the fire claim amounts,

7  you know?  You just made a point about experienced person

8  dealing with the mass torts, but you previously, I think, in

9  your paper said experienced bankruptcy person, too.

10          So to some extent, these corporate control issues are

11  prospective mediation points too, aren't they?  No?

12          MR. KAROTKIN:  I don't believe so.

13          THE COURT:  You don't think so?

14          MR. KAROTKIN:  No.  Because if the tort --

15          THE COURT:  Because you think that they're --

16          MR. KAROTKIN:  -- if the tort liability is resolved,

17  that goes away.

18          THE COURT:  Well, if it's resolved consensually --

19          MR. KAROTKIN:  That's what I mean, consensually.

20          THE COURT:  -- and your client agrees.  I mean, look.

21  You heard Ms. Dumas say how happy she'd be if your client said,

22  we'll take the thirteen and a half billion.  And I said, well,

23  let's see if you do, so --

24          MR. KAROTKIN:  And Your Honor, if they --

25          THE COURT:  No, we're not going to mediate this

(973) 406-2250 operations@escribers.net | www.escribers.net

                    PG&E Corp., Pacific Gas and Electric Co.

1    publicly, but --

2              MR. KAROTKIN:  No.  If they presented evidence where

3    we as fiduciaries could evaluate the claims, then --

4              THE COURT:  Well, you know, you've said --

5              MR. KAROTKIN:  But we can't -- but Your Honor, what we

6    can't do is just accept their word for it.

7              THE COURT:  No, you can't.  I agree with you.  But

8    weren't we going to start with the claims deadline?

9              MR. KAROTKIN:  Yes.  Exactly.

10             THE COURT:  And then even that may not be the maximum,

11   right?

12             MR. KAROTKIN:  It may not.

13             THE COURT:  It will be some number, but we don't know.

14             MR. KAROTKIN:  But it will give us -- Your Honor,

15   right now, we're operating in an information vacuum.  At least

16   the bar date, which is a week and a half from now --

17             THE COURT:  Right.

18             MR. KAROTKIN:  -- will give us some more information.

19             THE COURT:  Well, it will probably give you at least

20   some information about who hasn't filed claims rather than who

21   has filed claims.  Because the ones who have filed claims

22   may -- you know, there may be a lot of need to sort through

23   them and figure out which ones are legit.

24             MR. KAROTKIN:  Okay.  But Your Honor --

25             THE COURT:  Right?

(97 ...) operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    MR. KAROTKIN:  -- now we have no information.  And for

2    you to terminate exclusivity in the face of no claims

3    information, with a bar date not even having taken place, that

4    to me would be unprecedented.  The debtors are entitled to an

5    opportunity to evaluate the claims, to get the claims

6    information, and to determine -- and work with the tort claims

7    committee when they have the information to try to achieve a

8    settlement here.  And I think that's the right way to proceed.

9    We cannot, Your Honor, as fiduciaries, just agree to a

10   number because Ms. Dumas and Mr. Pitre say they believe that's

11   the number; that's not how a Chapter 11 works.

12   THE COURT:  Is 8.4 your number?

13   MR. KAROTKIN:  Pardon me?

14   THE COURT:  Is your 8.4 a number that is supported by

15   evidence?

16   MR. KAROTKIN:  Our 8.4 is a bottoms-up analysis done

17   by our experts --

18   THE COURT:  Okay.

19   MR. KAROTKIN:  -- over a long, long period of time.

20   THE COURT:  Okay.  But it's still a number.  In other

21   words, if somebody said, fine, let's just confirm that plan,

22   you're not going to have a fit and say, no, that's really less?

23   MR. KAROTKIN:  No.

24   THE COURT:  I mean --

25   MR. KAROTKIN:  Absolutely not.

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1       THE COURT:  Well, okay.  But I mean, there's -- there

2 have been different views.  Your colleague at the table there

3 has publicly said frequently, there's no admission as to

4 liability.  And he's entitled to say that.

5       MR. KAROTKIN:  We have put that in the plan.

6       THE COURT:  Oh.

7       MR. KAROTKIN:  And we will stand by that number.

8       THE COURT:  Well, that's what I assumed.

9       MR. KAROTKIN:  Of course.  And as I said, Your Honor,

10 let's have some evidence of what the claims are so the debtor

11 as a fiduciary can make a reasoned judgment as to what is the

12 appropriate amount.  Give us a chance to do that.  Give us a

13 mediator to help us do that.  And dispense with --

14       THE COURT:  Well, again, I don't want to --

15       MR. KAROTKIN:  -- all other litigation.

16       THE COURT:  Look, I've said, two, three times, you,

17 you and your client, are the ones that are saying it over and

18 over and I'm not opposing it, but what I'm saying is, if I were

19 a mediator in a case like this, I'd start by saying, okay,

20 what's the support?  I mean, we're back to the same question,

21 aren't we?  Your position, I'd presume, would be that your

22 experts have told you that that number is a hard number, can't

23 go lower.  But if the mediator says, well, what's your number,

24 to the other side, and they don't have an answer, then what

25 happens to the mediation?

(970) 983-8000 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    MR. KAROTKIN:  I assume they -- I assume they must

2 have some information to support the amounts they're looking

3 for.  That would be astonishing that they have no

4 information --

5    THE COURT:  No, I agree.

6    MR. KAROTKIN:  And that --

7    THE COURT:  I agree.

8    MR. KAROTKIN:  -- and that Your Honor would actually

9 approve that type of payment, with no information.

10    THE COURT:  Well, you're jumping the gun to what I

11 would approve because I might not approve it until people vote

12 on it.  But if they vote on it and there's adequate disclosure,

13 then I think we're somewhere.

14    But look, as we've said before, for the kind of

15 statements that the TCC and their counsel have made earlier

16 than even for their lawyer today to stand up and say, we'll

17 take to the bank a 13.5 billion dollar plan doesn't mean that

18 the votes are going to come in,  but it's certainly, from my

19 experience and I suspect from yours, when a committee supports

20 something, they probably get the support of the constituents;

21 don't you think?

22    MR. KAROTKIN:  I think it depends on the individual

23 circumstances of the case --

24    THE COURT:  Okay.  Fine, but --

25    MR. KAROTKIN:  -- and who they represent, who's on the

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1   committee; there are a lot of variables here, Your Honor, that

2   we don't know about.

3           THE COURT:  No, we don't.

4           MR. KAROTKIN:  So --

5           THE COURT:  Okay.

6           MR. KAROTKIN:  Okay?

7           THE COURT:  Mr. Bennett, are you going to take over?

8           MR. BENNETT:  Thank you, Your Honor.  No.

9           MR. KAROTKIN:  Yeah.  Oh, I'm sorry, I made a -- Mr.

10  Feldman wants two minutes, too.

11          THE COURT:  Okay.

12          MR. KAROTKIN:  Sorry.

13          THE COURT:  Mr. Feldman?

14          MR. FELDMAN:  I will be brief, Your Honor.  I really

15  only want to make, I think, two points, and I think I can do it

16  in less than two minutes.

17          THE COURT:  I --

18          THE CLERK:  We need an appearance.

19          THE COURT:  We need --

20          MR. FELDMAN:  For the record --

21          THE COURT:  Yeah.

22          MR. FELDMAN:  -- for the record, Matthew Feldman on

23  behalf of the Ad Hoc Committee of Subrogation Claimants.

24          Your Honor, I think in a certain sense, you've teed

25  this up, and we want to be as transparent as possible.  We have

PG&E Corp., Pacific Gas and Electric Co.

1    an eleven-billion-dollar-agreed-upon claim subject to this

2    Court's approval in two weeks.

3            THE COURT:  Right.

4            MR. FELDMAN:  These are not apples-to-apples plans;

5    we're going to park that issue for another time.  We're not

6    sure what we get under the bondholder plan, TCC plan.  It's an

7    eleven-billion-dollar face, but their form of consideration is

8    subject --

9            THE COURT:  Yeah, but that -- but that's about --

10           MR. FELDMAN:  -- is subject to issue.

11           THE COURT:  But that's about the only issue, right?

12           MR. FELDMAN:  Only issue.

13           THE COURT:  I mean, it's a constant, for our purposes.

14           MR. FELDMAN:  Only issue.  But what I really want to

15   address is something Mr. Dunne said, because he's -- I think

16   he's wrong about one thing, and I think he hasn't thought

17   through a second thing.  He's wrong, Your Honor, to say that

18   competition will be fostered and a global settlement will be

19   reached if the Court were to lift exclusivity and create

20   parallel plans.  In fact, I think it's quite the opposite.  And

21   Mr. Karotkin hinted at it earlier, but I think it's worth

22   saying it more clearly.

23           It's the threat of lifting exclusivity that drives

24   people together and drives negotiations.  If the Court were

25   actually to lift exclusivity, it will be exactly as -- as Mr.

(970) 390-0260   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    Karotkin referenced; the parties will go to their corners and

2    litigation will commence.  And you think you're busy now,

3    Judge, you will get even busier if that's the path the Court

4    decides to take.  That's one piece.

5         The second piece, I think, is more important, which is

6    Ms. Dumas said something very important today.  She said, it's

7    a cap without a floor.  We will agree no more than thirteen and

8    a half billion dollars.  If we go through estimation and it

9    turns out that the claims are more than thirteen and a half

10   billion dollars, we've agreed to a cap.  That's great from a

11   committee perspective, but in order to satisfy AB 1054, the

12   language says that you have to be either estimated or

13   liquidated, the claim, and paid in full.  The committee can

14   agree to a cap, but any individual --

15        THE COURT:  Well, no.  But that was my point.

16        MR. FELDMAN:  -- any individual tort claimant.

17        THE COURT:  One person --

18        MR. FELDMAN:  Well, you made the point, Your Honor --

19        THE COURT:  Yeah.

20        MR. FELDMAN:  -- in conjunction with best interest

21   test and in conjunction with whether or not you can meet 1129

22   standards.  I'm saying you can't get out of first base.  You

23   can't meet AB 1054 and access the wildfire fund, so why would

24   we ever want to see that plan --

25        THE COURT:  And tell just --

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          MR. FELDMAN:  -- on a parallel path?

2          THE COURT:  Fill that out.  Explain that in more

3    detail.

4          MR. FELDMAN:  Yeah.

5          THE COURT:  So let's assume that the TCC's plan is on

6    the table and Ms. Dumas's figure of 13.5 billion for the

7    victims is embedded into that plan.

8          MR. FELDMAN:  Correct.

9          THE COURT:  You're saying that --

10         MR. FELDMAN:  And now we go through estimation and

11   Judge Donato and the Tubbs judge come back and, in fact, the

12   victims are entitled to --

13         THE COURT:  Higher.

14         MR. FELDMAN:  -- eighteen billion dollars, just to --

15         THE COURT:  Yeah, X.

16         MR. FELDMAN:  -- whatever it is.

17         THE COURT:  Anything more than thirteen and a half.

18   Okay.

19         MR. FELDMAN:  More than thirteen and a half.

20   Anybody who doesn't consent to that thirteen and a half

21   recovery by voting in favor of the plan is entitled, in order

22   to meet the standards of AB 1054, to payment in full based on

23   the estimated amount.

24         THE COURT:  And the argument would be what, that it

25   simply doesn't comply with the law?

PG&E Corp., Pacific Gas and Electric Co.

1          MR. FELDMAN:  Correct.

2          THE COURT:  But the law says what the Court

3    determines.

4          MR. FELDMAN:  But the Court has determined that the

5    estimate of claims is above the thirteen-and-a-half billion

6    dollars.

7          THE COURT:  Okay.  Okay, so it's the -- it's the

8    district judge's determination of the value, not the bankruptcy

9    court's determination of what the plan -- the accepted plan

10   provided for.

11         MR. FELDMAN:  It has to be correct, Your Honor.  That

12   has to be what the --

13         THE COURT:  Well, I mean, I think --

14         MR. FELDMAN:  -- statute means.

15         THE COURT:  -- I think I'm agreeing with you.

16         MR. FELDMAN:  Yeah.

17         THE COURT:  But we none of us have much experience

18   with AB 1054, right?

19         MR. FELDMAN:  My goal in all of these cases, Judge, is

20   not to make law, and I'd like to not make law on AB 1054; I'd

21   like the company to emerge in June and get access to the

22   Wildfire Fund.

23         THE COURT:  No, but the language -- I mean, it's a

24   long difficult statute, but as I recall, the provisions in

25   there on that amount are -- is pretty straightforward, and it

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    seems --

2           MR. FELDMAN:  Pretty straightforward.

3           THE COURT:  -- to say pay them an agreed amount.  But

4    the statute doesn't get into the niceties of percentages and

5    acceptance ratios --

6           MR. FELDMAN:  It doesn't get into percentages, but it

7    specifically says "estimate".

8           THE COURT:  Correct.  Correct.  But -- yeah, that's

9    right.  So okay, we're in -- but then you're -- on the flip

10   side is, if the estimation is below the number, then you have a

11   different problem, but that's not an AB --

12          MR. FELDMAN:  Well, I don't think we have a different

13   problem.  If I understand Ms. Dumas, which I think is a really

14   important point, she has said we would agree to a lower amount

15   if the estimation and the Tubbs trial come out at a lower

16   amount.  I think I heard her very clearly say that.

17          THE COURT:  No, but I think Mr. Qureshi made the point

18   that he agrees that if the court -- district court determined a

19   lower amount, the plan's not confirmable, because Mr. Bennett

20   over there would tell us, correctly, that it would violate the

21   absolute priority rule by overpaying the claim amount.

22          MR. FELDMAN:  Correct, and then --

23          THE COURT:  And so --

24          MR. FELDMAN:  -- Ms. Dumas corrected that to say that

25   they would take the lesser amount.

(972) 591-6200   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    THE COURT:  Yeah.

2    MR. FELDMAN:  But I don't think that problem exists

3  anymore.

4    THE COURT:  So but the AB 1054 issue doesn't exist

5  either, if --

6    MR. FELDMAN:  Correct.

7    THE COURT:  -- if it's the amount.  It's only if the

8  amount is higher --

9    MR. FELDMAN:  Correct.  But the whole purpose of Mr.

10  Dunne's colloquy was to say there's financing for an even

11  higher amount, Your Honor.  And in fact, I think it's not -- I

12  think it's a red herring, is what it --

13    THE COURT:  So AB 1054 says that parties can reach an

14  agreement or the court can estimate.

15    MR. FELDMAN:  Right.

16    THE COURT:  So what do you do with the hold out --

17    MR. FELDMAN:  Correct.

18    THE COURT:  -- what do you do -- I mean, what do you

19  do as far as a mediation process?  How do you bind everybody?

20    MR. FELDMAN:  In a mediation, Your Honor -- and I --

21  that's the debtors' advocation of a mediation -- I think we

22  have to go through estimation, at the end of the day.

23    THE COURT:  Even if the TCC agrees?

24    MR. FELDMAN:  I think if the TCC can get on board,

25  they can do what we've done with our group, which is we've said

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1   we'll take eleven billion dollars, and our group members will

2   take the risk that someone is entitled, at the end of the day,

3   to a higher amount of money than they're getting under our

4   allocation.

5           We've said to the Court when we teed this up, that we

6   would take on that risk.  If the TCC and the individual

7   plaintiffs want to do that as well, I think they could do that.

8   It may result in disparate recoveries within a particular fire,

9   but that's a risk that's a group risk, not an individual risk.

10          THE COURT:  Okay.

11          MR. FELDMAN:  Thank you.

12          THE COURT:  Thank you, Mr. Feldman.

13          Mr. Bennett?

14          MR. BENNETT:  Thank you, Your Honor.

15          THE COURT:  And Mr. Karotkin said you would like

16  twenty; is that right?

17          MR. BENNETT:  I wanted twenty, he cut me to fifteen,

18  but I won't use --

19          THE COURT:  You can have twenty if you want.

20          MR. BENNETT:  Thank you, Your Honor.  I'll try not to

21  use all of it.

22          So I have a lot of different points I wanted to make,

23  because there are different -- there are a lot of different

24  things flying around this morning.

25          First relatively narrow confined issue, in many places

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1   in the so-called alternative plan, it provides that contract

2   rates will be paid to matured claims, not just the reinstated

3   claims.  In everywhere where that term appears, it is illegal

4   in the Ninth Circuit.

5          So I want to be perfectly clear.  A plan that contains

6   that term is not confirmable, and we would say it's not

7   confirmable both in the context of reinstatement, where

8   reinstatement is so economically disadvantageous to the debtor

9   and to ratepayers, but in the -- clearly with respect to

10  matured claims, like debts and bonds that have already matured,

11  credit facilities that have already matured, contract claims

12  that have already matured, to the extent that you provide in a

13  plan filed in the Ninth Circuit, for contract rate interest,

14  which is higher than federal judgment rate interest --

15         THE COURT:  So you think --

16         MR. BENNETT:  -- that's not --

17         THE COURT:  -- Cardelucci applies to matured and --

18  but you would -- you'd also made the point in your opposition

19  that paying any interest on unmatured claims is a different

20  flaw.

21         MR. BENNETT:  It acts -- in this instance, because

22  they've tried to reinstate them and create a separate

23  transaction, which indirectly causes them to be secured,

24  they've basically taken old, high, unsecured interest rates and

25  applied them to new secured debt.  That's a huge value

PG&E Corp., Pacific Gas and Electric Co.

1  transfer.  I think it's --

2          THE COURT:  So if that plan -- but if that plan were

3  on the table, and it's time to submit objections, you would

4  object on the matter of law, and --

5          MR. BENNETT:  Absolutely.

6          THE COURT:  -- and if you were right, they would amend

7  it, simple enough, right?  I mean, it's like everything else.

8          MR. BENNETT:  I suppose that's right.  I suppose,

9  though, that when you're dealing with kind of clear -- not kind

10  of clear -- absolutely clear Ninth Circuit authority, we

11  shouldn't have that extra detour, but that's okay.  I am -- my

12  job is to deal with things like that.

13          THE COURT:  But on your side, Mr. Karotkin made the

14  point that, for example, if the ruling goes the other way on

15  the interest, the debtor will just amend the claim up.  So I

16  mean, if the debtor can -- I mean, amend the plan up.  So if

17  the debtor can amend the plan up to make it legal, the

18  proponents of the opposing plan can reduce their plan --

19          MR. BENNETT:  Well --

20          THE COURT:  -- their claim -- their amount to make it

21  legal.

22          MR. BENNETT:  And by the way, actually, there's a big

23  difference there.  I think their commitments disappear if that

24  happens.

25          THE COURT:  Why does -- why is that?

(971) 224-0210 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          MR. BENNETT:  Because they provide that the plan has

2     to include the --

3          THE COURT:  Oh, the funding.

4          MR. BENNETT:  -- the funding of the interest.  So I

5     think that's a fundamental difference.  And we're going to come

6     to their commitments in a second, because I think that they

7     glanced past them rather quickly.

8          The next point on my agenda is the assertion that

9     somehow the financing parties that are supporting the debtors'

10    plan are going to run out of gas.  And that was mainly directed

11    to the equity holders.

12         Mr. Karotkin is correct that there's a couple of

13    things you have to remember about the debtors' plan.  One is,

14    it's not only supported by equity-holder financing; and

15    secondly, the equity-holder financing is very different than

16    the bondholder financing.  It's a backstop which allows the

17    debtors to sell stock to the highest bidders, wherever they may

18    be.

19         And one of the differences in the bondholder

20    commitment is that it requires that the stock be sold to the

21    bondholders, at their price.  So the financing structure that

22    the debtors negotiated with us -- this was an arm's-length

23    discussion, a little more than a week of intensive

24    negotiations -- resulted in a structure that actually gives the

25    debtor the opportunity and ability to get financing from any

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1  source they want to.  And the shareholder backstop is truly a

2  backstop; it's not a force financing; it's a strictly

3  protective structure.  Totally different.

4         Okay.  So my first real discussion about financing is

5  around where did this allegation come from that somehow the

6  debtors' financing was going to run out of gas?  One of the

7  things we all do before we get to a hearing in the morning is

8  we read the pleadings where this started.  And there was a

9  motion to terminate exclusivity.

10        And in the motion to terminate exclusivity there are

11  three complaints about the debtors' plan.  And I'm on page 9,

12  paragraph 14.  Your Honor probably remembers them.

13        THE COURT:  Oh, of course.

14        MR. BENNETT:  The first one was that the plan was

15  dramatically underfunded because they only had two signed

16  commitments on the first day.  They only have Abrams and

17  Knighthead, and they didn't have the rest.

18        The argument was you've got one-point --

19        THE COURT:  One-and-a-half I think that was --

20        MR. BENNETT:  -- one-and-a-half billion --

21        THE COURT:  One-and-a-half --

22        MR. BENNETT:  -- and you need fourteen.  Okay?

23        Well, actually, more than fourteen came in.  The

24  debtors have the haircut, and the debtors cut back everybody's

25  commitments to fit them within the required fourteen.  And the

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1   debtors went out and got supplemental financing.

2           So how this started was not a new argument that

3   they're going to run out of gas, it was well, you don't have

4   the financing you need.  Well, let's now understand where we

5   are, based on the record -- let's try to confine ourselves to

6   the record.  All of the financing the debtors said they would

7   need actually showed up.  In fact, one of the tranches and

8   maybe others -- if I'm not remembering correctly, Mr. Karotkin

9   can tell me -- but the equity tranche was oversubscribed.

10  Okay?

11          Now, as to this point -- we'll come to this in a

12  second -- they said well, we know that's not going to work

13  anymore, so we have to invent a new one.  And so they said,

14  well, the debtors are going to run out of gas, and the people

15  we think are going to run out of gas are the equity.  And we

16  think the debtors are going to run out of gas because it's just

17  about seven billion dollars' worth of equity value, and oh, by

18  the way, we think we know what the reorganization value is.

19          Well, but wait a minute.  None of that is evidence

20  about what the shareholders are willing to do.  Again, last

21  round oversubscribed.  Oh, one more part of the evidence.  That

22  was the second round of commitments.  When the first round

23  didn't fit the facts as the debtors' plan evolved, about a

24  week-and-a-half later, the second one showed up extraordinarily

25  rapidly.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    So what are the facts before the Court?  The facts

2  before the Court are:  oversubscribed financing, delivered when

3  they said it would be delivered, and oh, by the way, not the

4  first time, it's the second time.  Okay?

5    So we know what happened.  Those are the facts.  The

6  idea that it wouldn't happen again, that's speculative.

7  There's no evidence of that.  They did nothing to try to create

8  evidence of that.

9    What has happened, Your Honor, is they had to invent a

10  new argument because their old one fell flat.  Okay.  Just for

11  completeness purposes before we get back to their commitment,

12  which I want to do, the other two complaints were -- it's

13  important to remember, the subro settlement was overpayment.

14  That's what they said.  They said in their papers, the subro

15  settlement is too much.  Now, of course, the ink was barely dry

16  on that when they changed their minds and they said, the subro

17  settlement is perfect.  We embrace it.  Okay.  I'm waiting for

18  next for them to say the subro payment should be higher because

19  we'd like to buy their votes away.  But please, remember, you

20  are asked to terminate exclusivity because the subro settlement

21  was too high and then they embraced it.

22    And then the last one was that they were dramatically

23  undercompensating the bondholders -- that the debtors were

24  dramatically undercompensating the bondholders, and they were

25  dramatically undercompensating the tort claimants.  Well, the

PG&E Corp., Pacific Gas and Electric Co.

1    bondholders -- that's all about the fight about contract

2    interest in Make Wholes.  There's about to be a briefing

3    schedule.  I thought it was going to be before this hearing.

4    But there will be a briefing schedule at which Your Honor will

5    decide that, and I agree that's going to get decided for any

6    plan, and I'm looking forward to that set of advocacy.  But

7    now, the last thing was we were underpaying the tort claimants.

8          Okay.  This is a good place -- and I'll come back to

9    their commitment.  I don't want to forget it.  This is a good

10   place to shift to something else.  And what am I shifting to?

11   So evidence in the case.  Your Honor talked about evidence.

12   One of the things that Mr. Karotkin attached to his papers was

13   the full deposition transcript of the Brent (phonetic)

14   Williams' deposition.  I don't know if you got a chance to read

15   it.  I encourage you to do so before you decide the exclusivity

16   motion, but I'm going to zero in on one noteworthy section, and

17   I'll pause so that people can follow it to make sure I don't

18   misquote a single word, and that is page 127 of the Williams'

19   deposition.  It starts kind of in the middle of the page.

20         So who is Mr. Williams?  Mr. Williams is the financial

21   advisor to the TCC, the person they put up as having the most

22   knowledge about their negotiations with the bondholders and a

23   vast array of other things.  And there's a lot about that

24   deposition transcript that Mr. Karotkin cites, including the

25   apparently undisputed fact that number one -- or two facts.

(970) 490-2222   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    Number one, that the bondholders never challenged the TCC on

2    the amount of their claims, that they just got their forty-six-

3    billion-dollar estimate and said, okay.  Let's move on. And

4    then the second thing that it says is that the TCC never

5    challenged the bondholders' entitlement to contract rate

6    interest or Make Wholes.  That is -- comes up over and over

7    again.

8            But this was the part that was incredibly striking to

9    me and that you cannot disregard.  At page 127 Mr. Williams is

10   asked:

11           "Q.   How much would it take to pay them" -- is the

12   word in the transcript, but he means the individual wildfire

13   claimants -- "in full?"

14           Answer by Mr. Williams:

15           "A.   I have no idea.

16           Mr. Orsini:

17           "Q.   Because you haven't done that analysis?"

18           Mr. Williams:

19           "A.   That, and we haven't had our bar date."

20           I can't help finding that testimony dramatically

21   disconsonant with what happened here today where everybody

22   walked into Your Honor and said, well, you have to deal with

23   claims being more than 8.4 billion dollars that the debtor

24   calculated them at.  Their professionals have no idea.  Their

25   professionals say the bar date is important.

PG&E Corp., Pacific Gas and Electric Co.

1        There are many ways, I suppose, Your Honor, where

2   plans can be formulated, but against this backdrop, the plan

3   that the -- that our -- that the TCC and the bondholders would

4   like to see filed and exclusivity terminated, not on this

5   record.  Not on this record, which is embedded in --

6        THE COURT:  So what's going to happen on October 22nd

7   or -3rd or -4th?

8        MR. BENNETT:  We're going to get there.  So there's

9   another part that's kind of interesting that I don't think I'm

10  going out of bounds on, which is that I actually have some more

11  information now.  Everybody in the courtroom has some more

12  information now.  Why?  Because roughly -- it's not a week

13  even.  But I'll say roughly a week ago, the BrownGreer database

14  was made available but with a condition.  I'm not allowed to

15  talk about it to you until October 21st, okay?

16       THE COURT:  Or probably the 22nd.

17       MR. BENNETT:  Well, no.  It says that the condition is

18  it's not -- I am not allowed to talk to you about it until

19  October 21st.  That is in --

20       THE COURT:  Okay.  Then don't.  Don't say it, then.

21       MR. BENNETT:  I'm not going to.  But that mere fact

22  ought to focus the mind as to the effort and the extent to

23  which the TCC and the bondholders want to walk into court and

24  throw around big numbers, but at the end of the day prevent

25  anyone from actually talking about real numbers.  If you're

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    going to make a decision, Your Honor, to modify exclusivity,

2    let's do it on real numbers.

3         The 21st is going to be an important day.  You're

4    right.  Analysis is going to take some time.  We've got a

5    little bit of a head start because of BrownGreer.  We have a

6    little bit of an additional head start because of information

7    that we've received from the subros, but information will be

8    coming soon.

9         But against this background -- against this background

10   of a financial advisor having no idea and because he didn't do

11   the analysis and he haven't had our bar date, how can it

12   possibly be that the debtors' approach of relying on their own

13   estimates for the time being subject to amended -- we're

14   already dealing with the first amended plan.  How can it

15   possibly that that's not a reasonable way to proceed,

16   particularly where, as Mr. Karotkin accurately pointed out, the

17   only major settlements in this case were negotiated by the

18   debtors during exclusivity (indiscernible)?

19        THE COURT:  Mr. Bennett, how many times do you see

20   plans that are filed, typically by debtors but perhaps by

21   opponents, that don't have all the T's crossed and all the I's

22   dotted, I mean, including the simple case that says I'm going

23   to sell black acre to the buyer?  I just don't have a buyer

24   yet.  You don't toss the plan.  You let the plan start to

25   mature a bit and give an opportunity to the proponent to show

PG&E Corp., Pacific Gas and Electric Co.

1    that it's doable.  What --

2             MR. BENNETT:  Your Honor --

3             THE COURT:  What's difference about this other than

4    it's --

5             MR. BENNETT:  Okay.

6             THE COURT:  -- big?

7             MR. BENNETT:  That's a softball.

8             THE COURT:  Yeah.

9             MR. BENNETT:  There's two differences.

10            THE COURT:  Okay.  Softball -- hit it.

11            MR. BENNETT:  One, no data, at all.  Okay.

12            THE COURT:  But data will be somewhere next week --

13            MR. BENNETT:  Okay.

14            THE COURT:  -- two weeks.

15            MR. BENNETT:  But let's now talk about the true

16   foundations of the plan.

17            THE COURT:  No, no.  I'm not going to refuse your

18   argument, but I'm just saying, do you throw a plan out when the

19   proponent doesn't have all the answers on the day he or she

20   files it?

21            MR. BENNETT:  The question is, do you determine

22   exclusivity for a plan, one that is not grounded on any facts

23   because the proponent says the fact don't exist yet or they

24   haven't found out what they were --

25            THE COURT:  Okay.

escribers

(973) xxx operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1      MR. BENNETT:  -- and when it has an illegitimate

2  foundation?

3      THE COURT:  Okay.

4      MR. BENNETT:  So now, let me talk to the next point.

5      THE COURT:  Okay.

6      MR. BENNETT:  So there is attached as Exhibit 8, the

7  debtors' motion, a short email.  There's actually two emails --

8      THE COURT:  Yeah.  I don't want to hear that again.

9  That -- I'm not going to get into that subject.

10      MR. BENNETT:  Well, can I --

11      THE COURT:  I read them.  The whole one sentence.

12      MR. BENNETT:  There's another --

13      THE COURT:  I felt like I was watching CNN.

14      MR. BENNETT:  Okay.  Well, I want you, Your Honor, to

15  see the rest of the email exchange, which was not reproduced,

16  okay?

17      THE COURT:  Well, then why should I consider if it

18  wasn't in the record?

19      MR. BENNETT:  No, no.  It was in the record.  They

20  just used one copy instead of another one.  This is a produced

21  document with the base language below it.  And if Your Honor

22  will permit me, I have a bunch of copies for other copies, but

23  if I can approach with one for you --

24      THE COURT:  But let me tell you, I want to focus on

25  whether we should have a competing plan, not what somebody in

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1  the heat of battle said something, lawyer to lawyer.  You know,

2  this isn't kindergarten.  There are no bad words.  People can

3  use hard language if they want.

4      MR. BENNETT:  Yeah.  Your Honor, they can, but I think

5  Your Honor has to see the --

6      THE COURT:  I suspect you probably haven't always used

7  the king's English, and every time you've been in a tough,

8  hard -- imagine back there with the Dodgers and Magic Johnson

9  wanted to get the Dodgers out of bankruptcy, and I bet you

10  there was some hard language.

11      Go ahead.

12      MR. BENNETT:  Actually, there wasn't really.

13      THE COURT:  I'm sure.  I'm sure they all just

14  collapsed.

15      MR. BENNETT:  He was actually a perfect gentleman.

16      THE COURT:  What do you want me to read here?

17      MR. BENNETT:  Okay.  So I have two context points,

18  which I don't think was made clear in the papers.  Number one,

19  why does -- I'm not even going to quote the language.  Why does

20  Mr. Pitre send an email at all?  It's in response to the

21  announcement of a settlement.

22      THE COURT:  Yeah, I know.

23      MR. BENNETT:  It's one of the positive developments in

24  this case.  Okay.  So one of the problems I had when I read

25  this is, okay.  I can understand why in the heat of battle and

PG&E Corp., Pacific Gas and Electric Co.

1    for other purposes this quote might come out.  I'm having

2    trouble wondering why this quote comes out after everyone has

3    to regard was a seminal event in the cases and that within days

4    would be embraced by the bondholders and the TCC as an

5    appropriate settlement?

6        Now, I want you to look at the top email.  So this is

7    actually lawyer to lawyer, by the way.  This is --

8        THE COURT:  No.  I know it isn't.

9        MR. BENNETT:  This is lawyer to a business person,

10    Jeff Rosenbaum (phonetic) --

11        THE COURT:  Yes, I understand.

12        MR. BENNETT:  -- who by the way is a bankruptcy

13    expert.  Ms. Dumas is on it as well.  And --

14        THE COURT:  Yes.  I see that.

15        MR. BENNETT:  -- if I got an email like Mr. Pitre's, I

16    would probably write back something to the effect of, you know,

17    this isn't actually what we're doing.  When you're proposing a

18    plan of reorganization, you're trying to solve everybody's

19    problems, not just your own.  That's what a successful plan of

20    reorganization is.  That's when the Court should be thinking

21    about terminating exclusivity.

22        But no.  No one says, gee, we don't -- we want a plan

23    that should be broadly acceptable, should meet the needs of all

24    constituencies.  If there's anything that Mr. Pitre is saying

25    is his plans only designed for one purpose.  Now, Mr. Rosenbaum

PG&E Corp., Pacific Gas and Electric Co.

1    says --

2           THE COURT:  Mr. Pitre -- I mean, this is why I don't

3    want to make this personal, but he is only representing fire

4    victims.  He's not here as some sort of ombudsman to reorganize

5    PG&E.  He's trying to get his clients paid.

6           MR. BENNETT:  Okay.  And Mr. Rosenbloom, who is

7    supposedly being the adversary in that settlement discussion,

8    doesn't say cool it.  We don't do that.  We're doing something

9    else.  He says, let's get together and do exactly what you

10   want.

11          THE COURT:  Well, it isn't quite what it says.  It

12   says, let us know.  But I mean, what do you want me to make of

13   this?

14          MR. BENNETT:  I want --

15          THE COURT:  I can't believe we're wasting time on

16   this.

