1 | Robert A. Julian (SBN 88469)
Cecily A. Dumas (SBN 111449)
2 | BAKER & HOSTETLER LLP
1160 Battery Street, Suite 100
3 | San Francisco, CA 94111
Telephone:    628.208.6434
4 | Facsimile:    310.820.8859
Email: rjulian@bakerlaw.com
5 | Email: cdumas@bakerlaw.com

6 | Eric E. Sagerman (SBN 155496)
David J. Richardson (SBN 168592)
7 | Lauren T. Attard (SBN 320898)
BAKER & HOSTETLER LLP
8 | 11601 Wilshire Blvd., Suite 1400
Los Angeles, CA 90025-0509
9 | Telephone:   310.820.8800
Facsimile:   310.820.8859
10 | Email: esagerman@bakerlaw.com
Email: drichardson@bakerlaw.com
11 | Email: lattard@bakerlaw.com

12 | *Counsel to the Official Committee of Tort Claimants*

13 | **UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION**

14 |

| | |
|---|---|
| **In re:** | Bankruptcy Case No. 19-30088 (DM) |
| **PG&E CORPORATION** | Chapter 11 (Lead Case) (Jointly Administered) |
| **-and-** | |
| **PACIFIC GAS AND ELECTRIC COMPANY,** **Debtors.** | **OPPOSITION OF OFFICIAL COMMITTEE OF TORT CLAIMANTS TO DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 363(b) AND 105(a) AND FED. R. BANKR. P. 6004 AND 9019 FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO ENTER INTO RESTRUCTURING SUPPORT AGREEMENT WITH THE CONSENTING SUBROGATION CLAIMHOLDERS, (II) APPROVING THE TERMS OF SETTLEMENT WITH SUCH CONSENTING SUBROGATION CLAIMHOLDERS, INCLUDING THE ALLOWED SUBROGATION CLAIM AMOUNT, AND (III) GRANTING RELATED RELIEF [DKT NO. 3992]** |
| ☐ Affects PG&E Corporation | |
| ☐ Affects Pacific Gas and Electric Company | |
| ■ Affects both Debtors | |
| *All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | Date:    October 23, 2019 Time:    10:00 a.m. (Pacific Time) Place:   United States Bankruptcy Court Courtroom 17, 16th Floor San Francisco, CA 94102 |

Baker & Hostetler LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ............................................................................. 1

II. SETTLEMENT TERMS ..................................................................... 2

    A. There Is One, Unified Settlement ............................................. 2

    B. The Court Cannot Determine Whether Fire Victims Will Be Paid in Full Prior to the Estimation Proceeding and Tubbs Trial ........................................ 2

    C. The Settlement Predetermines Key Plan Terms ....................... 3

    D. The TCC Has Not "Embraced" this Settlement ...................... 5

    E. The Settlement Is a Vestige of Exclusivity ........................... 5

III. LEGAL ARGUMENT ..................................................................... 5

    A. The Debtors Have Applied the Wrong Standard for Approval of a Compromise of Controversies ............................................ 5

    B. The Wildfire Claims Are Each A Single, Indivisible Claim ............... 7

    C. The "Fair and Equitable" Test Has Specific Meaning in the Ninth Circuit ........... 8

    D. The Settlement Is Not "Fair and Equitable" ........................ 10

        1. The Insurers/Hedge Funds' Subrogation Rights Are Subordinate to the Fire Victims' Claims as a Matter of Law ........................ 10

        2. The Settlement Is Not "Fair and Equitable" Because it Erases Fire Victims' Right to be Paid the Entirety of their Damages before Subrogation Rights Receive any Payment under the Plan ........................ 15

        3. The Settlement Is Not "Fair and Equitable" Because it Impairs the Fire Victims' Ability to Recover the Entirety of their Damages in these Cases ............................................................. 16

        4. The Settlement Represents a Violation of the Insurers/Hedge Funds' Ongoing Duties of Good Faith and California Insurance Regulations ..... 17

        5. The Settlement Requires the Debtors' Solicitation of a Plan that Contains Impermissible Non-Debtor Releases ........................ 19

    E. The Motion Fails to Satisfy, or Attempt to Satisfy, The Debtors' Burden .......... 20

        1. The Probability of Success in the Litigation ................... 21

        2. The Difficulties, if any, to be Encountered in the Matter of Collection ... 22

        3. The Complexity of the Litigation Involved, and the Expense, Inconvenience and Delay Necessarily Attending It ................... 22

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

        4.     The Paramount Interest of the Creditors and a Proper Deference to Their Reasonable Views In the Premises ..................................................... 23

F.     The Settlement Is an Impermissible Sub Rosa Plan ............................................. 24

IV.    CONCLUSION ............................................................................................................. 25

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adeli v. Barclay (In re Berkeley Del. Court, LLC)*,
834 F.3d 1036 (9th Cir. 2016)...................................................................6

*American Hardwoods, Inc. v. Deutsche Credit Corp. (In re American Hardwoods Inc.)*,
885 F.2d 621 (9th Cir. 1989)..............................................................18, 20

*In re Applause, LLC*,
2006 Bankr. LEXIS 2341 (Bankr. C.D. Cal. April 3, 2006).....................8, 12, 15

*In re ASARCO, L.L.C.*,
650 F.3d 593 (5th Cir. 2011)......................................................................6

*In re Autosport Int'l, Inc.*,
2013 Bankr. LEXIS 2530 (Bankr. C.D. Cal. June 24, 2013)........................10

*In re AWECO, Inc.*,
725 F.2d 293 (5th Cir. 1984)..........................................................8, 9, 16, 18

*In re AWTR Liquidation Inc.*,
548 B.R. 300 (Bankr. C.D. Cal. 2016)........................................................6

*In re B.E.S. Concrete Products, Inc.*,
93 B.R. 228 (Bankr. E.D. Cal. 1988)........................................................12

*Barnes v. Independent Automobile Deals Association of California Health & Welfare Plan*,
64 F.3d 1389 (9th Cir. 1995).............................................................12, 18

*Chandler v. State Farm Mutual Automobile Insurance Co.*,
598 F.3d 1115 (9th Cir. 2010).......................................................13, 14, 17

*Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*,
710 F.3d 946 (9th Cir. 2013)...................................................................11

*Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
60 B.R. 612 (Bankr. S.D.N.Y. 1986)...........................................................6

*Connecticut Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*,
68 F.3d 914 (5th Cir. 1995)......................................................................7

- iii -

*Czyzewski v. Jevic Holding Corp.*,
 ___ U.S. ___, 137 S. Ct. 973, 197 L. Ed. 2d 398 (2017) ........................................9

*Fireman's Fund Ins. Co. v. Maryland Casualty Co.*,
 65 Cal.App.4th 1279 (1998) ..............................................................................11

*Hibbs v. Allstate Ins. Co.*,
 193 Cal.App.4th 809 (2011) ..........................................................................14, 17

*In re Denby Stores, Inc.*,
 86 B.R. 768 (Bankr. S.D.N.Y. 1988) ...............................................................12

*In re Dow Corning Corp.*,
 244 B.R. 705 (E.D. Mich. 1999) .......................................................................14

*In re Dow Corning Corp.*,
 250 B.R. 298 (Bankr. E.D. Mich. 2000) .............................................................8

*In re Drexel Burnham Lambert Grp., Inc.*,
 134 B.R. 493 (Bankr. S.D.N.Y. 1991) ...............................................................7

*In re HyLoft, Inc.*,
 451 B.R. 104 (Bankr. D. Nev. 2011) ..................................................................7

*In re Integrated Resources, Inc.*,
 147 B.R. 650 (Bankr. S.D.N.Y. 1992) ...............................................................6

*In re Lionel Corp.*,
 722 F.2d 1063 (2d Cir. 1983) .............................................................................6

*In re Mickey Thompson Entm't Grp., Inc.*,
 292 B.R. 415 (BAP 9th Cir. 2003) ...........................................................6, 10, 16

*In re Millennium Multiple Emplr. Welfare Benefit Plan*,
 2011 Bankr. LEXIS 1973 (Bankr. W.D. Okla. February 18, 2011) ......................24

*In re Montgomery Ward Holding Corp.*,
 242 B.R. 147 (D. Del. 1999) ..............................................................................6

*In re Roman Catholic Archbishop of Portland*,
 339 B.R. 215 (Bankr. D. Or. 2006) .....................................................................3

