# EXHIBIT A

Page 1

1                          Pages 1 - 51
2               UNITED STATES DISTRICT COURT
3               NORTHERN DISTRICT OF CALIFORNIA
4      Before The Honorable James Donato, Judge
5       IN RE: PG&E CORPORATION and    )
 PACIFIC GAS AND ELECTRIC        )
6      COMPANY,                  )
                           )
7              Debtors.    )    NO. 19-05257 JD
                    )
8                      )
9                 San Francisco, California
                Tuesday, September 10, 2019
10
              TRANSCRIPT OF PROCEEDINGS
11
 APPEARANCES:
12
 For Creditor Committee Official Committee of Tort Claimants:
13                 BAKER & HOSTETLER LLP
             Levi's Plaza
14                1160 Battery Street East - Suite 100
             San Francisco, California  94111
15           BY:  ROBERT A. JULIAN, ATTORNEY AT LAW
             KIMBERLY S. MORRIS, ATTORNEY AT LAW
16
 For Ad Hoc Group of Subrogation Claim Holders :
17                 WILLKIE, FARR & GALLAGHER LLP
             878 Seventh Avenue
18                New York, New York  10019
          BY:  ANTONIO YANEZ JR., ATTORNEY AT LAW
19                BENJAMIN P. MCCALLEN, ATTORNEY AT LAW
20                WILLKIE, FARR & GALLAGHER LLP
             1875 K Street, N.W.
21                Washington, D.C.  20006
          BY:  JOSEPH G. DAVIS, ATTORNEY AT LAW
22
23          (APPEARANCES CONTINUED ON FOLLOWING PAGE)
24     REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
             Official Reporter
25

1        MR. ORSINI:  So let me keep going down the list.

2        THE COURT:  Okay.  But, no, I mean, does that sound

3    about right, Mr. Julian?  You haven't had a chance to say much

4    yet so far, but --

5        MR. JULIAN:  Five or six days --

6        THE COURT:  Okay.

7        MR. JULIAN:  -- on liability, not on damages.

8        THE COURT:  Five or six days on the hook?

9        MR. JULIAN:  Your Honor, we just got their -- yeah.

10    They raised more issues than they're talking about, but if I

11    may address estimation overall --

12        THE COURT:  Yes.

13        MR. JULIAN:  -- in answering your question.

14        THE COURT:  Let's just pause for a moment and let

15    him -- yes, go ahead.

16        MR. JULIAN:  Sure.  First of all, the cases they're

17    talking about, the principles they're talking about, apply when

18    one is estimating claims for determining how big of a claim you

19    have to vote in a bankruptcy case or whether the plan is

20    feasible.

21        We're here for a completely different reason, and there's

22    a different standard that applies to that.  We're here by their

23    own admission to estimate how many claims will be allowed for

24    purposes of payment in a capped trust.

25        And the reason why I say there's a difference is because

1   when you're estimating -- when the Bankruptcy Court estimates

2   claims to determine a tort claim as for contract claimants --

3   contract claim or tort claim of a million dollars for purposes

4   of voting, if the judge is wrong, it doesn't matter because the

5   reorganized debtor comes out of bankruptcy and pays that claim

6   eventually whether it was $500,000 or a million two.

7        When you're dealing with what they're trying to do here

8   and like what happens in a mass tort case, it's this:  Their

9   plan essentially says that everyone in this case gets paid in

10   full except for the wildfire victims comprised of the insurers,

11   of some public entities, and the victims themselves.  And the

12   victims are going to have to live with whatever money is put

13   into that trust, and the amount of money that's put into that

14   trust is determined by your determining the value of those

15   claims as determined in the tort system in two ways:

16   Settlements and jury trials.

17        So you're predicting what will happen in settlements

18   historically with PG&E and what would happen in the future in

19   jury trials.  And here's the rub.  And there are only two cases

20   that really talk about this, Dow Corning involving products

21   liability, and the Archbishop of Portland cases involving mass

22   tort sexual abuse cases involving emotional distress; and the

23   judges in those cases said, "You know, if we estimate and we're

24   wrong and the trust is capped and the money is put in based on

25   my estimate, the judge's estimate, and the tort victims later

1    have their jury trials, as they're entitled to because they're

2    personal injury claims, the later jury trials could turn out to

3    be establishing damages higher than the estimation did."

