# EXHIBIT B

FILED

MAR 0 5 2002

UNITED STATES BANKRUPTCY COURT
SAN FRANCISCO, CA

1  JAMES L. LOPES (No. 63678)
   JANET A. NEXON (No. 104747)
2  GARY M. KAPLAN (No. 155530)
   HOWARD, RICE, NEMEROVSKI, CANADY,
3      FALK & RABKIN
   A Professional Corporation
4  Three Embarcadero Center, 7th Floor
   San Francisco, California 94111-4065
5  Telephone:  415/434-1600
   Facsimile:  415/217-5910
6
7  Attorneys for Debtor and Debtor in Possession
   PACIFIC GAS AND ELECTRIC COMPANY

8                 UNITED STATES BANKRUPTCY COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10                    SAN FRANCISCO DIVISION

11

12  In re                              Case No. 01-30923 DM

13  PACIFIC GAS AND ELECTRIC           Chapter 11 Case
    COMPANY, a California corporation,
14                                     Date:   March 25, 2002
                 Debtor.              Time:   9:30 a.m.
15                                     Place:  235 Pine Street
                                               San Francisco, California
16  Federal I.D. No. 94-0742640

17

18        NOTICE OF MOTION AND MOTION BY PACIFIC GAS AND ELECTRIC
       COMPANY FOR ORDER (A) APPROVING SETTLEMENT AND SUPPORT
19       AGREEMENT BY AND AMONG PLAN PROPONENTS AND SENIOR
       DEBTHOLDERS, (B) AUTHORIZING PAYMENT OF PRE- AND POST-
20       PETITION INTEREST TO HOLDERS OF UNDISPUTED CLAIMS IN
         CERTAIN CLASSES, (C) AUTHORIZING PAYMENT OF FEES AND
21       EXPENSES OF INDENTURE TRUSTEES AND PAYING AGENTS AND
       (D) AUTHORIZING DEBTOR TO ENTER INTO SIMILAR SETTLEMENTS;
22        SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES

23             [SUPPORTING DECLARATION OF KENT M. HARVEY FILED
                          SEPARATELY]

24

25

26

27

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

# TABLE OF CONTENTS

                                                                            **Page**

NOTICE OF MOTION AND MOTION                                                    1

MEMORANDUM OF POINTS AND AUTHORITIES                                           2

I.    INTRODUCTION                                         2

II.   FACTUAL BACKGROUND                                        5

    A.  General Background.                       5

    B.  The Settlement Agreement.                 6

III.  ARGUMENT                                                      10

    A.  The Settlement Agreement Should Be Approved.                                                        10

        1.  The Probability Of Success On The Merits.                                              12

        2.  Litigation Of The Disputed Issues Would Be Costly And Result In Delays In Administration Of The Estate.      14

        3.  The Settlement Is In The Best Interests Of Creditors.                                   15

    B.  This Court Should Authorize The Debtor To Make Payments Of Pre-Petition Interest And Post-Petition Interest To Holders Of Certain Undisputed Claims.                        16

        1.  This Court Has Statutory Authority And Equitable Power Under Sections 105(a) And 363(b) Of The Bankruptcy Code To Permit The Debtor To Make Interest Payments To Holders Of Undisputed Claims During The Chapter 11 Case.           16

        2.  Early Payment Of Interest To Holders Of Undisputed Claims Is In The Best Interest Of The Debtor's Estate And Creditors.                   19

        3.  Proposed Procedure For Making Interest Payments.                                        21

    C.  Payment Of The Fees And Expenses Of Indenture Trustees And Administrative Bank And Other Paying Agents Should Be Approved.                                      22

    D.  The Debtor Should Be Authorized To Enter Into Substantially Similar Settlements Without Further Court Approval.     24

CONCLUSION                                                                   25

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

# TABLE OF AUTHORITIES

Page(s)

Cases

Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d. 1063 (2d Cir. 1983) — 17

DiStefano v. Stern (In re JFD Enters.), No. 99-2034, 2000 WL 560189 (1st Cir. May 1, 2000) — 17

In re Chateaugay Corp., 80 B.R. 279 (Bankr. S.D.N.Y. 1987) — 19

In re Equalnet Communications Corp., 258 B.R. 368 (Bankr. S.D. Tex. 2000) — 19

In re Ernst Home Ctr., Inc., 209 B.R. 974 (Bankr. W.D. Wash. 1997) — 17

In re Ionosphere Clubs, Inc., 98 B.R. 174 (Bankr. S.D.N.Y. 1989) — 18

In re Purofied Down Prods. Corp., 150 B.R. 519 (S.D.N.Y. 1993) — 11

In re Structurelite Plastic Corp., 86 B.R. 922 (Bankr. S.D. Ohio 1988) — 18

In re UNR Indus., Inc., 143 B.R. 506 (Bankr. N.D. Ill. 1992), rev'd on other grounds, 173 B.R. 149 (C.D. Ill. 1994) — 18

In re W.T. Grant Co., 699 F.2d 599 (2d Cir. 1983) — 11

Martin v. Kane (In re A & C Props.), 784 F.2d 1377 (9th Cir. 1986) — 11, 12, 15

Michigan Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.), 80 B.R. 279 (S.D.N.Y. 1987) — 16

Myers v. Martin (In re Martin), 91 F.3d 389 (3d Cir. 1996) — 10, 12

Nellis v. Shugrue, 165 B.R. 115 (S.D.N.Y. 1994) — 11, 12

Official Unsecured Creditors' Comm. v. Pennsylvania Truck Lines, Inc. (In re Pennsylvania Truck Lines, Inc.), 150 B.R. 595 (E.D. Pa. 1992), aff'd, 8 F.3d 812 (3d Cir. 1993) — 11, 12

Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414 (1968) — 11

Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.), 134 B.R. 499 (Bankr. S.D.N.Y. 1991) — 10, 11, 15

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

# TABLE OF AUTHORITIES

Page(s)

## Statutes

11 U.S.C.
§§101, et seq. — 1
§105(a) — 1, 16, 17, 18, 21
§105(b) — 16
§363 — 21
§363(b) — 1, 16, 17
§1107 — 5
§1108 — 5
§1129(a)(7) — 17

Fed. R. Bankr. P.
9019 — 24
9019(a) — 2, 10

N.D. Cal. Local Bankr. R. 9014-1(c)(2) — 2


## Other Authorities

R. Eisenberg & F. Gecker, The Doctrine of Necessity and Its Parameters, 73 Marq. L. Rev. 1 (1989) — 18

2 Lawrence P. King, Collier on Bankruptcy ¶105.01 (15th ed. rev. 2001) — 17

10 Lawrence P. King, Collier on Bankruptcy ¶9019.03 (15th ed. rev. 2001) — 24

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

MOT. FOR ORDER APPROVING SETTLEMENT & SUPPORT AGMT
-iii-

# NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on March 25, 2002, at 9:30 a.m., or as soon thereafter as the matter may be heard, in the Courtroom of the Honorable Dennis Montali, located at 235 Pine Street, 22nd Floor, San Francisco, California, Pacific Gas and Electric Company, the debtor and debtor-in-possession in the above-captioned case ("PG&E" or the "Debtor"), will and hereby does move the Court (the "Motion") for entry of an order (a) approving that certain Settlement and Support Agreement dated February 12, 2002 (the "Settlement Agreement"), by and among the Debtor, PG&E Corporation (the "Parent" and, together with the Debtor, the "Plan Proponents") and the Senior Debtholders,[1] (b) authorizing the Debtor to make payments of Pre-Petition Interest[2] and Post-Petition Interest to the holders of undisputed Claims in certain Classes under the Plan during the Chapter 11 Case, (c) authorizing the Debtor to pay, on an on-going basis, the fees and expenses of certain indenture trustees and administrative bank or other paying agents who have a right to hold back or otherwise seek reimbursement of their fees and expenses from the beneficial holders of financial debt to whom they make distributions and (d) authorizing the Debtor to enter into additional settlement agreements with other holders of Class 5 Claims on substantially similar terms as the Settlement Agreement, without the need for further Court approval.

