Dennis F. Dunne (admitted *pro hac vice*)
Samuel A. Khalil (admitted *pro hac vice*)
MILBANK LLP
55 Hudson Yards
New York, New York 10001-2163
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

and

Gregory A. Bray (SBN 115367)
Thomas R. Kreller (SBN 161922)
MILBANK LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000
Facsimile: (213) 629-5063

*Counsel for the Official Committee
of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:** | Case No. 19-30088 (DM) |
| **PG&E CORPORATION** | Chapter 11 |
| - and - | (Lead Case) |
| **PACIFIC GAS AND ELECTRIC COMPANY,** | (Jointly Administered) |
| Debtors. | **OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE DEBTORS' SUBROGATION SETTLEMENT AND RSA MOTION** |
| ☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Date: October 23, 2019<br>Time: 10:00 a.m. (Pacific Time)<br>Place: United States Bankruptcy Court<br>Courtroom 17, 16th Floor<br>450 Golden Gate Avenue<br>San Francisco, CA 94102<br><br>Re: Docket No. 3992 |

The Official Committee of Unsecured Creditors (the "UCC") hereby objects (the "Objection") to the *Motion Pursuant to 11 U.S.C. §§ 363(b) and 105(a) and Fed. R. Bankr. P.*

6004 and 9019 for Entry of an Order (I) Authorizing the Debtors to Enter into Restructuring Support Agreement with the Consenting Subrogation Claimholders, (II) Approving the Terms of Settlement with Such Consenting Subrogation Claimholders, Including the Allowed Subrogation Claim Amount, and (III) Granting Related Relief [Docket No. 3992] (the "<u>RSA Motion</u>").[1] In support of its Objection, the UCC respectfully states as follows:

**OBJECTION**

1. By the RSA Motion, the Debtors seek approval of a far-reaching settlement that would not only allow $11.0 billion in subrogation claims (the "<u>Subrogation Claim Allowance</u>") but would also irrevocably obligate the Debtors to pay those claims in full in cash (the "<u>Full Pay Plan Treatment</u>") with no fiduciary out. While the proposed settlement represents progress in these cases, the Debtors' proposal to commit to the Full Pay Plan Treatment is both premature and goes too far at this stage of these cases.

2. The RSA Motion extolls the many benefits the Debtors are supposed to obtain through the Subrogation Claim Allowance, but largely ignores a fundamental flaw in the Debtors' commitment to the Full Pay Plan Treatment—namely, that such treatment may only be appropriate (and any plan that incorporates it may only be confirmable) if the Debtors prove to be solvent, but the RSA fails to provide the Debtors with any right to vary from that treatment even if the Debtors prove to be (or become) insolvent. To the contrary, the RSA requires the Debtors to pursue a plan containing the Full Pay Plan Treatment—and no other—even if the Debtors are insolvent and therefore (by definition) unable to provide like treatment to all other similarly situated creditors. The UCC maintains that the Debtors are solvent and unsecured creditors in its constituency are entitled to payment in full of their respective claims. Indeed, the two competing plans proposed in the cases are premised upon the Debtors' being solvent. Nonetheless, the UCC as a fiduciary for

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the RSA Motion.

the general unsecured creditors must evaluate the consequences of the Court's approval of the RSA Motion under all circumstances. And, absent a binding determination that the Debtors are solvent (which presumably cannot occur at least until the claims estimation process is complete), the RSA would lock the Debtors into the obligation to pursue what could be a facially discriminatory—and therefore unconfirmable—plan. The Debtors should not be taking on that commitment, and the RSA Motion therefore should be denied.

3.  Moreover, by restricting both the Consenting Creditors and the Debtors from engaging in negotiations with other parties, the RSA undermines the Court's recent order terminating the Debtors' exclusivity. The Consenting Creditors are, of course, free to partner with whomever they choose and to vote for any plan that they prefer, subject to applicable law. It is an entirely different matter, however, for the Court to be asked to formally order that their votes be locked up to a particular plan, especially in light of the decision to terminate exclusivity and that the "competing" plan offers the Consenting Creditors the same allowed claim. It is likewise inappropriate to provide the Consenting Creditors with a potential post-petition claim as a means to enforce their economic recovery against the rest of the creditor constituency. Rather than encouraging the parties in interest to engage and come to a consensual resolution, the RSA, if approved, will only serve to further harden the parties' positions and make an agreed upon resolution that much more difficult to achieve.

**A.    The RSA Improperly Locks in the Subrogation Claim Allowance and the Full Pay Plan Treatment for All Purposes**

4.  The proposed Subrogation Claim Allowance would allow the Subrogation Claims in the aggregate amount of $11.0 billion (the "<u>Subrogation Settlement</u>"). The UCC does not have reason to believe that the proposed allowed amount is not a fair and reasonable compromise, but the UCC objects to the terms of the Subrogation Settlement that would obligate the Debtors to

3

Case: 19-30088    Doc# 4236    Filed: 10/16/19    Entered: 10/16/19 15:42:13    Page 3 of 8

commit indelibly to providing the Full Pay Plan Treatment to the Subrogation Claims under any and all future circumstances.

