REBECCA J. WINTHROP (CA Bar No. 116386)
NORTON ROSE FULBRIGHT US LLP
555 South Flower Street Forty-First Floor
Los Angeles, California 90071
Telephone: (213) 892-9200
Facsimile: (213) 892-9494
rebecca.winthrop@nortonrosefulbright.com

Attorneys for Creditors ADVENTIST HEALTH
SYSTEM/WEST and FEATHER RIVER
HOSPITAL D/B/A ADVENTIST HEALTH
FEATHER RIVER

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION,<br><br>- and -<br><br>PACIFIC GAS AND ELECTRIC COMPANY<br><br>Debtors<br><br>. | Case No. 19 - 30088 (DM)<br><br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**THE ADVENTIST CLAIMANTS' OBJECTION TO THE DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 363(b) AND 105(a) AND FED. R. BANKR. P. 6004 AND 9019 FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO ENTER INTO RESTRUCTURING SUPPORT AGREEMENT WITH THE CONSENTING SUBROGATION CLAIMHOLDERS, (II) APPROVING THE TERMS OF SETTLEMENT WITH SUCH CONSENTING SUBROGATION CLAIMHOLDERS, INCLUDING THE ALLOWED SUBROGATION CLAIM AMOUNT, AND (III) GRANTING RELATED RELIEF [DE # 3992]** |
| ☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>* *All papers shall be filed in the Lead Case,* | **Hearing Date and Time:**<br>Date: October 23, 2019<br>Time: 10:00 a.m. (Pacific Time)<br>Place: Courtroom 17<br>450 Golden Gate Ave., 16th Floor<br>San Francisco, CA 94102 |

*No. 19-30088 (DM)*.

Creditors Adventist Health System/West, a California religious non-profit corporation ("<u>Adventist Health</u>"), and Feather River Hospital, a California religious non-profit corporation, d/b/a Adventist Health Feather River ("<u>AHFR</u>" and, collectively with Adventist Health, the "<u>Adventist Claimants</u>"), file this objection (the "<u>Objection</u>") to the Debtors' *Motion Pursuant to 11 U.S.C. §§ 363(b) and 105(a) and Fed. R. Bankr. P. 6004 and 9019 for Entry of an Order (I) Authorizing the Debtors to Enter Into the Restructuring Support Agreement with the Consenting Subrogation Claimholders; (II) Approving the Terms of Settlement With Such Consenting Subrogation Claimholders, Including the Allowed Subrogation Claim Amount, and (III) Granting Related Relief* (the "<u>Subrogation Settlement and RSA Motion</u>") [ECF No. 3992]. In support of the Objection, the Adventist Claimants respectfully set forth and represent as follows:

## I. INTRODUCTION

Adventist Health is a faith-based, nonprofit integrated health system headquartered in Roseville, California. It seeks to empower healthy communities and enhance the quality of life for those it services by improving access to comprehensive, quality health care services across multiple communities in California, Hawaii and Oregon.

AHFR is part of the Adventist Health hospital system. Prior to the Camp Fire, AHFR was a 100-bed acute care, community hospital with extensive operations in Butte County, but primarily in Paradise, California, including cancer, cardiology and a critical care unit, a diagnostic laboratory, an emergency department with connected MRI, CT and X-Ray services, an outpatient surgery center, home health and hospice services, hospital-based outpatient clinics, rural health clinics, and home oxygen, medical imaging, obstetrics, same-day and sleep medicine services. The hospital was staffed by nearly 200 physicians and advance practice professionals, approximately 1,200 employees and more than 400 volunteers. It was the largest employer in and

DOCUMENT PREPARED ON RECYCLED PAPER

the only hospital in Paradise.

The Camp Fire burned thousands of acres of land and devastated the town of Paradise and nearby communities. It also devastated the main campus of AHFR's Feather River Hospital, located in the town of Paradise (the "<u>Main Hospital Campus</u>"). Approximately 30 of the approximately 50 acres making up the developed portion of the Main Hospital Campus, plus another 68 acres of AHFR's adjacent woodlands, were burned. The damage and destruction done to the Main Hospital Campus was so extensive that it has rendered the Main Hospital Campus incapable of operation since the date of the fire.

