AKIN GUMP STRAUSS HAUER & FELD LLP    AKIN GUMP STRAUSS HAUER & FELD LLP

Michael S. Stamer (*pro hac vice*)
Ira S. Dizengoff (*pro hac vice*)
David H. Botter (*pro hac vice*)
Abid Qureshi (*pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone:      (212) 872-1000
Facsimile:      (212) 872-1002
Email:          mstamer@akingump.com
                idizengoff@akingump.com
                dbotter@akingump.com
                aqureshi@akingump.com

Ashley Vinson Crawford (SBN 257246)
580 California Street
Suite 1500
San Francisco, CA 94104
Telephone:      (415) 765-9500
Facsimile:      (415) 765-9501
Email:          avcrawford@akingump.com

*Counsel to the Ad Hoc Committee of Senior Unsecured
Noteholders of Pacific Gas and Electric Company*

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:** | Bankruptcy Case No. 19-30088 (DM) |
| **PG&E CORPORATION,** | Chapter 11 |
| **-and-** | (Lead Case) |
| **PACIFIC GAS AND ELECTRIC COMPANY,** | (Jointly Administered) |
| Debtors. | **OBJECTION OF THE AD HOC COMMITTEE OF SENIOR UNSECURED NOTEHOLDERS TO DEBTORS' MOTION TO ENTER INTO RESTRUCTURING SUPPORT AGREEMENT WITH THE CONSENTING SUBROGATION CLAIMHOLDERS** |
| ☐ Affects PG&E Corporation | |
| ☐ Affects Pacific Gas and Electric Company | **Hearing** |
| ☒ Affects both Debtors | Date:   October 23, 2019 |
| | Time:   10:00 a.m. (Pacific Time) |
| | Place:  Courtroom 17 |
| *All papers shall be filed in the Lead Case, No. 19-30088 (DM) | 450 Golden Gate Ave, 16th Floor San Francisco, CA 94102 |
| | **Re: Docket Nos. 3992, 3993** |

The Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company (the "Ad Hoc Committee")[1] in the above-captioned chapter 11 cases of Pacific Gas and Electric Company (the "Utility") and PG&E Corporation ("PG&E" and, together with the Utility, the "Debtors"), by its undersigned counsel, Akin Gump Strauss Hauer & Feld LLP, hereby submits this objection (the "Objection") to the *Debtors' Motion Pursuant to 11 U.S.C. §§ 363(b) and 105(a) and Fed. R. Bankr. P. 6004 and 9019 for Entry of an Order (I) Authorizing the Debtors to Enter into Restructuring Support Agreement with the Consenting Subrogation Claimholders, (II) Approving the Terms of Settlement with Such Consenting Subrogation Claimholders, Including the Allowed Subrogation Claim Amount, and (III) Granting Related Relief* [Docket No. 3992] (the "Motion").[2]  In support of this Objection, the Ad Hoc Committee respectfully states the following:

## OBJECTION

1.        On October 9, 2019, this Court, taking into account the need to move these cases forward and the wishes of the "party most deserving of consideration"—the wildfire victims—terminated the Debtors' exclusive right to propose and solicit a plan of reorganization. The Ad Hoc Committee and the Official Committee of Tort Claimants (the "TCC"), with the approval of this Court, are now proceeding with their proposed plan (the "TCC/AHC Plan") as joint plan proponents.  The Court granted termination because a "dual-track plan course going forward may facilitate negotiations for a global resolution and narrow the issues which are in legitimate dispute."  *Order Granting Joint Motion of the Official Committee of Tort Claimants and the Ad Hoc Committee of Senior Unsecured Noteholders to Terminate the Debtors' Exclusive Periods Pursuant to Section 1121(d)(1) of the Bankruptcy Code* [Docket No. 4167] ("Exclusivity Decision"), 3:12-15.  Moreover, the Court noted that in the absence of a global settlement, if both plans are confirmable, "the voters will make their choice or leave the court with the task of picking one of them."  *Id.*, 3:20-22.

2.        A settlement of the substantial subrogation claims against the Debtors' estates by the Motion would be a positive development that would allow all plan proponents to focus on resolving

---

[1] The Ad Hoc Committee filed an amended verified statement pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure on July 18, 2019 [Docket No. 3083].

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

1    other significant plan-related issues.  To that end, the Ad Hoc Committee does not oppose the

2    settlement *by the Debtors' estates* of the aggregate subrogation claims by allowance of an $11 billion

3    claim (the "Proposed Allowed Subrogation Claim") against these estates.

