BAKER & HOSTETLER LLP

Robert A. Julian (SBN 88469)
Cecily A. Dumas (SBN 111449)
160 Battery Street, Suite 100
San Francisco, CA 94111
Telephone:    (628) 208-6434
Facsimile:    (310) 820-8859
Email:        rjulian@bakerlaw.com
              cdumas@bakerlaw.com

Eric E. Sagerman (SBN 155496)
Lauren T. Attard (SBN 320898)
11601 Wilshire Boulevard
Suite 1400
Los Angeles, CA 90025
Telephone:    (310) 820-8800
Facsimile:    (310) 820-8859
Email:        esagerman@bakerlaw.com
              lattard@bakerlaw.com

*Counsel to the Official Committee of Tort Claimants*

AKIN GUMP STRAUSS HAUER & FELD LLP

Michael S. Stamer (*pro hac vice*)
Ira S. Dizengoff (*pro hac vice*)
David H. Botter (*pro hac vice*)
Abid Qureshi (*pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone:    (212) 872-1000
Facsimile:    (212) 872-1002
Email:        mstamer@akingump.com
              idizengoff@akingump.com
              dbotter@akingump.com
              aqureshi@akingump.com

Ashley Vinson Crawford (SBN 257246)
580 California Street
Suite 1500
San Francisco, CA 94104
Telephone:    (415) 765-9500
Facsimile: (415) 765-9501
Email:        avcrawford@akingump.com

*Counsel to the Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company*

ACCEPTANCES AND REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>-and-<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br>*All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case No. 19-30088 (DM)<br><br>Chapter 11<br><br>(Lead Case)<br>(Jointly Administered)<br><br>**JOINT CHAPTER 11 PLAN OF REORGANIZATION OF OFFICIAL COMMITTEE OF TORT CLAIMANTS AND AD HOC COMMITTEE OF SENIOR UNSECURED NOTEHOLDERS** |

ARTICLE I. DEFINITIONS, INTERPRETATION AND SETTLEMENTS ..................................... 1

ARTICLE II. ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY TAX CLAIMS AND
        OTHER UNCLASSIFIED CLAIMS ............................................................................ 27

    2.1     Administrative Expense Claims ...................................................................... 27
    2.2     Professional Fee Claims ................................................................................. 28
    2.3     DIP Facility Claims ....................................................................................... 28
    2.4     Priority Tax Claims ........................................................................................ 29

ARTICLE III. CLASSIFICATION OF CLAIMS AND INTERESTS.............................................. 29

    3.1     Classification in General................................................................................ 29
    3.2     Summary of Classification............................................................................. 29
    3.3     Separate Classification of Other Secured Claims ......................................... 30
    3.4     Nonconsensual Confirmation......................................................................... 30
    3.5     Debtors' Rights in Respect of Unimpaired Claims........................................ 30

ARTICLE IV. TREATMENT OF CLAIMS AND INTERESTS ..................................................... 31

    4.1     Class 1A – HoldCo Other Secured Claims .................................................... 31
    4.2     Class 2A – HoldCo Priority Non-Tax Claims ............................................... 31
    4.3     Class 3A – HoldCo Revolver Claims. ........................................................... 31
    4.4     Class 4A – HoldCo Term Loan Claims. ........................................................ 32
    4.5     Class 5A – HoldCo General Unsecured Claims ............................................ 32
    4.6     Class 6A – HoldCo Public Entities Wildfire Claims ..................................... 32
    4.7     Class 7A – HoldCo Subrogation Wildfire Claims ......................................... 32
    4.8     Class 8A – HoldCo Fire Victim Claims ........................................................ 33
    4.9     Class 9A – HoldCo Workers' Compensation Claims ..................................... 33
    4.10    Class 10A – HoldCo Intercompany Claims ................................................... 33
    4.11    Class 11A – HoldCo Subordinated Debt Claims ........................................... 33
    4.12    Class 12A – HoldCo Common Interests......................................................... 34
    4.13    Class 13A – HoldCo Other Interests.............................................................. 34
    4.14    Class 1B – Utility Other Secured Claims ...................................................... 34
    4.15    Class 2B – Utility Priority Non-Tax Claims ................................................. 34
    4.16    Class 3B – Utility Revolver Claims .............................................................. 35
    4.17    Class 4B – Utility Term Loan Claims............................................................ 35
    4.18    Class 5B – Utility Short-Term Senior Notes Claims. .................................... 35
    4.19    Class 6B – Utility Long-Term Senior Notes Claims. .................................... 36
    4.20    Class 7B – Utility PC Bond Claims............................................................... 36
    4.21    Class 8B – Utility General Unsecured Claims............................................... 37
    4.22    Class 9B – Utility Public Entities Wildfire Claims....................................... 37
    4.23    Class 10B – Utility Subrogation Wildfire Claims ......................................... 37
    4.24    Class 11B – Utility Fire Victim Claims ........................................................ 38
    4.25    Class 12B – Utility Workers' Compensation Claims ..................................... 38
    4.26    Class 13B – 2001 Utility Exchange Claims................................................... 39
    4.27    Class 14B – Utility Intercompany Claims ..................................................... 39
    4.28    Class 15B – Utility Subordinated Debt Claims ............................................. 39
    4.29    Class 16B – Utility Preferred Interests .......................................................... 39
    4.30    Class 17B – Utility Common Interests .......................................................... 39

ARTICLE V. PROVISIONS GOVERNING DISTRIBUTIONS ................................................... 39

    5.1     Distributions Generally .................................................................................. 39

5.2     Plan Funding...........................................................................................40
5.3     Postpetition Interest on Claims.................................................................40
5.4     Date of Distributions.................................................................................40
5.5     Distribution Record Date...........................................................................40
5.6     Disbursing Agent.......................................................................................40
5.7     Delivery of Distributions...........................................................................40
5.8     Funded Debt Trustee Fees..........................................................................41
5.9     Unclaimed Property....................................................................................41
5.10    Satisfaction of Claims................................................................................41
5.11    Fractional Stock.........................................................................................41
5.12    Manner of Payment under Plan..................................................................41
5.13    No Distribution in Excess of Amount of Allowed Claim...........................42
5.14    Setoffs and Recoupments..........................................................................42
5.15    Rights and Powers of Disbursing Agent....................................................42
5.16    Withholding and Reporting Requirements.................................................42
5.17    Credit for Distributions under Wildfire Assistance Program.....................43

ARTICLE VI. MEANS FOR IMPLEMENTATION AND EXECUTION OF THE PLAN ...................43

6.1     Restructuring Transactions; Effectuating Documents.................................43
6.2     Continued Corporate Existence.................................................................44
6.3     The Subrogation Wildfire Trust..................................................................44
6.4     Subrogation Wildfire Trustee.....................................................................45
6.5     Subrogation Trust Advisory Board.............................................................45
6.6     The Fire Victim Trust................................................................................45
6.7     Fire Victim Trustee....................................................................................46
6.8     Fire Victim Trust Oversight Committee.....................................................47
6.9     Public Entities Segregated Defense Fund...................................................47
6.10    Ad Hoc Committee Professional Fees........................................................47
6.11    Go-Forward Wildfire Fund........................................................................47
6.12    Officers and Board of Directors.................................................................48
6.13    [Management Incentive Plan......................................................................49
6.14    Cancellation of Existing Securities and Agreements..................................49
6.15    Cancellation of Certain Existing Security Agreements...............................49
6.16    Issuance of New HoldCo Common Stock...................................................49
6.17    Issuance of New HoldCo Senior Notes......................................................50
6.18    Issuance of New Utility Secured Notes......................................................50
6.19    Payment of Commitment Fees...................................................................50
6.20    Rights Offering..........................................................................................50
6.21    Prohibition Against Rate Increases............................................................50
6.22    Key Operating Businesses..........................................................................50
6.23    Rate Neutrality...........................................................................................51
6.24    Utility Consumer Rate Credit....................................................................51
6.25    Rebranding.................................................................................................51
6.26    Securities Act Registrations or Exemptions...............................................51

ARTICLE VII. PROCEDURES FOR DISPUTED CLAIMS ...................................................52

7.1     Objections to Claims..................................................................................52
7.2     Resolution of Disputed Administrative Expense Claims and Disputed Claims ............52
7.3     Payments and Distributions with Respect to Disputed Claims...................52
7.4     Distributions After Allowance....................................................................52
7.5     Disallowance of Claims.............................................................................52

ARTICLE VIII. EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........................................ 53

    8.1    General Treatment ............................................................................................. 53
    8.2    Determination of Cure Disputes and Deemed Consent .................................... 53
    8.3    Rejection Damages Claims ............................................................................... 54
    8.4    Assumption of Employee Benefit Plans ........................................................... 54
    8.5    Collective Bargaining Agreements ................................................................... 55
    8.6    Insurance Policies. ............................................................................................ 55
    8.7    Reservation of Rights. ...................................................................................... 55
    8.8    Modifications, Amendments, Supplements, Restatements, or Other Agreements ........... 55

ARTICLE IX. EFFECTIVENESS OF THE PLAN ........................................................................ 56

    9.1    Conditions Precedent to Confirmation of the Plan .......................................... 56
    9.2    Conditions Precedent to the Effective Date ..................................................... 56
    9.3    Satisfaction of Conditions ................................................................................ 57
    9.4    Waiver of Conditions ....................................................................................... 57
    9.5    Effect of Non-Occurrence of Effective Date ................................................... 57

ARTICLE X. EFFECT OF CONFIRMATION ............................................................................... 57

    10.1    Binding Effect .................................................................................................. 57
    10.2    Vesting of Assets ............................................................................................. 57
    10.3    Release and Discharge of Debtors .................................................................... 58
    10.4    Term of Injunctions or Stays. ........................................................................... 58
    10.5    Injunction Against Interference with Plan ....................................................... 58
    10.6    Injunction ......................................................................................................... 58
    10.7    Channeling Injunction ...................................................................................... 59
    10.8    Exculpation ...................................................................................................... 60
    10.9    Releases ............................................................................................................ 60
    10.10    Subordination ................................................................................................... 63
    10.11    Retention of Causes of Action/Reservation of Rights ..................................... 63
    10.12    Preservation of Causes of Action ..................................................................... 63
    10.13    Special Provisions for Governmental Units ..................................................... 64
    10.14    Document Retention ......................................................................................... 64
    10.15    Solicitation of Plan .......................................................................................... 64

ARTICLE XI. RETENTION OF JURISDICTION ......................................................................... 64

    11.1    Jurisdiction of Bankruptcy Court ..................................................................... 64

ARTICLE XII. MISCELLANEOUS PROVISIONS ....................................................................... 66

    12.1    Dissolution of Statutory Committees ............................................................... 66
    12.2    Substantial Consummation ............................................................................... 66
    12.3    Exemption from Transfer Taxes ....................................................................... 66
    12.4    Expedited Tax Determination .......................................................................... 67
    12.5    Payment of Statutory Fees ............................................................................... 67
    12.6    Plan Modifications and Amendments ............................................................... 67
    12.7    Revocation or Withdrawal of Plan ................................................................... 67
    12.8    Courts of Competent Jurisdiction ..................................................................... 67
    12.9    Severability ...................................................................................................... 67
    12.10    Governing Law ................................................................................................. 68
    12.11    Schedules and Exhibits .................................................................................... 68

12.12     Successors and Assigns ........................................................................ 68
12.13     Time ..................................................................................................... 68
12.14     Notices ................................................................................................. 68
12.15     Reservation of Rights ......................................................................... 70

The Official Committee of Tort Claimants and the Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company, as plan co-proponents within the meaning of section 1129 of the Bankruptcy Code, propose the following joint chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in Article I of the Plan.

<div align="center">

**ARTICLE I.**

**DEFINITIONS, INTERPRETATION AND SETTLEMENTS**

</div>

**DEFINITIONS**.  The following terms used herein shall have the respective meanings defined below (such meanings to be equally applicable to both the singular and plural):

    **1.1**    **2001 Utility Exchange Claim** means any Claim against the Utility arising solely from (a) amounts due to the CAISO, PX, and/or various market participants based on purchases or sales of electricity, capacity, or ancillary services by the Utility and other market participants in markets operated by the CAISO and the PX that are subject to determination by FERC in refund proceedings bearing FERC Docket Nos. EL00-95-000 and EL00-98-000 and related subdockets, and (b) amounts due under any settlement agreements, allocation agreements, escrow agreements, letter agreements, other written agreements, or court orders (including orders entered in the chapter 11 case styled *In re California Power Exchange Corporation*, Case No. LA 01-16577 ES) that expressly relate thereto.

    **1.2**    **503(b)(9) Claim** means a Claim or any portion thereof entitled to administrative expense priority pursuant to section 503(b)(9) of the Bankruptcy Code, which Claim was timely filed and Allowed pursuant to the 503(b)(9) Procedures Order.

    **1.3**    **503(b)(9) Procedures Order** means the *Amended Order Pursuant to 11 U.S.C. §§ 503(b)(9) and 105(a) Establishing Procedures for the Assertion, Resolution, and Satisfaction of Claims Asserted Pursuant to 11 U.S.C. § 503(b)(9)* [Docket No. 725].

    **1.4**    **Ad Hoc Committee** means the Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company.

    **1.5**    **Ad Hoc Committee Professionals** means (i) Akin Gump Strauss Hauer & Feld LLP, (ii) Perella Weinberg Partners, (iii) BraunHagey & Borden LLP, (iv) Davis Wright & Tremaine LLP, (v) The Glover Park Group LLC, (vi) The Weideman Group, (vii) Charles River Associates, and (viii) and any additional professionals the Ad Hoc Committee may retain from time to time.

    **1.6**    **Ad Hoc Subrogation Group** means the Ad Hoc Group of Subrogation Claim Holders.

    **1.7**    **Ad Hoc Subrogation Professionals** means (i) Willkie Farr & Gallagher LLP, (ii) Rothschild & Co., (iii) Diemer & Wei LLP, (iv) Kekst and Company Incorporated d/b/a Kekst CNC and (v) Wilson Public Affairs.

    **1.8**    **Administrative Expense Claim** means any cost or expense of administration of any of the Chapter 11 Cases arising on or before the Effective Date that is allowable under section 503(b) of the Bankruptcy Code and entitled to priority under sections 364(c)(1), 503(b) (including 503(b)(9) Claims), 503(c), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code that has not already been paid, including, (a) any actual and necessary costs and expenses of preserving the Debtors' estates, any actual and necessary costs and expenses of operating the Debtors' businesses, any indebtedness or obligations incurred or assumed by one or

more of the Debtors, as a debtor in possession, during the Chapter 11 Cases, including, for the acquisition or lease of property or an interest in property or the performance of services, or any fees or charges assessed against the estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code, (b) any DIP Facility Claim, (c) any Professional Fee Claim, and (d) any Intercompany Claim authorized pursuant to the Cash Management Order.

**1.9** **Aggregate Fire Victim Consideration** means the aggregate consideration of (a) the lesser of (i) $14.5 billion and (ii) the aggregate amount of Claims in Classes 6A, 8A, 9B and 11B, as determined by a court of competent jurisdiction prior to the Effective Date, consisting of (x) Cash and (y) New HoldCo Common Stock (at plan value) used to fund the Fire Victim Trust and (b) the assignment by the Debtors and Reorganized Debtors to the Fire Victim Trust of the Assigned Rights and Causes of Action.

**1.10** **Allowed** means, with reference to any Claim or Interest: (a) any Claim listed in the Debtors' Schedules, as such Schedules may be amended from time to time in accordance with Bankruptcy Rule 1009, as liquidated, non-contingent, and undisputed, and for which no contrary proof of Claim has been filed; (b) any Claim or Interest expressly allowed hereunder; (c) any Claim or Interest to which a Debtor and the holder of such Claim or Interest agree to the amount and priority of the Claim or Interest, which agreement is approved by a Final Order; (d) any individual Subrogation Wildfire Claim or a Claim held by a party to the Subrogation Wildfire Claim Allocation Agreement to which the Subrogation Wildfire Trustee and the holder of such Claim agree to the amount of such Claim (e) any Claim or Interest that is compromised, settled or otherwise resolved or Allowed pursuant to a Final Order (including any omnibus or procedural Final Order relating to the compromise, settlement, resolution, or allowance of any Claims) or under the Plan; or (f) any Claim or Interest arising on or before the Effective Date as to which no objection to allowance has been interposed within the time period set forth in the Plan; *provided*, that notwithstanding the foregoing, unless expressly waived by the Plan, the Allowed amount of Claims or Interests shall be subject to, and shall not exceed the limitations or maximum amounts permitted by, the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable. The Reorganized Debtors shall retain all Claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired under the Plan.

**1.11** **Assigned Rights and Causes of Action** means any and all rights, claims, causes of action, and defenses related thereto relating directly or indirectly to any of the Fires that the Debtors may have against any third party, including, without limitation, against insurance carriers, vendors, suppliers, third party contractors and consultants (including those who provided services regarding the Debtors' electrical system, system equipment, inspection and maintenance of the system, and vegetation management), current and former directors and officers of the Debtors, and others as mutually agreed upon by the Plan Proponents and identified in the Schedule of Assigned Rights and Causes of Action.

**1.12** **Avoidance Action** means any action commenced, or that may be commenced, before or after the Effective Date pursuant to chapter 5 of the Bankruptcy Code including sections 544, 545, 547, 548, 549, 550, or 551 of the Bankruptcy Code.

**1.13** **Ballot** means the form(s) of ballots distributed to holders of Impaired Claims or Interests on which the acceptance or rejection of the Plan is to be indicated.

**1.14** **Bankruptcy Code** means title 11 of the United States Code, as applicable to the Chapter 11 Cases.

**1.15** **Bankruptcy Court** means the United States Bankruptcy Court for the Northern District of California, having subject matter jurisdiction over the Chapter 11 Cases and,

to the extent of any reference withdrawal made under section 157(d) of title 28 of the United States Code, the District Court.

**1.16** **Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, applicable to the Chapter 11 Cases, and any Local Rules of the Bankruptcy Court.

**1.17** **Business Day** means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

**1.18** **CAISO** means the California Independent System Operator Corporation.

**1.19** **Cash** means legal tender of the United States of America.

**1.20** **Cash Management Order** means the *Final Order Pursuant to 11 U.S.C. §§ 105(a), 345(b), 363(b), and 363(c), and Fed. R. Bankr. P.6003 and 6004 (i) Authorizing Debtors to (a) Continue Their Existing Cash Management System, (b) Honor Certain Prepetition Obligations Related to the Use Thereof, (c) Continue Intercompany Arrangements, (d) Continue to Honor Obligations Related to Joint Infrastructure Projects, and (e) Maintain Existing Bank Accounts and Business Forms; and (ii) Waiving the Requirements of 11 U.S.C. § 345(b)*, dated March 13, 2019 [Docket No. 881].

**1.21** **Cause of Action** means, without limitation, any and all actions, class actions, proceedings, causes of action, controversies, liabilities, obligations, rights, rights of setoff, recoupment rights, suits, damages, judgments, accounts, defenses, offsets, powers, privileges, licenses, franchises, Claims, Avoidance Actions, counterclaims, cross-claims, affirmative defenses, third-party claims, Liens, indemnity, contribution, guaranty, and demands of any kind or character whatsoever, whether known or unknown, asserted or unasserted, reduced to judgment or otherwise, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in contract or in tort, in law, in equity, or otherwise, whether arising under the Bankruptcy Code or any applicable nonbankruptcy law, based in whole or in part upon any act or omission or other event occurring on or prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date. Without limiting the generality of the foregoing, when referring to Causes of Action of the Debtors or their estates, Causes of Action shall include (a) all rights of setoff, counterclaim, or recoupment and Claims for breach of contracts or for breaches of duties imposed by law or equity; (b) the right to object to any Claim or Interest; (c) Claims (including Avoidance Actions) pursuant to section 362 and chapter 5 of the Bankruptcy Code, including sections 510, 542, 543, 544 through 550, or 553; (d) Claims and defenses such as fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any Claims under any state or foreign law, including any fraudulent transfer or similar claims.

**1.22** **Channeling Injunction** means the permanent injunction provided for in Section 10.7 of the Plan with respect to Fire Claims to be issued pursuant to, and included in, the Confirmation Order.

**1.23** **Chapter 11 Cases** means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court and currently styled *In re PG&E Corporation and Pacific Gas and Electric Company*, Ch. 11 Case No. 19-30088 (DM) (Jointly Administered).

**1.24** **Claim** has the meaning set forth in section 101(5) of the Bankruptcy Code.

**1.25** **Claims Resolution Procedures** means, collectively, the Fire Victim Claims Resolution Procedures and the Subrogation Wildfire Claims Resolution Procedures.

**1.26** **Class** means any group of Claims or Interests classified herein pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

**1.27** **Collateral** means any property or interest in property of the estate of any Debtor subject to a lien, charge, or other encumbrance to secure the payment or performance of a Claim, which lien, charge, or other encumbrance is not subject to a Final Order ordering the remedy of avoidance on any such lien, charge, or other encumbrance under the Bankruptcy Code.

**1.28** **Collective Bargaining Agreements** means, collectively, (a) the IBEW Collective Bargaining Agreements, (b) the Collective Bargaining Agreement currently in place between the Utility and the Engineers and Scientists of California Local 20, IFPTE, and (c) the Collective Bargaining Agreement currently in place between the Utility and the Service Employees International Union.

**1.29** **Commitment Fees** means the fees payable to the Commitment Parties, in Cash or New HoldCo Common Stock at the election of each Commitment Party, as consideration for the Commitments, in the following amounts: (a) 3.0% of the New HoldCo Common Stock Investment, (b) 1.5% of the New HoldCo Senior Notes Investment, and (c) 1.5% of the maximum amount of the New Utility Secured Notes Investment.

**1.30** **Commitment Letter** means the Amended and Restated Commitment Letter dated October 3, 2019 setting forth the terms and conditions of the Commitments [Docket No. 4079].

**1.31** **Commitment Parties** means those members of the Ad Hoc Committee that are parties to the Commitment Letter and their permitted successors and assigns.

**1.32** **Commitment Threshold** means the Commitment Parties holding at least two-thirds (2/3) of the aggregate Commitments under the Commitment Letter.

**1.33** **Commitments** means the commitments set forth in the Commitment Letter to fully fund (a) the New HoldCo Common Stock Investment, (b) the New HoldCo Senior Notes Investment and (c) the New Utility Senior Notes Investment, in each case, to the extent the members of the Ad Hoc Committee and the holders of the HoldCo Common Interests fail to participate in the applicable investments up to amounts allocated to the Ad Hoc Committee and the holders of the HoldCo Common Interests and the Utility is not able to issue all of the New Utility Senior Notes in a market transaction.

**1.34** **Confirmation Date** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

**1.35** **Confirmation Hearing** means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

**1.36** **[Consenting Subrogation Creditors** means the "Consenting Subrogation Creditors" as set forth in [Subrogation Claims RSA].][1]

**1.37** **Confirmation Order** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code and approving the transactions contemplated thereby, which shall be in form and substance acceptable to the Debtors.

**1.38** **CPUC** means the California Public Utilities Commission.

**1.39** **CPUC Approval** means all necessary approvals, authorizations and final orders from the CPUC to implement the Plan, and to participate in the Go-Forward Wildfire Fund, including: (a) satisfactory provisions pertaining to authorized return on equity and regulated capital structure (as described in Section 6.23); (b) a disposition of proposals for certain potential changes to the Utility's corporate structure and authorizations to operate as a utility; (c) satisfactory resolution of claims for, including but not limited to, monetary fines or penalties under the California Public Utilities Code for prepetition conduct; (d) approval (or exemption from approval) of the financing structure and securities to be issued under Article VI of the Plan; [(e) approval of any hedges executed by the Utility in consultation with the CPUC staff]; (f) any approvals and determinations with respect to the Plan and related documents that may be required by the Wildfire Legislation (A.B. 1054); and (g) any necessary approvals for the Restructuring Transactions under the California Public Utilities Code, including but not limited to approval under CPUC § 854, as necessary, and timely compliance with SB-550.

**1.40** **Creditors Committee** means the statutory committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

**1.41** **Cure Amount** means the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary to (a) cure a monetary default, as required by section 365(a) of the Bankruptcy Code by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors, and (b) permit the Debtors to assume or assume and assign such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

**1.42** **D&O Liability Insurance Policies** means all unexpired directors', managers', and officers' liability insurance policies (including any "tail policy") of either of the Debtors.

**1.43** **Debtors** means, collectively, HoldCo and the Utility.

**1.44** **DIP Facilities** means the senior secured postpetition credit facilities approved pursuant to the DIP Facility Order, as the same may be amended, modified, or supplemented from time to time through the Effective Date in accordance with the terms of the DIP Facility Documents and the DIP Facility Order.

**1.45** **DIP Facility Agents** means JPMorgan Chase Bank, N.A., solely in its capacity as administrative agent under the DIP Facility Documents, and Citibank, N.A., solely in

---

[1] The terms set forth in this Plan relating to the Subrogation Claims RSA have been bracketed and are subject to change based on the Bankruptcy Court's disposition of the Debtors' motion to approve the Subrogation Claims RSA scheduled to be heard on October 23, 2019.

its capacity as collateral agent under the DIP Facility Documents, and their respective successors, assigns, or any replacement agents appointed pursuant to the terms of the DIP Facility Documents.

