Robert A. Julian (SBN 88469)
Cecily A. Dumas (SBN 111449)
BAKER & HOSTETLER LLP
1160 Battery Street, Suite 100
San Francisco, CA 94111
Telephone: 628.208.6434
Facsimile: 310.820.8859
Email: rjulian@bakerlaw.com
Email: cdumas@bakerlaw.com

Eric E. Sagerman (SBN 155496)
David J. Richardson (SBN 168592)
Lauren T. Attard (SBN 320898)
BAKER & HOSTETLER LLP
11601 Wilshire Blvd., Suite 1400
Los Angeles, CA 90025-0509
Telephone: 310.820.8800
Facsimile: 310.820.8859
Email: esagerman@bakerlaw.com
Email: drichardson@bakerlaw.com
Email: lattard@bakerlaw.com

*Counsel for Official Committee of Tort Claimants*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br>**PG&E CORPORATION**<br>-and-<br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br>                        Debtors.<br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>■ Affects both Debtors<br>*All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | Bankruptcy Case No. 19-30088 (DM)<br><br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS PURSUANT TO 11 U.S.C. §§ 105(a) AND 501 AND FED. R. BANKR. P. 3003(c) FOR ENTRY OF AN ORDER EXTENDING THE BAR DATE**<br><br>Date: November 13, 2019<br>Time: 9:30 a.m. (Pacific Time)<br>Place: United States Bankruptcy Court<br>          Courtroom 17, 16th Floor<br>          San Francisco, CA 94102<br>Objection Deadline: November 6, 2019 |

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT .................................................................................... 1

II. JURISDICTION ............................................................................................................ 3

III. BACKGROUND ........................................................................................................... 3

    A. THE BAR DATE ............................................................................................... 3

    B. THE NUMBER OF VICTIMS ......................................................................... 3

    C. CLAIMS ESTIMATION .................................................................................. 5

IV. THE VICTIMS' IMPAIRMENT ................................................................................... 6

    A. Mental and Physical Impairment Caused by the Trauma of the Fires Has Hindered Fire Victims' Abilities to Protect Their Interests in these Cases ............ 6

    B. Confusion over the Bankruptcy Cases and the Rights of Creditors Is Widespread ........................................................................................................ 9

    C. Impairment Caused by Issues Concerning the Notice Given .............................. 11

V. THE TCC'S PROPOSAL ............................................................................................ 12

VI. LEGAL ARGUMENT ................................................................................................. 13

VII. CONCLUSION ........................................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Argonaut Fin. Servs., Inc.*,
   164 B.R. 107 (N.D. Cal. 1994) ...................................................................................15

*Chemetron Corp. v. Jones*,
   72 F.3d 341 (3d Cir. 1995) ........................................................................................14

*Eisen v. Carlisle & Jacquelin*,
   417 U.S. 156 (1974) ..................................................................................................14

*Elchediak v. Heckler*,
   750 F.2d 892 (11th Cir. 1985) ...................................................................................14

*Ernst & Young v. Matsumoto (In re United Ins. Mgmt., Inc.)*,
   14 F.3d 1380 (9th Cir. 1994) ..............................................................................13, 15

*In re First Magnus Fin. Corp.*,
   415 B.R. 416 (Bankr. D. Ariz. 2009) ........................................................................13

*Fogel v. Zell*,
   221 F.3d 955 (7th Cir. 2000) .....................................................................................14

*Holmberg v. Armbrecht*,
   327 U.S. 392, 90 L. Ed. 743, 66 S. Ct. 582 (1945) ...................................................13

*In re Jackson*,
   2019 Bankr. LEXIS 2300, 2019 WL 3797580 (Bankr. D. S.C. July 24, 2019) ........15

*In re Mansaray-Ruffin*,
   530 F.3d 230 (3d Cir. 2008) ......................................................................................14

*Mullane v. Cent. Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950) ..................................................................................................14

*Omni Mfg., Inc. v. Smith (In re Smith)*,
   21 F.3d 660 (5th Cir. 1994) .......................................................................................13

*Parker v. Califano*,
   644 F.2d 1199 (6th Cir. 1981) ...................................................................................14

*Shrader v. Harris*,
   631 F.2d 297 (4th Cir. 1980) .....................................................................................13

*In re Tomlan*,
 102 B.R. 790 (Bankr. E.D.Wash. 1989), *aff'd, per curiam*, 907 F.2d 114 (9th
 Cir. 1990) ............................................................................................................................. 13

*In re Vanderpol*,
 2019 Bankr. LEXIS 3191, 2019 WL 4880065 (Bankr. D. Colo. August 28,
 2019) ..................................................................................................................................... 14

*Vitt v. Astrue*,
 2008 U.S. Dist. LEXIS 14674, 2008 WL 425936 (N.D. Cal. Feb. 14, 2008) ........................... 2

**Statutes**

28 U.S.C. § 157 ................................................................................................................................ 3

28 U.S.C. § 157(b) ........................................................................................................................... 3

28 U.S.C. § 1334 .............................................................................................................................. 3

