WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C. (*pro hac vice*)
(ray.schrock@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

CRAVATH, SWAINE & MOORE LLP
Paul H. Zumbro (*pro hac vice*)
(pzumbro@cravath.com)
Kevin J. Orsini (*pro hac vice*)
(korsini@cravath.com)
Omid H. Nasab (*pro hac vice*)
(onasab@cravath.com)
825 Eighth Avenue
New York, NY 10019
Tel: 212 474 1000
Fax: 212 474 3700

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors*
*and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>    **- and -**<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>                 **Debtors.**<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case,*<br>  *No. 19-30088 (DM).* | Bankruptcy Case No. 19-30088 (DM)<br>Chapter 11<br>(Lead Case) (Jointly Administered)<br><br>**DEBTORS' REPLY IN SUPPORT OF SUBROGATION CLAIMS SETTLEMENT AND RSA MOTION**<br><br>Re: Docket Nos. 3992 and 3993<br><br>Date: October 23, 2019<br>Time: 10:00 a.m. (Pacific Time)<br>Place: United States Bankruptcy Court<br>       Courtroom 17, 16th Floor<br>       San Francisco, CA 94102<br>Judge: Hon. Dennis Montali |

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

1   PG&E Corporation ("**PG&E Corp**.") and Pacific Gas and Electric Company

2   (the "**Utility**"), as debtors and debtors in possession (collectively, "**PG&E**" or the "**Debtors**") in the

3   above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this Reply (the "**Reply**") in

4   support of the *Debtors' Motion Pursuant to 11 U.S.C. §§ 363(b) and 105(a) and Fed. R. Bankr. P. 6004*

5   *and 9019 for Entry of an Order (i) Authorizing the Debtors to Enter into Restructuring Support*

6   *Agreement with the Consenting Subrogation Claimholders, (ii) Approving the Terms of Settlement with*

7   *Such Consenting Subrogation Claimholders, including the Allowed Subrogation Claim Amount, and*

8   *(iii) Granting Related Relief*, dated September 24, 2019 [Docket No. 3992] (the "**RSA Motion**")[1] and in

9   response to the various objections filed with respect thereto (collectively, the "**Objections**" filed by

10  the "**Objectors**").[2]

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

26  [1] Capitalized terms used not otherwise defined herein have the meanings assigned to them in the RSA
    Motion.

27  [2] The Objections include, without limitation, the objections and limited objections found at Docket Nos.

28  4220, 4231, 4232, 4236, 4237, 4239, and 4241.

# TABLE OF CONTENTS

Page

I.  PRELIMINARY STATEMENT ................................................................6

II. CERTAIN OF THE OBJECTIONS HAVE BEEN RESOLVED ..................................9

III. THE REMAINING OBJECTIONS TO THE RSA MOTION SHOULD BE OVERRULED ............................................................................................11

    A.    Entry into the RSA and Subrogation Claims Settlement Represents a Major Accomplishment in these Chapter 11 Cases, is not Inconsistent with the Court's Recent Decision to Terminate Exclusivity and Furthers the Prospects of Achieving a Global Settlement ................................11

    B.    Approval of the Subrogation Claim Settlement, including the Allowed Subrogation Claim Amount and Payment of Fees of the Ad Hoc Professionals, is Fair and Equitable and in the Best Interests of the Debtors' Estates and Satisfies the Requirements of Bankruptcy Rule 9019 ....................................................................................................15

    C.    The TCC's Made-Whole Objection Should be Summarily Rejected ...............18

    D.    The Class of Subrogation Claims is an Impaired Class ..................................20

    E.    The RSA Complies with Section 1125 of the Bankruptcy Code......................21

IV. CONCLUSION ........................................................................................23

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

**Cases**                                                                   **Page(s)**

*In re Allied Nevada Gold Corp.*,
   Case No. 15-10503 (MFW) (Bankr. D. Del. Aug. 27, 2015) ......................................13

*In re AWTR Liquidation Inc.*,
   548 B.R. 300 (Bankr. C.D. Cal. 2016) ..................................................................15, 16

*Century Glove, Inc. v. First American Bank of New York*,
   860 F. 2d 94 (3d Cir. 1988)...................................................................................1

*In re Charter Commc'ns*,
   419 B.R. 221 (Bankr. S.D.N.Y. Nov. 17, 2019) ...............................................17

*Draney v. Wilson, Morton, Assaf & McElligott*,
   No. CIV. 79-1029, 1985 WL 5820 (D. Ariz. Sept. 30, 1985)................................18

*Dumont v. Charles Schwab & Co.*,
   No. CIV.A. 99-2840, 2000 WL 1023231 (E.D. La. July 21, 2000)............................18

*In re Eagle Bulk Shipping Inc.*,
   Case No. 14-12303 (SHL) (Bankr. S.D.N.Y. Sept. 18, 2014) ........................13

*In re Energy Future Holdings Corp.*,
   Case No. 14-10979 (CSS) (Bankr. D. Del. Sept. 18, 2015) ...........................21

*In re Exide Technologies*,
   Case No. 13-11482 (KJC) (Bankr. D. Del. Feb. 2, 2015) .............................14

*In re FirstEnergy Solutions Corp.*,
   Case No. 18-50757 (AMK) (Bankr. N.D. Ohio April 30, 2019) ....................13

*In re Genco Shipping & Trading Ltd.*,
   Case No. 14-11108 (SHL) (Bankr. S.D.N.Y. April 25, 2014)...........................13

*In re Heritage Org., L.L.C.*,
   376 B.R. 783 (Bankr. N.D. Tex. 2007).........................................................22

*In re Hexion Holdings LLC*,
   Case No. 19-10684 (KG) (Bankr. D. Del. 2019) ........................................13

*In re Indianapolis Downs LLC*,
   486 B.R. 286 (Bankr. D. Del. 2013).........................................................9, 12, 13, 22

