**DIEMER & WEI, LLP**
Kathryn S. Diemer (#133977)
100 West San Fernando Street, Suite 555
San Jose, CA 95113
Telephone: 408-971-6270
Facsimile: 408-971-6271
Email: kdiemer@diemerwei.com

**WILLKIE FARR & GALLAGHER LLP**
Matthew A. Feldman (*pro hac vice*)
Joseph G. Minias (*pro hac vice*)
Benjamin P. McCallen (*pro hac vice*)
Daniel I. Forman (*pro hac vice*)
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email: mfeldman@willkie.com
        jminias@willkie.com
        dforman@willkie.com

*Counsel for Ad Hoc Group of Subrogation Claim Holders*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>**PG&E CORPORATION,**<br><br>-and-<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br>**Debtors.**<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☑ Affects both Debtors<br><br>*\* All papers shall be filed in the lead case,*<br>*No. 19-30088 (DM)* | Ch. 11 Bankr. Case No. 19-30088 (DM) (Jointly Admin.)<br><br>**REPLY IN SUPPORT OF DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 363(b) AND 105(A) AND FED. R. BANKR. P. 6004 AND 9019 FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO ENTER INTO RESTRUCTURING SUPPORT AGREEMENT WITH THE CONSENTING SUBROGATION CLAIMHOLDERS, (II) APPROVING THE TERMS OF SETTLEMENT WITH SUCH CONSENTING SUBROGATION CLAIMHOLDERS, INCLUDING THE ALLOWED SUBROGATION CLAIM AMOUNT, AND (III) GRANTING RELATED RELIEF**<br><br>**(THE "SUBROGATION SETTLEMENT AND RSA MOTION")**<br><br>Date:    October 23, 2019<br>Time:    10:00 a.m. (Pacific Time)<br>Place:   United States Bankruptcy Court<br>          Courtroom 17, 16th Floor<br>          San Francisco, CA 94102 |

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..................................................................................1

ARGUMENT ...........................................................................................................5

    A.    The TCC Is Estoped From Arguing That the Class of Subrogation Claims Is Subordinated to the Class of Wildfire Claims. ..................................6

    B.    The TCC's Made-Whole Objection Fails On The Merits. ...............................10

        1.    The RSA Is Predicated on the Eventual Confirmation of A Plan that Pays the Wild Fire Victims In Full...............................11

        2.    California Made-Whole Law Does Not Support Class Wide Subordination of Subrogation Claims ............................................13

    C.    The Releases in the RSA Are Enforceable. ...................................................19

        1.    The RSA Does Not Require Impermissible Third-Party Releases. ...........19

        2.    The Settlement Payment Condition Is Not a Mandatory Release. ...........19

    D.    The Covenants in the RSA Are Customary. ...................................................22

    E.    The Insolvency Termination Event in the RSA Is Reasonable...........................25

    F.    The RSA Is Not Subject to a Heightened Standard of Review...........................26

    G.    The Ad Hoc Subrogation Group Is Compromising $20 Billion in Claims.........................28

CONCLUSION..........................................................................................................28

-i-

## TABLE OF AUTHORITIES

**Case**      **Page(s)**

*21st Century Ins. Co. v. Superior Court,*
     47 Cal. 4th 511 (Cal. 2009)........................................................................................13

*In re A & C Props.,*
     84 F.2d 1377 (9th Cir. 1986) ....................................................................................5, 6

*In re Aegean Marine Petroleum Network Inc.,*
     No. 18-13374 (MEW) (Bankr. S.D.N.Y. Jan. 15, 2019) ..........................................22

*In re Aegerion Pharm., Inc.,*
     No. 19-11632 (MG) (Bankr. S.D.N.Y. Sept. 19, 2019)...........................................24

*In re Allied Nevada Gold Corp.,*
     No. 15-10503 (MFW) (Bankr. D. Del. Aug. 27, 2015) .....................................23, 24

*Asphalt Prof'ls Inc. v. Davis (In re Davis),*
     595 B.R. 818 (Bankr. C.D. Cal. 2019)........................................................................9

*In re Breitburn Energy Partners LP,*
     No. 16-11390 (SMB) (Bankr. S.D.N.Y. 2016)........................................................23

*Chandler v. State Farm Mut. Auto. Ins. Co.,*
     598 F.3d 1115 (9th Cir. 2010) ..........................................................................*passim*

*In re Circus & Eldorado Joint Venture,*
     No. 12-51156 (BTB) (Bankr. D. Nev. 2012) ..........................................................23

*In re Claire's Stores, Inc.,*
     No. 18-10583 (MFW) (Bankr. D. Del. Mar. 19, 2018) ...........................................23

*Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.),*
     68 F.3d 914 (5th Cir. 1995) .....................................................................................27

*Cox v. Cont'l Cas. Co.,*
     703 F. App'x 491 (9th Cir. 2017)..............................................................................10

*In re DACCO Transmission Parts (NY) Inc.,*
     No 16-13245 (MKV) (Bankr. S.D.N.Y. Mar. 21, 2017) ..........................................22

*In re Dow Corning Corp.,*
     244 B.R. 705 (Bankr. E.D. Mich. 1999).................................................................17

*Downing v. San Diego Gas & Elec. Co.,*
     No. D055820, 2010 WL 4233033 (Cal. Ct. App. Oct. 27, 2010)............................14

Case: 19-30088   Doc# 4348   Filed: 10/21/19   Entered: 10/21/19 13:29:21   Page 3 of 35

*In re Drexel Burnham Lambert Grp., Inc.*,
    134 B.R. 493 (Bankr. S.D.N.Y. 1991) ...................................................................27

*In re Eagle Bulk Shipping Inc.*,
    No. 14-12303 (SHL) (Bankr. S.D.N.Y. 2014) ...................................................23

*In re Eastman Kodak Co.*,
    No. 12-10202 (ALG) (Bankr. S.D.N.Y. 2012) ...................................................23

*In re Energy Future Holdings Corp.*,
    No. 14-10979 (CSS) (Bankr. D. Del. Sept. 18, 2015) .......................................24

*In re Exide Techs.*,
    No. 13-11482 (KJC) (Bankr. D. Del. Feb. 4, 2015) ..........................................24

*In re FirstEnergy Solutions Corp.*,
    No. 18-50757 (AMK) (Bankr. N.D. Ohio Apr. 30, 2019) .................................23

*Garbell v. Conejo Hardwoods, Inc.*,
    193 Cal. App. 4th 1563 (Cal. Ct. App. 2011) ...................................................15

*In re Great Atl. & Pac. Tea Co.*,
    No. 10-24549 (RDD) (Bankr. S.D.N.Y. 2010) ..................................................23

*In re Halcon Res. Corp.*,
    No. 16-11724 (BLS) (Bankr. D. Del. Aug. 19, 2016) ........................................22

*Hamada v. Far East Nat'l Bank (In re Hamada)*,
    291 F.3d 645 (9th Cir. 2002) ......................................................................16, 17

*Hamilton v. State Farm Fire & Cas. Co.*,
    270 F.3d 778, 782 (9th Cir. 2001) ..................................................................9, 10

*Hibbs v. Allstate Insurance Co.*,
    193 Cal. App. 4th 809 (Cal. Ct. App. 2011) .....................................................18

*In re HyLoft, Inc.*,
    451 B.R. 104 (Bankr. D. Nev. 2011) ................................................................27

*In re Key Energy Servs., Inc.*,
    No. 16-12306 (BLS) (Bankr. D. Del. Dec. 6, 2016)..........................................22

*In re LightSquared Inc.*,
    No. 12-12080 (SCC) (Bankr. S.D.N.Y. 2012) ..................................................23

*Love v. Fire Ins. Exch.*,
    221 Cal. App. 3d 1136 (Cal. Ct. App. 1990) ....................................................18

-iii-

*In re Magnetation LLC*,
    No. 15-50307 (GFK) (Bankr. D. Minn. July 15, 2015) .............................................24

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) ...............................................................................................9

*In re Pac. Gas and Elec. Co.*,
    304 B.R. 395 (Bankr. N.D. Cal. 2004) ...........................................................6, 21

*Pac. Gas & Elec. Co. v. Superior Court*,
    144 Cal. App. 4th 19 (Cal. Ct. App. 2006) ...........................................................19

*In re Peabody Energy Corp.*,
    No. 16-42529 (BSS) (Bankr. E.D. Mo. Jan. 31, 2017) .........................................23

*Plut v. Fireman's Fund Insurance Co.*,
    85 Cal. App. 4th 98 (Cal. Ct. App. 2000) .............................................................16

*Progressive West Insurance Co. v. Yolo County Superior Court*,
    135 Cal. App. 4th 263 (Cal. Ct. App. 2005) .........................................................16

*In re QCE Finance LLC*,
    No. 14-10543 (PJW) (Bankr. D. Del. May 12, 2014) ...........................................23

*Resorts Int'l, Inc. v. Lowenschuss (In re Lowenschuss)*,
    67 F.3d 1394 (9th Cir. 1995) ...............................................................................21

*Samson v. Nama Holdings, LLC*,
    No. CV 09–01433 MMM (PJW), 2009 WL 9150841 (C.D. Cal. May 20, 2009) ...................10

*Sapiano v. Williamsburg National Insurance Co.*,
    28 Cal. App. 4th 533 (Cal. Ct. App. 1994) .....................................................15, 16

*In re SeraCare Life Sciences, Inc.*,
    No. 06-00510 (LA) (Bankr. S.D. Cal. Dec. 21, 2006) ...........................................24

*Specialty Equip. Cos. v. Nielsen (In re Specialty Equip., Co.)*,
    3 F.3d 1043 (7th Cir. 1993) ..................................................................................21

*In re Spirtos*,
    103 B.R. 240 (Bankr. C.D. Cal. 1989) ............................................................16, 17

