**DIEMER & WEI, LLP**
Kathryn S. Diemer (#133977)
100 West San Fernando Street, Suite 555
San Jose, CA 95113
Telephone: 408-971-6270
Facsimile: 408-971-6271
Email: kdiemer@diemerwei.com

**WILLKIE FARR & GALLAGHER LLP**
Matthew A. Feldman (*pro hac vice*)
Joseph G. Minias (*pro hac vice*)
Benjamin P. McCallen (*pro hac vice*)
Daniel I. Forman (*pro hac vice*)
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email: mfeldman@willkie.com
        jminias@willkie.com
        dforman@willkie.com

*Counsel for Ad Hoc Group of Subrogation Claim Holders*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>    **-and-**<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br>        **Debtors.**<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☑ Affects both Debtors<br><br>*\* All papers shall be filed in the lead case,*<br>*No. 19-30088 (DM)* | Ch. 11 Bankr. Case No. 19-30088 (DM) (Jointly Admin.)<br><br>**DECLARATION OF BENJAMIN P. MCCALLEN IN SUPPORT OF THE AD HOC GROUP OF SUBROGATION CLAIM HOLDERS' REPLY IN SUPPORT OF DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 363(b) AND 105(A) AND FED. R. BANKR. P. 6004 AND 9019 FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO ENTER INTO RESTRUCTURING SUPPORT AGREEMENT WITH THE CONSENTING SUBROGATION CLAIMHOLDERS, (II) APPROVING THE TERMS OF SETTLEMENT WITH SUCH CONSENTING SUBROGATION CLAIMHOLDERS, INCLUDING THE ALLOWED SUBROGATION CLAIM AMOUNT, AND (III) GRANTING RELATED RELIEF**<br><br>Date:     October 23, 2019<br>Time:    10:00 a.m. (Pacific Time)<br>Place:   United States Bankruptcy Court<br>           Courtroom 17, 16th Floor<br>           San Francisco, CA 94102 |

I, Benjamin P. McCallen, declare as follows:

1.      I am a member of the Firm of Willkie Farr & Gallagher LLP, counsel to the Ad Hoc Group of Subrogation Claim Holders (the "**Ad Hoc Subrogation Group**"). I submit this Declaration in Support of the Ad Hoc Subrogation Group's Reply in Support of Debtor's Motion Pursuant to 11 U.S.C. §§ 363(b) and 105(a) and Fed. R. Bankr. P. 6004 and 9019.

2.      Attached hereto as Exhibit 1 is a true and correct copy of excerpts of the Transcript of Proceedings, *In re PG&E Corp. and Pac. Gas and Elec. Co.*, No. 19-30088 (Sept. 24, 2019).

3.      Attached hereto as Exhibit 2 is a true and correct copy of excerpts of the Transcript of Proceedings, *In re PG&E Corp. and Pac. Gas and Elec. Co.*, No. 19-30088 (October 7, 2019).

4.      Attached hereto as Exhibit 3 is a true and correct copy of excerpts of the 30(b)(6) Deposition of Homer Parkhill, *In re PG&E Corp. and Pac. Gas and Elec. Co.*, No. 19-30088 (Oct. 10, 2019).

5.      Attached hereto as Exhibit 4 is a true and correct copy of a letter from Matthew Feldman, counsel to the Ad Hoc Subrogation Group, to the 9019 Motion Objectors (Oct. 21, 2019).

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct and that I would be competent to testify thereto if called upon to do so.


Executed on the 21st day of October, 2019 at New York, New York.


                    */s/ Benjamin P. McCallen*
                    Benjamin P. McCallen

**Exhibit 1**

1       UNITED STATES BANKRUPTCY COURT

2       NORTHERN DISTRICT OF CALIFORNIA

3                    -oOo-

4    In Re:                        ) Case No. 19-30088
                                   ) Chapter 11
5    PG&E CORPORATION AND PACIFIC  )
     GAS AND ELECTRIC COMPANY      ) San Francisco, California
6                                  ) Tuesday, September 24, 2019
                        Debtors.   ) 9:30 AM
7    _____  )
                                     STATUS CONFERENCE RE:
8                                    DEBTOR'S PLAN

9                                    FIFTH OMNIBUS MOTION OF THE
                                     DEBTORS PURSUANT TO 11 U.S.C.
10                                   SECTION 365(A), FED. R.
                                     BANKR. P. 6006, AND B.L.R.
11                                   6006-1 FOR AN ORDER APPROVING
                                     ASSUMPTION OF CERTAIN REAL
12                                   PROPERTY LEASES ("LEASE
                                     ASSUMPTION MOTION") [3726]

13

14              TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE DENNIS MONTALI
              UNITED STATES BANKRUPTCY JUDGE

15

     APPEARANCES:
16   For the Debtors:              STEPHEN KAROTKIN, ESQ.
                                   JESSICA LIOU, ESQ.
17                                 Weil, Gotshal & Manges LLP
                                   767 Fifth Avenue
18                                 New York, NY 10153
                                   (212)310-8000
19

     For Official Committee of     DENNIS F. DUNNE, ESQ.
20   Unsecured Creditors:          Milbank LLP
                                   55 Hudson Yards
21                                 New York, NY 10001
                                   (212)530-5000
22

     For Official Committee of     CECILY A. DUMAS, ESQ.
23   Tort Claimants:               Baker & Hostetler LLP
                                   11601 Wilshire Boulevard
24                                 Suite 1400
                                   Los Angeles, CA 90025
25                                 (310)820-8800

Case: 19-30088   Doc# 4348-1   Filed: 10/21/19   Entered: 10/21/19 13:29:21   Page 4
of 30

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1  things, just to do exactly what I don't want to do, is get into

2  the merits.  I found it strange to read the TCCs papers to have

3  them citing a case that is so pivotal that went the wrong way.

