**Fill in this information to identify the case:**

Debtor 1: PG&E Corporation

Debtor 2: _____
(Spouse, if filing)

United States Bankruptcy Court for the: Northern District of California

Case number: 19-30088

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) that you received.

## Part 1: Identify the Claim

**1. Who is the current creditor?**
John J. Guerra, Successor Trustee of the Cyril G. Barbaccia Irrevocable Trust dated 12/15/1976
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**
☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**
Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

John J. Guerra, Successor Trustee c/o DNLC
Name
1830 15th Street, 2nd Floor
Number   Street
Sacramento     CA       95811
City           State    ZIP Code

Contact phone 916-443-2051
Contact email rcunningham@dnlc.net

Where should payments to the creditor be sent? (if different)

Name _____
Number   Street _____
City     State    ZIP Code

Contact phone _____
Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):
_____

**4. Does this claim amend one already filed?**
☑ No
☐ Yes. Claim number on court claims registry (if known) _____    Filed on ___/___/___ MM/DD/YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**
☑ No
☐ Yes. Who made the earlier filing? _____

## Part 2: Give Information About the Claim as of the Date the Case Was Filed

**6. Do you have any number you use to identify the debtor?**
☑ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7. How much is the claim?** $ Unknown . **Does this amount include interest or other charges?**
☐ No
SEE ATTACHMENT
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**
Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.
Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).
Limit disclosing information that is entitled to privacy, such as health care information.

SEE ATTACHMENT

**9. Is all or part of the claim secured?**
☐ No
☐ Yes. The claim is secured by a lien on property.   SEE ATTACHMENT

**Nature of property:**
☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.
☐ Motor vehicle
☐ Other. Describe: _____

**Basis for perfection:** _____
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____
**Amount of the claim that is secured:** $_____
**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed) _____%
☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**
☑ No
☐ Yes. Amount necessary to cure any default as of the date of the petition. $_____

**11. Is this claim subject to a right of setoff?**
☑ No
☐ Yes. Identify the property: _____

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☐ No | |
|---|---|---|
| | ☐ Yes. *Check one:* | **Amount entitled to priority** |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $ |

* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

### Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.
☑ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  10/21/2019
               MM / DD / YYYY

/s/ J. RUSSELL CUNNINGHAM
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | J. RUSSELL CUNNINGHAM |
| | First name    Middle name    Last name |
| Title | ATTORNEY AT LAW |
| Company | DESMOND, NOLAN, LIVAICH & CUNNINGHAM |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 1830 15TH STREET, 2ND FLOOR |
| | Number   Street |
| | SACRAMENTO         CA    95811 |
| | City               State  ZIP Code |
| Contact phone | 916-443-2051      Email |

## Attachment 1

John J. Guerra, Successor Trustee of the Cyril G. Barbaccia Irrevocable Trust dated December 15, 1976 ("CGB") is the fee title owner of real property located in Placer County, California, identified by Assessor's Parcel Numbers 498-010-012 and 498-010-013 (formerly 017-150-026).

CGB's claim is for just compensation pursuant to the Takings clause of the Fifth Amendment to the United States Constitution and Article I, section 19 of the California Constitution, and such other compensation as is or will become due, pursuant to a Settlement Agreement that resolved the Debtor's right to take in Placer County Case No. SCV 0035650, executed and effective on or about February 1, 2016. The Settlement Agreement, without voluminous exhibits, is supplied herewith as **Attachment 2**.

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement"), effective as of February 1, 2016, ("the Effective Date"), is made by and between Pacific Gas and Electric Company ("PG&E") on the one hand and John J. Guerra, Successor Trustee of the Cyril G. Barbaccia Irrevocable Trust dated December 15, 1976 ("Owner") on the other hand.

## RECITALS

WHEREAS PG&E is undertaking construction of the Line 407 segment of the PG&E Line 406/407 Natural Gas Pipeline Project (the "Project"), which was approved by the California State Lands Commission ("CSLC") as Lead Agency pursuant to the California Environmental Quality Act (CEQA) after environmental review and certification of a Final Environmental Impact Report ("Final EIR") in November 2009;

WHEREAS the Project route approved by the CSLC, as reflected in the Final EIR, includes portions of the real property in which Owner holds an interest in Placer County, California ("Property");

