Isaac M. Pachulski (CA Bar No. 62337)
Debra I. Grassgreen (CA Bar No. 169978)
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, CA 94111
Telephone: (415) 263-7000
Facsimile: (415) 263-7010
Email: dgrassgreen@pszjlaw.com

Eric Seiler (admitted *pro hac vice*)
Jason C. Rubinstein (admitted *pro hac vice*)
FRIEDMAN KAPLAN SEILER AND ADELMAN LLP
7 Times Square
New York, NY 10036-6516
Telephone (212) 833-1103
Facsimile (212) 373-7903
Email: eseiler@fklaw.com

*Attorneys for The Baupost Group, L.L.C.,
as the managing general partner and investment
manager for certain entities that indirectly
hold subrogation claims*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION,<br><br>-and-<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>*\* All papers shall be filed in the lead case, No. 19-30088 (DM)* | Case No. 19-30088 (DM)<br>Chapter 11<br>(Jointly Administered)<br><br>**JOINDER IN THE AD HOC GROUP OF SUBROGATION CLAIM HOLDERS' REPLY IN SUPPORT OF DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 363(b) AND 105(A) AND FED. R. BANKR. P. 6004 AND 9019 FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO ENTER INTO RESTRUCTURING SUPPORT AGREEMENT WITH THE CONSENTING SUBROGATION CLAIMHOLDERS, (II) APPROVING THE TERMS OF SETTLEMENT WITH SUCH CONSENTING SUBROGATION CLAIMHOLDERS, INCLUDING THE ALLOWED SUBROGATION CLAIM AMOUNT, AND (III) GRANTING RELATED RELIEF**<br><br>Date: October 23, 2019<br>Time: 10:00 a.m. (Pacific Time)<br>Place: United States Bankruptcy Court<br>Courtroom 17, 16th Floor<br>San Francisco, CA 94102 |

The Baupost Group, L.L.C., as the managing general partner and investment manager for certain entities that indirectly hold subrogation claims ("**Baupost**") hereby submits this Joinder (the "**Joinder**") in the *Reply of the Ad Hoc Group of Subrogation Claim Holders in Support of Debtors' Motion Pursuant to 11 U.S.C. §§ 363(b) and 105(A) and Fed. R. Bankr. P. 6004 and 9019 for Entry of An Order (I) Authorizing the Debtors to Enter into Restructuring Support Agreement with the Consenting Subrogation Claimholders, (II) Approving the Terms of Settlement with Such Consenting Subrogation Claimholders, Including the Allowed Subrogation Claim Amount, and (III) Granting Related Relief* [Dkt. No. 4348] (the "**Subrogation Group Reply**"). Baupost is a substantial creditor of these estates, a major holder of insurance subrogation claims, and a member of the Steering Committee of the Ad Hoc Group of Subrogation Claim Holders (the "**Ad Hoc Subrogation Group**").[1]

Notwithstanding the flurry of objections to the Motion,[2] one thing is not fairly disputable— settling $20 billion of asserted subrogation claims against these estates for $11 billion is a good idea. Instead of challenging this critical component of the proposed settlement (the substantial compromise of the subrogation claims), the objections to the Motion fall into two general categories: objections to specific provisions of the restructuring support agreement ("**RSA**") and objections to the Debtors' plan of reorganization. The former—objections to the RSA—are relatively narrow and have been fully addressed in the Subrogation Group Reply in which Baupost joins. Significantly, the Ad Hoc Subrogation Group and the Debtors have agreed to certain key modifications to the RSA in response to the objections. Objections to specific provisions of the Debtors' plan need not be determined in connection with approval of the RSA. The RSA simply binds the Debtors to prosecute a plan consistent with its terms; the Court is not being asked to determine at this time whether that plan is confirmable. There will be ample time for interested parties to object to the Debtors' plan and for the Debtors to make any appropriate modifications to it.

---

[1] Baupost's holdings of equity, subrogation claims, other unsecured wildfire claims, and other rights are set forth in the *Fifth Amended Verified Statement of the Ad Hoc Group of Subrogation Claim Holders Pursuant to Bankruptcy Rule 2019* [Dkt. No. 4302].

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Subrogation Group Reply.

Baupost submits this Joinder to underscore an important attribute of the Ad Hoc Subrogation Group's $11 billion proposed settlement with the Debtors that the TCC overlooks: the proposed settlement makes it more, not less, likely that the Debtors will remain solvent and that individual Fire Victims will be paid in full.

The TCC argues that the Court should not approve the proposed settlement now because, until the estimation proceedings before Judge Donato "are completed in March, no one in these Cases can credibly argue that they know what is required to pay Fire Victims in full." TCC Opposition to Motion [Dkt. No. 4232] at 2. The TCC further argues that, in a scenario in which this Court approves the proposed settlement and Judge Donato then "estimate[s] high" (*i.e.*, estimates the individual Fire Victims' damages at a level that significantly exceeds the cap contemplated by the Debtors' proposed plan), the Debtors could be rendered insolvent and have insufficient distributable value to fully pay the Ad Hoc Subrogation Group's $11 billion allowed claim *and* also pay individual Fire Victims for "the entirety of their damages." *Id.* at 3. To avoid the Debtors' insolvency and a scenario in which individual Fire Victims are not paid in full, the TCC insists that the treatment of the Ad Hoc Subrogation Group's claims should be resolved "solely in connection with plan confirmation"—or at least deferred until some unspecified point when the TCC has complete confidence that individual "Fire Victims will receive an actual recovery of their actual damages, in full." *Id.*

