DAVID B. LEVANT (*pro hac vice*)
david.levant@stoel.com
ANDREW H. MORTON (*pro hac vice*)
andrew.morton@stoel.com
JENNIFER L. MERSING (*pro hac vice*)
jennifer.mersing@stoel.com
JENNIFER N. SLOCUM (*pro hac vice*)
jennifer.slocum@stoel.com
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: 206.624.0900
Facsimile: 206.386.7500

SETH D. HILTON (SBN 181899)
seth.hilton@stoel.com
SARAH E. KOZAL (SBN 313043)
sarah.kozal@stoel.com
BAO M. VU (SBN 277970)
bao.vu@stoel.com
STOEL RIVES LLP
3 Embarcadero Center, Suite 1120
San Francisco, CA 94111
Telephone: 415.617.8900
Facsimile: 415.617.8907

*Attorneys for Ad Hoc Group of*
*Interconnection Customers*

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION**<br><br>  **- and -**<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br>               **Debtors.**<br><br>☐  Affects PG&E Corporation<br>☒  Affects Pacific Gas and Electric Company<br>☐  Affects both Debtors<br><br>*\*All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | Bankruptcy Case No. 19-30088 (DM)<br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**MOTION AND MEMORANDUM OF THE AD HOC GROUP OF INTERCONNECTION CUSTOMERS TO COMPEL PAYMENT OF PASS-THROUGH AMOUNTS WITHHELD BY PACIFIC GAS AND ELECTRIC COMPANY**<br><br>Date: November 13, 2019<br>Time: 10:00 a.m. (PT)<br>Place: United States Bankruptcy Court<br>       Courtroom 17, 16th Floor<br>       San Francisco, CA 94102<br><br>**Objection Deadline:**<br>    **November 8, 2019, at 4:00 p.m. (PT)** |

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ................................................................................................. 1

JURISDICTION .......................................................................................................................... 2

RELIEF REQUESTED ............................................................................................................... 2

BACKGROUND ......................................................................................................................... 3

    I.      Transmission of Electricity in California ..................................................... 3

    II.     Network Upgrades, Network Upgrade Payments, and NURs ............................. 5

    III.    Test Energy ........................................................................................................ 7

    IV.   Movants ............................................................................................................... 7

LEGAL ARGUMENT ................................................................................................................ 8

    I.      The Utility Should be Directed to Remit the Pass-Through Amounts to the Movants Because the Utility Has No Equitable Interest in Them ......................... 9

          A.     Federal Common Law Governs Whether the Pass-Through Amounts Are Property of the Utility's Estate ........................................... 10

          B.     Under Federal Common Law, the Pass-Through Amounts Are Being Held in Trust by the Utility for the Benefit of the Interconnection Customers and Therefore Are Not Property of the Utility's Bankruptcy Estate ......................................................................... 13

    II.     If the Pass-Through Amounts Are Not Subject to Immediate Turnover, They Must Be Segregated and the Movants Are Entitled to Adequate Protection ......................................................................................................... 17

    III.    The Movants Are Entitled to Relief From the Stay Because the Utility Lacks any Equity in the Pass-Through Amounts ................................................ 18

    IV.   Timely Remittance of the NURS to the Movants is in the Best Interest of the Bankruptcy Estate and Its Creditors ............................................................. 19

          A.     The Utility's Failure to Timely Remit the NURs to the Movants Deprives the Estate of Its Right to Receive Any Return on Equity for the Amount of Reimbursed Network Upgrade Costs ......................... 19

          B.     Failure to Make Timely Payment Exposes the Utility and Its Estate to Additional Potential Regulatory Burdens and Costs ............................ 20

NOTICE ..................................................................................................................................... 20

CONCLUSION .......................................................................................................................... 21

-i-

# TABLE OF AUTHORITIES

Page

**Cases**

*Am. Int'l Enters, Inc. v. F.D.I.C.,*
3 F.3d 1263 (9th Cir. 1993)..................................................................... 11

*Begier v. I.R.S.,*
496 U.S. 53 (1990) .................................................................................. 10

*Byrd v. Hoffman,*
417 B.R. 320 (D. MD 2008) .................................................................... 17

*Fortune & Faal v. Zumbrun (In re Zumbrun),*
88 B.R. 250 (B.A.P. 9th Cir. 1988)............................................................. 3

*Gracia-Gracia v. Financial Oversight and Mgmt. Board (In re Fin. Oversight & Mgmt. Board for Puerto Rico),*
--- F.3d ---, No. 18-1463, 2019 WL 4667518 (1st Cir. Sept. 25, 2019) ................. 18

*In re Datair Systems Corp.,*
42 B.R. 241 (Bankr. N.D. Ill. 1984).......................................................... 17

*Mardan Corp. v. C.G.C. Music, Ltd.,*
804 F.2d 1454 (9th Cir. 1986).................................................................. 10

*Nucorp Energy Sec. Litig.,*
772 F.2d 1486 (9th Cir. 1985).................................................................. 10

*Official Comm. Of Unsecured Creditors v. Columbia Gas Sys. Inc. (In re Columbia Gas Sys. Inc.),*
997 F.2d 1039 (3rd Cir. 1993) ................................. 10, 11, 12, 13, 14, 15

*Thompson v. Paul,*
547 F.3d 1055 (9th Cir. 2008).................................................................. 10

*U.S. v. Kimbell Foods, Inc.,*
440 U.S. 715 (1979)....................................................................... 11, 12, 13

*U.S. v. Northrop Corp.,*
59 F.3d 953 (9th Cir. 1995)...................................................................... 11

*Wheeler v. City of Santa Clara,*
894 F.3d 1046 (9th Cir. 2018)............................................................. 12, 13

**Statutes**

11 U.S.C. § 105 ........................................................................................... 2

11 U.S.C. § 361 ................................................................................. 2, 3, 17

11 U.S.C. § 361(2) ................................................................................ 17, 18

Case: 19-30088    Doc# 4400    Filed: 10/22/19    Entered: 10/22/19 23:27:39    Page 3 of 32

# TABLE OF AUTHORITIES

Page

11 U.S.C. § 362(d)(1) ............................................................................................ 19

11 U.S.C. § 362(d)(2) ................................................................................... 3, 18, 19

11 U.S.C. § 362(g) ................................................................................................. 19

11 U.S.C. § 363 ...................................................................................................... 17

11 U.S.C. § 363(a) ................................................................................................. 17

11 U.S.C. § 363(c) ............................................................................................ 17, 18

11 U.S.C. § 363(c)(4) ............................................................................................ 17

11 U.S.C. § 363(e) ................................................................................................. 17

11 U.S.C. § 541 ................................................................................................. 2, 10

11 U.S.C. § 541(d) ................................................................... 9, 11, 13, 14, 16

28 U.S.C. § 157 ....................................................................................................... 2

28 U.S.C. § 157(b) .................................................................................................. 2

28 U.S.C. § 1334 ..................................................................................................... 2

28 U.S.C. § 1408 ..................................................................................................... 2

28 U.S.C. § 1409 ..................................................................................................... 2

Cal. Civ. Code § 2223 ........................................................................................... 12

Cal. Civ. Code § 2224 ........................................................................................... 12

Federal Power Act, 16 U.S.C.A. §§ 792, *et seq.* .............................. 4, 5, 12, 13, 14, 16

Natural Gas Act .................................................................................................... 11

**Rules**

Fed. R. Bankr. P. 4001(a) ....................................................................................... 3

Fed R. Bankr. P. 7001 ............................................................................................. 3

Fed R. Bankr. P. 9014 ............................................................................................. 3

