WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C. (*pro hac vice*)
(ray.schrock@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

CRAVATH, SWAINE & MOORE LLP
Paul H. Zumbro (*pro hac vice*)
(pzumbro@cravath.com)
Kevin J. Orsini (*pro hac vice*)
(korsini@cravath.com)
Omid H. Nasab (*pro hac vice*)
(onasab@cravath.com)
825 Eighth Avenue
New York, NY 10019
Tel: 212 474 1000
Fax: 212 474 3700

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br>**Debtors.**<br><br>☐ Affects PG&E Corporation<br><br>☐ Affects Pacific Gas and Electric Company<br><br>☒ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case No. 19-30088 (DM)<br>Chapter 11<br>(Lead Case) (Jointly Administered)<br><br>**DEBTORS' MOTION FOR ENTRY OF ORDERS (I) APPROVING TERMS OF, AND DEBTORS' ENTRY INTO AND PERFORMANCE UNDER, EXIT FINANCING COMMITMENT LETTERS AND (II) AUTHORIZING INCURRENCE, PAYMENT AND ALLOWANCE OF RELATED FEES AND/OR PREMIUMS, INDEMNITIES, COSTS AND EXPENSES AS ADMINISTRATIVE EXPENSE CLAIMS**<br><br>Date:  November 13, 2019<br>Time:  10:00 a.m. (Pacific Time)<br>Place:  United States Bankruptcy Court<br>    Courtroom 17, 16th Floor<br>    San Francisco, CA 94102<br><br>Objection Deadline: November 6, 2019 |

PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession (collectively, "**PG&E**" or the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this motion (the "**Motion**"), pursuant to sections 105(a), 363(b), 503(b) and 507(a)(2) of title 11 of the United States Code (the "**Bankruptcy Code**"), and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for entry of orders (i) approving the terms of, and the Debtors' entry into and performance under, the Equity Backstop Commitment Letters and Debt Financing Commitment Letters (in each case, as defined below, and together, the "**Exit Financing Commitment Letters**") and (ii) authorizing the incurrence, payment and allowance of all related fees and/or premiums, indemnities, costs and expenses (the "**Exit Financing Obligations**") as administrative expense claims.

In support of the Motion, the Debtors respectfully submit the Declaration of Kenneth S. Ziman (the "**Ziman Declaration**"), filed contemporaneously herewith. Proposed forms of orders granting the relief requested herein with respect to the Equity Backstop Commitment Letters and the Debt Financing Commitment Letters are attached to this Motion as **Exhibit A** and **Exhibit B**, respectively (collectively, the "**Proposed Orders**").[1]

---

[1] The Proposed Orders with respect to the Equity Backstop Commitment Letters and the Debt Financing Commitment Letters have been separated for administrative purposes and for ease of reference.

# TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT .................................................................................1

II.   JURISDICTION ...................................................................................................7

III.  BACKGROUND ....................................................................................................7

      A.   The Debtors' Plan ........................................................................................7

      B.   The Equity Backstop Commitment Letters............................................................8

      C.   The Debt Financing Commitment Letters .............................................................10

      D.   Certain Key Terms and Provisions of the Exit Financing Commitment Letters
           and the Proposed Orders ...............................................................................12

IV.   BASIS FOR RELIEF REQUESTED ............................................................................25

      A.   Entry into the Exit Financing Commitment Letters is a Sound Exercise of the
           Debtors' Business Judgment and is in the Best Interests of Their Estates. ................25

      B.   Payment and Allowance of the Exit Financing Obligations as Administrative
           Expense Claims Should Be Approved Because They are Reasonable, Market-
           Based and Essential Terms of the Exit Financing Commitment Letters. ....................28

V.    WAIVER OF BANKRUPTCY RULE 6004(h) ................................................................32

VI.   NOTICE...........................................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re AbitibiBowater Inc.*,
    418 B.R. 815 (Bankr. D. Del. 2009) ...................................................................26

*In re Adelphia Commc'ns Corp.*,
    No. 02-41729 (REG), 2004 WL 1634538 (Bankr. S.D.N.Y. June 22, 2004)............................2, 5

*Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
    60 B.R. 612 (Bankr. S.D.N.Y. 1986) ...................................................................26

*Crystalin, L.L.C. v. Selma Props. Inc. (In re Crystalin, L.L.C.)*,
    293 B.R. 455 (B.A.P. 8th Cir. 2003) ...................................................................26

*In re Excel Innovations, Inc.*,
    502 F.3d 1086 (9th Cir. 2007) ...................................................................26

*Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*,
    107 F.3d 558 (8th Cir. 1997) ...................................................................26

*In re Hexion Holdings LLC*,
    No. 19-10684 (KG), (Bankr. D. Del. May 15, 2019) ...........................................26, 27, 29, 31, 32

*In re Integrated Resources, Inc.*,
    147 B.R. 650 (Bankr. S.D.N.Y. 1992) ...................................................................26

*In re Monitronics International, Inc.*,
    No. 19-33650 (DRJ) (Bankr. S.D. Tex. July 30, 2019) ...................................................................29

*In re Montgomery Ward Holding Corp.*,
    242 B.R. 147 (D. Del. 1999) ...................................................................26

*In re Pacific Drilling S.A.*,
    No. 17-13193 (MEW) (Bankr. S.D.N.Y. Sept. 25, 2018) ...................................................................29

*In re Robles*,
    No. 14-51812 (ASW), 2014 WL 3715092 (Bankr. N.D. Cal. July 24, 2014) ...............................26

*Smith v. Van Gorkom*,
    488 A.2d 858 (Del. 1985) ...................................................................26

*In re Station Casinos, Inc.*,
    No. BK-09-52477 (GWZ), 2010 Bankr. LEXIS 5447 (Bankr. D. Nev. Feb. 2, 2010) ...................................................................25

*In re Ultra Petroleum Corp.*,
No. 16-32202 (MI) (Bankr. S.D. Tex. Feb. 13, 2017) ...................................................2, 5

*In re Utah 7000, L.L.C.*,
No. 08-21869 (JB), 2008 WL 2654919 (Bankr. D. Utah July 3, 2008) ...........................................2

**Statutes & Rules**

11 U.S.C. § 105 .................................................................................................................27

11 U.S.C. § 105(a) .............................................................................................................26

11 U.S.C. § 362 .................................................................................................................25

11 U.S.C. § 363 .................................................................................................................27

11 U.S.C. § 363(b) .............................................................................................................26

11 U.S.C. § 363(b)(1) .........................................................................................................25

11 U.S.C. § 503(b) ........................................................................................................31, 32

11 U.S.C. § 507(a)(2) .........................................................................................................29

11 U.S.C. § et seq. ..................................................................................................... *passim*

28 U.S.C. § 157 ...................................................................................................................7

28 U.S.C. § 157(b) ...............................................................................................................7

28 U.S.C. § 1334 .................................................................................................................7

28 U.S.C. § 1408 .................................................................................................................7

28 U.S.C. § 1409 .................................................................................................................7

Fed. R. Bankr. P. 2002 .......................................................................................................33

Fed. R. Bankr. P. 6004(h) ...................................................................................................32

Internal Revenue Code Section 382 ....................................................................................13

Rule 5011-1(a) .....................................................................................................................7

Rule 5110 ...........................................................................................................................23

**Other Authorities**

California Assembly Bill 1054 ....................................................................................... *passim*

*Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General
Order 24 (N.D. Cal.) ...............................................................................................................7

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    PRELIMINARY STATEMENT

On September 9, 2019, the Debtors filed their initial Joint Chapter 11 Plan of Reorganization [Docket No. 3841] (as amended, supplemented or otherwise modified from time to time, the "**Plan**"). The Plan, which was subsequently amended to reflect an $11 billion settlement with holders of subrogation claims [Docket No. 3966], is designed to (a) pay all prepetition wildfire claims in full, (b) achieve a rate-neutral solution, on average, for customers, (c) meet the June 30, 2020 deadline for Plan confirmation established by California Assembly Bill 1054 ("**AB 1054**"), (d) obtain all necessary regulatory approvals, (e) support California's clean energy goals and (f) ensure that the reorganized Debtors have sufficient liquidity upon emergence to continue providing safe, clean and reliable electricity and natural gas to California residents.

In order to satisfy those objectives, the Debtors must have sufficient financing to consummate the Plan. The Plan contemplates multiple sources of funding, the foundations of which are the issuance of $14 billion in reorganized PG&E Corp. common stock ("**New PG&E Corp. Common Stock**"), to be used to fund payments under the Plan to wildfire victims, and the incurrence of $34.35 billion in senior debt obligations (the "**New Debt**"), to, among other things, refinance pre-petition high-coupon Utility bonds[2] and fund the payment in full, in cash, of the Debtors' obligations under their debtor-in-possession financing facilities.

---

[2]     The Debtors expect the incurrence of new long-term bonds at the Utility could save the Debtors over $170 million per year in interest expense as compared to the existing high-coupon bonds, which savings would accrue to the benefit of the Debtors' ratepayers. (Ziman Decl. ¶ 20.) As of the date of their most recent Verified Statement [Docket No. 4369 Ex. A], the Ad Hoc Group of Senior Unsecured Noteholders (the "**Ad Hoc Noteholder Committee**") held approximately $11.2 billion in these bonds (which holdings *increased by over $1.5 billion* since the Ad Hoc Noteholder Committee's prior Verified Statement [Docket No. 3083 Ex. A], filed before the termination of exclusivity). Accordingly, the plan of reorganization (the "**Noteholder Plan**") proposed by the Ad Hoc Noteholder Committee and the Official Committee of Tort Claimants needlessly provides for the reinstatement of the long-term Utility bonds, which only serves to enrich the members of the Ad Hoc Noteholder Committee to the detriment of the Debtors' other stakeholders. [Docket No. 4257.] The Debtors have proposed a Plan that refinances these high-coupon bonds with new, cheaper debt to maximize the value of their estates for the benefit of *all* stakeholders.

