# EXHIBIT H
## Securities Engagement Letter

Execution Version

| | |
|---|---|
| **J.P. MORGAN SECURITIES LLC**<br>383 Madison Avenue<br>New York, New York 10179 | **BARCLAYS**<br>745 Seventh Avenue<br>New York, NY 10019 |
| **BofA SECURITIES, INC.**<br>One Bryant Park<br>New York, NY 10036 | **CITIGROUP GLOBAL MARKETS INC.**<br>388 Greenwich Street<br>New York, NY 10013 |
| **GOLDMAN SACHS & CO. LLC**<br>200 West Street<br>New York, NY 10282 | |

<u>**PERSONAL AND CONFIDENTIAL**</u>

October 4, 2019

PG&E Corporation
Pacific Gas and Electric Company
77 Beale Street
P.O. Box 77000
San Francisco, California 94177
Attention:   Nicholas M. Bijur

**PG&E Corporation**
**Pacific Gas and Electric Company**
<u>**Securities Engagement Letter**</u>

Ladies and Gentlemen:

  Reference is hereby made to (i) the Chapter 11 bankruptcy cases, jointly administered under lead case number 19-30088 (the "**Chapter 11 Cases**"), currently pending before the United States Bankruptcy Court for the Northern District of California (the "**Bankruptcy Court**"), in which PG&E Corporation, a California corporation ("**PG&E**"), and Pacific Gas and Electric Company, a California corporation (the "**Utility**" and together with PG&E, the "**Debtors**") are debtors and debtors in possession and (ii) the first amended Chapter 11 plan of reorganization filed by the Debtors with the Bankruptcy Court on September 23, 2019 at ECF No. 3966 (as may be further amended, modified or otherwise changed, the "**Plan**") to implement the terms and conditions of the reorganization of the Debtors as provided therein. You agree that, unless the context otherwise requires, each reference herein to "you", and any provision hereof applicable to you shall apply to PG&E, the Utility, any entity formed to hold all of the assets of PG&E and/or the Utility upon emergence from bankruptcy ("**NewCo**") and any issuer of the Securities (as defined below), as applicable, and PG&E and the Utility agree to cause NewCo and any issuer of the Securities, as applicable, to comply with the terms of this letter agreement as if it were a party hereto.

You have advised us that, in connection with the consummation of the transactions contemplated by the Plan, PG&E intends to (a) enter into a new revolving credit facility in an aggregated committed amount of $500 million (the "**PG&E Revolving Credit Facility**") and (b)(i) issue senior secured notes pursuant to a

#92441072v46
Case: 19-30088    Doc# 4446-8    Filed: 10/23/19    Entered: 10/23/19 20:23:33    Page 2 of 20

registered public offering or Rule 144A or other private placement (the "**PG&E Senior Notes**"), (ii) incur term loans under a senior secured term loan facility (the "**PG&E Term Loan Facility**" and the loans thereunder, the "**PG&E Term Loans**" and, together with the PG&E Senior Notes, collectively, the "**Permanent Financing**") or (iii) issue or incur a combination of the foregoing. In connection therewith, PG&E desires to enter into a $7,000 million senior unsecured bridge loan facility (the "**PG&E Facility**") having the terms and subject to the conditions set forth in the PG&E Corporation Commitment Letter among PG&E, the Utility, JPMorgan Chase Bank, N.A. and the other "Commitment Parties" party thereto dated the date hereof and in the annexes thereto, to be available in the event that the Permanent Financing is not issued and/or incurred on or prior to the Effective Date (as defined in the Plan) of the Plan for any reason.

You have also advised us that, in connection with the consummation of the transactions contemplated by the Plan, the Utility intends to (a) enter into a new revolving credit facility in an aggregated committed amount of $3,500 million (the "**Utility Revolving Credit Facility**" and together with the PG&E Revolving Credit Facility, the "**Revolving Credit Facilities**") and (b) issue senior secured notes pursuant to a registered public offering or Rule 144A or other private placement (the "**Utility Senior Notes**", together with the PG&E Senior Notes, the "**Senior Notes**"). In connection therewith, the Utility desires to enter into a $27,350 million senior secured bridge loan facility (the "**Utility Facility**" and together with the PG&E Facility, the "**Facilities**") having the terms and subject to the conditions set forth in the Pacific Gas and Electric Company Commitment Letter among PG&E, the Utility, JPMorgan Chase Bank, N.A. and the other "Commitment Parties" party thereto dated the date hereof and in the annexes thereto, to be available in the event that the Utility Senior Notes are not issued on or prior to the Effective Date of the Plan for any reason.

