WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C. (*pro hac vice*)
(ray.schrock@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

CRAVATH, SWAINE & MOORE LLP
Paul H. Zumbro (*pro hac vice*)
(pzumbro@cravath.com)
Kevin J. Orsini (*pro hac vice*)
(korsini@cravath.com)
Omid H. Nasab (*pro hac vice*)
(onasab@cravath.com)
825 Eighth Avenue
New York, NY 10019
Tel: 212 474 1000
Fax: 212 474 3700

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors
and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

In re:

PG&E CORPORATION

- and -

PACIFIC GAS AND ELECTRIC COMPANY

Debtors.

☐ Affects PG&E Corporation
☐ Affects Pacific Gas and Electric Company
☒ Affects both Debtors

\* *All papers shall be filed in the Lead Case, No. 19-30088 (DM).*

Bankruptcy Case No. 19-30088 (DM)
Chapter 11 (Lead Case) (Jointly Administered)

**DECLARATION OF KENNETH S. ZIMAN IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF ORDERS (I) APPROVING TERMS OF, AND DEBTORS' ENTRY INTO AND PERFORMANCE UNDER, EXIT FINANCING COMMITMENT LETTERS AND (II) AUTHORIZING INCURRENCE, PAYMENT AND ALLOWANCE OF RELATED FEES AND/OR PREMIUMS, INDEMNITIES, COSTS AND EXPENSES AS ADMINISTRATIVE EXPENSE CLAIMS**

Date: November 13, 2019
Time: 10:00 a.m. (Pacific Time)
Place: United States Bankruptcy Court
 Courtroom 17, 16th Floor
 San Francisco, CA 94102
Objection Deadline: November 6, 2019

I, Kenneth S. Ziman, hereby declare under penalty of perjury as follows:

1. I am a Managing Director in the Restructuring Group at Lazard Frères & Co. LLC ("**Lazard**"), an investment banking firm that has its principal office at 30 Rockefeller Plaza, New York, New York 10112. Lazard is the primary U.S. operating subsidiary of a preeminent international investment banking, financial advisory, and asset management firm. Together with its predecessors and affiliates, Lazard has been advising clients around the world for over 165 years. Lazard and its professionals have considerable expertise and experience in providing investment banking and financial advisory services to financially distressed companies and to creditors, equity holders and other constituencies in reorganization proceedings and complex financial restructurings, both in and out of court. In addition, Lazard's investment banking professionals have extensive experience in advising debtors in chapter 11 cases and have served as investment bankers to numerous debtors, chapter 11 trustees, creditors' committees and buyers in chapter 11 cases. Since 1990, Lazard professionals have been involved in over 250 restructurings, representing over $1 trillion in debtor assets.

2. At Lazard, I specialize in advising public and private companies and creditor groups in complex financial restructurings and in raising capital for, selling, or acquiring financially distressed businesses. I have nearly 30 years of experience in corporate finance and restructuring. I joined Lazard in March 2016 after a more than 25-year career as a bankruptcy and restructuring lawyer, previously as a partner at Simpson Thacher & Bartlett LLP and most recently as the Deputy Practice Leader of Skadden, Arps, Slate, Meagher & Flom LLP's Corporate Restructuring department. Throughout my career I have represented debtors, individual creditors, official creditors' committees, unofficial bondholder committees, and other parties in interest in numerous in-court and out-of-court restructurings and recapitalizations involving companies in multiple industries, including those of Takata Corporation, Cobalt International Energy, Inc., ManorCare Inc., SunEdison, Inc., CGG Holdings (U.S.) Inc., Millennium Health, LLC, Dendreon Corporation, Exide Technologies, Savient Pharmaceuticals, Inc., Energy Future Holdings Corporation, Residential Capital, LLC, Select Staffing, iPayment, Inc. and MF Global Holdings

Ltd. I have submitted declarations and/or affidavits or have had testimony proffered in CGG, SunEdison and GCX Limited, among other cases.

3. I graduated from Colgate University with a B.A. and I have a law degree from the University of Pennsylvania Law School.

