WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C. (*pro hac vice*)
(ray.schrock@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

CRAVATH, SWAINE & MOORE LLP
Paul H. Zumbro (*pro hac vice*)
(pzumbro@cravath.com)
Kevin J. Orsini (*pro hac vice*)
(korsini@cravath.com)
Omid H. Nasab (*pro hac vice*)
(onasab@cravath.com)
825 Eighth Avenue
New York, NY 10019
Tel: 212 474 1000
Fax: 212 474 3700

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251
*Attorneys for Debtors and Debtors in Possession*

MILBANK LLP
Dennis F. Dunne (admitted *pro hac vice*)
Samuel A. Khalil (admitted *pro hac vice*)
55 Hudson Yards
New York, New York 10001-2163
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

*and*

Gregory A. Bray (SBN 115367)
Thomas R. Kreller (SBN 161922)
MILBANK LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000
Facsimile: (213) 629-5063
*Attorneys for the Official Committee
of Unsecured Creditors*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>- and –<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>**Debtors.**<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case No. 19-30088 (DM)<br>Chapter 11<br>(Lead Case) (Jointly Administered)<br><br>**JOINT BRIEF OF DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND SUPPLEMENTAL STATEMENT OF THE PG&E SHAREHOLDERS CONCERNING THE APPLICABILITY OF INVERSE CONDEMNATION**<br><br>Date: November 19, 2019<br>Time: 10:00 a.m.<br>Place: United States Bankruptcy Court<br>Courtroom 17, 16th Floor<br>San Francisco, CA 94102 |

PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession (collectively, "**PG&E**" or the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") hereby submit this Brief on the Applicability of Inverse Condemnation. As set forth herein, as a matter of law the application of inverse condemnation to investor-owned utilities such as PG&E is inconsistent with both California Supreme Court precedent and the Takings and Due Process Clauses of the U.S. Constitution. In support of this submission, the Debtors respectfully submit the Declaration of Kevin J. Orsini (the "**Orsini Declaration**"), filed contemporaneously herewith. The Debtors reserve the right to raise other defenses to inverse condemnation as a part of the estimation proceedings before the District Court, in connection with the claims objection process or otherwise.

The Official Committee of Unsecured Creditors (the "**UCC**") joins in this submission and reserves the right to participate in oral argument thereon, including by responding to any arguments made in opposition.

The PG&E Shareholders set forth their separate statement herein.

A proposed form of order granting the relief requested herein is annexed hereto as **Exhibit A** (the "**Proposed Order**").

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... iv

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................... 1

I.     PRELIMINARY STATEMENT ................................................................................ 1

II.    BACKGROUND ......................................................................................................... 4

      A.    The Regulation of Private Utilities in California ..................................... 4

      B.    The CPUC Has Stated That Private Utilities Cannot Automatically Raise
            Rates To Recover Inverse Condemnation Costs ..................................... 5

      C.    The 2017 and 2018 Wildfires ................................................................. 7

      D.    Procedural History ................................................................................... 8

III.   ARGUMENT .............................................................................................................. 9

      A.    Applicable Law ....................................................................................... 9

      B.    Inverse Condemnation Claims Are Unenforceable Against PG&E Because
            Inverse Condemnation Should Not Be Extended to Private Utilities Under
            California State Law. ............................................................................. 10

            1.    Under Existing California Supreme Court Precedent, Inverse
                    Condemnation Does Not Apply to PG&E. ............................... 10

            2.    Lower and Intermediate California Court Decisions Do Not Compel a
                    Different Result ......................................................................... 13

      C.    Inverse Condemnation Claims Are Unenforceable Because Application of
            Inverse Condemnation to Private Utilities Violates the United States
            Constitution ........................................................................................... 17

            1.    The Application of Inverse Condemnation to PG&E Violates the
                    Takings Clause of the Fifth Amendment of the United States
                    Constitution ............................................................................... 17

            2.    The Application of Inverse Condemnation to PG&E Violates PG&E's
                    Substantive Due Process Rights ............................................... 21

IV.   CONCLUSION ........................................................................................................ 23

STATEMENT OF PG&E SHAREHOLDERS .............................................................. 24

I.     THE CALIFORNIA SUPREME COURT WILL CONCLUDE THAT LOWER COURTS
      ERRED IN APPLYING INVERSE CONDEMNATION TO INVESTOR-OWNED
      UTILITIES ............................................................................................................... 25

II.    THE CALIFORNIA SUPREME COURT WILL CONSIDER THE DISASTROUS
      CONSEQUENCES OF THE ERRONEOUS LOWER COURT DECISIONS ................... 28

      A.    The Erroneous Lower Court Decisions Significantly Raise The Cost Of Capital For
            California's Investor-Owned Utilities ................................................... 29

      B.    Increased Cost Of Capital For California's Investor-Owned Utilities Harms
            The State In Critical Ways. ................................................................... 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Action Apartment Ass'n v. Santa Monica Rent Control Bd.*, 509 F.3d 1020 (9th Cir. 2007) ..................................................................................................................21, 22

*Albers v. County of Los Angeles*, 62 Cal.2d 250 (1965)..............................................1, 10, 11

*Am. Tower Corp. v. City of San Diego*, 763 F.3d 1035 (9th Cir. 2014) ...........................9, 16

*Anchor Lighting v. S. California Edison Co.*, 142 Cal.App.4th 541 (2006).............................5

*Bacich v. Bd. of Control of California*, 23 Cal.2d 343 (1943)................................................11

*Baker v. Burbank-Glendale-Pasadena Airport Auth.*, 39 Cal.3d 862 (1975)...............10, 12

*Barham v. Southern California Edison Co.*, 74 Cal.App.4th 744 .........................13, 14, 15

*Belair v. Riverside Cty. Flood Control Dist.*, 47 Cal.3d 550 (1988) ...............................11, 14

*Bd. of Regents v. Roth*, 408 U.S. 564 (1972) ........................................................................22

*City of Oroville v. Superior Court*, 250 Cal.Rptr.3d 803 (2019) ..........................................11

*Customer Co. v. City of Sacramento*, 10 Cal.4th 368 (1995) ...............................................11

*Duquesne v. Light Co. Barasch*, 488 U.S. 299 (1989)...........................................................18

*E. Enters. v. Apfel*, 524 U.S. 498 (1998)................................................................................18

*Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938) ..........................................................................9

*Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591 (1944) ..........................................5

*Gay Law Students Assn. v. Pac. Tel. and Tel. Co.*, 24 Cal.3d 458 (1979)....................15, 16

*Gutierrez v. Cty. of San Bernardino*, 198 Cal.App.4th 831 (2011) ...............................13, 15

*Harrison v. PG&E Corp.*, No. CGC17563108, 2018 WL 2447104 (Cal. Super. Ct. May 21, 2018)..............................................................................................................8, 15

*Holtz v. Superior Court*, 3 Cal.3d 296 (1970) ....................................................1, 10, 11

*In re Basave De Guillen*, 604 B.R. 826, 836 (B.A.P. 9th Cir. 2019).....................................13

*In re Foamex Int'l, Inc.*, 491 B.R. 100, 106 (Bankr. D. Del. 2013)......................................13

*Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005).....................................................18, 21, 22

*Locklin v. City of Lafayette*, 7 Cal. 4th 327 (1994)....................................................................11

*McAlister v. Essex Prop. Tr.*, 504 F. Supp. 2d 903 (C.D. Cal. 2007)......................................8

*Mercury Cas. Co. v. City of Pasadena*, 14 Cal.App.5th 917, 925-26 (2017)......................13

*Moreland Inv. Co. v. Superior Court*, 106 Cal.App.3d 1017, 1022-23 (1980) ...................16

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964)...................................................................17

*Orkin v. Taylor*, 487 F.3d 734 (9th Cir. 2007).........................................................................9

*Pac. Tel. & Tel. Co. v. Pub. Utils. Comm'n*, 62 Cal.2d 634 (1965) .......................................5

*Pacific Bell Tel. Co. v. S. Cal. Edison Co.*, 208 Cal.App.4th 1400 (2012) ...............8, 13, 14

*Pasillas v. Agric. Labor Relations Bd.*, 156 Cal.App.3d 312, 348 (1984)...........................16

*Penn. Coal Co. v. Mahon*, 260 U.S. 393 (1922) ....................................................................19

*Ponderosa Tel. Co. v. Pub. Utils. Comm'n*, 197 Cal.App.4th 48 (2011) .............................18

*Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15 (2000) ......................................................9

*S. Cal. Edison Co. v. Pub. Utils. Comm'n*, 20 Cal.3d 813 (1978) ..........................................5

*Shelley v. Kraemer*, 334 U.S. 1 (1948) ..................................................................................17

*Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 864 F.2d 1475 (9th Cir. 1989) ............22

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003)......................................21

*The Estate of Betty Beauchamp v. Dorothy Beauchamp Campbell*, No. BC419839,
2010 WL 7366697 (Cal. Super. June 23, 2010) ...................................................................8

*Varjabedian v. City of Madera*, 20 Cal.3d 285 (1977) .........................................................11

**Statutes & Rules**

28 U.S.C. § 157(b)(2) ................................................................................................................3

Bankruptcy Code Section 502(b)(1) ..........................................................................................9

Cal. Civ. Code, § 3333.............................................................................................................23

Cal. Pub. Util. Code, §§ 701-853, 1001-02 and 2101..............................................................4

California's Torts Claims Act, Gov't Code §§ 810 *et seq.*............................................13, 23

**Other Authorities**

*Butte Fire Cases*, No. JCCP4853, 2018 WL 3371780 (Cal. Super. Ct. Apr. 26, 2018)..............8, 9, 15

Cal. Const., Art. 1, § 19 ....................................................................................10, 11, 17

Cal. Const., Art. XII, §§ 3, 6...................................................................................4, 5, 6

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.       PRELIMINARY STATEMENT

Under the doctrine of inverse condemnation, a private party is entitled to compensation from a public entity if its property is "damaged" for public use.  The California Supreme Court has consistently explained that the "underlying purpose of [inverse condemnation] is . . . to socialize the burden . . . that should be assumed by society." *Holtz v. Superior Court*, 3 Cal.3d 296, 303 (1970) (internal citations and quotation marks omitted).  Inverse condemnation is a strict liability doctrine that applies regardless of negligence and thus serves as a form of social insurance, intended to be financed by the general public, based on the premise that the costs of damage from a public good "can better be absorbed, and with infinitely less hardship, by the taxpayers as a whole." *Albers v. County of Los Angeles*, 62 Cal.2d 250, 263 (1965).  In formulating the doctrine of inverse condemnation, the California Supreme Court was "most fundamentally influenced by th[e] 'loss distribution' premise". *Holtz*, 3 Cal.3d at 304.

