# EXHIBIT B

## Transcription of Audio Recording
## from the November 30, 2017 Commission Voting Meeting

*[Start recording]*

**Speaker One:**

..., Commissioner Randolph, presiding.

**Comm. Randolph:**

Thank you. I am presenting to you Item 40, the proposed decision addressing SDG&E's request for cost recovery from the wildfire expense memorandum account.

First, I'll address what this proposed decision determines. It denies recovery in rates to San Diego Gas & Electric of costs related to three wildfires that occurred in San Diego County in October 2007. The three fires—the Witch, Guejito and Rice—caused two deaths, injured dozens of firefighters, and damaged and destroyed homes, other buildings, and property in San Diego County.

Legal proceedings following an event like this necessarily take a long time to conclude. The 379 million dollars in costs that were presented to us by the utility in this application are what remained after trial court proceedings, settlements, insurance payouts, and a certain amount of recovery granted by FERC.

Our examination applies the prudent manager's standard to the very fact-specific question of how SDG&E managed its facilities before and during the fires. To give you a sense of how fact-specific our determination is, the determination in the Witch Fire turns on SDG&E's actions in response to four faults that occurred between two poles along the transmission line on October 21, 2007; the determination in the Guejito Fire turns on SDG&E's inspection of a communications lashing wire and its distance to a 12KV line; and the determination in the Rice Fire turns on SDG&E's actions to monitor and trim a fast-growing tree.

In each of these instances we undertook the core analysis and weighing of the evidence provided by the parties, as is required of us in our ratemaking and cost allocation role. There's no dispute that each of the fires was caused by SDG&E's facility—facilities and, in each instance, we find that SDG&E did not meet its burden to show that it acted as a prudent manager. On that basis, the PD denies recovery of the 379 million dollars in rates.

1

I also would like to take a moment to point out what this PD is not. It's not a final statement about the overall applicability of the doctrine of inverse condemnation to investor-owned utilities. In this proposed decision, I felt strongly that we cannot abdicate our ratemaking authority and cost allocation responsibility. Once those costs have been determined, it is our responsibility to make a prudent manager review. In this instance, it caused for allocating the proposed costs to shareholders, not its rate payers.

The proposed decision is also not a statement about the current state of SDG&E's management of its system or its wildfire readiness. As I have stated publicly in the past, SDG&E has taken innovative steps to become an industry leader in this area and has improved its weather identification system in order to better manage its wildfire risk. But this case has nothing to do with the current management of their system. Instead, it is a snapshot in time and a fact-driven analysis of the utility's preparation for and response to the 2007 incidents.

Last, I know that the tragic Northern California fires that happened last month are on many peoples' minds. This proposed decision is not about those fires or the facts that may be relevant in those instances. Again, this proposed decision is specific to the 2007 incidents and the facts of that case. We know that, as a State, we need to confront the increased risk and severity of wildfires in light of climate change. Some of that work is coming in the form of President Picker's leadership on updates to our general orders related to the more accurate fire threat maps that will be coming before this Commission next month. Some of that work will come in the form of continued state agency efforts to adapt to climate change, and some of that work will need to require policymakers to grapple with the challenging issues related to the costs of this increased risk. But those issues are not part of the review of the 2007 wildfires.

I would like to thank my commissioner colleagues for your extensive and highly engaged deliberation as we worked through the facts and analysis of this PD. I would like to thank the two Administrative Law Judges, Sasha Goldberg and Pat Tsen, who managed this case and were willing to go back and conduct a close analysis and answered questions from my office and other offices. I'd like to thank ALJ management, Jeanne McKinney and Chief Administrative Law Judge Anne Simon, for their work on this case. My former advisor, Leuwam Tesfai, worked very hard on this while she was in my office, and I thank her for her efforts, as well as those of my Chief of Staff Rachel Peterson, who took over after Leuam went to the Legal Division. Lastly, I'd like to thank my B-K partner Commissioner Peterman and her great advisor, Shannon

O'Rourke, for their very close attention to the details of this PD and their work on this. With that, I present this proposed decision to you and request your support.

**Comm. Peterman:**

Thank you, Commissioner Randolph, for your comprehensive and thoughtful comments. I really appreciate you putting the proposed decision before us in context, given that there are so many members of the public who understandably are interested in this proceeding and are concerned about the outcome.

I will also be supporting this proposed decision and would like to thank Judges Tsen and Goldberg and Commissioner Randolph and her Chief of Staff, Rachel Peterson, for their thorough and thoughtful work. I have taken a lot of time to consider this item and do believe that the judges have demonstrated that the conclusions they reached were based on the thorough review of the evidence presented by the parties. Based on this, overall, I'm comfortable supporting this decision.

I'm also appreciative of the additional detail the judges provided in the revisions to the proposed decision, which I think serve to further substantiate the original findings that San Diego Gas & Electric failed to meet its burden to prove it was a prudent manager in the lead up to all three fires.

I also appreciate the revisions to the proposed decision, clarifying that the legal doctrine of inverse condemnation does not displace the Commission's reasonableness review of whether SDG&E was a prudent manager in this case.

