# EXHIBIT C

STATE OF CALIFORNIA                                                        EDMUND G. BROWN JR., *Governor*

# PUBLIC UTILITIES COMMISSION
505 VAN NESS AVENUE
SAN FRANCISCO, CA 94102-3298

December 26, 2017

TO PARTIES OF RECORD IN APPLICATION 15-09-010:

At the Commission Meeting of November 30, 2017, President Michael Picker and Commissioner Martha Guzman Aceves stated that they would file a Joint Concurrence in Decision 17-11-033. The decision was mailed on December 6, 2017.

The joint concurrence of President Picker and Commissioner Guzman Aceves is now available and is attached herewith.

/s/   ERIC WILDGRUBE for
Anna E. Simon
Acting Administrative Law Judge

AES:lil

Attachment

A.15-09-010
D.17-11-033

**Concurrence of President and Commissioner Michael Picker and Commissioner Martha Guzman Aceves on Item 40, Decision Regarding Application of San Diego Gas & Electric Company for Authorization to Recover Costs Related to the 2007 Southern California Wildfires Recorded in the Wildfire Expense Memorandum Account**

This decision denies the Application of San Diego Gas & Electric Company (SDG&E) for Authorization to Recover Costs Related to the 2007 Southern California Wildfires Recorded in the Wildfire Expense Memorandum Account. We support this decision, but join in this concurrence to note concerns this decision revealed. We respectfully urge the California Legislature to affirmatively address the issues of liability calculation and cost allocation in instances when utility infrastructure is implicated in private property loss. We also respectfully urge the California Courts of Appeal to carefully consider the rationale for applying inverse condemnation in these types of cases. Despite our concerns, after a thorough review of the record and legal arguments, we join our colleagues in support of this decision, which is supported by the record.

This decision denies cost recovery of $379 million in costs related to the 2007 Southern California Wildfires recorded in the Wildfire Expense Memorandum Account (WEMA). Specifically it concludes SDG&E did not meet the preponderance of evidence standard that it acted as a prudent manager in response to the three wildfires at issue: Witch, Guejito, and Rice.

Preponderance of the evidence usually is defined "in terms of probability of truth, e.g., 'such evidence as, when weighed with that opposed to it, has more

convincing force and the greater probability of truth'."[1] In short, SDG&E must present more evidence that supports the requested result than would support an alternative outcome.

The decision reviews and discusses in detail whether SDG&E's actions met the preponderance of evidence standard. Although the analysis of these actions is thorough and the record supports the outcome of this case, we note the challenges of applying this standard in such a case.

**Witch Fire**

We believe the question of whether SDG&E's response to the Witch Fire was reasonable, which later merged with the Guejito Fire, is a close call, but the record supports the outcome of this case. The SDG&E facility involved in the ignition of the Witch Fire was Tie Line (TL) 637.[2] TL 637 is a 69 kilovolt (kV) transmission line that connects the Santa Ysabel and Creelman substations.[3] TL 637 is approximately 14 miles long and runs along a remote backcountry section of San Diego County.[4] Although there were no eyewitnesses to the ignition of the fire, the Cal Fire investigator determined that a fault on TL 637 between poles Z416675 and Z416676 on October 21, 2007, led to arcing of the lines, which dispersed hot particles to land in the grassy field below the

---

[1] D.12-12-030 at 42, *aff'd* D.15-07-044 at 28-30.

[2] SDGE-11-A at 2.

[3] *Id*.

[4] *Id*. at 3.

powerlines.[5] These particles were determined to have ignited the Witch Fire which was then spread by wind.[6]

A series of four faults occurred on TL 637 on October 21, 2007: the first fault at 8:53 a.m.; the second fault at 11:22 a.m.; the third fault at 12:23 p.m.; and the fourth fault at 3:25 p.m.[7] Cal Fire concluded that the Witch Fire ignited after the third fault occurred on TL 637 at 12:23 p.m. on October 21, 2007 because an Air Tanker Pilot first observed the fire at 12:29 p.m.[8] SDG&E Grid Operations became aware of the Witch Fire at 1:10 p.m., and de-energized TL 637 after the fourth fault at 3:27 p.m.[9] SDG&E maintains that its operation and management of its facilities linked to the Witch Fire prior to October 21, 2007 were reasonable.[10] SDG&E supports its position by showing: (1) SDG&E's response to the faults along TL 637 was reasonable given the information available at the time of the faults; (2) SDG&E's recloser policy was reasonable and prudent; and (3) the Witch Fire was not foreseeable.[11]

The decision of whether to de-energize power lines in a region in response to a catastrophic event such as a wildfire is significant, because it implicates public safety broadly. Street lights, telephones, and other infrastructure critical to a response to an emergency are dependent on electricity. When a wildfire

---

[5] *Id.* at 3; ORA-01 at 6 to 7.

[6] SGDE-11-A at 3-4, citing Cal Fire Report (Witch) at 2, 14, and 19.

[7] SDGE-11-A at 6 to7.

