# EXHIBIT E

**Date of Issuance**
**July 13, 2018**

Decision 18-07-025          July 12, 2018

BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA

| | |
|---|---|
| Application of San Diego Gas & Electric Company (U902E) for Authorization to Recover Costs Related to the 2007 Southern California Wildfires Recorded in the Wildfire Expense Memorandum Account (WEMA). | Application 15-09-010 (Filed September 25, 2015) |

## ORDER DENYING REHEARING OF DECISION (D.) 17-11-033

### I. INTRODUCTION

In this Order, we dispose of the Applications for Rehearing of Decision (D.) 17-11-033 (or "Decision"), filed by San Diego Gas & Electric Company ("SDG&E"), and by Pacific Gas and Electric Company ("PG&E") and Southern California Edison Company ("SCE") jointly.

In October 2007, over a dozen wildfires burned portions of southern California causing extensive property damage and a number of deaths. Investigation reports issued by the California Department of Forestry and Fire Protection ("Cal Fire") as well as the Commission's Consumer Protection and Safety Division (now the Safety and Enforcement Division ("SED"), determined that three of the fires were ignited by SDG&E electric transmission facilities: the Witch Fire; the Guejito Fire; and the Rice Fire (together "2007 Wildfires").

After the fires, SDG&E, PG&E, and SCE all sought Commission approval to establish Wildfire Expense Memorandum Accounts ("WEMAs") to record costs such as: a) payments to satisfy wildfire claims including co-insurance and deductibles expenses; b) outside legal expenses incurred defending wildfire claims; c) increases or decreases in wildfire insurance premiums from amounts authorized in SDG&E's general

Case: 19-30088    Doc# 4486-5    Filed: 10/25/19    Entered: 10/25/19 20:22:43    Page 2 of 34

rate case; and d) the cost of financing Wildfire Expense Balancing Account ("WEBA") balances. The Commission authorized the WEMA accounts in Resolution E-4311.[1]

In 2012 the Commission issued D.12-12-029 which, among other things, kept open SDG&E's WEMA account subject to reasonableness review consistent with Public Utilities Code Section 451 should SDG&E later seek to recover those costs from its ratepayers.[2]

In 2015, SDG&E in fact filed Application (A.) 15-09-010 requesting rate recovery for $379 million in WEMA costs recorded for the 2007 Wildfires.[3] In this proceeding we conducted the reasonableness review required by D.12-12-029. Such reviews are governed by Public Utilities Code Section 451.[4]

Section 451 requires utilities to show that all requested charges are "just and reasonable" in order to be recovered in rates.[5] To ensure that charges requested by a

---

[1] Resolution E-4311, dated July 29, 2010, at pp. 2-3, 10 [Findings and Conclusions Number 2].

[2] See *Application of San Diego Gas & Electric Company, Southern California Edison Company, Southern California Gas Company and Pacific Gas and Electric Company for Authority to Establish a Wildfire Expense Balancing Account to Record for Future Recovery Wildfire-Related Costs* [D.12-12-029] (2012) at pp. 13-14, 19 [Ordering Paragraph Number 2] (slip op.). (All citations to Commission decisions are to the official pdf versions which can be found on the Commission's website at: http://docs.cpuc.ca.gov/DecisionsSearch Form.aspx.)

[3] See *Application of San Diego Gas & Electric Company for Authorization to Recover Costs Related to the 2007 Southern California Wildfires Recorded in the Wildfire Expense Memorandum Account* (A.15-09-010), dated September 25, 2015, at p. 7.

[4] All subsequent section references are to the Public Utilities Code unless otherwise stated.

[5] D.17-11-033 at p. 10, citing e.g., *Re Southern California Edison Company* ("*Re SCE*") [D.87-06-021] (1987) 24 Cal.P.U.C.2d 476, 486. Pub. Util. Code Section 451 states in pertinent part:

> All charges demanded or received by any public utility…for any product or commodity furnished or to be furnished or any service rendered or to be rendered shall be just and reasonable. Every unjust or unreasonable charge demanded or received for such product or commodity or service is unlawful.

> Every public utility shall furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities…as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public.

Pub. Util. Code Section 454 states in pertinent part:

*(continued on next page)*

utility are just and reasonable, and ensure that a utility has operated and maintained its system in a safe and reasonable manner, we have adopted the longstanding Prudent Manager Standard.

Under that standard, a utility has the burden to affirmatively prove that it reasonably and prudently operated and managed its system.[6]  As discussed at more length in Part II.A. below, that means a utility must show that its actions, practices, methods, and decisions show reasonable judgment in light of what it knew or should have known at the time, and in the interest of achieving safety, reliability and reasonable cost.[7]

Our Decision found that, on balance, SDG&E failed to meet its burden to show that its operation and management of its system leading up to the 2007 Wildfires, and its immediate response at the time of the fires, was reasonable and prudent.  By definition then, rate recovery would be unjust, unreasonable, and unlawful under Section 451.  For that reason, we denied SDG&E's request to pass the $379 million in WEMA costs on to its ratepayers.[8]

Applications for Rehearing were filed by SDG&E as well as PG&E and SCE jointly.  SDG&E alleges: (1) it was unlawful to find SDG&E failed to meet the Prudent Manager Standard; (2) Commission precedent did not support the Commission's determination; (3) the Decision erred regarding the severity of wind and weather conditions in October 2007; and (4) the Decision erred by failing to allow rate recovery consistent with the cost spreading principle under the doctrine of inverse condemnation.

---

*(continued from previous page)*

   (a) Except as provided in Section 455, a public utility shall not change any rate or so alter any classification, contract, practice, or rule as to result in any new rate, except upon a showing before the commission and a finding by the commission that the new rate is justified….

[6] See, e.g., *Re SCE* [D.87-06-021], *supra*, 24 Cal.P.U.C.2d at p. 486.

[7] *Id.* at p. 486.

[8] D.17-11-033, at pp. 2, 6, 9-11, 70 [Conclusion of Law Number 9], p. 71 [Conclusion of Law Number 13] & p. 72 [Conclusion of Law Number 21] & [Ordering Paragraph Number 1].

Case: 19-30088   Doc# 4486-5   Filed: 10/25/19   Entered: 10/25/19 20:22:43   Page 4 of 34

PG&E and SCE challenge the Decision alleging that cost recovery should have been driven by the cost spreading policy of inverse condemnation rather than traditional Commission reasonableness review standards.[2]  Responses were filed by the Office of Ratepayer Advocates ("ORA"), Ruth Hendricks, and Protect Our Communities ("POC") and the Utility Consumers' Action Network ("UCAN") jointly.

We have reviewed each and every issue raised by SDG&E, PG&E and SCE and are of the opinion that good cause has not been established to grant rehearing.  Accordingly, the Applications for Rehearing of D.15-11-042 are denied because no legal error was shown.

## II.    DISCUSSION

### A.    Reasonableness Reviews and the Prudent Manager Standard

Commission regulation of privately owned utilities is governed by the principle of reasonableness, as to both a utility's ability to spread costs and charges among its ratepayers, as well as its provision of a safe and reliable utility system.  The principle derives from Section 451, which provides:

> All charges demanded or received by any public utility…shall be just and reasonable.  Every unjust or unreasonable charge demanded or received by for such product or commodity or service is unlawful.

> Every public utility shall furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities…as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public.

(Pub. Util. Code, § 451.)[10]

Consistent with Section 451, we can grant rate recovery only if requested rates and charges are deemed "just and reasonable."  Similarly, rates or charges deemed unjust or unreasonable are unlawful, and must be denied.

---

[2] PG&E and SCE's arguments are almost entirely subsumed in the issues and arguments raised by SDG&E.  Thus unless specifically noted, their arguments are not addressed separately.

[10] See also *ante,* fn. 5 [Pub. Util. Code, § 454, subd. (a).].

Case: 19-30088    Doc# 4486-5    Filed: 10/25/19    Entered: 10/25/19 20:22:43    Page 5 of 34

We have summarized this concept of reasonableness in *In the Matter of the Application of San Diego Gas & Electric Company and Southern California Gas Company for Authority to Revise Their Rates Effective January 1, 2013, in Their Triennial Cost Allocation Proceeding* [D.14-06-007] (2014) at p. 31 (slip op.), stating:

> California law, Commission practice and precedent, and common sense, all essentially require that before ratepayers bear any costs incurred by the utility, those costs must be just and reasonable….When that occurs, the Commission can find the costs incurred by the utility to be just and reasonable and therefore, they can be recovered from ratepayers.  When this is not the case however, the Commission can and must disallow those costs:  that is unjust or unreasonable costs must not be recovered in rates from ratepayers.

