# EXHIBIT G

**Credit FAQ:**

# Will California Still Have An Investment-Grade Investor-Owned Electric Utility?

**Feb 19, 2019**

Current Ratings    View Analyst Contact Information    Table of Contents    Rate This Article

On Jan. 29, 2019, **PG&E Corp.** and subsidiary **Pacific Gas & Electric Co.** filed for reorganization under Chapter 11 of the U.S. Bankruptcy Code, about two months after the start of the devastating Camp Fire. S&P Global Ratings has been actively reexamining its assessment of California's regulatory construct for electric utilities. Our initial reassessment led to a one-notch downgrade on Jan. 21, 2019, on **Edison International** (Edison) (BBB/Watch Neg/A-2) and its subsidiary, **Southern California Edison Co.** (SCE) (BBB/Watch Neg/A-2), and a one-notch downgrade on **Sempra Energy**'s (BBB+/Negative/A-2) subsidiary **San Diego Gas & Electric Co.** (SDG&E) (BBB+/Negative/A-2). Furthermore, we indicated that we could lower the ratings on these companies by one or more notches within the next few months. This raises the possibility that our issuer credit ratings (ICR) for all of California's investor-owned regulated electric utilities could be below investment grade before the start of the 2019 wildfire season. Here we address investors' most frequently asked questions.

## Frequently Asked Questions

**Why did PG&E's bankruptcy filing require S&P Global Ratings to reexamine its assessment of California's regulatory construct for electric utilities?**

Our view is that PG&E's management and board of directors filed for bankruptcy because of the potential for the company to incur significant liabilities stemming from the 2017 and 2018 wildfires and the uncertainties regarding the prospects for and timing of potential recoveries through the regulatory process. We believe that potential liability risks are significant in California and that the regulatory mechanisms to resolve these risks are unclear at best. Consequently, we believe California electric utilities face ongoing and unresolved risks related to future wildfires and, to the extent that this lack of clarity lingers, each of the other California electric utilities could potentially follow PG&E's lead if faced with a catastrophic wildfire in 2019 or beyond. Furthermore, the relatively short time line leading up to the board's determination that a voluntary bankruptcy was in the best interests of PG&E and its stakeholders, only about two months after the catastrophic Camp Fire, also led us to reexamine our assessment of California's regulatory construct for electric utilities.

**Could a second California electric utility potentially file for voluntary bankruptcy in 2019?**

We think it is possible. Without any regulatory reform, we view it as entirely possible that another electric utility could face a devastating wildfire during the 2019 wildfire season and, depending on the magnitude and severity, its board of directors could similarly determine that the best course of action would be to file for a voluntary bankruptcy before year-end 2019. In our view, the rapid decline in creditworthiness--PG&E filed for Chapter 11 only two months after the Camp Fire--shows how quickly things can change in California, given the current regulatory construct.

**Does S&P Global Ratings believe that there is still time for California to take constructive steps that support credit quality?**

Yes. As we see it, there is a window of opportunity to bring clarity to the regulatory construct. However, that opening will start to close at the beginning of the 2019 wildfire season. From a ratings perspective, we would need to see clear evidence that concrete steps are being taken during this relatively short period to strengthen California's regulatory construct for electric utilities. Absent clear evidence of leadership to identify concrete and realistic steps to reduce wildfire liability risks, S&P Global Ratings would lower the ratings on Edison, SCE, and SDG&E by one or more notches.

**When does S&P Global Ratings believe the California wildfire season begins?**

While the start of California's wildfire season generally varies throughout the state, we believe that the wildfire season can start as early as June.

**What specific concrete steps does S&P Global Ratings believe are necessary for California's electric utilities to maintain their credit quality?**

Based on PG&E Corp.'s public disclosures, we believe that PG&E's board of directors determined to file for reorganization under Chapter 11 of the U.S. Bankruptcy Code because of the following underlying risks:

- Potentially significant liabilities from the recent wildfires;
- Uncertainties regarding the prospects for and timing of recovering such costs from ratepayers; and
- The need for an orderly, fair, and expeditious process to resolve the potential wildfire liabilities.

