Robert A. Julian (SBN 88469)
Cecily A. Dumas (SBN 111449)
BAKER & HOSTETLER LLP
1160 Battery Street, Suite 100
San Francisco, CA 94111
Telephone:	628.208.6434
Facsimile:	310.820.8859
Email:  rjulian@bakerlaw.com
Email:  cdumas@bakerlaw.com

Eric E. Sagerman (SBN 155496)
David J. Richardson (SBN 168592)
Lauren T. Attard (SBN 320898)
BAKER & HOSTETLER LLP
11601 Wilshire Blvd., Suite 1400
Los Angeles, CA 90025-0509
Telephone:	310.820.8800
Facsimile:	310.820.8859
Email: esagerman@bakerlaw.com
Email: drichardson@bakerlaw.com
Email: lattard@bakerlaw.com

*Counsel to the Plaintiff Official Committee of Tort Claimants*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re:<br><br>**PG&E CORPORATION**<br><br>     -and-<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br>                          **Debtors.**<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>■ Affects both Debtors<br><br>*All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | Bankruptcy Case<br>No. 19-30088 (DM)<br><br>Chapter 11<br>(Lead Case)<br>(Jointly Administered) |
| **THE OFFICIAL COMMITTEE OF TORT CLAIMANTS,**<br>                          **Plaintiff,**<br>                          v.<br>**THE AD HOC GROUP OF SUBROGATION CLAIM HOLDERS,** an association of Subrogation Claimants,<br>                          **Defendant.** | Adv. Pro. No.<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT SUBORDINATING AND DISALLOWING CLAIMS AND FOR AN ACCOUNTING** |

The Official Committee of Tort Claimants (the "**TCC**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") of PG&E Corp. and Pacific Gas and Electric Company (collectively, the "**Debtors**" or "**PG&E**"), allege for its complaint ("**Complaint**") for declaratory judgment against the Ad Hoc Group of Subrogation Claim Holders ("**Subrogation Claimants**"), an association of holders of insurers' subrogation wildfire claims identified in the *Fifth Amended Verified Statement of the Ad Hoc Group of Subrogation Claim Holders Pursuant to Bankruptcy Rule 2019*, (Dkt. No. 4302), as follows:

## NATURE OF THE ACTION

1. The purpose of this Complaint is to resolve intercreditor disputes between the parties, which are impairing the parties' intercreditor relationships and participation in these Chapter 11 Cases.

2. Both California law, federal common law, and section 509(c) of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") require claims arising from subrogation rights to be subordinated to, not pari passu with, claims of creditors against the debtor. California's expression of this principle is found in the "made-whole" rule that dictates that the claims of insureds against a tortfeasor must be paid in full before payment of subrogation and reimbursement claims of an insurer that paid losses sustained by the insured. The same principle has been adopted into federal common law by the Ninth Circuit Court of Appeals. Section 509(c) sets forth the same principle in the context of all claims by way of subrogation, or for reimbursement or contribution of an entity that is liable with the debtor on a creditor's claim. In six separate verified Bankruptcy Rule 2019 statements, the Subrogation Claimants have repeatedly stated their subrogation claims arise under State law and Section 509 of the Bankruptcy Code, and hence, their Rule 2019 Statements subject their subrogation claims to the corresponding subordination provisions of State law and Section 509, as a matter of law. The Bankruptcy Court subordinated the insurers' subrogation claims in the same situation in the Dow Corning Chapter 11 case, ruling that where an insurer and the debtor are both liable for the victims' tort damages, the insurer's claims are subrogated and subordinated under Section 509.

3. An actual dispute has arisen and is continuing between the TCC and Subrogation Claimants. The TCC contends that Subrogation Claims against the Debtors are subject to payment subordination; upon information and belief, Subrogation Claimants contend that their claims are of equal priority with the claims of insureds from whose rights against the Debtors the subrogation claims arise. The parties require a declaration resolving such dispute in the context of these Chapter 11 Cases, as such a declaration is necessary to determine the rights of the parties in these cases. Resolution of the dispute is important because three recent events threaten the ability of the Wildfire Claimants to be made whole, absent subordination or a consensual allocation of funds among the Subrogation Claimants and the Wildfire Claimants: the filing of $8.6 billion of government wildfire claims; the pendency of Kincade Fire Claims; and the now-real possibility of additional wildfire claims occurring before the end of the current 2019 wildfire season, now that the Kincade Fire has established that PG&E is not able to protect the public from disaster.

