Robert A. Julian (SBN 88469)
Cecily A. Dumas (SBN 111449)
BAKER & HOSTETLER LLP
1160 Battery Street, Suite 100
San Francisco, CA 94111
Telephone:    628.208.6434
Facsimile:    310.820.8859
Email: rjulian@bakerlaw.com
Email: cdumas@bakerlaw.com

Eric E. Sagerman (SBN 155496)
David J. Richardson (SBN 168592)
Lauren T. Attard (SBN 320898)
BAKER & HOSTETLER LLP
11601 Wilshire Blvd., Suite 1400
Los Angeles, CA 90025-0509
Telephone:    310.820.8800
Facsimile:    310.820.8859
Email: esagerman@bakerlaw.com
Email: drichardson@bakerlaw.com
Email: lattard@bakerlaw.com

*Counsel to the Official Committee of Tort Claimants*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION**<br><br>     -and-<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br>                              **Debtors.**<br><br>☐ Affects PG&E Corporation<br><br>☐ Affects Pacific Gas and Electric Company<br><br>■ Affects both Debtors<br><br>*All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | Bankruptcy Case No. 19-30088 (DM)<br><br>Chapter 11 (Lead Case)<br>(Jointly Administered)<br><br>**RESPONSE OF OFFICIAL COMMITTEE OF TORT CLAIMANTS TO DEBTORS' RESTATED RESTRUCTURING SUPPORT AND SETTLEMENT AGREEMENT WITH THE CONSENTING SUBROGATION CLAIMHOLDERS [DKT NO. 4554-1]**<br><br>Date:    November 13, 2019<br>Time:    9:30 a.m. (Pacific Time)<br>Place:   United States Bankruptcy Court<br>         Courtroom 17, 16th Floor<br>         San Francisco, CA 94102 |

The Official Tort Claimants' Committee ("**TCC**") respectfully files this response to the Restated Restructuring Support Agreement (the "**Settlement**") [Dkt. No. 4554-1] filed by PG&E Corporation and Pacific Gas & Electric Company ("**PG&E**" and collectively, the "**Debtors**"), and the Ad Hoc Subrogation Group ("**Subrogation Claimants**"). In support of this response, the TCC is filing contemporaneously herewith the Declaration of Brent C. Williams (the "**Williams Decl.**") and the Declaration of Lauren T. Attard (the "**Attard Decl.**").

**A.     The Key Points of Law that relate to this settlement approval follow**:

1. A debtor can settle the amount of a claim against the estate, if the debtor establishes the settlements are in good faith, fair and equitable, but "preserve the rights of the creditors." *In re A&C Properties*, 784 F.2d 1377, 1382 (9th Cir. 1986).

2. The settlement cannot impair other creditors' rights in the case. *In re Technical Knockout Graphics*, 833 F.2d 797, 803 (9th Cir. 1987) (adopting "fair and equitable" language of *In re AWECO, Inc.*, 725 F.2d 293, 299 (5th Cir. 1984) (forbidding a settlement that reorders priorities)).

3. The settlement also cannot effect or force a release between two sets of creditors. *See Resorts Int'l v. Lowenschuss (in re Lowenschuss)*, 67 F.3d 1394, 1401 (9th Cir. 1995) ("This court has repeatedly held, without exception, that § 524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors.") (emphasis added); *American Hardwoods, Inc. v. Deutsche Credit Corp. (In re American Hardwoods Inc.)*, 885 F.2d 621, 626 (9th Cir. 1989) (finding "the bankruptcy court was powerless to discharge" nondebtor claims in a plan); *Underhill v. Royal*, 769 F.2d 1426, 1432 (9th Cir. 1985) ("The bankruptcy court 'has no power to discharge the liabilities of a bankrupt's guarantor.'").

4. Under California law, an insurer's payment of a portion of an insured's claim against a tortfeasor permits the insurer to step into the insured's position on the claim, and recover on a "subrogation claim" against the tortfeasor. *Fireman's Fund Ins. Co. v. Maryland Casualty Co.*, 65 Cal.App.4th 1279, 1291 (1998) (an insurer who pays a claim "is equitably *subrogated* to the claimant") (emphasis in original).

