# EXHIBIT C

**DIEMER & WEI, LLP**
Kathryn S. Diemer (#133977)
100 West San Fernando Street, Suite 555
San Jose, CA 95113
Telephone: (408) 971-6270
Facsimile: (408) 971-6271
Email: kdiemer@diemerwei.com

**WILLKIE FARR & GALLAGHER LLP**
Matthew A. Feldman (*pro hac vice*)
Joseph G. Minias (*pro hac vice*)
Daniel I. Forman (*pro hac vice*)
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email: mfeldman@willkie.com
    jminias@willkie.com
    dforman@willkie.com

*Counsel for Ad Hoc Group of Subrogation
Claim Holders*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>**PG&E CORPORATION,**<br><br>    -and-<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br>        **Debtors.**<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☑ Affects both Debtors<br><br>*\* All papers shall be filed in the lead case, No. 19-30088 (DM)* | Chapter 11<br>Bankr. Case No. 19-30088 (DM)<br>(Jointly Administered)<br><br>**MOTION OF THE AD HOC GROUP OF SUBROGATION CLAIM HOLDERS TO TERMINATE THE DEBTORS' EXCLUSIVE PERIODS PURSUANT TO SECTION 1121(d)(1) OF THE BANKRUPTCY CODE**<br><br>**Hearing Date and Time**: August 13, 2019 at 9:30 a.m. (PT)<br>**Objection Deadline**: August 6, 2019 at 4:00 p.m. (PT)<br>**Hearing Location**: 450 Golden Gate Ave., San Francisco, CA, Courtroom 17<br>**Judge**: Hon. Dennis Montali |

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ...................................................................................................................... 6

    A.    General Background ...................................................................................... 6

    B.    Background to the Motion ............................................................................. 6

ARGUMENT ........................................................................................................................... 7

I.    Termination of Exclusivity is Appropriate in These Cases .................................... 7

NOTICE ................................................................................................................................ 11

CONCLUSION ..................................................................................................................... 12

Case: 19-30088   Doc# 3147   Filed: 07/23/19   Entered: 07/23/19 10:56:24   Page 2 of
15

Case: 19-30088   Doc# 4630-3   Filed: 11/08/19   Entered: 11/08/19 15:41:24   Page 3
of 41

# **TABLE OF AUTHORITIES**

**Cases** **Page(s)**

*In re Adelphia Commc'ns Corp.*,
    352 B.R. 578 (Bankr. S.D.N.Y. 2006)..............................................................................7, 8

*In re Adelphia Commc'ns Corp.*,
    336 B.R. 610 (Bankr. S.D.N.Y. 2006)...................................................................................8

*In re Dow Corning Corp.*,
    208 B.R. 661 (Bankr. E.D. Mich. 1997)...............................................................................8

*In re Gibson & Cushman Dredging Corp.*,
    101 B.R. 405 (E.D.N.Y. 1989) .............................................................................................7

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*,
    808 F.2d 363 (5th Cir. 1987), *aff'd*, 484 U.S. 365 (1988) ...................................................7

**Statutes**

11 U.S.C. § 1121(d)(1) ................................................................................................................7

Case: 19-30088    Doc# 3147    Filed: 07/23/19    Entered: 07/23/19 10:56:24    Page 3 of
15
Case: 19-30088    Doc# 4630-3    Filed: 11/08/19    Entered: 11/08/19 15:41:24    Page 4
of 41

The Ad Hoc Group of Subrogation Claim Holders (the "**Ad Hoc Subrogation Group**") in the above-captioned chapter 11 cases of PG&E Corporation and Pacific Gas and Electric Company (together, "**PG&E**" or the "**Debtors**"), by its attorneys Willkie Farr & Gallagher LLP and Diemer & Wei, LLP, hereby submits this motion (the "**Motion**") pursuant to section 1121(d)(1) of title 11 of the United States Code (the "**Bankruptcy Code**") for entry of an order, substantially in the form attached hereto as **Exhibit A**, terminating the Debtors' exclusive periods to file and solicit acceptances of a proposed plan of reorganization (the "**Exclusive Periods**"). In support of the Motion, the Ad Hoc Subrogation Group[1] respectfully represents as follows:

**PRELIMINARY STATEMENT**

1.     At the May 22 hearing on the Debtors' motion to extend the Exclusive Periods, the Court invited parties that were committed to advancing these chapter 11 cases to submit proposed plans of reorganization. Specifically, the Court said, "[t]he door is half open to the ad hoc committee, the tort claimant committee, or any other party who believes there's a way to come up with a credible, potentially confirmable plan, other than what the debtors' counsel may have." May 22, 2019 Hr'g Tr. at 76:9-13. Since that hearing, the Ad Hoc Subrogation Group has worked tirelessly to present the Court with a credible, confirmable plan (the "**Subrogation Plan**"), the key terms of which are reflected in the term sheet attached hereto as Exhibit A. In light of the Subrogation Plan's numerous benefits discussed below, and the inability of the Debtors to effectively use the Exclusive Periods to build consensus around a plan structure, the Ad Hoc Subrogation Group submits that the Debtors' Exclusive Periods should be terminated immediately in order to enable the Ad Hoc Subrogation Group to file the Subrogation Plan.

2.     These cases were filed to address and resolve Wildfire Claims (as defined below). This point is underscored by the fact that (except for the Bondholder Plan's (as defined below) contrived "impairment" of long term bond claims) both the Bondholder Plan and the Subrogation

---

[1] The Ad Hoc Subrogation Group is governed by a steering committee, which supports the relief requested herein. The steering committee of the Ad Hoc Subrogation Group collectively holds more than 85% of the group's aggregate Subrogation Claims (as defined below).

Plan propose to leave all other creditor classes unimpaired. Further, the Debtors have publicly

acknowledged that such claims could exceed $30 billion.[2] Holders of Subrogation Claims[3] alone—

the overwhelming majority of which are members of the Ad Hoc Subrogation Group—hold in

excess of $20 billion of Wildfire Claims.[4] By far, the two largest groups of creditors holding

Wildfire Claims are the Ad Hoc Subrogation Group and the Official Committee of Tort Claimants

(the "**Tort Claimants Committee**"). The Subrogation Plan is the only path forward that has

garnered the support of at least one of these two critical constituencies, and the Ad Hoc

Subrogation Group has spent considerable time and effort negotiating with the Tort Claimants

Committee to push forward a joint plan (and will continue to do so).

    3. The Subrogation Plan not only incorporates a reasonable settlement of the total value

of all Subrogation Claims, but also preserves the ability of individual fire victims to assert their

claims against a well-funded trust and realize a full recovery on their claims.[5] Admittedly, the

---

[2] *Declaration of Jason P. Wells in Support of First Day Motions and Related Relief* [Docket No. 28], at p. 1. ("PG&E's potential liability with respect to the 2017 and 2018 Northern California wildfires could exceed $30 billion, without taking into account potential punitive damages, fines and penalties or damages with respect to 'future claims.'").

[3] "**Subrogation Claims**" are Wildfire Claims that include, but are not limited to, claims that arise from subrogation (whether such subrogation is contractual, equitable or statutory), assignment (whether such assignment is contractual, equitable or statutory), or otherwise in connection with payments made or to be made by the applicable insurer to insured tort victims, and whether arising as a matter of state or federal law, including, without limitation, Section 509 of the Bankruptcy Code. Insurers seek to recover the cost associated with claims it has paid to its affected customers, which in many cases results in the reimbursement of customer paid deductibles associated with the loss. Subrogation helps keep rates low for customers and controls insurer claim costs.

[4] Holders of Subrogation Claims have reported approximately $18.5 billion of payments and policy reserves to the California Department of Insurance, which amount does not include estimated but not yet reserved future payments, estimated or accrued interest and attorneys' fees, all of which are recoverable under applicable law. As of September 2018, holders of Subrogation Claims had reported approximately $10 billion in direct incurred losses resulting from the 2017 Northern California Wildfires. *See* http://www.insurance.ca.gov/0400-news/0100-press-releases/2018/upload/nr106Insuredlosses090618.pdf (reporting losses for Lake, Mendocino, Napa, Nevada, Solano, Sonoma and Yuba). As of April 30, 2019, holders of Subrogation Claims had reported approximately $8.5 billion in direct incurred losses resulting from the 2018 Northern California Wildfires. *See* http://www.insurance.ca.gov/0400-news/0100-press-releases/2019/upload/nr041-19InsuredLosses2018Wildfires050819.pdf (reporting losses for November 2018 wildfires).

[5] The Subrogation Plan contemplates that each individual fire victim will have the opportunity to realize a full recovery on his or her provable and compensable claim subject to the trust funding amount (including, for the avoidance of doubt, reimbursement of any deductibles paid prior to receipt of insurance policy proceeds). The Ad Hoc Subrogation Group intends to continue to work with the representatives of the Tort Claimants Committee and expects to file an amended term sheet that, in the judgment of the Ad Hoc Subrogation Group, provides for sufficient funding for a settlement trust in order to achieve this goal. While the Ad Hoc

2

major open issue in the Subrogation Plan is the total funding required for the individual fire victims' trust, which will be resolved following further negotiations, or (only if necessary) a targeted estimation process that will address only the individual Wildfire Claims.

4.     The Court is currently scheduled to hear this Motion concurrently with the two motions of the Ad Hoc Subrogation Group and Tort Claimants Committee to lift the stay. Terminating exclusivity to permit pursuit of the Subrogation Plan and lifting the stay to allow determination of the Debtors' liability on account of the Tubbs fire in state court can work in tandem, on parallel paths, to resolve these cases on a fair, equitable and timely basis.[6]  In and of itself, lifting the stay to permit the prompt adjudication of liability for the Tubbs fire will remove a major impediment to a negotiated, consensual resolution of these cases, whether or not exclusivity is terminated.  Similarly, if only exclusivity is terminated, the Subrogation Plan proposes a reasonable settlement of Tubbs liability that could be approved through the plan confirmation process.  But lifting the stay and terminating exclusivity together will provide the best opportunity to have these cases successfully resolved by the June 2020 deadline for participating in the insurance wildfire fund and within a time frame that will expedite distributions to individual wildfire victims.[7]

---

Subrogation Group continues to negotiate with the Tort Claimants Committee, the Subrogation Plan described herein is expected to provide recoveries up to a higher level than the Bondholder Plan.  To the extent the funding required for the settlement trust in order to pay victims impacts the plan's feasibility, additional legislative or regulatory solutions may need to be explored and pursued.

