# EXHIBIT F

(Mark One)

☒ QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended September 30, 2019

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934

For the transition period from _____ to _____

| Commission File Number | Exact Name of Registrant as Specified in its Charter | State or Other Jurisdiction of Incorporation | IRS Employer Identification Number |
|---|---|---|---|
| 1-12609 | PG&E Corporation | California | 94-3234914 |
| 1-2348 | Pacific Gas and Electric Company | California | 94-0742640 |

| PG&E Corporation | Pacific Gas and Electric Company |
|---|---|
| 77 Beale Street | 77 Beale Street |
| P.O. Box 770000 | P.O. Box 770000 |
| San Francisco, California 94177 | San Francisco, California 94177 |

Address of principal executive offices, including zip code

| PG&E Corporation | Pacific Gas and Electric Company |
|---|---|
| 415 973-1000 | 415 973-7000 |

Registrant's telephone number, including area code

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, no par value | PCG | The New York Stock Exchange |
| First preferred stock, cumulative, par value $25 per share, 5% series A redeemable | PCG-PE | NYSE American LLC |
| First preferred stock, cumulative, par value $25 per share, 5% redeemable | PCG-PD | NYSE American LLC |
| First preferred stock, cumulative, par value $25 per share, 4.80% redeemable | PCG-PG | NYSE American LLC |
| First preferred stock, cumulative, par value $25 per share, 4.50% redeemable | PCG-PH | NYSE American LLC |
| First preferred stock, cumulative, par value $25 per share, 4.36% series A redeemable | PCG-PI | NYSE American LLC |
| First preferred stock, cumulative, par value $25 per share, 6% nonredeemable | PCG-PA | NYSE American LLC |
| First preferred stock, cumulative, par value $25 per share, 5.50% nonredeemable | PCG-PB | NYSE American LLC |
| First preferred stock, cumulative, par value $25 per share, 5% nonredeemable | PCG-PC | NYSE American LLC |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

| | | |
|---|---|---|
| PG&E Corporation: | ☒ Yes | ☐ No |
| Pacific Gas and Electric Company: | ☒ Yes | ☐ No |

Case: 19-30088    Doc# 4630-6    Filed: 11/08/19    Entered: 11/08/19 15:41:24    Page 2 of 42

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).

PG&E Corporation: ☒ Yes ☐ No

Pacific Gas and Electric Company: ☒ Yes ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

PG&E Corporation:
☒ Large accelerated filer ☐ Accelerated filer
☐ Non-accelerated filer
☐ Smaller reporting company ☐ Emerging growth company

Pacific Gas and Electric Company:
☐ Large accelerated filer ☐ Accelerated filer
☒ Non-accelerated filer
☐ Smaller reporting company ☐ Emerging growth company

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.

PG&E Corporation: ☐

Pacific Gas and Electric Company: ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

PG&E Corporation: ☐ Yes ☒ No

Pacific Gas and Electric Company: ☐ Yes ☒ No

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

Common stock outstanding as of November 1, 2019:

PG&E Corporation: 529,229,517

Pacific Gas and Electric Company: 264,374,809

Case: 19-30088    Doc# 4630-6    Filed: 11/08/19    Entered: 11/08/19 15:41:24    Page 3 of 42

*Nuclear Decommissioning Trust Investments*

The following table provides a summary of equity securities and available-for-sale debt securities:

**(in millions)**

| As of September 30, 2019 | Amortized Cost | | Total Unrealized Gains | | Total Unrealized Losses | | Total Fair Value | |
|---|---|---|---|---|---|---|---|---|
| Nuclear decommissioning trusts | | | | | | | | |
| Short-term investments | $ | 17 | $ | — | $ | — | $ | 17 |
| Global equity securities | | 488 | | 1,449 | | (5) | | 1,932 |
| Fixed-income securities | | 1,508 | | 108 | | (2) | | 1,614 |
| Total [(1)] | $ | 2,013 | $ | 1,557 | $ | (7) | $ | 3,563 |
| As of December 31, 2018 | | | | | | | | |
| Nuclear decommissioning trusts | | | | | | | | |
| Short-term investments | $ | 29 | $ | — | $ | — | $ | 29 |
| Global equity securities | | 568 | | 1,246 | | (5) | | 1,809 |
| Fixed-income securities | | 1,288 | | 30 | | (18) | | 1,300 |
| Total [(1)] | $ | 1,885 | $ | 1,276 | $ | (23) | $ | 3,138 |

[(1)] Represents amounts before deducting $502 million and $408 million for the periods ended September 30, 2019 and December 31, 2018, respectively, primarily related to deferred taxes on appreciation of investment value.

The fair value of fixed-income securities by contractual maturity is as follows:

| (in millions) | As of September 30, 2019 | |
|---|---|---|
| Less than 1 year | $ | 49 |
| 1–5 years | | 508 |
| 5–10 years | | 390 |
| More than 10 years | | 667 |
| Total maturities of fixed-income securities | $ | 1,614 |

The following table provides a summary of activity for fixed income and equity securities:

| (in millions) | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2019 | | 2018 | | 2019 | | 2018 | |
| Proceeds from sales and maturities of nuclear decommissioning trust investments | $ | 346 | $ | 319 | $ | 808 | $ | 1,121 |
| Gross realized gains on securities | | 45 | | 3 | | 67 | | 51 |
| Gross realized losses on securities | | (5) | | (5) | | (12) | | (14) |

## NOTE 10: WILDFIRE-RELATED CONTINGENCIES

PG&E Corporation and the Utility have significant contingencies arising from their operations, including contingencies related to wildfires. A provision for a loss contingency is recorded when it is both probable that a liability has been incurred and the amount of the liability can be reasonably estimated. PG&E Corporation and the Utility evaluate which potential liabilities are probable and the related range of reasonably estimated losses and record a charge that reflects their best estimate or the lower end of the range, if there is no better estimate. The assessment of whether a loss is probable or reasonably possible, and whether the loss or a range of losses is estimable, often involves a series of complex judgments about future events. Loss contingencies are reviewed quarterly and estimates are adjusted to reflect the impact of all known information, such as negotiations, discovery, settlements and payments, rulings, advice of legal counsel, and other information and events pertaining to a particular matter. PG&E Corporation's and the Utility's provision for loss and expense excludes anticipated legal costs, which are expensed as incurred. PG&E Corporation's and the Utility's financial condition, results of operations, liquidity, and cash flows may be materially affected by the outcome of the following matters.

Case: 19-30088    Doc# 4630-6    Filed: 11/08/19    Entered: 11/08/19 15:41:24    Page 4 of 42

**Wildfire-Related Claims**

Wildfire-related claims on the Condensed Consolidated Financial Statements include amounts associated with the 2018 Camp fire, the 2017 Northern California wildfires, and the 2015 Butte fire.

At September 30, 2019 and December 31, 2018, the Utility's Condensed Consolidated Balance Sheets include estimated liabilities in respect of total wildfire-related claims as follows:

| | Balance at | | | |
|---|---|---|---|---|
| (in millions) | | September 30, 2019 | | December 31, 2018 |
| 2015 Butte fire | $ | 212 | $ | 226 |
| 2017 Northern California wildfires [1] | | 7,492 | | 3,500 |
| 2018 Camp fire [1] | | 12,856 | | 10,500 |
| **Total wildfire-related claims [2]** | **$** | **20,560** | **$** | **14,226** |

[1] Wildfire-related claims as of September 30, 2019 are shown net of $100 million of funds deposited into the Wildfire Assistance Fund on August 2, 2019 in connection with potential liabilities related to the 2018 Camp fire and 2017 Northern California wildfires. This $100 million is allocated to wildfire-related claims as follows: $30 million to the 2017 Northern California wildfires and $70 million to the 2018 Camp fire. For a description of the other components and categories of claims related to this liability accrual, see "Additional Information Related to 2018 Camp Fire and 2017 Northern California Wildfires Liability Accrual."

[2] On the Petition Date, all wildfire-related claims were classified as LSTC and all pending litigation was stayed. On August 16, 2019, the Bankruptcy Court issued the Lift Stay Decision in which it granted the TCC's and the Ad Hoc Subrogation Group's motions for relief from the automatic stay to allow a state court jury trial to proceed regarding the Tubbs fire. See "Proceeding in San Francisco County Superior Court for Certain Tubbs Fire-Related Claims" below.

In addition, during the three and nine months ended September 30, 2019, the Utility incurred legal and other costs of $25 million and $57 million, respectively, related to the 2018 Camp fire, with no corresponding costs in the same periods in 2018. During the three and nine months ended September 30, 2019, the Utility incurred legal and other costs of $13 million and $54 million, respectively, related to the 2017 Northern California wildfires, as compared to $53 million and $120 million, respectively, in the same periods in 2018.

**2018 Camp Fire Background**

On November 8, 2018, a wildfire began near the city of Paradise, Butte County, California (the "2018 Camp fire"), which is located in the Utility's service territory. Cal Fire's Camp Fire Incident Information Website as of October 25, 2019 (the "Cal Fire website") indicated that the 2018 Camp fire consumed 153,336 acres. On the Cal Fire website, Cal Fire reported the destruction of 13,972 residences, 528 commercial structures and 4,293 other buildings resulting from the 2018 Camp fire. There have been no subsequent updates of this information on the Cal Fire website.

On May 15, 2019, Cal Fire issued a news release announcing the results of its investigation into the cause of the 2018 Camp fire. According to the news release:

- Cal Fire determined that the 2018 Camp fire was caused by electrical transmission lines owned and operated by the Utility near Pulga, California.

- Cal Fire identified a second ignition site and stated that the second fire was consumed by the original fire which started earlier near Pulga, California. Cal Fire stated that the cause of the second fire was determined to be "vegetation into electrical distribution lines owned and operated by" the Utility.

Cal Fire indicated in its news release that its investigation report for the 2018 Camp fire has been forwarded to the Butte County District Attorney. The California Attorney General's Office is also investigating the 2018 Camp fire. (See "District Attorneys' Offices' Investigations" below for further information regarding the investigations of the 2018 Camp fire.) As of the date of this filing, Cal Fire's investigation report has not been released publicly.

PG&E Corporation and the Utility accept Cal Fire's determination that the 2018 Camp fire ignited at the first ignition site. PG&E Corporation and the Utility have not been able to form a conclusion as to whether a second fire ignited as a result of vegetation contact with the Utility's facilities.

PG&E Corporation and the Utility are continuing to review the evidence concerning the 2018 Camp fire. PG&E Corporation and the Utility have not yet had access to all of the evidence collected by Cal Fire as part of its investigation or to the investigation report prepared by Cal Fire.

Case: 19-30088    Doc# 4630-6    Filed: 11/08/19    Entered: 11/08/19 15:41:24    Page 5 of 42

Further, the CPUC's SED is conducting investigations to assess the compliance of electric and communication companies' facilities with applicable rules and regulations in areas impacted by the 2018 Camp fire. According to information made available by the CPUC, investigation topics include, but are not limited to, maintenance of facilities, vegetation management, and emergency preparedness and response. Various other entities may also be investigating the fire. It is uncertain when the investigations will be complete and whether the SED will release any preliminary findings before its investigations are complete.

**2017 Northern California Wildfires Background**

Beginning on October 8, 2017, multiple wildfires spread through Northern California, including Napa, Sonoma, Butte, Humboldt, Mendocino, Lake, Nevada, and Yuba Counties, as well as in the area surrounding Yuba City (the "2017 Northern California wildfires"). According to the Cal Fire California Statewide Fire Summary dated October 30, 2017, at the peak of the 2017 Northern California wildfires, there were 21 major fires that, in total, burned over 245,000 acres and destroyed an estimated 8,900 structures. The 2017 Northern California wildfires resulted in 44 fatalities.

Cal Fire has investigated the causes of the 2017 Northern California wildfires and made the following determinations:

- the Utility's equipment was involved in causing 20 wildfires (the La Porte, McCourtney, Lobo, Honey, Redwood, Sulphur, Cherokee, 37, Blue, Norrbom, Adobe, Partrick, Pythian, Nuns, Pocket, Atlas, Cascade, Pressley, Point and Youngs fires); and

- the Tubbs fire was caused by a private electrical system adjacent to a residential structure.

For additional details regarding Cal Fire's investigations and findings, see PG&E Corporation's and the Utility's joint quarterly report on Form 10-Q for the period ended June 30, 2019.

As described under the heading "District Attorneys' Offices' Investigations" below, certain of the 2017 Northern California wildfires were the subject of criminal investigations, which have been settled or resulted in PG&E Corporation and the Utility being informed by the applicable district attorneys' office of a decision not to prosecute.

The SED also conducted investigations into whether the Utility committed civil violations in connection with the 2017 Northern California wildfires. See "Order Instituting an Investigation into the 2017 Northern California Wildfires" in Note 11 for a description of these proceedings, including the alleged violations in connection with 2017 Northern California wildfires.

Various other entities may also be investigating certain of the fires. It is uncertain when the investigations will be complete.

**Third-Party Claims, Investigations and Other Proceedings Related to the 2018 Camp Fire and 2017 Northern California Wildfires**

If the Utility's facilities, such as its electric distribution and transmission lines, are determined to be the substantial cause of one or more fires, and the doctrine of inverse condemnation applies, the Utility could be liable for property damage, business interruption, interest and attorneys' fees without having been found negligent. California courts have imposed liability under the doctrine of inverse condemnation in legal actions brought by property holders against utilities on the grounds that losses borne by the person whose property was damaged through a public use undertaking should be spread across the community that benefited from such undertaking, and based on the assumption that utilities have the ability to recover these costs from their customers. Further, California courts have determined that the doctrine of inverse condemnation is applicable regardless of whether the CPUC ultimately allows recovery by the utility for any such costs. The CPUC may decide not to authorize cost recovery even if a court decision were to determine that the Utility is liable as a result of the application of the doctrine of inverse condemnation. (See "Loss Recoveries – Regulatory Recovery" below for further information regarding potential cost recovery related to the wildfires, including in connection with SB 901.)

In addition to claims for property damage, business interruption, interest and attorneys' fees, the Utility could be liable for fire suppression costs, evacuation costs, medical expenses, personal injury damages, punitive damages and other damages under other theories of liability, including if the Utility were found to have been negligent.

Further, the Utility could be subject to material fines, penalties, or restitution orders if the CPUC or any law enforcement agency were to bring an enforcement action, including a criminal proceeding, and it were determined that the Utility had failed to comply with applicable laws and regulations.

As of January 28, 2019, before the automatic stay arising as a result of the filing of the Chapter 11 Cases, PG&E Corporation and the Utility were aware of approximately 100 complaints on behalf of at least 4,200 plaintiffs related to the 2018 Camp fire, nine of which sought to be certified as class actions. The pending civil litigation against PG&E Corporation and the Utility related to the 2018 Camp fire, which is currently stayed as a result of the commencement of the Chapter 11 Cases, included claims under multiple theories of liability, including inverse condemnation, trespass, private nuisance, public nuisance, negligence, negligence per se, negligent interference with prospective economic advantage, negligent infliction of emotional distress, premises liability, violations of the Public Utilities Code, violations of the Health & Safety Code, malice and false advertising in violation of the California Business and Professions Code. The plaintiffs principally asserted that PG&E Corporation's and the Utility's alleged failure to maintain and repair their distribution and transmission lines and failure to properly maintain the vegetation surrounding such lines were the causes of the 2018 Camp fire. The plaintiffs sought damages and remedies that include wrongful death, personal injury, property damage, evacuation costs, medical expenses, establishment of a class action medical monitoring fund, punitive damages, attorneys' fees and other damages. PG&E Corporation's and the Utility's obligations with respect to such claims are expected to be determined through the Chapter 11 process.

As of January 28, 2019, before the automatic stay arising as a result of the filing of the Chapter 11 Cases, PG&E Corporation and the Utility were aware of approximately 750 complaints on behalf of at least 3,800 plaintiffs related to the 2017 Northern California wildfires, five of which sought to be certified as class actions. These cases were coordinated in the San Francisco County Superior Court. As of the Petition Date, the coordinated litigation was in the early stages of discovery. A trial with respect to the Atlas fire was scheduled to begin on September 23, 2019. The pending civil litigation against PG&E Corporation and the Utility related to the 2017 Northern California wildfires included claims under multiple theories of liability, including inverse condemnation, trespass, private nuisance and negligence. This litigation, including the trial date with respect to the Atlas fire, currently is stayed as a result of the commencement of the Chapter 11 Cases. The plaintiffs principally asserted that PG&E Corporation's and the Utility's alleged failure to maintain and repair their distribution and transmission lines and failure to properly maintain the vegetation surrounding such lines were the causes of the 2017 Northern California wildfires. The plaintiffs sought damages and remedies that include wrongful death, personal injury, property damage, evacuation costs, medical expenses, punitive damages, attorneys' fees and other damages. PG&E Corporation's and the Utility's obligations with respect to such claims are expected to be determined through the Chapter 11 process. However, on August 16, 2019, the Bankruptcy Court issued an order granting the TCC's motion to lift the stay on the 2017 Tubbs fire to allow a state court jury trial for certain preference plaintiffs, as further described under the heading "Proceeding in San Francisco Superior Court for Certain Tubbs Fire-Related Claims" below.

Insurance carriers who have made payments to their insureds for property damage arising out of the 2017 Northern California wildfires filed 52 subrogation complaints in the San Francisco County Superior Court and the Sonoma County Superior Court as of January 28, 2019. These complaints allege, among other things, negligence, inverse condemnation, trespass and nuisance. The allegations are similar to the ones made by individual plaintiffs. As of January 28, 2019, insurance carriers have filed 39 similar subrogation complaints with respect to the 2018 Camp fire in the Sacramento County Superior Court and the Butte County Superior Court. As described below under the heading "Restructuring Support Agreement with Holders of Subrogation Claims," on September 22, 2019, PG&E Corporation and the Utility entered into a RSA with certain holders of insurance subrogation claims to potentially resolve all insurance subrogation claims relating to the 2017 Northern California wildfires and the 2018 Camp fire through the Chapter 11 process.

Various government entities, including Yuba, Nevada, Lake, Mendocino, Napa and Sonoma Counties and the Cities of Santa Rosa and Clearlake, also asserted claims against PG&E Corporation and the Utility based on the damages that these government entities allegedly suffered as a result of the 2017 Northern California wildfires. Such alleged damages included, among other things, loss of natural resources, loss of public parks, property damages and fire suppression costs. The causes of action and allegations are similar to the ones made by individual plaintiffs and the insurance carriers. With respect to the 2018 Camp fire, Butte County has filed similar claims against PG&E Corporation and the Utility. As described below under the heading "Plan Support Agreements with Public Entities," on June 18, 2019, PG&E Corporation and the Utility entered into agreements with certain government entities to potentially resolve their wildfire-related claims through the Chapter 11 process.

Case: 19-30088    Doc# 4630-6    Filed: 11/08/19    Entered: 11/08/19 15:41:24    Page 7 of 42

As described in Note 2, on July 1, 2019, the Bankruptcy Court entered an order approving the Bar Date of October 21, 2019, at 5:00 p.m. (Pacific Time) for filing claims against PG&E Corporation and the Utility relating to the period prior to the Petition Date, including claims in connection with the 2018 Camp fire and the 2017 Northern California wildfires. On October 18, 2019, the TCC filed with the Bankruptcy Court a motion for entry of an order extending the Bar Date for individual wildfire-related claims. On October 28, 2019, PG&E Corporation and the Utility announced that they had offered to extend the Bar Date for individual wildfire-related claims from October 21, 2019 to December 20, 2019. On the same day, during a meet and confer between PG&E Corporation and the Utility and the TCC, and at the request of the TCC, PG&E Corporation and the Utility agreed to further extend the Bar Date for individual wildfire-related claims to December 31, 2019. On November 4, 2019, PG&E Corporation and the Utility and the TCC announced that they have reached agreement to an extension of the Bar Date for individual wildfire-related claims to December 31, 2019, which agreement also involves procedures for additional notice to potential individual wildfire claimants. PG&E Corporation and the Utility and the TCC will file a stipulation with the Bankruptcy Court detailing the terms of the agreement and seeking approval of their agreement. PG&E Corporation and the Utility have received numerous proofs of claim in connection with the 2018 Camp fire and the 2017 Northern California wildfires since the Petition Date and are early in the process of reconciling those claims to the amounts listed in the schedules of assets and liabilities. See "Potential Claims" in Note 2 above.

