# RSA Approval Motion: Objection Response Chart[1]

I. *Issues Addressed by Amended and Restated RSA*

| # | Objection | Objecting Party | Clarifying Changes to the RSA/ Plan of Reorganization |
|---|---|---|---|
| 1 | The RSA definition of "IP Claims" could be interpreted to include claims held by Government Units (as defined in section 101(27) of the Bankruptcy Code). | U.S. Department of Justice, Civil Division [Dkt. No. 4237 (pp. 3-5)] | • The definition of "IP Claims" in the Amended RSA now provides:<br>○ "'IP Claims' means any Wildfire Claim that is not a Public Entities Wildfire Claim ~~or~~, a Subrogation Claim **or any Wildfire Claim asserted by any Governmental Unit (as defined in section 101(27) of the Bankruptcy Code)**."<br>▪ *See* Amended RSA p. 4. [2] |
| 2 | Claims of Governmental Units should not be included as Subrogation Claims. | California Governor's Office of Emergency Services and California Department of Veterans Affairs [Dkt. No. 4220 (p. 2)] | • The definition of "Subrogation Claim" in the Amended RSA now provides:<br>○ "'Subrogation Claims' means…. **For the avoidance of doubt, Subrogation Claims shall not include the claims of any Governmental Unit (as defined in section 101(27) of the Bankruptcy Code) and any such claims shall not be the subject of, or compromised under, this Agreement.**"<br>▪ *See* Amended RSA p. 6. |

---

[1] This chart has been prepared for administrative convenience to set forth the changes made in the Amended and Restated RSA ("Amended RSA") filed by the Debtors in the *Notice of Filing of Amended and Restated Restructuring Support Agreement* [Dkt. No. 4554] ("Notice of Amended RSA"). For the avoidance of doubt, this chart is purely illustrative and is qualified entirely by reference to the terms of the Amended RSA.

[2] Citations to the Amended RSA are to pages numbers in the blackline copy of the Amended RSA filed in the Notice of Amended RSA unless otherwise specified.

| # | Objection | Objecting Party | Clarifying Changes to the RSA/ Plan of Reorganization |
|---|---|---|---|
| 3 | The RSA prohibits the Ad Hoc Subrogation Group ("AHG") from negotiating with other creditor constituencies to achieve global consensus. | TCC, UCC, Bondholder Group, Governor Newsom [Dkt. Nos. 4232 (p. 5), 4236 (pp. 6-7), 4241 (pp. 3-4), 4640 (p. 5)] | • Section 2(b)(ii) of the Amended RSA now provides:<br>  ○ "Subject to the terms and conditions hereof, for the duration of the Support Period, each Consenting Creditor shall not…(ii) **subject to the proviso in Section 2(a)(iii) hereof as to voting,** directly or indirectly, file, propose, support, solicit, assist, encourage, or participate in the formulation of or vote for any Alternative Restructuring or settlement of the Subrogation Claims other than as set forth herein, **provided that nothing herein precludes the Debtors and the Ad Hoc Subrogation Group from negotiating together with any other creditor constituencies or participating in mediation to achieve global consensus;**"<br>    ▪ *See* Amended RSA p. 8. |
| 4 | The RSA obligates the Debtors[3] to file a plan that pays subrogation claimants 100% of their allowed claims, even if the Debtors are insolvent. | UCC, TCC [Dkt. Nos. 4236 (p. 7), 4629 (pp.5-6)] | • Section 3(a)(i) of the Amended RSA now provides:<br>  ○ "Subject to the terms and conditions hereof, for the duration of the Support Period, the Company shall…(i) use commercially reasonable efforts to propose and pursue the Plan and seek the entry of a Confirmation Order, which incorporate the terms of the Settlement including any conditions thereto (including all of the terms hereof relating to the treatment of, and distributions on Subrogation Claims and the Aggregate Subrogation Recovery)**, provided that if the Bankruptcy Court determines the Debtors are insolvent, the Debtors may file a revised plan that does not pay subrogation claimants $11 billion in cash on $11 billion of allowed claims, provided, however, that such revised plan shall not subordinate the class of Subrogation Claims to the class of IP Claims (an "Insolvent Plan");**"<br>    ▪ *See* Amended RSA p. 9. |

---

[3] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Amended RSA.

