**Annex 1**

**Presiding Officer Decision**

# PUBLIC UTILITIES COMMISSION

505 VAN NESS AVENUE

SAN FRANCISCO, CA 94102-3298

**FILED**

08/06/19
11:59 AM

August 6, 2019

TO PARTIES OF RECORD IN INVESTIGATION 18-07-008:

This proceeding was filed on July 12, 2018, and is assigned to Commissioner Guzman Aceves and Administrative Law Judge (ALJ) Kelly.  This is the decision of the Presiding Officer, ALJ Kelly.

Any party to this adjudicatory proceeding may file and serve an Appeal of the Presiding Officer's Decision within 30 days of the date of issuance (*i.e.*, the date of mailing) of this decision.  In addition, any Commissioner may request review of the Presiding Officer's Decision by filing and serving a Request for Review within 30 days of the date of issuance.

Appeals and Requests for Review must set forth specifically the grounds on which the appellant or requestor believes the Presiding Officer's Decision to be unlawful or erroneous.  The purpose of an Appeal or Request for Review is to alert the Commission to a potential error, so that the error may be corrected expeditiously by the Commission.  Vague assertions as to the record or the law, without citation, may be accorded little weight.

Appeals and Requests for Review must be served on all parties and accompanied by a certificate of service.  Any party may file and serve a Response to an Appeal or Request for Review no later than 15 days after the date the Appeal or Request for Review was filed.  In cases of multiple Appeals or Requests for Review, the Response may be to all such filings and may be filed 15 days after the last such Appeal or Request for Review was filed.  Replies to Responses are not permitted.  (*See*, generally, Rule 14.4 of the Commission's Rules of Practice and Procedure at www.cpuc.ca.gov.)

If no Appeal or Request for Review is filed within 30 days of the date of issuance of the Presiding Officer's Decision, the decision shall become the decision of the Commission.  In this event, the Commission will designate a decision number and advise the parties by letter that the Presiding Officer's Decision has become the Commission's decision.

/s/  ANNE E. SIMON

Anne E. Simon
Chief Administrative Law Judge

AES:mph

Attachment

ALJ/POD-GK1/mph

Decision **PRESIDING OFFICER'S DECISION (Mailed 8/6/2019)**

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| Order Instituting Investigation into Pacific Gas and Electric Company's (U39E) Failure to Provide a 24-hour Notice Prior to Residential Electric Service Disconnections Between July 1 and July 18, 2016 and Adequacy of its Remedy Going Forward. | Investigation 18-07-008 |

**PRESIDING OFFICER'S DECISION
ADOPTING SETTLEMENT AGREEMENT**

## Summary

Pursuant to Rule 12.1 of the Commission's Rules of Practice and Procedure, this decision approves an all-party settlement between Pacific Gas and Electric (PG&E) and the Commission's Consumer Protection and Enforcement Division (CPED), which was filed on April 15, 2019. The settlement proposes that PG&E violated its Electric Tariff Rule 8 A.2 by failing to provide 6,255 customers at least 24 hour notice prior to disconnection for non-payment between July 1 and July 18, 2016 and disconnected 217 customers on October 20, 2018. The settlement resolves all issues in this proceeding and provides that PG&E will provide a $100 bill credit to the 6,371 customer accounts and will also contribute $637,100 to the Relief for Energy Assistance through

Case: 19-30088    Doc# 4666-1    Filed: 11/11/19    Entered: 11/11/19 17:30:51    Page 3
of 23

Community Help (REACH) program.[1]  We find the settlement is reasonable in light of the record, consistent with the law, and in the public interest.  We, therefore, approve and adopt the settlement.

## 1.  Background and Procedural History

A prehearing conference was held in this matter on October 30, 2018.  A scoping ruling was issued on December 18, 2018.  On January 31, 2019, the parties filed a motion to amend the scoping ruling.  On February 19, 2019, an amended scoping ruling was issued.  Pacific Gas and Electric Company (PG&E) and the Utility Enforcement Branch of the Commission's Consumer Protection and Enforcement Division (CPED)[2] (collectively, referred to as the Parties) reached a settlement to resolve all of the issues in this proceeding (Settlement Agreement).  The Parties filed a motion to adopt the Settlement Agreement on April 15, 2019 and a joint motion to amend the Settlement Agreement on May 9, 2019.[3]

### 1.1.  CPED Investigation, Recommendations and Report

This proceeding was initiated through an Order Instituting Investigation (OII) on July 12, 2018, to determine whether the named respondent, PG&E, violated any provisions of the Public Utilities Code, Commission General Orders, Decisions, Rules of Practice and Procedure, or other applicable laws or

---

[1] This program provides support to PG&E customers facing difficulties paying their bills.

