Dario de Ghetaldi – Bar No. 126782
Amanda L. Riddle – Bar No. 215221
Steven M. Berki – Bar No. 245426
Sumble Manzoor – Bar No. 301704
**COREY, LUZAICH,**
**DE GHETALDI & RIDDLE LLP**
700 El Camino Real
P.O. Box 669
Millbrae, CA 94030-0669
Telephone: (650) 871-5666
Facsimile: (650) 871-4144
deg@coreylaw.com
alr@coreylaw.com
smb@coreylaw.com
sm@coreylaw.com

Michael S. Danko – Bar No. 111359
Kristine K. Meredith – Bar No. 158243
Shawn R. Miller – Bar No. 238447
**DANKO MEREDITH**
333 Twin Dolphin Drive, Suite 145
Redwood Shores, CA 94065
Telephone: (650) 453-3600
Facsimile: (650) 394-8672
mdanko@dankolaw.com
kmeredith@dankolaw.com
smiller@dankolaw.com

Eric Gibbs – Bar No. 178658
Dylan Hughes – Bar No. 209113
**GIBBS LAW GROUP**
505 14th Street, Suite 1110
Oakland, CA 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
ehg@classlawgroup.com
dsh@classlawgroup.com

Attorneys for Individual
Fire Victim Creditors

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>PG&E CORPORATION and PACIFIC GAS AND ELECTRIC COMPANY,<br><br>          Debtors. | Bankruptcy Case<br>No. 19-30088 (DM)<br>Chapter 11<br>  (Lead Case)<br>  (Jointly Administered)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO DEBTORS' MOTION RE INVERSE CONDEMNATION**<br><br>Date: November 19, 2019<br>Time: 10:00 a.m.<br>Place: United States Bankruptcy Court<br>     Courtroom 17, 16th Floor<br>     San Francisco, CA 94102 |

# TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................... 3

II. JURISDICTION OF THE CALIFORINIA PUBLIC UTILITIES COMMISSION ............ 5

III. LEGISLATIVE HISTORY OF THE CPUC AND THE PUBLIC UTILITIES CODE ........ 7

    A. California Legislative History and Rules of Statutory Construction ........................ 7

    B. 1876 to 1880 – Creation of the Railroad Commission ............................... 8

    C. 1911 – Constitutional Amendments and Legislation ................................. 9

    D. 1915 – Creation of the Public Utilities Code ........................................ 10

IV. RECENT RULINGS BY THE CPUC AND THE CALIFORNIA COURTS RELATING
TO THE APPLICATION OF INVERSE CONDEMNATION TO PUBLIC UTILITIES . 12

    A. The Most Recent Ruling by the CPUC Explaining the Role of Inverse
Condemnation in Determining Reasonable Rates .................................. 12

    B. The Most Recent Rulings by the California Courts on the Application of Inverse
Condemnation to PG&E ........................................................ 14

        1. Rulings in the *Butte Fire Cases* ........................................ 14

        2. Rulings in the *California North Bay Fire Cases* ......................... 15

V. PROPER JUDICIAL REVIEW OF ORDERS AND DECISIONS OF THE CPUC
UNDER CALIFORNIA LAW COMPELS DENIAL OF DEBTOR'S MOTION ............ 16

    A. Extent of California Courts' Jurisdiction on Review ............................... 16

    B. Standards of Review ........................................................ 17

    C. The California Supreme Court Would Deny PG&E's Motion ........................ 18

VI. CONCLUSION ................................................................................................ 18

**TABLE OF AUTHORITIES**

**Cases**

*American Microsystems, Inc. v. City of Santa Clara* (1982) 137 Cal.App.3d 1037 ......................... 17

*Barham v. Southern California Edison* (1999) 74 Cal.App.4th 744 .................................................. 4

*Clayworth v. Pfizer, Inc.* (2010) 49 Cal.4th 758 ............................................................................... 8

*County of Inyo v. Public Utilities Com.* (1980) 26 Cal.3d 154 .................................................... 17, 18

*Durant v. City of Beverly Hills* (1940) 39 Cal.App.2d 133 ........................................................... 17

*Elliott v. City of Pacific Grove* (1975) 54 Cal.App.3d 53 ............................................................. 17

*Greyhound Lines, Inc. v. Public Utilities Com.* (1968) 68 Cal.2d 406 ......................................... 17

*Mount Hawley Insurance Co. v. Lopez* (2013) 215 Cal.App.4th 1385 ........................................... 7

*Pacific Bell Telephone Co. v. Southern California Edison Co.* (2012)
   208 Cal.App.4th 1400 ........................................................................................ 4, 16, 17

*Pacific Bell v. Public Utilities Comm.* (2006) 140 Cal.App.4th 718 .............................................. 14

*SFPP, L.P. v. Public Utilities Commission* (2013) 217 Cal.App.4th 784 ........................................ 6

*Southern California Gas. Co. v. Public Utilities Commission* (1979) 23 Cal.3d 470 ....................... 6

*Swanson v. Marin Mutual Water District* (1976) 56 Cal.App.3d 512 ............................................ 17

*Toward Utility Rate Normalization v. Public Utilities Com.* (1978) 22 Cal.3d 529 ................... 14, 17

*Utility Consumers Action Network v. Public Utilities Comm.* (2004) 120 Cal.App.4th 644 .............. 5

*Wise v. Pacific Gas & Electric Co.* (1999) 77 Cal.App.4th 287 ...................................................... 5

**Statutes**

Public Utilities Code § 1756 ........................................................................................................ 16

Public Utilities Code § 1757(a) ............................................................................................... 16, 18

Public Utilities Code § 1757(b) ................................................................................................... 16

Public Utilities Code § 1759 ........................................................................................................ 16

Public Utilities Code § 216(a)(1) ............................................................................................ 6, 9, 10

Public Utilities Code § 451 ..................................................................................................... 6, 9, 10

Public Utilities Code § 728 ..................................................................................................... 6, 9, 10

