Dario de Ghetaldi – Bar No. 126782
Amanda L. Riddle – Bar No. 215221
Steven M. Berki – Bar No. 245426
Sumble Manzoor – Bar No. 301704
**COREY, LUZAICH,**
**DE GHETALDI & RIDDLE LLP**
700 El Camino Real
P.O. Box 669
Millbrae, CA 94030-0669
Telephone: (650) 871-5666
Facsimile: (650) 871-4144
deg@coreylaw.com
alr@coreylaw.com
smb@coreylaw.com
sm@coreylaw.com

Michael S. Danko – Bar No. 111359
Kristine K. Meredith – Bar No. 158243
Shawn R. Miller – Bar No. 238447
**DANKO MEREDITH**
333 Twin Dolphin Drive, Suite 145
Redwood Shores, CA 94065
Telephone: (650) 453-3600
Facsimile: (650) 394-8672
mdanko@dankolaw.com
kmeredith@dankolaw.com
smiller@dankolaw.com

Eric Gibbs – Bar No. 178658
Dylan Hughes – Bar No. 209113
**GIBBS LAW GROUP**
505 14th Street, Suite 1110
Oakland, CA 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
ehg@classlawgroup.com
dsh@classlawgroup.com

Attorneys for Individual
Fire Victim Creditors

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>Pacific Gas and Electric Company CORPORATION and PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Debtors. | Bankruptcy Case No. 19-30088 (DM) Chapter 11 (Lead Case)   (Jointly Administered)<br><br>**DECLARATION OF DARIO DE GHETALDI IN SUPPORT OF OPPOSITION TO DEBTORS' MOTION RE INVERSE CONDEMNATION**<br><br>Date: November 19, 2019<br>Time: 10:00 a.m.<br>Place: United States Bankruptcy Court<br>  Courtroom 17, 16th Floor<br>  San Francisco, CA 94102 |

I, Dario de Ghetaldi, hereby declare under penalty of perjury:

1. I am an attorney at law, licensed to practice in the State of California, the Northern District of California, the Ninth Circuit, and before the Supreme Court of the United States. I am a partner in the firm of Corey, Luzaich, de Ghetaldi & Riddle, LLP, attorneys for approximately 6,400 fire victim claimants in this matter.

2. Attached hereto as Exhibit 1 is a true and correct copy of the "Declaration of Craig S. Simon in Support of Plaintiffs' Opposition to Pacific Gas and Electric Company's Motion for a Legal Determination of Inverse Condemnation Liability CCP § 1260.040," filed on May 26, 2017, in the *Butte Fire Cases*, Superior Court of Sacramento County, Case No. JCCP 4853.

3. Attached hereto as Exhibit 2 is a true and correct copy of the "Declaration of Craig S. Simon in Support of Plaintiffs' Opposition to Pacific Gas and Electric Company's Renewed Motion Concerning Liability for Inverse Condemnation [C.C.P. §§ 1008(a), 1008(b), & 1260.040]," filed on March 29, 2018, in the *Butte Fire Cases*, Superior Court of Sacramento County, Coordinated Case No. JCCP 4853.

4. Attached hereto as Exhibit 3 is a true and correct copy of the "Order re: Plaintiffs' Motion for a Legal Determination of Inverse Condemnation Liability," filed on November 8, 2012, in the *Pacific Gas and Electric Company San Bruno Fire Cases*, Superior Court of San Mateo County, Coordinated Case No. JCCP 4648 A.

5. Attached hereto as Exhibit 4 is a true and correct copy of the "Further Order re: Plaintiffs' Motion for a Legal Determination of Inverse Condemnation Liability," filed on November 15, 2012, in the *Pacific Gas and Electric Company San Bruno Fire Cases*, Superior Court of San Mateo County, Coordinated Case No. JCCP 4648 A.

6. Attached hereto as Exhibit 5 is a true and correct copy of the "Ruling on Submitted Matters, Inverse Condemnation Motions," filed on June 22, 2017, in the *Butte Fire Cases*, Superior Court of Sacramento County, Case No. JCCP 4853.

7. Attached hereto as Exhibit 6 is a true and correct copy of the "Ruling on Submitted Matter, Pacific Gas and Electric Company's Renewed Motion for a Legal Determination of Inverse

1 Condemnation Liability Pursuant to Code of Civil Procedure Section 1260.040," filed on May 1, 2018,

2 in the *Butte Fire Cases*, Superior Court of Sacramento County, Case No. JCCP 4853.

3       8.     Attached hereto as Exhibit 7 is a true and correct copy of the Order Denying Pacific

4 Gas and Electric Company's Petition for a Writ of Mandate/Prohibition, filed in the Third District

5 Court of Appeal for the State of California on June 7, 2018, in Case No. C087071.

6       9.     Attached hereto as Exhibit 8 is a true and correct copy of selected pages from Pacific

7 Gas and Electric Company's "Petition for Review," filed in the California Supreme Court on June 18,

8 2018, in Case No. S249429.

9       10.    Attached hereto as Exhibit 9 is a true and correct copy of the Order Denying Pacific

10 Gas and Electric Company's Petition for Review, filed in the California Supreme Court on August 8,

11 2018, in Case No. S249429.

12       11.    Attached hereto as Exhibit 10 is a true and correct copy of selected pages of the "Report

13 of the Railroad Commission of California From January 1, 1911 to June 30, 1912.

14       12.    Attached hereto as Exhibit 11 is a true and correct copy of selected pages of the

15 "Inaugural Address of Governor Hiram W. Johnson," January 3, 1911.

16       13.    Attached hereto as Exhibit 12 is a true and correct copy of selected pages of the

17 "Proclamation by the Governor Convening the Legislature in Extraordinary Session," November 27,

18 1911.

19       14.    Attached hereto as Exhibit 13 is a true and correct copy of selected pages of the "Public

20 Utilities Act," Stats. 1911, Ch. 14, approved December 23, 1911.

21       15.    Attached hereto as Exhibit 14 is a true and correct copy of selected pages of the "Second

22 Biennial Message of Governor Hiram W. Johnson to the Legislature of the State of California,"

23 January 5, 1915.

24       16.    Attached hereto as Exhibit 15 is a true and correct copy of selected pages of the "Public

25 Utilities Act," Stats. 1915, Ch. 91, effective August 8, 1915.

26       17.    Attached hereto as Exhibit 16 is a true and correct copy of selected pages of the "Report

27 of the Railroad Commission of California From January 1, 1915 to June 30, 1916.

28

18.     Attached hereto as Exhibit 17 is a true and correct copy of selected pages of the "Regulation of Public Utilities – Review of the History of Regulation and the Methods Adopted by the Commission," Hawly W. Brundige, President of the Commission, 1922.

19.     Attached hereto as Exhibit 18 is a true and correct copy of the "Order Denying Rehearing of Decision (D.) 17-11-033," issued by the California Public Utilities Commission, dated July 12, 2018.

20.     Attached hereto as Exhibit 19 is a true and correct copy of the Order Denying San Diego Gas & Electric's Petition for Review, filed in the California District Court of Appeal, Fourth Appellate District on November 13, 2018, in Case No. D074417, arising out of the California Public Utilities Commission Decision 17-11-033.

21.     Attached hereto as Exhibit 20 is a true and correct copy of a record from the California Supreme Court's website showing that it denied San Diego Gas & Electric's Petition for Review on October 7, 2019, in Case No. S252748, arising out of the California Public Utilities Commission Decision 17-11-033.

22.     Attached hereto as Exhibit 21 is a true and correct copy of a record from the United States Supreme Court's website showing that it denied San Diego Gas & Electric's Petition for Certiorari on October 7, 2019, in Case No. 18-1368, arising out of the California Public Utilities Commission Decision 17-11-033.

23.     Attached hereto as Exhibit 22 is a true and correct copy of the "Order Overruling Pacific Gas and Electric Company's Demurrers," filed on May 21, 2018, in the *California North Bay Fire Cases,* San Francisco Superior Court, Coordinated Case No. 4955.

24.     Attached hereto as Exhibit 23 is a true and correct copy of the Order Denying Pacific Gas and Electric Company's Petition for Review, filed in the California District Court of Appeal, First Appellate District, on September 17, 2018, in Case No. A154847.

25.     Attached hereto as Exhibit 24 is a true and correct copy of selected pages from Pacific Gas and Electric Company's Petition for Review, filed in the California Supreme Court on September 27, 2018, in Case No. S251585.

26. Attached hereto as Exhibit 25 is a true and correct copy of a record from the California Supreme Court's website showing that it denied Pacific Gas and Electric Company's Petition for Review on November 14, 2018, in Case No. S251585.

I declare under penalty of perjury that the foregoing is true and correct after reasonable inquiry to the best of my knowledge.

Executed on November 15, 2019, at Millbrae, California.

_____
Dario de Ghetaldi

# INDEX TO EXHIBITS

| Exhibit | Document | Page |
|---------|----------|------|
| 1 | "Declaration of Craig S. Simon in Support of Plaintiffs' Opposition to Pacific Gas and Electric Company's Motion for a Legal Determination of Inverse Condemnation Liability CCP § 1260.040," filed on May 26, 2017, in the *Butte Fire Cases*, Superior Court of Sacramento County, Case No. JCCP 4853. | 9 |
| 2 | "Declaration of Craig S. Simon in Support of Plaintiffs' Opposition to Pacific Gas and Electric Company's Renewed Motion Concerning Liability for Inverse Condemnation [C.C.P. §§ 1008(a), 1008(b), & 1260.040]," filed on March 29, 2018, in the *Butte Fire Cases*, Superior Court of Sacramento County, Coordinated Case No. JCCP 4853. | 13 |
| 3 | "Order re: Plaintiffs' Motion for a Legal Determination of Inverse Condemnation Liability," filed on November 8, 2012, in the *Pacific Gas and Electric Company San Bruno Fire Cases*, Superior Court of San Mateo County, Coordinated Case No. JCCP 4648 A. | 16 |
| 4 | "Further Order re: Plaintiffs' Motion for a Legal Determination of Inverse Condemnation Liability," filed on November 15, 2012, in the *Pacific Gas and Electric Company San Bruno Fire Cases*, Superior Court of San Mateo County, Coordinated Case No. JCCP 4648 A. | 26 |
| 5 | "Ruling on Submitted Matters, Inverse Condemnation Motions," filed on June 22, 2017, in the *Butte Fire Cases*, Superior Court of Sacramento County, Case No. JCCP 4853. | 29 |
| 6 | "Ruling on Submitted Matter, Pacific Gas and Electric Company's Renewed Motion for a Legal Determination of Inverse Condemnation Liability Pursuant to Code of Civil Procedure Section 1260.040," filed on May 1, 2018, in the *Butte Fire Cases*, Superior Court of Sacramento County, Case No. JCCP 4853. | 57 |
| 7 | Order Denying Pacific Gas and Electric Company's Petition for a Writ of Mandate/Prohibition, filed in the Third District Court of Appeal for the State of California on June 7, 2018, in Case No. C087071. | 104 |

| Exhibit | Document | Page |
|---|---|---|
| 8 | Pages 1-41 of Pacific Gas and Electric Company's "Petition for Review," filed in the California Supreme Court on June 18, 2018, in Case No. S249429. | 107 |
| 9 | Order Denying Pacific Gas and Electric Company's Petition for Review, filed in the California Supreme Court on August 8, 2018, in Case No. S249429. | 119 |
| 10 | Selected pages of the "Report of the Railroad Commission of California From January 1, 1911 to June 30, 1912. | 121 |
| 11 | Selected pages of the "Inaugural Address of Governor Hiram W. Johnson," January 3, 1911. | 129 |
| 12 | Selected pages of the "Proclamation by the Governor Convening the Legislature in Extraordinary Session," November 27, 1911. | 135 |
| 13 | Selected pages of the "Public Utilities Act," Stats. 1911, Ch. 14, approved December 23, 1911. | 139 |
| 14 | Selected pages of the "Second Biennial Message of Governor Hiram W. Johnson to the Legislature of the State of California," January 5, 1915. | 144 |
| 15 | Selected pages of the "Public Utilities Act," Stats. 1915, Ch. 91, effective August 8, 1915. | 150 |
| 16 | Selected pages of the "Report of the Railroad Commission of California From January 1, 1915 to June 30, 1916." | 156 |
| 17 | Selected pages from selected pages of the "Regulation of Public Utilities – Review of the History of Regulation and the Methods Adopted by the Commission," Hawly W. Brundige, President of the Commission, 1922. | 161 |
| 18 | "Order Denying Rehearing of Decision (D.) 17-11-033," issued by the California Public Utilities Commission, dated July 12, 2018. | 169 |
| 19 | Order Denying San Diego Gas & Electric's Petition for Review, filed in the California District Court of Appeal, Fourth Appellate District on November 13, 2018, in Case No. D074417. | 203 |

| Exhibit | Document | Page |
|---|---|---|
| 20 | Record of the California Supreme Court's Denial of San Diego Gas and Electric's Petition for Review, filed on January 30, 2019, in Case No. S252748. | 207 |
| 21 | Record of the United States Supreme Court's Disposition of San Diego Gas and Electric's Petition for Certiorari, filed on October 7, 2019, in Case No. 18-1368. | 209 |
| 22 | "Order Overruling Pacific Gas and Electric Company's Demurrers," filed on May 21, 2018, in the *California North Bay Fire Cases,* San Francisco Superior Court, Coordinated Case No. 4955. | 212 |
| 23 | Order Denying Pacific Gas and Electric Company's Petition for Review, filed in the California District Court of Appeal, First Appellate District, on September 17, 2018, in Case No. A154847. | 224 |
| 24 | Selected pages of Pacific Gas and Electric Company's Petition for Review, filed in the California Supreme Court on September 27, 2018, in Case No. S251585. | 226 |
| 25 | Record of the California Supreme Court's Denial of Pacific Gas and Electric Company's Petition for Review, filed on November 14, 2018, in Case No. S251585. | 245 |

# Exhibit 1

1    Steven M. Campora (SBN 110909)
    **DREYER BABICH BUCCOLA**
2    **WOOD & CAMPORA LLP**
    20 Bicentennial Circle
3    Sacramento, CA 95826
    Telephone: (916) 379-3500
4    Facsimile: (916) 379-3599
    scampora@dbbwc.com
5

6    Dario de Ghetaldi (SBN 126782)
    Amanda L. Riddle (SBN 215221)
7    **COREY, LUZAICH, DE GHETALDI,**
    **NASTARI & RIDDLE LLP**
8    700 El Camino Real
    Millbrae, CA 94030-0669
9    Telephone: (650) 871-5666
    Facsimile: (650) 871-4144
10   deg@coreylaw.com
    alr@coreylaw.com

11   **Co-Liaison Counsel for Individual Plaintiffs**

12

13           **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

14               **FOR THE COUNTY OF SACRAMENTO**

15

16   Coordination Proceeding Special Title    )   Case No. JCCP 4853
    (Rule 3.550)                         )
17                                   )   DECLARATION OF CRAIG S. SIMON IN
         **BUTTE FIRE CASES.**         )   SUPPORT OF PLAINTIFFS' OPPOSITION
18                                   )   TO PG&E'S MOTION FOR A LEGAL
                                  )   DETERMINATION OF INVERSE
19                                   )   CONDEMNATION LIABILITY CCP
                                  )   §1260.040
20                                   )

21                                   )

22                                   )   DATE:      June 9, 2017
                                  )   TIME:      10:00 a.m.
23                                   )   DEPT.:     42
                                  )   JUDGE:   Hon. Allen H. Sumner
24                                   )

25

26

27

28

*FILED/ENDORSED MAY 26 2017 By: L. Kennedy Deputy Clerk*

---

1    I, Craig S. Simon, declare as follows:

2    1.    I am a licensed attorney practicing law in the State of California at Berger Kahn,

3    A Law Corporation and a Co-Liaison Counsel for the Subrogation Plaintiffs in this action.  I

4    have knowledge of all facts stated herein and if called to testify, I would and could competently

5    testify to the facts contained in this deposition.

6    2.    This declaration is submitted in support of Plaintiffs' Opposition to PG&E's

7    motion for a legal determination of inverse condemnation liability.

8    3.    In each of the following cases I was Co-Liaison Counsel for Subrogation

9    Plaintiffs in actions against privately owned public utilities:

10        •    *Craig Carlson et ux., et al. v. Southern California Edison Company* (Grass

11             Valley Fire), San Bernardino County Superior Court, Case No. CIVSS811370,

12             Defendant Southern California Edison Company, Hon. John M. Pacheco;

13        •    *In Re Malibu Fire Cases*, Los Angeles County Superior Court, Case No.

14             BC387697, Defendant Southern California Edison Company, Hon. Gregory

15             Alarcon;

16        •    *In Re Sayre Fire Litigation*, Los Angeles County Superior Court, Case No.

17             BC457025, Defendant Southern California Edison Company, Hon. Mark V.

18             Mooney; and

19        •    *In Re Sesnon Fire*, Los Angeles County Superior Court, Case No. BC442504,

20             Defendant Southern California Gas Company, a division of Sempra Energy,

21             Hon. John Shepard Wiley, Jr.

22    4.    In each case, the defendant utility was insured, in part, by the same insurer which

23    is a utility-owned insurance company.  In each case the defendant utility filed a motion claiming

24    that inverse condemnation did not apply because eminent domain was not used to acquire the

25    land where the fire occurred and that they were not a government owned utility.  In each case the

26    motion was denied.

27    5.    In addition, Los Angeles Department of Water and Power, insured in part by the

28    same insurer as noted above, made the same argument that since eminent domain was not used to

1

DECLARATION OF CRAIG S. SIMON IN SUPPORT OF PLAINTIFFS' OPPOSITION TO PG&E'S MOTION FOR A LEGAL
DETERMINATION OF INVERSE CONDEMNATION LIABILITY – CCP § 1260.040
Case: 19-30088    Doc# 4769    Filed: 11/15/19    Entered: 11/15/19 14:43:53    Page 11
of 246

1  acquire the land where the Powerhouse Fire occurred, it could not be liable for inverse

2  condemnation.  That motion was denied.  The Second District Court of Appeal declined to hear

3  an interim writ taken by the defendant utility.  *In Re Powerhouse Fire Litigation*, Los Angeles

4  County Superior Court, Case No. BC527331, Hon. Amy D. Hogue.

5        I declare under penalty of perjury under the laws of the State of California that the

6  foregoing is true and correct and that this declaration is executed this 25th day of May 2017 at

7  Irvine, California.

8  Craig S. Simon

9  Craig S. Simon

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF CRAIG S. SIMON IN SUPPORT OF PLAINTIFFS' OPPOSITION TO PG&E'S MOTION FOR A LEGAL
DETERMINATION OF INVERSE CONDEMNATION LIABILITY – CCP § 1260.040

Exhibit 2

FILED/ENDORSED

MAR 2 9 2018

By: _____
        M. Pine
      Deputy Clerk

1   Steven M. Campora (SBN 110909)
    **DREYER BABICH BUCCOLA**
2   **WOOD & CAMPORA LLP**
    20 Bicentennial Circle
3   Sacramento, CA 95826
    Telephone: (916) 379-3500
4   Facsimile: (916) 379-3599
    scampora@dbbwc.com
5
    Dario de Ghetaldi (SBN 126782)
6   Amanda L. Riddle (SBN 215221)
    **COREY, LUZAICH,**
7   **DE GHETALDI & RIDDLE LLP**
    700 El Camino Real
8   Millbrae, CA 94030-0669
    Telephone: (650) 871-5666
9   Facsimile: (650) 871-4144
    deg@coreylaw.com
10  alr@coreylaw.com

11  **Co-Liaison Counsel for Individual Plaintiffs**

12

13              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

14                  **FOR THE COUNTY OF SACRAMENTO**

15

16  Coordination Proceeding Special Title          ) CASE NO. JCCP 4853
    (Rule 3.550)                                   )
17                                                 ) DECLARATION OF CRAIG S. SIMON IN
                                                   ) SUPPORT PLAINTIFFS' OPPOSITION TO
18       BUTTE FIRE CASES.                         ) PG&E'S RENEWED MOTION
                                                   ) CONCERNING LIABILITY FOR INVERSE
19                                                 ) CONDEMNATION
                                                   ) [C.C.P. §§ 1008(a), 1008(b), & 1260.040]
20                                                 )
                                                   ) DATE:      April 26, 2018
21                                                 ) TIME:      10:00 a.m.
                                                   ) DEPT.:     42
22                                                 ) JUDGE:     Hon. Allen H. Sumner
                                                   )
23  _____   )

24

25

26

27

28

File by Fax

## DECLARATION OF CRAIG S. SIMON

I, Craig S. Simon, declare as follows:

1.      I am the managing partner of Berger Kahn, A Law Corporation and I have been licensed to practice law in California since 1977. I served as a Co-Liaison counsel for the Subrogation Plaintiffs in the *Butte Fire Litigation* until the Subrogation Plaintiffs settled the litigation. I know the following facts to be true of my own knowledge, and if called to testify I could competently do so.

2.      The San Diego Wildfires occurred on October 21, 2007 and litigation was filed by a number of plaintiffs in 2007. The litigation eventually was consolidated and assigned to Judge Richard E.L. Strauss in Department C-75 in Downtown San Diego. The litigation, with Master Complaints and adoption forms, commenced in earnest in the latter part of 2008. I represented about 10 insurance family groups seeking subrogation against San Diego Gas & Electric, which was represented by Kenneth Chiate and Quinn Emanuel, who represents PG&E in this litigation. I was one of the lawyers for the insurance Subrogation Plaintiffs who argued motions in court. I served along with other attorneys from Grotefeld Hoffmann, Cozen O'Connor, and Shawn E. Caine, all who represented their clients in this *Butte Fire Litigation*.

3.      Attached as Exhibit 5 to Plaintiffs' Request for Judicial Notice is a true and correct copy of the Minute Order dated January 29, 2009, in the case entitled "In Re: 2007 Wildfire Insurer Litigation – Witch Creek/Guejito Fires," San Diego County Superior Court Case No. 37-2008-00093082-CU-NP-CTL.

4.      This ruling held "Plaintiffs have adequately alleged a cause of action for inverse condemnation against SDG&E." However, there was never a further motion made on the issue of inverse condemnation, never a trial on the issue, and no other definitive ruling.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 28th day of March 2018, at Irvine, California.

Craig S. Simon

Craig Simon, Esq.

1

Exhibit 3

1  SUPERIOR COURT OF THE STATE OF CALIFORNIA

**ENDORSED FILED**
**SAN MATEO COUNTY**

NOV - 8 2012

Clerk of the Superior Court
By   **M. MARLOWE**
DEPUTY CLERK

2  SAN MATEO COUNTY

3  400 COUNTY CENTER

4  REDWOOD CITY, CA 94063-1655

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF SAN MATEO

| | |
|---|---|
| Coordination Proceeding Special Title (Rule 3.550) ) ) ) | JCCP No. 4648 A |
| ) | TORT ACTIONS |
| PG&E "SAN BRUNO FIRE" CASES ) ) ) ) ) ) ) ) ) ) ) ) | ORDER RE: PLAINTIFFS' MOTION FOR A LEGAL DETERMINATION OF INVERSE CONDEMNATION LIABILITY |

## INTRODUCTION

Pursuant to California Code of Civil Procedure section 1260.040, Plaintiffs[1] move for a legal determination of PG&E's liability for inverse condemnation (Plaintiffs' Twelfth cause of action). This motion came on regularly for hearing before the San Mateo Superior Court on October 29, 2012, the Honorable Steven L. Dylina, presiding.

---

[1] Plaintiffs include: the Albertolle family, Maria Barr, the Chea family, the Kim family, the Healy family, the Magoolaghan family, the O'Neill family, the Pelligrini family, the Ruigomez family, the Tafralis family, the Vasquez family and Angie Williams.

-1-

Plaintiffs argue that liability is established by PG&E's responses to Plaintiffs' requests for admissions, PG&E's responses to Plaintiffs' interrogatories, deposition testimony of PG&E's employees and former employees, and documents produced by PG&E in this litigation.

PG&E argues that because it has admitted negligence,[2] traditional tort liability will provide the Plaintiffs with compensation for all property damage caused by the pipeline rupture and fire. PG&E also asserts the requirements of inverse condemnation have not been met. Specifically, PG&E claims it is a *private* company and thus Plaintiffs cannot show the requirement that a *public* entity has taken or damaged the property.

Alternatively, PG&E argues that if the inverse condemnation claims are to proceed they should be severed and the subrogation insurers joined in the severed proceeding. Finally, PG&E argues that if the motion is not denied or severed, the hearing on the motion should be continued so discovery can be completed.

This motion came on regularly for hearing before the San Mateo Superior Court on October 29, 2012, the Honorable Steven L. Dylina, presiding. The court has carefully considered the evidence referred to above and the parties' arguments, and for the reasons set forth below, GRANTS Plaintiffs' motion for a legal determination of inverse condemnation liability, and DENIES PG&E's request for a severance or continuance.

### FACTS

PG&E is a public utility operating in Northern and Central California, delivering natural gas to approximately 4.3 million gas customers. PG&E installed, owned and operated three main gas transmission pipelines serving the San Francisco peninsula, including Line 132. Originally constructed in 1948, a portion of line 132 was rerouted in 1956 and this portion became known as Segment 180.

---

[2] PG&E has admitted that its use of transmission pipe on Line 132 beginning in 1956 with a defective weld was negligent, and this negligence was a proximate cause of the rupture of the pipe on September 9, 2010.

-2-

PG&E admits that when it installed Segment 180 in 1956, PG&E crew determined its placement and configuration and performed the installation. On September 9, 2010, Segment 180 ruptured at the intersection of Glenview Drive and Earl Avenue in San Bruno. Plaintiffs claim that the ensuing explosion and fire damaged or destroyed Plaintiffs' property. PG&E has admitted that "its use of transmission pipe on Line 132 beginning in 1956 with a defective weld was negligent and this negligence was a proximate cause of the rupture of the pipe on September 9, 2010."

Both Plaintiffs and Defendants submitted Requests for Judicial Notice to the court, which the court has ordered granted. Pursuant to PG&E's request the court takes judicial notice of: (1) Easement deed from Consolidated Lands Incorporated to PG&E encompassing the location of the pipe that ruptured, dated June 2, 1958, (2) Map that includes the easement encompassing the location of the pipe that ruptured, granted by Consolidated Lands Incorporated to PG&E on June 2, 1958, and (3) Southern California Edison Company's Petition for Review by the Supreme Court of California, Supreme Court Case No. S205855, filed on October 9, 2012 [presenting the issue of "whether a privately-owned utility is strictly liable in inverse condemnation under [Article I, section 19 of the California Constitution] for property damage that was not proximately caused by its exercise of state power."] Pursuant to Plaintiffs' Request the court takes judicial notice of: City of San Bruno Ordinance No. 436 dated April 9, 1947 [granting to PG&E the franchise lay and use pipes to transmit gas along public streets].

Plaintiffs also filed sixty-three objections to PG&E's evidence offered in PG&E's Opposition to Plaintiffs' Motion. The court, mindful of its obligation pursuant to *Nazir v. United Airlines Inc.* (2009) 178 Cal.App.4th 243, has carefully reviewed the objections and ruled separately on each objection. The evidence submitted by PG&E went to the issue of damages (i.e. the amount of compensation to be awarded these Plaintiffs) which is not an issue before this court, and thus the court sustained all of Plaintiffs' objections to this evidence.

–3–

1  Finally, PG&E moved to file certain records under seal, and the court grants that

2  motion pursuant to California Rules of Court 2.550 and 2.551.

3  **DISCUSSION**

4  A.  PG&E's admission of liability for negligence

5  As a preliminary matter, the court addresses PG&E argument that because it has

6  admitted liability for negligence, Plaintiffs are barred from proceeding to prove liability

7  for inverse condemnation.  PG&E also asserts that prosecution of an inverse

8  condemnation claim does not increase the compensatory damages available to

9  Plaintiffs.

10  Plaintiffs' inverse condemnation clam is not based on PG&E's admission of

11  negligence.  Negligence and inverse condemnation are distinct claims with different

12  remedies, and PG&E offers no authority for why Plaintiffs cannot proceed under both

13  theories.

14  B.  Liability for Inverse Condemnation

15  An inverse condemnation proceeding is composed of two phases.  First, the

16  court determines whether the defendant is liable for a "taking".  Second, assuming the

17  court finds there has been a taking, a jury fixes the amount of compensation.  (Code

18  Civ. Proc. sections 1260.110(a), 1260.120(a).)  Section 1260.040 permits either party

19  to move for a ruling on the legal issue of liability prior to trial (*Dina v. People ex. rel.*

20  *Dept. of Transportation* (2007) 151 Cal.App.4[th] 1029, 1034).

21  1.  As a public utility PG&E is a "state actor" and may be held liable for inverse

22  condemnation

23  A threshold issue is whether the defendant that caused the damage to the

24  plaintiff's property is a "state actor".  Plaintiffs, relying on *Barham v. Southern Cal.*

25  *Edison Co.* (1999) 74 Cal.App.4[th] 744, argue that privately-held public utilities, such as

26  PG&E, may be held liable as "state actors" for inverse condemnation.

27  PG&E, citing *Cantu v. Pacific Gas and Electric Company* (1987) 189

28  Cal.App.3d 160, *Breidert v. Southern Pacific Company* (1964) 61 Cal.2d 659, argues

–4–

1  Plaintiffs' motion should be denied simply because it is a private corporation and not a

2  state or public entity.

3       PG&E also argues that the courts of appeal have split on this issue and that

4  *Barham v. Southern Cal. Edison Co., supra,* and the recent case of *Pacific Bell*

5  *Telephone Co. v. Southern Cal. Edison Co.* (2012) 208 Cal.App.4th 1400, are in conflict

6  with *Cantu* and *Breidert.*

7       PG&E further argues that because the defendants in *Pacific Bell Telephone Co*

8  have filed a petition for review before the California Supreme Court regarding this

9  issue, this court should wait to rule until the California Supreme Court weighs in on

10  this matter.

11       Having reviewed the above cited cases the court does not find them to be in

12  conflict. In *Barham,* the fourth district court of appeal held that a public utility, even

13  when it is a privately held corporation, is a "state actor" for purposes of inverse

14  condemnation liability and is held to the standards imposed on a public entity (*Barham,*

15  *supra,* 74 Cal.App.4th at p.753.)The court focused on whether the taking was for a

16  public use – i.e. the transmission of electric power to the public.

17       The second district, in *Pacific Bell Telephone Co.* similarly held, finding that

18  public utilities that essentially have "monopolistic authority" are state actors for

19  purposes of inverse condemnation liability (*Pacific Bell Telephone Co. v. Southern*

20  *Cal. Edison Co., supra,* 208 Cal.App.4th at p.1406).

21       *Cantu* and *Breidert* do not present the conflict that PG&E asserts because these

22  cases are clearly distinguishable on their facts. The facilities at issue in *Cantu* were

23  designed for a small private and not a large public use. *Breidert* simply held that when

24  a private entity *jointly participates* with a public entity it may be held liable for inverse

25  condemnation (*Breidert v. Southern Pacific Company, supra,* 61 Cal.2d at p.662). The

26  case did not hold this is the only situation under which a privately owned utility may be

27  held liable in inverse condemnation.

28       Therefore the court does not find that this inverse condemnation proceeding

should be put on hold at this time, pending the decision by the California Supreme

1   Court on whether to accept review in the *Pacific Bell Telephone Co* case. Currently

2   *Barham* remains good authority for this court to follow in finding that PG&E is a "state

3   actor" for purposes of inverse condemnation liability. However, if the California

4   Supreme Court grants review this court may need to reconsider whether Plaintiffs'

5   inverse condemnation proceeding should be stayed.

6       2. Plaintiffs have established all the elements of inverse condemnation

7       For Plaintiffs to prevail on their cause of action for inverse condemnation, they

8   must prove that a public entity has taken or damaged their property for a public use.

9   This requires pleading and proving each of the following: (1) the defendant planned,

10  designed, constructed, or operated an improvement; (2) the improvement was for

11  public use; and (3) the defendant's activity or failure to act as planned was the

12  substantial cause of the taking or damage (*Alber sv. County of Los Angeles* (1965) 62

13  Cal.2d 250, 263-264).

14      First, the court finds that Plaintiffs have submitted evidence establishing that

15  PG&E participated in the planning, design, construction and operation of Line 132.

16  PG&E's claim that it did not manufacture the pipe and the pipe was not designed to fail

17  is irrelevant under the case law. (*DiMartino v. City of Orinda* (2000) 80 Cal.App.4[th]

18  329, 336 [fact that part of storm drainage system was constructed by a private person

19  will not insulate a public utility from liability if the system has been accepted or

20  otherwise approved by the public entity]; *Yee v. City of Sausalito* (1983) 141

21  Cal.App.3d 917, 920 [the court held the focus of judicial inquiry is not whether the

22  injury was expected or foreseeable, but whether it was proximately caused by the use

23  of the public improvement for its intended purpose].

24      Second, PG&E has admitted in response to Plaintiffs' requests for admission

25  that it installed the pipeline that ruptured, and that it operated Line 132 for 54 years

26  after installing Segment 180. The improvement was for a public use, specifically to

27  supply gas to the San Francisco peninsula. A "public use" is a "use which concerns the

28  whole community or promotes the general interest in its relation to any legitimate

object of government." (*Bauer v. County of Ventura* (1955) 45 Cal.2d 276, 284.) The

transmission of electric power to the public has been held to be a public use. (*Barham v. Southern Cal. Edison Co., supra,* 74 Cal.App.4th at p.754.)

Finally, there can be no question that the failure of Line 132 was a substantial factor in causing the explosion and fire that damaged Plaintiffs' property.[3] Plaintiffs submitted declarations in support of this motion which set forth the damages to their real and personal property interests.[4]

B. The court finds that severance of the inverse condemnation claims is not required.

PG&E argues that if the inverse condemnation claims are not dismissed, they should be severed and stayed pending the California Supreme Court's decision on whether to accept review in the *Pacific Bell* case and to allow the subrogation insurers to join. As explained above, a stay is unnecessary because the cases do not present the split in authority claimed by PG&E.

Nor is it necessary to sever to allow the subrogation insurers to join the proceeding. PG&E has consistently maintained that the subrogation insurers should not be part of this proceeding and no evidence was presented at the hearing as to why the court should now join them.

C. The court does not need to continue this matter to consider additional evidence.

PG&E requests the court continue this matter to allow completion of expert discovery and to allow for a full presentation of the property damages claimed by Plaintiffs and by the subrogation insurers.

---

[3] PG&E also argues that because the manufacturing defect in the pipe was not a deliberate design, it cannot be held liable for inverse condemnation. There is no requirement, as PG&E alleges, that the defect be deliberate. All Plaintiffs need to show is that some deliberate act of PG&E was a substantial factor in causing damage to their property. (*Blau v. City of Los Angeles* (1973) 32 Cal.App.3d 77, 84-85.)

[4] PG&E alleges in its opposition papers that several Plaintiffs who resided a considerable distance from the pipeline have made claims of cracks in their property that were determined on examination to pre-date the pipeline rupture. PG&E offers no admissible evidence to support this claim.

However, as Plaintiffs point out, none of the discovery PG&E claims it needs goes to the issue of liability for inverse condemnation. Rather this discovery goes to the question of the amount of damages each Plaintiff is owed.

Nor is a continuance necessary to determine who may assert these claims. Plaintiffs confirmed at the hearing that they have or will shortly have assignments of the subrogation claims from their insurance carriers. As Plaintiffs assert, to the extent that PG&E is entitled to an offset for any payments it made to any particular Plaintiff, the amount of that offset will be determined by the court after the jury verdict is entered. Thus a continuance is unnecessary.

## CONCLUSION

Plaintiffs' motion for a legal determination of inverse condemnation liability is **GRANTED**, conditioned upon the court's right to reconsider this order should the California Supreme Court grant review in *Pacific Bell Telephone Co. v. Southern California Edison Co.* (2012) 208 Cal.App.4th 1400.

The court **DENIES** PG&E's request to sever and/or stay Plaintiffs' inverse condemnation claims.

The court **DENIES** PG&E's request to conduct a hearing to determine whether the subrogation insurers should be joined with Plaintiffs regarding the inverse condemnation claims. No such hearing is required because joinder is unnecessary as has previously been acknowledged by the parties and the court.

The court **DENIES** PG&E's request to continue this matter until discovery is complete because all necessary discovery to determine liability pursuant to section 1260.040 has been completed.

Dated: November 2, 2012

STEVEN L. DYLINA
JUDGE OF THE SUPERIOR COURT

–8–

**AFFIDAVIT OF MAILING   CASE NUMBER:   JCCP 4648 A**

**DOCUMENT:   Order Re: Plaintiff's Motion for Legal Determination of Inverse Condemnation Liability**

I declare, under penalty of perjury, that on the following date I deposited in the United State Post Office Mail Box at Redwood City, California a true copy of the foregoing document, enclosed in an envelope, with the proper and necessary postage pre-paid thereon, and addressed to the following:

Service by Email:

Gayle Gough
Sedgwick
gayle.gough@sedgwicklaw.com

Kate Dyer
Clarence & Dyer
kdyer@clarencedyer.com

Frank Pitre
Cotchett Pitre & Mccarthy LLP
tstevens@cpmlegal.com

Dario DeGhaltadi
Corey Luzaich Pliska, De
Ghetaldi & Nastari LLP
deg@coreylaw.com

Hon. Ronald Sabraw (Ret.)
jpeterson@jamsadr.com
rsabraw@judgesabraw.com

John Lyons
Latham & Watkins LLP
john.lyons@lw.com

Maureen Dear
modear3@comcast.net

Amanda Riddle
Corey Luzaich Pliska, De
Ghetaldi & Nastari LLP
alr@coreylaw.com

**FILED**
SAN MATEO COUNTY

NOV - 8 2012

Clerk of the Superior Court
By _____
DEPUTY CLERK

**Executed on November 8, 2012
at Redwood City, California**

**CLERK OF THE SUPERIOR AND MUNICIPAL COURTS**

**By:  Lorraine Guerrero
Deputy Clerk**

# Exhibit 4

In and for the Superior and Municipal Courts of California
County of San Mateo

| Judge: Steven Dylina | Dept.: 7 | Clerk: L. Guerrero |
| Case Number: JCCP 4648 A | | Court Reporter: unreported |

Date: November 14, 2012
(Title of Action)                                    (Appearances)
PG & E "San Bruno Fire"
Cases

vs.

Nature of Proceedings:  Minute order

FURTHER ORDER RE: PLAINTIFFS' MOTION FOR A LEGAL DETERMINATION
OF INVERSE CONDEMNATION LIABILITY

Pursuant to California Code of Civil Procedure section 1260.040, Plaintiffs the Albertolle

family, Maria Barr, the Chea family, the Kim family, the Healy family, the Magoolaghan

family, the O'Neill family, the Pelligrini family, the Ruigomez family, the Tafralis

family, the Vasquez family and Angie Williams moved for a legal determination of

PG&E's liability for inverse condemnation (Plaintiffs' Twelfth cause of action).

The motion came on regularly for hearing before the San Mateo Superior Court

on October 29, 2012, the Honorable Steven L. Dylina, presiding. The court granted

Plaintiffs' motion for a legal determination of inverse condemnation liability, conditioned

upon the court's right to reconsider this order should the California Supreme Court grant

review in *Pacific Bell Telephone Co. v. Southern California Edison Co.* (2012) 208

Cal.App.4th 1400 [Supreme Court Case No. S205855, petition for review filed on

October 9, 2012, presenting the issue of "whether a privately-owned utility is strictly

liable in inverse condemnation under Article I, section 19 of the California Constitution

for property damage that was not proximately caused by its exercise of state power."]

On November 14, 2012, the California Supreme Court DENIED REVIEW in the

*Pacific Bell Telephone Co.* case. Therefore, no reconsideration of this order is necessary

and the court confirms that Plaintiffs' motion for a legal determination of inverse

condemnation liability is GRANTED.

Case Number:  JCCP 4648    Nature of Proceedings:  Minute order
Date:  November 14, 2012

EXHIBIT C

## AFFIDAVIT OF MAILING  CASE NUMBER:  JCCP 4648 A

## DOCUMENT:  Minute Order

I declare, under penalty of perjury, that on the following date I deposited in the United
State Post Office Mail Box at Redwood City, California a true copy of the foregoing
document, enclosed in an envelope, with the proper and necessary postage pre-paid
thereon, and addressed to the following:

Service by Email:
Gayle Gough                     Kate Dyer
Sedgwick                        Clarence & Dyer
gayle.gough@sedgwicklaw.com     kdyer@clarencedyer.com

Frank Pitre                                Dario DeGhaltadi
Cotchett Pitre & Mccarthy LLP   Corey Luzaich Pliska, De
tstevens@cpmlegal.com              Ghetaldi & Nastari LLP
                                deg@coreylaw.com

Hon. Ronald Sabraw (Ret.)       John Lyons
jpeterson@jamsadr.com           Latham & Watkins LLP
rsabraw@judgesabraw.com         john.lyons@lw.com

Maureen Dear                    Amanda Riddle
modear3@comcast.net             Corey Luzaich Pliska, De
                                Ghetaldi & Nastari LLP
                                alr@coreylaw.com

**FILED**
SAN MATEO COUNTY

NOV 1 4 2012

Clerk of the Superior Court
By _____
DEPUTY CLERK

Executed on November 14, 2012
at Redwood City, California

CLERK OF THE SUPERIOR AND MUNICIPAL COURTS

By: Lorraine Guerrero
Deputy Clerk

EXHIBIT C

# Exhibit 5

FILED / ENDORSED

JUN 2 2 2017

By _____ Deputy Clerk

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SACRAMENTO

**BUTTE FIRE CASES**

Case No.: JCCP 4853

**RULING ON SUBMITTED MATTER:
INVERSE CONDEMNATION MOTIONS**

On June 16, 2017, hearing was held on the court's tentative ruling on the competing motions seeking seek a legal determination on whether Pacific Gas and Electric Company ("PG&E") is liable for inverse condemnation for damages caused by the Butte Fire. The parties appeared and presented oral argument, after which the court took the motions under submission.

The court, having fully considered the arguments of all parties, both written and oral, as well as the evidence submitted, now affirms its tentative ruling, as supplemented concerning the court's discussion of causation, as follows:

Plaintiffs and defendants, PG&E and Pacific Gas and Electric Corporation, bring competing motions pursuant to Code of Civil Procedure section 1260.040, seeking a legal determination whether PG&E is liable for inverse condemnation for damages caused by the Butte Fire. For the reasons set forth below, the court grants Plaintiffs' motion as to PG&E, denies Plaintiffs' motion as to Pacific Gas & Electric Corporation, and denies PG&E's motion.

The court finds PG&E may be held liable for inverse condemnation under California law even though it is a privately owned public utility. The court further finds, based upon the

1

admissible evidentiary record, the Butte Fire was caused by a public improvement as deliberately designed and constructed by PG&E.

## I.
## Preliminary Matters

### A.  Code of Civil Procedure section 1260.040

Plaintiffs allege several causes of action against PG&E relating to the Butte Fire, including inverse condemnation pursuant to Article I, section 19, of the California Constitution. (Individual Plaintiffs' Master Complaint ¶¶ 51-58.)

The parties agree the court has authority pursuant to Code of Civil Procedure section1260.040[1] to rule upon the question of liability for inverse condemnation presented by their competing motions. (PG&E, Memo. ISO Motion for Legal Determination of Inverse Condemnation Liability ["PG&E MPA"], p. 3:18-4:20; Plaintiffs' Memo. ISO Motion for Determination of Inverse Condemnation Liability ["Plaintiffs' MPA"], p. 7:10-8:3.)

Section 1260.040(a) provides if there is "a dispute between plaintiff and defendant over an evidentiary or other legal issue affecting the determination of compensation, either party may move the court for a ruling on the issue...." Subdivision (c) states it "supplements, and does not replace any other pretrial or trial procedure otherwise available to resolve an evidentiary or other legal issue affecting the determination of compensation."

The court may determine the legal issue of liability pursuant to the procedures set forth in section 1260.040. (*Dina v. People ex rel. Dept. of Transportation* (2007) 151 Cal.App.4th 1029.) Specifically, a party may move for a ruling on liability because that is a legal issue affecting the determination of compensation. The Court in *Dina* construed section 1260.040 broadly as

---

[1] All statutory references are to the Code of Civil Procedure, unless otherwise indicated.

2

RULING ON SUBMITTED MATTER; INVERSE CONDEMNATION MOTIONS [CCP §853]

consistent with the Legislative purpose to "facilitate resolution of condemnation cases without trial." (*Id*. at 1043.) The Court characterized section 1260.040 as "a powerful statute, unique to eminent domain law, which allows evidentiary issues and issues affecting compensation to be adjudicated by motion." (*Id.* at pp. 1043-1044.)

The Court in *Dina* analogized section 1260.040's proceedings as similar to a motion for a nonsuit, which may be granted "only when, disregarding conflicting evidence, viewing the record in the light most favorable to the plaintiff and indulging in every legitimate inference which may be drawn from the evidence, it determines there is no substantial evidence to support a judgment in the plaintiff's favor." (*Id.* at 1047.) Applying that stringent standard of review, the Court concluded the trial court properly ruled the evidence offered by plaintiffs was insufficient to support their claims.

Here the parties' competing motions on liability are more akin to motions for summary adjudication than a motion for nonsuit or judgment on the pleadings. Although the parties have not adhered to the procedural requirements of a motion for summary adjudication under section 437c, they acknowledge the court may reach the issue of liability through this special eminent domain law procedure based upon their evidentiary record.

## B. PG&E and the Pacific Gas and Electric Corporation

PG&E's Opposition to Plaintiffs' motion contends the motion does not clearly indicate whether it is brought against the Pacific Gas & Electric Corporation in addition to PG&E the utility entity. PG&E argues Plaintiffs failed to meet their burden as to the Pacific Gas & Electric Corporation (a private corporation), because there is no evidence the Pacific Gas & Electric Corporation is a public entity that can be liable for inverse condemnation, citing *Bach v. County of Butte* (1989) 215 Cal. App. 3d 294, 306-307 (1989). PG&E asserts the Pacific Gas & Electric

3

Corporation neither owns nor operates any electrical transmission and distribution facilities. (PG&E Opp., p. 1, fn 1.) Plaintiffs produce no evidence to the contrary.

PG&E's position appears correct. Accordingly, the court's finding of inverse condemnation liability extends to the public utility entity, PG&E.

### C. Damage Stipulation

For purposes of these competing motions, to expedite the court's determination of Plaintiffs' inverse condemnation claim alleged through their Master Motion, the parties agreed to avoid the necessity of individual declarations of damages for each moving plaintiff. Instead, the parties agreed only those plaintiffs scheduled for the initial trial commencing August 11, 2017, would submit evidence their property was damaged in the Butte Fire: Plaintiffs Larry and Karen Carr, Florencio and Martha Garcia, Robert and Barbara Garibaldi, Edward and Laura Miser, Ronald and Darunee Rogers, and Barbara Rose (collectively "August 11th Plaintiffs"). These damage declarations have been submitted.

The parties further stipulated if the court determines PG&E is liable for inverse condemnation, this determination will be binding as between PG&E and all Moving Plaintiffs presently in the Coordination Proceeding. The August 11th Plaintiffs would still have to prove the amount of their damages, and the remaining Moving Plaintiffs would have to prove both that their property was damaged in the Butte Fire and the amount of such damages.

The court has accepted the parties' stipulation as described above and will execute the order accompanying the stipulation.

4

### D.      Judicial Notice

Plaintiffs filed a Request for Judicial Notice asking the court take judicial notice of the deed for the power line right-of-way on the Kirk property in Amador County dated September 2, 1902, recorded in Book 23 of Deeds, page 564, Amador County Records, a copy of which is attached to the request as Exhibit 1. Plaintiffs' request is made upon the ground judicial notice of deeds is proper under Evidence Code section 452, subdivisions (c) and (h). This includes the existence of the recorded document, as well as the truth of the facts recited in it. (*Scott v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 743, 754-761.)

The request is granted.

Plaintiffs additionally request the court take judicial notice of pleadings PG&E filed in other, unrelated cases which also involved the issue of inverse condemnation. These filings are irrelevant, and thus that request is denied.

### E.      Evidentiary Objections

#### 1.      Plaintiffs' Objections

Plaintiffs interposed 94 objections to the evidence initially submitted by PG&E in support of its motion. Plaintiffs also objected to the supplemental declaration of Mari Henderson filed June 2, 2017.

##### a)      Mari Henderson Declaration

Plaintiffs object the Henderson declaration was not timely served, as required by sections 1005 and 1010, and therefore consideration of the late declaration would violate Plaintiffs' right to due process, citing *San Diego Watercrafts, Inc. v. Wells Fargo Bank, N.A.* (2002) 102 Cal. App. 4th 308, 316. Plaintiffs liken the competing motions brought here under section 1260.040 as motions for summary adjudication, and therefore contend late submission of this substantial

5

evidence denied them the right to be fully advised of the issues to be addressed and to be given adequate notice of what facts they must rebut to prevail.

Although a motion under section 1260.040 is not subject to the specific procedural requirements of section 437c, or California Rules of Court, rule 3.1350, the general demands of due process and fair notice underlying those procedures do apply with equal force to this special motion. Accordingly, the objection to the late declaration is sustained.

### b) Amended Objection Nos. 1-94

Plaintiffs' evidentiary objections are ruled upon as follows: Sustained as to Objection Nos. 1-74, 76-85, 87-94. Overruled as to Objection Nos. 75 and 86.

### 2. PG&E's Objections

PG&E interposed five evidentiary objections to Plaintiffs' evidence.

### a) Cal Fire Report

PG&E first objects to the *California Department of Forestry and Fire Protection Investigation Report*, Case Number 15CA-AEU-00249918 ("Cal Fire Report") submitted as Exh. A to the Simon Declaration. PG&E argues the Cal Fire Report constitutes inadmissible hearsay, citing *Box v. Cal. Date Growers Ass'n* (1976) 57 Cal. App. 3d 266, 270-71. PG&E contends the Cal Fire Report does not meet the requirements of the hearsay exception for a record by a public employee (Evid. Code § 1280) because: (1) Cal Fire Battalion Chief Gianni Muschetto signed his report on April 25, 2016, more than seven months after the fire on September 9, 2015; (2) the sources of information, and the method and time of preparation do not indicate trustworthiness because the Cal Fire Report relies extensively on hearsay statements of others; and (3) the report consists of expressions of opinion and conclusions which do not come within the public records exception.

6

RULING ON SUBMITTED MATTERS / INVERSE CONDEMNATION MOTIONS (CCP #852)

Plaintiffs argue PG&E's objections should be overruled because: (1) PG&E admitted in four separate discovery responses the Butte Fire was caused by contact between its line and a tree as concluded by the Cal Fire Report; (2) PG&E itself referenced and relied upon the Cal Fire Report in the Woodyard and Kennedy Declarations PG&E submitted in support of its Motion for a Legal Determination of Inverse Condemnation Liability; and (3) the report satisfies the public employee record exception in Evidence Code section 1280 because the report was made at or near the time of the act, condition, or event despite its final publication, and the report is not comprised of hearsay or opinions.

PG&E's objection is sustained. PG&E's discovery responses, particularly its admissions, may constitute evidence supporting the evidentiary facts Plaintiffs seek to establish here with the Cal Fire Report. But PG&E's discovery responses do not convert the Cal Fire Report itself into admissible evidence. For purposes of these motions, the court does not find the Cal Fire Report is subject to the public employee record exception under Evidence Code section 1280.

### b) Arborist Report

PG&E similarly objects to Michael T. Mahoney's *Arborist Report: Butte Fire Incident* ("Arborist Report") on the same grounds: It is inadmissible hearsay. Plaintiffs give the same response. The court makes the same ruling: The objection is sustained.

### c) Testimony of Mahoney, Cole and Felling

PG&E's objections as to the testimony of Mahoney, Cole and Felling, are overruled

## II.
## The Material Facts

The court finds the following facts:

7

RULING ON SUBMITTED MATTER; INVERSE CONDEMNATION MOTIONS (CCP 485)

**A.     PG&E is a public utility**

PG&E is a privately-owned public utility providing natural gas and electric service throughout a 70,000-square-mile service area statewide, comprising nearly 135,000 miles of overhead powerlines. (Tankersley Decl. ¶3.)

**B.     The Butte Fire was caused by contact between a tree and PG&E's power line**

As to evidence of the cause of the Butte Fire, Plaintiffs rely in substantial part upon the testimony of Mark J. Felling, Michael T. Cole, Michael Mahoney, PG&E's discovery responses and the absence of controverting evidence.

Mark J. Felling is a registered professional electrical engineer who has observed, investigated and reported on numerous fires involving contact between energized power lines and vegetation in his fifty-year career.  In this case Felling inspected the power line, vegetation and other environmental influences in the area of origin of the Butte Fire. He also reviewed pertinent documents, photographs and reports. (Felling Dec., ¶¶ 1-8.) In his declaration Felling states, "[T]here are no other plausible explanations for the damage exhibited by the Subject Conductor and the Subject Tree other than direct mutual contact" and that contact ignited the Butte Fire. (Felling Dec., ¶¶ 8-15.)

Michael T. Cole spent 37 years with Cal Fire, and has a private career spanning 10 years as a fire investigation consultant and licensed/certified fire investigator.  Cole also determined the Butte Fire was caused by the "Subject Tree" making contact with the "Subject Conductor" and first igniting the Butte Fire. (Cole Dec., ¶¶ 1-10.)

PG&E produced no evidence contradicting the findings of Felling or Cole as to the cause of the Butte Fire.  Just the opposite.  PG&E admitted in at least four discovery responses that contact between a tree and its lines was "a cause" of the Butte Fire.

8

RULING ON SUBMITTED MATTER / INVERSE CONDEMNATION MOTIONS [CCP 452]

First, PG&E responded to Plaintiffs' Special Interrogatory No. 17 in part as follows: "At this time, PG&E does not contend that tree-line contact was not a cause of the fire. PG&E accepts Cal Fire's finding that a tree made contact with a power line, but PG&E does not believe it is clear what caused the tree to fail." (Simon Dec., ¶ 10, Ex.I.)

Second, PG&E stated it "accepts and admits the Cal Fire report's finding that the tree described by Plaintiffs as the Subject Tree made contact with a power line…." (Simon Dec., ¶ 9, Ex. H, pp. 2:12-13, 23-25; 3:3-5, 18-20.)

Third, PG&E stated it "does not contend that tree-line contact was not a cause of the fire." (Simon Dec., ¶ 11, Ex. J.)

Finally, and most clearly, PG&E stated, "PG&E accepts Cal Fire's finding that a tree made contact with a power line and that tree-line contact was a cause of the fire." (Simon Dec., ¶ 10, Ex. I, p. 20:6-8.)

Accordingly, for purposes of these motions, the court finds Plaintiffs established a tree made contact with PG&E's power line, and that contact was a cause of the Butte fire.

## C. PG&E constructed, maintained and operated the power line

PG&E admits it had an easement on the Kirk property for its Electra 1101 Circuit. (Simon Dec., ¶ 12, Ex. K, RFA No. 113.)

The original deed for the power line right-of-way on the Kirk property was recorded in 1902. That instrument, dated September 2, 1902, recorded in Book 23 of Deeds, page 564, Amador County Records, calls for a forty (40) foot right-of-way, twenty (20) feet on each side of the centerline of poles.

The deed requires PG&E "to cut down and keep clear said lands of brush and trees, a distance of twenty (20) feet on each side of said centerline of poles, also to cut down any trees

9

standing outside of said twenty (20) foot limit on each side of said centerline of poles that may endanger said line of poles and wires." (Curtis Dec., ¶¶ 3 & 4; Plaintiffs' Request for Judicial Notice, Ex. 1 [1902 deed granting right-of-way].)

PG&E admits the Butte Fire originated on a PG&E right-of-way on the Kirk property. (Simon Dec., ¶ 12, Ex. K, RFA Nos. 112 and 114; ¶ 14, Ex. M, p. 40:8-15; ¶ 15, Ex. N;and ¶ 16, Ex. O, pp. 12:12-17, 14:7-19, 14:24-25, 18:6-8, 21:17-25, 54:19-55:6.)

PG&E admits it owns the utility poles on the Electra 1101 circuit that crossed the property, and it operated and maintained the Electra 1101 circuit. PG&E also admits it determined the placement and configuration of the utility poles on the Electra 1101 circuit that crossed the property. (Simon Dec., ¶ 17, Ex. P highlighted portions on pp. 3-5.) And PG&E admits it installed the conductors and power poles on the Kirk property. (Simon Dec., ¶ 12, Ex. K, RFA Nos. 117 and 118.)

PG&E identified on its pole-mapping diagram when it constructed each pole in and around the area of the fire's origin. Pole #099651, Object ID #13632446, was installed by PG&E in 1963. This was the pole immediately to the east of the area of the fire's origin. A pole without a number, but bearing Object ID #13632919, was also installed by PG&E in 1963. This pole was immediately to the west of the area of the fire's origin. The Electra substation splits into two circuits, Electra 1101 and Electra 1102. (Simon Dec., ¶ 22, Ex. U, p. 50:24-51:6.)

PG&E's "Unplanned Outage Report" for the loss of electricity due to the Butte Fire shows 3,643 customers on these circuits. (Simon Dec., ¶¶ 21 & 22, Ex. T, and Ex. U, p. 176:14-18.)

## III.
### Analysis and Decision

PG&E succinctly frames the core questions presented by these competing motions: First, should this court find PG&E, a privately-owned public utility, to be subject to inverse

10

condemnation liability?  Second, was the Butte Fire caused by a public improvement as deliberately designed and constructed? (PG&E, MPA, p. 5:2-6.)

The court concludes the answer to both is yes.

**A.**     **A Privately-Owned Public Utility May Be Liable For Inverse Condemnation**

**1)**     **Private Utilities**

California courts have long found public and quasi-public entities responsible for damages under inverse condemnation. (See, e.g., *Eachus v. Los Angeles Consolidated Elec. Ry. Co.* (1894) 103 Cal. 614 [railroad liable for cutting off access to a public road.].)

Courts have repeatedly classified utilities as "public entities." (*Barham v. Southern Cal. Edison Co.* (1999) 74 Cal. App. 4th 744, 752 (1999); *Gay Law Students Assn. v. Pac Tel. & Tel. Co.* (1979) 24 Cal. 3d 458, 470; *Pac. Bell Tel. Co. v. Pac. Gas and Electric Co.* (2012) 208 Cal. App. 4th, 1400 ["*Pacific Bell*"]; *Sheffet v. City of Los Angeles* (1970) 3 Cal. App. 3d 720, 732.)

More specifically, under California law the proposition a privately-owned public utility such as PG&E may be held liable for inverse condemnation is now solidly established. (*Barham v. Southern California Edison Co.*, *supra*, 74 Cal.App.4th 744, 753; *Pacific Bell*, *supra*, 208 Cal. App. 4th 1400.)

The Court in *Barham* found no "significant differences" between a privately held public utility and a publicly held utility for the purpose of inverse condemnation liability. (*Barham*, *supra*, 74 Cal.App. 4th at 753.)  Rather, the Court cited the California Supreme Court's holding in *Gay Law Students Assn. v. Pac Tel. & Tel. Co.*, *supra*, 24 Cal. 3d 458 that a public utility is a "state actor" when hiring its employees.  (*Barham* at 753.)  In *Gay Law Students*, the Supreme Court found "...the breadth and depth of governmental regulation of a public utility's business

11

1  practices inextricably ties the state to a public utility's conduct..." (*Gay Law Students, supra*, 24

2  Cal.3d at 470.)[2]

3  The Fourth District is not alone in this line of reasoning. In *Pacific Bell*, the Second

4  District adopted *Barham*'s reasoning in finding the quasi-monopolistic nature of Southern

5  California Edison rendered it a public entity. (*Pac. Bell*, *supra*, 208 Cal. App. 4th at 1405.) The

6  Court explained: "[A] public utility's monopolistic or quasi-monopolistic authority ... derives

7  directly from its exclusive franchise provided by the state."(*Id*. at 1406.)

8  PG&E argues repeatedly the California Supreme Court itself has not found a privately

9  held public utility liable under inverse condemnation. This is true, but not dispositive.

10  PG&E argues the appellate courts in *Barham* and *Pacific Bell* improperly extended the

11  holding of *Gay Law Students* beyond the employment context. PG&E cites *Automatic Sprinkler*

12  *Co. v. Southern Cal. Edison Co.* (1989) 216 Cal. App. 3d 627, 633 for its argument. However,

13  *Automatic Sprinkler* ultimately turned on a specific statutory scheme, not application of *Gay Law*

14  *Students*. (*Automatic Sprinkler* at 633.) Furthermore, the very same Court of Appeals declined to

15  extend the conclusions in *Automatic Sprinkler* to *Barham*. (*Barham*, *supra*, 74 Cal. App. 4th at

16  753.)

17  PG&E also cites language from the Third District Court of Appeal's decision in *Bach v.*

18  *County of Butte*, *supra*, 215 Cal.App. 3d at 307: "...it is elementary that an inverse

19  condemnation action ... requires state action and, therefore, cannot be asserted against private

20  parties." The court does not find this general statement controlling.

21

22  [2] Plaintiffs and PG&E both presented arguments as to whether PG&E is a "state actor" for purposes of inverse condemnation. While such a finding would certainly fulfill the public entity requirement, it not necessary. (See *Baker v. Burbank-Glendale-Pasadena Airport Authority* (1985) 39 Cal 3d 862, 867; *Barham*, *supra*, 74 Cal. App. 4th at

23  752-754; *Breidert v. Southern Pac. Co.* (1964) 61 Cal. App. 2d, 659; *Eachus, supra*,103 Cal. at 614; *Pacific Bell*, *supra*, 208 Cal. App. 4th at 1405; *Pacific Gas & Electric Co. v. Parachini* (1972) 29 Cal. App. 3d 159; *Slemons v.*

24  *Southern Cal. Edison Co*. (1967) 252 Cal. App. 2d 1022; *Uniwill v. City of Los Angeles* (2004124 Cal. App. 4th, 537, 544). It is only required that a public entity, not a state actor, damage property for public use.

25  12

Plaintiffs in *Bach* sought to sue their **neighbors** in inverse condemnation for the neighbors' complaint to the county the Bachs were operating a law practice out of their home in violation of zoning regulations. The Court of Appeal's summary dismissal of Bachs' "ill-conceived, frivolous" argument (*Bach*, supra, 215 Cal.App.3d at 307) is of little guidance in assessing PG&E's liability for damages resulting from operation of its power lines.

### 2) Risk Sharing

Over 70 years ago Justice Roger Traynor explained the fundamental public policy underlying the principle of liability for inverse condemnation:

> The construction of the public improvement is a deliberate operation of the state or its agency in furtherance of public purposes. In erecting a structure that is inherently dangerous to private property, the state or its agency undertakes by virtue of its constitutional provision to compensate property owners for injury to their property arising from the inherent dangers of public improvement .... The decisive consideration is the effect of the public improvement on the property and whether the owner of the damaged property if uncompensated would contribute more than his proper share to the public undertaking. It is irrelevant whether or not the injury to the property is accomplished by a corresponding benefit to the public purpose to which the improvement is dedicated, since the measure of liability is not the benefit derived from the property, but the loss to the owner.

(*House v. Los Angeles Co. Flood Control Dist. (*1944) 25 Cal.2d 384,396-397 [conc. opn. of Traynor, J.)

The Butte Fire occurred when a tree came into contact with a power line PG&E operates providing electrical service to over 3,640 customers on that line. The court finds if the individual property owners damaged here were to absorb that loss, they would be contributing more than their "proper share" to the cost of this undertaking. As the Court explained in *Pacific Bell, supra,* 208 Cal. App. 4th at 1408:

13

> For an owner whose property is damaged by the operation of a utility, he or she suffers a disproportionate share of the cost of the public improvement regardless of whether the utility is governmentally or privately owned. We do not believe the happenstance of which type of utility operates in an area should foreclose a property owner's right to just compensation under inverse condemnation for the damage, interest and attorney fees and should limit the property owner to traditional tort remedies.

### 3)    Public Improvement

Plaintiffs stress PG&E's electrical system is an improvement for public use.  The court agrees.

Determining whether a use is public or private is a question of law. (*Barham, supra*, 74 Cal.App.4th at 752.)  Courts have consistently held the public use requirement is satisfied when the improvement is used for the delivery of a utility service. (*Id.* at 751 ["transmission of electrical power is a public use and inverse condemnation will apply"]; accord *Slemons v. Southern California Edison Co., supra,* 252 Cal.App.2d at 1026-1027 [electric distribution lines serving three customers is a public use].)

PG&E's Electra circuits here serve 3,643 customers. (Simon Dec., ¶¶ 21 & 22, Ex. T, and Ex. U, p. 176:14-18.)  PG&E cannot reasonably dispute its electrical distribution lines are not installed and maintained for a public use.

Although there was no dispute in the parties' submissions that PG&E's electrical system was an improvement for public use, the court makes this inevitable finding based upon the essential service provided and the substantial segment of the public receiving or dependent upon the service.  (*Barham, supra*, 74 Cal.App.4th at 752; *Slemons v. Southern California Edison Co., supra,* 252 Cal.App.2d at 1026-1027.)

14

### 4)     Public Policy

PG&E is subject to inverse condemnation liability despite the fact it is a privately-owned public utility. The policy reasons underlying the just compensation right in inverse condemnation do not dictate a different conclusion.

PG&E argues because it is a privately-owned utility, the traditional policy justifications for inverse condemnation should not apply in this case because: (1) PG&E did not obtain the land upon which its line is located through eminent domain or joint action with the state; (2) PG&E does not enjoy sovereign immunity; and (3) PG&E does not have authority to spread the cost of any award to all its customers.

The court is not persuaded.

### 5)     Eminent Domain

The fact PG&E did not acquire its easement through eminent domain or joint action with the government is not material to its liability as a utility for inverse condemnation. A public entity may be held liable even if it cannot legally exercise eminent domain.

Inverse condemnation does not derive from any statutory eminent domain power, but directly from the Constitution. (*Baker v. Burbank-Glendale-Pasadena Airport Authority, supra,* 39 Cal. 3d at 867-868.) As such, inverse condemnation liability does not depend on the mechanism by which defendant acquired the land where the damage occurred. It only depends on whether a public entity damaged the property of another for public use. (See also *Barham*, *supra,* Cal. App. 4th at 754 ["A landowner whose property has been invaded by a public entity that lacks eminent domain power suffers no less a taking merely because the defendant was not authorized to take."].)

PG&E cites *Cantu v. Pacific Gas and Electric Co.* (1987) 189 Cal. App. 3d 160, 165, in

15

RULING ON SUBMITTED MATTER / INVERSE CONDEMNATION MOTIONS - CCP § 583

arguing inverse condemnation liability only lies where a defendant has used eminent domain or joint action to obtain the land where its instrumentality was housed. This assessment of *Cantu* misses the mark, as only the holding of a case is authoritative. (*Consumer's Lobby Against Monopolies v. Public Utilities Com.* (1979) 25 Cal. 3d 891, 902 ["The doctrine of stare decisis applies only to judicial precedents, i.e., to the ratio decidendi or actual ground of decision of a case cited as authority."].)

In *Cantu*, the Court stated it had found no case imposing liability without a finding of eminent domain or joint action. However, immediately afterwards it stated "[the] connection from these homes to a distribution line is a *private service* to which eminent domain and inverse liability principles do not apply." (*Cantu* at 165 [emphasis added.].)

In *Cantu*, the central question was whether the use was private, not whether the defendant used eminent domain or joined in government action. As such, further statements in *Cantu* regarding eminent domain and joint action are not controlling.

### 6) Cost Spreading

The court also rejects PG&E's argument the cost-sharing policy underlying inverse condemnation does not apply because it lacks the power to spread the cost of condemnation across the benefitted public.

In *Pacific Bell*, Southern California Edison ("SCE") similarly argued the loss-spreading rationale underpinning inverse condemnation liability did not apply to it because as a public utility it did not have taxing authority and could only raise rates with the approval of California's Public Utilities Commission. But the Court noted the government's delegation to SCE the right and obligation to provide a vital public interest (electricity) did "not remove the policy justifications underlying inverse condemnation liability: that individual property owners should

16

not have to contribute disproportionately to the risks from public improvements made to benefit the community as a whole. (*Belair v. Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550, 558)." (*Pacific Bell, supra*, 208 Cal. App. 4th at p. 1407.)

The court also noted SCE had not pointed to any evidence supporting its implication the PUC would not allow it adjustments to pass on damage liability during its periodic reviews. (*Pacific Bell*, *supra*, 208 Cal. App. 4th at p. 1407.)

Such evidence is similarly lacking here.

### 7)     Sovereign Immunity

PG&E argues the doctrine of inverse condemnation exists, in part, to overcome sovereign immunity, which would otherwise bar recovery in takings cases. This may be true, but overcoming sovereign immunity is not the only justification for imposing liability under inverse condemnation. (See *House, supra*, 25 Cal. 2d at 396-397; *Barham, supra*, 74 Cal. App. 4th at 752.)

Furthermore, the sole case PG&E cites is inapposite on the facts. In *Customer Co.* the Supreme Court declined to extend inverse condemnation liability to police officers who damaged property in their efforts to enforce the law. (*Customer Co. v. City of Sacramento* (1995) 10 Cal. 4th 368, 404-405.)  Indeed, in declining to apply inverse condemnation to police activities,  the Court recognized inverse condemnation typically deals with "the taking or damaging of private property in connection with public improvement projects," which is precisely the subject at issue here. (*Id* at 377.)

For all these reasons, the court finds PG&E may be held liable under a claim of inverse condemnation for the damages alleged here, notwithstanding the fact it is a privately-owned utility.

17

1

2

**B.     The Butte Fire Was Caused By A Public Improvement As Deliberately
Designed And Constructed By PG&E**

3

Without conceding it may be liable as a privately held utility, PG&E also argues Plaintiffs

4

fail to show the Butte Fire was caused by a public improvement as deliberately designed and

5

constructed.

6

PG&E contends California's appellate courts have imposed inverse condemnation liability

7

in only a handful of scenarios where the harm was caused by: (1) the public improvement's

8

intended design or operation; (2) its construction; or (3) deliberate failure to maintain the

9

improvement. PG&E argues none of these limited scenarios is present here.  PG&E argues

10

Plaintiffs at best allege only negligence by PG&E, which alone is insufficient to support inverse

11

condemnation liability.

12

Again the court is not persuaded.

13

PG&E argues Plaintiffs fail to show the deliberate design and construction of PG&E's

14

electrical lines caused any harm. (PG&E Opp. p.3:17-25.)  In this respect, PG&E contends

15

Plaintiffs must show PG&E deliberately designed its power lines with a deficiency that inevitably

16

would lead to a fire.  This is not the correct or applicable standard.

17

PG&E alternatively relies upon the reasonableness and thorough execution of its

18

Vegetation Management Program, as an implicit component of its design of the improvement.

19

PG&E essentially contends that since its Vegetation Management Program is reasonable, and that

20

program has not been deliberately abandoned or discontinued, that component of the design also

21

did not cause the fire. This alternative proposition is also not persuasive on the issue of causation

22

and deliberate design.

23

24

25

18

26
RULING ON SUBMITTED MATTERS / INVERSE CONDEMNATION MOTIONS §§ CP 43.1

### 1) Causation Standard

Inverse condemnation is a species of eminent domain actions created by article 1, section 19 of the California Constitution, which states in relevant part: "Private property may be taken or damaged for a public use and only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner." "In the landmark case of *Albers v. County of Los Angeles* (1965) 62 Cal.2d 250, 263-264 . . . [the California Supreme Court] construed this provision to mean that, with [certain] exceptions, 'any actual physical injury to real property proximately caused by [a public] improvement as deliberately designed and constructed is compensable under article I, section 14, of our Constitution whether foreseeable or not.'" (*Belair, supra,* 47 Cal.3d at 558.) However, the deliberateness requirement is satisfied by a public improvement that, as designed and constructed presents inherent risks of damage to private property, and the inherent risks materialize and cause damage. [Citation.]" (*Pacific Bell, supra,* 81 Cal.App.4th at 607.)

The Supreme Court "defined and clarified the element of proximate causation" in *Belair.* (*California State Auto. Ass'n Inter-Ins. Bureau v. City of Palo Alto ("CSAA")* (2006) 138 Cal.App.4th 474, 480.) The Supreme Court explained:

> [I]n order to establish [the requisite] causal connection between the public improvement and the plaintiff's damages, there must be a showing of "'a substantial cause-and-effect relationship excluding the probability that other forces alone produced the injury.' [Citations.]" [Citation.] Where independently generated forces not induced by the public . . . improvement . . . contribute to the injury, proximate cause is established where the public improvement constitutes a substantial concurring cause of the injury, i.e., where the injury occurred in substantial part because the improvement failed to function as it was intended.

19

(*Belair, supra,* 47 Cal.3d at 559-560.) Stated similarly in *CSAA*, "[a] public improvement is a 'substantial concurring cause' if other forces alone would not have caused the damage and the public improvement failed to function as intended." (*CSAA, supra,* 138 Cal.App.4th 508.)

Plaintiffs argue here, "the function of PG&E's Electra 1101 Circuit is to transmit electrical power to members of the public in a safe manner, without causing a fire. Under these circumstances, when the subject tree (even a green healthy one, maintained under the PG&E Vegetation Management Program) made contact with PG&E's power line and started the Butte Fire, the power line clearly failed to function as it was intended." (Plaintiffs' Opp., p. 12:1-10.) Plaintiffs note one of PG&E's "persons most qualified" testified if the Electra 1101 circuit was not there, the falling of the Subject Tree would not have caused a fire. (Simon Decl., ¶ 24, Ex. W, pp. 37:12-38:24.) This conclusion seems inescapable.

The court finds the deliberateness requirement is satisfied by PG&E's electrical system because, as designed and constructed, the public improvement presented inherent risk of damage to private property by fire on the easement and beyond. Further, the court also finds the risk inherent in the system's design and construction materialized, proximately causing the Butte fire.

PG&E installed and operated electric distribution lines serving over 3,600 customers, spanning miles of forest lands. The system as designed had the inherent risk trees could come into contact with the power lines and initiate a fire – hence the Vegetation Management Program. Given the placement of the system, and its vulnerability to contact with vegetation, the risk of fire was inherent. In the fullness of time, contact between the lines and a tree was inevitable. That risk materialized as the Butte Fire.

Alternatively, to the extent liability also depends upon the system failing to function as intended (which is not clear), the system is also found to have failed to function as intended: It was intended to transmit electricity without starting a fire.

20

### 2) The Reasonableness Standard for Inverse Condemnation Applied In Flood Control Cases Is Not Applicable

Much of the evidence PG&E proffered goes to its Vegetation Management Program. PG&E argued the reasonable efforts it takes to manage vegetation near its improvements to reduce the risk of fire should be considered in determining whether it is liable for inverse condemnation for damage caused by a fire occurring despite its efforts. (PG&E MPA, p.8:1-11:1, and fn. 11.)

However, the reasonableness of PG&E's maintenance of the natural environment surrounding its improvement is not a consideration for inverse condemnation liability in this context. Instead, as Plaintiffs argue, the strict liability standard applies here.

In *Pacific Bell*, SCE relied upon the long evolving line of ***flood-control*** inverse condemnation cases to argue a reasonableness standard should apply to its operation of privately owned high voltage power lines. The Court rejected this argument, explaining the special reasonableness standard applicable to flood-control cases does not apply outside that special context. (*Pacific Bell, supra,* 208 Cal. App. 4th at pp 1409-1411, citing *Pacific Bell Telephone Co. v. City of San Diego* (2000) 81 Cal.App.4th 596, 614-615.)

After reviewing the genesis of the flood-control standard and the reasoning of the seminal authorities, the Court in *Pacific Bell* concluded the "concerns that animated the rejection of the strict liability rule in the context of public flood control projects has no counterpart here" where the risk to Pacific Bell's facility of injury from ground faults was not a risk it was exposed to in the absence of Edison's electrical facility." (*Pacific Bell, supra,* 208 Cal. App. 4th at pp 1409-1411 citing *Pacific Bell Telephone Co. v. City of San Diego, supra,* 81 Cal.App.4th at 614-615.)

The same reasoning holds here. Unlike the common enemy of flood waters, the risk of wildfire from falling trees was not a risk Plaintiffs were exposed to in the absence of PG&E's

21

electrical improvements.

## IV.
## Conclusion

For the foregoing reasons, Plaintiffs' motion for a finding that PG&E is liable in inverse condemnation is granted. Plaintiffs' motion for a similar finding as to the Pacific Gas & Electric Corporation is denied.

PG&E's competing motion for a legal determination that it is not liable in inverse condemnation is denied.

Plaintiffs' counsel shall prepare an order for the court's signature pursuant to California Rules of Court, rule 3.1312.

DATED:    June 22, 2017

Judge Allen Sumner
Superior Court of California,
County of Sacramento

22

FILED / ENDORSED

JUN 2 2 2017

By _____ Deputy Clerk

1  Steven M. Campora (SBN 110909)
**DREYER BABICH BUCCOLA**
2  **WOOD & CAMPORA LLP**
20 Bicentennial Circle
3  Sacramento, CA 95826
Telephone: (916) 379-3500
4  scampora@dbbwc.com

5  Dario de Ghetaldi (SBN 126782)
Amanda L. Riddle (SBN 215221)
6  **COREY, LUZAICH, DE GHETALDI,**
**NASTARI & RIDDLE LLP**
7  700 El Camino Real, Millbrae, CA 94030-0669
deg@coreylaw.com; alr@coreylaw.com
8  **Co-Liaison Counsel for Individual Plaintiffs**

9  Kenneth R. Chiate (SBN 39554)          Gayle L. Gough (SBN 154398)
Jeffrey N. Boozell (SBN 199507)        Joel B. Crane (SBN 271699)
10 **QUINN EMANUEL URQUHART & SULLIVAN, LLP**  **GOUGH & HANCOCK, LLP**
865 South Figueroa Street, 10th Floor  Two Embarcadero Center, , Suite 640
11 Los Angeles, CA 90017                  San Francisco, CA 94111 Telephone:
Telephone: (213) 443-3000              (415) 848-8900
12 kenchiate@quinnemanuel.com            gayle.gough@ghcounsel.com
jeffboozell@quinnemanuel.com          joel.crane@ghcounsel.com
13 **Counsel for Defendants Pacific Gas and**
**Electric Company and PG&E Corporation**
14

15         **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

16              **FOR THE COUNTY OF SACRAMENTO**

17 Coordination Proceeding Special Title   ) Assigned to the Honorable Allen H. Sumner
(Rule 3.550)                            ) Case No. JCCP 4853
18                                         )
                                          )
19    BUTTE FIRE CASES.                   ) **STIPULATION AND [PROPOSED]**
                                          ) **ORDER REGARDING PLAINTIFFS'**
20                                         ) **PROPOSED MOTION FOR**
                                          ) **DETERMINATION OF INVERSE**
21 _____ ) **CONDEMNATION LIABILITY (C.C.P. §**
                                          ) **1260.040)**
22

23

24

25

26

27

28

_____
        STIP AND ORDER RE PLAINTIFFS' MOTION RE INVERSE CONDEMNATION   Butte Fire Cases
                                                                        JCCP 4853

WHEREAS:

1.  Individual Plaintiffs and Defendant PG&E (the "Parties") are parties to a Judicial Counsel Coordination Proceeding pursuant to Code of Civil Procedure § 404, *et seq.*, known as the *Butte Fire Cases*, JCCP 4853 (the "Coordination Proceeding"); and

2.  The Coordination Proceeding includes numerous common issues that were alleged in the Individual Plaintiffs' Master Complaint and the Parties desire to have the Court make certain legal determinations in advance of any trial of any of the claims in the Coordination Proceeding, which determinations will apply to any and all claims currently made in the Coordination Proceeding; and

3.  One common issue is whether Defendant PG&E is subject to inverse condemnation liability based on allegations in Individual Plaintiffs' Master Complaint that damage to their property allegedly was caused by the conduct of Defendant PG&E and that, as a result, Plaintiffs are entitled to damages according to proof; and

4.  Certain individual plaintiffs have adopted the Cause of Action for Inverse Condemnation as stated in the Individual Plaintiffs' Master Complaint by way of their respective Adoption Complaints (the "Moving Plaintiffs")[1]; and

5.  The Moving Plaintiffs intend to bring in the Coordination Proceeding a Motion for Determination of Inverse Condemnation Liability pursuant to Code of Civil Procedure § 1260.040 seeking a determination from this Court that Defendant PG&E is liable for inverse condemnation (the "Master Motion"); and

6.  To prevail on such motion, each Moving Plaintiff must establish that their real and/or personal property was damaged in the Butte Fire, and;

7.  Absent this stipulation, in order to establish such damage, each Moving Plaintiff

---

[1] The Subrogation Plaintiffs are in the process of finalizing their settlement with Defendants and will not be Moving Plaintiffs in this instance.

-1-

1    would be required to present evidence in the form of declarations of specific damages to that

2    Plaintiff's property, and;

3        8.   In order to expedite the Court's determination of Plaintiff's entitlement or lack of

4    entitlement to recover damages under the Cause of Action for Inverse Condemnation through the

5    Master Motion, the Parties wish to avoid the necessity of individual declarations concerning

6    damages from each of the Moving Plaintiffs.

7        Accordingly, the Parties agree as follows:

8        1.   In support of the Master Motion, only Plaintiffs Larry and Karen Carr,

9    Florencio and Martha Garcia, Robert and Barbara Garibaldi, Edward and Laura Miser, Ronald

10   and Darunee Rogers, and Barbara Rose (collectively "August 11th Plaintiffs") will submit

11   evidence that their real and/or personal property was damaged in the Butte Fire;

12       2.   If the Court determines that Defendant PG&E is liable for inverse

13   Condemnation, that determination pursuant to the Master Motion will be binding as between

14   PG&E and all Moving Plaintiffs presently in the Coordination Proceeding;

15       3.   If the Court determines that Defendant PG&E is liable for inverse condemnation and

16

17   notwithstanding the fact that such determination of liability shall be binding as between the

18   Moving Plaintiffs and PG&E presently in the Coordination Proceeding, August 11th Plaintiffs

19   still have the burden of proving the amount of their damages, and the remaining Moving

20   Plaintiffs still have the burden of proving that their real and/or personal property was damaged in

21   the Butte Fire and the amount of their damages, and;

22       4.       This Stipulation and [Proposed] Order shall not affect any party's rights to move

23   for reconsideration, to appeal, to challenge any rulings, or to seek any subsequent orders as may

24   be permitted by law, all of which are preserved.

25   /  /  /

26   /  /  /

27   /  /  /

28

-2-
STIP AND ORDER RE PLAINTIFFS' MOTION RE INVERSE CONDEMNATION

1       5. The Stipulation may be executed in counter-parts and facsimile signatures may be

2  deemed original signatures.

3  Dated: May 22, 2017           By:

Steven M. Campora

Dreyer Babich Buccola Wood & Campora, LLP
Co-Liaison Counsel for Individual Plaintiffs

Dated: May 22, 2017           By:

Amanda L. Riddle

Corey, Luzaich, de Ghetaldi, Nastari & Riddle LLP
Co-Liaison Counsel for Individual Plaintiffs

Dated: May 22, 2017           By:

Kenneth R. Chiate

Quinn Emanuel Urquhart & Sullivan LLP
Counsel for Defendant PG&E

Dated: May 22, 2017           By:

Gayle L. Gough

Gough & Hancock LLP
Counsel for Defendant PG&E

IT IS SO ORDERED.

DATED:   6/22/17

By

HON. ALLEN H. SUMNER
Judge of the Superior Court

-3-

STIP AND ORDER RE PLAINTIFFS' MOTION RE INVERSE CONDEMNATION

**ELECTRONIC PROOF OF SERVICE**

I, Diana Prisk, hereby declare as follows:

    I am employed by Corey, Luzaich, de Ghetaldi, Nastari & Riddle LLP, 700 El Camino Real, Millbrae, California, 94030. I am over the age of 18 years and am not a party to this action. On May 22, 2017, I caused service of true and correct copies of the following:

**STIPULATION AND [PROPOSED] ORDER REGARDING PLAINTIFFS'**

**PROPOSED MOTION FOR DETERMINATION OF INVERSE CONDEMNATION**

**LIABILITY (C.C.P. § 1260.040)**

    On the interested parties in this action pursuant to the most recent Omnibus Service List by submitting an electronic version of the document(s) via file transfer protocol (FTP) to CaseHomePage through the upload feature at www.casehomepage.com.

    I declare under penalty of penalty of perjury pursuant to the laws of the State of California that the foregoing is true and correct.

    Executed at Millbrae, California, on May 22, 2017.

_____
Diana Prisk

-4-

STIP AND ORDER RE PLAINTIFFS' MOTION RE INVERSE CONDEMNATION

Exhibit 6

FILED
ENDORSED

MAY - 1 2018

By _____ M. GARCIA
Deputy Clerk

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF SACRAMENTO**

**BUTTE FIRE CASES**

**Case No.: JCCP 4853**

**RULING ON SUBMITTED MATTER: PG&E'S RENEWED MOTION FOR A LEGAL DETERMINATION OF INVERSE CONDEMNATION LIABILITY PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 1260.040**

On April 26, 2018, the court heard the Renewed Motion by Pacific Gas and Electric Company ("PG&E") for a Legal Determination of Inverse Condemnation Liability. PG&E renews its motion for a legal determination of inverse condemnation liability under Code of Civil Procedure section 1008, subdivision (b), "on the ground that new facts have materialized since the Court's ruling on [its] previous motion." (PG&E's Renewed Mot. ("Mot.") 1:3-6.)[1] PG&E also requests the court sua sponte reconsider and deny plaintiffs' cross-motion. (*Id.* at 1:6-8.)

The parties appeared and presented oral argument.

The court, having fully considered the arguments of all parties, both written and oral, as well as the evidence submitted, affirms its tentative ruling, as supplemented concerning the parties' requests for judicial notice and evidentiary objections. The court also denies PG&E's request to certify its order to the Court of Appeal under section 166.1.[2]

---

[1] All statutory references are to the Cod of Civil Procedure unless otherwise specified.

[2] Additional minor changes have been made to the tentative ruling, including correcting the two errors discussed during the April 26, 2018 hearing.

1

RULING ON SUBMITTED MATTER

## Introduction

Whether PG&E, a privately owned public utility, ***should*** be liable under the doctrine of inverse condemnation for damages caused by the Butte Fire is a question of public policy to be addressed to the Legislature. Whether PG&E ***is*** liable for inverse condemnation damages under present controlling appellate case law is a question of law this court must decide. (See *People v. McGuire* (1872) 45 Cal. 56, 57-58 ["*Nisi prius* Courts are not at liberty to set aside or disregard the decisions of [a court of superior jurisdiction] because it may seem to them that the decisions are unsound. Until reversed or modified . . . , [a] decision[] must be accepted by all inferior tribunals."].)

## Factual Background

A. **Procedural History**

Plaintiffs and PG&E filed competing motions under section 1260.040 seeking a legal determination on whether PG&E is liable for inverse condemnation damages caused by the Butte Fire. Hearing on the competing motions was held June 16, 2017.

On June 22, 2017, the court issued its Ruling on Submitted Matter: Inverse Condemnation Motions ("Ruling"), granting plaintiffs' motion for a finding PG&E is liable in inverse condemnation and denying PG&E's competing motion for a legal determination it is not liable.[3] Specifically, the court found (1) PG&E may be held liable for inverse condemnation under California law even though it is a privately owned public utility, and (2) the Butte Fire was caused by a public improvement as deliberately designed and constructed by PG&E. The June 22, 2017 Ruling, attached hereto as Exhibit A, states in relevant part:

---

[3] The court denied plaintiffs' motion as to the Pacific Gas & Electric Corporation.

2

RULING ON SUBMITTED MATTER

## A. A Privately Owned Public Utility May Be Liable For Inverse Condemnation

### 1) Private Utilities

California courts have long found public and quasi-public entities responsible for damages under inverse condemnation. (See, e.g., *Eachus v. Los Angeles Consolidated Elec. Ry. Co.* (1894) 103 Cal. 614 [railroad liable for cutting off access to a public road.].)

Courts have repeatedly classified utilities as "public entities." (*Barham v. Southern Cal. Edison Co.* (1999) 74 Cal. App. 4th 744, 752 (1999); *Gay Law Students Assn. v. Pac Tel. & Tel. Co.* (1979) 24 Cal. 3d 458, 470; *Pac. Bell Tel. Co. v. Pac. Gas and Electric Co.* (2012) 208 Cal. App. 4th, 1400 ["*Pacific Bell*"]; *Sheffet v. City of Los Angeles* (1970) 3 Cal. App. 3d 720, 732.)

More specifically, under California law the proposition a privately-owned public utility such as PG&E may be held liable for inverse condemnation is now solidly established. (*Barham v. Southern California Edison Co., supra,* 74 Cal.App.4th 744, 753; *Pacific Bell, supra,* 208 Cal. App. 4th 1400.)

The Court in *Barham* found no "significant differences" between a privately held public utility and a publicly held utility for the purpose of inverse condemnation liability. (*Barham, supra,* 74 Cal.App. 4th at 753.) Rather, the Court cited the California Supreme Court's holding in *Gay Law Students Assn. v. Pac Tel. & Tel. Co., supra,* 24 Cal. 3d 458 that a public utility is a "state actor" when hiring its employees. (*Barham* at 753.) In *Gay Law Students*, the Supreme Court found "...the breadth and depth of governmental regulation of a public utility's business practices inextricably ties the state to a public utility's conduct..." (*Gay Law Students, supra,* 24 Cal.3d at 470.)

The Fourth District is not alone in this line of reasoning. In *Pacific Bell*, the Second District adopted *Barham's* reasoning in finding the quasi-monopolistic nature of Southern California Edison rendered it a public entity. (*Pac. Bell, supra,* 208 Cal. App. 4th at 1405.) The Court explained: "[A] public utility's monopolistic or quasi-monopolistic authority ... derives directly from its exclusive franchise provided by the state."(*Id.* at 1406.)

PG&E argues repeatedly the California Supreme Court itself has not found a privately held public utility liable under inverse condemnation. This is true, but not dispositive.

PG&E argues the appellate courts in *Barham* and *Pacific*

3

RULING ON SUBMITTED MATTER

1    *Bell* improperly extended the holding of *Gay Law Students* beyond the employment context. PG&E cites *Automatic Sprinkler Co. v.*

2    *Southern Cal. Edison Co.* (1989) 216 Cal. App. 3d 627, 633 for its argument. However, *Automatic Sprinkler* ultimately turned on a

3    specific statutory scheme, not application of *Gay Law Students*. (*Automatic Sprinkler* at 633.) Furthermore, the very same Court of

4    Appeals declined to extend the conclusions in *Automatic Sprinkler* to *Barham*. (*Barham, supra*, 74 Cal. App. 4th at 753.)

5

6    PG&E also cites language from the Third District Court of Appeal's decision in *Bach v. County of Butte, supra*, 215 Cal.App.

7    3d at 307: "…it is elementary that an inverse condemnation action … requires state action and, therefore, cannot be asserted against

8    private parties." The court does not find this general statement controlling.

9    Plaintiffs in *Bach* sought to sue their neighbors in inverse condemnation for the neighbors' complaint to the county the Bachs

10    were operating a law practice out of their home in violation of zoning regulations. The Court of Appeal's summary dismissal of

11    Bachs' "ill-conceived, frivolous" argument (*Bach, supra*, 215 Cal.App.3d at 307) is of little guidance in assessing PG&E's

12    liability for damages resulting from operation of its power lines.

13    **2)   Risk Sharing**

14    Over 70 years ago Justice Roger Traynor explained the fundamental public policy underlying the principle of liability for

15    inverse condemnation:

16    The construction of the public improvement is a deliberate operation of the state or its agency in

17    furtherance of public purposes. In erecting a structure that is inherently dangerous to private

18    property, the state or its agency undertakes by virtue of its constitutional provision to compensate

19    property owners for injury to their properly arising from the inherent dangers of public improvement ….

20    The decisive consideration is the effect of the public improvement on the property and whether the owner

21    of the damaged property if uncompensated would contribute more than his proper share to the public

22    undertaking. It is irrelevant whether or not the injury to the property is accomplished by a corresponding

23    benefit to the public purpose to which the improvement is dedicated, since the measure of

24    liability is not the benefit derived from the property, but the loss to the owner.

4

25

26

RULING ON SUBMITTED MATTER

(*House v. Los Angeles Co. Flood Control Dist.* (1944) 25 Cal.2d 384, 396-397 [conc. opn. of Traynor, J.)

The Butte Fire occurred when a tree came into contact with a power line PG&E operates providing electrical service to over 3,640 customers on that line. The court finds if the individual property owners damaged here were to absorb that loss, they would be contributing more than their "proper share" to the cost of this undertaking. As the Court explained in *Pacific Bell, supra*, 208 Cal. App. 4th at 1408:

> For an owner whose property is damaged by the operation of a utility, he or she suffers a disproportionate share of the cost of the public improvement regardless of whether the utility is governmentally or privately owned. We do not believe the happenstance of which type of utility operates in an area should foreclose a property owner's right to just compensation under inverse condemnation for the damage, interest and attorney fees and should limit the property owner to traditional tort remedies.

**3) Public Improvement**

. . . .

**4) Public Policy**

PG&E is subject to inverse condemnation liability despite the fact it is a privately-owned public utility. The policy reasons underlying the just compensation right in inverse condemnation do not dictate a different conclusion.

PG&E argues because it is a privately-owned utility, the traditional policy justifications for inverse condemnation should not apply in this case because: (1) PG&E did not obtain the land upon which its line is located through eminent domain or joint action with the state; (2) PG&E does not enjoy sovereign immunity; and (3) PG&E does not have authority to spread the cost of any award to all its customers.

The court is not persuaded.

**[(a)] Eminent Domain**

5

. . . .

### [(b)]   Cost Spreading

The court also rejects PG&E's argument the cost-sharing policy underlying inverse condemnation does not apply because it lacks the power to spread the cost of condemnation across the benefitted public.

In *Pacific Bell*, Southern California Edison ("SCE") similarly argued the loss-spreading rationale underpinning inverse condemnation liability did not apply to it because as a public utility it did not have taxing authority and could only raise rates with the approval of California's Public Utilities Commission [("PUC")]. But the Court noted the government's delegation to SCE the right and obligation to provide a vital public interest (electricity) did "not remove the policy justifications underlying inverse condemnation liability: that individual property owners should not have to contribute disproportionately to the risks from public improvements made to benefit the community as a whole. (*Belair v. Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550, 558)." (*Pacific Bell, supra*, 208 Cal. App. 4th at p. 1407.)

The court also noted SCE had not pointed to any evidence supporting its implication the PUC would not allow it adjustments to pass on damage liability during its periodic reviews. (*Pacific Bell, supra,* 208 Cal. App. 4th at p. 1407.)

Such evidence is similarly lacking here.

### [(c)]   Sovereign Immunity

. . . .

For all these reasons, the court finds PG&E may be held liable under a claim of inverse condemnation for the damages alleged here, notwithstanding the fact it is a privately-owned utility.

(June 22, 2017 Ruling at pp. 11-17.)

### B.   San Diego Gas & Electric Company's PUC Application

In September 2015, San Diego Gas & Electric Company applied for approval from the California Public Utilities Commission ("PUC") to recover as rate increases its costs and legal fees incurred in settling damage claims arising from three wildfires, collectively referred to as the

6

1  "2007 Southern California Wildfires." Inverse condemnation was a cause of action alleged

2  against San Diego Gas & Electric Company in the San Diego County coordinated proceedings

3  arising out of those fires.

4      In a Decision issued November 30, 2017, the PUC denied San Diego Gas & Electric

5  Company's application ("Decision"), holding the company "did not reasonably manage and

6  operate its facilities prior to the 2007 Southern California Wildfires." (PUC Decision 17-11-033,

7  at p. 2, attached as Ex. G to the Decl. of Jeffrey N. Boozell ("Boozell Decl.").) In its Decision the

8  PUC stated "Inverse Condemnation principles are not relevant to a Commission reasonableness

9  review under the prudent manager standard." (*Id.* at p. 65.)

10      PG&E contends the Decision was the first time the PUC "announced . . . that the cost

11  spreading rational for inverse condemnation has no bearing" on the PUC's approval of rate

12  increases. PG&E argues this declaration by the PUC is a new fact coming after this court's

13  Ruling, which "unambiguously establishes that the fundamental policy underlying the doctrine of

14  inverse condemnation has no application to private utilities such as PG&E." (Mot. 2:9-13.)

15  **Legal Standard**

16      Section 1008, subdivision (b), permits a party "who originally made an application for an

17  order which was refused in whole or part . . . [to] make a subsequent application for the same

18  order upon new or different facts, circumstances, or law." Unlike a motion for reconsideration

19  under section 1008, subdivision (a), there is no time limit for PG&E to renew its previous motion.

20  (*Stephen v. Enterprise Rent-A-Car* (1991) 235 Cal.App.3d 806, 816.)

21  **Discussion**

22      A.    **Deciding Inverse Condemnation Liability under Section 1260.040**

23      As discussed in the court's June 22, 2017 Ruling, in their initial motions the parties agreed

24  the court had authority pursuant to section 1260.040 to rule upon the question of liability for

25  7

1   inverse condemnation presented by their competing motions. (June 22, 2017 Ruling at p. 2.) At

2   that time, only one Court of Appeal had addressed the application of section 1260.040. In *Dina v*

3   *People ex rel. Department of Transportation* (2007) 151 Cal.App.4th 1029 ("*Dina*"), the Second

4   Appellate District held the trial court properly determined the legal issue of liability for inverse

5   condemnation pursuant to the motion procedure afforded by section 1260.040. (*Dina* at 1047.)

6   However, after this court's June 22, 2017 Ruling and PG&E filed its renewed motion, the

7   Fourth Appellate District expressly disagreed with *Dina*, stating "we part company with *Dina* in

8   interpreting section 1260.040 to authorize pretrial liability determinations" in an inverse

9   condemnation action. (*Weiss v. People ex rel. Dep't of Transp.* (2018) 20 Cal.App.5th 1156, 1175

10  ["*Weiss*"].) The Court stated, "Code of Civil Procedure section 1260.040 does not provide for a

11  nonsuit or other dispositive motion to resolve liability in limine in inverse condemnation actions,

12  and we decline to judicially create such a procedure." (*Id.* at 1166.)

13  In light of the recent split of authority on whether the issue of inverse condemnation

14  liability may be decided under section 1260.040, the court allowed the parties to file supplemental

15  briefing on the issue.

16  Plaintiffs maintain *Weiss* correctly interpreted the application of section 1260.040 and

17  argue the court may not hear PG&E's renewed motion because using section 1260.040 to

18  determine inverse condemnation liability "is improper and a violation of due process." (Pls.'

19  Supp. Br. 1:9-14, 5:17-19.) Although plaintiffs contend utilizing section 1260.040 to determine

20  inverse condemnation liability is improper, they say nothing concerning the continued validity of

21  the court's June 22, 2017 Ruling in their favor – rendered pursuant to section 1260.040 at their

22  urging.

23  In contrast, PG&E argues the court should continue to view this case as controlled by

24  *Dina* in light of the parties' representations and the court's "reliance and substantial investment of

25  8

RULING ON SUBMITTED MATTER

1    time and resources on the assumption that *Dina* controls."[4] (PG&E's Supp. Br. 2:6-13.)

2    Alternatively, PG&E argues if the court follows *Weiss* rather than *Dina* to deny PG&E's renewed

3    motion, the court must then vacate its June 22, 2017 Ruling. (*Id.* at 2:14-17.)

4         Assuming, arguendo, the *Dina* court correctly decided section 1260.040 can be used to

5    decide inverse condemnation liability pre-trial, the court nevertheless finds PG&E loses on the

6    merits of its renewed motion. Therefore, the court need not decide which Court of Appeal

7    decision to follow regarding section 1260.040.[5]

8         **B.     Requests for Judicial Notice**

9         Plaintiffs and PG&E filed Requests for Judicial Notice in support of their briefing.

10        PG&E's requests the court take judicial notice of the PUC's Decision and the December

11   26, 2017 Concurrence of Commissioners Picker and Aceves are GRANTED. (See *People ex rel.*

12   *Orloff v. Pacific Bell* (2003) 31 Cal.4th 1132, 1143, fn.4.)

13        The parties' remaining requests are denied as irrelevant to the court's decision.

14        **C.     Evidentiary Objections**

15        The court rules on plaintiffs' evidentiary objections as follows:

16        Plaintiffs' Objection No. 9 to Exhibit G to the Boozell Declaration (the PUC Decision)

17   _____

18   [4]   In its supplemental brief, PG&E "reserve[d] the right to argue in another case . . . that the
     conflicting view of law[, i.e., *Weiss*,] represents the better-reasoned decision." (PG&E Supp. Br.
     2:10-13.)

19
     [5]   Further, the court finds the due process concerns plaintiffs raise in their supplemental brief are
20   not at issue here given the circumstances and procedural history of this coordinated proceeding.
          PG&E's renewed motion does not concern disputed facts, nor does it require the court to
21   weigh evidence. Thus, the Court of Appeal's concern in *Weiss* with the impropriety of using
     section 1260.040 to resolve disputed factual issues does not apply here. Rather, the court is
22   deciding a legal issue - whether under existing California law a privately owned public utility can
     be held liable for inverse condemnation.
23        Additionally, plaintiffs cannot argue they are now prejudiced by using the very procedure they
     initially requested.

24

25                                              9

1   and Objection No. 10 to Exhibit H to the Boozell Declaration (the December 26, 2017

2   Concurrence) are OVERRULED.

3       The court does not rule on plaintiffs' remaining evidentiary objections since they concern

4   evidence not considered or otherwise material to this motion.

5      **D.**    **PG&E's Renewed Motion**

6          **1)**    **The PUC's Decision**

7       PG&E argues renewal of its motion for a legal determination of inverse condemnation

8   liability is permitted given the PUC's announcement for the first time in its November 2017

9   Decision that the cost-spreading rational for inverse condemnation has "no bearing" on the PUC's

10   obligation to allow utilities to recover only reasonably and prudently incurred costs. (Mot. 2:6-8.)

11   PG&E argues:

12              On June 22, 2017, the Court concluded that the doctrine of inverse condemnation applies to PG&E with respect to the Butte Fire. The Court rejected PG&E's argument that inverse condemnation is not properly applied to a private utility such as PG&E because, unlike a public utility, PG&E lacks the power unilaterally to spread the costs of inverse condemnation across the benefitted public. The Court relied on two intermediate court decisions that found that private utilities could be held liable for inverse condemnation because, in the view of those courts, there is no salient difference between a public utility (which can automatically pass on inverse damages to the public) and a private utility (which cannot). Critically, this Court held that PG&E had failed to put forth any evidence to support its contention that the [PUC]—the regulatory agency charged with reviewing and approving any rate increases proposed by PG&E—would not allow PG&E to pass on its inverse condemnation liability through rate increases.

21              Such evidence now exists and forms the basis for this Motion. . . .

23              Because the [PUC] must approve private utility rate increases, [its] declaration that it will not automatically allow such utilities to spread inverse losses through rate increases to the customers that benefit from the public improvement unambiguously establishes that the fundamental policy underlying the doctrine of

10

RULING ON SUBMITTED MATTER

inverse condemnation has no application to private utilities such as PG&E. Inverse is premised on automatic cost spreading and this new fact—which did not exist at the time of this Court's decision (or the prior decisions on which this Court relied)—refutes the assumption that a private utility can spread inverse costs in the same way that a public utility can. As a result, PG&E respectfully submits that, in light of this new fact, the prior decisions upon which this Court relied were incorrectly decided and that inverse condemnation cannot apply to a private utility such as PG&E under California law.

(Mot. 1:15-2:18.) PG&E also argues that PUC's declaration inverse condemnation is irrelevant to its rate-making process causes continued application of inverse condemnation to private utilities to violate the California and United States Constitutions. (*Id.* at 10:6-8.)

Plaintiffs argue PG&E's renewed motion fails for seven reasons:[6]

      1)    The court lacks jurisdiction to hear the motion because Public Utilities Code section 1759 vests exclusive jurisdiction to review decisions of the PUC with the Court of Appeal and Supreme Court;

      2)    The only proper procedure to review the PUC Decision is via a writ of review as provided in Public Utilities Code section 1759;

      3)    PG&E's renewed motion is not ripe for adjudication because the PUC's Decision is advisory;

      4)    The PUC's Decision is "not final" and therefore not ripe for review because multiple utilities have applied for rehearing and the PUC has not ruled on those applications;

      5)    PG&E has not presented any "new law" or "new facts," and thus there are no grounds supporting a renewed motion under section 1008;

---

[6]    The County of Calaveras filed a Joinder in Opposition to PG&E's renewed motion. The joinder was not considered since the County of Calaveras is not currently a party to the coordinated proceeding.

11

1    6)    PG&E's renewed motion is unsupported by competent evidence; and

2    7)    There has been no change in the controlling appellate case law, and

3  therefore, the doctrine of stare decisis compels this court to continue to follow it.

4  (Pls.' Opp'n 1:2-18.)

5    The court need not address plaintiff's first six arguments because the court concludes two

6  decisions of the Court of Appeal holding privately owned public utilities can be liable under the

7  doctrine of inverse condemnation are still controlling authority this court must follow.[7]  (*Barham*

8  *v. Southern California Edison Company* (1999) 74 Cal.App.4th 744 ["*Barham*"] and *Pacific Bell*

9  *Telephone Company v. Southern California Edison Company* (2012) 208 Cal.App.4th 1400

10  ["*Pacific Bell*"].)  The PUC's statement in its Decision that inverse condemnation principles "are

11  not relevant" to the PUC's rate review does not "fairly distinguish" this case from the facts or

12  rulings in *Barham* and *Pacific Bell*.  Accordingly, PG&E's renewed motion is DENIED.

13    **2)    Stare decisis**

14    Under the doctrine of stare decisis, tribunals exercising "inferior jurisdiction" must follow

15  decisions of courts exercising superior jurisdiction.  Our Supreme Court directs: "Decisions of

16  every division of the District Courts of Appeal are binding upon . . . all the superior courts of this

17  state, and this is so whether or not the superior court is acting as a trial or appellate court." (*Auto*

18  *Equity Sales, Inc. v. Super. Ct.* (1962) 57 Cal.2d 450, 455.) "Courts exercising inferior

19  jurisdiction must accept the law declared by courts of superior jurisdiction. It is not their function

20  to attempt to overrule decisions of a higher court." (*Ibid.;* accord *Lafferty v. Wells Fargo Bank*

21  _____

22  [7] The court recognizes the jurisdiction and independence of the PUC and a superior court's
inability to "review" a PUC decision. (Pub. Util. Code, § 1759, subd. (a).) However, PG&E's
23  renewed motion does not call upon the court to review the PUC's November 2017 Decision in
violation of the Public Utilities Code. (See, e.g., *Breidert v. S. Pacific Co.* (1964) 61 Cal.2d 659,
24  662 [discussing the respective jurisdiction of the PUC and courts]; *San Diego Gas & Elec. Co. v.
Super. Ct.* (1996) 13 Cal.4th 893, 916-920.)

12

1 (2013) 213 Cal. App. 4th 545, 569.)

2     In *Barham* the Court of Appeal (Fourth Appellate District) held a privately owned public

3 utility could be liable for inverse condemnation. The Court rejected the utility's argument that

4 inverse condemnation principles should not apply because Southern California Edison ("SCE") is

5 a privately owned public utility, not a public entity. (*Barham* at p. 752.) The Court of Appeal

6 explained:

7         Were we to adopt SCE's position, we would be required to
        differentiate between damage resulting from the operation of a

8         utility based solely upon whether the utility is operated by a
        governmental entity or by a privately owned public utility. Publicly

9         owned electric utilities have been held liable in inverse
        condemnation in situations virtually identical to this case.

10         [Citations.] We are not convinced that any significant differences
        exist regarding the operation of publicly versus privately owned

11         electric utilities as applied to the facts in this case and find there is
        no rational basis upon which to found such a distinction. We

12         conclude, under the factual scenario here present, SCE may be
        liable in inverse condemnation as a public entity. Further, article I,

13         section 19 of the California Constitution and the cases which
        interpret and apply it have as their principal focus the concept of

14         public use, as opposed to the nature of the entity appropriating the
        property.

15

16 (*Id.* at p. 753.)

17     Thirteen years later, the Court of Appeal (Second Appellate District) in *Pacific Bell*

18 agreed with the conclusion reached in *Barham* that a privately owned public utility could be liable

19 under inverse condemnation. (*Pacific Bell* at p. 1404.) The Court of Appeal reasoned:

20         On appeal [SCE] contends that the central case relied upon by the
        trial court in finding [SCE] liable for inverse condemnation,

21         *Barham, supra*, . . . wrongly interpreted Supreme Court precedent
        to hold a privately owned public utility like [SCE] may be liable for

22         inverse condemnation as a public entity. [Citation.] . . . .

23         We find [SCE's] reading of the Supreme Court cases to be
        overly limited and agree with the conclusion reached in *Barham*

24         and by the trial court that [SCE] may be liable under inverse
        condemnation for the damage to Pacific Bell's property.

25

13

26

1

2

. . . .

The *Barham* court found . . . support for its conclusion that [SCE] may be liable for inverse condemnation in the Supreme Court's decision in *Gay Law Students Assn. v. Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458 . . . . In *Gay Law Students Assn.,* the California Supreme Court held that the defendant, "a privately owned public utility, which enjoys a state-protected monopoly or quasi-monopoly," violates the California constitutional equal protection guarantee in article I, section 7 of the state Constitution, when it utilizes its authority arbitrarily to exclude a class of individuals from employment opportunities. [Citation.] The Supreme Court reasoned that the utility was "in many respects more akin to a governmental entity than to a purely private employer" and "the breadth and depth of governmental regulation of a public utility's business practices inextricably ties the state to a public utility's conduct, both in the public's perception and in the utility's day-to-day activities. [Citations]." [Citation.] Of particular significance in this case is that "a public utility's monopolistic or quasi-monopolistic authority … derives directly from its exclusive franchise provided by the state." [Citations.] A public utility's monopoly "is guaranteed and safeguarded by the state Public Utilities Commission, which possesses the power to refuse to issue certificates of public convenience and necessity to permit potential competition to enter" the market. (*Gay Law Students Assn., supra*, 24 Cal.3d at p. 471.)

In the instant appeal, we find that [SCE's] monopolistic or quasi-monopolistic authority, deriving directly from its exclusive franchise provided by the state (see *Gay Law Students Assn., supra*, 24 Cal.3d at p. 471), distinguishes [SCE's] action from the cases it cites rejecting inverse condemnation cases against private parties who do not have such monopolistic authority from the state. [Citation.]

We find further support in *Eachus v. Los Angeles etc. Ry. Co.* (1894) 103 Cal. 614 . . . . [L]ike *Gay Law Students Assn.* the dispositive factor in *Eachus* appears to be the quasi-monopolistic authority and delegated power given to the defendant by the grant of a franchise. In *Eachus, supra*, 103 Cal. 614, the Supreme Court affirmed the award to the plaintiff landowners of inverse condemnation damages under the former takings clause of the California Constitution against a defendant, a railway company that had "received a franchise from the city of Los Angeles to construct a railroad" along the street in front of the plaintiffs' property and, in

14

preparation for construction of the railroad, excavated the middle of the street to its official grade and thereby cut off the plaintiffs' access to the street. (*Eachus, supra*, 103 Cal. at pp. 615–616.) . . . .

"The term 'franchise' ordinarily refers to those services and functions that government itself is obligated to furnish to its citizens, and usually concerns matters of vital public interest such as water, gas, electricity, or telephone services, and the right to use the public streets and ways to bring them to the general public." [Citation.] Here, the government has chosen to grant a franchise and delegate the furnishing of electricity to [SCE] rather than operating the utility itself. Such a delegation does not remove the policy justifications underlying inverse condemnation liability: that individual property owners should not have to contribute disproportionately to the risks from public improvements made to benefit the community as a whole. [Citation.] [SCE] argues that this loss-spreading rationale does not apply because as a public utility it does not have taxing authority and may raise rates only with the approval of California's Public Utilities Commission. We note that in this case the judgment was for $123,841.95 and that [SCE] has not pointed to any evidence to support its implication that the commission would not allow [SCE] adjustments to pass on damages liability during its periodic reviews. [fn.]

As the *Barham* court noted, if we were to adopt [SCE's] position, "we would be required to differentiate between damage resulting from the operation of a utility based solely upon whether the utility is operated by a governmental entity or by a privately owned public utility" but we are "not convinced that any significant differences exist." (*Barham, supra*, 74 Cal.App.4th at p. 753.) For an owner whose property is damaged by the operation of a utility, he or she suffers a disproportionate share of the cost of the public improvement regardless of whether the utility is governmentally or privately owned. We do not believe the happenstance of which type of utility operates in an area should foreclose a property owner's right to just compensation under inverse condemnation for the damage, interest and attorney fees and should limit the property owner to traditional tort remedies. We therefore conclude that [SCE] may be liable for inverse condemnation and affirm the judgment.

(*Id.* at pp. 1404-1408.)

### 3) Distinguishing *Barham* and *Pacific Bell*

The language of *Barham* and *Pacific Bell* must be construed in light of the facts of each

15

1   case because "an opinion's authority is no broader than its factual setting." (*San Diego Cnty.*

2   *Employees Retirement Ass'n v. Cnty of San Diego* (2007) 151 Cal.App.4th 1163, 1183.) Cases do

3   not stand for propositions never considered by the court. (*People v. Frazier* (2005) 128

4   Cal.App.4th 807, 825.)

5       But this court is bound by the holdings of *Barham* and *Pacific Bell* unless the facts here

6   are "fairly distinguishable" from the facts before those Courts. (See, e.g., *People v. Linkenauger*

7   (1995) 32 Cal.App.4th 1603, 1613.) PG&E has not shown the PUC's Decision renders this

8   coordinated proceeding fairly distinguishable from the facts of *Barham* and *Pacific Bell* such that

9   those cases are no longer binding on this court.

10      Although both decisions discuss the cost-spreading policy behind inverse condemnation,

11  the court is not persuaded either decision rested on the assumption that the utility would

12  automatically be able to pass on its losses as rate increases to its customers. For example, in

13  *Barham* the Court discusses as a "principal focus" of cases interpreting inverse condemnation

14  under article 1, section 19 of the California Constitution, the "concept of public use." (*Barham,*

15  *supra,* 74 Cal.App.4th at 753.) Here, like in *Barham*, the plaintiffs' property was taken "for a

16  public use, i.e., the transmission of electric power to the public." (*Id.* at p. 754.)

17      In *Pacific Bell,* the Court highlights the privately owned public utility's "monopolistic or

18  quasi-monopolistic authority, deriving directly from its exclusive franchise provided by the state"

19  as a factor influencing its decision to hold SCE liable for inverse condemnation. (*Pacific Bell,*

20  *supra,* 208 Cal.App.4th at 1406-1407.) The *Pacific Bell* Court explained someone whose

21  property is damaged by operation of a public utility "suffers a disproportionate share of the cost

22  of the public improvement regardless of whether the utility is governmentally or privately

23  owned." (*Id.* at p. 1408.)

24      These premises for finding a privately owned utility liable for inverse condemnation are

25                                          16

26

1  unaffected by the PUC's intervening Decision. Moreover, the *Pacific Bell* Court indicated in a

2  footnote it did "not believe" a municipally owned utility's potential future inability "to spread the

3  cost of public improvements" would "immunize" the utility from inverse condemnation. (*Pacific*

4  *Bell, supra,* 208 Cal.App.4th at 1407, fn. 6.) Even if considered dicta, this statement suggests a

5  utility's ability to pass on its losses as rate increases was not essential to the *Pac Bell* Court's

6  decision.  Merely characterizing the Court of Appeal's observation on this point as dicta does not

7  mean its reasoning is wrong, unreasonable, or should not be considered. (*Sarguy v. Resolution*

8  *Trust. Corp.* (1992) 8 Cal.App. 4th 1039, 1045-1046.)

9          **4)**    **PG&E's Constitutional Arguments**

10       PG&E additionally argues if inverse condemnation continues to apply to a privately held

11  public utility after the PUC's Decision, such liability would constitute an uncompensated taking

12  in violation of the Fifth Amendment of the United States Constitution and Article I, Section 19 of

13  the California Constitution or, in the alternative, would be arbitrary and irrational, and therefore

14  violate PG&E's substantive due process rights under the California Constitution and the

15  Fourteenth Amendment of the United States Constitution. (Mot. 2:18-23.)

16       These constitutional arguments should be made to the appellate courts. This court remains

17  bound to follow *Barham* and *Pacific Bell.* To the extent PG&E raises public policy implications

18  of the PUC's Decision, these arguments should be addressed to the Legislature or PUC.

19          **5)**    **PG&E's Request for Certification under Code of Civil Procedure section 166.1**

20

21       In its reply brief, PG&E requests the court certify this order for appellate review under

    section 166.1 in the event its renewed motion is denied. PG&E's request is DENIED.

22       The parties represent that the question of whether privately owned utilities may be liable

23

24  under the doctrine of inverse condemnation is also presently before trial courts in Los Angeles

    and San Francisco Counties, as well as the California Legislature.  Given the PUC's recent

25  17

26

1  Decision, there are certainly "substantial grounds for difference of opinion" on this question

2  within the meaning of section 166.1. However, this court cannot represent that an interlocutory

3  ruling from a third Court of Appeal "may materially advance the conclusion" of this litigation. (§

4  166.1.)

5  **Conclusion**

6  For these reasons, PG&E's Renewed Motion for a Legal Determination of Inverse

7  Condemnation Liability is DENIED.

8  Plaintiffs' counsel shall prepare an order for the court's signature pursuant to California

9  Rules of Court, rule 3.1312.

14  DATED:    April _30_, 2018

Judge Allen H. Sumner
Superior Court of California,
County of Sacramento

25  18

RULING ON SUBMITTED MATTER

# EXHIBIT A



FILED / ENDORSED

JUN 2 2 2017

By _____ Deputy Clerk

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SACRAMENTO

**BUTTE FIRE CASES**

**Case No.: JCCP 4853**

**RULING ON SUBMITTED MATTER:
INVERSE CONDEMNATION MOTIONS**

On June 16, 2017, hearing was held on the court's tentative ruling on the competing motions seeking seek a legal determination on whether Pacific Gas and Electric Company ("PG&E") is liable for inverse condemnation for damages caused by the Butte Fire. The parties appeared and presented oral argument, after which the court took the motions under submission.

The court, having fully considered the arguments of all parties, both written and oral, as well as the evidence submitted, now affirms its tentative ruling, as supplemented concerning the court's discussion of causation, as follows:

Plaintiffs and defendants, PG&E and Pacific Gas and Electric Corporation, bring competing motions pursuant to Code of Civil Procedure section 1260.040, seeking a legal determination whether PG&E is liable for inverse condemnation for damages caused by the Butte Fire. For the reasons set forth below, the court grants Plaintiffs' motion as to PG&E, denies Plaintiffs' motion as to Pacific Gas & Electric Corporation, and denies PG&E's motion.

The court finds PG&E may be held liable for inverse condemnation under California law even though it is a privately owned public utility. The court further finds, based upon the

1

Case: 19-30088    Doc# 4769    Filed: 11/15/19    Entered: 11/15/19 14:43:53    Page 77
of 246

admissible evidentiary record, the Butte Fire was caused by a public improvement as deliberately designed and constructed by PG&E.

# I.
## Preliminary Matters

### A.    Code of Civil Procedure section 1260.040

Plaintiffs allege several causes of action against PG&E relating to the Butte Fire, including inverse condemnation pursuant to Article I, section 19, of the California Constitution. (Individual Plaintiffs' Master Complaint ¶¶ 51-58.)

The parties agree the court has authority pursuant to Code of Civil Procedure section 1260.040[1] to rule upon the question of liability for inverse condemnation presented by their competing motions. (PG&E, Memo. ISO Motion for Legal Determination of Inverse Condemnation Liability ["PG&E MPA"], p. 3:18-4:20; Plaintiffs' Memo. ISO Motion for Determination of Inverse Condemnation Liability ["Plaintiffs' MPA"], p. 7:10-8:3.)

Section 1260.040(a) provides if there is "a dispute between plaintiff and defendant over an evidentiary or other legal issue affecting the determination of compensation, either party may move the court for a ruling on the issue...." Subdivision (c) states it "supplements, and does not replace any other pretrial or trial procedure otherwise available to resolve an evidentiary or other legal issue affecting the determination of compensation."

The court may determine the legal issue of liability pursuant to the procedures set forth in section 1260.040. (*Dina v. People ex rel. Dept. of Transportation* (2007) 151 Cal.App.4th 1029.) Specifically, a party may move for a ruling on liability because that is a legal issue affecting the determination of compensation. The Court in *Dina* construed section 1260.040 broadly as

---

[1] All statutory references are to the Code of Civil Procedure, unless otherwise indicated.

2

consistent with the Legislative purpose to "facilitate resolution of condemnation cases without trial." (*Id.* at 1043.) The Court characterized section 1260.040 as "a powerful statute, unique to eminent domain law, which allows evidentiary issues and issues affecting compensation to be adjudicated by motion." (*Id.* at pp. 1043-1044.)

The Court in *Dina* analogized section 1260.040's proceedings as similar to a motion for a nonsuit, which may be granted "only when, disregarding conflicting evidence, viewing the record in the light most favorable to the plaintiff and indulging in every legitimate inference which may be drawn from the evidence, it determines there is no substantial evidence to support a judgment in the plaintiff's favor." (*Id.* at 1047.) Applying that stringent standard of review, the Court concluded the trial court properly ruled the evidence offered by plaintiffs was insufficient to support their claims.

Here the parties' competing motions on liability are more akin to motions for summary adjudication than a motion for nonsuit or judgment on the pleadings. Although the parties have not adhered to the procedural requirements of a motion for summary adjudication under section 437c, they acknowledge the court may reach the issue of liability through this special eminent domain law procedure based upon their evidentiary record.

### B.    PG&E and the Pacific Gas and Electric Corporation

PG&E's Opposition to Plaintiffs' motion contends the motion does not clearly indicate whether it is brought against the Pacific Gas & Electric Corporation in addition to PG&E the utility entity. PG&E argues Plaintiffs failed to meet their burden as to the Pacific Gas & Electric Corporation (a private corporation), because there is no evidence the Pacific Gas & Electric Corporation is a public entity that can be liable for inverse condemnation, citing *Bach v. County of Butte* (1989) 215 Cal. App. 3d 294, 306-307 (1989). PG&E asserts the Pacific Gas & Electric

3

Corporation neither owns nor operates any electrical transmission and distribution facilities. (PG&E Opp., p. 1, fn 1.) Plaintiffs produce no evidence to the contrary.

PG&E's position appears correct. Accordingly, the court's finding of inverse condemnation liability extends to the public utility entity, PG&E.

## C. Damage Stipulation

For purposes of these competing motions, to expedite the court's determination of Plaintiffs' inverse condemnation claim alleged through their Master Motion, the parties agreed to avoid the necessity of individual declarations of damages for each moving plaintiff. Instead, the parties agreed only those plaintiffs scheduled for the initial trial commencing August 11, 2017, would submit evidence their property was damaged in the Butte Fire: Plaintiffs Larry and Karen Carr, Florencio and Martha Garcia, Robert and Barbara Garibaldi, Edward and Laura Miser, Ronald and Darunee Rogers, and Barbara Rose (collectively "August 11th Plaintiffs"). These damage declarations have been submitted.

The parties further stipulated if the court determines PG&E is liable for inverse condemnation, this determination will be binding as between PG&E and all Moving Plaintiffs presently in the Coordination Proceeding. The August 11th Plaintiffs would still have to prove the amount of their damages, and the remaining Moving Plaintiffs would have to prove both that their property was damaged in the Butte Fire and the amount of such damages.

The court has accepted the parties' stipulation as described above and will execute the order accompanying the stipulation.

4

### D.   Judicial Notice

Plaintiffs filed a Request for Judicial Notice asking the court take judicial notice of the deed for the power line right-of-way on the Kirk property in Amador County dated September 2, 1902, recorded in Book 23 of Deeds, page 564, Amador County Records, a copy of which is attached to the request as Exhibit 1. Plaintiffs' request is made upon the ground judicial notice of deeds is proper under Evidence Code section 452, subdivisions (c) and (h). This includes the existence of the recorded document, as well as the truth of the facts recited in it. (*Scott v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 743, 754-761.)

The request is granted.

Plaintiffs additionally request the court take judicial notice of pleadings PG&E filed in other, unrelated cases which also involved the issue of inverse condemnation. These filings are irrelevant, and thus that request is denied.


### E.   Evidentiary Objections

### 1.   Plaintiffs' Objections

Plaintiffs interposed 94 objections to the evidence initially submitted by PG&E in support of its motion. Plaintiffs also objected to the supplemental declaration of Mari Henderson filed June 2, 2017.

### a)   Mari Henderson Declaration

Plaintiffs object the Henderson declaration was not timely served, as required by sections 1005 and 1010, and therefore consideration of the late declaration would violate Plaintiffs' right to due process, citing *San Diego Watercrafts, Inc. v. Wells Fargo Bank, N.A.* (2002) 102 Cal. App. 4th 308, 316. Plaintiffs liken the competing motions brought here under section 1260.040 as motions for summary adjudication, and therefore contend late submission of this substantial

5

evidence denied them the right to be fully advised of the issues to be addressed and to be given adequate notice of what facts they must rebut to prevail.

Although a motion under section 1260.040 is not subject to the specific procedural requirements of section 437c, or California Rules of Court, rule 3.1350, the general demands of due process and fair notice underlying those procedures do apply with equal force to this special motion. Accordingly, the objection to the late declaration is sustained.

**b)    Amended Objection Nos. 1-94**

Plaintiffs' evidentiary objections are ruled upon as follows: Sustained as to Objection Nos. 1-74, 76-85, 87-94. Overruled as to Objection Nos. 75 and 86.

**2.    PG&E's Objections**

PG&E interposed five evidentiary objections to Plaintiffs' evidence.

**a)    Cal Fire Report**

PG&E first objects to the *California Department of Forestry and Fire Protection Investigation Report*, Case Number 15CA-AEU-00249918 ("Cal Fire Report") submitted as Exh. A to the Simon Declaration. PG&E argues the Cal Fire Report constitutes inadmissible hearsay, citing *Box v. Cal. Date Growers Ass'n* (1976) 57 Cal. App. 3d 266, 270-71. PG&E contends the Cal Fire Report does not meet the requirements of the hearsay exception for a record by a public employee (Evid. Code § 1280) because: (1) Cal Fire Battalion Chief Gianni Muschetto signed his report on April 25, 2016, more than seven months after the fire on September 9, 2015; (2) the sources of information, and the method and time of preparation do not indicate trustworthiness because the Cal Fire Report relies extensively on hearsay statements of others; and (3) the report consists of expressions of opinion and conclusions which do not come within the public records exception.

6

Case: 19-30088    Doc# 4769    Filed: 11/15/19    Entered: 11/15/19 14:43:53    Page 82 of 246

Plaintiffs argue PG&E's objections should be overruled because: (1) PG&E admitted in four separate discovery responses the Butte Fire was caused by contact between its line and a tree as concluded by the Cal Fire Report; (2) PG&E itself referenced and relied upon the Cal Fire Report in the Woodyard and Kennedy Declarations PG&E submitted in support of its Motion for a Legal Determination of Inverse Condemnation Liability; and (3) the report satisfies the public employee record exception in Evidence Code section 1280 because the report was made at or near the time of the act, condition, or event despite its final publication, and the report is not comprised of hearsay or opinions.

PG&E's objection is sustained. PG&E's discovery responses, particularly its admissions, may constitute evidence supporting the evidentiary facts Plaintiffs seek to establish here with the Cal Fire Report. But PG&E's discovery responses do not convert the Cal Fire Report itself into admissible evidence. For purposes of these motions, the court does not find the Cal Fire Report is subject to the public employee record exception under Evidence Code section 1280.

### b) Arborist Report

PG&E similarly objects to Michael T. Mahoney's *Arborist Report: Butte Fire Incident* ("Arborist Report") on the same grounds: It is inadmissible hearsay. Plaintiffs give the same response. The court makes the same ruling: The objection is sustained.

### c) Testimony of Mahoney, Cole and Felling

PG&E's objections as to the testimony of Mahoney, Cole and Felling, are overruled

## II.
## The Material Facts

The court finds the following facts:

7

## A. PG&E is a public utility

PG&E is a privately-owned public utility providing natural gas and electric service throughout a 70,000-square-mile service area statewide, comprising nearly 135,000 miles of overhead powerlines. (Tankersley Decl. ¶3.)

## B. The Butte Fire was caused by contact between a tree and PG&E's power line

As to evidence of the cause of the Butte Fire, Plaintiffs rely in substantial part upon the testimony of Mark J. Felling, Michael T. Cole, Michael Mahoney, PG&E's discovery responses and the absence of controverting evidence.

Mark J. Felling is a registered professional electrical engineer who has observed, investigated and reported on numerous fires involving contact between energized power lines and vegetation in his fifty-year career. In this case Felling inspected the power line, vegetation and other environmental influences in the area of origin of the Butte Fire. He also reviewed pertinent documents, photographs and reports. (Felling Dec., ¶¶ 1-8.) In his declaration Felling states, "[T]here are no other plausible explanations for the damage exhibited by the Subject Conductor and the Subject Tree other than direct mutual contact" and that contact ignited the Butte Fire. (Felling Dec., ¶¶ 8-15.)

Michael T. Cole spent 37 years with Cal Fire, and has a private career spanning 10 years as a fire investigation consultant and licensed/certified fire investigator. Cole also determined the Butte Fire was caused by the "Subject Tree" making contact with the "Subject Conductor" and first igniting the Butte Fire. (Cole Dec., ¶¶ 1-10.)

PG&E produced no evidence contradicting the findings of Felling or Cole as to the cause of the Butte Fire. Just the opposite. PG&E admitted in at least four discovery responses that contact between a tree and its lines was "a cause" of the Butte Fire.

8

First, PG&E responded to Plaintiffs' Special Interrogatory No. 17 in part as follows: "At this time, PG&E does not contend that tree-line contact was not a cause of the fire. PG&E accepts Cal Fire's finding that a tree made contact with a power line, but PG&E does not believe it is clear what caused the tree to fail." (Simon Dec., ¶ 10, Ex.I.)

Second, PG&E stated it "accepts and admits the Cal Fire report's finding that the tree described by Plaintiffs as the Subject Tree made contact with a power line…." (Simon Dec., ¶ 9, Ex. H, pp. 2:12-13, 23-25; 3:3-5, 18-20.)

Third, PG&E stated it "does not contend that tree-line contact was not a cause of the fire." (Simon Dec., ¶ 11, Ex. J.)

Finally, and most clearly, PG&E stated, "PG&E accepts Cal Fire's finding that a tree made contact with a power line and that tree-line contact was a cause of the fire." (Simon Dec., ¶ 10, Ex. I, p. 20:6-8.)

Accordingly, for purposes of these motions, the court finds Plaintiffs established a tree made contact with PG&E's power line, and that contact was a cause of the Butte fire.

**C.     PG&E constructed, maintained and operated the power line**

PG&E admits it had an easement on the Kirk property for its Electra 1101 Circuit. (Simon Dec., ¶ 12, Ex. K, RFA No. 113.)

The original deed for the power line right-of-way on the Kirk property was recorded in 1902. That instrument, dated September 2, 1902, recorded in Book 23 of Deeds, page 564, Amador County Records, calls for a forty (40) foot right-of-way, twenty (20) feet on each side of the centerline of poles.

The deed requires PG&E "to cut down and keep clear said lands of brush and trees, a distance of twenty (20) feet on each side of said centerline of poles, also to cut down any trees

9

standing outside of said twenty (20) foot limit on each side of said centerline of poles that may endanger said line of poles and wires." (Curtis Dec., ¶¶ 3 & 4; Plaintiffs' Request for Judicial Notice, Ex. 1 [1902 deed granting right-of-way].)

PG&E admits the Butte Fire originated on a PG&E right-of-way on the Kirk property. (Simon Dec., ¶ 12, Ex. K, RFA Nos. 112 and 114; ¶ 14, Ex. M, p. 40:8-15; ¶ 15, Ex. N;and ¶ 16, Ex. O, pp. 12:12-17, 14:7-19, 14:24-25, 18:6-8, 21:17-25, 54:19-55:6.)

PG&E admits it owns the utility poles on the Electra 1101 circuit that crossed the property, and it operated and maintained the Electra 1101 circuit. PG&E also admits it determined the placement and configuration of the utility poles on the Electra 1101 circuit that crossed the property. (Simon Dec., ¶ 17, Ex. P highlighted portions on pp. 3-5.) And PG&E admits it installed the conductors and power poles on the Kirk property. (Simon Dec., ¶ 12, Ex. K, RFA Nos. 117 and 118.)

PG&E identified on its pole-mapping diagram when it constructed each pole in and around the area of the fire's origin. Pole #099651, Object ID #13632446, was installed by PG&E in 1963. This was the pole immediately to the east of the area of the fire's origin. A pole without a number, but bearing Object ID #13632919, was also installed by PG&E in 1963. This pole was immediately to the west of the area of the fire's origin. The Electra substation splits into two circuits, Electra 1101 and Electra 1102. (Simon Dec., ¶ 22, Ex. U, p. 50:24-51:6.)

PG&E's "Unplanned Outage Report" for the loss of electricity due to the Butte Fire shows 3,643 customers on these circuits. (Simon Dec., ¶¶ 21 & 22, Ex. T, and Ex. U, p. 176:14-18.)

### III.
### Analysis and Decision

PG&E succinctly frames the core questions presented by these competing motions: First, should this court find PG&E, a privately-owned public utility, to be subject to inverse

10

condemnation liability? Second, was the Butte Fire caused by a public improvement as deliberately designed and constructed? (PG&E, MPA, p. 5:2-6.)

The court concludes the answer to both is yes.

## A.    A Privately-Owned Public Utility May Be Liable For Inverse Condemnation

### 1)    Private Utilities

California courts have long found public and quasi-public entities responsible for damages under inverse condemnation. (See, e.g., *Eachus v. Los Angeles Consolidated Elec. Ry. Co.* (1894) 103 Cal. 614 [railroad liable for cutting off access to a public road.].)

Courts have repeatedly classified utilities as "public entities." (*Barham v. Southern Cal. Edison Co.* (1999) 74 Cal. App. 4th 744, 752 (1999); *Gay Law Students Assn. v. Pac Tel. & Tel. Co.* (1979) 24 Cal. 3d 458, 470; *Pac. Bell Tel. Co. v. Pac. Gas and Electric Co.* (2012) 208 Cal. App. 4th, 1400 ["*Pacific Bell*"]; *Sheffet v. City of Los Angeles* (1970) 3 Cal. App. 3d 720, 732.)

More specifically, under California law the proposition a privately-owned public utility such as PG&E may be held liable for inverse condemnation is now solidly established. (*Barham v. Southern California Edison Co.*, *supra*, 74 Cal.App.4th 744, 753; *Pacific Bell*, *supra*, 208 Cal. App. 4th 1400.)

The Court in *Barham* found no "significant differences" between a privately held public utility and a publicly held utility for the purpose of inverse condemnation liability. (*Barham*, *supra*, 74 Cal.App. 4th at 753.) Rather, the Court cited the California Supreme Court's holding in *Gay Law Students Assn. v. Pac Tel. & Tel. Co.*, *supra*, 24 Cal. 3d 458 that a public utility is a "state actor" when hiring its employees. (*Barham* at 753.) In *Gay Law Students*, the Supreme Court found "…the breadth and depth of governmental regulation of a public utility's business

11

Case: 19-30088    Doc# 4769    Filed: 11/15/19    Entered: 11/15/19 14:43:53    Page 87 of 246

practices inextricably ties the state to a public utility's conduct..." (*Gay Law Students*, *supra*, 24 Cal.3d at 470.)[2]

The Fourth District is not alone in this line of reasoning. In *Pacific Bell*, the Second District adopted *Barham*'s reasoning in finding the quasi-monopolistic nature of Southern California Edison rendered it a public entity. (*Pac. Bell*, *supra*, 208 Cal. App. 4th at 1405.) The Court explained: "[A] public utility's monopolistic or quasi-monopolistic authority ... derives directly from its exclusive franchise provided by the state."(*Id*. at 1406.)

PG&E argues repeatedly the California Supreme Court itself has not found a privately held public utility liable under inverse condemnation. This is true, but not dispositive.

PG&E argues the appellate courts in *Barham* and *Pacific Bell* improperly extended the holding of *Gay Law Students* beyond the employment context. PG&E cites *Automatic Sprinkler Co. v. Southern Cal. Edison Co.* (1989) 216 Cal. App. 3d 627, 633 for its argument. However, *Automatic Sprinkler* ultimately turned on a specific statutory scheme, not application of *Gay Law Students*. (*Automatic Sprinkler* at 633.) Furthermore, the very same Court of Appeals declined to extend the conclusions in *Automatic Sprinkler* to *Barham*. (*Barham*, *supra*, 74 Cal. App. 4th at 753.)

PG&E also cites language from the Third District Court of Appeal's decision in *Bach v. County of Butte*, *supra*, 215 Cal.App. 3d at 307: "...it is elementary that an inverse condemnation action ... requires state action and, therefore, cannot be asserted against private parties." The court does not find this general statement controlling.

---

[2] Plaintiffs and PG&E both presented arguments as to whether PG&E is a "state actor" for purposes of inverse condemnation. While such a finding would certainly fulfill the public entity requirement, it not necessary. (See *Baker v. Burbank-Glendale-Pasadena Airport Authority* (1985) 39 Cal 3d 862, 867; *Barham*, *supra*, 74 Cal. App. 4th at 752-754; *Breidert v. Southern Pac. Co.* (1964) 61 Cal. App. 2d, 659; *Eachus*, *supra*,103 Cal. at 614; *Pacific Bell*, *supra*, 208 Cal. App. 4th at 1405; *Pacific Gas & Electric Co. v. Parachini* (1972) 29 Cal. App. 3d 159; *Slemons v. Southern Cal. Edison Co*. (1967) 252 Cal. App. 2d 1022; *Uniwill v. City of Los Angeles* (2004124 Cal. App. 4th, 537, 544). It is only required that a public entity, not a state actor, damage property for public use.

RULING ON SUBMITTED MATTER: INVERSE CONDEMNATION MOTIONS JCCP 4853

Plaintiffs in *Bach* sought to sue their **neighbors** in inverse condemnation for the neighbors' complaint to the county the Bachs were operating a law practice out of their home in violation of zoning regulations. The Court of Appeal's summary dismissal of Bachs' "ill-conceived, frivolous" argument (*Bach*, supra, 215 Cal.App.3d at 307) is of little guidance in assessing PG&E's liability for damages resulting from operation of its power lines.

### 2)    Risk Sharing

Over 70 years ago Justice Roger Traynor explained the fundamental public policy underlying the principle of liability for inverse condemnation:

> The construction of the public improvement is a deliberate operation of the state or its agency in furtherance of public purposes. In erecting a structure that is inherently dangerous to private property, the state or its agency undertakes by virtue of its constitutional provision to compensate property owners for injury to their properly arising from the inherent dangers of public improvement .... The decisive consideration is the effect of the public improvement on the property and whether the owner of the damaged property if uncompensated would contribute more than his proper share to the public undertaking. It is irrelevant whether or not the injury to the property is accomplished by a corresponding benefit to the public purpose to which the improvement is dedicated, since the measure of liability is not the benefit derived from the property, but the loss to the owner.

(*House v. Los Angeles Co. Flood Control Dist.* (1944) 25 Cal.2d 384,396-397 [conc. opn. of Traynor, J.)

The Butte Fire occurred when a tree came into contact with a power line PG&E operates providing electrical service to over 3,640 customers on that line. The court finds if the individual property owners damaged here were to absorb that loss, they would be contributing more than their "proper share" to the cost of this undertaking. As the Court explained in *Pacific Bell, supra*, 208 Cal. App. 4th at 1408:

13

For an owner whose property is damaged by the operation of a utility, he or she suffers a disproportionate share of the cost of the public improvement regardless of whether the utility is governmentally or privately owned. We do not believe the happenstance of which type of utility operates in an area should foreclose a property owner's right to just compensation under inverse condemnation for the damage, interest and attorney fees and should limit the property owner to traditional tort remedies.

### 3) Public Improvement

Plaintiffs stress PG&E's electrical system is an improvement for public use. The court agrees.

Determining whether a use is public or private is a question of law. (*Barham, supra*, 74 Cal.App.4th at 752.) Courts have consistently held the public use requirement is satisfied when the improvement is used for the delivery of a utility service. (*Id.* at 751 ["transmission of electrical power is a public use and inverse condemnation will apply"]; accord *Slemons v. Southern California Edison Co., supra*, 252 Cal.App.2d at 1026-1027 [electric distribution lines serving three customers is a public use].)

PG&E's Electra circuits here serve 3,643 customers. (Simon Dec., ¶¶ 21 & 22, Ex. T, and Ex. U, p. 176:14-18.) PG&E cannot reasonably dispute its electrical distribution lines are not installed and maintained for a public use.

Although there was no dispute in the parties' submissions that PG&E's electrical system was an improvement for public use, the court makes this inevitable finding based upon the essential service provided and the substantial segment of the public receiving or dependent upon the service. (*Barham, supra*, 74 Cal.App.4th at 752; *Slemons v. Southern California Edison Co., supra*, 252 Cal.App.2d at 1026-1027.)

14

Case: 19-30088   Doc# 4769   Filed: 11/15/19   Entered: 11/15/19 14:43:53   Page 90 of 246

### 4) Public Policy

PG&E is subject to inverse condemnation liability despite the fact it is a privately-owned public utility. The policy reasons underlying the just compensation right in inverse condemnation do not dictate a different conclusion.

PG&E argues because it is a privately-owned utility, the traditional policy justifications for inverse condemnation should not apply in this case because: (1) PG&E did not obtain the land upon which its line is located through eminent domain or joint action with the state; (2) PG&E does not enjoy sovereign immunity; and (3) PG&E does not have authority to spread the cost of any award to all its customers.

The court is not persuaded.


### 5) Eminent Domain

The fact PG&E did not acquire its easement through eminent domain or joint action with the government is not material to its liability as a utility for inverse condemnation. A public entity may be held liable even if it cannot legally exercise eminent domain.

Inverse condemnation does not derive from any statutory eminent domain power, but directly from the Constitution. (*Baker v. Burbank-Glendale-Pasadena Airport Authority, supra,* 39 Cal. 3d at 867-868.) As such, inverse condemnation liability does not depend on the mechanism by which defendant acquired the land where the damage occurred. It only depends on whether a public entity damaged the property of another for public use. (See also *Barham, supra,* Cal. App. 4th at 754 ["A landowner whose property has been invaded by a public entity that lacks eminent domain power suffers no less a taking merely because the defendant was not authorized to take."].)

PG&E cites *Cantu v. Pacific Gas and Electric Co.* (1987) 189 Cal. App. 3d 160, 165, in

15

arguing inverse condemnation liability only lies where a defendant has used eminent domain or joint action to obtain the land where its instrumentality was housed. This assessment of *Cantu* misses the mark, as only the holding of a case is authoritative. (*Consumer's Lobby Against Monopolies v. Public Utilities Com.* (1979) 25 Cal. 3d 891, 902 ["The doctrine of stare decisis applies only to judicial precedents, i.e., to the ratio decidendi or actual ground of decision of a case cited as authority."].)

In *Cantu*, the Court stated it had found no case imposing liability without a finding of eminent domain or joint action. However, immediately afterwards it stated "[the] connection from these homes to a distribution line is a *private service* to which eminent domain and inverse liability principles do not apply." (*Cantu* at 165 [emphasis added.].)

In *Cantu*, the central question was whether the use was private, not whether the defendant used eminent domain or joined in government action. As such, further statements in *Cantu* regarding eminent domain and joint action are not controlling.

### 6)    Cost Spreading

The court also rejects PG&E's argument the cost-sharing policy underlying inverse condemnation does not apply because it lacks the power to spread the cost of condemnation across the benefitted public.

In *Pacific Bell*, Southern California Edison ("SCE") similarly argued the loss-spreading rationale underpinning inverse condemnation liability did not apply to it because as a public utility it did not have taxing authority and could only raise rates with the approval of California's Public Utilities Commission. But the Court noted the government's delegation to SCE the right and obligation to provide a vital public interest (electricity) did "not remove the policy justifications underlying inverse condemnation liability: that individual property owners should

16

1   not have to contribute disproportionately to the risks from public improvements made to benefit

2   the community as a whole. (*Belair v. Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550,

3   558)." (*Pacific Bell, supra,* 208 Cal. App. 4th at p. 1407.)

4       The court also noted SCE had not pointed to any evidence supporting its implication the

5   PUC would not allow it adjustments to pass on damage liability during its periodic reviews.

6   (*Pacific Bell, supra,* 208 Cal. App. 4th at p. 1407.)

7       Such evidence is similarly lacking here.

8

9       **7)    Sovereign Immunity**

10       PG&E argues the doctrine of inverse condemnation exists, in part, to overcome sovereign

11   immunity, which would otherwise bar recovery in takings cases. This may be true, but

12   overcoming sovereign immunity is not the only justification for imposing liability under inverse

13   condemnation. (See *House, supra,* 25 Cal. 2d at 396-397; *Barham, supra,* 74 Cal. App. 4th at

14   752.)

15       Furthermore, the sole case PG&E cites is inapposite on the facts. In *Customer Co.* the

16   Supreme Court declined to extend inverse condemnation liability to police officers who damaged

17   property in their efforts to enforce the law. (*Customer Co. v. City of Sacramento* (1995) 10 Cal.

18   4th 368, 404-405.) Indeed, in declining to apply inverse condemnation to police activities,  the

19   Court recognized inverse condemnation typically deals with "the taking or damaging of private

20   property in connection with public improvement projects," which is precisely the subject at issue

21   here. (*Id* at 377.)

22       For all these reasons, the court finds PG&E may be held liable under a claim of inverse

23   condemnation for the damages alleged here, notwithstanding the fact it is a privately-owned

24   utility.

25

26      RULING ON SUBMITTED MATTER: INVERSE CONDEMNATION MOTIONS JCCP 4853

### B. The Butte Fire Was Caused By A Public Improvement As Deliberately Designed And Constructed By PG&E

Without conceding it may be liable as a privately held utility, PG&E also argues Plaintiffs fail to show the Butte Fire was caused by a public improvement as deliberately designed and constructed.

PG&E contends California's appellate courts have imposed inverse condemnation liability in only a handful of scenarios where the harm was caused by: (1) the public improvement's intended design or operation; (2) its construction; or (3) deliberate failure to maintain the improvement. PG&E argues none of these limited scenarios is present here. PG&E argues Plaintiffs at best allege only negligence by PG&E, which alone is insufficient to support inverse condemnation liability.

Again the court is not persuaded.

PG&E argues Plaintiffs fail to show the deliberate design and construction of PG&E's electrical lines caused any harm. (PG&E Opp. p.3:17-25.) In this respect, PG&E contends Plaintiffs must show PG&E deliberately designed its power lines with a deficiency that inevitably would lead to a fire. This is not the correct or applicable standard.

PG&E alternatively relies upon the reasonableness and thorough execution of its Vegetation Management Program, as an implicit component of its design of the improvement. PG&E essentially contends that since its Vegetation Management Program is reasonable, and that program has not been deliberately abandoned or discontinued, that component of the design also did not cause the fire. This alternative proposition is also not persuasive on the issue of causation and deliberate design.

18

### 1) Causation Standard

Inverse condemnation is a species of eminent domain actions created by article 1, section 19 of the California Constitution, which states in relevant part: "Private property may be taken or damaged for a public use and only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner." "In the landmark case of *Albers v. County of Los Angeles* (1965) 62 Cal.2d 250, 263-264 . . . [the California Supreme Court] construed this provision to mean that, with [certain] exceptions, 'any actual physical injury to real property proximately caused by [a public] improvement as deliberately designed and constructed is compensable under article I, section 14, of our Constitution whether foreseeable or not.'" (*Belair, supra,* 47 Cal.3d at 558.) However, the deliberateness requirement is satisfied by a public improvement that, as designed and constructed presents inherent risks of damage to private property, and the inherent risks materialize and cause damage. [Citation.]" (*Pacific Bell, supra,* 81 Cal.App.4th at 607.)

The Supreme Court "defined and clarified the element of proximate causation" in *Belair*. (*California State Auto. Ass'n Inter-Ins. Bureau v. City of Palo Alto ("CSAA")* (2006) 138 Cal.App.4th 474, 480.) The Supreme Court explained:

> [I]n order to establish [the requisite] causal connection between the public improvement and the plaintiff's damages, there must be a showing of "'a substantial cause-and-effect relationship excluding the probability that other forces alone produced the injury.' [Citations.]" [Citation.] Where independently generated forces not induced by the public . . . improvement . . . contribute to the injury, proximate cause is established where the public improvement constitutes a substantial concurring cause of the injury, i.e., where the injury occurred in substantial part because the improvement failed to function as it was intended.

19

(*Belair, supra,* 47 Cal.3d at 559-560.) Stated similarly in *CSAA,* "[a] public improvement is a 'substantial concurring cause' if other forces alone would not have caused the damage and the public improvement failed to function as intended." (*CSAA, supra,* 138 Cal.App.4th 508.)

Plaintiffs argue here, "the function of PG&E's Electra 1101 Circuit is to transmit electrical power to members of the public in a safe manner, without causing a fire. Under these circumstances, when the subject tree (even a green healthy one, maintained under the PG&E Vegetation Management Program) made contact with PG&E's power line and started the Butte Fire, the power line clearly failed to function as it was intended." (Plaintiffs' Opp., p. 12:1-10.) Plaintiffs note one of PG&E's "persons most qualified" testified if the Electra 1101 circuit was not there, the falling of the Subject Tree would not have caused a fire. (Simon Decl., ¶ 24, Ex. W, pp. 37:12-38:24.) This conclusion seems inescapable.

The court finds the deliberateness requirement is satisfied by PG&E's electrical system because, as designed and constructed, the public improvement presented inherent risk of damage to private property by fire on the easement and beyond. Further, the court also finds the risk inherent in the system's design and construction materialized, proximately causing the Butte fire.

PG&E installed and operated electric distribution lines serving over 3,600 customers, spanning miles of forest lands. The system as designed had the inherent risk trees could come into contact with the power lines and initiate a fire – hence the Vegetation Management Program. Given the placement of the system, and its vulnerability to contact with vegetation, the risk of fire was inherent. In the fullness of time, contact between the lines and a tree was inevitable. That risk materialized as the Butte Fire.

Alternatively, to the extent liability also depends upon the system failing to function as intended (which is not clear), the system is also found to have failed to function as intended: It was intended to transmit electricity without starting a fire.

20

Case: 19-30088    Doc# 4769    Filed: 11/15/19    Entered: 11/15/19 14:43:53    Page 96 of 246

1

2       **2)      The Reasonableness Standard for Inverse Condemnation Applied In Flood**
3       **Control Cases Is Not Applicable**

4       Much of the evidence PG&E proffered goes to its Vegetation Management Program.

5       PG&E argued the reasonable efforts it takes to manage vegetation near its improvements to

6       reduce the risk of fire should be considered in determining whether it is liable for inverse

7       condemnation for damage caused by a fire occurring despite its efforts. (PG&E MPA, p.8:1-11:1,

8       and fn. 11.)

9       However, the reasonableness of PG&E's maintenance of the natural environment

10      surrounding its improvement is not a consideration for inverse condemnation liability in this

11      context. Instead, as Plaintiffs argue, the strict liability standard applies here.

12      In *Pacific Bell*, SCE relied upon the long evolving line of ***flood-control*** inverse

13      condemnation cases to argue a reasonableness standard should apply to its operation of privately

14      owned high voltage power lines. The Court rejected this argument, explaining the special

15      reasonableness standard applicable to flood-control cases does not apply outside that special

16      context. (*Pacific Bell, supra,* 208 Cal. App. 4th at pp 1409-1411, citing *Pacific Bell Telephone*

17      *Co. v. City of San Diego* (2000) 81 Cal.App.4th 596, 614-615.)

18      After reviewing the genesis of the flood-control standard and the reasoning of the seminal

19      authorities, the Court in *Pacific Bell* concluded the "concerns that animated the rejection of the

20      strict liability rule in the context of public flood control projects has no counterpart here" where

21      the risk to Pacific Bell's facility of injury from ground faults was not a risk it was exposed to in

22      the absence of Edison's electrical facility." (*Pacific Bell, supra,* 208 Cal. App. 4th at pp 1409-1411

23      citing *Pacific Bell Telephone Co. v. City of San Diego, supra,* 81 Cal.App.4th at 614-615.)

24      The same reasoning holds here. Unlike the common enemy of flood waters, the risk of

25      wildfire from falling trees was not a risk Plaintiffs were exposed to in the absence of PG&E's
                                                21

26

electrical improvements.

## IV.
## Conclusion

For the foregoing reasons, Plaintiffs' motion for a finding that PG&E is liable in inverse condemnation is granted. Plaintiffs' motion for a similar finding as to the Pacific Gas & Electric Corporation is denied.

PG&E's competing motion for a legal determination that it is not liable in inverse condemnation is denied.

Plaintiffs' counsel shall prepare an order for the court's signature pursuant to California Rules of Court, rule 3.1312.

DATED:    June 22, 2017

Judge Allen Sumner
Superior Court of California,
County of Sacramento

22

RULING ON SUBMITTED MATTER: INVERSE CONDEMNATION MOTIONS JCCP 4853



1  Steven M. Campora (SBN 110909)
   **DREYER BABICH BUCCOLA**
2  **WOOD & CAMPORA LLP**
   20 Bicentennial Circle
3  Sacramento, CA 95826
   Telephone: (916) 379-3500
4  scampora@dbbwc.com

5  Dario de Ghetaldi (SBN 126782)
   Amanda L. Riddle (SBN 215221)
6  **COREY, LUZAICH, DE GHETALDI,**
   **NASTARI & RIDDLE LLP**
7  700 El Camino Real, Millbrae, CA 94030-0669
   deg@coreylaw.com; alr@coreylaw.com
8  **Co-Liaison Counsel for Individual Plaintiffs**

9  Kenneth R. Chiate (SBN 39554)
   Jeffrey N. Boozell (SBN 199507)
10 **QUINN EMANUEL URQUHART & SULLIVAN, LLP**
   865 South Figueroa Street, 10th Floor
11 Los Angeles, CA 90017
   Telephone: (213) 443-3000
12 kenchiate@quinnemanuel.com
   jeffboozell@quinnemanuel.com
13 **Counsel for Defendants Pacific Gas and**
   **Electric Company and PG&E Corporation**
14

   Gayle L. Gough (SBN 154398)
   Joel B. Crane (SBN 271699)
   **GOUGH & HANCOCK, LLP**
   Two Embarcadero Center, , Suite 640
   San Francisco, CA 94111 Telephone:
   (415) 848-8900
   gayle.gough@ghcounsel.com
   joel.crane@ghcounsel.com

15              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

16                   **FOR THE COUNTY OF SACRAMENTO**

17 Coordination Proceeding Special Title      Assigned to the Honorable Allen H. Sumner
   (Rule 3.550)                               Case No. JCCP 4853
18
                                       )
19          **BUTTE FIRE CASES.**           )   **STIPULATION AND [PROPOSED]**
                                       )   **ORDER REGARDING PLAINTIFFS'**
20                                     )   **PROPOSED MOTION FOR**
                                       )   **DETERMINATION OF INVERSE**
21 _____ )   **CONDEMNATION LIABILITY (C.C.P. §**
                                       )   **1260.040)**
22

23

24

25

26

27

28

Case: 19-30088    Doc# 4769    Filed: 11/15/19    Entered: 11/15/19 14:43:53    Page 99
                                  of 246

WHEREAS:

1. Individual Plaintiffs and Defendant PG&E (the "Parties") are parties to a Judicial Counsel Coordination Proceeding pursuant to Code of Civil Procedure § 404, *et seq.*, known as the *Butte Fire Cases*, JCCP 4853 (the "Coordination Proceeding"); and

2. The Coordination Proceeding includes numerous common issues that were alleged in the Individual Plaintiffs' Master Complaint and the Parties desire to have the Court make certain legal determinations in advance of any trial of any of the claims in the Coordination Proceeding, which determinations will apply to any and all claims currently made in the Coordination Proceeding; and

3. One common issue is whether Defendant PG&E is subject to inverse condemnation liability based on allegations in Individual Plaintiffs' Master Complaint that damage to their property allegedly was caused by the conduct of Defendant PG&E and that, as a result, Plaintiffs are entitled to damages according to proof; and

4. Certain individual plaintiffs have adopted the Cause of Action for Inverse Condemnation as stated in the Individual Plaintiffs' Master Complaint by way of their respective Adoption Complaints (the "Moving Plaintiffs")[1]; and

5. The Moving Plaintiffs intend to bring in the Coordination Proceeding a Motion for Determination of Inverse Condemnation Liability pursuant to Code of Civil Procedure § 1260.040 seeking a determination from this Court that Defendant PG&E is liable for inverse condemnation (the "Master Motion"); and

6. To prevail on such motion, each Moving Plaintiff must establish that their real and/or personal property was damaged in the Butte Fire, and;

7. Absent this stipulation, in order to establish such damage, each Moving Plaintiff

---

[1] The Subrogation Plaintiffs are in the process of finalizing their settlement with Defendants and will not be Moving Plaintiffs in this instance.

-1-

1   would be required to present evidence in the form of declarations of specific damages to that

2   Plaintiff's property, and;

3       8.  In order to expedite the Court's determination of Plaintiff's entitlement or lack of

4   entitlement to recover damages under the Cause of Action for Inverse Condemnation through the

5   Master Motion, the Parties wish to avoid the necessity of individual declarations concerning

6   damages from each of the Moving Plaintiffs.

7       Accordingly, the Parties agree as follows:

8       1.  In support of the Master Motion, only Plaintiffs Larry and Karen Carr,

9   Florencio and Martha Garcia, Robert and Barbara Garibaldi, Edward and Laura Miser, Ronald

10  and Darunee Rogers, and Barbara Rose (collectively "August 11th Plaintiffs") will submit

11  evidence that their real and/or personal property was damaged in the Butte Fire;

12

13      2.  If the Court determines that Defendant PG&E is liable for inverse

14  Condemnation, that determination pursuant to the Master Motion will be binding as between

15  PG&E and all Moving Plaintiffs presently in the Coordination Proceeding;

16      3.  If the Court determines that Defendant PG&E is liable for inverse condemnation and

17  notwithstanding the fact that such determination of liability shall be binding as between the

18  Moving Plaintiffs and PG&E presently in the Coordination Proceeding, August 11th Plaintiffs

19  still have the burden of proving the amount of their damages, and the remaining Moving

20  Plaintiffs still have the burden of proving that their real and/or personal property was damaged in

21  the Butte Fire and the amount of their damages, and;

22      4.      This Stipulation and [Proposed] Order shall not affect any party's rights to move

23  for reconsideration, to appeal, to challenge any rulings, or to seek any subsequent orders as may

24  be permitted by law, all of which are preserved.

25  / / /

26  / / /

27  / / /

28

-2-

STIP AND ORDER RE PLAINTIFFS' MOTION RE INVERSE CONDEMNATION

1    5. The Stipulation may be executed in counter-parts and facsimile signatures may be

2  deemed original signatures.

3  Dated: May 22, 2017                   By: _____
                                              Steven M. Campora
4

5                                        Dreyer Babich Buccola Wood & Campora, LLP
                                         Co-Liaison Counsel for Individual Plaintiffs
6

7

8  Dated: May 22, 2017                   By: _____
                                              Amanda L. Riddle
9

10                                       Corey, Luzaich, de Ghetaldi, Nastari & Riddle LLP
                                         Co-Liaison Counsel for Individual Plaintiffs
11

12

13                                       By: _____
                                              Kenneth R. Chiate
14  Dated: May 22, 2017

15                                       Quinn Emanuel Urquhart & Sullivan LLP
                                         Counsel for Defendant PG&E
16

17

18                                       By: _____
                                              Gayle L. Gough
19  Dated: May 22, 2017

20                                       Gough & Hancock LLP
                                         Counsel for Defendant PG&E
21

22      IT IS SO ORDERED.

23

24  DATED: __6/22/17__

25

26

27  By _____
       HON. ALLEN H. SUMNER
28     Judge of the Superior Court

-3-

STIP AND ORDER RE PLAINTIFFS' MOTION RE INVERSE CONDEMNATION

1    **ELECTRONIC PROOF OF SERVICE**

2    I, Diana Prisk, hereby declare as follows:

3        I am employed by Corey, Luzaich, de Ghetaldi, Nastari & Riddle LLP, 700 El Camino

4    Real, Millbrae, California, 94030.  I am over the age of 18 years and am not a party to this

5    action.  On May 22, 2017, I caused service of true and correct copies of the following:

6        **STIPULATION AND [PROPOSED] ORDER REGARDING PLAINTIFFS'**

7    **PROPOSED MOTION FOR DETERMINATION OF INVERSE CONDEMNATION**

8    **LIABILITY (C.C.P. § 1260.040)**

9        On the interested parties in this action pursuant to the most recent Omnibus Service List

10   by submitting an electronic version of the document(s) via file transfer protocol (FTP) to

11   CaseHomePage through the upload feature at www.casehomepage.com.

12       I declare under penalty of penalty of perjury pursuant to the laws of the State of

13   California that the foregoing is true and correct.

14       Executed at Millbrae, California, on May 22, 2017.

15

16

17                                          _____

18                                          Diana Prisk

19

20

21

22

23

24

25

26

27

28

-4-

STIP AND ORDER RE PLAINTIFFS' MOTION RE INVERSE CONDEMNATION

# Exhibit 7

**IN THE**

# Court of Appeal of the State of California

**IN AND FOR THE**
## THIRD APPELLATE DISTRICT

PACIFIC GAS AND ELECTRIC COMPANY,
    Petitioner,
       v.
THE SUPERIOR COURT OF SACRAMENTO
COUNTY,
    Respondent;
ABAAN ABU-SHUMAYS et al.,
    Real Party in Interest.

                         C087071
                         Sacramento County
                         No.   JCCP4853

BY THE COURT:

     Petitioner's "Motion for Acceptance of Electronic Service on Real Parties in Interest" is granted.   The petition for writ of mandate or prohibition is denied.

                                 BLEASE, Acting P.J.

--------------------------------

cc: See Mailing List

**IN THE**

# Court of Appeal of the State of California

**IN AND FOR THE**
**THIRD APPELLATE DISTRICT**

MAILING LIST

Re: Pacific Gas and Electric Company v. The Superior Court of Sacramento County
C087071
Sacramento County No. JCCP4853

Copies of this document have been sent by mail to the parties checked below unless they were noticed electronically.  If a party does not appear on the TrueFiling Servicing Notification and is not checked below, service was not required.

Kenneth Reed Chiate
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017

Kathleen Marie Sullivan
Quinn Emanuel Urquhart & Sullivan LLP
555 Twin Dolphin Drive, 5th Floor
Redwood City, CA 94065

Amanda Lisa Riddle
Corey, Luzaich, de Ghetaldi, Nastari & Riddle LLP
700 El Camino Real
Millbrae, CA 94030

John Charles Hueston
Hueston Hennigan, LLP
523 W. 6th Street, Suite 400
Los Angeles, CA 90014

Charles Larry Davis
San Diego Gas & Electric Company
8330 Century Park Court, 2nd Floor
San Diego, CA 92123-1350

Mortimer Hall Hartwell
Vinson & Elkins
555 Mission St Ste 2000
San Francisco, CA 94105

Sacramento County Superior Court
✓   720 Ninth Street
Sacramento, CA 95814

Exhibit 8

No. S_____
(Court of Appeal No. C087071)
(Sacramento County Super. Ct. No. JCCP 4853)

# IN THE SUPREME COURT
# OF THE STATE OF CALIFORNIA

PACIFIC GAS AND ELECTRIC COMPANY,

*Petitioner,*

v.

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF SACRAMENTO,

*Respondent,*

ABAAN ABU-SHUMAYS et al.,

*Real Parties in Interest.*

From an Order Summarily Denying a Petition
for a Writ of Mandate, Prohibition, or Other Appropriate Relief,
by the Court of Appeal, Third Appellate District
Case No. C087071

## PETITION FOR REVIEW

KENNETH R. CHIATE (S.B. No. 039554)
KRISTEN BIRD (S.B. No. 192863)
JEFFREY N. BOOZELL (S.B. No. 199507)
QUINN EMANUEL URQUHART & SULLIVAN LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
kenchiate@quinnemanuel.com
kristenbird@quinnemanuel.com
jeffboozell@quinnemanuel.com

*Kathleen M. Sullivan (S.B. No. 242261)
DANIEL H. BROMBERG (S.B. No. 242659)
QUINN EMANUEL URQUHART & SULLIVAN LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100
kathleensullivan@quinnemanuel.com
danbromberg@quinnemanuel.com

*Attorneys for Petitioner Pacific Gas and Electric Company*

Received by the Supreme Court of California

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. 4

ISSUE PRESENTED ........................................................................ 8

INTRODUCTION ............................................................................ 8

STATEMENT OF THE CASE ........................................................ 12

    A.    Factual Background ........................................................ 12

    B.    The Superior Court's Ruling On Inverse Condemnation Liability ............................................................................ 13

    C.    The CPUC's Decision ..................................................... 14

    D.    The Trial Court's Denial Of PG&E's Renewed Motion ..................... 15

    E.    PG&E's Writ Petition In The Court Of Appeal ................................... 16

REASONS WHY REVIEW SHOULD BE GRANTED .............................................. 17

I.    THIS COURT SHOULD RESOLVE THE CONFLICT BETWEEN THE DECISIONS OF THE COURT OF APPEAL AND THE CPUC CONCERNING INVERSE CONDEMNATION LIABILITY FOR PRIVATELY OWNED UTILITIES ........................................................ 17

II.    THE PETITION RAISES A QUESTION OF GREAT IMPORTANCE TO THE CALIFORNIA ECONOMY ................................................. 28

III.    ALTERNATIVELY, THE COURT SHOULD GRANT AND TRANSFER TO THE COURT OF APPEAL ....................................... 36

CONCLUSION ............................................................................. 37

CERTIFICATE OF COMPLIANCE ............................................... 38

EXHIBIT A: COURT OF APPEAL ORDER ................................. 39

EXHIBIT B: LIST OF REAL PARTIES IN INTEREST (as of April 27, 2018) .......... 42

2

# TABLE OF CONTENTS
## (continued)

**Page**

PROOF OF SERVICE..................................................................................................77

3

# TABLE OF AUTHORITIES

**Page**

## CASES

*Action Apartment Assn. v. Santa Monica Rent Control Bd.*
(9th Cir. 2007) 509 F.3d 1020 ..............................................................27

*Aetna Life & Casualty Co. v. City of Los Angeles*
(1985) 170 Cal.App.3d 865 ..............................................................20

*Albers v. Cnty. of Los Angeles*
(1965) 62 Cal.2d 250 ..............................................................18, 25

*Archer v. City of Los Angeles* (1941)
19 Cal.2d 19..............................................................26

*Auto. Sprinkler Corp. v. S. Cal. Edison Co.*
(1989) 216 Cal.App.3d 627 ..............................................................24, 25

*Barham v. S. Cal. Edison Co.*
(1999) 74 Cal.App.4th 744.................9, 10, 11, 13, 16, 19, 20, 21, 23, 24, 26, 36

*Bauer v. Ventura Cnty.*
(1955) 45 Cal.2d 276 ..............................................................18

*Belair v. Riverside Cnty. Flood Control Dist.*
(1988) 47 Cal.3d 550..............................................................17, 18, 19

*Breidert v. S. Pac. Co.*
(1964) 61 Cal.2d 659 ..............................................................19

*Bunch v. Coachella Valley Water Dist.*
(1997) 15 Cal.4th 432..............................................................18

*Customer Co. v. City of Sacramento*
(1995) 10 Cal.4th 368..............................................................17, 18

*E. Enters. v. Apfel,*
(1998) 524 U.S. 498 ..............................................................26

*Gay Law Students Assn. v. Pac. Tel. & Tel. Co.*
(1979) 24 Cal.3d 458..............................................................20, 23, 24, 26

4

*Holtz v. Super. Ct.*
(1970) 3 Cal.3d 296 ........................................................... 9, 17

*House v. Los Angeles Cnty. Flood Control Dist.*
(1944) 25 Cal.2d 384 ............................................................ 18

*Locklin v. City of Lafayette*
(1994) 7 Cal.4th 327 ............................................................. 17

*Marshall v. Dep't of Water & Power*
(1990) 219 Cal.App.3d 1124 .............................................. 20

*Pac. Bell Tel. Co. v. S. Cal. Edison Co.*
(2012) 208 Cal.App.4th 1400 ................... 9, 10, 11, 13, 16, 19, 21, 23, 24, 26, 36

*Pac. Tel. & Tel. Co. v. City of Los Angeles*
(1955) 44 Cal.2d 272 ............................................................ 12

*Pasillas v. Agric. Labor Relations Bd.*
(1984) 156 Cal.App.3d 312 .................................................. 25

*San Diego Cnty. Emps. Retirement Assn. v. Cnty of San Diego*
(2007) 151 Cal.App.4th 1163 .............................................. 16

*Sinaloa Lake Owners Assn. v. City of Simi Valley*
(9th Cir. 1989) 864 F.2d 1475 ............................................ 27

*In re S. Cal. Edison*
(1990) 37 CPUC.2d 488 ....................................................... 23

*State Farm Mut. Auto. Ins. Co. v. Campbell*
(2003) 538 U.S. 408 ............................................................. 27

*Talbott v. Turlock Irr. Dist.*
(1933) 217 Cal. 504 .............................................................. 19

## STATUTORY AUTHORITIES

Civ. Code, § 1431 ...................................................................... 18

Gov't Code, § 811.2 .................................................................. 25

Pub. Util. Code, §§ 701–853 ................................................... 12

Pub. Util. Code, § 1001 ............................................................ 12

Case: 19-30088    Doc# 4769    Filed: 11/15/19    Entered: 11/15/19 14:43:53    Page 112
of 246

Pub. Util. Code, § 1002 ................................................................. 12

Pub. Util. Code, § 2101 ................................................................. 12

## CONSTITUTIONAL AUTHORITIES

Cal. Const., art. I, § 19................................................................ 9, 17

Cal. Const., art. XII, § 3............................................................... 12

Cal. Const., art. XII, § 6............................................................... 12

U.S. Const., amend. V................................................................... 26

U.S. Const., amend. XIV ................................................................ 26

## ADDITIONAL AUTHORITIES

Jonathan Arnold, *CPUC Denies SDG&E Wildfire Recovery; Notes "Incorrect Premise" of IC Doctrine* (Nov. 30, 2017) ........................... 29

Cal. Dep't of Forestry & Fire Prot., *Top 20 Most Destructive California Wildfires*, CA.gov (Jan. 12, 2018) ........................................ 35

Cal. Energy Comm'n, Tracking Progress (Dec. 2017) ............................... 29

Tani Cantil-Sakauye, C.J., State of the Judiciary Address to a Joint Session of the California Legislature (Mar. 19, 2018) ..................... 34

Edison International, Annual Report (Form 10-K) (Feb. 22, 2018)................ 28

Greg Gordon & Kevin Prior, *PCG Has Suspended Dividends, Citing Uncertainty Regarding Wildfire-related Liabilities* (Dec. 21, 2017) ........ 30

Gabe Grosberg & Sloan Millman, S&P Global Ratings, *PG&E Corp. and Subsidiary Downgraded to 'BBB' on Initial Results of Wildfire Investigation; Still CreditWatch Negative*, RatingsDirect® (June 13, 2018)........................................................................ 31

Chelsea Harvey, *Here's What We Know About Wildfires and Climate Change* (Oct. 13, 2017) ............................................................... 35

Robinson Meyer, *Has Climate Change Intensified 2017's Western Wildfires?* (Sept. 7, 2017)................................................................ 35

Melissa Pamer & Elizabeth Espinosa, KTLA5 News, *'We Don't Even Call It Fire Season Anymore ... It's Year Round': Cal Fire* (Dec. 11, 2017)..................................................................................................33, 34

Ivan Penn, *Power Companies' Mistakes Can Cost Billions. Who Should Pay?*, N.Y. Times (June 14, 2018)......................................................................11

PG&E Corp., Annual Report (Form 10-K) (Feb. 9, 2018) .........................................28

Sempra Energy, Annual Report (Form 10-K) (Feb. 27,2018), ..................................28

Todd A. Shipman & Gabe Grosberg, S&P Global Ratings, *Research Update: PG&E Corp. and Subsidiary Downgraded to 'BBB+' on Contingent Liabilities; Still CreditWatch Negative*, RatingsDirect® (Feb. 22, 2018)............31

Philip Smyth et al., Fitch Ratings, *Fitch Downgrades PG&E Corp. and Sub to 'BBB+'; Places on Rating Watch Negative*, at 3 (Feb. 26, 2018)........................31

Mike Yamamoto, *Market Notes: Tuesday, December 12, 2017* (Dec. 12, 2017) ..........30

Case: 19-30088    Doc# 4769    Filed: 11/15/19    Entered: 11/15/19 14:43:53    Page 114
of 246

## ISSUE PRESENTED

Are privately owned utilities subject to strict liability for inverse condemnation even though their regulator, the California Public Utilities Commission, has now announced that there is no guaranty it will spread the costs of such liability across the benefitted public through rate recovery?

## INTRODUCTION

Few issues have greater importance to the economy of California than whether privately owned utilities are subject to inverse condemnation liability but unable to recover the costs of that liability through their rates. Privately owned utilities serve over 75 percent of the State's residents across 75 percent of the State's territory, and play a vital role in California and its economy. And inverse condemnation claims against privately owned utilities are escalating exponentially as wildfires in California become more endemic and severe. But privately owned utilities are now caught in an untenable legal whipsaw between conflicting decisions of the Court of Appeal and the California Public Utilities Commission ("CPUC") regarding their inverse condemnation liability. That conflict urgently warrants this Court's review.

8

On the one hand, Court of Appeal decisions for the past two decades have held that privately owned utilities are strictly liable for inverse condemnation if they take or damage private property for public use (Cal. Const., art. I, § 19), just as government or other public entities are subject to such liability. (*Barham v. S. Cal. Edison Co.* (1999) 74 Cal.App.4th 744 ("*Barham*"); *Pac. Bell Tel. Co. v. S. Cal. Edison Co.* (2012) 208 Cal.App.4th 1400 ("*Pacific Bell*").) Those decisions rest on the core assumption that the "underlying purpose" of inverse condemnation is "to distribute throughout the community the loss inflicted upon the individual by the making of the public improvements" (*Holtz v. Super. Ct.* (1970) 3 Cal.3d 296, 303 ("*Holtz*")), and that privately owned utilities, consistent with that purpose, would be able to spread inverse condemnation costs across the ratepayers who benefit from the public utilities' transmission and distribution of electrical power.

But, on the other hand, a recent decision of the CPUC undermines that assumption and upends the cost-spreading rationale for those decisions. In an administrative proceeding involving another privately owned utility, San Diego Gas and Electric Company ("SDG&E"), the CPUC rejected that assumption as

"unsound." Denying SDG&E's application for recovery of inverse condemnation costs from several 2007 wildfires, a recent decision by the CPUC stated that "Inverse Condemnation principles are not relevant to a Commission reasonableness review under the prudent manager standard," in which a utility may spread costs to the benefitted public only if it meets the "heavy burden" of demonstrating its actions were both reasonable and prudent. And individual CPUC Commissioners, in discussing the decision, suggested that the Court of Appeal's decisions in *Barham* and *Pacific Bell* had been wrongly decided, for there is "no guaranty that … private utilities can recover the cost" of inverse condemnation liability "from their rate payers," and that application of inverse condemnation to privately owned utilities fails "to recognize important distinctions between public and private utilities." The CPUC decision thus has knocked out the core premise of *Barham* and *Pacific Bell*.

The CPUC's startling decision has also created a crisis for privately owned utilities in the capital and insurance markets, further underscoring the need for this Court's review. California's privately owned utilities have seen their market capitalization eroded and their credit downgraded in the aftermath of the

CPUC's decision. And the problem will only worsen as additional wildfires increase the amount of inverse condemnation litigation against privately owed utilities. Thousands of plaintiffs have filed dozens of actions asserting inverse condemnation claims against privately owned utilities in *Southern California Fire Cases*, No. JCCP 4965 (Ventura County) and *California North Bay Fire Cases*, No. JCCP 4995 (San Francisco County). And several CPUC Commissioners themselves have urged judicial re-examination of the Court of Appeal decisions in *Barham* and *Pacific Bell* in light of these developments. This looming crisis has captured national media attention as well. (See, e.g., Penn, *Power Companies' Mistakes Can Cost Billions. Who Should Pay?*, N.Y. Times (June 14, 2018).)

For all these reasons, the petition should be granted, and this Court should decide whether inverse condemnation liability applies to privately owned utilities if they cannot automatically pass along their inverse condemnation costs to their ratepayers.[1]

---

[1] This petition does not seek to hold PG&E harmless from damage from wildfires or other sources of damage to private property. Unlike public entities that are subject to inverse condemnation suits, a privately owned utility such as PG&E enjoys no presumptive sovereign immunity from ordinary tort claims for such damage and can be (and has been) sued in wildfire cases for negligence and

Exhibit 9

SUPREME COURT
**FILED** 120

AUG 8 2018

Jorge Navarrete Clerk

_____

Deputy

Court of Appeal, Third Appellate District - No. C087071

**S249429**

# IN THE SUPREME COURT OF CALIFORNIA

### En Banc

---

PACIFIC GAS AND ELECTRIC COMPANY, Petitioner,

v.

SUPERIOR COURT OF SACRAMENTO COUNTY, Respondent;

ABAAN ABU-SHUMAYS, Real Party in Interest.

---

The petition for review is denied.

Chin and Corrigan, JJ., were recused and did not participate.

**CANTIL-SAKAUYE**
_____
*Chief Justice*

Exhibit 10

# REPORT

OF THE

# Railroad Commission

## of California

From January 1, 1911 to June 30, 1912



FRIEND WM. RICHARDSON, SUPERINTENDENT OF STATE PRINTING
SACRAMENTO, CALIFORNIA

Case: 19-30088   Doc# 4769   Filed: 11/15/19   Entered: 11/15/19 14:43:53   Page 122
of 246

LEGISLATIVE INTENT SERVICE   (800) 666-1017

Commissioners

JOHN M. ESHLEMAN, President.
H. D. LOVELAND.
ALEX GORDON.
MAX THELEN.
EDWIN O. EDGERTON.

CHARLES R. DETRICK, Secretary.

Office of Commission,
833 Market Street,
San Francisco.

# TABLE OF CONTENTS

## PART I.

| | PAGE. |
|---|---|
| GENERAL | |
| Introductory Summary | 5 |
| Historical Review | 6 |
| Legal | 16 |
| Rates | 20 |
| Statistics and Accounts | 25 |
| Engineering | 53 |
| | 55 |

## PART II.

| | |
|---|---|
| FORMAL COMPLAINTS | 66 |

## PART III.

| | |
|---|---|
| FORMAL APPLICATIONS | 84 |
| For Stocks and Bonds | 100 |
| For Certificates of Public Convenience and Necessity | 109 |
| For Grade Crossings | 115 |
| Miscellaneous Applications | 119 |

## PART IV.

| | |
|---|---|
| INFORMAL COMPLAINTS | 122 |
| Against Carriers | 124 |
| Against Electric Power Corporations | 197 |
| Against Water Companies | 198 |
| Against Telephone Corporations | 201 |
| Involving Reparation | 207 |

## PART V.

| | |
|---|---|
| GENERAL ORDERS | 228 |

## PART VI.

| | |
|---|---|
| STATISTICAL TABLES | 232 |

## PART VII.

| | |
|---|---|
| LAWS AND RULES | 463 |
| Constitutional Provisions | 464, 467, 469 |
| Railroad Commission Act approved February 10, 1911 | 471 |
| Amendments to Railroad Commission Act | 499 |
| Public Utilities Act | 504 |
| Rules of Practice and Procedure | 554 |
| Hewitt Election Act | 573 |
| Law on Transportation of Explosives | 586 |
| Law on Hours of Labor of Trainmen | 592 |
| Full Crew Law | 594 |

Case: 19-30088   Doc# 4769   Filed 11/15/19   Entered 11/15/19 14:43:53   Page 123 of 246

## HISTORICAL REVIEW.

The first action taken by the State of California to regulate its public utilities, apart from local regulation, was the act of April 3, 1876, Statutes 1875–76, page 783. This act provided for the appointment by the governor of three Commissioners of Transportation, who were given limited jurisdiction over steam railroads. It was their duty to inspect all steam railroads with reference to security and the accommodation of the public, and they had power on petition of property owners to establish stations, switches and side tracks. The railroads were directed to file copies of all their tariffs, rules, regulations and instructions to employees, but the Commissioners had no power over rates, except limited powers on complaint. The act also defined extortion and unjust discrimination. The jurisdiction thus conferred upon the Commissioners of Transportation was confined to steam railroads and consisted of limited powers, both as to rates and service.

The next session of the legislature passed the act approved April 1, 1878, Statutes 1877–78, page 969, repealing the act of April 3, 1876, and creating the office of Commissioner of Transportation, who was to be appointed by the Governor. His powers as to the service of steam railroads were similar to those which had been conferred upon the three Commissioners of Transportation by the act of April 3, 1876. With reference to rates, the Commissioner was given power "to examine into all complaints made in writing as to unjust discrimination between persons and places and to endeavor, by amicable interposition, to bring about such changes in tariffs or rules as shall, in his judgment, promote the public interest, and (he) shall report all such cases with the results of his investigation and interposition to the Governor."

The Commissioner's power was accordingly advisory only in this respect. The provisions of this act with reference to extortions, discriminations, forfeitures and penalties remained the same as those contained in the act of April 3, 1876. In addition thereto, the act contained certain police regulations with reference to the making up of trains, the period of confining animals, the obstruction of highways, trespassing, intoxication of employees, and railroad policemen.

### RAILROAD COMMISSION CREATED.

When the new constitution was adopted in 1879, it contained in section 22 of article XII thereof a provision for the creation of the Railroad Commission. The State was divided into three districts, from each of which a railroad commissioner was elected for a period of four years. The Commission was given power over railroad and other transportation companies, which power was limited to the power to fix rates and to prescribe uniform

the constitution apparently failed to observe that by limiting the powers of the Commission to rates and accounts, they took from it the powers over service which both the Commissioners of Transportation and later the single Commissioner of Transportation had possessed. Other sections of article XII of the constitution contained provisions concerning long and short hauls and grant of free passes or tickets at a discount, increases in freight rates after reductions made for the purpose of competing with other common carriers, discrimination in charges or facilities for transportation as between either persons or places and other provisions applicable to railroad and other transportation companies.

The first legislature which convened after the adoption of the constitution of 1879 passed the act approved April 15, 1880, Statutes 1880, page 45, to organize and define the powers of the Board of Railroad Commissioners. Transportation companies were defined to include railroads other than street railroads, steamships plying from or to ports within this State and steamboats plying upon the rivers or inland waters of this State. The act contained certain provisions as to procedure, but naturally confined itself to the powers of the Railroad Commission as specified in the constitution. The act did not purport to repeal the act of April 1, 1878, which act probably remained in force in so far as the later act was not inconsistent with its provisions.

### NEW ACTS PASSED.

During the nineteen years between 1880 and 1909 there was no further legislation affecting the Railroad Commission. Finally, in 1909, the legislature of this State passed the act approved March 19, 1909, Statutes 1909, page 499, known as the Wright Act. This act increased the salary of railroad commissioners from $4,000 to $6,000 per annum and extended the definition of transportation companies so as to include express companies, car companies and others. The authority of the Commission with reference to rates was limited by this act to the authority to fix the maximum rates to be collected. The act made some changes in procedure and specified some additional penalties, not, however, amounting to imprisonment of the actual offender.

The next session of the legislature passed the act approved February 9, 1911, Statutes of 1911, page 13, known as the Stetson-Eshleman Act. The Commission was authorized by this act to fix the actual moving rate and also to ascertain the value of the property, both real and personal, of every railroad or other transportation company in the State and to prescribe a uniform system of accounts. The act also prescribed penalties for violations of the provisions of the act and of the constitution with reference to railroad and other transportation companies.

Case: 19-30088   Doc# 4769   Filed: 11/15/19   Entered: 11/15/19 14:43:53   Page 124
of 246

The powers of the Commission were limited to the powers prescribed by the Constitution as it then stood. These powers, as has been said, were the power to fix the rates and to prescribe the accounts of railroad and other transportation companies.

The legislature of 1911 decided that the powers of the Railroad Commission should be increased so as to cover all classes of public utilities within the State and that the scope of the Commission's powers with reference to such utilities should be enlarged from rates and accounting to other matters, such as service and finances. The legislature accordingly submitted to the electors of the State three constitutional amendments, as follows:

(a) Assembly Constitutional Amendment No. 50. This amendment altered sections 20 and 21 of article XII of the Constitution so as to remove the rigid application of the long and short haul rule in cases in which the Commission might consider such deviations reasonable, and so as to give the Commission power over excursion and commutation tickets and also power to award reparation to shippers in case of excessive or discriminatory rates.

(b) Assembly Constitutional Amendment No. 6. This amendment increased the members of the Railroad Commission from three to five, provided for their appointment by the Governor from the State at large, instead of election from specified districts, increased the term of office from four to six years after January 1, 1915, gave single commissioners the power when designated by the Commission to hold hearings, and removed all possible doubt as to the Commission's power to fix the actual moving rate.

(c) Senate Constitutional Amendment No. 47. This amendment defines public utilities so as to include commercial railroads, interurban railroads, street railroads, canals, pipe lines, telephone and telegraph companies, heat, light, water and power companies and storage and wharfage companies, and gives to the legislature the right to confer upon the Railroad Commission power to supervise and regulate all public utilities. All powers over public utilities theretofore vested in any political subdivision of the State, except those vested in incorporated cities and towns, were vested in the Railroad Commission upon the passage by the legislature of an act conferring such powers upon the Commission.

The above three amendments were adopted at the special election on constitutional amendments, held on October 10, 1911.

## SCOPE OF PRESENT LAW.

In the mean time, the Railroad Commission, foreseeing the passage of the amendments and the subsequent need for a carefully prepared Public Utilities Act, sent its attorney on a tour of inspection of the

leading railroad and public service commissions of the country. The attorney made a careful study of the statutes and of the actual work done by some ten of the leading railroad and public service commissions of the country, and on his return, the proposed Public Utilities Act was prepared by the attorney, the President of the Commission, and a number of members of the state legislature. The bill was introduced on November 28, 1911, in the special session of the legislature by Lester G. Burnett in the senate and W. A. Sutherland in the assembly, and was thereafter passed and approved by Governor Johnson on December 23, 1911, to become effective on March 23, 1912.

The Public Utilities Act defines public utilities to include the corporations or persons which own, control, operate or maintain railroads; street railroads; express companies; sleeping, dining, freight and other car companies; vessels regularly engaged in transportation over regular routes between points within this State; pipe lines; gas plants; electric plants; telegraph lines; water systems; public wharves; and warehouses used in connection with the transportation of property by a common carrier or vessel, or the loading or unloading of the same. The Railroad Commission is given power to regulate and control all the public utilities of the State, except that the incorporated cities and towns of the State, including the city and county of San Francisco, retain the powers over public utilities which they had on March 23, 1912, with the privilege, however, of voting those powers to the Railroad Commission. The powers of the Railroad Commission over public utilities are very wide, including power over rates, service, equipment, facilities and finances. The act prescribes a simple and effective procedure before the Commission and in the courts on review of the Commission's acts, and specifies adequate penalties for its violation.

The legislature of 1911 at its special session also passed what is known as the Hewitt Elections Act, approved January 2, 1912, providing for the method by which the electors of incorporated cities and towns may, if they so desire, vote to confer upon the Railroad Commission the powers of such incorporated cities or towns over public utilities.

The Public Utilities Act represents the judgment and experience not merely of California, but also of the leading states of the Union, with reference to the proper relationship between the state and its public utilities.

Case: 19-30088   Doc# 4769   Filed: 11/15/19   Entered: 11/15/19 14:43:53   Page 125 of 246

# LEGAL.

Provision for the appointment of an attorney for the Commission was made in section 1 of the Stetson-Eshleman bill. This provision was continued in section 4 of the Public Utilities Act, providing as follows:

"The Commission shall have power to appoint as attorney to the Commission an attorney at law of this State, who shall hold office during the pleasure of the Commission. It shall be the right and the duty of the attorney to represent and appear for the people of the State of California and the Commission in all actions and proceedings involving any question under this act or under any order or act of the Commission, and, if directed to do so by the commission, to intervene, if possible, in any action or proceeding in which any such question is involved; to commence, prosecute and expedite the final determination of all actions and proceedings directed or authorized by the Commission; to advise the Commission and each Commissioner, when so requested, in regard to all matters in connection with the powers and duties of the Commission and the members thereof; and generally to perform all duties and services as attorney to the Commission which the Commission may require of him."

When the work of the Commission was separated into departments shortly after March 23, 1912, one of the departments so created was the Legal Department. This department consists of the attorney, and two assistants.

For about a year subsequent to April 17, 1911, the entire work of the department was performed by the attorney. When the attorney was appointed a member of the Railroad Commission on March 15, 1912, his salary as attorney ceased and since that time the work of the legal department of the Commission has been carried on at no extra expense, except the salary of an assistant attorney.

## THE PUBLIC UTILITIES ACT.

Shortly after his appointment, the attorney, in view of the probable ratification of the constitutional amendments affecting the Railroad Commission, sent for copies of the railroad and public service commission laws of all the states of the Union and for the most recent reports of the leading commissions and entered upon a study of the statutes and reports preparatory to the draft of a Public Utilties Act.

Thereafter, on June 26, 1911, the Railroad Commission instructed the attorney to visit the leading railroad and public service commissions of the country, and to make to the Commission a written report concerning the powers and the actual work performed by these commissions.

The attorney, acting under these instructions, left San Francisco on July 3, 1911, and visited the railroad or public service commissions of Oregon, Washington, Nebraska, Minnesota, Wisconsin, New York, Massachusetts, Maryland, Georgia, Texas and Oklahoma and the Interstate Commerce Commission, returning to his duties in San Francisco on August 22, 1911. He subsequently prepared and submitted to the Commission a detailed written report of his observations, together with recommendations for public utility legislation in this State, which report and recommendations were ordered printed by the Railroad Commission.

Thereafter, the attorney and the president of the Commission cooperated in the preparation and revision of the proposed Public Utilities Act. Copies of the first draft of the bill were sent to members of the legislature and to representatives of all the leading public utilities of the State, and several largely attended public conferences were held at the office of the Commission in San Francisco before the bill was finally introduced in the legislature on November 28, 1911. From that date until December 16, on which day the bill passed the senate, the attorney and the president of the Commission were in Sacramento rendering assistance to the legislature in connection with the Public Utilities Act. The act was approved on December 23, 1911, and became effective on March 23, 1912.

## FORMAL PROCEEDINGS.

The Rules of Practice and Procedure to govern formal matters before the Railroad Commission were prepared by the attorney and were adopted on March 13, 1912, to be effective on March 23, 1912. These rules define a formal proceeding as being one which contemplates a hearing before the Commission or a Commissioner, sitting in a judicial or quasi-judicial capacity. Formal proceedings may be upon either (a) a complaint or (b) an application. A complaint means a formal proceeding, brought upon the Commission's own motion or upon complaint of a third party, but having for its object the rendition of an order or decision which can be enforced by the Commission. The term "application" means a formal proceeding brought by a public utility for the purpose of securing the Commission's authorization or permission to perform an act.

The rules prescribe carefully the requirements with reference to the filing both of formal complaints and of formal applications. After prescribing certain general formulas applicable to all formal proceedings and to complaints, hearings and rehearings, the rules contain definite specifications for applications for the construction, alteration or abolition of railroad crossings; safety devices at railroad crossings; new construction or extensions; franchises and permits; the sale, lease, assignment, mortgage or other disposition of property; the acquisition

Case: 19-30088    Doc# 4769    Filed: 11/15/19    Entered: 11/15/19 14:43:53    Page 126 of 246

of part or all of the capital stock of another public utility; authorizations of issues of stocks, bonds, notes and other evidences of indebtedness; increases in charges; relief from long and short haul rule; refunding of excessive or discriminatory charges; and extensions of time to file reports or comply with the Commission's orders.

The pleadings in all formal complaints and applications are handled by the Legal Department. As the pleadings are filed they are examined by the department as to their sufficiency and their compliance with the Rules of Practice and Procedure, and the necessary orders and notices are prepared under the department's supervision. When a complaint or an application is ready to be heard, the Commission sets a day for the hearing, at which time all parties of record and other interested parties are given an opportunity to be heard. The Commissioner or Commissioners designated to hear the proceeding thereupon prepare their opinion and order, which opinion and order are presented to the Commission for thorough consideration. The Commission thereupon approves the opinion and order in their original form or as modified and orders the same filed as the opinion and order of the Railroad Commission, whereupon they become the Commission's opinion and order.

### STOCK AND BOND APPLICATIONS.

The Rules of Practice and Procedure have been carefully prepared with a view to securing for the Commission all information necessary in stock and bond applications for the rendition of an intelligent judgment. At the hearings on such applications, careful examination is made into the financial condition of the applicant, its ability to pay interest or dividends on the securities proposed to be issued and the particular purpose or purposes for which the different items of the proposed issue are to be used.

The Commission's order on such applications prescribes the purposes and amounts for which the issue authorized or the proceeds thereof may be used, directs the applicant to report, under oath, the sale or sales of the securities or obligations authorized and the terms and conditions of sale and the amount realized therefrom; requires the applicant to make a verified report once each month showing in detail the use and application by it of the moneys so realized until such moneys shall have been fully expended, and specifies such condition or conditions and prescribes such terms as the Commission may deem reasonable and necessary to the exercise of its permission.

The Commission's department of statistics and accounts makes careful check of the monthly reports, so that the Commission may be assured that the applicant has complied with the Commission's order in the matter of the issue of stock, bonds, or other obligations and that the

moneys derived from the sale thereof are used only for the purposes and in the amounts specified in the order.

### COURT WORK.

This department has handled only one case in court. On December 7, 1911, the Commission was served with copy of complaint for an injunction in the case of *Southern Pacific Company* vs. *The Railroad Commission*, in the district court of the United States for the Northern District of California, Case No. 15410. In that case the Southern Pacific Company secured a temporary restraining order and asked for a permanent injunction against the enforcement of this Commission's order in what is known as the *San Pedro Rate Case*, affecting the rates on certain commodities, particularly lumber, moving between Los Angeles and San Pedro. The complaint alleged that the Commission's order was unlawful because it interfered with interstate commerce, confiscated complainant's property and denied to complainant the equal protection of the laws. On December 11, 1911, this department appeared in court and filed its demurrers to the complaint. Argument was had and the case was submitted on the same day. Thereafter, on February 7, 1912, the court rendered its decision on the demurrers, sustaining the demurrers and dismissing the complaint without leave to amend. No appeal was taken. The Commission's order went into effect and the Southern Pacific Company paid to the shippers the excess charges which they had collected subsequent to the effective date of the order.

No other decision of this Commission has been questioned in court. The provisions of the Public Utilities Act with reference to procedure have been drawn with considerable care, so as to insure swiftness and certainty in the proceedings, both before the Commission and before the courts. The decisions of the Commission on questions of fact are conclusive. No cause of action can arise out of any order or decision of the Commission except in favor of a person or corporation which shall first have applied to the Commission for a rehearing, specifying the grounds thereof. If, after such rehearing has been denied, or if, after the same has been granted, such person or corporation is still dissatisfied with the Commission's decision, the remedy is a review in the state supreme court, on which review no additional evidence can be introduced and the sole question is whether the Commission has exceeded its jurisdiction. In this way it is possible to secure speedily a decision of the highest court of this State.

### OPINIONS.

The legal department has been called upon by the Commission from time to time to render opinions on legal questions submitted by the Commission. A number of such opinions have been rendered by

the department. The most important is probably the opinion on the powers of the Railroad Commission and of incorporated cities and towns over public utilities; which opinion was approved by the Railroad Commission on May 24, 1912, and ordered printed and distributed among the incorporated cities and towns of the State for the information of their officials.

### GENERAL DUTIES.

In addition to the foregoing duties, this department has handled a large amount of correspondence with persons seeking information as to the powers and duties of the Commission or the procedure to be followed in formal or informal matters and other legal questions, and has spent considerable time in conferring with persons calling at the office of the Commission for the purpose of securing similar information. It has also been the duty of the department to prepare orders, pleadings and other legal documents for the Commission.

## RATES.

### RATE DEPARTMENT.

The Rate Department of the Commission is under the supervision of the Rate Expert, and to facilitate the handling of the vast amount of work which devolves upon it, it has been subdivided into the following divisions: Transportation; Telephone and Telegraph; Electric Light and Power; Water; Warehouse, and Complaints. Each division is under the direct charge of an assistant rate expert, and in addition two clerks are assigned to the transportation division. Four stenographers have also been assigned to this department. Each head of a division has been selected with a view to securing for that division a chief, of experience in the rate adjustments, rules, regulations, and practices of the public utilities.

All matters involving the rates of a public utility are referred to the Rate Department for investigation and recommendation. A very large number of inquiries and informal complaints are daily received and investigated. The matters complained of informally are taken up with the particular utility against which the complaint is directed and if possible an adjustment effected satisfactory to the complainant, thereby obviating the necessity of a formal hearing.

During the period covered by this report the Rate Department investigated approximately 750 informal complaints and answered a much larger number of inquiries, both written and verbal, as to the rates and practices of the utilities. At all hearings involving rates of the public utilities, a representative of the Rate Department, specialized in the rates involved, is present to assist the Commissioner who is trying the case.

### TRANSPORTATION COMPANIES.

Section 17 of the Railroad Commission Act, approved February 10, 1911, required each railroad, and other transportation company, to file, in triplicate, with the Commission full and complete schedules or tariffs showing all rates and charges for the transportation of freight and passengers between points within the State, and which were in force and operation at the time the act went into effect.

In pursuance of this provision of the act, the carriers filed with the Commission all tariffs in effect and operation as of February 10, 1911, approximating 1767 publications. Subsequent to the original filing under the Railroad Commission Act, the railroads, and other transportation companies, have filed approximately 6739 publications, making a total of 8516 publications filed during the period of this report.

The checking and examination of the tariffs filed in pursuance of

Exhibit 11

Case: 19-30088    Doc# 4769    Filed: 11/15/19    Entered: 11/15/19 14:43:53    Page 129 of 246

# INAUGURAL ADDRESS

OF

# GOVERNOR HIRAM W. JOHNSON

Before the Senate and Assembly of the State of California,
in Joint Assembly, at Sacramento, Tues-
day, January 3, 1911.



SACRAMENTO

1911

W. W. SHANNON,                    SUPT. STATE PRINTING

X re "The Railroad Question"

Case: 19-30088    Doc# 4769    Filed: 11/15/19    Entered: 11/15/19 14:43:53    Page 130
LEGISLATIVE INTENT SERVICE    of 246    (800) 666-1917

# INAUGURAL ADDRESS

OF

# GOVERNOR HIRAM W. JOHNSON

*To the Senate and Assembly of the State of California:*

In the political struggle from which we have just emerged the issue was so sharply defined and so thoroughly understood that it may be superfluous for me to indicate the policy which in the ensuing four years will control the executive department of the State of California. The electorate has rendered its decision, a decision conclusive upon all its representatives; but while we know the sort of government demanded and decreed by the people, it may not be amiss to suggest the means by which that kind of administration may be attained and continued. "Successful and permanent government must rest primarily on recognition of the rights of men and the absolute sovereignty of the people. Upon these principles is based the superstructure of our republic. Their maintenance and perpetuation measure the life of the republic." It was upon this theory that we undertook originally to go to the people; it was this theory that was adopted by the people; it is upon this theory, so far as your Executive is concerned, that this government shall be henceforth conducted. The problem first presented to us, therefore, is how best can the government be made responsive to the people alone? Matters of material prosperity and advancement, conservation of resources, development of that which lies within our borders, are easy of solution when once the primal question of the people's rule shall have been determined. In some form or other nearly every governmental problem that involves the health, the happiness, or the prosperity of the State has arisen, because some private interest has intervened or has sought for its own gain to exploit either the resources or the politics of the State. I take it, therefore, that the first duty that is mine to perform is to eliminate every private interest from the government, and to make the public service of the State responsive solely to the people. The State is entitled to the highest efficiency in our public service, and that efficiency I shall endeavor at all times to give. It

Case: 19-30088   Doc# 4769   Filed: 11/15/19   Entered: 11/15/19 14:43:53   Page 131
LEGISLATIVE INTENT SERVICE   (800) 666-1917
of 246

is obvious that the requisite degree of efficiency can not be attained where any public servant divides his allegiance between the public service and a private interest. Where under our political system, therefore, there exists any appointee of the Governor who is representing a political machine or a corporation that has been devoting itself in part to our politics, that appointee will be replaced by an official who will devote himself exclusively and solely to the service of the State. In this fashion, so far as it can be accomplished by the Executive, the government of California shall be made a government for the people. If there are in existence now any appointees who represent the system of politics which has been in vogue in this State for many years and who have divided their allegiance between the State and a private interest of any sort, or if there be in existence any Commission of like character, and I can not alone deal with either, then I shall look to the Legislature to aid me in my design to eliminate special interests from the government and to require from our officials the highest efficiency and an undivided allegiance; and I shall expect such legislative action to be taken as may be necessary to accomplish the desired result.

In pursuing this policy, so long as we deal only with the ward-heeler who holds a petty official position as a reward for political service, or with the weak and vacillating small politician, we will have the support and indeed the commendation of all the people and all the press; but as we go a little higher, with firm resolve and absolute determination, we will begin to meet with opposition here and there to our plan, and various arguments, apparently put forth in good faith for the retention of this official or that, will make their appearance; and finally when we reach, if we do, some representative, not only of the former political master of this State, the Southern Pacific Company, but an apostle of "big business" as well (that business that believes all government is a mere thing for exploitation and private gain), a storm of indignation will meet us from all of those who have been parties to or partisans of the political system that has obtained in the past; and particularly that portion of the public press which is responsive to private interest and believes that private interest should control our government, will, in mock indignation and pretended horror, cry out against the desecration of the public service and the awful politics which would permit the people to rule. Much, doubtless, will be said of destructiveness, of abuse of power, of anarchistic tendencies and the like, and of the astounding, and incomparable fitness of him who represents "big business" to represent us all. And in the end it may be that the very plan, simple, and direct, to which we have set ourselves in this administration will be wholly distorted and will be understood only by those who, with single-ness of purpose, are working for a return of popular government in California.

It matters not how powerful the individual may be who is in the service of the State, nor how much wealth and influence there may be behind him, nor how strenuously he may be supported by "big business" and by all that has been heretofore powerful and omnipotent in our political life, if he be the representative of Southern Pacific politics, or if he be one of that class who divides his allegiance to the State with a private interest and thus impairs his efficiency, I shall attack him the more readily because of his power and his influence and the wealth behind him, and I shall strive in respect to such a one in exactly the same way as with his weaker and less powerful accomplices. I prefer, as less dangerous to society, the political thug of the water front to the smugly respectable individual in broadcloth of pretended respectability who from ambush employs and uses that thug for his selfish political gain.

In the consummation of our design at last to have the people rule, we shall go forward, without malice or hatred, not in animosity or personal hostility, but calmly, coolly, pertinaciously, unswervingly and with absolute determination, until the public service reflects only the public good and represents alone the people.

### THE INITIATIVE, REFERENDUM, AND RECALL.

When, with your assistance, California's government shall be composed only of those who recognize one sovereign and master, the people, then is presented to us the question of, How best can we arm the people to protect themselves hereafter? If we can give to the people the means by which they may accomplish such other reforms as they desire, the means as well by which they may prevent the misuse of the power temporarily centralized in the Legislature and an admonitory and pre-cautionary measure which will ever be present before weak officials, and the existence of which will prevent the necessity for its use, then all that lies in our power will have been done in the direction of safeguarding the future and for the perpetuation of the theory upon which we ourselves shall conduct this government. This means for accomplishing other reforms has been designated the "Initiative and the referendum," and the precautionary measure by which a recalcitrant official can be removed is designated the "Recall." And while I do not by any means believe the initiative, the referendum, and the recall are the panacea for all our political ills, yet they do give to the electorate the power of action when desired, and they do place in the hands of the people the means by which they may protect themselves. I recommend to you, therefore, and I most strongly urge, that the first step in our design to preserve and perpetuate popular government shall be the adoption of the initiative, the referen-dum, and the recall. I recognize that this must be accomplished, so far as the State is concerned, by constitutional amendment. But I hope that at the earliest possible date the amendments may be submitted to the

Case: 19-30088   Doc# 4769   Filed: 11/15/19   Entered: 11/15/19 14:43:53   Page 132
LEGISLATIVE INTENT SERVICE   (800) 666-1917

people, and that you take the steps necessary for that purpose. I will not here go into detail as to the proposed measures. I have collected what I know many of your members have—the various constitutional amendments now in force in different states—and at a future time, if desired, the detail to be applied in this State may be taken up. Suffice it to say, so far as the recall is concerned, did the solution of the matter rest with me, I would apply it to every official. I commend to you the proposition that, after all, the initiative and the referendum depend on our confidence in the people and in their ability to govern. The opponents of direct legislation and the recall, however they may phrase their opposition, in reality believe the people can not be trusted. On the other hand, those of us who espouse these measures do so because of our deep-rooted belief in popular government, and not only in the right of the people to govern, but in their ability to govern; and this leads us logically to the belief that if the people have the right, the ability, and the intelligence to elect, they have as well the right, ability, and intelligence to reject or to recall; and this applies with equal force to an administrative or a judicial officer. I suggest, therefore, that if you believe in the recall, and if in your wisdom you desire its adoption by the people, you make no exception in its application. It has been suggested that by immediate legislation you can make the recall applicable to counties without the necessity of constitutional amendment. If this be so, and if you believe in the adoption of this particular measure, there is no reason why the Legislature should not at once give to the counties of the State the right which we expect to accord to the whole State by virtue of constitutional amendment.

Were we to do nothing else during our terms of office than to require and compel an undivided allegiance to the State from all its servants, and then to place in the hands of the people the means by which they could continue that allegiance, with the power to legislate for themselves when they desired, we would have thus accomplished perhaps the greatest service that could be rendered our State. With public servants whose sole thought is the good of the State the prosperity of the State is assured, exaction and extortion from the people will be at an end, in every material aspect advancement will be ours, development and progress will follow as a matter of course, and popular government will be perpetuated.

### THE RAILROAD QUESTION.

For many years in the past, shippers, and those generally dealing with the Southern Pacific Company, have been demanding protection against the rates fixed by that corporation. The demand has been answered by the corporation by the simple expedient of taking over the government of the State; and instead of regulation of the railroads, as the framers of the new Constitution fondly hoped, the railroad has regulated the State.

To Californians it is quite unnecessary to recall the motives that actuated the framers of the new Constitution when Article XII was adopted. It was thought that the Railroad Commission thereby created would be the bulwark between the people and the exactions and extortions and discriminations of the transportation companies. That the scheme then adopted has not proved effective has become only too plain. That this arose because of the individuals constituting the Railroad Commission is in the main true, but it is also apparent there has been a settled purpose on the part of the Southern Pacific Company not only to elect its own Railroad Commission, but also wherever those Commissioners made any attempt, however feeble, to act, to arrest the powers of the Commission, and to have those powers circumscribed within the narrowest limits. All of us who recall the adoption of the new Constitution will remember that we then supposed the most plenary powers were conferred upon the Commission. It has been gravely asserted of late, however, by those representing the Railroad Company, and they insist that in the decisions of our courts there is foundation for the assertion, that the Constitution does not give the Commission power to fix absolute rates. In my opinion this power is conferred upon the Commission, and in this I am upheld by the Attorney General of the State, and by the very able and eminent attorneys who represent the various traffic associations.

The people are indeed fortunate now in having a Railroad Commission of ability, integrity, energy, and courage. I suggest to you, and I recommend, that you give to the Commission the amplest power that can be conferred upon it. The president of the Railroad Commission, Mr. John M. Eshleman, in conjunction with Attorney General Webb, Senator Stetson, and others, in all of whom we have the highest confidence, has been at work preparing a bill which shall meet the requirements of the case, and I commend to your particular attention this instrument.

I would suggest that an appropriation of at least $75,000 be made for the use of the Commission that it may, by careful hearing and the taking of evidence, determine the physical value of the transportation companies in the State of California, and that the Commission may have the power and the means to determine this physical value justly and fairly, and thereafter ascertain the value of improvements, betterments and the like, and upon the values thus determined may fix the railroad rates within the State of California.

It is asserted that some ambiguity exists in that portion of the language of Section 22 of Article XII of the Constitution, which fixes the penalty when any railroad company shall fail or refuse to conform to rates established by the Commission or shall charge rates in excess thereof, and it is claimed that the use of the last phrase ''or shall charge rates in excess thereof'' excludes the power to punish discrimination by the railroad companies. The rational construction of the language used can lead to

Case: 19-30008   Doc# 4769   Filed: 11/15/19   Entered: 11/15/19 14:43:53   Page 133

LEGISLATIVE INTENT SERVICE   (800) 666-1917

no such conclusion; but if you believe there is any ambiguity in the constitutional provision as it now exists, or any doubt of the power conferred by it upon the Railroad Commission, I would suggest that this matter be remedied by a constitutional amendment. In no event, however, should action in reference to needed legislation and that herein suggested be deferred. It is not unlikely that the ingenuity of those who represent the railroad companies will pretend, and find some advocates in this, that all legislative action should await the amendment of the Constitution. I trust that you will not permit this specious plea to prevail, but that you will at once accord the power to the Commission that is designed by the bill referred to.

I beg of you not to permit the bogie man of the railroad companies, "Unconstitutionality," to deter you from enacting the legislation suggested, if you believe that legislation to be necessary; and I trust that none of us will be terrified by the threat of resort to the courts that follows the instant a railroad extortion is resented or attempted to be remedied. Let us do our full duty, now that at last we have a Railroad Commission that will do its full duty, and let us give this Commission all the power and aid and resources it requires; and if thereafter legitimate work done within the law and the Constitution shall be nullified, let the consequences rest with the nullifying power.

## AMENDMENT OF DIRECT PRIMARY LAW.

California took a long step toward popular government when the direct primary law was enacted. The first experiment under the direct primary law has been made, and despite the predictions of the cynical and the critical, the law has been a success and has come to stay. It may, however, be improved in many respects, and so recent has been the discussion of the minor imperfections of the act that they are familiar to us all; and I think the desire is general to remedy those defects. When the law shall have been amended and its imperfections corrected, and when it shall have been made less difficult for one to become a candidate for public office (and this should be one of the designs of amendment, I think), the important question of dealing with the candidacy for United States Senator remains. Of course, the Constitution of the United States requires that United States Senators shall be elected by state legislatures. Notwithstanding the popular demand expressed now for a quarter of a century that United States Senators should be elected by direct vote of the people, we have been unable to amend the Federal Constitution; but the people in more than half the states are striving to effect the same result by indirection. The result is that our people, in common with those of most of the states, are seeking to have the people themselves elect United States Senators. I do not think it is extravagant to say that nine electors out of ten in California desire the electorate directly to choose United

States Senators, and if they possessed the power they would remove the selection wholly from the Legislature. The present primary law in its partisan features does not attain the desired result. And the present law, in its provision relating to United States Senators, is at variance with the wishes of an overwhelming majority of our people. Some of those who desire direct election may wish a selection made by parties, while others would eliminate all partisan features in such an election; yet all wish a selection by the whole State by plurality; and the present provisions of the primary law meet with the approval of none who really wish the election of United States Senator by direct vote. I suggest to you, therefore, that the present law be amended so that there be a state-wide advisory vote upon United States Senator; and the logical result of a desire to elect United States Senators by direct vote of the people is that that election shall be of any person who may be a candidate, no matter what party he may be affiliated with. For that reason I favor the Oregon plan, as it is termed, whereby the candidate for this office as for any other office may be voted for, and by which the candidate receiving the highest number of votes may be ultimately selected. If in your wisdom you believe we should not go to the full extent expressed in my views, then, in any event, the primary law should make the vote for United States Senator state-wide so that the vote of the whole State, irrespective of districts, shall control.

### SHORT BALLOT.

The most advanced thought in our nation has reached the conclusion that we can best avoid blind voting and best obtain the discrimination of the electorate by a short ballot. A very well known editor in our State, during a recent lecture at Stanford University, challenged the faculty of that great institution to produce a single man who had cast an intelligent vote for the office of State Treasurer, and none was produced. Fortunately our State Treasurer is the highest type of citizen and official. The reason the challenge could not be met was that, in the hurry of our existence and in the engrossing importance of the contests for one or two offices, we can not or do not inform ourselves sufficiently regarding the candidates for minor offices. Again, we elect some officials whose duties are merely clerical or ministerial and whose qualifications naturally can not be well understood. Of course it is undesirable, and indeed detrimental, that we should elect officials of whom we know nothing and concerning whom the electorate can not learn and can not discriminate. It is equally undesirable that those occupying merely clerical positions should be voted for by the entire electorate of the State. The result of a long ballot is that often candidates for minor offices are elected who are unfit or unsatisfactory. This conclusion, I think, has been reached by students and the farseeing in every state in the Union. If we can remedy this condition it is our duty to do so, and it is plain that the remedy is

Case: 19-30088    Doc# 4769    Filed: 11/15/19    Entered: 11/15/19 14:43:53    Page 134

LEGISLATIVE INTENT SERVICE    (800) 666-1917

# Exhibit 12

# THE

# JOURNAL OF THE ASSEMBLY

DURING THE

## THIRTY-NINTH (EXTRA) SESSIONS

OF THE

## LEGISLATURE OF THE STATE OF CALIFORNIA

## 1911

Began on Monday, November Twenty-seventh, and ended on Sunday, December
Twenty-fourth, Nineteen Hundred and Eleven



CALIFORNIA STATE LIBRARY LAW DEPT.

LEGISLATIVE INTENT SERVICE     (800) 666-1917

Case: 19-30088    Doc# 4769    Filed: 11/15/19    Entered: 11/15/19 14:43:53    Page 136

# CALIFORNIA LEGISLATURE—ASSEMBLY.

## THIRTY-NINTH (EXTRA) SESSION.

### IN ASSEMBLY.

Assembly Chamber,
Monday, November 27, 1911.

The Assembly met at two o'clock P. M., in pursuance to the proclamation of his Excellency, Hiram W. Johnson, Governor of the State of California, dated the 21st day of November, 1911.

Hon. A. H Hewitt, Assemblyman from the Eighth District, and Speaker of the Assembly, in the chair.

#### ANNOUNCEMENT.

L. B. Mallory, Chief Clerk, announced that, in pursuance to the requirements of the Political Code, Section 237, the following officers of the Assembly of the thirty-ninth (regular) session of the Legislature were present and in their respective positions: L. B. Mallory, Chief Clerk; H. A. Harper, Minute Clerk, and E. H. Whyte, Sergeant-at-Arms.

The Speaker thereupon directed the Chief Clerk to call the roll of Assemblymen.

The roll was called, and the following members of the Assembly answered to their names:

Messrs. Beatty, Beckett, Benedict, Bennink, Bishop, Bliss, Bohnett, Brown, Butler, Callaghan, Cattell, Chandler, Clark, Cogswell, Cronin, Crosby, Cunningham, Denegri, Farwell, Feeley, Fitzgerald, Flint, Freeman, Gaylord, Gerdes, Griffiths, Guill, Hall, Hamilton, Harlan, Hayes, Held, Hinkle, Hinshaw, Jasper, Joel, Judson, Kennedy, Lamb, Lynch, Lyon of Los Angeles, Lyon of San Francisco, Maher, Malone, March, McDonald, McGowen, Mendenhall, Mott, Mullally, Nolan, Polsley, Preisker, Randall, Rimlinger, Rodgers of San Francisco, Rogers of Alameda, Rosendale, Rutherford, Ryan, Sbragia, Schmitt, Slater, Smith, Stevenot, Stuckenbruck, Sutherland, Telfer, Tibbits, Walker, Walsh, Williams, Wilson, Wylie, Young, and Mr. Speaker—76.

The Speaker declared a quorum present.

#### PRAYER.

By invitation of the Speaker, the opening prayer was offered by the Rev. Frank K. Baker, of Sacramento, California.

The Speaker directed the Chief Clerk to read the Governor's proclamation.

Case: 19-30088    Doc# 4769    Filed: 11/15/19    Entered: 11/15/19 14:43:53    Page 137 of 246

The following was read:

### PROCLAMATION BY THE GOVERNOR CONVENING THE LEGISLATURE IN EXTRAORDINARY SESSION.

EXECUTIVE DEPARTMENT, STATE OF CALIFORNIA.

WHEREAS, An extraordinary occasion has arisen and now exists, requiring that the Legislature of the State of California be convened,

Now, therefore, I, Hiram W. Johnson, Governor of the State of California, by virtue of the power and authority in me vested by Section 9 of Article V of the Constitution of the State of California, do hereby convene the Legislature of the State of California to meet and assemble in extraordinary session, at Sacramento, California, on Monday, the twenty-seventh day of November, one thousand nine hundred and eleven, at two o'clock P. M. of that day, for the following purposes and to legislate upon the following subjects, to wit:

1. To provide for the expression of the choice of the electors of the State of California for President of the United States; and to legislate concerning a presidential preference primary; and to consider and legislate upon the subject of direct primary for President of the United States wherein and whereby the people of the State of California may express their preference for President of the United States, and may by direct vote select delegates to the national conventions which have for their purpose the choosing of candidates for President of the United States; and to do in behalf of the matters and things herein mentioned all that may be deemed necessary and appropriate.

2. To adjust the senatorial and assembly districts of the State of California and reapportion the representation in the Legislature of the State of California, and to divide the State, in accordance with Section 6 of Article IV of the Constitution, into senatorial and assembly districts; to adjust the congressional districts of the State and to divide the State, in accordance with the Act of Congress approved August 8th, 1911, into eleven Congressional Districts; and to redistrict and divide the State into Equalization Districts in accordance with Section 9 of Article XIII of the Constitution.

3. To enact such modifications of and additions to the election laws of the State of California as may be deemed necessary or expedient to carry out with facility, and effectually and fully, the right of suffrage granted to women by Senate Constitutional Amendment No. 8, adopted by the people October 10, 1911, by which Section 1 of Article II of the Constitution of the State of California was amended; to enact all necessary laws in relation to elections and to registration of electors; to amend the direct primary law of the State of California; and to provide for and to create the office of registrar of voters in the counties where said office is not now provided for or created by law.

4. To provide for the inspection, measurement, and graduation of merchandise, manufactured articles and commodities, and for the appointment of such officers as may be necessary for such inspection, measurement, and graduation.

5. To enact legislation to define the powers and duties of the Railroad Commission and the powers and duties of public utilities, their officers, agents and employees, and the rights, duties and remedies of patrons of public utilities; and to define offenses by public utilities, their officers, agents and employees, and other persons or corporations, and providing penalties for such offenses, and to make an appropriation to carry out such legislation, and to enact legislation providing the method by which cities and counties or incorporated cities or towns may confer upon the Railroad Commission or thereafter reinvest themselves with powers of control vested in them over public utilities.

6. To consider and act upon legislation pertaining to irrigation and irrigation district bonds, and to revise and amend the Irrigation District Act.

7. To consider and act upon an amendment to the Constitution of the State of California, whereby free text-books shall be furnished by the State to the school children of the State.

8. To enact laws and pass resolutions concerning the report of the California Débris Commission, transmitted to the Speaker of the House of Representatives by the Secretary of War on the 27th day of June, 1911, and directing the State Engineer in relation to surveys and procuring data concerning said report, and directing the manner of approval of plans of reclamation upon and adjacent to the rivers and streams of California, and to make an appropriation to pay the expenses of the State Engineer in the performance of such additional duties as may be imposed, and creating a reclamation board and defining its powers.

9. To place under the charge, control, supervision, direction, and designation of the State Board of Control all publications of advertisements by any officer, board or commission of the State; and hereafter to have all advertising provided for by any law or advertising that is paid for, or is a charge against the State, controlled, supervised, directed, and designated by the State Board of Control.

10. To approve or reject the charter of the city of Stockton, adopted by the people of that city at an election held on the 17th day of October, 1911.

LEGISLATIVE INTENT SERVICE    (800) 666-1917



# Exhibit 13

the order and direction of said board, do and perform such work in the canvassing of such returns simultaneously. Such canvass may be made at such place in the county or city and county as the board may by order entered in its minutes designate and declare to be a necessity; *provided*, that where it shall be made at a place other than the usual place of meeting of such board, the place shall be open to the public and the canvass must be made in public, and the said board shall cause public notice to be posted at the usual place of meeting of said board in a conspicuous place for at least three (3) days before the time for making such canvass, and during all the time while such canvass is being made, which notice shall state clearly and fully the designation and description of the place where such canvass will be made and conducted.

**Open to the public.**

---

## CHAPTER 14.

*An act to provide for the organization of the railroad commission, to define its powers and duties and the rights, remedies, powers and duties of public utilities, their officers, define its powers and duties and the rights, remedies, of patrons of public utilities, and to provide penalties for offenses by public utilities, their officers, agents and employees and by other persons and corporations, creating the "railroad commission fund" and appropriating the moneys therein to carry out the provisions of this act, and repealing the railroad commission act, approved February 10, 1911, and also repealing an act entitled "An act to amend the railroad commission act by amending section fifteen thereof relating to powers and duties of the railroad commission of the State of California, and to amend section thirty-seven thereof relating to free and reduced-rate transportation for freight and passengers," approved April 6, 1911, and all acts and parts of acts inconsistent with the provisions of this act.*

[Approved December 23, 1911.]

*The people of the State of California do enact as follows:*

SECTION 1. This act shall be known as the "Public Utilities Act" and shall apply to the public utilities and public services herein described and to the commission herein referred to.

**Title and application.**

SEC. 2. (*a*) The term "commission," when used in this act, means the Railroad Commission of the State of California.

**Definitions— commission.**

(*b*) The term "commissioner," when used in this act, means one of the members of the commission.

**Commissioner.**

(*c*) The term "corporation," when used in this act, includes a corporation, a company, an association and a joint-stock association.

**Corporation.**

(*d*) The term "person," when used in this act, includes an individual, a firm and a copartnership.

**Person.**

(*e*) The term "transportation of persons," when used in this act, includes every service in connection with or incidental to the safety, comfort or convenience of the person transported and the receipt, carriage and delivery of such person and his baggage.

**Transportation of persons.**

(*f*) The term "transportation of property," when used in this act, includes every service in connection with or incidental to the transportation of property, including in particular its receipt, delivery, elevation, transfer, switching, carriage, ventilation, refrigeration, icing, dunnage, storage and handling, and the transmission of credit by express corporations.

**Transportation of property.**

(*g*) The term "street railroad," when used in this act, includes every railway, and each and every branch or extension thereof, by whatsoever power operated, being mainly upon, along, above or below any street, avenue, road, highway, bridge or public place within any city and county, or city or town, together with all real estate, fixtures and personal property of every kind used in connection therewith, owned, controlled, operated or managed for public use in the transportation of persons or property; but the term "street railroad," when used in this act, shall not include a railway constituting or used as a part of a commercial or interurban railway.

**Street railroad.**

(*h*) The term "street railroad corporation," when used in this act, includes every corporation or person, their lessees, trustees, receivers or trustees appointed by any court whatsoever, owning, controlling, operating or managing any street railroad for compensation within this state.

**Street railroad corporation.**

(*i*) The term "railroad," when used in this act, includes every commercial, interurban and other railway other than a street railroad, and each and every branch or extension thereof, by whatsoever power operated, together with all tracks, bridges, trestles, rights of way, subways, tunnels, stations, depots, union depots, ferries, yards, grounds, terminals, terminal facilities, structures and equipment, and all other real estate, fixtures and personal property of every kind used in connection therewith, owned, controlled, operated or managed for public use in the transportation of persons or property.

**Railroad.**

(*j*) The term "railroad corporation," when used in this act, includes every corporation or person, their lessees, trustees, receivers or trustees appointed by any court whatsoever, owning, controlling, operating or managing any railroad for compensation within this state.

**Railroad corporation.**

(*k*) The term "express corporation," when used in this act, includes every corporation or person, their lessees, trustees, receivers or trustees appointed by any court whatsoever, engaged in or transacting the business of transporting any freight, merchandise or other property for compensation on the line of any common carrier or stage or auto stage line within this state.

**Express corporation.**

(*l*) The term "common carrier," when used in this act, includes every railroad corporation; every street railroad corporation;

**Common carrier.**

Case: 19-30088 Doc# 4769 Filed: 11/15/19 Entered: 11/15/19 12:43:30 Page 140 of 246
LEGISLATIVE INTENT SERVICE (800) 666-1917

express corporation; dispatch, sleeping car, dining car, drawing room car, freight, freight-line, refrigerator, oil, stock, fruit, car loaning, car renting, car loading and every other car corporation or person, their lessees, trustees, receivers or trustees appointed by any court whatsoever, operating for compensation within this state; and every corporation or person, their lessees, trustees, receivers or trustees appointed by any court whatsoever, owning, controlling, operating or managing any vessel regularly engaged in the transportation of persons or property for compensation upon the waters of this state or upon the high seas, over regular routes between points within this state.

**Pipe line.**
(m) The term "pipe line," when used in this act, includes all real estate, fixtures and personal property, owned, controlled, operated or managed in connection with or to facilitate the transmission, storage, distribution or delivery of crude oil or other fluid substances except water through pipe lines.

**Pipe line corporation.**
(n) The term "pipe line corporation," when used in this act, includes every corporation or person, their lessees, trustees, receivers or trustees appointed by any court whatsoever, owning, controlling, operating or managing any pipe line for compensation within this state.

**Gas plant.**
(o) The term "gas plant," when used in this act, includes all real estate, fixtures and personal property, owned, controlled, operated or managed in connection with or to facilitate the production, generation, transmission, delivery or furnishing of gas (natural or manufactured) for light, heat or power.

**Gas corporation.**
(p) The term "gas corporation," when used in this act, includes every corporation or person, their lessees, trustees, receivers or trustees appointed by any court whatsoever, owning, controlling, operating or managing any gas plant for compensation within this state, except where gas is made or produced on and distributed by the maker or producer through private property alone solely for his own use or the use of his tenants and not for sale to others.

**Electric plant.**
(q) The term "electric plant," when used in this act, includes all real estate, fixtures and personal property owned, controlled, operated or managed in connection with or to facilitate the production, generation, transmission, delivery or furnishing of electricity for light, heat or power, and all conduits, ducts or other devices, materials, apparatus or property for containing, holding or carrying conductors used or to be used for the transmission of electricity for light, heat or power.

**Electrical corporation.**
(r) The term "electrical corporation," when used in this act, includes every corporation or person, their lessees, trustees, receivers or trustees appointed by any court whatsoever, owning, controlling, operating or managing any electric plant for compensation within this state, except where electricity is generated on or distributed by the producer through private property alone solely for his own use or the use of his tenants and not for sale to others.

**Telephone line.**
(s) The term "telephone line," when used in this act, includes all conduits, ducts, poles, wires, cables, instruments and appliances, and all other real estate, fixtures and personal property owned, controlled, operated or managed in connection with or to facilitate communication by telephone, whether such communication is had with or without the use of transmission wires.

**Telephone corporation.**
(t) The term "telephone corporation," when used in this act, includes every corporation or person, their lessees, trustees, receivers or trustees appointed by any court whatsoever, owning, controlling, operating or managing any telephone line for compensation within this state.

**Telegraph line.**
(u) The term "telegraph line," when used in this act, includes all conduits, ducts, poles, wires, cables, instruments and appliances, and all other real estate, fixtures and personal property owned, controlled, operated or managed in connection with or to facilitate communication by telegraph, whether such communication is had with or without the use of transmission wires.

**Telegraph corporation.**
(v) The term "telegraph corporation," when used in this act, includes every corporation or person, their lessees, trustees, receivers or trustees appointed by any court whatsoever, owning, controlling, operating or managing any telegraph line for compensation within this state.

**Water system.**
(w) The term "water system," when used in this act, includes all reservoirs, tunnels, shafts, dams, dikes, head-gates, pipes, flumes, canals, structures and appliances, and all other real estate, fixtures and personal property, owned, controlled, operated or managed in connection with or to facilitate the diversion, development, storage, supply, distribution, sale, furnishing, carriage, apportionment or measurement of water for power, irrigation, reclamation or manufacturing, or for municipal, domestic or other beneficial use.

**Water corporation.**
(x) The term "water corporation," when used in this act, includes every corporation or person, their lessees, trustees, receivers or trustees appointed by any court whatsoever, owning, controlling, operating or managing any water system for compensation within this state.

**Vessel.**
(y) The term "vessel," when used in this act, includes every species of water craft, by whatsoever power operated, which is owned, controlled, operated or managed for public use in the transportation of persons or property.

**Wharfinger.**
(z) The term "wharfinger," when used in this act, includes every corporation or person, their lessees, trustees, receivers or trustees, appointed by any court whatsoever, owning, controlling, operating or managing any dock, wharf or structure used by vessels in connection with or to facilitate the receipt or discharge of freight or passengers for compensation within this state.

**Warehouseman.**
(aa) The term "warehouseman," when used in this act, includes every corporation or person, their lessees, trustees, receivers or trustees appointed by any court whatsoever, owning, controlling, operating or managing any building or structure

Case: 19-30088   Doc# 4769   Filed: 11/15/19   Entered: 11/15/19 14:43:53   Page 1 of 1
LEGISLATIVE INTENT SERVICE   (800) 666-1917

in which property is regularly stored for compensation within this state, in connection with or to facilitate the transportation of property by a common carrier or vessel, or the loading or unloading of the same, other than a dock, wharf or structure, owned, operated, controlled or managed by a wharfinger.

**Public utility.**
(bb) The term "public utility," when used in this act, includes every common carrier, pipe line corporation, gas corporation, electrical corporation, telephone corporation, telegraph corporation, water corporation, wharfinger and warehouseman, as those terms are defined in this section, and each thereof is hereby declared to be a public utility and to be subject to the jurisdiction, control and regulation of the commission and to the provisions of this act.

**Commission, how constituted.**
SEC. 3. (a) The railroad commission shall consist of five members, who shall be appointed by the governor from the state at large; *provided,* that the three commissioners in office on the tenth day of October, nineteen hundred and eleven, shall serve out the term for which they were elected, and that two additional commissioners shall be appointed by the governor to hold office during the same term. Upon the expiration of said **Term of office.** term, the term of office of each commissioner thereafter shall be six years, excepting that of the commissioners first appointed after the expiration of said term one shall be appointed to hold office until the first day of January, nineteen hundred and seventeen, two until the first day of January, nineteen hundred and nineteen, and two until the first day of January, nineteen hundred and twenty-one. The commissioners shall elect one **President.** of their number president of the commission.

**Vacancy, how filled.**
(b) Whenever a vacancy in the office of commissioner shall occur, the governor shall forthwith appoint a qualified person to fill the same for the unexpired term. The legislature, by **Removal of commissioner.** a two-thirds vote of all members elected to each house, may remove any one or more of said commissioners from office for dereliction of duty or corruption or incompetency.

**Attorney to commission.**
SEC. 4. The commission shall have power to appoint as attorney to the commission an attorney at law of this state, who shall hold office during the pleasure of the commission. It shall be the right and the duty of the attorney to represent and appear for the people of the State of California and the commission in all actions and proceedings involving any question under this act or under any order or act of the commission, and, if directed to do so by the commission, to intervene, if possible, in any action or proceeding in which any such question is involved; to commence, prosecute and expedite the final determination of all actions and proceedings directed or authorized by the commission; to advise the commission and each commissioner, when so requested, in regard to all matters in connection with the powers and duties of the commission and the members thereof; and generally to perform all duties and services as attorney to the commission which the commission may require of him.

SEC. 5. The commission shall appoint a secretary, who shall

hold office during its pleasure. It shall be the duty of the **Secretary and assistant secretary.** secretary to keep a full and true record of all proceedings of the commission, to issue all necessary process, writs, warrants and notices, and to perform such other duties as the commission may prescribe. The commission may appoint an assistant secretary, who shall have all the powers conferred by law upon peace officers to carry weapons, make arrests and serve warrants and other process in any county or city and county of this state.

**Employees of commission.**
SEC. 6. The commission shall have power to employ, during its pleasure, such officers, experts, engineers, statisticians, accountants, inspectors, clerks and employees as it may deem necessary to carry out the provisions of this act or to perform the duties and exercise the powers conferred by law upon the commission.

**Qualifications for commissioners and employees.**
SEC. 7. Each commissioner and each person appointed to a civil executive office by the commission shall, before entering upon the duties of his office, take and subscribe the constitutional oath of office. Each commissioner shall be a qualified elector of this state, and no person in the employ of or holding any official relation to any corporation or person, which said corporation or person is subject in whole or in part to regulation by the commission, and no person owning stocks or bonds of any such corporation or who is in any manner pecuniarily interested therein shall be appointed to or hold the office of commissioner or be appointed or employed by the commission; *provided,* that if any such person shall become the owner of such stocks or bonds or become pecuniarily interested in such corporation otherwise than voluntarily, he shall within a reasonable time divest himself of such ownership or interest; failing to do so, his office or employment shall become vacant.

**Offices, and meetings of the commission.**
SEC. 8. (a) The office of the commission shall be in the city and county of San Francisco. The office shall always be open, legal holidays and non-judicial days excepted. The commission shall hold its sessions at least once in each calendar month in said city and county of San Francisco, and may also meet at such other times and in such other places as may be expedient and necessary for the proper performance of its duties. For the purpose of holding sessions in places other than the city and county of San Francisco, the commission shall have power to rent quarters or offices, and the expense thereof and in connection therewith shall be paid in the same manner as other expenses authorized by this act. The sessions of the **Sessions to be public.** commission shall be public.

**Seal.**
(b) The commission shall have a seal, bearing the following inscription: "Railroad Commission State of California." The seal shall be affixed to all writs and authentications of copies of records and to such other instruments as the commission shall direct. All courts shall take judicial notice of said seal.

**Office equipment.**
(c) The commission is authorized to procure all necessary books, maps, charts, stationery, instruments, office furniture, apparatus and appliances, and the same shall be paid for in the same manner as other expenses authorized by this act.

Case: 19-30088    Doc# 4769    Filed: 11/15/19    Entered: 11/15/19 14:43:53    Page 142
LEGISLATIVE INTENT SERVICE    (800) 666-1917

Quorum.

Sec. 9.  A majority of the commissioners shall constitute a quorum for the transaction of any business, for the performance of any duty or for the exercise of any power of the commission.  No vacancy in the commission shall impair the right of the remaining commissioners to exercise all the powers of the commission.  The act of a majority of the commissioners when in session as a board shall be deemed to be the act of the commission; but any investigation, inquiry or hearing which the commission has power to undertake or to hold may be undertaken or held by or before any commissioner designated for the purpose by the commission, and every finding, order or decision made by a commissioner so designated, pursuant to such investigation, inquiry or hearing, when approved and confirmed by the commission and ordered filed in its office, shall be and be deemed to be the finding, order or decision of the commission.

When single commissioner may act.

Salaries.

Sec. 10.  (a)  The annual salary of each commissioner shall be six thousand (6,000) dollars.  All officers, experts, engineers, statisticians, accountants, inspectors, clerks and employees of the commission shall receive such compensation as may be fixed by the commission.  The commissioners, attorney, secretary, rate expert and assistant secretary shall be civil executive officers and their salaries as fixed by law or the commission shall be paid in the same manner as are the salaries of other state officers.  The salary or compensation of every other person holding office or employment under the commission shall be paid monthly from the funds appropriated for the use of the commission, after being approved by the commission, upon claims therefor to be audited by the board of control.

Expenses.

(b)  All expenses incurred by the commission pursuant to the provisions of this act, including the actual and necessary traveling and other expenses and disbursements of the commissioners, their officers and employees, incurred while on business of the commission, shall be paid from the funds appropriated for the use of the commission, after being approved by the commission, upon claims therefor to be audited by the board of control.

Free transportation for commissioners and employees.

Sec. 11.  The commissioners and the officers and employees of the commission, shall, when in the performance of their official duties, have the right to pass, free of charge, on all railroads, cars, vessels and other vehicles of every common carrier, as said term is defined in this act, subject in whole or in part to control or regulation by the commission, between points within this state, and such persons shall not be denied the right to travel upon any railroad, car, vessel or other vehicle of such common carrier, whether such railroad, car, vessel or other vehicle be used for the transportation of passengers or freight, and regardless of its class.

Annual report.

Sec. 12.  The commission shall make and submit to the governor on or before the first day of December of each year subsequent to the year nineteen hundred and twelve, a report containing a full and complete account of its transactions and proceedings for the preceding fiscal year, together with such

---

other facts, suggestions, and recommendations as it may deem of value to the people of the state.

Sec. 13.  (a)  All charges made, demanded or received by any public utility, or by any two or more public utilities, for any product or commodity furnished or to be furnished or any service rendered or to be rendered shall be just and reasonable.  Every unjust or unreasonable charge made, demanded or received for such product or commodity or service is hereby prohibited and declared unlawful.  *[Charges by public utility must be reasonable.]*

(b)  Every public utility shall furnish, provide and maintain such service, instrumentalities, equipment and facilities as shall promote the safety, health, comfort and convenience of its patrons, employees and the public, and as shall be in all respects adequate, efficient, just and reasonable.  *[Sufficient equipment must be provided.]*

(c)  All rules and regulations made by a public utility affecting or pertaining to its charges or service to the public shall be just and reasonable.  *[Rules must be reasonable.]*

Schedules of common carriers.

Sec. 14.  (a)  Every common carrier shall file with the commission and shall print and keep open to the public inspection schedules showing the rates, fares, charges and classifications for the transportation between termini within this state of persons and property from each point upon its route to all other points thereon; and from each point upon its route to all points upon every other route leased, operated or controlled by it; and from each point on its route or upon any route leased, operated or controlled by it to all points upon the route of any other common carrier, whenever a through route and a joint rate shall have been established or ordered between any two such points.  If no joint rate over a through route has been established, the schedules of the several carriers in such through route shall show the separately established rates, fares, charges and classifications applicable to the through transportation.  The schedules printed as aforesaid shall plainly state the places between which property and persons will be carried, and shall also contain the classification of passengers or property in force, and shall also state separately all terminal charges, storage charges, icing charges and all other charges which the commission may require to be stated, all privileges or facilities granted or allowed, and all rules or regulations which may in any wise change, affect or determine any part, or the aggregate of, such rates, fares, charges and classifications, or the value of the service rendered to the passenger, shipper or consignee.  Subject to such rules and regulations as the commission may prescribe, such schedules shall be plainly printed in large type, and a copy thereof shall be kept by every such carrier readily accessible to and for inspection by the public in every station or office of such carrier where passengers or property are respectively received for transportation, when such station or office is in charge of an agent, and in every station or office of such carrier where passenger tickets or tickets for sleeping, parlor car or other train accommodations are sold or bills of lading or waybills or receipts for property are issued.  Any or

Contents of schedules.

Schedules to be exhibited in designated places.

Case: 19-30088   Doc# 4769   Filed: 11/15/19   Entered: 11/15/19 14:35:53   Page 143 of 246

LEGISLATIVE INTENT SERVICE       (800) 666-1917

Exhibit 14

Second Biennial Message

OF

# Governor Hiram W. Johnson

TO THE

Legislature of the State of California

1915

LIS - 11



CALIFORNIA
STATE
LIBRARY
LAW DEPT.

CALIFORNIA
STATE
LIBRARY
LAW DEPT.

CALIFORNIA
STATE PRINTING OFFICE
1915

X re Railroad Commission


IF ...NIA
ST. .E
BR.RY
.W DEPT.

# SECOND BIENNIAL MESSAGE

OF

# GOVERNOR HIRAM W. JOHNSON

EXECUTIVE DEPARTMENT.
STATE OF CALIFORNIA, January 5, 1915.

*To the Senate and Assembly:*

In accordance with custom and the requirement of the Constitution, it becomes my duty to communicate with you by message.

## INTRODUCTORY.

In the past four years, California has entered upon various new governmental policies. The two preceding legislatures, acting in conjunction with the executive, and in accordance with the expressed will of the people, have sought to approach more nearly true democracy. The policies adopted were undertaken neither hastily nor by way of experiment, but carefully, cautiously, after due investigation and that the sovereign will of the people might be obeyed. Peculiarly fitted to California have been the new policies that so recently have seen their consummation. Our resources are without limit. Our development has but commenced. Within our borders every industry can thrive. There is nothing that the world produces but in abundance is given to us. The blessings of a beneficent Creator most generously have been showered upon us. The world perhaps has never seen a citizenship surpassed by ours, and here more than any other place on earth, it was fitting and appropriate that there should be a more pronounced self-government and a fuller measure of social justice than in any other land.

Your predecessors of the last two sessions rose to the occasion and afforded this people the agencies of self-government with which to fulfill their destiny. Their work was well performed. To you now is given the task of continuing, perfecting, and perpetuating that which has been so auspiciously and so ably commenced. To this task you will bring, I am sure, the same devoted disinterestedness and patriotism that have characterized those who have preceded you. It will be my part wherever I can, for our people and our state, to aid and assist. The policy of the Chief Executive will be exactly what it has been during the past four years; to act with all who strive unselfishly for the common interest; harmoniously to go forward with any whose sole allegiance is the state; earnestly to endeavor to accomplish whatever

LEGISLATIVE INTENT SERVICE   (800) 666-1917

sometimes been questioned. On the other hand, the inequalities of the assessments made by the different counties of the property of the corporations, the difficulties encountered in equalization, among the different sections of the state, and various other annoyances were eliminated by the new method which has been in vogue in this state since 1910.

In the biennial message of 1913, it was pointed out that the new system of taxation would not afford, in 1913, and 1914, the revenue required by the state and it was asserted that under the new system a greater proportionate amount of taxes was paid by the individual property owner than by public service corporations.

Subsequently, in a special message to the legislature, I transmitted the report of the State Board of Equalization and in this report the board stated:

The board finds the average tax rate in the State of California for all property except that of the withdrawn public service corporations is $1.1386 upon each one hundred dollars of actual value. This means that the ordinary taxpayer in the state pays this rate.

The average rates of taxes paid by the several classes of the withdrawn public service corporations, as determined upon the basis of a stock and bond valuation, in accordance with the new tax scheme are:

1. For railroads and street railways, $0.9092 upon $100 of actual value of property;
2. For gas and electric companies, $0.75;
3. For telegraph and telephone companies, $0.9060;
4. For car companies (Pullman Company only), $0.8813;
5. For express companies (Wells, Fargo & Co. only), $1.5413.

I thereupon asked the legislature to increase the rates of taxation of the withdrawn corporations to such a sum as should compel them to pay their just proportion of taxes. The legislature promptly acted, made its investigations and thereafter increased the rates.

The following table will indicate to you the rates charged to the corporations prior to 1913 and since then:

| | Prior to 1913 | Since 1913 |
|---|---|---|
| Railroads | 4 % gross receipts | 4⅜ % gross receipts. |
| Gas and electric companies | 4 % gross receipts | 4.6 % gross receipts. |
| Telegraph and telephone companies | 3½% gross receipts | 4.2 % gross receipts. |
| Car companies | 3 % gross receipts | 4 % gross receipts. |
| Express companies | 2 % gross receipts | 2 % gross receipts. |
| Banks | 1 % of shares of stock | 1 % of shares of stock. |
| Franchises | 1 % assessed value | 1 % assessed value. |
| Insurance companies | 1¼% on premiums | 1⅜ % on premiums. |

Apparently, these increased rates did not on certain of the corporations impose a burden of taxation equivalent to that imposed upon individual property owners. The State Board of Equalization reported that the average burden of local taxes was $1.1386 per cent of the true value of the property taxed locally. The increases made in these various corporations would make the tax burden of these corporations apparently as follows:

| | | |
|---|---|---|
| Railroads | 1.079965 | per cent |
| Gas and electric companies | .8825 | per cent |
| Telegraph and telephone companies | 1.0872 | per cent |
| Banks and franchises remain at | 1. | per cent |

Another important element that must be considered, in determining whether or not those corporations are paying their just proportion of taxes, is the increase in the various cities and counties of the state in the rate of taxation during the past two years. From reports on file in the office of the State Controller and the State Board of Equalization, it appears that the county assessment rolls were increased during the last two years 10.2 per cent and the county taxes collected were increased 19.1 per cent. City taxes have increased at a still more rapid rate. The burden of local taxation is much heavier today than it was two years ago. The basic ratio, therefore, of 1.1386 per cent, determined two years ago, is now very considerably increased; and if the figures and reports of the State Board of Equalization are correct, it is obvious that the corporations just enumerated do not pay their just proportion of taxes and that the burden of taxation borne by the farmer and individual owner of city real estate is much greater than the burden imposed upon many of the withdrawn corporations.

I ask, therefore, that immediately you undertake the appropriate investigation, and that such determination be rendered by you during the first portion of your session as shall equalize the burden of taxation and require the payment by the corporations mentioned of their just proportion.

## THE RAILROAD COMMISSION.

So recently has the marvelous accomplishment of the Railroad Commission been exploited, that the extent of its activities and its tremendous contribution to the progress and advancement of our state presumably are well understood. From 1879 to 1912, the Railroad Commission had jurisdiction over railroad and transportation companies. The inactivity of the commission prior to 1911, it is unnecessary now to comment upon. On March 23, 1912, the Public Utilities Act went into effect. The Railroad Commission then was given jurisdiction not only over railroad and transportation companies, but over gas, electric, water, telephone and telegraph and similar utilities in their oper-

Case: 19-30088    Doc# 3769    Filed 11/15/19    Entered 11/15/19 14:43:53    Page 147 of 246

ations outside of municipalities. The Public Utilities Act provided, however, that municipalities could voluntarily surrender their authority by a vote of their electors, and many municipalities, during the last few years, have thus voluntarily come under the jurisdiction of the commission. From March, 1912, to December 22, 1914, 2,207 formal proceedings were filed with the commission, and during that period 2,019 of those were judicially determined. During the same time, 5,091 informal complaints, of sufficient importance to be docketed, were filed, and of this number 4,350 decided. In addition many thousands of complaints of less importance were passed upon; 2,460 miles of railroad have had their value fixed under the law permitting the Railroad Commission to make valuations of railroads and the value of 1,501 miles of railroad is now being considered.

One of the important jurisdictions exercised by the commission now is over bonds and stocks of utilities and in this field, it has performed a great service.

Applications have been filed since March 23, 1912, for issuance of $504,842,605 of stocks and bonds and of this $398,388,467 have been authorized, $29,129,657 denied, $11,039,257 dismissed, and there are pending $66,285,224.

Under the constitutional amendment recently adopted the rate fixing of public utilities in municipalities is given to the Railroad Commission. What will be done in this regard by the commission will be a substitute for what has heretofore been done by the cities, and necessarily the cities will be relieved of the expense and the labor entailed. It would by no means be unjust that some provision should be made by the legislature, inasmuch as this intricate and important work has been transferred, requiring the municipalities to meet the expenses necessary to the determination of the rates of their public utilities. The burden has been shifted to the state, but the expense should legitimately be borne by the cities.

In the brief period of less than two years under the Public Utilities Act, the Railroad Commission has done more than has ever been done in the history of this nation by a similar tribunal. Not alone has it done the work, but it has demonstrated that fair and effective regulation is beneficial to the patrons of the utilities and the general public, and at the same time of advantage to the utilities themselves. The policy of the state and of the Railroad Commission has been not to harass business, but to insist upon firm and intelligent control of public utilities, and that the patrons of those utilities should be protected from the extortionate demands that follow unrestrained monopoly.

If the government of the past four years of the State of California had failed in every other particular, the good that has been accomplished by the Railroad Commission alone in the protection afforded

for the state over its creations, however vast or rich or powerful, mark an epoch of transcendent accomplishment, unequalled in any other period of our history.

III.

## BOARD OF CONTROL.

During the past biennial period, the Board of Control continued and completed, within the limits of its power, the work of systematizing the state's business. Without fear of contradiction, we may today assert that the state's business is carried on with an economy and efficiency rivaling the most exacting methods of private corporations.

Between December 6, 1912, and December 5, 1914, the Board of Control audited claims amounting to $42,306,159.85. Of these claims the record shows:

| | |
|---|---:|
| Deductions for mistakes and improper charges | $203,036 62 |
| Claims withdrawn | 234,866 11 |
| Claims rejected | 61,314 95 |
| Total | $499,217 68 |

The board has completed the installation of a uniform system of accounting in all state departments and institutions. All institutions and departments are now subjected to regular audit. This audit not only protects the interests of the state, but affords the requisite shield to those in charge of the state's institutions. The auditing department of the board has commenced the work of the installation of a uniform system of accounting in the counties. This is now being done in the county of Los Angeles, where peculiar difficulties were presented. The value of the work has been attested by the grand jury and the supervisors of Los Angeles. Other counties of the state have followed the lead of the great county of Los Angeles and have asked the Board to perform for them a similar service. The equipment of the Board of Control is not sufficient readily to meet the demands that now come to it from the different localities of the state, and such a force ought to be accorded this very efficient and money-saving department of the government, as will enable it to carry its work into every county of the state.

Under the limitations of the law as it now exists, the board has safeguarded the purchases by the state and has saved the state many hundreds of thousands of dollars. Its work could be better done and the saving to the state vastly increased, the board insists, if there were a centralized purchasing department. At present, each institution enters into its own contracts, subject to the approval of the Board of

composed of forged signatures. It is stated that the first recall petition presented against Senator Grant in San Francisco, likewise had upon it many forged signatures. The initiative and referendum are the very highest prerogatives of the people. To permit their use through fraud or forgery is to pollute at its very source our government. So scandalous were the frauds upon the referendum petitions, that some months ago, I asked the Attorney General to investigate them and to take charge of cases pending in San Francisco. Recently, I have asked him to advise us of what, in his opinion, may be done to prevent the recurrence of these frauds in the future. Within a brief period, the Attorney General will report to me and I shall take pleasure in transmitting to you that report.

I ask your very earnest attention to the abuses of the initiative, referendum and recall, and that you pass such appropriate legislation as will, in your view, prevent those abuses hereafter.

### RURAL CREDITS.

For some years past in the United States, among those who realize the importance of developing and encouraging agriculture, the question of extending credit to farmers in order that the land might be rendered more productive, or to those about to acquire agricultural lands, has been widely discussed. Finally the discussion has crystallized into a general advocacy of a system of rural credits. The first rural credit system was developed in Prussia in 1770, and was originally established for the relief of the larger land owners. Finally, nearly a century later, the plan was applied to the small farmer, and for him perfected, and from that time it has grown and has been a source of untold advantage, not only to the individuals but to the state as well. Great Britain very recently has proved its beneficent results in dealing with the land question in Ireland. Australia and New Zealand have carried out with marked success and extraordinary benefit their rural credits plan. California presents a singularly fertile field for the development of a system of rural credits, and limitless are our possibilities if such a system could be carried out as successfully as it has been in the countries mentioned.

Mr. Harris Weinstock on the one hand and Mr. D. W. Ross, on the other, have submitted the detail of a rural credit system, the one depending upon cooperation, and the other upon the establishment of a state bank. It is not my wish, and in this I am sure you will agree with me, to rush hastily into any particular scheme. My hope is that we may finally, in California, carry out a plan which will populate our rural territory, develop it thoroughly, increase many times its productivity, and that will enable those who contribute to this result and go upon the land, to pay for

its cultivation or improvement upon long term payments with small rates of interest.

Such an undertaking as this is so vast and so important and fraught with such possibilities, that I suggest to you that a special committee with peculiar knowledge of matters of this sort, be appointed, to which committee will be referred all measures involving rural credit schemes; and which will devote the month of February, during the recess of the legislature, to a scientific study of the question and to the determination of whether or not, under our constitution, we may enter this new field of activity.

Our national government stands pledged to a system of rural credits; but in the stress of other matters has deferred action. Here in California, with an empire's domain, with a farming population far less than it should be, with land sufficient to accommodate and assimilate readily and easily ten times our present population, we may well investigate, and after due deliberation adopt a system elsewhere demonstrated—a system by which the wealth of the state is immeasurably increased, and the happiness of its citizens augmented.

I recapitulate to you the suggestions of this message:

1. Increase the rates of taxation of the corporations described.
2. Make the election of state officers non-partisan.
3. Create free labor exchanges.
4. Establish a system of rural credits.
5. Prevent abuses of the initiative, referendum and recall.

As occasion may arise, I shall communicate with you by special message. There are many matters, some of great importance and involving constructive policies, in which the state is engaged, and for which your effort and action will be asked. Our state has grown so rapidly, its resources are so unbounded, its activities so manifold, that within the limits of a single message, little more can be done than to indicate the most important of the subjects that engross us. To you for legislative sanction and to me for executive action this marvelous commonwealth is for the time entrusted. That we may in disinterested and patriotic spirit cooperate for the advancement, prosperity and happiness of the people is my fervent wish; and if, when our task is finished, we may leave our state and our people, a little better or happier because of us, our efforts will not have been in vain.

January 5, 1915.

*Hiram W. Johnson*

Governor.

Case: 19-30088    Doc# 4709    Filed: 11/15/19    Entered: 11/15/19 14:43:53    Page 149 of 246

Exhibit 15

## CHAPTER 91.

*An act to provide for the organization of the railroad commission, to define its powers and duties and the rights, remedies, powers and duties of public utilities and their officers, and the rights and remedies of patrons of public utilities, and to provide penalties for offenses by public utilities, their officers, agents and employees and by other persons and corporations, creating the "railroad commission fund" and appropriating the moneys therein to carry out the provisions of this act, and repealing title XV of part IV of division first of the Civil Code and all acts and parts of acts inconsistent with the provisions of this act.*

[Approved April 23, 1915. In effect August 8, 1915.]

*The people of the State of California do enact as follows:*

SECTION 1. This act shall be known as the "public utilities act" and shall apply to the public utilities and public services herein described and to the commission herein referred to.

Public utilities act.

Definitions:

SEC. 2. (a) The term "commission," when used in this act, means the railroad commission of the State of California.

"Commission."

(b) The term "commissioner," when used in this act, means one of the members of the commission.

"Commissioner."

(c) The term "corporation," when used in this act includes a corporation, a company, an association and a joint-stock association.

"Corporation."

(d) The term "person," when used in this act, includes an individual, a firm and a copartnership.

"Person."

(e) The term "transportation of persons," when used in this act, includes every service in connection with or incidental to the safety, comfort or convenience of the person transported and the receipt, carriage and delivery of such person and his baggage.

"Transportation of persons."

(f) The term "transportation of property," when used in this act, includes every service in connection with or incidental to the transportation of property, including in particular its receipt, delivery, elevation, transfer, switching, carriage, ventilation, refrigeration, icing, dunnage, storage and handling, and the transmission of credit by express corporations.

"Transportation of property."

(g) The term "street railroad," when used in this act, includes every railway, and each and every branch or extension thereof, by whatsoever power operated, being mainly upon, along, above or below any street, avenue, road, highway, bridge or public place within any city and county, or city or town, together with all real estate, fixtures and personal property of every kind used in connection therewith, owned, controlled, operated or managed for public use in the transportation of persons or property; but the term "street railroad," when used in this act, shall not include a railway constituting or used as a part of a commercial or interurban railway.

"Street railroad."

Case: 19-30088   Doc# 4769   Filed: 11/15/19   Entered: 11/15/19 14:43:53   Page 151

LEGISLATIVE INTENT SERVICE   (800) 666-1917

(h) The term "street railroad corporation," when used in this act, includes every corporation or person, their lessees, trustees, receivers or trustees appointed by any court whatsoever, owning, controlling, operating or managing any street railroad for compensation within this state.

(i) The term "railroad," when used in this act, includes every commercial, interurban and other railway other than a street railroad, and each and every branch or extension thereof, by whatsoever power operated, together with all tracks, bridges, trestles, rights of way, subways, tunnels, stations, depots, union depots, ferries, yards, grounds, terminals, terminal facilities, structures and equipment, and all other real estate, fixtures and personal property of every kind used in connection therewith, owned, controlled, operated or managed for public use in the transportation of persons or property.

(j) The term "railroad corporation," when used in this act, includes every corporation or person, their lessees, trustees, receivers or trustees appointed by any court whatsoever, owning, controlling, operating or managing any railroad for compensation within this state.

(k) The term "express corporation," when used in this act, includes every corporation or person, their lessees, trustees, receivers or trustees appointed by any court whatsoever, engaged in or transacting the business of transporting any freight, merchandise or other property for compensation on the line of any common carrier or stage or auto stage line within this state.

(l) The term "common carrier," when used in this act, includes every railroad corporation; street railroad corporation; express corporation; dispatch, sleeping car, dining car, drawing room car, freight, freight-line, refrigerator, oil, stock, fruit, car loaning, car renting, car loading and every other car corporation or person, their lessees, trustees, receivers or trustees appointed by any court whatsoever, operating for compensation within this state; and every corporation or person, their lessees, trustees, receivers or trustees appointed by any court whatsoever, owning, controlling, operating or managing any vessel regularly engaged in the transportation of persons or property for compensation upon the waters of this state or upon the high seas, over regular routes between points within this state.

(m) The term "pipe line," when used in this act, includes all real estate, fixtures and personal property, owned, controlled, operated or managed in connection with or to facilitate the transmission, storage, distribution or delivery of crude oil or other fluid substances except water through pipe lines.

(n) The term "pipe line corporation," when used in this act, includes every corporation or person, their lessees, trustees, receivers or trustees appointed by any court whatsoever, owning, controlling, operating or managing any pipe line for compensation within this state.

(o) The term "gas plant," when used in this act, includes all real estate, fixtures and personal property, owned, controlled, operated or managed in connection with or to facilitate the production, generation, transmission, delivery or furnishing of gas (natural or manufactured) for light, heat or power.

(p) The term "gas corporation," when used in this act, includes every corporation or person, their lessees, trustees, receivers or trustees appointed by any court whatsoever, owning, controlling, operating or managing any gas plant for compensation within this state, except where gas is made or produced on and distributed by the maker or producer through private property alone solely for his own use or the use of his tenants and not for sale to others.

(q) The term "electric plant," when used in this act, includes all real estate, fixtures and personal property owned, controlled, operated or managed in connection with or to facilitate the production, generation, transmission, delivery or furnishing of electricity for light, heat or power, and all conduits, ducts or other devices, materials, apparatus or property for containing, holding or carrying conductors used or to be used for the transmission of electricity for light, heat or power.

(r) The term "electrical corporation," when used in this act, includes every corporation or person, their lessees, trustees, receivers or trustees appointed by any court whatsoever, owning, controlling, operating or managing any electric plant for compensation within this state, except where electricity is generated on or distributed by the producer through private property alone solely for his own use or the use of his tenants and not for sale to others.

(s) The term "telephone line," when used in this act, includes all conduits, ducts, poles, wires, cables, instruments and appliances, and all other real estate, fixtures and personal property owned, controlled, operated or managed in connection with or to facilitate communication by telephone, whether such communication is had with or without the use of transmission wires.

(t) The term "telephone corporation," when used in this act, includes every corporation or person, their lessees, trustees, receivers or trustees appointed by any court whatsoever, owning, controlling, operating or managing any telephone line for compensation within this state.

(u) The term "telegraph line," when used in this act, includes all conduits, ducts, poles, wires, cables, instruments and appliances, and all other real estate, fixtures and personal property owned, controlled, operated or managed in connection with or to facilitate communication by telegraph, whether such communication is had with or without the use of transmission wires.

(v) The term "telegraph corporation," when used in this act, includes every corporation or person, their lessees, trustees,

Case: 19-30088   Doc# 4769   Filed: 11/15/19   Entered: 11/15/19 14:43:53   Page 152

LEGISLATIVE INTENT SERVICE   (800) 666-1917

receivers or trustees appointed by any court whatsoever, owning, controlling, operating or managing any telegraph line for compensation within this state.

*Water system.* (w) The term "water system," when used in this act, includes all reservoirs, tunnels, shafts, dams, dikes, head-gates, pipes, flumes, canals, structures and appliances, and all other real estate, fixtures and personal property, owned, controlled, operated or managed in connection with or to facilitate the diversion, development, storage, supply, distribution, sale, furnishing, carriage, apportionment or measurement of water for power, irrigation, reclamation or manufacturing, or for municipal, domestic or other beneficial use.

*Water corporation.* (x) The term "water corporation," when used in this act, includes every corporation or person, their lessees, trustees, receivers or trustees appointed by any court whatsoever, owning, controlling, operating or managing any water system for compensation within this state.

*Vessel.* (y) The term "vessel," when used in this act, includes every species of water craft, by whatsoever power operated, which is owned, controlled, operated or managed for public use in the transportation of persons or property.

*Wharfinger.* (z) The term "wharfinger," when used in this act, includes every corporation or person, their lessees, trustees, receivers or trustees, appointed by any court whatsoever, owning, controlling, operating or managing any dock, wharf or structure used by vessels in connection with or to facilitate the receipt or discharge of freight or passengers for compensation within this state.

*Warehouseman.* (aa) The term "warehouseman," when used in this act, includes every corporation or person, their lessees, trustees, receivers or trustees appointed by any court whatsoever, owning, controlling, operating or managing any building or structure in which property is regularly stored for compensation within this state, in connection with or to facilitate the transportation of property by a common carrier or vessel, or the loading or unloading of the same, other than a dock, wharf or structure, owned, operated, controlled or managed by a wharfinger.

*Public utility.* (bb) The term "public utility," when used in this act, includes every common carrier, pipe line corporation, gas corporation, electrical corporation, telephone corporation, telegraph corporation, water corporation, wharfinger and warehouseman, where the service is performed for or the commodity delivered to the public or any portion thereof. The term "public or any portion thereof" as herein used means the public generally, or any limited portion of the public including a person, private corporation, municipality or other political subdivision of the state, for which the service is performed or to which the commodity is delivered, and whenever any common carrier, pipe line corporation, gas corporation, electrical corporation, telephone corporation, telegraph corporation, water corporation, wharfinger or warehouseman performs a service or delivers a commodity to the public or any

portion thereof for which any compensation or payment whatsoever is received, such common carrier, pipe line corporation, gas corporation, electrical corporation, telephone corporation, telegraph corporation, water corporation, wharfinger or warehouseman is hereby declared to be a public utility subject to the jurisdiction, control and regulation of the commission and the provisions of this act. Furthermore, when any person or corporation performs any service or delivers any commodity to any person or persons, private corporation or corporations, municipality or other political subdivision of the state, which in turn either directly or indirectly, mediately or immediately, perform such service or deliver such commodity to or for the public or some portion thereof, such person or persons, private corporation or corporations and each thereof is hereby declared to be a public utility and to be subject to the jurisdiction, control and regulation of the commission and to the provisions of this act.

*Railroad commission.* SEC. 3. (a) The railroad commission shall consist of five members, who shall be appointed by the governor from the state at large. Upon the expiration of the terms, respectively, for which the commissioners now in office were appointed, the term of each commissioner thereafter shall be six years. The commissioners shall elect one of their number president of the commission.

*Vacancy.* (b) Whenever a vacancy in the office of commissioner shall occur, the governor shall forthwith appoint a qualified person to fill the same for the unexpired term. The legislature, by a two-thirds vote of all members elected to each house, may remove any one or more of said commissioners from office for dereliction of duty or corruption or incompetency.

*Attorney to commission.* SEC. 4. The commission shall have power to appoint as attorney to the commission an attorney at law of this state, who shall hold office during the pleasure of the commission. It shall be the right and the duty of the attorney to represent and appear for the people of the State of California and the commission in all actions and proceedings involving any question under this act or under any order or act of the commission, and, if directed to do so by the commission, to intervene, if possible, in any action or proceeding in which any such question is involved; to commence, prosecute and expedite the final determination of all actions and proceedings directed or authorized by the commission; to advise the commission and each commissioner, when so requested, in regard to all matters in connection with the powers and duties of the commission and the members thereof; and generally to perform all duties and services as attorney to the commission which the commission may require of him.

*Secretary.* SEC. 5. The commission shall appoint a secretary, who shall hold office during its pleasure. It shall be the duty of the secretary to keep a full and true record of all proceedings of the commission, to issue all necessary process, writs, warrants

Case 19-30088 Doc 4769 Filed: 11/15/19 Entered: 11/15/19 14:43:53 Page 153
LEGISLATIVE INTENT SERVICE (800) 666-1917

carrier, as said term is defined in this act, subject in whole or in part to control or regulation by the commission, between points within this state, and such persons shall not be denied the right to travel upon any railroad, car, vessel or other vehicle of such common carrier, whether such railroad, car, vessel or other vehicle be used for the transportation of passengers or freight, and regardless of its class.

Annual report. SEC. 12. The commission shall make and submit to the governor on or before the first day of December of each year, a report containing a full and complete account of its transactions and proceedings for the preceding fiscal year, together with such other facts, suggestions, and recommendations as it may deem of value to the people of the state.

SEC. 13. (a) All charges made, demanded or received by any public utility, or by any two or more public utilities, for any product or commodity furnished or to be furnished or any service rendered or to be rendered shall be just and reasonable. Every unjust or unreasonable charge made, demanded or received for such product or commodity or service is hereby prohibited and declared unlawful.

(b) Every public utility shall furnish, provide and maintain such service, instrumentalities, equipment and facilities as shall promote the safety, health, comfort and convenience of its patrons, employees and the public, and as shall be in all respects adequate, efficient, just and reasonable.

(c) All rules and regulations made by a public utility affecting or pertaining to its charges or service to the public shall be just and reasonable.

SEC. 14. (a) Every common carrier shall file with the commission and shall print and keep open to the public inspection schedules showing the rates, fares, charges and classifications for the transportation between termini within this state of persons and property from each point upon its route to all other points thereon; and from each point upon its route to all points upon every other route leased, operated or controlled by it; and from each point on its route or upon any route leased, operated or controlled by it to all points upon the route of any other common carrier, whenever a through route and a joint rate shall have been established or ordered between any two such points. If no joint rate over a through route has been established, the schedules of the several carriers in such through route shall show the separately established rates, fares, charges and classifications applicable to the through transportation. The schedules printed as aforesaid shall plainly state the places between which property and persons will be carried, and shall also contain the classification of passengers or property in force, and shall also state separately all terminal charges, storage charges, icing charges and all other charges which the commission may require to be stated, all privileges or facilities granted or allowed, and all rules or regulations which may in any wise change, affect or determine any part, or the aggregate of such rates and charges, or the

classifications, or the value of the service rendered to the passenger, shipper or consignee. Subject to such rules and regulations as the commission may prescribe, such schedules shall be plainly printed in large type, and a copy thereof shall be kept by every such carrier readily accessible to and for inspection by the public in every station or office of such carrier where passengers or property are respectively received for transportation, when such station or office is in charge of an agent, and in every station or office of such carrier where passenger tickets or tickets for sleeping, parlor car or other train accommodations are sold or bills of lading or waybills or receipts for property are issued. Any or all of such schedules kept as aforesaid shall be immediately produced by such carrier for inspection upon the demand of any person. A notice printed in bold type and stating that such schedules are on file with the agent and open to inspection by any person, and that the agent will assist any person to determine from such schedules any rates, fares, rules or regulations in force, shall be kept posted by the carrier in two public and conspicuous places in every such station or office. The form of every such schedule shall be prescribed by the commission and shall conform in the case of common carriers subject to the act of congress entitled "An act to regulate commerce," approved February fourth, eighteen hundred and eighty-seven, and the acts amendatory thereof and supplementary thereto, as nearly as may be to the form of schedules prescribed by the interstate commerce commission under said act.

(b) Under such rules and regulations as the commission may prescribe, every public utility other than a common carrier shall file with the commission within such time and in such form as the commission may designate, and shall print and keep open to public inspection schedules showing all rates, tolls, rentals, charges and classifications collected or enforced, or to be collected or enforced, together with all rules, regulations, contracts, privileges and facilities which in any manner affect or relate to rates, tolls, rentals, classifications, or service. The rates, tolls, rentals and charges, as to which the commission, by the amendment of November third, nineteen hundred and fourteen to section twenty-three of article twelve of the constitution of California and this act, for the first time acquires jurisdiction, shall not in any case exceed the rates, tolls, rentals or charges in effect on November third, nineteen hundred and fourteen. Nothing in this section contained shall prevent the commission from approving or fixing rates, tolls, rentals or charges, from time to time, in excess of or less than those shown by said schedules.

(c) The commission shall have power, from time to time, in its discretion, to determine and prescribe by order such changes in the form of the schedules referred to in this section as it may find expedient, and to modify the requirements of any of its orders, rules or regulations in respect to any matter

Public utility charges to be just.

Equipment, etc., to be safe and convenient.

Rules to be reasonable.

Common carrier rates to be filed.

Terminal charges.

Copy for public inspection.

Form of schedule.

Rates of other public utilities to be filed.

Changes in form of schedule.

Case 2:09-cv-05622-JAL Document 47-69   Filed: 11/15/19   Entered: 11/15/19 14:43:53   Page 154

LEGISLATIVE INTENT SERVICE   (800) 666-1917

to file monthly reports of earnings and expenses, and to file periodical or special, or both periodical and special reports concerning any matter about which the commission is authorized by this or any other act to inquire or to keep itself informed, or which it is required to enforce. All reports shall be under oath when required by the commission.

**Sec. 30.** Every public utility shall obey and comply with each and every requirement of every order, decision, direction, rule or regulation made or prescribed by the commission in the matters herein specified, or any other matter in any way relating to or affecting its business as a public utility, and shall do everything necessary or proper in order to secure compliance with and observance of every such order, decision, direction, rule or regulation by all of its officers, agents and employees.

**Sec. 31.** The railroad commission is hereby vested with power and jurisdiction to supervise and regulate every public utility in the state and to do all things, whether herein specifically designated or in addition thereto, which are necessary and convenient in the exercise of such power and jurisdiction.

**Sec. 32.** (a) Whenever the commission, after a hearing had upon its own motion or upon complaint, shall find that the rates, fares, tolls, rentals, charges or classifications, or any of them, demanded, observed, charged or collected by any public utility for any service or product or commodity, or in connection therewith, including the rates or fares for excursion or commutation tickets, or that the rules, regulations, practices or contracts, or any of them, affecting such rates, fares, tolls, rentals, charges or classifications, or any of them, are unjust, unreasonable, discriminatory or preferential, or in anywise in violation of any provision of law, or that such rates, fares, tolls, rentals, charges or classifications are insufficient, the commission shall determine the just, reasonable or sufficient rates, fares, tolls, rentals, charges, classifications, rules, regulations, practices or contracts to be thereafter observed and in force, and shall fix the same by order as hereinafter provided.

(b) The commission shall have power, upon a hearing, had upon its own motion or upon complaint, to investigate a single rate, fare, toll, rental, charge, classification, rule, regulation, contract or practice, or any number thereof, or the entire schedule or schedules of rates, fares, tolls, rentals, charges, classifications, rules, regulations, contracts and practices, or any thereof, of any public utility, and to establish new rates, fares, tolls, rentals, charges, classifications, rules, regulations, contracts or practices, or schedule or schedules, in lieu thereof.

**Sec. 33.** Whenever the commission, after a hearing had upon its own motion or upon complaint, shall find that the rates, fares or charges in force over two or more common carriers, between any two points in this state, are unjust, unreasonable or excessive, or that no satisfactory through route or joint rate, fare or charge exists between such points, and that the public convenience and necessity demand the establishment of a through route and jo—

between such points, the commission may order such common carriers to establish such through route and may establish and fix a joint rate, fare or charge which will be fair, just, reasonable and sufficient, to be followed, charged, enforced, demanded and collected in the future, and the terms and conditions under which such through route shall be operated. The commission may order that freight moving between such points shall be carried by the different common carriers, parties to such through route and joint rate, without being transferred from the originating cars. In case the common carriers do not agree upon the division between them of the joint rates, fares or charges established by the commission over such through routes, the commission shall, after hearing, by supplemental order, establish such division; *provided*, that where any railroad which is made a party to a through route has itself over its own line an equally satisfactory through route between the termini of the through route established, such railroad shall have the right to require as its division of the joint rate, fare or charge its local rate, fare or charge over the portion of its line comprised in such through route, and the commission may, in its discretion, allow to such railroad more than its local rate, fare, or charge whenever it will be equitable so to do. The commission shall have the power to establish and fix through routes and joint rates, fares or charges over common carriers and stage or auto stage lines and to fix the division of such joint rates, fares or charges.

**Sec. 34.** The commission shall have the power to investigate all existing or proposed interstate rates, fares, tolls, charges and classifications, and all rules and practices in relation thereto, for or in relation to the transportation of persons or property or the transmission of messages or conversations, where any act in relation thereto shall take place within this state; and when the same are, in the opinion of the commission, excessive or discriminatory or in violation of the act of congress entitled "An act to regulate commerce," approved February fourth, eighteen hundred and eighty-seven, and the acts amendatory thereof and supplementary thereto, or of any other act of congress, or in conflict with the rulings, orders or regulations of the interstate commerce commission, the commission may apply by petition or otherwise to the interstate commerce commission or to any court of competent jurisdiction for relief.

**Sec. 35.** Whenever the commission, after a hearing had upon its own motion or upon complaint, shall find that the rules, regulations, practices, equipment, appliances, facilities or service of any public utility, or the methods of manufacture, distribution, transmission, storage or supply employed by it, are unjust, unreasonable, unsafe, improper, inadequate or insufficient, the commission shall determine the just, reasonable, safe, proper, adequate or sufficient rules, regulations, practices, equipment, appliances, facilities, service or methods

Case 18-30088 Doc# 4769 Filed: 11/15/19 Entered: 11/15/19 14:43:53 Page 155<br>LEGISLATIVE INTENT SERVICE    (800) 666-1917

# Exhibit 16

# REPORT

OF THE

# Railroad Commission of California

From July 1, 1915, to June 30, 1916

VOL. I

CALIFORNIA
STATE LIBRARY
FEB 11 1955
DOCUMENTS SECTION

CALIFORNIA
STATE PRINTING OFFICE
1916

34880

Case 19-30088    Doc# 4769    Filed: 11/15/19    Entered: 11/15/19 14:43:53    Page 157
of 246
LEGISLATIVE INTENT SERVICE    (800) 666-1917

## COMMISSIONERS

MAX THELEN, President

H. D. LOVELAND

ALEX GORDON

EDWIN O. EDGERTON

FRANK R. DEVLIN

———

CHARLES R. DETRICK,
Secretary

Office of Commission
833 Market Street
San Francisco

## CONTENTS.

———

### CHAPTER I.
| | PAGE |
|---|---|
| LETTER OF TRANSMITTAL | 5 |
| JURISDICTION OF RAILROAD COMMISSION | 6 |
| UTILITIES SUBJECT TO JURISDICTION | 11 |
| ORGANIZATION OF RAILROAD COMMISSION | 12 |
| FORMAL PROCEEDINGS | 13 |
| INFORMAL PROCEEDINGS | 20 |
| THE YEAR'S WORK | 23 |
| WORK ON WHICH RAILROAD COMMISSION IS NOW ENGAGED | 29 |
| WORK OF RAILROAD COMMISSION, JANUARY 1, 1911, TO JUNE 30, 1916 | 33 |
| FINANCIAL CONDITION OF CALIFORNIA UTILITIES | 34 |
| NEW CONSTRUCTION | 36 |
| LEGAL | 45 |
| FEDERAL VALUATION OF RAILROADS | 46 |
| NATIONAL ASSOCIATION OF RAILWAY COMMISSIONERS | 49 |
| APPRECIATION | 50 |

### CHAPTER II.
| | PAGE |
|---|---|
| COMMON CARRIERS | 51 |
| RATES | 51 |
| SERVICE | 54 |

### CHAPTER III.
| | PAGE |
|---|---|
| GAS AND ELECTRIC COMPANIES | 60 |
| RATE SCHEDULES | 60 |
| IMPORTANT FORMAL PROCEEDINGS DECIDED AND PENDING | 60 |
| INFORMAL PROCEEDINGS | 63 |
| HYDROELECTRIC DEVELOPMENT | 64 |
| ELECTRIC DEVELOPMENT OF AGRICULTURAL PUMPING | 66 |
| NATURAL GAS SUPPLY AND USE | 68 |
| EXTENSIONS, ADDITIONS AND BETTERMENTS | 70 |

### CHAPTER IV.
| | PAGE |
|---|---|
| WATER COMPANIES | 73 |
| RATES | 73 |
| SERVICE | 76 |
| IMPORTANT FORMAL PROCEEDINGS | 77 |
| INFORMAL COMPLAINTS | 80 |
| EXTENSIONS, ADDITIONS AND BETTERMENTS | 80 |

### CHAPTER V.
| | PAGE |
|---|---|
| TELEPHONE AND TELEGRAPH COMPANIES | 82 |
| CONSOLIDATIONS | 82 |
| EXCHANGE RATES OF THE PACIFIC TELEPHONE AND TELEGRAPH COMPANY | 84 |
| OTHER FORMAL PROCEEDINGS | 85 |
| INFORMAL PROCEEDINGS | 86 |
| EXTENSIONS, ADDITIONS AND BETTERMENTS | 87 |

### CHAPTER VI.
| | PAGE |
|---|---|
| WAREHOUSEMEN AND WHARFINGERS | 89 |
| RATE SCHEDULES | 89 |
| FORMAL RATE PROCEEDINGS | 89 |
| MATTERS JURISDICTIONAL PROCEEDINGS | 90 |
| INFORMAL COMPLAINTS | 90 |

Case: 19-30088   Doc# 4769   Filed: 11/15/19   Entered: 11/15/19 14:43:52   Page 158

LEGISLATIVE INTENT SERVICE   (800) 666-1917

### CHAPTER VII.
|  | PAGE |
|---|---|
| VALUATIONS | 91 |

### CHAPTER VIII.
| | |
|---|---|
| ISSUE OF SECURITIES | 107 |
| JURISDICTION | 107 |
| GENERAL EFFECT OF POLICY ON PUBLIC UTILITY SECURITIES | 107 |
| STATISTICAL INFORMATION AS TO AMOUNT OF PUBLIC UTILITY SECURITIES | 108 |
| IMPORTANT APPLICATIONS FOR ISSUE OF SECURITIES DURING PAST YEAR | 122 |

### CHAPTER IX.
| | |
|---|---|
| CERTIFICATES OF PUBLIC CONVENIENCE AND NECESSITY | 127 |

### CHAPTER X.
| | |
|---|---|
| SAFETY FIRST | 135 |
| JURISDICTION | 135 |
| STATE-WIDE RAILROAD GRADE CROSSING INVESTIGATIONS | 135 |
| OTHER RAILROAD CROSSING PROCEEDINGS | 138 |
| INVESTIGATIONS OF OPERATING METHODS | 139 |
| RAILROAD ACCIDENTS | 139 |
| ACCIDENTS ON OTHER PUBLIC UTILITIES | 141 |
| INSPECTION OF RESERVOIR DAMS | 142 |
| CONSTRUCTION OF POWER TRANSMISSION LINES AND TELEPHONE LINES | 142 |

### CHAPTER XI.
| | |
|---|---|
| PUBLIC OWNERSHIP | 167 |
| JURISDICTION | 167 |
| EMINENT DOMAIN PROCEEDINGS | 167 |
| PUBLIC ACQUISITION OF UTILITY PROPERTY OTHERWISE THAN BY CONDEMNATION | 168 |
| SACRAMENTO VALLEY WEST SIDE CANAL COMPANY CASES | 170 |
| WATER UTILITIES | 171 |
| GAS UTILITIES | 172 |
| ELECTRIC UTILITIES | 173 |

### CHAPTER XII.
| | |
|---|---|
| RAILROAD COMMISSION AND THE STATE | 175 |

### APPENDIX A.
| | |
|---|---|
| FORMAL COMPLAINTS | 180 to 207 |

### APPENDIX B.
| | |
|---|---|
| FORMAL APPLICATIONS | 208 to 277 |
| COMMON CARRIERS | 208 to 225 |
| GAS AND ELECTRIC COMPANIES | 226 to 243 |
| WATER COMPANIES | 244 to 261 |
| TELEPHONE AND TELEGRAPH COMPANIES | 262 to 267 |
| WAREHOUSEMEN AND WHARFINGERS | 268 to 271 |
| MISCELLANEOUS | 272 to 277 |

### APPENDIX C.
| | |
|---|---|
| COURT PROCEEDINGS | 278 |

# CHAPTER I.

## LETTER OF TRANSMITTAL.

SAN FRANCISCO, CALIFORNIA, October 1, 1916.

*To His Excellency* HIRAM W. JOHNSON,
*Governor of California.*

DEAR SIR: We transmit herewith, as required by law, the report of the Railroad Commission of the state of California for the fiscal year ending June 30, 1916.

This report consists of two volumes. Volume I is a narrative in twelve chapters, with three appendices, of the work done by the Railroad Commission during the fiscal year ending June 30, 1916. Volume II is a digest of the finances of California public utilities. The information in Volume II as to common carriers is given for the fiscal year ending June 30, 1916, and the information with reference to other classes of utilities is given for the calendar year ending December 31, 1915.

The Decisions of the Railroad Commission are published in a series of reports entitled "Opinions and Orders of the Railroad Commission of California." Eight volumes, containing the Decisions from January 1, 1911, to December 31, 1915, have been published. The ninth volume will shortly go to press. The Decisions are also printed in pamphlet form within a few days after their rendition, and may be had from the Railroad Commission.

The General Orders of the Railroad Commission issued from January 1 to December 31, 1915, have been consolidated in a pamphlet available for public distribution. General Order No. 46, requiring the protection and guarding of moving machinery, gearing and other mechanical equipment, ladders and stairways, passages and other facilities, was issued subsequent to 1916.

In this Letter of Transmittal we shall merely give a bird's-eye view of the Commission's work during the fiscal year ending June 30, 1916. A more detailed report will appear in the following chapters. In this letter, we shall refer to the following subjects:

1. Jurisdiction of Railroad Commission.
2. Utilities subject to jurisdiction.
3. Organization of Railroad Commission.
4. Formal proceedings.
5. Informal proceedings.
6. The year's work.
   1916.
7. Work in which Railroad Commission is now engaged.
8. Work of Railroad Commission—January 1, 1911, to June 30,

Case: 19-30088   Doc# 4769   Filed: 11/15/19   Entered: 11/15/19 16:56:56   Page 45
of 246
LEGISLATIVE INTENT SERVICE
(800) 666-1917

9. Financial condition of California utilities.
10. New construction.
11. Legal.
12. Federal valuation of railroads.
13. National Association of Railway Commissioners.
14. Appreciation.

## 1. JURISDICTION OF RAILROAD COMMISSION.

The Railroad Commission of the state of California was created by section 22 of Article XII of the Constitution of California.

The Railroad Commission's powers are derived in part from the constitution and in part from statutes.

The constitutional provisions which have conferred powers upon the Railroad Commission are sections 20, 21, 22, 23, and 23a of Article XII of the state constitution.

The principal statute conferring powers upon the Railroad Commission is the Public Utilities Act. This act was originally approved on December 23, 1911, effective March 23, 1912 (St. 1911, Extra Session, p. 18), and was revised and re-enacted April 23, 1915, effective August 8, 1915. (St. 1915, p. 115.) The Public Utilities Act confers on the Railroad Commission jurisdiction over steam, interurban and street railroads, car corporations, express corporations, gas, electrical, telephone, telegraph, and water corporations, wharfingers, warehousemen and pipe line corporations, as these terms are defined in the act. Individuals and partnerships, as well as corporations engaged in these classes of service, are subject to the Railroad Commission's jurisdiction.

With certain exceptions in certain cities, to which matter more detailed reference will hereinafter be made, the Railroad Commission has jurisdiction over the rates, service, facilities, extensions, safety of construction and operation, accounts, transfers and encumbrances of property and issue of securities of all public utilities.

No street railroad, gas, electrical, telephone or water utility may enter a field already being served by a utility of like character unless the Railroad Commission's consent has first been secured.

The Railroad Commission has power, on petition of any municipality or other public authority, to make its finding determining the just compensation to be paid by such municipality or other public authority for the whole or any part of the property of any public utility. Such finding is conclusive in eminent domain proceedings.

In all respects necessary for the protection of the consuming and investing public as well as the utility itself, the Railroad Commission has jurisdiction.

By section 23 of Article XII of the constitution, as amended on October 10, 1911, the legislature was given unlimited power to confer

jurisdiction upon the Railroad Commission over public utilities in unincorporated territory, but it was provided, in effect, that incorporated cities and towns should retain the powers which were vested in them over public utilities until they should elect to vote such powers into the Railroad Commission. Chapter 40 of the Laws of the Extra Session of 1911 (St. 1911, Extra Session, p. 168), commonly known as the Hewitt Elections Act, provided the machinery by which each incorporated city or town might at an election called for that purpose relinquish to the Railroad Commission its powers (except local police power and in certain cases the initial power to grant franchises) over all or any class or classes of public utilities. Acting under this authority fifty-nine incorporated cities and towns have relinquished to the Railroad Commission their powers over various classes of public utilities, not including municipally-owned utilities in so far as they operate within the municipality.

Table No. 1 shows, in alphabetical order, the cities or towns which have elected to relinquish their powers over some class or classes of utilities, with the date of the election in each instance. Where the word "all" is used, the city relinquished its powers (with the exceptions hereinbefore noted) over railroads, street railroads and other common carriers as defined in the Public Utilities Act, gas, electric, telephone, telegraph and water corporations, wharfingers and warehousemen. In other instances the city or town relinquished its power over only a specified class or classes of utilities, as shown in the table.

#### TABLE No. 1.

Cities or Towns Which Have Elected to Relinquish to Railroad Commission Power Over All or Certain Classes of Public Utilities.

| City or town | Date of election | Class or classes of public utilities over which powers were relinquished |
|---|---|---|
|  | Aug. 10, 1914 | All except wharfingers and warehousemen. |
|  | Aug. 11, 1914 | All. |
|  | May 21, 1913 | All. |
|  | Feb. 27, 1914 | All. |
|  | Aug. 2, 1913 | All. |
|  | Feb. 6, 1914 | All. |
|  | Apr. 13, 1914 | All. |
|  | Jan. 22, 1913 | Gas and water corporations. |
| City | Aug. 30, 1913 | All. |
|  | Apr. 13, 1914 | All except wharfingers and warehousemen. |
|  | June 19, 1913 | All. |
| El Centro | Apr. 13, 1914 | Railroads, gas, electric, telephone, telegraph and water corporations. |
| Hayward | Apr. 13, 1914 | All. |
| Hemet | Apr. 13, 1914 | All. |
| Hermosa Beach | Apr. 13, 1914 | All. |
| Hollister | Apr. 13, 1914 | All. |
| Huntington Beach | Sept. 23, 1913 | Street railroads, gas, electric, telephone and water corporations. |
| Huntington Park | Apr. 13, 1914 | All except other common carriers, telegraph corporations, wharfingers and warehousemen. |

Case: 19-30088    Doc# 4769    Filed: 11/15/19    Entered: 11/15/19 14:43:53    Page 160 of 246
LEGISLATIVE INTENT SERVICE
91-666-1917

Exhibit 17

HSB
c.2

CALIFORNIA PUBLIC UTILITIES COMMISSION

Copy 2
California. Railroad commission.
REGULATION OF PUBLIC UTILITIES—REVIEW
OF THE HISTROY OF REGULATIONS....1922

(800) 666-1917

LEGISLATIVE INTENT SERVICE

LIBRARY
DOCUMENTS DEPT.

# REGULATION OF PUBLIC UTILITIES—REVIEW OF THE HISTORY OF REGULATION AND THE METHODS ADOPTED BY THE COMMISSION.

By HARLEY W. BRUNDIGE, President of the Commission.

During the life of men now in middle age there have grown up great corporations, providing certain essential services, upon which depend in very large degree, industry, production, and the prosperity and well being of all the people.

The furnishing of transportation, of communication, of light, heat, power and water have become essential and basic industries. In their absence all industry and all business must cease. When facilities furnished are inadequate, exactly in proportion to such inadequacy does industry and business halt or stagnate.

In the early stages of the development of these utility enterprises there was much that was objectionable. Up until within very recent years the supplying of these essential public services was regarded by the public as speculative enterprises in which too often promoters sought to acquire sudden and unearned wealth, with little or no thought as to the value or quality of the service rendered. "Wild-catting" was of as frequent occurrence in public utility promotions as in mining or in oil development. Stocks and bonds in such enterprises were issued in those early days to be passed out to the public with little or no regard to the security that was back of them. The public service corporations today have a bad inheritance, due to the abuses existing in the days before regulation, when many of the public service corporations were heavily overcapitalized, when watered stocks were made the basis of speculation by gamblers in such securities, and when the public was being exploited in rates to pay dividends upon securities of doubtful value.

In those early days the public had no supervision at all, either over rates or over the quality of the service rendered by the corporations supplying these essential services. In those unhappy days the rule of rate-making was "all the traffic will bear" and the rate-making power, vested as it was in the public utility corporations, was made an instrument to burden and to oppress the people.

Particularly was this true of the railroads exercising the rate-making power to favor or oppress not only individuals, but whole communities. Certain shippers were favored in rates over their business competitors in the same line, rebates were granted to the favored few, and those who incurred the wrath and displeasure of the railroad were denied privileges and facilities to which they were by right entitled.

In those early days the individual who asserted that the business of the railroad company, or of any other public service utility, differed in any manner from the business of the retail merchant or of the farmer in selling his own products, was regarded as a radical, dangerous to the state and to society.

When in 1879 it was provided in the new constitution that the Railroad Commission be created and given jurisdiction over the rates of railroad companies, and charged with the specific duty of seeing that

16245

LEGISLATIVE INTENT SERVICE   (800) 666-1917

passenger and freight rates were nondiscriminatory as between individuals and communities, there was a great outcry that the state was interfering with private business over which it had no concern. So lethargic was public sentiment, so complete was the political control of the railroads, that it was not until 1911 that the legislature of the State of California adopted proper legislation to give force and effect to the constitutional provisions adopted by the people in 1879. The legislature at the following session also extended the jurisdiction of the Railroad Commission so as to give it certain powers over rates and services of utilities other than railroads, and from time to time this act has been amended and enlarged.

### EARLY EFFORTS AT REGULATION.

In so far as the regulation of rates of utilities other than railroads is concerned, in the early days, prior to the enactment of the Public Utility Act, the public had no means of securing even approximately fair rates save through provisions inserted in the franchises of such companies. Inasmuch as these franchises—those which were not constitutional franchises—were for a definite term, usually forty years, it readily can be seen that a rate fixed by franchise, even though just and equitable at the time made, under changing conditions necessarily would become unjust and inequitable. The public rights could not be protected by contract rates imposed and specified in franchises.

Growing out of the failure of franchise rates to protect the public interest, the next step was to deprive the utility company of the power to make rates and to lodge that power in municipalities and in county boards of supervisors.

While this was a step in the right direction, the experience of most cities soon demonstrated that this plan was unworkable. The cities, save the largest, had no means whatever of determining what should be just and equitable rates to be charged for such services. It was impossible for them even to attempt to provide such means. Even the largest cities, such as San Francisco and Los Angeles, found the cost of creating the necessary organization intelligently to ascertain the facts and determine upon fair and equitable rates to be entirely too great to be borne by the communities.

This plan also provided the incentive for the utilities to combine their money and their forces for political ends and to attempt to control municipal elections so that men favorable to their interests would be placed upon local boards, having in their power the determination of the rates to be charged by such utilities.

Those persons who are familiar with the political history of California know only too well the extent to which the utility corporations succeeded in controlling municipal affairs in our larger and many of our smaller cities, during the period of municipal control of utility rates. The corporations were well organized and well financed. They knew exactly what they wanted and were fully informed as to the best means of attaining their ends. The people were unorganized, they had no funds, they had little or no opportunity of presenting their case. They had no means of collecting sufficient data upon which to base even

an intelligent public opinion. The contest was a most unequal one. Everywhere the people were largely at the mercy of the corporations.

Municipal regulation of public utility rates and service, like the attempt to fix rates in franchises, proved a failure.

Under the constitutional amendment adopted in 1911, it was provided that cities upon their own initiative might transfer to the Railroad Commission the jurisdiction previously exercised by them in fixing rates. Under this provision a number of California cities transferred this power to the Railroad Commission. In 1914 the constitution again was amended, placing the rate-making power in the hands of the Commission, where it since has been lodged.

### PURPOSE OF RAILROAD COMMISSION.

In the minds of many good citizens and intelligent men and women there is some confusion as to the purpose for which the Railroad Commission was created, the spirit of the law under which it acts, and the methods adopted by it in arriving at its conclusions. One of the mistaken ideas which seem to be quite prevalent is the conception that the Railroad Commission sits in an exclusively judicial capacity, passing upon the weight of evidence introduced upon the one hand by shrewd attorneys and capable experts employed by the utilities, and on the other by city attorneys and sometimes attorneys employed by consumers.

The Railroad Commission does not merely sit and weigh the mass of evidence on the one side and contrast it with what may be in some instances a pitiful lack of evidence on the other. Instead of so doing, it makes its own investigation by its own experts and technicians, who have access to every document and to every bit of information, and who present elaborate reports covering every phase and essential detail of the business. In addition to making such investigation the Commission also gives consideration to any facts brought forward either by attorneys for the municipality or by consumers or by their attorneys.

The conception which the Commission has of its duty is not that merely of a judge, sifting and weighing evidence presented, in which evidence it has no concern, but it holds that the Railroad Commission was created by the people of the State of California to be their champion and their protector. It is the duty of the Commission to see to it that ratepayers are given service at a fair price and that a public utility company may not be permitted to charge more than is fair.

To carry out this principle the Commission has surrounded itself with a staff of trained experts, whose business it is to inquire into every detail and item of the companies' business, and to advise the Commission as to the exact status of such business. This advice is contained in reports which are submitted in open hearings, and the experts are subject to cross-examination by the representatives of the utilities, by the representatives of municipalities and by the consumers. After securing this information in behalf of the consumers of utilities, the Commission subjects it to the most rigid scrutiny by all parties concerned, establishes by open hearings its complete accuracy, and upon such approvedly correct information bases rates fair alike to the consumer and to the utility.

2—16246

Case: 19-30088   Doc# 1769   Filed: 11/15/19   Entered: 11/15/19 14:43:53   Page 164 of 246

## PROCEDURE FOLLOWED IN RATE-MAKING.

As one of the first steps towards securing reliable and accurate data upon which rates may be based, the Commission requires all utilities to keep their books and accounts in conformity with classifications approved by the Commission, and which are based upon classifications of accounts prescribed for railroads by the Interstate Commerce Commission. In this uniform classification of accounts provisions is made so that every dollar received and every dollar expended by public utility corporations can be traced to its ultimate source. Severe penalties are provided for failure of utilities to keep their books in conformity with methods prescribed by the Commission.

The Commission employs a staff of trained auditors, who, under the law, are given access to every book and every document in possession of the utility. All utilities are required to make annual reports to the Commission. In addition, the Commission may and does call for special reports at other times. All of these reports are subject to check and verification by our auditors whenever necessity for such check seems apparent.

As illustrative of the efficiency of the classified accounting system under direction of the Commission, attention is called to the fact that a few years back the unlawful diversion of the sum of $1,059,000 of one of the large public utilities of the state was uncovered by the auditing department of the Railroad Commission, notwithstanding that clever brains had endeavored to conceal that unlawful diversion. That same machinery is still in operation by the Commission.

In addition to having access to all the company's books and documents and prescribing the manner in which these books must be kept, the Commission also maintains a staff of trained engineers and experts, who, whenever rates or service are involved, make personal investigation upon the ground and submit fully detailed reports of such investigation to the Commission.

In a letter recently addressed to the Railroad Commission, light was sought on what the writer felt was "the practical granting of demands of utilities by default, owing to the inability of consumers to present a case before the Commission for lack of funds, inexperience in such matters, etc."

Under the procedure adopted by the Railroad Commission in the matter of rate-making, there is no such thing possible as a default. The demands of utilities for increased rates have not been granted "practically" or otherwise by default, but every proposed rate increase has been investigated by this Commission fully and completely, and every pertinent fact necessary to determine what should be a fair and equitable rate has been presented.

The Commission recognizes the inability of consumers to secure the data necessary to a proper presentation of their case. The Commission also understands the handicap under which representatives of municipalities labor in attempting to secure sufficient data to protect the rights of consumers, because of this inability of the consumers or their representatives to secure sufficient data successfully to resist the application of the utility for what may be unfair and unjust rates to consumers.

The public utility law provides for the creation by the Commission of a staff of trained technicians and experts whose duty it is to secure exactly the data necessary on behalf of the ratepayers. This work for many years has been done carefully, fully and as expeditiously as possible by the Railroad Commission. At every hearing extensive reports have been introduced in evidence by the Commission's engineers and are made available for the information of city attorneys, attorneys representing consumers and the consumers themselves who attend such hearings. Ample time is given to examine these reports and opportunity is afforded for the closest cross-examination of the Commission's engineers and experts.

The Commission fully understands the duty imposed on it in all matters affecting rates to take the "laboring oar" for the purpose of ascertaining what are fair and equitable rates. It realizes that it can ascertain exact facts upon which fair rates must be based, because it is the only organization having skilled and trained technicians capable of getting at the exact facts. It is impracticable for the ratepayers to organize and raise sufficient funds to employ independent engineers to make such investigation. These outside engineers, even if employed, have not the access to the company's books and records which the Commission's engineers have under the express terms of the law. Even they can not be placed in position to make as full and complete investigation as can be made by employees of the Commission.

The Commission also understands the inability of the average municipality to maintain, because of the large cost, an organization sufficiently equipped and competent to do the work. It necessarily follows that such investigation as is made must be made by the Commission. This fact has been impressed upon the Commission every time a rate hearing has been held. Without in the slightest degree attempting in any way to reflect upon the ability or the purposes of representatives of municipalities and consumers who have appeared before the Commission, it can be stated as a matter of fact that not only the major part but practically the entire evidence on behalf of the ratepayers has been introduced by the Commission through its own experts. That this is true is not strange, and it does not in any way reflect upon either the attorneys or the consumers, who have little or no opportunity of obtaining the essential facts.

## COOPERATION WITH MUNICIPALITIES.

In many communities in the State of California there are the closest and most harmonious relations existing between the Commission and representatives of the cities. It is of the utmost importance to the people of the State of California and to the patrons of utilities that these friendly relations continue to exist. The Commission can do much to help municipalities, and in turn municipalities can be of great assistance to the Commission.

Looking at the problem purely from the standpoint of the Commission, it is obvious that with almost 800 major utilities serving more than three million persons now under the jurisdiction of the Commission, not including auto bus and freight truck utilities, it is impossible for the Commission to secure a sufficient appropriation or build up a staff

Case: 19-30088  Doc# 4769  Filed: 11/15/19  Entered: 11/15/19 14:43:53  Page 165
of 246

of inspectors capable of properly policing all utilities, particularly in regard to the quality of service rendered. In this important branch of the work it is highly desirable that the Commission have the aid and support of the municipalities so that the two agencies, working together for the common good, can secure the very best possible service.

Looking at the problem from the standpoint of the municipalities, it is also equally plain that the municipality can not have the same comprehensive view of utility standards of service that comes to the Commission by reason of the peculiar character of its work and the accurate and definite information concerning the utility that the Commission has gathered. Largely due to the fact that the Commission possesses the rate-making power and has supervision over the stock and bond issues of the corporations and all of their other activities, there is a disposition on the part of the utilities to obey the orders of the Commission with more alacrity than they show in obeying the orders of municipalities. The Commission can be as helpful to the municipalities as the municipalities can be helpful to the Commission. The sound and sensible thing to be done, therefore, is for the Commission and the municipalities to work together in the closest harmony and good will, to the end that the public secure the service to which it is entitled, at fair and reasonable rates.

It is not in the interest of the ratepayers that a municipality and the Commission should indulge in long and tiresome controversy over whose business it should be to perform a certain definite service. The thing the people are interested in is in securing that service. It is the policy of the Commission, in so far as possible, to attempt, by cooperation, to get the results to which it is felt the people are entitled. In this sort of accomplishment there is sufficient glory for all.

One of the things that have proved embarrassing, alike to many city attorneys and to the Commission, has been that when a company files with the Commission an application for an increase of rates, and before any fact in regard to the necessity or lack of necessity for such increase has been ascertained, city councils occasionally have issued instructions to the city attorney to appear before the Railroad Commission and oppose such proposed increase, and have denounced the proposal as "outrageous" without having any information at their command to determine whether or not it was in fact outrageous or justifiable. Acting under such instructions, city attorneys frequently have appeared at hearings, have examined exhibits and witnesses for the company, have been furnished all assistance which could be secured by the Commission, through its independent investigations and reports, and after having followed their instructions to the best of their ability have become convinced that economic conditions and all the facts concerning the business make necessary some increase, they then have been placed in the equivocal position of having lost their case. This is unfair to the attorneys. The proper instructions to them would have been to resist with all their might the fixing of an unjust or unreasonable rate. They should be placed in exactly the same position that the Commission occupies in attempting to fix fair rates. It is to the interest of the people that the rate be fair and equitable. It is against the public interest that a rate be unjust or unreasonable, either to the consumers

or to the utility. The city attorneys should be in a position where they can be helpful to the Commission in determining just and reasonable rates, rather than in a position of defending rates, which, in the light of existing facts, may be unjust and unreasonable.

## ORGANIZATION OF THE COMMISSION.

It has been stated that the Railroad Commission is organized and equipped to secure all necessary data concerning the making of rates and the quality of service supplied by the utilities of the state. It is doubtful, however, if the public understands exactly how the Commission is organized.

There are five Commissioners, appointed by the Governor, who must sit in review upon all the actions taken by the Commission, and all orders and decisions must be signed by a majority of the members.

There are five examiners, three of whom are heads of departments, who, in addition to being heads of departments, hold formal hearings and report their findings to the Commission.

The main offices of the Commission are in San Francisco, and there is a branch office in Los Angeles.

The work of the Commission is divided into eight departments:

The Secretary's Department has charge of correspondence, purchasing, accounting, general office work and attesting documents. Besides the secretary and assistant secretary there are twenty employees in this department.

There is a Legal Department, consisting of an attorney, an assistant attorney, and a stenographer.

The Recorder has charge of publicity, library, statistics and annual report. This department consists of one man, one stenographer and one clerk.

There is a Reporting Department, which makes a record of the proceedings in all formal hearings. It consists of one official reporter, four assistant reporters, two transcribers and one clerk.

There is a Department of Finance and Accounts, which has charge of all accounting records, and in addition gives technical advice to the Commission in all matters relating to the issuance of stocks, bonds and securities. It consists of one financial expert, one chief accountant, four accountants, four clerks and two stenographers.

There is a Rate Department, which has charge of the rates, both passenger and freight, on steam and electric railroads, express lines, on automobile lines, and the rates of wharves, and cold storage plants and warehouses. It consists of one rate expert, three assistant rate experts, one clerk and two stenographers.

There is a Service Department, having charge of the regulation of freight and passenger service on steam and electric railroads and charged with the investigation of accidents. This department consists of one service inspector, two assistant inspectors, and one stenographer.

Case: 19-30088   Doc# 4769   Filed: 11/15/19   Entered: 11/15/19 14:43:53   Page 166 of 246

In addition, there is an Engineering Department under a chief engineer and assistant chief engineer. The Engineering Department is divided into five sections:

*The first section* has to do with transportation, steam and electric, street railroads, vessels and pipe lines, service and valuation. It is in charge of a transportation engineer and has ten assistant engineers.

*The second section* has charge of water supply, irrigation, service, rates and valuation. It consists of one hydraulic engineer and eight assistant engineers.

*The third section* deals with gas, electricity and steam heat and is in charge of the assistant chief engineer, who also is the gas and electric engineer for the Commission, and employs thirteen assistant engineers.

*The fourth section* consists of the Division of Telephone and Telegraph, and consists of one engineer and four assistant engineers.

*The fifth section* has charge of general and special work, stenographic and drafting, and consists of one chief clerk, five clerks, ten stenographers, one office boy and one draftsman.

This is the organization which the State of California has created for the purpose of obtaining, collecting, assembling and analyzing all essential information the utilities operating in the state.

## POWERS AND DUTIES OF COMMISSION.

Concerning the scope of the work in which this organization is employed, reference is made to other chapters in this report dealing with the activities of the various departments.

Of the more than 9199 formal decisions issued by the Commission since its organization, only 88 cases have been appealed to the courts. Of these six still are pending, and only in fourteen instances has the Commission been overruled. This record is pointed to as conclusive proof that the acts of the Commission have been in accordance with established law and with well defined principles of equity, justice and fairness.

The Commission is of the opinion that there is not a sufficient understanding on the part of the public generally that the Commission in exercising the rate-making power must act within clearly express laws contained in our statutes, and also within constitutional limitations which have been clearly defined by the state and federal courts. Upon the federal and state constitutions as interpreted by the courts and upon the express provision of the Public Utilities Act is founded the entire structure of regulation. The so-called "policies" of the Commission merely are rules laid down by it in conformity with the requirements of the law.

In granting to the Railroad Commission the power to fix rates for public utilities, the exercise of that power is limited to the granting of reasonable rates. A rate which is unreasonable and unjust can not be made to stand by this Commission or by any other agency or instrumentality which might or could be created by the state. If, at any time, the people of the state, in the exercise of their police power and acting

through any agency created by them, should fix unjust or unfair rates resulting in confiscation of property, such rates could be overturned by the utility upon proper showing in the courts.

The theory that is back of the law providing for the fixing of rates by an agency of the state is that the people at all times and under changing conditions are entitled to enjoy the essential service provided by public utilities at the actual and reasonable cost of rendering such service, which, of course, includes a reasonable return upon the value of the property devoted to the furnishing of such service. The Commission believes this principle is fair and equitable alike to the consumer and the utility. There are, of course, instances in which a utility is overbuilt, or unwisely built, or located where there is no chance of obtaining at a reasonable rate a fair return upon the expenditure. In such cases there is, and there can be, no hope on the part of the utility to secure an adequate return upon an unwise investment; but, where prudence has been observed in the building of the plant where expenditures have been wisely and honestly made, the rule is equitable and just.

Under this theory of cost, the utility is deprived of that chance which exists in private and unregulated business to earn a high return during periods of prosperity and has no opportunity to recoup itself, such as exists in private business, for losses sustained during periods of depression. The theory is, as nearly as is possible, to keep the utility upon an even keel at all times so far as its earnings are concerned. This almost entirely removes the speculative value which inheres in other privately owned enterprises. It provides for a smaller return, but gives a greater assurance of continuance of such return.

### ELEMENTS OF COST OF SERVICE.

It is not the legal right or is it the policy of this Commission to *guarantee* any definite rate of earning to a utility. It is the legal duty and the policy of the Commission to allow a reasonable return, taking all conditions under consideration. It clearly is in the interest of the people to keep the utility in a position so that it may continue to function and to give satisfactory service which is so vitally necessary for the public welfare. Unless the company can show some return upon the money actually employed in providing the service required by the public it can not permanently maintain adequate or satisfactory service. When the Commission refers to the necessity of keeping a utility sound financially it has in mind only the necessity of the people who are dependent upon the service furnished and who demand that the quality of the service be maintained for their benefit and in their interest.

The cost of service consists of four items: The first is the operating expense; the second, depreciation; the third, taxes; the fourth, a fair return (usually computed in the neighborhood of 8 per cent) upon the value of the property actually used in supplying such service. The sum of these four items should equal the total amount of gross revenue received by the company.

Operating expenses are carefully scrutinized and analyzed. If there is unreasonable expenditure, such unreasonable amounts are deducted from the figures which are allowed as reasonable for operating expenses, and are not placed upon the consumers in rates.

Case: 19-3008 Doc #: 4769 FEDERATIVE INTERNET SERVICE Entered: 06/15/19 14:43:53 Page 167 of 246

The allowance for depreciation is to take care of units of property which wear out and can not be replaced through ordinary maintenance. The allowance is based upon estimated lives of the various classes of property and provides a fund which will take care of the replacement when the property has been wasted away.

In accordance with decisions of all the courts, taxes are allowed as an item of operating costs.

A fair return is a percentage on an amount arrived at by the Commission after an examination and consideration of all elements of value.

### VALUATIONS AND HIGH PRICES.

There seems to be a somewhat popular belief that valuations made in recent years for the purpose of establishing a rate base upon which is to be computed a fair return have reflected the prevailing high prices. This is not the fact, except in so far as these high prices are reflected in items purchased during the period such prices prevailed.

All prices, of course, are aware of the tremendous increase in prices of labor and all commodities in the period beginning with the war and lasting for some time after. These facts are so well known that they need no elaboration here. Material and labor entering into the construction and operation of public utilities advanced fully as much as have other commodities. These advanced prices have reflected themselves in operating costs, but save in so far as additional units have been made to existing plants, have not reflected themselves in the rate base upon which utilities have been permitted to earn.

While interest rates have also advanced in the last few years, the Commission has not permitted this fact unduly to increase the rate of return which the companies have been permitted to earn.

One of the most widely prevalent misconceptions that exist is that the utility is permitted a certain percentage of return after having provided for the payment of interest upon the bonded debts. This is not the fact. All interest obligations which a utility must meet must come out of the fair return (usually computed at about 8 per cent) and based upon the value of the property actually devoted to the public service. After these debt obligations have been taken care of, whatever then is left may be used by the company for paying dividends upon its stock.

The Commission does not fix rates upon capitalization. Such bearing as the outstanding securities of a company may have on the ratepayer is to be found in this: If the indebtedness of the company is very large, or if it exceeds the value of the property as fixed for ratemaking purposes, then there can be no earnings. In some instances the earnings may be insufficient to pay operating expenses and in addition the charges on bonded and other indebtedness. In such instances the company faces either reorganization or bankruptcy. A bankrupt company can not render satisfactory service to a community. It can not secure funds for extensions to take care of new business. It can not maintain its property in condition to give good service. The sooner such company is reorganized and its capitalization brought within reasonable limits, the better it is both for the company and the community to be served.

### UTILITIES NOT PERMITTED TO PROFITEER.

The soundness of the principles adopted by the Railroad Commission in fixing rates is made plain by the fact that while during the war period and thereafter the prices of commodities advanced from 72 to 300 per cent, at the same time the average advance in utility rates in California did not exceed 40 per cent. The utilities were not permitted to earn a larger percentage upon the value of their property than in the pre-war period. The Commission did not allow them to earn unusual or unreasonable profits, even despite the fact that money invested during that period in almost every other form of security or enterprise earned higher returns than it had theretofore. Whatever may have been the condition of unregulated business, the California Railroad Commission saw to it that the utilities of this state did not profiteer or earn any unreasonable rates of return.

The rule not to permit competition in territory the Commission believes to be adequately served is based on the principle that a utility adequately and sufficiently serving a certain territory should be left undisturbed to serve that field without being subjected to competitive conditions which inevitably must result in increased cost of service. Where the territory has not been adequately served, other utilities have been permitted to share the field. If the people are to be afforded the very best service possible it is equally necessary to protect the utility that furnishes adequate service and to admit into a territory not adequately served a new or competing utility that gives sufficient assurance that adequate service will be provided. The whole question involved in granting certificates of public convenience and necessity to utilities to enter fields already occupied must in the last analysis depend upon the character of service furnished by the utility already in the field.

16245  1-22  2000

Exhibit 18

Decision 18-07-025          July 12, 2018

BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA

| | |
|---|---|
| Application of San Diego Gas & Electric Company (U902E) for Authorization to Recover Costs Related to the 2007 Southern California Wildfires Recorded in the Wildfire Expense Memorandum Account (WEMA). | Application 15-09-010 (Filed September 25, 2015) |

## ORDER DENYING REHEARING OF DECISION (D.) 17-11-033

### I.    INTRODUCTION

In this Order, we dispose of the Applications for Rehearing of Decision (D.) 17-11-033 (or "Decision"), filed by San Diego Gas & Electric Company ("SDG&E"), and by Pacific Gas and Electric Company ("PG&E") and Southern California Edison Company ("SCE") jointly.

In October 2007, over a dozen wildfires burned portions of southern California causing extensive property damage and a number of deaths.  Investigation reports issued by the California Department of Forestry and Fire Protection ("Cal Fire") as well as the Commission's Consumer Protection and Safety Division (now the Safety and Enforcement Division ("SED"), determined that three of the fires were ignited by SDG&E electric transmission facilities: the Witch Fire; the Guejito Fire; and the Rice Fire (together "2007 Wildfires").

After the fires, SDG&E, PG&E, and SCE all sought Commission approval to establish Wildfire Expense Memorandum Accounts ("WEMAs") to record costs such as: a) payments to satisfy wildfire claims including co-insurance and deductibles expenses; b) outside legal expenses incurred defending wildfire claims; c) increases or decreases in wildfire insurance premiums from amounts authorized in SDG&E's general

rate case; and d) the cost of financing Wildfire Expense Balancing Account ("WEBA") balances.  The Commission authorized the WEMA accounts in Resolution E-4311.[1]

In 2012 the Commission issued D.12-12-029 which, among other things, kept open SDG&E's WEMA account subject to reasonableness review consistent with Public Utilities Code Section 451 should SDG&E later seek to recover those costs from its ratepayers.[2]

In 2015, SDG&E in fact filed Application (A.) 15-09-010 requesting rate recovery for $379 million in WEMA costs recorded for the 2007 Wildfires.[3]  In this proceeding we conducted the reasonableness review required by D.12-12-029.  Such reviews are governed by Public Utilities Code Section 451.[4]

Section 451 requires utilities to show that all requested charges are "just and reasonable" in order to be recovered in rates.[5]  To ensure that charges requested by a

---

[1] Resolution E-4311, dated July 29, 2010, at pp. 2-3, 10 [Findings and Conclusions Number 2].

[2] See *Application of San Diego Gas & Electric Company, Southern California Edison Company, Southern California Gas Company and Pacific Gas and Electric Company for Authority to Establish a Wildfire Expense Balancing Account to Record for Future Recovery Wildfire-Related Costs* [D.12-12-029] (2012) at pp. 13-14, 19 [Ordering Paragraph Number 2] (slip op.).  (All citations to Commission decisions are to the official pdf versions which can be found on the Commission's website at: http://docs.cpuc.ca.gov/DecisionsSearch Form.aspx.)

[3] See *Application of San Diego Gas & Electric Company for Authorization to Recover Costs Related to the 2007 Southern California Wildfires Recorded in the Wildfire Expense Memorandum Account* (A.15-09-010)*,* dated September 25, 2015, at p. 7.

[4] All subsequent section references are to the Public Utilities Code unless otherwise stated.

[5] D.17-11-033 at p. 10, citing e.g., *Re Southern California Edison Company* ("*Re SCE*") [D.87-06-021] (1987) 24 Cal.P.U.C.2d 476, 486.  Pub. Util. Code Section 451 states in pertinent part:

> All charges demanded or received by any public utility…for any product or commodity furnished or to be furnished or any service rendered or to be rendered shall be just and reasonable.  Every unjust or unreasonable charge demanded or received for such product or commodity or service is unlawful.

> Every public utility shall furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities…as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public.

Pub. Util. Code Section 454 states in pertinent part:

*(continued on next page)*

Case: 19-30088   Doc# 4769   Filed: 11/15/19   Entered: 11/15/19 14:43:53   Page 171 of 246

utility are just and reasonable, and ensure that a utility has operated and maintained its system in a safe and reasonable manner, we have adopted the longstanding Prudent Manager Standard.

Under that standard, a utility has the burden to affirmatively prove that it reasonably and prudently operated and managed its system.[6]  As discussed at more length in Part II.A. below, that means a utility must show that its actions, practices, methods, and decisions show reasonable judgment in light of what it knew or should have known at the time, and in the interest of achieving safety, reliability and reasonable cost.[7]

Our Decision found that, on balance, SDG&E failed to meet its burden to show that its operation and management of its system leading up to the 2007 Wildfires, and its immediate response at the time of the fires, was reasonable and prudent.  By definition then, rate recovery would be unjust, unreasonable, and unlawful under Section 451.  For that reason, we denied SDG&E's request to pass the $379 million in WEMA costs on to its ratepayers.[8]

Applications for Rehearing were filed by SDG&E as well as PG&E and SCE jointly.  SDG&E alleges: (1) it was unlawful to find SDG&E failed to meet the Prudent Manager Standard; (2) Commission precedent did not support the Commission's determination; (3) the Decision erred regarding the severity of wind and weather conditions in October 2007; and (4) the Decision erred by failing to allow rate recovery consistent with the cost spreading principle under the doctrine of inverse condemnation.

---

*(continued from previous page)*

> (a) Except as provided in Section 455, a public utility shall not change any rate or so alter any classification, contract, practice, or rule as to result in any new rate, except upon a showing before the commission and a finding by the commission that the new rate is justified….

[6] See, e.g., *Re SCE* [D.87-06-021], *supra*, 24 Cal.P.U.C.2d at p. 486.

[7] *Id.* at p. 486.

[8] D.17-11-033, at pp. 2, 6, 9-11, 70 [Conclusion of Law Number 9], p. 71 [Conclusion of Law Number 13] & p. 72 [Conclusion of Law Number 21] & [Ordering Paragraph Number 1].

PG&E and SCE challenge the Decision alleging that cost recovery should have been driven by the cost spreading policy of inverse condemnation rather than traditional Commission reasonableness review standards.[2] Responses were filed by the Office of Ratepayer Advocates ("ORA"), Ruth Hendricks, and Protect Our Communities ("POC") and the Utility Consumers' Action Network ("UCAN") jointly.

We have reviewed each and every issue raised by SDG&E, PG&E and SCE and are of the opinion that good cause has not been established to grant rehearing. Accordingly, the Applications for Rehearing of D.15-11-042 are denied because no legal error was shown.

## II. DISCUSSION

### A. Reasonableness Reviews and the Prudent Manager Standard

Commission regulation of privately owned utilities is governed by the principle of reasonableness, as to both a utility's ability to spread costs and charges among its ratepayers, as well as its provision of a safe and reliable utility system. The principle derives from Section 451, which provides:

> All charges demanded or received by any public utility…shall be just and reasonable. Every unjust or unreasonable charge demanded or received by for such product or commodity or service is unlawful.

> Every public utility shall furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities…as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public.

(Pub. Util. Code, § 451.)[10]

Consistent with Section 451, we can grant rate recovery only if requested rates and charges are deemed "just and reasonable." Similarly, rates or charges deemed unjust or unreasonable are unlawful, and must be denied.

---

[2] PG&E and SCE's arguments are almost entirely subsumed in the issues and arguments raised by SDG&E. Thus unless specifically noted, their arguments are not addressed separately.

[10] See also *ante,* fn. 5 [Pub. Util. Code, § 454, subd. (a).].

Case: 19-30088 Doc# 4769 Filed: 11/15/19 Entered: 11/15/19 14:43:53 Page 173 of 246

We have summarized this concept of reasonableness in *In the Matter of the Application of San Diego Gas & Electric Company and Southern California Gas Company for Authority to Revise Their Rates Effective January 1, 2013, in Their Triennial Cost Allocation Proceeding* [D.14-06-007] (2014) at p. 31 (slip op.), stating:

> California law, Commission practice and precedent, and common sense, all essentially require that before ratepayers bear any costs incurred by the utility, those costs must be just and reasonable….When that occurs, the Commission can find the costs incurred by the utility to be just and reasonable and therefore, they can be recovered from ratepayers. When this is not the case however, the Commission can and must disallow those costs: that is unjust or unreasonable costs must not be recovered in rates from ratepayers.

In implementing Section 451 for purposes of utility reasonableness reviews, the Commission utilizes an established Prudent Manager Standard as the test to evaluate whether requested costs are just and reasonable. We have summarized this test as follows:

> The standard for reviewing utility actions has been established as one of reasonableness and prudence….The term "reasonable and prudent" means that at a particular time any of the practices, methods, and acts engaged in by a utility follows the exercise of reasonable judgment in light of facts known known or which should have been known at the time the decision was made. The act or decision is expected by the utility to accomplish the desired result at the lowest reasonable cost consistent with good utility practices. Good utility practices are based upon cost-effectiveness, reliability, safety, and expedition.

(See, e.g., *Re SCE* [D.87-06-021], *supra,* 24 Cal.P.U.C.2d at p. 486.)

Further guidance is embodied in other decisions, such as D.02-08-064, which states:

> A reasonable and prudent act is not limited to the optimum practice, method, or act to the exclusion of all others, but rather encompasses a spectrum of possible practices, methods, or acts consistent with the utility system needs, the

interest of the ratepayers and the requirements of governmental agencies of competent jurisdiction….

The greater the level of money, risk and uncertainty involved in a decision, the greater the care the utility must take in reaching that decision….

The burden rests heavily upon a utility to prove… that it is entitled to the requested rate relief and not upon the Commission, its staff, or any interested party to prove the contrary.

(*Investigation into the Natural Gas Procurement Practices of Southwest Gas Company* [D.02-08-064] (2002) at pp. 5-8 (slip op.) (citations omitted).)

We have also stated:

When [utilities] file applications to demonstrate the reasonableness of Safety Enhancement they will bear the burden of proof that the companies used industry best practices and that their actions were prudent.  This is not a "perfection" standard: it is a standard of care that demonstrates all actions were well planned, properly supervised and all necessary records are retained.

(D.14-06-007, *supra,* at pp. 31, 36 (slip op.).)

Although these concepts guide all Prudent Manager reviews, each case must be evaluated in light of own unique circumstances and the evidence presented.  In this case we reviewed evidence presented by SDG&E, ORA, UCAN, POC, Ruth Hendricks, San Diego Consumers' Action Network ("SDCAN"), and the Mussey Grade Road Alliance ("MGRA").

SDG&E contests our findings for all three 2007 Wildfires.  In its Application for Rehearing, SDG&E essentially attempts to re-litigate the issues and the evidence.  Such attempts are improper under Section 1732.  However, to fully address SDG&E's claims we will discuss SDG&E's allegations below.

## B.    SDG&E's Reasonableness Challenges

### 1.    The Witch Fire

Cal Fire determined that the Witch Fire was caused by SDG&E's 14-mile long 69 kilovolt ("kV") transmission line ("TL") 637 that runs between its Santa Ysabel

and Creelman substations.  TL 637 experienced four faults between 8:53 a.m. and 3:25 p.m. on October 21, 2007.[11]  SDG&E's automatic reclosers re-energized the line after each of the faults.  But the repeated re-energization caused arcing after the third fault that caused hot particles to ignite vegetation below the line.[12]

SDG&E does not contest these facts, but argues we ignored what it knew or reasonably could have known at the time.  SDG&E argues we wrongly found that it: (a) failed to adequately monitor the faults; (b) failed to send a protective engineer to identify the fault locations; and (c) failed to adequately appreciate the arcing risk and more timely de-energize TL 637.  (SDG&E Rhg. App., at  pp. 27-38, citing D.17-11-033, at pp. 27-29, 66-67 [Findings of Fact Numbers 15, 16, 17, 18 & 19] & p. 71 [Conclusions of Law Number 11].)  We disagree.

### a)    Fault Monitoring

SDG&E contends the fact that it dispatched troubleshooters to the substations after the first two faults and dispatched a patrolman after the third fault, proved that it acted prudently.[13]  (SDG&E Rhg. App., at pp. 28-30.)

We acknowledged these steps, but disagreed that they were adequate.  We reasoned that under the conditions, a prudent manager should have sent a protective engineer to determine the exact location and cause of the faults, or, absent that, should have de-energized TL 637 sooner to prevent any potential fire from starting.[14]

---

[11] The first fault occurred at 8:53 a.m., the second at 11:22 a.m., the third at 12:23 p.m., and the fourth at 3:25 p.m.  The Witch Fire was first observed by an air tanker at 12:29 p.m., shortly after the third fault.  Ultimately, TL 637 was not de-energized until approximately 3 hours after the Witch Fire started and almost two hours after SDG&E's Grid Operations became aware of it. (D.17-11-033, at pp. 12-13; ORA Exhibit 2 (ORA-02); SDG&E Exhibits 11 & 11-A (SDG&E-11, at p. 4, SDG&E-11-A, at pp. 2-4.)

[12] Witch Fire Investigation Report.  Case No. 07-CDF-570, Incident No. 07-CA-MVU-10432. October 21, 2007.  California Department of Forestry and Fire Protection.

[13] A patrol never actually occurred.  High winds prevented a helicopter patrol, and rough terrain prevented a patrol by foot.  A fire near the Santa Ysabel substation also made patrol too dangerous.  (SDG&E-11-A, at pp. 7-8, 10-11.)

[14] D.17-11-033, at pp. 27-29.

SDG&E argues that such extraordinary measures were unnecessary. SDG&E said faults are common on windy days, and its reclosers successfully re-energized the line after each of the first two faults. Thus, SDG&E saw no cause for heightened concern.

This reasoning ignores a number of important considerations that a prudent manager should have taken into account. For example:

- SDG&E knew, or should have known that October 21, 2007 was not going to be just an ordinary windy day. For several days Predictive Services at the Southern California Geographic Area Coordination Center, in coordination with the National Weather Service, had been predicting "High Risk" and "Red Flag" wind events for October 21, 2007.[15] SDG&E's own troubleshooters attested to the intensity of the winds on that day.[16]

- SDG&E knew or should have known there was a history of significant wind-related power line fires in San Diego County.[17]

- SDG&E knew that although its recloser policy was industry practice, faults that resulted in multiple re-energization attempts posed a risk of arcing that could ignite vegetation and cause fires.[18]

- SDG&E should have known that multiple faults on TL 637 were cause for concern given faults on TL 637 were uncommon.[19]

- SDG&E knew TL 637 was located in a remote backcountry location with an abundance of vegetation that would be prone to fire.[20]

- SDG&E knew on the day of the Witch Fire that several other fires had already been triggered by the winds.[21]

---

[15] SDG&E-01, Appendix 1, California Fire Siege 2007, at pp. 16-17.

[16] See, e.g., SDG&E-11-A, at pp. 6-7, 10-11, 13.

[17] MGRA Exh. 1 (MGRA-1, at pp. 5-8, 11-18, 23-28.); POC Exh. 1 (POC-1, at pp. 8-9, 11-13, 17-18.)

[18] See e.g., D.17-11-033, at p. 18; ORA-18; Reporters Transcript ("RT") Volume ("Vol.") 2, SDG&E/Geier, at p. 197; ORA-20.

[19] D.17-11-033, at p. 27; ORA-3, at pp. 1-3 (TL 637 Fault History).

[20] SDG&E-11, at pp 3-4.

[21] SDG&E-11-A, at pp. 8-9.

SDG&E argues there was no known or foreseeable risk because not all past fires were linked to utility facilities,[22] and its own facilities had never started a fire due to conductor (line-to-line) contact. SDG&E also argued that its resources were consumed with responding to the Harris Fire, which it deemed a priority because it threatened SDG&E's 500 kV Southwest Powerlink.[23]

These arguments were not persuasive given the above known safety risks. These factors indicated more than a routine response effort was needed. Evidence showed that other response and service entities had prudently prepared for heightened response efforts in light of the impending Santa Ana conditions.[24] Nothing suggested SDG&E had done the same.

SDG&E said only that it took the usual routine measures by sending troubleshooters to the substations. But troubleshooters do not necessarily locate faults and dispatching patrolmen do not help if a patrol is not possible. In addition, while we recognize SDG&E's concerns regarding the Harris Fire, it is not clear why problems on TL 637 or any other line did not merit equal effort.

SDG&E argues there was no evidence a prudent manager would have acted differently. But that was not the burden of any party to prove. Under a reasonably objective view, the conditions warranted more intervention.

### b)     Failure to Deploy a Protective Engineer

Because SDG&E could not patrol the line, it could only have determined the fault locations on TL 637 by deploying a protective engineer to run a computer model using mileage data from its event records.

SDG&E contends that even if it had done that, it could not have prevented the Witch Fire. SDG&E reasons there was only an hour between the second and third faults, and it would have taken longer for a protective engineer to calculate the fault

---

[22] SDG&E-12, at pp. 23-25.

[23] SDG&E-11-A, at pp. 8-9.

[24] (SDG&E-01, Appendix 1, California Fire Siege 2007, at pp. 16-17.)

Case: 19-30088    Doc# 4769    Filed: 11/15/19    Entered: 11/15/19 14:43:53    Page 178 of 246

locations.  Thus, SDG&E argues sending a protective engineer would have changed nothing, and there was no proof its failure to do so caused the fire.  (SDG&E Rhg. App., at pp. 30-32.)

SDG&E misses the fundamental point.  Even if the fire would have started anyway, a reasonableness review looks at whether it acted reasonably and prudently given what it knew or should have known about the potential safety risk.

As explained above, SDG&E knew that Santa Ana wind conditions were predicted, it knew it had such conditions on that day, and it knew those conditions increased the potential for fire risk.  SDG&E also knew there were other wind-related fire events already happening, it knew TL 637 had already faulted twice, it knew repeated reclosing attempts could cause a fire, and it knew relatively quickly that it could not physically patrol TL 637.

Together, these factors suggest that a prudent manager would use all available resources to ensure that TL 637 did not ignite a fire.  Here, that would have meant utilizing a protective engineer and event records to determine the location and cause of the faults.  Even SDG&E conceded that effective use of event records would have put SDG&E in a better position to respond to the faults.[25]  But SDG&E did not do that.  And had SDG&E taken that step, it may have been possible to find that its actions were prudent.

### c)    Delay in De-Energizing TL 637

SDG&E Grid Operations de-energized TL 637 approximately 6.5 hours after first fault occurred and almost 2.5 hours after it knew the Witch Fire had started. We did not consider this time lapse to be reasonable under the conditions (e.g., high winds, multiple faults, etc.), and the likelihood for fire under these conditions.

SDG&E argues there was no reason to de-energize TL 637 any sooner.  It states that the Harris Fire and 2003 Cedar Fires did not involve powerlines, and it didn't know that conductor contact could cause a fire.  SDG&E says all it knew was that it had

---

[25] See, e.g., RT Vol. 3, at p. 349.

temporary faults on a backcountry line on a windy day. Thus, to suggest it could have foreseen a fire or been more proactive was hindsight bias. (SDG&E Rhg. App., at pp. 33-35.)

That SDG&E can name two fires that did not involve powerlines was not persuasive. It knew or should have known that multiple fires, such as the 1970 Laguna Fire, the 2004 Wynola Fire, and the 2005 Fallbrook Fire, were wind and powerline related. That should have put SDG&E on notice that the situation was unsafe.

SDG&E's position regarding the weather conditions is also problematic. Here it says it was just another windy day. Elsewhere it says the winds were extreme and unprecedented.[26] (SDG&E Rhg. App., at pp. 34, 55-57.) It cannot have been both.

In addition, the fact that SGD&E had no direct experience with conductor contact causing a fire misses the larger point. It is reasonable to expect that a prudent manager, when faced with potential conductor contact, would know it presented a heightened safety risk.[27]

SDG&E contends that even if it had de-energized the line when Grid Operations learned of the fire (1:10 p.m.), it would not have prevented it because the fire had already started. But that is not the point. The issue was whether SDG&E could show that its actions and decisions were prudent given what it knew or should have known at the time. De-energizing the line, at least once SDG&E knew the Witch Fire had started, would have been a reasonable and prudent thing to do. SDG&E's own testimony attested to the fact that energized power lines can create additional risks to firefighters and the public in fire conditions.[28]

---

[26] SDG&E states it had safety procedures for Red Flag conditions. (SDG&E Rhg. App., at p. 35.) However, procedures alone do not prove a utility's actions or decisions in any particular instance were reasonable. (*Re Southern California Edison Company* ("*Mohave*") [D.94-03-048] 53 Cal.P.U.C.2d 452, 465-466.)

[27] SDG&E minimizes the potential for fire ignition from repeated re-energization stating the conditions contemplated in its 2001 Field Guide were different. (SDG&E Rhg. App., at p. 35.) Whether the exact same conditions were in play was not the issue. SDG&E knew that an event causing repeated re-energization could cause arcing and potential fire ignitions. Disavowal of any such knowledge is simply not persuasive.

[28] SDG&E-11-A, at p. 11.

SDG&E contends that de-energizing powerlines should not be taken lightly because electricity is needed to provide water supply, traffic signals, communications, and emergency services during fire events.  (SDG&E Rhg. App., at pp. 32-33.)

These are important considerations.  Yet, SDG&E has utilized de-energization strategies before to minimize fire risk.[29]  And SDG&E made no showing here that de-energizing TL 637 sooner would have caused significant adverse impacts.  Given the backcountry location of TL 637, it was not clear why SDG&E waited so long after the fire had begun to de-energize TL 637.[30]

Finally, SDG&E argues that the $379 disallowance amounted to a penalty, and one that was grossly excessive given its culpability.  (SDG&E Rhg. App., at p. 37, citing *BMW of N. Am. v. Gore* ("*BMW*") (1996) 517 U.S. 599.)

*BMW* involved an award of $4,000 in actual damages and $2,000,000 in punitive damages.  The Court deemed $2,000,000 to be excessive in that it was 500 times the amount of actual harm caused by the defendant's conduct.  (*Id.* at pp. 562, 565, 574-576, 581-582.)  That is not the case here.

This case did not involve punitive damages.  And even if did, the $379 million disallowance would not have been excessive compared to the $2.4 billion in actual harm caused by the 2007 Wildfires.

## 2.    The Guejito Fire

Cal Fire determined that the Guejito fire ignited when a Cox Communications ("Cox") lashing wire came into contact with an SDG&E 12 kV overhead conductor between poles 196394 and 196387.  The SDG&E line was located

---

[29] ORA-60.

[30] SDG&E contends that its actions post-ignition, and in response to, the fire were outside the scope of this proceeding.  (SDG&E Rhg. App., at p. 37, citing Scoping Memo, at p. 4; RT Vol. 3, at pp. 388-400, 404, 433 & 436.)  Nothing in the Scoping Memo or elsewhere imposed such a limitation.

Case: 19-30088    Doc# 4769    Filed: 11/15/19    Entered: 11/15/19 14:43:53    Page 181 of 246

above the Cox equipment, and the winds blew the lashing wire up into SDG&E's line, causing an arc and starting the fire.[31]

SDG&E does not contest these facts, but argues we failed to say *why* the lashing wire contacted SDG&E's line, i.e., because Cox's lashing wire was broken. SDG&E claims we ignored that evidence, thus failed to state a material finding of fact. (SDG&E Rhg. App., at pp. 38-41.)

We did not ignore the fact that Cox's lashing wire was broken prior to the contact. But there was no need to make a specific finding to that effect. It was an obvious point, and not material in and of itself.

SDG&E also contends it had no way to know that the lashing wire broke, and it was unreasonable to find that its actions were imprudent just because of a "technical" clearance violation. (SDG&E Rhg. App., at p. 42.)

SDG&E misses the point. It is not about whether SDG&E knew the lashing wire was broken or even when it broke. The issue is that SDG&E knew it had an obligation to maintain its facilities in compliance with established equipment clearance requirements under General Order ("GO") 95.[32]

SDG&E's own testimony readily acknowledged the mandates of GO 95, specifically noting Rule 31.1 (Design, Construction, and Maintenance), Rule 31.2 (Inspection of Lines), Rule 32.1 (Two or More Systems), and Rule 38 (Minimum Clearances of Wires From Other Wires). SDG&E also acknowledged the pole inspection requirements under GO 165.

These regulations required SDG&E to maintain a minimum 6 foot clearance between its line and Cox's equipment. SDG&E was also required to conduct regular patrol inspections to ensure compliance with all safety requirements at least every 2 years, with detailed inspections every 5 years.

---

[31] Guejito Fire Investigation Report. Incident No. CA-MVU-010484. October 22, 2007. California Department of Forestry and Fire Protection; D.17-11-033, at p. 29; ORA-05, at pp. 1075-78.

[32] A copy of GO 95 can be located at: http://www.cpuc.ca.gov/generalorders/.

SDG&E testified that it complied with all inspection requirements, and had last inspected Pole 196394 on June 22, 2007, and Pole 196378 on April 8, 2005.[33]  Still, there was a significant clearance violation that SDG&E's inspections failed to identify.[34]  SDG&E should have known about that violation and resolved it before the Guejito Fire.

SDG&E tries to shift the responsibility to Cox.  But GO 95 applies to both SDG&E and Cox, and both were responsible to ensure compliance with respect to their respective facilities.

SDG&E also suggests that the lashing wire would have contacted its line regardless of the clearance violation, thus there was no causal link between the violation and the fire.  That is a theory SDG&E cannot prove, and the rules are designed to prevent such contact.  SDG&E's speculation and conjecture do not establish error.

SDG&E's position also seems to ignore the point of reasonable and prudent management.  Had SDG&E complied with the established clearance rules, absent any other imprudent conduct, there would have been some basis to find that it reasonably and prudently operated and maintained its facilities.  Here, the GO violation and the failure of SDG&E's inspections to identify the violation demonstrated a failure to reasonably and prudently operate and maintain overhead electric lines in accordance with established rules and regulations.  Compliance is not discretionary.  Thus, we could not reasonably find that SDG&E met the Prudent Manager Standard.

### 3.    The Rice Fire

Cal Fire determined that the Rice Fire ignited when a limb from sycamore tree FF1090 broke and knocked an SDG&E 12 kV line to the ground, starting the fire.[35]  SDG&E does not contest these facts, but contends the Decision: (a) violated section 311; and (b) was unsupported by the evidence.  We find these arguments are without merit.

---

[33] SDG&E-12, at p. 10-11.

[34] D.17-11-033, at pp. 30-31; SDG&E-07, at pp. 14-15.

[35] Rice Fire Investigation Report.  Case No. 07-CDF-572, Incident No. 07-CA-MVU-010502.  October 23, 2007.  California Department of Forestry and Fire Prevention.  (See, also e.g., D.17-11-033, at p. 36; SDG&E-08, at p. 2.)

**a)      Section 311**

SDG&E contends that after the Proposed Decision was issued, we invented an entirely new theory to support the proposed outcome.[36]  SDG&E contends that the modifications made to the Decision were substantive revisions that constituted an "alternate."  As such, SDG&E argues Section 311 required the Decision to be recirculated for a new 30-day review and comment period, and by not doing that SDG&E was denied adequate due process.  (SDG&E Rhg. App., at pp. 43-45.)

Section 311(e) requires that "alternate" decisions be subject to a 30-day public notice and comment period.  But the statute did not apply here because the modifications SDG&E complains of did not make the Decision an "alternate" within the meaning of section 311(e), or the Commission's implementing rules.

Section 311(e) defines an "alternate" as:

> [E]ither a substantive revision to a proposed decision that *materially changes the resolution of a contested issue,* or any substantive addition to the findings of fact, conclusions of law, or ordering paragraphs.

(Pub. Util. Code, § 311, subd. (e) (emphasis added.).)

Similarly, Rule 14.1 of the Rules or Practice and Procedure define an "alternate" as follows:

> (d) "Alternate proposed decision"…means a *substantive revision by a Commissioner* to a proposed decision or draft resolution…which either:
>
> (1) materially changes the resolution of a contested issue, or
>
> (2) makes any substantive addition to the findings of fact, conclusions of law, or ordering paragraphs.
>
> A substantive revision to a proposed decision or draft resolution *is not an "alternate proposed decision"*…if the revision does no more than make changes suggested in prior comments on the proposed decision….

---

[36] A copy of the Proposed Decision can be located at:
http://docs.cpuc.ca.gov/SearchRes.aspx?DocFormat=ALL&DocID=193981771.

Case: 19-30088    Doc# 4769    Filed: 11/15/19    Entered: 11/15/19 14:43:53    Page 184 of 246

(See also Cal. Code of Regs., tit. 20, § 14.1, subd. (d) (emphasis added.).)[37]

The modifications at issue were not an "alternate" because they were not substantive revisions made by a Commissioner, nor did they materially change the outcome recommended by the Proposed Decision. The modifications were simply changes made by the Administrative Law Judge ("ALJ") in response to comments on the Proposed Decision.

Decisions routinely contain changes made by an ALJ following comments on a Proposed Decision. That practice is consistent with section 311(d), which allows the Commission to adopt, modify, or set aside all of a Proposed Decision without any additional review or comment.[38]

The modifications also did not present an entirely new theory to support the proposed outcome. The Proposed Decision and Final Decision both show that the same basic issues were discussed in addressing the Rice Fire. For example, both documents discussed: vegetation clearance requirements; SDG&E's Vegetation Management Program ("VMP"); SDG&E's inspection records for Tree FF1090; the positions of the parties; recommendations by SDG&E's tree contractor; the 0-3 month trim designation under the SDG&E's VMP; evidence regarding the growth rate for Tree FF1090; the latent defect in the limb that fell; and Reliability Tree issues.[39]

The modifications did no more than provide additional detail, based on the evidence, with respect to the same issues. SDG&E had, and availed itself of, the

---

[37] Section 311(e) also requires the Commission to have rules for implementing Section 311(e), stating:

> The commission shall adopt rules that provide for the time and manner of review and comment and the rescheduling of the item on a subsequent public agenda, except that the item may not be rescheduled for consideration sooner than 30 days following service of the alternate item upon all parties.

[38] See Pub. Util. Code, § 311(d).

[39] See Proposed Decision, at pp. 34-43 and Decision, at pp. 36-49.

opportunity to comment on those issues in its testimony, its briefs, and its comments on the Proposed Decision.[40]  Accordingly, SDG&E received adequate due process.

### b)    Record Evidence

The Decision found that SDG&E failed to prove that its vegetation management of Tree FF1090 was prudent because it: deviated from its own past annual trim cycle; failed to keep complete trim records;[41] failed to identify structural issues that may have led to more timely trimming of the limb that broke; and let more than two years lapse prior to the fire without having trimmed Tree FF1090.[42]

SDG&E states there was no need to trim Tree FF1090 in the two years before the fire because it did not find any clearance violations.[43]  (SDG&E Rhg. App., at pp. 51-52.)  Yet even if that was so, SDG&E knew Tree FF1090 was fast growing.[44] And records showed that the tree had been on an annual trim cycle prior to the two year lapse.[45]

That practice suggested that at least at some point, SDG&E believed it was prudent to trim Tree FF1090 annually.  It was not clear why it was suddenly prudent *not* to follow that practice.  It was also not persuasive that SDG&E's idea of prudent management was to trim a tree only when there is a recorded clearance violation.

SDG&E's handling of a trim recommendation that was made before the fire was also a cause for concern.  In July 2007, SDG&E's tree contractor Davey Tree Surgery Company ("Davey") inspected Tree FF1090 and identified a limb directly

---

[40] See, e.g., SDG&E's Comments on the Proposed Decision of ALJs Tsen and Goldberg, dated September 11, 2017 and SDG&E's Reply Comments on the Proposed Decision of ALJs Tsen and Goldberg, dated September 18, 2017.

[41] D.17-11-033, at pp. 36-49.

[42] D.17-11-033, at pp. 42-44; SDG&E-08, Appendix 6.

[43] SDG&E contends the evidence proved that the limb that broke grew away from the line, and we relied on unsubstantiated hearsay to say SDG&E did not prove that fact.  (SDG&E Rhg. App., at pp. 48-49.)  Even if the evidence was hearsay, it is not impermissible to rely on hearsay evidence in administrative proceedings.  (See, e.g., *Investigation re North Shuttle Service Inc.* [D.98-05-019] (1998) 80 Cal.P.U.C.2d 223, 230.)

[44] See, e.g., ORA-32, Data Request Response Number 7.

[45] SDG&E-08, Appendix 6.

overhanging SDG&E's electric line. The contractor testified that the tree showed strong growth toward SDG&E's electric line, thus the limb required immediate trimming.[46]

Using SDG&E's computerized Vegetation Management System ("VMS"), the contractor selected the menu item called "Months to Next Trim" and picked the option that appeared to require the most immediate trim (0-3 months).[47] He understood that to mean that the tree would be trimmed within three months of his inspection.[48]

In explaining why the tree had not been trimmed at the time of the fire, SDG&E said the contractor misunderstood the 0-3 designation. SDG&E argued it did not mean the tree should be trimmed within 3 months of inspection. It only meant the tree would grow out of compliance within 3 months.[49] SDG&E also argued that if a more immediate trim was required, the contractor should have flagged the tree as a hazard tree.[50]

This argument seemed to suggest the only way a tree would be trimmed is if it was identified as a hazard, or if it grew out of compliance with established clearance minimums. Such conditions do not make a strong case for prudent preventative maintenance. If nothing else, it appeared SDG&E had not adequately trained its contractor to know the appropriate means by which to ensure a tree would be trimmed on a more immediate basis. Adequate contractor training is part of a utility's responsibility as prudent manager.

SDG&E's response at the time the trim recommendation was made also raised questions as to prudency. Prior to authorizing a time and equipment billing for the recommended trim, an SDG&E employee went to observe Tree FF1090. He said he recommended against any trimming because he considered the overhang to be too

---

[46] ORA-44, RT Excerpt at pp. 10-13, 39-40, 56.

[47] Options under the 'Months to Next Trim' field were 0-3 months, 3-6 months, and 6-9 months, etc. (SDG&E-13, at p. 10.)

[48] ORA-44, RT Excerpt at pp. 10-11, 39-40, 56.

[49] See, e.g., ORA-34, RT Excerpt at pp. 6-7; SDG&E-13, at pp. 10-11.

[50] SDG&E-08, at pp. 12, 17.

slight.[51]  That is SDG&E's discretion.  Yet if there is a direct overhang, prudent practice suggests that trimming or removing such a limb would be the obvious and safe course to take.

In testimony, SDG&E stated that the limb that broke on October 22, 2007, broke due to the failure of a codominant branch structure with included bark.[52] Throughout the proceeding that was referred to as a "hidden defect."  SDG&E contends that because it was hidden, it could not have known the limb might break, and such defects would be difficult to detect from regular ground inspections.[53]  SDG&E argues even Rule 35 only requires removal of such limbs when a utility has actual knowledge of the problem.[54]  (SDG&E Rhg. App., at pp. 46-48.)

We recognize that Tree FF1090 was fairly tall and that could hinder SGD&E's ability to detect the defect during routine ground inspections.  But the broken limb was also part of a growth structure called a codominant leader branch growth.  And it is known that hidden defects are common in such growth structures.  The tree also appeared to have certain indicia of a Reliability (or hazard) Tree.

SDG&E's own Vegetation Management Plan indicated that both these factors, if properly identified, would result in immediate trimming or removal of the affected limbs.[55]  The Plan also represented that SDG&E routinely inspected for structural defects, limbs that may break even if there are no clearance issues (such as codominant limb growth), and Reliability Tree issues.[56]  Thus, it was not clear why SDG&E's inspections had failed to identify these issues prior to the fire.  SDG&E never

---

[51] SDG&E-13, Appendix 4, at pp. 1-2.

[52] SDG&E-13, Appendix 2, at p. 4.

[53] SDG&E-13, Appendix 2, at p. 4.

[54] SDG&E contends it was, or would have been error to find SDG&E violated Rule 35.  Nothing in the Decision made such a finding.  We merely identified the standard required by that Rule. (D.17-11-033, at p. 37.)

[55] D.17-11-033, at pp. 46-49; SDG&E-13, at p. 11; SDG&E-08, Appendix 3, at pp. 30-31.

[56] SDG&E-13, at p. 9.

Case: 19-30088    Doc# 4769    Filed: 11/15/19    Entered: 11/15/19 14:43:53    Page 188 of 246

claimed that it could not have identified these problems during normal inspections. It only said that it had not found them.

Finally, SDG&E contends that even if it had marked Tree FF1090 as a Reliability Tree and/or trimmed that tree, there was no proof that the fire would have been avoided. (Rhg. App., at pp. 48, 51.)

There is no way to know that. At least the potential for fire would have been reduced. And again, the argument sidesteps the fact that if SDG&E had adhered to its annual trim cycle for this tree, adequately trained its contractors, or acted on what seemed to be reasonably identifiable structural problems, it may have been possible to agree that SDG&E's actions were prudent. The evidence did not support that conclusion here.

### C.    Commission Precedent

In discussing the outcome in this case, the Decision found certain similarities between the facts of this case and three other notable prudency reviews where the Commission denied rate recovery due to various utility errors or failures. (D.17-11-033, at pp. 49-54, citing *Re Southern California Edison Company* ("*SONGS I*") [D.84-09-120] (1984) 16 Cal.P.U.C.2d 249 [Replacement power costs related to an oil leak and fire at San Onofre Nuclear Generating Station]; *Re Pacific Gas and Electric Company* ("*Helms*") [D.85-08-102] (1985) 18 Cal.P.U.C.2d 700 [Costs related to delays in construction of the Helms Pumped Storage Project]; *Mojave* [D.94-03-048], *supra,* 53 Cal.P.U.C.2d 452 [Costs associated with explosion at the Mojave Generating Station].)

SDG&E contends these decisions fail to support any finding of imprudence, because unlike *Mohave*, SDG&E implemented its inspection and maintenance program, unlike *Helms*, SDG&E was not issued safety citations or subject to work shut downs, and unlike *SONGS I,* SDG&E did not have improper equipment in place. (SDG&E Rhg. App., at pp. 54-55.)

It was not necessary that these specific facts be the same. As discussed above, each case presents its own unique facts and circumstances. But there were certain

Case: 19-30088    Doc# 4769    Filed: 11/15/19    Entered: 11/15/19 14:43:53    Page 189 of 246

analogies, and SDG&E ignored those.[57]  SDG&E may disagree with our findings in that regard.  But that does not establish that we erred.[58]

### D.    Wind and Weather Conditions

SDG&E contends that the wind and weather conditions were unprecedented when the fires broke out, and it was error to find that those conditions did not impact SDG&E's operation and management of its facilities.  (SDG&E Rhg. App., at pp. 55-57.)

We did not say the conditions had no impact at all.  We recognize Santa Ana wind conditions can present certain challenges.  Yet the evidence suggested the conditions were not as extreme and unprecedented as SDG&E claimed, and SDG&E failed to show that the conditions impacted its actions in a manner that should have negated any finding of imprudence.[59]

In evaluating the weather conditions, we considered evidence presented by SDG&E's own experts as well the experts of other parties.[60]  These experts used very different methodologies to arrive at their conclusions.

SDG&E's main expert used wind tunnel simulations and calculations derived from a numerical computer program designed to approximate the physical process of the atmosphere (Mesoscale modeling).[61]

---

[57] SDG&E also argues we must find "clear and identifiable errors" in order to find imprudence. (SDG&E Rhg. App., at p. 53.)  Certain prudence reviews have identified such errors.  But that is not the established test.  And even if it was, SDG&E fails to explain how many of the issues discussed herein would not qualify as such.

[58] See *Southern California Edison Company v. Public Utilities Commission* (2005) 128 Cal.App.4th 1, 8.

[59] D.17-11-033, at pp. 55-60.

[60] See,  e.g., SDG&E-01; SDG&E-10; SDG&E-15; MGRA-1; POC-1; UCAN-01; UCAN-02; UCAN-07.

[61] SDG&E-10, at pp. 3-11, 13-19; SDG&E-15.  Based on this approach SDG&E calculated mean or sustained wind speeds of 56 mph for the Witch Fire, 34 mph for the Guejito Fire and 37 mph for the Rice Fire.  Peak gust speeds were calculated to be 78-87, 59-68, and 70-75 mph, respectively.  (SDG&E-10, at p. 3.)  SDG&E also states that the California Fire Siege 2007 Report deemed the 2007 fires as among the most devastating in California history.  (SDG&E Rhg. App., at p. 56, citing SDG&E-01, Appendix 2, at p. 6.)  The Report does indicate the wind event was severe.  But the fact that the fires were devastating does not necessarily mean that the

*(continued on next page)*

This approach was criticized as producing artificial results, and parties argued SDG&E had failed to account for the limitations and error estimates associated with its approach.[62]

By contrast, UCAN's experts relied on Remote Automatic Weather Station ("RAWS") data, i.e., actual wind observations recorded at various geographical locations at the time of the event. Based on that data, they concluded that the October 2007 weather conditions were neither unprecedented nor uniquely extreme.[63]

SDG&E rejected RAWS in arriving at its wind estimates. SDG&E said RAWS data was unreliable because on the ground obstructions could minimize what SDG&E believed to be the actual wind values.[64]

In response, UCAN's experts argued, among other things, that: (a) rejection of RAWS data led to a biased result; (b) the consistency of RAWs data at the various weather stations proved its accuracy and reliability; (c) SDG&E's calculations were overstated as based on a worst case scenario; (d) wind tunnel estimates were unnecessary and relied on flawed computer (Mesoscale) inputs; (e) theoretical calculations and modeling fail to accurately capture the physical terrain and actual atmospheric conditions; and (f) SDG&E's Santa Ana Wildfire Threat Index ("SAWTI") appeared to overstate the impact of the winds on fire spread.[65]

Perhaps no approach is perfect. The evidence was conflicting. But on balance, we found the evidence supported UCAN's approach as being more realistic, and reliable. Thus, we find no error.

---

*(continued from previous page)*
wind and weather conditions were unprecedented.

[62] See, e.g., ORA-55, at pp. 4-3 to 4-9.

[63] UCAN-01; UCAN-02; UCAN-07. Based on RAWS observations UCAN determined mean or sustained wind speeds of 23-29 mph for the Witch Fire, 26-33 mph for the Guejito Fire, and 17-25 mph for the Rice Fire. Associated peak sustained winds were 30-38, 26-33, and 20-28 mph, respectively. Gust speeds at the time of ignition were determined to be 43.1, 56.7, and 34.4, respectively. (UCAN-02, at p. 3.)

[64] See, e.g., SDG&E-10, at pp. 13-19.

[65] UCAN-01, at pp. 4-5, 11-17; UCAN-07, at pp. 25-27.

Case: 19-30088    Doc# 4769    Filed: 11/15/19    Entered: 11/15/19 14:43:53    Page 191
of 246

### E.    Inverse Condemnation Generally

Inverse condemnation is a reverse eminent domain proceeding.  Both derive from the constitutional principle that private property may not be "taken" or damaged for public use without just compensation.[66]  In an eminent domain proceeding, a public or governmental entity seeks to condemn or "take" private property for a public use (such as the construction of an electric transmission line).

In an inverse condemnation proceeding, a property owner seeks to hold a public or government entity strictly liable for any physical injury/damages that may have been caused by that entity's public improvement.  Traditionally, the doctrine has covered damages to real property.  But it can also compensate for the loss of personal property.[67]

Under inverse condemnation, liability can be found whether or not the damage was foreseeable, and even if there was no fault or negligence by the public entity.[68]  All a plaintiff need establish is a causal relationship between the governmental activity and the property loss complained of, i.e., proximate cause.  And a public entity can be held strictly liable for damages if its public improvement was a substantial cause of the damages, even if it is only one of several concurrent causes.[69]

The policy underlying inverse condemnation is one of cost sharing or cost spreading.  It is intended to relieve individual property owners from the economic burden of damages by spreading the costs among the larger community of individuals that benefit from the public improvement.[70]

Relevant case law reflects that the doctrine was initially applied to only local public or governmental entities such as a City Department of Water and Power.

---

[66] See, e.g., *Marshall v. Department of Water and Power of the City of Los Angeles* ("*Marshall*") (1990) 219 Cal.App.3d 1124, 1138-1139; *San Diego Gas & Electric Company v. The Superior Court of Orange County* ("*Covalt*") (1996) 13 Cal.4th 893, 939-940, citing Cal. Cost., art. I, § 19; U.S. Const., 5th Amend.

[67] *Marshall, supra,* 219 Cal.App.3d at pp. 1138-113.

[68] *Marshall, supra,* 219 Cal.App.3d at pp. 1138-1139.

[69] *Marshall, supra,* 219 Cal.App.3d at p. 1139.

[70] See, e.g., *Barham v. Southern California Edison Company* ("*Barham*") (1999) 74 Cal.App.4th 744, 752.

Case: 19-30088    Doc# 4769    Filed: 11/15/19    Entered: 11/15/19 14:43:53    Page 192 of 246

More recently, the Courts have allowed inverse condemnation claims against Commission-regulated, privately-owned utilities ("IOUs").[71]

In extending inverse condemnation liability to IOUs, the Courts have reasoned there are functional similarities between local public or government entities and regulated IOUs. For example, in 1999 the Court stated:

> …the Supreme Court held that a public utility is in many respects more akin to a governmental entity than to a purely private employer….[m]oreover, the nature of the California regulatory scheme demonstrates that the state generally expects a public utility to conduct its affairs more like a governmental entity than like a private corporation….We are not convinced that any significant differences regarding the operation of publicly versus privately owned utilities…

(*Barham, supra,* 74 Cal.App.4th at p. 753.)

In a later case, SCE argued that a distinction could be drawn because unlike governmental entities (such as a city), IOUs have no taxing authority. IOUs can only raise rates with Commission approval.[72] But the Court said only that SCE failed to prove the Commission would *not* allow it to pass along costs in rates, stating:

> As the *Barham* court noted, if we were to adopt Edison's position, "we would be required to differentiate between damage resulting from the operation of a utility based solely upon whether it is operated by a governmental entity or by a privately owned public utility' but we are "not convinced that any significant differences exist."

*Pacific Bell Telephone Company v. Southern California Edison Company* ("*Pac Bell*") (2012) 208 Cal.App.4th 1400, 1407-1408.)

## F.    SDG&E's Inverse Condemnation Challenge

After the 2007 Wildfires, more than 2,500 civil lawsuits were filed against SDG&E by property owners and governmental entities seeking recovery for damages

---

[71] For purposes of this order, the terms IOUs and utilities are used interchangeably to mean Commission-regulated, privately-owned utilities. The terms do not include publicly-owned utilities.

[72] *Pacific Bell Telephone Company v. Southern California Edison Company* ("*Pac Bell*") (2012) 208 Cal.App.4th 1400, 1407-1408.

Case: 19-30088    Doc# 4769    Filed: 11/15/19    Entered: 11/15/19 14:43:53    Page 193 of 246

caused by the 2007 Wildfires. The San Diego Superior Court ruled that the civil plaintiffs could bring a cause of action against SDG&E under the doctrine of inverse condemnation.[73]

Because the investigation reports linked SDG&E's facilities to the Witch, Guejito, and Rice fires, SDG&E argued that fully litigating the damage claims was too great a financial risk in light of its potential liability. For that reason SDG&E settled the claims in lieu of litigating them to conclusion. In its Application before this Commission, SDG&E stated that the requested $379 million represents claim amounts not otherwise covered by its liability insurance, settlements with third parties, or cost recovery from the Federal Energy Regulatory Commission ("FERC").[74]

SDG&E's settlement of the claims meant the Superior Court never formally determined that SDG&E was strictly liable under inverse condemnation. But SDG&E argued liability was inevitable, thus our review should have been driven by the cost spreading principle of inverse condemnation, not by the traditional Section 451/Prudent Manager review.

SDG&E argues that if we had applied the cost spreading principle, rate recovery would have been allowed. But in denying that recovery, we: (1) created an unnecessary conflict of laws; (2) produced an unjust and unreasonable result; and (3) violated Constitutional takings principles. We discuss these allegations below.

### 1.    Conflict of Laws

Inverse condemnation is a constitutional principle and this Commission must abide by the Constitution.[75] SDG&E therefore reasons we created a conflict of laws by failing to harmonize Section 451 and inverse condemnation in a manner that allowed it to pass its WEMA costs on to ratepayers.[76] (SDG&E Rhg. App., at pp. 13-16, citing

---

[73] See A.15-09-010, at p. 2, citing *In re Wildfire Litigation,* January 29, 2009 Minute Orders Overruling SDG&E's Demurrers to the Master Complaints.

[74] A.15-09-010, at p. 7. [Total WEMA costs identified as $2.4 billion.].

[75] See Pub. Util. Code, §§ 1757, subd. (a)(6) & 1757.1, subd. (a)(6).

[76] SDG&E argues our Decision ignored inverse condemnation, thus failed to contain adequate

*(continued on next page)*

*PG&E Corporation v. Public Utilities Commission* ("*PG&E Corp.*") (2004) 118
Cal.App.4[th] 1174, 1199.)  We disagree.

As discussed above, Commission regulation of IOUs is governed by the
principle of reasonableness pursuant to Section 451.  SDG&E's challenge raises the
following question: could or must the Commission have foregone Section 451 and the
associated Prudent Manager review in lieu of applying inverse condemnation cost sharing
principles?  We find the answer to that question is no.

Inverse condemnation arises in the context of litigating civil damages
claims.  We have no jurisdiction to award damages or litigate such cases.[77]  It is not in
our purview to render determinations regarding whether inverse condemnation or other
legal tort doctrines should be applied in assessing damages claims.  Those issues are for
the Courts, not this Commission.

More importantly, even if the Court had found SDG&E strictly liable under
inverse condemnation, we could not have set aside Section 451 review.  The California
Constitution expressly prohibits agencies such as this Commission from foregoing such
statutory mandates.  Section 3.5 provides:

> Sec. 3.5 An administrative agency, including an
> administrative agency created by the Constitution or an
> initiative statute, has no power:

---

*(continued from previous page)*
findings and conclusions on all issues material to a decision.  (SDG&E Rhg. App., at p. 13,
citing Section 1705.)  That is incorrect.  Our Decision merely explained that the scope of this
proceeding was limited to determining whether SDG&E met the Prudent Manager Standard.
Inverse condemnation is not an element of, or material to, that analysis.  Thus, no separate
findings or conclusions were required.

[77] Pub. Util. Code Section 2106 provides in pertinent part:

> Any public utility which does, causes to be done, or permits any act,
> matter, or thing prohibited or declared unlawful, or which omits to do
> any act, matter, or thing required to be done, either by the Constitution,
> any law of this State, or any order or decision of the commission, shall
> be liable…for all loss, damages, or injury caused thereby or resulting
> therefrom.  *If the court finds* that the act or omission was willful, it
> may in addition to the actual damages, award exemplary damages.  An
> action to recover from such loss, damage, or injury may be brought *in
> any court of competent jurisdiction* by any corporation or person….

Case: 19-30088    Doc# 4769    Filed: 11/15/19    Entered: 11/15/19 14:43:53    Page 195
of 246

(a) To declare a statute unenforceable, or refuse to enforce a statute, on the basis of it being unconstitutional unless an appellate court has made a determination that such statute is unconstitutional;

(b) To declare a statute unconstitutional;

(c) To declare a statute unenforceable, or refuse to enforce a statute on the basis that federal law or federal regulations prohibit the enforcement of such statute unless an appellate court has made a determination the enforcement of such statute is prohibited by federal law or regulations.

(Cal. Const., art. 3, § 3.5.)

SDG&E ignores these issues, saying only that the Courts have assumed the cost spreading policy of inverse condemnation could be satisfied by IOU rate recovery. (SDG&E Rhg. App., at p. 12.)  Assumptions, however, are not legal requirements.  Thus, unless or until the Courts or the Legislature provide otherwise, our treatment of IOU cost recovery is bound by the statutory mandate of Section 451.

*PG&E Corp.* does not change our conclusion.  *PG&E Corp.* states that the Commission cannot disregard express legislative directives or restrictions on its power. (*PG&E Corp., supra,* 118 Cal.App.4[th] at pp. 1198-1199.)  This is not relevant here because there are no legislative directives or prohibitions regarding the application of Section 451 versus inverse condemnation.

SDG&E also cites *People v. Garcia* (2017) 2 Cal.5[th] 792 to suggest that we were required to forego Section 451 and allow rate recovery under the doctrine of constitutional avoidance.[78]  (SDG&E Rhg. App., at pp. 14-16.)  Again, we disagree.

In *People v. Garcia*, the Court found that requiring sex offenders, as a condition of probation, to waive the psychotherapist-patient privilege did not violate the constitutional rights to privacy or right against self-incrimination.  In reaching that conclusion, the Court reasoned the statute was narrowly tailored so that a defendant's

_____

[78] PG&E and SCE cite to *California Housing Finance Agency v. Elliott* (1976) 17 Cal.3d 575 for the same notion.  (PG&E/SCE Rhg. App., at p. 2.)  We find nothing in that case to suggest an agency must abdicate its own governing statutes and standards in light of constitutional principles.

rights were only limited in specific circumstances and consistent with the State's goal of managing sex offenders. (*Id.* at pp. 792, 800-801, 802-803, 806-807.)

Like the statute in *People Garcia,* Section 451 is narrowly tailored to deny cost recovery only if costs are deemed unjust and unreasonable. That is consistent with the State's goal of ensuring that utility customers receive safe and reliable service, and pay only just and reasonable rates.[79]

Finally, SDG&E contends that even if its actions and decisions were unreasonable, we should have allocated/apportioned costs between ratepayers and shareholders consistent with other reasonableness reviews. (SDG&E Rhg. App., at pp. 14-15, citing *Re Pacific Gas and Electric Company* [D.84-12-033] (1984) 16 Cal.2d 457; *Re Southern California Edison Company* [D.87-06-021] (1987) 24 Cal.P.U.C.2d 476; and *Re Southern California Gas Company* [D.94-05-020] (1994) 54 Cal.P.U.C.2d n391.)

The cited cases are not controlling here. Those cases involved unique circumstances where we approved settlements in which the parties had agreed to allocate costs in varying degrees between ratepayers and shareholders. (*Re Pacific Gas and Electric Company* [D.84-12-033], *supra*, 16 Cal.2d at pp. 457, 460, 489 [Findings of Fact Numbers 1, 3, 6 & 11]; *Re Southern California Edison Company* [D.87-06-021], supra, 16 Cal.P.U.C.2d pp476, 478; and *Re Southern California Gas Company* [D.94-05-020], *supra,* 54 Cal.P.U.C.2d 392-393, 402.) Settlements, however, are not precedential. And they do not establish standards or principles that carry over to future proceedings.[80]

## 2. Alleged Unreasonable and Unjust Result

SDG&E contends we wrongly found inverse condemnation inapplicable to Prudent Manager reviews because doing so subjected SDG&E to an unreasonable whipsaw of incompatible legal standards. SDG&E argues that because inverse

---

[79] Cal. Const., art XII, § 6; Pub. Util. Code, §§ 451, 454, subd. (a), 728.

[80] Commission Rule of Practice and Procedure 12.5; Cal. Code of Regs., tit. 20, § 12.5.

Case: 19-30088 Doc# 4769 Filed: 11/15/19 Entered: 11/15/19 14:43:53 Page 197 of 246

condemnation excludes any analysis of reasonableness, it defied logic that it was subjected it to that standard here.  (SDG&E Rhg. App., at pp. 16-17.)

As discussed above, we were bound to apply the reasonableness standard of Section 451 under the law that exists today.  That inverse condemnation is indifferent regarding reasonableness did not negate our own statutory obligation.

SDG&E also argues we wrongly used its own actions against it in finding that inverse condemnation was irrelevant for purposes of this Phase 1 review.  In particular, SDG&E objects to the fact we said it had withdrawn its inverse condemnation testimony in Phase 1.[81]  SDG&E argues that did not mean it waived those arguments, it just meant SDG&E adhered to the scope of Phase 1.  (SDG&E Rhg. App., at pp. 18-19.)

Our Decision did not say or find that SDG&E had waived all inverse condemnation arguments.  The question was at what juncture that issue might be relevant.  Phase I was about the Prudent Manager review.  As discussed above, many considerations are relevant in that context, but inverse condemnation is not among them.  Thus we correctly found that inverse condemnation was not material to Phase 1.

SDG&E also objects to our stating no Court determined SDG&E was strictly liable under inverse condemnation.[82]  SDG&E argues we could not possibly intend to suggest that a utility must litigate a case to judgement, irrespective of cost, in order to preserve arguments such as inverse condemnation.  (SDG&E Rhg. App., at pp. 19-20.)

Again, that is not what our Decision said.  It is a utility's prerogative to settle civil lawsuits.  It was simply a statement of fact.  And this Commission was not free, in the place of a Court, to make that determination.

Finally, SDG&E contends we could have avoided any tension between Section 451 and inverse condemnation by looking only at whether it was reasonable for

---

[81] D.17-11-033, at pp. 64-65.
[82] D.17-11-033, at p. 65.

SDG&E to settle the damage claims.  (SDG&E Rhg. App., at pp. 16-20, citing *San Diego Gas & Electric Company,* 146 FERC P63,017, ¶¶ 61-62 (2014).)[83]

The purpose of this proceeding was determined by the Scoping Memo. Phase 1 was to address the prudent operation and management of SDG&E's facilities. Whether it was reasonable for SDG&E to have settled the legal claims was an issue for Phase 2.[84]  We were not required to forego the Phase 1 evaluation just because SDG&E preferred a more limited review.

SDG&E's reliance on *San Diego Gas & Electric Company,* 146 FERC P63,017, ¶¶ 61-62 (2014) is also flawed.  FERC did not conduct a dedicated reasonableness review.  SDG&E had requested WEMA cost recovery as part of a Transmission Owner rate case.  (*Id.* at ¶¶ 1-4.)  That is very different than a Prudent Manager review.

In addition, even when FERC considers whether a utility's conduct was reasonable, it applies a very different standard of review.  FERC presumes all costs requested by an IOU are reasonable and prudent, and its analysis stops there unless there is a specific challenge to the utility's request.  (*Id.* at ¶¶ 37-38.)

Our standard is more rigorous.  Utilities bear the burden to prove that all costs sought to be recovered in rates are just and reasonable.[85]  SDG&E did not meet that burden here.  Thus, we find no legal error.

---

[83] PG&E and SCE contend the rate recovery should not be used to deter imprudent actions. Rather, penalties should be used for that purpose.  (PG&E/SCE Rhg. App., at pp. 9-10.)  We did impose such a penalty in D.10-04-047.  (*Investigation on the Commission's Own Motion into the Operations and Practices of San Diego Gas & Electric Company Regarding the Utility Facilities Linked to the With and Rice Fires of October 2007; Investigation on the Commission's Own Motion into the Operations and Practices of San Diego Gas & Electric Company Regarding the Utility Facilities Linked to the Guejito Fire of October 2007* [D.10-10-047] (2010) at p. 1, 16-17 [Ordering Paragraph Number 4] (slip op.).)  The disallowance here was the lawful consequence of review under Section 451.

[84] Scoping Memo and Ruling of Assigned Commissioner and Assigned Administrative Law Judge ("Scoping Memo"), dated April 11, 2016, at pp. 4-6.

[85] See, e.g., *SONGS 1* [D.84-09-120], *supra,* 16 Cal.P.U.C.2d at p. 283 [Stating also: "It would be unconscionable from a regulatory perspective to reward such imprudent activity by passing the resultant costs through to ratepayers."].

### 3.     Constitutional Takings

The State and federal Constitutions prohibit the government from "taking" private property for public use without just compensation.[86]  Generally, there are two types of taking arguments: (1) economic taking; and (2) the physical taking of property.

SDG&E argues there was an economic taking.  Specifically, that our denial of WEMA rate recovery, i.e., SDG&E's ability collect the $379 million from its ratepayers, was an unlawful taking of money it has a right to receive.  (SDG&E Rhg. App., at pp. 21-22.)

This argument assumes that a utility is guaranteed rate recovery for any costs that it incurs (particularly where inverse condemnation could apply).  That is not the case.  For purposes of utility ratemaking or rate recovery, the Courts have found that an unlawful taking or confiscation does not occur unless a regulation or rate is unjust and unreasonable.[87]  And whether a regulation or rate is just and reasonable depends on a balancing of the interests of the regulated entity and the interests of its ratepayers.[88]

Utilities are not entitled to any particular rate recovery.  "That a particular rate may not cover the costs of a particular good or service does not work confiscation in and of itself."[89]  Similarly, a regulated has does not have a constitutional right to a profit or any right against a loss.[90]  As long as the regulation or rates " 'as a whole afford [the regulated firm] just compensation for [its] over-all services to the public, they are not confiscatory. (Citation omitted.)"[91]

---

[86] Cal. Const., art. I, § 19; U.S. Const., 5th Amend.  As applied to utilities, Courts have stated that the guiding principle has been that the Constitution protects utilities from being limited to a charge for their property serving the public which is so "unjust" as to be confiscatory.  (See, e.g., *Duquesne Light Co. v. Barasch* ("*Duquesne*") (1989) 488 U.S. 299, 307-308.)

[87] *Duquesne , supra,* 488 U.S. at p. 307; *20th Century Insurance Co. v. Garamendi* ("*20th Cent. Ins.*") (1994) 8 Cal.4[th] 216, 292.

[88] *Federal Power Commission v. Hope Natural Gas Company* ("*FPC v. Hope*") (1943) 320 U.S. 591, 603; *20th Cent. Ins., supra,* 8 Cal.4[th] at p. 293.

[89] *20th Cent. Ins., supra,* 8 Cal.4[th] at p. 293.

[90] *Id.* at p. 294.

[91] *Id.* at p. 293.

For SDG&E to establish a taking here, it would have to show that it had a protected interest in rate recovery, that we unlawfully withheld that money, and that the takings was for a public purpose.[92]  SDG&E does not establish any of these things here.

Instead, SDG&E reiterates the constitutional policy that under the takings clause a government entity should not force some people alone to bear public burdens which, in all fairness, should be borne by the public as a whole.

Here, SDG&E argues that had it not settled the damages claims, a finding of strict liability was a foregone conclusion.  Thus, in SDG&E's view, its WEMA costs were a public burden that its ratepayers, not it alone, should have to bear.  (SDG&E Rhg. App., at p. 21, citing *Kavanau v. Santa Monica Rent Control Board* ("*Kavanau*") (1997) 16 Cal.4th 761, 773-774.)

We do not see any violation under the standard in *Kavanau*.  That case states that claims of unlawfulness cannot be disposed of by "general propositions."  (*Id.* at pp. 773-744.)  In addition, absent a clear takings the Court will look at other factors such as the economic impact of a regulation on the claimant, the extent to which the regulation interfered with investment-backed expectations, the character of the government action, and the nature of the State's interest in the regulation. (*Id.* at pp. 773-775.)

SDG&E's claim is based entirely on the general proposition of cost sharing. That alone does not prove any constitutional violation occurred.  In addition, under other factors a Court may consider, our determination was lawful.  For example, while the denial of rate recovery may have an economic impact on SDG&E, utilities have no guaranteed expectation of rate recovery under Section 451.  The law is clear.  To be compensable, costs, charges and rates must be just and reasonable.[93]

The character of our action was also in keeping with this Commission's statutory obligations and established ratemaking practice.  And we have a substantial

---

[92] See, e.g., *Bronco Wine Company v. Jolly* ("*Bronco Wine*") (2005) 129 Cal.App.4th 988, 1030.
[93] Pub. Util. Code, § 451.  (See also e.g., *FPC v. Hope, supra,* 320 U.S. at p. 600.)

Case: 19-30088   Doc# 4769   Filed: 11/15/19   Entered: 11/15/19 14:43:53   Page 201 of 246

interest in protecting consumers (ratepayers) from exorbitant, unjust, and unreasonable rates.  Thus, we find no unlawful takings.

## III.    CONCLUSION

The Application for Rehearing of D.17-11-033 is denied because no legal error was established.

THEREFORE, **IT IS ORDERED** that:

1.    The Applications for Rehearing of D.17-11-033 are denied.
2.    This proceeding, Application (A.) 15-09-010 is closed.
      This order is effective today.
      Dated July 12, 2018, at San Francisco, California.

MICHAEL PICKER
President
CARLA J. PETERMAN
LIANE M. RANDOLPH
MARTHA GUZMAN ACEVES
CLIFFORD RECHTSCHAFFEN
Commissioners

Case: 19-30088    Doc# 4769    Filed: 11/15/19    Entered: 11/15/19 14:43:53    Page 202 of 246

Exhibit 19

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

Court of Appeal
Fourth Appellate District

**FILED ELECTRONICALLY**

*11/13/2018*

Kevin J. Lane, Clerk
By: Michael Hubbard

| | |
|---|---|
| SAN DIEGO GAS & ELECTRIC, | D074417 |
|     Petitioner, | (Public Utilities Commission No. 17-11-033) |
|     v. | |
| PUBLIC UTILITIES COMMISSION, | |
|     Respondent; | |
| PROTECT OUR COMMUNITIES FOUNDATION et al., | |
|     Real Parties in Interest. | |

THE COURT:

The petition for writ of review filed by San Diego Gas & Electric Company (SDG&E) and the accompanying exhibits, the answers filed by real parties in interest Protect Our Communities Foundation (POCF) and Ruth Henricks, the answer filed by the California Public Utilities Commission, and the reply to answers filed by SDG&E have been read and considered by Justices Benke, O'Rourke, and Dato.

SDG&E challenges the Commission's decision denying its application to include $379 million in settlement payments stemming from litigation involving wildfires caused by its facilities in 2007. SDG&E asserts the Commission's decision should be annulled because it interpreted Public Utilities Code section 451 (further statutory references are to the Public Utilities Code) in a manner that unconstitutionally conflicts with the strict liability the utility faced in the wildfire litigation as a result of the plaintiffs' inverse condemnation claims. SDG&E also argues the Commission's decision must be annulled because insufficient evidence supported its determination that (1) SDG&E was an imprudent manager and (2) SDG&E's conduct caused the Witch Fire.

1

" ' "[A]ny aggrieved party [to a decision of the Commission] may petition for a writ of review in the court of appeal . . . ." ' " (*SFPP, L.P. v. Public Utilities Commission* (2013) 217 Cal.App.4th 784, 793 (*SFPP*).) "[W]hen 'writ review is the exclusive means of appellate review of a final order or judgment, an appellate court may not deny an apparently meritorious writ petition, timely presented in a formally and procedurally sufficient manner, merely because, for example, the petition presents no important issue of law or because the court considers the case less worthy of its attention than other matters.' [Citation.] We are not, however, 'compelled to issue the writ if the [Commission] did not err . . . .' " (*Ibid*.)

"The limited grounds and standards for our review are set forth in section 1757, subdivision (a). 'No new or additional evidence shall be introduced upon review by the court. In a complaint or enforcement proceeding, or in a ratemaking or licensing decision of specific application that is addressed to particular parties, the review by the court shall not extend further than to determine . . . whether any of the following occurred: (1) The commission acted without, or in excess of, its powers or jurisdiction. (2) The commission has not proceeded in the manner required by law. (3) The decision of the commission is not supported by the findings. (4) The findings in the decision of the commission are not supported by substantial evidence in light of the whole record. (5) The order or decision of the commission was procured by fraud or was an abuse of discretion. (6) The order or decision of the commission violates any right of the petitioner under the Constitution of the United States or the California Constitution.' " (*SFPP, supra*, 217 Cal.App.4th at pp. 793-794.)

" 'There is a strong presumption favoring the validity of a Commission decision.' " (*SFPP, supra,* 217 Cal.App.4th at p. 794.) " 'Generally, we give presumptive value to a public agency's interpretation of a statute within its administrative jurisdiction because the agency may have "special familiarity with satellite legal and regulatory issues," leading to expertise expressed in its interpretation of the statute. [Citation.] Therefore, "the PUC's 'interpretation of the Public Utilities Code should not be disturbed unless it fails to bear a reasonable relation to statutory purposes and language . . . .' " ' " (*Ibid*.)

The Commission's determination that the principals of inverse condemnation did not bar its prudent manager analysis under section 451 was not in excess of its powers, nor a violation of the law, including the Constitutions of the United States and California. Contrary to SDG&E's assertion, the Commission's review was statutorily mandated, and no legal authority authorized it to forego its obligation under section 451. Of note, SDG&E settled the inverse condemnation claims in the wildfire litigation rather than continue to advance its position that it could not be held strictly liable as a non-governmental entity. Further, had the Commission determined that SDG&E acted as a prudent manager, the costs could have been passed onto the ratepayers regardless of any potential strict liability in a civil litigation setting.

In addition, the exhibits submitted by SDG&E do not support its assertion that the Commission's findings under section 451 were not supported by sufficient evidence. Specifically, the record contains substantial evidence showing both that SDG&E's facilities caused all three of the wildfires at issue, and that SDG&E did not meet its burden to show that it reasonably and prudently operated and maintained those facilities. (See *Toward Utility Rate Normalization v. Public Utilities Com.* (1978) 22 Cal.3d 529, 537 ["The findings of fact by the Commission are to be accorded the same weight that is given to jury verdicts and the findings are not open to attack for insufficiency if they are supported by any reasonable construction of the evidence."].)

In sum, SDG&E has failed to demonstrate that the Commission erred on the claims it asserts. Under these circumstances, we decline to issue the writ of review. (*Pacific Bell v. PUC* (2006) 140 Cal.App.4th 718, 729.) The petition is denied. The application of Southern California Edison Company and Pacific Gas and Electric Company for leave to file an amicus curiae brief is denied as moot.

BENKE, Acting P. J.

Copies to: All parties

3

# Exhibit 20

# Appellate Courts Case Information



## Supreme Court

Change court

*Court data last updated: 11/14/2019 06:00 PM*

# Disposition

**SAN DIEGO GAS & ELECTRIC v. PUBLIC UTILITIES COMMISSION (PROTECT OUR COMMUNITIES FOUNDATION)**
**Division SF**
**Case Number S252748**

Only the following dispositions are displayed below: Orders Denying Petitions, Orders Granting Rehearing and Opinions. Go to the Docket Entries screen for information regarding orders granting review.

**Case Citation:** none

| Date | Description |
|------|-------------|
| 01/30/2019 | Petition for review denied |

**Click here** to request automatic e-mail notifications about this case.

Careers  |  Contact Us  |  Accessibility  |  Public Access to Records  |  Terms of Use  |  Privacy

© 2019 Judicial Council of California

California Courts - Appellate Court Case Information                          https://appellatecases.courtinfo.ca.gov/search/case/disposition.cfm?dist...

# Exhibit 21



SUPREME COURT
OF THE UNITED STATES

Search Site for...

ADVANCED SEARCH
DOCKET SEARCH

210

SEARCH TIPS

| OPINIONS | FILING & RULES | ORAL ARGUMENTS | CASE DOCUMENTS | NEWS MEDIA | ABOUT THE COURT |

HOME  SEARCH RESULTS



Search documents in this case: [          ] Search

### No. 18-1368

| Title: | San Diego Gas & Electric Company, Petitioner |
| | v. |
| | California Public Utilities Commission |
| Docketed: | May 1, 2019 |
| Lower Ct: | Court of Appeal of California, Fourth Appellate District, Division One |
| Case Numbers: | (D074417) |
| Decision Date: | November 13, 2018 |
| Discretionary Court Decision Date: | January 30, 2019 |

| DATE | PROCEEDINGS AND ORDERS |
|------|------------------------|
| Apr 30 2019 | Petition for a writ of certiorari filed. (Response due May 31, 2019) |
| | Petition    Certificate of Word Count    Proof of Service |
| May 20 2019 | Waiver of right of respondent Public Utilities Commission of the State of California to respond filed. |
| | Main Document |
| May 22 2019 | Waiver of right of respondent The Protect Our Communities Foundation to respond filed. |
| | Main Document |
| May 28 2019 | DISTRIBUTED for Conference of 6/13/2019. |
| May 30 2019 | Response Requested. (Due July 1, 2019) |
| May 30 2019 | Waiver of right of respondent Public Utilities Commission of the State of California to respond filed. |
| | Main Document |
| May 30 2019 | Motion to file amicus brief filed by Edison Electric Institute. |
| | Main Document    Certificate of Word Count    Proof of Service |
| May 30 2019 | Motion to file amici brief filed by Shareholders in California Investor-Owned Utilities. |
| | Main Document    Certificate of Word Count    Proof of Service |
| May 30 2019 | Brief of respondent Ruth Henricks in opposition filed. |
| | Main Document    Proof of Service    Certificate of Word Count |
| May 30 2019 | Motion to file amicus brief filed by Southern California Edison Company. |
| | Main Document    Certificate of Word Count    Proof of Service |
| Jun 07 2019 | Motion to extend the time to file a response from July 1, 2019 to July 31, 2019, submitted to The Clerk. |
| | Main Document |
| Jun 11 2019 | Motion to extend the time to file a response is granted and the time is extended to and including July 31, 2019, for all respondents. |
| Jul 26 2019 | Brief of respondent California Public Utilities Commission in opposition filed. |
| | Main Document    Certificate of Word Count    Proof of Service |
| Jul 31 2019 | Brief of respondent The Protect Our Communities Foundation in opposition filed. |
| | Main Document    Certificate of Word Count    Proof of Service |
| Aug 13 2019 | Reply of petitioner San Diego Gas & Electric Company filed. |
| | Main Document    Certificate of Word Count    Proof of Service |
| Aug 14 2019 | DISTRIBUTED for Conference of 10/1/2019. |
| Oct 07 2019 | Motion to file amicus brief filed by Southern California Edison Company GRANTED. |
| Oct 07 2019 | Motion to file amicus brief filed by Edison Electric Institute GRANTED. |
| Oct 07 2019 | Motion to file amici brief filed by Shareholders in California Investor-Owned Utilities GRANTED. |
| Oct 07 2019 | Petition DENIED. |

| NAME | ADDRESS | PHONE |
|------|---------|-------|
| **Attorneys for Petitioner** | | |
| Kathleen Marie Sullivan | Quinn Emanuel Urquhart & Sullivan, LLP | (212) 849-7000 |
| Counsel of Record | 51 Madison Ave., 22nd Floor | |
| | New York, NY 10010 | |
| | kathleensullivan@quinnemanuel.com | |
| Party name: San Diego Gas & Electric Company | | |
| **Attorneys for Respondent** | | |
| Michael J. Aguirre | Aguirre & Severson, LLP | 6198765364 |

Suite 1050
San Diego, CA 92101

maguire@amslawyers.com

Party name: Ruth Henricks

| | | |
|---|---|---|
| Kannon K. Shanmugam<br>  Counsel of Record | Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>2001 K Street, N.W.<br>Washington, DC 20006 | (202) 223-7300 |
| | kshanmugam@paulweiss.com | |

Party name: Public Utilities Commission of the State of California

| | | |
|---|---|---|
| Matthew D. Zinn<br>  Counsel of Record | Shute, Mihaly & Weinberger LLP<br>396 Hayes St.<br>San Francisco, CA 94102 | 415-552-7272 |
| | zinn@smwlaw.com | |

Party name: The Protect Our Communities Foundation

| | | |
|---|---|---|
| Catherine C. Engberg<br>  Counsel of Record | Shute, Mihaly & Weinberger, LLP<br>396 Hayes Street<br>San Francisco, CA 94102 | 415-552-7272 |

Party name: The Protect Our Communities Foundation

| | | |
|---|---|---|
| Christine Jun Hammond | California Public Utilities Commission<br>505 Van Ness Avenue<br>San Francisco, CA 94102 | 415-703-2682 |
| | christine.hammond@cpuc.ca.gov | |

Party name: Public Utilities Commission of the State of California

**Other**

| | | |
|---|---|---|
| John Charles Hueston<br>  Counsel of Record | Hueston Hennigan LLP<br>523 West 6th Street, Suite 400<br>Los Angeles, CA 90014 | 213-788-4340 |
| | jhueston@hueston.com | |

Party name: Southern California Edison Company

| | | |
|---|---|---|
| Ilana Beth Gelfman<br>  Counsel of Record | Jones Day<br>100 High Street<br>Boston, MA 02110 | (617) 960-3939 |
| | igelfman@jonesday.com | |

Party name: Shareholders in California Investor-Owned Utilities

| | | |
|---|---|---|
| Jeremy Charles Marwell<br>  Counsel of Record | Vinson & Elkins LLP<br>2200 Pennsylvania Avenue, NW, Suite 500W<br>Washington, DC 20037 | 202-639-6507 |
| | jmarwell@velaw.com | |

Party name: Edison Electric Institute

## OPINIONS
Opinions of the Court
Opinions Relating to Orders
In-Chambers Opinions
Bound Volumes
Internet Sources Cited in Opinions
Media Resources
Case Citation Finder

## FILING & RULES
Electronic Filing
Rules and Guidance
Supreme Court Bar

## ORAL ARGUMENTS
Argument Transcripts
Argument Audio
Calendars and Lists
Courtroom Seating

## CASE DOCUMENTS
Docket Search
Orders of the Court
Orders by Circuit
Granted/Noted Cases List
Journal

## NEWS MEDIA
Services for News Media
Press Releases
Media Advisories
Press Credentials
Speeches
A Reporter's Guide to Applications (PDF)
Chief Justice's Year-End Reports on the Federal Judiciary

## ABOUT THE COURT
Justices
Supreme Court at Work
The Supreme Court Building
History and Traditions
Visiting the Court
Building Regulations
Frequently Asked Questions

CONTACT US | SITE MAP | HELP | FELLOWS PROGRAM | JOBS | LINKS | WEBSITE POLICIES AND NOTICES | PRIVACY POLICY | USA.GOV

**SUPREME COURT OF THE UNITED STATES** • 1 First Street, NE • Washington, DC 20543

# Exhibit 22

Case: 19-30088    Doc# 4769    Filed: 11/15/19    Entered: 11/15/19 14:43:53    Page 212 of 246



F I L E D

San Francisco County Superior Court

MAY 2 1 2018

CLERK OF THE COURT

BY: _____
Deputy Clerk

1

2

3

4

5              SUPERIOR COURT OF CALIFORNIA

6                 COUNTY OF SAN FRANCISCO

7

8

| COORDINATION PROCEEDING SPECIAL TITLE [RULE 3.550] ***California North Bay Fire Cases*** | Judicial Council Coordination Proceeding No.: 4955 **ORDER OVERRULING PG&E'S DEMURRERS** |

14      Three groups of plaintiffs – the Individual Plaintiffs, Public Entity Plaintiffs, and

15  Subrogation Plaintiffs (together, Plaintiffs) –each filed a separate Master Complaint against

16  Defendants PG&E Corporation and Pacific Gas & Electric Company (together PG&E).  Each of

17  the Master Complaints contains a cause of action for inverse condemnation.  PG&E demurred on

18  the same ground to each of the inverse condemnation claims.

19      The demurrers essentially argue that inverse condemnation claims must be dismissed

20  unless it is now obvious that PG&E will be able to pass on any damages award by e.g.,

21  increasing rates, so as to meet the 'socialization' or risk spreading rationale of inverse

22  condemnation.

23      I heard argument May 15, 2018, and now overrule the demurrer.

24

25

26

27

Case: 19-30088    Doc# 4769    Filed: 11/15/19    Entered: 11/15/19 14:43:53    Page 213 of 246

**Judicial Notice and Evidentiary Objections**

PG&E requests judicial notice of five items attached to the Declaration of Keith Eggleton. The requests as to Exhibits A-D are opposed; there are none to Exhibit E.

With respect to Exhibit A, the courtesy copy provided is a disc containing some 155 hours, 15 minutes, and 25 seconds of sporadic faint electronic sounds. Obviously the provision of the disk was a mistake and the request for notice is denied.

Judicial notice of Exhibits B-D is granted. Evid. Code § 452(c); *Breidert v. Southern Pac. Co.*, 61 Cal.2d 659, 661-62 (1964) (taking judicial notice of existence and effect of a PUC decision and plaintiffs' request to the PUC). Notice does not extend to the truth of facts in those documents.

Exhibit E is a Form 10-K in which PG&E represents that PG&E Corporation is a holding company whose primary operating subsidiary is Pacific Gas and Electric Company. Eggleton Decl., Ex. E at 8. The purpose of the request for judicial notice is to establish that this fact is true. *See* Demurrer, 9 n.9. The request for judicial notice itself did not seek notice of the truth of PG&E's representations in the Form 10-K, although it did cite authority to support noticing the truth of PG&E's representations in the Form 10-K if the matter was not disputable. PG&E RJN, 3; *Apple Inc. v. Superior Court*, 18 Cal.App.5th 222, 241-42 (2017). Here, the fact that PG&E Corporation is a holding company whose primary operating subsidiary is Pacific Gas and Electric Company does not appear to be disputable, so it is judicially noticed. *Compare* Individual Plaintiffs' Master Complaint ¶ 10 (alleging the same); Public Entity Plaintiffs' Master Complaint ¶ 10 (alleging the same); Subrogation Plaintiffs' Master Complaint ¶ 10 (alleging the same). PG&E has not identified other facts in the document that should be noticed for their truth.

Case: 19-30088    Doc# 4769    Filed: 11/15/19    Entered: 11/15/19 14:43:53    Page 214 of 246

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Individual Plaintiffs request judicial notice of four documents, attached to the Declaration of Khaldoun Baghdadi. The requests are unopposed. The requests are granted. Evid. Code § 452(c); *Breidert*, 61 Cal.2d at 661-62.

Public Entity Plaintiffs request judicial notice of six documents, attached to the Declaration of John Fiske. The requests are unopposed. With respect to Exhibits 1-3, I grant judicial notice of the fact that the various PUC filings in connection with the applications for rehearing were made on the relevant dates in January 2018 but deny judicial notice of the fact that the decision is not yet final, as that fact is disputed. *Compare* Public Entity Plaintiffs RJN, 1-3; Reply, 10-11. For Exhibits 4-6, I grant the unopposed requests. Public Entity Plaintiffs RJN, 3-5; Evid. Code § 452(c).

Subrogation Plaintiffs request judicial notice of four documents, attached to their Request for Judicial Notice. The requests are unopposed. With respect to Exhibits 1-3, I grant judicial notice of the fact that the documents were filed in PUC proceedings but deny judicial notice of the fact that the decision is not yet final as that fact is disputed. *Compare* Subrogation Plaintiffs RJN, 1-3; Reply, 19-11. I also grant judicial notice of Exhibit 4, which is the Subrogation Plaintiffs' Master Complaint in this action. (But I would consider all Master Complaints that are challenged by the present demurrer without the need for a request for judicial notice.)

**Inverse Condemnation**

**1.     Availability of Inverse Condemnation**

As all parties agree, there are two significant cases on the issue of the availability of inverse condemnation. *Barham v. Southern Cal. Edison Co.*, 74 Cal.App.4th 744, 751 (1999); *Pacific Bell Telephone Co. v. Southern California Edison Co.*, 208 Cal.App.4th 1400 (2012).

- 3 -

PG&E's papers are ambiguous as to whether PG&E challenges those cases (i) and desires me to bypass them,[1] or (ii) because they are distinguishable.[2] At argument PG&E sought to clarify that at least at this trial court level it takes the latter position. By the end of argument, though, it was clear PG&E took the former position. The basic premises of PG&E's challenge is "that inverse condemnation is wholly inapplicable to a privately owned utility whose rates are set by a regulatory body, such as PG&E." Demurrer, 9:6-8.

Plaintiffs in an inverse condemnation case must prove that a public entity has taken or damaged their property for a public use. *Barham,* 74 Cal.App.4th at 751. *Barham* held Southern California Edison Company (SCE) was a "public agency" that damaged the plaintiffs' property for a "public use." *Id.* at 751-52. This was so even though SCE was a privately owned public utility. The Court held it still qualified as a pertinent "public entity." *Id.* at 752-53. The Court refused a test that distinguished privately owned utilities as not subject to inverse condemnation—there was "no rational basis" for such a distinction. *Id.*

*Barham* was reviewed in *Pacific Bell Telephone Co. v. Southern California Edison Co.,* 208 Cal.App.4th 1400 (2012). *Pacific Bell* agreed with *Barham. Pacific Bell* emphasized SCE's "monopolistic or quasi-monopolistic authority, deriving directly from its exclusive franchise provided by the state[,]" as a basis to distinguish other authority that rejected the application of inverse condemnation liability. *Id.* at 1406. The Court explained that "the government has chosen to grant a franchise and delegate the furnishing of electricity to [SCE] rather than operating the utility itself. Such a delegation does not remove the policy justifications underlying the inverse condemnation liability, that individual property owners should not have to

---

[1] PG&E's Memorandum In Support (Demurrer) at 10:22, 16:19- "mistaken assumptions"; 13:20-PG&E asks me to agree with commissioners that appellate authority is in error).
[2] Id. at e.g., 14:22.

contribute disproportionately to the risks from public improvements made to benefit the community as a whole." *Id.* at 1407.

PG&E reads the result in these two cases, and their discussion of the cost sharing rationale of inverse condemnation, as simply reflecting the *lack of a record* that the utility would not be able to pass on to the public inverse condemnation damages.[3] So it offers evidence here that the California Public Utilities Commissions (PUC) will not "automatically" allow utilities to pass on their damages liability. Demurrer, 10, 13. PG&E's primary document is a PUC decision stating that inverse condemnation principles are irrelevant to the reasonableness review through which the PUC applies a "prudent manager" standard to assess whether a utility may increase rates to recover damages. Eggleton Decl., Ex. B at 65, 69-73.[4]

Even if PG&E were right that proof that a privately-owned public utility will be unable to recoup its losses through rate increases eviscerates a plaintiff's right to inverse condemnation, I would overrule the demurrer. Taking the PUC decision at face value, the loss spreading rationale may be satisfied in this case so long as PG&E acted as a "prudent manager." Whether PG&E acted as a "prudent manager" is disputed—PG&E of course contends it will eventually show that it *met* that standard. I cannot say that as a matter of law that there will be no loss

---

[3] The fundamental policy "underlying the concept of inverse condemnation is that the costs of a public improvement benefiting the community should be spread among those benefited rather than allocated to a single member of the community." *Pacific Bell*, supra, 81 Cal.App.4th at 602; see also e.g., *Williams v. Moulton Niguel Water Dist.*, No. G053002, 2018 WL 2057534, at *6 (Cal. Ct. App. May 3, 2018) (purpose of inverse condemnation to ensure that individual property owners are not compelled to bear burdens or incur costs that, in fairness and justice, should be borne by the public at large).

[4] The document may be limited to the case then before the PUC, and even there it's not clear how much weight to be given to the PUC's statement that "Inverse Condemnation principles" are not relevant to the "prudent manager standard" – the utility itself withdrew testimony on inverse condemnation. Eggleton Decl., Ex. B at 65. As the paragraph that follows that quote implies, it may be the PUC only meant that it, and not a superior court via some sort of judgment, would decide how to apply the PUC's 'prudent manager' standard. Evidence that the PUC has not allowed a different utility to pass on damages liability in a different case is not indisputable proof that the PUC will not allow PG&E to pass on its damages here.

- 5 -

spreading in this case. Cf. *Pacific Bell*, 208 Cal.App.4th at 1407 (noting absence of any evidence that the commission would not allow SCE to pass on its damages liability).

But PG&E is not correct to suggest that a lack of proof of cost spreading (or some showing that cost spreading may not be available) is material to the decision, on demurrer, whether inverse condemnation is available. By the end of argument before me, it became clear that PG&E's position was founded on the fact that for privately owned utilities, there is never a guarantee that the regulatory agency will permit cost spreading via e.g. increased rates, whereas with publically owned utilities there is always some tax revenue to fall back on. These facts, PG&E argued, mean that it is never possible for privately owned utilities to be subject to inverse condemnation.

That position is flatly contradicted by *Pacific Bell,* which upheld an inverse condemnation claim against a privately owned utility. *Pacific Bell* emphasized the fact that SCE operated a state-authorized monopoly or quasi-monopoly. 208 Cal.App.4th at 1406. Even when it noted the "loss spreading" rationale, the Court couched the rationale in terms that emphasized the policy against overburdening individual property owners rather than the policy of socializing the cost. *Id.* at 1407-08. The implication is that the *Pacific Bell* Court would have reached the same result even if there had been evidence that the PUC would bar SCE from passing along its damages liability to its ratepayers.

### 2. Whether Application of Inverse Condemnation Violates the Takings Clause

"The Takings Clause of the Fifth Amendment provides: '[N]or shall private property be taken for public use, without just compensation.' The aim of the Clause is to prevent the government 'from forcing some people alone to bear public burdens which, in all fairness and

-6-

justice, should be borne by the public as a whole.'" *Eastern Enters. v. Apfel*, 524 U.S. 498, 522 (1998) (citation omitted).

Although PG&E compares inverse condemnation claim to strict liability, it provided no case in which a court invalidated a state law that required an entity that damaged property to pay for that damage in strict liability. Instead, it relies on several regulatory takings cases.

In that context, "a party challenging governmental action as an unconstitutional taking bears a substantial burden. ... [T]he process for evaluating a regulation's constitutionality involves an examination of the 'justice and fairness' of the governmental action. [Citation.] That inquiry, by its nature, does not lend itself to any set formula, [citation], and the determination whether "justice and fairness' require that economic injuries caused by public action [must] be compensated by the government, rather than remain disproportionately concentrated on a few persons,' is essentially ad hoc and fact intensive, [citation]." *Eastern Enters.*, 524 U.S. at 523 (citations omitted). Several factors have particular significance: The economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the governmental action. *Id.* at 523-24. With respect to public utilities, "[t]he guiding principle has been that the Constitution protects utilities from being limited to a charge for their property serving the public which is so 'unjust' as to be confiscatory." *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 307 (1989).

PG&E argues, without authority, that inverse condemnation liability is an unconstitutional taking unless PG&E is guaranteed to recover damages through its rates. Such authority as there is suggests the proper time for PG&E to raise a challenge is if, and when, the PUC denies PG&E's request to recover any inverse condemnation costs. *Duquesne*, 488 U.S. at

-7-

307. PG&E's Takings Clause argument amounts to a challenge to a PUC decision that has not been, and may never be, made.

Anyway, given the fact intensive inquiry involved, the issue cannot be resolved on demurrer. The economic impact of the regulation is unknown until damages are fixed. PG&E's investment backed expectations are not in evidence. The Takings Clause analysis is fact intensive, and so not for a demurrer. Compare *Duquesne*, 388 U.S. at 310-16 (performing a Takings Clause analysis in the context of a utility).

### 3. Whether Application of Inverse Condemnation Violates Substantive Due Process

"The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (discussing constitutional limitations on punitive damages). PG&E argues that imposing inverse condemnation liability on a public utility that is not guaranteed to recover its costs through automatic rate recovery because (1) such a scenario is contrary to the loss spreading rationale that supports a claim for inverse condemnation; and (2) such an imposition is unnecessary because PG&E is subject to general tort liability. Demurrer, 20-21.

It is not arbitrary or irrational to require a privately owned public utility, which has been granted a monopoly or quasi-monopoly status by the state and which is authorized to pass on its costs to its ratepayers upon satisfying a prudent manager standard, to pay property owners for the damages caused by its instrumentalities. This scenario is consistent with the policy articulated in *Pacific Bell*. *See Pacific Bell*, 208 Cal.App.4th at 1406-08. At best, PG&E raises the possibility that it may not be able to spread the losses. But is not arbitrary or irrational to deny PG&E the opportunity to spread its losses where it fails to satisfy a prudent manager standard.

- 8 -

**PG&E Corporation's Holding Company Status**

PG&E argues that PG&E Corporation cannot be a liable for inverse condemnation because it is a holding company. Demurrer, 17 n.9. PG&E supports the argument with a cryptic citation to *Barham*. *Id.* PG&E seems to suggest that, as a holding company, PG&E Corporation did not own, control, operate, or manage any electric plant for compensation within the state of California. *Barham*, 74 Cal.App.4th at 752. This inference is contrary to the allegations in the demurrer, and so not here cognizable. Individual Plaintiffs' Master Complaint ¶ 11; Public Entity Plaintiffs' Master Complaint ¶ 11; Subrogation Plaintiffs' Master Complaint ¶ 11.

**Conclusion**

The demurrers are overruled.

PG&E asked me to certify the inverse condemnation issue to the Court of Appeal under C.C.P. § 166.1. To be sure the issue is of great interest, but that is not the test. I decline to certify because there is little I can add that the appellate court cannot discern from a petition for a writ. There may be a 'controlling issue of law' but only as to one cause of action---the case must proceed on the other claims, with much the same discovery, whether inverse condemnation is involved or not.[5]

---

[5] To delve a bit into the practicalities: If the PUC's "prudence" standard is roughly equivalent to negligence, then (A) if PG&E was prudent (and not negligent) it will pay damages as inverse condemnation, but not for negligence (tort) liability; (B) if it was not prudent, and if PG&E is right that it cannot be liable for inverse condemnation (since damages cannot be passed on via rate hikes), then it will still pay damages as a function of tort liability. The practical difference between PG&E being right and wrong on the legal issue decided in this order pertains, primarily, to the settlement value of the cases to the extent that evidence of PG&E's negligence is not clear.

-9-

The two principal cases I and the parties have discussed, *Pacific Bell* and *Barham*, do not suggest a reasonable, contrary view of the law. If there is such a contrary view, it will be that of an appellate opinion yet to come, and my views are not material.

PG&E must answer the pending complaints not later than June 11, 2018.

Dated: May 21, 2018

Curtis E.A. Karnow
Judge Of The Superior Court

- 10 -

**CERTIFICATE OF ELECTRONIC SERVICE**
(CCP 1010.6(6) & CRC 2.260(g))

I, DANIAL LEMIRE, a Deputy Clerk of the Superior Court of the County of San Francisco, certify that I am not a party to the within action.

On ___MAY 2 1 2018___, I electronically served THE ATTACHED DOCUMENT via File & ServeXpress on the recipients designated on the Transaction Receipt located on the File & ServeXpress website.

Dated: ___MAY 2 1 2018___

T. Michael Yuen, Clerk

By: _____
DANIAL LEMIRE, Deputy Clerk

Exhibit 23



# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

PACIFIC GAS AND ELECTRIC
COMPANY,

    Petitioner,

v.

SUPERIOR COURT OF CALIFORNIA,
CITY AND COUNTY OF SAN
FRANCISCO,

    Respondent;

BARBARA ABBOT, et al.,

    Real Parties in Interest.

A154847

San Francisco Super. Ct.
No. JCCP4955



Court of Appeal, First Appellate District
FILED
SEP 17 2018
Charles D. Johnson, Clerk
by_____ Deputy Clerk

THE COURT:

    The application by Southern California Edison Company and San Diego Gas &
Electric Company to file an amicus curiae brief is granted.

    The petition for writ of mandate, prohibition, or other appropriate relief is denied.

    The request for judicial notice is denied.

    (Streeter, Acting P.J., Reardon, J., and Tucher, J. participated in the decision.)

Date: _____ SEP **1 7** 2018 _____      STREETER, ACTING P.J.    Acting P.J.

# Exhibit 24

No. S_____
(Court of Appeal No. A154847)
(San Francisco Super. Ct. No. JCCP 4955)

## IN THE SUPREME COURT
## OF THE STATE OF CALIFORNIA

PACIFIC GAS AND ELECTRIC COMPANY,

*Petitioner,*

v.

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF SAN FRANCISCO,

*Respondent,*

BARBARA ABBOTT *et al.,*

*Real Parties in Interest.*

From an Order Summarily Denying a Petition for a Writ of
Mandate, Prohibition, or Other Appropriate Relief by the Court
of Appeal, First Appellate District, Case No. A154847

## PETITION FOR REVIEW

| | |
|---|---|
| Keith E. Eggleton* | Kathleen M. Sullivan |
| (S.B. No. 159842) | (S.B. No. 242261) |
| Rodney G. Strickland | QUINN, EMANUEL, URQUHART & |
| (SBN 161934) | SULLIVAN, LLP |
| WILSON SONSINI GOODRICH & | 555 Twin Dolphin Drive, 5th |
| ROSATI, P.C. | Floor |
| 650 Page Mill Road | Redwood Shores, CA 94065 |
| Palo Alto, CA 94304 | Telephone: (650) 801-5000 |
| Telephone: (650) 493-9300 | Facsimile: (212) 801-5100 |
| Facsimile: (650) 493-6811 | |

*Counsel for Petitioners Pacific Gas and Electric Company and
PG&E Corporation*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ 4

ISSUE PRESENTED ................................................................................. 8

INTRODUCTION ...................................................................................... 8

STATEMENT OF THE CASE ................................................................ 19

     A.    PG&E And The CPUC ................................................. 19

     B.    The North Bay Fires And Plaintiffs' Claims .................. 20

     C.    The CPUC's November 2017 Decision Denying Recovery Of Inverse Condemnation Costs To SDG&E ............................................................................. 21

     D.    PG&E's Demurrer To The Inverse Condemnation Causes Of Action And The Trial Court's Ruling ........... 25

     E.    PG&E's Writ Petition In The Court Of Appeal .............. 29

WHY REVIEW SHOULD BE GRANTED ............................................. 31

I.    THE COURT'S REVIEW IS REQUIRED TO SETTLE AN IMPORTANT QUESTION OF LAW .......................................... 31

     A.    Inverse Condemnation Liability Cannot Extend To Privately Owned Utilities Unless They Can Spread The Costs Of That Liability Across The Benefitted Public .......................................................................... 31

          1.    Cost-Spreading Is The Central Policy Underlying Inverse Condemnation Liability ...... 32

          2.    Inverse Condemnation Has Historically Applied Only To Governmental And Other Public Entities ......................................................... 34

**TABLE OF CONTENTS**
**(continued)**

3. *Barham* And *Pacific Bell* Extended Inverse Condemnation Liability To Privately Owned Utilities Based On The Cost-Spreading Rationale ................................................................. 35

4. The CPUC Decision Makes Clear That *Barham's* And *Pacific Bell's* Assumptions Regarding Cost-Spreading Were Unfounded ..... 38

B. Application Of Inverse Condemnation Liability To Privately Owned Utilities In the Absence Of Cost-Spreading Would Be Unconstitutional .......................... 45

1. Application Of Inverse Condemnation Liability To Privately Owned Utilities Would Violate The Takings Clause Of The Fifth Amendment ........................................................... 47

2. Application Of Inverse Condemnation Liability To Privately Owned Utilities In the Absence Of Cost-Spreading Would Violate Their Substantive Due Process Rights ................. 52

II. THE COURT'S REVIEW IS REQUIRED AS THE PETITION INVOLVES AN ISSUE OF FUNDAMENTAL IMPORTANCE TO THE CALIFORNIA ECONOMY .............. 55

CONCLUSION ......................................................................... 60

CERTIFICATE OF WORD COUNT ....................................... 61

Case: 19-30088    Doc# 4769    Filed: 11/15/19    Entered: 11/15/19 14:43:53    Page 229 of 246

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Albers v. County of Los Angeles* (1965) 62 Cal.2d 250 .................. 9, 33, 35

*Automatic Sprinkler Corp. v. S. Cal. Edison Co.* (1989) 216
 Cal.App.3d 627 ..................................................................... 42

*Bacich v. Bd. of Control* (1943) 23 Cal.2d 343 ................................... 33, 35

*Baker v. Burbank-Glendale-Pasadena Airport Auth.* (1985)
 39 Cal.3d 862 ............................................................... 31, 34

*Barham v. S. Cal. Edison Co.* (1999) 74 Cal.App.4th 744 ............... passim

*Bd. of Regents v. Roth* (1972) 408 U.S. 564 ................................. 52

*Belair v. Riverside Cty. Flood Contrl Dist.* (1988) 47 Cal.3d
 550 .......................................................................... passim

*Customer Co. v. City of Sacramento* (1995) 10 Cal.4th 368 ............... 33, 35

*Duquesne Light Co. v. Barasch* (1989) 488 U.S. 299 ........................ 48, 50

*E. Enters. v. Apfel* (1998) 524 U.S. 498 ................................... passim

*Fed. Power Comm'n v. Hope Nat. Gas Co.* (1944) 320 U.S.
 591 ........................................................................... 19

*Gay Law Students Assn. v. Pac. Tel. & Tel. Co.* (1979) 24
 Cal.3d 458 ................................................................. 41, 42

*Gutierrez v. County of San Bernardino* (2011) 198
 Cal.App.4th 831 ............................................................ 9

*Holtz v. Superior Court* (1970) 3 Cal.3d 296 ........................... 8, 33, 35, 56

*House v. Los Angeles Cty. Flood Control Dist.* (1944) 25
 Cal.2d 384 ................................................................. 34

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Jackson v. Metro. Edison Co.* (1974) 419 U.S. 345 ................................... 42

*Lingle v. Chevron U.S.A. Inc.* (2005) 544 U.S. 528 .................................. 50

*Locklin v. City of Lafayette* (1994) 7 Cal.4th 327 ............................... 33, 35

*Marshall v. Dept. of Water & Power* (1990) 219 Cal.App.3d
    1124 ........................................................................................... 33

*Moreland Inv. Co. v. Superior Court* (1980) 106 Cal.App.3d
    1017 ........................................................................................... 43

*N.Y. Times Co. v. Sullivan* (1964) 376 U.S. 254 ...................................... 46

*Pacific Tel. & Tel. Co. v. Pub. Utils. Comm'n* (1965) 62
    Cal.2d 634 ................................................................................. 20

*Pacific Bell Tel. Co. v. S. Cal. Edison Co.* (2012) 208
    Cal.App.4th 1400 ................................................................. passim

*Pasillas v. Agric. Labor Relations Bd.* (1984) 156
    Cal.App.3d 312 ...................................................................... 42, 43

*Ponderosa Tel. Co. v. Pub. Utils. Comm'n* (2011) 197
    Cal.App.4th 48 ........................................................................... 49

*Regency Outdoor Advert., Inc. v. City of Los Angeles* (2006)
    39 Cal.4th 507 ........................................................................... 34

*S. Cal. Edison Co. v. Pub. Utils. Comm'n* (1978) 20 Cal.3d
    813 ............................................................................................. 20

*Shelley v. Kraemer* (1948) 334 U.S. 1 ...................................................... 46

*Sinaloa Lake Owners Assn. v. City of Simi Valley*
    (9th Cir. 1989) 864 F.2d 1475 ................................................. 53

Case: 19-30088   Doc# 4769   Filed: 11/15/19   Entered: 11/15/19 14:43:53   Page 231
of 246

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*State Farm Mut. Auto. Ins. Co. v. Campbell* (2003) 538 U.S.
408.................................................................................52, 53

*Varjabedian v. City of Madera* (1977) 20 Cal.3d 285 ..........................33, 35

*Williams v. Moulton Niguel Water Dist.* (2018) 22
Cal.App.5th 1198, 1210 .......................................................... 40

**Statutes & Rules**

Cal. Const., art. XII, § 3 ........................................................... 19

Cal. Const., art. XII, § 6 ........................................................... 19

Cal. Const., art. I, § 19 .........................................................15, 47

Code of Civ. Proc., § 3333 ......................................................... 55

Pub. Util. Code, §§ 701-853, 1001, 1002, 2101 ......................................... 19

Pub. Util. Code, §§ 451.1, 451.2, as amended by Stats.
2018, ch. 626 §§ 26, 27 .......................................................... 18

Tort Claims Act, Government Code sections 810 *et seq.* ..................... 55

Fifth Amendment of the United States Constitution ...................15, 47

Fourteenth Amendment of the United States
Constitution ...................................................................15, 52

**Additional Authorities**

*Brown on Wildfires Outbreak: 'We Are In For A Rough
Ride'*, CBS SF Bay Area (Aug. 1, 2018)............................................. 17

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Governor Edmund G. Brown, Jr., letter to Senator Bill
    Dodd and Assemblyman Chris Holden, (2017-2018
    Reg. Sess.) July 24, 2018.......................................................................17

Case: 19-30088   Doc# 4769   Filed: 11/15/19   Entered: 11/15/19 14:43:53   Page 233 of 246

## ISSUE PRESENTED

Should inverse condemnation—a doctrine developed in the context of public utilities that are not subject to rate-making regulatory authority and are backstopped by public taxation power—apply to a privately owned utility such as Pacific Gas and Electric Company ("PG&E"), which has no taxation power and can increase utility rates only with the express permission of the California Public Utilities Commission ("CPUC")?

## INTRODUCTION

Under the doctrine of inverse condemnation, a private party is entitled to compensation from a public entity if its property is "damaged" for public use.  This Court has consistently explained that the "underlying purpose of [inverse condemnation] is to distribute throughout the community the loss inflicted upon the individual by the making of the public improvements:  to socialize the burden . . . that should be assumed by society."  (*Holtz v. Superior Court* (1970) 3 Cal.3d 296, 303 (*Holtz*), internal citations and

quotation marks omitted.)  Inverse condemnation thus serves as a form of social insurance, financed by the general public, based on the premise that the costs of damage from a public good "can better be absorbed, and with infinitely less hardship, by the taxpayers as a whole."  (*Albers v. County of Los Angeles* (1965) 62 Cal.2d 250, 263 (*Albers*).)

When inverse condemnation is applied to a true public entity, such as a municipality or government utility, that entity serves merely as a conduit for the socialization of losses.  The public entity pays inverse condemnation damages to the impacted individual and then socializes those damages by recouping them from the public at large though taxes or utility rate increases.  This loss distribution framework is the constitutional "underpinning [of] inverse condemnation."  (*Gutierrez v. County of San Bernardino* (2011) 198 Cal.App.4th 831, 837.)

This petition raises a question of great public interest that goes to the very viability of California's privately owned utilities, which

serve over 75 percent of California's residents and play a vital role in California and its economy: can inverse condemnation apply to a private utility such as PG&E, which has no taxation power and can increase utility rates only with the express permission of the CPUC? Two previous Court of Appeal decisions have addressed this question and extended inverse condemnation liability to privately owned utilities. (*Pacific Bell Tel. Co. v. S. Cal. Edison Co.* (2012) 208 Cal.App.4th 1400 (*Pacific Bell*); *Barham v. S. Cal. Edison Co.* (1999) 74 Cal.App.4th 744 (*Barham*).) However, both decisions expressly assumed that private utilities, just like governments and public entities, would be able to spread the cost of inverse condemnation liability among the benefitted public. (See *Pacific Bell*, *supra*, 208 Cal.App.4th at 1407; *Barham*, *supra*, 74 Cal.App.4th at 753.)

The CPUC has now expressly disproven that assumption. (2 App. 344-418.) Calling the cost-spreading rationale "unsound" and insisting that inverse condemnation liability is "not relevant" to rate recovery, the CPUC denied an application by privately owned

utility San Diego Gas & Electric ("SDG&E") to recover $379 million in uninsured costs resulting from the settlement of claims for inverse condemnation based on wildfires within SDG&E's service territory. (*Id.* at 410.) Thus, unlike a public entity, PG&E has no guarantee that it can engage in the very loss-spreading that forms the constitutional underpinning of inverse condemnation. Private utilities like PG&E and SDG&E are now caught in a whipsaw between unlimited strict inverse condemnation liability as a result of the prior Court of Appeal decisions and the CPUC's refusal to take that liability into account in rate recovery.

The instant litigation arises from multiple wildfires that began on October 8 and 9, 2017, in over 100 different locations throughout Northern California (the "North Bay Fires"). Fanned by extreme winds, these fires spread at a catastrophic pace and ultimately impacted at least a dozen counties. These fires were the result of a confluence of unprecedented weather events, including years of record breaking drought and bark beetle infestations that have led to

an extreme tree mortality crisis; exceedingly heavy rainfall during the 2016-2017 winter, causing new vegetation growth; the hottest summer on record in 2017 for the Northern California area, killing and drying that new growth to create additional fuel; extremely low humidity throughout the Northern California area; and a high wind event on October 8 and 9, 2017, before the first rains had come through to soak the vegetation and ground. An official with the California Department of Forestry and Fire Protection ("Cal Fire") has stated that "[no one] could be prepared for the conditions that surfaced in California on . . . Oct[ober] 8."[1]

In addition to alleging negligence by PG&E, Plaintiffs seek to hold PG&E strictly liable through the doctrine of inverse condemnation for billions of dollars in property damages even though the events of October 8 and 9 were unforeseeable. PG&E demurred only to the inverse condemnation causes of action based on the threshold legal issue that inverse condemnation is

---

[1] 1 App. 158-62.

inapplicable to a private utility whose rates are set by a regulatory body and therefore has no guarantee that it can socialize inverse losses. The respondent court overruled PG&E's demurrer in a ruling that PG&E respectfully submits was in error for at least two reasons.

*First*, as noted, California law establishes that the entire basis for inverse condemnation is spreading the loss among the benefitted public. The fundamental logic of the doctrine depends upon the ability of the inverse defendant to spread the inverse condemnation judgment imposed by a court across the entire benefitted public. Inverse condemnation is not about allocating the loss from one private entity to another, and it has nothing to do with fault, negligence or imprudence. Indeed, even imprudent or negligent public utilities can spread inverse losses through tax or rate increases. It is now clear, however, that PG&E cannot engage in the same automatic loss-spreading as public utilities. Instead, the CPUC

has demonstrated that it can leave PG&E to bear the inverse losses entirely by itself.

The trial court incorrectly concluded that the CPUC's recent decision would not have changed the ruling in *Pacific Bell*, and therefore found that it was bound by that decision. But *Pacific Bell* was expressly premised on the court's assumption that the utility *would* be able to socialize its inverse losses by recouping the damages through rate increases. (*Pacific Bell*, *supra*, 208 Cal.App.4th at 1407.) According to *Pacific Bell*, the privately owned utility "ha[d] not pointed to any evidence to support its implication that the [CPUC] would not allow [the utility] adjustments to pass on damages liability during its periodic reviews." (*Ibid.*) The CPUC's new policy provides exactly that evidence. The continued application of inverse condemnation to a private utility such as PG&E in the face of this new evidence cannot be squared with the nearly 100 years of California jurisprudence explaining that loss-spreading is the sine qua non of inverse.

*Second*, the respondent court erroneously rejected PG&E's argument that the application of inverse condemnation to PG&E is unconstitutional. Now that PG&E has "no guaranty" that it can spread any losses it is forced to pay as a result of inverse condemnation claims, it is clear that the application of inverse condemnation to PG&E would effect nothing more than the transfer of private property from one private entity (PG&E) to another (the inverse plaintiff) without any compensation, regardless of whether PG&E had complied with all applicable laws and standards. (4 App. 1101.) This uncompensated taking of PG&E's property would violate the Fifth Amendment of the United States Constitution as incorporated against the states by the Fourteenth Amendment and Article I, section 19 of the California Constitution.

The respondent court concluded that whether PG&E would suffer a taking was a fact-intensive inquiry not appropriate for resolution on demurrer and that PG&E should raise its constitutional challenge if and when the CPUC denies PG&E's

request to recover any inverse condemnation costs. This conclusion directly contradicts *Eastern Enterprises v. Apfel*, in which the United States Supreme Court determined that a taking had occurred even where the affected party may eventually have been able to seek recovery of certain costs, as there was no guaranteed right of reimbursement at the time of the taking. (*E. Enters. v. Apfel* (1998) 524 U.S. 498, 531.) The respondent court also erroneously rejected PG&E's argument that the application of inverse condemnation to PG&E would be arbitrary and irrational in violation of PG&E's substantive due process rights under the Fourteenth Amendment of the United States Constitution and the California Constitution.

The question presented requires resolution by this Court. One CPUC Commissioner recently noted that the courts that have extended inverse condemnation from public entities to private utilities such as PG&E have "done so without really grappling with the salient difference between public and private utilities, which is that there's no guaranty that private utilities can recover the cost

16

from their ratepayers." (4 App. 1101.) Nor has there been any legislative resolution of the issue. Earlier this summer, Governor Brown—who has recognized that wildfires are the "new normal" in California given the effects of climate change[2]—proposed legislation that would grapple with this issue by removing the strict liability standard of inverse condemnation in situations involving electrical utility caused fires and replacing it with a reasonableness test.[3] But the legislature failed to adopt the Governor's proposal, instead enacting a law addressing certain wildfire-related issues that passed on the Governor's request to reform inverse condemnation law. Only this Court, therefore, can solve the problem that has been created by the lower courts in extending the application of inverse

---

[2] *Brown on Wildfires Outbreak: 'We Are In For A Rough Ride'*, CBS SF Bay Area (Aug. 1, 2018), <https://sanfrancisco.cbslocal.com/2018/08/01/brown-on-wildfires-outbreak-were-in-a-new-normal/> (as of Sept. 27, 2018).

[3] Governor Edmund G. Brown, Jr., letter to Senator Bill Dodd and Assemblyman Chris Holden, (2017-2018 Reg. Sess.) July 24, 2018, <https://focus.senate.ca.gov/sites/focus.senate.ca.gov/themes/wildfirecommittee/files/Governor-Brown-Proposal_072418.pdf> (as of Sept. 27, 2018).

condemnation to private utilities. (See Pub. Util. Code §§ 451.1, 451.2, as amended by Stats. 2018, ch. 626 §§ 26, 27.)

Allowing inverse condemnation to stand against private utilities will have grave consequences for the State of California, as private utilities such as PG&E may potentially face increased insurance costs, decreased rates of return and diminished interest from investors in the capital markets. These consequences can be expected to have ripple effects throughout the state economy. PG&E is currently faced with the potential of tens of thousands of claims arising from dozens of wildfires and amounting to billions of dollars in potential damages. PG&E thus may have no practical choice but to settle a number of inverse condemnation claims under the current law. PG&E may have no recourse against the plaintiffs who received settlements that were later determined to be improperly and unconstitutionally paid, and as the CPUC recently made clear, there is no guarantee that PG&E will be able to spread the costs across the benefitted community.

# Exhibit 25

# Appellate Courts Case Information



## Supreme Court

Change court

*Court data last updated: 11/14/2019 06:00 PM*

## Disposition

**PACIFIC GAS AND ELECTRIC COMPANY v. S.C. (ABBOTT)**
**Division SF**
**Case Number S251585**

Only the following dispositions are displayed below: Orders Denying Petitions, Orders Granting Rehearing and Opinions. Go to the Docket Entries screen for information regarding orders granting review.

**Case Citation:**         **none**

| Date | Description |
|------|-------------|
| 11/14/2018 | Petition for review denied |

**Click here** to request automatic e-mail notifications about this case.

Careers  |  Contact Us  |  Accessibility  |  Public Access to Records  |  Terms of Use  |  Privacy

© 2019 Judicial Council of California