Robert A. Julian (SBN 88469)
Cecily A. Dumas (SBN 111449)
BAKER & HOSTETLER LLP
1160 Battery Street, Suite 100
San Francisco, CA 94111
Telephone: 628.208.6434
Facsimile: 310.820.8859
Email: rjulian@bakerlaw.com
Email: cdumas@bakerlaw.com

Eric E. Sagerman (SBN 155496)
David J. Richardson (SBN 168592)
Lauren T. Attard (SBN 320898)
BAKER & HOSTETLER LLP
11601 Wilshire Blvd., Suite 1400
Los Angeles, CA 90025-0509
Telephone: 310.820.8800
Facsimile: 310.820.8859
Email: esagerman@bakerlaw.com
Email: drichardson@bakerlaw.com
Email: lattard@bakerlaw.com

David B. Rivkin, Jr. (SBN 394446)
BAKER & HOSTETLER LLP
1050 Connecticut Ave., NW, Suite 1100
Washington, DC 20036
Telephone: 202.861.1731
Facsimile: 202.861.1783
Email: drivkin@bakerlaw.com

*Counsel for The Official Committee of Tort Claimants*

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

**In re:**

**PG&E CORPORATION**

**-and-**

**PACIFIC GAS AND ELECTRIC COMPANY,**

**Debtors.**

□ Affects PG&E Corporation

□ Affects Pacific Gas and Electric Company

■ Affects both Debtors

**All papers shall be filed in the Lead Case, No. 19-30088 (DM)*

Bankruptcy Case No. 19-30088 (DM)

Chapter 11
(Lead Case)
(Jointly Administered)

**RESPONSE BRIEF OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS CONCERNING THE APPLICABILITY OF INVERSE CONDEMNATION [DKT. NO. 4485]**

Date: November 19, 2019
Time: 10:00 a.m.
Place: United States Bankruptcy Court
Courtroom 17, 16th Floor
San Francisco, CA 94102

## TABLE OF CONTENTS

**Page**

I. Preliminary Statement .... 1
II. Introduction .... 4
III. Background .... 6
A. Inverse Condemnation Liability Under California Law .... 6
B. Procedural History .... 8
IV. Argument .... 9
A. The Inverse Condemnation Issue Has Already Been Decided .... 9
B. PG&E Is Subject to Inverse Condemnation Under Binding California Law .... 12
C. Pacific Bell and Barham are Indistinguishable from This Case .... 14
D. Inverse Condemnation Liability Does Not Depend on Entitlement to Automatic Cost-Recovery .... 18
E. The Evidence Suggests That PG&E Already Has Or Will Be Able to Socialize Its Inverse Condemnation Liability .... 23
F. There Is No "Taking" of PG&E's Property. .... 27
1. Monetary Liability Owed to a Third Party Does Not "Take" Property .... 27
2. PG&E's Takings Argument Is Not Ripe Because the CPUC May Allow Recovery of Inverse Condemnation Liability .... 28
3. PG&E Is not Entitled to Relief That Is Tantamount to an Injunction .... 31
4. Imposing Inverse Condemnation Liability on PG&E Would Not Constitute a Taking Under Penn Central .... 32
G. Imposing Inverse Condemnation Liability on PG&E Does Not Violate Due Process .... 33
V. Conclusion .... 35

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Case: 19-30088 Doc# 4773 Filed: 11/15/19 Entered: 11/15/19 15:49:46 Page 2 of 49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abelleira v. District Court of Appeal*,
17 Cal.2d 280 (1941) ........ 3

*Aetna Life & Cas. Co. v. City of Los Angeles*,
170 Cal. App. 3d 865 (1985)........ 7

*Albers v. Los Angeles Cty.*,
62 Cal. 2d 250 (1965) ........ 22, 35

*Am. Triticale, Inc. v. Nytco Servs., Inc.*,
664 F.2d 1136 (9th Cir. 1981)........ 12

*American Tower Corp. v. City of San Diego*,
763 F.3d 1035 (9th Cir. 2014)........ 13, 14

*Ark. Game & Fish Com'n v. United States*,
568 U.S. 23 (2012)........ 35

*Baker v. Burbank-Glendale-Pasadena Airport Auth.*,
39 Cal. 3d 862 (1985) ........ 16

*Bakke v. Regents of Univ. of California*,
18 Cal. 3d 34 (Cal. 1976), *aff'd in part, rev'd in par*t, 438 U.S. 265 (1978)........ 3

*Barham v. S. Cal. Edison Co.*,
74 Cal. App. 4th 744 (Cal. Ct. App. 1999) ........ *passim*

*In re Basave de Guillen*,
604 B.R. 826 (BAP 9th Cir. 2019)........ 14

*Breidart v. S. Pac. Co.*,
61 Cal. 2d 659 (1964) ........ 21

*Burlington N. R.R. Co. v. Dep't of Pub. Serv. Regulation*,
763 F.2d 1106 (9th Cir. 1985)........ 34

*Butte Fire Cases*,
No. JCCP4853, 2018 WL 3371780 (Cal. Super. Ct. Apr. 26, 2018)........ 16, 22, 23

*Campbell v. United States*,
932 F.3d 1331 (Fed. Cir. 2019) (unpublished summary order) ........ 29

*Chabad Lubavitch of the Quad Cities, Inc. v. City of Bettendorf*,
389 F. Supp. 3d 590 (S.D. Iowa 2019)........ 29

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Case: 19-30088 Doc# 4773 Filed: 11/15/19 Entered: 11/15/19 15:49:46 Page 3 of 49

*City of Carlsbad v. Rudvalis*,
109 Cal. App. 4th 667 (2003).......... 18

*City of Oroville v. Superior Court*,
7 Cal. 5th 1091 (2019) .......... 20, 23

*In re City of Stockton*,
909 F.3d 1256 (9th Cir. 2018).......... 28

*Clement v. State Reclamation Bd.*,
35 Cal. 2d 628 (1950) .......... 19

*Coal Mines Railroad Co. v. Moss*,
23 Cal. 323, 327 (1863) .......... 7

*Covington & Lexington Tpk. Rd. Co. v. Sandford*,
164 U.S. 578 (1896).......... 30

*DM Arbor Court, Ltd. v. City of Houston*,
No. Civ. H-18-1884, 2019 WL 4464953 (S.D. Tex. Sept. 18, 2019) .......... 29

*Duquesne Light Co. v. Barasch*,
488 U.S. 299 (1989).......... 30

*Eachus v. Los Angeles Consolidated Electric Railway Co.*,
103 Cal. 614 (1894) .......... 7, 16

*Eastern Enterprises v. Apfel*,
524 U.S. 498 (1998).......... 28, 32, 33

*Edison Int'l v. Superior Court (Abate)*,
No. S253094 (Cal. Feb. 20, 2019) .......... 9

*Edison Int'l v. Superior Ct. (Abate)*,
No. B294164 (Cal. Feb. 20, 2019).......... 2

*Escondido Union Sch. Dist. v. Casa Suenos De Oro, Inc.*,
129 Cal. App. 4th 944 (2005).......... 19

*First English Evangelical Lutheran Church of Glendale v. Cty. of Los Angeles*,
482 U.S. 304 (1987).......... 32

*In re Foamex International Inc.*,
491 B.R. 100 (Bankr. D. Del. 2013) .......... 14

*FPC v. Hope Nat. Gas Co.*,
320 U.S. 591 (1944).......... 31

*FPC v. Nat. Gas Pipeline Co.*,
315 U.S. 575 (1942).......... 30

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Case: 19-30088 Doc# 4773 Filed: 11/15/19 Entered: 11/15/19 15:49:46 Page 4 of 49

*FPC v. Texaco Inc.*,
417 U.S. 380 (1974) .......... 31

*Gay Law Students Ass'n. v. Pacific Telephone & Telegraph Co.*,
24 Cal. 3d 458 (1979) .......... 15, 17, 18

*Gurnsey v. Northern California Power Co.*
160 Cal. 699 (1911) .......... 7

*Gutierrez v. San Bernardino County*,
198 Cal. App. 4th 831 (2011) .......... 22

*Harrison v. PG&E Corp.*,
No. CGC17563108, 2018 WL 2447104 (May 21, 2018) .......... 9, 22, 23

*Henrichs v. Valley View Dev.*,
474 F.3d 609 (9th Cir. 2007) .......... 10

*Holtz v. Superior Court*,
3 Cal. 3d 296 (1970) .......... 7, 19, 20, 22

*House v. Los Angeles Flood Control Dist.*,
25 Cal. 2d 384 (1944) (Traynor, J. concurring) .......... 19

*Imen v. Glassford*,
201 Cal. App. 3d 898 (1988) .......... 11

*Jersey Cent. Power & Light Co. v. FERC*,
810 F.2d 11681 (D.C. Cir. 1987) (en banc) .......... 31

*Kasel v. Remington Arms Co.*,
24 Cal. App. 3d 711 (1972) .......... 34

*In re Kirkland*,
915 F.2d 1236 (9th Cir. 1990) .......... 12, 13, 14

*Knick v. Township of Scott, Pennsylvania*,
139 S. Ct. 2162 (2019) .......... 29, 31, 32

*Koontz v. St. Johns River Water Mgmt. Dist.*,
570 U.S. 595 (2013) .......... 32

*Lingle v. Chevron U.S.A. Inc.*,
544 U.S. 528 (2005) .......... 32

*Los Angeles Cty. Metro. Transp. Auth. v. Cont'l Dev. Corp.*,
16 Cal. 4th 694 (1997) .......... 7

*Lungren v. Deukmejian*,
45 Cal. 3d 727 (1988) .......... 18

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Case: 19-30088 Doc# 4773 Filed: 11/15/19 Entered: 11/15/19 15:49:46 Page 5 of 49

*Marin Municipal Water District v. City of Mill Valley*, 202 Cal. App. 3d 1161 (1988)........ 19, 20

*Marshall v. Department of Water & Power* 219 Cal. App. 3d 1124 (1990)........ 7, 25

*Mercury Casualty Co. v. City of Pasadena*, 14 Cal. App. 5th 917 (2017)........ 22

*Moreland Investment Co. v. Superior Court*, 106 Cal. App. 3d 1017 (1980)........ 21, 22

*Mosk v. Superior Court*, 25 Cal. 3d 474 (Cal. 1979)........ 3

*Murphy v. Murphy* 164 Cal. App. 4th 376 (2008)........ 11

*Murray v. Alaska Airlines, Inc.*, 50 Cal. 4th 860 (2010)........ 11

*Orkin v. Taylor*, 487 F.3d 734 (9th Cir. 2007)........ 13

*Pac. Bell Tel. Co. v. S. Cal. Edison Co.*, 208 Cal. App. 4th 1400 (Cal. Ct. App. 2012)........ *passim*

*Pac. Gas & Elec. Co. v. Superior Court (Abbott)*, No. S251585 (Cal. Nov. 14, 2018)........ 9

*Pac. Gas & Elec. Co. v. Superior Court (Abu-Shumays)*, No. S249429 (Cal. Aug. 8, 2018)........ 9

*Pacific Bell v. City of San Diego*, 81 Cal. App. 4th 596........ *passim*

*Pasillas v. Agricultural Labor Relations Board*, 156 Cal. App. 3d 312 (1984)........ 17

*Penn. Cent. Transp. Co. v. City of New York*, 438 U.S. 104 (1978)........ 30, 32

*Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1 (1987)........ 29

*Phillips v. Wash. Legal Found.*, 524 U.S. 156 (1998)........ 27

*Pierce v. Pac. Gas & Elec. Co.*, 166 Cal. App. 3d 68 (1985)........ 34

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Case: 19-30088 Doc# 4773 Filed: 11/15/19 Entered: 11/15/19 15:49:46 Page 6 of 49

*Ponderosa Tel. Co. v. Public Util. Comm'n*, 36 Cal. App. 5th 999 (2019)........ 26

*Producers Dairy Delivery Co. v. Sentry Ins. Co.*, 41 Cal. 3d 903 (1986)........ 11

*Prof. Engs. Calif. Gov't v. Schwarzenegger*, 50 Cal.4th 989 (Cal. 2010)........ 3

