1               UNITED STATES BANKRUPTCY COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                         -oOo-

4    In Re:                    ) Case No. 19-30088
                               ) Chapter 11
5    PG&E CORPORATION AND PACIFIC   )
     GAS AND ELECTRIC COMPANY,  ) San Francisco, California
6                               ) Tuesday, November 19, 2019
                    Debtor.     ) 10:00 AM
7    _____   )
                                   STATUS CONFERENCE
8
                                 HEARING ON ORAL ARGUMENT
9                                REGARDING INVERSE
                                 CONDEMNATION
10
                     TRANSCRIPT OF PROCEEDINGS
11            BEFORE HONORABLE DENNIS MONTALI
                 UNITED STATES BANKRUPTCY JUDGE
12   APPEARANCES:
     For the Debtors:          JESSICA LIOU, ESQ.
13                             Weil, Gotshal & Manges LLP
                               767 Fifth Avenue
14                             New York, NY 10153
                               (212) 310-8000
15
                               KEVIN J. ORSINI, ESQ.
16                             Cravath, Swaine & Moore LLP
                               825 Eighth Avenue
17                             New York, NY 10019
                               (212) 474-1000
18
     For the Official Committee  ROBERT A. JULIAN, ESQ.
19   of Tort Claimants:        Baker & Hostetler LLP
                               11601 Wilshire Boulevard
20                             Suite 1400
                               Los Angeles, CA 90025
21                             (310) 442-8887

22                             DAVID B. RIVKIN, JR., ESQ.
                               Baker and Hostetler LLP
23                             1050 Connecticut Avenue, NW
                               Suite 1100
24                             Washington, DC 20036
                               (202) 861-1731
25

(973) 406-2250 | operations@escribers.net | www.escribers.net

```
 1   For the Ad Hoc Group of    MATTHEW A. FELDMAN, ESQ.
     Subrogation Claim Holders:  Willkie Farr & Gallagher LLP
 2                               787 Seventh Avenue
                                 New York, NY 10019
 3                               (212) 728-8651

 4                               JOSEPH G. DAVIS, ESQ.
                                 Willkie Farr & Gallagher LLP
 5                               1875 K Street, N.W.
                                 Washington, DC 20006
 6                               (202) 303-1131

 7   For PGE Shareholders:       JAMES O. JOHNSTON, ESQ.
                                 Jones Day
 8                               555 South Flower Street
                                 Los Angeles, CA 90071
 9                               (213) 489-3939

10   For Wildfire Victims:       DARIO DE GHETALDI, ESQ.
                                 AMANDA L. RIDDLE, ESQ.
11                               Corey, Luzaich, de Ghetaldi &
                                 Riddle LLP
12
     For North Bay Fire         STEVE SKIKOS, ESQ.
13   Victims:                   Skikos, Crawford, Skikos & Joseph,
                                 LLP
14                               One Sansome Street
                                 Suite 2830
15                               San Francisco, CA 94104
                                 (415) 546-7300
16

17

18

19

20   Court Recorders:            BENJAMIN GAPUZ AND ANKEY THOMAS

21   Transcriber:                CLARA RUBIN
                                 eScribers, LLC
22                               7227 N. 16th Street
                                 Suite #207
23                               Phoenix, AZ 85020
                                 (973) 406-2250
24
     Proceedings recorded by electronic sound recording;
25   transcript provided by transcription service.
```

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1     SAN FRANCISCO, CALIFORNIA, TUESDAY, NOVEMBER 19, 2019, 9:59 AM

2                              -oOo-

3          (Call to order of the Court.)

4               THE CLERK:  All rise.  Court is now in session, the

5     Honorable Dennis Montali presiding.

6               THE COURT:  Good morning, everyone.

7               IN UNISON:  Good morning, Your Honor.

8               THE COURT:  Please be seated.  Welcome back.

9               THE CLERK:  This is the Court's 10 o'clock calendar,

10    in the matter of PG&E Corporation.

11              THE COURT:  Good morning.

12              MS. LIOU:  Good morning, Your Honor.  Jessica Liou

13    from Weil, Gotshal & Manges LLP, here on behalf of the debtors.

14              Your Honor, we have a short agenda today.

15              THE COURT:  Wait one --

16              MS. LIOU:  We only have two items.

17              THE COURT:  Ms. Liou.  Ms. Liou, hold on, we're

18    getting a little echo.

19              THE CLERK:  Yeah.  Hear that too.

20              THE COURT:  See if we can get that --

21              All right.

22              THE CLERK:  Go ahead.

23              THE COURT:  Let's try it again.

24              MS. LIOU:  Is that better?

25              THE COURT:  Yeah.  I think so.

(973) 406-2250 | operations@escribers.net | www.escribers.net

                PG&E Corp., Pacific Gas & Electric Co.

1               MS. LIOU:  I still hear it.

2               THE COURT:  Well, let our experts figure it out.

3               Yes, two matters.

4               MS. LIOU:  Yes.  Two matters on the agenda:  one is a

5        brief status update on the --

6               THE COURT:  No.

7               MS. LIOU:  -- adversary proceeding.

8               THE COURT:  No; hold again.  We're getting feedback.

9           (Pause.)

10              THE COURT:  Let's give it a test drive.  Again; try

11       again.

12              MS. LIOU:  Sure.  Is this better?

13              THE COURT:  No, we're still getting that --

14              MS. LIOU:  Yeah.

15              THE COURT:  -- feedback, for some reason.  It's just

16       echoing.  Can you hear it from your side?

17              MS. LIOU:  I do.

18              THE COURT:  Yeah.  We know what's happening?

19              THE CLERK:  We're good.  Yeah.

20              MS. LIOU:  Okay.

21              THE COURT:  All right, try it one more time.

22              MS. LIOU:  All right, one more time.  So we have a

23       short agenda today.  We've got two matters on; the first item

24       is a brief status update on the adversary proceeding and,

25       relatedly, the RSA --

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1      THE COURT:  Right.

2      MS. LIOU:  -- motion.  With respect to the RSA motion,

3  as Your Honor's aware, there are ongoing mediation discussions

4  and, to facilitate the continuation of those discussions, the

5  debtors have filed a notice of adjournment with respect to that

6  motion; it is now adjourned to December 4th.

7      THE COURT:  Yeah, you know, I had occasion this

8  morning to read the transcript of the hearing yesterday in

9  front of Judge Donato, and I believe he was told a later date.

10  So is that -- and I still had it on the 4th also.

11      MS. LIOU:  Yes.  The correct date is the 4th.

12      THE COURT:  Okay.

13      MS. LIOU:  And in a moment I'll cede the podium to Mr.

14  Feldman from the Willkie law firm, to provide an update on the

15  status of the adversary proceeding.  But before I do that, I

16  did want to note that, with respect to the second matter on the

17  agenda, the inverse-condemnation issue, Mr. Orsini from the

18  Cravath law firm will be handing the oral argument for that.

19      And one other item I wanted to note for Your Honor is

20  that the debtors will be filing a motion today or tomorrow to

21  further extend our exclusive solicitation period.  As you know,

22  our existing period expires next Tuesday, on November 26.  And

23  we will be seeking an extension through and including March

24  20th, 2020, which is consistent with the proposed confirmation

25  time line we filed with the Court earlier.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  So when're you going to -- you're going to

2 set that for when?  The December -- the later December

3 calendar, or what?

4    MS. LIOU:  Yes, we are.  We're --

5    THE COURT:  December 11th?

6    MS. LIOU:  Right.  And we will be relying on the case-

7 management order, which provides for an automatic bridge to the

8 actual hearing date, consistent with what we've done for a

9 number of other motions in this case.

10    THE COURT:  Sure.  Okay.

11    MS. LIOU:  And we just wanted to note that the relief

12 will be, of course, subject to the fact that we will -- we

13 acknowledge that the TCC noteholder plan will also be moving

14 forward.

15    THE COURT:  Well, I'm not -- you'd rather -- okay.

16    MS. LIOU:  All right.  I now cede the podium to Mr.

17 Feldman.

18    THE COURT:  Okay.  Mr. Feldman, before you start, let

19 me just make a statement.  I may have created some confusion

20 when I issued a docket text talking about knowing that the RSA

21 motion was continued.  But then the docket text said we're

22 going to talk about it today.  It was really the issue of what

23 to do with the adversary proceeding and should I defer the RSA

24 until there's progress there.  So that's -- I didn't mean to

25 confuse the issue.  Maybe I didn't confuse you.

PG&E Corp., Pacific Gas & Electric Co.

1      MR. FELDMAN:  I understood precisely, Your Honor.  For

2 the record, Matthew Feldman from the law firm, Willkie Farr &

3 Gallagher LLP, on behalf of the ad hoc group of subrogation

4 claimants.

5      THE COURT:  Okay.

6      MR. FELDMAN:  In fact, Your Honor, I'm going to be

7 very clear and not talk about the RSA or any of the legal

8 issues related to --

9      THE COURT:  Well, it's out there.

10      MR. FELDMAN:  -- the RSA.

11      THE COURT:  It's looming, right?

12      MR. FELDMAN:  But there is an ongoing mediation, and I

13 think anything we say in this courtroom can have an impact on

14 that.

15      THE COURT:  Yeah.

16      MR. FELDMAN:  And the goal is --

17      THE COURT:  Well, that's fine.

18      MR. FELDMAN:  -- not to have an impact on that.

19      Your Honor, we don't believe that these two are

20 inexorably linked.  In fact, with respect to the adversary,

21 what the TCC seeks to do is really a confirmation issue; they

22 would like to subordinate our claims, whereas the RSA goes to

23 allowance and form of consideration and other input into the

24 form of plan.

25      THE COURT:  Well, I got that, but it sort of struck me

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  that if you couldn't win -- I mean, I couldn't rule for you and

2  also for the TCC --

3          MR. FELDMAN:  I don't agree with that -

4          THE COURT:  -- I don't think.

5          MR. FELDMAN:  -- Your Honor.  I think you could.  You

6  could agree that we have an eleven-billion-dollar claim --

7          THE COURT:  Right.

8          MR. FELDMAN:  -- to be paid in cash under the plan,

9  and then subsequently you could rule that our ability to

10 collect that is subordinated to the recoveries that the TCC

11 seeks to subordinate it to.  So I don't think that you have to

12 make -- I don't think it would be inconsistent, Your Honor.

13         THE COURT:  Okay.

14         MR. FELDMAN:  Obviously, we have a strong view about

15 the likelihood of success, but that's irrelevant --

16         THE COURT:  Well, that's irrelevant.

17         MR. FELDMAN:  -- to this discussion.  Yeah.

18         THE COURT:  So your point is, then, that I should let

19 the adversary proceeding run its course; if somebody wants to

20 make a motion or to do whatever, we let it do it.  But when we

21 come to December 4th or whatever date it ultimately happens,

22 I'll either go approve it or disapprove it.  And if I approve

23 the RSA, then whether that impacts the adversary proceeding is

24 for another day.

25         MR. FELDMAN:  And by the way, Your Honor, if you

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   disapprove the RSA, we still have to resolve this issue.

2        THE COURT:  No; I understand.

3        MR. FELDMAN:  Either way, this issue has to be

4   resolved --

5        THE COURT:  Well --

6        MR. FELDMAN:  -- but it has to be resolved in

7   conjunction with confirmation --

8        THE COURT:  -- but --

9        MR. FELDMAN:  -- not in conjunction with an RSA.

10       THE COURT:  Right; disapproving the RSA seems to be

11  consistent with what the plaintiff in the adversary proceeding

12  seeks.

13       MR. FELDMAN:  There is that argument, Your Honor.

14       I want to make -- I want to make two other points

15  before I cede the podium to Mr. Julian; one is, Your Honor,

16  that there is one count in the adversary proceeding -- I

17  believe it's Count III -- having to do with an accounting --

18       THE COURT:  Right.

19       MR. FELDMAN:  -- that goes to what portion of our

20  claim might be disallowed under a very specific insured-versus-

21  insurer ruling.  But that count, even if the TCC is completely

22  correct, is a 700-million-dollar issue.  And so when this Court

23  hears the RSA and hears the 9019, that issue, whether or not

24  the debtor's business judgment in settling for a nine-billion-

25  dollar haircut on the claim, a forty-five-percent haircut --

PG&E Corp., Pacific Gas & Electric Co.

1    whether that takes into account this issue, that is the one --

2    that is the one cause of action that I don't think belongs in

3    this adversary proceeding; I think it's an objection to the

4    RSA.  Obviously, the TCC, although they have filed multiple

5    objections to the RSA, didn't think of that one in time.

6            But that issue does have to be resolved, Your Honor,

7    in conjunction with the RSA, but it should be resolved as part

8    of a 9019, not as a separate --

9            THE COURT:  Well, I mean, are you saying --

10           MR. FELDMAN:  -- standalone adversary.

11           THE COURT:  -- that if I were to overrule the TCC's

12   objections based upon that piece and issue an order approving

13   the RSA, that, what, that would gut the third cause of action?

14           MR. FELDMAN:  It would resolve the third cause of

15   action.

16           THE COURT:  Okay, well, yeah, Mr. Julian may have a

17   contrary view.  I mean, I'm not going to decide anything today;

18   it's just to do -- what to do with it procedurally.  So you

19   made your -- it's clear from your point of view.

20           MR. FELDMAN:  I guess the last point, Your Honor, I

21   would say is that part of our participation in this case, at

22   this claim amount and treatment, is conditioned on an RSA

23   ultimately being approved.  If that isn't going to happen, then

24   obviously we're continuing to be involved in the estimation, we

25   are continuing to be involved in Tubbs, and we will continue to

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    prosecute our rights to our claim at a much higher --

2         THE COURT:  Well, and I read your colleague's comment

3    to Judge Donato yesterday.  I can't control that either.

4         MR. FELDMAN:  It is what it is.

5         THE COURT:  It is what it is.

6         MR. FELDMAN:  But we are bumping up against the -- the

7    opportunity to have this considered is quickly disappearing.

8         THE COURT:  Got it.

9         MR. FELDMAN:  Thank you, Your Honor.

10        THE COURT:  Okay.  And, Mr. Julian, before you

11   speak --

12        Does the debtor want to be heard on this issue today

13   at all, Mr. Orsini or whoever's here?

14        MS. LIOU:  No, we do not.

15        THE COURT:  Nothing?  Okay.

16        Mr. Julian, what's your recommendation about what I do

17   with the adversary proceeding today?  I mean, I'm not going to

18   do anything today, but I mean from a scheduling point of view.

19        MR. JULIAN:  May I give you some data first?

20        THE COURT:  Anything you like.

21        MR. JULIAN:  I'd like to respond to debtor's counsel's

22   statement that they requested you to continue the motion to

23   approve the RSA to facilitate mediation efforts, and

24   subrogation claimants' counsel's comment right now that we have

25   an ongoing mediation.  When he said "we", it was subrogation

PG&E Corp., Pacific Gas & Electric Co.

1    claimants' counsel saying, we have an ongoing mediation.  So

2    they've opened the door to whether that's true.

3              THE COURT:  Well, I'm not --

4              MR. JULIAN:  We've had three --

5              THE COURT:  But do I really need to know about

6    anything?  I don't really --

7              MR. JULIAN:  Yes.

8              THE COURT:  -- want to know much.

9              MR. JULIAN:  Well, I don't want to talk about the

10   mediation, but they've opened the door.  They have not attended

11   a single one of the three mediations.  They're not ordered to

12   appear to (sic) tomorrow's mediation.

13             And when the counsels stand up and tell you that

14   settlement's going well and mediation's going well, the

15   elephant in the room is that this subrogation settlement, which

16   you have continued, is holding up settlement -- resolution of

17   this entire case.  I will certify to you, in my belief, that if

18   that motion is resolved and that settlement is disapproved on

19   the grounds that I briefed in my supplemental briefing, this

20   case will resolve promptly.  And we briefed the reasons why, in

21   my supplemental brief.

22             THE COURT:  No, I --

23             MR. JULIAN:  They took the cash.

24             THE COURT:  The briefs were very thorough on both

25   sides.  I --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1           MR. JULIAN:  They took the cash.  There's no cash

2   left.

3           THE COURT:  I understand.  But again, you're --

4           MR. JULIAN:  I can't even walk into a door --

5           THE COURT:  But you're getting into the merits and I'd

6   rather not --

7           MR. JULIAN:  All right.

8           THE COURT:  -- get into the merits.

9           MR. JULIAN:  I could -- but I -- they opened the door

10  to tell you this.  And I can't walk into --

11          THE COURT:  Well --

12          MR. JULIAN:  -- a room --

13          THE COURT:  -- I don't think that's fair.  They -- I

14  appointed a mediator and know nothing since.  And --

15          MR. JULIAN:  Okay.

16          THE COURT:  -- the only thing I know since --

17          MR. JULIAN:  Fair enough, Your Honor.

18          THE COURT:  -- is what I heard on this record this

19  morning, and I didn't hear much.  And I -- it's not that I

20  discount what you say.  To me, the fact that -- what you said

21  doesn't mean the deal's dead; it means it's a process.

22          MR. JULIAN:  Let me address the adversary proceeding,

23  then.

24          THE COURT:  Right.

25          MR. JULIAN:  We believe that these claims are

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  meritorious and that, because they took the cash, there's an

2  issue in this case for the settlement, for the plan-

3  confirmation hearing, and for this adversary proceeding.  And

4  here's the reason why I did it:  You asked us weeks ago to tee

5  up issues in front of Your Honor, that would speed up the case

6  and --

7           THE COURT:  Um-hum.

8           MR. JULIAN:  -- would deal with plan confirmation.

9  This is a priority issue when they take the cash.  It's not

10  just allowing the claim.  Allow the claim if you want to; it's

11  a little bit too high, as you know.  But they're taking the

12  cash.  And we can't resolve the cash, because they're taking

13  all the cash.  And so that's a priority issue.  And I think you

14  know our position on that.

15           So while I appreciate Your Honor's willingness to wait

16  for the accounting in that case to take place to prove up the

17  extent to which the subrogation claimants are subordinated,

18  whether it's fifteen billion or seventeen billion, depending

19  upon how many claimants show up in the case, the fact is that

20  that's a good thing to do, to await that determination, but our

21  objection to the RSA is multi-prong and doesn't depend upon

22  that accounting.  But you have the discretion to continue that

23  portion of the RSA if you want to.  I would only ask that you

24  do a line-item veto.

25           THE COURT:  Well, no, I guess I'm not making myself

(970) 462-5150 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    clear.  To me, there is this contested matter called a motion

2    to approve the RSA, 9019 motion; call it what you want.  It's

3    in the main case.  And you and a number of people similarly

4    situated have objected, and people on the debtor's side and the

5    subrogation side have supported it.  And there's extensive

6    briefing.  And then the parties, for reasons that are known or

7    unknown, have continued it twice.

8         And meanwhile, you, on your clients' behalf, filed an

9    adversary proceeding, which is your -- you're entitled to do

10   that, of course.  And just from a scheduling point of view,

11   adversary proceedings have a life of their own that are kind of

12   out on a more --

13        MR. JULIAN:  Oh, I see.

14        THE COURT:  -- stretched-out schedule.  So I'm going,

15   well, what am I supposed to do?

16        MR. JULIAN:  Let me --

17        THE COURT:  It sounds to me like you feel confident

18   that you should move the ball quickly on the adversary

19   proceeding.

20        MR. JULIAN:  Yes.

21        THE COURT:  Do it.  Make your motions.  Do whatever.

22   And Mr. Feldman says, no, he wants to have an up or down on the

23   RSA.  I'm not deciding anything at the moment --

24        MR. JULIAN:  We're willing to move --

25        THE COURT:  -- except scheduling.

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    MR. JULIAN: -- both very quickly. Let me just tell

2  you where we are. We had a meet-and-confer on moving the

3  adversary proceeding quickly. As you know, one of the key

4  factual issues is the accounting of the subrogation claims,

5  which are being affected daily, as you know now, because we're

6  getting claims coming into Prime Clerk daily --

7    THE COURT: Um-hum.

8    MR. JULIAN: -- with the extension of the bar date.

9    THE COURT: Right.

10    MR. JULIAN: As each new claim comes in, to the extent

11  they were insured and paid by subrogation claimants partially,

12  that increases the subordination risk of the subrogation

13  claimants in this case. If Judge Donato gets his way, which I

14  hope he does, that there's ninety-five-percent participation in

15  this case, the subrogation claimants' subordination issue will

16  be almost classwide. And so that's where --

17    THE COURT: Almost what?

18    MR. JULIAN: Classwide. For the whole class --

19    THE COURT: Classwide.

20    MR. JULIAN: -- of subrogation claimants.

21    THE COURT: I just didn't hear the term.

22    MR. JULIAN: Yes. So what I asked them to do was --

23  how soon can I get the factual accounting so that we can file a

24  motion for summary judgment on this in the adversary

25  proceeding. And the response was this week they're filing

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    their individual claims that correspond to the individual

2    victim claims on file and otherwise.  And so -- and that that

3    would resolve a great part of my accounting.  So I think what

4    we do is we come back to Your Honor in two weeks and tell

5    you -- give you an update on what that claim filing by the

6    subrogation claimants did for our accounting request.  And then

7    I think we can start moving very quickly on that.

8            THE COURT:  Well, but again, go back to just basics of

9    any adversary proceeding.  There's a time to respond; decide

10   shouldn't that be kept open.  There's a time to decide about

11   motions and so on.

12           MR. JULIAN:  Yes.

13           THE COURT:  I don't care what we do.  I just want to

14   make sure we don't lose track of it; that's all.  So do you

15   want to have a stipulation with the subrogation claimants that

16   their time to respond to the adversary proceeding is open

17   and --

18           MR. JULIAN:  No, not open, Your Honor.  It's due.  And

19   they told me they're going to file their motion to dismiss.

20           THE COURT:  Oh, okay.  Okay.  Well, they didn't tell

21   me that.

22           MR. JULIAN:  Yeah.

23           THE COURT:  Okay.

24           MR. JULIAN:  And we'll respond promptly and get that

25   on for a hearing in front of Your Honor.

of 155
(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  Well, we have a December 4 date specially

2    set at the request of the debtor, for a continued hearing on

3    the RSA.  We have another -- a regular date of the 11th, I

4    believe, and that's the only date on the calendar, at least

5    till the end of -- till the holidays.  That doesn't mean I

6    can't have more hearings.  I just said -- just have to deal

7    with them, that's all.  And I realize that there's a lot going

8    on upstairs and down the street in the coming weeks.  So I'm

9    here to serve you.

10    Well, then, Mr. Julian, unless you want to be more

11    specific, I'll just take this as my status report and say

12    there's nothing -- there're no action item (sic) at the

13    moment --

14    MR. JULIAN:  Right.

15    THE COURT:  -- in the adversary proceeding, and there

16    is a continued hearing date on December 4th and, if there isn't

17    a resolution or a further continuance, I will probably issue

18    another docket text order that suggests some limited amount of

19    time for arguments -- further argument, because things are,

20    happily, moving quickly.  And then I'll either make a ruling

21    from the bench or take it under advisement and move quickly on

22    it.

23    MR. JULIAN:  Thank you, Your Honor.

24    THE COURT:  All right?

25    MR. JULIAN:  Thank you.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  Okay.  All right.  Okay, so for everyone

2  else's sake, then the only matter on the agenda today left is

3  the -- what we commonly call the inverse-condemnation motion.

4  I've issued a docket text about that.  And I'm ready to

5  proceed.

6    Mr. Orsini, you've got your share of an hour, along

7  with your colleagues, and your homework assignment.  Good

8  morning.

9    MR. ORSINI:  I appreciate homework assignments, Your

10  Honor.  Good morning.  For the record, Kevin Orsini, Cravath,

11  Swaine & Moore, on behalf of debtors.

12    Your Honor, I believe your docket text allocated an

13  hour --

14    THE COURT:  Um-hum.

15    MR. ORSINI:  -- to our side.  I candidly don't know

16  that we'll need the full hour.  I'll reserve fifteen minutes

17  for rebuttal.

18    THE COURT:  Okay.

19    MR. ORSINI:  And Mr. Johnston from Jones Day has asked

20  for five minutes of my opening time.  So by my math, that would

21  leave me with forty minutes.

22    THE COURT:  As much as you want, but not to exceed

23  forty.

24    MR. ORSINI:  Understood, Your Honor.

25    THE COURT:  I mean, look, you've -- both sides have

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    extensively briefed it.  I've done a lot of reading.  I've got

2    some history on California law.  I've got cases about flood-

3    control districts and lots of other things, so -- go for it.

4    But --

5                MR. ORSINI:  So here we go.

6                THE COURT:  -- answer my question about West.

7                MR. ORSINI:  I will, Your Honor.  So the fundamental

8    purpose behind the constitutional provision of inverse

9    condemnation is to distribute loss from a public good

10   throughout the community.  It's this socialization of losses

11   that forms the fundamental basis of inverse.  Your Honor, those

12   aren't my words.  Those are the words of the California Supreme

13   Court time and time --

14               THE COURT:  Um-hum.

15               MR. ORSINI:  -- and time again.

16               THE COURT:  No, and you quoted it frequently.  Yeah.

17               MR. ORSINI:  And --

18               THE COURT:  Yeah.

19               MR. ORSINI:  -- we'll talk more about that, Your

20   Honor.  But inverse was developed, and actually works, in the

21   context of a true public entity.  So we have unfortunately a

22   very recent example of a circumstance in which inverse would

23   work, and that's the Getty fire down in Los Angeles.  The Getty

24   fire, according to the mayor of Los Angeles, was an act of God

25   that was caused when a branch blew into a tree (sic) line

(973)406-2250 | operations@escribers.net | www.escribers.net

                  PG&E Corp., Pacific Gas & Electric Co.

1    that's operated by the municipal utility.

2            So in a circumstance like that -- and these are the

3    circumstances the Supreme Court has addressed -- California

4    Supreme Court has addressed -- you have inverse condemnation,

5    which actually works in terms of distribution of losses,

6    because the municipal utility can spread the losses among the

7    community by raising rates, or ultimately through taxation

8    power.  That's what inverse is about.

9            What Your Honor is charged with deciding today -- no

10   small task -- is how the Supreme Court of California would rule

11   in a circumstance like this, where that fundamental loss-

12   distribution framework does not exist; unambiguously does not

13   exist.  The CPUC could not have been more clear about that in

14   its recent rulings, and the state court -- the California

15   Supreme Court has never actually addressed this issue.

16           THE COURT:  Well --

17           MR. ORSINI:  That's --

18           THE COURT:  -- you made that clear.

19           MR. ORSINI:  That's the job before you.

20           So let me go right to your question:  why doesn't West

21   end the entire conversation and I sit down?  Your Honor, all

22   West says is that what an appellate court in the state has

23   concluded is one piece of data, one datum, that this Court

24   ought to consider, and it ought to be something that you would

25   not disregard -- and this is the language of West -- unless

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   you're convinced by other persuasive data that the highest

2   court of the state would decide otherwise.  Okay, that's what

3   West says.

4            Now, the TCC and others argue that --

5            THE COURT:  I don't believe the Supreme Court

6   identified any data, in that case, that the circuit court

7   should have looked at.  If --

8            MR. ORSINI:  That's right.  In the West case, there

9   was no other data --

10           THE COURT:  There was no other data.

11           MR. ORSINI:  -- certainly not described by the United

12  States Supreme Court in assessing whether or not to take a

13  different view that the intermediate --

14           THE COURT:  Did you notice that --

15           MR. ORSINI:  -- court had.

16           THE COURT:  -- the West case was argued and decided in

17  three weeks?  I mean, you imagine how things used to be done.

18           MR. ORSINI:  How things used to work, Your Honor?

19           Look, the other important point about the West case --

20  so what was going on in the West case that the TCC has cited

21  is, in that case the United States Supreme Court said, we ought

22  to give extra deference to the intermediate appellate court's

23  decision, where in that litigation the highest court of the

24  state has decided to let that loss stand.  And they try and

25  analogize that to the circumstances we have here.  Those aren't

(973)406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  the circumstances we have here.

2        THE COURT:  Well, they sound like it.

3        MR. ORSINI:  Well, they're not, Your Honor.

4        THE COURT:  Okay.

5        MR. ORSINI:  What we have here are two intermediate

6  court decisions that were decided years ago in different cases,

7  that we've briefed.

8        THE COURT:  Not --

9        MR. ORSINI:  And I'll talk about --

10       THE COURT:  Not too many years ago.

11       MR. ORSINI:  Not too many years ago, but --

12       THE COURT:  Okay.

13       MR. ORSINI:  -- but fundamentally, Your Honor, before

14 the CPUC said what it said.

15       THE COURT:  One CPUC decision that went the other way

16 with a concurring opinion of two commissioners that said, I

17 think the law ought to change.

18       MR. ORSINI:  The one decision the CPUC has stated very

19 clearly, the governor's strike force has accepted that that's

20 the law of this state, that's the law we have to apply right

21 now, which is that the CPUC will not permit automatic cost

22 recovery.  It said inverse condemnation is completely

23 irrelevant to any of the considerations they have to reach.

24       THE COURT:  But that doesn't mean they won't consider

25 a cost recovery.  It said --

PG&E Corp., Pacific Gas & Electric Co.

1          MR. ORSINI:  It does not, Your Honor.

2          THE COURT:  It goes to this question of prudent

3   practice, which is -- as I think someone on the other side

4   said, it sort of sounds like negligence.

5          MR. ORSINI:  Well, and -- but that's not what inverse

6   is about, Your Honor, and that's the fundamental problem.

7          THE COURT:  No; that's --

8          MR. ORSINI:  Inverse --

9          THE COURT:  -- that's true, it's not.

10         MR. ORSINI:  Inverse condemnation is strict liability.

11  So let's go back to the Getty fire.  It could have been an act

12  of God.  They could have been the most negligent tree trimmers

13  in the history of tree trimmers; it would not matter.  Inverse

14  condemnation in that instance would apply, and the costs would

15  be socialized to the entire community.  That's what inverse is

16  supposed to be about.

17         What we have with an investor-owned utility like PG&E

18  is the CPUC saying, well, we'll decide whether or not you pass

19  along those costs.  And that's their right to do.  That's what

20  the statutes give them the power to do.

21         THE COURT:  And -- well, we're digressing, but why

22  doesn't that issue make this moot today?  Because you haven't

23  lost that argument for the current fires.

24         MR. ORSINI:  Because, Your Honor, it's a fundamental

25  question of whether or not inverse can apply to a privately-

(970) 454-0811 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   owned utility --

2           THE COURT:  Right.

3           MR. ORSINI:  -- whether we're considered a public

4   utility.

5           THE COURT:  Well -- but, Mr. Orsini --

6           MR. ORSINI:  And -- no, I understand.  I'm getting --

7           THE COURT:  -- we're back --

8           MR. ORSINI:  -- to the question, Your Honor.

9           THE COURT:  -- we're back to West and two intermediate

10  court decisions, and I'm supposed to look at data --

11          MR. ORSINI:  Um-hum.

12          THE COURT:  -- or one datum.  And show me one.  Give

13  me one.  The only data or datum I have that is persuasive, I

14  think, is that the California legislature, all of three months

15  ago, decided not to change the law.  If that isn't a

16  significant marker, I don't know what is.

17          MR. ORSINI:  Well --

18          THE COURT:  I mean, the California legislator (sic)

19  could have changed the law, and didn't.  I'm supposed to

20  predict that the California Supreme Court, four justices out of

21  seven, would decide they know better than the California

22  legislature on that point?  I don't know how I do that.

23          MR. ORSINI:  Your Honor, inverse condemnation is

24  something that's been created as a judicial doctrine.  And

25  you're absolutely right; the California legislature could have

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    acted.

2           THE COURT:  Um-hum.

3           MR. ORSINI:  They did act in some other ways.  They

4    did act in terms of the standard that's applied by the CPUC,

5    they did act in terms of creation of a wildfire fund, all of

6    which are forward-looking issues and don't actually apply to

7    fires that are at issue here.

8           THE COURT:  No, I know they don't.  Of course they

9    don't.

10          MR. ORSINI:  Right?  And so in terms of predicting

11   what the Supreme Court would do, I can't show you a Supreme

12   Court case where they have said we would not apply inverse

13   condemnation --

14          THE COURT:  But --

15          MR. ORSINI:  -- to PG&E.

16          THE COURT:  But the message I get from West is I'm

17   supposed to find something --

18          MR. ORSINI:  Yes, Your Honor.

19          THE COURT:  -- something.  Is there -- there was a --

20   was there a concurring decision; was there publications or

21   writings by members of the court; or some clue.  What is the

22   clue that I would get to know how -- I have to do some

23   predicting.

24          MR. ORSINI:  You do --

25          THE COURT:  It's not how I would rule if I were

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    suddenly put on the Supreme Court.  It's how are four of the

2    seven justices going to do it.

3         MR. ORSINI:  You're supposed to do exactly what the

4    Ninth Circuit did in American Tower.

5         THE COURT:  Yeah?  Which is?

6         MR. ORSINI:  What the Ninth Circuit did in American

7    Tower, after the West decision was issued, citing to the West

8    decision, okay, where in American Tower the question was

9    whether or not you should interpret a particular statute under

10   California law in a particular way.  An intermediate court in

11   California had interpreted it one way.  The Ninth Circuit said,

12   that's a piece of information for us, but we can also look at

13   the statute ourselves and we can assess what the statute says

14   and what the legal doctrine underlying that statute says, and

15   we can conclude that, if the Supreme Court were presented with

16   the question that we now face, it would come out differently

17   than the intermediate court in the state of California had come

18   out.

19        THE COURT:  But what are -- again, I use the term

20   "marker"; maybe that's an imprecise word.  What is the clue

21   that the California Supreme Court has signaled to me?

22        MR. ORSINI:  Can I approach?

23        THE COURT:  Oh, sure, but what are you going to give

24   me, a --

25        MR. ORSINI:  I'm going to give you some clues.

(973)406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          THE COURT:  -- the pray (sic) book -- or the playbook?

2          Oh, got great, big letters; I can read it.

3   Indicators.

4          MR. ORSINI:  I just gave Mr. Julian eight copies.

5          Your Honor, there're three categories.  Slide 2 is

6   what the California Supreme Court said.  Let me be very clear,

7   Your Honor; Barnham (sic) and Pacific Bell were wrong.  And

8   I'll talk about why they were wrong.

9          THE COURT:  Well, you know what, if they are wrong, do

10  I have a choice?  That's the important --

11         MR. ORSINI:  You a hundred percent have a choice, Your

12  Honor --

13         THE COURT:  Oh, okay, well --

14         MR. ORSINI:  -- because if you conclude, based upon

15  the Supreme Court's decisions, based upon the California

16  Supreme Court's doctrine around inverse condemnation, that it

17  would reach a different conclusion than those courts, you

18  absolutely have a choice.

19         THE COURT:  Okay.

20         MR. ORSINI:  Okay?  And so why do I believe that the

21  California Supreme Court would reach a different result?  Well,

22  because if you look at all of the quotes that are on slide 2 --

23         THE COURT:  Those are the excerpts that were in your

24  brief, right?  I --

25         MR. ORSINI:  Some of them are, yes.

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          THE COURT:  I recognize those little pin --

2          MR. ORSINI:  Some of those are, yes, Your Honor.

3          THE COURT:  Okay.

4          MR. ORSINI:  The fundamental point, Your Honor, is,

5    the California Supreme Court has said that the purpose of

6    inverse condemnation unambiguously is socialization of losses.

7          THE COURT:  Um-hum.

8          MR. ORSINI:  There can be no debate about that.

9          THE COURT:  No, I do agree.  I agree.  It is --

10          MR. ORSINI:  And -- but if you agree with that

11    principle, it compels the conclusion that the Supreme Court

12    will conclude that it doesn't apply to us in these

13    circumstances, when the CPUC has said, guess what, that loss

14    distribution, forget about it --

15          THE COURT:  But --

16          MR. ORSINI:  -- doesn't apply.

17          THE COURT:  But, Mr. Orsini, the California Supreme

18    Court might say, the CPUC in Southern Cal. Gas determined that

19    the utility didn't engage in prudent practice, therefore

20    they're stuck.  And maybe the CPUC will determine here that

21    PG&E did engage in prudent practice and therefore they'll get

22    their socialization fix.

23          MR. ORSINI:  Well, two points on that, Your Honor.

24    The CPUC's taking a very different position as to our prudence

25    and ongoing proceedings, right now --

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          THE COURT:  Well, but that --

2          MR. ORSINI:  -- which are not resolved yet.

3          THE COURT:  But they haven't resolved that.

4          MR. ORSINI:  They have not resolved yet, number one.

5   But number two, Your Honor, I submit, it doesn't matter.  It

6   doesn't matter, because the point is we can't wait around to

7   see if the CPUC may or may not permit cost recovery in any

8   particular case involving an investor-owned utility.  The

9   question that this Court is presented with, the question that

10  the California Supreme Court would be presented with, is, is

11  this private entity -- we are undoubtedly a private entity --

12  in this context of inverse condemnation, should we be treated

13  as a public entity.

14         THE COURT:  Well, Barnham and --

15         MR. ORSINI:  Yes.

16         THE COURT:  -- Pacific Tel. (sic) talk about public

17  purpose.

18         MR. ORSINI:  Right.  They talk about --

19         THE COURT:  They didn't --

20         MR. ORSINI:  Well, Barnham doesn't talk about --

21         THE COURT:  The public purpose of -- pardon?

22         MR. ORSINI:  Barnham doesn't talk about much,

23  candidly, Your Honor; it sort of assumes the answer.  Pacific

24  Bell goes through a much more detailed analysis.

25         THE COURT:  Okay.

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    MR. ORSINI:  And so let me address that analysis.  But

2  before I do that, one other point I just want to make with

3  respect to the CPUC, because there were some, I think, confused

4  statements in the submissions by my friends on the other side,

5  about what exactly happened in the Southern California

6  decision, where there was a suggestion that CPUC said, well,

7  because you were imprudent with respect to the fire at issue,

8  you shouldn't be able to recover the costs.  Now, even if that

9  had been what they'd said, it still wouldn't change the answer

10  here.  But that's actually not what they said.

11    THE COURT:  Well, but they spent --

12    MR. ORSINI:  What they said --

13    THE COURT:  -- most of seventy pages describing three

14  fires.

15    MR. ORSINI:  They spent seventy pages describing three

16  fires and when San Diego argued to them.  But none of the

17  things that you've identified as imprudent would have prevented

18  the fire from occurring.

19    You know what the CPUC said?  It's at Exhibit E to my

20  declaration, at page 10.  The CPUC said that "misses the

21  fundamental point.  Even if the fire would have started anyway,

22  a reasonableness review looks at" their actions generally.  So

23  the point being, inverse condemnation was developed for public

24  entities, where it doesn't matter how prudent, imprudent,

25  negligent, reckless they were; they get a guarantee of cost

PG&E Corp., Pacific Gas & Electric Co.

1  recovery.  They're a conduit for the socialization of losses.

2        On the other hand, investor-owned utilities such as

3  PG&E -- the CPUC has said, in its one decision on this issue,

4  its most recent decision on this issue, I don't care if you

5  were imprudent on something that had absolutely nothing to do

6  with the cause of the fire, you don't get your costs recovered.

