1  Anne Costin (SBN 260126)
   **COSTIN LAW INC.**
2  315 Montgomery Street, 10th Floor
   San Francisco, CA 94104
3  Tel: (415) 977-0400
   Email: anne@costinlawfirm.com
4  Attorney for Creditor TODD HEARN

5

6

7

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re | Bankruptcy Case No. 19-30088 |
| PG&E CORPORATION | Chapter 11 |
| & | **DECLARATION OF ATTORNEY ANNE COSTIN IN SUPPORT OF MOTION FOR RELIEF FROM AUTOMATIC STAY** |
| PACIFIC GAS & ELECTRIC COMPANY, | |
| Debtors | Hearing Date/Time: December 17, 2019 |
| | 10:00 a.m. |
| TODD HEARN | Objection Deadline: December 12, 2019 |
| Creditor and Moving Party | 4:00 p.m. |
| v. | Dept: Courtroom 17, 16th Floor |
| PACIFIC GAS & ELECTRIC COMPANY | 450 Golden Gate Avenue |
| Debtor & Responding Party | San Francisco, CA 94102 |

1

## **COSTIN DECLARATION**

2    I, Anne Costin, do hereby declare and state as follows:

3        1.    I am an adult above the age of eighteen years of age. I am licensed to practice law in

4    the State of California, and have been since 2008. I am counsel for creditor and moving party Todd

5    Hearn. I have personal knowledge of the facts contained herein and if called as a witness I could and

6    would testify competently thereto.

7        2.    On September 27, 2019 I submitted a Proof of Claim on Todd Hearn's behalf using the

8    online Prime Clerk submission system. I can see by conducting a claim search on Prime Clerk that

9    this claim was assigned Claim #9913.

10        3.    On October 21, 2019 I submitted an Amended Proof of Claim on Todd Hearn's behalf

11    using the online Prime Clerk submission system. I can see by conducting a claim search on Prime

12    Clerk that this claim was assigned Claim #81516.

13        4.    Attached hereto as Exhibit A is a true and correct copy of the Amended Proof of Claim

14    which I submitted on Todd Hearn's behalf on October 21, 2019, which contains a draft copy of the

15    Complaint that I seek leave to file on Todd Hearn's behalf in the Napa County Superior Court, and

16    my attempt to place an estimated value on Hearn's damages.

17        5.    I declare under penalty of perjury under the laws of the State of California that the

18    foregoing is true and correct and that this declaration was executed on November 18, 2019 at San

19    Francisco, California.

20                                                            _____
                                                                ANNE COSTIN
21

22

23

24

25

26

27

# EXHIBIT A



Anne Costin <anne@costinlawfirm.com>

## Electronic Proof of Claim_L@$AU27395 between Prime Clerk and Anne Costin is Signed and Filed!

**Prime Clerk** <echosign@echosign.com>             Mon, Oct 21, 2019 at 4:02 PM
Reply-To: Prime Clerk E-Filing <efiling@primeclerk.com>
To: Anne Costin <anne@costinlawfirm.com>, Prime Clerk E-Filing <efiling@primeclerk.com>

# Prime Clerk



### Electronic Proof of Claim_L@$AU27395 between Prime Clerk and Anne Costin is Signed and Filed!

From: Prime Clerk E-Filing (Prime Clerk)
To: Anne Costin and Prime Clerk E-Filing

Attached is a final copy of **Electronic Proof of Claim_L@$AU27395**.

Copies have been automatically sent to all parties to the agreement.

You can view **the document** in your Adobe Sign account.

Why use Adobe Sign:

- Exchange, Sign, and File Any Document. In Seconds!
- Set-up Reminders. Instantly Share Copies with Others.
- See All of Your Documents, Anytime, Anywhere.

Thank you for your electronic submission. Please do not send a duplicate of this submission by any other method of return.

To ensure that you continue receiving our emails, please add echosign@echosign.com to your address book or safe list.

📄 **Electronic Proof of Claim_L@$AU27395 - signed.pdf**
759K

# United States Bankruptcy Court, Northern District of California

**Fill in this information to identify the case (Select only one Debtor per claim form):**

☐ PG&E Corporation (19-30088)

☒ Pacific Gas and Electric Company (19-30089)

## Official Form 410

# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents**; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

Unless an exception in the Bar Date Order applies to you, you should not use this form to submit a claim that arises out of or relates to the fires that occurred in Northern California prior to January 29, 2019.

---

### Part 1: Identify the Claim

| | | |
|---|---|---|
| 1. Who is the current creditor? | **Todd Hearn** | |
| | Name of the current creditor (the person or entity to be paid for this claim) | |
| | Other names the creditor used with the debtor | |

| | |
|---|---|
| 2. Has this claim been acquired from someone else? | ☒ No <br> ☐ Yes. From whom? |

| | | |
|---|---|---|
| 3. Where should notices and payments to the creditor be sent? <br><br> Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** <br><br> Anne Costin <br> Costin Law Inc. <br> 315 Montgomery Street, 10th Floor <br> San Francisco, CA 94104 | **Where should payments to the creditor be sent? (if different)** <br><br> Todd Hearn <br> 357 Coombs Street <br> Napa, CA 94559 |
| | Contact phone 415-977-0400 <br> Contact email anne@costinlawfirm.com | Contact phone 707-501-0759 <br> Contact email toddhearn357@yahoo.com |

| | |
|---|---|
| 4. Does this claim amend one already filed? | ☐ No <br> ☒ Yes. Claim number on court claims registry (if known) 9913     Filed on 09/27/2019 <br>                                                 MM / DD / YYYY |

| | |
|---|---|
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☒ No <br> ☐ Yes. Who made the earlier filing? |

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$ 7,591,023.00 .

**Does this amount include interest or other charges?**

☒ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Whistle-blower employment case (see Attachments)

_____

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. Amount necessary to cure any default as of the date of the petition. $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No | |
|---|---|---|
| | ☐ **Yes.** *Check one:* | **Amount entitled to priority** |

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).  $_____

☐ Up to $2,850 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).  $_____

☐ Wages, salaries, or commissions (up to $12,850) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).  $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).  $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).  $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)( ___ ) that applies.  $_____

\* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3: Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☐ I am the creditor.
☑ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

**Signature:** *Anne Costin*
Anne Costin (Oct 21, 2019)

**Email:** anne@costinlawfirm.com

_____
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Anne Costin (SBN 260126) | | |
|---|---|---|---|
| | First name | Middle name | Last name |

| Title | Attorney for Todd Hearn |
|---|---|

| Company | Costin Law Inc. |
|---|---|
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |

| Address | 315 Montgomery Street, 10th Floor | | |
|---|---|---|---|
| | Number Street | | |
| | San Francisco | CA | 94104 |
| | City | State | ZIP Code |
| Contact phone | 415-977-0400 | Email | anne@costinlawfirm.com |

**Attach Supporting Documentation** (limited to a single PDF attachment that is less than 5 megabytes in size and under 100 pages):

☒ I have supporting documentation.
(attach below)

☐ I do **not** have supporting documentation.

