MORGAN, LEWIS & BOCKIUS LLP
William D. Kissinger (SBN 135276)
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Tel:   +1.415.442.1480
Fax:   +1.415.442.1001
william.kissinger@morganlewis.com

-and-

MORGAN, LEWIS & BOCKIUS LLP
Richard W. Esterkin (SBN 70769)
300 South Grand Ave.
Los Angeles, CA 90071-3132
Tel:   +1.213.612.2500
Fax:   +1.213.612.2501
richard.esterkin@morganlewis.com

*Attorneys for Henrietta D Energy Storage LLC*

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO

| | |
|---|---|
| **In re** | Case No. 19-30088 (DM) |
| **PG&E CORPORATION** | Chapter 11 |
| -and- | (Lead Case) (Jointly Administered) |
| **PACIFIC GAS AND ELECTRIC COMPANY,** | **DECLARATION OF CHRISTOPHER STREETER IN SUPPORT OF MOTION OF HENRIETTA D ENERGY STORAGE, LLC FOR ENTRY OF AN ORDER MODIFYING THE AUTOMATIC STAY TO PERMIT CONTRACT TERMINATION** |
| Debtors. | |
| ☐ Affects PG&E Corporation | **Hearing Date:** December 17, 2019 **Time:** 10:00 a.m. (PST) |
| ☒ Affects Pacific Gas and Electric Company | Courtroom: Hon. Dennis Montali |
| ☐ Affects both Debtors | 450 Golden Gate Avenue 16th Floor, Courtroom 17 San Francisco, CA 94102 |
| *\* All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | |

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
NEW YORK

DECLARATION OF CHRISTOPHER STREETER

I, Christopher Streeter, declare as follows:

1. I am the chief information officer of Convergent Energy and Power LP ("Convergent"). I submit this declaration (the "Declaration") on behalf of Convergent in support of the Motion of Henrietta D Energy Storage LLC ("Henrietta") for an Modifying the Automatic Stay to Permit Contract Termination (the "Motion"). I have personal knowledge of the facts stated in this Declaration and am familiar with the terms of the Energy Storage Agreement, dated November 4, 2019 (the "ESA") and the contents of the Facilities Study, dated April 6, 2017 (the "FAS"). If called as a witness I could, and would, competently testify under oath as set forth below.

2. Henrietta is a Delaware limited liability company and a subsidiary of Convergent, a Delaware limited partnership headquartered in New York City and a leading developer of energy storage solutions in North America.

3. Henrietta and Pacific Gas and Electric Company ("PG&E") are parties to the ESA. The ESA generally provides that Henrietta will construct a four hour 10 megawatt ("MW") battery storage facility (the "Facility") and that PG&E would have the right over the twenty year term of the ESA to dispatch the battery to either discharge or charge energy to or from the grid beginning on May 1, 2020.

4. Since entering into the ESA, Henrietta has invested in development expenses for site control and land payments, interconnection studies, permit applications (and related consulting costs including engineering, environmental, entitlements and architecture) in an amount no less than $500,000. Pursuant to the ESA, Henrietta also posted Project Development Security (as defined under the ESA) to PG&E in the sum of $600,000.

5. The ESA contemplates that the Facility will be capable of a certain level of minimum storage and daily discharge throughput. Specifically, Appendix II of the ESA specifies

that run hour limitations could be up to 79MWh of Maximum Delivered Discharge Energy per day. Henrietta had initially planned to comply with the requirements under Appendix II of the ESA by charging the batteries two full charge and discharge cycles per day, based on the agreed batteries' performance limits. The planned charging capability is essential to Henrietta achieving the proposed 79 MWh of daily discharge throughput specified in Appendix II.

6. In order to develop the project, as required by the ESA, PG&E conducted a Facilities Study ("FAS") regarding its existing electric distribution system to determine what interconnection facilities and what system upgrades would be required to enable the Facility to safely and reliably interconnect to PG&E's grid while also enabling the Facility to meet the ESA's performance requirements. In April 2017, PG&E provided Henrietta with the FAS, which assessed, among other things, how the Facility would interconnect with PG&E's local grid, the upgrades that would be required, and limitations on the Facility's operations in light of the current capabilities of PG&E's distribution system.

7. The FAS concluded that there would be significant limitations on the operation of the Facility, and, in particular, identified limits on the when and how much the Facility could charge its batteries. Specifically, based upon the FAS, PG&E required that the Facility's batteries (a) could not be charged whenever the load on the local grid exceeds 20MW and (b) could only be charged with up to 5MW from April 1 through July 15 of each year. The FAS contained no information about what system upgrades and their associated costs would be necessary to overcome the limitations of PG&E's distribution system. Both parties agree that unless these limitations could be mitigated, these charging restrictions will prevent Henrietta from being able to meet the ESA's requirements.

8. PG&E's failure to identify what it would take to upgrade its distribution system so as to enable that system to meet the Facility's charging needs was contrary to the parties'

expectations and to the provisions of the ESA. Under the ESA, PG&E was required to provide this information to Henrietta so that it could decide whether the project could bear the additional costs in order to upgrade the system to the extent needed. Section 5.2(e)(ii) of the ESA provides for a no fault termination right under which each party can walk away from the project if the cost to upgrade PG&E's distribution system exceeded a particular financial threshold – $50 per kW, or $500,000 given the 10 MW size of the project.

9. Henrietta shared the results of the FAS with the contract management group within PG&E immediately upon receipt of the study. (The FAS was prepared by a separate office within PG&E that handles interconnection). Henrietta pointed out this issue over many months in both pre-petition and post-petition commercial discussions, requesting further explanations and further study. In those discussions, PG&E did not suggest that the termination of the ESA was necessary. Instead, PG&E encouraged Henrietta to believe there was a possible work around that would lead to a consensual solution. But PG&E has never provided, as required in the ESA, any further explanation as to the nature or cost of any feasible work around that would avoid the charging limitations and provide Henrietta with the capability to meet ESA's performance metrics, nor did it provide any further study as promised.