17          MR. BENNETT:  The question is whether exclusivity

18   should be terminated --

19          THE COURT:  Right.

20          MR. BENNETT:  -- for a plan that number one is founded

21   on no information, whatsoever --

22          THE COURT:  That's --

23          MR. BENNETT:  -- and number two --

24          THE COURT:  That's right.

25          MR. BENNETT:  -- has suspect underpinnings?

PG&E Corp., Pacific Gas and Electric Co.

1        THE COURT:  But what -- okay.

2        MR. BENNETT:  Last point.

3        THE COURT:  That's your point.

4        MR. BENNETT:  Last point is that -- so Your Honor has

5   been told that the commitments by the shareholders and the

6   other commitments that have been obtained by the company are

7   going to fall away and they're going to disappear.  So but the

8   record in the case includes behind -- and there's two versions

9   of the letter -- but behind notices of filing of amended

10  commitment letter of certain members of the ad hoc committee of

11  senior unsecured noteholders and then I think there was one

12  more revision that came later.  So there were two revisions.

13       Paragraph 2 is just an example, not the only place in

14  those commitments, is where in three places the commitment is

15  only enforceable if in the sole discretion of the commitment

16  parties constituting the majority every single document that is

17  later produced is acceptable to them, three times.  Then -- in

18  the third instance, the sole discretion qualifier is they get

19  to decide whether there's been a termination event.

20       THE COURT:  I'm trying to keep up with you.  Which

21  document are you looking at now?

22       MR. BENNETT:  This is the commitment from the

23  bondholders.

24       THE COURT:  From them?

25       MR. BENNETT:  From them.

escribers
(973) 406 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Yeah.

2          MR. BENNETT:  Okay.  You will not find this kind of

3    language in the commitments that was negotiated between --

4          THE COURT:  But so what?  I mean, am I supposed to --

5          MR. BENNETT:  They're --

6          THE COURT:  -- think that the deal turns on that?  I

7    mean, these people aren't -- nor your side.  People aren't in

8    this game because they want to take hike.  It's because they

9    want to be in the game.

10         MR. BENNETT:  You need them to be there when things

11   get rough.

12         THE COURT:  Correct.

13         MR. BENNETT:  And this one is not going to be there

14   when it gets rough.  The question is, which commitment was

15   illusory, and the assertion, even by Mr. Dunne, who should know

16   better, was that the commitments that were negotiated arm's

17   length between the company and the holders were somehow not

18   going to be there and would disappear.  The ones that disappear

19   are the ones that have a signature that say, in our sole and

20   absolute discretion we get to decide what the documents say.

21   In our sole discretion, we get to decide if conditions are met

22   or not met.  Those are commitments that are going to disappear.

23         THE COURT:  Okay.  Are we done?

24         MR. BENNETT:  Your Honor, this has been a lot of

25   progress.  You should keep the cases exactly where they are.

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    By the way, we support the debtors' view for the same reason I

2    said at the last hearing that a mediation would be a good

3    thing.  I think one of the principal problems here is lack of

4    information, lack of sharing information.  Strong mediators are

5    able to solve that problem.

6            THE COURT:  That's true.

7            MR. BENNETT:  And that's a major problem.  Thank you,

8    Your Honor.

9            THE COURT:  Thank you, Mr. Bennett.

10           Anyone else want to be heard in supporting the

11   debtors' side?  I think -- okay.  We'll go back to -- Mr.

12   Karetzi (phonetic), are you the closer?  Are you the one -- you

13   said you want to reserve ten minutes, right?

14           MR. KARETZI:  Your Honor, we're going to divide it up,

15   if that's okay.  Ms. Dumas is going to go first.

16           THE COURT:  Okay.  And for those of you who are

17   anxious to see (indiscernible), I'm going to get you out of

18   here a little bit before then.

19           MS. DUMAS:  Thank you, Your Honor.  Cecily Dumas,

20   Baker & Hostetler on behalf of the official committee of tort

21   claimants.  I'm going to take thirty seconds at the podium, and

22   then I would like to cede a bit of my time to Mr. Pitre, not to

23   talk about the email --

24           THE COURT:  If he wants to get up and defend himself

25   on the email, I don't want to hear it.

(970) operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          MS. DUMAS:  No, no, no.  I said, not related to the

2     email.

3          Just one clarification from what's been said about the

4     access to information, the BrownGreer database, which has been

5     made available to the debtors in the official committee of

6     unsecured creditors, that in and of itself contains over 30,000

7     claims.  It's really just the logistical issue associated with

8     getting that many claims from BrownGreer to Prime Clerk, that

9     they're not completely in there yet.  So they've got plenty of

10    claims information, and I have no doubt that Mr. Orsini has 150

11    minions using Google Earth to actually look at all the

12    structures of the addresses that are in BrownGreer right now.

13    So this is --

14         THE COURT:  You didn't have to say that.  Are the

15    claims going to be filed?  Is that your understanding, that the

16    claims will be filed by the deadline?

17         MS. DUMAS:  My understanding, Your Honor --

18         THE COURT:  Okay.

19         MS. DUMAS:  -- with due respect to the capabilities of

20    Prime Clerk is that their system is unable to take the 30- to

21    35,000 claims in an easy fashion and that they are logistically

22    circumscribed by the number of claims they can batch upload

23    every day.  My point is that they have had access to those

24    claims.  They've spent hundreds of millions of dollars figuring

25    out what these claims are worth.  So they know.  And to Mr.

                PG&E Corp., Pacific Gas and Electric Co.

1    Karotkin's 8.4 billion, our 8.4 billion number is solid.

2           Let's go back into the world of reality for just a

3    moment.  That 8.4 under the debtors' plan is really 6.9 when

4    you take subro and PE out, and that bucket is for the victims,

5    FEMA, CAL FIRE, and other state agencies, CPUC finds, and any

6    other --

7           THE COURT:  Yeah.  You said that before.

8           MS. DUMAS:  -- governmental entity.  Okay.

9           THE COURT:  I got that before.

10          MS. DUMAS:  So this is not a high bar.  It's not like

11   another round of mediation for which there have been many will

12   not -- will do something magically different.  We simply

13   disagree.  We'll go to estimation.  The final point I want to

14   make --

15          THE COURT:  What does that mean?  You won't

16   participate in mediation?

17          MS. DUMAS:  If we're required to go to mediation --

18          THE COURT:  Well, no --

19          MS. DUMAS:  We have no basis --

20          THE COURT:  I want to know are you unwilling --

21          MS. DUMAS:  We have no basis to conclude --

22          THE COURT:  Is the committee unwilling to do it

23   voluntarily?

24          MS. DUMAS:  The committee believes --

25          THE COURT:  Is the only way I'm going to get you to

(970) 400-0789 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1   mediate is to order it?

2           MS. DUMAS:  The committee believes that no mediation

3   prior to lifting exclusivity will be any more productive than

4   any of the other dozens of mediations conducted with qualified

5   mediators.

6           THE COURT:  So that means that at least for now, you

7   and your client are not -- you're only going to go in the face

8   of exclusivity if you're ordered to do it?

9           MS. DUMAS:  Yes.  That's right, Your Honor.

10          THE COURT:  Okay.

11          MS. DUMAS:  We've tried very, very hard,

12  unsuccessfully.  And the last point I want to make, which

13  should go without saying in the PG&E case, but the issues that

14  have been bandied about by the Court and other parties about

15  the corporate governance fight, to the public, to my

16  constituents, these arguments ring very hollow when we're

17  talking about a felon, we're talking about a utility that has

18  blown up neighborhoods, burned down towns.  I mean, so what if

19  there's a replacement of the board and the management of PG&E.

20  Yes, it's --

21          THE COURT:  I think you've --

22          MR. BENNETT:  -- a little bit of a hassle --

23          THE COURT:  Hold it.  I think you're missing the

24  point.  I understand your point.  You've said it before.

25  You've said it again, and I've said it, your clients don't care

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    about corporate reorganization --

2            MS. DUMAS:  They actually very much do, Your Honor.

3            THE COURT:  But what I'm getting is, but they probably

4    do care about sitting and waiting while we have a knockdown,

5    drag out, crammed down, absolute priority rule classification

6    discrimination issues that has nothing to do with them.

7            MS. DUMAS:  That is a hundred percent incorrect.

8            THE COURT:  Okay.  Why would they like to have that

9    battle --

10           MS. DUMAS:  Because --

11           THE COURT:  -- go forward and jeopardize the deadline

12   of AB 1054?

13           MS. DUMAS:  It's not going to jeopardize the deadline.

14   It's not going to jeopardize the deadline.  What's been done in

15   the time frame that it's been done, if the Court allows that to

16   go forward in the manner that we've requested, it's not going

17   to jeopardize the deadline.

18           THE COURT:  How do I know that?

19           MS. DUMAS:  That is a red herring.

20           THE COURT:  How do I know that?  Tell me how that --

21   prove that.  What's the -- so just imagine that I take your

22   request and terminate exclusivity, when are we going to have

23   these confirmation battles?  When are we going to have what Mr.

24   Bennett described before?  He didn't mention it today, but it's

25   clear, when is the valuation trial going to take place?

PG&E Corp., Pacific Gas and Electric Co.

1    MS. DUMAS:  Your Honor, let me answer it this way, we

2   have seen -- so under the plan, the equity -- the victims will

3   be a major stakeholder in reorganized PG&E under the bondholder

4   plan.  We have seen, we have heard of the bondholders'

5   proposals with respect to board composition, more access to

6   parties other than the handpicked board that equity put in,

7   more access to direct PUC involvement or a delegate promoted by

8   the PUC.  We very, very, very, very, very much care about

9   corporate governance of this reorganized debtor.  We have zero

10  faith in the board that's been in place, and we don't see it,

11  at all, as a bad thing.

12    Now, in terms of time frame -- in terms of time frame,

13  they're threatening you that they will hold up confirmation to

14  keep the felon in place.  That's what they're saying.  They're

15  saying, we're going to have a confirmation fight over the

16  values and every other issue to keep existing management in

17  place.  That, I respectfully submit, Your Honor, is not a good

18  thing.

19    THE COURT:  Can I confirm a plan if there's a

20  legitimate challenge to the classification or a legitimate

21  challenge to whether the absolute party rule has been

22  circumscribed?

23    MS. DUMAS:  No.  All the confirmation issues are going

24  to need to be determined --

25    THE COURT:  Right.

PG&E Corp., Pacific Gas and Electric Co.

1        MS. DUMAS:  -- or resolved as Your Honor suggested, as

2   Mr. Dunne suggested, positions can move.  I -- there's

3   nothing --

4        THE COURT:  Not if one side is unwilling to

5   participate in mediation and only --

6        MS. DUMAS:  I'm not --

7        THE COURT:  -- is ordered to participate.

8        MS. DUMAS:  Your Honor, I said without the termination

9   of exclusivity --

10       THE COURT:  No, I know.  I know.

11       MS. DUMAS:  -- we would consider ourselves to absolved

12   ourselves of our duty to mediate because we've done it so many

13   times, but I'm not -- I'm talking about confirmation issues.

14       THE COURT:  In other words, Judge, give me what I want

15   and then I'll do what you want.

16       MS. DUMAS:  Your Honor, we've --

17       THE COURT:  Ms. Dumas, I call it the way I see it.

18       MS. DUMAS:  And that's --

19       THE COURT:  Let's go to Mr. Pitre.

20       MS. DUMAS:  All right.  That's fine, Your Honor.

21   Thank you.

22       THE COURT:  Mr. Pitre, you weren't expected to be

23   here, and I didn't expect you to be put on the spot just

24   because you used a couple of words that some people don't think

25   were appropriate, but I really don't want to turn this into

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    your interpretation of your own emails.

2           MR. PITRE:  This is not me -- it's not about me, Your

3    Honor.  I can tell you that the email was quite restrained

4    given my Sicilian background.  So I can tell you that I tried

5    to be careful in what I wrote, but my feelings were much

6    greater than what is expressed.

7           THE COURT:  Some of us are from other parts of

8    Northern -- more Northern Italy.

9           MR. PITRE:  Yes.  I understand that the Sicilians are

10   not viewed favorably; however, I'm very proud of that culture.

11   And I can tell you that that email was not sugarcoated because

12   there was some very strong feelings that I have that I think

13   are important to the issue here that I'd like to address.

14          THE COURT:  That's what I want you to focus on.

15          MR. PITRE:  Thank you.  The first is I heard

16   someone -- there was a comment that we didn't want to let this

17   be a sideshow to what's really important, and I think everybody

18   agrees that is what's most important here is making sure the

19   victims are fairly compensated within the structures of this

20   bankruptcy proceeding.  And I think most importantly within

21   that, my concern is that the actions of the debtor and the

22   shareholders seem critical given their actions as opposed to

23   their stated and repeated mantra that the victims deserve

24   priority, the victims deserve fair treatment, the victims

25   deserve our concern.  I don't see their actions showing that

PG&E Corp., Pacific Gas and Electric Co.

1    concern.

2            THE COURT:  What about their plan?

3            MR. PITRE:  Their plan --

4            THE COURT:  You don't like the number, but their plan

5    says we're putting 8.4 billion down the table, and we also

6    heard their lawyer say today, if the district court orders a

7    different number, they have to put that number on there, too.

8            MR. PITRE:  Well, my Sicilian math tells me 8.4

9    billion, less what we have to pay state and federal agencies,

10   less what we have to pay CPUC penalties, when compared with an

11   offer of 14.5 billion.  To me, that's a dramatic difference to

12   these victims.

13           THE COURT:  Well, there's a difference.  There's no

14   question.  The math --

15           MR. PITRE:  Yes.

16           THE COURT:  -- speaks for itself.

17           MR. PITRE:  But it's not just money.

18           THE COURT:  But wait a minute.  That's what I asked

19   you.  I didn't ask you for the math.  I asked you, what am I

20   supposed to make of the debtors' plan.  We heard again today,

21   this is our number, and if we get a higher number, we're going

22   to go with the higher number because that's what AB 1054 says.

23   That's what the district court will order.  That's what they're

24   stuck with.

25           And the only issue, Mr. Pitre, is whether if that

(973)(888) operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1  number is lower than your agreed number and your settlement

2  whether your higher number can be forced upon the debtor and

3  Ms. Dumas, herself, conceded that it cannot be.

4           MR. PITRE:  So let's take it one step at a time.

5  First, the question that the Court asked me is, well, according

6  to the PG&E plan, if it comes out to be higher through the

7  estimation process and Tubbs trial, that they are going to pay

8  the higher number.  That's what I heard.

9           THE COURT:  That's what I heard.

10           MR. PITRE:  What I haven't heard is where they're

11  going to get the money to pay for it --

12           THE COURT:  Well, I heard --

13           MR. PITRE:  -- and I've asked --

14           THE COURT:  Well, I heard --

15           MR. PITRE:  And then that's --

16           THE COURT:  Well, I heard a lot about it.  I've been

17  reading about it, since Friday when they filed the papers.

18           MR. PITRE:  Judge, I've been to innumerable mediation

19  sessions, where we have asked --

20           THE COURT:  I just read the papers on Friday.  Did

21  you?

22           MR. PITRE:  I did.

23           THE COURT:  Okay.

24           MR. PITRE:  And I haven't heard anybody say that

25  they're going to pay any portion of that to the victims.

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1   Nothing, and the --

2          THE COURT:  Well, then you're not --

3          MR. PITRE:  -- most important thing --

4          THE COURT:  Mr. Pitre, then you're just not reading

5   the language, because that's what I --

6          MR. PITRE:  Your Honor?

7          THE COURT:  -- read in the plan.

8          MR. PITRE:  There's a lot of things you read in

9   newspapers, but it's a lot different when people --

10         THE COURT:  No, I didn't read it in the newspaper.  I

11  read it in the filings that Mr. Karotkin and his colleagues

12  filed on Friday.

13         MR. PITRE:  My question to this Court is that takes

14  time to get there.  And one of things that we have to make is a

15  decision, and one of the issues that has come is, how much time

16  do we have to get things done?  And to the extent that there is

17  a plan, to the extent that there is an agreed-upon value of

18  what those claims are worth and can get done quickly, meaning

19  we don't have to go through those processes.  We can

20  immediately go to distribution of the money to the -- we have

21  to consider --

22         THE COURT:  How do we do that?  Would you explain --

23         MR. PITRE:  If --

24         THE COURT:  -- how that happens?

25         MR. PITRE:  If we could get the plan -- if we could

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1   get competition, if we could get two different plans before

2   this Court, so we begin the process of evaluating them and

3   avoid the unnecessary time expense --

4           THE COURT:  Well, slow down.  You've already evaluated

5   one of the two by --

6           MR. PITRE:  Yes.

7           THE COURT:  -- your own admission.

8           MR. PITRE:  And the other one is nowhere --

9           THE COURT:  And you don't like the other one --

10          MR. PITRE:  The other one --

11          THE COURT:  -- because it's six billion dollars too

12  low, because they're --

13          MR. PITRE:  It's an insult to the victims.

14          THE COURT:  Is there anything else wrong with the

15  other plan, but the number's too low?

16          MR. PITRE:  Yeah.  To be quite candid with you, one of

17  the important things --

18          THE COURT:  What's wrong with it?

19          MR. PITRE:  One of the important things to me, having

20  spent a decade having to deal with PG&E and the calamities that

21  have occurred, I think the most important thing is corporate

22  governance.  We had a decade --

23          THE COURT:  Well, Mr. Pitre, why didn't you cover

24  governance, if you're paid in cash?

25          MR. PITRE:  Because we want to prevent the next fire,

(970) 402-0252  |  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    Judge.  We want to prevent --

2           THE COURT:  Wait.  Well, no --

3           MR. PITRE:  -- the next calamity.

4           THE COURT:   No, we're here getting your constituents

5    and the victims of these fires taken care of.

6           MR. PITRE:  That's true.  That's step one.

7           THE COURT:  And the California legislature will take

8    care of something for 2020, and I can't solve the problems for

9    2019.

10          But let's stick with the last -- I just want to stick

11   with today's motion.

12          MR. PITRE:  Sure.

13          THE COURT:  Would you have any more to add about

14   today's motion?

15          MR. PITRE:  Yeah, I do, Your Honor.

16          THE COURT:  Okay.  Then, you have one minute.

17          MR. PITRE:  Well, one of the things --

18          THE COURT:  No, you have one minute, Mr. Pitre.  I'm

19   concluding this space --

20          MR. PITRE:  Sure.

21          THE COURT:  -- in one minute, and I'll let the other

22   counsel behind you be heard.

23          MR. PITRE:  Sure.  It's in the best interest of my

24   clients, the victims, to have competing plans, so they can get

25   a fair shake.  They shouldn't be held hostage to the

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    negotiations that have taken place so far.  One thing that's

2    clear:  the negotiations thus far have shown that the interest

3    of shareholders and the interest of PG&E are valued higher, and

4    the insurance carriers than victim, and the only chance and the

5    only hope they have is to have competing plans.

6         The other thing I'd like to say is that the numbers

7    have been bantered about, the 13.5, 14.5 billion dollar number.

8    That was not just me on a simple sheet of paper coming up with

9    a number.  The quote that was made by Mr. Williams -- he's a

10   financial analyst; he was not a damage consultant.  That sheet

11   of paper was developed by a half-dozen lawyers together with

12   damage consultants who took the information of having settled

13   scores of cases with PG&E to put those values together.  They

14   didn't come out of thin air.  And when PG&E says they have no

15   information -- they had enough information to tell the SEC that

16   the claims exceeded thirty billion --

17        THE COURT:  Okay.  You're repeating yourself.  I got

18   that.  Thank you very much.

19        MR. PITRE:  Thank you, Your Honor.

20        THE COURT:  All right.

21        Mr. Qureshi, oh, wait.  Are you --

22        MR. QURESHI:  Sure.

23        THE COURT:  Are you already heard?

24        MS. ALEXANDER:  Yes, thank you, Your Honor.

25        Good afternoon.  Mary Alexander, and I am --

PG&E Corp., Pacific Gas and Electric Co.

1      THE COURT:  Okay.  No one said you were here on this

2  today, so what motion --

3      MS. ALEXANDER:  I just want to raise --

4      THE COURT:  What side are you on, here?  I know what

5  side you're on, but I mean we're trying to get the last

6  argument on a contested motion regarding exclusivity.  Is that

7  what you're going to speak to?

8      MS. ALEXANDER:  I am speaking to it --

9      THE COURT:  Okay.  Go ahead.

10      MS. ALEXANDER:  -- from the Ghost Ship Executive

11  Committee, that we did file, as you know, the joinder, and I

12  just wanted to put it on the record that raised our voice in

13  support of that motion --

14      THE COURT:  Can you explain why the Ghost Ship isn't

15  satisfied with the PG&E plan that treats the Ghost Ship victims

16  completely unrelated to these estimations and pays them to the

17  extent that the company is found liable?  Is that not a

18  sensible outcome for you?

19      MS. ALEXANDER:  So --

20      THE COURT:  Because I'm confused about that.

21      MS. ALEXANDER:  So is this plan.  This plan is more

22  sensible.  It puts the insurance that is available for 2016

23  into the trust.

24      THE COURT:  This plan -- as I read this PG&E's plan,

25  not the bondholders plan -- Ghost Ship is carved out of these

(973) operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1   estimation and treatment and Ghost Ship victims get paid

2   whatever they are entitled to be paid.  Is that not a good

3   thing?  Is that -- I mean, you really don't think that's a good

4   idea?

5           MS. ALEXANDER:  I think what is a good idea is that

6   this plan, which has the view of the time of it, is of the

7   essences, rather than waiting for the --

8           THE COURT:  Do you --

9           MS. ALEXANDER:  And that we --

10          THE COURT:  You're not answering my question.

11          MS. ALEXANDER:  No, but I --

12          THE COURT:  I have a plan that the TCC and others

13  support that has a finite figure and that is doomed to fail if

14  the estimates come out higher and must be reduced lower if the

15  estimates are lower.  But I contrast that specifically for your

16  victims, the Ghost Ship, that the PG&E plan says Ghost Ship

17  victims get paid whatever they're entitled to be paid, period.

18  End of story.  I think that's the way I read it.  And I can't

19  imagine why that isn't a good result for your side.  But if you

20  don't -- listen I'm not going to make a decision based upon my

21  interpretation of your position.  You've made your position

22  clear today that you support breaking that specifically.  I got

23  it.  So I will leave it at that.

24          MS. ALEXANDER:  Thank you very much, Your Honor.

25          MS. PINO:  And Your Honor, we wanted to address the

(971) 703-8953 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    plan --

2         THE COURT:  You need to say your name for the record.

3         MS. PINO:  Oh.  Estala Pino --

4         THE COURT:  Okay.  Well, you're on the same question.

5    It's the same question, so I --

6         MS. PINO:  It's the same question.

7         THE COURT:  -- got the point.

8         MS. PINO:  Oh.

9         THE COURT:  But let's move on.

10        MS. PINO:  Okay.

11        THE COURT:  I don't -- listen, I'm going to send you

12   all to Judge Donato, whether we finish or not here.

13        Ms. Pino, I got the point.

14        Mr. Qureshi, you're the closer.

15        MR. QURESHI:  Thank you, Your Honor, and I will be

16   very brief.

17        I want to go back to some of the scenarios and just

18   run through what will happen if Your Honor terminates.  So

19   let's start --

20        THE COURT:  Okay.

21        MR. QURESHI:  -- with 6.9 billion dollars in the

22   equity plan, 13.5 billion dollars in the creditor plan, okay?

23        THE COURT:  Um-hum.

24        MR. QURESHI:  Scenario 1, Your Honor, is claims come

25   in below 6.9 billion dollars, okay, when there are two plans.

(973)(770)-6220   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1  In that scenario, we're done. The debtor's plan gets

2  confirmed. There's no contested confirmation hearing.

3  Everybody goes home.

4          THE COURT: We know that's --

5          MR. QURESHI: Scenario 2 --

6          THE COURT: -- not likely to happen, right?

7          MR. QURESHI: We don't think that's likely to happen,

8  Your Honor.

9          THE COURT: Okay. So let's not waste time on that

10  one.

11          MR. QURESHI: Scenario 2, estimation results somewhere

12  in between the 6.9 billion dollar number and the 13.5.

13          THE COURT: Right.

14          MR. QURESHI: Okay. Contested confirmation hearing,

15  there is no absolute priority issue --

16          THE COURT: What is there to contest, if the debtor

17  opts this plan and you're locked into lowering yours?

18          MR. QURESHI: So --

19          THE COURT: What is there to debate?

20          MR. QURESHI: That there is no absolute priority issue

21  in that scenario, because as you heard from Ms. Dumas, the

22  settlement number will come down to whatever that level is. So

23  then the only issue at confirmation would be feasibility. Look

24  at the financing that they are able to raise over and above

25  their cap, if they're able to get there. And Your Honor can,

PG&E Corp., Pacific Gas and Electric Co.

1  in that circumstance, make a choice.  Which plan is better?

2  But that's not a particularly complicated litigation.

3  　　　　Now, let's look at Scenario 3.  Scenario 3 is

4  estimation comes in north of our number, thirty billion

5  dollars, whatever the number is.

6  　　　　THE COURT:  Whatever the number is.

7  　　　　MR. QURESHI:  In that scenario, Your Honor, again we

8  have a settlement with the Tort claimants.  They believe that

9  they will be able to carry the class to vote in favor of a plan

10  that provides the agreed-upon cap of 25.5 billion dollars.

11  Certainly, there's no absolute priority issue to litigate in

12  that scenario, Your Honor.  And it's important to note that the

13  reason the settlement was structured in that way, Your Honor,

14  is so we continue to have the benefit of AB 1054.

15  　　　　THE COURT:  What about Mr. Feldman's comment?  What do

16  I do about that?  Is he wrong?

17  　　　　MR. QURESHI:  I think he's a hundred percent wrong,

18  Your Honor.  I think the wording --

19  　　　　THE COURT:  So the majority, let's say two-thirds

20  majority number, two-thirds an amount vote for the plan, but a

21  group of victims come forth and say, that plan must fail

22  because it doesn't comply with 1054.

23  　　　　MR. QURESHI:  If it is --

24  　　　　THE COURT:  Was I right or wrong?

25  　　　　MR. QURESHI:  I believe that they are wrong.  If it is

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    a settlement that is authorized by this Court, if it is

2    approved by this Court, then that settlement is the amount, and

3    we continue to have the benefit of AB 1054.  But in the --

4         THE COURT:  Well, but let's get back to the point.  Is

5    it a settlement?

6         MR. QURESHI:  I believe --

7         THE COURT:  Is it a settlement if it's forced on the

8    debtor?

9         MR. QURESHI:  We believe that it absolutely is a --

10        THE COURT:  Okay.

11        MR. QURESHI:  -- settlement which we --

12        THE COURT:  Well, we might have to brief that later.

13        MR. QURESHI:  If we can persuade Your Honor that it's

14   a settlement that this Court ought to approve.

15        THE COURT:  No, I understand, and --

16        MR. QURESHI:  Yeah.

17        THE COURT:  -- that's for another day.  That's your

18   take on why I should go back to where you and I were three

19   hours.

20        MR. QURESHI:  Correct.

21        THE COURT:  Method term of exclusivity.

22        MR. QURESHI:  So --

23        THE COURT:  I gotcha.

24        MR. QURESHI:  So let me close with this thought, Your

25   Honor.  In all of what we heard from Mr. Karotkin and from Ms.

PG&E Corp., Pacific Gas and Electric Co.

1    Pino, I heard no single reason why it is not sensible for all

2    of the creditors to have an alternative on the table, to have

3    an alternative that prevents a potentially very significant

4    downside, if estimation comes in high and the AB 1054 deadline

5    gets blown.

6              THE COURT:  No, I understand.

7              MR. QURESHI:  What they are asking us to do is to take

8    a tremendous risk, the only beneficiary of which is equity.

9              Your Honor, when our last effort exclusivity

10   terminated was denied, Your Honor made the point that the Court

11   did not see for the victims here, which again is what these

12   cases are all about, the benefit of terminator.  That has the

13   most significant circumstance that has changed, Your Honor.

14   The victims who --

15             THE COURT:  No, I understand.

16             MR. QURESHI:  -- are making that point.

17             THE COURT:  You made that point.

18             MR. QURESHI:  Thank you, Your Honor.

19             THE COURT:  Okay.  All right.  Thank you very much for

20   all time and effort and your emotion and your energy, and the

21   matter will stand submitted.  I will do my best to get a very

22   quick decision out, like I did last time around.

23             MR. JULIAN:  Your Honor, do you -- I'm sorry.  You

24   asked if the TCC had any objection to the Cantu issue being

25   joined with inverse condemnation.  The issue is yes because you

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1  sent it to Judge Donato, and PG&E filed a statement which we're

2  going to look at in fifteen, saying that the issue is in front

3  of Judge Donato.

4          THE COURT:  Well, that's what I asked him.  That's

5  exactly why I asked for clarification, why --

6          MR. JULIAN:  I'll read to you from their pleading file

7  today --

8          THE COURT:  Wait a minute.  Hold on.  Hold on.  Hold

9  on.

10          What?

11          THE CLERK:  We need his appearance for the record.

12          THE COURT:  Need your appearance for the record.

13          MR. JULIAN:  Robert Julian, Baker Hostetler for the

14  TCC.

15          And the joint statement on the calendar for today

16  before at 2 before Judge Donato --

17          THE COURT:  You don't have to read it.  I read it.

18  And I read it, and that's why, Mr. Julian, did you read my

19  order for today's hearing?  I asked for clarification.  Is this

20  Cantu hearing and the Cantu issue going to be briefed to him or

21  to me?

22          MR. JULIAN:  Not to you, Your Honor.

23          THE COURT:  Well, says who?

24          MR. JULIAN:  Your order.

25          THE COURT:  Well, no, my order says give me a

                PG&E Corp., Pacific Gas and Electric Co.

1    clarification.

2              MR. JULIAN:  No, I --

3              THE COURT:  And I thought I heard Mr. Orsini say it

4    didn't matter to the debtor, and I'm looking for a stipulation

5    on that.

6              MR. JULIAN:  May I just --

7              THE COURT:  Why isn't it part of the inverse

8    condemnation issue, just a variation of it?

9              MR. JULIAN:  It's a factually intensive issue like --

10             THE COURT:  Are the facts in dispute?

11             MR. JULIAN:  Yes.  It's a factually -- may I answer

12   your question, Your Honor?

13             THE COURT:  Well, if you can, Mr. Julian, but I wish

14   you'd raised this about 10 o'clock this morning, because I'm

15   trying --

16             MR. JULIAN:  I was in the other court.

17             THE COURT:  Well, that's your problem.  What other

18   court?

19             MR. JULIAN:  The next court.

20             THE COURT:  I'm trying to get the exclusivity issue

21   and --

22             MR. JULIAN:  Right.

23             THE COURT:  -- I thought it was a nonissue about

24   Cantu.  So if we're going to take time now, go ahead, make your

25   pitch about when the Cantu argument's going to be presented,

PG&E Corp., Pacific Gas and Electric Co.

1    how it's going to be presented.

2         MR. JULIAN:  In your order we're trying to reference

3    you said you were reserving one issue, inverse condemnation.

4    In the joint statement filed for today in front of Donato, PG&E

5    said to be sure the issue of strict liability under inverse

6    condemnation is likely to be addressed in advance of the

7    hearing through the combination of Judge Montali's ruling on

8    the threshold question of whether inverse condemnation even

9    applies to the debtors, which will be argued on December 11,

10   and this Court's ruling on summary judgment motions on

11   concerning the applicability of the --

12        THE COURT:  I think I just told you I had read that,

13   and that's why I asked for clarification.

14        MR. JULIAN:  And we asked Judge Donato to not to rule

15   on summary judgment motions, but to resolve all liability

16   issues as pursuant to the debtors' settlement history.  It's a

17   factually intensive issue as to whether the line is really part

18   of a prior property or part of the electrical system.  And it's

19   not an inverse condemnation issue.

20        THE COURT:  It was presented originally as part of the

21   inverse condemnation issue.

22        Mr. Orsini, do you want to defer this --

23        MR. JULIAN:  Well, we disagree, Your Honor.

24        THE COURT:  -- or brief it later when you have -- how

25   would you like me to resolve this, before you have to go

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1   upstairs and deal with it all over again?

2   MR. ORSINI:  I'm happy to defer, Your Honor.  I mean,

3   what Mr. Julian just said is fundamentally false.  It is

4   absolutely an inverse condemnation issue.  It's all about

5   inverse condemnation.  But they want to avoid, in every respect

6   possible, any rulings on potential liability.

7   We said what we said that you read in the statement.

8   That was, it appears now, a confusion on my part as to what

9   Your Honor was pertaining to what was going to the District

10  Court.  As I've said, we're happy to present it either way.  If

11  they're taking the position that there's going to be disputed

12  facts on that, let's tee it up like any other summary judgment

13  motion in front of Your Honor.

14  THE COURT:  But even if they're disputed facts, that's

15  not the point.  The point is is it a personal injury or

16  wrongful death --

17  MR. ORSINI:  It is --

18  THE COURT:  -- estimation issue?

19  MR. ORSINI:  It is 1,000 percent not, Your Honor.

20  THE COURT:  Not, that's what I thought.

21  MR. ORSINI:  It is entirely property damage related.

22  There is no argument to the contrary.

23  THE COURT:  Okay.  What I'm going to suggest to Mr.

24  Julian is that somebody figure out a way, whether it be today

25  or sometime soon, to get Judge Donato to make the call.  I am

escribers
(973)406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    not in the business of having a turf battle with the district

2    judge that I'm the one that -- not that particular one, but I'm

3    the one that asked that he take over personal injury/wrongful

4    death for the reasons that I went through extensively before.

5    And so to me, it sounds like Cantu is what Mr. Orsini says.

6         Mr. Julian, if you and your colleagues believe that

7    the proper way and a decision on Cantu must be made by the

8    district judge, take it up with him.  And if he wants to keep,

9    he'll keep it.  And if he wants me to do it, I'll do it,

10   either/or.

11        MR. JULIAN:  All parties agreed last time in front of

12   Judge Donato that all economic loss, property damages issues

13   were in front of him, as well as personal injury.  That's on

14   the record.

15        THE COURT:  But, you also -- everybody agreed that I

16   had the inverse condemnation issues, so --

17        MR. JULIAN:  Yes, yes.

18        THE COURT:  -- you will need to revisit the question,

19   unless there's a consent on the other side.  I don't care.  I

20   just don't confusion about it, that's all.