*In re Spirtos*,
 103 B.R. 240 (Bankr. C.D. Cal. 1989) ..............................................................14

*In re Walter*,
 83 B.R. 14 (B.A.P. 9th Cir. 1988) ......................................................................6

*In re Woodson*,
 839 F.2d 610 (9th Cir. 1988) ......................................................................10, 16

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- iv -

*Martin v. Kane (In re A&C Properties)*,
784 F.2d 1377 (9th Cir. 1986) ................................................................... *passim*

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*,
478 F.3d 452 (2d Cir. 2007) ...................................................................... 9, 10

*Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*,
700 F.2d 935 (5th Cir. 1983) .............................................................................. 24

*Phoenix Ins. Co. v. Erie & Western Transp. Co.*,
117 U.S. 312, 6 S. Ct. 750, 29 L. Ed. 873 (1886) .................................................. 8

*Plut v. Fireman's Fund Ins. Co.*,
85 Cal.App.4th 98 (2000) .......................................................................... 13, 16

*Progressive West Ins. Co. v. Yolo County Superior Court*,
135 Cal.App.4th 263 (2005) .............................................................................. 11

*Resorts Int'l v. Lowenschuss (in re Lowenschuss)*,
67 F.3d 1394 (9th Cir. 1995) ..................................................................... 18, 20

*Sapiano v. Williamsburg Nat. Ins. Co.*,
28 Cal.App.4th 533 (1994) ......................................................................... 11, 12

*SEC v. American Trailer Rentals Co.*,
379 U.S. 594, 85 S. Ct. 513, 13 L. Ed. 2d 510 (1965) ............................................. 9

*Steinberg v. Allstate Ins. Co.*,
226 Cal.App.3d 216 (1990) .............................................................................. 25

*Underhill v. Royal*,
769 F.2d 1426 (9th Cir. 1985) ..................................................................... 18, 20

*United States v. Dos Cabezas Corp.*,
995 F.2d 1486 (9th Cir. 1993) ......................................................................... 12

*United States v. Technical Knockout Graphics (In re Technical Knockout Graphics)*,
833 F.2d 797 (9th Cir. 1987) .................................................................. 9, 16, 18

**Statutes**

11 U.S.C. § 101(5) ........................................................................................... 19

11 U.S.C. § 363 ............................................................................................ 6, 7

11 U.S.C. § 502 ............................................................................................... 14

11 U.S.C. § 503(b) ........................................................................................... 10

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- v -

11 U.S.C. § 509 ............................................................................ *passim*

11 U.S.C. § 524(e) ...............................................................................18

11 U.S.C. § 1122 ....................................................................................7

11 U.S.C. § 1124 ....................................................................................7

11 U.S.C. § 1129 ....................................................................................7

**Rules of Procedure**

F.R.B.P. 9019 ............................................................................ *passim*

**Legislative History**

124 Cong. Rec. H11,089 (daily ed. 28 Sept. 1978) (statement of Rep. Edwards)
    reprinted in 1978 U.S.C.C.A.N. 6436 ..........................................12

S. Rep. No. 598, 98th Cong. 2d Sess. 54-55, reprinted in 1978 U.S.C.C.A.N. 5787 ...................12

**California Regulations**

Cal. Code Regs., tit. 10, § 2695.1 ......................................................17

Cal. Code Regs., tit. 10, § 2695.4 ......................................................17

Cal. Code Regs., tit. 10, § 2695.7 ................................................17, 18

**Treatises**

4 *Collier on Bankruptcy* P 502.06 (15th ed. rev. 1999) ..............................15

Case: 19-30088    Doc# 4232    Filed: 10/16/19    Entered: 10/16/19 15:26:07    Page 7 of
32

The Official Tort Claimants' Committee ("TCC") hereby files this opposition to the motion [Dkt. 3992] (the "Motion") filed by PG&E Corporation and Pacific Gas & Electric Company (collectively, the "Debtors") for approval of a Restructuring Support Agreement (the "RSA") and a settlement term sheet (the "Term Sheet") (collectively, the "Settlement").

## I.    **INTRODUCTION**

The Debtors' Motion asks this Court to approve two agreements: (i) an RSA under a "business judgment" standard, and (ii) a Term Sheet under a F.R.B.P. 9019 standard. In truth, there is one, single, executed and incorporated Settlement document for approval under a Ninth Circuit legal standard that receives little discussion and no analysis in the Motion.

The Settlement is a violation of the Ninth Circuit's "fair and equitable" standard. It reorders the Bankruptcy Code's priority scheme by committing the estates to pay subordinated subrogation rights before Judge Donato can determine in the estimation proceeding whether the victims of California wildfires (the "Fire Victims") will be paid in full under the Debtors' capped trust. The Settlement pays $11 billion in cash to subrogation claimants while the Fire Victims' trust is funded with stocks, bonds, or other non-cash alternatives. And it forces Fire Victims to give their insurance companies impermissible third-party releases. Each of these terms of the Settlement bars a finding that the Settlement is "fair and equitable."

The Insurance Companies and Hedge Funds that hold subrogation rights owe a continuing duty of good faith to the Fire Victims under California law. Their pursuit of payment in a manner that impairs their insureds' ability to obtain a full recovery is a violation of these duties, and an actionable claim for bad faith. The Settlement embodies this breach of the duty of good faith, and seeks to address it—not with a remedy for the Fire Victims—but with two impermissible third-party releases of the Insurers/Hedge Funds by the Fire Victims, first when Fire Victims vote on the plan (or fail to submit a ballot), and again through a release that must be signed in order to receive a distribution under the plan.

The Settlement gives a substantial cash recovery to insurers who are subordinated by law, and whose business model is underwriting risk, and it gives substantial profit to insider hedge funds who have invested in the subrogation rights arising from the Fire Victims' claims. But it

also decimates the legal rights of the Fire Victims who are not parties to the Settlement, and have not agreed to give up the rights and benefits that are erased in the Settlement. The Settlement is not "fair and equitable" as a matter of federal bankruptcy law or California law, and it is neither fair nor equitable as a matter of conscience.

## II. SETTLEMENT TERMS

There are several issues concerning the terms of the Debtors' Settlement which will help to place the legal issues in context.

### A. There Is One, Unified Settlement

There is only one, fully executed agreement for approval by this Court, not two agreements under two separate legal standards. The RSA is the only document signed by the Debtors and the Insurers/Hedge Funds. It states that it "constitutes the entire agreement of the Parties" (*see* RSA, Section 10), and incorporates an unexecuted settlement Term Sheet that "is for illustrative purposes only and is intended to facilitate discussions" (*see* Term Sheet at Preamble). The pretense that there are two separate agreements, and two separate standards for analysis, is false. There is a single, executed Settlement that is subject to the Ninth Circuit's standards for approval of a compromise of controversies.

### B. The Court Cannot Determine Whether Fire Victims Will Be Paid in Full Prior to the Estimation Proceeding and Tubbs Trial

Judge Donato has scheduled the estimation proceeding to commence on February 18, 2020, for a projected two to three-week trial, while the eight-week Tubbs trial is scheduled to begin on January 7, 2020. Though estimation is unnecessary for the TCC/bondholder plan, it is necessary for this Settlement. And until those proceedings are completed in March, no one in these Cases can credibly argue that they know what is required to pay Fire Victims in full.

Payment of Fire Victims in full is not simply a matter of best intentions. It is a legal standard governing whether the Insurers/Hedge Funds have a right to enter into their Settlement with the Debtors, and it pertains directly to whether the Debtors' Settlement is "fair and equitable" under Ninth Circuit authority, as discussed in the legal analysis below.

As this Court knows, a capped trust creates a risk that Fire Victims will not be paid in full,

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 2 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

particularly where the Debtors' Plan proposes a catch-all capped trust that is meant to cover the claims of Fire Victims, FEMA, the CPUC, attorney's fees, any criminal restitution, and any other wildfire-related claims that may arise, all from an $8.4 billion fund of cash/stocks/bonds. Whether any plan in these cases will actually pay Fire Victims in full will only be known in hindsight. Recognizing this, Judge Donato stated at a hearing held on September 10, 2019, that he "fully embraced" the TCC's concern that estimation of claims for a capped trust could lead to a substantial underestimation of actual damages, and noted that he could address such a risk by applying a 2.5 times multiplier to property damages, though he intends a more detailed analysis. *See* Declaration of David J. Richardson (the "Richardson Decl."), at ¶ 4 and <u>Exhibit A</u> thereto. Judge Donato's position is consistent with courts that have held that courts should estimate claims that include wrongful death and personal injury claims for purposes of a capped trust on the high side to avoid injury to the rights of the claimants. *See In re Roman Catholic Archbishop of Portland*, 339 B.R. 215, 223 (Bankr. D. Or. 2006) ("[E]stimation of the claims for compensatory damages should err on the high side of the probable range, to assure an adequate fund for payment of liquidated claims").