4         THE COURT:  Let me -- yes, I fully embrace that.  I

5    get it.

6         MR. JULIAN:  Okay.

7         THE COURT:  So, look, here are the two poles in my

8    view.  Maybe I'm wrong, but here's how I'm thinking of it.  On

9    the one hand is making sure that everyone who's injured will be

10    made whole.  Okay?

11        MR. JULIAN:  Yes, Your Honor.

12        THE COURT:  On the other hand is the debtors' need to

13    have a number that they can plan with so that their plan of

14    reorganization can be approved.  Something's happening at the

15    PUC.  You know, there's a lot of downstream effects so you both

16    need an estimate of what the amount of money is going to be,

17    but the clear goal of estimation is to make sure nobody gets

18    stiffed at the end of it for legitimate claims.  So I'm not

19    worried about that.  I really want to focus on how we're going

20    to get there.

21        MR. ORSINI:  Right, Your Honor.

22        THE COURT:  And let me just jump-start it a little

23    bit.  Okay?

24        We have ruled out, I believe -- I certainly have -- we're

25    not doing individualized claim hearings.  That's just not

1    consistent at all with Section 502(c) or the amount of time we

2    have, and it's unrealistic and it doesn't matter anyway because

3    I can't bind anybody's hands.  So we're not going to add up

4    each claim individually.  That's an impossible task.

5         And I'm not -- as I said earlier, I'm not just going to

6    take 17 billion, multiply it by 2 and a half, and call it a

7    day, although I think in all seriousness I could do that, but

8    I'm not going to.

9         So what's the middle ground?  I'm asking you for the

10   middle ground.  I have come up with one and I'll just propose

11   it to you.  One middle ground would be to -- if there are legal

12   issues on liability, we can address those.  Those are, I think,

13   relatively straightforward as I suggested; but then past that,

14   what about something like this:

15        We have experts come in.  I think this data is readily

16   available, maybe it's not; but I think someone could say --

17   someone has done, I'm sure, detailed studies about what an

18   average wrongful death claim or payout is in a fire situation

19   for various regions of the state or maybe California as a

20   whole.

21        I'm sure there's data what the average property damage

22   claim is for fire.  Maybe it's by region in California or on

23   the state as a whole.  And then we multiply that by the number

24   of people who realistically -- it's an estimate, it's not an

25   exact headcount and it's also not a guess, it's an estimate --

1    people who realistically have a claim.

2        And that seems to me to be a week, maybe eight-day

3    expert -- I would probably do something like, you know, I'm

4    fond of a procedure called "hot tubbing" where we just have the

5    experts come in, and I mediate the discussion and we quickly

6    establish common ground among the people who are best situated

7    to know.

8        I mean, isn't something like that --

9        MR. JULIAN:  Yes, Your Honor, with one footnote.

10       THE COURT:  Oh, so you agree.

11       MR. JULIAN:  With one footnote.

12       THE COURT:  Okay.  I don't really do footnotes but go

13   ahead, yes.

14       MR. JULIAN:  In 2015 there was the Butte fire.  In

15   fact, they want to estimate the remaining Butte fire claims

16   that have not been paid.  There's --

17       THE COURT:  2015, yes.

18       MR. JULIAN:  546 homes were destroyed, some couple

19   hundred other structures.  They've paid out so far $900 million

20   in settlements and they've booked 1.1 billion total for that.

21       And we have been asking for their documentation -- we just

22   got it -- because we believe that the average payout in that

23   case for the property damage, the personal injury damages of

24   people suffocating and fleeing the fire and getting burned and

25   fearing for their lives, and the lost profits for the