A copy of the Settlement Agreement is annexed as Exhibit "A" to the accompanying Declaration of Kent M. Harvey. This Motion is made pursuant to Sections 105(a) and 363(b) of the United States Bankruptcy Code, 11 U.S.C. §§101, et seq. (the

---

[1] The term "Senior Debtholders" means: State Teachers Retirement System of Ohio, DC Water and Sewer Authority, Chandler Asset Management, Franklin Mutual Advisers, LLC, King Street Capital, M.H. Davidson & Co., L.L.C., OZF Management L.P., OZ Management, L.L.C., Pacific Investment Management Company, L.L.C., Satellite Asset Management L.P., Security Benefit Life Insurance Co., Stark Investments, Angelo Gordon & Co., the State of Tennessee, Appaloosa Management LP, Deutsche Banc Alex. Brown, Inc., Bankers Trust Company, Halcyon Offshore Management Company LLC, and Halcyon/Alan B. Slifka Management Company LLC.

[2] Capitalized terms not defined herein have the meanings ascribed to them in the Settlement Agreement or in the First Amended Plan of Reorganization under Chapter 11 of the Bankruptcy Code for Pacific Gas and Electric Company, dated December 19, 2001 (as amended from time to time, the "Plan").

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1  "Bankruptcy Code") and Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the

2  "Bankruptcy Rules"), and is based on the facts and law set forth herein, the Declaration of

3  Kent M. Harvey, the record of this case and any admissible evidence presented at or prior to

4  the hearing on the Motion.

5      PLEASE TAKE FURTHER NOTICE that pursuant to Rule 9014-1(c)(2) of the

6  Bankruptcy Local Rules for the United States District Court for the Northern District of

7  California, any written opposition to the Motion and the relief requested herein must be filed

8  with the Bankruptcy Court and served upon appropriate parties (including counsel for each

9  of the Debtor, the Senior Debtholders, the Office of the United States Trustee, and the

10  Official Committee of Unsecured Creditors) at least five (5) days prior to the scheduled

11  hearing date. If there is no timely objection to the requested relief, the Court may enter an

12  order granting such relief without further hearing.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  INTRODUCTION

15      The Senior Debtholders are a group of creditors holding approximately $2 billion

16  in General Unsecured Claims against the Debtor, including Commercial Paper Claims,

17  Floating Rate Note Claims, Medium Term Note Claims, Senior Note Claims and Revolving

18  Line of Credit Claims, each of which is classified as a Class 5 Claim under the Plan.[3] Soon

19  after the filing of the Plan, the Senior Debtholders communicated to the Debtor their strong

20  disagreement with various aspects of the treatment to be afforded such Claims under the

21  Plan. In particular, the Senior Debtholders disagreed with the Debtor regarding the

22  appropriate rate of interest earned on their Claims, raised concerns regarding whether the

23  Long-Term Notes to be issued to creditors under the Plan would have a market value of par

24  and took the position—disputed by the Debtor—that they were entitled to exercise certain

25  subordination rights against the holders of QUIDS Claims because they were not assured of

26  payment in full.

27

28  [3]The evidentiary basis and support for the facts set forth in this Motion are contained in the Declaration of Kent M. Harvey filed concurrently herewith.

HOWARD RICE NEMEROVSKI CANADY FALK &RABKIN
A Professional Corporation

1    In an effort to avoid costly and time-consuming litigation over these disputed

2  issues, the Senior Debtholders and the Plan Proponents commenced good faith and arms-

3  length negotiations.  After months of extensive and arduous negotiations, the parties reached

4  a compromise regarding the treatment of Senior Indebtedness.  This compromise and

5  settlement was memorialized initially in a stipulation and term sheet filed with the

6  Bankruptcy Court on January 14, 2002, and subsequently in the Settlement Agreement for

7  which the Debtor now seeks approval.

8    In the Settlement Agreement (which is described more fully below), the Plan

9  Proponents have agreed to fix the principal amount of the Senior Debtholders' Claims and to

10  make certain amendments to the Plan after the Settlement Agreement becomes effective,

11  including, among other things, amendments relating to the rates of interest earned on Senior

12  Indebtedness and altering certain terms of the Long-Term Notes to enhance their value and

13  transferability.  In addition, the Plan Proponents have agreed, subject to this Court's

14  approval, to pay the reasonable fees and expenses of the Senior Debtholders and to make

15  payments of accrued and unpaid Pre-Petition Interest and Post-Petition Interest to the Senior

16  Debtholders during the Chapter 11 Case.  In consideration of the Plan Proponents'

17  agreements, the Senior Debtholders have agreed to support confirmation of the Plan,

18  including voting their Allowed Claims in favor of the Plan, subject to certain conditions.

19    As noted above, the compromise memorialized in the Settlement Agreement is

20  the product of months of extensive negotiations among the parties.  The settlement

21  negotiations were difficult, not only because of the number of parties involved—18 creditors

22  are party to the Settlement Agreement—but also because these creditors had diverse

23  interests, depending upon the particular debt instrument(s) they hold.  Notwithstanding these

24  diverse interests, the parties were able to reach accord on the terms of a settlement, the

25  benefits of which were intended for all holders of Senior Indebtedness and, in some cases,

26  all holders of Class 5 Claims.  Moreover, the Settlement Agreement now provides the

27  framework for additional settlements with other creditors.

28    The Debtor has weighed carefully the benefits afforded to the estate by the

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

settlement against the expense, risks and delays attendant to litigation over the interest rate and QUIDS Claim subordination issues and, in the exercise of its business judgment, has concluded that the settlement terms are fair and reasonable and are in the best interests of the estate in that they reflect:

 a. the inherent risks of litigation;

 b. the expense that would be incurred in protracted litigation between the Senior Debtholders and the Plan Proponents and the holders of QUID Claims over certain of these issues and the likely delays such litigation would cause in the administration of the estate and prosecution of the Plan; and

 c. the benefits that will be afforded to other creditors who are not parties to the Settlement Agreement but who will nevertheless receive favorable treatment based on the terms thereof, including the contemplated Plan amendments and the Debtor's proposal to make current interest payments to holders of certain undisputed Claims.

  The Debtor also seeks authorization from this Court to make current interest payments to the holders of undisputed Claims (other than Administrative Expense Claims, Environmental, Fire Suppression and Tort Claims and Chromium Litigation Claims[4]) after the Settlement Agreement becomes effective.[5] The Debtor submits that payment of Pre-Petition Interest and Post-Petition Interest is warranted under the exceptional circumstances of this Chapter 11 Case. The Debtor, a solvent entity, will have to make these payments eventually pursuant to a plan of reorganization. Currently, the estate is incurring unnecessary interest expense because the rates at which the Debtor must accrue and compound accrued interest are significantly higher than the rates the Debtor can earn on its invested cash in today's financial markets. Payment of current interest to the holders of undisputed Claims thus will have a twofold benefit: it will reduce this negative arbitrage,

_____

[4]These Claims do not earn interest under the Plan. See Plan §4.1. Accordingly, these Claims are not included in the Classes of Claims for which the Debtor seeks authorization to pay interest pursuant to this Motion.

[5]There are three conditions to effectiveness of the Settlement Agreement: (a) Court approval of the Settlement Agreement, (b) Court approval of the Disclosure Statement and (c) entry into the Settlement Agreement or substantially similar agreements by the holders of at least $3 billion in Class 5 Claims.

MOT. FOR ORDER APPROVING SETTLEMENT & SUPPORT AGMT

-4-

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1   thus enhancing the value of the estate, and at the same time relieve creditors of some of the

2   financial burdens they have suffered as a result of this bankruptcy.

3        Finally, the Debtor seeks authorization to pay the fees and expenses of certain

4   indenture trustees and administrative bank and other paying agents to ensure full payment,

5   without holdback, is made to the beneficial holders of financial debt, and to enter into

6   similar agreements with other creditors, without the need for further Court authorization.

7        The Debtor respectfully urges this Court to approve the settlements embodied in

8   the Settlement Agreement and grant the related relief described herein as fair and equitable

9   and in the best interests of this estate and its creditors.