5. Under the Subrogation Settlement, the $11.0 billion Subrogation Claim Allowance is to be binding *for all purposes in the Debtors' chapter 11 cases*. See RSA §4 (the Subrogation Claim Allowance "shall be binding in the Chapter 11 Cases, and shall survive termination of [the RSA], except as otherwise expressly provided" in the RSA).[2] Moreover, the Debtors are proposing to commit that the only plan they can pursue in these cases (or at least until the RSA is terminated) will pay the allowed Subrogation Claims in full in cash or, solely at the election of individual holders of Subrogation Claims, in a combination of cash and reorganized equity. See RSA §§ 4, 3(a)(ix).

6. In other words, upon approval of the Subrogation Settlement and the RSA, the Debtors will be committed to pursuing a plan that will entitle the Subrogation Claimants to $11.0 billion of cash, regardless of whether the Debtors prove to be solvent. Although the Consenting Creditors have the option to terminate the RSA if the Debtors prove to be insolvent, the Debtors do not have the same right. See n.2 *infra*. The RSA prohibits the Debtors from supporting any plan other than the Debtors' plan (which is defined to include any amendments or modifications). See RSA § 1(a) (definition of "Plan"). The RSA also prohibits the Debtors from proposing a plan that deviates from the RSA. RSA § 3(b)(ii) ("the Company shall not . . . propose, support, solicit, encourage, or participate in any chapter 11 plan or settlement of the Subrogation Claims other than as set forth herein . . . ."). The Consenting Creditors therefore have the ability to keep the Debtors "locked in" to the Full Pay Plan Treatment even if the Debtors prove to be insolvent.

---

[2] The "otherwise provided" language refers to the Debtors' right to terminate the RSA upon an uncured breach by the Consenting Creditors holding at least 5% of the RSA Claims and the right of the Consenting Creditors to terminate the RSA if they determine that the Debtors are insolvent or unable to raise sufficient funds to satisfy the Subrogation Claim Allowance. See RSA § 5(f)(iii).

7.	In addition, if the Debtors breach the RSA (which, again, does not provide a fiduciary out for the Debtors), the Consenting Creditors are entitled to specific performance. See RSA § 16. The RSA is unclear on whether, if it is approved and the obligations thereunder become administrative obligations of the Debtors' estates,[3] the Consenting Creditors may be able to assert an $11.0 billion claim, and entitled to payment in full in cash, under any alternative plan that might be filed in these cases. The right to assert such a claim alone may put the Debtors' ability to confirm any plan in these cases at the mercy of the Consenting Creditors. At a minimum, the RSA needs to be clarified to make clear what happens with respect to the Subrogation Claim Allowance, and what rights the Consenting Creditors would have, if the Court confirms an alternative plan.

8.	Such clarification is especially important in light of the Court's recent termination of the Debtors' exclusivity and allowing the Official Committee of Tort Claimants and the Ad Hoc Committee of Senior Unsecured Noteholders to file their own joint plan for the Debtors (the "Alternative Plan"). Although the Alternative Plan also provides Subrogation Claimants with $11.0 billion of value, the distribution provided to them thereunder consists of cash and equity without giving them the option to choose the distribution currency. Indeed, the Subrogation Claimants have already expressed their lack of support for the Alternative Plan. See *Objection of the Ad Hoc Group of Subrogation Claim Holders to the Joint Motion of the TCC and AHG to Terminate the Debtors' Exclusive Periods Pursuant to Section 1121(d)(1) of the Bankruptcy Code* [Docket No. 4102]. Thus, the estates may find themselves in the ironic situation of paying the Subrogation Claimants $11.0 billion under the Alternative Plan, while facing an administrative claim of the Consenting Creditors for damages stemming from the breach of the RSA.

---

[3] See, e.g., In re Wright, 256 B.R. 858 (Bankr. W.D. N.C. 2001) (holding that damages arising from post-petition breach of an assumed lease are entitled to administrative priority); In re Sporting Way, Inc., 126 B.R. 110 (Bankr. M.D. Fla. 1991) (same).