The Camp Fire also significantly damaged several of AHFR's other areas of operations in the town of Paradise, including Feather River Health Center, which had once been one of the largest Rural Health Clinic in Adventist Health's system. While the Feather River Health Center has reopened, it has only limited services and is not equipped or staffed to handle patients with emergencies or other acute care needs, and must send them out of town to other facilities. The Adventist Claimants have substantial claims as a result of these events, for which it has received only partial payment thus far from its insurer.

The Adventist Claimants object to the Subrogation Settlement and RSA Motion because it contains what is nothing more than a thinly disguised compelled third party release that could prevent the Adventist Claimants from receiving further recovery on account of their insurance claims. Such releases are barred in the Ninth Circuit and should not be approved here. Additionally, approval of the Subrogation Settlement and RSA Motion potentially violates the "made-whole" doctrine and section 509(c) of the Bankruptcy Code. Further, no cause exists to grant a waiver of the 14-day stay period under Bankruptcy Rule 6004(h), as the Debtors demand.

**II.    THE SUBROGATION SETTLEMENT AND RSA MOTION**

The Subrogation Settlement and RSA Motion itself appears to seek two distinct forms of relief. First, the Subrogation Settlement and RSA Motion seeks approval pursuant to sections 363(b) and 105(a) of the Bankruptcy Code of the Debtors' entry into a Restructuring Support

Agreement, dated as of September 22, 2019, among the Debtors and the Consenting Creditors[1] (the "RSA").  Next, the Subrogation Settlement and RSA Motion separately seeks approval pursuant to Bankruptcy Rule 9019 of a settlement that is embodied in the RSA and which incorporates the settlement term sheet attached as Exhibit A to the RSA (the "Settlement Term Sheet") between the Debtors and certain holders of insurance subrogation claims (the "Subrogation Claims Settlement").

The Subrogation Claims Settlement and RSA Motion is most certainly not the type of settlement in which the Debtors' insurers actually tender the full amount of their policies to fund a litigation trust with cash for the benefit of creditors.  All that is offered to benefit the estates is an agreement by the subrogation claimants to limit their claims against the Debtors to $11 billion, allegedly down from approximately $20 billion.  However, no competent evidence is provided showing the amount of the subrogation claimants' current fixed claims based on payouts that have been made by the insurance companies to wildfire victims (and this alone should bar approval of the motion).[2]

Further, the settlement effectively freezes the subrogation claimants' downside at its current position because it forces wildfire claimants to provide a third-party release to their insurers in order to receive any distribution from the estates.  Buried in the documents is the fact that the RSA and Settlement Term Sheet effectively compel wildfire claimants to grant a broad third-party release of ***all parties in interest in the chapter 11 cases, including their insurance companies***.  Section 3(a)(iii) of the RSA expressly requires the Debtors to:

---

[1] "Consenting Creditors" is defined in the preamble of the RSA as "each of the undersigned creditors party hereto from time to time solely in each creditor's capacity as a holder of Subrogation Claims (as defined below) (including Transferees and Joining Parties (each as defined below)."

[2] The portions of the RSA that may reference claim amounts are redacted.  The only other apparent "evidence" is a two line statement in the Declaration of Jason P. Wells [Dkt. No. 3993], the Debtors' Senior Vice President and Chief Financial Officer, in support of the Debtors' motion, asserting that the aggregate amount of such claims "are likely in excess of $20 billion" [Wells Decl., p. 3, ll. 6-7.]  However, no evidence has been submitted to demonstrate the basis of Mr. Wells' personal knowledge of these facts.  Instead, Mr. Wells relies on an "understanding" based on undisclosed hearsay "information provided by members and attorneys for members of the Ad Hoc Subrogation Group." [Wells Decl., p. 3, ll. 14-18.]  "There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." *Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424 (1968) (emphasis added).

DOCUMENT PREPARED ON RECYCLED PAPER

98776686.1

- 4 -

upon entry into any settlement with any holder or holders of IP Claims that fixes the amount or terms for satisfaction of an IP Claim, including with respect to rights against a post-Effective Date trust established for the resolution and payment of such Claims, require, as a condition to payment or other distribution to or for the benefit of such holder pursuant to such settlement or other agreement, that the holder of the IP Claim contemporaneously ***execute and deliver a release and waiver of any and all claims*** to the fullest extent permitted by law ***against all parties in interest in the Chapter 11 Cases***, ***including any potential made-whole claims against present and former holders of Subrogation Claims***, which release shall be in form and substance reasonably acceptable to the Debtors and the Requisite Consenting Creditors. (the "Settlement Payment Condition")

(emphasis added).