4         3.       However, this is the not the settlement the Court is being asked to approve through the

5    Motion.  Instead, the Debtors seek approval of a restructuring support agreement (the "RSA") with the

6    Ad Hoc Subrogation Group, which contains numerous provisions that are entirely unreasonable, anti-

7    competitive and not in the best interests of the estates. Instead of inuring to the benefit of the estates,

8    the RSA sought to be approved by the Debtors will only serve the Debtors' and equity holders' self-

9    interests and effectively undermine this Court's Exclusivity Decision.  The Ad Hoc Committee,

10   therefore, respectfully requests that the Court deny approval of the RSA.

11       **A.  The Unreasonable Provisions of the RSA**

12       4.       The Ad Hoc Committee specifically objects to approval of the RSA because it includes

13   the following provisions that are unreasonable, clearly not in the best interests of the estates, and create

14   an unequal playing field in favor of the Debtors and their equity partners a mere two weeks after the

15   Court's Exclusivity Decision.  Rather than fostering negotiations toward a consensual plan, approval of

16   the RSA will serve to only further entrench the Debtors and equity and most certainly lead to future

17   discord.

18       5.       **Requirement to Vote Against The TCC/AHC Plan, and Vote For the Debtor Plan**.

19   First, the RSA requires the members of the Ad Hoc Subrogation Group to affirmatively vote to reject

20   the TCC/AHC Plan (or any other plan of reorganization besides the Debtors' plan) under any

21   circumstance.  The RSA also requires the Proposed Allowed Subrogation Claim to be voted only in

22   favor of the plan proposed by the Debtors (the "Debtor Plan").  Thus, even if the TCC/AHC Plan

23   includes and pays the $11 billion Proposed Allowed Subrogation Claim in full, or even if the

24   TCC/AHC Plan provides for better treatment, the Ad Hoc Subrogation Group is required to reject the

25   TCC/AHC Plan.  *See* RSA, §§ 2(a)(iii).

26       6.       **Prohibition Against Discussions Regarding the TCC/AHC Plan**.  Second, the terms

27   of the RSA prohibit the Ad Hoc Subrogation Group from engaging in any conduct that would, among

28   other things, directly or indirectly encourage, assist or support the formulation of or vote for any plan

other than the Debtor Plan.  RSA, § 2(b)(ii).  This provision prevents the Ad Hoc Subrogation Group from engaging in any discussions or negotiations with the Ad Hoc Committee or TCC and directly undermines the Court's desire expressed in the Exclusivity Decision to "facilitate negotiations for a global resolution and narrow the issues which are in legitimate dispute."  Exclusivity Decision at 3.

7. **Non-Binding Allowed Subrogation Claim**.  The core settlement benefit to these estates, namely, fixing the subrogation claims at $11 billion, is simply not made available to the estates and creditors generally.  Rather, the RSA structures the Proposed Allowed Subrogation Claim as a one-way option for the Ad Hoc Subrogation Group.   If any of a host of "termination events" occurs (including any breach by the Debtors of any provision of the RSA, solicitation of the TCC/AHC Plan before the Debtor Plan, or confirmation of the TCC/AHC Plan, for example), the $11 billion Proposed Allowed Subrogation Claim is no longer binding, and the subrogation claim holders can pursue their previously compromised claims **in their entirety**.   *See* RSA, §§ 5(c), (d).  The Proposed Allowed Subrogation Claim, therefore, is not being settled for the benefit of the Debtors' estates and creditors, but only to advance the Debtors' and equity holders' interests.  Setting aside how the Debtors as a fiduciary and self-styled "honest broker" could move forward with such a self-interested request in the first place, clearly this Court cannot approve such a contingent "settlement" as in the best interests of the Debtors' estates at this point in these cases.  Indeed, while the proposed order submitted with this Motion seeks an allowed $11 billion claim plus a $55 million administrative claim, if the Court were inclined to approve the Proposed Allowed Subrogation Claim, allowance must bind not just the estates, but also the claimants, for the remainder of these cases.

8. **Amendments Without Further Court Approval**.  Furthermore, the amendment provision of the RSA allows the terms of the RSA to be modified without further approval of the Court.  *See* RSA, § 9.  The RSA would, therefore, allow the Debtors and the Ad Hoc Subrogation Group to modify the terms of their settlement without the need to provide notice to parties in interest, contrary to the requirements of Bankruptcy Rule 9019.  Permitting modification without notice to other parties, or the involvement of this Court, would give the Debtors and the equity holders carte blanche to make any changes they deem appropriate.  Given the unreasonable nature of the terms they have

1   sought approval of in the Motion, the Debtors should not be given the permission to make matters

2   worse.