**1.46** **DIP Facility Claim** means any Claim arising under, or related to, the DIP Facility Documents.

**1.47** **DIP Facility Credit Agreement** means that certain Senior Secured Superpriority Debtor-In-Possession Credit, Guaranty and Security Agreement, dated as of February 1, 2019, by and among the Utility as borrower, HoldCo as guarantor, the DIP Facility Agents, and the DIP Facility Lenders, as the same has been or may be further amended, modified, or supplemented from time to time.

**1.48** **DIP Facility Documents** means, collectively, the DIP Facility Credit Agreement and all other "Loan Documents" (as defined therein), and all other agreements, documents, and instruments delivered or entered into pursuant thereto or entered into in connection therewith (including any collateral documentation) (in each case, as amended, supplemented, restated, or otherwise modified from time to time).

**1.49** **DIP Facility Lenders** means the lenders under the DIP Facility Credit Agreement and each other party that becomes a lender thereunder from time to time in accordance with the terms of the DIP Facility Credit Agreement.

**1.50** **DIP Facility Order** means the *Final Order Pursuant to 11 U.S.C. §§ 105, 362, 363, 503 and 507, Fed. R. Bankr. P. 2002, 4001, 6004 and 9014 and (i) Authorizing the Debtors to Obtain Senior Secured, Superpriority, Postpetition Financing, (ii) Granting Liens and Superpriority Claims, (iii) Modifying the Automatic Stay, and (iv) Granting Related Relief* [Docket No. 1091], dated March 27, 2019, as may be amended, modified, or supplemented from time to time through the Effective Date.

**1.51** **DIP Letters of Credit** means any letters of credit issued by a DIP Facility Lender pursuant to the DIP Facility Credit Agreement.

**1.52** **Disallowed** means a Claim, or any portion thereof, (a) that has been disallowed by a Final Order, agreement between the holder of such Claim and the applicable Debtor, or the Plan; (b) that is listed in the Debtors' Schedules, as such Schedules may be amended, modified, or supplemented from time to time in accordance with Bankruptcy Rule 1009, at zero ($0) dollars or as contingent, disputed, or unliquidated and as to which no proof of Claim has been filed by the applicable deadline or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or applicable law; or (c) that is not listed in the Debtors' Schedules and as to which no proof of Claim has been timely filed by the applicable deadline or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or under applicable law.

**1.53** **Disbursing Agent** means the Utility (or such Entity designated by the Ad Hoc Committee and without the need for any further order of the Bankruptcy Court) in its capacity as a disbursing agent pursuant to Section 5.6 hereof.

**1.54** **Disclosure Statement** means the disclosure statement relating to the Plan, including, all schedules, supplements, and exhibits thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

**1.55** **Disclosure Statement Order** means a Final Order finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code.

**1.56**    **Disputed** means with respect to a Claim or any portion thereof (a) that is neither Allowed nor Disallowed under the Plan or a Final Order, nor deemed Allowed under sections 502, 503, or 1111 of the Bankruptcy Code; (b) that has not been Allowed and is listed as unliquidated, contingent, or disputed in the Schedules; (c) that is a Subrogation Wildfire Claim (i) not held by a Consenting Subrogation Creditor or (ii) a party to the Subrogation Wildfire Claim Allocation Agreement; or (d) for which a proof of Claim has been filed and related to which the Debtors or any party in interest has interposed a timely objection or request for estimation, and such objection or request for estimation has not been withdrawn or determined by a Final Order.

**1.57**    **Distribution Record Date** means the Effective Date, unless otherwise provided in the Plan or designated by the Bankruptcy Court.  The Distribution Record Date shall not apply to Securities of the Debtors deposited with DTC, the holders of which shall receive a distribution in accordance with Article V of this Plan and, as applicable, the customary procedures of DTC.

**1.58**    **District Court** means the United States District Court for the Northern District of California having subject matter jurisdiction over the Chapter 11 Cases.

**1.59**    **DTC** means the Depository Trust Company.

**1.60**    **Effective Date** means a Business Day on or after the Confirmation Date selected by the Plan Proponents, on which the conditions to the effectiveness of the Plan specified in Section 9.2 hereof have been satisfied or otherwise effectively waived in accordance with the terms hereof.

**1.61**    **Eligible Offeree** has the meaning set forth in the Rights Offering Procedures, if applicable.

**1.62**    **Employee Benefit Plans** means any written contracts, agreements, policies, programs, and plans (including any related trust or other funding vehicle) governing any obligations relating to compensation, reimbursement, indemnity, health care benefits, disability benefits, deferred compensation benefits, travel benefits, vacation and sick leave benefits, savings, severance benefits, retirement benefits, welfare benefits, relocation programs, life insurance, and accidental death and dismemberment insurance, including written contracts, agreements, policies, programs, and plans for bonuses and other incentives or compensation for the directors, officers, and employees of any of the Debtors.

**1.63**    **Entity** has the meaning set forth in section 101(15) of the Bankruptcy Code.

**1.64**    **Exculpated Parties** means collectively, and, in each case, solely in their capacities as such:  (a) the Debtors and Reorganized Debtors; (b) the DIP Facility Agents; (c) the DIP Facility Lenders; (d) the Funded Debt Trustees; (e) the HoldCo Revolver Lenders; (h) the HoldCo Term Loan Lenders; (i) the Utility Revolver Lenders; (j) the Utility Term Loan Lenders; (k) the Public Entities Releasing Parties; (l) the Statutory Committees and their members; (m) the Commitment Parties; (n) the Ad Hoc Committee and its members; and (o) with respect to each of the foregoing entities (a) through (n), such entities' predecessors, successors, assigns, subsidiaries, affiliates, managed accounts and funds, current and former officers and directors, principals, equity holders, members, partners, managers, employees, subcontractors, agents, advisory board members, restructuring advisors, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors (and employees thereof), and

other professionals, and such entities' respective heirs, executors, estates, servants, and nominees, in each case solely in their capacity as such.[2]

**1.65    FERC** means the Federal Energy Regulatory Commission.

**1.66    FERC Approval** means (a) authorization, satisfactory to the Ad Hoc Committee, from FERC under Section 203 of the Federal Power Act to implement the Plan and, to the extent necessary and appropriate, authorization under Section 204 of the Federal Power Act to issue new securities as provided under the Plan, (b) acceptance, satisfactory to the Ad Hoc Committee, with respect to any new or modified service tariffs under the Federal Power Act or Natural Gas Act necessary or appropriate to implement the Plan, (c) approval or acceptance under Section 305 of the Federal Power Act with respect to the creation of any interlocking directorates and (d) in the event that the Plan results in the transfer of natural gas assets or hydroelectric assets within the jurisdiction of FERC, if necessary and appropriate, approval, satisfactory to the Ad Hoc Committee, under Section 7 of the Natural Gas Act and Section 8 of the Federal Power Act, respectively, to transfer such assets.

**1.67    Federal Judgment Rate** means the interest rate of 2.59% as provided under 28 U.S.C. § 1961(a), calculated as of the Petition Date.

**1.68    Federal Power Act** means chapter 12 of title 16 of the United States Code.

**1.69    Final Order** means an order or judgment of the Bankruptcy Court entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases which has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; *provided*, that no order or judgment shall fail to be a Final Order solely because of the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure has been or may be filed with respect to such order or judgment.  The susceptibility of a Claim to a challenge under section 502(j) of the Bankruptcy Code shall not render a Final Order not a Final Order.

**1.70    Fires** means the fires that occurred in Northern California, listed on **Exhibit A** annexed hereto.

**1.71    Fire Claim** means any Claim against the Debtors in any way arising out of the Fires, including, but not limited to, any Claim resulting from the Fires for (a) general and/or specific damages, including any Claim for personal injury, wrongful death, emotional distress and similar claims, pavement fatigue, damage to culverts, ecosystem service losses, municipal budget adjustments/reallocation, lost revenue and tax impacts, local share of reimbursed fire clean-up costs, future estimated infrastructure costs, water service losses, lost landfill capacity, costs related to unmet housing (e.g., housing market impact due to the Fires and adjustments for increased homeless population), and/or hazard mitigation costs (including, watershed restoration and hazardous tree removal expenses); (b) damages for repair, depreciation and/or replacement of

---

[2]  The exculpation and release provisions of this Plan currently do not apply to the holders of Subrogation Wildfire Claims or the Consenting Subrogation Creditors and are to be determined.

damaged, destroyed, and/or lost personal and/or real property; (c) damages for loss of the use, benefit, goodwill, and enjoyment of real and/or personal property; (d) damages for loss of wages, earning capacity and/or business profits and/or any related displacement expenses; (e) economic losses; (f) damages for wrongful injuries to timber, trees, or underwood under California Civil Code § 3346; (g) damages for injuries to trees under California Code of Civil Procedure § 733; (h) punitive and exemplary damages under California Civil Code §§ 733 and 3294, California Public Utilities Code § 2106, or otherwise, (i) restitution; (j) fines or penalties; (k) any and all costs of suit, including all attorneys' fees and expenses, expert fees, and related costs, including all attorneys and other fees under any theory of inverse condemnation; (l) for prejudgment and/or postpetition interest; (m) other litigation costs stemming from the Fires; and (n) declaratory and/or injunctive relief. For avoidance of doubt and without prejudice to the Debtors' right to object to any such Claim, "Fire Claim" shall not include any (y) Claim for substantial contribution under section 503(b) of the Bankruptcy Code, or (z) any Subordinated Debt Claim and HoldCo Common Interest.

**1.72** **Fire Insurance Policy** means any Insurance Policy that was issued or allegedly issued that does or may afford the Debtors rights, benefits, indemnity, or insurance coverage with respect to any Fire Claim.

**1.73** **Fire Insurance Proceeds** means any proceeds received by the Debtors under a Fire Insurance Policy.

**1.74** **Fire Trust Agreements** means, collectively, the Subrogation Wildfire Trust Agreement and the Fire Victim Trust Agreement.

**1.75** **Fire Trusts** means, collectively, the Subrogation Wildfire Trust and the Fire Victim Trust.

**1.76** **Fire Victim Claim** means any Fire Claim that is not a Public Entities Wildfire Claim or a Subrogation Wildfire Claim.

**1.77** **Fire Victim Claims Estimation Proceeding** means the proceeding currently pending in the United States District Court for the Northern District of California, Case No. 3:19-cv-05257-JD, pursuant to which the court shall estimate the Debtors' aggregate liability with respect to the Fire Victim Claims, for purposes of confirming and implementing the Plan.

**1.78** **Fire Victim Claims Resolution Procedures** means the procedures in the form included in the Plan Supplement or Fire Victim Trust Agreement, for each holder of a Fire Victim Claim to resolve their claim, at the option of the holder, via a settlement matrix or allowed claim requirements and procedures approved by the Tort Claimants Committee and the Bankruptcy Court as part of confirmation of the Plan, including mediation, binding arbitration procedures, or a jury trial to the extent a holder of Fire Victim Claims is entitled to such a trial.

**1.79** **Fire Victim Trust** means one or more trusts established on the Effective Date, in accordance with Section 6.7 of the Plan, to administer, process, settle, resolve, liquidate, satisfy, and pay Fire Victim Claims.

**1.80** **Fire Victim Trust Agreement** means that certain trust agreement or agreements by and among the Reorganized Debtors, the Fire Victim Trust, the Fire Victim Trustee, and the Fire Victim Trust Oversight Committee, in form and substance acceptable to the Tort Claimants Committee, substantially in the form included in the Plan Supplement, which shall establish and set forth the provisions of the Fire Victim Trust.

**1.81** **Fire Victim Trust Oversight Committee** means the oversight committee appointed in accordance with the Fire Victim Trust Agreement to oversee the Fire Victim Trust in accordance with the Plan and the Fire Victim Trust Agreement.

**1.82** **Fire Victim Trustee** means the Person or Persons selected by the Tort Claimants Committee, subject to the approval of the Bankruptcy Court, and identified in the Plan Supplement, to serve as the trustee(s) of the Fire Victim Trust, and any successor thereto, appointed pursuant to the Fire Victim Trust Agreement.

**1.83** **Funded Debt Claims** means, collectively, the HoldCo Revolver Claims, the HoldCo Term Loan Claims, the Utility PC Bond Claims, the Utility Revolver Claims, Utility Short-Term Senior Notes Claims, the Utility Long-Term Senior Notes Claims and the Utility Term Loan Claims.

**1.84** **Funded Debt Documents** means, collectively, the HoldCo Revolver Documents, the HoldCo Term Loan Documents, the PC Bond Loan Documents, the PC Bond LOC Documents, the Utility Revolver Documents, the Utility Term Loan Documents, and the Utility Senior Notes Documents.

**1.85** **Funded Debt Trustees** means, collectively, the HoldCo Revolver Agent, the HoldCo Term Loan Agent, the Utility Revolver Agent, the Utility Term Loan Agent, and the Utility Senior Notes Trustee.

**1.86** **Funded Debt Trustee Fees** means, collectively, the reasonable and documented compensation, fees, expenses and disbursements of the Funded Debt Trustees and each paying agent (as applicable) in connection with the Chapter 11 Cases and under the applicable Funded Debt Documents, including any fees, expenses and disbursements of attorneys, advisors, or agents retained or utilized by the Funded Debt Trustees in connection with the Chapter 11 Cases.

**1.87** **General Unsecured Claim** means any Claim, other than a DIP Facility Claim, Administrative Expense Claim, Professional Fee Claim, Priority Tax Claim, Other Secured Claim, Priority Non-Tax Claim, Funded Debt Claim, Workers' Compensation Claim, 2001 Utility Exchange Claim, Fire Claim, Ghost Ship Fire Claim, Intercompany Claim, or Subordinated Debt Claim, that is not entitled to priority under the Bankruptcy Code or any Final Order. General Unsecured Claims shall include any (a) Prepetition Executed Settlement Claim and (b) Claim for damages resulting from or otherwise based on the Debtors' rejection of an executory contract or unexpired lease.

**1.88** **Ghost Ship Fire** means the fire known as the "Ghost Ship Fire" which occurred in Oakland, California on December 2, 2016.

**1.89** **Ghost Ship Fire Claim** means any Claim related to or arising from the Ghost Ship Fire.

**1.90** **Go-Forward Wildfire Fund** means a long-term, state-wide fund established, pursuant to section 3292(a) of the California Public Utilities Code and the Wildfire Legislation (A.B. 1054), to pay for certain future wildfire obligations, the terms of which are set forth in the Wildfire Legislation (A.B. 1054).

**1.91** **Governmental Unit** has the meaning set forth in section 101(27) of the Bankruptcy Code.

**1.92** **HoldCo** means Debtor PG&E Corporation, a California corporation.

**1.93** **HoldCo Common Interest** means any HoldCo Interest which results or arises from the existing common stock of HoldCo, including any Claim against HoldCo subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to such common stock.

**1.94** **HoldCo General Unsecured Claim** means any General Unsecured Claim against HoldCo.

**1.95** **HoldCo Ghost Ship Fire Claim** means any Ghost Ship Fire Claim against HoldCo.

**1.96** **HoldCo Intercompany Claim** means any Intercompany Claim against HoldCo.

**1.97** **HoldCo Interest** means any Interest in HoldCo immediately prior to the Effective Date.

**1.98** **HoldCo Other Interest** means any HoldCo Interest that is not a HoldCo Common Interest.

**1.99** **HoldCo Other Secured Claim** means any Other Secured Claim against HoldCo.

**1.100** **HoldCo Fire Victim Claim** means any Fire Victim Claim against HoldCo.

**1.101** **HoldCo Priority Non-Tax Claim** means any Priority Non-Tax Claim against HoldCo.

**1.102** **HoldCo Public Entities Wildfire Claim** means any Public Entities Wildfire Claim against HoldCo.

**1.103** **HoldCo Revolver Agent** means such entity or entities acting as administrative agent under the HoldCo Revolver Documents, and any of their respective successors, assigns, or replacement agents appointed pursuant to the terms of the HoldCo Revolver Documents.

**1.104** **HoldCo Revolver Claim** means any Claim arising under, or related to, the HoldCo Revolver Documents.

**1.105** **HoldCo Revolver Credit Agreement** means that certain Second Amended and Restated Credit Agreement, dated as of April 27, 2015, by and among HoldCo, the HoldCo Revolver Agent, and the HoldCo Revolver Lenders, as amended, supplemented, restated, or otherwise modified from time to time.

**1.106** **HoldCo Revolver Documents** means, collectively, the HoldCo Revolver Credit Agreement and all other "Loan Documents" (as defined therein), and all other agreements, documents, and instruments delivered or entered into pursuant thereto or entered into in connection therewith (in each case, as amended, supplemented, restated, or otherwise modified from time to time).

**1.107** **HoldCo Revolver Lenders** means the lenders under the HoldCo Revolver Credit Agreement and each other party that becomes a lender thereunder from time to time in accordance with the terms of the HoldCo Revolver Credit Agreement.

**1.108** **HoldCo Subordinated Debt Claim** means any Claim against HoldCo that is subject to subordination under section 510(b) of the Bankruptcy Code, including any Claim for reimbursement, indemnification or contribution, but excluding any HoldCo Common Interest.

**1.109** **HoldCo Subrogation Wildfire Claim** means any Subrogation Wildfire Claim against HoldCo.

**1.110** **HoldCo Term Loan Agent** means Mizuho Bank, Ltd. solely in its capacity as administrative agent under the HoldCo Term Loan Documents, its successors, assigns, or any replacement agent appointed pursuant to the terms of the HoldCo Term Loan Documents.

**1.111** **HoldCo Term Loan Claim** means any Claim arising under, or related to, the HoldCo Term Loan Documents.

**1.112** **HoldCo Term Loan Credit Agreement** means that certain Term Loan Agreement, dated as of April 16, 2018, by and among HoldCo, as borrower, the HoldCo Term Loan Agent, and the HoldCo Term Loan Lenders, as amended, supplemented, restated, or otherwise modified from time to time.

**1.113** **HoldCo Term Loan Documents** means, collectively, the HoldCo Term Loan Credit Agreement and all other "Loan Documents" (as defined therein), including all other agreements, documents, and instruments delivered or entered into pursuant thereto or entered into in connection therewith (in each case, as amended, supplemented, restated, or otherwise modified from time to time).

**1.114** **HoldCo Term Loan Lenders** means the lenders under the HoldCo Term Loan Credit Agreement and each other party that becomes a lender thereunder from time to time in accordance with the terms of the HoldCo Term Loan Credit Agreement.

**1.115** **HoldCo Workers' Compensation Claim** means any Workers' Compensation Claim against HoldCo.

**1.116** **IBEW Collective Bargaining Agreements** mean, collectively, the two (2) Collective Bargaining Agreements currently in place between the Utility and IBEW Local 1245: (i) the IBEW Physical Agreement, and (ii) the IBEW Clerical Agreement.

**1.117** **IBEW Local 1245** means Local Union No. 1245 of the International Brotherhood of Electrical Workers.

**1.118** **Impaired** means, with respect to a Claim, Interest, or Class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

**1.119** **Insurance Policies** means any insurance policy issued to any of the Debtors or under which the Debtors have sought or may seek coverage, including but not limited to the D&O Liability Insurance Policies.

**1.120** **Intercompany Claim** means any Claim against a Debtor held by either another Debtor or by a non-Debtor affiliate which is controlled by a Debtor (excluding any Claims of an individual).

**1.121** **Interest** means (a) any equity security (as defined in section 101(16) of the Bankruptcy Code) of a Debtor, including all units, shares, common stock, preferred stock, partnership interests, or other instrument evidencing any fixed or contingent ownership interest in any Debtor, including any option, warrant, or other right, contractual or otherwise, to acquire any

such interest in a Debtor, whether or not transferable and whether fully vested or vesting in the future, that existed immediately before the Effective Date and (b) any Claim against any Debtor subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

**1.122** **Interim Compensation Order** means the *Order Pursuant to 11 U.S.C. §§ 331 and 105(a) and Fed. R. Bankr. P. 2016 for Authority to Establish Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Docket No. 701].

**1.123** **Lien** has the meaning set forth in section 101(37) of the Bankruptcy Code.

**1.124** **[Management Incentive Plan** means the post-emergence management incentive plan for certain of the Reorganized Debtors' employees [on the terms set forth in the Management Incentive Plan Term Sheet] that may be established and implemented at the discretion of the New Board on or after the Effective Date.][3]

**1.125** **[Management Incentive Plan Term Sheet** means that certain term sheet that sets forth the principal terms of the Management Incentive Plan, which shall be included in the Plan Supplement and which shall incorporate the requirements of the Wildfire Legislation (A.B. 1054) and any decisions of the CPUC with respect to implementation.][4]

**1.126** **Natural Gas Act** means chapter 15b of title 15 of the United States Code.

**1.127** **New Board** means, on and as of the Effective Date, the board of directors of Reorganized HoldCo, and the board of directors of the Reorganized Utility, as applicable.

**1.128** **New HoldCo Common Stock** means the common stock of HoldCo issued in connection with the implementation of the Plan.

**1.129** **New HoldCo Common Stock Purchase Agreement** means the agreement providing the terms for the New HoldCo Common Stock Investment, substantially in the form included in the Plan Supplement, and which shall be in form and substance acceptable to the Ad Hoc Committee and the Commitment Parties representing the Commitment Threshold.

**1.130** **New HoldCo Common Stock Investment** means the purchase of New HoldCo Common Stock for $15,512,332,599 by the members of the Ad Hoc Committee and the holders of the HoldCo Common Interest, to the extent such holders elect to purchase pursuant to the Rights Offering, on the Effective Date in the manner contemplated by the Commitment Letter and the New HoldCo Common Stock Purchase Agreement, which shall represent 59.3% of post-Effective Date HoldCo Common Interests on a fully diluted basis (assuming that the total value (at plan value) of New HoldCo Common Stock issued to the Fire Victim Trust as part of the Aggregate Fire Victim Consideration and the Subrogation Wildfire Trust pursuant Section 4.23 of the Plan on the Effective Date is equal to $12.75 billion); *provided*, that such fully diluted ownership percentage will be adjusted according to the final amount of the Aggregate Fire Victim Consideration determined as provided in Section 1.9.

---

[3] A Management Incentive Plan may be necessary to satisfy the management compensation requirements under the Wildfire Legislation (A.B. 1054). The Plan Proponents are not aware if the Debtors have already prepared a Management Incentive Plan. The terms of the Management Incentive Plan are to be determined.

[4] See footnote 3 above.

**1.131** __New HoldCo Senior Notes__ means $5,750,000,000 in new senior unsecured notes issued by the Reorganized HoldCo on the Effective Date under the New HoldCo Senior Notes Indenture as contemplated by the Commitment Letter.

**1.132** __New HoldCo Senior Notes Documents__ means, collectively, the New HoldCo Senior Notes Indenture, the New HoldCo Senior Notes Purchase Agreement and all other agreements, indentures, documents and instruments delivered or entered into pursuant to or in connection with the New HoldCo Senior Notes Investment (in each case, as amended, supplemented, restated, or otherwise modified from time to time and in each case in form and substance acceptable to the Ad Hoc Committee and the Commitment Parties representing the Commitment Threshold).

**1.133** __New HoldCo Senior Notes Indenture__ means the indenture governing the New HoldCo Senior Notes, substantially in the form included in the Plan Supplement and which shall be in form and substance acceptable to the Ad Hoc Committee and the Commitment Parties representing the Commitment Threshold.

**1.134** __New HoldCo Senior Notes Investment__ means the purchase of the New HoldCo Senior Notes by the members of the Ad Hoc Committee on the Effective Date in the manner contemplated by the Commitment Letter and the New HoldCo Senior Notes Purchase Agreement.

**1.135** __New HoldCo Senior Notes Purchase Agreement__ means the agreement providing the terms for the New HoldCo Senior Notes Investment, substantially in the form included in the Plan Supplement and which shall be in form and substance acceptable to the Ad Hoc Committee and the Commitment Parties representing the Commitment Threshold.

**1.136** __New Organizational Documents__ means, if applicable, the forms of articles of incorporation or other forms of organizational documents and bylaws, as applicable, of the Reorganized Debtors, substantially in the form included in the Plan Supplement and which shall be in form and substance acceptable to the Plan Proponents and the Commitment Parties representing the Commitment Threshold.

**1.137** __New Utility Secured Notes__ means $7,978,610,000 in new secured notes issued by the Reorganized Utility on the Effective Date under the New HoldCo Senior Notes Indenture as contemplated by the Commitment Letter.

**1.138** __New Utility Secured Notes Collateral Documents__ means, collectively, all documents relating to the granting of mortgages, pledges, Liens and other security interests to secure the New Utility Secured Notes, substantially in the form included in Plan Supplement and which shall be in form and substance acceptable to the Ad Hoc Committee and the Commitment Parties representing the Commitment Threshold.

**1.139** __New Utility Secured Notes Documents__ means, collectively, the New Utility Secured Notes Indenture, the New Utility Secured Notes Collateral Documents, the New Utility Secured Notes Purchase Agreement and all other agreements, indentures, documents, instruments and collateral documentation delivered or entered into pursuant to or in connection with the New HoldCo Secured Notes Investment (in each case, as amended, supplemented, restated, or otherwise modified from time to time and in each case in form and substance acceptable to the Ad Hoc Committee and the Commitment Parties representing the Commitment Threshold).

**1.140** __New Utility Secured Notes Indenture__ means the indenture governing the New Utility Secured Notes, substantially in the form included in the Plan Supplement and which

shall be in form and substance acceptable to the Ad Hoc Committee and the Commitment Parties representing the Commitment Threshold.