28 U.S.C. § 1408 .............................................................................................................................. 3

28 U.S.C. § 1409 .............................................................................................................................. 3

**Other Authorities**

Bankr. L.R. 5011-1(a) ...................................................................................................................... 3

Fed. R. Bankr. P. 3003(c)(3) .......................................................................................................... 13

Fed. R. Evid. 706 ........................................................................................................................... 12

Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges,
 General Order 24 .................................................................................................................... 3

# I. PRELIMINARY STATEMENT

The principal question raised by this Motion[1] is whether the October 21, 2019 bar date (the "**Fire Bar Date**") should be extended for the fire victims on the ground that evidence filed herewith establishes that a large number of victims are not filing claims in these chapter 11 cases because they are impaired from filing. Their impairments include emotional distress, suffering from trauma caused by the wildfire that destroyed everything they own, confusion caused by the trauma, a lack of awareness of the fire claims bar date, and a belief that a claimant needs to be insured to file a claim. For some of these victims, the trauma of their situation means that all of their energy is spent getting out of bed in the morning. Every day is a struggle, and the burden of understanding and addressing their rights in a complex legal case that carries the word "bankruptcy," from which they understand that a company is unable to pay its debts, has caused far too many to miss the existing Fire Bar Date. The TCC believes that the Court should appoint a fiduciary to educate and assist the impaired victims to file their claims, which is something many of them are having trouble doing because their abilities have been impaired by PG&E's wildfires.

The TCC contends that these Cases present circumstances that no Court has considered before when addressing bar date issues. While there is a need to reorganize the Debtors along a prompt timeline established by the State, there is a moral and legal imperative to ensure that the victims of PG&E's fires do not also become the victims of a system that is unable to address their needs and circumstances. For the reasons argued herein, the TCC requests that this Court take steps to ensure that access for fire victims to the rights accorded by the Bankruptcy Code are maximized to the fullest extent possible, while maintaining the necessary timeline for reorganization. Therefore, the TCC requests that this Court continue the Fire Bar Date to January 31, 2020, which is two weeks before Judge Donato will begin his estimation proceedings, or, in the alternative, continue the Fire Bar Date to December 5, 2019, and appoint an expert to determine the extent to which the victims are impaired, and report the expert's findings to this Court on a possible further extension. In either scenario, the TCC further requests that this Court appoint a fiduciary to educate and assist the impaired victims to file proofs of claim by the extended bar date.

---

[1] Any capitalized terms used herein but not defined herein shall have the meaning ascribed to them in the Motion.

The facts discussed in this Motion are newly discovered by the TCC. After individuals' attorneys brought these facts and declarations to the TCC this month, lead trial counsel for the TCC conducted his own investigation by traveling this past weekend to the FEMA emergency housing site for Camp Fire survivors, together with investigator James Drinkhall ("Drinkhall"), and interviewed survivors and corroborated the facts described in the victims' Declarations.

The TCC does not believe that the extension requested herein will have any negative impact on the estimation proceedings currently pending in the District Court, nor on the parties' current efforts to propose and negotiate plans of reorganization. In fact, at a hearing held on October 7, 2019, Judge Donato asked the parties how the District Court should handle estimating future claims. Judge Donato asked, "I'm just concerned about the after -- I'll call it after-arising claims. . . . There's no concrete answer. . . . All I'm asking is, do I need to account for that in the estimation?" 10/7/19 Hr'g Tr., Julian Decl. Ex. A, at 42-44. He further explained his request in Order No. 1 Re Estimation Proceedings: "The Court raised the possibility of injuries manifesting after the claim bar deadline set by the bankruptcy court, and whether the estimation should account for those contingencies. The parties should be prepared to discuss this issue at the next conference." Julian Decl., Ex. B at 3. When a victim is impaired from recognizing an injury and from filing a claim, that impairment constitutes an injury similar to a future manifestation of a claim. *Cf. Vitt v. Astrue*, 2008 U.S. Dist. LEXIS 14674, 2008 WL 425936, at *6 (N.D. Cal. Feb. 14, 2008) (explaining that equitable tolling was permitted in cases of a mental impairment that is "plausibly of sufficient severity to impair both comprehension and the ability to act upon notice of procedural mandates").

The TCC is not asking by this Motion that this Court address the issue of future claims, because Judge Donato has directed the parties to report to him on whether, and how, those claims should be addressed in the estimation proceeding; and this Court's extension of the current bar date may resolve Judge Donato's concern about 2017 and 2018 fire victims attempting to file claims after the October 21, 2019, bar date. Rather, this Motion is limited to ensuring that those fire victims whose claims presently exist are not foreclosed from receiving a recovery because they are impaired from filing a claim prior to October 21, 2019.