*Kaul v. Mentor Graphics Corp.*,
   No. 16-CV-02496-BLF, 2016 WL 6249024 (N.D. Cal. Oct. 26, 2016), *aff'd*, 730 F.
   App'x 437 (9th Cir. 2018) ......................................................................16

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

*In re Kellogg Square P'ship*,
   160 B.R. 336 (Bankr. D. Minn. 1993)..................................................................22

*In re Laser Realty, Inc. v. Fernandez (In re Fernandez)*,
   2009 Bankr. LEXIS 2846 (Bankr. D.P.R. Mar. 31, 2009) ..........................................17

*In re LightSquared Inc.*,
   Case No. 12-12080 (SCC) (Bankr. S.D.N.Y. Mar. 27, 2015) ......................................13

*In re Manuel Mediavilla, Inc.*,
   568 B.R. 551 (B.A.P. 1st Cir. 2017).................................................................17

*McCoy v. Kazi*,
   No. CV0807244SJOCWX, 2010 WL 11465179 (C.D. Cal. Aug. 27, 2010) ...................16

*In re Milagro Holdings*,
   LLC, Case No. 15-11520 (KG) (Bankr. D. Del. 2015) ...............................................13

*In re Sabine Oil & Gas Corp.*,
   555 B.R. 180 (Bankr. S.D.N.Y. 2016)...............................................................18

*In re SeraCare Life Sciences*,
   Case No. 06-00510 LA11 (Bankr. S.D. Cal. Dec. 21, 2006)........................................14

*In re TK Holdings Inc.*,
   Case No. 17-11375 (BLS) (Bankr. D. Del. Dec. 13, 2017)....................................13, 21

*Trans World Airlines, Inc. v. Texaco Inc. (In re Texaco Inc.)*,
   81 B.R. 813, 815 (Bankr. S.D.N.Y. 1988) ............................................................12

*In re Walter Energy, Inc.*,
   Case No. 15-02741-TOM11 (Bankr. N.D. Ala. Sept. 14, 2015) ...................................13

**Statutes**

11 U.S.C. § 101 ........................................................................................16

11 U.S.C. § 101(27) ..................................................................................10

11 U.S.C. § 1125(b) ................................................................................7, 21

**Other Authorities**

Fed. R. Banrk. P. 9019 ..........................................................................7, 9, 15, 16

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

## I.      PRELIMINARY STATEMENT

The Debtors have made what the Court and, indeed, all other parties in interest have acknowledged as "substantial progress" in the administration of their Chapter 11 Cases by achieving a settlement of all Subrogation Claims (the "**Subrogation Claims Settlement**") and filing the *Debtors' First Amended Joint Chapter 11 Plan of Reorganization* on September 23, 2019 [Docket No. 3966] (the "**Debtors' Plan**").  The Subrogation Claims Settlement has resolved $20 billion of Subrogation Claims for consideration to be paid under the Debtors' Plan in the amount of $11 billion, representing a 45% discount.

Notably, the Ad Hoc Noteholders Committee (the "**Ad Hoc Noteholders Committee**") and the Official Committee of Tort Claimants (the "**TCC**"), having been unsuccessful in frustrating the Debtors' efforts to achieve the Subrogation Claims Settlement and in order to convince this Court to terminate the Debtors' exclusive periods, quickly adopted the Debtors' Subrogation Claims Settlement, and advised the Court that if they were authorized to file a competing plan, they would treat the Subrogation Claims in the same way, including from the TCC's perspective, abandoning any contention that the Subrogation Claims be subordinated based on made-whole principles or otherwise.  Under these circumstances, for the TCC to dedicate virtually all of its Objection to the approval of the RSA on this basis is not only disingenuous, but an affront to this Court and to the chapter 11 process.

As is customary, the Subrogation Claims Settlement that was reached between the Debtors and the Consenting Creditors was embodied in the RSA.  As the Objectors are well aware, the terms of the RSA hardly are unique, unusual or atypical and, as stated, document a settlement that is admittedly fair and reasonable and significantly advances the timely and successful administration of these cases.[3]  As the Court indicated in its ruling on their motion to terminate the Debtors' exclusive periods, it was not going to "second-guess" the TCC's decision to partner with the Ad Hoc Noteholders Committee's plan (the "**Elliott Plan**").  *See* Order Term. Excl. Periods [Docket No. 4167] at 3:6-9.  The

---

[3] The Debtors inadvertently did not mention in the RSA Motion that in PG&E's prior chapter 11 case, the Utility agreed, apparently in response to certain objections, to remove the voting restriction in a plan support agreement that was presented to the Court for approval.  The Debtors are not aware as to whether the Court actually ruled on this issue in connection with that matter.

Court should take the same approach with respect to the Subrogation Claimants. They have agreed with the Debtors to settle their claims on the terms set forth in the RSA, having determined that this is the best path to a successful conclusion of these Chapter 11 Cases, and, indeed, made that decision while being actively pursued by the TCC and the Ad Hoc Noteholders Committee to support the Elliott Plan. As the Court is well aware, termination of the Debtors' exclusive periods only means that a competing plan may be filed, it is not a license to interfere with and undermine the Debtors' efforts to build a consensus for their Plan.

The principal Objections to the RSA Motion are summarized as follows:

1. Approval of the RSA would be inconsistent with the Court's recent order terminating the Debtors' exclusive periods;

2. Approval of the RSA would require the Debtors to pay the holders of Subrogation Claims $11 billion under all circumstances, including if it were determined the Debtors were insolvent;

3. The RSA somehow is violative of the individual wildfire claimants' made-whole rights under California law, and provides for improper releases;

4. The Allowed Subrogation Claim Amount of $11 billion is not a fair compromise and settlement under Bankruptcy Rule 9019; and

5. The RSA constitutes an inappropriate solicitation of votes on a plan in contravention of section 1125 of the Bankruptcy Code.