*In re TK Holdings Inc.*,
    No. 17-11375 (BLS) (Bankr. D. Del. 2017); ...................................................22, 23

*Travelers Indem. Co. v. Ingebretsen*,
    38 Cal. App. 3d 858 (Cal. Ct. App. 1974) ............................................................13

Case: 19-30088   Doc# 4348   Filed: 10/21/19   Entered: 10/21/19 13:29:21   Page 5 of 35

*U.S. Bank N.A. v. Village at Lakeridge, LLC (In re Village at Lakeridge, LLC)*,
　　814 F.3d 993 (9th Cir. 2016) ................................................................. 27

*Van Orden v. United Servs. Auto. Ass'n*,
　　318 P.3d 1042 (Mont. 2014) ................................................................. 14

*Wagner v. Prof'l Eng'rs in Cal. Gov't*,
　　354 F.3d 1036 (9th Cir. 2004) ................................................................. 10

*Winkelmann v. Excelsior Ins. Co.*,
　　650 N.E.2d 841 (N.Y. 1995) ................................................................. 13, 15, 17

*In re Z Gallerie*,
　　No. 19-10488 (Bankr. D. Del. May 25, 2019) ................................................................. 24

**Statutes & Rules**

2019 Cal. Legis. Serv. Ch. 79 (A.B. 1054) (WEST) ................................................................. 12, 21

Cal. Code. Reg. § 2795.7(q) ................................................................. 19

Fed. R. Civ. P. 12(f) ................................................................. 9

The Ad Hoc Group of Subrogation Claim Holders (the "**Ad Hoc Subrogation Group**"), by and through their undersigned counsel, submit this reply (the "**Reply**") in support of the Debtors' *Motion Pursuant to 11 U.S.C. §§ 363(b) and 105(a) and Fed. R. Bankr. P. 6004 and 9019 for Entry of an Order (I) Authorizing the Debtors to Enter Into Restructuring Support Agreement with the Consenting Subrogation Claimholders, (II) Approving the Terms of Settlement with Such Consenting Subrogation Claimholders, Including the Allowed Subrogation Claim Amount, and (III) Granting Related Relief* [Dkt. No. 3992] (the "**Motion**") filed by Debtors PG&E Corporation and Pacific Gas and Electronic Company (collectively, "**PG&E**").[1]  In support of this Reply, the Ad Hoc Subrogation Group respectfully states as follows:

## PRELIMINARY STATEMENT

The RSA marks a critical step in the resolution of these cases:  it will settle over $20 billion in claims held by the Ad Hoc Subrogation Group's members for an allowed claim of $11 billion, and pave the way for the Debtors to pay all wildfire victims' claims in full by the June 30, 2020 deadline to resolve these cases set by AB 1054.  The law and the facts overwhelmingly support the Court's approval of this settlement.  It results from strenuously contested, arm's length negotiations that spanned multiple months.  It required meaningful concessions from not only the Debtors, but also the Ad Hoc Subrogation Group, which accepted an approximately 45% discount on its claims in a solvent bankruptcy in which every other significant creditor, including the holders of unsecured claims, is expected to be paid in full.  And the record is devoid of any objection to the propriety of the Ad Hoc Subrogation Group resolving over $20 billion in claims for an $11 billion allowed claim.  To the contrary, even the TCC and Noteholders' alternative plan contemplates that the Ad Hoc Subrogation Group's claims will be resolved for an $11 billion allowed claim.

Instead of attacking the RSA's provision for an $11 billion allowed claim, the oppositions to the Motion principally focus on objections to the Debtors' proposed plan of reorganization, and include only a handful of narrow objections to the RSA itself.  In particular, in addition to the TCC's

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

1   attempt to revive its argument that the subrogation claims should be subordinated on a class basis, the

2   majority of the oppositions target the RSA's lock-up provision (although similar provisions are

3   common in bankruptcy cases), third party-releases (although the releases proposed by the RSA are

4   permissible under the law), and terms addressing the parties' rights if the Debtors are rendered

5   insolvent.  The latter two of these objections relate to plan confirmation issues that need not be

6   decided now.  Nevertheless, to ensure that these objections do not delay approval of this settlement,

7   the Ad Hoc Subrogation Group confirmed, in a letter to the parties dated October 21, 2019, that:

8   • Notwithstanding the RSA's lock-up provision, the subrogation claimants are free to

9   participate in a global mediation (with the Debtors) to achieve an overall resolution of

10  these cases (and, in any event, it is by no means clear that the Ad Hoc Subrogation

11  Group's affirmative vote would be required to confirm a plan sponsored by the TCC

12  and Noteholders);

13  • the Ad Hoc Subrogation Group would support revising the Debtors' plan to require

14  wildfire victims to opt in to (rather than opt out of) releases of subrogation claimants

15  under the plan and to remove any requirement that individual wildfire victims release

16  their claims to be made whole to the extent that they are unable to recover the full

17  value of their allowed claims from the Debtors; and

18  • in the event of insolvency, the Debtors are not required to file a plan that would pay

19  the subrogation claimants $11 billion in cash.[2]

20  These clarifications should suffice to resolve virtually every objection to the RSA.

21  The most vehement objection to the RSA and proposed settlement—lodged by the TCC—is

22  really an objection to the Debtors' plan of reorganization, not the RSA, but it would be without merit

23  even if it were appropriate to litigate plan confirmation issues at this stage.  Simply stated, the TCC

24  urges the Court to reject the RSA based on the mistaken premise that the Debtors' $11 billion

25

26  [2]  If the TCC is prepared to accept the $14.5 billion damages cap (which would apply to the claims of the individual Fire
    Victims and Fire Victims apart from subrogation claimholders) set forth in the plan it is co-sponsoring with the
27  Noteholders—including in the context of a plan advanced by the Debtors—the prospect of the Debtors being unable to
    satisfy their payment obligations to the Ad Hoc Subrogation Group and to individual wildfire victims appears unlikely.

28

2

1  settlement with the Ad Hoc Subrogation Group will impair individual fire victims' ability to be
2  satisfied on their claims.  According to the TCC, the Court should subordinate the Ad Hoc
3  Subrogation Group's claims *en masse* to the claims of individual wildfire victims or, at minimum,
4  defer its consideration of any settlement of the Ad Hoc Subrogation Group's claims until the full
5  extent of the Debtors' liability to individual fire victims can be quantified and the Debtors' ability to
6  pay these individuals in full can be confirmed.  The Court should reject the TCC's objection because
7  it mischaracterizes the structure of the Debtors' proposed plan, ignores or misstates controlling law,
8  and contradicts the TCC's representations to the Court.  Moreover, if successful, the TCC's objection
9  would upend months of progress in these cases and squander a settlement that frees up billions of
10 dollars for individual wildfire victims.

11         To start, the TCC's premise that the RSA will result in individual fire victims' claims going
12 unpaid fails to appreciate that the RSA specifically incorporates the requirement that PG&E's
13 ultimate plan of reorganization comply with AB 1054, which requires a determination that all
14 wildfire victims are paid the full amount of the claims allowed through estimation or settlement.  If
15 victims are not satisfied because it turns out that the Debtors are insolvent, then the requirements of
16 AB 1054 cannot be satisfied.  In that event, the Ad Hoc Subrogation Group would have the option to
17 terminate the RSA.  The TCC's made-whole concerns are only relevant to a hypothetical scenario in
18 which the Ad Hoc Subrogation Group does not exercise this termination option, and at that time the
19 TCC will be free to make any arguments it wishes about the implications of the made-whole doctrine
20 to the Ad Hoc Subrogation Group's claims (although, for the reasons explained below, such
21 arguments would be unavailing).

22         Further, even if the Debtors' plan construct were not designed to ensure payment in full to the
23 individual fire victims (and thereby obviate the TCC's made-whole concerns), the TCC's contention
24 that the Ad Hoc Subrogation Group acted improperly in settling with the Debtors before the TCC
25 settled with the Debtors is entirely misplaced.  There is nothing improper about the Ad Hoc
26 Subrogation Group settling first, as subrogation carriers often do.  Indeed, the Ninth Circuit expressly
27 endorsed this practice, and further held that the subrogating insurer is entitled to be *paid* by the third-
28

3

party tortfeasor before the insured (something the Ad Hoc Subrogation Group does *not* seek to do), in the very decision the TCC improperly relies on in condemning the settlement. *See Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115 (9th Cir. 2010).

In addition to misstating the apposite law and mischaracterizing the structure of the Debtors' proposed plan, the TCC's contention that the Ad Hoc Subrogation Group's claims should be subject to categorical subordination is flatly inconsistent with its own proposed plan (which does not contemplate such subordination) and its representations to the Court. To encourage the Court to hear their motion to terminate exclusivity on a shortened timetable, and then again to convince the Court to terminate exclusivity, the TCC and Noteholders argued that their plan would pay the Ad Hoc Subrogation Group's claim on the "same priority" as the TCC's. The TCC's motive at the time was clear. It wanted to assure the Court that exclusivity could be terminated in such a way that the compromise between the Debtors and the Ad Hoc Subrogation Group—a major step toward achieving a confirmable plan—could be preserved.

But having convinced the Court to terminate exclusivity, the TCC now appears to have jettisoned its representation. In its objection, the TCC accuses the subrogation group of violating California law and breaching its duties of good faith by not subordinating its claims to the TCC's. The TCC's objection thus goes far beyond seeking to preserve individual made-whole rights in certain defined circumstances, instead insisting upon across-the-board subordination by class. The amended plan the TCC filed with the Noteholders a day after its objection appears to go a step further, stating that the $11 billion allowed subrogation claim provided by that plan is "subject to change."[3] The TCC's objection and the language in its plan (which appears intended to give the TCC flexibility to categorically subordinate the Ad Hoc Subrogation Group's claims) cannot be squared with the position the TCC took in urging the Court to terminate exclusivity. Accordingly, the TCC should be judicially estopped from lodging the very challenge it told the Court it was withdrawing.