4  Normally, I was told, don't cite a case that went the wrong way

5  if you think it's making your point.  And I don't, so -- but

6  Mr. Feldman, help me.  Should I have Mr. Karotkin coordinate

7  with the other parties --

8           MR. FELDMAN:  Well, here --

9           THE COURT:  -- to tee up the legal issues, or not?

10          MR. FELDMAN:  Well, here is what I was going to say,

11 Your Honor.  I think this legal issue is teed up, and I think

12 it's teed up in connection with the soon-to-be-filed motion to

13 approve our settlement.  So I think the Court is going to have

14 to deal with this issue in connection with that motion.

15 But what I would also say, which I did not intend to say as I

16 was sitting in the courtroom today, until Mr. Qureshi got up,

17 is that, frankly, Your Honor, I'm not sure how you can rule on

18 the exclusivity motion without having resolved this issue

19 because it's fundamental to their plan that they be able to

20 subordinate the subrogation claims.

21      THE COURT:  Well --

22      MR. FELDMAN:  And Mr. Qureshi suggested, through

23 announcing settlement proposals, that maybe it's not

24 fundamental, but I'm not going to go down that road.  I'm going

25 to -- I'm going to -- I'm going to comment only on what's in

PG&E Corp., Pacific Gas and Electric Co.

1    the record today, which is a plan that seeks to subordinate us.

2    Which if it's dead in the water --

3            THE COURT:  Well, but --

4            MR. FELDMAN:  -- before we start --

5            THE COURT:  But that's --

6            MR. FELDMAN:  -- why are you terminating exclusivity

7    for?

8            THE COURT:  Well, that's my point.  If it's dead in

9    the water as a matter of law, I wouldn't terminate, so --

10           MR. FELDMAN:  Correct, Your Honor.

11           THE COURT:  I --

12           MR. FELDMAN:  Well, then we have to tee it up between

13   now and whatever date Your Honor decides we ought to hear

14   exclusivity.  But I think it's more appropriately teed up in

15   connection with the company's 9019 motion related to our

16   settlement, which I expect --

17           THE COURT:  What --

18           MR. FELDMAN:  -- will be filed today.

19           THE COURT:  Well, when do you -- well, so I had talked

20   to Mr. Karotkin before about --

21           MR. FELDMAN:  I believe he told you it was going to be

22   teed up for the 23rd.

23           THE COURT:  The 23rd.  So I mean, this is not going to

24   sit well with your opponents, here, but --

25           MR. FELDMAN:  But I think they've given --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    THE COURT:  -- should I --

2    MR. FELDMAN:  -- you this, Your Honor.  I wasn't

3 planning to stand up and say this, but I don't see how it could

4 be done otherwise.

5    THE COURT:  Well, I didn't -- I didn't think about a

6 separate 9019 motion until I read a little bit more on the

7 documents that were filed yesterday.  So I read -- I know

8 that -- I knew that there was this eleven-billion-dollar

9 settlement and wasn't surprised to see it make it to the

10 revised plan.  But what struck me as different was to hear it

11 is also coming as a 9019 motion.  It didn't -- I don't get

12 worried about it, I don't think it's the wrong thing to do,

13 it's just something I didn't anticipate because I thought it

14 would be a plan issue.

15    So but your point is a good point.  If it's relevant

16 to exclusivity, then the question is, should I tier exclusivity

17 and the 9019 motion all together, and you're making a good

18 argument that maybe I should do that, which is not what the

19 exclusivity -- opponents of exclusivity want to hear.  But it

20 would be unfortunate to have everybody rush discovery, rush

21 briefing, rush an argument, only to have me come out here on

22 the 7th and say, continue to --

23    MR. FELDMAN:  Can't decide it, right.

24    THE COURT:  Can't decide it.

25    MR. FELDMAN:  Right.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1        (Recess from 11:27 a.m., until 11:43 a.m.)

2              THE CLERK:  All rise.

3              THE COURT:  Okay, please remain seated.  You're all

4        standing up anyway.

5              So I took a minute before -- a little longer than I

6        expected, because we were checking our calendars.  And I

7        checked with my staff, and I'm sorry about that mix-up on the

8        holiday -- the Jewish holiday.  We cleared dates -- all the

9        PG&E dates in advance, and so maybe that slipped through.  But

10       again, after we hear from the other counsel, I'll figure out

11       what to do about rescheduling what we need to reschedule, so,

12       let's go --

13             MR. STAMER:  Good afternoon, Your Honor.  For the

14       record, Mike Stamer from Akin Gump, on behalf of the ad hoc

15       noteholder group.