WHEREAS PG&E has commenced an eminent domain action in the Superior Court for the County of Placer ("Court"), entitled *Pacific Gas & Electric Company v. Jack Previte, Successor Trustee of the Cyril G. Barbaccia Irrevocable Trust, et al.*, Case No. SCV 0035650 (the "Action"), for the purpose of obtaining the property interests described in the Complaint ("Property Interests");

WHEREAS the Court granted PG&E's Motion for Prejudgment Possession of the Property Interests;

WHEREAS Owner has requested that PG&E make certain adjustments to the Project alignment, and

WHEREAS PG&E is willing to accommodate Owner's request subject to the terms herein and in the Memorandum of Understanding, effective February 1, 2016, by and between PG&E, Owner, the owners of other properties within the Sierra Vista Specific Plan (collectively with Owner, the "Sierra Vista Owners") and the City of Roseville ("City"),

NOW, THEREFORE, in consideration of the terms and conditions herein, Owner and

PG&E (the "Parties" and each a "Party") hereby agree as follows:

1. **Possession and Use.**

    A.  Owner acknowledges and agrees that PG&E has the right to possess and use the Property Interests described in the Complaint filed in the Action pursuant to the Court's Order granting PG&E's Motion for Prejudgment Possession. Owner grants to PG&E the right to possess and use the additional and/or modified easements described and depicted in **Exhibits B and C** hereto. PG&E's rights to possession and use of the easements include all of the rights in and subject to the limitations described in Exhibits B and C, as expressly modified by the terms herein.

    B.  Just compensation for the above-described easements will be determined by agreement of the parties or by judgment in the Action. Compensation for the temporary construction easement shall be based on a minimum one year time period, commencing the date construction starts. Additional time, if any, shall be compensated at the rate determined during the compensation phase of the eminent domain action. . In no event shall either the access or temporary construction easements extend beyond two years from the commencement of construction of the pipeline on the Property.

2. **Agreed Adjustment of Alignment of Pipeline.**

    C.  In reliance upon Owner's description of and data relating to the expected future grade and future location of utilities on the Property, the 30-inch gas pipeline shall be designed and constructed within a 50'-wide permanent easement with a minimum depth of cover of 5 feet except for those portions of the pipeline constructed via Horizontal Directional Drill ("HDD"), sixteen utility sags with a 9-foot minimum depth of cover, and four major street crossings with a 13-foot minimum depth of cover as measured from future finished grades previously provided by MacKay & Somps. The installed minimum depth of cover is based on either current or future grade, whichever is deeper at the time the pipeline is constructed. Sag details, location of sags and street crossings, and horizontal location of the pipeline shall be constructed substantially consistent with the attached **Exhibit A** (GTS Plans for L-407 Baseline Road, 11 sheets dated 1/21/2016). PG&E acknowledges that Owner intends to build the roadways and other improvements depicted on Exhibit A, and such construction is consistent with the easement acquisitions necessary for PG&E's project. Exhibit A is for reference only

and is not intended for construction purposes. GTS and PG&E will provide L-407 Phase 1, Issued for Construction drawings when finalized.

  D. PG&E will make reasonable Minor Adjustments in the vertical alignment of the Project to accommodate changes in Owner's development plans provided that any such adjustments are requested, with supporting engineered drawings, no later than August 1, 2016 or, if the construction start date (currently scheduled for February 1, 2017) is delayed, then 180 days before the revised construction start date. A "Minor Adjustment" is a change that will not increase the number of field bends in the pipeline, will not increase the width of any utility sags or road crossings, and will not require the use of different construction techniques or any additional or different approval(s) from the California State Lands Commission or any other agency.

  **3. Additional Rights and Obligations Governing Property Interests.** In addition to the terms and conditions set forth in Exhibits B and C, PG&E's possession and use of the Property Interests are subject to the following additional terms:

  A. Final compaction over the portions of the pipeline installed by open trench construction shall achieve a relative minimum compaction of 85% within landscaped areas and 95% under all future roadways

  B. PG&E shall provide Owner and the City with a schedule of major milestones for the pipeline construction project no later than February 15, 2016. PG&E will provide Owner and the City with updated construction schedules every six months or as substantial changes are made to the schedule

  C. PG&E will instruct its contractor(s) to coordinate with the contractors engaged by Owner regarding construction activities, scheduling and temporary access. Either Owner or PG&E may request a meeting to coordinate construction activity