The TCC's argument fails to appreciate that the Ad Hoc Subrogation Group members' settlement of their $20 billion in claims for $11 billion at this stage of the case dramatically increases the likelihood that the Debtors will remain solvent and be able to pay individual Fire Victims in full even if Judge Donato were to "estimate high." The reason for this is that the same factual and legal findings that would be necessary for the Debtors' liability to the individual Fire Victims to be "estimate[d] high" would also result in the Ad Hoc Subrogation Group's members being entitled to recover damages that approach or even exceed $20 billion. *First*, the Debtors would need to be found (or estimated to be) liable for the Tubbs Fire—which alone was responsible for approximately 40% of the tens of billions of dollars in property damage, as well as other injuries, caused by the

2017 and 2018 Northern California Wildfires.³  If the individual Fire Victims fail to establish the Debtors' liability for the Tubbs Fire, they will be unable to recover for *any* of their billions of dollars in claimed injuries arising from that fire.  *Second*, the Debtors would need to be found (or estimated to be) negligent in connection with the 2017 and 2018 Northern California Wildfires.  If the individual Fire Victims are unable to establish the Debtors' negligence for any particular fire, they will be unable to recover for personal injury, wrongful death, or emotional distress relating to that fire.  At most, they will be able to recover damages for their uninsured property losses—and then only if the Debtors are deemed liable under the theory of inverse condemnation.  *See generally Baker v. Burbank-Glendale-Pasadena Airport Auth.*, 39 Cal. 3d 862, 866 (1985) (inverse condemnation action arises only from the "the taking or damaging . . . of property").  Thus, the only scenario in which the Debtors' liability to the individual Fire Victims is "estimate[d] high" is one in which the individual Fire Victims establish that the Debtors' equipment caused the Tubbs Fire *and* that the Debtors' negligence was responsible for all of the major 2017 and 2018 Wildfires (including the Tubbs Fire).

In this scenario, if the Court declines to approve the proposed settlement and the Ad Hoc Subrogation Group's members, litigating side-by-side with the individual Fire Victims, prevail in demonstrating that PG&E caused the Tubbs Fire and acted negligently, the Ad Hoc Subrogation Group members' damages would approach or even exceed $20 billion—an amount that, in combination with the individual Fire Victims' damages, could tip the Debtors into insolvency and impair their ability to pay individual Fire Victims in full.

The proposed settlement redounds to the benefit of the individual Fire Victims by substantially reducing the risk of the Debtors' insolvency and freeing up over $9 billion in estate value from which the individual Fire Victims (including uninsured individual Fire Victims who have no conceivable made-whole claims) can look to recover in a scenario in which they prevail in establishing that PG&E equipment caused the Tubbs Fire and that PG&E's negligence caused the 2017 and 2018 Northern California Wildfires.

---

³ *See* Debtors' Motion Pursuant 11 U.S.C. §§ 105(a) and 502(c) for the Establishment of Wildfire Claims Estimation Procedures [Dkt. No. 3091], at 20 ("The TCC estimates the Tubbs Fire caused at least $18 billion in damages.").

1. The TCC obviously recognizes the benefits of the Court's granting the Ad Hoc Subrogation Group members an $11 billion allowed claim. The TCC's own filed plan of reorganization [Dkt. No. 4257] is premised on the Ad Hoc Subrogation Group members' claims being "settled and allowed in the aggregate amount of $11 billion," as part of a plan that would cap the individual Fire Victims' damages (together with those of Public Entity claimants) at $14.5 billion irrespective of an estimation in excess of that amount. Presumably, the TCC believes that its proposed plan (which contemplates a cap on the individual Fire Victims' claims that is billions of dollars higher than the cap embedded in the Debtors' proposed plan) would not make the Debtors insolvent. This confirms that (1) there is, in fact, no dispute among the parties with respect to the appropriateness of the Debtors' $11 billion proposed settlement with the Ad Hoc Subrogation Group's members, and (2) allowing the Ad Hoc Subrogation Group's claims in this amount will enable the Debtors to pay the individual Fire Victims and the Public Entity claimants in full and thereby fulfill, and obtain the benefits of, AB 1054.

Finally, it is clear that the TCC and Noteholders' joint plan would be unconfirmable in an "estimate high" scenario in which the Court has also rejected the proposed $11 billion settlement. Even after leaving little to no value for existing equity holders, the TCC and Noteholders' joint plan assumes that the Debtors have at most $25.5 billion in value to distribute between and among the Ad Hoc Subrogation Group's members, the individual Fire Victims, and the Public Entity claimants. If the proposed settlement is not approved and the Ad Hoc Subrogation Group's members establish their entitlement to more than $20 billion of this amount, then the TCC and Noteholders' joint plan will be unable to satisfy the claims of all Fire Victims and, consequently, could not be confirmed.

| | | |
|---|---|---|
| Dated: October 21, 2019 | | PACHULSKI STANG ZIEHL & JONES LLP |

*/s/ Debra I. Grassgreen*
Isaac M. Pachulski
Debra I. Grassgreen

- and –

Eric Seiler (admitted *pro hac vice*)
Jason C. Rubinstein (admitted *pro hac vice*)
FRIEDMAN KAPLAN SEILER
AND ADELMAN LLP

*Attorneys for The Baupost Group, L.L.C., as the managing general partner and investment manager for certain entities that indirectly hold subrogation claims*