**Other Authorities**

111 FERC ¶ 61,163 (2005) ................................................................................ 4, 14

112 FERC ¶ 61,009 (2005) ..................................................................................... 6

Case: 19-30088    Doc# 4400    Filed: 10/22/19    Entered: 10/22/19 23:27:39    Page 4 of
32

# TABLE OF AUTHORITIES

**Page**

*H.R. Rep. No. 95-595,* 95th Cong., 1st Sess. 368 (1977), *reprinted in* 1978
    U.S.C.C.A.N. 5963 ........................................................................................... 14

Order No. 2003, 104 FERC ¶ 61,103 (2003) ........................................... 5, 12, 13, 14, 15

Restatement (Second) of Trusts § 2 cmt. f (1959) ........................................................ 10

Case: 19-30088    Doc# 4400    Filed: 10/22/19    Entered: 10/22/19 23:27:39    Page 5 of
32

Each of the Interconnection Customers of Pacific Gas and Electric Company (the "*Utility*" and, together with PG&E Corporation, the "*Debtors*") identified in Section IV below (collectively, the "*Movants*" or the "*Ad Hoc Group of Interconnection Customers*"), by and through their undersigned counsel of record, hereby moves the Court for entry of an order in substantially the form attached as **Exhibit A** directing the Utility to remit to them all Pass-Through Amounts (as defined below) received by the Utility for their benefit. This Motion and Memorandum is supported by the declaration of Jennifer Mersing (the "*Mersing Declaration*"), the Narayanan Declaration, the Liddell Declaration, and the Yoder Declaration, each as defined below, filed contemporaneously herewith and the files and records referenced herein.

## PRELIMINARY STATEMENT

This Motion and Memorandum concerns the Utility's refusal to remit to the Movants moneys that the Utility receives from third parties and is obligated to forward to the Movants on a "dollar-for-dollar" basis under both contractual agreements and under the regulations that govern the Utility's electricity transmission system.

In addition to its primary business of selling electricity and gas to its energy customers, the Utility owns and operates an electricity transmission system comprising approximately 18,000 circuit miles of interconnected transmission lines operating at voltages ranging from 60 to 500 kilovolts and operates 84 electric transmission substations with a capacity of approximately 65,000 megavolt amperes (the Utility's "*Transmission System*") [1] This Transmission System is interconnected with the electric power systems in the Western Electricity Coordinating Council, which includes many western states, Alberta and British Columbia, Canada, and parts of Mexico.

The transmission of electricity within a geographic area is a natural monopoly. In return for recognizing and protecting the Utility's monopoly Transmission System, the Utility is subject to extensive regulation by the Federal Energy Regulatory Commission ("*FERC*"), the California

---

[1] The Transmission System is distinct from the Utility's distribution network, which interconnects approximately 107,000 circuit miles of distribution lines with the Transmission System at switching and distribution substations, where high-voltage transmission voltages are lowered to voltages suitable for distribution to the Utility's customers.

Public Utilities Commission ("*CPUC*"), and the California Independent System Operator Corporation ("*CAISO*").

Among other things, the Utility is required to provide open access to the Transmission System to parties ("*Transmission Customers*"), including the Utility's competitors and their customers, wishing to contract for delivery of power through the Utility's service territory pursuant to CAISO's FERC-approved Open Access Transmission Tariff (the "*Tariff*").

Just as its wires transmit power between third parties, the Utility also is a conduit for certain payments by Transmission Customers to the owners of energy projects, including the Movants, that are connected to the Transmission System pursuant to interconnection agreements ("*Interconnection Customers*"). This Motion concerns the Utility's role as a financial intermediary between third parties and Interconnection Customers for payments that the Utility has kept for itself instead of forwarding to the Movants, in breach of both its contractual and regulatory obligations.

As explained in more detail below, the Utility has no equitable interests in the payments, is violating applicable law in detaining them, and is needlessly exposing the estate to potential losses and regulatory sanctions for its failure to forward the Pass-Through Amounts to the Movants. Accordingly, the Movants respectfully request that the Court enter an order either directing the Utility to forward to them all Pass-Through Amounts that have been and that are subsequently received by the Utility or granting the alternative or further relief described below.

### JURISDICTION

1. The Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334, the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.), and 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California (the "*Bankruptcy Local Rules*").

2. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

3. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The statutory predicates for this motion are §§ 105, 361, 362, 363, and 541 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "*Bankruptcy Code*"), Rules 4001

and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Bankruptcy Local Rule 4001-1.

## RELIEF REQUESTED

5.     By this motion (this "**Motion**"), the Movants request entry of an order compelling (i) payment as soon as practicable, and in all events no later than December 31, 2019, of all outstanding pre- and post-petition Pass-Through Amounts and (ii) timely payment of all Pass-Through Amounts that become due and payable after the date of this Motion.

6.     In the alternative, if the Utility is not required to remit all Pass-Through Amounts to the Movants, the Utility should be ordered to segregate all Pass-Through Amounts and provide the Movants with adequate protection through a lien on such segregated funds pursuant to Sections 361 and 363 of the Bankruptcy Code.

7.     In the further alternative, if the Court perceives that it is unable to resolve the issues raised by the Motion, the Court should grant Movants relief from the automatic stay to pursue appropriate relief.[2]

## BACKGROUND

## I.     TRANSMISSION OF ELECTRICITY IN CALIFORNIA

8.     Approximately three-quarters of California and a small portion of Nevada are served by a single, interconnected system of power transmission lines and facilities under CAISO's control.[3] Transmission assets are owned separately by multiple transmission companies, including

---

[2]     The Movants believe the requested relief is properly sought by motion pursuant to Fed. R. Bankr. P. 4001(a) and 9014, rather than by adversary proceeding pursuant to Fed. R. Bankr. P. 7001. The Motion seeks relief from the automatic stay under 11 U.S.C. § 362(d)(2), which may properly be brought and adjudicated on motion, to resolve the same legal issue (based on the same facts) underlying the Movants' entitlement to all of the relief requested by the Motion: whether the Utility has any equity or equitable interest in the Pass-Through Amounts. And because the Motion would be considered as a contested matter, service by summons and complaint is not necessary as a matter of due process because "the same fundamental requisites of due process must be satisfied . . . in the same manner as in an adversary proceeding". *See Fortune & Faal v. Zumbrun (In re Zumbrun)*, 88 B.R. 250, 252 (B.A.P. 9th Cir. 1988).

[3]     *See* Mersing Declaration, at ¶¶ 2-5.

(continued . . .)

Case: 19-30088     Doc# 4400     Filed: 10/22/19     Entered: 10/22/19 23:27:39     Page 8 of 32

the Utility, which then agree to grant CAISO, as the independent system operator, operational control over their respective transmission assets.[4]

9.      In return for turning over operation of their transmission facilities to CAISO, the transmission companies recover their transmission costs (including a return on equity for their transmission capital investments) through CAISO.[5]

10.      As a transmission-owning member of CAISO, the Utility is required by the terms of the Tariff to provide interconnection to its Transmission System to eligible power generation projects ("**Project Companies**") that wish to sell power, directly or indirectly (*e.g.*, through the Utility), to end-user electric power customers (i.e., Transmission Customers).[6] The rights and obligations of the Utility, as a "participating transmission owner" (a "**PTO**"), CAISO, as the system operator, and the Project Companies, as "Interconnection Customers," are governed by two standard forms of interconnection agreements that have been publicly filed and approved by FERC following a public comment period:  a Small Generator Interconnection Agreement for projects smaller than 20 megawatts and a Large Generator Interconnection Agreement for projects of 20 megawatts or more.[7] Any proposed changes to the material terms of the applicable form of interconnection agreement must be submitted to FERC for approval.[8]

11.      Pursuant to Section 205 of the Federal Power Act, 16 U.S.C. §§ 792, *et seq.* (the "**FPA**"), FERC has jurisdiction over the transmission and wholesale sale of electric energy in interstate commerce and is responsible for establishing "just and reasonable rates" for such transmission and wholesale electric energy sales.[9] CAISO operates and provides open and non-discriminatory access to the bulk of California's wholesale transmission grid.[10] CAISO does not

---

[4]      *Id.*

[5]      *Id.*

[6]      *Id.*

[7]      *See* Tariff at Appendices T, V, BB, CC, EE and FF.