Given the importance of such financing, the Debtors, in the exercise of their business judgment, have obtained equity and debt financing commitments to provide assurances that they will have access to sufficient capital on the effective date of the Plan (the "**Effective Date**"). Under the equity commitment letters executed by PG&E Corp. (each in substantially the form attached to this Motion as **Exhibit C**, and collectively, the "**Equity Backstop Commitment Letters**"), the parties identified on **Exhibit D** (collectively, the "**Equity Backstop Parties**") have severally committed to purchase up to $14 billion in New PG&E Corp. Common Stock (collectively, the "**Equity Backstop Commitments**") on the Effective Date, on the terms and subject to the conditions set forth in the Equity Backstop Commitment Letters. Under the bridge commitment letters entered into by PG&E Corp. and the Utility on October 11, 2019 (collectively, the "**Bridge Commitment Letters**")[3], certain money-center banks have agreed to backstop the New Debt incurrences contemplated by the Plan (collectively, the "**Bridge Commitments**" and, together with the Equity Backstop Commitments, the "**Exit Financing Commitments**"), on the terms and subject to the conditions set forth in the Bridge Commitment Letters. The Debtors anticipate effectuating the equity and debt issuances contemplated by the Plan through market transactions in order to obtain the most favorable pricing and other terms. However, the Debtors have obtained these "backstop" commitments for the sake of certainty that sufficient funds will be available on the Effective Date even if market conditions deteriorate and the contemplated exit financing cannot be obtained on more favorable terms.

By this Motion, the Debtors seek approval of the terms of, and their entry into and performance under, these Exit Financing Commitments. Under the Bankruptcy Code, the decision of a debtor-in-possession to obtain financing commitments is entitled to deference under the business judgment rule. *See, e.g.*, *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG), 2004 WL 1634538, at *2 (Bankr. S.D.N.Y. June 22, 2004); *In re Ultra Petroleum Corp.*, No. 16-32202 (MI) (Bankr. S.D. Tex. Feb. 13, 2017) (ECF No. 1126); *In re Utah 7000, L.L.C.*, No. 08-21869 (JB), 2008 WL 2654919,

---

[3]     The Bridge Commitment Letters entered into by PG&E Corp. and the Utility are attached to this Motion as **Exhibit E** and **Exhibit F**, respectively.

at *2–3 (Bankr. D. Utah July 3, 2008). The Debtors' business judgment is amply demonstrated here, where the Exit Financing Commitments have been obtained on favorable terms and in amounts sufficient to allow the Debtors to successfully emerge from chapter 11 in the event market financing is unavailable.

**The Equity Backstop Commitment Letters.** The terms of the Equity Backstop Commitment Letters afford the Debtors unprecedented flexibility in financing their emergence from the Chapter 11 Cases. (Ziman Decl. ¶ 18.) Although equity backstop commitment letters often require a debtor to consummate a particular type of equity offering—typically, a rights offering—the Equity Backstop Commitments here provide the Debtors with the flexibility to raise market-priced equity in the public and private markets[4] while still ensuring that the needed capital will be available if those offerings are not consummated in time for the Debtors to emerge in accordance with the timelines in AB 1054. Specifically:

- At equity valuations above a 13.5x implied price-to-earnings multiple (subject to adjustment based on changes in utility market indices), the Debtors are afforded discretion as to the type of primary equity offering that is consummated.

- Even at certain lower valuations, the Debtors may raise up to 20% of the equity proceeds in a widely-syndicated equity offering or, subject to certain consent rights, a private offering, with the remainder raised through a rights offering.

As equity is raised, the Equity Backstop Commitments (and associated future premiums) are reduced in accordance with the terms of the Equity Backstop Commitment Letters. Also, and importantly, the

---

[4] The backstop provided by the Equity Backstop Parties compares favorably to the equity financing proposed by the Ad Hoc Noteholder Committee, as set forth in their commitment letter filed with the Court on October 3, 2019 [Docket No. 4079 Ex. A] (the "**Ad Hoc Noteholder Commitment Letter**") and embodied in the Noteholder Plan. Instead of permitting market-based financing, the Noteholder Plan provides for a hard-wired new-money equity investment by members of the Ad Hoc Noteholder Committee at a _$3 billion_ discount. This would result in the Ad Hoc Noteholder Committee owning more than 50% of the post-emergence equity of reorganized PG&E Corp. even if more attractive financing is available in the market, representing an attempt by the Ad Hoc Noteholder Committee to seize control of the Debtors at a substantial discount. A plan geared toward maximizing value should encourage (or at least permit) market offerings.

Equity Backstop Commitment Letters (and the contemplated equity issuances and rights offerings) are structured in a manner that preserves the Debtors' significant net operating loss carryforwards and other tax attributes, which is important to maximizing the value of the Debtors' estates. (*Id.* ¶ 14.)

Moreover, given the inherent uncertainty of these Chapter 11 Cases, the Debtors negotiated for significant flexibility as to the length of the Equity Backstop Commitments. Subject to the terms of the Equity Backstop Commitment Letters, the commitments may be maintained for over 300 days, a significant duration for a transaction of this complexity. Given the length of the commitments, the Equity Backstop Parties required certain termination rights and conditions precedent to their funding obligations, principally regarding unexpected material adverse events such as pre-petition wildfire claims exceeding an agreed threshold, adverse regulatory determinations, significant post-petition wildfires and material non-ordinary course asserted administrative expense claims. With that in mind, the Debtors negotiated for most commitment premiums to be earned only as the Equity Backstop Parties' termination rights fall away and as conditionality is reduced.[5] Although the Equity Backstop Commitments are scheduled to expire initially on January 20, 2020, the Debtors, *in their sole discretion*, may extend the commitments three times: (1) to April 30, 2020 for an additional premium of 1.25%, (2) to June 30, 2020 for an additional premium of 2.50% and (3) to August 29, 2020 for an additional premium of 0.50%. These extension dates were selected to afford the Debtors discretion at key inflection points in the Chapter 11 Cases and to allow the Debtors to accept superior financing opportunities, if presented, with limited sunk costs. Subject to the occurrence of the Effective Date, these commitment premiums will be paid in New PG&E Corp. Common Stock.

---

[5]     Notably, the Noteholder Plan provides for all financing fees to be earned upfront, with no attempt to mitigate the conditionality in the Ad Hoc Noteholder Commitment Letter. These fees are payable not to third party institutions (as with the Exit Financing Commitments), but rather to the same members of the Ad Hoc Noteholder Committee that, by design, will be purchasing the post-emergence equity. In effect, the Ad Hoc Noteholder Committee is seeking to pay itself a fee to acquire a majority of reorganized PG&E Corp. equity at a substantial discount.

**The Debt Financing Commitment Letters.** In addition to the Equity Backstop Commitments, PG&E Corp. and the Utility have executed the Bridge Commitment Letters with certain money-center banks, which provide for 364-day[6] bridge loan facilities (the "**Bridge Facilities**")—in aggregate amounts of $7.0 billion for PG&E Corp. and $27.35 billion for the Utility—that would be funded on the Effective Date in the event the Debtors are otherwise unable to issue sufficient New Debt. In addition, the Debtors have executed fee letters (the "**Bridge Fee Letters**"), which provide for, among other things, the payment of certain fees associated with the Bridge Facilities, and engagement letters (the "**Debt Financing Engagement Letters**")[7], which engage the same banks to arrange the New Debt.[8] The Debtors do not currently anticipate drawing on the Bridge Facilities, and expect instead to issue new long-term bonds and incur new credit facilities on market terms at or prior to emergence,[9] but the Bridge Facilities provide assurances that sufficient funds will be available if these debt financings cannot be consummated.

---

[6] The 364-day period begins with the funding of the Bridge Facilities. As noted above, the Debtors do not expect to draw upon the Bridge Facilities, but instead expect to avail themselves of market financing between now and the Effective Date. (Ziman Decl. ¶ 22.) Even if the Bridge Facilities were to be funded, they are likely to be refinanced well in advance of their 364-day maturity. (*Id.*) Courts in other large, complex bankruptcies have approved debtors' entry into commitment letters for facilities of a similar duration. *See, e.g., In re Adelphia Commc'ns Corp.*, 2004 WL 1634538, at *7 (Bankr. S.D.N.Y. June 22, 2004) (approving commitment letters providing for a bridge facility with a one year maturity); *In re Ultra Petroleum Corp.*, No. 16-32202 (MI) (Bankr. S.D. Tex. Feb. 13, 2017) (ECF No. 1126) (same).

[7] The Debt Financing Engagement Letters, the Bridge Commitment Letters and the Bridge Fee Letters are collectively referred to in this Motion as the "**Debt Financing Commitment Letters**".

[8] Redacted copies of the Debt Financing Engagement Letters are attached hereto as **Exhibit G** (the "**Bank Financing Engagement Letter**") and **Exhibit H** (the "**Securities Engagement Letter**"). Simultaneous with the filing of this Motion, the Debtors are filing a motion seeking authority to file the Debt Financing Engagement Letters in redacted form and the Bridge Fee Letters under seal (the "**Sealing Motion**"). As more fully set forth in the Sealing Motion, unredacted copies of such letters have been provided to the Bankruptcy Court, the Office of the United States Trustee and advisors to the Official Committee of Unsecured Creditors and Official Committee of Tort Claimants on a confidential and professionals' eyes only basis.

[9] As with the equity financing, the Noteholder Plan contemplates the PG&E Corp. debt financing to only be offered to members of the Ad Hoc Noteholder Committee, rather than allowing the Debtors to obtain market-based financing on better terms. Though the Noteholder Plan *technically* permits the

The Debt Financing Commitment Letters, like the Equity Backstop Commitment Letters, afford the Debtors significant flexibility in structuring the New Debt. The Debtors, in their business judgment, may incur debt securities, credit facilities and securitization bonds or facilities at any time on or prior to the Effective Date, allowing the Debtors to avail themselves of attractive market conditions that may arise during the pendency of these cases.[10] The Bridge Commitments will be reduced on a dollar-for-dollar basis by the net cash proceeds of any such incurrences. The Debt Financing Commitment Letters also permit the Debtors to incur the revolving credit facilities contemplated by the Plan to ensure adequate liquidity at emergence, without any corresponding reduction to the Bridge Commitments.

The Bridge Commitments, like the Equity Backstop Commitments, extend through August 29, 2020, on terms that are consistent with (or better than) market. The significant duration of the Bridge Commitments comes with conditionality and termination rights, which broadly align with those under the Equity Backstop Commitment Letters and are otherwise limited to customary bridge financing conditions. As with the equity premiums, the Debtors negotiated the Bridge Facilities so that most of the associated fees are incurred over time as conditionality and termination rights fall away. (*See* Ziman Decl. ¶ 27.)