Accordingly, the parties hereto agree as follows:

1. Engagement.

Subject to the approval of this letter agreement by the Bankruptcy Court, in connection with the financing of the transactions and distributions contemplated by the Plan, and the refinancing or replacement of the Facilities or other interim debt financing for the transactions and distributions contemplated by the Plan (such financing, refinancing or replacement, collectively, the "**Exit Financing**"), you hereby engage J.P. Morgan Securities LLC ("**J.P. Morgan**"), Barclays Capital Inc., BofA Securities, Inc. (or any of its designated affiliates), Citigroup Global Markets Inc. on behalf of Citi (as defined below) and Goldman Sachs & Co. LLC (collectively, the "**Engagement Parties**", "**we**" or "**us**") to be, as applicable, the joint bookrunning managers and joint lead underwriters, joint lead placement agents or joint lead initial purchasers ((i) in the case of any Offering or Proposed Financing by PG&E (or any entity formed to hold all of the assets of PG&E upon emergence from bankruptcy), with J.P. Morgan's name appearing on the left-hand side of any prospectus, offering memorandum, private placement memorandum or similar document and with J.P. Morgan holding the leading roles and responsibilities associated with such placement and (ii) in the case of any Offering or Proposed Financing by the Utility (or any entity formed to hold all of the assets of the Utility upon emergence from bankruptcy), with each Engagement Party acting as an active joint bookrunning manager, active joint lead underwriter, active joint lead placement agent or active joint lead initial purchaser) (each, a "**Titled Capacity**") in respect of any public or private offering by you or your affiliates of debt securities (but excluding (i) any debt convertible into equity, (y) any commercial paper programs and (z) any securities issued by a special purpose vehicle pursuant to a securitization) (any such securities, the "**Securities**"; and any such offering, an "**Offering**"), whether completed prior to, on or after the Effective Date, including, but not limited to, the contemplated issuance by (x) the Utility of at least $27,350 million aggregate principal amount of Utility Senior Notes, (y) PG&E of at least $7,000 million aggregate principal amount of PG&E Senior Notes, in each case, as contemplated by the Plan (the "**Proposed Financing**"). Notwithstanding the foregoing, you may appoint,

2

in each case after consultation with the Engagement Parties, (A) ████████████████████ and (B) ██████████



████████ (the additional financial institutions described in clauses (A) and (B), the "**Additional Engagement Parties**"), in each case, so long as (i) each Engagement Party shall be entitled to serve in the applicable Titled Capacity described above ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████; provided that to the extent any Additional Engagement Party participates in such Offering or Proposed Financing, the economics allocated to such Additional Engagement Party shall reduce the economics of the Engagement Parties on a pro rata basis. For the avoidance of doubt, except as provided in the proviso relating to the Additional Engagement Parties in the immediately preceding sentence, no other underwriter, placement agent or initial purchaser may be appointed nor any other title or economics awarded in connection with the Proposed Financing or any other Offering without the consent of the Engagement Parties. In connection with any Offering in which any Engagement Party elects to participate, you shall enter into an underwriting agreement, placement agency engagement letter or purchase agreement, as applicable, with such Engagement Parties, which agreement shall be consistent with this letter agreement and otherwise in a mutually acceptable form. For purposes of this letter agreement, "**Citi**" shall mean Citigroup Global Markets Inc., Citibank N.A., Citicorp USA, Inc., Citicorp North America, Inc. and/or any of their affiliates as any of them shall determine to be appropriate to provide the services contemplated herein.

Each Engagement Party reserves the right not to participate in any Offering, and the foregoing is not an agreement by any Engagement Party or any of its affiliates to underwrite, place or purchase any Securities or otherwise provide any financing.

It is currently expected that the Proposed Financing will be consummated substantially concurrently with the Effective Date. You agree to promptly commence the preparation of a registration statement or an offering memorandum relating to the Proposed Financing and that you will use commercially reasonable efforts to provide to us, no later than 30 days prior to the Effective Date, the completed preliminary prospectus or the preliminary offering memorandum relating to the Proposed Financing.

2. <u>Matters Relating to Engagement</u>. You will not, and will cause your affiliates not to, initiate, solicit or enter into any discussions or negotiations looking toward the issuance, offering or sale of the Securities to any third parties, except through the Engagement Parties. In the event that you receive any inquiry concerning the Securities, you agree to promptly inform the Engagement Parties of such inquiry. In addition, you agree that from the date hereof until the termination of this letter agreement, you will not offer, sell, contract to sell or otherwise dispose of any securities substantially similar to the Securities without the prior written consent of the Engagement Parties. You further represent and agree that no offers or sales of securities of the same or a similar class as the Securities have been made or will be made by you or any of your affiliates or on your or their behalf which would be integrated with the offer and sale of the Securities under the doctrine of integration referred to in Regulation D under the Securities Act of 1933, as amended (the "**Act**") so as to require registration of the Securities under the Act.