4. I submit this Declaration in support of the *Debtors' Motion for Entry of Orders (i) Approving Terms of, and Debtors' Entry into and Performance Under, Exit Financing Commitment Letters and (ii) Authorizing Incurrence, Payment and Allowance of Related Fees and/or Premiums, Indemnities, Costs and Expenses as Administrative Expense Claims* (the "**Motion**").[1]

5. Lazard is a long-time advisor to PG&E Corporation ("**PG&E Corp.**"), and its primary operating subsidiary, Pacific Gas and Electric Company (the "**Utility**"; together with PG&E Corp., "**PG&E**", the "**Company**" or the "**Debtors**"), with the initial engagement for advisory services starting in 2011. Since that time, Lazard has provided financial advisory and investment banking services to PG&E Corp. with respect to a variety of matters, including, without limitation: analysis of the financial condition of the Company, evaluation of potential transactions that the Company may pursue, assessment of financing options, and shareholder advisory services. Given Lazard's long history with PG&E Corp., Lazard has significant familiarity with and knowledge of the Debtors' business, operations, and financial challenges.

6. Lazard currently serves as advisor to the Debtors in their Chapter 11 Cases. In such capacity, Lazard assists the Company in its assessment of the Company's ability to raise capital and its evaluation of the sources of financing required in order to successfully emerge from chapter 11. During the course of these cases, Lazard has engaged in dialogue with the legal counsel and advisors to a number of significant shareholders, including in regards to their willingness to invest in the Company to finance its emergence from chapter 11.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

7. Along with management, Lazard has also engaged in communications with certain money-center banks regarding the Company's ability to access capital from the traditional equity markets. Feedback received from these discussions indicated that regular-way equity markets access would require resolution of the Company's 2020 general rate case and cost of capital proceedings, as well as a clearer understanding of the aggregate wildfire claims liability and how those claims will be treated under a chapter 11 plan. Feedback received further indicated that banks would only be willing to commit, at the time, to a volume underwriting of any equity financing; this means although the banks would guarantee an amount of equity proceeds, there would not be a floor price at which that equity might be raised, thereby presenting unlimited dilution risk to current shareholders.

8. In connection with efforts to terminate the Debtors' exclusivity by the Ad Hoc Committee of Senior Unsecured Noteholders (the "**Ad Hoc Noteholder Committee**") and the Ad Hoc Group of Subrogation Claim Holders in July and August 2019, two large shareholders of PG&E Corp., Knighthead Capital Management ("**Knighthead**") and Abrams Capital Management ("**Abrams**"; together with Knighthead, the "**13D Parties**"), submitted a letter to the Chair of PG&E Corp. setting forth an unsolicited financing proposal to provide $1.5 billion of equity capital commitments in support of the Company's Plan of Reorganization (as defined below) (the "**Initial Equity Backstop Commitment Letter**"). This proposal was made public by the 13D Parties on August 8, 2019, through a Schedule 13D filing with the Securities and Exchange Commission. The 13D Parties' proposal contemplated a $15 billion total equity raise, with the additional capital being provided by other shareholders. Subsequently, the Company received substantially similar equity capital commitments from more than 35 investors, representing equity backstop commitments in excess of $14 billion in the aggregate.

9. Starting on August 17, and continuing through September, the Company and its financial and legal advisors engaged in negotiations with the 13D Parties concerning the terms of the Initial Equity Backstop Commitment Letter. Over the course of these discussions, the Debtors improved upon several of the terms initially proposed by the 13D Parties, including with respect

to structure, conditionality, length and flexibility to pursue a variety of equity financing options. At a board meeting on September 8, the PG&E Corp. board (the "**Board**") authorized PG&E Corp. to enter into backstop commitment letters that had been revised to reflect the outcome of these discussions and negotiations (the "**Revised Equity Backstop Commitment Letters**") with affiliates of the 13D Parties. On September 9, PG&E Corp. entered into the Revised Equity Backstop Commitment Letters with certain affiliates of the 13D Parties for aggregate commitments of $1.5 billion, and such backstop commitment letters were filed with the Court as an exhibit to the Debtors' "Summary of Key Elements of Debtors' Joint Chapter 11 Plan of Reorganization". [Docket No. 3844]