The way that the inverse condemnation doctrine is supposed to work is thus very simple:  if members of the community suffer a loss from a public improvement, those individuals are compensated for the loss by the community as a whole.  The idea is that if the entire community benefits from an improvement (such as an electric grid), then it is not fair for a subset of those people whose property is taken or damaged by that improvement (such as by a fire caused by that grid) to bear a disproportionate share of the cost for that improvement.  Inverse condemnation was developed to facilitate the socialization of losses through the public entities that construct, own and operate the public improvements at issue.  The true public entity, such as a municipality or government utility, serves merely as a conduit for loss-spreading.  Although the public entity pays the inverse condemnation damages to the impacted individuals, it does not itself bear the loss.  Instead, it socializes those damages by recouping them from the public at large through taxes or utility rate increases.

To state the most fundamental point, PG&E, an investor-owned utility, is **not** a public entity.  It cannot levy taxes.  It cannot levy special assessments.  And, unlike a true public utility that is not subject to any regulatory limits on its ability to raise rates, PG&E does not control the rates it can

charge its customers.  Instead, PG&E's ability to raise rates and spread inverse losses is expressly

limited by the authority of the California Public Utilities Commission ("**CPUC**").  Critically, the

CPUC made clear in 2017 that whether a private utility has incurred costs related to inverse

condemnation is **not relevant** to whether that utility will be able to socialize those losses through

rate increases.  In other words, the CPUC has plainly stated that private utilities such as PG&E are

not guaranteed any ability to spread inverse condemnation losses and may be left bearing the

financial consequences themselves.  This risk that the utility will be precluded from spreading

inverse losses amongst the benefitted public led directly to these Chapter 11 Cases.

      The whipsaw now facing California's investor-owned utilities is untenable.  On the one hand,

certain lower state court decisions discussed below have extended inverse condemnation to investor-

owned utilities on the express assumption that the CPUC would allow private utilities to shift inverse

condemnation costs to the public through increased rates.  On the other hand, the CPUC has

explicitly rejected that critical assumption.  It is therefore no surprise that there is a broad consensus

that inverse condemnation law in California is broken:

- The Governor's Strike Force regarding wildfires and climate change found that "[w]hile a utility faces strict liability for all damages caused by its equipment, it can recover those costs through rates only by proving to the CPUC that its conduct was prudent. This regime—strict liability for wildfire damage coupled with uncertain ability to recover those damages in rates—increases the risk of bankrupt utilities, which in turn drives up costs for consumers, threatens fair recoveries for fire victims, undermines the state's ability to mitigate and adapt to climate change, and creates uncertainty for utility employees and contractors."  (Wildfires and Climate Change:  California's Energy Future:  A Report from Governor Newsom's Strike Force (the "**Strike Force Report**"), dated April 12, 2019 at 28, attached as Orsini Decl. Ex. A.)

- CPUC Commissioner Rechtschaffen has stated that "the doctrine of inverse condemnation, as its [*sic*] been developed by the courts and applied to public utilities, may be worth re-examining in a sense that the courts applying the cases to public utilities have done so without really grappling with the salient difference between public and private utilities, which is that there's no guaranty that . . . private utilities can recover the cost from their ratepayers, so this is an issue that the legislature and the courts may wish to examine and may be called on to examine in the future".  (Nov. 30, 2017 CPUC Hr'g ("**CPUC Hearing**") at 4, attached as Orsini Decl. Ex. B.)

- Former CPUC President and Commissioner Picker and Commissioner Guzman Aceves have expressed similar concerns:  "the logic for applying inverse condemnation to utilities—costs will necessarily be socialized across a large group rather than borne by a single injured property owner . . . is unsound. . . . [T]he application of inverse condemnation to utilities in all events of private property loss [fails] to recognize important distinctions between public and private utilities and that the financial pressure on utilities from the application of inverse condemnation may lead to higher rates" resulting from "increase[s] in the cost of capital and the expense associated with

insurance." (Concurrence of President and Commissioner Michael Picker and Commissioner Martha Guzman Aceves on Item 40, Decision Regarding Application of ("**SDG&E**") for Authorization to Recover Costs Related to the 2007 Southern California Wildfires Recorded in the Wildfire Expense Memorandum Account ("**WEMA**") (the "**CPUC Concurrence**") at 5-6, attached as Orsini Decl. Ex. C.)

These statements from the California Governor and the CPUC Commissioners are a clear invitation to this Court to fix the misapplication of the law of inverse condemnation by lower California courts.

This Court has the authority to disallow claims based on inverse condemnation as a matter of law. 28 U.S.C. § 157(b)(2) ("Core proceedings include, but are not limited to . . . allowance or disallowance of claims against the estate.") The applicability of inverse condemnation materially impacts the value of claims arising out of the 2017 and 2018 Wildfires because, among other things, without strict liability, a claimant would have to prove that PG&E was negligent. In determining whether claims for inverse condemnation should be disallowed as a matter of law, this Court must look to state law. If the claim cannot survive under state law, it cannot be allowed. Where, as here, the California Supreme Court has not ruled on the issue presented, this Court must predict what the state's highest court would say. The fundamental guarantee that a public entity can spread inverse condemnation losses across the entire community has been present in every single inverse condemnation case ever decided by the California Supreme Court. That guarantee is absent here. As a result, this Court will be unable to square the nearly 100 years of California Supreme Court jurisprudence espousing cost-spreading as the *sine qua non* of the doctrine with the continued application of inverse condemnation to a private utility such as PG&E. This is particularly the case following the CPUC's controversial 2017 decision.

In addition, the application of inverse condemnation to PG&E is unconstitutional. Because PG&E has "no guaranty" that it can spread any losses it is forced to pay as a result of inverse condemnation claims, the application of inverse condemnation to PG&E is nothing more than the transfer of private property from one private entity (PG&E) to another (the inverse plaintiff) without any compensation, let alone just compensation. This uncompensated taking of PG&E's property violates the Fifth Amendment of the United States Constitution (as incorporated against the states by the Fourteenth Amendment) and the California Constitution. In the alternative, the application of

1    inverse condemnation to PG&E would be arbitrary and irrational, and violates PG&E's substantive

2    due process rights protected by the Fourteenth Amendment and the California Constitution.

3          In sum, inverse condemnation is a strict liability doctrine that was developed by the

4    California Supreme Court to spread losses among the community at large regardless of whether a

5    public entity has been negligent.  It works in the context of public entities because they are not left

6    bearing the losses themselves.  It does not work with respect to an investor-owned utility, which is

7    most aptly demonstrated by the fact that the Debtors are in Chapter 11.  A ruling that inverse

8    condemnation does not apply to investor-owned utilities is compelled by the existing California

9    Supreme Court doctrine.[1]

10   **II.    BACKGROUND**

11          **A.    The Regulation of Private Utilities in California**

12          PG&E is a privately owned utility.  (Amended Declaration of Jason P. Wells (Dkt. 263)

13   ("**Wells Decl.**") 7:9-10.)  PG&E provides natural gas and utility services to approximately 16 million

14   customers, including both individuals and businesses.  (*See id.* at 7:11-12.)  PG&E raises the capital

15   necessary to fund ongoing operations largely by receiving payment for the provision of its electric

16   and gas services.  (*See id.* at 7:25-27.)  In the ordinary course of business, PG&E must also raise

17   significant amounts of capital to finance investments needed to provide safe and reliable gas and

18   electric service to its customers.  (*See id.* at 3:23-4:2; *id.* at 8:8-16.)  PG&E has typically turned to

19   the debt and equity markets to raise the additional capital needed for such expenditures.  (*Id.* at 8:8-

20   16.)

21          In California, private utilities such as PG&E are regulated by the CPUC.  *See* Cal. Const.,

22   Art. XII, § 3; Cal. Pub. Util. Code, §§ 701-853, 1001-02 and 2101.  (Wells Decl. 7:20-22.)  The

23   CPUC provides service and safety standards by which the utilities must abide, oversees markets to

24   inhibit anti-competitive activity, resolves complaints by customers and, importantly, sets customer

---

[1] To be clear, a ruling that inverse condemnation does not apply to investor-owned utilities will have <u>no</u> impact on the Debtors' potential liability under negligence theories.  To the extent the Debtors (or any other investor-owned utility) negligently start a fire, they will be held liable regardless of the ruling on this submission, which addresses only the strict liability doctrine that applies regardless of fault.

rates. *See Anchor Lighting v. S. California Edison Co.*, 142 Cal.App.4th 541, 547-48 (2006). The CPUC does not regulate publicly owned utilities, *i.e.*, those operated by government agencies.

The United States Supreme Court has long recognized that a public utility's rates must "enable the company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed." *Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 605 (1944). The CPUC rate-setting process is intended to serve those purposes by allowing private utilities to recover operating expenses, capital costs and a reasonable rate of return on invested capital. Thus, a utility is entitled to recover its expenses on a dollar-for-dollar basis as part of its rates, along with a reasonable rate of return on the value of its property devoted to public use. *S. Cal. Edison Co. v. Pub. Utils. Comm'n*, 20 Cal.3d 813, 818-19 (1978); *Pac. Tel. & Tel. Co. v. Pub. Utils. Comm'n*, 62 Cal.2d 634, 644-45 (1965).

Private utilities such as PG&E cannot unilaterally raise their rates. When a private utility like PG&E wants to raise its rates because, among other reasons, it has incurred costs related to its provision of electric service, it must apply to the CPUC to approve a rate increase after adjudication in an administrative proceeding. *See* Cal. Const., Art. XII, §§ 3, 6. In evaluating whether a rate change should be approved, the CPUC applies a "prudent manager" standard, under which it examines whether the costs incurred are "reasonable." (*See* Decision Denying Application of [SDG&E] for Authorization to Recover Costs Related to the 2007 Southern California Wildfires Recorded in the [WEMA] (the "**SDG&E Decision**") at 10, attached as Orsini Decl. Ex. D.) If the CPUC deems the costs unreasonable, it will not approve the increase. (*Id.*) Until recently, private utilities assumed that if they incurred costs related to strict inverse condemnation liability, those costs could be recouped via rate increases, which would be approved by the CPUC.