And with that, I will be supporting the decision. Thank you.

**Comm. Rechschaffen:**

I'm also going to be supporting the decision. I'd like to thank Commissioner Randolph and Commissioner Peterman for their excellent leadership here and Judge—Judges Tsen and Goldberg for their work.

As my colleagues have said, this resulted from a very, very careful review, a comprehensive review and re-review of the facts here, as appropriate in a case of this magnitude.

This decision does not hold the utilities to a standard of perfection. That's a strawman, that's not what we're doing here. The burden of proof is on SDG&E to show that they acted as a prudent manager and, based on a careful review, they, we concluded, the decision concludes they

3

did not meet that burden.

I want to say just a word about the inverse condemnation doctrine. As the decision concludes it really wasn't an issue in the first phase and it's somewhat of a theoretical issue in this matter given that no court has held that the doctrine, that San Diego Gas & Electric is strictly liable based simply, held that the plaintiffs could plead inverse condemnation, but in any case the result here is quite clear: We can't apply a standard that provides an incentive for a utility to act imprudently or unreasonably. Not only is that inconsistent with our ratemaking authority, but that would send precisely the wrong signals to the utility. We want to encourage and incentivize careful, prudent management, and if we ruled that recovery is possible with something less than prudent management, we'd send the wrong signal.

Having said that, it is worth noting that the doctrine of inverse condemnation, as its been developed by the courts and applied to public utilities, may be worth re-examining in a sense that the courts applying the cases to public utilities have done so without really grappling with the salient difference between public and private utilities, which is that there's no guaranty that private utilities can recover the cost from their ratepayers, so this is an issue that the legislature and the courts may wish to examine and may be called on to examine in the future.

But having said that, it doesn't change *our* obligation to rule that the utility can't recover unless they acted prudently, so, I'll be supporting the decision, and thank you again for your work on this.

**President Picker:**

So, Commissioner Guzman Aceves and I actually formed a Bagley-Keene Alliance to really thoroughly go through the record together and to talk through some of the issues involved and we are filing a joint concurrence, so we're going to actually speak to that joint concurrence and I'll just lead off.

Some of… this is a very important general subject matter area they pointed out when they spoke last week about the fire map proceeding. The number of people who are choosing to live in areas that we now know to be elevated fire hazard or extreme fire hazard is growing, and that area is actually growing as we get more information about the impact of climate change. The fuel area is growing from about 31,000 square miles in California to 77,000 square miles in California. That's almost 42% of the State's land mass.

So, add to that the fact that as people move into these areas, which are growing in the severity of the hazard, and we see more and more severe windstorms and lightning storms happening more frequently here in California, we also know that those people demand and have a right to have both electric and telecommunications as they move into those fire hazard areas. So this is becoming an increasingly complex area for us.

Here, the decision that we have to make is about whether the utility or the ratepayer should be responsible for the financial costs associated with these very specific fires. What we talk about here may or may not have any precedent on any future fire issues that come before us. Um, so, let me just provide a little bit of context about when wildfires and the utility infrastructure is implicated, there's been a unique legal framework created by California Courts of Appeal, and by the statutory requirements of the Public Utilities Codes, which dictate how costs are calculated and allocated between utilities and ratepayers, respectively.

So, both my Bagley-Keene partner and I, Commissioner Guzman Aceves have concerns about this legal framework, and I think other Commissioners here have spoken to that. But despite our concerns, we don't have our authority to change California case law or the Public Utilities Code, so we have to apply the law as it stands today.

We also have some general concerns about how this particular decision treats the Witch Fire. An analysis of San Diego Gas & Electric's actions is thorough and the record is well-developed by the Administrative Law Judge, we have to really note reluctantly that we find San Diego acted in an unreasonable manner in relationship to the Witch Fire. Despite those particular concerns, which I'll detail shortly, we defer to the ALJs and to the Presiding Commissioner because they spent more time in the process of developing the record and participated more in the fact finding, and I think that we have to admit to ourselves that they're more well-situated to make the determination.

Uh, so, generally, this decision concludes that San Diego Gas & Electric didn't meet the preponderance of evidence standard that it acted as a prudent manager in response to the three fires at issue, I think that Commissioner Randolph detailed that, but in specific context about the Witch Fire, the San Diego Gas & Electric Facility involved in the ignition of the Witch Fire was tie line 637. Tie line 637 is about 14 miles long and runs through a remote back country section of the county, and so there weren't any eyewitnesses to the ignition of the fire. The CalFire investigator determined that the fault on transmission line 637 between two poles due to the

arcing line led to a dispersed hot particle's landing in the grassy field below the power lines, and those particles were determined to have ignited the Witch Fire which then spread the wind.

A series of four faults occurred on transmission lines 637 on October 21st, 2007, so, CalFire concluded the Witch Fire ignited after the third fault occurred on transmission line 637 at 12:23 p.m. SDG&E grid operations became aware of the Witch Fire at 1:10 and then de-energized the transmission line after the fourth fault at 3:27. They presented evidence and made arguments why its actions, most importantly the decision to de-energize the line, was reasonable in response to these events.