[8] *Id.*

[9] *Id.*

[10] SDG&E Phase 1 Opening Brief at 30.

[11] SDG&E Phase 1 Reply Brief at 30 to 31.

threatens the electricity grid for a specific region, the utility must consider not only the immediate danger of the wildfire, but also the public safety considerations of de-energizing a particular circuit. Utilities are understandably reluctant to de-energize circuits without a compelling rationale. Here, SDG&E faced this choice with the Witch fire. The record reflects the wildfire threatened TL 637 and SDG&E did not de-energize the line until 3:27 p.m. This decision finds that SDG&E acted imprudently. Under the preponderance of the evidence standard, the Commission must consider all of these facts. We found the determination of when was the appropriate time to de-energize TL 637 to be a close call, but the record supports the outcome of this decision.

We also note developing an evidentiary record regarding wind is a challenge, but is essential to a case such as this where wind played a key role. SDG&E contends that the wind conditions were severe and unprecedented. If that is the case, SDG&E's decision to not de-energize TL 637 before the start of the fire is complex. The complexity of that decision reflected in the record in this case demonstrates the challenge of applying a prudency standard, which requires us to consider in the aggregate whether SDG&E acted reasonably and make what we consider to be a binary choice whether SDG&E should be able to recover all or none of the costs. The ability to do a more nuanced assessment of fault could be a helpful regulatory tool and we respectfully ask the legislature to consider this issue.

Despite the concerns regarding the Witch fire identified in this concurrence, we defer to the conclusion of the Administrative Law Judges (ALJs), because as the finders of fact in this proceeding, they are situated best to

make factual determinations.  Indeed the record in this case supports the outcome of this decision.

### Legal Liability of a Utility Related to Wildfires

In this case SDG&E assumed the legal principle of inverse condemnation applied to torts claims in this matter and settled claims by the public before submitting an application to the Commission.  In its application, the SDG&E cites California Courts of Appeal cases addressing utility legal liability in the context of other types of private property loss.[12]  SDG&E contends a court noted it could be appropriate to apply the legal principle of inverse condemnation to utilities in some instances.[13]

The California Public Utilities Code requires the Commission to subject applications for recovery of cost by investor owned utilities to a reasonableness review,[14] which is not true for publicly owned utilities.  If the preponderance of the evidence shows that the utility acted prudently, the Commission will allow the utility to recover costs from the ratepayers.  However in this instance, the Commission determined the actions of SDG&E were imprudent based on the specific facts in the case and will not allow recovery of costs.  Thus the logic for applying inverse condemnation to utilities - costs will necessarily be socialized across a large group rather than borne by a single injured property owner, regardless of prudence on the part of the utility - is unsound.

---

[12] SDG&E Application at 4 to 7.

[13] SDG&E Application at 6.

[14] Cal. Pub. Util. Code Section 451.

Case: 19-30088    Doc# 4486-3    Filed: 10/25/19    Entered: 10/25/19 20:22:43    Page 7 of 9

A.15-09-010
D.17-11-033

Returning to the case at hand, SDG&E settled tort claims by the public before submitting an application to the Commission to recover those costs. The Commission then fulfilled its statutorily prescribed role to perform a reasonableness review. This process demonstrates two concerns to us, which we believe merit further review. First, the SDG&E accrued liability by settling tort claims before the Commission could determine the prudency of its actions in a reasonableness review. Second, as noted above the application of a prudency standard, which provides the Commission with what we consider to be a binary choice of determining prudency in the aggregate, could be improved upon to explicitly allow a more nuanced assessment of fault.

We are also concerned that the application of inverse condemnation to utilities in all events of private property loss would fail to recognize important distinctions between public and private utilities and that the financial pressure on utilities from the application of inverse condemnation may lead to higher rates for ratepayers. Investor owned utilities are partially dependent on the capital markets to raise money and the insurance market to mitigate financial risk. If strict liability is imposed for damage associated with wildfires caused in whole or in part by utility infrastructure, the risk profile of the investor-owned utility may be questioned by investors and insurance providers alike. The increase in the cost of capital and the expense associated with insurance could lead to higher rates for ratepayers, even in instances where the investor-owned utility complied with the Commission's safety standards.

We respectfully urge the California Legislature to affirmatively address the issues of liability calculation and cost allocation in instances when utility infrastructure is implicated in private property loss. We also respectfully urge

Case: 19-30088    Doc# 4486-3    Filed: 10/25/19    Entered: 10/25/19 20:22:43    Page 8 of 9

A.15-09-010
D.17-11-033

the California Courts of Appeal to carefully consider the rationale for applying inverse condemnation in these types of cases.  Despite our concerns, after a thorough review of the record and legal arguments, we join our colleagues in support of this decision, which is supported by the record.

   Dated December 21, 2017, at San Francisco, California.

| /s/  MICHAEL PICKER | /s/  MARTHA GUZMAN ACEVES |
|---|---|
| Michael Picker<br>President | Martha Guzman Aceves<br>Commissioner |