In implementing Section 451 for purposes of utility reasonableness reviews, the Commission utilizes an established Prudent Manager Standard as the test to evaluate whether requested costs are just and reasonable.  We have summarized this test as follows:

> The standard for reviewing utility actions has been established as one of reasonableness and prudence….The term "reasonable and prudent" means that at a particular time any of the practices, methods, and acts engaged in by a utility follows the exercise of reasonable judgment in light of facts known known or which should have been known at the time the decision was made.  The act or decision is expected by the utility to accomplish the desired result at the lowest reasonable cost consistent with good utility practices.  Good utility practices are based upon cost-effectiveness, reliability, safety, and expedition.

(See, e.g., *Re SCE* [D.87-06-021], *supra,* 24 Cal.P.U.C.2d at p. 486.)

Further guidance is embodied in other decisions, such as D.02-08-064, which states:

> A reasonable and prudent act is not limited to the optimum practice, method, or act to the exclusion of all others, but rather encompasses a spectrum of possible practices, methods, or acts consistent with the utility system needs, the

Case: 19-30088    Doc# 4486-5    Filed: 10/25/19    Entered: 10/25/19 20:22:43    Page 6 of 34

> interest of the ratepayers and the requirements of
> governmental agencies of competent jurisdiction….
>
> The greater the level of money, risk and uncertainty involved
> in a decision, the greater the care the utility must take in
> reaching that decision….
>
> The burden rests heavily upon a utility to prove… that it is
> entitled to the requested rate relief and not upon the
> Commission, its staff, or any interested party to prove the
> contrary.

(*Investigation into the Natural Gas Procurement Practices of Southwest Gas Company*

[D.02-08-064] (2002) at pp. 5-8 (slip op.) (citations omitted).)

> We have also stated:
>
> When [utilities] file applications to demonstrate the
> reasonableness of Safety Enhancement they will bear the
> burden of proof that the companies used industry best
> practices and that their actions were prudent.  This is not a
> "perfection" standard: it is a standard of care that
> demonstrates all actions were well planned, properly
> supervised and all necessary records are retained.

(D.14-06-007, *supra,* at pp. 31, 36 (slip op.).)

Although these concepts guide all Prudent Manager reviews, each case must be evaluated in light of own unique circumstances and the evidence presented.  In this case we reviewed evidence presented by SDG&E, ORA, UCAN, POC, Ruth Hendricks, San Diego Consumers' Action Network ("SDCAN"), and the Mussey Grade Road Alliance ("MGRA").

SDG&E contests our findings for all three 2007 Wildfires.  In its Application for Rehearing, SDG&E essentially attempts to re-litigate the issues and the evidence.  Such attempts are improper under Section 1732.  However, to fully address SDG&E's claims we will discuss SDG&E's allegations below.

### B.    SDG&E's Reasonableness Challenges

#### 1.    The Witch Fire

Cal Fire determined that the Witch Fire was caused by SDG&E's 14-mile long 69 kilovolt ("kV") transmission line ("TL") 637 that runs between its Santa Ysabel

and Creelman substations.  TL 637 experienced four faults between 8:53 a.m. and 3:25 p.m. on October 21, 2007.[11]  SDG&E's automatic reclosers re-energized the line after each of the faults.  But the repeated re-energization caused arcing after the third fault that caused hot particles to ignite vegetation below the line.[12]

SDG&E does not contest these facts, but argues we ignored what it knew or reasonably could have known at the time.  SDG&E argues we wrongly found that it: (a) failed to adequately monitor the faults; (b) failed to send a protective engineer to identify the fault locations; and (c) failed to adequately appreciate the arcing risk and more timely de-energize TL 637.  (SDG&E Rhg. App., at  pp. 27-38, citing D.17-11-033, at pp. 27-29, 66-67 [Findings of Fact Numbers 15, 16, 17, 18 & 19] & p. 71 [Conclusions of Law Number 11].)  We disagree.

### a)    Fault Monitoring

SDG&E contends the fact that it dispatched troubleshooters to the substations after the first two faults and dispatched a patrolman after the third fault, proved that it acted prudently.[13]  (SDG&E Rhg. App., at pp. 28-30.)

We acknowledged these steps, but disagreed that they were adequate.  We reasoned that under the conditions, a prudent manager should have sent a protective engineer to determine the exact location and cause of the faults, or, absent that, should have de-energized TL 637 sooner to prevent any potential fire from starting.[14]

---

[11] The first fault occurred at 8:53 a.m., the second at 11:22 a.m., the third at 12:23 p.m., and the fourth at 3:25 p.m.  The Witch Fire was first observed by an air tanker at 12:29 p.m., shortly after the third fault.  Ultimately, TL 637 was not de-energized until approximately 3 hours after the Witch Fire started and almost two hours after SDG&E's Grid Operations became aware of it. (D.17-11-033, at pp. 12-13; ORA Exhibit 2 (ORA-02); SDG&E Exhibits 11 & 11-A (SDG&E-11, at p. 4, SDG&E-11-A, at pp. 2-4.)

[12] Witch Fire Investigation Report.  Case No. 07-CDF-570, Incident No. 07-CA-MVU-10432. October 21, 2007.  California Department of Forestry and Fire Protection.

[13] A patrol never actually occurred.  High winds prevented a helicopter patrol, and rough terrain prevented a patrol by foot.  A fire near the Santa Ysabel substation also made patrol too dangerous.  (SDG&E-11-A, at pp. 7-8, 10-11.)

[14] D.17-11-033, at pp. 27-29.

Case: 19-30088    Doc# 4486-5    Filed: 10/25/19    Entered: 10/25/19 20:22:43    Page 8 of 34

SDG&E argues that such extraordinary measures were unnecessary. SDG&E said faults are common on windy days, and its reclosers successfully re-energized the line after each of the first two faults. Thus, SDG&E saw no cause for heightened concern.

This reasoning ignores a number of important considerations that a prudent manager should have taken into account. For example:

- SDG&E knew, or should have known that October 21, 2007 was not going to be just an ordinary windy day. For several days Predictive Services at the Southern California Geographic Area Coordination Center, in coordination with the National Weather Service, had been predicting "High Risk" and "Red Flag" wind events for October 21, 2007.[15] SDG&E's own troubleshooters attested to the intensity of the winds on that day.[16]

- SDG&E knew or should have known there was a history of significant wind-related power line fires in San Diego County.[17]

- SDG&E knew that although its recloser policy was industry practice, faults that resulted in multiple re-energization attempts posed a risk of arcing that could ignite vegetation and cause fires.[18]

- SDG&E should have known that multiple faults on TL 637 were cause for concern given faults on TL 637 were uncommon.[19]

- SDG&E knew TL 637 was located in a remote backcountry location with an abundance of vegetation that would be prone to fire.[20]

- SDG&E knew on the day of the Witch Fire that several other fires had already been triggered by the winds.[21]

---

[15] SDG&E-01, Appendix 1, California Fire Siege 2007, at pp. 16-17.

[16] See, e.g., SDG&E-11-A, at pp. 6-7, 10-11, 13.

[17] MGRA Exh. 1 (MGRA-1, at pp. 5-8, 11-18, 23-28.); POC Exh. 1 (POC-1, at pp. 8-9, 11-13, 17-18.)

[18] See e.g., D.17-11-033, at p. 18; ORA-18; Reporters Transcript ("RT") Volume ("Vol.") 2, SDG&E/Geier, at p. 197; ORA-20.

[19] D.17-11-033, at p. 27; ORA-3, at pp. 1-3 (TL 637 Fault History).

[20] SDG&E-11, at pp 3-4.

[21] SDG&E-11-A, at pp. 8-9.

Case: 19-30088    Doc# 4486-5    Filed: 10/25/19    Entered: 10/25/19 20:22:43    Page 9 of 34

SDG&E argues there was no known or foreseeable risk because not all past fires were linked to utility facilities,[22] and its own facilities had never started a fire due to conductor (line-to-line) contact. SDG&E also argued that its resources were consumed with responding to the Harris Fire, which it deemed a priority because it threatened SDG&E's 500 kV Southwest Powerlink.[23]

These arguments were not persuasive given the above known safety risks. These factors indicated more than a routine response effort was needed. Evidence showed that other response and service entities had prudently prepared for heightened response efforts in light of the impending Santa Ana conditions.[24] Nothing suggested SDG&E had done the same.