We believe the significant liabilities that PG&E potentially faces from wildfires are a direct result of climate change and the California courts' interpretation of the legal doctrine of inverse condemnation. Our ratings base case for California's electric utilities assumes that climate change will persist and that California will continue to face catastrophic wildfires. We do not expect that much can be accomplished in the near term to reduce the threat of catastrophic wildfires in the state, and we believe that inverse condemnation will compound the risks California's electric utilities currently face. Under the legal doctrine of inverse condemnation, if a California utility's facilities are determined to be the substantial cause of a wildfire, the utility could be liable for all of the wildfire's property damage and other associated costs without the utility being negligent.

In our view, California's interpretation of the legal doctrine of inverse condemnation effectively makes California's electric utilities the state's reinsurer, which creates new risks that were never envisioned when investor-owned utilities were established. We don't believe that an electric utility is large enough, sufficiently diversified, or adequately capitalized to be a reinsurer. Overall, in our view, the combination of climate change, frequent and severe wildfires, and California's interpretation of inverse condemnation, if unaddressed, significantly raises the risk for California's electric utilities to a level inconsistent with any other North American utility.

A second risk that PG&E cited was that it did not expect the California Public Utility Commission to permit the company to securitize its wildfire costs on an expedited or emergency basis. PG&E also believed that it would likely take years to obtain authorization to securitize the wildfire costs despite the company's assessment of the extraordinary challenges it faces. Under our methodology, investment-grade utility ratings require a regulatory framework that is transparent, consistent, predictable, and allows for timely cost recovery. In our view, a regulatory construct that lacks these foundational elements could subject the utility to financial instability and lead us to revise downward our assessment of the regulatory framework's relative credit supportiveness. California has been plagued with catastrophic wildfires for years. In our view, California's regulatory process to recover these material wildfire costs is still unpredictable, relatively untested, and lacks transparency and uncertainly regarding the timeliness of cost recovery.

**Will any California investor-owned electric utility still have an investment-grade rating before the start of the 2019 wildfire season?**

Possibly. We are actively monitoring what, if any, improvements will be implemented to the regulatory construct before the start of the 2019 wildfire season. Absent concrete steps taken by regulators and/or politicians to reduce the risks for California's electric utilities, S&P Global Ratings could lower the ratings on Edison, SCE, and SDG&E by one or more notches --indicative of the possibility that the ICR on these companies could be below investment grade before the start of the 2019 wildfire season.

**Florida's utilities are also at risk for natural disasters--why does S&P Global Ratings have an investment-grade rating on all investor-owned electric utilities in Florida?**

In our view, there are two key distinguishing factors between the regulatory construct in California and Florida. The first is inverse condemnation and the second is recovery.

As mentioned, the legal doctrine of inverse condemnation that developed under California's common law holds a utility strictly liable for damages arising from wildfires if its equipment is a substantial cause of the wildfire, regardless of the utility's negligence. In our view, this makes California's utilities the state's reinsurer every time a wildfire destroys part of its service territory. For example, assume a wildfire caused by a California utility without negligence had total damages of $5 billion, which included damages to the utility's assets of just $100 million. The California utility could be liable for the entire amount of damages from the catastrophic fire, or as much as $5 billion. In that same situation, under Florida law, the Florida utility would seek to recover from ratepayers just the damage to its own assets or $100 million.

The second key difference is the recovery process. In Florida, utilities follow what we would characterize as a predictable and reliable process to recover their costs following a catastrophic hurricane. Florida utilities can petition for the recovery of storm

costs without being subject to an earnings test and the state has allowed for the securitization of these costs. These credit-supportive measures in Florida have been implemented many times and reduce the credit risks associated with the state's unpredictable weather conditions. In contrast, the California recovery process is untested and uncertain. PG&E identified this risk in its bankruptcy filing, citing the uncertainty surrounding the timing and amounts, if any, it could recover following the 2017 and 2018 wildfires. The lack of a well-defined and timely process to adequately quantify and recover wildfire costs, in our view, is a second material distinction for California's regulatory construct.