4. Additional intercreditor disputes exist between the parties that must be resolved in order for the parties to proceed in the Chapter 11 Cases. For example, the Subrogation Claimants have repeatedly represented to the Department of Insurance that their subrogation claims based on amounts paid to insureds and reserves for amounts to be paid in the future total approximately $15 billion; however, the Subrogation Claimants now contend they have booked reserves for future payments that increase their aggregate claims to approximately $20 billion. The Subrogation Claimants have never produced to the TCC any proof that their claims exceed $15 billion or that they are reserving amounts to pay insureds in the future that would increase the amount of their claims to $20 billion. In addition, the Subrogation Claimants have not produced any accounting that would show which specific subrogation claims are not subject to subordination on the basis that the corresponding Wildfire Claim has been made whole and has not been filed in this case on that basis. Without such basic accountings, the TCC and the Court cannot evaluate the Subrogation Claimants' interests in this case or protect the Wildfire Claimants' subordination rights.

5. In addition, certain claims of the Subrogation Claimants are subject to disallowance because such Subrogation Claimants paid billions of dollars of insured property damage claims at the actual cash value, which is the replacement value of the lost personal property, less depreciation.

However, the actual cash value claims are not recoverable against the Debtors because the Subrogation Claimants hold claims against the Debtors only for the present-day fair market value of the personal property, which is often less than the actual cash value that the Subrogation Claimants paid the insureds. Without an accounting of such payments, the Court cannot evaluate whether payment of any amounts to the Subrogation Claimants may constitute an overpayment under the law.

6. A portion of such Subrogation Claims is also not recoverable because the Subrogation Claimants also insured the Debtors' liability for the claims of injured parties; and under California law, an insurer who insures both sides of the loss (here, both the Debtors and the victims), cannot recover the subrogation loss.

7. Finally, the Subrogation Claimants are attempting to force their insureds to release the Subrogation Claimants of the insureds' claims against the Subrogation Claimants, as a condition to the Wildfire Claimants obtaining payment of the insureds' claims, which is illegal under California law.

## THE PARTIES

8. Plaintiff TCC is the Official Committee of Tort Claimants in these Chapter 11 Cases, appointed on February 15, 2019, by the Office of the United States Trustee (Dkt. No. 453). The TCC represents the interests of over 30,000 persons who assert claims against the Debtors arising from the losses they suffered in the 2015, 2017 and 2018 Northern California wildfires ("**Wildfire Losses**"). The TCC also represents the interests of persons who assert claims against the Debtors arising from the 2016 Ghost Ship Warehouse fire, but those interests are not at issue in this Complaint.

9. The Subrogation Claimants is an unincorporated association of insurers and other parties who either insured and paid a portion of their insureds' Wildfire Losses, or who purchased the claims of insurers who themselves paid a portion of Wildfire Losses. The Subrogation Claimants and their Subrogation Claims are identified in the *Fifth Amended Verified Statement of the Ad Hoc Group of Subrogation Claim Holders Pursuant to Bankruptcy Rule 2019*, Dkt. No. 4302. The Subrogation Claimants have sued the Debtors in Adversary Proceeding 19-03015

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

as a party, and may be sued in this case as a party in adversary proceedings and contested matters. By Order dated March 15, 2019, Dkt. No. 926, the Court ordered that service of papers upon the Subrogation Claimants' counsel, Deimer & Wei, LLP, constitutes notice to the Subrogation Claimants.

**JURISDICTION AND VENUE**

10. This adversary proceeding arises under Bankruptcy Code sections 509 and 524(e) in the Chapter 11 Cases of the Debtors. The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. sections 157 and 1334. This is a core proceeding under 28 U.S.C. section 157(b). The TCC consents to the Court's entry of final judgment in this proceeding.

11. Venue is proper before the Court pursuant to 28 U.S.C. sections 1408 and 1409.

**FACTUAL BACKGROUND**

12. In 2015, 2017 and 2018, PG&E's equipment, and system and vegetation management practices, sparked a series of wildfires in Northern California that killed over 130 individuals, injured over 50,000 individuals, destroyed over 30,000 structures, and burned hundreds of thousands of California acreage. The persons affected by the fires (the "**Wildfire Claimants**") suffered Wildfire Losses, including personal injury damages, property damages, and/or lost their loved ones in the fires, and incurred other losses and attorneys' fees. The Wildfire Claimants have asserted or could assert claims ("**Wildfire Claims**") for recovery of their Wildfire Losses against the Debtors and their insurers. Some of the Wildfire Claimants held insurance policies that covered a portion of their respective Wildfire Claims, issued by the Subrogation Claimants. Upon information and belief, none of the insurance policies covered claims arising from noneconomic damages, such as physical injuries, emotional distress and trauma resulting from fleeing the fires. Upon information and belief, each Subrogation Claimant paid benefits to Wildfire Claimants under insurance policies it had issued to such Wildfire Claimants. Upon information and belief, some Subrogation Claimants contend they paid policy limits on some Wildfire Claims.