1

5. California's and the federal common law's made whole rule establishes a priority of payment between an insured victim and his or her insurance company: an insurer cannot settle or recover on its subrogation claim if the insured victim is prosecuting his or her claim against PG&E, and the state rule thereby subordinates the subrogation claim to the prosecuting victim's claim. *Barnes v. Independent Automobile Deals Association of California Health & Welfare Plan*, 64 F.3d 1389, 1395 (9th Cir. 1995) (adopting "as federal common law th[e] generally accepted rule that, in the absence of a clear contract provision to the contrary, an insured <u>must</u> be made whole before an insurer can enforce its right to subrogation") (emphasis added); *Chandler v. State Farm Mutual Automobile Insurance Co.*, 598 F.3d 1115, 1118-20 (9th Cir. 2010) (permitting insurer to pursue subrogation recovery where insured merely "sit[s] back and do[es] nothing to assert its rights against" the tortfeasor).

6. Congress codified the common law subrogation and corresponding subordination provisions in Bankruptcy Code Section 509. *In re Applause, LLC*, 2006 Bankr. LEXIS 2341 at *14 (Bankr. C.D. Cal. April 3, 2006) ("The language in Section 509(c) derives from the common law 'made whole' rule …"); *In re Denby Stores, Inc.*, 86 B.R. 768, 779 (Bankr. S.D.N.Y. 1988) (holder of subrogation claim "is subordinated" under Section 509(c) until original claimants are "paid in full, either through payments under Title 11 or otherwise").

7. In *Dow Corning*, and the California Central District's *Applause* case, the courts held the subrogation and subordination rules applied to an insurer's claims against the debtor under Bankruptcy Code section 509. *In re Dow Corning Corp.*, 244 B.R. 705, 715 (E.D. Mich. 1999) (government's Medicare obligations make it a codebtor with tortfeasor that caused injury for purposes of Section 509); *citing* 4 *Collier on Bankruptcy* P 502.06[2][b] (15th ed. rev. 1999) ("Under Section 502, codebtor status is broadly interpreted, and a claim for reimbursement has been held to presuppose a codebtor relationship"); *In re Applause, LLC*, 2006 Bankr. LEXIS 2341 at *10-12 (if insurer's claim was based on equitable subrogation, it was disallowed as debt of beneficiary "has not been paid in full," and if based on Section 509, was disallowed given likelihood debtor would be incapable of paying the underlying claim in full).

2

8. The Subrogation Claimants have filed six Bankruptcy Rule 2019 verified statements that admit their "subrogation claims…arise…as a matter of State or federal law, including…Section 509 of the Bankruptcy Code." *See, e.g.,* Dkt. No. 4302 at 1 n.1.

**B.    The Key Facts that relate to this settlement approval follow:**

1. According to the Department of Insurance official reports, the Subrogation Claimants have reported they incurred losses, meaning paid and reserved and unpaid losses, arising from the 2017 North Bay and 2018 Camp Fires in a total amount of approximately $18.2 billion. Attard Decl. ¶¶ 3-4, Ex. A and B.

2. The Subrogation Claimants' motion to terminate exclusivity and attached plan term sheet allowed $15.8 billion of subrogation claims in this case. Attard Decl. Ex. C, Dkt. No. 3147, Term Sheet at 1.

3. The Subrogation Claimants' plan term sheet required the Debtors to pay their claim in a proportion of "90% in new…preferred equity stock and 10% in cash." Attard Decl. Ex. C, Term Sheet at 1.

4. The Subrogation Claimants' plan term sheet required "the Debtors cash on hand at emergence and proceeds of…the issuance of Mandatory Convertible Preferred shall be used to…fund the creation of the Settlement Trust for Individual Wildfire Claimants." Attard Decl. Ex. C, Term Sheet at 2.