[6]     *See Motion of the Ad Hoc Subrogation Group for Relief from the Automatic Stay* [Docket No. 2863].  Various parties that filed responses to the Bondholders' Motion (defined below) were supportive of terminating exclusivity for a truly credible and potentially confirmable plan.  *Statement of the Official Committee of Unsecured Creditors Regarding the Ad Hoc Committee of Senior Unsecured Noteholders' Motion to Terminate the Debtors' Exclusive Periods Pursuant to Section 1121(d)(1) of the Bankruptcy Code* [Docket No. 3064], at p. 3-4 ("The Official Committee suggests that any other party that may wish to propose a plan for the Debtors be granted similar relief if the Court determines, following notice and a hearing, that such party's proposal constitutes a credible plan…");  *Statement of BOKF, N.A. in Support of the Motion of the Ad Hoc Committee of Senior Unsecured Noteholders to Terminate the Debtors' Exclusivity Period* [Docket No. 3061], at p. 4 ("In the event any other non-Debtor party wishes to file and propose a chapter 11 plan, it should only be permitted to do so if it too can demonstrate that its proposed plan is real, credible and viable…").

[7]     The Subrogation Plan is designed to work on a parallel path with Tubbs litigation (without being contingent on its outcome), because it proposes a reasonable settlement of Tubbs liability.  Nevertheless, it is critical to commence litigating the Tubbs issues now so that these cases do not return to square one in the event the Subrogation Plan is not confirmed.

3

5. Customer safety is a paramount concern for members of the Ad Hoc Subrogation Group. The Subrogation Plan term sheet includes specific provisions to ensure wildfire prevention and mitigation are a top priority for the reorganized PG&E. A majority of the directors will be appointed to help safeguard that appropriate investments are made in upgrades to PG&E's transmission system, forest management and other efforts to reduce the risk and severity of future wildfires. In summary, the Subrogation Plan also:

- Provides for payment of Individual Wildfire Claims from a well-funded settlement trust;

- Includes an expedited and efficient claim process for individuals to be paid based either on individual claim settlements with the trust or contingent upon proving their claims, to enable the individual wildfire victims to rebuild and move forward in their recovery;

- Resolves Wildfire Subrogation Claims at an amount significantly less than full recovery to help expedite the bankruptcy proceedings;[8]

- Converts a significant portion of all Wildfire Subrogation Claims into equity to strengthen the reorganized Debtors' balance sheet and reduce the amount of new money (and substantial related costs) necessary for the Debtors to exit chapter 11;

- Creates a strong balance sheet for the reorganized Debtors that allows the company to maintain an investment grade rating and positions the reorganized utility to (a) maintain compliance with state renewable energy standards, and (b) invest in requisite grid improvement and safety enhancement initiatives;

---

[8] The aggregate recovery on account of Subrogation Claims is a settlement and compromise solely for purposes of the Subrogation Plan. If the allowed amount of all Subrogation Claims were litigated, holders of Subrogation Claims could and would assert claims in a substantially higher amount than the compromise amount proposed in the Subrogation Plan. Approximately $18.5 billion of payments and policy reserves have been reported to the California Department of Insurance, which amount does not include estimated but not yet reserved future payments, estimated or accrued interest and attorneys' fees, all of which are recoverable under applicable law, and would raise the total amount of Subrogation Claims to over $20 billion. Upon confirmation of the Subrogation Plan, the compromised aggregate allowed claim will be binding on each individual class member and a binding allocation of the recovery among class members will be set forth in the Subrogation Plan or a supplement thereto.

4

- Maintains rate neutrality for all of the Debtors' customers;

- Contributes approximately $5 billion to the proposed wildfire recovery fund for future wildfire claims;

- Strengthens and extends the relationship with the reorganized Debtors' active workforce;

- Assumes the Debtors' current retirement plan; and

- Allocates more value to existing equity holders than any other option presently on file.

6.      The motion of the Ad Hoc Group of Senior Unsecured Noteholders to terminate exclusivity, and their proposed term sheet, do nothing to move the needle on the key issue in this case—the resolution of Wildfire Claims—because their plan, and satisfaction of a key condition precedent to its confirmation, has no support from either of the two major Wildfire Claim constituencies and depends on an unrealistically low cap for all Wildfire Claims.[9]  Further, that plan (the "**Bondholder Plan**") is deficient for all the reasons set forth in the Ad Hoc Subrogation Group's objection and response to the related motion.[10]  Moreover, the Subrogation Plan is superior to the Bondholder Plan in many key areas.  A chart comparing the two plans is below:

| **Issue** | **Bondholder Plan** | **Subrogation Plan** |
|---|---|---|
| Subrogation Claims Amount | Up to $7.795 billion[11] | $15.8 billion |
| Individual Claims Amount | Up to $6.045 billion[12] | Paid in full up to the trust funding amount |
| Municipal Claims Amount | $1 billion | $1 billion |

---

[9]      *Motion of the Ad Hoc Committee of Senior Unsecured Noteholders to Terminate the Debtors Exclusive Periods Pursuant to Section 1121(d)(1) of the Bankruptcy Code* [Docket No. 2741] (the "**Bondholders' Motion**").

[10]     *See Objection and Response of the Ad Hoc Group of Subrogation Claim Holders to the Motion of the Ad Hoc Committee of Senior Unsecured Noteholders to Terminate the Debtors' Exclusive Periods Pursuant to Section 1121(d)(1) of the Bankruptcy Code* [Docket No. 3062].

[11]     Excluding the potential 15% adjustment.

[12]     Excluding the potential 15% adjustment and legal fees.

5

| Treatment of Existing Funded Debt | Long term unsecured notes exchanged for replacement *secured* notes with claim priority over future wildfire victims and other unsecured creditors | Reinstated or refinanced (without security or priority over future wildfire victims and other unsecured creditors) |
|---|---|---|
| Contribution to the Wildfire Recovery Fund | $5 billion | $5 billion |

7.      Accordingly, the Ad Hoc Subrogation Group respectfully requests that the Court terminate exclusivity in its favor and enter the order attached hereto as Exhibit B, so that the Ad Hoc Subrogation Group may prosecute the Subrogation Plan.

## BACKGROUND

**A.      General Background**

8.      On January 29, 2019, PG&E Corporation and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession, commenced these voluntary cases under chapter 11 of the Bankruptcy Code.

9.      The Ad Hoc Subrogation Group's membership and collective holdings of claims and interests are disclosed in the *Third Amended Verified Statement of the Ad Hoc Group of Subrogation Claim Holders Pursuant to Bankruptcy Rule 2019* [Docket No. 3020], as may be amended from time to time.

**B.      Background to the Motion**

10.      On May 1, 2019, the Debtors filed a motion seeking their first extension of the exclusive period to file a plan of reorganization to November 29, 2019 and the exclusive period to solicit acceptances of their plan to January 28, 2020 [Docket No. 1797] (the "**Exclusivity Extension Motion**"). On May 22, 2019, this Court held a hearing on the Exclusivity Extension Motion and over certain objections, granted the Debtors an extension of the exclusive right to file a plan until September 26, 2019 and the exclusive right to seek acceptances for such plan until November 26, 2019.

11.      On June 25, 2019, the Ad Hoc Group of Senior Unsecured Noteholders filed the

6

Bondholders' Motion. On July 18, the Ad Hoc Subrogation Group filed an objection to that motion. There, the Ad Hoc Subrogation Group explained why the Bondholder Plan is neither credible nor confirmable, and noted that it was working towards presenting its own plan which would satisfy this Court's "credible and potentially confirmable" standard and would "(a) allow individual wildfire victims to elect to settle their claims promptly or proceed to litigate and ultimately recover the compensable value of their claims from a well-funded trust; (b) settle Subrogation Claims at a reasonable level; and (c) provide existing equity with the exclusive opportunity to participate in a rights offering to recapitalize the Debtors."[13]

## ARGUMENT

### I.    Termination of Exclusivity is Appropriate in These Cases

12.    The time has come for this Court to terminate exclusivity for a viable plan. Section 1121 of the Bankruptcy Code provides that the court "may for cause reduce or increase" periods during which the Debtors enjoy the exclusive right to file and solicit acceptances of a plan. 11 U.S.C. § 1121(d)(1); *In re Gibson & Cushman Dredging Corp.*, 101 B.R. 405, 409 (E.D.N.Y. 1989) (intention of section 1121 is to "cure the prior practice that gave debtors undue bargaining leverage to delay and thereby force a settlement out of otherwise unwilling creditors" (internal quotations omitted)); *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 808 F.2d 363, 372 (5th Cir. 1987) ("Section 1121 was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors"), *aff'd*, 484 U.S. 365 (1988).

13.    The Bankruptcy Code does not define "cause," and the determination of cause is a fact-specific inquiry. *In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 586-87 (Bankr. S.D.N.Y. 2006). While the Bankruptcy Code is silent as to what constitutes cause for extending or terminating exclusivity, the courts have identified nine factors for consideration: (1) the size and

---

[13]    *See Objection and Response of the Ad Hoc Group of Subrogation Claim Holders to the Motion of the Ad Hoc Committee of Senior Unsecured Noteholders to Terminate the Debtors' Exclusive Periods Pursuant to Section 1121(d)(1) of the Bankruptcy Code* [Docket No. 3062], at p. 3.

7

complexity of the case; (2) the necessity for sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information; (3) the existence of good faith progress toward reorganization; (4) the fact that the debtor is paying its bills as they become due; (5) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (6) whether the debtor has made progress in negotiations with its creditors; (7) the amount of time which has elapsed in the case; (8) whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and (9) whether an unresolved contingency exists. *Adelphia*, 352 B.R. at 586-87 (citing *In re Dow Corning Corp.*, 208 B.R. 661, 664-65 (Bankr. E.D. Mich. 1997); *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 674 (Bankr. S.D.N.Y. 2006) (Gerber, J.), *aff'd,* 342 B.R. 122 (S.D.N.Y. 2006) (Scheindlin, J.)).

14.     Importantly, as noted by the court in *Dow Corning*, "[w]hen the Court is determining whether to terminate a debtor's exclusivity, the *primary consideration* should be whether or not doing so would facilitate moving the case forward." 208 B.R. at 670 (emphasis added). Notably, this determination is one of practicality, which can override a mere "toting up of the factors." *Id.* Terminating exclusivity to move the case forward is the overriding factor here, both because of the June 2020 deadline for participating in the wildfire fund, and the inability of wildfire victims to receive adequate compensation until a plan is confirmed.