PG&E Corporation and the Utility are continuing to review the evidence concerning the 2018 Camp fire and the 2017 Northern California wildfires. PG&E Corporation and the Utility have not yet had access to all of the evidence collected by Cal Fire as part of its investigations. PG&E Corporation and the Utility and wildfire litigation plaintiffs have reached an agreement to transfer available evidence collected by Cal Fire for the fires for which its investigation reports have been released to a shared storage facility. The transfer of the evidence is not yet complete. (See "District Attorneys' Offices' Investigations" below for information regarding certain investigations related to the 2018 Camp fire and 2017 Northern California wildfires.)

Regardless of any determinations of cause by Cal Fire with respect to any pre-petition fire, ultimately PG&E Corporation's and the Utility's liability will be resolved through the Chapter 11 process, the state court proceedings related to the 2017 Tubbs fire, regulatory proceedings and any potential enforcement proceedings. The timing and outcome of these and other potential proceedings are uncertain.

As discussed under the headings "Plan Support Agreements with Public Entities" and "Restructuring Support Agreement with Holders of Subrogation Claims," PG&E Corporation and the Utility have entered into agreements with certain government entity claimholders to potentially resolve their wildfire-related claims as well as with certain insurance subrogation claimholders to potentially resolve all wildfire-related insurance subrogation claims. As discussed under the heading "Additional Information Related to 2018 Camp Fire and 2017 Northern California Wildfires Liability Accrual," PG&E Corporation and the Utility have been engaged from time to time in discussions with representatives of individual wildfire claimholders to potentially resolve their claims. PG&E Corporation and the Utility cannot predict the outcome or timing of discussions with any other claimholders.

On October 25, 2019, PG&E Corporation and the Utility submitted a brief to the Bankruptcy Court challenging the application of inverse condemnation to California's investor-owned utilities, including the Utility. The UCC joined in PG&E Corporation's and the Utility's brief, and a group of PG&E Corporation's shareholders filed a supporting supplemental statement. Opposition briefs are due on November 15, 2019, and the Bankruptcy Court will hear argument regarding PG&E Corporation's and the Utility's motion on November 19, 2019.

***Proceeding in San Francisco County Superior Court for Certain Tubbs Fire-Related Claims (the "Tubbs Trial")***

On July 2, 2019, the TCC filed a motion, pursuant to section 362(d)(1) of the Bankruptcy Code, for entry of an order modifying the automatic stay to permit certain individual plaintiffs to proceed to a jury trial on their claims against PG&E Corporation and the Utility arising from the Tubbs fire, and to request the San Francisco Superior Court in the coordinated litigation for the 2017 Northern California wildfires to order one or more of the cases of these individual plaintiffs to trial with preference pursuant to California Code of Civil Procedure section 36. On July 9, 2019, the TCC submitted an amended motion to request relief from the stay with respect to additional individual plaintiffs to proceed to a jury trial on their claims against PG&E Corporation and the Utility arising from the Tubbs fire.

On July 3, 2019, the Ad Hoc Subrogation Group submitted a motion for relief from the automatic stay to permit certain of the Ad Hoc Subrogation Group's members to pursue their claims against PG&E Corporation and the Utility regarding the issue of PG&E Corporation's and the Utility's liability for the Tubbs fire in the San Francisco Superior Court in the coordinated litigation for the 2017 Northern California wildfires.

On August 16, 2019, the Bankruptcy Court issued the Lift Stay Decision in which it granted the TCC's and the Ad Hoc Subrogation Group's motions for relief from the automatic stay to allow a state court jury trial to proceed regarding the Tubbs fire.

On September 12, 2019, the San Francisco County Superior Court issued a tentative ruling, granting motions for the Tubbs fire trial to proceed with respect to all designated individual plaintiffs on a preferential fast-track basis and denying PG&E Corporation's and the Utility's motion to transfer the trial from San Francisco County to Sonoma County, which the San Francisco County Superior Court reaffirmed on September 16, 2019, and set trial to begin on January 7, 2020.

At a status conference held on October 1, 2019, a pre-trial schedule was established, including dates relating to fact and expert discovery, motions in limine and jury selection. The court further ordered that the trial would be bifurcated into two phases – a liability phase to be tried first, followed, if necessary, by a damages phase. The court scheduled the trial to last for eight weeks, with four weeks for liability and four weeks for damages. The court further stated that it tentatively agreed with the plaintiffs' argument that the same jury should hear both phases of the trial. On October 7, 2019, PG&E Corporation and the Utility notified the court and the plaintiffs that PG&E Corporation and the Utility would consent to a single jury for both phases of the preference trial. Also on October 7, 2019, PG&E Corporation and the Utility filed a motion for a protective order against publicity seeking to prevent plaintiffs' counsel from communicating with members of the news media concerning specific evidence or theories of liability. The plaintiffs filed oppositions to the motion on October 17, 2019. Oral argument on the motion was held on October 30, 2019, during which the court directed the parties to further meet and confer on the issue and report back to the court for continued hearing on November 8, 2019. Discovery is ongoing.

The ultimate outcome of this proceeding is uncertain and could materially affect PG&E Corporation's and the Utility's financial condition, results of operations, liquidity, and cash flows.

### *Wildfire Claims Estimation Proceeding in the U.S. District Court for the Northern District of California (the "Estimation Proceeding")*

On July 18, 2019, PG&E Corporation and the Utility filed a motion for entry of an order establishing procedures and schedules for the estimation of PG&E Corporation's and the Utility's aggregate liability for certain claims arising out of the 2018 Camp fire, the 2017 Northern California wildfires and the 2015 Butte fire.

On August 21, 2019, the Bankruptcy Court issued recommendations to the District Court recommending the District Court order the partial withdrawal of the reference of the section 502(c) estimation of unliquidated claims arising from the 2018 Camp fire and the 2017 Northern California wildfires. On August 23, 2019, the District Court issued an order adopting the recommendation of the Bankruptcy Court in full and ordering that the reference to the Bankruptcy Court be withdrawn in part. Accordingly, the section 502(c) estimation of unliquidated claims arising from the 2018 Camp fire, the 2017 Northern California wildfires and the 2015 Butte fire is expected to take place before the District Court (and not the Bankruptcy Court).

On October 9, 2019, the District Court issued an initial order setting the estimation hearing for February 18, 2020 and reserving two weeks for the hearing, with the possibility of an additional week if warranted. In the order, the District Court named the TCC and PG&E Corporation and the Utility as the lead participants in the estimation proceedings. With respect to the subject matter of the estimation proceedings, the District Court proposed to "factor in the uncertainty of the liability disputes by directing the parties to assess the probability that the claimants would be successful at trial." The parties will continue to meet and confer on those issues. In terms of potential damages, the parties agree that the District Court will estimate losses for property, personal injury (including emotional distress and mental and physical health impairments), wrongful death and punitive damages (if any).

On October 11, 2019, the District Court issued a Scheduling Order. According to the Scheduling Order, fact discovery is to be completed by December 23, 2019, expert discovery is to be completed by February 6, 2020, parties' opening briefs are due February 12, 2020, and the first day of hearing is set for February 18, 2020.

The ultimate outcome of this proceeding is uncertain and could materially affect PG&E Corporation's and the Utility's financial condition, results of operations, liquidity, and cash flows.

*Plan Support Agreements with Public Entities*

On June 18, 2019, PG&E Corporation and the Utility entered into PSAs with certain local public entities (collectively, the "Supporting Public Entities") providing for an aggregate of $1.0 billion to be paid by PG&E Corporation and the Utility to such public entities pursuant to PG&E Corporation and the Utility's Chapter 11 plan of reorganization in order to settle such public entities' claims against PG&E Corporation and the Utility relating to the 2018 Camp fire, 2017 Northern California wildfires and 2015 Butte fire (collectively, "Public Entity Wildfire Claims"). For more information on the PSAs, see "Plan Support Agreements with Public Entities" in Note 10 of the Notes to the Condensed Consolidated Financial Statements in Item 1 of PG&E Corporation and the Utility's joint Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2019.

*Restructuring Support Agreement with Holders of Subrogation Claims*

On September 22, 2019, PG&E Corporation and the Utility entered into a Restructuring Support Agreement with the Consenting Subrogation Creditors of insurance subrogation claims. On November 1, 2019, PG&E Corporation and the Utility and the Consenting Subrogation Creditors of insurance subrogation claims entered into an amended and restated Restructuring Support Agreement. The RSA provides for an aggregate amount of $11.0 billion to be paid by PG&E Corporation and the Utility pursuant to the Proposed Plan in order to settle the Subrogation Claims, upon the terms and conditions set forth in the RSA. Under the RSA, PG&E Corporation and the Utility have also agreed to reimburse the holders of Subrogation Claims for professional fees of up to $55 million, upon the terms and conditions set forth in the RSA.

The RSA provides that, subject to certain terms and conditions (including that PG&E Corporation and the Utility remain solvent), the Consenting Subrogation Creditors will support the Proposed Plan with respect to its treatment of the Subrogation Claims, including by voting their Subrogation Claims to accept the Proposed Plan in the Chapter 11 Cases.

The effectiveness of the RSA is conditioned upon approval of the Bankruptcy Court in accordance with the terms of the RSA by no later than November 14, 2019 (which date may be extended with the consent of the holders of at least two-thirds of the Subrogation Claims held by Consenting Subrogation Creditors).

The RSA will automatically terminate if (i) the Proposed Plan is not confirmed by June 30, 2020 (or such later date as may be authorized by any amendment to AB 1054) or (ii) the Effective Date does not occur prior to December 31, 2020 (or six months following the deadline for confirmation of the Proposed Plan if such deadline is extended by any amendment to AB 1054).

The RSA may be terminated by any Consenting Subrogation Creditor as to itself if the Aggregate Subrogation Recovery is modified. The RSA may be terminated by the Consenting Subrogation Creditors holding at least two-thirds of the Subrogation Claims held by Consenting Subrogation Creditors under certain circumstances, including, among others, if (i) they reasonably determine in good faith at any time prior to confirmation of the Proposed Plan that PG&E Corporation and the Utility are insolvent or otherwise unable to raise sufficient capital to pay the Aggregate Subrogation Recovery on the Effective Date, (ii) PG&E Corporation and the Utility breach the terms of the RSA or otherwise fail to take certain actions specified in the RSA, (iii) the Proposed Plan does not treat the individual plaintiffs' wildfire-related claims consistent with the provisions of AB 1054, (iv) the Bankruptcy Court allows a plan proponent other than PG&E Corporation and the Utility to commence soliciting votes on a plan (other than the Proposed Plan) that incorporates the terms of the settlement contemplated by the RSA and PG&E Corporation and the Utility have not already commenced soliciting votes on the Proposed Plan which incorporates such settlement, (v) the Bankruptcy Court confirms a plan other than the Proposed Plan or (vi) the Proposed Plan is modified to be inconsistent with such settlement. The RSA may be terminated by PG&E Corporation and the Utility (a) in the event of certain breaches of the RSA by Consenting Subrogation Creditors holding at least 5% of the Subrogation Claims held by Consenting Subrogation Creditors or (b) if the Bankruptcy Court confirms a plan other than the Proposed Plan or if the terms of the Proposed Plan related to the settlement contemplated by the RSA become unenforceable or are enjoined.

Subject to certain limited exceptions, the aggregate amount of $11.0 billion (the "Allowed Subrogation Claim Amount") will survive any termination of the RSA and will be binding on PG&E Corporation and the Utility in the Chapter 11 Cases.

On September 24, 2019, PG&E Corporation and the Utility filed a motion with the Bankruptcy Court seeking authority to enter into, and perform under, the RSA and approving the terms of the settlement contemplated under the RSA. Pursuant to that motion, PG&E Corporation and the Utility requested that the allowance of the Subrogation Claims in the aggregate amount of $11.0 billion be effective upon the approval of the motion and that the treatment and satisfaction of the Subrogation Claims be effectuated pursuant to the Proposed Plan following confirmation of the effectiveness of the Proposed Plan. Various stakeholders filed objections to PG&E Corporation's and the Utility's motion, including the UCC, the Ad Hoc Noteholder Committee, the TCC and the U.S. Government. A hearing on PG&E Corporation's and the Utility's motion to approve the RSA was held on October 23, 2019, at which the Bankruptcy Court continued the hearing on the motion to November 13, 2019. On November 2, 2019, PG&E Corporation and the Utility filed the RSA, as amended, with the Bankruptcy Court.

**Certain Federal, State and Local Claims in Connection with the 2018 Camp Fire and 2017 Northern California Wildfires**

FEMA has filed proofs of claim in the Chapter 11 Cases in the amount of $1.2 billion in connection with the 2017 Northern California wildfires and $2.6 billion in connection with the 2018 Camp fire.

In addition, Cal Fire has filed proofs of claim in the Chapter 11 Cases in the amount of $133 million in connection with the 2017 Northern California wildfires and specifying at least $110 million in connection with the 2018 Camp fire. The OES has filed proofs of claim in the amount of $347 million in connection with the 2017 Northern California wildfires and $2.3 billion in connection with the 2018 Camp fire. The California Department of Transportation has filed proofs of claim in the Chapter 11 Cases in the amount of $217 million in connection with the 2018 Camp fire.

Certain other Federal, state and local entities have filed proofs of claim in the Chapter 11 Cases in connection with the 2015 Butte fire, the 2017 Northern California wildfires and the 2018 Camp fire. Proofs of claim have also been filed for unspecified amounts to be determined at a later time.

PG&E Corporation and the Utility are early in the process of reviewing the proofs of claim that have been filed in the Chapter 11 Cases. It is possible that additional Federal, state and local entities have filed or will file proofs of claim for wildfire-related claims in the Chapter 11 Cases. PG&E Corporation and the Utility may ask the Bankruptcy Court to disallow claims that they believe are duplicative, have been later amended or superseded, are without merit, are overstated or should be disallowed for other reasons. See "Potential Claims" in Note 2. In addition, there is dispute over whether claims asserted by the U.S. Government and the State of California (including any department, agency or instrumentality thereof) are unliquidated and subject to estimation under section 502(c) of the Bankruptcy Code. On November 1, 2019, PG&E Corporation and the Utility filed a notice with the Bankruptcy Court designating the Federal and state agency claims they contend are unliquidated and subject to estimation under section 502(c) of the Bankruptcy Code. A hearing on this issue before the Bankruptcy Court is set for December 17, 2019.

**Potential Losses in Connection with the 2018 Camp Fire and 2017 Northern California Wildfires**

On May 8, 2019, the California Department of Insurance issued a news release announcing an update on property losses in connection with the 2018 wildfires in Southern California (which are not in the Utility's service territory) and the 2018 Camp fire, indicating that "total claims over $12 billion as of April [2019]" in insured losses have been reported from the November 2018 fires, of which approximately $8.6 billion relates to statewide claims from the 2018 Camp fire. On September 6, 2018, the California Department of Insurance issued a news release announcing that insurers have received nearly 55,000 insurance claims totaling more than $12.28 billion in losses, of which approximately $10 billion relates to statewide claims from the 2017 Northern California wildfires.

The dollar amounts announced by the California Department of Insurance represent an aggregate amount of approximately $18.6 billion of insurance claims made as of the above dates related to the 2018 Camp fire and 2017 Northern California wildfires. PG&E Corporation and the Utility expect that additional claims have been submitted and will continue to be submitted to insurers, particularly with respect to the 2018 Camp fire. The Ad Hoc Subrogation Group in the Chapter 11 Cases has estimated that the total value of their claims related to the 2017 Northern California wildfires and the 2018 Camp fire could exceed $20 billion, including attorneys' fees and interest. These claims reflect insured property losses only.

The $18.6 billion of insurance claims made as of the above dates does not account for uninsured or underinsured property losses, interest, attorneys' fees, fire suppression and clean-up costs, evacuation costs, personal injury or wrongful death damages, medical expenses or other costs, such as potential punitive damages, fines or penalties, or losses related to claims that have not manifested yet ("future claims"), each of which could be significant. The TCC has most recently estimated in the Chapter 11 Cases that the individual plaintiffs' wildfire-related claims are valued at $30 billion to $40 billion. On October 17, 2019, the TCC and the Ad Hoc Noteholder Committee filed the TCC/Ad Hoc Noteholder Plan, which would allocate no more than approximately $13.5 billion of consideration to resolve all claims concerning the 2015 Butte fire, the 2017 Northern California wildfires and the 2018 Camp fire that are not the subject of either the PSAs with the Supporting Public Entities or the RSA with the Consenting Subrogation Creditors. This proposed cap on the covered wildfire claims would apply only if the TCC/Ad Hoc Noteholder Plan were confirmed by the Bankruptcy Court. The potential liabilities concerning those covered claims, and other wildfire claims, could materially exceed $13.5 billion as described below.

Potential liabilities related to the 2018 Camp fire and 2017 Northern California wildfires depend on various factors, including but not limited to the cause of each fire, contributing causes of the fires (including alternative potential origins, weather and climate related issues), the number, size and type of structures damaged or destroyed, the contents of such structures and other personal property damage, the number and types of trees damaged or destroyed, attorneys' fees for claimants, the nature and extent of any personal injuries, including the loss of lives, the extent to which future claims arise, the amount of fire suppression and clean-up costs, other damages the Utility may be responsible for if found negligent or as estimated in the Chapter 11 Cases, the amount of any penalties or fines that may be imposed by governmental entities, and the amount of any penalties, fines, or restitution orders that might result from any criminal charges brought.

There are a number of unknown facts and legal considerations that may impact the amount of any potential liability. Among other things, there is uncertainty at this time as to the number of current and future claims that will be allowed by the Bankruptcy Court, how claims for punitive damages and claims by variously situated persons will be classified and treated and whether such claims will be allowed, the impact that historical settlement values for wildfire claims and other factors may have on the estimation of wildfire liability in the Chapter 11 Cases, and the number of wildfire-related claims that will be filed in the Chapter 11 Cases as a result of the agreement to extend the Bar Date for individual wildfire-related claims. If PG&E Corporation and the Utility were to be found liable for certain or all of the costs, expenses and other losses described above with respect to the 2018 Camp fire and 2017 Northern California wildfires, the amount of such liability could exceed $30 billion. This estimate is based on a wide variety of data and other information available to PG&E Corporation and the Utility and their advisors, including various precedents involving similar claims, the estimates of insured losses (along with associated interest and attorneys' fees) disclosed in the Chapter 11 Cases by the Ad Hoc Subrogation Group, the estimates of losses not covered by insurance disclosed in the Chapter 11 Cases by the TCC, and the TCC/Ad Hoc Noteholder Plan. This estimate accounts for property losses (including insured, uninsured and underinsured property losses), interest, attorneys' fees, fire suppression and clean-up costs, evacuation costs, personal injury or wrongful death damages, medical expenses and certain other costs but does not include potential punitive damages, fines and penalties or damages related to claims that have not manifested yet. This estimate is not intended to provide an upper end of the range of potential liability arising from the 2018 Camp fire and 2017 Northern California wildfires. In certain circumstances, PG&E Corporation's and the Utility's liability could be substantially greater than such amount.