| # | Objection | Objecting Party | Clarifying Changes to the RSA/ Plan of Reorganization |
|---|---|---|---|
| 5 | Under section 3(a)(iii) of the RSA, if an insured individual plaintiff settles with the Debtors, such party is required to release ordinary course insurance claims against their insurer. | TCC, Adventist Claimants [Dkt. Nos. 4232 (pp. 19-20), 4239 (pp. 5-8)] | • Section 3(a)(iii) of the Amended RSA was modified to narrow the scope of the release as follows, and the draft form of release is now attached to the Amended RSA:<br>  o "Subject to the terms and conditions hereof, for the duration of the Support Period, the Company shall . . .(iii) upon entry into any settlement with any holder or holders of IP Claims that fixes the amount or terms for satisfaction of an IP Claim, including with respect to rights against a post-Effective Date trust established for the resolution and payment of such Claims, require, as a condition to payment or other distribution to or for the benefit of such holder pursuant to such settlement or other agreement, that the holder of the IP Claim contemporaneously execute and deliver a release and waiver of any ~~and all claims to the fullest extent permitted by law against all parties in interest in the Chapter 11 Cases, including any~~ potential made-whole claims against present and former holders of Subrogation Claims~~, which release shall be in form and substance reasonably acceptable to the Debtors the Requisite Consenting Creditors~~ **substantially in the form attached hereto as Exhibit B** (the "Settlement Payment Condition")…"<br>    ▪ See Amended RSA pp. 9-10.<br>• The Form of Release attached as Exhibit B to the Amended RSA provides:<br>  o "Releasor is not releasing any claims Releasor may have against any Releasee other than the Releasor's foregoing release of made-whole claims."<br>    ▪ See ¶ 4, Ex. B to Amended RSA.<br>• The scope of release is consistent with releases entered into between insured individual plaintiffs and the Debtors in comparable prepetition incidents, copies of which have been filed with the Bankruptcy Court under seal. |

| # | Objection | Objecting Party | Clarifying Changes to the RSA/ Plan of Reorganization |
|---|---|---|---|
| | | | ○ Exhibit A (Butte Fire Release) Sample Language: "The subrogation claims, if any, of Plaintiff's property insurers, if any, are excepted from this release and the [PLAINTIFFS] agree that they will not submit any further claim or receive any further benefit from their property insurers that may give rise to any additional or further subrogation claims for any property loss caused directly or indirectly by the Fire."<br>○ Exhibit B (San Bruno Release) Sample Language: "The subrogation claims, if any, of the undersigned's property insurer is excepted from this release and the undersigned agrees that they will not submit any further claim or receive any further benefit from their property insurer that may give rise to any additional or further subrogation claims for any property loss caused directly or indirectly by the Accident." |
| 6 | If an insured individual plaintiff settles with the Debtors, such plaintiff must release its insurer, but the insurer is not required to provide a "mutual release" to the insured. | Adventist Claimants [Oct. 23 Hr'g Tr. at 198:7-200:4, Dkt. No. 4637 (p. 4)] | • Section 3(a)(iii) of the Amended RSA clarifies that the releases will be mutual and now provides:<br>○ " . . . **provided that the Confirmation Order shall deem each holder of a Subrogation Claim that is a beneficiary of a release and waiver of made-whole claims executed by a holder of an IP Claim as set forth herein to have released such holder of an IP Claim from any claim to such holder's recovery from the Debtors on account of such settled IP Claim;**"<br>▪ *See* Amended RSA pp. 9-10. |

| # | Objection | Objecting Party | Clarifying Changes to the RSA/ Plan of Reorganization |
|---|---|---|---|
| 7 | If the Debtors are insolvent, the Debtors are required to pursue a plan that finds prepetition wildfire claims are satisfied, which may not be possible. | UCC [Dkt. No. 4236 (pp. 7-8)] | • Section 3(a)(v) of the Amended RSA clarifies that if the Bankruptcy Court determines that the Debtors are insolvent, then the Debtors shall not be obligated to seek the finding set forth in Section 3(a)(v)(A):<br>   ○ "Subject to the terms and conditions hereof, for the duration of the Support Period, the Company shall . . . (v) propose and pursue the Plan and seek entry of a Confirmation Order that contain (and ~~the Plan and Confirmation Order~~ **any plan and confirmation order pursued by the Debtors** shall contain) the following provisions, findings and orders, as applicable in substantially the form set forth below (the "Findings and Orders"), **provided that, if the Bankruptcy Court determines the Debtors are insolvent, the Debtors will not be required to pursue a plan or confirmation order with the finding set forth in Section 3(a)(v)(A) below**…(A) the Bankruptcy Court 'has determined that the resolution of the insolvency proceeding provides funding or establishes reserves for, provides for assumption of, or otherwise provides for satisfying any prepetition wildfire claims asserted against the electrical corporation in the insolvency proceeding in the amounts agreed upon in any pre-insolvency proceeding settlement agreements or any post-insolvency settlement agreements, authorized by the court through an estimation process or otherwise allowed by the court;'"<br>      ▪ *See* Amended RSA p. 10. |
| 8 | The RSA would allow the Debtors and AHG to amend the RSA without further Bankruptcy Court approval. | Bondholder Group [Dkt. No. 4241 p. 4-5)] | • Section 9 of the Amended RSA now provides:<br>   ○ ". . . **Notwithstanding anything herein to the contrary, any material modifications or amendments to this Agreement shall be subject to Bankruptcy Court approval on not less than five (5) Business Days' notice**."<br>      ▪ *See* Amended RSA pp. 18-19. |