[2]  CPED is a Division of the Commission charged with investigating and enforcing compliance with the Pub. Util. Code and other utility laws, and the Commission's rules, regulations, orders and decisions.

[3] The Amended Settlement Agreement is attached as Attachment A to this decision.

Case: 19-30088    Doc# 4666-1    Filed: 11/11/19    Entered: 11/11/19 17:30:51    Page 4 of 23

requirements pertaining its failure to provide 24-hour notice required in its Electric Rule No. 8 A.2 Tariff (Rule 8 A.2).[4]

This OII is in response to an investigation conducted by the Commission's Utility Enforcement Branch (EUB).[5]  After conducting its investigation, CPED staff developed a report: "Investigation of PG&E for Admitted Violation of Rule 8 A.2 By Improperly Disconnecting Electric Customers"(Staff Report) dated June 11, 2018.[6]

From July 1 to July 18, 2016, PG&E disconnected approximately 6,255 residential electric customers without providing an outbound telephone call at least 24 hours prior to the disconnection of service.[7]  PG&E's Contact Center Operations discovered this had happened on July 19, 2016.[8]  PG&E notified the Commission's Policy and Planning Division that it had completed the disconnections without proper notice on August 30, 2016.[9]  The Staff Report details PG&E's admission of violating Rule 8 A.2 by failing to provide 24-hour notice to residential electric customers prior to disconnection service.[10]  The report also details PG&E's remedies to prevent future service disconnections

---

[4] Rule 8 A.2 provides in pertinent part that PG&E is required to provide a 15-day notice if after 19 days, a residential customer has a past due balance.  Subsequent to this 15-day notice, PG&E must provide a 48-hour and a 24-hour notice of disconnection if a customer's account balance is still past due.

[5] Prior to June 1, 2016, EUB was in the Commission's Safety and Enforcement Division.

[6] The Staff Report is attached to OII.

[7] Staff Report at 1.

[8] *Id.* at 2.

[9] *Id.*

[10] PG&E admitted that its automated calling system failed between July 1 and July 18, 2016 and that it disconnected 6,255 customers without proper notice in violation of Rule 8 A.2. (*See*, Staff Report Attachment D).

Case: 19-30088    Doc# 4666-1    Filed: 11/11/19    Entered: 11/11/19 17:30:51    Page 5 of 23

without proper notice.  PG&E addressed the automated calling malfunction by moving the customer telephone notification function to a new server[11] and instituted notification processes that indicate when calls are not initiated or are not completed.  These notifications are manually reviewed each business day, and the notifications allow for real-time inter-department communications to cancel disconnection activities if an error occurs.

On October 20, 2018, PG&E discovered that it had disconnected 217 customers for non-payment that day.  On October 12, 2018, one of PG&E's Java Message Service Servers stopped processing order for electric shut-off-for-nonpayment.  On October 20, 2018, a routine maintenance was performed on the servers, thereby restarting the servers and causing them to process and complete all queued transactions that had been stored since October 12, 2018.  This resulted in 217 electric service disconnections across PG&E's territory.  These disconnections happened on a Saturday, which is in violation of PG&E's Electric Tariff Rule 11B.

As part of PG&E's corrective measures, PG&E implemented a control that discards any remote disconnection transactions that are stuck for two or more hours.  If a server restarts during the two-hour window, the transactions will also be discarded.  Additionally, PG&E implemented various notification measures that alerts its Credit Department, the Smart Meter Operations Center, and Enterprise Integration that there are transactions held in a queue in order to allow each business group to address any potential issues in real-time.

---

[11]  The initial disconnections resulted from a technical issue with automated calling server.

Case: 19-30088    Doc# 4666-1    Filed: 11/11/19    Entered: 11/11/19 17:30:51    Page 6 of 23

PG&E notified the Commission about these disconnections via telephone on October 29, 2018 and discussed the incident during the October 30, 2018 Prehearing Conference for this investigation.