**Other Authorities**

*Application of Pacific Gas and Electric Company* (Nov. 7, 2002) 221 P.U.R.4th 501 ........................ 7

California Constitution, Article XII, § 5 ........................................................................................... 5

California Constitution, Article XII, § 6 ........................................................................................... 6

California Constitution, Article XII, §§ 5-6 ...................................................................................... 5

Statutes 1998, ch. 886 .................................................................................................................... 16

# I. INTRODUCTION

Debtors' motion is the latest in a series of misplaced attempts by privately owned public utilities to undermine the Constitutionally based principles of inverse condemnation. The attempts are misplaced because inverse condemnation actually benefits those public utilities who act reasonably and prudently. Under long-established principles and procedures, the CPUC will not authorize a rate increase to recover the cost of providing compensation if it determines the utility was negligent or intentionally at fault. However, a public utility whose facilities cause damages to others can obtain the authority from the CPUC to increase rates to recover the cost of providing compensation for those damages if the utility can show that it acted reasonably and prudently.

Over the past twelve years, several major California privately and government owned public utilities made repeated and unsuccessful attacks on the application of inverse condemnation to their involvement in nine (9) wildfires in addition to those involved in this bankruptcy proceeding:

- **2007** – *In re 2007 Wildfire Insurer Litigation – Witch/Creek/Guejito Fires*, San Diego County Superior Court, Case No. 37-2008-00093082-CU-NP-CTL; Hon. Richard E. L. Strauss.
- **2007** – *Craig Carlson, et us., et al. v. Southern California Edison Company* (Grass Valley Fire), San Bernardino County Superior Court, Cas No. CIVSS811370; Hon. John M. Pacheco.
- **2007** – *In re Malibu Fire Case*, Los Angeles County Superior Court, Case No. BC387697; Defendant Southern California Edison; Hon. Gregory Alarcon.
- **2008** – *In re Sayre Fire Litigation*, Los Angeles County Superior Court, Case No. BC457025; Defendant Southern California Edison Company; Hon. Mark V. Mooney.
- **2008** – *In re Sesnon Fire*, Los Angeles County Superior Court, Case No. BC457025; Defendant Southern California Gas Company, a division of Sempra Energy; Hon. John Shepard Wiley, Jr.
- **2013** – *In re Powerhouse Fire Litigation*, Los Angeles County Superior Court, Case No. BC527331; Defendant Los Angeles Department of Power and Water; Hon. Amy D. Hogue.
- **2015** – *Haber v. Southern California Edison Company* (Round Fire), Los Angeles County Superior Court, Case No. BC585858; Hon. Terry Green.

(Declaration of Dario de Ghetaldi, Esq., in Opposition to Debtors' Motion ("De Ghetaldi Decl."), Exs. 1 & 2.)

PG&E made similar repeated and unsuccessful attacks on the application of inverse condemnation in litigation arising out of the disasters caused by their equipment over the last ten years.

On November 8, 2012, in the coordinated 2010 PG&E San Bruno Fire Cases, the court granted plaintiffs' motion for a determination of PG&E's liability for inverse condemnation under Code of Civil Procedure § 1260.040, but conditioned the order on the California Supreme Court's ruling on a pending petition for review arising out of *Pacific Bell Telephone Co. v. Southern California Edison Co.* (2012) 208 Cal.App.4th 1400. (De Ghetaldi Decl., Ex. 3, p. 24.) On November 14, 2012, the court in the San Bruno Fire Cases entered a minute order that provided:

> The motion came on regularly for hearing before the San Mateo Superior Court on October 29, 2012, the Honorable Steven L. Dylina, presiding. The court granted Plaintiffs' motion for a legal determination of inverse condemnation liability, conditioned upon the court's right to reconsider this order should the California Supreme Court grant review in *Pacific Bell Telephone Co. v. Southern California Edison Co.* (2012) 208 Cal.App.4th 1400 [Supreme Court Case No. S205855, petition for review filed on October 9, 2012 presenting the issue of "whether a privately-owned utility is strictly liable in inverse condemnation under Article I, section 19 of the California Constitution for property damage that was not proximately caused by its exercise of state power."]

> On November 14, 2012, the California Supreme Court DENIED REVIEW in the *Pacific Bell Telephone Co.* case. Therefore, no reconsideration of this order is necessary, and the court confirms that Plaintiffs' motion for a legal determination of inverse condemnation liability is GRANTED.

(De Ghetaldi Decl., Ex. 4, p. 27.)

The attacks on inverse condemnation raised by PG&E and other public utilities center on challenges to *Barham v. Southern California Edison* (1999) 74 Cal.App.4th 744 and *Pacific Bell, supra,* 208 Cal.App.4th 1400. Given that the California Supreme Court denied Southern California Edison's petition for review in *Barham* on November 23, 1999, and denied Southern California Edison's petition for review in *Pacific Bell* on November 14, 2012, those challenges have little to recommend their viability.

In July 2018, the CPUC issued a decision dealing with the applicability of inverse condemnation to the CPUC's rate-making process. (De Ghetaldi Decl., Ex. 18, p. 169.) Southern California Edison unsuccessfully sought a writ of review in the District Court of Appeal, the California

Supreme Court, and the United States Supreme Court. (De Ghetaldi Decl., Exs. 19-21, pp. 203, 207, and 209.)

In both the *Butte Fire Cases* and the *California North Bay Fire Cases*, PG&E challenged rulings of the Coordination Trial Courts on issues virtually identical to the issues raised in their motion in this matter, and ultimately brought those challenges before the California Supreme Court. In both instances, PG&E's petitions for review were denied. (De Ghetaldi Decl., Exs. 5-9 and 22-25, pp. 29-120 and 212-238.).

Debtors' pending motion adds nothing to the many similar motions and writs on inverse condemnation that have been heard in courts up and down the California judicial system for the last ten (10) years, and it offers nothing to remotely suggest that the California Supreme Court would do anything other than it already has done at least five (5) times – deny a writ of review challenging the Constitutional and statutory foundation of liability for inverse condemnation.