*Reardon v. City & Cty. of San Francisco*, 66 Cal. 492 (1885)........ 7

*Redev. Agency v. Gilmore*, 38 Cal. 3d 790 (1985)........ 19

*In re Reyes*, BAP No. EC-18-1229, 2019 WL 1759749 (B.A.P. 9th Cir. Apr. 19, 2019)........ 10

*Roos v. Red*, 130 Cal. App. 4th 870 (2005)........ 11

*Sagaponack Realty, LLC v. Vill. of Sagaponack*, 778 F. App'x 63 (2d Cir. 2019)........ 29

*San Diego Police Officers' Ass'n v. San Diego City Emps.' Ret. Sys.*, 568 F.3d 725 (9th Cir. 2008)........ 11

*In re So. Cal. Edison Co.*, No. ER19-1553-000 (FERC May 2, 2019)........ 26

*State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003)........ 35

*Stoner v. New York Life Ins. Co.*, 311 U.S. 464 (1941)........ 12, 13, 14

*Texas v. United States*, 523 U.S. 296 (1998)........ 29

*United States v. King Mountain Tobacco Co.*, 745 F. App'x 700 (9th Cir. 2018)........ 27

*Verizon Commc'n, Inc. v. FCC*, 535 U.S. 467 (2002)........ 31

*West v. American Tel. & Tel. Co.*, 311 U.S. 223 (1940)........ 1, 2, 13, 14

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Case: 19-30088 Doc# 4773 Filed: 11/15/19 Entered: 11/15/19 15:49:46 Page 7 of 49

*Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985) .... 29

**Statutes**

42 U.S.C. § 1983 .... 31

Cal. Civ. Proc. Code § 394 .... 21

Cal. Civ. Proc. Code § 1036 .... 1, 12

Cal. Pub. Util. Code § 451 .... 29

Cal. Pub. Util. Code §§ 451.1, 3284 .... 27

Cal. Pub. Util. Code § 612 .... 15

**Other Authorities**

Cal. Const. art. I, § 19 .... 4, 6, 18, 23

Cal. Const. art. VI, § 2 .... 2

Cal. Jury Instr. BAJI 3.45 .... 25

Cal. Pub. Utilities Comm'n Dec. 17-11-033, at 10 (Nov. 30, 2017) .... 24, 25

Governor Newsom's Strike Force, *Wildfires And Climate Change: California's Energy Future* (Apr. 12, 2019) .... 5

Inara Scott, Incentive Regulation, New Business Models, and the Transformation of the Electric Power Industry, 5 Mich. J. Envtl. & Admin. L. 319 (2016) .... 24

J.D. Morris, *PG&E to raise average monthly bill nearly $5 next month*, San Francisco Chronicle, https://www.sfchronicle.com/business/article/PG-E-to-raisse-average-monthly-gas-bill-nearly-2-14450522.php (Sept. 18, 2019) (Last Accessed Nov. 13, 2019) .... 24

Pacific Gas & Electric Co., Application of Pacific Gas and Electric Company for Authority to Establish the Wildfire Expense Memorandum Account, at 3 (July 26, 2017) .... 5

Pacific Gas & Electric Co., Comments to Commission on Catastrophic Wildfire Cost and Recovery, at 3 (April 22, 2019) .... 5

Senate Committee on Appropriations, AB 1054 (Holden), July 8, 2019, at 3 .... 5

Baker & Hostetler LLP
Attorneys at Law
San Francisco

Case: 19-30088 Doc# 4773 Filed: 11/15/19 Entered: 11/15/19 15:49:46 Page 8 of 49

Sophia Kunthara, *PG&E profit rises to $564 million for quarter, revenue declines*, SFGate https://www.sfgate.com/business/article/PG-E-profit-rises-to-564-million-for-quarter-13363879.php (Nov. 9, 2018) (Last Accessed Nov. 13, 2019) .......... 24

U.S. Const., amend. V .......... 35

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Case: 19-30088 Doc# 4773 Filed: 11/15/19 Entered: 11/15/19 15:49:46 Page 9 of 49

The Official Committee of Tort Claimants (the "**TCC**") in the chapter 11 cases of PG&E Corporation and Pacific Gas and Electric Company (the "**Debtors**" or "**PG&E**"), together with the additional signatories to this brief, hereby submits the following response ("**Response**") to the joint brief on the applicability of inverse condemnation [Dkt. No. 4485]. In support of the Response, the TCC submits the declaration of David B. Rivkin ("**Rivkin Decl**."), filed contemporaneously herewith. The TCC also relies on the previously filed Declaration of Robert A. Julian, dated July 2, 2019 [Dkt. No. 2844] ("**Julian Decl**."). The TCC respectfully states as follows:

**I. Preliminary Statement**

The Court must adopt the two Court of Appeal decisions that apply California inverse condemnation law to utilities. Those Court of Appeal decisions declare that, when private property is taken or damaged by a California utility, the State Constitution requires the utility to compensate the owner for damages caused by the utility's improvements, which includes interest and attorneys' fees. *Pac. Bell Tel. Co. v. S. Cal. Edison Co*., 208 Cal. App. 4th 1400, 1410 (Cal. Ct. App. 2012) *as modified* (Sept. 13, 2012); *Barham v. S. Cal. Edison Co*., 74 Cal. App. 4th 744, 751-52 (Cal. Ct. App. 1999); CCP § 1036. The Debtors dispute their responsibility for inverse condemnation damages on a single basis: the Debtors argue a federal court should not apply the Court of Appeal's decisions if there is "persuasive data" the California Supreme Court would overturn the Court of Appeal's decisions, and such persuasive arguments supposedly exist.

However, in *West v. American Tel. & Tel. Co*., 311 U.S. 223 (1940), the U.S. Supreme Court ruled the persuasive data rule does not apply if a state Supreme Court "denied review" of the appellate issue, because a state Supreme Court's denial of review is persuasive evidence the state Supreme Court did not see the necessity of reviewing or modifying the existing intermediate appellate court decision. "Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise. [citations omitted] This is the more so where, as in this case, the highest court has refused to review the lower court's decision rendered in one phase of

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Case: 19-30088 Doc# 4773 Filed: 11/15/19 Entered: 11/15/19 15:49:46 Page 10 of 49

the very litigation which is now prosecuted by the same parties before the federal court." 311 U.S. at 237.

In *West*, the Supreme Court held that when the state Supreme Court denies a petition for review of the Court of Appeals decision, the "denial of review" is "the State Supreme Court decision" that the federal court **must follow**, as controlling evidence that the Supreme Court will not change existing Court of Appeal precedent. Referring to the fact the State Supreme Court "refused to review the lower court's decision," the Supreme Court held: "Even though it is arguable that the Supreme Court of Ohio will, at some later time, modify the rule of the West case, whether that will ever happen remains a matter of conjecture. In the meantime, the state law applicable to these parties has been authoritatively declared by the highest state court in which a decision could be had." *Id.*

That is the case here. As PG&E explained in its March 31, 2019 10-Q, in two separate Supreme Court decisions, dated September 6, 2018, and November 14, 2018, the California Supreme Court denied PG&E's petitions for review of the California Court of Appeal's separate decisions refusing to overturn the Sacramento Superior Court's and the San Francisco Superior Court's JCCP trial court decisions applying the California Court of Appeal's inverse law to PG&E's liability for the 2015 Butte fire and the 2017 North Bay Fires. We attach PG&E's 10-Q explanation of the Supreme Court's repeated denials of its petitions for review, to this Response as Appendix A, excerpted from the Julian Decl., Ex. C, at 46, 54-55. The Supreme Court also recently denied a third petition for review of an inverse condemnation issue based on the 2017 Thomas fire. *Edison Int'l v. Superior Ct. (Abate)*, No. B294164 (Cal. Feb. 20, 2019) (denying petition for review based on 2017 Thomas Fires), available at https://tinyurl.com/y36725fj, https://appellatecases.courtinfo.ca.gov.

The Court should understand that, if PG&E seriously believed that the California Supreme Court would have rejected *Barham* and *Pacific Bell*, it could have sought that review in a pending appeal. But, instead, having had its arguments rejected at every level of the California courts, it chose to forum shop. In particular, under California Constitution Article VI, Section 12, PG&E could have requested the California Supreme Court to immediately decide this precise inverse

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

condemnation appellate issue, now pending in the Court of Appeal on PG&E's third appellate review attempt of the California Superior Court's 2018 inverse rulings. See Appendix A, 10-Q at 55. An Article VI, Section 12 transfer of an appeal raising constitutional issues to the Supreme Court is a fundamental step of appellate practice. *See, e.g., Prof. Engs. Calif. Gov't v. Schwarzenegger*, 50 Cal.4th 989, 1000 (Cal. 2010) (reviewing a transferred appeal pursuant to Article VI Section 12 regarding the Governor's authority); *Mosk v. Superior Court*, 25 Cal. 3d 474, 480 (Cal. 1979) (noting that the court transferred constitutional issues to itself pursuant to Article VI Section 12); *Bakke v. Regents of Univ. of California*, 18 Cal. 3d 34, 39 (Cal. 1976) ("We transferred the cause directly here, prior to a decision by the Court of Appeal, because of the importance of the issues involved."), *aff'd in part, rev'd in par*t, 438 U.S. 265 (1978). *Cf. Abelleira v. District Court of Appeal*, 17 Cal.2d 280, 291-92 (1941) (discussing the doctrine of exhaustion of administrative remedies).

In other words, rather than ask this Court to "predict" whether the California Supreme Court would decide to grant review of the recent 2018 Court of Appeal decisions, PG&E could have simply filed a request with the California Supreme Court asking the Supreme Court to resolve PG&E's actual pending, third, inverse appeal, and the Supreme Court would respond directly, for a fourth time in one year, whether the Supreme Court believes the issue is worthy of deciding and reversing the appellate precedent. PG&E's decision not to take this fundamental step of appellate practice demonstrates that even PG&E does not believe its argument that the California Supreme Court would decide this issue differently than every single other California court to address it and that its attempt to achieve a different result here is improper.

The PG&E shareholders and the Debtors both suggest that the California Supreme Court would rule in a way that they have not yet. Any suggestion that this Court certify the appellate issue to the State Supreme Court should be denied on procedural, fairness, laches and forum shopping grounds. The Debtors decided to forum shop this issue into the Bankruptcy Court by asking this court to predict how the State Supreme Court would decide the issue, rather than request the State Supreme Court to resolve the issue directly via the State's well recognized direct verification procedure available under the Constitution. In our August 7, 2019 estimation brief (Dkt.

No. 3431), we pointed out the Debtors' decision was forum shopping, justifying denial of the motion on this additional ground. Months went by. The estimation hearing is now around the corner. Judge Donato requested this Court's resolution of the inverse motion be moved up, not delayed. With that record behind us, PG&E now suggests that the State Supreme Court would rule for PG&E, something PG&E could have asked from the Court ten months ago when PG&E filed its appeal of the inverse decision to the State Appellate Court, or at least when we flagged their forum shopping three months ago. That ship has sailed. It is now too late to avail ourselves of what would have been a common sense move ten months ago, as the State Supreme Court could not rule in this case in three weeks. PG&E's suggestions about how PG&E would rule is not responsive to Judge Donato's request, defies common sense, and is a continuation of its forum shopping.

As we explained last summer, we believe the Debtors have lost the opportunity to ask this Court to refuse to follow the Court of Appeal decisions. If the Court reaches the inverse condemnation issue, we offer the following brief on that subject.

## II. Introduction

PG&E has spent the past year complaining about the fact that it is subject to inverse condemnation liability under California law and furiously lobbying to change the law. Because its lobbying efforts have not met with success, PG&E now asks this Court to do what California's political branches have been understandably unwilling to do: bail out the utility from having to fully compensate the victims of fires caused by its equipment. The thin veneer of legal argumentation atop its briefing should not disguise that its argument is fundamentally one of policy, disputing the wisdom of California's decision to extend inverse condemnation liability to privately owned utilities.