7  That is not what the Supreme Court has said about inverse

8  condemnation.  And so let's go to Pacific Bell.

9        What does Pacific Bell rely upon in order to conclude

10 that inverse condemnation should apply to an investor-owned

11 utility?  One, it relies on the presumption that cost recovery

12 will be permitted; presumption that has now been affirmatively

13 disproven.  There may be a case out there where it's permitted,

14 but there's no guarantee of it.  And absent that, the

15 underpinning is gone.  That was point number one.

16       THE COURT:  Well, is there a case that says cost

17 recovery is denied when you are prudent?

18       MR. ORSINI:  Is there a case that says cost --

19       THE COURT:  I mean, in other words, you just faulted

20 the CPUC for saying San Diego Gas was imprudent, even though

21 the fire might have been caused by some other thing.  What I'm

22 asking you:  has the CPU ever -- CPUC ever denied cost recovery

23 where it determined that the utility was prudent?

24       MR. ORSINI:  In the context of a loss such as this,

25 I'm not aware of one.

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  Well, but --

2    MR. ORSINI:  But again, Your Honor, I don't think

3  that's relevant.  I really don't think that's relevant,

4  because --

5    THE COURT:  Well, it may not be relevant, but it's a

6  data point.

7    MR. ORSINI:  Okay.  But it's a -- but I don't think

8  it's a data point that tells us anything.

9    THE COURT:  Okay.

10    MR. ORSINI:  There are lots of data points.

11    THE COURT:  Okay.

12    MR. ORSINI:  Right.  But I don't think it's a data

13  point that actually tells you anything, because, again, it's

14  all about the guarantee of cost-spreading, socialization of

15  loss, spreading the loss among the entire community, not taking

16  it from one set of private individuals and putting it on

17  another set.  And that's where Pacific Bell fundamentally made

18  a mistake.  It presumed cost recovery would occur.  There's the

19  footnote 6 which says, well, even if L.A. Power and Water (sic)

20  is brought under the auspices of the CPUC, that wouldn't mean

21  that they would fall outside of inverse condemnation.  It's

22  dicta.  I'm not sure that's actually right.  But in any event,

23  even if they didn't get rate increases, guess what they do

24  have?  Taxation and levy authority.  Okay?

25    So, fundamental problem number one was an assumption

(970)096-2555 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    that's been disproven.  But fundamental problem number two --

2    because ultimately what were they being asked to decide, and

3    what are you being asked to decide:  is a private-investor-

4    owned utility a governmental entity for the purposes of inverse

5    condemnation?

6              THE COURT:  Or is what the utility was engaged in --

7    was a public purpose?

8              MR. ORSINI:  I actually don't think that's the right

9    question, Your Honor.

10             THE COURT:  Well, but that's what two courts said.

11             MR. ORSINI:  Well, but this is --

12             THE COURT:  Again, you say --

13             MR. ORSINI:  But that's not what the California

14   Supreme Court has said.  If you --

15             THE COURT:  Okay.

16             MR. ORSINI:  -- look at every one of the decisions

17   I've pointed you to, right, they don't talk about monopoly

18   status, they don't talk about quasi monopoly status.

19             THE COURT:  No, they talk about the --

20             MR. ORSINI:  They say they were most fundamentally

21   influenced by the loss-spreading rationale.  That's why they

22   developed inverse condemnation, not because what's being

23   provided is a public good but because what's being provided as

24   a public good by a public entity should be spread across the

25   public.  And that's what Pacific Bell missed.

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  So the developed rationale is cost-

2  spreading, but that doesn't mean it's been confined narrowly as

3  you would have me predict that the Court would do it.

4    MR. ORSINI:  Because the Supreme Court hasn't

5  addressed it, so we have to ask --

6    THE COURT:  I know.  You've --

7    MR. ORSINI:  -- what would they do.  But, Your

8  Honor --

9    THE COURT:  You've made it clear.

10    MR. ORSINI:  -- if we're -- if we stipulate for a

11  second that the fundamental purpose of this is cost-spreading

12  and we can't cost-spread, how can that dictate that the

13  expected result from the California Supreme Court was they say,

14  you know what, forget what we've said for the past hundred

15  years, forget the whole point of this, forget what we've called

16  the constitutional underpinning, forget the thing that we've

17  said we most were influenced by; don't care about any of that,

18  despite decades of jurisprudence; now we're going to come up

19  with another rationale.  Okay, candidly, Your Honor, that's

20  where we get to our federal constitutional arguments, because

21  if that's the result, that is arbitrary.  That is irrational to

22  say that the purpose of a doctrine is to do something that we

23  all stipulate is not guaranteed.  It doesn't get more arbitrary

24  or irrational than that.  Right?

25    But the Pacific Bell court didn't really grapple with

PG&E Corp., Pacific Gas & Electric Co.

1   that; it instead relied upon the Gay Law Students Association

2   case, which was a case in which the California Supreme Court

3   had concluded that an investor-owned utility, a private

4   utility, could be treated as a public entity for the purposes

5   of discrimination.

6           THE COURT:  I'm aware of that --

7           MR. ORSINI:  Right?

8           THE COURT:  Um-hum.

9           MR. ORSINI:  And there, Your Honor's absolutely right;

10  in the context of the purpose for anti-discrimination laws, the

11  purpose of the jurisprudence that said we don't want people who

12  are providing a public good to discriminate against people on

13  the basis of their sexual orientation or any other basis, for

14  discrimination, that's protected; in that context, we will

15  decide that they are a public entity.  Okay?

16          Pasillas, which they have a -- the TCC will make an

17  argument Pasillas is talking about one-half of gay law students

18  and not the other.  It's false.  Just read the decision.  What

19  Pasillas said is, when you're analyzing a constitutional or

20  statutory principle like they were in Gay Law Students, like we

21  are here, it's a context-specific inquiry, and it could be a

22  different answer in a different circumstance.  And you know how

23  else I know that?  The Moreland case, Your Honor.

24          The Moreland case, which we cite in our brief, was

25  decided one year after Gay Law Students.  The question in that

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   case was, again, is an investor-owned utility a governmental

2   entity.  But in that case, the question was being asked from a

3   different perspective; it was being asked from the perspective

4   of a venue statute.  And what the court said there was,

5   actually relying upon the fact -- relying upon the fact that

6   they could not raise rates without CPUC approval, the Moreland

7   decision, one year after Gay Law Students, said, in this

8   context, the entity is not a public entity.

9           In each of those cases, they were confronted with the

10  same question:  do we treat the utility as a private entity or

11  a public entity.  In answering those questions, the courts

12  looked to the underlying purpose of the doctrine at issue,

13  which is precisely what the California Supreme Court would have

14  to do here, which is precisely what you need to predict as to

15  how the Supreme Court would resolve it.  And given the fact

16  there is no ambiguity that this is about cost-spreading, we

17  submit, Your Honor, that the Supreme Court would say, in this

18  context, PacBell got it wrong.  And do I know that with

19  certainty?  Of course I don't.  Of course I can't.  But what I

20  do know is what the Supreme Court of the state of California

21  has said for one hundred years.

22          And back to the West point where we started.  It is

23  true that we sought review of the lower-court decisions before

24  we filed the bankruptcy --

25          THE COURT:  Right.

PG&E Corp., Pacific Gas & Electric Co.

1              MR. ORSINI:  -- but it was all interlocutory.  It was

2     all interlocutory, discretional writs, which are exceedingly

3     rarely granted.  And ultimately --

4              THE COURT:  No, but the --

5              MR. ORSINI:  -- at the end of all those cases --

6              THE COURT:  -- but the TCC argues that you should have

7     exhausted your remedies, should have gone the final step;

8     right?

9              MR. ORSINI:  Everything was stayed here, Your Honor.

10    Everything was stayed here.  We could have made a motion to

11    lift the stay, sure.  I note that the final judgment that

12    they're referring to -- the plaintiff actually made a motion to

13    push the appeal, and then it was withdrawn after the plane was

14    purchased by one of the creditors in this case.  Okay?

15             Could we have still moved to lift the stay at that

16    point?  Sure, we could have.  We made the determination based

17    upon the speed at which the California appellate courts move,

18    versus the speed at which this court needs to move, that this

19    was an issue we can and should present here.  You want to call

20    that forum-shopping?  You can call it forum-shopping.  It's an

21    assessment of what's likely to actually get us to the answer in

22    the time period that we all know is critical.

23             And so, Your Honor, it's -- I understand that what I'm

24    asking the Court to do is to reach a ruling that is

25    inconsistent with two intermediate-level decisions in

PG&E Corp., Pacific Gas & Electric Co.

1   California.  I understand that.  But those decisions were

2   premised upon assumptions that have now been disproven, and

3   they're fundamentally inconsistent with everything the

4   California Supreme Court has said.

5          THE COURT:  Well, but you still hadn't -- you still

6   haven't told me why I should jump the gun.  I realize that

7   everything's moving quickly in this case and upstairs and down

8   the street, but there is kind of a ripeness issue.

9          MR. ORSINI:  I don't believe there is, Your Honor.

10          THE COURT:  Well, okay, but --

11          MR. ORSINI:  And the reason -- let me say -- let me

12   say again why.

13          THE COURT:  But suppose you get an adverse ruling from

14   me and from Judge Donato and life goes on and then three years

15   from now the CPUC says --

16          MR. ORSINI:  Here's some cost recovery.

17          THE COURT:  -- here's some cost recovery.

18          MR. ORSINI:  Right.

19          THE COURT:  I mean, it took -- how long did San Diego

20   Gas & Electric fight the fight?  And -- several years, right?

21          MR. ORSINI:  Yeah, at least.

22          THE COURT:  Right, right.

23          MR. ORSINI:  At least several years.

24          THE COURT:  Right.

25          MR. ORSINI:  So --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1      THE COURT:  Well, the fires were when?  2004 or '07?

2      MR. ORSINI:  2007, I believe, Your Honor.

3      THE COURT:  Whatever.  It's a long time ago.

4      MR. ORSINI:  And the answer is, first of all, if we

5  can get cost recovery down the road, that'll be a good result

6  from that perspective.

7      THE COURT:  It's better than not getting it, right?

8      MR. ORSINI:  It's -- well, that's obviously the case;

9  it's better than not getting it.  But, Your Honor, let's think

10  about the opposite scenario.  The opposite scenario is you,

11  Judge Donato, state court, whichever jurisdiction it is,

12  rejects my argument and says inverse condemnation applies to

13  PG&E; guess what, you have to pay out X billion dollars based

14  solely on the strict-liability doctrine, that's premised on the

15  notion you'll get cost recovery.  Five years from now, we have

16  an opposite outcome.

17      THE COURT:  Um-hum.

18      MR. ORSINI:  The CPUC says, sorry, PG&E, no cost

19  recovery for you.  Now we have a circumstance --

20      THE COURT:  Because you weren't prudent.

21      MR. ORSINI:  Sure.

22      THE COURT:  That they probably -- it would say,

23  because you weren't prudent, right --

24      MR. ORSINI:  It would say, because --

25      THE COURT:  -- not because we think inverse

(973) 406-2250  operations@escribers.net | www.escribers.net

                PG&E Corp., Pacific Gas & Electric Co.

1    condemnation is our measure, but prudence is our measure.

2            MR. ORSINI:  Well, actually, more than that, because

3    they will explicitly say inverse condemnation is not our

4    measure --

5            THE COURT:  I think -- yes, that's right.

6            MR. ORSINI:  -- we don't care about strict liability,

7    we don't care about the fact that strict liability has been

8    imposed based upon the presumption you will get to spread these

9    costs, we're going to exercise our statutory authority and

10   obligation to decide whether or not you've been prudent.  I'm

11   not criticizing the CPUC in that respect.

12           THE COURT:  You might be.

13           MR. ORSINI:  Well, no, I'm actually not.  I may

14   criticize the standard a little bit, but I'm not criticizing

15   them for applying their standard.

16           And if we're in that scenario where the court has

17   said, you have to pay billions of dollars inverse condemnation,

18   strictly liable, based on this presumption that you might get

19   it down the road -- we get down the road four years and the

20   CPUC says, sorry, you weren't prudent, you don't get cost

21   recovery.  Then what happens?

22           THE COURT:  Then you take it to the California Supreme

23   Court.

24           MR. ORSINI:  Based entirely upon the regulatory

25   decision as to whether or not they could be exercising a

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    prudence review.

2              THE COURT:  Well --

3              MR. ORSINI:  That's a fundamentally different issue,

4    Your Honor.

5              THE COURT:  Well, but is it the -- at the end of the

6    day, if the California Supreme Court says that the CPUC erred

7    by sticking it to prudence and it should have been an absolute

8    entitlement, don't you win -- I realize the timing is

9    significant.

10             MR. ORSINI:  No, but it's more than timing, Your

11   Honor, because it's two fundamentally different questions --

12             THE COURT:  Okay.

13             MR. ORSINI:  -- because the question that would be

14   asked and answered in that proceeding down the road would be

15   whether or not the CPUC was properly applying its regulatory

16   authority in deciding what was or was not prudent conduct.

17   Inverse condemnation would not play into that assessment.

18   Okay?  Whereas here, if this Court says we're subject to

19   inverse condemnation and we pay the billions of dollars based

20   upon strict liability, that's gone --

21             THE COURT:  I guess --

22             MR. ORSINI:  -- that's over.

23             THE COURT:  I guess I'm having trouble understanding

24   why you call them two different issues if you can make the case

25   that -- and again, we're not talking about today, we're talking

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   about years from now --

2            MR. ORSINI:  Yeah, but --

3            THE COURT:  -- that PG&E might have not been prudent

4   in general, but it didn't -- it wasn't imprudent in connection

5   with these fires.

6            MR. ORSINI:  So let me try it -- let me try it again,

7   Your Honor, because in that scenario, in the scenario where

8   we're challenging a cost-recovery prudence decision by the

9   Public Utilities Commission, inverse condemnation doesn't play

10  into the analysis.  That's what the CPUC has said, that's what

11  the Courts have said, okay, because the CPUC regulatory

12  authority, to make its decisions about rates, is a

13  fundamentally separate issue.  And that's precisely the

14  problem.  We're left in this untenable position where the

15  courts on the front end are saying, we're going to hold you

16  strictly liable, regardless of prudence, regardless of fault,

17  regardless of negligence; strictly liable, based on a doctrine

18  that grew entirely out of the notion of cost-spreading; and

19  let's hope it works out for you in the end; if it doesn't work

20  out in the end, that initial decision is not, cannot, will not

21  be revisited.

22            So it's a hundred-percent right, because the question

23  here is a doctrine that requires cost-spreading --

24            THE COURT:  Well --

25            MR. ORSINI:  -- a doctrine that is entirely about it.

(970) 495-0055   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    If it's not guaranteed, Your Honor, the doctrine doesn't fit.

2           THE COURT:  But you have -- if you could magically

3    transport yourself across the street to the California Supreme

4    Court, you could argue to it tomorrow that this doctrine has

5    been misapplied for all these years --

6           MR. ORSINI:  I would love to transport myself --

7           THE COURT:  -- and --

8           MR. ORSINI:  -- across the street tomorrow.

9           THE COURT:  -- the way you have to get there here is

10   persuade me and, if you don't persuade me, persuade either an

11   intermediate federal court or the Ninth Circuit, to certify it

12   to the California Supreme Court.  You might get there anyway,

13   and so if you get there without going to CPUC, that's fine.

14   And the question is whether I should take the jump to tee it up

15   your way in the face of all these other markers or data points.

16   But if I don't, you still have access at some point, maybe not

17   five years, maybe two, maybe one, maybe --

18          MR. ORSINI:  Well, but not --

19          THE COURT:  -- a shorter --

20          MR. ORSINI:  -- in time for this case, Your Honor.

21          THE COURT:  Well, I don't know.

22          MR. ORSINI:  Not --

23          THE COURT:  I don't know whether that's true.

24          MR. ORSINI:  We're all trying to get out of here by

25   June 30th.

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  Well, no, I understand, but the fact of

2    the matter is, if PG&E gets hit with a substantial inverse

3    liability, it has to deal with it; you know that.  And if at

4    some point the California Supreme Court reverses it, then it

5    reverses it and --

6    MR. ORSINI:  And then what, Your Honor?  We've emerged

7    from bankruptcy; we've put billions of dollars into a trust.

8    That money's going to come back?

9    THE COURT:  I don't know.

10    MR. ORSINI:  Right?  And that --

11    THE COURT:  I don't --

12    MR. ORSINI:  -- that's why, Your Honor --

13    THE COURT:  I don't know what happens.

14    MR. ORSINI:  -- I don't think that's -- it's tenable

15    to wait for the California Supreme Court.  That's why we've

16    teed it up in the context that we have, which is, to be very

17    clear, estimation.

18    THE COURT:  But don't you expect that, no matter what,

19    if I make a ruling, it's going to be reviewed?

20    MR. ORSINI:  Your Honor, I expect just about every

21    ruling that's going to made with respect to estimation --

22    THE COURT:  Yeah.

23    MR. ORSINI:  -- in this case, if we can't resolve

24    it --

25    THE COURT:  Well, no, of course.

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    MR. ORSINI:  -- it's going to be reviewed.

2    THE COURT:  I do too.

3    MR. ORSINI:  And so the question is can it be reviewed

4    in time.  But more significantly, right, what's before us right

5    now, what American Tower says, what it says citing to West, is

6    that this Court has to try to predict what the Supreme Court

7    would do.  And I submit, Your Honor, that we believe, based on

8    all the datum I've -- data, not datum, I provided to you, that

9    it's clear how the Supreme Court would come out.

10    And what we're asking the Court, in the context of

11    estimation, to do is to make a ruling as to whether or not

12    we're right or potentially -- we've had this conversation

13    before, Your Honor, because this is estimation -- how likely do

14    you think that I'm right?  Right?  How --

15    THE COURT:  Wait, wait.  Hold on.

16    (The Court and clerk confer.)

17    THE COURT:  Oh.  Yeah.  So, they can hear you and they

18    can't hear me.

19    MR. ORSINI:  It's rarely the case that people can't

20    hear me, Your Honor.

21    But we need to go to estimation.  Right?  The Court is

22    charged, under the long line of estimation cases that we cited

23    to the Court back in the summer, that the Court is more

24    familiar with than I ever will be, with making an assessment as

25    to these underlying legal issues.  And in making this

(970) 658-0050  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  assessment as to whether or not we are liable under inverse

2  condemnation or likely to be liable under inverse condemnation,

3  what West and American Tower say is you have to look at all of

4  the data points; those data points include Pacific Bell and

5  Barnham, but they also include a hundred years of jurisprudence

6  saying that the principle being inverse is different. They

7  include effectively everybody in the government who has touched

8  this --

9            THE COURT: But isn't it --

10           MR. ORSINI: -- saying inverse is broken.

11           THE COURT: Isn't the notion that the legislature

12  declined the invitation in July, itself, a data point?

13           MR. ORSINI: It is a data point, Your Honor. I

14  don't --

15           THE COURT: And a significant one.

16           MR. ORSINI: I don't -- look, the legislature made

17  changes. The legislature made changes --

18           THE COURT: But the --

19           MR. ORSINI: -- to the -- wait --

20           THE COURT: I know, but we --

21           MR. ORSINI: -- but to the overall --

22           THE COURT: We know about all these other changes, but

23  we're talking about --

24           MR. ORSINI: But they're relevant, Your Honor.

25           THE COURT: Okay.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    MR. ORSINI:  They made changes to the overall risk

2  structure, because we have an investability problem in this

3  state, because of inverse condemnation.

4    THE COURT:  Um-hum.

5    MR. ORSINI:  They made changes to the wildfire fund

6  because we have an investment problem because of inverse

7  condemnation.  Did they go so far as to say, you know what, for

8  these fires that already happened, we're going to rescind

9  inverse?  No, they did not.

10    THE COURT:  But why not?

11    MR. ORSINI:  Well, Your Honor, I think we can --

12    THE COURT:  Why -- no, no, but I'm going to finish my

13  question:  why not?  And the question to me is, they chose not

14  to, because they accept the law the way it is, not the way you

15  want it to be.  Why do I ignore that?

16    MR. ORSINI:  That may be one reason they did it.

17  Another reason could have been because of political climate.

18  Another reason could have been because they know this issue's

19  before the Court, so they fixed the problem, going forward, and

20  left to the courts to interpret what the law actually is.

21    THE COURT:  Well, I don't --

22    MR. ORSINI:  So, yes, it's --

23    THE COURT:  -- I don't know that anybody teed it up

24  that way back then.  I mean, this law was enacted in July; the

25  bankruptcy court's case was underway.  But -- look, I think --

(973)406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   let me try it a different way.  If they were busy doing the

2   wildfire fund and putting the deadline and doing all the

3   corporate-governance things and a million other things that

4   aren't what you and I are talking about today, and if they --

5   if there hadn't been any attention paid to the doctrine, that'd

6   be one thing.  But I don't -- I just read the newspaper, you

7   know, or read the -- read something.  I can't ignore the fact

8   that on the agenda somewhere in Sacramento was this question

9   to -- do we or don't we change this principle, and the answer

10  is they clearly chose not to.

11              MR. ORSINI:  That's true, Your Honor.

12              THE COURT:  And that sounds like a data point.

13              MR. ORSINI:  It is a data point.

14              THE COURT:  Okay.

15              MR. ORSINI:  Again, we have to weigh all the data

16  points.

17              THE COURT:  I know, but what -- I'm ranking them.

18              MR. ORSINI:  And, Your Honor --

19              THE COURT:  You know, it's like if the 49ers were

20  playing and their starting quarterback was injured.  I'd take

21  that into account.  Are they likely to win if their second

22  quarterback is playing?  Well --

23              MR. ORSINI:  If they're playing my Giants, probably.

24              THE COURT:  Well, they probably this year -- Giants

25  lose all the time.  And I was -- 49ers used to lose all the

PG&E Corp., Pacific Gas & Electric Co.

1  time.

2  MR. ORSINI:  Your Honor, it's clearly a data point.

3  You need to rank the data points.  I also think, when you're

4  ranking the data points, supreme courts care a whole lot about

5  precedent, their own precedent; they care a whole lot about

6  consistency in the law.

7  THE COURT:  Correct.

8  MR. ORSINI:  And when you tie together the decision

9  after decision after decision, going back decades, it can't be

10  squared with inverse condemnation; it -- with --

11  THE COURT:  Well, but, and listen, I'm --

12  MR. ORSINI:  -- inverse condemnation applied here.

13  THE COURT:  -- feeling like I'm arguing with you,

14  because I'm not; I'm discussing it with you, and I'm going to

15  let Mr. Johnston speak.  But you've got a long list of reasons

16  of statement of policy, and they don't address this other

17  question.  In other words, to say the policy is to socialize

18  the cost is fine; it's a great policy; I'm all for it.  But

19  they -- none of these things suggest anything about the public

20  function that -- which you reject as --

21  MR. ORSINI:  Well, what they --- well, I --

22  THE COURT:  No, no, you reject Barnham and PacBell for

23  saying what they say.  But what struck me in there was the

24  utilities in those cases were engaging in a public function of

25  providing electricity or phone service, what's in the first

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    one, for the public.

2            MR. ORSINI:  They absolutely are.  And they --

3            THE COURT:  And so --

4            MR. ORSINI:  -- absolutely were.

5            THE COURT:  -- that's a data point.

6            MR. ORSINI:  Well, it's a data point that doesn't tell

7    you a whole lot, because it's a data point about a policy

8    that's not the articulated policy behind the doctrine.  Right?

9    So could it be, Your Honor, that they decide, again, forget the

10   policy we've identified, there's another one?  Sure; it's a

11   possibility.  Right?  But we have to predict what they're

12   likely to do.  And what they've done is repeatedly articulate

13   why inverse exists.

14           THE COURT:  Okay.

15           MR. ORSINI:  And all I'm saying is I think that tells

16   you what they would likely do when they're presented with a

17   case where that reason is lacking.

18           THE COURT:  Let me hear from your colleague, and then

19   you have fifteen minutes.  When you come back, devote one

20   minute to what I stated in one of my -- one of my docket texts

21   about whether I should invoke Rule 54(b) or -- and/or direct-

22   appeal options.  Either way, whether -- no matter how I rule,

23   I -- so be prepared --

24           MR. ORSINI:  I can address that now.

25           THE COURT:  Well, do it when you reply.

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          MR. ORSINI:  Okay.  Thanks very much.

2          THE COURT:  I know you're going to say yes, but I want

3    to hear it anyway.  Listen, you might not.  If I rule your way,

4    you might tell me, don't even think of certifying it.

5          Mr. Johnston.  Good --

6          MR. JOHNSTON:  Good morning, Your Honor.  Jim Johnston

7    of Jones Day, on behalf of the PG&E shareholders.  Thank you

8    for the time.  I won't repeat what Mr. Orsini said.

9          You asked, in your docket text and of course

10   throughout the colloquy today, for specific markers or

11   indicators that might predict how the California Supreme Court

12   would address and rule on this issue when -- if and when faced

13   with the question.  That was part of the reason why we made a

14   separate statement at the end of the brief.  We tried to give

15   you some real-world, hard facts that we think the Supreme Court

16   would consider when it takes up the issue.

17         Specifically, since the decoupling of cost-spreading

18   from strict inverse-condemnation liability in late 2017, less

19   than two years ago --

20         THE COURT:  You mean because of the decision of the

21   Commission?

22         MR. JOHNSTON:  Yes.

23         THE COURT:  Yeah.

24         MR. JOHNSTON:  In November -- I think it was

25   November --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1        THE COURT:  Yeah.

2        MR. JOHNSTON:  -- '17th --

3        THE COURT:  Yeah.

4        MR. JOHNSTON:  -- 2017.  The undisputed and

5   unavoidable fact is that it has become much, much more

6   expensive for all of California's investor-owned utilities to

7   raise money; not just PG&E, which we know has a unique set of

8   circumstances, but also Southern California Edison and San

9   Diego Gas & Electric.

10       Since the CPUC's denial of the rate-recoupment denial

11  by San Diego Gas & Electric, the markets and investor community

12  have come to grips with the fact that California IOUs now face

13  the prospect of strict liability for increasingly massive and

14  devastating wildfires, divorced from any negligence, with great

15  doubt about their ability to recover those liabilities and

16  rates.

17       THE COURT:  Well, but again --

18       MR. JOHNSTON:  It's that --

19       THE COURT:  -- I'm going to say the same thing to you

20  that I said to Mr. Orsini:  what about IOUs that aren't

21  imprudent?  Is there any indication that the CPUC would punish,

22  or condemn if you will, a prudent utility and say, you won't

23  get your cost recovery?

24       MR. JOHNSTON:  There is --

25       THE COURT:  There's none.  There's no indication.

PG&E Corp., Pacific Gas & Electric Co.

1        MR. JOHNSTON:  There is no indication, but there also
2    is a distinction drawn by the CPUC, between negligence and
3    prudency.  Prudency, as interpreted by the CPUC, is a stricter
4    standard than negligence.  A utility can be not negligent and,
5    absent inverse condemnation, would suffer no liability
6    whatsoever, while at the same time being found years down the
7    road, by the CPUC, to have been found imprudent.

8        So you have this divorce between negligence and
9    prudency.  And the real problem, as shown by the markets and
10   all the rating-agency downgrades, S&P asking whether California
11   will ever have an investment-grade utility in the future, is
12   that it's the perception of that risk, the perception of the
13   risk that a utility will be found to be liable, not having been
14   negligent, but not being able to recover the rates.  That's the
15   new reality.  The --

16       THE COURT:  Well, but again, I -- this is angels on a
17   pin?  No, it's not angels on a pin, or it's not Aristotle
18   debating life's meaning.  But can you draw the line between
19   prudent and imprudent, and negligent or non-negligent?  Can you
20   articulate it in an easy formula?  I can't.

21       MR. JOHNSTON:  I cannot.

22       THE COURT:  I can't.

23       MR. JOHNSTON:  No.

24       THE COURT:  I'm sure --

25       MR. JOHNSTON:  And --

(973) 406-2250    operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  -- there're some philosophers that can,

2    and maybe some tort professors at the law school, but I don't

3    know how to --

4    MR. JOHNSTON:  Well --

5    THE COURT:  -- describe it.

6    MR. JOHNSTON:  -- I think, more importantly, my

7    clients cannot and the markets cannot.  And because they

8    cannot, there's this perception of risk --

9    THE COURT:  So the answer is --

10   MR. JOHNSTON:  -- and what do --

11   THE COURT:  -- be prudent.  I mean, this sounds

12   flippant, I don't mean it that way, but it's, like, the way you

13   avoid negligence is by not being negligent; the way you -- the

14   way you get your cost recovery is by being prudent.

15   MR. JOHNSTON:  It is by --

16   THE COURT:  Isn't --

17   MR. JOHNSTON:  It is by being prudent.

18   THE COURT:  Isn't that right?  I mean --

19   MR. JOHNSTON:  So -- yes.  What I'm trying to relate

20   to you is that it's created a difficulty for these

21   institutions --

22   THE COURT:  No; understood.

23   MR. JOHNSTON:  -- in this state, to raise money.  And

24   so the --

25   THE COURT:  And the commissioner --

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1      MR. JOHNSTON:  -- the capital-raising function is now

2   much more expensive.

3      THE COURT:  I've forgotten the name, but the

4   concurring commissioner said, Legislature, please fix it, or,

5   Courts, please fix it.  But --

6      MR. JOHNSTON:  Correct.  And before I turn to why this

7   is actually important, I know you brought up many times why

8   didn't it get fixed in Sacramento this summer, why hasn't it

9   been fixed in the past.

10      THE COURT:  Some people might not think it's a problem

11   that needs to be fixed.

12      MR. JOHNSTON:  Correct, although the statements from

13   the highest officials in the state that it is a problem would

14   indicate that reasonable minds think that there's an issue

15   here.

16      THE COURT:  Well, that's what politicians do:  they

17   differ.  But they could fix it tomorrow if they wanted to;

18   right?

19      MR. JOHNSTON:  Not necessarily, Your Honor.

20      THE COURT:  No?

21      MR. JOHNSTON:  And that's the point I wanted to raise.

22      THE COURT:  You don't think so?

23      MR. JOHNSTON:  Who knows what's in the minds of those

24   in Sacramento.  But I have heard it said many times, including

25   from legislatures, that the legislators cannot do anything

PG&E Corp., Pacific Gas & Electric Co.

1    about this problem, because it's a constitutional issue.

2    Inverse condemnation is rooted in the state constitution.

3              THE COURT:  Well --

4              MR. JOHNSTON:  And there is a view that says that the

5    legislature's powerless to deal with this, and that this is

6    something that has to be addressed by the Supreme Court, making

7    a ruling on the state constitution.

8              THE COURT:  Well, it's interesting, because I don't

9    pretend to know a lot of California constitutional history that

10   isn't related to bankruptcy, which isn't the case.  But in

11   preparing for today, I read over and over Section -- Article I,

12   Section 19, I believe it is, and it doesn't say anything about

13   IOUs.  It says that, if something -- if somebody takes your

14   property, you should be reimbursed.  Doesn't say by whom.

15   So --

16             MR. JOHNSTON:  Right.

17             THE COURT:  So the courts have said, well, if it's a

18   governmental agency, you should be reimbursed and, if it's a

19   IOU, you should be reimbursed.

20             MR. JOHNSTON:  And that will be the question that the

21   California Supreme Court eventually will have to grapple with:

22   whether the intermediate appellate courts, in applying it to a

23   privately-owned entity, got it wrong.

24             THE COURT:  Yeah, but my point is that the

25   constitution itself doesn't flag -- doesn't give a clue to that

PG&E Corp., Pacific Gas & Electric Co.

1    answer.  The language doesn't; does it?

2            MR. JOHNSTON:  No.

3            THE COURT:  No.

4            MR. JOHNSTON:  And so who's --

5            THE COURT:  It uses the past tense:  will be

6    compensated.

7            MR. JOHNSTON:  So --

8            THE COURT:  It doesn't say who will compensate.

9            MR. JOHNSTON:  Who best to decide what that means than

10   the California Supreme Court.  And that's my point is simply

11   that it's not as powerful a data point as it might seem, that

12   there was inaction by the legislator -- legislature this summer

13   on this point.

14           THE COURT:  So your point to me is that maybe some

15   people in Sacramento said, we can't fix it legislatively,

16   absent a constitutional amendment?

17           MR. JOHNSTON:  That's the point I'm trying to make,

18   yes.  And so it's not actually a data point that's all that

19   powerful or persuasive.

20           So why I brought this up and why I think the market

21   reaction and the cost of capital and the increase in the cost

22   of capital -- it's fair to say, well, why would the Supreme

23   Court care about that.  And this is where we come back to what

24   Mr. Orsini touched on, is the governor, CPUC, the wildfire

25   commission instituted by the legislature, have all recognized

PG&E Corp., Pacific Gas & Electric Co.

1    this is a critical statewide issue.  This isn't a PG&E issue

2    set aside.  The cost of capital and the increase in the cost of

3    capital limits IOUs' ability to harden the grid, to prevent

4    future fires.  It limits their ability to meet the state's

5    aggressive clean-energy goals.  And of course it puts upward

6    pressure on rates.  These are all things that the state, from

7    the governor on down, has deemed to be important, actually

8    critical.

9         I know you've read the Strike Force report.  On page 2

10   it says that the current, inverse condemnation, without a

11   guarantee of rate recovery, is untenable for utility customers

12   and our economy; it directly impacts California's access to

13   safe and reliable and affordable electricity.  The legislative

14   commission on catastrophic wildfires said virtually the same

15   thing; it concluded that the strict-liability interpretation of

16   the inverse --

17        THE COURT:  So let me go back for a minute.  Maybe

18   somebody in Sacramento couldn't change the constitution, but

19   could they change the Public Utilities Code?  I would think

20   that they could.

21        MR. JOHNSTON:  I think --

22        THE COURT:  The legislature --

23        MR. JOHNSTON:  -- they could.

24        THE COURT:  -- it would seem to me -- I'll take as

25   given from you that in five minutes, a majority of the Senate

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   and the Assembly couldn't change the California constitution,

2   but I believe they could change the California Public Utilities

3   Code --

4           MR. JOHNSTON:  I believe that --

5           THE COURT:  -- and --

6           MR. JOHNSTON:  -- to be the case.

7           THE COURT:  -- fix with that quick fix what drives the

8   commissioners to make the decision the way they make (sic).

9   Isn't that right?

10          MR. JOHNSTON:  I'm not a regulatory lawyer --

11          THE COURT:  No.

12          MR. JOHNSTON:  -- but I suspect that it's possible --

13          THE COURT:  Yeah.

14          MR. JOHNSTON:  -- that the California legislator --

15  legis -- I get that word wrong.

16          THE COURT:  Legislature.

17          MR. JOHNSTON:  -- legislature could direct the CPUC

18  with respect to cost recovery in inverse-condemnation cases.

19  So that is --

20          THE COURT:  And then they could presumably, as a

21  matter of state law, change the standard from prudence to

22  negligence and let the academics decide what the line is

23  drawn -- how to draw that line.  But they could call it

24  negligence rather than prudence.

25          MR. JOHNSTON:  Yes.  And prudency is, I believe,

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1     nowhere found in the Public Utilities Codes.  It's --

2          THE COURT:  Yeah, I don't know --

3          MR. JOHNSTON:  That is a --

4          THE COURT:  Yeah.

5          MR. JOHNSTON:  -- a doctrine that has been developed

6     by the CPUC over time.

7          THE COURT:  Well, I bet it's one of those things where

8     you know imprudence when you see it; right?

9          MR. JOHNSTON:  I --

10         THE COURT:  Okay.  I think --

11         MR. JOHNSTON:  I suspect that it's right.

12         THE COURT:  But go ahead.  Yeah, you've got just a

13    little bit left --

14         MR. JOHNSTON:  Okay.

15         THE COURT:  -- so go ahead and finish what you want to

16    make -- say.

17         MR. JOHNSTON:  I made the point, Your Honor; simply

18    that the current state of the inverse doctrine and what we were

19    trying to convey is an acknowledged, recognized problem.  I

20    don't think there's any dispute about that.  And so we submit

21    that there's no doubt that, given warnings from the highest

22    level of the state, notwithstanding inaction this summer on

23    this specific issue -- that those are the facts that the

24    Supreme Court would grapple with when it takes up the issue.

25    And as a result, that's the type of information that Your Honor

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    also can consider in predicting how the Supreme Court would

2    rule.

3              THE COURT:  Okay.

4              MR. JOHNSTON:  Thank you.

5              THE COURT:  Thank you, Mr. Johnston.

6              Mr. Julian, are you going to do the honors today, or

7    are you having your colleague do it?  Since you gave him credit

8    for most of the brief, other than the first four pages.

9              MR. JULIAN:  I'm going to have him do all that, Your

10   Honor, but I'm going to set the table a little bit.

11             THE COURT:  And are you sharing the time with anyone

12   else, any of the --

13             MR. JULIAN:  Yes, we are.

14             THE COURT:  Okay, just tell me what you have it on

15   (sic).

16             MR. JULIAN:  We have one hour, and the TCC will take

17   up thirty minutes; subrogation claimants, fifteen; and Mr. de

18   Ghetaldi, fifteen.

19             THE COURT:  Okay.  Thank you.

20             MR. JULIAN:  And for the record, Robert Julian of

21   Baker Hostetler, for the tort committee.

22             Your Honor, I would like to address the application of

23   the West case and five other issues that relate to estimation,

24   and a conflict we have with subrogation claimants' position in

25   the briefing today.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1     So let me start off with West and say that I disagree

2  with Mr. Orsini's statement to you that in the 1940 West case,

3  the Supreme Court said that a denial of the petition for review

4  by the Supreme Court, in the very matter in which the case is

5  being litigated, is a datum point instead of being controlling.

6     THE COURT:  One thing that -- one thing that Mr.

7  Orsini didn't say, that I simply observed, and that's slightly

8  different from our case, is in West it was the actual same

9  parties all the way up the line.  Here we didn't -- we don't

10  have PG&E in -- as a party in the two court-of-appeal

11  decisions.  It is the party, of course, in the state-court

12  actions that are more recent.

13     MR. JULIAN:  Yes.

14     THE COURT:  So I don't know whether that's a

15  difference or not, but it's a fact; right?

16     MR. JULIAN:  Let me address it.

17     THE COURT:  Okay.

18     MR. JULIAN:  So, factually, we have the two court-of-

19  appeal decisions, which PG&E wants the California Supreme Court

20  to disregard.  And what has happened factually in the

21  litigation involving PG&E and the claimants that I represent in

22  the Butte 2015 fire litigation and the North Bay 2017

23  litigation, in which you granted relief from stay to prevent

24  the Tubbs trial to go forward --

25     THE COURT:  Right.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1     MR. JULIAN:  -- those parties litigated this very

2  issue at length.  PG&E took the matter on appeal by a writ of

3  mandate --

4     THE COURT:  Oh, yes.  No, that's the point you made in

5  your brief.

6     MR. JULIAN:  Yes.

7     THE COURT:  I very much appreciate the way you laid it

8  out.  I got it.

9     MR. JULIAN:  And the courts of appeal there refused to

10  disturb or overturn the analysis of the two court-of-appeal

11  decisions.