 Attachment

PLEASE REVIEW YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTS AND REDACT ACCORDINGLY PRIOR TO UPLOADING THEM. PROOFS OF CLAIM AND ATTACHMENTS ARE PUBLIC DOCUMENTS THAT WILL BE AVAILABLE FOR ANYONE TO VIEW ONLINE.

IMPORTANT NOTE REGARDING REDACTING YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTATION When you submit a proof of claim and any supporting documentation you must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.

A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. The responsibility for redacting personal data identifiers (as defined in Federal Rule of Bankruptcy Procedure 9037) rests solely with the party submitting the documentation and their counsel. Prime Clerk and the Clerk of the Court will not review any document for redaction or compliance with this Rule and you hereby release and agree to hold harmless Prime Clerk and the Clerk of the Court from the disclosure of any personal data identifiers included in your submission. In the event Prime Clerk or the Clerk of the Court discover that personal identifier data or information concerning a minor individual has been included in a pleading, Prime Clerk and the Clerk of the Court are authorized, in their sole discretion, to redact all such information from the text of the filing and make an entry indicating the correction.

# Instructions for Proof of Claim

United States Bankruptcy Court                                            12/15

These instructions and definitions generally explain the law. In certain circumstances, such as bankruptcy cases that debtors do not file voluntarily, exceptions to these general rules may apply. You should consider obtaining the advice of an attorney, especially if you are unfamiliar with the bankruptcy process and privacy regulations.

> **A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.**
> 18 U.S.C. §§ 152, 157 and 3571.

## How to fill out this form

- **Fill in all of the information about the claim as of January 29, 2019.**

- **Fill in the caption at the top of the form.**

- **If the claim has been acquired from someone else, then state the identity of the last party** who owned the claim or was the holder of the claim and who transferred it to you before the initial claim was filed.

- **Attach any supporting documents to this form.**
  Attach redacted copies of any documents that show that the debt exists, a lien secures the debt, or both. (See the definition of *redaction* on the next page.)

  Also attach redacted copies of any documents that show perfection of any security interest or any assignments or transfers of the debt. In addition to the documents, a summary may be added. Federal Rule of Bankruptcy Procedure (called "Bankruptcy Rule") 3001(c) and (d).

- **Do not attach original documents because attachments may be destroyed after scanning.**

- **If the claim is based on delivering health care goods or services, do not disclose confidential health care information. Leave out or redact confidential information both in the claim and in the attached documents.**

- **A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, individual's tax identification number, or financial account number, and only the year of any person's date of birth.** See Bankruptcy Rule 9037.

- **For a minor child, fill in only the child's initials and the full name of the child's parent or guardian.** For example, write *A.B., a minor child (John Doe, parent).* See Bankruptcy Rule 9037.

## Confirmation that the claim has been filed

To receive confirmation that the claim has been filed, either enclose a stamped self-addressed envelope and a copy of this form. You may view a list of filed claims in this case by visiting the Claims and Noticing Agent's website at https://restructuring.primeclerk.com/pge.

## Understand the terms used in this form

**Administrative expense:** Generally, an expense that arises after a bankruptcy case is filed in connection with operating, liquidating, or distributing the bankruptcy estate. 11 U.S.C. § 503.

**Claim:** A creditor's right to receive payment for a debt that the debtor owed on the date the debtor filed for bankruptcy. 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Creditor:** A person, corporation, or other entity to whom a debtor owes a debt that was incurred on or before the date the debtor filed for bankruptcy. 11 U.S.C. § 101 (10).

**Debtor:** A person, corporation, or other entity who is in bankruptcy. Use the debtor's name and case number as shown in the bankruptcy notice you received. 11 U.S.C. § 101 (13).

**Evidence of perfection:** Evidence of perfection of a security interest may include documents showing that a security interest has been filed or recorded, such as a mortgage, lien, certificate of title, or financing statement.

**Information that is entitled to privacy:** A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If a claim is based on delivering health care goods or services, limit the disclosure of the goods or services to avoid embarrassment or disclosure of confidential health care information. You may later be required to give more information if the trustee or someone else in interest objects to the claim.

**Priority claim:** A claim within a category of unsecured claims that is entitled to priority under 11 U.S.C. § 507(a). These claims are paid from the available money or property in a bankruptcy case before other unsecured claims are paid. Common priority unsecured claims include alimony, child support, taxes, and certain unpaid wages.

**Proof of claim:** A form that shows the amount of debt the debtor owed to a creditor on the date of the bankruptcy filing. The form must be filed in the district where the case is pending.

**Redaction of information:** Masking, editing out, or deleting certain information to protect privacy. Filers must redact or leave out information entitled to **privacy** on the *Proof of Claim* form and any attached documents.

**Secured claim under 11 U.S.C. § 506(a):** A claim backed by a lien on particular property of the debtor. A claim is secured to the extent that a creditor has the right to be paid from the property before other creditors are paid. The amount of a secured claim usually cannot be more than the value of the particular property on which the creditor has a lien. Any amount owed to a creditor that is more than the value of the property normally may be an unsecured claim. But exceptions exist; for example, see 11 U.S.C. § 1322(b) and the final sentence of § 1325(a).

Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment may be a lien.

**Setoff:** Occurs when a creditor pays itself with money belonging to the debtor that it is holding, or by canceling a debt it owes to the debtor.

**Unsecured claim:** A claim that does not meet the requirements of a secured claim. A claim may be unsecured in part to the extent that the amount of the claim is more than the value of the property on which a creditor has a lien.

## Offers to purchase a claim

Certain entities purchase claims for an amount that is less than the face value of the claims. These entities may contact creditors offering to purchase their claims. Some written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court, the bankruptcy trustee, or the debtor. A creditor has no obligation to sell its claim. However, if a creditor decides to sell its claim, any transfer of that claim is subject to Bankruptcy Rule 3001(e), any provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.) that apply, and any orders of the bankruptcy court that apply.