10. As part of the discussions between the parties, Henrietta proposed potential solutions, including (a) changing the battery technology it had proposed to use to construct the Facility and (b) lowering the daily discharge throughput in the ESA's Appendix II from 79MWh to 40MWh. PG&E has declined these proposals, without explanation.

11. During PG&E's chapter 11 proceedings, Henrietta has continued commercial discussions with PG&E about the Facility and PG&E's required charging restrictions, including discussions about a mutual agreement to terminate the ESA. PG&E had continued these

discussions, in apparent good faith, so Henrietta had refrained from taking steps to exercise its termination right in reliance on these discussions.

12. On September 24, 2019, however, Henrietta received a letter from PG&E stating that PG&E's charging restrictions would prevent the Facility from performing as described in the ESA and that PG&E would not accept the Facility with the limitations imposed on the Facility by its grid. . A copy of the letter dated September 24, 2019 from Ted Yura, Energy Contract Management at PG&E to Henrietta is attached hereto as <u>Exhibit A</u>.

13. PG&E's September 24 letter makes clear that: (a) PG&E is no longer willing to accept any performance that Henrietta may tender; (b) Henrietta is excused from performing its obligations; and, (c) Henrietta is entitled to terminate the ESA. Section 5.2(e) of the ESA states that:

> (e) <u>Distribution Upgrades or Interconnection Facilities associated with Charging Energy.</u> Within thirty (30) days of the date on which the final System Impact Study or equivalent study per PG&E's Wholesale Distribution Tariff ("Interconnection Study") is completed, Seller will make available to Buyer the results of the Interconnection Study. If the Interconnection Study results indicate constraints that may limit the Project's ability to charge and identifies mitigations required to alleviate that constraint, the Seller shall elect either to fund any and all Distribution Upgrades or Interconnection Facilities sufficient to eliminate the charging constraints as required via the interconnection study process ("Charging Energy Interconnection Investment") as described in Section 5.2(e)(i) or proceed to a no fault termination as described in Section 5.2(e)(ii).

14. Although PG&E delivered the initial FAS in April 2017, the FAS identified no mitigations "required to alleviate the constraint" imposed by PG&E's charging restrictions. During the months of discussions between the parties, Henrietta sought, without success, to identify and address the constraints created by the charging restrictions imposed by PG&E's grid. PG&E's September 24 letter makes it plain for the first time that PG&E has no intention or ability to find a solution to those constraints.

15. Further, Sections 6.1(a) and (c) of the ESA, in pertinent parts, state that:

(a) Except as set forth in this Article Six or as expressly set forth in this Agreement, during the Delivery Term, Buyer shall be responsible for delivering all of the Charging Energy for the Project to the Electrical Delivery Point for Scheduled Operations. . . .

(c) Buyer shall be responsible for the Energy costs associated with providing the Charging Energy to the Electrical Delivery Point for Scheduled Operations. . .

"Scheduled Operations" as defined under the ESA includes a reference to the operational requirements set forth in Appendix II of the ESA. The September 24 letter makes plain that, were Henrietta to complete construction of the Facility, due to the limited capabilities of PG&E's grid, PG&E would breach its obligation under ESA sections 6.1(a) and (c) by not delivering adequate charging energy to the Facility.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on November 22, 2019 at New York, New York.

_____
Christopher Streeter

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
NEW YORK

# EXHIBIT A

**The September 24 Letter**



**Ted Yura**
Senior Manager
Energy Contract Management

245 Market Street, N12E
San Francisco, CA 94105-1702

*Mailing Address*
Mail Code N12E
P. O. Box 770000
San Francisco, CA 94177-0001

September 24, 2019

Johannes Rittershausen
CEO
1065 Avenue of the Americas, 7th Floor
New York, NY 10018

<u>Sent via email.</u>

**Re: Charging Restrictions for Henrietta D Energy Storage (PG&E Log No. 40S004)**

Dear Mr. Rittershausen:

Pacific Gas and Electric Company ("PG&E") and Henrietta D Energy Storage LLC ("Seller") are parties to that certain Energy Storage Agreement dated as of November 23, 2015 ("ESA"). All capitalized terms not defined herein shall have their meaning set forth in the ESA.

Seller has informed PG&E that the Interconnection Study for the Project specifies restrictions on the Project's ability to charge, including restrictions on charging the facility when Henrietta Bank 1 load exceeds 20 MW, and a limitation on charging at loads higher than 5 MW between April 1 and July 15 of each year. These restrictions would prevent the Project from performing pursuant to the parameters outlined in Appendix II of the ESA.

Section 16.1(a) of the ESA states that as a Condition Precedent to the Initial Delivery Date, "Seller shall have constructed the Project, which will include the equipment and characteristic as described in Appendix II". With this letter, PG&E reaffirms for the avoidance of doubt that it will <u>not</u> consider the project to have achieved the Initial Delivery Date if there are any conditions in place, including charging restrictions, which would prevent the Project from performing pursuant to the parameters outlined in Appendix II of the ESA.

PG&E reserves all rights and remedies available to it under the ESA and through courts of law and equity, and nothing in this letter should be construed as a waiver of any such remedies. Please contact Paul Owen at (415) 973-4639 or pto2@pge.com if you have any questions.

Sincerely,

*[signature]*

Ted Yura
Senior Manager, Energy Contract Management

---

20190924_Henrietta D Energy Storage_40S004_Charging Restrictions     Page 1 of 1