21        MR. JULIAN:  Neither do I.  We're just following what

22   they wrote on the paper, Judge.

23        THE COURT:  Yeah, but I'm following what is the

24   ambiguity in the paper.  So you need to get it clarified.

25        MR. JULIAN:  Will do, Your Honor.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1      THE COURT:  And then, I'll look forward to getting a

2  stipulation from somebody on when I'm going to get the briefing

3  schedule on the two issues that we talked last time.

4      MR. SKIKOS:  Your Honor, this is the last point, I

5  hope, for today.

6      THE COURT:  Name?

7      MR. SKIKOS:  Steve Skikos.

8      THE COURT:  Mr. Skikos?

9      MR. SKIKOS:  On September 24th, Your Honor told the

10  TCC that if there was going to be an issue related to the

11  unincluded to bring into Your Court's attention now.  For the

12  last two weeks, I've done nothing but evaluate the notice

13  program, talk to fire victims, and come to an understanding of

14  what's going on here.  The whole battle in this case, and

15  everybody knows it, but no one once has said it today, is the

16  unincluded claim preclusion.  How many fire victims are

17  successfully going to be precluded from bringing their clients?

18  That's the issue here.  And I --

19      THE COURT:  Successfully or just -- yeah, precluded?

20      MR. SKIKOS:  I'm not going to say --

21      THE COURT:  You're implying --

22      MR. SKIKOS:  I'm not implying your intent.

23      THE COURT:  You're implying conspiracy theory, that

24  they're causing it to happen.

25      MR. SKIKOS:  No, I'm not implying intent.

(970) 595-9796 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    THE COURT:  Well, you're sounding like their

2    arguments.  So what is your point?

3    MR. SKIKOS:  My point is that we're bringing the

4    motion to extend the bar date tomorrow.

5    My point is -- my last point is this.  I proposed to

6    the debtor in January that we share data.  I proposed and we

7    had an agreement back in December to share case-specific data.

8    We have been willing to share case-specific data.  I put it on

9    the record in this court on January 31st.  My point is this.

10   I'm very much in favor on consensual resolution.  There's

11   enough people in this room that know that.  But I'm not going

12   to be in favor of having tens of thousands of people who don't

13   know what's going on in this case precluded.

14   So the motion's going to be brought tomorrow, and I'm

15   asking for a hearing date before bar the date, because I

16   listened very careful to you.

17   THE COURT:  I can't hear it.  I mean, I'll hear it on

18   expedited basis, I guess, this week.  I'm not even here next

19   week, so I'm not going to be able to hear it before the bar

20   date, unless the debtor agrees that I can hear it.

21   MR. SKIKOS:  I think this is one time, one time

22   that --

23   THE COURT:  And the bar date can be extended after the

24   fact, if there's a reason for it.

25   MR. SKIKOS:  Well, I'll meet and confer with the

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    debtor, but I really believe it should be heard ASAP --

2          THE COURT:  Mr. Skikos, I'm not going to have at ten

3    minutes till 2 be told that there's a motion about to be filed

4    that you want heard this week, and we've known about this bar

5    date for six months, and you've had six months to make a motion

6    to extend it.  I raised it with Mr. Pitre last time.  I said,

7    if somebody wants to bring a motion, I'll hear on it.  And I

8    will; I still will.

9          MR. SKIKOS:  Okay.

10         THE COURT:  I just won't hear it on two days' notice,

11   unless the debtor agrees, and personally I cannot change my own

12   schedule.  And therefore, if I have the motion presented and

13   the debtor doesn't persuade me or doesn't concede hearing it

14   quickly, I'll deal with it after the fact.

15         MR. SKIKOS:  Right.  And I'm not putting any intent on

16   anybody.  I didn't mean to do it that way.

17         THE COURT:  Well, it sounded like you were.  Okay.

18         Matter is submitted.  Thank you all for your time.

19         Well, what do they want?

20         UNIDENTIFIED SPEAKER:  No, no.  I'm scheduling for the

21   briefing schedule.  We'll just confer and get back to you.

22         THE COURT:  Sounds good.

23      (Whereupon these proceedings were concluded at 1:48 PM)

24

25

1              C E R T I F I C A T I O N

2

3    I, Amanda G. Stockton, certify that the foregoing transcript is

4    a true and accurate record of the proceedings.

5

6

7    *[signature]*

8    _____

9    /s/ AMANDA G. STOCKTON

10

11   eScribers

12   7227 N. 16th Street, Suite #207

13   Phoenix, AZ 85020

14

15   Date:  October 8, 2019

16

17

18

19

20

21

22

23

24

25

eScribers
(973) 406- | operations@escribers.net | www.escribers.net

# A

**a6 (1)**
24:23
**AB (30)**
84:23;90:14,15;
95:15,18;96:10;98:2,3,
8;99:5;113:11,16;
114:10,15;125:1;
126:14,25;140:11,23;
141:22;142:18,20;
143:11;144:4,13;
167:12;171:22;181:14;
182:3;183:4
**Abid (1)**
55:11
**abide (1)**
40:1
**ability (11)**
9:2;46:19;63:4,6;
74:12;88:11;89:19;
90:5;104:20;110:4;
148:25
**able (17)**
8:14;15:24;37:3,11,
11,17;69:12;73:22;
74:2;91:9;95:17;
111:11;163:5;180:24,
25;181:9;190:19
**above (7)**
57:20;63:3,25;71:13;
104:5;142:5;180:24
**Abrams (1)**
149:16
**absolute (11)**
63:18;66:11;95:24;
113:7;143:21;162:20;
167:5;168:21;180:15,
20;181:11
**absolutely (11)**
20:14;64:22;71:7,25;
86:6;124:24;135:25;
147:5,10;182:9;187:4
**absolved (1)**
169:11
**absorb (2)**
11:1;65:12
**accept (9)**
28:25;30:6;31:23;
48:10;85:13;124:6,10,
19;134:6
**acceptable (2)**
159:23;161:17
**acceptance (1)**
143:5
**accepted (2)**
70:19;142:9
**access (8)**
88:12;95:17;140:23;
142:21;164:4,23;
168:5,7
**accommodation (1)**

11:6
**accordance (1)**
119:11
**according (1)**
172:5
**accordingly (1)**
109:2
**account (7)**
19:3;50:14;58:17,21;
59:4;64:5;89:16
**accurate (2)**
74:18;89:23
**accurately (1)**
155:16
**achieve (3)**
130:15;132:18;135:7
**achieved (4)**
118:10,14;119:12;
130:17
**acknowledgment (1)**
32:24
**acre (1)**
155:23
**across (2)**
9:3;95:10
**act (2)**
29:8;47:5
**actions (3)**
170:21,22,25
**acts (1)**
146:21
**actually (28)**
14:19;25:24;36:24;
42:12;79:25;83:5;
103:25;107:9;108:24;
109:14;120:19;122:16;
128:13;137:8;139:25;
147:22;148:24;149:23;
150:7;154:10,25;
157:7;158:12,15;
159:7,17;164:11;167:2
**Ad (11)**
55:12;118:17;
120:23;121:21,22;
122:2;125:23;127:6,
22;138:23;161:10
**add (3)**
8:10;38:7;175:13
**added (3)**
19:5;27:22;35:5
**adding (1)**
44:23
**addition (3)**
39:4;58:23;59:9
**additional (8)**
7:25;9:6,7;17:4,20;
38:24;40:21;155:6
**address (17)**
8:7,15;12:9;17:17;
27:2;34:21;40:12;53:2;
83:4;113:8;126:9,13;
128:3,12;139:15;
170:13;178:25

**addressed (4)**
13:11;23:5;35:16;
186:6
**addresses (1)**
164:12
**adequate (1)**
137:12
**adequately (1)**
31:25
**adhere (1)**
13:7
**adjustments (1)**
49:19
**administrative (1)**
32:5
**admission (2)**
136:3;174:7
**admitted (7)**
13:16,22,24;34:11,
25;36:4;92:22
**adopt (2)**
20:10;118:13
**adopted (1)**
72:22
**advance (2)**
108:20;186:6
**advantage (1)**
113:21
**advantageous (1)**
88:13
**adversary (1)**
160:7
**adverse (2)**
29:21;40:5
**advisement (4)**
11:3,11;49:11;51:14
**advisor (2)**
152:21;155:10
**advisors (3)**
91:21;94:18;127:22
**advocacy (1)**
152:6
**advocate (2)**
98:1;122:11
**advocated (1)**
20:11
**Advocates (3)**
114:6,11,22
**advocate's (1)**
109:20
**advocation (1)**
144:21
**affirmative (1)**
132:24
**afford (1)**
79:18
**afternoon (7)**
91:4;111:18,19,20;
116:4,5;176:25
**again (55)**
7:4;9:5;10:22;11:7;
19:4;25:23;26:2;29:4;
30:22;33:13;39:8;

40:18,18;43:9;45:8;
60:14;62:15,21;65:20;
66:12;67:17;69:23;
71:8;75:15;76:2,22;
83:14;84:3;85:4;89:3,
15;105:9;107:10;
109:5;116:13;117:1,
17;118:9,11;119:14,
16;123:19;124:20,21;
126:11;136:14;150:20;
151:6;153:7;157:8;
166:25;171:20;181:7;
183:11;187:1
**against (7)**
14:25;69:21;87:18;
102:10;154:2;155:9,9
**agencies (5)**
56:8;57:4;82:25;
165:5;171:9
**agenda (1)**
148:8
**aggregate (11)**
48:7;57:6;59:23;
61:15;62:16;65:25;
68:10;69:1,9;83:12;
84:9
**aggressively (1)**
69:21
**aging (1)**
48:22
**ago (6)**
105:7;115:18;121:9;
124:22;132:24;154:13
**agree (26)**
8:5,5;36:24;39:5;
42:22;46:16;47:17;
62:6;67:2;69:14;76:6;
77:18;96:20;98:8;
102:20;110:20;111:7;
115:3;134:7;135:9;
137:5,7;140:7,14;
143:14;152:5
**agreed (10)**
79:11;84:12;91:3;
99:9;124:8;140:10;
143:3;172:1;188:11,15
**agreed-upon (2)**
173:17;181:10
**agreeing (1)**
142:15
**agreement (20)**
9:22;36:2;38:18;
42:5,9;46:6;54:20;
59:23;61:14;62:15;
68:6,9;72:18;92:15;
118:7;122:14;125:6,7;
144:14;190:7
**agreements (2)**
42:2;77:13
**agrees (6)**
133:20;143:18;
144:23;170:18;190:20;
191:11

**ahead (10)**
5:14;6:1;7:15;75:10;
80:3;81:14;121:13;
158:11;177:9;185:24
**air (1)**
176:14
**airplane (3)**
19:18;27:7,9
**Akin (1)**
55:11
**ALEXANDER (11)**
176:24,25;177:3,8,
10,19,21;178:5,9,11,24
**Alisa (1)**
114:5
**alive (2)**
104:9,15
**allegation (2)**
75:15;149:5
**alleviate (1)**
43:18
**allocating (1)**
116:7
**allocation (3)**
7:7;55:13;145:4
**allocations (1)**
8:13
**allow (8)**
17:11;70:14;93:13;
94:12;95:15;97:12;
113:22;131:12
**allowable (2)**
39:11;80:15
**allowed (5)**
10:24;45:10;90:1;
154:14,18
**allowing (3)**
89:12;109:18;112:4
**allows (4)**
37:20;97:9;148:16;
167:15
**alluded (1)**
30:20
**almost (1)**
47:12
**along (8)**
51:18;93:23;106:21;
115:10
**Alsup (1)**
22:5
**alternative (12)**
59:11,12;69:16;
70:24;79:6,8,12;
125:14;126:24;146:1;
183:2,3
**although (1)**
8:6
**always (2)**
16:8;158:6
**ambiguity (1)**
188:24
**amend (8)**
25:6;84:2;126:13;

Case: 19-30088    Doc# 4162    Filed: 10/08/19    Entered: 10/08/19 15:30:05    Page 193
of 220

127:20;147:6,15,16,17
**amended (7)**
  109:2;118:15;119:2;
  125:13;155:13,14;
  161:9
**amendments (1)**
  108:11
**among (1)**
  112:8
**amount (34)**
  19:24;25:18;26:13;
  56:1;68:13,15;77:17;
  79:2;81:17;82:22;84:8;
  91:11;99:17;103:2;
  104:14;109:21,22;
  136:12;141:23;142:25;
  143:3,14,16,19,21,25;
  144:7,8,11;145:3;
  147:20;153:2;181:20;
  182:2
**amounts (4)**
  8:3;24:15;133:6;
  137:2
**analysis (6)**
  115:9,10;135:16;
  153:17;155:4,11
**analyst (1)**
  176:10
**analysts (1)**
  114:12
**and/or (1)**
  123:8
**Angeles (1)**
  28:4
**announced (1)**
  118:6
**announcement (1)**
  158:21
**annual (1)**
  74:23
**anonymity (1)**
  100:10
**anticipated (1)**
  27:14
**anxious (1)**
  163:17
**anymore (2)**
  144:3;150:13
**apologize (1)**
  56:19
**app (3)**
  16:9;30:22,23
**apparently (1)**
  152:25
**appeal (1)**
  40:5
**appearance (4)**
  6:1;138:18;184:11,
  12
**appearing (2)**
  6:5;18:19
**appears (2)**
  146:3;187:8

**appellate (1)**
  26:4
**apples-to-apples (1)**
  139:4
**applicability (1)**
  186:11
**applicable (2)**
  23:7;38:9
**application (12)**
  7:23;14:15,15;16:20;
  25:13,17;26:11,12,20;
  30:24;33:19;37:10
**applications (22)**
  12:14,16;15:11;23:4,
  10,11,15,20,23,24;
  25:2,2,19,19,22;31:24;
  32:2;33:11;37:3,21,24;
  44:5
**applied (2)**
  27:15;146:25
**applies (7)**
  53:19;81:21;125:23;
  146:17;186:9
**apply (4)**
  26:23;30:17;53:18,
  24
**appoint (1)**
  129:4
**appreciate (6)**
  8:24;22:17;30:4;
  36:3,6;56:25
**approach (6)**
  27:4;28:12,17;73:25;
  155:12;157:23
**appropriate (10)**
  24:23;26:15;34:9;
  39:7;40:18;47:19;
  67:16;136:12;159:5;
  169:25
**approval (1)**
  139:2
**approvals (1)**
  119:14
**approve (5)**
  111:11;137:9,11,11;
  182:14
**approved (3)**
  35:19;110:22;182:2
**approximately (6)**
  55:17;58:20;64:17;
  65:2;75:21;76:20
**apps (4)**
  24:4,5,24;31:10
**argue (1)**
  86:9
**argued (3)**
  66:23;71:3;186:9
**arguing (2)**
  75:5,7
**argument (14)**
  14:4;22:20;53:24;
  80:11;118:25;125:19,
  21;141:24;149:18;

150:2;151:10;156:18;
  177:6;187:22
**arguments (6)**
  75:12;101:15,16;
  108:5;166:16;190:2
**argument's (1)**
  185:25
**arise (1)**
  117:14
**arms (1)**
  94:5
**arm's (2)**
  118:1;162:16
**arm's-length (1)**
  148:22
**around (9)**
  5:21;25:24;31:4;
  45:15;128:10;145:24;
  149:5;154:24;183:22
**arrangement (1)**
  22:15
**arrangements (1)**
  14:24
**array (1)**
  152:23
**Article (1)**
  100:13
**articulated (1)**
  38:21
**A's (1)**
  113:2
**ASAP (1)**
  191:1
**aside (6)**
  8:22;59:17;81:7,9;
  93:9;98:14
**aspect (1)**
  113:9
**aspects (2)**
  45:8;89:6
**asserted (1)**
  60:20
**assertion (2)**
  148:8;162:15
**assess (2)**
  45:12;115:8
**assessing (1)**
  43:18
**assets (1)**
  121:7
**associated (2)**
  89:8;164:7
**assume (11)**
  20:20;50:11;102:14,
  23;104:4;106:23;
  116:12;120:14;137:1,
  1;141:5
**assumed (2)**
  29:15;136:8
**assumption (2)**
  83:13,15
**assumptions (1)**
  89:22

**assure (2)**
  52:9;119:11
**asterisk (1)**
  89:24
**astonished (1)**
  120:19
**astonishing (1)**
  137:3
**atmosphere (1)**
  132:18
**attached (2)**
  152:12;157:6
**attempt (2)**
  45:25;49:14
**attempts (1)**
  38:21
**attendant (2)**
  76:3;128:6
**attending (2)**
  12:22;40:11
**attention (4)**
  25:4;47:9;114:23;
  189:11
**attorney (4)**
  13:17;34:12,13;49:2
**attorneys (4)**
  13:15,18;20:9;
  101:12
**August (3)**
  117:3,20;128:14
**authority (1)**
  147:10
**authorize (1)**
  100:15
**authorized (2)**
  99:24;182:1
**avail (1)**
  105:11
**available (6)**
  30:14;123:1;126:5;
  154:14;164:5;177:22
**average (3)**
  13:18;18:23;115:13
**aversion (1)**
  42:22
**avoid (4)**
  32:2;105:19;174:3;
  187:5
**aware (7)**
  22:19,25;28:1,14;
  31:7;72:23;113:13
**away (10)**
  58:23;65:17;66:4;
  81:15;89:3;103:8;
  123:5;133:17;151:19;
  161:7

**B**

**back (33)**
  25:3;26:17;39:9;
  49:1;53:14;67:23;70:3,
  18;74:4;87:7;91:4;

92:23;101:20;103:19;
  105:17;112:25;117:20;
  123:19;127:13;136:20;
  141:11;149:24;151:11;
  152:8;158:8;159:16;
  163:11;165:2;179:17;
  182:4,18;190:7;191:21
**backdrop (2)**
  35:15;154:2
**background (3)**
  155:9,9;170:4
**backing (1)**
  61:5
**backstop (3)**
  148:16;149:1,2
**backup (3)**
  70:4;71:1;101:4
**bad (4)**
  26:3;48:23;158:2;
  168:11
**BAILIFF (2)**
  5:4,8
**Baker (3)**
  36:20;37:19;51:1;
  79:22;163:20;184:13
**balance (1)**
  18:14
**balanced (1)**
  109:15
**ball (1)**
  96:6
**bandied (1)**
  166:14
**bank (1)**
  137:17
**bankruptcy (16)**
  19:5;20:13;21:9,16;
  26:2;84:22;90:17;
  94:14;98:5;99:7;131:6;
  133:9;142:8;158:9;
  159:12;170:20
**bantered (1)**
  176:7
**BAP (1)**
  37:19
**bar (17)**
  13:16,24;34:25;
  81:24;83:11;122:24;
  134:16;135:3;153:19,
  25;155:11;165:10;
  190:4,15,19,23;191:4
**barely (1)**
  151:15
**base (3)**
  109:23;140:22;
  157:21
**based (12)**
  10:6;20:15;10:11;
  43:25;99:1;106:8,13;
  112:18;141:22;150:5;
  178:20
**basic (1)**
  40:3

Case: 19-30088   Doc# 4162   Filed: 10/08/19   Entered: 10/08/19 15:30:05   Page 194
of 220

**basically (3)**
102:7;125:2;146:24
**basis (3)**
165:19,21;190:18
**bat (1)**
115:25
**batch (1)**
164:22
**battle (11)**
73:2,8;87:22;88:9;
95:25;106:2;158:1,25;
167:9;188:1;189:14
**battles (1)**
167:23
**beat (1)**
64:10
**become (3)**
64:23;65:1;108:4
**becomes (2)**
10:3;64:19
**begin (2)**
16:2;174:2
**behalf (12)**
22:21,22;53:9;55:12,
16;68:11;79:22;
101:18;111:21;114:6;
138:23;163:20
**behind (6)**
25:17;31:10;102:4;
161:8,9;175:22
**believes (3)**
73:6;165:24;166:2
**believing (1)**
114:19
**belonged (1)**
53:12
**below (6)**
66:4;102:25;104:5;
143:10;157:21;179:25
**beneficial (1)**
128:8
**beneficiary (1)**
183:8
**benefit (8)**
37:22;111:9;118:13;
125:1;126:14;181:14;
182:3;183:12
**benefits (3)**
95:15,18;115:9
**Bennett (66)**
104:18;116:8;138:7,
8;143:19;145:13,14,17,
20;146:16,21;147:5,8,
19,22;148:1,4;149:14,
20,22;154:8,17,21;
155:19;156:2,5,7,9,11,
13,15,21;157:1,4,6,10,
12,14,19;158:4,12,15,
17,23;159:9,12,15;
160:6,14,17,20,23,25;
161:2,4,22,25;162:2,5,
10,13,24;163:7,9;
166:22;167:24

**Bennett's (2)**
103:15,16
**best (14)**
50:10;56:24;80:3;
86:9;88:16;94:9,9,11;
95:9;112:5;113:20;
140:20;175:23;183:21
**bet (2)**
56:5;158:9
**bets (1)**
101:2
**better (13)**
28:21;39:24;40:7;
48:12;54:17;77:18;
80:8;113:15;117:15;
130:4;132:6;162:16;
181:1
**beyond (2)**
23:17;35:16
**bidders (1)**
148:17
**big (10)**
8:16;24:22;47:11,15;
49:7;87:3;113:11;
147:22;154:24;156:6
**bigger (2)**
24:20;88:25
**bill (5)**
19:18;25:8;26:9;
38:21;44:20
**billable (4)**
12:20,24;16:2;25:16
**billed (4)**
19:23;21:8;22:10;
48:16
**billing (5)**
12:24;22:14;24:15;
34:12;48:8
**billion (109)**
57:6,16,16;58:20;
59:3;60:5,5,5;61:5,7,
11;62:16,25;64:1,13;
65:25;66:17,18,18;
68:10,21,22,25;69:2;
73:11;74:25;75:20,24;
80:23,23;81:2,4,15,16,
18,18,19,20;82:14,16,
17;83:7,8,8,13,16,16;
84:8,10,16,18;85:13;
89:19;91:11,12;92:3,4,
6,18;93:3;94:3,20;
95:1,12;97:1;99:4,5;
118:8,9;119:6,7;
120:13;121:22;122:10;
123:4,22;124:5;
129:10,11,12,13,14;
131:14,17;133:22;
137:17;140:8,10;
141:6,14;142:5;145:1;
149:20;150:17;153:23;
165:1,1;171:5,9,11;
174:11;176:7,16;
179:21,22,25;180:12;

181:4,10
**billion-dollar (4)**
64:18;117:25;120:7;
153:3
**bind (1)**
144:19
**Binder (1)**
18:18
**bit (17)**
29:13;33:8;35:25;
42:20;47:11,24;48:15;
74:5,7;81:1,19;155:5,6,
25;163:18,22;166:22
**black (1)**
155:23
**blacklined (1)**
35:23
**blended (3)**
14:7,8,9
**blessedly (2)**
6:14,17
**blessing (1)**
39:15
**blown (2)**
166:18;183:5
**blunt (1)**
87:20
**blurred (1)**
23:10
**board (7)**
73:1;77:12;144:24;
166:19;168:5,6,10
**bogged (2)**
95:20,25
**bond (11)**
65:8;75:16;83:6,6,8,
17;87:9;88:13;89:9;
90:14;95:20
**bondholder (6)**
104:6;109:7;139:6;
148:16,19;168:3
**bondholder/TCC (5)**
102:25;104:7;
106:24;107:15;109:21
**Bondholders (21)**
55:17;65:2,5;99:6;
103:7;104:11;110:6;
115:5;119:18,24;
148:21;151:23,24;
152:1,22;153:1;154:3,
23;159:4;161:23;
177:25
**bondholders' (5)**
112:7;115:9,10;
153:5;168:4
**bonds (1)**
146:10
**both (30)**
9:5;26:20;33:9;34:9;
38:12;43:6;56:7;57:17;
58:10;66:14;70:19;
75:14;77:16;90:13;
91:3;92:8,9,9,12;

106:3;107:22,23;
108:12,13;109:3,19;
112:4;113:14,22;146:7
**bottoms-up (1)**
135:16
**Botts (1)**
37:19
**bounds (1)**
154:10
**Brad (1)**
111:21
**Bray (18)**
22:21;36:16;38:4,5,
5;39:5,7,14,16,19;
40:13,16;41:1,4,7;
49:13;51:8;101:10
**break (4)**
55:8;78:19;101:14;
115:19
**breakdown (2)**
57:15,21
**breaking (1)**
178:22
**breakpoint (1)**
65:11
**Brent (1)**
152:13
**bridge (2)**
75:25;108:3
**bridged (1)**
129:16
**brief (10)**
53:1,13;54:24;58:2;
114:8;115:21;138:14;
179:16;182:12;186:24
**briefed (1)**
184:20
**briefing (8)**
18:6;52:5;71:2;
92:24;152:2,4;189:2;
191:21
**Briefly (3)**
18:13;48:5;74:14
**briefs (7)**
10:25;11:2;17:24,25,
25;54:20;80:10
**bright (1)**
34:11
**brightest (1)**
34:24
**bright-line (1)**
34:5
**bring (4)**
91:4;114:22;189:11;
191:7
**bringing (2)**
189:17;190:3
**brings (1)**
92:2
**broadly (1)**
159:23
**broke (1)**
40:4

**broken (1)**
90:3
**Brotherhood (1)**
111:22
**brought (1)**
190:14
**BrownGreer (5)**
154:13;155:5;164:4,
8,12
**Bruce (2)**
6:2;7:6
**bucket (2)**
82:17;165:4
**buckets (2)**
81:16;102:13
**budget (6)**
32:21,25,25,25;
33:10,18
**budgets (1)**
32:21
**build (2)**
50:25;57:9
**building (1)**
21:23
**bunch (2)**
76:4;157:22
**burned (1)**
166:18
**busier (1)**
140:3
**business (3)**
94:14;159:9;188:1
**busy (1)**
140:2
**buy (1)**
151:19
**buyer (2)**
155:23,23

**C**

**CAL (6)**
81:22,25;82:19;83:9;
84:9;165:5
**calamities (1)**
174:20
**calamity (1)**
175:3
**calculated (1)**
153:24
**calculation (1)**
122:1
**calendar (3)**
32:4;115:22;184:15
**CALIFORNIA (7)**
5:1;23:8;24:6;34:9;
57:3;94:15;175:7
**Call (17)**
5:3;10:7;11:8;27:25;
30:1;36:4;41:9,11,12;
45:23;57:13;59:14,15;
111:1;115:18;169:17;
187:25

Min-U-Script®

Case: 19-30088    Doc# 4162    Filed: 10/08/19    Entered: 10/08/19 15:30:05    Page 195
of 220

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(3) basically - Call

**called (1)**
41:14
**calling (1)**
118:18
**calls (2)**
10:6;25:4
**came (5)**
19:11;122:8;128:14;
149:23;161:12
**Camp (1)**
89:25
**camps (1)**
92:9
**can (115)**
5:20;8:17;9:23;11:1,
6;13:20;15:20,21;
19:17,18;20:15;29:19;
32:2;36:2;38:21;39:23;
40:19;41:11,12;42:1;
46:19,22,24;47:25,25;
48:25;49:18;56:21;
64:22;72:18;73:6,19;
74:8;79:8,10,11;82:13;
83:19,22;85:9;90:7,24;
96:1,10;98:6;100:3,25;
101:24;105:18;106:11,
17,20;107:10,13,14,16,
22;110:22;113:14;
115:15;116:12,17;
119:19;120:3,8,14;
121:6,10;125:16,17;
126:25;128:25;129:16,
18;130:9,10;133:4;
136:11;138:15;140:13,
21;144:13,14,24,25;
145:19;147:16,17,18;
150:9;152:17;154:2;
155:11,14;157:10,23;
158:2,4,25;164:22;
168:19;169:2;170:3,4,
11;172:2;173:18,19;
175:24;177:14;180:25;
182:13;185:13;190:20,
23
**candid (1)**
174:16
**Cantu (15)**
52:19,21,23;53:5,6,6,
8,24;183:24;184:20,
20;185:24,25;188:5,7
**cap (43)**
23:19;24:7,9;25:18,
20;44:6,7,11;57:6,9,18;
58:11,19;59:23;61:15;
63:23;65:25;68:10;
81:2,15,19,21;82:2,5;
83:8,17,21;84:12,14,
15,17,19;85:13,15;
88:15;91:13;93:3;
94:25;140:7,10,14;
180:25;181:10
**capabilities (1)**
164:19

**capable (2)**
10:24;104:15
**capital (9)**
104:14;109:23;
119:6,7;125:15;126:5,
9;127:4;132:1
**capped (1)**
26:13
**capping (1)**
91:12
**Cardelucci (1)**
146:17
**care (16)**
11:8;30:11;48:22;
73:8;95:22;96:18,21;
103:3,25;131:3;
166:25;167:4;168:8;
175:5,8;188:19
**careful (2)**
170:5;190:16
**carefully (1)**
34:6
**carpet (1)**
116:15
**carriers (1)**
176:4
**carries (1)**
111:1
**carry (2)**
76:14;181:9
**carved (1)**
177:25
**case (59)**
9:4;10:25;14:8;
18:22;21:15;23:13;
24:13,15,21,22;26:1;
27:5,9,10,11,16,22;
31:8;38:16;39:9,12;
40:12,15,17;46:4,24,
24;48:14;50:22;61:17,
19;64:22;69:16;72:3;
73:1,2;90:18,19;94:4,
19;108:12;121:19;
122:17;126:22;128:13,
17;129:9,19;130:6;
136:19;137:23;152:11;
155:17,22;158:24;
161:8;166:13;189:14;
190:13
**cases (20)**
14:9;21:13;23:14;
24:13;28:13;31:15;
42:18,19;43:4,25;44:2;
90:19;128:7;129:16;
132:19;142:19;159:3;
162:25;176:13;183:12
**case-specific (2)**
190:7,8
**cash (3)**
81:17;89:20;174:24
**categories (1)**
83:9
**causation (1)**

99:16
**cause (3)**
28:21;98:1;128:16
**caused (1)**
121:22
**causes (2)**
126:12;146:23
**causing (1)**
189:24
**Cecily (2)**
79:21;163:19
**cede (2)**
18:13;163:22
**ceding (1)**
18:17
**CEO (1)**
50:3
**certain (7)**
14:24;35:19;77:17;
89:22,22;138:24;
161:10
**certainly (8)**
8:18;9:9;42:4;45:6;
76:10;120:8;137:18;
181:11
**certified (1)**
10:1
**challenge (3)**
53:17;168:20,21
**challenged (2)**
153:1,5
**challenges (1)**
107:24
**challenging (1)**
66:18
**chance (10)**
6:4;102:15;108:14;
113:15,20;129:17;
132:17;136:12;152:14;
176:4
**chances (1)**
60:20
**change (8)**
71:21,22;72:2;88:22,
22;104:23;109:10;
191:11
**changed (6)**
56:1,2;58:13;117:4;
151:16;183:13
**changes (3)**
36:5;71:25;110:7
**channeling (1)**
105:23
**Chapter (4)**
19:1;28:13;117:24;
135:11
**charge (5)**
13:18;15:19,21,24;
16:12
**charged (2)**
14:16;15:10
**charges (1)**
15:13

**charging (2)**
13:16;44:10
**charitable (1)**
127:7
**check (1)**
108:15
**checks (1)**
104:10
**Chicago (1)**
6:11
**choice (2)**
120:10;181:1
**choices (1)**
91:17
**choose (1)**
128:1
**chose (1)**
94:23
**Circuit (7)**
37:19,19;39:9;
110:14;146:4,13;
147:10
**circumscribed (2)**
164:22;168:22
**circumstance (11)**
61:13;63:3;64:16;
65:4;69:12,18;73:10,
17;83:18;181:1;183:13
**circumstances (6)**
38:11;80:14;83:23;
90:2;93:22;137:23
**cites (2)**
92:24;152:24
**city (1)**
95:10
**claim (7)**
7:24;8:1;60:11;
66:24;72:14;80:22;
82:14,15,16;133:6;
139:1;140:13;143:21;
147:15,20;189:16
**claimant (1)**
140:16
**Claimants (17)**
79:23;80:14;118:7,
11,17,19;124:3;125:3;
128:20;129:10;130:17;
138:23;151:25;152:7;
153:13;163:21;181:8
**claims (93)**
22:6;56:7,12;57:3,4,
7,10,19;59:2;60:4,9,12,
12,18,19,20,21;61:4;
63:19,22;64:14;67:4;
69:9,13;71:13,18;
73:11;79:5;81:2;82:24;
83:11,12,17;84:25,25;
85:1;94:4,4,20;99:13,
17,21,25;100:5,16,18,
22,23;101:3;118:5,8;
121:4,6,8,16,16,17,24;
122:19,25;123:3;
127:24;134:3,8,20,21,

21;135:2,5,5,6;136:10;
140:9;142:5;146:2,3,
10,11,19;153:2,23;
164:7,8,10,15,16,21,22,
24,25;173:18;176:16;
179:24
**clarification (5)**
164:3;184:5,19;
185:1;186:13
**clarified (1)**
188:24
**clarify (4)**
80:5,9,17;84:5
**clarifying (1)**
22:17
**clarity (1)**
99:11
**class (9)**
49:17;66:24;77:5;
99:8,8;112:16,17;
131:5;181:9
**classes (1)**
51:24
**classification (2)**
167:5;168:20
**clause (1)**
99:15
**clear (23)**
29:5;31:23;34:4;
35:21;36:25;39:10;
53:22;66:25;80:13;
81:24;83:22;120:24,
25;127:21;131:10;
146:5;147:9,10,10;
158:18;167:25;176:2;
178:22
**clearly (6)**
53:23;78:18;104:25;
139:22;143:16;146:9
**CLERK (5)**
115:24;138:18;
164:8;20;184:11
**client (10)**
25:5;32:22;47:21;
96:11;105:18;133:1,
20,21;136:17;166:7
**clients (12)**
14:24;95:22,22;
103:15,16;104:2;
112:11;132:13;160:5;
166:25;175:24;189:17
**client's (1)**
98:1
**close (4)**
11:12;45:2;58:6;
182:24
**closer (1)**
24:19;114:4;163:12;
179:14
**closing (2)**
36:18;41:9
**closure (1)**
10:8