The Fire Victims' right to be paid in full ahead of subordinated subrogation claimants is the Fire Victims' primary protection to ensure that they can recover the entirety of their damages. But the Settlement erases that right before it is clear whether Judge Donato will estimate high or estimate low. Until Judge Donato has ruled, any Settlement that attempts to deprive Fire Victims of their protections under the made whole rule cannot be "fair and equitable."

The Debtors recognized this point by wisely conditioning their $1 billion public entities settlement on a future finding that it is "fair and equitable" in the context of plan confirmation proceedings. The same rule and procedure must apply to any proposal for treatment of subordinated subrogation rights, such that the Settlement should be resolved solely in connection with plan confirmation proceedings unless and until there is an assurance that Fire Victims will receive an actual recovery of their actual damages, in full.

### C. The Settlement Predetermines Key Plan Terms

The Settlement includes extraordinary terms that should only be resolved in the context of

plan confirmation, including:

- The $11 billion allowed amount for the interests of the Insurers/Hedge Funds (the "Subrogation Rights") will survive and "shall be binding in the Chapter 11 Cases" as a <u>minimum</u> payment to the Insurers/Hedge Funds, even upon termination of the Settlement (RSA, Sections 4, 5(b));

- The Debtors cannot object to or settle any Subrogation Right, even if the Settlement has been terminated (RSA, Section 4);

- The Insurers/Hedge Funds and Debtors are each barred from negotiating any plan terms with other parties in these Cases (RSA, Section 2(b)(ii));

- The Settlement provides a guaranteed cash recovery for Subrogation Claims, while funding the Fire Victims' trust with a capped payment of cash, stocks, bonds, and other cash alternatives, creating discriminatory treatments that favors the subordinated class;

- The Settlement bars the Debtors from entering into any plan provision or agreement that recognizes mandatory subordination of Subrogation Claims under both California law and 11 U.S.C. § 509(c) (Plan Term Sheet, p. 4);

- Fire Victims are forced to grant the Insurers/Hedge Funds impermissible third-party releases, the first of which arises if the Fire Victims do not properly fill out their ballot, or fail to vote (which means that any Fire Victim who is homeless or lacks access to regular mail service will automatically release all claims) (RSA, p. 4; Plan at Sections 1.159, and 10.9(b)); and

- Even if a Fire Victim properly preserves claims on their ballot, they must sign a second third-party release of the Insurers/Hedge Funds in order to receive a distribution under the Plan (RSA, Section 3(a)(iii)).

The scope of the Settlement is far beyond the description given in the Motion, and it requires far more than a "business judgment" review. It violates so many provisions of the Bankruptcy Code and California law that it cannot be deemed "fair and equitable" under Ninth Circuit authority. It should be denied, or at the very least, continued to plan confirmation.

- 4 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

### D. The TCC Has Not "Embraced" this Settlement

The Debtors have argued before this Court that the TCC has "embraced" the Settlement in its own term sheet with bondholders. This severely misstates the TCC/bondholder term sheet. The TCC agreed to include $11 billion in funding for subrogation rights in the TCC/bondholder term sheet in exchange for a payment to Fire Victims that is about $6 billion higher than the Debtors' proposal, but the term sheet has not adopted any of the other offensive terms described in this Opposition. The TCC recognizes that a plan of reorganization is inherently a product of negotiation and compromise, and that Fire Victims may voluntarily propose or support a plan that permits a payment for Subrogation Rights if they conclude that it is in their overall interest to do so. This is the choice that the TCC was forced to make in response to the Debtors' Settlement. The TCC/bondholder term sheet is not an "embrace" of the Settlement, it is mitigation of damages in response to the Insurers/Hedge Funds' breach of their duties of good faith to their Insureds. The same dollar number for subrogation claims in two competing plans is a red herring. The Debtors cannot upset the Code's priority scheme over the objection of Fire Victims, and cannot do so in a pre-plan Settlement under any circumstances.

### E. The Settlement Is a Vestige of Exclusivity

The Settlement is a product of the Debtors' efforts to maintain plan exclusivity. It was negotiated to demonstrate movement towards confirmation, and to pressure other parties to settle on the terms described in the attached Plan. But the Settlement also bars the Insurers/Hedge Funds from discussing any alternative plan with any other parties in these Cases. *See* RSA, Section 2(b)(ii). The Settlement is not merely an agreement to liquidate the value of Subrogation Rights for purposes of the Debtors' Plan, but expressly and intentionally hinders any efforts to discuss plan terms among all parties in interest. If the Settlement is approved, there can be no global mediation, there can only be two competing plans proceeding parallel to one another.

## III. LEGAL ARGUMENT

### A. The Debtors Have Applied the Wrong Standard for Approval of a Compromise of Controversies

The Debtors' Motion asks this Court to: (i) approve the RSA under a "business judgment"

standard on the grounds that it is a mere plan support agreement, and (ii) approve the Term Sheet on the grounds that standards under F.R.B.P. 9019 are "deferential" to a debtor's judgment. This is a misleading description the single, executed Settlement that is before this Court, and it was described this way solely to create the impression that a "business judgment" standard is the standard for approval that this Court should apply.

In the Ninth Circuit, the "business judgment" standard of Section 363 in only relevant to the approval of a settlement when the settlement involves the disposition of property *of* the estate, such as a transfer of property, or a settlement of a claim *of* the estate. Section 363 is not applicable to a settlement of claims *against* the estate. *See In re Mickey Thompson Entm't Grp., Inc.*, 292 B.R. 415 (BAP 9th Cir. 2003); *see also Adeli v. Barclay (In re Berkeley Del. Court, LLC)*, 834 F.3d 1036, 1040 (9th Cir. 2016) (following *Mickey Thompson* and holding that court could apply Section 363 to "settlement involving a sale of the estate's potential claims").

None of the cases cited in the Debtors' Motion for the Section 363 standard even suggest that Section 363 applies to a settlement of claims *against* the estate. Each deals with a debtor's use or sale of estate assets, while none pertain to a settlement of claims against the estate.[1]

The Settlement is not a "sale" of estate claims. It is a complex agreement to liquidate claims *against* the estate, predetermine their classification and priority for future plan confirmation, and force Fire Victims to release third-party claims in order to receive a discriminatory distribution. The Bankruptcy Code sections that are relevant to the Motion are not Sections 363 or 105, but Sections 1122, 1124, and 1129.

The Debtors claim that this Court approved a plan support agreement/ settlement that supports their position in the first PG&E case in 2002. It does not. The motion filed in 2002 sought approval pursuant to Section 363 solely for a term in the agreement seeking authority to

---

[1] *See In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983) (sale of debtor's ownership in common stock of second corporation); *In re Walter*, 83 B.R. 14, 17 (B.A.P. 9th Cir. 1988) (addressing debtors' use of pension funds under Section 363); *In re ASARCO, L.L.C.*, 650 F.3d 593, 597 (5th Cir. 2011) (sale of a debtor's interest in a judgment); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 155 (D. Del. 1999) (approval of employee incentive programs under Section 363); *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (inquiring whether debtor's engagement of lobbyists was "ordinary course" under Section 363); *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (no mention of Section 363, addressing break-up fees); *In re AWTR Liquidation Inc.*, 548 B.R. 300, 314 (Bankr. C.D. Cal. 2016) (no mention of Section 363, addressing insider fraud and breaches of fiduciary duties).

- 6 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

pay interest on undisputed claims during the chapter 11 case. *See* <u>Exhibit B</u> to Richardson Decl., at pp. 19-21. The portion of the motion that addressed the settlement of claims against the estate for plan purposes was based solely on Rule 9019, and included a four-page analysis of the Rule 9019 factors that must be satisfied (*Id*. at pp. 10-16), unlike the current Motion, which makes no effort to address these necessary factors.