10                    II.   FACTUAL BACKGROUND

11      A.   General Background.

12        On April 6, 2001, PG&E filed a voluntary petition for relief under Chapter 11 of

13   the Bankruptcy Code.  PG&E continues to manage and operate its businesses and properties

14   as a debtor-in-possession, pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

15        On December 19, 2001, the Plan Proponents filed the Plan.  The General

16   Unsecured Claims which are classified in the Plan as Class 5 Claims include, among others,

17   Commercial Paper Claims, Senior Note Claims, Medium Term Note Claims, Floating Rate

18   Note Claims and Revolving Line of Credit Claims, also referred to herein as "Senior

19   Indebtedness."  The Plan, as it has been subsequently amended, currently proposes to pay

20   each holder of an Allowed Class 5 Claim:  (a) Pre-Petition Interest and Post-Petition Interest

21   accrued and unpaid up to the Effective Date, (b) Cash equal to 60% of the remaining

22   Allowed Claim after the payment of Pre-Petition Interest, (c) Long-Term Notes equal to

23   40% of the remaining Allowed Claim, and (d) a pro rata share of a $40 million placement

24   fee (equal to approximately 1.5% of the Long Term Notes to be issued under the Plan) to be

25   divided among the holders of Allowed Claims in certain Classes.  Plan, §4.14.  The Plan

26   further states that, unless otherwise provided in the Plan, Post-Petition Interest on Allowed

27   Claims entitled to such interest under the Plan will be calculated and paid at the lowest non-

28   default rate and in accordance with the terms specified in the applicable indenture or

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1  instrument governing the Allowed Claims, or if no instrument exists or if the applicable

2  instrument does not specify a non-default rate of interest, at the Federal Judgment Rate in

3  existence as of the Petition Date. Plan, §4.1.

4        As noted above, the Senior Debtholders, who hold approximately $2 billion in

5  Class 5 Claims (primarily Senior Indebtedness), disagreed with the interest rates proposed to

6  be paid on Senior Indebtedness and other elements of the treatment of these Claims under

7  the Plan. Although the parties began good faith settlement discussions shortly after the

8  original version of the Plan was filed on September 20, 2001, they were not able to reach an

9  immediate agreement. On November 27, 2001, the Senior Debtholders filed an objection to

10  approval of the Disclosure Statement in which they challenged, among other things, the

11  interest rates to be paid under the Plan, expressed concern about the value of the Long-Term

12  Notes and asserted that they were entitled to exercise certain subordination rights against the

13  holders of QUIDS Claims. On January 10, 2002, the Senior Debtholders filed a second

14  objection to the Disclosure Statement.

15        The Plan Proponents and the Senior Debtholders continued negotiations and

16  ultimately reached an agreement in principle. On January 14, 2002, the parties executed and

17  filed with the Court a Stipulation (including a term sheet attached thereto), pursuant to which

18  the Senior Debtholders withdrew their objections to the Disclosure Statement, subject to the

19  parties entering into a definitive settlement agreement incorporating the terms of the

20  settlement.

21    B.    The Settlement Agreement.

22        On February 12, 2002, the Plan Proponents entered into the Settlement

23  Agreement. The Settlement Agreement, which is the result of months of extensive, good

24  faith negotiations among the parties, resolves a number of disputes regarding the Senior

25  Debtholders' Claims, including, among others, disputes over (a) the principal amount of the

26  Class 5 Claims held by the Senior Debtholders, (b) the rate of interest earned on such

27  Claims, (c) the amount of the placement fee to be distributed to holders of Allowed Claims

28  in certain Classes under the Plan (including the Senior Debtholders), (d) the Cash payments

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

to be made to holders of Allowed Claims and (e) certain terms of the Long-Term Notes to be distributed under the Plan.

Under the Settlement Agreement,[6] the principal amount of the Class 5 Claims held by the Senior Debtholders will be fixed at the full face amount of the underlying financial instruments that they hold. Settlement Agreement, §1.[7] Upon the effectiveness of the Settlement Agreement, the Plan Proponents have agreed to amend the Plan to provide that the interest rate for Class 5 Claims will be the interest rate applicable to such Claims on the Petition Date.[8] Id., §2(a). In addition, the Plan Proponents have agreed to make the following amendments to the Plan:

> a. <u>Step-up Interest Rates</u>. The base interest rates earned on Senior Indebtedness will increase on a going-forward basis if the Plan does not become effective by certain dates, as follows: (i) 37.5 basis points on February 15, 2003; (ii) an additional 37.5 basis points on September 15, 2003; and (iii) an additional 37.5 basis points on March 15, 2004. The Debtor is not required to accrue or pay any increased interest rates for any interest accruing prior to February 15, 2003. Settlement Agreement, §2(b).

> b. <u>Placement Fee</u>. The placement fee to be distributed on a <u>pro rata</u> basis on the Effective Date to holders of Allowed Claims in Class 5 and the holders of Allowed Claims in certain other Classes (as

_____

[6] A general description of the Settlement Agreement follows. For a more detailed understanding of all of the terms of the settlement, reference should be made to the Settlement Agreement, a copy of which is attached as Exhibit "A" to the Harvey Declaration.

[7] The Settlement Agreement provides that the amount of each Senior Debtholder's Allowed Claim will be stated on Schedule A-1 to the Settlement Agreement, and will be treated as confidential, with certain exceptions. Settlement Agreement §1. The Schedule will be prepared no later than three days prior to the hearing on this Motion, and will set forth the Senior Debtholders' Claims as of the date thereof. Debtor will separately bring a motion seeking to file Schedule A-1 under seal, pursuant to the procedures set forth in the Court's Case Management Order (revised June 14, 2001).

[8] For example, the base interest rates earned on the following types of Class 5 Claims will be fixed at the contract rate in existence for such Claims on the Petition Date, as follows: (i) Commercial Paper Claims—7.466% per annum; (ii) Floating Rate Note Claims—7.583% per annum (calculated on an actual days elapsed over 360 days, with an implied yield of 7.690%); (iii) Medium Term Note Claims—5.81% to 8.45% per annum or higher, as provided in the applicable documents governing the issuance of the particular Medium Term Notes; (iv) Senior Note Claims—9.625% per annum; and (v) Revolving Line of Credit Claims—8.0% per annum. Interest on such Class 5 Claims will be compounded quarterly, with the exception that the Medium Term Note Claims and the Senior Note Claims will be compounded semi-annually (all in accordance with the indenture or other documents governing the indebtedness). See Settlement Agreement, §2(a).

HOWARD RICE NEMEROVSKI CANADY FALK &RABKIN
A Professional Corporation

MOT. FOR ORDER APPROVING SETTLEMENT & SUPPORT AGMT

and to the extent provided in the Plan) will be increased to 2.5% of the aggregate amount of Long-Term Notes issued pursuant to the Plan and increased further by an additional 50 basis points with respect to any Long-Term Notes issued by ETrans and GTrans with a maturity of greater than ten years. Id., §5.

c.    Effective Date Payments.  Each holder of an Allowed Class 5 Claim will receive on the Effective Date of the Plan the following distributions:  (i) a Cash payment equal to 60% of its remaining Allowed Class 5 Claim (after deducting any payments made to such holder prior to the Effective Date); (ii) a pro rata share of certain Excess Cash,[9] if any, to be distributed to holders of Allowed Claims in Class 5 and holders of Allowed Claims in such other Classes, as and to the extent the payment of Excess Cash to such Classes is provided for in the Plan; and (iii) Long-Term Notes equal to the balance of such Allowed Class 5 Claim after deducting the Cash payments made pursuant to clauses (i) and (ii). Id., §4.

d.    Long-Term Notes.  At least 50% of the Long-Term Notes issued by ETrans and GTrans will have a maturity of ten years.  The interest rates on the Long-Term Notes and the New Money Notes issued by Gen, ETrans and GTrans will increase in an amount equal to the increase in the Option Adjusted Spread, quoted in the Lehman Brothers Electrical Utility Corporate Bond Index, over a defined period of time and subject to a maximum increase of 25 basis points. Id., §§6-7.