B.  **The RSA Improperly Locks Up Votes and Makes Reaching a Consensual Resolution More Difficult**

9.  The Court terminated the Debtors' exclusivity, in part, because it believed that "[a] dual-track plan course going forward may facilitate negotiations for a global resolution and narrow the issues which are in legitimate dispute." See *Order Granting Joint Motion of the Official Committee of Tort Claimants and Ad Hoc Committee of Senior Unsecured Noteholders to Terminate the Debtors' Exclusive Periods Pursuant to Section 1121(d)(1) of the Bankruptcy Code* (the "Exclusivity Termination Order") [Docket No. 4167] at 3.  Rather than fostering negotiations, however, the RSA restricts the ability of the Debtors to engage in negotiations.  RSA § 3(b)(ii) ("the Company shall not . . . propose, support, solicit, encourage, or participate in any chapter 11 plan or settlement of the Subrogation Claims other than as set forth herein. . . .").[4]  The RSA also prohibits the Consenting Creditors from "participate[ing] in the formulation of . . . any Alternative Restructuring or settlement of the Subrogation Claims other than as set forth in the RSA" (RSA § (2)(b)(ii)), prohibits the Consenting Creditors from voting for any plan other than the Debtors' plan and requires that the Consenting Creditors vote against any alternative plan.  RSA § 2(a)(iii).  By restricting the parties' ability to negotiate, the RSA unnecessarily hardens the parties' positions and makes it more difficult to reach a consensual resolution of these cases, thus undermining the entire purpose of the Exclusivity Termination Order.

10.  Approving the RSA at this time would make the termination of exclusivity into a pyrrhic victory, as it would tie the Debtors' hands before numerous material case controversies have been resolved and commit the Consenting Creditors to voting on a particular plan before a disclosure statement has been filed, let alone approved.  Because approving the RSA would significantly

---

[4]  The RSA also requires the Debtors to give priority treatment to Subrogation Claims (RSA 3(b)(iii)) and to obtain releases from the wildfire victims (RSA 3(a)(iii)), thus restricting the Debtors' ability to negotiate these plan terms.

undermine the efforts to reach a consensual resolution that the Exclusivity Termination Order was intended to foster, the RSA Motion should be denied.

**C.   The RSA Locks the Debtors into a Potentially Unconfirmable Plan**

11.     By locking in the Full Pay Plan Treatment for the $11.0 billion of Subrogation Claims, the RSA may also force the Debtors to seek confirmation of an unconfirmable plan or risk incurring damages to the Consenting Creditors.

12.     As discussed above, although the RSA grants a termination right to the Consenting Creditors upon their determination of the Debtors' insolvency, the Debtors do not have a corresponding right.  Thus, even if the Debtors prove to be insolvent, their Plan must still provide $11.0 billion in cash in satisfaction of the Subrogation Claims, as well as pay up to $55 million of professional fees incurred by the Ad Hoc Subrogation Group.  The RSA leaves the Debtors with no "out" in the event of their insolvency.

13.     Although the UCC presently does not believe the wildfire claims will render the debtors' insolvent, it is nonetheless a possibility for which the UCC as a fiduciary must account. If the estimation proceeding were to find the Debtors liable for billions of dollars more than anybody expects, or the state court were to find the Debtors liable for substantial damages arising from the Tubbs Fire, or post-petition wildfires were to occur and result in additional unsecured or administrative expense claims, the trajectory of the cases could be far different and the claims of other unsecured creditors may be impaired, while the Debtors will remain obligated to pay the Subrogation Claimants in full in cash (plus professional fees).  As other unsecured creditor classes are not likely to vote in support of such a plan, the Debtors would have to seek confirmation under section 1129(b)(1) of the Bankruptcy Code.  However, that would not be possible as the plan would unfairly discriminate against the Debtors' unsecured creditors other than the holders of Subrogation Claims.  See, e.g., In re Tucson Self-Storage, Inc., 166 B.R. 892 (B.A.P. 9th Cir.

1994) (denying confirmation under section 1129(b)(1) where the plan unfairly discriminated against a class of unsecured deficiency claims).

14. Finally, the RSA requires that, to the extent the Debtors enter into a settlement with any individual wildfire claimant, "as a condition to payment or other distribution" to such claimant, the Debtors must demand that each such holder "contemporaneously execute and deliver a release and waiver of any and all claims to the fullest extent permitted by law against all parties in interest in the Chapter 11 Cases, including any potential made-whole claims against present and former holders of Subrogation Claims." RSA § 3(a)(iii). Moreover, the RSA requires that this condition be set forth in the Confirmation Order. See RSA § 3(v)(B). This is an issue for the TCC to determine and the UCC does not necessarily object to the proposed releases provided there is no recourse by the Consenting Creditors against the estates or reorganized debtors regardless of whether the proposed releases in the Subrogation Settlement are actually obtained.

## CONCLUSION

For the reasons set forth above, the UCC respectfully requests that the Court: (i) sustain the Objection; (ii) deny the RSA Motion; and (iii) grant such other relief as may be appropriate.

Dated: October 16, 2019

**MILBANK LLP**

*/s/Gregory A. Bray*
DENNIS F. DUNNE
SAMUEL A. KHALIL
GREGORY A. BRAY
THOMAS R. KRELLER

*Counsel for the Official Committee of Unsecured Creditors*