Section 3(a)(iii) of the RSA is similar (although not identical) to a provision contained on page 4 of the Settlement Term Sheet which provides that:

If the Debtors enter into any settlement with any holder or holders of IP Claims[3] that fixes the amount or terms for satisfaction of an IP Claim, including with respect to rights against a post-Effective Date trust established for the resolution and payment of such claims, such settlement will require, as a condition to payment or other distribution to or for the benefit of such holder pursuant to such settlement or other agreement, that the holder of the claim contemporaneously execute and deliver a release and waiver of any and all claims to the fullest extent permitted by law ***against all parties in interest in the Chapter 11 Cases, including made-whole claims against holders of Subrogation Claims***, a form of which will be annexed to the RSA (the "Settlement Payment Condition").

(emphasis added).

### III.  OBJECTION

   A.   *Approval of the Subrogation Settlement and RSA Motion Would Effectively Approve Non-Consensual Third Party Releases, Which are Not Permissible in the Ninth Circuit.*

The Adventist Claimants separately contracted and paid for insurance from a third-party insurer. The release provisions proposed in the RSA and Settlement Term Sheet, however, effectively strip the Adventist Claimants of their insurance coverage. Given the construct in the RSA and the Settlement Term Sheet, the Adventist Claimants will be unable to settle their claims against the Debtors and receive a distribution or payment from the Debtors ***unless*** the Adventist Claimants ***also*** grant a release and waiver of any claims they possess against ***any party in interest***, including their third-party insurers to whom they have paid premiums to cover the losses at issue.

---

[3] "IP Claims" are defined essentially as claims related to the various wildfires at issue.

DOCUMENT PREPARED ON RECYCLED PAPER

This aspect of the Settlement Term Sheet and RSA Motion is extremely problematic since many wildfire claimants like the Adventist Claimants are still in the process of addressing and discussing their claims with their insurance providers. The insurance companies have not fully paid and resolved the claims and the process is expected to continue for some time.[4] Moreover, there is no guarantee of 100% recovery in this case to a wildfire claimant that settles with the Debtors on the allowance of a claim. All that would be agreed to is an allowed claim, and notwithstanding any overall top-down estimation of wildfire claims, there may or not be sufficient funds in a trust to pay 100% to all wildfire claims. Yet, under the RSA and Settlement Term Sheet, wildfire claimants will be compelled to release both their own insurance companies and any other party in interests in these cases from any further responsibility if they want to reach a settlement with the Debtors.

These release provisions are in essence impermissible nonconsensual third-party releases in that the Adventist Claimants' rights to settle and receive a distribution in this case would effectively be held hostage unless they first provide the required release to both their insurer <u>and</u> all other parties in interest, and release both claims relating to the Camp Fire <u>and</u> "any and all claims to the fullest extent permitted by law."

While the cases discussing nonconsensual third-party releases most often are in the context of a court's confirmation of a chapter 11 plan, these cases are still applicable to this court's approval of the Subrogation Settlement and RSA Motion. This is because the terms of the RSA and the Settlement Term Sheet (including the release provisions) are specifically incorporated and will be implemented through the Plan. *See* Exhibit B to the RSA (the Plan, §10.9 entitled "Releases").

As a general rule, the Bankruptcy Code does not provide for general releases of non-debtor parties. Specifically, section 524(e) of the Bankruptcy Code provides that the "discharge

---

[4] The Adventist Claimants' insurer has made partial payments to the Adventist Claimants in connection with the insurance claim resolution process that is ongoing. The proposed release, however, is not mutual as between the Subrogation Claimants and their insured. Thus, an insurer might demand repayment from the claimant of prior payment(s) made to the claimant under its policy (*e.g.*, in the event a wildfire claimant obtains recovery from the litigation trust contemplated by the Debtors' plan). While the Adventist Claimants believe that any such claim would be rejected, the potential that insurance carriers have an alternative avenue of recovery for themselves demonstrates the improvidence and unfairness of the compelled tort victims' release provisions proposed by the Debtors and the subrogation claimants.