3            9.      **Deemed "Impairment" of Proposed Subrogation Claim**.  Even though the RSA and

4   Motion contemplate payment of the $11 billion Proposed Allowed Subrogation Claim in full in cash,

5   the RSA requires that the Subrogation Claim class be deemed "impaired."  Following months of the

6   Debtors' complaints in this Court about the purported problems with so-called "artificial impairment,"

7   this Court should not allow the Debtors to hardwire an impaired accepting class vote only for a single

8   plan, when the class has both agreed to the amount of their claim and the payment terms.  At the very

9   least, the Court should not, in the context of the Motion, determine that the Proposed Allowed

10  Subrogation Claim is impaired for plan purposes when it is paid in full in cash on the effective date of

11  the plan.

12  **B.  The Court Should Not Approve the RSA**

13        10.     The terms of the RSA were negotiated and agreed to prior to this Court's Exclusivity

14  Decision when the Debtors were trying desperately to retain exclusivity at all costs.  This Court has

15  authorized the TCC/AHC Plan to be formulated and proposed, and rejected the Debtors' pleas to retain

16  their exclusive status.  This Court cannot and should not allow the Debtors, a mere two weeks after the

17  Exclusivity Decision, to gain an unfair advantage in these cases by approving an RSA that would,

18  among other things, (a) obligate subrogation claim holders to vote out-of-hand to reject the TCC/AHC

19  Plan that provides for payment in full of the Proposed Allowed Subrogation Claim, and (b) bar the

20  TCC and Ad Hoc Committee from engaging with subrogation claim holders to resolve inter-creditor

21  disputes.  Moreover, if an $11 billion settlement of the subrogation claims is fair to the estates, then the

22  voting, anti-negotiation, and other commitments under the RSA are neither necessary nor appropriate

23  and should fall away.

24        11.     Nor should the Court approve a settlement that is essentially binding only if the Debtor

25  Plan is confirmed.  Court approval of a settlement pursuant to Bankruptcy Rule 9019 binds the *estate*

26  to the terms of the compromise entered into by the debtor in possession.  *In re Flores*, 2013 WL

27  6186262, at *8 (Bankr. C.D. Cal. Nov. 25, 2013) ("The purpose and effect of seeking court approval of

28  a compromise under Rule 9019 is to bind the bankruptcy estate to the terms of any bargain struck by a

trustee or debtor-in-possession."). Therefore, there is no legal basis for the Debtors to seek court

approval of the Proposed Allowed Subrogation Claim *only* for the Debtor Plan. Nor is such a claim

allowance actually beneficial to these estates, as it is a one-way, contingent settlement that gives a free

option to the Ad Hoc Subrogation Group. Such a settlement is not in the estates' best interests, not in

the paramount interests of creditors, and is inconsistent with the Debtors' fiduciary duties. The Court

should reject these self-serving efforts and instead require the Debtors to act as the true fiduciary for all

stakeholders and bind their estates to this settlement no matter what plan goes forward.

12. Finally, the RSA prohibits holders of subrogation claims from evaluating the competing

plans on their merits and expressing their preference by vote. Thus, the RSA runs directly contrary to

section 1129(c) of the Bankruptcy Code, which directs the Court to consider the preferences of

creditors and equity security holders in choosing between two confirmable plans. Creditors should be

permitted to vote for both plans where, as here, their treatment would be the same under both plans.

The Ad Hoc Committee believes that holders of subrogation claims would, if permitted, vote in favor

of both competing plans that provide them equivalent treatment. This would make clear what is

already obvious in these cases, and has already been affirmed by this Court, that the preference and

interest of wildfire victims is the key consideration.

13. This Court may approve settlement of the subrogation claims through full and final

allowance of the Proposed Allowed Subrogation Claim pursuant to Rule 9019. But in order to give

full force and effect to the Court's Exclusivity Decision, the Court must deny approval of the RSA.

Each plan proponent may then elect to treat the claims in its respective plan as it sees fit, with it left for

another day whether the proposed treatment comports with the Bankruptcy Code and other applicable

law. Such a modification would narrow the issues in dispute between the groups and encourage

dialogue among the parties, all of which could have the effect of facilitating a global resolution of

these cases that would truly be in the interests of all stakeholders.

<u>**CONCLUSION**</u>

14.     For the foregoing reasons, the Ad Hoc Committee respectfully requests that the Court deny the Motion until the modifications requested herein are made and grant such other relief as the Court deems appropriate.


Dated:  October 16, 2019               **AKIN GUMP STRAUSS HAUER & FELD LLP**


By: /s/ *Ashley Vinson Crawford*
    Ashley Vinson Crawford (SBN 257246)
    Michael S. Stamer (*pro hac vice*)
    Ira S. Dizengoff (*pro hac vice*)
    David H. Botter (*pro hac vice*)
    Abid Qureshi (*pro hac vice*)


*Counsel to the Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company*