**1.141** **New Utility Secured Notes Investment** means the purchase of the New Utility Secured Notes by (a) third party investors and (b) to the extent the Reorganized Utility fails to issue all or a portion of the New Utility Secured Notes to third party investors, the members of the Ad Hoc Committee in the amount of any such shortfall, on the Effective Date in the manner contemplated by the Commitment Letter and the New Utility Secured Notes Purchase Agreement.

**1.142** **New Utility Secured Notes Purchase Agreement** means the agreement providing the terms for the New Utility Secured Notes Investment, substantially in the form included in the Plan Supplement and which shall be in form and substance acceptable to the Ad Hoc Committee and the Commitment Parties representing the Commitment Threshold.

**1.143** **NRC** means the Nuclear Regulatory Commission.

**1.144** **NRC Approval** means approval from the NRC for the transfer of the license for the Debtors' Diablo Canyon Power Plant.

**1.145** **North Bay Public Entities** means, collectively, (a) the City of Clearlake, a California municipal corporation duly organized and existing by virtue of the laws of the State of California; (b) the City of Napa, a California municipal corporation duly organized and existing by virtue of the laws of the State of California; (c) the City of Santa Rosa, a California municipal corporation duly organized and existing by virtue of the laws of the State of California; (d) the County of Lake, a general law county and political subdivision of the State of California duly organized and existing by virtue of the laws of the State of California; (e) Lake County Sanitation District, a sanitary district organized under the laws of the State of California; (f) the County of Mendocino, a general law county and political subdivision of the State of California, duly organized and existing by virtue of the laws of the State of California; (g) Napa County, a general law county and political subdivision of the State of California, duly organized and existing by virtue of the laws of the State of California; (h) the County of Nevada, a general law county and political subdivision of the State of California, duly organized and existing by virtue of the laws of the State of California; (i) the County of Sonoma, a general law county and political subdivision of the State of California, duly organized and existing by virtue of the laws of the State of California; (j) the Sonoma County Agricultural Preservation and Open Space District, a public agency formed pursuant to the Public Resources code sections 5500, et seq.; (k) Sonoma County Community Development Commission, a public and corporate entity pursuant to section 34110 of the California Health & Safety Code; (l) Sonoma County Water Agency, a public agency of the State of California; (m) Sonoma Valley County Sanitation District, a sanitary district organized under the laws of the State of California; and (n) the County of Yuba, a general law county and political subdivision of the State of California, duly organized and existing by virtue of the laws of the State of California.

**1.146** **Ordinary Course Professionals Order** means the *Order Pursuant to 11 U.S.C. §§ 105(a), 327, 328, and 330 Authorizing the Debtors to Employ Professionals Used in the Ordinary Course of Business Nunc Pro Tunc to the Petition Date*, dated February 28, 2019 [Docket No. 707].

**1.147** **Other Secured Claim** means a Secured Claim that is not a DIP Facility Claim or Priority Tax Claim.

**1.148** **Person** has the meaning set forth in section 101(41) of the Bankruptcy Code.

**1.149** <u>**Petition Date**</u> means January 29, 2019, the date on which the Debtors commenced the Chapter 11 Cases.

**1.150** <u>**Plan**</u> means this chapter 11 plan, as the same may be amended, supplemented, or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

**1.151** <u>**Plan Document**</u> means any of the documents, other than this Plan, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, including the documents to be included in the Plan Supplement, all of which shall be in form and substance as provided herein.

**1.152** <u>**Plan Funding**</u> means, collectively, (a) the proceeds of the New HoldCo Common Stock Investment, (b) the proceeds of the New HoldCo Senior Notes Investment, (c) the proceeds of the New Utility Secured Notes Investment, (d) the Fire Insurance Proceeds, and (e) Cash on hand. For the avoidance of doubt, Plan Funding does not include any Claim that has been Reinstated pursuant to the Plan.

**1.153** <u>**Plan Proponents**</u> means, collectively, the Ad Hoc Committee and the Tort Claimants Committee. All acts or consent rights in this Plan relating to Plan Proponents are intended to require each of the Plan Proponents.

**1.154** <u>**Plan Supplement**</u> means the forms of certain documents effectuating the transactions contemplated herein, which documents shall be filed with the Clerk of the Bankruptcy Court no later than fourteen (14) days prior to the deadline set to file objections to the confirmation of the Plan, including, but not limited to: (a) the Schedule of Rejected Contracts; (b) the Fire Trust Agreements; (c) the Fire Victim Claims Resolution Procedures, (d) the New Organizational Documents (to the extent such New Organizational Documents reflect material changes from the Debtors' existing organizational documents and bylaws); (e) to the extent known, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; (f) the New HoldCo Common Stock Purchase Agreement; (g) the New HoldCo Senior Notes Indenture; (h) the New HoldCo Senior Notes Purchase Agreement; (i) the New Utility Secured Notes Collateral Documents; (j) the New Utility Secured Notes Indenture; (k) the New Utility Secured Notes Purchase Agreement; (l) the Registration Rights Agreement; (m) the Schedule of Assigned Rights and Causes of Action; (n) the identity of the Fire Victims Trustee; and [(o) the Management Incentive Plan Term Sheet]. Such documents shall be consistent with the terms hereof, *provided*, that, through the Effective Date, the Plan Proponents, except with respect to documents that are subject to the consent rights of the Commitment Parties representing the Commitment Threshold, shall have the right to amend, modify, or supplement documents contained in, and exhibits to, the Plan Supplement in accordance with the terms of the Plan.

**1.155** <u>**Prepetition Executed Settlement Claim**</u> means any liquidated Claim against a Debtor, other than a 2001 Utility Exchange Claim and Fire Claim, arising from a binding award, agreement, or settlement fully effective prior to the Petition Date, which for the purposes of the Plan shall be Allowed in the amount set forth in the applicable award, agreement or settlement.

**1.156** <u>**Priority Non-Tax Claim**</u> means any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7), or (9) of the Bankruptcy Code.

**1.157** <u>**Priority Tax Claim**</u> means any Claim of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**1.158** <u>Professional</u> means an Entity, excluding those Entities entitled to compensation pursuant to the Ordinary Course Professionals Order that is retained pursuant to an order of the Bankruptcy Court in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code.

**1.159** <u>Professional Fee Claim</u> means any Administrative Expense Claim for the compensation of a Professional and the reimbursement of expenses incurred by such Professional through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to any Final Order (including, but not limited to, any fees of a Professional held back in accordance with the Interim Compensation Order or otherwise). To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses (whether or not paid pursuant to an order granting interim allowance), then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

**1.160** <u>Professional Fee Escrow Account</u> means an interest-bearing account which will hold Cash in an amount equal to the Professional Fee Reserve Amount and funded by the Debtors in Cash on the Effective Date, pursuant to Section 2.2(b) of the Plan.

**1.161** <u>Professional Fee Reserve Amount</u> means the total amount of Professional Fee Claims estimated in accordance with Section 2.2(c) of the Plan.

**1.162** <u>Public Entities</u> means, collectively, (a) the North Bay Public Entities; (b) the Town of Paradise; (c) the County of Butte; (d) the Paradise Park and Recreation District; (e) the County of Yuba; and (f) the Calaveras County Water District.

**1.163** <u>Public Entities Operative Complaints</u> means all complaints filed by the Public Entities in relation to the Fires, including the complaints filed in *Calaveras County Water District v. PG&E*, No. 34-2018-00238630 (Cal. Super. Ct. Sacramento Cty), the Public Entity Master Complaint filed in Judicial Council Coordination Proceeding No. 4853, *Butte Fire Cases*, No. JCCP 4853 (Cal. Super. Ct. Sacramento Cty.), *City of Clearlake v. PG&E Corp. et al.*, No. CV419398 (Cal. Super. Ct. Lake Cty.), *City of Napa v. PG&E Corp. et al.*, No. 19CV000148 (Cal. Super. Ct. Napa Cty.), *City of Santa Rosa v. Pacific Gas and Electric Company, et al., No. SCV-262772 (Cal. Super. Ct. Sonoma Cty.), County of Lake v. PG&E Corp. et al.*, No. CV-419417 (Cal. Super. Ct. Lake Cty.), *Mendocino County v. PG&E Corporation et al.*, No. SCUK-CVPO-18-70440 (Cal. Super. Ct. Mendocino Cty.), *Napa County v. PG&E Corporation et al.*, No. 18CV000238 (Cal. Super. Ct. Napa Cty.), *County of Nevada v. PG&E Corp. et al.*, No. CU19-083418 (Cal. Super. Ct. Nevada Cty.), *County of Sonoma v. PG&E Corporation et al.*, No. SCV-262045 (Cal. Super. Ct. Sonoma Cty.), *County of Yuba v. PG&E Corp. et al.*, No. CVCV19-00045 (Cal. Super. Ct. Yuba Cty.), the Public Entity Master Complaint filed in Judicial Council Coordination Proceeding No. 4955 (*California North Bay Fire Cases*, No. JCCP 4955 (Cal. Super. Ct. San Francisco Cty.), *Butte County v. PG&E Corp et al.*, No. 19CV00151 (Cal. Super. Ct. Butte Cty.) and *Town of Paradise v. PG&E Corporation et al.*, No. 19CV00259 (Cal. Super. Ct. Butte Cty.).

**1.164** <u>Public Entities Plan Support Agreements</u> means the Plan Support Agreements as to Plan Treatment of Public Entities' Wildfire Claims, each dated June 18, 2019, by and between the Debtors and the Public Entities.

**1.165** <u>Public Entities Releasing Parties</u> means the Public Entities and any Person or Entity that is bound by such Public Entity's agreement.

**1.166**  **Public Entities Segregated Defense Fund** means a segregated fund established from the Fire Victim Trust for the benefit of the Public Entities in the amount of $10 million, which funds shall be used solely to reimburse the Public Entities for any and all legal fees and costs associated with the defense or resolution of any Public Entities Third Party Claims against a Public Entity, in accordance with the Public Entities Plan Support Agreements.

**1.167**  **Public Entities Settlement Distribution Protocol** means the $1.0 billion in Cash, to be deposited in a trust account and distributed in accordance with the Plan and the Public Entities Plan Support Agreements, to satisfy the Public Entities Wildfire Claims.

**1.168**  **Public Entities Third Party Claims** means any past, present, or future Claim held by entities or individuals other than the Debtors or the Public Entities against the Public Entities that in any way arises out of or relates to the Fires, including but not limited to any Claim held by individual plaintiffs or subrogated insurance carriers against the Public Entities for personal injuries, property damage, reimbursement of insurance payments, and/or wrongful death that in any way arises out of or relates to the Fires.

**1.169**  **Public Entities Wildfire Claim** means any Fire Claim against the Debtors, including any Claim pleaded or asserted or that could have been pleaded or asserted based on the factual allegations set forth in the Public Entities Operative Complaints or that were filed or could be filed by the Public Entities in connection with the Chapter 11 Cases whether arising under California law or any other applicable law of the United States (state or federal) or any other jurisdiction, in each case whether such claims are absolute or contingent, direct or indirect, known or unknown, foreseen or unforeseen, in contract, tort or in equity, under any theory of law.

**1.170**  **PX** means the California Power Exchange Corporation.

**1.171**  **Registration Rights Agreement** means the Reorganized HoldCo registration rights agreement in the form included in the Plan Supplement and which shall be in form and substance acceptable to the Plan Proponents and the Commitment Parties representing the Commitment Threshold.

**1.172**  **Reinstatement** means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Interest entitles the holder of such Claim or Interest in accordance with section 1124 of the Bankruptcy Code, or (b) if applicable under section 1124 of the Bankruptcy Code: (i) curing all prepetition and postpetition defaults other than defaults relating to the insolvency or financial condition of the applicable Debtor or its status as a debtor under the Bankruptcy Code; (ii) reinstating the maturity date of the Claim; (iii) compensating the holder of such Claim for damages incurred as a result of its reasonable reliance on a contractual provision or such applicable law allowing the Claim's acceleration; and (iv) not otherwise altering the legal, equitable or contractual rights to which the Claim entitles the holder thereof, and Claims are **Reinstated** when the requirements for Reinstatement have been met by Debtors.

**1.173**  **Released Parties** means, collectively, and in each case solely in their capacities as such:  (a) the Debtors and Reorganized Debtors; (b) the DIP Facility Agents; (c) the DIP Facility Lenders; (d) the Commitment Parties; (e) the Public Entities Releasing Parties; (f) the the Ad Hoc Committee and its members; (g) the Statutory Committees and their members; (h) the Funded Debt Trustees; (i) the HoldCo Revolver Lenders; (j) the HoldCo Term Loan Lenders; (k) the Utility PC Bond Lenders; (l) the Utility Revolver Lenders; (m) the Utility Term Loan Lenders; (n) the holders of Utility Long-Term Senior Notes Claims; (o) the holders of the Utility Short-Term Senior Notes Claims;  (p) the Public Entities Releasing Parties; (q) with respect to each of the foregoing entities (a) through (p), such entities' predecessors, successors, assigns, subsidiaries, affiliates, managed accounts and funds, current and former officers and directors, principals, equity holders, members, partners, managers, employees, subcontractors, agents, advisory board

members, restructuring advisors, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors (and employees thereof), and other professionals, and such entities' respective heirs, executors, estates, servants, and nominees, in each case solely in their capacity as such.[5]

**1.174**   **Releasing Parties** means, collectively, and, in each case, solely in their capacities as such:  (a) the Debtors; (b) the Reorganized Debtors, (c) any holder of a Claim who is solicited and voluntarily indicates on a duly completed ballot submitted on or before the Voting Deadline that such holder opts in to granting the releases set forth in Section 10.9(b) of the Plan to the extent permitted by applicable law, provided that such holder's opt-in, opt-out, or failure to complete that portion of the ballot shall not in any way affect the classification or treatment of such Claim; (d) the DIP Facility Agents; (e) the DIP Facility Lenders; (f) the Funded Debt Trustees; (g) the HoldCo Revolver Lenders; (h) the HoldCo Term Loan Lenders; (i) the Utility PC Bond Lenders; (j) the Utility Revolver Lenders; (k) the Utility Term Loan Lenders; (l) the holders of Utility Long-Term Senior Notes Claims; (m) the holders of the Utility Short-Term Senior Notes; (n) the Public Entities Releasing Parties; (o) the Statutory Committees and their members; (p) the Commitment Parties; and (q) with respect to each of the foregoing entities (a) through (p), such entities' predecessors, successors, assigns, subsidiaries, affiliates, managed accounts and funds, current and former officers and directors, principals, equity holders, members, partners, managers, employees, subcontractors, agents, advisory board members, restructuring advisors, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors (and employees thereof), and other professionals, and such entities' respective heirs, executors, estates, servants, and nominees, in each case solely in their capacity as such.[6]

**1.175**   **Reorganized Debtors** means each of the Debtors, or any successor thereto, as reorganized, pursuant to and under the Plan, on the Effective Date.

**1.176**   **Reorganized HoldCo** means HoldCo as reorganized, pursuant to and under the Plan, on the Effective Date.

**1.177**   **Reorganized Utility** means the Utility as reorganized, pursuant to and under the Plan, on the Effective Date.

**1.178**   **Restructuring** means the restructuring of the Debtors, the principal terms of which are set forth in the Plan, the Plan Documents and the Plan Supplement.

**1.179**   **Restructuring Transactions** has the meaning set forth in Section 6.2(a) of the Plan.

**1.180**   **[Requisite Consenting Subrogation Creditors** means the "Requisite Consenting Subrogation Creditors" as set forth in the [Subrogation Claims RSA].]

**1.181**   **Rights Offering** means an offering pursuant to which each Eligible Offeree is entitled to receive subscription rights to acquire in the aggregate up to 5% of the New

---

[5]  The exculpation and release provisions of this Plan currently do not apply to the holders of Subrogation Wildfire Claims or the Consenting Subrogation Creditors and are to be determined.

[6]  The exculpation and release provisions of this Plan currently do not apply to the holders of Subrogation Wildfire Claims or the Consenting Subrogation Creditors and are to be determined.

HoldCo Common Stock issued pursuant to the New HoldCo Common Stock Investment in accordance with the Plan, the Rights Offering Procedures, and the Commitment Letter.

**1.182** **Rights Offering Procedures** means the procedures governing and for the implementation of the Rights Offering, as approved by the Bankruptcy Court.

**1.183** **S.B. 901** means Senate Bill No. 901

**1.184** **Schedule of Rejected Contracts** means the schedule of executory contracts and unexpired leases to be rejected by the Debtors pursuant to the Plan, to be filed as part of the Plan Supplement.

**1.185** **Schedule of Assigned Rights and Causes of Action** means the schedule of Assigned Rights and Causes of Action to be included in the Plan Supplement.

**1.186** **Schedules** means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules as such schedules and statements have been or may be amended, supplemented, or modified from time to time.

**1.187** **Secured Claim** means any Claim secured by a Lien on property in which a Debtor's estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in such estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to sections 506(a) and, if applicable, 1129(b) of the Bankruptcy Code.

**1.188** **Securities Act** means the Securities Act of 1933, as amended from time to time.

**1.189** **Security** has the meaning set forth in section 101(49) of the Bankruptcy Code.

**1.190** **Statutory Committees** means collectively, the Creditors Committee and the Tort Claimants Committee.

**1.191** **Subordinated Debt Claim** means any HoldCo Subordinated Debt Claim and any Utility Subordinated Debt Claim.

**1.192** **[[Subrogation Claims RSA]** means that certain Restructuring Support Agreement, dated as of September 22, 2019, by and among the Debtors and the Consenting Subrogation Creditors (as defined therein), as amended, supplemented, restated, or otherwise modified from time to time, in accordance with its terms.][7]

**1.193** **[Subrogation Wildfire Claims Settlement Approval Order** means the order of the Bankruptcy Court, dated [●], 2019, approving the settlement of the Subrogation Wildfire Claims and the Allowance of the Utility Subrogation Wildfire Claims as provided therein [Docket No. [●]].]

---

[7] The terms set forth in this Plan relating to the Subrogation Claims RSA have been bracketed and are subject to change based on the Bankruptcy Court's disposition of the Debtors' motion to approve the Subrogation Claims RSA scheduled to be heard on October 23, 2019.

**1.194** **Subrogation Wildfire Claim** means any Fire Claim (other than a Fire Claim arising from the Butte Fire (2015)) that arises from subrogation (whether such subrogation is contractual, equitable, or statutory), assignment (whether such assignment is contractual, equitable, or statutory), or otherwise in connection with payments made or to be made by the applicable insurer to insured tort victims, including attorneys' fees, and whether arising as a matter of state or federal law, including, without limitation, under section 509 of the Bankruptcy Code. For the avoidance of doubt, Subrogation Wildfire Claims shall include both "Paid" and "Reserved" claims, each as defined in the [Subrogation Claims RSA].

**1.195** **Subrogation Wildfire Claim Allocation Agreement** means the agreement entered into by and among certain holders of Subrogation Wildfire Claims, and which describes the procedures for the payment of Subrogation Wildfire Claims by the Subrogation Wildfire Trust, consistent with the terms of the [Subrogation Claims RSA]].

**1.196** **Subrogation Wildfire Claims Resolution Procedures** means the procedures for the resolution, liquidation, and payment of Subrogation Wildfire Claims by the Subrogation Wildfire Trust, substantially in the form included in the Plan Supplement.

**1.197** **Subrogation Wildfire Trust** means one or more trusts established on the Effective Date, in accordance with Section 6.4 of the Plan, to administer, process, settle, resolve, liquidate, satisfy and pay all Subrogation Wildfire Claims.

**1.198** **Subrogation Wildfire Trust Advisory Board** means the advisory board appointed by the holders of Subrogation Wildfire Claims in accordance with the Subrogation Wildfire Claim Allocation Agreement to oversee the Subrogation Wildfire Trust in accordance with the Plan, the Subrogation Wildfire Trust Agreement, and the Subrogation Wildfire Claim Allocation Agreement.

**1.199** **Subrogation Wildfire Trust Agreement** means that certain trust agreement or agreements substantially in the form included in the Plan Supplement, which shall be in form and substance satisfactory to the Ad Hoc Subrogation Group in accordance with the Subrogation Wildfire Claim Allocation Agreement, [and the Debtors (whose consent will not be unreasonably withheld)].

**1.200** **Subrogation Wildfire Trustee** means the Person selected by the holders of Subrogation Wildfire Claims in accordance with the Subrogation Wildfire Claim Allocation Agreement to serve as the trustee or trustees of the Subrogation Wildfire Trust, and any successor thereto, in each case, appointed pursuant to the Subrogation Wildfire Trust Agreement.

**1.201** **Tax Code** means title 26 of the United States Code, as amended from time to time.

**1.202** **Tort Claimants Committee** means the official committee of tort claimants appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

**1.203** **Trading Order** means the *Final Order Pursuant to Sections 105(a) and 362 of the Bankruptcy Code Establishing (1) Notification Procedures and Certain Restrictions Regarding Ownership and Acquisitions of Stock of the Debtors and (2) a Record Date Regarding the Ownership of Claims Against the Debtors with Respect to Certain Notification and Sell-Down Procedures and Requirements*, dated March 27, 2019 [Docket No. 1094].

**1.204** **TURN** means The Utility Reform Network.

**1.205** <u>**U.S. Trustee**</u> means Andrew S. Vara, Acting United States Trustee for Region 3, or such other person appointed to serve as the United States Trustee in respect of the Chapter 11 Cases.

**1.206** <u>**Unimpaired**</u> means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of section 1124 of the Bankruptcy Code.

**1.207** <u>**Utility**</u> means Debtor Pacific Gas and Electric Company, a California corporation.

**1.208** <u>**Utility Common Interest**</u> means any Interest in the Utility that is not a Utility Preferred Interest.

**1.209** <u>**Utility Fire Victim Claim**</u> means any Fire Victim Claim against the Utility.

**1.210** <u>**Utility General Unsecured Claim**</u> means any General Unsecured Claim against the Utility.

**1.211** <u>**Utility Ghost Ship Fire Claim**</u> means any Ghost Ship Fire Claim against the Utility.

**1.212** <u>**Utility Intercompany Claim**</u> means any Intercompany Claim against the

**1.213** <u>**Utility Letters of Credit**</u> means any letters of credit issued by a Utility Revolver Lender pursuant to the Utility Revolver Documents.

**1.214** <u>**Utility Other Secured Claim**</u> means any Other Secured Claim against the Utility.

**1.215** <u>**Utility PC Bond Claim**</u> means any Claim arising under, or related to, the Utility PC Bond Documents.

**1.216** <u>**Utility PC Bond Documents**</u> means, collectively, the PC Bond Loan Documents and the PC Bond LOC Documents.

**1.217** <u>**Utility PC Bond Lenders**</u> means the counterparties of the Utility under the Utility PC Bond Documents.

**1.218** <u>**Utility PC Bond Loan Documents**</u> means each of the following loan agreements, as amended, supplemented, restated, or otherwise modified from time to time, (a) Loan Agreement between the California Infrastructure and Economic Development Bank and the Utility, dated August 1, 2009 (Series 2009 A); (b) Loan Agreement between the California Infrastructure and Economic Development Bank and the Utility, dated August 1, 2009 (Series 2009 B); (c) Amended and Restated Loan Agreement between California Infrastructure and Economic Development Bank and the Utility, dated September 1, 2010 (Series 2008F); (d) Loan Agreement between the California Infrastructure and Economic Development Bank and the Utility, dated April 1, 2010 (Series 2010 E); (e) Loan Agreement between the California Pollution Control Financing Authority and the Utility, dated September 1, 1997 (1997 Series B-C); (f) First Supplemental Loan Agreement between the California Pollution Control Financing Authority and the Utility, dated December 1, 2003 (1997 Series B); (g) Loan Agreement between the California Pollution Control Financing Authority and the Utility, dated May 1, 1996 (1996 Series A-G); (h) First Supplemental Loan Agreement between the California Pollution Control Financing Authority and the Utility, dated July 1, 1998 (1996 Series A-G); and (i) Third Supplemental Loan Agreement between the

California Pollution Control Financing Authority and the Utility, dated December 1, 2003 (1996 Series C, E, F).

**1.219** **Utility PC Bond LOC Documents** means each of the following reimbursement agreements, as assigned, amended, supplemented, restated, or otherwise modified from time to time: (a) Reimbursement Agreement (Series 2009A) between the Utility and Union Bank, N.A., dated June 5, 2014; (b) Reimbursement Agreement (Series 2009B) between the Utility and Union Bank, N.A., dated June 5, 2014; (c) Reimbursement Agreement between the Utility and Canadian Imperial Bank of Commerce, New York Branch relating to California Pollution Control Financing Authority Pollution Control Refunding Revenue Bonds (Pacific Gas and Electric Company) 1997 Series B, dated December 1, 2015; (d) Reimbursement Agreement between the Utility and Mizuho Bank Ltd. relating to California Pollution Control Financing Authority Pollution Control Refunding Revenue Bonds (Pacific Gas and Electric Company) 1996 Series C, dated December 1, 2015; (e) Reimbursement Agreement between the Utility and Sumitomo Mitsui Banking Corporation relating to California Pollution Control Financing Authority Pollution Control Refunding Revenue Bonds (Pacific Gas and Electric Company) 1996 Series E, dated December 1, 2015; and (f) Reimbursement Agreement between the Utility and TD Bank N.A. relating to California Pollution Control Financing Authority Pollution Control Refunding Revenue Bonds (Pacific Gas and Electric Company) 1996 Series F, dated December 1, 2015.