## II. JURISDICTION

This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, the Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges, General Order 24 (N.D. Cal.), and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California (the "**Bankruptcy Local Rules**"). This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III. BACKGROUND

### A. THE BAR DATE

On May 1, 2019, the Debtors filed a motion for approval of a claims noticing program to fire victims and other parties (Dkt. No. 1784). By this motion, PG&E sought a September 16, 2019 bar date, the approval of three claim forms, including a claim form for fire victims, and the approval of three forms of notice of the bar date. In response, on May 3, 2019, the TCC filed a motion to approve a customized claim form for fire victims (Dkt. No. 1824), which claim form did not require victims to attach supporting documentation in order to file valid claims.

On July 1, 2019, this Court entered an order establishing a bar date for fire claims of October 21, 2019 and approving the Debtors' notice program to be implemented by Prime Clerk (Dkt. No. 2806). This provided a total of three months and one week between the launch date of the Debtors' notice program to fire victims and the bar date for fire victims to file proofs of claim. In these three months, there have been several major developments that warrant the extension of the Fire Bar Date.

### B. THE NUMBER OF VICTIMS

The 2015 Butte Fire burned 70,868 acres, destroyed 877 structures, and resulted in 2 fatalities.[2] Initially, 10,000 people were displaced due to mandatory or advised evacuation orders.[3] The 2016 Ghost Ship Fire occurred on December 2, 2016 and is also included within these

---

[2] *Butte Fire*, California Department of Forestry & Fire Protection, (Oct. 15, 2015), https://www.fire.ca.gov/incidents/2015/9/9/butte-fire/.

[3] *California fire updates: Death toll rises to 5 in Butte, Valley fires*, Los Angeles Times, (Sept, 17, 2015), https://www.latimes.com/local/lanow/la-me-california-fire-valley-butte-updates-htmlstory.html.

3

claims. The 2017 North Bay Fires burned 245,000 acres, destroyed 9,000 structures, and resulted in 45 fatalities.[4] Approximately 78% of the relevant property destruction was caused by the Tubbs fire, where 5,636 structures were destroyed[5], and the Nuns fire, where 1,355 structures were destroyed.[6] By October 15, 2017, authorities stated that 100,000 people had been evacuated or were under evacuation orders.[7]

The 2018 Camp Fire burned 153,336 acres, destroyed 18,793 structures, and resulted in 85 fatalities.[8] The town of Paradise and community of Concow suffered the greatest amount of fire-related destruction. The population of Paradise is down 82% from pre-fire numbers.[9] The communities of Pulga and Magalia also suffered substantial damage. A comprehensive system for tracking evacuees and displacement statistics does not exist, but three days after the fire started, officials estimated that 52,000 people had evacuated the region.[10] It is estimated that 50,000 people have been displaced as a result of this one fire.[11]

Yet, notwithstanding these numbers, as of September 26, 2019, only 1,545 fire-related proof of claim forms were uploaded to Prime Clerk, the system for filing proofs of claim described in the Debtors' notice program. By contrast, there are over 40,000 represented claimants whose claims are documented in the Brown Greer database. *See* Stip. & Order relating to the Brown Greer dated September 17, 2019 (Dkt. Nos. 3907 & 3922). The fire-related proofs of claim forms uploaded into Prime Clerk independently from Brown Greer represent a percentage of the total potential

---

[4] Nicholas Nauslar, et al., *The 2017 North Bay and Southern California Fires: A Case Study*, (June 9, 2018), https://www.spc.noaa.gov/publications/nauslar/2017cali.pdf.
[5] *Tubbs Fire (Central LNU Complex)*, California Department of Forestry and Fire Protection, (Feb. 9, 2018), https://www.fire.ca.gov/incidents/2017/10/8/tubbs-fire-central-lnu-complex/.
[6] *Nuns/Adobe/Norrbom/Pressley/Partrick Fires/Oakmont (Central LNU Complex)*, California Department of Forestry and Fire Protections, (Feb. 9, 2018), https://www.fire.ca.gov/incidents/2017/10/8/nuns-adobe-norrbom-pressley-partrick-fires-oakmont-central-lnu-complex/.
[7] Associated Press, *California wildfire death toll rises to 40 amid cluster of blazes 100 miles wide*, The Guardia, (Oct. 15, 2017), https://www.theguardian.com/world/2017/oct/13/california-wildfires-crews-progress.
[8] *Camp Fire*, California Department of Forestry & Fire Prevention, (Sept. 18, 2019), https://www.fire.ca.gov/incidents/2018/11/8/camp-fire/.
[9] *California Tops 39.9 Million Residents at New Year Per New State Demographic Report*, California Department of Finance, (May 1, 2019), https://htv-prod-media.s3.amazonaws.com/files/e-1-2019-press-release-1556737607.pdf.
[10] Ashley McBride, et al., *29 dead in Camp Fire as firefighters make gains on Butte County blaze*, San Francisco Chronicle, (Nov. 13, 2018), https://www.sfgate.com/california-wildfires/article/Butte-County-fire-only-grows-slightly-as-13381900.php.
[11] Frances Sellers, *Forced from Paradise*, The Washington Post, (July 23, 2019), https://www.washingtonpost.com/graphics/2019/national/paradise-fire-displaced-residents/.