The Objections should be overruled for obvious reasons. They assert no legal or factual basis to frustrate what this Court has characterized as "substantial progress" in these cases, and both the Ad Hoc Noteholders Committee and the TCC expressly support the Subrogation Claims Settlement. Denial of the RSA will constitute a significant setback in these cases, resurrecting $20 billion in claims and the specter of insolvency, to the detriment and prejudice of all parties in interest. The Court should not let this scenario unfold.

As indicated above, and as the Court must recognize, the RSA is a customary agreement with customary provisions, including those relating to the support of the Debtors' Plan. Indeed, that is perhaps the most fundamental provision of any RSA. Plan support agreements such as the RSA are routinely approved in recognition of how they serve to build consensus and advance the administration of chapter 11 cases. Notably, no party has cited any legal authority as a basis to reject approval of the

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

RSA, including the plan voting provisions provided for therein.

The contention that the recent termination of the Debtors' exclusive periods somehow compels a different result also lacks any supporting authority. Under the Objectors' logic, it would never be appropriate to approve an RSA with plan voting restrictions because in every case a debtor's exclusive periods could be terminated. In fact, all RSAs contemplate the circumstances of alternative plans and, therefore, the termination of exclusivity, and routinely are approved.

Moreover, there is no evidence that approval of the RSA will inhibit the ability to achieve a global resolution of these Chapter 11 Cases. As set forth in the October 21, 2019 letter from Mr. Feldman of the Willkie Farr & Gallagher firm, counsel to the Ad Hoc Subrogation Group (the "**Willkie Letter**"),[4] and as the Debtors agree, "nothing in the RSA precludes the Debtors and the Ad Hoc Subrogation Group from negotiating together with any other creditor constituencies or participating in mediation to achieve a global consensus." Willkie Letter ¶ 1. Both the Debtors and the Ad Hoc Subrogation Group intend to pursue this goal and the Debtors hope that the TCC and Ad Hoc Noteholders Committee share this view as well. Indeed, as counsel for the TCC told the Court at the recent exclusivity hearing (again in an apparent effort to convince the Court to terminate exclusivity) – the TCC would only engage in mediation if the Court terminated the Debtors' exclusive periods. *See* Hr'g Tr. (Oct. 7, 2019) at 166:2-9. Having achieved that goal, hopefully the TCC will live up to its commitment to the Court.

The specter raised by the UCC that the RSA would enable the Subrogation Claimants to receive $11 billion, even if the Debtors were determined to be insolvent, also has been addressed. First, as a practical matter, no plan could meet the requirements for confirmation under the circumstances the UCC posits. In any event, the Willkie Letter again disposes of this Objection, making it clear that, if the Court determines the Debtors are insolvent, the Debtors no longer are required to file a plan that pays Subrogation Claimants $11 billion. *See* Willkie Letter ¶ 2.

The TCC's Objection, which is dedicated primarily to its contention that the RSA violates the made-whole rights of certain wildfire claimants, simply is wrong. There is nothing in the RSA which

---

[4] A copy of the Willkie Letter is annexed hereto as **Exhibit A**.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

compels any individual wildfire claimant to release or waive any made-whole rights, and the TCC's mischaracterization of the terms of the RSA cannot change this. Moreover, because the Debtors' Plan will comply with AB 1054, there can be no made-whole issue in any event. As noted above, for the TCC to raise this objection after having agreed in open court to file a plan with the same treatment for the Subrogation Claims as the Debtors' Plan is tantamount to bad faith. Nevertheless, to dispel any possible basis for the TCC's Objection, as noted in the Willkie Letter, Section 10.9(b) of the Debtors' Plan will be amended to require claimants to opt-in to releases, consistent with the Elliott Plan.

The TCC's assertion that the settlement of the Subrogation Claims at a 45% discount does not satisfy the requirements of Bankruptcy Rule 9019 fares no better. In the first instance, no other party has raised this objection, obviously recognizing the fairness of the compromise and settlement that was the culmination of long and hard fought, arms' length negotiations. Moreover, having adopted the settlement for itself to convince the Court to terminate the Debtors' exclusive periods, the TCC is estopped from raising this objection.

Lastly, as demonstrated below, any contention that the RSA constitutes an improper solicitation completely misses the mark. The RSA is the culmination of negotiations among sophisticated parties – something to be encouraged in chapter 11 cases. As appropriately noted by Judge Shannon in *In re Indianapolis Downs LLC*, 486 B.R. 286, 297 (Bankr. D. Del. 2013), in approving a restructuring support agreement:

> But consistent with the holding in *Century Glove*, courts must be chary of construing those disclosure and solicitation provisions in a way that chills or hamstrings the negotiation process that is at the heart of Chapter 11.

The Debtors have achieved a significant accomplishment in these Chapter 11 Cases that is critical to moving these cases forward toward a timely and successful conclusion. The Objectors have put forth no legitimate reasons why that accomplishment should be frustrated and why the relief requested in the RSA Motion should not be approved.

## II. CERTAIN OF THE OBJECTIONS HAVE BEEN RESOLVED

The Debtors have been in discussions with various parties regarding the RSA Motion, including the U.S. Trustee, the U.S. Department of Justice, and counsel for California's Governor's

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Office of Emergency Services and the Department of Veterans Affairs, and have agreed to certain clarifications or other revisions to the Proposed Order to address the concerns of such parties. These changes include, among other things, adding language to the Proposed Order clarifying that the claims of Governmental Units (as defined in section 101(27) of the Bankruptcy Code) are not included in the definition of Subrogation Claims for purposes of the RSA and the Subrogation Claims Settlement, and adding procedures for the review of the reasonable professional fees and expenses of certain of the Ad Hoc Professionals. A revised form of Proposed Order incorporating these and other changes (the "**Revised Proposed Order**") will be filed with the Court prior to the hearing on the RSA Motion.