In the interest of achieving a final, confirmable plan that satisfies AB 1054 on the necessary

---

[3] *See Joint Chapter 11 Plan of Reorganization of Official Committee of Tort Claimants and Ad Hoc Committee of Senior Unsecured Noteholders* [Dkt. No. 4257] 5 n.1, 20 n.7, 30 n.8-9, 33 n.10, 38 n.11.

4

timeline, the Ad Hoc Subrogation Group, through the RSA, has agreed to a substantial, $9 billion discount on its claims against the solvent Debtors, even though all other creditors, including the very creditors challenging the RSA, are expected to have their claims paid in full.  By freeing up billions of dollars that otherwise would be payable to the Ad Hoc Subrogation Group, this discount dramatically increases the likelihood that the Debtors will remain solvent and able to fulfill their obligations to individual wildfire victims, and therefore inures directly to the benefit of such victims. It is more than a little ironic that this settlement gives rise to charges of breach of good faith.

Simply put, the Debtors' settlement with the Ad Hoc Subrogation Group is a significant step forward in these complex bankruptcy cases.  If the Court denies this Motion, the Debtors' agreement with the Ad Hoc Subrogation Group will evaporate, the $11 billion settlement will be lost, and these cases will quickly devolve to where they were in July:  $20 billion of subrogation claims (representing more than one-third of the Debtors' value) will be back on the table; the Ad Hoc Subrogation Group may be forced to move to terminate exclusivity to have its own competing plan of reorganization considered; and the Debtors, the TCC, and the Ad Hoc Subrogation Group will be forced into an estimation and that could lead to insolvency.  That result would benefit no one, least of all the individual wildfire victims.

For these reasons, and those set forth below, the Debtors' Motion should be granted and the RSA approved.

## ARGUMENT

In determining the fairness, reasonableness, and adequacy of a proposed settlement, bankruptcy courts in this Circuit consider: "(a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises." *In re A & C Props.*, 784 F.2d 1377, 1381 (9th Cir. 1986) (citations omitted).

No party other than the TCC argues that the legal standard for approval of the settlement has not been met.  The TCC's challenges to the RSA based on these factors are based entirely on their

5

premature, and in any event improper, argument that the Ad Hoc Subrogation Group's $11 billion allowed claim must be subordinated to the claims of wildfire victims.  (TCC Obj. at 21-24.)  As demonstrated below, the TCC is wrong on that point, leaving it with no meaningful contention that the 9019 factors are not met.  Moreover, "[t]his court's role in approving any settlement under Rule 9019 is limited.  Rather than an exhaustive investigation or a mini-trial on the merits, this court need only find that the settlement was negotiated in good faith and is reasonable, fair and equitable."  *In re Pac. Gas and Elec. Co.,* 304 B.R. 395, 416-17 (Bankr. N. D. Cal. 2004) (citing *A & C Props.*, 784 F.2d at 1381).  Under the facts of this case, where the subrogated insurers have already paid individual fire victims in excess of $15 billion and have reserved billions more for future payments, no one can reasonably argue that the settlement "falls below the lowest point in the range of reasonableness."  *Id.* at 417 (citation omitted).  The remaining objections are addressed below.

**A.**     ***The TCC Is Estopped From Arguing That the Class of Subrogation Claims Is Subordinated to the Class of Wildfire Claims.***

On September 13, 2019, the Ad Hoc Subrogation Group and the Debtors announced the Proposed Settlement.  Before the RSA had even been finalized, on September 18, 2019, the TCC filed with the Court a document styled as a "Status Conference Statement" [Dkt. No. 3931] (the "**TCC Statement**") raising various objections to the Proposed Settlement.  The central claim in the TCC Statement was that the Proposed Settlement violated the absolute priority rule because the Subrogation Claims were subordinated to the claims of the wildfire claimants on the basis of the made-whole rule.  (TCC Statement at 3-5.)

The Noteholders and TCC thereafter reached a "settlement," which was to be embodied in a proposed plan of reorganization, that contemplated a single fund for payment of wildfire victims and subrogation claims, with the subrogation claims subordinated to those of the individual victims.  At the next status conference on September 24, it became clear that the TCC's subordination argument raised issues about the confirmability of their proposed plan, and threatened to prevent their motion to terminate exclusivity from being heard on shortened notice.  (Ex. 1 (Transcript of Proceedings, *In re PG&E Corp. and Pac. Gas and and Elec. Co.*, No. 19-30088 (Sept. 24, 2019)) at 92:8-9 (As the

Court noted, "[i]f it's dead in the water as a matter of law, I wouldn't terminate[.]").)

To convince the Court to allow their motion to terminate exclusivity to be heard on the same day as the Debtors' motion to extend exclusivity (October 7, 2019), the TCC and Noteholders represented to the Court after a break in the proceedings that they would moot this issue by (i) incorporating an $11 billion allowed claim for the Ad Hoc Subrogation Group into their forthcoming term sheet and (ii) abandoning the unprecedented structure that would have subordinated subrogation claims as a class:

> MR. STAMER: . . . Your Honor, what I'm standing up to do, hopefully, is take a legal issue—a legal issue off your plate . . . I can announce to the Court, ***and I've conferred with counsel for the TCC***, that we anticipate, in advance of the hearing on the 7th that we will be modifying our term sheet, that we will be increasing the twenty-four number to a larger number, and we will be providing the full eleven billion dollars to the subrogation claimants, the same amount that is being offered or settled by the company. ***We believe that this renders the subordination issue academic***.

(Ex. 1 at 111:22-25; 112:1-10 (emphasis added).)  Shortly thereafter, the Court asked a question to confirm counsel's representation:

> COURT:  And will it tell the eleven-billion dollar class members that they are going to be paid in the ***same priority*** which the tort victims will be paid?

> MR STAMER:  ***Your Honor, the answer is yes.***

(*Id.* at 113:6-9 (emphasis added).)

Consistent with that position, on September 25, 2019, the TCC and the Noteholders filed an amended term sheet that contemplated paying the class of subrogation claimants on the same priority as tort claimants, subject to approval of the TCC.  (*Notice of Filing of Amended Joint Plan Term Sheet* [Dkt. No. 4006].)  On September 27, the TCC adopted the revised structure granting subrogation and tort claimants equal priority.  (*Notice of Filing of Amended Joint Plan Term Sheet* [Dkt. No. 4076].)  At the argument on their motion to terminate exclusivity, on October 7, the Noteholders told the Court that the only reason subrogation claimants may object to their treatment under their plan co-sponsored with the TCC is the form of consideration:

> MR. QURESHI:  And so—and the subrogation holders, Your Honor, the only reason they're objecting, under either plan they get an eleven-billion-dollar-allowed claim.

They don't like the form of consideration in our plan, but they also signed an RSA in which the debtors preclude them for negotiating with us. When those shackles are lifted, Your Honor, we're confident that we can reach agreement on the form of consideration with the subrogation holders.

(Ex. 2 (Transcript of Proceedings, *In re PG&E Corp. and Pac. Gas and Elec. Co.*, No. 19-30088 (October 7, 2019)) at 72:12-19.)

It was thus foundational to the termination of exclusivity argument that there would be two competing plans that treated subrogation claimants equally. The Court verbalized this understanding several times during the argument. In the course of considering whether the TCC/Noteholders plan was confirmable, the Court "put the subrogation [claims] to the side, because that—unless I'm missing something, that's a constant in both plans." (*Id.* at 66:12-14.)

Similarly, when discussing potential outcomes of the estimation hearing, the Court directed counsel to "take the subrogation out" as the Ad Hoc Subrogation Group would be treated equally under either plan. (*Id.* at 62:23; *see also id.* at 123:19 ("[A]gain, I'm going to back out the subro[.]")) Again, the TCC said nothing. And later in that hearing when describing the history of the negotiations surrounding the RSA, the Court and counsel for the SLF fire victim claimants had the following exchange:

> MR. MARSHACK: . . . . Hate to be the one that really brings this to light, but once upon a time, [the Debtors] said that subro was only owed 8.5 billion dollars, but now they say it's 11 billion.
>
> THE COURT: But what did subro say they were owed, once upon a time, twenty billion, right?
>
> MR. MARSHACK: Right.
>
> THE COURT: Well, wasn't there a compromise from both sides? Both sides, both camps here compromised, essentially the subro figure.
>
> MR. MARSHACK: Correct.
>
> THE COURT: ***That's a constant; that's for both plans.***
>
> MR. MARSHACK: ***Correct***[].

(*Id.* at 92:1-13 (emphasis added).) At no point during the October 7 argument did the TCC inform

8

the Court that the TCC intended to challenge the $11 billion *pari passu* claim for the Ad Hoc Subrogation Group and that it was *not* a "constant in both plans." Then, on October 9, the Court entered an order terminating exclusivity premised on the facts that "the Debtor have made significant progress in these cases," including because of a "tentative settlement" with the Ad Hoc Subrogation Group, and thus "the plan is on track as well as can be expected for now."[4]

The language of the TCC Joint Plan causes concern that the TCC seeks to subvert the progress described by the Court by walking back the pledge that subrogation claimants would be treated equally in its plan. Specifically, the TCC Joint Plan includes a footnote stating: "The terms set forth in this Plan relating to the Subrogation Claims RSA have been bracketed and are subject to change based on the Bankruptcy Court's disposition of the Debtors' motion to approve the Subrogation Claims RSA scheduled to be heard on October 23, 2019." (*See* TCC Joint Plan at 10 n.1, 25 n.7, 35 n.8, 38 n.10.) Although the intention behind this language is unclear, it suggests that the TCC may be poised to abandon its commitments relating to the treatment of the Ad Hoc Subrogation Group's claims.