16             Your Honor, I am not going to be responding to Mr.

17       Bennett's comments, including his comments about the

18       credibility of the tort victims' lawyers.  I assume there'll be

19       a few people in the courtroom that will be responding to that.

20             THE COURT:  Well, I'm not going to take any action on

21       that anyway, but --

22             MR. STAMER:  Understood.  Your Honor, what I'm

23       standing up to do, hopefully, is take a legal issue -- a legal

24       issue off your plate.

25             Mr. Feldman, in his presentation, talked about the

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    issue associated with subordination between the tort claims and

2    the subrogation claimants.  I can announce to the Court, and

3    I've conferred with counsel for the TCC, that we anticipate, in

4    advance of the hearing on the 7th that we will be modifying our

5    term sheet, that we will be increasing the twenty-four number

6    to a larger number, and we will be providing the full eleven

7    billion dollars to the subrogation claimants, the same amount

8    that is being offered or settled by the company.

9         We believe that this renders the subordination issue

10   academic.

11        THE COURT:  Well, are they pari passu or similar?  I

12   mean, are they going to be treated equally?

13        MR. STAMER:  They'll be treated such that eleven

14   billion dollars will be carved out for the benefit of the

15   subrogation claimants.

16        THE COURT:  But pro rata or pari passu or some other

17   legal term that doesn't --

18        MR. STAMER:  We can use whatever Latin you need to,

19   Judge.  That --

20        THE COURT:  Any language will do.

21        MR. STAMER:  -- but the bottom line is that they have

22   asked for and negotiated with the company for an eleven-

23   billion-dollar pool of capital:  cash, potentially some other

24   noncash items.

25        As Mr. Qureshi said before, we actually offered that

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    to the subrogation claimants over the weekend.  And Your Honor,

2    we will put that offer in a modified term sheet --

3            THE COURT:  But listen --

4            MR. STAMER:  Yes, sure.

5            THE COURT:  -- my question is -- because I'll have to

6    look at this document.  And will it tell the eleven-billion-

7    dollar class members that they are going to be paid in the same

8    priority which the tort victims will be paid?

9            MR. STAMER:  Your Honor, the answer is yes.

10           THE COURT:  Okay.

11           MR. STAMER:  I believe the way it will work is there

12   will be segregated pools of capital.

13           THE COURT:  That's fine.

14           MR. STAMER:  And therefore they will be treated the

15   same as the other tort victims.

16           Your Honor, as I think you heard from Mr. Qureshi,

17   what we have done is we have agreed with the TCC to a pool of

18   capital that will be available to settle all of the tort

19   claims.

20           THE COURT:  So --

21           MR. STAMER:  And that number is twenty-four billion

22   dollars.

23           THE COURT:  But it's going up.

24           MR. STAMER:  And I'm happy to stand up and say, Your

25   Honor, it's going up.  Competition is a good thing.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1      THE COURT:  Okay, but my point is, I don't care

2  whether it's going up or not, you've made it clear to me -- I

3  take it you believe, Mr. Stamer, that if we're having this

4  exclusivity hearing on the 7th or some other day, I won't be

5  told that the plan is dead as a matter of law because of an

6  improper or impermissible subordination --

7      MR. STAMER:  That is correct, Your Honor.

8      THE COURT:  -- of a class?

9      MR. STAMER:  That is --

10      THE COURT:  Okay.

11      MR. STAMER:  -- it took me a little while to get

12  there, but that's exactly why I'm standing up, Your Honor.

13      THE COURT:  Well, you --

14      MR. STAMER:  We are taking that legal issue off of

15  your plate.  We anticipate the subrogation claimants -- it's

16  the eleven billion dollars they're focused on, not focused on

17  whose money that is.  So we anticipate this will completely

18  remove that issue from contention, and therefore, we should be

19  clear to go forward on the 7th.

20      THE COURT:  It won't get rid of the make-whole

21  argument, if that's a part -- a separate issue.

22      MR. STAMER:  The made-whole argument -- you're talking

23  about the argument that is assertible by the tort claimants --

24      THE COURT:  I --

25      MR. STAMER:  -- to be made whole --

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Yes.

2          MR. STAMER:  -- for amounts not covered by insurance?

3    Correct, Your Honor.

4          THE COURT:  Yeah.

5          MR. STAMER:  This does not address that issue.

6          THE COURT:  It's a different issue.

7          MR. STAMER:  That is an issue that will likely come up

8    in connection with the motion to approve the settlement with

9    the subros; and leading that charge, I anticipate, will be the

10   tort claimants committee and individual tort claimants.

11         THE COURT:  Okay.  And the proposal that you're now

12   talking about is not -- you're not going to make a separate

13   9019-type motion, or you are?

14         MR. STAMER:  Your Honor, the -- and maybe I can

15   clarify the comments that Mr. Qureshi made before about the

16   settlement and the question that you asked.

17         As Your Honor knows, you can settle claims in

18   connection with a plan of reorganization --

19         THE COURT:  Yes, of course.

20         MR. STAMER:  -- under 9019.  As a plan proponent, if

21   we're fortunate enough to be given the right to file a plan, we

22   will be proposing to settle all of the tort claims, subros and

23   the like, for an aggregate amount of twenty-four billion plus

24   whatever we put in the next round.