  D. Any special construction techniques that may be required by PG&E (*i.e.* hand digging) for the future construction and placement of utilities to support the SVSP shall be limited to within 2-feet vertically and 5-feet horizontally from the edge of the L-407 pipeline once the pipeline has been physically located and marked. PG&E will waive any and all costs associated with PG&E facility location and inspection for the construction of future

improvements in the vicinity of the gas line. All construction activity in the vicinity of the pipeline shall otherwise be subject to requirements, standards and practices of Underground Service Alert of Northern/Central California and Nevada ("USA North")

  E. Heavy equipment to be used over the installed pipeline shall conform to the Wheel Loading Table attached hereto as **Exhibit D.**

  F. Pursuant to APM BIO-16 and APM BIO set forth in the Final EIR, PG&E will, upon completion of construction restore the permanent and temporary easement areas to their preexisting condition, including with respect to drainage patterns.

  G. PG&E will compensate Owner for any damage to the Owner's property that may result from PG&E's exercise of its easement rights, including for replacement, in like kind, quality and number, of all surface, underground, and landscape improvements that are removed, damaged or destroyed by PG&E.

  H. In the event that adherence to typical design and separation standards is not possible, Owner may request approval of atypical design as shown in Exhibit A, Sheet 11, which approval shall not be unreasonably withheld.

  I. Prior to construction of any PG&E facilities within the City's jurisdiction, PG&E shall submit, as necessary, all plans for construction within the City's jurisdiction for review, comment, and approval, including grading, drainage, and traffic control plans.

  J. PG&E shall be responsible for obtaining and effectuating all necessary approvals and permits, and paying all costs and fees necessary for the construction of the Project

  K. After completion of construction of the Project, PG&E will provide the City as-built drawings.

  L. The additional terms set forth in subparagraphs 3.A through 3.K above shall be incorporated into any Final Order of Condemnation entered in the Action or into any settlement agreement which resolves the issue in the Action.

 **4.** **Escrow Account.**

  A. PG&E will establish an interest-bearing escrow account with U.S. Bank with an opening balance of $1,000,000 (One Million Dollars) to be distributed to the Sierra Vista

Owners as provided herein for extraordinary costs associated with the construction of all SVSP utilities. Each of the Sierra Vista Owners may apply for distribution of funds from the account where (1) conflicts arise between SVSP utilities and any portion of the PG&E pipeline, (2) the actual as-built depth of cover of the pipeline is less than 9 feet, and (3) the conflict requires modification of the SVSP utility. All attempts to align SVSP utilities to cross at sag locations will be made.

        B.      The monies in the fund, including accrued interest, will be available for a period of 20 years commencement of construction of the Project on any of the Sierra Vista Owners' properties.

        C.      The funds shall be available to the Sierra Vista Owners on a pro-rata basis, calculated according to the relative length of the frontage of each property excluding (1) the HDD depths and (2) the areas within the bores and sags. The share of the funds available to each of the Sierra Vista Owners is set out in **Exhibit E**. The Sierra Vista Owners and their successors may reallocate the available funds at their discretion, provided that they give written notice of such reallocation to PG&E. In the event of any change of ownership of all or any portion of Owner's property such that any other person becomes entitled as a successor-in-interest to Owner to request distributions from the account funds, Owner shall promptly provide written notice of such change to PG&E as provided herein.

        D.      Owner may request a disbursement of funds from the account by delivering to PG&E a request for disbursement including (1) Owner's name; (2) Owner's pro-rata share of the funds, pursuant to Subsection (C) above; (3) the amount of funds previously disbursed to Owner; (4) a description of the conflict and reason why the SVSP utility cannot be aligned to cross at a sag in the PG&E pipeline; and (4) appropriate engineered drawings and cost estimates, showing the nature and location of the asserted conflict and the estimated cost of modifying the utility. Within 30 days of receipt of such a request, PG&E shall determine whether the asserted conflict meets the criteria described above. PG&E staff time necessary for the review of plans, or observation and inspection of construction shall be at PG&E's sole cost.

        E.      Nothing in this Agreement or in the MOU shall be deemed or construed to be an admission by PG&E that the Project will or is likely to increase Owner's cost of developing the Property in any amount.

5.  **Relocation of Baseline Pressure Reducing Station.**

    A.  Subject to PG&E obtaining all necessary approvals from the California State Lands Commission (CSLC) and any other necessary agency approvals, PG&E agrees to relocate and construct the Pressure Reducing Station (PRS) on Specific Plan Parcels CG-70 and DF-40 located east of Market Street as depicted in Exhibit A and in general conformity with **Exhibit F** hereto. (Exhibit F is subject to further refinement.) The grading of the site will conform to the future rough grade of the adjacent property as provided by Owners provided that proper site drainage is facilitated. Owners acknowledge and agree that it may be reasonably necessary for PG&E to go outside of the boundaries of the temporary construction easement to effectuate the grading.