[8]      *See PJM Interconnection, L.L.C.*, 111 FERC ¶ 61,163 at P.18 (2005).

[9]      *See* Mersing Declaration, at ¶ 9.

[10]      *See* Mersing Declaration, at ¶ 2.

(continued . . .)

-4-

itself own any transmission facilities, but rather operates the transmission facilities of its member PTOs, including the Utility.[11] The interconnection of generation projects to the CAISO-controlled transmission system is subject to regulation by FERC pursuant to the FPA.[12] CAISO operates under the terms and conditions of its Tariff, which must meet FERC's requirements and standards in order to qualify for FERC's official approval and remain valid and binding under the requirements of the FPA.[13]

12.    The Utility falls under the definition of a "public utility" under the FPA and is therefore subject to FERC's regulatory oversight regarding both the stability of its rates and the reliability of its power supply.[14] The Utility is also subject to FERC's Standards of Conduct, which requires that utility companies keep their transmission operations strictly separate from their role as a power company in the business of marketing and sales.[15] The Utility engages in wholesale power sales transactions, such as power purchase agreements ("***PPAs***"), while also functioning in the separate role of the transmission facility operator of numerous generation projects located within its geographic region.[16]  This Motion concerns only the Utility's role as a transmission operator, *and not* its role as a private company engaged in the sale of power through PPAs.

## II.    NETWORK UPGRADES, NETWORK UPGRADE PAYMENTS, AND NURS

13.    In 2003, FERC issued an order setting forth a new policy based on its findings that the country's transmission networks require certain modifications and upgrades on an ongoing basis, as more and more individual generator projects join each regional grid.[17] Pursuant to the new policy, an Interconnection Customer who seeks to build a generator facility in a PTO's geographic

---

[11]    *Id.*

[12]    *Id,* at ¶ 3.

[13]    *Id.*

[14]    *Id,* at ¶ 9.

[15]    *Id*, at ¶ 5.

[16]    *Id*.

[17]    Order No. 2003, 104 FERC ¶ 61,103 (2003), (the "***FERC Order***").

(continued . . .)

Case: 19-30088   Doc# 4400   Filed: 10/22/19   Entered: 10/22/19 23:27:39   Page 10 of 32

region enters into a three-party interconnection agreement with the respective PTO and CAISO.[18] Each project's respective interconnection agreement details the specific network upgrades required, based on an interconnection study process conducted beforehand by CAISO and the relevant PTO.[19] The Interconnection Customer is required to post security at the beginning of a new project, which is used by the PTO to fund the required network upgrades.[20] The Interconnection Customer is entitled to a refund equal to the total amount, plus interest, that it initially paid for the network upgrades (such refunds, the "***Network Upgrade Reimbursements***" or "***NURs***").[21] The PTO is permitted to include the costs of the network upgrades in its transmission rates after it has refunded the NURs to the Interconnection Customer.[22] At that point, the PTO is able to earn a return on the network upgrade costs.[23]

14. Once the project reaches its commercial operation date, the NURs become due to be refunded to the Interconnection Customer on a dollar-for-dollar basis, plus interest based on the methodology set forth under 18 C.F.R. § 35.19a(a)(2)(iii), either through direct payments made on a levelized basis over a five-year period or according to any alternative payment schedule that is mutually agreeable to the Interconnection Customer and the PTO, provided that the full repayment is made within 5 years from the project's commercial operation date.[24]

15. The Utility, as a transmission operator, recovers its transmission costs through CAISO.[25] This includes the amounts paid for NURs.[26] Prior to repaying the NURs to the

---

[18] Pursuant to the FERC Order, all public utilities that own, control or operate transmission facilities must include in their tariffs both standard generator interconnection procedures and a standard interconnection agreement.

[19] *See* Mersing Declaration, at ¶ 6.

[20] *Id*, at ¶¶ 6-7.

[21] *Id*, at ¶¶ 7-8.

[22] *Id*, at ¶¶ 12-13.

[23] *Id.*

[24] *See Cal. Indep. Sys. Operator Corp.*, 112 FERC ¶ 61,009 (2005). Interconnection customers may choose to receive applicable financial rights as an alternative to receiving the NURs as cash refund payments over a five-year period.

[25] *See* Mersing Declaration, at ¶ 11.

[26] *Id*, at ¶ 12-13.

(continued . . .)

Case: 19-30088   Doc# 4400   Filed: 10/22/19   Entered: 10/22/19 23:27:39   Page 11 of 32

1    Interconnection Customers, transmission operators are not entitled to earn a return on such
2    amounts.[27]  Only after the NURs have been repaid to the Interconnection Customers are the
3    transmission operators entitled to include the NUR costs in their rate base and earn a return on the
4    NUR costs.[28] In the Utility's current rate filing (currently pending before certain FERC settlement
5    and hearing procedures), the Utility has continued to include line item entries to recover amounts
6    paid for NURs.[29]

7    **III.   TEST ENERGY**

8         16.    Under a power purchase agreement, the standard practice is to implement an initial
9    test period between the date the facility is first brought online and synchronized to the CAISO-
10   controlled transmission system and the date the facility is considered to have achieved commercial
11   operation.[30]  The project company, together with CAISO, uses this test period to confirm that the
12   facility is operating properly before CAISO grants approval to allow the facility to become fully
13   commercially operational.[31]  During the test period, the energy generated by the facility is
14   commonly sold to a power purchase off-taker at a price specified in the relevant power purchase
15   agreement.

16        17.    On December 30, 2013, CA Flats Solar 150, LLC ("***Cal Flats 150***") entered into a
17   Power Purchase Agreement (the "***PG&E PPA***") with the Utility, which provides that Cal Flats 150's
18   full compensation for the energy sold to the Utility during the test period shall be categorized as
19   "CAISO Revenues" for the delivered energy, which the Utility is required to forward promptly to
20   Cal Flats 150 in accordance with the schedule in Section 6.1 of the PG&E PPA.[32]

21

22

23   _____

24   [27]    *Id.*

         [28]    *Id.*

25   [29]    *Id.*

26   [30]    *See* Narayanan Declaration, *defined below*, at ¶ 17.

27   [31]    *Id*.

         [32]    *Id*, at ¶ 18 (citing to Section 4.1(c) of the PG&E PPA).

28
                                                                              (continued . . .)

18.     The test period under the PG&E PPA was conducted from December 20, 2018 through January 28, 2019 (the "**Test Period**").[33] After the conclusion of the Test Period, CAISO remitted $274,159.67 to the Utility as payment for "test energy" generated by Cal Flats 150 during the Test Period (the "**Test Period Payment**", and together with the NURs, the "**Pass-Through Amounts**").[34] Here, as with the NUR payments, the Utility is serving as a pass-through agent for the Test Period Payment received from CAISO and due to be paid to Cal Flats 150. To date, the Utility has failed to remit the Test Period Payment to Cal Flats 150, as required under Section 4.1(c) of the PG&E PPA, and is instead holding such amounts for itself.