Together, the Equity Backstop Commitment Letters and the Debt Financing Commitment Letters benefit the estates by providing assurances of the Debtors' ability to fund the

---

Debtors to issue new Utility debt to third parties, it may only be offered on terms "acceptable to" the Ad Hoc Noteholder Committee. *See* Ad Hoc Noteholder Commitment Letter § 1(c); *see also* Noteholder Plan §§ 1.138-1.140, 1.142. Moreover, the incurrence of new secured Utility debt under the Noteholder Plan would cause the long-term Utility bonds held by the Ad Hoc Noteholder Committee (and which the Noteholder Plan inexplicably proposes to reinstate) to be "equally and ratably" secured as a result of certain provisions in the pre-petition indentures. In reinstating this high-coupon debt, the Ad Hoc Noteholder Committee would receive the best of both worlds, to the detriment of the Debtors' other stakeholders—bonds that are both expensive *and* secured on a first-priority basis. This debt financing structure would divert value from the Debtors' stakeholders to the Ad Hoc Noteholder Committee.

[10]     Although the Debtors do not currently expect to do so, the Debt Financing Commitment Letters also allow the Debtors to reinstate all or a portion of their pre-petition funded indebtedness.

6

distributions contemplated by the Plan and the Debtors' emergence from the Chapter 11 Cases. For all the above reasons and as discussed further below, the Debtors have determined, in their business judgment, that the Equity Backstop Commitment Letters and the Debt Financing Commitment Letters are in their best interests and in the best interests of their estates, creditors, shareholders and all parties in interest. The Debtors respectfully request the Court's approval of the terms of, and the Debtors' entry into and performance under, the Exit Financing Commitment Letters and authority to incur and pay the obligations set forth therein.

## II.    JURISDICTION

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.), and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409. The Debtors submit that the Court may enter the Proposed Orders as final orders consistent with Article III of the United States Constitution.

## III.    BACKGROUND

### A.    The Debtors' Plan

On September 9, 2019, the Debtors filed their Plan, which proposed a rate-neutral framework to fairly compensate wildfire victims and other stakeholders, prioritized the interests of PG&E customers and communities and met PG&E's legal obligations. [Docket No. 3841.] The Debtors concurrently filed a Summary of the Key Elements of the Debtors' Plan. [Docket No. 3844.]

On September 13, 2019, the Debtors announced an agreement in principle with entities holding approximately 85% of insurance subrogation claims to resolve all insurance subrogation claims arising out of the 2017 and 2018 wildfires for $11 billion pursuant to the Plan (the "**Subrogation Settlement**"). On September 22, 2019, the Debtors executed a Restructuring Support Agreement (the "**Subrogation RSA**") with those entities, reflecting the Subrogation Settlement. The Subrogation Settlement followed the Debtors' June 18, 2019 settlement with certain local public

entities (the "**Public Entities Settlement**"), which provides for an aggregate of $1 billion to be paid to such public entities in full satisfaction of their claims against the Debtors' estates. The Subrogation Settlement was incorporated into an amended Plan filed by the Debtors on September 23, 2019. [Docket No. 3966.]

In addition to the Subrogation Settlement and the Public Entities Settlement, the Plan, as amended, provides for (i) compensation of individual wildfire victims and certain public entities from a trust funded for their benefit in an amount not to exceed $8.4 billion, (ii) payment in full, with interest at the legal rate, of all prepetition funded debt obligations, all prepetition trade claims and employee-related claims, (iii) assumption of all power purchase agreements and community choice aggregation servicing agreements, (iv) assumption of all pension obligations, other employee obligations and collective bargaining agreements with labor, (v) future participation in the state wildfire insurance fund (the "**Go-Forward Wildfire Fund**") established by AB 1054 and (vi) satisfaction of the legislative requirements of AB 1054.

The Plan contemplates various sources of funding, including (a) new equity issuances, (b) the issuance or incurrence of new debt at both the PG&E Corp. and Utility levels, (c) if available (but not required), wildfire recovery or similar bonds ("**Wildfire Victim Recovery Bonds**") and (d) cash on hand.

On October 9, 2019, the Court entered an order terminating, solely as to the Official Committee of Tort Claimants and the Ad Hoc Noteholder Committee, the Debtors' exclusive periods to file and solicit their Plan, ordering the Ad Hoc Noteholder Committee and the Official Committee of Tort Claimants to file their proposed competing plan no later than October 17, 2019 and setting a status conference on the competing plans for October 23, 2019. [Docket No. 4167.] The Noteholder Plan was filed on October 17, 2019.

**B.    The Equity Backstop Commitment Letters**

In August 2019, the Debtors began a dialogue with two current PG&E Corp. shareholders, Knighthead Capital Management, LLC ("**Knighthead**") and Abrams Capital Management, L.P. ("**Abrams**"), who had publicly expressed interest in providing equity backstop

8

commitments to allow the Debtors to fund their Plan. (Ziman Decl. ¶ 8.) Subsequently, the Debtors received substantially similar equity capital commitments from more than 35 investors, representing equity backstop commitments in excess of $14 billion in the aggregate. (*Id.*)

The Debtors also engaged in discussions with certain money-center banks to determine whether such banks would be willing to provide equity backstop commitments on the same or better terms as those proposed by the shareholders. The Debtors found that such banks were willing to guarantee the necessary equity proceeds to the Debtors (*i.e.*, a volume underwriting), but were unable to agree to a floor price at which such equity would be raised. (*Id.* ¶ 7.) The arrangement proposed by these banks would present a significant risk that PG&E Corp. would be required to issue a substantially greater percentage of its common shares for the same aggregate proceeds received by the Debtors under the Equity Backstop Commitment Letters. (*Id.*) Accordingly, in consultation with their financial advisors, the Debtors determined the backstop commitments offered by Knighthead and Abrams, which offered both a guarantee of necessary equity proceeds *and* a floor price (with *no* "market" out), were the better course for the Debtors and their stakeholders. (*Id.* ¶¶ 7–9.)

Over the course of extensive negotiations with Knighthead, Abrams and their advisors, the Debtors improved upon many of the terms initially proposed, including structure, conditionality, length of commitment and flexibility to pursue a variety of equity financing options. (*Id.* ¶ 9.) On September 9, 2019, PG&E Corp. executed the Equity Backstop Commitment Letters with Knighthead and Abrams as initial Equity Backstop Parties. (*Id.*) The initial Equity Backstop Commitment Letters were subsequently amended and restated on September 13 to, among other things, incorporate the terms of the Subrogation Settlement. (*Id.* ¶ 10.)

After September 13, the Debtors engaged with other parties, including other current shareholders and non-shareholders (including bondholders and parties not currently invested in the Debtors' equity or debt securities)[11], to obtain commitments from such parties as well. By

---

[11] Though the Equity Backstop Commitment Letters were originally negotiated with Knighthead and Abrams, two existing equityholders, 40% of the Equity Backstop Commitments were available for allocation based on the offered amount of commitments (rather than shareholdings), meaning that non-equityholders could also participate. In addition, non-equityholders were permitted to purchase

September 20, the Debtors had received more than the $14 billion in Equity Backstop Commitments contemplated by the Plan. (*Id.* ¶¶ 11–12.) Accordingly, on September 30, the Equity Backstop Commitments were allocated as between the Equity Backstop Parties in accordance with the allocation mechanisms set forth in the Equity Backstop Commitment Letters, achieving total Equity Backstop Commitments of $14 billion. (*Id.* ¶ 13.)

The Equity Backstop Commitment Letters require the Equity Backstop Parties to purchase up to $14 billion in New PG&E Corp. Common Stock, on the terms and subject to the conditions thereof, at a price per share that would imply a price-to-earnings multiple of 10x (subject to certain adjustments) based on Normalized Estimated Net Income for 2021. *See* Equity Backstop Commitment Letters § 1(a)(iv). The Debtors are not obligated under all circumstances to issue such shares to the Equity Backstop Parties, but instead are permitted, at higher implied price-to-earnings multiples, to consummate other equity offerings (including primary equity offerings and rights offerings). *See id.* at §§ 1(a)(i), (ii). In the event that such other equity offerings (together with other permitted capital sources) do not raise $14 billion of proceeds in the aggregate, the Debtors must draw on the Equity Backstop Commitments, subject to the satisfaction or waiver of the conditions in the Equity Backstop Commitment Letters. *See id.* at § 1(a)(iv).

Certain key terms and provisions of the Equity Backstop Commitment Letters are summarized in Section III.D below.

### C. The Debt Financing Commitment Letters

Since the second quarter of 2019, the Debtors and their financial advisors have maintained a dialogue with several prominent money-center banks regarding debt financing alternatives for the Debtors' emergence from chapter 11. (Ziman Decl. ¶ 21.) These conversations culminated in several banks providing illustrative financing structures and terms in the third quarter

shares between the time they delivered their commitments and the allocation date, with any additional shares acquired counted for allocation purposes. The Debtors actively engaged non-equityholders during the syndication of the Equity Backstop Commitments and encouraged them to take advantage of these provisions. In short, the Debtors provided non-equityholders with a meaningful opportunity to participate in the Equity Backstop Commitments. (Ziman Decl. ¶¶ 11–12.)

of 2019. Incorporating the feedback received from these banks, the Debtors developed an exit financing strategy that they believe maximizes the value of their estates for the benefit of all stakeholders—incurring new, less expensive long-term debt in place of the Debtors' pre-petition high-coupon debt.[12] New long-term debt at the Utility could save the Debtors over $170 million per year in interest expense as compared to existing high-coupon bonds, resulting in nearly $1.5 billion (on a net present value basis) in savings. (*Id.* ¶ 20.)

On September 25 and 26, the Debtors and their financial advisors contacted several money-center banks requesting initial proposals for bridge financing, a short-term debt financing option that is designed to provide certainty that sufficient funds will be available on the Effective Date if market financing is either more expensive or unavailable. (*Id.* ¶¶ 22–23.) All the banks contacted delivered proposals by October 1. (*Id.* ¶ 23.) The Debtors, in consultation with their legal and financial advisors, evaluated these proposals based on a number of metrics, including the proposed terms and fees, the cost and certainty of the commitments, the experience and reputations of the parties and the ability of such banks to work collaboratively with the Debtors. (*Id.* ¶ 24.) The Debtors developed and shared a counterproposal with all the banks. After discussions with the banks, the Debtors selected JPMorgan Chase Bank, N.A. ("**JPMorgan**"), Bank of America, N.A. ("**BANA**"), BofA Securities, Inc. ("**BofA**" and, together with BANA, "**Bank of America**"), Barclays Bank PLC ("**Barclays**"), Citigroup Global Markets Inc. ("**Citi**"), Goldman Sachs Bank USA ("**GS Bank**") and Goldman Sachs Lending Partners LLC (together with GS Bank, "**Goldman Sachs**"; JPMorgan, Bank of America,

---

[12] As noted above, the Noteholder Plan seeks to reinstate the Debtors' long-term Utility bonds, which would serve no purpose other than to enrich the Ad Hoc Noteholder Committee and the other noteholders at the expense of the Debtors' other stakeholders, including California ratepayers. Recognizing the significant profit that they stand to gain (to the detriment of the Debtors' other stakeholders) if these high-coupon Utility bonds are reinstated, the members of the Ad Hoc Noteholder Committee have increased their holdings of Utility bonds by over $1.5 billion since their last Verified Statement. [Docket Nos. 3083, 4369.]