3

You shall not, directly or indirectly (except through the Engagement Parties or as otherwise consented to by the Engagement Parties), sell or offer to sell any of the Securities (or any substantially similar security) during the term of this letter agreement and in any event you have not made and will not make, directly or indirectly, any offer or sale of any security which is or would be integrated with the sale of any Securities that are not being offered or sold in a registered Offering in a manner that would require such Securities to be registered under the Act. In the case of any Offering which is executed as a private placement pursuant to Section 4(a)(2) of the Act or Regulation D thereunder, you represent that you and your affiliates, including any issuer of the Securities, have not and will not (i) offer or sell any Securities by any form of general solicitation or general advertising (within the meaning of Rule 502(c) of Regulation D under the Act) and (ii) engage in any directed selling efforts within the meaning of Regulation S under the Act. In addition, you acknowledge that you are responsible for making all necessary notifications of, and filings with, all federal, state and other applicable securities regulatory authorities with respect to the transactions contemplated by in this letter agreement; provided that you shall not file a Form D with respect to the Offering without the prior written consent of the Engagement Parties.

You acknowledge and agree that each Engagement Party has been engaged solely as an independent contractor to provide the services set forth herein. In rendering such services, each Engagement Party will be acting solely pursuant to a contractual relationship on an arm's length basis with respect to any Offering (including in connection with determining the terms of such Offering) and not as a financial advisor or a fiduciary to you or any other person. Additionally, you acknowledge that the Engagement Parties are not advising you or any other person as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction. You shall consult with your own advisors concerning such matters and shall be responsible for making your own independent investigation and appraisal of the transactions contemplated hereby, and the Engagement Parties shall not have any responsibility or liability to you or any other person with respect thereto. You further acknowledge and agree that any review by any Engagement Party of PG&E, the Utility, any NewCo, any Offering, the terms of the Securities and other matters relating thereto will be performed solely for the benefit of such Engagement Party and shall not be on behalf of you or any other person. You also acknowledge and agree that no Engagement Party shall have any liability to you or your affiliates for any actions or omissions of any other Engagement Party. Finally, you agree that each Engagement Party may perform the services contemplated hereby in conjunction with its affiliates, and that any such affiliates performing services hereunder shall be entitled to the benefits, and be subject to the terms, of this letter agreement.

You acknowledge that each Engagement Party is a securities firm that is engaged in securities trading and brokerage activities, as well as providing investment banking and financial advisory services. In the ordinary course of trading and brokerage activities, each Engagement Party and its affiliates may at any time hold long or short positions, and may trade or otherwise effect transactions, for their own account or the accounts of customers, in debt or equity securities of entities that may be involved in the transactions contemplated hereby. Each Engagement Party recognizes its responsibility for compliance with federal securities laws in connection with such activities.

In addition, each Engagement Party and its affiliates may from time to time perform various investment banking, commercial banking and financial advisory services for other clients and customers who may have conflicting interests with respect to you or the Offering. You acknowledge that each Engagement Party and its affiliates have no obligation to use in connection with this engagement, or to furnish to you, confidential information obtained from other companies.

Furthermore, you acknowledge that each Engagement Party and its affiliates may have fiduciary or other relationships whereby each Engagement Party and its affiliates may exercise voting power over securities of various persons, which securities may from time to time include securities of you, potential purchasers of the Securities or others with interests in respect of the Offering. You acknowledge

that each Engagement Party and its affiliates may exercise such powers and otherwise perform their functions in connection with such fiduciary or other relationships without regard to their relationship to you hereunder.

3. <u>Termination</u>.  (a) This letter agreement may be terminated by any Engagement Party (as to itself), in whole or in part, at any time upon written notice to you.  This letter agreement may be terminated by you after the earliest of (i) the date that is twelve months after the date hereof, if the Effective Date has not occurred, (ii) the Effective Date, if the Effective Date of the Plan was accomplished without any loans under the Facilities or other interim Exit Financing and so long as any Offering consummated prior to or concurrently with the Effective Date was made in compliance with this letter agreement, (iii) the first anniversary of the Effective Date and (iv) the date of receipt by you of aggregate cash proceeds in an amount equal to at least the then outstanding obligations under the Facilities or any other interim Exit Financing from the sale of Securities in a transaction in which the Engagement Parties act in a Titled Capacity with no less than the percentage of the economics of such transaction applicable to the Engagement Parties established pursuant to paragraph 1 of this letter agreement, if the Proposed Financing is consummated after the Effective Date.  Upon any termination of this letter agreement, the obligations of the parties hereunder shall terminate, except for their obligations under paragraphs 4, 5, 7 and 8 below.