10. Shortly after entering into the Revised Equity Backstop Commitment Letters, the Debtors reached a settlement with the Ad Hoc Group of Subrogation Claim Holders. As the Revised Equity Backstop Commitment Letters did not incorporate this settlement, the Company and the 13D Parties negotiated a revised form of backstop commitment letter that was publicly disclosed on September 13, 2019 via a Current Report on Form 8-K (the "**Amended Equity Backstop Commitment Letter**"), which, among other matters, reflected contemplated amendments to the Company's Plan of Reorganization to incorporate the subrogation settlement and the related increase of the "Wildfire Claims Cap" set forth in the Revised Equity Backstop Commitment Letters to $18.9 billion (subject to certain exclusions from, and adjustments to, such $18.9 billion figure).

11. The Company initiated a process to obtain an additional $12.5 billion of equity commitments on September 14, 2019. The Amended Equity Backstop Commitment Letter contemplated a $14 billion total equity raise, with the capital being provided by shareholders and non-shareholders (the "**Equity Backstop Commitments**"). Of the $14 billion of Equity Backstop Commitments, 60% was available only to shareholders who offered Equity Backstop Commitments to the Company, to be further allocated among such shareholders based on shareholdings. The other 40% of the Equity Backstop Commitments was made available to shareholders and non-shareholders who offered Equity Backstop Commitments to the Company,

which was to be further allocated *pro rata* based on the amount of Equity Backstop Commitments offered by such parties. All parties were permitted to include in their shareholdings shares purchased between the time they delivered their commitments and the allocation date.

12. As part of this process, Lazard distributed the form backstop agreement to a diverse group of accredited investors (as defined in Rule 501 of Regulation D under the Securities Act of 1933, as amended). The Debtors actively engaged with non-shareholders during this process and, overall, provided non-shareholders with a meaningful opportunity to participate in the Equity Backstop Commitments. In addition, the Company provided an investor presentation to such accredited investors that described the backstop commitment structure and other key information about the Debtors and the Chapter 11 Cases. The Company also hosted an informational meeting on September 17, 2019 and the Company and Lazard engaged with potential investors via individual phone calls and one-on-one meetings. Any accredited investors that expressed interest to the Company or Lazard in participating in the backstop received a copy of the form of Amended Equity Backstop Commitment Letter. The Company addressed comments to the form of backstop commitment letter from certain of these investors in a further revised backstop agreement ("**Final Equity Backstop Commitment Letter**") distributed on September 20, 2019 to parties that received the Amended Equity Backstop Commitment Letter.

13. The Company accepted commitments from a total of 117 Equity Backstop Parties, which aggregated to a combined commitment of $15.1 billion, before giving effect to the allocation provisions in the Final Equity Backstop Commitment Letters (summarized above) that provided for an automatic reduction of Equity Backstop Commitments to an aggregate amount of $14 billion. The Equity Backstop Parties owned a combined 269 million shares of the Company as of September 26, 2019, which represented approximately 51% of shares outstanding as of such date. The Debtors executed the Final Equity Backstop Commitment Letters on September 30, 2019.

14. The Company and its advisors were able to negotiate several terms within the Final Equity Backstop Commitment Letter to the Company's advantage relative to the terms of the Initial Equity Backstop Commitment Letter. The Debtors simplified the equity offering mechanics