**B.     The CPUC Has Stated That Private Utilities Cannot Automatically Raise Rates To Recover Inverse Condemnation Costs**

A decade before the wildfires that gave rise to these Chapter 11 Cases, several wildfires spread throughout portions of Southern California. After the fires, the California Department of Forestry and Fire Protection ("**Cal Fire**") and the CPUC's investigative division attributed the ignition of three of these wildfires (the "**2007 wildfires**") to electrical facilities owned and operated

by SDG&E.  (SDG&E Decision at 2.)  In connection with those wildfires, SDG&E established a

WEMA to track costs associated with the three fires.[2]  The WEMA account grew to $2.4 billion in

costs and legal fees incurred primarily to resolve third-party inverse condemnation claims arising

from the 2007 wildfires.  (*Id.* at 3.)  In September 2015, SDG&E applied to the CPUC to recover,

through rates, $379 million of the WEMA account for unreimbursed costs that SDG&E paid due to

inverse condemnation.  (*Id*.)

On August 22, 2017, the CPUC Administrative Law Judges issued a proposed decision

denying SDG&E's application.  On November 30, 2017, the CPUC issued a final decision, denying

in full SDG&E's application for recovery of costs related to the 2007 wildfires.  (*See* SDG&E

Decision.)  In the decision, the CPUC applied its administratively created "prudent manager"

standard, under which it examines whether costs incurred are "reasonable."  (*Id.* at 65.)  The CPUC

also announced for the first time that the principles of inverse condemnation are not relevant to rate

setting because the CPUC has exclusive jurisdiction over cost recovery:  "Inverse Condemnation

principles are not relevant to a Commission reasonableness review under the prudent manager

standard. . . .  Even if SDG&E were strictly liable, we see nothing in the cited case law that would

supersede this Commission's exclusive jurisdiction over cost recovery/cost allocation issues

involving Commission regulated utilities."  (*Id*.)

Concurrently with the SDG&E decision, the CPUC Commissioners held a hearing in which

they affirmed the CPUC's policy but called upon the courts and legislature to reconsider the doctrine

of inverse condemnation.  Commissioner Rechtschaffen stated:

> "[I]t is worth noting that the doctrine of inverse condemnation, as its [*sic*] been developed by
> the courts and applied to public utilities, may be worth re-examining in a sense that the courts
> applying the cases to public utilities have done so without really grappling with the salient
> difference between public and private utilities, which is that there's no guaranty that private
> utilities can recover the cost from their ratepayers, so this is an issue that the legislature and
> the courts may wish to examine and may be called on to examine in the future.  But having
> said that, it doesn't change *our* obligation to rule that the utility can't recover unless they
> acted prudently . . . ."

---

[2] A WEMA is a tracking mechanism used by a regulated utility to segregate costs that it may later seek
to recover through rates in an application to the CPUC.

(CPUC Hearing at 4) (emphasis in original). Other Commissioners agreed. For example, Commissioner Peterman remarked: "I also appreciate the revisions to the proposed decision, clarifying that the legal doctrine of inverse condemnation does not displace the Commission's reasonableness review of whether SDG&E was a prudent manager in this case." (*Id.* at 3.) On December 26, 2017, Former President and Commissioner Picker and Commissioner Guzman Aceves filed a joint concurrence where they directly urged the courts to reconsider the rationale for applying inverse condemnation to private utilities, specifically because "the logic for applying inverse condemnation to utilities—costs will necessarily be socialized across a large group rather than borne by a single injured property owner, regardless of prudence on the part of the utility—is unsound." (CPUC Concurrence at 5.) The Commissioners also stated in their concurrence that "the application of inverse condemnation to utilities in all events of private property loss [fails] to recognize important distinctions between public and private utilities and that the financial pressure on utilities from the application of inverse condemnation may lead to higher rates" resulting from "increase[s] in the cost of capital and the expense associated with insurance." (*Id.* at 6.) As noted in the Governor's Strike Force Report, it can lead to increased risk of bankrupt utilities. (Strike Force Report at 28.)

**C.      The 2017 and 2018 Wildfires**

In 2017 and 2018, a series of catastrophic wildfires raged across Northern California. On October 8 and 9, 2017, multiple wildfires began at different locations throughout Northern California. Fanned by extreme winds, these fires spread at a catastrophic pace and ultimately impacted at least a dozen counties (the "**North Bay Fires**"). These fires were the result of a confluence of unprecedented weather events, including: five years of record-breaking drought and bark beetle infestations that led to an extreme tree mortality crisis; exceedingly heavy rainfall during the winter of 2016-2017, causing new vegetation growth; the hottest summer on record in 2017 for the Northern California area, killing and drying that new growth to create additional fuel; extremely low humidity throughout the Northern California area; and high-wind events, before the first rains had come through to soak the vegetation and ground. Similar conditions contributed to the rapid

spread of another devastating fire which began on November 8, 2018, and became the largest

wildfire in the state's history (the "**Camp Fire**").[3]

**D.    Procedural History**

Prior to PG&E filing for chapter 11 protection, thousands of individuals sued PG&E seeking

compensation for damage incurred during the 2015 Butte Fire, the 2017 North Bay Fires and the

2018 Camp Fire.  The plaintiffs in those cases alleged that PG&E was liable under a theory of

inverse condemnation.

On May 18, 2018, PG&E filed a demurrer in the North Bay Fires coordinated proceeding in

San Francisco Superior Court on the basis that inverse condemnation should not apply to private

utilities for the reasons set forth herein and that, if it did apply, it violated the Takings and Due

Process Clauses of the United States Constitution.  *Harrison v. PG&E Corp.*, No. CGC17563108,

2018 WL 2447104, at *2-4 (Cal. Super. Ct. May 21, 2018).  The court overruled PG&E's demurrer,

primarily on the ground that it was bound by a California Court of Appeal decision in *Pacific Bell*

*Telephone Co. v. Southern California Edison Co.*, 208 Cal.App.4th 1400 (2012), a case decided

before the CPUC rejected automatic loss-spreading under inverse.  *Harrison*, 2018 WL 2447104, at

*3-4.  As an interlocutory order, the North Bay Fire decision was not appealable as of right.  PG&E

petitioned the California Court of Appeal and California Supreme Court for leave to appeal.  Both

petitions were denied.[4]

In the state court coordinated proceeding concerning the 2015 Butte Fire, PG&E filed a

similar motion for a legal determination that inverse condemnation did not apply to PG&E.  *See*

*Butte Fire Cases*, No. JCCP4853, 2018 WL 3371780, at *10 (Cal. Super. Ct. Apr. 26, 2018).  On

April 26, 2018, the Superior Court denied PG&E's motion, similarly noting that it was bound by the

---

[3] Also at issue in this case are inverse condemnation claims related to a wildfire that started on November 9, 2015, in Amador County, California (the "**Butte Fire**").

[4] As interlocutory orders subject to appeal, the North Bay Fire and Butte Fire decisions are not final and do not have preclusive effect on this Court.  *McAlister v. Essex Prop. Tr.*, 504 F. Supp. 2d 903, 911 (C.D. Cal. 2007) ("A judgment is not final [for the purposes of collateral estoppel] while there is time to appeal or while an appeal is pending."); *The Estate of Betty Beauchamp v. Dorothy Beauchamp Campbell*, No. BC419839, 2010 WL 7366697 (Cal. Super. June 23, 2010) (finding "no case in which collateral estoppel has been applied to a denial of summary adjudication/judgment").

California Court of Appeal decisions in *Pacific Bell* and *Barham*. *Id.* As an interlocutory order, the Butte Fire decision was not appealable as of right. PG&E petitioned the California Court of Appeal and California Supreme Court for leave to appeal, but those petitions were also denied.

There has been no briefing or decision regarding inverse condemnation in the Camp Fire coordinated proceeding in San Francisco Superior Court.

Whether PG&E, as an investor-owned utility, may be held strictly liable for inverse condemnation is a threshold legal issue that has a material impact on the District Court's estimation of the Wildfire Claims. In the Court's recommendation to withdraw the reference of the Section 502(c) of Title 11 of the United States Code (the "**Bankruptcy Code**") estimation of unliquidated claims, the Court ruled that it would retain the inverse determination issue to assist the District Court in its estimation of the Wildfire Claims. (*See* Dkt. 3648 at 8 n.4.) Given the significance of this critical issue, the Court ordered the parties to submit briefs prior to commencement of the estimation proceedings.

## III.    ARGUMENT

### A.    Applicable Law

Under Bankruptcy Code Section 502(b)(1), a bankruptcy court shall not allow a claim if it "is unenforceable against the debtor and property of the debtor, under any agreement or applicable law". 11 U.S.C. § 502(b)(1). Whether inverse condemnation applies to a private utility debtor such as PG&E is a matter of state law. *Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 20 (2000) ("The 'basic federal rule' in bankruptcy is that state law governs the substance of claims . . . ."). When deciding matters of state law, federal courts must apply "the law of the state" as "declared by its Legislature in a statute or by its highest court in a decision". *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). If the law is unclear, federal courts must predict what the highest court in the state would say. *Orkin v. Taylor*, 487 F.3d 734, 741 (9th Cir. 2007) ("If the state's highest appellate court has not decided the question presented, then we must predict how the state's highest court would decide the question."). Federal courts may reject judgments of state appellate courts or other lower state courts if they are "convinced by other persuasive data that the highest court of the state would decide otherwise". *Am. Tower Corp. v. City of San Diego*, 763 F.3d 1035, 1047 (9th Cir. 2014) (concluding

1    that "the text of the [relevant] statute is 'persuasive data' that the California Court of Appeal

2    misinterpreted" the statute).

3         Critically, the California Supreme Court has never ruled on the key question presented in this

4    submission:  whether inverse condemnation applies to an investor-owned utility, particularly given

5    the CPUC's confirmation that there is no guarantee of cost recovery.  To the contrary, as described

6    below, the cases that have been decided by the California Supreme Court confirm that, if presented

7    with this question, existing precedent would compel a finding that inverse condemnation does not

8    apply to investor-owned utilities such as PG&E.

9         **B.      Inverse Condemnation Claims Are Unenforceable Against PG&E Because
              Inverse Condemnation Should Not Be Extended to Private Utilities Under
10             California State Law.**

11         Under California law, only a public entity is subject to inverse condemnation.  *See Baker v.*

12   *Burbank-Glendale-Pasadena Airport Auth.*, 39 Cal.3d 862, 866-67 (1975) (holding that a "public

13   entity" is liable for inverse condemnation when "damage result[s] from an exercise of governmental

14   power while seeking to promote the general interest") (quotation omitted).  The California Supreme

15   Court has never held that a private utility such as PG&E is a public entity for purposes of an inverse

16   condemnation claim.  Because the CPUC's new policy restricts the ability of private utilities to

17   spread inverse condemnation costs among their customers, PG&E cannot be treated as a public

18   entity for inverse condemnation purposes.