So this decision on whether to de-energize power lines in a region in response to a catastrophic event such as a wildfire is significant because it has impact on public safety broadly. Streetlights, telephones, power at facilities, other infrastructure critical to response in an emergency are dependent on electricity. And when a wildfire threatens the electricity grid for a specific region, the utility must consider not only the immediate danger of the wildfire, but also the public safety considerations in de-energizing of a specific circuit, and particularly a circuit that goes between two substations. Utilities are understandably reluctant to de-energize circuits without a compelling rationale.

Here, they sent an engineer out to check each time. The record reflects that wildfire threatened transmission line 637 and SDG&E, however, did not de-energenize until 3:27. This decision finds that SDG&E acted imprudently. Under the preponderance of evidence standard, the determination of when was the appropriate time to de-energize is a pretty close call, given that there are other safety trade-offs.

Commissioner Guzman Aceves and I believe that the record could support a finding that San Diego Gas & Electric acted prudently in most decisions based on the information available to it at the time. This is a challenge, as you are depending on engineers and humans who are standing there on the ground trying to make the best judgment based on what they can see and what they know at the time.

So, we have concerns about the evidence submitted regarding wind. Developing an evidentiary record regarding wind is challenging, particularly given that we've never really required or even seen the need for the kind of detailed meteorology that we now understand is required to actually be able to operate safely in these fire hazards. We believe, again, that the record could support San Diego Gas & Electric's contention the wind conditions were severe and

6

unprecedented and, if that's the case, again, their decision not to de-energize transmission line 637 before the start of the fire becomes more complex. So it's less clear that San Diego Gas & Electric could have de-energized the line before the third fault based on the information they knew or should have known at the time.

But, again, despite these concerns that we have, trying to put ourselves into the shoes of somebody on the ground at the time of the fire, we have to defer to the conclusion of the ALJs because, as finders of fact in this proceeding, they're much more well-situated to make these factual determinations than we are.

So, I think Commissioner Guzman Aceves is going to speak to some of the other issues that continue to plague us about this.

**Comm. Guzman Aceves:**

Thank you, President Picker.

First, I want to start by saying that I do appreciate on this particular point the finding of fact specifics in this case, and, um prudent manager, thank you. We did deliberate for a very long time, and I personally had a very difficult decision-making process on two of the cases that I felt were very close calls. And I greatly appreciate the time that Judge Tsen and Goldberg took, and Commissioner Randolph and her staff, in really working through those issues. I will vote for the PD, but I want to recognize that these were very close calls.

As to the issue that President Picker mentioned and our concern with the existing overarching legal framework, it is a problem today that the Commission is not allowed to make nuanced findings and attribute costs to these multiple contributing factors. In general, we believe that where there are multiple causes in complex situations, the Commission should be able to apportion liability based on the utility's contribution to the outcome. In other states, this exercise of judgment is allowed.

Also, as Commissioner Rechtschaffen was saying, given our responsibility to perform reasonableness reviews, we cannot and should not be required to pass through all utility-incurred costs regardless of whether the utility acted as a prudent manager.

The law of inverse condemnation is unsettled. The premise that utilities should face strict liability due to a perceived ability to socialize costs rests on an incorrect premise. We respectfully call on the legislature to consider the overarching legal framework with both of these issues, including providing the Commission the explicit authority to apportion responsibility in

7

prudency reviews to multiple causes, especially if the imprudence of a utility is a minority factor, amongst other factors.

We stress such a modification should not have an impact on the burden of proof, which should remain with the applicant utility seeking to recover costs. This is a two-fold problem in terms of legal framework, and I greatly appreciate all the detail that was taken in this decision, but I'm more concerned with the overarching lack of a more comprehensive framework that allows us to deal with these very complex situations. So, I do want to reserve the right to file this joint concurrence with President Picker.

**Speaker One:**

Thank you. Um, with—I would ask the clerk to read the roll.

**Clerk:**

Excuse me. For Item 14, Commissioner Guzman Aceves?

**Comm. Guzman Aceves:**

Aye.

**Clerk:**

Commissioner Peterman?

**Comm. Peterman:**

Yes

**Clerk:**

Commissioner Randolph?

**Comm. Randolph:**

Aye

**Clerk:**

Commissioner Rechtschaffen?

**Comm. Rechtschaffen:**

Yes

8

Case: 19-30088    Doc# 4486-2    Filed: 10/25/19    Entered: 10/25/19 20:22:43    Page 9 of 10

**Clerk:**

President Picker?

**President Picker:**

Yes

**Comm. Randolph:**

Do the two concurs need to note now their reservation of rights to concur?

**Comm. Guzman Aceves:**

Yes, with the reservation of right to file a joint concurrence.

**President Picker:**

Do I need to also . . . I also reserve the right to file a joint concurrence. Thank you. So moving on to Item 42, which . . . .

*[End recording]*