SDG&E said only that it took the usual routine measures by sending troubleshooters to the substations. But troubleshooters do not necessarily locate faults and dispatching patrolmen do not help if a patrol is not possible. In addition, while we recognize SDG&E's concerns regarding the Harris Fire, it is not clear why problems on TL 637 or any other line did not merit equal effort.

SDG&E argues there was no evidence a prudent manager would have acted differently. But that was not the burden of any party to prove. Under a reasonably objective view, the conditions warranted more intervention.

### b)    Failure to Deploy a Protective Engineer

Because SDG&E could not patrol the line, it could only have determined the fault locations on TL 637 by deploying a protective engineer to run a computer model using mileage data from its event records.

SDG&E contends that even if it had done that, it could not have prevented the Witch Fire. SDG&E reasons there was only an hour between the second and third faults, and it would have taken longer for a protective engineer to calculate the fault

---

[22] SDG&E-12, at pp. 23-25.

[23] SDG&E-11-A, at pp. 8-9.

[24] (SDG&E-01, Appendix 1, California Fire Siege 2007, at pp. 16-17.)

locations.  Thus, SDG&E argues sending a protective engineer would have changed nothing, and there was no proof its failure to do so caused the fire.  (SDG&E Rhg. App., at pp. 30-32.)

SDG&E misses the fundamental point.  Even if the fire would have started anyway, a reasonableness review looks at whether it acted reasonably and prudently given what it knew or should have known about the potential safety risk.

As explained above, SDG&E knew that Santa Ana wind conditions were predicted, it knew it had such conditions on that day, and it knew those conditions increased the potential for fire risk.  SDG&E also knew there were other wind-related fire events already happening, it knew TL 637 had already faulted twice, it knew repeated reclosing attempts could cause a fire, and it knew relatively quickly that it could not physically patrol TL 637.

Together, these factors suggest that a prudent manager would use all available resources to ensure that TL 637 did not ignite a fire.  Here, that would have meant utilizing a protective engineer and event records to determine the location and cause of the faults.  Even SDG&E conceded that effective use of event records would have put SDG&E in a better position to respond to the faults.[25]  But SDG&E did not do that.  And had SDG&E taken that step, it may have been possible to find that its actions were prudent.

### c)    Delay in De-Energizing TL 637

SDG&E Grid Operations de-energized TL 637 approximately 6.5 hours after first fault occurred and almost 2.5 hours after it knew the Witch Fire had started. We did not consider this time lapse to be reasonable under the conditions (e.g., high winds, multiple faults, etc.), and the likelihood for fire under these conditions.

SDG&E argues there was no reason to de-energize TL 637 any sooner.  It states that the Harris Fire and 2003 Cedar Fires did not involve powerlines, and it didn't know that conductor contact could cause a fire.  SDG&E says all it knew was that it had

---

[25] See, e.g., RT Vol. 3, at p. 349.

Case: 19-30088    Doc# 4486-5    Filed: 10/25/19    Entered: 10/25/19 20:22:43    Page 11 of 34

temporary faults on a backcountry line on a windy day.  Thus, to suggest it could have foreseen a fire or been more proactive was hindsight bias.  (SDG&E Rhg. App., at pp. 33-35.)

That SDG&E can name two fires that did not involve powerlines was not persuasive.  It knew or should have known that multiple fires, such as the 1970 Laguna Fire, the 2004 Wynola Fire, and the 2005 Fallbrook Fire, were wind and powerline related.  That should have put SDG&E on notice that the situation was unsafe.

SDG&E's position regarding the weather conditions is also problematic. Here it says it was just another windy day.  Elsewhere it says the winds were extreme and unprecedented.[26]  (SDG&E Rhg. App., at pp. 34, 55-57.)  It cannot have been both.

In addition, the fact that SGD&E had no direct experience with conductor contact causing a fire misses the larger point.  It is reasonable to expect that a prudent manager, when faced with potential conductor contact, would know it presented a heightened safety risk.[27]

SDG&E contends that even if it had de-energized the line when Grid Operations learned of the fire (1:10 p.m.), it would not have prevented it because the fire had already started.  But that is not the point.  The issue was whether SDG&E could show that its actions and decisions were prudent given what it knew or should have known at the time.  De-energizing the line, at least once SDG&E knew the Witch Fire had started, would have been a reasonable and prudent thing to do.  SDG&E's own testimony attested to the fact that energized power lines can create additional risks to firefighters and the public in fire conditions.[28]

---

[26] SDG&E states it had safety procedures for Red Flag conditions.  (SDG&E Rhg. App., at p. 35.)  However, procedures alone do not prove a utility's actions or decisions in any particular instance were reasonable.  (*Re Southern California Edison Company* ("*Mohave*") [D.94-03-048] 53 Cal.P.U.C.2d 452, 465-466.)

[27] SDG&E minimizes the potential for fire ignition from repeated re-energization stating the conditions contemplated in its 2001 Field Guide were different. (SDG&E Rhg. App., at p. 35.) Whether the exact same conditions were in play was not the issue.  SDG&E knew that an event causing repeated re-energization could cause arcing and potential fire ignitions.  Disavowal of any such knowledge is simply not persuasive.

[28] SDG&E-11-A, at p. 11.

SDG&E contends that de-energizing powerlines should not be taken lightly because electricity is needed to provide water supply, traffic signals, communications, and emergency services during fire events.  (SDG&E Rhg. App., at pp. 32-33.)

These are important considerations.  Yet, SDG&E has utilized de-energization strategies before to minimize fire risk.[29]  And SDG&E made no showing here that de-energizing TL 637 sooner would have caused significant adverse impacts.  Given the backcountry location of TL 637, it was not clear why SDG&E waited so long after the fire had begun to de-energize TL 637.[30]

Finally, SDG&E argues that the $379 disallowance amounted to a penalty, and one that was grossly excessive given its culpability.  (SDG&E Rhg. App., at p. 37, citing *BMW of N. Am. v. Gore* ("*BMW*") (1996) 517 U.S. 599.)

*BMW* involved an award of $4,000 in actual damages and $2,000,000 in punitive damages.  The Court deemed $2,000,000 to be excessive in that it was 500 times the amount of actual harm caused by the defendant's conduct.  (*Id.* at pp. 562, 565, 574-576, 581-582.)  That is not the case here.

This case did not involve punitive damages.  And even if did, the $379 million disallowance would not have been excessive compared to the $2.4 billion in actual harm caused by the 2007 Wildfires.

### 2.    The Guejito Fire

Cal Fire determined that the Guejito fire ignited when a Cox Communications ("Cox") lashing wire came into contact with an SDG&E 12 kV overhead conductor between poles 196394 and 196387.  The SDG&E line was located

---

[29] ORA-60.

[30] SDG&E contends that its actions post-ignition, and in response to, the fire were outside the scope of this proceeding.  (SDG&E Rhg. App., at p. 37, citing Scoping Memo, at p. 4; RT Vol. 3, at pp. 388-400, 404, 433 & 436.)  Nothing in the Scoping Memo or elsewhere imposed such a limitation.

Case: 19-30088    Doc# 4486-5    Filed: 10/25/19    Entered: 10/25/19 20:22:43    Page 13 of 34

above the Cox equipment, and the winds blew the lashing wire up into SDG&E's line, causing an arc and starting the fire.[31]

SDG&E does not contest these facts, but argues we failed to say *why* the lashing wire contacted SDG&E's line, i.e., because Cox's lashing wire was broken. SDG&E claims we ignored that evidence, thus failed to state a material finding of fact. (SDG&E Rhg. App., at pp. 38-41.)

We did not ignore the fact that Cox's lashing wire was broken prior to the contact. But there was no need to make a specific finding to that effect. It was an obvious point, and not material in and of itself.

SDG&E also contends it had no way to know that the lashing wire broke, and it was unreasonable to find that its actions were imprudent just because of a "technical" clearance violation. (SDG&E Rhg. App., at p. 42.)