**Would a loss of investor confidence in California electric utilities be significant?**
We think so. Utilities are different from most industrial companies because they generally operate with negative discretionary cash flow, reflecting the high capital spending necessary to maintain and improve their electrical systems. To offset this risk, we think a utility's credit quality depends on its operating under a credit-supportive regulatory construct that is consistent and predictable. Also, because utilities have negative discretionary cash flow their creditworthiness is linked to reliable access to the capital markets to operate their businesses. If investor confidence in the California construct wanes, a utility's access to the capital markets may be limited and its cost of capital may increase. In our view, the lack of consistent access to the capital markets or lack of steady affordable capital can add considerable strain to a utility's business model.

**Are the SCE and SDG&E service territories susceptible to wildfires?**
Yes. In our view, both service territories face wildfire risks. SCE's operating territory has had major catastrophic wildfires in each of the past two seasons. Many wildfires have also occurred in San Diego County over this timeframe, but have either been insignificant or SDG&E has not been determined to be the cause of these wildfires. Therefore, SDG&E has not been financially responsible for a major devastating wildfire over the past decade. Although the topography differs greatly throughout California, and the management of this issue by a utility can mitigate some of the risks, given the increasing effects of climate change, S&P Global Ratings assumes that all of California's regulated electric utilities are susceptible to catastrophic wildfire-related risks.

**Does S&P Global Ratings take into account SDG&E's state-of-the-art technological system?**
Yes. In our view, SDG&E has one of the most sophisticated advanced wildfire warning systems in the world. The company has invested in hundreds of weather stations and fire cameras that have the capability to identify when specific areas could be most susceptible to a wildfire. Furthermore, after a wildfire starts, the utility's fire camera system is equipped with the technology to identify the wildfire's GPS coordinates. This information is relayed to the California Department of Forestry and Fire Protection, which determines the most appropriate course of action to extinguish the fire at its earliest stage.

The company's advance warning system has already prevented at least one wildfire that potentially could have been catastrophic. However, despite this advanced warning system, we don't think the utility is immune to the risk of a devastating wildfires. We believe that all California electric utilities are susceptible to potential liabilities from wildfires because of environmental changes and high winds that could spread the fire at a rate that outpaces the capabilities of the the first responders. While SDG&E is certainly not immune to wildfire risks, because of the company's advanced operations, S&P Global Ratings has consistently rated the company higher than its California electric utility peers.

**If SDG&E is downgraded would S&P Global Ratings also downgrade Sempra Energy?**
Probably. To date, we have lowered our rating on SDG&E by two notches due to the uncertainty regarding California's regulatory construct but have maintained our ICR on SDG&E's parent, Sempra Energy. Currently, our ICR on SDG&E is the same as our rating on Sempra Energy. Because SDG&E accounts for about 35% of consolidated Sempra, a further downgrade of SDG&E to below our Sempra ICR would likely result in a weaker credit assessment at the consolidated parent and would likely result in a downgrade to Sempra Energy.

**Can senior secured first-mortgage bonds be rated above the issuer credit rating?**
Yes. First-mortgage bonds (FMB) issue ratings can be notched above our ICR on a regulated utility depending on the rating category and our recovery rating, which is based on the extent of the collateral coverage. FMBs benefit from a first-priority lien on substantially all of the utility's real property owned or subsequently acquired. Collateral coverage of over 1.5x supports a recovery rating of '1+' and an issue rating of two notches above the ICR in the 'BBB' category, and three notches above the ICR in the speculative-grade category.