13. The Debtors commenced the Chapter 11 Cases by filing voluntary petitions on January 29, 2019.

14. On July 23, 2019, the Subrogation Claimants requested the Court's permission to file a plan of reorganization that would contain the following relevant provisions: First, the plan would grant the Subrogation Claimants an allowed claim of $15.8 billion on their Subrogation Claims; second, the plan would channel the Wildfire Claims and the Subrogation Claims to a plan trust for payment; third, the plan would capitalize the plan trust with enough consideration to pay the allowed Subrogation Claims in full, but would be insufficient to pay the allowed amount of Wildfire Claims in full; and fourth, the plan would release the Subrogation Claimants of the Wildfire Claimants' claims against the Subrogation Claimants. *Motion of the Ad Hoc Group of Subrogation Claim Holders to Terminate the Debtors' Exclusive Periods Pursuant to Section 1121(d)(1) of the Bankruptcy Code,* Dkt. No. 3147 at 5.

15. On September 9, 2019, the Debtors filed a plan of reorganization (the "**Plan**") pursuant to which the Debtors (1) separately classify the claims of the Subrogation Claimants ("**Subrogation Claims**") from the claims Wildfire Claimants; and (2) treat Subrogation Claims as having equal priority in right to payment under the Plan with Wildfire Claims.

16. On September 24, 2019, the Debtors filed a motion to approve their settlement agreement with the Subrogation Claimants, pursuant to which the Subrogation Claims would receive aggregate payments under the Plan of $11 billion, plus up to $55 million in attorneys' fees ("**Subrogation Claims Settlement**"). Under the Plan, as amended by the Debtors, the proposed to pay Subrogation Claims and the Wildfire Claims with equal priority, though the Subrogation Claims may be paid in full in cash, while the Wildfire Claims may receive a distribution that is a mix of cash, stock, and other cash alternatives, which is primarily non-cash.

17. The Subrogation Claimants have filed a Bankruptcy Rule 2019 Statement in which they have alleged they paid approximately $15.8 billion of Wildfire Claims, matching the Subrogation Claimants' allegation in their own plan of the amount they contend they are owed. The Subrogation Claimants have not filed any more than $15.8 billion of claims in these cases. The Subrogation Claimants typically settle such subrogation claims for approximately 55% to 65% of the amount of such claims. The Subrogation Claimants' proposal to settle their claim for $11 billion

is approximately 70% of all insurance benefits paid by the settling Subrogation Claimants, or payment in full, and more, based on their maximum settlement history in California.

18. Upon information and belief, certain of the Subrogation Claimants also issued liability insurance policies to the Debtors that respond to the losses asserted by the Wildfire Claimants.

# FIRST CLAIM FOR RELIEF

# DECLARATORY RELIEF—SUBORDINATION OF SUBROGATION CLAIMS UNDER STATE MADE-WHOLE RULE

19. The TCC incorporates paragraphs 1-18 of this Complaint.

20. The insurance policies on which the Subrogation Claims are based are construed under California law. In addition to the duties undertaken by the parties by the express terms of their agreements, the law implies in every insurance contract an implied duty of good faith and fair dealing. *Comunale v. Traders & Gen. Ins. Co.*, 50 Cal.2d 654, 658 (1958). The implied promise requires each contracting party to refrain from doing anything to injure the rights of the other to receive the benefits of the agreement. *Crisci v. Sec. Ins. Co.*, 66 Cal.2d 425, 429 (1966). For the insurer to fulfill its obligation, it "must give at least as much consideration" to the insured's interest as its own. *Egan v. Mut. of Omaha*, 24 Cal.3d 809, 819 (1979).