5. The Subrogation Claimants requested the Debtors to settle their claims before the Subrogation Claimants filed any proofs of claims under penalty of perjury in this case.

6. The Debtors have proposed to settle the Subrogation Claimants' eventual claims by allowing the subrogation claims in the amount of $11 billion; and also by guaranteeing a payment on the allowed claims of $11 billion cash on plan confirmation, irrespective of whether there will be cash available to pay wildfire victim claims. This is a complete reversal of the Subrogation Claimants' own plan that paid the Subrogation Claimants 90% in stock, rather than cash.

7. The Debtors have proposed to settle local public entity wildfire claims for the guaranteed payment of $1 billion in cash, subject to a fairness hearing during plan confirmation

when the Court will be in a position to determine whether the settlement is fair to all other wildfire claims in the context of the case as it is at the time. Attard Decl. Ex. G.

8. After the Debtors proposed to pay the guaranteed cash payments to the Subrogation Claimants and the settling Public Entities, the federal and state governments filed approximately $8.6 billion of wildfire claims. Attard Decl. Ex. D.

9. After the Debtors proposed to pay the guaranteed cash settlements to the Subrogation Claimants and settling Public Entities, wildfire victims filed approximately 70,000 wildfire claims in this case. Attard Decl. Ex. E, at 5. Judge Donato has not yet estimated the value of the claims.

10. After the Debtors proposed to pay the guaranteed cash settlements to the Subrogation Claimants and settling Public Entities, PG&E's equipment sparked the Kincade fire, which, according to the Debtors' November 6, 2019 10-Q, could result in "significant liability in excess of insurance coverage that would be expected to have a material impact on PG&E Corporation's and the Utility's financial condition, results of operations, liquidity, and cash flows, as well as on the bankruptcy timing and process and the ability of the Utility to participate in the Wildfire Fund." Attard Decl. Ex. F at 82.

11. After the Debtors proposed to pay the guaranteed cash settlements to the Subrogation Claimants and settling Public Entities, the Debtors filed their November 6, 2019 10-Q that discloses they also are subject to CPUC fines and criminal sanctions arising out of the Camp Fire. Attard Decl. Ex. F at 65-66, 74-75.

12. There is nothing in the record that shows whether the Debtors have enough liquidity or cash left in the estate to fully satisfy claims of the wildfire victims who have filed claims against the estate and who may file additional claims during the bar date extension, plus the $8.4 billion of government claims, the Kincade fire claims, or future wildfire claims that may arise from more PG&E equipment failures this fire season, the CPUC fines, or the Butte County criminal sanctions for causing the Camp Fire.

13. In order for the Debtors to provide the same amount of total consideration and form of consideration as provided to the fire victims in the Bondholder/TCC plan, and given the limited

4

cash left in the estate, the only form of recovery available is non-cash consideration. This consideration could include wildfire victims recovery property created pursuant to the Wildfire Victim Recovery Bonds, or other securitized bonds, and the proceeds of such bonds (if applicable), New HoldCo Common Stock, or Mandatory Convertible Preferred Stock (if applicable), and other non-cash considerations in the reorganized debtor. Williams Decl. at ¶ 5.

**C.     The TCC's objections to the Subrogation Claimants' settlement follow:**

1. The settlement is not fair to the unsettled wildfire claims, because the settlement locks up $11 billion in cash for the insurers and other Subrogation Claimants. In order for the Debtors' plan to provide fire victims with $13.5 billion of total consideration as provided for in the Bondholders/TCC Plan, it is likely that a significant portion of the total consideration to fire victims would be provided in the form of equity and other non-cash consideration. Williams Decl. at ¶ 5.