15.     Here, other factors also weigh in favor of terminating exclusivity to accelerate progress towards plan consummation before the June 2020 deadline. While the case is complex, these cases have unique and significant time exigencies. After over six months, the Debtors have reached a settlement with only a relatively small subset of all wildfire claimants, and no meaningful progress toward settlement or resolution with the remaining creditors in these cases whose claims need to be impaired. It is precisely this lack of progress and engagement that has necessitated the Ad Hoc Subrogation Group to seek the relief proposed herein. Without significant cooperation with the Wildfire Claim holders, any plan proposed by the Debtors would be illusory. Furthermore, termination of exclusivity is required because the Debtors failed to demonstrate urgency in utilizing their exclusive periods to negotiate a plan in earnest (factors 2, 3 and 6), and to this point the

Debtors have failed to demonstrate a reasonable prospect for filing a viable plan (factor 5).

16. The Ad Hoc Subrogation Group has designed a plan that holders of Subrogation Claims will support, and constructively proposes a procedure whereby individuals with Wildfire Claims have the opportunity to realize a full recovery on their compensable claims. It is fully expected that the trust funding amount in the Subrogation Plan will significantly exceed the distributable amount for individual Wildfire Claims in the Bondholder Plan, which makes it more likely that the relevant condition to confirmation will be satisfied in the case of the Subrogation Plan. Moreover, through equitizing a significant portion of the Subrogation Claims, the Ad Hoc Subrogation Group has the resources to provide the necessary financing to render the Subrogation Plan both credible and confirmable.

17. Features of the Subrogation Plan include (a) reinstatement or refinancing of all funded debt claims; (b) establishment of a sufficiently funded claims resolution trust to satisfy the claims of individual wildfire claimants; (c) equitization of 90% of the aggregate allowed Subrogation Claims; (d) the option for existing equity holders, if they timely choose to support the plan, to invest in the reorganized company through a rights offering;[14] (e) payment in full, or reinstatement of, general unsecured claims; (f) a balance sheet upon emergence that allows the reorganized Debtors to maintain an investment grade rating, and will position the reorganized Utility to continue its compliance with state renewable energy standards and invest in requisite grid improvement and safety enhancement initiatives; (g) the assumption of the Debtors' existing retirement plan; and (h) rate neutrality for the reorganized Debtors' customers.

18. All stakeholders stand to benefit from the Subrogation Plan, which gives these chapter 11 cases a viable path towards confirmation and emergence. Specifically:

- Current individual holders of Wildfire Claims will be able to recover quickly from a settlement trust funded with sufficient consideration to pay such

---

[14] If existing equity holders decline to participate in the rights offering, the Ad Hoc Subrogation Group is confident it will either (a) find other parties willing to participate, including existing stakeholders and/or outside parties, or (b) eliminate the need for further capital through additional sources of funding.

9

claims;

- Future victims of wildfires will be able to look to the new proposed wildfire recovery fund and take advantage of the $5 billion contributed under the Subrogation Plan;

- Current holders of funded debt against the company will be reinstated against an investment grade issuer;

- The Utility's customers will not suffer a net rate increase, and will benefit from a safer and more reliable network in line with the state's renewable energy standards; and

- The Debtors' employees' and retirees' jobs and benefits will be preserved.

19.     The cornerstone of the Subrogation Plan is the willingness of holders of Subrogation Wildfire Claims to equitize their voluntarily reduced claims in exchange for mandatory convertible preferred equity ("**MCP**").[15]  The MCP structure ensures the Subrogation Plan's feasibility, as it minimizes the Debtors' need to raise significant amounts of cash to emerge from chapter 11. Another chief benefit of the MCP structure is that objections to the plan based on enterprise value will be blunted because the Court will have the benefit of the market, not just experts, to help determine the value of the MCP issued under the Subrogation Plan.

20.     This Motion is being filed on a date of great uncertainty in these cases.  The Bondholders' Motion, the two lift stay motions relating to the Tubbs fire, and the Debtors' motion to estimate are all likely to be heard either before or concurrently with this Motion.  In any potential set of outcomes, however, granting this Motion so that the Subrogation Plan, the most credible and potentially confirmable plan yet proposed, can be pursued will move these cases forward and put these cases on a viable path to an early resolution.  For the reasons set forth herein, the Ad Hoc Subrogation Group respectfully requests that this Court enter the order attached hereto as Exhibit B

---

[15]     The MCP in the Subrogation Plan has been successfully implemented before.  It was inspired by preferred equity with similar features in the 2013 bankruptcy of American Airlines.  *See* Disclosure Statement for Debtors' Second Amended Join Chapter 11 Plan, *In re AMR Corp.*, No. 11-15463 (SHL) (Bankr. S.D.N.Y. June 5, 2013) [Docket No. 8591], at p. 11-14.

1    and permit the Ad Hoc Subrogation Group to file and solicit acceptances of the Subrogation Plan.

2                                              **NOTICE**

3         21.      Notice of this Response will be provided to (a) counsel to the Debtors; (b) the Office

4    of the U.S. Trustee for Region 17 (Attn: Andrew R. Vara, Esq. and Timothy Laffredi, Esq.);

5    (c) counsel to the Official Committee of Unsecured Creditors (d) counsel to the Tort Claimants

6    Committee; (e) the Securities and Exchange Commission; (f) the Internal Revenue Service; (g) the

7    Office of the California Attorney General; (h) the California Public Utilities Commission; (i) the

8    Nuclear Regulatory Commission; (j) the Federal Regulatory Commission; (k) the Office of the

9    United States Attorney for the Northern District of California; (l) counsel for the agent under the

10   Debtors' debtor in possession financing facility; and (m) those persons who have formally appeared

11   in these chapter 11 cases and requested service pursuant to Bankruptcy Rule 2002.  The Ad Hoc

12   Subrogation Group respectfully submits that no further notice is required.

## CONCLUSION

WHEREFORE, the Ad Hoc Subrogation Group requests that the Court grant the

relief set forth in the proposed order attached as Exhibit B, or otherwise as is just and proper.

Dated:  July 23, 2019

**WILLKIE FARR & GALLAGHER LLP**

/s/ Matthew A. Feldman
Matthew A. Feldman (*pro hac vice*)

Joseph G. Minias (*pro hac vice*)
Daniel I. Forman (*pro hac vice*)

787 Seventh Avenue
New York, NY 10019-6099

Telephone: (212) 728-8000
Facsimile: (212) 728-8111

Email:   mfeldman@willkie.com

jminias@willkie.com
dforman@willkie.com

**DIEMER & WEI, LLP**
Kathryn S. Diemer (#133977)

100 West San Fernando Street, Suite 555
San Jose, CA 95113

Telephone: (408) 971-6270
Facsimile: (408) 971-6271

Email: kdiemer@diemerwei.com

*Counsel for Ad Hoc Group of Subrogation Claim Holders*

**Exhibit A**

**Term Sheet**

## PG&E CORP., ET AL.

## RESTRUCTURING TERM SHEET

### July 23, 2019

This term sheet (the "Term Sheet") is proposed by the Ad Hoc Group of Subrogation Claim Holders (the "Ad Hoc Subrogation Group") and sets forth the principal terms of a comprehensive restructuring (the "Restructuring") of the existing debt and other obligations of the Debtors (as defined below) each of which commenced cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court"), on January 29, 2019 (the "Petition Date"). The Restructuring contemplated herein shall be implemented pursuant to a proposed joint chapter 11 plan of reorganization (the "Plan").

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND/OR OTHER APPLICABLE LAW. THIS TERM SHEET DOES NOT ADDRESS ALL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH ANY POTENTIAL TRANSACTION REFERENCED HEREIN, AND THE ENTRY INTO OR THE CREATION OF ANY BINDING AGREEMENT IS SUBJECT TO THE EXECUTION OF DEFINITIVE DOCUMENTATION IN FORM AND SUBSTANCE CONSISTENT WITH THIS TERM SHEET AND OTHERWISE ACCEPTABLE TO THE AD HOC SUBROGATION GROUP.

| Plan Overview | |
|---|---|
| **Term** | **Description** |
| Debtors | PG&E Corporation ("PG&E Corp.") and Pacific Gas and Electric Company (the "Utility," and collectively with PG&E Corp., the "Debtors"). Following the occurrence of the effective date of the Plan ("Effective Date"), PG&E Corp. and the Utility will be referred to herein as "Reorganized PG&E Corp." and the "Reorganized Utility," respectively, and collectively as the "Reorganized Debtors." |
| Transaction Overview | As set forth in greater detail herein, the Plan shall provide for<br><br>• A resolution of all allowed claims (as such term is defined in section 101(5) of the Bankruptcy Code) related to or in any way arising from the wildfires that occurred in Northern California prior to the Petition Date (each a "Wildfire Claim") through (a) honoring municipalities' settlements with the Debtors; (b) a settlement of all subrogation Wildfire Claims in exchange for a distribution of $15.8 billion of consideration split between 90% in new mandatory convertible preferred equity (the "Mandatory Convertible Preferred") and 10% in cash; and (c) the funding and creation of the Settlement Trust (defined below) for Individual Wildfire Claimants (defined below) with up to $[●] billion[1] for the purposes of paying Wildfire Claims |

---

[1] This Term Sheet contemplates that each individual fire victim will have the opportunity to realize a full recovery on his or her provable and compensable claim up to the Trust Funding Amount (defined below) (including, for the avoidance of doubt, reimbursement of any deductibles paid prior to receipt of insurance policy proceeds). The Ad Hoc Subrogation Group intends to continue to work with the representatives of the Tort Claimants Committee and expects to file an amended Term Sheet that, in the judgment of the Ad Hoc Subrogation Group, provides for sufficient funding for a Settlement Trust in order to achieve this goal.

asserted by Individual Wildfire Claimants (defined below), each on the terms provided below;

- The issuance of $14.2 billion Mandatory Convertible Preferred by Reorganized PG&E Corp. as the primary source of distributions on Subrogation Claims;[2]

- The refinancing of short-term funded debt, reinstatement of long-term funded debt and the issuance of incremental debt capital at levels that maintain an investment grade rating;