If PG&E Corporation and the Utility were to be found liable for any punitive damages, and such damages were allowed by the Bankruptcy Court, or if PG&E Corporation and the Utility were subject to fines or penalties, the amount of such punitive damages, fines and penalties could be significant. PG&E Corporation and the Utility have received significant fines and penalties in connection with past incidents. For example, in 2015, the CPUC approved a decision that imposed penalties on the Utility totaling $1.6 billion in connection with the natural gas explosion that occurred in the City of San Bruno, California on September 9, 2010 (the "San Bruno explosion"). These penalties represented nearly three times the underlying liability for the San Bruno explosion of approximately $558 million incurred for third-party claims, exclusive of shareholder derivative lawsuits and legal costs incurred. The amount of punitive damages, fines and penalties imposed on PG&E Corporation and the Utility could likewise be a significant amount in relation to the underlying liabilities with respect to the 2018 Camp fire and 2017 Northern California wildfires. PG&E Corporation's and the Utility's obligations with respect to such claims are expected to be determined through the Chapter 11 process. Regulatory proceedings are not subject to the automatic stay imposed as a result of the commencement of the Chapter 11 Cases; however, collection efforts in connection with fines or penalties arising out of such proceedings are stayed.

**2018 Camp Fire and 2017 Northern California Wildfires Accounting Charge**

*2018 Camp Fire*

In light of the current state of the law and the information currently available to the Utility, PG&E Corporation and the Utility have determined that it is probable they will incur a loss for claims in connection with the 2018 Camp fire. PG&E Corporation and the Utility recorded a charge in the amount of $10.5 billion for the year ended December 31, 2018 and a charge in the amount of $1.9 billion for the three months ended June 30, 2019. Based on additional facts and circumstances available to the Utility as of the date of this filing, including the entry into the RSA, PG&E Corporation and the Utility recorded an additional charge for claims in connection with the 2018 Camp fire in the amount of $526 million for the three months ended September 30, 2019, for a total charge of $2.4 billion for the nine months ended September 30, 2019.

The aggregate liability of $12.9 billion for claims in connection with the 2018 Camp fire corresponds to the lower end of the range of PG&E Corporation's and the Utility's reasonably estimated probable losses, and is subject to change based on additional information.

PG&E Corporation and the Utility currently believe that it is reasonably possible that the amount of the loss related to the 2018 Camp fire will be greater than the amount accrued, but are unable to reasonably estimate the additional loss and the upper end of the range because there are a number of unknown facts and legal considerations that may impact the amount of any potential liability, including the outcomes of claims estimation, whether existing settlements are upheld, how the claims filed by Federal, state and local entities are resolved, and the ongoing criminal investigation. PG&E Corporation and the Utility intend to continue to review the available information and other information as it becomes available, including evidence in Cal Fire's possession, evidence from or held by other parties, claims that have not yet been submitted, additional information about the nature and extent of personal and business property damage and losses, the nature, number and severity of personal injuries, and information made available through the discovery process.

The process for estimating losses associated with claims requires management to exercise significant judgment based on a number of assumptions and subjective factors, including but not limited to factors identified above and estimates based on currently available information and prior experience with wildfires. As more information becomes available, management estimates and assumptions regarding the financial impact of the 2018 Camp fire may change, which could result in material increases to the loss accrued.

The $12.9 billion liability does not include any amounts for potential penalties or fines that may be imposed by governmental entities on PG&E Corporation or the Utility, or punitive damages, if any, or any losses related to future claims for damages that have not manifested yet, each of which could be significant. In addition, the charge does not include any amount with respect to FEMA reimbursement claims, claims for property damages related to federal land and other property or claims by certain state and local public entities that are not party to the PSAs, which amounts could be substantial. The charge also does not include any amounts for potential losses in connection with the wildfire-related securities class action litigation described below.

*2017 Northern California Wildfires*

In light of the current state of the law and the information currently available to the Utility, PG&E Corporation and the Utility have determined that it is probable they will incur a loss for claims in connection with all 21 of the 2017 Northern California wildfires identified above, the reasons for which are discussed in more detail in this section below. PG&E Corporation and the Utility recorded a charge in the amount of $2.5 billion during the quarter ended June 30, 2018 and a charge in the amount of $1.0 billion during the quarter ended December 31, 2018, for a total charge in the amount of $3.5 billion for the year ended December 31, 2018. PG&E Corporation and the Utility recorded a charge in the amount of $2.0 billion for the three months ended June 30, 2019. Based on additional facts and circumstances available to the Utility as of the date of this filing, including the entry into the RSA, PG&E Corporation and the Utility recorded an additional charge for claims in connection with the 2017 Northern California wildfires in the amount of $2.0 billion for the three months ended September 30, 2019, for a total charge of $4.0 billion for the nine months ended September 30, 2019.

The aggregate liability of $7.5 billion for claims in connection with the 2017 Northern California wildfires corresponds to the lower end of the range of PG&E Corporation's and the Utility's reasonably estimated probable losses and is subject to change based on additional information.

Case: 19-30088    Doc# 4630-6    Filed: 11/08/19    Entered: 11/08/19 15:41:24    Page 13 of 42

In the case of the Tubbs and 37 fires, PG&E Corporation and the Utility continue to believe that if the claims related to these fires were litigated on the merits, it would not be probable that they would incur a loss for such claims. As a result of settlement offers PG&E Corporation and the Utility had made to holders of claims related to the Tubbs and 37 fires, PG&E Corporation and the Utility determined that it is probable they will incur a loss for claims in connection with such fires. With respect to the other 19 of the 2017 Northern California wildfires (the La Porte, McCourtney, Lobo, Honey, Redwood, Sulphur, Cherokee, Blue, Pocket, Atlas, Cascade, Point, Nuns, Norrbom, Adobe, Partrick, Pythian, Youngs and Pressley fires), PG&E Corporation and the Utility previously determined that it is probable they would incur a loss for claims in connection with such fires if such claims were litigated on the merits.

PG&E Corporation and the Utility currently believe that it is reasonably possible that the amount of the loss related to the 2017 Northern California wildfires will be greater than the amount accrued, but are unable to reasonably estimate the additional loss and the upper end of the range because there are a number of unknown facts and legal considerations that may impact the amount of any potential liability, including the outcomes of claims estimation, whether existing settlements are upheld, how the claims filed by Federal, state and local entities are resolved, and the proceeding for certain Tubbs fire-related claims. PG&E Corporation and the Utility intend to continue to review the available information and other information as it becomes available, including evidence in Cal Fire's possession, evidence from or held by other parties, claims that have not yet been submitted, and additional information about the nature and extent of personal and business property damage and losses, the nature, number and severity of personal injuries, and information made available through the discovery process.

The process for estimating losses associated with claims requires management to exercise significant judgment based on a number of assumptions and subjective factors, including but not limited to factors identified above and estimates based on currently available information and prior experience with wildfires. As more information becomes available, management estimates and assumptions regarding the financial impact of the 2017 Northern California wildfires may change, which could result in material increases to the loss accrued.

The $7.5 billion liability does not include any amounts for potential penalties or fines that may be imposed by governmental entities on PG&E Corporation or the Utility, or punitive damages, if any, or any losses related to future claims for damages that have not manifested yet, each of which could be significant. In addition, the charge does not include any amount in respect of FEMA reimbursement claims, claims for property damages related to federal land and other property or claims by certain state and local public entities that are not party to the PSAs, which amounts could be substantial. The charge also does not include any amounts for potential losses in connection with the wildfire-related securities class action litigation described below.

### *Additional Information Related to 2018 Camp Fire and 2017 Northern California Wildfires Liability Accrual*

The aggregate liability of $20.3 billion for claims in connection with the 2018 Camp fire and the 2017 Northern California wildfires is comprised of (i) $11.0 billion for subrogated insurance claimholders pursuant to the RSA, plus (ii) $47 million for expected professional fees for professionals retained by subrogated insurance claimholders to be reimbursed pursuant to the RSA, plus (iii) $7.5 billion for individual wildfire claimholders (including those with uninsured and underinsured property losses, among other claims), plus (iv) $1.0 billion for the Supporting Public Entities with respect to their Public Entity Wildfire Claims pursuant to the PSAs, plus (v) $900 million for clean-up and fire suppression costs, minus (vi) $100 million of payments made to the Wildfire Assistance Fund on August 2, 2019. As described above, the aggregate liability of $20.3 billion for claims in connection with the 2018 Camp fire and the 2017 Northern California wildfires corresponds to the lower end of the range of PG&E Corporation's and the Utility's reasonably estimated probable losses and is subject to change based on additional information. (See "Potential Losses in Connection with the 2018 Camp Fire and 2017 Northern California Wildfires" above.)

Case: 19-30088    Doc# 4630-6    Filed: 11/08/19    Entered: 11/08/19 15:41:24    Page 14 of 42

The aggregate liability of $7.5 billion for individual wildfire claimholders is based on PG&E Corporation's and the Utility's estimate of probable loss developed from data and other information available to PG&E Corporation and the Utility and corresponds to the lower end of the range of PG&E Corporation's and the Utility's reasonably estimated probable losses and is subject to change based on additional information. As described above, the TCC/Ad Hoc Noteholder Plan proposes a trust for payment of all wildfire-related claims (other than insurance subrogation claims and Public Entity Wildfire Claims) to be funded with consideration in an amount equal to the lesser of (i) $13.5 billion (the "TCC/Ad Hoc Noteholder Plan Cap") and (ii) an amount of such claims as determined by a court of competent jurisdiction. This trust under the TCC/Ad Hoc Noteholder Plan would be available to pay the claims of individual wildfire claimholders and certain other claims (other than insurance subrogation claims and Public Entity Wildfire Claims), such as clean-up and fire suppression costs. Under the Proposed Plan, $900 million of the $8.4 billion trust for wildfire-related claims (other than insurance subrogation claims and Public Entity Wildfire Claims) corresponds to clean-up and fire suppression costs. The TCC, which is the official representative of all tort claimants in the Chapter 11 Cases (but not the representative of any individual wildfire claimholder), has stated that the TCC/Ad Hoc Noteholder Plan has the support of the individual wildfire claimholders. The actual amount of PG&E Corporation's and the Utility's liability to individual wildfire claimholders will be addressed and treated under a plan of reorganization in the Chapter 11 Cases and will be determined either through (i) the Tubbs Trial and the Estimation Proceeding or (ii) settlement with the individual wildfire claimholders.

Over the past several months, representatives of PG&E Corporation and the Utility have from time to time engaged in settlement discussions with representatives of the individual wildfire claimholders. On October 28, 2019, the Bankruptcy Court issued an order directing the principal parties in the Chapter 11 Cases to participate in mediation. On November 1, 2019, the California Governor announced that his office would seek to "broker" the mediation in order to encourage a "swift and consensual resolution to the Chapter 11 Cases."

PG&E Corporation and the Utility are aware that representatives of certain debt- and equity-holders of PG&E Corporation and the Utility have from time to time engaged in separate settlement discussions with representatives of the individual wildfire claimholders, including following the date of the mediation order. As previously disclosed, PG&E Corporation's and the Utility's most recent settlement offer to the representatives of the individual wildfire claimholders was $7.5 billion. PG&E Corporation and the Utility are not aware of the amount of any settlement offer that may have been made by any representatives of any debt- or equity-holders to the representatives of the individual wildfire claimholders, although PG&E Corporation and the Utility believe that one or more settlement offers may have been made and that it is likely that such offers significantly exceed the previous offer made by PG&E Corporation and the Utility.

Based on the facts and circumstances available to PG&E Corporation and the Utility as of the date of this filing, including the status of settlement discussions, PG&E Corporation and the Utility believe that in the event the claims of the individual wildfire claimholders are resolved through settlement, the amount of such settlement may be much closer to the amount of the TCC/Ad Hoc Noteholder Plan Cap than to the amount of the liability accrual of $7.5 billion. As of the date of this filing, PG&E Corporation and the Utility believe that these settlement discussions are in a particularly critical period of the negotiation. PG&E Corporation and the Utility believe that the potential exists for material developments in such negotiation in the near term. Accordingly, if PG&E Corporation, the Utility and the representatives of the individual wildfire claimholders reach agreement, PG&E Corporation's and the Utility's probable loss contingency for the claims of the individual wildfire claimholders may increase by a material amount, which would result in an additional accrual above the $7.5 billion reflected in this filing. Any such increase could be substantial and could be recorded in the fourth quarter of 2019.

Notwithstanding recent developments in the status of settlement negotiations, PG&E Corporation and the Utility are unable to reasonably estimate (a) whether the amount of the liability to individual wildfire claimholders will actually be determined through (i) the Tubbs Trial and the Estimation Proceeding or (ii) settlement with the representatives of the individual wildfire claimholders or (b) the actual amount of such liability under either scenario. In addition, PG&E Corporation and the Utility cannot predict the outcome or timing of any settlement discussions with the representatives of the individual wildfire claimholders, and there can be no assurance that any settlement will be reached.

**Loss Recoveries**

PG&E Corporation and the Utility had insurance coverage for liabilities, including wildfire. Additionally, there are several mechanisms that allow for recovery of costs from customers. Potential for recovery is described below. Failure to obtain a substantial or full recovery of costs related to the 2018 Camp fire and 2017 Northern California wildfires or any conclusion that such recovery is no longer probable could have a material effect on PG&E Corporation's and the Utility's financial condition, results of operations, liquidity, and cash flows. In addition, the inability to recover costs in a timely manner could have a material effect on PG&E Corporation's and the Utility's financial condition, results of operations, liquidity, and cash flows.

**Insurance**

PG&E Corporation and the Utility had $842 million of insurance coverage for liabilities, including wildfire events, for the period from August 1, 2017 through July 31, 2018, subject to an initial self-insured retention of $10 million per occurrence and further retentions of approximately $40 million per occurrence. During the third quarter of 2018, PG&E Corporation and the Utility renewed their liability insurance coverage for wildfire events in an aggregate amount of approximately $1.4 billion for the period from August 1, 2018 through July 31, 2019, comprised of $700 million for general liability (subject to an initial self-insured retention of $10 million per occurrence), and $700 million for property damages only, which property damage coverage includes an aggregate amount of approximately $200 million through the reinsurance market where a catastrophe bond was utilized.

PG&E Corporation and the Utility record a receivable for insurance recoveries when it is deemed probable that recovery of a recorded loss will occur. Through September 30, 2019, PG&E Corporation and the Utility recorded $1.38 billion for probable insurance recoveries in connection with the 2018 Camp fire and $842 million for probable insurance recoveries in connection with the 2017 Northern California wildfires. These amounts reflect an assumption that the cause of each fire is deemed to be a separate occurrence under the insurance policies. The amount of the receivable is subject to change based on additional information. PG&E Corporation and the Utility intend to seek full recovery for all insured losses.

If PG&E Corporation and the Utility are unable to recover the full amount of their insurance, PG&E Corporation's and the Utility's financial condition, results of operations, liquidity, and cash flows could be materially affected. Even if PG&E Corporation and the Utility were to recover the full amount of their insurance, PG&E Corporation and the Utility expect their losses in connection with the 2018 Camp fire and 2017 Northern California wildfires will substantially exceed their available insurance.

The balances for insurance receivables with respect to the 2018 Camp fire and the 2017 Northern California wildfires are included in Other accounts receivable in PG&E Corporation's and the Utility's Condensed Consolidated Balance Sheets. The balance for insurance receivable for the 2018 Camp fire was $1.38 billion as of September 30, 2019 and December 31, 2018. The balance for insurance receivable for the 2017 Northern California wildfires was $807 million and $829 million as of September 30, 2019 and December 31, 2018, respectively.

*Regulatory Recovery*

On June 21, 2018, the CPUC issued a decision granting the Utility's request to establish a WEMA to track specific incremental wildfire liability costs effective as of July 26, 2017. The decision does not grant the Utility rate recovery of any wildfire-related costs. Any such rate recovery would require CPUC authorization in a separate proceeding. The Utility may be unable to fully recover costs in excess of insurance, if at all. Rate recovery is uncertain, therefore the Utility has not recorded a regulatory asset related to any wildfire claims costs. Even if such recovery is possible, it could take a number of years to resolve and a number of years to collect.

In addition, SB 901, signed into law on September 21, 2018, requires the CPUC to establish a CHT, directing the CPUC to limit certain disallowances in the aggregate, so that they do not exceed the maximum amount that the Utility can pay without harming ratepayers or materially impacting its ability to provide adequate and safe service. SB 901 also authorizes the CPUC to issue a financing order that permits recovery, through the issuance of recovery bonds (also referred to as "securitization"), of wildfire-related costs found to be just and reasonable by the CPUC and, only for the 2017 Northern California wildfires, any amounts in excess of the CHT. SB 901 does not authorize securitization with respect to possible 2018 Camp fire costs.

On January 10, 2019, the CPUC adopted an OIR, which establishes a process to develop criteria and a methodology to inform determinations of the CHT in future applications under Section 451.2(a) of the Public Utilities Code for recovery of costs related to the 2017 Northern California wildfires.

On March 29, 2019, the assigned commissioner issued a scoping memo, which confirmed that the CPUC in this proceeding would establish a CHT methodology applicable only to 2017 fires, to be invoked in connection with a future application for cost recovery, and would not determine a specific financial outcome in this proceeding.

On July 8, 2019, the CPUC issued a decision in the CHT proceeding. The CPUC decision provides that "[a]n electrical corporation that has filed for relief under chapter 11 of the Bankruptcy Code may not access the Stress Test to recover costs in an application under Section 451.2(b), because the Commission cannot determine the corporation's 'financial status,' which includes, among other considerations, its capital structure, liquidity needs, and liabilities, as required by Section 451.2(b)." This determination effectively bars PG&E Corporation and the Utility from access to relief under the CHT during the pendency of the Chapter 11 Cases. On August 7, 2019, the Utility submitted to the CPUC an application for rehearing of the decision. The Utility indicated in its application, among other things, that the CPUC's decision "is contrary to law because it bars a utility that has filed for Chapter 11 from accessing the CHT, requires a utility to file a cost recovery application before the CHT will be determined, and erects ratepayer protection mechanisms as an extra-statutory hurdle for accessing the CHT." The Utility also argued that the CPUC should apply the CHT methodology to costs related to the 2018 Camp fire.

The decision otherwise adopts a methodology to determine the CHT based on (1) the maximum additional debt that a utility can take on and maintain a minimum investment grade credit rating; (2) excess cash available to the utility; (3) a potential maximum regulatory adjustment of either 20% of the CHT or 5% of the total disallowed wildfire liabilities, whichever is greater; and (4) an adjustment to preserve for ratepayers any tax benefits associated with the CHT. The decision also requires a utility to include proposed ratepayer protection measures to mitigate harm to ratepayers as part of an application under Section 451.2(b).

Failure to obtain a substantial or full recovery of costs related to wildfires could have a material effect on PG&E Corporation's and the Utility's financial condition, results of operations, liquidity and cash flows.

**Wildfire-Related Derivative Litigation**

Two purported derivative lawsuits alleging claims for breach of fiduciary duties and unjust enrichment were filed in the San Francisco County Superior Court on November 16, 2017 and November 20, 2017, respectively, naming as defendants certain current and certain former members of the Board of Directors and certain current and former officers of PG&E Corporation and the Utility. PG&E Corporation and the Utility are named as nominal defendants. These lawsuits were consolidated by the court on February 14, 2018, and are denominated *In Re California North Bay Fire Derivative Litigation*. On April 13, 2018, the plaintiffs filed a consolidated complaint. After the parties reached an agreement regarding a stay of the derivative proceeding pending resolution of the tort actions described above and any regulatory proceeding relating to the 2017 Northern California wildfires, on April 24, 2018, the court entered a stipulation and order to stay. The stay is subject to certain conditions regarding the plaintiffs' access to discovery in other actions. On January 28, 2019, the plaintiffs filed a request to lift the stay for the purposes of amending their complaint to add allegations regarding the 2018 Camp fire.

On August 3, 2018, a third purported derivative lawsuit, entitled *Oklahoma Firefighters Pension and Retirement System v. Chew, et al.*, was filed in the U.S. District Court for the Northern District of California, naming as defendants certain current and former members of the Board of Directors and certain current and former officers of PG&E Corporation and the Utility. PG&E Corporation is named as a nominal defendant. The lawsuit alleges claims for breach of fiduciary duties and unjust enrichment as well as a claim under Section 14(a) of the federal Securities Exchange Act of 1934 alleging that PG&E Corporation's and the Utility's 2017 proxy statement contained misrepresentations regarding the companies' risk management and safety programs. On October 15, 2018, PG&E Corporation filed a motion to stay the litigation. Prior to the scheduled hearing on this motion, this matter was automatically stayed by PG&E Corporation's and the Utility's commencement of bankruptcy proceedings, as discussed below.