| # | Objection | Objecting Party | Clarifying Changes to the RSA/ Plan of Reorganization |
|---|---|---|---|
| 9 | The release in the plan is not a consensual third-party release. | TCC [Dkt. No. 4232 (pp. 19-20)] | • The newly filed Plan's definition of "Releasing Parties" now requires claimants to opt-in to releases, consistent with the Bondholders/TCC's plan:<br>    o "**Releasing Parties** means, collectively, and, in each case, in their capacities as such… (c) any holder of a Claim that is ~~Unimpaired under the Plan that does not file a timely objection to the releases provided for in Section 10.9(b) of the Plan; (d) any holder of a Claim (i) who votes to accept or reject the Plan, or (ii) whose vote to accept or reject the Plan is solicited but that does not vote either to accept or to reject the Plan and, in each case, does not indicate~~ <u>solicited and voluntarily</u> indicate~~s~~ on a duly completed ~~b~~<u>B</u>allot submitted on or before the Voting Deadline that such holder opts ~~out of~~ <u>into</u> granting the releases set forth in Section ~~10.9(b)~~ <u>10.9(b)</u> of the Plan <u>to the extent permitted by applicable law, provided that such holder's opt-in, opt-out, or failure to complete that portion of the Ballot shall not in any way affect the classification or treatment of such Claim</u>…"<br>• Section 10.9(b) of the Plan was amended to clarify the limited scope of the release being given by Other Wildfire Claim Holders—a defined term which includes insured individual plaintiffs—to holders of "Subrogation Wildfire Claims':<br>    o "…**and nothing herein shall be deemed to impose a release by holders of Other Wildfire Claims of insurance claims arising under their insurance policies against holders of Subrogation Wildfire Claims, other than any rights such holder may elect to release as part of any settlement as set forth in Section 4.19(f)(ii) hereof.**"<br>• In addition section 10.9(c) of the Plan was added to clarify that the Plan does not impose any non-consensual releases: |

- 6 -

| # | Objection | Objecting Party | Clarifying Changes to the RSA/ Plan of Reorganization |
|---|---|---|---|
| | | | o "***Only Consensual Non-Debtor Releases.*** **Except as set forth under Section 4.19(f)(ii) hereof, for the avoidance of doubt, and notwithstanding any other provision of this Plan, nothing in the Plan is intended to, nor shall the Plan be interpreted to, effect a nonconsensual release by a holder of a Claim in favor of a party that is not a Debtor, it being acknowledged that such holder shall be deemed to release a party that is not a Debtor under the Plan solely to the extent that such holder consensually elects to provide such Plan release in accordance with the opt-in release procedures set forth herein or in any applicable Ballot. The holder of a Claim shall receive the same amount of consideration under the Plan whether or not such holder elects to release a party that is not a Debtor in accordance with the opt-in release procedures set forth herein or in any applicable Ballot.**" |