This incident was added to the scope of this proceeding following the issuance of the Assigned Commissioner's Amended Scoping Memo and Ruling dated February 19, 2019.

## 2.  The Settlement Agreement

In general, the main components to the Settlement Agreement are (1) the recitals and (2) the agreement.  PG&E voluntarily acknowledges that the events that occurred in this proceeding were in fact a violation of two of its tariffs. Among other things, the Settlement Agreement establishes that PG&E will do the following:

> Customer Payments:  Within ninety days of the Commission's issuance of a decision adopting this Agreement, PG&E will provide a bill credit of $100 to each of 6,371 customer accounts that have not already received a $100 credit.[12]  The total for this portion of the Agreement is $637,100, to be paid by shareholders.  For undeliverable bill credits to customers affected by the June 2016 and October 2018 disconnections, such refunds will escheat to the State of California consistent with PG&E's current practices.

> Contribution to Relief for Energy Assistance through Community Help (REACH):  Upon the Commission issuing a decision adopting this Agreement, PG&E shall owe a contribution to the REACH Program in the amount of $637,100 (the "REACH Claim"), to be paid by shareholders, on account of the prepetition claims settled herein.  PG&E may satisfy the REACH Claim in accordance with the terms of an order entered by the

---

[12]  The 101 customers that already received a $100 credit through PG&E's Quality Assurance Standard Provision (QAS) #10 will not receive any additional credit under this Agreement.

Case: 19-30088   Doc# 4666-1   Filed: 11/11/19   Entered: 11/11/19 17:30:51   Page 7 of 23

Bankruptcy Court[13] granting PG&E authority to pay the REACH Claim in full or in part.  PG&E will request that the Bankruptcy Court grant PG&E authority to pay the REACH Claim in full within ninety days of the Bankruptcy Court's authorization.  In the event the Bankruptcy Court authorizes PG&E to pay the REACH Claim in full or in part but does not specify a time to comply, PG&E will pay the claim within ninety days of the Bankruptcy Court's authorization.

### 2.1.  Penalty

Both Parties contend that a penalty is not warranted in this proceeding. They noted PG&E's openness in reporting the violation that started the original investigation and the incident that was added to the proceeding in the amended scoping ruling.  An additional consideration is that these disconnections were a result of a technical issue and not a deliberate action.

## 3.  Standard of Review

The Joint Motion seeks Commission approval and adoption of the Settlement Agreement and its terms.  Under Rule 12.1 of the Commission's Rules of Practice and Procedure to approve and adopt a settlement, the Commission must find that a settlement is reasonable in light of the whole record, consistent with the law, and in the public interest.

## 4.  Discussion

As discussed below, the Settlement Agreement addresses all issues in the scope of this proceeding and meets the Rule 12.1(d) requirements.  We will first evaluate the provision of the Settlement Agreement not to impose a penalty on PG&E.  Then we discuss how the Settlement Agreement, as a whole, addresses all issues in this proceeding and complies with Rule 12.1(d) requirements.

---

[13] United States Bankruptcy Court for the Northern District of California, Case Number 19-30088-DM.

### 4.1.  Penalty

As noted above, the Settlement Agreement indicates that a penalty is not appropriate in this proceeding.  We note that PG&E was proactive in reporting both incidents to the Commission.  We also note that PG&E has implemented several provisions to prevent these types of technical failures in the future. Additionally, we note that PG&E has agreed to give all 6,371 customers impacted by the July 2016 and October 2018 disconnections a bill credit of $100 and it has also agreed to make a contribution to the REACH Program in the amount of $637,100, both of which will be funded by shareholders and not the ratepayers. We also agree that the PG&E made various corrections to prevent these types of future technical failures and is making a substantial contribution to REACH Program.  Furthermore, we recognize that these disconnections were a result of technical failures and not a deliberate act.  Therefore, we conclude that it is appropriate not to impose a penalty in this proceeding.

### 4.2.  Rule 12.1 Compliance

Now we turn to the whole of the Settlement Agreement to discuss how it addresses all the issues in the proceeding and meets the requirements of Rule 12.1(d) of the Commission's Rules of Practice and Procedure that it is reasonable in light of the whole record, consistent with the law and in the public interest.