## II.     JURISDICTION OF THE CALIFORINIA PUBLIC UTILITIES COMMISSION

In its challenges to inverse condemnation, PG&E repeatedly misstates the nature and extent of the CPUC's authority and the role that inverse condemnation plays or does not play in the CPUC's rate-making authority. The CPUC is not an ordinary administrative agency, but a constitutionally established body with broad legislative and judicial powers. (*Wise v. Pacific Gas & Electric Co.* (1999) 77 Cal.App.4th 287, 300.) Having been granted an effective monopoly on the provision of utility services, the control of certain aspects of a public utility's operations are consigned by the California Constitution to the regulatory powers of the CPUC in order to protect the citizens of this State from the misuse of that monopoly power. (See Cal. Const., Art. XII, §§ 5-6.)

The California Constitution "confers broad authority on the CPUC to regulate utilities, including the power to fix rates, establish rules, hold various types of hearings, award reparations, and establish its own procedures." (*Utility Consumers Action Network v. Public Utilities Comm.* (2004) 120 Cal.App.4th 644, 645.)

Article XII, § 5, of the California Constitution provides: "The Legislature has plenary power, unlimited by the other provisions of this constitution but consistent with this article, to confer additional authority and jurisdiction upon the commission, to establish the manner and scope of review

of commission action in a court of record, and to enable it to fix just compensation for utility property taken by eminent domain."

Article XII, § 6, of the California Constitution provides: "The commission may fix rates, establish rules, examine records, issue subpoenas, administer oaths, take testimony, punish for contempt, and prescribe a uniform system of accounts for all public utilities subject to its jurisdiction."

Pursuant to this constitutional authority, three relevant statutes have been in effect substantially unchanged since the enactment of the Public Utilities Code in 1911 and the 1915 amendments to it:

- Public Utilities Code § 216(a)(1) provides: "'Public utility' includes every common carrier, toll bridge corporation, pipeline corporation, gas corporation, electrical corporation, telephone corporation, telegraph corporation, water corporation, sewer system corporation, and heat corporation, where the service is performed for, or the commodity is delivered to, the public or any portion thereof."

- Public Utilities Code § 451 provides: "All charges demanded or received by any public utility, or by any two or more public utilities, for any product or commodity furnished or to be furnished or any service rendered or to be rendered shall be just and reasonable. Every unjust or unreasonable charge demanded or received for such product or commodity or service is unlawful. [¶] Every public utility shall furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities, including telephone facilities, as defined in Section 54.1 of the Civil Code, as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public. [¶] All rules made by a public utility affecting or pertaining to its charges or service to the public shall be just and reasonable."

- Public Utilities Code § 728 provides in pertinent part: "Whenever the commission, after a hearing, finds that the rates or classifications, demanded, observed, charged, or collected by any public utility for or in connection with any service, product, or commodity, or the rules, practices, or contracts affecting such rates or classifications are insufficient, unlawful, unjust, unreasonable, discriminatory, or preferential, the commission shall determine and fix, by order, the just, reasonable, or sufficient rates, classifications, rules, practices, or contracts to be thereafter observed and in force.

(De Ghetaldi Decl., Exs. 13 and 15, pp. 139 and 150.)

Under this constitutional and statutory authority, the CPUC has the exclusive responsibility of making policy decisions related to rate setting. (*SFPP, L.P. v. Public Utilities Commission* (2013) 217 Cal.App.4th 784, 798.) The CPUC's jurisdiction includes the sole power to establish rates collected by privately owned utilities that will permit the utility to recover its cost and expenses, plus a reasonable rate of return on the value of its property devoted to public use. (*Southern California Gas. Co. v. Public Utilities Commission* (1979) 23 Cal.3d 470, 476.)

As an investor owned utility, PG&E has an obligation to generate profits for its shareholders. However, it is well settled that privately owned utilities have no Constitutional right to profits. (*SFPP*,

*supra,* 217 Cal.App.4th at 801.)  Instead, the CPUC determines the reasonable rate of return based upon the value of the service the utility "employs for the convenience of the public." (*Id.,* at p. 798.)

It is not the CPUC's mission to ensure that all privately owned utilities are profitable every year, or that their officers and executives receive bonus packages regardless of the company's conduct. In fact, the CPUC "must set the [return on equity] at the lowest level that meets the test of reasonableness." (*Application of Pacific Gas and Electric Company* (Nov. 7, 2002) 221 P.U.R.4th 501, 510.)  It is plainly within the power of the CPUC to evaluate the entire course of a privately-owned utility's conduct and determine that it is not entitled to spread the costs incurred as a result of its failure to manage and operate its facilities as a prudent manager.  This is the process under which the California Constitution, statutes, and regulations exercise control PG&E and other privately-owned utilities that are entitled to enjoy the dominant power of a monopoly position, free from competition in the delivery of electricity and natural gas.  However, this monopoly position comes at the cost of submitting to the CPUC's decisions even when they negatively impact the profitability of the enterprise.

## III. LEGISLATIVE HISTORY OF THE CPUC AND THE PUBLIC UTILITIES CODE

### A. California Legislative History and Rules of Statutory Construction

The legislative history of the creation of the CPUC and the Public Utilities Code provides valuable insights into the unique nature of the CPUC's regulatory role and powers.  The court in *Mount Hawley Insurance Co. v. Lopez* (2013) 215 Cal.App.4th 1385, 1396-1397, provided an excellent summary of the process a California court undertakes in a historical review of legislation:

> We begin with the fundamental rule that our primary task is to determine the lawmakers' intent.  In construing statutes, we aim to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law.  California courts have established a process of statutory interpretation to determine legislative intent that may involve up to three steps.  The key to statutory interpretation is applying the rules of statutory construction in their proper sequence as follows: we first look to the plain meaning of the statutory language, then to its legislative history and finally to the reasonableness of a proposed construction.