Yet, as PG&E well knows, the law in California is that privately owned utilities carry out a "public use" and so are subject to the California Constitution's Takings Clause and its mandate to compensate property owners whose property is "taken or damaged for a public use." Cal. Const. art. I, § 19. Or, as PG&E put it in a filing with the California Public Utilities Commission ("**CPUC**"), "California's law of inverse condemnation…allows plaintiffs to sue private utilities and recover for property and other damages caused by utility facilities without needing to establish

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

negligence."[1] Or, as PG&E stated in comments to the California government just a few months ago, "IOUs [investor-owned utilities] (through their investors) are left to shoulder all costs of property damage from catastrophic wildfires, as well as all attorneys' fees and expert costs from litigation, if their facilities were involved in ignition of a fire."[2] That "existing standard," it stated, "essentially makes utilities the insurers of last resort for property damage resulting from wildfires caused by utility equipment" and "exposes utilities to massive liabilities."[3]

PG&E was correct to acknowledge that the "existing" law subjects it to inverse condemnation liability. That is the unanimous view of California courts interpreting and applying the California Constitution, including two decisions of the Court of Appeals holding privately owned utilities subject to inverse condemnation liability. That consensus also includes a final judgment against PG&E for Butte Fire liability involving a claim *currently before this Court*. Inverse condemnation liability has likewise been recognized by the California Legislature; for example, the official Senate report on AB 1054 stated, "California's current legal structure of inverse condemnation makes utilities liable for all property damage associated with fires started by their equipment."[4] And California's executive branch, in the "Governor's Strike Force" report that PG&E cites over a dozen times, recognizes that "California's inverse condemnation law…holds a utility strictly liable for wildfire damages if the utility's equipment ignites a wildfire, even if the utility's design and maintenance of infrastructure were not unreasonable or negligent."[5]

Refusing to accept that its arguments have been rejected by every court to consider them—including the California Supreme Court, on three separate occasions in the past year or so—PG&E has decided to try yet again, in the hope that a federal court will overrule California courts' consistent interpretation of California law. Among the many problems with that strategy is that PG&E is already subject to a final judgment on inverse condemnation liability that this Court lacks

---

[1] Pacific Gas & Electric Co., Application of Pacific Gas and Electric Company for Authority to Establish the Wildfire Expense Memorandum Account, at 3 (July 26, 2017).

[2] Pacific Gas & Electric Co., Comments to Commission on Catastrophic Wildfire Cost and Recovery, at 3 (April 22, 2019).

[3] *Id.* at 1.

[4] Senate Committee on Appropriations, AB 1054 (Holden), July 8, 2019, at 3.

[5] Declaration of Kevin J. Orsini, dated October 25, 2019 [Dkt. No. 4486], Exhibit A (Governor Newsom's Strike Force Report).

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

jurisdiction to reconsider and that provides a sound basis to hold PG&E estopped from attempting to relitigate this same issue in case after case, at substantial expense in terms of judicial and party economy. Another problem for PG&E is that, as much as it resists the point, the decisions of state intermediate appellate courts on matters of state law are binding in federal court, at least according to the U.S. Supreme Court, and the California Court of Appeals decisions recognizing inverse condemnation liability are therefore dispositive of state law in these proceedings. A third problem, and not a small one, is that PG&E's principal contention is wrong: neither the text of the California Constitution, nor any decision interpreting it, recognizes guaranteed cost "socialization" as an element of an inverse condemnation claim.

California law on inverse condemnation being what it is, PG&E is left to argue, with more than a whiff of desperation, that the whole thing is unconstitutional. About its substantive due process argument, it is enough to observe that requiring utilities to compensate damages caused by their own equipment bears a rational relationship to legitimate state interests in safety and public welfare, which is all due process demands. And PG&E's takings argument is both premature and misplaced. Premature, because the utility is not yet subject to any liability and has not been denied cost-recovery for what is, at this time, still a speculative cost. Misplaced, because PG&E's real complaint (legally, at least) is with the CPUC and perhaps the state itself, both of which may have obligations under the federal Takings Clause that PG&E's victims obviously do not.

In sum, PG&E would be better served by directing its lobbying at the Legislature, which at least has authority to change California law, rather than this Court, which does not.

## III. Background

### A. Inverse Condemnation Liability Under California Law

Article I, Section 19 of the California Constitution provides, in relevant part, "Private property may be taken or damaged for a public use and only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner." The predecessor of that language dates back to California's first state constitution, adopted in 1849, and the current text has been unchanged since 1879, when the words "or damaged" were added. That change was quickly interpreted by the California Supreme Court "as imposing liability for compensation absent fault."

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*Holtz v. Superior Court*, 3 Cal. 3d 296, 310 (1970) (discussing *Reardon v. City & Cty. of San Francisco*, 66 Cal. 492, 499 (1885)).

The California Constitution's Takings Clause has, since the very beginning, been applied to private parties charged by the state to carry out public uses. That makes sense, because the immediate aim that motivated the Clause's framers was "to preclude *private* railroad companies…from taking land without first compensating the owner[.]" *Los Angeles Cty. Metro. Transp. Auth. v. Cont'l Dev. Corp.,* 16 Cal. 4th 694, 706 (1997) (emphasis added) (discussing and citing framing history). Thus, it was to be expected that the California Supreme Court, in *Contra Coal Mines Railroad Co. v. Moss*, upheld delegation of the state's eminent domain power to a private railroad company. 23 Cal. 323, 327 (1863). Subsequently, *Eachus v. Los Angeles Consolidated Electric Railway Co.* affirmed an award of inverse condemnation damages against a privately owned railroad that enjoyed a government franchise. 103 Cal. 614 (1894). It did not take long for the Clause to be applied to privately owned electric utilities. In *Gurnsey v. Northern California Power Co.*, the California Supreme Court recognized that a property owner was entitled to compensation (rather than ejectment) from the local power company operating under a franchise for its overburdening of an easement over his land. 160 Cal. 699 (1911).

Beginning in the 1980s, California courts recognized that ordinary takings principles were applicable to fire damage caused by electric utilities. The first two appellate decisions to recognize such liability involved publicly owned utilities. *See Aetna Life & Cas. Co. v. City of Los Angeles*, 170 Cal. App. 3d 865 (1985); *Marshall v. Department of Water & Power* 219 Cal. App. 3d 1124 (1990). Twenty years ago, a California appeals court was asked to join the two lines of precedent—one imposing inverse condemnation liability on privately owned entities like utilities carrying out public uses, the other recognizing inverse condemnation liability for utility-caused fires. It did so, in *Barham v. Southern California Edison Co.*, finding no basis to distinguish between publicly owned and privately owned utilities carrying out the same public use, the transmission of electricity to the public. 74 Cal. App. 4th 744 (1999). A little more than a decade later, a second appeals court decision reached the same conclusion on the same reasoning. *Pac. Bell Tel. Co. v. S. Cal. Edison Co.*, 208 Cal. App. 4th 1400 (2012) *as modified*.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

B. Procedural History

These proceedings involve PG&E's liability for a series of fires allegedly caused by its equipment and, among the claims asserted against PG&E, are ones for inverse condemnation liability under the California Constitution for damage to property. Prior to the commencement of these proceedings, PG&E faced and litigated inverse condemnation claims brought by victims of the 2015 Butte Fire, which PG&E was determined to have caused, in the Sacramento County Superior Court. PG&E moved that court for a determination that, as a privately owned utility, it was not subject to inverse condemnation liability, arguing (among other things) that it "does not have the authority to spread the costs of any award to all its customers." Rivkin Decl. Ex. A Butte Fire Cases, No. JCCP 4853 at 15 (Cal. Super. Ct. Sacramento County June 22, 2017). Viewing the argument as one of "public policy" more than law, the court declared itself "not persuaded" and denied PG&E's motion in a June 2017 decision applying the rule of *Barham* and *Pacific Bell*. *Id*.

Subsequently, the CPUC denied an application by another privately owned utility, San Diego Gas & Electric Company, for recovery of certain costs it incurred in settling fire-related inverse condemnation claims, reasoning that the utility's failure to "reasonably manage and operate its facilities" prior to the fires meant that the costs were not recoverable under the "prudent manager standard." Decision Denying Application of San Diego Gas & Electric Company, Public Utilities Commission of the State of California at 2, 11 (December 6, 2017). [6]

Based on that decision, PG&E renewed its request for relief, arguing that the CPUC decision undermined the legal basis for inverse condemnation liability because it determined that such liability is not automatically recoverable and so does not satisfy the "cost spreading" rationale for inverse condemnation. Rivkin Decl. Ex. B, Butte Fire Cases, No. JCCP 4853 at 6 (Cal. Super. Ct. Sacramento County May 1, 2018) (order on inverse condemnation). In a May 2018 decision, the court again disagreed, reasoning that "[w]hether PG&E, a privately owned public utility, should be liable under the doctrine of inverse condemnation for damages caused by the Butte Fire is a question of public policy to be addressed to the Legislature." *Id*. at 2. None of the precedents in this area, it concluded, rested on the assumption of automatic cost-spreading. *Id*. at 16. It also rejected PG&E's

[6] Available at http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M200/K045/200045020.PDF.

Baker & Hostetler LLP
Attorneys at Law
San Francisco

arguments that imposing inverse condemnation liability on it would constitute an uncompensated taking in violation of the Fifth Amendment and would violate its substantive due process rights. *Id.* at 17. After that decision, the court entered a stipulated final judgment against PG&E in favor of two plaintiffs who had asserted inverse condemnation claims.

In separate litigation before the San Francisco Superior Court concerning 2017 fires alleged to have been caused by PG&E, it moved for dismissal of inverse condemnation claims based on the 2017 CPUC decision and the lack of automatic cost-spreading. The court, in a May 2018 decision, rejected PG&E's argument, on the same basis as the *Butte Fire* court, and also rejected PG&E's takings and substantive due process arguments. *Harrison v. PG&E Corp.*, No. CGC17563108, 2018 WL 2447104 (May 21, 2018).

PG&E sought and was denied relief by California's Courts of Appeals and Supreme Court. It filed petitions for a writ of mandate or prohibition (essentially mandamus) in the Third and First Appellate Districts challenging the Superior Court decisions permitting the inverse condemnation claims against it to proceed. Both were denied. In each case, it petitioned the California Supreme Court for review, and in each case, its petitions were denied. Order, *Pac. Gas & Elec. Co. v. Superior Court (Abu-Shumays)*, No. S249429 (Cal. Aug. 8, 2018); Order, *Pac. Gas & Elec. Co. v. Superior Court (Abbott)*, No. S251585 (Cal. Nov. 14, 2018). Consistent with those denials, the California Supreme Court earlier this year denied a petition for review by another privately owned utility, Edison International, presenting the same issue. Order, *Edison Int'l v. Superior Court (Abate)*, No. S253094 (Cal. Feb. 20, 2019).

## IV. Argument

### A. The Inverse Condemnation Issue Has Already Been Decided

The Court need not reach the merits of PG&E's arguments against inverse condemnation because PG&E is subject to a *final judgment* that is binding and provides a basis to hold precluded PG&E's arguments against inverse condemnation. Preclusion is particularly warranted in this instance, both to avoid inconsistent treatment of claims and claimants and to carry out the policy underlying preclusion that parties are not entitled to keep reasserting the same arguments in case after case after they have already had a full and fair opportunity to be heard and lost.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

The final judgment entered against PG&E resolved an inverse condemnation claim asserted by Barbara Jean and Robert Thomas Zelmer against PG&E for damages they suffered from the 2015 Butte Fire. Rivkin Decl., Ex. C, Stipulated Judgment at 2. PG&E twice moved the court to hold that, as a privately owned utility, it was not subject to inverse condemnation liability, raising the same "socialization" and constitutional arguments that it does here. *See* Rivkin Decl. Ex. B, Ruling on Submitted Matter: PG&E's Renewed Motion for a Legal Determination of Inverse Condemnation Liability, at 2, 7, 17, *Butte Fire Cases*, No. JCCP 4853 (Sacramento Sup. Ct. May 1, 2018). The court denied its motions. It held: (1) that the California Constitution subjects privately owned utilities to inverse condemnation liability; (2) that the November 2017 CPUC decision denying recovery for such liability was irrelevant; (3) that *Barham* and *Pacific Bell* were indistinguishable because neither rested on the assumption of automatic cost-spreading; and (4) that PG&E's constitutional arguments could not alter the result. *See generally id*. There being no dispute over the Zelmers' damages, the parties entered into a stipulated judgment, which the court entered as a final judgment. *See* Rivkin Decl. Ex. D Order Granting Motion for Entry of Stipulated Judgment, *Butte Fire Cases*, No. JCCP 4853 (Sacramento Sup. Ct. Nov. 29, 2018). Subsequently, the Zelmers filed a claim in this bankruptcy proceeding for the $850,000 to which they were entitled under the final judgment. Claim 125-1 (filed Apr. 19, 2019).