12     THE COURT:  I understand, but they did it in the

13  context of petitions for writs; right?

14     MR. JULIAN:  Yes.

15     THE COURT:  And that's slightly different.

16     MR. JULIAN:  Slightly different.

17     THE COURT:  Slightly different.

18     MR. JULIAN:  Slightly different.  But is it really

19  different when you look at what the Supreme Court told us in

20  the West case in 1940?  And I'm going to explain some

21  circumstantial evidence as to why what I'm saying is true and

22  they know it.  First, what the Supreme Court there said is,

23  look, let's be honest, the parties litigated this ad nauseum in

24  the state court --

25     THE COURT:  Well, it was a very convoluted record

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    there, wasn't it?  I mean --

2              MR. JULIAN:  Yeah.

3              THE COURT:  -- I couldn't keep track of who died and

4    who's -- the will and who --

5              MR. JULIAN:  The issue there --

6              THE COURT:  -- who had the stock.

7              MR. JULIAN:  The issue --

8              THE COURT:  It's not important.

9              MR. JULIAN:  The issue there was what were the

10   elements of a conversion case.

11             THE COURT:  Right.

12             MR. JULIAN:  The trial court said you needed a demand

13   before conversion.  Court of appeal agreed.  Looks like a

14   summary decision, not real reason.  Went up to the Supreme

15   Court of Ohio, and Ohio denied petition for review.  The

16   appellant attacked it in federal court.  Circuit court of

17   appeal and federal court came to a different conclusion.  The

18   Supreme Court said, hold on, timeout.  The Supreme Court said,

19   yes, the fact that the court of appeal ruled one way is a datum

20   point.  But then they said the fact that the Supreme Court

21   denied review is dispositive.  They said, this is -- whether to

22   file the court-of-appeal decision or not, is all the more true

23   here where, quote, "as in this case, the highest court has

24   refused to review the lower court's decision, rendered in one

25   phase of the very litigation which is now prosecuted by the

PG&E Corp., Pacific Gas & Electric Co.

1   same parties before the federal court."

2           Then this quote:  "Even though it is arguable that the

3   Supreme" -- you could just substitute "California" in this

4   decision, and "San Francisco Bankruptcy Court", to these cases.

5   Listen:  "Even though it is arguable that the Supreme Court of

6   Ohio will at some later time modify the rule of the West case,

7   whether that will ever happen remains a matter of conjecture.

8   In the meantime the state law applicable to these parties and

9   in this case has been authoritatively declared by the highest

10  state court in which a decision could be had.  In the present

11  suit" -- "If the present suit", he's talking about federal

12  court, "had been brought in the Cuyahoga county court", again,

13  quote, "no reason is advanced for supposing that the Cuyahoga

14  court of appeals would depart from its previous ruling or that

15  the Supreme Court of the state would grant the review which it

16  withheld before.  We think that the law thus announced and

17  applied is the law of the state applicable in the same case,

18  ... to the same parties".  Federal court is --

19          THE COURT:  But that's the point:  it's the same case,

20  same parties.  And that is a distinction.  And you're --

21          MR. JULIAN:  Yes.

22          THE COURT:  -- trying to then ingrain or graft that

23  onto 2015 and 2017 fires, which is the same party now but it's

24  a different judicial process; that's all.

25          MR. JULIAN:  Correct.

(979) 966-550  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1            THE COURT:  Okay.

2            MR. JULIAN:  Let's put it this way:  how many times --

3     their -- let's look at what's really happening here.  Their

4     argument is premised upon the idea that the justices of the

5     California Supreme Court are potted plants, to coin a phrase in

6     Washington, DC, and don't realize the fires have taken place,

7     and that PG&E is on the verge of bankruptcy and is going to

8     throw chaos into the rates and problems for Northern

9     Californians.

10           If the Supreme Court of California was asleep, maybe

11    they didn't mean what they said when they denied those three

12    petitions for review:  once with the Thomas fire from Ventura,

13    and twice with respect to the Butte fire and this fire.  They

14    denied petitions for review.  Then what happened next?  PG&E

15    finally got its wish:  a third collateral attack on the trial

16    courts.  PG&E appealed the trial court's final decision in the

17    Butte case, to the California Court of Appeal, in December of

18    2018, eleven months ago.

19           And the idea that Mr. Orsini implied that they didn't

20    know how important it was, so they didn't seek immediate

21    transfer, which is what any competent lawyer in this state

22    would do, to the California Supreme Court, the fundamental

23    element of practicing law --

24           THE COURT:  Well, they -- you do agree, don't you,

25    they would have had to go through the formality of getting

PG&E Corp., Pacific Gas & Electric Co.

1  relief from stay if granted?  Presumably it would have been

2  granted, but --

3          MR. JULIAN:  No.

4          THE COURT:  No?  Well, the stay was applied -- the

5  stay applied.  I mean, there're lots of cases that say, where

6  the debtor is the appellant, still the stay applies.  But you

7  typically grant relief from stay, routinely.

8          MR. JULIAN:  Two points.

9          THE COURT:  Right?

10          MR. JULIAN:  First of all --

11          THE COURT:  Okay.

12          MR. JULIAN:  Two points.  First of all, in December

13  and January, they could have taken that fundamental step.  And

14  let me explain why.  They knew, at the time, that estimation

15  was going to be a big deal.  They'd already hired Cravath and

16  Weil at the time; they were on the payroll.  My God, they

17  billed 200 million dollars for that advice, Your Honor.  They

18  knew estimation turns on settlements.  Here's the point:  The

19  Butte 2015 settlements were settled -- if you read the 10-Q,

20  1.1 billion dollars reserved, based upon the very inverse

21  ruling that they now attack.  They knew what was going to

22  happen here.  Mr. Orsini says he needs this ruling today from

23  you to affect Judge Donato's estimation.

24          They should have filed that automatic transfer to the

25  California Supreme Court in December or January, or requested

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1 you to grant relief from stay.

2 THE COURT: Well, so walk me through how they would

3 have done it. Forget the stay for the moment. By when the

4 court of appeals denied review of the trial-court decision in

5 Butte, they should have what?

6 MR. JULIAN: Apples and oranges.

7 THE COURT: Pardon?

8 MR. JULIAN: Apples and oranges. Let me explain

9 two --

10 THE COURT: Okay.

11 MR. JULIAN: -- two facts for you.

12 THE COURT: Go ahead.

13 MR. JULIAN: First of all, we're dealing with two

14 separate Butte 2015 --

15 THE COURT: Okay.

16 MR. JULIAN: -- appellate routes. The first appellate

17 route was the trial court rules that inverse applies.

18 THE COURT: Right.

19 MR. JULIAN: PG&E takes it up on a writ to the court

20 of appeal; it's denied. PG&E takes a petition for review to

21 the California Supreme Court; that's denied. Months later, the

22 judgment is finally entered in the Butte County case, pursuant

23 to a consent.

24 THE COURT: Right; the consent --

25 MR. JULIAN: PG&E appeals for the second time in

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  Butte, this time on a direct appeal, not a writ, to the

2  California Appellate Court, in December of 2018.

3      THE COURT:  Okay.

4      MR. JULIAN:  At that time, they could have invoked

5  Article VI, Section 12, of the California constitution.

6      THE COURT:  But the court of appeals has not ruled on

7  that; correct?

8      MR. JULIAN:  Correct.

9      THE COURT:  Okay.

10     MR. JULIAN:  And so when an -- like the Bakke

11 (phonetic) case; when an important constitutional issue impacts

12 the State of California, litigants know that, under California

13 Constitution Article VI, Section 12, they file an immediate --

14 immediate, they don't wait ten months -- immediate application

15 with the California Supreme Court to transfer the pending

16 appeal from the court of appeal to the --

17     THE COURT:  Well --

18     MR. JULIAN:  -- Supreme Court.

19     THE COURT:  -- "transfer" -- you're using the word

20 "transfer" correctly, but what you mean is bypass the

21 intermediate court --

22     MR. JULIAN:  Yes.

23     THE COURT:  -- much like we would do in this court if

24 I authorize a direct appeal.  And the court of appeals at the

25 Ninth Circuit bypasses the district court of the BAP --

PG&E Corp., Pacific Gas & Electric Co.

1          MR. JULIAN:  Yes.

2          THE COURT:  -- which is what we've done in the third

3   case.

4          MR. JULIAN:  Right.

5          THE COURT:  Okay.

6          MR. JULIAN:  Which the --

7          THE COURT:  It's the same thing.  It's transfer but

8   it's in effect a vertical transfer.

9          MR. JULIAN:  It's Mr. Orsini standing up to the

10  California Supreme Court, saying, you know, Your Honors, this

11  is going to be so important for PG&E and the ratepayers, and

12  we're getting the --

13         THE COURT:  Okay --

14         MR. JULIAN:  -- getting it in the shorts (phonetic).

15         THE COURT:  -- but, Mr. Julian, he didn't do that;

16  therefore, what, is it a waiver?  Is --

17         MR. JULIAN:  Yes.  The --

18         THE COURT:  Is it a waiver or -- I mean, it's not West

19  again.

20         MR. JULIAN:  It's not West.  It's --

21         THE COURT:  It's not West again.  It's --

22         MR. JULIAN:  It's --

23         THE COURT:  They could have taken a course and didn't;

24  therefore I should conclude that they waived their right?

25         MR. JULIAN:  No.  It's a -- when you ask the federal

(97 )06-1555 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    court to ignore comity and go out on a limb -- just like the

2    limbs that fall on the electrical lines.  No.

3              THE COURT:  Come on.

4              MR. JULIAN:  Well --

5              THE COURT:  We don't --

6              MR. JULIAN:  -- would go out on a limb and rule --

7    let's face it, they're asking you to guess what the Supreme

8    Court will do, when there's two cases on point.  They have to

9    exhaust their judicial remedies.

10             THE COURT:  Well, I guess what I'm asking you is --

11             MR. JULIAN:  They didn't exhaust (sic).

12             THE COURT:  -- is there a legal doctrine --

13             MR. JULIAN:  Yes.

14             THE COURT:  -- of exhaustion here that applies?  I

15   mean, we know --

16             MR. JULIAN:  I cited -- I -- close as I could come to

17   that is a case I cited on page 3 of our brief, which was an

18   exhaustion of administrative remedies.  But I think it's the

19   same thing.

20             THE COURT:  But, I mean, exhaustion of administrative

21   remedies is well established in the law.  In fact --

22             MR. JULIAN:  Sure.

23             THE COURT:  -- I believe the -- didn't the Ninth

24   Circuit or the U.S. Supreme Court just revisit that issue in

25   another context?  Completely unrelated, but it was just in the

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    last few days, I believe, they let a litigant avoid an

2    exhaustion remedy.

3            But my point -- your point here is that PG&E, having

4    been in a position at the end of last calendar year -- whether

5    they were in bankruptcy or not isn't the point --

6            MR. JULIAN:  Right.

7            THE COURT:  -- could have, but didn't, take this issue

8    to the Cal. Supreme Court, or attempt to, if they had attempted

9    to and the Cal. Supreme Court had said, no; then we'd be back

10   to the --

11           MR. JULIAN:  No, that's persuasive data that they

12   don't want to hear it.  How many times does the California

13   Supreme Court have to tell this Court no before it's

14   significant persuasive data?

15           THE COURT:  Well, it's sort of like what is it you

16   don't understand about "no".  Right?  Is that what you're

17   saying?

18           MR. JULIAN:  Right.  And --

19           THE COURT:  But my question to you is, is it legally

20   fatal to them --

21           MR. JULIAN:  Yes.

22           THE COURT:  -- as a waiver of remedy?

23           MR. JULIAN:  Yes.

24           THE COURT:  And you're citing a case in your brief, on

25   page 3, but, beyond that, there's no doctrine

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    MR. JULIAN:  But beyond that, it's federal comity.

2    The same thing happened two months ago when PG&E asked Judge

3    Donato to reinstate the stay that you terminated, to permit

4    Tubbs to go forward.  And he said, as a matter of federal

5    comity, I'm not going to get involved in that, that's the state

6    court doing its business.  And what I'm saying to you is

7    there's a sensitivity, in federal courts, not to get involved

8    in state-court decisions unless it's absolutely crystal clear

9    that they must.

10    THE COURT:  So --

11    MR. JULIAN:  It wasn't --

12    THE COURT:  So, in theory, Mr. Orsini could get -- ask

13    for relief from stay today and go to the California Supreme

14    Court tomorrow, or if -- or through the California Court of

15    Appeal, on the final Butte matter; right?

16    MR. JULIAN:  If that -- I don't know if that case is

17    still alive.  It -- maybe it was --

18    THE COURT:  No, I don't know either.

19    MR. JULIAN:  -- settled.

20    THE COURT:  But procedurally --

21    MR. JULIAN:  Yes.

22    THE COURT:  -- procedurally, if there is a way to go

23    through the state system, that option is still open.

24    MR. JULIAN:  If that case is still alive --

25    THE COURT:  Yes.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          MR. JULIAN:  -- yes.

2          THE COURT:  I don't --

3          MR. JULIAN:  And --

4          THE COURT:  Well, don't you know if it is?  I mean,

5    didn't it just stop when the stay applied?  I would assume it

6    did.

7          MR. JULIAN:  Well --

8          THE COURT:  I would assume that the automatic stay

9    would have prevented the court of appeals from affirming or

10   reversing the judgment of the --

11         MR. JULIAN:  Mr. Orsini's going to have to answer

12   that.

13         THE COURT:  No, but I don't -- I know he can answer

14   it, but you and I both know, as a matter of bankruptcy law, or

15   I know, that courts of appeal usually don't mess with

16   bankruptcy stays; they just --

17         MR. JULIAN:  Correct.

18         THE COURT:  -- they just say -- I mean --

19         MR. JULIAN:  Correct.

20         THE COURT:  -- "Let me know when I can do something."

21         MR. JULIAN:  Correct.

22         THE COURT:  Right?  Okay.

23         MR. JULIAN:  The -- if that case is still alive, the

24   reason why it's fatal now is Judge Donato said he wanted the

25   inverse ruling moved up for a reason.  And --

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  Well, I understand what -- again, we're

2  back to the unusual nature of the role that I'm playing and the

3  role that he's playing, but it's -- it is what it is.  Your

4  point today is that I should tell PG&E, sorry, you're not going

5  to get anywhere with me, because you've had your shot and you

6  didn't take it, or --

7    MR. JULIAN:  As a matter of --

8    THE COURT:  -- or alternatively, you took it and lost

9  in 1940 in the West case?

10   MR. JULIAN:  Well, for one, you've been told twice a

11  petition for review denied.  Three, you had your chance for a

12  direct appeal; you didn't take it.  And you shouldn't be

13  placing Judge Montali in a position of going out on a branch on

14  federal comity issue where you had the chance to do it and it's

15  now too late to go somewhere else.  That's my point.  That's

16  what I believe.

17   And -- but, Your Honor --

18   THE COURT:  Well, we agree one thing:  that if I

19  accept your argument that I should tell Mr. Orsini, "You lose

20  West.  You lose because of Julian's theory on the California

21  Court of Appeals," I'm really not doing what he wants me to do.

22  He --

23   MR. JULIAN:  Correct.

24   THE COURT:  He wants me to predict.  And I could

25  predict that the California Supreme Court would affirm, or

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    predict that they'll revise.  But you don't want me to predict,

2    either way.

3              MR. JULIAN:  Well --

4              THE COURT:  Procedurally, I should say they're out of

5    luck, go find -- take your argument to the state court.

6              MR. JULIAN:  You could -- well --

7              THE COURT:  Pardon?

8              MR. JULIAN:  -- it's up to you.  You could also

9    cushion your decision.  You could make both decisions.  Mr.

10   Rivkin, though, is going to address the constitutionality.  I'm

11   here just to address West and an issue we have with Subro, and

12   to tell you why this is important to estimation.

13             THE COURT:  Okay.

14             MR. JULIAN:  But last but not least on West, we know

15   that our construction of West is correct, because the debtors

16   have admitted it.

17             THE COURT:  They admitted it -- you mean in the 10-Q?

18             MR. JULIAN:  On August --

19             THE COURT:  10-K?  Whatever --

20             MR. JULIAN:  On August 7, I briefed West, as you know,

21   in the estimation brief.

22             THE COURT:  Um-hum.

23             MR. JULIAN:  On August 14, I appeared before you.  We

24   had that little dialogue about whether this should be briefed.

25             THE COURT:  Um-hum.

operations@escribers.net | www.escribers.net
(973) 406-2250

PG&E Corp., Pacific Gas & Electric Co.

1      MR. JULIAN:  And you said, "It sounds" -- when I

2  talked about West's denial of a petition for review, you said,

3  "It sounds like a winning argument."  And then you asked us to

4  brief it.  None of these folks briefed it.

5      THE COURT:  Well, that's funny; I -- when I read your

6  brief over the weekend, I looked back and said, I don't

7  remember West being cited before.  And I

8      MR. JULIAN:  It was.

9      THE COURT:  -- I looked up in Mr. Orsini's brief and I

10  didn't even see it in the table of cases.  So --

11      MR. JULIAN:  Well, actually it's there, Your Honor.

12      THE COURT:  Thus my docket text.

13      MR. JULIAN:  Your Honor, here's where it is:  On July

14  18, Mr. Orsini filed his motion to estimate claims, and cited

15  the American Tower Corporation case at page 20 of his brief.

16  And the American Tower case itself, on the page he cited, it

17  cites West.  In his brief that he filed in front of Your Honor

18  on September 10 -- no, I'm sorry, October 25, he cited American

19  Tower again, at page 1047.  And at 1047, it cites West too.

20      THE COURT:  Okay.  Well, you --

21      MR. JULIAN:  And you told us to brief it.  And in

22  state court I'd be entitled to a jury instruction that says,

23  when the party on the other side has access to a witness or a

24  document and doesn't mention it to the judge, that means it's

25  consciousness of guilt, that the case is against them or the

PG&E Corp., Pacific Gas & Electric Co.

1    witness is against them.

2         Your Honor, these folks, by --

3         THE COURT:  Well, we're not instructing juries today,

4    so --

5         MR. JULIAN:  Well --

6         THE COURT:  -- don't worry about that.

7         MR. JULIAN:  -- but the point is they knew it, Your

8    Honor.  They purposefully laid it in the weeds so that I didn't

9    have a chance to address it.

10        THE COURT:  But you did address it, and I responded by

11   telling them to be prepared to discuss it, and they did.

12   And --

13        MR. JULIAN:  Two points -- last point, Your Honor.

14        THE COURT:  Um-hum.

15        MR. JULIAN:  But they know it's bad, which is why they

16   didn't address it.

17        First, estimation.  This inverse decision is important

18   for Judge Donato and us because it makes estimation of about

19   thirty to -- forty to seventy percent of the claims, depending

20   on the estimation, very simple.  You heard Mr. Orsini say it's

21   strict liability.  That's why I believe Judge Donato asked for

22   this to be pushed up.  It's very important --

23        THE COURT:  Listen, I don't care that he asked for it

24   to be pushed up.  It's important -- it's important.  It's --

25        MR. JULIAN:  It's important.

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          THE COURT:  -- critical.  And --

2          MR. JULIAN:  And so --

3          THE COURT:  -- so --

4          MR. JULIAN:  -- that brings me to the last point.

5    Subrogation claimants, with whom we used to have a fiduciary

6    relationship with (sic), or supposedly still do, filed a

7    separate brief, and now I'm adverse to them on that.  You asked

8    me on August 14, quote, "If I ask your side and the debtor to

9    brief the question of whether inverse condemnation, as a matter

10   of law, is applicable to this debtor" -- close quote, and I

11   said, yes, that it was an issue of law; no facts.  They now

12   want you to decide that there's some factual issue, Subro does,

13   and I'm not going to be able to stand up here and reply to you

14   in about thirty minutes when they finish.  So I'd like to tell

15   you what I think of it, in advance.

16          These folks are now adverse to us, Your Honor.

17   They're trying to drive our claims down.  They want this to be

18   a disputed issue of fact, unbelieving it'll hurt them in

19   estimation too, but hoping that their eleven billion dollars

20   gets approved and they take the eleven billion of cash from

21   here.  And so we don't make this an insolvent case, they want

22   us in front of Judge Donato, not to have an estimation -- or an

23   inverse ruling.  They want you today not to decide.  That's

24   what their brief says.  We're adverse to them on that, Your

25   Honor.  And it's contrary to the agreements --

PG&E Corp., Pacific Gas & Electric Co.

1      THE COURT:  Well --

2      MR. JULIAN:  -- we had in this court --

3      THE COURT:  -- but the shareholders group, Mr.

4   Johnston, wants me to decide it.  Mr. Johnston, for his group,

5   and Mr. Orsini for --

6      MR. JULIAN:  We want you to decide it.

7      THE COURT:  Well, but so do they; right?  They want me

8   to decide it their way, but they want me to decide it.  So --

9      MR. JULIAN:  But several --

10      THE COURT:  Well --

11      MR. JULIAN:  Several want you to say that there's a

12   disputed issue of fact, and we object to that.  This is an

13   issue of law.

14      THE COURT:  Okay.

15      MR. JULIAN:  It should be resolved.

16      THE COURT:  I -- I'll hear what they have to say about

17   that.

18      MR. JULIAN:  And the idea that they can get their

19   eleven billion dollars and then try to convince you that

20   there's a disputed issue of fact on this, to bring our number

21   down in front of Judge Donato, is just not right.

22      THE COURT:  I guess I don't quite see how that

23   follows.  In other words, you made the point, in your

24   opposition to the Subro motion -- I mean to the RSA motion,

25   that they're trying to cash out.  And I believe the debtor's

PG&E Corp., Pacific Gas & Electric Co.

1    response to this -- well, those can be negotiated positions.

2    And so, I mean, what -- how could I -- in your mind, could I

3    ever confirm a plan that leaves the debtor without cash, or

4    with no cash-cash to pay your client?

5              MR. JULIAN:  Equity.  When --

6              THE COURT:  Well, okay, but that goes back to --

7              MR. JULIAN:  Stock.

8              THE COURT:  -- value.  What if the equity goes up in

9    value?  You'll be happy to have it.  I mean, I understand.  I'm

10   not being naive here.

11             MR. JULIAN:  I can't tell you what's gone on in

12   mediation.

13             THE COURT:  No, that's right, and I don't want you to.

14   But my point is that adequate -- I mean, "indubitable

15   equivalent" talks about cash or equivalent and, if you had

16   equity that was indubitable, then it might not be -- it's not a

17   big deal if it's indubitable.  I grant you that we don't know

18   what that is here in this case, so leave it --

19             MR. JULIAN:  I'd like to address that on December 4.

20             THE COURT:  Yeah.

21             MR. JULIAN:  For today, my point is, our view legally

22   of West is different than them.  We think it is controlling.

23   We think the fact that they didn't want to address it is

24   important.  We think the fact that they didn't go to the

25   Supreme Court again like they could have, shows that they're

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   forum-shopping.  And this Court should not be used to forum-
2   shopping.

3         THE COURT:  Well, "forum-shopping"'s one of those
4   pejorative terms.  I've never heard anybody complimented for
5   forum-shopping.  But I believe that debtors are entitled to
6   access to the federal court in bankruptcy, and federal courts
7   have to take the debtors as they find them.

8         MR. JULIAN:  Not when they're asking the bankruptcy
9   court to predict what the Supreme Court would do, when they've
10  been in front of the Supreme Court on petitions twice before.
11  I disagree, Your Honor.

12        THE COURT:  Well, but that's a different argument.
13  But I want to --

14        MR. JULIAN:  Yeah.

15        THE COURT:  -- go back to -- just so I -- because I
16  can't keep track of all these briefs.  So then just remind me
17  the name of the case that -- the case that you're relying on --

18        MR. JULIAN:  West?

19        THE COURT:  No, no.  On page 3 -- you said on page 3
20  there's another case.  And I've --

21        MR. JULIAN:  Yes.

22        THE COURT:  I've got all these briefs here, but I'm
23  just not keeping track of all of them together here.  So --

24        MR. JULIAN:  Not on point, Your Honor, because it's
25  exhaustion-of-administrative-remedies case.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          THE COURT:  Yeah, see, that's right; the exhaustion-

2     of-remedy case.  So --

3          MR. JULIAN:  It's page 3, line 10; Abelleira v.

4     District Court of Appeal.

5          THE COURT:  On -- oh.  Okay.  Give me one second.

6     I'll turn the clock off.

7          MR. JULIAN:  Not going to be right on point.

8          THE COURT:  I'll turn the clock off for a minute.

9          No -- well, see, I'm looking at your table of cases.

10    Tell me again the name you just --

11         MR. JULIAN:  Abelleira.

12         THE COURT:  Abelleira.  But it's not in your table --

13    oh -- no, it's not in your table of cases.  So what am I

14    missing?  And did I miss -- no, I'm sorry.  I beg your pardon.

15    I stand corrected.  I'm reading the wrong brief.  Never mind.

16    I got you.

17         MR. JULIAN:  Yeah, it's the first case on the table of

18    authorities.

19         THE COURT:  Yeah.  No, I was --

20         MR. JULIAN:  Your Honor --

21         THE COURT:  I grabbed the wrong pile.

22         MR. JULIAN:  -- what I would like to do is turn the

23    podium over to David Rivkin, our constitutional-law expert from

24    Washington, DC, who's written the rest of the brief and will

25    get into the merits of the brief that are beyond West.

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  Okay.  Thank you, Mr. Rivkin -- or Mr.

2  Julian, rather.  Excuse me.  And --

3    MR. RIVKIN:  Thanks, Bob.

4    THE COURT:  -- once --

5    MR. RIVKIN:  David Rivkin on behalf of the --

6    THE COURT:  Mr. Rivkin wait one second.

7    Yeah.  Okay.  Mr. Julian, I stand corrected.

8  Abelleira is the very first case cited on your table of

9  authorities.

10    Okay, Mr. Rivkin --

11    MR. RIVKIN:  Your Honor --

12    THE COURT:  -- good morning.

13    MR. RIVKIN:  -- it's a pleasure to be with you.

14    THE COURT:  Welcome to the party.

15    MR. RIVKIN:  How much time do I have?

16    THE COURT:  How much time do you want?  We're kind of

17  loose on the time.

18    MR. RIVKIN:  I would appreciate if -- get an

19  opportunity to enlarge time a bit, since I think that would be

20  helpful in your quest to find the markers.

21    Let me begin by trying to answer the question, Your

22  Honor, as totally put forward, regarding why legislature did

23  what it did.  One point I would like to make a bit out of order

24  is that automatic cost recovery, which Mr. Orsini has pled is

25  supposedly so fatal to inverse-condemnation doctrine, is a

PG&E Corp., Pacific Gas & Electric Co.

1   chimera; it does not exist, Your Honor, in the utility world.

2   Every single expenditure, ordinary or capital, is subjected

3   essentially to prudency review, in the case of California,

4   under Section 451. That is the case. There's absolutely

5   nothing unique about inverse-condemnation-related costs.

6        I would also commend Your Honor for pointing out that

7   legislature indeed could not have changed Article XIX; could

8   have easily changed the statute dealing with public utility,

9   because they -- not only they didn't; it's interesting; if you

10   look at the mechanics of AB 1054, the way -- you draw the money

11   from the fire fund, but you are still liable to put them back

12   if you are not subject to -- if you cannot demonstrate the same

13   standard the PUC uses.

14        THE COURT: The prudent standard?

15        MR. RIVKIN: The prudency standard.

16        THE COURT: So, imprudence; you pay?

17        MR. RIVKIN: That is --

18        THE COURT: Right?

19        MR. RIVKIN: You draw and then you put back.

20        THE COURT: Okay.

21        MR. RIVKIN: So, shows you manifestly the marker is

22   the political branches of California, as recently as several

23   weeks ago, understood what the law of the land is. And by the

24   way, everybody -- I'm going to spend most of my time talking

25   about what the State of California law is and why it's binding

PG&E Corp., Pacific Gas & Electric Co.

1    here; maybe spend twenty seconds talking about what I think is

2    the takings-and-substitute-process argument.  One thing I

3    wanted to dramatize, despite some musings from PUC members:

4    everybody in California, Your Honor, understands what the state

5    of the law is; both political branches do, and certainly the

6    government and legislature; so does PUC, which is why they're

7    praying desperately to change the law, and making this prayer

8    here, masquerading as a legal argument.  It's really,

9    essentially, a policy pleading.  Now --

10   THE COURT:  Well, they haven't intervened.  They

11   haven't made -- they haven't come and asked me to do anything.

12   MR. RIVKIN:  Well, they're in effect asking you to

13   engage in a policymaking exercise, which would not be

14   appropriate for any court, even aside from Erie choice

15   function.

16   I'm not going to quote from Article XIX since you

17   mentioned that you looked at it many times.  There's really --

18   THE COURT:  Well, it's mercifully short.

19   MR. RIVKIN:  Mercifully short and to the point.  It

20   mentions nothing about socialization.  There's no question that

21   under California -- provision of electricity is a public use.

22   Our brief cites nearly a dozen decisions.  And it, to that

23   effect, should be the end of the matter, because PG&E is

24   carrying out a public use; it's liable for any property damage

25   that it has caused; end of story.  And I'm going to try very

(970) 406-1775   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    briefly to socialize, no pun intended, why it works this way.

2          PG&E says, no, it doesn't work for us, because we're a

3    privately-owned utility and this is all precedented with

4    Barnham and PacBell.  This is dead-wrong, Your Honor.

5    California Supreme Court ruled 125 years ago, in a case called

6    Eachus that we cite, that private parties charged by the state

7    to carry out public uses is subject to inverse condemnation.

8    That, in fact, Judge Montali, is what motivated framers of

9    Article XIX to write it the way it is.  It's been mentioned in

10   our brief; the immediate goal was to stop private railroad

11   companies, which are what?  Not electric utilities but private

12   companies providing public service from taking land, providing

13   compensation.  From the very, very beginning, that was the

14   case.

15          MR. RIVKIN:  And then we take you to the 1911 Supreme

16   Court case called Gurnsey.  And guess what happened in Gurnsey?

17   You had an electric utility that aggrieved the property owner

18   by unduly enlarging the right of way.  And what did the Supreme

19   Court do?  They subjected them to inverse condemnation.

20   Suddenly, California's Supreme Court recognized that electric

21   utilities have to pay damage caused by their equipment.  It was

22   obvious that the private utilities were subject to the same

23   rule.

24          THE COURT:  And which case is that, please?  I'm just

25   looking at your table.

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    MR. RIVKIN:  It's Gurnsey, G-U-R-N --

2    THE COURT:  Okay, Gurnsey, Gurnsey, like the cow.

3    MR. RIVKIN:  Yes.

4    THE COURT:  Got it.

5    MR. RIVKIN:  So 1894 Ecos (phonetic)?

6    THE COURT:  Yeah, I've got it.

7    MR. RIVKIN:  And 1911 Gurnsey.  I will skip how many

8  times California Supreme Court has refused to hear appeals.

9  That point does not need to be belabored.  What I would say is

10  that the facts that we have here -- and it's not just West

11  (phonetic).  It's not just Stillner (phonetic).  The leading

12  precedent, of course, in the Ninth Circuit, as far as we're

13  concerned is In re Kirkland (phonetic).

14    The interesting thing In re Kirkland was that you had

15  four appellate court decisions, where you went one way, the

16  oldest one went another way.  So we had a bit of mixed bag, as

17  far as statements from either the appellate court decisions.

18  What does Kirkland do?  It applies during the theory choice the

19  decisions of the three appellate courts.

20    What we have here, Your Honor, given the fact plain

21  language of Article XIX, given Gurnsey, given Ecos, given all

22  the other decisions -- and I'll get to socialization in one

23  second.  I have never seen, since the time I started practicing

24  law in '85, a state court that, frankly -- state-court

25  decisions, statutory language, constitutional language that was

PG&E Corp., Pacific Gas & Electric Co.

1    so crystal clear.  There's really no choice to be made.  The

2    word is, here, choice.  It's just recognizing what's out there.

3         Now, I mean, I hate to waste your time on American

4    Tower.  It was mentioned primarily by Mr. Orsini.  If you look

5    at the facts there, that's a 2014 case from the nine -- the

6    Ninth Circuit.  You have public notice requirement.  By law

7    language in the statute, the Supreme Court does not rule in it.

8    It's certainly nothing comparable to the record of the Supreme

9    Court over a hundred years, a mere footnote.  And then you have

10   an appeals court that clearly misread violating a cannon of

11   surplusage, clearly misread the statutory language.  Nothing,

12   nothing like this is comparable there.

13        THE COURT:  Mr. Rivkin, can you just take one second?

14   Mr. -- because --

15        MR. RIVKIN:  Let me brief --

16        THE COURT:  Okay, go ahead.  I just needed to get some

17   more paper.

18        MR. RIVKIN:  Let me briefly walk us through the

19   socialization argument, which is important.  And I'm afraid

20   that Mr. Orsini wrong and if I had an hour, I would've

21   described all the ways he is wrong, but let me at least

22   highlight --

23        THE COURT:  No, you can't have an hour to do that.

24        MR. RIVKIN:  No, I'm jesting.  The key point here is

25   that all the references to cause socialization -- and I think

PG&E Corp., Pacific Gas & Electric Co.

1   from Your Honor's questions, that point has already been

2   made -- are referenced as a feature of inverse condemnation.

3   It does not mean that it is a prerequisite of inverse

4   condemnation.

5           And the whole -- and even understood as mere

6   descriptors of what happens in inverse-condemnation mode.  A

7   fundamental problem is for PG&E is that cost socialization does

8   not mean putting things in an aid base.  The fundamental

9   purpose of inverse condemnation, the whole doctrine -- which,

10  by the way, is not judicially created.  It is in the

11  Constitution -- is that an individual property owner who is

12  aggrieved by something that has befallen him or her, by virtue

13  of a public use --

14          THE COURT:  Right.

15          MR. RIVKIN:  -- should not bear a disproportionate

16  portion of a burden.  It is in that sense that socialization

17  matters.  It is not in the sense that you're supposed to be

18  able to put things in your aid base and you're supposed to be

19  able to obtain assured course recovery.

20          THE COURT:  Well, but a public entity does it in its

21  tax base, right, as a matter of law?  I mean, in fact, I

22  presume even if a governmental unit is grossly negligent, it's

23  still -- it still has to raise the taxes to pay for the

24  problem, right?

25          MR. RIVKIN:  Actually, Your Honor, I would say that

PG&E Corp., Pacific Gas & Electric Co.

1    that is not always the case.  That's an obvious chimera, so I

2    mentioned --

3            THE COURT:  Well, it might be a chimera, but how do

4    you -- you know, if something goes wrong and something burns

5    down the fire department, who builds a new fire house?

6            MR. RIVKIN:  I'll answer the question.  In the

7    dramatic situation that something burns down, you have to

8    rebuild it.  But there are a lot of people in this country who

9    have seen how publicly-owned utilities -- Detroit comes to

10   mind, Flint comes to mind -- then presented with serious

11   problems, require additional money, Your Honor, do not put

12   their rates up.  Because while they're not subject to PUC

13   regulation --

14           THE COURT:  Okay.

15           MR. RIVKIN:  -- they're subject to regulation by their

16   political masters.  People of Flint would be very surprised

17   that they didn't get a new water treatment facility built and

18   suddenly put in their aid base.  My point is, in the alpha and

19   omega of the utility world, nothing is guaranteed.  You have

20   multiple layers of review, multiple bites of the apple.

21           By the way, there's a wonderful footnote -- Footnote

22   6, if I'm not mistaken, in Barnham which talks about the fact

23   that it would be passing strange if you suddenly put public

24   utilities under PUC jurisdiction, which California law allows.

25   Under the logic put forward by folks like PG&E, all of a sudden

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    they would be able to escape the consequences of inverse

2    condemnation.  So it is not -- it's socialization of cost

3    understood as you have a public use and you have a public

4    improvement that all the citizens of California enjoy.  You are

5    not supposed to have one or two of them bear the burdens.

6    That's what it means.

7          Now I'm not going to get into the point about why --

8    even if cost socialization was required, why it has not

9    happened.  I think Your Honor has gotten into this quite a bit.

10   Let me very briefly address PG&E constitutional arguments,

11   which is my main forte.

12         THE COURT:  Well, one of them I think that you

13   addressed in your brief is that this compensation that they

14   have -- nothing's being taken from them.

15         MR. RIVKIN:  Yes, yes.

16         THE COURT:  I mean, they -- if I read the brief, it

17   sounds like there were tears in his eyes from all the things

18   that are being taken away, but nothing's being taken away.

19         MR. RIVKIN:  That is absolutely true, Your Honor --

20         THE COURT:  Right?  Okay.

21         MR. RIVKIN:  -- and I can quote Easton Enterprises or

22   I can make a more common sense point.  Under PG&E's view of the

23   world, every single provision of a tort law is a taking.  And

24   tort law has negligence, has heightened standard of liability,

25   and then it has strict liability.

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  But the due process argument -- the due

2    process argument's a different argument, right?

3    MR. RIVKIN:  No, no.  I understand, but my point is

4    that if we were right, then strict liability in tort law -- I

5    mean, let me put it this way, it's a blessing to be a private

6    utility that at least has a realistic shot at cost recovery,

7    because if Your Honor was a private citoyen and you were

8    subject to horrendous strict liability that absolutely

9    destroyed you, you wouldn't even have a shot at passing this

10   through.  Gee, would that violate substantive due process, as

11   if you rational -- substantive due process is a very forgiving

12   test.

13       The teaching of Lee Optical, which was a leading

14   Supreme Court case, the teaching of Burlington Northern, which

15   is the leading Ninth Circuit case, merely says a rational basis

16   between what the government is seeking and what is it doing.

17   And gee, why is it irrational to say, look, you're a utility.

18   You're not a charity.  You're making a lot of money off the

19   citizens of California.  You have preferential ability to

20   access capital markets.  You give bailouts like AB 1054.

21   You've got to take the good with the bad.  We're going to

22   subject -- restrict liability, so sorry.

23       And the notion, by the way, Mr. Orsini, but they were

24   surprised by -- well, wait, there's -- I would urge Your Honor

25   to look at it carefully.  There's absolutely no language in

(970) 485-8876 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    Pacific Bell that says we expect you to get cost recovery.  It

2    says you're not putting the evidence forward that you wouldn't.

3    But the notion that PG&E, a company, a utility, for whom the

4    most important thing in life is understanding regulatory law,

5    is surprised there's something called chapter -- or Section,

6    forgive me, 451, that guarantees cost recovery?  And they were

7    surprised that PUC in California and every other PUC in the

8    land does essentially a reasonableness and prudence review?  It

9    cannot be, Your Honor.  It's absolutely, absolutely

10   implausible.

11          And as far as the rationality here, which is, as I

12   said, a very forgiving argument, so why is it rational for the

13   people of California, for elected representatives to conclude

14   you've got to take the good with the bad.  You're going to make

15   a lot of money.  You're going to -- guaranteed rate of return

16   for those things that we do put in the rate base, but you're

17   going to bear strict liability and, you know, hopefully you

18   will work with regulators to make sure that your facilities are

19   done in a way that minimizes most problems.  And if you get in

20   trouble, we may bail you out.  It certainly is rational.