## Please send completed Proof(s) of Claim to:

**If by first class mail:**
PG&E Corporation Claims Processing Center
c/o Prime Clerk LLC
Grand Central Station, PO Box 4850
New York, NY 10163-4850

**If by overnight courier or hand delivery:**
PG&E Corporation Claims Processing Center
c/o Prime Clerk LLC
850 Third Avenue, Suite 412
Brooklyn, NY 11232

**You may also hand deliver your completed Proof(s) of Claim to any of the following service center offices (beginning July 15, 2019 through the Bar Date (October 21, 2019) during the hours of 8:30 a.m. – 5:00 p.m. Prevailing Pacific Time):**

Chico Service Center
350 Salem Street
Chico, CA 95928

Marysville Service Center
231 "D" Street
Marysville, CA 95901

Napa Service Center
1850 Soscol Ave. Ste 105
Napa, CA 94559

Oroville Service Center
1567 Huntoon Street
Oroville, CA 95965

Redding Service Center
3600 Meadow View Road
Redding, CA 96002

Santa Rosa Service Center
111 Stony Circle
Santa Rosa, CA 95401

**Photocopy machines will not be available at the Claim Service Centers; you must bring a photocopy of your claim if you wish to receive a date-stamped copy.**

---

**Do not file these instructions with your form**

# ATTACHMENT – ITEMIZED ESTIMATION OF AMOUNT OF CLAIM – *AMENDED*

*\*This attachment is amended in an attempt to more accurately reflect damages incurred*
*\*Updated information is in italics*

As permitted by and pursuant to California Labor Code Section 6310, Section 1102.5, and his corresponding common law wrongful termination cause of action, Creditor Todd Hearn seeks recovery of past and future wage and benefit loss, emotional distress damages, punitive damages, and reasonable attorney's fees and costs caused by PG&E's unlawful termination of his employment.

Hearn is not an economist nor judge or juror, but given the requirement that he value his potential claim now for this Proof of Claim process, he attempts to calculate and estimate his damages as follows:

## Wage Loss:

Hearn worked for PG&E for over 20 years as a lineman and intended to work for the company until he retired at 65 years old (i.e. until April 4, 2034).

In 2017 Hearn's annual salary was $275,000 per year (approximately $22,917 per month). *Had Hearn remained employed, he would have been promoted into a Foreman job in January of 2019 per his union contract. Along with that promotion Hearn would have earned an additional 6% wage increase. If his annual salary is used to calculate that increase, his salary in 2019 would have been approximately $291,500.*

PG&E terminated Hearn's employment on January 22, 2019. As such he has lost *$194,328* to date (*$24,291* in wages per month x 8 months between termination and present/September 22, 2019).

Hearn has not located replacement employment, and may not be able to do so given that he has been barred by PG&E from working for PG&E directly or for any PG&E contractor. As such, Hearn's wage loss damages continue to accrue. Hearn estimates his future salary loss at *$4,235,495 ($291,500* per year x 14.5 years between present/September 22, 2019 and retirement date of April 4, 2031). *Each year Hearn expected a cost of living increase of approximately 3%. This increase is not included in this estimation, so this wage loss number is conservative.*

Per above, estimated Past and Future Wage Loss = *$4,429,823 ($194,328* past + *$4,235,495* future)

## Health Benefit Loss:

Hearn earned medical benefits for himself and his family through his employment at PG&E. He estimates the current replacement cost value of those benefits at $2,100 per month. Hearn lost those valuable benefits when PG&E terminated his employment.

As such, Hearn estimates his past medical benefit loss to be $16,800 ($2,100 per month x 8 months between termination and present/September 22, 2019) and his future medical benefit loss to be $365,400 ($25,200 per year x 14.5 years between present/September 22, 2019 and retirement date of April 4, 2034).

Per above, estimated Past and Future Health Benefit Loss = $382,200 ($16,800 past + $365,400 future)

## Retirement Pension Benefit Loss:

Hearn participated in PG&E's Final Pay Pension program. Pensions are calculated based on a formula taking into account the number of years of service/employment.

Because PG&E terminated his employment, Hearn has been informed that starting at age 65 he will receive approximately $3,225 per month in retirement benefits.

If Hearn had remained a PG&E employee until retirement at age 65 as he intended, he would have completed additional of service with PG&E, and as such is informed and believes that his monthly retirement benefits would have increased. Hearn estimates (because he must for the purpose of this proof of claim) that he would have received approximately *$8,000* per month in retirement had he remained employed as planned until age 65.

Hearn therefore estimates his retirement benefit loss to be approximately *$57,300* per year (*$4,775* differential per month x 12 months). Assuming 25 years of benefits (age 65 to 90), Hearn's losses would equate to approximately *$1,432,500* (*$57,300* per year x 25 years).

## Retirement Health Benefit Loss:

Hearn is informed and believes that due to his termination, he has also lost his eligibility to participate in PG&E's health benefit plan for retirees. Hearn is informed and believes that PG&E pays 55% of health premium costs for retirees.

Assuming (conservatively) that his health premiums were to remain the same as they are presently at $2,100 per month, this assistance would equate to approximately $13,860 per year. Assuming 25 years of benefits (age 65 to 90), Hearn's losses would equate to approximately $346,500 ($13,860 per year x 25 years).

## Emotional Distress Damages:

As the Court is aware traditionally emotional distress damage determination is within the province of the jury. Given the severity of the harm to Hearn here - the loss of a 20 year career - a seven figure general damages award would be expected and appropriate. For the purposes of this Proof of Claim, Hearn estimates his emotional distress claim at $1,000,000.

**Punitive Damages:**

Hearn asserts that PG&E's conduct in retaliating against him and unlawfully terminating his employment was willful, malicious, oppressive, and fraudulent.

Assuming that Hearn was awarded all of the special and general damages above, and that punitive damages were awarded at 9 times the total compensatory damages amount, punitive damages could reach over $60 million. Hearn notes as such in this summary to preserve his right to seek punitive damages in the event his litigation is permitted to proceed.

**Reasonable Attorney's Fees and Costs:**

Hearn has retained an employment law attorney (Costin Law Inc.) to represent him in his whistle-blower action against PG&E. If the Court permits this employment action to proceed to litigation, Hearn as a prevailing party would be entitled by statute to his reasonably incurred fees and costs. Costin Law Inc. will additionally file a Proof of Claim so as to preserve this potential recovery.