Case: 19-30088    Doc# 4162    Filed: 10/08/19    Entered: 10/08/19 15:30:05    Page 196
of 220

**CNN (2)**
29:8;157:13
**cobble (2)**
73:17,22
**code (1)**
24:23
**codes (1)**
37:5
**collapsed (1)**
158:14
**colleague (2)**
114:4;136:2
**colleagues (2)**
173:11;188:6
**collective (1)**
105:21
**colloquy (2)**
47:14;144:10
**combination (4)**
53:15;60:14;66:20;
186:7
**coming (5)**
58:15;63:20;68:8;
155:8;176:8
**commence (1)**
140:2
**comment (7)**
10:22;46:5,14,15;
50:18;170:16;181:15
**comments (4)**
8:17;36:18;41:10;
114:9
**commission (1)**
44:17
**commit (1)**
122:12
**commitment (8)**
148:20;151:11;
152:9;161:10,14,15,22;
162:14
**commitments (18)**
57:17;58:10,12,23;
64:1;75:19;117:20;
147:23;148:6;149:16,
25;150:22;161:5,6,14;
162:3,16,22
**committed (7)**
57:21,25;68:21;
73:16;104:14;119:7;
122:12
**committee (30)**
38:6;55:12;72:9;
79:22;86:7,19;101:9,
19;110:6;118:18,19;
120:24;121:21,22;
122:3;125:24;129:10;
135:7;137:19;138:1,
23;140:11,13;161:10;
163:20;164:5;165:22,
24;166:2;177:11
**committees (1)**
32:9
**committee's (1)**

**101:22**
**committing (2)**
86:7,8
**company (10)**
50:4;73:6;74:20;
78:15;84:22;126:6;
142:21;161:6;162:17;
177:17
**compare (1)**
9:3
**compared (1)**
171:10
**comparison (1)**
14:20
**compensable (4)**
23:22;24:24;27:8;
35:4
**compensate (1)**
91:10
**compensated (1)**
170:19
**compensation (2)**
25:25;45:4
**compensations (1)**
10:17
**competing (17)**
70:5,19;87:21;93:14;
102:14;104:25;105:12;
109:19;111:4,6;
117:14;122:9;128:4;
131:12;157:25;175:24;
176:5
**competition (4)**
128:8,16;139:18;
174:1
**complained (1)**
118:24
**complaints (2)**
149:11;151:12
**completely (5)**
58:24;83:21;132:10;
164:9;177:16
**completeness (1)**
151:11
**complicated (1)**
181:2
**complied (1)**
43:19
**compliment (1)**
98:1
**comply (6)**
26:3;37:15;38:8;
90:15;141:25;181:22
**composition (1)**
168:5
**comprehensive (1)**
17:14
**compromise (5)**
42:8;62:5;92:8;
130:16,17
**compromised (1)**
92:9
**compromising (1)**

**118:8**
**concede (9)**
17:7;60:9;69:3;
71:11;76:9,10;122:5;
123:7;191:13
**conceded (1)**
172:3
**concern (4)**
48:5;170:21,25;
171:1
**concerned (4)**
13:21;38:19;109:14;
112:2
**concerning (1)**
186:11
**concerns (4)**
17:18;41:22;45:7;
48:7
**concerted (1)**
118:17
**conclude (4)**
40:17;109:9,25;
165:21
**concluded (2)**
114:13;191:23
**concluding (3)**
46:5;107:2;175:19
**conclusion (2)**
10:4;71:16
**concurrently (1)**
104:22
**condemnation (10)**
183:25;185:8;186:3,
6,8,19,21;187:4,5;
188:16
**condition (2)**
154:14,17
**conditional (1)**
19:13
**conditionally (1)**
97:11
**conditioned (1)**
65:21
**conditions (1)**
162:21
**conduces (1)**
107:4
**conduct (1)**
9:13
**conducted (1)**
166:4
**confer (4)**
30:12;49:15;190:25;
191:21
**conference (2)**
12:23;117:18
**confident (3)**
34:7;35:13;72:18
**confidentiality (1)**
42:2
**confine (1)**
150:5
**confined (1)**

**145:25**
**confirm (9)**
68:11;78:20,20;98:3;
99:5;102:17,17;
135:21;168:19
**confirmable (10)**
62:14;66:7;69:2;
84:5;100:25;107:25;
126:24;143:19;146:6,7
**confirmation (17)**
58:3;62:18;68:8;
95:23;104:9;107:16;
113:11;119:11;129:19;
167:23;168:13,15,23;
169:13;180:2,14,23
**confirmed (5)**
22:15;31:13;32:6;
70:16;180:2
**conflict (1)**
23:21
**conflicts (4)**
23:22;25:14;26:10;
30:14
**confused (2)**
15:17;177:20
**confusion (4)**
23:20;30:20;187:8;
188:20
**Congress (1)**
18:16
**conjunction (2)**
140:20,21
**connection (1)**
73:24
**consecutively (1)**
104:21
**consensual (2)**
39:3;190:10
**consensually (2)**
133:18,19
**consensus (4)**
50:21,25;132:18,19
**consent (2)**
141:20;188:19
**consented (1)**
100:9
**consequence (1)**
64:11
**consequences (2)**
29:21;94:24
**consider (5)**
28:17;119:14;
157:17;169:11;173:21
**considerably (1)**
129:13
**consideration (5)**
72:15,19;105:4;
113:12;139:7
**considerations (1)**
113:6
**considered (2)**
84:3;113:25
**considering (1)**

**116:11**
**consistent (5)**
13:3;17:2;43:11;
115:17;119:3
**conspiracy (1)**
189:23
**constant (4)**
66:14;92:12;123:21;
139:13
**constituencies (1)**
159:24
**constituency (2)**
72:3;101:23
**constituents (4)**
106:4;137:20;
166:16;175:4
**constituting (1)**
161:16
**Constitution (2)**
99:15;100:19
**constructive (1)**
93:24
**consultant (1)**
176:10
**consultants (1)**
176:12
**consulted (1)**
44:1
**contains (2)**
146:5;164:6
**contemplate (1)**
104:25
**contemplates (1)**
24:24
**contemplating (2)**
69:10;109:18
**contest (1)**
180:16
**contested (3)**
177:6;180:2,14
**context (5)**
45:5;117:14;129:7;
146:7;158:17
**contingency (1)**
22:15
**continue (4)**
26:9;78:14;181:14;
182:3
**continues (1)**
76:14
**continuing (1)**
127:25
**contract (10)**
76:8,14;85:1;108:25;
119:21;146:1,11,13;
152:1;153:5
**contractors (1)**
111:25
**contractual (2)**
59:9;127:24
**contrary (1)**
187:22
**contrast (1)**

Case: 19-30088    Doc# 4162    Filed: 10/08/19    Entered: 10/08/19 15:30:05    Page 197
of 220

178:15

**control (8)**
19:25;73:1,8;87:22;
96:11;124:2;126:19;
133:10

**controlling (1)**
28:12

**convenience (1)**
101:14

**converge (1)**
99:2

**conversation (2)**
49:3;112:9

**convince (1)**
97:18

**cool (1)**
160:8

**coordinating (1)**
16:20

**copies (2)**
157:22,22

**copy (1)**
157:20

**corner (1)**
5:21

**corners (1)**
140:1

**corporate (22)**
50:7;12;73:7;87:22;
88:9;96:11;103:17,19,
22;106:2,6,20,25;
109:12,15;123:6;
126:19;133:10;166:15;
167:1;168:9;174:21

**Corporation (1)**
5:8

**corrected (4)**
15:19,22;80:17;
143:24

**correcting (2)**
15:18,25

**correctly (2)**
143:20;150:8

**cost (4)**
18:25;19:21;20:15;
109:22

**costs (9)**
18:20;19:6;20:12;
76:7,8;89:23,25;90:6;
120:13

**cough (4)**
70:11,12;80:6,7

**coughing (1)**
70:10

**counsel (13)**
11:3,9;22:14;24:14;
36:17;38:6;50:3;74:4;
95:9;111:17;121:1;
137:15;175:22

**count (2)**
74:5,6

**counted (1)**
21:18

**couple (7)**
90:24;93:19;107:19;
111:15;114:21;148:12;
169:24

**coupled (1)**
25:18

**coupon (1)**
127:25

**course (20)**
15:7;18:23;22:6;
23:1;31:10;34:3;37:9,
22;39:25;40:20,22;
47:13;73:4;76:14;
117:11;125:25;132:8;
136:9;149:13;151:15

**Court (859)**
5:3,4,6,9,12,19,19,
24;6:1,4,6,8,12,15,19,
21,23;7:1,3,5,7,11,15,
19;8:9,11;9:8,15,17,19;
10:10,22;11:18,25;
12:2,8,11,15;13:3,5,20;
14:3,13,22;15:2,5,15;
16:1,4,8,11,13,16,18,
24;17:1,3,5,9,11,14,19,
21,23;18:2,5,8,16,25;
19:8,14,16,23;20:3,6,8,
16,19,24;21:3,7,7,9,14,
18,21,23,25;22:2,3,8,
10,13,23,25;23:3,7,9,
13,17,25;24:9,12,20;
25:1,10,23;26:4,6,14,
16,22,25;27:3,12,17,
22,25;28:3,6,9,14,18,
23;29:2,17,25;30:3,9,
25;31:3,9,22;32:3,8,11,
14,17,19,23;33:6,22;
34:10,12,13,18,23;
35:1,3,8,14,20,22;36:1,
7,9,11,13,15,17,20,24;
37:1,13;38:1,3,24;39:2,
6,12,13,15,17,20,24;
40:2,14,25;41:2,6,8,14,
16;42:4,24;43:3,10;
44:16,19,22,25;46:11,
14,16;47:2;48:2,4,17,
19,21,25;49:7,10;
50:17,19,23;51:3,5,13,
17,21,25;52:2,4,11,15,
17,20,22,24;53:1,3,6,8,
11,16,20,22;54:1,5,9,
12,15;55:3,7,15,23;
56:10,12,22,24;57:13,
23,25;58:18;59:14,17,
19,25;60:3,8,12,16,18,
23;61:2,5,9,11,18,24;
62:1,3,7,9,12,19,23;
63:6,11,14,17,24;64:2,
7,10,25;65:9,14,16,18,
23;66:1,3,7,9,11,16,20;
67:1,3,7,9,13,16,19,22;
68:1,3,13,17,20,24;
69:4,14;70:1,3,7,18,22,

25;71:2,5,14,19,21;
72:11,23;73:4,12,20;
74:3,9,12,16;75:5,9,19;
76:6,11,15,17;77:4,7,
15,20,23;78:2,7,13,16,
18,23,25;79:4,14,16,
20;80:2,7,18,20,22;
81:3,7,10,12,14;82:3,6,
8,11,18,21,24;83:2,24,
25;84:7,11,14,16,18,
20;85:2,4,6,11,15,20;
86:2,5,7,12,14,17,21,
25;87:4,10,13,16,25;
88:3,6,8,17,21,24;89:2,
11;90:7,10,12,22,24;
91:5,7,14,16,23;92:5,8,
12,20;93:6,11,13,16,
21;94:1,7,13,14,25;
95:4,6,8,19;96:8,14,17,
20,22,25;97:3,5,7,10,
15,18,21,23,25;98:3,5,
9,24;99:2,13,19,22;
100:1,3,7,12,12,21;
101:5,8;102:2,20,22;
103:10,13,15,17,21,24;
104:3;105:1,5;106:5,9,
16;107:7,10;108:21;
110:10,13,16,19,24;
111:6,12,14,20;112:7,
11,15,21,24;113:7,10,
13,24;114:1,3,17,25;
115:2,6,17,25;116:2,4,
10,13,17,19,21,23;
117:20;118:3,22;
119:2,10,10,25;120:9,
22;123:2,7,8,12,16,21;
124:1,7,9,11,13;125:4,
7,9,17,19,25;126:3,15,
21;127:5,9,11,18;
128:9,21;129:5;130:1,
8,12,19;131:1,18,20,
22,24;132:2,5,8,12,14,
21;133:13,15,18,20,25;
134:4,7,10,13,17,19,
25;135:12,14,18,20,24;
136:1,6,8,14,16;137:5,
7,10,24;138:3,5,7,11,
13,17,19,21;139:3,9,
11,13,19,24;140:3,15,
17,19,25;141:2,5,9,13,
15,17,24;142:2,2,4,7,
13,15,17,23;143:3,8,
17,18,18,23;144:1,4,7,
13,14,16,18,23;145:5,
10,12,15,19;146:15,17;
147:2,6,13,20,25;
148:3;149:13,19,21;
151:1,2;154:6,16,20,
23;155:19;156:3,6,8,
10,12,14,17,25;157:3,
5,8,11,13,17,24;158:6,
13,16,22;159:8,11,14,

20;160:2,11,15,19,22,
24;161:1,3,20,24;
162:1,4,6,12,23;163:6,
9,16,24;164:14,18;
165:7,9,15,18,20,22,
25;166:6,10,14,21,23;
167:3,8,11,15,18,20;
168:19,25;169:4,7,10,
14,17,19,22;170:7,14;
171:2,4,6,13,16,18,23;
172:5,9,12,14,16,20,
23;173:2,4,7,10,13,22,
24;174:2,4,7,9,11,14,
18,23;175:2,4,7,13,16,
18,21;176:17,20,23;
177:1,4,9,14,20,24;
178:8,10,12;179:2,4,7,
9,11,20,23;180:4,6,9,
13,16,19;181:6,15,19,
24;182:1,2,4,7,10,12,
14,15,17,21,23;183:6,
10,15,17,19;184:4,8,
12,17,23,25;185:3,7,
11,13,16,17,18,19,20,
23;186:12,20,24;
187:10,14,18,20,23;
188:15,18,23;189:1,6,
8,19,21,23;190:1,9,17,
23;191:2,10,17,22

**courtroom (4)**
82:13;100:8,17;
154:11

**courts (2)**
32:5;43:7

**Court's (11)**
11:23;23:1;27:2;
30:4;7;31:14;40:23;
139:2;142:9;186:10;
189:11

**cover (3)**
70:10;127:20;174:23

**covered (2)**
47:13;132:22

**covers (1)**
26:20

**coxed (1)**
117:9

**CPUC (20)**
18:25;19:2;21:8;
22:6;37:8;79:11,11;
83:10;84:9;96:10;
104:24;105:14;109:5,
6,18,20;114:17;
119:12;165:5;171:10

**CPUCs (1)**
89:22

**cram (4)**
95:23;110:24,25;
111:2

**crammed (1)**
167:5

**Cravath (3)**
21:2;51:1;53:9

**create (5)**
128:8;132:18;
139:19;146:22;151:7

**created (1)**
25:25

**credibility (1)**
92:1

**credit (2)**
75:1;146:11

**Creditor (11)**
57:11;59:1,12,12;
72:2;74:20,23;75:3;
79:10;112:5;179:22

**creditors (13)**
38:6;72:7;79:8;
95:12;97:13;100:25;
101:19;106:3;117:10;
131:9,9;164:6;183:2

**Creditors' (2)**
101:9,22

**Creditor's (2)**
72:8;124:16

**cries (1)**
129:14

**criminal (2)**
21:17;22:1

**critical (1)**
170:22

**cross (1)**
85:10

**cross-country (1)**
49:17

**crossed (2)**
10:2;155:21

**crossroads (2)**
130:5,6

**crowd (1)**
5:9

**crush (1)**
6:10

**culture (1)**
170:10

**Cum (2)**
52:18,18

**current (3)**
58:22;59:4;114:15

**currently (1)**
119:8

**curtailed (1)**
31:15

**cushion (1)**
94:4

**cut (3)**
26:4;145:17;149:24

**D**

**damage (5)**
54:14;61:12;176:10,
12;187:21

**damages (1)**
188:12

**dangerous (1)**

Min-U-Script®

Case: 19-30088    Doc# 4162    Filed: 10/08/19    Entered: 10/08/19 15:30:05    Page 198
of 220

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(6) control - dangerous

31:12
**data (5)**
156:11,12;190:6,7,8
**database (2)**
154:13;164:4
**date (17)**
77:12;81:17,24;
83:11;89:20;122:24;
134:16;135:3;153:19,
25;155:11;190:4,15,15,
20,23;191:5
**day (20)**
12:24;77:23;78:8;
96:19;99:3;107:25;
108:13;111:1;117:2,
17;120:25;123:14;
144:22;145:2;149:16;
154:24;155:3;156:19;
164:23;182:17
**days (8)**
11:4;49:14,14,18,25;
129:22,22;159:3
**days' (1)**
191:10
**DCC (1)**
25:12
**dead (3)**
60:8,24;61:14
**deadline (16)**
49:20;60:18;69:19;
79:7;104:2;105:19,22;
119:12,15;134:8;
164:16;167:11,13,14,
17;183:4
**deal (16)**
11:8;49:7;84:20,21,
23;85:23;106:20,22;
117:10;127:23;147:12;
153:22;162:6;174:20;
187:1;191:14
**dealing (4)**
87:14;133:8;147:9;
155:14
**death (4)**
54:7;64:10;187:16;
188:4
**debate (2)**
101:24;180:19
**debating (1)**
14:5
**debt (17)**
57:18;58:11;59:10;
65:14;75:22,23;76:12,
13;94:25;108:6;109:3,
7,21;119:7,19;127:25;
146:25
**debtor (39)**
61:21;73:16;85:9;
87:19;90:15;92:13;
93:2;94:17,22;95:16;
100:15;102:24;103:1;
104:5;107:14;111:3;
115:19;124:14;126:14,

23;127:6;136:10;
146:8;147:15,16,17;
148:25;153:23;168:9;
170:21;172:2;180:16;
182:8;185:4;190:6,20;
191:1,11,13
**debtors (45)**
52:7;53:10;56:3;
67:5;69:10;72:16,21;
76:2;87:6;88:12;89:15;
102:15;110:4,5,21;
116:6;117:7,8,16,19,
23,25;118:1,6,10,14,
15;119:17;120:16;
122:4;128:19;135:4;
148:17,22;149:24,24;
150:1,6,14,16;151:23;
155:18,20;164:5;186:9
**debtors' (23)**
101:15;108:3;
114:12;115:7,11;
119:8,13,16;122:11;
125:10;144:21;148:9,
13;149:6,11;150:23;
155:12;157:7;163:1,
11;165:3;171:20;
186:16
**debtor's (15)**
57:6;70:15;72:10;
75:12,17;81:2;82:1;
84:4;88:14;89:6,8,18;
94:8;97:12;180:1
**debts (1)**
146:10
**decade (2)**
174:20,22
**December (3)**
105:17;186:9;190:7
**decide (8)**
39:5;87:17;101:24;
152:5,15;161:19;
162:20,21
**decided (5)**
102:3;106:13;122:6,
25;152:5
**decides (1)**
140:4
**decision (13)**
41:4;70:20;87:18;
89:16;112:19;113:18;
120:8;126:13;155:1;
173:15;178:20;183:22;
188:7
**declarations (3)**
94:15,16,18
**decrees (1)**
80:20
**dedicated (1)**
121:7
**default (1)**
27:3
**defeat (1)**
86:10

**defend (1)**
163:24
**defer (3)**
15:23;186:22;187:2
**definitely (1)**
27:11
**definition (2)**
54:13;81:21
**Delaware (1)**
28:16
**delay (1)**
126:18
**delegate (1)**
168:7
**delivered (2)**
151:2,3
**delta (2)**
66:19;129:13
**demonstrated (1)**
125:14
**denied (1)**
183:10
**Dennis (2)**
5:5;101:18
**dense (1)**
38:13
**departure (1)**
42:25
**depending (2)**
64:23;74:25
**depends (2)**
113:18;137:22
**deposition (5)**
127:21;152:13,14,
19,24
**describe (2)**
37:9;70:7
**described (2)**
29:14;167:24
**descriptive (2)**
29:15;37:15
**deserve (3)**
170:23,24,25
**designed (3)**
12:17;87:21;159:25
**detail (1)**
141:3
**detailed (1)**
50:6
**details (2)**
9:14;41:20
**determination (6)**
92:23;115:13;
120:15;123:17;142:8,9
**determine (2)**
135:6;156:21
**determined (5)**
113:4;127:14;142:4;
143:18;168:24
**determines (3)**
83:24;113:7;142:3
**detour (1)**
147:11

**detriment (1)**
99:8
**detriments (1)**
115:10
**develop (1)**
90:17
**developed (2)**
115:15;176:11
**developments (1)**
158:23
**deviance (2)**
14:11;15:12
**deviate (1)**
14:8
**difference (11)**
30:19;43:8;77:9;
83:7;87:2,3;147:23;
148:5;156:3;171:11,13
**differences (2)**
148:19;156:9
**different (29)**
23:24;28:19;34:14;
35:7;42:7;43:9;44:2;
45:7;53:15;54:16;
69:17;87:11,23;108:1;
123:15;132:10;136:2;
143:11,12;145:22,23,
23;146:19;148:15;
149:3;165:12;171:7;
173:9;174:1
**differently (1)**
64:2
**difficult (3)**
10:4;37:17;142:24
**difficulty (1)**
56:20
**diligently (1)**
50:20
**diluted (2)**
77:20;112:17
**dilution (1)**
77:22
**Dincirca (1)**
23:14
**dinner (1)**
41:13
**direct (1)**
168:7
**directed (1)**
148:10
**direction (2)**
46:9;49:23
**directly (1)**
8:7
**disadvantageous (1)**
146:8
**disagree (3)**
34:18;165:13;186:23
**disagreement (1)**
7:18
**disallow (1)**
13:12
**disallowed (1)**

29:22
**disappear (5)**
147:23;161:7;
162:18,18,22
**disappears (1)**
59:5
**disclose (3)**
14:15;32:21;58:1
**disclosed (2)**
29:23;75:18
**disclosing (1)**
29:22
**disclosure (4)**
15:3;25:6;58:2;
137:12
**disclosures (1)**
24:2
**discomfort (1)**
10:23
**disconsonant (1)**
153:21
**discount (7)**
14:25;27:4;83:19;
118:9;126:7,7;127:23
**discounted (1)**
14:17
**discounting (1)**
83:6
**discrepancy (1)**
81:20
**discretion (4)**
161:15,18;162:20,21
**discriminates (1)**
113:5
**discrimination (5)**
78:11;112:8,16;
131:5;167:6
**discriminatory (1)**
130:25
**discussed (1)**
26:7
**discussion (7)**
14:21;35:24;44:5;
50:1;148:23;149:4;
160:7
**discussions (4)**
35:12,15;45:22;
107:21
**disparate (1)**
145:8
**dispense (1)**
136:13
**dispute (3)**
35:20;54:4;185:10
**disputed (2)**
187:11,14
**disputes (1)**
32:1
**disqualify (1)**
25:5
**disregard (1)**
153:9
**disrespect (1)**

Case: 19-30088    Doc# 4162    Filed: 10/08/19    Entered: 10/08/19 15:30:05    Page 199
of 220

28:21
**disrespectfully (1)**
28:18
**distinction (1)**
23:9
**distributable (1)**
123:1
**distribution (1)**
173:20
**district (21)**
19:12;23:7;24:6;
25:21;26:23;27:6;
66:20;88:18,24;99:2;
100:12;119:10,23;
123:8;142:8;143:18;
171:6,23;187:9;188:1,
8
**districts (1)**
28:15
**district-wide (1)**
27:18
**divide (1)**
163:14
**DOA (1)**
88:18
**doable (2)**
99:18;156:1
**dock (1)**
6:15
**docket (2)**
8:15;117:1
**doctrinaire (1)**
45:4
**document (3)**
157:21;161:16,21
**documents (1)**
162:20
**Dodgers (2)**
158:8,9
**dollar (7)**
8:4;58:21;82:17;
84:8;137:17;176:7;
180:12
**dollars (56)**
7:24;18:21;57:6,16;
58:20;59:3,7;60:5;
62:16;64:13;68:11,21;
69:2;73:11;74:24,25,
25;75:16,20,23,24;
76:21;82:14;83:13;
91:11;92:3,18;93:3;
94:3,20;95:1,12;97:2;
99:4;118:8,9;119:6,7;
120:13;121:22;122:10;
123:4;124:5;140:8,10;
141:14;142:6;145:1;
153:23;164:24;174:11;
179:21,22,25;181:5,10
**dollars' (1)**
150:17
**Donato (31)**
22:9;60:4;62:24;
80:16,20;84:8;89:5,13;

91:16;98:10,16,25;
99:25;100:3;115:22;
119:9;123:17;124:4;
125:12;126:12;131:14,
16;141:11;179:12;
184:1,3,16;186:4,14;
187:25;188:12
**Donato's (2)**
21:7;91:3
**done (32)**
10:9;32:23;33:4,4,5;
34:8;36:18;42:14,15;
43:16;47:3;49:24;
85:23;101:16;102:17;
104:13;105:18;108:16,
16;119:5,24;135:16;
144:25;153:17;162:23;
167:14,15;169:12;
173:16,18;180:1;
189:12
**doomed (1)**
178:13
**door (2)**
5:21;67:17
**dotted (1)**
155:22
**doubt (1)**
164:10
**down (22)**
25:1;29:7;42:16;
46:22;95:20,23,25;
102:11;104:9;105:16;
109:14;110:25,25;
111:2;112:9;113:4,8;
166:18;167:5;171:5;
174:4;180:22
**downside (5)**
126:17,18;128:4,5;
183:4
**dozens (1)**
166:4
**drafted (1)**
71:10
**drag (1)**
167:5
**dramatic (1)**
171:11
**dramatically (5)**
149:15;151:22,24,
25;153:20
**drill (1)**
102:11
**drives (2)**
139:23,24
**drop (1)**
80:7
**dry (2)**
118:20;151:15
**due (5)**
81:17;99:15;100:19;
108:4;164:19
**Dumas (106)**
68:11;72:8;79:3,16,

19,21,21;80:4,8,19,21,
25;81:6,9,11,13,15;
82:5,7,10,12,19,23;
83:1;84:2,12,15,17,19,
21;85:3,5,8,12,18,24;
86:3,6,11,13,15,19,24;
87:1,5,12,15,24;88:2,4,
7,11,20,23;89:1,3,12;
90:9,11,13,23;91:19,
22;121:9;123:7,22,24;
125:20;133:21;135:10;
140:6;143:13,24;
159:13;163:15,19,19;
164:1,17,19;165:8,10,
17,19,21,24;166:2,9,
11;167:2,7,10,13,19;
168:1,23;169:1,6,8,11,
16,17,18,20;172:3;
180:21
**Dumas' (1)**
120:24
**Dumas's (3)**
95:22;97:19;141:6
**Dunne (33)**
101:11,17,18;102:3,
21,23;103:12,14,16,19,
22,25;104:4;105:2,10;
106:6,10,17;107:9,12;
108:23;110:12,14,17,
20;111:4,8,13;127:3,
13;139:15;162:15;
169:2
**Dunne's (3)**
101:10;132:13;
144:10
**duplicating (1)**
16:21
**duplication (1)**
8:8
**during (3)**
9:3;115:18;155:18
**duties (1)**
119:17
**duty (3)**
16:19;19:7;169:12

**E**

**earlier (7)**
37:6;41:21;42:13,22;
117:13;137:15;139:21
**earliest (2)**
115:12;129:24
**early (3)**
27:19;114:20,21
**Earth (1)**
164:11
**easier (4)**
12:17;62:21;81:3;
89:8
**easily (1)**
119:19
**easy (3)**

102:16;133:5;164:21
**eat (2)**
49:18;65:12
**eaten (1)**
19:1
**eats (3)**
64:5;82:8,11
**ECBs (1)**
73:19
**echo (1)**
109:5
**economic (8)**
59:8;63:10,11;64:20;
65:7;115:8;125:22;
188:12
**economically (2)**
103:5;146:8
**Ed (1)**
105:23
**effect (2)**
73:7;159:16
**effective (3)**
77:12;81:17;89:20
**effectively (1)**
36:5
**effort (8)**
8:8;9:1;36:2;46:18;
118:17;154:22;183:9,
20
**efforts (2)**
9:3;16:22
**eight (8)**
7:13;55:18,19;66:18;
79:17,25,25;129:13
**eighteen (9)**
57:22;60:5;68:20;
69:2;80:22;81:18;
118:3,4;141:14
**eight-four (1)**
81:20
**eight-hundred (1)**
7:24
**eighty (1)**
30:17
**either (18)**
11:5;13:22;21:6;
24:16;31:7;32:22;39:4;
50:3;58:1;59:10;72:14;
101:23;103:1;115:4;
125:5;140:12;144:5;
187:10
**either/or (1)**
188:10
**elected (1)**
118:12
**Electrical (2)**
111:22;186:18
**eleven (7)**
61:5;76:21;81:4,10,
16;118:9;145:1
**eleven-billion-dollar (1)**
139:7
**eleven-billion-dollar-agreed-upon (1)**

139:1
**eleven-billion-dollar-allowed (1)**
72:14
**eliminate (1)**
65:11
**eliminating (1)**
90:5
**Elizabeth (1)**
36:19
**else (17)**
8:12;49:13;64:12;
73:1,2;85:12;87:18;
106:20;119:5;122:6;
125:16;133:3;147:7;
152:10;160:9;163:10;
174:14
**email (10)**
157:7,15;158:20;
159:6,15;163:23,25;
164:2;170:3,11
**emails (2)**
157:7;170:1
**embedded (2)**
141:7;154:5
**embellishment (1)**
40:17
**embodies (1)**
110:9
**emboldened (1)**
130:14
**embrace (1)**
151:17
**embraced (2)**
151:21;159:4
**emerge (1)**
142:21
**emergence (1)**
108:4
**emotion (1)**
183:20
**employed (1)**
78:3
**employee (1)**
77:16
**employees (7)**
77:2,9,14;78:14;
111:25;112:18;130:24
**employer (1)**
112:3
**employment (3)**
19:13;77:13;112:13
**encourage (1)**
152:15
**end (19)**
11:12;19:5;42:6;
49:25;52:14;54:17,19;
77:23;78:8;84:25;
95:20;96:19;99:3;
107:25;108:13;144:22;
145:2;154:24;178:18
**endorse (1)**
120:6
**endorsing (1)**

120:10

**energies (1)**
9:4

**energy (1)**
183:20

**enforceable (1)**
161:15

**engage (1)**
10:9

**English (1)**
158:7

**enormous (1)**
19:24

**enough (14)**
25:24;41:5;45:12;
48:24;51:11;68:3;
78:25;95:12;97:5;
119:7;122:2;147:7;
176:15;190:11

**ensure (1)**
19:8

**enter (3)**
17:1;35:17;45:21

**entire (1)**
49:3

**entirely (1)**
187:21

**entities (8)**
51:1,2;72:20;81:23;
84:10;118:2,3;130:7

**entitled (13)**
65:6;83:24;127:15,
16;129:10,11;135:4;
136:4;141:12,21;
145:2;178:2,17

**entitlement (1)**
153:5

**entity (3)**
57:3;118:5;165:8

**entrenched (1)**
96:3

**entries (5)**
12:5;15:18;16:16;
29:15,15

**entry (11)**
15:19,21,22,25;16:1;
29:7,11,20,21;45:10,18

**equitable (1)**
113:5

**equity (63)**
19:1;56:3;57:17;
58:11,14,15,16,17,21,
22;59:4,4,7,10;63:3,9,
19,21;64:6,13,14,16,
19;65:11;69:12,19;
71:9;72:25;74:21,24;
75:21;77:10,10;87:7;
96:3,4,4;103:1,6,11,12;
104:5,10;105:16;
109:14;112:8,21;
119:6;123:5;125:16;
126:2;127:4;131:4,5;
132:3;148:11;150:9,

15,17;168:2,6;179:22;
183:8

**equity-holder (2)**
148:14,15

**equity's (1)**
102:24

**erroneous (4)**
15:18,18,21,25

**esoteric (1)**
131:6

**especially (1)**
41:24

**essences (1)**
178:7

**essential (1)**
115:13

**essentially (1)**
92:9

**establish (1)**
82:15

**established (1)**
38:23

**Estala (1)**
179:3

**estate (5)**
26:9;37:22;71:16;
72:9;122:18

**estates (2)**
79:13;121:7

**estate's (1)**
121:23

**estimate (12)**
99:13;100:5,15,16,
17,22,23;101:3;142:5;
143:7;144:14;153:3

**estimated (7)**
56:15;80:16;82:1,3;
99:25;140:12;141:23

**estimates (6)**
60:4;99:1;125:12;
155:13;178:14,15

**estimating (1)**
99:21

**estimation (64)**
22:6;37:7;56:6;57:4,
10;59:1;60:13,24,25;
61:3,11,23;62:4,12,17,
20;64:2,4,17,23;65:10,
22;66:4,20;67:4,25;
68:4,7,8,15,20,23;69:1,
8;71:12;73:5;83:20;
85:23;99:2;100:9;
102:15,25;104:4;
106:8,14;107:1,16;
113:18;119:8;123:8,
18;125:5;140:8;
141:10;143:10,15;
144:22;165:13;172:7;
178:1;180:11;181:4;
183:4;187:18

**estimations (1)**
177:16

**estoppel (1)**

8:7

**evaluate (3)**
134:3;135:5;189:12

**evaluated (3)**
90:13;115:15;174:4

**evaluating (1)**
174:2

**even (27)**
14:5;26:17;39:3;
42:24,25;81:24;82:14,
15;87:19;92:21,22;
94:3;105:12;117:7;
130:8;134:10;135:3;
137:16;140:3;144:10,
23;154:13;158:19;
162:15;186:8;187:14;
190:18

**event (2)**
159:3;161:19

**eventuality (3)**
62:15;64:20;79:13

**everybody (23)**
35:13;37:23;73:1,2;
79:13;85:12;87:17;
94:10,11,22;96:2;
101:14;103:5;132:10,
11,15;144:19;153:21;
154:11;170:17;180:3;
188:15;189:15

**everybody's (2)**
149:24;159:18

**every-day (2)**
77:24;78:2

**everyone (4)**
5:6;8:12;44:6;159:2

**everywhere (1)**
146:3

**Evidence (20)**
9:13;94:13,25;121:3,
3,5,18,18;122:24;
126:11,12;134:2;
135:15;136:10;150:19,
21;151:7,8;152:11,11

**evolved (1)**
150:23

**ex (2)**
32:20;36:25

**Exactly (20)**
12:7;13:4,6;16:10,
15;38:14;46:8;82:10;
83:1,3;86:24;112:23,
23;128:12;130:16;
134:9;139:25;160:9;
162:25;184:5