The Debtors' attempt to foist a "business judgment" standard of analysis on their Settlement is particularly misplaced given the insider nature of the Settlement. The Settlement resolves six billion of dollars of subrogation rights held by Baupost, one of the Debtors' largest shareholders, who played an active role in direct negotiations with the Debtors' management. See <u>Exhibit C</u> to Richardson Decl. Therefore, the Settlement must be reviewed with greater scrutiny, not a mere business judgment pass. *See Connecticut Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 919 (5th Cir. 1995) ("The court's scrutiny must be great when the settlement is between insiders and an overwhelming majority of creditors in interest oppose such settlement of claims."); *In re HyLoft, Inc.*, 451 B.R. 104, 113 (Bankr. D. Nev. 2011) ("While insider status alone is not fatal to dealings between a debtor and an insider, the court must scrutinize these dealings more carefully."); *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 498 (Bankr. S.D.N.Y. 1991) (applying higher scrutiny to approval of a settlement between insider and the chapter 11 debtor, where no trustee was appointed).

Despite the stricter standard of review that must be applied to this Settlement, it would fail under the barest standard of review, as it is not "fair and equitable" on its face.

**B. The Wildfire Claims Are Each A Single, Indivisible Claim**

The Motion is based on the premise that Fire Victims hold their Wildfire-related claims against the Debtors' estate, while the Insurers/Hedge Funds hold their own, separate claims against the Debtors. This is incorrect. For each Fire Victim, there is a single, indivisible claim to recover their losses. When an insurance company pays benefits to a Fire Victim, it—or its assignee—acquires a subrogation right under that same claim, subject to the Fire Victim's right to a priority recovery of the entirety of their damages. The Insurer does not acquire a separate claim, and the Insurer and the Insured do not become competitors, holding two separate claims.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*In re Applause, LLC*, 2006 Bankr. LEXIS 2341 *15 (Bankr. C.D. Cal. April 3, 2006) (citing Restatement (Third) of Surety and Guaranty, § 27(1), for concept that insured and subrogated insurer hold interests in "the same undivided claim" until the insured has been paid in full); *In re Dow Corning Corp.*, 250 B.R. 298, 327 (Bankr. E.D. Mich. 2000) (government's reimbursement claim is same claim as tort claim pursued by beneficiary, otherwise "there is no legal theory that would enable the Government to seek reimbursement from the party sued."); *Phoenix Ins. Co. v. Erie & Western Transp. Co.*, 117 U.S. 312, 321, 6 S. Ct. 750, 29 L. Ed. 873 (1886) ("[T]he insurer acquires a beneficial interest in that right of action").

The Settlement does not settle any of these single claims of Fire Victims, but instead settles the subrogated rights of subordinated Insurers/Hedge Funds, without any certainty that the Debtors will ever pay Fire Victims in full. As fully explained below, this is a violation of federal bankruptcy law and California law, and it deprives the Settlement of "fair and equitable" status.

## C.     <u>The "Fair and Equitable" Test Has Specific Meaning in the Ninth Circuit</u>

When the Motion's analysis turns to application of Rule 9019, the Debtors briefly state that the Settlement must be "fair and equitable," and must be analyzed pursuant to four factors described in *Martin v. Kane (In re A&C Properties)*, 784 F.2d 1377 (9th Cir. 1986).

But beyond a brief quotation, the Motion does nothing to demonstrate that the Debtors' insider Settlement satisfies this standard. This is likely intentional, as the standards cannot be met. But the Debtors' refusal to address these standards is fatal to the Settlement:

> An approval of a compromise, absent a sufficient factual foundation which establishes that it is fair and equitable, inherently constitutes an abuse of discretion.

*In re A&C Props.*, 784 F.2d at 1383 (*citing In re AWECO, Inc.*, 725 F.2d 293, 299 (5th Cir. 1984)).

The Ninth Circuit's adoption of the "fair and equitable" language from the *In re AWECO* case is particularly instructive. In *In re AWECO*, the Fifth Circuit considered the propriety of a settlement that paid an unsecured creditor, but could have imperiled the ability of senior creditors to receive full payment on their claims under a plan. In language that is directly relevant to this case, and relying on authority of the U.S. Supreme Court, the Fifth Circuit explained:

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

> The words "fair and equitable" are terms of art -- they mean that "senior interests are entitled to full priority over junior ones." *SEC v. American Trailer Rentals Co.*, 379 U.S. 594, 85 S. Ct. 513, 13 L. Ed. 2d 510 (1965); *Protective Committee v. Anderson, supra*, 390 U.S. at 441, 88 S. Ct. at 1171. If a court approves a settlement as part of a reorganization plan absent reasonable assurance that the settlement accords with the fair and equitable standard, that court has abused its discretion.

*In re AWECO*, 725 F.2d at 298. The Ninth Circuit subsequently followed this specific holding of *AWECO*, both for plan analysis, and pre-plan settlements. *See United States v. Technical Knockout Graphics (In re Technical Knockout Graphics)*, 833 F.2d 797, 803 (9th Cir. 1987) ("To approve a reorganization plan, the court must find that the proposed plan is "fair and equitable," meaning that the payment priorities of the Bankruptcy Code are met. The debtor-in-possession is not free to pay whomever it chooses before the plan is confirmed, as this could defeat the priority scheme established by Congress.") (citation to *In re AWECO* omitted); *see also Czyzewski v. Jevic Holding Corp.*, __ U.S. __, 137 S. Ct. 973, 986, 197 L. Ed. 2d 398 (2017) (affirming decision denying approval of structure dismissal settlement as its violation of the Code's priority requirements resembled routinely-rejected transactions such as a "sub rosa" plan, or an asset sale that "swallo[wed] up Chapter 11's safeguards"); *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 464 (2d Cir. 2007) ("whether a particular settlement's distribution scheme complies with the Code's priority scheme must be the most important factor for the bankruptcy court to consider when determining whether a settlement is 'fair and equitable' under Rule 9019")[2].

A settlement in the Ninth Circuit must also be "fair and equitable" to the creditors of the estate. The Motion focuses on the best interests of the Debtors, but the Ninth Circuit focuses on whether a settlement is "fair and equitable" to creditors, and whether it satisfies the "paramount

---

[2] The Motion claims *Iridium* is a case that "approved settlements and support agreements similar to the Subrogation Claims Settlement and RSA under Bankruptcy Rule 9019." Motion at p. 25. It is the opposite. In *Iridium*, the Second Circuit actually reversed a bankruptcy court's approval of a settlement very similar to this Settlement, for the same reasons argued in this Opposition, and relying in part on *AWECO*. The Settlement in *Iridium* was a multi-party, pre-plan settlement that conceded the validity of certain lenders' liens, and divided estate cash into three funds, one of which was created to fund litigation against Motorola, an administrative creditor. Any leftover litigation funds would be distributed to junior creditors, depriving Motorola of payment on its claim. Motorola objected to the settlement on the grounds that it was not "fair and equitable" because it violated the absolute priority rule, relying on *AWECO*. 478 F.3d at 456-460. The lower court approved the settlement, but the Second Circuit reversed on the grounds that the movant had failed to present "specific and credible grounds to justify [the settlement's] deviation" from the Code's priority scheme.

- 9 -

interest of creditors" prong of its four-part test. *In re A&C Props.*, 784 F.2d at 1381; *In re Mickey Thompson*, 292 B.R. at 420 (a compromise must be "fair and equitable to the creditors"). It has further explained that in the course of reviewing a settlement for approval, a "court must preserve the rights of the creditors." *In re A&C Props.*, 784 F.2d at 1382. *See also In re Woodson*, 839 F.2d 610, 620-21 (9th Cir. 1988) (a settlement by a debtor-in-possession that benefits it "own interests at the expense of [its] creditors" is not "fair and equitable").

Further, a court may not approve a settlement where the object of the settlement is beyond the scope of the Court's authority or jurisdiction. *In re Autosport Int'l, Inc.*, 2013 Bankr. LEXIS 2530 *14 (Bankr. C.D. Cal. June 24, 2013) (noting that if a court did not have authority to retroactively approve fees under Section 503(b) "approving the settlement would be improper"). As discussed below, the Settlement forces Fire Victims to execute two impermissible third-party releases of the Insurers/Hedge Funds, and therefore cannot satisfy Rule 9019.