Additional material terms of the Settlement Agreement are:

a.    Payment of Interest and Fees and Expenses.  The Debtor has agreed, subject to the approval of the Bankruptcy Court, to make an initial payment to the Senior Debtholders of accrued and unpaid Pre-Petition Interest and Post-Petition Interest through the last day of the calendar month immediately preceding the date on which the Settlement Agreement is approved, in arrears, no later than ten days after all conditions to effectiveness of the Settlement Agreement have been satisfied; and payments of Post-Petition Interest thereafter in quarterly installments, with the last such payment to occur on the Effective Date.  Such interest payments are subject to re-characterization as a partial payment of principal in the unlikely event that the Debtor is determined by a final non-appealable order of the Bankruptcy Court to be insolvent on a balance sheet basis or the Chapter 11 Case is converted to a case under chapter 7.  The Debtor also has agreed, in consideration of the efforts of the Senior Debtholders in negotiating and compromising the disputes as memorialized in the Settlement Agreement and subject to the approval of the Bankruptcy Court, to pay certain reasonable fees and expenses

---

[9] The "Excess Cash" to be distributed on the Effective Date, if any, will equal the amount (if any) by which the Debtor's cash balance on its last month-end closing balance sheet preceding the date of the preliminary prospectus for the New Money Notes, less the sum of certain of the Debtor's cash requirements (all as more particularly set forth in the Settlement Agreement), exceeds $500 million. See Settlement Agreement, §4.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

of the Senior Debtholders. Settlement Agreement, §§2(c)-(e), 19.

    b.  Senior Debtholders' Plan Support. The Senior Debtholders have agreed to support confirmation of the Plan. Subject to the Settlement Agreement becoming effective and the receipt by the Senior Debtholders of a Plan and Disclosure Statement incorporating the terms of the Settlement Agreement and other solicitation materials approved by the Bankruptcy Court, each Senior Debtholder has agreed to (a) vote its Allowed Class 5 Claim(s), currently held and any acquired in the future,[10] in acceptance of the Plan, (b) fully support confirmation of the Plan, (c) not consent to, vote for, or otherwise support or encourage any plan of reorganization other than the Plan, (d) not take any actions to develop or formulate an alternative plan of reorganization, (e) not solicit or meet with other parties to develop or formulate an alternative plan of reorganization, and (f) not object to, delay or impede or otherwise oppose or object to the Plan or Disclosure Statement. Id., §13.

    c.  Termination Events. The obligations of the Senior Debtholders may only be terminated upon the occurrence of: (a) a material breach of the Settlement Agreement by the Plan Proponents, (b) a re-characterization of Post-Petition Interest payments as partial payments of principal, (c) the failure of the Debtor to make timely interest payments, (d) a determination by the Bankruptcy Court that the Debtor is insolvent on a balance sheet basis or the conversion of the Chapter 11 Case to a case under Chapter 7, (e) the failure of the Plan to become effective on or before June 1, 2003, (f) the voluntary withdrawal of the Plan by the Plan Proponents, or (g) the entry of an order by the Bankruptcy Court finding that the Plan is not confirmable (each, a "Creditor Termination Event"). The obligations of the Plan Proponents may only be terminated upon the occurrence of (a) a determination by the Bankruptcy Court that the Debtor is insolvent on a balance sheet basis or the conversion of the Chapter 11 Case to a case under Chapter 7, (b) the rejection of the Plan by holders of Allowed Class 5 Claims, (c) as to an individual Senior Debtholder, a breach by such Senior Debtholder of its obligation to support the Plan, and (d) as to all Senior Debtholders, if a breach or breaches by Senior Debtholders of their support obligations under the Settlement Agreement results in the remaining non-breaching holders of Allowed Class 5 Claims who are parties to the Settlement Agreement or substantially similar agreements constituting less than the Required Holders (as defined below) (each, a "Plan Proponent Termination Event"). Id., §14.

    d.  Survival of Certain Obligations. The Debtor is required to accrue interest at the rates set forth in the Settlement Agreement unless (i) an event occurs giving rise to the re-characterization of Post-Petition Interest payments as partial payments of principal; (ii) a Senior Debtholder breaches its support obligations prior to a Creditor Termination Event (in which case the Debtor may cease accruing interest at the agreed rates only with respect to the breaching Senior

---

[10]Any additional Class 5 Claims acquired by the Senior Debtholders will be subject to the Settlement Agreement. See Settlement Agreement, §14.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

Debtholder), or (iii) as a result of breaches of the support obligations by one or more Senior Debtholders prior to a Creditor Termination Event, the Required Holders constitute less than $3 billion in Allowed Claims that currently are Class 5 Claims (in which case the Debtor may cease accruing interest at the agreed rates for all Senior Debtholders). The Debtor, however, may terminate payment of interest: (i) if an event occurs giving rise to the re-characterization of Post-Petition Interest payments as partial payments of principal, (ii) if a Senior Debtholder breaches its support obligations prior to a Creditor Termination Event (in which case the Debtor may terminate payment of interest only with respect to the breaching Senior Debtholder), (iii) if, as a result of breaches of the support obligations by one or more Senior Debtholders prior to a Creditor Termination Event, the Required Holders constitute less than $3 billion in Allowed Claims that currently are Class 5 Claims (in which case the Debtor may terminate payment of interest as to all Senior Debtholders), (iv) any other Plan Proponent Termination Event occurs, or (v) as to any Senior Debtholder, if such Senior Debtholder does not support a subsequent plan of reorganization filed by the Plan Proponents. Id., §§2, 14 and 25.

e.    Nomination of Underwriters.  Subject to the right of the Debtor to exclude any underwriter that refuses to enter into an appropriate underwriting agreement, the Senior Debtholders, in consultation with the Committee, have the right to nominate 5 underwriters to participate in the marketing of the New Money Notes that correspond by issuer and maturity date or principal payment dates with the Long-Term Notes. Id., §11.

The Settlement Agreement will become effective only if (a) the Disclosure Statement is approved by this Court, (b) the Settlement Agreement is approved by this Court and (c) holders of Class 5 Claims, including each Senior Debtholder, holding at least $3 billion in the aggregate in Allowed Class 5 Claims have entered into the Settlement Agreement or substantially similar agreements (the "Required Holders"). Id., §21.

III.    ARGUMENT

A.    The Settlement Agreement Should Be Approved.

Bankruptcy Rule 9019(a) empowers a bankruptcy court to approve any settlement or compromise related to a reorganization or liquidation.[11] Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996); Vaughn v. Drexel Burnham Lambert Group, Inc. (In re

HOWARD RICE NEMEROVSKI CANADY FALK & RABKIN
A Professional Corporation

_____

[11]Bankruptcy Rule 9019(a) simply states, in part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).

1   Drexel Burnham Lambert Group, Inc.), 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).  Indeed,

2   compromises and settlements are a common and favored occurrence in bankruptcy cases

3   because they allow a debtor and its creditors to avoid the financial and other burdens

4   associated with litigation over contentious issues and expedite the administration of the

5   bankruptcy estate.  Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.

6   Anderson, 390 U.S. 414, 424 (1968); Martin v. Kane (In re A & C Props.), 784 F.2d 1377,

7   1380-81 (9th Cir. 1986).

8           In reviewing proposed settlements, the bankruptcy court's inquiry focuses only

9   upon whether the compromise is fair and equitable and in the best interest of the estate.

10  TMT Trailer, 390 U.S. at 424; A & C Props., 784 F.2d at 1380-81; Nellis v. Shugrue, 165

11  B.R. 115, 121 (S.D.N.Y. 1994).  In making this determination, however, the bankruptcy

12  court is not required to conduct a mini-trial on the merits of the underlying dispute or an

13  independent investigation into the reasonableness of the settlement.  Blair, 538 F.2d at 851;

14  see also In re Purofied Down Prods. Corp., 150 B.R. 519, 522 (S.D.N.Y. 1993); Drexel

15  Burnham, 134 B.R. at 505.

16          Rather, the standards for such approval have been described as lenient and

17  intended to encourage approval of settlements in bankruptcy cases.  See Purofied Down, 150

18  B.R. at 522-23.  The bankruptcy court need only canvass the legal and factual issues

19  underpinning the compromise to ensure that the proposed settlement does not fall "'below

20  the lowest point in the range of reasonableness.'"  Nellis v. Shugrue, 165 B.R. at 121-22

21  (quoting In re W.T. Grant Co., 699 F.2d 599, 609 (2d Cir. 1983)); Purofied Down, 150 B.R.