DOCUMENT PREPARED
ON RECYCLED PAPER

of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." While some circuits have found that in "unusual circumstances" a bankruptcy court may issue a non-debtor release pursuant to section 105(a) of the Bankruptcy Code, the Ninth Circuit has consistently held that because section 105(a) of the Bankruptcy Code does not authorize relief inconsistent with more specific provisions, it cannot be used to displace the specific provisions of section 524(e) of the Bankruptcy Code. As a result, nonconsensual third-party releases are not permitted. *See, e.g., Resorts Int'l Inc. v. Lowenschuss (In re Lowenschuss)*, 67 F.3d 1394, 1401-02 (9th Cir. 1995) (rejecting the argument that the general equitable powers under Section 105(a) permit the bankruptcy court to discharge the liabilities of non-debtors); *Am. Hardwoods, Inc. v. Deutsche Credit Corp. (In re Am. Hardwoods, Inc.)*, 885 F.2d 621, 625-27 (9th Cir. 1989) ("section 105 does not authorize relief inconsistent with more specific law," and court concluded "the specific provisions of section 524 displace the court's equitable powers under section 105 to order the permanent relief [against a non-debtor] sought by [the debtor]").

Notwithstanding the foregoing, one bankruptcy court in the Ninth Circuit has stated that a third-party release could be approved if it: (i) is fully disclosed; (ii) is purely consensual; and (iii) does not unfairly discriminate against others. *See, e.g., Billington v. Winograde (In re Hotel Mt. Lassen, Inc.)*, 207 B.R. 935, 941 (Bankr. E.D. Cal. 1997) (noting in dicta that "[a]ny third-party release in connection with a plan of reorganization, at a minimum, must be fully disclosed and purely voluntary on the part of the releasing parties and cannot unfairly discriminate against others" and further noting that "[a]lthough the Ninth Circuit's decisions in *Lowenschuss* and *American Hardwoods* do not discuss the permissibility of purely consensual third-party releases, the logic of those decisions does not preclude them . . . [and] such consensual arrangements are commonly proposed in Ninth Circuit bankruptcy courts in connection with plans that are confirmed and, perhaps because of the consensual nature of the releases, are rarely appealed").

The Debtors may argue that the release provisions are "consensual," in that a claimant must technically agree to the purported release, and nothing stops a claimant from simply litigating their claim to trial and judgment. However, this "consent" is still manufactured, in that

claimants are being forced to provide a release in order to settle their claims and receive a distribution under the Debtors' plan. Under this construct, the only alternative available to wildfire claimants to avoid the third-party release is to pursue non-stop and costly litigation of their claims. This is entirely antithetical to the public policy and goals of a bankruptcy case where settlements have long been favored in order to avoid costly litigation. *See Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. at 424 ("[i]n administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts"); *see also Ahern v. Central Pac. Freight Lines*, 846 F.2d 47, 48 (9th Cir. 1988) (public policy favors and encourages settlements in litigation to conserve judicial reserves and limit costly litigation). Accordingly, the dynamic for individual claimants is certainly not one of a consensual release.

Accordingly, the release provisions in the RSA and the Settlement Term Sheet are no different from a nonconsensual third-party release in a plan, which this Court cannot approve.[5]

> B. *Approval of the Subrogation Settlement and RSA Motion Potentially Violates the "Made-Whole" Doctrine and Section 509(c) of the Bankruptcy Code.*

An insurer's right of subrogation is subject to an important common law exception, which has been applied in the Ninth Circuit and is often referred to as the "made-whole" doctrine. Specifically, an insurer is precluded "from recovering any third-party funds unless and until the insured has been made whole for the loss." *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1118 (9th Cir. 2010). The applicability of the doctrine generally depends on whether the insured has been completely compensated for all the elements of damages, not merely those for which the insurer has indemnified the insured."[6] *Id.* at 1118.

Section 509(c) of the Bankruptcy Code is consistent with and requires the same outcome

---

[5] To the extent the Debtors argue that these matters are plan issues to be addressed at confirmation, it is the Debtors who have presented the issue now before the Court in seeking to lock in what is a compelled third-party release in an RSA and the Settlement Term Sheet.