**1.220** **Utility Preferred Interest** means any Interest in the Utility which results or arises from preferred stock issued by the Utility.

**1.221** **Utility Priority Non-Tax Claim** means any Priority Non-Tax Claim against the Utility.

**1.222** **Utility Public Entities Wildfire Claim** means any Public Entities Wildfire Claim against the Utility.

**1.223** **Utility Revolver Agent** means Citibank, N.A., solely in its capacity as administrative agent under the Utility Revolver Documents, its successors, assigns, or any replacement agent appointed pursuant to the terms of the Utility Revolver Documents.

**1.224** **Utility Revolver Claim** means any Claim arising under the Utility Revolver Documents.

**1.225** **Utility Revolver Credit Agreement** means that certain Second Amended and Restated Credit Agreement, dated as of April 27, 2015, by and among Utility, the Utility Revolver Agent, and the Utility Revolver Lenders, as amended, supplemented, restated, or otherwise modified from time to time.

**1.226** **Utility Revolver Documents** means, collectively, the Utility Revolver Credit Agreement and all other "Loan Documents" (as defined therein), including all other agreements, documents, and instruments delivered or entered into pursuant thereto or entered into in connection therewith (in each case, as amended, supplemented, restated, or otherwise modified from time to time).

**1.227** **Utility Revolver Lenders** means the lenders under the Utility Revolver Credit Agreement and each other party that becomes a lender thereunder from time to time in accordance with the terms of the Utility Revolver Credit Agreement.

**1.228** **Utility Long-Term Senior Notes** means, collectively, the following series of notes issued by the Utility pursuant to the applicable Utility Senior Notes Indentures: (a) 3.25% Senior Notes due June 15, 2023; (b) 4.25% Senior Notes due August 1, 2023; (c) 3.85% Senior

Notes due November 15, 2023; (d) 3.75% Senior Notes due February 15, 2024; (e) 3.40% Senior Notes due August 15, 2024; (f) 3.50% Senior Notes due June 15, 2025; (g) 3.50% Senior Notes due June 15, 2025, (h) 2.95% Senior Notes due March 1, 2026; (i) 3.30% Senior Notes due March 15, 2027; (j) 3.30% Senior Notes due December 1, 2027; (k) 4.65% Senior Notes due August 1, 2028; (l) 6.05% Senior Notes due March 1, 2034; (m) 5.80% Senior Notes due March 1, 2037; (n) 5.80% Senior Notes due March 1, 2037; (o) 6.35% Senior Notes due February 15, 2038; (p) 6.25% Senior Notes due March 1, 2039; (q) 5.40% Senior Notes due January 15, 2040; (r) 5.40% Senior Notes due January 15, 2040; (s) 4.50% Senior Notes due December 15, 2041; (t) 4.45% Senior Notes due April 15, 2042; (u) 3.75% Senior Notes due August 15, 2042; (v) 4.60% Senior Notes due June 15, 2043; (w) 5.125% Senior Notes due November 15, 2043; (x) 4.75% Senior Notes due February 15, 2044; (y) 4.75% Senior Notes due February 15, 2044; (z) 4.30% Senior Notes due March 15, 2045; (aa) 4.30% Senior Notes due March 15, 2045; (bb) 4.25% Senior Notes due March 15, 2046; (cc) 4.00% Senior Notes due December 1, 2046; (dd) 4.00% Senior Notes due December 1, 2046; and (ee) 3.95% Senior Notes due December 1, 2047.

**1.229** **Utility Long-Term Senior Notes Claims** means any Claim arising under, or related to, the Utility Long-Term Senior Notes Documents.

**1.230** **Utility Long-Term Senior Notes Documents** means, collectively, the applicable Utility Senior Notes Indentures, the Utility Long-Term Senior Notes, and all other agreements, documents, and instruments delivered or entered into pursuant thereto or entered into in connection therewith (in each case, as amended, restated, modified, or supplemented from time to time).

**1.231** **Utility Short-Term Senior Notes** means, collectively, the following series of notes issued by the Utility pursuant to the applicable Utility Senior Notes Indentures: (a) 3.50% Senior Notes due October 1, 2020; (b) 3.50% Senior Notes due October 1, 2020; (c) 4.25% Senior Notes due May 15, 2021; (d) 3.25% Senior Notes due September 15, 2021; and (e) 2.45% Senior Notes due August 15, 2022.

**1.232** **Utility Short-Term Senior Notes Claim** means any Claim arising under, or related to, the Utility Short-Term Senior Notes Documents.

**1.233** **Utility Short-Term Senior Notes Documents** means, collectively, the applicable Utility Senior Notes Indentures, the Utility Short-Term Senior Notes, and all other agreements, documents, and instruments delivered or entered into pursuant thereto or entered into in connection therewith (in each case, as amended, restated, modified, or supplemented from time to time).

**1.234** **Utility Senior Notes Documents** means, collectively, the Utility Long-Term Senior Notes Documents and the Utility Short-Term Senior Notes Documents.

**1.235** **Utility Senior Notes Indentures** means, the following senior notes indentures, between the Utility, as issuer, and the Utility Senior Notes Trustee, governing the Utility Long-Term Senior Notes and Utility Short-Term Senior Notes, as applicable, including all agreements, notes, instruments, and any other documents delivered pursuant thereto or in connection therewith (in each case, as amended, supplemented, restated, or otherwise modified from time to time): (a) Amended and Restated Indenture, dated as of April 22, 2005; (b) First Supplemental Indenture, dated as of March 13, 2007 – Supplement to the Amended and Restated Indenture dated as of April 22, 2005; (c) Third Supplemental Indenture, dated as of March 3, 2008 – Supplement to the Amended and Restated Indenture, dated as of April 22, 2005; (d) Sixth Supplemental Indenture, dated as of March 6, 2009 – Supplement to the Amended and Restated Indenture, dated as of April 22, 2005; (e) Seventh Supplemental Indenture, dated as of June 11, 2009 – Supplement to the Amended and Restated Indenture, dated as of April 22, 2005 (f) Eighth

Supplemental Indenture dated as of November 18, 2009 – Supplement to the Amended and Restated Indenture dated as of April 22, 2005; (g) Ninth Supplemental Indenture, dated as of April 1, 2010 – Supplement to the Amended and Restated Indenture, dated as of April 22, 2005; (h) Tenth Supplemental Indenture, dated as of September 15, 2010 – Supplement to the Amended and Restated Indenture, dated as of April 22, 2005; (i) Twelfth Supplemental Indenture, dated as of November 18, 2010 – Supplement to the Amended and Restated Indenture, dated as of April 22, 2005; (j) Thirteenth Supplemental Indenture dated as of May 13, 2011 – Supplement to the Amended and Restated Indenture dated as of April 22, 2005; (k) Fourteenth Supplemental Indenture dated as of September 12, 2011 – Supplement to the Amended and Restated Indenture dated as of April 22, 2005; (l) Sixteenth Supplemental Indenture, dated as of December 1, 2011 – Supplement to the Amended and Restated Indenture, dated as of April 22, 2005; (m) Seventeenth Supplemental Indenture, dated as of April 16, 2012 – Supplement to the Amended and Restated Indenture, dated as of April 22, 2005; (n) Eighteenth Supplemental Indenture, dated as of August 16, 2012 – Supplement to the Amended and Restated Indenture, dated as of April 22, 2005; (o) Nineteenth Supplemental Indenture, dated as of June 14, 2013 – Supplement to the Amended and Restated Indenture, dated as of April 22, 2005; (p) Twentieth Supplemental Indenture, dated as of November 12, 2013 – Supplement to the Amended and Restated Indenture, dated as of April 22, 2005; (q) Twenty-First Supplemental Indenture, dated as of February 21, 2014 – Supplement to the Amended and Restated Indenture, dated as of April 22, 2005; (r) Twenty-Third Supplemental Indenture, dated as of August 18, 2014 – Supplement to the Amended and Restated Indenture, dated as of April 22, 2005; (s) Twenty-Fourth Supplemental Indenture, dated as of November 6, 2014 – Supplement to the Amended and Restated Indenture, dated as of April 22, 2005; (t) Twenty-Fifth Supplemental Indenture, dated as of June 12, 2015 – Supplement to the Amended and Restated Indenture, dated as of April 22, 2005; (u) Twenty-Sixth Supplemental Indenture, dated as of November 5, 2015 – Supplement to the Amended and Restated Indenture, dated as of April 22, 2005; (v) Twenty- Seventh Supplemental Indenture, dated as of March 1, 2016 – Supplement to the Amended and Restated Indenture, dated as of April 22, 2005; (w) Twenty-Eighth Supplemental Indenture, dated as of December 1, 2016 – Supplement to the Amended and Restated Indenture, dated as of April 22, 2005; (x) Twenty-Ninth Supplemental Indenture, dated as of March 10, 2017 – Supplement to the Amended and Restated Indenture, dated as of April 22, 2005; (y) Indenture, dated as of November 29, 2017; (z) Indenture, dated as of August 6, 2018; and (aa) First Supplemental Indenture dated as of August 6, 2018 – Supplement to the Indenture, dated as of August 6, 2018.

 **1.236**  **Utility Senior Notes Trustee** means, as applicable, The Bank of New York Mellon Trust Company, N.A., or BOKF, N.A. solely in their capacity as indenture trustee or successor indenture trustee under the Utility Senior Notes Indentures for the applicable Utility Senior Notes, and their successors and assigns.

 **1.237**  **Utility Subordinated Debt Claim** means any Claim against the Utility that is subject to subordination under section 510(b) of the Bankruptcy Code, including any Claim for reimbursement, indemnification or contribution.

 **1.238**  **Utility Subrogation Wildfire Claim** means any Subrogation Wildfire Claim against the Utility.

 **1.239**  **Utility Term Loan Agent** means The Bank of Tokyo- Mitsubishi UFJ, Ltd., solely in its capacity as administrative agent under the Utility Term Loan Documents, its successors, assigns, or any replacement agent appointed pursuant to the terms of the Utility Term Loan Documents.

 **1.240**  **Utility Term Loan Claim** means any Claim arising under the Utility Term Loan Documents.

**1.241** <u>**Utility Term Loan Credit Agreement**</u> means that certain Term Loan Agreement, dated as of February 23, 2018, by and among the Utility as borrower, the Utility Term Loan Agent, and the Utility Term Loan Lenders, as amended, supplemented, restated, or otherwise modified from time to time.

**1.242** <u>**Utility Term Loan Documents**</u> means, collectively, the Utility Term Loan Credit Agreement and all other "Loan Documents" (as defined therein), including all other agreements, documents, and instruments delivered or entered into pursuant thereto or entered into in connection therewith (in each case, as amended, supplemented, restated, or otherwise modified from time to time).

**1.243** <u>**Utility Term Loan Lenders**</u> means the lenders under the Utility Term Loan Credit Agreement and each other party that becomes a lender thereunder from time to time in accordance with the terms of the Utility Term Loan Credit Agreement.

**1.244** <u>**Utility Workers' Compensation Claim**</u> means any Claim against the Utility by an employee of the Utility for the payment of workers' compensation benefits under applicable law.

**1.245** <u>**Voting Deadline**</u> means the date set by the Bankruptcy Court by which all completed Ballots must be received.

**1.246** <u>**Wildfire Assistance Program**</u> means the Wildfire Assistance Program established and administered pursuant to the Wildfire Assistance Program Orders.

**1.247** <u>**Wildfire Assistance Program Orders**</u> means, collectively, *the Order Authorizing Debtors to Establish and Fund Program to Assist Wildfire Claimants with Alternative Living Expenses and Other Urgent Needs and (b) Granting Related Relief*, dated May 24, 2019 [Docket No. 2223], the *Supplemental Order (a) Approving Appointment of Administrator and Establishing Guidelines for the Wildfire Assistance Program and (b) Granting Related Relief*, dated June 5, 2019 [Docket No. 2409], and the *Order (a) Establishing Qualified Settlement Fund for the Wildfire Assistance Program and (b) Authorizing QSF Administrator*, dated July 17, 2019 [Docket No. 3026].

**1.248** <u>**Wildfire Legislation (A.B. 1054)**</u> means A.B. 1054, 2019 Assemb. (Cal. 2019).

**1.249** <u>**Workers' Compensation Claims**</u> means, collectively, the HoldCo Workers' Compensation Claims and the Utility Workers' Compensation Claims.

## <u>INTERPRETATION; APPLICATION OF DEFINITIONS AND RULES OF CONSTRUCTION.</u>

For purposes herein:  (a) the words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein; (b) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (c) except as otherwise provided, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (d) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation;" (e) a term used herein that is not defined herein or by cross reference shall have the meaning assigned to that term in the Bankruptcy Code; (f) the rules of construction contained in section 102 of the Bankruptcy Code shall apply to the Plan; (g) the headings in the Plan are

for convenience of reference only and shall not limit or otherwise affect the provisions hereof; (h) in the event that a particular term of the Plan (including any exhibits or schedules hereto) conflicts with a particular term of the definitive documentation required to be implemented pursuant to the terms of the Plan or any settlement or other agreement contemplated hereunder, the definitive documentation shall control and shall be binding on the parties thereto; (i) except as otherwise provided, any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the terms of the Plan; (j) any effectuating provisions may be interpreted by the Plan Proponents in a manner consistent with the overall purpose and intent of the Plan, all without further notice to or action, order, or approval of the court or any other entity, and such interpretation shall control in all respects; (k) except as otherwise provided, any reference to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; and (l) any docket number references in the Plan shall refer to the docket number of any document filed with the Bankruptcy Court in the Chapter 11 Cases.

## GENERAL SETTLEMENT OF CLAIMS AND INTERESTS.

The Plan shall be deemed a motion to approve a good-faith compromise and settlement pursuant to which the Debtors and the holders of Claims against and/or Interests in the Debtors settle all Claims, Interests, and Causes of Action pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan. Notwithstanding this provision, the claims of the individual holders of Fire Claims and Subrogation Wildfire Claims shall be resolved by settlement or otherwise in accordance with the Fire Trust Agreements and the Claims Resolution Procedures. The Confirmation Order shall constitute the Court's approval of the compromise, settlement, and release of all such Claims, Interests, and Causes of Action, as well as a finding by the Bankruptcy Court that all such compromises, settlements, and releases are mutual and bi-directional and are in the best interests of the Debtors, their estates, and the holders of Claims, Interests, and Causes of Action, and is fair, equitable, and reasonable. Except as otherwise provided in the Plan, the Fire Trust Agreements and the Claims Resolution Procedures, in accordance with the provisions of the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors, may compromise and settle all Claims and Causes of Action against, and Interests in, the Debtors and their estates. The compromises, settlements, and releases described herein shall be deemed nonseverable from each other and from all other terms of the Plan.

## ARTICLE II.

## ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY TAX CLAIMS AND OTHER UNCLASSIFIED CLAIMS

**2.1 Administrative Expense Claims**. In full and final satisfaction, settlement, release, and discharge of any Allowed Administrative Expense Claim against a Debtor, except to the extent the Debtors or Reorganized Debtors, as applicable, and a holder of an Allowed Administrative Expense Claim against a Debtor agrees to a less favorable treatment of such Administrative Expense Claim, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed Administrative Expense Claim shall receive, in full and final satisfaction, settlement, and discharge of such Allowed Administrative Expense Claim, an amount in Cash equal to the Allowed amount of such Administrative Expense Claim; *provided that* any Allowed Administrative Expense Claim that is not due and payable prior to the Effective Date, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the

conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

## 2.2 Professional Fee Claims.

(a) All final requests for the payment of Professional Fee Claims against a Debtor, including any Professional Fee Claim incurred during the period from the Petition Date through and including the Effective Date, must be filed and served on the Reorganized Debtors no later than sixty (60) days after the Effective Date. All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Interim Compensation Order, and any other prior orders of the Bankruptcy Court regarding the payment of Professionals in the Chapter 11 Cases, and once approved by the Bankruptcy Court, promptly paid in Cash in the Allowed amount from the Professional Fee Escrow Account. If the Professional Fee Escrow Account is insufficient to fund the full Allowed amount of all Professional Fee Claims, remaining unpaid Allowed Professional Fee Claims will be allocated among and paid in full in Cash directly by the Reorganized Debtors.

(b) Prior to the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount. Such funds shall not be considered property of the estates of the Debtors or the Reorganized Debtors. Any amounts remaining in the Professional Fee Escrow Account after payment in full of all Allowed Professional Fee Claims shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

(c) No later than ten (10) Business Days prior to the Effective Date, each Professional shall provide the restructuring advisors for the Debtors with an estimate of its unpaid Professional Fee Claims incurred in rendering services to the Debtors or their estates before and as of the Effective Date; *provided*, that such estimate shall not be deemed to limit the amount of fees and expenses that are the subject of the Professional's final request for payment of its Professional Fee Claims whether from the Professional Fee Escrow Account or, if insufficient, from the Reorganized Debtors. If a Professional does not timely provide an estimate as set forth above, the Debtors or Reorganized Debtors shall estimate the unpaid and unbilled fees and expenses of such Professional for purposes of funding the Professional Fee Escrow Account. The total amount of Professional Fee Claims estimated pursuant to this Section shall comprise the Professional Fee Reserve Amount. The Professional Fee Reserve Amount, as well as the return of any excess funds in the Professional Fee Escrow Account after all Allowed Professional Fee Claims have been paid in full, shall be allocated to the applicable Debtor for whose benefit such Professional Fees Claims were incurred.

(d) Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Debtors. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

## 2.3 DIP Facility Claims. In full and final satisfaction, settlement, release, and discharge of the Allowed DIP Facility Claims against the Debtors (subject to the last sentence of this Section 2.3), on the Effective Date, such Allowed DIP Facility Claims shall be paid in full in Cash by the Debtors in the Allowed amount of such DIP Facility Claims and all commitments under the DIP Facility Documents shall terminate. On the Effective Date, any DIP Letters of Credit outstanding shall be replaced, returned to the issuing DIP Facility Lender, or collateralized with cash or backstopped with new letters of credit in accordance with the terms of the applicable DIP Letter of Credit and the DIP Facility Documents. Upon the indefeasible payment or satisfaction in full in Cash of the DIP Facility Claims (other than any DIP

Facility Claims based on the Debtors' contingent obligations under the DIP Facility Documents not yet due and payable), the termination of all commitments thereunder, and the replacement, return, collateralization or backstop of all outstanding DIP Letters of Credit in accordance with the terms of this Plan, on the Effective Date, all Liens granted to secure such obligations automatically shall be terminated and of no further force and effect.

**2.4    Priority Tax Claims**.  In full and final satisfaction, settlement, release, and discharge of any Allowed Priority Tax Claim against a Debtor, except to the extent that the Debtors or Reorganized Debtors (with the consent of the Plan Proponents), as applicable, and a holder of an Allowed Priority Tax Claim agree to a less favorable treatment of such Claim, each holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors or Reorganized Debtors, (a) Cash in an amount equal to such Allowed Priority Tax Claim on the Effective Date or as soon as reasonably practicable thereafter, or (b) Cash, in equal semi-annual installments and continuing over a period not exceeding five (5) years from and after the Petition Date, together with interest accrued thereon at the applicable nonbankruptcy rate, which as to any Allowed Priority Tax Claim of the Internal Revenue Service on behalf of the United States shall be the applicable rate specified by the Tax Code, as of the Confirmation Date, applied pursuant to section 511 of the Bankruptcy Code, subject to the sole option of the Reorganized Debtors to prepay the entire amount of the Allowed Priority Tax Claim.  Any Allowed Priority Tax Claim that is not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligation becomes due.

## ARTICLE III.

## CLASSIFICATION OF CLAIMS AND INTERESTS

**3.1    Classification in General**.  A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided that* a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Allowed Claim or Allowed Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

**3.2    Summary of Classification**.

(a)    The following table designates the Classes of Claims against, and Interests in, the Debtors and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) presumed to accept or deemed to reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.

| **Class** | **Designation** | **Impairment** | **Entitled to Vote** |
|---|---|---|---|
| **Claims Against and Interests in HoldCo** | | | |
| Class 1A | HoldCo Other Secured Claims | Unimpaired | No (presumed to accept) |
| Class 2A | HoldCo Priority Non-Tax Claims | Unimpaired | No (presumed to accept) |
| Class 3A | HoldCo Revolver Claims | Unimpaired | No (presumed to accept) |
| Class 4A | HoldCo Term Loan Claims | Unimpaired | No (presumed to accept) |
| Class 5A | HoldCo General Unsecured Claims | Unimpaired | No (presumed to accept) |
| Class 6A | HoldCo Public Entities Wildfire Claims | Impaired | Yes |

| | | | |
|---|---|---|---|
| Class 7A | HoldCo Subrogation Wildfire Claims | [Impaired][8] | [Yes] |
| Class 8A | HoldCo Fire Victim Claims | Impaired | Yes |
| Class 9A | HoldCo Workers' Compensation Claims | Unimpaired | No (presumed to accept) |
| Class 10A | HoldCo Intercompany Claims | Unimpaired | No (presumed to accept) |
| Class 11A | HoldCo Subordinated Debt Claims | Unimpaired | No (presumed to accept) |
| Class 12A | HoldCo Common Interests | Impaired | Yes |
| Class 13A | HoldCo Other Interests | Unimpaired | No (presumed to accept) |
| **Claims Against and Interests in the Utility** | | | |
| Class 1B | Utility Other Secured Claims | Unimpaired | No (presumed to accept) |
| Class 2B | Utility Priority Non-Tax Claims | Unimpaired | No (presumed to accept) |
| Class 3B | Utility Revolver Claims | Unimpaired | No (presumed to accept) |
| Class 4B | Utility Term Loan Claims | Unimpaired | No (presumed to accept) |
| Class 5B | Utility Short-Term Senior Note Claims | Unimpaired | No (presumed to accept) |
| Class 6B | Utility Long-Term Senior Note Claims | Unimpaired | No (presumed to accept) |
| Class 7B | Utility PC Bond Claims | Unimpaired | No (presumed to accept) |
| Class 8B | Utility General Unsecured Claims | Unimpaired | No (presumed to accept) |
| Class 9B | Utility Public Entities Wildfire Claims | Impaired | Yes |
| Class 10B | Utility Subrogation Wildfire Claims | [Impaired][9] | [Yes] |
| Class 11B | Utility Fire Victim Claims | Impaired | Yes |
| Class 12B | Utility Workers' Compensation Claims | Unimpaired | No (presumed to accept) |
| Class 13B | 2001 Utility Exchange Claims | Unimpaired | No (presumed to accept) |
| Class 14B | Utility Intercompany Claims | Unimpaired | No (presumed to accept) |
| Class 15B | Utility Subordinated Debt Claims | Unimpaired | No (presumed to accept) |
| Class 16B | Utility Preferred Interests | Unimpaired | No (presumed to accept) |
| Class 17B | Utility Common Interests | Unimpaired | No (presumed to accept) |

**3.3** **Separate Classification of Other Secured Claims**. Each Other Secured Claim, to the extent secured by a Lien on Collateral different from the Collateral securing another Other Secured Claim, shall be treated as being in a separate sub-Class for the purposes of receiving distributions under this Plan.

**3.4** **Nonconsensual Confirmation**. In the event any impaired Class of Claims or Interests entitled to vote on the Plan does not accept the Plan by the requisite statutory majority under section 1126(c) of the Bankruptcy Code, then the Debtors reserve the right to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code.

**3.5** **Debtors' Rights in Respect of Unimpaired Claims**. Except as otherwise provided in this Plan, nothing under this Plan shall affect the rights of the Reorganized Debtors in respect of any Claim that is not "impaired" (within the meaning of such term in section 1124 of the Bankruptcy

---

[8] The terms set forth in this Plan relating to the Subrogation Claims RSA have been bracketed and are subject to change based on the Bankruptcy Court's disposition of the Debtors' motion to approve the Subrogation Claims RSA scheduled to be heard on October 23, 2019.

[9] See footnote 8 above.

Code), including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Claim.

**ARTICLE IV.**

**TREATMENT OF CLAIMS AND INTERESTS**

**4.1** **Class 1A – HoldCo Other Secured Claims**.

(a) <u>Treatment</u>: In full and final satisfaction, settlement, release, and discharge of any Allowed HoldCo Other Secured Claim, except to the extent that the Debtors or Reorganized Debtors (with the consent of the Plan Proponents), as applicable, and a holder of an Allowed HoldCo Other Secured Claim agree to a less favorable treatment of such Claim, each holder of an Allowed HoldCo Other Secured Claim shall, at the option of the Debtors or Reorganized Debtors, (i) retain its HoldCo Other Secured Claim and its Lien on the Collateral securing such Claim; (ii) receive Cash in an amount equal to such Allowed Claim, including the payment of any interest due and payable under section 506(b) of the Bankruptcy Code, on the Effective Date or as soon as reasonably practicable thereafter; or (iii) receive treatment of such Allowed HoldCo Other Secured Claim in any other manner that is necessary to satisfy the requirements of section 1124 of the Bankruptcy Code. In the event a HoldCo Other Secured Claim is treated under clause (ii) of this Section 4.1(a), the Liens securing such Other Secured Claim shall be deemed released immediately upon payment.

(b) <u>Impairment and Voting</u>: The HoldCo Other Secured Claims are Unimpaired, and the holders of HoldCo Other Secured Claims are presumed to have accepted the Plan.