4

claims and demonstrate that unrepresented and displaced victims largely failed to file claims. As Mr. Pitre explained to the Court on September 24, 2019, there are close to 100,000 fire claims that should be filed in the Debtors' cases:

> MR. PITRE: "And just to give the Court an idea, when the word 100,000 was used by Mr. Julian, I just want to give the Court some perspective. There were 14,000 residences that were destroyed in the Camp Fire. Most of those residences, based on statistics, excuse me, had three to five people who lived in those homes. If you do some simple math, that's about 70,000 individuals who were potentially impacted. And that's Camp Fire alone. There's another 8- to 9,000 for North Bay Fires. And when you use two to three people and you do the math, you get to 100,000 easily. And that doesn't count businesses" (Sept. 24th Hr'g Tr. 125:8-18).

### C. <u>CLAIMS ESTIMATION</u>

Judge Donato has scheduled the estimation hearing to commence on February 18, 2020. Julian Decl. Ex. B, C. The TCC contends that the estimation proceeding will not be impacted in any material way by a Fire Bar Date extended to January 31, 2020. The filing of additional proofs of claim will have no impact on the scope of the estimation proceeding, nor the particular fires that will be at issue. Nor would an extended Fire Bar Date impact the Debtors' ability to confirm a plan in time to satisfy the conditions of AB 1054. Completion of the estimation proceeding has always been a necessary event prior to plan confirmation, but the timing and structure for that procedure was not apparent until long after this Court established the Fire Bar Date in June 2019. The schedule for the estimation proceeding is a new and material fact that helps to place the likely timeline for these Cases into perspective, and should erase any concerns that may have prevented a later bar date from having been established back in June 2019.

Judge Donato is conducting the estimation in a manner that will "reasonably estimate PG&E's probable liability to the victims of the Northern California wildfires." Julian Decl. Ex. B. at 2. This "reasonable" estimation of "probable liability" will not require knowing the exact dollar amount of claims three months in advance of the estimation proceeding. To the contrary, an extension of the Fire Bar Date to January 31, 2020, will ensure that the experts have sufficient time to provide the District Court with "reasonable" estimates.

5

## IV. THE VICTIMS' IMPAIRMENT

### A. Mental and Physical Impairment Caused by the Trauma of the Fires Has Hindered Fire Victims' Abilities to Protect Their Interests in these Cases

The lower-than-expected number of filed proofs of claim is not due to over-estimation of the number of claimants, nor a lack of interest on the part of the fire victims. There is substantial evidence on the scope of the destruction caused by the fires to demonstrate that there are many thousands of victims who have not come forward. And there is substantial evidence that the primary reason that many fire victims have not yet filed proofs of claim is the victims' personal emotional or physical impairment, caused by the trauma of the fires, and the circumstances in which those victims now live.

The declarations filed with and described in this Motion demonstrate that many of the fire victims suffer severe, ongoing trauma from their experiences escaping the fires, from the loss of everything they owned, and from their current personal circumstances. Many of these people fall within the lower economic rung of fire victims. They were renters, and often senior citizens, who lacked insurance, lost all of their possessions, and are now living in FEMA shelters or with family members far from their former home. Not only would a notice sent to their old mailing address not reach them, but many would be incapable of facing the emotional trauma that would be revived by the process of addressing their damages.

The TCC has previously provided this Court with evidence that 40.6% of the households that were lost in the fires were renters, totaling 8,267 households, each with 2-3 residents, and that 87.4% of these rental households were uninsured or underinsured. *See* Docket No. 2120, filed 5/20/2019. This represents 15,000-20,000 individuals who are among the most vulnerable of the fire victim population, and who are the most likely to have been unable to protect their interests in these Cases. Many are elderly. Many are unemployed or living on social assistance. And many are now living in emergency housing, if they have any housing at all. The Debtors' notice program did not provide a procedure for locating renters, who did not own the destroyed structure, and therefore have no address to which the Debtors could send actual notice.

A few of these victims have provided declarations filed with this Motion to describe their ongoing emotional trauma, and the losses they experienced. But many more are incapable of doing this much on their own. On October 12, 2019, Drinkhall and counsel for the TCC together visited a FEMA Camp for victims of the Camp Fire, located in Gridley, California, in order to speak with a random selection of five fire victims who have been so deeply affected by the fires. The fire victims they spoke with, all former renters, were elderly, dealing with emotional trauma, dealing with physical ailments, and had immense difficulty simply speaking about the events of the fires. Three of the five had not filed a proof of claim, not because they were uninterested in recovering the value of their losses, but because they are overwhelmed by daily life, because they lack notice or knowledge of the events of this Case, and because they are incapable of understanding what is required to protect their interests.