In addition, as set forth above, the Willkie Letter addresses and dispenses with many of the Objections and, to the extent required, clarifying language will be added to the Revised Proposed Order. This includes:

- ***Plan Negotiations/Global Settlement.*** Clarifying that nothing in the RSA precludes the Debtors and the Ad Hoc Subrogation Group from negotiating together with any other creditor constituencies or participating in mediation to achieve a global consensus.

- ***Consequences of Insolvency.*** Clarifying that if the Court determines the Debtors are insolvent, the Debtors will no longer be required to (a) file a plan that pays subrogation claimants $11 billion in cash on $11 billion of allowed claims; (b) require that individual claimants in connection with a voluntary settlement release made-whole claims pursuant to Section 3(a)(iii) of the RSA for the portion of their allowed claims against the Debtors' estates that are not fully satisfied under the Debtors' Plan, or (c) pursue a plan or confirmation order with the finding set forth in Section 3(a)(v) of the RSA, relating to satisfaction of certain provisions of AB 1054.

  If the Court determines the Debtors are insolvent and the Debtors file a revised plan that does not pay the subrogation claimants $11 billion in cash, the Consenting Creditors would be free to vote for or against any such revised plan. For the avoidance of doubt, subject to the right to terminate the RSA and seek a higher claim as provided in the RSA, the subrogation claims would continue to be allowed in the aggregate amount of $11 billion.

- ***Releases.*** Three clarifications with respect to the releases referenced in Section 3(a)(iii) of the RSA and Section 10.9(b) of the Debtors' Plan:

  o The releases of Subrogation Claimants are intended to narrowly address claims related to the Chapter 11 Cases and the Debtors' restructuring and any made whole claims that may be asserted relating to the 2017 and 2018

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

wildfires by individual plaintiffs who elect to settle their claims against the Debtors or a post-effective date trust (individually or as a group). There is no intention to impose a release of ordinary-course insurance claims by insureds arising under their insurance policies.

○ Section 10.9(b) of the Debtors' Plan will be amended to require claimants to opt-in to releases, consistent with the Elliott Plan, with respect to any release of Subrogation Claimants under the plan.

○ Pursuant to Section 3(a)(iii) of the RSA, payments to individual holders of wildfire claims that *settle* their claims against the Debtors or a post-effective date trust (individually or as a group) will be conditioned on executing a release of any made whole claims against insurers and their assignees. Individual plaintiffs that litigate their claims to judgment will have no such requirement. The Debtors and the Ad Hoc Subrogation Group will work with the TCC to ensure the form release is drafted to narrowly address only its intended purpose.

• ***RSA Amendments.*** Material RSA amendments will be noticed to the Court and parties in interest with an opportunity to respond, to make sure any material adjustment to the settlement passes muster under the applicable legal standard.

## III. THE REMAINING OBJECTIONS TO THE RSA MOTION SHOULD BE OVERRULED

### A. Entry into the RSA and Subrogation Claims Settlement Represents a Major Accomplishment in these Chapter 11 Cases, is not Inconsistent with the Court's Recent Decision to Terminate Exclusivity, and Furthers the Prospects of Achieving a Global Settlement.

As stated, the RSA and Subrogation Claims Settlement are critical milestones in these Chapter 11 Cases and significantly advance the Debtors' path to confirmation and their successful emergence from chapter 11 on a schedule that will meet the June 30, 2020 deadline established under AB 1054. Indeed, the Court previously referred to this settlement as "***major progress***" towards the advancement of these Chapter 11 Cases. Hr'g Tr. (Sept. 24, 2019) at 45:2 (emphasis added).

Certain of the Objectors, however, now contend that approval of the RSA is premature or no longer appropriate in light of the Court's recent decision to terminate the Debtors' exclusive periods and allow the filing of the Elliott Plan. Those parties, however, conveniently ignore the words of the Court in its opinion terminating exclusivity where the Court recognized that the Debtors' Plan "reflects successful resolution of major issues" specifically citing the announcement of the Subrogation Claims

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Settlement as evidence of such efforts. Order Term. Excl. Periods, at 2:9-18.

The Objectors now take issue with the standard and routine provisions of the RSA that require the Consenting Creditors to support solely the Debtors' Plan, arguing that such provisions work to undermine the Court's decision to terminate exclusivity. They are mistaken. The RSA and Subrogation Claims Settlement clearly work to achieve the stated and express goal espoused by the Court when it terminated exclusivity, namely building support and consensus for a "global resolution" and to "narrow the issues which are in legitimate dispute." Order Term. Excl. Periods, at 3:14-15. The Court further noted that it would be entirely appropriate and in fact a "very acceptable outcome" for one plan to emerge as confirmable, *id.* at 3:19-20, and, by entering into the RSA and successfully resolving the significant matters in dispute with the Subrogation Claimants, the Debtors are working to do just that. As estate fiduciaries, and as they did with the Public Entities Settlement before and now with the RSA and Subrogation Claims Settlement, the Debtors are continuing to work to build consensus towards a global resolution and remove issues that are in dispute to ensure that a plan may be confirmed in time to meet the June 2020 deadline imposed under AB 1054. Conversely, the Elliott Plan lines the pockets of the Noteholders at a cost of billions of dollars to customers and the Debtors' other economic stakeholders.