Not surprisingly, the law of judicial estoppel prevents exactly this kind of reversal.[5] Judicial estoppel "precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001). "Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position[.]" *Asphalt Prof'ls Inc. v. Davis (In re Davis)*, 595 B.R. 818, 839 (Bankr. C.D. Cal. 2019) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 742-43 (2001)). To find that a party is subject to judicial estoppel, the court must determine that a party's later position is "clearly inconsistent" with its earlier position and that the court relied on, or "accepted," the party's previous inconsistent position. *Hamilton*, 270 F.3d at 782-83. Courts also consider whether the party asserting inconsistent positions would derive an unfair advantage if not

---

[4]   *See* Order Granting Joint Motion to Terminate Exclusivity [Dkt. No. 4167] at 2.
[5]   Indeed, given the TCC's reversal of positions, the Court would be within its discretion to strike those portions of the TCC Objection that are inconsistent with their prior statements entirely. *See* Fed. R. Civ. P. 12(f).

estopped. *Id.*

All of those factors are met here. The TCC's current position is clearly inconsistent with its position prior to the termination of exclusivity. Critically, the TCC is again insisting on class-wide subordination of Subrogation Claims, the very issue that had supposedly been rendered "academic" at the September 24th hearing. And while counsel for the Noteholders preserved an individual made-whole objection on behalf of the TCC at the conclusion of the hearing on September 24th,[6] taking the position that the settlement cannot release the made-whole rights of individual victims against their individual insurers in the event that they are not made whole is vastly different from taking the position that the settlement requires class-based subordination of Subrogation Claims.

Indeed, courts have refused to allow parties asserting inconsistent positions to benefit in circumstances like those present here. *See, e.g.*, *Cox v. Cont'l Cas. Co.*, 703 F. App'x 491, 495 (9th Cir. 2017) (district court did not abuse its discretion in ruling professional liability insurer was estopped from asserting defense of fraud when insurer represented in opposing discovery that it was not asserting defense of fraud); *Wagner v. Prof'l Eng'rs in Cal. Gov't*, 354 F.3d 1036, 1049-50 (9th Cir. 2004) (district court abused its discretion in granting summary judgment on a chargeability claim when plaintiff had earlier taken the position that the litigation did not include a chargeability claim in its successful motion to dismiss a counterclaim); *Samson v. Nama Holdings, LLC*, No. CV 09–01433 (MMM), 2009 WL 9150841, at *18 (C.D. Cal. May 20, 2009) (plaintiffs judicially estopped from asserting that claims against them in their individual capacity should be arbitrated when they previously argued they were parties to the arbitration provisions only in their capacity as manager, causing arbitrators to dismiss claims asserted against them as individuals). The law of judicial estoppel therefore prevents the TCC from objecting to the lack of class-wide subordination.

**B.    *The TCC's Made-Whole Objection Fails On The Merits.***

Even if the Court permits the TCC to be heard on its objection, the objection fails on its own terms. The TCC claims that under the made-whole rule, the wildfire claimants have a "right to

---

[6]    *See* Ex. 1 at 114:20-115:10.

recover the entirety of their damages from the Debtors" before the subrogation claimants "can receive any payment on their Subrogation Rights," and because there is no guarantee that the wildfire claimants will be made whole, especially in advance of an estimation proceeding, the Subrogation Claims must be subordinated to the wildfire claims. (TCC Obj. at 10.) Hence, the TCC claims that any settlement that places the subrogation and wildfire claims on equal priority cannot be "fair and equitable." (*Id.*) Further, the RSA allegedly impaired the rights of the wildfire claimants and, indeed, by settling with the Debtors before the wildfire victims did, the TCC argues that the subrogation claimants violated their duties of good faith to their insureds and violated California law. (*Id.* at 17-18.) These arguments fail for multiple reasons.

1. *The RSA Is Predicated on the Eventual Confirmation of A Plan that Pays the Wild Fire Victims In Full.*

The short answer to most of the TCC Objection is that the RSA is predicated on the wildfire victims being satisfied—it is not just a condition to and hardwired into the RSA; it is required by the absolutely priority rule and by AB 1054.

Under the absolute priority rule, any plan that proposes a recovery for PG&E's current equity will not be confirmable unless each class of wildfire claims either receives the full value of the claims in the class, or votes in favor of the plan. If there is a dissenting class of wildfire claims at confirmation, the Court will have to determine that such class will be satisfied before the equity holders retain any interest in the reorganized PG&E.

In addition, the Debtors' plan construct takes as its starting point that all wildfire claimants will receive a full recovery, as ***required by AB 1054***, to enable PG&E to participate in the new insurance fund—a critical fact that TCC fails to even mention in its objection. Specifically, Section 3291(b)(1)(B) of AB 1054 provides, as a condition for PG&E's participation in the wildfire insurance fund, that: "The bankruptcy court or a court of competent jurisdiction . . . has determined that the resolution of the insolvency proceeding provides funding or . . . otherwise provides for satisfying any prepetition wildfire claims asserted against the electrical corporation in the amounts agreed upon in . . . . any post-insolvency settlement agreements, authorized by the court through an estimation process or

otherwise allowed by the court."  2019 Cal. Legis. Serv. Ch. 79 (A.B. 1054) (WEST).

Practically speaking, this means that individual fire victims' claims will be satisfied in full in the context of a solvent debtor case, either through a settlement or an estimation of their claims.  If that occurs, then the TCC's made-whole concerns would be rendered moot.

Moreover, the RSA does not prejudice individual fire victims' right to be satisfied if the Debtors are rendered insolvent—as the result of an estimation hearing or otherwise.  If the Debtors become insolvent, neither of the current competing plans will be confirmable.  At that point, the Ad Hoc Subrogation Group will have the right to terminate the RSA.  (*See* RSA § 5(d)(iii) (providing that if "the Plan proposed and pursued by the Debtors does not treat the IP Claims consistent with the provisions of A.B. 1054," the RSA is terminable at the election of the Consenting Creditors).  If they opt to terminate it, the RSA's terms (including the release provisions) will be extinguished, all parties' rights with respect to the aggregate amount of Subrogation Claims and their treatment under a plan will be preserved, and the Ad Hoc Subrogation Group will be free to prosecute its claims as it sees fit.  And if they opt against termination, the Ad Hoc Subrogation Group's $11 billion allowed claim will survive, but as the Ad Hoc Subrogation Group clarified in a letter to all objectors in advance of the hearing (Ex. 4 (Letter from Matthew Feldman, Counsel to the Ad Hoc Subrogation Group, to 9019 Motion Objectors (Oct. 21, 2019)), the RSA would no longer require payment of that claim in full in cash.  Also, regardless of whether the Ad Hoc Subrogation Group exercises its insolvency termination option, the Debtors will be free to negotiate a new plan that would be confirmable under 11 U.S.C. § 1129, and the Debtors will no longer be bound to (1) require that individual fire victims release made-whole claims for the portion of their allowed claims against the Debtors' estates that are not fully satisfied under the revised plan, or (2) pursue a plan that complies with AB 1054 by requiring that the Ad Hoc Subrogation Group's claims be satisfied.

In any event, for the reasons set forth below, neither California law nor the Bankruptcy Code permit a class-wide subordination of subrogation claims, but more importantly, that is a bridge to be crossed if and when we get to it.

## 2. *California Made-Whole Law Does Not Support Class Wide Subordination of Subrogation Claims.*

*First*, the made-whole rule is inapplicable here because the insurers took an active leadership role and participated in the litigation against PG&E. *See Chandler*, 598 F.3d at 1118 ("[T]he made-whole rule does not apply if the insurer participates in prosecuting the claim against the third-party tortfeasor."). Where, as here, insurers have supported the underlying insured's litigation efforts, rather than simply sit back and benefit from the insured's recovery, California courts have declined to apply the made-whole rule. *See Travelers Indem. Co. v. Ingebretsen*, 38 Cal. App. 3d 858, 866 (Cal. Ct. App. 1974) (concluding that the participation exception to the made-whole rule applies where insurers "assisted the homeowners' attorneys in prosecuting the suit" and contributed financially to suit).

*Second*, the TCC's made-whole objection suffers from a fatal flaw: there is no valid basis to subordinate the Subrogation Claims as a class. Where the made-whole rule is concerned, "'an insurer's obligation runs to its insured, and then only to the extent of the policy limits.'" *Chandler*, 598 F.3d at 1119 (quoting *Winkelmann v. Excelsior Ins. Co*., 650 N.E.2d 841, 844 (N.Y. 1995)). Thus, a wildfire claimant's right to be made whole does not cross claims, insureds, insurers, or fires. And indisputably uninsured individual claimants have no right to be made whole by any subrogation claimant.[7] Indeed, by the TCC's own admission, the uninsured and underinsured represent a large percentage of the TCC constituency. *See* Memorandum of Points and Authorities in Support of Motion of the Official Committee of Tort Claimants Pursuant to 11 U.S.C. §§ 105(a) and 501 and Fed. R. Bankr. P. 3003(c) for Entry of An Order Extending Bar Date [Dkt. No. 4293] at 6 ("The TCC has previously provided this Court with evidence that 40.6% of the households that were lost in the fires were renters, totaling 8,267 households, each with 2-3 residents, and that 87.4% of these rental

---

[7]     Further, even in circumstances where they have cognizable made-whole claims against their insurers, insureds are not entitled to be made-whole for their attorneys' fees. *See 21st Century Ins. Co. v. Superior Court*, 47 Cal. 4th 511, 519 (Cal. 2009) ("[N]o California court has ever held that an insured was not made whole because he or she had to bear the attorney fees incurred in recovering damages not covered by the insurance contract."). Thus, in the event the Debtors are insolvent, individual insureds' right to recover attorneys' fees, if any, will be *pari passu* with, and not senior to, the Subrogation Claims.