25         THE COURT:  But that's -- I mean, that's the nature of

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

**Exhibit 2**

1                    UNITED STATES BANKRUPTCY COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3                                 -oOo-

4     In Re:                        ) Case No. 19-30088
                                    ) Chapter 11
5     PG&E CORPORATION AND PACIFIC  )
      GAS AND ELECTRIC COMPANY      ) San Francisco, California
6                                   ) Monday, October 7, 2019
                         Debtors.   ) 10:00 AM
7     _____

                                    JOINT MOTION OF THE OFFICIAL
8                                   COMMITTEE OF TORT CLAIMANTS
                                    AND AD HOC COMMITTEE OF
9                                   SENIOR UNSECURED NOTEHOLDERS
                                    TO TERMINATE THE DEBTORS'
10                                  EXCLUSIVE PERIODS PURSUANT TO
                                    SECTION 1121(D)(1) OF THE
11                                  BANKRUPTCY CODE [3940]

12                                  MOTION TO APPROVE FEE
                                    PROCEDURES FILED BY BRUCE
13                                  MARKELL [3950]

14                      TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE DENNIS MONTALI
15                   UNITED STATES BANKRUPTCY JUDGE

16    APPEARANCES:
      For the Debtors:            PAUL H. ZUMBRO, ESQ.
17                                KEVIN J. ORSINI, ESQ.
                                  Cravath, Swaine & Moore LLP
18                                825 Eighth Avenue
                                  New York, NY 10019
19                                (212)474-1000

20    For the Debtors:            STEPHEN KAROTKIN, ESQ.
                                  Weil, Gotshal & Manges LLP
21                                767 Fifth Avenue
                                  New York, NY 10153
22                                (212)310-8000

23    For Bruce A. Markell:       SCOTT H. MCNUTT, ESQ.
                                  McNutt Law Group LLP
24                                219 9th Street
                                  San Francisco, CA 94103
25                                (415)995-8475

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1      MR. QURESHI:  Sure.

2      THE COURT:  -- exceeds your figure, right?

3      MR. QURESHI:  Not exceeds, Your Honor.  If estimation

4  plus TUBS plus the government claims --

5      THE COURT:  I'm backing your eleven billion for the

6  (indiscernible) and just focusing on the fire victims.  So

7  that's fourteen and a half billion, right?  Right?

8      MR. QURESHI:  So you --

9      THE COURT:  Right?

10     MR. QURESHI:  Correct, so --

11     THE COURT:  So if the estimation is sixteen billion

12 for fire damage, what does that do to your plan?

13     MR. QURESHI:  Our plan in that circumstance is not

14 dead, Your Honor, because we have an agreement, a settlement,

15 with the TCC for an aggregate cap of 25.5.  So let's talk about

16 a world where ours is the only plan -- not suggesting that

17 that's the case, but just to test the --

18     THE COURT:  Well, you'd like there to be, but at the

19 moment, that isn't the case.

20     MR. QURESHI:  And we're not suggesting today, Your

21 Honor, that the debtor shouldn't be permitted to proceed with

22 their plan.  But just to illustrate this point.  So our plan,

23 we do not believe requires estimation.

24     THE COURT:  No, I know that.  I know that.

25     MR. QURESHI:  Right?

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    THE COURT:  But that's not, but that --

2    MR. QURESHI:  Right.

3    THE COURT:  -- but until your plan is in and their

4  plan is withdrawn, there's got to be an estimation if we want a

5  compromise, right?

6    MR. QURESHI:  We agree.

7    THE COURT:  So you still haven't explained --

8    MR. QURESHI:  We -- we --

9    THE COURT:  I'll shut up and let you tell me, but

10  explain to me --

11    MR. QURESHI:  Sure.

12    THE COURT:  -- what happens if the estimation exceeds

13  14.5 for the victims.

14    MR. QURESHI:  Our plan is still confirmable in that

15  eventuality.  Again, we have an agreement with the TCCs to have

16  the aggregate liabilities to be 25.5 billion dollars,

17  irrespective of what might happen in estimation.  So we would

18  then proceed to confirmation with our plan --

19    THE COURT:  But -- but why -- but suppose -- wait a

20  minute.  If the estimation comes in more than the twenty-five

21  and a half -- and again, it's easier for me to focus on the --

22    MR. QURESHI:  Sure.

23    THE COURT:  -- take the subrogation out.  So if -- if

24  magically I could tell Judge Donato plus TUBS jury says 18

25  billion, how -- what -- well, your 14.5 is off the table.  Who

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    would ever vote for it?

2        MR. QURESHI:  Well, Your Honor, the point is in that

3    circumstance, unlike the equity holders, if it comes in above

4    that number, we will have the ability, if it is necessary, to

5    increase the recoveries in our plan.  So the point --

6        THE COURT:  And wouldn't PG&E have the similar ability

7    to do it?

8        MR. QURESHI:  Theoretically, Your Honor, that is

9    right.  But the point with the equity plan is they're not going

10   to have an economic incentive to do that.

11       THE COURT:  Why would your plans have an economic

12   incentive?