    B.  In reliance upon the Owners' representation that they unanimously support and agree to the relocation of the PRS as depicted in Exhibits A and F, and that the relocation of the PRS will be deemed permissible under the current EIR for the Sierra Vista Specific Plan without further formal publicly-circulated environmental review (i.e., without a subsequent or supplemental environmental impact report [EIR] or a new mitigated negative declaration or negative declaration, as opposed to an addendum to the Final Environmental Impact Report certified by the City of Roseville in 2010), PG&E is proceeding with efforts to obtain approval of the relocation from the California State Lands Commission (CSLC) if required by CSLC or to expedite any other required agency approvals related to the relocation. In coordination with Owners and the City, PG&E will use best efforts to try to obtain all necessary approvals from the CSLC and/or any other agency for the PRS relocation. Such efforts will include communicating with CSLC staff; presenting to CSLC staff an application for variance (after seeking and obtaining input from the Owners and City on a draft application); providing all information requested by staff in and subsequent to the application; investigating whether a formal or informal appeal to the Commission would be available to either PG&E, the City, or the Owners in the event that CSLC staff were to deny the proposed variance; sharing with the City and the Owners the information received regarding the existence of any such formal or informal appeal to the Commission; and, if the application is denied by staff, making use of such procedures, if any, as may be available to request review of the denial by the Commission, provided that such review will not result in further formal publicly-circulated environmental review (*i.e.*, a subsequent EIR or supplemental EIR or a new mitigated negative declaration or negative

declaration, as opposed to an addendum to the Final Environmental Impact Report certified by the SLC in 2009). In the event of a denial of the variance application by CSLC staff, the Owners and the City shall also have the right to make use of whatever procedure(s) may be available to seek review of such a denial by the Commission. PG&E will notify the affected Owners (i.e., those on whose properties the PRS is to be relocated) and the City of any and all meetings it has with the CSLC staff to discuss the CSLC process for reviewing the variance and/or the relocation of the PRS, and the affected Owners and the City will have a right to attend those meetings accompanied by legal counsel of their own choosing. If, despite PG&E's best efforts, the CSLC declines to approve the relocation in reliance on the Amended Final EIR without further formal publicly-circulated environmental review (i.e., without a new EIR, a subsequent EIR, a supplemental EIR, a mitigated negative declaration, or a negative declaration, as opposed to a variance or addendum to the Amended Final EIR), or if the CSLC and/or any other necessary agency approvals have not been granted within eight (8) months of submittal of a completed application therefor, Owners and the City will not oppose, object to or challenge construction of the PRS construction at the original FEIR approved location. If, at the end of the 8-month period, PG&E reasonably believes that the necessary approvals will be granted within a reasonable period, then PG&E may extend the period for an additional thirty (30) days.

    C.  In the event that the approval of the PRS relocation by CSLC or any other agency imposes conditions on the relocation, and if additional permanent or temporary property interests would be required to comply with such conditions, then Owners shall provide, and PG&E shall compensate the Owners for, such additional property interests to PG&E to permit PG&E to comply with the condition.

    D.  Ultimate access into the PRS will be from the future Ronten Road. PG&E will complete the final access improvements into the PRS within three months of the completion of Ronten Road or three months of receipt of City of Roseville Permit(s) for installation of such access, whichever is later. Interim access will be from the future Market Street, which will likely be constructed before Ronten Road. Until Market Street is built, PG&E may construct a temporary access road to the PRS from Baseline to the gates of the PRS, within a 50 foot wide corridor along the east side of the PRS. The parties acknowledge and agree that the temporary access road depicted on Sheet 1 of Exhibit B may have to be revised in order to avoid impacting wetlands or other environmental resources. In that event, PG&E agrees that the access road may

be revised to avoid such resources and the Affected Owners agree that they will provide such additional or different property interests as necessary to accommodate the change, at no cost to PG&E. The temporary road will be removed by PG&E and the area will be restored to rough grade as provided by the Owners within 120 days of the date that Owners give notice to PG&E that Market Street is paved and available for PG&E's use. Alternatively, the temporary roadway will be removed by the subject Owner at PG&E's cost.