## IV.     MOVANTS

19.     Each of the Movants is the owner of a renewable energy or energy storage project interconnected to the Utility's Transmission System. The Movants are CA Flats Solar 130, LLC, CA Flats Solar 150, LLC, and Solar Star California XIII, LLC (collectively, the "**Capital Dynamics Project Companies**"); 67RK 8me LLC, 65HK 8me LLC, and 87RL 8me LLC (also known as Hayworth, Redcrest and Woodmere, or the "Redwood Solar Projects") and Adera Solar, LLC (collectively, the "**sPower Project Companies**"); and RE Mustang LLC, RE Mustang 3 LLC, and RE Mustang 4 LLC (collectively, the "**Mustang Project Companies**").

20.     As described in greater detail in the declarations in support of this Motion submitted by Anand Narayanan, with respect to the Capital Dynamics Project Companies (the "**Narayanan Declaration**"), Ryan Liddell, with respect to the sPower Project Companies (the "**Liddell Declaration**"), and Jon C. Yoder, with respect to the Mustang Project Companies (the "**Yoder Declaration**", and together with the Narayanan Declaration and the Liddell Declaration, the "**Client Declarations**"), each of the Movants is party to an interconnection agreement with CAISO and the Utility (the "**Interconnection Agreements**"). Some of the Movants have entered into PPAs with the Utility; others have agreed to sell their power to third parties, including both large corporate power consumers and nonprofit community choice aggregators.

---

[33]     *Id.*, at ¶ 16.

[34]     *Id.*, at ¶¶ 16-18.

21.     Pursuant to their Interconnection Agreements with the Utility and CAISO, all of the Movants have paid (or agreed to pay) for the construction of network upgrades to the Transmission System and are (or will be) entitled to Network Upgrade Reimbursements funded on a "dollar-for-dollar" basis by the Transmission Customers and passed through the Utility.[35]

22.     In addition, the Utility is currently withholding amounts received from CAISO for Cal Flats 150, as reimbursement for energy generated during the respective project's Test Period.[36] Pursuant the PG&E PPA, the Test Period Payment for such energy is first remitted from CAISO to the Utility, and the Utility is in turn required to promptly forward the Test Period Payment on to Cal Flats 150.[37]

## LEGAL ARGUMENT

23.     The Movants submit that based upon the foregoing facts, and under applicable law as set forth below, the relief requested by this Motion should be granted and the Court should enter an order compelling the Utility to flow through, to the intended beneficiaries, the Pass-Through Amounts it has received and is scheduled to receive for the benefit of the Interconnection Customers.  According to the congressional intent manifested in the express language of the FERC Order, the Pass-Through Amounts were never intended to be property of the Utility, let alone its general creditors. Moreover, by withholding the Pass-Through Amounts, the Utility is throwing a wrench into the federally regulated power transmission system, which requires continual maintenance and essential upgrades. The Utility's abrupt refusal to comply with its obligations to remit the Pass-Through Amounts has caused uncertainty and confusion to ripple through the energy community, as current counterparties and potential future business partners have no clarity on why the Utility sought court approval to continue issuing some refunds despite the automatic stay (as under the Customer Programs Motion),[38] while the Utility has simply refused to make the NUR

---

[35]     *See* Narayanan Declaration, at ¶¶ 10-15, Liddell Declaration, at ¶¶ 7-12, and Yoder Declaration, at ¶¶ 5-8.

[36]     *See* Narayanan Declaration, at ¶¶ 16-19.

[37]     *Id.*

[38]     *See Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 507(a)(7) and Fed. R. Bankr. P. 6003 and 6004 for Interim and Final Orders (I) Authorizing Debtors to (A)*
(continued . . .)

Case: 19-30088     Doc# 4400     Filed: 10/22/19     Entered: 10/22/19 23:27:39     Page 14 of 32

payments and Test Period Payment without any explanation or differentiation. Finally, the Utility is ultimately doing itself and its creditors a disservice by refusing to do so because (i) the Utility can only receive a return on equity for network upgrade costs **after** it has refunded the corresponding NURs to the relevant Interconnection Customer and (ii) interest continues to accrue on the unpaid NURs, and the Utility will ultimately have to pay the total amount due to the Interconnection Customers, plus interest, out of its bankruptcy estate. Therefore, the longer the Utility delays in refunding the NURs, the larger the total amount ultimately paid by the Utility to the Interconnection Customers.

## I. THE UTILITY SHOULD BE DIRECTED TO REMIT THE PASS-THROUGH AMOUNTS TO THE MOVANTS BECAUSE THE UTILITY HAS NO EQUITABLE INTEREST IN THEM

24. The principal issue raised by this Motion is whether the Pass-Through Amounts received by the Utility from third-parties for the purpose of recovering network upgrade costs that were incurred and paid solely by Interconnection Customers are, or are not, property of the Utility's estate as defined in Section 541(d) of the Bankruptcy Code. A bankruptcy estate includes all property of the debtor, but only to the extent of the debtor's equitable interest in the property. 11 U.S.C. § 541(d).

25. A trustee who holds funds in trust for a beneficiary possesses only legal title in the funds, while the equitable interest belongs to the beneficiary. *See* Restatement (Second) of Trusts § 2 cmt. f (1959). "Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'" *Begier v. I.R.S.*, 496 U.S. 53, 59 (1990).

26. To the extent the Utility holds the Pass-Through Amounts in trust, such funds are not property of the estate, but belong instead to the Interconnection Customers. In order to determine whether, on the merits, the Pass-Through Amounts are held in trust, the Court must first resolve whether the issue is controlled by state law or federal common law.

---

*Maintain and Administer Customer Programs, Including Public Purpose Programs, and (B) Honor and Prepetition Obligations Relating Thereto; and (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers*, Case No. 19-30088, (Bankr. N.D. Cal. Jan. 29, 2019) [Dkt. No. 16] (the "***Customer Programs Motion***").

Case: 19-30088   Doc# 4400   Filed: 10/22/19   Entered: 10/22/19 23:27:39   Page 15 of 32

27. Confronting these same questions in an analogous case, the Third Circuit Court of Appeals correctly concluded that federal common law controls and treats funds like the Pass-Through Amounts as held in trust by the debtor. *See Official Comm. of Unsecured Creditors v. Columbia Gas Sys. Inc. (In re Columbia Gas Sys. Inc.)*, 997 F.2d 1039, 1051 (3d Cir. 1993). Indeed, the Debtors' Customer Programs Motion, citing *Columbia Gas*, acknowledged and sought an order recognizing as much with respect to certain other funds, but, inexplicably, not the Pass-Through Amounts. Likewise, and for the reasons explained below, federal common law controls and compels the conclusion that the Pass-Through Amounts are also held by the Utility in trust for the benefit of the Interconnection Customers.

A. **Federal Common Law Governs Whether the Pass-Through Amounts Are Property of the Utility's Estate**

28. It is well established that the interpretation of federal statutes, including Section 541 of the Bankruptcy Code, is governed by federal law.[39] Applying federal law, courts may adopt state law as the federal rule of decision or they may fashion a uniform federal common law rule.[40]

29. The Supreme Court has outlined a three-factor test to determine whether uniform federal common law or state law should apply, based on the nature and importance of the governmental interest at issue and the effect of applying state law on that interest. *See United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 727 (1979).