11

Barclays, Citi and Goldman Sachs, collectively, the "**Initial Bridge Commitment Parties**"[13]) to act as initial commitment parties with respect to the contemplated bridge facilities. (*Id.*)

Following extensive negotiations during the week of September 30 with the Initial Bridge Commitment Parties, which negotiations improved on many of the terms initially proposed by such banks (including pricing, fees, flexibility, conditionality and "alternate transaction" provisions), the Initial Bridge Commitment Parties delivered signed Debt Financing Commitment Letters on October 4, 2019. [Docket No. 4119-2.] On October 11, following deliberations, the Boards of Directors of each of PG&E Corp. and the Utility approved the Debtors' entry into the Debt Financing Commitment Letters, which were executed by the Debtors on the same day.

Certain key terms and provisions of the Debt Financing Commitment Letters are summarized in Section III.D below.

### D. Certain Key Terms and Provisions of the Exit Financing Commitment Letters and the Proposed Orders

Certain key terms and provisions of the Equity Backstop Commitment Letters are summarized as follows:[14]

| | |
|---|---|
| **Equity Backstop Commitments** *See* Equity Backstop Commitment Letters § 2(a); Exhibit A to Equity Backstop | In the aggregate, the Equity Backstop Parties have severally committed to fund $14 billion to PG&E Corp. on the Effective Date to finance the payments to wildfire victims contemplated by the Plan, in consideration of the issuance of New PG&E Corp. Common Stock to the Equity Backstop Parties on the Effective Date, subject to the terms and conditions set forth in each Equity Backstop Commitment Letter. The price at which any such new shares would be issued to the Equity Backstop Parties (the "**Equity Backstop Price**") would equal (a) 10 (subject to downward adjustment based on changes in the Applicable Utility Index Multiple), *times* (b) PG&E Corp.'s consolidated |

---

[13] The Initial Bridge Commitment Parties, together with any other parties that become party to the Debt Commitment Letters as additional "Commitment Parties", are collectively referred to as the "**Bridge Commitment Parties**", and the Bridge Commitment Parties and the Equity Backstop Parties are collectively referred to as the "**Exit Commitment Parties**".

[14] This summary is qualified in its entirety by reference to the provisions of the Equity Backstop Commitment Letters. To the extent that any discrepancies exist between the summary described in this Motion and the terms of the Equity Backstop Commitment Letters, the Equity Backstop Commitment Letters shall govern. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Equity Backstop Commitment Letters.

12

| | |
|---|---|
| Commitment Letters. | Normalized Estimated Net Income, *divided by* (c) the number of fully diluted shares of PG&E Corp. that will be outstanding on the Effective Date (assuming the Equity Backstop Commitments are fully drawn). |
| **Equity Offerings** *See* Equity Backstop Commitment Letters § 1(a). | <u>Permitted Equity Offering</u>.  Subject to an aggregate cap of $14 billion of net cash proceeds, PG&E Corp. will be permitted to conduct any primary offering of its common stock (including public offerings and private placements) in order to finance the Plan, as long as the Implied P/E Multiple for such offering equals or exceeds 13.5 (subject to upward adjustment based on changes in the Applicable Utility Index Multiple, the "**Permitted Equity Offering Threshold**").<br><br><u>Rights Offering</u>.  If PG&E Corp. conducts an equity offering with an Implied P/E Multiple of at least 12 (subject to downward adjustment based on changes in the Applicable Utility Index Multiple, the "**Rights Offering Minimum Multiple**") but less than the Permitted Equity Offering Threshold, then PG&E Corp. must structure such equity offering so that at least 80% of the aggregate cash proceeds are raised through a rights offering to holders of shares of common stock of PG&E Corp. (the "**Rights Offering**").  Rights issued to PG&E Corp. shareholders in a Rights Offering would have an exercise price equal to the per share price implied by the Rights Offering Minimum Multiple.  If PG&E Corp. conducts a Rights Offering, it would also be permitted to raise up to 20% of the aggregate cash proceeds through another form of primary equity offering, subject to the approval of a majority of the holders of Equity Backstop Commitments as to the identity of the purchaser in such other equity offering if it is not a broadly syndicated underwritten public offering.<br><br><u>Equity Backstop Funding</u>.  If PG&E Corp. is unable to conduct an equity offering with an Implied P/E Multiple at least equal to the Rights Offering Minimum Multiple, then PG&E Corp. would be required to draw upon the Equity Backstop Commitments. |
| **Net Operating Losses** *See* Equity Backstop Commitment Letters § 1. | Any Permitted Equity Offering or Rights Offering, and the organizational documents of reorganized PG&E Corp., may include such terms and conditions as are reasonably advisable in order to avoid an "ownership change" within the meaning of Section 382 of the Internal Revenue Code and the Treasury Regulations promulgated thereunder or to otherwise preserve the ability of the Debtors to utilize their net operating loss carryforwards and other tax attributes. |
| **Reduction of Commitments** *See* Equity Backstop Commitment Letters § 7. | In the event that the Debtors (a) receive binding commitments providing for funding from any Additional Capital Sources that satisfy the criteria set forth in the Equity Backstop Commitment Letters or (b) actually obtain funding from any Additional Capital Sources, the aggregate amount of Equity Backstop Commitments will be reduced by the amount of such Additional Capital Sources.  "**Additional Capital Sources**" means, generally, (i) the principal amount of debt that is issued by PG&E Corp. in excess of $7 billion in connection with the Plan; (ii) the aggregate liquidation preference of preferred stock distributed to holders of wildfire claims pursuant to the Plan; (iii) the principal amount of any Wildfire Victim Recovery Bonds; (iv) the |

13

| | |
|---|---|
| | proceeds of any preferred stock issued by the Utility; (v) the proceeds of any third-party transactions based upon the monetization of any net operating loss carryforwards or other tax attributes; and (vi) the principal amount of any other debt that is issued or reinstated by the Utility in excess of $27.35 billion in connection with the Plan. During the terms of the Equity Backstop Commitment Letters, PG&E Corp. may not issue any senior equity securities (other than the preferred stock referenced in clause (ii) above). |
| **Commitment Premiums and Expense Reimbursement** *See* Equity Backstop Commitment Letters §§ 2(c), 6; Exhibit A to Equity Backstop Commitment Letters. | The initial Commitment Premium for the Equity Backstop Commitments is 0.75% of the amount of the Equity Backstop Commitments. The initial term of the Equity Backstop Commitment Letters expires on January 20, 2020. The Debtors have the option to extend the term of the Equity Backstop Commitment Letters (a) to April 30, 2020 for an additional Commitment Premium of 1.25% of the amount of the Equity Backstop Commitments, (b) to June 30, 2020 for an additional Commitment Premium of 2.50% of the amount of the Equity Backstop Commitments, and (c) to August 29, 2020 for an additional Commitment Premium of 0.50% of the amount of the Equity Backstop Commitments. All such Commitment Premiums are cumulative. If the Debtors terminate the Equity Backstop Commitment Letters in connection with certain proposals to acquire at least 50% of the outstanding shares of PG&E Corp. common stock, the Commitment Premiums are paid in cash. Additionally, in the event that a plan of reorganization other than the Debtors' Plan is confirmed, then the Commitment Premiums shall be paid in cash if elected by the applicable Equity Backstop Party. Except as described in the immediately preceding sentences, all Commitment Premiums are payable in shares of New PG&E Corp. Common Stock, and the number of such shares to be paid as Commitment Premiums will be calculated using the Equity Backstop Price described above.<br><br>Additionally, the Debtors agreed to reimburse on a regular basis the Equity Backstop Parties for the reasonable fees and expenses of Jones Day and a financial advisor incurred prior to the termination of the Equity Backstop Commitment Letters, subject to overall caps on reimbursement of $17 million in the case of Jones Day and $19 million in the case of the financial advisor. |
| **Conditions to the Obligations of the Equity Backstop Parties** *See* Equity Backstop Commitment Letters § 4. | The Equity Backstop Parties' funding obligations under the Equity Backstop Commitment Letters are subject to the satisfaction or waiver of specified conditions, including (i) approval of the Equity Backstop Commitment Letters by the Court; (ii) satisfaction or waiver of all conditions precedent to the Effective Date set forth in the Plan; (iii) entry by the Court of an order (the "**Confirmation Order**") confirming the Plan, with such amendments, modifications, changes and consents to the Plan as approved by parties holding a majority of the Equity Backstop Commitments (such approval not to be unreasonably withheld, conditioned or delayed), which Confirmation Order shall be unstayed and in full force and effect; (iv) the weighted average earning rate base of the Debtors for estimated 2021 being no less than 95% of $48 billion (*i.e.*, $45.6 billion); and (v) absence of a Material Adverse Effect. |