(b) This letter agreement may be terminated by you "for cause" within the meaning of, and subject to, the terms of paragraph 5(d) below with respect to any Rule 5110 Offering (as defined below).

4. <u>Indemnification</u>.  Subject to the approval of this letter agreement by the Bankruptcy Court, in consideration of the engagement hereunder, you (in such capacity, the "**Indemnifying Party**") shall, to the extent set forth in Annex A hereto, indemnify and hold harmless each Engagement Party and the other Indemnified Persons referred to in said Annex, which Annex is incorporated herein by reference and constitutes a part hereof.

You agree that the fees, expenses and indemnities payable hereunder and incurred pursuant hereto, and as set forth in, this letter agreement (a) are reasonable, (b) are actual and necessary costs and expenses of preserving the Debtors' estates and (c) subject to the approval of this letter agreement by the Bankruptcy Court, constitute allowed Administrative Claims against the Debtors on a joint and several basis under the Plan.

5. <u>Fees and Expenses</u>.  (a)  Subject to the approval of this letter agreement by the Bankruptcy Court, in any Offering that is consummated prior to termination of this letter agreement and in which any Engagement Party acts in a Titled Capacity, you shall, or shall cause any applicable issuer to, pay aggregate underwriters' or initial purchasers' discounts, or placement agency fees, as applicable, equal to ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ in each case payable at the closing of such Offering out of the proceeds thereof, such fees to be allocated ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ in each case subject to pro rata reduction in connection with the appointment of any Additional Engagement Party in accordance with paragraph 1 above.

(b)  Subject to the approval of this letter agreement by the Bankruptcy Court, you shall reimburse the Engagement Parties promptly upon request for all their reasonable and documented out-of-pocket costs and expenses (including, without limitation, reasonable and documented out-of-pocket fees, disbursements and other charges of legal counsel) incurred in connection with this letter agreement or

5

any of the transactions contemplated hereby (including any Offering), whether or not any Securities are issued, offered or sold. You shall be responsible for all reasonable and documented printing costs, filing fees and "blue-sky" fees and expenses (including reasonable and documented out-of-pocket counsel fees in that connection) and all applicable stamp, issuance, transfer or other similar taxes or duties and all applicable listing fees and expenses and your roadshow expenses (including the expense of any chartered aircraft jointly used).

(c) Subject to the approval of this letter agreement by the Bankruptcy Court, in the event that during the period commencing on the date hereof and ending 12 months following the termination hereof you or any of your affiliates obtain Exit Financing or any other exit financing in connection with a plan of reorganization other than the Plan (other than bank or syndicated credit financing) (any such financing, an "**Alternate Financing**") without, with respect to any Engagement Party, such Engagement Party acting in its Titled Capacity in connection therewith and without receiving at least the percentage of minimum economics of such financing applicable to such Engagement Party established pursuant to paragraph 1 above (in accordance with, and with the economics contemplated by, paragraph 1 and 5(a) above) (the "**Requisite Economics**"), then you agree to pay to such Engagement Party that is not acting in its Titled Capacity at the time of consummation of the Alternate Financing, an amount equal to 50% (or, if such Alternate Financing refinances or replaces any Facility that is outstanding or in effect immediately prior to the consummation of such Alternate Financing, 100%) of the fees that would have been payable pursuant to paragraph 5(a) above if such Engagement Party acted in its Titled Capacity with the Requisite Economics for such Alternate Financing; *provided* that no such fee shall be payable to any Engagement Party that has been offered the opportunity to act in a Titled Capacity with the Requisite Economics with respect to such financing and has elected not to do so (unless such offer was made in connection with an Alternate Financing in respect of an exit financing in connection with a plan of reorganization other than the Plan).

(d) Notwithstanding anything to the contrary herein, any Engagement Party is participating as an underwriter in accordance with the terms of this letter agreement in any Offering that is subject to Rule 5110 of the Financial Industry Regulatory Authority, Inc. ("**FINRA**") (the services contemplated by this letter agreement with respect to any such offering, the "**Underwriting Services**" and any such offering, a "**Rule 5110 Offering**"), and thereafter you determine in your reasonable good faith judgment to terminate such Engagement Party's engagement for cause in accordance with paragraph 3(b), you shall have no obligation to pay any fee to such Engagement Party that would otherwise be payable to such Engagement Party pursuant to paragraph 5(c) hereof in connection with such Offering after such termination. For purposes of this section, "termination for cause" means a termination of this letter agreement, after reasonable notice by you, as a result of the material failure of an Engagement Party to provide the Underwriting Services, provided that such failure to provide the Underwriting Services is not a result of market, economic or political conditions, your condition (financial or otherwise), any failure by you to perform your obligations hereunder or under the securities laws, or any other circumstances outside such Engagement Party's control. In addition, the parties hereto mutually acknowledge and agree that any underwriting fees in respect of any Offering that is subject to FINRA Rule 5110 are reasonable in relation to the Underwriting Services contemplated in this letter agreement.