from the Initial Equity Backstop Commitment Letter, and the Final Equity Backstop Commitment Letter is structured based on the price-to-earnings multiple the Debtors are able to achieve with respect to the future equity raises contemplated to occur closer to the Effective Date of the Debtors' Plan.  In the event that the price-to-earnings multiple implied by an equity raise is equal to or exceeds $13.5x^2$, the Debtors can pursue a Permitted Equity Offering (*i.e.*, raise equity at best terms / structure available in the market).  If the price-to-earnings multiple implied by an equity raise is less than $13.5x^2$ but equals or exceeds $12.0x^2$, then the Debtors must raise at least 80% of equity proceeds through a Rights Offering, but may still consummate certain Permitted Equity Offerings for up to 20% of equity proceeds.  The features of the Rights Offering, including freely tradeable rights and oversubscription privileges, are intended to allow all stakeholders to participate in the capital raise.  At any multiple lower than the Rights Offering threshold multiple, the Debtors will rely on the Backstop Commitments, which are priced at $10.0x^2$.  This structure helps ensure that the Debtors will be able to raise the anticipated necessary equity capital upon emergence from the Chapter 11 Cases.  Absent the Backstop Commitments, the Debtors could face a situation where they seek to raise equity financing upon emergence from chapter 11 with no guarantee of availability or price.  As ultimately negotiated, the Backstop Commitments mitigate this downside risk and provide flexibility for the Debtors to also raise equity financing at higher prices via a Rights Offering or a Permitted Equity Offering if there is sufficient demand in the public markets. Importantly, the equity investment contemplated by the Final Equity Backstop Commitment Letter is also structured in a manner that preserves the Debtors' significant net operating loss carryforwards and other tax attributes, an important component to maximizing the value of the Debtors' estates.

15. As described above, the Debtors negotiated in the Final Equity Backstop Commitment Letter that in the event of a Rights Offering, the Company maintains the option of raising up to 20% of the total equity proceeds through another form of primary equity offering (*e.g.*, a private placement), subject to certain consent rights of the Equity Backstop Parties in the

---

[2] Subject to adjustment in accordance with the Final Equity Backstop Commitment Letter.

case of equity offerings that are not broadly syndicated. This flexibility could be valuable in bringing long-term utility investors back into the stock sooner and allowing the Company to diversify its shareholder base immediately upon emergence from chapter 11. The Initial Equity Backstop Commitment Letter featured no such option.

16. Furthermore, the Debtors negotiated changes to the Equity Commitment Premium that deferred near-term cost and provided the Company with flexibility to seek alternative equity capital if circumstances change through June 30, 2020. As contemplated, the Equity Commitment Premiums, which can aggregate to up to 500 basis points in total, are divided into four components:

i) 75 basis points of the Equity Commitment Premiums are earned on the later to occur of (a) the date that the Equity Backstop Parties and PG&E executed the Final Equity Backstop Commitment Letters and (b) Court approval of the Final Equity Backstop Commitment Letters, unless the Equity Backstop Commitment Letters have already been terminated;

ii) 125 basis points of the Equity Commitment Premiums will be earned on the date, if any, on which the Equity Backstop Parties receive the First Extension Notice (as defined in the Final Equity Backstop Commitment Letters);

iii) 250 basis points of the Equity Commitment Premiums will be earned on the date, if any, on which the Equity Backstop Parties receive the Second Extension Notice (as defined in the Final Equity Backstop Commitment Letters); and

iv) 50 basis points of the Equity Commitment Premiums will be earned on the date, if any, on which the Equity Backstop Parties receive the Third Extension Notice (as defined in the Final Equity Backstop Commitment Letters).

17. While there was an overall increase in the Equity Commitment Premium (versus the August 7, 2019 version), the construct in the Final Equity Backstop Commitment Letter affords the Debtors increased flexibility to defer fees over time and elect not to extend the Final Equity Backstop Commitment Letters in their discretion on any of the extension dates. I believe that this feature of the Final Equity Backstop Commitment Letters benefits the Debtors, because they only

incur an Equity Backstop Premium of 0.75% upon Court approval of the agreement and maintain the ability to pivot to a different financing option through January 20, 2020 before paying any incremental Equity Backstop Premiums. Such fees are necessary and market-based compensation for the Equity Backstop Parties; absent the Equity Commitment Premium, the Equity Backstop Parties would not have been willing to provide the Equity Backstop Commitments on present terms.

18.     Based upon analysis conducted by Lazard of equity backstop commitments provided since 2016, the total aggregate Equity Commitment Premiums (5.0%) appears comparable to, or less than, other equity backstop commitment premiums that have been agreed and approved by other Bankruptcy Courts in order to finance chapter 11 plans. Furthermore, the optionality provided to PG&E Corp. in terms of its ability to exercise or forego extensions of the Equity Backstop Commitments in its discretion allows the Debtors to potentially replace the Equity Backstop Commitments with a different form of financing, and otherwise provides unprecedented flexibility.