19         **1.      Under Existing California Supreme Court Precedent, Inverse
                   Condemnation Does Not Apply to PG&E.**

20

21         As the California Supreme Court has articulated, the "underlying purpose" of inverse

22   condemnation is to distribute losses suffered by an individual due to a public improvement

23   throughout the community that benefits from that improvement.  *Holtz*, 3 Cal.3d at 303; *Albers*, 62

24   Cal.2d at 263.  The California Supreme Court has reiterated this cost-spreading rationale for the

25   imposition of inverse condemnation liability for more than 75 years,[5] including as recently as earlier

26   this year:

27   _____

28   [5] Article I, section 19 of the California Constitution sets forth the State's eminent domain provision
     and provides that "[p]rivate property may be taken or damaged for a public use and only when just

- "[T]he policy underlying [inverse condemnation] is to distribute throughout the community the loss inflicted upon the individual by the making of public improvements." *Bacich v. Bd. of Control of California*, 23 Cal.2d 343, 350 (1943).

- "[T]he policy underlying [inverse condemnation] is to distribute throughout the community the loss inflicted upon the individual by the making of the public improvements." *Varjabedian v. City of Madera*, 20 Cal.3d 285, 296 (1977) (citation and quotation omitted).

- "The relevant 'policy' basis of article I, section [19] . . . is 'to distribute throughout the community the loss inflicted upon the individual by [the public enterprise].'" *Customer Co. v. City of Sacramento*, 10 Cal.4th 368, 409 (1995).

- "[T]he underlying purpose of our constitutional provision in inverse—as well as ordinary—condemnation is 'to distribute throughout the community the loss inflicted upon the individual . . .'" *Belair v. Riverside Cty. Flood Control Dist.*, 47 Cal.3d 550, 558 (1988).

- "[T]he underlying purpose of our constitutional provision in inverse—as well as ordinary—condemnation is 'to distribute throughout the community the loss inflicted upon the individual by the making of public improvements.'" *Locklin v. City of Lafayette*, 7 Cal. 4th 327, 365 (1994).

- The purpose of inverse condemnation is to "distribute throughout the community the losses resulting from the public improvement." *City of Oroville v. Superior Court*, 250 Cal.Rptr.3d 803, 811 (2019).

Every inverse condemnation defendant in the seminal cases that have developed the State's inverse condemnation law was a government or other public entity that had the unilateral power to fund inverse condemnation liability through compulsory taxation, rates or fees. *See, e.g.*, *Bacich*, 23 Cal.2d at 345 (Board of Control, California Toll-Bridge Authority and State Department of Public Works); *Customer Co.*, 10 Cal.4th at 395 (City of Sacramento and Sacramento County); *Locklin*, 7 Cal.4th at 340 (City of Lafayette, County of Contra Costa, Contra Costa County Flood Control District, California Department of Transportation and Bay Area Rapid Transit District); *Belair*, 47 Cal.3d at 554 (Riverside County Flood Control District and State of California); *Varjabedian*, 20 Cal.3d at 288-89 (City of Madera); *Holtz*, 3 Cal.3d at 299 (San Francisco Bay Area Rapid Transit District and the City and County of San Francisco); *Albers*, 62 Cal.2d at 254 (Los Angeles County).

---

compensation . . . has first been paid to . . . the owner." Cal. Const., Art. 1, § 19(a). Cal. Const. Art. 1, § 19(a). Inverse condemnation is the "inverse" of eminent domain, *i.e.*, it provides the private property owner with a mechanism to seek just compensation when a public entity has taken or damaged his or her property.

1     Each of these entities was therefore guaranteed the right to spread the costs of an inverse

2     condemnation damages judgment among the public at large rather than bearing these public benefit

3     costs themselves. Consistent with this rationale, the California Supreme Court has **only** ever

4     extended inverse condemnation beyond the state or the government to other "public entities" that can

5     engage in automatic cost-spreading. For example, the California Supreme Court found that an

6     airport was a "public entity" only after it was acquired by three cities and was thus able to spread the

7     costs for inverse condemnation liability using the cities' taxing authority. *Baker*, 39 Cal.3d at 865-

8     68.

9         Unlike traditional public utilities, PG&E does not have the power to automatically spread the

10    costs of inverse condemnation. PG&E has no taxing authority. And since its rates are subject to

11    CPUC approval, PG&E has no guarantee that it will be able to raise rates to recover costs incurred as

12    a result of inverse condemnation liability. Instead, the CPUC has made clear that inverse

13    condemnation is not relevant to the reasonableness review it undertakes with respect to ratemaking

14    applications. (SDG&E Decision at 65 ("Inverse Condemnation principles are not relevant to a

15    Commission reasonableness review under the prudent manager standard.").) PG&E, a private

16    utility, is thus fundamentally different from the public entities on which the inverse condemnation

17    case law was based. (*See, e.g.*, CPUC Hearing at 4 (noting "the salient difference between public

18    and private utilities . . . is that there's no guaranty that private utilities can recover the cost from their

19    ratepayers").)

20         PG&E's provision of utility services benefits not only its customers but also the entirety of

21    Northern California, which benefits from the economic activity that electric and gas utility service

22    allows. There is a disconnect between this critical public benefit and PG&E's inability to socialize

23    among the public it serves the costs inherent in providing this benefit. Because private utilities such

24    as PG&E cannot engage in the cost-spreading that is fundamental to the imposition of inverse

25    condemnation as articulated by the California Supreme Court, they should not be subject to inverse

26    condemnation.[6]

27

28    [6] Inverse condemnation liability also is unnecessary with respect to private utilities because damages
are otherwise recoverable under applicable tort law. Public entities often have immunity or other

## 2.     Lower and Intermediate California Court Decisions Do Not Compel a Different Result.

As described above, the California Supreme Court has never extended inverse condemnation to private utilities. It has instead repeatedly held that the constitutional basis for inverse condemnation is the guarantee of loss-spreading that is fundamentally absent with respect to private utilities (particularly following the CPUC's 2017 decision). Intermediate appellate courts in California also have repeatedly affirmed that the fundamental policy underlying inverse condemnation is the loss-spreading principle outlined above. For example, in a recent case, the California Court of Appeal noted that "the fundamental policy 'underlying the concept of inverse condemnation is that the costs of a public improvement benefiting the community should be spread among those benefited.'" *Mercury Cas. Co. v. City of Pasadena*, 14 Cal.App.5th 917, 925-26 (2017); *see also Gutierrez v. Cty. of San Bernardino*, 198 Cal.App.4th 831, 485 (2011) (referring to the loss distribution premise as an "important policy underpinning inverse condemnation damages").

In pressing the argument that inverse condemnation applies to private utilities such as PG&E, the claimants will rely on two California intermediate appellate decisions: *Barham v. Southern California Edison Co.*, 74 Cal.App.4th 744, and *Pacific Bell Telephone Co. v. Southern California Edison Co.*, 208 Cal.App.4th 1400. In both cases, which were decided long before the CPUC's November 30, 2017 decision, the courts extended inverse condemnation to private utilities based on the cost-spreading rationale.[7] Those decisions were incorrect when issued and are even more obviously wrong in light of the CPUC's subsequent rejection of loss-spreading in connection with the SDG&E 2007 wildfires.

---

protections from tort liability such as those afforded by California's Torts Claims Act, Gov't Code §§ 810 *et seq.*, making inverse condemnation a means of socializing the costs not otherwise recoverable under the tort system. By contrast, investor-owned utilities such as PG&E are not immune from tort liability.

[7] This Court is not bound by the decisions of lower California courts. *In re Basave De Guillen*, 604 B.R. 826, 836 (B.A.P. 9th Cir. 2019) (rejecting interpretation of California intermediate appellate court on question of state law where the California Supreme Court had not yet decided the issue); *see also In re Foamex Int'l, Inc.*, 491 B.R. 100, 106 (Bankr. D. Del. 2013) (recognizing that "the decrees of lower state courts are not binding" on the bankruptcy court for "issue[s] grounded in state law").

1    In *Barham*, the California Court of Appeal made new law by extending inverse

2  condemnation to a private utility for the first time in California history.  In so doing, the court

3  expressly acknowledged that "the *fundamental* policy underlying the concept of inverse

4  condemnation is to *spread among the benefitting community* any burden disproportionately borne by

5  a member of that community."  *Barham*, 74 Cal.App.4th at 752 (emphases added) (citing *Belair*, 47

6  Cal.3d at 558).  The *Barham* court cited to cases holding *public* entities liable for inverse

7  condemnation under similar circumstances and found that Southern California Edison ("**SCE**") was

8  liable for inverse condemnation because no "significant differences exist regarding the operation of

9  publicly versus privately owned electric utilities."  *Id.* at 752-53.  The court failed to consider

10  situations in which the private utility cannot act as a conduit for cost-spreading and simply assumed

11  it always would be able to socialize losses the same way a public utility can.

12    In *Pacific Bell*, the court relied on *Barham* to once again extend inverse condemnation to

13  SCE.  208 Cal.App.4th at 1408.  As in *Barham*, the *Pacific Bell* court cited *Belair* for the proposition

14  that the "loss spreading rationale" for inverse condemnation should apply to both publicly and

15  privately owned utilities.  *Id.* at 1407.  Presuming that the loss-spreading rationale justified

16  extending inverse condemnation to SCE, the court rejected SCE's argument that it differed from

17  public entities because it had no power unilaterally to raise rates and entirely depended on the

18  CPUC's regulatory discretion.  *Id.* at 1407-08.  Indeed, the *Pacific Bell* court found that SCE "ha[d]

19  not pointed to any evidence to support its implication that the [CPUC] would not allow [it]

20  adjustments to pass on damages liability during its periodic reviews."[8]  *Id.* at 1407.

21    In the Butte Fire and North Bay Fire cases, the state superior courts concluded that, as lower

22  California courts, they were bound by the California Court of Appeal decisions in *Barham* and

23

---

24  [8] In a footnote, the *Pacific Bell* court noted that it did "not believe" that if public utilities were subject
   to the oversight of the CPUC that this "would immunize [government] utilities from inverse
25  condemnation liability under the theory that they were no longer able to spread the cost of public
   improvements."  208 Cal.App.4th at 1407 n.6.  But this statement preceded the CPUC's recent policy
26  articulation.  That statement also has no bearing here, as even a regulated *public* entity would be
   supported by *public* tax funds and would not, in any circumstance, be required to rely on *private* funds
27  and *private* property to satisfy an award of inverse condemnation damages.  The opposite is true for a
   private utility such as PG&E.
28

1  *Pacific Bell*, and therefore had to conclude that inverse condemnation applied to PG&E, an investor-

2  owned utility.  *Butte Fire Cases*, 2018 WL 3371780, at *9-10; *Harrison*, 2018 WL 2447104, at *3.