SDG&E misses the point. It is not about whether SDG&E knew the lashing wire was broken or even when it broke. The issue is that SDG&E knew it had an obligation to maintain its facilities in compliance with established equipment clearance requirements under General Order ("GO") 95.[32]

SDG&E's own testimony readily acknowledged the mandates of GO 95, specifically noting Rule 31.1 (Design, Construction, and Maintenance), Rule 31.2 (Inspection of Lines), Rule 32.1 (Two or More Systems), and Rule 38 (Minimum Clearances of Wires From Other Wires). SDG&E also acknowledged the pole inspection requirements under GO 165.

These regulations required SDG&E to maintain a minimum 6 foot clearance between its line and Cox's equipment. SDG&E was also required to conduct regular patrol inspections to ensure compliance with all safety requirements at least every 2 years, with detailed inspections every 5 years.

---

[31] Guejito Fire Investigation Report. Incident No. CA-MVU-010484. October 22, 2007. California Department of Forestry and Fire Protection; D.17-11-033, at p. 29; ORA-05, at pp. 1075-78.

[32] A copy of GO 95 can be located at: http://www.cpuc.ca.gov/generalorders/.

Case: 19-30088    Doc# 4486-5    Filed: 10/25/19    Entered: 10/25/19 20:22:43    Page 14 of 34

SDG&E testified that it complied with all inspection requirements, and had last inspected Pole 196394 on June 22, 2007, and Pole 196378 on April 8, 2005.[33] Still, there was a significant clearance violation that SDG&E's inspections failed to identify.[34] SDG&E should have known about that violation and resolved it before the Guejito Fire.

SDG&E tries to shift the responsibility to Cox. But GO 95 applies to both SDG&E and Cox, and both were responsible to ensure compliance with respect to their respective facilities.

SDG&E also suggests that the lashing wire would have contacted its line regardless of the clearance violation, thus there was no causal link between the violation and the fire. That is a theory SDG&E cannot prove, and the rules are designed to prevent such contact. SDG&E's speculation and conjecture do not establish error.

SDG&E's position also seems to ignore the point of reasonable and prudent management. Had SDG&E complied with the established clearance rules, absent any other imprudent conduct, there would have been some basis to find that it reasonably and prudently operated and maintained its facilities. Here, the GO violation and the failure of SDG&E's inspections to identify the violation demonstrated a failure to reasonably and prudently operate and maintain overhead electric lines in accordance with established rules and regulations. Compliance is not discretionary. Thus, we could not reasonably find that SDG&E met the Prudent Manager Standard.

### 3.    The Rice Fire

Cal Fire determined that the Rice Fire ignited when a limb from sycamore tree FF1090 broke and knocked an SDG&E 12 kV line to the ground, starting the fire.[35] SDG&E does not contest these facts, but contends the Decision: (a) violated section 311; and (b) was unsupported by the evidence. We find these arguments are without merit.

---

[33] SDG&E-12, at p. 10-11.

[34] D.17-11-033, at pp. 30-31; SDG&E-07, at pp. 14-15.

[35] Rice Fire Investigation Report. Case No. 07-CDF-572, Incident No. 07-CA-MVU-010502. October 23, 2007. California Department of Forestry and Fire Prevention. (See, also e.g., D.17-11-033, at p. 36; SDG&E-08, at p. 2.)

Case: 19-30088    Doc# 4486-5    Filed: 10/25/19    Entered: 10/25/19 20:22:43    Page 15 of 34

a)    **Section 311**

SDG&E contends that after the Proposed Decision was issued, we invented an entirely new theory to support the proposed outcome.[36]  SDG&E contends that the modifications made to the Decision were substantive revisions that constituted an "alternate."  As such, SDG&E argues Section 311 required the Decision to be recirculated for a new 30-day review and comment period, and by not doing that SDG&E was denied adequate due process.  (SDG&E Rhg. App., at pp. 43-45.)

Section 311(e) requires that "alternate" decisions be subject to a 30-day public notice and comment period.  But the statute did not apply here because the modifications SDG&E complains of did not make the Decision an "alternate" within the meaning of section 311(e), or the Commission's implementing rules.

Section 311(e) defines an "alternate" as:

[E]ither a substantive revision to a proposed decision that *materially changes the resolution of a contested issue,* or any substantive addition to the findings of fact, conclusions of law, or ordering paragraphs.

(Pub. Util. Code, § 311, subd. (e) (emphasis added.).)

Similarly, Rule 14.1 of the Rules or Practice and Procedure define an "alternate" as follows:

(d) "Alternate proposed decision"…means a *substantive revision by a Commissioner* to a proposed decision or draft resolution…which either:

(1) materially changes the resolution of a contested issue, or

(2) makes any substantive addition to the findings of fact, conclusions of law, or ordering paragraphs.

A substantive revision to a proposed decision or draft resolution *is not an "alternate proposed decision"*…if the revision does no more than make changes suggested in prior comments on the proposed decision….

---

[36] A copy of the Proposed Decision can be located at:
http://docs.cpuc.ca.gov/SearchRes.aspx?DocFormat=ALL&DocID=193981771.

Case: 19-30088    Doc# 4486-5    Filed: 10/25/19    Entered: 10/25/19 20:22:43    Page 16 of 34

(See also Cal. Code of Regs., tit. 20, § 14.1, subd. (d) (emphasis added.).)[37]

The modifications at issue were not an "alternate" because they were not substantive revisions made by a Commissioner, nor did they materially change the outcome recommended by the Proposed Decision. The modifications were simply changes made by the Administrative Law Judge ("ALJ") in response to comments on the Proposed Decision.

Decisions routinely contain changes made by an ALJ following comments on a Proposed Decision. That practice is consistent with section 311(d), which allows the Commission to adopt, modify, or set aside all of a Proposed Decision without any additional review or comment.[38]

The modifications also did not present an entirely new theory to support the proposed outcome. The Proposed Decision and Final Decision both show that the same basic issues were discussed in addressing the Rice Fire. For example, both documents discussed: vegetation clearance requirements; SDG&E's Vegetation Management Program ("VMP"); SDG&E's inspection records for Tree FF1090; the positions of the parties; recommendations by SDG&E's tree contractor; the 0-3 month trim designation under the SDG&E's VMP; evidence regarding the growth rate for Tree FF1090; the latent defect in the limb that fell; and Reliability Tree issues.[39]

The modifications did no more than provide additional detail, based on the evidence, with respect to the same issues. SDG&E had, and availed itself of, the

_____

[37] Section 311(e) also requires the Commission to have rules for implementing Section 311(e), stating:

> The commission shall adopt rules that provide for the time and manner of review and comment and the rescheduling of the item on a subsequent public agenda, except that the item may not be rescheduled for consideration sooner than 30 days following service of the alternate item upon all parties.

[38] See Pub. Util. Code, § 311(d).

[39] See Proposed Decision, at pp. 34-43 and Decision, at pp. 36-49.

Case: 19-30088    Doc# 4486-5    Filed: 10/25/19    Entered: 10/25/19 20:22:43    Page 17 of 34

opportunity to comment on those issues in its testimony, its briefs, and its comments on the Proposed Decision.[40]  Accordingly, SDG&E received adequate due process.

### b)    Record Evidence

The Decision found that SDG&E failed to prove that its vegetation management of Tree FF1090 was prudent because it: deviated from its own past annual trim cycle; failed to keep complete trim records;[41] failed to identify structural issues that may have led to more timely trimming of the limb that broke; and let more than two years lapse prior to the fire without having trimmed Tree FF1090.[42]

SDG&E states there was no need to trim Tree FF1090 in the two years before the fire because it did not find any clearance violations.[43]  (SDG&E Rhg. App., at pp. 51-52.)  Yet even if that was so, SDG&E knew Tree FF1090 was fast growing.[44] And records showed that the tree had been on an annual trim cycle prior to the two year lapse.[45]

That practice suggested that at least at some point, SDG&E believed it was prudent to trim Tree FF1090 annually.  It was not clear why it was suddenly prudent *not* to follow that practice.  It was also not persuasive that SDG&E's idea of prudent management was to trim a tree only when there is a recorded clearance violation.

SDG&E's handling of a trim recommendation that was made before the fire was also a cause for concern.  In July 2007, SDG&E's tree contractor Davey Tree Surgery Company ("Davey") inspected Tree FF1090 and identified a limb directly

---

[40] See, e.g., SDG&E's Comments on the Proposed Decision of ALJs Tsen and Goldberg, dated September 11, 2017 and SDG&E's Reply Comments on the Proposed Decision of ALJs Tsen and Goldberg, dated September 18, 2017.

[41] D.17-11-033, at pp. 36-49.