**Can senior unsecured bonds be rated above the issuer credit rating?**

Yes, but only in certain situations. If an ICR on a regulated utility is investment grade ('BBB-' or higher), the senior unsecured bonds cannot be rated above the ICR. If the ICR on a utility is speculative grade ('BB+' or lower), then notching will depend on the recovery rating and the ICR level.

If the utility ICR is in the 'BB' category, we could rate the senior unsecured bonds one notch above the ICR if we determine that under a hypothetical default scenario, we assess substantial recovery for the unsecured bondholders (recovery of 70% or greater), consistent with a recovery rating of '2'. If we rate the ICR on a utility 'B+' or lower, we could rate the senior unsecured bonds two notches above the ICR if we assign the unsecured debt a '1' recovery rating (recovery of greater than 90%) or one notch above the ICR if we assign the unsecured debt a '2' recovery rating (recovery of 70%-90%) in a simulated default scenario. For unsecured holding company debt, we cap the recovery ratings at '3' (recovery of 50%-70%) for companies in the 'BB' category and at '2' for companies rated below 'B+'.

## Related Criteria And Research

**Related Research**

- [PG&E Corp. Downgraded To 'D' On Bankruptcy Filing; Subsidiary Debt Lowered To 'D'](#), Jan. 29, 2019
- [Edison International And Subsidiary Southern California Edison Downgraded To 'BBB'; Ratings Placed On Watch Negative](#), Jan. 21, 2019
- [San Diego Gas & Electric Co. Downgraded To 'BBB+', Outlook Remains Negative](#), Jan. 21, 2019
- [What's Behind Our Multi-Notch Downgrade Of PG&E Corp.?](#), Jan. 11, 2019
- [Sempra Energy And Southern California Gas Co. Ratings Affirmed; Outlook Remains Negative](#), Sept. 5, 2018

This report does not constitute a rating action.

| | |
|---|---|
| **Primary Credit Analyst:** | Gabe Grosberg, New York (1) 212-438-6043;<br>gabe.grosberg@spglobal.com |
| **Secondary Contact:** | Rebecca Ai, New York + (212) 438-7278;<br>rebecca.ai@spglobal.com |
| **Recovery Analyst:** | Steve H Wilkinson, CFA, New York (1) 212-438-5093;<br>steve.wilkinson@spglobal.com |

**Rate This Article**

How helpful was this article?

Do you have any comments?

[Go]

No content (including ratings, credit-related analyses and data, valuations, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, as well as their directors, officers, shareholders, employees or agents (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions (negligent or otherwise), regardless of the cause, for the results obtained from the use of the Content, or for the security or maintenance of any data input by the user. The Content is provided on an "as is" basis. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages.

Credit-related and other analyses, including ratings, and statements in the Content are statements of opinion as of the date they are expressed and not statements of fact. S&P Global Market Intelligence's opinions, analyses and rating acknowledgment decisions (described below) are not recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. While S&P Global Market Intelligence has obtained information from sources it believes to be reliable, S&P Global Market Intelligence does not perform an audit and undertakes no duty of due diligence or independent verification of any information it receives. Rating-related publications may be published for a variety of reasons that are not necessarily dependent on action by rating committees, including, but not limited to, the publication of a periodic update on a credit rating and related analyses.

Case: 19-30088    Doc# 4486-7    Filed: 10/25/19    Entered: 10/25/19 20:22:43    Page 5 of 6

S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain non-public information received in connection with each analytical process.

S&P Global Ratings does not contribute to or participate in the creation of credit scores generated by S&P Global Market Intelligence. Lowercase nomenclature is used to differentiate S&P Global Market Intelligence PD credit model scores from the credit ratings issued by S&P Global Ratings.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, **www.standardandpoors.com** (free of charge), and **www.capitaliq.com** (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at **www.standardandpoors.com/usratingsfees**.

Processing time: 0.226999999998952
PageId: 1765

Case: 19-30088    Doc# 4486-7    Filed: 10/25/19    Entered: 10/25/19 20:22:43    Page 6
of 6