21. The California Supreme Court stated the following principles in the context of a disability policy. The principles apply with equal force to a homeowner's insurance policy and a business property policy: "The insured in a contract like the one before us does not seek to obtain a commercial advantage by purchasing the policy—rather he seeks protection against calamity." *Id.* at 819. Calamity has befallen the Wildfire Claimants: PG&E caused fires that burned their homes, schools, banks, stores, neighborhoods, communities, and in the case of Paradise, California, an entire town. Wildfire Claimants have not been compensated for the losses they suffered from the wildfires that PG&E caused.

22. Subrogation is an equitable doctrine that permits an insurer to assert the rights and remedies of an insured against a third-party tortfeasor. *Fireman's Fund Ins. Co. v. Maryland Casualty Co.,* 21 Cal. App. 4th 1586, 1595-96 (1994). When an insurance company pays out a

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

claim on a first-party insurance policy to its insured, the insurance company is subrogated to the rights of its insured in order to "pursue recovery from third parties responsible to the insured for the loss for which the insurer was liable and paid." *Id*. at 1596. Subrogation is purely a derivative doctrine, as an "insurer entitled to subrogation is in the same position as an assignee of the insured's claim, and succeeds only to the rights of the insured…. Thus, an insurer cannot acquire by subrogation anything to which the insured has no rights, and may claim no rights which the insured does not have." *Transcon. Ins. Co. v. Ins. Go. of Pennsylvania.* 148 Cal. App. 4th 1296, 1305-06 (2007).

23. The Subrogation Claims are derivative of the claims of the Wildfire Claimants. In the Chapter 11 Cases, the Court entered an order authorizing the Subrogation Claimants to file their subrogation claims in their own names, provided that they also file a schedule of the Wildfire Claimants whose losses the subrogated claims represent. See Dkt. No. 2806 at ¶ 3(d) & Ex. A-3. The order is administrative in nature and does not alter the Subrogation Claims' status as derivative claims.

24. "It is a general equitable principle of insurance law that, absent an agreement to the contrary, an insurance company may not enforce a right to subrogation until the insured has been fully compensated for her injuries, that is, has been made whole." *Barnes v. Independent Automobile Deals Association of California Health & Welfare Plan*, 64 F.3d 1389, 1395 (9th Cir. 1995); *see also Progressive West Ins. Co. v. Yolo County Superior Court*, 135 Cal. App. 4th 263, 274 (2005) ("It is a general equitable principle of insurance law that, absent an agreement to the contrary, an insurance company may not enforce a right to subrogation until the insured has been fully compensated for [his or] her injuries, that is, has been made whole."); *Sapiano v. Williamsburg Nat. Ins. Co.*, 28 Cal.App.4th 533 (1994) ("[T]he entire debt must be paid. Until the creditor has been made whole for its loss, the subrogee may not enforce its claim based on its rights of subrogation"). The applicability of the made-whole rule "*generally depends on whether the insured has been completely compensated for all the elements of damages, not merely those for which the insurer has indemnified the insured.*" *Chandler v. State Farm Mut. Auto Ins. Co.*, 598 F.3d 1115, 1118 (9th Cir. 2010) (Emphasis added.)

25. The Wildfire Claimants have not been made whole for their losses.

26. Several recently occurring events have threatened the Wildfire Claimants' ability to be made whole for their losses, and the parties and the Court are unable at this time to evaluate the impact of these events on the Wildfire Claimants' ability to be made whole for their Wildfire losses:

    (a) First, Federal and California government entities have filed claims for recovery of Wildfire Losses in excess of $7.4 billion, which impairs the Wildfire Claimants' ability to be made whole unless the Subrogation Claims are subordinated as required by applicable law, or the Subrogation Claimants and the TCC agree to a consensual allocation of available funds in this case.

    (b) Second, one of the Debtors' transmission towers on a Sonoma County ridge ignited the Kincade Fire in Northern California on October 24, 2019, when the Debtors' deenergized the electrical system in the low-lying Sonoma County valleys, but did not deenergize the system on the ridges were the winds were gusting with greater force. The fire is still burning, and the losses from that fire may exceed the Debtors' wildfire insurance coverage of $430 million (as the Debtors reported in the second quarter 2019 10-Q at page 71).

    (c) Third, California's 2019 wildfire season will not end until the end of December, and given the Debtors' repeated failures to maintain a safe electrical system, and make the correct deenergizing choices, there is a risk that the Debtors could face more wildfire loss claims this year.