2. The settlement is not in the best interests of the estate and its creditors: if the settlement is approved, the victims cannot settle their claims with the Debtors at the same level of total consideration that they have currently negotiated, because the victims' own plan makes clear that they need at least half of their $13.5 billion of payments to be in cash. *Id.*

3. The settlement grants a guaranteed priority payment of cash to the insurers and their successor subrogation claimants, in violation of the made whole and subordination principles of California law and Section 509 of the Bankruptcy Code, which apply to the Subrogation Claimants according to their verified statements in this case; and hence, the settlement violates the victims' priority rights in this case. The Subrogation Claimants have abandoned their July 2019 opening offer to take stock as their payment, a prior exercise of fiduciary protection of their insureds, in favor of a hard ball grab of all the cash in the estate, at the insured victims' expense. This Court would respect a subordination clause in an intercreditor agreement; the result should not be any different in this case simply because we are dealing with individual victims instead of financial institutions.

4. The settlement cannot be evaluated for fairness in relation to the remaining wildfire claims, outside the estimation and plan process, because the settlement guarantees payment of $11 billion in cash to the insurers, and the Court does not yet know whether or not there is sufficient

5

cash or equity value left in the estate to pay whatever amount estimation establishes is owed to the fire victims and the government on their claims, which presently exceed $20 billion, as well as the Kincade fire claims, future fire claims, CPUC fines, and Butte County criminal sanctions for the Camp Fire. The Debtors' conditioning of their $1 billion settlement with the local public entity claimants in the context of plan confirmation is proof that a debtor in this context should not settle such claims out of the context of the overall plan construct.

5. The settlement is not fair or equitable to the wildfire victims because the Subrogation Claims are derivative of the wildfire victim claims, and hence should only be settled as part of a settlement that accords to the wildfire victims' claims the same percentage liability allowance, the same type and percentage consideration, and the same payment terms. The Court is considering settling a portion of the victims' claims against PG&E, to which the Subrogation Claimants are subrogated. By definition, a settlement of the victims' claims, to which the Subrogation Claimants are subrogated, must be on the same or better terms granted to the insureds. This settlement fails in that regard by granting preferential and superior treatment to the Subrogation Claimants.

6. The settlement was not an arms-length, good faith, settlement; the settlement is a collusive agreement between equity to benefit equity: Baupost Group LLC, a 4.6% equity holder in this case, holds 39.4% of the subrogation claims of the Ad Hoc Subrogation Group and controls the Subrogation Claimants' settlement. In addition, three of the top four equity holders of PG&E own subrogation claims, including Baupost. Williams Decl. Ex. A; *see also* Williams Decl. ¶ 6.

7. The settlement is not fair or equitable in any sense of those words: Baupost purchased $6 billion of subrogation claims, the majority of which for a reported 30 to 35 cents on the dollar, and stands to make billions of dollars in profit on its purchases. Williams Decl. Ex. D. In contrast, the victims who are living in tents and trailers trying to rebuild their lives would recover only stock in a fire prone felon, and would be unable to readily liquidate their stock for a fair price and rebuild.

8. The settlement attempts to impose an illegal release by the victims in favor of the Subrogation Claimants; and, typical for the type of PG&E and insurer hard ball we have witnessed

to date, the release is one way only, by the insureds in favor of their insurers, and not the other way around.

## **CONCLUSION**

It is time to call this settlement what it is: a mistake. The Debtors have given away all their cash and placed the wildfire victims in a position of full risk in this case. For their part, the insurers participated in the stripping of cash for their own benefit, to the detriment of their insureds, to whom they owe duties of good faith and fair dealing. As a result, the parties are unable to resolve this case consensually while the settlement is a possibility. Litigation is assured if the Court approves the settlement over the TCC's objections. Settlements are supposed to narrow the disputes in the case; this one would enlarge those disputes, and create new ones that would embroil the case in litigation past confirmation.

Wherefore, for all of the reasons argued herein and in the TCC's Opposition to the 9019 Motion, the TCC respectfully requests that this Court deny the Motion so this case may be resolved, or continue consideration of the settlement to plan confirmation.

Dated: November 8, 2019         BAKER & HOSTETLER LLP

By:  /s/Robert A. Julian
         Robert A. Julian

*Counsel to the Official Committee of Tort Claimants*