- The exclusive opportunity for holders of PG&E Corp. Common Interests to participate in the recapitalization of the Debtors via a $[●] billion new money investment in exchange for new common equity of Reorganized PG&E Corp. (the "New Common Equity");

- The Debtors cash on hand at emergence, proceeds of the new money investments and the issuance of the Mandatory Convertible Preferred shall be used to (a) pay in full in cash all DIP Financing Facility Claims (as defined below), (b) pay in full in cash all funded debt that is not reinstated on the Effective Date, (c) pay in full in cash all allowed administrative and priority claims, (d) fund the creation of the Settlement Trust for Individual Wildfire Claimants, and (e) fund the Debtors' contribution of $5.0 billion to a long-term California statewide wildfire fund created for purposes of paying claims arising from future utility-related wildfires in California (the "California Wildfire Insurance Fund"); and

- Payment of all trade claims in the ordinary course of business and assumption and/or continuation of pension-related obligations.

| Treatment of Claims and Interests Under the Chapter 11 Plan | |
|---|---|
| **Unclassified Claims** | |
| **Claim** | **Treatment** |
| DIP Financing Facility Claims | Each holder of a claim under the Senior Secured Superpriority Debtor-in-Possession Credit, Guaranty and Security Agreement, dated as of February 1, 2019 (the "DIP Financing Facility," and the claims arising thereunder, the "DIP Financing Facility Claims") shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such DIP Financing Facility Claim, payment in full in cash on the Effective Date. |
| Administrative Expense Claims | Each holder of an allowed administrative expense claim against the Debtors under section 507(a)(2) of the Bankruptcy Code (other than DIP Financing Facility Claims) (the "Administrative Expense Claims") shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Administrative Expense Claim, cash equal to the allowed amount of such Administrative Expense Claim on the later of (i) the Effective Date or as soon thereafter as is reasonably practicable, and (ii) the date such Administrative Expense Claim becomes an allowed |

---

While the Ad Hoc Subrogation Group continues to negotiate with the Tort Claimants Committee, the Plan described herein is expected to provide recoveries up to a higher level than the plan proposed by the Ad Hoc Bondholder Group.

[2]    The issuance of Mandatory Convertible Preferred may be increased if the Settlement Trust is funded (at least in part) with Mandatory Convertible Preferred.

| | Administrative Expense Claim or as soon thereafter as is reasonably practicable. |
|---|---|
| Priority Tax Claims | Each holder of an allowed claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) of the type specified in section 507(a)(8) of the Bankruptcy Code against any Debtor (the "Priority Tax Claims") shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Priority Tax Claim, (a) cash equal to the amount of such allowed Priority Tax Claim on the later of (i) the Effective Date or as soon thereafter as is reasonably practicable and (ii) the date such Priority Tax Claim becomes an allowed Priority Tax Claim or as soon thereafter as is reasonably practicable, or (b) such other treatment consistent with the provisions of section l 129(a)(9) of the Bankruptcy Code. |

| **Wildfire Claims Against PG&E Corp. and Utility[3]** | | | |
|---|---|---|---|
| **Claim** | **Classification/Treatment/Voting** | **Estimated Recovery** | **Estimated % Recovery of Total Claims** |
| Class 1A: Subrogation Claims | *Classification:* Holders of Wildfire Claims that arise from subrogation (whether such subrogation is contractual, equitable or statutory), assignment (whether such assignment is contractual, equitable or statutory), or otherwise in connection with payments made or to be made by the applicable insurer to insured tort victims, and whether arising as a matter of state or federal law, including, without limitation, Section 509 of the Bankruptcy Code (including attorneys' fees and interest, collectively the "Subrogation Claims").<br><br>*Treatment:* On the Effective Date, each holder of an allowed Subrogation Claim (a "Subrogation Claim Holder") shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Subrogation Claim, the holder's share of $1.6 billion cash, and $14.2 billion Mandatory Convertible Preferred, *provided that* any such recoveries on account of amounts reserved by such Subrogation Claim Holder representing amounts to be paid to underlying insureds may be held in trust for the benefit of such Subrogation Claim Holder (on terms acceptable to the Ad Hoc | $15.8 billion[4] | ~70% |

---

[3]     If required, the Plan will provide for separate classes of Wildfire Claims against each entity.

[4]     The aggregate recovery on account of Subrogation Claims is a settlement and compromise solely for purposes of the Plan described herein. If the allowed amount of all Subrogation Claims were litigated, holders of Subrogation Claims could and would assert claims in a substantially higher amount than the compromise amount proposed in this Term Sheet. Approximately $18.5 billion of payments and policy reserves have been reported to the California Department of Insurance, which amount does not include estimated but not yet reserved future payments, estimated or accrued interest and attorneys' fees, all of which are recoverable under applicable law, and would raise the total amount of Subrogation Claims to over $20 billion. Upon confirmation of the Plan, the compromised aggregate allowed claim will be binding on each individual class member and a binding allocation of the recovery among class members will be set forth in the Plan or a supplement thereto.

3

| | | Estimated Allowed Claims | Estimated % Recovery |
|---|---|---|---|
| | Subrogation Group) until such insurance policy payments are made, at which point such recoveries shall be released. *Voting*: Impaired - entitled to vote. | | |
| Class 2A: Municipal Claims | *Classification:* Wildfire Claims held by a Municipality (as defined in section 101(40) of the Bankruptcy Code) ("Municipal Claims"). *Treatment*: On the Effective Date, holders of allowed Municipal Claims will receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Municipal Claims, $1.0 billion in cash to be allocated in accordance with the existing Plan Support Agreements between the Debtors and certain municipalities (the "Municipalities"), provided, that, such Plan Support Agreements may not be amended in any manner that affects the Debtors' aggregate liability to the Municipalities without the consent of the Ad Hoc Subrogation Group. *Voting*: [TBD] | $1.0 billion | [TBD]% |
| Class 3A: Individual Wildfire Claims | *Classification:* Holders ("Individual Wildfire Claimants") of Wildfire Claims other than Subrogation Claims and Municipal Claims ("Individual Wildfire Claims"). *Treatment:* Individual Wildfire Claims will be channeled to a trust to be established on the Effective Date (the "Settlement Trust"). The Settlement Trust will assume all of the Debtors' liability with respect to Individual Wildfire Claims, and Individual Wildfire Claimants will be the beneficiaries of the Settlement Trust. The Settlement Trust will be funded as set forth below. The right to assert Individual Wildfire Claims against the Settlement Trust shall be deemed payment in full of all Individual Wildfire Claims. The order confirming the Plan (the "Confirmation Order") shall provide that all claims shall be released and forever barred and the Individual Wildfire Claimants shall be deemed to have been made whole with respect to the subrogation claims of the members of Class 1A. *Voting*: Impaired - entitled to vote. | $[●] up front and up to a maximum of $[●] over time | 100%, subject to the Trust Funding Amount |
| **PG&E Corp. Claims** | | | |
| **Claim** | **Classification/Treatment/Voting** | **Estimated Allowed Claims** | **Estimated % Recovery** |
| Class 1B: Other PG&E Corp. Priority Claims | *Classification:* Holders of allowed claims against PG&E Corp. entitled to priority under section 507(a) of the Bankruptcy Code (other than DIP Claims, Administrative Expense Claims and Priority Tax | [TBD] | 100% |

4

| | | | |
|---|---|---|---|
| | Claims) (the "Other PG&E Corp. Priority Claims"). | | |
| | **Treatment:** Each holder of an allowed Other PG&E Corp. Priority Claim against PG&E Corp. shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Other PG&E Corp. Priority Claim, (i) cash in an amount equal to such allowed claim on the Effective Date or as soon thereafter as is reasonably practicable, or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | | |
| | **Voting:** Unimpaired - deemed to accept. | | |
| Class 2B: Other PG&E Corp. Secured Claims | **Classification:** Holders of claims (other than DIP Financing Facility Claims) that are secured by valid, perfected and enforceable liens on property in which PG&E Corp. has an interest or that are subject to setoff pursuant to section 553 of the Bankruptcy Code (the "Other PG&E Corp. Secured Claims"). | [TBD] | 100% |
| | **Treatment:** Each holder of an allowed Other PG&E Corp. Secured Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Other PG&E Corp. Secured Claim, (i) retention of its Other PG&E Corp. Secured Claim and any properly perfected and valid liens; (ii) payment in full in cash, including the payment of any interest allowed and payable under section 506(b) of the Bankruptcy Code, on the Effective Date or as soon thereafter as is reasonably practicable, or (iii) treatment of such allowed Other PG&E Corp. Secured Claim in any other manner that renders the claim unimpaired, including reinstatement under section 1124(2) of the Bankruptcy Code. | | |
| | **Voting:** Unimpaired - deemed to accept. | | |
| Class 3B: PG&E Corp. Unsecured Revolving Credit Facility Claims | **Classification:** Holders of claims arising under the Second Amended and Restated Credit Agreement, dated as of April 27, 2015, by and between PG&E Corp. and Citibank, N.A., as administrative agent (the "PG&E Corp. Unsecured Revolving Credit Agreement"), in the aggregate principal amount of up to $300 million (the "PG&E Corp. Unsecured Revolving Credit Facility Claims"). | ~ $300 million | 100% |
| | **Treatment:** On the Effective Date or as soon thereafter as is reasonably practicable, each holder of an allowed PG&E Corp. Unsecured Revolving Credit Facility Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed PG&E Corp. Unsecured Revolving Credit Facility Claim, cash in an amount equal to (i) the outstanding principal and accrued and unpaid interest as of the Petition Date under the PG&E Corp. Unsecured Credit Agreement and (ii) accrued and unpaid interest from the Petition Date through the | | |