On October 23, 2018, a fourth purported derivative lawsuit, entitled *City of Warren Police and Fire Retirement System v. Chew, et al.*, was filed in San Francisco County Superior Court, alleging claims for breach of fiduciary duty, corporate waste and unjust enrichment. It names as defendants certain current and former members of the Board of Directors and certain current and former officers of PG&E Corporation and names PG&E Corporation as a nominal defendant. The plaintiff filed a request with the court seeking the voluntary dismissal of this matter without prejudice on January 18, 2019.

On November 21, 2018, a fifth purported derivative lawsuit, entitled *Williams v. Earley, Jr., et al.*, was filed in federal court in San Francisco, alleging claims identical to those alleged in the *Oklahoma Firefighters Pension and Retirement System v. Chew, et al.* lawsuit listed above against certain current and former officers and directors, and naming PG&E Corporation and the Utility as nominal defendants. This lawsuit includes allegations related to the 2017 Northern California wildfires and the 2018 Camp fire. This action was stayed by stipulation of the parties and order of the court on December 21, 2018, subject to resolution of the pending securities class action.

On December 24, 2018, a sixth purported derivative lawsuit, entitled *Bowlinger v. Chew, et al.*, was filed in San Francisco Superior Court, alleging claims for breach of fiduciary duty, abuse of control, corporate waste, and unjust enrichment in connection with the 2018 Camp fire against certain current and former officers and directors, and naming PG&E Corporation and the Utility as nominal defendants. On February 5, 2019, the plaintiff in *Bowlinger v. Chew, et al.* filed a response to the notice asserting that the automatic stay did not apply to his claims. PG&E Corporation and the Utility accordingly filed a Motion to Enforce the Automatic Stay with the Bankruptcy Court as to the *Bowlinger* action, which was granted. The court has scheduled a case management conference for December 13, 2019.

On January 25, 2019, a seventh purported derivative lawsuit, entitled *Hagberg v. Chew, et al.*, was filed in San Francisco Superior Court, alleging claims for breach of fiduciary duty, abuse of control, corporate waste, and unjust enrichment in connection with the 2018 Camp fire against certain current and former officers and directors, and naming PG&E Corporation and the Utility as nominal defendants.

On January 28, 2019, an eighth purported derivative lawsuit, entitled *Blackburn v. Meserve, et al.*, was filed in federal court alleging claims for breach of fiduciary duty, unjust enrichment, and waste of corporate assets in connection with the 2017 Northern California wildfires and the 2018 Camp fire against certain current and former officers and directors, and naming PG&E Corporation as a nominal defendant.

Due to the commencement of the Chapter 11 Cases, PG&E Corporation and the Utility filed notices in each of these proceedings on February 1, 2019, reflecting that the proceedings are automatically stayed pursuant to Section 362(a) of the Bankruptcy Code.

**Securities Class Action Litigation**

*Wildfire-Related Class Action*

In June 2018, two purported securities class actions were filed in the United States District Court for the Northern District of California, naming PG&E Corporation and certain of its current and former officers as defendants, entitled *David C. Weston v. PG&E Corporation, et al.* and *Jon Paul Moretti v. PG&E Corporation, et al.*, respectively. The complaints alleged material misrepresentations and omissions related to, among other things, vegetation management and transmission line safety in various PG&E Corporation public disclosures. The complaints asserted claims under Section 10(b) and Section 20(a) of the federal Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, and sought unspecified monetary relief, interest, attorneys' fees and other costs. Both complaints identified a proposed class period of April 29, 2015 to June 8, 2018. On September 10, 2018, the court consolidated both cases and the litigation is now denominated *In re PG&E Corporation Securities Litigation*. The court also appointed the Public Employees Retirement Association of New Mexico as lead plaintiff. The plaintiff filed a consolidated amended complaint on November 9, 2018. After the plaintiff requested leave to amend their complaint to add allegations regarding the 2018 Camp fire, the plaintiff filed a second amended consolidated complaint on December 14, 2018.

Due to the commencement of the Chapter 11 Cases, PG&E Corporation and the Utility filed a notice on February 1, 2019, reflecting that the proceedings are automatically stayed pursuant to Section 362(a) of the Bankruptcy Code. On February 15, 2019, PG&E Corporation and the Utility filed a complaint in Bankruptcy Court against the plaintiff seeking preliminary and permanent injunctive relief to extend the stay to the claims alleged against the individual officer defendants.

On February 22, 2019, a purported securities class action was filed in the United States District Court for the Northern District of California, entitled *York County on behalf of the York County Retirement Fund, et al. v. Rambo, et al.* (the "York County Action"). The complaint names as defendants certain current and former officers and directors, as well as the underwriters of four public offerings of notes from 2016 to 2018. Neither PG&E Corporation nor the Utility is named as a defendant. The complaint alleges material misrepresentations and omissions in connection with the note offerings related to, among other things, PG&E Corporation's and the Utility's vegetation management and wildfire safety measures. The complaint asserts claims under Section 11 and Section 15 of the Securities Act of 1933, and seeks unspecified monetary relief, attorneys' fees and other costs, and injunctive relief. On May 7, 2019, the York County Action was consolidated with *In re PG&E Corporation Securities Litigation*.

On May 28, 2019, the plaintiffs in the consolidated securities actions filed a third amended consolidated class action complaint, which includes the claims asserted in the previously-filed actions and names as defendants PG&E Corporation, the Utility, certain current and former officers and directors, and the underwriters. The action remains stayed as to PG&E Corporation and the Utility. On August 28, 2019, the Bankruptcy Court denied PG&E Corporation's and the Utility's request to extend the stay to the claims against the officer, director, and underwriter defendants. On October 4, 2019, the officer, director, and underwriter defendants filed motions to dismiss the third amended complaint, which motions are currently set to be heard by the District Court on February 6, 2020.

*De-energization Class Action*

On October 25, 2019, a purported securities class action was filed in the United States District Court for the Northern District of California, entitled Vataj v. Johnson et al. The complaint names as defendants a current director and certain current and former officers of PG&E Corporation. Neither PG&E Corporation nor the Utility is named as a defendant. The complaint alleges materially false and misleading statements regarding PG&E Corporation's wildfire prevention and safety protocols and policies, including regarding the Utility's public safety power shutoffs, that allegedly resulted in losses and damages to holders of PG&E Corporation's securities. The complaint asserts claims under Section 10(b) and Section 20(a) of, and Rule 10b-5 promulgated under, the Exchange Act of 1934, and seeks unspecified monetary relief, attorneys' fees and other costs.

Given the early stages of the litigations, including but not limited to the fact that defendants' motions to dismiss have not yet been heard and no discovery has occurred in the consolidated class action litigation, and that the de-energization class action was recently filed, PG&E Corporation and the Utility are unable to reasonably estimate the amount of any potential loss.

*Indemnification Obligations*

To the extent permitted by law, PG&E Corporation and the Utility have obligations to indemnify directors and officers for certain events or occurrences while a director or officer is or was serving in such capacity, which indemnification obligations extend to the claims asserted against the directors and officers in the securities class action. PG&E Corporation and the Utility maintain directors and officers insurance coverage to reduce their exposure to such indemnification obligations, and have provided notice to their insurance carriers of the claims asserted in the securities class action. PG&E Corporation and the Utility additionally have potential indemnification obligations to the underwriters for the Utility's note offerings, pursuant to the underwriting agreements associated with those offerings. These indemnification obligations to the officers, directors and underwriters may be limited or affected by the Chapter 11 Cases.

**District Attorneys' Offices' Investigations**

During the second quarter of 2018, Cal Fire issued news releases stating that it referred the investigations related to the McCourtney, Lobo, Honey, Sulphur, Blue, Norrbom, Adobe, Partrick, Pythian, Pocket and Atlas fires to the appropriate county District Attorney's offices for review "due to evidence of alleged violations of state law." On March 12, 2019, the Sonoma, Napa, Humboldt and Lake County District Attorneys announced that they would not prosecute PG&E Corporation or the Utility for the fires in those counties, which include the Sulphur, Blue, Norrbom, Adobe, Partrick, Pythian, Pocket and Atlas fires.

PG&E Corporation and the Utility were the subject of criminal investigations or other actions by the Nevada County District Attorney's Office to whom Cal Fire had referred its investigations into the McCourtney and Lobo fires. On July 23, 2019, the Nevada County District Attorney informed PG&E Corporation and the Utility of his decision not to pursue criminal charges in connection with the McCourtney and Lobo fires.

The Honey fire was referred to the Butte County District Attorney's Office, and in October 2018, the Utility reached an agreement to settle any civil claims or criminal charges that could have been brought by the Butte County District Attorney in connection with the Honey fire, as well as the La Porte and Cherokee fires (which were not referred). The settlement provides for funding by the Utility for at least four years of an enhanced fire prevention and communication program, in the amount of up to $1.5 million, not recoverable in rates.

On October 9, 2018, the Office of the District Attorney of Yuba County announced its decision not to pursue criminal charges at such time against PG&E Corporation or the Utility pertaining to the Cascade fire. The District Attorney's Office also indicated that it reserved the right "to review any additional information or evidence that may be submitted to it prior to the expiration of the criminal statute of limitations."

In addition, the Butte County District Attorney's Office and the California Attorney General's Office have opened a criminal investigation of the 2018 Camp fire. PG&E Corporation and the Utility have been informed by the Butte County District Attorney's Office and the California Attorney General's Office that a grand jury has been empaneled in Butte County, and the Utility was served with subpoenas in the grand jury investigation. The Utility has produced documents and continues to produce documents and respond to other requests for information and witness testimony in connection with the criminal investigation of the 2018 Camp fire, including, but not limited to, documents related to the operation and maintenance of equipment owned or operated by the Utility. The Utility has also cooperated with the Butte County District Attorney's Office and the California Attorney General's Office in the collection of physical evidence from equipment owned or operated by the Utility. PG&E Corporation and the Utility are unable to predict the outcome of the criminal investigation into the 2018 Camp fire. The Utility could be subject to material fines, penalties, or restitution if it is determined that the Utility failed to comply with applicable laws and regulations, as well as non-monetary remedies such as oversight requirements. The criminal investigation is not subject to the automatic stay imposed as a result of the commencement of the Chapter 11 Cases. On October 17, 2019, the Butte County District Attorney's Office and the California Attorney General's Office filed proofs of claim in the Chapter 11 Cases of an undetermined amount on the basis of the criminal investigation of the 2018 Camp fire.

Additional investigations and other actions may arise out of the other 2017 Northern California wildfires and the 2018 Camp fire. The timing and outcome for resolution of the remaining referrals by Cal Fire to the appropriate county District Attorneys' offices are uncertain.

### SEC Investigation

On March 20, 2019, PG&E Corporation learned that the SEC's San Francisco Regional Office is conducting an investigation related to PG&E Corporation's and the Utility's public disclosures and accounting for losses associated with the 2018 Camp fire, the 2017 Northern California wildfires and the 2015 Butte fire. PG&E Corporation and the Utility are unable to predict the timing and outcome of the investigation.

### Clean-up and Repair Costs

The Utility incurred costs of $704 million for clean-up and repair of the Utility's facilities (including $270 million in capital expenditures) through September 30, 2019, in connection with the 2018 Camp fire. The Utility also incurred costs of $346 million for clean-up and repair of the Utility's facilities (including $171 million in capital expenditures) through September 30, 2019, in connection with the 2017 Northern California wildfires. The Utility is authorized to track and seek recovery of clean-up and repair costs through CEMA. (CEMA requests are subject to CPUC approval.) The Utility capitalizes and records as regulatory assets costs that are probable of recovery. At September 30, 2019, the CEMA regulatory asset balances related to the 2018 Camp fire and 2017 Northern California wildfires were zero and $88 million, respectively, and are included in long-term regulatory assets on the Condensed Consolidated Balance Sheets. Additionally, the capital expenditures for clean-up and repair are included in property, plant and equipment at September 30, 2019.

Should PG&E Corporation and the Utility conclude that recovery of any clean-up and repair costs included in the CEMA is no longer probable, PG&E Corporation and the Utility will record a charge in the period such conclusion is reached. Failure to obtain a substantial or full recovery of these costs could have a material effect on PG&E Corporation's and the Utility's financial condition, results of operations, liquidity, and cash flows.

### Wildfire Assistance Fund

On May 24, 2019, the Bankruptcy Court entered an order authorizing PG&E Corporation and the Utility to establish and fund a program (the "Wildfire Assistance Fund") to assist those displaced by the 2018 Camp fire and 2017 Northern California wildfires with the costs of substitute or temporary housing ("Alternative Living Expenses") and other urgent needs. The Wildfire Assistance Fund is intended to aid certain wildfire claimants who are either uninsured or still in need of assistance for Alternative Living Expenses or have other urgent needs. The Wildfire Assistance Fund consists of $105 million deposited into a segregated account controlled by an independent third-party administrator appointed by the Bankruptcy Court, who will disburse and administer the funds. Up to $5 million of the Wildfire Assistance Fund may be used to pay the costs of administering the fund. The establishment of the Wildfire Assistance Fund is not an acknowledgment or admission by PG&E Corporation or the Utility of liability with respect to the 2018 Camp fire or 2017 Northern California wildfires.

The Utility fully funded $105 million into the Wildfire Assistance Fund on August 2, 2019. As of November 1, 2019, the administrator issued claimant payments totaling $22 million under the Wildfire Assistance Fund. The deadline to apply for financial assistance under the fund is November 15, 2019.

**Wildfire Fund under AB 1054**

On July 12, 2019, the California Governor signed into law AB 1054, a bill which provides for the establishment of a statewide fund that will be available for eligible electric utility companies to pay eligible claims for liabilities arising from wildfires occurring after July 12, 2019 that are caused by the applicable electric utility company's equipment, subject to the terms and conditions of AB 1054. Eligible claims are claims for third party damages resulting from any such wildfires, limited to the portion of such claims that exceeds the greater of (i) $1.0 billion in the aggregate in any calendar year and (ii) the amount of insurance coverage required to be in place for the electric utility company pursuant to Section 3293 of the Public Utilities Code, added by AB 1054.

Electric utility companies that draw from the fund will only be required to repay amounts that are determined by the CPUC in an application for cost recovery not to be just and reasonable, subject to a rolling three-year disallowance cap equal to 20% of the electric utility company's transmission and distribution equity rate base. For the Utility, this disallowance cap is expected to be approximately $2.3 billion for the three-year period starting in 2019, subject to adjustment based on changes in the Utility's total transmission and distribution equity rate base. The disallowance cap is inapplicable in certain circumstances, including if the Wildfire Fund administrator determines that the electric utility company's actions or inactions that resulted in the applicable wildfire constituted "conscious or willful disregard for the rights and safety of others," or the electric utility company fails to maintain a valid safety certification. Costs that the CPUC determines to be just and reasonable will not need to be repaid to the fund, resulting in a draw-down of the fund.

The Wildfire Fund and disallowance cap will be terminated when the amounts therein are exhausted. The Wildfire Fund is expected to be capitalized with (i) $10.5 billion of proceeds of bonds supported by a 15-year extension of the Department of Water Resources charge to ratepayers, (ii) $7.5 billion in initial contributions from California's three investor-owned electric utility companies and (iii) $300 million in annual contributions paid by California's three investor-owned electric utility companies. The contributions from the investor-owned electric utility companies will be effectively borne by their respective shareholders, as they will not be permitted to recover these costs from ratepayers. The costs of the initial and annual contributions are allocated among the three investor-owned electric utility companies pursuant to a "Wildfire Fund allocation metric" set forth in AB 1054 based on land area in the applicable utility's service territory classified as high fire threat districts and adjusted to account for risk mitigation efforts. The Utility's initial Wildfire Fund allocation metric is expected to be 64.2% (representing an initial contribution of approximately $4.8 billion and annual contributions of approximately $193 million). In addition, all initial and annual contributions will be excluded from the measurement of the Utility's authorized capital structure. The Wildfire Fund will only be available for payment of eligible claims so long as there are sufficient funds remaining in the Wildfire Fund. Such funds could be depleted more quickly than expected, including as a result of claims made by California's other participating electric utility companies.

On July 23, 2019, the Utility notified the CPUC of its intent to participate in the Wildfire Fund. On August 7, 2019, PG&E Corporation and the Utility submitted a motion with the Bankruptcy Court for the entry of an order authorizing PG&E Corporation and the Utility to participate in the Wildfire Fund and to make any initial and annual contributions to the Wildfire Fund upon emergence from Chapter 11. On August 26, 2019, the Bankruptcy Court entered an order granting such authorizations. In order to participate in the Wildfire Fund, the Utility must also meet the eligibility and other requirements set forth in AB 1054, and pay its share of the initial contribution to the Wildfire Fund upon emergence from Chapter 11. In such event (assuming the Utility satisfies the eligibility and other requirements set forth in AB 1054), the Wildfire Fund will be available to the Utility to pay for eligible claims arising between the effective date of AB 1054 and the Utility's emergence from Chapter 11, subject to a limit of 40% of the amount of such claims. The balance of any such claims would need to be addressed through the Chapter 11 Cases.

The Utility expects to record its required contributions as an asset and amortize the asset over the estimated life of the Wildfire Fund. The Wildfire Fund asset will be further adjusted for impairment as the assets are used to pay eligible claims, which will result in decreases to the assets available for coverage of future events. AB 1054 does not establish a definite term of the Wildfire Fund; therefore, this accounting treatment is subject to significant judgments and estimates. The assumptions create a high degree of uncertainty related to the estimated useful life of the Wildfire Fund. The most significant assumption is the number and severity of catastrophic fires that could occur in California within the participating electric utilities' service territories during the term of the Wildfire Fund. The Utility intends to utilize historical, publicly available fire-loss data as a starting point; however, future fire-loss can be difficult to estimate due to uncertainties around the impacts of climate change, land use changes, and mitigation efforts by the California electric utility companies. Other assumptions include the estimated cost of wildfires caused by other electric utilities, the amount at which wildfire claims will be settled, the likely adjudication of the CPUC in cases of electric utility-caused wildfires, the level of future insurance coverage held by the electric utilities, and the future transmission and distribution equity rate base growth of other electric utilities. Significant changes in any of these estimates could materially impact the amortization period. There could also be a significant delay between the occurrence of a wildfire and the timing of which the Utility recognizes impairment for the reduction in future coverage, due to the lack of data available to the Utility following a catastrophic event, especially if the wildfire occurs in the service territory of another electric utility. As of September 30, 2019, the Utility has not reflected the required contributions in its Condensed Consolidated Financial Statements as it has not yet satisfied all of the Wildfire Fund eligibility criteria pursuant to AB 1054.

**2015 Butte Fire**

In September 2015, a wildfire (the "2015 Butte fire") ignited and spread in Amador and Calaveras Counties in Northern California. On April 28, 2016, Cal Fire released its report of the investigation of the origin and cause of the 2015 Butte fire. According to Cal Fire's report, the 2015 Butte fire burned 70,868 acres, resulted in two fatalities, destroyed 549 homes, 368 outbuildings and four commercial properties, and damaged 44 structures. Cal Fire's report concluded that the 2015 Butte fire was caused when a gray pine tree contacted the Utility's electric line, which ignited portions of the tree, and determined that the failure by the Utility and/or its vegetation management contractors, ACRT Inc. and Trees, Inc., to identify certain potential hazards during its vegetation management program ultimately led to the failure of the tree.