II. *Objections Unaddressed by Clarifying Changes to the Amended RSA and Revised Plan*

| # | Objection | Objecting Party | AHG Brief Response |
|---|---|---|---|
| I. | Why Approval of the Amended RSA Should Not Be Delayed due to Cash Considerations or Other Proceedings | | |
| 1 | The settlement is unfair because it provides $11 billion in cash to holders of Subrogation Claims and would force individual plaintiffs ("IPs") to take non-cash consideration. | TCC Dkt. No. 4629 (p. 5)] | • The Amended RSA does not "force" the IP's to take any particular form of consideration. Approval of the Amended RSA will not result in the confirmation of any particular plan, and any plan filed pursuant to the Amended RSA will have to satisfy the Bankruptcy Code's requirements for confirmation. The form of consideration that IPs will ultimately receive will be determined by the plan of reorganization, as confirmed by the Bankruptcy Court, not any restructuring support agreement.<br>• The settlement embodied in the Amended RSA is predicated on a solvent debtor case, where claims of IPs would be satisfied in full.<br>• The issue of consideration can be dealt with even if the Amended RSA is approved via mediation, or negotiations between the Debtors, TCC and Bondholder Group. For example, a plan under which the Bondholder Group receives take back paper or equity at plan value on account of their claims would free up billions of dollars in cash that could be used to pay wildfire victims. |
| 2 | Approving the Amended RSA and its $11 billion cash claim now would undermine the mediation order. | SLF Fire Victims [Oct. 23 Hr'g Tr. at 215:19-216:9] | • The Amended RSA is a major building block in the development of a consensual plan of reorganization. Settlements are encouraged in bankruptcy and the AHG is the largest creditor constituency to make a deal with the Debtors to date.<br>• Approving the Amended RSA would increase the odds of a successful mediation because it will eliminate a key issue—the valuation of Subrogation Claims. No party in interest has seriously challenged the reasonableness of allowing the Subrogation Claims in the substantially reduced amount of $11 billion; but no one should assume that the AHG would accept this multi-billion reduction in the context of an attempted retrade of other components of the Amended RSA that are an integral part of this settlement.<br>• Rejecting the settlement will set the case back months by injecting a major new variable into the mediation, causing parties to become further entrenched in their positions and jeopardizing the resolution of these cases on the needed timeline. The Bankruptcy Court should be facilitating deal making not discouraging it. |

| # | Objection | Objecting Party | AHG Brief Response |
|---|---|---|---|
| 3 | Motion to approve the Amended RSA should be delayed until the resolution of the estimation proceeding because it guarantees the payment of $11 billion in cash to insurers without regard to other potential obligations (*e.g.* estimated IP claims, Kincade Fire claims, etc.). | TCC [Dkt. No. 4629 (pp. 5-6)] | • Section 3(a)(i) of the Amended RSA clarifies that the AHG would not receive an $11 billion cash payment under all plan scenarios.<br>• The Amended RSA does not "guarantee" the receipt of $11 billion in cash—any plan filed pursuant to the Amended RSA must still meet the Bankruptcy Code's tests for confirmation and be confirmed by the Bankruptcy Court.<br>• The Debtors have reasonably exercised their business judgment that the multi-billion dollar reduction in the amount of Subrogation Claims under the Amended RSA is a reasonable quid pro quo for the Debtors' commitment to file and pursue a plan that provides for this form of consideration. Any eventual plan that incorporates the terms of the Amended RSA will still need Bankruptcy Court approval.<br>• The issue of consideration can still be dealt with in mediation, or negotiations between the Debtors, Equity Group, TCC and Bondholder Group even if the Amended RSA is approved. For example, a plan could provide for the Bondholder Group (who are not discounting their claims) to receive some take back paper or equity at plan value, that would free up billions of dollars in cash that could be used to pay wildfire victims. |
| 4 | Compromise should not be approved until after the Tubbs trial verdict because a victory on Tubbs for the Debtors may mean AHG is getting more than 100 cents on Subrogation Claims. | TCC [Oct. 23 Hr'g Tr. at 153:2-8] | • The very purpose of a settlement is to weigh litigation risk and come to a reasonable resolution. The flip side of the TCC's argument is that in the event of a victory for the plaintiffs in the Tubbs trial, the AHG likely would insist on a far higher aggregate allowed claim to settle its claims.<br>• In any event, in all scenarios, AHG will be able to establish that it is not getting more than 100 cents on their claims, as $15.1 billion has already been paid to victims with billions more to come (before accounting for any interest or attorneys' fees, both of which are routinely awarded in state court subrogation litigation). |