As discussed in this decision, this Settlement Agreement resolves all the issues within the scope of this proceeding, as set forth in the OII which provided that the purpose of this investigation was to examine whether PG&E violated Tariff Rule 8 A.2 when it failed to provide an outbound call at least 24 hours

Case: 19-30088    Doc# 4666-1    Filed: 11/11/19    Entered: 11/11/19 17:30:51    Page 9 of 23

prior to disconnection.[14]  The Settlement Agreement also resolves the issue added to the amended scoping ruling of this proceeding when PG&E again self-reported that it disconnected 217 customers on a Saturday in violation of Electric Tariff Rule 11B.

PG&E represents the utility and its shareholders, while CPED represents the interests of ratepayers.  The settlement is the result of extensive and vigorous negotiations.  The parties to the settlement have a thorough understanding of the issues and could therefore make informed decisions in the settlement process.

The Commission could have resolved the issues differently than the Settlement Agreement.  Accordingly, the settling parties have balanced a variety of issues of importance to them and have agreed to the settlement as a reasonable means by which to resolve the issues.  For the reasons discussed above, the settlement is reasonable in light of the record as a whole.

There are no terms within the settlement agreement that would bind the Commission in the future or violate existing law.  Therefore, we find the settlement consistent with the law.

There is a public policy favoring the settlement of disputes to avoid costly and protracted litigation.[15]  The settlement satisfies this public policy preference for the following reasons:

    a.  By reaching agreement, the parties avoid the costs and uncertainties of further litigation in this proceeding and eliminate the possible litigation costs for rehearing and appeal.  Approval of the settlement provides speedy and complete resolution of the issues.

---

[14]  By its own reporting PG&E admitted to violating this rule.

[15]  Decision (D.) 88-12-083, 30 CPUC 2d 189, 221.

Case: 19-30088   Doc# 4666-1   Filed: 11/11/19   Entered: 11/11/19 17:30:51   Page 10 of 23

b. The settlement meets the applicable settlement standards of Rule 12.1(d), should be accorded the same deference the Commission accords settlements generally, and should be adopted.

c. Bill credits will provide the impacted customers with compensation and PG&E will also make a significant contribution to the REACH Program.

Adoption of the settlement is binding on all parties to the proceeding. However, pursuant to Rule 12.5, the settlement does not bind or otherwise impose a precedent in this or any future proceeding.

Based thereon, we find the Settlement Agreement and its terms reasonable in light of the whole record, consistent with law, and in the public interest.

## 5. Categorization and Need for Hearing

The OII categorized this proceeding as adjudicatory as defined in Rule 1.3(a) and anticipated that this proceeding would require evidentiary hearings. The Assigned Commissioner's Scoping Memo and Ruling affirmed that categorization. However, the parties reached a settlement before hearings were conducted. Therefore, the preliminary finding that hearings would be necessary is changed to no hearings necessary.

## 6. Assignment of Proceeding

Martha Guzman Aceves is the assigned Commissioner and Gerald F. Kelly is the assigned Administrative Law Judge and Presiding Officers in this proceeding.

## Findings of Fact

1. On June 11, 2018 CPED issued a Staff Report on the self-report of PG&E's violation of Rule 8 A.2.

2. On February 19, 2019, the scoping memo was amended to investigate PG&E's self-reported violation of Rule 11B.

Case: 19-30088   Doc# 4666-1   Filed: 11/11/19   Entered: 11/11/19 17:30:51   Page 11 of 23

3.  Based on the Staff Report, the Commission initiated an OII to investigate the violations.

4.  CPED and PG&E are the only parties to this proceeding, and they have negotiated the Settlement Agreement and filed their Joint Motion for Adoption of Settlement Agreement and Joint Motion to Amend Provisions in the Proposed Settlement Agreement.

5.  Penalties are not warranted in this proceeding.

6.  PG&E will provide a $100 bill credit to all 6,371 customers impacted by its July 2016 and October 2018 disconnects discussed in this proceeding.

7.  PG&E will also make a contribution to the REACH Program in the amount of $637,100.

8.  Both the bill credit and REACH contribution will be funded by shareholders.

9.  The issues in this proceeding are adequately addressed by the Settlement Agreement, and there are no outstanding issues of material fact in dispute.

**Conclusions of Law**

1.  The Joint Motion for Adoption of the Settlement Agreement should be granted as amended by the Joint Motion to Amend Certain Provisions of the Settlement Agreement.