> The first step in the interpretive process looks to the words of the statute themselves. We look first to the words of the statute, because the statutory language is generally the most reliable indicator of legislative intent.  If the interpretive question is not resolved in the first step, we proceed to the second step of the inquiry.  In this step, courts may turn to secondary rules of interpretation, such as maxims of construction, which serve as aids in the sense that they express familiar insights about conventional language usage.  We may also look to the legislative history.  Both the legislative history of the

statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent.  If ambiguity remains after resort to secondary rules of construction and to the statute's legislative history, then we must cautiously take the third and final step in the interpretive process.  In this phase of the process, we apply reason, practicality, and common sense to the language at hand.  Where an uncertainty exists, we must consider the consequences that will flow from a particular interpretation.  Thus, in determining what the Legislature intended we are bound to consider not only the words used, but also other matters, such as context, the object in view, the evils to be remedied, the history of the times and of legislation upon the same subject, public policy and contemporaneous construction.  These other matters can serve as important guides, because our search for the statute's meaning is not merely an abstract exercise in semantics. To the contrary, courts seek to ascertain the intent of the Legislature for a reason – to *effectuate the purpose* of the law.

We do not necessarily engage in all three steps of the analysis.  It is only when the meaning of the words is not clear that courts are required to take a second step and refer to the legislative history.  If ambiguity remains after resort to secondary rules of construction and to the statute's legislative history, then we must cautiously take the third and final step in the interpretative process. [Citations and multiple quotes omitted.]"

In the second step of a court's interpretive inquiry, a California court examines "the entire history of the Legislature's enactment and amendment of the statute." (*Ailanto Properties v. City of Half Moon Bay* (2006) 142 Cal.App.4th 572, 586.)  If a statute "is susceptible of multiple interpretations ... [a court] will divine the statute's meaning by turning to a variety of extrinsic sources, including the legislative history, the nature of the overall statutory scheme, and consideration of the sorts of problems the Legislature was attempting to solve when it enacted the statute.  [Citations omitted.]" (*Clayworth v. Pfizer, Inc.* (2010) 49 Cal.4th 758, 770.)  In reviewing the legislative history, an "examination of the original text of the statute and the evolution of the language" of a statute that has been amended is "useful in ascertaining its current meaning." (*Ailanto Properties*, *supra*, 142 Cal.App.4th at p. 586.)

**B.     1876 to 1880 – Creation of the Railroad Commission**

Prior to 1876, regulation of public utilities in California was performed only at the local level. The first state legislation to impose control on any utility was an act in 1876 that "provided for the appointment by the governor of three Commissioners of Transportation, who were given limited jurisdiction over steam railroads."  In 1878, the act of 1876 was repealed, and a new act was passed creating the position of a single Commissioner of Transportation whose powers were similar to those of the three Commissioners of Transportation.  (De Ghetaldi Decl., Ex. 10, p. 124.)

Section 22 of Article XII of the new constitution of 1879 created the Railroad Commission, predecessor of the Public Utilities Commission, which was "given power over railroad and other transportation companies, which power was limited to the power to fix rates and to prescribe uniform systems of accounts." Possibly through inadvertence, the newly created Railroad Commission's power over transportation companies' rates and systems of accounts was more limited than the powers that had been granted in the 1876 and 1878 legislation. Legislation in 1880 organized and defined the Board of Railroad Commissioners. (*Ibid*.)

### C.    1911 – Constitutional Amendments and Legislation

The next relevant legislative enactments were the Railroad Commission Acts of 1909 and 1911. They were a significant source of the original language of the current California Public Utilities Code but were limited in application to railroads and other transportation companies. (*Ibid.*)

In his inaugural address on January 3, 1911, Governor Hiram W. Johnson spoke about "The Railroad Question" and stressed the need to enact legislation or amendments to the Constitution that would finally dispose of arguments advanced by the railroads that the Railroad Commission lacked the authority to set "absolute rates" and to impose penalties. (De Ghetaldi Decl., Ex. 11, pp. 133-134.)

On October 11, 1911, the California electorate approved several Constitutional amendments at a special election that paved the way for the Legislature to regulate all public utilities. (De Ghetaldi Decl., Ex.10, p. 125.)

One of those amendments, Senate Constitutional Amendment No. 47, defined public utilities to include "[e]very private corporation, and every individual or association of individuals, owning, operating, managing, or controlling" railroads, canals, freight lines, telephone and telegraph companies, or those that furnish "heat, light, water, or power." (De Ghetaldi Decl., Ex. 10, p. 125; compare current Public Utilities Code § 216(a)(1).) Amendment No. 47 declared that all such public utilities would be "subject to such control and regulation by the railroad commission as may be provided by the legislature." (*Ibid*; compare current Public Utilities Code §§ 451 and 728.)

On November 27, 1911, Governor Hiram W. Johnson asked the Legislature to enact legislation "to define the powers and duties of public utilities, their officers, agents, and employees, and the rights, duties, and remedies of patrons of public utilities; and to define offenses by public utilities, their

officers, agents, and employees, and other persons or corporations, and providing penalties for such offenses ...." (De Ghetaldi Decl., Ex. 12, p. 138, Item # 5.)

On December 23, 1911, Governor Johnson approved the "Public Utilities Act" that was "to provide for the organization of the railroad commission, to define its powers and duties and the rights, remedies, powers and duties of public utilities, their officers, define its powers and duties and the rights, remedies, of patrons of the public utilities . . . ." (De Ghetaldi Decl., Ex. 13, p. 140.) Current Public Utilities Code sections 216(a) and 451 are derived directly from former uncodified sections 2(bb) and 13 of the 1911 Public Utilities Act.