To the extent that PG&E disputes its inverse condemnation liability to the Zelmers, it is seeking review of issues that were litigated and decided against it in the final state-court judgment against it, and that is barred by the Rooker-Feldman doctrine. That doctrine "provides that federal district [and bankruptcy] courts lack jurisdiction to exercise appellate review over final state court judgments. Essentially, the doctrine bars state-court losers complaining of injuries caused by state-court judgments rendered before the district [or bankruptcy] court proceedings commenced from asking district [or bankruptcy] courts to review and reject those judgments." *Henrichs v. Valley View Dev.*, 474 F.3d 609, 613 (9th Cir. 2007) (quotation marks and citations omitted); *see also In re Reyes*, BAP No. EC-18-1229, 2019 WL 1759749, at *6–7 (B.A.P. 9th Cir. Apr. 19, 2019) (holding that doctrine deprived bankruptcy court of jurisdiction to consider debtors' arguments disputing the merits of claims arising from state-court judgment). Here, it bars reconsideration of

Case: 19-30088 Doc# 4773 Filed: 11/15/19 Entered: 11/15/19 15:49:46 Page 19 of 49

PG&E's liability to the Zelmers.[7]

That final judgment also provides a basis to reject, as to all claimants, PG&E's arguments against inverse condemnation liability under the doctrine of collateral estoppel, also known as "issue preclusion." Under California law, collateral estoppel may bar relitigation of an issue if "(1) the issue necessarily decided in the previous suit is identical to the issue sought to be relitigated; (2) there was a final judgment on the merits of the previous suit; and (3) the party against whom the plea is asserted was a party…to the previous suit." *Producers Dairy Delivery Co. v. Sentry Ins. Co.*, 41 Cal. 3d 903, 910 (1986). All three elements are satisfied here: (1) the *Butte Fire* court considered and rejected the same arguments on the same issue (the application of inverse condemnation liability to privately owned utilities) as here; (2) its decision resulted in a final judgment against PG&E; and (3) PG&E was, of course, a party to that suit.

Application of collateral estoppel is warranted, for three reasons. First, holding PG&E estopped is necessary to avoid the possibility of "inconsistent judgments which undermine the integrity of the judicial system," *Murray v. Alaska Airlines, Inc.*, 50 Cal. 4th 860, 879 (2010), given that there is no basis to distinguish, with respect to the legal issue here, between the Zelmers and other fire victims asserting inverse condemnation claims. Second, estoppel would "promote the sound public policy of limiting litigation by preventing a party who has had one fair trial on an issue from again drawing that issue into controversy and by avoiding inconsistent judgments." *Imen v. Glassford*, 201 Cal. App. 3d 898, 905–06 (1988) (citations omitted); *see also Murphy v. Murphy* 164 Cal. App. 4th 376, 404 (2008) (explaining that estoppel is warranted to "promote judicial economy by minimizing repetitive litigation"). And, third, PG&E had a "full and fair" opportunity to litigate the inverse condemnation issue in the *Butte Fire* proceedings—in fact, two opportunities—such that holding PG&E to the resulting judgment would not work any injustice. *See Roos v. Red*, 130 Cal. App. 4th 870, 880 (2005).

---

[7] In addition, the judgment is binding under ordinary principles of claim preclusion because (1) the same claim of liability is at issue, (2) the first suit resulted in a final judgment on the merits, and (3) PG&E was a party to that suit. *See San Diego Police Officers' Ass'n v. San Diego City Emps.' Ret. Sys.*, 568 F.3d 725, 734 (9th Cir. 2008) (identifying elements for preclusion).

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Case: 19-30088 Doc# 4773 Filed: 11/15/19 Entered: 11/15/19 15:49:46 Page 20 of 49

At this point, it is beyond dispute that California law subjects privately owned utilities like PG&E to inverse condemnation liability, and no legitimate purpose is served by permitting PG&E to raise yet again the same arguments that California courts have repeatedly rejected.

B. PG&E Is Subject to Inverse Condemnation Under Binding California Law

California courts have already determined that privately owned utilities like PG&E are subject to inverse condemnation liability, and the Debtors' argument that those decisions are not binding on this case is simply wrong. *Pacific Bell Telephone Co. v. Southern California. Edison Co.*, 208 Cal. App. 4th 1400 (2012), and *Barham v. Southern California Edison Co.*, 74 Cal. App. 4th 744 (1999), both hold that, when private property is taken or damaged by a privately owned utility, the California Constitution requires the utility to compensate the owner, including interest and attorneys' fees. *See* Cal. Civ. Proc. Code § 1036. Those directly on-point decisions are consistent with the precedent of the California Supreme Court, which has repeatedly declined requests by utilities to reject inverse condemnation liability in these circumstances. There is no basis for this Court to depart from the unanimous rulings of California courts on this point.

"[F]ederal courts, under the doctrine of *Erie Railroad v. Tompkins*, must follow the decisions of intermediate state courts in the absence of convincing evidence that the highest court of the state would decide differently" when deciding a question of state law. *Stoner v. New York Life Ins. Co.*, 311 U.S. 464, 467 (1941) (citations omitted). In other words, the decisions of intermediate state courts on matters of state law are, by default, binding in federal court.

The Ninth Circuit applied that rule to a bankruptcy case in *In re Kirkland*, 915 F.2d 1236 (9th Cir. 1990). At issue was the interpretation of several provisions of the California Commercial Code. *Id.* at 1241. Although the California Supreme Court had not spoken on the issue, several California Courts of Appeal had, with the recent decisions supporting the debtor's position. *Id.* at 1239. The Ninth Circuit held that the *Stoner* rule governed: "When interpreting state law, a federal court is bound by the decision of the highest state court….However, 'in the absence of convincing evidence that the highest court of the state would decide differently, a federal court is obligated to follow the state's intermediate courts.'" *Id.* at 1238–39 (citations omitted) (quoting *Am. Triticale, Inc. v. Nytco Servs., Inc.*, 664 F.2d 1136, 1143 (9th Cir. 1981), which in turn quoted *Stoner*, *supra*).

Baker & Hostetler LLP
Attorneys at Law
San Francisco

Accordingly, the court declared itself "bound by the interpretation adopted by the majority of California appeals courts." *Id.* at 1239. It recognized, correctly, that it did "not write on a blank slate and" so was "compelled to apply the law as we find it interpreted by California courts." *Id.* at 1241. Likewise, under *Stoner* and *Kirkland*, the interpretation of California law adopted by *Pacific Bell* and *Barham* is binding in these federal proceedings.

Also relevant is that the California Supreme Court has declined challenges by utilities to PG&E's interpretation three times over just the past two years. *West v. American Telephone & Telegraph Co*. holds that such denials demonstrate that lower decisions correctly interpret and apply state law. 311 U.S. 223, 237 (1940). A federal court, it explained, is generally bound where "an intermediate appellate state court rests its considered judgment upon the rule of law which it announces," and such a decision may not "be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Id.* Where "the highest court has refused to review the lower court's decision," that weighs heavily against any claim that the lower court erred. *Id.* Three such refusals, in the space of about a year, is all but conclusive of the California Supreme Court's view of the law in this area.

The authorities cited by PG&E as grounds to disregard *Pacific Bell* and *Barham* do not support that result. In *Orkin v. Taylor*, unlike here, on-point California Supreme Court precedent contradicted the reasoning of an aberrant Court of Appeals decision on the relevant issue: whether a "discovery" rule applied to accrual of the statute of limitations. 487 F.3d 734 (9th Cir. 2007). That decision conflicted with the California Supreme Court's holding that any discovery rule included a "constructive notice" requirement. Accordingly, the Ninth Circuit "conclude[d] that it is highly unlikely that the California Supreme Court would abandon [its previous] rule, much less adopt a new rule…." *Id.* at 741. Here, by contrast, there is no conflict in authority, clear or otherwise.

Similarly inapposite is *American Tower Corp. v. City of San Diego*, 763 F.3d 1035 (9th Cir. 2014). The case involved claims that a permit denial by the City of San Diego violated, among other things, California law. Despite a California Court of Appeals decision to the contrary, the Ninth Circuit held there to be no violation because the plain text of the California statute was "persuasive data that the California Court of Appeal misinterpreted" the relevant provisions. *Id.* at

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1047 (quotation marks omitted). The previous decision, it explained, "violated the fundamental canon of construction that a statute should not be construed so as to render any of its provisions mere surplusage." *Id.* at 1047–48. Thus, the Ninth Circuit had a firm basis for its conclusion that "[w]e do not believe that the California Supreme Court would do the same." *Id.* at 1048.[8] Here, by contrast, the plain text of the California Constitution provides no basis to depart from *Pacific Bell* and *Barham*.

In the absence of any basis, much less a firm one, to conclude that *Pacific Bell* and *Barham* conflict with the law of the California Supreme Court, those decisions are binding here.

C. <u>*Pacific Bell* and *Barham* are Indistinguishable from This Case</u>

PG&E cannot distinguish *Pacific Bell* and *Barham* from this case. Its claim, that those decisions were premised on the assumption, since (it contends) rebutted, that utilities could automatically "socialize" the cost of inverse condemnation liability is wrong. To the contrary, California law has long recognized that the state may not evade its constitutional obligations by enlisting private entities like utilities to carry out public purposes and that, accordingly, such entities are subject to obligations under the California Constitution including its Takings Clause's just compensation requirement.

*Barham* involved basically the same circumstances as here. The plaintiffs sought compensation from a privately owned utility, Southern California Edison ("**SCE**"), for damage to their property caused by a 1993 wildfire allegedly sparked by SCE's overhead power lines. 74 Cal. App. 4th at 748–49. The court held that the utility, although privately owned, could be treated as a public entity subject to inverse condemnation liability, based on five considerations, all applicable here. First, it is well established under California law that "condemning private property for the

---

[8] Debtors also misconstrue the holdings of *In re Basave de Guillen*, 604 B.R. 826 (BAP 9th Cir. 2019), and *In re Foamex International Inc.*, 491 B.R. 100 (Bankr. D. Del. 2013), in asserting that "[t]his Court is not bound by the decisions of lower California courts." Br. at 13 n.7. Neither court rejected or side-stepped *Stoner, West,* and *In re Kirkland*. The *In re Basave De Guillen* court applied those precedents, and concluded that the single, relevant California Court of Appeals case was factually distinguishable and had failed to take into account important sections and purposes of the statute at issue. 604 B.R. at 836–37. There were, in other words, "persuasive data" that the California Supreme Court would not follow the intermediate court's lead in that case. The court in *In re Foamex International, Inc.*, reached a similar conclusion. There, the court was called upon to determine whether Pennsylvania's Supreme Court would recognize a tortious interference claim in the context of an at-will employment agreement. It was not faced with two clear, definitive and indistinguishable intermediate decisions, as here, but with "a morass of inconsistent rulings" by the state's lower courts. 491 B.R. at 106.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

transmission of electrical power is a public use and inverse condemnation applies." *Id.* at 745. Second, utilities enjoy eminent domain power under California law. *Id*. at 752–54. (citing Cal. Pub. Util. Code § 612). Third, the California Supreme Court held, in *Gay Law Students Ass'n. v. Pacific Telephone & Telegraph Co.*, 24 Cal. 3d 458 (1979), that privately owned utilities may be "state actor[s]," particularly in areas where state regulation leads a "utility to conduct its affairs more like a governmental entity than like a private corporation." *Barham*, 74 Cal. App. 4th at 753 (quotation marks omitted). Fourth, there was no basis to distinguish privately owned utilities from publicly owned utilities, which had "been held liable in inverse condemnation in situations virtually identical to this case." *Id.* (citing authorities). Finally, and above all else, the "principal focus" of the California Constitution's Takings Clause is "the concept of public use, as opposed to the nature of the entity appropriating the property," and (as noted above) California law expressly recognizes that transmitting electricity to the public is a public use. *Id.*

Each of those five considerations applies equally to PG&E. Moreover, the *Barham* court did not regard whether a utility could automatically recover the cost of inverse condemnation liability to be a relevant consideration.