21          Now as far as Eastern Enterprises is concerned, you're

22   correct, paying monetary damages to parties other than the

23   government is never a taking.  There is the ripeness problem.

24   And one more point here, Your Honor, going back to federalism

25   and comity, which Bob mentioned, if you assume that PG&E's

                    PG&E Corp., Pacific Gas & Electric Co.

1    taking argument is right, then you have to assume that the

2    Commission, if presented with this argument, would allow PG&E a

3    sufficient cost recovery to avoid a constitutional violation.

4    I think on the principles of federalism and comity, no federal

5    court can ever assume that the state governments follow the

6    law.

7             And another point to mention, which I know we make in

8    our --

9             THE COURT:  And I need you to wrap up, because I have

10   one other counsel --

11            MR. RIVKIN:  Yes, one -- one final point, it's

12   important to remember that the government can take property.

13   It can pay compensation.  Even if there is a taking here, there

14   is not a taking inherently, a ripeness problem -- the Neat

15   (phonetic) case and even Williamson County, which had

16   modified --

17            THE COURT:  Yeah, the Neat case is the case that I

18   just thought about recently.

19            MR. RIVKIN:  Yes, I thought so, when you talked

20   about -- the proper remedy is not equitable relief.  And

21   anyway, all of that stuff, if their beef is with anybody, it's

22   with the State of California.  It's not with us.  Thank you,

23   Your Honor.

24            THE COURT:  Thank you, Mr. Rivkin and welcome to the

25   court.

PG&E Corp., Pacific Gas & Electric Co.

1    Mr. de Ghetaldi, are you going to close for us?  Where

2    are you?  Thank you for your history lesson, Mr. de Ghetaldi.

3    UNIDENTIFIED SPEAKER:  Your Honor, we actually have --

4    we have two more.

5    THE COURT:  Oh, two more.  I'm sorry.  Oh, yes, excuse

6    me.  I'm sorry.  I forgot about the subrogation, my error.

7    MR. DAVIS:  Your Honor, Joseph Davis, Willkie, Farr

8    and Gallagher, for the subrogation claimants.  I'm also from

9    D.C., but I don't count myself a constitutional scholar, sorry.

10    Okay, is that better?

11    THE COURT:  That's better.

12    MR. DAVIS:  So I'm going to focus a bit on the

13    procedural posture we're in, which relates directly to how the

14    Court should view the issue before it.

15    But I want to start by responding to Mr. Julian, whose

16    comments were quite a surprise.  And you know came after we,

17    the subrogation claimants, worked with him and his partner, Mr.

18    Rivkin, made substantial contributions to his briefing.  There

19    was lots of opportunities to have discussion about what our

20    position was.  And essentially, he misstated our position.  Our

21    position is not that you can't rule for us, for the TCC or the

22    subrogation claimholders who have supported their position.

23    Our point is that because the debtors are relying on

24    disputed questions of fact in the context of this -- what is

25    supposed to be an estimation proceeding deciding a "pure issue

PG&E Corp., Pacific Gas & Electric Co.

1    of law", you cannot rule against us.  You can rule for us.  You

2    cannot rule against us the way they have postured this

3    argument, okay?

4         Now that's true really for two reasons.  First of all,

5    they presented this issue in the context of a 502(c)

6    estimation.  And the purpose of estimation is not to adjudicate

7    the claims, per se, right?  The purpose is to understand the

8    value of those claims.  And that means understanding, right,

9    what would've happened in the California courts, had the

10   bankruptcy never occurred, right?  It doesn't mean and doesn't

11   permit disallowing billions of dollars' worth of claims on

12   speculation about what the California Supreme Court might do.

13        On the contrary, we already know what would've

14   happened if these claims had gone to the California courts.

15   They would have gone to trial, absolutely.  They admitted in

16   their papers that's what would have happened.  So the notion

17   that you could disallow billions of dollars in values of claims

18   on the speculation that someday in the future, something

19   different might happen just doesn't fly.

20        THE COURT:  Well, I don't -- I don't follow you.  So

21   if they'd gone to trial and there had been a substantial

22   judgment against the utility based upon inverse condemnation,

23   on appeal, the California Supreme Court might have reversed

24   that.  It could've, right?

25        MR. DAVIS:  In theory, it's possible that that

PG&E Corp., Pacific Gas & Electric Co.

1  could've happened, but to say that those claims have no value,

2  PG&E has never taken one of these cases all the way through

3  trial, up to appeal.

4          THE COURT:  Well, okay, but --

5          MR. DAVIS:  Never in history has this occurred and

6  there's a reason for that.

7          THE COURT:  Well, I understand and I've heard that

8  before.  I'm not questioning that.  But I'm questioning your

9  statement about I can rule for you, but not against you.  I

10 don't -- it seems to me that if Mr. Orsini persuades me to make

11 a prediction, the prediction would be that the inverse-

12 condemnation theory fails and it's not available.  That doesn't

13 mean that Judge Donato couldn't make estimations based upon

14 negligence, right?

15         MR. DAVIS:  Well, that's certainly true.

16         THE COURT:  Well, whether --

17         MR. DAVIS:  But the notion -- that is certainly true.

18 But the notion that the inverse-condemnation claims, as they

19 sit here, have no value is -- doesn't comport with the reality

20 of what would've happened outside of bankruptcy court.

21         THE COURT:  Well, but aren't we back to the question

22 of my job is to make a prediction?  And if I predict that the

23 Supreme Court would toss the doctrine, then they have no value.

24 Right?

25         MR. DAVIS:  Well, I --

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  And then when you go back to the case law

2  on estimation, courts have estimated claims at zero and been

3  affirmed because that is a reasonable estimation, based upon

4  whatever arguments and facts are presented to that trial court.

5    MR. DAVIS:  Yes, in circumstances that are exactly not

6  like this.

7    THE COURT:  Well --

8    MR. DAVIS:  Only in circumstances where the law is

9  crystal clear, that the claims are going to fail and that

10  there's no value to those claims, not in a circumstance where

11  the law is crystal clear that the claims are going to go to

12  trial and succeed, in that sense.

13    THE COURT:  Well, but I'm still confused.  Look, for

14  reasons that we don't have to go into, there was a -- there's

15  been a bifurcation between two judicial officers.  And this

16  judicial officer was told, and agreed, that there are certain

17  things that I'm not permitted under the law to do.  But there's

18  certain things that I am permitted to do, including make legal

19  rulings.  And Judge Donato, I believe, has been deferential to

20  that role, also.  And that's why he's having all this time with

21  an estimation, the kind of stuff he talked about yesterday and

22  every other hearing.

23    And to me, if I predict that the California Supreme

24  Court would go Mr. Orsini's way, then my ruling here would be a

25  prediction that inverse condemnation is a losing theory.  That

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   doesn't mean the estimation's over.  It means the estimator

2   accepts that and takes it into account and makes an estimation

3   based upon the fact issues that are presented to him, I think.

4   I mean, tell me if I'm wrong about that.

5           MR. DAVIS:  Well, I -- well I actually think that's

6   not what PG&E's asking to do.

7           THE COURT:  Okay.

8           MR. DAVIS:  If you take it from PG&E's perspective,

9   they're asking you to value these claims at zero, is what

10  they're asking to do.

11          THE COURT:  I'm not -- value the legal theory that

12  strict liability with -- absent fault produces no liability.  I

13  believe that's -- Mr. Orsini will have a chance to clarify, but

14  I -- that's how I interpret his argument.  But the flip side of

15  that is if I disregard his argument, then inverse condemnation

16  has significant value.  So I mean, it's -- as you know, it's a

17  huge value.  And so it's a question of likely prediction, based

18  upon everything we've been talking about today, what Mr. Rivkin

19  just explained and -- and everyone else did.  I mean, why --

20  what -- that seems to be my marching orders, make a call up or

21  down on that principle.

22          MR. DAVIS:  Well, I think in the context of

23  estimation, they haven't cited and I have not seen a case where

24  a court has said these claims on this -- because of this legal

25  issue, where all of the courts that would have heard this case

PG&E Corp., Pacific Gas & Electric Co.

1    outside of bankruptcy have affirmed the doctrine, have affirmed

2    the basis for relief, could say effectively, in the context of

3    estimation, I'm going to disallow it.  If what Your Honor's

4    telling you is that's not what's going to happen there -- here,

5    in any event, then I accept that.  But what I'd like to do is

6    talk a little bit more about the factual issues that they have

7    tried to interject here.

8              THE COURT:  Okay.

9              MR. DAVIS:  Right, because you know, the linchpin of

10   their argument is what they term "cost-spreading".  And so --

11             THE COURT:  Well, that's what I take as the

12   philosophical underpinning for the concept of inverse

13   condemnation, which Mr. Rivkin doesn't agree with, but that's

14   what I'm hearing, the argument.

15             MR. DAVIS:  Right.  And what -- and their argument is

16   that they cannot automatically engage in cost-spreading based

17   on a CPUC decision.  But whether or not PG&E can or can't

18   engage in cost-spreading is a question of fact and it's

19   disputed.  And no one has had any kind of opportunity to

20   adjudicate that in any way.

21             THE COURT:  Well, they had --

22             MR. DAVIS:  All they're doing is pointing to a single

23   CPUC decision.

24             THE COURT:  But I -- I guess I disagree with you.  If

25   I'm persuaded that the California Supreme Court would not apply

PG&E Corp., Pacific Gas & Electric Co.

1   the doctrine of inverse condemnation, then the legal result

2   would be that unless PG&E is found to be negligent or culpable

3   in some other way, it doesn't have liability for the fires.

4   But if it's strictly liable, as a matter of inverse

5   condemnation, then it is liable, whether it's shared -- whether

6   it's cost recovery or not, at some point in the future.

7           In other words, if I accept Mr. Julian's argument,

8   which is essentially your argument also, that the doctrine

9   applies, therefore PG&E is on the hook, period, like the act of

10  God in the Getty fire.  In other words, I think Mr. Orsini is

11  conceding the point that if PG&E caused the Getty fire or PG&E

12  was the provider in the Getty fire and there was a lightning

13  strike, they still have strict liability if the doctrine

14  applies.

15          MR. DAVIS:  Right.  But the reason they're saying the

16  doctrine shouldn't apply is because in theory, they can't cost-

17  spread.

18          THE COURT:  No, they're saying because it doesn't

19  apply to private utilities.

20          MR. DAVIS:  Because they can't cost-spread.

21          THE COURT:  You never get to cost-spreading if private

22  utilities simply are not vulnerable to inverse-condemnation

23  jurisprudence or principles.

24          MR. DAVIS:  Well, on that point, you know, just coming

25  back to this American Tower case that they're citing and the --

(973)406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    there was a datum point in that case and the datum point was a

2    statute that the court was able to look at and make a decision

3    on.  As I think Your Honor pointed out, the datum point in this

4    case is the Constitution.  That's where this comes from.

5             THE COURT:  Well, there's a bunch of data points.

6             MR. DAVIS:  We keep calling it a doctrine.  I realize

7    that --

8             THE COURT:  There's a laundry -- a bunch of data

9    points.

10            MR. DAVIS:  What was your term?  I'm putting them in

11    order.  I think we usually start with the language of the

12    Constitution, which as you pointed out, says nothing about who

13    does the taking.

14            THE COURT:  Right.

15            MR. DAVIS:  It says the taking is for a public use and

16    that it should be compensated.  And in fact, if you look at the

17    rest of that provision, it's interesting because it does speak

18    to state agencies.  In fact, it even defines the terms "local

19    government" and "state agencies" and yet, in that provision

20    that we're talking about, does not reference those as takers.

21            THE COURT:  Right, right.

22            MR. DAVIS:  So I think we're seeing eye-to-eye at

23    least on that point.

24            THE COURT:  Well, listen, I was of the opinion,

25    reading your brief, that you were lined up completely with the

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    TCC.

2            MR. DAVIS:  Absolutely.

3            THE COURT:  But you made the statement that I can only

4    rule for you but not against you.  I guess I found that

5    strange.  I don't quite understand it, but --

6            MR. DAVIS:  Just to be crystal clear about it, the

7    reason is that their arguments based on the CPUC decision and

8    based on their ability or inability to cost-spread as the

9    fundamental policy rationale for changing inverse-condemnation

10   law, those arguments rest on facts.

11           Let me just give you one example, because it touches

12   on something you mentioned before.  Their argument is that they

13   shouldn't be subject to strict liability.

14           THE COURT:  Right.

15           MR. DAVIS:  They shouldn't be responsible for

16   automatically paying these costs if they are not negligent.

17   That's the way they framed this argument, right?

18           THE COURT:  Correct, yes, yes.

19           MR. DAVIS:  And they rightly pointed out in the CPUC

20   decision, there's abundant evidence of negligence.  So there is

21   not one case -- they cannot point to one case where they can

22   definitively say an IOU was not negligent and yet, also held

23   strictly liable for inverse-condemnation costs.  Not one case.

24   And it's clear --

25           THE COURT:  That's correct.  That's correct.  I -- I

PG&E Corp., Pacific Gas & Electric Co.

1   said --

2          MR. DAVIS:  -- you read -- it's clear.  You read that

3   opinion.

4          THE COURT:  I said that, right.

5          MR. DAVIS:  Because it goes -- right it goes into

6   incredible detail.

7          THE COURT:  I mean, to me it sounds to me -- I don't

8   know what's in the minds of the commissioners, but it seemed to

9   me that the commission was saying we make the rules here and if

10  we determine that someone is not prudent, then we're going to

11  whack them.  And if we determine that they are prudent, then

12  finish the sentence.  Finish the sentence is they'll probably

13  get their cost adjustments, through their rates.

14         MR. DAVIS:  And very importantly, the prudence

15  determination was in the context of those three specific fires.

16  It looked at each of the fires, heard evidence, fact witnesses,

17  expert witnesses, took briefing.  There was cross-examination.

18         THE COURT:  And came out with a unanimous decision by

19  five commissioners that STG (phonetic) was not prudent.

20         MR. DAVIS:  Exactly.

21         THE COURT:  I almost used the word negligent.  It

22  wasn't.  It was not prudent.  Therefore -- and therefore, I

23  think we know what happened after that.  So okay, anyway -- I

24  need to -- finish your point, but then I need to hear from Mr.

25  de Ghetaldi.

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1        MR. DAVIS:  Okay, so I'll just -- yeah, no, no, I'll

2   just wrap it up.  We agree with the TCC.  California law is

3   clear.  Inverse condemnation applies to PG&E.  The Court can

4   and should reach that conclusion.  But as I said, to the extent

5   the Court wants to credit, you know, the facts on which PG&E is

6   relying to suggest otherwise, it shouldn't be able to do that

7   in this procedural posture, but either way, the Court should

8   deny the relief that PG&E has requested.  Thank you.

9        THE COURT:  Okay, thank you very much.

10  All right, Mr. de Ghetaldi.  Now, our history lesson.  And I

11  think Mr. Julian said you had fifteen minutes.  I'll give you

12  the fifteen.  If you don't need it, that's fine, too.  I don't

13  want to have another one of our marathons through the midday

14  lunch.  Go ahead.

15        MR. DE GHETALDI:  I'll try not to, Your Honor.  Thank

16  you.  Dario de Ghetaldi, from Corey, Luzaich, de Ghetaldi and

17  Riddle.

18        Your Honor, we represent these days almost 6,500

19  victims of these PG&E fires.  I think that's the second-largest

20  voting bloc of victims.  So this is primarily a California

21  constitutional and statutory issue.  That's why I tried to

22  confine my brief to those boundaries.

23        I've been briefing this issue and arguing it since the

24  days of the San Bruno gas explosion and fire.  And up through

25  the Butte fires, it's not the Butte County fires, it's the

(973)406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   Butte fire cases and the North Bay fire cases.  And I thought

2   it was important and critical for the Court to look at four

3   histories, because that's what California courts do when they

4   examine statutes and constitutions, constitutional provisions.

5        I tried to focus on the constitutional history, the

6   statutory history, the judicial history and the regulatory

7   history as it's confined to this issue.  And I think that there

8   are four lessons that those histories show.  First of all, that

9   the public utilities code, the CPUC itself, and inverse

10  condemnation all stem from both statutory and constitutional

11  authority.  That's where they came from.  That's where they're

12  ingrained.

13       Secondly, the public utilities code and the CPUC were

14  created to protect the public from the abuses of monopoly

15  powers that were given to public utilities.  And public

16  utilities are defined, going back to 1911, as including power

17  companies.  And so, with all due respect, one of the issues

18  that was raised was market views about -- and the effect on the

19  market.  That's never been an issue in any case that reviewed

20  the validity of inverse condemnation.

21       The third issue, Your Honor, is that California courts

22  have no jurisdiction to control how the CPUC sets rates.  They

23  can only review the decisions of the CPUC to see if there was

24  some kind of an error, whether there was a factual error or

25  some kind of a legal error.  But they cannot set the

(970) 352-7311  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   methodology that the CPUC uses to set rates.

2         THE COURT:  Well, I mean, therefore what?  I mean,

3   neither can the bankruptcy court, but --

4         MR. DE GHETALDI:  That's the point.

5         THE COURT:  But that's not -- but is that the point of

6   this issue?  I mean, I think what the argument on the other

7   side is that strict liability doesn't get you to rates.  It

8   means you can't be punished for something that you're not

9   culpable for.  And your argument and the other side, the TCC

10  and everyone's argument is yes, you can.  That's called strict

11  liability.

12        MR. DE GHETALDI:  It's not a punishment, Your Honor.

13        THE COURT:  Well --

14        MR. DE GHETALDI:  It's not a punishment.

15        THE COURT:  No, it's a something.  It's a something.

16  What is it, if it's not a punishment?  It's a consequence of --

17        MR. DE GHETALDI:  It's a consequence, yes.

18        THE COURT:  -- of doing -- being in the business of

19  providing electricity.

20        MR. DE GHETALDI:  It's a consequence of having a

21  monopoly to produce, distribute, and sell electricity.

22        THE COURT:  Okay, but my point -- I'm not questioning

23  that.  And if you thought I was taking issue with it, I didn't

24  mean to.  What I meant is that's not a rate pay-fixing

25  function.  It's a function of the monopoly, and it goes with

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   the territory, that you have strict liability, right?

2           MR. DE GHETALDI:  Yes, Your Honor.

3           THE COURT:  Okay.

4           MR. DE GHETALDI:  But one of my problems, year after

5   year when this comes up, is what is being challenged?  Is it

6   the power of a court or the legislature or the constitution, as

7   in Article XIX, to say that when there -- when private property

8   is damaged for a public purpose, then there has to be

9   compensation?  Or is it something that arises in the context of

10  a rate-making proceeding, which is what the SDG&E 2007 fires

11  cases was all about?

12          So those two -- I think those are two separate aspects

13  of this issue that tend to get conflated.  And I appreciate the

14  Court's observation that they are separate and apart, but I do

15  believe that the issue has been raised in both of those

16  contexts.  And so, that was my point.

17          THE COURT:  Okay.

18          MR. DE GHETALDI:  All right?  So one of the things

19  that nobody has talked about so far today is the relief that is

20  being requested.  The proposed order that PG&E submitted has

21  two holdings that they requested.  Number one, inverse does not

22  apply to investor-owned utilities such as PG&E under applicable

23  California Supreme Court precedent.

24          We all know that there's no case.  And so, I think

25  that there is --

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  Well, if I just cut off the last half of

2  that sentence, it's still a legal conclusion.  I mean, I'm

3  not -- I haven't made up my mind, obviously.  But the language

4  at the tail end of that proposed order is surplusage.  If I

5  just said -- if I just made a ruling, PG&E is not liable under

6  inverse-condemnation principles, then that would be the end of

7  it, right?

8    MR. DE GHETALDI:  But that's not what they're

9  asking --

10    THE COURT:  I know it's not.  Okay.

11    MR. DE GHETALDI:  -- the Court to do in their proposed

12  order, okay?

13    THE COURT:  Okay, okay.

14    MR. DE GHETALDI:  Okay?

15    THE COURT:  Um-hum.

16    MR. DE GHETALDI:  All right.  So the second -- so

17  Article XIX, as I said, Your Honor, the Court, I believe, needs

18  to focus on the language of that when it looks at the validity

19  of inverse condemnation.  And it's short.  It says -- the first

20  sentence says, "Private property may not be taken or damaged

21  for a public use and only when just compensation, ascertained

22  by a jury unless waived, has first been paid to or into court

23  for the owner."  It's constitutional doctrine --

24    THE COURT:  Right.

25    MR. DE GHETALDI:  -- that has been extended to

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    privately-owned public utilities who engage in activities that

2    damage private property.

3            THE COURT:  Correct.

4            MR. DE GHETALDI:  It seems a simple proposition to me.

5    The second aspect -- the second ruling that PG&E asked the

6    Court to make is that the application of inverse condemnation

7    to investor-owned utilities, such as PG&E would violate the

8    takings and due process clauses of the U.S. Constitution.

9            I'm not going to talk about that, other than to

10   observe that both under the authorities that we cited -- both

11   under California law and federal law, there is no guarantee

12   that private utilities can recover specific rates.  In both

13   cases, the rates have to be reasonable.  And there's a very

14   good discussion, I think, on that issue in the SFPP case that

15   we cited, 217 Cal.App.4th 784, beginning around page 800.

16           So what has always bothered me, and I think that the

17   Court is seeing this as well, is that I think that in the -- at

18   least in the context of rate-making, that inverse condemnation

19   can be a utility's friend.  Because I think as the Court is

20   seeing, if there is a finding only of strict liability under

21   inverse condemnation, without an additional finding of

22   negligence or strict liability, then -- and there's never been

23   a case that I know of where that's actually come to the CPUC

24   because usually there is -- there are other things involved.

25           THE COURT:  Well, usually I presume there is a

PG&E Corp., Pacific Gas & Electric Co.

1   determination of no liability and that's the end of the story,

2   right?

3               MR. DE GHETALDI:  Well, the only case that I know of

4   that is in that neighborhood is the PacBell case, which is -- I

5   call it the bird on the wire case.  A big bird landed on the

6   wire --

7               THE COURT:  Right.

8               MR. DE GHETALDI:  -- and shorted out the wires of a

9   Southern California Edison pole and it damaged a PacBell --

10              THE COURT:  Right, the vault or whatever it was.

11              MR. DE GHETALDI:  The vault, right, right.

12              THE COURT:  Something in the -- something in the

13  ground, right?  Yeah.

14              MR. DE GHETALDI:  Right.  And that's a case that went

15  to the court of appeal, obviously, and the California Supreme

16  Court denied review on.  And this Court knows they also denied

17  reviewing Barnham.

18              THE COURT:  Right.

19              MR. DE GHETALDI:  But the PUC process and the role of

20  inverse condemnation, I would recommend the Court -- and you

21  probably have already, but review the decision on the petition

22  for rehearing in the SDG&E case.  That decision on rehearing

23  contains an extensive discussion of the CPUC's rate-making

24  process, on how it looks at fault, no fault, prudent manager,

25  and I think it clarifies one of the catch phrases that PG&E has

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    fixated on and other utilities have fixated on and that is that

2    inverse condemnation is not relevant to rate-making.

3            It's just different.  It's just different, the way

4    that they do things at the CPUC.  They require, for example,

5    the utility to carry the burden of initial proof that they

6    acted like a prudent manager.  It flips around what it would be

7    for us plaintiff's lawyers in a case.

8            And then if the utility fails to meet that standard,

9    it cannot pass along the cost.  And as I think that several

10   people have, at least intimated, there's no case where a

11   utility has been found to be strictly liable under inverse, but

12   then not found to be negligent --

13           THE COURT:  Right.

14           MR. DE GHETALDI:  -- that came before the CPUC.

15           THE COURT:  That's what they -- they conceded that.

16           MR. DE GHETALDI:  But I think one of the issues that

17   the Court raised that I haven't heard much discussion about is

18   the ripeness issue.  This issue isn't ripe.  I don't know where

19   they are saying that this issue is being raised.  Is it being

20   raised as to all of these fires?  Only some of them?  Is it

21   being raised as to the Butte fire, where it's already been

22   adjudicated?

23           THE COURT:  Well, isn't the absence of ripeness one of

24   the data points that might suggest the Cal Supreme Court

25   wouldn't touch it right now?

PG&E Corp., Pacific Gas & Electric Co.

1    MR. DE GHETALDI:  Absolutely, Your Honor, because the

2 California Supreme Court's jurisdiction and the California

3 Appellate Court's jurisdiction is limited to a review of what

4 the CPUC does.

5    THE COURT:  Well, but come on, let's talk about the

6 real context to where we are now.

7    MR. DE GHETALDI:  Okay.

8    THE COURT:  The fact of the matter is I'm asked to

9 make a ruling.  This is a first-level, lower federal court.

10 There is a procedure, a long one or a fast one, to get the

11 Ninth Circuit to decide to certify it.  And if the Ninth

12 Circuit certifies it to the Cal Supreme Court, I guess the Cal

13 Supreme Court can deny that request by saying it's not ripe or

14 they can accept it and rule up and down on the merits.

15    Now, Mr. Orsini and everybody else knows that we're

16 moving at a very fast pace, here.  And everyone in this case is

17 under some terrible time pressure.  But the fact is that is the

18 way it could go and the Cal Supreme Court would decide to deal

19 with it as a legal question or not.

20    MR. DE GHETALDI:  That's true.

21    THE COURT:  That's true.

22    MR. DE GHETALDI:  That's true.

23    THE COURT:  So, but if I am persuaded that there's

24 nothing ripe, that's another reason to deny the debtors'

25 request here today.

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          MR. DE GHETALDI:  Which is why I raise the point, Your

2    Honor.

3          THE COURT:  Okay.

4          MR. DE GHETALDI:  Which is why I raise the point.

5          THE COURT:  Well, we both did.

6          MR. DE GHETALDI:  Okay.

7          THE COURT:  Okay.

8          MR. DE GHETALDI:  So -- why I re-raised it.  Another

9    thing I wanted to at least clarify, Your Honor, is some of the

10   recent judicial history of this issue.  And it needs clarifying

11   because I've lived through it and I know -- I know what

12   happened.  The Court knows about Barnham and PacBell, a 1999

13   case and a 2012 case.

14         THE COURT:  Right.

15         MR. DE GHETALDI:  Okay.  In the Butte fire cases, we

16   had two hearings in the trial court and a coordination trial

17   judges court.

18         THE COURT:  No, I've read the decisions of the judge

19   there and Judge Karnow here.

20         MR. DE GHETALDI:  Right.  In the first one, there were

21   competing motions -- one by PG&E saying we're not liable for

22   inverse, one by the plaintiff saying PG&E was.  That decision

23   went against PG&E and in favor of the plaintiffs.  PG&E brought

24   a writ.

25         THE COURT:  Right.

PG&E Corp., Pacific Gas & Electric Co.

1       MR. DE GHETALDI:  Right.  The writ was denied.  Then

2  there was a second motion, in which PG&E alleged that there --

3  they called it a renewed motion and a renewal motion, based on

4  new evidence and new law.  That motion was denied.

5       There was a writ that was brought on that one, as

6  well.  That was denied.  And that was -- that writ, there was a

7  petition for review.  The petition for review from an

8  interlocutory writ for the California Supreme Court is the same

9  process, the same standards that the California Supreme Court

10  uses in reviewing an appeal.  It's a discretionary writ and

11  it's a writ that's based essentially on we'll issue,

12  essentially, in two circumstances.  One, where there is a

13  significant issue of law and one -- and two, where there are

14  conflicting decisions of the courts of appeal.

15       And so, I think that whenever the Supreme Court denies

16  one of these writs, it's not just a denial of an interlocutory

17  petition for mandate or prohibition.  It's more significant

18  than that.

19       THE COURT:  Well, again, not to -- I mean, Mr.

20  Rivkin's brief, or Mr. Julian, I don't know who I'd give credit

21  to, their brief, they did lay the sequence out and it just --

22  it's just more evidence to say that their argument about the

23  West case is persuasive.

24       MR. DE GHETALDI:  Right.

25       THE COURT:  Or and may be dispositive, from my point

PG&E Corp., Pacific Gas & Electric Co.

1  of view.

2          MR. DE GHETALDI:  Right.

3          THE COURT:  Let me ask you to wrap up, just so I can

4  make sure I don't --

5          MR. DE GHETALDI:  Okay, very quickly.

6          THE COURT:  -- go through the afternoon.

7          MR. DE GHETALDI:  Very quickly.  Then there is the San

8  Diego Gas and Electric versus the PUC case.  The writ that was

9  taken from the administrative proceedings that --

10          THE COURT:  Right.

11          MR. DE GHETALDI:  -- where the Court has the record

12  of.  In that case, there's a written order by the court of

13  appeal.  It's not published, but there's a written order.  And

14  it's on page 205 of the exhibits to my brief.  And I think that

15  it's -- the Court should consider --

16          THE COURT:  And it denied that writ.  It's denied,

17  right?

18          MR. DE GHETALDI:  That's right.  And then --

19          THE COURT:  I didn't take the time to read every word

20  you submitted.

21          MR. DE GHETALDI:  Understood.

22          THE COURT:  Is there a reason?  Do they explain the

23  reasoning or is it just denied?

24          MR. DE GHETALDI:  They -- yes, they explain the

25  ruling.  They explain --

PG&E Corp., Pacific Gas & Electric Co.

1          THE COURT:  I'll read -- I'll review it.

2          MR. DE GHETALDI:  -- the process and why they ruled

3 the way in which they did.  And then PG&E brought a petition

4 for review from that writ denial and that petition for review

5 was denied on October 17th of this year.

6          THE COURT:  You mean SDC.

7          MR. DE GHETALDI:  I'm sorry, SDG&E, right, right.

8          THE COURT:  Yes and then the Supreme Court -- the U.S.

9 Supreme Court denied it also.

10          MR. DE GHETALDI:  I think the U.S. Supreme Court

11 denied it, right.

12          THE COURT:  And then, as I recall, they resolved it,

13 right?

14          MR. DE GHETALDI:  Yeah, so --

15          THE COURT:  Funny how that happens.

16          MR. DE GHETALDI:  So I think that, you know, Your

17 Honor has to play Carnac here.  But I haven't heard anything.

18          THE COURT:  You know, the younger people don't know

19 about Carnac.  They know how to play Jeopardy!

20          MR. DE GHETALDI:  I know, I know.  Don't get me

21 started on mid-century furniture, which my wife has been

22 looking for.  You know, I grew up and was born in 1950, so

23 it's --

24          THE COURT:  You're a baby.

25          MR. DE GHETALDI:  It makes me feel old.  But anyway,

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    look, this is going to be -- undercurrents of a rational basis

2    test, certainly, and where you have such a long history and

3    where you have the primary purpose of the public utilities code

4    to be -- to protect the people of the State of California from

5    abuses by monopolies, such as these public utilities, I cannot

6    see how any rational basis examination would find that there's

7    any problem with the inverse-condemnation law.

8            THE COURT:  Okay, thank you very much.

9            MR. DE GHETALDI:  Thank you.

10          THE COURT:  I'm going to stick with my words and have

11    Mr. Orsini with some closing comments.

12          Mr. Julian, I want you to be prepared to respond to

13    the point about whether I should do anything under Rule 54(b)

14    or direct appeal, no matter how I rule.  So just be prepared to

15    give me your opinion on that after Mr. Orsini finishes.

16          So, Mr. Orsini, by our agreement, you've got fifteen

17    minutes.

18          MR. ORSINI:  I won't take it, Your Honor.

19          THE COURT:  Okay, well, you've got it if you want it.

20          MR. ORSINI:  On the direct appeal certification, my

21    answer is yes regardless of how you rule.  This is an important

22    issue. It's an important issue of law.  And we think it ought

23    to be certified for direct appeal and ultimately --

24          THE COURT:  Well, you're mixing two concepts.  54(b)

25    allows me to certify and make my ruling final.  And I cited for

(973)406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    that proposition my own decision in the first PG&E case.  Well,

2    what was important was the District Court Judge Walker

3    disagreed with me on the merits but he affirmed my decision to

4    do something that hadn't been done before.  It was a 54(b)

5    certification in the middle of a main bankruptcy case.

6         And so, that means that -- and that cuts both ways,

7    because if I make a 54(b) certification, then it's a final

8    order.  And if somebody doesn't appeal it, they may be stuck.

9    Separate from that, as I did in the FERC adversary proceeding,

10   I recommended a direct appeal to the Court of Appeals and that

11   was accepted by the Court of Appeals.

12        So they're two different concepts and the fact was in

13   the FERC case, it was a final order so, you know, you never get

14   to 54(b).  But here, this would be an interlocutory order.  But

15   I have the authority, under the direct appeals statute to

16   certify for direct appeal an interlocutory order.  So it's kind

17   of --

18        MR. ORSINI:  I understand, Your Honor.  I certainly --

19        THE COURT:  -- it's six of one, half a dozen in the

20   other, but --

21        MR. ORSINI:  I certainly think you should do the

22   latter, certify it for a direct appeal.  We wouldn't object to

23   going the 54(b) route, as you did in the earlier case.  I think

24   there's -- I agree with your decision.  I think there's some

25   procedural uncertainty there.  And given such an important

PG&E Corp., Pacific Gas & Electric Co.

1    issue, I'd hate to get hung up on the procedural issues.  So

2    perhaps certifying it for direct appeal is the easier path.  I

3    don't think there's any --

4            THE COURT:  Well, no, I -- it strikes me that I should

5    do both or neither, but --

6            MR. ORSINI:  And if that's Your Honor's view as to how

7    best to get this expedited for review, regardless of how it

8    comes out, we certainly would not disagree with that.

9            THE COURT:  Well, and if I rule in your favor, you

10   don't want me to do that, do you?

11           MR. ORSINI:  You know what, Your Honor, I do, because

12   it's an important issue.

13           THE COURT:  Okay, okay.

14           MR. ORSINI:  So we'd be perfectly happy -- I'm not

15   going to stand up here and say you can rule for me but not

16   against me.  So either way it comes out, we would support that

17   approach, Your Honor.

18           THE COURT:  Okay, okay.  Thanks.

19           MR. ORSINI:  A couple things quickly, Mr. de Ghetaldi

20   himself explained why there's not a ripeness issue.  It's

21   because there's no guarantee of cost recovery.  Now, you could

22   very easily, and you may disagree with my legal argument, but I

23   think Your Honor is clear on what my legal argument is.  And my

24   legal argument is given what the California Supreme Court has

25   said time and time again about the purpose of inverse, that in

(972) 6-2555   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    a circumstance like this where there is no guarantee of

2    socialization, it cannot apply to us.  I'm not saying it can't

3    apply because ultimately we won't get cost recovery here.  It's

4    the lack of certainty.  It's the lack of a guarantee that goes

5    to the fundamental core of what the doctrine's about.

6           Again, disagree with me, agree with me, but it's not a

7    ripeness issue.  It's a question of our argument as presented

8    is in these circumstances, where we cannot get the same

9    guarantee of cost recovery that the public utility has, that's

10   the basis for the doctrine, can it be applied to us?  So that's

11   the ripeness issue.

12          There's no disputed facts here.  This is a legal

13   determination you can make.  There's certainly no dispute about

14   the fact that we're not guaranteed the cost recovery.  Every

15   single person who argued against me up here today conceded the

16   fact.  There's no dispute on that.  That's the only fact you

17   need to resolve this motion.

18          THE COURT:  But you do concede that history -- history

19   works against you on that theory.  That there's never been a

20   denial of cost recovery when there's been an absence of

21   imprudence?

22          MR. ORSINI:  Never been a denial of --

23          THE COURT:  A double-negative.

24          MR. ORSINI:  I'm not aware of any circumstances --

25          THE COURT:  A prudent utility hasn't been denied cost

operations@escribers.net | www.escribers.net
(973) 406-2250

PG&E Corp., Pacific Gas & Electric Co.

1    recovery under the strict-liability principle.

2              MR. ORSINI:  Not to my knowledge, Your Honor.

3              THE COURT:  Not to your knowledge.

4              MR. ORSINI:  But I don't think that cuts against me,

5    because again, I don't think it's relevant.  I don't think it

6    matters, given that what matters here from our perspective is

7    the absence of the guaranteed cost recovery.

8              THE COURT:  Yeah, the absence of the guarantee.

9              MR. ORSINI:  And it's not a chimera.  You can simply

10   look at Moreland.  Again, as I said before, in Moreland the

11   very reason that the California Appellate Court said the public

12   utility wasn't a governmental entity was precisely because

13   unlike the public utility, it didn't have that guarantee.  And

14   I didn't quite understand Mr. Rivkin's argument about Flint.  I

15   think what he was saying was they may just decide not to build

16   a better water plant.  Well, that's true.  But --

17             THE COURT:  Well, I think he was saying the people

18   that drank the bad water aren't paying for the good water.

19             MR. ORSINI:  That may be true, Your Honor.   But

20   inverse condemnation is about socialization of loss.  And

21   that's the other place where I just fundamentally take issue

22   with Mr. Rivkin's argument.  He suggested what he thought you

23   could glean the purpose to be from an 1890s case and one other

24   case, Gurney (sic).  Again, I'd refer you to slide 2 that I

25   handed up before.  It could not be more clear.  I'm not making

PG&E Corp., Pacific Gas & Electric Co.

1    up what the Supreme Court has said is the important fundamental

2    purpose.  It's their language.  It's right there.

3              THE COURT:  But would you concede that the drafters of

4    Article I, Section 19 didn't give us any --

5              MR. ORSINI:  I would concede that the --

6              THE COURT:  You might have drafted it differently.

7              MR. ORSINI:  I might've drafted it differently.  It

8    says what it says and then the courts have to give meaning to

9    that.

10             THE COURT:  Right.

11             MR. ORSINI:  And the California Supreme Court has

12   given meaning to what that means.  That was not very

13   articulate.  Has given meaning to how that should be

14   interpreted.

15             With respect to West, Your Honor, we did brief that

16   extensively this summer.  There was no -- we're not entitled to

17   a jury instruction here.  There was no admission that we're

18   wrong here.  Certainly, citing American Tower wasn't some

19   admission that Mr. Julian's right about what West means.  To

20   the contrary, as I argued before, American Tower cited to West.

21   Okay, nowhere in West do you see the word dispositive.  Nowhere

22   in West do you see a statement that this Court has to just take

23   the denial of review and run with it.  What it says is that's a

24   data point.

25             THE COURT:  The circuit judges in West probably got

PG&E Corp., Pacific Gas & Electric Co.

1    that reversal from the Supreme Court and said we just got a

2    wrist slap, right?

3              MR. ORSINI:  Well, I --

4              THE COURT:  I mean, they did.

5              MR. ORSINI:  Well, yes, but again, you asked me the

6    question earlier and I think this is the important question.

7    Was there any other data point?  There was no other data point

8    in that case.  And it was a final judgment, which we don't have

9    with any of the PG&E cases.

10             THE COURT:  That's true.  That is true.

11             MR. ORSINI:  So they did get their wrists slapped and

12   I think you would get your wrist slapped here if I had stood up

13   and said, Your Honor, I don't have any other data point.  But

14   here's how I'm telling you, in a -- I do know who Carnac is --

15   here's how I'm telling you the Supreme Court will rule.  But

16   that's not the record before you.  Again, you can disagree with

17   my argument and you very well may.  But there are plenty of

18   data points that would permit you to actually make a

19   prediction.