**Total Estimated Amount of Claim:**

Wage Loss = *$4,429,823*
Health Benefit Loss = $382,200
Retirement Pension Benefit Loss = *$1,432,500*
Retirement Health Benefit Loss = $346,500
Emotional Distress Damages = $1,000,000
**Total Compensatory Damages:  *$7,591,023***

Anne Costin (SBN 260126)
**COSTIN LAW INC.**
315 Montgomery Street, 10th Floor
San Francisco, CA 94104
Tel: (415) 977-0400
Email: anne@costinlawfirm.com
Attorney for PLAINTIFF
TODD HEARN

# IN THE SUPERIOR COURT OF CALIFORNIA

## IN AND FOR THE COUNTY OF NAPA

### UNLIMITED CIVIL JURISDICTION

| | |
|---|---|
| TODD HEARN, | Case No. |
| Plaintiff, | **COMPLAINT** |
| v. | |
| PACIFIC GAS AND ELECTRIC COMPANY; and DOES 1-25, inclusive, | 1. Retaliation in Violation of California Labor Code Section 1102.5; |
| | 2. Retaliation in Violation of California Labor Code Section 6310; |
| Defendant. | 3. Wrongful Termination in Violation of Public Policy. |
| | **DEMAND FOR JURY TRIAL** |

COMPLAINT - PAGE 1

## **COMPLAINT**

Now comes TODD HEARN, Plaintiff in this action, and files this Complaint, and further alleges as follows:

### **Parties to the Civil Action**

1.      Plaintiff TODD HEARN (hereinafter referred to as "PLAINTIFF" or "HEARN") is a male adult natural person who is and was at times mentioned herein a resident of the State of California, County of Napa.

2.      Defendant PACIFIC GAS AND ELECTRIC COMPANY (hereinafter referred to as "DEFENDANT" or "PG&E") is a Corporation doing business in the State of California, County of Napa, and are subject to suit before this Court.

3.      DOES 1-25 are herein sued under fictitious names. Their true names and capacities are unknown to PLAINTIFF. PLAINTIFF is informed and believes and thereon alleges that DOES 1-25 are business organizations of unknown form who were the employers of the PLAINTIFF. The true names and capacities, whether individual, corporate, associate, or otherwise, of DOES 1-25, inclusive, are unknown to PLAINTIFF, who therefore sues the DOE Defendants by fictitious names. PLAINTIFF will amend this complaint to show their true names and capacities when they have been ascertained.

4.      For the purposes of this Complaint, each use of the term "PG&E" refers not only to named Defendant PACIFIC GAS AND ELECTRIC COMPANY, but also to DOES 1-25.

### **Venue and Jurisdiction**

5.      Venue is proper in Napa County because PLAINTIFF worked for DEFENDANT in Napa County, the unlawful practices alleged herein were committed in Napa County, witnesses to the unlawful practices reside and/or work in Napa County, and records relevant to the unlawful practices are maintained and administered in Napa County.

6.      Subject matter in this action is properly heard in this Court, as the action incorporates an amount in controversy as set forth in the complaint which exceeds $25,000.00.

DRAFT

**Facts Common to All Causes of Action**

7.     PLAINTIFF TODD HEARN worked as a lineman for PG&E in Northern California for over 20 years. His final job assignment with the company was as a Journeyman Lineman in Napa from 2013-2019. In 2016 and 2017, HEARN was the Napa Grassroots Safety Lead for PG&E.

8.     Prior to 2017, PG&E used specific types of fuses in fire danger areas which were designed to snuff out any electric fault internally without generating a spark. If there was a fault on a PG&E power line, the fuse door would drop open, the fuse would automatically de-energize, and the power would automatically shut off as a safety measure. After such a safety shut-down occurred, a PG&E employee (called a "Troubleman") would then physically drive to the location of the fault and visually inspect the powerline for damage. If there was damage to the line, the PG&E employee would repair it before re-energizing the fuse. If there was a fire danger (for example a tree branch fallen on the line), the PG&E employee would address it before re-energizing the fuse. Having a Troubleman personally inspect a line with a fault was a significant safety precaution.

9.     This safety precaution, of course, cost PG&E money. PG&E had to pay an employee to drive to the location of the fault and to conduct the inspection.

10.     In early 2017, PG&E found a way to save money and eliminate this labor cost. The Company began installing a new device called a "Tripsaver" on its electric lines, including on lines in the Napa area.

11.     When a fault occurred on a PG&E electric line, the Tripsaver would attempt to automatically re-energize (i.e. "re-close") the line by shooting between 12-21 kilovolts of electricity into the potentially damaged line. PG&E benefitted financially from these Tripsaver installations: as the name of the device implies, the Tripsaver saved PG&E the cost of sending a Troubleman on the trip out to examine electric lines where faults had occurred.

12.     Unfortunately, Tripsavers also have a significant downside: they are a safety hazard. Automatically sending voltage into a potentially damaged line created a serious risk of fire, especially in forested and dry areas like Napa.

COMPLAINT - PAGE 3

13.     For example, if a tree branch fell on a PG&E line and created a fault, the Tripsaver would automatically send voltage directly into that damaged area, easily starting a fire in the fallen tree. In conditions like Napa, using a Tripsaver was essentially like pouring hot lava into a dry forest.

14.     To make matters worse, PG&E installed these Tripsavers on old existing crossarms and in old cutouts, which were not designed to hold such devices. Therefore even if PG&E turned "off" a Tripsaver's re-closing capability, the mere opening of the device alone cause these old cross-arms to break, potentially starting a fire.

15.     PG&E instructed employees to install Tripsavers without the standard corresponding documentation (called "job packages") that accompanied regular work assignments. And PG&E performed these installations without having engineers update PG&E's circuit maps to track where such changes had occurred. These mapping procedures are crucial to ensure fire safety in the community and for the safety of PG&E workers.

16.     As a result of this improper and haphazard manner of installation of Tripsavers, PG&E employees were unable to identify (or shut down) dangerous areas of line. And when PG&E finally (and only after devastating fires) decided to take action with regard to the Tripsavers, no job packages or circuit mapping existed to allow anyone to identify where these dangerous devices were located.

17.     Extremely concerned by PG&E's installation of these Tripsavers, HEARN and several other experienced PG&E Lineman immediately raised their safety concerns to PG&E management.