**examiner (17)**
6:3;14:12;16:20;
17:8,15;19:9;20:20;
23:19;29:14;30:11;
31:20;32:18;34:16;
35:11;37:1;38:12;
43:17

**examiner's (3)**
11:25;17:1;35:19

**examining (1)**
12:18

**example (10)**
9:25;12:22;33:17;
43:13;44:5;58:25;90:3;
120:1;147:14;161:13

**exceed (1)**
94:20

**exceeded (1)**
176:16

**exceeds (3)**
61:2,3;62:12

**Excellent (1)**
51:12

**exception (2)**
38:11;72:4

**excess (2)**
80:15;124:5

**excessive (1)**
120:13

**exchange (1)**
157:15

**excited (1)**
131:6

**excluded (1)**
8:21

**exclusive (1)**
7:25

**exclusivity (55)**
54:18;55:4;56:8;
58:9;69:6,17;72:4,6,
10;73:2,13,25;78:19;
79:9,9;86:3;97:12;
105:14;107:4,13,18,24;
108:24;109:24;110:2;
115:14;117:21;121:2;
128:16,18,22;129:3;
130:8;135:2;139:19,
23,25;149:9,10;
151:20;152:15;154:4;
155:1,18;156:22;
159:21;160:17;166:3,
8;167:22;169:9;177:6;
182:21;183:9;185:20

**excuse (4)**
43:7;80:23;88:17,17

**executive (3)**
50:7;86:19;177:10

**exemption (1)**
19:15

**Exhibit (1)**
157:6

**exist (2)**
144:4;156:23

**existence (1)**
33:12

**existing (8)**
40:19;58:17;63:21;
64:5,19;131:4;132:3;
168:16

**exists (2)**
99:11;144:2

**exit (4)**

106:19;113:10,21,22

**expect (4)**
22:24;89:2;115:5;
169:23

**expectation (1)**
53:14

**expected (2)**
27:9;169:22

**expedite (1)**
43:21

**expedited (1)**
190:18

**expense (8)**
19:2;50:8;74:19,22;
75:1;117:12;126:18;
174:3

**expenses (4)**
7:25;13:12;37:20;
50:9

**expensive (1)**
74:20

**experience (3)**
129:16;137:19;
142:17

**experienced (7)**
29:5,6,18;47:10;
129:15;133:7,9

**expert (1)**
159:13

**experts (2)**
135:17;136:22

**explain (8)**
8:11;27:8;62:10;
69:5;102:6;141:2;
173:22;177:14

**explained (1)**
62:7

**explaining (1)**
85:7

**explanation (1)**
14:11

**explicitly (1)**
14:19

**express (2)**
11:23;87:20

**expressed (2)**
87:11;170:6

**extend (2)**
190:4;191:6

**extended (1)**
190:23

**extensively (1)**
188:4

**extent (16)**
9:10;19:6;32:2;
39:23,24;40:19;46:16,
21,24;47:2;133:10;
146:12;154:22;173:16,
17;177:17

**extra (4)**
68:13,14;76:8;
147:11

**extraordinarily (3)**

Case: 19-30088    Doc# 4162    Filed: 10/08/19    Entered: 10/08/19 15:30:05    Page 201
of 220

56:5;57:11;150:24

# F

**face (4)**
76:2;135:2;139:7;
166:7
**face-to-face (1)**
49:17
**facilities (1)**
146:11
**facility (2)**
75:25;76:4
**fact (18)**
21:12;45:2;53:19,24;
82:3;98:6;99:10,12;
126:22;139:20;141:11;
144:11;150:7;152:25;
154:21;156:23;190:24;
191:14
**facts (14)**
54:1,3;90:16;94:15;
118:22;150:23;151:1,
1,5;152:25;156:22;
185:10;187:12,14
**factual (1)**
90:1
**factually (3)**
185:9,11;186:17
**fail (3)**
71:6;178:13;181:21
**fails (3)**
69:13,15;106:24
**failure (2)**
94:25;105:22
**Fair (7)**
48:24;68:3;78:25;
97:5;113:5;170:24;
175:25
**fairly (2)**
91:10;170:19
**faith (1)**
168:10
**fall (2)**
106:7;161:7
**fallback (1)**
105:13
**falling (1)**
109:14
**falls (3)**
105:16;106:15,17
**false (1)**
187:3
**far (5)**
13:21;118:5;144:19;
176:1,2
**fashion (1)**
164:21
**fatal (1)**
120:2
**fatally (3)**
58:7;120:2,4
**favor (13)**

41:18;68:6,10;72:5,
9,10;79:9;93:19;
108:23;141:21;181:9;
190:10,12
**favorable (1)**
23:14
**favorably (1)**
170:10
**fear (1)**
87:20
**feasibility (6)**
58:5;106:11;109:5;
113:12;115:14;180:23
**feasible (2)**
73:23;108:5
**February (6)**
60:3;69:23;89:13;
105:17;131:13,14
**Federal (6)**
9:13;56:8;119:9;
127:15;146:14;171:9
**fee (57)**
5:9,12,16;6:3;7:23;
11:25;12:14,16,18;
14:12,15;15:11;16:9,
19,20;17:1,7;19:9;
20:1;23:4,11,15,19,23;
24:4,24;25:2,19,19,22;
26:11,19,21;29:14,20;
30:11,22,23,23;31:10,
20;32:1,18;33:18;
34:16;35:11,17,19;
37:1,2,9,20;38:12;
40:5;43:16;44:5;52:9
**feedback (1)**
132:25
**feel (1)**
29:19
**feelings (2)**
170:5,12
**feels (1)**
39:24
**fees (14)**
7:24;10:10;15:13;
19:5;21:12;26:4;29:22;
31:5,16;75:14,16,17,
22;76:5
**Feld (1)**
55:11
**Feldman (40)**
138:10,13,14,20,22,
22;139:4,10,12,14;
140:16,18,20;141:1,4,
8,10,14,16,19;142:1,4,
11,14,16,19;143:2,6,
12,22,24;144:2,6,9,15,
17,20,24;145:11,12
**Feldman's (1)**
181:15
**fell (1)**
151:10
**felon (2)**
166:17;168:14

**felt (2)**
34:21;157:13
**FEMA (7)**
57:3;81:22;83:9,10;
84:9;124:8;165:5
**FEMA's (1)**
82:14
**fences (1)**
69:20
**FERC (1)**
21:7
**few (7)**
11:4;59:6;90:19;
105:7;109:1;115:18;
121:9
**fiduciaries (6)**
72:6;118:10;120:16;
122:4;134:3;135:9
**fiduciary (4)**
72:9;109:13;119:17;
136:11
**fifteen (4)**
47:20;116:9;145:17;
184:2
**fifteen- (1)**
65:2
**fifteen-hundred (1)**
18:20
**fifteen-minute (2)**
101:14;115:18
**fifty (3)**
27:4;28:17;129:10
**fight (11)**
95:21,21;96:5,11,23;
103:25;109:15;117:13;
152:1;166:15;168:15
**fighting (1)**
126:18
**figure (16)**
8:4;45:18;59:17;
61:2;66:5,21;92:10;
97:19;99:3,16;100:16;
133:5;134:23;141:6;
178:13;187:24
**figuring (1)**
164:24
**file (10)**
10:25;17:16;51:6;
54:23;74:11;100:24;
119:3;123:17;177:11;
184:6
**filed (24)**
33:18;51:9,9,10;
56:4;70:14;75:19;
104:24;117:7,24;
118:15;134:20,21,21;
146:13;154:4;155:20;
164:15,16;172:17;
173:12;184:1;186:4;
191:3
**filers (1)**
128:25
**files (1)**

156:20
**filing (2)**
24:16;161:9
**filings (3)**
17:12;92:25;173:11
**Fill (1)**
141:2
**filled (1)**
19:11
**final (10)**
30:23;31:1,3,17;
39:22;52:9;93:7;95:7;
100:1;165:13
**finality (2)**
31:11;32:8
**finalize (1)**
7:21
**finally (3)**
9:5;14:7;34:22
**finance (2)**
73:6;89:21
**financeable (1)**
71:23
**financial (5)**
91:21;94:18;152:20;
155:10;176:10
**financially (2)**
88:12;89:7
**financing (39)**
57:14,17,18,18,21,
25;58:10,12,14,16,23;
59:9;64:21;69:13;
71:17;73:16,17,22;
75:14,19,22;76:3;
108:3;109:8;144:10;
148:9,14,15,16,21,25;
149:2,4,6;150:1,4,6;
151:2;180:24
**find (7)**
71:16;81:23;90:18;
96:23;103:4;109:1;
162:2
**finding (2)**
98:25;153:20
**findings (1)**
75:9
**finds (2)**
100:21;165:5
**fine (11)**
9:15,17;26:8;37:12,
25;48:13;85:16;96:1;
135:21;137:24;169:20
**finger (1)**
117:2
**finish (1)**
179:12
**finished (1)**
70:15
**finite (1)**
178:13
**Fire (11)**
21:6;22:2;53:21;
61:6,12;66:20;81:22,

25;82:19;83:9;84:9;
89:25;90:3;123:8;
133:6;145:8;160:3;
165:5;174:25;189:13,
16
**fires (3)**
53:24;99:17;175:5
**firm (18)**
12:10,12,25;13:19,
23;14:22;15:20;21:5,5,
5;25:3,3,12;34:24;
37:3;51:8,9;55:19
**firms (5)**
14:10,23;43:7;47:3;
86:16
**first (35)**
5:16,22;7:22;11:22;
12:13,19;16:14;25:25;
27:22;34:8;47:7;49:16;
58:12;63:19;65:19;
74:19;80:5;93:6;113:3;
115:7;117:7;122:17;
127:3;131:16;140:22;
145:25;149:4,14,16;
150:22;151:4;155:14;
163:15;170:15;172:5
**fit (3)**
135:22;149:25;
150:23
**five (22)**
7:21;10:18;11:21;
22:22;24:7,9,19;25:18;
26:17,19;27:23;37:13,
14;44:6,11,14,19;49:2;
55:20;83:13;97:1;
100:23
**five- (1)**
24:17
**five-percent (1)**
24:17
**fix (1)**
85:15
**fixes (2)**
88:19;123:18
**FJR (1)**
108:25
**flat (1)**
151:10
**flaw (1)**
146:20
**flawed (1)**
58:7
**flexibility (1)**
97:11
**flip (1)**
143:9
**floor (1)**
140:7
**fluff (1)**
60:21
**fly (2)**
6:10;28:4
**flying (1)**

Case: 19-30088    Doc# 4162    Filed: 10/08/19    Entered: 10/08/19 15:30:05    Page 202
of 220

145:24
focus (9)
26:1;62:21;74:22;
104:1;117:1;128:13;
154:22;157:24;170:14
focused (3)
25:11,12;103:22
focusing (1)
61:6;131:2
fold (4)
91:17;103:3;104:6;
108:14
folks (1)
124:17
follow (10)
23:7;24:6;29:7,16;
33:19;39:1;41:2;69:23;
114:9;152:17
followed (2)
55:17,19
following (2)
188:21,23
follow-up (1)
9:19
fooled (1)
105:8
force (1)
149:2
forced (2)
172:2;182:7
forever (1)
27:19
forget (1)
152:9
forgetting (1)
52:20
forgot (1)
53:3
forgotten (1)
33:8
form (8)
60:25;72:15,19;
73:22;109:19,22;
114:15;139:7
formulated (1)
154:2
forth (3)
115:11;122:1;181:21
forty (1)
129:22
forty-five (2)
115:20;118:9
forty-hour (2)
23:19;24:4
forty-six (1)
37:5
forty-six- (1)
153:2
forward (23)
25:15;32:11;39:10;
43:24;60:1;75:10;95:2;
96:6;98:7;108:14;
109:17;110:8;111:9;

113:22;125:1;128:17;
129:17;132:16,19;
152:6;167:11,16;189:1
fostered (1)
139:18
fought (1)
118:11
found (4)
90:4;124:4;156:24;
177:17
foundation (1)
157:2
foundations (1)
156:16
founded (1)
160:20
four (9)
11:24;12:13,16,22;
21:21,22;51:1;100:19,
23
four-month (1)
30:8
fourteen (11)
55:17;61:7;66:17;
68:22;80:24;119:5;
122:10;124:5;149:22,
23,25
fox (1)
80:11
frame (3)
167:15;168:12,12
FRANCISCO (1)
5:1
frankly (2)
89:9;98:13
freight (1)
129:19
frequently (1)
136:3
Friday (3)
172:17,20;173:12
friends (1)
118:12
front (9)
31:25;51:15;99:10;
102:5;184:2;186:4;
187:13;188:11,13
frustrate (1)
118:18
fulfilled (2)
117:19;131:13
full (25)
13:16;22:24;65:6;
67:11;73:15;91:12;
94:11,12,22;95:12;
97:13;98:8;101:1,4,23,
24,25;104:12,12;
106:6;125:3;140:13;
141:22;152:13;153:13
full-throated (1)
102:4
fully (1)
91:10

functionally (1)
31:10
fund (8)
104:13;106:18;
119:7;125:15;126:6;
132:1;140:23;142:22
fundamental (2)
79:2;148:5
Fundamentally (2)
24:3;187:3
funded (1)
104:15
funding (3)
108:2;148:3,4
Funds (3)
81:22;113:21;125:2
further (9)
10:23,25;11:2;14:4;
17:5,11,15;18:4;36:1
future (3)
20:4;32:7;112:3

G

galvanized (1)
130:14
game (2)
162:8,9
gap (1)
129:16
gas (10)
89:18;91:22;125:20;
126:1;148:10;149:6;
150:3,14,15,16
gatekeeping (1)
114:11
gave (1)
66:3
gee (1)
159:22
general (2)
12:3;50:3
generally (3)
19:17;23:22;27:8
generated (1)
21:13
generous (1)
16:6
gentleman (2)
97:18;158:15
gets (13)
49:1;56:13;70:3;
75:2;85:12;97:1;99:21;
106:18;112:17;126:14;
162:14;180:1;183:5
Ghost (7)
177:10,14,15,25;
178:1,16,16
giant (2)
96:3,3
given (13)
6:9;17:14;19:4;
41:24;44:3;45:14;55:8;

79:6;100:6,22;107:8;
170:4,22
gives (1)
148:24
giving (3)
63:21;99:6;120:10
glanced (1)
148:7
glide (1)
107:16
global (4)
107:4;132:18,19;
139:18
goal (3)
101:25;131:8;142:19
goes (11)
9:1;58:22,24;59:25;
64:15;82:16;93:8;
98:11;133:17;147:14;
180:3
Good (36)
5:6,7;7:2,3;16:8;
20:25;21:1;29:10;
36:19;38:5;53:7;55:10;
66:21;79:20;84:20,21,
22;90:25;91:1;111:18,
19,20;114:5;116:4,5;
122:2;152:8,9;163:2;
168:17;176:25;178:2,
3,5,19;191:22
goodbye (1)
126:25
good-faith (1)
120:12
Google (1)
164:11
gotcha (1)
182:23
Gotshal (2)
52:7;116:6
govern (1)
110:18
governance (12)
103:20,23;106:2,7,
20,25;109:12,15;
166:15;168:9;174:22,
24
governing (1)
28:25
government (7)
56:7,12;57:3;59:2;
61:4;69:9;71:13
governmental (3)
82:24;84:10;165:8
graduate (1)
13:24
grand (1)
19:20
grant (3)
97:10;100:17,24
granted (3)
99:13;100:4,15
granting (1)

100:22
gratified (1)
115:6
great (3)
85:19;113:16;140:10
greater (1)
170:6
Green (11)
22:21;36:16,19,19,
22,24;37:14;38:2,3,20;
49:13
greet (1)
94:5
Gregory (1)
38:5
grossly (1)
119:18
grounded (1)
156:22
group (6)
51:7;99:14;144:25;
145:1,9;181:21
groups (2)
40:10;96:3
guarding (1)
80:11
guardrails (2)
39:23;40:20
guess (10)
9:20;16:4;33:24;
34:3;46:5;16:64:7;
81:22;116:11;190:18
guidance (4)
23:8;30:4;40:21;
45:14
guided (3)
40:23;41:1;117:9
guideline (12)
13:25;24:6,7;25:21;
27:6,7;28:25;33:17;
37:12,25;43:5;44:3
guidelines (25)
13:5,6,11,12,14;
14:14;25:25;27:6,10,
18,18,25;33:4,17;37:1;
38:9,10,16,17,23,25;
39:4,21,22;40:19
Gump (1)
55:11
gun (1)
137:10
guy (1)
78:8
guys (1)
54:23

H

haircut (1)
149:24
half (23)
26:4;61:7;62:21;
66:17;68:22,24;79:24;

Case: 19-30088   Doc# 4162   Filed: 10/08/19   Entered: 10/08/19 15:30:05   Page 203
of 220

80:24;83:16;91:19;
122:10;123:22;129:12,
13,14,14;133:22;
134:16;140:8,9;
141:17,19,20
**half-dozen (1)**
176:11
**hand (4)**
6:17;9:1,1;16:9
**handle (1)**
79:12
**handpicked (1)**
168:6
**hang (1)**
14:3
**happen (18)**
31:1;40:6;62:17;
78:3;88:21;91:8;95:19;
103:1;104:17;124:25;
127:16;129:1;151:6;
154:6;179:18;180:6,7;
189:24
**happened (11)**
83:11;85:21;117:3,
22;128:13,17,19,20;
151:5,9;153:21
**happens (19)**
32:4,5;59:25;60:6;
62:12;63:19;65:19;
66:4;67:24;69:11;
104:19,20;128:7;
131:11,11,24;136:25;
147:24;173:24
**happy (6)**
29:16;33:3;53:13;
133:21;187:2,10
**hard (5)**
136:22;158:3,8,10;
166:11
**hard- (1)**
118:10
**hardly (1)**
100:1
**harm (2)**
36:9,11
**Harris (18)**
18:12,13,18,18;19:4,
15,22;20:1,4,7,14,17;
105:23;114:3,3,7;
115:2,3
**hassle (1)**
166:22
**Hate (1)**
92:1
**Hauer (1)**
55:11
**Haysfirm (1)**
90:10
**haystack (1)**
13:2
**head (3)**
6:12;155:5,6
**health (1)**

127:13
**healthy (1)**
113:22
**hear (29)**
6:20;7:16;8:17,18,
18;11:12;30:13,13;
36:17;101:8,11,12,13,
15;107:19;108:19,21;
110:3;111:14;113:10;
115:19;157:8;163:25;
190:17,17,19,20;191:7,
10
**heard (36)**
18:11,12;38:7;42:14;
43:10;51:7,8;54:17;
90:10;98:14;123:7,22;
125:21;129:9;133:21;
143:16;163:10;168:4;
170:15;171:6,20;
172:8,9,10,12,14,16,
24;175:22;176:23;
180:21;182:25;183:1;
185:3;191:1,4
**hearing (32)**
5:9;11:13;12:20,23;
30:6;31:1,4,17;40:5;
43:23;46:7;47:6,7;
50:24;51:22;52:9,14;
54:19;56:2,20;70:4;
117:21;149:7;152:3;
163:2;180:2,14;
184:19,20;186:7;
190:15;191:13
**hearings (11)**
30:7,10,22;31:21;
40:11;43:22;114:21;
132:22,22,24
**heat (3)**
20:24;158:1,25
**heck (1)**
41:2
**hedges (1)**
101:2
**held (2)**
30:8;175:25
**help (6)**
7:20;31:4;96:11;
110:1;136:13;153:20
**helpful (5)**
40:15,22;42:19;
45:24;108:1
**henhouse (1)**
80:12
**here's (4)**
32:25;47:23;49:8;
58:4
**herring (3)**
108:19;144:12;
167:19
**herself (1)**
172:3
**hey (2)**
25:5;94:21

**high (14)**
12:20;46:3;69:8;
79:6;86:23;89:14;
121:16,16,18;127:25;
146:24;151:21;165:10;
183:4
**higher (34)**
14:16;64:3,4,14;
65:10;67:25;68:4,9,16;
71:24;73:18;90:4;94:5;
98:12,17;123:9,9,18,
21,23;125:12;141:13;
144:8,11;145:3;
146:14;151:18;171:21,
22;172:2,6,8;176:3;
178:14
**highest (1)**
148:17
**highly (1)**
47:9
**hike (1)**
162:8
**himself (1)**
163:24
**hinted (1)**
139:21
**historical (1)**
31:7
**history (3)**
28:2;131:19;186:16
**hit (3)**
44:10;74:15;156:10
**hits (2)**
91:16;98:17
**Hoc (10)**
55:12;118:17;
120:24;121:21,22;
122:3;125:24;127:22;
138:23;161:10
**hocs (1)**
127:7
**hold (8)**
54:21;84:6;144:16;
166:23;168:13;184:8,
8,8
**holder (9)**
83:6,6,8,17;87:9;
88:13;89:9;90:14;
103:11
**holders (19)**
56:3;58:15,16,21;
59:7;63:3;69:12,20;
71:9;72:5,13,19;75:16;
77:10;87:7;112:8;
125:16;148:11;162:17
**holders' (1)**
95:20
**hollow (1)**
166:16
**home (2)**
122:10;180:3
**honestly (1)**
80:12

**Honor (277)**
6:24;8:24;11:17,19;
14:2,6;16:18,25;18:6,
13,15,18,19:4;20:5,14,
17;21:1,16;23:5;24:5,
23;27:2,11;28:2,11,12,
24;29:12;30:20;34:3,
22;35:7,16;36:3,19;
38:5;40:16;41:7;50:16;
51:16;52:1,6;53:5,14,
23;54:11;55:2,10,13,
24,25;56:4,9,17,19;
57:2,5,8,11,15,16;58:8,
14,22;59:7,11,21;
60:14;61:3,14,21;63:2,
8,16;64:17;65:1,4,6,17;
66:25;68:5,15;69:5,11,
17,18,24;70:24;71:8;
72:2,7,13,18,25;73:3,
11,13,24;74:7,8,10,21;
75:4,11,17,23;76:10,
19,24;77:6,11,19;
78:12,22;79:1,7,15,19;
82:15;84:2,9,24;85:8;
86:11;89:17;91:1,1;
92:1;17;93:1;94:8,17;
97:6;98:23;99:20;
100:21;101:17,20,24;
102:5,7,12,14;103:2;
104:1,23;105:19;
107:3,18;108:13,18,20;
109:10,12,25;111:13,
19;112:12;114:5,7,9,
14,19;115:3,16;116:5,
20;117:1,5,6,12,17,23;
118:5;119:16,22;
120:6,11;122:2,4,16;
123:14;124:3,20,25;
125:11;126:5,11,20;
127:1;128:4,14,16;
129:2,15,21;130:3,10;
132:4,17;133:24;
134:5,14,24;135:9;
136:9;137:8;138:1,8,
14,24;139:17;140:18;
142:11;144:11,20;
145:14,20;149:12;
151:9;152:4,11;
153:22;154:1;155:1;
156:2;157:14,21;
158:4,5;161:4;162:24;
163:8,14,19;164:17;
166:9;167:2;168:1,17;
169:1,8,16,20;170:3;
173:6;175:15;176:19,
24;178:24,25;179:15,
18,24;180:8,25;181:7,
12,13,18;182:13,25;
183:9,10,13,18,23;
184:22;185:12;186:23;
187:2,9,13,19;188:25;
189:4,9
**Honorable (1)**

5:5
**honored (1)**
96:10
**honoring (1)**
42:2
**Honor's (6)**
19:10;34:15;104:6,
16;105:12;114:20
**hook (1)**
90:3
**hope (9)**
6:20;9:21;32:6;
38:25;46:3;71:9;79:24;
176:5;189:5
**hopefully (3)**
25:17;43:22;45:24
**hoping (2)**
31:2;105:20
**horrible (1)**
20:9
**horse (2)**
106:18;107:21
**hostage (1)**
175:25
**Hostetler (5)**
36:20;51:1;79:22;
163:20;184:13
**hostile (3)**
117:12;124:15;128:5
**hourly (1)**
48:11
**hours (14)**
12:20,24;27:23;37:2,
10;38:22;47:20,20;
48:13,14,21;49:2;
94:19;182:19
**house (1)**
96:18
**huge (3)**
40:10;96:5;146:25
**Huh (1)**
52:22
**hundred (8)**
48:13,14,21;54:10;
59:6;75:21;167:7;
181:17
**hundreds (1)**
164:24
**hundred-year-old (1)**
90:2
**hypothesize (1)**
73:10
**hypothetical (1)**
112:25
**hypothetically (1)**
82:13
**hypotheticals (1)**
68:18

---

**I**

**IBEW (5)**
55:20;72:10;111:17,

24;114:10

**IBEW's (1)**
112:4

**IBU (1)**
101:13

**idea (6)**
151:6;153:15,24;
155:10;178:4,5

**identical (1)**
77:11

**identify (2)**
8:20;13:1

**ie (1)**
104:9

**ignored (1)**
129:6

**III (1)**
100:13

**illegal (1)**
146:3

**illegitimate (1)**
157:1

**illusory (1)**
162:15

**illustrate (1)**
61:22

**illustrative (1)**
82:20

**imagine (3)**
158:8;167:21;178:19

**immediately (1)**
173:20

**impaired (5)**
64:24;65:1;132:11,
13,15

**imperfect (2)**
83:14;121:15

**implicate (1)**
54:6

**implied (1)**
34:20

**implying (4)**
189:21,22,23,25

**important (23)**
21:13;34:21;42:10;
47:5;75:23;87:15,16;
110:2;113:9;140:5,6;
143:14;151:13;153:25;
155:3;170:13,17,18;
173:3;174:17,19,21;
181:12

**importantly (1)**
170:20

**impose (1)**
120:13

**imposed (1)**
111:2

**imposition (1)**
120:7

**improper (1)**
100:22

**improvements (1)**
49:19

**inability (1)**
94:24

**incented (1)**
87:7

**incentive (7)**
59:8;63:10,12;64:20;
65:7;112:20;125:22

**inclined (1)**
38:24

**include (4)**
14:17;17:4;37:6;
148:2

**included (3)**
15:8,10;82:1

**includes (3)**
14:20;68:5;161:8

**including (4)**
118:18;127:6;
152:24;155:22

**inclusive (1)**
57:7

**inconsistent (1)**
33:16

**incorporate (1)**
13:13

**incorporating (2)**
117:24;118:16

**incorrect (2)**
77:1;167:7

**increase (5)**
8:2,4,4;19:6;63:5

**incredibly (1)**
153:8

**incur (1)**
76:4

**indeed (1)**
46:9

**independent (1)**
16:19

**indicated (2)**
10:17;43:6

**indicating (1)**
36:8

**indifference (1)**
103:7

**indirectly (1)**
146:23

**indiscernible (5)**
23:14;25:12;61:6;
155:18;163:17

**indiscrete (1)**
29:20

**individual (6)**
137:22;140:14,16;
145:6,9;153:12

**individuals (1)**
35:11

**inevitable (1)**
108:11

**inevitably (1)**
117:14

**infirmities (1)**
107:20

**inflection (1)**
103:6

**information (30)**
33:10;45:12,15;
83:15;89:16;115:5;
121:8,15;134:15,18,20;
135:1,3,6,7;137:2,4,9;
154:11,12;155:6,7;
160:21;163:4,4;164:4,
10;176:12,15,15

**infrastructure (1)**
112:1

**initial (5)**
25:13,17;26:11,12;
117:24

**injury (4)**
54:7,16;187:15;
188:13

**injury/wrongful (1)**
188:3

**ink (3)**
38:13;118:20;151:15

**innumerable (1)**
172:18

**insolvency (1)**
85:9

**instance (2)**
146:21;161:18

**instances (2)**
13:1;39:11

**instead (1)**
157:20

**instituting (1)**
119:13

**institutions (1)**
127:8

**insult (1)**
174:13

**insurance (2)**
176:4;177:22

**intend (1)**
80:14

**intended (1)**
44:12

**intending (2)**
17:19,24

**intensive (3)**
148:23;185:9;186:17

**intent (3)**
189:22,25;191:15

**intention (1)**
38:10

**intentional (1)**
105:8

**interest (23)**
64:18;74:19,22;75:1;
76:8,16;86:9;119:21;
120:1;127:15,24;
140:20;146:13,14,19,
24;147:15;148:4;
152:2;153:6;175:23;
176:2,3

**interesting (2)**

127:2;154:9

**interests (4)**
59:5;87:23;111:24;
120:12

**interim (6)**
7:23;25:19;30:22,23;
32:1;33:18

**intern (1)**
26:21

**International (1)**
111:22

**interpretation (2)**
170:1;178:21

**interrupt (2)**
56:20,24

**interruption (1)**
56:25

**intervals (1)**
30:8

**into (40)**
8:12;9:14;11:24;
19:2;38:19;41:20;
42:12;45:21;50:10,14;
64:5;75:12;79:3;82:8,
11,17;84:14,15,17,19;
85:9;87:7,22;89:16;
101:20;106:2,7;
118:13;129:7;141:7;
143:4,6;153:22;
154:23;157:9;165:2;
169:25;177:23;180:17;
189:11

**invent (2)**
150:13;151:9

**inverse (11)**
54:13;183:25;185:7;
186:3,5,8,19,21;187:4,
5;188:16

**invest (1)**
126:6

**investigations (3)**
21:17;22:1,5

**investment (1)**
126:2

**invite (1)**
111:3

**involuntary (1)**
72:7

**involve (1)**
7:23

**involved (3)**
21:19;35:14;95:23

**involvement (1)**
168:7

**IOU (1)**
98:7

**ironclad (1)**
44:4

**irrespective (4)**
53:19;62:17;68:7,8

**I's (1)**
155:21

**issuance (1)**

75:1

**issue (55)**
8:7;11:12;12:9;29:1;
30:21;33:2,2;52:24;
54:18;55:4;56:17;58:8;
76:24;79:2;93:13;
105:24;106:7;108:18;
112:13;114:11;124:23,
24;128:3;130:23;
139:5,10,11,12,14;
144:4;145:25;164:7;
168:16;170:13;171:25;
180:15,20,23;181:11;
183:24,25;184:2,20;
185:8,9,20;186:3,5,17,
19,21;187:4,18;189:10,
18

**issued (2)**
117:3;119:12

**issues (34)**
8:15,19;9:10,22;
10:12,25;12:15;30:24;
32:16;34:2;35:10,15;
46:10;53:15,16;78:19;
95:21,23,24,24;107:22;
108:2;117:11,11;
133:10;166:13;167:6;
168:23;169:13;173:15;
186:16;188:12,16;
189:3

**Italy (1)**
170:8

**items (5)**
8:16;31:7;47:12,12;
50:13

**J**

**jacked (1)**
44:19

**January (5)**
60:3;105:17;131:13;
190:6,9

**Jeff (1)**
159:10

**jeopardize (4)**
167:11,13,14,17

**jeopardy (1)**
80:2

**job (5)**
45:19;98:10;103:17;
112:24;147:12

**Johnson (1)**
158:8

**joinder (1)**
177:11

**joined (1)**
183:25

**joint (2)**
184:15;186:4

**judge (57)**
16:6,9,13;21:7,20;
22:5,9;26:10;41:9,11;

Case: 19-30088    Doc# 4162    Filed: 10/08/19    Entered: 10/08/19 15:30:05    Page 205
of 220

46:22;48:3;60:4;62:24;
80:16,20;84:8;88:18,
24;89:5,13;91:3,16;
96:7;98:10,16,25;
99:25;100:3,13;
115:21;119:9;123:17;
124:4;125:11;126:12,
21;131:14,16;140:3;
141:11,11;142:19;
169:14;172:18;175:1;
179:12;184:1,3,16;
186:7,14;187:25;
188:2,8,12,22
**judgement (2)**
29:10;127:15
**judges (2)**
21:18,22
**judge's (1)**
142:8
**judgment (6)**
54:4;136:11;146:14;
186:10,15;187:12
**JULIAN (25)**
183:23;184:6,13,13,
18,22,24;185:2,6,9,11,
13,16,19,22;186:2,14,
23;187:3,24;188:6,11,
17,21,25
**jump (1)**
55:25
**jumping (1)**
137:10
**June (14)**
45:23;47:6,6;69:18;
79:7;84:22;104:2,14;
105:18,22;108:16;
119:12,15;142:21
**junior (1)**
99:8
**jurisdiction (1)**
31:14
**jury (2)**
62:24;66:20
**justification (2)**
12:25;14:11
**justified (1)**
15:14

**K**

**Karetzi (2)**
163:12,14
**Karotkin (124)**
5:14,16;52:4,6,6,12,
16,25;53:2;54:18,21;
55:1,3,6;85:21,24;
104:18;110:3;115:25;
116:1,3,3,5,6,11,16,18,
20,22,24;118:4;119:1,
4;120:5,11,19,23;
121:14;122:16,21,23;
123:3,11,14,20,24;
124:2,8,10,12,20;

125:5,8,10,18,23;
126:1,4,20;127:1,6,10,
12,19;128:12,24;
129:7;130:2,10,13,20;
131:11,16,19,21,23,25;
132:3,6,9,13,15;
133:12,14,16,19,24;
134:2,5,9,12,14,18,24;
135:1,13,16,19,23,25;
136:5,7,9,15;137:1,6,8,
22,25;138:4,6,9,12;
139:21;140:1;145:15;
147:13;148:12;150:8;
152:12,24;155:16;
173:11;182:25
**Karotkin's (1)**
165:1
**keep (6)**
161:20;162:25;
168:14,16;188:8,9
**keeps (1)**
96:9
**Kevin (1)**
53:9
**key (1)**
44:1
**kid (1)**
34:23
**kill (1)**
114:17
**kills (1)**
88:19
**kind (27)**
9:2;10:9;12:15;32:1;
39:4;41:20,20,24;
43:23;44:4;50:8,9;
53:16;69:16,25;71:3;
81:13;90:5;95:25;
102:4;111:11;137:14;
147:9,9;152:19;154:9;
162:2
**kindergarten (1)**
158:2
**king's (1)**
158:7
**kiss (1)**
126:25
**KNAPP (12)**
111:19,21,21;112:9,
12,17,23;113:3,14,25;
114:1,2
**Knighthead (1)**
149:17
**knockdown (1)**
167:4
**knowing (2)**
19:12;115:12
**knowledge (3)**
19:16;105:11;152:22
**known (1)**
191:4
**knows (2)**
74:10;189:15