In summary, a settlement cannot be approved as "fair and equitable" in the Ninth Circuit if it: (i) reorders the Code's priority scheme; (ii) deprives non-settling creditors of their rights; <u>or</u> (iii) grants impermissible third-party releases. As explained below, the Settlement fails on all three accounts, and cannot be approved as a "fair and equitable" settlement. Perhaps at plan confirmation, certain Settlement terms may be approved in a plan, much like the entire public entities settlement. But the Settlement cannot be approved as "fair and equitable" at this time.

### D. The Settlement Is Not "Fair and Equitable"

#### 1. The Insurers/Hedge Funds' Subrogation Rights Are Subordinate to the Fire Victims' Claims as a Matter of Law

Under California law and Section 509(c) of the Bankruptcy Code, the Fire Victims have a right to recover the entirety of their damages from the Debtors before the Insurers/Hedge Funds can receive any payment on their Subrogation Rights. The Debtors' insider Settlement erases this critical right in violation of the "fair and equitable" requirement, and it does so before the parties know whether Judge Donato will estimate the Fire Victims' claims high, or estimate low.

The rights of Insurers are determined by California law, which provides that an Insurer who makes a payment to an Insured obtains a right to reimbursement from the tortfeasor by

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

equitable subrogation, in the name of the Insured. *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 957 (9th Cir. 2013) ("Subrogation is a common law doctrine based in equity that permits an insurer to take the place of the insured to pursue recovery from third-party tortfeasors responsible for the insured's loss."); *Fireman's Fund Ins. Co. v. Maryland Casualty Co.*, 65 Cal.App.4th 1279, 1291 (1998) (an insurer who pays a claim "is equitably *subrogated* to the claimant") (emphasis in original).

The concept of subrogation has been codified into Section 509 of the Bankruptcy Code, and recognizes a statutory right to pursue a right of reimbursement from the debtor. *See* 11 U.S.C. § 509(a) and (b).

Subrogation rights are the <u>only</u> rights that the Insurers/Hedge Funds have settled under this Settlement, and they only possess such rights standing in the shoes of the Fire Victims. The Insurers are not the Debtors' insurers, they are the Fire Victims' insurers, and as a result there is no contract or duty between the Insurers and the Debtors that could give the Insurers/Hedge Funds any independent standing to pursue their Subrogation Claims. If the Insurers/Hedge Funds do not possess such subordinate Subrogation Rights, then they possess no right to be here at all.

Under California law, it is a general rule that a subrogated insurer, or its assignee, may not recover any payment from the tortfeasor on account of their subrogation rights unless and until the insured has been "made whole" by recovering the entirety of their damages. *See Progressive West Ins. Co. v. Yolo County Superior Court*, 135 Cal.App.4th 263, 274 (2005) ("It is a general equitable principle of insurance law that, absent an agreement to the contrary, an insurance company may not enforce a right to subrogation until the insured has been fully compensated for [his or] her injuries, that is, has been made whole."); *Sapiano v. Williamsburg Nat. Ins. Co.*, 28 Cal.App.4th 533 (1994) ("[T]he entire debt must be paid. Until the creditor has been made whole for its loss, the subrogee may not enforce its claim based on its rights of subrogation").

The made-whole rule has been adopted into the Bankruptcy Code, in Section 509(c), which provides:

> (c) The court **shall subordinate** to the claim of a creditor and for the benefit of such creditor an allowed claim, by way of subrogation under this section, or for reimbursement or

- 11 -

Case: 19-30088    Doc# 4232    Filed: 10/16/19    Entered: 10/16/19 15:26:07    Page 18 of 32

contribution, of an entity that is liable with the debtor on, or that has secured, such creditor's claim, until such creditor's claim is paid in full, either through payments under this title or otherwise.

11 U.S.C. § 509(c) (emphasis added).  *See In re Applause, LLC*, 2006 Bankr. LEXIS 2341 at *14 ("The language in Section 509(c) derives from the common law 'made whole' rule …"); *In re Denby Stores, Inc.*, 86 B.R. 768, 779 (Bankr. S.D.N.Y. 1988) (holder of subrogation claim "is subordinated" under Section 509(c) until original claimants are "paid in full, either through payments under Title 11 or otherwise").  Section 509(c) bars a subrogation claimholder from "compet[ing] with the creditor" until the creditor has been "paid in full."  *United States v. Dos Cabezas Corp.*, 995 F.2d 1486, 1492 (9th Cir. 1993) (*quoting* 124 Cong. Rec. H11,089 (daily ed. 28 Sept. 1978) (statement of Rep. Edwards) reprinted in 1978 U.S.C.C.A.N. 6436, 6449-50); *see also* S. Rep. No. 598, 98th Cong. 2d Sess. 54-55, reprinted in 1978 U.S.C.C.A.N. 5787, 5840-41).

Whether the Insurers/Hedge Funds assert their Subrogation Rights under California law, or Section 509, they are subject to the made whole rule.

Under the Bankruptcy Code, under California law, and under federal common law, subordination or disallowance of subrogation rights is mandatory until the insured has recovered the entirety of their damages.  *See* Section 509(c) ("The court shall subordinate …"); *In re B.E.S. Concrete Products, Inc.*, 93 B.R. 228 (Bankr. E.D. Cal. 1988) (finding Section 509(c) to be "mandating automatic subordination until the original creditor's claim is paid in full"); *Sapiano v. Williamsburg Nat. Ins. Co.*, 28 Cal.App.4th 533, 536 (1994) ("[T]he entire debt <u>must</u> be paid. Until the creditor has been made whole for its loss, the subrogee may not enforce its claim based on its rights of subrogation") (emphasis added); *Barnes v. Independent Automobile Deals Association of California Health & Welfare Plan*, 64 F.3d 1389, 1395 (9th Cir. 1995) (adopting "as federal common law th[e] generally accepted rule that, in the absence of a clear contract provision to the contrary, an insured <u>must</u> be made whole before an insurer can enforce its right to subrogation") (emphasis added).

Courts have modified the general rule to permit <u>certain</u> actions by a subrogated insurer depending upon the position of the Insured.  If the Insured pursues a recovery of remaining damages from the tortfeasor, the Insurer/Hedge Fund has a choice: it must join forces with the

Insured and assist in the litigation, or it must sit on the sidelines and do nothing until the Insured has been paid in full. The Insurers cannot—as the Insurers/Hedge Funds have done here— venture out on their own in competition with the Insured:

> When an insurer does not participate in the insured's action against a tortfeasor, despite knowledge of that action, **the insurer cannot recover any funds obtained through settlement of the action unless the full amount received exceeds the insured's actual loss**. [Citation.] Furthermore, the insured need not account to the nonparticipating insurer 'for more than the surplus remaining in his hands, after satisfying his loss in full and his reasonable expenses incurred in the recovery.' [Citation.] Thus, when an insurer elects not to participate in the insured's action against a tortfeasor, **the insurer is entitled to subrogation only after the insured has recouped his loss** and some or all of his litigation expenses incurred in the action against the tortfeasor.

*Plut v. Fireman's Fund Ins. Co.*, 85 Cal.App.4th 98, 104 (2000) (emphasis added).

The Fire Victims have filed class action lawsuits to obtain a full recovery of their damages, and tens of thousands of Fire Victims have filed proofs of claim in these bankruptcy Cases. The Insurers/Hedge Funds made a conscious decision <u>not</u> to join in those actions.

By contrast, when an Insured merely "sit[s] back and do[es] nothing to assert its rights against" the tortfeasor, a subrogated insurer may pursue a subrogation recovery if it does not impair the Insured's rights. *Chandler v. State Farm Mutual Automobile Insurance Co.*, 598 F.3d 1115, 1120 (9th Cir. 2010). In *Chandler*, the owner of a damaged van did not separately sue the negligent party to recover his remaining damages. But in these Cases, the Fire Victims are not "sit[ting] back and do[ing] nothing." *Id.* They are represented in class actions, and they are filing proofs of claim. Many of those who have not appeared in these cases are homeless, living in tent shelters, lacking basic internet services, or are elderly and unable to represent their interests. The Fire Victims who have yet to appear in these cases are not the van owner in *Chandler* who sat back and did nothing.