22  at 522; Official Unsecured Creditors' Comm. v. Pennsylvania Truck Lines, Inc. (In re

23  Pennsylvania Truck Lines, Inc.), 150 B.R. 595, 598 (E.D. Pa. 1992), aff'd, 8 F.3d 812 (3d

24  Cir. 1993); Drexel Burnham, 134 B.R. at 505.  In making this determination, significant

25  deference may be given to the informed judgment of the debtor-in-possession and its counsel

26  that a proposed compromise is fair and equitable.  Martin, 91 F.3d at 395; Nellis v. Shugrue,

27  165 B.R. at 122; Purofied Down, 150 B.R. at 522-23; Drexel Burnham, 134 B.R. at 505.

28          Over the years, four significant criteria have been developed by the courts for

MOT. FOR ORDER APPROVING SETTLEMENT & SUPPORT AGMT

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1  consideration in determining whether a proposed settlement falls below the lowest point in

2  the range of reasonableness:

3        1.   the probability of success on the merits;

4        2.   the difficulties, if any, to be encountered in the matter of collection;

5        3.   the complexity of the litigation involved, and the expense, inconvenience

6  and delay necessarily attending it; and

7        4.   the paramount interest of the creditors and a proper deference to their

8  reasonable views.

9  A & C Props., 784 F.2d at 1381; see also Martin, 91 F.3d at 393; Nellis v. Shugrue, 165 B.R.

10  at 122; Pennsylvania Truck Lines, 150 B.R. at 598.  As demonstrated below, each of the

11  applicable criteria is satisfied here.[12]

12        1.   The Probability Of Success On The Merits.

13        The Settlement Agreement fully and finally resolves numerous disputes between

14  the Debtor and the Senior Debtholders without the need for expensive,  distracting and time-

15  consuming litigation.  The disputes resolved by the Settlement Agreement—each of which is

16  discussed below in detail—include the amount of the Senior Debtholders' Class 5 Claims

17  and the appropriate interest rate to be paid on such Claims, the Senior Debtholders'

18  contention that the Plan may afford them less than full payment of their Claims, and the

19  Senior Debtholders' assertion that they are entitled to exercise certain subordination rights

20  against the holders of QUIDS Claims.

21        Although the Debtor believes that its positions have considerable merit and that,

22  if litigated, the Debtor would have prevailed on the issues in dispute, no litigation is without

23  risk.  Further, certain of the issues raised by the Senior Debtholders have not been

24  conclusively decided and, in some cases, have not been considered within the Ninth Circuit.

25  Accordingly, how the Court ultimately would have ruled on these disputes is uncertain, and

26  by resolving the disputes, the Debtor and the Senior Debtholders recognize the inherent risks

27

28     [12]The second factor typically considered by courts—difficulty associated with collection—is not applicable here.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

MOT. FOR ORDER APPROVING SETTLEMENT & SUPPORT AGMT

-12-

1  of litigation and the benefits of reaching a compromise, including the avoidance of

2  significant expense and time associated with litigation.

3       The first accommodation embodied in the settlement relates to the amount of the

4  Senior Debtholders' Claims and the interest rate to be paid on such Claims. Each of the

5  Senior Debtholders' Allowed Class 5 Claims will be fixed at the full face amount of the

6  underlying debt instrument. The Settlement Agreement also resolves the dispute among the

7  parties regarding the rate of interest accrual on the Senior Indebtedness. The Senior

8  Debtholders have asserted that they are entitled to be paid interest at the rate of 10% per

9  annum, the legal rate specified under California state law for breach of contract. The Debtor

10 believes, however, that the trend in bankruptcy cases in the Ninth Circuit is to award Post-

11 Petition Interest at the Federal Judgment Rate as of the Petition Date (here, approximately

12 4%), but provided in the Plan that Post-Petition Interest would accrue at the lowest non-

13 default rate of interest in the agreement or instrument governing the particular Claim (rates

14 that are generally higher than the Federal Judgment Rate as of the Petition Date) and, in the

15 absence of such a document (or provision therein), at the Federal Judgment Rate as of the

16 Petition Date. The Settlement Agreement reflects the parties' compromise—interest will

17 accrue at the contract rate, fixed as of the Petition Date, with a potential for certain increases

18 in the interest rate if the Plan does not become effective by certain dates.

19       The dispute over whether the treatment under the Plan affords payment in full to

20 the Senior Debtholders also has been fully resolved. Although the Debtor firmly believes

21 that the Plan provides for the payment in full of all Allowed Claims, the increase in interest

22 rates and the agreed-upon modification of certain terms of the Long-Term Notes[13] puts this

23

24       [13]Among the other amendments intended to enhance the value and transferability of the
   Long-Term Notes, the Plan Proponents have agreed that distributions to holders of Allowed
25 Class 5 Claims will include a pro rata share of Excess Cash, if any, thus potentially reducing
   the amount of Long-Term Notes issued to creditors; that at least 50% of the Long-Term
26 Notes to be issued to ETrans and GTrans will have a maturity of ten years; and that the
   interest rates on the Long-Term Notes and the Corresponding New Money Notes issued by
27 Gen, ETrans and GTrans will increase in an amount equal to the increase in the Option
   Adjusted Spread, quoted in the Lehman Brothers Utility Corporate Bond Index over a
28 defined period of time and subject to a maximum increase of 25 basis points.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

MOT. FOR ORDER APPROVING SETTLEMENT & SUPPORT AGMT

-13-

1  issue to rest without the need for extensive litigation between the Plan Proponents and the

2  Senior Debtholders. The foregoing compromise—under which the Senior Debtholders no

3  longer contend that they will receive less than full payment on their Claims—also forecloses

4  the need to litigate with the Senior Debtholders regarding the subordination issues related to

5  the QUIDS Claims. The Senior Debtholders had asserted that unless and until their claims

6  are paid in full, the holders of QUIDS Claims, which are contractually subordinated to the

7  Claims of the Senior Debtholders, cannot receive any recovery on their claims. Although

8  the Debtor believes that the treatment of the QUIDS Claims in the Plan is appropriate, this

9  compromise settles the controversy with the Senior Debtholders without the need for costly

10  and distracting litigation involving multiple parties.

11       2.  <u>Litigation Of The Disputed Issues Would Be Costly And Result In Delays</u>

12  <u>In Administration Of The Estate.</u>

13      As set forth above, the Settlement Agreement resolves numerous complex issues

14  between the Debtor and eighteen creditors holding approximately $2 billion in Class 5

15  Claims.[14]  In agreeing to the settlement embodied therein, the Debtor has made what it

16  believes is an economically prudent business judgment that the estate's assets are better

17  utilized in facilitating a settlement rather than prosecuting litigation.

18      The disputes at issue go to the heart of the Chapter 11 Case and, if left

19  unresolved, would have resulted in extensive and costly litigation[15] in various contexts

20  throughout the Chapter 11 Case, including objections to the Disclosure Statement, objections

21  to the Senior Debtholders' Claims and ultimately, objections to confirmation of the Plan.

22  Already, the negotiations between the Debtor and the Senior Debtholders have resulted in

23  the filing of the Stipulation and the withdrawal of their objections to the Disclosure

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

24  ────────────────

25      [14]The Settlement Agreement will become effective only if $3 billion in Class 5 Claims
have entered into the Settlement Agreement or similar agreements.

26      [15]Certain of the disputes with the Senior Debtholders might have required extensive
discovery. Not only would such discovery have been expensive, it would have distracted the
27  Debtor from, and delayed, its reorganization efforts. The Settlement Agreement resolves all
of these issues and obviates the need for litigation that would likely delay administration of
28  this estate.

1  Statement, thus saving the estate considerable litigation expenses.  The Settlement

2  Agreement resolves all outstanding issues between the Debtor and the Senior Debtholders,

3  and commits the Senior Debtholders to support the Plan.

4         3.    The Settlement Is In The Best Interests Of Creditors.

5            The last criteria considered by bankruptcy courts reviewing a proposed settlement

6  is the paramount interest of creditors, with a deference to their reasonable views.  A & C

7  Props., 784 F.2d at 1381; Drexel Burnham, 134 B.R. at 505-06.  While a creditor's objection

8  to a proposed settlement must be given deference, it is not controlling and will not bar

9  approval of settlements that "do not fall below the lowest point in the range of

10  reasonableness."  A & C Props., 784 F.2d at 1382; Drexel Burnham, 134 B.R. at 505.