[6] There are only two exceptions to the "made-whole" doctrine, neither of which apply to the Adventist Claimants. First, the doctrine does not apply where an insurer disclaims the doctrine in an insurance contract by using clear and specific language that indicates the parties' intent to permit the insurer to seek reimbursement even if the insured has not been made whole. Second, the doctrine does not apply if the insurer participates in the prosecution of the insured's claim against the third-party tortfeasor. *Chandler*, 598 F.3d at 1118.

98776686.1 - 8 -

DOCUMENT PREPARED ON RECYCLED PAPER

as the "made-whole" doctrine. Section 509(c) of the Bankruptcy Code expressly provides that a subrogation claim "of an entity that is liable with the debtor on" account of the claim of another creditor is subordinated "until such creditor's claim is paid in full. . . ." The insurers are co-liable with the Debtors on account of the wildfire claims albeit under different legal theories—one contractually and the other under tort and other legal theories. *See In re Dow Corning Corp.*, 244 B.R. 705, 715 (Bankr. E.D. Mich. 1999) (US government is an "entity that is liable with the debtor on" on account of the government's claims against Dow Corning for reimbursement of medical expenses paid to Dow Corning's tort victims; both the government and Dow Corning are potentially liable to the tort victims for the same injuries under different theories). As a result, the insurers' subrogation claims are subordinated under section 509(c) of the Bankruptcy Code to the claims of the wildfire victims until the wildfire victims' insurance claims are paid in full. *See In re Dow Corning Corp.*, 250 B.R. 298, 364-65 (Bankr. E.D. Mich. 1999) (Section 509(c) applies to the US government's subrogation claims; however, the government was not subordinated because it had fully paid its debt to the tort victims).

Here, approval of the Subrogation Settlement and RSA Motion violates the "made-whole" doctrine and section 509(c) of the Bankruptcy Code because the Subrogation Trust will be funded with $11 billion in cash on the Effective Date. An insurer that holds a Subrogation Claim thus receives distributions under the Plan before the insured (*i.e.*, a wildfire claimant) was "made whole" for its losses, either due to applicability of the release provisions, or because there are not enough funds in any subsequently established trust that would pay the wildfire claimant's claim in full.

    C.    *Waiver of the 14-Day Stay Period Under Bankruptcy Rule 6004(h) Should Not Be Approved.*

The Adventist Claimants object to the Debtors' request that the Court waive the 14-day automatic stay of any order approving the Settlement Term Sheet and RSA Motion. "Bankruptcy Rule 6004(h) is intended to provide sufficient time for an objecting party to seek a stay pending appeal before an order can be implemented, and protect the objector's appellate rights." *In re Dana Corp.*, 358 B.R. 567, 584 (Bankr. S.D.N.Y. 2006); *see also In re PSINet Inc.*, 268 B.R. 358,

379 (Bankr. S.D.N.Y. 2001) (court denied a request to dispense with the waiting period of Rule 6004(g) (now (h)) where the debtor made no evidentiary showing of a business exigency requiring an immediate closing); *see also* 10 COLLIER ON BANKRUPTCY § 6004.11 (Richard Levin & Henry J. Sommer eds., 16th ed.) ("if an objection has been filed and is overruled, the court should eliminate or reduce the 14-day stay period only upon a showing that there is a sufficient business need to close the transaction within the 14-day period and the interests of the objecting party, taking into account the likelihood of success on appeal, are sufficiently protected").

The only justification offered is an unsupported conclusory allegation that "[i]mmediate implementation of the RSA is in the best interests of the Debtors and all parties in interest." The Adventist Claimants assert that this does not rise to the level of cause needed to deprive objecting parties of their appellate rights, much less sufficient exigent circumstances to justify a waiver of the 14-day stay period under Bankruptcy Rule 6004(h).

## IV. RESERVATION OF RIGHTS

The Adventist Claimants reserve the right to join in objections to the Subrogation Settlement and RSA Motion filed by other parties, including the objection filed by the Official Committee of Tort Claimants [ECF No. 4232], and to raise and be heard on those objections at the hearing.

Dated: October 16, 2019

REBECCA J. WINTHROP
NORTON ROSE FULBRIGHT US LLP

By: */s/ Rebecca J. Winthrop*
REBECCA J. WINTHROP
Attorney for Creditors ADVENTIST HEALTH SYSTEM/WEST and FEATHER RIVER HOSPITAL D/B/A ADVENTIST HEALTH FEATHER RIVER