**4.2** **Class 2A – HoldCo Priority Non-Tax Claims**.

(a) <u>Treatment</u>: In full and final satisfaction, settlement, release, and discharge of any Allowed HoldCo Priority Non-Tax Claim, except to the extent that the Debtors or Reorganized Debtors (with the consent of the Plan Proponents), as applicable, and a holder of an Allowed HoldCo Priority Non-Tax Claim agree to a less favorable treatment of such Claim, each holder of an Allowed HoldCo Priority Non-Tax Claim shall receive, at the option of the Debtors or Reorganized Debtors, as applicable (i) Cash in an amount equal to such Allowed HoldCo Priority Non-Tax Claim, including interest through the Effective Date calculated at the applicable contract rate or, in the absence of a contract rate, the Federal Judgment Rate, payable on the Effective Date or as soon as reasonably practicable thereafter, or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(b) <u>Impairment and Voting</u>: The HoldCo Priority Non-Tax Claims are Unimpaired, and the holders of HoldCo Priority Non-Tax Claims are presumed to have accepted the Plan.

**4.3** **Class 3A – HoldCo Revolver Claims.**

(a) <u>Allowance</u>: On the Effective Date, the HoldCo Revolver Claims shall be Allowed in an aggregate amount equal to [$●], which amount consists of (i) the principal amount of HoldCo Revolver Claims outstanding as of the Petition Date plus all accrued and unpaid interest owed as of the Petition Date at the applicable contract rate plus (ii) all interest accrued from the Petition Date through the Effective Date at the applicable contract rate.

(b) <u>Treatment</u>: In full and final satisfaction, settlement, release, and discharge of each Allowed HoldCo Revolver Debt Claim, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed HoldCo Revolver Claim shall receive its pro rata share of Cash equal to the aggregate amount of the Allowed HoldCo Revolver Claims.

(c)     <u>Impairment and Voting</u>:  The HoldCo Revolver Claims are Unimpaired, and the holders of HoldCo Revolver Claims are presumed to have accepted the Plan.

**4.4     <u>Class 4A – HoldCo Term Loan Claims.</u>**

(a)     <u>Allowance</u>:  On the Effective Date, the HoldCo Term Loan Claims shall be Allowed in an aggregate amount equal to [$●], which amount consists of (i) the principal amount of HoldCo Term Loan Claims outstanding as of the Petition Date plus all accrued and unpaid interest owed as of the Petition Date at the applicable contract rate plus (ii) all interest accrued from the Petition Date through the Effective Date at the applicable contract rate.

(b)     <u>Treatment</u>:  In full and final satisfaction, settlement, release, and discharge of each Allowed HoldCo Term Loan Claim, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed HoldCo Term Loan Claim shall receive its pro rata share of Cash equal to the aggregate amount of the Allowed HoldCo Term Loan Claims.

(c)     <u>Impairment and Voting</u>:  The HoldCo Term Loan Claims are Unimpaired, and holders of HoldCo Term Loan Claims are presumed to have accepted the Plan.

**4.5     <u>Class 5A – HoldCo General Unsecured Claims</u>.**

(a)     <u>Treatment</u>:  In full and final satisfaction, settlement, release, and discharge of any Allowed HoldCo General Unsecured Claim, except to the extent that the Debtors or the Reorganized Debtors, as applicable, and a holder of an Allowed HoldCo General Unsecured Claim agree to a less favorable treatment of such Claim, on (i) the Effective Date or as soon as reasonably practicable thereafter or (ii) as soon as reasonably practicable following the date such Claim becomes an Allowed HoldCo General Unsecured Claim, each holder of an Allowed HoldCo General Unsecured Claim shall receive Cash in an amount equal to such holder's Allowed HoldCo General Unsecured Claim.  The Allowed amount of any HoldCo General Unsecured Claim shall include all interest accrued from the Petition Date through the Effective Date at the applicable contract rate or, in the absence of a contract rate, the Federal Judgment Rate.

(b)     <u>Impairment and Voting</u>:  The HoldCo General Unsecured Claims are Unimpaired, and holders of HoldCo General Unsecured Claims are presumed to have accepted the Plan.

**4.6     <u>Class 6A – HoldCo Public Entities Wildfire Claims</u>.**

(a)     <u>Treatment</u>:   On the Effective Date, all HoldCo Public Entities Wildfire Claims shall be deemed satisfied, settled, released and discharged through the treatment provided to Utility Public Entities Wildfire Claims.  HoldCo Public Entities Wildfire Claims shall be satisfied solely from the transfer of Cash in amount of $1.0 billion from the Fire Victims Trust and the Public Entities Segregated Defense Fund, as described in the treatment of Utility Public Entities Wildfire Claims in Class 8B in section 4.21(a) of the Plan, with no recourse to the Debtors, Reorganized Debtors, or their respective assets and properties.

(b)     <u>Impairment and Voting</u>:   The HoldCo Public Entities Wildfire Claims are Impaired, and holders of HoldCo Public Entities Wildfire Claims are entitled to vote to accept or reject the Plan.

**4.7     <u>Class 7A – HoldCo Subrogation Wildfire Claims</u>.**

(a)     <u>Treatment</u>:  On the Effective Date, all HoldCo Subrogation Wildfire Claims shall be deemed satisfied, settled, released and discharged through the treatment provided to Utility Subrogation Wildfire Claims.  Pursuant to the Channeling Injunction, each holder of a HoldCo Subrogation Wildfire Claim shall have its Claim permanently channeled to the Subrogation Wildfire Trust, and such Claim shall

be asserted exclusively against the Subrogation Wildfire Trust in accordance with its terms, with no recourse to the Debtors, the Reorganized Debtors, or their respective assets and properties.

(b)     [Impairment and Voting: The HoldCo Subrogation Wildfire Claims are Impaired, and holders of HoldCo Subrogation Wildfire Claims are entitled to vote to accept or reject the Plan.][10]

### 4.8    Class 8A – HoldCo Fire Victim Claims.

(a)     Treatment: On the Effective Date, all HoldCo Fire Victim Claims shall be deemed satisfied, settled, released and discharged through the treatment provided to Utility Fire Victim Claims. Pursuant to the Channeling Injunction, each holder of a HoldCo Fire Victim Claim shall have its Claim permanently channeled to the Fire Victim Trust, and such Claim shall be asserted exclusively against the Fire Victim Trust in accordance with its terms, with no recourse to the Debtors, the Reorganized Debtors, or their respective assets and properties.

(b)     Impairment and Voting: The HoldCo Fire Victim Claims are Impaired, and holders of HoldCo Fire Victim Claims are entitled to vote to accept or reject the Plan.

### 4.9    Class 9A – HoldCo Workers' Compensation Claims.

(a)     Treatment: On and after the Effective Date, each Holder of a HoldCo Workers' Compensation Claim shall be entitled to pursue its Claim against Reorganized HoldCo as if the Chapter 11 Cases had not been commenced.

(b)     Impairment and Voting: The HoldCo Workers' Compensation Claims are Unimpaired, and holders of HoldCo Workers' Compensation Claims are presumed to have accepted the Plan.

### 4.10    Class 10A – HoldCo Intercompany Claims.

(a)     Treatment: On the Effective Date, all Allowed HoldCo Intercompany Claims shall either be (i) cancelled (or otherwise eliminated) and receive no distribution under the Plan or (ii) Reinstated, in each case as determined by the Reorganized Debtors (with the consent of the Plan Proponents), as applicable.

(b)     Impairment and Voting: The HoldCo Intercompany Claims are Unimpaired, and the holders of HoldCo Intercompany Claims are presumed to have accepted the Plan.

### 4.11    Class 11A – HoldCo Subordinated Debt Claims.

(a)     Treatment: In full and final satisfaction, settlement, release, and discharge of any HoldCo Subordinated Debt Claim, except to the extent that the Debtors or the Reorganized Debtors, as applicable, and a holder of an Allowed HoldCo Subordinated Debt Claim agree to a less favorable treatment of such Claim, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed HoldCo Subordinated Debt Claim shall receive Cash in an amount equal to such holder's Allowed HoldCo Subordinated Debt Claim.

---

[10] The terms set forth in this Plan relating to the Subrogation Claims RSA have been bracketed and are subject to change based on the Bankruptcy Court's disposition of the Debtors' motion to approve the Subrogation Claims RSA scheduled to be heard on October 23, 2019.

(b)    Impairment and Voting:  The HoldCo Subordinated Debt Claims are Unimpaired, and the holders of HoldCo Subordinated Debt Claims are presumed to have accepted the Plan.

### 4.12    Class 12A – HoldCo Common Interests.

(a)    Treatment:  On the Effective Date, subject to the New Organizational Documents, each holder of a HoldCo Common Interest shall (i) retain such Interest subject to dilution from any New HoldCo Common Stock, issued pursuant to the Plan and [(b) to the extent such holder is an Eligible Offeree, shall receive a pro rata distribution of any subscription rights to purchase in the aggregate up to 5% of the New HoldCo Common Interests issued pursuant to the New HoldCo Common Stock Investment through the Rights Offering.

(b)    Impairment and Voting:  The HoldCo Common Interests are Impaired, and the holders of HoldCo Common Interests are entitled to vote to accept or reject the Plan.

### 4.13    Class 13A – HoldCo Other Interests.

(a)    Treatment:  On the Effective Date, each holder of a HoldCo Other Interest shall have such holder's HoldCo Other Interest Reinstated.

(b)    Impairment and Voting:  The HoldCo Other Interests are Unimpaired, and the holders of HoldCo Other Interests are presumed to have accepted the Plan.

### 4.14    Class 1B – Utility Other Secured Claims.

(a)    Treatment:  In full and final satisfaction, settlement, release, and discharge of any Allowed Utility Other Secured Claim, except to the extent that the Debtors or Reorganized Debtors (with the consent of the Plan Proponents), as applicable, and a holder of an Allowed Utility Other Secured Claim agree to a less favorable treatment of such Claim, each holder of an Allowed Utility Other Secured Claim shall, at the option of the Debtors or Reorganized Debtors, (i) retain its Utility Other Secured Claim and its Lien on the Collateral securing such Claim; (ii) receive Cash in an amount equal to such Allowed Claim, including the payment of any interest due and payable under section 506(b) of the Bankruptcy Code, on the Effective Date or as soon as reasonably practicable thereafter; or (iii) receive treatment of such Allowed Utility Other Secured Claim in any other manner that is necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.  In the event a Utility Other Secured Claim is treated under clause (ii) of this Section 4.14(a), the Liens securing such Other Secured Claim shall be deemed released immediately upon payment.

(b)    Impairment and Voting:  The Utility Other Secured Claims are Unimpaired, and the holders of Utility Other Secured Claims are presumed to have accepted the Plan.

### 4.15    Class 2B – Utility Priority Non-Tax Claims.

(a)    Treatment:  In full and final satisfaction, settlement, release, and discharge of any Allowed Utility Priority Non-Tax Claim, except to the extent that the Debtors or Reorganized Debtors (with the consent of the Plan Proponents), as applicable, and a holder of an Allowed Utility Priority Non-Tax Claim agree to a less favorable treatment of such Claim, each holder of an Allowed Utility Priority Non-Tax Claim shall receive, at the option of the Debtors or the Reorganized Debtors, as applicable (i) Cash in an amount equal to such Allowed Utility Priority Non-Tax Claim, including interest through the Effective Date calculated at the applicable contract rate or, in the absence of a contract rate, the Federal Judgment Rate, payable on the Effective Date or as soon as reasonably practicable thereafter, or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(b)  <u>Impairment and Voting</u>:  The Utility Priority Non-Tax Claims are Unimpaired, and the holders of Utility Priority Non-Tax Claims are presumed to have accepted the Plan.

### 4.16  <u>Class 3B – Utility Revolver Claims</u>

(a)  <u>Allowance</u>:  On the Effective Date, the Utility Revolver Claims shall be Allowed in an aggregate amount equal to [$●], which amount consists of (i) the principal amount of Utility Revolver Claims outstanding as of the Petition Date plus all accrued and unpaid interest owed as of the Petition Date at the applicable contract rate plus (ii) all interest accrued from the Petition Date through the Effective Date at the applicable contract rate.

(b)  <u>Treatment</u>:  In full and final satisfaction, settlement, release, and discharge of each Allowed Utility Revolver Claim, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed Utility Revolver Claim shall receive its pro rata share of Cash equal to the aggregate amount of the Allowed Utility Revolver Claims.

On the Effective Date, any Utility Letters of Credit outstanding shall be replaced, returned to the issuing Utility Revolver Lender, or collateralized with cash or new letters of credit in accordance with the terms of the applicable Utility Letter of Credit and the Utility Revolver Documents.

(c)  <u>Impairment and Voting</u>:  The Utility Revolver Claims are Unimpaired, and the holders of Utility Revolver Claims are presumed to have accepted the Plan.

### 4.17  <u>Class 4B – Utility Term Loan Claims.</u>

(a)  <u>Allowance</u>:  On the Effective Date, the Utility Term Loan Claims shall be Allowed in an aggregate amount equal to [$●], which amount consists of (i) the principal amount of Utility Term Loan Claims outstanding as of the Petition Date plus all accrued and unpaid interest owed as of the Petition Date at the applicable contract rate plus (ii) all interest accrued from the Petition Date through the Effective Date at the applicable contract rate.

(b)  <u>Treatment</u>:  In full and final satisfaction, settlement, release, and discharge of each Allowed Utility Term Loan Claim, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed Utility Term Loan Claim shall receive its pro rata share of Cash equal to the aggregate amount of the Allowed Utility Term Loan Claims.

(c)  <u>Impairment and Voting</u>:  The Utility Term Loan Claims are Unimpaired, and the holders of Utility Term Loan Claims are presumed to have accepted the Plan.

### 4.18  <u>Class 5B – Utility Short-Term Senior Notes Claims.</u>

(a)  <u>Allowance</u>: On the Effective Date, the Utility Short-Term Senior Notes Claims shall be Allowed in an aggregate amount equal to [$●], which amount consists of (i) the principal amount of Utility Short-Term Senior Notes Claims outstanding as of the Petition Date plus all accrued and unpaid interest owed as of the Petition Date at the applicable contract rate, (ii) all interest accrued from the Petition Date through the Effective Date at the applicable contract rate and (iii) any prepayment premium, makewhole or other similar call protection under the applicable Utility Short-Term Notes or Utility Short-Term Notes Indentures.

(b)  <u>Treatment</u>:  In full and final satisfaction, settlement, release, and discharge of each Allowed Utility Short-Term Senior Notes Claim, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed Utility Short-Term Senior Notes Claim shall receive its pro rata share of Cash equal to the aggregate amount of the Allowed Utility Short-Term Senior Notes Claims.

(c)     Indenture Trustee Fees:  On the Effective Date, the Reorganized Debtors shall pay the reasonable and documented compensation, fees, expenses and disbursements of the Utility Senior Notes Trustee and each paying agent (as applicable) in connection with the Chapter 11 Cases and under the Utility Short-Term Senior Notes Documents, including any fees, expenses and disbursements of attorneys, advisors, or agents retained or utilized by the Utility Senior Notes Trustee in connection with the Chapter 11 Cases.

(d)     Impairment and Voting:  The Utility Short-Term Senior Notes Claims are Unimpaired, and the holders of Utility Short-Term Senior Notes Claims are presumed to have accepted the Plan.

### 4.19    Class 6B – Utility Long-Term Senior Notes Claims.

(a)     Allowance: On the Effective Date, the Utility Long-Term Senior Notes Claims shall be Allowed in an aggregate amount equal to [$●], which amount consists of (i) the principal amount of Utility Short-Term Senior Notes Claims outstanding as of the Petition Date plus all accrued and unpaid interest owed as of the Petition Date at the applicable contract rate and (ii) all interest accrued from the Petition Date through the Effective Date at the applicable contract rate.

(b)     Treatment:  In full and final satisfaction, settlement, release, and discharge of each Allowed Utility Long-Term Senior Notes Claim, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed Utility Long-Term Senior Notes Claim shall (i) have its Allowed Utility Long-Term Senior Notes Claim Reinstated and (ii) receive its pro rata share of Cash equal to the aggregate amount of (x) all accrued and unpaid interest owed as of the Petition Date at the applicable contract rate and (y) all interest accrued from the Petition Date through the Effective Date at the applicable contract rate.

(c)     Indenture Trustee Fees:  On the Effective Date, the Reorganized Debtors shall pay the reasonable and documented compensation, fees, expenses and disbursements of the Utility Senior Notes Trustee and each paying agent (as applicable) in connection with the Chapter 11 Cases and under the Utility Long-Term Senior Notes Documents, including any fees, expenses and disbursements of attorneys, advisors, or agents retained or utilized by the Utility Senior Notes Trustee in connection with the Chapter 11 Cases.

(d)     Impairment and Voting:  The Utility Long-Term Senior Notes Claims are Unimpaired, and the holders of Utility Long-Term Senior Notes Claims are presumed to have accepted the Plan.

### 4.20    Class 7B – Utility PC Bond Claims.

(a)     Allowance:  On the Effective Date, the Utility PC Bond Claims shall be Allowed in an aggregate amount equal to [$●], which amount consists of (i) the principal amount of Utility PC Bond Claims outstanding as of the Petition Date plus all accrued and unpaid interest owed as of the Petition Date at the applicable contract rate plus (ii) all interest accrued from the Petition Date through the Effective Date at the applicable contract rate.

(b)     Treatment:  In full and final satisfaction, settlement, release, and discharge of each Allowed Utility PC Bond Loan Claim, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed Utility PC Bond Claim shall receive its pro rata share of Cash equal to the aggregate amount of the Allowed Utility PC Bond Claims.

(c)     Impairment and Voting:  The Utility PC Bond Claims are Unimpaired, and the holders of Utility PC Bond Claims are presumed to have accepted the Plan.

**4.21    Class 8B – Utility General Unsecured Claims.**

(a)    Treatment:  In full and final satisfaction, settlement, release, and discharge of any Allowed Utility General Unsecured Claim, except to the extent that the Debtors or Reorganized Debtors (with the consent of the Plan Proponents), as applicable, and a holder of an Allowed Utility General Unsecured Claim agree to a less favorable treatment of such Claim, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed Utility General Unsecured Claim shall receive Cash in an amount equal to such holder's Allowed Utility General Unsecured Claim.  The Allowed amount of any Utility General Unsecured Claim shall reflect all interest accrued from the Petition Date through the Effective Date at the applicable contract rate or, in the absence of a contract rate, the Federal Judgment Rate.

(b)    Impairment and Voting:  The Utility General Unsecured Claims are Unimpaired, and the holders of Utility General Unsecured Claims are presumed to have accepted the Plan.

**4.22    Class 9B – Utility Public Entities Wildfire Claims**.

(a)    Treatment:  In full and final satisfaction, settlement, release, and discharge of all Allowed Utility Public Entities Wildfire Claims, on the Effective Date, or as soon as reasonably practicable thereafter, but in no event later than thirty (30) days after the Effective Date, the Fire Victim Trust shall transfer Cash in the aggregate amount of $1.0 billion (as provided in the Public Entities Plan Support Agreement) to a separate trust created and maintained for the benefit of the Public Entities.  The Public Entities thereafter shall receive distributions in accordance with the Public Entities Settlement Distribution Protocol.  The Fire Victim Trust shall also transfer $10 million to establish the Public Entities Segregated Defense Fund, in accordance with the terms of the Public Entities Plan Support Agreements.  Utility Public Entities Wildfire Claims shall be satisfied solely from the Cash amount of $1.0 billion and the Public Entities Segregated Defense Fund, as described above.

(b)    Impairment and Voting:  The Utility Public Entities Wildfire Claims are Impaired, and holders of the Utility Public Entities Wildfire Claims are entitled to vote to accept or reject the Plan.

**4.23    Class 10B – Utility Subrogation Wildfire Claims**.

The Utility Subrogation Wildfire Claims shall be treated as follows:

(a)    Allowance:  For purposes of this Plan, and in accordance with the [Subrogation Wildfire Claims Approval Order], the Utility Subrogation Wildfire Claims shall be settled and Allowed in the aggregate amount of $11 billion.

(b)    Treatment:  On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors shall fund the Subrogation Wildfire Trust with $11 billion consisting of (a) Cash and [(b) New HoldCo Common Stock (at plan value)].  No postpetition, and pre-Effective Date, interest shall be paid with respect to the Utility Subrogation Wildfire Claims as Allowed pursuant to the immediately preceding clause (a).  All Utility Subrogation Wildfire Claims shall be satisfied solely from the assets funded to the Subrogation Wildfire Trust.

(c)    Professional Fees:  On the Effective Date, the Reorganized Debtors shall pay the reasonable, documented, and contractual professional fees of the Ad Hoc Subrogation Professionals up to an aggregate amount of $55 million (inclusive of all such fees and expenses paid by the Debtors prior to the Effective Date, and which shall include success fees, transaction fees or other similar fees).

(d)    Distributions and Discharge:  Funding of the Subrogation Wildfire Trust as provided above shall be in full and final satisfaction, release, and discharge of all Utility Subrogation Wildfire Claims.  Each holder of a Utility Subrogation Wildfire Claim that is party to the Subrogation

Wildfire Claim Allocation Agreement shall receive payment as determined in accordance with the Subrogation Wildfire Claim Allocation Agreement. Holders of Disputed Utility Subrogation Wildfire Claims as of the Effective Date shall not receive any payment unless and until such claims either are resolved consensually as between such holders and the Subrogation Wildfire Trustee or become Allowed Claims.

(e) Channeling Injunction: On the Effective Date, the Debtors' liability for all Utility Subrogation Wildfire Claims shall be fully assumed by, and be the sole responsibility of, the Subrogation Wildfire Trust, and all such Claims shall be satisfied solely from the assets of the Subrogation Wildfire Trust. Pursuant to the Channeling Injunction, each holder of a Utility Subrogation Wildfire Claim shall have its Claim permanently channeled to the Subrogation Wildfire Trust, and such Claim shall be asserted exclusively against the Subrogation Wildfire Trust in accordance with its terms, with no recourse to the Debtors, the Reorganized Debtors, or their respective assets and properties.

(f) [Impairment and Voting: The Utility Subrogation Wildfire Claims are Impaired, and holders of Utility Subrogation Wildfire Claims are entitled to vote to accept or reject the Plan.][11]

### 4.24    Class 11B – Utility Fire Victim Claims.

(a) Treatment: In accordance with the requirements of section 3292 of the Wildfire Legislation (A.B. 1054), on the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors shall establish and fund the Fire Victim Trust with the Aggregate Fire Victim Consideration. Utility Fire Victim Claims shall be satisfied solely from the Fire Victim Trust.

(b) Funding of the Fire Victim Trust as provided above shall be in full and final satisfaction, release, and discharge of all Utility Fire Victim Claims. Each holder of a Utility Fire Victim Claim shall receive payment as determined in accordance with the Fire Victim Claims Resolution Procedures.

(c) On the Effective Date, the Debtors' liability for all Utility Fire Victim Claims shall be fully assumed by, and be the sole responsibility of the Fire Victim Trust, and all such Claims shall be satisfied solely from the assets of the Fire Victim Trust. Pursuant to the Channeling Injunction, each holder of a Utility Fire Victim Claim shall have its Claim permanently channeled to the Fire Victim Trust, and such Claim shall be asserted exclusively against the Fire Victim Trust in accordance with its terms, with no recourse to the Debtors, the Reorganized Debtors, or their respective assets and properties.

(d) Impairment and Voting: The Utility Fire Victim Claims are Impaired, and holders of Utility Fire Victim Claims are entitled to vote to accept or reject the Plan.

### 4.25    Class 12B – Utility Workers' Compensation Claims.

(a) Treatment: On and after the Effective Date, each Holder of a Utility Workers' Compensation Claim shall be entitled to pursue its Claim against Reorganized HoldCo as if the Chapter 11 Cases had not been commenced.

(b) Impairment and Voting: The Utility Workers' Compensation Claims are Unimpaired, and holders of Utility Workers' Compensation Claims are presumed to have accepted the Plan.

---

[11] The terms set forth in this Plan relating to the Subrogation Claims RSA have been bracketed and are subject to change based on the Bankruptcy Court's disposition of the Debtors' motion to approve the Subrogation Claims RSA scheduled to be heard on October 23, 2019.

**4.26** **Class 13B – 2001 Utility Exchange Claims**.

(a) <u>Treatment</u>: On and after the Effective Date, each Holder of a 2001 Utility Exchange Claim shall be entitled to pursue its Claim against the Reorganized Utility as if the Chapter 11 Cases had not been commenced.

(b) <u>Impairment and Voting</u>: The 2001 Utility Exchange Claims are Unimpaired, and holders of 2001 Utility Exchange Claims are presumed to have accepted the Plan.

**4.27** **Class 14B – Utility Intercompany Claims**.

(a) <u>Treatment</u>: On the Effective Date, all Allowed Utility Intercompany Claims shall either be (i) cancelled (or otherwise eliminated) and receive no distribution under the Plan or (ii) Reinstated, in each case as determined by the Reorganized Debtors (with the consent, not to be unreasonably withheld, of the Plan Proponents), as applicable.

(b) <u>Impairment and Voting</u>: The Utility Intercompany Claims are Unimpaired, and holders of Utility Intercompany Claims are presumed to have accepted the Plan.

**4.28** **Class 15B – Utility Subordinated Debt Claims**.

(a) <u>Treatment</u>: In full and final satisfaction, settlement, release, and discharge of any Utility Subordinated Debt Claim, except to the extent that the Debtors or the Reorganized Debtors, as applicable, and a holder of an Allowed Utility Subordinated Debt Claim agree to a less favorable treatment of such Claim, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed Utility Subordinated Debt Claim shall receive Cash in an amount equal to such holder's Allowed Utility Subordinated Debt Claim.