One resident of the FEMA Camp, identified herein as Jane Doe #1[12], was too traumatized to meet with Drinkhall in person, and only spoke with him by phone, two trailers away. Over the course of her conversation, she explained that:

> "I have been diagnosed with PTSD . . . I lost everything I owned . . . I can't look at a candle flame without thinking of fire. I almost burned to death. Those flames were five feet away from me and I was trapped in my apartment for an hour trying to get out. I was saved only because of neighbors (she later said it was her roommate) . . . my anxiety is mostly caused by the fire, not having to live in these FEMA units . . . during that fire, I saw people trapped in cars . . . I ran up and down the street trying to get help . . . there were people burned to death on Edgewood (Lane, the street where her apartment building was located)." (Drinkhall Decl., ¶ 6).

Another resident of the FEMA Camp, 89 year-old Jane Doe #2, explained the she is like many survivors of the Camp Fire, who "cannot cope with daily life now," and explained her traumatic escape from Paradise:

> "I was in the Feather River Hospital in Paradise when the fire hit. It was chaos, such chaos, they were trying to get everyone out at once. With my oxygen problems, I couldn't do anything for myself, it was so hard to breathe in all that plus the smoke, I had to keep catching my breath. So helpless … Right outside, they put me in a car with a 19-year-old driver who was crying . . . there were walls of red flame on both sides of the street . . . wind so strong and hot, it was blowing hard, sideways with embers shooting everywhere, wood, branches and metal

---

[12] The TCC has redacted the names of the interviewed victims in this Motion and the Drinkhall Declaration to protect their identity and the confidential nature of some of their testimony. An unredacted version of the Drinkhall Declaration will be filed under seal with this Court.

7

through the air, propane cans exploding, screaming, sparks falling on and around the cars . . we got to the K-Mart parking lot and hundreds of cars were there . . . then on the highway, three lanes of cars abreast, dead stopped, our car window was hot to touch, I happened to turn around and a car behind us just exploded, then some people jumped out of cars and started running. I thought it was over for me . . . but somehow firetrucks were hosing the road down. It took us four hours to get out … I relive that in nightmares." (Drinkhall Decl. ¶¶ 9-10).

Neither Jane Doe # 1 nor Jane Doe #2 had filed a proof of claim, and it is unlikely that either will file a proof of claim without assistance and better information, neither of which will be effective without a continued Fire Bar Date. *Id.*, ¶¶ 6, 11. The multiple declarations of other victims filed in support of this Motion tell similar stories.

It is difficult to comprehend what it means for people to experience a trauma of the level that many experienced in the fires. Escaping the fire, running out of gas, stuck in a line of cars while the flames and smoke rapidly approached, being separated from children, witnessing exploding cars, and driving through flames, are among the circumstances that these victims faced, and among the facts that must considered for there to be due process. Many victims have had to start over with no material possessions whatsoever—the life-long accumulation of every treasured and practical personal item gone in a day—while having to process the ongoing disability of PTSD. Many places of employment, and entire communities, disappeared, leaving thousands unemployed and starting over in entirely new environments, or isolated in FEMA housing.

The physical loss, whether of a home or an entire town, has been compounded by the emotional loss of community that has resulted wherever a fire victim has been forced to relocate, whether in a new, permanent home, or a temporary shelter. "I miss living in my neighborhood community. I felt secure with the people around me." (Chocktoot Decl. at ¶ 5). "Following the fire, we were unable to afford housing anywhere in California. We were forced to relocate over 500 miles away in late November and now live in Caldwell, Idaho. It was very hard to move away from all our good friends and family and the community I lived in for my entire life." (Gardner Decl. at ¶ 7). For outsiders, it is difficult to understand the impact that a loss of community and neighborhood can have on communication. Word of mouth from trusted sources is critically important especially when it comes to potentially life-altering legal decisions.

8

It is the professional viewpoint of Dr. Roger Pitman that PTSD and related emotional impairment experienced by fire victims "would interfere with many claimants' ability to review, complete, and submit the POC by the October 21 deadline." (Pitman Decl., at ¶ 5).

There still exists a fire-related homeless population who cannot be reached by a traditional notice program. Tens of thousands of people remain displaced and may not be reachable at former mailing addresses. Most people have not rebuilt. Most insurance claims are still open, and many people remain uninsured. For some, even basic communication is a real issue. Countless people are still traumatized, and some have lost hope. Unfortunately, tens of thousands of innocent fire victims are about to lose their right to receive a distribution from the Debtors' estates even though they have valid claims and deserve to be compensated for their losses.

Indeed, those most likely to have not filed proofs of claim are the ones most in need of a recovery. They are the uninsured renters and seniors who lost everything, rather than the insured homeowner who may have received a partial recovery from their insurer. Their absence from this case would be a failure of the system.

### B. Confusion over the Bankruptcy Cases and the Rights of Creditors Is Widespread

The traumatized and displaced fire victims who are trying to rebuild their lives lack sufficient information to make an informed participation decision. For example, fire victims believe that PG&E has few assets available to pay claims, or that the filing of these bankruptcy cases means that PG&E cannot pay their damages. "Instead, PG&E filed for bankruptcy and we thought it was the end for all of us" (Brown Decl., at ¶ 12). Also, "I later found out that PG&E went bankrupt. I also thought bankruptcy meant no money." (Davis Decl., at ¶ 8). "At the same time, I heard that PG&E might file for bankruptcy, but I didn't know they did. So, I believed that money was not available to compensate fire victims anyway." (Bradway Decl., at ¶ 8). Many fire victims believe that if they file a claim in this case, they will be taking money away from families and individuals that need the money more. "I thought I wasn't a victim because I got out alive." (Davis Decl. at ¶ 7).