Absent the routine and customary plan support provisions set forth in the RSA, the Debtors' substantial efforts and hard-fought negotiations with the Ad Hoc Subrogation Group would be meaningless. Courts have stated as much when presented with similar challenges to approval of plan support agreements and voting lock-up provisions. *See, e.g., In re Indianapolis Downs, LL.*, 486 B.R. 286, 296 (Bankr. D. Del. 2013) (refusing to designate votes over an RSA provision that "predictably" contained a commitment to vote for the plan embodied in the deal, when "the record clearly reflects that the Restructuring Support Parties were acting at all times to maximize their own recoveries and to advance the Debtors' reorganization process to facilitate a prompt and substantial return on their respective claims"); *see also Trans World Airlines, Inc. v. Texaco Inc. (In re Texaco Inc.)*, 81 B.R. 813, 815 (Bankr. S.D.N.Y. 1988) ("If Pennzoil were free to support another plan while Texaco's plan was still capable of being approved, the negotiation between Texaco and Pennzoil would be meaningless.").

Again, as appropriately noted by Judge Shannon in *In re Indianapolis Down,s LLC*, 486 B.R. at 296:

> As noted, the record reflects that sophisticated parties negotiated a deal and memorialized that deal in the RSA; predictably, it contained a commitment to vote for a plan that embodied that deal. In the absence of such a provision, it does not appear that the parties would have had a deal. Negotiation and formulation of a plan in a large, complex Chapter 11 case such as this one is not a hypothetical exercise.

Simply put, reaching a negotiated settlement with a debtor is not an opportunity to set a floor and then to go and shop that deal to other constituencies. That is not a way to successfully advance the administration of a chapter 11 case.

The Objectors would have this Court accept the proposition that no restructuring or chapter 11 plan support agreement should ever be approved because in every chapter 11 case there exists the possibility that exclusivity may be terminated. That is clearly not a tenable position, as similar agreements with the precise support provisions set forth in the RSA are routinely approved by Courts in other cases and have been found to be instrumental in building consensus in other successful chapter 11 restructurings. Indeed, counsel for the Ad Hoc Noteholders Committee, the TCC, and the UCC routinely utilize such agreements with substantially similar provisions when representing the interests of both debtors and creditors in other chapter 11 cases. *See, e.g., In re Allied Nevada Gold Corp.*, Case No. 15-10503 (MFW) (Bankr. D. Del. Aug. 27, 2015) [Docket Nos. 755, 926]; *In re Eagle Bulk Shipping Inc.*, Case No. 14-12303 (SHL) (Bankr. S.D.N.Y. Sept. 18, 2014) [Docket Nos. 63, 95]; *In re FirstEnergy Solutions Corp.*, Case No. 18-50757 (AMK) (Bankr. N.D. Ohio April 30, 2019) [Docket Nos. 2151, 2577]; *In re Genco Shipping & Trading Ltd.*, Case No. 14-11108 (SHL) (Bankr. S.D.N.Y. April 25, 2014) [Docket Nos. 13, 47]; *In re Hexion Holdings LLC*, Case No. 19-10684 (KG) (Bankr. D. Del. 2019) [Docket No. 366]; *In re LightSquared Inc.*, Case No. 12-12080 (SCC) (Bankr. S.D.N.Y. Mar. 27, 2015) [Docket Nos. 1745, 2276]; *In re Milagro Holdings*, LLC, Case No. 15-11520 (KG) (Bankr. D. Del. 2015) [Docket Nos. 31, 138]; *In re TK Holdings Inc.*, Case No. 17-11375 (BLS) (Bankr. D. Del. Dec. 13, 2017) [Docket Nos. 1109, 1359]; *In re Walter Energy, Inc.*, Case No. 15-02741-TOM11 (Bankr. N.D. Ala. Sept. 14, 2015) [Docket Nos. 44, 724]. And, in fact, restructuring support agreements have been utilized and found to be entirely appropriate in similar circumstances where other Courts have made

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

the decision to terminate a debtor's exclusive periods. *Se,e e.g., In re Exide Technologies*, Case No. 13-11482 (KJC) (Bankr. D. Del. Feb. 2, 2015) [Docket Nos. 2893, 3087] (approving, after exclusivity had been terminated, a plan support agreement where certain supporting creditors agreed not to support or vote for any other plan); *In re SeraCare Life Sciences*, Case No. 06-00510 LA11 (Bankr. S.D. Cal. Dec. 21, 2006) [Docket Nos. 837, 961] (approving, after exclusivity had been terminated, a plan support agreement pursuant to which the signing parties agreed not to support any other plan).

Moreover, the Objectors fail to give proper deference to the clear and express intentions of the Subrogation Claimants as evidenced by their decision to enter into the RSA and the Subrogation Claims Settlement, which were the result of protracted, good faith, arms' length negotiations among sophisticated parties and competent and experienced retained professionals. After considering various offers and alternative proposals from the Debtors and other parties, including the Ad Hoc Noteholders Committee and the TCC, the Consenting Creditors made an informed decision to support the Debtors' Plan and enter into the RSA and Subrogation Claims Settlement. The members of the Ad Hoc Subrogation Group were not prevented from engaging with the members of the Ad Hoc Noteholders Committee or the TCC. To the contrary, the Noteholders and the TCC made every effort to undermine the negotiations between the Debtors and the Ad Hoc Subrogation Group right up until the time of the announcement of the Subrogation Claims Settlement. *See* Hr'g Tr. (Sept. 24, 2019) at 112:21-113:1, (Mr. Stamer: "but the bottom line is that [the Subrogation Claimants] have asked for and negotiated with the company for an eleven-billion-dollar pool of capital: cash, potentially some other noncash items….As Mr. Quershi said before, we actually offered that to the subrogation claimants over the weekend."). Perhaps more importantly, the RSA secures a recognized beneficial settlement and avoids a bidding war that would hinder rather than promote achieving a global consensus.