Case: 19-30088    Doc# 4348    Filed: 10/21/19    Entered: 10/21/19 13:29:21    Page 19 of 35

households were uninsured or underinsured.").

What this means is that uninsured individual claimants have no right to be made whole by any holders of subrogation claims. As to underinsured individual claimants, they at most may have a right to be made whole by their own insurers, and only to the extent that the *individual* was under-insured for the sorts of losses for which the insured sought indemnification from the insurer.[8] *See Van Orden v. United Servs. Auto. Ass'n*, 318 P.3d 1042, 1046 (Mont. 2014) (holding that where the made-whole rule applies, the insured must only be made whole for the "element of damage for which the insured purchased insurance"). The made-whole rule's application to these bankruptcy cases (if it applies at all) would thus depend on a series of factors that must be evaluated on a claimant-by-claimant basis: (1) the fire in which the individual claimant was injured; (2) the nature of the individual claimant's injury (*e.g.*, property damage or personal injury); (3) whether the individual claimant was insured; (4) the types of injury for which the insurer indemnified the individual claimant; (5) whether the individual claimant received full compensation for his or her losses; and (6) whether the insurer assisted the individual claimant in pursuing claims against the tortfeasor.

Given the individualized nature of the analysis required, it would be impermissible to subordinate the rights of all holders of subrogation claims *as a class* to the claims of all wildfire claimants *as a class* based on the made-whole rule.[9]

*Third*, the made-whole rule does not operate to prescribe the order in which insurers and insureds may settle, which seems to be the unfounded assumption behind much of the TCC's Objection. Indeed, the primary case on which the TCC relies makes clear that California law *authorizes* an insurer to settle a subrogation claim with a tortfeasor prior to the underlying insured

---

[8] The TCC identifies no authority holding that secondary holders of Subrogation Claims, which received such claims through transfer or assignment and did not collect premiums from individual insureds, can be subject to made-whole liability to underinsured individual claimants. If the made-whole doctrine applies to any of the Subrogation Claims, the question of whether it also applies to assignees of such claims may need to be adjudicated.

[9] In a similar vein, courts have recognized the wide disparities between tort victims in fire cases and denied class certification for such liability claims on the grounds that they were not "analytically amenable to class treatment." *See Downing v. San Diego Gas & Elec. Co.*, No. D055820, 2010 WL 4233033, at *19 (Cal. Ct. App. Oct. 27, 2010) (unpublished) (affirming denial of class certification for plaintiffs seeking recovery of property damages following wildfires because, among other reasons, "[a]ll class members must prove specific forms of damages to their particular properties, and that such damage was caused by the negligence alleged (ignition). . . .").

being made whole. *Chandler* presented the very same issue posed by the TCC Objection—whether an insurer may settle its subrogation claim with a third-party tortfeasor before the insured has been made whole for all of its damages. 598 F.3d at 1115-16. In affirming dismissal, the Ninth Circuit expressly adopted the decision of the New York Court of Appeals in *Winkelmann v. Excelsior Ins. Co.*, 650 N.E.2d at 844, which held that "the insurer need not delay its subrogation claim against the third party to avoid impairing the insured's rights." *Chandler*, 598 F.3d at 1119. Thus, *Chandler* holds that an insurer has no obligation to make the policyholder whole out of reimbursement proceeds "unless and until" the insured attempts and fails to recover from the tortfeasor. *Id.* at 1116.[10] Until the insured is prevented from being made whole, the insured lacks standing to assert any made-whole rights and any such made-whole claims are unripe. *Id.* at 1122-23.

The TCC's argument that there is one "indivisible" wildfire claim is thus irrelevant. (TCC Obj. at 7.) It is established that "[w]hen the insured is only partially compensated by the insurer for a loss, as was the case here, the subrogation doctrine results in ***two or more parties having a right of action for recovery of damages*** based upon the underlying negligence." *See Garbell v. Conejo Hardwoods, Inc.*, 193 Cal.App.4th 1563, 1571 (Cal. Ct. App. 2011) (emphasis added). Indeed, like *Chandler*, *Garbell* confirms that insurers may settle first so long as the insureds, in the end, get paid in full. *See id.* at 1571-72. The Court should not accept the TCC's premise that the Ad Hoc Subrogation Group could not enter into any settlement unless and until the TCC and IPs first settled.

None of the TCC's cited cases is to the contrary. (*See* TCC Obj. at 11-13.) As the Ninth Circuit admonished in *Chandler*, "one must keep subrogation claims against insureds separate from subrogation claims against third-party tortfeasors." *Chandler*, 598 F.3d at 1120. But the TCC failed to abide by that very directive here, since it cites cases where an insurer asserted subrogation rights ***against an insured***. First, *Sapiano v. Williamsburg National Insurance Co.* was a case in which the court found that the insurer "sat back without assisting while Sapiano prosecuted the suit against

---

[10]   Hence, the basis that the TCC offers to distinguish *Chandler*—that it was a case where the insureds sat back and did nothing to enforce their rights—elides the key holding of that decision. (*See* TCC Obj. at 13.) The Ninth Circuit squarely held that it is not until an insured sues "***and is unable to recover the amount he claims he is owed***" that a made-whole claim becomes ripe. *See Chandler*, 598 F.3d at 1123 (emphasis added).

Case: 19-30088   Doc# 4348   Filed: 10/21/19   Entered: 10/21/19 13:29:21   Page 21 of 35

Valdepena, then, after Sapiano negotiated a proposed settlement, demanded all the proceeds for itself" from the insured. 28 Cal. App. 4th 533, 539 (Cal. Ct. App. 1994). For that reason, ***Chandler expressly distinguished Sapiano*** and stated that "its rationale is inapposite" where the insurer seeks recovery directly from the tortfeasor because "there is no indication that the insured will not be made whole if he sues the third-party tortfeasor." *Chandler*, 598 F.3d at 1120. Likewise, *Progressive West Insurance Co. v. Yolo County Superior Court*, 135 Cal. App. 4th 263 (Cal. Ct. App. 2005) (*see* TCC Obj. at 11), suffers from the same defect. There, the insurer sued its insured to recover money it had paid to the insured; the court held that the insurer could not seek reimbursement until the insured had been made whole. *Progressive*, 135 Cal. App. 4th at 273-74. *Plut v. Fireman's Fund Insurance Co.*, 85 Cal. App. 4th 98 (Cal. Ct. App. 2000) (*see* TCC Obj. at 12-13), is even further afield, since the case did not involve an insurer bringing an action against, or settling with, the tortfeasor itself, and hence provides no support for the proposition that the made-whole rule dictates a settlement order.

*Fourth*, section 509(c) of the Bankruptcy Code does not mandate a different result. The TCC argues that the subrogation claimants may assert subrogation rights in this bankruptcy exclusively through section 509 and that section 509(c) bars a subrogation holder from recovering until the creditor has been paid in full. (*See* TCC Obj. at 11-12, 14-15.) This contention misses the mark for the simple reason that section 509 is not the exclusive source of subrogation rights in a bankruptcy. Indeed, the Ninth Circuit recognizes three types of subrogation in the bankruptcy context: (1) contractual subrogation, (2) equitable subrogation under state law, and (3) statutory subrogation pursuant to section 509 of the Bankruptcy Code. *See Hamada v. Far East Nat'l Bank (In re Hamada)*, 291 F.3d 645, 649 (9th Cir. 2002) (discussing the existence of three types of subrogation, including subrogation under state law); *In re Spirtos*, 103 B.R. 240, 244 (Bankr. C.D. Cal. 1989) ("Case law under the [Bankruptcy] Code does not consider section 509 to be the exclusive source of subrogation rights."). Thus, the applicability of Section 509 is irrelevant and need not be addressed by the Court because state law rights of subrogation and Section 509 rights of subrogation are not mutually exclusive.

The TCC tries to argue that the subrogation claimants are "codebtors" and thus must be

Valdepena, then, after Sapiano negotiated a proposed settlement, demanded all the proceeds for itself" from the insured. 28 Cal. App. 4th 533, 539 (Cal. Ct. App. 1994). For that reason, ***Chandler expressly distinguished Sapiano*** and stated that "its rationale is inapposite" where the insurer seeks recovery directly from the tortfeasor because "there is no indication that the insured will not be made whole if he sues the third-party tortfeasor." *Chandler*, 598 F.3d at 1120. Likewise, *Progressive West Insurance Co. v. Yolo County Superior Court*, 135 Cal. App. 4th 263 (Cal. Ct. App. 2005) (*see* TCC Obj. at 11), suffers from the same defect. There, the insurer sued its insured to recover money it had paid to the insured; the court held that the insurer could not seek reimbursement until the insured had been made whole. *Progressive*, 135 Cal. App. 4th at 273-74. *Plut v. Fireman's Fund Insurance Co.*, 85 Cal. App. 4th 98 (Cal. Ct. App. 2000) (*see* TCC Obj. at 12-13), is even further afield, since the case did not involve an insurer bringing an action against, or settling with, the tortfeasor itself, and hence provides no support for the proposition that the made-whole rule dictates a settlement order.

*Fourth*, section 509(c) of the Bankruptcy Code does not mandate a different result. The TCC argues that the subrogation claimants may assert subrogation rights in this bankruptcy exclusively through section 509 and that section 509(c) bars a subrogation holder from recovering until the creditor has been paid in full. (*See* TCC Obj. at 11-12, 14-15.) This contention misses the mark for the simple reason that section 509 is not the exclusive source of subrogation rights in a bankruptcy. Indeed, the Ninth Circuit recognizes three types of subrogation in the bankruptcy context: (1) contractual subrogation, (2) equitable subrogation under state law, and (3) statutory subrogation pursuant to section 509 of the Bankruptcy Code. *See Hamada v. Far East Nat'l Bank (In re Hamada)*, 291 F.3d 645, 649 (9th Cir. 2002) (discussing the existence of three types of subrogation, including subrogation under state law); *In re Spirtos*, 103 B.R. 240, 244 (Bankr. C.D. Cal. 1989) ("Case law under the [Bankruptcy] Code does not consider section 509 to be the exclusive source of subrogation rights."). Thus, the applicability of Section 509 is irrelevant and need not be addressed by the Court because state law rights of subrogation and Section 509 rights of subrogation are not mutually exclusive.