13       MR. QURESHI:  Because --

14       THE COURT:  Well, it's the same numbers, right?  The

15   same residual value.

16       MR. QURESHI:  No, Your Honor.

17       THE COURT:  No?

18       MR. QURESHI:  Because of the absolute priority rule.

19   Equity comes last.  So the first thing that happens when claims

20   start coming in about -- remember, in their plan, they are

21   giving existing equity a seven-billion-dollar recovery.  So

22   when claims -- and that's premised upon an 18.9-billion-dollar

23   cap on wildfire liabilities.

24       THE COURT:  Yes, I understand.

25       MR. QURESHI:  So if those liabilities come in above

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1      THE COURT:  Okay, but I'm going to -- I -- I --

2      MR. QURESHI:  Sure.

3      THE COURT:  I gave you time and then I'm taking it

4  away.  What happens if the estimation comes in below your

5  figure?

6      MR. QURESHI:  The T --

7      THE COURT:  Is your plan confirmable?

8      MR. QURESHI:  Yes.

9      THE COURT:  Well, why?  Doesn't it --

10      MR. QURESHI:  Because --

11      THE COURT:  -- violate the absolute priority rule by

12  overpaying the victims?  In other words, again, I want to put

13  the subrogation to the side, because that -- unless I'm missing

14  something, that's a constant in both plans.  So --

15      MR. QURESHI:  It --

16      THE COURT:  -- to me -- to me, your plan pays the

17  victims fourteen and half billion, the PG&E plan that your

18  challenging today offers them eight billion or 8.4 billion.  So

19  there's about a six-billion-dollar delta.  But if the

20  combination of district court estimation plus TUB fire jury

21  comes up lower than your figure, it seems to me that's good for

22  the victims, but it makes for an uncomfortable plan because

23  they're over -- just as -- as the stockholders have argued, it

24  overpays the claim -- the class.

25      MR. QURESHI:  Let me try to be clear, Your Honor.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1          MR. QURESHI:  -- rather than a backup plan.

2          THE COURT:  Well, the terms in the briefing, it was

3  argued that it was kind of --

4          MR. QURESHI:  Right.

5          THE COURT:  -- when -- we need our plan because the

6  other one is going to fail.

7          MR. QURESHI:  And that absolutely is how we view it.

8  Again, Your Honor, if the world comes to pass the way the

9  equity holders hope that it will, which is underneath that

10  18.9-billion-dollar number, then as drafted, our plan would not

11  work and we concede that.  What we are saying is, because there

12  is a tremendous risk that estimation and TUBS and the

13  government claims are going to come in well above that --

14          THE COURT:  Right.

15          MR. QURESHI:  -- it is just not a sensible risk for

16  this estate to take, to find ourselves, at the conclusion of

17  that process, in a place where the financing isn't there to

18  satisfy those claims.

19          THE COURT:  Okay.  So --

20          MR. QURESHI:  And the only --

21          THE COURT:  So that's -- so that's the change that

22  you've said.  You -- that -- then when I ask for the change,

23  your saying they haven't -- they haven't got a financeable plan

24  at this point if the numbers come in higher.

25          MR. QURESHI:  That's one of the changes.  Absolutely

PG&E Corp., Pacific Gas and Electric Co.

1  right.

2          Another change, Your Honor, is that every creditor

3  constituency in the case that has taken a position on whether

4  to terminate exclusivity, with one exception in the subrogation

5  holders that I will come to, is in favor of terminating

6  exclusivity.  The TCC, obviously the fiduciaries for what Your

7  Honor has referred to as the involuntary Creditors here -- and

8  you're going to here from Ms. Dumas -- the Official Creditor's

9  Committee, another estate fiduciary, is in favor of terminating

10  exclusivity, the debtor's largest union.  The IBEW is in favor.

11          THE COURT:  No, I know the list.  I've got the list.

12          MR. QURESHI:  Right.  And so -- and the subrogation

13  holders, Your Honor, the only reason they're objecting, under

14  either plan they get an eleven-billion-dollar-allowed claim.

15  They don't like the form of consideration in our plan, but they

16  also signed an RSA in which the debtors preclude them from

17  negotiating with us.  When those shackles are lifted, Your

18  Honor, we're confident that we can reach an agreement on the

19  form of consideration with the subrogation holders.

20          And so -- and the public entities, by the way, that

21  have the one-billion-dollar settlement with the debtors, that's

22  adopted in our plan as well.

23          THE COURT:  No, I'm aware of that.

24          MR. QURESHI:  Okay.  Right.  So the way that all

25  shakes out, Your Honor, is you have the equity owners, who

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1    MR. MARSHACK:  Good morning, Your Honor.  Your Honor,

2 just a suggestion -- if we're running out of time, and as you

3 and I have both agreed upon in the past, Judge Donato's pretty

4 quick, if you would like to bring us all back this afternoon?

5    THE COURT:  No.

6    MR. MARSHACK:  Okay.

7    THE COURT:  I don't.

8    MR. MARSHACK:  We'll make it happen.  PG&E says in

9 their pleadings that they are ready, willing, and able to

10 fairly and fully compensate wildfire victims for their losses.