E. PG&E shall grade the entire area around and within 25 feet of the PRS to ultimate rough grade and construct the masonry wall to match the finished grade as provided by the Owners.

F. The PRS shall be enclosed with an 8-foot high masonry wall with access gates, all of which must be in conformance with the SVSP Design Guidelines. The PRS design, including fencing, must comply with PG&E Corporate Security requirements. In the event of any conflict between the SVSP Design Guidelines and the PG&E Corporate Security requirements, the latter shall govern and the City will grant any necessary variance(s) from the Design Guidelines.

G. Within 45 days of the execution of the Settlement Agreements, PG&E shall make a one-time payment to the subject Owners for the current cost of installation of landscaping around the PRS. The landscaping cost shall be based on the SVSP design criteria, and the cost of the landscaping and installation shall be calculated by MacKay & Somps in conjunction with all necessary consultants.

H. Due to the relocation of the PRS, the storm drain located at the Market Place intersection, as shown on the exhibit accompanying the Owners' and City's proposal will be relocated to avoid conflict with the PRS. In addition, the width of the pipeline offset for the intersection may be adjusted to accommodate for the PRS' proximity to the intersection.

I. Temporary power to the PRS will be supplied by Roseville Electric. Prior to construction, PG&E shall coordinate its power requirements with Roseville Electric. In the event that permanent underground power is not available to the site, a temporary overhead line will be extended to the site. The Owners or City will provide a temporary public utility easement for the temporary line once the alignment is set. All costs associated with the design and construction of the temporary overhead line will be the responsibility of PG&E. Once permanent

underground power is extended to the site, PG&E will remove the temporary facilities.

6. **Temporary Restricted Road Access.** Owner acknowledges and agrees that the relocation of the Pressure Reducing Station as described above will require PG&E to temporarily block access from Baseline Road to A Street and Upland Drive and may require temporarily restricted (but not blocked) access to Fiddyment Road. PG&E will, in coordination with the City, use reasonable means to minimize the extent of any interference with traffic on Fiddyment Road and to limit the period of any such impact on access to roadways. PG&E will make every effort to ensure no roadway is blocked for more than two weeks. PG&E will coordinate with the City and prepare a traffic control plan to address the access impacts caused by its Project.

7. **Claims and Defenses in the Action**

    A. PG&E will amend its Complaint filed in the Action as necessary to ensure consistency with this Agreement. Owner will execute a Stipulation for Filing of Amended Complaint for filing with the Court. Owner agrees and acknowledges that the filing of the Amended Complaint does not constitute an abandonment of any portion of any of the eminent domain actions. The date of valuation is the Effective Date.

    B. In consideration of the terms and conditions herein, Owner waives any right to challenge PG&E's right to take and possess the Property Rights in the Action.

    C. In further consideration of PG&E's funding of the escrow account described in Section 4 above, Owner agrees that any appraisal and opinion of just compensation submitted by Owner in the Action will not include potential increased construction costs as a factor in determining just compensation in the Action.

    D. Subject to the above, PG&E and Owner reserve all rights and arguments with respect to the amount of just compensation to be paid for PG&E's acquisition of the Property Rights.

    E. Under and consistent with the terms of section 1268.510 of the California Code of Civil Procedure, PG&E reserves the right to abandon the Action in whole or in part.

    F. Upon the payment of just compensation as determined by a settlement or judgment after trial, Owner will execute, notarize and deliver to PG&E deeds conveying the Easements as described in Exhibits B and C hereto.

      G.     PG&E shall withdraw its Memorandum of Costs filed in the declaratory relief action, and waives claims, if any, to other litigation expenses and costs incurred as part of the declaratory relief or CPUC actions.

**8.**    **Owner's Representations.** Owner represents and warrants:

      A.     Owner has the full right, power and legal authority to enter into this Agreement, and to carry out Owner's obligations under this Agreement.

      B.     Owner is not aware of any legal, administrative, or other proceeding or inquiry pending against the Property or against Owner which could affect Owner's title to the Property, or the value of the Property, or subject Owner to liability with respect to the Property.

      C.     Owner is not aware of any attachments, execution proceedings, or assignments for the benefit of creditors, insolvency, bankruptcy, reorganization or other proceedings pending against Owner.