30. To determine whether a federal rule is warranted, courts should consider: (1) the need for a federal uniform law; (2) whether the application of state law would frustrate specific objectives of the federal program at issue; and (3) the extent to which application of a federal common law rule would upset commercial expectations that state law would govern. *Id.* Generally,

---

[39] *See In re Nucorp Energy Sec. Litig.*, 772 F.2d 1486, 1489 (9th Cir. 1985) ("A claim which arises under a federal statute and implicates federal policy is appropriately decided under federal law."); *see also Thompson v. Paul*, 547 F.3d 1055, 1061 (9th Cir. 2008) ("Federal statutory rights could be easily defeated if state law could be used to control the incidents of those rights and the defenses to them." (quoting *Petro-Ventures, Inc. v. Takessian*, 967 F.2d 1337, 1340 (9th Cir. 1992))).

[40] *See Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1457 (9th Cir. 1986) (where disagreements arose between a vendor and purchaser over contribution costs of environmental clean-up pursuant to federal statute CERCLA, court must decide whether to interpret the contracts under state law or to develop a uniform federal standard).

(continued . . .)

Case: 19-30088    Doc# 4400    Filed: 10/22/19    Entered: 10/22/19 23:27:39    Page 16 of 32

1  federal law should coincide with the relevant state law unless the state law would undermine the

2  objectives of the federal statutory scheme and there is a distinct need for nationwide standards. *Id.*[41]

3  31.    The *Columbia Gas* case is analogous, persuasive, and correct. There, the debtor,

4  owner of a natural gas pipeline, requested authority to pay certain obligations, including amounts

5  the debtor had collected under the previous pricing method, after FERC passed an order

6  implementing a new pricing method and requiring the suppliers to refund amounts customers had

7  been overcharged under the previous method. *Columbia Gas*, 997 F.2d at 1053.

8  32.    Applying *Kimbell*, the Third Circuit determined that there existed the need for a

9  national uniform law because (i) the refunds at issue arose directly under FERC tariff orders,

10  thereby sufficiently implicating federal interests; (ii) the application of state trust law would

11  frustrate the central objective of the Natural Gas Act and "warp the definition Congress intended to

12  provide to the exclusion from the bankruptcy estate for equitable interests" under Section 541(d);

13  and (iii) the application of federal common law would not upset commercial expectations, as

14  "[c]reditors cannot reasonably assume that state law will allocate various parties' interests in

15  federally created property rights." *Id*. at 1055-56. Likewise, here, application of the *Kimbell* test

16  establishes that federal common law, rather than state trust law, properly governs the question of

17  whether the Pass-Through Amounts are held in trust by the Utility for its Interconnection

18  Customers.

19  33.    First, the Utility's original obligation to collect and reimburse the Pass-Through

20  Amounts arises directly from the FERC Order, which establishes a national regulatory framework

21  governing the interconnection of projects to the transmission system in order to maintain the

22  integrity and stability of the transmission network through the funding of network upgrades. It is

---

[41]    The Ninth Circuit Court of Appeals has applied the *Kimbell* test in a variety of cases to determine whether the respective issue warranted the adoption of a federal common law rule. *See United States v. Northrop Corp.*, 59 F.3d 953, 961 (9th Cir. 1995) (determining under the *Kimbell* test that the adoption of a uniform federal common law rule regarding claims brought under the federal False Claims Act was necessary, as opposed to incorporating various state laws, since state law would contradict the intent expressed by Congress); *see also Am. Int'l Enters., Inc. v. F.D.I.C.*, 3 F.3d 1263, 1268 (9th Cir. 1993) (applying the *Kimbell* test to determine that the adoption of a uniform federal common law rule was not necessary where the California statute of frauds did not conflict with the FDIC's existing real estate transaction procedures).

under this framework that the Utility acquired the Pass-Through Amounts. Consequently, the question of whether the Pass-Through Amounts became property of the estate upon the Utility's commencement of its bankruptcy case sufficiently implicates the important federal interest of regulating interstate transmission in order to provide a stable and reliable power supply throughout the nation and warrants the application of federal common law. *See id.* at 1055.

34. Second, applying state law to determine the nature of the Utility's interests in the Pass-Through Amounts would frustrate the FPA's purpose of providing open access and non-discriminatory transmission service to ensure a stable supply of power throughout the United States. California trust law requires an element of wrongdoing to establish the existence of a constructive trust. [42] In contrast, federal common law looks to the contractual arrangement between the entity holding the funds and the intended recipient to determine whether an implied trust exists or rather a debtor-creditor relationship between the parties. [43] The application of federal common law of trusts is warranted, because the federal intent behind the regulatory requirements of FERC and the FPA would be contravened by the application of state trust law. [44]

35. Finally, it is beyond cavil that the application of federal common law to resolve federally created property rights arising from the federal statutory and regulatory scheme of the FPA and the FERC Order would not upset commercial expectations that state law should govern such property rights.

36. All three factors of the Supreme Court's *Kimbell* test support the determination that the federal common law of trusts governs the question of whether the Utility holds the Pass-Through Amounts in trust for the benefit of the Interconnection Customers.

---

[42] *See* Cal. Civ. Code §§ 2223, 2224.

[43] *See Columbia Gas*, 997 F.2d at 1056 ("Federal common law imposes a trust when an entity acts as a conduit, collecting money from one source and forwarding it to its intended recipient.").

[44] *See Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1056 (9th Cir. 2018) ("State law should not be incorporated where doing so would frustrate specific objectives of the federal programs." (brackets and citation omitted)).

**B.** **Under Federal Common Law, the Pass-Through Amounts Are Being Held in Trust by the Utility for the Benefit of the Interconnection Customers and Therefore Are Not Property of the Utility's Bankruptcy Estate**

37.     To determine whether, under federal common law, the Pass-Through Amounts are held in trust by the Utility, *Columbia Gas* is again analogous. Applying federal common law, the Third Circuit found that the debtor held the refunds in trust for its customers, and therefore excluded them from the bankruptcy estate. *Columbia Gas*, 997 F.2d at 1059. The court first reasoned that under a trust the beneficiary holds an equitable interest in the trust property, while only bare legal title is vested in the trustee.[45] The court went on to determine that because the debtor held the customer refunds in trust, the refunds were excluded from the bankruptcy estate and were immediately payable to the debtor's customers.[46]

38.     Congress intended that Section 541(d) of the Bankruptcy Code exclude from the debtor's estate not only funds held by the debtor in an *express trust*, but also funds held in *constructive trust*.

> Situations occasionally arise where property ostensibly belonging to the debtor will actually not be property of the debtor, but will be held in trust for another. For example, if the debtor has incurred medical bills that were covered by insurance, and the insurance company had sent the payment of the bills to the debtor before the debtor had paid the bill for which the payment was a reimbursement, the payment would actually be held in constructive trust for the person to whom the bill was owed.

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 368 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6324.

39.     The example used in Congressional sessions to explain Section 541(d)'s demarcation of the debtor's estate clearly shows the congressional intent that when a debtor acts as a conduit, receiving and transmitting funds from one party to another, it holds these funds in a constructive trust and lacks any equitable interest in such funds.

40.     In *Columbia Gas*, the Third Circuit Court of Appeals held that in assessing whether an implied trust can be found under federal common law, a court must look to whether the intent of

---

[45]     *Id.*

[46]     *Id.*

the parties was to create a trust or a loan. *Columbia Gas*, 997 F.2d at 1060. If the language of the contracts does not definitively establish an express trust, the intent can be seen in the language of the parties, their conduct, and other circumstances found in the context surrounding the transaction. *Id.*

41.     In typical transactions, both trust and debtor-creditor relationships are created by freely-negotiated contractual agreement between two parties. Here, however, the Utility's obligation to collect and reimburse the NURs was created unilaterally by FERC, pursuant to its statutory authority under the FPA.