| | |
|---|---|
| **Termination Events**<br>*See* Equity Backstop Commitment Letters §§ 5–6. | Equity Backstop Parties. The Equity Backstop Parties may terminate the Equity Backstop Commitment Letters if, among other things: (i) the Court has not entered an order approving the Equity Backstop Commitment Letters on or before November 20, 2019; (ii) the Plan is amended, modified or changed without the consent of entities holding a majority of the Equity Backstop Commitments (not to be unreasonably withheld, conditioned or delayed), or any plan supplement or other plan document is filed or finalized without the consent of entities holding a majority of the Equity Backstop Commitments (not to be unreasonably withheld, conditioned or delayed); (iii) the Confirmation Order has not been entered by the Court on or before June 30, 2020; (iv) the Effective Date has not occurred on or before 60 days after entry of the Confirmation Order; (v) the Debtors have failed to perform any of their obligations in the Equity Backstop Commitment Letters, which failure to perform would give rise to the failure of certain conditions precedent; (vi) wildfires occur in the Utility's service area in 2019 that damage or destroy in excess of 500 dwellings or commercial structures ("**Structures**") in the aggregate that are asserted to arise out of the Debtors' activities; (vii) wildfires occur in the Utility's service area in 2020 that damage or destroy in excess of 500 Structures in the aggregate at a time when the portion of the Utility's system at the location of such wildfire was not successfully de-energized; (viii) the Debtors' aggregate liability with respect to prepetition wildfire-related claims is determined to exceed $18.9 billion (without counting wildfire-related claims that are approved by the CPUC for recovery or pass-through against such cap), subject to upward adjustment for reasonable professional fees (the "**Wildfire Claims Cap**"); (ix) the CPUC fails to issue all necessary approvals prior to June 30, 2020; (x) there is in effect an order or law permanently prohibiting the consummation of the Plan; (xi) if at any time after the first day of the confirmation hearing, asserted administrative expense claims in the Chapter 11 Cases (subject to certain ordinary course exceptions) exceed $250 million; or (xii) the Utility does not participate in the Go-Forward Wildfire Fund.<br><br>PG&E Corp. Among other circumstances, PG&E Corp. may terminate an Equity Backstop Commitment Letter in the event (i) the applicable Equity Backstop Party repudiates, invalidly purports to terminate or fails to fund its Equity Backstop Commitment when required; or (ii) of certain proposals to acquire at least 50% of the outstanding shares of PG&E Corp. common stock. PG&E Corp. may also elect not to extend the Equity Backstop Commitments, as described further above. |
| **Plan Support**<br>*See* Equity Backstop Commitment Letters §§ 14, 18. | Until the termination of the Equity Backstop Commitment Letters, subject to certain limitations, the Equity Backstop Parties must (i) use all reasonable efforts to support the Plan with respect to the treatment of their PG&E Corp. common shares and to act in good faith with respect to any permitted equity offering, (ii) vote all of their PG&E Corp. common shares and claims to accept the Plan, and (iii) vote their PG&E Corp. common shares and claims to reject any plan of reorganization other than the Plan. If the Debtors provide another creditor holding a funded debt claim a more favorable treatment than provided to a Equity Backstop Party with a similar funded debt claim, the Debtors shall |

| | take all actions so that the more favorable treatment applies to such Equity Backstop Party's similar funded debt claim.<br><br>Nothing in the Equity Backstop Commitment Letters prohibits any party from appearing as a party-in-interest in the Chapter 11 Cases, so long as such appearance and the positions advocated are consistent with the Equity Backstop Commitment Letters and the Plan, and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying or preventing the consummation of the transactions contemplated by the Plan. |
|---|---|
| **Subrogation Settlement** *See* Equity Backstop Commitment Letters § 15(b); Exhibit A to Equity Backstop Commitment Letters. | If the Court does not approve the Subrogation RSA on or prior to October 31, 2019, then (i) the Wildfire Claims Cap under the Equity Backstop Commitment Letters shall be reduced to $17.9 billion (without counting wildfire-related claims that are approved by the CPUC for recovery or pass-through against such cap), subject to upward adjustment for reasonable professional fees, and (ii) the Debtors have agreed to amend the Plan to remove the Subrogation Settlement. |

Certain key terms and provisions of the Debt Financing Commitment Letters are summarized as follows (subject, in the case of the Bridge Facilities, to the "market flex" terms contained in the Bridge Fee Letters):[15]

| | **Bridge Commitment Letters** | |
|---|---|---|
| | **PG&E Corp. Bridge Facility** | **Utility Bridge Facility** |
| **Borrower** | PG&E Corp. | Utility |
| **Facility** | Up to $7,000 million 364-day senior unsecured bridge term loan credit facility | Up to $27,350 million 364-day senior secured bridge term loan credit facility |

---

[15]     This summary is qualified in its entirety by reference to the provisions of the Debt Financing Commitment Letters. To the extent that any discrepancies exist between the summary described in this Motion and the terms of the Debt Financing Commitment Letters, the Debt Financing Commitment Letters shall govern. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Debt Financing Commitment Letters.

| | | |
|---|---|---|
| **Roles**<br>*See* Bridge Commitment Letters, § 1. | JPMorgan will act as administrative agent and, solely for the Utility Bridge Facility, as collateral agent. JPMorgan, BofA, Barclays, Citi and GS Bank will act as joint bookrunners and joint lead arrangers. | |
| **Interest Rate**<br>*See* Bridge Commitment Letters, Annex A-I. | At the option of PG&E Corp. or the Utility, as applicable, (a) the Adjusted LIBO Rate plus the Applicable Margin set forth below or (b) ABR plus the Applicable Margin set forth below minus 1.00% (but not less than 0.00%). | |
| | <u>Applicable Margin</u>: 1.75% - 3.00% | <u>Applicable Margin</u>: 1.125% - 2.50% |

| Public debt rating | Rate | | Public debt rating | Rate |
|---|---|---|---|---|
| BB+ / Ba1 | 1.75% | | BBB+ / Baa1 | 1.125% |
| BB / Ba2 | 2.00% | | BBB / Baa2 | 1.375% |
| BB- / Ba3 | 2.125% | | BBB- / Baa3 | 1.50% |
| B+ / B1 or worse | 2.25% | | BB+ / Ba1 or worse | 1.75% |

| | | |
|---|---|---|
| | Each of the foregoing increases by 0.25% each 90 day period after the Closing Date. | Each of the foregoing increases by 0.25% each 90 day period after the Closing Date. |
| **Security**<br>*See* Bridge Commitment Letters, Annex A. | Unsecured | Secured by a first-priority security interest in substantially all Utility assets (subject to permitted liens and other customary exceptions and limitations on perfection steps and thresholds to be agreed). |
| **Bridge Facility Fees and "Alternate Transaction"**<br>*See* Bridge Commitment Letters, Annex A-1; Bridge Fee Letters. | <u>Ticking Fees</u>. 0.30% per annum times the actual daily undrawn commitments accruing during the period commencing 90 days after the date of the PG&E Corp. Bridge Commitment Letter and ending on and including the earlier of (x) the Closing Date and (y) the date of termination of the commitments, for the account of each lender, payable | <u>Ticking Fees</u>. 0.175% per annum times the actual daily undrawn commitments accruing during the period commencing 90 days after the date of the Utility Bridge Commitment Letter and ending on and including the earlier of (x) the Closing Date and (y) the date of termination of the commitments, for the account of |

| | |
|---|---|
| quarterly in arrears and on certain other specified dates. | each lender, payable quarterly in arrears and on certain other specified dates. |
| <u>Duration Fees</u>. For the ratable benefit of the lenders, in an amount equal to (i) 0.50% of the aggregate principal amount of the loans outstanding on the 90th day after the Closing Date; (ii) 0.75% of the aggregate principal amount of the loans outstanding on the 180th day after the Closing Date; and (iii) 1.00% of the aggregate principal amount of the loans outstanding on the 270th day after the Closing Date. | <u>Duration Fees</u>. For the ratable benefit of the lenders, in an amount equal to (i) 0.50% of the aggregate principal amount of the loans outstanding on the 90th day after the Closing Date; (ii) 0.75% of the aggregate principal amount of the loans outstanding on the 180th day after the Closing Date; and (iii) 1.00% of the aggregate principal amount of the loans outstanding on the 270th day after the Closing Date. |
| <u>Other Fees / "Alternate Transaction"</u>. Set forth in the Bridge Fee Letter, unredacted copies of which are to be provided under seal to the Court, the Office of the United States Trustee and advisors to the Official Committee of Unsecured Creditors and Official Committee of Tort Claimants on a confidential and professionals' eyes only basis. | <u>Other Fees / "Alternate Transaction"</u>. Set forth in the Bridge Fee Letter, unredacted copies of which are to be provided under seal to the Court, the Office of the United States Trustee and advisors to the Official Committee of Unsecured Creditors and Official Committee of Tort Claimants on a confidential and professionals' eyes only basis. |
| **Mandatory Prepayments and Commitment Reductions** <br> *See* Bridge Commitment Letters, Annex A. | The aggregate commitments in respect of the applicable Bridge Facility shall be automatically and permanently reduced, and after the Closing Date, the aggregate principal amount of loans under the applicable Bridge Facility shall be prepaid, in each case without penalty or premium and on a dollar-for-dollar basis, by: <br><br> a) 100% of the Net Cash Proceeds of all non-ordinary course asset sales or dispositions or any insurance or condemnation proceeds (subject to certain exceptions set forth in the Bridge Commitment Letters); <br> b) 100% of the Net Cash Proceeds received from (i) incurrences of debt securities or other debt (including pursuant to any bank or other credit facility and any securitization) (other than Excluded Debt and amounts referred to in clause (c) below) and (ii) issuances of equity securities (including shares of common stock or preferred equity or equity-linked securities) (other than Excluded Equity Offerings); and <br> c) 100% of the committed amount under Qualifying Bank Financings (subject to certain exceptions); |

| | |
|---|---|
| | *provided*, *however*, that until such time as the Equity Backstop Commitments have been reduced to $0, except as provided in the Bridge Commitment Letters, the Bridge Commitments are not reduced by any cash proceeds from any Additional Capital Source (as defined in the Equity Backstop Commitment Letters) to the extent that such cash proceeds also reduce the Equity Backstop Commitments.<br><br>The obligations of the Bridge Commitment Parties to fund on the Closing Date shall be automatically and permanently reduced, without penalty or premium and on a dollar-for-dollar basis, by the aggregate principal amount of any roll-over, "take-back" or reinstated debt of PG&E Corp. or the Utility, as applicable. |
| **Syndication**<br>*See* Bridge Commitment Letters, § 3. | PG&E Corp. and the Utility have agreed that, until the earlier of (x) the achievement of a Successful Syndication (as defined in the applicable Bridge Fee Letter) and (y) 60 days following the Closing Date of the applicable Bridge Facility, PG&E Corp. and the Utility (i) will not, without the prior written consent of the Arrangers, syndicate or issue, attempt to syndicate or issue or announce the syndication or issuance of any competing debt facility or any debt or equity security (other than common equity) that would reasonably be expected to materially impair the primary syndication of the Bridge Facilities (subject to certain exceptions set forth in the Bridge Commitment Letters), and (ii) will actively assist the Arrangers in achieving a mutually satisfactory syndication. |
| **Expense Reimbursement**<br>*See* Bridge Commitment Letters, § 5. | The Bridge Commitment Parties and their respective affiliates will be reimbursed for out-of-pocket expenses incurred in connection with the Bridge Facilities and any related documentation or the administration, amendment, modification or waiver thereof. |
| **Indemnification**<br>*See* Bridge Commitment Letters, § 5. | Subject to certain exceptions set forth in the Bridge Commitment Letters, the Bridge Commitment Parties and their related parties will be indemnified from any losses, claims, damages, liabilities and related expenses to which any such indemnified person may become subject arising out of or in connection with the Bridge Commitment Letters, the Bridge Facilities, the use of the proceeds thereof or any related transaction or any Proceeding, and will be reimbursed for reasonable, documented and invoiced out-of-pocket legal expenses (subject to the Counsel Limitation) or other reasonable, documented and invoiced out-of-pocket expenses incurred in connection with investigation or defense. |
| **Conditions Precedent**<br>*See* Bridge Commitment Letters, Annex B. | The obligations of the lenders to lend under the Bridge Facilities are subject to satisfaction or waiver of certain condition precedents (or the absence of certain termination rights) substantially similar to those described above with respect to the Equity Backstop |