6. <u>Disclosure</u>. In connection with its engagement hereunder with respect to any Offering, each Engagement Party shall assist you in preparing a prospectus, offering memorandum, private placement memorandum or other document to be used in connection with each Offering in which such Engagement Parties participate (the "**Offering Document**"). You shall furnish the Engagement Parties with all financial and other information concerning the Debtors, the Plan, the financing thereof and related matters (the "**Information**") that the Engagement Parties may reasonably request for inclusion in any Offering Document or otherwise. You represent that (i) the Information (other than projections), as supplemented at the time of pricing the applicable Securities and taken as a whole, and the Offering

6

#92441072v46
Case: 19-30088    Doc# 4446-8    Filed: 10/23/19    Entered: 10/23/19 20:23:33    Page 7 of 20

Document will be complete and correct in all material respects and will not include an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading, (ii) all historical financial data included in any Offering Document will be prepared in all material respects in accordance with generally accepted accounting principles and practices then in effect in the United States (or with appropriate reconciliation to such U.S. generally accepted accounting principles and practices if required by law or regulation or requested by the Engagement Parties) and, in the case of the consolidated financial statements included in such Offering Document, will be prepared in all material respects in accordance with Regulation S-X under the Act, and will fairly present in all material respects the financial condition and operations of the Debtors, (iii) all pro forma financial statements included in any Offering Document will be prepared in all material respects in accordance with Article 11 of Regulation S-X under the Act and (iv) any projections, financial or otherwise, provided to the Engagement Parties will be prepared in good faith with a reasonable basis for the assumptions and the conclusions reached therein and on a basis consistent with the historical financial data of the Debtors; it being understood that actual results may vary from such projections. You agree to notify the Engagement Parties promptly upon becoming aware of any material adverse change, or development that may lead to any material adverse change, in the business, properties, management, operations, financial condition or prospects of the Debtors. In addition, you agree to promptly notify the Engagement Parties if you become aware of an untrue statement or an alleged untrue statement of a material fact contained in any Information previously provided to the Engagement Parties, or the omission or the alleged omission to state therein a material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. You acknowledge and agree that the Offering Document is your own work product. Each Engagement Party may rely, without independent verification, upon the accuracy and completeness of the Information and any Offering Document, and the Engagement Parties do not assume any responsibility therefor. In the case of any Offering which is executed as a private placement pursuant to Section 4(a)(2) of the Act or Regulation D thereunder, you shall extend to each prospective purchaser of Securities the opportunity, prior to the closing date for the sale of any Securities to such prospective purchaser, to ask questions of, and receive answers from, you concerning you, the Securities and the terms and conditions of such Offering and to obtain any information that such prospective purchasers may consider necessary in making an informed investment decision or to verify the accuracy of the information set forth in any private placement memorandum, investor presentation and/or other marketing materials relating to such Offering, including any amendments or supplements thereto, documents incorporated therein by reference and any other information provided by you in due diligence or otherwise.

7. <u>Confidentiality</u>.

(a) Each Engagement Party shall use all non-public information provided to it by or on behalf of you or any of your subsidiaries or affiliates solely for the purpose of providing the services that are the subject of this letter agreement and shall treat confidentially all such information and shall not disclose such information to any third party or circulate or refer publicly to such information, except in each case for information that was or becomes publicly available other than by reason of disclosure by such Engagement Party in violation of this letter agreement or was or becomes available to such Engagement Party or its affiliates from a source which is not known by such Engagement Party to be subject to a confidentiality obligation to you, <u>provided</u> that nothing herein shall prevent any Engagement Party from disclosing any such information (i) to purchasers or prospective purchasers of Securities in connection with an Offering of such Securities, (ii) pursuant to the order of any court or administrative agency or in any pending legal or administrative proceeding (in which case we agree to promptly notify you to the extent lawfully permitted to do so), (iii) to rating agencies; *provided* that such information is limited to the terms and conditions relating to the applicable Securities and any other information that is requested by rating agencies and is supplied only on a confidential basis, (iv) upon the request or demand of any regulatory authority having jurisdiction over such Engagement Party or any of its affiliates (in which case such person agrees (except with respect to any audit or examination conducted by bank examiners or any governmental bank

regulatory authority exercising examination or regulatory authority) to inform you promptly thereof to the extent practicable and not prohibited by applicable law, rule or regulation), (v) to any Engagement Party's affiliates and to the any Engagement Party's and their respective affiliates' respective employees, legal counsel, independent auditors, service providers and other experts or agents who need to know such information and are informed of the confidential nature of such information and are instructed to keep such information confidential in accordance with the provisions of this Section 7(a), it being understood that each Engagement Party shall be responsible for any violation of the provisions of this Section 7(a) by any such person, or (vi) to any other underwriter, initial purchaser or placement agent with respect to such Offering. This undertaking by each Engagement Party shall automatically terminate on the earlier of (x) one year following the completion of any Offering or the termination of such Engagement Party's engagement hereunder or (y) two years from the date hereof. Nothing in this letter agreement precludes any Engagement Party or its affiliates from using or disclosing any confidential information in connection with any suit, action or proceeding for the purpose of defending itself, reducing its liability or protecting or exercising any of its rights, remedies or interests.