19.     Furthermore, the reimbursement of reasonable fees and expenses of Jones Day, legal advisor to certain of the Equity Backstop Parties, of up to $17.0 million and a financial advisor to certain of the Equity Backstop Parties of up to $19.0 million, as contemplated by the Final Equity Backstop Commitment Letters, is a necessary component of the agreement and without which the equity capital would not otherwise have been provided on the present terms. Based on the totality of the circumstances, I believe that the full Equity Commitment Premium of 5.0%, in addition to the expense reimbursement structure described above, is fair and reasonable.

20.     In addition to the work on the Final Equity Backstop Commitment Letters, the Debtors have been working in parallel with money-center banks to ensure needed access to debt capital at emergence. The Debtors' Joint Chapter 11 Plan of Reorganization filed on September 9, 2019 and amended on September 23, 2019 (the "**Plan of Reorganization**") contemplates up to $34.35 billion of new debt financing, consisting of $27.35 billion at the Utility and $7.0 billion at PG&E Corp. to refinance their current capital structure and fund their emergence from chapter

11. The Plan of Reorganization seeks to maximize the value of the Debtors' estates by refinancing pre-petition Utility debt with less expensive secured bonds at market rates. With respect to pre-petition long-term bonds at the Utility, this new debt could save the Debtors over $170 million per year in interest expense, resulting in nearly $1.5 billion (on a net present value basis) accruing to the benefit of the Debtors' ratepayers.

21. Since the second quarter of 2019, the Debtors and their advisors have maintained ongoing dialogue with money-center banks to discuss debt financing options relative to the Debtors' emergence from chapter 11. These conversations ultimately culminated in five banks providing highly confident letters ("**HCLs**") relative to raising debt and equity financing at emergence; the Debtors provided these HCLs to the Court as part of the September 9, 2019 filing of their Plan of Reorganization. Furthermore, throughout the course of the third quarter, several banks developed illustrative debt financing structures and term sheets for presentation to the Debtors, to assist the Debtors in considering exit financing options.

22. In late September 2019, following the filing of the second motion of the Ad Hoc Noteholder Committee to terminate the Debtors' exclusive periods, the Board determined that the Company should seek to obtain committed debt financing to bolster the confidence of claimants, financial creditors, equityholders, ratepayers and other stakeholders that the Debtors' Plan of Reorganization, the best available alternative, can be consummated in accordance with statutory requirements. Much like the Final Equity Backstop Commitment Letters, committed bridge financing would act as a backstop for the debt capital necessary to effectuate the Debtors' Plan of Reorganization. Bridge financing is short-term in nature (usually with a maturity within one year) and commonly used to provide certainty of execution on large, complex transactions by offering protection against market dislocation that could frustrate access to regular-way capital markets transactions at a later date. In the case of the Debtors, and as is typical, it is not expected that the bridge financing would be drawn. However, even if funded, the bridge financing would likely be refinanced well in advance of its 364-day maturity. The bridge financing commitments will allow

the Debtors to proceed with the prosecution of their Plan of Reorganization in a manner that will allow them to successfully emerge from chapter 11.

23. Following the Company's decision to obtain bridge financing commitments, the Debtors and their advisors commenced negotiations regarding bridge financing commitments, with the intention of finalizing the commitments by October 4, 2019, in advance of the October 7, 2019 hearing on the motion to terminate the Debtors' exclusivity. As such, the Debtors and their advisors contacted money-center banks on September 25 and 26 requesting initial proposals for bridge financing commitments. The Company and Lazard contacted nine leading banks and requested term sheet proposals for total Utility bridge commitments of $27.35 billion and PG&E Corp. bridge commitments of $7.0 billion. All of the aforementioned banks delivered proposals by October 1, 2019.