3        The fundamental problem, however, is that the reasoning of *Barham* and *Pacific Bell* was

4  flawed because it assumed that private utilities, like public utilities, would be able to spread inverse

5  condemnation costs among the entire rate-paying population.  As stated above, the *Barham* court

6  wholly failed to examine whether a private utility could actually engage in cost-spreading—which

7  the court acknowledged was the "fundamental policy" underlying inverse condemnation and instead

8  simply assumed that no "significant differences" existed between public and private utilities.

9  *Barham*, 74 Cal.App.4th at 752-53.  Likewise, in *Pacific Bell*, the court found that, because SCE had

10  not actually provided evidence that the CPUC would not allow SCE to socialize its inverse

11  condemnation costs through rate adjustments, SCE must be able to do so.  The CPUC's 2017

12  decision declaring inverse condemnation "not relevant" to cost recovery through the rate-setting

13  process provides the evidence that the *Pacific Bell* court found lacking.  It likewise proves that the

14  assumption made by the *Barham* and *Pacific Bell* courts that private utilities will be able to spread

15  the costs of inverse condemnation liability is false.

16        Those decisions also cannot be salvaged based on the notion, adopted by the California

17  Superior Courts in the North Bay and Butte Fire cases, that *Pacific Bell* turned on the "quasi-

18  monopolistic authority" of private utilities.  *See Butte Fire Cases*, 2018 WL 3371780, at *9;

19  *Harrison*, 2018 WL 2447104, at *3.  According to the California Supreme Court, it is not the

20  monopoly status of any public entity that provides the basis for inverse condemnation liability.  It is

21  instead the cost-spreading rationale that is the *sine qua non* of inverse condemnation.  Whether

22  PG&E is a quasi-monopolist or not is entirely beside the point given the constitutional and "policy

23  underpinning" of inverse condemnation.  *Gutierrez*, 198 Cal.App.4th at 837.

24        The reliance in *Pacific Bell* on the quasi-monopolistic status of private utilities was also

25  based on a misreading of a single case, *Gay Law Students Assn. v. Pacific Telephone and Telegraph

26  Co.*, 24 Cal.3d 458 (1979).  In *Gay Law Students*, the question presented was whether the Equal

27  Protection Clause, which applies only to state or governmental entities, could apply to a private

28  utility such that the private utility could be prohibited from engaging in discriminatory employment

practices. 24 Cal.3d at 466. In ruling in the affirmative, the California Supreme Court reasoned that the State's grant of quasi-monopoly power on the private utility limits competition that might otherwise discourage a private utility's discriminatory practices and also enlists taxpayers in indirect support of the discriminatory practices. *Id.* at 470-72.

In *Pacific Bell*, the court failed to realize that *Gay Law Students* was context-specific and that the California Supreme Court's decision had no relevance to any issue other than the applicability of the Equal Protection Clause. *See Pasillas v. Agric. Labor Relations Bd.*, 156 Cal.App.3d 312, 348 (1984) (noting that *Gay Law Students* "must be read in context, as addressing only the problem of arbitrary discrimination in employment (or membership) criteria affecting an individual's fundamental right to work") (emphasis omitted). Indeed, in at least one other context, the California Court of Appeal has made clear that a private utility is **not** a public entity. *See Moreland Inv. Co. v. Superior Court*, 106 Cal.App.3d 1017, 1022-23 (1980) (holding that a private utility is not a governmental agency under California Code of Civil Procedure section 397, in part because it cannot directly pass on eminent domain costs to ratepayers).

What *Gay Law Students* and *Morehead* therefore illustrate is that whether a private utility should be considered a public or private entity depends entirely on the particular context in which the question is raised. Here, the context is whether PG&E, a private utility, should be treated the same as a public utility for purposes of inverse condemnation liability, where the public utility—but not PG&E—has the unilateral ability to spread the associated costs among the community at large, thereby satisfying the underlying rationale of the inverse condemnation doctrine. The answer is plainly no.

In short, the attempts by the two California trial courts to justify why *Pacific Bell* and *Barham* were correctly decided even after the CPUC confirmed that cost-spreading is not guaranteed to an investor-owned utility simply cannot be squared with the years of California Supreme Court jurisprudence regarding the doctrine. Unlike those lower state courts, this Court is not bound by *Pacific Bell* or *Barham*. Instead, it must predict what the California Supreme Court would say on this issue. *See Am. Tower Corp.*, 763 F.3d at 1047 (rejecting decision of California Court of Appeal because federal court was "convinced by other persuasive data that the highest court of the state

would decide otherwise"). Every single California Supreme Court case that concerns inverse condemnation explicitly recognizes that the entire premise underlying inverse condemnation liability is to spread the costs of a public improvement among the entire benefitted community. They say nothing about monopolist or "quasi-monopolistic" status, and they certainly do not support the notion that the strict liability inverse condemnation standard can be used to shift the cost of a public improvement from the benefitted public to a private entity that provides that benefit.

## C. Inverse Condemnation Claims Are Unenforceable Because Application of Inverse Condemnation to Private Utilities Violates the United States Constitution.

Even if this Court were to find that California law permits the application of inverse condemnation to private utilities such as PG&E, that would not be the end of the analysis. Instead, any such ruling would compel the conclusion that California state law concerning inverse condemnation violates the United States Constitution as applied to investor-owned utilities such as the Debtors.[9] Without a guarantee that PG&E can recover inverse condemnation costs, the imposition of such strict liability through a doctrine premised on socialization of losses constitutes an unlawful taking without just compensation, and an arbitrary and irrational process that violates the Debtors' substantive due process rights. No California state court has ever reached these Federal Constitutional questions that are now directly within this Court's jurisdiction.

### 1. The Application of Inverse Condemnation to PG&E Violates the Takings Clause of the Fifth Amendment of the United States Constitution.

The Takings Clause of the Fifth Amendment provides: "[N]or shall private property be taken for public use, without just compensation". U.S. Const., amend. V.[10] The United States Supreme Court has explained that the purpose of this clause is to "prevent the government from forcing some people alone to bear the public burdens which, in all fairness and justice, should be borne by the

---

[9] A California Superior Court's ruling on inverse condemnation constitutes state action subject to the constitutional limitation. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964); *Shelley v. Kraemer*, 334 U.S. 1, 14-18 (1948).

[10] Similarly, Article I, Section 19 of the California Constitution provides: "Private property may be taken or damaged for a public use . . . only when just compensation" has been paid. Cal. Const., art. I, § 19.

1    public as a whole." *E. Enters. v. Apfel*, 524 U.S. 498, 522 (1998) (internal quotations omitted). If

2    PG&E were subject to strict liability for inverse condemnation, but could not recover its inverse

3    condemnation costs, the application of inverse condemnation would be a naked transfer of property

4    from one private party to another without just compensation. This is an unconstitutional taking.

5          In *Eastern Enterprises*, the United States Supreme Court held that the following factors are

6    significant in determining whether an unconstitutional taking has occurred: "[t]he economic impact

7    of the regulation, its interference with reasonable investment backed expectations, and the character

8    of the governmental action." *Id.* at 523-24 (citation omitted). In assessing the "character of the

9    governmental action", courts look to whether the governmental action "amounts to a physical

10   invasion or instead merely affects property interests through 'some public program adjusting the

11   benefits and burdens of economic life to promote the common good'". *Lingle v. Chevron U.S.A.

12   Inc.*, 544 U.S. 528, 539 (2005) (citation omitted). The application of inverse condemnation to

13   PG&E meets each of these requirements of an unlawful taking.

14         *First*, the application of inverse condemnation creates a considerable financial burden on

15   PG&E by requiring the company to absorb inverse condemnation costs without any guarantee of

16   recovery from its customers. Courts have recognized that forcing companies to take on considerable

17   costs without the possibility of reimbursement is an unconstitutional deprivation of property. *See E.

18   Enters.*, 524 U.S. at 529-32 (finding considerable financial burden was imposed where the Coal Act

19   required plaintiff to make substantial payments and where the Act did not guarantee a right to

20   reimbursement).[11]

21         The economic impact of the potential liabilities due to inverse condemnation is readily

22   apparent. PG&E has reached an agreement with entities representing insurance subrogation claims

23

---

24   [11] Courts have recognized that limiting a utility's rate-setting ability can, in some circumstances,
25   constitute a taking. *See Duquesne v. Light Co. Barasch*, 488 U.S. 299, 308 (1989) ("If the rate does
      not afford sufficient compensation, the State has taken the use of utility property without paying just
26   compensation and so violated the Fifth and Fourteenth Amendments."); *Ponderosa Tel. Co. v. Pub.
      Utils. Comm'n*, 197 Cal.App.4th 48, 59 (2011) (holding that the CPUC had engaged in impermissible
27   appropriation by failing to permit a rate increase). These cases acknowledge that even though utility
      companies may exercise a unique quasi-monopolistic function, their revenues are ultimately controlled
28   by rate-setting agencies and that the government may not impose liabilities on private utilities in a
      manner that unjustly deprives utilities of those revenues.

for $11 billion to resolve all such claims arising from the 2017 North Bay Fires and the 2018 Camp Fire. The Official Committee of Tort Claimants ("**TCC**"), on behalf of individual wildfire claimants, has asserted that the value of individual wildfire claims in the aggregate is somewhere between $30 to $40 billion (Aug. 14, 2019 Hr'g Tr. at 136:23-137:1). As the Court is aware, the TCC is now the joint proponent of a plan that values the individual wildfire claims and public entity claims together at $14.5 billion. (Dkt. 4257 at 7.) Because the CPUC will not consider inverse condemnation liability in assessing rate applications by private utilities, there is no guaranty that PG&E will be able to recover these considerable costs.

This dynamic has already caused PG&E to lose billions of dollars of market value and led directly to these Chapter 11 Cases. As stated in its "first day" papers filed with its Chapter 11 petition, in light of the thousands of claims asserted against PG&E with respect to the 2017 and 2018 Wildfires, PG&E no longer has the ability to access the capital necessary for the proper discharge of its public duties—duties that include providing safe and reliable gas and electric service to its millions of customers, and properly investing in its infrastructure. (Wells Decl. 8:8-16.) PG&E's stock price fell 21% after reporting to the CPUC that there was an equipment failure near the area of the Camp Fire, from which the market inferred that PG&E's equipment may have caused the fire. This decline occurred prior to any reports regarding what role, if any, negligence may have played in the ignition.