[42] D.17-11-033, at pp. 42-44; SDG&E-08, Appendix 6.

[43] SDG&E contends the evidence proved that the limb that broke grew away from the line, and we relied on unsubstantiated hearsay to say SDG&E did not prove that fact.  (SDG&E Rhg. App., at pp. 48-49.)  Even if the evidence was hearsay, it is not impermissible to rely on hearsay evidence in administrative proceedings.  (See, e.g., *Investigation re North Shuttle Service Inc.* [D.98-05-019] (1998) 80 Cal.P.U.C.2d 223, 230.)

[44] See, e.g., ORA-32, Data Request Response Number 7.

[45] SDG&E-08, Appendix 6.

Case: 19-30088    Doc# 4486-5    Filed: 10/25/19    Entered: 10/25/19 20:22:43    Page 18 of 34

overhanging SDG&E's electric line. The contractor testified that the tree showed strong growth toward SDG&E's electric line, thus the limb required immediate trimming.[46]

Using SDG&E's computerized Vegetation Management System ("VMS"), the contractor selected the menu item called "Months to Next Trim" and picked the option that appeared to require the most immediate trim (0-3 months).[47] He understood that to mean that the tree would be trimmed within three months of his inspection.[48]

In explaining why the tree had not been trimmed at the time of the fire, SDG&E said the contractor misunderstood the 0-3 designation. SDG&E argued it did not mean the tree should be trimmed within 3 months of inspection. It only meant the tree would grow out of compliance within 3 months.[49] SDG&E also argued that if a more immediate trim was required, the contractor should have flagged the tree as a hazard tree.[50]

This argument seemed to suggest the only way a tree would be trimmed is if it was identified as a hazard, or if it grew out of compliance with established clearance minimums. Such conditions do not make a strong case for prudent preventative maintenance. If nothing else, it appeared SDG&E had not adequately trained its contractor to know the appropriate means by which to ensure a tree would be trimmed on a more immediate basis. Adequate contractor training is part of a utility's responsibility as prudent manager.

SDG&E's response at the time the trim recommendation was made also raised questions as to prudency. Prior to authorizing a time and equipment billing for the recommended trim, an SDG&E employee went to observe Tree FF1090. He said he recommended against any trimming because he considered the overhang to be too

---

[46] ORA-44, RT Excerpt at pp. 10-13, 39-40, 56.

[47] Options under the 'Months to Next Trim' field were 0-3 months, 3-6 months, and 6-9 months, etc. (SDG&E-13, at p. 10.)

[48] ORA-44, RT Excerpt at pp. 10-11, 39-40, 56.

[49] See, e.g., ORA-34, RT Excerpt at pp. 6-7; SDG&E-13, at pp. 10-11.

[50] SDG&E-08, at pp. 12, 17.

slight.[51]  That is SDG&E's discretion.  Yet if there is a direct overhang, prudent practice suggests that trimming or removing such a limb would be the obvious and safe course to take.

In testimony, SDG&E stated that the limb that broke on October 22, 2007, broke due to the failure of a codominant branch structure with included bark.[52] Throughout the proceeding that was referred to as a "hidden defect."  SDG&E contends that because it was hidden, it could not have known the limb might break, and such defects would be difficult to detect from regular ground inspections.[53]  SDG&E argues even Rule 35 only requires removal of such limbs when a utility has actual knowledge of the problem.[54]  (SDG&E Rhg. App., at pp. 46-48.)

We recognize that Tree FF1090 was fairly tall and that could hinder SGD&E's ability to detect the defect during routine ground inspections.  But the broken limb was also part of a growth structure called a codominant leader branch growth.  And it is known that hidden defects are common in such growth structures.  The tree also appeared to have certain indicia of a Reliability (or hazard) Tree.

SDG&E's own Vegetation Management Plan indicated that both these factors, if properly identified, would result in immediate trimming or removal of the affected limbs.[55]  The Plan also represented that SDG&E routinely inspected for structural defects, limbs that may break even if there are no clearance issues (such as codominant limb growth), and Reliability Tree issues.[56]  Thus, it was not clear why SDG&E's inspections had failed to identify these issues prior to the fire.  SDG&E never

---

[51] SDG&E-13, Appendix 4, at pp. 1-2.

[52] SDG&E-13, Appendix 2, at p. 4.

[53] SDG&E-13, Appendix 2, at p. 4.

[54] SDG&E contends it was, or would have been error to find SDG&E violated Rule 35.  Nothing in the Decision made such a finding.  We merely identified the standard required by that Rule. (D.17-11-033, at p. 37.)

[55] D.17-11-033, at pp. 46-49; SDG&E-13, at p. 11; SDG&E-08, Appendix 3, at pp. 30-31.

[56] SDG&E-13, at p. 9.

claimed that it could not have identified these problems during normal inspections. It only said that it had not found them.

Finally, SDG&E contends that even if it had marked Tree FF1090 as a Reliability Tree and/or trimmed that tree, there was no proof that the fire would have been avoided. (Rhg. App., at pp. 48, 51.)

There is no way to know that. At least the potential for fire would have been reduced. And again, the argument sidesteps the fact that if SDG&E had adhered to its annual trim cycle for this tree, adequately trained its contractors, or acted on what seemed to be reasonably identifiable structural problems, it may have been possible to agree that SDG&E's actions were prudent. The evidence did not support that conclusion here.

### C.    Commission Precedent

In discussing the outcome in this case, the Decision found certain similarities between the facts of this case and three other notable prudency reviews where the Commission denied rate recovery due to various utility errors or failures. (D.17-11-033, at pp. 49-54, citing *Re Southern California Edison Company* ("*SONGS I*") [D.84-09-120] (1984) 16 Cal.P.U.C.2d 249 [Replacement power costs related to an oil leak and fire at San Onofre Nuclear Generating Station]; *Re Pacific Gas and Electric Company* ("*Helms*") [D.85-08-102] (1985) 18 Cal.P.U.C.2d 700 [Costs related to delays in construction of the Helms Pumped Storage Project]; *Mojave* [D.94-03-048], *supra,* 53 Cal.P.U.C.2d 452 [Costs associated with explosion at the Mojave Generating Station].)

SDG&E contends these decisions fail to support any finding of imprudence, because unlike *Mohave*, SDG&E implemented its inspection and maintenance program, unlike *Helms*, SDG&E was not issued safety citations or subject to work shut downs, and unlike *SONGS I,* SDG&E did not have improper equipment in place. (SDG&E Rhg. App., at pp. 54-55.)

It was not necessary that these specific facts be the same. As discussed above, each case presents its own unique facts and circumstances. But there were certain

Case: 19-30088   Doc# 4486-5   Filed: 10/25/19   Entered: 10/25/19 20:22:43   Page 21 of 34

analogies, and SDG&E ignored those.[57]  SDG&E may disagree with our findings in that regard.  But that does not establish that we erred.[58]

### D.    Wind and Weather Conditions

SDG&E contends that the wind and weather conditions were unprecedented when the fires broke out, and it was error to find that those conditions did not impact SDG&E's operation and management of its facilities.  (SDG&E Rhg. App., at pp. 55-57.)

We did not say the conditions had no impact at all.  We recognize Santa Ana wind conditions can present certain challenges.  Yet the evidence suggested the conditions were not as extreme and unprecedented as SDG&E claimed, and SDG&E failed to show that the conditions impacted its actions in a manner that should have negated any finding of imprudence.[59]

In evaluating the weather conditions, we considered evidence presented by SDG&E's own experts as well the experts of other parties.[60]  These experts used very different methodologies to arrive at their conclusions.

SDG&E's main expert used wind tunnel simulations and calculations derived from a numerical computer program designed to approximate the physical process of the atmosphere (Mesoscale modeling).[61]

---

[57] SDG&E also argues we must find "clear and identifiable errors" in order to find imprudence.  (SDG&E Rhg. App., at p. 53.)  Certain prudence reviews have identified such errors.  But that is not the established test.  And even if it was, SDG&E fails to explain how many of the issues discussed herein would not qualify as such.

[58] See *Southern California Edison Company v. Public Utilities Commission* (2005) 128 Cal.App.4th 1, 8.

[59] D.17-11-033, at pp. 55-60.

[60] See, e.g., SDG&E-01; SDG&E-10; SDG&E-15; MGRA-1; POC-1; UCAN-01; UCAN-02; UCAN-07.