27. California courts recognize two exceptions to the applicability of the made-whole rule: (1) the insured may disclaim the made-whole rule in an insurance contract by using clear and specific language that indicates the parties' intent to permit the insurer to seek reimbursement even if the insured has not been made whole; and (2) the made-whole rule does not apply if the insurer participates in the prosecution of the insured's claim against the third-party tortfeasor through to judgment. *Chandler*, 598 F.3d at 1118. While an insurer may typically pursue a recovery of its subrogation rights if its insured is taking no action to recover the remainder of its damages from the tortfeasor (*Chandler*, 598, F.3d at 1118), the made-whole rule, and the rights of the insured to

be paid in full prior to payment of the tortfeasor, remains in place. This is particularly so where an insurer does not assist the insured in taking its claim against the tortfeasor to judgment. Under such circumstances, the made-whole rule remains firmly in place and the insurer is barred from seeking a recovery of its own subrogation rights. *Barnes v. Independent Automobile Deals Association of California Health & Welfare Plan*, 64 F.3d 1389, 1395 (9th Cir. 1995) ("[W]hen the insurance company makes no payment to the injured insured for covered expenses, and places all the cost and risk of seeking recovery from a third party on the injured insured, the make-whole rule remains in place despite the 'all rights' language in the contract."). The TCC is informed and believes, and on the basis of such information and belief alleges, that the Debtors have a limited fund from which they can pay Wildfire Claimants and the Subrogation Claimants. The Subrogation Claimants abandoned the Wildfire Claimants' litigation to pursue their own side deal with the Debtors, and are doing nothing to fund the Wildfire Claimants' litigation or pursuit of recoveries in these cases. Instead, the Subrogation Claimants have established themselves as competitors with the Wildfire Claimants from the limited funds available from the Debtors. Thus, the made-whole rule bars any recovery by the Subrogation Claimants unless and until the Wildfire Claimants have received a recovery of the entirety of their damages.

28. The TCC contends that the made-whole rule applies to the Subrogation Claims and operates to bar the Subrogation Claimants from receiving equal treatment of their claims in the Chapter 11 Cases, and that neither of the exceptions apply. The TCC is informed and believes, and on the basis of such information and belief alleges, that the Subrogation Claimants dispute this contention.

29. The TCC further contends that in attempting to settle the Subrogation Claims with the Debtors, the Subrogation Claimants placed their own interests ahead of the interests of their insureds, the Wildfire Claimants, in contravention of their duties under the implied covenant of good faith and fair dealing. Under applicable law in the Ninth Circuit Court of Appeals, any claims of the Wildfire Claimants arising from such breaches may not be released under a plan of reorganization. Nor may the claims of the Wildfire Claimants be released under a settlement reached in these Cases. The Debtors' Settlement with the Subrogation Claimants purports to

release such claims between the Wildfire Claimants and the Subrogation Claimants—a release of claims between creditors. A Bankruptcy Court lacks the jurisdiction to approve a settlement and release of claims between creditors. *State ex rel. Roberts v. Mushroom King, Inc.*, 77 B.R. 813, 820 (D. Or. 1987) ("A state law dispute between two creditors does not come within the jurisdiction of the bankruptcy court unless it is otherwise 'impossible to administer completely the bankrupt's estate.' "). This is particularly so where one of the groups of creditors is not even a party to the purported Settlement.

30. The TCC further contends that the Subrogation Claimants do not qualify for the exception to the made-whole rule that applies when an insured disclaims the made-whole rule in an insurance contract by using clear and specific language that indicates the parties' intent to permit the insurer to seek reimbursement even if the insured has not been made whole. Upon information and belief, the TCC alleges that to the extent that any Subrogation Claimant contends that a Wildfire Claimant signed such a provision in their insurance contract, such provision is invalid or insufficient to waive the made-whole rule.

31. A declaration of the Court is necessary and appropriate to determine the respective rights of the Subrogation Claimants and Wildfire Claimants in these cases, and enforce the Wildfire Claimants' rights under the California Made-Whole Rule and fiduciary principles.