| | | | |
|---|---|---|---|
| | Effective Date at the contract rate, to the extent enforceable under applicable law.<br><br>***Voting:*** Unimpaired - deemed to accept. | | |
| Class 4B: PG&E Corp. Unsecured Term Loan Claims | ***Classification:*** Holders of claims arising under the Term Loan Agreement, dated as of April 16, 2018, by and between PG&E Corp. and Mizuho Bank, Ltd., as administrative agent (the "PG&E Corp. Unsecured Term Loan Credit Agreement") in the aggregate principal amount of $350 million (the "PG&E Corp. Unsecured Term Loan Claims").<br><br>***Treatment:*** On the Effective Date or as soon thereafter as is reasonably practicable, each holder of an allowed PG&E Corp. Unsecured Term Loan Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed PG&E Corp. Unsecured Term Loan Claim, cash in an amount equal to (i) the outstanding principal and accrued and unpaid interest as of the Petition Date under the PG&E Corp. Unsecured Term Loan Credit Agreement and (ii) accrued and unpaid interest from the Petition Date through the Effective Date at the contract rate, to the extent enforceable under applicable law.<br><br>***Voting:*** Unimpaired - deemed to accept. | ~ $350 million | 100% |
| Class 5B: PG&E Corp. General Unsecured Claims | ***Classification:*** Holders of general unsecured claims (other than Other PG&E Corp. Priority Claims, PG&E Corp. Unsecured Revolving Credit Facility Claims, and PG&E Corp. Unsecured Term Loan Claims) against PG&E Corp. (the "PG&E Corp. General Unsecured Claims")<br><br>***Treatment:*** Each holder of an allowed PG&E Corp. General Unsecured Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed PG&E Corp. General Unsecured Claim, cash in an amount equal to the allowed PG&E Corp. General Unsecured Claim, together with accrued and unpaid interest from the Petition Date through the Effective Date at the applicable contract rate or, in the absence of a contract rate, the federal judgement rate, on the earlier of (i) the Effective Date or as soon thereafter as is reasonably practicable or (ii) as soon as reasonably practicable following the date such PG&E Corp. General Unsecured Claim becomes an allowed PG&E Corp. General Unsecured Claim.<br><br>***Voting:*** Unimpaired - deemed to accept. | [TBD] | 100% |
| Class 6B: PG&E Corp. Intercompany Claims | ***Classification:*** Claims held by the Utility or any non-Debtor affiliate of PG&E Corp. against PG&E Corp. (the "PG&E Corp. Intercompany Claims"). | [TBD] | 100% |

| | | Estimated Allowed Claims | Estimated % Recovery |
|---|---|---|---|
| | *Treatment:* All allowed PG&E Corp. Intercompany Claims, if any, shall be reinstated, compromised or cancelled at the election of the Debtors (with the consent of the **Ad Hoc Subrogation Group**, not to be unreasonably withheld), such that the PG&E Corp. Intercompany Claims are treated in a tax-efficient manner.<br><br>*Voting:* Unimpaired - not entitled to vote. | | |
| Class 8B: PG&E Corp. Common Interests | *Classification:* Holders of outstanding common interests in PG&E Corp. (the "<u>PG&E Corp. Common Interests</u>").<br><br>*Treatment:* Holders of allowed PG&E Corp. Common Interests shall retain ownership of all PG&E Corp. Common Interests, subject to the issuance of New Common Equity pursuant to the Rights Offering and the conversion of the Mandatory Convertible Preferred.<br><br>*Voting:* [TBD] | N/A | [TBD]% |

| Utility Claims | | | |
|---|---|---|---|
| **Claim** | **Classification/Treatment/Voting** | **Estimated Allowed Claims** | **Estimated % Recovery** |
| Class 1C: Other Utility Priority Claims | *Classification:* Holders of allowed claims against the Utility entitled to priority under section 507(a) of the Bankruptcy Code (other than DIP Financing Facility Claims, Administrative Expense Claims and Priority Tax Claims) (the "<u>Other Utility Priority Claims</u>").<br><br>*Treatment:* Each holder of an allowed Other Utility Priority Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Other Utility Priority Claim, (i) cash in an amount equal to such allowed Other Utility Priority Claim on the Effective Date or as soon as practicable thereafter, or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.<br><br>*Voting:* Unimpaired - deemed to accept. | [TBD] | 100% |
| Class 2C: Other Utility Secured Claims | *Classification:* Holders of claims (other than DIP Financing Facility Claims) that are secured by valid, perfected and enforceable liens on property in which the Utility has an interest or that are subject to setoff pursuant to section 553 of the Bankruptcy Code (the "<u>Other Utility Secured Claims</u>").<br><br>*Treatment:* Each holder of an allowed Other Utility Secured Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Other Utility Secured Claim, (i) retention of its Other Utility Secured Claim and any | [TBD] | 100% |

7

| | | | |
|---|---|---|---|
| | properly perfected and valid liens, (ii) payment in full in cash, including the payment of any interest allowed and payable under section 506(b) of the Bankruptcy Code, on the Effective Date or as soon thereafter as is reasonably practicable, or (iii) treatment of such allowed Other Utility Secured Claim in any other manner that renders the Other Utility Secured Claim unimpaired, including reinstatement under section 1124(2) of the Bankruptcy Code.<br><br>***Voting:*** Unimpaired - deemed to accept. | | |
| Class 3C: Utility Unsecured Revolving Credit Facility Claims | ***Classification:*** Holders of claims arising under the Second Amended and Restated Credit Agreement, dated as of April 27, 2015, by and between the Utility and Citibank, N.A., as administrative agent (the "<u>Utility Unsecured Revolving Credit Agreement</u>"), in the aggregate principal amount of up to $3 billion (the "<u>Utility Unsecured Revolving Credit Facility Claims</u>").<br><br>***Treatment:*** On the Effective Date or as soon thereafter as is reasonably practicable, each holder of an allowed Utility Unsecured Revolving Credit Facility Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Utility Unsecured Revolving Credit Facility Claim, cash in an amount equal to (i) the outstanding principal and accrued and unpaid interest as of the Petition Date under the Utility Unsecured Revolving Credit Agreement and (ii) accrued and unpaid interest from the Petition Date through the Effective Date at the contract rate, to the extent enforceable under applicable law.<br><br>***Voting:*** Unimpaired - deemed to accept. | ~ $2.885 billion | 100% |
| Class 4C: Utility Unsecured Term Loan Claims | ***Classification:*** Holders of claims arising under the Term Loan Credit Agreement, dated as of February 23, 2018, by and between the Utility and the Bank of Tokyo-Mitsubishi UFJ, Ltd., as administrative agent (the "<u>Utility Unsecured Term Loan Agreement</u>") in the aggregate principal amount of $250 million (the "<u>Utility Unsecured Term Loan Claims</u>").<br><br>***Treatment:*** On the Effective Date or as soon thereafter as is reasonably practicable, each holder of an allowed Utility Unsecured Term Loan Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Utility Unsecured Term Loan Claim, cash in an amount equal to (i) the outstanding principal and accrued and unpaid interest as of the Petition Date under the Utility Unsecured Term Loan Agreement and (ii) accrued and unpaid interest from the Petition Date through the Effective Date at the contract rate, to the extent enforceable under applicable law. | ~ $250 million | 100% |

Case: 19-30088   Doc# 3147-1   Filed: 07/23/19   Entered: 07/23/19 10:56:24   Page 9 of 22

Case: 19-30088   Doc# 4630-3   Filed: 11/08/19   Entered: 11/08/19 15:41:24   Page 25 of 41

| | | | |
|---|---|---|---|
| | *Voting:* Unimpaired - deemed to accept. | | |
| Class 5C: Short-Term Utility Unsecured Notes Claims | *Classification:* Holders of claims arising under the notes (or the applicable indenture relating thereto) (the "<u>Short-Term Utility Unsecured Notes</u>" and the indentures, the "<u>Short-Term Utility Unsecured Notes Indentures</u>") maturing on or before December 31, 2022 (the "<u>Short-Term Utility Unsecured Notes Claims</u>"), identified in Schedule 1 hereto.[5]<br><br>*Treatment:* On the Effective Date or as soon thereafter as is reasonably practicable, each holder of an allowed Short-Term Utility Unsecured Notes Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Short-Term Utility Unsecured Notes Claim, cash in an amount equal to the sum of (i) outstanding principal and accrued and unpaid interest as of the Petition Date at the contract rate under the applicable Short-Term Utility Unsecured Notes or Short-Term Utility Unsecured Notes Indentures, (ii) accrued and unpaid interest from the Petition Date through the Effective Date at the contract rate under the applicable Short Term Utility Unsecured Notes or Short-Term Utility Unsecured Notes Indentures, to the extent enforceable under applicable law, and (iii) any prepayment premium, makewhole or other similar call protection under the applicable Short-Term Utility Unsecured Notes or Short-Term Utility Unsecured Notes Indentures, to the extent enforceable under applicable law.<br><br>*Voting:* Unimpaired – deemed to accept. | ~ $1.75 billion | 100% |
| Class 6C: Long-Term Utility Unsecured Notes Claims | *Classification:* Holders of claims arising under any notes (or the applicable indenture relating thereto) (the "<u>Long-Term Utility Unsecured Notes</u>" and the indentures, the "<u>Long-Term Utility Unsecured Notes Indentures</u>") maturing on or after January 1, 2023 (the "<u>Long-Term Utility Unsecured Notes Claims</u>"), identified in Schedule 2 hereto.[6]<br><br>*Treatment:* On the Effective Date, the Long-Term Utility Unsecured Notes will be reinstated (including any accrued and unpaid interest from the Petition Date through the Effective Date at the contract rate under the applicable Long-Term Utility Unsecured Notes or Long-Term Utility Unsecured Notes Indentures, to the extent enforceable under applicable law), and the Long-Term Utility Unsecured Notes Claims will be unimpaired in accordance with section 1124(2) of the | ~$15.8 billion | 100% |

---

[5]    If required, the Plan will provide subclasses for claims arising from each separate issuance of the Short-Term Utility Unsecured Notes.

[6]    If required, the Plan will provide subclasses for claims arising from each separate issuance of the Long-Term Utility Unsecured Notes.