*Third-Party Claims*

On May 23, 2016, individual plaintiffs filed a master complaint against the Utility and its two vegetation management contractors in the Superior Court of California, County of Sacramento. Subrogation insurers also filed a separate master complaint on the same date. The California Judicial Council previously had authorized the coordination of all cases in Sacramento County. As of January 28, 2019, 95 known complaints were filed against the Utility and its two vegetation management contractors in the Superior Court of California in the Counties of Calaveras, San Francisco, Sacramento, and Amador. The complaints involve approximately 3,900 individual plaintiffs representing approximately 2,000 households and their insurance companies. These complaints were part of, or were in the process of being added to, the coordinated proceeding. Plaintiffs sought to recover damages and other costs, principally based on the doctrine of inverse condemnation and negligence theory of liability. Plaintiffs also sought punitive damages. Several plaintiffs dismissed the Utility's two vegetation management contractors from their complaints. The Utility does not expect the number of claimants to increase significantly in the future, because the statute of limitations for property damage and personal injury in connection with the 2015 Butte fire has expired. Further, due to the commencement of the Chapter 11 Cases, these plaintiffs have been stayed from continuing to prosecute pending litigation and from commencing new lawsuits against PG&E Corporation or the Utility on account of pre-petition obligations. On January 30, 2019, the Court in the coordinated proceeding issued an order staying the action.

On April 28, 2017, the Utility moved for summary adjudication on plaintiffs' claims for punitive damages. The court denied the Utility's motion and the Utility filed a writ with the Court of Appeal of the State of California, Third Appellate District. The writ was granted on July 2, 2018, directing the trial court to enter summary adjudication in favor of the Utility and to deny plaintiffs' claim for punitive damages under California Civil Code Section 3294. Plaintiffs sought rehearing and asked the California Supreme Court to review the Court of Appeal's decision. Both requests were denied. Neither the trial nor appellate courts originally addressed whether plaintiffs can seek punitive damages at trial under Public Utilities Code Section 2106. However, the trial court, in November 2018, denied a motion filed by the Utility that would have confirmed that punitive damages under Public Utilities Code Section 2106 are unavailable. The Utility believes a loss related to punitive damages is unlikely, but possible.

On June 22, 2017, the Superior Court of California, County of Sacramento ruled on a motion of several plaintiffs and found that the doctrine of inverse condemnation applied to the Utility with respect to the 2015 Butte fire. The court held, among other things, that the Utility had failed to put forth any evidence to support its contention that the CPUC would not allow the Utility to pass on its inverse condemnation liability through rate increases. While the ruling was binding only between the Utility and the plaintiffs in the coordination proceeding at the time of the ruling, others could make similar claims. On January 4, 2018, the Utility filed with the court a renewed motion for a legal determination of inverse condemnation liability, citing the November 30, 2017 CPUC decision denying the San Diego Gas & Electric Company application to recover wildfire costs in excess of insurance, and the CPUC declaration that it will not automatically allow utilities to spread inverse condemnation losses through rate increases.

On May 1, 2018, the Superior Court of California, County of Sacramento issued its ruling on the Utility's renewed motion in which the court affirmed, with minor changes, its tentative ruling dated April 25, 2018. The court determined that it was bound by earlier holdings of two appellate courts decisions, Barham and Pacific Bell. Further, the court stated that the Utility's constitutional arguments should be made to the appellate courts and suggested that, to the extent the Utility raised the public policy implications of the November 30, 2017 CPUC decision in the San Diego Gas & Electric Company cost recovery proceeding, these arguments should be addressed to the Legislature or CPUC. The Utility filed a writ with the Court of Appeal seeking immediate review of the court's decision. On June 18, 2018, after the writ was summarily denied, the Utility filed a Petition for Review with the California Supreme Court, which also was denied. On September 6, 2018, the court set a trial for some individual plaintiffs to begin on April 1, 2019. The Utility reached agreement with two plaintiffs in the litigation to stipulate to judgment against the Utility on inverse condemnation grounds. The court granted the Utility's stipulated judgment motion on November 29, 2018 and the Utility filed its appeal on December 11, 2018. As a result of the filing of the Chapter 11 Cases, these lawsuits, including the trial and the appeal from the stipulated judgment, are stayed.

In addition to the coordinated plaintiffs, Cal Fire, the OES, the County of Calaveras, the Calaveras County Water District, and four smaller public entities (three fire districts and the California Department of Veterans Affairs) brought suit or indicated that they intended to do so. The Calaveras County Water District and the four smaller public entities filed their complaints in August 2018 and September 2018. They were added to the coordinated proceedings. The Utility settled the claims of the three fire protection districts and the Calaveras County Water District.

On April 13, 2017, Cal Fire filed a complaint with the Superior Court of California, County of Calaveras, seeking to recover over $87 million for its costs incurred on the theory that the Utility and its vegetation management contractors were negligent, or violated the law, among other claims. On July 31, 2017, Cal Fire dismissed its complaint against Trees, Inc., one of the Utility's vegetation contractors. Cal Fire had requested that a trial of its claims be set in 2019, following any trial of the claims of the individual plaintiffs. On October 19, 2018, the Utility filed a motion for summary judgment arguing that Cal Fire cannot recover any fire suppression costs under the Third District Court of Appeal's decision in Dep't of Forestry & Fire Prot. v. Howell (2017) 18 Cal. App. 5th 154. The hearing on that motion was set for January 31, 2019, but the hearing and Cal Fire's case against the Utility are now stayed. Prior to the stay, the Utility and Cal Fire were also engaged in a mediation process.

Also, on February 20, 2018, the County of Calaveras filed suit against the Utility and the Utility's vegetation management contractors to recover damages and other costs, based on the doctrine of inverse condemnation and negligence theory of liability. The County also sought punitive damages. On March 2, 2018, the County served a mediation demand seeking in excess of $167 million, having previously indicated that it intended to bring an approximately $85 million claim against the Utility. This claim included costs that the County of Calaveras allegedly incurred or expected to incur for infrastructure damage, erosion control, and other costs. The Utility and the County of Calaveras settled the County's claims in November 2018 for $25.4 million.

Further, in May 2017, the OES indicated that it intended to bring a claim against the Utility that it estimated to be approximately $190 million. This claim would include costs incurred by the OES for tree and debris removal, infrastructure damage, erosion control, and other claims related to the 2015 Butte fire. The Utility has not received any information or documentation from the OES since its May 2017 statement. In June 2017, the Utility entered into an agreement with the OES that extended its deadline to file a claim to December 2020.

69

PG&E Corporation's and the Utility's obligations with respect to such outstanding claims are expected to be determined through the Chapter 11 process. As described in Note 2, on July 1, 2019, the Bankruptcy Court entered an order approving the Bar Date of October 21, 2019, at 5:00 p.m. (Pacific Time) for filing claims against PG&E Corporation and the Utility relating to the period prior to the Petition Date, including claims in connection with the 2015 Butte fire. On October 18, 2019, the TCC filed with the Bankruptcy Court a motion for entry of an order extending the Bar Date for individual wildfire-related claims. On October 28, 2019, PG&E Corporation and the Utility announced that they had offered to extend the Bar Date for individual wildfire-related claims from October 21, 2019 to December 20, 2019. On the same day, during a meet and confer between PG&E Corporation and the Utility and the TCC, and at the request of the TCC, PG&E Corporation and the Utility agreed to further extend the Bar Date for individual wildfire-related claims to December 31, 2019. On November 4, 2019, PG&E Corporation and the Utility and the TCC announced that they have reached agreement to an extension of the Bar Date for individual wildfire-related claims to December 31, 2019, which agreement also involves procedures for additional notice to potential individual wildfire claimants. PG&E Corporation and the Utility and the TCC will file a stipulation with the Bankruptcy Court detailing the terms of the agreement and seeking approval of their agreement. PG&E Corporation and the Utility have received numerous proofs of claim in connection with the 2015 Butte fire since the Petition Date and are early in the process of reconciling those claims to the amount listed in the schedules of assets and liabilities. See "Potential Claims" in Note 2 above.

### Certain Federal, State and Local Claims in Connection with the 2015 Butte Fire

FEMA has filed a proof of claim in the Chapter 11 Cases in the amount of $161 million in connection with the 2015 Butte fire. The U.S. Department of the Interior has filed proofs of claim in the Chapter 11 Cases in the amount of $63 million in connection with the 2015 Butte fire.

In addition, Cal Fire has filed a proof of claim in the Chapter 11 Cases in the amount of $105 million in connection with the 2015 Butte fire. The OES has filed a proof of claim in the amount of $107 million in connection with the 2015 Butte fire.

Certain other Federal, state and local entities have filed proofs of claim in the Chapter 11 Cases in connection with the 2015 Butte fire, the 2017 Northern California wildfires and the 2018 Camp fire. Proofs of claim have also been filed for unspecified amounts to be determined at a later time.

PG&E Corporation and the Utility are early in the process of reviewing the proofs of claim that have been filed in the Chapter 11 Cases. It is possible that additional Federal, state and local entities have filed or will file proofs of claim for wildfire-related claims in the Chapter 11 Cases. PG&E Corporation and the Utility may ask the Bankruptcy Court to disallow claims that they believe are duplicative, have been later amended or superseded, are without merit, are overstated or should be disallowed for other reasons. See "Potential Claims" in Note 2. In addition, there is dispute over whether claims asserted by the U.S. Government and the State of California (including any department, agency or instrumentality thereof) are unliquidated and subject to estimation under section 502(c) of the Bankruptcy Code. On November 1, 2019, PG&E Corporation and the Utility filed a notice with the Bankruptcy Court designating the Federal and state agency claims they contend are unliquidated and subject to estimation under section 502(c) of the Bankruptcy Code. A hearing on this issue before the Bankruptcy Court is set for December 17, 2019.

### Estimated Losses from Third-Party Claims

In connection with the 2015 Butte fire, the Utility may be liable for property damages, business interruption, interest, and attorneys' fees without having been found negligent, through the doctrine of inverse condemnation.

In addition, the Utility may be liable for fire suppression costs, personal injury damages, and other damages if the Utility is found to have been negligent. While the Utility believes it was not negligent, there can be no assurance that a court would agree with the Utility.

The Utility's assessment of the estimated loss related to the 2015 Butte fire is based on assumptions about the number, size, and type of structures damaged or destroyed, the contents of such structures, the number and types of trees damaged or destroyed, as well as assumptions about personal injury damages, attorneys' fees, fire suppression costs, and certain other damages.

The Utility has determined that it is probable that it will incur a loss of $1.1 billion in connection with the 2015 Butte fire. While this amount includes the Utility's assumptions about fire suppression costs (including its assessment of the Cal Fire loss), it does not include any portion of the estimated claim from the OES. The Utility still does not have sufficient information to reasonably estimate any liability it may have for that additional claim.

The process for estimating costs associated with claims relating to the 2015 Butte fire requires management to exercise significant judgment based on a number of assumptions and subjective factors. As more information becomes known, management estimates and assumptions regarding the financial impact of the 2015 Butte fire may result in material increases to the loss accrued.

PG&E Corporation's and the Utility's Condensed Consolidated Balance Sheets included liabilities for 2015 Butte fire third-party claims of $212 million and $226 million as of September 30, 2019 and December 31, 2018, respectively, reflecting payments of $14 million in January 2019, prior to the Petition Date. As of September 30, 2019, the Utility has paid $888 million of the $904 million in settlements to date in connection with the 2015 Butte fire.

If the Utility records losses in connection with claims relating to the 2015 Butte fire that materially exceed the amount the Utility accrued for these liabilities, PG&E Corporation's and the Utility's financial condition, results of operations, liquidity, and cash flows could be materially affected in the reporting periods during which additional charges are recorded.

*Loss Recoveries*

The Utility has liability insurance from various insurers, that provides coverage for third-party liability attributable to the 2015 Butte fire in an aggregate amount of $922 million. The Utility records insurance recoveries when it is deemed probable that a recovery will occur and the Utility can reasonably estimate the amount or its range. Through September 30, 2019, the Utility recorded $922 million for probable insurance recoveries in connection with losses related to the 2015 Butte fire. While the Utility plans to seek recovery of all insured losses, it is unable to predict the ultimate amount and timing of such insurance recoveries. In addition, the Utility has received $60 million in cumulative reimbursements from the insurance policies of its vegetation management contractors. Recoveries of additional amounts under the insurance policies of the Utility's vegetation management contractors, including policies where the Utility is listed as an additional insured, are uncertain.

The balance for the insurance receivable is included in Other accounts receivable in PG&E Corporation's and the Utility's Condensed Consolidated Balance Sheets and was $50 million and $85 million as of September 30, 2019 and December 31, 2018, respectively, reflecting reimbursements of $35 million during the nine months ended September 30, 2019.

## NOTE 11: OTHER CONTINGENCIES AND COMMITMENTS

PG&E Corporation and the Utility have significant contingencies arising from their operations, including contingencies related to enforcement and litigation matters and environmental remediation. A provision for a loss contingency is recorded when it is both probable that a liability has been incurred and the amount of the liability can reasonably be estimated. PG&E Corporation and the Utility evaluate which potential liabilities are probable and the related range of reasonably estimated losses and record a charge that reflects their best estimate or the lower end of the range, if there is no better estimate. The assessment of whether a loss is probable or reasonably possible, and whether the loss or a range of losses is estimable, often involves a series of complex judgments about future events. PG&E Corporation's and the Utility's provision for loss and expense excludes anticipated legal costs, which are expensed as incurred.

The Utility also has substantial financial commitments in connection with agreements entered into to support its operating activities.

PG&E Corporation's and the Utility's financial condition, results of operations, and cash flows may be materially affected by the outcome of the following matters.

**Enforcement and Litigation Matters**

*U.S. District Court Matters and Probation*

On August 9, 2016, the jury in the federal criminal trial against the Utility in the United States District Court for the Northern District of California, in San Francisco, found the Utility guilty on one count of obstructing a federal agency proceeding and five counts of violations of pipeline integrity management regulations of the Natural Gas Pipeline Safety Act. On January 26, 2017, the court imposed a sentence on the Utility in connection with the conviction. The court sentenced the Utility to a five-year corporate probation period, oversight by the Monitor for a period of five years, with the ability to apply for early termination after three years, a fine of $3 million to be paid to the federal government, certain advertising requirements, and community service.

The probation includes a requirement that the Utility not commit any local, state, or federal crimes during the probation period. As part of the probation, the Utility has retained the Monitor at the Utility's expense. The goal of the Monitor is to help ensure that the Utility takes reasonable and appropriate steps to maintain the safety of its gas and electric operations, and to maintain effective ethics, compliance and safety related incentive programs on a Utility-wide basis.

On November 27, 2018, the court overseeing the Utility's probation issued an order requiring that the Utility, the United States Attorney's Office for the Northern District of California (the "USAO") and the Monitor provide written answers to a series of questions regarding the Utility's compliance with the terms of its probation, including what requirements of the Utility's probation "might be implicated were any wildfire started by reckless operation or maintenance of PG&E power lines" or "might be implicated by any inaccurate, slow, or failed reporting of information about any wildfire by PG&E." The court also ordered the Utility to provide "an accurate and complete statement of the role, if any, of PG&E in causing and reporting the recent 2018 Camp fire in Butte County and all other wildfires in California" since January 2017 ("Question 4 of the November 27 Order"). On December 5, 2018, the court issued an order requesting that the Office of the California Attorney General advise the court of its view on "the extent to which, if at all, the reckless operation or maintenance of PG&E power lines would constitute a crime under California law." The responses of the Attorney General were submitted on December 28, 2018, and the responses of the Utility, the USAO and the Monitor were submitted on December 31, 2018.

On January 3, 2019, the court issued a new order requiring that the Utility provide further information regarding the 2017 Atlas fire. The court noted that "[t]his order postpones the question of the adequacy of PG&E's response" to Question 4 of the November 27 Order. On January 4, 2019, the court issued another order requiring that the Utility provide, "with respect to each of the eighteen October 2017 Northern California wildfires that [Cal Fire] has attributed to [the Utility's] facilities," information regarding the wind conditions in the vicinity of each fire's origin and information about the equipment allegedly involved in each fire's ignition. The responses of the Utility were submitted on January 10, 2019.

On January 9, 2019, the court ordered the Utility to appear in court on January 30, 2019, as a result of the court's finding that "there is probable cause to believe there has been a violation of the conditions of supervision" with respect to reporting requirements related to the 2017 Honey fire. In addition, on January 9, 2019, the court issued an order (the "January 9 Order") proposing to add new conditions of probation that would require the Utility, among other things, to:

- prior to June 21, 2019, "re-inspect all of its electrical grid and remove or trim all trees that could fall onto its power lines, poles or equipment in high-wind conditions, . . . identify and fix all conductors that might swing together and arc due to slack and/or other circumstances under high-wind conditions[,] identify and fix damaged or weakened poles, transformers, fuses and other connectors [and] identify and fix any other condition anywhere in its grid similar to any condition that contributed to any previous wildfires,"

- "document the foregoing inspections and the work done and . . . rate each segment's safety under various wind conditions" and

- at all times from and after June 21, 2019, "supply electricity only through those parts of its electrical grid it has determined to be safe under the wind conditions then prevailing."

The Utility was ordered to show cause by January 23, 2019 as to why the Utility's conditions of probation should not be modified as proposed. The Utility's response was submitted on January 23, 2019. The court requested that Cal Fire file a public statement, and invited the CPUC to comment, by January 25, 2019. On January 30, 2019, the court found that the Utility had violated a condition of its probation with respect to reporting requirements related to the 2017 Honey fire. Also, on January 30, 2019, the court ordered the Utility to submit to the court on February 6, 2019 the 2019 Wildfire Mitigation Plan that the Utility was required to submit to the CPUC by February 6, 2019 in accordance with SB 901, and invited interested parties to comment on such plan by February 20, 2019. In addition, on February 14, 2019, the court ordered the Utility to provide additional information, including on its vegetation clearance requirements. The Utility submitted its response to the court on February 22, 2019.

On March 5, 2019, the court issued an order proposing to add new conditions of probation that would require the Utility, among other things, to:

- "fully comply with all applicable laws concerning vegetation management and clearance requirements;"

- "fully comply with the specific targets and metrics set forth in its wildfire mitigation plan, including with respect to enhanced vegetation management;"

- submit to "regular, unannounced inspections" by the Monitor "of PG&E's vegetation management efforts and equipment inspection, enhancement, and repair efforts" in connection with a requirement that the Monitor "assess PG&E's wildfire mitigation and wildfire safety work;"

- "maintain traceable, verifiable, accurate, and complete records of its vegetation management efforts" and report to the Monitor monthly on its vegetation management status and progress; and

- "ensure that sufficient resources, financial and personnel, including contractors and employees, are allocated to achieve the foregoing" and to forgo issuing "any dividends until [the Utility] is in compliance with all applicable vegetation management requirements as set forth above."

The court ordered all parties to show cause by March 22, 2019, as to why the Utility's conditions of probation should not be modified as proposed. The responses of the Utility, the USAO, Cal Fire, the CPUC, and non-party victims were filed on March 22, 2019. At a hearing on April 2, 2019, the court indicated it would impose the new conditions of probation proposed on March 5, 2019, on the Utility, and on April 3, 2019, the court issued an order imposing the new terms though amended the second condition to clarify that "[f]or purposes of this condition, the operative wildfire mitigation plan will be the plan ultimately approved by the CPUC."

Also, on April 2, 2019, the court directed the parties to submit briefing by April 16, 2019, regarding whether the court can extend the term of probation beyond five years in light of the violation that has been adjudicated and whether the Monitor reports should be made public. The responses of the Utility, the USAO, and the Monitor were filed on April 16, 2019. The Utility's response contended that the term of probation may not be extended beyond five years and the USAO's response contended that whether the term of probation could be extended beyond five years was an open legal issue.