| # | Objection | Objecting Party | AHG Brief Response |
|---|---|---|---|
| | *II.   Why the Amended RSA Does Not Violate the Rights of Individual Insured Parties* | | |
| 5 | The Amended RSA impairs insured IPs' rights under the made whole doctrine to be paid in full before subordinated Subrogation Claims. | TCC [Dkt. Nos. 4232 (pp. 10-15), 4629 (p. 5)] | • The TCC is estopped from making class-wide subordination arguments given its previous representations to the Bankruptcy Court, and the TCC/Bondholder plan provides for the same $11 billion allowed claim.  The TCC's backtracking on its agreement to not litigate the subordination issue—a position that now contradicts its own plan—is further evidence of its role as an unreliable negotiation counter party.  Rewarding the TCC's about-face would only further embolden it to continue taking unrealistic bargaining positions and further polarize parties in these cases.<br>• In any event, the TCC's made whole arguments fail on the merits for reasons including:<br>    o The made whole rule does not dictate the order in which subrogation claimholders and underlying insureds must settle—*Chandler* is explicit on this point—and subrogation claimholders historically settle before IPs. *See Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115 (9th Cir. 2010).<br>    o The Amended RSA is predicated on the eventual confirmation of a plan that pays wildfire victims in full (*i.e.*, pursuant to the absolute priority rule and AB 1054).<br>• California made whole law does not support class wide subordination of Subrogation Claims because (i) the application of the made whole doctrine must be analyzed on a claim by claim basis, and (ii) the insurer participation exception to the made whole rule applies here given the AHG members' participation in the Tubbs trial and estimation proceeding. |
| 6 | Insured IP claims and Subrogation Claims are a single and indivisible claim. | TCC [Dkt. Nos. 4232 (pp. 7-8), 4629 (p. 6)] | • The Ninth Circuit's decision in *Chandler* confirms that insurers can pursue and settle Subrogation Claims independently of their insureds.<br>• Insurers may settle first so long as the insureds, in the end, get paid in full, which is fully expected in this case. |
| 7 | If AHG members claim rights under Bankruptcy Code Section 509, then they | TCC [Dkt. Nos. 4232 (pp. 10-15), 4629 (p. 5)] | • This argument is based on the false premise that subrogation claimants can seek subrogation only under Bankruptcy Code Section 509 and not under applicable California law.  The subrogation claimants are entitled to pursue rights of subrogation under Section 509 *and* under state law.  In other words, Section 509 |

| # | Objection | Objecting Party | AHG Brief Response |
|---|---|---|---|
| | are subordinated as co-debtors. If the AHG's members are not co-debtors, then they have no rights under Section 509. | | does not necessarily define the scope of the AHG's claims, or even necessarily apply to those claims.<br>• Members of the AHG are not co-debtors of PG&E whose claims are subordinated pursuant to Section 509(c) because, under Ninth Circuit case law, codebtor status is reserved for "a limited class of creditors, namely, true co-debtors" such as a "surety, guarantor, or comaker" who are "liable with the debtor on the obligation owed to the creditor." *See Hamada v. Far East Nat'l Bank (In re Hamada)*, 291 F.3d 645, 650 (9th Cir. 2002). Like the issuer of the letter of credit in *Hamada*, the contractual obligation of an insurer to its insured under an insurance policy is the primary obligation of the insurer which exists independently of, and does not depend on, the liability of any third party tortfeasor to the insured. |
| 8 | The proposed settlement violates insurers' and hedge funds' duties of good faith and California insurance regulations. | TCC [Dkt. No. 4232 (pp. 17-18)] | • Insurers' duty of good faith is satisfied by paying what the insured is due under the insurance policy. There is no authority suggesting that an insurer's settlement of a Subrogation Claim can amount to bad faith.<br>• Under the plain terms of the Amended RSA and proposed plan, the AHG will be unable to enforce any releases to the extent they violate California insurance regulations. |
| | **III.   Why the Amended RSA Releases are Permissible** | | |
| 9 | The Settlement Payment Condition in the Amended RSA would require IPs to give impermissible third-party releases or coerce them into granting such releases. | TCC, U.S. Department of Justice, Civil Division, Adventist Claimants, [Dkt. Nos. 4232, (pp.19-20), 4237 (pp. 3-5), 4239 (pp. 5-8), | • The Settlement Payment Condition does not implicate Ninth Circuit case law, such as *Resorts Int'l, Inc. v. Lowenschuss (In re Lowenschuss)*, 67 F.3d 1394 (9th Cir. 1995), that relies on Section 524(e) of the Bankruptcy Code to prohibit the non-consensual discharge of claims against non-debtors under a plan, or a non-consensual release of the liability of non-debtors by way of a permanent injunction or other Bankruptcy Court order. This is because the Debtors' plan involves neither. Confirmation of the Debtors' plan will not discharge any potential made whole claim, and the Confirmation Order will not enjoin the prosecution of any such claim. *Lowenschuss* and similar cases do not address consensual third party releases that a creditor can choose to provide (or not provide) as part of a settlement.<br>  ○ A ruling in the prior PG&E chapter 11 case found a non-debtor release to be permissible, where a claimant *consents* to the release of his or her |