2.  The Settlement Agreement addresses all issues in the scope of this proceeding, including the issue added in the amended scoping ruling.

3.  The Settlement is reasonable in light of the whole record, consistent with law, and in the public interest, consistent with Rule 12.1(d) of the Commission's Rules.

4.  I.18-07-008 should be closed.

# O R D E R

**IT IS ORDERED** that:

1.  The Joint Motion of Pacific Gas and Electric Company and the Consumer Protection and Enforcement Division for Adoption of Settlement filed on April 15, 2019 as amended by the Joint Motion to Amend Provisions in the Proposed Settlement Agreement is granted, and the settlement is approved as set forth herein.

2.  Pacific Gas and Electric Company (PG&E) shall seek approval of the Settlement Agreement by the United States Bankruptcy Court for the Northern District of California, Case No. 19-30088-DM (the "Bankruptcy Court")

3.  Pacific Gas and Electric Company (PG&E) shall be liable for a $100 bill credit to each of the 6,371 customers impacted by PG&E's July 2016 and October 2018 disconnections (the "Customer Credits") within 90 days of the adoption of this Settlement Agreement, for an aggregate liability of $637,100.

4.  Pacific Gas and Electric Company (PG&E) shall satisfy the Customer Credits in accordance with the terms of an order to be entered by the Bankruptcy Court.

5.  Pacific Gas and Electric Company (PG&E) shall request that the Bankruptcy Court grant PG&E authority to the issue the Customer Credits within 90 days of the Bankruptcy Court's authorization.

6.  If the Bankruptcy Court authorizes Pacific Gas and Electric Company (PG&E) to issue the Customer Credits, but does not specify a time to comply, PG&E shall issue such credits within 90 days of the Bankruptcy Court's authorization.

Case: 19-30088   Doc# 4666-1   Filed: 11/11/19   Entered: 11/11/19 17:30:51   Page 13 of 23

7.  For undeliverable bill credits to customers affected by the June 2016 and October 2018 disconnections, such refunds will escheat to the State of California consistent with Pacific Gas and Electric's current practices.

8.  The Customer Credits will be funded by shareholders.

9.  Upon issuance of this decision, Pacific Gas and Electric Company shall be liable for a contribution of $637,100 to Relief for Energy Assistance through Community Help (REACH) program.

10. Pacific Gas and Electric Company (PG&E) shall satisfy the contribution of $637,100 to the Relief for Energy Assistance through Community Help (REACH) program in accordance with terms of an order to be entered by the Bankruptcy Court.

11. Pacific Gas and Electric Company (PG&E) shall request that the Bankruptcy Court grant PG&E authority to the contribute to the Relief for Energy Assistance through Community Help (REACH Program) within 90 days of the Bankruptcy Court's authorization.

12. If the Bankruptcy Court authorizes Pacific Gas and Electric Company (PG&E) to pay the Relief for Energy Assistance through Community Help (REACH) program claim, but does not specify a time to comply, PG&E shall satisfy the claim within 90 days of the Bankruptcy Court's authorization.

13. The $637,100 contribution to Relief for Energy Assistance through Community Help (REACH) program will be funded by shareholders.

14. Within 120 days of the issuance of this Presiding Officer's Decision, Pacific Gas and Electric shall provide a status update to the service list regarding Bankruptcy Court approval of the Settlement Agreement.

15. This proceeding remains open pending approval of the Settlement Agreement by the Bankruptcy Court.

Case: 19-30088    Doc# 4666-1    Filed: 11/11/19    Entered: 11/11/19 17:30:51    Page 14 of 23

This order is effective today.

Dated _____2019, at San Francisco, California.

# ATTACHMENT A

# AMENDED SETTLEMENT AGREEMENT

This Amended Settlement Agreement (Agreement) is made and entered into on May 9, 2019 (Execution Date) by and between the Utility Enforcement Branch of the Consumer Protection and Enforcement Division (CPED) of the California Public Utilities Commission (Commission), and Pacific Gas and Electric Company (PG&E), an investor-owned utility regulated by the Commission. CPED and PG&E are each referred to herein as a "Party" and shall be collectively known as the "Parties."