### D. 1915 – Creation of the Public Utilities Code

In Governor Johnson's Second Biennial Address to the Legislature on January 5, 1915, he stated:

> "The policy of the state and of the Railroad Commission has been not to harass business, but to insist upon firm and intelligent control of public utilities, and that the patrons of those utilities should be protected from the extortionate demands that follow unrestrained monopoly.
>
> "If the government of the past four years of the State of California had failed in every other particular, the good that has been accomplished by the Railroad Commission, the final supremacy established for the state over its creations, however vast or rich or powerful, mark an epoch of transcendental establishment, unequalled in any other period in our history."

(De Ghetaldi Decl., Ex. 14, p. 148.)

The Public Utilities Code was enacted on August 8, 1915, and included the modifications of the predecessors of current Public Utilities Code §§ 216(a)(1) and 451, and added the predecessor to Public Utilities Code § 728. (De Ghetaldi Decl., Ex. 15, pp. 151 and 153-155.) The Railroad Commissioner's Report from 1915 outlined the changes made by the 1915 legislation and the power of the Railroad Commission. This report emphasized, "In all respects necessary for the protection of the consuming and investing public as well as the utility itself, the Railroad Commission has jurisdiction." (De Ghetaldi Decl., Ex. 16, p. 160.)

The introductory paragraphs from the 1922 report by Harley W. Brundige, President of the Railroad Commission, entitled "Regulation of Public Utilities – Review of the History of Regulation and the Methods Adopted by the Commission," illuminate the remedial public policies underlying the Public Utilities Act and its predecessor statutes:

"During the life of men now in middle age there have grown up great corporations, providing certain essential services, upon which depend in very large degree, industry, production, and the prosperity and well being of all the people.

"The furnishing of transportation, of communication, of light, heat, power and water have become essential and basic industries.  In their absence all industry and all business must cease.  When facilities furnished are inadequate, exactly in proportion to such inadequacy does industry and business halt or stagnate.

"In the early stages of the development of these utility enterprises there was much that was objectionable.  Up until within very recent years the supplying of these essential public services was regarded by the public as speculative enterprises in which too often promoters sought to acquire sudden and unearned wealth, with little or no thought as to the value or quality of the services rendered.  'Wild-catting' was of as frequent occurrence in public utility promotions as in mining or in oil development. Stocks and bonds in such enterprises were issued in those early days to be passed out to the public with little or no regard to the security that was back of them.  The public service corporations today have a bad inheritance, due to the abuses existing in the days before regulation, when many of the public service corporations were heavily overcapitalized, when watered stocks were made the basis of speculation by gamblers in such securities, and when the public was being exploited in rates to pay dividends upon securities of doubtful value.

"In those early days the public had no supervision at all, either over rates or over the quality of the services rendered by the corporations supplying these essential services. In those unhappy days the rule of rate-making was 'all the traffic will bear' and the rate-making power, vested as it was in the public utility corporations, was made an instrument to burden and to oppress the people."

(De Ghetaldi Decl., Ex. 17, p. 1.)

In the report's section on "Early Efforts at Regulation," Chairman Brundige continued, emphasizing the need for state-wide regulation of public utilities because of the inability of municipalities to control the utility corporations:

"Those persons who are familiar with the political history of California know only too well the extent to which the utility corporations succeeded in controlling municipal affairs in our larger and many of our smaller cities, during the period of municipal control of utility rates.  The corporations were well organized and well financed. They knew exactly what they wanted and were fully informed as to the best means if attaining their ends.  The people were unorganized, they had no funds, they had little or no opportunity of presenting their case.  They had no means of collecting sufficient data upon which to base even an intelligent public opinion.  The contest was a most unequal one.  Everywhere people were at the mercy of the corporations."

(De Ghetaldi Decl., Ex. 17, p. 164.)

These excerpts show that the regulations first adopted in the Railroad Act and later in the Public Utilities Code were enacted to control the exploitive tendencies of the public utilities in order to protect the public.  Under California law, in reviewing legislative history, courts properly consider "the sorts

of problems the Legislature was attempting to solve when it enacted the statute." (*Clayworth, supra,* 49 Cal.4th at p. 770.)

## IV. RECENT RULINGS BY THE CPUC AND THE CALIFORNIA COURTS RELATING TO THE APPLICATION OF INVERSE CONDEMNATION TO PUBLIC UTILITIES

### A. The Most Recent Ruling by the CPUC Explaining the Role of Inverse Condemnation in Determining Reasonable Rates

The 2007 litigation San Diego Gas & Electric Company ("SDG&E") arising out of the Witch, Creek, and Guejito wildfires in Southern California settled without the court making a finding on the victims' claims for compensation under inverse condemnation. The only order entered by the court relating to inverse condemnation was a minute order overruling a demurrer by SDG&E holding, "Plaintiffs have adequately alleged a cause of action for inverse condemnation against SDG&E." There was never a further motion made relating to inverse condemnation, never a trial on the issue, and no other definitive ruling on the issue. (De Ghetaldi Decl., Ex. 2, p. 5.)

After the settling the cases arising from the 2007 fires, SDG&E sought approval from the CPUC to pass along a portion of the settlement payments it made to ratepayers. In November 2017, the CPUC issued an order denying SDG&E's request. (See Declaration of Kevin J. Orsini in Support of Debtors' Motion ("Orsini Decl."), Doc. # 4486, Ex. D.) Virtually ignored by PG&E in its motion is the CPUC's order denying SDG&E's petition for rehearing. (Orsini Decl., Ex. E [included as an exhibit but not discussed in Debtors' points and authorities]; De Ghetaldi Decl., Ex. 18, p. 169.) The introductory paragraphs of that order are worth noting:

> In October 2007, over a dozen wildfires burned portions of southern California causing extensive property damage and a number of deaths. Investigation reports issued by the California Department of Forestry and Fire Protection ("Cal Fire") as well as the Commission's Consumer Protection and Safety Division (now the Safety and Enforcement Division ("SED"), determined that three of the fires were ignited by SDG&E electric transmission facilities: the Witch Fire; the Guejito Fire; and the Rice Fire (together "2007 Wildfires").