*Pacific Bell*, which carefully scrutinized and ultimately agreed with *Barham*'s reasoning, is also indistinguishable. It involved a successful inverse condemnation claim against SCE based on damage to property caused by a ground fault. 208 Cal. App. 4th at 1403. The court rejected SCE's argument that it was immune from inverse condemnation liability because it was privately owned, relying (like *Barham*) on the company's status as a utility carrying out a public use and its franchise status: "[SCE's] monopolistic or quasi-monopolistic authority, deriving directly from its exclusive franchise provided by the state, distinguishes [SCE's] action from the cases it cites rejecting inverse condemnation cases against private parties who do not have such monopolistic authority from the state." *Id.* at 1406 (citations omitted). And (similar to *Barham*) *Pacific Bell* recognized that immunizing privately owned utilities, but not publicly owned ones, from inverse condemnation liability would yield absurd policy outcomes: "We do not believe the happenstance of which type of utility operates in an area should foreclose a property owner's right to just compensation under inverse condemnation for the damage, interest and attorney fees." *Id.* at 1408.

*Pacific Bell* was not, as PG&E claims (at 14), premised on the assumption that SCE could automatically pass its costs along to customers. In fact, it expressly rejected reliance on that assumption. In response to the company's claim that, lacking the power to tax, it was unable to socialize costs like a government actor, the court stated that "[SCE] has not pointed to any evidence to support its implication that the [public utility] commission would not allow [SCE] adjustments to pass on damages liability during its periodic reviews." *Id.* at 1407. It also rejected the legal premise underlying SCE's argument, stating that the fact that utilities may be subject to limiting rate regulation by the CPUC does not "immunize" them "from inverse condemnation liability under the theory that they were no longer able to spread the cost of public improvements." *Id*. n.6.[9] Thus, for the *Pacific Bell* court, cost recovery was irrelevant.

On that point, *Pacific Bell* was entirely correct. Contrary to PG&E's claim (at 13), the California Court has extended inverse condemnation liability to privately owned entities, without any mention of cost recovery. *Eachus v. Los Angeles Consolidated Electric Railway Co.*, 103 Cal. 614 (1894), which PG&E neither cites nor discusses, affirmed an award of inverse condemnation damages to a landowner whose property was cut off from the public road by a "grade" (in this case, a 28-foot-deep trench) for a private rail-line constructed pursuant to a franchise from the city of Los Angeles. *Id.* at 615. What mattered, the court explained, was that the construction was "for the benefit of the public…, and if, in establishing such grade, the owner suffers damage, his property has been damaged for public use." *Id.* at 621 (quotation marks omitted). PG&E's failure to confront *Eachus* is telling, given that the decision is among those underpinning *Pacific Bell*'s holding that privately owned utilities are subject to inverse condemnation liability.[10]

---

[9] PG&E claims (at 14 n.8) that this language has no bearing here, but the same argument was rejected by the *Butte Fire* court. It stated: "Even if considered dicta, this statement suggests that whether [the utility] could pass on its losses as rate increases was not essential to the *Pac Bell* Court's decision. Merely characterizing the Court of Appeals observation as dicta does not mean its reasoning is wrong, unreasonable, or should not be considered." *Butte Fire Cases*, No. JCCP4853, 2018 WL 3371780, at *10 (Cal. Super. Ct. Apr. 26, 2018). In any instance, that portion of *Pacific Bell* is not dicta; SCE, like PG&E here, argued that it was not subject to inverse condemnation liability because it could not socialize costs, and the court rejected that argument on both factual and legal grounds.

[10] PG&E's reliance (at 10, 12) on *Baker v. Burbank-Glendale-Pasadena Airport Auth.*, 39 Cal. 3d 862 (1985), on this point is misplaced. *Baker* did not hold, as PG&E states (at 10), that "only a public entity is subject to inverse condemnation," but that inverse condemnation liability does *not* depend on whether an entity possesses eminent domain power. *Id*. at 867. Moreover, the court's reference to the defendant airport becoming a "public entity" was part of the court's recitation of the facts, and not a word of the decision suggests that fact was material to the holding.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Although PG&E studiously ignores *Eachus*, it strives mightily—if unsuccessfully—to distinguish *Gay Law Students Ass'n* (hereinafter "*GLSA*"), on which *Pacific Bell* also relied. *GLSA* held that privately owned utilities may be regarded as state actors in areas where they are closely regulated by the state and are therefore subject to the California Constitution's equal protection guarantee. 24 Cal. 3d at 469–75. It also held that sexual-orientation discrimination by private utilities violated a statutory provision that it read to incorporate common-law prohibitions on discriminatory practices by monopolies like labor unions. *Id*. at 480–85. PG&E contends (at 16) that *Pasillas v. Agricultural Labor Relations Board* undercuts the application of *GLSA* here, quoting *Pasillas*'s statement that *GLSA* "must be read in context, as addressing only the problem of *arbitrary discrimination* in employment." 156 Cal. App. 3d 312, 348 (1984). The *Pasillas* court made clear, however, that it was referring specifically to *GLSA*'s second holding, addressing common-law duties arising from an entity's monopoly status, which it called the "[t]he *Marinship* strand of the *Gay Law Students* decision." *Id.* at 349; *see also id.* ("That common law duty arising out of 'monopoly' concepts, moreover, cannot aid [plaintiffs]…."). By contrast, it recognized that *GLSA*'s other holding subjecting utilities to the California Constitution's equal protection guarantee was premised on the utility's "state-protected monopoly status and quasi-government entity character." *Id*. at 348 (citing *GLSA*, 24 Cal. 3d at 469–75). Accordingly, *Pasillas* cannot be understood to undercut the application of *GLSA* here or in *Pacific Bell* and *Barham*.

In any instance, *GLSA* speaks for itself, and what it says both follows *Eachus* and dictates the holdings of *Pacific Bell* and *Barham*. A utility, *GLSA* reasoned, is "more akin to a governmental entity than to a purely private employer" for purposes of the California Constitution, based on: (1) "the breadth and depth of governmental regulation of a public utility's business practices"; (2) "the nature of the California regulatory scheme," which "demonstrates that the state generally expects a public utility to conduct its affairs more like a governmental entity than like a private corporation"; (3) the fact that its prices and "the standards which govern its facilities and services are established by the state"; and (4) the fact that the state has "endowed many public utilities…with considerable powers generally enjoyed only by governmental entities, most notably the power of eminent domain." 24 Cal. 3d at 469–70. Above all else, it concluded, a public utility must be

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

regarded as a state actor in areas where its "monopolistic or quasi-monopolistic authority…derives directly from its exclusive franchise provided by the state." *Id.* at 470. That rule, without a doubt, encompasses PG&E in these circumstances.

D. Inverse Condemnation Liability Does Not Depend on Entitlement to Automatic Cost-Recovery

PG&E's entire argument is grounded on the false assumption that the "*sine qua non*" of inverse condemnation liability is the guaranteed right to spread or socialize costs to the public generally through taxation or rates. *See* Br. at 15. The California Constitution provides, unequivocally, that "[p]rivate property may be taken or damaged for a public use and only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner." Cal. Const. art. 1, § 19. Nothing in the text of the California Constitution limits that right to situations in which the condemnor has a "guaranteed" right to socialize its liability.

Takings liability exists to protect individual property owners against usurpation of their property rights by government or those it charges to carry out public uses. *See, e.g.*, *City of Carlsbad v. Rudvalis*, 109 Cal. App. 4th 667, 678 (2003) ("The principle behind the concept of just compensation is to put the owner in as good a position pecuniarily as he would have occupied if his property had not been taken."). Although California courts have cited loss-spreading as one of the policies underlying the compensation requirement, it does not follow that a defendant's inability to automatically and completely socialize the cost of compensation divests injured property owners of their constitutional right to compensation. Indeed, no California court has ever held that automatic cost-spreading is an element of an inverse condemnation claim. PG&E's argument purports to convert cost-spreading from one of several judicial rationales for takings liability into an element of a constitutional cause of action, contravening the California Supreme Court's admonition that "[w]ords used in a…constitutional provision should be given the meaning they bear in ordinary use. If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of [] intent[.]" *Lungren v. Deukmejian*, 45 Cal. 3d 727, 735 (1988).

Baker & Hostetler LLP
Attorneys at Law
San Francisco

Case: 19-30088 Doc# 4773 Filed: 11/15/19 Entered: 11/15/19 15:49:46 Page 27 of 49

Instead, the critical question—consistent with the text of the California Constitution—is whether private property has been taken or damaged for a public use. *See Holtz*, 3 Cal. 3d 296, 303 (1970) ("'The decisive consideration is whether the owner of the damaged property if uncompensated would contribute more than his proper share to the public undertaking.'") (quoting *Clement v. State Reclamation Bd.*, 35 Cal. 2d 628, 642 (1950); s*ee also Barham*, 74 Cal. App. 4th at 753 ("[A]rticle I, section 19 of the California Constitution and the cases which interpret and apply it have as their principal focus the concept of public use, as opposed to the nature of the entity appropriating the property."). That is true whether the property was taken or damaged by a government or private entity, and whether or not that entity can automatically and completely spread the resulting costs across society.[11]

Were the law otherwise, the Takings Clause's right to compensation for damage to property would be a dead letter. Under that mistaken view, the state and its subdivisions could override the compensation requirement of the California Constitution in practically every instance by outsourcing public uses to private parties and denying them cost recovery. What prevents the state and its subdivisions from evading their obligations under the California Constitution's Takings Clause is that it brooks no such exception. Indeed, California courts have consistently held that, where a public use causes a taking of or damage to property, a mere "statute cannot defeat a condemnee's constitutional right to just compensation." *Escondido Union Sch. Dist. v. Casa Suenos De Oro, Inc.*, 129 Cal. App. 4th 944, 973 (2005) (citing *Redev. Agency v. Gilmore*, 38 Cal. 3d 790, 797 (1985)). And if a statute cannot override the constitutional compensation requirement, neither can an administrative action (like a CPUC determination) authorized by statute.

There is not a single case—and PG&E has cited none—where a California court has agreed with its assertion that inverse condemnation claims are prohibited where "socialization" of costs is not guaranteed and automatic. To the contrary, *Marin Municipal Water District v. City of Mill Valley*, 202 Cal. App. 3d 1161 (1988), specifically rejected that contention. There, a county water

[11] This owner-centric approach is also found in the determination of what compensation is due. As Justice Traynor explained: "It is irrelevant whether or not the injury to the property is accompanied by a corresponding benefit to the public purpose to which the improvement is dedicated, since the measure of liability is not the benefit derived from the property, but the loss to the owner." *House v. Los Angeles Flood Control Dist.*, 25 Cal. 2d 384, 397 (1944) (Traynor, J. concurring).

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

district sought recovery under inverse condemnation against a city, and the city argued that this claim "[ran] counter to the purpose of inverse condemnation" of "socializ[ing] the burden of loss" because it would cause "the loss distribution [to] decrease—from countywide to citywide—rather than increase." *Id*. at 1165. The Court of Appeals disagreed, explaining that inverse condemnation cases concerning "unintentional damage…*are based primarily on principles of tort and property law*." *Id*. (emphasis added). Thus, it continued: "When the public entity fails to construct or maintain its improvement properly, it takes a calculated risk that damage to private property may occur. If damage to private property results, it is proper to require the entity that took this risk to bear the loss when damage occurs." *Id*. (citations omitted); *see also Holtz*, 3 Cal. 3d at 310–11 (imposing inverse condemnation liability on public entity that damaged plaintiff's property through an excavation because it undertook actions that "created some risk…of damage to plaintiffs' property" and should therefore "bear the loss when damage does occur").