20             And then, with respect to the laches waiver argument,

21   there's no case that says that.  Let me be very clear about

22   something.  We tee'd up this issue early this summer.  We

23   wanted this issue decided quickly.  The TCC and the subros

24   opposed that.  We did not seek the transfer, using the vertical

25   transfer language, in the state-court system in December,

PG&E Corp., Pacific Gas & Electric Co.

1    January, because we were on the cusp of filing for Chapter 11

2    when a stay would've gone into effect.

3              And we made the decision, right or wrong, that the

4    right way, the most expedient way to get this critical legal

5    issue decided, was through this process, which your Court --

6    which Your Honor absolutely has the authority and indeed, the

7    responsibility to decide under all of the many cases that were

8    cited to you in the context of setting up these estimation

9    procedures during the summer.  Thank you, Your Honor.

10             THE COURT:  Thank you very much.

11             Okay, Mr. Julian, just that one point.  You don't have

12   to -- you can speak from there or from here.  Do you have a

13   vote or an opinion on the two appellate options?

14             MR. JULIAN:  I do.  I'll give it in three parts.

15   First of all, I haven't asked the TCC for their view, but I

16   have a view that will be informative for you.  First of all,

17   the purpose of your determining under Rule 54(b) that this is a

18   final order is so someone can appeal, or it can be certified

19   under Section 158 of the judicial code.  You have the

20   authority -- I think you --

21             THE COURT:  No, actually I don't think it can be

22   certified under the judicial code by me.  I think -- I don't

23   think so.  But that's okay, either way we come out the same

24   way.

25             MR. JULIAN:  Well --

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  I mean, you don't -- do you think I should

2  or should not do a 54(b) certification?

3    MR. JULIAN:  I -- if I may.  My interpretation of

4  54(b) has always been you can make it a final order.

5    THE COURT:  Right.

6    MR. JULIAN:  Then, if I may read, 158(d)2, it gives

7  the Court, the Ninth Circuit, jurisdiction to hear it on

8  certification if you or we certify one of three things.  And

9  all I ask you to do is to -- if you do certify it, to certify

10  it under Section 158(d)2(A)3, not 1 and 2.  Once you get there,

11  I'd like to explain why.

12    THE COURT:  Well, I think you're throwing me for a

13  loop here, because I don't think -- I think it's the -- I --

14  it's -- well, let me catch up with you.  What section are you

15  referring to now?  158 --

16    MR. JULIAN:  158(d)2(A) says that the Ninth Circuit

17  shall have jurisdiction if the bankruptcy court, acting on its

18  own motion, certifies (i)2 or 3.  And I'd like to talk to you

19  about (i)2 and 3.  You have the right to certify to the Ninth

20  Circuit if it's a final order under 54(b).

21    THE COURT:  Okay.

22    MR. JULIAN:  And (i)I says that if the judgment or

23  order involves a question of law as to which there is no

24  controlling decision of the U.S. Court of Appeals or the

25  Supreme Court.  I disagree.  There is controlling decision.

PG&E Corp., Pacific Gas & Electric Co.

1    Two, the judgment or order involves a question of law

2    requiring resolution of conflicting decisions.  I view that as

3    conflicting decisions involving the federal court or the state

4    court.  There are no conflicting decisions, as you heard.

5    But 3 is important.  An immediate appeal from the

6    judgment, order, or decree may materially advance the progress

7    of the case in which the appeal is taken, if the court of

8    appeal authorizes direct appeal.  And that's what I think you

9    should consider doing.  And the reason for that is important to

10   me and, I believe, Judge Donato.  This way, if you certify

11   under that section, it's the Court of Appeal who can read my

12   brief --

13   THE COURT:  No, okay.  I'm going to -- I'm going to

14   correct and tell you I misunderstood something you said before,

15   but now I am going to disagree with the second thing.

16   MR. JULIAN:  Okay.

17   THE COURT:  When you started your discussion of 54(b),

18   which I'm familiar with, you then made a certification.  I

19   didn't think you were talking about the direct appeal.  I

20   thought you were talking about something that district judges

21   can do and that is to certify interlocutory orders under --

22   MR. JULIAN:  54(b).

23   THE COURT:  -- I forget the number.  No, under 1292 or

24   something.

25   MR. JULIAN:  Oh, yeah.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  But my point is, now that I'm focusing on

2  the correct statute, the direct appeal is 158(d)2, but Roman --

3  1, 2 and 3 are three alternatives, but the "and", if the court

4  of appeal authorizes direct, to me is to all three of them.  In

5  other words, it takes -- the trial court or remember, the

6  parties themselves can do what's called a joint certification,

7  even if the bankruptcy judge doesn't do anything.  So you can

8  have a plaintiff versus a defendant and the judge just doesn't

9  do anything and the plaintiff and the defendant could agree to

10 direct certification.

11    MR. JULIAN:  Oh, I see.

12    THE COURT:  And they would make the statement, we

13 think it comes under 1, 2 or 3.  But that little tail after the

14 3 still is the out -- the circuit court can just toss it, if it

15 wants to, either way.  That's the way it's been done in

16 practice.

17    So my point is that your argument, I think, is that

18 you believe under D(iii) that's reason enough to do it.  And I

19 don't disagree with you.

20    MR. JULIAN:  Yeah, I just don't have consent of the

21 client to --

22    THE COURT:  No, I understand, I understand that.

23    MR. JULIAN:  -- recommend that.  I understand where

24 you are.

25    THE COURT:  And I'm not going to make a decision based

(971) 6-5500 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    only on that.  I -- look, I did it in the FERC thing.  I've

2    done it a couple of others -- a couple other cases, not PG&E.

3    I did it and then the Court of Appeals -- in one case, nobody

4    took it up.  In another case, the Court of Appeals denied.  I

5    don't know, that's what happened.  That's all.

6        But the 54(b) is one, I believe, if the bankruptcy

7    court does a 54(b) certification, the appeal is either to the

8    BAP or the district court --

9        MR. JULIAN:  Yes.

10        THE COURT:  And I don't think the district court or

11   the BAP has any discretion, unless they determine that the

12   54(b) certification itself was in error, which is what Judge

13   Walker did in the first case.  I 54(b)'d denial of approval of

14   a disclosure statement.  Like, whoever heard of that being a

15   final order?  But I said it was and he agreed with me.  Then he

16   made the mistake of disagreeing with me on the merits.  The

17   Ninth Circuit had to reverse him on that one.

18        MR. JULIAN:  Well, I think you have plenty of cause

19   under 54(b).

20        THE COURT:  Okay.  I want to thank all -- everyone,

21   all the lawyers, for briefing this very difficult issue.  I'll

22   do my best to do something quickly and dispositively.

23        MR. ORSINI:  Can I just make one quick point, Your

24   Honor?

25        THE COURT:  Mr. Orsini, yes, sir.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1      MR. ORSINI:  Just in response to what Mr. Julian just

2  said.  I just -- I'd say we disagree as to whether or not 1 or

3  2 are appropriate.

4      THE COURT:  It's in the -- 1, 2 or 3.

5      MR. ORSINI:  I understand.  I just wanted to point

6  that out, including because 1 has an or in it that says "or as

7  a matter of public importance."  I think we can all stipulate

8  this is.  So we consent to the approach of a 54(b) --

9      THE COURT:  I think that in the FERC certification I

10  said it's a matter of public importance.

11      MR. ORSINI:  There's no question.  There's no

12  question.

13      THE COURT:  And whatever it was -- and I don't think

14  there's any doubt about it's a matter of public importance.

15      MR. ORSINI:  That's the only point I was rising to

16  make.

17      THE COURT:  Thank you all for your attention today and

18  your hard work on this difficult issue.

19      MR. SKIKOS:  Your Honor --

20      THE COURT:  Yes, sir?

21      MR. SKIKOS:  This is not a controversial issue.

22      THE COURT:  You're sure?

23      MR. SKIKOS:  I'm positive.

24      THE COURT:  I need a name for the record.

25      MR. SKIKOS:  Steve Skikos.  So we have a data sharing

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1 and cooperation agreement.

2        THE COURT:  Yes, I know you do.

3        MR. SKIKOS:  We have three stipulations, two orders

4 have been entered.  The third order is a stipulation --

5 proposed orders of stipulation reproduction of current

6 addresses information, document 4794.

7        THE COURT:  Yeah, he just filed that this morning,

8 right?  Or yesterday.

9        MR. SKIKOS:  Yesterday.

10        THE COURT:  Yeah.

11        MR. SKIKOS:  And we have a limited time in the holiday

12 coming up to get -- deal with the displacement issue and the

13 bar date participation issue.  So if Your Honor could look at

14 that and if it pleases Your Honor --

15        THE COURT:  Did you upload the order?

16        MR. SKIKOS:  Yes, it's uploaded.

17        THE COURT:  Well, I usually sign those on the same

18 day.  I've been here all day.  I'll sign it later today.

19        MR. SKIKOS:  Well, thank you very much.

20        THE COURT:  Thank you.  I appreciate -- I'm glad you

21 were able to work that out.  All right.  We're adjourned.

22 Thank you, everyone.

23        IN UNISON:  Thank you, Your Honor.

24    (Whereupon these proceedings were concluded at 12:30 PM)

25

1                    C E R T I F I C A T I O N

2

3    I, Clara Rubin, certify that the foregoing transcript is a true

4    and accurate record of the proceedings.

5

6

7

8

9

10

11   _____

12   /s/ CLARA RUBIN

13

14   eScribers

15   7227 N. 16th Street, Suite #207

16   Phoenix, AZ 85020

17

18   Date:   November 20, 2019

19

20

21

22

23

24

25



**A**

**AB (2)**
86:10;94:20
**Abelleira (4)**
84:3,11,12;85:8
**ability (6)**
8:9;53:15;59:3,4;
94:19;105:8
**able (9)**
31:8;54:14;80:13;
91:18,19;93:1;104:2;
107:6;133:21
**absence (4)**
114:23;123:20;
124:7,8
**absent (4)**
32:14;54:5;58:16;
101:12
**absolute (1)**
42:7
**absolutely (17)**
25:25;28:18;32:5;
36:9;51:2,4;74:8;86:4;
93:19;94:8,25;95:9,9;
98:15;105:2;115:1;
127:6
**abundant (1)**
105:20
**abuses (2)**
108:14;120:5
**academics (1)**
60:22
**accept (5)**
48:14;76:19;102:5;
103:7;115:14
**accepted (2)**
23:19;121:11
**accepts (1)**
101:2
**access (5)**
44:16;59:12;78:23;
83:6;94:20
**according (1)**
20:24
**account (3)**
10:1;49:21;101:2
**accounting (7)**
9:17;14:16,22;16:4,
23;17:3,6
**acknowledge (1)**
6:13
**acknowledged (1)**
61:19
**across (3)**
34:24;44:3,8
**act (6)**
20:24;24:11;26:3,4,
5;103:9
**acted (2)**
26:1;114:6
**acting (1)**

128:17
**action (4)**
10:2,13,15;18:12
**actions (1)**
31:22;63:12
**activities (1)**
112:1
**actual (2)**
6:8;63:8
**actually (24)**
20:20;21:5,15;26:6;
31:10;33:13,22;34:8;
37:5;38:12,21;41:2,13;
48:20;56:7;58:18;59:7;
78:11;91:25;97:3;
101:5;112:23;126:18;
127:21
**ad (2)**
7:3;64:23
**additional (2)**
92:11;112:21
**address (15)**
13:22;31:1;50:16;
51:24;52:12;62:22;
63:16;77:10,11;79:9,
10,16;82:19,23;93:10
**addressed (6)**
21:3,4,15;35:5;57:6;
93:13
**addresses (1)**
133:6
**adequate (1)**
82:14
**adjourned (2)**
5:6;133:21
**adjournment (1)**
5:5
**adjudicate (2)**
98:6;102:20
**adjudicated (1)**
114:22
**adjustments (1)**
106:13
**administrative (3)**
72:18,20;118:9
**admission (2)**
125:17,19
**admitted (3)**
77:16,17;98:15
**advance (2)**
80:15;129:6
**advanced (1)**
66:13
**adversary (23)**
4:7,24;5:15;6:23;
7:20;8:19,23;9:11,16;
10:3,10;11:17;13:22;
14:3;15:9,11,18;16:3,
24;17:9,16;18:15;
121:9
**adverse (4)**
39:13;80:7,16,24
**advice (1)**

68:17
**advisement (1)**
18:21
**affect (1)**
68:23
**affected (1)**
16:5
**affirm (1)**
76:25
**affirmatively (1)**
32:12
**affirmed (4)**
100:3;102:1,1;121:3
**affirming (1)**
75:9
**affordable (1)**
59:13
**afraid (1)**
90:19
**afternoon (1)**
118:6
**again (34)**
3:23;4:8,10,11;13:3;
17:8;20:15;27:19;33:2,
13;34:12;37:1;39:12;
42:25;43:6;49:15;51:9;
53:17;54:16;66:12;
71:19,21;76:1;78:19;
82:25;84:10;117:19;
122:25;123:6;124:5,
10,24;126:5,16
**against (14)**
11:6;36:12;78:25;
79:1;98:1,2,22;99:9;
105:4;116:23;122:16;
123:15,19;124:4
**agencies (2)**
104:18,19
**agency (1)**
57:18
**agenda (6)**
3:14;4:4,23;5:17;
19:2;49:8
**aggressive (1)**
59:5
**aggrieved (2)**
88:17;91:12
**ago (11)**
14:4;23:6,10,11;
25:15;40:3;52:19;
67:18;74:2;86:23;88:5
**agree (12)**
8:3,6;29:9,9,10;
67:24;76:18;102:13;
107:2;121:24;123:6;
130:9
**agreed (3)**
65:13;100:16;131:15
**agreement (1)**
120:16;133:1
**agreements (1)**
80:25
**ahead (6)**

3:22;61:12,15;69:12;
90:16;107:14
**aid (3)**
91:8,18;92:18
**alive (3)**
74:17,24;75:23
**alleged (1)**
117:2
**allocated (1)**
19:12
**Allow (2)**
14:10;96:2
**allowance (1)**
7:23
**allowing (1)**
14:10
**allows (2)**
92:24;120:25
**almost (4)**
16:16,17;106:21;
107:18
**along (3)**
19:6;24:19;114:9
**alpha (1)**
92:18
**alternatively (1)**
76:8
**alternatives (1)**
130:3
**although (2)**
10:4;56:12
**always (3)**
92:1;112:16;128:4
**ambiguity (1)**
37:16
**amendment (1)**
58:16
**American (12)**
27:4,6,8;46:5;47:3;
78:15,16,18;90:3;
103:25;125:18,20
**among (2)**
21:6;33:15
**amount (2)**
10:22;18:18
**analogize (1)**
22:25
**analysis (4)**
30:24;31:1;43:10;
64:10
**analyzing (1)**
36:19
**and/or (1)**
51:21
**Angeles (2)**
20:23,24
**angels (2)**
54:16,17
**announced (1)**
66:16
**answered (1)**
42:14
**anti-discrimination (1)**

36:10
**apart (1)**
110:14
**appeal (42)**
38:13;51:22;63:19;
64:2,9;65:13,17,19;
67:17;69:20;70:1,16,
16,24;74:15;75:15;
76:12;84:4;98:23;99:3;
113:15;117:10,14;
118:13;120:14,20,23;
121:8,10,16,22;122:2;
127:18;129:5,7,8,8,11,
19;130:2,4;131:7
**appealed (1)**
67:16
**appeals (15)**
66:14;69:4,25;70:6,
24;75:9;76:21;89:8;
90:10;121:10,11,15;
128:24;131:3,4
**appear (1)**
12:12
**appeared (1)**
77:23
**appellant (2)**
65:16;68:6
**appellate (13)**
21:22;22:22;38:17;
57:22;69:16,16;70:2;
89:15,17,19;115:3;
124:11;127:13
**apple (1)**
92:20
**Apples (2)**
69:6,8
**applicable (4)**
66:8,17;80:10;
110:22
**application (3)**
62:22;70:14;112:6
**applied (7)**
26:4;50:12;66:17;
68:4,5;75:5;123:10
**applies (8)**
40:12;68:6;69:17;
72:14;89:18;103:9,14;
107:3
**apply (14)**
23:20;24:14,25;26:6,
12;29:12,16;32:10;
102:25;103:16,19;
110:22;123:2,3
**applying (3)**
41:15;42:15;57:22
**appointed (1)**
13:14
**appreciate (6)**
14:15;19:9;64:7;
85:18;110:13;133:20
**approach (3)**
27:22;122:17;132:8
**appropriate (2)**

Case: 19-30088    Doc# 4819    Filed: 11/20/19    Entered: 11/20/19 13:14:33    Page 135
of 155

87:14;132:3
**approval (2)**
37:6;131:13
**approve (4)**
8:22,22;11:23;15:2
**approved (2)**
10:23;80:20
**approving (1)**
10:12
**arbitrary (2)**
35:21,23
**arguable (2)**
66:2,5
**argue (2)**
22:4;44:4
**argued (4)**
22:16;31:16;123:15;
125:20
**argues (1)**
38:6
**arguing (2)**
50:13;107:23
**argument (42)**
5:18;9:13;18:19;
24:23;36:17;40:12;
67:4;76:19;77:5;78:3;
83:12;87:2,8;90:19;
94:1,2;95:12;96:1,2;
98:3;101:14,15;
102:10,14,15;103:7,8;
105:12,17;109:6,9,10;
117:22;122:22,23,24;
123:7;124:14,22;
126:17,20;130:17
**arguments (6)**
18:19;35:20;93:10;
100:4;105:7,10
**argument's (1)**
94:2
**arises (1)**
110:9
**Aristotle (1)**
54:17
**around (4)**
28:16;30:6;112:15;
114:6
**Article (10)**
57:11;70:5,13;86:7;
87:16;88:9;89:21;
110:7;111:17;125:4
**articulate (3)**
51:12;54:20;125:13
**articulated (1)**
51:8
**ascertained (1)**
111:21
**aside (2)**
59:2;87:14
**asleep (1)**
67:10
**aspect (1)**
112:5
**aspects (1)**

110:12
**Assembly (1)**
60:1
**assess (1)**
27:13
**assessing (1)**
22:12
**assessment (4)**
38:21;42:17;46:24;
47:1
**assignment (1)**
19:7
**assignments (1)**
19:9
**Association (1)**
36:1
**assume (5)**
75:5,8;95:25;96:1,5
**assumes (1)**
30:23
**assumption (1)**
33:25
**assumptions (1)**
39:2
**assured (1)**
91:19
**attack (2)**
67:15;68:21
**attacked (1)**
65:16
**attempt (1)**
73:8
**attempted (1)**
73:8
**attended (1)**
12:10
**attention (2)**
49:5;132:17
**August (4)**
77:18,20,23;80:8
**auspices (1)**
33:20
**authoritatively (1)**
66:9
**authorities (3)**
84:18;85:9;112:10
**authority (8)**
33:24;41:9;42:16;
43:12;108:11;121:15;
127:6,20
**authorize (1)**
70:24
**authorizes (2)**
129:8;130:4
**automatic (5)**
6:7;23:21;68:24;
75:8;85:24
**automatically (2)**
102:16;105:16
**available (1)**
99:12
**avoid (3)**
55:13;73:1;96:3

**await (1)**
14:20
**aware (4)**
5:3;32:25;36:6;
123:24
**away (2)**
93:18,18

**B**

**baby (1)**
119:24
**back (26)**
3:8;17:4,8;24:11;
25:7,9;37:22;45:8;
46:23;48:24;50:9;
51:19;58:23;59:17;
73:9;76:2;78:6;82:6;
83:15;86:11,19;95:24;
99:21;100:1;103:25;
108:16
**bad (4)**
79:15;94:21;95:14;
124:18
**bag (1)**
89:16
**bail (1)**
95:20
**bailouts (1)**
94:20
**Baker (1)**
62:21
**Bakke (1)**
70:10
**ball (1)**
15:18
**bankruptcy (19)**
37:24;45:7;48:25;
57:10;66:4;67:7;73:5;
75:14,16;83:6,8;98:10;
99:20;102:1;109:3;
121:5;128:17;130:7;
131:6
**BAP (3)**
70:25;131:8,11
**bar (2)**
16:8;133:13
**Barnham (10)**
28:7;30:14,20,22;
47:5;50:22;88:4;92:22;
113:17;116:12
**base (5)**
91:8,18,21;92:18;
95:16
**based (23)**
10:12;28:14,15;
38:16;40:13;41:8,18,
24;42:19;43:17;46:7;
68:20;98:22;99:13;
100:3;101:3,17;
102:16;105:7,8;117:3,
11;130:25
**basics (1)**

17:8
**basis (8)**
20:11;36:13,13;
94:15;102:2;120:1,6;
123:10
**Bay (2)**
63:22;108:1
**bear (3)**
91:15;93:5;95:17
**become (1)**
53:5
**beef (1)**
96:21
**befallen (1)**
91:12
**beg (1)**
84:14
**begin (1)**
85:21
**beginning (2)**
88:13;112:15
**behalf (6)**
3:13;7:3;15:8;19:11;
52:7;85:5
**behind (2)**
20:8;51:8
**belabored (1)**
89:9
**belief (1)**
12:17
**Bell (9)**
28:7;30:24;32:8,9;
33:17;34:25;35:25;
47:4;95:1
**belongs (1)**
10:2
**bench (1)**
18:21
**best (3)**
58:9;122:7;131:22
**bet (1)**
61:7
**better (8)**
3:24;4:12;25:21;
40:7,9;97:10,11;
124:16
**beyond (3)**
73:25;74:1;84:25
**bifurcation (1)**
100:15
**big (4)**
28:2;68:15;82:17;
113:5
**billed (1)**
68:17
**billion (7)**
14:18,18;40:13;
68:20;80:19,20;81:19
**billions (5)**
41:17;42:19;45:7;
98:11,17
**binding (1)**
86:25

**bird (2)**
113:5,5
**bit (10)**
14:11;41:14;61:13;
62:10;85:19,23;89:16;
93:9;97:12;102:6
**bites (1)**
92:20
**blessing (1)**
94:5
**blew (1)**
20:25
**bloc (1)**
107:20
**Bob (2)**
85:3;95:25
**book (1)**
28:1
**born (1)**
119:22
**both (14)**
12:24;16:1;19:25;
75:14;77:9;87:5;
108:10;110:15;112:10,
10,12;116:5;121:6;
122:5
**bothered (1)**
112:16
**boundaries (1)**
107:22
**branch (2)**
20:25;76:13
**branches (2)**
86:22;87:5
**bridge (1)**
6:7
**brief (35)**
4:5,24;12:21;28:24;
36:24;52:14;62:8;64:5;
72:17;73:24;77:21;
78:4,6,9,15,17,21;80:7,
9,24;84:15,24,25;
87:22;88:10;90:15;
93:13,16;104:25;
107:22;117:20,21;
118:14;125:15;129:12
**briefed (7)**
12:19,20;20:1;23:7;
77:20,24;78:4
**briefing (7)**
12:19;15:6;62:25;
97:18;106:17;107:23;
131:21
**briefly (3)**
88:1;90:18;93:10
**briefs (3)**
12:24;83:16,22
**bring (1)**
81:20
**brings (1)**
80:4
**broken (1)**
47:10

Min-U-Script®

Case: 19-30088    Doc# 4819    Filed: 11/20/19    Entered: 11/20/19 13:14:33    Page 136
of 155

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.com

(2) approval - broken

brought (7)
33:20;56:7;58:20;
66:12;116:23;117:5;
119:3
Bruno (1)
107:24
build (1)
124:15
builds (1)
92:5
built (1)
92:17
bumping (1)
11:6
bunch (2)
104:5,8
burden (2)
91:16;114:5
burdens (1)
93:5
Burlington (1)
94:14
burns (2)
92:4,7
business (3)
9:24;74:6;109:18
busy (1)
49:1
Butte (14)
63:22;67:13,17;
68:19;69:5,14,22;70:1;
74:15;107:25,25;
108:1;114:21;116:15
bypass (1)
70:20
bypasses (1)
70:25

**C**

Cal (7)
29:18;73:8,9;114:24;
115:12,12,18
CalApp4th (1)
112:15
calendar (4)
3:9;6:3;18:4;73:4
CALIFORNIA (100)
3:1;20:2,12;21:3,10,
14;25:14,18,20,21,25;
27:10,11,17,21;28:6,
15,21;29:5,17;30:10;
31:5;34:13;35:13;36:2;
37:13,20;38:17;39:1,4;
41:22;42:6;44:3,12;
45:4,15;52:11;53:8,12;
54:10;57:9,21;58:10;
60:1,2,14;63:19;66:3;
67:5,10,17,22;68:25;
69:21;70:2,5,12,12,15;
71:10;73:12;74:13,14;
76:20,25;86:3,22,25;
87:4,21;88:5;89:8;

92:24;93:4;94:19;95:7,
13;96:22;98:9,12,14,
23;100:23;102:25;
107:2,20;108:3,21;
110:23;112:11;113:9,
15;115:2,2;117:8,9;
120:4;122:24;124:11;
125:11
Californians (1)
67:9
California's (3)
53:6;59:12;88:20
Call (9)
3:3;15:2;19:3;38:19,
20;42:24;60:23;
101:20;113:5
called (8)
15:1;35:15;88:5,16;
95:5;109:10;117:3;
130:6
calling (1)
104:6
came (5)
65:17;97:16;106:18;
108:11;114:14
can (69)
3:20;4:16;7:13;
16:23,23;17:7;21:6;
24:25;27:12,13,15,22;
28:2;29:8;35:12;38:19,
20;40:5;42:24;46:3,17;
48:11;51:24;54:4,18,
19;55:1;62:1;75:13,20;
81:18;82:1;90:13;
93:21,22;96:5,12,13;
98:1;99:9;102:17;
105:3,21;107:3;
108:23;109:3,10;
112:12,19;115:13,14;
118:3;122:15;123:10,
13;124:9;126:16;
127:12,18,18,21;128:4;
129:11,21;130:6,7,14;
131:23;132:7
candidly (3)
19:15;30:23;35:19
cannon (1)
90:10
capital (6)
58:21,22;59:2,3;
86:2;94:20
capital-raising (1)
56:1
care (9)
17:13;32:4;35:17;
41:6,7;50:4,5;58:23;
79:23
carefully (1)
94:25
Carnac (3)
119:17,19;126:14
carry (2)
88:7;114:5

carrying (1)
87:24
case (123)
6:9;10:21;12:17,20;
14:2,5,16,19;15:3;
16:13,15;22:6,8,16,19,
20,21;26:12;30:8;
32:13,16,18;36:2,2,23,
24;37:1,2;38:14;39:7;
40:8;42:24;44:20;
45:23;46:19;48:25;
51:17;57:10;60:6;
62:23;63:2,4,8;64:20;
65:10,23;66:6,9,17,19;
67:17;69:22;70:11;
71:3;72:17;73:24;
74:16,24;75:23;76:9;
78:15,16,25;80:21;
82:18;83:17,17,20,25;
84:2,17;85:8;86:3,4;
88:5,14,16,24;90:5;
92:1;94:14,15;96:15,
17,17;100:1;101:23,
25;103:25;104:1,4;
105:21,21,23;108:19;
110:24;112:14,23;
113:3,4,5,14,22;114:7,
10;115:16;116:13,13;
117:23;118:8,12;
121:1,5,13,23;124:23,
24;126:8,21;129:7;
131:3,4,13
case- (1)
6:6
cases (22)
20:2;23:6;37:9;38:5;
46:22;50:24;60:18;
66:4;68:5;72:8;78:10;
84:9,13;99:2;108:1,1;
110:11;112:13;116:15;
126:9;127:7;131:2
cash (13)
8:8;12:23;13:1,1;
14:1,9,12,12,13;80:20;
81:25;82:3,15
cash-cash (1)
82:4
catastrophic (1)
59:14
catch (2)
113:25;128:14
categories (1)
28:5
cause (6)
10:2,13,14;32:6;
90:25;131:18
caused (5)
20:25;32:21;87:25;
88:21;103:11
cede (3)
5:13;6:16;9:15
certain (2)
100:16,18

certainly (12)
22:11;87:5;90:8;
95:20;99:15,17;120:2;
121:18,21;122:8;
123:13;125:18
certainty (2)
37:19;123:4
certification (11)
120:20;121:5,7;
128:2,8;129:18;130:6,
10;131:7,12;132:9
certified (3)
120:23;127:18,22
certifies (2)
115:12;128:18
certify (7)
12:17;44:11;115:11;
120:25;121:16,22;
128:8,9,9,19;129:10,21
certifying (2)
52:4;122:2
challenged (1)
110:5
challenging (1)
43:8
chance (4)
76:11,14;79:9;
101:13
change (10)
23:17;25:15;31:9;
49:9;59:18,19;60:1,2,
21;87:7
changed (3)
25:19;86:7,8
changes (5)
47:17,17,22;48:1,5
changing (1)
105:9
chaos (1)
67:8
chapter (2)
95:5;127:1
charged (3)
21:9;46:22;88:6
charity (1)
94:18
chimera (4)
86:1;92:1,3;124:9
choice (7)
28:10,11,18;87:14;
89:18;90:1,2
chose (2)
48:13;49:10
circuit (19)
22:6;27:4,6,11;
44:11;65:16;70:25;
72:24;89:12;90:6;
94:15;115:11,12;
125:25;128:7,16,20;
130:14;131:17
circumstance (7)
20:22;21:2,11;36:22;
40:19;100:10;123:1

circumstances (10)
21:3;22:25;23:1;
29:13;53:8;100:5,8;
117:12;123:8,24
circumstantial (1)
64:21
cite (2)
36:24;88:6
cited (15)
22:20;46:22;72:16,
17;78:7,14,16,18;85:8;
101:23;112:10,15;
120:25;125:20;127:8
cites (2)
78:17,19;87:22
citing (5)
27:7;46:5;73:24;
103:25;125:18
citizens (2)
93:4;94:19
citoyen (1)
94:7
claim (9)
8:6;9:20,25;10:22;
11:1;14:10,10;16:10;
17:5
claimants (13)
7:4;14:17,19;16:11,
13,20;17:6,15;62:17;
63:21;80:5;97:8,17
claimants' (4)
11:24;12:1;16:15;
62:24
claimholders (1)
97:22
claims (22)
7:22;13:25;16:4,6;
17:1,2;78:14;79:19;
80:17;98:7,8,11,14,17;
99:1,18;100:2,9,10,11;
101:9,24
clarifies (1)
113:25
clarify (2)
101:13;116:9
clarifying (1)
116:10
class (1)
16:18
classwide (3)
16:16,18,19
clauses (1)
112:8
clean-energy (1)
59:5
clear (20)
7:7;10:19;15:1;
21:13,18;28:6;35:9;
45:17;46:9;74:8;90:1;
100:9,11;105:6,24;
106:2;107:3;122:23;
124:25;126:21
clearly (5)

Min-U-Script®

Case: 19-30088    Doc# 4819    Filed: 11/20/19    Entered: 11/20/19 13:14:33    Page 137
of 155

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(3) brought - clearly

23:19;49:10;50:2;
90:10,11
**CLERK (7)**
3:4,9,19,22;4:19;
16:6;46:16
**client (2)**
82:4;130:21
**clients (1)**
55:7
**clients' (1)**
15:8
**climate (1)**
48:17
**clock (2)**
84:6,8
**close (3)**
72:16;80:10;97:1
**closing (1)**
120:11
**clue (4)**
26:21,22;27:20;
57:25
**clues (1)**
27:25
**Code (7)**
59:19;60:3;108:9,13;
120:3;127:19,22
**Codes (1)**
61:1
**coin (1)**
67:5
**collateral (1)**
67:15
**colleague (2)**
51:18;62:7
**colleagues (1)**
19:7
**colleague's (1)**
11:2
**collect (1)**
8:10
**colloquy (1)**
52:10
**coming (4)**
16:6;18:8;103:24;
133:12
**comity (6)**
72:1;74:1,5;76:14;
95:25;96:4
**commend (1)**
86:6
**comment (2)**
11:2,24
**comments (2)**
97:16;120:11
**Commission (5)**
43:9;52:21;58:25;
59:14;96:2;106:9
**commissioner (2)**
55:25;56:4
**commissioners (2)**
23:16;60:8;106:8,19
**committee (1)**

62:21
**common (1)**
93:22
**commonly (1)**
19:3
**community (5)**
20:10;21:7;24:15;
33:15;53:11
**companies (3)**
88:11,12;108:17
**company (1)**
95:3
**comparable (2)**
90:8,12
**compels (1)**
29:11
**compensate (1)**
58:8
**compensated (2)**
58:6;104:16
**compensation (5)**
88:13;93:13;96:13;
110:9;111:21
**competent (1)**
67:21
**competing (1)**
116:21
**completely (4)**
9:21;23:22;72:25;
104:25
**complimented (1)**
83:4
**comport (1)**
99:19
**concede (3)**
123:18;125:3,5
**conceded (2)**
114:15;123:15
**conceding (1)**
103:11
**concept (1)**
102:12
**concepts (2)**
120:24;121:12
**concerned (2)**
89:13;95:21
**conclude (6)**
27:15;28:14;29:12;
32:9;71:24;95:13
**concluded (4)**
21:23;36:3;59:15;
133:24
**conclusion (5)**
28:17;29:11;65:17;
107:4;111:2
**concurring (3)**
23:16;26:20;56:4
**condemn (1)**
53:22
**condemnation (56)**
20:9;21:4;23:22;
24:10,14;25:23;26:13;
28:16;29:6;30:12;

31:23;32:8,10;33:21;
34:5,22;40:12;41:1,3,
17;42:17,19;43:9;47:2,
2;48:3,7;50:10,12;
54:5;57:2;59:10;80:9;
88:7,19;91:2,4,9;93:2;
98:22;99:12;100:25;
101:15;102:13;103:1,
5;107:3;108:10,20;
111:19;112:6,18,21;
113:20;114:2;124:20
**conditioned (1)**
10:22
**conduct (1)**
42:16
**conduit (1)**
32:1
**confer (1)**
46:16
**confident (1)**
15:17
**confine (1)**
107:22
**confined (2)**
35:2;108:7
**confirm (1)**
82:3
**confirmation (5)**
5:24;7:21;9:7;14:3,8
**conflated (1)**
110:13
**conflict (1)**
62:24
**conflicting (4)**
117:14;129:2,3,4
**confronted (1)**
37:9
**confuse (2)**
6:25,25
**confused (2)**
31:3;100:13
**confusion (1)**
6:19
**conjecture (1)**
66:7
**conjunction (3)**
9:7,9;10:7
**connection (1)**
43:4
**consciousness (1)**
78:25
**consent (4)**
69:23,24;130:20;
132:8
**consequence (3)**
109:16,17,20
**consequences (1)**
93:1
**consider (6)**
21:24;23:24;52:16;
62:1;118:15;129:9
**consideration (1)**
7:23

**considerations (1)**
23:23
**considered (2)**
11:7;25:3
**consistency (1)**
50:6
**consistent (3)**
5:24;6:8;9:11
**constitution (12)**
57:2,7,25;59:18;
60:1;70:5,13;91:11;
104:4,12;110:6;112:8
**constitutional (17)**
20:8;35:16,20;36:19;
57:1,9;58:16;70:11;
89:25;93:10;96:3;97:9;
107:21;108:4,5,10;
111:23
**constitutionality (1)**
77:10
**constitutional-law (1)**
84:23
**constitutions (1)**
108:4
**construction (1)**
77:15
**contains (1)**
113:23
**contested (1)**
15:1
**context (20)**
20:21;30:12;32:24;
36:10,14;37:8,18;
45:16;46:10;64:13;
72:25;97:24;98:5;
101:22;102:2;106:15;
110:9;112:18;115:6;
127:8
**contexts (1)**
110:16
**context-specific (1)**
36:21
**continuance (1)**
18:17
**continuation (1)**
5:4
**continue (3)**
10:25;11:22;14:22
**continued (5)**
6:21;12:16;15:7;
18:2,16
**continuing (2)**
10:24,25
**contrary (4)**
10:17;80:25;98:13;
125:20
**contributions (1)**
97:18
**control (3)**
11:3;20:3;108:22
**controlling (4)**
63:5;82:22;128:24,
25

**controversial (1)**
132:21
**conversation (1)**
21:21;46:12
**conversion (2)**
65:10,13
**convey (1)**
61:19
**convince (1)**
81:19
**convinced (1)**
22:1
**convoluted (1)**
64:25
**cooperation (1)**
133:1
**coordination (1)**
116:16
**copies (1)**
28:4
**core (1)**
123:5
**Corey (1)**
107:16
**corporate-governance (1)**
49:3
**Corporation (2)**
3:10;78:15
**corrected (2)**
84:15;85:7
**correctly (1)**
70:20
**correspond (1)**
17:1
**cost (41)**
23:21,25;30:7;31:25;
32:11,16,18,22;33:18;
39:16,17;40:5,15,18;
41:20;50:18;53:23;
55:14;58:21,21;59:2,2;
60:18;85:24;91:7;93:2,
8;94:6;95:1,6;96:3;
103:6;106:13;114:9;
122:21;123:3,9,14,20,
25;124:7
**cost- (1)**
35:1;103:16
**cost-recovery (1)**
43:8
**costs (8)**
24:14,19;31:8;32:6;
41:9;86:5;105:16,23
**cost-spread (3)**
35:12;103:20;105:8
**cost-spreading (10)**
33:14;35:11;37:16;
43:18,23;52:17;
102:10,16,18;103:21
**counsel (2)**
12:1;96:10
**counsels (1)**
12:13
**counsel's (2)**

Min-U-Script®

Case: 19-30088   Doc# 4819   Filed: 11/20/19   Entered: 11/20/19 13:14:33   Page 138
of 155

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(4) CLERK - counsel's

11:21,24
**count (4)**
9:16,17,21;97:9
**country (1)**
92:8
**county (4)**
66:12;69:22;96:15;
107:25
**couple (3)**
122:19;131:2,2
**course (13)**
6:12;8:19;15:10;
26:8;37:19,19;45:25;
52:9;59:5;63:11;71:23;
89:12;91:19
**Court (782)**
3:3,4,6,8,11,15,17,
20,23,25;4:2,6,8,10,13,
15,18,21;5:1,7,12,25;
6:1,5,10,15,18;7:5,9,
11,15,17,25;8:4,7,13,
16,18;9:2,5,8,10,18,22;
10:9,11,16;11:2,5,8,10,
15,20;12:3,5,8,22,24;
13:3,5,8,11,13,16,18,
24;14:7,25;15:14,17,
21,25;16:7,9,17,19,21;
17:8,13,20,23;18:1,15,
24;19:1,14,18,22,25;
20:6,13,14,16,18;21:3,
4,10,14,15,16,18,22,23;
22:2,5,5,6,10,12,14,15,
16,21,23;23:2,4,6,8,10,
12,15,24;24:2,7,9,21;
25:2,5,7,9,10,12,18,20;
26:2,8,11,12,14,16,19,
21,25;27:1,5,10,15,17,
19,21,23;28:1,6,9,13,
19,21,23;29:1,3,5,7,9,
11,15,17,18;30:1,3,9,
10,14,16,19,21,25;
31:11,13;32:7,16,19;
33:1,5,9,11;34:6,10,12,
14,15,19;35:1,3,4,6,9,
13,25;36:2,6,8;37:4,13,
15,17,20,25;38:4,6,18,
24;39:4,5,10,13,17,19,
22,24;40:1,3,7,11,17,
20,22,25;41:5,12,16,
22,23;42:2,5,6,12,18,
21,23;43:3,24;44:2,4,7,
9,11,12,19,21,23;45:1,
4,9,11,13,15,18,22,25;
46:2,6,6,9,10,15,16,17,
21,23,23;47:9,11,15,
18,20,22,25;48:4,10,
12,19,21,23;49:12,14,
17,19,24;50:7,11,13,
22;51:3,5,14,18,25;
52:2,11,15,20,23;53:1,
3,17,19,25;54:16,22,
24;55:1,5,9,11,16,18,
22,25;56:3,10,16,20,