18.     On at least one occasion, HEARN specifically informed Napa Electric Supervisor Rolando Solis that the PG&E lines on Bennett Lane in Napa posed a hazard because they contained dangerous fuses, and lacked fire breaks (i.e. an designated 12 foot area cleared of vegetation which surrounded a power pole)..

19.     Despite notice of serious safety concerns from HEARN and other veteran PG&E Lineman, PG&E ignored the explicit safety complaints and responded by directing the Lineman to do their jobs and complete the Tripsaver installations.

20.     In late February of 2017, HEARN attended a regional Grassroots safety meeting in San Ramon, California. HEARN again reported his concerns about the Tripsavers being installed - and improperly installed - in high fire risk areas like Napa. HEARN complained that Linemen in his area were already seeing the devices malfunction, and HEARN expressed further concern that PG&E was acting against the Tripsavers manufacturer's safety warnings.

21.     In response to HEARN's complaints, PG&E Director Ron Richardson stated that he would look into the matter. PG&E Senior Vice President of Electric Operations Pat Hogan informed HEARN that PG&E "may have put the cart before the horse" and that he would look into creating a Tripsaver committee and training class.

22.     At first, HEARN was relieved by PG&E's response. But then, on March 20, 2017, HEARN attended the Tripsavers "training" class in Livermore, California. Despite explicit assurances from PG&E's managing agents, HEARN was shocked to discover that there was no safety training on Tripsavers in the "training" being offered by PG&E. Instead, PG&E confirmed that the company was having system-wide problems with Tripsavers, and further confirmed that the devices should not be installed on old cross-arms or in old cut-outs. At this meeting, PG&E stated that it was looking at replacing the newly installed Tripsavers with a different device called a "Linesaver." Again, HEARN initially felt relieved because the Linesavers were much safer and HEARN thought PG&E was finally going to start taking steps to address the known safety risks posed by the company's use of the Tripsavers.

23.     Yet despite being on clear notice of the fire dangers posed by Tripsavers, PG&E continued to install them in Napa during the Spring and Summer of 2018 because they saved the Company money. HEARN (and other employees including Electric Crew Foremen) continued to report their concerns about the improper placement of the devices in fire areas. PG&E leadership

1 repeatedly instructed HEARN and others to "Just do it" (regarding the completion of Tripsavers

2 installation) and repeatedly threatened that they "had a due date."

3     24.    Frustrated that his safety complaints were being ignored, and fearful that his

4 persistence was making him a target for retaliation, HEARN felt pressured to step down from his

5 position on PG&E's Grassroots safety program and ultimately did so.

6     25.    Toward the end of Summer of 2017, HEARN became aware of another major safety

7 concern: PG&E was changing or downgrading "A" and "Emergency" tags to save money on

8 overtime labor. When a PG&E Lineman or Troubleman observed or learned of a needed repair on a

9 PG&E line (for example a broken pole or malfunctioning fuse) the employee would report that

10 needed repair to PG&E using a "tag." If the situation needed immediate attention, for example due

11 to a safety concern, it would be given an "A" or "Emergency" tag, thereby triggering prompt action

12 by the company. If a repair could wait, a lesser tag would be assigned.

13     26.    HEARN and other workers had suspected for some time that PG&E might be

14 downgrading tags, but in 2017, they found proof of PG&E's actions related to a broken power pole

15 job on Foss Hill Road in Calistoga, California, when they saw email correspondence wherein a

16 PG&E Supervisor instructed a Troubleman to "change" the fire rating the Troubleman had assigned

17 to a broken pole in a hire fire area. The Troubleman protested that it was a dangerous situation

18 located in a "Finder Box," but the Supervisor changed and falsified the tag and pushed the repair

19 date out.

20     27.    HEARN and his coworkers raised this issue to PG&E at the next safety meeting, but

21 PG&E took no action in response.

22     28.    On October 8, 2017, HEARN was part of a Standby Crew prepared to be called in

23 due to a wind event, i.e. extremely dry and windy conditions which PG&E knew created an

24 enhanced risk of fire. HEARN's crew was called to a location above Calistoga due to a wire down

25 power outage. During the job, HEARN and his crew heard an audio radio transmission wherein a

26 Troubleman called into PG&E's Control Center and advised the Operator there was a major fire on

27 the mountain. The Troubleman instructed PG&E's headquarters to shut down the entire circuit (so

28

1 as to de-energize the lines and prevent any further voltage firing into the area), but the Operator
2 refused, stating "I don't have authority."

3     29.     PG&E's failure to have an adequate safety plan in place during known and expected
4 dangerous fire conditions, and the Company's refusal to take simple and obvious steps to prevent the
5 spread of fire when it could have easily done so, caused immense harm. HEARN believes that had
6 PG&E taken basic safety precautions - such as removing Tripsavers they knew were dangerous, and
7 shutting down the circuit when requested to do so - the Napa fires may have been avoided or
8 contained.

9     30.     Devastating wildfires occurred in Napa in October of 2017. After those fires,
10 HEARN is informed that PG&E removed and reprogramed some (but not all) of the installed
11 Tripsavers located in fire danger areas. Yet PG&E failed to implement any recordkeeping
12 procedures, so Linemen like HEARN were unable to determine which devices remained, or where
13 they were located.

14     31.     Tripsavers continued to malfunction in early 2018. In May of 2018, Napa Electric
15 Crew Foreman Steve Semenero submitted a report regarding Tripsavers through PG&E's Corrective
16 Action Program ("CAP") on behalf of HEARN's Napa Crew. Although PG&E claimed that the
17 CAP program was supposed to identify and resolve employee safety concerns, to HEARN's
18 knowledge PG&E did nothing in response to the safety report.

19     32.     On June 7, 2018, HEARN attended a training program in San Francisco. When the
20 instructor began the meeting by pronouncing PG&E's "stand up for safety" slogan, HEARN stood
21 up and reported (again) his concerns about the Tripsavers in Napa and the safety risks they posed. In
22 response, the instructor stated that PG&E was aware of the problems with the Tripsavers and that
23 they would soon be replaced. Immediately following HEARN's safety report, PG&E North Bay
24 Compliance Supervisor Mike Propst got on his phone and walked out of the meeting.

25     33.     On June 21, 2018, HEARN attended a safety meeting in Napa. HEARN stated that it
26 was fire season and disclosed his concerns regarding the Tripsavers. HEARN asked what PG&E
27 was doing about it.