**Kornberg (1)**
52:10
**Kornberg's (1)**
105:17

**L**

**Lacey (6)**
114:5,5,8,19;115:1,3
**lack (2)**
163:3,4
**Laffredi (31)**
11:18,19,19;12:7,9,
12;13:4,6;14:2,6,19;
15:1,4,7,23;16:3,7,10,
12,15,17,25;17:4,7,10,
13,17,22;18:1,3,6
**lands (2)**
102:24;104:4
**language (9)**
31:20;140:12;
142:23;157:21;158:3,
10,19;162:3;173:5
**large (2)**
28:13;40:10
**larger (1)**
91:17
**largest (1)**
72:10
**last (31)**
21:19;35:9;56:2;
63:19;76:25;92:14,14,
16;105:25;107:19;
111:15;127:21;128:10;
130:4;150:20;151:22;
152:7;161:2,4;163:2;
166:12;175:10;177:5;
183:9,22;188:11;
189:3,4,12;190:5;
191:6
**late (1)**
41:13
**later (8)**
12:5;74:4;76:4;
150:24;161:12,17;
182:12;186:24
**latter (1)**
23:13
**law (26)**
12:10;13:23;14:22;
23:13;29:10;34:9,20,
25;38:16;39:9,14,21;
40:12,25;41:1;80:15;
86:15;97:9;99:7;120:4,
6;141:25;142:2,20,20;
147:4
**law's (1)**
26:1
**lawyer (14)**
14:14;15:20;29:6;
34:24;39:17;47:19;
121:25;137:16;158:1,
1;159:7,7,9;171:6

**lawyers (15)**
10:24;12:4;16:5;
29:6,18;40:7,9;44:3;
50:10,11;54:16,16;
98:2;131:6;176:11
**lay (1)**
47:11
**layer (1)**
38:24
**lead (2)**
9:20;55:16
**learned (1)**
93:8
**least (12)**
7:21;8:19;10:6;
27:13;46:23;47:10;
49:15;86:8;109:18;
134:15,19;166:6
**leave (6)**
11:21;41:23;59:17;
93:9;115:24;178:23
**leaves (4)**
55:21;58:20;81:18;
83:7
**leaving (3)**
83:16;98:14;122:18
**led (1)**
29:21
**leeway (1)**
29:3
**left (6)**
59:5;81:18;85:1;
89:18;97:19;98:2
**legal (2)**
147:17,21
**legally (1)**
104:11
**legislation (1)**
73:18
**legislature (3)**
98:4,6;175:7
**legit (1)**
134:23
**legitimate (5)**
19:2;121:6;122:13;
168:20,20
**length (2)**
118:1;162:17
**less (10)**
44:8;84:10;88:12;
105:24;112:13;130:15;
135:22;138:16;171:9,
10
**lesser (1)**
143:25
**letter (2)**
161:9,10
**letting (2)**
87:19;96:9
**level (11)**
10:3;38:20;59:6;
60:10;65:14;68:9;
73:15;102:19;106:17;

109:7;180:22
**levels (1)**
127:1
**liabilities (8)**
57:7,20;59:23;60:17;
62:16;63:23,25;85:14
**liability (18)**
57:9,18;58:11,19,22,
24;60:4;73:18;99:16;
121:20;122:2;124:5;
125:12;133:16;136:4;
186:5,15;187:6
**liable (1)**
177:17
**liaison (1)**
11:8
**lift (5)**
105:13;107:12;
108:24;139:19,25
**lifted (1)**
72:17
**lifting (4)**
107:4,24;139:23;
166:3
**light (2)**
27:5;92:2
**likelihood (1)**
69:8
**likely (8)**
54:1;58:2;90:15;
109:23;130:15;180:6,
7;186:6
**limb (1)**
97:9
**limit (4)**
20:15;24:4,4;127:3
**limits (1)**
108:2
**line (7)**
34:11;50:6,6;51:15;
73:2;105:13;186:17
**lined (2)**
85:6;87:18
**lines (1)**
51:18
**lining (1)**
105:11
**lion's (1)**
118:4
**liquidated (5)**
82:6,15,16,24;
140:13
**list (3)**
47:14;72:11,11
**listen (8)**
10:18;11:2;14:4;
45:7;77:15;87:17;
178:20;179:11
**listened (1)**
190:16
**litigants (1)**
46:23
**litigate (2)**

Min-U-Script®

Case: 19-30088    Doc# 4162    Filed: 10/08/19    Entered: 10/08/19 15:30:05    Page 206
of 220

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

**(14) judgement - litigate**

69:21;181:11
**litigation (8)**
  21:6,8;37:7;117:12;
  128:6;136:15;140:2;
  181:2
**little (17)**
  15:16;29:13;33:8;
  38:19;42:20;47:11;
  48:15;74:5,7;81:19;
  94:4;124:21;148:23;
  155:5,6;163:18;166:22
**livelihoods (1)**
  112:2
**Lives (2)**
  95:13,13
**LLP (1)**
  101:18
**loan (2)**
  75:25;76:1
**Loans (1)**
  108:4
**local (6)**
  13:11;27:25;38:9,16;
  39:21;111:22
**Locke (1)**
  111:21
**locked (6)**
  84:14,15,17,19;
  123:12;180:17
**logistical (1)**
  164:7
**logistically (1)**
  164:21
**long (9)**
  25:24;37:11,24;
  38:14;116:11;128:21;
  135:19,19;142:24
**longer (6)**
  28:6;64:24;65:5,6;
  80:1;116:12
**long-standing (1)**
  13:5
**long-term (1)**
  115:8
**long-time (1)**
  112:3
**look (17)**
  13:7;28:10;45:18;
  49:1;51:6;107:1;119:2;
  130:16;133:20;136:16;
  137:14;159:6;164:11;
  180:23;181:3;184:2;
  189:1
**looked (3)**
  28:3;34:6;109:21
**looking (7)**
  44:9;12;49:12;137:2;
  152:6;161:21;185:4
**loop (1)**
  58:6
**Lord (1)**
  111:21
**Los (1)**

28:4
**lose (1)**
  58:6
**losers (1)**
  98:21
**loss (1)**
  188:12
**losses (1)**
  91:10
**lost (2)**
  95:14;96:18
**lot (36)**
  8:23;15:11;21:15;
  28:13;29:6,12;33:15,
  15;35:11;37:17;38:13;
  39:14,21;41:19,19;
  42:11;44:2;46:18;47:9,
  9;80:1;91:25;107:20;
  109:9;116:12;132:22,
  23;134:22;138:1;
  145:22,23;152:23;
  162:24;172:16;173:8,9
**lots (1)**
  35:4
**love (1)**
  10:25
**loved (1)**
  39:17
**loves (1)**
  44:6
**low (3)**
  86:22;174:12,15
**lower (17)**
  64:15;66:21;67:5,7,
  9;98:11,17,18;103:6;
  119:20;136:23;143:14,
  15,19;172:1;178:14,15
**lowering (1)**
  180:17
**lunches (1)**
  13:10
**luxury (1)**
  69:24

**M**

**magic (2)**
  116:15;158:8
**magically (2)**
  62:24;165:12
**magnitude (2)**
  40:15;121:19
**main (1)**
  8:19
**mainly (1)**
  148:10
**maintain (2)**
  129:3,23
**maintained (1)**
  56:8
**maintaining (1)**
  112:1
**major (4)**

100:8;155:17;163:7;
  168:3
**majority (3)**
  161:16;181:19,20
**makes (8)**
  16:13;66:22;77:14;
  98:25;101:2;120:1;
  123:17;125:19
**make-well (1)**
  76:7
**making (10)**
  16:21;42:6;57:8;
  75:9;84:23;89:16;
  118:24;122:8;170:18;
  183:16
**Malter (1)**
  18:19
**management (4)**
  112:19,20;166:19;
  168:16
**Manges (2)**
  52:7;116:6
**manner (2)**
  77:14;167:16
**mantra (2)**
  128:17;170:23
**many (17)**
  9:10;14:23;39:10;
  43:4,17,25;45:8;48:9;
  102:8,8;145:25;154:1;
  155:19;164:8;165:11;
  169:12;189:16
**March (1)**
  69:23
**marched (1)**
  104:9
**marches (1)**
  129:19
**mark (1)**
  45:2
**Markell (60)**
  6:2,18,21,22,24;7:2,
  4,6,6,9,12,17,20;8:10,
  24;9:16,18,23;11:17;
  15:16,23;16:21;18:8,
  14;20:11,23;35:11,12,
  18;36:4,17;41:11,15,
  18;42:11;43:2,4,12;
  44:18,21,24;45:1;
  46:12;47:1,25;48:3,5,
  18,20,24;49:6,9,12,20;
  50:1,2;51:20,21,23;
  52:3
**Markell's (1)**
  33:7
**market (1)**
  126:5
**markup (1)**
  36:6
**Marshack (49)**
  90:25;91:1,6,8,15,16,
  20,24;92:7,11,13,20;
  93:1,10,12,15,17,25;

94:2,8;95:5,7,9,19;
  96:7,13,15,18,21,24;
  97:1,4,6,8,16,20,21,22,
  24;98:19;99:9,20,24;
  100:2,4,7,11,14;101:7
**Mary (1)**
  176:25
**mass (2)**
  129:16;133:8
**match (2)**
  85:16,24
**material (1)**
  89:4
**math (3)**
  171:8,14,19
**matrix (1)**
  94:20
**Matter (23)**
  5:8;6:3;11:3,10;
  32:3;43:16;47:20;
  49:11,21;50:15;51:14,
  17;82:21;98:10;99:7;
  120:4,6;122:9;126:23;
  147:4;183:21;185:4;
  191:18
**matters (9)**
  8:6,23;21:16;22:5;
  30:15;47:17;50:5;52:5,
  5
**matter's (1)**
  51:6
**Matthew (1)**
  138:22
**mature (1)**
  155:25
**matured (6)**
  146:2,10,10,11,12,17
**maturity (1)**
  117:9
**maxim (1)**
  60:20
**maximize (1)**
  108:14
**maximizes (1)**
  109:17
**maximum (2)**
  85:8;134:10
**may (34)**
  22:13;29:2;32:7;
  39:3,5,8;40:16;44:8,8;
  48:12,17,19,19,19,21;
  65:4;74:8;83:12;89:23,
  23;90:16,16;103:3;
  107:24,25;125:21;
  134:10,12,22,22;145:8;
  148:17;185:6,11
**maybe (16)**
  9:21;11:4,15;14:18;
  15:15;28:23;33:7;36:6;
  40:25;46:1;54:16;
  84:22;104:16,16;
  116:14;150:8
**McNutt (11)**

5:22,23,25;6:2,5,
  7,9,14,17,20
**meal (1)**
  95:11
**meals (2)**
  13:10,10
**mean (98)**
  10:14;13:23;16:4;
  17:9,9,23;18:25;19:17,
  19;21:11;22:13;25:8;
  27:23;31:9;32:3;35:3;
  39:14,15;40:2,3,12;
  42:6,9,13;43:4,13,14;
  45:5;47:23;48:12;51:5,
  6,17;52:17;53:4,11;
  54:15;56:14,20;58:6;
  60:13,19;64:11;67:13;
  70:7;77:5;82:12;85:16,
  17;86:15,21;93:22;
  97:15;98:4;103:17;
  105:5;107:7;108:22;
  110:13;120:4;122:5,
  12,14;123:10;124:1,7,
  11,19;125:20;128:22,
  24;131:1,2;133:19,20;
  135:24;136:1,20;
  137:17;139:13;142:13,
  23;144:18;147:7,16,
  16;155:22;160:2,12;
  162:4,7;165:15;
  166:18;177:5;178:3;
  187:2;190:17;191:16
**meaning (3)**
  103:10;107:5;173:18
**means (7)**
  57:19;88:18;105:2;
  108:9;142:14;153:12;
  166:6
**meantime (1)**
  30:18
**measure (1)**
  113:23
**mediate (6)**
  46:23,24;130:12;
  133:25;166:1;169:12
**mediation (18)**
  107:14;129:14,23;
  130:3,3,9;133:11;
  136:25;144:19,20,21;
  163:2;165:11,16,17;
  166:2;169:5;172:18
**mediations (1)**
  166:4
**mediator (8)**
  47:3;129:4,15;
  132:25,25;136:13,19,
  23
**mediators (2)**
  163:4;166:5
**meet (10)**
  30:12;49:15;58:3;
  113:16;119:15;140:21,
  23;141:22;159:23;

Case: 19-30088   Doc# 4162   Filed: 10/08/19   Entered: 10/08/19 15:30:05   Page 207
of 220

190:25
**meeting (4)**
12:20;47:6;49:17;
113:15
**member (2)**
112:25;113:2
**members (4)**
112:1;118:19;145:1;
161:10
**memory (1)**
14:13
**mention (2)**
35:10;167:24
**mentioned (4)**
42:13;103:3;114:20;
128:5
**mere (1)**
154:21
**mess (1)**
42:9
**met (3)**
122:1;162:21,22
**metaphor (1)**
125:20
**Method (1)**
182:21
**microphone (2)**
70:10,11
**middle (2)**
46:3;152:19
**might (15)**
8:22;29:19;31:13;
42:7;46:2;62:17;67:14;
86:9;92:20;98:18;
104:17;132:22;137:11;
159:1;182:12
**Milbank (4)**
25:12;38:6;51:1;
101:18
**militates (1)**
108:23
**million (9)**
59:6;74:24,25;75:16,
20,21,22;76:21;80:22
**millions (1)**
164:24
**mind (3)**
70:11;105:12;154:22
**minds (2)**
83:5;151:16
**mine (1)**
99:22
**minimal (1)**
76:20
**minimize (1)**
126:20
**minions (1)**
164:11
**minute (9)**
62:20;79:24;119:25;
150:19;171:18;175:16,
18,21;184:8
**minutes (31)**

7:9,10;11:21,22;
20:21;22:22,25;47:20;
55:17,18,20,21,21;
79:17,25,25;80:1,1;
90:24;106:1;111:15;
114:7;115:18,20;
116:8,9;121:9;138:10,
16;163:13;191:3
**misplaced (1)**
107:21
**misquote (1)**
152:18
**missing (5)**
64:7;66:13;100:14;
104:2;166:23
**mitigate (1)**
112:6
**mix (1)**
109:14
**mixed (1)**
25:7
**model (1)**
94:19
**modified (3)**
60:10;67:12,14
**modify (3)**
39:25;77:13;155:1
**moment (6)**
58:7;61:19;75:7;
82:11;104:15;165:3
**MONDAY (1)**
5:1
**money (19)**
81:18;87:23;91:25;
92:14,16,19;93:4,5;
95:17;121:23;122:3,7,
12,13,18;145:3;
171:17;172:11;173:20
**Montali (3)**
5:5;41:11;48:3
**Montali's (1)**
186:7
**month (6)**
24:4;37:2,10;48:13,
22;49:3
**monthly (2)**
25:22;26:21
**months (6)**
27:19;100:20,23;
121:5;191:5,5
**Moore (1)**
21:2
**moot (1)**
107:16
**more (81)**
7:13;8:23;11:6;
12:17,18,22,24;14:9;
17:16,16;29:20;36:7;
37:17;42:10;45:21;
48:15;49:21;54:5,22;
57:20,25;58:2;59:8,9,
22;62:20;67:11;74:8,
20;75:2,20;79:3;83:23;

84:11,25;89:7,9,18;
90:11,15;91:24;92:19,
21;93:4,5;94:3;97:1,6,
23,25;99:6;104:12;
109:14;111:24;112:13;
113:9;128:22,24;
130:12;131:6;134:18;
139:22;140:5,7,9;
141:2,17,19;148:23;
149:23;150:21;153:23;
154:10,11;161:12;
166:3;168:5,7;170:8;
175:13;177:21
**morning (19)**
5:6,7;7:2,3;11:3;
20:25;21:1;36:19;38:5;
53:7;55:10;79:20;
90:25;91:1;114:5;
117:13;145:24;149:7;
185:14
**most (12)**
10:12,14;31:15;
36:24;45:5;76:22;
152:21;170:18,20;
173:3;174:21;183:13
**mother (1)**
41:12
**motion (32)**
5:13;8:10;11:25;
17:2;30:21;31:20;32:4;
33:25;46:10;94:12;
97:11;100:5,15,17,22;
110:11;128:22;149:9,
10;152:16;157:7;
175:11,14;177:2,6,13;
187:13;190:4;191:3,5,
7,12
**motions (3)**
32:18;186:10,15
**motion's (2)**
5:16;190:14
**motivates (1)**
87:14
**move (14)**
54:18;74:3;75:10;
78:16;96:5;110:8;
111:9,16;113:22;
128:17;132:19;153:3;
169:2;179:9
**moving (2)**
129:17;132:16
**much (28)**
6:25;11:1;23:2;
24:19;36:14;38:7;
42:20;44:8,10;77:18;
89:18;97:25;110:21;
122:8;126:1;127:4;
130:15;142:17;151:15;
153:11;167:2;168:8;
170:5;173:15;176:18;
178:24;183:19;190:10
**mucky (1)**
81:1

**multiple (1)**
79:12
**must (6)**
14:21;58:9;137:1;
178:14;181:21;188:7
**muster (1)**
126:23
**myself (1)**
110:1

# N

**naive (1)**
83:5
**name (4)**
52:20;53:4;179:2;
189:6
**narrow (1)**
145:25
**national (2)**
14:14;25:3
**nature (6)**
17:16;27:5;47:7;
110:24;111:4,6
**near (3)**
24:18;32:6;70:10
**necessarily (1)**
46:8
**necessary (4)**
10:8;39:25;63:4;
120:8
**need (35)**
18:3;25:1;46:9;71:5;
73:18;84:5,21;85:22;
89:21;90:7,20;95:22;
104:8,13,14;108:13;
111:9;113:9;115:8;
116:12,19,21;134:22;
138:18,19;149:22;
150:4,7;162:10;
168:24;179:2;184:11,
12;188:18,24
**needed (1)**
113:21
**needing (1)**
117:10
**needle (1)**
13:2
**needles (1)**
88:14
**needlessly (1)**
119:18
**needs (5)**
31:24;59:11;80:17;
115:11;159:23
**negligent (1)**
90:5
**negotiate (1)**
93:9
**negotiated (7)**
117:25;118:1;
128:19;148:22;155:17;
162:3,16

**negotiating (5)**
10:15;46:1,2;72:17;
93:17
**negotiation (2)**
42:13;93:8
**negotiations (12)**
9:12;10:10;45:6;
108:10;118:1,11;
121:20;139:24;148:24;
152:22;176:1,2
**neighborhoods (1)**
166:18
**neither (2)**
132:16;188:21
**neutral (6)**
90:13;114:13,18,24;
115:4,12
**neutrality (1)**
18:23;114:10
**never-ending (1)**
17:24
**nevertheless (2)**
109:24;124:6
**new (11)**
25:5;34:1,9,24;
73:18;76:3;123:15;
146:25;150:2,13;
151:10
**newer (1)**
29:18
**news (1)**
26:3
**newspaper (1)**
173:10
**newspapers (1)**
173:9
**next (13)**
5:21;49:14;84:22;
90:18;128:18;148:8;
151:18;156:12;157:4;
174:25;175:3;185:19;
190:18
**nice (1)**
127:20
**niceties (1)**
143:4
**night (1)**
29:9
**Ninth (7)**
37:19,19;39:9;
110:14;146:4,13;
147:10
**nobody (1)**
25:25
**nobody's (1)**
131:9
**noise (1)**
108:7
**nonattorney (1)**
13:19
**nonbankruptcy (3)**
14:9,20;15:13
**non-debtor (1)**

Case: 19-30088   Doc# 4162   Filed: 10/08/19   Entered: 10/08/19 15:30:05   Page 208
of 220

110:7
none (3)
31:16;142:17;150:19
nonissue (1)
185:23
nonpublic (1)
89:15
nonstarter (1)
13:21
non-summary (1)
54:4
nonunderstanding (1)
10:3
nonworking (1)
8:1
nor (1)
162:7
normal (1)
14:16
Normally (1)
14:14
north (3)
69:9;102:24;181:4
Northern (7)
23:7;24:6;25:21;
26:23;27:6;170:8,8
note (2)
8:6;181:12
noted (1)
12:15
Noteholder (1)
55:12
noteholders (1)
161:11
notes (3)
76:22;121:10,13
noteworthy (1)
152:16
notice (2)
189:12;191:10
notices (1)
161:9
notion (2)
9:2;31:11
notwithstanding (3)
118:17;122:25;124:4
nowhere (2)
24:18;174:8
nuance (1)
38:20
Nucor (5)
39:10,15,17;40:3,6
number (89)
15:9,10;19:20;21:18;
24:7;25:7;38:21;40:9;
57:20;58:25;59:19,20,
22;63:4;64:18;71:10;
73:6;74:23;84:24;
86:22,23;87:8;88:14,
19,24;89:4,14,14;
91:17,18,19;93:7;
98:11,13,17,17,18;
99:4;102:13,16,24,25;

104:5,6;105:25;
106:14;107:1;109:11;
111:9,23;123:9,18,23;
134:13;135:10,11,12,
14,20;136:7,22,22,23;
143:10;152:25;153:1;
158:18;160:20,23;
164:22;165:1;171:4,7,
7,21,21,22;172:1,1,2,8;
176:7,9;180:12,22;
181:4,5,6,20
numbers (13)
25:7;63:14;71:24;
80:25;81:1;88:22,22;
91:20;125:21;154:24,
25;155:2;176:6
number's (1)
174:15

## O

OAI (1)
21:8
object (2)
45:20;147:4
objected (1)
40:9
objecting (1)
72:13
objection (5)
74:17;75:12;100:18;
115:7;183:24
objections (7)
30:13;43:24;75:15;
77:1;100:18;108:10;
147:3
objectively (1)
89:25
obligation (1)
59:9
obligations (3)
88:15;89:20,21
obliged (1)
29:19
observation (1)
46:15
obtained (2)
27:10;161:6
obvious (2)
122:6;126:18
obviously (9)
7:18;10:11;21:11;
30:12;72:6;92:23;
105:6;118:13;130:24
OCC (1)
38:4
occasion (1)
29:20
occur (2)
108:11,12
occurred (4)
45:23;80:13;117:16;
174:21

occurs (1)
60:19
o'clock (3)
115:22;116:14;
185:14
OCTOBER (4)
5:1;154:6,15,19
odds (1)
95:17
off (8)
6:17;15:21;39:24;
46:22;55:16;62:25;
98:25;106:19
offer (3)
94:3;121:22;171:11
offering (1)
95:1
offers (1)
66:18
office (6)
25:4;50:25;109:20;
114:6,11,22
officer (2)
50:2,12
officers (1)
103:17
office's (1)
50:7
Official (6)
72:8;79:22;101:9,18;
163:20;164:5
offline (1)
49:3
often (1)
110:1
OII (2)
104:24;105:15
old (4)
77:23;78:2;146:24;
151:10
ombudsman (1)
160:4
omnibus (1)
30:7
Once (9)
7:4;29:20;92:2,6,17,
21;107:1;130:10;
189:15
one (133)
9:1;10:5,6;11:6;
16:14;18:10,20;19:16;
21:3,10;22:18;24:19;
25:20;26:19;30:19,21;
33:24;34:3;36:4,7,18;
40:7;42:21;43:8;45:23;
46:8;47:10,13,14,22,
23;48:1,7;49:23;50:18;
52:9;56:5;57:8;71:6,
25;72:4;74:1,8;76:1;
84:4;89:24;90:11,19;
91:24;92:1;95:7,11;
97:6;98:19,22;99:24;
101:11;102:18;103:1;

106:12,13,23;107:14;
108:8;109:1,25;
122:17;124:1;126:21;
129:19;130:22;132:21,
23;133:1;139:16;
140:4,17;148:13,19;
149:6,14;150:7,13,21,
24;151:10,22;152:12,
16,25;153:1;156:11,
22;157:11,20,20,23;
158:18,23,24;159:22,
25;160:20;161:11;
162:13;163:3,12;
164:3;169:4;172:4;
173:14,15;174:5,8,9,
10,16,19;175:6,16,17,
18,21;176:1;177:1;
180:10;186:3;188:2,2,
3;189:15;190:21,21
one- (1)
117:24
One-and-a-half (3)
149:19,20,21
one-billion-dollar (1)
72:21
one-on-one (1)
49:4
one-page (1)
121:24
one-point (1)
149:18
ones (6)
50:13;134:21,23;
136:17;162:18,19
one's (1)
122:12
one-way (1)
56:5
one-year (1)
75:25
ongoing (4)
10:10;22:4;24:1;
26:9
only (45)
11:1,21;21:13,16;
25:22;30:22;32:15;
47:14;51:9;61:16;
71:20;72:13;74:1;79:7;
87:1;92:3,18;100:23;
106:23;110:3,23;
111:10;126:1;133:1;
138:15;139:11,12,14;
144:7;148:14;149:15,
16;155:17;159:25;
160:3;161:13,15;
165:25;166:7;169:5;
171:25;176:4,5;
180:23;183:8
oOo- (1)
5:2
open (4)
31:8;67:17;93:21;
94:5

opening (2)
8:17;10:15
operating (4)
83:14;112:1;121:15;
134:15
opinion (2)
13:25;117:4
opinions (1)
87:11
opponent (1)
118:24
opponents (2)
126:15;155:21
opportunity (9)
17:20;41:21;42:1;
74:11;75:13;95:15;
135:5;148:25;155:25
oppose (3)
43:13;94:9,10;
129:20
opposed (1)
170:22
opposing (2)
136:18;147:18
opposite (1)
139:20
opposition (2)
94:12;146:18
optimistic (1)
30:9
option (2)
24:16;105:23
optional (1)
76:19
opts (1)
180:17
oral (1)
128:9
order (29)
5:3,15;7:7;13:13;
17:1;19:20;46:7;52:8;
69:6;79:10;98:3;99:13,
20,22;100:1;101:3;
111:8;117:2;119:13;
125:1;126:17;140:11;
141:21;166:1;171:23;
184:19,24,25;186:2
ordered (3)
35:20;166:8;169:7
orders (1)
171:6
ordinary (1)
34:2
originally (2)
15:25;186:20
Orsini (30)
53:2,3,5,7,9,9,13,17,
21,23;54:3,5,8,10,13;
55:1;75:4,8;92:20;
93:3;116:14;153:16;
164:10;185:3;186:22;
187:2,17,19,21;188:5
Orsini's (1)

Min-U-Script®
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(17) none - Orsini's

Case: 19-30088    Doc# 4162    Filed: 10/08/19    Entered: 10/08/19 15:30:05    Page 209
of 220

83:21

**Orton (1)**
110:14

**others (4)**
53:25;105:7;150:8;
178:12

**otherwise (2)**
38:11;125:8

**ought (6)**
49:4;73:8;96:2;
129:17;154:22;182:14

**ours (2)**
33:5;61:16

**ourselves (8)**
24:18;34:23;71:16;
102:10;105:11;150:5;
169:11,12

**out (91)**
5:15;6:10;10:2;
13:23;20:10;23:9;26:2;
28:11;29:10;33:23;
34:2;35:13;38:25;
45:18;46:6,7;47:11,21;
48:20;52:13;59:3;
60:24;62:23;64:12,18;
72:25;76:4;77:24;78:4,
5,9,10;81:23;82:25;
84:22;89:5;90:18,20;
91:2;92:23;95:11;
96:23;97:9;99:16;
100:17;102:15;103:4;
104:10,10;109:1,4;
113:1,19;122:3;
123:19;125:11,15;
126:9;129:14;131:2;
133:5;134:23;140:9,
22;141:2;143:15;
144:16;148:10;149:6;
150:1,3,14,15,16;
154:10;155:16;156:18,
24;158:9;159:1,2;
163:17;164:25;165:4;
167:5;172:6;176:14;
177:25;178:14;183:22;
187:24

**outcome (6)**
28:21;56:5;65:21;
68:7;117:10;177:18

**outcomes (2)**
102:9,12

**outset (1)**
129:9

**outside (1)**
96:4

**over (29)**
5:21;7:24;15:12;
18:20;30:24;32:25;
44:11;66:23;70:9;74:5,
25;80:10;87:22;95:21;
100:13,18;118:12;
135:19;136:17,18;
138:7;143:20;153:6,6;
164:6;168:15;180:24;

187:1;188:3

**overflow (1)**
5:19

**overly (1)**
12:20

**overpay (4)**
99:8;119:18;120:3,3

**overpaying (4)**
66:12;102:18;104:8;
143:21

**overpayment (3)**
80:11;120:1;151:13

**overpays (1)**
66:24

**oversight (1)**
31:15

**overstaffing (1)**
12:20

**oversubscribed (3)**
150:9,21;151:2

**overtime (2)**
13:9,10

**overworked (2)**
48:9,10

**owe (1)**
122:13

**owed (4)**
92:3,5,18,19

**own (13)**
10:23;12:14;14:13;
103:6;126:8,8;130:15,
18;155:12;159:19;
170:1;174:7;191:11

**owners (1)**
72:25

**owns (1)**
96:19

**P**

**package (1)**
127:22

**page (6)**
25:14;32:11;149:11;
152:18,19;153:9

**pages (3)**
49:21;104:24;118:20

**paid (25)**
50:9;67:8,11;85:13;
88:9;96:6;101:1,4,23;
104:1,2,12,12;123:4;
125:3;131:8,10;
140:13;146:2;160:5;
174:24;178:1,2,17,17

**paper (6)**
121:25;133:9;176:8,
11;188:22,24

**papers (10)**
34:19;36:5;75:5;
87:13;129:8;151:14;
152:12;158:18;172:17,
20

**paragraph (2)**

149:12;161:13

**parallel (5)**
70:18;89:13;95:16;
139:20;141:1

**Pardon (1)**
135:13

**parent (1)**
48:22

**park (1)**
139:5

**part (16)**
10:14;19:7;32:20;
33:9;45:9;46:17;57:4;
113:11;150:21;153:8;
154:9;185:7;186:17,
18,20;187:8

**participate (3)**
165:16;169:5,7

**particular (18)**
12:4,5,10,21,23,23;
13:23,24;14:8;15:10;
38:22;42:8;53:21;86:9;
99:10;118:3;145:8;
188:2

**particularly (3)**
29:17;155:16;181:2

**parties (13)**
10:13;84:7;115:20,
24;119:17;130:14;
140:1;144:13;148:9;
161:16;166:14;168:6;
188:11

**parts (1)**
170:7

**party (5)**
93:7;110:5,22;
121:19;168:21

**pass (6)**
11:6;71:8;74:22;
90:6;122:8;126:23

**passed (3)**
75:2;90:1;109:23

**passing (1)**
122:3

**pass-through (1)**
89:22

**past (3)**
41:16;91:3;148:7

**path (7)**
104:9;107:16;
108:17;109:17;112:5;
140:3;141:1

**Paul (1)**
21:1

**pause (1)**
152:17

**pay (17)**
20:4;85:1,9;91:12;
94:22;95:12;97:12;
98:8;103:2;121:7;
143:3;153:11;171:9,
10;172:7,11,25

**payable (2)**

76:21;89:20

**payer (1)**
18:21

**payers (4)**
18:21;74:23;75:2;
90:6

**paying (8)**
75:17;87:25;88:10;
94:10,11;106:3;
119:20;146:19

**payment (6)**
80:14;101:24,25;
137:9;141:22;151:18

**pays (4)**
66:16;68:22;108:25;
177:16

**PE (2)**
81:16;165:4

**pen (1)**
58:13

**penalties (3)**
83:9,10;171:10

**pending (1)**
114:14

**people (33)**
10:18;18:17;25:14;
29:3;40:10;42:3;43:23;
44:10,22;46:2;50:4;
51:7,11;87:14,23;96:3;
103:15;116:12;122:17,
18;128:15;131:17;
137:11;139:24;150:14;
152:17;158:2;162:7,7;
169:24;173:9;190:11,
12

**people's (1)**
122:3

**per (3)**
12:24;18:21;94:12

**percent (29)**
14:10;15:9,9;24:8,9,
18,19,19;25:18;26:17,
19;27:4;28:17;30:17;
37:13,14;44:6,11,14,
19,25;54:10;118:9;
126:7,7;127:23;167:7;
181:17;187:19

**percentage (3)**
19:21;20:12;24:13

**percentages (2)**
143:4,6

**perfect (2)**
151:17;158:15

**perfectly (3)**
34:9;43:13;146:5

**Perhaps (8)**
8:17;19:19;29:17;
47:3;69:19;83:5;
130:12;155:20

**period (6)**
11:10;25:20;37:4,18;
135:19;178:17

**periods (1)**

26:20

**permissible (1)**
45:13

**permit (3)**
9:8,8;157:22

**permitted (2)**
35:23;61:21

**person (5)**
133:7,9;140:17;
152:21;159:9

**personal (7)**
10:23;54:6,15;160:3;
187:15;188:3,13

**personally (2)**
133:1;191:11

**perspective (2)**
101:22;140:11

**persuade (3)**
96:1;182:13;191:13

**persuading (1)**
16:5

**persuasive (1)**
94:21

**pertaining (1)**
187:9

**PG&E (38)**
5:8;18:20;27:22;
31:4,8,16;47:21;48:13;
52:9;56:16;63:6;64:14;
65:11;66:17;77:12,17;
78:8;91:8;95:11;96:19;
98:6,12;99:4;111:25;
112:4;160:5;166:13,
19;168:3;172:6;
174:20;176:3,13,14;
177:15;178:16;184:1;
186:4

**PG&E's (5)**
85:15;88:22;95:9;
112:1;177:24

**ph (1)**
39:10

**phone (3)**
6:5,23;40:11

**phonetic (4)**
99:14;152:13;
159:10;163:12

**pick (3)**
69:23;99:3;128:1

**picked (4)**
8:16;12:5;34:3;
107:21

**picks (1)**
98:11

**piece (4)**
50:10;54:7;140:4,5

**pieces (2)**
57:9;107:2

**pin (1)**
25:1

**PINO (3)**
178:25;179:3,3,6,8,
10,13;183:1

Case: 19-30088    Doc# 4162    Filed: 10/08/19    Entered: 10/08/19 15:30:05    Page 210
of 220