Moreover, as the Ninth Circuit confirmed in *Chandler*, its exception is limited and consistent with California law providing that a subrogated Insurer/Hedge Fund can only pursue its own recovery upon the inaction of the Insured if its efforts do not impair the ability of the Insured to recover its own remaining damages in full. *Id.*, 598 F.3d at 1122 (dismissing insured's bad faith claim against insurer because insured had not demonstrated that the insurer's self-help

- 13 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

actions "had done anything to impair" his rights to recover his own damages); *Hibbs v. Allstate Ins. Co.*, 193 Cal.App.4th 809, 821 (2011) (insured stated a claim for bad faith against insurer where insurer's efforts to recover subrogation damages were "a detriment" to the insured's ability to recover its remaining damages). The Insurers/Hedge Funds have substantially impaired the rights of Fire Victims in these Cases by entering into the Settlement with the Debtor, in violation of their ongoing duties of good faith.

There is nothing inequitable about applying the made whole rule to the Insurers/Hedge Funds. It is a long-standing rule designed to place appropriate risk of loss on those entities who engage in the business of underwriting loss, while protecting the victim. *Chandler*, 598 F.3d at 1120 (insurer "should bear the risk of loss" when "the loss of one of the two must go unsatisfied").

The TCC acknowledges that the Insurers/Hedge Funds may have a good-faith argument that, in any case where a Fire Victim has not filed a proof of claim in these cases—regardless of their personal circumstances—that Fire Victim may have waived their right to the made whole rule. But if such an argument is even advanced, it further undermines the Settlement, as it demonstrates that there are two separate classes of Insurers/Hedge Funds who are improperly receiving the same treatment in the Settlement. If the Insurers/Hedge Funds could succeed in arguing that non-appearing Fire Victims have waived the made whole rule, then they must concede that their Subrogation Claims must be split into two classes: (i) Subrogation Claims arising from the claims of Fire Victims who have <u>not</u> filed proofs of claim, which may be parri passu to the claims of Fire Victims, or in the same class; and (ii) a class of Subrogation Claims arising from the claims of Fire Victims who <u>have</u> filed claims, which must be a subordinated class. Moreover, even if the made whole rule is waived for some claims, the Insurers/Hedge Funds' duty of good faith to refrain from impairing the rights of their Insureds remains in place, for <u>all</u> Insureds, and has been breached by the Settlement's impairment of Fire Victims' rights.

If the Insurers/Hedge Funds claim their subrogation rights under California law, they are subordinated under California law. If they claim their rights under Section 509(a) and (b), they are subordinated under Section 509(c). Despite having reserved their right to argue that their

- 14 -

claims arise under Section 509 [*see* Dkt. No. 3020, p. 2, fn. 1], the Insurers/Hedge Funds may try to argue that they are not a "codebtor" with the Debtors for the Fire Victims' damages, and therefore aren't subject to Section 509(c). But the meaning of "codebtor" is broad. *In re Spirtos*, 103 B.R. 240, 244-48 (Bankr. C.D. Cal. 1989) ("The subrogation provision of section 509 does not preclude an insurer from being subrogated to the rights and claims of its insured against a debtor."); *In re Dow Corning Corp.*, 244 B.R. 705, 715 (E.D. Mich. 1999) (government's Medicare obligations make it a codebtor with tortfeasor that caused injury for purposes of Section 509); *citing* 4 *Collier on Bankruptcy* P 502.06[2][b] (15th ed. rev. 1999) ("Under Section 502, codebtor status is broadly interpreted, and a claim for reimbursement has been held to presuppose a codebtor relationship"). And if the Insurers/Hedge Funds are not "codebtors," then they have no rights under Section 509, and remain subordinated by California law that applies to equitable subrogation rights. It is one or the other, and the outcome is identical. *See In re Applause, LLC*, 2006 Bankr. LEXIS 2341 at *10-12 (if insurer's claim was based on equitable subrogation, it was disallowed as debt of beneficiary "has not been paid in full," and if based on Section 509, was disallowed given likelihood debtor would be incapable of paying the underlying claim in full).

The Subrogation Rights of the Insurers/Hedge Funds are subordinate to the claims of Fire Victims as a matter of law, and the Settlement's violation of that principle deprives it of "fair and equitable" status.

**2. The Settlement Is Not "Fair and Equitable" Because it Erases Fire Victims' Right to be Paid the Entirety of their Damages before Subrogation Rights Receive any Payment under the Plan**

The concept that Fire Victims will be paid "in full" under any plan is nothing more than a promise at this stage of the Cases. Even the Debtors' definition of payment "in full" under their Plan—which is forcing plan confirmation over the objections of Fire Victims, with a capped amount for their payment, rather than actual payment in full—is uncertain unless and until estimation of claims is complete.

Yet based on that alleged goal of payment "in full," and nothing more, the Settlement erases the Fire Victims' right to receive payment of the entirety of their damages ahead of any payment for Subrogation Rights. It furthers this impropriety by committing $11 billion in cash

- 15 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

for such payment, while the Fire Victims' trust will receive discriminatory treatment through a capped funding of cash, stock, bonds, or other cash alternatives at the Debtors' discretion. *See* Plan at p. 88 of 158, Section 1.125.

The Settlement and Plan improperly reverse the senior/subordinate relationship of the Insurer/Insured claims in these Cases, in violation of Section 509(c), in violation of California law, and in violation of the duties that the Insurers/Hedge Funds continue to owe to the Fire Victims. By upsetting the Code's priority scheme in this manner, before there is any certainty whether Judge Donato will estimate high or low, the Settlement has violated the primary requirement for approval of a compromise under Rule 9019, and cannot be "fair and equitable" under the Ninth Circuit's standard. *In re A&C Props.*, 784 F.2d at 1383; *In re Technical Knockout Graphics*, 833 F.2d at 803; *In re AWECO*, 725 F.2d at 299.

### 3. The Settlement Is Not "Fair and Equitable" Because it Impairs the Fire Victims' Ability to Recover the Entirety of their Damages in these Cases

Prior to the Petition Date, the class action lawsuits were the forum in which the Fire Victims were seeking to recover the entirety of their damages from the Debtors. Now, these chapter 11 Cases are the primary forum in which the Fire Victims are pursuing that right. As explained above, the Insurers/Fire Victims owe a duty of good faith to the Fire Victims that requires that they either assist the Fire Victims in their pursuit of a full recovery in these Cases, or do nothing to recover their own Subrogation Rights until the Fire Victims have recovered their damages. *Plut v. Fireman's Fund Ins. Co.*, 85 Cal.App.4th at 104.

By entering into their Settlement and plan support agreement with the Debtors, particularly at a time when the Debtors' exclusive right to propose a plan remained in place, the Insurers/Hedge Funds impaired the Fire Victims' ability to obtain an equitable remedy in these Cases, and forced the Fire Victims to mitigate their resulting damages by entering into a competing plan and compromise of their rights in these Cases. The joint TCC/bondholder plan establishes a much higher payment for the claims of Fire Victims than the Settlement and Debtors' Plan, but it also impairs rights of the Fire Victims as part of that compromise. The Settlement impairs the rights of the Fire Victims within its terms, and it further impaired the

rights of Fire Victims by forcing them to mitigate their damages in a competing term sheet.

A settlement that impairs the rights of creditors in the Ninth Circuit is a settlement that cannot be deemed "fair and equitable." *In re Woodson*, 839 F.2d at 620-21; *In re Mickey Thompson*, 292 B.R. at 420. The Settlement cannot satisfy the Ninth Circuit's standard for approval of a compromise.

### 4. The Settlement Represents a Violation of the Insurers/Hedge Funds' Ongoing Duties of Good Faith and California Insurance Regulations

As explained above, by entering into a Settlement that impairs the rights of Fire Victims in the very same Cases in which Fire Victims are pursuing a recovery of their entire damages, the Insurers/Hedge Funds have breached their ongoing duties of good faith to their insureds. *Chandler*, 598 F.3d at 1122; *Hibbs*, 193 Cal.App.4th at 821.

They have also breached duties that arise under California statutes and regulations by entering into their Settlement with the Debtors. Title 10 of the California Insurance Regulations, Sections 2695.1 et seq., is entitled "Fair Claims Settlement Practices Regulations." At least three of the specific regulations that fall within Title 10 are relevant to the Debtors' Settlement.

Section 2695.4 provides that no insurer may request that an unrepresented claimant "sign a release that extends beyond the subject matter which gave rise to the claim payment unless, prior to execution of the release, the legal effect of the release is disclosed and fully explained by the insurer to the claimant in writing." Cal. Code Regs., tit. 10, § 2695.4. The Settlement's impermissible third-party release requires unrepresented Fire Victims to execute a release of the Insurers/Hedge Funds of any and all claims when voting on the plan, and sign a second release of the Insurers/Hedge Funds in order to receive payment of their distribution under the plan (*see* discussion in following Section), in violation of this regulation.