11            The compromises reached in the Settlement Agreement will result—once the

12  Settlement Agreement is effective—in amendments to the Plan that will benefit all holders

13  of Senior Indebtedness and, in certain respects, substantially all unsecured creditors.  For

14  example:

15     a.    all holders of Senior Indebtedness will benefit from the higher
             interest rates to be earned on such Claims;

16
       b.    certain creditors will benefit from the increased placement fee;
17
       c.    certain creditors will benefit from the enhanced terms of the
18            Long-Term Notes; and

19     d.    all creditors entitled to Pre-Petition Interest and Post-Petition
             Interest under the Plan will benefit from the current payment of
20            interest.

21            The Settlement Agreement also benefits the estate and its creditors because it lays

22  the framework for future settlements with other creditors and advances the administration of

23  the Chapter 11 Case and the ultimate confirmation of the Plan.  The principal objective of a

24  Chapter 11 case is the confirmation and consummation of a plan, and the settlement with the

25  Senior Debtholders furthers that goal.

26            The Debtor has carefully considered the risks, complexity and expense associated

27  with litigation with the Senior Debtholders regarding their Claims and the treatment afforded

28  to them under the Plan and the delays that would be occasioned by such litigation.  In the

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1    Debtor's sound business judgment, these factors—when considered with the benefits

2    afforded the estate and its creditors by the settlement—tip the scale heavily in favor of

3    approval of the proposed settlement as fair, reasonable and equitable and in the best interests

4    of the estate and its constituencies. For these reasons, the Debtor believes that the

5    Settlement Agreement should be approved.

6         B.    This Court Should Authorize The Debtor To Make Payments Of Pre-Petition
               Interest And Post-Petition Interest To Holders Of Certain Undisputed Claims.
7

8         In consideration of the compromises reached and because it is in the best interest

9    of the estate, the Debtor agreed in the Settlement Agreement to pay all accrued and unpaid

10   Pre-Petition Interest and Post-Petition Interest to the Senior Debtholders and to continue to

11   pay Post-Petition Interest in arrears on a quarterly basis during the Chapter 11 Case. By this

12   Motion, the Debtor seeks authorization to provide this same benefit to all holders of Claims

13   (other than holders of Administrative Expense Claims, Environmental, Fire Suppression and

14   Tort Claims and Chromium Litigation Claims) to which no objection is pending.[16]

15        1.    This Court Has Statutory Authority And Equitable Power Under Sections
               105(a) And 363(b) Of The Bankruptcy Code To Permit The Debtor To
16             Make Interest Payments To Holders Of Undisputed Claims During The
               Chapter 11 Case.
17

18        Sections 105(a) and 363(b) of the Bankruptcy Code provide the statutory

19   authority for the payment of Pre-Petition Interest and Post-Petition Interest to holders of

20   undisputed Claims, as contemplated herein.

21        Section 363(b) provides that "[t]he trustee, after notice and a hearing, may use,

22   sell, or lease, other than in the ordinary course of business, property of the estate." Under

23   Section 363(b), the Court may authorize a proposed use of property if it finds that the

24   transaction represents a reasonable business judgment by the debtor. See Michigan Bureau

25   of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.), 80 B.R. 279,

26   282 (S.D.N.Y. 1987) (authorizing pre-confirmation distribution under Sections 105(b) and

27

28        [16]The Debtor reserves its right to object to any Claim on any available ground,
          notwithstanding the prior payment of interest to the holder of such Claim.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

MOT. FOR ORDER APPROVING SETTLEMENT & SUPPORT AGMT
-16-

Case: 01-30923   Doc# 5013   Filed: 03/05/02   Entered: 03/06/02 08:51:00   Page 20

Case: 19-30088   Doc# 4235-2   Filed: 10/16/19   Entered: 10/16/19 15:39:12   Page 21
of 30

1  363(b)); see also Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722

2  F.2d. 1063, 1070-71 (2d Cir. 1983); In re Ernst Home Ctr., Inc., 209 B.R. 974, 979 (Bankr.

3  W.D. Wash. 1997) (approval of non-ordinary course of business transaction appropriate

4  where debtor has "articulated business justification" for the transaction). In considering a

5  proposed use of estate property outside the ordinary course of business, the debtor's business

6  judgment is subject to "great judicial deference." See DiStefano v. Stern (In re JFD Enters.),

7  No. 99-2034, 2000 WL 560189, at *5 (1st Cir. May 1, 2000).

8      There are sound and practical business reasons for the Debtor's current payment

9  of interest during the Chapter 11 Case. The Chapter 11 Case presents fairly exceptional

10 circumstances. The Debtor is solvent. Thus, to satisfy the "best interests" test of Section

11 1129(a)(7) of the Bankruptcy Code and confirm a plan of reorganization, the Debtor must

12 pay post-petition interest to holders of Allowed Claims. Because, absent Court

13 authorization, the Debtor is prohibited from making such payments during the Chapter 11

14 Case, the Debtor must compound accrued unpaid interest at rates that are significantly higher

15 than the interest the estate can earn on its cash investments in today's economic climate—

16 thus creating a negative arbitrage to the Debtor. On the other hand, current payments of

17 interest would inure to the benefit of the estate and its creditors and prejudice no one. The

18 Debtor has sufficient funds on hand to make the interest payments; creditors will be brought

19 current on interest payments and paid interest on a going-forward basis; the unnecessary cost

20 to the estate caused by this negative arbitrage will be eliminated; and in the unlikely event

21 that the Debtor were determined to be insolvent, the Post-Petition Interest payments would

22 be re-characterized as partial payments of principal.

23      In addition, Section 105(a) of the Bankruptcy Code grants this Court broad

24 equitable power to "issue any order, process, or judgment that is necessary or appropriate to

25 carry out the provisions of this title." The purpose of Section 105(a) is "to assure the

26 bankruptcy courts power to take whatever action is appropriate or necessary in aid of the

27 exercise of their jurisdiction." 2 Lawrence P. King, Collier on Bankruptcy ¶105.01, at 105-6

28 (15th ed. rev. 2001).

1    Pursuant to Section 105(a), bankruptcy courts are granted broad authority and

2    discretion to enforce the provisions of the Bankruptcy Code, either pursuant to specific

3    statutory fiat or equitable common law principles. Under the doctrine of necessity, a

4    bankruptcy court may exercise its equitable powers to authorize a debtor to pay certain pre-

5    petition claims, even though such payment is not explicitly authorized under the Bankruptcy

6    Code. As the court stated in In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr.

7    S.D.N.Y. 1989):

8         "The ability of a Bankruptcy Court to authorize the payment of pre-
          petition debt when such payment is needed to facilitate the
9         rehabilitation of the debtor is not a novel concept. It was first
          articulated by the United States Supreme Court in Miltenberger v.
10        Logansport, C.&S.W.R. Co., 106 U.S. 286, 1 S.Ct. 140, 27 L.Ed. 117
          (1882), and is commonly referred to as either the 'doctrine of
11        necessity' or the 'necessity of payment' rule." (Id. at 175-76)

12   The court in that case recognized a bankruptcy court's authority under Section 105(a) to

13   authorize payment of certain pre-petition debt to avoid economic sanctions against the

14   debtor that would result from nonpayment. Id.

15        Courts have established that "the Necessity Doctrine may also be used, however,

16   to justify post-petition payment of a wide variety of other types of pre-petition claims, as

17   long as payment of those claims will help to 'stabilize [the] debtor's business relationships

18   without significantly hurting any party.'" In re UNR Indus., Inc., 143 B.R. 506, 519 (Bankr.