(b) <u>Impairment and Voting</u>: The Utility Subordinated Debt Claims are Unimpaired, and the holders of Utility Subordinated Debt Claims are presumed to have accepted the Plan.

**4.29** **Class 16B – Utility Preferred Interests**.

(a) <u>Treatment</u>: On the Effective Date, all Utility Preferred Interests shall be Reinstated.

(b) <u>Impairment and Voting</u>: The Utility Preferred Interests are Unimpaired, and holders of Utility Preferred Interests are presumed to have accepted the Plan.

**4.30** **Class 17B – Utility Common Interests**.

(a) <u>Treatment</u>: On the Effective Date, all Utility Common Interests shall be Reinstated.

(b) <u>Impairment and Voting</u>: The Utility Common Interests are Unimpaired, and the holders of Utility Common Interests are presumed to have accepted the Plan.

**ARTICLE V.**

**PROVISIONS GOVERNING DISTRIBUTIONS**

**5.1** **Distributions Generally**. Except as otherwise provided in the Plan, the Fire Trust Agreements, or the Claims Resolution Procedures the Disbursing Agent shall make all distributions to the

appropriate holders of Allowed Claims, or such other persons designated by this Plan, in accordance with the terms of this Plan.

**5.2** **Plan Funding**. Except as otherwise provided in the Plan, distributions of Cash shall be funded from the proceeds of the Plan Funding, including the Fire Insurance Proceeds, as of the applicable date of such distribution as set forth herein.

**5.3** **Postpetition Interest on Claims**. Postpetition interest shall be paid as provided under the Plan or required by the Bankruptcy Code. Except as otherwise provided in the Plan, to the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest that accrued thereon from and after the Effective Date.

**5.4** **Date of Distributions**. Unless otherwise provided in this Plan, any distributions and deliveries to be made under this Plan shall be made on the Effective Date or as soon as reasonably practicable thereafter; *provided*, that the Reorganized Debtors may implement periodic distribution dates to the extent they determine appropriate. Holders of Fire Claims subject to the Claims Resolution Procedures shall receive distributions in accordance with the applicable Claims Resolution Procedures.

**5.5** **Distribution Record Date**. Except as otherwise provided in the Fire Trust Agreements or the Claims Resolution Procedures, as of the close of business on the Distribution Record Date, the various lists of holders of Claims and Interests in each Class, as maintained by the Debtors or their agents, shall be deemed closed, and there shall be no further changes in the record holders of any Claims or Interests after the Distribution Record Date. None of the Debtors, the Reorganized Debtors, or the Disbursing Agent shall have any obligation to recognize any transfer of a Claim or Interest occurring after the close of business on the Distribution Record Date. In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, none of the Debtors, the Reorganized Debtors, or the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

**5.6** **Disbursing Agent**. Except as otherwise provided in the Plan, all distributions under this Plan shall be made by the Disbursing Agent, on behalf of the applicable Debtor, on and after the Effective Date as provided herein. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties. The Debtors or the Reorganized Debtors, as applicable, shall use commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors' or Reorganized Debtors' books and records. The Debtors or the Reorganized Debtors, as applicable, shall cooperate in good faith with the Disbursing Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in Section 5.16 of this Plan. Fire Claims subject to the Channeling Injunction shall not be administered by the Disbursing Agent and shall instead be administered by the Fire Trusts.

**5.7** **Delivery of Distributions**.

(a) Except as otherwise provided in the Plan, the Disbursing Agent will make the applicable distribution under this Plan and, subject to Bankruptcy Rule 9010, will make all distributions to any holder of an Allowed Claim as and when required by this Plan at: (i) the address of such holder on the books and records of the Debtors or their agents, (ii) the address in the most recent proof of claim filed by such holder, or (iii) the address in any written notice of address change delivered to the Debtors or the Disbursing Agent, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001. In the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Disbursing Agent has been notified of the then current address of such holder, at which time or as soon thereafter as reasonably practicable, such distribution shall be made to such holder without interest.

(b)     The Disbursing Agent, with the Funded Debt Trustees' cooperation, shall make any distributions on account of the Allowed Funded Debt Claims. The Funded Debt Trustees shall have no duties or responsibility relating to any form of distribution that is not DTC eligible and the Disbursing Agent, the Debtors, or the Reorganized Debtors, as applicable, shall seek the cooperation of DTC so that any distribution on account of an Allowed Funded Debt Claim that is held in the name of, or by a nominee of, DTC, shall be made through the facilities of DTC on the Effective Date or as soon as practicable thereafter. The Reorganized Debtors shall reimburse the Funded Debt Trustees for any reasonable and documented fees and expenses (including the reasonable and documented fees and expenses of its counsel and agents) incurred after the Effective Date solely in connection with actions explicitly requested by the Reorganized Debtors necessary for implementation of the Plan; *provided*, that, for the avoidance of doubt, nothing in the Plan or Confirmation Order shall be considered or construed as an explicit request by the Reorganized Debtors authorizing the incurrence of fees and expenses by the Funded Debt Trustees.

**5.8     Funded Debt Trustee Fees**. To allow the holders of the Funded Debt Claims to receive the full treatment set forth in the Plan without reduction by charging liens or by the Funded Debt Trustees pursuant to the Funded Debt Documents, the Debtors or the Reorganized Debtors shall, on account of the Funded Debt Claims, pay to the Funded Debt Trustees, to the extent they are not paid pursuant to another provision of the Plan, under the applicable Funded Debt Documents, an amount in cash equal to the Funded Debt Trustee Fees owed to the respective Funded Debt Trustees that are incurred and invoiced as of the Effective Date. To the extent the Funded Debt Trustee Fees are paid on the Effective Date, the Funded Debt Trustees shall not withhold distributions in respect of any charging liens on account of such amounts.

**5.9     Unclaimed Property**. For distributions other than from the Fire Trusts, all distributions payable on account of Claims that are not deliverable, or have not responded to a request for information to make such delivery, and remain unclaimed shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the Reorganized Debtors or their successors or assigns one year from the later of (a) the Effective Date and (b) the date that is ten (10) Business Days after the date a Claim is first Allowed, and all claims of any other Entity (including the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred. The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and filings with the Bankruptcy Court.

**5.10     Satisfaction of Claims**. Unless otherwise provided herein, any distributions and deliveries to be made on account of Allowed Claims under this Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

**5.11     Fractional Stock**. No fractional shares or Interests of New HoldCo Common Stock shall be distributed. If any distributions of New HoldCo Common Stock pursuant to the Plan or the Plan Documents would result in the issuance of a fractional share or Interest of New HoldCo Common Stock, then the number of shares or Interests of New HoldCo Common Stock to be issued in respect of such distribution shall be calculated to one decimal place and rounded up or down to the closest whole share or Interest (with a half share or Interest or greater rounded up and less than a half share or Interest rounded down). The total number of shares or Interests of New HoldCo Common Stock, as applicable, to be distributed in connection with the Plan shall be adjusted as necessary to account for the rounding provided for in this Section 5.10. No consideration shall be provided in lieu of fractional shares or Interests that are rounded down. Neither the Reorganized Debtors nor the Disbursing Agent shall have any obligation to make a distribution that is less than (1) share or Interest of New HoldCo Common Stock. Any New HoldCo Common Stock that is not distributed in accordance with this Section 5.10 shall be returned to, and ownership thereof shall vest in, Reorganized HoldCo.

**5.12     Manner of Payment under Plan**. Except as specifically provided herein, at the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made under this

Plan may be made by check, ACH, wire transfer, or any other method agreed between the Debtors or Reorganized Debtors and the holder of the Claim.

**5.13    No Distribution in Excess of Amount of Allowed Claim**.  Notwithstanding anything to the contrary in this Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, distributions in excess of the Allowed amount of such Claim, except to the extent that payment of postpetition interest on such Claim is specifically provided for by the Plan, the Confirmation Order, or another order of the Bankruptcy Court or required by the Bankruptcy Code.

**5.14    Setoffs and Recoupments**.  Each Debtor or Reorganized Debtor, as applicable, or such Entity's successor or designee, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, offset or recoup against any Allowed Claim and the distributions to be made pursuant to this Plan on account of such Allowed Claim any and all Claims, rights, and Causes of Action that such Debtor or Reorganized Debtor or its successors may hold against the holder of such Allowed Claim; *provided*, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder will constitute a waiver or release by a Debtor or Reorganized Debtor or its successor of any Claims, rights, or Causes of Action that any such entity or it successor or designee may possess against such holder; *provided*, *further*, that no setoff or recoupment shall be exercised on account of any of the Assigned Rights and Causes of Action.

**5.15    Rights and Powers of Disbursing Agent**.

(a)    The Disbursing Agent shall be empowered to:  (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; make all applicable distributions or payments provided for under this Plan; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers (A) as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any order issued after the Effective Date) or pursuant to this Plan or (B) as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of this Plan.

(b)    To the extent the Disbursing Agent is an Entity other than a Debtor or Reorganized Debtor, except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including for reasonable attorneys' and other professional fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

**5.16    Withholding and Reporting Requirements**.

(a)    In connection with this Plan and all distributions made hereunder, the Reorganized Debtors and the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions under this Plan shall be subject to any such withholding or reporting requirements.  In the case of a non-Cash distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax.  Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan.

(b)    Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under this Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any federal, state, local, or foreign taxing authority, including income, withholding, and other tax obligations, on account of such distribution. The Reorganized Debtors and the Disbursing Agent have the right, but not the obligation, to not make a distribution until

such holder has made arrangements satisfactory to any issuing or disbursing party for payment of any such tax obligations.

(c)     The Reorganized Debtors and the Disbursing Agent may require, as a condition to receipt of a distribution, that the holder of an Allowed Claim provide any information necessary to allow the distributing party to comply with any such withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority.  If the Reorganized Debtors or the Disbursing Agent make such a request and the holder fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtor and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.

**5.17**     **Credit for Distributions under Wildfire Assistance Program**.  If a holder of an Allowed Fire Claim has received any distribution from the Wildfire Assistance Program, such distribution shall be credited against any distribution to be made on account of such holder's Fire Claim under this Plan and in accordance with the terms of the Fire Trust Agreements.

## ARTICLE VI.

## MEANS FOR IMPLEMENTATION AND EXECUTION OF THE PLAN

**6.1**     **Restructuring Transactions; Effectuating Documents**.

(a)     Following the Confirmation Date or as soon as reasonably practicable thereafter, the Debtors or the Reorganized Debtors, as applicable, may take all actions, with the consent of the Plan Proponents, as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan or to obtain any of the Plan Funding (collectively, the "**Restructuring Transactions**"), including (i) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan, (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, pledge or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or federal law, (iv) the execution and delivery of the Plan Documents, (v) the issuance of securities, all of which shall be authorized and approved in all respects in each case without further action being required under applicable law, regulation, order, or rule, (vi) such other transactions that are necessary or appropriate to implement the Plan in the most tax efficient manner, and (vii) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

(b)     Each officer, or member of the board of directors, of the Debtors is (and each officer, or member of the board of directors of the Reorganized Debtors shall be) authorized to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including any action by the stockholders or directors of the Debtors or the Reorganized Debtors) except for those expressly required pursuant to the Plan.

(c)     All matters provided for herein involving the corporate structure of the Debtors or Reorganized Debtors, or any corporate action required by the Debtors or Reorganized Debtors in connection

herewith shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stockholders or directors of the Debtors or Reorganized Debtors, and with like effect as though such action had been taken unanimously by the stockholders of the Debtors or Reorganized Debtors.

**6.2** **Continued Corporate Existence**. Except as otherwise provided in this Plan (including pursuant to the Restructuring Transactions), the Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized. On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor, each Reorganized Debtor may, in its sole discretion, take such action as permitted by applicable law and such Reorganized Debtor's organizational documents, as such Reorganized Debtor may determine is reasonable and appropriate, including causing: (i) the legal name of a Reorganized Debtor to be changed; (ii) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter; or (iii) Reorganized HoldCo to amend its charter so as to prevent the acquisition, sale, or other transaction of any class or classes of stock of Reorganized HoldCo, other than pursuant to the Plan, for the purpose of preserving the tax attributes of the Reorganized Debtors if such acquisition, sale, or other transaction would result in an increase in the amount stock of Reorganized HoldCo beneficially owned (as determined for applicable tax purposes) by any person or group of persons that owns, or as a result of such acquisition, sale, or other transaction would own, at least 4.75% of any class or classes of stock of Reorganized HoldCo.

**6.3** **The Subrogation Wildfire Trust**.

(a) On or before the Effective Date, the Subrogation Wildfire Trust shall be established by the Subrogation Wildfire Trustee and on the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors shall fund the Subrogation Wildfire Trust as provided in Section 4.22(b) hereof. In accordance with the Subrogation Wildfire Trust Agreement and the Subrogation Wildfire Trust Claims Distribution Procedures, each of which shall become effective as of the Effective Date, the Subrogation Wildfire Trust shall administer, process, settle, resolve, liquidate, satisfy, and pay all Subrogation Wildfire Claims. All Subrogation Wildfire Claims shall be channeled to the Subrogation Wildfire Trust and shall be subject to the Channeling Injunction.

(b) Each trust comprising the Subrogation Wildfire Trust is intended to be treated, and shall be reported, as a "qualified settlement fund" for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes, to the extent applicable; *provided*, however, that the Reorganized Debtors may elect to treat any trust comprising the Subrogation Wildfire Trust as a "grantor trust" for U.S. federal income tax purposes, in which case each such trust shall be treated consistently for state and local tax purposes, to the extent applicable. The Subrogation Wildfire Trustee and all holders of Subrogation Wildfire Claims shall report consistently with the foregoing. The Subrogation Wildfire Trustee shall be the "administrator," within the meaning of Treasury Regulations Section 1.468B-2(k)(3), of the Subrogation Wildfire Trust and, in such capacity, the Subrogation Wildfire Trustee shall be responsible for filing all tax returns of the Subrogation Wildfire Trust and, out of the assets of the Subrogation Wildfire Trust, the payment of any taxes due with respect to trust assets or otherwise imposed on the Subrogation Wildfire Trust (including any tax liability arising in connection with the distribution of trust assets), and shall be permitted to sell any assets of the Subrogation Wildfire Trust to the extent necessary to satisfy such tax liability (including any tax liability arising in connection with such sale).

(c) Except as otherwise provided in the Subrogation Wildfire Trust Agreement, or the Subrogation Wildfire Claim Allocation Agreement, the Subrogation Wildfire Trustee will make the applicable distribution under the Subrogation Wildfire Trust Agreement and, subject to Bankruptcy Rule 2002, at: (i) the address of such holder on the books and records of the Debtors or their agents; (ii) the address provided by such holder on its most recent proof of claim, or (iii) the address in any written notice of address change delivered to the Debtors prior to the Effective Date, or the Subrogation Wildfire Trustee after the Effective Date, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001. In the event that any distribution to any holder is returned as undeliverable, no

distribution or payment to such holder shall be made unless and until the Subrogation Wildfire Trustee has been notified of the then-current address of such holder, at which time or as soon as reasonable practicable thereafter, such distribution shall be made to such holder without interest.

(d) The Subrogation Wildfire Trustee may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the Subrogation Wildfire Trust through the termination of the Subrogation Wildfire Trust.

**6.4** **Subrogation Wildfire Trustee**.

(a) Powers and Duties of Trustee. The powers and duties of the Subrogation Wildfire Trustee shall include, but shall not be limited to, those responsibilities vested in the Subrogation Wildfire Trustee pursuant to the terms of the Subrogation Trust Agreement, or as may be otherwise necessary and proper to (i) make distributions to holders of Subrogation Wildfire Claims in accordance with the terms of the Plan, Subrogation Trust Agreement, and Subrogation Wildfire Claim Allocation Agreement and (ii) carry out the provisions of the Plan relating to the Subrogation Wildfire Trust and the Subrogation Wildfire Claims. The Trustee shall maintain good and sufficient books and records relating to each Subrogation Wildfire Claim, including the identity of the owner of each Subrogation Wildfire Claim and the amount and date of all Distributions made on account of each such Subrogation Wildfire Claim.

(b) The Subrogation Wildfire Trustee shall cooperate fully with the Reorganized Debtors in connection with the preparation and filing by the Reorganized Debtors of any tax returns, claims for refunds, or other tax filings, and any tax proceedings, to the extent relating to any transfers to, distributions by, or the operations of the Subrogation Wildfire Trust.

**6.5** **Subrogation Trust Advisory Board**.

(a) Appointment of Subrogation Trust Advisory Board. The Subrogation Trust Advisory Board shall consist of three (3) initial members selected by holders of Subrogation Wildfire Claims in accordance with the Subrogation Trust Agreement and the Subrogation Wildfire Claim Allocation Agreement.

(b) Powers and Duties of Subrogation Trust Advisory Board. The Subrogation Trust Advisory Board shall, as and when requested by the Subrogation Wildfire Trustee, or as is otherwise either (i) required under the Plan, the Confirmation Order, the Subrogation Trust Agreement or (ii) contemplated by the Subrogation Wildfire Claim Allocation Agreement, consult with and advise the Subrogation Wildfire Trustee as to the administration and management of the Subrogation Wildfire Trust in accordance with the terms of this Plan, the Confirmation Order, and/or the Subrogation Trust Agreement.

(c) The Subrogation Wildfire Trust Advisory Board shall be appointed on the Effective Date. The rights and responsibilities of the Subrogation Wildfire Trust Advisory Board shall be set forth in the Subrogation Wildfire Trust Agreement.

**6.6** **The Fire Victim Trust**.

(a) On or before the Effective Date, the Fire Victim Trust shall be established. In accordance with the Plan, the Confirmation Order, the Fire Victim Trust Agreement and the Fire Victim Claims Resolution Procedures, the Fire Victim Trust shall administer, process, settle, resolve, liquidate, satisfy, and pay all Fire Victim Claims. All Fire Victim Claims shall be channeled to the Fire Victim Trust and shall be subject to the Channeling Injunction. The Fire Victim Trust shall be funded with the Aggregate Fire Victim Consideration.

(b) Each trust comprising the Fire Victim Trust is intended to be treated, and shall be reported, as a "qualified settlement fund" for U.S. federal income tax purposes and shall be treated

consistently for state and local tax purposes, to the extent applicable; *provided*, however, that the Reorganized Debtors may elect to treat any trust comprising the Fire Victim Trust as a "grantor trust" for U.S. federal income tax purposes, in which case each such trust shall be treated consistently for state and local tax purposes, to the extent applicable. The Fire Victim Trustee and all holders of Fire Victim Claims shall report consistently with the foregoing. The Fire Victim Trustee shall be the "administrator," within the meaning of Treasury Regulations Section 1.468B-2(k)(3), of the Fire Victim Trust and, in such capacity, the Fire Victim Trustee shall be responsible for filing all tax returns of the Fire Victim Trust and, out of the assets of the Fire Victim Trust, the payment of any taxes due with respect to trust assets or otherwise imposed on the Fire Victim Trust (including any tax liability arising in connection with the distribution of trust assets), shall be permitted to sell any assets of the Fire Victim Trust to the extent necessary to satisfy such tax liability (including any tax liability arising in connection with such sale).

(c)     On the Effective Date, the Fire Victim Claims Resolution Procedures shall become effective. As set forth more fully in the Fire Victim Trust Agreement and the Fire Victim Claims Resolution Procedures, the Fire Victim Trust shall receive a credit against any Fire Victim Claim for the amount that any holder of such Fire Victim Claim, its predecessor, successor, or assignee received or shall receive from any insurance company under and pursuant to the terms and coverage provisions of any insurance policy for losses resulting from a Fire.

### 6.7     Fire Victim Trustee

(a)     <u>Powers and Duties of Trustee</u>. The powers and duties of the Fire Victim Trustee shall include, but shall not be limited to, those responsibilities vested in the Fire Victim Trustee pursuant to the terms of the Fire Victim Trust Agreement, or as may be otherwise necessary and proper to (i) make distributions to holders of Fire Victim Claims in accordance with terms of the Plan and the Fire Victim Trust Agreement and (ii) carry out the provisions of the Plan relating to the Fire Victim Trust and the Fire Victim Claims. The Trustee shall maintain good and sufficient books and records relating to each Fire Victim Claim, including the identity of the owner of each Fire Victim Claim and the amount and date of all Distributions made on account of each such Fire Victim Claim.

(b)     The Fire Victim Trustee shall cooperate fully with the Reorganized Debtors in connection with the preparation and filing by the Reorganized Debtors of any tax returns, claims for refunds, or other tax filings, and any tax proceedings, to the extent relating to any transfers to, distributions by, or the operations of the Fire Victim Trust.

(c)     Except as otherwise provided in the Fire Victim Trust Agreement, or the Fire Victim Claims Resolution Procedures, the Fire Victim Trustee will make the applicable distribution under the Fire Victim Trust Agreement and, subject to Bankruptcy Rule 2002, at: (i) the address of such holder on the books and records of the Debtors or their agents; (ii) the address provided by such holder on its most recent proof of claim, or (iii) the address in any written notice of address change delivered to the Debtors prior to the Effective Date, or the Fire Victim Trustee after the Effective Date, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001. In the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Fire Victim Trustee has been notified of the then-current address of such holder, at which time or as soon as reasonable practicable thereafter, such distribution shall be made to such holder without interest.

(d)     Given that the amount of the Fire Victim Trust is limited, the Fire Victim Trustee shall provide for an appropriate payment reserve, in such trustee's reasonable business judgment, to ensure equal payment for all holders of Fire Victim Claims in accordance with applicable law. The Fire Victim Trustee shall release reserves only when appropriate and it is clear that claimants will receive equitable distributions as described below.

(e)     Unless otherwise ordered by the Bankruptcy Court, in order to maintain an appropriate reserve, the Fire Victim Trustee shall pay one or more interim distributions on Allowed Fire Victim Claims, reserving a final distribution on such claims until the end of Fire Victim Trust administration after equal percentage payments have been made on Allowed Fire Victim Claims.

(f)     In the event that there are remaining funds after payment of all claims of the Fire Victim Trust, the excess funds remaining in the Fire Victim Trust shall be paid to the Go-Forward Wildfire Trust.

(g)     The Fire Victim Trustee may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the Fire Victim Trust through the termination of the Fire Victim Trust.

**6.8     Fire Victim Trust Oversight Committee**

(a)     Appointment of Fire Victim Trust Oversight Committee.  The Fire Victim Trust Oversight Committee shall consist of the number of members and be appointed in accordance with the Fire Victim Trust Agreement. The Fire Victim Trust Oversight Committee shall be appointed on the Effective Date.

(b)     Powers and Duties of Fire Victim Trust Oversight Committee.  The Fire Victim Trust Oversight Committee shall consult with and advise the Fire Victim Trustee as to the administration and management of the Fire Victim Trust in accordance with the terms of this Plan, the Confirmation Order, and/or the Fire Victim Trust Agreement.  The rights and responsibilities of the Fire Victim Trust Oversight Committee shall be set forth in the Fire Victim Trust Agreement.

**6.9     Public Entities Segregated Defense Fund.**

(a)     On the Effective Date, the Reorganized Debtors shall fund the Public Entities Segregated Defense Fund in accordance with the terms of the Public Entities Plan Support Agreements.

(b)     The Public Entities Segregated Defense Fund shall be maintained by the Reorganized Debtors until the later of (i) the expiration of the applicable statute of limitations period for any and all Public Entities Third Party Claims and (ii) the conclusion of all litigation, including appeals, involving all Public Entities Third Party Claims.

**6.10     Ad Hoc Committee Professional Fees**.  On the Effective Date, as part of the good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, the Reorganized Debtors shall pay the reasonable and documented fees and expenses of the Ad Hoc Committee Professionals, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Ad Hoc Committee Professional Fees.

**6.11     Go-Forward Wildfire Fund.**

(a)     On the Effective Date, the Reorganized Debtors shall contribute, in accordance with the Wildfire Legislation (A.B. 1054), an initial contribution of approximately $4.8 billion and first annual contribution of approximately $193 million, to the Go-Forward Wildfire Fund in order to secure the participation of the Reorganized Debtors therein.

(b)     The Reorganized Debtors shall also be responsible for ongoing funding commitments to the Go-Forward Wildfire Fund as required by the terms thereof and the Wildfire Legislation (A.B. 1054).

### 6.12 __Officers and Board of Directors.__

(a)　__New Board of Reorganized Holdco.__　On the Effective Date and for a period of two (2) years thereafter, the New Board of Reorganized HoldCo shall consist of nine (9) directors, comprising the chief executive officer of Reorganized HoldCo and eight (8) other directors.　From the second anniversary of the Effective Date through the fifth anniversary of the Effective Date, the New Board of HoldCo shall consist of at least nine (9) directors and no more than eleven (11) directors.　The chief executive officer of Reorganized HoldCo shall be a director on the New Board of Reorganized HoldCo, but shall not be the chairperson of the New Board of Reorganized HoldCo.　The remaining directors of the New Board of Reorganized HoldCo shall be appointed on the Effective Date, as provided in the Plan Supplement, and elected annually thereafter in the following manner:

(i)　One (1) director shall be designated by IBEW Local 1245;

(ii)　One (1) director shall be designated by TURN, on behalf of ratepayers;

(iii)　One (1) director shall be designated by the Fire Victim Trust Oversight Committee; and

(iv)　Each remaining director shall be elected by the holders of the New HoldCo Common Stock.