9

There exists a belief among far too many victims of the fires that the Debtors have been financially devastated to a point that victims' claims will not be paid. Some victims who are not homeless but incurred substantial damages mistakenly believe that if they file claims, they be may taking limited resources from the destitute, disabled and elderly whose power may be shut off. Many are concerned with the well-being of their neighbors who may have suffered greater losses and are having a more difficult time recovering. Some victims are willing to sacrifice their own interest for the sake of their neighbors and other victims based upon misinformation. People do not know what the claims qualification criteria are and if they qualify. (Bradway Decl. at ¶ 8; Davis Decl. at ¶ 7; Gardner Decl. at ¶ 9). Others lack knowledge of their legal options, such as Jane Doe #2, who explained that she could not retain a lawyer on her $900/month SSI income, and hadn't understood that contingency counsel was an option. (Drinkhall Decl. at ¶ 11).

PG&E conducted an advertising campaign following the North Bay fires. None of these ads acknowledged any responsibility for the fires. (Everidge Decl. at ¶ 8). "After the fires, I saw advertisements about all the safety measures PG&E was taking to protect us from another disaster. But I never saw any communications from PG&E about their equipment started the fires in the first place." (Thomas Decl. at ¶ 6.) Recent ads tell viewers to prepare for an emergency by mapping escape routes and making an emergency kit in case of quick evacuations. These commercials present a backpack and evacuation route as a solution to the devastation already caused by fires. While promoting fire safety and preparation is important, the message to the fire victims in these communities is that these fires are inevitable, and they are not the Debtors' responsibility.

Communications between fire victims and insurers have also caused confusion. Fire victims are uniformly stating that they have not been told by their adjusters that they could make a claim against the Debtors for their underinsured amounts and other damages. (Gardner Decl. at ¶ 9; Davis Decl. at ¶ 5; and Shamsavari Decl. at ¶ 6). Many of the fire victims' insurance claims remain open. (Mooney Decl. at ¶ 8; Everidge Decl. at ¶ 10; Shamsavari Decl. at ¶ 6). Most of the fire victims have not completed rebuilds. (Barton Decl. at ¶ 7; Mooney Decl. at ¶ 7). Almost none of the fire victims were told the amounts of the claims the insurers are making from their losses. (Barton Decl. at ¶ 6; Everidge Decl. at ¶ 7; Thomas Decl. at ¶ 9). Almost none were told the

10

insurance companies filed claims for Tubbs and then later settled Tubbs with PG&E. (Bojarsky Decl. at ¶ 7). The insurers' $11 billion cash settlement is an important fact that the fire victims should now be given time to consider. "I recently learned that the insurance companies in this bankruptcy settled for around $10 billion." (Mooney Decl. at ¶ 8).

In her declaration, Camp Fire survivor Patricia Garrison presents a summary of the common misunderstandings and gaps of information that exist throughout her community of Camp Fire victims, which is consistent with the experiences of the other declarants pertaining to other wildfires:

- Some fire victims do not understand why they should file a proof of claim in this bankruptcy; they do not understand the benefits of filing a proof of claim.
- Some fire victims have not received a proof of claim form; often because they have been displaced and are no longer receiving mail at their former address.
- Some fire victims have stated the information regarding the proof of claim is lost among the many flyers, emails, and post cards they are receiving from marketing law offices.
- Some fire victims believe that there is no point in filing a claim because PG&E is bankrupt and has no money to give them.
- Some fire victims believe that they are not entitled to make a claim if they received any payment from their insurance company.
- Some fire victims believe that they can file a claim if they lost their home, but are unaware of other claims that are recoverable such as emotional distress.
- Other fire victims believe that if they were renting, they do not have a claim to make.
- Some fire victims do not know that if they were uninsured or underinsured they can still make a claim.

### C. **Impairment Caused by Issues Concerning the Notice Given**

The victims' impairment also extends to notice of the Fire Bar Date. The Debtors' notice mailings were not an influential factor in the participation decisions by their apparent absence. Many do not recall ever receiving the notice. *See* Gardner Decl. at ¶ 8; Davis Decl. at ¶ 6; Brown Decl. at ¶ 11; Gardner Decl. at ¶ 9; Mooney Decl. at ¶ 9; Chocktoot Decl. at ¶ 8; Thomas Decl. at ¶ 7; Everidge Decl. at ¶ 9; Shamsavari Decl. at ¶ 8.