Entry into the RSA is evidence of the Consenting Creditors' clear preference for the Debtors' Plan and their belief that the best and most likely path towards a global consensual deal and the successful and timely conclusion of these cases is to support the plan filed by the Debtors. This was the position of the Subrogation Claimants prior to the Court's decision to terminate exclusivity, and remains their position today.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Any further concerns raised by the Objectors as to these customary RSA provisions easily are dispensed with by the clarifications set forth in the Willkie Letter, which will be incorporated as necessary into the Revised Proposed Order, that provide that "nothing in the RSA precludes the Debtors and the Ad Hoc Subrogation Group from negotiating together with any other creditor constituencies or participating in mediation to achieve a global consensus." Willkie Letter ¶ 1

Additionally, to clarify any misconception that, as certain Objectors argue, approval of the RSA would require the Debtors to pay holders of Subrogation Claims $11 billion under all circumstances, even if it were determined that the Debtors were insolvent, again, the Willkie Letter addresses and disposes of that objection as well. As stated in that letter, either the RSA can be amended or the order approving the RSA can provide that if the Court determines the Debtors are insolvent, the Debtors will not be required to (a) file a plan providing for the payment to the Subrogation Claimants of $11 billion, or (b) require that individual claimants release made-whole claims in connection with a voluntary settlement for the portion of their allowed claims that are not fully satisfied under such plan.

**B.  Approval of the Subrogation Claims Settlement, including the Allowed Subrogation Claim Amount and Payment of Fees of the Ad Hoc Professionals, is Fair and Equitable and in the Best Interests of the Debtors' Estates, and Satisfies the Requirements of Bankruptcy Rule 9019.**

Contrary to the assertions of the TCC and other Objectors, approval at this time of the Subrogation Claims Settlement, including the Allowed Subrogation Claim Amount and payment of the Ad Hoc Professionals' fees as contemplated in the RSA, is reasonable and appropriate and in the best interests of the Debtors' estates.

First, the TCC mistakenly contends that a heightened standard of scrutiny should apply when evaluating the Subrogation Claims Settlement, asserting that entry into the settlement constitutes an insider transaction with the Baupost Group LLC ("**Baupost**"). Not surprisingly, however, the TCC fails to cite any authority to support this proposition, nor can it. It is well-established that the "entire" or "inherent fairness" test only applies when reviewing transactions with "a dominant or controlling stockholder" and not minority shareholders such as Baupost. *In re AWTR Liquidation Inc.*, 548 B.R. 300, 318-19 (Bankr. C.D. Cal. 2016); *see also, Kaul v. Mentor Graphics Corp.*, No. 16-CV-02496-BLF,

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

2016 WL 6249024, at *10 (N.D. Cal. Oct. 26, 2016), *aff'd*, 730 F. App'x 437 (9th Cir. 2018) ("the standard of judicial review in examining the propriety of an interested cash-out merger transaction by a controlling or dominating shareholder is entire fairness."); *McCoy v. Kazi*, No. CV0807244SJOCWX, 2010 WL 11465179, at *14 (C.D. Cal. Aug. 27, 2010) ("The Plaintiffs state correctly that a controlling or dominating shareholder transacting with the corporation bears the burden of proving the transaction's entire fairness").  Not surprisingly, the TCC provides no evidence to support a finding that Baupost or any other Consenting Creditor is an insider or controlling or dominating shareholder.  In addition, the TCC similarly has presented no evidence whatsoever that Baupost's position as a creditor somehow makes it a statutory insider under section 101 of the Bankruptcy Code.  *See In re Village of Lakeridge, LLC*, 814 F.3d 993, 1001 (9th Cir. 2016).  Indeed, the record is uncontroverted that the RSA was the product of extensive, arms' length negotiations over many weeks and months, and substantial due diligence.  *See* Wells Decl. at 3-5; Wells Dep. Tr. (Oct. 10, 2019) at 36-55.

Second, the TCC stood before the Court at the status conference on September 24, 2019 (the "**September 24 Status Conference**"), and agreed to adopt the terms of the Subrogation Claims Settlement in an effort to convince the Court to terminate exclusivity and allow the TCC and the Ad Hoc Noteholders Committee to file the Elliott Plan.  Now, after the Court has granted that request, the TCC makes a complete about-face and argues that the terms of that settlement are not fair and equitable and in the best interests of the estates.  Not even the Ad Hoc Noteholders Committee, the TCC's co-plan proponent, has the temerity to make that argument.  Indeed, at no time at the hearings on September 24 and October 7 did the TCC indicate anything other than that it would adopt the $11 billion Subrogation Claims Settlement.  Under these circumstances, the TCC simply cannot credibly assert that the Subrogation Claims Settlement is not fair and equitable.

Further, as demonstrated in the Wells Declaration, the Subrogation Claims Settlement clearly satisfies the requirements of Bankruptcy Rule 9019.  In terms of absolute dollar amount, the settlement under any scenario clearly does not fall below the lowest point in the range of reasonableness.  The assertible Subrogation Claims likely exceed $20 billion.  The settled and compromised amount of $11 billion, although a very substantial sum, represents a significant reduction by approximately 45%.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Additionally, the record is uncontroverted that the Subrogation Claims Settlement is the product of protracted, good faith negotiations over a period of many months and substantial due diligence and professional advice received by the Debtors and their Board. *See* Wells Dep. Tr. (Oct. 10, 2019) at 36-55. As Mr. Wells noted in his deposition testimony, in the weeks preceding the execution of the Subrogation Claims Settlement, the Debtors' Board and its Restructuring Committee were meeting several times a week with their retained professionals to assess the status of the negotiations and how they were proceeding. *See* Wells Dep. Tr. (Oct. 10, 2019) at 60-62. Ultimately, the Debtors concluded that the terms of the RSA and Subrogation Claims Settlement were fair, reasonable, and in the best interests of the Debtors' estates and parties in interest. Under these circumstances, the Court should give deference to the Debtors' judgment that the terms are fair and reasonable. *See In re Charter Commc'ns*, 419 B.R. 221, 256 (Bankr. S.D.N.Y. Nov. 17, 2019) ("All parties to the CII Settlement were represented by highly regarded law firms and financial advisors with ample relevant experience in the restructuring field. The Court also notes that the parties to the Settlement themselves are sophisticated and experienced in high-stakes negotiations. This factor favors approving the settlement.").