The TCC tries to argue that the subrogation claimants are "codebtors" and thus must be

subordinated under section 509(c).  (*See* TCC Obj. at 15.)  The TCC relies on *In re Spirtos*, 103 B.R. at 248, and *In re Dow Corning Corp.*, 244 B.R. 705, 715 (Bankr. E.D. Mich. 1999), to support its assertion that "the meaning of 'codebtor' is broad."  (*Id.*)  However, the TCC's reliance on *Spirtos* and *Dow Corning Corp.* is misplaced.  In *Spirtos*, the court found a title insurer's subrogation rights derived under California state law and distinguished such equitable subrogation from subrogation available to codebtors.  *See* 103 B.R. at 245 (noting that equitable subrogation is "separate and distinct from subrogation rights afforded by section 509 [of the bankruptcy code]" to codebtors and sureties).  Moreover, the *Dow Corning Corp.* court specifically noted that its broad interpretation of codebtor status was based on Sixth Circuit law.  *See* 244 B.R. at 715 ("[T]he Sixth Circuit has defined differently the phrase 'an entity that is liable with the debtor.'").  These cases arise in the Ninth Circuit; therefore, Ninth Circuit law is controlling.  The Ninth Circuit has held that codebtor status is reserved for "a limited class of creditors, namely, true co-debtors" such as a "surety, guarantor, or comaker" who are "liable with the debtor on the obligation owed to the creditor." *Hamada*, 291 F.3d at 650 (internal quotations and citations omitted).  Here, the Subrogation Claims clearly arose independently of the Debtors' obligations to its creditors and thus the subrogation claimants and PG&E are not co-debtors.

The TCC's remaining contentions are equally baseless.  The Ad Hoc Subrogation Group has in no way "impaired" the rights of wildfire claimants by entering into the RSA.  (*See* TCC Obj. at 16-17.)  It is difficult to fathom how the Ad Hoc Subrogation Group could have impaired the TCC's rights by negotiating a settlement with PG&E providing for the same $11 billion allowed claim that the TCC's own plan is (or, at least, was) offering.  Struggling to explain exactly how its rights have been impaired, the TCC suggests that by settling first, the subrogation claimants damaged its bargaining position and "forc[ed] them to mitigate their damages in a competing term sheet."  (TCC Obj. at 16-17.)  But that is the same speculative theory of "impairment" rejected in the *Winkelmann* decision cited approvingly by the Ninth Circuit in *Chandler*.  *See Winkelmann*, 85 N.Y.2d at 581 ("Insofar as plaintiffs allege that [insurer]'s conduct 'forced' them to litigate rather than settle their claim against [tortfeasor], that claim, even if true, does not state a cause of action against [insurer] for

Case: 19-30088   Doc# 4348   Filed: 10/21/19   Entered: 10/21/19 13:29:21   Page 23 of 35

1   impairing plaintiffs' rights.").  The crux of the TCC's complaint appears to be that the Ad Hoc

2   Subrogation Group is aligning with PG&E when "[t]he joint TCC/bondholder plan establishes a

3   much higher payment for the claims of Fire Victims than the Settlement[.]"  (TCC Obj. at 16.)  But

4   the TCC's recovery under the PG&E plan is not an issue before the Court.  That issue will be

5   resolved consensually, through litigation, or as the result of a competing plan going forward, but in

6   any event at a later date.  The only issue presented now is the subrogation claimants' settlement

7   pursuant to the RSA.  In short, the TCC has failed to articulate any cognizable theory of impairment.

8           Moreover, the members of the Ad Hoc Subrogation Group have not violated their ongoing

9   duties of good faith to their insureds.  (*See* TCC Obj. at 17-18.)  California law confirms that while

10  insurers owe a duty of good faith to their insureds, they are not fiduciaries.  *See Love v. Fire Ins.*

11  *Exc.*, 221 Cal. App. 3d 1136, 1148-49 (Cal. Ct. App. 1990).  For an insured to establish a claim for a

12  breach of the duty of good faith by an insurer, it must show that the insurer unreasonably withheld

13  benefits due under a policy.  *See id.*  That simply is not the case here.  Tellingly, the TCC cites no

14  California authority supporting that an insurer's settlement of a subrogation claim in these

15  circumstances amounts to bad faith.

16          Inexplicably, the TCC again cites *Chandler* in support of its claim of breach of the covenant

17  of good faith even though the case squarely reaches the opposite holding.  (*See* TCC Obj. at 17.)  Nor

18  does *Hibbs v. Allstate Insurance Co.*, 193 Cal. App. 4th 809 (Cal. Ct. App. 2011), support a finding

19  that the covenant of good faith was violated here.  (*See* TCC Obj. at 17.)  In that case, the California

20  Court of Appeals found that an auto insurance company may be liable for bad faith where it pays for

21  repairs not authorized by the insured and then seeks to recover those fees in subrogation from a third-

22  party tortfeasor.  *Hibbs*, 193 Cal. App. 4th at 821-22.  Those facts bear no relevance to this case.

23          *Finally*, the TCC is incorrect in asserting that the RSA violates California Code Regulations

24  §§ 2695.4 and 2695.7(q).  (*See* TCC Obj. at 17-18.)  Given that Section 10.9(b) of the plan provides

25  that any claim will only be released "to the maximum extent permitted by law and unless barred by

26  law," the Ad Hoc Subrogation Group cannot enforce any release procedure in a manner inconsistent

27  with California Insurance Regulations.  Thus even if the TCC's reading of Section 2695.4 is correct,

28

a question which the Court need not reach, the TCC's objection provides no basis for disapproving of the RSA. Furthermore, by the plain language of the regulation, Section 2695.7(q) only requires an insurer "that makes a subrogation demand" to include "in every demand" the insured's deductible. Cal. Code. Reg. § 2795.7(q). A "subrogation demand" is a pre-suit demand and refers to the pursuit of a subrogation claim "short of litigation." *Pac. Gas & Elec. Co. v. Superior Court*, 144 Cal. App. 4th 19, 25-26 (Cal. Ct. App. 2006). It is only in this narrow context that an insurer must include the insured's deductible. *See id.* at 26. And no "subrogation demand" was made here. The Ad Hoc Subrogation Group instead litigated its claims against PG&E and then settled them through the RSA. In these circumstances, the Ad Hoc Subrogation Group has no obligation to, and cannot, seek to recover the insured's deductibles.

**C.      *The Releases in the RSA Are Enforceable.***

  1.      *The RSA Does Not Require Impermissible Third-Party Releases.*

  The TCC and other parties object to the releases contained in Section 10.9(b) of the plan as purportedly impermissible third-party releases. (*See* TCC Obj. at 19-20; *see also* Adventist Obj. at 5-8; Fed. Agencies Obj. at 3-5.) To resolve this issue, as stated in the letter (*see* Ex. 4), the Ad Hoc Subrogation Group supports revising the Debtors' plan to require claimants to opt-in to releases, consistent with the Noteholders/TCC's plan with respect to any release of subrogation claimants under the plan.

  2.      *The Settlement Payment Condition Is Not a Mandatory Release.*

  The TCC and the Adventist Claimants next object to the purported requirement in the RSA that the Plan and Confirmation Order requires an IP to execute a release of certain claims in order to receive a distribution pursuant to a settlement of the claim as an impermissible mandatory release of a non-debtor party. (*See* TCC Obj. at 20; Adventist Obj. at 5.) While not truly objections to the RSA, they rest on a mischaracterization of the "Settlement Payment Condition" in the RSA, which requires the Debtors or the post-Effective Date trust to condition any ***voluntary*** settlements with IPs on the IPs executing a release of potential made-whole claims against subrogation claimants. Specifically, the

Settlement Payment Condition provides that the Debtors shall:

> [U]pon entry into any settlement with any holder or holders of IP Claims that fixes the amount or terms for satisfaction of an IP Claim, including with respect to rights against a post-Effective Date trust established for the resolution and payment of such Claims, require, as a condition to payment or other distribution to or for the benefit of such holder pursuant to such settlement or other agreement, that the holder of the IP Claim contemporaneously execute and deliver a release and waiver of any and all claims to the fullest extent permitted by law against all parties in interest in the Chapter 11 Cases, including any potential made-whole claims against present and former holders of Subrogation Claims, which release shall be in form and substance reasonably acceptable to the Debtors and Requisite Consenting Creditors.[11]

The release is thus wholly voluntary. If an IP elects to litigate its claims against PG&E or the post-Effective Date trust to a judgment, it will preserve any made-whole claims against the subrogation claimants to the extent such claims exist (which they will not if the Debtors remain solvent). It is only in the event of a voluntary settlement that a release is required. And it serves a legitimate function: it reflects that wildfire claimants will be made whole as part of PG&E's (or the TCC/Noteholders') plan of reorganization and prevents future unnecessary litigation in the event that IPs settle with PG&E or the post-Effective Date trust and then seek a windfall from the subrogation claimants by bringing a made-whole claim after already having been made whole in these proceedings.

As the Ad Hoc Subrogation Group has clarified, there is no intention to impose a release of ordinary-course insurance claims by insureds arising under their insurance policies. In addition, as confirmed in the letter (*see* Ex. 4), if the Court determines the Debtors are insolvent, the Debtors would no longer be bound to (a) require that individual claimants release made-whole claims per section 3(a)(iii) of the RSA for the portion of their allowed claims against the Debtors' estates that are not fully satisfied under the revised plan; or (b) pursue a plan or confirmation order with the provisions and/or findings set forth in section 3(a)(v)(A) of the RSA.