11 They say the amount is 8.4 billion dollars and -- but they are

12 capping it at 8.4 billion.  They will pay us in full, but they

13 will give us a cap.

14    THE COURT:  Well, that's the plan that's on the table.

15    MR. MARSHACK:  That's the plan.  But their words --

16    THE COURT:  But Mr. Marshack, if Judge Donato hits

17 them with a larger number, they have two choices, right:  fold

18 their tent or put the -- plug in the number.  And from what Ms.

19 Dumas says, the top of that number is thirteen and a half.

20    MR. MARSHACK:  You say that, but the TCC's numbers and

21 their financial advisors say they don't have any, to quote Ms.

22 Dumas, gas in the tank.

23    THE COURT:  Okay.

24    MR. MARSHACK:  That's one.  And two, if they had more

25 money, why aren't they putting it up?  A lot of this, Your

PG&E Corp., Pacific Gas and Electric Co.

1    Honor, is just pure credibility.  Hate to be the one that

2    really brings this to light, but once upon a time, they said

3    that subro was only owed 8.5 billion dollars, but now they say

4    it's 11 billion.

5          THE COURT:  But what did subro say they were owed,

6    once upon a time, twenty billion, right?

7          MR. MARSHACK:  Right.

8          THE COURT:  Well, wasn't there a compromise from both

9    sides?  Both sides, both camps here compromised, essentially,

10   the subro figure.

11         MR. MARSHACK:  Correct.

12         THE COURT:  That's a constant; that's for both plans.

13         MR. MARSHACK:  Correct.  But did the debtor give up

14   all the last -- did they give up the last money they had?  To

15   make the subro agreement, to get them to vote for their plan,

16   did they give up a last money they had to do so?

17         And my point is this, Your Honor:  They say, once upon

18   a time, that we were only owed 8.43 billion dollars, and that's

19   what they say today.  We are going to be owed more money.

20         THE COURT:  Mr. Marshack, you might recall Mr. Orsini

21   has said more than once that they haven't even, in some

22   respects, haven't even admitted to that, because there had been

23   no determination.  But they obviously can't back out of a plan

24   they've proposed, and the briefing that cites them in their

25   public filings, they say what they say, but --

(973) 406-2250 | operations@escribers.net | www.escribers.net

                PG&E Corp., Pacific Gas and Electric Co.

1    what is the distributable value available.

2            THE COURT:  Right.

3            MR. KAROTKIN:  What is it?  Not, are the claims worth

4    this?  Should they be paid this?  Should seven billion dollars

5    of equity value be taken away from the shareholders of this

6    corporate?

7            THE COURT:  But you also heard Ms. Dumas concede that,

8    if the estimation by the District Court and/or Tubbs fire comes

9    in higher, they're not going to try to get the higher number.

10   So I mean, do you believe that?

11           MR. KAROTKIN:  Do I believe it?

12           THE COURT:  Well, do you believe that they're locked

13   in?  In other words --

14           MR. KAROTKIN:  I don't know, Your Honor.  Every day we

15   get a new plan with different provisions from them.

16           THE COURT:  Well, okay.  But let's stick with the plan

17   that they want to file.  If Judge Donato makes a determination

18   after the estimation trial and fixes a number that's higher

19   than -- again, I'm going to back out the subro --

20           MR. KAROTKIN:  Um-hum.

21           THE COURT:  -- because that's a constant -- higher

22   than thirteen and a half billion, I heard Ms. Dumas say the TCC

23   will not try to get a higher number.

24           MR. KAROTKIN:  And is Ms. Dumas, as you said, voting

25   on this plan?

(973) 406-2250 | operations@escribers.net | www.escribers.net

**Exhibit 3**

```
 1              UNITED STATES BANKRUPTCY COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3                 SAN FRANCISCO DIVISION
 4
 5    _____
                                      )
 6    In re:                          )
                                      )
 7    PG&E CORPORATION,               )
                                      )
 8         and                        ) No. 19-30088 (DM)
                                      )
 9    PACIFIC GAS AND ELECTRIC COMPANY,) Chapter 11
                                      )
10              Debtors.              )
                                      )
11    _____)
12
13
14       VIDEOTAPED 30(b)(6) DEPOSITION OF HOMER PARKHILL
15                 San Francisco, California
16                 Thursday, October 10, 2019
17                        Volume I
18
19
20
21
22    Reported by:
23    CATHERINE A. RYAN, RMR, CRR
24    CSR No. 8239
25    Job No. 3565635
```

Case: 19-30088    Doc# 4348-1    Filed: 10/21/19    Entered: 10/21/19 13:29:21    Page 25 of 30

1    A    Yeah, would you rephrase the question?
10:55:05
2    Q    Let me rephrase it.
3        Other than representing the ad hoc
4    subrogation group and its members in trying to reach
5    a settlement, did these ad hoc professionals file
10:55:11
6    any lawsuits against the debtor, pro- -- line up
7    beside the fire victims in any lawsuits to support
8    the claims against the debtor, or anything else that
9    would have created the atmosphere in which the
10   debtor was agreeing to reach a settlement on these
10:55:28
11   claims?
12       MR. McCALLEN:  I'll object to form.
13       THE WITNESS:  Well, in the context of
14   negotiating the settlement, there were a number of
15   things the ad hoc group of professionals were
10:55:40
16   focused on, including the formulation and
17   advancement of an alternative plan term sheet, which
18   was filed with the court.  There has been multiple
19   meetings and outreach to your clients at the TCC in
20   conjunction with trying to devise a comprehensive
10:56:00
21   settlement for fire victims that happened early on
22   to advocate for the fire victims broadly.
23       So I'd put that in the context of the
24   overall landscape in creating momentum towards and
25   pressure towards a settlement.
10:56:22