      D.     Owner has not entered into any contracts for the sale of the Property or any portion thereof to any person.

      E.     Owner acknowledges that to the best of its knowledge, it is not aware of any rights held by any person within the easement areas on the Owner's property, other than the rights described in the Litigation Guarantee provided by PG&E. Each Owner will also agree that any rights granted to any person after the Effective Date of this Memorandum will not be senior to the rights conveyed to PG&E by this Memorandum or to be conferred by the Easement Deeds.

**9.**    **Settlement Payment.**

      F.     In consideration of the terms and conditions herein, and upon receipt of a Form W-9 completed and signed by Owner, PG&E shall pay Owner the sum of $5,000, which sum will be credited against the amount of just compensation ultimately determined to be due to the Property Owner for PG&E's acquisition of the Property Interests.

      G.     PG&E shall reimburse Owner and the other Sierra Vista property owners who are parties to the Memorandum of Understanding, jointly and collectively, for engineering costs in an amount of $150,000 as evidenced by invoices provided by Owners.

**10. Cooperation.** Owner shall cooperate with PG&E, the other SVSP Owners and the City to obtain all necessary approvals from the CSLC and other agencies for the Project modifications and will confirm to the California State Lands Commission that the Project as modified fully complies with PG&E's obligations under Mitigation Measure LU-1d.

**11. Indemnification.** PG&E shall indemnify Owner against any loss and damage caused by any wrongful or negligent act or omission of PG&E or of its agents or employees in the course of their employment arising from or related to its use of the Property Interests under this Agreement, provided, however, that this indemnity shall not extend to that portion of such loss or damage that shall have been caused by Owner's comparative negligence or willful misconduct.

**12. Entire Agreement.** This Agreement, together with the Memorandum of Understanding between the Parties dated February 1, 2016, which is incorporated herein by this reference as though set forth in full, reflects the entire agreement between the Parties and shall supersede all prior or contemporaneous agreements, discussions, understandings or promises, written or oral, between the Parties concerning PG&E's possession and use of the Easements. In the event of any discrepancy between then terms in this Agreement and the terms of the Memorandum of Understanding, the provisions of this Agreement shall govern the parties' rights and obligations.

**13. Governing Law.** This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of California.

**14. Interpretation.** The Parties agree that the terms and provisions of this Agreement embody their mutual intent and that such term and conditions are not to be construed more liberally in favor of, or more strictly against, either Party.

**15. Notices.** All notices required or permitted to be given hereunder shall be delivered by certified mail as follows:

<u>To Owner:</u>

John J. Guerra Jr., CEO
Successor Trustee of the Cyril G. Barbaccia Irrevocable Trust dated December 15, 1976
Barbaccia Properties Holding
165 Blossom Hill Rd.
San Jose, CA 95123

To PG&E:

Seth Curran
Pacific Gas and Electric Company
Land Management
2730 Gateway Oaks Dr. Suite #220
Sacramento, CA 95833

With a copy to:

Cesar V. Alegria, Jr., Esq.
Pacific Gas & Electric Company
Legal Department
P.O. Box 7442
San Francisco, CA 94120

A party may provide written notice of any change of the party's designated contact person(s), which notice shall be effective fifteen (15) days after receipt by the other party.

**16.** **Successors in Interest.** This Agreement shall not be recorded but a Memorandum of Settlement Agreement may be recorded. This Agreement shall be binding on and inure to the benefit of the heirs, devisees, executors, administrators, legal representatives, successors and assigns of the Parties.

**17.** **Fees and Costs.** Except as otherwise provided in this Agreement, each party shall bear its attorneys' fees and legal costs incurred in connection with negotiating the matters described in this Agreement.

**18.** **Severability.** In case any part, term, portion or provision of this Agreement is determined to be illegal, invalid or unenforceable, the remaining parts, terms, portions and provisions shall remain valid, enforceable, and in full force and effect.

**19.** **Amendment.** Owner's and PG&E's obligations under this Agreement may not be altered or amended in any respect except by a writing executed by Owner and PG&E.

**20.** **Authority to Execute and Bind.** Each of the Parties represents and warrants that the person executing this Agreement on the Party's behalf has full and complete legal authority to do so and thereby bind the Party to this Agreement.

21. **Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have executed this Agreement.

_/s/_ Successor Trustee of the
Cyril G. Barbaccia Irrevocable Trust dated
December 15, 1976

Pacific Gas & Electric Company

By John Guerra Jr.  By _/s/_
    (print name)            

CEO/Trustee     Chris Medders
    (title)         (print name)

            Manager, Land Acquisition
                    (title)

SF #4832-0935-4544 v1