42.     Neither the Utility nor the Interconnection Customers can alter their respective interest in the NURs by contract without FERC approval.[47] The Utility is required to enter into interconnection agreements with any potential Interconnection Customer seeking to build a generator project that would interconnect with the Utility's Transmission System, provided the Interconnection Customer has followed the required procedures and satisfies the criteria contained in the Tariff.[48]

43.     Therefore, the analysis of the Utility's interest in the NURs turns on the manifestations of FERC's intent.  The FERC Order and Tariff are the source of the Utility's obligation to reimburse the Pass-Through Amounts to the Interconnection Customers, according to the schedule detailed in their respective Interconnection Agreement. According to the network upgrade scheme established by FERC, the Utility was never meant to retain the NURs for its own use, benefit, or profit. Indeed, the Utility's very right to acquire the NURs was conditioned on the corresponding requirement that the Utility would flow the NURs through to the Interconnection Customers.

44.     When the Utility reimburses the Interconnection Customers for the network upgrade payments they originally made, it is not paying them for goods and services rendered. Like the

---

[47]     *See PJM Interconnection*, 111 FERC ¶ 61,163 at P.18 ("[A] Transmission Provider seeking a case-specific deviation from its *pro forma* interconnection agreement bears a high burden to justify and explain that its changes are necessary (not merely 'consistent with or superior to') changes.").

[48]     *See* Tariff at Appendices S, U, W, Y and Z.

Case: 19-30088   Doc# 4400   Filed: 10/22/19   Entered: 10/22/19 23:27:39   Page 20 of 32

natural gas pipeline owner in *Columbia Gas*, the Utility acts as a mere conduit, collecting funds and transmitting them to and for the benefit of another party.

45.     In the submission of its rate filing to FERC on October 1, 2018, the Utility recognized its role as a conduit in the network upgrade scheme and acknowledged that the funds it collects for network upgrades must be reimbursed to the generators (an alternate term for interconnection customers):

> Under the terms of the agreements and their associated tariffs, PG&E collects up-front payments from generators to fund design, engineering and construction of the Network Upgrades needed for the project's interconnection. FERC's current policy requires that such Network Upgrade payments made by the customer are subject to refund (Network Upgrade Transmission Credits) to the generator with interest.[49]

46.     The important difference here is between commercial loans, originating from a contractually negotiated *quid pro quo,* and a trust relationship in which the debtor is obligated to collect and distribute certain funds without the ability to choose the counterparties or modify the terms of the transaction. The Interconnection Customers have not freely chosen to loan money to the Utility and have only made the original payments pursuant to requirements established in the FERC Order and the Tariff.  Similarly, the Utility is required by law to accept the payments solely to perform network upgrades and to reimburse the Interconnection Customers from revenues collected by CAISO and entered in the Utility's accounting books and records as "network upgrade credits" to be paid to the Interconnection Customers.[50]

47.     Likewise, in its obligation to remit the Test Period Payment, the Utility operates as a conduit with no equitable interest in the amounts it's holding in trust for Cal Flats 150.  Although this requirement arises under the PG&E PPA, the Utility's role is the same as that of the debtor who receives payments from an insurance company, intended to be directed towards the debtor's

---

[49]    Testimony of Pedram Arani, Program Manager in the Utility's Electric Grid Interconnection Department.  *Pacific Gas and Electric Company*, Transmission Owner Tariff Rate Filing, Exhibit No. PGE-0013, FERC Docket No. ER19-13 (filed Oct. 1, 2018).

[50]    *See Mersing Declaration*, at ¶¶ 11-12 (The Utility is required by FERC to maintain its books and records in accordance with FERC's Uniform System of Accounts (18 C.F.R. Part 101), in which NURs are entered as "network upgrade credits" under Account 252 ("Customer advances for construction").

(continued . . .)

Case: 19-30088    Doc# 4400    Filed: 10/22/19    Entered: 10/22/19 23:27:39    Page 21 of 32

medical bills, as cited by Congress as a situation in which a debtor holds funds in a constructive trust and therefore such funds do not fall within the scope of the debtor's estate under Section 541(d) of the Bankruptcy Code.[51]

48.     Therefore, the Pass-Through Amounts cannot be considered property of the Utility's bankruptcy estate, as the Utility was and is acting only as a conduit for the Pass-Through Amounts held in trust. The Utility's creditors should not be permitted to share in funds in which the Utility has no equitable interest and no right to retain for its own use or benefit.[52]

## II.     IF THE PASS-THROUGH AMOUNTS ARE NOT SUBJECT TO IMMEDIATE TURNOVER, THEY MUST BE SEGREGATED AND THE MOVANTS ARE ENTITLED TO ADEQUATE PROTECTION

49.     To the extent the Utility is not required to immediately turn over the Pass-Through Amounts, the Interconnection Customers' interests in such trust property are entitled to adequate protection under Sections 361 and 363 of the Bankruptcy Code.

50.     Section 363(e) provides that an entity which possesses an "interest in property" used by the debtor may request that the court prohibit or condition the debtor's use of that property as is necessary to provide adequate protection of such interest. 11 U.S.C. § 363(e).

51.     Courts have held that a constructive trust establishes an entity's interest in property for adequate protection purposes under Section 363. *See In re Datair Sys. Corp.*, 42 B.R. 241, 244 (Bankr. N.D. Ill. 1984) (holding that a creditor would possess a secured claim for adequate protection if its position arises as a result of a constructive trust); *see also Byrd v. Hoffman*, 417

---

[51]     *See supra,* at ¶ 41.

[52]     The issue of tracing is easily resolved for two reasons. First, the Utility had as of the Petition Date and appears to have had at all times funds in its primary bank account (into which the Pass-Through Amounts are initially deposited) far in excess of the Pass-Through Amounts. *See Declaration of Jason P. Wells in Support of First Day Motions and Related Relief*, Case No. 19-30088(DM) (Bankr. N.D. Cal. Jan. 29, 2019) [Dkt. No. 28], at ¶¶ 23 and 28. Thus, applying the lowest intermediate balance test, the entirety of the Pass-Through Amounts are traceable. *See Columbia Gas*, 997 F.2d at 1066 (explaining how funds may be traced using lowest intermediate balance test). Second, even if the Pass-Through Amounts could not be traced using the lowest intermediate balance test, the application of the lowest intermediate balance test to limit recovery by the Movants would contravene the congressional intent behind the FPA, for the same reasons as explained by the Columbia Gas court. *See id.* (holding that "these refunds—all of them—belong to the customers, and if [the debtor] has the ability to pay, trust laws notwithstanding, it should be allowed to pay in full.").

Case: 19-30088    Doc# 4400    Filed: 10/22/19    Entered: 10/22/19 23:27:39    Page 22 of 32

B.R. 320, 330 (D. Md. 2008) (holding that appellants would need to establish a valid constructive trust claim in order to be considered an entity with an interest in the property under Section 363).

52.     Section 361(2) provides that when Section 363 requires adequate protection of an entity's interest in property, such adequate protection may be given in the form of a lien to the extent that the debtor's use of the property results in a decrease in the value of such entity's interest in the property. 11 U.S.C. § 361(2).

53.     As outlined above, the Interconnection Customers have a constructive trust interest in the Pass-Through Amounts being withheld by the Utility. Therefore, under Sections 361(2) and 363(e) of the Bankruptcy Code, the Interconnection Customers should be granted adequate protection in the form of liens on the Pass-Through Amounts that are being held by the Utility during the pendency of its bankruptcy case.