Commitment Letters and certain other conditions, including: (i) entry by the Court of (a) the Approval Order (as defined below) and (b) a confirmation order confirming the Plan in form and substance reasonably satisfactory to the Required Commitment Parties by no later than June 30, 2020, with each order in full force and effect, final and non-appealable and not subject to a stay; (ii) none of the Plan, the Confirmation Order or the Approval Order shall have been amended or modified or any condition therein waived without the consent of the Required Commitment Parties (not to be unreasonably withheld, conditioned or delayed); (iii) compliance in all material respects with the Confirmation Order; (iv) all documents necessary to implement the Plan and the financings and distributions contemplated thereunder shall have been executed (each, if adverse to the interests of the Bridge Commitment Parties, in form and substance reasonably acceptable to the Required Commitment Parties); (v) delivery of specified historical and pro forma financial information; (vi) accuracy of representations and warranties and lack of default or event of default; (vii) execution of definitive documentation for the Bridge Facilities; (viii) delivery of customary legal opinions, corporate organizational documents and solvency certificates and payment of all fees; (ix) delivery of documents and information under applicable "know your customer" and anti-money laundering rules; (x) solely with respect to the Utility Bridge Facility, execution and delivery of all documents and instruments required to perfect the security interests in the Collateral and completion of flood insurance due diligence; (xi) receipt by the Utility of investment grade senior secured debt ratings with a stable or better outlook; (xii) absence of a Material Adverse Effect since June 30, 2019; (xiii) receipt by PG&E Corp. of at least $14,000 million of proceeds from the issuance of equity; and (xiv) ownership by PG&E Corp. of 100% of the Utility common stock.

| | |
|---|---|
| **Termination Rights**<br>*See* Bridge Commitment Letters, § 11. | The Bridge Commitment Parties' commitments and agreements with respect to the Bridge Facilities are subject to termination rights, including (i) certain termination rights that are substantially similar to termination rights described above with respect to the Equity Backstop Commitment Letters or conditions precedent described above with respect to the Equity Backstop Commitment Letters or the Bridge Commitment Letters, (ii) the occurrence of the Effective Date without using the applicable Bridge Facility; (iii) the dismissal or conversion of the Chapter 11 Cases or the appointment of a trustee or examiner with enlarged powers; and (iv) if the Court shall not have entered an order approving the Debt Financing Commitment Letters (the "**Approval Order**"), in form and substance reasonably satisfactory to the Bridge Commitment Parties, on or before November 20, 2019. |
| **Bank Financing Engagement Letter** | |

| | |
|---|---|
| **Bank Engagement**<br>*See* Bank Financing Engagement Letter, § 1. | JPMorgan, BofA, Barclays, Citi and GS Bank (or their designated affiliates) are engaged to act as joint lead arrangers and joint bookrunners for (a) a $500 million PG&E Corp. revolving credit facility, (b) a $3,500 million Utility revolving credit facility, (c) a senior secured PG&E Corp. term loan facility and (d) any other bank loan or credit facility (other than a securitization facility) (clauses (a)-(d), collectively, the "**Bank Financing**"), in each case in connection with the financing of the transactions and distributions contemplated by the Plan, the refinancing or replacement of the Bridge Facilities or other interim debt financing for the transactions and distributions contemplated by the Plan, or any permanent revolving or term credit facility or other financing entered into in connection with the Plan (collectively, the "**Exit Financing**"). |
| **Cooperation**<br>*See* Bank Financing Engagement Letter, § 2. | PG&E Corp. and the Utility have agreed to actively assist the Arrangers in achieving a mutually satisfactory syndication of any syndicated Bank Financing. |
| **Termination**<br>*See* Bank Financing Engagement Letter, § 3. | The engagement may be terminated by any Arranger (as to itself) at any time on written notice. PG&E Corp. and the Utility may terminate the engagement on the earliest of (a) twelve months after the date of the Bank Financing Engagement Letter, if the Effective Date has not occurred, (b) the Effective Date, if the Bridge Facilities or other interim exit financing were not used and if any Bank Financing consummated prior to or concurrently with the Effective Date complied with the Bank Financing Engagement Letter, (c) the first anniversary of the Effective Date and (d) the date of receipt by PG&E Corp. and the Utility of aggregate cash proceeds equal to outstanding obligations under the Bridge Facilities or any other interim Exit Financing from the incurrence of Bank Financing in a transaction in which each Arranger acts in its titled capacity and receives its Requisite Economics (as defined below), if the Bank Financing is consummated after the Effective Date. |
| **Indemnification / Expense Reimbursement**<br>*See* Bank Financing Engagement Letter, § 4. | Set forth in the Bank Financing Engagement Letter. |
| **Alternate Financing**<br>*See* Bank Financing Engagement Letter, § 5(b). | If during the period commencing on the date of the Bank Financing Engagement Letter and ending 12 months following its termination, PG&E Corp., the Utility or any of their respective affiliates obtain Exit Financing or any other exit financing in connection with a plan of reorganization other than the Plan (any such financing, an "**Alternate Financing**") without an Arranger acting in its titled capacity in connection therewith and without receiving at least the percentage of minimum economics of such financing under the |

| | |
|---|---|
| | Bank Financing Engagement Letter (the "**Requisite Economics**"), then PG&E Corp. and the Utility have agreed to pay to such Arranger an amount equal to 50% (or, if such Alternate Financing refinances or replaces any outstanding Bridge Facility, 100%) of the fees that would have been payable to such Arranger if such Arranger acted in its titled capacity with the Requisite Economics for such Alternate Financing; *provided* that no fee is payable to any Arranger that has been offered the opportunity to act in a titled capacity with the Requisite Economics and has elected not to do so (unless in connection with an Alternate Financing in connection with a plan other than the Plan). |
| **Minimum Economics/Fees** | Set forth in the Bank Financing Engagement Letter, unredacted copies of which are to be provided to the Court, the Office of the United States Trustee and advisors to the Official Committee of Unsecured Creditors and Official Committee of Tort Claimants on a confidential and professionals' eyes only basis. |
| **Securities Engagement Letter** | |
| **Securities Engagement** *See* Securities Engagement Letter, § 1. | J.P. Morgan Securities LLC, BofA, Barclays Capital Inc., Citi and Goldman Sachs & Co. LLC (or their designated affiliates) (collectively, the "**Securities Engagement Parties**") are engaged to act as joint bookrunning managers and joint lead underwriters, joint lead placement agents or joint lead initial purchasers, as applicable, in respect of any offering (each, an "**Offering**") by PG&E Corp., the Utility or any of their respective affiliates of debt securities (other than (x) any convertible debt, (y) any commercial paper programs and (z) any securitization) (the "**Securities**"), whether completed prior to, on or after the Effective Date, including the contemplated issuance of (a) at least $7,000 million aggregate principal amount of PG&E Corp. senior notes and (b) at least $27,350 million aggregate principal amount of Utility senior notes (clause (a) and (b) collectively, the "**Proposed Financing**"), in each case in connection with the financing of the transactions and distributions contemplated by the Plan, and the refinancing or replacement of the Bridge Facilities or other interim debt financing for the transactions and distributions contemplated by the Plan (collectively, the "**Exit Financing**"). |
| **Matters Relating to Securities Engagement** *See* Securities Engagement Letter, § 2. | PG&E Corp. and the Utility will not initiate, solicit or enter into any discussions or negotiations for the issuance, offering or sale of Securities to any third parties, except through the Securities Engagement Parties. If PG&E Corp. or the Utility receive any inquiry concerning the Securities, PG&E Corp. and the Utility will promptly inform the Securities Engagement Parties. In addition, PG&E Corp. and the Utility have agreed that, during the term of the Securities Engagement Letter, they will not offer, sell, contract to sell or otherwise dispose of any securities substantially similar to |

| | |
|---|---|
| | the Securities without the prior written consent of the Securities Engagement Parties. |
| | PG&E Corp. and the Utility shall not (except through the Securities Engagement Parties or as otherwise consented to by the Securities Engagement Parties) sell or offer to sell any Securities (or any substantially similar securities) during the term of the Securities Engagement Letter, and shall not offer or sell any security that would be integrated with the sale of any Securities that are not being offered or sold in a registered Offering in a manner that would require such Securities to be registered under the Act. |
| **Termination**<br>*See* Securities Engagement Letter, § 3. | The engagement may be terminated by any Securities Engagement Party (as to itself) on written notice. PG&E Corp. and the Utility may terminate the engagement on the earliest of (a) twelve months after the date of the Securities Engagement Letter, if the Effective Date has not occurred, (b) the Effective Date, if the Bridge Facilities or other interim exit financing were not used and if any Offering consummated prior to or concurrently with the Effective Date complied with the Securities Engagement Letter, (c) the first anniversary of the Effective Date and (d) the date of receipt by PG&E Corp. and the Utility of aggregate cash proceeds equal to outstanding obligations under the Bridge Facilities or any other interim Exit Financing from the sale of Securities in a transaction in which each Securities Engagement Party acts in a titled capacity and receives its Requisite Economics, if such transaction is consummated after the Effective Date. Additionally, PG&E Corp. and the Utility may terminate the Securities Engagement Letter "for cause" with respect to any Rule 5110 Offering. |
| **Indemnification /**<br>**Expense Reimbursement**<br>*See* Securities Engagement Letter, § 4 and Annex A. | Set forth in the Securities Engagement Letter. |
| **Alternate Financing**<br>*See* Securities Engagement Letter, § 5(c). | If during the period commencing on the date of the Securities Engagement Letter and ending 12 months following its termination, PG&E Corp., the Utility or any of their respective affiliates obtain Exit Financing or any other exit financing in connection with a plan of reorganization other than the Plan (other than bank or syndicated credit financing) (any such financing, an "**Alternate Financing**") without a Securities Engagement Party acting in its titled capacity under the Securities Engagement Letter in connection therewith and without receiving at least the percentage of minimum economics of such financing under the Securities Engagement Letter (the "**Requisite Economics**"), then PG&E Corp. and the Utility have agreed to pay to such Securities Engagement Party an amount equal to 50% (or, if such Alternate Financing refinances or replaces any outstanding Bridge Facility, 100%) of the fees that would have been payable to such Securities Engagement Party if such Securities |