(b) You agree that you will not disclose this letter agreement, the contents hereof or the activities of the Engagement Parties pursuant hereto to any person without the prior approval of such Engagement Party, except that you may disclose this letter agreement and the contents hereof (i) to your shareholders, directors, employees, advisors and agents (including legal counsel, independent auditors and other experts, professional advisors or agents) who are directly involved in the consideration of this matter or (ii) as may be compelled in a judicial or administrative proceeding or as otherwise required by law (in which case you agree to inform us promptly thereof). Notwithstanding the foregoing, nothing herein shall prevent you from disclosing such information (x) in a manner consistent with the exceptions set forth in clauses (iii) through (vi) in paragraph 7(a); provided that you accept responsibility for compliance by the persons referred to in such clause (v) with the provisions of this paragraph 7 or (y) as permitted by the last sentence of paragraph 7(a) immediately above, in the case of each of the foregoing clauses (x) and (y) substituting "you" for "any Engagement Party" therein, in either case as applicable. In addition, following your acceptance hereof, you may disclose (A) the existence, but not the content, of this letter agreement in any Offering Document or in any public filing in connection with the Plan or the financing thereof to the extent customary or required by applicable law or regulation (and you agree that any such disclosure of any fees shall be subject to customary redactions) and (B) the terms of this letter agreement relating to fees and expenses, but only as part of generic disclosure regarding fees and expenses in the aggregate, including in any presentation of sources and uses in an Offering Document or other offering and marketing materials or to the extent necessary or advisable in order to comply with your SEC disclosure obligations.

Notwithstanding anything to the contrary herein, any disclosure of the fees herein to obtain Bankruptcy Court approval shall only be made via a filing under seal and, to the extent required, by providing an unredacted copy thereof directly to the Bankruptcy Court, the Office of the United States Trustee or advisors to the Official Committee of Unsecured Creditors, the Official Committee of Tort Claimants and any other official committee established pursuant to Section 1102 on a confidential and professionals' eyes only basis; *provided*, *however*, that you shall be permitted to publicly disclose the fees payable hereunder, solely on an aggregate basis combined with all other fees payable by you in connection with the financing for which you are seeking the approval of the Bankruptcy Court.

The provisions contained in this paragraph 7 shall remain in full force and effect notwithstanding the termination of this letter agreement.

8. <u>Governing Law and Submission to Jurisdiction</u>. This letter agreement and any claim, controversy or dispute arising under or related to this letter agreement shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York. EACH PARTY HERETO IRREVOCABLY AGREES TO WAIVE (TO THE FULLEST EXTENT PERMITTED BY LAW) TRIAL

BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS LETTER AGREEMENT OR THE PERFORMANCE OF SERVICES HEREUNDER.

Each of the parties hereto (for itself and its affiliates) agrees that any suit or proceeding arising in respect of this letter agreement or any Engagement Party's agreements hereunder will be tried exclusively in (i) subject to clause (ii)(B), until the Effective Date of the Plan, the Bankruptcy Court and (ii)(A) thereafter or (B) if the Bankruptcy Court refuses to accept, or the Bankruptcy Court or any appellate court from the Bankruptcy Court determines in a final, non-appealable order that the Bankruptcy Court does not have, jurisdiction, any Federal court of the United States of America sitting in the Borough of Manhattan or, if that court does not have subject matter jurisdiction, in any state court located in the City and County of New York, and each party hereby submits to the exclusive jurisdiction of such court. Service of any process, summons, notice or document by registered mail addressed to you shall be effective service of process against such person for any suit, action or proceeding brought in any such court. You irrevocably and unconditionally waive any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum. A final judgment in any such suit, action or proceeding brought in any such court shall be conclusive and binding and may be enforced in any other courts to whose jurisdiction you are or may be subject, by suit upon judgment.