24. After analysis of the initial proposals, which the Debtors evaluated based on a number of metrics, including the proposed terms and fees, the cost and certainty of the commitments, the experience and reputations of the parties and the ability of such banks to work collaboratively with the Debtors, the Debtors developed and shared a counterproposal based on anticipated market-clearing terms and selected JPMorgan, Citi, Bank of America, Barclays and Goldman Sachs as initial commitment parties (the "**Initial Bridge Commitment Parties**")[3]. It is currently contemplated that additional banks will be included in the final syndication to broaden lender exposure. The Board approved the Debtors' entry into the bridge commitments on October 11, 2019; the Debtors executed the bridge commitments on the same day (the "**Bridge Commitments**").

25. Subject to the terms of the Bridge Commitment Letters and Bridge Fee Letters, the Debtors are obligated to pay certain fees (the "**Bridge Fees**") to the Bridge Commitment Parties to compensate them for their Bridge Commitments. Similar to the Equity Commitment Premiums in the Final Equity Backstop Commitment Letters, the Bridge Fees are necessary and market-based

---

[3] The Initial Bridge Commitment Parties are also engaged to act as arrangers and underwriters for market-based "take-out financing" through a combination of bank debt and bond placement at both PG&E Corp. and the Utility.

compensation for the Bridge Commitment Parties, and, absent the Bridge Fees, the Initial Bridge Commitment Parties would not be willing to provide the Bridge Commitments. If the entire $34.35 billion in Bridge Commitments remain open until June 30, 2020 (*i.e.*, the statutory confirmation deadline), the aggregate Bridge Fees payable by the Debtors with respect to such Bridge Commitments would be approximately $210 million.

26. In addition to the Bridge Fees, the Debtors would be required to pay additional amounts (including fees and interest) if the Bridge Commitments are actually drawn at emergence from chapter 11. The pricing of the Bridge Commitments, summarized below, provides certainty to the Debtors of the availability and cost of debt capital if the bridge is utilized upon exit from chapter 11. Furthermore, the Bridge Commitments have added significance here given the importance of timely emergence to obtain the benefits of the AB 1054 wildfire fund and limited ability to delay emergence to allow credit markets to settle if there is volatility in the markets at the time of emergence. The interest rates associated with the Bridge Commitments are as follows:

i) for the Utility: L+112.5-175 bps (subject to a credit rating grid); 25 bps increase every 90 days; maximum 75 bps increase; and

ii) for PG&E Corp.: L+175-225 bps (subject to a credit rating grid); 25 bps increase every 90 days; maximum 75 bps increase.

27. As a result of negotiations led by the Company and Lazard, the Bridge Fees were negotiated down relative to the initial proposals and are structured so that payment is staggered over time (consistent with the fee construct in the Final Equity Backstop Commitment Letters); the Bridge Commitments can be reduced or terminated to the extent there are changes to the financing needs or the Debtors' Plan of Reorganization, including any determination to reinstate pre-petition debt. Furthermore, fees are only payable upon receipt of Bankruptcy Court approval. In my experience and based on analysis conducted by Lazard of financing fees for large bridge financing transactions since 2014, the terms are consistent with (or better than) those for similarly large, complex transactions. I believe that the Bridge Fees were the subject of arms'-length and good faith negotiations between the Debtors and the Initial Bridge Commitment Parties, are

integral components of the overall terms of the Bridge Commitments, were required by the Initial Bridge Commitment Parties as consideration for the extension of the Bridge Commitments and are reasonable under the circumstances.

28. I believe the Equity Backstop Commitments and the Bridge Commitments align the incentives of the Debtors with those of leading financial institutions in favor of the ultimate success of the Debtors' Plan of Reorganization. These financial institutions have committed significant capital (and incurred reputational risk) to ensure the viability of the Debtors' Plan of Reorganization and I believe therefore have an interest in seeing it through to completion. I believe these commitments also enhance the confidence of claimants, financial creditors, equityholders, ratepayers and other stakeholders that the Debtors will emerge from chapter 11 as a financially sound utility.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: October 23, 2019

/s/ *Kenneth S. Ziman*
Kenneth S. Ziman