*Second*, applying inverse condemnation to PG&E interferes with PG&E's reasonable investment-backed expectations in the use of its revenues and the operation of its business. *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415-16 (1922) (state action that defeats intended use of property and makes operations commercially impracticable is unconstitutional). As a private entity, PG&E has relied for nearly two decades on the premise in *Barham* and *Pacific Bell* that imposition of inverse condemnation liability would be offset by the ability to spread the costs through the rate recovery process. PG&E and its debt and equity investors never expected that, on the one hand, PG&E would be held strictly liable for inverse condemnation costs, while, on the other hand, it would be unable to recover those costs through rates. PG&E and its debt and equity investors

assumed—as did the California courts—that private entities would be able to automatically spread inverse condemnation costs the same way that publicly owned utilities can.

The uncertainty inherent in whether a private utility will be able to recover billions of dollars in inverse condemnation costs affects that company's ability to develop a sound business plan and raise the much-needed capital on which it depends.  Former CPUC President and Commissioner Picker and Commissioner Guzman Aceves correctly noted in their concurrence to the CPUC's decision that one of the dangers of applying inverse condemnation to private utilities is that "the risk profile of the investor-owned utility may be questioned by investors and insurance providers alike." (CPUC Concurrence at 6.)

They were right.  In September 2018, the credit ratings of PG&E and other major private utilities like Southern California Edison and SDG&E were downgraded by Moody's, a major credit rating agency, which cited inverse condemnation as a primary reason behind the downgrade.[12]  And, only two months after the Camp Fire, PG&E's bonds were downgraded to junk status by S&P Global,[13] largely as a result of the strict liability inverse condemnation costs the company faced in the wake of the California wildfires.  S&P Global later downgraded the rating of two of California's other leading utilities in a similar fashion.[14]  S&P Global commented that a significant factor affecting the investor-risk profile of private utilities in California is inverse condemnation:

> **"[T]he legal doctrine of inverse condemnation effectively makes California's electric utilities the state's reinsurer, which creates new risks that were never envisioned when investor-owned utilities were established.  We don't believe that an electric utility is large enough, sufficiently diversified, or adequately**

---

[12] Rob Nikolewski, "Credit ratings agency downgrades SDG&E and other California utilities over wildfire concerns", The San Diego Union Tribune, Sept. 30, 2018, *available at* https://www.sandiegouniontribune.com/business/energy-green/sd-fi-moodys-sdge-20180919-story.html.

[13] "S&P downgrades PG&E ratings to 'junk' status", Reuters, Jan. 7, 2019, *available at* https://www.reuters.com/article/pge-ratings-sp/sp-downgrades-pge-ratings-to-junk-status-idUSL3N1Z81RE.

[14] David Baker, "Another California Utility One Wildfire Away From Ruin", Bloomberg, Feb. 11, 2019, *available at* https://www.insurancejournal.com/news/west/2019/02/11/517298.htm; *see also* Garrett Hering, "S&P Ratings:  Other Calif. utilities could join PG&E in junk status, bankruptcy", S&P Global Ratings, *available at* https://www.spglobal.com/marketintelligence/en/news-insights/trending/Kl2LNodp5Eh88H1VIw4lTA2.

**capitalized to be a reinsurer.** Overall, in our view, the combination of climate change, frequent and severe wildfires, and California's interpretation of inverse condemnation, if unaddressed, significantly raises the risk for California's electric utilities to a level inconsistent with any other North American utility."[15]

This financial pressure has effects far beyond those felt by the private utility, as private utilities such as PG&E are facing increased insurance costs, decreased rates of return and diminished interest from investors in the capital markets. These consequences can be expected to have ripple effects throughout the state economy.

*Third*, the application of inverse condemnation to PG&E does not "adjust[] the benefits and burdens of economic life to promote the common good." *Lingle*, 544 U.S. at 539. Under inverse condemnation, PG&E has to pay landowners for damage to their property caused (without fault) by PG&E's power lines. In this circumstance, PG&E—and not the customers who benefit from its power lines—is left to bear the costs alone. This disconnect threatens the private utility's financial stability, as evidenced by PG&E's decision to file for chapter 11 protection.[16]

2.        <u>The Application of Inverse Condemnation to PG&E Violates PG&E's Substantive Due Process Rights.</u>

The Fourteenth Amendment protects against government deprivations of life, liberty or property that are arbitrary and irrational. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416-17 (2003) ("The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor."); *Action Apartment Ass'n v. Santa Monica Rent Control Bd.*, 509 F.3d 1020, 1025-26 (9th Cir. 2007) ("[A]n arbitrary and irrational deprivation of real property . . . might be 'so arbitrary or irrational that it runs afoul of the

---

[15] "S&P Global Ratings: Will California Still Have An Investment Grade Investor-Owned Electric Utility?," Feb. 19, 2019 *available at* https://www.capitaliq.com/CIQDotNet/CreditResearch/RenderArticle.aspx?articleId=2168627&Sct ArtId=467165&from=CM&nsl_code=LIME&sourceObjectId=10866063&sourceRevId=14&fee_in d=N&exp_date=20290218-21:25:39 (emphasis added).

[16] Again, to the extent the Debtors (or any other investor-owned utility) negligently start a fire, they will be held liable regardless of whether this Court finds that the strict liability doctrine of inverse condemnation does not apply to investor-owned utilities such as PG&E, and the Debtors will have to pay the damages associated with any negligence liability.

Due Process Clause.'" (citing *Lingle*, 544 U.S. at 542)).[17]  Because inverse condemnation rests on the premise that losses from public improvements should be spread throughout the community, applying inverse condemnation to PG&E when it cannot engage in such loss-spreading is arbitrary and irrational.

As a threshold matter, inverse condemnation liability deprives PG&E of its property because PG&E is required to pay money damages.  *Cf. Bd. of Regents v. Roth*, 408 U.S. 564, 571-72 (1972) ("property interests protected by [ ] due process extend well beyond actual ownership of real estate, chattels, or money").  Contrary to the typical inverse condemnation cases, PG&E is not entitled to retain the "condemned" property in exchange for its payment and thus receives no benefit in exchange for compensating the landowner.  The only question, therefore, is whether this deprivation is arbitrary and irrational.  *Action Apartment*, 509 F.3d at 1025-26.  It is, for at least two reasons.

*First*, taking PG&E's property without a showing of fault and without automatic rate recovery is not substantially related to the stated cost-spreading justification for inverse condemnation.  *See Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 864 F.2d 1475, 1484-87 (9th Cir. 1989) ("To establish a violation of substantive due process, the plaintiffs must prove that the government's action was 'clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.") (citation omitted).  To the contrary, under the CPUC's policy, PG&E cannot spread its costs without satisfying the CPUC's "prudent manager" standard.  According to the CPUC, the "fundamental point" is that "[e]ven if the fire would have started anyway, a reasonableness review looks at whether [the utility] acted reasonably and prudently."  (CPUC Decision 18-07-025 at 10, attached as Orsini Decl. Ex. E.)

But it is arbitrary and irrational to deny PG&E the opportunity to spread its losses based on a prudent manager standard administered by the CPUC.  Because inverse condemnation was developed as a form of social insurance for public utilities subjected to no-fault liability, it is arbitrary and irrational to hold private utilities to a prudent manager standard for rate recovery of costs incurred by those private utilities under a strict liability regime predicated on the ability to

---

[17] A California Superior Court's ruling on inverse condemnation constitutes state action.  *See supra* n.10.

spread costs.  The CPUC has expressed concerns with the application of inverse condemnation to private utilities for exactly this reason.  (CPUC Concurrence 5-6.)

*Second*, inverse condemnation is irrational as applied to PG&E.  Sovereign immunity and the Tort Claims Act, Cal. Gov't Code §§ 810 *et seq*., protect government entities from private claims. Inverse condemnation therefore allows private property owners an opportunity to recover damages from government entities when otherwise no remedy may be available. PG&E, however, is a private corporation and is subject to general tort liability premised on the showing of negligence.  Private individuals do not need inverse condemnation to recover for harm allegedly caused by PG&E.  *See* Cal. Civ. Code, § 3333.

## IV.    CONCLUSION

For the reasons stated above, the Court should rule that inverse condemnation does not apply under a proper application of California law to PG&E as an investor-owned utility and grant such other relief as just and proper.

Dated: October 25, 2019

WEIL, GOTSHAL & MANGES LLP
CRAVATH, SWAINE & MOORE LLP
KELLER & BENVENUTTI LLP

 */s/ Kevin J. Orsini*
  Kevin J. Orsini

*Counsel for the Debtors and Debtors in Possession*


MILBANK LLP

*/s/ Andrew M. Leblanc*
Andrew M. Leblanc

*Counsel for the Official Committee
of Unsecured Creditors*

1

## STATEMENT OF PG&E SHAREHOLDERS

2       The Court asked for briefing on whether the California Supreme Court would apply the state-

3   law strict liability doctrine of inverse condemnation to investor-owned utilities like PG&E.  The

4   PG&E Shareholders[18] agree with the Debtors that the California Supreme Court is highly unlikely to

5   do so and hereby join the Debtors' accompanying brief.

6       The PG&E Shareholders submit this statement to highlight market forces that are likely to

7   factor heavily in the California Supreme Court's consideration of the issue.  The erroneous decisions

8   of two lower courts have created an untenable situation in California.  Those courts applied the

9   doctrine of inverse condemnation – developed as a way to spread the cost of *government* works

10  among *taxpayers* – to the State's private, investor-owned utilities (PG&E, Southern California

11  Edison, and San Diego Gas & Electric).  The courts reasoned that, like governments, investor-owned

12  utilities can spread inverse condemnation liabilities by raising electricity rates.  In 2017, however,

13  the CPUC upended that reasoning and called into question the utilities' ability to pass liabilities to

14  ratepayers even in circumstances where they have not acted negligently.

15      The market reaction to the CPUC's decision was swift and severe.  Facing the specter of

16  strict inverse condemnation liability for catastrophic wildfires of unprecedented size and scope,

17  combined with the highly uncertain ability to recover some or all of that liability from customers, the

18  equity markets began to demand higher cost of equity capital from the California investor-owned

19  utilities.  Because the CPUC obligates investor-owned utilities like PG&E to rely on equity for a

20  majority of the capital needed for wildfire mitigation, implementation of California's aggressive

21  renewable energy standards, and other critical expenditures, it is no exaggeration to say that the

22

23

---

24  [18]    The PG&E Shareholders are the entities identified on Exhibit A to the *Fourth Amended*

25  *Verified Statement Of Jones Day Pursuant To Federal Rule Of Bankruptcy Procedure 2019*
    [ECF 4366].  The PG&E Shareholders are acting in their individual capacities but authorized the

26  filing of this single submission for the purpose of administrative efficiency.  Each of the PG&E
    Shareholders is expressing its independent views, and counsel does not have the actual or apparent

27  authority to obligate any one entity to act in concert with any other entity with respect to PG&E
    equity securities.  The PG&E Shareholders have not agreed to act in concert with respect to their

28  respective interests in PG&E equity securities.