[61] SDG&E-10, at pp. 3-11, 13-19; SDG&E-15.  Based on this approach SDG&E calculated mean or sustained wind speeds of 56 mph for the Witch Fire, 34 mph for the Guejito Fire and 37 mph for the Rice Fire.  Peak gust speeds were calculated to be 78-87, 59-68, and 70-75 mph, respectively.  (SDG&E-10, at p. 3.)  SDG&E also states that the California Fire Siege 2007 Report deemed the 2007 fires as among the most devastating in California history.  (SDG&E Rhg. App., at p. 56, citing SDG&E-01, Appendix 2, at p. 6.)  The Report does indicate the wind event was severe.  But the fact that the fires were devastating does not necessarily mean that the

*(continued on next page)*

This approach was criticized as producing artificial results, and parties argued SDG&E had failed to account for the limitations and error estimates associated with its approach.[62]

By contrast, UCAN's experts relied on Remote Automatic Weather Station ("RAWS') data, i.e., actual wind observations recorded at various geographical locations at the time of the event. Based on that data, they concluded that the October 2007 weather conditions were neither unprecedented nor uniquely extreme.[63]

SDG&E rejected RAWS in arriving at its wind estimates. SDG&E said RAWS data was unreliable because on the ground obstructions could minimize what SDG&E believed to be the actual wind values.[64]

In response, UCAN's experts argued, among other things, that: (a) rejection of RAWS data led to a biased result; (b) the consistency of RAWs data at the various weather stations proved its accuracy and reliability; (c) SDG&E's calculations were overstated as based on a worst case scenario; (d) wind tunnel estimates were unnecessary and relied on flawed computer (Mesoscale) inputs; (e) theoretical calculations and modeling fail to accurately capture the physical terrain and actual atmospheric conditions; and (f) SDG&E's Santa Ana Wildfire Threat Index ("SAWTI") appeared to overstate the impact of the winds on fire spread.[65]

Perhaps no approach is perfect. The evidence was conflicting. But on balance, we found the evidence supported UCAN's approach as being more realistic, and reliable. Thus, we find no error.

---

*(continued from previous page)*
wind and weather conditions were unprecedented.

[62] See, e.g., ORA-55, at pp. 4-3 to 4-9.

[63] UCAN-01; UCAN-02; UCAN-07. Based on RAWS observations UCAN determined mean or sustained wind speeds of 23-29 mph for the Witch Fire, 26-33 mph for the Guejito Fire, and 17-25 mph for the Rice Fire. Associated peak sustained winds were 30-38, 26-33, and 20-28 mph, respectively. Gust speeds at the time of ignition were determined to be 43.1, 56.7, and 34.4, respectively. (UCAN-02, at p. 3.)

[64] See, e.g., SDG&E-10, at pp. 13-19.

[65] UCAN-01, at pp. 4-5, 11-17; UCAN-07, at pp. 25-27.

Case: 19-30088    Doc# 4486-5    Filed: 10/25/19    Entered: 10/25/19 20:22:43    Page 23 of 34

### E.     Inverse Condemnation Generally

Inverse condemnation is a reverse eminent domain proceeding.  Both derive from the constitutional principle that private property may not be "taken" or damaged for public use without just compensation.[66]  In an eminent domain proceeding, a public or governmental entity seeks to condemn or "take" private property for a public use (such as the construction of an electric transmission line).

In an inverse condemnation proceeding, a property owner seeks to hold a public or government entity strictly liable for any physical injury/damages that may have been caused by that entity's public improvement.  Traditionally, the doctrine has covered damages to real property.  But it can also compensate for the loss of personal property.[67]

Under inverse condemnation, liability can be found whether or not the damage was foreseeable, and even if there was no fault or negligence by the public entity.[68]  All a plaintiff need establish is a causal relationship between the governmental activity and the property loss complained of, i.e., proximate cause.  And a public entity can be held strictly liable for damages if its public improvement was a substantial cause of the damages, even if it is only one of several concurrent causes.[69]

The policy underlying inverse condemnation is one of cost sharing or cost spreading.  It is intended to relieve individual property owners from the economic burden of damages by spreading the costs among the larger community of individuals that benefit from the public improvement.[70]

Relevant case law reflects that the doctrine was initially applied to only local public or governmental entities such as a City Department of Water and Power.

---

[66] See, e.g., *Marshall v. Department of Water and Power of the City of Los Angeles* ("*Marshall*") (1990) 219 Cal.App.3d 1124, 1138-1139; *San Diego Gas & Electric Company v. The Superior Court of Orange County* ("*Covalt*") (1996) 13 Cal.4th 893, 939-940, citing Cal. Cost., art. I, § 19; U.S. Const., 5th Amend.

[67] *Marshall, supra,* 219 Cal.App.3d at pp. 1138-113.

[68] *Marshall, supra,* 219 Cal.App.3d at pp. 1138-1139.

[69] *Marshall, supra,* 219 Cal.App.3d at p. 1139.

[70] See, e.g., *Barham v. Southern California Edison Company* ("*Barham*") (1999) 74 Cal.App.4th 744, 752.

More recently, the Courts have allowed inverse condemnation claims against Commission-regulated, privately-owned utilities ("IOUs").[71]

In extending inverse condemnation liability to IOUs, the Courts have reasoned there are functional similarities between local public or government entities and regulated IOUs. For example, in 1999 the Court stated:

> …the Supreme Court held that a public utility is in many respects more akin to a governmental entity than to a purely private employer….[m]oreover, the nature of the California regulatory scheme demonstrates that the state generally expects a public utility to conduct its affairs more like a governmental entity than like a private corporation….We are not convinced that any significant differences regarding the operation of publicly versus privately owned utilities…

(*Barham, supra,* 74 Cal.App.4th at p. 753.)

In a later case, SCE argued that a distinction could be drawn because unlike governmental entities (such as a city), IOUs have no taxing authority. IOUs can only raise rates with Commission approval.[72] But the Court said only that SCE failed to prove the Commission would *not* allow it to pass along costs in rates, stating:

> As the *Barham* court noted, if we were to adopt Edison's position, "we would be required to differentiate between damage resulting from the operation of a utility based solely upon whether it is operated by a governmental entity or by a privately owned public utility' but we are "not convinced that any significant differences exist."

*Pacific Bell Telephone Company v. Southern California Edison Company* ("*Pac Bell*") (2012) 208 Cal.App.4th 1400, 1407-1408.)

### F.     SDG&E's Inverse Condemnation Challenge

After the 2007 Wildfires, more than 2,500 civil lawsuits were filed against SDG&E by property owners and governmental entities seeking recovery for damages

---

[71] For purposes of this order, the terms IOUs and utilities are used interchangeably to mean Commission-regulated, privately-owned utilities. The terms do not include publicly-owned utilities.

[72] *Pacific Bell Telephone Company v. Southern California Edison Company* ("*Pac Bell*") (2012) 208 Cal.App.4th 1400, 1407-1408.

Case: 19-30088    Doc# 4486-5    Filed: 10/25/19    Entered: 10/25/19 20:22:43    Page 25 of 34

caused by the 2007 Wildfires.  The San Diego Superior Court ruled that the civil plaintiffs could bring a cause of action against SDG&E under the doctrine of inverse condemnation.[73]

Because the investigation reports linked SDG&E's facilities to the Witch, Guejito, and Rice fires, SDG&E argued that fully litigating the damage claims was too great a financial risk in light of its potential liability.  For that reason SDG&E settled the claims in lieu of litigating them to conclusion.  In its Application before this Commission, SDG&E stated that the requested $379 million represents claim amounts not otherwise covered by its liability insurance, settlements with third parties, or cost recovery from the Federal Energy Regulatory Commission ("FERC").[74]

SDG&E's settlement of the claims meant the Superior Court never formally determined that SDG&E was strictly liable under inverse condemnation.  But SDG&E argued liability was inevitable, thus our review should have been driven by the cost spreading principle of inverse condemnation, not by the traditional Section 451/Prudent Manager review.

SDG&E argues that if we had applied the cost spreading principle, rate recovery would have been allowed.  But in denying that recovery, we: (1) created an unnecessary conflict of laws; (2) produced an unjust and unreasonable result; and (3) violated Constitutional takings principles.  We discuss these allegations below.