## SECOND CLAIM FOR RELIEF

## DECLARATORY RELIEF—SUBORDINATING SUBROGATION CLAIMS PURSUANT TO BANKRUPTCY CODE SECTION 509(C), FEDERAL COMMON LAW, AND CALIFORNIA LAW

32. The TCC incorporates paragraphs 1-31 of this Complaint.

33. Section 509(a) of the Bankruptcy Code provides that an entity that is liable with the debtor on a claim of a creditor against the debtor, and that pays such claim, is subrogated to the rights of the creditor to the extent of such payment. California law also provides, by the made-whole rule, that subrogation rights are subordinated to the prior rights of the insured to be made whole, and the Ninth Circuit has adopted this principle into federal common law. *See Barnes v. Independent Automobile Deals Association of California Health & Welfare Plan*, 64 F.3d 1389,

1395 (9th Cir. 1995) (adopting "as federal common law th[e] generally accepted rule that, in the absence of a clear contract provision to the contrary, an insured must be made whole before an insurer can enforce its right to subrogation"). That is the case here: after the fires occurred, both the Debtors and the Subrogation Claimants and/or their predecessor insurance companies were liable for the Wildfire Losses and Wildfire Claims.

34. The Wildfire Claimants' right to recover those Wildfire Losses and Wildfire Claims from the Subrogation Claimants and the Debtors constitutes a "claim" under Bankruptcy Code section 101(5), and hence the Wildfire Claims against the Debtors and the Subrogation Claimants are covered by Section 509(a). Accordingly, pursuant to Bankruptcy Code section 509(a), the Subrogation Claimants are subrogated to the Wildfire Claims, to extent of the Subrogation Claimants' payments to the Wildfire Claimants.

35. The Subrogation Claimants have asserted such Subrogation Claims against the Debtors on the basis of those payments. The Subrogation Claimants' Rule 2019 Statement states that the Subrogation Claims arise under state and federal law, including Bankruptcy Code section 509, and the Subrogation Claimants must accept the burdens that apply to their theory of recovery in these cases. It would be unconscionable for the Court to relieve the Subrogation Claimants of their admission that section 509 of the Code applies, after the Subrogation Claimants have appeared in these cases repeatedly based on the accuracy and veracity of their five Rule 2019 Statements.

36. Even if this Court were to conclude that the Subrogation Claimants are not liable "with" the Debtors, the Subrogation Claimants are subject to mandatory subordination under California law and federal common law. Codebtor status is irrelevant to the application of California law and federal common law on equitable or contractual subrogation. The made-whole rule is a rule of subordination, and it requires subordination of the claims of the Subrogation Claimants.

37. Pursuant to Bankruptcy Code section 509(c), federal common law, and/or California law, the Court must subordinate the Subrogation Claims to the Wildfire Claims against the Debtors and any trust set forth in a plan of reorganization, until the Wildfire Claims are paid in full by the Debtors under a plan of reorganization. The Subrogation Claimants dispute that conclusion. But

- 12 -
Case: 19-30088    Doc# 4628    Filed: 11/08/19    Entered: 11/08/19 15:09:52    Page 12 of 18

that argument is not supported by the only case law on point, as the bankruptcy court in the *Dow Corning* chapter 11 case ruled in the same insurer/victim/tortfeasor circumstance present in that case. *In re Dow Corning Corp.*, 256 B.R. 298, 365 (Bankr. E. D. Mich. 2000). *See also In re Applause, LLC*, 2006 Bankr. LEXIS 2341 *10-12 (Bankr. C.D. Cal. April 3, 2006) (finding subrogation rights disallowed under both Section 509(c) and California law, whichever applied).

38. The Subrogation Claimants claim the benefit of their right to assert their Subrogation Claims against the Debtors under section 509 and California subrogation law, but deny the consequence of subrogation under both: subordination of their Subrogation Claims until the Wildfire Claims are paid in full.

39. The TCC is informed and believes, and on the basis of such information and belief alleges, that the Subrogation Claimants dispute such contentions.

40. A declaration of the Court is necessary and appropriate to determine the respective rights of the Subrogation Claimants and Wildfire Claimants in these cases, enforce the Wildfire Claimants' rights under the Bankruptcy Code, and subordinate the Subrogation Claims to the Wildfire Claims in the Chapter 11 Cases.

## THIRD CLAIM FOR RELIEF
## FOR AN ACCOUNTING

41. The TCC incorporates paragraphs 1-40 of this Complaint.

42. Absent a consensual allocation of funds between a subrogated insurer and an insured, the proper administration of a bankruptcy case that involves establishing a trust fund of money to pay both insured and subrogation claims arising out of a single set of insured claims would be to fund the trust in a total amount that is proper, and distribute the funds as follows: first pay off the insured victims; second, pay off the subrogation claims so long as the related insured claim has not filed a claim against the debtor; and last, pay off the insurance companies that have subrogation claims that relate to the filed insured victim claims. This distribution plan would require matching each Wildfire Claimant's proof of claim to a Subrogation Claim, so that the parties can determine the Subrogation Claims for which there is not a corresponding Wildfire Claim, and which may therefore not be subject to subordination. This process would determine which

Subrogation Claims must be subordinated and which Subrogation Claims are not subordinated. None of that has occurred in these Chapter 11 Cases.