Case: 19-30088   Doc# 3147-1   Filed: 07/23/19   Entered: 07/23/19 10:56:24   Page 10 of 22

Case: 19-30088   Doc# 4630-3   Filed: 11/08/19   Entered: 11/08/19 15:41:24   Page 26 of 41

| | | | |
|---|---|---|---|
| | Bankruptcy Code. | | |
| | *Voting:* Unimpaired – deemed to accept. | | |
| Class 7C: Utility Pollution Control Bond Claims | *Classification:* Holders of claims arising under the Pollution Control Bonds issued by the California Pollution Control Financing Authority and the California Infrastructure and Economic Development Bank (the "Utility Pollution Control Bonds") and related reimbursement obligations from certain letter of credit facilities in the aggregate outstanding principal amount of $863 million (the "Utility Pollution Control Bonds Claims"). | $863 million | 100% |
| | *Treatment:* On the Effective Date or as soon thereafter as is reasonably practicable, each holder of an allowed Utility Pollution Control Bonds Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Utility Pollution Control Bonds Claim, cash in an amount equal to the sum of (i) outstanding principal and accrued and unpaid interest as of the Petition Date at the contract rate under the applicable Utility Pollution Control Bonds and (ii) accrued and unpaid interest from the Petition Date through the Effective Date at the contract rate under the applicable Utility Pollution Control Bonds, to the extent enforceable under applicable law. | | |
| | *Voting:* Unimpaired – deemed to accept. | | |
| Class 8C: Utility Intercompany Claims | *Classification:* Claims held by the PG&E Corp. or any non-Debtor affiliate of PG&E Corp. against the Utility (the "Utility Intercompany Claims"). | [TBD] | 100% |
| | *Treatment:* All allowed Utility Intercompany Claims, if any, shall be reinstated, compromised or cancelled at the election of the Debtors (with the consent of the Ad Hoc Subrogation Group, not to be unreasonably withheld), such that the Utility Intercompany Claims are treated in a tax-efficient manner. | | |
| | *Voting*: Unimpaired - not entitled to vote. | | |
| Class 9C: Other Utility General Unsecured Claims | *Classification:* Holders of general unsecured claims (other than Other Utility Priority Claims, Utility Unsecured Revolving Credit Facility Claims, Utility Unsecured Term Loan Claims, Short-Term Utility Unsecured Notes Claims, Long-Term Utility Unsecured Notes Claims, Wildfire Claims, and Utility Workers' Compensation Claims) against the Utility (the "Other Utility General Unsecured Claims"). | [TBD] | 100% |
| | *Treatment:* Each holder of an allowed Other Utility General Unsecured Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such allowed Other Utility General Unsecured Claim, cash in an amount equal to the allowed Other Utility General Unsecured Claim, | | |

| | | | |
|---|---|---|---|
| | together with accrued and unpaid interest from the Petition Date through the Effective Date at the applicable contract rate or, in the absence of a contract rate, the federal judgement rate, on the earlier of (i) the Effective Date or as soon thereafter as is reasonably practicable or (ii) the date such Other Utility General Unsecured Claim becomes an allowed Other Utility General Unsecured Claim, or as soon thereafter as is reasonably practicable.<br><br>*Voting:* Unimpaired - deemed to accept. | | |
| Class 10C: Utility Workers' Compensation Claims | *Classification:* Holders of claims against the Utility by employees of the Utility for the payment of workers' compensation benefits under applicable law (the "Utility Workers' Compensation Claims").<br><br>*Treatment:* Each allowed Utility Workers' Compensation Claim shall be satisfied in full in the ordinary course of business at such time and in such manner as the Utility is obligated to satisfy such Utility Workers' Compensation Claim under applicable law.<br><br>*Voting:* Unimpaired - deemed to accept. | [TBD] | 100% |
| Class 11C: Utility Preferred Interests | *Classification:* Holders of outstanding preferred interests in the Utility (the "Utility Preferred Interests")<br><br>*Treatment:* Holders of allowed Utility Preferred Interests shall retain ownership of all Utility Preferred Interests in the Reorganized Utility (including any associated liquidation preference). Accrued but unpaid dividends as of the Effective Date shall be paid in cash.<br><br>*Voting:* Unimpaired - deemed to accept. | $258 million | 100% |
| Class 12C: Utility Common Interests | *Classification:* PG&E Corp. as holder of all outstanding common interests in the Utility (the "Utility Common Interests").<br><br>*Treatment:* Reorganized PG&E Corp., as holder of the Utility Common Interests, shall retain ownership of all Utility Common Interests in the Reorganized Utility.<br><br>*Voting:* Unimpaired - deemed to accept. | N/A | 100% |
| **Chapter 11 Plan Implementation** | | | |
| Estimation Proceeding | In the event that Class 3A (Individual Wildfire Claims) votes to reject the Plan, there will be an estimation proceeding for the limited purpose of determining whether the aggregate amount of Individual Wildfire Claims exceeds $[●] billion. In connection with the estimation proceeding the Bankruptcy Court and/or the District Court will estimate the Debtors' liability on all Individual Wildfire Claims for purposes of confirming the Plan, in accordance with the Bankruptcy Code and applicable law. Such estimation proceeding shall conclude prior to the hearing on Plan confirmation. The estimated amount of the aggregate Individual Wildfire Claims as determined by Bankruptcy Court and/or District Court order is referred to herein as the "Estimated Individual Wildfire Liability." If Class 3A (Individual Wildfire Claims) rejects the Plan, a condition precedent to confirmation shall be that the Estimated Individual | | |

| | |
|---|---|
| | Wildfire Liability does not exceed $[●] billion. |
| Settlement Trust for Individual Wildfire Claimants | The purpose of the Settlement Trust will be to (x) assume liability for all valid Individual Wildfire Claims and (y) use the Trust Funding Amount to promptly and fairly compensate Individual Wildfire Claimants by establishing an efficient mechanism to administer, process, settle, resolve, liquidate and pay all valid Individual Wildfire Claims pursuant to the Settlement Trust Distribution Procedures (the "TDP").

The Settlement Trust shall be funded with $[●] up front and up to a maximum of $[●] over time (each of which may be in cash, Mandatory Convertible Preferred, or a combination thereof) (the "Trust Funding Amount") for payment to Individual Wildfire Claims as such claims are resolved.

An agreement (the "Trust Agreement") shall establish and set forth the provisions of the Settlement Trust and shall be consistent with the terms attached hereto as Exhibit [●], and otherwise in form and substance acceptable to the Ad Hoc Subrogation Group.

The Settlement Trust will be administered by three trustees (each such person, a "Trustee"). The Debtors, the Official Committee of Tort Claimants ("Tort Claimants Committee") and the Ad Hoc Subrogation Group shall each have the right to appoint one trustee, subject to the approval of the Bankruptcy Court in the Confirmation Order. The Confirmation Order shall also appoint a trust advisory committee ("TAC"). The TAC will be a [●]-member committee to represent the interests of the holders of the accrued Individual Wildfire Claims. The TAC will initially consist of [●].[7] The Trustees and the TAC shall have the authority to retain any advisors for the purpose of carrying out their respective duties under the Trust Agreement. |
| Individual Claims Trust Distribution Procedures | Simultaneously with entering into the Trust Agreement, the Trustees, the TAC and the Reorganized Debtors will agree on the terms of, and promptly implement, the TDP, on substantially the same terms as attached hereto as Exhibit [●], which terms shall include the following:

- Holders of unliquidated Individual Wildfire Claims that timely file proofs of claim in the Chapter 11 Cases shall be eligible to file a proof of claim and supporting documentation with the Settlement Trust.

- The Settlement Trust shall develop and adopt (with the consent of the Reorganized Debtors and the TAC) an expeditious process to liquidate and pay valid Individual Wildfire Claims submitted to the Settlement Trust, including, but not limited to, by reference to a damages matrix.

- If, following processing, the Settlement Trust establishes a liquidated value for any Individual Wildfire Claim submitted to the Settlement Trust, it shall tender to the claimant an offer of payment of the aforementioned determined value, together with a form of release adopted by the Settlement Trust with the consent of the Reorganized Debtors and the TAC. The form of release shall include (but not be limited to) a full release of Wildfire Claims against the Debtors, Reorganized Debtors, and the Settlement Trust, and an acknowledgement that the claimant shall be deemed to have been made whole with respect to the subrogation claims of the members of Class 1A. If the claimant accepts the offer of payment and returns the release forms |

---

[7]   [Subject to further discussions, it is expected that the TAC shall be comprised of the members of the Tort Claimants Committee (or a subset thereof)]

12

Case: 19-30088    Doc# 3147-1    Filed: 07/23/19    Entered: 07/23/19 10:56:24    Page 13
of 22
Case: 19-30088    Doc# 4630-3    Filed: 11/08/19    Entered: 11/08/19 15:41:24    Page 29
of 41

| | |
|---|---|
| | properly executed, the claim shall be paid as soon as practicable and pursuant to a regular payment schedule to be developed by the Settlement Trust with the consent of the Reorganized Debtors and the TAC. |
| | • The Settlement Trust, with the consent of the Reorganized Debtors and the TAC, shall institute binding and non-binding arbitration procedures for resolving disputes concerning (a) the Settlement Trust's denial of a claim and/or (b) the liquidated value of a claim. |
| | • Individual Wildfire Claimants may elect binding or non-binding arbitration after receiving a denial or offer from the Settlement Trust. A claimant who submits to binding arbitration, or non-binding arbitration and accepts the arbitral award, will receive payment in the same manner as a claimant who accepts the Settlement Trust's original offer. |
| | • Individual Wildfire Claimants who elect non-binding arbitration and then reject their arbitral awards retain the right to have their claim liquidated through the tort system. The Settlement Trust shall defend the claim, and the Reorganized Debtors shall have the right to assume responsibility for the defense of the lawsuit. Individual Wildfire Claimants shall be eligible for payment of a final judgment for monetary damages obtained in the tort system from the Settlement Trust. |
| Channeling Injunction | The Settlement Trust shall be the sole source of recovery for Individual Wildfire Claimants against the Debtors. The Plan and Confirmation Order shall channel all Wildfire Claims held by Individual Wildfire Claimants against the Debtors to the Settlement Trust for payment, and shall bar and enjoin Individual Wildfire Claimants from seeking to recover on account of their Wildfire Claims against the Reorganized Debtors or any assets of the Reorganized Debtors (the "Channeling Injunction"). |
| California Wildfire Insurance Fund | On the Effective Date, the Reorganized Debtors shall contribute $5.0 billion to the California Wildfire Insurance Fund. |
| Sources of Plan Funding | Distributions under the Plan shall be funded through a combination of the following sources: (a) the issuance of the Mandatory Convertible Preferred, (b) the Debtors' cash on hand at emergence, (c) insurance proceeds, (d) $5.2 billion of additional Reorganized PG&E Corp. debt, $4.3 billion of additional Reorganized Utility debt, and $0.2 billion of additional Reorganized Utility Preferred Interests, each to be raised in the capital markets, and (e) an optional new money equity investment of up to $[●] billion via the Rights Offering (as defined below) if sufficient holders of PG&E Corp. Common Interests timely agree to support the Plan as set forth below.