The court held a sentencing hearing on the probation violation related to reporting requirements in connection with the 2017 Honey fire on May 7, 2019. After that hearing, the court imposed two additional conditions of probation by order dated May 14, 2019: (1) requiring that PG&E Corporation's Board of Directors, Chief Executive Officer, senior executives, the Monitor and U.S. Probation Officer visit the towns of Paradise and San Bruno "to gain a firsthand understanding of the harm inflicted on those communities;" and (2) requiring that a committee of PG&E Corporation's Board of Directors assume responsibility for tracking progress of the 2019 Wildfire Mitigation Plan and the additional terms of probation regarding wildfire safety, reporting in writing to the full Board at least quarterly. The court also stated that it was not going to rule at this time on whether the court has authority to extend probation and would leave that question "in abeyance." The court did not discuss whether the Monitor reports should be made public. Members of PG&E Corporation's Board of Directors and senior management attended site visits to the Town of Paradise on June 7, 2019 and the City of San Bruno on July 16, 2019, which were coordinated by the U.S. Probation Officer overseeing the Utility's probation. In addition, the Compliance and Public Policy Committee, a committee of PG&E Corporation's Board of Directors, will be responsible for tracking the Utility's progress against the Utility's wildfire mitigation plan, as approved by the CPUC, and compliance with the terms of the Utility's probation regarding wildfire safety.

On July 10, 2019, the court ordered the Utility to respond to a Wall Street Journal article titled "PG&E Knew for Years Its Lines Could Spark Wildfires, and Didn't Fix Them" on a paragraph-by-paragraph basis, stating the extent to which each paragraph in the article is accurate. The court also ordered the Utility to disclose all political contributions made by the Utility since January 1, 2017, and provide additional explanations regarding those contributions and dividends distributed prior to filing the Chapter 11 Cases. The Utility filed its response with the court on July 31, 2019. In the response, the Utility disagreed with the Wall Street Journal article's suggestion that the Utility knew of the specific maintenance conditions that caused the 2018 Camp fire and nonetheless deferred work that would have addressed those conditions.

On July 26, 2019, the Monitor submitted a letter to the court regarding its VM field inspections ("VM inspections"), which were designed to evaluate the Utility's compliance with aspects of its publicly-filed Wildfire Mitigation Plan's EVM. The Monitor's letter, which was filed on the public docket on August 14, 2019, provided its preliminary observations and preliminary findings, which included that (1) the Utility's contractors had missed trees that should have been identified and worked under the EVM program; and (2) the Utility's systems for recording, tracking and assigning EVM work were inconsistent and may have been contributing to the missed work. In its September 3, 2019 response to the Monitor's letter, the Utility detailed its plan to address the concerns raised by the Monitor. The Monitor's concerns and the Utility's response were discussed at a hearing on September 17, 2019.

During the September 17, 2019 hearing, the court asked the Utility to provide information about: (1) its preparation for high wind season; and (2) the number of fires 10 acres or greater allegedly caused by the Utility to date in 2019. The Utility responded on October 1, 2019 by describing its efforts to strengthen its programs and infrastructure to maximize safety and mitigate the potential wildfire risk during high wind season. The Utility also responded that as of September 17, 2019, the Utility's equipment may have contributed to nine ignitions in 2019 that resulted in fires 10 acres or greater. Two of these fires were potentially caused by vegetation and one was potentially caused by equipment. On October 2, 2019, the court asked the Utility for further information regarding the three fires potentially caused by vegetation and equipment. In its response, which was filed on October 9, 2019, the Utility provided information regarding certain fires, including but not limited to total acreage of the fire, ignition date, and potential causes.

On October 8, 2019, the court held a hearing related to the Utility's San Bruno community service. An additional related hearing is scheduled for November 12, 2019.

On October 14, 2019, the court issued a request for information in connection with the PSPS event the Utility initiated on October 9, 2019 that shut off power to approximately 738,000 customers in 34 counties across Northern and Central California, asking the Utility to file a statement setting forth, among other information, "how many trees and limbs fell or blew onto the deenergized lines and how many of those would likely have caused arcing had the power been left on." The Utility's response was filed on October 30, 2019.

On November 4, 2019, the court issued a request for information in connection with PSPS events the Utility initiated in late October of 2019, asking the Utility to file a statement setting forth, among other information, the same type of information requested on October 14, 2019 in connection with the PSPS event initiated on October 9, 2019. The Utility's response is due on November 29, 2019.

**CPUC and FERC Matters**

*OII into the 2017 Northern California Wildfires*

On June 27, 2019, the CPUC issued an OII (the "2017 Northern California Wildfires OII") to determine whether the Utility "violated any provision(s) of the California Public Utilities Code (PU Code), Commission General Orders (GO) or decisions, or other applicable rules or requirements pertaining to the maintenance and operation of its electric facilities that were involved in igniting fires in its service territory in 2017."

The 2017 Northern California Wildfires OII discloses the findings of a June 13, 2019 report by the SED, which, among other things, alleges that the Utility committed 27 violations in connection with 12 of the 2017 Northern California wildfires (specifically, the Adobe, Atlas, Cascade, Norrbom, Nuns, Oakmont/Pythian, Partrick, Pocket, Point, Potter/Redwood, Sulphur and Youngs fires). As described in the OII, the 27 alleged violations include failure to maintain vegetation clearances, failure to identify and abate hazardous trees, improper record keeping, incomplete patrol prior to re-energizing a circuit, failure to retain evidence, failure to report an incident, and failure to maintain clearances between lines. No violations were identified by the SED in connection with the Cherokee, La Porte and Tubbs fires. The 37 fire was determined by the SED to not be a reportable incident. The SED report does not address the Lobo and McCourtney fires because Cal Fire referred its investigations into these fires to local law enforcement and the information contained in its investigation reports related to these fires remains confidential. On a status conference call before the assigned ALJ on July 29, 2019, the SED informed the parties that because the Nevada County District Attorney had decided not to pursue criminal charges in connection with the Lobo and McCourtney fires, the SED may add alleged violations related to those fires and the 2018 Camp fire to the OII.

The 2017 Northern California Wildfires OII required the Utility to (i) show cause by July 29, 2019 why it should not be sanctioned for the 27 violations alleged in the SED report and (ii) submit a report by August 5, 2019, responding to information requests relating to "matters of concern that […] warrant further investigation and possible charges for violations of law." These latter matters include the following: (i) the Utility's vegetation management procedures and practices, (ii) the Utility's procedures and practices regarding use of "recloser" devices in fire risk areas and during fire season, (iii) the Utility's lack of procedures or policies for proactive de-energization of power lines during times of extreme fire danger, and (iv) the Utility's record-keeping and other practices. The Utility was also required to take certain corrective actions and provide information regarding the qualifications of vegetation management personnel within 30 days of the issuance of the 2017 Northern California Wildfires OII. The Utility was required to also file an application to develop an open source, publicly available asset management system/database and mobile app, the costs of development and continued operation of which would be at shareholder expense.

As required by the OII, on July 29, 2019, the Utility filed its initial response to the OII. In the initial response, the Utility indicated that it intends to fully cooperate with the CPUC but also stated that it disagreed with certain of the alleged violations set forth in the OII. The Utility also filed a Corrective Actions Report and an Application to Develop a Mobile Application and Supporting Systems, both as required by the OII. Also as required by the OII, on August 5, 2019, the Utility submitted a report to respond to the information requests contained in the OII, as explained above.

On October 9, 2019, the SED disclosed investigation reports, which, among other things, allege that the Utility committed five violations in connection with the Lobo and McCourtney fires. On October 17, 2019, the SED filed a motion to add the alleged violations related to the Lobo and McCourtney fires to the OII. The Utility does not intend to oppose the motion. The SED has disclosed that its investigation report for the 2018 Camp fire may be available by mid-November 2019. It is uncertain when the SED will file a motion to add alleged violations related to the 2018 Camp fire to the OII. The assigned ALJ has scheduled evidentiary hearings in the OII to take place on December 9-13, 2019.

The Utility, SED, PAO, CUE, TURN, OSA, Mendocino and Sonoma Counties, Napa County, City and County of San Francisco, the City of Santa Rosa, and Thomas Del Monte have continued to engage in multilateral settlement discussions. The parties have not reached a settlement but have agreed to continue to engage in settlement discussions. The OII will continue to follow its procedural schedule.

Based on the information currently available, PG&E Corporation and the Utility believe it is probable that the CPUC will impose penalties, including fines or other remedies, on the Utility. The Utility is unable to reasonably estimate the amount or range of future charges that could be incurred given the CPUC's wide discretion and the number of factors that can be considered in determining penalties. The Utility is unable to predict the timing and outcome of this proceeding. PG&E Corporation's and the Utility's financial condition, results of operations, liquidity and cash flows could be materially affected if the Utility were required to pay a material amount of penalties or if the Utility were required to incur a material amount of costs that it cannot recover through rates.

This proceeding is not subject to the automatic stay imposed as a result of the commencement of the Chapter 11 Cases; however, collection efforts in connection with fines or penalties arising out of this proceeding are stayed.

***OII and Order to Show Cause into the Utility's Locate and Mark practices***

On December 14, 2018, the CPUC issued an order instituting investigation and order to show cause (the "OII") to assess the Utility's practices and procedures related to the locating and marking of natural gas facilities. The OII directs the Utility to show cause as to why the CPUC should not find violations in this matter, and why the CPUC should not impose penalties, and/or any other forms of relief, if any violations are found. The Utility also is directed in the OII to provide a report on specific matters, including that it is conducting locate and mark programs in a safe manner.

The OII cites a report by the SED dated December 6, 2018, which alleges that the Utility violated the law pertaining to the locating and marking of its gas facilities and falsified records related to its locate and mark activities between 2012 and 2017. As described in the OII, the SED cites reports issued in this matter by two consultants retained by the Utility, that (i) included certain facts and conclusions about the extent of inaccuracies in the Utility's late tickets and the reasons for the inaccuracies, and (ii) provided an analysis, based on the available data, of tickets that should be properly categorized as late, and identification of associated dig-ins. As a result, the OII will determine whether the Utility violated any provision of the Public Utilities Code, general orders, federal law adopted by California, other rules, or requirements, and/or other state or federal law, by its locate and mark policies, practices, and related issues, and the extent to which the Utility's practices with regard to locate and mark may have diminished system safety.

The CPUC indicates that it has not concluded that the Utility has violated the law in any instance pertaining to late tickets, locating and marking, or any matter related to either, or to any other matter raised in this OII. However, if violations are found, the CPUC will consider what monetary fines and other remedies are appropriate, will review the duration of violations and, if supported by the evidence, it will consider ordering daily fines.

On March 14, 2019, as directed by the CPUC, the Utility submitted a report that addressed the SED report and responded to the order to show cause. A prehearing conference was held on April 4, 2019, to establish scope and a procedural schedule. The assigned commissioner and ALJ encouraged the SED and the Utility to engage in settlement discussions. On April 24, 2019, the Utility provided notice of a settlement conference and the parties began ongoing settlement discussions. On May 7, 2019, the assigned commissioner issued a scoping memo and ruling that included within the proceedings, in addition to the issues identified in the OII relating to the Utility's locate and mark procedures, issues relating to locating and marking of the Utility's electric distribution facilities and the use of "qualified electrical workers" for locating and marking underground infrastructure. On July 24, 2019, the SED submitted its opening testimony to the CPUC. A status conference with the ALJ was held on July 30, 2019. In accordance with the current procedural schedule issued by the ALJ on June 27, 2019, intervenor testimony was submitted on August 16, 2019, and the Utility's reply testimony was submitted on September 18, 2019.

On October 3, 2019, the Utility, SED and CUE jointly submitted to the CPUC a proposed settlement agreement and jointly moved for its approval. The following parties have participated in the settlement negotiations but have not joined the settlement: PAO, TURN, OSA, and the City and County of San Francisco. The proposed settlement will be reviewed by the ALJ overseeing the proceeding, and these other parties will have an opportunity to provide comments on the proposed settlement agreement before a final CPUC decision is issued. On October 11, 2019, PAO, TURN, and OSA indicated that they intend to provide comments on the proposed settlement agreement. Pursuant to the settlement agreement, the Utility agreed to a total financial remedy of $65 million, comprised of (i) a fine of $5 million funded by shareholders to be paid to the General Fund of the State of California pursuant to, and in accordance with, the time frame and other provisions governing distributions as set forth in the Chapter 11 plan of reorganization for the Utility as confirmed by the Bankruptcy Court; and (ii) $60 million in shareholder-funded initiatives intended to enhance, among other things, the Utility's locate and mark compliance and capabilities and the reliability of the Underground Service Alert ticket management information that the Utility maintains in the ordinary course of its business.
In accordance with the settlement agreement, shareholder-funded system enhancements will include, among other things, locate and mark ticket compliance audits to verify accurate categorization of timeliness, compliance audits using field reviews of gas and electric locate and mark tickets to assess performance, procedure adherence and compliance, and additional locate and mark staff. The expenditure of any sums not fully expended within three years of the effective date of the settlement agreement will be subject to further agreement among the parties.

The Utility expects that the system enhancement spending pursuant to this settlement agreement will occur through 2022.

The settlement agreement will become effective upon: (i) approval by the CPUC in a written decision and (ii) following such approval by the CPUC, approval by the Bankruptcy Court. The CPUC may accept, reject or modify the terms of the settlement agreement, including imposing additional penalties on the Utility.

On October 4, 2019, the ALJ issued a ruling modifying the procedural schedule to focus the evidentiary hearings on the proposed settlement agreement. An evidentiary hearing was held on October 21, 2019; comments on the settlement agreement were submitted by certain other parties on November 4, 2019, and reply comments are due November 19, 2019.

As of September 30, 2019, PG&E Corporation's and the Utility's Condensed Consolidated Balance Sheets include a $5 million accrual for the amounts payable to the General Fund of the State of California.

Because the CPUC has wide discretion and there are a number of factors that can be considered in determining penalties, the Utility is unable to predict the timing and outcome of this proceeding. PG&E Corporation's and the Utility's financial condition, results of operations, liquidity and cash flows could be materially affected if the Utility were required to pay a material amount of penalties beyond the amount reserved, or if the Utility were required to incur a material amount of costs that it cannot recover through rates.

This proceeding is not subject to the automatic stay imposed as a result of the commencement of the Chapter 11 Cases; however, collection efforts in connection with fines or penalties arising out of this proceeding are stayed.

For more information about this proceeding, see Note 14 of the Notes to the Consolidated Financial Statements in Item 8 of the 2018 Form 10-K.

***OII into Compliance with Ex Parte Communication Rules***

On April 26, 2018, the CPUC approved the revised PD issued on April 3, 2018, adopting the settlement agreement jointly submitted to the CPUC on March 28, 2017, as modified (the "settlement agreement") by the Utility, the Cities of San Bruno and San Carlos, PAO, the SED, and TURN.

The decision resulted in a total penalty of $97.5 million comprised of: (1) a $12 million payment to the California General Fund, (2) forgoing collection of $63.5 million of GT&S revenue requirements for the years 2018 ($31.75 million) and 2019 ($31.75 million), (3) a $10 million one-time revenue requirement adjustment to be amortized in equivalent annual amounts over the Utility's next GRC cycle (i.e., the 2020 GRC), and (4) compensation payments to the Cities of San Bruno and San Carlos in a total amount of $12 million ($6 million to each city). In addition, the settlement agreement provides for certain non-financial remedies, including enhanced noticing obligations between the Utility and CPUC decision-makers, as well as certification of employee training on the CPUC ex parte communication rules. Under the terms of the settlement agreement, customers will bear no costs associated with the financial remedies set forth above.

As a result of the CPUC's April 26, 2018 decision, on May 17, 2018, the Utility made a $12 million payment to the California General Fund and $6 million payments to each of the Cities of San Bruno and San Carlos. At September 30, 2019, the Utility has refunded $24 million for a portion of the 2019 GT&S revenue requirement reduction. In accordance with accounting rules, adjustments related to revenue requirements are recorded in the periods in which they are incurred.

The CPUC also ordered a second phase in this proceeding to determine if any of the additional communications that the Utility reported to the CPUC on September 21, 2017, violate the CPUC ex parte rules. On June 28, 2019, the Cities of San Bruno and San Carlos, PAO, the SED, TURN, and the Utility filed a joint motion with the CPUC seeking approval of a comprehensive settlement agreement that addresses all issues in the second phase of this proceeding. The phase two settlement agreement proposed that the Utility pay a total penalty of $10 million comprised of: (1) a $2 million payment to the California General Fund, (2) forgoing collection of $5 million in revenue requirements during the term of its 2019 GT&S rate case, (3) forgoing collection of $1 million in revenue requirement during the term of its 2020 GRC cycle, and (4) compensation payments to the Cities of San Bruno and San Carlos in a total amount of $2 million ($1 million to each city). According to the terms of the phase two settlement, these payments and forgone collection would not take place until a plan of reorganization is approved in the Chapter 11 Cases. In accordance with accounting rules, adjustments related to forgone collections would be recorded in the periods in which they are incurred.

As of September 30, 2019, PG&E Corporation's and the Utility's Consolidated Balance Sheets include a $4 million accrual for the amounts payable to the California General Fund and the Cities of San Bruno and San Carlos. On September 20, 2019, the CPUC extended the statutory deadline until December 31, 2019 to review the phase two settlement agreement and to prepare a proposed decision. The Utility is unable to predict whether the CPUC will approve the settlement.

For more information about this proceeding, see Note 14 of the Notes to the Consolidated Financial Statements in Item 8 of the 2018 Form 10-K.

*Transmission Owner Rate Case Revenue Subject to Refund*

The FERC determines the amount of authorized revenue requirements, including the rate of return on electric transmission assets, that the Utility may collect in rates in the TO rate case. The FERC typically authorizes the Utility to charge new rates based on the requested revenue requirement, subject to refund, before the FERC has issued a final decision. The Utility bills and records revenue based on the amounts requested in its rate case filing and records a reserve for its estimate of the amounts that are probable of refund. Rates subject to refund went into effect on March 1, 2017, and March 1, 2018, for TO18 and TO19, respectively. Rates subject to refund for TO20 went into effect on May 1, 2019.

On October 1, 2018, the ALJ issued an initial decision in the TO18 rate case and the Utility filed initial briefs on October 31, 2018, in response to the ALJ's recommendations. The Utility expects the FERC to issue a decision in the TO18 rate case by late-2019, however, that decision will likely be the subject of requests for rehearing and appeal.

On September 21, 2018, the Utility filed an all-party settlement with FERC, which was approved by FERC on December 20, 2018, in connection with TO19. As part of the settlement, the TO19 revenue requirement will be set at 98.85% of the revenue requirement for TO18 that will be determined upon issuance of a final unappealable decision in TO18.

On November 30, 2018, the FERC issued an order accepting the Utility's October 2018 filing of its TO20 formula rate case, subject to hearings and refund, and established May 1, 2019, as the effective date for rate changes. FERC also ordered that the hearings will be held in abeyance pending settlement discussions among the parties.

The Utility is unable to predict the timing or outcome of FERC's decisions in the TO18 and TO19 proceedings or the timing or outcome of the TO20 proceeding.

*Natural Gas Transmission Pipeline Rights-of-Way*

In 2012, the Utility notified the CPUC and the SED that the Utility planned to complete a system-wide survey of its transmission pipelines in an effort to address a self-reported violation whereby the Utility did not properly identify encroachments (such as building structures and vegetation overgrowth) on the Utility's pipeline rights-of-way. The Utility also submitted a proposed compliance plan that set forth the scope and timing of remedial work to remove identified encroachments over a multi-year period and to pay penalties if the proposed milestones were not met. In March 2014, the Utility informed the SED that the survey had been completed and that remediation work, including removal of the encroachments, was expected to continue for several years. The SED has not addressed the Utility's proposed compliance plan, and it is reasonably possible that the SED will impose fines on the Utility in the future based on the Utility's failure to continuously survey its system and remove encroachments. The Utility is unable to reasonably estimate the amount or range of future charges that could be incurred given the SED's wide discretion and the number of factors that can be considered in determining penalties.