| # | Objection | Objecting Party | AHG Brief Response |
|---|---|---|---|
| | | 4629 (pp. 6-7), 4637 (pp. 2-3)] | claims against a non-debtor. *See In re Pac. Gas and Elec. Co.*, 304 B.R. 395, 418 n.26 (Bankr. N.D. Cal. 2004) (finding the legal principle set forth in *Lowenschuss* to be "inapplicable" because "the Plan does not discharge or release nondebtors from claims that belong to others (except the Commission, *which has consented to the release*)") (emphasis added).<br>• This objection mischaracterizes the Amended RSA. The Amended RSA requires that a voluntary settlement of an IP's claim with the Debtor or a plan trust (as applicable) and payment of such a claim be pursuant to a settlement conditioned on the release. If the individual believes that the settlement amount offered by the Debtors or plan trust is inadequate, it can litigate with the Debtors or plan trust (as applicable) for the excess and, in the event it obtains a judgment that the Debtors or plan trust cannot fully satisfy, proceed with any made whole claim it may have against the applicable insurer for the deficiency.<br>    o TCC's own proposed plan includes third-party releases that are granted by electing creditors.<br>• The purpose of subrogation claims is to "prevent the insured from obtaining a double recovery (and thus being unjustly enriched) and to place the responsibility for paying the loss on the party who caused the loss." *See Chandler* 598 F.3d at 1117.<br>    o The Amended RSA release achieves this purpose, and therefore is expressly supported by *Chandler* which permits an insurer to recover from the tortfeasor even if the injured party has yet to recover.<br>    o The construct provided under the Amended RSA places the primary responsibility for losses caused by the Debtors on the Debtors, by essentially requiring the IPs first to seek a fully compensatory recovery from the Debtors or plan trust. If the IP is not satisfied with the settlement amount offered by the Debtors or plan trust, rather than absolving the Debtors of liability, the IP may proceed against both the Debtors and underlying insurer to recover the shortfall.<br>    o Indeed, this scenario was expressly addressed in the *Chandler* decision, where the Ninth Circuit said that it "is not convinced that an insured could |

| # | Objection | Objecting Party | AHG Brief Response |
|---|---|---|---|
| | | | circumvent the rule espoused by the Court" by simply suing the tortfeasor and settling for $1.00. *Chandler* at 1121. In other words, an insured has no right under the made whole rule to choose to pursue its claim, in whole or in part, against its insurer instead of the tortfeasor.<br>• The release would not extinguish insureds' claims against their insurers for ordinary-course insurance claims by insureds arising under their insurance policies.<br>• In the context of a "paid in full" plan (*i.e.*, the plan contemplated by the Amended RSA), IPs will not have made whole claims in any event (and certainly not on a class-wide basis).<br>    o The release comports with the language of AB 1054 and is therefore "belt and suspenders."<br>• The made whole release is needed so that there is not an incentive for the trustee of the individual wildfire trust, or individual lawyers that represent both insured and uninsured claimants, to *overpay* an uninsured claimant because they can *underpay* an insured claimant who retains the right to proceed against his or her insurer, and to prevent the claims from being settled for less than fair value because of the perceived ability to pursue the insurers.<br>• The objection that the Settlement Payment Condition is "coercive" because it "forces" IPs to either settle with the plan trust or take his or her chances litigating against the Debtors or the plan trust ignores that IPs would have essentially the same choice absent the proposed settlement. That is, the individual would have to choose between settling with or litigating against the Debtors to recover his or her losses. If forcing the individual to choose between settlement and litigation is unacceptably coercive, there is no settlement framework that would survive scrutiny.<br>• The Settlement Payment Condition is equitable—the AHG is giving up approximately $9 billion in claims. |