## RECITALS

WHEREAS, PG&E is a gas and electric investor-owned utility subject to the Commission's jurisdiction and the Commission's general orders, rules and decisions;

WHEREAS, PG&E did not initiate automated calls to 6,255 customers at least 24 hours prior to disconnection for non-payment between July 1 and July 18, 2016, as required by PG&E's Electric Tariff Rule 8 A.2. When PG&E learned of this error on July 19, 2016, it took a number of remedial steps. PG&E temporarily suspended service disconnections while working on a fix, reversed disconnections and any service fees for impacted customers, investigated the cause of the problem and implemented measures to prevent a repeat of the problem. PG&E addressed the computer malfunction that caused the error by moving the customer telephone notification function to a new server and instituted notification processes that indicate when calls are not initiated or are not completed. The notifications are manually reviewed each business day, and the notifications allow for real-time inter-department communications to cancel disconnection activities if an error occurs. PG&E self-reported this incident to the Commission's Policy and Planning Division via telephone call on August 30, 2016. PG&E provided additional information by letter on October 11, 2016, in response to a September 27, 2016 letter from Energy Division Director Edward Randolph;

WHEREAS, on July 20, 2018, the Commission issued an Order Instituting Investigation into PG&E's Electric Service Disconnections Procedures and its Failure to Provide Proper Notice Prior to Service Disconnections (OII or I.18-07-008). The OII was opened in order to further examine whether PG&E violated its tariffs or any other applicable rules or orders during the lapse in 24-hour notice calls for the period from July 1 to July 18, 2016, and whether penalties or other remedies were warranted;

WHEREAS, PG&E discovered on October 20, 2018, that it had disconnected service to 217 customers for non-payment that day. PG&E immediately started the process of reversing these disconnects and any related charges. In addition, PG&E investigated the cause of the error and developed processes to prevent a repeat of the problem. On October 12, 2018, one of PG&E's Java Message Service servers stopped processing transactions, including orders for electric service shut off for nonpayment. This caused transactions to queue and to not complete. On October 20, 2018, a routine maintenance was performed on servers, thereby restarting the servers and causing them to process and complete all queued transactions that had been stored since October 12,

1

2018. This resulted in 217 electric service disconnections across PG&E's service territory. As part of PG&E's corrective measures, PG&E implemented a control that discards any remote disconnection transactions that are stuck for two hours or more. If a server restarts within that two-hour window, the transactions will also be discarded. Also, PG&E implemented a notification measure that alerts its Credit department, the Smart Meter Operations Center, and Enterprise Integration that there are transactions held in a queue in order to allow each business group to address an issue in real-time. PG&E notified the Commission about the disconnections via telephone on October 29, 2018, and also discussed the incident during the October 30, 2018 Prehearing Conference for I.18-07-008. PG&E provided additional detail in a letter to Energy Division Director Edward Randolph on November 7, 2018. The February 19, 2019 Assigned Commissioner's Amended Scoping Memo and Ruling added the October 20, 2018 incident to the Scope of I.18-07-008;

WHEREAS, all active parties entered into settlement discussions during the weeks subsequent to the proceeding's prehearing conference, duly noticed on November 9, 2018;

WHEREAS, the Parties agree that this Agreement is in their mutual best interests and in the best interest of PG&E's customers and the public interest, and that a settlement and complete resolution of the allegations will avoid unnecessary, wasteful and costly litigation and conserve the resources of the Parties and of the Commission;

WHEREAS, the Parties desire to compromise, settle, and resolve fully and finally all allegations that were raised or could have been raised (including the October 20, 2018 disconnects) as part of I.18-07-008 or on the facts giving rise to that proceeding;

WHEREAS, this Agreement is contingent on Commission approval of this settlement agreement;

NOW THEREFORE, in consideration of the promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree and stipulate as follows:

## AGREEMENT

1. **Compromise**: This Agreement is entered into in full compromise of any disputed claims, allegations or outstanding issues raised between or among the Parties.

2. **Customer Payments**: Within ninety days of the Commission's issuance of a decision adopting this Agreement, PG&E will provide a bill credit of $100 to each of 6,371 customer accounts that have not already received a $100 credit.[1] The total for this portion of the Agreement is $637,100, to be paid by shareholders. For undeliverable bill

---

[1] The 101 customers that already received a $100 credit through PG&E's Quality Assurance Standard provision (QAS) #10 will not receive any additional credit under this Agreement.