> After the fires, SDG&E, PG&E, and SCE all sought Commission approval to establish Wildfire Expense Memorandum Accounts ("WEMAs") to record costs such as: a) payments to satisfy wildfire claims including co-insurance and deductibles expenses; b) outside legal expenses incurred defending wildfire claims; c) increases or decreases in wildfire insurance premiums from amounts authorized in SDG&E's general rate case; and d) the cost of financing Wildfire Expense Balancing Account ("WEBA") balances. The Commission authorized the WEMA accounts in Resolution E-4311.

In 2012 the Commission issued D.12-12-029 which, among other things, kept open SDG&E's WEMA account subject to reasonableness review consistent with Public Utilities Code Section 451 should SDG&E later seek to recover those costs from its ratepayers.

In 2015, SDG&E in fact filed Application (A.) 15-09-010 requesting rate recovery for $379 million in WEMA costs recorded for the 2007 Wildfires. In this proceeding we conducted the reasonableness review required by D.12-12-029. Such reviews are governed by Public Utilities Code Section 451.

Section 451 requires utilities to show that all requested charges are "just and reasonable" in order to be recovered in rates. To ensure that charges requested by a utility are just and reasonable, and ensure that a utility has operated and maintained its system in a safe and reasonable manner, we have adopted the longstanding Prudent Manager Standard.

Under that standard, a utility has the burden to affirmatively prove that it reasonably and prudently operated and managed its system. As discussed at more length in Part II.A. below, that means a utility must show that its actions, practices, methods, and decisions show reasonable judgment in light of what it knew or should have known at the time, and in the interest of achieving safety, reliability and reasonable cost.

Our Decision found that, on balance, SDG&E failed to meet its burden to show that its operation and management of its system leading up to the 2007 Wildfires, and its immediate response at the time of the fires, was reasonable and prudent. By definition then, rate recovery would be unjust, unreasonable, and unlawful under Section 451. For that reason, we denied SDG&E's request to pass the $379 million in WEMA costs on to its ratepayers.

Applications for Rehearing were filed by SDG&E as well as PG&E and SCE jointly. SDG&E alleges: (1) it was unlawful to find SDG&E failed to meet the Prudent Manager Standard; (2) Commission precedent did not support the Commission's determination; (3) the Decision erred regarding the severity of wind and weather conditions in October 2007; and (4) the Decision erred by failing to allow rate recovery consistent with the cost spreading principle under the doctrine of inverse condemnation.

PG&E and SCE challenge the Decision alleging that cost recovery should have been driven by the cost spreading policy of inverse condemnation rather than traditional Commission reasonableness review standards. Responses were filed by the Office of Ratepayer Advocates ("ORA"), Ruth Hendricks, and Protect Our Communities ("POC") and the Utility Consumers' Action Network ("UCAN") jointly.

We have reviewed each and every issue raised by SDG&E, PG&E and SCE and are of the opinion that good cause has not been established to grant rehearing. Accordingly, the Applications for Rehearing of D.15-11-042 are denied because no legal error was shown.

(De Ghetaldi Decl., Ex. 18, pp. 170-173; footnotes omitted.)

The July 2018 Order Decision Denying Rehearing, the CPUC also included a more detailed and extensive discussion of the role that inverse condemnation both does and does not play in its ratemaking process. (De Ghetaldi Decl., Ex. 18, pp. 192-202.)

The District Court of Appeal denied SDG&E's petition for review in an order that exemplifies the process that a California appellate court undertakes in reviewing an order or decision of the CPUC:

> The Commission's determination that the principals of inverse condemnation did not bar its prudent manager analysis under section 451 was not in excess of its powers, nor a violation of the law, including the Constitutions of the United States and California. Contrary to SDG&E's assertion, the Commission's review was statutorily mandated, and no legal authority authorized it to forego its obligation under section 451. Of note, SDG&E settled the inverse condemnation claims in the wildfire litigation rather than continue to advance its position that it could not be held strictly liable as a nongovernmental entity. Further, had the Commission determined that SDG&E acted as a prudent manager, the costs could have been passed onto the ratepayers regardless of any potential strict liability in a civil litigation setting.
>
> In addition, the exhibits submitted by SDG&E do not support its assertion that the Commission's findings under section 451 were not supported by sufficient evidence. Specifically, the record contains substantial evidence showing both that SDG&E's facilities caused all three of the wildfires at issue, and that SDG&E did not meet its burden to show that it reasonably and prudently operated and maintained those facilities. (See *Toward Utility Rate Normalization v. Public Utilities Com.* (1978) 22 Cal.3d 529, 537 ["The findings of fact by the Commission are to be accorded the same weight that is given to jury verdicts and the findings are not open to attack for insufficiency if they are supported by any reasonable construction of the evidence."].)
>
> In sum, SDG&E has failed to demonstrate that the Commission erred on the claims it asserts. Under these circumstances, we decline to issue the writ of review. (*Pacific Bell v. PUC* (2006) 140 Cal.App.4th 718, 729.) The petition is denied. The application of Southern California Edison Company and Pacific Gas and Electric Company for leave to file an amicus curiae brief is denied as moot.

(De Ghetaldi Decl., Ex. 19, pp. 205-206.)

SDG&E then unsuccessfully sought review in the California Supreme Court and unsuccessfully petitioned for a writ of certiorari from the United States Supreme Court. (De Ghetaldi Decl., Exs. 20 and 21, pp. 207 and 209.)

**B.      The Most Recent Rulings by the California Courts on the Application of Inverse Condemnation to PG&E**

**1.      Rulings in the *Butte Fire Cases***

Within the last year, California courts from the Superior Courts to the Supreme Court have ruled on the issues raised in Debtors' motion in cases that do not involve direct review of decisions of the CPUC. Thousands of wildfire victims in those cases are claimants in this bankruptcy proceeding.