The California Supreme Court recently reiterated, and expanded on, this point in *City of Oroville v. Superior Court*, 7 Cal. 5th 1091 (2019). It noted that "useful public improvements must eventually be maintained and not merely designed and built. So the 'inherent risk' aspect of the inverse condemnation inquiry…also encompasses risks from the maintenance or continued upkeep up of the public work." *Id.* at 1107. If the owner of a public improvement "makes a policy choice to benefit from the cost savings from declining to pursue a reasonable maintenance program…inverse condemnation principles command 'the corollary obligation to pay for the damages caused when the risks attending these cost-saving measures materialize.'" *Id.* (quoting *Pacific Bell v. City of San Diego*, 81 Cal. App. 4th 596, 608).[12]

Here, PG&E took (and profited from) a series of calculated risks in constructing and maintaining its electrical distribution system—*e.g.*, using uninsulated wires, failing to remediate hazardous vegetation in furtherance of cost-cutting initiatives, and failing to de-energize its lines

[12] *City of Oroville* also observed that inverse condemnation is based on a presumption that "where damages are the direct consequence of the inherent risks posed by the public improvement, responsibility for the individual property owner's loss is spread across the community benefitting from the public work." 7 Cal. 5th at 1107. This observation was not substantively related to the issue before the court, which was a question of causation. In passing, *Oroville* recognized risk-spreading as one rationale of inverse condemnation but did not (as no court has) identify it as an element of an inverse condemnation claim.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Case: 19-30088 Doc# 4773 Filed: 11/15/19 Entered: 11/15/19 15:49:46 Page 29 of 49

during high wind events—for its own benefit and the benefit of its investors, and as a result, inflicted catastrophic losses on thousands of Northern California residents. PG&E—and PG&E alone—had the skill, know-how, and capacity to minimize such risks, making it, in economic terms, the cheapest (and only) cost avoider. Individual fire victims have no legal right or practical ability to trim vegetation around PG&E's lines or "harden" PG&E's infrastructure by installing insulated lines, much less the experience to do so safely. Imposing inverse liability on PG&E will appropriately allocate and spread the burden of PG&E's calculated risks to the multi-billion dollar company (and its investors) that most directly benefitted from taking them—and the only one in a position to have mitigated them—instead of concentrating that burden on individual fire victims (which would be the opposite of cost-spreading). Enjoying billions in revenue, substantial liability insurance coverage, and the purported ability to issue billions in debt financing, PG&E is far better positioned to absorb the losses caused by its equipment than are hapless individual property owners.

PG&E's cases are not to the contrary. *Moreland Investment Co. v. Superior Court* expressly recognized that a privately owned utility is not guaranteed the right to pass on to ratepayers the cost of eminent domain. 106 Cal. App. 3d 1017 (1980).[13] There, San Diego Gas & Electric ("**SDG&E**") brought an eminent domain action to condemn property owned by Moreland Investment Co. in San Diego County. Moreland argued that SDG&E was a "local agency" under California Civil Procedure Code § 394, requiring removal of the trial on compensation to a neutral county. *Id.* at 1019. The court disagreed, noting that SDG&E was not a "local agency" because of its public utility status within that statute's meaning. It neither considered, nor addressed, the question whether SDG&E was engaged in a "public use" for inverse condemnation purposes. *Id.* at 1022.

But Moreland did have something to say on that subject. It noted that the type of public pressure addressed by Section 394—from taxpayers who would be required to foot the eminent domain bill, and the potential bias their presence on a jury might occasion—was not present in SDG&E's case. As a privately owned utility, the court reasoned, SDG&E could only partially pass on its eminent domain costs to utility ratepayers based on the reasonability determinations required

[13] "An inverse condemnation action is an eminent domain proceeding initiated by the property owner rather than the condemner. The principles which affect the parties' rights in an inverse condemnation suit are the same as those in an eminent domain action." *Breidart v. S. Pac. Co.*, 61 Cal. 2d 659, 663 n.1 (1964).

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

by the Public Utility Code. "The shareholders are expected to bear some of the costs of acquisitions while ratepayers make a partial contribution." *Moreland*, 106 Cal. App. 3d at 1022. Thus, "there is no direct connection, nor is there a one-to-one correspondence between the size of the condemnation award in this proceeding and SDG&E's ultimate rate increases to the public, which will not even be computed until the new facilities are in operation." *Id.*

PG&E's reliance (at 13, 15) on *Mercury Casualty Co. v. City of Pasadena*, 14 Cal. App. 5th 917 (2017), and *Gutierrez v. San Bernardino County*, 198 Cal. App. 4th 831 (2011), is misplaced. *Mercury Casualty Co.* rejected inverse condemnation liability based on damage caused when a tree, growing on public land, fell on plaintiffs' home. 14 Cal. App. 5th at 920. The court explained that "the primary consideration in an inverse condemnation action is whether the owner of the damaged property if uncompensated would contribute more than his proper share to a public undertaking." *Id.* at 926 (quoting *Albers v. Los Angeles Cty.*, 62 Cal. 2d 250, 262 (1965) (quotation marks omitted). And, in holding that an inverse condemnation action did not lie, the court properly focused on the nature of the alleged public use, not on who owned the tree: "we conclude that [the tree] was not a work of public improvement because there was no evidence it was planted as part of a planned project or design serving a public purpose or use." *Id.* at 931. Here, unlike in *Mercury*, there is no dispute that PG&E's electric transmission is a public use.

Similarly, the *Gutierrez* court referred to the "loss distribution premise" of inverse condemnation, but it actually quoted and applied the well-established rule that "'the decisive consideration is whether the owner of damaged property if uncompensated would contribute more than his proper share to the public undertaking.'" 198 Cal. App. 4th at 837 (quoting *Holtz*, 3 Cal. 3d at 303). It did not suggest that an injured landowner's right to compensation depended on the defendant's ability to socialize its liability. Instead, its focus, like that of the California Constitution's Takings Clause, was on making the individual landowner whole.

Finally, PG&E's efforts to distinguish the judicial decisions that rejected its "socialization" argument, *Butte Fire Cases*, No. JCCP4853, 2018 WL 3371780 (Cal. Super. Ct. Apr. 26, 2018) and *Harrison v. PG&E Corp.*, No. CGC17563108, 2018 WL 2447104 (Cal. Super. Ct. May 21, 2018), are equally ineffectual. In *Butte Fire*, the court denied PG&E's renewed motion for a judicial

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

determination on whether it was subject to inverse condemnation liability, which the company filed after the CPUC applied the "prudent manager" standard to deny SDG&E's application to include certain inverse condemnation costs in its rates. 2018 WL 3371780 at *6. Although the court recognized that *Barham* and *Pacific Bell* "discuss the cost-spreading policy behind inverse condemnation, the court [was] not persuaded either decision rested on the assumption that the utility would automatically be able to pass on its losses as rate increased to its customers." *Id.* at *9. Thus "[w]hether PG&E, as a privately owned public utility, *should* be liable under the doctrine of inverse condemnation…is a question of public policy for the Legislature to resolve." *Id.* at *1.

Similarly, *Harrison* correctly concluded that PG&E's cost-spreading argument was "flatly contradicted by *Pacific Bell*," which instead "emphasized the fact that SCE operated a state-authorized monopoly or quasi-monopoly" under a state franchise. 2018 WL 2447104, at *3, And, it noted, when the *Pacific Bell* Court did address "loss-spreading," it "couched the rationale in terms that emphasized the policy against overburdening individual property owners rather than the policy of socializing the costs." *Id.* at *3.[14]

E. The Evidence Suggests That PG&E Already Has Or Will Be Able to Socialize Its Inverse Condemnation Liability

The crux of PG&E's argument is that it faces an untenable "whipsaw" because California courts have extended inverse condemnation liability to privately owned utilities "on the express assumption that the CPUC would allow private utilities to shift inverse condemnation costs to the public through rate increases," even though "the CPUC has explicitly rejected that critical assumption." Br. at 2. In addition to being contradicted by an unbroken string of California decisions, this argument depends on PG&E's speculation that it will be unable to recoup its inverse condemnation liability because its rates are subject to approval by the CPUC. But the evidence

[14] PG&E also claims (at 12 n.6) that inverse condemnation liability is "unnecessary with respect to private utilities because damages are otherwise recoverable under applicable tort law." This claim is incorrect and ignores both the vagaries of tort law and the purpose of inverse condemnation. Injured landowners have a right to compensation when their property is taken or damaged for a public use. Cal. Const. art. I, § 19. This right applies regardless of what other theories of liability might be available. *See City of Oroville v. Superior Court*, 7 Cal. 5th 1091, 1106 (2019) ("If damage to private property is substantially caused by the inherent risks of the design or construction of a public improvement, a public entity must provide just compensation for the damage, whether it was intentional or the result of negligence by the public entity.").

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

suggests that, even absent an entitlement to guaranteed rate recovery, PG&E has passed on, or will be able to pass on, its potential inverse condemnation liability.

At the outset, PG&E's woe-is-me argument concerning its ability to recover costs associated with inverse condemnation liability is disingenuous. PG&E complains (at 7–8) that, "unlike a true public utility that is not subject to any regulatory limits on its ability to raise rates, [it] does not control the rates is can charge its customers." But PG&E fails to mention the most important consequence of its status as an privately owned utility: unlike a non-profit public utility, PG&E can, and has, reaped enormous profit.[15] Its state-granted monopoly eliminates two key risk for PG&E investors: competition and the recovery of invested capital.[16] While PG&E may not have the ability to unilaterally raise rates, it can, and has, successfully petitioned regulators for a higher rate of return. For example, in 2018, PG&E requested, and the CPUC approved, a rate increase of nearly $5.00 per month for residential consumers.[17]

Even taken at face value, PG&E fails to establish any purported "whipsaw," which it defines as privately owned utilities like PG&E being subject to strict liability under the doctrine of inverse condemnation for fires they cause without the guaranteed ability to recover inverse condemnation damages through rate increases approved by the CPUC. *See* Br. at 1–6. This argument rests on a number of false and speculative premises.

First, PG&E does not establish that PG&E—or any privately owned utility—has ever or will ever face a circumstance in which, absent fault, it is unable to spread its costs. When the CPUC denied a rate increase to SDG&E to cover "inverse condemnation costs" (the only time the CPUC has ever done so), its denial was based on SDG&E's failure to act reasonably and prudently in connection with the events that gave rise to the fires. The CPUC's definition of "reasonable and prudent" closely mirrors the California standard of care in negligence cases. *Compare* Cal. Pub.

---

[15] Sophia Kunthara, *PG&E profit rises to $564 million for quarter, revenue declines*, SFGate https://www.sfgate.com/business/article/PG-E-profit-rises-to-564-million-for-quarter-13363879.php (Nov. 9, 2018) (Last Accessed Nov. 13, 2019).

[16] Inara Scott, Incentive Regulation, New Business Models, and the Transformation of the Electric Power Industry, 5 Mich. J. Envtl. & Admin. L. 319 (2016).

[17] J.D. Morris, *PG&E to raise average monthly bill nearly $5 next month*, San Francisco Chronicle, https://www.sfchronicle.com/business/article/PG-E-to-raisse-average-monthly-gas-bill-nearly-2-14450522.php (Sept. 18, 2019) (Last Accessed Nov. 13, 2019).

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Utilities Comm'n Dec. 17-11-033, at 10 (Nov. 30, 2017) ("[R]easonable and prudent means…the exercise of reasonable judgment in light of the facts known or which should have been known at the time the decision was made."), *with* Cal. Jury Instr. BAJI 3.45 (requiring "what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances"). In the SDG&E case, the CPUC closely examined the record and concluded that the utility did not meet the "reasonable and prudent" standard because it ignored red flag warnings indicating high wind conditions, other fires in the vicinity, a request by Cal Fire to de-energize another transmission line, and three faults over a period of 3.5 hours. *See id.* at 27. In another fire, the CPUC faulted SDG&E for a "six-year gap in inspection records" and found it "to be indicative of imprudent management." *See id.* at 35. In sum, before denying rate recovery, the CPUC engaged in a "fact specific" analysis of each fire "taking into account extensive records submitted by the parties, industry practice…, and contemporaneous information available to SDG&E at the time of the separate ignitions," and concluded that SDG&E had acted negligently. *See id.* at 10.