22;57:3,6,8,17,21,24;
58:3,5,8,10,14,23;
59:17,22,24;60:5,7,11,
13,16,20;61:2,4,7,10,
12,15,24;62:1,3,5,11,
14,19;63:3,4,6,14,17,
19,25;64:4,7,12,15,17,
19,22,24,25;65:3,6,8,
11,12,13,15,16,16,17,
18,18,19,20,23;66:1,4,
5,10,12,12,14,15,18,19,
22;67:1,5,10,17,22,24;
68:4,9,11,25;69:2,4,7,
10,12,15,17,18,19,21,
24;70:2,3,6,6,9,15,16,
17,18,19,21,23,23,24,
25;71:2,5,7,10,13,15,
18,21,23;72:1,3,5,8,10,
12,14,20,23,24;73:7,8,
9,13,13,15,19,22,24;
74:6,10,12,14,14,18,20,
22,25;75:2,4,8,9,13,18,
20,22;76:1,8,18,21,24,
25;77:4,5,7,13,17,19,
22,25;78:5,9,12,20,22;
79:3,6,10,14,23;80:1,3;
81:1,2,3,7,10,14,16,22;
82:6,8,13,20,25;83:1,3,
6,9,9,10,12,15,19,22;
84:1,4,5,8,12,19,21;
85:1,4,6,12,14,16;
86:14,16,18,20;87:10,
14,18;88:5,16,19,20,
24;89:2,4,6,8,15,17,24;
90:7,9,10,13,16,23;
91:14,20;92:3,14;
93:12,16,20;94:1,14;
96:5,9,17,24,25;97:5,
11,14;98:12,20,23;
99:4,7,16,20,21,23;
100:1,4,7,13,24;101:7,
11,24;102:8,11,21,24,
25;103:18,21;104:2,5,
8,14,21,24;105:3,14,
18,25;106:4,7,18,21;
107:3,5,7,9;108:2;
109:2,3,5,13,15,18,22;
110:3,6,17,23;111:1,
10,11,13,15,17,22,24;
112:3,6,17,19,25;
113:7,10,12,15,16,16,
18,20;114:13,15,17,23,
24;115:5,8,9,12,13,18,
21,23;116:3,5,7,12,14,
16,17,18,25;117:8,9,
15,19,25;118:3,6,10,
11,12,15,16,19,22;
119:1,6,8,8,9,10,12,15,
18,24;120:8,10,19,24;
121:2,10,11,19;122:4,
9,13,18,24;123:18,23,
25;124:3,8,11,17;
125:1,3,6,10,11,22,25;

126:1,4,10,15;127:5,
10,21;128:1,5,7,12,17,
21,24,25;129:3,4,7,11,
13,16,20;130:1,3,5,12,
14,22,25;131:3,4,7,8,
10,10,20,25;132:4,9,
13,17,20,22,24;133:2,
7,10,15,17,20
**court-of- (1)**
63:18
**court-of-appeal (3)**
63:10;64:10;65:22
**courtroom (1)**
7:13
**courts (25)**
28:17;34:10;37:11;
38:17;43:11,15;48:20;
50:4;56:5;57:17,22;
64:9;67:16;74:7;75:15;
83:6;89:19;98:9,14;
100:2;101:25;108:3,
21;117:14;125:8
**Court's (10)**
3:9;22:22;28:15,16;
48:25;65:24;67:16;
110:14;115:2,3
**cow (1)**
89:2
**CPU (1)**
32:22
**CPUC (49)**
21:13;23:14,15,18,
21;24:18;26:4;29:13,
18,20;30:7;31:3,6,19,
20;32:3,20,22;33:20;
37:6,39:15;40:18;
41:11,20;42:6,15;
43:10,11;44:13;53:21;
54:2,3,7;58:24;60:17;
61:6;102:17,23;105:7,
19;108:9,13,22,23;
109:1;112:23;114:4,
14;115:4
**CPUC's (3)**
29:24;53:10;113:23
**Cravath (3)**
5:18;19:10;68:15
**created (5)**
6:19;25:24;55:20;
91:10;108:14
**creation (1)**
26:5
**credit (3)**
62:7;107:5;117:20
**creditors (1)**
38:14
**critical (6)**
38:22;59:1,8;80:1;
108:2;127:4
**criticize (1)**
41:14
**criticizing (2)**
41:11,14

**cross-examination (1)**
106:17
**crystal (5)**
74:8;90:1;100:9,11;
105:6
**culpable (2)**
103:2;109:9
**current (1)**
24:23;59:10;61:18;
133:5
**cushion (1)**
77:9
**cusp (1)**
127:1
**customers (1)**
59:11
**cut (1)**
111:1
**cuts (2)**
121:6;124:4
**Cuyahoga (2)**
66:12,13

**D**

**daily (2)**
16:5,6
**damage (3)**
87:24;88:21;112:2
**damaged (3)**
110:8;111:20;113:9
**damages (1)**
95:22
**Dario (1)**
107:16
**data (40)**
11:19;21:23;22:1,6,
9,10,25:10,13;33:6,8,
10,12;44:15;46:8;47:4,
4,12,13;49:12,13,15;
50:2,3,4;51:5,6,7;
58:11,18;73:11,14;
104:5,8;114:24;
125:24;126:7,7,13,18;
132:25
**date (10)**
5:9,11;6:8;8:21;
16:8;18:1,3,4,16;
133:13
**datum (10)**
21:23;25:12,13;46:8,
8;63:5;65:19;104:1,1,3
**David (2)**
84:23;85:5
**Davis (32)**
97:7,7,12;98:25;
99:5,15,17,25;100:5,8;
101:5,8,22;102:9,15,
22;103:15,20,24;104:6,
10,15,22;105:2,6,15,
19;106:2,5,14,20;107:1
**day (6)**
8:24;19:19;42:6;

52:7;133:18,18
**days (3)**
73:1;107:18,24
**DC (3)**
67:6;84:24;97:9
**de (57)**
62:17;97:1,2;106:25;
107:10,15,16,16;109:4,
12,14,17,20;110:2,4,
18;111:8,11,14,16,25;
112:4;113:3,8,11,14,
19;114:14,16;115:1,7,
20,22;116:1,4,6,8,15,
20;117:1,24;118:2,5,7,
11,18,21,24;119:2,7,
10,14,16,20,25;120:9;
122:19
**dead (1)**
13:21
**deadline (1)**
49:2
**dead-wrong (1)**
88:4
**deal (8)**
14:8;18:6;45:3;57:5;
68:15;82:17;115:18;
133:12
**dealing (2)**
69:13;86:8
**deal's (1)**
13:21
**debate (1)**
29:8
**debating (1)**
54:18
**debtor (6)**
11:12;18:2;68:6;
80:8,10;82:3
**debtors (8)**
3:13;5:5,20;19:11;
77:15;83:5,7;97:23
**debtors' (1)**
115:24
**debtor's (4)**
9:24;11:21;15:4;
81:25
**decades (2)**
35:18;50:9
**December (13)**
5:6;6:2,2,5;8:21;
18:1,16;67:17;68:12,
25;70:2;82:19;126:25
**decide (23)**
10:17;17:9,10;22:2;
24:18;25:21;34:2,3;
36:15;41:10;51:9;58:9;
60:22;80:12,23;81:4,6,
8,8;115:11,18;124:15;
127:7
**decided (7)**
22:16,24;23:6;25:15;
36:25;126:23;127:5
**deciding (4)**

Case: 19-30088    Doc# 4819    Filed: 11/20/19    Entered: 11/20/19 13:14:33    Page 139
of 155

15:23;21:9;42:16;
97:25
**decision (44)**
22:23;23:15,18;
26:20;27:7,8;31:6;
32:3,4;36:18;37:7;
41:25;43:8,20;50:8,9,
9;52:20;60:8;65:14,22,
24;66:4,10;67:16;69:4;
77:9;79:17;102:17,23;
104:2;105:7,20;
106:18;113:21,22;
116:22;121:1,3,24;
127:3;128:24,25;
130:25
**decisions (25)**
23:6;25:10;28:15;
34:16;37:23;38:25;
39:1;43:12;63:11,19;
64:11;74:8;77:9;87:22;
89:15,17,19,22,25;
108:23;116:18;117:14;
129:2,3,4
**declaration (1)**
31:20
**declared (1)**
66:9
**declined (1)**
47:12
**decoupling (1)**
52:17
**decree (1)**
129:6
**deemed (1)**
59:7
**defendant (2)**
130:8,9
**defer (1)**
6:23
**deference (1)**
22:22
**deferential (1)**
100:19
**defined (1)**
108:16
**defines (1)**
104:18
**definitively (1)**
105:22
**demand (1)**
65:12
**demonstrate (1)**
86:12
**denial (10)**
53:10,10;63:3;78:2;
117:16;119:4;123:20,
22;125:23;131:13
**denied (23)**
32:17,22;65:15,21;
67:11,14;69:4,20,21;
76:11;113:16,16;
117:1,4,6;118:16,16,
23;119:5,9,11;123:25;

131:4
**denies (1)**
117:15
**Dennis (1)**
3:5
**deny (3)**
107:8;115:13,24
**depart (1)**
66:14
**department (1)**
92:5
**depend (1)**
14:21
**depending (2)**
14:18;79:19
**describe (1)**
55:5
**described (2)**
22:11;90:21
**describing (2)**
31:13,15
**descriptors (1)**
91:6
**desperately (1)**
87:7
**despite (2)**
35:18;87:3
**destroyed (1)**
94:9
**detail (1)**
106:6
**detailed (1)**
30:24
**determination (5)**
14:20;38:16;106:15;
113:1;123:13
**determine (4)**
29:20;106:10,11;
131:11
**determined (2)**
29:18;32:23
**determining (1)**
127:17
**Detroit (1)**
92:9
**devastating (1)**
53:14
**developed (3)**
20:20;31:23;34:22;
35:1;61:5
**devote (1)**
51:19
**dialogue (1)**
77:24
**dicta (1)**
33:22
**dictate (1)**
35:12
**died (1)**
65:3
**Diego (6)**
31:16;32:20;39:19;
53:9,11;118:8

**differ (1)**
56:17
**difference (1)**
63:15
**different (28)**
22:13;23:6;28:17,21;
29:24;36:22,22;37:3;
42:3,11,24;47:6;49:11;
63:8;64:15,16,17,18,
19;65:17;66:24;82:22;
83:12;94:2;98:19;
114:3,3;121:12
**differently (3)**
27:16;125:6,7
**difficult (2)**
131:21;132:18
**difficulty (1)**
55:20
**digressing (1)**
24:21
**Diii (1)**
130:18
**direct (17)**
60:17;70:1,24;76:12;
120:14,20,23;121:10,
15,16,22;122:2;129:8,
19;130:2,4,10
**direct- (1)**
51:21
**directly (2)**
59:12;97:13
**disagree (11)**
63:1;83:11;102:24;
122:8,22;123:6;
126:16;128:25;129:15;
130:19;132:2
**disagreed (1)**
121:3
**disagreeing (1)**
131:16
**disallow (2)**
98:17;102:3
**disallowed (1)**
9:20
**disallowing (1)**
98:11
**disappearing (1)**
11:7
**disapprove (2)**
8:22;9:1
**disapproved (1)**
12:18
**disapproving (1)**
9:10
**disclosure (1)**
131:14
**discount (1)**
13:20
**discretion (2)**
14:22;131:11
**discretional (1)**
38:2
**discretionary (1)**

117:10
**discriminate (1)**
36:12
**discrimination (2)**
36:5,14
**discuss (1)**
79:11
**discussing (1)**
50:14
**discussion (6)**
8:17;97:19;112:14;
113:23;114:17;129:17
**discussions (2)**
5:3,4
**dismiss (1)**
17:19
**displacement (1)**
133:12
**dispositive (3)**
65:21;117:25;125:21
**dispositively (1)**
131:22
**disproportionate (1)**
91:15
**disproven (3)**
32:13;34:1;39:2
**dispute (3)**
61:20;123:13,16
**disputed (6)**
80:18;81:12,20;
97:24;102:19;123:12
**disregard (3)**
21:25;63:20;101:15
**distinction (2)**
54:2;66:20
**distribute (2)**
20:9;109:21
**distribution (3)**
21:5,12;29:14
**district (6)**
70:25;84:4;121:2;
129:20;131:8,10
**districts (1)**
20:3
**disturb (1)**
64:10
**divorce (1)**
54:8
**divorced (1)**
53:14
**docket (8)**
6:20,21;18:18;19:4,
12;51:20;52:9;78:12
**doctrine (28)**
25:24;27:14;28:16;
35:22;37:12;40:14;
43:17,23,25;44:1,4;
49:5;51:8;61:5,18;
72:12;73:25;85:25;
91:9;99:23;102:1;
103:1,8,13,16;104:6;
111:23;123:10
**doctrine's (1)**

123:5
**document (2)**
78:24;133:6
**dollar (1)**
9:25
**dollars (9)**
40:13;41:17;42:19;
45:7;68:17,20;80:19;
81:19;98:17
**dollars' (1)**
98:11
**Donato (14)**
5:9;11:3;16:13;
39:14;40:11;74:3;
75:24;79:18,21;80:22;
81:21;99:13;100:19;
129:10
**Donato's (1)**
68:23
**done (10)**
6:8;20:1;22:17;
51:12;69:3;71:2;95:19;
121:4;130:15;131:2
**door (4)**
12:2;10;13:4,9
**double-negative (1)**
123:23
**doubt (3)**
53:15;61:21;132:14
**down (17)**
15:22;18:8;20:23;
21:21;39:7;40:5;41:19,
19;42:14;54:6;59:7;
80:17;81:21;92:5,7;
101:21;115:14
**downgrades (1)**
54:10
**dozen (2)**
87:22;121:19
**drafted (2)**
125:6,7
**drafters (1)**
125:3
**dramatic (1)**
92:7
**dramatize (1)**
87:3
**drank (1)**
124:18
**draw (4)**
54:18;60:23;86:10,
19
**drawn (2)**
54:2;60:23
**drive (2)**
4:10;80:17
**drives (1)**
60:7
**due (7)**
17:18;94:1,1,10,11;
108:17;112:8
**during (2)**
89:18;127:9

Min-U-Script®

Case: 19-30088    Doc# 4819    Filed: 11/20/19    Entered: 11/20/19 13:14:33    Page 140
of 155

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(6) decision - during

## E

**Eachus (1)**
88:6
**earlier (3)**
5:25;121:23;126:6
**early (1)**
126:22
**easier (1)**
122:2
**easily (2)**
86:8;122:22
**Eastern (1)**
95:21
**Easton (1)**
93:21
**easy (1)**
54:20
**echo (1)**
3:18
**echoing (1)**
4:16
**economy (1)**
59:12
**Ecos (2)**
89:5,21
**Edison (2)**
53:8;113:9
**effect (5)**
71:8;87:12,23;
108:18;127:2
**effectively (2)**
47:7;102:2
**efforts (1)**
11:23
**eight (1)**
28:4
**either (14)**
8:22;9:3;11:3;18:20;
44:10;51:22;74:18;
77:2;89:17;107:7;
122:16;127:23;130:15;
131:7
**elected (1)**
95:13
**Electric (7)**
39:20;53:9,11;88:11,
17,20;118:8
**electrical (1)**
72:2
**electricity (5)**
50:25;59:13;87:21;
109:19,21
**element (1)**
67:23
**elements (1)**
65:10
**elephant (1)**
12:15
**eleven (4)**
67:18;80:19,20;
81:19

**eleven-billion-dollar (1)**
8:6
**else (5)**
36:23;62:12;76:15;
101:19;115:15
**else's (1)**
19:2
**emerged (1)**
45:6
**enacted (1)**
48:24
**end (14)**
18:5;21:21;38:5;
42:5;43:15,19,20;
52:14;73:4;87:23,25;
111:4,6;113:1
**engage (6)**
29:19,21;87:13;
102:16,18;112:1
**engaged (1)**
34:6
**engaging (1)**
50:24
**enjoy (1)**
93:4
**enlarge (1)**
85:19
**enlarging (1)**
88:18
**enough (2)**
13:17;130:18
**entered (2)**
69:22;133:4
**Enterprises (2)**
93:21;95:21
**entire (4)**
12:17;21:21;24:15;
33:15
**entirely (3)**
41:24;43:18,25
**entities (1)**
31:24
**entitled (4)**
15:9;78:22;83:5;
125:16
**entitlement (1)**
42:8
**entity (16)**
20:21;30:11,11,13;
34:4,24;36:4,15;37:2,8,
8,10,11;57:23;91:20;
124:12
**equipment (1)**
88:21
**equitable (1)**
96:20
**Equity (3)**
82:5,8,16
**equivalent (2)**
82:15,15
**Erie (1)**
87:14
**erred (1)**

42:6
**error (5)**
97:6;108:24,24,25;
131:12
**escape (1)**
93:1
**essentially (7)**
86:3;87:9;95:8;
97:20;103:8;117:11,12
**established (1)**
72:21
**estimate (1)**
78:14
**estimated (1)**
100:2
**estimation (28)**
10:24;45:17,21;
46:11,13,21,22;62:23;
68:14,18,23;77:12,21;
79:17,18,20;80:19,22;
97:25;98:6,6;100:2,3,
21;101:2,23;102:3;
127:8
**estimations (1)**
99:13
**estimation's (1)**
101:1
**estimator (1)**
101:1
**even (20)**
9:21;13:4;31:8,21;
32:20;33:19,23;52:4;
66:2,5;78:10;87:14;
91:5;22;93:8;94:9;
96:13,15;104:18;130:7
**event (2)**
33:22;102:5
**eventually (1)**
57:21
**everybody (4)**
47:7;86:24;87:4;
115:15
**everyone (6)**
3:6;19:1;101:19;
115:16;131:20;133:22
**everyone's (1)**
109:10
**everything's (1)**
39:7
**evidence (6)**
64:21;95:2;105:20;
106:16;117:4,22
**exactly (4)**
27:3;31:5;100:5;
106:20
**examination (1)**
120:6
**examine (1)**
108:4
**example (3)**
20:22;105:11;114:4
**exceed (1)**
19:22

**exceedingly (1)**
38:2
**except (1)**
15:25
**excerpts (1)**
28:23
**exclusive (1)**
5:21
**Excuse (2)**
85:2;97:5
**exercise (2)**
41:9;87:13
**exercising (1)**
41:25
**exhaust (2)**
72:9,11
**exhausted (1)**
38:7
**exhaustion (4)**
72:14,18,20;73:2
**exhaustion- (1)**
84:1
**exhaustion-of-administrative-remedies (1)**
83:25
**Exhibit (1)**
31:19
**exhibits (1)**
118:14
**exist (3)**
21:12,13;86:1
**existing (1)**
5:22
**exists (1)**
51:13
**expect (3)**
45:18,20;95:1
**expected (1)**
35:13
**expedient (1)**
127:4
**expedited (1)**
122:7
**expenditure (1)**
86:2
**expensive (2)**
53:6;56:2
**expert (2)**
84:23;106:17
**experts (1)**
4:2
**expires (1)**
5:22
**explain (7)**
64:20;68:14;69:8;
118:22,24,25;128:11
**explained (2)**
101:19;122:20
**explicitly (1)**
41:3
**explosion (1)**
107:24
**extend (1)**
5:21

**extended (1)**
111:25
**extension (2)**
5:23;16:8
**extensive (2)**
15:5;113:23
**extensively (2)**
20:1;125:16
**extent (3)**
14:17;16:10;107:4
**extra (1)**
22:22
**eyes (1)**
93:17
**eye-to-eye (1)**
104:22

## F

**face (4)**
27:16;44:15;53:12;
72:7
**faced (1)**
52:12
**facilitate (2)**
5:4;11:23
**facilities (1)**
95:18
**facility (1)**
92:17
**fact (38)**
6:12;7:6,20;13:20;
14:19;37:5,5,15;41:7;
45:1;49:7;53:5,12;
63:15;65:19,20;72:21;
80:18;81:12,20;82:23,
24;88:8;89:20;91:21;
92:22;97:24;101:3;
102:18;104:16,18;
106:16;115:8,17;
121:12;123:14,16,16
**facts (10)**
52:15;61:23;69:11;
80:11;89:10;90:5;
100:4;105:10;107:5;
123:12
**factual (5)**
16:4,23;80:12;102:6;
108:24
**factually (2)**
63:18,20
**fail (1)**
100:9
**fails (2)**
99:12;114:8
**fair (3)**
13:13,17;58:22
**fall (2)**
33:21;72:2
**false (1)**
36:18
**familiar (2)**
46:24;129:18

Case: 19-30088    Doc# 4819    Filed: 11/20/19    Entered: 11/20/19 13:14:33    Page 141
of 155

**far (6)**
48:7;89:12,17;95:11,
21;110:19
**Farr (2)**
7:2;97:7
**fast (2)**
115:10,16
**fatal (3)**
73:20;75:24;85:25
**fault (4)**
43:16;101:12;
113:24,24
**faulted (1)**
32:19
**favor (2)**
116:23;122:9
**feature (1)**
91:2
**federal (18)**
35:20;44:11;65:16,
17;66:1,11,18;71:25;
74:1,4,7;76:14;83:6,6;
96:4;112:11;115:9;
129:3
**federalism (2)**
95:24;96:4
**feedback (2)**
4:8,15
**feel (2)**
15:17;119:25
**feeling (1)**
50:13
**Feldman (28)**
5:14;6:17,18;7:1,2,6,
10,12,16,18;8:3,5,8,14,
17,25;9:3,6,9,13,19;
10:10,14,20;11:4,6,9;
15:22
**FERC (4)**
121:9,13;131:1;
132:9
**few (1)**
73:1
**fiduciary (1)**
80:5
**fifteen (8)**
14:18;19:16;51:19;
62:17,18;107:11,12;
120:16
**fight (2)**
39:20,20
**figure (1)**
4:2
**file (5)**
16:23;17:2,19;65:22;
70:13
**filed (10)**
5:5,25;10:4;15:8;
37:24;68:24;78:14,17;
80:6;133:7
**filing (4)**
5:20;16:25;17:5;
127:1

**final (13)**
38:7,11;67:16;74:15;
96:11;120:25;121:7,
13;126:8;127:18;
128:4,20;131:15
**finally (2)**
67:15;69:22
**find (5)**
26:17;77:5;83:7;
85:20;120:6
**finding (2)**
112:20,21
**fine (4)**
7:17;44:13;50:18;
107:12
**finish (6)**
48:12;61:15;80:14;
106:12,12,24
**finishes (1)**
120:15
**fire (23)**
20:23,24;24:11;31:7,
18,21;32:6,21;63:22;
67:12,13,13;86:11;
92:5,5;103:10,11,12;
107:24;108:1,1;
114:21;116:15
**fires (18)**
24:23;26:7;31:14,16;
40:1;43:5;48:8;59:4;
66:23;67:6;103:3;
106:15,16;107:19,25,
25;110:10;114:20
**firm (3)**
5:14,18;7:2
**first (22)**
4:23;11:19;40:4;
50:25;62:8;64:22;
68:10,12;69:13,16;
79:17;84:17;85:8;98:4;
108:8;111:19,22;
116:20;121:1;127:15,
16;131:13
**first-level (1)**
115:9
**fit (1)**
44:1
**five (6)**
19:20;40:15;44:17;
59:25;62:23;106:19
**fix (7)**
29:22;56:4,5,17;
58:15;60:7,7
**fixated (2)**
114:1,1
**fixed (4)**
48:19;56:8,9,11
**flag (1)**
57:25
**Flint (3)**
92:10,16;124:14
**flip (1)**
101:14

**flippant (1)**
55:12
**flips (1)**
114:6
**flood- (1)**
20:2
**fly (1)**
98:19
**focus (3)**
97:12;108:5;111:18
**focusing (1)**
130:1
**folks (4)**
78:4;79:2;80:16;
92:25
**follow (2)**
96:5;98:20
**follows (1)**
81:23
**footnote (4)**
33:19;90:9;92:21,21
**force (2)**
23:19;59:9
**forget (8)**
29:14;35:14,15,15,
16;51:9;69:3;129:23
**forgive (1)**
95:6
**forgiving (2)**
94:11;95:12
**forgot (1)**
97:6
**forgotten (1)**
56:3
**form (2)**
7:23,24
**formality (1)**
67:25
**forms (1)**
20:11
**formula (1)**
54:20
**forte (1)**
93:11
**forty (3)**
19:21,23;79:19
**forty-five-percent (1)**
9:25
**forum- (1)**
83:1
**forum-shopping (4)**
38:20,20;83:1,5
**forum-shopping's (1)**
83:3
**forward (7)**
6:14;48:19;63:24;
74:4;85:22;92:25;95:2
**forward-looking (1)**
26:6
**found (8)**
54:6,7,13;61:1;
103:2;105:4;114:11,12
**four (7)**

25:20;27:1;41:19;
62:8;89:15;108:2,8
**framed (1)**
105:17
**framers (1)**
88:8
**framework (1)**
21:12
**FRANCISCO (2)**
3:1;66:4
**frankly (1)**
89:24
**frequently (1)**
20:16
**friend (1)**
112:19
**friends (1)**
31:4
**front (8)**
5:9;14:5;17:25;
43:15;78:17;80:22;
81:21;83:10
**full (1)**
19:16
**function (6)**
50:20,24;56:1;87:15;
109:25,25
**fund (4)**
26:5;48:5;49:2;
86:11
**fundamental (17)**
20:7,11;21:11;24:6,
24;29:4;31:21;33:25;
34:1;35:11;67:22;
68:13;91:7,8;105:9;
123:5;125:1
**fundamentally (8)**
23:13;33:17;34:20;
39:3;42:3,11;43:13;
124:21
**funny (2)**
78:5;119:15
**furniture (1)**
119:21
**further (3)**
5:21;18:17,19
**future (4)**
54:11;59:4;98:18;
103:6

# G

**Gallagher (2)**
7:3;97:8
**Gas (7)**
29:18;32:20;39:20;
53:9,11;107:24;118:8
**gave (2)**
28:4;62:7
**Gay (5)**
36:1,17,20,25;37:7
**Gee (2)**
94:10,17

**general (1)**
43:4
**generally (1)**
31:22
**gets (3)**
16:13;45:2;80:20
**Getty (6)**
20:23,23;24:11;
103:10,11,12
**Ghetaldi (57)**
62:18;97:1,2;106:25;
107:10,15,16,16;109:4,
12,14,17,20;110:2,4,
18;111:8,11,14,16,25;
112:4;113:3,8,11,14,
19;114:14,16;115:1,7,
20,22;116:1,4,6,8,15,
20;117:1,24;118:2,5,7,
11,18,21,24;119:2,7,
10,14,16,20,25;120:9;
122:19
**Giants (2)**
49:23,24
**given (13)**
37:15;59:25;61:21;
89:20,21,21,21;108:15;
121:25;122:24;124:6;
125:12,13
**gives (1)**
128:6
**glad (1)**
133:20
**glean (1)**
124:23
**goal (2)**
7:16;88:10
**goals (1)**
59:5
**God (4)**
20:24;24:12;68:16;
103:10
**goes (12)**
7:22;9:19;24:2;
30:24;39:14;82:6,8;
92:4;106:5,5;109:25;
123:4
**Good (20)**
3:6,7,11,12;4:19;
14:20;19:7,10;20:9;
34:23,24;36:12;40:5;
52:5,6;85:12;94:21;
95:14;112:14;124:18
**Gotshal (1)**
3:13
**government (6)**
47:7;87:6;94:16;
95:23;96:12;104:19
**governmental (5)**
34:4;37:1;57:18;
91:22;124:12
**governments (1)**
96:5
**governor (2)**

Case: 19-30088    Doc# 4819    Filed: 11/20/19    Entered: 11/20/19 13:14:33    Page 142
of 155

58:24;59:7
**governor's (1)**
  23:19
**grabbed (1)**
  84:21
**graft (1)**
  66:22
**grant (4)**
  66:15;68:7;69:1;
  82:17
**granted (4)**
  38:3;63:23;68:1,2
**grapple (3)**
  35:25;57:21;61:24
**great (4)**
  17:3;28:2;50:18;
  53:14
**grew (2)**
  43:18;119:22
**grid (1)**
  59:3
**grips (1)**
  53:12
**grossly (1)**
  91:22
**ground (1)**
  113:13
**grounds (1)**
  12:19
**group (3)**
  7:3;81:3,4
**guarantee (11)**
  31:25;32:14;33:14;
  59:11;112:11;122:21;
  123:1,4,9;124:8,13
**guaranteed (6)**
  35:23;44:1;92:19;
  95:15;123:14;124:7
**guarantees (1)**
  95:6
**guess (14)**
  10:20;14:25;29:13;
  33:23;40:13;42:21,23;
  72:7;10;81:22;88:16;
  102:24;105:4;115:12
**guilt (1)**
  78:25
**gun (1)**
  39:6
**G-U-R-N (1)**
  89:1
**Gurney (1)**
  124:24
**Gurnsey (7)**
  88:16,16;89:1,2,2,7,
  21
**gut (1)**
  10:13

**H**

**haircut (2)**
  9:25,25

**half (2)**
  111:1;121:19
**hand (1)**
  32:2
**handed (1)**
  124:25
**handing (1)**
  5:18
**happen (5)**
  10:23;66:7;68:22;
  98:19;102:4
**happened (15)**
  31:5;48:8;63:20;
  67:14;74:2;88:16;93:9;
  98:9,14,16;99:1,20;
  106:23;116:12;131:5
**happening (2)**
  4:18;67:3
**happens (5)**
  8:21;41:21;45:13;
  91:6;119:15
**happily (1)**
  18:20
**happy (2)**
  82:9;122:14
**hard (2)**
  52:15;132:18
**harden (1)**
  59:3
**hate (2)**
  90:3;122:1
**Hear (15)**
  3:19;4:1,16;13:19;
  16:21;46:17,18,20;
  51:18;52:3;73:12;
  81:16;89:8;106:24;
  128:7
**heard (12)**
  11:12;13:18;56:24;
  79:20;83:4;99:7;
  101:25;106:16;114:17;
  119:17;129:4;131:14
**hearing (8)**
  5:8;6:8;14:3;17:25;
  18:2,16;100:22;102:14
**hearings (2)**
  18:6;116:16
**hears (2)**
  9:23,23
**heightened (1)**
  93:24
**held (1)**
  105:22
**helpful (1)**
  85:20
**here's (7)**
  14:4;39:16,17;68:18;
  78:13;126:14,15
**high (1)**
  14:11
**higher (1)**
  11:1
**highest (6)**

22:1,23;56:13;61:21;
65:23;66:9
**highlight (1)**
  90:22
**himself (1)**
  122:20
**hired (1)**
  68:15
**histories (2)**
  108:3,8
**history (14)**
  20:2;24:13;57:9;
  97:2;99:5;107:10;
  108:5,6,6,7;116:10;
  120:2;123:18,18
**hit (1)**
  45:2
**hoc (1)**
  7:3
**hold (5)**
  3:17;4:8;43:15;
  46:15;65:18
**holding (1)**
  12:16
**holdings (1)**
  110:21
**holiday (1)**
  133:11
**holidays (1)**
  18:5
**homework (2)**
  19:7,9
**honest (1)**
  64:23
**Honor (139)**
  3:7,12,14;5:19;7:1,6,
  19;8:5,12,25;9:13,15;
  10:6,20;11:9;13:17;
  14:5;17:4,18,25;18:23;
  19:10,12,24;20:7,11,
  20;21:9,21;22:18;23:3,
  13;24:1,6,24;25:8,23;
  26:18;28:5,7,12;29:2,4,
  23;30:5,23;33:2;34:9;
  35:8,19;36:23;37:17;
  38:9,23;39:9;40:2,9;
  42:4,11;43:7;44:1,20;
  45:6,12,20;46:7,13,20;
  47:13,24;48:11;49:11,
  18;50:2;51:9;52:6;
  56:19;61:17,25;62:10,
  22;68:17;76:17;78:11,
  13,17;79:2,8,13;80:16,
  25;83:11,24;84:20;
  85:11,22;86:1,6;87:4;
  88:4;89:20;91:25;
  92:11;93:9,19;94:7,24;
  95:9,24;96:23;97:3,7;
  104:3;107:15,18;
  108:21;109:12;110:2;
  111:17;115:1;116:2,9;
  119:17;120:18;121:18;
  122:11,17,23;124:2,19;

125:15;126:13;127:6,
9;131:24;132:19;
133:13,14,23
**Honorable (1)**
  3:5
**honors (2)**
  62:6;71:10
**Honor's (6)**
  5:3;14:15;36:9;91:1;
  102:3;122:6
**hook (1)**
  103:9
**hope (2)**
  16:14;43:19
**hopefully (1)**
  95:17
**hoping (1)**
  80:19
**horrendous (1)**
  94:8
**Hostetler (1)**
  62:21
**hour (6)**
  19:6,13,16;62:16;
  90:20,23
**house (1)**
  92:5
**huge (1)**
  101:17
**hundred (5)**
  28:11;35:14;37:21;
  47:5;90:9
**hundred-percent (1)**
  43:22
**hung (1)**
  122:1
**hurt (1)**
  80:18

**I**

**i2 (2)**
  128:18,19
**idea (3)**
  67:4,19;81:18
**identified (1)**
  22:6;31:17;51:10
**ignore (3)**
  48:15;49:7;72:1
**iI (1)**
  128:22
**III (1)**
  9:17
**imagine (1)**
  22:17
**immediate (6)**
  67:20;70:13,14,14;
  88:10;129:5
**impact (2)**
  7:13,18
**impacts (3)**
  8:23;59:12;70:11
**implausible (1)**

95:10
**implied (1)**
  67:19
**importance (3)**
  132:7,10,14
**important (28)**
  22:19;28:10;56:7;
  59:7;65:8;67:20;70:11;
  71:11;77:12;79:17,22,
  24,24,25;82:24;90:19;
  95:4;96:12;108:2;
  120:21,22;121:2,25;
  122:12;125:1;126:6;
  129:5,9
**importantly (2)**
  55:6;106:14
**imposed (1)**
  41:8
**imprecise (1)**
  27:20
**improvement (1)**
  93:4
**imprudence (2)**
  61:8;86:16;123:21
**imprudent (9)**
  31:7,17,24;32:5,20;
  43:4;53:21;54:7,19
**inability (1)**
  105:8
**inaction (2)**
  58:12;61:22
**include (1)**
  47:4,5,7
**including (5)**
  5:23;56:24;100:18;
  108:16;132:6
**inconsistent (3)**
  8:12;38:25;39:3
**increase (2)**
  58:21;59:2
**increases (2)**
  16:12;33:23
**increasingly (1)**
  53:13
**incredible (1)**
  106:6
**indeed (2)**
  86:7;127:6
**indicate (1)**
  56:14
**indication (3)**
  53:21,25;54:1
**Indicators (2)**
  28:3;52:11
**individual (3)**
  17:1,1;91:11
**individuals (1)**
  33:16
**indubitable (3)**
  82:14,16,17
**inexorably (1)**
  7:20
**influenced (2)**

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

Case: 19-30088     Doc# 4819     Filed: 11/20/19     Entered: 11/20/19 13:14:33     Page 143
of 155

34:21;35:17
**information (3)**
27:12;61:25;133:6
**informative (1)**
127:16
**ingrain (1)**
66:22
**ingrained (1)**
108:12
**inherently (1)**
96:14
**initial (2)**
43:20;114:5
**injured (1)**
49:20
**input (1)**
7:23
**inquiry (1)**
36:21
**insolvent (1)**
80:21
**instance (1)**
24:14
**instead (2)**
36:1;63:5
**instituted (1)**
58:25
**institutions (1)**
55:21
**instructing (1)**
79:3
**instruction (2)**
78:22;125:17
**insured (1)**
16:11
**insured-versus- (1)**
9:20
**insurer (1)**
9:21
**intended (1)**
88:1
**interesting (4)**
57:8;86:9;89:14;
104:17
**interject (1)**
102:7
**interlocutory (7)**
38:1,2;117:8,16;
121:14,16;129:21
**intermediate (9)**
22:13,22;23:5;25:9;
27:10,17;44:11;57:22;
70:21
**intermediate-level (1)**
38:25
**interpret (3)**
27:9;48:20;101:14
**interpretation (2)**
59:15;128:3
**interpreted (3)**
27:11;54:3;125:14
**intervened (1)**
87:10

**intimated (1)**
114:10
**into (21)**
7:23;10:1;13:4,5,8,
10;16:6;20:25;42:17;
43:10;45:7;49:21;67:8;
84:25;93:7,9;100:14;
101:2;106:5;111:22;
127:2
**inverse (79)**
20:8,11,20,22;21:4,
8;23:22;24:5,8,10,13,
15,25;25:23;26:12;
28:16;29:6;30:12;
31:23;32:7,10;33:21;
34:4,22;40:12,25;41:3,
17;42:17,19;43:9;45:2;
47:1,2,6,10;48:3,6,9;
50:10,12;51:13;54:5;
57:2;59:10,16;61:18;
68:20;69:17;75:25;
79:17;80:9,23;88:7,19;
91:2,3,9;93:1;98:22;
100:25;101:15;102:12;
103:1,4;107:3;108:9,
20;110:21;111:19;
112:6,18,21;113:20;
114:2,11;116:22;
122:25;124:20
**inverse- (1)**
99:11
**inverse-condemnation (12)**
5:17;19:3;52:18;
60:18;85:25;91:6;
99:18;103:22;105:9,
23;111:6;120:7
**inverse-condemnation-related (1)**
86:5
**investability (1)**
48:2
**investment (1)**
48:6
**investment-grade (1)**
54:11
**investor (1)**
53:11
**investor-owned (9)**
24:17;30:8;32:2,10;
36:3;37:1;53:6;110:22;
112:7
**invitation (1)**
47:12
**invoke (1)**
51:21
**invoked (1)**
70:4
**involved (5)**
10:24,25;74:5,7;
112:24
**involves (2)**
128:23;129:1
**involving (3)**
30:8;63:21;129:3