28

COMPLAINT - PAGE 7

34. Almost immediately thereafter, PG&E North Bay Compliance Supervisor Mike Propst (the same person who had heard HEARN's safety complaint two weeks before) and PG&E Supervisor Mike Degner informed HEARN that PG&E was placing him on "crisis leave" and that he was required to turn in his badge and keys and had to leave the property. HEARN asked why he was being placed on leave, but PG&E refused to provide him with any reason.

35. Weeks went by and PG&E failed to provide HEARN with any justification for his removal from work. In July of 2018, HEARN complained to multiple PG&E leaders (Supervisor Mike Degner, Superintendent Vince Magri, and Human Resources Representative Vanessa Parker) that he believed he had been removed from work in retaliation for reporting Tripsavers and other serious safety concerns. HEARN believes that PG&E failed and/or refused to take any action in response to his retaliation complaints. PG&E continued to refuse to inform HEARN why he had been walked off the job.

36. On August 24, 2018, after over two months on leave, HEARN was interviewed by a PG&E corporate security representative, who informed HEARN for the first time that PG&E had been tracking his location through a GPS tracker device on his truck. PG&E informed HEARN that he was under investigation for driving to his house (which was ½ mile from the Napa yard where he regularly worked) during work hours. HEARN was shocked: for at least 18 years his Supervisors and Crew Foreman had granted him permission to go home between jobs assignments instead of waiting (and not working) at the yard. At no point in time had anyone at PG&E informed HEARN that this conduct was not permissible; it was a common and authorized practice for many employees, so long as they responded promptly as soon as they were notified that there was a new assignment to perform. HEARN is informed and believes that other employees that live and work in Napa continue to this day to engage in this "violation" without consequence. Upon learning of the reason for his forced leave at this August 24, 2018 meeting, HEARN promptly stated that he believed he was being retaliated against for repeatedly bringing up his concerns regarding Tripsavers and other safety issues.

37. Two additional months went by. HEARN remained on leave.

38. On October 28, 2018, HEARN filed a safety retaliation complaint with the California State Department of Industrial Relations - Retaliation Complaint Investigation Unit.

39. On October 30, 2018, almost four months after HEARN had first complained of retaliation, he was contacted by an "independent" attorney-investigator hired by PG&E named Kelly Applegate. According to her law firm bio, prior to becoming an investigator, Ms. Applegate worked as an in-house attorney for PG&E where she was tasked with defending the company against claims brought by employees.

40. Despite HEARN's concerns regarding Ms. Applegate's objectivity and motivation, HEARN spoke at length with her regarding his safety and retaliation concerns. HEARN explained that he believed that PG&E's Grassroots Safety program appeared to operate as a policing agency for the Company. HEARN informed Ms. Applegate that in addition to investigating his own situation she should look into the fact that multiple Grassroots members had been targeted and terminated for suspect reasons. Ms. Applegate informed HEARN that her investigation should take about one month. Yet months passed, and HEARN heard nothing.

41. In early January of 2019, HEARN emailed Ms. Applegate and asked for an update. Incredibly, Ms. Applegate responded that her investigation had "nothing to do with" why HEARN had been removed from work at PG&E and whether or not he would be able to return. Given that HEARN's retaliation complaint was based on his belief that the charges levied against him were pretextual and being used to cover up retaliation, it is unclear what, if anything, Ms. Applegate actually investigated for PG&E.

42. On January 4, 2019, HEARN provided the California State Department of Industrial Relations - Retaliation Complaint Investigation Unit ("DIR") with a detailed chronology of the safety complaints he had raised and retaliation experienced.

43. On January 22, 2019, just 18 days after HEARN provided the DIR with a detailed chronology of his safety complaints and the workplace retaliation he experienced, and the same day that it was publicly announced that PG&E had been "cleared" of responsibility for starting the Tubbs Fire in Sonoma County in October 2017, PG&E terminated HEARN's employment, claiming that he

1 │ had misused company time, misstated his work activities, and submitted fraudulent timecards.
2 │ HEARN denies these allegations, and alleges that PG&E actually fired him in retaliation for the
3 │ repeated safety complaints he had made.

4 │     44.    HEARN updated PG&E investigator Kelly Applegate regarding his termination,
5 │ again asserting retaliation. She never responded.

6 │     45.    On March 18, 2019, PG&E Human Resources Representative Paula Jean informed
7 │ HEARN (by letter) that the Company had completed its investigation and that HEARN's
8 │ allegation's were unsubstantiated. HEARN is informed and believes that PG&E's investigation was
9 │ biased and incomplete, and that, had a full and fair inquiry actually taken place, a finding of
10 │ retaliation would have resulted.

11 │     46.    On June 21, 2019, HEARN attended PG&E's shareholder's meeting in San
12 │ Francisco, where he again set forth (in writing and by letter delivered to key board members) his
13 │ concerns regarding Tripsavers. Despite having already lost his own job, HEARN persisted in raising
14 │ these concerns because he believes that Tripsavers remain a huge fire danger in Napa and other
15 │ communities where they are installed.

16 │     47.    On July 17, 2019, PG&E Vice President of Asset Risk Management and Community
17 │ Wildfire Safety Program Sumeet Singh responded to the letter HEARN had delivered to him at the
18 │ shareholder's meeting. Mr. Singh's letter claimed that after the 2017 wildfires PG&E "implemented
19 │ a program" to disable the automatic re-energizing capabilities of 2,800 installed Tripsavers devices.
20 │ Notably, Mr. Singh's letter did not state whether the program had actually been completed, or even
21 │ started.

22 │     48.    On July 22, 2019, HEARN personally drove around the Napa area and observed
23 │ multiple Tripsavers devices which remained installed, many on old existing crossarms and in old
24 │ cutouts, i.e., improperly installed and posing an ongoing safety hazard.

25 │     49.    As a result of PG&E's actions, HEARN has suffered financially and emotionally.
26 │ HEARN lost his 20 year career, and along with it the ability to support his family. PG&E's refusal
27 │
28 │

COMPLAINT - PAGE 10

1  to act in response to repeated safety complaints caused HEARN significant stress and anxiety, and
2  the Company's decision to fire him for false reasons shocked and devastated him.

## FIRST CAUSE OF ACTION

### Retaliation in Violation of California Labor Code Section 1102.5

5      50.    By this reference, PLAINTIFF hereby incorporates each and every paragraph set
6  forth above as though fully set forth at this place.