**pipeline (1)**
124:17
**pitch (2)**
93:23;185:25
**Pitre (48)**
121:25;135:10;
158:20;159:24;160:2;
163:22;169:19,22;
170:2,9,15;171:3,8,15,
17,25;172:4,10,13,15,
18,22,24;173:3,4,6,8,
13,23,25;174:6,8,10,
13,16,19,23,25;175:3,
6,12,15,17,18,20,23;
176:19;191:6
**Pitre's (1)**
159:15
**place (15)**
27:19;39:1;71:17;
106:7;113:2;127:21;
135:3;152:8,10;
161:13;167:25;168:10,
14,17;176:1
**placed (1)**
117:8
**places (2)**
145:25;161:14
**plain (2)**
77:23;78:2
**plaintiff (1)**
121:25
**plaintiffs (1)**
145:7
**plan (304)**
31:13;32:6;56:4,4,
16;57:6,11,12,21;58:1,
6,10,17;59:1,12,12,25;
60:10,23;61:12,13,16,
22,22;62:3,4,14,18;
63:5,9,20;64:11,14;
65:12,20;66:7,16,17,
22;67:6,10,11,13,19;
68:5,6,10,22;69:2,6,10,
13,15,24;70:4,5,14,15,
16,24;71:1,5,10,23;
72:14,15,22;73:14;
74:1,20,21,23,24;75:3,
18,22,24;76:1,6,9,12,
20,24;77:3,8,9,13,17,
19,21,25;78:5,20,21;
79:10;80:24;81:2,21;
82:1;83:4,6,7,8;84:4,5;
85:7,15;86:10;87:9,19,
21;88:13,14,15,16,18,
19;89:6,7,8,9,12;90:15,
15,20,20;91:14,15;
92:15,23;93:2,6,14,18,
18;94:6,9,13,22;95:1,
20;96:9;97:13,19;98:4,
20;99:5;100:24,25;
101:23;102:3,17,24;
104:5,6,7,8,13;105:4,
12,13,16;106:11,12,23,

24;107:14,20;108:11,
17,24;109:1,11,16,21;
110:6,7,8,8,11,23,24,
25,25;111:2,10,10;
112:4,5,7;114:14,23;
115:4,9,11,11,12;
117:7,24;118:13,15;
119:3,8,14,16;120:2;
122:9;123:15,16,25;
124:6,10,14,15,16,22;
125:10,12,13,15;126:6,
8,8,9,13,24;127:20;
129:23;130:15,18,24;
131:12;132:1,10;
135:21;136:5;137:17;
139:6,6;140:24;141:5,
7,21;142:9,9;146:1,5,
13;147:2,2,16,17,18,
18;148:1,10,13;149:11,
14;150:23;152:6;
154:2;155:14,24,24;
156:16,18,22;157:25;
159:18,19,22;160:20;
165:3;168:2,4,19;
171:2,3,4,20;172:6;
173:7,17,25;174:15;
177:15,21,21,24,24,25;
178:6,12,16;179:1,22,
22;180:1,17;181:1,9,
20,21
**plane (1)**
28:7
**plans (39)**
63:11;66:14;70:19;
75:15;79:12;84:4;
90:13;92:12;93:22;
97:12;99:10;102:1,14;
104:25;106:12;107:13,
13,22;108:8,12,14;
109:6,19;111:5,6;
113:14;115:15;117:14;
128:4;132:16;139:4,
20;154:2;155:20;
159:25;174:1;175:24;
176:5;179:25
**plan's (2)**
60:8;143:19
**play (1)**
47:2
**players (1)**
100:8
**pleading (1)**
184:6
**pleadings (2)**
91:9;149:8
**pleas (1)**
87:17
**please (4)**
27:12;43:15;118:25;
151:19
**pleased (2)**
7:20;94:6
**plenty (4)**

125:14;126:5,9;
164:9
**plug (1)**
91:18
**plus (7)**
60:3,24;61:4,4;
62:24;66:20;89:21
**pm (3)**
115:23,23;191:23
**podium (4)**
43:11;88:4;101:21;
163:21
**point (115)**
7:18;8:10;9:14;
10:12;11:9,16;13:21;
16:17;17:16;20:8;24:7,
20;27:1;28:11,25;30:5,
19;31:9,17;33:11,13,
14,23,24;34:3,5;35:9;
48:20;49:1;50:7;52:8;
57:8;58:12;59:7,8;
60:23;61:22;63:2,5,9;
64:22;65:7;68:5,17;
70:3;71:24;73:24;
75:23;76:9,25;78:18;
80:5;82:8,20,22,23;
84:13,23;87:1;88:2;
90:11;92:17;93:11;
95:5,7;96:8;97:6;
100:14,21;101:5;
103:6,7;104:10;
109:25;110:21;114:11,
23;122:13;124:14;
126:15;130:5;132:16,
23;133:7;140:15,18;
143:14,17;146:18;
147:14;148:8;150:11;
157:4;161:2,3,4;
164:23;165:13;166:12,
24,24;179:7,13;182:4;
183:10,16,17;187:15,
15;189:4;190:2,3,5,5,9
**pointed (3)**
23:9;64:12;155:16
**points (19)**
8:20;9:7,24,25;10:9,
12;21:11;22:18;23:3;
33:25;34:1;74:15;
101:20;107:19;130:23;
133:11;138:15;145:22;
158:17
**population (1)**
40:10
**portion (1)**
172:25
**posed (1)**
56:1
**position (21)**
30:21;31:24;34:15;
50:5,8;65:3,8;72:3;
88:13;99:14,14;102:6;
103:4;112:22;113:17;
130:13;132:9;136:21;

178:21,21;187:11
**positions (3)**
10:15,15;169:2
**positive (1)**
158:23
**possibility (2)**
90:4;105:6
**possible (3)**
115:12;138:25;187:6
**possibly (3)**
83:13;155:12,15
**post-confirmation (2)**
31:17;112:13
**post-reorganization (1)**
77:12
**potential (1)**
187:6
**potentially (2)**
18:22;183:3
**PPI (1)**
108:18
**practice (5)**
14:23;16:8;29:18;
33:17;34:20
**practices (1)**
34:15
**practicing (1)**
34:25
**preadmitted (1)**
13:17
**precautionary (1)**
113:23
**precedent (2)**
48:25;119:23
**preclude (1)**
72:16
**precluded (4)**
9:14;189:17,19;
190:13
**preclusion (1)**
189:16
**predecessors (1)**
101:21
**predications (1)**
131:13
**predict (1)**
19:6
**predictable (1)**
12:18
**predicted (1)**
105:7
**prejudice (2)**
129:21;130:3
**prejudiced (1)**
130:2
**preliminary (1)**
21:3
**premised (5)**
58:11,16;63:22;
88:15,16
**premiums (3)**
76:19,21,23
**preparation (1)**

37:20
**prepared (2)**
32:22;121:25
**preparing (2)**
23:4;37:2
**present (3)**
121:3,8;187:10
**presented (12)**
115:6;121:4,18,19,
20,21,24;134:2;
185:25;186:1,20;
191:12
**presently (1)**
114:15
**presents (1)**
88:13
**preserve (1)**
111:8
**presiding (1)**
5:5
**pressed (1)**
8:23
**presumably (3)**
16:2;46:4;98:5
**presume (2)**
12:4;136:21
**presumptive (1)**
24:11
**pre-trial (1)**
58:2
**pretty (3)**
91:3;142:25;143:2
**prevent (3)**
154:24;174:25;175:1
**prevents (1)**
183:3
**previously (1)**
133:8
**price (1)**
148:21
**Prime (2)**
164:8,20
**principal (3)**
40:3;118:7;163:3
**principle (1)**
29:1
**prior (8)**
87:18;109:10;117:4,
21;131:4;132:21;
166:3;186:18
**priority (10)**
63:18;66:11;95:24;
113:7;143:21;167:5;
170:24;180:15,20;
181:11
**privately (1)**
42:15
**privilege (1)**
45:16
**probably (13)**
7:10;28:19,19;80:8;
105:6,7;134:19;
137:20;149:12;154:16;

Case: 19-30088    Doc# 4162    Filed: 10/08/19    Entered: 10/08/19 15:30:05    Page 211
of 220

158:6;159:16;167:3
**problem (10)**
95:14;105:21;
116:20;122:7;143:11,
13;144:2;163:5,7;
185:17
**problems (5)**
85:25;158:24;
159:19;163:3;175:8
**procedurally (1)**
22:20
**procedure (1)**
5:13
**procedures (1)**
22:11
**proceed (7)**
61:21;62:18;68:8;
69:7;112:5;135:8;
155:15
**proceeded (2)**
10:5,6
**proceeding (4)**
57:10;119:9,11;
170:20
**proceedings (10)**
22:7;32:5;37:7,8;
56:6;57:5;65:22;119:9,
13;191:23
**process (14)**
12:18;30:12;40:22;
43:22;71:17;79:11;
99:15;100:19;108:9;
124:19;133:1;144:19;
172:7;174:2
**processes (1)**
173:19
**produced (2)**
157:20;161:17
**productive (2)**
45:24;166:3
**Prof (14)**
6:2,18,21;15:15,23;
16:21;18:8,14;20:11;
33:6;35:12,18;36:4,17
**professional (10)**
7:22;9:3;10:1;20:1,
12;21:6;32:24;34:7;
42:8;49:4
**professionals (36)**
8:2;9:6,11,12;11:7,
13;12:22;13:7,19,20;
17:17;19:11;21:11;
23:15;26:3,16;27:5;
30:7;32:20;33:10;
37:23;41:23,25;42:17,
18;43:19;44:1;45:14;
46:9;47:10,16;48:9;
50:9,21;153:24,25
**Professor (9)**
8:11;26:13;33:21;
41:8,9;49:12,20;50:2;
51:19
**program (2)**

112:20;189:13
**progress (3)**
117:16,18;162:25
**prominent (1)**
25:3
**promised (1)**
117:23
**promises (1)**
18:22
**promoted (2)**
111:1;168:7
**proof (1)**
58:4
**proper (2)**
117:10;188:7
**property (4)**
54:13;186:18;
187:21;188:12
**proponent (2)**
90:20;109:11,16;
110:7,7;155:25;
156:19,23
**proponents (1)**
147:18
**proposal (4)**
33:20;117:9;120:12;
121:6
**proposals (1)**
168:5
**propose (2)**
55:1;77:8
**proposed (9)**
23:19;27:4;34:17;
77:2;92:24;114:23;
119:8;190:5,6
**proposes (2)**
124:14,15
**proposing (6)**
24:3,5;25:15,20;
94:22;159:17
**prospective (2)**
27:13;133:11
**protect (7)**
45:16;65:4,8;79:8,
13;87:22;102:10
**protected (1)**
95:3
**protective (1)**
149:3
**protocol (17)**
9:7,21,22;10:14;
12:3;15:17;33:16;
35:18,22;39:3;41:19;
43:25;45:3,22;46:6;
47:18;49:19
**protocols (3)**
33:7;40:14;43:25
**proud (1)**
170:10
**prove (8)**
58:5;83:19;89:23;
94:11,15;121:19;
122:18;167:21

**proves (1)**
24:20
**provide (5)**
12:25;14:11;33:10;
146:12;148:1
**provided (2)**
126:12;142:10
**provider (1)**
46:19
**provides (5)**
68:10;112:5;125:13;
146:1;181:10
**Provision (2)**
10:1;47:18
**provisions (6)**
10:13;39:2;76:7;
123:15;125:2;142:24
**proxy (3)**
43:17;46:16,21
**public (14)**
21:14;22:19;49:5;
72:20;81:23;92:25;
109:20;114:6,11,22;
118:1,5;130:6;166:15
**publicly (3)**
42:15;134:1;136:3
**PUC (3)**
81:22;168:7,8
**puff (1)**
50:10
**punish (1)**
16:5
**punished (1)**
29:4
**punitive (1)**
24:13
**pure (1)**
92:1
**purpose (2)**
144:9;159:25
**purposes (8)**
32:7;82:21;86:4;
107:23,23;139:13;
151:11;159:1
**pursuant (1)**
186:16
**pursue (2)**
130:15,18
**pushing (1)**
77:18
**put (29)**
29:10;37:1;42:1;
46:17;52:13;59:8;
64:20;66:12;74:1;81:7;
91:18;93:5,18;94:13,
17;109:13;115:11;
117:2;126:2;127:4;
129:7;136:5;152:21;
168:6;169:23;171:7;
176:13;177:12;190:8
**puts (4)**
88:24;93:2,7;177:22
**putting (4)**

91:25;102:12;171:5;
191:15

### Q

**qualified (1)**
166:4
**qualifier (1)**
161:18
**quick (5)**
46:12;91:4;97:8;
99:12;183:22
**quickly (5)**
111:16;117:22;
148:7;173:18;191:14
**quite (5)**
59:15;139:20;
160:11;170:3;174:16
**quo (2)**
129:4,23
**quote (7)**
91:21;117:8,17;
158:19;159:1,2;176:9
**QURESHI (148)**
55:10,11,16,24;
56:11,17;57:2,14,24;
58:8,19;59:16,18,21;
60:2,7,9,14,17,18,22;
61:1,3,8,10,13,20,25;
62:2,6,8,11,14,22;63:2,
8,13,16,18,25;64:4,9,
16;65:1,13,15,17,19,
24;66:2,6,8,10,15,25;
67:2,4,8,10,15,18,21,
23;68:2,4,14,19,23;
69:1,5,15;70:2,6,13,17,
21,23;71:1,4,7,15,20,
25;72:12,24;73:10,13,
21;74:7,10,14,17;75:4,
11;76:10,12,16,18;
77:6,8,19,22;78:1,5,12,
14,17,22,24;79:1,5,15,
16;81:4,24;83:3;88:21;
96:9;121:17;125:19;
143:17;176:21,22;
179:14,15,21,24;180:5,
7,11,14,18,20;181:7,
17,23,25;182:6,9,11,
13,16,20,22,24;183:7,
16,18
**Qureshi's (1)**
79:25

### R

**raise (6)**
21:11;23:3;69:12;
74:15;177:3;180:24
**raised (5)**
9:11;17:18;30:21,22;
46:10;70:4;77:1;
124:21,23;126:16;
130:22,23;177:12;

185:14;191:6
**raising (3)**
32:16;34:1;101:21
**range (1)**
42:16
**rapidly (1)**
150:25
**rate (23)**
14:20;15:2;18:21,21,
23;24:11;48:11;74:22;
75:2;76:2,8,16;90:6,
13;108:25;109:23;
114:18;119:21;127:15,
24;146:13,14;153:5
**ratepayer (4)**
114:10,13,24;115:4
**ratepayers (5)**
109:19;115:13;
120:7,14;146:9
**rates (18)**
13:17,18;14:8,8,9,16,
16,17;19:5,17,17,23;
20:2,4;42:14;119:20;
146:2,24
**rather (9)**
11:4;24:3;29:22;
53:12;71:1;112:24;
134:20;148:7;178:7
**rating (1)**
75:1
**rational (1)**
103:5
**ratios (1)**
143:5
**re (2)**
36:18;110:14
**reach (4)**
11:6;72:18;122:14;
144:13
**reached (4)**
7:21;42:7;47:4;
139:19
**reaching (1)**
46:6
**read (23)**
7:17;33:8;74:12;
80:10;149:8;152:14;
157:11;158:16,24;
172:20;173:7,8,10,11;
177:24;178:18;184:6,
17,17,18,18;186:12;
187:7
**reading (2)**
172:17;173:4
**ready (6)**
5:10;7:16;55:4;
70:14;91:9;116:2
**Real (7)**
48:5;97:8;99:12;
105:24;149:4;154:25;
155:2
**realism (1)**
81:5

Min-U-Script®

Case: 19-30088    Doc# 4162    Filed: 10/08/19    Entered: 10/08/19 15:30:05    Page 212
of 220

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(20) problem - realism

**realistic (2)**
9:23;105:6
**reality (1)**
165:2
**realize (1)**
33:2
**realized (1)**
80:10
**really (33)**
11:24;12:13,17;13:1,
13;14:3;17:17;25:9,11,
12,22;33:24;37:10;
38:6;39:24;70:18;73:8;
92:2;105:22;106:7;
124:22;135:22;138:14;
139:14;143:13;158:12;
164:7;165:3;169:25;
170:17;178:3;186:17;
191:1
**reason (14)**
38:24;47:5;58:13;
69:7;72:13;73:3,4,5;
126:23;131:1;163:1;
181:13;183:1;190:24
**reasonable (9)**
8:25;10:17;32:6;
43:14;44:8,13;45:3;
48:16;155:15
**reasonableness (1)**
19:8
**reasoned (1)**
136:11
**reasons (9)**
8:12;10:5;56:15;
87:1,2,8,10;102:7;
188:4
**rebuilt (1)**
95:13
**rebuttal (7)**
7:14;9:9;17:8,9;
55:22;101:16;115:21
**recall (4)**
40:2;92:20;132:22;
142:24
**receive (1)**
127:25
**received (1)**
155:7
**Recess (1)**
115:23
**recipients (1)**
124:18
**recognize (2)**
27:6;31:14
**recognized (1)**
119:22
**recognizing (3)**
109:22;118:13;
119:17
**recommend (2)**
12:21;13:17
**recommendation (7)**
12:19;13:9,15;14:7;

15:7;43:1,5
**recommendations (3)**
11:24;12:13,17
**recommended (1)**
100:10
**reconsider (1)**
27:4
**record (24)**
34:4;17;35:17,21;
55:11;84:6;101:17;
118:23,24;138:20,22;
150:5,6;154:5,5;
157:18,19;161:8;
177:12;179:2;184:11,
12;188:14;190:9
**recording (1)**
47:16
**recoveries (2)**
63:5;145:8
**recovery (6)**
58:16,21;63:21;64:5;
65:6;141:21
**red (3)**
108:19;144:12;
167:19
**redacted (1)**
45:10
**redactions (3)**
28:24;29:3;45:9
**redemption (1)**
76:19
**reduce (1)**
147:18
**reduced (2)**
26:4;178:14
**reductions (3)**
7:23,25;8:3
**refer (1)**
100:12
**reference (2)**
23:21;186:2
**referenced (1)**
140:1
**referred (3)**
35:12;72:7;117:13
**referring (3)**
20:1;23:17,18
**refinanced (1)**
119:19
**reflect (1)**
129:8
**refresh (1)**
14:13
**refuse (1)**
156:17
**regard (7)**
12:19;13:9,15;14:7;
17:8;86:3;159:3
**regarding (1)**
177:6
**regimen (1)**
90:14
**regulatory (2)**

22:5;119:14
**reinstate (1)**
146:22
**reinstated (4)**
76:13,13,22;146:2
**reinstatement (4)**
108:5;127:23;146:7,
8
**reinstating (2)**
119:19,21
**reinvent (1)**
70:8
**reiterate (1)**
16:18
**relate (1)**
22:4
**related (7)**
37:20;80:11;84:25;
85:14;164:1;187:21;
189:10
**relates (1)**
25:22
**relatively (2)**
20:12;145:25
**relevant (2)**
26:20;77:13
**relitigating (1)**
30:23
**relying (1)**
155:12
**remaining (4)**
7:13;9:22;11:22;
59:4
**remarks (3)**
107:3;120:24;121:1
**remember (7)**
27:18;40:3,4;63:20;
148:13;151:13,19
**remembering (1)**
150:8
**remembers (1)**
149:12
**renders (1)**
77:3
**renege (1)**
42:5
**reorganization (4)**
150:18;159:18,20;
167:1
**reorganize (1)**
160:4
**reorganized (2)**
168:3,9
**repeated (1)**
170:23
**repeating (1)**
176:17
**replacement (1)**
166:19
**replies (1)**
18:2
**reply (4)**
9:8;17:16;74:11,13

**report (1)**
7:20
**reporting (1)**
47:16
**represent (2)**
36:22;137:25
**representatives (1)**
124:18
**representing (3)**
6:2;57:17;160:3
**represents (2)**
59:22;111:24
**reproduced (1)**
157:15
**reputation (1)**
25:3
**request (12)**
17:1;19:7;23:7;
28:16;32:22;39:22;
40:18,20;43:8,10;
56:21;167:22
**requested (6)**
9:6;22:22;24:15;
43:9;46:1;167:16
**requesting (1)**
26:13
**require (4)**
13:8;15:3;19:7;33:4
**required (7)**
8:3;12:25;14:10;
37:8;119:22;149:25;
165:17
**requirement (2)**
18:23;24:2
**requirements (2)**
37:16;113:15
**requires (4)**
33:18;61:23;107:18;
148:20
**reserve (10)**
6:16;7:13;20:21;
55:22;74:4;79:21,24;
90:8,24;163:13
**reserved (2)**
8:2;64:13
**reserving (1)**
186:3
**residual (1)**
63:15
**resistance (1)**
33:9
**resolution (2)**
56:7;190:10
**resolve (3)**
85:25;186:15,25
**resolved (4)**
59:2;133:16,18;
169:1
**resonates (1)**
105:20
**resources (2)**
88:12;89:9
**respect (24)**

7:22;8:6,8,25;9:4;
41:15,25;42:21;43:16;
44:5;45:7,22;46:10;
52:12;53:15;76:19;
108:3,12;109:7;
119:13;146:9;164:19;
168:5;187:5
**respectfully (4)**
27:3;28:16;58:9;
168:17
**respects (2)**
43:17;92:22
**respond (5)**
11:5;17:5;33:24;
41:22;51:11;75:13
**responded (1)**
133:2
**responding (1)**
75:11
**response (11)**
11:25;17:15;28:19;
33:7;34:1;49:21;50:8;
51:9,10,10;158:20
**responses (3)**
10:7;12:2;98:19
**responsibility (1)**
34:7
**responsive (1)**
42:19
**rest (3)**
51:22;149:17;157:15
**restaurant (2)**
44:20;53:18
**restrained (1)**
170:3
**restrictions (1)**
44:15
**result (8)**
64:15;77:20;105:8;
114:13;117:9;119:20;
145:8;178:19
**resulted (2)**
18:20;148:24
**results (1)**
180:11
**resume (2)**
101:15;115:19
**retained (2)**
41:23;50:21
**retention (11)**
23:10,19,23;24:5;
25:2,13,17;26:12,18,
20;44:6
**retired (8)**
31:5;52:10;77:15,16;
78:8;9;112:25;113:1
**retiree (1)**
78:16
**retirees (5)**
77:3,10;78:3;112:19;
130:23
**retroactive (1)**
27:13

Case: 19-30088   Doc# 4162   Filed: 10/08/19   Entered: 10/08/19 15:30:05   Page 213
of 220

**return (1)**
  41:18
**reversal (1)**
  117:5
**reverse (3)**
  44:4;110:25;111:2
**reversed (3)**
  99:21;100:6;101:3
**review (13)**
  12:14;15:11;16:19,
  22,22;31:4,25;45:11;
  57:15;105:3;109:5;
  110:17;111:11
**reviewed (2)**
  31:16;35:22
**reviewing (1)**
  16:14
**revision (1)**
  161:12
**revisions (1)**
  161:12
**revisit (2)**
  36:6;188:18
**revolver (2)**
  75:24,25
**rhythms (1)**
  108:10
**ride (1)**
  106:21
**right (171)**
  5:10;12:7;8:8;2;12:6,
  11;15:1,5;16:3,7,10,12,
  17;18:1,8;19:21;20:3,
  13,20,24;21:9;22:3,8,
  11;23:15,25;26:25;
  28:5,8,14;31:21;35:25;
  36:10,15,21;38:8;39:6,
  18;40:6;41:8;43:1,3;
  44:20,21,25;45:1;47:1;
  49:6,8;51:3,5,15,17;
  53:20;55:25;56:17;
  57:15;58:18;60:8,21;
  61:2,7,7,9,25;62:2,5;
  63:9,14;65:16,17,24;
  67:5;68:2;69:11;70:25;
  71:4,14;72:1,12,24;
  73:14;74:21;76:15,17;
  77:5,21;80:13;81:19;
  82:12;83:1,3,21;84:5,7,
  85:23;86:6,14,22,24;
  88:14;89:19;90:18;
  91:17;92:6,7;93:15;
  94:5;99:8;100:2,4,24;
  101:8;102:2;103:9;
  104:16,18;105:2;
  106:9,9,16,16,17,24;
  111:14;112:16;113:2;
  115:17;116:23,24;
  120:17,20;123:2;
  124:24;125:4,7,9;
  126:3,25;127:5;
  128:11;129:2,2,3;
  134:11,15,17,25;135:8;

**139**:3,11;142:18;
  143:9;144:15;145:16;
  147:6,7,8;155:4;
  160:19,24;163:13;
  164:12;166:9;168:25;
  169:20;176:20;180:6,
  13;181:24;183:19;
  185:22;191:15
**ring (1)**
  166:16
**rise (2)**
  5:4;115:24
**risk (13)**
  71:12,15;73:16;74:1;
  76:2;79:3;89:12;145:2,
  6,9,9,9;183:8
**risks (2)**
  76:2;89:7
**risky (5)**
  56:5;57:11,13;89:7;
  108:17
**road (3)**
  112:10;113:4,8
**robe (1)**
  46:22
**Robert (2)**
  18:18;184:13
**rode (1)**
  106:19
**role (4)**
  32:8;43:15,21;47:3
**rolled (1)**
  42:12
**room (4)**
  5:19,19;19:11;
  190:11
**Rosenbaum (2)**
  159:10,25
**Rosenbloom (1)**
  160:6
**rough (2)**
  162:11,14
**roughly (3)**
  55:21;154:12,13
**round (4)**
  150:21,22,22;165:11
**row (1)**
  81:16
**RSA (1)**
  72:16
**Rubicon (1)**
  85:10
**Rule (29)**
  9:13;13:25;23:4;
  24:16,17,18;26:23;
  27:3;30:3,7,17;34:5;
  40:4,5;42:6;43:6,14;
  44:4,12;63:18;66:11;
  110:4;112:8;113:8;
  131:4;143:21;167:5;
  168:21;186:14
**rules (7)**
  14:14;15:2;19:12,15;

**34**:7;39:1;40:24
**ruling (15)**
  8:3;11:4,23;17:2;
  19:10;30:16;42:23,24,
  25;54:25;109:10;
  128:10;147:14;186:7,
  10
**rulings (5)**
  9:6;23:2,6;108:10;
  187:6
**run (15)**
  80:25;81:1;84:3;
  89:13;104:21,21;
  109:4;148:10;149:6;
  150:3,14,15,16;179:18
**running (1)**
  91:2

---

## S

**sake (1)**
  99:1
**same (26)**
  9:3;25:19;32:11;
  43:24;45:17;46:23;
  47:5;49:19;63:14,15;
  64:11,12,15;74:6;81:4;
  83:9;109:3;110:15;
  115:15;121:17;128:15;
  136:20;163:1;179:4,5,
  6
**SAN (1)**
  5:1
**sanctity (1)**
  42:9
**sandwich (1)**
  95:10
**satisfied (1)**
  177:15
**satisfy (7)**
  69:13;71:18;73:14,
  17;99:4;114:15;140:11
**saw (8)**
  7:7;12:1,15;43:5,5,6;
  80:10;105:1
**saying (36)**
  25:16;26:11,16;
  27:12;33:19;35:6;67:5,
  9;70:13;71:11,23;
  83:25;84:4,5;85:12;
  86:22;102:5;104:6,8;
  108:13;109:9;110:20;
  111:8;122:11;136:17,
  18,19;139:22;140:22;
  141:9;156:18;159:24;
  166:13;168:14,15;
  184:2
**scenario (17)**
  67:24,24;68:14,15;
  99:11,12;128:7;
  132:10;179:24;180:1,
  5,11,21;181:3,3,7,12
**scenarios (1)**

**179**:17
**schedule (9)**
  30:6;108:22;119:11,
  14;152:3,4;189:3;
  191:12,21
**scheduling (3)**
  9:2;52:12;191:20
**school (3)**
  77:16;78:9;112:25;
  113:1
**scores (1)**
  176:13
**Scott (1)**
  5:25
**script (1)**
  131:4
**sea (1)**
  90:3
**seats (1)**
  5:21
**SEC (1)**
  176:15
**Second (22)**
  11:23;13:9;23:5;
  48:1;67:17;76:5;89:12;
  90:20;94:9,13;95:14;
  101:11;102:11;128:21;
  139:17;140:5;148:6;
  150:12,22,24;151:4;
  153:4
**secondly (1)**
  148:15
**seconds (1)**
  163:21
**secret (1)**
  29:9
**Section (7)**
  10:2,17;14:19;43:19;
  45:4;81:21;152:16
**secured (4)**
  108:6;109:3;146:23,
  25
**security (2)**
  28:7;87:7
**seeing (1)**
  11:6
**seek (1)**
  80:14
**seem (3)**
  54:6;131:7;170:22
**seemed (3)**
  32:17,19;53:11
**seems (6)**
  9:20;23:10;33:12;
  66:21;86:21;143:1
**sell (2)**
  148:17;155:23
**seminal (1)**
  159:3
**send (4)**
  107:13;115:21;
  158:20;179:11
**senior (3)**

**50**:2;65:14;161:11
**sense (5)**
  9:1;31:18;48:12;
  69:19;138:24
**sensible (5)**
  71:15;73:25;177:18,
  22;183:1
**sensitive (1)**
  21:12
**sent (2)**
  54:9;184:1
**sentence (1)**
  157:11
**separate (5)**
  7:25;46:6;51:9;77:4;
  146:22
**separately (2)**
  56:13,14
**September (4)**
  117:23;118:6,15;
  189:9
**serial (1)**
  128:25
**seriatim (1)**
  32:1
**series (1)**
  45:3
**seriously (2)**
  16:23;32:3
**served (1)**
  16:5
**service (1)**
  45:1
**session (1)**
  5:4
**sessions (1)**
  172:19
**set (7)**
  8:22;22:2;31:21;
  64:1;107:1;110:15;
  152:6
**setting (3)**
  15:8;70:4;122:1
**settled (2)**
  109:11;176:12
**settlement (49)**
  35:12;59:1,13,15;
  61:14;65:20,21,24;
  72:21;84:8;107:5;
  109:17;110:4,5,9,17,
  22,23;111:11;117:25;
  118:10,12,14,16,18;
  119:3;121:23;128:19;
  130:6;135:8;139:18;
  151:13,15,17,20;
  158:21;159:5;160:7;
  172:1;180:22;181:8,
  13;182:1,2,5,7,11,14;
  186:16
**settlements (6)**
  7:21,23;8:1;10:18;
  118:21;155:17
**settling (1)**

Case: 19-30088   Doc# 4162   Filed: 10/08/19   Entered: 10/08/19 15:30:05   Page 214
of 220

118:8
seven (4)
64:13;75:21;123:4;
150:17
seven-billion- (1)
58:20
seven-billion-dollar (1)
63:21
seven-figure (1)
19:19
seventeen (4)
60:5;126:7,7;127:23
seventeen-billion-dollar (1)
65:3
seventy (1)
86:15
several (4)
12:15;17:19;31:5;
103:3
shackles (1)
72:17
shake (1)
175:25
shakes (1)
72:25
share (4)
118:4;190:6,7,8
shareholder (2)
115:20;149:1
shareholders (9)
77:24;78:3;103:13,
14;123:5;150:20;
161:5;170:22;176:3
sharing (1)
163:4
sheet (8)
77:11;80:16;83:22;
84:2;114:12;121:24;
176:8,10
sheets (1)
75:18
shift (1)
152:10
shifting (1)
152:10
ship (8)
116:15;177:10,14,
15,25;178:1,16,16
short (2)
10:16;157:7
short- (1)
115:8
shortly (1)
6:20
show (2)
94:2;155:25
showed (2)
150:7,24
showing (1)
170:25
shown (1)
176:2
shows (1)

16:9
shrunk (1)
129:13
shut (1)
62:9
sic (1)
101:13
Sicilian (2)
170:4;171:8
Sicilians (1)
170:9
side (22)
8:19;11:5;47:22;
55:14;59:10,14;64:1;
66:13;76:8;98:14;
108:3,6;136:24;
143:10;147:13;162:7;
163:11;169:4;177:4,5;
178:19;188:19
sides (3)
92:9;9;109:3
sideshow (2)
128:10;170:17
signal (1)
108:8
signature (2)
118:20;162:19
signed (2)
72:16;149:15
significant (6)
14:24;21:12;27:9;
76:24;183:3,13
significantly (2)
8:4;69:9
silly (1)
24:12
similar (2)
18:22;63:6
simple (4)
65:10;147:7;155:22;
176:8
simplicity's (1)
99:1
simply (11)
20:8;23:9;42:21;
46:18;65:12;69:24;
77:1;100:10;120:2;
141:25;165:12
single (5)
13:23;86:8;152:18;
161:16;183:1
Singleton (1)
55:19
sit (2)
42:16;46:22
sitting (2)
88:8;167:4
situation (3)
85:9;113:17;124:15
situations (1)
45:17
six (7)
44:22;83:13,16,16;

174:11;191:5,5
six-billion-dollar (1)
66:19
six-nine (1)
81:20
sixteen (2)
60:4;61:11
SKIKOS (14)
189:4,7,7,8,9,20,22,
25;190:3,21,25;191:2,
9,15
Skype (1)
49:15
slightly (2)
33:16;102:24
slippery (1)
13:22
slope (1)
13:23
slow (1)
174:4
small (4)
19:20;20:12;24:13,
15
smaller (1)
47:12
so-called (1)
146:1
softball (2)
156:7,10
software (1)
46:19
sold (1)
148:20
sole (4)
161:15,18;162:19,21
solicited (1)
129:24
solid (1)
165:1
solve (4)
105:21;159:18;
163:5;175:8
solvent (2)
64:24;65:5
somebody (14)
25:4;29:8;94:2;
104:13;106:19;108:15;
122:6;124:15;125:16;
135:21;157:25;187:24;
189:2;191:7
somehow (4)
74:20;148:9;149:5;
162:17
someone (6)
48:12;50:4;120:3,3;
145:2;170:16
sometime (1)
187:25
sometimes (1)
44:3
somewhere (4)
74:24;137:13;