Section 2695.7(q) requires a subrogated insurer to demand and recover their insured's deductible as part of any settlement with the tortfeasor:

> Every insurer that makes a subrogation demand shall include in every demand the first party claimant's deductible. Every insurer shall share subrogation recoveries on a proportionate basis with the first party claimant, unless the first party claimant has otherwise recovered the whole deductible amount.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10 CCR 2695.7(q).  The Insurers/Hedge Funds did not demand and obtain a recovery of every Fire Victim's unpaid deductible as a part of their Settlement, in violation of this regulation.  *See* Exhibit D to Richardson Decl.

The Insurers/Hedge Funds and the Debtors are very aware of Section 2695.7.  Their proof of claim form for subrogation claimants requires that each claimant file copies of their notices to Insureds under Section 2695.7(p).  *See* Dkt. No. 2688, ECF Page 4 of 18, ¶ 2.  The purpose of such notices is to inform Insureds that their Insurer is no longer pursuing a subrogation recovery, including the Insured's unpaid deductible.  Here, that concept has been corrupted by notices that will inform Insureds that their Insurers/Hedge Funds have abandoned their duties to their Insureds in order to reach their own settlement of their own interests.

If the Insurers/Hedge Funds had simply recognized their ongoing duties of "good faith" to the Fire Victims, and worked with the TCC to obtain the best possible recovery for the Fire Victims in these Cases, the Insurers/Hedge Funds might have had a legal argument to circumvent the made whole rule by their own efforts.  *See Barnes*, 64 F.3d at 1396 (*citing* 16 Couch on Insurance 2d § 61:1 at 125 (rev. ed. 1983) for the principle that insurer who participates in lawsuit against third party and assists with burdens of litigation can recover out of the judgment amount it has paid even when insured has not been made whole).  Instead, the Insurers/Hedge Funds made a conscious choice to treat the Fire Victims as their adversaries, rather than the beneficiaries of their ongoing duties of good faith and fair dealing, and to impermissibly place their own Subrogation Rights ahead of the Fire Victims' superior rights under federal and California law.

A Settlement that embodies an Insurer's abandonment of their duties of good faith and their obligations under state insurance regulations cannot be a "fair and equitable" settlement in the Ninth Circuit.  It violates the Code's priority scheme, it undermines the rights of Fire Victims to protect their interests in these Cases, and it asks this Court to approve the Insurers/Hedge Funds' breaches of their duties of good faith.  This cannot be the meaning of "fair and equitable," as a matter of law, or a matter of conscience.  *In re A&C Props.*, 784 F.2d at 1383; *AWECO*, 725 F.2d at 299; *In re Technical Knockout Graphics*, 833 F.2d at 803.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**5.    The Settlement Requires the Debtors' Solicitation of a Plan that Contains Impermissible Non-Debtor Releases**

It is blackletter law in the Ninth Circuit that a Bankruptcy Court does not have jurisdiction to grant non-debtor releases in a plan. *See Resorts Int'l v. Lowenschuss (in re Lowenschuss)*, 67 F.3d 1394, 1401 (9th Cir. 1995) ("This court has repeatedly held, <u>without</u> <u>exception</u>, that § 524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors.") (emphasis added); *American Hardwoods, Inc. v. Deutsche Credit Corp. (In re American Hardwoods Inc.)*, 885 F.2d 621, 626 (9th Cir. 1989) (finding "the bankruptcy court was powerless to discharge" nondebtor claims in a plan); *Underhill v. Royal*, 769 F.2d 1426, 1432 (9th Cir. 1985) ("The bankruptcy court 'has no power to discharge the liabilities of a bankrupt's guarantor.' ").

The Debtors cannot grant third party releases in a "plan settlement" that are impermissible in a plan.  Yet that is precisely what they seek to do by this Settlement, twice.

The first release required by the Settlement is derived from the requirement that the Debtors file the Plan that is Exhibit B to the Settlement.  The Plan provides in Section 10.9(b) that any vote by a Fire Victim to either accept or reject the Plan that is not properly completed to reserve claims, or any failure to submit a ballot, will be deemed a release of any Wildfire-related claims against the Insurers/Hedge Funds:

> As of … the Effective Date … **the Released Parties, are deemed forever released** and discharged, to the maximum extent permitted by law and unless barred by law, **by the Releasing Parties from any and all claims**, interests … damages … Causes of Action … losses … and liabilities whatsoever … that such holders or their affiliates (to the extent such affiliates can be bound) would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner **arising from, in whole or in part, the Debtors, the Wildfires** … **the Subrogation Claims RSA** …

*See* Plan, Section 10.9(b) (emphasis added).

The "Released Parties" who benefit from this release include the Insurers/Hedge Funds who are parties to the Settlement (*see* Plan, Section 1.15), while the released "Claim(s)" are those that fall under the broad definition set forth in Section 101(5) of the Code (*Id.*, Section 1.23).

And the "Releasing Parties" who are providing this broad release to the Insurers/Hedge

Case: 19-30088    Doc# 4232    Filed: 10/16/19    Entered: 10/16/19 15:26:07    Page 26 of 32

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Funds are defined to include all Fire Victims who fail to submit a properly marked ballot:

> any holder of a Claim (i) who votes to accept or reject the Plan, or (ii) whose vote to accept or reject the Plan is solicited but that does not vote either to accept or to reject the Plan and, in each case, does not indicate on a duly completed ballot submitted on or before the Voting Deadline that such holder opts out of granting the releases set forth in Section 10.9(b) of the Plan …

*See* Plan, Section 1.159.  If a Fire Victim votes on the Plan but doesn't properly mark the ballot to preserve their claims, they have released the Insurers/Hedge Funds.  More egregiously, if a Fire Victim does not submit any ballot, they have also released the Insurers/Hedge Funds (even if their reason for failing to submit a ballot may be because they are homeless, elderly, or unable to understand the Plan's convoluted release terms).  It is only if a Fire Victim submits a ballot that is properly marked to preserve their claims that a Fire Victim will not have released their claims.

But just in case anyone manages to properly preserve such claims while voting, the Settlement requires that this Court's confirmation order require that, before a Fire Victim can receive any distribution in this case, they must execute a release of "any and all claims" against various parties that include the Insurers/Hedge Funds, and specifically include "any potential made-whole claims," in a form subject to the approval of the Insurers/Hedge Funds.  *See* RSA, Sections 3(a)(iii) and (v), *see also* Term Sheet, p. 4, "Debtors Covenants."

These provisions in the Settlement and Plan for multiple third-party releases render unconfirmable any plan that complies with the Settlement, and ensure that the Settlement itself is neither "fair" nor "equitable."  *See In re Lowenschuss*, 67 F.3d at 1401; *American Hardwoods*, 885 F.2d at 626; *Underhill*, 769 F.2d at 1432.  If this Court is to depart from established Ninth Circuit law and permit third-party releases in a plan, it should do so only in the context of plan confirmation, and not in a pre-plan Settlement that contains these and other impermissible terms.

### E.   The Motion Fails to Satisfy, or Attempt to Satisfy, The Debtors' Burden

As the Motion briefly acknowledges, a settlement must be analyzed for approval under Rule 9019 pursuant to four specific factors:

> (a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*In re A&C Props.*, 784 F.2d at 1381 (9th Cir. 1986).

"[A]s the party proposing the compromise," the Debtors have the burden of proving that the Settlement meets this standard. *Id*. This Court's own local rules require that any party filing a motion for approval of a settlement must submit a declaration that explains:

> why the compromise is "fair and equitable" and "in the range of reasonableness" and include a fact-specific analysis of the four factors set out in *In re A & C Properties*, 784 F.2d 1377, 1381 (9th Cir. 1986). In routine settlements, the factors can be described in a paragraph or two; more complex matters require a more detailed analysis.

*See* Practices and Procedures in Judge Montali's Court, Section I.H.

The Motion does not provide any detailed analysis of these factors. It attaches the Declaration of Jason P. Wells [Dkt. No. 3993] (the "Wells Decl."), but the Wells Decl. doesn't offer any "fact specific analysis" as required by this Court. Instead, it merely repeats that the Settlement satisfies the inapplicable "business judgment" test. *Id*., pp. 4:4, 5:3, 5:27, and 6:27.