19   N.D. Ill. 1992) (quoting R. Eisenberg & F. Gecker, The Doctrine of Necessity and Its

20   Parameters, 73 Marq. L. Rev. 1, 2 (1989)), rev'd on other grounds, 173 B.R. 149 (C.D. Ill.

21   1994). In that case, the court authorized the debtor to pay pre-petition workers'

22   compensation claims which it found were necessary to enable the debtor to maintain its self-

23   insurance privileges, where such self insurance would be less expensive than purchasing

24   insurance from a third party. The court accordingly determined that such payments were in

25   the best interests of the estate and were authorized under the necessity doctrine. See also In

26   re Structurelite Plastic Corp., 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988) ("a bankruptcy

27   court may exercise its equity powers under section 105(a) to authorize payment of pre-

28   petition claims where such payment is necessary to 'permit the greatest likelihood of

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

MOT. FOR ORDER APPROVING SETTLEMENT & SUPPORT AGMT
-18-

1   survival of the debtor and payment of creditors in full or at least proportionately'") (citing <u>In</u>

2   <u>re Chateaugay Corp.</u>, 80 B.R. 279, 287 (Bankr. S.D.N.Y. 1987)); <u>In re Equalnet</u>

3   <u>Communications Corp.</u>, 258 B.R. 368, 369 (Bankr. S.D. Tex. 2000) ("[i]n certain cases,

4   courts in this district have found exception to [the] general rule of nonpayment [of pre-

5   petition claims]. These exceptions arise primarily out of common sense and the presence of

6   legal or factual inevitability of payment"). Indeed, this Court recognized its ability to

7   authorize the payment of pre-petition claims when it used its equitable powers to authorize

8   the Debtor to make, <u>inter alia</u>, certain payments of pre-petition employee-related expenses.

9   <u>See, e.g.</u>, Order Granting Motion for Authority to Pay Pre-Petition Compensation and

10  Benefits, dated April 6, 2001.

11          2.      <u>Early Payment Of Interest To Holders Of Undisputed Claims Is In The
                    Best Interest Of The Debtor's Estate And Creditors.</u>

12

13          The Debtor has made a sound business judgment that early interest payments

14  constitute a prudent and justified use of estate assets. As noted above, this is based on

15  exceptional circumstances. The Debtor is solvent. Payment of post-petition interest to

16  creditors is inevitable, as it will be required to confirm a plan of reorganization. As reflected

17  in its Monthly Operating Reports filed herein, the Debtor has sufficient funds on hand to

18  make payments of Pre-Petition Interest and Post-Petition Interest to holders of undisputed

19  Claims.[17]

20          Significantly, the Debtor's inability to make current interest payments has

21  resulted (and will continue to result) in a significant cost to the estate. The Debtor's cash

22  currently is primarily invested in money market funds, which experienced an average annual

23

24          [17]The initial interest payments on PG&E's financial debt ("Financial Debt") are
    estimated to aggregate approximately $477 million, and projected subsequent quarterly

25  interest payments on such Financial Debt through December 31, 2002 are estimated to
    aggregate approximately $313 million. The initial interest payments on PG&E's non-

26  financial debt ("Non-Financial Debt") are estimated to aggregate approximately $157
    million and projected subsequent quarterly interest payments on such Non-Financial Debt,

27  through December 31, 2002, are estimated to aggregate approximately $57 million. As of
    December 31, 2001, the Debtor's cash balance was $4.22 billion, more than sufficient funds

28  to make the proposed interest payments.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1   return of 2.15% during the month of December, 2001 and an average annual return of 2.00%

2   during the month of January, 2002. At the same time, the average interest rate on Financial

3   Debt is approximately 7.9%, and the average interest rate on Non-Financial Debt is 5.5%.

4   Because the Debtor cannot pay this interest on a current basis absent Court approval, it must

5   accrue and compound the accrued interest at these significantly higher rates.

6       As of March 31, 2002, the Debtor estimates that it will have accrued

7   approximately $477 million in interest on Financial Debt alone. Because of the

8   compounding of interest, a nine-month delay, through December 31, 2002, in the payment of

9   interest on Financial Debt will increase the Debtor's interest payments by approximately $35

10  million. At the same time, the interest PG&E will likely earn on its investment of the cash

11  that would be used to pay accrued interest, during the period from March 31, 2002 through

12  December 31, 2002, would offset these increased interest expenses by only an estimated $6

13  million. Thus, unless PG&E is allowed to make interest payments on its Financial Debt

14  during the period from March 31, 2002 through December 31, 2002, it will suffer an

15  unnecessary interest expense of $29 million on Financial Debt alone. In addition, by making

16  interest payments to the holders of Non-Financial Debt during the six month period from

17  July 1, 2002 through December 31, 2002, PG&E will avoid incurring another $2 million in

18  unnecessary interest expense.[18] Accordingly, the early payment of interest will result in

19  savings of approximately $31 million during the nine-month period ending December 31,

20  2002.

21      Significantly, since all holders of undisputed Claims in the Classes entitled to

22  receive interest will benefit from the early interest payments, the policy concern underlying

23  the general prohibition of pre-confirmation distributions—i.e., disparate treatment of

24  creditors—is not implicated here. In addition, these payments do not pose any risk of harm

25

26      [18]As set forth below, PG&E proposes to commence interest payments on Non-
    Financial Debt no later than July 30, 2002. PG&E requires this additional time to reconcile
27  and determine which Claims based on Non-Financial Debt are disputed before commencing
    interest payments on these Claims. Interest would continue to accrue on these Claims until
28  paid.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1   to the estate.  In the unlikely event that the Debtor were ever adjudged insolvent, the Post-

2   Petition Interest payments would be re-characterized as partial payments of principal.  Thus,

3   there is no danger that any one creditor would receive more than its pro rata payment on

4   account of its Allowed Claim.

5       For these reasons, the Debtor respectfully submits that early interest payments

6   constitute a sound use of the Debtor's assets under Section 363 of the Bankruptcy Code and

7   should be authorized on that basis, and pursuant to Section 105(a) of the Bankruptcy Code.

8       3.    Proposed Procedure For Making Interest Payments.

9       The Debtor proposes to make the initial interest payments to holders of Financial

10  Debt who hold undisputed Claims (including the Senior Debtholders) within ten days after

11  all conditions to the effectiveness of the Settlement Agreement have been satisfied.

12  Subsequent interest payments in respect of such Claims will be made in arrears on a

13  quarterly basis on the first Business Day of the next calendar quarter.

14      With respect to Non-Financial Debt, the Debtor proposes to make initial interest

15  payments in respect of undisputed Claims by the later of (a) July 30, 2002 and (b) ten

16  Business Days after the entry of an order approving the Disclosure Statement.  The Debtor

17  requires this time to determine which of the thousands of claims filed in the Chapter 11 Case

18  should be subject to objection and to prepare objections accordingly, a process that must be

19  substantially completed before interest payments can commence.[19]  In addition, this time

20  will allow the Debtor to establish the administrative procedures necessary to compute the

21  amount of Pre-Petition Interest and Post-Petition Interest that is owed and to facilitate

22  payments to thousands of creditors.[20]  Post-Petition Interest will continue to accrue on

23  Allowed Claims until payments are made.  Subsequent interest payments will be made

24
25      [19]As stated in the Disclosure Statement, the Debtor anticipates filing all of its
    objections to Disputed Claims by June 30, 2002.

26      [20]Because payments to holders of Financial Debt are made through an indenture trustee
    or administrative bank or other paying agent, this additional time is not required to make
27  payments to the holders of Financial Debt.  Thus, the Debtor has agreed, under the
    Settlement Agreement, to make the initial payment of Pre-Petition Interest and Post-Petition
    Interest to the Senior Debtholders within ten Business Days after all conditions to
28  effectiveness of the Settlement Agreement have been satisfied.

Case: 19-30088   Doc# 4235-2   Filed: 10/16/19   Entered: 10/16/19 15:39:12   Page 26
of 30

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1    quarterly in arrears within thirty days following the end of each calendar quarter.

2        The Debtor requests that the Court establish a record date of June 30, 2002 for the

3    initial interest payments to the holders of undisputed Claims arising out of Non-Financial

4    Debt and the last Business Day of each calendar quarter as the record date for subsequent

5    interest payments to such holders. The Debtor further requests that the Court order that

6    interest payments be made only to the record holders of such Claims on the applicable

7    record date.