(b)　New Board of the Reorganized Utility.　The New Board of the Reorganized Utility shall consist of the directors of the New Board of Reorganized HoldCo.　The chairperson of the New Board of Reorganized HoldCo shall not be the chairperson of the New Board of the Reorganized Utility.

(c)　The New Boards of Reorganized HoldCo and the Reorganized Utility shall consist of a diverse set of individuals (including, among other things, in compliance with the requirements of California State Bill-826).　The majority of the directors of each of the New Boards shall consist of Californians and individuals who have credentialed experience in the areas of utility operations, engineering, safety, regulation or clean energy.　The New Boards shall, among other things, satisfy the requirements of the Wildfire Legislation (A.B. 1054) and other applicable law, including with respect to directors having appropriate experience in safety, finance and utility operations.　The composition of the New Board shall be disclosed in the Plan Supplement in accordance with section 1129(a)(5) of the Bankruptcy Code.

(d)　The initial officers of each of the respective Reorganized Debtors on and after the Effective Date shall be identified in the Plan Supplement.

(e)　Except to the extent that a member of the board of directors of a Debtor continues to serve as a director of the respective Reorganized Debtor on and after the Effective Date, the members of the board of directors of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such director will be deemed to have resigned or shall otherwise cease to be a director of the applicable Debtor on the Effective Date.

(f)　Commencing on the Effective Date, the directors of each of the Reorganized Debtors shall be elected and serve pursuant to the terms of the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents. The New Organizational Documents shall incorporate the terms provided in this section.

**6.13** [**Management Incentive Plan**. On or after the Effective Date, the Management Incentive Plan may be established and implemented at the discretion of the New Board and in compliance with the Wildfire Legislation (A.B. 1054).][12]

**6.14** <u>Cancellation of Existing Securities and Agreements</u>.

(a) Except for the purpose of enabling holders of Allowed Claims to receive a distribution under the Plan as provided herein and except as otherwise set forth in this Plan, the Plan Supplement or the Confirmation Order, on the Effective Date, all agreements, instruments, and other documents evidencing any prepetition Claim or and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect. For the avoidance of doubt, in accordance with applicable sections of the Plan, none of the HoldCo Common Interests, the HoldCo Other Interests, the Utility Long-Term Senior Notes, Utility Preferred Interests, or the Utility Common Interests shall be cancelled pursuant to the Plan. The holders of, or parties to, such cancelled instruments, Securities, and other documentation shall have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan.

(b) The Funded Debt Trustees, except for the Utilities Senior Notes Trustee, solely in its capacity as the indenture trustee for the Utility Long-Term Senior Notes, shall be released and discharged from all duties and responsibilities under the applicable Funded Debt Documents; *provided*, that notwithstanding the releases in Article X of the Plan, the entry of the Confirmation Order or the occurrence of the Effective Date, each of the Funded Debt Documents or agreement that governs the rights of the holder of a Claim or Interest shall continue in effect to the extent necessary to: (i) enforce the rights, Claims, and interests of the Funded Debt Trustees thereto vis-a-vis any parties other than the Released Parties; (ii) allow the holders of Funded Debt Claims, as applicable, to receive distributions under the Plan, to the extent provided for under the Plan; (iii) appear to be heard in the Chapter 11 Cases or in any proceedings in this Court or any other court; (iv) preserve any rights of the Funded Debt Trustees to payment of fees, expenses, and indemnification obligations from or on any money or property to be distributed in respect of the Allowed Funded Debt Claims, solely to the extent provided in the Plan; and (v) enforce any obligation owed to the Funded Debt Trustees under the Plan.

**6.15** <u>Cancellation of Certain Existing Security Agreements</u>. Promptly following the payment in full or other satisfaction of an Allowed Other Secured Claim, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors, as applicable, any Collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

**6.16** <u>Issuance of New HoldCo Common Stock</u>. Following confirmation of the Plan, the Debtors shall enter into the New HoldCo Common Stock Purchase Agreement. On the Effective Date, Reorganized HoldCo shall consummate the New HoldCo Common Stock Investment and issue the New HoldCo Common Stock on the terms set forth in the New HoldCo Common Stock Purchase Agreement, without the need for any further corporate, limited liability company, or shareholder action. All of the New HoldCo Common Stock distributed under the Plan shall be duly authorized, validly issued, and fully paid and non-assessable. On the Effective Date, the Reorganized Debtors shall issue New HoldCo Common Stock valued at $12.75 billion (at plan value) to the Fire Victim Trust as provided herein and the Subrogation Wildfire Trust to the extent applicable, with such New HoldCo Common Stock representing

---

[12] A Management Incentive Plan may be necessary to satisfy the management compensation requirements under the Wildfire Legislation (A.B. 1054). The Plan Proponents are not aware if the Debtors have already prepared a Management Incentive Plan. The terms of the Management Incentive Plan are to be determined.

40.6% of the post-Effective Date HoldCo Common Interests on a fully diluted basis (assuming that the total value of New HoldCo Common Stock issued to the Fire Victim Trust as part of the Aggregate Fire Victim Consideration and the Subrogation Wildfire Trust pursuant to Section 4.23 of the Plan on the Effective Date is equal to $12.75 billion); *provided*, that such fully diluted ownership percentage will be adjusted according to the final amount of the Aggregate Fire Victim Consideration determined as provided in Section 1.9.

**6.17    Issuance of New HoldCo Senior Notes**.  Following confirmation of the Plan, the Debtors shall enter into the New HoldCo Senior Notes Documents.  On the Effective Date, Reorganized HoldCo shall consummate the New HoldCo Senior Notes Investment and issue the New HoldCo Senior Notes on the terms set forth in the New HoldCo Senior Notes Purchase Agreement and the New HoldCo Senior Notes Documents, without the need for any further corporate, limited liability company, or shareholder action.

**6.18    Issuance of New Utility Secured Notes**.  Following confirmation of the Plan, the Debtors shall enter into the New Utility Secured Notes Documents.  On the Effective Date, the Reorganized Utility shall consummate the New Utility Secured Notes Investment and issue the New Utility Secured Notes to (a) third party investors and (b) to the extent the Reorganized Utility fails to issue all or a portion of the New Utility Secured Notes to third party investors, the members of the Ad Hoc Committee in the amount of any such shortfall on the terms set forth in the New Utility Secured Notes Purchase Agreement and the New Utility Secured Notes Documents, without the need for any further corporate, limited liability company, or shareholder action.

**6.19    Payment of Commitment Fees**.  On the Effective Date, the Reorganized Debtors will pay the Commitment Fees applicable to the New HoldCo Common Stock Investment, the New HoldCo Senior Notes Investment, and the New Utility Secured Notes Investment to the Commitment Parties as set forth in the Commitment Letter.

**6.20    Rights Offering**.  Following approval by the Bankruptcy Court of the Rights Offering Procedures and, if the offer, issuance and distribution of Securities pursuant to the Rights Offering is to be registered under the Securities Act, effectiveness of an appropriate registration statement registering such offer, issuance and distribution under the Securities Act, the Debtors shall commence and consummate the Rights Offering in accordance with the Rights Offering Procedures.  New HoldCo Common Stock shall be issued to each Eligible Offeree that exercises its respective subscription rights pursuant to the Rights Offering Procedures and the Plan.  The consummation of the Rights Offering shall be conditioned on the occurrence of the Effective Date.  Amounts held by the subscription agent with respect to the Rights Offering prior to the Effective Date shall not be entitled to any interest on account of such amounts and no Eligible Offeree participating in the Rights Offering shall have any rights in New HoldCo Common Stock until the Rights Offering is consummated.

**6.21    Prohibition Against Rate Increases**.  The Debtors and the Reorganized Debtors will not seek to recover the contributions made to the Fire Victim Trust, the Subrogation Wildfire Trust or the Go-Forward Wildfire Fund, either directly or indirectly, through rate increases.

**6.22    Key Operating Businesses**.  The New Organizational Documents shall provide that the Reorganized Debtors shall not sell, and shall oppose any attempt to municipalize, any portion of the operating business or assets, for a period of five (5) years after the Effective Date; *provided*, *however*, that this provision shall not apply to any owned, including currently occupied, real estate.  For the avoidance

of doubt, this restriction will not limit any change in control transaction relating to Reorganized HoldCo, including, without limitation, a merger, tender offer or similar transaction.

**6.23** **Rate Neutrality**. To ensure the rate neutrality of the Plan, the Debtors and Reorganized Debtors:

(a) Shall not seek a return of equity exceeding 10.25% or to alter the current authorized capital structure for a period of three (3) years after the Effective Date;

(b) Shall ensure that the cost of debt capital passed through to ratepayers under the Plan shall be equal to or less than the costs currently passed through to ratepayers;

(c) Shall not seek to recover for any Fire Claims from ratepayers; and

(d) Shall neither issue nor seek authority to issue securitized bonds or any similar instruments secured by statutorily-imposed ratepayer charges, whether under S.B. 901, Wildfire Legislation (A.B. 1054) or otherwise, in connection with the payment of Fire Claims or the contributions to the Go-Forward Wildfire Fund.

**6.24** **Utility Consumer Rate Credit**. The Reorganized Debtors shall provide for the sale of certain key real estate assets of the Reorganized Debtors to allow for up to a $1 billion rate credit for the benefit of all PG&E customers, to be applied equally over a period of 10 years from the Effective Date.

**6.25** **Rebranding**. For the first sixty (60) days following the Effective Date, all employees of the Reorganized Utility shall have the opportunity to submit recommendations for renaming or rebranding the Reorganized Utility. If, after a period of ninety (90) days following the Effective Date, no employee recommendation is selected for renaming or rebranding the Reorganized Utility, the Reorganized Utility shall effect a change of name to "Golden State Power Light & Gas Co.," and the Reorganized PG&E Corp. shall effect a change of name to "GSPL&G Corp."

**6.26** **Securities Act Registrations or Exemptions**.

(a) The offer, issuance and distribution of the New HoldCo Common Stock, New HoldCo Senior Notes, New Utility Secured Notes and other Securities as provided hereunder may be exempt from registration under (i) the Securities Act of 1933 and all rules and regulations promulgated thereunder and (ii) any state or local law requiring registration for the offer, issuance, or distribution of Securities, pursuant to section 1145 of the Bankruptcy Code, without further act or action by any Entity, pursuant to another available exemption from registration, such as section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder, or pursuant to Article III of the Securities Act, or such offer, issuance and distribution may be registered under the Securities Act pursuant to an appropriate registration statement. Any offer, issuance and distribution of Securities pursuant to the Commitment Letter may be exempt from registration pursuant to section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder.

(b) Under section 1145 of the Bankruptcy Code, any securities issued under the Plan that are exempt from such registration pursuant to section 1145(a) of the Bankruptcy Code will be freely tradable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act of 1933, (ii) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments, (iii) the restrictions, if any, on the transferability of such securities and instruments, including any restrictions on the transferability under the terms of the New Organizational Documents, (iv) any applicable procedures of DTC, and (v) applicable regulatory approval.

**ARTICLE VII.**

**PROCEDURES FOR DISPUTED CLAIMS**

**7.1** **Objections to Claims**.  Except as otherwise provided herein, in the Claims Resolution Procedures, the [Subrogation Claims RSA], and in the Fire Trust Agreements, the Reorganized Debtors, with the consent of the Plan Proponents shall be entitled to object to Claims other than Fire Claims, which objections shall be governed by the Fire Victim Claims Resolution Procedures, and other than Subrogation Wildfire Claims, which objections shall be governed by the Subrogation Wildfire Claims Resolution Procedures.  The Subrogation Wildfire Trustee shall be entitled to object to Subrogation Wildfire Claims.  Any objections to Claims shall be served and filed on or before the later of (i) one-hundred and eighty (180) days after the Effective Date and (ii) such later date as may be fixed by the Bankruptcy Court (as the same may be extended by the Bankruptcy Court for cause shown).

**7.2** **Resolution of Disputed Administrative Expense Claims and Disputed Claims**.  Except as otherwise provided for in the Plan, in the Claims Resolution Procedures or in the Fire Trust Agreements, on and after the Effective Date, the Reorganized Debtors, with the consent of the Plan Proponents shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Disputed Administrative Expense Claims or Disputed Claims and to compromise, settle, or otherwise resolve any Disputed Administrative Expense Claims and Disputed Claims without approval of the Bankruptcy Court, other than with respect to any Professional Fee Claims.  On and after the Effective Date, the Subrogation Wildfire Trustee shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Disputed Subrogation Wildfire Claims without approval of the Bankruptcy Court.  Notwithstanding the foregoing, and for the avoidance of doubt, Subrogation Wildfire Claims and Fire Victim Claims may only be compromised, settled, or resolved pursuant to the applicable Claims Resolution Procedures and Fire Trust Agreement.

**7.3** **Payments and Distributions with Respect to Disputed Claims**.  Notwithstanding anything herein to the contrary, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim (including on account of the non-Disputed portion of such Claim) unless and until such Disputed Claim becomes an Allowed Claim.

**7.4** **Distributions After Allowance**.  After such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the holder thereof shall be entitled to distributions, if any, to which such holder is then entitled as provided in this Plan.  Such distributions shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim (or portion thereof) becomes a Final Order.

**7.5** **Disallowance of Claims**.  Any Claims held by an Entity from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, as determined by a Final Order, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Final Order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors.  Except as otherwise provided herein or by an order of the Bankruptcy Court, all proofs of Claim filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the

Bankruptcy Court, other than a claim for damages arising from the rejection of an executory contract or unexpired lease.

## ARTICLE VIII.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 8.1 General Treatment.

(a)     As of, and subject to, the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases of the Reorganized Debtors shall be deemed assumed, unless such executory contract or unexpired lease (i) was previously assumed or rejected by the Debtors, pursuant to a Final Order, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (iii) is the subject of a motion to assume, assume and assign, or reject filed by the Debtors, with the consent of the Plan Proponents, on or before the Confirmation Date, or (iv) is specifically designated as an executory contract or unexpired lease to be rejected on the Schedule of Rejected Contracts, which shall be in form and substance acceptable to the Plan Proponents.

Notwithstanding the foregoing, as of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all power purchase agreements, renewable energy power purchase agreements, and Community Choice Aggregation servicing agreements of the Debtors shall be deemed assumed.

(b)     Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments, or rejections provided for in this Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease assumed pursuant to this Plan shall vest in, and be fully enforceable by, the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of this Plan, any order of the Bankruptcy Court authorizing and providing for its assumption or assumption and assignment, or applicable law.

### 8.2 Determination of Cure Disputes and Deemed Consent.

(a)     Any monetary defaults under an assumed or assumed and assigned executory contract or unexpired lease, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount, as reflected in the applicable cure notice, in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such executory contracts or unexpired leases may otherwise agree.

(b)     At least fourteen (14) days before the Confirmation Hearing, the Debtors, with the consent of the Plan Proponents shall distribute, or cause to be distributed, assumption and cure notices to the applicable third parties.  **Any objection by a counterparty to an executory contract or unexpired lease to the proposed assumption, assumption and assignment, or related Cure Amount must be filed, served, and actually received by the Debtors at least seven (7) days before the Confirmation Hearing**. Any counterparty to an executory contract or unexpired lease that fails to object timely to the proposed assumption, assumption and assignment, or Cure Amount will be deemed to have assented to such assumption, assumption and assignment, or Cure Amount.  Notwithstanding anything herein to the contrary, in the event that any executory contract or unexpired lease is removed from the Schedule of Rejected Contracts after such fourteen (14)-day deadline, a cure notice with respect to such executory contract or unexpired lease will be sent promptly to the counterparty thereof and a noticed hearing set to consider whether such executory contract or unexpired lease can be assumed or assumed and assigned, as applicable.

(c)     In the event of an unresolved dispute regarding (i) any Cure Amount, (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within

the meaning of section 365 of the Bankruptcy Code) under the executory contract or unexpired lease to be assumed, or (iii) any other matter pertaining to assumption, assumption and assignment, or the Cure Amounts required by section 365(b)(1) of the Bankruptcy Code, such dispute shall be resolved by a Final Order (which order may be the Confirmation Order).

(d)     If the Bankruptcy Court makes a determination regarding any of the matters set forth in Section 8.2(c) above with respect to any executory contract or unexpired lease is greater than the amount set forth in the applicable cure notice, as set forth in Section 8.8(a) below, the Debtors or Reorganized Debtors, as applicable, with the consent of the Plan Proponents, shall have the right to alter the treatment of such executory contract or unexpired lease, including, without limitation, to add such executory contract or unexpired lease to the Schedule of Rejected Contracts, in which case such executory contract or unexpired lease shall be deemed rejected as of the Effective Date.

(e)     Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims and Causes of Action against any Debtor or defaults by any Debtor, whether monetary or nonmonetary, including those arising under sections 503(b)(9) or 546(c) of the Bankruptcy Code, defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired lease. Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

**8.3     Rejection Damages Claims**. **In the event that the rejection of an executory contract or unexpired lease hereunder results in damages to the other party or parties to such contract or lease, any Claim for such damages, if not heretofore evidenced by a timely filed proof of Claim, shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors, or their respective estates, properties or interests in property, unless a proof of Claim is filed with the Bankruptcy Court and served upon the Debtors or the Reorganized Debtors, as applicable, and the Plan Proponents no later than thirty (30) days after the later of (i) the Confirmation Date or (ii) the effective date of the rejection of such executory contract or unexpired lease, as set forth on the Schedule of Rejected Contracts or order of the Bankruptcy Court. The Confirmation Order shall constitute the Bankruptcy Court's approval of the rejection of all the leases and contracts identified in the Schedule of Rejected Contracts.**

**8.4     Assumption of Employee Benefit Plans**. On the Effective Date, all Employee Benefit Plans are deemed to be, and shall be treated as, executory contracts under this Plan and, on the Effective Date, shall be assumed with their existing terms pursuant to sections 365 and 1123 of the Bankruptcy Code; *provided*, *however*, the Debtors and Reorganized Debtors, as applicable, shall make any and all contributions necessary to satisfy any minimum funding requirements under 29 U.S.C. § 1082 and 26 U.S.C. § 430; *provided, further*, that the following Employee Benefit Plans shall be modified on or a reasonable period after the Effective Date:

(a)     The New Boards shall revise the current long term incentive compensation plans of Reorganized HoldCo and the Reorganized Utility by increasing the proportion of awards subject to performance-based vesting criteria. Performance criteria for awards shall be modified by increasing or implementing performance weightings that are based on achievement of public safety, infrastructure hardening and other related strategic long term objectives.

**8.5** **Collective Bargaining Agreements**.

(a)     On or prior to the Effective Date, and subject to the occurrence of the Effective Date, the Reorganized Debtors shall assume the Collective Bargaining Agreements, including as modified herein.

(b)     Upon confirmation, the Debtors shall enter into an agreement with IBEW Local 1245 with such agreement to become effective only upon the occurrence of the Effective Date, extending the IBEW Collective Bargaining Agreements until December 31, 2023 with such extension to include (i) a reasonable and appropriate general wage increase for each of the extension years (2022 and 2023) deemed to be appropriate,  reasonable, consistent with past practice and included in go-forward allowed rates; (ii) a prohibition on any involuntary layoffs during the term of the extended IBEW Collective Bargaining Agreements; *provided*, that such prohibition will not limit any individual employee terminations or displacements and will not apply to contract workforce or non-bargaining unit members; and (iii) reemphasize the Reorganized Debtors' and Local 1245's commitment to maintaining a spirit of cooperation between labor and management.

**8.6** **Insurance Policies.**

(a)     All Insurance Policies (including all D&O Liability Insurance Policies and tail coverage liability insurance) to which any Debtor is a party as of the Effective Date shall be deemed to be and treated as executory contracts and shall be assumed by the applicable Debtors or Reorganized Debtor and shall continue in full force and effect thereafter in accordance with their respective terms.

**8.7** **Reservation of Rights.**

(a)     The Plan Proponents may amend the Schedule of Rejected Contracts and any cure notice until the later of (i) through 4:00 p.m. (Pacific Time) on the Business Day immediately prior to the commencement of the Confirmation Hearing or (ii) if Section 8.2(d) is applicable, the Business Day seven (7) Business Days following the determination by the Bankruptcy Court, in order to add, delete, or reclassify any executory contract or unexpired lease; *provided*, that if the Confirmation Hearing is adjourned for a period of more than two (2) consecutive calendar days, the Plan Proponents' right to amend such schedules and notices shall be extended to 4:00 p.m. (Pacific Time) on the Business Day immediately prior to the adjourned date of the Confirmation Hearing, with such extension applying in the case of any and all subsequent adjournments of the Confirmation Hearing.

(b)     Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Supplement, nor anything contained in this Plan or in the Plan Documents, will constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors or the Reorganized Debtors or their respective affiliates has any liability thereunder.

(c)     Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Reorganized Debtors under any executory or non-executory contract or unexpired or expired lease.

(d)     Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or unexpired or expired lease.

**8.8** **Modifications, Amendments, Supplements, Restatements, or Other Agreements**.  Unless otherwise provided in the Plan, each executory contract or unexpired lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such executory contract or unexpired lease, and executory contracts and unexpired

leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

## ARTICLE IX.

## EFFECTIVENESS OF THE PLAN

9.1 **Conditions Precedent to Confirmation of the Plan**. The following are conditions precedent to confirmation of the Plan:

(a) The Disclosure Statement Order has been entered by the Bankruptcy Court;

(b) The Bankruptcy Court shall have entered the Confirmation Order in form and substance acceptable to the Plan Proponents;

(c) The Commitment Letter shall be in full force and effect and binding on all parties thereto, and shall not have been terminated by the parties thereto.

9.2 **Conditions Precedent to the Effective Date**. The following are conditions precedent to the Effective Date of the Plan:

(a) The Confirmation Order, in form and substance acceptable to the Plan Proponents and the Commitment Parties representing the Commitment Threshold, shall have been entered by the Bankruptcy Court no later than the June 30, 2020 date set forth in section 3292(b) of the Wildfire Legislation (A.B. 1054) or any extension of such date;

(b) The Confirmation Order, in form and substance acceptable to the Plan Proponents and the Commitment Parties representing the Commitment Threshold, shall be in full force and effect and have become a final order, and no stay thereof shall be in effect;

(c) The Debtors or Plan Proponents, as applicable, shall have implemented all transactions contemplated by this Plan;

(d) All documents and agreements necessary to consummate the Plan shall have been effected or executed, and all Plan Documents shall be in form and substance acceptable to the Plan Proponents and the Commitment Parties representing the Commitment Threshold;

(e) The Debtors and/or Plan Proponents, as applicable, shall have elected, received Bankruptcy Court approval, and satisfied all conditions, to participate in and fund the Go-Forward Wildfire Fund;

(f) The Debtors or Plan Proponents, as applicable, shall have obtained the Plan Funding;

(g) The Debtors and/or Plan Proponents, as applicable, shall have received all authorizations, consents, legal and regulatory approvals, rulings, letters, no-action letters, opinions, or documents that are necessary to implement and consummate the Plan and the Plan Funding and that are required by law, regulation, or order, including the CPUC Approval, FERC Approval and NRC Approval, and each such approval shall remain in full force and effect;

(h) The Fire Trusts shall have been established in accordance with the terms provided in the Plan, the Trustees for each shall have been appointed, the members of the Fire Victim Trust Oversight Committee and the Subrogation Wildfire Trust Advisory Board shall have been appointed and the Fire

Victim Trust Agreement and Claims Resolution Procedures shall be in form and substance acceptable to the Plan Proponents and the Commitment Parties representing the Commitment Threshold;

(i)     The New HoldCo Common Stock, New HoldCo Senior Notes and the New Utility Secured Notes shall have been issued in accordance with the terms of the Plan and the applicable Plan Supplement Documents and in a manner acceptable to the Plan Proponents and the Commitment Parties representing the Commitment Threshold;

(j)     The Plan shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section 12.6 of the Plan.

**9.3     Satisfaction of Conditions**.  Except as otherwise provided herein, any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  The determination of whether the conditions precedent in Section 9.1 and 9.2 have occurred will be made by the Plan Proponents and the Commitment Parties representing the Commitment Threshold.  If the Plan Proponents collectively determine that any of the conditions precedent set forth in Sections 9.1 or 9.2 hereof cannot be satisfied and the occurrence of such conditions is not waived pursuant to Section 9.4, then the Plan Proponents shall file a notice of the failure of the Effective Date with the Bankruptcy Court.

**9.4     Waiver of Conditions**.  The conditions set forth in Sections 9.1 or 9.2 may be waived or modified by only by the Plan Proponents, with the consent of the Commitment Parties representing the Commitment Threshold (such consent not to be unreasonably withheld, conditioned or delayed), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

**9.5     Effect of Non-Occurrence of Effective Date**.  If the Effective Date does not occur on or before August 30, 2020, then:  (a) the Plan will be null and void in all respects; and (b) nothing contained in the Plan or the Disclosure Statement shall:  (i) constitute a waiver or release of any Claims, Interests, or Causes of Action by an Entity; (ii) prejudice in any manner the rights of any Debtor or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Ad Hoc Committee, Tort Claimants Committee or any other Entity; *provided*, that the August 30, 2020 deadline for the occurrence of the Effective Date may be extended for up to 90 days by the Plan Proponents and the Commitment Parties representing the Commitment Threshold, so long as all conditions to the Effective Date other than under Section 9.2(g) have been satisfied (other than those conditions that by their nature can only be satisfied on the Effective Date but are capable of being satisfied at such time).