Assuming the notice was received in the mail, it may have been discarded as junk mail, not trusted, or considered a scam. Ongoing trauma and PTSD has prevented many from understanding the significance of the notice, or being able to read it. (Bradway Decl. at ¶ 9; Brown Decl. at ¶ 10;

11

Davis Decl. at ¶ 3; Gardner Decl. at ¶ 3; Mooney Decl. at ¶ 3; Chocktoot Decl. at ¶ 6). The notice could be found to be confusing to a lay person. "I do not recall [the notice] coming with the normal PG&E envelope that PG&E customers get. The questions were confusing; I didn't understand what they meant." (Bradway Decl., at ¶ 9). The Debtors did not send out the notice in PG&E bills. Instead, the notice was sent by Prime Clerk in an envelope that was not the official PG&E stationary, familiar to Northern Californians. In a time when most delivered mail is junk mail, the notice was not sufficiently identifiable as an important legal notice.

Moreover, the communities affected by the fires have more recently addressed protracted periods without power, and therefore without internet access, adding to the burdens of daily life, the burdens of keeping a business afloat, and the confusion surrounding their rights in these Cases in the days leading up to the current Fire Bar Date. These power shut-offs brought back memories of the fires, coincided with the two-year anniversary of the 2017 North Bay Fires, and preceded the one-year anniversary of the Camp Fire. For a fire victim dealing with deep, emotional trauma, a year or two is a short space of time for recovery, and anniversaries are particularly cruel for the reminders that they bring. These are significant impairments that have prevented fire victims from filing claims, but should not be allowed to bar them from participating in these Cases.

## V. THE TCC'S PROPOSAL

The TCC proposes the following solutions to this problem.

<u>Extend the Fire Claims Bar Date.</u> The TCC proposes that the Court adopt one of the following methods to extend the fire claims bar date:

1. An Order extending the bar date of October 21, 2019 to January 31, 2020, on the ground that a substantial number of fire victims have been unable to file proofs of claim in this case, because they erroneously believe they may not file claims, have not received notice of the case, or are physically, mentally and/or emotionally impaired as a result of the trauma, injuries and living conditions caused by the Debtors' fires.

2. In the alternative, an Order extending the bar date of October 21, 2019 to December 5, 2019; appointing an independent Court-Appointed Expert pursuant to Fed. R. Evid. 706 to investigate the extent to which fire victims have not received notice of the current bar

12

date, erroneously believe they may not file claims in this case, or are physically, mentally or emotionally impaired from filing claims by the current or extended bar date; and extending the bar date past December 5, 2019, up through a maximum extension of January 31, 2020, to the extent the Court determines following receipt of the Court-Appointed Expert's report that there is cause for such a further extension.

<u>Appoint a Fiduciary to Educate Victims</u>. The TCC further proposes that the Court appoint a Fiduciary to educate the fire victims and to assist the fire victims to file claims, to the extent the Fiduciary determines the victims are under physical, mental or emotional circumstances that impair their ability to file claims without assistance. The TCC's counsel's visit to the FEMA camp established that a fiduciary is necessary to educate and assist these victims, because their traumas and living conditions impair their ability to fill out the claim form. Such assistance is necessary in order to partially remedy the trauma that PG&E caused. Without such assistance, the TCC believes the extension may not provide a solution for the thousands of impaired survivors.

## VI. LEGAL ARGUMENT

Fed. R. Bankr. P. 3003(c)(3) provides that a court may extend the time for filing claims "for cause shown." Extensions of the bar date may be granted by filing a motion, for cause shown, prior to the expiration of the bar date. *In re Tomlan*, 102 B.R. 790, 791-92 n.1 (Bankr. E.D.Wash. 1989), *aff'd, per curiam*, 907 F.2d 114 (9th Cir. 1990). "Cause" has included situations where creditors have not received actual notice. *See, e.g., In re First Magnus Fin. Corp.*, 415 B.R. 416, 422 (Bankr. D. Ariz. 2009); *cf. Omni Mfg., Inc. v. Smith (In re Smith)*, 21 F.3d 660, 666 (5th Cir. 1994) ("cause," not "excusable neglect," is the standard that applies to a request for a bar date extension that is filed before the bar date expires).

It is a general equitable principle that deadlines are frequently extended for those who are impaired or lack competence to meet the deadlines on time. *Ernst & Young v. Matsumoto (In re United Ins. Mgmt., Inc.)*, 14 F.3d 1380, 1384 (9th Cir. 1994) (equitable tolling applies where a party is ignorant of a wrong without any fault or lack of diligence on their part). "As a general rule, 'this equitable doctrine is read into every federal statute of limitation.'" *Id.*, at 1384-85 (*quoting Holmberg v. Armbrecht*, 327 U.S. 392, 397, 90 L. Ed. 743, 66 S. Ct. 582 (1945)). *See also Shrader*

13

*v. Harris*, 631 F.2d 297, 301-02 (4th Cir. 1980) (extending social security review deadline to permit hearing for plaintiff who demonstrated mental impairment that hindered an understanding of the procedure); *Elchediak v. Heckler*, 750 F.2d 892, 894-95 (11th Cir. 1985) (plaintiff raises colorable constitutional claim for lack of due process to address failure to meet filing deadline where he could show mental impairment and pro se status); *Parker v. Califano*, 644 F.2d 1199 (6th Cir. 1981) (plaintiff raises colorable constitutional due process claim if there is evidence that a failure to take advantage of administrative remedies was due to plaintiff's suffering from a mental illness at the time).