Moreover, the TCC cannot reasonably expect the Debtors to set forth a detailed, point-by-point explanation or analysis of the probability of their success against the Subrogation Claimants in the estimation litigation that is currently still pending with respect to the TCC's constituency. Courts have routinely acknowledged that uncertainty of litigation and federal policy weigh in favor of approval of settlements. *See In re Laser Realty, Inc. v. Fernandez (In re Fernandez)*, 2009 Bankr. LEXIS 2846 at *9-10 (Bankr. D.P.R. Mar. 31, 2009) ("The Court concludes that the uncertainty of the litigation between the debtors and Citibank weighs heavily in favor of the approval of the Settlement Agreement . . ."); *In re Manuel Mediavilla, Inc.*, 568 B.R. 551, 567 (B.A.P. 1st Cir. 2017) (recognizing "federal policy encouraging settlement of bankruptcy litigation.").

The TCC and other Objectors look to second guess particular terms of the Subrogation Claims Settlement and would have the Court review those terms independently and in a vacuum, accepting some provisions and rejecting others. Such an approach, however, is entirely improper, and Courts repeatedly have held that settlements, such as the Subrogation Claims Settlement, should be

examined as a whole when determining whether such agreements are fair and equitable and in the best interests of debtors and their estates. *See, e.g., Draney v. Wilson, Morton, Assaf & McElligott*, No. CIV. 79-1029, 1985 WL 5820, at *2 (D. Ariz. Sept. 30, 1985) ("Compromise is the essence of settlement and the Court should not make the proponents of a proposed settlement justify each term of settlement against a hypothetical or speculative measure of which concessions might have been gained; inherent in compromise is a yielding of absolutes and abandoning of highest hopes."); *Dumont v. Charles Schwab & Co.*, No. CIV.A. 99-2840, 2000 WL 1023231, at *4 (E.D. La. July 21, 2000) ("The Court may not approve a settlement unless it finds that the settlement is fair, adequate and reasonable…However, the Court is not required to open to debate every provision of the proposed settlement."); *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 258 (Bankr. S.D.N.Y. 2016) ("In complex settlements, it is appropriate for the court not only to consider each settled claim individually but also to consider the reasonableness of the settlement agreement as a whole") (internal citations omitted).

Following good faith negotiations among the Debtors, the Subrogation Claimants, and their respective retained professionals, and after due deliberation and evaluation of the terms and issues presented, the Debtors and the Board determined that entry into the Subrogation Claims Settlement pursuant to the terms of the RSA was fair, equitable, and in the best interest of the Debtors' estates and parties in interest. Under well-established authority, the Court should give deference to that determination.

### C. The TCC's Made-Whole Objection Should be Summarily Rejected

As demonstrated above, the TCC's Objection premised on its assertion that made-whole principles somehow subordinate the entire class of Subrogation Claims is completely inconsistent with prior statements and representation made to the Court that it would not assert that position. Simply put, the TCC cannot have it both ways – it cannot, in an effort to convince the Court to terminate exclusivity, state that its competing plan would treat the Subrogation Claims the same, and a few days later raise the made-whole objection in the context of the RSA Motion and the Debtors' Plan.

Even if the Court were to permit this about-face, the TCC's objection must be rejected because the RSA and the Debtors' Plan are premised on the wildfire claimants being made whole – as

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

required by AB 1054. Additionally, with the clarification in the Willkie Letter, there are no impermissible releases either in the RSA or the Debtors' Plan.

### i. The Wildfire Claims will be Paid in Full under AB 1054

As the Debtors have stated repeatedly and as provided in the Debtors' Plan, implementation of the Debtors' Plan is conditioned on the Debtors' participation in the Go-Forward Wildfire Fund under AB 1054. (*See* Debtors' Plan Sections 6.9, 9.2). Specifically, in order for the Reorganized Debtors to participate in the Go-Forward Wildfire Fun, the Court must determine "that the resolution of the [Chapter 11 Cases] provides funding or . . . otherwise provides for satisfying any prepetition wildfire claims asserted against [the Debtors] in the amounts agreed upon in any . . . post-insolvency settlement agreements, authorized by the court through an estimation process or otherwise allowed by the court." AB 1054 § 3291(a)(1)(B). Accordingly, for the Debtors' Plan to be confirmed and go effective, there must be a determination that the TCC's constituency is satisfied in full. Thus, by definition there can be no made-whole claim.

### ii. There are No Impermissible Third Party Releases

To the extent the Objectors have raised issues with the scope of the releases set forth in Section 10.9(b) of the Debtors' Plan, as noted in the Willkie Letter, those will be addressed. The Debtors' Plan will be revised to make it clear that wildfire claimants must affirmatively opt-in to releases.

Further, despite the TCC's repeated statements that the Debtors' Plan and the RSA require all wildfire claimants to execute a release of all claims in order to receive *any* distribution under the Debtors' Plan (TCC Objection pp. 1, 20), that plainly is not the case. The RSA could not be clearer on this point. The Settlement Payment Condition in the RSA, which requires a release of potential made-whole claims against the Subrogation Claimants, applies only to consensual, voluntary settlements and not to any distribution under the Debtors' Plan. Section 3(a)(iii) of the RSA provides that the Debtors shall:

> [U]pon entry into any settlement with any holder or holders of IP Claims that fixes the amount or terms for satisfaction of an IP Claim, including with respect to rights against a post-Effective Date trust established for the resolution and payment of such Claims, require, as a condition to payment or other distribution to or for the benefit of such holder pursuant to such

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

settlement or other agreement, that the holder of the IP Claim contemporaneously execute and deliver a release and waiver of any and all claims to the fullest extent permitted by law against all parties in interest in the Chapter 11 Cases, including any potential made-whole claims against present and former holders of Subrogation Claims, which release shall be in form and substance reasonably acceptable to the Debtors and Requisite Consenting Creditors.