Therefore, the Settlement Payment Condition does not impermissibly require the release of claims against non-debtors. Section 524(e) of the Bankruptcy Code "precludes bankruptcy courts

---

[11]  RSA § 3(a)(iii).

from discharging the liabilities of non-debtors." *See Resorts Int'l, Inc. v. Lowenschuss (In re Lowenschuss)*, 67 F.3d 1394, 1401 (9th Cir. 1995). However, the Northern District of California has found a non-debtor release to be permissible, where a claimant *consents* to release of his or her claims against a non-debtor. *See In re Pac. Gas and Elec. Co.*, 304 B.R. 395, 418 n.26 (Bankr. N.D. Cal. 2004) (finding the legal principle set forth in *Lowenschuss* to be "inapplicable" because "the Plan does not discharge or release nondebtors from claims that belong to others (except the Commission, *which has consented to the release*)") (emphasis added). Other federal courts have also held that Section 524(e) does not preclude a bankruptcy court from approving consensual releases. *See Specialty Equip. Cos. v. Nielsen (In re Specialty Equip., Cos.)*, 3 F.3d 1043, 1046–47 (7th Cir. 1993) (approving of consensual non-debtor releases). The Settlement Payment Condition in the RSA does not require the bankruptcy court to approve a plan that would impermissibly discharge non-debtors' liabilities over their objection. Rather, the provision only applies to IP Claimants who *consent* to resolution of their claims against the Debtors through a settlement.

Moreover, the Settlement Payment Condition aligns the RSA with the requirement of AB 1054. For the Debtors to participate in the Wildfire Fund established by AB 1054, the bankruptcy court must "determine[] that the resolution of the insolvency proceeding provides funding or establishes reserves for . . . satisfying any prepetition wildfire claims asserted against" the Debtors. A.B. 1054 at § 3291(b)(1)(B). When asked about the purpose of this release provision in his deposition, Mr. Parkhill, the Ad Hoc Subrogation Group's financial advisor, testified, "[The release] was intended to . . . memorialize the concept of this plan, which is that all wildfire claimants are being paid in full, which is a requirement of AB 1054." (Ex. 3 (30(b)(6) Deposition of Homer Parkhill, *In re PG&E Corp. and Pac. Gas and Elec. Co.*, No. 19-30088 (Oct. 10, 2019)) at 108:20-23.) Mr. Parkhill elaborated that the Ad Hoc Subrogation Group's "understanding was that if the [RSA] didn't represent a solvent debtor and didn't comply with 1054, this plan wouldn't be operable." (*Id.* at 109:5-8.) In short, the Settlement Payment Condition does not compel IPs to release any claims as a condition of recovering from PG&E. Rather, it simply reflects that the IPs are necessarily being made-whole by any plan of reorganization, as AB 1054 requires. A release in

voluntary settlement thus amounts to "belt and suspenders" to prevent potential disputes following PG&E's emergence from bankruptcy.

Nor is this an issue that needs to be resolved now. To the extent that the TCC contends that wildfire claimants will not be made whole in any plan or plans or reorganization presented to the Court for approval, that will be resolved at a later date.

**D.** ***The Covenants in the RSA Are Customary.***

The objectors argue that approval of the RSA will somehow preclude negotiations among the major creditor constituencies.[12] But, as the Ad Hoc Subrogation Group clarified in a letter to all objectors in advance of the hearing (*see* Ex. 4), nothing in the RSA prohibits the Subrogation Claimants, together with the Debtors, from negotiating together with any other creditor constituency or participating in mediation to achieve global consensus. This is consistent with the Court's stated desire to "facilitate negotiations for a global resolution and narrow the issues which are in legitimate dispute." (*Order Granting Join Motion to Terminate Exclusivity* [Dkt. No. 4167] at 3.) In fact, the settlement of approximately $20 billion in subrogation claims for a reduced claim in the allowed amount of $11 billion addresses one of the few remaining major open issues, and brings these cases one step closer to final resolution.

As counsel to the objectors are well aware, the covenants in the RSA requiring the subrogation claimants to support solely the Debtor's plan are near-universal features of restructuring support agreements, even after exclusivity has been terminated. It is easy to find restructuring support agreements approved within the past 5 years in major chapter 11 cases across the country that require creditors to vote in favor of a debtor's plan and to refrain from voting in favor of alternative restructurings. *See e.g., In re Aegean Marine Petroleum Network Inc.*, No. 18-13374 (MEW) (Bankr. S.D.N.Y. Jan. 15, 2019); *In re TK Holdings Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Dec. 13, 2017); *In re DACCO Transmission Parts (NY) Inc.*, No 16-13245 (MKV) (Bankr. S.D.N.Y. Mar. 21, 2017); *In re Key Energy Servs., Inc.*, No. 16-12306 (BLS) (Bankr. D. Del. Dec. 6, 2016); *In re*

---

[12] *See* TCC Obj. at 5; Fed. Agencies Obj. at 5; BOKF Obj. at 4; Noteholders Obj. at 4.

*Halcon Res. Corp.*, No. 16-11724 (BLS) (Bankr. D. Del. Aug. 19, 2016). Indeed, on multiple occasions within the last few years, Elliott Management Corporation ("**Elliott**")—the key Noteholder driving that group's efforts in these cases—has taken a leading role in negotiating restructuring support agreements with similar provisions that require consenting creditors to only vote in favor of the debtors' plan. *See In re Claire's Stores, Inc.*, No. 18-10583 (MFW) (Bankr. D. Del. Mar. 19, 2018); *In re Peabody Energy Corp.,* No. 16-42529 (BSS) (Bankr. E.D. Mo. Jan. 31, 2017).

Counsel for the Noteholders has also negotiated similar provisions in multiple restructuring support agreements in other cases. *See In re FirstEnergy Solutions Corp.*, No. 18-50757 (AMK) (Bankr. N.D. Ohio Apr. 30, 2019) (order approving restructuring support agreement requiring consenting creditors to vote in favor of the debtors' plan where Akin Gump served as debtors' counsel); *In re Allied Nevada Gold Corp.*, No. 15-10503 (MFW) (Bankr. D. Del. Aug. 27, 2015) (same); *In re QCE Finance LLC*, No. 14-10543 (PJW) (Bankr. D. Del. May 12, 2014) (same). Similarly, counsel for the UCC has advocated for restructuring support agreements which require the consenting creditors to support only the debtors' plan and prevent the consenting creditors from voting in favor of any other alternative plan. *See In re TK Holdings Inc..*, No. 17-11375 (BLS) (Bankr. D. Del. 2017); *In re Breitburn Energy Partners LP*, No. 16-11390 (SMB) (Bankr. S.D.N.Y. 2016); *In re Eastman Kodak Co.*, No. 12-10202 (ALG) (Bankr. S.D.N.Y. 2012); *In re Great Atl. & Pac. Tea Co.,* No. 10-24549 (RDD) (Bankr. S.D.N.Y. 2010); *In re Eagle Bulk Shipping Inc.*, No. 14-12303 (SHL) (Bankr. S.D.N.Y. 2014); *In re LightSquared Inc.*, No. 12-12080 (SCC) (Bankr. S.D.N.Y. 2012); *In re Circus & Eldorado Joint Venture*, No. 12-51156 (BTB) (Bankr. D. Nev. 2012).

Therefore, any argument from the objectors that the RSA should not be approved because it includes "lock-up" or support obligations is disingenuous. It is typical practice in large chapter 11 restructurings for the debtor to negotiate the parameters of a plan with a group of creditors, and bind them to support implementing the negotiated deal.

The more nuanced objections argue that the specific facts of this case alter typical practice and render support provisions inappropriate. However, those arguments are similarly unpersuasive.

First, the objectors argue that plan support covenants are unreasonable because the Court has terminated exclusivity.[13]  But, each of the agreements subject to the cases cited above specifically references "voting" on alternative restructurings and therefore explicitly contemplates a situation where the creditor has the ability to vote on multiple plans.  In fact, when faced with the similar circumstances as those present here—consideration of a "lock-up" after terminating exclusivity— courts have approved similar covenants.  *See In re Exide Techs.*, No. 13-11482 (KJC) (Bankr. D. Del. Feb. 4, 2015) (order approving plan support agreement requiring key creditors to only support the debtors' plan months after the debtors' exclusivity periods were terminated); *In re SeraCare Life Sciences, Inc.*, No. 06-00510  (LA) (Bankr. S.D. Cal. Dec. 21, 2006) (same).

Second, certain objectors focus on the consenting creditors' affirmative obligation to vote against the TCC/Noteholders' plan (as compared to a simple negative covenant not to support alternatives).[14]  However, that feature is not unique to the RSA before the Court, and is in fact a common feature of restructuring support agreements approved by other bankruptcy courts.  *See In re Aegerion Pharm. Inc.*, No. 19-11632 (MG) (Bankr. S.D.N.Y. Sept. 19, 2019) (confirming plan embodying a restructuring support agreement with an affirmative covenant requiring consenting creditors to vote against any alternative transaction); *In re Z Gallerie, LLC*, No. 19-10488 (KB) (Bankr. D. Del. May 25, 2019) (plan support agreement requiring consenting creditors to vote against any alternative transaction); *In re Magnetation LLC*, No. 15-50307 (GFK) (Bankr. D. Minn. July 15, 2015) (order approving a restructuring support agreement with an affirmative covenant requiring consenting creditors to vote against any alternative transaction); *In re Energy Future Holdings Corp.*, No. 14-10979 (CSS) (Bankr. D. Del. Sept. 18, 2015) (same).  Counsel to the Noteholders has even negotiated for this exact type of provision in a previous case.  *In re Allied Nevada Gold Corp.*, No. 15-10503 (MFW) (Bankr. D. Del. Aug. 27, 2015) (order approving a restructuring support agreement requiring consenting creditors to "timely vote or cause to be voted its Claims and Interests against any Alternative Transaction," where Akin Gump served as debtors' counsel).