Page 106

1    BY MR. RICHARDSON:
10:56:23
2    Q    Other than trying to negotiate and obtain
3    a percentage of recovery for their clients, did
4    these ad hoc professionals file any litigation
5    against the debtors or participate in litigation
10:56:33
6    against the debtors?
7    A    Would you consider filing an alternative
8    plan and seeking to terminate exclusivity litigation
9    against the debtors?
10   Q    If that's all you can identify, that --
10:56:49
11   that could be your answers.
12   A    And asides from appearing in court -- in
13   court and objecting to certain other matters
14   throughout these cases that relate to estimation,
15   that relate to claims, there's been a whole series
10:57:04
16   of things, I think that you're aware of, that we've
17   stood side by side with you on relating to all of
18   these matters, so I'm not sure what your definition
19   is of "litigation" vis-a-vis the debtors, but the
20   record's very clear around the activities of the
10:57:17
21   ad hoc group.
22   Q    Turning -- at the bottom of the page, do
23   you see, in subparagraph F, where it provides that:
24   In accordance with the provisions of the RSA, the
25   Confirmation Order shall contain the following
10:57:39

Page 107

1    findings and order, and then, in subparagraph 2
10:57:42
2    below, the requirement that any holder of an other
3    wildfire claim shall, quote, contain as a --
4    sorry -- that any settlement with a holder of a
5    wildfire claim shall contain as a condition of
10:58:00
6    payment or other distribution that the holder or
7    holders of such claim contem- -- contemporaneously
8    execute and deliver a release and waiver of any and
9    all claims to the fullest extent permitted by law,
10   and it continues on from there on the following
10:58:14
11   page.
12       Do you see that section?
13   A    I do.
14   Q    Do you see the specific inclusion of
15   present and former holders of subrogation wildfire
10:58:26
16   claims?
17   A    I do.
18   Q    Was this release intended to cover
19   made-whole claims the fire victims might pursue?
20   A    It was intended to, again, memorialize the
10:58:40
21   concept of this plan, which is that all wildfire
22   victims were being paid in full, which is a
23   requirement of AB 1054 to -- to take advantage of
24   AB 1054; that all wildfire claims have to be paid in
25   full, so yes.
10:59:00

Page 108

1    Q    Did you have an understanding, based on
10:59:05
2    any evidence at the time this agreement was signed,
3    that the debtor was going to be paying all fire
4    victims' claims in full?
5    A    Our understanding was that if the
10:59:16
6    settlement didn't represent a solvent debtor and
7    didn't comply with 1054, this plan wouldn't be
8    operable, which is why we have termination
9    provisions specifically related to those two points.
10   Q    Was that an important term for you in this
10:59:34
11   settlement?
12   A    Yes.
13   Q    The requirement?
14   A    Yes.
15   Q    Did it comply with 1054?
10:59:39
16   A    Of course.
17   Q    Do you know why, then, the subrogation
18   group didn't conduct its own analysis to determine
19   if it would actually be possible for the debtors to
20   pay all other wildfire claims under this plan?
10:59:49
21   A    One of the reasons is we don't have the
22   information the debtor has relating to the scope and
23   the landscape of these claims.
24   Q    Was it discussed with the debtors that
25   entering into this settlement might force wildfire
11:00:05

Page 109

28 (Pages 106 - 109)

Case: 19-30088    Doc# 4348-1    Filed: 10/21/19    Entered: 10/21/19 13:29:21    Page 26
of 30

**Exhibit 4**

# WILLKIE FARR & GALLAGHER LLP

787 Seventh Avenue
New York, NY 10019-6099
Tel: 212 728 8000
Fax: 212 728 8111

October 21, 2019

**VIA EMAIL**

Robert A. Julian
Cecily A. Dumas
Baker & Hostetler LLP
1160 Battery Street, Suite 100
San Francisco, CA 94111

Dennis F. Dunne
Samuel A. Khalil
Milbank LLP
55 Hudson Yards
New York, NY 10001

Michael S. Stamer
David H. Botter
Akin Gump Strauss Hauer &
Feld LLP
One Bryant Park
New York, NY 10036

Andrew I. Silfen
Beth M. Brownstein
Arent Fox LLP
1301 Avenue of the Americas,
42nd Floor
New York, NY 10019

Joseph H. Hunt
Ruth A. Harvey
P.O. Box 875
Ben Franklin Station
Washington, DC 20044-0875

Xavier Becerra
Margarita Padilla
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550

Rebecca J. Winthrop
Norton Rose Fulbright US LLP
555 South Flower Street, 41st
Floor
Los Angeles, CA 90071

Timothy S. Laffredi
United States Department of
Justice
Office of the U.S. Trustee
450 Golden Gate Avenue,
Suite 05-0153
San Francisco, CA 94102