54.     Additionally, Section 363(c)(4) of the Bankruptcy Code requires the debtor to segregate and account for any cash collateral in the debtor's possession, custody, or control. 11 U.S.C. § 363(c)(4). Section 363(a) includes in the definition of "cash collateral" cash or other cash equivalents, whenever acquired, in which the estate and an entity other than the estate have an interest. As outlined above, while the Utility currently holds bare legal title to the Pass-Through Amounts, it is the Interconnection Customers who hold the actual equitable interest. As both the Utility and the Interconnection Customers have an interest in the Pass-Through Amounts, the Pass-Through Amounts fall under the definition of cash collateral.

55.     Accordingly, the Movants respectfully ask that the Court order the Utility to segregate the Pass-Through Amounts from its general accounts, as required under Section 363(c) and grant adequate protection in the form of liens under Section 361(2), so that the Interconnection Customers may receive the full amount of the payments they previously advanced to the Utility in compliance with the federally mandated framework for funding network upgrades. Adequate protection liens and segregation of the Pass-Through Amounts are critically necessary to clarify any misapprehensions that the Pass-Through Amounts might be available to satisfy the Utility's

-18-

general creditors or that the Interconnection Customer's liens are subject to the liens of any of the Utility's secured creditors, including the DIP Lenders.[53]

### III. THE MOVANTS ARE ENTITLED TO RELIEF FROM THE STAY BECAUSE THE UTILITY LACKS ANY EQUITY IN THE PASS-THROUGH AMOUNTS

56.     In the further alternative, even if the Court declines to impose a constructive trust as to the withheld Pass-Through Amounts, the Movants are entitled to relief from the automatic stay to pursue their rights and interests in such property pursuant to Section 362(d)(2) of the Bankruptcy Code. Section 362(d)(2) provides that stay relief "*shall*" be granted "with respect to a stay of an act against property" if "the debtor does not have an equity in such property" and "such property is not necessary to an effective reorganization." 11 U.S.C. § 362(d)(2) (emphasis added).

57.     As explained above, the Utility has only a legal, rather than equitable, interest in the Pass-Through Amounts. Consequently, the first prong of Section 362(d)(2) is met. *See* 11 U.S.C. § 362(d)(2)(A); *Gracia-Gracia v. Financial Oversight and Mgmt. Board (In re Fin. Oversight & Mgmt. Board for Puerto Rico)*, --- F.3d ---, No. 18-1463, 2019 WL 4667518, at *4-5 (1st Cir. Sept. 25, 2019) (explaining that debtor's lack of equitable interest in property satisfies 11 U.S.C. § 362(d)(2)(A) and may also support termination of stay for "cause" under § 362(d)(1) (citing *In re Zubenko*, 528 B.R. 784, 790 (Bankr. E.D. Cal. 2015) (finding "cause exist[ed] under § 362(d)(1) to . . . terminate the automatic stay" when the estate lacked equitable interest in property)).

58.     The Pass-Through Amounts are also "not necessary to an effective reorganization" of the Utility. 11 U.S.C. § 362(d)(2)(B). The Utility bears the burden of proving that the Pass-Through Amounts are necessary to an effective reorganization. 11 U.S.C. § 362(g). The Utility's own proposed plan of reorganization provides for payment of all general unsecured claims.[54] The Pass-Through Amounts therefore are not necessary to the Utility's post-bankruptcy reorganization.

---

[53]     "**DIP Lenders**" as defined in the *Final Order Pursuant to 11 U.S.C. §§ 105, 362, 363, 364, 503 and 507 and Federal Rule of Bankruptcy Procedure 2002, 4001, 6004, and 9014 (I) Authorizing Debtors to Obtain Senior Secured, Superpriority, Postpetition Financing, (II) Granting Liens and Superpriority Claims, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief*, Case No. 19-30088(DM) (Bankr. N.D. Cal. Mar. 27, 2019) [Dkt. No. 1091].

[54]     *See Debtors' First Amended Joint Chapter 11 Plan of Reorganization*, Case No. 19-30088, (Bankr. N.D. Cal. Sept. 23, 2019) [Dkt. No. 3966], at P. 35-39.

Nor is there any basis to find that the Utility's retention of the Pass-Through Amounts is necessary to the Utility's operations or ability to administer its estate pending its consummation of an effective reorganization. Accordingly, even if the Court declines to impose a constructive trust and thus determines that the Utility's bare legal interest in the Pass-Through Amounts constitutes property of the estate, it nevertheless must grant the Movants relief from the automatic stay to seek recovery of the Pass-Through Amounts. 11 U.S.C. § 362(d)(2).

## IV. TIMELY REMITTANCE OF THE NURS TO THE MOVANTS IS IN THE BEST INTEREST OF THE BANKRUPTCY ESTATE AND ITS CREDITORS

### A. The Utility's Failure to Timely Remit the NURs to the Movants Deprives the Estate of Its Right to Receive Any Return on Equity for the Amount of Reimbursed Network Upgrade Costs

59.     Once the Utility has reimbursed the withheld and forthcoming NURs to the Interconnection Customers, the Utility will be able to record those amounts in its transmission rate base and receive a return on equity for the network upgrade costs. Under the framework established in the FERC Order, the Utility is permitted to include the monetary amounts of the network upgrade funding that it collects from the Interconnection Customers in its transmission rates, but ***only after*** the Utility has provided the network upgrade reimbursements to the interconnection customer. Therefore, the Utility must first refund the NURs to the Interconnection Customers before it can earn a return on equity for these amounts. Meanwhile, the estate and its creditors are not only being deprived of the value of that return, but paying for the privilege as interest on the withheld NURs continues to accrue.

### B. Failure to Make Timely Payment Exposes the Utility and Its Estate to Additional Potential Regulatory Burdens and Costs

60.     Finally, the possible regulatory consequences to the Utility's estate of breaching its obligations to timely remit the Pass-Through Amounts counsels in favor of timely performance. For that reason, the Utility moved in its first bankruptcy case for authority to pay certain "Generator Advances" for network upgrades, justifying such payments based on the effect that nonpayment would have on its relationship with FERC (which had ordered the payments):

> Sound business justifications support PG&E's compliance with FERC rulings as described in the Motion. PG&E is obligated to submit to FERC jurisdiction and obey FERC orders. FERC has

mandated that transmission owners across the country provide such credits. Because PG&E is subject to FERC regulations, it must abide by subsequent mandates ordered by FERC.

*See Notice of Motion and Motion of [the Utility] for Order Authorizing Debtor to Repay Certain Generator Advances* at 7-8, Case No. 01-30923 (Bankr. N.D. Cal. Mar. 20, 2003) [Dkt. No. 12396].

### NOTICE

Notice of the Motion will be provided to (i) the Debtors and counsel to the Debtors; (ii) counsel to the Office of the United States Trustee for Region 17; (iii) counsel to the administrative agent under the Debtors' debtor-in-possession financing facility; (iv) counsel to the collateral agent under the Debtors' debtor-in-possession financing facility; (v) counsel to the CPUC; (vi) the U.S. Nuclear Regulatory Commission; (vii) the U.S. Department of Justice, as counsel for the United States on behalf of the Federal Energy Regulatory Commission; (viii) the Official Committee of Unsecured Creditors; (ix) the Official Committee of Tort Claimants; (x) the Securities and Exchange Commission; (xi) the Internal Revenue Service; (xii) the Office of the California Attorney General; (xiii) the Office of the United States Attorney for the Northern District of California; and (xiv) those parties who have requested notice pursuant to Fed. R. Bankr. P. 2002. The Movants respectfully submit that no further notice is required.