| | |
|---|---|
| | Engagement Party acted in its titled capacity with the Requisite Economics for such Alternate Financing; *provided* that no fee is payable to any Securities Engagement Party that has been offered the opportunity to act in a titled capacity with the Requisite Economics and has elected not to do so (unless in connection with an Alternate Financing in connection with a plan other than the Plan). |
| **Disclosure** <br> *See* Securities Engagement Letter, § 6. | PG&E Corp. and the Utility shall furnish the Securities Engagement Parties with all financial and other information concerning the Debtors, the Plan, the financing thereof and related matters that the Securities Engagement Parties may reasonably request for inclusion in any Offering Document or otherwise. |
| **Minimum Economics/Fees** | Set forth in the Securities Engagement Letter, unredacted copies of which are to be provided to the Court, the Office of the United States Trustee and advisors to the Official Committee of Unsecured Creditors and Official Committee of Tort Claimants on a confidential and professionals' eyes only basis. |

Certain additional provisions of the Proposed Orders are summarized as follows:[16]

| | |
|---|---|
| **Nature of Exit Financing Obligations** <br> *See* Proposed Orders, ¶ 4. | The Exit Financing Obligations shall be treated as allowed administrative expenses of the Debtors whether or not the Exit Financing Commitments are funded, and none of such amounts shall be discharged, modified, or otherwise affected by any chapter 11 plan of any of the Debtors, subject to and in accordance with the Exit Financing Commitment Letters. |
| **Amendments** <br> *See* Proposed Orders, ¶ 7. | The Proposed Orders provide that the Debtors and the Exit Commitment Parties may enter into any nonmaterial amendment, modification or supplement of any provision of the Exit Financing Commitment Letters without further notice, hearing or order of the Court. In the case of any material amendment, modification or supplement to the Exit Financing Commitment Letters that is adverse to the Debtors (a "**Material Amendment**"), the Debtors shall provide notice to the Notice Parties (as defined below), each of whom shall have five (5) calendar days from the date of receipt of such notice to object in writing to the Debtors and the applicable Exit Commitment Parties to such Material Amendment. If no objections are timely received (or if the Notice Parties indicate via electronic mail that they have no objection) to a Material |

---

[16] This summary is qualified in its entirety by reference to the Proposed Orders. To the extent that any discrepancies exist between the summary described in this Motion and the Proposed Orders, the Proposed Orders shall govern.

| | |
|---|---|
| | Amendment, the Debtors are authorized to execute such Material Amendment. If a Notice Party timely objects and such objection is not resolved prior to the date upon which such objection is scheduled to be heard by the Court, approval of the Court (which may be sought on an expedited basis) will be necessary to execute a Material Amendment.<br><br>This provision is similar to paragraph 26 of that certain *Final Order Pursuant to 11 U.S.C. §§ 105, 362, 363, 364, 503 and 507 and Fed. R. Bankr. P. 2002, 4001, 6004 and 9014 (i) Authorizing Debtors to Obtain Senior Secured, Superpriority, Postpetition Financing, (ii) Granting Liens and Superpriority Claims, (iii) Modifying the Automatic Stay, and (iv) Granting Related Relief* [Docket No. 1091]. |
| **No Imposition of Liability**<br>*See* Proposed Orders, ¶ 8. | Nothing in the Proposed Orders, the Exit Financing Commitment Letters or any other documents related to the transactions contemplated thereby shall in any way be construed or interpreted to impose or allow the imposition upon any Exit Commitment Party of any liability for any claims arising from the post-petition activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts. |
| **Automatic Stay**<br>*See* Proposed Orders, ¶ 13. | The Proposed Orders provide for the modification of the automatic stay under section 362 of the Bankruptcy Code to the extent necessary to enable the Exit Commitment Parties to perform under the Exit Financing Commitment Letters and to exercise any and all of their contractual rights thereunder. |

## IV. BASIS FOR RELIEF REQUESTED

### A. Entry into the Exit Financing Commitment Letters is a Sound Exercise of the Debtors' Business Judgment and is in the Best Interests of Their Estates.

Section 363(b)(1) of the Bankruptcy Code provides that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate". 11 U.S.C. § 363(b)(1). "Such use, sale or lease must be based upon a debtor's sound business judgment. The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re Station Casinos, Inc.*, No. BK-09-52477

(GWZ), 2010 Bankr. LEXIS 5447, at *7 (Bankr. D. Nev. Feb. 2, 2010) (quoting *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992)).

Courts emphasize that the business judgment rule is not an onerous standard and may be satisfied "as long as the proposed action *appears* to enhance the debtor's estate". *Crystalin, L.L.C. v. Selma Props. Inc. (In re Crystalin, L.L.C.)*, 293 B.R. 455, 464 (B.A.P. 8th Cir. 2003) (emphasis in original, alterations and internal quotation marks omitted) (quoting *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.*), 107 F.3d 558, 566 n.16 (8th Cir. 1997)); *see also In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (stating the business judgment standard is "not a difficult standard to satisfy"). Once a debtor articulates a valid business justification, a presumption arises that the debtor's decision was made on an informed basis, in good faith and with the belief that the decision was in the best interests of the debtor's estate. *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

Section 105(a) of the Bankruptcy Code further supports entry of an order approving the Exit Financing Commitment Letters by providing that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [title 11]." 11 U.S.C. § 105(a); *see also In re Excel Innovations, Inc.*, 502 F.3d 1086, 1093 (9th Cir. 2007); *In re Robles*, No. 14-51812 (ASW), 2014 WL 3715092, at *1 (Bankr. N.D. Cal. July 24, 2014). Together, sections 363(b) and 105(a) of the Bankruptcy Code give the Court sufficient authority to grant the relief requested herein. *See In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (stating courts should permit use of assets outside the ordinary course of business if "sound business purpose justifies such actions"); *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

Courts have routinely relied on such sections of the Bankruptcy Code when approving the relief sought herein. *See, e.g.*, *In re Hexion Holdings LLC*, No. 19-10684 (KG), at 4 (Bankr. D.

26

Del. May 15, 2019) (ECF No. 367) ("The Equity Backstop Agreement and the terms and provisions included therein are approved in their entirety pursuant to sections 105 and 363 of the Bankruptcy Code."); *In re Hexion Holdings LLC*, No. 19-10684 (KG), at 4 (Bankr. D. Del. May 15, 2019) (ECF No. 368) ("The Debt Backstop Agreement and the terms and provisions included therein are approved in their entirety pursuant to sections 105 and 363 of the Bankruptcy Code.").

As in other cases where exit financing commitment agreements have been approved, the Debtors' decision to enter into the Exit Financing Commitment Letters was a valid exercise of their business judgment. The equity financings backstopped by the Equity Backstop Commitment Letters are an important component of the Debtors' successful emergence from chapter 11, since they will allow the Debtors to fund payments to wildfire victims contemplated by the Plan and required by AB 1054. Given the possibility that the price of PG&E Corp. shares may decrease or that market conditions could deteriorate between now and confirmation of the Plan, it is important to the Debtors to lock in a reasonable baseline share price that can be improved if the Debtors' market value and market conditions permit. (*See* Ziman Decl. ¶ 14.)

Similarly, the Bridge Commitment Letters backstop the Debtors' incurrence of new long-term debt to refinance pre-petition high-coupon debt, which, in the case of the Utility bonds, could save the Debtors over $170 million per year in interest expense (or nearly $1.5 billion (on a net present value basis) in the aggregate). (*Id.* ¶ 20.) As with the Equity Backstop Commitment Letters, the Debt Financing Commitment Letters provide assurances that sufficient funds will be available on the Effective Date in the event that market financings cannot be consummated.

Though the Exit Commitment Parties agreed to provide the Exit Financing Commitments in Fall 2019, there are no assurances that they (or anybody else) would be willing to do so on similar terms on the Effective Date, anticipated to occur in more than eight months. Recognizing, however, that the Debtors may be able to consummate financings on more attractive terms than those contemplated by the Exit Financing Commitment Letters as they near emergence, the Debtors negotiated for flexibility around structure and timing of exit financings. This flexibility allows

the Debtors to pursue exit financings that maximize the value of their estates for the benefit of all stakeholders.

Moreover, the Exit Financing Commitment Letters align the incentives of the Debtors with those of leading financial institutions toward the ultimate success of the Debtors' Plan. (*Id.* ¶ 28.) These financial institutions have committed significant capital (and incurred reputational risk) to ensure the viability of the Debtors' Plan and therefore have an interest in seeing it through to completion. (*Id.*) These commitments also enhance the confidence of claimants, financial creditors, equityholders, ratepayers and other stakeholders that the Debtors will be able to fund the contemplated payments on the Effective Date and emerge from chapter 11 as a financially sound utility. (*Id.*)

For all the above reasons, the Debtors have concluded that the Exit Financing Commitment Letters are best designed to maximize the value of their estates and the likelihood of their successful emergence from the Chapter 11 Cases in accordance with the terms of the Plan. Accordingly, the Motion should be approved.

**B.**   **Payment and Allowance of the Exit Financing Obligations as Administrative Expense Claims Should Be Approved Because They are Reasonable, Market-Based and Essential Terms of the Exit Financing Commitment Letters.**

The Exit Financing Obligations are essential components of the Exit Financing Commitment Letters. Such fees and/or premiums, indemnities, costs and expenses are necessary and reasonable compensation for the substantial undertakings of the Exit Commitment Parties, and are favorable for the Debtors when compared to fees in cases of similar size and complexity. (*See* Ziman Decl. ¶¶ 18, 27.) Absent the Debtors' agreement to pay the Exit Financing Obligations, the Exit Commitment Parties would not have been willing to provide the Exit Financing Commitments. (*Id.* ¶ 17.) Without the Exit Financing Commitments, the Debtors have no assurances that they will have access to the financing proceeds required to fund the payments contemplated by the Plan, including the satisfaction in full of wildfire claims and pre- and post-petition funded debt obligations. (*Id.* ¶¶ 14, 22.) Therefore, without agreeing to pay the Exit Financing Obligations in accordance with

the Exit Financing Commitment Letters, the Debtors would bear risks that are beyond their ability to control (and which could ultimately jeopardize their timely emergence).