9. <u>Miscellaneous</u>. This letter agreement contains the entire agreement between the parties relating to the subject matter hereof and supersedes all oral statements and prior writings with respect thereto. This letter agreement may not be amended or modified except by a writing executed by each of the parties hereto. Paragraph headings herein are for convenience only and are not a part of this letter agreement. This letter agreement is solely for the benefit of you and the Engagement Parties, and no other person (except for Indemnified Persons, to the extent set forth in Annex A hereto) shall acquire or have any rights under or by virtue of this letter agreement. This letter agreement may not be assigned by you without the prior written consent of each Engagement Party. You further acknowledge and agree that in accordance with the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) and the requirements of the beneficial ownership regulation (31 C.F.R. § 1010.230), each Engagement Party is required to obtain, verify and record information that identifies their respective clients, including you, which information may include the name and address of their respective clients, as well as other information that will allow each Engagement Party to properly identify their respective clients.

If any term, provision, covenant or restriction contained in this letter agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable or against public policy, the remainder of the terms, provisions, covenants and restrictions contained herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated. You and the Engagement Parties shall endeavor in good faith negotiations to replace the invalid, void or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, void or unenforceable provisions.

This letter agreement may be executed in counterparts, each of which will be deemed an original, but all of which taken together will constitute one and the same instrument.

[*Signature pages follow*]

9

If the foregoing correctly sets forth our understanding, please indicate your acceptance of the terms hereof by signing in the appropriate space below and returning to the Engagement Parties an executed copy hereof, whereupon this letter shall become a binding agreement between us.

Very truly yours,

J.P. MORGAN SECURITIES LLC

By: *[signature]*
Name:
Title:
    Daniel Pombo
    Managing Director

*[Signature Page to Securities Engagement Letter]*
Case: 19-30088    Doc# 4446-8    Filed: 10/23/19    Entered: 10/23/19 20:23:33    Page 11 of 20

BARCLAYS CAPITAL INC.

By: _____
Name: Robert Stowe
Title: Managing Director

**BofA SECURITIES, INC.**

By: _____*Rijhwani*_____
Name:
Title:      Sanjay Rijhwani
            Managing Director

CITIGROUP GLOBAL MARKETS INC.

By: _____
Name: Carolyn Kee
Title: Managing Director

**GOLDMAN SACHS & CO. LLC**

By: _____
Name:
Title:     Charles D. Johnston
           Authorized Signatory

Accepted and agreed to as of
the date first above written:

**PG&E CORPORATION**

By: *Jason P. Wells*
    Name: Jason P. Wells
    Title: EVP & CFO

**PACIFIC GAS AND ELECTRIC COMPANY**

By: _____
    Name:
    Title:

*[Signature Page to Securities Engagement Letter]*
Case: 19-30088   Doc# 4446-8   Filed: 10/23/19   Entered: 10/23/19 20:23:33   Page 16 of 20

Accepted and agreed to as of
the date first above written:

**PG&E CORPORATION**

By:_____
   Name:
   Title:


**PACIFIC GAS AND ELECTRIC COMPANY**

By: /s/ David Thomason
   Name: David Thomason
   Title: CFO & Controller

Annex A

The Indemnifying Party shall, jointly and severally, indemnify and hold harmless each Engagement Party, its affiliates and their respective officers, directors, employees, agents and controlling persons (each an "Indemnified Person") from and against any and all losses, claims, damages, liabilities and reasonable expenses, joint or several, to which any such Indemnified Person may become subject arising out of or in connection with the transactions contemplated by the letter agreement to which this Annex A is attached (the "Agreement"), or any claim, litigation, investigation or proceedings relating to the foregoing ("Proceedings") regardless of whether any of such Indemnified Persons is a party thereto and whether such Proceedings are brought by you, your equityholders, affiliates, creditors or any other person, and to reimburse such Indemnified Persons for any reasonable legal or other reasonable and documented out-of-pocket expenses as they are incurred in connection with investigating, responding to or defending any of the foregoing (including in enforcing the terms of this Annex A), provided that the foregoing indemnification will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or expenses to the extent that they are finally judicially determined to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnified Person. If for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless, then the Indemnifying Party shall, jointly and severally, contribute to the amount paid or payable by such Indemnified Person as a result of such loss, claim, damage, liability or expense in such proportion as is appropriate to reflect not only the relative benefits received by the Indemnifying Party on the one hand and such Indemnified Person on the other hand but also the relative fault of the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, as well as any relevant equitable considerations. It is hereby agreed that the relative benefits to the Indemnifying Party on the one hand and all Indemnified Persons on the other hand shall be deemed to be in the same proportion as (i) the total value received or proposed to be received by you or the applicable issuer pursuant to any sale of Securities (whether or not consummated) bears to (ii) the fee paid or proposed to be paid to each Engagement Party in connection with such sale. The Indemnifying Party also agrees that no Indemnified Person shall have any liability based on their exclusive or contributory negligence or otherwise to the Indemnifying Party, any person asserting claims on behalf of or in right of any of the Indemnifying Party, or any other person in connection with or as a result of the transactions contemplated by the Agreement, except as to any Indemnified Person to the extent that any losses, claims, damages, liability or expenses incurred by you are finally judicially determined to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnified Person in performing the services that are the subject of the Agreement; provided, however, that in no event shall an Indemnified Person have any liability for any special, indirect, consequential or punitive damages arising out of or in connection with the transactions contemplated by the Agreement, even if advised of the possibility thereof. The indemnity, reimbursement and contribution obligations of the Indemnifying Party under this Annex A shall be in addition to any liability that the Indemnifying Party may otherwise have to an Indemnified Person and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Indemnifying Party and any Indemnified Person.