1    lower courts' misguided application of inverse condemnation now threatens the reliability, safety,

2    and affordability of the State's electricity grid.

3            Indeed, Governor Newsom's wildfire strike force, convened in the wake of PG&E's

4    bankruptcy, recently concluded that "[t]his regime – strict liability for wildfire damage coupled with

5    uncertain ability to recover those damages in rates – increases the risk of bankrupt utilities, which in

6    turn drives up costs for consumers, threatens fair recoveries for fire victims, undermines the state's

7    ability to mitigate and adapt to climate change, and creates uncertainty for utility employees and

8    contractors."[19]  California's Commission on Catastrophic Wildfire Cost and Recovery, formed in

9    response to the devastating 2017 wildfires, agreed that "[t]he current interpretation of inverse

10   condemnation, holding utilities strictly liable for any wildfire caused by utility equipment regardless

11   of standard of care or negligence, imperils the viability of the state's utilities, customers' access to

12   affordable energy and clean water, and the state's climate and clean energy goals; it also[] does not

13   equitably socialize the costs of utility-caused wildfires."[20]

14           But "neither the [California] Supreme Court nor the legislature has ever opined on this

15   subject and, of course, has not opined on this subject in response to the unique wildfire emergency

16   the State now faces."  WILDFIRE COMMISSION REPORT, Appendix I at 7 n.19.  When the California

17   Supreme Court does consider whether to reject the application of inverse condemnation to PG&E

18   and other investor-owned utilities, it is sure to take note of the havoc wrought by the lower court

19   decisions.

20   **I.    THE CALIFORNIA SUPREME COURT WILL CONCLUDE THAT LOWER
21           COURTS ERRED IN APPLYING INVERSE CONDEMNATION TO INVESTOR-
             OWNED UTILITIES**

22           Article I, section 19 of the California Constitution provides that "[p]rivate property may be

23   taken or damaged for a public use and only when just compensation, ascertained by a jury unless

24   waived, has first been paid to, or into court for, the owner."  Cal. Const. art. I, § 19.  "[A]rticle I,

25   

26   [19]    Governor Newsom's Strike Force, *Wildfires And Climate Change: California's Energy
     Future* (Apr. 12, 2019) ("STRIKE FORCE REPORT"), at 27, attached as Orsini Decl. Ex. A.

27   [20]    *Final Report Of The Commission On Catastrophic Wildfire Cost And Recovery* (June 17,
28   2019) ("WILDFIRE COMMISSION REPORT"), Executive Summary at 4, attached as Orsini Decl. Ex. F.

section 19 provides the basis for two kinds of actions: a conventional eminent domain proceeding, instituted by a public entity to acquire private property for public use; and an inverse condemnation action, initiated by a private property owner seeking compensation for a taking or damage to his or her property." *City of Oroville v. Superior Court of Butte County*, 7 Cal. 5th 1091, 1102 (2019).

To prevail on an inverse condemnation claim, a plaintiff need only prove "a sufficiently meaningful causal relationship between the damage to private property and the inherent risks posed by the public improvement as designed, constructed, or maintained." *Id.* at 1108. Because the plaintiff need not establish negligence or other tortious conduct, inverse condemnation is a form of strict liability. As such, it provides a mechanism "to socialize the burden" of losses from public works without regard to fault. *Holtz v. Superior Court*, 3 Cal. 3d 296, 303-04 (1970) (quotations omitted); *see Customer Co. v. City of Sacramento*, 10 Cal. 4th 368, 409 (1995) (en banc) ("the underlying purpose of [inverse condemnation] is to distribute throughout the community the loss inflicted upon the individual by the public enterprise as deliberately conceived") (quotations omitted); *Albers v. Los Angeles Cty.*, 62 Cal. 2d 250, 263 (1965) ("the cost of such damage can better be absorbed, and with infinitely less hardship, by the taxpayers as a whole than by the owners of the individual parcels damaged").

Because inverse condemnation is intended to spread the cost of public improvements to the taxpayers who benefit from them, the doctrine logically does not apply to losses caused by a private, non-governmental entity. Unlike governments, private entities cannot raise taxes to distribute inverse condemnation liabilities among those who benefit from their services. Despite this, however, two of California's intermediate appellate courts have extended the doctrine to investor-owned utilities. In *Barham v. Southern Cal. Edison Co.*, the Fourth District held that a private utility "may be liable in inverse condemnation as a public entity," 74 Cal. App. 4th 744, 753 (1999), and in *Pacific Bell Telephone Co. v. Southern Cal. Edison Co.*, the Second District agreed that a private utility "may be liable under inverse condemnation for the damage [it caused to private] property." 208 Cal. App. 4th 1400, 1404 (2012).

Consistent with the cost spreading rationale of the inverse condemnation doctrine, both courts assumed that the CPUC would allow private utilities to pass on inverse-condemnation

liabilities through rate adjustments "during its periodic reviews." *Pacific Bell*, 208 Cal. App. 4th at 1407; *Barham*, 74 Cal. App. 4th at 752-53 (noting that the purpose of inverse condemnation is to "spread among the benefiting community any burden disproportionately borne by a member of that community" and concluding that no "significant differences exist between publicly versus privately owned electric utilities" in this regard).

Unfortunately, that critical assumption turned out to be wrong. In 2017, the CPUC refused to allow San Diego Gas & Electric to raise rates to recoup settlement amounts it had paid to wildfire victims who had asserted inverse condemnation claims for wildfire damages.[21] The CPUC determined that strict liability in inverse condemnation simply was "not relevant" to the rates a utility may charge. *Id.*

The potential ramifications of this conclusion (described below) were alarming enough that CPUC President Picker and CPUC Commissioner Guzman Aceves wrote separately to criticize the *Barham* and *Pacific Bell* decisions: "the logic for applying inverse condemnation to utilities – costs will necessarily be socialized across a large group rather than borne by a single injured property owner, regardless of prudence on the part of the utility – is unsound."[22] The Commissioners thus "urge[d] the California Courts of Appeal to carefully consider the rationale for applying inverse condemnation in these types of cases." *Id.* at 6-7.

California's Commission on Catastrophic Wildfire Cost and Recovery similarly concluded that *Barham* and *Pacific Bell* "are suspect" because they are "based on the factually disproven assumption that the utility could pass its liability onto ratepayers." WILDFIRE COMMISSION REPORT, Executive Summary at 7 n.7. That Commission therefore recommended that the State "[r]eplace the current strict liability interpretation of inverse condemnation for electric and water utilities with a fault-based negligence standard." *Id.*, Appendix I at 7.

---

[21]    Cal. Pub. Utilities Comm'n Dec. 17-11-033, at 64-65 (Nov. 30, 2017), attached as Orsini Decl. Ex. D.

[22]    Concurrence of President Michael Picker and Commissioner Martha Guzman Aceves Regarding Dec. 17-11-033 (Dec. 26, 2017), at 5, attached as Orsini Decl. Ex. C.

These criticisms are sound. *Barham* and *Pacific Bell* improperly sever inverse condemnation from its legal mooring of cost spreading and apply the doctrine to a scenario it was never intended to cover: damage caused by privately owned firms that lack the ability to spread losses to those who benefit from the services provided. Given this, the California Supreme Court is likely to conclude that *Barham* and *Pacific Bell* were wrongly decided.

## II. THE CALIFORNIA SUPREME COURT WILL CONSIDER THE DISASTROUS CONSEQUENCES OF THE ERRONEOUS LOWER COURT DECISIONS

The misapplication of inverse condemnation to investor-owned utilities, coupled with the CPUC's determination that inverse condemnation liability is "not relevant" to the question of whether utilities can recover inverse condemnation losses in rates, has resulted in a crisis. As the Governor's strike force summarized:

> [T]he current system for allocating costs associated with catastrophic wildfires – often caused by utility infrastructure, but exacerbated by drought, climate change, land-use policies, and a lack of forest management – is untenable both for utility customers and for our economy. Multi-billion dollar wildfire liabilities over the last several years have crippled the financial health of our privately and publicly owned electric utilities. Pacific Gas & Electric Company (PG&E) filed for bankruptcy in the face of massive potential liability for wildfire damages. Other investor-owned and public utilities have experienced recent credit ratings downgrades, with San Diego Gas & Electric (SDG&E) and Southern California Edison Company (SCE) now precipitously hovering just above junk status. Utilities rely on credit to finance ongoing infrastructure investments, including fire mitigation. As utilities' credit ratings deteriorate, their borrowing costs increase and those costs for capital necessary to make essential safety improvements are passed directly to customers. *These downgrades, and the prospect of additional utility bankruptcy filings, directly impact Californians' access to safe, reliable and affordable electricity.*

STRIKE FORCE REPORT at 2-3 (emphasis added). The Commission on Catastrophic Wildfire Cost and Recovery likewise found that "[t]he increasing costs of capital and the risk of bankruptcy associated with the strict liability interpretation of inverse condemnation doctrine for . . . investor-owned utilities is harmful to wildfire victims, ratepayers, and the utilities themselves." WILDFIRE COMMISSION REPORT, Executive Summary at 4.

Because the California Supreme Court applies inverse condemnation in light of the policy concerns that animate the doctrine, it is likely to consider these unintended consequences of the

erroneous lower court decisions when it takes up the issue. *Customer Co.*, 10 Cal. 4th at 378 ("section 19 never has been applied in a literal manner, without regard to the history or intent of the provision").

    **A.**    **The Erroneous Lower Court Decisions Significantly Raise The Cost Of Capital For California's Investor-Owned Utilities.**

The Governor's strike force observed that "[c]limate change has created a new wildfire reality for California." STRIKE FORCE REPORT, Executive Summary at 1. "The state's fire season is now almost year round. More than 25 million acres of California wildlands are classified as under very high or extreme fire threat. Approximately 25 percent of the state's population – 11 million people – lives in that high-risk area." *Id.* "Climate change, forest management practices, and real estate development patterns in the [wildland urban interface] have dramatically increased the risk and magnitude of wildfire damage." *Id.* at 27. As a consequence, "[w]ildfires are not only more frequent but far more devastating. Fifteen of the 20 most destructive wildfires in the state's history have occurred since 2000; ten of the most destructive fires have occurred since 2015." *Id.*, Executive Summary at 1.