### 1.    Conflict of Laws

Inverse condemnation is a constitutional principle and this Commission must abide by the Constitution.[75]  SDG&E therefore reasons we created a conflict of laws by failing to harmonize Section 451 and inverse condemnation in a manner that allowed it to pass its WEMA costs on to ratepayers.[76]  (SDG&E Rhg. App., at pp. 13-16, citing

---

[73] See A.15-09-010, at p. 2, citing *In re Wildfire Litigation,* January 29, 2009 Minute Orders Overruling SDG&E's Demurrers to the Master Complaints.

[74] A.15-09-010, at p. 7.  [Total WEMA costs identified as $2.4 billion.].

[75] See Pub. Util. Code, §§ 1757, subd. (a)(6) & 1757.1, subd. (a)(6).

[76] SDG&E argues our Decision ignored inverse condemnation, thus failed to contain adequate

*(continued on next page)*

*PG&E Corporation v. Public Utilities Commission* ("*PG&E Corp.*") (2004) 118
Cal.App.4[th] 1174, 1199.)  We disagree.

As discussed above, Commission regulation of IOUs is governed by the
principle of reasonableness pursuant to Section 451.  SDG&E's challenge raises the
following question: could or must the Commission have foregone Section 451 and the
associated Prudent Manager review in lieu of applying inverse condemnation cost sharing
principles?  We find the answer to that question is no.

Inverse condemnation arises in the context of litigating civil damages
claims.  We have no jurisdiction to award damages or litigate such cases.[77]  It is not in
our purview to render determinations regarding whether inverse condemnation or other
legal tort doctrines should be applied in assessing damages claims.  Those issues are for
the Courts, not this Commission.

More importantly, even if the Court had found SDG&E strictly liable under
inverse condemnation, we could not have set aside Section 451 review.  The California
Constitution expressly prohibits agencies such as this Commission from foregoing such
statutory mandates.  Section 3.5 provides:

> Sec. 3.5 An administrative agency, including an
> administrative agency created by the Constitution or an
> initiative statute, has no power:

---

*(continued from previous page)*
findings and conclusions on all issues material to a decision.  (SDG&E Rhg. App., at p. 13,
citing Section 1705.)  That is incorrect.  Our Decision merely explained that the scope of this
proceeding was limited to determining whether SDG&E met the Prudent Manager Standard.
Inverse condemnation is not an element of, or material to, that analysis.  Thus, no separate
findings or conclusions were required.

[77] Pub. Util. Code Section 2106 provides in pertinent part:

> Any public utility which does, causes to be done, or permits any act,
> matter, or thing prohibited or declared unlawful, or which omits to do
> any act, matter, or thing required to be done, either by the Constitution,
> any law of this State, or any order or decision of the commission, shall
> be liable…for all loss, damages, or injury caused thereby or resulting
> therefrom.  *If the court finds* that the act or omission was willful, it
> may in addition to the actual damages, award exemplary damages.  An
> action to recover from such loss, damage, or injury may be brought *in
> any court of competent jurisdiction* by any corporation or person….

(a) To declare a statute unenforceable, or refuse to enforce a
statute, on the basis of it being unconstitutional unless an
appellate court has made a determination that such statute
is unconstitutional;

(b) To declare a statute unconstitutional;

(c) To declare a statute unenforceable, or refuse to enforce a
statute on the basis that federal law or federal regulations
prohibit the enforcement of such statute unless an
appellate court has made a determination the enforcement
of such statute is prohibited by federal law or regulations.

(Cal. Const., art. 3, § 3.5.)

SDG&E ignores these issues, saying only that the Courts have assumed the
cost spreading policy of inverse condemnation could be satisfied by IOU rate recovery.
(SDG&E Rhg. App., at p. 12.)  Assumptions, however, are not legal requirements.  Thus,
unless or until the Courts or the Legislature provide otherwise, our treatment of IOU cost
recovery is bound by the statutory mandate of Section 451.

*PG&E Corp.* does not change our conclusion.  *PG&E Corp.* states that the
Commission cannot disregard express legislative directives or restrictions on its power.
(*PG&E Corp., supra,* 118 Cal.App.4th at pp. 1198-1199.)  This is not relevant here
because there are no legislative directives or prohibitions regarding the application of
Section 451 versus inverse condemnation.

SDG&E also cites *People v. Garcia* (2017) 2 Cal.5th 792 to suggest that we
were required to forego Section 451 and allow rate recovery under the doctrine of
constitutional avoidance.[78]  (SDG&E Rhg. App., at pp. 14-16.)  Again, we disagree.

In *People v. Garcia*, the Court found that requiring sex offenders, as a
condition of probation, to waive the psychotherapist-patient privilege did not violate the
constitutional rights to privacy or right against self-incrimination.  In reaching that
conclusion, the Court reasoned the statute was narrowly tailored so that a defendant's

---

[78] PG&E and SCE cite to *California Housing Finance Agency v. Elliott* (1976) 17 Cal.3d 575 for
the same notion.  (PG&E/SCE Rhg. App., at p. 2.)  We find nothing in that case to suggest an
agency must abdicate its own governing statutes and standards in light of constitutional
principles.

Case: 19-30088    Doc# 4486-5    Filed: 10/25/19    Entered: 10/25/19 20:22:43    Page 28
of 34

rights were only limited in specific circumstances and consistent with the State's goal of managing sex offenders.  (*Id.* at pp. 792, 800-801, 802-803, 806-807.)

Like the statute in *People Garcia,* Section 451 is narrowly tailored to deny cost recovery only if costs are deemed unjust and unreasonable.  That is consistent with the State's goal of ensuring that utility customers receive safe and reliable service, and pay only just and reasonable rates.[79]

Finally, SDG&E contends that even if its actions and decisions were unreasonable, we should have allocated/apportioned costs between ratepayers and shareholders consistent with other reasonableness reviews.  (SDG&E Rhg. App., at pp. 14-15, citing *Re Pacific Gas and Electric Company* [D.84-12-033] (1984) 16 Cal.2d 457; *Re Southern California Edison Company* [D.87-06-021] (1987) 24 Cal.P.U.C.2d 476; and *Re Southern California Gas Company* [D.94-05-020] (1994) 54 Cal.P.U.C.2d n391.)

The cited cases are not controlling here.  Those cases involved unique circumstances where we approved settlements in which the parties had agreed to allocate costs in varying degrees between ratepayers and shareholders.  (*Re Pacific Gas and Electric Company* [D.84-12-033], *supra*, 16 Cal.2d at pp. 457, 460, 489 [Findings of Fact Numbers 1, 3, 6 & 11]; *Re Southern California Edison Company* [D.87-06-021], supra, 16 Cal.P.U.C.2d pp476, 478; and *Re Southern California Gas Company* [D.94-05-020], *supra,* 54 Cal.P.U.C.2d 392-393, 402.)  Settlements, however, are not precedential.  And they do not establish standards or principles that carry over to future proceedings.[80]

## 2.    Alleged Unreasonable and Unjust Result

SDG&E contends we wrongly found inverse condemnation inapplicable to Prudent Manager reviews because doing so subjected SDG&E to an unreasonable whipsaw of incompatible legal standards.  SDG&E argues that because inverse

---

[79] Cal. Const., art XII, § 6; Pub. Util. Code, §§ 451, 454, subd. (a), 728.

[80] Commission Rule of Practice and Procedure 12.5; Cal. Code of Regs., tit. 20, § 12.5.

condemnation excludes any analysis of reasonableness, it defied logic that it was subjected it to that standard here. (SDG&E Rhg. App., at pp. 16-17.)

As discussed above, we were bound to apply the reasonableness standard of Section 451 under the law that exists today. That inverse condemnation is indifferent regarding reasonableness did not negate our own statutory obligation.

SDG&E also argues we wrongly used its own actions against it in finding that inverse condemnation was irrelevant for purposes of this Phase 1 review. In particular, SDG&E objects to the fact we said it had withdrawn its inverse condemnation testimony in Phase 1.[81] SDG&E argues that did not mean it waived those arguments, it just meant SDG&E adhered to the scope of Phase 1. (SDG&E Rhg. App., at pp. 18-19.)

Our Decision did not say or find that SDG&E had waived all inverse condemnation arguments. The question was at what juncture that issue might be relevant. Phase I was about the Prudent Manager review. As discussed above, many considerations are relevant in that context, but inverse condemnation is not among them. Thus we correctly found that inverse condemnation was not material to Phase 1.