43. Instead, in their Bankruptcy Rule 2019 Statements, motions and other papers filed in the Chapter 11 Cases, the Subrogation Claimants lumped all of the subordinated Subrogation Claims and potentially unsubordinated Subrogation Claims together as a single class, and requested that they be afforded equal priority to their own insureds' Wildfire Claims that are validly filed against PG&E prior to the bar date.

44. Lumping subordinated and unsubordinated Subrogation Claims is improper from an insurance fiduciary duty standpoint, an accounting standpoint between the insurance company and its insured, and a bankruptcy administration standpoint. In doing so, the Subrogation Claimants have violated their duties to the insureds and rendered a proper evaluation of the priority of the claims inappropriate and impossible until the accounting and allocation are made.

45. Cause exists for entry of Judgment directing the Subrogation Claimants to provide an accounting of each Subrogation Claim, including the name of the insured to which the Subrogation Claim relates, the amount that the insurance company has paid on behalf of the insured, the amount the Subrogation Claimant paid for replacement value on each insured claim, and the amount that the insured has asserted against PG&E in these Chapter 11 Cases, so that the Court can afford effectual relief including subordination of the corresponding Subrogation Claims under state law, the made-whole rule under both state law and federal common law, and/or section 509 of the Bankruptcy Code.

46. Cause exists for entry of Judgment directing the Subrogation Claimant to prove up the amount of their claims including, without limitation, the amount of reserves each Subrogation Claimant supposedly has set aside to pay future claims, and to set forth in detail the extent to which the Subrogation Claimants have disputed in any way their obligation to pay the reserved amounts to their insureds.

47. Cause exists for entry of Judgment directing Subrogation Claimants who have purchased their claims from insurers to account for the claims they have purchased by setting forth

in detail each claim they purchased, the dollar amount of the purchased claims, and the dollar amount paid for the purchase of such claims.

### FOURTH CLAIM FOR RELIEF

### PARTIAL DISALLOWANCE OF SUBROGATION CLAIMS

48. The TCC incorporates paragraphs 1-47 of this Complaint.

49. California's anti-subrogation rule provides that, where an insurer has insured both the tortfeasor and the injured party under separate policies, the insurer cannot bring a subrogation action standing in the shoes of the injured party against the insurer's other insured party, the tortfeasor. *State Farm Gen. Ins. Co. v. Wells Fargo Bank, N.A.*, 143 Cal. App. 4th 1098, 1106-07 (2006); *Truck Ins. Exch. v. City of Los Angeles*, 95 Cal. App. 4th 13, 22-23 (2002), *as modified on denial of reh'g* (Feb. 6, 2002).

50. The TCC is informed and believes, and on the basis of such information and belief alleges, that certain Subrogation Claims—that the TCC believes to be in excess of $700 million but will be shown according to proof—placed liability insurance with the Debtors that provided coverage for the Debtors for some of the Wildfire Claims. Stated another way, at least $700 million of Subrogation Claims are prohibited by California's anti-subrogation rule because the Subrogation Claimants insured both sides of the Wildfire Claim loss.

51. The TCC contends that payments to Subrogation Claimants that provided liability insurance covering the Wildfire Claims would violate the anti-subrogation rule. The TCC is informed and believes, and on the basis of such information and belief alleges, that Subrogation Claimants dispute such contentions.

52. In addition, certain claims of the Subrogation Claimants are subject to disallowance because such Subrogation Claimants paid billions of dollars of insured property damage claims at insured values that matched the replacement value of the lost personal property, but are not recoverable against the Debtors because the Subrogation Claimants hold claims against the Debtors only for the present-day value of the personal property, and not the insured replacement value. A declaration of the Court is necessary and appropriate to determine the respective rights of the

Subrogation Claimants and Wildfire Claimants in these cases. The Subrogation Claimants also dispute these conclusions and that dispute should similarly be resolved.