If holders of PG&E Corp. Common Interests decline to participate in the Rights Offering the Ad Hoc Subrogation Group is confident it will either (a) find other parties willing to participate in the Rights Offering, including existing stakeholders and/or outside parties, or (b) eliminate the need for further capital through additional sources of funding. |
| Mandatory Convertible Preferred [8] | On the Effective Date, PG&E Corp. shall issue $14.2 billion of Mandatory Convertible Preferred to holders of Subrogation Claims.[8]

The Mandatory Convertible Preferred shall have ten (10) mandatory conversion |

---

[8]  The issuance of Mandatory Convertible Preferred may be increased if the Settlement Trust is funded (at least in part) with Mandatory Convertible Preferred.

Case: 19-30088    Doc# 3147-1    Filed: 07/23/19    Entered: 07/23/19 10:56:24    Page 14
of 22
Case: 19-30088    Doc# 4630-3    Filed: 11/08/19    Entered: 11/08/19 15:41:24    Page 30
of 41

| | periods, each occurring on the first Business Day after: |
|---|---|
| | • The three (3) month anniversary of the Effective Date; |
| | • The six (6) month anniversary of the Effective Date; |
| | • The nine (9) month anniversary of the Effective Date; |
| | • The twelve (12) month anniversary of the Effective Date; |
| | • The fifteen (15) month anniversary of the Effective Date; |
| | • The eighteen (18) month anniversary of the Effective Date; |
| | • The twenty-one (21) month anniversary of the Effective Date; |
| | • The twenty-four (24) month anniversary of the Effective Date |
| | • The twenty-seven (27) month anniversary of the Effective Date |
| | • The thirty (30) month anniversary of the Effective Date (collectively, the "Conversion Dates"). |
| | One-tenth (1/10th) of the total issued Mandatory Convertible Preferred (plus all accrued dividends outstanding as of each Conversion Date) shall mandatorily convert into New Common Equity on each of the Conversation Dates as set forth below: |
| | • On each of the first and second Conversion Dates, one-tenth (1/10th) of the total issued Mandatory Convertible Preferred (plus all accrued dividends outstanding through the applicable Conversion Date) shall convert into New Common Equity at the New Equity Capital Issuance Value (defined below). |
| | • On each of the final eight Conversion Dates, one-tenth (1/10th) of the total issued Mandatory Convertible Preferred (plus all accrued dividends outstanding through the applicable Conversion Date) shall convert into New Common Equity at a 15% discount to the trailing 20 New York Stock Exchange trading day volume weighted average price of the New Common Equity at such time. |
| | Following the second Conversion Date, holders of Mandatory Convertible Preferred shall have the option (commencing 20 New York Stock Exchange trading days after the prior Conversion Date and prior to the next Conversion Date) to convert the amount of Mandatory Convertible Preferred that will mandatorily convert at the next Conversion Date at a 15% discount to the trailing 20 New York Stock Exchange trading day volume weighted average price of the New Common Equity at such time. For the avoidance of doubt, following the final Conversion Date, all Mandatory Convertible Preferred shall have been converted into New Common Equity. |
| | Mandatory Convertible Preferred shall accrue a quarterly dividend which shall be paid in kind at a 8.0% annual rate. |
| | The Mandatory Convertible Preferred shall be registered and/or issued pursuant to section 1145 of the Bankruptcy Code (as determined by the Ad Hoc Subrogation Group) and tradeable within a timeline consistent with any required regulatory approvals. |
| Rights Offering | Subject to the condition described in the following paragraph, the holders of PG&E Corp. Common Interests shall have the exclusive opportunity to participate in the recapitalization of the Debtors via a rights offering for up to $[●] billion of New Common Equity (the "Rights Offering"), based on a fixed reorganized equity value of $[●] billion (the "New Equity Capital Issuance Value"). |

Case: 19-30088    Doc# 3147-1    Filed: 07/23/19    Entered: 07/23/19 10:56:24    Page 15
of 22
Case: 19-30088    Doc# 4630-3    Filed: 11/08/19    Entered: 11/08/19 15:41:24    Page 31
of 41

| | |
|---|---|
| | If holders of at least 66% of the PG&E Corp. Common Interests decide to participate and support confirmation of the Plan described herein by signing a plan support agreement (in form and substance acceptable to the Ad Hoc Subrogation Group) no later than September 30, 2019, the Rights Offering shall be open to all holders of existing PG&E Corp. Common Interests. If there is a group of equity holders that is willing, and has the ability, to commit to and fund the purchase of the New Common Equity offered through the Rights Offering (as determined by the Ad Hoc Subrogation Group), that group may be offered the opportunity to backstop the Rights Offering. Backstop parties for the Rights Offering shall receive a backstop fee of 3.0%, paid in New Common Equity.<br><br>If equity holders holding sufficient existing PG&E Corp. Common Interests fail to timely support confirmation of the Plan, the right to participate in, and backstop, the Rights Offering shall be rescinded (or reallocated in the discretion of the Ad Hoc Subrogation Group) and additional sources of funding may be pursued to the extent required under the plan. |
| **Other Terms** | |
| Wildfire Safety Program | The Reorganized Debtors shall adopt a wildfire safety program in amount and scope acceptable to the Ad Hoc Subrogation Group (in consultation with subject matter experts and stakeholders) (the "Wildfire Safety Program") that prioritizes investment in fire mitigation and loss containment for residents in high risk wildfire areas, and executive compensation shall be appropriately linked to the Wildfire Safety Program. |
| Regulatory Approval | Prior to the Effective Date, and the extent necessary, the Debtors shall obtain all necessary regulatory approvals needed to effectuate the Restructuring, including, any necessary antitrust approvals and approvals provided by the Federal Energy Regulatory Commission, the California Public Utilities Commission, and the Nuclear Regulatory Commission. |
| Releases and Exculpation | The Plan shall provide customary releases (including third party releases to the extent permitted under applicable law) and exculpation provisions, in each case, to the fullest extent permitted by law and effective as of the Effective Date, for the benefit of the Debtors, the reorganized Debtors, the Ad Hoc Subrogation Group and its members, any official committees appointed in the Chapter 11 Cases and their members, and such entities' respective current and former affiliates, and such entities' and their current and former affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.<br><br>The releases shall include (but not be limited to) a full release of Wildfire Claims against the Debtors and Reorganized Debtors, and any claims against the members of Class 1A alleging that the claimant has not been made whole by consummation of the Plan. |
| Corporate Governance | Upon the Effective Date and until the first Business Day after the thirty (30) month anniversary of the Effective Date ("Initial Term"), the board of directors (the "New PG&E Corp. Board") of the Reorganized Debtors shall consist of 9 members. The Chief Executive Officer of the Reorganized Debtors shall serve on the New PG&E |

15

| | |
|---|---|
| | Corp. Board. The remaining directors of the New PG&E Corp. Board shall be appointed on the Effective Date and the Ad Hoc Subrogation Group shall work with IBEW Local 1245, TURN (on behalf of the ratepayers), and the Tort Claimants Committee to develop an appropriate board composition. |
| | To the extent a vacancy arises on the New PG&E Corp. Board during the Initial Term, the remaining members of the New PG&E Corp. Board shall designate a replacement director to serve out the remainder of the Initial Term. Following the Initial Term, members of the board of directors of Reorganized Debtors shall be elected annually. |
| | The board of directors of the Reorganized Utility (the "<u>New Utility Board</u>" and together with the New PG&E Corp. Board, the "<u>New Boards</u>") will consist of the same nine (9) members of the New PG&E Corp. Board. The chairperson of the New PG&E Corp. Board shall not be the chairperson of the New Utility Board. |
| Utility Rates to Consumers | The Plan shall be rate-neutral to end-market consumers in California on a net basis. |
| Key Employee Matters | The Reorganized Debtors shall negotiate with the International Brotherhood of Electrical Workers ("**IBEW**") and Local Union No. 1245 of the International Brotherhood of Electrical Workers ("**Local 1245**") with respect to extending the two (2) Collective Bargaining Agreements currently in place between Pacific Gas & Electric Company and Local 1245 (the IBEW Physical Agreement and the IBEW Clerical Agreement, collectively the "**IBEW CBAs**") with such negotiations to emphasize the Reorganized Debtors' and Local 1245's commitment to maintaining a spirit of cooperation between labor and management. |
| Other Employee Matters | Compensation-related agreements between and of the Debtors and any directors, officers and employees of the Debtors existing as of the Effective Date, including any indemnification and severance obligations, short term incentive plan and other incentive plans, with the exception of the revisions set forth herein, existing as of the Effective Date, shall be assumed by the Reorganized Debtors. |
| | The New Boards shall revise the long term incentive compensation programs of the Reorganized Debtors by increasing the proportion of LTIP awards subject to performance-based vesting criteria. Performance criteria for LTIP awards will be modified by increasing/implementing performance weightings that are based on achievement of public safety, infrastructure hardening and other related strategic long term objectives consistent with the Wildfire Safety Program. |
| Pension Matters | Upon the Effective Date, the Reorganized Debtors shall assume and continue to maintain the PG&E Retirement Plan under its current terms, except to the extent any amendment is required by law, and shall make any and all contributions necessary to satisfy the minimum funding requirements under ERISA Section 302 and Internal Revenue Code Section 430. |
| Executory Contracts and Unexpired Leases | All executory contracts and unexpired leases not expressly listed for rejection on an exhibit to the Plan, or previously assumed or rejected by the Debtors pursuant to an order of the Bankruptcy Court shall be deemed assumed as of the Effective Date. |
| | The Debtors or Reorganized Debtors, as applicable, may later, amend, modify, or supplement the list of assumed executory contracts an unexpired leases and the schedules of executory contracts an unexpired leases with respect to the Debtors or Reorganized Debtors, as applicable, at any time, through and including 45 days after the Effective Date. |