**Other Matters**

PG&E Corporation and the Utility are subject to various claims, lawsuits, and regulatory proceedings that separately are not considered material. Accruals for contingencies related to such matters (excluding amounts related to the contingencies discussed above under "Enforcement and Litigation Matters") totaled $98 million at December 31, 2018. These amounts were included in Other current liabilities in the Condensed Consolidated Balance Sheets. On the Petition Date, these amounts were moved to LSTC. PG&E Corporation and the Utility do not believe it is reasonably possible that the resolution of these matters will have a material impact on their financial condition, results of operations, or cash flows.

*2015 GT&S Rate Case Capital Disallowance*

On June 23, 2016, the CPUC approved a final phase one decision in the Utility's 2015 GT&S rate case. The phase one decision excluded from rate base $696 million of capital spending in 2011 through 2014 in excess of the amount adopted in the prior GT&S rate case. The decision permanently disallowed $120 million of that amount and ordered that the remaining $576 million be subject to an audit overseen by the CPUC staff, with the possibility that the Utility may seek recovery in a future proceeding. Additional charges may be required in the future based on the outcome of the CPUC's audit of 2011 through 2014 capital spending. Capital disallowances are reflected in operating and maintenance expenses in the Condensed Consolidated Statements of Income. For more information, see Note 14 of the Notes to the Consolidated Financial Statements in Item 8 of the 2018 Form 10-K.

**Environmental Remediation Contingencies**

The Utility's environmental remediation liability is primarily included in non-current liabilities on the Condensed Consolidated Balance Sheets and is comprised of the following:

| (in millions) | Balance at | | | |
|---|---|---|---|---|
| | September 30, 2019 | | December 31, 2018 | |
| Topock natural gas compressor station | $ | 382 | $ | 369 |
| Hinkley natural gas compressor station | | 143 | | 146 |
| Former manufactured gas plant sites owned by the Utility or third parties [1] | | 586 | | 520 |
| Utility-owned generation facilities (other than fossil fuel-fired), other facilities, and third-party disposal sites [2] | | 115 | | 111 |
| Fossil fuel-fired generation facilities and sites [3] | | 116 | | 137 |
| **Total environmental remediation liability** | **$** | **1,342** | **$** | **1,283** |

[1] Primarily driven by the following sites: Vallejo, San Francisco East Harbor and Outside East Harbor, Napa, Beach Street, San Francisco North Beach.
[2] Primarily driven by the Geothermal landfill and Shell Pond site.
[3] Primarily driven by the San Francisco Potrero Power Plant.

Case: 19-30088   Doc# 4630-6   Filed: 11/08/19   Entered: 11/08/19 15:41:24   Page 32 of 42

The Utility's gas compressor stations, former manufactured gas plant sites, power plant sites, gas gathering sites, and sites used by the Utility for the storage, recycling, and disposal of potentially hazardous substances are subject to requirements issued by the Environmental Protection Agency under the Federal Resource Conservation and Recovery Act in addition to other state hazardous waste laws. The Utility has a comprehensive program in place designed to comply with federal, state, and local laws and regulations related to hazardous materials, waste, remediation activities, and other environmental requirements. The Utility assesses and monitors the environmental requirements on an ongoing basis, and implements changes to its program as deemed appropriate. The Utility's remediation activities are overseen by the DTSC, several California regional water quality control boards, and various other federal, state, and local agencies.

The Utility's environmental remediation liability at September 30, 2019, reflects its best estimate of probable future costs for remediation based on the current assessment data and regulatory obligations. Future costs will depend on many factors, including the extent of work necessary to implement final remediation plans and the Utility's time frame for remediation. The Utility may incur actual costs in the future that are materially different than this estimate and such costs could have a material impact on results of operations, financial condition, and cash flows during the period in which they are recorded. At September 30, 2019, the Utility expected to recover $998 million of its environmental remediation liability for certain sites through various ratemaking mechanisms authorized by the CPUC.

For more information, see remediation site descriptions below and see Note 14 of the Notes to the Consolidated Financial Statements in Item 8 of the 2018 Form 10-K.

### *Natural Gas Compressor Station Sites*

The Utility is legally responsible for remediating groundwater contamination caused by hexavalent chromium used in the past at the Utility's natural gas compressor stations. The Utility is also required to take measures to abate the effects of the contamination on the environment.

### *Topock Site*

The Utility's remediation and abatement efforts at the Topock site are subject to the regulatory authority of the California DTSC and the U.S. Department of the Interior. On April 24, 2018, the DTSC authorized the Utility to build an in-situ groundwater treatment system to convert hexavalent chromium into a non-toxic and non-soluble form of chromium. Construction activities began in October 2018 and will continue for several years. The Utility's undiscounted future costs associated with the Topock site may increase by as much as $207 million if the extent of contamination or necessary remediation is greater than anticipated. The costs associated with environmental remediation at the Topock site are expected to be recovered primarily through the HSM, where 90% of the costs are recovered in rates.

### *Hinkley Site*

The Utility has been implementing remediation measures at the Hinkley site to reduce the mass of the chromium plume in groundwater and to monitor and control movement of the plume. The Utility's remediation and abatement efforts at the Hinkley site are subject to the regulatory authority of the California Regional Water Quality Control Board, Lahontan Region. In November 2015, the California Regional Water Quality Control Board, Lahontan Region adopted a clean-up and abatement order directing the Utility to contain and remediate the underground plume of hexavalent chromium and the potential environmental impacts. The final order states that the Utility must continue and improve its remediation efforts, define the boundaries of the chromium plume, and take other action. Additionally, the final order sets plume capture requirements, requires a monitoring and reporting program, and includes deadlines for the Utility to meet interim cleanup targets. The United States Geological Survey team is currently conducting a background study on the site to better define the chromium plume boundaries. A draft background study report is expected to be issued in 2020 and finalized thereafter. The Utility's undiscounted future costs associated with the Hinkley site may increase by as much as $129 million if the extent of contamination or necessary remediation is greater than anticipated. The costs associated with environmental remediation at the Hinkley site will not be recovered through rates.

*Former Manufactured Gas Plants*

Former MGPs used coal and oil to produce gas for use by the Utility's customers before natural gas became available. The by-products and residues of this process were often disposed of at the MGPs themselves. The Utility has undertaken a program to manage the residues left behind as a result of the manufacturing process; many of the sites in the program have been addressed. The Utility's undiscounted future costs associated with MGP sites may increase by as much as $621 million if the extent of contamination or necessary remediation is greater than anticipated. The costs associated with environmental remediation at the MGP sites are recovered through the HSM, where 90% of the costs are recovered in rates.

*Utility-Owned Generation Facilities and Third-Party Disposal Sites*

Utility-owned generation facilities and third-party disposal sites often involve long-term remediation. The Utility's undiscounted future costs associated with Utility-owned generation facilities and third-party disposal sites may increase by as much as $91 million if the extent of contamination or necessary remediation is greater than anticipated. The environmental remediation costs associated with the Utility-owned generation facilities and third-party disposal sites are recovered through the HSM, where 90% of the costs are recovered in rates.

*Fossil Fuel-Fired Generation Sites*

In 1998, the Utility divested its generation power plant business as part of generation deregulation. Although the Utility sold its fossil-fueled power plants, the Utility retained the environmental remediation liability associated with each site. The Utility's undiscounted future costs associated with fossil fuel-fired generation sites may increase by as much as $80 million if the extent of contamination or necessary remediation is greater than anticipated. The environmental remediation costs associated with the fossil fuel-fired sites will not be recovered through rates.

**Insurance**

*Wildfire Insurance*

In 2018, PG&E Corporation and the Utility renewed their liability insurance coverage for wildfire events in an aggregate amount of approximately $1.4 billion for the period from August 1, 2018 through July 31, 2019, comprised of $700 million for general wildfire liability in policies covering wildfire and non-wildfire events (subject to an initial self-insured retention of $10 million per occurrence), and $700 million for wildfire property damages only, which included approximately $200 million of coverage through the use of a catastrophe bond. In 2019, PG&E Corporation and the Utility has liability insurance coverage for wildfire events in an amount of $430 million (subject to an initial self-insured retention of $10 million per occurrence) for the period of August 1, 2019 through July 31, 2020, and $1 billion in liability insurance coverage for non-wildfire events (subject to an initial self-insured retention of $10 million per occurrence), comprised of $520 million for the period of August 1, 2019 through July 31, 2020 and $480 million for the period of September 3, 2019 through September 2, 2020. PG&E Corporation and the Utility continue to pursue additional insurance coverage. Various coverage limitations applicable to different insurance layers could result in uninsured costs in the future depending on the amount and type of damages resulting from covered events.

PG&E Corporation's and the Utility's cost of obtaining the wildfire and non-wildfire insurance coverage in place for the period of August 1, 2019 through September 2, 2020 is approximately $212 million, compared to the approximately $50 million that the Utility is currently recovering through rates through December 31, 2019. The Utility intends to seek recovery for the full amount of premium costs paid in excess of the amount the Utility currently is recovering from customers through the end of the current GRC period, which ends on December 31, 2019.

PG&E Corporation and the Utility record a receivable for insurance recoveries when it is deemed probable that recovery of a recorded loss will occur. Through September 30, 2019, PG&E Corporation and the Utility recorded $1.38 billion for probable insurance recoveries in connection with the 2018 Camp fire and $842 million for probable insurance recoveries in connection with the 2017 Northern California wildfires. These amounts reflect an assumption that the cause of each fire is deemed to be a separate occurrence under the insurance policies. The amount of the receivable is subject to change based on additional information. PG&E Corporation and the Utility intend to seek full recovery for all insured losses and believe it is reasonably possible that they will record a receivable for the full amount of the insurance limits in the future.

Case: 19-30088    Doc# 4630-6    Filed: 11/08/19    Entered: 11/08/19 15:41:24    Page 34 of 42

*Nuclear Insurance*

The Utility maintains multiple insurance policies through NEIL and European Mutual Association for Nuclear Insurance, covering nuclear or non-nuclear events at the Utility's two nuclear generating units at Diablo Canyon and the retired Humboldt Bay Unit 3. If NEIL losses in any policy year exceed accumulated funds, the Utility could be subject to a retrospective assessment. If NEIL were to exercise this assessment, as of the policy renewal on April 1, 2020, the maximum aggregate annual retrospective premium obligation for the Utility would be approximately $41 million. If European Mutual Association for Nuclear Insurance losses in any policy year exceed accumulated funds, the Utility could be subject to a retrospective assessment of approximately $4 million, as of the policy renewal on April 1, 2020. For more information about the Utility's nuclear insurance coverage, see Note 14 of the Notes to the Consolidated Financial Statements in Item 8 of the 2018 Form 10-K.

**Tax Matters**

PG&E Corporation's and the Utility's unrecognized tax benefits may change significantly within the next 12 months due to the resolution of audits. As of September 30, 2019, it is reasonably possible that unrecognized tax benefits will decrease by approximately $10 million within the next 12 months. PG&E Corporation and the Utility believe that the majority of the decrease will not impact net income.

PG&E Corporation does not believe that the Chapter 11 Cases resulted in loss of or limitation on the utilization of any of the tax carryforwards. PG&E Corporation will continue to monitor the status of tax carryforwards during the pendency of the Chapter 11 Cases.

**Purchase Commitments**

In the ordinary course of business, the Utility enters into various agreements to purchase power and electric capacity; natural gas supply, transportation, and storage; nuclear fuel supply and services; and various other commitments. At December 31, 2018, the Utility had undiscounted future expected obligations of approximately $40 billion. (See Note 14 of the Notes to the Consolidated Financial Statements in Item 8 of the 2018 Form 10-K.) The Utility has not entered into any new material commitments during the nine months ended September 30, 2019.

**NOTE 12: SUBSEQUENT EVENTS**

**2019 Kincade Fire**

On October 23, 2019, a wildfire began northeast of Geyserville in Sonoma County, California (the "2019 Kincade fire"), located in the service territory of the Utility. The Cal Fire Kincade Fire Incident Update dated November 6, 2019, 7:00 p.m. Pacific Time (the "incident update") indicated that the 2019 Kincade fire had consumed 77,758 acres and was 100% contained. In the incident update, Cal Fire reported 0 fatalities and four first responder injuries. The incident update also indicates the following: structures destroyed, 374 (consisting of 174 residential structures, 11 commercial structures and 189 other structures); and structures damaged, 60 (consisting of 35 residential structures, one commercial structure and 24 other structures).

On October 23, 2019, by 3 p.m. Pacific Time, the Utility had conducted a PSPS event and turned off the power to approximately 27,837 customers in Sonoma County, including Geyserville and the surrounding area. As part of the PSPS, the Utility's distribution lines in these areas were deenergized. Following the Utility's established and CPUC-approved PSPS protocols and procedures, transmission lines in these areas remained energized.

On October 24, 2019, the Utility submitted an electric incident report to the CPUC indicating that:

- at approximately 9:20 p.m. Pacific Time on October 23, 2019, the Utility became aware of a transmission level outage on the Geysers #9 Lakeville 230 kV line when the line relayed and did not reclose;

- at approximately 7:30 a.m. Pacific Time on October 24, 2019, a responding Utility troubleman patrolling the Geysers #9 Lakeville 230 kV line observed that Cal Fire had taped off the area around the base of transmission tower 001/006 in the area of the 2019 Kincade fire; and

- on site Cal Fire personnel brought to the troubleman's attention what appeared to be a broken jumper on the same tower.

The cause of the 2019 Kincade fire is under investigation by Cal Fire and the CPUC, and PG&E Corporation and the Utility are cooperating with their investigations. PG&E Corporation and the Utility are also conducting their own investigation into the cause of the 2019 Kincade fire. This investigation is preliminary, and PG&E Corporation and the Utility do not have access to all of the evidence in the possession of Cal Fire or other third parties.

Based on the facts and circumstances available to PG&E Corporation and the Utility as of the date of this filing, including the information contained in the electric incident report and other information gathered as part of PG&E Corporation's and the Utility's investigation, PG&E Corporation and the Utility believe it is reasonably possible that they will incur a loss in connection with the 2019 Kincade fire. However, due to the limited amount of time that has elapsed since the start of the 2019 Kincade fire, the preliminary stages of the investigations, lack of access to potentially relevant evidence and the uncertainty as to the cause of the fire and the extent and magnitude of potential damages, PG&E Corporation and the Utility cannot reasonably estimate the amount or range of such possible loss.

While the cause of the 2019 Kincade fire remains under investigation and there are a number of unknown facts surrounding the cause of the 2019 Kincade fire, the Utility could be subject to significant liability in excess of insurance coverage that would be expected to have a material impact on PG&E Corporation's and the Utility's financial condition, results of operations, liquidity, and cash flows, as well as on the bankruptcy timing and process and the ability of the Utility to participate in the Wildfire Fund.

**Impact of Recent and Future Public Safety Power Shutoffs**

On October 9, 2019, the Utility initiated a PSPS event which was the subject of significant criticism, including from the California Governor and the CPUC. In connection with this PSPS event, the California Governor suggested that PG&E Corporation and the Utility provide affected customers an automatic credit or rebate of $100 per residential customer and $250 per small business, to be funded by PG&E Corporation's and the Utility's shareholders. On October 29, 2019, PG&E Corporation and the Utility announced that they would issue such credits to customers with respect to the October 9, 2019 PSPS event. PG&E Corporation and the Utility estimate that such credit will result in an approximately $90 million charge for the fourth quarter of 2019. As of the date of this filing, PG&E Corporation and the Utility do not expect to issue any similar customer credits in connection with any other PSPS events (whether past events or in the future). If PG&E Corporation or the Utility were to issue any credits, rebates or other payments in connection with any other PSPS events (whether past events or in the future), the aggregate amount of any such credits or rebates could be substantial and could have a material effect on PG&E Corporation's and the Utility's financial condition, results of operations, liquidity, and cash flows. In addition, the PSPS program has had an adverse impact on PG&E Corporation's and the Utility's reputation with customers, regulators and policymakers and future PSPS events may increase these negative perceptions.

On October 28, 2019, the CPUC announced that it would open a formal investigation of 2019 PSPS events, utility compliance with CPUC regulations and requirements, any resulting violations, and potential actions to ensure utilities are held accountable. The CPUC will meet on November 13, 2019 to discuss initiating an investigation into whether California's investor-owned electric utilities prioritized safety and complied with the CPUC's regulations and requirements with respect to their October 2019 PSPS events. The purpose of this investigation would be to investigate whether California's investor-owned utilities' actions to de-energize their electric facilities during hazardous weather conditions properly balance the need to provide reliable service with public safety. In later phases of this proceeding, the CPUC may consider taking action if violations of the CPUC's decisions or general orders have been committed and to enforce compliance, if necessary. PG&E Corporation and the Utility are unable to predict the timing and outcome of such an investigation.

The Utility's wildfire risk mitigation initiatives, including the PSPS program, as outlined in the 2019 Wildfire Mitigation Plan, involve substantial and ongoing expenditures and could involve other costs. The extent to which the Utility will be able to recover these expenditures and potential other costs through rates is uncertain.

**ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

**OVERVIEW**

PG&E Corporation is a holding company whose primary operating subsidiary is Pacific Gas and Electric Company, a public utility serving northern and central California.  The Utility generates revenues mainly through the sale and delivery of electricity and natural gas to customers.

The Utility is regulated primarily by the CPUC and the FERC.  The CPUC has jurisdiction over the rates, terms, and conditions of service for the Utility's electricity and natural gas distribution operations, electric generation, and natural gas transportation and storage.  The FERC has jurisdiction over the rates and terms and conditions of service governing the Utility's electric transmission operations and interstate natural gas transportation contracts.  The NRC oversees the licensing, construction, operation, and decommissioning of the Utility's nuclear generation facilities.  The Utility is also subject to the jurisdiction of other federal, state, and local governmental agencies.

This is a combined quarterly report of PG&E Corporation and the Utility and should be read in conjunction with each company's separate Condensed Consolidated Financial Statements and the Notes to the Condensed Consolidated Financial Statements included in this quarterly report.  It also should be read in conjunction with the 2018 Form 10-K.

**Chapter 11 Proceedings**

On the Petition Date, PG&E Corporation and the Utility filed voluntary petitions for relief under Chapter 11 in the Bankruptcy Court. PG&E Corporation's and the Utility's Chapter 11 Cases are being jointly administered under the caption In re: PG&E Corporation and Pacific Gas and Electric Company, Case No. 19-30088 (DM). For additional information regarding the Chapter 11 Cases, refer to the website maintained by Prime Clerk, LLC, PG&E Corporation's and the Utility's claims and noticing agent, at http://restructuring.primeclerk.com/pge.

For more information about the Chapter 11 Cases, see "Item 1A. Risk Factors – Risks Related to Chapter 11 Proceedings and Liquidity" and "Item 7. MD&A – Chapter 11 Proceedings" in the 2018 Form 10-K and Notes 2 and 5 of the Notes to the Condensed Consolidated Financial Statements in Item 1 of this Form 10-Q.

**Going Concern**

The accompanying Condensed Consolidated Financial Statements to this Form 10-Q have been prepared on a going concern basis, which contemplates the continuity of operations, the realization of assets and the satisfaction of liabilities in the normal course of business. However, PG&E Corporation and the Utility are facing extraordinary challenges relating to a series of catastrophic wildfires that occurred in Northern California in 2017 and 2018. As a result of these challenges, such realization of assets and satisfaction of liabilities are subject to uncertainty. For more information about the 2018 Camp fire and 2017 Northern California wildfires, see Note 10 of the Notes to the Condensed Consolidated Financial Statements and the 2018 Form 10-K.

Management has concluded that uncertainty regarding these matters raises substantial doubt about PG&E Corporation's and the Utility's ability to continue as going concerns, and their independent registered public accountants included an explanatory paragraph in their auditors' reports relating to the consolidated balance sheets of PG&E Corporation and the Utility as of December 31, 2018 and 2017, and the related consolidated statements of income, comprehensive income, equity, and cash flows, for each of the three years in the period ended December 31, 2018, included in the 2018 Form 10-K, which stated certain conditions exist which raise substantial doubt about PG&E Corporation's and the Utility's ability to continue as going concerns in relation to the foregoing. The Condensed Consolidated Financial Statements do not include any adjustments that might result from the outcome of these uncertainties. For more information about these matters, see Notes 1 and 2 to the Condensed Consolidated Financial Statements and the 2018 Form 10-K.