| # | Objection | Objecting Party | AHG Brief Response |
|---|---|---|---|
| | **IV.** **Why Specific Amended RSA and Form of Release Provisions are Permissible** | | |
| 10 | The Allowed aggregate subrogation claim is potentially non-binding in the event the Debtors are insolvent. Thus, the AHG has a one-way option to pursue a higher claim amount, and the proposed settlement does not benefit the Debtors' estates or creditors. | UCC, Bondholder Group, Governor Newsom [Dkt. Nos. 4236 (pp. 3-5), 4241 (p. 4), 4640 (pp. 4-5)] | • Termination provisions, triggered by circumstances that frustrate a party's purpose in entering into the agreement and are beyond its control, are routine contractual terms. Such provisions are often structured as "one way options" because individual parties have divergent purposes for entering into the agreement, and one party's purpose may be frustrated by a development that is of little significance to the other party.<br>• The Debtors also have "one way" options in certain circumstances under the Amended RSA—*e.g.*, in the event of a default by Consenting Creditors holding at least 5% of RSA claims, the Debtors can elect to terminate and eliminate the Allowed aggregate subrogation claim in favor of litigating the claim amount or not terminate and hold the Consenting Creditors to the $11 billion allowed claim.<br>• The AHG negotiated a "one-way" option in the insolvency context (just as the Debtors negotiated a one-way option in other contexts) because the $11 billion settlement is premised on receiving $11 billion in value from a solvent debtor. If the Debtors are insolvent—which is outside the control of the AHG—then, in addition to the risk of not receiving the bargained for $11 billion in value, the Consenting Creditors (i) would be subject to potential further reduction from made whole claims asserted by insured IPs, and (ii) would be able to seek a higher claim amount, but subject to challenges by parties in interest. The circumstances that would permit the Consenting Creditors to seek a higher claim amount are all outside of their control. |
| 11 | Amended RSA approval would give AHG ability to assert $20 billion claim on eve of confirmation in insolvent case thereby causing undue delay | UCC [Oct. 23 Hr'g Tr. at 216:18-217:9] | • The AHG will make a strategic choice when it comes to voting for or against an insolvent plan, whether it wants to keep its claim or pursue a higher claim. Practically speaking this can't happen on the eve of confirmation.<br>• The objectors have offered no explanation of how the Debtors could satisfy AB 1054 in a scenario where they are insolvent; and, if insolvency would in any event render the Debtors unable to satisfy AB 1054, the Debtors will not need to emerge by the end of June 2020. The June 30 deadline would therefore be irrelevant.<br>• This argument is entirely speculative. If the Amended RSA terminates, the most likely scenario is a renegotiated claim amount or a litigated confirmation fight that |

| # | Objection | Objecting Party | AHG Brief Response |
|---|---|---|---|
| | | | will determine an appropriate reserve. That process need not unduly delay anything. |
| 12 | Amended RSA requirement that the AHG vote against the TCC/Bondholder plan is unreasonable. | TCC, UCC, Bondholder Group, Governor Newsom [Dkt. Nos. 4232 (p. 24), 4236 (pp. 6-7), 4241 (p. 3), 4640 (p. 5)] | • This provision is a common feature in other restructuring support agreements. Indeed, many of the objecting parties and their counsel have negotiated or participated in restructuring support agreements involving similar provisions in other cases. Such a provision does not prevent a global resolution with other parties in interest.<br>• The termination of exclusivity does not make this provision unreasonable. It is a common term in restructuring support agreements; it is meaningless except in a context where exclusivity has been lifted; and the existence of competing plans is the fact pattern where it is particularly relevant (in fact, this is the *only* circumstance where such a provision is relevant at all). |
| 13 | Release language should not require acknowledgment that releasing party is "paid in full" | Adventist Claimants [Dkt. No. 4637 (p. 3)] | • The Amended RSA's form of release ("Form of Release") was filed to narrow concerns.<br>• The Form of Release has been narrowly tailored to release only made whole claims, and the AHG remains willing to work with objectors on further refinements on this point ahead of confirmation. |
| 14 | Release language should not be limited to insurers releasing victims for claims to amounts recovered "from the Debtors" | Adventist Claimants [Dkt. No. 4637 (pp. 3-4)] | • The Amended RSA's Form of Releases was designed to be purely symmetrical. Said differently, the injured party is asked to release made whole claims against its insurer (*i.e.* claims to the insurer's recovery from the Debtors), and in return the insurers will be deemed to release any claims to the amounts injured parties recover from the debtors. |
| 15 | Releases should be signed, not ordered through a confirmation order. | Adventist Claimants [Dkt. No. 4637 (pp. 3-4)] | • The AHG did not want to hold up payments to insureds while insurers were tracked down to sign individual mutual releases. So the confirmation order mechanism in the Amended RSA was born out of convenience and a desire to facilitate swift payments to victims from a plan trust.<br>• Currently holders of an estimated 96% in dollar amount of Subrogation Claims and over 80% in number of all claimants have signed up to the Amended RSA. The mutual release is unquestionably consensual as to those parties. |