Case: 19-30088    Doc# 4666-1    Filed: 11/11/19    Entered: 11/11/19 17:30:51    Page 18 of 23

credits to customers affected by the June 2016 and October 2018 disconnections, such refunds will escheat to the State of California consistent with PG&E's current practices.

**3. Contribution to Relief for Energy Assistance through Community Help (REACH):** Upon the Commission issuing a decision adopting this Agreement, PG&E shall owe a contribution to the REACH Program in the amount of $637,100 (the "REACH Claim"), to be paid by shareholders, on account of the prepetition claims settled herein. PG&E may satisfy the REACH Claim in accordance with the terms of an order entered by the Bankruptcy Court[2] granting PG&E authority to pay the REACH Claim in full or in part. PG&E will request that the Bankruptcy Court grant PG&E authority to pay the REACH Claim in full within ninety days of the Bankruptcy Court's authorization. In the event the Bankruptcy Court authorizes PG&E to pay the REACH Claim in full or in part but does not specify a time to comply, PG&E will pay the claim within ninety days of the Bankruptcy Court's authorization. This program provides support to PG&E customers facing difficulties in paying their bills. From October 1, 2015 through September 31, 2017, REACH has provided approximately four million four hundred twenty-six thousand and two hundred twenty-three dollars ($4,426,223) to approximately fifteen thousand, nine hundred and ninety-three (15,993) customers over the course of this three year period. In 2018, 4,176 (0.076%) of PG&E's residential customers received REACH assistance.

**4. Commission Approval:** This Agreement is subject to the approval of the Commission, which approval the Parties agree they will seek promptly and on an expedited basis.

**5. Penalties:** The Parties agree that PG&E was proactive in self-reporting both incidents to the Commission. The Parties also agree that the subsequent corrective measures that have been implemented appear reasonable given the knowledge Parties have at this time. PG&E has also agreed to provide at shareholder expense, a $100 bill credit to each of the 6,371 customer accounts that have not already received a $100 Quality Assurance Standard credit, and to contribute $637,100 to the REACH program as provided in Section 3, to support PG&E customers facing difficulties in paying their bills. Therefore, penalties are not recommended.

**6. Releases:** Upon the Commission's adoption of this Agreement, each of the Parties hereto hereby fully, finally and forever releases, waives, and discharges the other Parties and their respective representatives, agents, officers and directors, heirs, subsidiaries, affiliates, successors and assigns of any claims that were raised or could have been raised (including the October 20, 2018 disconnects) as part of I.18-07-008 or on the facts giving rise to that proceeding. For purposes of the OII, upon the Closing, the Parties waive the right to any further hearing, administrative law judge decision, Commission decision, and other briefs, and all further and other proceedings to which the parties may be entitled under the California Public Utilities Code and Commission

---

[2] U.S. Bankruptcy Court for the Northern District of California, Case Number 19-3008-DM.

Case: 19-30088    Doc# 4666-1    Filed: 11/11/19    Entered: 11/11/19 17:30:51    Page 19 of 23

regulations and rules. In furtherance of such intention, the Parties agree that the releases contained in this Agreement will remain in effect and will be fully binding notwithstanding the discovery or existence of any additional or different facts; provided, however, nothing in this Agreement shall be deemed to release the Parties from any obligation under this Agreement.

7.     **Acknowledgment of Release and Waiver of Section 1542**:  The Parties agree that upon the Commission's adoption of this Agreement, this Agreement will forever bar every claim, demand, and cause of action described in the OII, or related to that proceeding, that may be brought by each of the Parties, as applicable.  Each Party expressly waives all rights or benefits which it now has, or in the future may have, under Section 1542 of the California Civil Code, and any law or common law principle of similar effect.  Section 1542 of the California Civil Code states as follows:

> **A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.**

The Parties hereby acknowledge that they are aware that they may hereafter discover facts in addition to or different from those which they now know or believe to exist with respect to the matters covered by this Agreement.  The Parties also acknowledge that such different or additional facts, if they exist, may have given rise to causes of action, claims, demands, controversies, damages, costs, and expenses which are presently unknown, unanticipated, and unsuspected.  The Parties further agree, represent, and warrant that the releases contained herein have been negotiated and agreed upon in light of that realization, and that it is their intention through this Agreement, and with the advice of counsel, fully, finally, and forever to settle and release to the fullest extent permitted by law any and all existing claims, causes of action, disputes, and differences, that were raised or could have been raised, arising out of or related to the OII which exists, as of the Execution Date of this Agreement.  In furtherance of such intention, the Parties agree that the releases contained in this Agreement will remain in effect and will be fully binding notwithstanding the discovery or existence of any additional or different facts; provided, however, nothing in this Agreement shall be deemed to release the Parties from any obligation under this Agreement.