In the coordinated 2015 *Butte Fire Cases*, the parties made competing motions relating to liability for inverse condemnation under Code of Civil Procedure § 1260.040. In June 2017, the court

granted plaintiffs' motion, found PG&E liable for inverse condemnation, and denied PG&E's motion. (De Ghetaldi Decl., Ex. 5, p. 29.)  PG&E then brought a renewed motion for a determination that it was not liable for inverse condemnation based on "new" evidence and law.  That motion was denied in May 2018.  (De Ghetaldi Decl., Ex. 6, p. 57.)  In June 2018, the District Court of Appeal denied PG&E's petition for a writ of mandate/prohibition.  (De Ghetaldi Decl., Ex. 7, p. 104.)

PG&E then petitioned the California Supreme Court for a writ of review, raising substantially all of the same issues that it raises here.  The "Issue Presented" by PG&E to the California Supreme Court was:

> Are privately owned utilities subject to strict liability for inverse condemnation even though their regulator, the California Public Utilities Commission, has now announced that there is no guaranty it will spread the costs of such liability across the benefitted public through rate recovery?

(De Ghetaldi Decl., Ex. 8, p. 115.)

In August 2018, the California Supreme Court denied PG&E petition for a writ of review.  (De Ghetaldi Decl., Ex. 9, p. 119.)

## 2.    Rulings in the *California North Bay Fire Cases*

In 2018, PG&E demurred to plaintiffs' cause of action for inverse condemnation in the coordinated *California North Bay Fire Cases*.  The Coordination Trial Judge overruled the demurrer, holding: (a) inverse condemnation can properly be applied to a privately-owned public utility; (b) the application of inverse condemnation does not violate the Takings Clause of the Fifth Amendment; and (c) the application of inverse condemnation to a privately-owned public utility does not violate substantive Due Process.  (De Ghetaldi Decl., ¶ 23, Ex. 22, pp. 215-222.)

PG&E almost immediately filed a petition in the District Court of Appeal for a writ of review. That petition was denied.  (De Ghetaldi Decl., Ex. 23, p. 224.)  PG&E then sought a writ of review in the California Supreme Court.  The issue presented by PG&E in its writ petition to the California Supreme Court was essentially identical to the issue it presents to this Court and the issue it presented in the *Butte Fire Cases*:

> Should inverse condemnation—a doctrine developed in the context of public utilities that are not subject to rate-making regulatory authority and are backstopped by public taxation power—apply to a privately owned utility such as Pacific Gas and Electric

Company ("PG&E"), which has no taxation power and can increase utility rates only with the express permission of the California Public Utilities Commission ("CPUC").

(De Ghetaldi Decl., Ex. 24, p. 234.) On November 14, 2018, the California Supreme Court denied PG&E's petition for a writ of review. (De Ghetaldi Decl., Ex. 25, p. 245.)

## V. PROPER JUDICIAL REVIEW OF ORDERS AND DECISIONS OF THE CPUC UNDER CALIFORNIA LAW COMPELS DENIAL OF DEBTOR'S MOTION

### A. Extent of California Courts' Jurisdiction on Review

The process of judicial review of the orders and decisions of the CPUC is unique under California law. Public Utilities Code § 1759 defines the narrow jurisdiction California courts have over orders and decisions of the CPUC:

> (a) No court of this state, except the Supreme Court and the court of appeal, to the extent specified in this article, shall have jurisdiction to review, reverse, correct, or annul any order or decision of the commission or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the commission in the performance of its official duties, as provided by law and the rules of court.

> (b) The writ of mandamus shall lie from the Supreme Court and from the court of appeal to the commission in all proper cases as prescribed in Section 1085 of the Code of Civil Procedure.

"When it adopted [Public Utilities Code § 1756] expanding Court of Appeal jurisdiction beyond the PUC's adjudicative decisions, the Legislature announced an intent 'to conform judicial review of the Public Utilities Commission decisions that pertain to utility service providers with competitive markets to be consistent with judicial review of the other state agencies.' (Stats. 1998, ch. 886, § 1.5, subd. (b).)" (*Pacific Bell v. Public Utilities Comm'n* (2000) 79 Cal.App.4th 269, 280.)

Public Utilities Code § 1757, subds. (a) and (b), specify both the process and standard of review that the California Courts of Appeal and the California Supreme Court must follow:

> (a) No new or additional evidence shall be introduced upon review by the court. In a complaint or enforcement proceeding, or in a ratemaking or licensing decision of specific application that is addressed to particular parties, the review by the court shall not extend further than to determine, on the basis of the entire record which shall be certified by the commission, whether any of the following occurred:

> (1) The commission acted without, or in excess of, its powers or jurisdiction.

> (2) The commission has not proceeded in the manner required by law.

> (3) The decision of the commission is not supported by the findings.

> (4) The findings in the decision of the commission are not supported by substantial evidence in light of the whole record.

(5) The order or decision of the commission was procured by fraud or was an abuse of discretion.

(6) The order or decision of the commission violates any right of the petitioner under the Constitution of the United States or the California Constitution.

(b) Nothing in this section shall be construed to permit the court to hold a trial de novo, to take evidence other than as specified by the California Rules of Court, or to exercise its independent judgment on the evidence.

## B. Standards of Review

California courts "will not disturb the PUC's selection between the procedures absent a manifest abuse of discretion or an unreasonable interpretation of the statutes governing its procedures. (*Greyhound Lines, Inc. v. Public Utilities Com.* (1968) 68 Cal.2d 406, 410-411; *Pacific Bell v. Public Utilities Comm'n, supra*, 79 Cal.App.4th at p. 283.). Debtors have shown neither.

In the area of economic regulation, such as rate regulation, it need only be shown that the distinction between customers bears a rational relationship to other reasonable considerations. (*Toward Utility Rate Normalization, supra,* 22 Cal.3d at p. 544; *Wood v. Public Utilities Commission* (1971) 4 Cal.3d 288, 294; *Swanson v. Marin Mutual Water District* (1976) 56 Cal.App.3d 512, 523-524.)