Notwithstanding its finding that SDG&E acted imprudently, the CPUC emphasized that it "was prepared in this case, as it will in the future, to find SDG&E's conduct is reasonable and prudent, if the facts warrant such a conclusion." *See id.* at 10–11. Thus, the CPUC may grant rate increases to cover inverse condemnation costs, as long as the utility has acted in a "reasonable and prudent" manner. *See* Cal. Pub. Utilities Comm'n Dec. 17-11-033, at *10 (Nov. 30, 2017). The CPUC has made no findings regarding PG&E's prudence in connection with the wildfires at issue in these proceedings, and a determination that PG&E is liable in inverse condemnation would not automatically entail a finding that it was imprudent, *see, e.g.*, *Marshall v. Dep't of Water & Power of Los Angeles*, 219 Cal. App. 3d 1124, 1138 (1990) (noting that fault is irrelevant for inverse condemnation), and therefore would not preclude PG&E from satisfying the prudent manager standard, obtaining interim cost recovery, and socializing its inverse condemnation liability.

Second, citing (at 2–3, 5–7, 12) the example of SDG&E, PG&E falsely suggests that, absent recovery through an CPUC interim rate setting, privately owned utilities no way of recovering inverse condemnation costs. But PG&E fails to explain that SDG&E was able offset all but $379 million of the $2.4 billion it paid to settle inverse condemnation claims with funds from insurance,





Case: 19-30088 Doc# 4773 Filed: 11/15/19 Entered: 11/15/19 15:49:46 Page 34 of 49

third-party settlements, and rate increases approved by the Federal Energy Regulatory Commission ("**FERC**"). *See* SDG&E Decision, SDG&E Decision, Dk. 4486-4, Orsini Decl. Ex. D, at 2–3. There is absolutely no record establishing how much of PG&E's inverse condemnation costs—if any—could not be recovered from rate increases through FERC or other sources.[18]

Third, the CPUC already permits PG&E to charge ratepayers for at least some of its inverse condemnation costs. PG&E argues (at 30) that "[t]he California utilities…must provide a greater return…to attract investor capital that just as easily may be deployed in favor of less-risky alternatives, including utilities in states that do not impose strict inverse condemnation liability." And the CPUC has long recognized that utilities need to maintain a rate of return that attracts outside investors and that ensures the utility's financial ability to provide safe and reliable service. *See, e.g.*, *Ponderosa Tel. Co. v. Public Util. Comm'n*, 36 Cal. App. 5th 999, 1004–05 (2019) (CPUC acknowledging that a utility's rate of return should be set "at a level that is adequate to enable the utility to attract investors to finance the replacement and expansion of its facilities so it can fulfill its public utility service obligation"). Further, the CPUC already permits PG&E to include wildfire related costs in its general rate applications. *See, e.g.*, Cost Recovery Mechanisms for Energy Utilities (CPUC Oct. 26, 2016) (utilities can use the "Z-factor" mechanisms to account for exogenous costs that were unforeseen when rates were established subject to CPUC review and approval during the general ratemaking process).[19] Thus, a measure of cost-spreading related to inverse condemnation is already baked into PG&E's rates. *See also* Notice of Intervention, Protest, Request for Hearing, Request for Five-Month Suspension & Reservation of Rights of the California Public Utilities Commission, *In re So. Cal. Edison Co.*, No. ER19-1553-000 at 22–23 (FERC May 2, 2019) (noting that utility return on equity "already includes" a risk premium and that "some, if not most, of the wildfire liability risk already would be reflected in the measured cost of equity").

Fourth, even supposing PG&E were unable to pass on some fraction of its inverse liability to ratepayers, that residual liability (if any) will be spread between and among PG&E's investors.

---

[18] The Wells Declaration, on which PG&E relies to assert that the CPUC sets PG&E's rates, actually says that PG&E's rates are set by both the CPUC and FERC. *See* Wells Decl. at 7–8.

[19] Available at https://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Transparency/Commissioner_Meetings/Cost%20Recovery%20Mechanisms%20intra%20rate%20cases%20Oct%2025%20(2).pptx%20[Read-Only].pdf (Last Accessed Nov. 13, 2019).

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Having profited off of PG&E's "calculated risks" in building and maintaining its electrical distribution system, there is no reason why PG&E's investors should not absorb some of the costs arising from the wildfires.

Finally, AB 1054 will establish a Wildfire Fund from which PG&E may be able to recoup its inverse liability from future wildfires. *See* Cal. Pub. Util. Code §§ 451.1, 3284. In view of individual fire victims' settled expectation—based on two decades of precedent—that utilities would make them whole for property damage caused by their equipment, and given PG&E's ability to shift its future inverse liability to the Wildfire Fund, it would be unfair to leave individual victims here in the lurch by divesting them of their ability to recover from PG&E.

F. <u>There Is No "Taking" of PG&E's Property.</u>

PG&E asserts that the mere recognition of wildfire victims' inverse condemnation claims would constitute a "taking" in violation of the Fifth Amendment. Any constitutional objection PG&E may have to inverse condemnation liability is not relevant to the payment of liability to wildfire victims, because monetary payments to third parties generally do not implicate the Takings Clause. Instead, if PG&E has a viable constitutional objection at all, it would be to a future decision of the CPUC denying it appropriate cost-reimbursement, and not as a defense to any claim here.

*1.* <u>*Monetary Liability Owed to a Third Party Does Not "Take" Property*</u>

PG&E's takings claim suffers from a fatal flaw: inverse condemnation liability payments to wildfire victims do not operate upon or alter any specific, identifiable property interest of PG&E and so cannot effect a taking. Instead, as it pertains to the wildfire victims asserting inverse commendation claims in this case, PG&E is in the same position as any other tortfeasor that has a responsibility to make whole the persons it has harmed. For this reason, PG&E has no viable objection under the Takings Clause to the payment of monetary liability to innocent property owners who have been harmed by wildfires that PG&E caused.

"[T]he existence of a property interest is the threshold question of any takings analysis, and it is determined by reference to existing rules or understandings that stem from an independent source such as state law." *United States v. King Mountain Tobacco Co.*, 745 F. App'x 700, 702 (9th Cir. 2018) (quotation marks omitted) (citing *Phillips v. Wash. Legal Found.*, 524 U.S. 156,

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Case: 19-30088 Doc# 4773 Filed: 11/15/19 Entered: 11/15/19 15:49:46 Page 36 of 49

164 (1998)); *see also In re City of Stockton*, 909 F.3d 1256, 1266 (9th Cir. 2018) (noting that the Takings Clause is implicated in bankruptcy only if actual property rights exist). In this regard, many governmental actions—and certainly civil causes of action in tort, contract, or otherwise—could be said to "take" money because they impose costs or liability.

But such claims are not viable under *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998). In that case, a majority of the Supreme Court held that the Takings Clause is inapplicable to governmental action that imposes monetary liability unrelated to a specific, identifiable piece of property. That was the conclusion of Justice Kennedy, concurring in the judgment and dissenting in part. *See id*. at 543 (Kennedy, J.) (noting that there was no Takings Clause violation because the Act "neither targets a specific property interest nor depends upon any particular property for the operation of its statutory mechanisms. The liability imposed on Eastern no doubt will reduce its net worth and its total value, but this can be said of any law which has an adverse economic effect."). It was likewise the conclusion of the four dissenters. *See id*. at 554 (Breyer, J., dissenting) (stating, on behalf of four justices, that because "[t]his case involves not an interest in physical or intellectual property, but an *ordinary liability to pay money* and not to the Government, but to third parties," there was no taking). As Justice Kennedy put it, "we have been careful not to lose sight of the importance of identifying the property allegedly taken, lest all governmental action be subjected to examination under the constitutional prohibition against taking without just compensation, with the attendant potential for money damages." *Id*. at 543 (Kennedy, J.).

Here, PG&E does not even attempt to try to tie an alleged monetary exaction for inverse condemnation liability to a specific property interest. Instead, PG&E's inverse condemnation liability is no different than any other strict liability tort claim. In fact, PG&E is in a far better position than the ordinary strict-liability tortfeasor because it may enjoy cost recovery, to the extent authorized by the CPUC. Such liability cannot be regarded as any kind of taking.

*2. PG&E's Takings Argument Is Not Ripe Because the CPUC May Allow Recovery of Inverse Condemnation Liability*

Any takings argument that PG&E may have in the future is not ripe now because the CPUC may allow recovery and PG&E may be able to recover from other sources. The Court may not

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

assume, as PG&E asks it to do, that the CPUC, a state agency, will violate its constitutional rights by setting a confiscatory rate. *See, e.g.*, *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 15 (1987).

The requirement of a final decision to create a ripe controversy applies in the takings context. Although *Knick v. Township of Scott, Pennsylvania*, overruled the state-litigation exhaustion requirement of *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), it left intact the requirement that, to be ripe, a takings claim must be predicated on a "final decision" rendered by the relevant state entity. 139 S. Ct. 2162, 2169 (2019).[20]

There is no such "final decision" here. While PG&E bemoans the fact that it is not entitled to automatic cost recovery through rate increases, there is no dispute that the CPUC may allow PG&E to recover the cost of inverse condemnation liability so long as PG&E can demonstrate that its actions satisfied the standard for cost recovery. *See generally* Cal. Pub. Util. Code § 451. A claim resting on "contingent future events that may not occur as anticipated, or indeed may not occur at all" is not ripe. *Texas v. United States*, 523 U.S. 296, 300 (1998) (quotation marks omitted). Indeed, PG&E's own argument (at 12) requires several things must happen before a taking could possibly occur here: (1) PG&E would have to be held liable for inverse condemnation; (2) the CPUC would have to deny PG&E the ability to recover its inverse condemnation costs.

Rather than wait for those things to occur, PG&E engages in pure speculation. It urges this Court to consider the "economic impact of the *potential liabilities* due to inverse condemnation," it laments that the capital market has "inferred that PG&E's equipment *may have caused* the [Camp] fire"; it concedes that there is debate about "what role, *if any* negligence may have played" in the Camp Fire ignition; it concedes the "*uncertainty inherent* in whether a private utility *will be able* to recover billions of dollars in inverse condemnation costs"; it notes that if inverse condemnation

---

[20] *See also Sagaponack Realty, LLC v. Vill. of Sagaponack*, 778 F. App'x 63, 64 (2d Cir. 2019) ("*Knick* leaves undisturbed the first prong [of ripeness] that a state regulatory agency must render a final decision on a matter before a taking claim can proceed."); *Campbell v. United States*, 932 F.3d 1331, 1338–40 (Fed. Cir. 2019) (unpublished summary order) (applying finality requirement); *DM Arbor Court, Ltd. v. City of Houston*, No. Civ. H-18-1884, 2019 WL 4464953, at *3 (S.D. Tex. Sept. 18, 2019) (noting that *Knick* did not overrule the finality requirement of ripeness for takings claim); *Chabad Lubavitch of the Quad Cities, Inc. v. City of Bettendorf*, 389 F. Supp. 3d 590, 595–96 (S.D. Iowa 2019) (applying finality requirement to takings claim post-*Knick*).

Baker & Hostetler LLP
Attorneys at Law
San Francisco

liability is imposed, its risk profile "*may be questioned* by investors and insurance providers alike." Br. at 18–20 (emphasis added).

These statements reflect that PG&E's taking argument is premised upon speculation heaped atop speculation. In addition to uncertainty over PG&E's ultimate liability here, there is no way to know whether and to what extent it will be allowed to pass those costs along to ratepayers. Indeed, PG&E does not concede that it will be unable to do or that the door to its cost-recovery for inverse condemnation liability is barred. Accordingly, its claim is not ripe, and any takings suit must wait until the CPUC has decided the question of how much inverse condemnation liability, if any, it will include in PG&E's rates. *See generally Penn. Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 137 (1978) (holding that a takings claim was not ripe because "we do not know that appellants will be denied any use of any portion of airspace above the Terminal" when the Commission had not made final determination," and that determination relied on a variety of factors).

Requiring a final decision on whether PG&E will be afforded compensation by the Commission for its inverse condemnation liability is particularly important because a decision to the contrary would disrupt rate-recovery proceedings generally. Unlike many takings plaintiffs—for example, a homeowner whose property is seized to make way for a new roadway—regulated public utilities regularly bear costs later subject to recovery upon approval by their regulator. The question of what expenses are appropriately recoverable has been heavily litigated since the 19th century in the context only of challenges to laws and regulations that definitively determined whether recovery for certain expenses would be allowed and challenges to decisions by regulators to set a rate that the utility in question believes is unconstitutionally low.