**IOU (2)**
57:19;105:22
**IOUs (3)**
53:12,20;57:13
**IOUs' (1)**
59:3
**irrational (3)**
35:21,24;94:17
**irrelevant (3)**
8:15,16;23:23
**issue (87)**
5:17;6:22,25;7:21;
9:1,3,22,23;10:1,6,12;
11:12;14:2,9,13;16:15;
18:17;21:15;24:22;
26:7;31:7;32:3,4;
37:12;38:19;39:8;42:3;
43:13;52:12,16;56:14;
57:1;59:1,1;61:23,24;
64:2;65:5,7,9;70:11;
72:24;73:7;76:14;
77:11;80:11,12,18;
81:12,13,20;97:14,25;
98:5;101:25;107:21,
23;108:7,19,21;109:6,
23;110:13,15;112:14;
114:18,18,19;116:10;
117:11,13;120:22,22;
122:1,12,20;123:7,11;
124:21;126:22,23;
127:5;131:21;132:18,
21;133:12,13
**issued (3)**
6:20;19:4;27:7
**issues (12)**
7:8;14:5;16:4;26:6;
42:24;46:25;62:23;
101:3;102:6;108:17;
114:16;122:1
**issue's (1)**
48:18
**item (3)**
4:23;5:19;18:12
**items (1)**
3:16

**J**

**January (3)**
68:13,25;127:1
**Jeopardy! (1)**
119:19
**Jessica (1)**
3:12
**jesting (1)**
90:24
**Jim (1)**
52:6
**job (2)**
21:19;99:22
**Johnston (55)**
19:19;50:15;52:5,6,
6,22,24;53:2,4,18,24;

54:1,21,23,25;55:4,6,
10,15,17,19,23;56:1,6,
12,19,21,23;57:4,16,
20;58:2,4,7,9,17;59:21,
23;60:4,6,10,12,14,17,
25;61:3,5,9,11,14,17;
62:4,5;81:4,4
**joint (1)**
130:6
**Jones (2)**
19:19;52:7
**Joseph (1)**
97:7
**Judge (24)**
5:9;11:3;16:13;
39:14;40:11;68:23;
74:2;75:24;76:13;
78:24;79:18,21;80:22;
81:21;88:8;99:13;
100:19;116:18,19;
121:2;129:10;130:7,8;
131:12
**judges (3)**
116:17;125:25;
129:20
**judgment (10)**
9:24;16:24;38:11;
69:22;75:10;98:22;
126:8;128:22;129:1,6
**judicial (9)**
25:24;66:24;72:9;
100:15,16;108:6;
116:10;127:19,22
**judicially (1)**
91:10
**Julian (179)**
9:15;10:16;11:10,16,
19,21;12:4,7,9,23;13:1,
4,7,9,12,15,17,22,25;
14:8;15:13,16,20,24;
16:1,8,10,18,20,22;
17:12,18,22,24;18:10,
14,23,25;28:4;62:6,9,
13,16,20,20;63:13,16,
18;64:1,6,9,14,16,18;
65:2,5,7,9,12;66:21,25;
67:2;68:3,8,10,12;69:6,
8,11,13,16,19,25;70:4,
8,10,18,22;71:1,4,6,9,
14,15,17,20,22,25;
72:4,6,11,13,16,22;
73:6,11,18,21,23;74:1,
11,16,19,21,24;75:1,3,
7,11,17,19,21,23;76:7,
10,23;77:3,6,8,14,18,
20,23;78:1,8,11,13,21;
79:5,7,13,15,25;80:2,4;
81:2,6,9,11,15,18;82:5,
7,11,19,21;83:8,14,18,
21,24;84:3,7,11,17,20,
22;85:2,7;97:15;
107:11;117:20;120:12;
127:11,14,25;128:3,6,

16,22;129:16,22,25;
130:11,20,23;131:9,18;
132:1
**Julian's (3)**
76:20;103:7;125:19
**July (3)**
47:12;48:24;78:13
**jump (2)**
39:6;44:14
**June (1)**
44:25
**juries (1)**
79:3
**jurisdiction (7)**
40:11;92:24;108:22;
115:2,3;128:7,17
**jurisprudence (4)**
35:18;36:11;47:5;
103:23
**jury (3)**
78:22;111:22;125:17
**justices (3)**
25:20;27:2;67:4

**K**

**Karnow (1)**
116:19
**keep (3)**
65:3;83:16;104:6
**keeping (1)**
83:23
**kept (1)**
17:10
**Kevin (1)**
19:10
**key (2)**
16:3;90:24
**kind (8)**
15:11;39:8;85:16;
100:21;102:19;108:24,
25;121:16
**Kirkland (3)**
89:13,14,18
**knew (4)**
68:14,18,21;79:7
**knowing (1)**
6:20
**knowledge (2)**
124:2,3
**known (1)**
15:6
**knows (4)**
56:23;113:16;
115:15;116:12

**L**

**LA (1)**
33:19
**laches (1)**
126:20
**lack (2)**

Min-U-Script®
Case: 19-30088    Doc# 4819    Filed: 11/20/19    Entered: 11/20/19 13:14:33    Page 144
of 155
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(10) information - lack

123:4,4
**lacking (1)**
51:17
**laid (2)**
64:7;79:8
**land (3)**
86:23;88:12;95:8
**landed (1)**
113:5
**language (13)**
21:25;58:1;89:21,25,
25;90:7,11;94:25;
104:11;111:3,18;
125:2;126:25
**last (7)**
10:20;73:1,4;77:14;
79:13;80:4;111:1
**late (2)**
52:18;76:15
**later (5)**
5:9;6:2;66:6;69:21;
133:18
**latter (1)**
121:22
**laundry (1)**
104:8
**law (58)**
5:14,18;7:2;20:2;
23:17,20,20;25:15,19;
27:10;36:1,17,20,25;
37:7;48:14,20,24;50:6;
55:2;60:21;66:8,16,17;
67:23;72:21;75:14;
80:10,11;81:13;86:23,
25;87:5,7;89:24;90:6;
91:21;92:24;93:23,24;
94:4;95:4;96:6;98:1;
100:1,8,11,17;105:10;
107:2;112:11,11;
117:4,13;120:7,22;
128:23;129:1
**laws (1)**
36:10
**lawyer (2)**
60:10;67:21
**lawyers (2)**
114:7;131:21
**lay (1)**
117:21
**layers (1)**
92:20
**leading (3)**
89:11;94:13,15
**least (10)**
18:4;39:21,23;77:14;
90:21;94:6;104:23;
112:18;114:10;116:9
**leave (2)**
19:21;82:18
**leaves (1)**
82:3
**Lee (1)**
94:13

**left (5)**
13:2;19:2;43:14;
48:20;61:13
**legal (17)**
7:7;27:14;46:25;
72:12;87:8;100:18;
101:11,24;103:1;
108:25;111:2;115:19;
122:22,23,24;123:12;
127:4
**legally (2)**
73:19;82:21
**legis (1)**
60:15
**legislative (1)**
59:13
**legislatively (1)**
58:15
**legislator (3)**
25:18;58:12;60:14
**legislators (1)**
56:25
**legislature (16)**
25:14,22,25;47:11,
16,17;56:4;58:12,25;
59:22;60:16,17;85:22;
86:7;87:6;110:6
**legislatures (1)**
56:25
**legislature's (1)**
57:5
**length (1)**
64:2
**less (1)**
52:18
**lesson (2)**
97:2;107:10
**lessons (1)**
108:8
**letters (1)**
28:2
**level (1)**
61:22
**levy (1)**
33:24
**liabilities (1)**
53:15
**liability (26)**
24:10;41:6,7;42:20;
45:3;52:18;53:13;54:5;
79:21;93:24,25;94:4,8,
22;95:17;101:12,12;
103:3,13;105:13;
109:7,11;110:1;
112:20,22;113:1
**liable (14)**
41:18;43:16,17;47:1,
2;54:13;86:11;87:24;
103:4,5;105:23;111:5;
114:11;116:21
**life (3)**
15:11;39:14;95:4
**life's (1)**

**54:18**
**lift (2)**
38:11,15
**lightning (1)**
103:12
**likelihood (1)**
8:15
**likely (7)**
38:21;46:13;47:2;
49:21;51:12,16;101:17
**limb (2)**
72:1,6
**limbs (1)**
72:2
**limited (3)**
18:18;115:3;133:11
**limits (2)**
59:3,4
**linchpin (1)**
102:9
**line (8)**
5:25;20:25;46:22;
54:18;60:22,23;63:9;
84:3
**lined (1)**
104:25
**line-item (1)**
14:24
**lines (1)**
72:2
**linked (1)**
7:20
**Liou (22)**
3:12,12,16,17,17,24;
4:1,4,7,12,14,17,20,22;
5:2,11,13;6:4,6,11,16;
11:14
**list (1)**
50:15
**listen (5)**
50:11;52:3;66:5;
79:23;104:24
**litigant (1)**
73:1
**litigants (1)**
70:12
**litigated (3)**
63:5;64:1,23
**litigation (5)**
22:23;63:21,22,23;
65:25
**little (9)**
3:18;14:11;29:1;
41:14;61:13;62:10;
77:24;102:6;130:13
**lived (1)**
116:11
**LLP (2)**
3:13;7:3
**local (1)**
104:18
**logic (1)**
92:25

**long (6)**
39:19;40:3;46:22;
50:15;115:10;120:2
**look (24)**
19:25;22:19;25:10;
27:12;28:22;34:16;
47:3,16;48:25;64:19,
23;67:3;86:10;90:4;
94:17,25;100:13;
104:2,16;108:2;120:1;
124:10;131:1;133:13
**looked (6)**
22:7;37:12;78:6,9;
87:17;106:16
**looking (3)**
84:9;88:25;119:22
**looks (4)**
31:22;65:13;111:18;
113:24
**looming (1)**
7:11
**loop (1)**
128:13
**loose (1)**
85:17
**Los (2)**
20:23,24
**lose (5)**
17:14;49:25,25;
76:19,20
**losing (1)**
100:25
**loss (7)**
20:9;22:24;29:13;
32:24;33:15,15;124:20
**loss- (1)**
21:11
**losses (5)**
20:10;21:5,6;29:6;
32:1
**loss-spreading (1)**
34:21
**lost (2)**
24:23;76:8
**lot (9)**
18:7;20:1;50:4,5;
51:7;57:9;92:8;94:18;
95:15
**lots (4)**
20:3;33:10;68:5;
97:19
**love (1)**
44:6
**lower (2)**
65:24;115:9
**lower-court (1)**
37:23
**luck (1)**
77:5
**lunch (1)**
107:14
**Luzaich (1)**
107:16

### M

**magically (1)**
44:2
**main (3)**
15:3;93:11;121:5
**majority (1)**
59:25
**makes (3)**
79:18;101:2;119:25
**making (7)**
14:25;46:24,25;57:6;
87:7;94:18;124:25
**management (1)**
6:7
**manager (2)**
113:24;114:6
**mandate (2)**
64:3;117:17
**Manges (1)**
3:13
**manifestly (1)**
86:21
**many (10)**
14:19;23:10,11;56:7,
24;67:2;73:12;87:17;
89:7;127:7
**marathons (1)**
107:13
**March (1)**
5:23
**marching (1)**
101:20
**marker (3)**
25:16;27:20;86:21
**markers (3)**
44:15;52:10;85:20
**market (3)**
58:20;108:18,19
**markets (4)**
53:11;54:9;55:7;
94:20
**masquerading (1)**
87:8
**massive (1)**
53:13
**masters (1)**
92:16
**materially (1)**
129:6
**math (1)**
19:20
**matter (28)**
3:10;5:16;15:1;19:2;
24:13;30:5,6;31:24;
45:2,18;51:22;60:21;
63:4;64:2;66:7;74:4,
15;75:14;76:7;80:9;
87:23;91:21;103:4;
115:8;120:14;132:7,
10,14
**matters (6)**

Min-U-Script®

Case: 19-30088    Doc# 4819    Filed: 11/20/19    Entered: 11/20/19 13:14:33    Page 145
of 155

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(11) lacking - matters

4:3,4,23;91:17;
124:6,6
**Matthew (1)**
7:2
**may (20)**
6:19;10:16;11:19;
30:7,7;32:13;33:5;
41:13;48:16;95:20;
111:20;117:25;121:8;
122:22;124:15,19;
126:17;128:3,6;129:6
**Maybe (13)**
6:25;27:20;29:20;
44:16,17,17,17;55:2;
58:14;59:17;67:10;
74:17;87:1
**mayor (1)**
20:24
**mean (57)**
6:24;8:1;10:9,17;
11:17,18;13:21;18:5;
19:25;22:17;23:24;
25:18;32:19;33:20;
35:2;39:19;48:24;
52:20;55:11,12,18;
65:1;67:11;68:5;70:20;
71:18;72:15,20;75:4,
18;77:17;81:24;82:2,9,
14;90:3;91:3,8,21;
93:16;94:5;98:10;
99:13;101:1,4,16,19;
106:7;109:2,2,6,24;
111:2;117:19;119:6;
126:4;128:1
**meaning (4)**
54:18;125:8,12,13
**means (10)**
13:21;58:9;78:24;
93:6;98:8;101:1;109:8;
121:6;125:12,19
**meant (1)**
109:24
**meantime (1)**
66:8
**meanwhile (1)**
15:8
**measure (3)**
41:1,1,4
**mechanics (1)**
86:10
**mediation (8)**
5:3;7:12;11:23,25;
12:1,10,12;82:12
**mediations (1)**
12:11
**mediation's (1)**
12:14
**mediator (1)**
13:14
**meet (2)**
59:4;114:8
**meet-and-confer (1)**
16:2

**members (2)**
26:21;87:3
**mention (2)**
78:24;96:7
**mentioned (6)**
87:17;88:9;90:4;
92:2;95:25;105:12
**mentions (1)**
87:20
**mercifully (2)**
87:18,19
**mere (2)**
90:9;91:5
**merely (1)**
94:15
**meritorious (1)**
14:1
**merits (6)**
13:5,8;84:25;115:14;
121:3;131:16
**mess (1)**
75:15
**message (1)**
26:16
**methodology (1)**
109:1
**mid-century (1)**
119:21
**midday (1)**
107:13
**middle (1)**
121:5
**might (19)**
9:20;29:18;32:21;
41:12,18;43:3;44:12;
52:3,4,11;56:10;58:11;
82:16;92:3;98:12,19,
23;114:24;125:6
**might've (1)**
125:7
**million (2)**
49:3;68:17
**mind (5)**
82:2;84:15;92:10,10;
111:3
**minds (3)**
56:14,23;106:8
**minimizes (1)**
95:19
**minute (3)**
51:20;59:17;84:8
**minutes (9)**
19:16,20,21;51:19;
59:25;62:17;80:14;
107:11;120:17
**misapplied (1)**
44:5
**misread (2)**
90:10,11
**miss (1)**
84:14
**missed (1)**
34:25

**misses (1)**
31:20
**missing (1)**
84:14
**misstated (1)**
97:20
**mistake (2)**
33:18;131:16
**mistaken (1)**
92:22
**misunderstood (1)**
129:14
**mixed (1)**
89:16
**mixing (1)**
120:24
**mode (1)**
91:6
**modified (1)**
96:16
**modify (1)**
66:6
**moment (4)**
5:13;15:23;18:13;
69:3
**monetary (1)**
95:22
**money (6)**
53:7;55:23;86:10;
92:11;94:18;95:15
**money's (1)**
45:8
**monopolies (1)**
120:5
**monopoly (5)**
34:17,18;108:14;
109:21,25
**Montali (3)**
3:5;76:13;88:8
**months (5)**
25:14;67:18;69:21;
70:14;74:2
**Moore (1)**
19:11
**moot (1)**
24:22
**more (27)**
4:21,22;15:12;18:6,
10;20:19;21:13;30:24;
35:23;41:2;42:10;46:4,
23;53:5;55:6;56:2;
63:12;65:22;90:17;
93:22;95:24;97:4,5;
102:6;117:17,22;
124:25
**Moreland (5)**
36:23,24;37:6;
124:10,10
**morning (11)**
3:6,7,11,12;5:8;
13:19;19:8,10;52:6;
85:12;133:7
**most (10)**

24:12;31:13;32:4;
34:20;35:17;62:8;
86:24;95:4,19;127:4
**motion (24)**
5:2,2,6,20;6:21;8:20;
11:22;12:18;15:1,2;
16:24;17:19;19:3;
38:10,12;78:14;81:24,
24;117:2,3,3,4;123:17;
128:18
**motions (2)**
6:9;15:21;17:11;
116:21
**motivated (1)**
88:8
**move (5)**
15:18,24;18:21;
38:17,18
**moved (2)**
38:15;75:25
**moving (6)**
6:13;16:2;17:7;
18:20;39:7;115:16
**much (19)**
11:1;12:8;13:19;
19:22;30:22,24;52:1;
53:5,5;56:2;64:7;
70:23;85:15,16;107:9;
114:17;120:8;127:10;
133:19
**multiple (3)**
10:4;92:20,20
**multi-prong (1)**
14:21
**municipal (2)**
21:1,6
**musings (1)**
87:3
**must (1)**
74:9
**myself (3)**
14:25;44:6;97:9

# N

**naive (1)**
82:10
**name (4)**
56:3;83:17;84:10;
132:24
**narrowly (1)**
35:2
**nature (1)**
76:2
**nauseum (1)**
64:23
**nearly (1)**
87:22
**Neat (2)**
96:14,17
**necessarily (1)**
56:19
**need (12)**

12:5;19:16;37:14;
46:21;50:3;89:9;96:9;
106:24,24;107:12;
123:17;132:24
**needed (2)**
65:12;90:16
**needs (5)**
38:18;56:11;68:22;
111:17;116:10
**negligence (13)**
24:4;43:17;53:14;
54:2,4,8;55:13;60:22,
24;93:24;99:14;
105:20;112:22
**negligent (12)**
24:12;31:25;54:4,14,
19;55:13;91:22;103:2;
105:16,22;106:21;
114:12
**negotiated (1)**
82:1
**neighborhood (1)**
113:4
**neither (2)**
109:3;122:5
**new (5)**
16:10;54:15;92:5,17;
117:4,4
**newspaper (1)**
49:6
**next (2)**
5:22;67:14
**nine (1)**
90:5
**nine-billion- (1)**
9:24
**ninety-five-percent (1)**
16:14
**Ninth (15)**
27:4,6,11;44:11;
70:25;72:23;89:12;
90:6;94:15;115:11,11;
128:7,16,19;131:17
**nobody (2)**
110:19;131:3
**none (4)**
31:16;50:19;53:25;
78:4
**non-negligent (1)**
54:19
**North (2)**
63:22;108:1
**Northern (2)**
67:8;94:14
**note (4)**
5:16,19;6:11;38:11
**noteholder (1)**
6:13
**nothing's (2)**
93:14,18
**notice (3)**
5:5;22:14;90:6
**notion (8)**

Min-U-Script®
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(12) Matthew - notion

Case: 19-30088    Doc# 4819    Filed: 11/20/19    Entered: 11/20/19 13:14:33    Page 146
of 155

40:15;43:18;47:11;
94:23;95:3;98:16;
99:17,18
**notwithstanding (1)**
61:22
**NOVEMBER (4)**
3:1;5:22;52:24,25
**nowhere (1)**
61:1;125:21,21
**number (10)**
6:9;15:3;30:4,5;
32:15;33:25;34:1;
81:20;110:21;129:23

# O

**object (2)**
81:12;121:22
**objected (1)**
15:4
**objection (2)**
10:3;14:21
**objections (2)**
10:5,12
**obligation (1)**
41:10
**observation (1)**
110:14
**observe (1)**
112:10
**observed (1)**
63:7
**obtain (1)**
91:19
**obvious (2)**
88:22;92:1
**Obviously (6)**
8:14;10:4,24;40:8;
111:3;113:15
**occasion (1)**
5:7
**occur (1)**
33:18
**occurred (2)**
98:10;99:5
**occurring (1)**
31:18
**o'clock (1)**
3:9
**October (2)**
78:18;119:5
**off (5)**
63:1;84:6,8;94:18;
111:1
**officer (1)**
100:16
**officers (1)**
100:15
**officials (1)**
56:13
**of-remedy (1)**
84:2
**Ohio (3)**

65:15,15;66:6
**old (1)**
119:25
**oldest (1)**
89:16
**omega (1)**
92:19
**once (3)**
67:12;85:4;128:10
**one (96)**
3:15;4:4,21,22;5:19;
9:15,16;10:1,2,5;
12:11;16:3;21:23,23;
23:15,18;25:12,12,13;
27:11;30:4;31:2;32:3,
11,15,25;33:16,25;
34:16;36:25;37:7,21;
38:14;44:17;47:15;
48:16;49:6;51:1,10,19,
20,20;61:7;62:16;63:6,
6;65:19,24;76:10,18;
83:3;84:5;85:6,23;
87:2;89:15,16,22;
90:13;93:5,12;95:24;
96:10,11,11;99:2;
102:19;105:11,21,21,
23;107:13;108:17;
110:4,18,21;113:25;
114:16,23;115:10,10;
116:20,21,22;117:5,12,
13,16;121:19;124:23;
127:11;128:8;131:3,6,
17,23
**one-half (1)**
36:17
**ongoing (5)**
5:3;7:12;11:25;12:1;
29:25
**only (17)**
3:16;13:16;14:23;
18:4;19:2;25:13;86:9;
100:8;105:3;108:23;
111:21;112:20;113:3;
114:20;123:16;131:1;
132:15
**onto (1)**
66:23
**oOo- (1)**
3:2
**open (4)**
17:10,16,18;74:23
**opened (3)**
12:2,10;13:9
**opening (1)**
19:20
**operated (1)**
21:1
**opinion (5)**
23:16;104:24;106:3;
120:15;127:13
**opportunities (1)**
97:19
**opportunity (3)**

11:7;85:19;102:19
**opposed (1)**
126:24
**opposite (3)**
40:10,10,16
**opposition (1)**
81:24
**Optical (1)**
94:13
**option (1)**
74:23
**options (2)**
51:22;127:13
**oral (1)**
5:18
**oranges (2)**
69:6,8
**order (25)**
3:3;6:7;10:12;18:18;
32:9;85:23;104:11;
110:20;111:4,12;
118:12,13;121:8,13,14,
16;127:18;128:4,20,
23;129:1,6;131:15;
133:4,15
**ordered (1)**
12:11
**orders (4)**
101:20;129:21;
133:3,5
**ordinary (1)**
86:2
**orientation (1)**
36:13
**Orsini (200)**
5:17;11:13;19:6,9,
10,15,19,24;20:5,7,15,
17,19;21:17,19;22:8,
11,15,18;23:3,5,9,11,
13,18;24:1,5,8,10,24;
25:3,5,6,8,11,17,23;
26:3,10,15,18,24;27:3,
6,22,25;28:4,11,14,20,
25;29:2,4,8,10,16,17,
23;30:2,4,15,18,20,22;
31:1,12,15;32:18,24;
33:2,7,10,12;34:8,11,
13,16,20;35:4,7,10;
36:7,9;38:1,5,9;39:9,
11,16,18,21,23,25;
40:2,4,8,18,21,24;41:2,
6,13,24;42:3,10,13,22;
22,24;45:6,10,12,14,
20,23;46:1,3,19;47:10,
13,16,19,21,24;48:1,5,
11,16,22;49:11,13,15,
18,23;50:2,8,12,21;
51:2,4,6,15,24;52:1,8;
53:20;58:24;63:7;
67:19;68:22;71:9;
74:12;76:19;78:14;
79:20;81:5;85:24;90:4,

20;94:23;99:10;
101:13;103:10;115:15;
120:11,15,16,18,20;
121:18,21;122:6,11,14,
19;123:22,24;124:2,4,
9,19;125:5,7,11;126:3,
5,11;131:23,25;132:1,
5,11,15
**Orsini's (4)**
63:2;75:11;78:9;
100:24
**others (2)**
22:4;131:2
**otherwise (3)**
17:2;22:2;107:6
**ought (5)**
21:24,24;22:21;
23:17;120:22
**ourselves (1)**
27:13
**out (37)**
4:2;7:9;15:12;25:20;
27:16,18;32:13;40:13;
43:18,19,20;44:24;
46:9;64:8;72:1,6;
76:13;77:4;81:25;
85:23;86:6;87:24;88:7;
90:2;95:20;104:3,12;
105:19;106:18;113:8;
117:21;122:8,16;
127:23;130:14;132:6;
133:21
**outcome (1)**
40:16
**outside (3)**
33:21;99:20;102:1
**over (8)**
42:22;57:11,11;61:6;
78:6;84:23;90:9;101:1
**overall (2)**
47:21;48:1
**overrule (1)**
10:11
**overturn (1)**
64:10
**own (4)**
15:11;50:5;121:1;
128:18
**owned (2)**
25:1;34:4
**owner (3)**
88:17;91:11;111:23

# P

**PacBell (6)**
37:18;50:22;88:4;
113:4,9;116:12
**pace (1)**
115:16
**Pacific (10)**
28:7;30:16,23;32:8,
9;33:17;34:25;35:25;

47:4;95:1
**page (12)**
31:20;59:9;72:17;
73:25;78:15,16,19;
83:19,19;84:3;112:15;
118:14
**pages (3)**
31:13,15;62:8
**paid (7)**
8:8;16:11;49:5;
111:22
**paper (1)**
90:17
**papers (1)**
98:16
**pardon (4)**
30:21;69:7;77:7;
84:14
**part (4)**
10:7,21;17:3;52:13
**partially (1)**
16:11
**participation (1)**
10:21;16:14;133:13
**particular (3)**
27:9,10;30:8
**parties (11)**
15:6;63:9;64:1,23;
66:1,8,18,20;88:6;
95:22;130:6
**partner (1)**
97:17
**parts (1)**
127:14
**party (5)**
63:10,11;66:23;
78:23;85:14
**Pasillas (3)**
36:16,17,19
**pass (2)**
24:18;114:9
**passing (2)**
92:23;94:9
**past (3)**
35:14;56:9;58:5
**path (1)**
122:2
**Pause (1)**
4:9
**pay (8)**
40:13;41:17;42:19;
82:4;86:16;88:21;
91:23;96:13
**pay-fixing (1)**
109:24
**paying (3)**
95:22;105:16;124:18
**payroll (1)**
68:16
**pejorative (1)**
83:4
**pending (1)**
70:15

Case: 19-30088    Doc# 4819    Filed: 11/20/19    Entered: 11/20/19 13:14:33    Page 147
of 155

**people (14)**
15:3,4;36:11,12;
46:19;56:10;58:15;
92:8,16;95:13;114:10;
119:18;120:4;124:17
**per (1)**
98:7
**percent (2)**
28:11;79:19
**perception (3)**
54:12,12;55:8
**perfectly (1)**
122:14
**perhaps (1)**
122:2
**period (4)**
5:21,22;38:22;103:9
**permit (5)**
23:21;30:7;74:3;
98:11;126:18
**permitted (4)**
32:12,13;100:17,18
**person (1)**
123:15
**perspective (5)**
37:3,3;40:6;101:8;
124:6
**persuade (1)**
44:10,10,10
**persuaded (2)**
102:25;115:23
**persuades (1)**
99:10
**persuasive (6)**
22:1;25:13;58:19;
73:11,14;117:23
**petition (11)**
63:3;65:15;69:20;
76:11;78:2;113:21;
117:7,7,17;119:3,4
**petitions (4)**
64:13;67:12,14;
83:10
**PG&E (58)**
3:10;24:17;26:15;
29:21;32:3;40:13,18;
43:3;45:2;52:7;53:7;
59:1;63:10,19,21;64:2;
67:7,14,16;69:19,20,
25;71:11;73:3;74:2;
76:4;87:23;88:2;91:7;
92:25;93:10;95:3;96:2;
99:2;102:17;103:2,9,
11,11;107:3,5,8,19;
110:20,22;111:5;
112:5,7;113:25;
116:21,22,23,23;117:2;
119:3;121:1;126:9;
131:2
**PG&E's (4)**
93:22;95:25;101:6,8
**phase (1)**
65:25

**philosophers (1)**
55:1
**philosophical (1)**
102:12
**phone (1)**
50:25
**phonetic (8)**
70:11;71:14;89:5,11,
11,13;96:15;106:19
**phrase (1)**
67:5
**phrases (1)**
113:25
**piece (3)**
10:12;21:23;27:12
**pile (1)**
84:21
**pin (3)**
29:1;54:17,17
**place (3)**
14:16;67:6;124:21
**placing (1)**
76:13
**plain (1)**
89:20
**plaintiff (5)**
9:11;38:12;116:22;
130:8,9
**plaintiffs (1)**
116:23
**plaintiff's (1)**
114:7
**plan (5)**
6:13;7:24;8:8;14:8;
82:3
**plan- (1)**
14:2
**plane (1)**
38:13
**plant (1)**
124:16
**plants (1)**
67:5
**play (4)**
42:17;43:9;119:17,
19
**playbook (1)**
28:1
**playing (5)**
49:20,22,23;76:2,3
**pleading (1)**
87:9
**Please (4)**
3:8;56:4,5;88:24
**pleases (1)**
133:14
**pleasure (1)**
85:13
**pled (1)**
85:24
**plenty (2)**
126:17;131:18
**PM (1)**

133:24
**podium (4)**
5:13;6:16;9:15;
84:23
**point (97)**
8:18;10:19,20;11:18;
15:10;22:19;25:22;
29:4;30:6;31:2,21,23;
32:15;33:6,8,13;35:15;
37:22;38:16;44:16;
45:4;47:12,13;49:12,
13;50:2;51:5,6,7;
56:21;57:24;58:10,11,
13,14,17,18;61:17;
63:5;64:4;65:20;66:19;
68:18;72:8;73:3,3,5;
76:4,15;79:7,13;80:4;
81:23;82:14,21;83:24;
84:7;85:23;87:19;89:9;
90:24;91:1;92:18;93:7,
22;94:3;95:24;96:7,11;
97:23;103:6,11,24;
104:1,1,3,23;105:21;
106:24;109:4,5,22;
110:16;116:1,4;
117:25;120:13;125:24;
126:7,7,13;127:11;
130:1,17;131:23;
132:5,15
**pointed (4)**
34:17;104:3,12;
105:19
**pointing (2)**
86:6;102:22
**points (16)**
9:14;29:23;33:10;
44:15;47:4,4;49:16;
50:3,4;68:8,12;79:13;
104:5,9;114:24;126:18
**pole (1)**
113:9
**policy (8)**
50:16,17,18;51:7,8,
10;87:9;105:9
**policymaking (1)**
87:13
**political (4)**
48:17;86:22;87:5;
92:16
**politicians (1)**
56:16
**portion (3)**
9:19;14:23;91:16
**position (5)**
14:14;29:24;43:14;
62:24;73:4;76:13;
97:20,20,21,22
**positions (1)**
82:1
**positive (1)**
132:23
**possibility (1)**
51:11

**possible (2)**
60:12;98:25
**posture (2)**
97:13;107:7
**postured (1)**
98:2
**potentially (1)**
46:12
**potted (1)**
67:5
**power (5)**
21:8;24:20;33:19;
108:16;110:6
**powerful (2)**
58:11,19
**powerless (1)**
57:5
**powers (1)**
108:15
**practice (4)**
24:3;29:19,21;
130:16
**practicing (2)**
67:23;89:23
**pray (1)**
28:1
**prayer (1)**
87:7
**praying (1)**
87:7
**precedent (4)**
50:5,5;89:12;110:23
**precedented (1)**
88:3
**precisely (5)**
7:1;37:13,14;43:13;
124:12
**predict (3)**
25:20;35:3;37:14;
46:6;51:11;52:11;
76:24,25;77:1,1;83:9;
99:22;100:23
**predicting (3)**
26:10,23;62:1
**prediction (6)**
99:11,11,22;100:25;
101:17;126:19
**preferential (1)**
94:19
**premised (3)**
39:2;40:14;67:4
**prepared (4)**
51:23;79:11;120:12,
14
**preparing (1)**
57:11
**prerequisite (1)**
91:3
**present (3)**
38:19;66:10,11
**presented (6)**
27:15;30:9,10;51:16;
92:10;96:2;98:5;100:4;

101:3;123:7
**presiding (1)**
3:5
**pressure (2)**
59:6;115:17
**presumably (2)**
60:20;68:1
**presume (2)**
91:22;112:25
**presumed (1)**
33:18
**presumption (4)**
32:11,12;41:8,18
**pretend (1)**
57:9
**prevent (2)**
59:3;63:23
**prevented (2)**
31:17;75:9
**previous (1)**
66:14
**primarily (2)**
90:4;107:20
**primary (1)**
120:3
**Prime (1)**
16:6
**principle (5)**
29:11;36:20;47:6;
49:9;101:21;124:1
**principles (3)**
96:4;103:23;111:6
**priority (2)**
14:9,13
**private (17)**
30:11,11;33:16;36:3;
37:10;88:6,10,11,22;
94:5,7;103:19,21;
110:7;111:20;112:2,12
**private-investor- (1)**
34:3
**privately- (1)**
24:25
**privately-owned (3)**
57:23;88:3;112:1
**probably (7)**
18:17;40:22;49:23,
24;106:12;113:21;
125:25
**problem (17)**
24:6;33:25;34:1;
43:14;48:2,6,19;54:9;
56:10,13;57:1;61:19;
91:7,24;95:23;96:14;
120:7
**problems (4)**
67:8;92:11;95:19;
110:4
**procedural (4)**
97:13;107:7;121:25;
122:1
**procedurally (4)**
10:18;74:20,22;77:4

Min-U-Script®

Case: 19-30088    Doc# 4819    Filed: 11/20/19    Entered: 11/20/19 13:14:33    Page 148
of 155

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(14) people - procedurally

**procedure (1)**
115:10
**procedures (1)**
127:9
**proceed (1)**
19:5
**proceeding (23)**
4:7,24;5:15;6:23;
8:19,23;9:11,16;10:3;
11:17;13:22;14:3;15:9,
19;16:3,25;17:9,16;
18:15;42:14;97:25;
110:10;121:9
**proceedings (4)**
15:11;29:25;118:9;
133:24
**process (12)**
13:21;66:24;94:1,2,
10,11;112:8;113:19,
24;117:9;119:2;127:5
**produce (1)**
109:21
**produces (1)**
101:12
**professors (1)**
55:2
**progress (2)**
6:24;129:6
**prohibition (1)**
117:17
**promptly (2)**
12:20;17:24
**proof (1)**
114:5
**proper (1)**
96:20
**properly (1)**
42:15
**property (8)**
57:14;87:24;88:17;
91:11;96:12;110:7;
111:20;112:2
**proposed (5)**
5:24;110:20;111:4,
11;133:5
**proposition (2)**
112:4;121:1
**prosecute (1)**
11:1
**prosecuted (1)**
65:25
**prospect (1)**
53:13
**protect (2)**
108:14;120:4
**protected (1)**
36:14
**prove (1)**
14:16
**provide (1)**
5:14
**provided (3)**
34:23,23;46:8

**provider (1)**
103:12
**provides (1)**
6:7
**providing (5)**
36:12;50:25;88:12,
12;109:19
**provision (5)**
20:8;87:21;93:23;
104:17,19
**provisions (1)**
108:4
**prudence (10)**
29:24;41:1;42:1,7;
43:8,16;60:21,24;95:8;
106:14
**Prudency (6)**
54:3,3,9;60:25;86:3,
15
**prudent (25)**
24:2;29:19,21;31:24;
32:17,23;40:20,23;
41:10,20;42:16;43:3;
53:22;54:19;55:11,14,
17;86:14;106:10,11,19,
22;113:24;114:6;
123:25
**public (52)**
20:9,21;25:3;30:13,
16,21;31:23;34:7,23,
24,24,25;36:4,12,15;
37:8,11;43:9;50:19,24;
51:1;59:19;60:2;61:1;
86:8;87:21,24;88:7,12;
90:6;91:13,20;92:23;
93:3,3;104:15;108:9,
13,14,15,15;110:8;
111:21;112:1;120:3,5;
123:9;124:11,13;
132:7,10,14
**publications (1)**
26:20
**publicly-owned (1)**
92:9
**published (1)**
118:13
**PUC (9)**
86:13;87:3,6;92:12,
24;95:7,7;113:19;
118:8
**pun (1)**
88:1
**punish (1)**
53:21
**punished (1)**
109:8
**punishment (3)**
109:12,14,16
**purchased (1)**
38:14
**pure (1)**
97:25
**purpose (19)**

20:8;29:5;30:17,21;
34:7;35:11,22;36:10,
11;37:12;91:9;98:6,7;
110:8;120:3;122:25;
124:23;125:2;127:17
**purposefully (1)**
79:8
**purposes (2)**
34:4;36:4
**pursuant (1)**
69:22
**push (1)**
38:13
**pushed (2)**
79:22,24
**put (13)**
27:1;45:7;67:2;
85:22;86:11,19;91:18;
92:11,18,23,25;94:5;
95:16
**puts (1)**
59:5
**putting (5)**
33:16;49:2;91:8;
95:2;104:10

**Q**

**quarterback (2)**
49:20,22
**quasi (1)**
34:18
**quest (1)**
85:20
**quick (2)**
60:7;131:23
**quickly (13)**
11:7;15:18;16:1,3;
17:7;18:20,21;39:7;
118:5,7;122:19;
126:23;131:22
**quite (5)**
81:22;93:9;97:16;
105:5;124:14
**quote (7)**
65:23;66:2,13;80:8,
10;87:16;93:21
**quoted (1)**
20:16
**quotes (1)**
28:22

**R**

**railroad (1)**
88:10
**raise (7)**
37:6;53:7;55:23;
56:21;91:23;116:1,4
**raised (6)**
108:18;110:15;
114:17,19,20,21
**raising (1)**

21:7
**rank (1)**
50:3
**ranking (2)**
49:17;50:4
**rarely (2)**
38:3;46:19
**rate (5)**
33:23;59:11;95:15,
16;109:24
**rate-making (4)**
110:10;112:18;
113:23;114:2
**ratepayers (1)**
71:11
**rate-recoupment (1)**
53:10
**rates (14)**
21:7;37:6;43:12;
53:16;54:14;59:6;67:8;
92:12;106:13;108:22;
109:1,7;112:12,13
**rather (4)**
6:15;13:6;60:24;
85:2
**rating-agency (1)**
54:10
**rational (6)**
94:11,15;95:12,20;
120:1,6
**rationale (4)**
34:21;35:1,19;105:9
**rationality (1)**
95:11
**re (2)**
89:13,14
**reach (5)**
23:23;28:17,21;
38:24;107:4
**reaction (1)**
58:21
**read (19)**
5:8;11:2;28:2;36:18;
49:6,7,7;57:11;59:9;
68:19;78:5;93:16;
106:2,2;116:18;
118:19;119:1;128:6;
129:11
**reading (3)**
20:1;84:15;104:25
**ready (1)**
19:4
**real (3)**
54:9;65:14;115:6
**realistic (1)**
94:6
**reality (2)**
54:15;99:19
**realize (5)**
18:7;39:6;42:8;67:6;
104:6
**really (13)**
6:22;7:21;12:5,6;