7      51.    California Labor Code Section 1102.5 (a) provides that "An employer, or any person
8  acting on behalf of the employer, shall not make, adopt, or enforce any rule, regulation, or policy
9  preventing an employee from disclosing information to a government or law enforcement agency, to
10  a person with authority over the employee, or to another employee who has authority to investigate,
11  discover, or correct the violation or noncompliance, or from providing information to, or testifying
12  before, any public body conducting an investigation, hearing, or inquiry, if the employee has
13  reasonable cause to believe that the information discloses a violation of state or federal statute, or a
14  violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether
15  disclosing the information is part of the employee's job duties."

16      52.    HEARN asserts that by removing HEARN from his job at PG&E in the manner and
17  timing set forth above (i.e. placing him on forced leave), and by terminating his employment, PG&E
18  engaged in a policy to attempt to prevent HEARN from further disclosing information regarding
19  PG&E's unsafe equipment and practices. HEARN had reasonable cause to believe that the
20  information he provided disclosed violations of law, including (but likely not limited to) violation of
21  Cal/OSHA Electrical High-Voltage Safety Orders, state regulations set forth at Title 8 §2710
22  (Examination, Installation, and Use of Equipment), §2712 (Atmospheric and Environmental
23  Protection), and §2714 (Installation and Maintenance).

24      53.    California Labor Code Section 1102.5 (b) provides that "An employer, or any person
25  acting on behalf of the employer, shall not retaliate against an employee for disclosing information,
26  or because the employer believes that the employee disclosed or may disclose information, to a
27  government or law enforcement agency, to a person with authority over the employee or another
28

1  employee who has the authority to investigate, discover, or correct the violation or noncompliance,

2  or for providing information to, or testifying before, any public body conducting an investigation,

3  hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a

4  violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal

5  rule or regulation, regardless of whether disclosing the information is part of the employee's job

6  duties."

7      54.     HEARN asserts that by removing HEARN from his job at PG&E in the manner and

8  timing set forth above (i.e. placing him on forced leave), and by terminating his employment, PG&E

9  retaliated against him because he had disclosed, and/or because PG&E believed HEARN might

10 disclose violations of law, including (but likely not limited to) violation of Cal/OSHA Electrical

11 High-Voltage Safety Orders, state regulations set forth at Title 8 §2710 (Examination, Installation,

12 and Use of Equipment), §2712 (Atmospheric and Environmental Protection), and §2714 (Installation

13 and Maintenance).

14      55.     As set forth above, PLAINTIFF is informed and believes and thereon alleges that

15 DEFENDANT willfully and/or with reckless indifference violated California Labor Code Section

16 1102.5 by placing him on a forced leave of absence and terminating his employment.

17      56.     As a direct and proximate result of the unlawful conduct of DEFENDANT,

18 PLAINTIFF has suffered special damages including but not limited to past and future loss of

19 income, benefits, and other damages to be proven at time of trial.

20      57.     As a direct and proximate result of the unlawful conduct of DEFENDANT,

21 PLAINTIFF has suffered general damages including but not limited to shock, embarrassment,

22 humiliation, emotional distress, stress and other damages to be proven at the time of trial.

23      58.     DEFENDANT committed the acts herein alleged maliciously, fraudulently and

24 oppressively in conscious disregard for PLAINTIFF's rights. DEFENDANT committed and/or

25 ratified the acts alleged herein. These acts were committed with the knowledge of employees' lack

26 of fitness in the workplace but were allowed to proceed, by officers, directors, and/or managing

27

28

1   agents of DEFENDANT. PLAINTIFF is, therefore, entitled to recover punitive damages from

2   DEFENDANT in an amount according to proof at trial.

3       59.     As a result of the conduct of DEFENDANT, PLAINTIFF was forced to retain an

4   attorney in order to protect his rights. Accordingly, PLAINTIFF seeks the reasonable attorneys' fees

5   and costs incurred in this litigation in an amount according to proof at trial.

6       WHEREFORE, PLAINTIFF prays for judgment as set forth below

7                  **SECOND CAUSE OF ACTION**

8       **Retaliation in Violation of California Labor Code Section 6310**

9       60.     By this reference, PLAINTIFF hereby incorporates each and every paragraph set

10   forth above as though fully set forth at this place.

11       61.     California Labor Code Section 6310 provides that it is unlawful to "discharge or in

12   any manner discriminate against any employee" because the employee has "Made any oral or written

13   complaint to the division, other governmental agencies having statutory responsibility for or

14   assisting the division with reference to employee safety or health, his or her employer, or his or her

15   representative" or because the employee has "Instituted or caused to be instituted any proceeding

16   under or relating to his or her rights."

17       62.     California Labor Code Section 6310 further provides that "Any employee who is

18   discharged, threatened with discharge, demoted, suspended, or in any other manner discriminated

19   against in the terms and conditions of employment by his or her employer because the employee has

20   made a bona fide oral or written complaint to the division, other governmental agencies having

21   statutory responsibility for or assisting the division with reference to employee safety or health, his

22   or her employer, or his or her representative, of unsafe working conditions, or work practices, in his

23   or her employment or place of employment, or has participated in an employer-employee

24   occupational health and safety committee, shall be entitled to reinstatement and reimbursement for

25   lost wages and work benefits caused by the acts of the employer."

26       63.     HEARN asserts that by removing HEARN from his job at PG&E in the manner and

27   timing set forth above (i.e. placing him on forced leave), and by terminating his employment, PG&E

28

COMPLAINT - PAGE 13

1 │ retaliated against him because he made a bona fide complaint of unsafe working conditions and/or
2 │ work practices to PG&E, i.e. his employer, and/or because he made a complaint to the California
3 │ State Department of Industrial Relations Retaliation Complaint Investigation Unit.

4 │     64.    As set forth above, PLAINTIFF is informed and believes and thereon alleges that
5 │ DEFENDANT willfully and/or with reckless indifference violated California Labor Code Section
6 │ 6310 by placing him on a forced leave of absence and terminating his employment.

7 │     65.    As a direct and proximate result of the unlawful conduct of DEFENDANT,
8 │ PLAINTIFF has suffered special damages including but not limited to past and future loss of
9 │ income, benefits, and other damages to be proven at time of trial.

10 │     66.    As a direct and proximate result of the unlawful conduct of DEFENDANT,
11 │ PLAINTIFF has suffered general damages including but not limited to shock, embarrassment,
12 │ humiliation, emotional distress, stress and other damages to be proven at the time of trial.