156:12;180:11
soon (3)
25:18;155:8;187:25
sore (2)
33:13,14
sorry (14)
5:18;26:11;52:11;
53:3;56:22;64:7;75:21,
24;80:5;83:10;100:14;
138:9,12;183:23
sort (13)
15:8;29:14,15;31:21,
24;47:14;50:20;87:7;
88:16;112:19;133:3;
134:22;160:4
sorts (1)
76:21
sounded (1)
191:17
sounding (1)
190:1
sounds (4)
30:19;70:7;188:5;
191:22
source (1)
149:1
sources (3)
125:14;131:23,25
space (1)
175:19
span (1)
12:15
sparsely (1)
87:13
speak (4)
7:10;9:9;47:25;
177:7
SPEAKER (6)
5:11,17;56:19,23;
57:1;191:20
Speaking (3)
24:18;89:17;177:8
speaks (1)
171:16
special (1)
22:14
specific (9)
12:3,9;17:18;27:10;
32:15;35:10;40:8;
53:24;125:2
specifically (11)
13:1;24:24;40:3;
48:6;51:8;54:6;97:23,
25;143:7;178:15,22
specifics (1)
132:25
spectrum (1)
12:16
speculative (1)
151:6
spend (2)
37:2;122:7
spending (1)

48:21
spent (6)
21:6;23:4;47:16,19;
164:24;174:20
spilled (1)
38:13
splitting (1)
114:7
sponsors (1)
122:9
spot (1)
169:23
spring (1)
90:18
squished (1)
8:13
stakeholder (1)
168:3
stakeholders (1)
74:1
stand (5)
5:20;15:17;136:7;
137:16;183:21
standard (3)
14:17;29:7;110:15
standards (3)
58:3;140:22;141:22
standing (5)
5:20;102:5,9;105:10;
131:7
start (15)
5:12;46:2;55:12,25;
56:3;57:16;63:20;70:9;
79:10;134:8;136:19;
155:5,6,24;179:19
started (3)
116:13;149:8;150:2
starts (1)
152:19
state (14)
18:21;22:2;56:8;
57:3;64:24;65:5;98:4,
6,7;119:10;120:7,14;
165:5;171:9
Stated (4)
9:5;56:16;64:2;
170:23
statement (10)
25:7;50:2,6;58:2;
100:8;115:7;184:1,15;
186:4;187:7
statements (2)
26:21;137:15
States (3)
10:21;27:7;81:25
status (4)
112:18;117:18;
129:4,23
statute (4)
112:15;142:14,24;
143:4
stay (6)
7:19;39:23;40:19;

Case: 19-30088    Doc# 4162    Filed: 10/08/19    Entered: 10/08/19 15:30:05    Page 215
of 220

51:22;116:14;125:22
**stays (2)**
112:24;113:2
**step (4)**
101:19;103:2;172:4;
175:6
**Stephen (3)**
52:6;116:3,5
**Steve (1)**
189:7
**stick (6)**
68:18;93:11,16;
123:16;175:10,10
**still (19)**
15:21;20:11;30:13,
17;31:8;52:13;62:7,14;
65:2,7;70:14;82:5;
101:3;109:16;128:1;
130:9;131:7;135:20;
191:8
**stipulate (1)**
26:8
**stipulation (3)**
54:24;185:4;189:2
**stock (5)**
77:17;78:9;113:1;
148:17,20
**stockholders (1)**
66:23
**stood (1)**
85:21
**stop (4)**
56:10;57:23;90:7;
119:25
**stopwatch (1)**
55:13
**story (3)**
29:19;100:7;178:18
**straightforward (2)**
142:25;143:2
**Strauss (1)**
55:11
**street (1)**
95:11
**strict (1)**
186:5
**strictly (1)**
149:2
**strikes (1)**
23:21
**striking (1)**
153:8
**stroke (1)**
58:13
**Strong (2)**
163:4;170:12
**structure (3)**
148:21,24;149:3
**structured (1)**
181:13
**structures (3)**
108:1;164:12;170:19
**struggle (1)**

126:19
**stuck (3)**
98:13,14;171:24
**stuff (3)**
12:4;26:1;32:9
**sub (2)**
81:5,16
**subject (10)**
9:12;18:22;30:14;
40:23;107:24;139:1,8,
10;155:13;157:9
**subjects (1)**
132:23
**subjunctive (1)**
105:24
**submit (5)**
54:4;107:17;108:17;
147:3;168:17
**submitted (8)**
17:6;35:23;49:22;
50:15;51:7,17;183:21;
191:18
**subro (11)**
92:3,5,10,15;123:19;
151:13,14,16,18,20;
165:4
**subrogation (13)**
62:23;66:13;72:4,12,
19;118:7,11,16,19;
119:3;128:20;130:17;
138:23
**subros (1)**
155:7
**subsequent (1)**
12:6
**substance (1)**
38:20
**substantial (1)**
117:18
**substantive (1)**
34:1
**successful (3)**
129:18,18;159:19
**successfully (4)**
124:23;132:20;
189:17,19
**suddenly (2)**
8:13;25:4
**suffered (1)**
129:22
**sugarcoated (1)**
170:11
**suggest (3)**
38:11;77:2;187:23
**suggested (5)**
31:20;41:21;54:19;
169:1,2
**suggesting (3)**
15:20;61:16,20
**suggestion (1)**
91:2;129:6
**suggestions (2)**
20:9;37:16

**suite (1)**
102:10
**sum (1)**
79:1
**summarize (1)**
117:22
**summarizing (1)**
98:4
**summary (3)**
186:10,15;187:12
**super (1)**
85:18
**supplemental (1)**
150:1
**supplied (1)**
115:5
**support (15)**
11:23;19:9,9;37:24;
93:25;102:4;107:15;
115:14;136:20;137:2,
20;163:1;177:13;
178:13,22
**supported (2)**
135:14;148:14
**supporters (1)**
108:2
**supporting (6)**
83:4;87:9;109:24;
121:1;148:9;163:10
**supports (3)**
20:15;107:14;137:19
**suppose (6)**
62:19;68:20;98:25;
147:8,8;154:1
**supposed (8)**
14:15;24:25;38:14,
15;54:25;124:13;
162:4;171:20
**supposedly (1)**
160:7
**Supreme (1)**
39:12,20
**sure (43)**
16:21;17:19;22:16,
18,23;26:2;29:5;34:4;
35:21;42:2;46:8;48:11;
52:15;55:15;56:11,16;
57:14,24;60:2;61:1;
62:11,22;66:2;68:19;
74:9;89:1;93:8;95:2;
101:2;116:17,25;
126:14;127:7;139:6;
152:17;158:13,13;
170:18;175:12,20,23;
176:22;186:5
**surprise (1)**
105:9
**surprised (1)**
120:21
**surrounding (2)**
90:2;112:3
**survive (1)**
98:7

**suspect (4)**
110:3;137:19;158:6;
160:25
**Swaine (1)**
21:2
**swing (3)**
69:20;87:8;89:4
**system (4)**
49:4;114:20;164:20;
186:18

**T**

**table (11)**
26:6;44:22;46:23;
62:25;91:14;93:7;
136:2;141:6;147:3;
171:5;183:2
**takeover (2)**
117:13;128:6
**talk (12)**
19:18;25:9;42:16;
61:15;81:7;107:22;
154:15,18;156:15;
157:4;163:23;189:13
**talked (6)**
37:6;42:12;51:18;
106:14;152:11;189:3
**talking (11)**
8:21;22:11;42:15;
50:13;99:22;112:21;
127:1;154:25;166:17,
17;169:13
**tandem (1)**
112:5
**tank (4)**
89:18;91:22;125:20;
126:1
**tap (1)**
104:10
**TAS (1)**
37:5
**task (1)**
38:22
**tasked (1)**
111:25
**TCC (45)**
22:21;36:22;37:5,12;
54:16;55:18,18;61:15;
65:20;68:6,9,11,21;
72:6;83:4;93:17,18,25;
94:6;95:15;104:5,11;
109:10;119:24;120:23;
121:2,21,23;122:3;
123:22;137:15;139:6;
144:23,24;145:6;
152:21;153:1,4;154:3,
23;159:4;178:12;
183:24;184:14;189:10
**TCC/SLF (1)**
99:14
**TCCs (1)**
62:15

**TCC's (7)**
91:20;95:1;97:11,13;
100:24;109:13;141:5
**teach (2)**
51:24,25
**teacher (2)**
77:16;78:10;113:1,1
**technical (3)**
31:18;78:7;109:25
**technicalities (1)**
110:1
**technicality (1)**
110:19
**technically (1)**
110:10
**tee (1)**
187:12
**teed (3)**
108:20;138:24;145:5
**telephone (1)**
49:15
**telling (3)**
29:9;65:9;132:17
**tells (1)**
171:8
**ten (17)**
14:9;15:8,9;20:21;
22:24;49:14,14,18,21,
25;55:21;80:1,1;99:4,
5;163:13;191:2
**ten- (1)**
101:14
**ten-day (1)**
49:20
**tens (1)**
190:12
**tension (3)**
29:13,16,17
**tent (1)**
91:18
**tentative (12)**
7:17;8:6,7;11:23;
17:2;19:10;23:1,6;
42:22,24,25;47:4
**ten-thousand (1)**
25:14
**term (9)**
75:18;77:11;80:16;
83:22;84:2;114:12;
146:3,6;182:21
**terminate (13)**
69:6;72:4;97:11;
110:2;128:18,22;
130:8,13;135:2;149:9,
10;151:20;167:22
**terminated (6)**
58:9;73:3,13;79:10;
121:2;154:4;160:18;
183:10
**terminates (2)**
69:17;179:18
**terminating (8)**
72:5,9;73:24;79:9;

Min-U-Script®

Case: 19-30088    Doc# 4162    Filed: 10/08/19    Entered: 10/08/19 15:30:05    Page 216
of 220

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(24) stays - terminating

107:18;128:16;129:3;
159:21
**termination (2)**
109:24;161:19;169:8
**terminator (1)**
183:12
**terms (13)**
9:2;20:2;32:8;34:11;
37:15;43:18;71:2;
89:18;103:7;109:5;
116:7;168:12,12
**terrific (1)**
93:18
**test (3)**
61:17;86:9;140:21
**testify (1)**
118:25
**testifying (2)**
75:4;118:25
**testimony (2)**
127:22;153:20
**Texas (1)**
28:15
**texts (1)**
29:9
**Thanks (2)**
101:17;114:1
**That'd (2)**
85:18,18
**theirs (1)**
81:10
**Theoretically (1)**
63:8
**theory (1)**
189:23
**therefore (3)**
90:5;115:14;191:12
**thin (1)**
176:14
**thinking (4)**
11:2;47:11;83:3;
159:20
**third (2)**
13:15;161:18
**thirteen (11)**
91:19;123:22;
129:11,12,14;133:22;
140:7,9;141:17,19,20
**thirteen-and-a-half (4)**
84:7;85:22,25;142:5
**thirty (9)**
73:11;84:18;129:11,
22;131:14,17;163:21;
176:16;181:4
**thirty-four (1)**
119:6
**thorough (1)**
12:3
**though (8)**
31:10;34:16;37:1;
43:11;60:23;76:7;
81:25;147:9
**thought (20)**

5:17,18,23;6:9;8:16;
18:17;22:16;33:9;
41:21;51:11;75:5;
83:18;97:17;116:13;
139:16;152:3;182:24;
185:3,23;187:20
**thoughts (1)**
35:23
**thousand (1)**
7:24
**thousands (1)**
190:12
**thread (1)**
88:14
**threat (1)**
139:23
**threatening (1)**
168:13
**three (18)**
7:10;11:22;21:20,22,
23;48:21;50:4;74:15;
82:14,16;99:18;
120:13;132:24;136:16;
149:11;161:14,17;
182:18
**three- (1)**
120:6
**threshold (2)**
53:17;186:8
**throughout (2)**
27:15;76:16
**throw (4)**
89:10;102:4;154:24;
156:18
**throwing (1)**
20:10
**Thursday (1)**
54:25
**thus (1)**
176:2
**ticket (2)**
8:16;47:12
**tied (2)**
24:25;46:8
**till (1)**
191:3
**Tim (1)**
11:19
**timekeeper (1)**
12:24
**timekeepers (1)**
12:21
**Timeline (3)**
41:23;105:3,15
**timelines (1)**
113:16
**times (10)**
17:19;45:5,17;48:9;
84:24;103:3;136:16;
155:19;161:17;169:13
**timing (1)**
10:23;54:20;80:3
**today (51)**

6:4,5,10;8:13;9:8;
10:24;22:21;32:4;33:3;
34:4;35:16,24;42:12;
54:17;57:25;58:9;
61:20;66:18;69:17;
73:24;78:21;82:18;
86:1;92:19;93:13;
101:10;102:9;103:8;
104:13,18;105:10;
106:1;107:23;108:19,
22;117:5;121:1;
137:16;140:6;153:21;
167:24;171:6,20;
177:2;178:22;184:7,
15;186:4;187:24;
189:5,15
**today's (4)**
8:3;175:11,14;
184:19
**together (6)**
73:17,22;139:24;
160:9;176:11,13
**told (6)**
117:20;136:22;
161:5;186:12;189:9;
191:3
**tomorrow (5)**
25:3;54:24;94:3;
190:4,14
**took (4)**
99:13,14;127:21;
176:12
**top (2)**
91:19;159:6
**topics (1)**
35:19
**Tort (14)**
79:22;80:14;84:24;
110:6;129:9,16;
133:14,16;135:6;
140:16;151:25;152:7;
163:20;181:8
**torts (2)**
106:6;133:8
**toss (1)**
155:24
**total (6)**
19:21,23;20:12;
55:20;57:19;76:20
**Totally (1)**
149:3
**totals (1)**
20:2
**tough (1)**
158:7
**toward (1)**
50:20
**tower (1)**
90:2
**town (1)**
50:11
**towns (1)**
166:18

**track (3)**
70:19;95:16;96:10
**train (1)**
129:19
**tranche (1)**
150:9
**tranches (1)**
150:7
**transaction (1)**
146:23
**transcript (3)**
152:13,24;153:12
**transfer (1)**
147:1
**transparent (2)**
12:18;138:25
**transportation (1)**
13:10
**travel (5)**
8:1;13:10;27:7,9;
42:22
**traveling (1)**
49:16
**treat (1)**
50:15
**treated (2)**
56:13,14
**treatment (6)**
77:2,4,9;130:25;
170:24;178:1
**treats (1)**
177:15
**tremendous (4)**
56:1;71:12;79:2;
183:8
**trial (9)**
22:2;46:22;56:6;
59:2;119:10;123:18;
143:15;167:25;172:7
**tricky (1)**
81:13
**tried (6)**
10:13;87:20;100:16;
146:22;166:11;170:4
**tries (1)**
73:17
**triggered (1)**
76:23
**trouble (1)**
159:2
**Troy (1)**
82:12
**true (8)**
20:14;25:23;77:25;
86:11;127:11;156:15;
163:6;175:6
**truing (1)**
112:21
**truly (2)**
83:5;149:1
**trust (1)**
177:23
**Trustee (20)**

8:18;9:5;10:21;
11:15,20;12:14;16:19;
20:11;32:9;33:8,24;
34:19;37:17;38:7,9,12,
17;39:22;41:22;51:10
**Trustee's (3)**
33:3;40:9;50:25
**try (16)**
10:11;28:4;36:7;
50:24;66:25;69:21;
97:22;107:14;109:16;
123:9,23;129:23;
135:7;145:20;150:5;
151:7
**trying (21)**
16:4;26:10;36:11;
37:15;43:17;52:13;
68:5;83:23;87:16;94:8;
104:1;105:19,21;
107:10;159:18;160:5;
161:20;177:5;185:15,
20;186:2
**T's (1)**
155:21
**TUB (1)**
66:20
**Tubbs (10)**
21:6;22:1;37:7;
83:20;99:2;119:10;
123:8;141:11;143:15;
172:7
**TUBS (9)**
56:6;57:9;59:2;60:3,
24;61:4;62:24;69:9;
71:12
**turf (1)**
188:1
**turkey (1)**
95:10
**turn (15)**
7:12;11:15,22;18:10,
19;20:11,15;50:10;
51:9;55:20;109:20;
111:15;115:3;120:19;
169:25
**turns (4)**
87:21;125:11;140:9;
162:6
**twelve (2)**
12:24;89:19
**twelve-hour (1)**
48:8
**twenty (15)**
7:9;37:2,10;44:25;
47:20,20;84:16;92:6;
94:3;99:16;116:8;
118:8;145:16,17,19
**twenty-five (2)**
62:20;116:8
**twenty-five- (1)**
64:17
**twenty-five-and-a-half-billion-dollar (1)**
73:15

Case: 19-30088    Doc# 4162    Filed: 10/08/19    Entered: 10/08/19 15:30:05    Page 217
of 220

PG&E CORPORATION AND PACIFIC GAS
AND ELECTRIC COMPANY

Chapter 11

Case No. 19-30088
October 7, 2019

**twenty-four (2)**
50:21;51:2
**twenty-hour (3)**
24:4;16;37:18
**twenty-two (1)**
99:17
**two (60)**
7:10;23:3;27:23;
31:6,6;36:17;48:13,14;
53:15;68:24;81:16;
84:4;87:23,23;91:17,
24;96:2,4;97:12;98:19,
23;99:10,18;102:5,14,
25;106:1,11,12;107:2,
13,13;108:1;109:6;
114:7;115:15;128:22,
24;130:22;136:16;
138:10,15,16;139:2;
149:15;151:12;152:25;
156:9,14;157:7;
158:17;160:23;161:8,
12;174:1,5;179:25;
189:3,12;191:10
**two-hour (4)**
23:4;27:3;43:6,14
**two-thirds (2)**
181:19,20
**type (4)**
12:4;26:1;40:17;
137:9
**typical (1)**
90:17
**typically (1)**
155:20

**U**

**UCC (2)**
22:22;55:19
**ultimately (2)**
40:23;107:17
**Um-hum (7)**
64:25;73:12;106:5;
123:20;130:1;132:2;
179:23
**unable (2)**
126:16;164:20
**unaccounted (1)**
81:23
**unadmitted (1)**
34:8
**unauthorized (1)**
34:20
**uncertainties (1)**
102:11
**uncertainty (2)**
112:2,6
**uncomfortable (1)**
66:22
**uncomped (1)**
29:16
**unconfirmable (4)**
77:3;120:2,4,5

**under (54)**
9:13;11:3,10;32:25;
34:6,9;45:4,17;49:11;
51:14;58:10;64:11,13;
65:11,20;67:5,10;
72:13;74:23,24;75:2,
22;76:12,19,23;77:8,
17,20,22,25;78:5;
80:13,15;81:21;82:1;
83:6,8,17,18,22,24;
90:14;93:22;110:4;
119:22;124:20;125:1;
127:25;139:6;145:3;
165:3;168:2,3;186:5
**undercompensating (3)**
151:23,24,25
**underfunded (1)**
149:15
**underneath (1)**
71:9
**underpaying (1)**
152:7
**underpinnings (1)**
160:25
**understood (7)**
10:12;30:16;32:10;
38:15;44:7;67:21;
74:14
**undisputed (1)**
152:25
**unduly (1)**
26:12
**unfairly (1)**
113:5
**unfortunately (3)**
44:3;51:23;88:11
**UNIDENTIFIED (6)**
5:11,17;56:19,23;
57:1;191:20
**unilateral (1)**
31:21
**unincluded (2)**
189:11,16
**union (5)**
72:10;111:15,23;
112:25;113:1
**unique (1)**
90:19
**UNISON (1)**
5:7
**United (3)**
9:5;10:21;81:25
**unless (15)**
10:20;38:10,22;
45:11;46:12;49:17;
60:10;66:13;67:12;
69:16;85:9;122:18;
188:19;190:20;191:11
**unlike (1)**
63:3
**unlikely (1)**
89:25
**unmatured (1)**

146:19
**unnecessary (1)**
174:3
**unprecedented (1)**
135:4
**unpredictable (1)**
102:9
**unrelated (3)**
47:21;87:2;177:16
**unruly (1)**
42:21
**Unsecured (4)**
101:19;146:24;
161:11;164:6
**unsuccessfully (1)**
166:12
**untenable (1)**
37:10
**unusual (1)**
47:24
**unwilling (3)**
165:20,22;169:4
**unwillingness (1)**
32:20
**up (65)**
5:22;12:5;25:8;34:3;
38:4;41:23;42:6,9;
46:4;49:18;54:17;57:9;
58:22,24;59:8;62:9;
64:20;66:21;69:23;
79:1;84:25;85:7,21;
87:18;91:25;92:13,14,
16;93:5,18,21;94:2;
95:20;97:19,19;100:3;
103:2;105:11,13;
106:12;108:20;112:21;
114:9;115:21,25;
116:15;118:19;137:16;
138:25;145:5;147:15,
16,17;150:7,24;
152:21;153:6;161:20;
163:14,24;166:18;
168:13;176:8;187:12;
188:8
**update (1)**
52:5
**upload (1)**
164:22
**upon (13)**
19:13;58:11,16;
63:22;65:21;91:3;92:2,
6,17;99:1;111:2;172:2;
178:20
**upping (1)**
95:16
**upstairs (4)**
53:12;54:9;88:18;
187:1
**USD (2)**
7:12;9:11
**use (4)**
105:25;145:18,21;
158:3

**used (6)**
41:8,12;125:20;
157:20;158:6;169:24
**using (1)**
90:3;164:11
**usual (2)**
108:9,10
**utility (3)**
53:18;90:4;166:17

**V**

**vacuum (1)**
134:15
**vague (2)**
29:15;45:19
**validity (3)**
121:3,5;122:24
**valuable (1)**
35:4
**valuation (5)**
95:21;96:23;98:9;
106:11;167:25
**value (13)**
35:5;59:3;63:15;
123:1,5;126:8,8,9;
142:8;146:25;150:17,
18;173:17
**valued (1)**
176:3
**values (2)**
168:16;176:13
**vaporize (1)**
98:16
**vaporizes (2)**
98:20,20
**variables (2)**
102:8;138:1
**variation (1)**
185:8
**varied (1)**
14:22
**various (5)**
7:22;24:15;41:25;
42:3,17
**varying (1)**
9:6
**vast (1)**
152:23
**vehicle (1)**
111:10
**ventilated (1)**
108:8
**versions (1)**
161:8
**vetted (1)**
67:19
**viable (2)**
107:23;113:10
**victim (6)**
83:16;86:8,9;96:15,
16;176:4
**victims (54)**

61:6;62:13;66:12,17,
22;69:22;73:9,14;
81:22;83:9,23;84:6,9;
87:22;88:1,10;91:10;
93:19,25;95:3,25;96:6;
97:13;98:20,21;99:17;
101:1,4;104:1;109:13;
131:8;141:7,12;160:4;
165:4;168:2;170:19,
23,24,24;171:12;
172:25;174:13;175:5,
24;177:15;178:1,16,
17;181:21;183:11,14;
189:13,16
**victim's (2)**
80:22;88:9
**view (17)**
12:4;15:5,16,20;
34:5;50:7;54:16;56:13,
15;71:7;76:23;108:7,
19;112:4;113:20;
163:1;178:6
**viewed (1)**
170:10
**viewing (1)**
105:12
**views (4)**
35:19;109:6;117:5;
136:2
**violate (2)**
66:11;143:20
**violates (5)**
99:15;100:19;112:8;
113:7;130:24
**virtually (2)**
59:5;77:24
**voice (1)**
177:12
**voluntarily (2)**
32:23;165:23
**voluntary (1)**
16:6
**vote (10)**
63:1;68:6,9,21;
92:15;93:19;137:11,
12;181:9,20
**voted (2)**
97:14;124:22
**voters (1)**
120:10
**votes (3)**
124:2;137:18;151:19
**voting (3)**
86:13;123:24;141:21

**W**

**Wait (14)**
7:5,17;11:13;18:10;
62:19;96:22;97:4;
122:5,11;150:19;
171:18;175:2;176:21;
184:8

Case: 19-30088    Doc# 4162    Filed: 10/08/19    Entered: 10/08/19 15:30:05    Page 218
of 220

**waiting (4)**
88:9;151:17;167:4;
178:7
**walk (2)**
103:8;154:23
**walked (1)**
153:22
**wannabes (1)**
96:4
**wants (11)**
18:11;73:2;90:10;
94:2;120:6;133:3;
138:10;163:24;188:8,
9;191:7
**warning (2)**
114:20,21
**warrant (1)**
117:4
**waste (1)**
180:9
**wasting (1)**
160:15
**watch (2)**
96:2,2
**watching (2)**
88:9;157:13
**way (46)**
10:5,23;15:12;39:9;
42:1,8;46:2;47:19;
58:4;69:22;70:23;71:8;
72:20,24;74:20;79:7;
93:8,9;94:9,10,11,14;
98:15;106:23;109:7;
122:14;131:7;133:2;
135:8;147:14,22;
150:18;151:3;155:15;
159:7,12;163:1;
165:25;168:1;169:17;
178:18;181:13;187:10,
24;188:7;191:16
**ways (3)**
33:16;106:11;154:1
**wedded (1)**
15:9
**week (10)**
21:19;127:21;
134:16;148:23;154:12,
13;156:12;190:18,19;
191:4
**week-and-a-half (1)**
150:24
**weekend (1)**
80:10
**weeks (7)**
105:7;109:1;121:5;
128:22;139:2;156:14;
189:12
**Weil (4)**
21:5;33:5;52:7;
116:6
**well-established (2)**
38:16;39:9
**well-funded (1)**

90:20
**Wells (1)**
50:3
**well-settled (1)**
119:22
**weren't (3)**
8:23;134:8;169:22
**what'll (1)**
88:21
**what's (25)**
15:5;39:11,11;45:19;
52:17;80:15;85:1;
94:11;95:19;107:25;
126:17;128:4;129:21;
136:20,23;154:6;
156:3;164:3;167:14,
21;170:17,18;174:18;
189:14;190:13
**whatsoever (1)**
160:21
**what-where-when (1)**
29:8
**wheel (1)**
70:8
**Whereupon (1)**
191:23
**wherever (1)**
148:17
**who- (1)**
29:7
**Whoever's (1)**
70:10
**whole (7)**
29:19;76:4;77:14;
108:18;144:9;157:11;
189:14
**Wholes (3)**
127:16;152:2;153:6
**whopping (1)**
81:17
**who's (2)**
103:10;137:25
**wide (1)**
42:16
**wildfire (27)**
22:6;57:7,9,18,19;
59:23;60:17;63:23;
81:2;84:25;85:14;
88:15;89:20;91:10;
93:18,25;95:3;96:15;
97:13;98:20;100:25;
101:4;125:2,3;140:23;
142:22;153:12
**Williams (6)**
152:20,20;153:9,14,
18;176:9
**Williams' (2)**
152:14,18
**willing (11)**
9:9;10:18;26:17;
29:3;45:7,21;85:13;
91:9;129:12;150:20;
190:8

**willingness (1)**
32:19
**winners (1)**
98:21
**wins (2)**
95:2;103:25
**wiped (7)**
64:18;77:24;78:4,5,
9,10;113:1
**wish (3)**
9:10;43:7;185:13
**wishes (1)**
10:11
**withdrawn (1)**
62:4
**within (13)**
38:23;39:23;40:19;
77:5;82:1;108:4;
112:16;131:5;145:8;
149:25;159:3;170:19,
20
**without (7)**
30:14;35:14;44:14;
117:10;140:7;166:13;
169:8
**wonder (1)**
40:4
**wonderful (1)**
19:11
**wondering (2)**
93:23;159:2
**word (3)**
134:6;152:18;153:12
**wording (1)**
181:18
**words (13)**
32:21;44:16;56:14;
65:10;66:12;91:15;
117:19;121:14;123:13;
135:21;158:2;169:14,
24
**work (17)**
34:2;35:13;37:14;
43:18;48:12;49:4;
50:20;52:13;54:25;
67:11,14;71:11;78:15;
80:18;111:25;135:6;
150:12
**worked (3)**
78:8;94:18;130:3
**worker (1)**
22:4
**Workers (1)**
111:22
**working (2)**
13:10;48:14
**works (2)**
105:15;135:11
**world (5)**
39:17;61:16;67:13;
71:8;165:2
**worried (1)**
100:16

**worries (1)**
116:22
**worry (3)**
86:17,17;127:19
**worse (1)**
40:6
**worth (7)**
14:5;48:11;123:3;
139:21;150:17;164:25;
173:18
**worthless (1)**
64:19
**write (3)**
29:7;108:15;159:16
**write-offs (2)**
16:6,9
**writes (1)**
15:21
**writing (3)**
11:5;41:22;42:1
**written (2)**
33:16;128:10
**wrong (21)**
83:19,21;87:6;88:6,
7;90:16,18;95:11,13,
14;100:7;104:19,20;
139:16,17;174:14,18;
181:16,17,24,25
**wrongful (1)**
54:7;187:16
**wrote (2)**
170:5;188:22

**Y**

**year (6)**
34:8;76:1,4;99:18;
108:4;129:25
**years (3)**
31:5;99:18,18
**yep (2)**
103:12;105:2
**yet-to-be-filed (4)**
56:7;57:2,10;69:8
**yield (3)**
7:12;10:21;55:18
**York (1)**
34:9

**Z**

**zero (3)**
34:16;152:16;168:9
**Zumbro (85)**
9:20;11:8;20:22;
21:1,1,10,20,22,24;
22:1,4,9,12,17,24;
23:12,16,18;24:1,10,
14,22;25:9,11;26:5,8,
15,19,23;27:1,15,21,
24;28:1,5,8,10,15,21,
24;29:12,24;30:2,4,16,
25;31:2,6,19;32:10,13,

15,18;33:2,14,23;
34:14,19,23;35:2,6,9,
25;36:3,10,12,14,15,
25;37:7;45:2;49:12,24;
50:16,18,20,24;51:4,7,
12,15;52:1,19,21,23

**1**

**1 (4)**
31:4,8,16;179:24
**1,000 (1)**
187:19
**1.1 (1)**
74:25
**1.220 (1)**
81:21
**1.4 (1)**
75:20
**1:48 (1)**
191:23
**10 (1)**
185:14
**1054 (29)**
84:23;90:16;95:15,
18;96:10;98:2,3,8;
99:5;113:11,16;
114:10,16;125:1;
126:14,25;140:11,23;
141:22;142:18,20;
144:4,13;167:12;
171:22;181:14,22;
182:3;183:4
**1054's (1)**
90:14
**11 (6)**
19:1;28:13;92:4;
117:24;135:11;186:9
**1129 (1)**
140:21
**1129c (1)**
113:17
**12:08 (1)**
115:23
**12:23 (1)**
115:23
**1245 (1)**
111:23
**127 (2)**
152:18;153:9
**13 (1)**
28:25
**13.5 (11)**
83:7,7,8;84:10;
85:13;86:23;137:17;
141:6;176:7;179:22;
180:12
**13th (2)**
117:3;118:6
**14 (1)**
149:12
**14.5 (7)**
62:13,25;65:10;95:1;

Case: 19-30088    Doc# 4162    Filed: 10/08/19    Entered: 10/08/19 15:30:05    Page 219
of 220

121:22;171:11;176:7

**15 (1)**
13:6

**15,000 (1)**
111:24

**150 (1)**
164:10

**16 (1)**
13:6

**17 (2)**
27:6;43:5

**18 (1)**
62:24

**18.9 (7)**
57:6,15,16;58:19;
64:1;81:2,15

**18.9-billion-dollar (2)**
63:22;71:10

**180-degree (1)**
117:5

**1st (1)**
129:25

**2**

**2 (7)**
115:22;116:13;
161:13;180:5,11;
184:16;191:3

**2014 (2)**
24:2;26:1

**2014a (1)**
25:8

**2014b (1)**
25:6

**2016 (1)**
177:22

**2019 (4)**
5:1;118:16;119:15;
175:9

**2020 (1)**
175:8

**215- (1)**
25:13

**21st (3)**
154:15,19;155:3

**22 (1)**
13:12

**22nd (2)**
154:6,16

**23rd (1)**
118:16

**24th (1)**
189:9

**25 (1)**
59:3

**25.25 (1)**
65:25

**25.5 (5)**
61:15;62:16;65:25;
68:10;181:10

**25.5-billion-dollar (1)**
59:13

**25.5-billion-dollar-aggregate (1)**
58:25

**25-billion-dollar (1)**
59:6

**3**

**3 (2)**
181:3,3

**30 (1)**
119:15

**30- (1)**
164:20

**30,000 (2)**
124:3;164:6

**30th (8)**
69:18;79:7;104:2,14;
105:18,22;108:16;
119:12

**31st (1)**
190:9

**330 (7)**
10:2,17;14:19;16:22;
22:10;24:23;43:20

**330a1 (1)**
45:4

**331 (1)**
16:22

**34.4 (1)**
75:24

**35,000 (1)**
164:21

**38 (1)**
13:12

**39 (1)**
13:12

**3rd (1)**
154:7

**4**

**40,000 (2)**
99:17;124:3

**408 (1)**
9:13

**4th (1)**
154:7

**5**

**5 (1)**
104:24

**5.1.2 (2)**
47:18;48:12

**6**

**6 (4)**
24:7;26:24;37:12,25

**6.9 (12)**
81:18,19,20;82:2,9,
17,25;83:7;165:3;
179:21,25;180:12

**670 (1)**
75:16

**7**

**7 (1)**
5:1

**7,000 (1)**
94:19

**772 (2)**
75:20,22

**8**

**8 (1)**
157:6

**8.4 (19)**
66:18;81:10;82:9;
86:22;91:11,12;93:3;
94:20;95:11;98:16;
135:12,14,16;153:23;
165:1,1,3;171:5,8

**8.43 (1)**
92:18

**8.5 (1)**
92:3

**800,000 (1)**
8:4

**9**

**9 (2)**
104:25;149:11

**9019 (3)**
110:4,11,17

**911 (1)**
27:19

**946 (1)**
74:23

**954 (1)**
74:25

**9th (1)**
117:23

Case: 19-30088    Doc# 4162    Filed: 10/08/19    Entered: 10/08/19 15:30:05    Page 220
of 220