### 1. The Probability of Success in the Litigation

The Subrogation Rights held by the Insurers/Hedge Funds are merely an interest in the indivisible Claims of the Fire Victims. The probability of the Subrogation Rights' success is identical to the probability of the TCC's success in the estimation proceeding and Tubbs trial. The only substantial difference is the discounting factor that must be applied to the Subrogation Rights if Fire Victims are not paid in full, and Subrogation Rights are disallowed or subordinated pursuant to the mandatory made-whole doctrine. Thus, the probability of success analysis has to begin with the underlying claims of Fire Victims, yet the Motion and Wells Decl. say nothing to explain the nature or existence of such an analysis.

Nor do the Motion or Wells Decl. explain the decision to pay the same recovery for all Subrogation Rights. The Debtors' Settlement pays a recovery on all Subrogation Claims regardless of the Wildfire that was involved, while the Debtors continue to deny liability to the Fire Victims for the same, underlying and indivisible claims. Rather than explain this absurdity, the Motion and Wells Decl. simply argue that all Subrogation Rights are subject to uncertain

- 21 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

litigation, and therefore are properly settled under the terms of the Settlement. *See* Wells Decl., p. 5 of 8. This is not a fact-based justification for the probability of success factor, and silence on this *A&C Props.* factor means that the Debtors have failed to meet their burden.

The probability of success analysis is actually remarkably simple. If, following estimation of claims and the Tubbs trial, the Debtors are unable to pay the entirety of the Fire Victims' damages, then the probability of success of the *subordinated* Subrogation Claims is zero. On the other hand, if, following estimation and the Tubbs trial, the Debtor are able to pay the entirety of the Fire Victims' damages, then the probability of success of the subordinated Subrogation Claims is the extent to which the Debtor has sufficient remaining funds to pay such claims.

The Debtors' insider Settlement has reversed the order of that analysis, by paying Subrogation Claims first, and then promising that there will surely be enough cash/stocks/bonds left over to pay Fire Victims' claims, whether Judge Donato estimates high or low. This is not "probability of success." This is a Debtor that was desperate to show movement towards a plan, even it required a plan partner willing to abandon its duties of good faith to Insureds.

The Debtors have made no effort to justify the probability of success factor as it applies to this Settlement, in a case where they continue to dispute any payment to Fire Victims on the exact same indivisible claims.

### 2. The Difficulties, if any, to be Encountered in the Matter of Collection

This factor is irrelevant to the Settlement.

### 3. The Complexity of the Litigation Involved, and the Expense, Inconvenience and Delay Necessarily Attending It

The Debtors' only effort to address this factor is to argue in the Wells Decl. that the estimation trial will be "time consuming, expensive, and highly uncertain." *Id.*, p. 5 of 8.

This is not only insufficient to meet the Debtors' burden, it is also wrong. The estimation trial will estimate the identical, indivisible claims of the Fire Victims. The only difference is that counsel for the Insurers/Hedge Funds will watch from the benches, knowing that their clients have already secured a subrogation recovery in violation of California law. The estimation trial will involve the same complexity, expense, inconvenience and delay whether or not there is a

Settlement with the Insurers/Hedge Funds.

This factor does not support the Settlement.

### 4. The Paramount Interest of the Creditors and a Proper Deference to Their Reasonable Views In the Premises

The Motion and Wells Decl. say nothing to address this factor other than to make the conclusory statement that the Settlement is "in the best interests of the Debtors' estates and all stakeholders." Motion at p. 23.

But the Settlement is an abandonment of Fire Victims, and a sly deal with insiders whose only right to payment in this case is dependent upon the priority rights of those same abandoned creditors. Among its terms, it:

- impairs creditors by forcing them to release the Insurers/Hedge Funds in order to receive a distribution under the Plan;
- impairs creditors by causing creditors to give an impermissible third-party release if they do not return a ballot, or mark it incorrectly;
- erases Fire Victims' rights to be paid the entirety of their damages before their Insurers/Hedge Funds are paid, in violation of California law and Section 509(c);
- pays funds to Insurers/Hedge Funds while the Debtors simultaneously contest the same, indivisible claims of the Fire Victims in federal and state litigation;
- violates the Insurers/Hedge Funds' duties to the Fire Victims under California law;
- violates the absolute priority rule;
- requires discriminatory treatment in the plan by paying all cash to the Insurers/Hedge Funds' trust, but paying a mix of cash/stocks/bonds to the Fire Victims' trust, at the Debtors' option; and
- favors insider shareholders who hold Subrogation Claims by assignment, while continuing to contest liability to the Fire Victims.

The Settlement fails to protect the "paramount interest" of creditors.

In sum, the Debtors have failed to present any fact-based argument or declaration in connection with the four *A&C Props.* factors that must be satisfied before the Settlement may be

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

approved. It is a knowing and intentional failure to meet their burden, for the reasons argued above. The Settlement cannot meet the requisite standard, and the Motion must be denied.

### F.       The Settlement Is an Impermissible Sub Rosa Plan

The Motion should also be denied on the grounds that the Settlement is a *sub rosa* plan. "The debtor and the bankruptcy court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan sub rosa. . . ." *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983).

Settlements that dictate the terms of a future plan, restrict creditors' rights to vote, distribute significant estate assets, dispose of claims, or otherwise violate the policies of chapter 11, are impermissible in chapter 11. *In re Millennium Multiple Emplr. Welfare Benefit Plan*, 2011 Bankr. LEXIS 1973 *23-24 (Bankr. W.D. Okla. February 18, 2011) (citing cases).

The Settlement is far more than a mere settlement of claims, and far more than a plan support agreement. The Settlement determines the amount of the Insurers/Hedge Funds' Subrogation Rights for all purposes in these Cases, regardless of what plan might be confirmed—*unless* the Insurers/Hedge Funds are able to demand and obtain more under certain circumstances.

The Settlement deprives Fire Victims of a free and fair vote on the Debtors' plan, forces Fire Victims to sign third-party releases in order to get paid under a plan, and impermissibly erases the claims of Fire Victims against third parties even if they have no notice of these Cases.

The Settlement reorders the priorities of creditors holding claims or rights thereunder pertaining to the Wildfires by ensuring that the Insurers/Hedge Funds receive a guaranteed payment of cash on their respective Subrogation Rights without ensuring that their capped trust will have sufficient cash to pay the undetermined claims of the Fire Victims.

The Settlement requires pre-confirmation payment of $55 million to the Insurers/Hedge Funds' attorneys, even though they have done nothing to create the pool of funds from which they will be paid, which is improper under California law. *See Steinberg v. Allstate Ins. Co.*, 226 Cal.App.3d 216 (1990) (denying settlement's term requiring payment of attorney's fees of subrogated insurer, finding that the settlement pool of fund had been generated by the work of

- 24 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

plaintiffs' counsel, not insurance counsel, and awarding the fees instead to plaintiffs' counsel.)

At the very least, these are terms that deprive the Settlement of "fair and equitable" status. But they are also terms that satisfy the test of a *sub rosa* plan.

## IV.  CONCLUSION

If the Settlement had merely liquidated the Subrogation Rights at $11 billion, subject to proper treatment in a future plan pursuant to the priorities established by applicable law, none of the arguments raised herein would apply.  The Insurers/Hedge Funds would not have violated their ongoing duties of good faith because Fire Victims' rights would not have been impaired. The Settlement would not have violated the Code's priority scheme.  The Settlement would not have forced two impermissible third-party releases on all Fire Victims.  And the Settlement would not have required discriminatory treatment of the Fire Victims' trust with payments in cash alternatives.  But the Settlement includes all of these terms, and cannot be deemed a "fair and equitable" settlement under Ninth Circuit authority.  Perhaps some of these terms would be permissible in the course of consensual plan confirmation, or in a Second Circuit settlement.  But they are impermissible terms in a pre-plan settlement in the Ninth Circuit.

Wherefore, for all of the reasons argued herein, the TCC respectfully requests that this Court deny the Motion.

Dated: October 16, 2019

BAKER & HOSTETLER LLP

By:  */s/Robert A. Julian*
Robert A. Julian

*Counsel to the Official Committee of Tort Claimants*

Case: 19-30088    Doc# 4232    Filed: 10/16/19    Entered: 10/16/19 15:26:07    Page 32 of 32