8        C.    <u>Payment Of The Fees And Expenses Of Indenture Trustees And Administrative</u>

9            <u>Bank And Other Paying Agents Should Be Approved.</u>

10        Under the Settlement Agreement, the Debtor agreed to use its reasonable best

11    efforts to ensure that the Senior Debtholders receive a full distribution on account of their

12    Claims, with no deduction or holdback by any indenture trustee or paying agent. <u>See</u>

13    Settlement Agreement, §16(a). To satisfy this obligation, the Debtor agreed, subject to the

14    approval of the Bankruptcy Court, to pay all costs and expenses necessary to ensure that a

15    full distribution is made to Senior Debtholders. <u>Id.</u> Rather than limit this benefit to the

16    Senior Debtholders, the Debtor seeks, subject to the procedures described below, to pay the

17    fees and expenses of all indenture trustees and paying agents[21] which have a right, under

18

19         [21]The indenture trustees or other paying agents whose fees and expenses would be paid
20    are: (a) Wilmington Trust Company (successor-in-interest to The Bank of New York), as
indenture trustee for the Floating Rate Notes, the Medium Term Notes and the Senior Notes,
21    all issued under the indenture dated as of September 1, 1987 between the Debtor and The
Bank of New York, as amended and supplemented (the "1987 Indenture"); (b) The Bank of
22    New York, the former indenture trustee under the 1987 Indenture; (c) Bankers Trust
Company (Deutsche Bank), in its capacity as trustee for the 1992 Series A Pollution Control
23    Bonds, 1996 Series C Pollution Control Bonds, 1996 Series E Pollution Control Bonds,
1996 Series F Pollution Control Bonds and 1997 Series B Pollution Control Bonds; (d) U.S.
24    Bank Trust, N.A. in its capacity as trustee for the 1992 Series B Pollution Control Bonds,
1993 Series A Pollution Control Bonds, and 1993 Series B Pollution Control Bonds;
25    (e) Bank One Trust Company, N.A. (successor-in-interest to The First National Bank of
Chicago), as property trustee under the amended and restated trust agreement dated as of
26    November 28, 1995 among the Debtor, The First National Bank of Chicago, a Delaware
Trustee and certain Administrative Trustees; (f) National City Bank of Indiana (successor-
27    in-interest to Bank One Trust Company, N.A.), indenture trustee for the QUIDS, issued
under the indenture dated November 28, 1995, as supplemented as of November 28, 1995
28    and March 25, 1996; and (g) Bank of America National Trust and Savings Association, as
administrative agent and documentation agent for the Debtor's Revolving Line of Credit.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1  governing agreements or instruments, to deduct their fees and expenses from distributions to

2  beneficial holders or otherwise to seek reimbursement from the beneficial holder of

3  Financial Debt, so that all such creditors will receive full payment.

4  Unless the Debtor agrees to pay such costs, each of the paying agents and trustees

5  would likely deduct their costs and expenses from the amounts which will be paid to holders

6  of undisputed Financial Debt. Given the relatively modest cost of covering these fees and

7  expenses—current outstanding amounts are estimated to be approximately $3 million—the

8  Debtor seeks the Court's authorization to pay these fees and expenses. The Debtor also

9  requests that it be authorized to continue to pay such fees and expenses on an on-going basis.

10  The Debtor proposes that the same procedures established for the payment of fees

11  and expenses of BNY Western Trust Company, as indenture trustee for certain mortgage

12  bonds, in the Cash Collateral Stipulation, approved by this Court on May 9, 2001, be utilized

13  in connection with payments to indenture trustees and other paying agents as well as for

14  payment of the fees and expenses of the Senior Debtholders, as provided in the Settlement

15  Agreement:

16      (1)   Any indenture trustee, administrative bank, other paying agent or
Senior Debtholder seeking reimbursement of its fees and

17             expenses will be required to serve copies of its invoices and the
invoices of any professionals it has retained upon the Debtor, its

18             counsel, counsel to the Committee and the United States
Trustee's Office.

19

20      (2)   If any such party believes that all or a portion of the amounts
reflected in any invoice are unreasonable (an "Objecting Party"),

21             such Objecting Party will be required to provide written notice
thereof to such Senior Debtholder, indenture trustee,

22             administrative bank or other paying agent, or the applicable
professional, within 20 days of the receipt of the invoice in
question (with a copy to the Debtor and its counsel).

23

24      (3)   Promptly after the expiration of such 20-day period, the Debtor
will pay any undisputed portion of such invoices, and retain the

25             balance thereof pending resolution of any dispute with an
Objecting Party, or, if any such dispute cannot be consensually
resolved, upon approval of any disputed portion by this Court.

26

27      (4)   The payment of any fees and expenses of any indenture trustee,
administrative bank, other paying agent or Senior Debtholder

28             will be expressly subject to disallowance by the Court.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1    The Debtor respectfully submits that the payment of fees and expenses of Senior

2    Debtholders, indenture trustees, administrative bank or other paying agents as provided

3    herein should be authorized as a necessary corollary to the payment of interest.

4    D.    The Debtor Should Be Authorized To Enter Into Substantially Similar
             Settlements Without Further Court Approval.

5

6         Finally, the Debtor seeks authorization to enter into additional settlement

7    agreements with other holders of Allowed Class 5 Claims on substantially the same terms as

8    the Settlement Agreement,[22] without the burden and expense of seeking further Court

9    approval of such settlements.

10        It is well-established that where numerous settlements are anticipated, the court in

11   its discretion may grant the debtor-in-possession authority to settle under Rule 9019(b)

12   within appropriate parameters without requiring that each and every potential settlement be

13   set for hearing. See 10 Collier on Bankruptcy, supra, ¶9019.03, at 9019-5 to 9019-6.

14   Indeed, this Court recognized its authority to authorize settlements without having each

15   individual settlement brought before the Court when it authorized the Debtor to enter into

16   settlements of disputed Claims within certain parameters. See Order on Debtor's Motion for

17   Authorization to Settle Certain Pre-Petition Claims, dated January 3, 2002.

18        Absent advance approval by the Court to enter into additional agreements with

19   creditors that are substantially similar to the Settlement Agreement, the Debtor would be

20   required under Bankruptcy Rule 9019 to seek this Court's approval of each such subsequent

21   settlement. The Debtor submits that it would be wasteful for the Debtor and burdensome for

22   the Court to review repeated motions seeking approval of settlements that are on

23   substantially the same terms already approved by this Court. To avoid this waste of estate

24   and judicial resources, the Debtor respectfully requests that the Court authorize the Debtor to

25   enter into future settlements on substantially the same terms as the Settlement Agreement

26

27        [22]A condition to effectiveness of the Settlement Agreement is that holders of Allowed
      Class 5 Claims aggregating at least $3 billion must be party to the Settlement Agreement or
28    substantially similar agreements. Settlement Agreement, §21.

MOT. FOR ORDER APPROVING SETTLEMENT & SUPPORT AGMT
-24-
Case: 01-30923   Doc# 5013   Filed: 03/05/02   Entered: 03/06/02 08:51:00   Page 28

Case: 19-30088   Doc# 4235-2   Filed: 10/16/19   Entered: 10/16/19 13:39:12   Page 29
of 30

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1   without further Court approval.

2                            **CONCLUSION**

3         For all the foregoing reasons, the Debtor respectfully requests that this Court

4   make and enter an order that (a) approves the Settlement Agreement, (b) authorizes the

5   payment of Pre-Petition Interest and Post-Petition Interest to the holders of undisputed

6   Claims specified herein, (c) authorizes the Debtor to bring current and to pay, on an on-

7   going basis, the fees and expenses of indenture trustees and paying agents specified herein

8   and (d) authorizes the Debtor, without further approval from this Court, to enter into future

9   settlement agreements with other creditors on substantially similar terms as the Settlement

10   Agreement.

11

12   DATED:  March _5_ , 2002.

13                             Respectfully,

14                             HOWARD, RICE, NEMEROVSKI, CANADY,
                              FALK & RABKIN

15                             A Professional Corporation

16

17                           By: _____
                                  JAMES L. LOPES

18                             Attorneys for Debtor and Debtor in Possession
                            PACIFIC GAS AND ELECTRIC COMPANY

19

20

21

22

23

24

25

26

27

28   WD 030502/F-1419913/Y1/977963/v6

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

MOT. FOR ORDER APPROVING SETTLEMENT & SUPPORT AGMT
-25-
Case: 01-30923   Doc# 5013   Filed: 03/05/02   Entered: 03/06/02 08:51:00   Page 29

Case: 19-30088   Doc# 4235-2   Filed: 10/16/19   Entered: 10/16/19 15:39:12   Page 30
of 30