## ARTICLE X.

## EFFECT OF CONFIRMATION

**10.1     Binding Effect**.  Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of this Plan shall bind every holder of a Claim against or Interest in any Debtor and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether the Claim or Interest of such holder is impaired under this Plan and whether such holder has accepted this Plan.

**10.2     Vesting of Assets**.  Upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all assets and property of the Debtors shall vest in the Reorganized Debtors, as applicable, free and clear of all Claims, Liens, charges, and other interests, except as otherwise provided herein.  The Reorganized Debtors may operate their businesses and use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were

no pending cases under any chapter or provision of the Bankruptcy Code, except as otherwise provided herein.

**10.3** **Release and Discharge of Debtors**. Upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided herein, each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date. Upon the Effective Date, all such Persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or Interest in the Debtors.

**10.4** **Term of Injunctions or Stays**. Unless otherwise provided herein or in a Final Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay. The Trading Order shall remain enforceable as to transfers through the Effective Date with respect to those persons having "beneficial ownership" of "PG&E Stock" (as such terms are defined in Trading Order). Accordingly, the Trading Order has no applicability or effect with respect to the trading of stock of Reorganized HoldCo after the Effective Date.

**10.5** **Injunction Against Interference with Plan**. Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan; *provided*, *that* nothing herein or in the Confirmation Order shall preclude, limit, restrict or prohibit any party in interest from seeking to enforce the terms of the Plan, the Confirmation Order, or any other agreement or instrument entered into or effectuated in connection with the consummation of the Plan.

**10.6** **Injunction**.

(a) Except as otherwise provided in this Plan or in the Confirmation Order, as of the entry of the Confirmation Order but subject to the occurrence of the Effective Date, all Persons who have held, hold, or may hold Claims or Interests are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Reorganized Debtor, or an estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including, any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Reorganized Debtor, or an estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Reorganized Debtor, or an estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of this Plan; *provided*, that nothing contained herein shall preclude such Persons who have held, hold, or may hold Claims against a Debtor or an estate from exercising their rights, or obtaining benefits, pursuant to and consistent with the terms of this Plan, the Confirmation Order, or any other

agreement or instrument entered into or effectuated in connection with the consummation of the Plan; *provided further* that this Section 10.6 shall not apply to holders of Ghost Ship Fire Claims or Workers' Compensation Claims.

(b)    By accepting distributions pursuant to this Plan, each holder of an Allowed Claim will be deemed to have affirmatively and specifically consented to be bound by this Plan, including, the injunctions set forth in this Section.

**10.7    Channeling Injunction**.

(a)    The sole source of recovery for holders of Subrogation Wildfire Claims and Fire Victim Claims shall be from the Subrogation Wildfire Trust and the Fire Victim Trust, as applicable.  The holders of such Claims shall have no recourse to or Claims whatsoever against the Reorganized Debtors or their assets and properties.  Consistent with the foregoing all Persons that have held or asserted, or that hold or assert any Subrogation Wildfire Claim or Fire Victim Claim shall be permanently and forever stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery from any Reorganized Debtor or its assets and properties with respect to any Fire Claims, including all of the following actions:

(i)    commencing, conducting, or continuing, in any manner, whether directly or indirectly, any suit, action, or other proceeding of any kind in any forum with respect to any such Fire Claim, against or affecting any Reorganized Debtor, or any property or interests in property of any Reorganized Debtor with respect to any such Fire Claim;

(ii)    enforcing, levying, attaching, collecting or otherwise recovering, by any manner or means, or in any manner, either directly or indirectly, any judgment, award, decree or other order against any Reorganized Debtor or against the property of any Reorganized Debtor with respect to any such Fire Claim;

(iii)    creating, perfecting, or enforcing in any manner, whether directly or indirectly, any Lien of any kind against any Reorganized Debtor or the property of any Reorganized Debtor with respect to any such Fire Claims;

(iv)    asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, whether directly or indirectly, against any obligation due to any Reorganized Debtor or against the property of any Reorganized Debtor with respect to any such Fire Claim; and

(v)    taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents, with respect to any such Fire Claim.

(b)    **Reservations**.  Notwithstanding anything to the contrary in this Section 10.7 of the Plan, this Channeling Injunction shall not enjoin:

(i)    the rights of holders of Subrogation Wildfire Claims and Fire Victim Claims to the treatment afforded them under the Plan, including the right to assert such Claims in accordance with the applicable Fire Trust Agreements solely against the applicable Fire Trust whether or not there are funds to pay such Fire Claims; and

(ii)    the Fire Trusts from enforcing their rights under the Fire Trust Agreements.

(c) **Modifications**. There can be no modification, dissolution, or termination of the Channeling Injunction, which shall be a permanent injunction.

(d) **No Limitation on Channeling Injunction**. Nothing in the Plan, the Confirmation Order, or the Fire Trust Agreements shall be construed in any way to limit the scope, enforceability, or effectiveness of the Channeling Injunction provided for herein and in the Confirmation Order.

(e) **Bankruptcy Rule 3016 Compliance**. The Debtors' compliance with the requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

**10.8** **Exculpation**. **Notwithstanding anything herein to the contrary, and to the maximum extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Claim, Interest, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, loss, remedy, or liability for any claim (including, but not limited to, any claim for breach of any fiduciary duty or any similar duty) in connection with or arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of the Public Entities Plan Support Agreements, the Commitment Letter, [the [Subrogation Claims RSA]], the DIP Facilities, the Disclosure Statement, the Plan, the Restructuring Transactions, the Fire Trusts (including the Plan Documents, the Claims Resolution Procedures and the Fire Trust Agreements), or any agreement, transaction, or document related to any of the foregoing, or the solicitation of votes for, or confirmation of, this Plan; the funding of this Plan; the occurrence of the Effective Date; the administration of this Plan or the property to be distributed under this Plan; any membership in (including, but not limited to, on an *ex officio* basis), participation in, or involvement with the Statutory Committees; the issuance of Securities under or in connection with this Plan; or the transactions in furtherance of any of the foregoing; except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan. The Exculpated Parties and each of their respective affiliates, agents, directors, officers, employees, advisors, and attorneys have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distributions pursuant to this Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan, including the issuance of Securities thereunder. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability. Nothing in this Section or this Plan shall be deemed a release of any right, claim, or defense any holder of a Fire Victim Claim has against such holder's insurer, or such insurer's rights, claims, or defenses related thereto.[13]**

**10.9** **Releases**.

(a) *Releases by the Debtors*. **As of and subject to the occurrence of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce this Plan and the Plan Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, the service of the Released Parties to facilitate the reorganization of the Debtors, the implementation of the Restructuring, and except as otherwise provided in this Plan or in the Confirmation Order, the Released Parties are deemed forever released and discharged, to the**

---

[13] The exculpation and release provisions of this Plan currently do not apply to the holders of Subrogation Wildfire Claims or the Consenting Subrogation Creditors and are to be determined.

maximum extent permitted by law and unless barred by law, by the Debtors, the Reorganized Debtors, and the Debtors' estates, in each case on behalf of themselves and their respective successors, assigns, and representatives and any and all other Entities who may purport to assert any Cause of Action derivatively, by or through the foregoing Entities, from any and all claims, interests, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, remedies, or liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or the Debtors' estates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, or the Debtors' estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Fires, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the DIP Facilities, the Plan Funding, the Restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Restructuring Transactions, the Public Entities Plan Support Agreements, the Commitment Letter, the negotiation, formulation, or preparation of the Disclosure Statement and this Plan and related agreements, instruments, and other documents (including the Plan Documents, the Claims Resolution Procedures, the Fire Trust Agreements, Public Entities Plan Support Agreements, and the Commitment Letter), the solicitation of votes with respect to this Plan, any membership (including, but not limited to, on an *ex officio* basis), participation in, or involvement with the Statutory Committees, or any other act or omission, transaction, agreement, event, or other occurrence, and in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan; *provided*, that notwithstanding anything to the contrary herein, no Released Party or Exculpated Party shall be released or exculpated, as the case may be, from any Cause of Action to the extent it is included within the Assigned Rights and Causes of Action.[14]

        (b)     *Releases by Holders of Claims and Interests*.  As of and subject to the occurrence of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Plan Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties, are deemed forever released and discharged, to the maximum extent permitted by law and unless barred by law, by the Releasing Parties from any and all claims, interests, obligations, suits, judgments, damages, demands, rights, Causes of Action, losses, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, and any claims for breach of any fiduciary duty (or any similar duty), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such holders or their affiliates (to the extent such affiliates can be bound) would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Fires, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the DIP Facilities, the Plan Funding, the Restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Restructuring Transactions, the Public Entities Plan Support Agreement, the Commitment Letter, the negotiation, formulation, or

---

[14] The exculpation and release provisions of this Plan currently do not apply to the holders of Subrogation Wildfire Claims or the Consenting Subrogation Creditors and are to be determined.

preparation of the Disclosure Statement, the Plan and related agreements, instruments, and other documents (including the Plan Documents, the Claims Resolution Procedures, the Fire Trust Agreements, Public Entities Plan Support Agreements, and the Commitment Letter), the solicitation of votes with respect to the Plan, any membership in (including, but not limited to, on an *ex officio* basis), participation in, or involvement with the Statutory Committees, or any other act or omission, transaction, agreement, event, or other occurrence, and in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. Notwithstanding the above, the holders of Workers' Compensation Claims retain the right to assert such Claims against the Reorganized Debtors in accordance with the terms of the Plan; the holders of Fire Victim Claims retain the right to pursue any Claim for policy benefits he, she or it may have under an insurance policy issued to such holder of a Fire Victim Claim; *provided,* that notwithstanding anything to the contrary herein, no Released Party or Exculpated Party shall be released or exculpated, as the case may be, from any Cause of Action to the extent it is included within the Assigned Rights and Causes of Action, and the Debtors shall not be released from liability for the Fire Claims, and instead shall remain subject to liability, up to the amount of available coverage under any applicable Insurance Policy, to the extent necessary to trigger such coverage.[15]

(c)     *Only Consensual Non-Debtor Releases*. For the avoidance of doubt and notwithstanding any other provision of this Plan, nothing in the Plan is intended to, nor shall the Plan be interpreted to, effect a nonconsensual release by a holder of a Claim in favor of a party that is not a Debtor, it being acknowledged that such holder shall be deemed to release a party that is not a Debtor solely to the extent that such holder consensually elects to provide such a release in accordance with the opt-in release procedures set forth herein or in any applicable Ballot. The holder of a Claim shall receive the same amount of consideration under the Plan whether or not such holder elects to release a party that is not a Debtor.

(d)     *Release of Liens*. Except as otherwise specifically provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, including the Plan Documents, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtors.

(e)     *Waiver of Statutory Limitations on Releases*. Each releasing party in each of the releases contained in the Plan (including under Article X of the Plan) expressly acknowledges that although ordinarily a general release may not extend to claims which the releasing party does not know or suspect to exist in his favor, which if known by it may have materially affected its settlement with the party released, each releasing party has carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or claims. Without limiting the generality of the foregoing, each releasing party expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known by it may have materially affected its settlement with the released party, including the provisions of California Civil Code section 1542. The releases contained

---

[15] The exculpation and release provisions of this Plan currently do not apply to the holders of Subrogation Wildfire Claims or the Consenting Subrogation Creditors and are to be determined.

**in this Article X of the Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.**

(f) <u>**Injunction Related to Releases and Exculpation**</u>. The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to this Plan, including, the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in this Plan. Notwithstanding the above, the holders of Ghost Ship Fire Claims and Workers' Compensation Claims retain the right to assert such Claims against the Reorganized Debtors in accordance with the terms of the Plan.

**10.10** <u>**Subordination**</u>. The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments thereof under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Plan Proponents reserve the right to reclassify any Allowed Claim (other than any DIP Facility Claims) or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**10.11** <u>**Retention of Causes of Action/Reservation of Rights**</u>.

(a) Except as otherwise provided in Section 10.9 hereof, nothing herein or in the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or Causes of Action that the Debtors or the Reorganized Debtors may have or which the Reorganized Debtors may choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including (i) any and all Claims against any Person or Entity, to the extent such Person or Entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, the Reorganized Debtors, or their officers, directors, or representatives and (ii) for the turnover of any property of the Debtors' estates.

(b) Nothing herein or in the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Petition Date, against or with respect to any Claim left unimpaired by the Plan. The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff, and other legal or equitable defenses that they had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights with respect to any Claim left unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

(c) The Reorganized Debtors reserve and shall retain the applicable Causes of Action, except for the Assigned Rights and Causes of Action, notwithstanding the rejection of any executory contract or unexpired lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors in accordance with the terms hereof. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**10.12** <u>**Preservation of Causes of Action**</u>. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue**

any and all available Causes of Action against them. **The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein.**

10.13 **Special Provisions for Governmental Units**. Solely with respect to Governmental Units, nothing herein shall limit or expand the scope of discharge, release, or injunction to which the Debtors or the Reorganized Debtors are entitled under the Bankruptcy Code. Further, nothing herein, including Sections 10.8 and 10.9 hereof, shall discharge, release, enjoin, or otherwise bar (a) any liability of the Debtors or the Reorganized Debtors to a Governmental Unit arising on or after the Confirmation Date with respect to events occurring on or after the Confirmation Date, (b) any liability to a Governmental Unit that is not a Claim, (c) any valid right of setoff or recoupment of a Governmental Unit, (d) any police or regulatory action by a Governmental Unit, (e) any environmental liability to a Governmental Unit that the Debtors, the Reorganized Debtors, any successors thereto, or any other Person or Entity may have as an owner or operator of real property after the Effective Date, or (f) any liability to a Governmental Unit on the part of any Persons or Entities other than the Debtors or the Reorganized Debtors, *provided*, that nothing in this Section 10.13 shall affect the Debtors' releases in Section 10.9 hereof, nor shall anything herein enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any of the matters described in clauses (a) through (f) above.

10.14 **Document Retention**. On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with the Debtors' standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

10.15 **Solicitation of Plan**. As of and subject to the occurrence of the Confirmation Date: (a) the Plan Proponents shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation and (b) the Plan Proponents and each of their respective members, directors, officers, employees, affiliates, agents, restructuring advisors, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance, and solicitation shall not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

## ARTICLE XI.

## RETENTION OF JURISDICTION

11.1 **Jurisdiction of Bankruptcy Court**. On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction of all matters arising under, arising out of, or related to the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a) To hear and determine motions for and any disputes involving the assumption, assumption and assignment, or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom, including the determination of any Cure Amount;

(b) To determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced before or after the Confirmation Date, including, any proceeding with respect to a Cause of Action or Avoidance Action;

(c)     To ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

(d)     To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claims and including as provided under the Claims Resolution Procedures;

(e)     To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(f)     To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order, judgment or ruling of the Bankruptcy Court, including enforcement of the releases, exculpations, and the Channeling Injunction;

(g)     To hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code and to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)     To hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Confirmation Date;

(i)     To hear and determine disputes arising in connection with or related to the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated herein, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(j)     To hear and determine disputes arising in connection with Disputed Claims;

(k)     To take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following consummation;

(l)     To recover all assets of the Debtors and property of the Debtors' estates, wherever located;

(m)     To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)     To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code);

(o)     To enforce all orders previously entered by the Bankruptcy Court;

(p)     To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(q)     To resolve any disputes concerning whether a Person or entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or

objecting to a Cure Amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(r)     To determine any other matters or adjudicate any disputes that may arise in connection with or are related to the Plan, the Disclosure Statement, the Confirmation Order, the Plan Supplement, or any document related to the foregoing; *provided*, that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court;

(s)     To hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge;

(t)     To hear and determine any rights, claims, or Causes of Action held by or accruing to the Debtors or the Reorganized Debtors pursuant to the Bankruptcy Code or any federal or state statute or legal theory;

(u)     To hear and determine (i) any dispute involving the Fire Trusts, including but not limited to the interpretation of the Fire Trust Agreements and the administration of the Fire Trusts and (ii) any other matter concerning the administration of the Fire Trusts, until the Fire Trusts are terminated;

(v)     To hear any other matter not inconsistent with the Bankruptcy Code; and

(w)     To enter a final decree closing the Chapter 11 Cases.

To the extent that the Bankruptcy Court is not permitted under applicable law to preside over any of the forgoing matters, the reference to the "Bankruptcy Court" in this Article XI shall be deemed to be replaced by the "District Court." Nothing in this Article XI shall expand the exclusive jurisdiction of the Bankruptcy Court beyond that provided by applicable law.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

**12.1     Dissolution of Statutory Committees**.  On the Effective Date, the Statutory Committees shall dissolve, the current and former members of the Statutory Committees, including any *ex officio* members, and their respective officers, employees, counsel, advisors and agents, shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases, except for the limited purpose of prosecuting (i) requests for allowances of compensation and reimbursement of expenses incurred prior to the Effective Date or (ii) any appeals of the Confirmation Order.

**12.2     Substantial Consummation**.  On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

**12.3     Exemption from Transfer Taxes**.  Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any Security or property hereunder or in connection with the transactions contemplated hereby, the creation, filing, or recording of any mortgage, deed of trust, or other security interest, the making, assignment, filing, or recording of any lease or sublease, or the making or delivery of any deed, bill of sale, or other instrument of transfer under, in furtherance of, or in connection with the Plan, or any agreements of consolidation, deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated herein, shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code and shall not be subject to or taxed under any law imposing a stamp tax or similar tax, to the maximum extent provided by section 1146(a) of the Bankruptcy Code.  To the maximum extent provided by section 1146(a) of the Bankruptcy Code and

applicable nonbankruptcy law, the Restructuring Transactions shall not be taxed under any law imposing a stamp tax or similar tax.

**12.4** **Expedited Tax Determination**. The Reorganized Debtors may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of the Debtors or the Reorganized Debtors for all taxable periods of the Debtors through the Effective Date.

**12.5** **Payment of Statutory Fees**. On the Effective Date, and thereafter as may be required, each of the Debtors shall pay all the respective fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code, together with interest, if any, pursuant to section 3717 of title 31 of the United States Code, until the earliest to occur of the entry of (i) a final decree closing such Debtor's Chapter 11 Case, (ii) a Final Order converting such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or (iii) a Final Order dismissing such Debtor's Chapter 11 Case.

**12.6** **Plan Modifications and Amendments**. The Plan may be amended, modified, or supplemented by the Plan Proponents, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise direct, so long as such action does not materially and adversely affect the treatment of holders of Claims or Interests hereunder. The Plan Proponents may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of the Plan and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as so amended, modified, or supplemented. Prior to the Effective Date, the Plan Proponents may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court; *provided*, that such technical adjustments and modifications do not materially and adversely affect the treatment of holders of Claims or Interests.

**12.7** **Revocation or Withdrawal of Plan**. The Plan Proponents may revoke, withdraw, or delay consideration of the Plan prior to the Confirmation Date, either entirely or with respect to one or more of the Debtors, and to file subsequent amended plans of reorganization. If the Plan is revoked, withdrawn, or delayed with respect to fewer than all of the Debtors, such revocation, withdrawal, or delay shall not affect the enforceability of the Plan as it relates to the Debtors for which the Plan is not revoked, withdrawn, or delayed. If the Plan Proponents revoke the Plan in its entirety, the Plan shall be deemed null and void. In such event, nothing herein shall be deemed to constitute a waiver or release of any Claim by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any other Person in any further proceedings involving the Debtors.

**12.8** **Courts of Competent Jurisdiction**. If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

**12.9** **Severability**. If, prior to entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, in each case at the election and request of the Plan Proponents may alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and provide that each term and provision hereof, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its

terms; (b) integral to the Plan and may not be deleted or modified except in accordance with the terms of the Plan; and (c) nonseverable and mutually dependent.

**12.10** **Governing Law**.  Except to the extent the Bankruptcy Code or other U.S. federal law is applicable, or to the extent a schedule hereto, or a schedule in the Plan Supplement expressly provides otherwise, the rights, duties, and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of California, without giving effect to the principles of conflicts of law thereof to the extent they would result in the application of the laws of any other jurisdiction.

**12.11** **Schedules and Exhibits**.  The schedules and exhibits to the Plan and the Plan Supplement are incorporated into, and are part of, the Plan as if set forth herein.

**12.12** **Successors and Assigns**.  All the rights, benefits, and obligations of any Person named or referred to herein shall be binding on, and inure to the benefit of, the heirs, executors, administrators, successors, and/or assigns of such Person.

**12.13** **Time**.  In computing any period of time prescribed or allowed herein, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

**12.14** **Notices**.  To be effective, all notices, requests, and demands to or upon the Debtors shall be in writing (including by facsimile or electronic transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered, or in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

**If to the Tort Claimants Committee:**

Baker & Hostetler LLP
1160 Battery Street, Suite 100
San Francisco, CA 94111
Attn:  Robert Julian and Cecily A. Dumas
Telephone:  (628) 208 6434
Email:  rjulian@bakerlaw.com and
cdumas@bakerlaw.com

Baker & Hostetler LLP
11601 Wilshire Boulevard, Suite 1400
Los Angeles, CA 90025
Attn:  Eric E. Sagerman and Lauren T. Attard
Telephone (310) 820 8800
Email:  esagerman@bakerlaw.com,
lattard@bakerlaw.com

**If to the Ad Hoc Committee**

Akin Gump Strauss Hauer & Feld LLP
Michael S. Stamer
David H. Botter
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Email:  mstamer@akingump.com
dbotter@akingump.com

Akin Gump Strauss Hauer & Feld LLP
Ashley Vinson Crawford (SBN 257246)
580 California Street
Suite 1500
San Francisco, CA 94104
Telephone: (415) 765-9500
Email:  avcrawford@akingump.com

**If to the Debtors, to:**

PG&E Corporation and Pacific Gas
and Electric Company
77 Beale Street
San Francisco, CA 94105
Attn: Janet Loduca, Senior Vice President and
General Counsel
E-mail: J1Lc@pge.com

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn: Stephen Karotkin, Ray C. Schrock,
Jessica Liou and Matthew Goren
Telephone: (212) 310-8000
E-mail: stephen.karotkin@weil.com,
ray.schrock@weil.com,
jessica.liou@weil.com,
matthew.goren@weil.com

Keller & Benvenutti LLP
650 California Street, Suite 1900
San Francisco, CA 94108
Attn: Tobias S. Keller, Peter J. Benvenutti,
and Jane Kim
Telephone: (415) 796 0709
Email: tkeller@kellerbenvenutti.com,
pbenvenutti@kellerbenvenutti.com,
jkim@kellerbenvenutti.com.

Cravath, Swaine & Moore LLP Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Attn: Kevin J. Orsini, Paul H. Zumbro
Telephone: (212) 474-1000
Email: korsini@cravath.com,
pzumbro@cravath.com

**If to the Creditors Committee:**

Milbank LLP
55 Hudson Yards
New York, New York 10001-2163
Attn: Dennis F. Dunne
Telephone: (212) 530-5000
Email: ddunne@milbank.com

Milbank LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA US 90067-3019
Attn: Thomas A. Kreller
Telephone: (424) 386-4000
Email: tkreller@milbank.com

**If to the U.S. Trustee:**

United States Department of Justice
Office of the U.S. Trustee
450 Golden Gate Avenue, Suite 05-0153
San Francisco, CA 94102
Attn: Andrew R. Vara and Timothy S. Laffredi
Telephone: (415) 705-3333
Email: Andrew.R.Vara@usdoj.gov and
Timothy.S.Laffredi@usdoj.gov

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

       After the occurrence of the Effective Date, the Reorganized Debtors have authority to send a notice to Entities that in order to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the occurrence of the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities that have filed such renewed requests.

       **12.15** **<u>Reservation of Rights</u>**.  Except as otherwise provided herein, this Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order.  None of the filing of this Plan, any statement or provision of this Plan, or the taking of any action by the Plan Proponents with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of the Plan Proponents with respect to any Claims or Interests prior to the Effective Date.

**Dated: October 17, 2019**
**San Francisco, California**

Respectfully submitted,

**BAKER & HOSTETLER LLP**

By: _/s/ *Cecily A. Dumas*_____
Robert A. Julian (SBN 88469)
Cecily A. Dumas (SBN 111449)
Eric E. Sagerman (SBN 155496)
Lauren T. Attard (SBN 320898)

*Counsel to the Official Committee of Tort Claimants*

**AKIN GUMP STRAUSS HAUER & FELD LLP**

By: _/s/ *Ashley Vinson Crawford*_____
Ashley Vinson Crawford (SBN 257246)
Michael S. Stamer (pro hac vice)
Ira S. Dizengoff (pro hac vice)
David H. Botter (pro hac vice)
Abid Qureshi (pro hac vice)

*Counsel to the Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company*

**EXHIBIT A**

**Fires**

1. Butte Fire (2015)
2. North Bay Wildfires (2017)
   a. LaPorte
   b. McCourtney
   c. Lobo
   d. Honey
   e. Redwood / Potter Valley
   f. Sulphur
   g. Cherokee
   h. 37
   i. Blue
   j. Pocket
   k. Atlas
   l. Cascade
   m. Nuns
   n. Adobe
   o. Norrbom
   p. Pressley
   q. Patrick
   r. Pythian / Oakmont
   s. Maacama
   t. Tubbs
   u. Point
   v. Sullivan
3. Camp Fire (2018)
4. Ghost Ship Fire (2016)