Inadequate notice of the bar date "is a defect which precludes discharge of a claim in bankruptcy." *Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d Cir. 1995). When actual or constructive notice is required, a "process which is a mere gesture is not due process." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950). "[N]otice must be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174 (1974). The level of notice due to a party is "highly dependent on the context;" thus, a "process that may be constitutionally sufficient in one setting may be insufficient in another." *In re Mansaray-Ruffin*, 530 F.3d 230, 239 (3d Cir. 2008). This Motion seeks to address both aspects of deficient notice in these Cases: both content and delivery. *Fogel v. Zell*, 221 F.3d 955, 962 (7th Cir. 2000) ("Fair or adequate notice has two basic elements: content and delivery. If the notice is unclear, the fact that it was received will not make it adequate").

In chapter 7 cases, courts have held that a debtor's negligence in providing sufficient notice, such as a failure to include all creditors and their mailing addresses on the matrix, is "cause" to permit a timely extension of a bar date under F.R.B.P. 3002(c). *See In re Vanderpol*, 2019 Bankr. LEXIS 3191 *15-16, 2019 WL 4880065 (Bankr. D. Colo. August 28, 2019) (extending bar date where matrix omitted creditor); *In re Jackson*, 2019 Bankr. LEXIS 2300 *3-4, 2019 WL 3797580 (Bankr. D. S.C. July 24, 2019) (extending bar date where debtor failed to include creditor on matrix). This Motion is based on the broader definition of "cause" that applies in chapter 11 cases,

under Rule 3003, but the grounds for "cause" are the same. Inadequate notice to known creditors should be addressed with a reasonable extension of the bar date.

In this case, virtually every fire victim is a "known" creditor, as every household that received electrical power in the vicinity of the fires was a known entity to the Debtors for former billing and account purposes, and is therefore a known creditor. As such, they are all entitled to <u>actual</u> notice, not mere publication notice. *In re Argonaut Fin. Servs., Inc.*, 164 B.R. 107, 110 (N.D. Cal. 1994) ("Courts have found that known creditors are deserving of actual notice while unknown creditors are owed only publication notice.") (citations omitted). But in these unprecedented Cases, the Debtors' own negligence has erased thousands of those known mailing addresses from the map, and has scattered many of those residents to addresses unknown. Notices sent to pre-fire billing addresses will omit thousands. But more to the point, we are looking at 15,000 to 20,000 former renters, for whom the Debtors may not have an address; and a fiduciary is necessary to try to provide actual notice to those who are impaired. Dr. Pittman has testified that the fire victims have suffered PTSD and related trauma that will impair their ability to file claims in this case. (Pitman Decl., at ¶ 9). Such impairment compels equitable relief. *In re United Ins. Mgmt., Inc.)*, 14 F.3d at 1384. In these unprecedented Cases, the evidence establishes that this impairment is systemic.

The Debtors' own actions have created this environment in which a traditional bankruptcy noticing plan will not reach a substantial percentage of creditors who are entitled by law to receive actual notice of the claims bar date. And while the TCC acknowledges that it will not likely be possible to provide actual notice to *every* fire victim, that is not the relief requested in this Motion. An extension of the Fire Bar Date, and the assistance of a fiduciary to actively reach a far greater number of fire victims than have received notice thus far, would at least represent a substantial effort to comply with the mandatory notice requirement, and with the equities that this case demands.

The process that was established in June 2019 may have seemed sufficient at the time, given the facts and circumstances that existed. But now we have the benefit of hindsight, along with a greater understanding of the timeline that will apply to claims estimation and plan confirmation.

15

There is no justification for a bar date to terminate the rights of fire victims three months before the estimation trial begins.

Due process has not been provided to tens of thousands of fire victims who are now at risk of being deprived of funds that they desperately need to rebuild their lives. The circumstances that give rise to this Motion are circumstances of the Debtors' own making. Known creditors have become unknown addressees not by their own conduct, but because their homes and communities have been destroyed through the Debtors' negligence. The bankruptcy system requires flexibility to address this critical need in a case without precedent. Under the relief requested by the TCC, the estimation trial will proceed as scheduled, and the Debtors will still exit bankruptcy prior to the June 2020 deadline. And, importantly, thousands of California fire victims who have not appeared in these cases will have the opportunity to become eligible to receive compensation for their claims. This pleading is captioned as motion, but it is actually a plea for the unrepresented victims that truly deserve this Court's understanding.

### VII. CONCLUSION

For the foregoing reasons, the TCC respectfully requests that the Court grant the relief requested in the Motion, and any other relief that the Court believes is just and proper.

Dated: October 18, 2019

Respectfully submitted,

BAKER & HOSTETLER LLP

By: /s/ *Robert Julian*
     Robert Julian

*Counsel for The Official Committee of Tort Claimants*