If a wildfire claimant elects to litigate and not voluntarily settle, all of its rights are preserved, including the right to pursue any made-whole claims against the Subrogation Claimants.

Accordingly, neither the RSA nor the Debtors' Plan will run afoul of applicable Ninth Circuit precedent, where the only non-debtor releases will be purely consensual.

### D.     The Class of Subrogation Claims is an Impaired Class

The Ad Hoc Noteholders Committee argues that the Debtors are artificially impairing the class of Subrogation Claims and that such determination should not be made at this time.  The Ad Hoc Noteholders Committee's position is meritless — the Subrogation Claims Settlement contemplates settlement of all Subrogation Claims at a significant (45%) discount.  Additionally, unlike other unsecured claimants, including the Noteholders, the treatment of the Subrogation Claims under the Debtors' Plan does not provide for the payment of prepetition or postpetition interest.  The Subrogation Claimants are not unimpaired simply because they have settled.  By that line of thinking, the claims of the TCC's constituency would also be considered unimpaired under the Elliott Plan as well.

Regardless, the Court already addressed this at the September 24 Status Conference when it clearly indicated that the class of Subrogation Claims under the Debtors' Plan is an impaired class. Specifically, the Court stated:

> MR. KAROTKIN: We expect that -- it's our view they are clearly -- that class is clearly impaired under the plan, and they will vote --
>
> THE COURT: *Oh, I don't doubt that, either*.
>
> MR. KAROTKIN: Okay.
>
> THE COURT: My point is that -- and you made it clear in the original plan -- I can't keep track of all your classes -- *but clearly it was an impaired class before the settlement. Now, it's still an impaired class*.

Hr'g Tr. (Sept. 24, 2019) 10:17-25. (*Emphasis supplied*).  In light of the above, and the undisputed facts and circumstances that are obvious to all parties in interest and presented in the RSA Motion, the class

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

of Subrogation Claims is clearly an impaired class.

**E.    THE RSA COMPLIES WITH SECTION 1125 OF THE BANKRUPTCY CODE**

The RSA also satisfies the requirements of section 1125 of the Bankruptcy Code.  Section 1125(b) provides that "[a]n acceptance or rejection of a plan may not be solicited after the commencement of the case under this title . . . unless, at the time of or before such solicitation, there is transmitted . . . a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information." 11 U.S.C. § 1125(b).

Courts generally construe section 1125(b) narrowly and find that the provision should not by itself be a reason to restrict a debtor's ability to reach consensual resolutions after the commencement of a chapter 11 case. *See, e.g.*, *Century Glove, Inc. v. First American Bank of New York*, 860 F. 2d 94, 101 (3d Cir. 1988).  For example, courts have approved post-petition restructuring support agreements where, as here, the agreements require the parties to use commercially reasonable efforts to pursue confirmation of a specific plan of reorganization and not support any other alternatives. *See, e.g.*, *In re TK Holdings Inc.*, Case No. 17-11375 (BLS) (Bankr. D. Del. Dec. 13, 2017) [Docket No. 1359] (approving support agreement that required Debtors to support and take "all commercially reasonable steps necessary and appropriate" to facilitate approval and confirmation of the plan, disclosure statement, and global settlement); *In re Energy Future Holdings Corp.*, Case No. 14-10979 (CSS) (Bankr. D. Del. Sept. 18, 2015) [Docket No. 6097] (approving plan support agreement requiring parties to use "commercially reasonable efforts" to obtain court approval of the settlement, disclosure statement, and plan).

In addition, courts have approved post-petition restructuring support agreements that were entered into in the context of plan negotiations or settlement agreements, and have recognized that such agreements comply with the requirements of section 1125(b).  *See, e.g., In re Energy Future Holdings Corp.,* Case No. 14-10979 (Bankr. D. Del. Sept. 18, 2015) [Docket No. 6097] (approving postpetition plan support agreement pursuant to which creditor agreed to vote in favor of plan provided there were no material modifications to the agreed upon plan); *see also In re Indianapolis Downs, LLC*, 486 B.R. 286, 295 (Bankr. D. Del. 2013) (recognizing that parties could memorialize agreements reached

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

in support of plans because "Congress intended that creditors have the opportunity to negotiate with debtors and amongst each other . . . in a way that allows a Chapter 11 case to move forward."); *In re Heritage Org., L.L.C.*, 376 B.R. 783, 789–95 (Bankr. N.D. Tex. 2007) (agreement to vote for plan set forth in term sheet was not solicitation of official vote); *In re Kellogg Square P'ship*, 160 B.R. 336, 340 (Bankr. D. Minn. 1993).

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

## IV. CONCLUSION

Here, sophisticated Subrogation Claimants have made a decision to substantially compromise their claims and, as an integral part of that compromise, to pursue and support the Debtors' Plan. The Subrogation Claims Settlement and the RSA materially advance the administration of these Chapter 11 Cases and clearly represent a sound exercise of the Debtors' business judgment. The Court should neither second guess that business judgment nor second guess the decision of the Subrogation Claimants.

The Debtors request the Court approve the RSA Motion, overrule the remaining Objections, and grant such other relief to the Debtors as is necessary and appropriate.

**WEIL, GOTSHAL & MANGES LLP**

**KELLER & BENVENUTTI LLP**

By:  /s/ *Stephen Karotkin*
        Stephen Karotkin

*Attorneys for Debtors and Debtors in Possession*