---

[13]  *See* TCC Obj. at 5; BOKF Obj. at 4; UCC Obj. at 6; Fed. Agencies Obj. at 5; Noteholders Obj. at 6.
[14]  *See* BOKF Obj. at 4; UCC Obj. at 6; Fed. Agencies Obj. at 5; Noteholders Obj. at 5.

Case: 19-30088    Doc# 4348    Filed: 10/21/19    Entered: 10/21/19 13:29:21    Page 30 of 35

Finally, rather than impede progress, support provisions protect the estate from wasting considerable time and resources to reach an unstable agreement that creditors can later abandon opportunistically, and ensure that the debtors are making genuine progress towards a consensual, confirmable plan. Indeed, the objectors' concerns should be dispatched by the clarification that nothing in the RSA prohibits the Debtors and consenting creditors from negotiating a global resolution with the other major creditor constituencies. The only difference between plan negotiations before RSA approval and after, is that the Debtors have resolved one major variable in their plan of reorganization. Rather than hinder negotiations, checking off major contingencies is a step in the right direction.

**E.     *The Insolvency Termination Event in the RSA Is Reasonable.***

The UCC and BOKF have objected to the insolvency termination event set forth in Section 5(c) of the RSA, which gives the Ad Hoc Subrogation Group the right to terminate the RSA if the Debtors become insolvent.[15] As stated in the letter to all objectors (*see* Ex. 4) and described above, the Ad Hoc Subrogation Group has clarified that in the event of insolvency, the RSA will not require the Debtors to:  (a) file a plan that pays subrogation claimants $11 billion in cash, (b) require individual claimants to release made-whole claims, if any, for the portion of their allowed claims not fully satisfied under the revised plan, or (c) obtain a finding that the plan conforms with AB 1054's requirement that fire victims be satisfied.

Further amending the RSA to create a bilateral termination right in the event of insolvency as requested by the objectors would be a step too far. From the Debtors' perspective, there is no reason to change what today is a beneficial settlement of a $20 billion claim for $11 billion if the Debtors are ultimately insolvent. The Debtors will be able to treat that claim at the same discount as all other unsecured claims. From the subrogation claimants' perspective, however, the economics of the deal may change materially if the Debtors are not paying other unsecured creditors in full. The Ad Hoc Subrogation Group negotiated for the one-way termination option because the $11 billion settlement

---

[15]   *See* UCC Obj. at 2; BOKF Obj. at 4.

is premised on a solvent case where subrogation claimants can expect to receive the benefit of their full, negotiated claim amount. However, if the Debtors are insolvent and unable to satisfy individual tort claimants in full, the TCC may argue that subrogation claimants' recoveries are subject to made-whole claims. If the TCC prevails, in an insolvency scenario, the subrogation claimants' negotiated recoveries could be subjected to two reductions—one reduction equally applicable to all creditors of the same priority, and a second reduction to account for any made-whole exposure. If the Ad Hoc Subrogation Group availed itself of its termination right in an insolvency scenario, it would be able to assert a higher claim amount, but in that event, all parties' rights to dispute the claim amount are preserved. Furthermore, without the option to retain the $11 billion allowed claim, the Ad Hoc Subrogation Group would suffer significant prejudice if the Debtors are determined to be insolvent following an estimation proceeding in which the Subrogation Claims were *not* estimated because of the settlement reflected in the RSA. Accordingly, the one-way insolvency termination option in the RSA was fairly negotiated to account for the subrogation claimants' asymmetrical risk in the event of an insolvency, and all parties' rights are preserved if the subrogation claimants elect to abandon their allowed claim of $11 billion.

**F.**     ***The RSA Is Not Subject to a Heightened Standard of Review.***

The TCC disputes the standard of review applicable to the RSA—asserting that it is the "fair and equitable" standard, rather than the "business judgment" standard that applies here. (*See* TCC Obj. at 1, 5-10.) The arguments raised by the TCC regarding the appropriate level of judicial review primarily will be addressed by the Debtors. The Ad Hoc Subrogation Group wishes to only address the argument by the TCC that one of the many members of the Ad Hoc Subrogation Group, the Baupost Group LLC ("**Baupost**"), is an "insider" of PG&E under the Bankruptcy Code, and accordingly that the Court should apply a higher level of scrutiny when considering the RSA. (TCC Obj. at 7.) The TCC makes *no* effort to substantiate this contention, which lacks any basis in law or fact.

To start, Section 101(31) of the Bankruptcy Code defines certain individuals and entities as

Case: 19-30088    Doc# 4348    Filed: 10/21/19    Entered: 10/21/19 13:29:21    Page 32 of 35

"insiders" of a corporate debtor. Baupost satisfies none of these criteria: Baupost is not an affiliate, managing agent or partner of the Debtors, and neither Baupost nor any of its principals is an officer, director, or "person in control of" the Debtors. The TCC does not—and would have no basis to— argue otherwise. Although Baupost is a shareholder of PG&E, its holdings comprise less than 5% of PG&E's outstanding common stock. *Compare* Ad Hoc Subrogation Group Fifth Amended Rule 2019 Statement [Dkt. No. 4228], *with* PG&E Corp. Form 10-Q, at 2 (Aug. 9, 2019). And Baupost is not a member of the PG&E shareholder group represented by Jones Day in these Chapter 11 cases. These facts alone demonstrate that the authorities on which the TCC relies in its attempt to brand Baupost an "insider" are uniformly inapposite. *See Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 915-16 (5th Cir. 1995) (vacating settlement between debtor and its corporate parent), *In re HyLoft, Inc.*, 451 B.R. 104, 113-14 (Bankr. D. Nev. 2011) (settlement was between debtor and its affiliates and affiliates' principals that served as officers and directors of debtor), *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 498 (Bankr. S.D.N.Y. 1991) (settlement between debtor and one of its officers and directors).

Moreover, Baupost's status as a creditor does not make it an "insider" of the Debtors under Section 101 or otherwise. The Ninth Circuit has held unequivocally that:

> [a] creditor is *not* a non-statutory insider unless: (1) the closeness of its relationship with the debtor is comparable to that of the enumerated insider classifications in § 101(31), *and* (2) the relevant transaction is negotiated at less than arm's length. A court *cannot* assign non-statutory insider status to a creditor simply because it finds the creditor and debtor share a close relationship.

*U.S. Bank N.A. v. Village at Lakeridge, LLC (In re Village at Lakeridge, LLC)*, 814 F.3d 993, 1001 (9th Cir. 2016) (emphases added, internal citations omitted). Here, there is no evidence–*none*–to suggest that Baupost shares any "close relationship" with the Debtors, let alone a relationship that is in any way comparable to the "insider" relationships enumerated in Section 101(31). Further, the TCC does not—and cannot—point to anything in the record that demonstrates, or even suggests, that the RSA was negotiated at anything "less than arm's length." *Id.* To the contrary, the uncontradicted record evidence confirms that the Debtors and the *Ad Hoc Subrogation Group*—which represents

over 100 creditors, not just Baupost—engaged in a protracted, on-again, off-again negotiating process over a period of months, in which the two sides challenged one another's respective legal positions, made a series of offers and counter-offers, and litigated the Debtors' right to maintain exclusivity, among other issues. (*See* Parkhill Decl. ¶¶ 6, 8.) In connection with this process, the Debtors performed diligence of the subrogation claims underlying the RSA, including by reviewing a substantial, claim-by-claim aggregated summary of subrogation claims made available by the Ad Hoc Subrogation Group. (*See* Parkhill Decl. ¶¶ 6, 15-16 & Ex. C.)

The RSA yielded by this adversarial process embodies a compromise position in which the Ad Hoc Subrogation Group's members, including but not limited to Baupost, agreed to reduce their claims by *$9 billion* in damages against the Debtors. There is simply no basis for the TCC's contention that this Settlement should be subjected to heightened scrutiny as if it were an insider deal.

**G.** ***The Ad Hoc Subrogation Group Is Compromising $20 Billion in Claims.***

The RSA resolves approximately $20 billion in Subrogation Claims. The Adventist Claimants object that there is no evidence to demonstrate the value of the Subrogation claims. (*See* Adventist Obj. at 4.) That is simply false. Adventist, which did not participate in discovery concerning the RSA, is the only party to advance this objection. However, as set forth in the declaration from Homer Parkhill, the subrogation claimants produced in discovery copious data confirming the amounts of both their paid and reserved claims. (*See* Parkhill Decl. ¶¶ 9-10, 13, 15, citing Exs. A-C.)

<u>**CONCLUSION**</u>

WHEREFORE, the Ad Hoc Subrogation Group requests that the Court grant the Motion and such other and further relief as the Court may deem just and proper.

Dated: October 21, 2019

**WILLKIE FARR & GALLAGHER LLP**

/s/ *Benjamin P. McCallen*
Matthew A. Feldman (*pro hac vice*)
Joseph G. Minias (*pro hac vice*)
Benjamin P. McCallen (*pro hac vice*)
Daniel I. Forman (*pro hac vice*)
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email: mfeldman@willkie.com
        jminias@willkie.com
        bmccallen@willkie.com
        dforman@willkie.com

**DIEMER & WEI, LLP**
Kathryn S. Diemer (#133977)
100 West San Fernando Street, Suite 555
San Jose, CA 95113
Telephone: (408) 971-6270
Facsimile: (408) 971-6271
Email: kdiemer@diemerwei.com

*Counsel for Ad Hoc Group of Subrogation Claim Holders*

29