Re:     In re PG&E Corp. and Pacific Gas and Electric Company, Case No. 19-30088 (DM)

Dear Counsel:

We have reviewed your objections to the pending motion to approve the settlement of subrogation claims and associated restructuring support agreement between the PG&E Corporation and Pacific Gas and Electric Company (the "Debtors") and the holders of subrogation claims (the "RSA"). In an effort to limit the issues in dispute ahead of this week's hearing, the Ad Hoc Subrogation Group makes the following representations, which we understand to be consistent with the Debtors' understanding of the RSA. With the following clarifications, we hope to address many of the concerns raised in your objections, and therefore significantly narrow the issues that need to argued before the Court:

1. ***Plan Negotiations/Global Settlement:*** Consistent with Judge Montali's stated desire to "facilitate negotiations for a global resolution and narrow the issues which are in

legitimate dispute,"[1] nothing in the RSA precludes the Debtors and the Ad Hoc Subrogation Group from negotiating together with any other creditor constituencies or participating in mediation to achieve global consensus. In fact, the settlement of subrogation claims for $11 billion resolves one of the few remaining major open issues, and brings the cases one step closer to resolution.

2. ***Consequences of Insolvency:*** It was never the parties' intention to require the Debtors to file a plan that would pay subrogation claimants $11 billion in cash on $11 billion of allowed claims if the Debtors are insolvent. Therefore, we are willing to clarify in an amendment to the RSA or the order approving the RSA, that if the Court determines the Debtors are insolvent, the Debtors will no longer be required to:

    a. file a plan that pays subrogation claimants $11 billion in cash on $11 billion of allowed claims;

    b. require that individual claimants in connection with a voluntary settlement release made whole claims per section 3(a)(iii) of the RSA for the portion of their allowed claims against the Debtors' estates that are not fully satisfied under the revised plan; or

    c. pursue a plan or confirmation order with the finding set forth in section 3(a)(v)(A) of the RSA.[2]

If the Court determines the Debtors are insolvent and the Debtors file a revised plan that does not pay the subrogation claimants $11 billion in cash, the Consenting Creditors would be free to vote for or against any such revised plan. For the avoidance of doubt, subject to the right to terminate the RSA and seek a higher claim as provided in the RSA, the subrogation claims will continue to be allowed in the aggregate amount of $11 billion.

3. ***Releases:*** Three clarifications with respect to the releases referenced in section 3(a)(iii) of the RSA and Section 10.9(b) of the draft plan attached to the RSA:

---

[1]      *Order Granting Joint Motion of the Official Committee of Tort Claimants and the Ad Hoc Committee of Senior Unsecured Noteholders to Terminate the Debtors' Exclusive Periods Pursuant ot Section 1121(d)(1) of the Bankruptcy Code* [Docket No. 4167].

[2]      Section 3(a)(v)(A) of the RSA provides as follows:

     Subject to the terms and conditions hereof, for the duration of the Support Period, the Company shall . . . (v) propose and pursue the Plan and seek entry of a Confirmation Order that contain (and the Plan and Confirmation Order shall contain) the following provisions, findings and orders, as applicable in substantially the form set forth below (the "Findings and Orders"): (a) the Bankruptcy Court "has determined that the resolution of the insolvency proceeding provides funding or establishes reserves for, provides for assumption of, or otherwise provides for satisfying any prepetition wildfire claims asserted against the electrical corporation in the insolvency proceeding in the amounts agreed upon in any pre-insolvency proceeding settlement agreements or any post-insolvency settlement agreements, authorized by the court through an estimation process or otherwise allowed by the court."

*First.*  As previously communicated to counsel to the Official Committee of Tort Claimants (the "TCC") in person at the October 7 hearing, and in writing by letter dated October 8, the releases of subrogation claim holders are intended to narrowly address claims related to the bankruptcy and the Debtors' restructuring and any made whole claims that may be asserted relating to the 2017 and 2018 wildfires by individual plaintiffs who elect to settle their claims against the Debtors or a post-effective date trust (individually or as a group).  There is no intention to impose a release of ordinary-course insurance claims by insureds arising under their insurance policies.

*Second.*  The Ad Hoc Subrogation Group would support revising the Debtors' plan to require claimants to opt-in to releases, consistent with the Bondholders/TCC's plan, at least with respect to any release of subrogation claimants under the plan.

*Third.*  Per section 3(a)(iii) of the RSA, payments to individual holders of wildfire claims that *settle* their claims against the Debtors or a post-effective date trust (individually or as a group) will be conditioned on executing a release of any made whole claims against insurers and their assignees.  Individual plaintiffs that litigate their claims to judgment will have no such requirement.  We expect to work with the TCC to ensure the form release is drafted to narrowly address only its intended purpose.

4. ***RSA Amendments:***  material RSA amendments will be noticed to the Court and parties in interest with an opportunity to respond, to make sure any material adjustment to the settlement passes muster under the applicable legal standard.

Very truly yours,

Matthew A. Feldman

CC:  Stephen Karotkin, Esq.
     Kevin Orsini, Esq.
     Ad Hoc Subrogation Group Steering Committee