### CONCLUSION

For the foregoing reasons, the Movants request that the Court issue an order in the form attached as **Exhibit A**, requiring the Utility (i) to make immediate payment of the Pass-Through Amounts to the respective Movants, including interest accrued thereon at the regulated rate, and (ii) to immediately resume making timely payments of all NURs becoming due thereafter, in addition to such other and further relief as the Court may deem just and appropriate.

-21-

DATED: October 22, 2019

STOEL RIVES LLP

_/s/ David B. Levant_
David B. Levant (*pro hac vice*)
Andrew H. Morton (*pro hac vice*)
Jennifer L. Mersing (*pro hac vice*)
Jennifer N. Slocum (*pro hac vice*)
Stoel Rives LLP
600 University Street, Suite 3600
Seattle, WA 98101
206.624.0900
david.levant@stoel.com

*Attorneys for Ad Hoc Group of*
*Interconnection Customers*

**EXHIBIT A**

**Proposed Order**

1  DAVID B. LEVANT (*pro hac vice*)
   david.levant@stoel.com
2  JENNIFER L. MERSING (*pro hac vice*)
   jennifer.mersing@stoel.com
3  ANDREW H. MORTON (*pro hac vice*)
   andrew.morton@stoel.com
4  JENNIFER N. SLOCUM (*pro hac vice*)
   jennifer.slocum@stoel.com
5  STOEL RIVES LLP
   600 University Street, Suite 3600
6  Seattle, WA  98101
   Telephone:  206.624.0900
7  Facsimile:  206.386.7500

   SETH D. HILTON (SBN 181899)
   seth.hilton@stoel.com
   SARAH E. KOZAL (SBN 313043)
   sarah.kozal@stoel.com
   BAO M. VU (SBN 277970)
   bao.vu@stoel.com
   STOEL RIVES LLP
   3 Embarcadero Center, Suite 1120
   San Francisco, CA 94111
   Telephone: 415.617.8900
   Facsimile:  415.617.8907

8  *Attorneys for Ad Hoc Group of*
   *Interconnection Customers*
9

10            **UNITED STATES BANKRUPTCY COURT**

11            **NORTHERN DISTRICT OF CALIFORNIA**

12                **SAN FRANCISCO DIVISION**

| | |
|---|---|
| 13  **In re:** | Bankruptcy Case No. 19-30088 (DM) |
| 14  **PG&E CORPORATION** | Chapter 11 (Lead Case) |
| 15     **- and -** | (Jointly Administered) |
| 16  **PACIFIC GAS AND ELECTRIC COMPANY,** | **ORDER GRANTING MOTION BY AD HOC GROUP OF INTERCONNECTION CUSTOMERS TO COMPEL PAYMENT** |
| 17            **Debtors.** | **OF PASS-THROUGH AMOUNTS WITHHELD BY PACIFIC GAS AND ELECTRIC COMPANY** |
| 18  ☐  Affects PG&E Corporation  ☒  Affects Pacific Gas and Electric | |
| 19      Company | Date:  November 13, 2019 |
| 20  ☐  Affects both Debtors | Time:  10:00 a.m. (PT) Place: United States Bankruptcy Court |
| 21  *All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | Courtroom 17, 16th Floor San Francisco, CA  94102 |
| 22 | **Objection Deadline:** |
| 23 | **November 8, 2019, at 4:00 p.m. (PT)** |

24         This matter came before the Court on the "Motion and Memorandum of the Ad Hoc Group

25  of Interconnection Customers to Compel Payment of Pass-Through Amounts Withheld by Pacific

26  Gas and Electric Company" (Dkt. No. ____; the "***Pass-Through Motion***").[55]  The Court has

27  ───────────────
   [55]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed
28       to such terms in the Pass-Through Motion.

jurisdiction to consider the Pass-Through Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, the Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges, General Order 24 (N.D. Cal.) and Bankruptcy Local Rule 5011-1(a); venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; the Pass-Through Motion and the requested relief constitute a core proceeding pursuant to 28 U.S.C. § 157(b); the Court having found and determined that notice of the Pass-Through Motion as provided to the parties listed therein is reasonable and sufficient under the circumstances, and it appearing that no other or further notice need be provided; and this Court having reviewed the Pass-Through Motion, related declarations and submissions (including, without limitation, the Mersing Declaration, the Narayanan Declaration, the Liddell Declaration, and the Yoder Declaration); the Court having determined that the bankruptcy estate of Pacific Gas and Electric Company (the "***Utility***") has no equitable interest in the Pass-Through Amounts (as defined below) within the meaning of 11 U.S.C. § 541(d); and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Pass-Through Motion is granted to the extent set forth in this Order.

2.      The Utility is hereby ordered, as soon as practicable and in all events no later than December 31, 2019, to remit to the following-listed interconnection customers of the Utility (the "***Interconnection Customers***") the amounts indicated after their names that the Utility was contractually obligated to remit to them on or prior to the date of this Order pursuant to the terms of the interconnection agreement referenced below (the "***Interconnection Agreements***"):

| Movant/Interconnection Customer | Interconnection Agreement | Amount |
|---|---|---|
| Solar Star California XIII, LLC | LGIA Q577 | $6,000,000.00 |
| 67RK 8me LLC,<br>65HK 8me LLC,<br>87RL 8me LLC | LGIA Q744 | $462,171.42 |
| Adera Solar, LLC | SGIA Q644 | $219,150.00 |

Case: 19-30088   Doc# 4400   Filed: 10/22/19   Entered: 10/22/19 23:27:39   Page 30 of 32

| Movant/Interconnection Customer | Interconnection Agreement | Amount |
|---|---|---|
| RE Mustang LLC, RE Mustang 3 LLC, RE Mustang 4 LLC | LGIA Q643W | $3,514,185.93 |

3.      The Utility is further ordered to remit to the Interconnection Customers, together with the remittances ordered in the preceding paragraph, accrued interest on such amounts at the rate specified by the Federal Energy Regulatory Commission (and as referenced in the applicable interconnection agreement) as of the date such amounts are remitted to the Interconnection Customer by the Utility.

4.      The Utility is ordered to determine, as soon as reasonably practicable, the dates and amounts on which the NURs under the CA Flats Interconnection Agreement, as defined in the Narayanan Declaration, are payable to Cal Flats 130 and to Cal Flats 150 under the CA Flats Interconnection Agreement in the same manner as the Utility would if it were not a debtor under Chapter 11, and relief from the stay is granted to Cal Flats 130 and Cal Flats 150 to participate in all negotiations and proceedings contemplated by the CA Flats Interconnection Agreement for such purpose. Upon determination of such NUR amounts and the schedule for payment of the NURs, the Utility is authorized and directed to remit to Cal Flats 130 and to Cal Flats 150 all such NUR amounts (if any) that are determined to be past due and all that subsequently become due and payable, as and when payable, so long as the Utility remains a debtor under the Bankruptcy Code.

5.      The Utility is further ordered, as soon as practicable and in all events no later than December 31, 2019, to remit to Cal Flats 150 payment in the amount of $274,159.67 for test energy generated from December 20, 2018 through January 28, 2019.

6.      From and after the date of this Order, the Utility is further ordered to timely remit to the Interconnection Customers all Pass-Through Amounts consistent with the Utility's contractual obligations under the Interconnection Agreements.

Case: 19-30088    Doc# 4400    Filed: 10/22/19    Entered: 10/22/19 23:27:39    Page 31 of 32

7. For purposes of this Order, "***Pass-Through Amounts***" means (i) "Network Upgrade Reimbursements", as defined in each of the Interconnection Agreements, and (ii) the "Test Period Payments", as defined in Section 4.1(c) of the CA Flats Solar 150, LLC Power Purchase Agreement with the Utility.

8. This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

**\*\*END OF ORDER\*\***