For these reasons, the Debtors determined, in their business judgment and in consultation with their advisors, that their agreements to pay the Exit Financing Obligations were essential and fair means to obtain the Exit Financing Commitments. Compared to the substantial value provided by the Exit Financing Commitment Letters, and the significant duration of the Exit Financing Commitments, the Exit Financing Obligations are a reasonable use of estate resources and should be accorded administrative expense priority under section 507(a)(2) of the Bankruptcy Code. The Exit Financing Obligations are actual and necessary costs, not only for preserving the Debtors' estates, but also for maximizing their value and enhancing overall stakeholder recoveries.

The commitment premiums (the "**Equity Commitment Premiums**") under the Equity Backstop Commitment Letters (0.75%, subject to increase to a maximum of 5.00% as the Equity Backstop Commitments continue to be extended and conditionality and termination rights fall away or are otherwise resolved) and the Debtors' agreement to pay reasonable fees and expenses of counsel and a financial advisor to the Equity Backstop Parties, subject to caps of $17 million and $19 million, respectively, are market-based and comparable to, or less than, those that courts have approved in other recent chapter 11 cases. *See, e.g.*, *In re Monitronics International, Inc.*, No. 19-33650 (DRJ) (Bankr. S.D. Tex. July 30, 2019) (ECF No. 159) (approving debtors' assumption of put option agreement providing for an 8.0 percent backstop put option premium for a 115 day commitment term and expense reimbursement of the backstop parties' advisors); *In re Hexion Holdings LLC*, No. 19-10684 (KG) (Bankr. D. Del. May 15, 2019) (ECF No. 367) (approving backstop premium equal to 8.0 percent of the rights offering amount for a 126 day term and expense reimbursement of the backstop parties' advisors); *In re Pacific Drilling S.A.*, No. 17-13193 (MEW) (Bankr. S.D.N.Y. Sept. 25, 2018) (ECF No. 616) (approving backstop premium equal to 5.3 percent of the aggregate rights offering amount for a 66 day term and expense reimbursement of the backstop parties' advisors). Here, subject to the occurrence of the Effective Date, the Equity Commitment Premiums are payable in shares of New PG&E Corp. Common Stock, which minimizes the cash outflow on the Effective Date.

Moreover, as described above, the Equity Commitment Premiums have been structured so that only modest premiums (0.75%, significantly less than any of the transactions identified above) are payable upfront for the Equity Backstop Commitments, which initially terminate on January 20, 2020, but may be extended by the Debtors at three points in the Chapter 11 Cases. The first extension date, January 20, 2020, coincides with the Equity Backstop Parties' termination right if a material wildfire occurs in the Debtors' service territory in 2019, which must be exercised on or before January 15, 2020. In exercising the first extension option, the Debtors can proceed with certainty that this termination right may not thereafter be exercised. On the second extension date, April 30, 2020, the Debtors will have greater certainty as to the likely quantum of wildfire claims and outcome of ongoing regulatory proceedings. If the related conditions precedent have not been satisfied (or the Debtors conclude they are unlikely to be satisfied) as of such date, the Debtors may elect not to further extend the Equity Backstop Commitment Letters, while only paying the first two commitment premiums (*i.e.*, 2.00% in the aggregate). The third extension date, June 30, 2020, coincides with the confirmation date required by AB 1054 (and the associated Equity Backstop Commitment Letter termination right in favor of the Equity Backstop Parties). The rolling extension feature was specifically designed to accommodate the unpredictability of these Chapter 11 Cases—as the termination rights fall away, and as uncertainty related to the Equity Backstop Commitment conditions is resolved, the Debtors may decide whether to extend the Equity Backstop Commitments (and incur the associated Equity Commitment Premiums) or terminate them. However, even if the Equity Backstop Commitments are extended through August 29, 2019, the maximum Equity Commitment Premium that would be owing is still in line with market, notwithstanding the significant duration of the Equity Backstop Commitments. (Ziman Decl. ¶ 18.)

Like the Equity Commitment Premiums, the fees, expense reimbursements and indemnities owing by the Debtors under the Bridge Fee Letters and the Debt Financing Engagement Letters are reasonable under the circumstances, are the product of arms'-length negotiations and are comparable to, or better than, market. (Ziman Decl. ¶ 27.) The Debtors and their advisors negotiated the fees down relative to the initial proposals and developed a mechanism to stage fees over time,

consistent with the milestone dates in the Equity Backstop Commitment Letters, which is atypical for bridge facilities. (*Id.*) This structure allows the Debtors to maximize the value of their estates by proceeding with their Plan (which the Debtors believe is in the best interests of all stakeholders), while minimizing the fees incurred by the Debtors until closer to the Effective Date (when associated conditionality and termination rights have been reduced or eliminated). Moreover, the Bridge Facilities are intended to serve only as a backstop for lower-cost "take-out" financing. As and when such lower-cost financing is incurred, the Bridge Commitments are reduced dollar-for-dollar. If the entire $34.35 billion in Bridge Commitments remain outstanding until June 30, 2020 (*i.e.*, the statutory confirmation deadline), the aggregate fees payable by the Debtors with respect to such Bridge Commitments would be approximately $210 million.[17] Based on analyses conducted by the Debtors' financial advisors, this quantum of commitment fees is comparable to, or less than, those charged in other large complex bridge financing transactions over the last five years. (*Id.*)

Treatment of the Exit Financing Obligations as administrative expenses of the estate is also well within market parameters and is a customary term in exit financing commitment letters. *See, e.g.*, *In re Hexion Holdings LLC*, No. 19-10684 (KG), at 5 (Bankr. D. Del. May 15, 2019) (ECF No. 367) ("The . . . expenses provided for or permitted by the Equity Backstop Agreement (including . . . the Equity Expense Reimbursement . . . ) are hereby approved as reasonable, [and] shall constitute allowed administrative expense claims pursuant to section 503(b) of the Bankruptcy Code . . . ."); *In re Hexion Holdings LLC*, No. 19-10684 (KG), at 5 (Bankr. D. Del. May 15, 2019) (ECF No. 368)

---

[17] In addition to such commitment fees, the Bridge Commitment Letters and Bridge Fee Letters provide for the payment of fees if the Bridge Facilities are funded and on certain specified dates thereafter depending on the amount of the Bridge Facilities outstanding as of such dates. As described above, the Bridge Commitment Parties have also been engaged to arrange permanent bank and debt securities exit financings, which, if consummated, would result in the payment by the Debtors of certain additional fees. In the event the Debtors fail to use the Bridge Commitment Parties in connection with the financings for which they have been engaged, the Bridge Commitment Parties would be entitled to customary alternate transaction fees. The aggregate fees payable by the Debtors pursuant to the Debt Financing Commitment Letters will depend on a variety of factors, including the length of time the Bridge Commitments and/or Bridge Facilities remain outstanding, the amount of the Bridge Facilities funded and the type and size of the applicable exit financing or alternate transaction.

1  ("The fees, premiums, and . . . expenses provided for or permitted by the Debt Backstop Agreement

2  (including . . . the Debt Backstop Commitment Premium, the Additional Premium, the Debt Expense

3  Reimbursement, and the Debt Backstop Indemnity Obligations) are hereby approved as reasonable,

4  [and] shall constitute allowed administrative expense claims pursuant to section 503(b) of the

5  Bankruptcy Code . . . .").

6  In exchange for the Debtors' agreement to pay the Exit Financing Obligations, the

7  Debtors will receive substantial benefits.  The Exit Financing Obligations are necessary inducements

8  for the Exit Commitment Parties to enter into the Exit Financing Commitment Letters, are favorable

9  relative to market and are staged over time so that only incurred as conditionality is reduced.  Given

10  the magnitude of the commitments of the Exit Commitment Parties, the Debtors have determined, in

11  their business judgment, to incur the Exit Financing Obligations to provide assurances of their ability

12  to consummate their Plan on the Effective Date.

13  For the foregoing reasons, the Debtors respectfully submit that approval of the Exit

14  Financing Commitment Letters is in the best interest of their estates and an appropriate exercise of

15  their business judgment.

16  **V.    WAIVER OF BANKRUPTCY RULE 6004(h)**

17  To implement the foregoing, the Debtors respectfully request the waiver of the 14-day

18  stay under Bankruptcy Rule 6004(h).  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing

19  the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days

20  after entry of the order, unless the court orders otherwise".  Fed. R. Bankr. P. 6004(h). For the reasons

21  described above, the relief requested herein allows the Debtors to achieve greater certainty around the

22  financing of their Plan.

23  **VI.   NOTICE**

24  Notice of this Motion will be provided to (i) the Office of the United States Trustee for

25  Region 17 (Attn: Andrew Vara, Esq. and Timothy Laffredi, Esq.); (ii) counsel to the Creditors

26  Committee; (iii) counsel to the Tort Claimants Committee; (iv) the Securities and Exchange

27  Commission; (v) the Internal Revenue Service; (vi) the Office of the California Attorney General; (vii)

28

the California Public Utilities Commission; (viii) the Nuclear Regulatory Commission; (ix) the Federal Energy Regulatory Commission; (x) the Office of the United States Attorney for the Northern District of California; (xi) counsel for the agent under the Debtors' debtor-in-possession financing facilities; (xii) counsel for the Equity Backstop Parties; (xiii) counsel for the Initial Bridge Commitment Parties; and (xiv) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**"). The Debtors respectfully submit that no further notice is required.

No previous request for the relief sought herein has been made by the Debtors.

[*Signature on next page*]

WHEREFORE the Debtors respectfully request entry of the proposed orders granting (i) the relief requested herein and (ii) such other and further relief as the Court may deem just and appropriate.

Dated: October 23, 2019

**WEIL, GOTSHAL & MANGES LLP**
**CRAVATH, SWAINE & MOORE LLP**
**KELLER & BENVENUTTI LLP**


   /s/ *Paul H. Zumbro*
Paul H. Zumbro


*Attorneys for Debtors and Debtors in Possession*