Promptly after receipt by an Indemnified Person of notice of the commencement of any Proceedings, such Indemnified Person will, if a claim is to be made hereunder against the Indemnifying Party in respect thereof, notify the Indemnifying Party in writing of the commencement thereof; provided that (i) the omission so to notify the Indemnifying Party will not relieve it from any liability that it may have hereunder except to the extent it has been materially prejudiced by such failure and (ii) the omission so to notify the Indemnifying Party will not relieve it from any liability that it may have to an Indemnified Person otherwise than on account of this indemnity agreement. In case any such Proceedings are brought against any Indemnified Person and it notifies the Indemnifying Party of the commencement thereof, the Indemnifying Party will be entitled to participate therein, and, to the extent that it may elect by written notice delivered to such Indemnified Person, to assume the defense thereof, with counsel reasonably satisfactory to such Indemnified Person, provided that if the defendants or potential defendants in any such

#92441072v46

Case: 19-30088    Doc# 4446-8    Filed: 10/23/19    Entered: 10/23/19 20:23:33    Page 18 of 20

Proceedings include both such Indemnified Person and the Indemnifying Party and such Indemnified Person shall have concluded that there may be legal defenses available to it that are different from or additional to those available to the Indemnifying Party, such Indemnified Person shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Proceedings on behalf of such Indemnified Person.  Upon receipt of notice from the Indemnifying Party to such Indemnified Person of its election so to assume the defense of such Proceedings and approval by such Indemnified Person of counsel, the Indemnifying Party shall not be liable to such Indemnified Person for expenses incurred by such Indemnified Person in connection with the defense thereof (other than reasonable costs of investigation) unless (i) such Indemnified Person shall have employed separate counsel in connection with the assertion of legal defenses in accordance with the proviso to the next preceding sentence (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one separate counsel (in addition to any local counsel), approved by the applicable Engagement Party, representing the Indemnified Persons who are parties to such Proceedings), (ii) the Indemnifying Party shall not have employed counsel reasonably satisfactory to such Indemnified Person to represent such Indemnified Person within a reasonable time after notice of commencement of the Proceedings or (iii) the Indemnifying Party shall have authorized in writing the employment of counsel for such Indemnified Person.

    The Indemnifying Party shall not be liable for any settlement of any Proceedings effected without its written consent (which consent shall not be unreasonably withheld, delayed or conditioned).  If any settlement of any Proceeding is consummated with the written consent of the Indemnifying Party or if there is a final judgment in any such Proceedings, the Indemnifying Party agrees to indemnify and hold harmless each Indemnified Person from and against any and all losses, claims, damages, liabilities and expenses by reason of such settlement or judgment in accordance with the provisions of this Annex A. Notwithstanding anything in this Annex A to the contrary, if at any time an Indemnified Person shall have requested the Indemnifying Party to reimburse such Indemnified Person for legal or other expenses in connection with investigating, responding to or defending any Proceedings as contemplated by this Annex A, the Indemnifying Party shall be liable for any settlement of any Proceedings effected without its written consent if (i) such settlement is entered into more than 30 days after receipt by the Indemnifying Party of such request for reimbursement and (ii) the Indemnifying Party shall not have reimbursed such Indemnified Person in accordance with such request prior to the date of such settlement.  The Indemnifying Party shall not, without the prior written consent of an Indemnified Person (which consent shall not be unreasonably withheld), effect any settlement of any pending or threatened Proceedings in respect of which indemnity could have been sought hereunder by such Indemnified Person unless such settlement (a) includes an unconditional release of such Indemnified Person in form and substance satisfactory to such Indemnified Person from all liability on claims that are the subject matter of such Proceedings and (b) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person. The Indemnifying Party acknowledges that any failure to comply with its obligations under the preceding sentence may cause irreparable harm to the Indemnified Persons.

    Capitalized terms used but not defined in this Annex A have the meanings assigned to such terms in the Agreement.

#92441072v46

Case: 19-30088    Doc# 4446-8    Filed: 10/23/19    Entered: 10/23/19 20:23:33    Page 19
of 20