Unfortunately, these wildfires frequently and unavoidably ignite as a consequence of normal operation of electrical utility service, such as when high winds propel a tree limb into a live power line. Simply put, "[a]s long as electrical lines run through tinder-dry forests, California can mitigate but not eliminate utility-sparked fires." *Id.* at 27. The risk is particularly acute for PG&E, which has the largest service territory in the State (70,000 square miles), half of which has been designated as high fire threat.

Because the inverse condemnation doctrine imposes liability regardless of negligence, PG&E and California's other investor-owned utilities face the prospect of colossal damages no matter whether they are at fault. Indeed, given the strict liability inverse condemnation regime, utilities are now subject to massive claims even for wildfires that may not have been caused by their equipment. Case in point: PG&E is subject to $10 billion or more in claims relating to the Tubbs fire even though CalFire determined that PG&E equipment did not ignite the blaze.

This legal landscape has turned California investor-owned utilities into *de facto* insurers of much of California's existential wildfire risk. *See Credit FAQ: Will California Still Have An Investment-Grade Investor-Owned Electric Utility?*, S&P GLOBAL RATINGS (Feb. 19, 2019) ("California's interpretation of the legal doctrine of inverse condemnation effectively makes California's electric utilities the state's reinsurer, which creates new risks that were never envisioned when investor-owned utilities were established. We don't believe that an electric utility is large enough, sufficiently diversified, or adequately capitalized to be a reinsurer. Overall, in our view, the combination of climate change, frequent and severe wildfires, and California's interpretation of inverse condemnation, if unaddressed, significantly raises the risk for California's electric utilities to a level inconsistent with any other North American utility.").[23]

As a result, investment in California investor-owned utilities is objectively riskier than investment in other state's utilities. Since the CPUC determined that inverse condemnation was "not relevant" to rate recovery of wildfire liabilities, PG&E's credit ratings steadily deteriorated[24] and, even though they did not face anywhere near the same level of wildfire liability as PG&E, Southern California Edison and San Diego Gas & Electric similarly saw their credit ratings fall until they were "precipitously hovering just above junk status." STRIKE FORCE REPORT at 3.

The California utilities therefore must provide a greater return in order to attract investor capital that just as easily may be deployed in favor of less-risky alternatives, including utilities in states that do not impose strict inverse condemnation liability. Indeed, PG&E, Southern California Edison, and San Diego Gas & Electric each have asked for substantial increases in their authorized return on equity in order to account for the potential of material wildfire liabilities.[25] WILDFIRE

---

[23] Attached as Orsini Decl. Ex. G.

[24] Nephele Kirong, *S&P Downgrades PG&E Over Calif. Wildfire Risks*, S&P GLOBAL MARKET INTELLIGENCE (Feb. 26, 2018), attached as Orsini Decl. Ex. H. Nephele Kirong, *Moody's Downgrades PG&E, Pacific Gas And Electric Ratings On Wildfire Risks*, S&P GLOBAL MARKET INTELLIGENCE (Nov. 16, 2018), attached as Orsini Decl. Ex. I; Molly Smith & Natalya Doris, *PG&E Bonds Reach New Lows As S&P Cuts Five Notches To Junk*, BLOOMBERG (Jan. 8, 2019), attached as Orsini Decl. Ex. J.

[25] PG&E requested a 12% ROE (up from 10.25%), Southern California Edison requested a 11.45% ROE (up from 10.3%), and San Diego Gas & Electric requested a 12.38% ROE (up from 10.2%). *See* Opening Brief of Pacific Gas and Electric Company, Application 19-04-014, at 1-2

COMMISSION REPORT, Appendix II at 7 ("More recently, all three utilities proposed large increases in the allowed return on equity, which they believe will be required to attract new equity investment. While that proceeding is ongoing and its outcome is far from clear, what is clear is that a substantially higher return on equity (the 'cost' of equity) – reflecting the same risks that have led to higher debt costs – will likely be required to attract new investment in California utilities."); *see What is Cost of Capital (CoC)?*, CAL. PUBLIC UTILITIES COMM'N ("The Commission attempts to set the authorized ROE at a level that is adequate to enable the utility to attract investors to finance the replacement and expansion of its facilities so it can fulfill its public utility service obligation. In practice, this level is determined by estimating market returns on investments for other companies with similar levels of risk.").[26]

Notably, the perception of risk has persisted even in the wake of AB 1054, the legislation enacted this Summer to create a statewide wildfire insurance fund for wildfires ignited in 2019 and beyond. Since the passage of AB 1054, credit ratings of the State's investor-owned utilities not in bankruptcy have stabilized but not rebounded.[27] As one expert noted, "[t]he rating agencies are still concerned about the residual risk over the long term from inverse condemnation as applied in California, uncertainties surrounding the effectiveness of wildfire reform implementation, and that the operational challenges of heightened wildfire risk could act to impair future utility credit quality in the state. The credit rating agencies have made clear that AB 1054 alone is not sufficient to restore credit quality to its former level."[28]

---

(Sept. 30, 2019), attached as Orsini Decl. Ex. K; Opening Brief of Southern California Edison Company, Application 19-04-014, at 2 (Sept. 30, 2019), attached as Orsini Decl. Ex. L; Opening Brief of San Diego Gas & Electric, Application 19-04-014, at 1 (Sept. 30, 2019), attached as Orsini Decl. Ex.M.

[26] Attached as Orsini Decl. Ex. N.

[27] *See* Testimony of Todd Shipman, Application 19-04-017, at 6 (Aug. 1, 2019) ("The wildfire reform legislation has stemmed the credit quality deterioration caused by the development of wildfire risks in California. But it has not reversed it."), attached as Orsini Decl. Ex. P.

[28] *Id.* at 7.

**B.** **Increased Cost Of Capital For California's Investor-Owned Utilities Harms The State In Critical Ways.**

The increase in cost of capital of California's investor-owned utilities is just not a question of the profitability – or lack thereof – of the firms, an issue about which the California Supreme Court might not concern itself. To the contrary, as California's policymakers have observed, increased cost of capital has severe and far-reaching negative repercussions on numerous important policy objectives as to which the Supreme Court certainly would take notice.

To start, increased cost of capital results in higher rates: "Because utilities must attract new capital – generally a 50/50 mix of debt and equity – in order to construct new infrastructure, with the interest (debt) and return (equity) paid for out of rates, increases in risk perception have direct implications for rates. . . . Credit downgrades lead to increases in the cost of borrowing for utilities that ultimately will be reflected in customer rates." WILDFIRE COMMISSION REPORT, Appendix II at 7; *id.* at 7 n.13 ("[A] 1% increase in the cost of debt occasioned by a ratings downgrade, coupled with an ensuing 3% increase in the cost of equity, would result in a 6.5% increase in the average monthly bill of PG&E customers. Customers of Southern California Edison and San Diego Gas & Electric would suffer similarly.") (citing estimates of PG&E Shareholders). As the concurring CPUC Commissioners noted, "[i]nvestor owned utilities are partially dependent on the capital markets to raise money and the insurance market to mitigate financial risk. If strict liability is imposed for damage associated with wildfires caused in whole or in part by utility infrastructure, the risk profile of the investor-owned utility may be questioned by investors and insurance providers alike. The increase in the cost of capital and the expense associated with insurance could lead to higher rates for ratepayers, even in instances where the investor-owned utility complied with the Commission's safety standards."[29]

Rising cost of capital also limits the utilities' ability to invest in infrastructure projects, including critical wildfire mitigation efforts. Utilities deploy a variety of techniques to avoid and contain wildfires, including "vegetation management" and "system hardening such as widespread

---

[29] Concurrence of President Michael Picker and Commissioner Martha Guzman Aceves Regarding Dec. 17-11-033 (Dec. 26, 2017), at 6, attached as Orsini Decl. Ex. C.

1  electric line replacement with covered conductors designed to lower wildfire ignitions."[30]  They also

2  are developing new technologies, including "situational awareness technology such as weather

3  stations, high definition cameras, and use of computer modeling, weather and wind data and

4  machine learning to predict where wildfires are most likely to strike."  *Id.*

5          These projects are extremely expensive.  PG&E, Southern California Edison, and San Diego

6  Gas & Electric project that they will spend more than $4.2 billion on wildfire mitigation efforts in

7  2019 alone.  STRIKE FORCE REPORT at 51.  "[T]he costs of proposed projects in utility Wildfire

8  Mitigation Plans could result in increases of up to seven percent in monthly bills for residential

9  customers, not accounting for any adverse change in the cost of capital for the utilities."  WILDFIRE

10  COMMISSION REPORT, Appendix II at 6.  As the cost of capital rises, the utilities' ability to undertake

11  mitigation efforts naturally will be constrained, particularly given that CPUC approval for rate

12  increases respecting safety and fire prevention expenditures is necessary but not always forthcoming.

13  *Id.* at 7 ("These correlated changes [in cost of capital] dramatically raise the costs of any future

14  utility infrastructure projects for wildfire safety or other reasons."); STRIKE FORCE REPORT at 3

15  ("Utilities rely on credit to finance ongoing infrastructure investments, including fire mitigation.  As

16  utilities' credit ratings deteriorate, their borrowing costs increase and those costs for capital

17  necessary to make essential safety improvements are passed directly to customers.").

18          Similarly, increased cost of capital threatens California's clean-energy goals.  "The state's

19  greenhouse reduction goals are also dependent on healthy utilities that are able to support renewable

20  energy markets, energy efficiency programs, and technology advancements.  As utilities face a

21  higher cost of capital and the risk of bankruptcy, these programs will suffer."  WILDFIRE

22  COMMISSION REPORT, Appendix I at 4; *see* STRIKE FORCE REPORT at 17 ("To continue the state's

23  progress in reducing greenhouse gas emissions in the energy sector, California needs investment-

24  worthy IOUs.").

25

26

27  ────────────────

   [30]      Cal. Public Utilities Comm'n Dec. 19-05-036, at 3 (May 30, 2019) (Guidance Decision on
28  Wildfire Mitigation Plans Submitted Pursuant to Senate Bill 901), attached as Orsini Decl. Ex. O.

1    Application of the inverse condemnation doctrine to PG&E and other investor-owned

2    utilities has created an "untenable" situation in California, something the California Supreme Court

3    is likely to consider when determining whether the lower courts erred.

4

5    Dated: October 25, 2019

6                                            JONES DAY

7                                            _/s/ Joshua M. Mester_____

8                                             Joshua M. Mester

9                                            *Attorney for PG&E Shareholders*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28