SDG&E also objects to our stating no Court determined SDG&E was strictly liable under inverse condemnation.[82] SDG&E argues we could not possibly intend to suggest that a utility must litigate a case to judgement, irrespective of cost, in order to preserve arguments such as inverse condemnation. (SDG&E Rhg. App., at pp. 19-20.)

Again, that is not what our Decision said. It is a utility's prerogative to settle civil lawsuits. It was simply a statement of fact. And this Commission was not free, in the place of a Court, to make that determination.

Finally, SDG&E contends we could have avoided any tension between Section 451 and inverse condemnation by looking only at whether it was reasonable for

---

[81] D.17-11-033, at pp. 64-65.

[82] D.17-11-033, at p. 65.

Case: 19-30088    Doc# 4486-5    Filed: 10/25/19    Entered: 10/25/19 20:22:43    Page 30
of 34

SDG&E to settle the damage claims.  (SDG&E Rhg. App., at pp. 16-20, citing *San Diego Gas & Electric Company,* 146 FERC P63,017, ¶¶ 61-62 (2014).)[83]

The purpose of this proceeding was determined by the Scoping Memo. Phase 1 was to address the prudent operation and management of SDG&E's facilities. Whether it was reasonable for SDG&E to have settled the legal claims was an issue for Phase 2.[84]  We were not required to forego the Phase 1 evaluation just because SDG&E preferred a more limited review.

SDG&E's reliance on *San Diego Gas & Electric Company,* 146 FERC P63,017, ¶¶ 61-62 (2014) is also flawed.  FERC did not conduct a dedicated reasonableness review.  SDG&E had requested WEMA cost recovery as part of a Transmission Owner rate case.  (*Id.* at ¶¶ 1-4.)  That is very different than a Prudent Manager review.

In addition, even when FERC considers whether a utility's conduct was reasonable, it applies a very different standard of review.  FERC presumes all costs requested by an IOU are reasonable and prudent, and its analysis stops there unless there is a specific challenge to the utility's request.  (*Id.* at ¶¶ 37-38.)

Our standard is more rigorous.  Utilities bear the burden to prove that all costs sought to be recovered in rates are just and reasonable.[85]  SDG&E did not meet that burden here.  Thus, we find no legal error.

---

[83] PG&E and SCE contend the rate recovery should not be used to deter imprudent actions. Rather, penalties should be used for that purpose.  (PG&E/SCE Rhg. App., at pp. 9-10.)  We did impose such a penalty in D.10-04-047.  (*Investigation on the Commission's Own Motion into the Operations and Practices of San Diego Gas & Electric Company Regarding the Utility Facilities Linked to the With and Rice Fires of October 2007; Investigation on the Commission's Own Motion into the Operations and Practices of San Diego Gas & Electric Company Regarding the Utility Facilities Linked to the Guejito Fire of October 2007* [D.10-10-047] (2010) at p. 1, 16-17 [Ordering Paragraph Number 4] (slip op.).)  The disallowance here was the lawful consequence of review under Section 451.

[84] Scoping Memo and Ruling of Assigned Commissioner and Assigned Administrative Law Judge ("Scoping Memo"), dated April 11, 2016, at pp. 4-6.

[85] See, e.g., *SONGS 1* [D.84-09-120], *supra,* 16 Cal.P.U.C.2d at p. 283 [Stating also: "It would be unconscionable from a regulatory perspective to reward such imprudent activity by passing the resultant costs through to ratepayers."].

### 3.    Constitutional Takings

The State and federal Constitutions prohibit the government from "taking" private property for public use without just compensation.[86] Generally, there are two types of taking arguments: (1) economic taking; and (2) the physical taking of property.

SDG&E argues there was an economic taking. Specifically, that our denial of WEMA rate recovery, i.e., SDG&E's ability collect the $379 million from its ratepayers, was an unlawful taking of money it has a right to receive. (SDG&E Rhg. App., at pp. 21-22.)

This argument assumes that a utility is guaranteed rate recovery for any costs that it incurs (particularly where inverse condemnation could apply). That is not the case. For purposes of utility ratemaking or rate recovery, the Courts have found that an unlawful taking or confiscation does not occur unless a regulation or rate is unjust and unreasonable.[87] And whether a regulation or rate is just and reasonable depends on a balancing of the interests of the regulated entity and the interests of its ratepayers.[88]

Utilities are not entitled to any particular rate recovery. "That a particular rate may not cover the costs of a particular good or service does not work confiscation in and of itself."[89] Similarly, a regulated has does not have a constitutional right to a profit or any right against a loss.[90] As long as the regulation or rates " 'as a whole afford [the regulated firm] just compensation for [its] over-all services to the public, they are not confiscatory. (Citation omitted.)"[91]

---

[86] Cal. Const., art. I, § 19; U.S. Const., 5th Amend. As applied to utilities, Courts have stated that the guiding principle has been that the Constitution protects utilities from being limited to a charge for their property serving the public which is so "unjust" as to be confiscatory. (See, e.g., *Duquesne Light Co. v. Barasch* ("*Duquesne*") (1989) 488 U.S. 299, 307-308.)

[87] *Duquesne , supra,* 488 U.S. at p. 307; *20th Century Insurance Co. v. Garamendi* ("*20th Cent. Ins.*") (1994) 8 Cal.4[th] 216, 292.

[88] *Federal Power Commission v. Hope Natural Gas Company* ("*FPC v. Hope*") (1943) 320 U.S. 591, 603; *20th Cent. Ins., supra,* 8 Cal.4[th] at p. 293.

[89] *20th Cent. Ins., supra,* 8 Cal.4[th] at p. 293.

[90] *Id.* at p. 294.

[91] *Id.* at p. 293.

For SDG&E to establish a taking here, it would have to show that it had a protected interest in rate recovery, that we unlawfully withheld that money, and that the takings was for a public purpose.[92] SDG&E does not establish any of these things here.

Instead, SDG&E reiterates the constitutional policy that under the takings clause a government entity should not force some people alone to bear public burdens which, in all fairness, should be borne by the public as a whole.

Here, SDG&E argues that had it not settled the damages claims, a finding of strict liability was a foregone conclusion. Thus, in SDG&E's view, its WEMA costs were a public burden that its ratepayers, not it alone, should have to bear. (SDG&E Rhg. App., at p. 21, citing *Kavanau v. Santa Monica Rent Control Board* ("*Kavanau*") (1997) 16 Cal.4th 761, 773-774.)

We do not see any violation under the standard in *Kavanau*. That case states that claims of unlawfulness cannot be disposed of by "general propositions." (*Id.* at pp. 773-744.) In addition, absent a clear takings the Court will look at other factors such as the economic impact of a regulation on the claimant, the extent to which the regulation interfered with investment-backed expectations, the character of the government action, and the nature of the State's interest in the regulation. (*Id.* at pp. 773-775.)

SDG&E's claim is based entirely on the general proposition of cost sharing. That alone does not prove any constitutional violation occurred. In addition, under other factors a Court may consider, our determination was lawful. For example, while the denial of rate recovery may have an economic impact on SDG&E, utilities have no guaranteed expectation of rate recovery under Section 451. The law is clear. To be compensable, costs, charges and rates must be just and reasonable.[93]

The character of our action was also in keeping with this Commission's statutory obligations and established ratemaking practice. And we have a substantial

---

[92] See, e.g., *Bronco Wine Company v. Jolly* ("*Bronco Wine*") (2005) 129 Cal.App.4th 988, 1030.
[93] Pub. Util. Code, § 451. (See also e.g., *FPC v. Hope, supra,* 320 U.S. at p. 600.)

Case: 19-30088    Doc# 4486-5    Filed: 10/25/19    Entered: 10/25/19 20:22:43    Page 33 of 34

interest in protecting consumers (ratepayers) from exorbitant, unjust, and unreasonable rates.  Thus, we find no unlawful takings.

## III.    CONCLUSION

The Application for Rehearing of D.17-11-033 is denied because no legal error was established.

THEREFORE, **IT IS ORDERED** that:

1.    The Applications for Rehearing of D.17-11-033 are denied.

2.    This proceeding, Application (A.) 15-09-010 is closed.

This order is effective today.

Dated July 12, 2018, at San Francisco, California.

MICHAEL PICKER
President
CARLA J. PETERMAN
LIANE M. RANDOLPH
MARTHA GUZMAN ACEVES
CLIFFORD RECHTSCHAFFEN
Commissioners

Case: 19-30088    Doc# 4486-5    Filed: 10/25/19    Entered: 10/25/19 20:22:43    Page 34 of 34