# FIFTH CLAIM FOR RELIEF

# DECLARATORY RELIEF—DECLARING THIRD PARTY RELEASES ARE BARRED BY BANKRUPTCY CODE SECTION 524(E)

53. The TCC incorporates paragraphs 1-52 of this Complaint.

54. The Subrogation Claimants' attempt to enter into a settlement with the Debtors that would release the Subrogation Claimants of the Wildfire Claimants' claims against the Subrogation Claimants is barred by Bankruptcy Code section 524(e), and is illegal under well-settled Ninth Circuit law, California Insurance Code sections 2695.4(e), 2695.7(e) and 2695.7(i), and California case law. [In a series of well-settled decisions, the Ninth Circuit has repeatedly held that a plan provision that releases claims between non-debtor parties violates Bankruptcy Code section 524(e), which prohibits the discharge of debts between non-debtor parties. *In re Lowenschuss*, 67 F. 3d 1394, 1401-02 (9th Cir. 1995). The Subrogation Claimants dispute that conclusion. Moreover, a settlement brought before a Bankruptcy Court under F.R.B.P. 9019 cannot settle claims between two groups of creditors—particularly when one such group is not even a party to the settlement—as a Bankruptcy Court lacks the jurisdiction to approve a settlement and release of claims between creditors. *State ex rel. Roberts v. Mushroom King, Inc.*, 77 B.R. 813, 820 (D. Or. 1987) ("A state law dispute between two creditors does not come within the jurisdiction of the bankruptcy court unless it is otherwise 'impossible to administer completely the bankrupt's estate.'").

55. There is a substantial controversy between the TCC and the Subrogation Claimants of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

56. A declaratory judgment confirming that the Subrogation Claimants may not negotiate for, or receive a forced release of the Wildfire Claimants' claims against, the Subrogation Claimants is therefore both necessary and appropriate in order to enforce the Wildfire Claimants' rights in these cases.

# **PRAYER**

WHEREFORE, the TCC respectfully requests the Court enter Judgment against defendant Ad Hoc Group of Subrogation Claim Holders, as follows:

(a) Judgment declaring the Subrogation Claims are subordinated to the Wildfire Claims pursuant to the 'made-whole rule' under California law and federal common law;

(b) Judgment declaring that the Subrogation Claims are subordinated to the Wildfire Claims pursuant to the provisions of Bankruptcy Code section 509(c);

(c) Judgment declaring the Subrogation Claimants may not receive any payment on their Subrogation Claims until each of the Wildfire Claims are paid in full via a direct payment of cash and/or securities to the Wildfire Claimants themselves (and not payment to a capped Trust established to pay such claims at some point in time from a limited fund in the capped Trust);

(d) Judgment directing the Subrogation Claimants to provide an accounting of each Subrogation Claim, including the name of the insured to which the Subrogation Claim relates, the amount that the insurance company has paid on behalf of the insured, the amount the Subrogation Claimant paid for replacement value on each insured claim, and the amount that the insured has asserted against PG&E in these Chapter 11 Cases, so that the Court can afford effectual relief including subordination of the corresponding Subrogation Claims under state law, the made-whole rule under both state law and federal common law, and/or section 509 of the Bankruptcy Code;

(e) Judgment directing the Subrogation Claimant to prove up the amount of their claims including, without limitation, the amount of reserves each Subrogation Claimant supposedly has set aside to pay future claims, and to set forth in detail the extent to which the Subrogation Claimants have disputed in any way their obligation to pay the reserved amounts to their insureds;

(f) Judgment directing Subrogation Claimants who have purchased their claims from insurers to account for the claims they have purchased by setting forth in detail each

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Case: 19-30088    Doc# 4628    Filed: 11/08/19    Entered: 11/08/19 15:09:52    Page 17 of 18

claim they purchased, the dollar amount of the purchased claims, and the dollar amount paid for the purchase of such claims;

(g) Judgment that Subrogation Claims held by Subrogation Claimants who insured the Debtors for Wildfire Claims are barred by the California anti-subrogation rule, according to proof;

(h) Judgment declaring that the Subrogation Claimants may not obtain a release of the Wildfire Claimants' claims against the Subrogation Claimants from the Debtors, by settlement, by a plan of reorganization, or otherwise by the Court;

(i) Costs of suit herein; and

(j) Any other relief that the TCC requests in open court or in a paper filed in Court, or that the Court finds is just or reasonable.

Dated: November 8, 2019

BAKER & HOSTETLER LLP

By: */s/ Robert A. Julian*
     Robert A. Julian

*Counsel to the Plaintiff Official Committee of Tort Claimants*