16

| | |
|---|---|
| Renewable Energy Power Purchase Agreements | Notwithstanding anything to the contrary in this Term Sheet, the Debtors and Reorganized Debtors, as applicable, shall not reject any renewable energy power purchase agreement. |
| Tax Matters | The Debtors and the Ad Hoc Subrogation Group will work together in good faith and will use commercially reasonable efforts to structure and implement the Restructuring in a tax efficient and cost-effective manner for the Reorganized Debtors and creditors.<br><br>Post-Effective Date ownership of PG&E Corp. shall be structured to maximize the usage of go-forward tax attributes to the extent consistent with the Plan. |
| Limitations on Additional Debt Incurrences and Dividends on Common Equity | Following the Effective Date, and until the thirty (30) month anniversary of the Effective Date, the Reorganized Debtors shall be subject to limitations on (a) borrowing funded debt in excess of $[●] that would have priority of payment over any non-converted Mandatory Convertible Preferred, other than to refinance funded debt outstanding as of the Effective Date, and (b) issuing dividends on account of New Common Equity. |
| Conditions Precedent to Emergence | The occurrence of the Effective Date shall be subject to the following conditions precedent; provided that any condition could be waived with the consent of the Ad Hoc Subrogation Group:<br><br>• In the event that Class 3A votes to reject the Plan, the Estimated Individual Wildfire Liability shall not exceed $[●] billion.<br><br>• The Confirmation Order shall have been entered by the Court in form and substance acceptable to the Ad Hoc Subrogation Group, be in full force and effect and not be subject to any stay or injunction and shall have become a final order.<br><br>• All definitive documents relating to the Plan shall be in form and substance acceptable to the Ad Hoc Subrogation Group.<br><br>• The Settlement Trust shall have been established, the Trustees shall have been appointed, and the TAC shall be constituted, each in accordance with the terms provided herein.<br><br>• The Utility retains debt capacity of 47% of its rate base, and PG&E Corp. shall have sufficient debt capacity to consummate the Plan based on existing rating agency guidance on Investment Grade parameters.<br><br>• Conclusion of the Utility's 2020 general rate case and 2019 cost of capital proceeding before the CPUC satisfactory to the Ad Hoc Subrogation Group, or a mutually agreed deferral.<br><br>• CPUC approval, including issuance of a financing order, of the overall financing structure, including issuance of new securities under the Plan, if required.<br><br>• No final, unappealable order has been entered by any court of competent jurisdiction that determines whether or not (or the extent to which) the Debtors' are liable for causing the 2017 Tubbs Fire.<br><br>• No occurrence of an additional wildfire or series of wildfires prior to the Effective Date that, in the aggregate, is reasonably estimated by the Ad Hoc Subrogation Group in good faith to result in more than $[●] of post-petition claims against the Reorganized Debtors.<br><br>• All actions, documents, certificates and agreements necessary or appropriate to implement the Plan shall have been effected or executed or deemed executed and delivered, as the case may be, to the required parties and, to the extent required, |

Case: 19-30088    Doc# 3147-1    Filed: 07/23/19    Entered: 07/23/19 10:56:24    Page 18
of 22
Case: 19-30088    Doc# 4630-3    Filed: 11/08/19    Entered: 11/08/19 15:41:24    Page 34
of 41

|  | filed with the applicable governmental units in accordance with applicable laws. |
|  | • All authorizations, consents, regulatory approvals, rulings or documents that are necessary or appropriate to implement and effectuate the Plan shall have been received. |
|  | • Following the Effective Date, the Reorganized Debtors will be eligible to access funds provided by the California Wildfire Insurance Fund. |
|  | • Following the Effective Date, the common stock of PG&E Corporation will continue to be traded on the New York Stock Exchange, or an equivalent major stock exchange satisfactory to the Ad Hoc Subrogation Group. |

Case: 19-30088    Doc# 3147-1    Filed: 07/23/19    Entered: 07/23/19 10:56:24    Page 19
of 22
Case: 19-30088    Doc# 4630-3    Filed: 11/08/19    Entered: 11/08/19 15:41:24    Page 35
of 41

## **Schedule 1**

### Short-Term Utility Unsecured Notes

1. $550 million principal amount of 3.50% senior notes due October 1, 2020

2. $250 million principal amount of 3.50% senior notes due October 1, 2020

3. $300 million principal amount of 4.25% senior notes due May 15, 2021

4. $250 million principal amount of 3.25% senior notes due September 15, 2021

5. $400 million principal amount of 2.45% senior notes due August 15, 2022

Case: 19-30088    Doc# 3147-1    Filed: 07/23/19    Entered: 07/23/19 10:56:24    Page 20
of 22
Case: 19-30088    Doc# 4630-3    Filed: 11/08/19    Entered: 11/08/19 15:41:24    Page 36
of 41

Long-Term Utility Unsecured Notes

1.  $3,000 million principal amount of 6.05% senior notes due March 1, 2034

2.  $700 million principal amount of 5.80% senior notes due March 1, 2037

3.  $400 million principal amount of 6.35% senior notes due February 15, 2038

4.  $550 million principal amount of 6.25% senior notes due March 1, 2039

5.  $550 million principal amount of 5.40% senior notes due January 15, 2040

6.  $250 million principal amount of 5.80% senior notes due March 1, 2037

7.  $250 million principal amount of 5.40% senior notes due January 15, 2040

8.  $250 million principal amount of 4.50% senior notes due December 15, 2041

9.  $400 million principal amount of 4.45% senior notes due April 15, 2042

10. $350 million principal amount of 3. 75% senior notes due August 15, 2042

11. $375 million principal amount of 3.25% senior notes due June 15, 2023

12. $375 million principal amount of 4.60% senior notes due June 15. 2043

13. $300 million principal amount of 3.85% senior notes due November 15, 2023

14. $500 million principal amount of 5.125% senior notes due November 15, 2043

15. $450 million principal amount of 3. 75% senior notes due February 15, 2024

16. $450 million principal amount of 4. 75% senior notes due February 15, 2044

17. $350 million principal amount of 3.40% senior notes due August 15, 2024

18. $225 million principal amount of 4. 75% senior notes due February 15, 2044

19. $500 million principal amount of 4.30% senior notes due March 15, 2045

20. $400 million principal amount of 3.50% senior notes due June 15, 2025

21. $100 million principal amount of 4.30% senior notes due March 15, 2045

22. $200 million principal amount of 3.50% senior notes due June 15, 2025

23. $450 million principal amount of 4.25% senior notes due March 15, 2046

Case: 19-30088   Doc# 3147-1   Filed: 07/23/19   Entered: 07/23/19 10:56:24   Page 21
of 22
Case: 19-30088   Doc# 4630-3   Filed: 11/08/19   Entered: 11/08/19 15:41:24   Page 37
of 41

24. $600 million principal amount of 2.95% senior notes due March 1, 2026

25. $400 million principal amount of 4.00% senior notes due December 1, 2046

26. $400 million principal amount of 3.30% senior notes due March 15, 2027

27. $200 million principal amount of 4.00% senior notes due December 1, 2046

28. $1,150 million principal amount of 3.30% senior notes due December 1, 2027

29. $850 million principal amount of 3.95% of senior notes due 204 7

30. $500 million principal amount of 4.25% senior notes due 2023

31. $300 million principal amount of 4.65% senior notes due 2028

Case: 19-30088   Doc# 3147-1   Filed: 07/23/19   Entered: 07/23/19 10:56:24   Page 22
of 22
Case: 19-30088   Doc# 4630-3   Filed: 11/08/19   Entered: 11/08/19 15:41:24   Page 38
of 41

1

**Exhibit B**

2

**Proposed Order**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| 1 | **DIEMER & WEI, LLP** |
| | Kathryn S. Diemer (#133977) |
| 2 | 100 West San Fernando Street, Suite 555 |
| | San Jose, CA 95113 |
| 3 | Telephone: (408) 971-6270 |
| | Facsimile: (408) 971-6271 |
| 4 | Email: kdiemer@diemerwei.com |

**DIEMER & WEI, LLP**
Kathryn S. Diemer (#133977)
100 West San Fernando Street, Suite 555
San Jose, CA 95113
Telephone: (408) 971-6270
Facsimile: (408) 971-6271
Email: kdiemer@diemerwei.com

**WILLKIE FARR & GALLAGHER LLP**
Matthew A. Feldman (*pro hac vice*)
Joseph G. Minias (*pro hac vice*)
Daniel I. Forman (*pro hac vice*)
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email: mfeldman@willkie.com
         jminias@willkie.com
         dforman@willkie.com

*Counsel for Ad Hoc Group of Subrogation
Claim Holders*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| **PG&E CORPORATION,** | Bankr. Case No. 19-30088 (DM) |
| -and- | (Jointly Administered) |
| **PACIFIC GAS AND ELECTRIC COMPANY,** | **ORDER TO TERMINATE THE DEBTORS' EXCLUSIVE PERIODS WITH RESPECT TO THE AD HOC SUBROGATION GROUP** |
| **Debtors.** | |
| ☐ Affects PG&E Corporation | |
| ☐ Affects Pacific Gas and Electric Company | |
| ☒ Affects both Debtors | |
| *\* All papers shall be filed in the lead case, No. 19-30088 (DM)* | |

1  Upon consideration of the motion (the "**Motion**") of the Ad Hoc Group of

2  Subrogation Claim Holders (the "**Ad Hoc Subrogation Group**") in the above-captioned

3  chapter 11 cases of Pacific Gas and Electric Company and PG&E Corporation for an order,

4  pursuant to section 1121(d) of title 11 of the United States Code (the "**Bankruptcy Code**"),

5  terminating the Debtors' exclusive plan filing and solicitation periods (the "**Exclusive**

6  **Periods**"); this Court finds and concludes that the Court has jurisdiction over the subject matter

7  of the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; this is a

8  core proceeding pursuant to 28 U.S.C. § 157(b); the legal and factual bases set forth in the

9  Motion establish just cause for the relief granted herein; the relief requested in the Motion is in

10  the best interests of the Debtors, their estate and their creditors; notice of the Motion was

11  sufficient, and no other or further notice need be provided; and after due deliberation and

12  sufficient cause appearing therefor,

13  **IT IS HEREBY ORDERED THAT:**

14  1.  The Motion is granted to the extent set forth herein.

15  2.  With respect to the Ad Hoc Subrogation Group, the Debtors' Exclusive

16  Periods are terminated pursuant to section 1121(d) of the Bankruptcy Code, and the Ad Hoc

17  Subrogation Group may file and solicit a plan of reorganization.

18  3.  The terms and conditions of this order shall be immediately effective and

19  enforceable upon its entry.

20  4.  This Court shall retain jurisdiction to hear and determine all matters

21  arising from or related to the implementation, interpretation, or enforcement of this Order.

22  ** END OF ORDER **

23

24

25

26

27

28

2

Case: 19-30088   Doc# 3147-2   Filed: 07/23/19   Entered: 07/23/19 10:56:24   Page 3
of 2
Case: 19-30088   Doc# 4630-3   Filed: 11/08/19   Entered: 11/08/19 15:41:24   Page 41
of 41