**Summary of Changes in Net Income and Earnings per Share**

PG&E Corporation's net loss was $1.6 billion and $4.0 billion in the three and nine months ended September 30, 2019, respectively, compared to net income of $564 million and $22 million in the same periods in 2018. PG&E Corporation recognized charges of $526 million and $2.0 billion associated with the 2018 Camp fire and the 2017 Northern California wildfires, respectively, for the three months ended September 30, 2019, with no corresponding charges during the same period in 2018. PG&E Corporation recognized charges of $2.4 billion and $4.0 billion associated with the 2018 Camp fire and the 2017 Northern California wildfires, respectively, for the nine months ended September 30, 2019, compared to charges of $2.1 billion, net of probable insurance recoveries of $385 million, associated with the 2017 Northern California wildfires during the same period in 2018.

**Key Factors Affecting Financial Results**

PG&E Corporation and the Utility believe that their financial condition, results of operations, liquidity, and cash flows may be materially affected by the following factors:

- *The Outcome of the Chapter 11 Cases.* For the duration of the Chapter 11 Cases, PG&E Corporation's and the Utility's business is subject to the risks and uncertainties of bankruptcy. For example, the Chapter 11 Cases could adversely affect the Utility's relationships with suppliers and employees which, in turn, could adversely affect the value of the business and assets of PG&E Corporation and the Utility. PG&E Corporation and the Utility also have incurred and expect to continue to incur increased legal and other professional costs associated with the Chapter 11 Cases and the reorganization. At this time, it is not possible to predict with certainty the effect of the Chapter 11 Cases on their business or various creditors, or whether or when PG&E Corporation and the Utility will emerge from bankruptcy. PG&E Corporation's and the Utility's future financial condition, results of operations, liquidity and cash flows depend upon confirming, and successfully implementing, on a timely basis, a plan of reorganization. On October 9, 2019, the Bankruptcy Court entered an order granting the motion of the TCC and the Ad Hoc Noteholder Committee to terminate the exclusive rights of PG&E Corporation and the Utility to file a plan of reorganization as to the TCC and the Ad Hoc Noteholder Committee. On October 17, 2019, the TCC and the Ad Hoc Noteholder Committee filed the TCC/Ad Hoc Noteholder Plan. (See Note 2 of the Notes to the Condensed Consolidated Financial Statements in Item 1.) The resulting competing plan process could reduce the likelihood that the plan of reorganization that is ultimately approved by the CPUC and confirmed by the Bankruptcy Court is one filed by PG&E Corporation and the Utility and, in any event, could have a material effect on PG&E Corporation's and the Utility's ability to achieve confirmation of a plan of reorganization that would enable PG&E Corporation and the Utility to reach their stated goals.

  If the TCC/Ad Hoc Noteholder Plan were consummated, holders of PG&E Corporation common stock would experience extreme dilution in their percentage ownership of PG&E Corporation and the value of their shares. Under the TCC/Ad Hoc Noteholder Plan, post-emergence, the pre-petition holders of PG&E Corporation common stock would hold approximately 0.1% of the total outstanding PG&E Corporation common stock (with the balance of the post-emergence PG&E Corporation common stock held (i) 59.3% by certain members of the Ad Hoc Noteholder Committee (with pre-emergence holders of PG&E Corporation common stock potentially being afforded the opportunity to make up to 5% of this investment through a rights offering) and (ii) 40.6% by one or both of the wildfire claimholder trusts). The TCC and Ad Hoc Noteholder Committee have requested that the Bankruptcy Court expedite the confirmation process of the TCC/Ad Hoc Noteholder Plan on a faster timetable than the Proposed Plan. As the TCC/Ad Hoc Noteholder Plan progresses through the Chapter 11 process, such progress could have a material adverse effect on PG&E Corporation's stock price. Finally, it is possible that the changes in ownership contemplated by the TCC/Ad Hoc Noteholder Plan would result in an "ownership change" within the meaning of Section 382 of the Internal Revenue Code (and regulations thereunder), which could result in limitations on PG&E Corporation or the Utility to utilize their net operating loss carryforwards.

84

- *The Utility's Ability to Fund Ongoing Operations and Other Capital Needs.* In connection with the Chapter 11 Cases, PG&E Corporation and the Utility entered into the DIP Credit Agreement, which was approved on a final basis on March 27, 2019. For the duration of the Chapter 11 Cases, PG&E Corporation and the Utility expect that the DIP Credit Agreement, together with cash on hand and cash flow from operations, will be the Utility's primary source of capital to fund ongoing operations and other capital needs and that they will have limited, if any, access to additional financing. In the event that cash on hand, cash flow from operations, and availability under the DIP Credit Agreement are not sufficient to meet liquidity needs, PG&E Corporation and the Utility may be required to seek additional financing, and can provide no assurance that additional financing would be available or, if available, offered on acceptable terms. The amount of any such additional financing could be limited by negative covenants in the DIP Credit Agreement, which include restrictions on PG&E Corporation's and the Utility's ability to, among other things, incur additional indebtedness and create liens on assets.

- *The Impact of the 2018 Camp Fire and the 2017 Northern California Wildfires.* PG&E Corporation and the Utility face several uncertainties in connection with the 2018 Camp fire and 2017 Northern California wildfires, related to:

  ◦ the amount of possible loss related to third-party claims (as of September 30, 2019, the Utility had incurred aggregate losses of $20.4 billion for claims in connection with the 2018 Camp fire and the 2017 Northern California wildfires, which reflects the low end of the range of reasonably estimated probable losses and is subject to change based on additional information), which aggregate possible losses, if the Utility were found liable for certain or all of the costs, expenses and other losses in connection with the 2018 Camp fire and 2017 Northern California wildfires could exceed $30 billion (not including potential punitive damages, fines and penalties or damages related to future claims);

  ◦ whether, in light of the CPUC July 8, 2019 final decision in the CHT OIR that excludes companies in Chapter 11 from accessing the CHT, the Utility will be able to obtain a substantial recovery of costs related to the 2017 Northern California wildfires;

  ◦ the impact of investigations, including criminal, regulatory, and SEC investigations;

  ◦ the outcome of the 2017 Northern California Wildfires OII, and any resulting fines or penalties;

  ◦ fines or penalties, which could be material, if any regulatory or law enforcement agency were to bring an enforcement action, including a criminal proceeding, and determine that the Utility had failed to comply with applicable laws and regulations;

  ◦ the amount of punitive damages, fines and penalties, or damages in respect of future claims, which could be material;

  ◦ the applicability of the doctrine of inverse condemnation in the 2018 Camp fire and 2017 Northern California wildfires litigation, which the Utility is continuing to challenge by filing a brief on the inverse condemnation cause of action with the Bankruptcy Court on October 25, 2019;

  ◦ the applicability of other theories of liability, including negligence, related to the 2018 Camp fire and 2017 Northern California wildfire claims;

  ◦ the recoverability of the above-mentioned costs, even if a court decision imposes liability under the doctrine of inverse condemnation;

  ◦ the ability of PG&E Corporation and the Utility to finance costs, expenses and other possible losses in respect of claims related to the 2018 Camp fire and the 2017 Northern California wildfires, through securitization mechanisms or otherwise;

  ◦ the amount and recoverability of enhanced and accelerated inspection costs of the Utility's electric transmission and distribution assets (the Utility incurred costs of $121 million and $606 million for enhanced and accelerated inspection and repair costs for the three and nine months ended September 30, 2019, respectively); and

  ◦ the amount and recoverability of clean-up and repair costs (the Utility incurred costs of $1.05 billion for clean-up and repair of the Utility's facilities through September 30, 2019).

85

(See Notes 4 and 10 of the Notes to the Condensed Consolidated Financial Statements in Item 1 and Item 1A. Risk Factors in Part II.)

- *The Impact of the 2019 Kincade Fire.* Regardless of whether the Utility is determined to have caused the 2019 Kincade fire, the 2019 Kincade fire is expected to have numerous adverse consequences to PG&E Corporation and the Utility, including, among others:

  ◦ PG&E Corporation's and the Utility's ability to consummate the Proposed Plan by June 30, 2020 (or at all) could be impaired, and PG&E Corporation and the Utility may not be able to amend the Proposed Plan, or develop another alternative to the Proposed Plan, that could be confirmed by June 30, 2020 (or at all);

  ◦ depending on the number and type of structures damaged or destroyed by the 2019 Kincade fire or the amount of post-petition claims against PG&E Corporation or the Utility as a result of the 2019 Kincade fire, PG&E Corporation and the Utility may not be able to satisfy, or obtain a waiver of, the conditions precedent to the commitments under the Backstop Commitment Letters or the Debt Commitment Letters, or the Backstop Parties or the Commitment Parties, respectively, may have the right to terminate such commitments, which would jeopardize PG&E Corporation's and the Utility's ability to finance the Proposed Plan;

  ◦ PG&E Corporation and the Utility may not be able to obtain alternative financing to the transactions contemplated by the Backstop Commitment Letters and the Debt Commitment Letters, and may not be able to obtain financing for an alternative plan that may be proposed by PG&E Corporation and the Utility after the impact of the 2019 Kincade fire is better known;

  ◦ the Utility could be subject to significant liability in excess of insurance coverage that would be expected to have a material impact on PG&E Corporation's and the Utility's financial condition, results of operations, liquidity, and cash flows;

  ◦ PG&E Corporation, which has experienced significant declines in stock price since the beginning of the 2019 Kincade fire, could fail to satisfy the continued listing criteria of the New York Stock Exchange, which could result in the suspension of trading of PG&E Corporation common stock or Utility preferred stock and delisting of such securities;

  ◦ the 2019 Kincade fire may have adverse consequences on the Utility's probation proceeding, the Utility's proceedings with the CPUC and FERC (including the 2017 Northern California Wildfires OII, the Safety Culture OII and the Chapter 11 Proceedings OII), the criminal investigation into the 2018 Camp fire and future regulatory proceedings, including future applications for the safety certification required by AB 1054;

  ◦ PG&E Corporation and the Utility may experience even greater difficulty in securing adequate insurance coverage for wildfire risks; and

  ◦ PG&E Corporation and the Utility expect to suffer additional reputational harm and face an even more challenging operating, political, and regulatory environment.

- *The Uncertainties in Connection with Any Future Wildfires, Wildfire Insurance, and AB 1054.* While PG&E Corporation and the Utility cannot predict the occurrence, timing or extent of damages in connection with future wildfires, factors such as environmental conditions (including weather and vegetation conditions) and the efficacy of wildfire risk mitigation initiatives are expected to influence the frequency and severity of future wildfires. Although the financial impact of future wildfires could be mitigated through insurance, the Utility may not be able to obtain sufficient wildfire insurance coverage at a reasonable cost, or at all, and any such coverage may include limitations that could result in substantial uninsured losses depending on the amount and type of damages resulting from covered events. In addition, the policy reforms contemplated by AB 1054 are likely to affect the financial impact of future wildfires on PG&E Corporation and the Utility should any such wildfires occur. The Wildfire Fund would be available to the Utility to pay eligible claims for liabilities arising from future wildfires and would serve as an alternative to traditional insurance products, provided that the Utility satisfies the numerous conditions to the Utility's participation in the Wildfire Fund set forth in AB 1054 and that the Wildfire Fund has sufficient remaining funds.

Case: 19-30088    Doc# 4630-6    Filed: 11/08/19    Entered: 11/08/19 15:41:24    Page 40 of 42

However, the impact of AB 1054 on PG&E Corporation and the Utility is subject to numerous uncertainties, including the Utility's eligibility to access relief under the Wildfire Fund (which is dependent on, among other things, the Chapter 11 Cases being resolved by June 30, 2020 pursuant to a plan or similar document not subject to a stay and the Utility making its initial contribution thereto), the Utility's ability to demonstrate to the CPUC that wildfire-related costs paid from the Wildfire Fund were just and reasonable, and whether the benefits of participating in the Wildfire Fund ultimately outweigh its substantial costs. The Utility may not be able to finance its required contributions to the Wildfire Fund, which consist of an initial contribution of approximately $4.8 billion and annual contributions of approximately $193 million. Finally, even if the Utility satisfies the eligibility and other requirements set forth in AB 1054, for eligible claims against the Utility arising between July 12, 2019 and the Utility's emergence from Chapter 11, the availability of the Wildfire Fund to pay such claims will be capped at 40% of the amount of such claims.

- *The AB 1054 Deadline of June 30, 2020.* In the event that PG&E Corporation and the Utility are unable to confirm a plan of reorganization by June 30, 2020, the Utility will not be eligible to participate in the Wildfire Fund established under AB 1054. In that scenario, the Utility (i) would be unable to seek payment from the Wildfire Fund for liabilities arising from wildfires occurring after the July 12, 2019 effective date of AB 1054 (which in the case of pre-emergence wildfires, such as the 2019 Kincade fire, would be limited to 40% of such liabilities), (ii) would not receive the benefit of the 20% disallowance cap contemplated by AB 1054, (iii) would not be required to make any contributions to the Wildfire Fund, (iv) in applications for cost recovery for wildfires occurring after July 12, 2019, would nevertheless be subject to review under the "just and reasonable" standard set forth in section 451.1 of the Public Utilities Code (i.e., the standard as modified by AB 1054) and (v) may be eligible to obtain the annual safety certifications contemplated by section 8389 of the Public Utilities Code (which has implications for the burden of proof in a proceeding for cost recovery under section 451.1 of the Public Utilities Code). Under certain circumstances, it is possible that a successor corporation to the Utility which is formed after July 12, 2019 could be authorized to participate in the Wildfire Fund if the administrator of the Wildfire Fund determines that such successor corporation meets the requirements for participation in the Wildfire Fund set forth in AB 1054. There can be no assurance that such a successor corporation would be authorized to participate in the Wildfire Fund or that, even if it were, that investors in PG&E Corporation common stock would own an interest in such successor corporation or otherwise directly or indirectly receive any benefits from such participation.

- *The Uncertainties Regarding the Impact of Recent and Future Public Safety Power Shutoffs.* The Utility's wildfire risk mitigation initiatives involve substantial and ongoing expenditures and could involve other costs. The extent to which the Utility will be able to recover these expenditures and potential other costs through rates is uncertain. The PSPS program, one of the Utility's wildfire risk mitigation initiatives outlined in the 2019 Wildfire Mitigation Plan, has been the subject of significant recent criticism, including from the California Governor and the CPUC. In connection with the PSPS event initiated on October 9, 2019, the California Governor suggested that PG&E Corporation and the Utility provide affected customers an automatic credit or rebate of $100 per residential customer and $250 per small business, to be funded by PG&E Corporation's and the Utility's shareholders. On October 29, 2019, PG&E Corporation and the Utility announced that they would issue such credits to customers with respect to the October 9, 2019 PSPS event. PG&E Corporation and the Utility estimate that such credit will result in an approximately $90 million charge for the fourth quarter of 2019. As of the date of this filing, PG&E Corporation and the Utility do not expect to issue any similar customer credits in connection with any other PSPS events (whether past events or in the future). If PG&E Corporation or the Utility were to issue any credits, rebates or other payments in connection with any other PSPS events (whether past events or in the future), the aggregate amount of any such credits, rebates, or other payments could be substantial and could have a material effect on PG&E Corporation's and the Utility's financial condition, results of operations, liquidity, and cash flows. In addition, the PSPS program has had an adverse impact on PG&E Corporation's and the Utility's reputation with customers, regulators and policymakers and future PSPS events may increase these negative perceptions. On October 28, 2019, the CPUC announced it would open a formal investigation of 2019 PSPS events, utility compliance with CPUC regulations and requirements, any resulting violations, and potential actions to ensure utilities are held accountable. PG&E Corporation and the Utility cannot predict the timing and outcome of such an investigation.

- *The Outcome of Other Enforcement, Litigation, and Regulatory Matters, and Other Government Proposals.* The Utility's financial results may continue to be impacted by the outcome of other current and future enforcement, litigation (to the extent not stayed as a result of the Chapter 11 Cases), and regulatory matters, including those described above as well as the outcome of the Locate and Mark OII, the outcome of the Safety Culture OII, the outcome of phase two of the ex parte OII, the sentencing terms of the Utility's January 27, 2017 federal criminal conviction, including the oversight of the Utility's probation and the potential recommendations by the Monitor, and potential penalties in connection with the Utility's safety and other self-reports. (See Note 11 of the Notes to the Condensed Consolidated Financial Statements in Item 1.) In addition, the Utility's business profile and financial results could be impacted by the outcome of recent calls for municipalization of part or all of the Utility's businesses and offers by municipalities and other public entities to acquire the electric assets of the Utility within their respective jurisdictions. Finally, on November 1, 2019, the California Governor held a press conference covering various topics relevant to PG&E Corporation and the Utility. Among other statements, the California Governor noted that "If [PG&E Corporation and the Utility] are unable to secure [their] own fate and future . . . then the State will prepare itself as backup for a scenario where we do that job for them." PG&E Corporation and the Utility cannot predict the nature, occurrence, timing or extent of any such "backup" scenario, and there can be no assurance that any such scenario would not involve significant ownership or management changes to PG&E Corporation or the Utility, including by the State of California.

- *The Timing and Outcome of Ratemaking Proceedings.* The Utility's financial results may be impacted by the timing and outcome of its 2020 GRC, FERC TO18, TO19, and TO20 rate cases, 2020 cost of capital proceeding, and its ability to timely recover costs not currently in rates, including costs already incurred and future costs tracked in its CEMA, WEMA, FHPMA, WMPMA, and FRMMA that are incurred in connection with the Utility's 2019 Wildfire Mitigation Plan, the amount of which is substantial and is expected to increase. The outcome of regulatory proceedings can be affected by many factors, including intervening parties' testimonies, potential rate impacts, the Utility's reputation, the regulatory and political environments, and other factors. (See Notes 4 and 11 of the Notes to the Condensed Consolidated Financial Statements in Item 1 and "Regulatory Matters" below.)

- *The Utility's Compliance with the CPUC Capital Structure.* The CPUC's capital structure decisions require the Utility to maintain a 52% equity ratio on average over the period that the authorized capital structure is in place, and to file an application for a waiver to the capital structure condition if an adverse financial event reduces its equity ratio by 1% or more. Due to the net charges recorded in connection with the 2018 Camp fire and the 2017 Northern California wildfires as of December 31, 2018, the Utility submitted to the CPUC an application for a waiver of the capital structure condition on February 28, 2019. The waiver is subject to CPUC approval. The CPUC's decisions state that the Utility shall not be considered in violation of these conditions during the period the waiver application is pending resolution. The Utility is unable to predict the timing and outcome of its waiver application. (See "Regulatory Matters" below.)

- *Personnel Changes.* The Utility has recently experienced significant changes in leadership, in particular with the addition of a new Chief Executive Officer of the Utility, Andrew Vesey, and turnover at the position of head of gas operations. Although the appointment of Mr. Vesey is expected to bring strong leadership to both the gas and electric businesses, further management turnover may be disruptive to operations and impair PG&E Corporation's and the Utility's ability to execute their strategies and operational initiatives.

For more information about the factors and risks that could affect PG&E Corporation's and the Utility's financial condition, results of operations, liquidity, and cash flows, or that could cause future results to differ from historical results, see "Item 1A. Risk Factors" in this Form 10-Q and the 2018 Form 10-K. In addition, this quarterly report contains forward-looking statements that are necessarily subject to various risks and uncertainties. These statements reflect management's judgment and opinions that are based on current estimates, expectations, and projections about future events and assumptions regarding these events and management's knowledge of facts as of the date of this report. See the section entitled "Forward-Looking Statements" below for a list of some of the factors that may cause actual results to differ materially. PG&E Corporation and the Utility are not able to predict all the factors that may affect future results and do not undertake an obligation to update forward-looking statements, whether in response to new information, future events, or otherwise.