| # | Objection | Objecting Party | AHG Brief Response |
|---|---|---|---|
| 16 | Why are government entities not required to sign similar releases? | Adventist Claimants [Dkt. No. 4637 (p. 3)] | • Most government agencies have settled their Subrogation Claims.<br>• Insurance carriers are less concerned about made whole risk associated with such claims. |
| | **V.** | | ***The Applicable Standard of Review is Deferential to the Debtors' Business Judgment*** |
| 17 | The proposed settlement and entry into the Amended RSA should be subject to a heightened version of the "fair and equitable" standard rather than the more deferential business judgment standard because it was negotiated between the Debtors and an insider. | TCC [Dkt. Nos. 4232 (pp. 5-7), 4629 (pp. 5-7)] | • *In re A & C Props.*, 784 F.2d 1377 (9th Cir. 1986) establishes the test for evaluating a Rule 9019 settlement motion in the Ninth Circuit.<br>   o When evaluating a 9019 motion, "[i]t has been held that the court's proper role is "'to canvas the issues and see whether the settlement falls below the lowest point in the range of reasonableness.'" *In re Pacific Gas and Elec. Co.*, 304 B.R. 395, 417 (Bankr. N. D. Cal. 2004) (internal citations omitted).<br>• The Debtors are authorized to use estate property outside of the ordinary course of business upon a showing that the Debtors have exercised their business judgment. *See In re Walter*, 83 B.R. 14, 17 (B.A.P. 9th Cir. 1988) ("The bankruptcy court has considerable discretion in deciding whether to approve or disapprove the use of estate property by a debtor in possession, in the light of sound business justification.").<br>• There is no factual basis for applying a different test here. Baupost is not an "insider" as defined by Section 101(31) of the Bankruptcy Code for reasons including: (i) it is not an officer, director, affiliate, managing agent or partner of the Debtors, and (ii) it is not a "person in control" of the Debtors as evidenced by Baupost (a) holding less than 5% of the currently traded common shares, and (b) not being part of the Jones Day-represented shareholder group.<br>• Baupost is one member of a group that contains over 100+ institutions, the overwhelming majority of which are the insurance companies that acquired their claims by compensating victims of the fires. |

| # | Objection | Objecting Party | AHG Brief Response |
|---|---|---|---|
| | **VI.    Remaining Objections Should be Overruled** | | |
| 18 | The settlement is an impermissible *sub rosa* plan | TCC [Dkt. No. 4232 (pp. 24-25). | • Establishing the existence of a *sub rosa* plan in the context of a settlement is a high burden that is satisfied only in "extreme circumstances." *See In re Tower Auto. Inc.*, 241 F.R.D. 162, 169 (S.D.N.Y. 2006) (internal citations omitted); *In re McClure*, 2015 WL 1607365, at *8 (Bankr. C.D. Cal. Apr. 2, 2015) ("First, it is not clear that the *sub rosa* plan objection applies to anything other than § 363 sales, and ***possibly*** settlement agreements.") (emphasis added).<br>• Chapter 11's requirements are not being "short circuited"—the effectiveness of the Debtors' Plan contemplated by the settlement is contingent on a yet to come plan confirmation process and confirmation order. Distributions to the various classes of creditors set forth in the Debtors' plan will not be made until the Bankruptcy Court confirms such plan. |
| 19 | Impermissible solicitation pursuant to Section 1125 | BOKF, U.S. Department of Justice, Civil Division [Dkt. Nos. 4231 (p. 6); 4237 (p.5)] | • No violation of Bankruptcy Code Section 1125(b) exists here because there was no specific request for an official vote to either accept or reject a plan. In fact, Section 2(a)(ii) of the Amended RSA requires each Consenting Creditor to covenant to "vote or cause to be voted (when solicited to do so in accordance with this Agreement after receipt of a Disclosure Statement approved by the Bankruptcy Court and by the applicable deadline for doing so)…"<br>• The first words on the Amended RSA are in bold and capitalized: "This Agreement is not, and shall not be deemed, a solicitation for consents to any chapter 11 plan of reorganization pursuant to sections 1125 and 1126 of the Bankruptcy Code…"<br>• Post-petition RSAs are allowed in the Ninth Circuit, so long as the agreements are not actually requests for an official vote. See <u>In re Nesbitt Portland Property LLC</u>, 2013 WL 4401333 at *2 (Bankr. C.D. Cal. June 19, 2019); <u>In re Art and Architecture Books of the 21st Century</u>, (Bankr. C.D. Cal.), Case No. 2:13-bk-14135-RK, Dkt. No. 1807 (approving post-petition plan support agreement barring party to vote in favor of alternate transaction). |

<u>Attachment A</u>

Attachment B