8.     **Warranties:**  By entering into this Agreement, the Parties will resolve the OII, along with any other matters, claims, or actions related to the OII which are known to exist by the CPED, whether filed or unfiled.  No further litigation with respect to the OII will be continued by any Party in any forum, except to enforce the terms of this Agreement, if necessary.  CPED represents and warrants that as of the Execution Date there are no existing claims, causes of action, or issues, related to the OII, that have accrued but have not yet been disclosed, pertaining to PG&E's July 2016 and October 2018 improper electric service disconnects.  To the extent that any such claims, causes of

4

action, or issues have accrued and are known but not disclosed as of the Execution Date, by CPED, they will be waived with prejudice.

9.     **Voluntary Agreement; No Construction Against Drafter:** Each Party hereby represents and agrees that this Agreement is freely and voluntarily executed. Each Party further represents that this Agreement has been negotiated and they have had the opportunity to consult with legal counsel prior to signing this Agreement. Accordingly, the Parties agree that any legal or equitable principles that might require the construction of this Agreement or any of its provisions against the party responsible for drafting this Agreement will not apply in any construction or interpretation of this Agreement.

10.     **Counterparts:** This Agreement may be executed in one or more counterparts, all of which taken together will constitute one and the same instrument.

11.     **Other People Bound by this Agreement:** The rights conferred and obligations imposed on any Party by this Agreement shall inure to the benefit of or be binding on that Party's representatives, agents, officers, directors, heirs, subsidiaries, affiliates, successors, or assigns as if those people or entities were themselves parties to the Agreement.

12.     **Authorization:** Each Party represents and warrants that it has the necessary power and authority, and has been duly authorized, to execute and deliver this Agreement, to perform its obligations hereunder, and to consummate the transactions contemplated hereby.

13.     **Governing Law:** This Agreement shall be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of California.

14.     **Entire Agreement:** This Agreement sets forth the entire agreement and understanding of the Parties relating to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, relating to the subject matter hereof. This Agreement may be pleaded as a complete defense to, and may form the basis for an injunction against, any action, suit or other legal proceeding which may be initiated, prosecuted, or attempted in breach of this Agreement that is related to the OII.

15.     **Severability/Commission Modification of the Agreement:** No individual term of this Agreement is agreed to by any Party except in consideration of the Parties' assent to all other terms. Thus, the Agreement is indivisible and no term is severable. Any Party may withdraw from this Agreement if the Commission modifies or fails to approve the Agreement. But the Parties agree to negotiate in good faith with regard to any Commission-ordered changes in order to restore the balance of benefits and burdens, and to exercise the right to withdraw only if those negotiations fail.

16.     **Alternative Dispute Resolution:** Should any dispute arise between the Parties concerning the meaning of this Agreement or the Parties' compliance with it, the Parties

5

will try in good faith to mediate the dispute using a mediator selected by the Commission's Alternative Dispute Resolution panel. Should good faith mediation fail to resolve the dispute, the Parties may then exercise any other remedies they might have. Accepted to and agreed as of the Execution Date.

**CONSUMER PROTECTION AND ENFORCEMENT DIVISION (CPED), CPUC**

By _____

      **Jeanette Lo**
      **Branch Chief, Utility Enforcement Branch**

Date _____

**PACIFIC GAS AND ELECTRIC COMPANY**

By _____

      **Scott Sanford**
      **Vice President, Customer Operations**

Date \_\_\_\_5 / 7 / 2019_____

6

**CONSUMER PROTECTION AND ENFORCEMENT DIVISION (CPED), CPUC**

By _____

Jeanette Lo

**Branch Chief, Utility Enforcement Branch**

Date _____ May 1, 2019 _____


**PACIFIC GAS AND ELECTRIC COMPANY**

By _____

**Scott Sanford**
**Vice President, Customer Operations**

Date _____

7