The CPUC ensures that rates charged by privately owned public utilities are just and reasonable as required by Public Utilities Code § 451. Similarly, the rates charged by a municipally owned utility must be fair, reasonable, just, and nondiscriminatory. (*American Microsystems, Inc. v. City of Santa Clara* (1982) 137 Cal.App.3d 1037, 1041; *Boynton v. City of Lakeport Mun. Sewer Dist.* (1972) 28 Cal.App.3d 91, 94.)

One of the fairness or rational basis arguments raised repeatedly by the various privately-owned public utilities is that government owned public utilities have unfettered authority to set rates. The argument is specious. Although the CPUC has no jurisdiction to review rates set by government owned public utilities, ratepayers can bring private actions to challenge unfair, unreasonable, or discriminatory rates. (See *Elliott v. City of Pacific Grove* (1975) 54 Cal.App.3d 53, 57-58; *Durant v. City of Beverly Hills* (1940) 39 Cal.App.2d 133, 138-139; *County of Inyo v. Public Utilities Com.* (1980) 26 Cal.3d 154, 159-160.)

The only unfairness that the California Supreme Court has found with the lack of the CPUC's jurisdiction over rates set by government owned public utilities is unfairness to ratepayers: "Judicial

review of rates . . . does not provide protection comparable to PUC proceedings. The PUC maintains an expert, independent staff to investigate rate requests; it renders an independent decision on each record that it examines. A court, in contrast, must limit its review to the rates established by the involved utility and must depend upon the expert testimony presented by the parties. [Citation.] Thus, while judicial review can protect consumers against plainly unfair rates, that remedy does not offer an opportunity for the detailed analysis and careful structuring of rates possible in a PUC proceeding." (*County of Inyo, supra,* 26 Cal.3d at pp. 159-160

### C.    The California Supreme Court Would Deny PG&E's Motion

California law only authorizes a court to involve itself in the ratemaking jurisdiction of the PUC in certain limited circumstances, one of which is the requirement that a court can only review an order or decision of the PUC.  Under the specific provisions of Public Utilities Code § 1757, neither the California Courts of Appeal nor the California Supreme Court has jurisdiction to issue the purely advisory type of opinion that Debtors seek to have this Court make.  Debtors have not asked this Court to review any order or decision of the PUC, let alone one that manifests an abuse of discretion or an unreasonable interpretation of the statutes governing PUC procedures.  Debtors have not made any sort of record of a proceeding before the CPUC that they might challenge, nor have they presented this Court with the proper record required by Public Utilities Code § 1757(a).  That failure leads to the inevitable conclusion that a California Court of Appeal or the California Supreme Court would only and could only deny the relief that Debtors seek.  This Court must do the same.

Even if the Debtors could produce some kind of record of a decision of the CPUC that they could challenge in a proper writ proceeding, the legislative history of the Public Utilities Code and the extensive judicial history of failed challenges to the methods by which the CPUC sets rates both overwhelmingly lead to the inevitable conclusion that the issues raised in Debtors' motion would be doomed if they were to be reviewed yet again by the California Supreme Court.

## VI.    CONCLUSION

The Railroad Commission and its progeny, the CPUC, were created over one hundred years ago by the California Legislature under authority of the California Constitution.  The CPUC was given

unique jurisdiction over the rates charged by public utilities in order to protect the rate-paying public from abuse by the public utilities who were granted monopoly rights to provide services.

Under procedures adopted by the CPUC, public utilities have the burden of proof to justify the fairness and reasonableness of any proposed rate increase. Concomitant with that burden is the obligation to show that the public utility acted like a "prudent manager." Failure to carry that burden leads to a denial of a proposed rate increase.

California courts have only limited jurisdiction over the decisions of the CPUC. The Public Utilities Code specifies the constrained processes under which courts can operate when reviewing a decision of the CPUC. The Public Utilities Code does not allow the California Supreme Court to issue the sort of advisory opinion sought by the Debtors' motion. When acting as a proxy for the California Supreme Court, this Court should not accept Debtors' invitation to issue an advisory opinion that would be beyond the jurisdiction of the California Supreme Court to issue.

Debtors have never brought a petition for review of a case in which they sought and were denied a rate increase after entry of a judgment in a court proceeding where they were found liable for inverse condemnation but found not liable for negligence or intentional fault. The pronouncements of the CPUC suggest that a finding of liability for inverse condemnation in those circumstances would not foreclose a rate increase if the utility could carry the burden of showing it acted like a "prudent manager." The defective record brought to this Court by the Debtors certainly does not suggest otherwise.

This is not rocket science or higher mathematics. The CPUC has a unique approach that differs from the approaches normally taken by courts. The CPUC's approach is not irrational, and is supported by over 100 years of practice. The recent spate of requests for judicial review initiated by a group of privately-owned public utilities have been supported by what can only charitably be called tiresome misunderstandings and misstatements of the intent of the Public Utilities Code, the practice of the CPUC, and the role of the judiciary.

/ / /

/ / /

/ / /

1   For all of the foregoing reasons, the Individual Fire Victim Creditors respectfully request that

2   Debtors' motion be denied.

3   DATED: November 15, 2019                    Respectfully submitted,

4                                                **COREY, LUZAICH, DE GHETALDI & RIDDLE LLP**

5
                                                 By:  _____
6                                                      Dario de Ghetaldi
                                                      Amanda L. Riddle
7                                                      Steven Berki
                                                      Sumble Manzoor
8                                                      Attorneys for Individual Fire Victim Creditors

9                                                **DANKO MEREDITH**
                                                      Michael S. Danko
10                                                     Kristine K. Meredith
                                                      Shawn R. Miller
11                                                     Attorneys for Individual Fire Victim Creditors

12                                               **GIBBS LAW GROUP**
                                                      Eric Gibbs
13                                                     Dylan Hughes
                                                      Attorneys for Individual Fire Victim Creditors

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28