In that respect, when the government regulates and sets rates for certain regulated private entities that have an obligation to serve the public, it has broad authority to set rates in the manner it chooses and to allow (or not allow) recovery of expenses so long as the government does not set rates that are confiscatory. *See, e.g.*, *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 307–08 (1989) (citing *Covington & Lexington Tpk. Rd. Co. v. Sandford*, 164 U.S. 578, 597 (1896); *FPC v. Nat.*

*Gas Pipeline Co.*, 315 U.S. 575, 585 (1942); *FPC v. Texaco Inc.*, 417 U.S. 380, 391–92 (1974)).[21] The Supreme Court has described this test as mandating results that are "just and reasonable." *FPC v. Hope Nat. Gas Co.*, 320 U.S. 591, 603 (1944). In considering whether a particular rate decision is confiscatory, courts consider whether the rates "'enable the company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed.'" *Verizon Commc'ns, Inc. v. FCC*, 535 U.S. 467, 484 (2002) (quoting *Hope Nat. Gas Co.*, 320 U.S. at 605). But "[a] regulated utility has no constitutional right to a profit, and a company that is unable to survive without charging exploitative rates has no entitlement to such rates." *Jersey Cent. Power & Light Co. v. FERC*, 810 F.2d 1168, 1180–81 (D.C. Cir. 1987) (en banc) (citations omitted). Here, PG&E seeks to sidestep that entire body of law, by asserting a takings claim before it is even possible to ascertain its injury, if any.

### *3. PG&E Is not Entitled to Relief That Is Tantamount to an Injunction*

PG&E's takings argument fails because, at best, it may be entitled to compensation from the State of California for inverse condemnation liability incurred, not relief that is tantamount to an injunction barring wildfire victims from proceeding with their claims.

In *Knick*, the Supreme Court held that a property owner whose property has been taken by a state without just compensation may bring a Fifth Amendment claim under 42 U.S.C. § 1983 at the time of the taking, but reaffirmed that the additional avenue for compensation it identified "does not as a practical matter mean that government action or regulation may not proceed in the absence of contemporaneous compensation." 139 S. Ct. at 2177. Instead, "[g]iven the availability of post-taking compensation, barring the government from acting will ordinarily not be appropriate." *Id.* Thus, rather than attempting to obtain a declaration and injunction preventing the imposition of inverse condemnation liability under California law, the appropriate course of action is for PG&E to seek any compensation to which it believes itself constitutionally entitled from the State of

[21] Unlike the payment of monetary inverse condemnation liability to a wildfire claim, a taking claim brought against a government entity in the context of a rate case or challenge to a law governing rate proceedings may have a sufficient tie to a specific property interest, the utility's capital, to constitute a taking. But the question of whether an appropriate return on capital is allowed can never occur at the time an expenditure is made, only where recovery has been disallowed or there is a certainty that recovery will be disallowed. And even there, however, the Supreme Court has held that "[a]ny investor paying attention had to realize that he…would simply have to rely on the constitutional bar against confiscatory rates." *Verizon Commc'n, Inc. v. FCC*, 535 U.S. 467, 528 (2002).

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

California "at the time of the taking." *Id.*; *see also First English Evangelical Lutheran Church of Glendale v. Cty. of Los Angeles*, 482 U.S. 304, 314–15 (1987) ("As its language indicates, and as the Court has frequently noted, [the Takings Clause] does not prohibit the taking of private property, but instead places a condition on the exercise of that power. This basic understanding of the amendment makes clear that it is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation*....") (citations omitted).

*4. Imposing Inverse Condemnation Liability on PG&E Would Not Constitute a Taking Under Penn Central*

Finally, even if PG&E were correct that the payment of inverse condemnation liability could constitute a taking, it could never satisfy *Penn Central*'s three-factor standard for regulatory takings, which considers: (1) the economic impact of the governmental action on the plaintiff; (2) the extent to which the governmental action interferes with plaintiff's reasonable investment-backed expectations; and (3) the nature of the governmental action. *Penn Central*, 438 U.S. at 124; *see Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 614 (2013); *see also Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538–39 (2005) (noting that the *Penn Central* factors apply to regulatory takings).

On the first factor, PG&E asserts (at 18) that the "considerable financial burden" it may bear suffices. Not so. To begin with, as explained above, PG&E's ultimate financial burden—the difference between its inverse condemnation liability and the amount it is permitted to recover—is uncertain at this time. That aside, PG&E offers no explanation why the "financial burden" it may face as a result of inverse condemnation liability meets the mark, in a way that (for example) ordinary negligence liability, which could be massive and almost never recoverable, does not. Sure, PG&E's share price may have fallen after it caused billions of dollars in damage through wildfires, *see* Br. at 19, but that is typically what happens when the market believes corporations engaged in substantial misconduct. On this point, PG&E's sole authority is Justice O'Connor's plurality opinion in *Eastern Enterprises*, 524 U.S. at 498, which was rejected by the majority of the Court on the takings issue. PG&E, however, does not even meet the O'Connor standard, which focuses in the first instance on proportionality of liability. *Id.* at 530. Whereas the mining company there

Baker & Hostetler LLP
Attorneys at Law
San Francisco

was assessed liability unrelated to its own actions, PG&E at most faces liability for the injuries that its actions caused, a perfectly proportionate remedy.

PG&E cannot possibly satisfy the second factor—interference with reasonable investment-backed expectations—because California law has never premised inverse condemnation liability on cost recovery through "socialization." PG&E's claim (at 19) that it "relied for nearly two decades on the premise in *Barham* and *Pacific Bell* that imposition of inverse condemnation liability would be offset by the ability to spread the costs through the rate recovery process" rings hollow, given that cost recovery was not a part of *Barham*'s analysis and that *Pacific Bell* expressly rejected the argument that limiting rate regulation could somehow alter inverse condemnation liability. There is nothing "reasonable" about reading into the law things that are not there while ignoring the inconvenient bits.

Finally, the third factor—the nature of governmental action—cannot be satisfied even under the rationale of Justice O'Connor's *Eastern Enterprises* opinion, on which PG&E relies. What mattered to Justice O'Connor was that the action there—retroactively imposing on certain employers the obligation to fund retired coal miners' health benefits without respect to the employers' own actions, any promises they made, or "any injury they caused"—was so "unusual" as to "implicate[] fundamental principles of fairness underlying the Takings Clause." 524 U.S. at 537. There is, of course, nothing unusual or unfair about holding a party liable for the injuries caused by its actions, and that is all that California's law of inverse condemnation does.

Accordingly, even assuming they are applicable here, none of the three *Penn Central* factors supports PG&E's argument that inverse condemnation liability for its own actions amounts to a taking.

G. <u>Imposing Inverse Condemnation Liability on PG&E Does Not Violate Due Process</u>

PG&E rounds out its briefing with a strained "substantive due process" argument that fails for basically the same reasons as its taking argument.

Inverse condemnation liability, the argument goes (at 21–22), is a sufficiently "arbitrary and irrational" deprivation of its property that it violates the Due Process Clause. But, in the very

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

next breath, PG&E states that what it actually considers to be "arbitrary and irrational" is the possible denial of "the opportunity to spread its losses based on a prudent manager standard administered by the CPUC." Br. at 22. As described above, if PG&E's beef is with the CPUC and its decisions, then PG&E should raise the matter with the CPUC or, if that proves unsuccessful, sue the CPUC or the state. The victims of the wildfires PG&E caused obviously have no direct say in whether or how the CPUC allows it to recover its costs.

Even assuming that PG&E's substantive due process argument is actually directed at inverse condemnation liability, as opposed to California law governing cost-recovery, it still fails. Whether PG&E will face any injury at all is, at this time, speculative, for the reasons described above. And any injury that it may face under California's inverse condemnation law comes nowhere near the outer bounds of substantive due process, which merely requires a "rational relationship to a legitimate state interest." *See Burlington N. R.R. Co. v. Dep't of Pub. Serv. Regulation*, 763 F.2d 1106, 1109–12 (9th Cir. 1985). California's imposition of inverse condemnation liability on privately owned utilities is entirely rational to achieve state interests, whether or not the state subsequently allows a given utility to recover the costs in its rates. One such state interest is compensating property owners whose property was damaged by privately owned utilities. *See Pac. Bell v. City of San Diego*, 81 Cal. App. 4th 596, 602 (2000). The state likewise has a legitimate interest in requiring privately owned utilities to internalize the damage that their activities cause to private property because they reap the financial rewards, regardless of whether they were negligent and regardless of whether they are permitted to spread that harm to their ratepayers. *See Kasel v. Remington Arms Co.*, 24 Cal. App. 3d 711, 725 (1972). These reasonable rationales are more than sufficient to reject PG&E's due process argument, because "only rationality, not a perfect relation is required." *Burlington N. R.R. Co.*, 763 F.2d at 1110.

The rational-basis standard similarly dooms PG&E's argument (at 23)—that it is "irrational" to apply inverse condemnation liability to a private business subject to general tort liability. Inverse condemnation liability is essentially strict liability, a standard that already applies to PG&E in circumstances where its electricity constitutes a product. *See Pierce v. Pac. Gas & Elec. Co.*, 166 Cal. App. 3d 68 (1985). Extending strict liability to a subset of harm, property

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

damage, caused by transmission activities is in no way irrational; to the contrary, it makes perfectly good sense as a means of forcing private entities to internalize costs and of placing costs on the least-cost avoider.

Moreover, PG&E's principal authority does not even support its argument. *State Farm Mutual Automobile Insurance Co. v. Campbell* concerns limitations on punitive damages not aimed at compensating victims from the harms they suffered at the hands of another, but instead at punishing unlawful conduct and deterring it from recurring. 538 U.S. 408, 416 (2003). But inverse condemnation damages are entirely compensatory and so not subject to the limitation on non-compensatory damages recognized by *State Farm*.

Finally, PG&E's complaint that it is not entitled to "retain" the property it damaged misunderstands the law. Inverse condemnation liability is often imposed where property is damaged but not actually retained by the state. For example, in *Albers v. County of Los Angeles*, the California Supreme Court forced the County of Los Angeles to compensate property owners whose property was damaged by a landslide caused by roadwork, but there is no indication that the County got to keep the damaged property. 62 Cal. 2d 250 (1965). In this respect, PG&E's liability is no different from any California government entity or private entity charged to carry out public uses. Indeed, invasions of property rights subject to the U.S. Constitution's Takings Clause do not necessarily result in any retention of property; instead, as here, occupation for public use is enough. *See Ark. Game & Fish Com'n v. United States,* 568 U.S. 23, 38 (2012) (temporary flooding of land). It cannot be the case that liability without retention of property is barred by the Due Process Clause when it is, in appropriate circumstances, required by the adjacent Takings Clause. *See* U.S. Const., amend. V.

## V. Conclusion

For the foregoing reasons, the Court should deny the relief requested by PG&E.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Dated: November 15, 2019

BAKER & HOSTETLER LLP

Authors: Pages 1–4: Robert Julian
Pages 4–35: David Rivkin

By: /s/ *Robert A. Julian*
Robert A. Julian

*Counsel for The Official Committee of Tort Claimants*

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Dated: November 15, 2019

DREYER BABICH BUCCOLA WOOD CAMPORA, LLP

By: ______________________

Steven M. Campora

*Attorneys for Becky Christensen, et al.*

Dated: November 15, 2019

EDELSON P.C.

By: [signature]
Rafey S. Balabanian

*Attorneys for a Member of the Official Committee of Tort Claimants and Other Individual Fire Victims*

Dated: November 15, 2019

NORTON ROSE FULBRIGHT US LLP

By: ______________________

REBECCA J. WINTHROP
Attorney for Creditors ADVENTIST HEALTH SYSTEM/WEST and FEATHER RIVER HOSPITAL D/B/A ADVENTIST HEALTH FEATHER RIVER

Dated: November 14, 2019

RICHARDS LAW FIRM (RLF)

By: [signature]

John T. Richards, Esq.
Evan Willis, Esq.
*RLF-Representing 81 individual, business, commercial, family trust, and personal injury victims of the Camp Fire.*