33:3;35:25;64:18;67:3;
76:21;87:8,17;90:1;
98:4
**real-world (1)**
52:15
**reason (20)**
4:15;14:4;39:11;
48:16,17,18;51:17;
52:13;65:14;66:13;
75:24,25;99:6;103:15;
105:7;115:24;118:22;
124:11;129:9;130:18
**reasonable (3)**
56:14;100:3;112:13
**reasonableness (2)**
31:22;95:8
**reasoning (1)**
118:23
**reasons (5)**
12:20;15:6;50:15;
98:4;100:14
**rebuild (1)**
92:8
**rebuttal (1)**
19:17
**recall (1)**
119:12
**recent (5)**
20:22;21:14;32:4;
63:12;116:10
**recently (2)**
86:22;96:18
**reckless (1)**
31:25
**recognize (1)**
29:1
**recognized (3)**
58:25;61:19;88:20
**recognizing (1)**
90:2
**recommend (2)**
113:20;130:23
**recommendation (1)**
11:16
**recommended (1)**
121:10
**record (9)**
7:2;13:18;19:10;
62:20;64:25;90:8;
118:11;126:16;132:24
**recover (4)**
31:8;53:15;54:14;
112:12
**recovered (1)**
32:6
**recoveries (1)**
8:10
**recovery (32)**
23:22,25;30:7;32:1,
11,17,22;33:18;39:16,
17;40:5,15,19;41:21;
53:23;55:14;59:11;
60:18;85:24;91:19;

Min-U-Script®

Case: 19-30088    Doc# 4819    Filed: 11/20/19    Entered: 11/20/19 13:14:33    Page 149
of 155

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(15) procedure - recovery

94:6;95:1,6;96:3;
103:6;122:21;123:3,9,
14,20;124:1,7
**refer (1)**
124:24
**reference (1)**
104:20
**referenced (1)**
91:2
**references (1)**
90:25
**referring (2)**
38:12;128:15
**refused (3)**
64:9;65:24;89:8
**regarding (1)**
85:22
**regardless (5)**
43:16,16,17;120:21;
122:7
**regular (1)**
18:3
**regulation (2)**
92:13,15
**regulators (1)**
95:18
**regulatory (6)**
41:24;42:15;43:11;
60:10;95:4;108:6
**rehearing (2)**
113:22,22
**reimbursed (3)**
57:14,18,19
**reinstate (1)**
74:3
**reject (2)**
50:20,22
**rejects (1)**
40:12
**relate (2)**
55:19;62:23
**related (2)**
7:8;57:10
**relatedly (1)**
4:25
**relates (1)**
97:13
**relationship (1)**
80:6
**relevant (6)**
33:3,3,5;47:24;
114:2;124:5
**reliable (1)**
59:13
**relied (1)**
36:1
**relief (10)**
6:11;63:23;68:1,7;
69:1;74:13;96:20;
102:2;107:8;110:19
**relies (1)**
32:11
**rely (1)**

32:9
**relying (6)**
6:6;37:5,5;83:17;
97:23;107:6
**remains (1)**
66:7
**remedies (4)**
38:7;72:9,18,21
**remedy (3)**
73:2,22;96:20
**remember (3)**
78:7;96:12;130:5
**remind (1)**
83:16
**rendered (1)**
65:24
**renewal (1)**
117:3
**renewed (1)**
117:3
**repeat (1)**
52:8
**repeatedly (1)**
51:12
**reply (2)**
51:25;80:13
**report (2)**
18:11;59:9
**represent (2)**
63:21;107:18
**representatives (1)**
95:13
**reproduction (1)**
133:5
**request (4)**
17:6;18:2;115:13,25
**requested (5)**
11:22;68:25;107:8;
110:20,21
**require (2)**
92:11;114:4
**required (1)**
93:8
**requirement (1)**
90:6
**requires (1)**
43:23
**requiring (1)**
129:2
**re-raised (1)**
116:8
**rescind (1)**
48:8
**reserve (1)**
19:16
**reserved (1)**
68:20
**resolution (3)**
12:16;18:17;129:2
**resolve (8)**
9:1;10:14;12:20;
14:12;17:3;37:15;
45:23;123:17

**resolved (10)**
9:4,6;10:6,7;12:18;
30:2,3,4;81:15;119:12
**respect (13)**
5:2,5,16;7:20;31:3,7;
41:11;45:21;60:18;
67:13;108:17;125:15;
126:20
**respond (5)**
11:21;17:9,16,24;
120:12
**responded (1)**
79:10
**responding (1)**
97:15
**response (3)**
16:25;82:1;132:1
**responsibility (1)**
127:7
**responsible (1)**
105:15
**rest (3)**
84:24;104:17;105:10
**restrict (1)**
94:22
**result (6)**
28:21;35:13,21;40:5;
61:25;103:1
**return (1)**
95:15
**reversal (1)**
126:1
**reverse (1)**
131:17
**reversed (1)**
98:23
**reverses (2)**
45:4,5
**reversing (1)**
75:10
**review (28)**
31:22;37:23;42:1;
63:3;65:15,21,24;
66:15;67:12,14;69:4,
20;76:11;78:2;86:3;
92:20;95:8;108:23;
113:16,21;115:3;
117:7,7;119:1,4,4;
122:7;125:23
**reviewed (4)**
45:19;46:1,3;108:19
**reviewing (2)**
113:17;117:10
**revise (1)**
77:1
**revisit (1)**
72:24
**revisited (1)**
43:21
**Riddle (1)**
107:17
**right (143)**
3:21;4:21,22;5:1;6:6,

16;7:11;8:7;9:10,18;
11:24;13:7,24;16:9;
18:14,24;19:1;21:20;
22:8;23:20;24:19;25:2,
25;26:10;28:24;29:25;
30:18;33:12,22;34:8,
17;35:24;36:7,9;37:25;
38:8;39:18,20,22,22,
24;40:7,23;41:5;43:22;
45:10;46:4,4,12,14,14,
21;51:8,11;55:18;
56:18;57:16;60:9;61:8,
11;63:15,25;64:13;
65:11;68:9;69:18,24;
71:4,24;73:6,16,18;
74:15;75:22;81:7,21;
82:13;84:1,7;86:18;
88:18;91:14,21,24;
93:20;94:2,4;96:1;
98:7,8,10,24;99:14,24;
102:9,15;103:15;
104:14,21,21;105:14,
17;106:4,5;107:10;
110:1,18;111:7,16,24;
113:2,7,10,11,11,13,14,
18;114:13,25;116:14,
20,25;117:1,24;118:2,
10,17,18;119:7,7,11,
13;125:2,10,19;126:2;
127:3,4;128:5,19;
133:8,21
**rightly (1)**
105:19
**rights (1)**
11:1
**ripe (3)**
114:18;115:13,24
**ripeness (8)**
39:8;95:23;96:14;
114:18,23;122:20;
123:7,11
**rise (1)**
3:4
**rising (1)**
132:15
**risk (5)**
16:12;48:1;54:12,13;
55:8
**Rivkin (41)**
77:10;84:23;85:1,3,
5,5,6,10,11,13,15,18;
86:15,17,19,21;87:12,
19;88:15;89:1,3,5,7;
90:13,15,18,24;91:15,
25;92:6,15;93:15,19,
21;94:3;96:11,19,24;
97:18;101:18;102:13
**Rivkin's (3)**
117:20;124:14,22
**road (5)**
40:5;41:19,19;42:14;
54:7
**Robert (1)**

62:20
**role (4)**
76:2,3;100:20;
113:19
**Roman (1)**
130:2
**room (2)**
12:15;13:12
**rooted (1)**
57:2
**route (2)**
69:17;121:23
**routes (1)**
69:16
**routinely (1)**
68:7
**RSA (24)**
4:25;5:2;6:20,23;7:7,
10,22;8:23;9:1,9,10,23;
10:4,5,7,13,22;11:23;
14:21,23;15:2,23;18:3;
81:24
**rule (27)**
8:1,9;21:10;26:25;
51:21,22;52:3,12;62:2;
66:6;72:6;88:23;90:7;
97:21;98:1,1,2;99:9;
105:4;115:14;120:13,
14,21;122:9,15;
126:15;127:17
**ruled (1)**
65:19;70:6;88:5;
119:2
**rules (2)**
69:17;106:9
**ruling (19)**
9:21;18:20;38:24;
39:13;45:19,21;46:11;
57:7;66:14;68:21,22;
75:25;80:23;100:24;
111:5;112:5;115:9;
118:25;120:25
**rulings (2)**
21:14;100:19
**run (2)**
8:19;125:23

## S

**S&P (1)**
54:10
**Sacramento (5)**
49:8;56:8,24;58:15;
59:18
**safe (1)**
59:13
**sake (1)**
19:2
**same (21)**
37:10;53:19;54:6;
59:14;63:8;66:1,17,18,
19,20,23;71:7;72:19;
74:2;86:12;88:22;

Min-U-Script®

Case: 19-30088    Doc# 4819    Filed: 11/20/19    Entered: 11/20/19 13:14:33    Page 150
of 155

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(16) refer - same

117:8,9;123:8;127:23;
133:17
**SAN (9)**
3:1;31:16;32:20;
39:19;53:8,11;66:4;
107:24;118:7
**saying (23)**
10:9;12:1;24:18;
32:20;43:15;47:6,10;
50:23;51:15;64:21;
71:10;73:17;74:6;
103:15,18;106:9;
114:19;115:13;116:21,
22;123:2;124:15,17
**scenario (5)**
40:10,10;41:16;43:7,
7
**schedule (1)**
15:14
**scheduling (3)**
11:18;15:10,25
**scholar (1)**
97:9
**school (1)**
55:2
**SDC (1)**
119:6
**SDG&E (3)**
110:10;113:22;119:7
**se (1)**
98:7
**seated (1)**
3:8
**second (13)**
5:16;35:11;49:21;
69:25;84:5;85:6;89:23;
90:13;111:16;112:5,5;
117:2;129:15
**second-largest (1)**
107:19
**Secondly (1)**
108:13
**seconds (1)**
87:1
**Section (11)**
57:11,12;70:5,13;
86:4;95:5;125:4;
127:19;128:10,14;
129:11
**seeing (3)**
104:22;112:17,20
**seek (2)**
67:20;126:24
**seeking (2)**
5:23;94:16
**seeks (3)**
7:21;8:11;9:12
**seem (2)**
58:11;59:24
**seemed (1)**
106:8
**seems (4)**
9:10;99:10;101:20;

112:4
**sell (1)**
109:21
**Senate (1)**
59:25
**sense (4)**
91:16,17;93:22;
100:12
**sensitivity (1)**
74:7
**sentence (4)**
106:12,12;111:2,20
**separate (8)**
10:8;43:13;52:14;
69:14;80:7;110:12,14;
121:9
**September (1)**
78:18
**sequence (1)**
117:21
**serious (1)**
92:10
**serve (1)**
18:9
**service (2)**
50:25;88:12
**session (1)**
3:4
**set (9)**
6:2;18:2;33:16,17;
53:7;59:2;62:10;
108:25;109:1
**sets (1)**
108:22
**setting (1)**
127:8
**settled (2)**
68:19;74:19
**settlement (4)**
12:15,16,18;14:2
**settlements (2)**
68:18,19
**settlement's (1)**
12:14
**settling (1)**
9:24
**seven (2)**
25:21;27:2
**seventeen (1)**
14:18
**seventy (3)**
31:13,15;79:19
**several (6)**
39:20,23;81:9,11;
86:22;114:9
**sexual (1)**
36:13
**SFPP (1)**
112:14
**shall (1)**
128:17
**share (1)**
19:6

**shared (1)**
103:5
**shareholders (2)**
52:7;81:3
**sharing (2)**
62:11;132:25
**shopping (1)**
83:2
**short (5)**
3:14;4:23;87:18,19;
111:19
**shorted (1)**
113:8
**shorter (1)**
44:19
**shorts (1)**
71:14
**shot (3)**
76:5;94:6,9
**show (4)**
14:19;25:12;26:11;
108:8
**shown (1)**
54:9
**shows (2)**
82:25;86:21
**sic (13)**
12:12;18:12;20:25;
25:18;28:1,7;30:16;
33:19;60:8;62:15;
72:11;80:6;124:24
**side (11)**
4:16;15:4,5;19:15;
24:3;31:4;78:23;80:8;
101:14;109:7,9
**sides (2)**
12:25;19:25
**sign (2)**
133:17,18
**signaled (1)**
27:21
**significant (7)**
25:16;42:9;47:15;
73:14;101:16;117:13,
17
**significantly (1)**
46:4
**similarly (1)**
15:3
**simple (2)**
79:20;112:4
**simply (5)**
58:10;61:17;63:7;
103:22;124:9
**single (5)**
12:11;86:2;93:23;
102:22;123:15
**sit (2)**
21:21;99:19
**situated (1)**
15:4
**situation (1)**
92:7

**six (1)**
121:19
**SKIKOS (10)**
132:19,21,23,25,25;
133:3,9,11,16,19
**skip (1)**
89:7
**slap (1)**
126:2
**slapped (2)**
126:11,12
**Slide (3)**
28:5;22;124:24
**slightly (5)**
63:7;64:15,16,17,18
**small (1)**
21:10
**socialization (15)**
20:10;29:6,22;32:1;
33:14;87:20;89:22;
90:19,25;91:7,16;93:2,
8;123:2;124:20
**socialize (2)**
50:17;88:1
**socialized (1)**
24:15
**solely (1)**
40:14
**solicitation (1)**
5:21
**somebody (4)**
8:19;57:13;59:18;
121:8
**someday (1)**
98:18
**someone (3)**
24:3;106:10;127:18
**somewhere (2)**
49:8;76:15
**soon (1)**
16:23
**sorry (10)**
40:18;41:20;76:4;
78:18;84:14;94:22;
97:5,6,9;119:7
**sort (4)**
7:25;24:4;30:23;
73:15
**sought (1)**
37:23
**sound (1)**
23:2
**sounds (8)**
15:17;24:4;49:12;
55:11;78:1,3;93:17;
106:7
**Southern (4)**
29:18;31:5;53:8;
113:9
**speak (4)**
11:11;50:15;104:17;
127:12
**SPEAKER (1)**

97:3
**specially (1)**
18:1
**specific (6)**
9:20;18:11;52:10;
61:23;106:15;112:12
**Specifically (1)**
52:17
**speculation (2)**
98:12,18
**speed (3)**
14:5;38:17,18
**spend (2)**
86:24;87:1
**spent (2)**
31:11,15
**spread (4)**
21:6;34:24;41:8;
103:17
**spreading (2)**
33:15;35:2
**squared (1)**
50:10
**stand (6)**
12:13;22:24;80:13;
84:15;85:7;122:15
**standalone (1)**
10:10
**standard (10)**
26:4;41:14,15;54:4;
60:21;86:13,14,15;
93:24;114:8
**standards (1)**
117:9
**standing (1)**
71:9
**start (5)**
6:18;17:7;63:1;
97:15;104:11
**started (3)**
31:21;37:22;89:23;
119:21;129:17
**starting (1)**
49:20
**state (38)**
21:14,22;22:2,24;
23:20;27:17;37:20;
40:11;48:3;55:23;
56:13;57:2,7;59:6;
60:21;61:18,22;64:24;
66:8,10,15,17;67:21;
70:12;74:5,23;77:5;
78:22;86:25;87:4;88:6;
89:24;96:5,22;104:18,
19;120:4;129:3
**state-court (4)**
63:11;74:8;89:24;
126:25
**stated (2)**
23:18;51:20
**statement (10)**
6:19;11:22;50:16;
52:14;63:2;99:9;105:3;

Min-U-Script®

Case: 19-30088    Doc# 4819    Filed: 11/20/19    Entered: 11/20/19 13:14:33    Page 151
of 155

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(17) SAN - statement

125:22;130:12;131:14
**statements (3)**
   31:4;56:12;89:17
**States (2)**
   22:12,21
**state's (1)**
   59:4
**statewide (1)**
   59:1
**status (6)**
   4:5,24;5:15;18:11;
   34:18,18
**statute (10)**
   27:9,13,13,14;37:4;
   86:8;90:7;104:2;
   121:15;130:2
**statutes (2)**
   24:20;108:4
**statutory (7)**
   36:20;41:9;89:25;
   90:11;107:21;108:6,10
**stay (15)**
   38:11,15;63:23;68:1,
   4,5,6,7;69:1,3;74:3,13;
   75:5,8;127:2
**stayed (2)**
   38:9,10
**stays (1)**
   75:16
**stem (1)**
   108:10
**step (2)**
   38:7;68:13
**Steve (1)**
   132:25
**STG (1)**
   106:19
**stick (1)**
   120:10
**sticking (1)**
   42:7
**still (22)**
   4:1,13;5:10;9:1;
   31:9;38:15;39:5,5;
   44:16;68:6;74:17,23,
   24;75:23;80:6;86:11;
   91:23,23;100:13;
   103:13;111:2;130:14
**Stillner (1)**
   89:11
**stipulate (3)**
   35:10,23;132:7
**stipulation (3)**
   17:15;133:4,5
**stipulations (1)**
   133:3
**stock (2)**
   65:6;82:7
**stood (1)**
   126:12
**stop (2)**
   75:5;88:10
**story (2)**

87:25;113:1
**strange (2)**
   92:23;105:5
**street (4)**
   18:8;39:8;44:3,8
**stretched-out (1)**
   15:14
**strict (19)**
   24:10;41:6,7;42:20;
   52:18;53:13;79:21;
   93:25;94:4,8;95:17;
   101:12;103:13;105:13;
   109:7,10;110:1;
   112:20,22
**stricter (1)**
   54:3
**strict-liability (3)**
   40:14;59:15;124:1
**strictly (6)**
   41:18;43:16,17;
   103:4;105:23;114:11
**strike (3)**
   23:19;59:9;103:13
**strikes (1)**
   122:4
**strong (1)**
   8:14
**struck (2)**
   7:25;50:23
**structure (1)**
   48:2
**stuck (2)**
   29:20;121:8
**Students (1)**
   36:1,17,20,25;37:7
**stuff (2)**
   96:21;100:21
**subject (10)**
   6:12;42:18;86:12;
   88:7,22;92:12,15;94:8,
   22;105:13
**subjected (2)**
   86:2;88:19
**submissions (1)**
   31:4
**submit (4)**
   30:5;37:17;46:7;
   61:20
**submitted (2)**
   110:20;118:20
**subordinate (2)**
   7:22;8:11
**subordinated (2)**
   8:10;14:17
**subordination (2)**
   16:12,15
**Subro (3)**
   77:11;80:12;81:24
**subrogation (20)**
   7:3;11:24,25;12:15;
   14:17;15:5;16:4,11,12,
   15,20;17:6,15;62:17,
   24;80:5;97:6,8,17,22

**subros (1)**
   126:23
**subsequently (1)**
   8:9
**substantial (3)**
   45:2;97:18;98:21
**substantive (2)**
   94:10,11
**substitute (1)**
   66:3
**succeed (1)**
   100:12
**success (1)**
   8:15
**sudden (1)**
   92:25
**suddenly (4)**
   27:1;88:20;92:18,23
**suffer (1)**
   54:5
**sufficient (1)**
   96:3
**suggest (3)**
   50:19;107:6;114:24
**suggested (1)**
   124:22
**suggestion (1)**
   31:6
**suggests (1)**
   18:18
**suit (2)**
   66:11,11
**summary (2)**
   16:24;65:14
**summer (7)**
   46:23;56:8;58:12;
   61:22;125:16;126:22;
   127:9
**supplemental (2)**
   12:19,21
**support (1)**
   122:16
**supported (2)**
   15:5;97:22
**suppose (1)**
   39:13
**supposed (10)**
   15:15;24:16;25:10,
   19;26:17;27:3;91:17,
   18;93:5;97:25
**supposedly (2)**
   80:6;85:25
**supposing (1)**
   66:13
**Supreme (111)**
   20:12;21:3,4,10,15;
   22:5,12,21;25:20;
   26:11,11;27:1,15,21;
   28:6,15,16,21;29:5,11,
   17;30:10;32:7;34:14;
   35:4,13;36:2;37:13,15,
   17,20;39:4;41:22;42:6;
   44:3,12;45:4,15;46:6,

9;50:4;52:11,15;57:6,
   21;58:10,22;61:24;
   62:1;63:3,4,19;64:19,
   22;65:14,18,18,20;
   66:3,5,15;67:5,10,22;
   68:25;69:21;70:15,18;
   71:10;72:7,24;73:8,9,
   13;74:13;76:25;82:25;
   83:9,10;88:5,15,18,20;
   89:8;90:7,8;94:14;
   98:12,23;99:23;
   100:23;102:25;110:23;
   113:15;114:24;115:2,
   12,13,18;117:8,9,15;
   119:8,9,10;122:24;
   125:1,11;126:1,15;
   128:25
**Sure (14)**
   4:12;6:10;17:14;
   27:23;33:22;38:11,16;
   40:21;51:10;54:24;
   72:22;95:18;118:4;
   132:22
**surplusage (2)**
   90:11;111:4
**surprise (1)**
   97:16
**surprised (4)**
   92:16;94:24;95:5,7
**suspect (2)**
   60:12;61:11
**Swaine (1)**
   19:11
**system (2)**
   74:23;126:25

**T**

**table (8)**
   62:10;78:10;84:9,12,
   13,17;85:8;88:25
**tail (2)**
   111:4;130:13
**takers (1)**
   104:20
**takings (1)**
   112:8
**takings-and-substitute-process (1)**
   87:2
**talk (17)**
   6:22;7:7;12:9;20:19;
   23:9;28:8;30:16,18,20,
   22;34:17,18,19;102:6;
   112:9;115:5;128:18
**talked (4)**
   78:2;96:19;100:21;
   110:19
**talking (13)**
   6:20;36:17;42:25,25;
   47:23;49:4;66:11;
   86:24;87:1;101:18;
   104:20;129:19,20
**talks (2)**

82:15;92:22
**task (1)**
   21:10
**tax (1)**
   91:21
**taxation (2)**
   21:7;33:24
**taxes (1)**
   91:23
**TCC (17)**
   6:13;7:21;8:2,10;
   9:21;10:4;22:4,20;
   36:16;38:6;62:16;
   97:21;105:1;107:2;
   109:9;126:23;127:15
**TCC's (1)**
   10:11
**teaching (2)**
   94:13,14
**tears (1)**
   93:17
**tee (2)**
   14:4;44:14
**teed (2)**
   45:16;48:23
**tee'd (1)**
   126:22
**Tel (1)**
   30:16
**telling (4)**
   79:11;102:4;126:14,
   15
**tells (1)**
   33:8,13;51:15
**ten (1)**
   70:14
**tenable (1)**
   45:14
**tend (1)**
   110:13
**tense (1)**
   58:5
**term (4)**
   16:21;27:19;102:10;
   104:10
**terminated (1)**
   74:3
**terms (6)**
   21:5;26:4,5,10;83:4;
   104:18
**terrible (1)**
   115:17
**territory (1)**
   110:1
**test (3)**
   4:10;94:12;120:2
**texts (1)**
   51:20
**Thanks (3)**
   52:1;85:3;122:18
**that'd (1)**
   49:5
**that'll (1)**

Case: 19-30088    Doc# 4819    Filed: 11/20/19    Entered: 11/20/19 13:14:33    Page 152
of 155

40:5
**theory (9)**
74:12;76:20;89:18;
98:25;99:12;100:25;
101:11;103:16;123:19
**therefore (8)**
29:19,21;71:16,24;
103:9;106:22,22;109:2
**there're (4)**
18:12;28:5;55:1;
68:5
**third (6)**
10:13,14;67:15;71:2;
108:21;133:4
**thirty (3)**
62:17;79:19;80:14
**Thomas (1)**
67:12
**thorough (1)**
12:24
**though (4)**
32:20;66:2,5;77:10
**thought (5)**
96:18,19;108:1;
109:23;124:22;129:20
**three (17)**
12:4,11;22:17;25:14;
28:5;31:13,15;39:14;
67:11;76:11;89:19;
106:15;127:14;128:8;
130:3,4;133:3
**throughout (2)**
20:10;52:10
**throw (1)**
67:8
**throwing (1)**
128:12
**thus (2)**
66:16;78:12
**tie (1)**
50:8
**till (2)**
18:5,5
**timeout (1)**
65:18
**times (6)**
56:7,24;67:2;73:12;
87:17;89:8
**timing (2)**
42:8,10
**today (29)**
3:14;4:23;5:20;6:22;
10:17;11:12,17,18;
19:2;21:9;24:22;42:25;
49:4;52:10;57:11;62:6,
25;68:22;74:13;76:4;
79:3;80:23;82:21;
101:18;110:19;115:25;
123:15;132:17;133:18
**together (2)**
50:8;83:23
**told (7)**
5:9;17:19;39:6;

64:19;76:10;78:21;
100:16
**tomorrow (5)**
5:20;44:4,8;56:17;
74:14
**tomorrow's (1)**
12:12
**took (8)**
12:23;13:1;14:1;
39:19;64:2;76:8;
106:17;131:4
**tort (5)**
55:2;62:21;93:23,24;
94:4
**toss (2)**
99:23;130:14
**totally (1)**
85:22
**touch (1)**
114:25
**touched (2)**
47:7;58:24
**touches (1)**
105:11
**Tower (12)**
27:4,7,8;46:5;47:3;
78:15,16,19;90:4;
103:25;125:18,20
**track (4)**
17:14;65:3;83:16,23
**transcript (1)**
5:8
**transfer (9)**
67:21;68:24;70:15,
19,20;71:7,8;126:24,25
**transport (2)**
44:3,6
**treat (1)**
37:10
**treated (2)**
30:12;36:4
**treatment (2)**
10:22;92:17
**tree (3)**
20:25;24:12,13
**trial (13)**
63:24;65:12;67:15,
16;69:17;98:15,21;
99:3;100:4,12;116:16,
16;130:5
**trial-court (1)**
69:4
**tried (4)**
52:14;102:7;107:21;
108:5
**trimmers (2)**
24:12,13
**trouble (2)**
42:23;95:20
**true (19)**
12:2;20:21;24:9;
37:23;44:23;49:11;
64:21;65:22;93:19;

98:4;99:15,17;115:20,
21,22;124:16,19;
126:10,10
**trust (1)**
45:7
**try (11)**
3:23;4:10,21;22:24;
43:6,6;46:6;49:1;
81:19;87:25;107:15
**trying (8)**
44:24;55:19;58:17;
61:19;66:22;80:17;
81:25;85:21
**Tubbs (1)**
10:25;63:24;74:4
**TUESDAY (2)**
3:1;5:22
**turn (4)**
56:6;84:6,8,22
**turns (1)**
68:18
**twenty (1)**
87:1
**twice (4)**
15:7;67:13;76:10;
83:10
**two (46)**
3:16;4:3,4,23;7:19;
9:14;17:4;23:5,16;
25:9;29:23;30:5;34:1,
10;38:25;42:11,24;
44:17;52:19;63:10,18;
64:10;68:8,12;69:9,11,
13;72:8;74:2;79:13;
93:5;97:4,5;98:4;
100:15;110:12,12,21;
116:16;117:12,13;
120:24;121:12;127:13;
129:1;133:3
**type (1)**
61:25
**typically (1)**
68:7

**U**

**ultimately (7)**
8:21;10:23;21:7;
34:2;38:3;120:23;
123:3
**Um-hum (14)**
14:7;16:7;19:14;
20:14;25:11;26:2;29:7;
36:8;40:17;48:4;77:22,
25;79:14;111:15
**unambiguously (2)**
21:12;29:6
**unanimous (1)**
106:18
**unavoidable (1)**
53:5
**unbelieving (1)**
80:18

**uncertainty (1)**
121:25
**under (37)**
8:8;9:20;18:21;27:9;
33:20;46:22;47:1,2;
70:12;86:4;87:21;
92:24,25;93:22;
100:17;110:22;111:5;
112:10,11,20;114:11;
115:17;120:13;121:15;
124:1;127:7,17,19,22;
128:10,20;129:11,21,
23;130:13,18;131:19
**undercurrents (1)**
120:1
**underlying (3)**
27:14;37:12;46:25
**underpinning (3)**
32:15;35:16;102:12
**understands (1)**
87:4
**understood (7)**
7:1;19:24;55:22;
86:23;91:5;93:3;
118:21
**underway (1)**
48:25
**undisputed (1)**
53:4
**undoubtedly (1)**
30:11
**unduly (1)**
88:18
**unfortunately (1)**
20:21
**UNIDENTIFIED (1)**
97:3
**unique (2)**
53:7;86:5
**UNISON (2)**
3:7;133:23
**unit (1)**
91:22
**United (2)**
22:11,21
**unknown (1)**
15:7
**unless (6)**
18:10;21:25;74:8;
103:2;111:22;131:11
**unlike (1)**
124:13
**unrelated (1)**
72:25
**untenable (2)**
43:14;59:11
**unusual (1)**
76:2
**up (51)**
11:6;12:13,16;14:5,
5,16,19;15:22;35:18;
44:14;45:16;48:23;
52:16;56:7;58:20;

61:24;62:17;63:9;
65:14;69:19;71:9;
75:25;77:8;78:9;79:22,
24;80:13;82:8;92:12;
96:9;99:3;101:20;
104:25;107:2,24;
110:5;111:3;115:14;
118:3;119:22;122:1,
15;123:15;124:25;
125:1;126:12,22;
127:8;128:14;131:4;
133:12
**update (1)**
4:5,24;5:14;17:5
**upload (1)**
133:15
**uploaded (1)**
133:16
**upon (21)**
10:12;14:19,21;
28:14,15;32:9;36:1;
37:5,5;38:17;39:2;
41:8,24;42:20;67:4;
68:20;98:22;99:13;
100:3;101:3,18
**upstairs (2)**
18:8;39:7
**upward (1)**
59:5
**urge (1)**
94:24
**use (7)**
27:19;87:21,24;
91:13;93:3;104:15;
111:21
**used (6)**
22:17,18;49:25;80:5;
83:1;106:21
**uses (5)**
58:5;86:13;88:7;
109:1;117:10
**using (2)**
70:19;126:24
**usually (5)**
75:15;104:11;
112:24,25;133:17
**utilities (25)**
32:2;43:9;50:24;
53:6;59:19;60:2;61:1;
88:11,21,22;92:9,24;
103:19,22;108:9,13,15,
16;110:22;112:1,7,12;
114:1;120:3,5
**utility (36)**
21:1,6;24:17;25:1,4;
29:19;30:8;32:11,23;
34:4,6;36:3,4;37:1,10;
53:22;54:4,11,13;
59:11;86:1,8;88:3,17;
92:19;94:6,17;95:3;
98:22;114:5,8,11;
123:9,25;124:12,13
**utility's (1)**

Min-U-Script®
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(19) theory - utility's

Page 153
of 155

112:19

## V

**validity (2)**
108:20;111:18
**value (11)**
82:8,9;98:8;99:1,19,
23;100:10;101:9,11,16,
17
**values (1)**
98:17
**vault (1)**
113:10,11
**Ventura (1)**
67:12
**venue (1)**
37:4
**verge (1)**
67:7
**versus (3)**
38:18;118:8;130:8
**vertical (2)**
71:8;126:24
**veto (1)**
14:24
**VI (2)**
70:5,13
**victim (1)**
17:2
**victims (2)**
107:19,20
**view (15)**
8:14;10:17,19;11:18;
15:10;22:13;57:4;
82:21;93:22;97:14;
118:1;122:6;127:15,
16;129:2
**views (1)**
108:18
**violate (2)**
94:10;112:7
**violating (1)**
90:10
**violation (1)**
96:3
**virtually (1)**
59:14
**virtue (1)**
91:12
**vote (1)**
127:13
**voting (1)**
107:20
**vulnerable (1)**
103:22

## W

**Wait (10)**
3:15;14:15;30:6;
45:15;46:15,15;47:19;
70:14;85:6;94:24

**waived (2)**
71:24;111:22
**waiver (4)**
71:16,18;73:22;
126:20
**walk (4)**
13:4,10;69:2;90:18
**Walker (2)**
121:2;131:13
**wants (8)**
8:19;15:22;63:19;
76:21,24;81:4;107:5;
130:15
**warnings (1)**
61:21
**Washington (2)**
67:6;84:24
**waste (1)**
90:3
**Water (5)**
33:19;92:17;124:16,
18,18
**way (56)**
8:25;9:3;16:13;
23:15;27:10,11;44:9,
15;48:14,14,24;49:1;
51:22;52:3;55:12,12,
13,14;60:8;63:9;64:7;
65:19;67:2;74:22;77:2;
81:8;86:10,24;88:1,9,
18;89:15,16;91:10;
92:21;94:5,23;95:19;
98:2;99:2;100:24;
102:20;103:3;105:17;
107:7;114:3;115:18;
119:3;122:16;127:4,4,
23,24;129:10;130:15,
15
**ways (3)**
26:3;90:21;121:6
**weeds (1)**
79:8
**week (1)**
16:25
**weekend (1)**
78:6
**weeks (5)**
14:4;17:4;18:6;
22:17;86:23
**weigh (1)**
49:15
**Weil (2)**
3:13;68:16
**Welcome (3)**
3:8;85:14;96:24
**weren't (3)**
40:20,23;41:20
**West (45)**
20:6;21:20,22,25;
22:3,8,16,19,20;25:9;
26:16;27:7,7;37:22;
46:5;47:3;62:23;63:1,
2,8;64:20;66:6;71:18,

20,21;76:9,20;77:11,
14,15,20;78:7,17,19;
82:22;83:18;84:25;
89:10;117:23;125:15,
19,20,21,22,25
**West's (1)**
78:2
**whack (1)**
106:11
**what's (14)**
4:18;11:16;34:22,23;
38:21;46:4;50:25;
56:23;67:3;82:11;90:2;
102:4;106:8;130:6
**whatsoever (1)**
54:6
**whenever (1)**
117:15
**when're (1)**
6:1
**whereas (2)**
7:22;42:18
**Whereupon (1)**
133:24
**whichever (1)**
40:11
**whoever's (1)**
11:13
**whole (7)**
16:18;35:15;50:4,5;
51:7;91:5,9
**who's (1)**
58:4;65:4;84:24
**whose (1)**
97:15
**wife (1)**
119:21
**wildfire (4)**
26:5;48:5;49:2;
58:24
**wildfires (2)**
53:14;59:14
**Williamson (1)**
96:15
**willing (1)**
15:24
**willingness (1)**
14:15
**Willkie (3)**
5:14;7:2;97:7
**win (3)**
8:1;42:8;49:21
**winning (1)**
78:3
**wire (2)**
113:5,6
**wires (1)**
113:8
**wish (1)**
67:15
**withdrawn (1)**
38:13
**withheld (1)**

66:16
**without (5)**
37:6;44:13;59:10;
82:3;112:21
**witness (2)**
78:23;79:1
**witnesses (2)**
106:16,17
**wonderful (1)**
92:21
**word (7)**
27:20;60:15;70:19;
90:2;106:21;118:19;
125:21
**words (9)**
20:12,12;32:19;
50:17;81:23;103:7,10;
120:10;130:5
**work (7)**
20:23;22:18;43:19;
88:2;95:18;132:18;
133:21
**worked (1)**
97:17
**works (5)**
20:20;21:5;43:19;
88:1;123:19
**world (3)**
86:1;92:19;93:23
**worry (1)**
79:6
**worth (1)**
98:11
**wrap (3)**
96:9;107:2;118:3
**wrist (2)**
126:2,12
**wrists (1)**
126:11
**writ (13)**
64:2;69:19;70:1;
116:24;117:1,5,6,8,10,
11;118:8,16;119:4
**write (1)**
88:9
**writings (1)**
26:21
**writs (3)**
38:2;64:13;117:16
**written (3)**
84:24;118:12,13
**wrong (14)**
28:7,8,9;37:18;
57:23;60:15;84:15,21;
90:20,21;92:4;101:4;
125:18;127:3

## X

**XIX (6)**
86:7;87:16;88:9;
89:21;110:7;111:17

## Y

**year (7)**
36:25;37:7;49:24;
73:4;110:4,5;119:5
**years (18)**
23:6;10,11;35:15;
37:21;39:14,20,23;
40:15;41:19;43:1;44:5,
17;47:5;52:19;54:6;
88:5;90:9
**yesterday (5)**
5:8;11:3;100:21;
133:8,9
**younger (1)**
119:18

## Z

**zero (2)**
100:2;101:9

## 0

**07 (1)**
40:1

## 1

**1 (6)**
128:10;130:3,13;
132:2,4,6
**1.1 (1)**
68:20
**10 (4)**
3:9;31:20;78:18;
84:3
**1047 (2)**
78:19,19
**1054 (2)**
86:10;94:20
**10-K (1)**
77:19
**10-Q (2)**
68:19;77:17
**11 (1)**
127:1
**11th (2)**
6:5;18:3
**12 (2)**
70:5,13
**12:30 (1)**
133:24
**125 (1)**
88:5
**1292 (1)**
129:23
**14 (2)**
77:23;80:8
**158 (2)**
127:19;128:15
**158d2 (2)**

Case: 19-30088    Doc# 4819    Filed: 11/20/19    Entered: 11/20/19 13:14:33    Page 154
of 155

128:6;130:2
**158d2A (1)**
  128:16
**158d2A3 (1)**
  128:10
**17th (2)**
  53:2;119:5
**18 (1)**
  78:14
**1890s (1)**
  124:23
**1894 (1)**
  89:5
**19 (3)**
  3:1;57:12;125:4
**1911 (3)**
  88:15;89:7;108:16
**1940 (3)**
  63:2;64:20;76:9
**1950 (1)**
  119:22
**1999 (1)**
  116:12

### 2

**2 (9)**
  28:5,22;59:9;124:24;
  128:10;130:3,13;
  132:3,4
**20 (1)**
  78:15
**200 (1)**
  68:17
**2004 (1)**
  40:1
**2007 (2)**
  40:2;110:10
**2012 (1)**
  116:13
**2014 (1)**
  90:5
**2015 (4)**
  63:22;66:23;68:19;
  69:14
**2017 (4)**
  52:18;53:4;63:22;
  66:23
**2018 (2)**
  67:18;70:2
**2019 (1)**
  3:1
**2020 (1)**
  5:24
**205 (1)**
  118:14
**20th (1)**
  5:24
**217 (1)**
  112:15
**25 (1)**
  78:18
**26 (1)**

5:22

### 3

**3 (12)**
  72:17;73:25;83:19,
  19;84:3;128:18,19;
  129:5;130:3,13,14;
  132:4
**30th (1)**
  44:25

### 4

**4 (2)**
  18:1;82:19
**451 (2)**
  86:4;95:6
**4794 (1)**
  133:6
**49ers (2)**
  49:19,25
**4th (5)**
  5:6,10,11;8:21;18:16

### 5

**502c (1)**
  98:5
**54b (18)**
  51:21;120:13,24;
  121:4,7,14,23;127:17;
  128:2,4,20;129:17,22;
  131:6,7,12,19;132:8
**54b'd (1)**
  131:13

### 6

**6 (2)**
  33:19;92:22
**6,500 (1)**
  107:18

### 7

**7 (1)**
  77:20
**700-million-dollar (1)**
  9:22
**784 (1)**
  112:15

### 8

**800 (1)**
  112:15
**85 (1)**
  89:24

### 9

**9:59 (1)**

3:1
**9019 (3)**
  9:23;10:8;15:2