13 │     67.    DEFENDANT committed the acts herein alleged maliciously, fraudulently and
14 │ oppressively in conscious disregard for PLAINTIFF's rights. DEFENDANT committed and/or
15 │ ratified the acts alleged herein. These acts were committed with the knowledge of employees' lack
16 │ of fitness in the workplace but were allowed to proceed, by officers, directors, and/or managing
17 │ agents of DEFENDANT. PLAINTIFF is, therefore, entitled to recover punitive damages from
18 │ DEFENDANT in an amount according to proof at trial.

19 │     68.    As a result of the conduct of DEFENDANT, PLAINTIFF was forced to retain an
20 │ attorney in order to protect his rights. Accordingly, PLAINTIFF seeks the reasonable attorneys' fees
21 │ and costs incurred in this litigation in an amount according to proof at trial.

22 │     WHEREFORE, PLAINTIFF prays for judgment as set forth below.

23 │ ### THIRD CAUSE OF ACTION

24 │ ### Wrongful Demotion in Violation of Public Policy

25 │     69.    By this reference, PLAINTIFF hereby incorporates each and every paragraph set
26 │ forth above as though fully set forth at this place.

27 │

28 │

70.  At all times mentioned herein, California Labor Code Section 1102.5 et. seq. was in full force and effect, and establishes that the public policy of the State of California is, in part, to prohibit retaliation against employees who disclose (or may disclose) information which may show a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation.

71.  At all times mentioned herein, California Labor Code Section 6310 et. seq. was in full force and effect, and establishes that the public policy of the State of California is, in part, to prohibit retaliation against employees who complain of unsafe working conditions or practices.

72.  PLAINTIFF was employed by DEFENDANT.

73.  DEFENDANT terminated PLAINTIFF's employment.

74.  PLAINTIFF asserts that his complaints of unsafe work practices, and/or his disclosure of information (and/or DEFENDANT's believe that PLAINTIFF might disclose information) which PLAINTIFF reasonably believed disclosed a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation was a motivating reason behind his termination.

75.  The termination caused PLAINTIFF harm.

76.  PLAINTIFF is therefore informed and believes and thereon alleges that DEFENDANT wrongfully terminated him in violation of public policy.

77.  As a direct and proximate result of the unlawful conduct of DEFENDANT, PLAINTIFF has suffered special damages including but not limited to past and future loss of income, benefits, and other damages to be proven at time of trial.

78.  As a direct and proximate result of the unlawful conduct of DEFENDANT, PLAINTIFF has suffered general damages including but not limited to shock, embarrassment, humiliation, emotional distress, stress and other damages to be proven at the time of trial.

79.  DEFENDANT committed the acts herein alleged maliciously, fraudulently and oppressively in conscious disregard for PLAINTIFF's rights. DEFENDANT committed and/or ratified the acts alleged herein. These acts were committed with the knowledge of employees' lack

COMPLAINT - PAGE 15

1 of fitness in the workplace but were allowed to proceed, by officers, directors, and/or managing

2 agents of DEFENDANT. PLAINTIFF is, therefore, entitled to recover punitive damages from

3 DEFENDANT in an amount according to proof at trial.

4 WHEREFORE, PLAINTIFF prays for judgment as set forth below.

5 **PRAYER FOR RELIEF**

6 WHEREFORE, PLAINTIFF makes the following demand:

7 a) That process be issued and served as provided by law, requiring PG&E to appear and

8 answer or face judgment;

9 b) That this Court order injunctive relief, i.e. for PG&E to make, in good faith, an offer

10 of employment to PLAINTIFF in a position with like seniority, status, pay and benefits as

11 PLAINTIFF would have enjoyed but for PG&E'S wrongful conduct, and to provide training to its

12 employees on the topics of safety and retaliation in the workplace.

13 c) That PLAINTIFF have and recover judgment against PG&E in an amount to be

14 determined at trial as special and general damages for its wrongful conduct;

15 d) That PLAINTIFF have and recover a judgment against PG&E for punitive damages

16 in an amount to be determined at trial sufficient to punish, penalize and/or deter;

17 e) That PLAINTIFF have and recover a judgment against PG&E in an amount to be

18 determined at trial for expenses of this litigation, including, but not limited to, reasonable attorney's

19 fees (for PLAINTIFF'S statutory causes of action).

20 f) That PLAINTIFF have and recover all penalties available to him due to PG&E'S

21 violations of the California Labor Code.

22 g) That PLAINTIFF have and recover a judgment against PG&E for all pre-judgment

23 and post-judgment interest; and

24

25 //

26

27 //

28

COMPLAINT - PAGE 16

h)     That PLAINTIFF have such other relief as this Court deems just and proper.

DATED:  September _____, 2019                    **COSTIN LAW INC.**

By:_____
ANNE COSTIN
Attorney for PLAINTIFF HEARN

### DEMAND FOR JURY TRIAL

PLAINTIFF hereby demands Trial by Jury.

DATED: September _____, 2019                    **COSTIN LAW INC.**

By:_____
ANNE COSTIN
Attorney for PLAINTIFF HEARN

COMPLAINT - PAGE 17

# Electronic Proof of Claim_L@$AU27395

Final Audit Report 2019-10-21

| | |
|---|---|
| Created: | 2019-10-21 |
| By: | Prime Clerk E-Filing (efiling@primeclerk.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAOWisDXx8Kv0y1Z2-qnb7H_jwmSl0SYaT |

## "Electronic Proof of Claim_L@$AU27395" History

⬛ Web Form created by Prime Clerk E-Filing (efiling@primeclerk.com)
2019-10-21 - 10:27:09 PM GMT

⊘ Anne Costin (anne@costinlawfirm.com) uploaded the following supporting documents:
  ⊘ Attachment

2019-10-21 - 11:02:56 PM GMT

⬛ Web Form filled in by Anne Costin (anne@costinlawfirm.com)
2019-10-21 - 11:02:56 PM GMT- IP address: 108.192.18.141

⊘ (User email address provided through API User-Agent: Mozilla/5.0 (Windows NT 6.3; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/77.0.3865.90 Safari/537.36)
2019-10-21 - 11:02:59 PM GMT- IP address: 108.192.18.141

✅ Signed document emailed to Anne Costin (anne@costinlawfirm.com) and Prime Clerk E-Filing (efiling@primeclerk.com)
2019-10-21 - 11:02:59 PM GMT