ENDORSED
FILED
ALAMEDA COUNTY
JAN 1 9 2018
CLERK OF THE SUPERIOR COURT
By MICHELLE ROSS
Deputy

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ALAMEDA - UNLIMITED JURISDICTION

| | |
|---|---|
| **IN RE GHOST SHIP FIRE LITIGATION** ) | Case No.: RG16843631 (And Related Cases) |
| Plaintiffs ) | **SECOND AMENDED MASTER** |
| ) | **COMPLAINT FOR:** |
| vs. ) | |
| ) | |
| CHOR NAR SIU NG, individually and as ) | **1. NEGLIGENCE** |
| Trustee of the CHOR NAR SIU NG ) | **2. NEGLIGENCE AGAINST PG&E** |
| REVOCABLE TRUST DATED SEPTEMBER ) | **DEFENDANTS** |
| 28, 2007; ) | |
| EVA NG; ) | **3. PREMISES LIABILITY** |
| KAI NG; ) | **4. NEGLIGENT FAILURE TO EVICT** |
| DERICK ION ALMENA; ) | |
| MICAH ALLISON; ) | **5. NEGLIGENT HIRING,** |
| NICHOLAS ALEXANDER BOUCHARD; ) | **SUPERVISION, TRAINING AND/OR** |
| DANIEL LOPEZ; ) | **RETENTION** |
| 510 CUSTOM AUDIO; ) | |
| OMAR VEGA, individually and dba CUSTOM ) | **6. PUBLIC NUISANCE** |
| O'S; ) | **7. STRICT LIABILITY** |
| JOHN HRABKO aka RADAR; ) | **8. SURVIVAL ACTION** |
| AMANDA BETH BROWN, individually and ) | |
| dba 100% SILK; ) | **9. NEGLIGENT INFLICTION OF** |
| BRITT BROWN, individually and dba 100% ) | **EMOTIONAL DISTRESS** |
| SILK; ) | **10. INTENTIONAL INFLICTION OF** |
| 100% SILK; ) | **EMOTIONAL DISTRESS** |
| NOT NOT FUN RECORDS; ) | |
| JOEL SHANAHAN aka GOLDEN DONNA; ) | **11. GOVERNMENT TORT LIABILITY** |
| RUSSELL E.L. BUTLER aka BLACK JEANS; ) | **12. [left intentionally blank]** |
| OPAL RECORDS; ) | **13. NEGLIGENCE AGAINST DOES 501** |
| BENJAMIN CANNON; ) | |
| MAX HARRIS aka MAX OHR; ) | **THROUGH 750** |
| PACIFIC GAS & ELECTRIC COMPANY; ) | **14. SURVIVAL ACTION – GOV'T** |
| PG&E CORPORATION; ) | **ENTITIES & DOES 501 THROUGH 750** |
| CITY OF OAKLAND; ) | |
| COUNTY OF ALAMEDA; ) | **DEMAND FOR JURY TRIAL** |
| STATE OF CALIFORNIA (OFFICE OF THE ) | |
| STATE FIRE MARSHAL and DEPARTMENT ) | |
| OF FORESTRY AND FIRE PROTECTION); ) | |
| and DOES 1 through 750, inclusive, ) | |
| ) | |
| Defendants ) | |
| ) | |

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Exhibit 4
of 251
Page 1 of 251

# TABLE OF CONTENTS

Page

I. INTRODUCTION ............................................................................................. 1

II. JURISDICTION AND VENUE ....................................................................... 1

III. THE PARTIES ................................................................................................. 2

   A. PLAINTIFFS ............................................................................................. 2

   B. NAMED DEFENDANTS ........................................................................... 2

   C. DOE DEFENDANTS ................................................................................. 7

   D. AGENCY AND CONCERT OF ACTION ................................................. 9

IV. FACTUAL BACKGROUND .......................................................................... 9

   A. THE OWNERS AND LESSEES OF THE GHOST SHIP AND ADJOINING BUILDINGS ............................................................................................. 9

   B. THE DANGEROUS AND UNSAFE GHOST SHIP ................................. 11

   C. KNOWN USE OF GHOST SHIP AS AN EVENT VENUE/CABARET ..... 19

   D. PRIOR FIRES AT THE GHOST SHIP AND ADJOINING BUILDINGS ..... 22

   E. THE OWNERS/MANAGERS OF THE GHOST SHIP KNEW ABOUT THE PRIOR FIRES AND RECEIVED PRIOR COMPLAINTS ABOUT THE DANGEROUS ELECTRICAL SYSTEM AND UNSAFE CONDITIONS ...... 22

   F. ALLEGATIONS SPECIFIC TO PG&E AND DOES 251 THROUGH 300 ..... 25

   G. THE EVENT ON DECEMBER 2, 2016 ................................................... 31

V. CAUSES OF ACTION .................................................................................... 35

   FIRST CAUSE OF ACTION FOR NEGLIGENCE AGAINST ALL DEFENDANTS, EXCEPT PG&E DEFENDANTS, CITY, COUNTY, STATE AND DOES 251 THROUGH 300 AND DOES 501 THROUGH 750 ................................ 35

   SECOND CAUSE OF ACTION FOR NEGLIGENCE AGAINST THE PG&E DEFENDANTS AND DOES 251 THROUGH 300 ......................................... 40

   THIRD CAUSE OF ACTION FOR PREMISES LIABILITY AGAINST ALL DEFENDANTS EXCEPT CITY, COUNTY, STATE AND DOES 501 THROUGH 750 44

   FOURTH CAUSE OF ACTION FOR NEGLIGENT FAILURE TO EVICT AGAINST DEFENDANTS CHOR NG, EVA NG, KAI NG AND DOES 1 THROUGH 50, INCLUSIVE .............................................................................................. 46

   FIFTH CAUSE OF ACTION FOR NEGLIGENT HIRING, SUPERVISION, TRAINING AND/OR RETENTION AGAINST ALL DEFENDANTS EXCEPT CITY, COUNTY, STATE AND DOES 501 THROUGH 750 ................................. 48

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Page 2
of 251

IN RE GHOST SHIP FIRE LITIGATION SECOND AMENDED MASTER COMPLAINT - Exhibit 4

SIXTH CAUSE OF ACTION FOR PUBLIC NUISANCE AGAINST ALL DEFENDANTS EXCEPT CITY, COUNTY, STATE AND DOES 501 THROUGH 750 49

SEVENTH CAUSE OF ACTION FOR STRICT LIABILITY AGAINST DEFENDANTS PG&E AND DOES 251 THROUGH 300 ................................................ 50

EIGHTH CAUSE OF ACTION – SURVIVAL ACTION AGAINST ALL DEFENDANTS EXCEPT CITY, COUNTY, STATE AND DOES 501 THROUGH 750 ........................................................................................................................ 51

NINTH CAUSE OF ACTION FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AGAINST ALL DEFENDANTS EXCEPT CITY, COUNTY AND STATE ........................................................................................................................ 54

TENTH CAUSE OF ACTION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST ALL DEFENDANTS EXCEPT, CITY, COUNTY AND STATE .................................................................................................... 55

ELEVENTH CAUSE OF ACTION FOR GOVERNMENT TORT LIABILITY AGAINST DEFENDANTS CITY, COUNTY AND STATE ........................................ 577

A. CITY OF OAKLAND .................................................................................. 577

B. COUNTY OF ALAMEDA ............................................................................. 91

C. STATE OF CALIFORNIA ........................................................................... 106

TWELFTH CAUSE OF ACTION [left intentionally blank] ............................................ 115

THIRTEENTH CAUSE OF ACTION FOR NEGLIGENCE AGAINST DEFENDANTS DOES 501 THROUGH 750 .......................................... 116

FOURTEENTH CAUSE OF ACTION – SURVIVAL ACTION AGAINST DEFENDANTS CITY, COUNTY, STATE AND DOES 501 THROUGH 750 ............. 117

VI. PRAYER FOR RELIEF ................................................................................ 120

VII. JURY TRIAL DEMANDED ......................................................................... 121

Plaintiffs bring this action for damages and make the following allegations based upon information and belief.

## I.  INTRODUCTION

1.      This case arises from the horrific fire that occurred on December 2, 2016, at the "Ghost Ship," which is located at 1315 31st Avenue in the City of Oakland, County of Alameda, State of California.  Thirty-six (36) people lost their lives and many others were seriously injured.

2.      At approximately 11:15 pm on December 2, 2016, over 100 invitees were at an electronic dance music event when the fire started inside the Ghost Ship.  These invitees, along with artists performing at the event and residents, were plunged into darkness and thick, black smoke and tried to exit the unsafe structure.

3.      The interior of the 10,000 square-foot Ghost Ship was a death trap that contained a maze of makeshift rooms, alcoves and partitions.  It was cluttered with carvings, mannequins, paintings, artwork, scraps of wood, pianos, furniture, tapestries and several recreational vehicles.

4.      The Ghost Ship lacked a safe means of access between the upper floor where the music event was and the exit on the ground floor.  The Ghost Ship lacked adequate and sufficient fire safety measures and was not up to fire protection and life safety codes, including, but not limited to, not having adequate and sufficient smoke alarms, fire extinguishers, overhead sprinklers, exit signs, emergency lighting, exit lights and a safe means of exit, all in violation of applicable statutes.

5.      Thirty-six (36) people were unable to exit and were trapped in the inferno inside.  These victims suffered injuries from the fire, including from smoke inhalation, while trying to escape.  The victims who perished were alive and feared for their safety.  They were eventually overcome by the fire and smoke, and subsequently died inside the Ghost Ship.  They did not die instantaneously when the fire broke out.  They were injured and suffered from the injuries caused by the fire and smoke for many minutes before dying.  This horrific disaster was foreseeable.

## II.  JURISDICTION AND VENUE

6.      The amount in controversy exceeds the jurisdictional limits of the Superior Court, Limited Jurisdiction.

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Page 4
of 251

7. Venue is proper in Alameda County Superior Court because one or more Defendants reside in the County of Alameda, is subject to the personal jurisdiction of this Court, and the injury and damage to Plaintiffs occurred within the jurisdictional area of this Court.

## III. THE PARTIES

**A. PLAINTIFFS**

8. Plaintiffs suffered wrongful death, personal, emotional and/or economic injures as a result of the Ghost Ship fire. Plaintiffs bring their causes of action as an heir to a victim that died as a result of the Ghost Ship fire and/or for his or her own injuries sustained as a result of the Ghost Ship fire.

**B. NAMED DEFENDANTS**

9. Defendants CHOR NAR SIU NG, individually and as trustee of the CHOR NAR SIU NG REVOCABLE TRUST DATED SEPTEMBER 28, 2007, EVA NG, KAI NG and DOES 1 through 50, inclusive, and each of them, are and were, at all times relevant hereto, owners and/or managers of the real property upon which the Ghost Ship was located. Said Defendants are and were, at all times relevant hereto, the owners and/or managers of the real property parcels with Assessor Parcel Numbers ("APN") 25-690-11, APN 25-690-10 & APN 25-690-9, and street addresses of 1305, 1309, 1313 and 1315 31st Avenue and 3071 and 3073 International Boulevard, Oakland.

10. CHOR NAR SIU NG is a natural person who is, and at all times relevant hereto, was a resident of the County of Alameda, State of California. CHOR NAR SIU NG is also referred to herein as CHOR NG.

11. EVA NG is a natural person who is, and at all times relevant hereto, was a resident of the County of Alameda, State of California.

12. KAI NG is a natural person who is, and at all times relevant hereto, was a resident of the County of Alameda, State of California.

13. Defendants DERICK ION ALMENA, MICAH ALLISON, NICHOLAS ALEXANDER BOUCHARD and DOES 51 through 100, inclusive, and each of them, leased, rented, promoted, marketed, controlled, secured, operated, built, constructed, developed, designed,

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Page 5 of 251    Exhibit 4

engineered, maintained, managed, inspected, repaired and/or provided services to 1305 31st Avenue and 1315 31st Avenue, including the Ghost Ship, where events open to the public were held and entertainment was provided. Said Defendants had been leasing the Ghost Ship for at least three years and had converted the Ghost Ship into residential ad hoc spaces/units and leased those spaces to others. Permits were not obtained by said Defendants for the conversion to residential or public events held at the Ghost Ship.

14.     DERICK ION ALMENA is a natural person who is, and at all times relevant hereto, was a resident of the County of Alameda, State of California. DERICK ION ALMENA is also referred to herein as ALMENA.

15.     MICAH ALLISON is a natural person who is, and at all times relevant hereto, was a resident of the County of Alameda, State of California. MICAH ALLISON is also referred to herein as ALLISON.

16.     NICHOLAS ALEXANDER BOUCHARD is a natural person who is, and at all times relevant hereto, was a resident of the County of Alameda, State of California. NICHOLAS ALEXANDER BOUCHARD is also referred to herein as BOUCHARD.

17.     Defendants DANIEL LOPEZ, 510 CUSTOM AUDIO, OMAR VEGA, individually and dba CUSTOM O'S, and DOES 101 through 150, inclusive, and each of them, leased, rented, marketed, controlled, secured, operated, built, constructed, developed, designed, engineered, maintained, managed, inspected and/or repaired 1309 31st Avenue and 1313 31st Avenue and/or the premises located on Assessor Parcel Number, APN 25-690-10, manufactured, distributed and/or sold materials to the Ghost Ship and the adjacent and surrounding premises, and provided utilities and services to the Ghost Ship. Defendants DANIEL LOPEZ, 510 CUSTOM AUDIO, OMAR VEGA, individually and dba CUSTOM O'S, and DOES 101 through 150 supplied electricity from their premises, restrooms and event space on their premises for use by patrons and invitees during music and other events held at the Ghost Ship.

18.     510 CUSTOM AUDIO is, and at all times relevant hereto, was a California corporation organized and existing under the laws of the State of California, with its principal place of business in Oakland.

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Page 6 of 251

19. DANIEL LOPEZ is a natural person who is, and at all times relevant hereto, was a resident of the County of Alameda, State of California. DANIEL LOPEZ is also referred to herein as LOPEZ.

20. OMAR VEGA is a natural person who is, and at all times relevant hereto, was a resident of the County of Alameda, State of California. OMAR VEGA is also referred to herein as VEGA. VEGA was the owner and/or sole proprietor of CUSTOM O'S.

21. Defendants JOHN HRABKO also known as RADAR, 100% SILK, BRITT BROWN, AMANDA BETH BROWN, NOT NOT FUN RECORDS, JOEL SHANAHAN also known as GOLDEN DONNA, RUSSELL E.L. BUTLER also known as BLACK JEANS, OPAL RECORDS and DOES 151 through 200, inclusive, and each of them, promoted, marketed, sold tickets at, leased, rented, performed at, controlled, secured, operated, developed, designed, engineered, maintained, managed, inspected and/or provided services at the Ghost Ship, and the adjacent and surrounding premises, where entertainment was provided on December 2, 2016.[1]

22. JOHN HRABKO aka RADAR is a natural person who is, and at all times relevant hereto, was a resident of Alameda County, California, and conducting substantial business in the State of California, including the County of Alameda. JOHN HRABKO is also referred to herein as HRABKO.

23. 100% SILK is and was, at all times relevant hereto, a business entity, form unknown, owned and/or operated by BRITT BROWN, AMANDA BETH BROWN and/or NOT NOT FUN RECORDS, who are also the alter egos of 100% SILK. 100% SILK "an independent record label and taste-maker in the expanding and evolving world of electronic dance music."[2] 100% SILK was founded in 2011 by BRITT BROWN, AMANDA BETH BROWN and/or NOT NOT FUN RECORDS, and is the sub-label and/or subsidiary of NOT NOT FUN RECORDS. BRITT BROWN, AMANDA BETH BROWN and/or NOT NOT FUN RECORDS, at all times relevant hereto, mentioned, dominated, influenced and controlled 100% SILK and the officers

---

[1] Defendants 100% SILK, BRITT BROWN, AMANDA BETH BROWN, NOT NOT FUN RECORDS have been dismissed without prejudice.
[2] http://silkdocumentary.vhx.tv/.

Case: 19-30088   Doc# 4877-4   Filed: 11/26/19   Entered: 11/26/19 20:03:10   Page 7 of 251

Exhibit 4

thereof as well as the business, property and affairs of each of said businesses and/or individuals. There existed and now exists a unity of interest and ownership between 100% SILK and each of the alter egos, i.e., BRITT BROWN, AMANDA BETH BROWN and/or NOT NOT FUN RECORDS. The individuality and separateness of said Defendants and 100% SILK have ceased. 100% SILK has been and now is a mere shell and naked framework which BRITT BROWN, AMANDA BETH BROWN and/or NOT NOT FUN RECORDS used as a conduit for the conduct of their personal business, property and affairs.

24. BRITT BROWN is a natural person who is, and at all times relevant hereto, was a resident of the County of Los Angeles, State of California, and was conducting substantial business in the State of California, including the County of Alameda. BRITT BROWN is an owner, founder, operator, sole proprietor, alter ego, partner, joint venturer, agent, and/or officer of NOT NOT FUN RECORDS and 100% SILK.

25. AMANDA BETH BROWN is a natural person who is, and at all times relevant hereto, was a resident of the County of Los Angeles, State of California, and was conducting substantial business in the State of California, including the County of Alameda. AMANDA BETH BROWN is also referred to herein as AMANDA BROWN. AMANDA BROWN is an owner, founder, operator, sole proprietor, alter ego, partner, joint venturer, agent, and/or officer of NOT NOT FUN RECORDS and 100% SILK.

26. NOT NOT FUN RECORDS is, and at all times relevant hereto, was a California corporation organized and existing under the laws of the State of California with its principal place of business in the County of Los Angeles. NOT NOT FUN RECORDS is a Los Angeles based record label founded by BRITT BROWN and AMANDA BROWN, and is also the parent company and/or alter ego of 100% SILK.

27. JOEL SHANAHAN, also known as GOLDEN DONNA, is a natural person who is, and at all times relevant hereto, was conducting substantial business in the State of California, including the County of Alameda. JOEL SHANAHAN is also referred to herein as SHANAHAN. SHANAHAN was an artist on the 100% SILK/NOT NOT FUN RECORDS label and was involved in the organization, promotion, sale, marketing, advertising, provision of security and

5
IN RE GHOST SHIP FIRE LITIGATION SECOND AMENDED MASTER COMPLAINT

provision of entertainment of the music event on December 2, 2016.

28. RUSSELL E.L. BUTLER, also known as BLACK JEANS, is a natural person who is, and at all times relevant hereto, was conducting substantial business in the State of California, including the County of Alameda. RUSSELL E.L. BUTLER is also referred to herein as BUTLER. BUTLER was involved in the planning, organization, promotion, sale, marketing, advertising, provision of security and provision of entertainment of the event at the Ghost Ship, and is an artist who is represented, managed and/or employed by OPAL RECORDS.

29. OPAL RECORDS is, and at all times relevant hereto, was conducting substantial business in the State of California, including the County of Alameda. OPAL RECORDS is a music label based in the United Kingdom, whose artists include BUTLER, and was involved in the planning, organization, promotion, sale, marketing, advertising, provision of security and provision of entertainment of the event at the Ghost Ship.

30. Defendants BENJAMIN CANNON and DOES 201 through 250, inclusive, and each of them, performed work at the Ghost Ship and the adjoining buildings, including but not limited to electrical work. Said Defendants also leased, occupied, inspected, maintained, repaired and/or controlled the Ghost Ship and/or adjoining buildings.

31. BENJAMIN CANNON is a natural person who is, and at all times relevant hereto, was a contractor, whose contractor's license with the State of California had expired. BENJAMIN CANNON is also referred to herein as CANNON. CANNON sublet space from LOPEZ, 510 CUSTOM AUDIO, VEGA and/or DOES 101 through 150.

32. Defendant MAX HARRIS also known as MAX OHR is a natural person, who did, and at all times relevant hereto, live and work inside the Ghost Ship, operating his tattoo business, making jewelry and performing at music events. MAX OHR is also referred to herein as OHR. OHR sublet space from ALMENA, ALLISON, BOUCHARD and DOES 51 through 100. OHR was hired by ALMENA, ALLISON, BOUCHARD, HRABKO, 100% SILK, BRITT BROWN, AMANDA BROWN, NOT NOT FUN RECORDS, SHANAHAN, BUTLER, OPAL RECORDS and/or DOES 51 through 100 and 151 through 200 to promote and work the event on December 2, 2016. The services he provided include, but are not limited to promoting the event, collecting the

Case: 19-30088   Doc# 4877-4   Filed: 11/26/19   Entered: 11/26/19 20:03:10   Page 9
of 251
Exhibit 4

entrance fee and providing security.

33.     Defendants PACIFIC GAS & ELECTRIC COMPANY, PG&E CORPORATION and DOES 251 through 300, inclusive, and each of them, provided and/or worked on the electric service provided to the Ghost Ship and adjoining buildings.

34.     PACIFIC GAS & ELECTRIC COMPANY, a subsidiary corporation of PG&E Corporation, is incorporated in the State of California and is based in San Francisco.  PACIFIC GAS & ELECTRIC COMPANY is also referred to herein as PG&E COMPANY.  PG&E COMPANY is a combination natural gas and electric utility which provides gas and electric service to millions of customers in northern and central California.

35.     PG&E CORPORATION is an energy-based holding company incorporated in the State of California.  PG&E CORPORATION is the parent company of PG&E COMPANY. Collectively, PACIFIC GAS & ELECTRIC COMPANY and PG&E CORPORATION are referred to herein as the "PG&E."

36.     Defendants CITY OF OAKLAND (also referred to herein as the "CITY"), COUNTY OF ALAMEDA (also referred to herein as the "COUNTY") and STATE OF CALIFORNIA (OFFICE OF THE STATE FIRE MARSHAL and DEPARTMENT OF FORESTRY AND FIRE PROTECTION) (hereinafter referred to as the "STATE") are public entities.[3]

**C.     DOE DEFENDANTS**

37.     At all times relevant hereto, Defendants DOES 301 through 500, inclusive, and each of them, were somehow negligent or otherwise responsible for the injuries and death of the Ghost Ship fire victims and the damages alleged herein.

38.     Plaintiffs are informed and believe, and thereon allege that each of the Defendants, including DOES 301 through 500, is negligently or otherwise responsible in some manner for the events and happenings herein referred to and those Defendants negligently acted, or failed to act. Their negligence and/or failure to act and the dangerous conditions on the subject premises legally

---

[3]  Defendants COUNTY OF ALAMEDA and THE STATE OF CALIFORNIA have been dismissed without prejudice.

caused the injuries and damages hereinafter set forth.

39. The true names and capacities, whether individual, corporate, associate or otherwise of Defendants DOE 1 through DOE 500, inclusive, are unknown to Plaintiffs who therefore sue said Defendants by such fictitious names pursuant to Code of Civil Procedure section 474. Plaintiffs further allege each fictitious Defendant is in some manner responsible for the acts and occurrences set forth herein. Plaintiffs will amend this Complaint to show their true names and capacities when the same are ascertained.

40. At all times relevant hereto, Defendant DOES 501 through 750, inclusive, were either residents of the State of California, doing business in the County of Alameda, and/or are otherwise subject to the jurisdiction of the State of California.

41. The true names and capacities of the Defendants DOES 501 through 750, inclusive, whether individual, corporate, associate or otherwise, are unknown to Plaintiffs at the time of the filing of this Complaint and Plaintiffs therefore sue said Defendants by such fictitious names and will amend the Complaint to show their true names or capacities when the same have been ascertained.

42. Plaintiffs are informed and believe, and thereon allege, that each of the DOE Defendants, 501 through 750, is in some manner responsible for the events and happenings herein set forth and proximately caused injuries and damages to Plaintiffs as alleged. Plaintiffs are informed and believe and based thereon allege that each of the Defendants herein, whether named or named fictitiously, was the agent, servant, employee, co-venturer, partner, or in some manner the agent and/or principal of each of the other Defendants, and was acting within the course and scope of said agency, representation or employment in doing or failing to do the acts alleged herein. The acts and conduct alleged herein of each such Defendant were known to, and authorized and ratified by, each and every remaining Defendant. At all times relevant hereto, Defendants, and each of them, held a special relationship with Plaintiffs and with each other, non-delegable in nature, and subjected Plaintiffs to a peculiar and high risk of harm for a breach thereof.

Case: 19-30088   Doc# 4877-4   Filed: 11/26/19   Entered: 11/26/19 20:03:10   Page 11 of 251
Exhibit 4

## D.    AGENCY AND CONCERT OF ACTION

43.    At all times relevant hereto, each of the Defendants was the agent, servant, employee, partner, aider and abettor, contractor, subcontractor, co-conspirator and/or joint venturer of each of the remaining Defendants named herein and were at all times operating and acting within the purpose, course and scope of said agency, service, employment, partnership, conspiracy, contract, alter ego and/or joint venture, and with the permission and consent of their co-Defendants.  Each Defendant has rendered substantial assistance and encouragement to the other Defendants, knowing that their conduct was wrongful and/or unlawful, and each Defendant has ratified and approved the acts of each of the remaining Defendants.

## IV.    FACTUAL BACKGROUND

## A.    THE OWNERS AND LESSEES OF THE GHOST SHIP AND ADJOINING BUILDINGS

44.    1305 31st Avenue is a structure located in an R-30 Zone, yet it is considered by Alameda County to be a "Warehouse, Portion of a Single Economic Unit."  This Single Economic Unit includes APN 25-690-11 (1305 31st Ave.), APN 25-690-10 (1315 31st Ave.) and APN 25-690-9 (3703 International Blvd).  The buildings sit at the corner of 31st Avenue and International Blvd., and run almost the complete length of the block on 31st Avenue between International Blvd. and East 13th Street.  As part of the consolidated Single Economic Unit, there is an undeveloped yard on the south side between the structure on 1305 31st Ave. and the residence at 1301 31st Ave.:  APN No 25-690-5.

45.    APN 25-690-11 was commonly referred to as the "Ghost Ship" by its occupants and in various promotions of the illegal cabaret and businesses that operated there.  Graffiti painted on the front of it on the 31st Avenue side said "GHOSTSHIP."  The building, at various times, also went by other names including, but not limited to, the Satya Yuga Collective.  At times, APN 25-690-11 has been misidentified as 1315 31st Ave.  The building was covered in graffiti, and debris obstructed the sidewalk and ingress/egress creating a dangerous condition of public property for those seeking to enter or exit the building.  See Photograph in Paragraph 47 below.  From the outside, it was evident that the windows were blocked by debris stacked from

floor to ceiling and numerous metal objects were attached to the exterior of the building in a dangerous manner.

46.     APN 25-690-11 is reported to have been constructed in the early 1900s. Prior to December 2, 2016, numerous unpermitted modifications to the entire Single Economic Unit had occurred on numerous occasions including, but not limited to: a new electric service; new meters and submeters; construction of illegal residential units; toilettes, kitchens and showers; inter and intra building passageways to access bathrooms, residential and event spaces and the rooftop; structural changes in the exterior and interior walls; and unpermitted and shared electrical systems.

47.     Photograph showing the exterior of the Ghost Ship and side lot before the fire:[4]



48.     Defendants CHOR NG, EVA NG, KAI NG and DOES 1 through 50, and each of them, owned, leased, rented, marketed, controlled, secured, operated, built, constructed, developed, designed, engineered, maintained, managed, inspected, repaired and/or provided services to the premises. Said Defendants had mandatory and nondelegable duties to inspect and maintain APNs 25-690-11, 25-690-10 and 25-690-9 in a safe and usable condition, and to repair any dangerous or unsafe conditions.

---

[4] Source: "I-Team Timeline: Complaints Against Ghost Ship Warehouse Since 2014," ABC 7 News, Dan Noyes, December 5, 2016.

1      49.    Defendants CHOR NG, EVA NG, KAI NG and DOES 1 through 50 leased the

2 property on APN 25 690-11, including the Ghost Ship to Defendants ALMENA, ALLISON,

3 BOUCHARD and DOES 51 through 100, and each of them.

4      50.    Defendants CHOR NG, EVA NG, KAI NG and DOES 1 through 50, and each of

5 them, leased the property on APN 25 690-10, which had street addresses of 1309, 1313 and/or 1315

6 31 Ave. and/or 3071 International Blvd. to Defendants DANIEL LOPEZ, OMAR VEGA and DOES

7 101 through 150, and each of them.

8     **B.**     **THE DANGEROUS AND UNSAFE GHOST SHIP**

9      51.    Dangerous and flammable materials, including industrial and art supplies, propane

10 tanks that fueled camping stoves and recreational vehicles and their components and parts, were

11 located throughout the interior of the Ghost Ship.  Photographs of the interior of the Ghost Ship

12 show how it contained a maze of makeshift rooms, alcoves and partitions, and was cluttered with

13 carvings, mannequins, paintings, artwork, scraps of wood, pianos, furniture, tapestries and several

14 recreational vehicle trailers.

15      52.    Photograph showing the inside of the Ghost Ship before the fire:[5]

16



27

28     [5]Source:  "Video shows conditions inside Ghost Ship warehouse before fatal Oakland fire:  2 Investigates," KTVU, Simone Aponte, December 7, 2016 (updated January 30, 2017).

53.     The Ghost Ship did not have adequate and sufficient fire safety measures and was not up to fire protection and life-safety codes. The Ghost Ship did not have adequate and sufficient smoke alarms, fire extinguishers, overhead sprinklers, exit signs, emergency lighting, exit lights and a safe means of ingress and egress. Following its investigation, the Bureau of Alcohol, Tobacco, Firearms and Explosives stated that the building did not appear to have any fire-suppression system or alarms.

54.     The main means of access between the ground floor of the Ghost Ship and the second floor, where the event space was located, was a makeshift staircase made of pallets and scrap wood. The staircase was not code compliant and had irregular angles and inconsistent spacing between steps, which significantly impeded the ability of the invitees trapped inside to exit. The only other means of access was a staircase hidden behind the performance stage on the second floor and hidden in the corner of the ground floor.

55.     Photograph showing bottom portion of the makeshift staircase before the fire:[6]



56.     Photograph showing the top portion of the makeshift staircase and interior of the Ghost Ship before the fire:[7]

---

[6]Source: http://www.oaklandghostship.com (last visited December 22, 2016).
[7]Source: http://www.oaklandghostship.com (last visited December 22, 2016).

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Page 15 of 251
Exhibit 4

1
2
3
4
5
6
7
8
9
10
11
12
13



14
15      57.      Photograph showing the makeshift staircase at night, which was representative of

16  the Ghost Ship on December 2, 2016 before being plunged into darkness during the fire:[8]

17
18
19
20
21
22
23
24
25
26
27
28

---

[8]Source:  @OpheliaNecro, "I am obsessed with this painting that was hanging above the staircase at Ghost Ship (The Oakland Warehouse). Any info on artist?pic.twitter.com/ByTjs9WuBv," December 6, 2016.

1
2
3
4
5
6
7
8
9
10
11
12
13



14      58.     A makeshift opening on the second floor of the Ghost Ship provided access to

15  restrooms and additional residential and event space in the building next door (APN 25-690-10).

16  See "Opening in wall" in the diagram below:[9]

17
18
19
20
21
22
23
24
25
26
27

28  [9]Source: "Warehouse in Oakland Fire Was Used Illegally," New York Times, Ford Fessenden & Anjali Singhvi, December 5, 2016.

Case: 19-30088   Doc# 4877-4   Filed: 11/26/19   Entered: 11/26/19 20:03:10   Page 17
of 251

IN RE GHOST SHIP FIRE LITIGATION SECOND AMENDED MASTER COMPLAINT    Exhibit 4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Case: 19-30088  Doc# 4877-4  Filed: 11/26/19  Entered: 11/26/19 20:03:10  Page 18
of 251

IN RE GHOST SHIP FIRE LITIGATION SECOND AMENDED MASTER COMPLAINT

Exhibit 4

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

59.    Photographs showing the opening in the wall between the Ghost Ship and the

adjoining structure:[10]

Looking from Ghost Ship                    Looking towards Ghost Ship

 

60.    Defendants ALMENA, ALLISON, BOUCHARD and DOES 51 through 100,

leased the makeshift rooms and alcoves to approximately 24 individuals and entities, including

OHR.  Said Defendants charged each between $300 and $700 per month, or so, per lease.

ALMENA and ALLISON lived on the second floor with their three minor children.

---

[10]Source:  "EXCLUSIVE: Filth, chaos, weird religious symbols, feral animals and orgies - inside Oakland warehouse of horrors before deadly blaze as tenant tells of previous fires," The Daily Mail, Ryan Perry, December 6, 2016.

1    61.    Photograph showing OHR's "Deeper Magic Tattoo Studio" inside the Ghost Ship

2    before the fire:[11]



17    62.    The Ghost Ship lacked a safe and sufficient electrical system and supply.  Power

18    to the Ghost Ship was supplied from a meter shared with the structures on APN 25-690-10 and

19    APN 25-690-9, and electricity was supplied through holes in the wall between the Ghost Ship

20    and the adjacent structures.  Extension cords and cables were snaked throughout the Ghost Ship,

21    and electrical boxes were installed by unlicensed contractors, including ALMENA and

22    CANNON.

23    63.    PG&E was the supplier of electricity to one or more of the structures located on

24    APNs 25-609-9, 25-609-10 and 25-609-11.  The power from the high voltage transmission lines

25    entered APN 25-609-9 into a mechanical room, in a common area, where two meters were located.

26    One or more other meters were located throughout the structures in APN 25-609-10.  No meter

27

28    _____

[11]Source:  http://www.oaklandghostship.com (last visited December 22, 2016).

1  was located in APN 25-609-11.  None of the meters were labeled as required to demonstrate the

2  parcels and/or establishments that they served.

3      64.      Several submeters were installed throughout the buildings, which were used to

4  determine how much electricity was used by each tenant and/or subtenant of the buildings.

5  Photographs showing panel (circuit breaker) and submeter, located on APN 690-25-10 for

6  electricity to the Ghost Ship taken on February 22, 2017:

7          Satya Yuga is written on the panel




19      65.      Diagram showing how

20  electricity was provided through the Ghost

21  Ship and the adjoining buildings:[12]



**HOW POWER FLOWED TO GHOST SHIP**
Newly obtained emails and documents further explain how electricity
traveled to the Ghost Ship warehouse. Power flowed into the property
from a utility pole on the street corner, beginning at a transformer above
the cellphone store. Electricity then went to a second transformer in the
auto body shop. Wires running through a hole in the wall supplied the
warehouse artist collective. All the properties shared one PG&E meter.

---

[12]"Exclusive:  Ghost Ship owners knew of dangerous electrical system before deadly fire," The Mercury News, by
Aaron Davis, Matthias Gafni, Thomas Peele & David Debolt, March 24, 2017.

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Page 21
of 251

Exhibit 4
Page 21 of 251

66.     The electrical system was overloaded with excessive use by the dozens of people who lived and worked at the Ghost Ship, including artists, musicians and tattoo artists that used electrical equipment, as well as the musicians and groups that performed public events held at the Ghost Ship.  There were often sparks from the electrical system that smelled and circuit breakers blew out often.  Overloaded electrical lines at the rear of the Ghost Ship likely contributed to the fire.

C.     **KNOWN USE OF GHOST SHIP AS AN EVENT VENUE/CABARET**

67.     The Ghost Ship had an open, obvious and known history of having public events and parties inside, outside and on the roof top, and charging an entrance fee to the events.  There were numerous complaints of excessive noise and debris made to the City of Oakland Police Department when events were occurring.

68.     It was obvious that ALMENA, ALLISON and/or BOUCHARD were using the Ghost Ship, under the name "Satya Yuga," as a venue for private events.  Satya Yuga's Yelp page, which lists the Ghost Ship address as the location of the business, contains pictures dating back to February 2014 showing the second floor being used for private events.

69.     One Yelp reviewer from March 9, 2015 wrote that ALMENA "demanded more than double the original booking fee from the promoter," the promoter refused to pay, and his group was asked to leave from a "private event" and threatened with violence.[13]

---

[13]https://yelp.com/biz/satya-yuga-oakland.

Case: 19-30088   Doc# 4877-4   Filed: 11/26/19   Entered: 11/26/19 20:03:10   Page 22 of 251

Exhibit 4

1    70.    Photographs showing the second floor performance stage/dance floor:[14]





[14]Source 1st photograph: 'It was a tinderbox': Site of Oakland warehouse fire was jammed with flammable objects," The Washington Post, Bontemps, Wang, Guerra & Scherer, December 4, 2016; photograph from Satya Yuga Facebook page. Source 2nd photograph: 2014 photograph provided by Ajesh Shah, "Oakland building where fire victims died was source of complaints," SFGATE, by Jill Tucker, Rachel Swan, Erin Allday & J.K. Dineen, December 5, 2016.

Exhibit 4
Page 23 of 251

1    71.    Photograph
2  showing a prior event at Ghost
3  Ship and the performance
4  stage/dance floor:[15]



5
6
7
8
9
10
11
12
13



14
15    72.  Defendant OHR was a routine
16  performer/disc jockey ("DJ") at the
17  Ghost Ship.  Flyers, example depicted to
18  the left, show that he was a "Resident
19  DJ" and played several times a month.[16]
20
21
22
23
24
25
26
27

28
[15]Source:  http://www.oaklandghostship.com (last visited December 22, 2016).
[16]Source:  http://www.oaklandghostship.com (last visited December 22, 2016).

Case: 19-30088   Doc# 4877-4   Filed: 11/26/19   Entered: 11/26/19 20:03:10   Page 24
of 251
IN RE GHOST SHIP FIRE LITIGATION SECOND AMENDED MASTER COMPLAINT Exhibit 4

## D. PRIOR FIRES AT THE GHOST SHIP AND ADJOINING BUILDINGS

73.    There had been fires inside the Ghost Ship and the adjoining structures prior to December 2, 2016.  The most recent fire occurred the day before, on December 1, 2016, when a refrigerator caught on fire.  That fire was put out by one or more of the persons residing there.

74.    In October 2014, a sofa caught fire outside the main entrance of the Ghost Ship on 31st Avenue and had to be put out by Oakland Fire Department firefighters, who had been hired, trained, supervised and retained by the City of Oakland.

75.    On December 3, 2014, there was a transformer fire in the structure on APN 25-690-10 that was likely caused by the overloading of the electrical power system.

76.    According to former resident, jewelry maker Shelley Mack, there were three fires when she lived there – in late 2014 and early 2015 – caused by faulty electrics.[17]

## E. THE OWNERS/MANAGERS OF THE GHOST SHIP KNEW ABOUT THE PRIOR FIRES AND RECEIVED PRIOR COMPLAINTS ABOUT THE DANGEROUS ELECTRICAL SYSTEM AND UNSAFE CONDITIONS

77.    In late 2014, CANNON reported the transformer fire in the structure on APN 25-690-10 to KAI NG and EVA NG, and stated that it was likely caused by "catastrophically overloading" the power system.[18]

78.    On December 3, 2014, CANNON sent an invoice to KAI NG and EVA NG for $32,000 worth of electrical work to replace the burnt-out transformer.  In that invoice, CANNON stated that he found that the subpanels (also known as breaker boxes) were not properly installed with grounding and "deferred maintenance dating back decades requiring immediate intervention to avoid additional fires…every piece of wire downstream of main panel (was) improperly installed, illegal and dangerous."[19]  After that fire, CANNON had installed a 25-kilovolt-amp transformer, breakers, distribution panels, conduits and cable boxes.[20]

---

[17] "EXCLUSIVE: Filth, chaos, weird religious symbols, feral animals and orgies - inside Oakland warehouse of horrors before deadly blaze as tenant tells of previous fires," The Daily Mail, Ryan Perry, December 6, 2016.
[18] "Exclusive:  Ghost Ship owners knew of dangerous electrical system before deadly fire," The Mercury News, by Aaron Davis, Matthias Gafni, Thomas Peele & David Debolt, March 24, 2017.
[19] Id.
[20] Id.

79.     In an email to KAI NG in January 2015, CANNON wrote about the dangerous electrical infrastructure in the buildings that had not yet been upgraded.  That dangerous infrastructure included the "tiny" transformer in the crawl space above the Boost mobile store because it could not handle the electrical load.  CANNON reported that the existing subpanels and wiring in the crawl space were "grossly unsafe," and recommended $15,000 in electrical upgrades to "get the whole building into a safe state."  He also stated:  "We need a second transformer because the building is split in half power wise, I've already replaced that first transformer (we had no power when it went up in flames), but the second one is too small for the loads on it as well."  KAI NG reportedly "balked" at the costs and the NGS did not do any work to make the electrical system safe.[21]

80.     On February 13, 2015, ALMENA reported to KAI NG that electricity flowed to the Ghost Ship from the adjoining businesses within the block of buildings owned by the NGS (APNs 25-690-10 and 25-690-9) through "ancient and violated lines of distribution" that were "in dire need of a total and immediate upgrade."[22]

81.     On February 15, 2015, KAI NG stated to ALMENA:  "The lack of electrical infrastructure was made very clear before your lease began."[23]

82.     In October 2016, Ghost Ship resident, Max Harris, emailed EVA NG and KAI NG, further warning of the "overexertion" on the electrical system.[24]  Mr. Harris reported to KAI NG that "it was terminal and was getting worse."  KAI NG just asked for more money.[25]

83.     Prior to the December 2, 2016 fire, Zachary "Zeke" Schultz, a former resident of the Ghost Ship and a tenant of the building adjacent to the Ghost Ship, texted and spoke extensively with the NG Defendants regarding people living in the Ghost Ship.  The NGs agreed that this was a problem, and stated that they planned to terminate the lease, which was set to expire in November 2018.

---

[21] Id.
[22] Id.
[23] Id.
[24] Id.
[25] Id.

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Page 26 of 251
Exhibit 4
Page 26 of 251

84.     Subtenants and other individuals warned ALMENA that the Ghost Ship was a "death trap" and told him to purchase fire extinguishers. Former resident, DeL Lee left after a few months because he thought the Ghost Ship was unsafe. According to Lee: "I tried to throw a party, and the power would shut off – because of the way it was set up, all the plugs were in the same sockets. The whole place was wires and cables and wood….It would spark and smell."[26]

85.     Ms. Mack, who lived in one of the recreational vehicles parked inside, reported that she moved out in February 2015, after complaining to ALMENA about the dangerous and unsanitary conditions.[27]

86.     There were numerous complaints made to the City of Oakland, Planning and Building Department, for hazardous and unsafe conditions, including the building being used illegally for residential purposes. The complaints include, but are not limited to the following:

- April 9, 2014 – a "blight" complaint was filed, with the description: "Large structures built at property, not strapped down or stable."
- June 4, 2014 – a "blight" complaint was filed, with the description: "Vacant lot, trash & debris, construction debris, vector issues."
- September 30, 2014 – a "blight" complaint was filed, with the description: "Pallets, construction materials blocking sidewalk."
- October 7, 2014 – a "habitability" complaint was filed, with the description: "Constructing house/structure without permits."
- October 8, 2014 – a "habitability" complaint was filed. A building inspector went to the property and reported that a "structure" had been removed so there was no longer an actionable violation that could be cited.
- November 13, 2016 – a "blight" complaint was filed, with the description: "There are a ton of garbage piling up on the property on 1305 31st Avenue.

---

[26] "Oakland warehouse fire: Overloaded electrical system seen as cause," East Bay Times, Matthias Gafni & Thomas Peele, December 12, 2016.

[27] EXCLUSIVE: Filth, chaos, weird religious symbols, feral animals and orgies - inside Oakland warehouse of horrors before deadly blaze as tenant tells of previous fires," The Daily Mail, Ryan Perry, December 6, 2016.

Also, a lot of items are left on the sidewalk near the property. Some trash was hazardous. This property is a storage but the owner turned it to become trash recycle site. the [sic] yard became a trash collection site and the main building was remodel for residential. The change causes our neighborhood looks very bad and creates health issue."

- November 14, 2016 – a "blight" complaint was filed, with the description: "Illegal interior building structure."

87.     The notices of the violations were sent to CHOR NG. EVA NG responded to several notices.

88.     The conditions of the Ghost Ship and surrounding properties constituted dangers to human safety and were in violation of local ordinances, including Oakland Municipal Code Sections: 8.24.020D (property inadequately maintained); 8.24.020C (building or structure in a state of disrepair); 8.40.170 (hallway and exit obstructions prohibited); 9.16.060 (lighting-approval of city before energy is supplied); 9.52.030 (permit required for special events); 15.08.050 (maintenance code-general standards); 15.08.190 (habitable space); 15.08.210 (room dimensions); 15.08.220 (light and ventilation); 15.08.240 (security); 15.08.260 (mechanical and electrical systems); 15.08.270 (exiting); 15.08.300 (wooden stairs); 15.08.310 (fire protection); 15.08.320 (smoke detectors); 15.08.340 (substandard and public nuisance buildings); 15.12.100 (CA Fire Code); 15.24.020 (substandard buildings); and 15.64.060 (abatement of security bars on windows).

89.     The complaints and code violations unquestionably put the NGs on notice of the illegal, unsafe, residential and event space use of the Ghost Ship and adjoining buildings, dating back to at least 2014, over two years before the fire. The same is true of the Ghost Ship website, which was created over two years ago, and clearly displays the unsafe conditions of the property and its illegal use as an event space/cabaret.

F.     **ALLEGATIONS SPECIFIC TO PG&E AND DOES 251 THROUGH 300**

90.     When "PG&E" is referenced throughout this Complaint it shall mean to include their officers, directors, agents, employees and independent contractors and DOES 251 through

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Page 28
of 251
Exhibit 4
Page 28 of 251

300, and each of them.

91.     The California Public Utilities Commission ("CPUC") regulates privately owned electric, natural gas, telecommunications, water, railroad, rail transit, and passenger transportation companies.  The CPUC serves the public interest by protecting consumers and ensuring the provision of safe, reliable utility service and infrastructure at just and reasonable rates.

92.     The CPUC process for regulating a franchise, such as that awarded to PG&E, includes the establishment of certain regulations encompassed within, among other things, Rules and Tariffs.  These regulations involve a complex process.  This process utilizes a formal set of procedures ultimately resulting in the issuance of Decisions by the CPUC that are then codified in Rules and obligations that both the public and utility must adhere to.  This process often starts with the CPUC receiving an "Advice Letter" from PG&E.  "Advice Letter" means (1) an informal request by a utility for Commission approval, authorization, or other relief, including an informal request for approval to furnish service under rates, charges, terms or conditions other than those contained in the utility's tariffs then in effect, and (2) a compliance filing by a load-serving entity pursuant to Public Utilities Code Section 380.  The advice letter then proceeds through a regulatory process, and a "Disposition" is reached.

93.     "Disposition" refers to the grant or rejection (including modification) of the relief requested in an advice letter. The disposition of an advice letter will be by resolution adopted by the CPUC, except for (1) an advice letter rejected without prejudice by the reviewing Industry Division pursuant to General Rule 5.3, or (2) an advice letter that is subject to disposition by Industry Division pursuant to General Rule 7.6.1.  If the disposition results in a grant or modification then a Decision is reached and the Rule is so modified and encapsulated with a Rule which is then published and posted through a CPUC Sheet, showing the Rule and revisions.

94.     PG&E owed various duties under statute, regulation and common law, including but not limited to Electric Rules, to the owners and occupants of APNs 25-609-9, 25-609-10 and 25-609-11, their employees, invitees and guests, to provide safe and sufficient power to these facilities.

///

Case: 19-30088   Doc# 4877-4   Filed: 11/26/19   Entered: 11/26/19 20:03:10   Page 29
of 251
IN RE GHOST SHIP FIRE LITIGATION SECOND AMENDED MASTER COMPLAINT    Exhibit 4
Page 29 of 251

95.     As a California employer, PG&E was required to have an injury and illness prevention program for their employees, which included identifying and evaluating workplace hazards, scheduled periodic inspections to identify unsafe conditions and work practices, and correcting unsafe and unhealthy conditions and work practices in a timely manner.  Cal. Labor Code § 6401.7; *see also* Section 6400 & 8 C.C.R. 3203.  PG&E's assessment under these California labor laws should have identified the unsafe conditions of its employees working at or near APNs 25-609-9, 25-609-10 and 25-609-11.  PG&E should then have corrected the unsafe conditions and/or prevented its employees from working there before the December 2, 2016 fire.

96.     Pursuant to Cal. Public Utility Code Section 702, every public utility "shall obey and comply with every order, decision, direction, or rule made or prescribed by the commission in the matters in any way relating to or affecting its business as a public utility, and shall do everything necessary or proper to secure compliance therewith by all of its officers, agents, and employees."

97.     The various state statutes, local ordinances, rules of the CPUC, and standards of reasonable custom and practice, do impose direct and affirmative duties on operators of utilities (including PG&E) for the safety of the public and civil penalties may be assigned against the utility for failure to comply with them, including exemplary damages where warranted.

98.     California Public Utilities Code Section 2106 was in force and effect at all times relevant hereto.  Section 2016 states:

> Any public utility which does, causes to be done, or permits any act, matter, or thing prohibited or declared unlawful, or which omits to do any act, matter, or thing required to be done, either by the Constitution, any law of this State, or any order or decision of the commission, shall be liable to the persons or corporations affected thereby for all loss, damages, or injury caused thereby or resulting therefrom. If the court finds that the act or omission was willful, it may, in addition to the actual damages, award exemplary damages. An action to recover for such loss, damage, or injury may be brought in any court of competent jurisdiction by any corporation or person.

99.     At all times relevant hereto, PG&E, pursuant to Electric Rule 16 "Service Extensions" had the right to enter and leave the premises at APNs 25-609-9, 10 & 11 for any purpose connected with the furnishing of electric service (meter reading, inspection, testing,

Case: 19-30088   Doc# 4877-4   Filed: 11/26/19   Entered: 11/26/19 20:03:10   Page 30 of 251
IN RE GHOST SHIP FIRE LITIGATION SECOND AMENDED MASTER COMPLAINT   Exhibit 4

routine repairs, replacement, maintenance, vegetation management, emergency work, etc.), and

the exercise of any and all rights secured to it by law, or under PG&E's tariff schedules.

100.    At all times relevant hereto, Electric Rule 11 "Discontinuance and Restoration of

Service" was in force and effect.  PG&E, pursuant to Rule No. 11, including Rules 11(H)(1&2) &

(I), Unsafe Apparatus or Condition, had the following rights and obligations:

> H(1) PG&E may deny or terminate service to the customer immediately and without notice when:
> a. PG&E determines that the premises wiring, or other electrical equipment, or the use of either, is unsafe, or endangers PG&E's service facilities; or
> b. The customer threatens to create a hazardous condition; or
> c. Any governmental agency, authorized to enforce laws, ordinances or regulations involving electric facilities and/or the use of electricity, notifies PG&E in writing that the customer's facilities and/or use of electricity is unsafe or not in compliance with applicable laws, ordinances, or regulations
>
> H(2) When relocation or replacement of electric service by PG&E is necessary, the service, including the metering facilities, will be installed in locations mutually acceptable to PG&E and the customer and which conform to current applicable codes, regulations and standards.  If no such mutually acceptable location can be agreed upon, PG&E shall discontinue service until the customer and PG&E reach agreement.
>
> I. SERVICE DETRIMENTAL TO OTHER CUSTOMERS
> PG&E will not supply service to a customer operating equipment which is considered by PG&E to be detrimental to either the service of other PG&E customers or to PG&E.
> PG&E will terminate service and refuse to restore service to any customer who continues to operate such equipment after receiving notification from PG&E to cease.

101.    PG&E installed several "Smart Meters" in various parts of APNs 25-609-9 and 25-

609-10 and in doing so knew or should have known with reasonable diligence that the electrical

supply and distribution systems, including but not limited to plugs, wires, breakers, transformers

and other power delivery systems were dangerous, defective, out-of-code compliance, and an

imminent threat to the health, safety and lives of the owners, occupants, customers and invitees of

those structures.  PG&E, however, failed to engage in mandatory or common law duties to

demand that the consumers/customers correct, replace and/or repair the facilities, correct, replace

or repair said facilities themselves or disconnect them until such time that the facilities were code

compliant and/or safe.

Case: 19-30088   Doc# 4877-4   Filed: 11/26/19   Entered: 11/26/19 20:03:10   Page 31
of 251

Exhibit 4

102.     Electric Rule 16 also established a duty on behalf of PG&E to safely plan, design and engineer their service extensions.  Rule 16 states, in relevant part, the following:

A. GENERAL
(1) DESIGN. PG&E will be responsible for planning, designing, and engineering its Service Extensions using PG&E's standards for design, materials and construction.

D. RESPONSIBILITIES FOR NEW SERVICE EXTENSIONS
(2) PG&E RESPONSIBILITY
a.    SERVICE, METER, AND TRANSFORMER.  PG&E will furnish, install, own, and maintain the following Service Facilities as applicable after Applicant meets all requirements to receive service:
(4) METERING. When the meter is owned by PG&E, PG&E will be responsible for the necessary instrument transformers where required, test facilities, meters, associated metering equipment, and the metering enclosures when PG&E elects to locate metering equipment at a point that is not accessible to Applicant.
(5) TRANSFORMER. The transformer where required, including any necessary switches, capacitors, electrical protective equipment, etc. When either a pad mounted or overhead transformer is installed on Applicant's Premises, the Service Extension shall include the primary conductors from the connection point at the distribution supply line to the transformer and the secondary conductors, if any, from the transformer to the Service Delivery Point.
d.    GOVERNMENT INSPECTION. PG&E will establish electric service to Applicant following notice from the governmental authority having jurisdiction that the Applicant-owned facilities have been installed and inspected in accordance with any applicable laws, codes, ordinances, rules, or regulations, and are safe to energize.

103.     At all times relevant hereto, Electric Rule 18 "Supply to Separate Premises and Submetering of Electric Energy" was in effect, and PG&E was required to separately meter each premises/facility and or commercial enterprise.  Rule 18 reads in relevant part:

A. SEPARATE METERING
Separate premises, even though owned by the same customer, will not be supplied through the same meter, except as may be specifically provided for in the applicable rate schedule.

C. FURNISHING AND METERING OF ELECTRICITY:
1. RESIDENTIAL SERVICE
PG&E will furnish and meter electricity to each individual residential dwelling unit. . . .
2. NONRESIDENTIAL SERVICE
PG&E will furnish and meter electricity to each individual nonresidential premises or space, except:
a.    Where electricity is furnished under a rate schedule that specifically provides for resale service;

b. Where a customer is receiving electricity through a single meter and the cost of electricity is absorbed in the rental for the individual premises or spaces, there is no separate identifiable charge by such customer to the tenants for electricity, and the rent does not vary with electric consumption; or where all of the following conditions are met:
(1) Service is supplied to a high rise building which is owned or managed by a single entity on a single premises; and
(2) Where a master-meter customer installs, owns, and maintains electric submeters on its existing building's distribution system for cost allocation of dynamic pricing and/or conservation incentive purposes the cost of electricity allocated to the commercial building tenants will be billed at the same rate as the master meter billed by PG&E under the CPUC approved rate schedule servicing the master meter.

c. Where, in the sole opinion of PG&E, it is impractical for PG&E to meter individually each premises or space. In such a case, PG&E will meter those premises or spaces that it is practical to meter, if any.

d. Where the Commission has authorized PG&E to supply electric service through a single meter and to furnish service to nonresidential tenants on the same basis as in 1.c. above.

104.    Where submetering was authorized, PG&E had an obligation, pursuant to Rule 18, to monitor, inspect and test such submetering and, if they had done so, they would have seen, upon reasonable inspection, that improper and dangerous use, distribution and delivery of power to APNs 25-609-9, 10 & 11 was occurring.

105.    Rule 18 (D) further reads:
D. TESTING OF SUBMETERS
As a condition of service for submetering, where electric energy is furnished in accordance with Paragraphs C1., C.2., C.3, and C.4 above, customers using submeters as a basis for charges for electricity shall submit to PG&E certification by a meter testing laboratory, satisfactory to PG&E, as to the accuracy of the submeters upon initial installation of such submeters, or for existing submeters upon request of PG&E. As a further condition of service for submetering, the customer shall agree that he will be governed by PG&E's Rule 17, Meter Tests and Adjustment of Bills for Meter Error, with the exception that the word "subcustomer" be substituted for "customer" and the words "Utility's customer" be substituted for "Company." As a further condition of service for submetering, the customer shall agree that PG&E may inspect and examine customer's billing procedures from time to time to determine that such service is made in accordance with this rule or as otherwise may be authorized by the Commission.

106.    The conditions in Rule 18(C)(2)(a)-(d) were never met or applied to APNs 25-609-9, 10 & 11.  PG&E knew or should have known that improper submetering had been, or was being, utilized unlawfully, within said parcels and was, indeed, creating a hazard of fire, injury and death.

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Page 33
of 251

IN RE GHOST SHIP FIRE LITIGATION SECOND AMENDED MASTER COMPLAINT    Exhibit 4

107.     In the alternative, had the conditions of Rule 18(C)(2)(a)-(d) been met, PG&E knew or should have known of the unlawful and dangerous manner in which the residents/occupants of APN 25-609-11 were obtaining power from APNs 26-609-9 & 10.  PG&E failed to meet its obligations under Rule 18(D).  Pursuant to Rule 18(E), PG&E should have either discontinued the service to the submetered customer or, instead, provided a separate service which would have required them to install a new meter and meet all the duties and obligations to do so as set forth elsewhere in this Complaint.

108.     Pursuant to Rule 16, in a building with two or more tenants, or where more than one meter is used on the same premises, the meters should have been grouped at one central location, with each meter position or socket being clearly and permanently marked to indicate the particular unit, occupancy or load supplied by it.  The meters located within APNs 25-609-9, 10 & 11 were not marked as required.  PG&E did not, with each meter position or socket clearly and permanently mark the particular unit, occupancy or load supplied by it.

109.     At all times relevant hereto, CPUC General Order 95, Section III, at 31.1, was in effect and required electricity providers, such as PG&E, to furnish safe, proper and adequate electrical service.

### G.     THE EVENT ON DECEMBER 2, 2016

110.     Leading up to and on December 2, 2016, Defendants ALMENA, ALLISON, BOUCHARD, HRABKO, 100% SILK, BRITT BROWN, AMANDA BROWN, NOT NOT FUN RECORDS, SHANAHAN, BUTLER, OPAL RECORDS, OHR and/or DOES 51 through 100, and 151 through 200 organized and/or managed the music event at the Ghost Ship as part of "100% Silk West Coast Tour" for SHANAHAN, Chelsea Dolan, also known as Cherushi, and DJ Johnny Igaz, also known as Nackt.[28]

///

///

///

_____

[28]Chelsea Dolan and Johnny Igaz were victims of the fire.

31
Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Page 34 of 251
IN RE GHOST SHIP FIRE LITIGATION SECOND AMENDED MASTER COMPLAINT    Exhibit 4

Page 34 of 251

111.    The music event was heavily promoted, including on social media, by HRABKO, 100% SILK, BRITT BROWN, AMANDA BROWN, NOT NOT FUN RECORDS, SHANAHAN, BUTLER, OPAL RECORDS, OHR and/or DOES 51 through 100, and 151 through 200 starting a least one month prior to the event.  One of the promotional "flyers," which was posted through social media is shown below:[29]



112.    Defendants ALMENA, ALLISON, BOUCHARD, HRABKO, 100% SILK, BRITT BROWN, AMANDA BROWN, NOT NOT FUN RECORDS, SHANAHAN, BUTLER, OPAL RECORDS, OHR and/or DOES 51 through 100, and 151 through 200 charged an entrance fee of $10 before 11:00 pm and $15 after 11:00 pm to enter the Ghost Ship on December 2, 2016.

113.    The promotion and marketing efforts resulted in drawing a large crowd.  More than 100 people were reportedly in attendance by 11:15 pm, only about two hours after the doors opened.

_____

[29] http://nacktmusic.com (last visited April 12, 2017).  *See also* https://www.evensi.us/golden-donna-100-silk-2016-west-coast-tour-oakland-rave/192392900 (last visited April 12, 2017) (the event was "saved" by 493 people who saw the promotion on this website).

1    114.    Most of the Decedents and Plaintiffs who were injured or damaged as a result of the

2  Ghost Ship fire, purchased a ticket and were at the Ghost Ship on the evening of the December 2,

3  2016, as a paying patron of the music event.

4    115.    During the music event, one of the Ghost Ship's residents noticed smoke and flames,

5  and called 911 at approximately 11:23 pm, after running outside.

6    116.    After the fire started on December 2, 2016, the interior of the Ghost Ship went dark

7  and patrons were unable to find their way to the only two means of egress:  a staircase at the rear

8  of the building, which was hidden behind the performance stage and a makeshift staircase (made

9  of pallets and scrap wood) in the front of the building that patrons had used to access the second

10  floor.

11    117.    Oakland Firehouse No. 13 is within yards from the Ghost Ship – so close that the

12  Ghost Ship is visible from the front of the fire station.  Oakland firefighters arrived within four

13  minutes of receiving the first call.  At that point, flames had engulfed one wall of the building.

14    118.    The fire and thick, black smoke spread.  Many escaped, but thirty-six (36) people

15  were trapped in the inferno inside.  They were eventually overcome by the fire and smoke, and

16  subsequently died inside.  Photographs of the Ghost Ship on fire with victims trapped inside:[30]



---

[30]Source 1st Photograph:  Allen Wedington, CNN (see http://www.ksbw.com/article/no-cause-yet-in-oakland-warehouse-fire-that-killed-36/8496186 (last visited April 14, 2017)); Source 2nd Photograph:  "Photos Ghost Ship Warehouse Fire in Oakland," KGO/ABC 7 News, December 4, 2016.



119.    Photograph of the Ghost Ship, the "Death Trap" after the fire:[31]



///

///

///

---

[31]Source: "10 Additional Ghost Ship Victims Identified," KGO/ABC 7 News, December 6, 2016.

IN RE GHOST SHIP FIRE LITIGATION SECOND AMENDED MASTER COMPLAINT    Exhibit 4

## V.  CAUSES OF ACTION

### FIRST CAUSE OF ACTION FOR NEGLIGENCE AGAINST ALL DEFENDANTS, EXCEPT PG&E DEFENDANTS, CITY, COUNTY, STATE, DOES 251 THROUGH 300 AND DOES 501 THROUGH 750

120.    Plaintiffs bring this cause of action as an heir to a victim that died as a result of the Ghost Ship fire or for his or her own injuries sustained as a result of the Ghost Ship fire.

121.    Plaintiffs hereby reallege and incorporate by reference, each and every allegation contained in paragraphs 1 to 89 and 110-119 of the Complaint, as though fully set forth herein.

122.    At all times mentioned herein, Defendants, and each of them, owned, operated, leased, rented, promoted, sold tickets at, patrolled, secured, built, constructed, developed, designed, engineered, maintained, inspected, repaired, managed, performed at, manufactured, distributed and/or sold materials to, provided utilities and services to, and/or otherwise controlled the Ghost Ship, and the adjacent and surrounding premises, at the time of the incident.

123.    Defendants, and each of them, had a duty to take reasonable steps to eliminate and warn of the risks and dangers posed by the activities occurring at and surrounding the Ghost Ship. Defendants, and each of them, owed a duty to Plaintiffs and Decedents, and to others at the Ghost Ship, to undertake reasonable steps to ensure that the Ghost Ship and adjacent properties were maintained in a safe and usable condition and free of any risks and dangers, and to inspect for and warn against such risks and dangers.  Defendants, and each of them, had a duty to sublessees, renters and residents of the Ghost Ship to maintain the property in a safe and livable condition, by keeping the property free of debris and clutter, following safety procedures, and providing a proper supply of electrical power and life-safety fire prevention measures. Defendants, and each of them, had a duty to employ or contract with personnel at events such as the music show that was held on December 2, 2016, to provide security and to ensure the safety of the Ghost Ship and its visitors during such events.

124.    Defendants, and each of them, had a duty, among other things, to properly own, manage, lease, run, promote, sell tickets at, oversee and/or provide utilities and services to the Ghost Ship; to properly manufacture, distribute and/or sell materials to the Ghost Ship and the

Case: 19-30088   Doc# 4877-4   Filed: 11/26/19   Entered: 11/26/19 20:03:10   Page 38 of 251

Exhibit 4

Page 38 of 251

adjacent and surrounding premises; to provide adequate and safe means of egress for patrons and invitees; to take reasonable steps to eliminate the risks and dangers posed by the activities occurring at and surrounding the Ghost Ship, and adjacent and surrounding premises; to obtain permits for construction and holding public events; to hire competent employees, agents and/or contractors to secure the safety of patrons and invitees; to provide adequate security; to keep the premises safe for patrons and invitees; to have and/or make sure the premises were safely constructed consistent with applicable building codes and construction standards; to have and/or make sure the premises had adequate and sufficient fire safety measures and emergency evacuation measures, including adequate lighting; to have and/or make sure the premises contained a safe and sufficient supply of electrical power; to warn about the dangerous and unsafe conditions; and/or to not falsely imprison patrons and invitees and trap them inside the Ghost Ship during the fire.

125.    Defendants, and each of them, negligently and carelessly owned, operated, leased, rented, promoted, sold tickets at, patrolled, secured, built, constructed, developed, designed, maintained, inspected, repaired, managed, manufactured, distributed and/or sold materials to, provided utilities and services to and/or otherwise controlled the Ghost Ship, and the surrounding and adjacent premises, and the music event on December 2, 2016, by, among other things, failing to properly own, manage, lease, run, promote, sell tickets at, oversee and/or provide utilities and services to the Ghost Ship; failing to provide adequate and safe means of egress for patrons and invitees; failing to take reasonable steps to eliminate the risks and dangers posed by the activities occurring at and surrounding the Ghost Ship, and adjacent and surrounding premises; failing to obtain permits for construction and holding public events; failing to hire competent employees, agents and/or contractors to secure the safety of patrons and invitees; failing to obtain permits for construction and holding public events; failing to provide adequate security; failing to keep the premises safe for patrons and invitees; failing to have and/or make sure the premises were safely constructed consistent with applicable building codes; failing to have and/or make sure the premises had adequate and sufficient fire safety measures and emergency evacuation measures, including adequate lighting; failing to have and/or make sure the premises contained a safe and sufficient supply of electrical power; failing to warn about the dangerous and unsafe conditions;

Case: 19-30088   Doc# 4877-4   Filed: 11/26/19   Entered: 11/26/19 20:03:10   Page 39
of 251

Exhibit 4

and/or falsely imprisoning patrons and invitees and trapping them inside during the fire.

126. At all times relevant hereto, Defendants DOES 1 through 250 and 301 through 500, inclusive, and each of them, were somehow responsible for the injuries and damages sustained by Plaintiffs and Decedents, as alleged herein. Plaintiffs are informed and believe, and thereon allege that each of said Defendants, is negligently or otherwise responsible in some manner for the events and happenings herein referred to and those Defendants negligently acted, or failed to act. Their negligence and/or failure to act and the dangerous conditions on the subject premises legally caused the injuries and damages hereinafter set forth.

127. The Defendants were in violation of many codes and statutes as explained above. These violations constitute negligence per se pursuant to Cal. Evid. Code § 669, and were a substantial factor in bringing about Plaintiffs' injuries and damages, and the premature death of 36 victims.

128. It was reasonably foreseeable that by failing to perform any or all duties set forth herein, the fire would occur during the music event on December 2, 2016.

129. Prior to the music event on December 2, 2016, Defendants, and each of them, knew and/or had reason to know that the Ghost Ship was in disrepair and had a faulty electrical system and contained life-threatening, dangerous and/or illegal conditions, which could likely result in injury to and death to persons.

130. The negligence of Defendants, and each of them, was a direct and proximate cause of the subject incident and the injuries and death of Decedents and damages of Plaintiffs.

131. The acts, omissions and/or negligence of Defendants, and each of them, were a substantial factor in causing Decedents' injuries and resulting death and harm to the Plaintiffs, and the direct and proximate cause of the injuries and damages sustained by Plaintiffs.

132. As a further, proximate result of the acts, omissions and negligence of Defendants, and each of them, Plaintiffs have incurred the injuries and damages as set forth herein.

133. With respect to the Plaintiffs claiming personal injury and/or property damage associated with a living Plaintiff that was injured and/or sustained property damage as a result of the fire, said Plaintiffs make the following punitive damages allegations in paragraphs 134 through

37

Exhibit 4
Page 40 of 251

1    141.

2        134.    Defendants, and each of them, acted with oppression, fraud and/or malice in that,

3    among other things, they acted with a willful and conscious disregard for the rights and safety of

4    Plaintiffs.[32]

5        135.    Defendants, and each of them, acted with malice, oppression and/or fraud in that,

6    among other things, they acted with a willful and conscious disregard for the rights and safety of

7    the Plaintiffs despite knowing the risk of serious injury or death that could likely result from the

8    unsafe and dangerous condition of the Ghost Ship and surrounding and adjacent premises.

9        136.    Defendants, and each of them, knew or should have known that the conditions at

10   the Ghost Ship and neighboring properties were a safety hazard that posed a danger to human life,

11   including but not limited to: inadequate means of ingress and egress; a faulty and unsafe electrical

12   system; inadequate, inoperable, and/or non-existent lighting, smoke alarms, fire extinguishers,

13   overhead sprinklers and/or exit signs; unsafe structures and stairways; obstructed and unclear

14   walkways and exits cluttered with debris; rooms filled with flammable and combustible

15   materials; and/or lack of permitting and security for public events, among other dangerous

16   conditions.  Defendants, and each of them, knew or should have known that the Ghost Ship

17   would be a venue for the music show on December 2, 2016, and that such event would lack

18   necessary and proper permits, security, a safe electrical system and/or safety measures, and that

19   the number of invitees would exceed the maximum limit for safe occupancy of the Ghost Ship.

20   Defendants, and each of them, also had advanced knowledge that a failure to fix or address the

21   aforementioned conditions would result in the probability of a catastrophic event, which

22   foreseeably would lead to harm and/or injuries to the health and safety of residents and invitees.

23   Defendants, and each of them, intentionally chose not to take reasonable steps to make the Ghost

24   Ship safe for occupancy and use as a music event space, and failed to warn invitees as to the

25   dangerous and unsafe conditions on the property.  With respect to those Defendants who

26   _____

27   [32]For this and other causes of action for wrongful death only, no Plaintiff is seeking punitive damages for causes of
     action brought pursuant to C.C.P. § 377.60, *et seq.* for wrongful death of their decedent.  Said Plaintiffs, however, do
28   seek punitive damages on their survival causes of action brought pursuant to C.C.P. § 377.30, *et seq.*; see the Seventh
     Cause of Action, *infra*.

presented the Ghost Ship as a music venue, in so presenting, they engaged in fraudulent conduct intended to deceive invitees by misrepresenting and concealing the dangerous conditions of the property.

137.    Defendants, by themselves and/or through their employees and/or agents, acted with malice in that their despicable conduct was carried on with a willful and conscious disregard of the rights or safety of the Plaintiffs.  The term "malice" includes conduct evincing a conscious disregard of the probability that the defendant's conduct will result in injury to others.  *See Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757.  Defendants' conduct was so vile, base or contemptible that it would be looked down on and despised by reasonable people.

138.    Defendants, by themselves and/or through their employees and/or agents, acted with oppression in that their despicable conduct subjected the Plaintiffs to cruel and unjust hardship in conscious disregard of their rights.  "Oppression" in Civil Code Section 3294 "means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights."  "Conscious disregard" for purposes of proving "oppression" does not require "willful" actions.  Cal. Civ. Code § 3294(c)(2); CACI 3940 & 3941; *Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1225-1226.

139.    Defendants knew that their despicable conduct, as described herein, would likely and within a high degree of probability cause harm to the Plaintiffs.

140.    The conduct of Defendants, and each of them, as set forth herein, was fraudulent in that each of them engaged in intentional misrepresentation, deceit, or concealment of material facts known to them, including that the premises lacked sufficient and safe electrical system, fire safety measures and a safe means of egress.  That information was fraudulently withheld from the Plaintiffs and Decedents.

141.    Defendants, and each of their employees' and/or agents' egregious conduct, including malice, oppression and fraud, were substantial factors in causing the incident and the Plaintiffs' injuries and/or damages.  An officer, a director, and/or a managing agent of Defendants, and each of them, authorized the employees' or agents' wrongful conduct, and/or adopted, ratified or approved the conduct after it occurred.  An award of punitive damages in a

sum according to proof at trial is, therefore, justified, warranted and appropriate under the facts and circumstances of this case, and to punish or set an example of Defendants and deter such behavior by Defendants and others in the future.

WHEREFORE, all Plaintiffs pray for judgment against Defendants, and each of them, as set forth herein.

## SECOND CAUSE OF ACTION FOR NEGLIGENCE AGAINST THE PG&E DEFENDANTS AND DOES 251 THROUGH 300

142. Plaintiffs bring this cause of action as an heir to a victim that died as a result of the Ghost Ship fire or for his or her own injuries sustained as a result of the Ghost Ship fire.

143. Plaintiffs hereby reallege and incorporate by reference, each and every allegation contained in paragraphs 1 through 119 of the Complaint, as though fully set forth herein.

144. PG&E and DOES 251 through 300, and each of them, at all times relevant hereto, owned, operated, controlled, managed, leased, loaned, borrowed, bailed and/or maintained electrical equipment that supplied power to the Ghost Ship and the adjoining structures.

145. Defendants had a legal duty to Plaintiffs and Decedents, as foreseeable victims, to exercise the utmost care and diligence in maintaining and operating said electrical equipment so as to not cause or contribute to a fire. Defendants breached that duty by failing to exercise care in their operation and maintenance of said electrical equipment, including, but not limited to, failing to properly monitor and inspect the electrical equipment, failing to properly repair the electrical equipment and failing to comply with applicable safety standards.

146. Defendants owed a duty to Plaintiffs and others to act reasonably in the design, construct, and maintenance of the electrical systems serving APNs 25-609-9, 10 & 11, so as to furnish safe, proper, and adequate electrical service. Pursuant to Rule 11, Defendants owed a duty to abate unsafe apparatus and conditions. Pursuant to Rule 16, Defendants owed a duty to safely plan, design and engineer its service extensions. Pursuant to Rule 18, Defendants owed a duty to supply power safely and through separate meters to APNs 25-609-9, 10 & 11. Under General Order 95, Section III, at 31.1, Defendants owed Plaintiffs a duty to design, construct and maintain the electrical systems serving APNs 25-609-9, 10 & 11, so as to furnish safe, proper and adequate

electrical service.

147.    Defendants, as part of their duty to separately monitor each facility, should have installed a meter at APN 25-609-11 and, in doing so, as part of determining the required load, amperage, phasing and other metrics, would have, pursuant to regulation, standard industry and practice, and common law duty, conducted an inspection and analysis of the facilities and their use, and determined the need for, proposed and actual use of, power and would have conducted an inspection of the existing systems to assure that they were up to code as a new service requires code compliance.

148.    Additionally a reasonable utility would have undertaken calculations of power load, voltage, amperage, and other factors and examined the existing transformer, the potential requirement for a new transformer including evaluating the need for a new "vault," panels, breaker, etc.

149.    Defendants in meeting their obligations to separately meter would have been required to obtain, from the owner/user, a set of electrical drawings, prepared by a licensed electrical engineer prior to initiating service through the new meter.  This would have required a review of the electrical infrastructure of the facilities, enterprises, and parcels to be served which would have revealed – and corrected – the deficiencies prior to service being initiated as it would have called for a plan check, pulling of a permit, inspection, sign-off and/or issuance of a Certificate of Occupancy by the appropriate authorities within the City of Oakland.

150.    Defendants, in order to fulfill their legal duties should have conducted an evaluation and analysis of the voltage and amperage, load calculation, transformer requirements, breaker panels, wiring distribution, and needs and usage of the power within APN 25-609-11. Had Defendants done so, as a reasonably prudent utility would have, they would have observed and identified the hazardous and out-of-code conditions within the electrical distribution system which led to the deadly fire, including but not limited to:  the overloading of the circuitry in both parcels; the substandard and missing meters; improper submetering; and/or inadequate and defective transformers, wiring, outlets, electrical cords, junction boxes, breaker panels, breakers, and the improper umbilicus of power coming from APN 25-609-10 into APN 25-609-11.

151.     The scope of Defendants' duties, if reasonably fulfilled, would have triggered the need for a permit which, in turn, would have required a city inspector to come and specifically inspect the installation and the other factors referenced above.

152.     As a result of Defendants' failure to meet their duty to provide adequate and appropriate metering, occupants of APN 25-609-11 obtained power from APN 25-609-9 & 10 in a manner which presented a serious risk of an electrical hazard, injury and death to the residents, occupants and/or invitees of APN 25-609-11.

153.     Defendants also failed to meet their duties in the management of the exterior facilities that suppled power to APNs 25-609-9 & 10, including the high voltage overhead power lines and components that powered the buildings.  The electrical system as it was delivered to foreseeable users inside the buildings was defective at the point after it passed through the customer's meter and into the buildings.

154.     Defendants breached their various duties, including but not limited to:

- Failing to provide a separate meter for each residence, customer, enterprise and/or facility within APNs 25-609-9, 10 & 11.

- Failing to adequately monitor the power that was supplied to APN 25-609-9, including spikes, surges and/or trouble tickets.

- Failing to obtain appropriate plans, calculations, permits and inspections required to install a new electric service and meter.

- Failing to locate all of the meters for APNs 25-609-9, 10 & 11 at one single location and individually marking them and, instead, locating them haphazardly through the structures in a manner which presented a risk of hazard to the residents, occupants, their guests, employees and invitees of APN 25-609-11.

- Failing to supply a safe, sufficient and reliable source of power for the occupants of APN 25-609-11, their guests, employees and invitees.

- Failing to determine the need for, amount of and distribution of the power within APNs 25-609-9, 10 & 11 in such a manner so as to reduce a risk of hazard, fire, injury and death to the residents, occupants, their guests, employees and invitees.

42

- Failing to determine and monitor the method and manner in which power was distributed, delivered and consumed within APNs 25-609-9, 10& 11, such that they failed to obtain the necessary designs, permits, inspections and approvals required before power should have been provided to said parcels.

- Failing to provide the proper transformers, including any necessary switches, capacitors, electrical protective equipment, etc. for the safe delivery and distribution of electricity within APNs 25-609-9, 10 & 11.

- Failing to identify and inspect submeters, the method and manner in which submeters were being installed and operated, and discontinuing service because of defective submeters.

- Failing to discontinue service to APNs 25-609-9, 10 & 11 until such time that the systems and equipment distributing the electricity within said parcels was rendered such that safe, reliable and appropriate electricity could be supplied.

- Failing, while being present in the buildings for the purpose of meter installation and/or reading to observe, recognize and remedy the hazardous, dangerous, and life-threatening conditions and misuse of power or, in the alternative, to disconnect power until the dangers could be rendered safe.

- Failing to discontinue supplying electricity to APNs 25-609-9 & 10 which were operating equipment to the service of other PG&E customers and or individuals who were residents, occupants, their guests, employees and invitees.

- Failing to act as a reasonable electric utility provider under any and all other statutes, regulations, ordinances, or common law.

- Failed to act as a reasonable electric utility provider in the management of the exterior facilities that suppled power to APNs 25-609-9 & 10 because the electrical system as it was delivered to foreseeable users inside the buildings was defective at the point after it passed through the customer's meter and into the buildings.

155. At all times relevant hereto, Defendants owed the public, including Plaintiffs and Decedents, a duty to be truthful and accurate in their filings and representations made in connection with the delivery, distribution, inspection and maintenance of power to APNs 25-609-

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Page 46 of 251
IN RE GHOST SHIP FIRE LITIGATION SECOND AMENDED MASTER COMPLAINT    Exhibit 4

9, 10 & 11. Defendants violated this a duty to be truthful and accurate in their filings and representations made in connection with the delivery, distribution, inspection, maintenance of power to APNs 25-609-9, 10 & 11.

156. At the time of injury to Plaintiffs and Decedents, there were in force and effect various statutes, laws, regulations, rules and ordinances which were designed to protect Plaintiffs, Decedents and others similarly situated from harm, injury and/or death. Plaintiffs and Decedents fall within the class of persons these statutes, laws, regulations, rules and ordinances were designed to protect.

157. Defendants did violate said statutes, laws, regulations, rules and ordinances and a result Plaintiffs and Decedents suffered injury and/or death to their detriment and as a result, the conduct of Defendants constitutes per se negligence under Cal. Evid. Code § 669.

158. Defendants' breach of the aforementioned duties, and others, was a substantial factor in causing the fire and other conditions which led to the injuries and damages alleged herein.

159. With respect to the Plaintiffs claiming personal injury and/or property damage associated with a living Plaintiff that was injured and/or sustained property damage as a result of the fire, said Plaintiffs make the following punitive damages allegations. The conduct of Defendants was fraudulent, oppressive and/or malicious as defined under California Civil Code 3294 and/or was ratified by the officers, directors and/or managing agents of Defendants so as to warrant the imposition of punitive damages in an amount to be determined at the time of trial. Further, Plaintiffs incorporate the foregoing paragraphs 134 through 141 regarding punitive damages herein as though fully set forth.

WHEREFORE, all Plaintiffs pray for judgment against Defendants, and each of them, as set forth herein.

### THIRD CAUSE OF ACTION FOR PREMISES LIABILITY
### AGAINST ALL DEFENDANTS EXCEPT CITY, COUNTY, STATE AND DOES 501
### THROUGH 750

160. Plaintiffs bring this cause of action as an heir to a victim that died as a result of the

Case: 19-30088   Doc# 4877-4   Filed: 11/26/19   Entered: 11/26/19 20:03:10   Page 47
of 251
Exhibit 4

Ghost Ship fire or for his or her own injuries sustained as a result of the Ghost Ship fire.

161.    Plaintiffs hereby reallege and incorporate by reference, each and every allegation contained in paragraphs 1 to 132 and 144 to 158 of the Complaint, as though fully set forth herein.

162.    At all times relevant hereto, the Ghost Ship, and adjacent and surrounding premises, were owned, operated, leased, rented, promoted, patrolled, secured, built, constructed, developed, designed, maintained, inspected, repaired, managed, serviced or otherwise controlled by said Defendants, and each of them.

163.    Defendants, and each of them, negligently and carelessly owned, operated, leased, rented, promoted, patrolled, secured, built, constructed, developed, designed, maintained, inspected, repaired, managed, provided utilities and services to and/or otherwise controlled the Ghost Ship, and adjacent and surrounding premises.

164.    Defendants, and each of them, wantonly, recklessly, negligently and carelessly owned, operated, leased, rented, promoted, patrolled, secured, built, constructed, developed, designed, maintained, inspected, repaired, managed, provided utilities and services to and/or otherwise controlled the premises by, among other things, failing to properly own, manage, lease, run, oversee and/or provide services to the Ghost Ship; failing to provide adequate and safe means of egress for patrons and invitees; failing to take reasonable steps to eliminate the risks and dangers posed by the activities occurring at and surrounding the Ghost Ship, and adjacent and surrounding premises; failing to obtain permits for construction and holding public events; failing to hire competent employees, agents and/or contractors to secure the safety of patrons and invitees; failing to provide adequate security; failing to keep the premises safe for patrons, invitees and residents; failing to have and/or make sure the premises were safely constructed consistent with applicable building codes; failing to have and/or make sure the premises had adequate and sufficient fire safety measures and emergency evacuation measures, including adequate lighting; failing to have and/or make sure the premises contained a safe and sufficient supply of electrical power; and/or falsely imprisoning patrons, invitees and residents, and trapping them inside the Ghost Ship during the fire.

165.    At all times relevant hereto, the premises contained dangerous and unsafe

conditions of which Defendants, and each of them, had actual and/or constructive notice.

166.    The premises were in a dangerous and unsafe condition due to the negligent discharge of mandatory and nondelegable duties, ownership, leasing, renting, marketing, control, securing, operation, building, construction, engineering, development, design, maintenance, management, inspection, provision of utilities and services to, and/or repair of the premises, including the lack of warnings, visibility and lighting, by said Defendants, and each of them.

167.    At all times relevant hereto, Defendants, and each of them, violated state and local laws for safe design, construction, building, maintenance, inspection and repair of the premises.

168.    It was reasonably foreseeable that as a result of the negligent and careless ownership, operation, leasing, renting, promoting, patrolling, securing, building, construction, development, design, maintenance, inspection, repair, management, provision of utilities and services to, and/or control of the premises that the life-threatening and dangerous conditions would occur at the Ghost Ship and surrounding and adjacent premises, and cause injury to persons inside and subsequently result in the premature death of 36 victims and injury to many others.

169.    As a direct and proximate result of said dangerous and unsafe conditions of the premises, Plaintiffs were caused to sustain injuries and damages as set forth herein.

170.    With respect to the Plaintiffs claiming personal injury and/or property damage associated with a living Plaintiff that was injured and/or sustained property damage as a result of the fire, said Plaintiffs incorporate herein by reference as though fully set forth, the punitive damages allegations contained in paragraphs 134 through 141 and 159.

WHEREFORE, all Plaintiffs pray for judgment against Defendants, and each of them, as set forth herein.

## FOURTH CAUSE OF ACTION FOR NEGLIGENT FAILURE TO EVICT
## AGAINST DEFENDANTS CHOR NG, EVA NG, KAI NG
## AND DOES 1 THROUGH 50, INCLUSIVE

171.    Plaintiffs bring this cause of action as an heir to a victim that died as a result of the Ghost Ship fire or for his or her own injuries sustained as a result of the Ghost Ship fire.

172.    Plaintiffs hereby reallege and incorporate by reference, each and every allegation

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Page 49
of 251
Exhibit 4

contained in paragraphs 1 to 89, 110 to 132 and 162 to 169 of the Complaint, as though fully set forth herein.

173.   At all times mentioned herein, Defendants CHOR NG, EVA NG, KAI NG and DOES 1 through 50, and each of them, leased the premises where the Ghost Ship and the surrounding and adjacent premises were located to Defendants ALMENA, ALLISON, BOUCHARD, LOPEZ, VEGA, CUSTOM O'S and DOES 51 through 150, and each of them, as well as CANNON.

174.   Defendants CHOR NG, EVA NG, KAI NG and DOES 1 through 50, and each of them, prior to December 2, 2016, knew and/or had reason to know that the Ghost Ship was unlawfully being used for residential and business purposes and music events, was in disrepair and had a faulty electrical system and contained life-threatening, dangerous and/or illegal conditions which could likely result in injury and death to persons, and had received numerous complaints in the years before December 2, 2016.  Said Defendants, and each of them, knew or reasonably should have known that their lessees, the managers and operators of the Ghost Ship and the surrounding and adjacent premises, were unfit in carrying out their duties and/or incompetent to safely own, operate or manage the Ghost Ship and the surrounding and adjacent premises.

175.   Defendants CHOR NG, EVA NG, KAI NG and DOES 1 through 50, and each of them, had a duty to protect patrons and invitees inside the Ghost Ship from the foreseeable life-threatening and dangerous conditions, including fire.  Said Defendants had the duty and responsibility to take reasonable steps to eliminate the risks and dangers posed by the aforementioned activities in and about the premises, including but not limited to, evicting their lessees, who were the managers and operators of the Ghost Ship and surrounding and adjacent premises.  In failing to evict as alleged herein, Defendants failed to perform said duties, and were negligent.

176.   It was reasonably foreseeable that the continued leasing of the Ghost Ship and the surrounding and adjacent premises created a risk to patrons, invitees and residents of the Ghost Ship who were injured as a result of the fire.

177.   As a direct and proximate result of the conduct of said Defendants, Plaintiff

suffered injuries and damages as alleged herein.

178.     With respect to the Plaintiffs claiming personal injury and/or property damage associated with a living Plaintiff that was injured and/or sustained property damage as a result of the fire, said Plaintiffs incorporate herein by reference as though fully set forth, the punitive damages allegations contained in paragraphs 134 through 141.

WHEREFORE, all Plaintiffs pray for judgment against Defendants, and each of them, as set forth herein.

### FIFTH CAUSE OF ACTION FOR NEGLIGENT HIRING, SUPERVISION, TRAINING AND/OR RETENTION AGAINST ALL DEFENDANTS EXCEPT CITY, COUNTY AND STATE

179.     Plaintiffs bring this cause of action as an heir to a victim that died as a result of the Ghost Ship fire or for his or her own injuries sustained as a result of the Ghost Ship fire.

180.     Plaintiffs hereby reallege and incorporate by reference, each and every allegation contained in paragraphs 1 to 132, 144 to 158 and 173 to 177 of the Complaint, as though fully set forth herein.

181.     Defendants, and each of them, had a duty of care in the hiring, retention, training and/or supervision of one or more of their employees, contractors or agents.

182.     One or more of Defendants' employees, contractors or agents was unfit or incompetent to perform the work for which he or she was hired.

183.     Defendants knew or should have known that these employees, contractors or agents were unfit or incompetent and that this unfitness or incompetence created a particular risk of harm to others, including Plaintiffs and Decedents.

184.     In failing to exercise reasonable care in the hiring, supervision, training and/or retention of one or more employees, contractors or agents, Defendants, and each of them, breached a duty of care owed to Plaintiffs and Decedents.

185.     As a direct and proximate result of the negligence, recklessness, carelessness and other wrongdoing of Defendants, Plaintiffs suffered injuries and damages as alleged herein.

186.     With respect to the Plaintiffs claiming personal injury and/or property damage

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Page 51
of 251

Exhibit 4

associated with a living Plaintiff that was injured and/or sustained property damage as a result of the fire, said Plaintiffs incorporate herein by reference as though fully set forth, the punitive damages allegations contained in paragraphs 134 through 141 and 159.

WHEREFORE, all Plaintiffs pray for judgment against Defendants, and each of them, as set forth herein.

## SIXTH CAUSE OF ACTION FOR PUBLIC NUISANCE AGAINST ALL DEFENDANTS EXCEPT CITY, COUNTY, STATE AND DOES 501 THROUGH 750

187.    Plaintiffs bring this cause of action as an heir to a victim that died as a result of the Ghost Ship fire or for his or her own injuries sustained as a result of the Ghost Ship fire.

188.    Plaintiffs hereby reallege and incorporate by reference, each and every allegation contained in paragraphs 1 to 132, 144 to 1584, 173 to 177 and 181 to 185 of the Complaint, as though fully set forth herein.

189.    At all times relevant hereto, Defendants, and each of them: (1) by failing to act, created a condition that was a blight, harmful to health and/or a fire and/or life-safety hazard; (2) created or maintained a condition that affected a substantial number of people at the same time; (3) that an ordinary person would be reasonably disturbed by the condition; (4) that the seriousness of the harm outweighs the social utility of Defendants' conduct; (5) Plaintiffs and Decedents did not consent to Defendants' conduct; (6) Plaintiffs and Decedents suffered harm to their health and safety, personal injury and/or death, which was different from the type of harm suffered by the general public; and (7) Defendants' conduct was a substantial factor in causing Plaintiffs and Decedents' harm.

190.    With respect to the Plaintiffs claiming personal injury and/or property damage associated with a living Plaintiff that was injured and/or sustained property damage as a result of the fire, said Plaintiffs incorporate herein by reference as though fully set forth, the punitive damages allegations contained in paragraphs 134 through 141 and 159.

WHEREFORE, all Plaintiffs pray for judgment against Defendants, and each of them, as set forth herein.

///

49

## SEVENTH CAUSE OF ACTION FOR STRICT LIABILITY AGAINST
## DEFENDANTS PG&E AND DOES 251 THROUGH 300

191.     Plaintiffs bring this cause of action as an heir to a victim that died as a result of the Ghost Ship fire or for his or her own injuries sustained as a result of the Ghost Ship fire.

192.     Plaintiffs hereby reallege and incorporate by reference, each and every allegation contained in paragraphs 1 to 119 and 144 to 158 of the Complaint, as though fully set forth herein.

193.     Defendants supplied various products, including but not limited to the electrical system, electrical power, meters, connections, monitoring devices, wiring, etc. (hereinafter "The Products") to APNs 25-609-09 & 10.  In doing so, Defendants placed The Products into the system of commerce in exchange for compensation.

194.     The Products that were delivered to foreseeable users inside the building were defective at the point after they passed through the customer's meter and into the buildings.  The electrical system was defective at its point of delivery inside the building because it did not perform as safely as an ordinary consumer would have expected it to perform when used or misused in an intended or reasonably foreseeable way.  PG&E had, or should have had, knowledge that The Products would be used without inspection for defects for the purposes of obtaining and utilizing electrical power.

195.     Suppliers of electricity are subject to strict liability in tort for personal injuries and deaths caused by delivery of electricity at dangerously high voltage due to defective products, including transformers.  The electrical failure occurred as the electricity entered the meter into APN 25-690-9 and/or APN 25-690-10 where the submeters were placed to determine electrical usage by various tenants.  The Products entered the stream of commerce prior to manifestation of the defect.  Strict liability extends not only in favor of the users and consumers, but also in favor of bystanders such as the Plaintiffs and Decedents herein who were foreseeably present at a location where The Products were being delivered and consumed.

196.     The Products did not perform as safely as an ordinary consumer would have expected them to perform when used or misused in an intended or reasonably foreseeable way.

Case: 19-30088   Doc# 4877-4   Filed: 11/26/19   Entered: 11/26/19 20:03:10   Page 53
of 251
Exhibit 4

197.     As a proximate result of The Products' defective condition, Plaintiffs and Decedents, and each of them, were harmed and suffered significant injuries and damages as set forth herein.

198.     The Products' failure to perform safely was a substantial factor in causing Plaintiffs and Decedents' harm.

199.     With respect to the Plaintiffs claiming personal injury and/or property damage associated with a living Plaintiff that was injured and/or sustained property damage as a result of the fire, said Plaintiffs make the following punitive damages allegations. The conduct of Defendants was fraudulent, oppressive and/or malicious as defined under California Civil Code 3294 and/or was ratified by the officers, directors and/or managing agents of Defendants so as to warrant the imposition of punitive damages in an amount to be determined at the time of trial. Further, Plaintiffs incorporate the foregoing paragraphs 134 through 141 and 159 regarding punitive damages herein as though fully set forth.

WHEREFORE, all Plaintiffs pray for judgment against Defendants, and each of them, as set forth herein.

**EIGHTH CAUSE OF ACTION – SURVIVAL ACTION**

**AGAINST ALL DEFENDANTS EXCEPT CITY, COUNTY, STATE AND DOES 501**

**THROUGH 750**

200.     Plaintiffs hereby reallege and incorporate by reference, each and every allegation contained in paragraphs 1 to 132, 144 to 158, 173 to 177, 181 to 185, 189 and 193 to 198 of the Complaint, as though fully set forth herein.

201.     At all times relevant hereto, Defendants, and each of them, negligently, carelessly, recklessly and/or unlawfully acted and/or failed to act so as to cause the injuries and subsequent death of the Decedent victims.

202.     Despite their best efforts, Decedents were unable to escape the inferno. Rather, they remained alive for at least several minutes. During this time, Decedents experienced profound fear, suffering and overwhelming despair.

203.     Causes of Action One through Seven, therefore, survive the death of Decedents

and accordingly pass to the personal representatives of their estates and/or successors-in-interest pursuant to C.C.P. § 377.20.

204.    As a direct and legal result of the wrongful acts and/or omissions of the Defendants, and each of them, on December 2, 2016, and prior to the Decedents' deaths, Decedents suffered personal injuries from smoke inhalation, the roof collapsing and/or other objects burning and/or falling, as well as property damage from their clothes and other belongings being partially or totally destroyed, and incurred expenses for emergency services, rescue efforts, identification and/or removal of Decedents' remains, coroner, funeral and burial expenses.

205.    It was reasonably foreseeable that as a direct and proximate result of the acts, omissions and negligence of Defendants, and each of them, and each of their breach of duties, that Decedents would be injured, then die, and caused to sustain economic damages.

206.    The acts, omissions and/or negligence of Defendants, and each of them, were a substantial factor in causing Decedents' injuries and resulting deaths and harm to the Plaintiffs, and the direct and proximate cause of the injuries and damages sustained by Plaintiffs.

207.    Defendants, and each of them, acted with oppression, fraud and/or malice in that, among other things, they acted with a willful and conscious disregard for the rights and safety of Decedents.

208.    Defendants, and each of them, knew or should have known that the conditions at the Ghost Ship and neighboring properties were a safety hazard that posed a danger to human life, including, but not limited to: inadequate means of ingress and egress; a faulty and unsafe electrical system; inadequate, inoperable, and/or non-existent lighting, smoke alarms, fire extinguishers, overhead sprinklers and/or exit signs; unsafe structures and stairways; obstructed and unclear walkways and exits cluttered with debris; rooms filled with flammable and combustible materials; and/or lack of permitting and security for public events, among other dangerous conditions.  Defendants, and each of them, knew or should have known that the Ghost Ship would be a venue for the music show on December 2, 2016, and that such event would lack necessary and proper permits, security, and safety measures, and that the number of invitees would exceed the maximum limit for safe occupancy of the Ghost Ship.  Defendants, and each of

them, also had advanced knowledge that a failure to fix or address the aforementioned conditions would result in the probability of a catastrophic event, which foreseeably would lead to harm and/or injuries to the health and safety of residents and invitees. Defendants, and each of them, intentionally chose not to take reasonable steps to make the Ghost Ship safe for occupancy and use as a music event space, and failed to warn invitees as to the dangerous and unsafe conditions on the property. Defendants, and each of them, in presenting the Ghost Ship as a music venue, engaged in fraudulent conduct intended to deceive invitees by misrepresenting and concealing the dangerous conditions of the property.

209. Defendants, and each of them, acted with malice, oppression and/or fraud in that, among other things, they acted with a willful and conscious disregard for the rights and safety of the Decedents despite knowing the risk of serious injury or death that could likely result from the unsafe and dangerous condition of the Ghost Ship and surrounding and adjacent premises.

210. Defendants, by themselves and/or through their employees and/or agents, acted with malice in that their despicable conduct was carried on with a willful and conscious disregard of the rights or safety of the Ghost Ship victims. The term "malice" includes conduct evincing a conscious disregard of the probability that a defendant's conduct will result in injury to others. *See Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757. Defendants' conduct was so vile, base or contemptible that it would be looked down on and despised by reasonable people.

211. Defendants, by themselves and/or through their employees and/or agents, acted with oppression in that their despicable conduct subjected the Decedents to cruel and unjust hardship in conscious disregard of their rights. "Oppression" in Civil Code Section 3294 "means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." "Conscious disregard" for purposes of proving "oppression" does not require "willful" actions. Cal. Civ. Code § 3294(c)(2); CACI 3940 & 3941; *Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1225-1226.

212. Defendants knew that their despicable conduct, as described herein, would likely and within a high degree of probability cause harm to the Decedents.

213. The conduct of Defendants, and each of them, as set forth herein, was fraudulent

in that each of them engaged in intentional misrepresentation, deceit, or concealment of material facts known to them, including that the premises lacked sufficient and safe fire safety measures and a safe means of egress.  That information was fraudulently withheld from the Decedents.

214.    Defendants, and each of their employees' and/or agents' egregious conduct, including malice, oppression and fraud, were substantial factors in causing the incident and the Decedents' injuries and untimely deaths.  An officer, a director, and/or a managing agent of Defendants, and each of them, authorized the employees' or agents' wrongful conduct, and/or adopted, ratified or approved the conduct after it occurred.  An award of punitive damages in a sum according to proof at trial is, therefore, justified, warranted and appropriate under the facts and circumstances of this case.

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as set forth herein.

## NINTH CAUSE OF ACTION FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AGAINST ALL DEFENDANTS EXCEPT CITY, COUNTY AND STATE

215.    Plaintiffs bring this cause of action for his or her own injuries sustained as a result of the Ghost Ship fire as a direct victim and/or bystander victim.

216.    Plaintiffs hereby reallege and incorporate by reference, each and every allegation contained in paragraphs 1 through 199 of the Complaint, as though fully set forth herein.

217.    Defendants, and each of them, had a legal duty to Plaintiffs, as foreseeable victims, to exercise reasonable care as set forth herein.  Defendants' breach was the legal and proximate cause of the injuries and damages suffered by Plaintiffs.

218.    As a result of the negligent conduct of Defendants, and each of them, Plaintiffs suffered serious emotional distress.  Defendants knew or should have known that Plaintiffs would be harmed and suffer serious emotional distress during and as a result of their acts, omissions, conduct and/or other wrongdoing, and ensuing fire.  Defendants knew or should have known that their conduct would cause serious emotional distress to Plaintiffs and that she or he would be harmed by the fire, causing injuries, death and property damage.  The Defendants' conduct was a substantial factor in causing his or her serious emotional distress.

219.    Additionally and/or alternatively, Defendants, and each of them, negligently caused the deaths of Plaintiffs' Decedent as Plaintiffs watched the horrific scene in person, on television or on the internet and/or received text messages or other communications from his or her loved one.  Plaintiffs knew that his or her loved one was trapped inside the burning building.  Plaintiffs were aware that his or her loved one was being injured.  The Defendants' conduct was a substantial factor in causing Plaintiffs' serious emotional distress.

220.    Because of the conduct of the Defendants, and each of them, and as a direct and proximate result thereof, Plaintiffs have sustained emotional distress, shock and injury to his or her nervous system, all of which has caused, continues to cause, and will cause physical and mental pain and suffering, all to Plaintiffs' general damage in a sum to be determined at the time of trial.  Plaintiffs suffer and continue to suffer severe emotional distress as a result of the fire, including, but not limited to, anxiety, fear, nervousness, shock, horror and worry.

221.    As a direct and legal result of Defendants' negligence, Plaintiffs were injured physically, emotionally, and/or economically, and/or were in the zone of danger of the fire, and reasonably feared for their lives as they attempted to escape the raging inferno, and/or witnessed close family members sustain serious injury and/or death as they attempted to escape the raging inferno.  As a result, Plaintiffs suffered damages as alleged herein.

222.    Plaintiffs incorporate herein by reference as though fully set forth, the punitive damages allegations contained in paragraphs 134 through 141 and 159.

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as set forth herein.

## TENTH CAUSE OF ACTION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST ALL DEFENDANTS EXCEPT CITY, COUNTY AND STATE

223.    Plaintiffs bring this cause of action for his or her own injuries sustained as a result of the Ghost Ship fire as a direct victim.

224.    Plaintiffs hereby reallege and incorporate by reference, each and every allegation contained in paragraphs 1 through 199 of the Complaint, as though fully set forth herein.

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Page 58
of 251
Exhibit 4

225.    Defendants engaged in extreme and outrageous conduct.  Specific examples of Defendants' outrageous conduct include, but are not limited to, knowing that the conditions at the Ghost Ship and neighboring properties were a safety hazard that posed a danger to human life, Defendants had, among other things: inadequate means of ingress and egress; a faulty and unsafe electrical system; inadequate, inoperable, and/or non-existent lighting, smoke alarms, fire extinguishers, overhead sprinklers and/or exit signs; unsafe structures and stairways; obstructed and unclear walkways and exits cluttered with debris; rooms filled with flammable and combustible materials; and/or lack of permitting and security for public events, among other dangerous conditions.  Defendants, and each of them, knew or should have known that the Ghost Ship would be a venue for the music show on December 2, 2016, and that such event would lack necessary and proper permits, security, and safety measures, and that the number of invitees would exceed the maximum limit for safe occupancy of the Ghost Ship.  Defendants, and each of them, also had advanced knowledge that a failure to fix or address the aforementioned conditions would result in the probability of a catastrophic event, which foreseeably would lead to harm and/or injuries to the health and safety of residents and invitees.  Defendants, and each of them, intentionally chose not to take reasonable steps to make the Ghost Ship safe for occupancy and use as a music event space, and failed to warn invitees as to the dangerous and unsafe conditions on the property.  Defendants, and each of them, in presenting the Ghost Ship as a music venue, engaged in fraudulent conduct intended to deceive invitees by misrepresenting and concealing the dangerous conditions of the property.

226.    Defendants engaged in the aforementioned outrageous conduct with reckless disregard of the probability that such conduct would result in a fire or similar disaster that would result in severe emotional distress to Plaintiffs.

227.    Plaintiffs did in fact suffer severe emotional distress as a result of the fire caused by Defendants' outrageous conduct, as alleged herein.

228.    Defendants' outrageous conduct, which led to the devastating fire described herein, was the actual and proximate cause of Plaintiffs' emotional distress.

229.    The wrongful acts of Defendants were done maliciously, oppressively,

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Page 59
of 251
Exhibit 4

fraudulently, and in conscious disregard of the safety and health of the Plaintiffs.

230.     Plaintiffs incorporate herein by reference as though fully set forth, the punitive damages allegations contained in paragraphs 134 through 141 and 159.

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as set forth herein.

## ELEVENTH CAUSE OF ACTION FOR GOVERNMENT TORT LIABILITY AGAINST DEFENDANTS CITY, COUNTY AND STATE

231.     Plaintiffs bring this cause of action as an heir to a victim that died as a result of the Ghost Ship fire or for his or her own injuries sustained as a result of the Ghost Ship fire.

232.     Plaintiffs reallege and incorporate herein by this reference, each and every allegation contained in paragraphs 1 to 89 and 110 to 119 of this Complaint, as though fully set forth herein.

### A.     CITY OF OAKLAND

233.     Plaintiffs were required to exhaust administrative remedies pursuant to Cal. Gov't Code § 910, and prior to the filing of this Amended Master Complaint, have exhausted those remedies.  Plaintiffs complied with Gov't Code §§ 905 and 915 by having duly presented claims for the damages sought herein to the CITY through a Master Claim presented in person on May 24, 2017, after 5:00 pm.  The Master Claim was denied as a matter of law after the 21 days to respond under Case Management Order No. 4 lapsed on or about June 15, 2017.

234.     Plaintiffs incorporate by reference, as if fully set forth herein, their Master Claim against the CITY, a true and correct copy of which is attached hereto as Exhibit 1.

235.     As detailed below, Plaintiffs allege that the CITY is liable for damages pursuant to, but not limited to, Gov't Code §§ 815.2, 815.4, 815.6, & 840.2.  Plaintiffs claim that the CITY, through its statements, actions and deeds, and inactions, as well as pursuant to statutes, regulations, codes and ordinances, created and established a special relationship/duty which required that they take affirmative action to protect the Decedents and Plaintiffs from the very risk of harm, injuries and/or death, which they suffered as a result of the fire on December 2, 2016. Plaintiffs claim that the CITY failed to perform these obligations entirely or, where they engaged

in such actions, they failed to exercise reasonable diligence in discharging those duties, thereby constituting negligence, negligence per se and/or breach of mandatory duties.

**FACTS COMMON TO ALL CAUSES OF ACTION AGAINST DEFENDANT CITY OF OAKLAND**

236.    The CITY is a municipal corporation, formed by Charter in 1852, incorporated in 1854. The CITY functions through the actions of its agents, employees, officials, department heads, and chiefs of its various departments and agencies. These include, but are not limited to, the Oakland Fire Department, the Oakland Police Department, the Oakland Housing and Community Development Department and the Oakland Planning and Building Department and its Building Permits, Inspections and Code Enforcement Services (these agents, employees and departments are hereinafter collectively referred to as the "CITY").

237.    On December 2, 2016, a fire broke out in the structure known as the Ghost Ship in Oakland. Plaintiffs claim that the CITY had duties, including mandatory duties, to protect the public from the very type of conditions and harm which led to the deadly fire on December 2, 2016, including: (1) substandard, hazardous, out of code, structural components wiring and utilities; (2) inadequate fire protection; (3) insufficient, blocked, and unmarked fire exits; and (4) improper occupancy and use as a residence and cabaret.

238.    As detailed below, the CITY knew long in advance of the subject fire that the Ghost Ship was being used as a work/live residence; that it was not properly permitted for such use; that such use constituted an ongoing and constant danger not only to Ghost Ship residents but to any visitors to the Ghost Ship; that the dangers included a likely risk of fire; and that in the event of a fire, occupants of the building were likely to die or suffer serious bodily injury due to many violations of mandated building codes and safety provisions, all of which the CITY was aware of and required to enforce at all relevant times. Among other laws and regulations, the CITY negligently failed to comply with its own mandatory building, fire and safety codes, all of which were specifically intended to prevent the very type of occurrence that led to the injury and death of 36 persons and serious injury to many others.

239.    The Ghost Ship warehouse building was constructed for bottling milk by a company called Dairy Rich in 1930.  Later, it was used to store copper and metal pipes.  It was not designed, constructed, or equipped to serve as a residence or live/work space for human beings.  It has never been modified, remodeled or renovated pursuant to any permit or code to permit such residency.  At no time in the 86 years since it was built has a single permit been issued by any government entity sanctioning the Ghost Ship's use as a residence or a live/work space, including its most recent designation by the CITY as a warehouse.  Nor has any government entity ever issued a permit designating the Ghost Ship as an event space for live music, art or any other endeavor.  But the Ghost Ship was not invisible to CITY personnel and officials.

240.    As alleged herein, the Ghost Ship was a long-time blight on the local neighborhood.  The warehouse where 36 people perished on December 2, 2016 can be seen and heard from the driveway of CITY firehouse No. 13, less than 200 yards away.  For at least two years before the fire, a long list CITY police officers were either dispatched to or arrived at the Ghost Ship responding to altercations and events that not only resulted in arrests, but contemporaneous and repeated observations of highly dangerous conditions. CITY firefighters were in and out of the building on multiple occasions. CITY received a plethora of complaints reporting unsafe and flatly dangerous conditions. Local residents complained loud and long to CITY personnel that the warehouse was not only unsightly, but dangerous to building tenants, neighborhood residents, and the general public.

241.    There was good reason to complain.  As is detailed elsewhere herein, the Ghost Ship warehouse was in gross violation of virtually every relevant safety and building code intended to protect inhabitants and visitors from the risk of injury or death. Tragically, the last time the CITY's building department or Fire Department formally inspected the facility to insure its compliance with mandatory safety provisions was more than three decades ago. That is because at all relevant times the CITY not only failed to enforce its own mandatory duties, but negligently relied on a database that was, itself, negligently gathered, updated and maintained.

Nor was the Ghost Ship activities limited to just the neighborhood.  The business operated by Defendant ALMENA included frequent art and music events for which tickets were marketed,

sold and distributed online, including tickets for the December 2, 2016 event. Between June 2014 and December 2, 2016, at least six Ghost Ship events ranging from "erotic occult carnivals" to a "Burning Man Precompression Afterparty" were heavily promoted on Facebook. The December 2, 2016 event featured what event promoters labeled, "an insane lineup" of electronic dance music performers, including Defendant Golden Donna. Promotion of the event on social media commenced weeks in advance. The promotion worked- upwards of 100 people attended and were inside the Ghost Ship at the time the fire broke out.

242.    The Decedents travelled from all over the Bay Area to the Ghost Ship. For example, Decedent Michela Gregory traveled from South San Francisco, and Decedent Alex Vega drove in from San Bruno to attend that night; neither had ever been to the Ghost Ship before. Conversely, Decedent Nick Walrath, who worked in San Francisco but lived in Oakland, rode his bicycle to the event after purchasing a ticket online. Decedent Sara Hoda traveled from Walnut Creek, while Decedent Griffin Madden lived in Berkeley. Decedent Vanessa Plotkin made her way to the Ghost Ship all the way from Los Angeles. This evidences that the Ghost Ship was not just a neighborhood attraction, but an event center regularly attended by the larger Oakland and Bay Area community.

243.    According to Oakland's former Fire Chief Teresa Deloach Reed, the CITY's building database that alerts the department about what buildings to inspect was initially compiled around 15 years ago by firefighters who drove around and drew up lists of businesses. Reed admits that prior to the subject fire her department was required to conduct mandatory annual inspections of commercial facilities to insure compliance with minimum safety requirements. Fire Chief Reed, who retired earlier this year following accusations of improper conduct in the performance of these duties, publicly admitted that the department fell short in its responsibilities with respect to the Ghost Ship.

244.    The CITY departments negligently failed to update the list of buildings to be inspected, and negligently failed to cross-reference it with any lists of commercial properties maintained by the CITY's building department. The CITY departments negligently failed to share information, including complaints, violations, citations or the results of their respective

60

observations of the subject property. This negligence was a substantial factor in the death of every person who failed to escape the Ghost Ship, and injuries suffered by those who managed to escape. It is especially heinous in light of the fact that the many Ghost Ship infractions of every imaginable fire and safety code were open and obvious to trained personnel like firefighters, police and other officials.

245. The Ghost Ship was hard to miss: the front of the building was emblazoned with large, vivid and multi-colored original graffiti graphics. Lines of people regularly queued up outside the building to attend various artistic events, none of which were permitted and all of which were illegal. The sideyard to the east side of the building was frequently strewn with junk, vehicles, garbage and debris. The street in front of the building was crowded with cars, motorcycles and bicycles belonging to building residents. Neighbors regularly and often complained about the blight on the neighborhood created by unlawful residents of the Ghost Ship, including allegations of illegal drug sales, theft, and violence. Firefighters drove by the building dozens of times a week, on their way to and from work at the station a bare 200 yards away, and on dispatched calls in the performance of their duties. Police officers were often at the warehouse, usually in response to complaints related to drug trafficking, violence or landlord-tenant disputes. This was not a quiet building on a quiet street in a quiet neighborhood. People were living, working and attending events at the warehouse in clear view of neighbors and the authorities.

246. Thus, illegal activities, illegal tenancy, and illegal for-profit events swirled around the Ghost Ship, transforming it from a formerly empty warehouse into a constant source of danger to everyone who entered its doors. The facts set forth herein evidence that Defendant CITY had direct and constructive knowledge of these dangers, including the dangerous conditions in the building itself, yet negligently failed to take any affirmative steps to protect residents of and visitors to the Ghost Ship.

247. The Strategic Plan 2016 published by the Oakland Police Department acknowledges that, as recently as 2014, the CITY was identified as the second most dangerous city of its size in the USA. Violent crime has increased during the last ten years, as have incidents of robbery. Defendant CITY has long recognized that part of this continued increase is related to

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Page 64
of 251
IN RE GHOST SHIP FIRE LITIGATION SECOND AMENDED MASTER COMPLAINT    Exhibit 4

inherent bias between police and the citizens they are sworn to protect. According to the Police Department's Strategic Plan 2016 this bias impairs communication and hampers the ability to pursue criminals, investigate crimes and enforce violations of the law that put citizens at risk of harm. In its Strategic Plan the Oakland Police Department undertook to consider and enact policies prohibiting profiling and discrimination based on race, ethnicity, national origin, age, gender, gender identity/expression, sexual orientation, immigration status, disability, housing status, occupation, and/or language fluency. Such bias results in selective enforcement of the law; citizens at the lower end of the socioeconomic strata are less likely to benefit from enforcement efforts than those at the upper end.

248. Plaintiffs are informed and believe and thereupon allege that this bias leading to selective enforcement is also rooted in simple economics. Defendant CITY authorizes and sets fees for routine fire code and safety inspections conducted by the Oakland Fire Department. *See* City of Oakland Master Fee Schedule FY 2016-2017. Plaintiffs are informed and believe and thereupon allege that selective enforcement of building and safety codes in commercial buildings is directly related to a policy adopted by the Oakland Fire Department that gives priority to higher-end buildings with modern or upgraded fire-prevention systems because property owners are able to pay for those inspections. Plaintiffs allege that this policy exists to generate revenue for the CITY because the owners of commercial buildings with high-end fire suppression and alarms are much more likely to pay for inspections than run-down, ancient warehouses located in Oakland's less desirable socioeconomic areas, where building owners often refuse or are unable to pay.

249. The Ghost Ship was a magnet for tenants in the lower end of the socioeconomic scale. But thanks to ongoing marketing efforts and social media, it also attracted artists, performers, musicians and fans that paid admission to attend Ghost Ship events. Lax law enforcement efforts universally endangered not only those who lived and worked at the Ghost Ship, but those who were only there to visit. The Ghost Ship regularly and unlawfully hosted a variety of art and live music events that were not only open to the public but required payment of an entry fee, including the show on December 2, 2106. These events were advertised, were open to the public, and were promoted and presented with full knowledge of fire and police personnel,

despite highly dangerous conditions that were open and obvious, and about which various city personnel had direct knowledge. All were put at risk by the consistent and ongoing failure of CITY officials to exercise even the most basic precautions. This was not due to a lack of knowledge on the part of CITY personnel, but a lack of effort grounded in apathy and discrimination. Such discrimination is longstanding.

250. According to CITY data, between January 2011 and March 2017 OAKLAND firefighters referred 879 properties for fire code violations, including lack of sprinklers, smoke detectors or adequate fire extinguishers; improperly marked or inaccessible emergency exits; or improperly stored flammable materials. These are precisely the kind of dangerous conditions that existed at the Ghost Ship. Of those reports, 696 were never inspected. Only 183 of the referred properties were ultimately inspected, and just a few of those inspections took place within the first month. For many of the violations, months or years passed before any follow up inspection occurred. This evidences a pattern of selective enforcement that regularly puts the lives of CITY residents at risk of serious injury or death. Just such a pattern led to the death of four people living at a halfway house on San Pablo Avenue.

251. In September 2015, a CITY firefighter failed to properly report dangerous conditions in a halfway house for low income persons on San Pablo Avenue because of improper training related to the use of online reporting software. As a result, 16 months passed before the CITY's fire prevention bureau took any action. Even after the CITY became aware of numerous serious violations, including defects that increased the risk of fire, CITY took no steps to close the facility or evacuate residents until repairs were made. Three days later four residents died when fire broke out in the building. A few months before the fire, CITY fire captain Richard Chew recommended in a departmental email chain about the San Pablo facility that, ""[W]e consider shutting this building down immediately due to the danger to life safety". CITY Fire Department Arson Investigator Maria Sabatini overruled that recommendation, despite clear evidence of danger in this halfway house that provided transitional housing for recovering drug addicts and the homeless.

252.    As alleged herein, various CITY officials, including police and fire personnel, often visited the Ghost Ship for reasons unrelated to an inspection of the property for specific code or safety violations.  These personnel were not only trained to recognize and report unsafe conditions that put lives and property at risk, but specifically acknowledged dangerous conditions certain to result in injury or death, yet negligently failed to even report these obvious, admitted dangers.

253.    For example, fire personnel did conduct periodic, annual safety inspections of other commercial enterprises located in extremely close proximity to the Ghost Ship, including without limitation a grocery store, dry cleaner and fire extinguisher vendor. In fact, firefighters conducted safety inspections at Kick CITY, a shoe store across the street from the Ghost Ship, every year for the three years prior to the subject fire.  Kick CITY had no prior reports of vandalism, drug related arrests, residents living in a commercial space, or dangerous conditions.  Kick CITY did not host illegal musical events or raves, did not rent work/live space to artists-in-residence, and did not regularly attract police to the scene in response to dispatches alleging drug sales and violence, as did the Ghost Ship.  Kick CITY just sold shoes in a clean, modern, professionally managed, licensed and properly permitted business environment where access to and from the building was unrestricted, and no fire or safety hazards that put visitors or personnel at risk can be found.

254.    Despite the CITY's failures to formally inspect the Ghost Ship, the Ghost Ship building had a long history of citations for nuisance or substandard or hazardous or injurious conditions.  From 2005 to 2014 Defendant building owners NGS paid at least $26,570.20 in code enforcement fees to the city for the empty lot adjacent to the warehouse.  Local residents lodged five complaints reporting unsafe conditions with the CITY Planning and Building Department between 2014 and the date of the subject fire.  Darin Ranelleti, Director of that department and his employees were responsible for following up on public safety complaints, admitted that the most recent public safety complaint was received on November 17, 2016, barely two weeks before the date of the subject incident.  The Department negligently failed to investigate. Given the open and obvious dangers evident throughout the Ghost Ship, such investigation could only have resulted in barring further access to the building by non-residents such as the victims of the December 2, 2016 fire until and unless it was brought up to code for such use.

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Page 67
of 251

Exhibit 4
Page 67 of 251

255.     Such negligence conflicts with goals adopted by the CITY.  Those goals are expressed at the Department's website, and include, "continuing to improve code enforcement to keep Oakland residents and business neighborhoods safe and healthy," to "provide responsive, timely and accurate customer service," and to "improve livability through well-maintained and accessible streets, sidewalks, parks, trees and facilities."

256.     Similarly, according to its website, the CITY's Building Services division "provides services for building-related activities, including Code Enforcement, Inspections, Permits, Plan Reviews and Records." (Emphasis added). The Building Services Division:

- Assures compliance with the California Building, Electrical, Plumbing, Mechanical Codes and the Oakland Municipal Code to ensure the construction of safe buildings in Oakland.

- Enforces the California Housing Law and the Oakland Municipal Code to ensure that existing buildings used for human occupancy and the surrounding property are maintained in a safe and healthy manner.

- Assists builders, property owners, architects, engineers and realtors in understanding and processing appropriate construction permits.

- Assists the development community to understand the state health and safety codes, regional environmental regulations, and city development and land subdivision ordinances.

- Provides record cataloging and archive retrieval.

257.     As alleged herein, the Ghost Ship warehouse failed to comply with relevant building or safety codes.  The code violations range from sanitation and use (the building was being used as a live/work facility and entertainment venue when it was not permitted, certified, constructed or acceptable for such use), to egregious violations of building and safety codes including those related to ventilation, signage, fire suppression, electrical wiring, construction, and materials storage. Such violations are patent and obvious to anyone with even superficial knowledge of relevant safety provisions.  As noted above, the CITY has admitted code violations existed.

65

258. The Planning and Building Department assigns enforcement to its CITY Code Enforcement division. According to that division's website, "Substandard buildings and structures pose significant threats to Life, Health, and Safety for occupants as well as the public. All building systems -- structural, electrical, plumbing, mechanical, zoning, public nuisance and habitability -- are required to meet minimum standards." To insure compliance, this department provides the following services related to housing, zoning and building codes:

- Response to complaints of violations, deficiencies, or other problems relating to the Oakland Housing Code (unsafe or unsanitary buildings that jeopardize the health and/or safety of the occupants or the neighborhood).

- Responses to zoning complaints alleging violations of the Zoning Regulations (e.g. illegal multi-family occupancy in a one-family zone, salvage yards, billboards, and businesses in residential zones).

- Investigation of public nuisance structures or conditions (graffiti, environmental conditions, or substandard buildings which are causing a blight upon the neighborhood).

- Enforcement of abatement conditions. (Emphasis added).

259. There is no dispute that code violations were rampant in the Ghost Ship. The Oakland Fire Department Origin and Cause Report prepared by the Oakland Fire Department Fire/Arson Investigative Unit dated March 18, 2017 confirms that "[t]he building was not equipped with an automatic fire suppression system (sprinklers) or an automatic fire detection system". Instead of relying on "fixed electrical components of the building, such as outlets," occupants used "power strips . . . to supply electricity to lamps and appliances". The electrical system included various power supplies that appeared to be unregulated, including two "spider boxes" that were "observable remains of part of a makeshift system that supplied areas of the building with electricity". A copy of the report is attached herein as, Exhibit 4, OAKLAND FD REPORT. The author of that report testified in the preliminary hearing in the underlying criminal case that in her opinion the cause of the fire origin was electrical in nature.

260.     None of these systems, including the primary "pirated" system identified in the Report, was permitted.  None complied with building, fire or safety codes.  The Report notes that building hallways, "were not constructed of traditional materials such as drywall-covered, wood-framed walls. Instead, the walls of the hallways were assembled together from aggregates of salvaged and scavenged materials, such as pianos, organs, windows, wood benches, lumber, and innumerable other items stacked next to and on top of each other."  All of these materials were not only highly flammable, but blocked proper and safe egress into and out of the building.  These defects constitute patent violations of city, county and state building and safety codes, discussed below.

261.     According to the Report, "the warehouse was further divided into individual 'cubicle' live-work spaces by a conglomeration of makeshift items including but not limited to: wooden studs, steel beams, doors, window frames, bedframes, railings, pianos, benches, chairs, intact motorhomes and trailers, portions of trailers, corrugated metal sheeting, tapestries, plywood, sculptures, tree stumps and tree limbs. Tenants described several live-work units that were constructed of multiple levels to the height of the first floor ceiling. The elevated units were variously described as lofts, perches, and tree forts, constructed of actual tree stumps and large dimensional lumber." (Emphasis added).  This kind of jerry-rigged construction violates every relevant building and safety codes that the CITY was sworn to uphold in order to protect the lives and property of city residents and, in this instance, the larger Oakland and Bay Area community of potential visitors to the Ghost Ship warehouse.  Such construction openly departs from any acceptable building or structural norms. The report notes a plethora of other safety hazards and construction violations.

262.     The Planning and Building Department is not the only CITY division to have negligently failed to follow up on first-hand reports of dangerous conditions at the Ghost Ship. Reports of conditions that created the risk of fire were made to the CITY Fire Marshall by one or more residents of the Ghost Ship starting in 2014.  This was more than sufficient time for the CITY Fire Department to have acted pursuant to its own mandatory criteria.  But its negligent failure to do so does not mean that the CITY was unaware of the dangerous conditions that led to

the deaths of 36 people, or that the facility was unlawfully being used as a residence and commercial enterprise. Various city personnel, acting in the course and scope of their employment at all relevant times, negligently failed to report illegal occupancy, illegal use as a venue, and/or dangerous conditions well in advance of the subject fire following visits to the facility unrelated to any formal inspection process.

263. CITY police and firefighters were present inside the Ghost Ship on numerous occasions unrelated to any inspection prior to the December 2, 2016 fire: they were present in 2014, 2015 and 2016. For instance, on September 26, 2014, Oakland Fire Department firefighters Fernando Kuan, Atif Shakoor, Brian Petrie, Tamara M. Holmes and Lieutenant George Feelen were dispatched to the Ghost Ship in response to a fire that ignited a couch and piles of wood and debris just outside the warehouse walls. After firefighters extinguished the couch fire they entered and toured the building. Further, witnesses place Oakland Fire Department Arson Investigator Maria Sabatini at the scene while the blaze was being extinguished and later, while the firefighters entered the Ghost Ship warehouse. Sabatini is the same Oakland Fire Department official who overruled recommendations to shut down the San Pablo Avenue halfway house due to unsafe conditions a few months before fire broke out there, killing four people. One of the firefighters called the Ghost Ship a "museum" and stopped to play one of the many pianos scattered around the space cluttered with wood and furniture stacked to the ceilings.

264. Lieutenant Feelen advised Defendant ALMENA of specific dangerous conditions that existed inside the building, including the lack of fire extinguishers and extreme hazards associated with the staircase. ALMENA was told that as long as there were marked fire exits, the facility was "OK". This same group of firefighters returned the next day to attend a private party featuring live bands upstairs and a barbecue. According to CITY Police Officer Michael Erickson, Sabatini not only attended this party but met with Defendant Almena.

265. As was the case at the time of the subject incident, illegal living spaces existed within the warehouse, which was completely packed with flammable materials. The firefighters observed the clutter and a maze of small passageways through the debris located on the ground floor of the Ghost Ship. They also observed lines of extension cords snaking through the building

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Page 71
of 251
Exhibit 4

to service appliances, lights, heaters and other electrical devices, and traversed the makeshift staircase cobbled together from wooden pallets that led to the second floor where bands were playing.

266.    Clearly these firefighters were not on the premises to conduct an official inspection. Unfortunately, Lieutenant Feelen, an experienced professional and the ranking firefighter on the scene, negligently failed to report any of the dangerous conditions he observed, even though such conditions would have required issuance of a citation and a report of the dangerous conditions to other CITY departments.

267.    After learning that CITY firefighters had attended this party in 2014 yet took no steps to act on obvious safety violations, Acting Fire Chief Mark Hoffman stated that he was, "saddened to hear this," and that he "can't defend their actions". Hoffman admitted that the proper procedure was for firefighters to immediately open an investigation of the warehouse facility based on "direct evidence of misuse of the property". Hoffman criticized fire personnel for "being negligent by not responding properly," and for "ignoring telltale signs of danger". This admittedly negligent failure to report obvious dangerous conditions or to take any steps to evacuate the building not only evidences direct knowledge of a dangerous and highly flammable premises but was a substantial factor in the loss of life and physical injuries that occurred on December 2, 2016.

268.    On December 3, 2014 CITY Police Officers Michael Camacho, William Bardsley, Peni Likio, Kris Botelho, and Tye E. Kushner were dispatched to the Ghost Ship following reports of an assault by resident Max Schultz. Schultz reported to the officers that he, his son and his grandchildren and another ten people all resided at the Ghost Ship. In conversations with Schultz the officers acknowledged the building is not fit for human habitation. Yet, none of the officers took any step to report unlawful habitation or use of the building, or report any dangerous conditions associated with the building. This negligent failure to report or to take any steps to evacuate the building was a substantial factor in the loss of life and physical injuries that occurred on December 2, 2016.

269.    On January 3, 2015, CITY Police Officers Kevin Godchaux, Francis Hammon, Josue Mora, Richard Kane, Kito Yslava and others were dispatched to the Ghost Ship following reports of an assault following a party hosted by Master Tenant Derek Almena.  During this occasion the officers entered the building and interviewed various residents.  At the time the building was filled with people who had attended a music event.  Officers searched the building looking for musical equipment that one of the event DJs had left behind and wanted to retrieve. The search was extensive; officers observed flammable, combustible materials and unsafe conditions throughout the facility.

270.    These officers knew that it was illegal for people to reside under these conditions. The officers personally observed both children and adults residing in the warehouse, yet negligently failed to report these conditions to the CITY Fire Department or Planning and Building Department. Based on their personal observation of open and obvious dangers, these officers recognized that the warehouse facility was not safe for use as an event venue.  Yet, despite knowing that it was being used for such commercial purposes, the officers negligently failed to either compel event attendees to leave the facility or report such illegal use to any other government entity.  This negligent failure to report or to take any steps to evacuate the building was a substantial factor in the loss of life and physical injuries that occurred on December 2, 2016.

271.    Just a few short weeks later on January 31, 2015, CITY Police Officers Nicole Rhodes, Jonathan Low, Rodney Kirkland, Theodore Jew and Karl Templeman were dispatched to the Ghost Ship in response to what turned out to be a landlord-tenant dispute. On arrival, Defendant ALMENA reported that he wanted to evict all tenants from the building, primarily in response to alleged threats against him by a building resident with a gun.  Officer Low advised Almena that, "I think we're gonna have to shut [the Ghost Ship] down. We're just coming here too many times."  Officer Low questions Almena's right to occupy the building.  Low questions other tenants, who explain they pay rent and refer to themselves as, "residents."  Low advises that he is aware that persons pay rent to live in the building based on other calls.  Almena advised the officers that a transformer in the building had blown, and that the electrical supply to the building was antiquated.  Low responded that he did not care about that.  None of these officers took any

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Page 73
of 251
IN RE GHOST SHIP FIRE LITIGATION SECOND AMENDED MASTER COMPLAINT    Exhibit 4

steps to report was what obviously illegal residency of the building, despite admitting prior

knowledge that persons were paying rent to live in an unpermitted commercial space that was

inherently dangerous. This negligent failure to report or to take any steps to evacuate the building

not only evidences knowledge of a dangerous condition but was a substantial factor in the loss of

life and physical injuries that occurred on December 2, 2016.

272. On that same evening, and into the early morning hours of February 1, 2015, CITY

Police Officers Nikola Dokic, Diane Jim, Ty Hawkins and Jay Factora were dispatched in

response to 911 calls reporting a man with a gun threatening to kill building occupants. During

numerous visits to the Ghost Ship between January 31 and February 1, Officer Dokic interviewed

a number of persons who self-identified as residents. Dokic reported to another officer that

persons are not supposed to be living in the building. During this same series of visits, Officer

Factora reported that he had been to the warehouse on CPS calls, and had been inside. Instead of

attempting to enter the building and apprehend a person who might be armed, the officers told

Almena to evict residents. Again, none of these officers took any steps to report what was

obviously illegal residency of the building. This failure to report or to take any steps to evacuate

the building not only evidences knowledge of a dangerous condition but was a substantial factor in

the loss of life and physical injuries that occurred on December 2, 2016.

273. On February 2, 2015, Oakland CITY Police Officers Nikola Dokic and Bryant K.

Ocampo were dispatched to the Ghost Ship in response to a landlord-tenant dispute. Dokic

advised the disputing parties as to their relative obligations as landlord and tenant. Dokic then

confirmed that the tenant's key worked, and mediated an agreement allowing the tenant access to

the building's upstairs restroom facilities until the lower level restroom was functional. This

contact evidences further notice that law enforcement personnel employed by CITY OF

OAKLAND had direct notice of illegal occupancy of the Ghost Ship warehouse nearly two years

before the incident date, yet negligently failed to report or correct the situation.

274. At approximately 1:37 a.m. on March 1, 2015 a citizen flagged down Oakland

CITY Police Officer Hector Chavez to report that she had just left an illegal rave at the Ghost

Ship. Officer Chavez reported an "unusually high number of vehicles parked around the area" and

that he had been advised of noise complaints. Chavez knocked on the warehouse door and announced his presence as a police officer. A person or persons inside first opened the door and then attempted to deny Chavez access who physically and forcibly stopped the door from closing. Chavez reported evidence of an illegal gathering.  His report notes that residents were in violation of Oakland Municipal Code 05.12.020 for operating a cabaret without a permit "since I know from previous contacts with [Defendant Almena] that this facility does not have a cabaret permit and is supposed to be an art studio." Officer Chavez advises the attendees that he is shutting the rave down.  Based on his observations, Officer Chavez then stated that, "I will talk to the city, and we'll be dealing with this place" and that ALMENA would have to pay a "big fine."  Officer Chavez accurately describes the layout of the building to another officer as two stories with the top as a dance floor area. Despite his knowledge of illegal conduct, and his prior knowledge that the building was being occupied illegally by tenants, Officer Chavez negligently failed to report any of these conditions. This negligent failure to report or to take any steps to evacuate the building not only evidences knowledge of a dangerous condition but was a substantial factor in the loss of life and physical injuries that occurred on December 2, 2016.

275.    On September 8, 2015, Oakland CITY Police Officers Jonathan Low and Moises Polanco were dispatched to the Ghost Ship in response to a property dispute.  A tenant was moving out and asked the officers to stand by while he removed his personal property.  Both officers entered the building to evaluate status.  After entering, the officers ascended the jerry-rigged staircase built from scrap wood and pallets to the second floor; Officer Low questioned whether the structure was stable.  As the officers waited for the tenant to clear out, Officer Polanco said to Officer Low, "One spark…one spark and [it would be] real bad…It's like a huge fireplace…here…I would be worried about all the electrical wires…wow."

276.    This conversation between two highly trained and experienced police officers who personally entered and viewed the property evidences they had direct and personal knowledge of the obvious and palpably dangerous conditions that existed at the Ghost Ship long before the date of the subject fire.  Nor was this Officer Low's first visit to the warehouse.  He had prior personal knowledge that the building was being illegally occupied and had previously warned tenants that

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Page 75 of 251
IN RE GHOST SHIP FIRE LITIGATION SECOND AMENDED MASTER COMPLAINT    Exhibit 4

the building should be shut down.  Still, both Low and Polanco negligently failed to report the fire hazards they observed during this visit. This negligent failure to report or to take any steps to evacuate the building not only evidences direct knowledge of a dangerous and highly flammable condition but was a substantial factor in the loss of life and physical injuries that occurred on December 2, 2016.

277.    The CITY had in place ordinances which required the police to notify the Chief of Police to report new businesses to the Chief of Police.  *See* Oak. Mun. Cod. §§ 5.12.010 *et seq.*; Oak. Mun. Cod. § 5.70.020.  The Ghost Ship was a business:  it advertised events, collected door cover charges and sold alcohol, all without permits.  Pursuant to the Oakland Municipal Code, the Ghost Ship was operating as an illegal cabaret.  The Oakland Police knew this, failed to notify the Chief of Police and failed to undertake appropriate action to check for permits.  The Ghost Ship did not have permits.  The Oakland Police should have demanded that the Ghost Ship cease operating in violation of the law and obtain a cabaret license.

278.    On each of those occasions that the police came to the premises the same dangerous conditions present at the time of the subject fire, and that were a substantial factor in causing said fire, not only existed, but were open and obvious safety hazards that did not require any special training to recognize, identify and report.  These conditions included open and obvious use of multiple strings of extension cords to power numerous personal heaters; propane tanks being used indoors as heaters in close proximity to highly flammable material; lack of safe egress out of the building; lack of properly marked exits; exit signs; lack of fire extinguishers or exit signs; improperly constructed and overtly dangerous stairs; overcrowding; lack of fire sprinkler or fire suppression systems; inadequate lighting; obvious infestation by rodents; animal feces; inadequate ventilation; the presence of toxic and flammable liquids and materials; and lack of any smoke detectors and fire alarms.

279.    Against this backdrop of patently dangerous conditions, CITY employees observed and had notice that the Ghost Ship, which was not intended, permitted, designed, or constructed to accommodate residents, was at all relevant times being impermissibly used as a residence by a significant number of persons.  Although under a duty to identify and protect citizens from such

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Page 76
of 251

Exhibit 4
Page 76 of 251

hazards, CITY employees negligently failed to take any affirmative steps to report the conditions to proper authorities, issue citations compelling persons to vacate the premises, or otherwise act affirmatively to protect the citizens in residence at the Ghost Ship, or visitors to the Ghost Ship, from the risk of known dangerous conditions. Such failure to report, act or otherwise protect citizens from the risk of known, open and obvious dangers was a substantial factor in causing the subject fire that is at the heart of this cause of action.

280. CITY Police Officers are required to contact the CITY Planning and Building Department Code Enforcement and/or the Fire Department to report dangerous conditions that pose a risk to building occupants, especially when that risk relates to unsafe, unsanitary conditions that jeopardize the health and/or safety of the occupants or the neighborhood. CITY Police Officers failed to communicate these hazards to the appropriate authorities so action could be taken to abate the conditions and protect the residents and the public.

**MANDATORY DUTY LIABILITY FOR PUBLIC ENTITY-Government Code § 815.6**

281. Gov't Code § 815.6 provides: "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty."

282. As set in detail below, when read in context with the other enactments, the CITY was under mandatory duties pursuant to the following enactments but failed to discharge its duties and failed to exercise reasonable diligence to discharge its duties: Health and Safety Code §§ 13145, 13146, 17920.3, 17952, 17960, 17961, 17962 ; Oakland Municipal Code §§ 1.04.010, 5.12.010 to 5.12.080, 8.04.030, 8.040.060, 8.040.080, 8.04.160, 8.24.070, 15.08.120, 15.08.340, 15.08.080, 15.08.090, 15.08.340, 15.08.350, 15.70.020; Fire Code §§ 1.11.2.1.1, 1.12, 110, 110.3, 110.4, 701.2, 109.4.1; Code of Regs, tit. 24, § 1.8.3; Code of Regs, tit. 24, § 104.1.

283. The CITY, by ordinance, did adopt and incorporate various codes and regulations creating mandatory, non-discretionary duties pursuant to the Oakland Municipal Code, Oakland

Planning Ordinances and the California Codes of Regulations, located within California Code of Regulations, Title 24 pertaining to health and life safety; California Building Code (24 CCR Part 2), California Fire Code (24 CCR Part 9), California Mechanical Code (24 CCR Part 4), California Plumbing Code (24 CCR Part 5), and California Residential Code (24 CCR Part 2.5).

284. The following are excerpts from the various codes and ordinances adopted by and/or applicable to the CITY. They clearly demonstrate that their purpose is safeguarding the public health and welfare:

Cal. Fire Code § 1.1.2 Purpose: The purpose of this code is to establish the minimum requirements consistent with nationally recognized good practices to safeguard the public health, safety and general welfare from the hazards of fire, explosion or dangerous conditions in new and existing buildings, structures and premises . . . ., and to provide safety and assistance to fire fighter and emergency responders during emergency operations.

Cal. Building Code § 1.1.2 General Purpose: The purpose of this code is to establish the minimum requirements to safeguard the public health, safety, and general welfare through structural strength, means of egress facilities, strength facilities . . . . safety to life and property from fire and other hazards attributed to the built environment. . .

Cal. Electrical Code § 89.101.2: The purpose of this code is to establish the minimum requirements to safeguard the public health, safety, and general welfare through structural strength, means of egress facilities, strength facilities . . . . safety to life and property from fire and other hazards attributed to the built environment. . .

Cal. Mechanical Code Chapter 1: A mechanical code, as with any other code, is intended to be adopted as a legally enforceable document to safeguard safety, health, property and public welfare. The code cannot be effective without satisfactory provisions for its administration and enforcement.

§ 1.1.2 General Purpose: The purpose of this code is to establish the minimum requirements to safeguard the public health, safety, and general welfare through structural strength, means of egress facilities, strength facilities . . . . safety to life and property from fire and other hazards attributed to the built environment. . .

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Page 78 of 251

285.    The CITY adopted the California Fire Code, Electrical Code, Plumbing Code and Mechanical Codes.

286.    Based on its long use as a work/live unit prior to the date of the subject incident, the Ghost Ship falls under the Oakland Planning Ordinances definition of an "enclosed nonresidential facility." *See* Section 17.10.720, which provides that such facilities are specifically intended to accommodate, "Civic, Commercial, Industrial, or Agricultural or Extractive Activities and which are separated from adjacent areas on all sides by walls pierced only by windows, vents, or customary entrances and exits." The Ghost Ship meets these criteria. The Oakland Planning and Building Codes restrict persons from residing in nonresidential industrial buildings unless said building has been properly designated and permitted as a "live/work" building. Such facilities must comply with all provisions of City of Oakland Live/Work Building Code and the California Building Code. Per these codes and ordinances, the CITY lacks discretion to allow establishment of a work/live unit unless the building's design complies with all applicable building codes, including those related to building egress, safety, structural integrity, access, fire safety, electrical, plumbing and ventilation. This includes, without limitation, all applicable California building codes and regulations that govern life safety issues, includes rules regarding structural and fire safety as well as myriad other aspects of actual physical construction intended to protect building occupants. This also includes provisions of the California Fire Code, 24 C.C.R. Parts 9 & 10, *et seq*. The Ghost Ship did not comply with any regulations intended to protect human life. Had the CITY complied with its own mandatory code provisions, this would have eliminated the dangerous use of chains of "power strips" throughout the building to provide electrical power to personal devices, including personal heaters, refrigerators, computers, televisions, stereos, lights, small appliances, portable air conditioners, and a wide range of other electrical devices.

287.    The CITY failed to comply with its own progressive enforcement process related to known violations of the Oakland Municipal Codes related to blight; structural, electrical, mechanical, construction and occupancy without permit; and zoning, including without limitation those set forth at Oakland Municipal Code Sections 8.24, 15.08 and Title 17. These provisions are intended to identify and correct various hazardous conditions in residential and commercial

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Page 79 of 251

Exhibit 4
Page 79 of 251

properties, including the types of violations and dangerous conditions present in the Ghost Ship at all relevant times.

288.    The Oakland Municipal Code, throughout its ordinances, set forth the public health and safety purpose of these various regulations including but not limited to:

15.08.020 – Purpose.  The purpose of this Code is to provide minimum standards to safeguard life or limb, health, property, and public welfare by regulations and controlling the use and occupancy, locations, and maintenance of all residential and non-residential buildings, structures, portions thereof, and real property within the City of Oakland.

289.    The Oakland Municipal Code established a class of structures and conditions which were legally substandard and a Public Nuisance:

15.08.340:  (A) General.  Any residential or non-residential building, structure, or portion thereof which is determined to be an Unsafe in accordance with the Oakland Building Construction Code; or any residential or non-residential building, structure or portion thereof, including but not limited to any dwelling unit, guest room or suite of rooms, commercial office or retail sales space, classroom or associated locker room or toilet room, assembly space, or any real property in which there exists any of the conditions referenced in this Section to an extent that is Unsafe to the life, limb, health, property, safety or welfare of the public or the occupants thereof shall be deemed and hereby is declared to be Substandard and a Public Nuisance.

(B) Inadequate Sanitation.  Residential and non-residential buildings, structures, or portions thereof shall be deemed Substandard and a Public Nuisance when they are unsanitary.

(C) Structural Hazards.  Residential and non-residential buildings or structures or portions thereof shall be deemed Substandard and a Public Nuisance when they are or contain structural hazards and deemed Substandard and a Public Nuisance when they are or contain structural hazards. . .

(E) Hazardous Electrical Wiring and Equipment.  Electrical wiring and equipment which was installed in violation of code requirements in effect at the time of installation or

77

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Page 80 of 251

IN RE GHOST SHIP FIRE LITIGATION SECOND AMENDED MASTER COMPLAINT – Exhibit 4

Page 80 of 251

electrical wiring and equipment not installed in accordance with generally accepted construction practices in area where no codes were in effect or which has not been maintained in good conditions or which is not being used in a safe manner shall be considered Substandard and a Public Nuisance.

(G) Hazardous Mechanical Equipment. Mechanical equipment which was installed in violation of code requirements in effect at the time of installation or mechanical equipment not installed in accordance with generally accepted construction practices in areas where no codes were in effect, or which has not been maintained in good and safe condition, shall be considered Substandard and a Public Nuisance.

(I) Fire Hazard. Any residential or non-residential building, structure, or portion thereof, device, apparatus, equipment, combustible waste or vegetation which, in the opinion of the Fire Chief, is in such a condition as to cause a fire or explosion or provide a ready fuel to augment the spread and intensity of fire or explosion arising from any cause shall be considered a Substandard and a Public Nuisance.

(J) Faulty Materials of Construction. The use of materials of construction, except those which are specifically allowed or approved by this Code and the Oakland Building Construction Code, and which have been adequately maintained in good and safe condition, shall cause a residential or non-residential building or structure to be Substandard and a Public Nuisance.

(K) Hazardous or Unsanitary Premises. The accumulation of weeds, vegetation, junk, dead organic matter, debris, garbage, offal, rat harborages, stagnant water, combustible materials, surface or subsurface toxic substances, storage or use of chemicals, gas, oil or toxic or flammable liquids, and similar materials or conditions on a premises constitutes fire, health or safety hazards which shall be abated in accordance with the procedure specified in Section 15.08.350 of this Code.

(L) Inadequate Exits. Except for those buildings or structures or portions thereof which have been provided with adequate exit facilities conforming to the provisions of this Code, residential and non-residential buildings or structures or portions thereof whose existing

facilities where installed in violation of code requirements in effect at the time of their construction or whose exit facilities have not been increased in number or width in relation to any increase in occupant load due to alterations, additions or change in use or occupancy subsequent to the time of construction shall be considered Substandard and a Public Nuisance.

(M) Inadequate Fire-Protection or Firefighting Equipment. Residential and non-residential buildings or structures or portions thereof shall be considered Substandard and a Public Nuisance when they are not provided with the fire-resistive construction or fire-extinguishing systems or equipment required by this Code, except those buildings or structures or portions thereof which conformed with all applicable laws at the time of their construction and whose fire-resistive integrity and fire-extinguishing systems or equipment have been adequately maintained and improved in relation to any increase in occupant load, alteration or addition, or any change in occupancy.

(N) Improper Occupancy. All residential and non-residential buildings or structures or portions thereof which were not designed or intended to be used or approved for their current occupancies shall be considered Substandard and a Public Nuisance.

290.   Oakland Municipal Code Section 8.24.020(C) defines a "blighted condition" as "a building or structure which in in a state of disrepair," including without limitation, "[b]uildings or structures . . . which are obsolete, broken, deteriorated, or substantially defaced to the extent that the disrepair . . . presents a risk to public safety."

291.   Pursuant to Oakland Municipal Code Section 8.24.050, "[t]he Building Official and his or her designees shall be responsible for the enforcement of this chapter and shall make such inspections and take such actions as may be required to enforce the provisions of this chapter". Further, "The Building Official and designees are hereby authorized and directed to enforce all of the provisions of [the Oakland building code] and Chapter 8.24 (Property Blight) of the Oakland Municipal Code. For such purposes, the Building Official shall have the powers of a law enforcement officer." Oakland Building Maintenance Code Section 15.08.080(A). Further, "Whenever any condition set forth in this chapter is determined by the Building Official, or his or

her designee, to be dangerous and imminently hazardous to public health and safety, the use or occupancy of the blighted property may be restricted in accordance with the procedures set forth in [the Oakland Building Maintenance Code]. Municipal Code Section 8.24.070.

292.    The CITY had a mandatory, non-discretionary, duty to abate and/or eliminate any hazards in structures which were substandard and/or a public nuisance including but not limited to demanding repair and rehabilitation, demolition and/or ordering said structures to be vacated.  The Oakland Municipal Code required that whenever a structure is substandard and/or a public nuisance in such an unsafe condition as to make it dangerous either to life and limb of the occupants or to private or public property or to health or safety of the public, it shall be ordered to be vacated and secured and maintained against unauthorized entry.

293.    Under the Oakland Municipal Code, the existence of any of the following was prima facie evidence of an existence of an existing and continuing hazard to life, property and public welfare:  failure to provide, obtain or maintain valid permits, certifications, tests, listings, affixed labeling, or other conditions of permit; failure to repair, demolish, remove, or rehabilitate unsafe materials, appliances, fixtures, equipment or other property; or failure to prevent, restrain, correct, or abate conditions unsafe or hazardous for egress or fire protection or health due to inadequate maintenance, excess loading, dilapidation, or abandonment.

294.    The California Health and Safety Code pertaining to  construction, reconstruction, enlargement, conversion, and alteration of dwellings, including without limitation, Sections 13145, 13146, 13146.2, 17960, 17961(a), 17962, 17920 et seq., 17921 and 17952, collectively placed a mandatory duty on the CITY to enforce State Building Code provisions related to fire and panic safety; building and construction safety; occupancy safety; ventilation safety; electrical safety; resident health and safety; sanitation, heating, lighting, water and habitability; building maintenance; wiring; plumbing; adequate exit facilities; building fire resistance; and construction materials, all of which are intended to protect city residents from the risks of fire and related hazards.  For instance, Section 13146.2 imposes a mandatory duty upon the CITY to perform annual inspections when providing fire protection services:

(a)  Every City or county fire department or district providing fire protection services

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Page 83 of 251

Exhibit 4
Page 83 of 251

required by Sections 13145 and 13146 to enforce building standards adopted by the State Fire Marshal and other regulations of the State Fire Marshal shall, annually, inspect all structures subject to subjection (b) of Section 17921, except [single-family] dwellings, for compliance with building standards and other regulations of the State Fire Marshal.

295.     Further, Section 17920.10 *et seq*., mandated that substandard buildings be vacated or destroyed within thirty days after notice of substandard condition.  The CITY failed to enforce building safety codes imposed by Section 17920.10 *et seq*, including the provisions that CITY employees to order that substandard buildings be vacated or destroyed within thirty days after notice of substandard condition.  The purpose of all of these provisions is to protect and safeguard human life, and the CITY's failure to comply and breach of mandatory statutory duties were was a substantial factor in causing the subject fire, loss of life, personal injuries and property damage.

296.     The California Fire Code established a mandatory duty requiring that the Chief of the Oakland Fire Department enforce the Fire Code relating to fire and panic safety and enforce rules and regulations established under the Fire Code including but not limited to those pertaining to the following:

Clearances.  No combustible material shall be placed or stored within 10 feet of any building or structure.

Exits, Aisles, Ramps, Corridors and Passageways.  No person shall install, place or permit the installation or placement of any bed, chair, equipment, concession, turnstile, ticket office or anything whatsoever, in any manner which would block or obstruct the required width of any exit. (b) No person shall install, place or permit the installation or placement of any combustible material or equipment in or exposed to any exit.

Fire Hazards.  No person, including but not limited to the State and its political subdivisions, operating any occupancy subject to these regulations shall permit any fire hazard, as defined in this article, to exist on premises under their control, or fail to take immediate action to abate a fire hazard when requested to do so by the enforcing agency. Note: "Fire Hazard" as used in these regulations means any condition, arrangement, or act which will increase, or may cause an increase of, the hazard or menace of fire to a greater

degree than customarily recognized as normal by persons in the public service of preventing, suppressing or extinguishing fire; or which may obstruct, delay, or hinder, or may become the cause of obstruction, delay or hindrance to the prevention, suppression, or extinguishment of fire.

Unsafe conditions. Structures or existing equipment that are or hereafter become unsafe or deficient because of inadequate means of egress or which constitute a fire hazard, or are otherwise dangerous to human life or the public welfare, or which involve illegal or improper occupancy or inadequate maintenance, shall be deemed an unsafe condition. Identified hazardous electrical conditions in permanent wiring shall be brought to the attention of the responsible code official. Electrical wiring, devices, appliances and other equipment that is modified or damaged and constitutes an electrical shock or fire hazard shall not be used. Electric hazards include but are not limited to multiplug adapters, extension cords and portable electric space heaters.

Where any components of a structure are not maintained and do not function as intended or do not have the fire resistance required by the code under which the building was constructed, remodeled or altered, such component(s) or portion thereof shall be deemed an unsafe condition and shall be repaired or replaced to conform to that code under which the building was constructed, remodeled or altered. Where the extent of the conditions of components is such that any building, structure or portion thereof presents an imminent danger to the occupants of the building, structure or portion thereof, the fire code official is required to evacuate the building.

297.    The various laws and regulations identified in the preceding paragraphs were designed to ensure public safety and welfare and to protect against the very harms of the type which occurred on December 2, 2016.

298.    The CITY, through its employees, agents, officials, departments, representatives and contractors (collectively also referred to as "employees"), knew, or should have known, that conditions in, on, and outside the building were in violation of numerous health and safety codes including but not limited to the Oakland Municipal Code, Fire Code, Mechanical Code, Plumbing

Code, Electrical Code and Building Code.  These conditions include but are not limited to the following:

          Unpermitted and unlawful use of the facility as a cabaret;

          Unlawful and unpermitted use of the facility as a residence;

          Unsafe conditions;

          Hazardous electrical wiring and equipment;

          Hazardous mechanical equipment;

          Fire hazards;

          Faulty materials of construction;

          Inadequate exits;

          Dangerous aisles, stairs, passageways, ingress and egress due to of the accumulation of furniture, pianos, pallets, tapestries, wood, metal, glass;

          The parking of various recreational vehicles used as living quarters indoors;

          Makeshift kitchens and exposed heating systems;

          Inadequate fire protection and firefighting equipment including but not limited to the lack of fire detection and suppression systems; and

          Inadequate clearances.

      299.    Decedents and Plaintiffs are within the general class of persons that were entitled to protection by the various statutes, ordinances and regulations set forth herein for the provision of health and safety and are persons who one would reasonably anticipate might be threatened by the CITY's negligent acts and omissions.

      300.    The CITY, knowing of the dangerous, substandard and hazardous conditions, breached its mandatory duties, including but not limited to:  ensuring that the Fire, Electrical, Mechanical, Building, Health and Safety codes, and other statutes and ordinances, were being complied with and properly implemented; properly identifying and/or communicating the known dangers and hazards to the appropriate agencies and departments; and failing to act to remedy, abate, and or vacate the building as required so as to eliminate, cure or cause to be cured, the dangerous conditions which ultimately led to the fire and catastrophic injuries and loss of life on

Exhibit 4

December 2, 2016.

301.    Decedents and Plaintiffs are within the general class of persons that one reasonably would anticipate might be threatened by the CITY's conduct; and the harm suffered by Decedents and Plaintiffs is within the general class of harms that one reasonably would anticipate might result from the CITY's conduct.

302.    The acts, omissions, negligence and/or breach of mandatory duties of the CITY were a substantial factor in causing Decedents' injuries and resulting deaths and harm to the Plaintiffs, and the direct and proximate cause of the injuries and damages sustained by Plaintiffs. The CITY did not make reasonable efforts or exercise reasonable diligence to perform its mandatory duties imposed under any statute, regulation, ordinance, code or other applicable enactment.

303.    As a further, proximate result of the acts, omissions, negligence and breach of mandatory duties by the CITY, Plaintiffs have incurred the injuries and damages as set forth herein.

**PUBLIC ENTITY EMPLOYEE NEGLIGENCE LIABILITY- Government Code §§ 815.2 and 820.8**

304.    Gov't Code § 815.2(a) provides:  "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative."

305.    Pursuant to Government Code Section 820.8, a public employee is not exonerated from liability for injuries proximately caused by his or her own negligent or wrongful acts or omissions.

306.    Here, as set forth above and throughout this Second Amended Complaint, the negligent failure to act by city officials increased the danger to persons who did not reside or work at the Ghost Ship, including Plaintiffs in this action. The CITY is vicariously liable for four distinct reasons.

84

307.     First, applying the multi-factor analysis employed by California's Supreme Court in *Thompson v. County of Alameda* and *Dutton v. City of Pacifica* to evaluate public entity duty, the facts alleged herein establish that the CITY, by and through various agencies including its Planning and Building Department, Fire Department and Police Department, owed a tort duty of care to the greater Oakland community, including the Plaintiffs herein.

308.     It was foreseeable that casual visitors to the Ghost Ship warehouse, with no particularized knowledge of the building's dangerous conditions, would suffer harm in the event a fire broke out while they were attending an unpermitted, illegal event.  The Oakland Fire Department/ATF report attached herein as Exhibit 4, OAKLAND FIRE DEPARTMENT REPORT describes structural deficiencies, safety and code violations and a tinder-box environment which created risk to all who entered. The Complaint alleges facts sufficient to allege that no formal inspection was necessary; on even casual observation for an unrelated purpose the building would have been evacuated and closed had any city official bothered to report obvious violations.

309.     According to Exhibit 4, OAKLAND FIRE DEPARTMENT REPORT, the building was rife with structural deficiencies, safety and code violations, and a tinder-box environment which put all who entered at risk.  It was patently unsafe for any work/live purpose, including the musical and entertainment raves that were a regular feature of the Ghost Ship enterprise, and that were well known to law enforcement and fire department personnel.

310.     Based on the facts alleged herein, the nexus between the acts and omissions of city employees and the harm suffered by Plaintiffs constitutes proximate causation.  There is no dispute that had any fire department, police or building department employee reported these obvious violations the Ghost Ship would have been evacuated and closed.  This failure to act was by any measure a substantial contributing factor to the harm suffered.

311.     On the facts alleged herein, Defendant CITY engaged in a pattern of discrimination against the poor and disenfranchised in its selective efforts to identify and correct dangerous conditions that rises to the level of culpability.  Surrounding businesses with no history of blighted conditions, illegal activities, or dangerous conditions were regularly inspected by CITY officials,

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Page 88
of 251
Exhibit 4
Page 88 of 251

while the Ghost Ship was categorically ignored. Even after police officers and firefighters who were in the building for purposes unrelated to a formal inspection acknowledged obvious dangerous conditions that posed a significant risk of injury or death to occupants, no actions were taken. Officers, firefighters and code enforcement officials consistently ignored complaints about safety. When officials did respond to reports of illegal activities or landlord/tenant disputes, they turned a blind eye to obvious defects certain to put casual visitors to the building at risk. Such conduct constitutes deliberate indifference to the foreseeable results of such conduct. To the extent such conduct is tied to bias and prejudice against residents of the Ghost Ship neighborhood, it is morally blameworthy.

312. There is strong public and official policy devoted to preventing foreseeable risk of harm to city residents and visitors. According to their own publications and public admissions and as specified and pled herein, Defendant CITY, by and through its police, fire and building department personnel, had formal policies in place ostensibly meant to prevent future harm to citizens caused by dangerous conditions in commercial buildings, including blighted sites like the Ghost Ship. Defendant CITY's failure to act on these policies resulted in foreseeable and real consequences to the community. The deaths and injuries suffered by the persons inside the Ghost Ship on December 2, 2016 have caused a ripple effect throughout Defendant CITY, which has vowed to renew its efforts to follow its own guidelines and policies with respect to code enforcement, and to review and overhaul policies and procedures related to the CITY Fire Department. Unfortunately, such overhaul is too little, too late for victims of the Ghost Ship fire and their families.

313. On the facts alleged, reporting obvious dangerous conditions to appropriate CITY personnel, imposed zero burdens on Defendant CITY. The only burden would have been on the Ghost Ship owner, who would have been required to bring the building up to code for its intended purpose, transform the building for some other permissible use, or permanently close its doors. As alleged herein, all of the various departments that interacted with the Ghost Ship were authorized to report dangerous conditions that put members of the public at risk. No law, regulation, ordinance or code precluded a firefighter, a police official, or a building department

employee from reporting such conditions. The burden to do so was slight, while the risk of not doing so was significant. In this context and on the facts alleged, the duty at issue herein is not to individual residents of the Ghost Ship or to individuals per se, but to the larger Oakland community and the public at large, many of whom would foreseeably have occasion to visit the Ghost Ship for a musical or art event. Those are precisely the victims who lost their lives on December 2, 2016; with one exception none of the people who died or were injured actually lived or worked at the Ghost Ship.

314.     On the facts alleged, the needs and the interests of the larger Oakland community were transgressed by the negligent failure of CITY officials to act.

315.     In balancing the relevant public policy considerations, there is no basis to forego imposing a legal duty on Defendant CITY, by and through its employees, to do its job with respect to protecting citizens at large from known dangerous conditions. As alleged, CITY firefighters regularly inspected and reported safety violations in commercial businesses in close proximity to the Ghost Ship. At least one Lieutenant for the Fire Department entered the building on an unrelated matter and notified tenants of specific fire hazards. Police officers were regular visitors to the Ghost Ship, and had ample opportunity to enter and observe, even if their presence in the building was unrelated to code enforcement. CITY building officials were obligated to respond to citizen complaints of blight conditions, and obligated to conduct annual inspections of commercial buildings, yet failed to do so. Thus, on the facts alleged herein there is no basis to support the proposition that CITY employees are somehow exempt from reporting dangerous conditions that will foreseeably put innocent members of the community who were not familiar with the Ghost Ship at risk of harm, even if such conditions are observed outside of the framework of a formal inspection. Given that the statutory scheme and policies of all involved CITY departments is to protect the public from the risk of harm caused by dangerous conditions, including violations of fire, building code and safety provisions, the failure of CITY employees to act constitutes an actionable breach of duty to all.

316.     This collective failure falls well below the standard of care for police, fire and building department personnel in cities of similar size and location. At least three Bay Area cities

have specific guidelines intended to identify and correct dangerous conditions in commercial and residential properties when such conditions are observed by city personnel, whether or not such observations occur during a "formal" inspection.

317.    Long before December 2, 2016 the cities of Richmond, San Francisco and San Jose developed and incorporated systems intended to facilitate notification of proper authorities when police officers or other city officials observe or otherwise become aware of dangerous conditions on real property. These systems include reporting dangerous living conditions like the haphazard subdivision of non-habitable spaces into separate living areas without proper egress.  These policies are intended to prevent dangerous living conditions from falling through the cracks.

318.    To facilitate proper protection of its citizens, Richmond requires mandatory training on how to spot fire, safety and building code violations and proper reporting methods. That city also assigns a specific officer to code enforcement for each police beat. Similarly, San Francisco assigns a designated "permit officer" to each of the city's ten district stations.  This is a uniformed police officer who is specially trained to address reports of or complaints about hazards in buildings, regardless of the source of information.  Other officers are trained to report dangerous or illegal conditions directly to the permit officer in their district.  For serious complaints the permit officer initiates an inspection of the subject property by a task force that may be attended by every relevant city department, including fire, health and building/planning. San Jose employs a similar protocol.

319.    These nearby cities affirmatively undertook to develop programs designed to protect citizens from the risk of harm caused by dangerous conditions of private properties. Conversely, CITY OF OAKLAND has cultivated an environment where identification of dangerous conditions and enforcement of the CITY's own municipal code is the exception rather than the rule in certain dispossessed and disenfranchised areas, including the Ghost Ship neighborhood, where inspection and enforcement of building code violations in commercial buildings are typically limited to those entities who can and will pay for such services.

320.    Second, as a result of the violations of the mandatory duties alleged in this complaint, which were violated by the CITY employees acting within the course and scope of

their employment with the CITY, the CITY is vicariously liable under Gov't Code § 815.2(a) for the employees' negligence. *See Hoyem v. Manhattan Beach City School District* (1978) 22 Cal.3d 508; *Dailey v. Los Angeles Unified School District* (1970) 2 Cal.3d 741.

321. <u>Third</u>, the CITY has internal policies, procedures and practices for when CITY employees have obtained actual knowledge of dangerous and hazardous conditions of structures and premises within the CITY's jurisdiction, including, on information and belief, documentation and reporting requirements. The CITY's employees, despite having actual knowledge of the dangerous and hazardous conditions at the Ghost Ship, failed to comply with these internal policies, procedures and practices, by failing to document and/or report the dangerous and hazardous conditions. The direct and proximate cause of the CITY's employees' failure to comply with these internal policies procedures and practices ultimately led to the fire and catastrophic injuries and loss of life on December 2, 2016.

322. The CITY is vicariously liable under Gov't Code § 815.2(a) for the violation of these internal standards. *See Grudt v. City of Los Angeles* (1970) 2 Cal.3d 575, 587-588; *Straughter v. State* (1976) 89 Cal.App.3d 102, 110-111; *Briggs v. State* (1971) 14 Cal.App.3d 489, 497; *Dillenbeck v. City of Los Angeles* (1968) 69 Cal.2d 472; *Curreri v. City & County of San Francisco* (1968) 262 Cal.App.2d 603, 610.

323. <u>Fourth</u>, the CITY is liable under Gov't Code § 815.2(a) for its employees' failure to warn. The California Supreme Court has delineated when a public entity has a duty to warn in situations such as alleged in this complaint. *See Peterson v. San Francisco Community College* (1984) 36 Cal.3d 799; *Tarasoff v. Regents of Univ. of Cal.* (1976) 17 Cal.3d 425; *Johnson,* 69 Cal.2d 782. These cases establish a duty to warn where, as here, the public entity has actual knowledge of imminent peril for a foreseeable, known and identifiable group of individuals. *Peterson,* 36 Cal.3d at 815; *Johnson,* 69 Cal.2d at 786; *Tarasoff,* 17 Cal.3d at 444-447.

324. The CITY's employees had actual knowledge of imminent peril for a foreseeable, known and identifiable group of individuals: those entering the Ghost Ship to attend music evidences and those staying at the Ghost Ship. Despite this knowledge of the unsafe and dangerous conditions inside the Ghost Ship, the CITY's employees failed to warn this foreseeable,

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Exhibit 4
of 251
Page 92 of 251

known and identifiable group of individuals of the imminent peril. The direct and proximate cause of the CITY's employees' failure to warn ultimately led to the catastrophic injuries and loss of life on December 2, 2016. The CITY is vicariously liable under Gov't Code § 815.2(a) for its employees' failure to warn.

**SPECIAL RELATIONSHIP LIABILITY- Government Code § 815.2**

325. A public entity will have a duty of care to a third party if a special relationship has been created where there has been an express or implied promise or conduct that creates detrimental reliance. *Williams v. State* (1983) 34 Cal.3d 18, 25. For instance, a special duty will arise where the public employee takes an "affirmative action which contributed to, increased, or changed the risk which would have otherwise existed." *Id.* at 27.

326. Among other ways, the CITY established a special relationship with the Decedents and Plaintiffs when members of the Oakland Fire Department told the master tenant, ALMENA, and others that use of the facility in a manner known to them (as a cabaret and/or living space) would be safe and allowable/acceptable so long as exit signs were put up. In reasonable reliance upon these statements nothing further was done to abate the known dangerous conditions.

327. On information and belief, the statements made by members of the Oakland Fire Department were overheard by Plaintiffs and/or Decedents, or were communicated to Plaintiffs and/or Decedents, and were reasonably relied upon by Plaintiffs and/or Decedents. These specific statements from the CITY's fire personnel were affirmative conduct which contributed to, increased and/or changed the risk that would have otherwise existed.

328. The specific statements made by the CITY's fire personnel are precisely the type of specific assurances, as opposed to general statements, that create a special relationship. *See Carpenter v. City of Los Angeles* (1991) 230 Cal.App.3d 923; *Wallace v. City of Los Angeles* (1993) 12 Cal.App.4th 1385.

**PUBLIC ENTITY INDEPENDENT CONTRACTOR LIABILITY- Government Code § 815.4**

329. Pursuant to Government Code § 815.4, the CITY is vicariously liable for Decedents' injuries and deaths and Plaintiffs' injuries and damages resulting from the acts or

omissions of independent contractors, including Defendants DOES 501 through 750, committed by the independent contractor itself or through its employee, agent or representative, that involve a failure to discharge a non-delegable duty and to take special precautions and prevent against special risks of physical harm to third persons during the process or as a result of work completed when they knew or should have known such physical harm or property damage were likely to occur without special precautions to prevent against the risk of harm. At all times relevant hereto, the CITY negligently hired and/or contracted with DOES 501 through 750, and each of them. The CITY is, therefore, vicariously liable for Decedents and Plaintiffs' injuries and damages that were caused in whole or part by independent contractors.

## B. COUNTY OF ALAMEDA[33]

330. Plaintiffs were required to exhaust administrative remedies pursuant to Cal. Gov't Code § 910, and prior to the filing of this Amended Master Complaint, have exhausted those remedies. Plaintiffs complied with Gov't Code §§ 905 and 915 by having duly presented claims for the damages sought herein to the COUNTY through a Master Claim presented in person on April 28, 2017. Notices of Adoption of the Master Claim were presented in person on April 28, 2017. The County started serving denials of the Notices of Adoption on or about May 16, 2017.

331. Plaintiffs incorporate by reference, as if fully set forth herein, their Master Claim against the COUNTY, a true and correct copy of which is attached hereto as Exhibit 2.

332. The COUNTY, formed by Charter, was founded in 1853. The COUNTY functions through the actions of its agents, employees, officials and heads of its various departments and agencies. These include, but are not limited to, the Sheriff's Office, Social Services Agency, Planning Department, Vector Control Services District and Fire Department (these agents, employees, officials and departments are hereinafter collectively referred to as the "COUNTY").

333. Plaintiffs claim that the COUNTY had duties, including mandatory duties, to protect the public from the very type of conditions and harm, which led to the deadly fire on December 2, 2016, including: (1) substandard, hazardous, out of code, structural components,

---

[33] Defendant COUNTY OF ALAMEDA has been dismissed without prejudice.

wiring and utilities; (2) inadequate fire protection; (3) insufficient, blocked, and unmarked fire exits; and (4) improper occupancy and use as a residence and cabaret.

334.    Plaintiffs allege that the COUNTY is liable for damages pursuant to, but not limited to, Gov't Code §§ 815, 815.2, 815.4, 815.6, 822.2 & 840.2.  Plaintiffs claim that the COUNTY, through its statements, actions and deeds, and inactions, as well as pursuant to statutes, regulations, codes and ordinances created and established a special relationship/duty which required that they take affirmative action to protect the Decedents and Plaintiffs from the very risk of harm, injuries and/or death, which they suffered as a result of the fire on December 2, 2016.

335.    Plaintiffs claim that the COUNTY failed to perform these obligations entirely or, where they engaged in such actions, they failed to exercise reasonable diligence in discharging those duties, thereby constituting negligence, negligence per se and/or breach of mandatory duties. Plaintiffs claim that the COUNTY knew or should have known about the unsafe conditions and failed to fulfill its duties with reasonable diligence to abate them and render the property safe.

336.    COUNTY employees, agents, officials, departments, representatives and contractors (collectively "employees"), were present at the Ghost Ship and adjoining premises and buildings on numerous occasions in the three years before the December 2, 2016 fire.  For instance, COUNTY employees were present inside the Ghost Ship in at least July 2016 and September 2016, for reasons related to child protective services.  On each such occasion, the employees were acting in the course and scope of their employment.  On each such occasion, the dangerous conditions described herein not only existed, but were open, obvious and patent dangers.  The conditions that existed inside the Ghost Ship on December 2, 2016 were the same as existed prior to the fire when COUNTY employees were inside the Ghost Ship.  COUNTY employees are trained to make accurate assessments of dangerous situations and are trained to recognize conditions that endanger the safety of occupants in unsafe buildings and residences. Said employees were negligent in carrying out investigations, protective, safety and other responsibilities.

337.    On several occasions prior to the December 2, 2016 fire, employees of the COUNTY's Social Services Agency, whose identities are as yet unknown, but who were at all

times acting in the course and scope of their employment, were at the Ghost Ship for reasons related to child protective services. COUNTY employees had received and responded to reports of child abuse and neglect against ALMENA and ALLISON. As part of numerous investigations into misconduct by ALMENA and ALLISON, various such employees visited and inspected their Ghost Ship home for the specific purpose of determining whether that environment constituted a safe abode for the three minor children.

338. On these occasions, these employees knew and saw that persons were illegally inhabiting the warehouse, including ALMENA, ALLISON and their three minor children. Such unlawful use and occupation of the premises, particularly in light of the unsafe and unsanitary conditions that existed at all relevant times, jeopardized the health and safety of building occupants and of visitors to the building.

339. The COUNTY knew that ALMENA and ALLISON were illegally living in the dangerous and unsafe Ghost Ship with their three minor children. COUNTY employees, including those from the Alameda County Sheriff's Department, Alameda County Probation Department and/or Alameda County Social Services Agency, are mandatory reporters under Cal. Penal Code Section 11165.7. Said employees of the COUNTY failed to comply with their mandatory child abuse and neglect reporting requirements when conducting calls or visits to the Ghost Ship.

340. California Penal Code Section 11166(a) provides that a report must be made when the mandated reporter "has knowledge of or observes a child" whom the reporter "knows or reasonably suspects has been the victim of child abuse or neglect." Such report shall be made to the Social Services Agency immediately by telephone. A written report shall be filed within 36 hours documenting the information. These reporting requirements are mandatory, and the failure to report constitutes the breach of mandatory duty by the COUNTY.

341. Once a child is under the protection of the COUNTY's Social Services Agency, regulations require frequent visits with the children. The visits are mandatory and there is no discretion on the frequency of the visits.

342. Investigations by the COUNTY compelled a mandatory consideration of whether

the ALMENA/ALLISON children could safely remain in their residence, the Ghost Ship. This consideration included a determination of whether allowing the children to remain in the residence "would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." Welf. & Inst. Code Sections 361.5, 366.22 & 366.25. *See also* Welf. & Inst. Code Section 306, which compels a mandatory consideration as to whether a child can safely remain in his or her residence. Further, Welf. & Inst. Code Section 328 imposes a mandatory duty on social workers to conduct an investigation to determine whether proceedings to remove the minor from parental custody should be instituted. Such investigation necessarily requires an inspection of the minor's residence. *See, e.g.*, Welf. & Inst. Code Sections 361.5, 366.22 and 366.25. Also, social workers are under a mandatory duty to update prior findings at least once every six months. *See* Welf. & Inst. Code Section 16501.1. Such update necessarily depends on an evaluation of the minor's residence.

343. These ongoing and periodic investigations are conducted against a statutory definition of what constitutes a "safe" home or residence setting. *See* Welf. & Inst. Code Section 16501.15 and Penal Code Section 11165.5, which defines such residence as one that is "free from abuse or neglect." Similarly, Welf. & Inst. Code Section 16504 compels social workers to consider appropriate services to consider whether physical or emotional health or safety is jeopardized should the minor remain at home. These determinations require in-home evaluations and the creation of a comprehensive assessment and case plan detailing conditions that endanger the minor, and documentation of each such contact. *See* Welf. & Inst. Code Section 16504; Department of Social Services Manuals of Policies and Procedures 31-125, 31-201 and 31-320. Here, employees of the COUNTY Social Services Agency failed to adequately conduct, document and report such evaluations, and failed to prepare and/or submit an assessment and case plan that resulted in the children living in a safe home environment.

344. It would have been a clear violation of any applicable statutory standard related to the health and safety of a minor for any COUNTY employee, acting in the course and scope of such employment, to have reached an objective determination that any minor residing in the Ghost Ship was "free from abuse or neglect," or was in any way "safe" given the many dangers to human

Case: 19-30088   Doc# 4877-4   Filed: 11/26/19   Entered: 11/26/19 20:03:10   Page 97
of 251

Exhibit 4
Page 97 of 251

life and safety that existed in the Ghost Ship at all relevant times.

345.    On each visit by such COUNTY employee to the Ghost Ship and adjoining buildings, the conditions that existed therein constituted a risk to the health and safety of anyone, let alone minors, in residence there.  These conditions put the COUNTY on notice of dangerous conditions and illegal residents well in advance of the subject incident, on numerous prior occasions.  These agencies had a mandatory and ministerial duty to cross-report allegations and information related to child abuse.  Every COUNTY employee who participated in such investigations and inspections negligently failed to report said dangerous conditions, negligently failed to cross-report known, dangerous conditions, and negligently failed to take any affirmative steps to protect the minor children, and thereby other residents, from the obvious risks of fire hazards and dangerous conditions that were substantial factors in causing the fire.

346.    Although the COUNTY's employees did remove ALMENA and ALLISON's children for several months, they negligently failed to notify any other agencies of the dangers that existed in the Ghost Ship and adjoining buildings that continued to expose other residents, occupants and visitors to an imminent risk of injury or death.  This is an unusual and negligent departure from protocol from the Social Services Agency that regularly interacts with sheriff, fire and other departments on discovery of dangerous conditions that jeopardize human life, especially in a setting where so many persons were exposed to risks of unsafe, unsanitary and life-threatening conditions.  This is also an unusual and negligent departure from the protocols of the sheriff and fire departments on the discovery of said dangerous conditions.

347.    As a result of the aforementioned knowledge and conduct, and act that showed that the Ghost Ship was a safe place to live, a special relationship existed between COUNTY employees and Decedents and Plaintiffs, who were a foreseeable, known and identifiable group of individuals, including residents and attendees of music events inside the Ghost Ship and adjoining buildings.

348.    There were numerous complaints of excessive noise and debris made to law enforcement when illegal cabarets/raves were being held, and that alcohol was being sold illegally, yet the COUNTY did nothing to shut it down.  Employees of the COUNTY, whose identities are

as yet unknown, but who were at all times acting in the course and scope of their employment, responded to and visited the Ghost Ship and adjoining buildings and saw the substandard conditions and fire hazards firsthand.

349.    The COUNTY, through its employees, knew or should have known that the Ghost Ship was being used as a cabaret, for business purposes (including a tattoo parlor)[34] and unlawful residences for numerous inhabitants, including the ALMENA/ALLISON children, and was a public nuisance.

350.    Against this backdrop of patently dangerous conditions, COUNTY employees of the sheriff, fire and vector control departments observed and had notice that the Ghost Ship, which was not intended, permitted, designed, or constructed to accommodate residents, was at all relevant times being impermissibly used as a residence by a significant number of persons, and had vector issues that were a hazard to the health and safety of the occupants and visitors to the Ghost Ship and adjoining buildings.  Said COUNTY employees are required to contact the proper authorities, including, but not limited to, the CITY Planning and Building Department Code Enforcement and/or the CITY and COUNTY Fire Departments to report dangerous conditions that pose a risk to building occupants, especially when that risk relates to unsafe, unsanitary conditions that jeopardize the health and/or safety of the occupants or the neighborhood.

351.    Although under a duty to identify and protect citizens from such hazards, said COUNTY employees negligently failed to take any affirmative steps to report the conditions to proper authorities within the COUNTY, CITY or STATE; issue citations compelling persons to vacate the premises; or otherwise act affirmatively to protect the citizens in residence at the Ghost Ship, or visitors to the Ghost Ship, from the risk of known dangerous conditions.  Such failure to report, act or otherwise protect citizens from the risk of known, open and obvious dangers was a substantial factor in causing the subject fire that is at the heart of this cause of action.

352.    The COUNTY was aware of numerous violations of State and local statutes, regulations, ordinances and codes, including but not limited to:  California Health and Safety

---

[34]Tattoo parlors are regulated in The County General Ordinance Code, Chapter 6.116 "General Provisions for Body Art (Tattooing), Body Piercing, and Permanent Cosmetics."

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Page 99 of 251

Exhibit 4
Page 99 of 251

Code; California Code of Regulations, Title 24 pertaining to health and life safety, including California Building Code (24 CCR Part 2), California Fire Code (24 CCR Part 9), California Mechanical Code (24 CCR Part 4), California Plumbing Code (24 CCR Part 5), and California Residential Code (24 CCR Part 2.5); California Administrative Code; and Alameda County General Ordinance and Administrative Codes. These statutes, regulations, ordinances and codes created mandatory duties for the COUNTY and its employees to undertake affirmative actions to make the premises safe or shut it down. Said mandatory duties were obligatory and not discretionary or permissive and included, but were not limited to, requirements to investigate buildings and structures and enforce the applicable laws to protect against the particular kind of injuries that were suffered by Decedents and the Plaintiffs.

353. The following are excerpts from the various codes and ordinances adopted by and/or applicable to the COUNTY. They clearly demonstrate that their purpose is safeguarding the public health and welfare:

Cal. Fire Code § 1.1.2 Purpose: The purpose of this code is to establish the minimum requirements consistent with nationally recognized good practices to safeguard the public health, safety and general welfare from the hazards of fire, explosion or dangerous conditions in new and existing buildings, structures and premises . . . . , and to provide safety and assistance to fire fighter and emergency responders during emergency operations.

Cal. Building Code § 1.1.2 General Purpose: The purpose of this code is to establish the minimum requirements to safeguard the public health, safety, and general welfare through structural strength, means of egress facilities, strength facilities . . . . safety to life and property from fire and other hazards attributed to the built environment. . .

Cal. Electrical Code § 89.101.2: The purpose of this code is to establish the minimum requirements to safeguard the public health, safety, and general welfare through structural strength, means of egress facilities, strength facilities . . . . safety to life and property from fire and other hazards attributed to the built environment. . .

Cal. Mechanical Code Chapter 1: A mechanical code, as with any other code, is intended to be adopted as a legally enforceable document to safeguard safety, health, property and public

97

Case: 19-30088   Doc# 4877-4   Filed: 11/26/19   Entered: 11/26/19 20:03:10   Page 100 of 251

Exhibit 4

welfare.  The code cannot be effective without satisfactory provisions for its administration and enforcement.

§ 1.1.2 General Purpose: The purpose of this code is to establish the minimum requirements to safeguard the public health, safety, and general welfare through structural strength, means of egress facilities, strength facilities . . . . safety to life and property from fire and other hazards attributed to the built environment. . .

354.    The COUNTY adopted the California Fire Code in Chapter 6.04 of the Alameda County General Ordinance Code with amendments in Section 6.04.010.  Section 109.3 – Notice of Violation was amended and provides:  "In cases of extreme danger to persons or property, immediate compliance shall be required…."

355.    The California Fire Code established a mandatory duty requiring that the Chief of the Fire Department to enforce the Fire Code relating to fire and panic safety and enforce rules and regulations established under the Fire Code.  The California Fire Code includes the following provisions that relate to the COUNTY's duties and/or the COUNTY being on notice of the applicable fire and life-safety codes and standards when at the Ghost Ship and adjoining buildings, or aware of the unsafe conditions there, including:

Clearances.  No combustible material shall be placed or stored within 10 feet of any building or structure.

Exits, Aisles, Ramps, Corridors and Passageways.  No person shall install, place or permit the installation or placement of any bed, chair, equipment, concession, turnstile, ticket office or anything whatsoever, in any manner which would block or obstruct the required width of any exit. (b) No person shall install, place or permit the installation or placement of any combustible material or equipment in or exposed to any exit.

Fire Hazards.  No person, including but not limited to the State and its political subdivisions, operating any occupancy subject to these regulations shall permit any fire hazard, as defined in this article, to exist on premises under their control, or fail to take immediate action to abate a fire hazard when requested to do so by the enforcing agency. Note: "Fire Hazard" as used in these regulations means any condition, arrangement, or act

which will increase, or may cause an increase of, the hazard or menace of fire to a greater degree than customarily recognized as normal by persons in the public service of preventing, suppressing or extinguishing fire; or which may obstruct, delay, or hinder, or may become the cause of obstruction, delay or hindrance to the prevention, suppression, or extinguishment of fire.

Unsafe conditions. Structures or existing equipment that are or hereafter become unsafe or deficient because of inadequate means of egress or which constitute a fire hazard, or are otherwise dangerous to human life or the public welfare, or which involve illegal or improper occupancy or inadequate maintenance, shall be deemed an unsafe condition. Identified hazardous electrical conditions in permanent wiring shall be brought to the attention of the responsible code official. Electrical wiring, devices, appliances and other equipment that is modified or damaged and constitutes an electrical shock or fire hazard shall not be used. Electric hazards include but are not limited to multiplug adapters, extension cords and portable electric space heaters.

Where any components of a structure are not maintained and do not function as intended or do not have the fire resistance required by the code under which the building was constructed, remodeled or altered, such component(s) or portion thereof shall be deemed an unsafe condition and shall be repaired or replaced to conform to that code under which the building was constructed, remodeled or altered. Where the extent of the conditions of components is such that any building, structure or portion thereof presents an imminent danger to the occupants of the building, structure or portion thereof, the fire code official is required to evacuate the building.

356. The COUNTY, through its employees, knew, or should have known, that conditions in, on, and outside the building were in violation of numerous health and safety codes including but not limited to the Mechanical Code, Plumbing Code, Electrical Code and Building Codes. These conditions include but are not limited to the following:

Unpermitted and unlawful use of the facility as a cabaret;

Unlawful and unpermitted use of the facility as a residence;

Case: 19-30088   Doc# 4877-4   Filed: 11/26/19   Entered: 11/26/19 20:03:10   Page
102 of 251

Unsafe conditions;

Hazardous electrical wiring and equipment;

Hazardous mechanical equipment;

Fire hazards;

Faulty materials of construction;

Inadequate exits;

Dangerous aisles, stairs, passageways, ingress and egress due to of the accumulation of furniture, pianos, pallets, tapestries, wood, metal, glass;

The parking of various recreational vehicles used as living quarters indoors;

Makeshift kitchens and exposed heating systems;

Inadequate fire protection and firefighting equipment including but not limited to the lack of fire detection and suppression systems; and

Inadequate clearances.

357.    The following provisions of the Health and Safety Code relate to the COUNTY's duties and the COUNTY being on notice of the fire, life-safety and housing laws and requirements when COUNTY employees were at the Ghost Ship and adjoining buildings before the December 2, 2016 fire.  Health and Safety Code Section 17920.3 defines substandard conditions to be, among other things:

-Inadequate sanitation lavatory, or bathtub or shower in a dwelling unit;

-General dilapidation or improper maintenance;

-Structural hazards;

-All wiring, except that which conformed with all applicable laws in effect at the time of installation if it is currently in good and safe condition and working properly;

-All materials of construction, except those that are specifically allowed or approved by this Code and that have been adequately maintained in good and safe condition;

-All buildings or portions thereof not provided with adequate exit facilities;

-All buildings or portions thereof that are not provided with the fire-resistive construction or fire-extinguishing systems or equipment required; and

-All buildings or portions thereof occupied for living, sleeping, cooking, or dining purposes that were not designed or intended to be used for those occupancies.

358. Health & Safety Code §§ 13145 & 13146 address the enforcement of building standards and regulations, which relate to the COUNTY's duties and the COUNTY being on notice of the applicable fire, life-safety and substandard conditions when COUNTY employees were at the Ghost Ship and adjoining buildings before the December 2, 2016 fire. Provisions to be enforced in the California Building Code - Title 24, Part 10, include the duties of an investigator when she/he determines there is an unsafe condition, include declaring the structure illegal and abating it under The County General Ordinance Code.

359. The County Ordinance Chapter 15.08 Building Code with amendments in Article 1, includes:

§ 114.1.1 Illegal buildings [BID]. {Added} Any building, structure, equipment, or portion thereof, erected, constructed, enlarged, altered, repaired, moved, improved, removed, converted, demolished, or equipped without a permit when such permit is required by this code shall be declared to be illegal and shall be abated by being made to conform to this code and to all pertinent laws, rules, regulations, or ordinances, by demolition and removal as specified in AC Chapter 15.28 of this title, or by any other remedy available at law.

Under 25 CCR § 54 Nuisances — Notices, the building shall be ordered vacated: Whenever any building or portion thereof, has become substandard as described in Section 17920.3 or is a building as described in 17920.10, of the Health and Safety Code, and when determined to be a nuisance as defined in Section 17920 of the Health and Safety Code by the enforcement agency, the following shall apply:

The enforcement agency shall notify the owner of the building and any mortgagee or beneficiary under any deed of trust, of record, as follows. The notice shall state the conditions causing the building to become substandard or in violation of Section 17920.10 of the Health and Safety Code, and shall order the building, or portion thereof, vacated and shall institute proceedings for the correction or

Case: 19-30088   Doc# 4877-4   Filed: 11/26/19   Entered: 11/26/19 20:03:10   Page
104 of 251

Exhibit 4

abatement thereof, either by demolition, closing or repair, within 30 days after the date of the notice.

360.     In Ordinance 15.24, the COUNTY adopted the Uniform Housing Code Chapter 10, Substandard Buildings, which contains the following provisions (as amended 15.24.020), that relates to the COUNTY's duties and/or put the COUNTY on notice of the dangerous and unsafe conditions at the Ghost Ship and adjoining buildings:

1001.1 – General.  Any building or portion thereof that is determined to be an unsafe building in accordance with AC Section 15.08.170, or any building or portion thereof, including any dwelling unit, guest room or suite of rooms, or the premises on which the same is located, in which there exists any of the conditions referenced in this section to an extent that endangers the life, limb, health, property, safety or welfare of the public or the occupants thereof, shall be deemed and hereby are declared to be substandard buildings. The building official shall commence proceedings to cause repair, rehabilitation, vacation or demolition of substandard buildings in accordance with AC Section 15.08.150 of this title.

1001.2 – Inadequate Sanitation.  Buildings or portions thereof shall be deemed substandard when they are unsanitary.  Inadequate sanitation shall include, but not be limited to, the following: . . .

-Lack of or improper water closet, lavatory, bathtub or shower in a dwelling unit or lodging house;

-Room and space dimensions less than required by this code;

-Lack of required electrical lighting; and

-General dilapidation or improper maintenance.

1001.4 – Nuisance.  Buildings or portions thereof in which there exists any nuisance as defined in this title are deemed substandard buildings.

1001.5 – Hazardous Electrical Wiring.  Electrical wiring that was installed in violation of code requirements in effect at the time of installation or electrical wiring not installed in accordance with generally accepted construction practices in areas where no codes were in

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:19    Page 105 of 251

effect or that has not been maintained in good condition or that is not being used in a safe manner shall be considered substandard.

1001.9 – Fire Hazard.  Any building or portion thereof, device, apparatus, equipment, combustible waste, or vegetation that, in the opinion of the chief of the fire department is in such a condition as to cause a fire or explosion or provide a ready fuel to augment the spread and intensity of fire or explosion arising from any cause shall be considered substandard.

1001.10 – Faulty Materials of Construction.  The use of materials of construction, except those that are specifically allowed or approved by this code and the Building Code, and that have been adequately maintained in good and safe condition, shall cause a building to be substandard.

1001.12 – Inadequate Exits.  Except for those buildings or portions thereof that have been provided with adequate exit facilities conforming to the provisions of this code, buildings or portions thereof whose exit facilities were installed in violation of code requirements in effect at the time of their construction or whose exit facilities have not been increased in number or width in relation to any increase in occupant load due to alterations, additions or change in use or occupancy subsequent to the time of construction shall be considered substandard.

Notwithstanding compliance with code requirements in effect at the time of their construction, buildings or portions thereof shall be considered substandard when the building official finds that an unsafe condition exists through an improper location of exits, a lack of an adequate number or width of exits, or when other conditions exist that are dangerous to human life.

1001.13 – Inadequate Fire-protection or Firefighting Equipment.  Buildings or portions thereof shall be considered substandard when they are not provided with the fire-resistive construction or fire-extinguishing systems or equipment required by this code, except those buildings or portions thereof that conformed with all applicable laws at the time of their construction and whose fire-resistive integrity and fire-extinguishing systems or equipment

Case: 19-30088   Doc# 4837-4   Filed: 11/26/19   Entered: 11/26/19 20:03:10   Page 106 of 251

have been adequately maintained and improved in relation to any increase in occupant load, alteration or addition, or any change in occupancy.

1001.14 – Improper Occupancy. All buildings or portions thereof occupied for living, sleeping, cooking or dining purposes that were not designed or intended to be used for such occupancies shall be considered substandard.

361. COUNTY employees acting in the course and scope of their employment, had prior notice that the Ghost Ship was being illegally occupied and used; that it did not comply with mandatory building, fire and safety codes; and that it posed an ongoing hazard to building visitors and occupants. Said employees negligently failed to comply with duties, including mandatory duties, that required them to identify, report, and/or require repairs and modifications of the building to comply with requisite building, fire and safety ordinances, regulations and codes, or negligently failed to determine the building as unfit for human occupation and vacated in order to protect life and property.

362. Despite notice of the unsafe and dangerous conditions, the COUNTY, among other things, negligently failed to investigate, negligently failed to respond to complaints, negligently failed to protect the public, negligently failed to train, supervise and monitor its employees and/or independent contractors, negligently failed to abate an impending peril, negligently failed to warn the public of the dangerous and unsafe conditions, negligently failed to abate a public nuisance, and is liable for failing to stop the ultra-hazardous activities from occurring.

363. As a result of the foregoing, the COUNTY knew or should have known of the unsafe and dangerous conditions at the Ghost Ship and adjoining buildings, which could result in imminent peril to a foreseeable group of individuals at the Ghost Ship, which were not readily discoverable by them.

364. The unsafe and dangerous conditions included a foreseeable threat of harm to those who would be entering the Ghost Ship to attend music events and those staying at the Ghost Ship. Despite knowledge of the unsafe and dangerous conditions inside the Ghost Ship, the COUNTY failed to warn this foreseeable, known and identifiable group of individuals of the unsafe and dangerous conditions.

Case: 19-30088   Doc# 4877-4   Filed: 11/26/19   Entered: 11/26/19 20:03:10   Page 107 of 251

365.     As a result of the aforementioned knowledge and conduct, a special relationship existed between COUNTY employees and the Decedents and Plaintiffs, as a member of a foreseeable, known and identifiable group of individuals, including residents and attendees of music events inside the Ghost Ship and adjoining buildings.

366.     Pursuant to Government Code § 815.4, the COUNTY is vicariously liable for Decedents' injuries and deaths and Plaintiffs' injuries and damages resulting from the acts or omissions of independent contractors, including Defendants DOES 501 through 750, committed by the independent contractor itself or through its employee, agent or representative, that involve a failure to discharge a non-delegable duty and to take special precautions and prevent against special risks of physical harm to third persons during the process or as a result of work completed when they knew or should have known such physical harm or property damage were likely to occur without special precautions to prevent against the risk of harm.  At all times relevant hereto, the COUNTY negligently hired and/or contracted with DOES 501 through 750, and each of them.  The COUNTY is, therefore, vicariously liable for Decedents and Plaintiffs' injuries and damages that were caused in whole or part by independent contractors.

367.     Decedents and Plaintiffs are within the general class of persons that one reasonably would anticipate might be threatened by the COUNTY's conduct; and the harm suffered by Decedents and Plaintiffs is within the general class of harms that one reasonably would anticipate might result from the COUNTY's conduct.

368.     The acts, omissions, negligence and/or breach of mandatory duties of the COUNTY were a substantial factor in causing Decedents' injuries and resulting deaths and harm to the Plaintiffs, and the direct and proximate cause of the injuries and damages sustained by Plaintiffs.  The COUNTY did not make reasonable efforts or exercise reasonable diligence to perform its mandatory duties imposed under any statute, regulation, ordinance, code or other applicable enactment.

369.     As a further, proximate result of the acts, omissions, negligence and breach of mandatory duties by the COUNTY, Plaintiffs have incurred the injuries and damages as set forth herein.

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Page
108 of 251
Exhibit 4

## C.    STATE OF CALIFORNIA[35]

370.    Plaintiffs complied with Government Code §§ 905 and 915 by having duly presented claims for the damages sought herein to Defendant STATE OF CALIFORNIA through a joint claim presented by mail on May 8, 2017, and subsequently modified by amendments to with additional claimants on May 23, May 26, June 1 and June 2, 2017.  The STATE OF CALIFORNIA served denial of the claim on May 17, 2017.

371.    Plaintiffs incorporate by reference, as if fully set forth herein, their joint claim against the STATE, a true and correct copy of which is attached hereto as Exhibit 3.

372.    The STATE functions through the actions of its agents, employees, officials, department heads, and chiefs of its various departments and agencies.  These include, but are not limited to, the Office of the State Fire Marshal and the Department of Forestry and Fire Protection, and their agents, employees and departments, including the State Fire Marshal on or before December 2, 2016 (all of which are hereinafter collectively referred to as the "STATE").

373.    Plaintiffs claim that the STATE had duties, including mandatory duties, to protect the public from the very type of conditions and harm which led to the tragedy on December 2, 2016: a deadly structure fire, including:  (1) substandard, hazardous, out of code, structural components, wiring and utilities; (2) inadequate fire protection; (3) insufficient, blocked, and unmarked fire exits; and (4) improper occupancy and use as a residence and cabaret.

374.    Plaintiffs allege that the STATE is liable for damages pursuant to, but not limited to, California Government Code Sections 815, 815.2, 815.4, 815.6, 822.2 & 840.2.  The STATE, through its statements, actions and deeds, as well as pursuant to statute, regulations, codes and ordinances, created and established a special relationship/duty which required that they take affirmative action to protect the Decedents and Plaintiffs from the very risk of harm, injury and/or death, which they suffered on December 2, 2016.  In carrying out its duties under these laws, including under the California Fire Code, the STATE failed to perform these obligations entirely or, where they engaged in such actions, they failed to exercise reasonable diligence in discharging

---

[35]  Defendant STATE OF CALIFORNIA has been dismissed without prejudice.

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Page
109 of 251

Exhibit 4

those duties, thereby constituting negligence, negligence per se and/or breach of mandatory duties.

375. Despite notice of the unsafe and dangerous conditions, the STATE, among other things, negligently failed to investigate, negligently failed to respond to complaints, negligently failed to protect the public, negligently failed to train, supervise and monitor its agents, employees and/or independent contractors, negligently failed to abate an impending peril, negligently failed to warn the public of the dangerous and unsafe conditions, negligently failed to abate a public nuisance, and is liable for failing to stop the ultra-hazardous activities from occurring.

376. STATE employees, agents, officials, departments, representatives and contractors (collectively "employees") failed to exercise reasonable diligence in the discharge of their duties. Said employees were negligent in carrying out investigations, protective and safety responsibilities. The negligent acts and omissions and wrongful conduct of the STATE's employees were committed within the scope of their employment.

377. The Ghost Ship had an open, obvious and known history of having public events and parties inside, outside and on the roof top, and charging an entrance fee to the events. The STATE through it employees knew or should have known that the Ghost Ship was being used as a cabaret, for unpermitted business purposes and unlawful residences for numerous inhabitants, including children, and was a public nuisance. The STATE was aware or should have been aware of numerous violations of State and local statutes, regulations, ordinances and codes, including but not limited to: California Health and Safety Code; California Code of Regulations, Title 24 pertaining to health and life safety, including California Building Code (24 CCR Part 2), California Fire Code (24 CCR Part 9), California Mechanical Code (24 CCR Part 4), California Plumbing Code (24 CCR Part 5), and California Residential Code (24 CCR Part 2.5); and California Administrative Code.

378. Such applicable laws placed duties, including mandatory duties, on the STATE to identify and remedy dangerous conditions, including the California Fire Code, which imposes a mandatory duty upon the STATE to safeguard the public health and general welfare against

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Page
110 of 251

Exhibit 4
Page 110 of 251

danger from fire, including:

§ 1.11.1 SFM-Office of the State Fire Marshal. Specific scope of application of the agency responsible for enforcement, the enforcement agency and the specific authority to adopt and enforce such provisions of this code, unless otherwise stated.

The specific scope of application includes "Assembly or similar place of assemblage" like the Ghost Ship "where 50 or more persons may gather together in a building, room or structure for the purpose of amusement, entertainment, instruction, deliberation, worship, drinking or dining,…"

§ 1.11.2.1.1 – Enforcement. The responsibility for enforcement of building standards adopted by the State Fire Marshal and published in the California Building Standards Code relating to fire and panic safety is as follows:

4. The State Fire Marshal shall have authority to enforce the building standards and other regulations of the State Fire Marshal in corporate cities and districts providing fire protection services on request of the chief fire official or the governing body….

§ 1.12 – Enforcement Agency [California Code of Regulations, Title 19, Division 1, § 3.12 - Enforcement Agency]:

(a) The provisions of these regulations, California Code of Regulations Title 19, Division 1, shall be enforced by the State Fire Marshal, the chief of any city or county fire department or fire protection district, and their authorized representatives, in their respective areas of jurisdiction….

(b)(3) The State Fire Marshal shall have authority to enforce the rules and regulations in corporate cities and county fire protection districts upon request of the chief fire official or the governing body.

379. The California Fire Code established a mandatory duty, unless fully delegated, requiring the State Fire Marshal to enforce the Fire Code relating to fire and panic safety and enforce rules and regulations established under the Fire Code including but not limited to those pertaining to the following:

Case: 19-30088   Doc# 4877-4   Filed: 11/26/19   Entered: 11/26/19 20:03:10   Page
111 of 251

Exhibit 4

Clearances. No combustible material shall be placed or stored within 10 feet of any building or structure.

Exits, Aisles, Ramps, Corridors and Passageways. No person shall install, place or permit the installation or placement of any bed, chair, equipment, concession, turnstile, ticket office or anything whatsoever, in any manner which would block or obstruct the required width of any exit. No person shall install, place or permit the installation or placement of any combustible material or equipment in or exposed to any exit.

Fire Hazards. No person, including but not limited to the State and its political subdivisions, operating any occupancy subject to these regulations shall permit any fire hazard, as defined in this article, to exist on premises under their control, or fail to take immediate action to abate a fire hazard when requested to do so by the enforcing agency.

Note: "Fire Hazard" as used in these regulations means any condition, arrangement, or act which will increase, or may cause an increase of, the hazard or menace of fire to a greater degree than customarily recognized as normal by persons in the public service of preventing, suppressing or extinguishing fire; or which may obstruct, delay, or hinder, or may become the cause of obstruction, delay or hindrance to the prevention, suppression, or extinguishment of fire.

Unsafe conditions. Structures or existing equipment that are or hereafter become unsafe or deficient because of inadequate means of egress or which constitute a fire hazard, or are otherwise dangerous to human life or the public welfare, or which involve illegal or improper occupancy or inadequate maintenance, shall be deemed an unsafe condition. Identified hazardous electrical conditions in permanent wiring shall be brought to the attention of the responsible code official. Electrical wiring, devices, appliances and other equipment that is modified or damaged and constitutes an electrical shock or fire hazard shall not be used. Electric hazards include but are not limited to multiplug adapters, extension cords and portable electric space heaters.

Where any components of a structure are not maintained and do not function as intended or do not have the fire resistance required by the code under which the building was

Case: 19-30088   Doc# 4877-4   Filed: 11/26/19   Entered: 11/26/19 20:03:10   Page
112 of 251
IN RE GHOST SHIP FIRE LITIGATION SECOND AMENDED MASTER COMPLAINT    Exhibit 4

constructed, remodeled or altered, such component(s) or portion thereof shall be deemed an unsafe condition and shall be repaired or replaced to conform to that code under which the building was constructed, remodeled or altered.  Where the extent of the conditions of components is such that any building, structure or portion thereof presents an imminent danger to the occupants of the building, structure or portion thereof, the fire code official is required to evacuate the building.

380.     The STATE, through its employees, knew, or should have known, that conditions in, on, and outside the building were in violation of numerous health and safety codes including but not limited to the Fire Code, Mechanical Code, Plumbing Code, Electrical Code and Building Code.  These conditions include but are not limited to the following:

Unpermitted and unlawful use of the facility as a cabaret;

Unlawful and unpermitted use of the facility as a residence;

Unsafe conditions;

Hazardous electrical wiring and equipment;

Hazardous mechanical equipment;

Fire hazards;

Faulty materials of construction;

Inadequate exits;

Dangerous aisles, stairs, passageways, ingress and egress due to the accumulation of furniture, pianos, pallets, tapestries, wood, metal, glass;

The parking of various recreational vehicles used as living quarters indoors;

Makeshift kitchens and exposed heating systems;

Inadequate fire protection and firefighting equipment including but not limited to the lack of fire detection and suppression systems; and

Inadequate clearances.

381.     The following provisions of the Health and Safety Code (discussed in paragraphs 323 through 326) relate to the STATE's duties and the STATE being on notice of the fire, life-safety and housing laws and requirements when STATE employees were at the Ghost Ship and

Case: 19-30088   Doc# 4877-4   Filed: 11/26/19   Entered: 11/26/19 20:03:19   Page
113 of 251
Exhibit 4
Page 113 of 251

adjoining buildings before the December 2, 2016 fire. Health and Safety Code Section 17920.3 defines substandard conditions to be, including but not limited to:

-Inadequate sanitation, water closet, lavatory, bathtub or shower in a dwelling unit;

-General dilapidation or improper maintenance;

-Structural hazards;

-All wiring, except that which conformed with all applicable laws in effect at the time of installation if it is currently in good and safe condition and working properly;

-All materials of construction, except those that are specifically allowed or approved by this Code and that have been adequately maintained in good and safe condition;

-All buildings or portions thereof not provided with adequate exit facilities;

-All buildings or portions thereof that are not provided with the fire-resistive construction or fire-extinguishing systems or equipment required; and

-All buildings or portions thereof occupied for living, sleeping, cooking, or dining purposes that were not designed or intended to be used for those occupancies.

382.    The California Health and Safety Code and Administrative Code Sections 24 & 25 require the STATE to enforce the California Building Standards Code. Health and Safety Code Section 13145: Enforcement of building standards and regulations provides:

The State Fire Marshal, the chief of any city, county, or city and county fire department or district providing fire protection services, or a Designated Campus Fire Marshal, and their authorized representatives, shall enforce in their respective areas building standards relating to fire and panic safety adopted by the State Fire Marshal and published in the California Building Standards Code and other regulations that have been formally adopted by the State Fire Marshal for the prevention of fire or for the protection of life and property against fire or panic.

25 CCR § 54 Nuisances — Notices.  Whenever any building or portion thereof, has become substandard as described in Section 17920.3 or is a building as described in 17920.10, of the Health and Safety Code, and when determined to be a nuisance as defined in Section 17920 of the Health and Safety Code by the enforcement agency, the following

Case: 19-30088   Doc# 4877-4   Filed: 11/26/19   Entered: 11/26/19 20:03:10   Page
114 of 251

shall apply:

  The enforcement agency shall notify the owner of the building and any mortgagee or beneficiary under any deed of trust, of record, as follows. The notice shall state the conditions causing the building to become substandard or in violation of Section 17920.10 of the Health and Safety Code, and shall order the building, or portion thereof, vacated and shall institute proceedings for the correction or abatement thereof, either by demolition, closing or repair, within 30 days after the date of the notice.

383. Health and Safety Code Section 13146 imposes a mandatory duty upon the STATE, when requested, to protect against danger from fire:

  The responsibility for enforcement of building standards adopted by the State Fire Marshal and published in the California Building Standards Code relating to fire and panic safety and other regulations of the State Fire Marshal shall be as follows:

  (d) The State Fire Marshal shall have authority to enforce the building standards and other regulations of the State Fire Marshal in corporate cities and districts providing fire protection services upon request of the chief fire official or the governing body.

384. Health and Safety Code § 13145 — Enforcement of building standards and regulations, provides:

  The State Fire Marshal, the chief of any city, county, or city and county fire department or district providing fire protection services, or a Designated Campus Fire Marshal, and their authorized representatives, shall enforce in their respective areas building standards relating to fire and panic safety adopted by the State Fire Marshal and published in the California Building Standards Code and other regulations that have been formally adopted by the State Fire Marshal for the prevention of fire or for the protection of life and property against fire or panic.

385. Health and Safety Code § 13146.2 imposes a mandatory duty upon the STATE to perform annual inspections when providing fire protection services:

  (a) Every City or county fire department or district providing fire protection services

Case: 19-30088 Doc# 4877-4 Filed: 11/26/19 Entered: 11/26/19 20:03:10 Page 115 of 251

required by Sections 13145 and 13146 to enforce building standards adopted by the State Fire Marshal and other regulations of the State Fire Marshal shall, annually, inspect all structures subject to subjection (b) of Section 17921, except [single-family] dwellings, for compliance with building standards and other regulations of the State Fire Marshal.

386.    To the extent that the STATE knew or should have known that ALMENA and ALLISON were illegally living in the dangerous and unsafe Ghost Ship with their three minor children, the STATE is liable for the failure of its employees to comply with mandatory child abuse and neglect reporting laws, which include reporting requirements under Cal. Penal Code Section 11166(a).  That section specifically provides that a report must be made when the mandated reporter "has knowledge of or observes a child" whom the reporter "knows or reasonably suspects has been the victim of child abuse or neglect."  Such report shall be made to the Alameda County Social Services Agency immediately by telephone.  A written report shall be filed within 36 hours documenting the information.  These reporting requirements are mandatory, and the failure to report constitutes the breach of mandatory duty by a government agency.  *See also* Penal Code Sections 11166.05; 11165.2; 11165.3; 11165.4; 11165.6; and 11165.9.

387.    STATE employees acting in the course and scope of their employment, knew or should have known that the Ghost Ship was being illegally occupied and used; that it did not comply with mandatory building, fire and safety codes; and that is posed an ongoing hazard to building visitors and occupants.  Said employees negligently failed to comply with duties, including mandatory duties, that required them to identify, report, and/or require repairs and modifications of the building to comply with requisite building, fire and safety ordinances, regulations and codes, or negligently failed to determine the building as unfit for human occupation and vacated in order to protect life and property.

388.    Given that the STATE knew or should have known of the unsafe and dangerous conditions, the STATE, among other things, negligently failed to investigate, negligently failed to respond to complaints, negligently failed to protect the public, negligently failed to conduct mandatory annual inspections, negligently failed to train, supervise and monitor its employees, negligently failed to abate an impending peril, negligently failed to warn the public of the

Case: 19-30088   Doc# 4877-4   Filed: 11/26/19   Entered: 11/26/19 20:03:10   Page 116 of 251

dangerous and unsafe conditions, and/or negligently failed to abate a public nuisance, and is liable for failing to stop the ultra-hazardous activities from occurring.

389. As a result of the foregoing, the STATE knew or should have known of the unsafe and dangerous conditions at the Ghost Ship and adjoining buildings, which could result in imminent peril to a foreseeable group of individuals at the Ghost Ship, which were not readily discoverable by them.

390. The unsafe and dangerous conditions included a foreseeable threat of harm to those who would be entering the Ghost Ship to attend music events and those staying at the Ghost Ship. Despite knowledge of the unsafe and dangerous conditions inside the Ghost Ship, the STATE failed to warn this foreseeable, known and identifiable group of the unsafe and dangerous conditions.

391. As a result of the aforementioned knowledge and conduct, a special relationship existed between STATE employees and the Decedents and Plaintiffs, as a member of a foreseeable, known and identifiable group of individuals, including residents and attendees of music events inside the Ghost Ship and adjoining buildings.

392. Pursuant to Government Code § 815.4, the STATE is vicariously liable for Decedents' injuries and deaths and Plaintiffs' injuries and damages resulting from the acts or omissions of independent contractors, including Defendants DOES 501 through 750, committed by the independent contractor itself or through its employee, agent or representative, that involve a failure to discharge a non-delegable duty and to take special precautions and prevent against special risks of physical harm to third persons during the process or as a result of work completed when they knew or should have known such physical harm or property damage were likely to occur without special precautions to prevent against the risk of harm. At all times relevant hereto, the STATE negligently hired and/or contracted with DOES 501 through 750, and each of them. The STATE is, therefore, vicariously liable for Decedents and Plaintiffs' injuries and damages that were caused in whole or part by independent contractors.

393. Decedents and Plaintiffs are within the general class of persons that one reasonably would anticipate might be threatened by the STATE's conduct; and the harm suffered

Case: 19-30088   Doc# 4877-4   Filed: 11/26/19   Entered: 11/26/19 20:03:19   Page
117 of 251
Exhibit 4

by Decedents and Plaintiffs is within the general class of harms that one reasonably would anticipate might result from the STATE's conduct.

394.    The acts, omissions, negligence and/or breach of mandatory duties of the STATE were a substantial factor in causing Decedents' injuries and resulting deaths and harm to the Plaintiffs, and the direct and proximate cause of the injuries and damages sustained by Plaintiffs. The STATE did not make reasonable efforts or exercise reasonable diligence to perform its mandatory duties imposed under any statute, regulation, ordinance, code or other applicable enactment.

395.    As a further, proximate result of the acts, omissions, negligence and breach of mandatory duties by the STATE, Plaintiffs have incurred the injuries and damages as set forth herein.

396.    With respect to all allegations against the CITY, COUNTY and STATE in this cause of action, Plaintiffs who bring this cause of action for his or her injuries sustained as a result of the Ghost Ship fire as a direct victim and/or bystander victim, said Plaintiffs hereby incorporate all of the allegations set forth in the Ninth Cause of Action for Negligent Infliction of Emotional Distress, in paragraphs 215 through 221 as though fully set forth.

397.    With respect to all allegations against the CITY, COUNTY and STATE in this cause of action, Plaintiffs who bring this cause of action for his or her injuries sustained as a result of the Ghost Ship fire as a direct victim, said Plaintiffs hereby incorporate all of the allegations set forth in the Tenth Cause of Action for Intentional Infliction of Emotional Distress, in paragraphs 223 through 229 as though fully set forth.

WHEREFORE, all Plaintiffs pray for judgment against Defendants, and each of them, as hereinafter set forth.

**TWELFTH CAUSE OF ACTION**

**[intentionally left blank]**

IN RE GHOST SHIP FIRE LITIGATION SECOND AMENDED MASTER COMPLAINT

Case: 19-30088   Doc# 4877-4   Filed: 11/26/19   Entered: 11/26/19 20:03:10   Page
118 of 251

Exhibit 4

## THIRTEENTH CAUSE OF ACTION FOR NEGLIGENCE AGAINST
## DEFENDANTS DOES 501 THROUGH 750

398.    Plaintiffs bring this cause of action as an heir to a victim that died as a result of the Ghost Ship fire or for his or her own injuries sustained as a result of the Ghost Ship fire.

399.    Plaintiffs reallege and incorporate herein by this reference, each and every allegation contained in paragraphs 1 to 89, 110 to 119, 235 to 336 and 340 to 349 of this Complaint, as though fully set forth herein.

400.    The Defendants sued herein as DOES 501 through 750, inclusive, were the agents, employees, representatives and/or independent contractors of Defendants CITY, COUNTY and STATE, whose agents, employees, representatives and/or independent contractors acted negligently.  At all times relevant herein, Defendants DOES 501 through 750, inclusive, acted within the scope of such agency, employment, representation or contract.

401.    At all times relevant hereto, Defendants DOES 501 through 750, and each of them, owed a duty of care to Decedents, Plaintiffs and to others.  Defendants DOES 501 through 750, inclusive, and each of them, are negligent or otherwise somehow responsible for Decedents' injuries and subsequent deaths and the injuries and damages sustained by Plaintiffs, as alleged herein.  Said Defendants are liable for breaches of their duties as set forth herein.

402.    Among other things, Defendants DOES 501 through 750, and each of them, negligently controlled, operated, managed, leased, secured, constructed, developed, designed, maintained, investigated, inspected and/or repaired the Ghost Ship and adjoining premises and buildings.  Plaintiffs are informed and believe and thereon allege that said Defendants knew or should have known of the dangerous and unsafe conditions at the Ghost Ship and adjoining premises and buildings.

403.    Defendants DOES 501 through 750, and each of them, negligently performed the work they were hired to undertake and complete, failed to take adequate precautions and safeguards regarding life-safety measures and failed to warn the foreseeable, known and identifiable group of victims of the unsafe and dangerous conditions associated with the Ghost Ship and adjoining premises and buildings.

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Page
119 of 251
IN RE GHOST SHIP FIRE LITIGATION SECOND AMENDED MASTER COMPLAINT    Exhibit 4

404.     It was reasonably foreseeable that as a direct and proximate result of said acts, omissions and negligence of DOES 501 through 750, and each of them and each of their breach of duties, that Decedents would be injured, then die, and caused to sustain economic damages, and Plaintiffs would be injured and/or harmed.

405.     The acts, omissions and/or negligence of DOES 501 through 750, and each of them, were a substantial factor in causing Decedents' injuries and resulting deaths and harm to the Plaintiffs, and the direct and proximate cause of the injuries and damages sustained by Plaintiffs.

406.     As a further, proximate result of the acts, omissions, negligence of DOES 501 through 750, and each of them, Plaintiffs have incurred the injuries and damages as set forth herein.

407.     With respect to the Plaintiffs claiming personal injury and/or property damage associated with a living Plaintiff that was injured and/or sustained property damage as a result of the fire, said Plaintiffs incorporate herein by reference as though fully set forth, the punitive damages allegations contained in paragraphs 134 through 141 and 159.

WHEREFORE, all Plaintiffs pray for judgment against Defendants, and each of them, as herein set forth.

## FOURTEENTH CAUSE OF ACTION – SURVIVAL ACTION AGAINST DEFENDANTS CITY, COUNTY, STATE AND DOES 501 THROUGH 750

408.     Plaintiffs hereby reallege and incorporate by reference, each and every allegation contained in paragraphs 1 to 89, 110 to 119, and 231 to 397 of the Complaint, as though fully set forth herein.

409.     At all times relevant hereto, Defendants, and each of them, negligently, carelessly, recklessly and/or unlawfully acted and/or failed to act so as to cause the injuries and subsequent death of the Decedent victims.

410.     Despite their best efforts, Decedents were unable to escape the inferno.  Rather, they remained alive for at least several minutes.  During this time, Decedents experienced profound fear, suffering and overwhelming despair.

411.     Causes of Action Eleven through Thirteen, therefore, survive the death of

Case: 19-30088   Doc# 4877-4   Filed: 11/26/19   Entered: 11/26/19 20:03:10   Page
120 of 251
Exhibit 4

Decedents and accordingly pass to the personal representatives of their estates and/or successors-in-interest pursuant to C.C.P. § 377.20.

412. As a direct and legal result of the wrongful acts and/or omissions of the Defendants, and each of them, on December 2, 2016, and prior to the Decedents' deaths, Decedents suffered personal injuries from smoke inhalation, the roof collapsing and/or other objects burning and/or falling, as well as property damage from their clothes and other belongings being partially or totally destroyed, and incurred expenses for emergency services, rescue efforts, identification and/or removal of Decedents' remains, coroner, funeral and burial expenses.

413. It was reasonably foreseeable that as a direct and proximate result of the acts, omissions and negligence of Defendants, and each of them, and each of their breach of duties, that Decedents would be injured, then die, and caused to sustain economic damages.

414. The acts, omissions and/or negligence of Defendants, and each of them, were a substantial factor in causing Decedents' injuries and resulting deaths and harm to the Plaintiffs, and the direct and proximate cause of the injuries and damages sustained by Plaintiffs.

415. Defendants DOES 501 through 750, and each of them, acted with oppression, fraud and/or malice in that, among other things, they acted with a willful and conscious disregard for the rights and safety of Decedents.

416. Defendants DOES 501 through 750, and each of them, knew or should have known that the conditions at the Ghost Ship and neighboring properties were a safety hazard that posed a danger to human life, including, but not limited to: inadequate means of ingress and egress; a faulty and unsafe electrical system; inadequate, inoperable, and/or non-existent lighting, smoke alarms, fire extinguishers, overhead sprinklers and/or exit signs; unsafe structures and stairways; obstructed and unclear walkways and exits cluttered with debris; rooms filled with flammable and combustible materials; and/or lack of permitting and security for public events, among other dangerous conditions. Defendants, and each of them, knew or should have known that the Ghost Ship would be a venue for the music show on December 2, 2016, and that such event would lack necessary and proper permits, security, and safety measures, and that the number of invitees would exceed the maximum limit for safe occupancy of the Ghost Ship.

Case: 19-30088   Doc# 4837-4   Filed: 11/26/19   Entered: 11/26/19 20:03:19   Page
121 of 251

Exhibit 4

Defendants, and each of them, also had advanced knowledge that a failure to fix or address the aforementioned conditions would result in the probability of a catastrophic event, which foreseeably would lead to harm and/or injuries to the health and safety of residents and invitees. Defendants, and each of them, intentionally chose not to take reasonable steps to make the Ghost Ship safe for occupancy and use as a music event space, and failed to warn invitees as to the dangerous and unsafe conditions on the property. Defendants, and each of them, in presenting the Ghost Ship as a music venue, engaged in fraudulent conduct intended to deceive invitees by misrepresenting and concealing the dangerous conditions of the property.

417. Defendants DOES 501 through 750, and each of them, acted with malice, oppression and/or fraud in that, among other things, they acted with a willful and conscious disregard for the rights and safety of the Decedents despite knowing the risk of serious injury or death that could likely result from the unsafe and dangerous condition of the Ghost Ship and surrounding and adjacent premises.

418. Defendants DOES 501 through 750, by themselves and/or through their employees and/or agents, acted with malice in that their despicable conduct was carried on with a willful and conscious disregard of the rights or safety of the Ghost Ship victims. The term "malice" includes conduct evincing a conscious disregard of the probability that a defendant's conduct will result in injury to others. *See Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757. Defendants' conduct was so vile, base or contemptible that it would be looked down on and despised by reasonable people.

419. Defendants DOES 501 through 750, by themselves and/or through their employees and/or agents, acted with oppression in that their despicable conduct subjected the Decedents to cruel and unjust hardship in conscious disregard of their rights. "Oppression" in Civil Code Section 3294 "means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." "Conscious disregard" for purposes of proving "oppression" does not require "willful" actions. Cal. Civ. Code § 3294(c)(2); CACI 3940 & 3941; *Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1225-1226.

420. Defendants DOES 501 through 750 knew that their despicable conduct, as

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Page
122 of 251
Exhibit 4

described herein, would likely and within a high degree of probability cause harm to the Decedents.

421. The conduct of Defendants DOES 501 through 750, and each of them, as set forth herein, was fraudulent in that each of them engaged in intentional misrepresentation, deceit, or concealment of material facts known to them, including that the premises lacked sufficient and safe fire safety measures and a safe means of egress. That information was fraudulently withheld from the Decedents.

422. Defendants DOES 501 through 750, and each of their employees' and/or agents' egregious conduct, including malice, oppression and fraud, were substantial factors in causing the incident and the Decedents' injuries and untimely deaths. An officer, a director, and/or a managing agent of Defendants, and each of them, authorized the employees' or agents' wrongful conduct, and/or adopted, ratified or approved the conduct after it occurred. An award of punitive damages in a sum according to proof at trial is, therefore, justified, warranted and appropriate under the facts and circumstances of this case.

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as set forth herein.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs generally pray judgment against Defendants:

1.    For compensatory and general damages in an amount according to proof;

2.    For special damages in an amount according to proof;

3.    For punitive damages where allowed by the law;

4.    For pre- and post-judgment interest on all damages as allowed by the law;

5.    For costs of suit incurred herein;

6.    For attorney fees under existing law;[36] and

7.    For such other and further relief as the Court deems just and proper.

---

[36] Plaintiffs understand a motion to strike the attorney fees prayer was granted as to Ngs and that the request for fees is not as to the Ngs at this time.

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Page 123 of 251
Exhibit 4
Page 123 of 251

1    Plaintiffs specifically pray judgment against Defendants as set forth in their Notice of

2    Adoption of Master Complaint and/or Notice of Adoption of the First Amended Master

3    Complaint, filed herewith.

**VII.    JURY TRIAL DEMANDED**

5    Plaintiffs demand a trial by jury.

6    DATED:  January 18, 2018          MARY ALEXANDER & ASSOCIATES, P.C.

By: _____
          Mary E. Alexander, Esq.
          Jennifer L. Fiore, Esq.
          Sophia M. Aslami, Esq.

          *Plaintiffs' Liaison Counsel*

IN RE GHOST SHIP FIRE LITIGATION, SECOND AMENDED MASTER COMPLAINT

# Exhibit 1

Exhibit 4
Page 125 of 251

Case No. RG17843691 and Related/Consolidated Claims
In Re the Ghost Ship Incident
Master Claim Against the City of Oakland (Gov't Code Section 910)
To Be Used with Notice of Adoption of Master Claim Form

1. **DESCRIBE THE INCIDENT INCLUDING YOUR REASON FOR BELIEVING THE CITY IS LIABLE FOR YOUR DAMAGES:**

On the evening of December 2, 2016, Injury Claimant and/or Decedent Claimant (hereinafter "Claimant") was at 1305 31st Avenue in Oakland when a deadly fire broke out during a publicly promoted commercial music event and "gathering." As a result of numerous violations of countless State and local laws and ordinances, 36 people were killed and many more were injured. This was the largest loss of life in a fire in Oakland history and the deadliest building fire in California since the 1906 earthquake.

At approximately 11:15 pm on December 2, 2016, over 100 invitees were at the music event when the fire started inside the Ghost Ship. These invitees, along with artists performing at the event and residents, were plunged into darkness and smoke and tried to exit the unsafe structure. The interior of the 10,000 square-foot Ghost Ship was a death trap that contained a maze of makeshift rooms, alcoves and partitions. It was cluttered with carvings, mannequins, paintings, artwork, scraps of wood, pianos, furniture, tapestries and several recreational vehicles.

The Ghost Ship lacked a safe means of access between the upper floor where the music event was and the warehouse exit on the ground floor. The Ghost Ship lacked adequate and sufficient fire safety measures and was not up to fire protection and life safety codes, including, but not limited to, not having adequate and sufficient smoke alarms, fire extinguishers, overhead sprinklers, exit signs, emergency lighting, exit lights and a safe means of ingress and egress.

Thirty-six (36) people were unable to exit and were trapped in the inferno inside. These victims suffered injuries from the fire, including from smoke inhalation, while trying to escape. The victims who perished were alive and feared for their safety. They were eventually overcome by the fire and smoke, and subsequently died inside the Ghost Ship. They did not die instantaneously when the fire broke out. They were injured and suffered from the injuries caused by the fire and smoke for many minutes before dying.

The City of Oakland is a municipal corporation, formed by Charter, founded in 1852 and incorporated in 1854. The City functions through the actions of its agents, employees, officials, department heads, and chiefs of its various departments and agencies. These include, but are not limited to, the Oakland Fire Department (hereinafter "OFD"), the Oakland Police Department (hereinafter "OPD") and the Oakland Planning and Building Department and its Building Permits, Inspections and Code Enforcement Services (hereinafter "OPBD"; these agents, employees and departments are hereinafter collectively referred to as "The City").

1

RECEIVED

MAY 2 4 2017

SMREExhibit 4
Page 126 of 251

Claimant claims that The City was under a mandatory duty to protect the public from the very type of conditions and harm which led to the tragedy on December 2, 2016: a deadly structure fire, including: 1) substandard, hazardous, out of code, structural components; 2) wiring and utilities, inadequate fire protection; 3) insufficient, blocked, and unmarked fire exits; and 4) improper occupancy and use as a residence and cabaret.

Claimant alleges that The City is liable for damages pursuant to, but not limited to, California Government Code Sections 815, 815.2, 815.4, 815.6, 822.2 & 840.2. Claimant claims that The City, through its statements, actions and deeds, as well as pursuant to statute, created and established a special relationship/duty which required that they take affirmative action to protect the Claimant from the very risk of harm and/or death, which they suffered on December 2, 2016. Claimant claims that The City failed to perform these obligations entirely or, where they engaged in such actions, they failed to exercise reasonable diligence in discharging those duties, thereby constitution negligence and/or negligence per se.

Despite notice of the unsafe and dangerous conditions, the City, among other things, negligently failed to investigate, negligently failed to respond to complaints, negligently failed to protect the public, negligently failed to train, supervise and monitor its agents, employees and/or independent contractors, negligently failed to abate an impending peril, negligently failed to warn the public of the dangerous and unsafe conditions, negligently failed to abate a public nuisance, and are liable for failing to stop the ultra-hazardous activities occurring.

The City's agents, agents and/or independent contractors failed to exercise reasonable diligence in discharge of their duties. Said agents, employees and/or independent contractors were negligent in carrying out investigations, protective and safety responsibilities. The negligent acts and omissions and wrongful conduct of The City's agents, employees and/or independent contractors were committed within the scope of their employment. The City is liable for any tortious act or omission of an independent contractor of the public entity to the same extent that the public entity would be subject to such liability if it were a private person.

Claimant is within the general class of persons that one reasonably would anticipate might be threatened by The City's acts and omissions. The City breached its duties under California law, and as a proximate and direct legal result of the City's negligence and breach of duties, Claimant was caused to suffer injuries and damages. The extent of Claimant's injuries and damages are more fully set forth in the Notice of Adoption of Master Claim Form.

## A. Facts Supporting Claimant's Claims

1305 31st Avenue is a structure located in an R-30 Zone, yet it is considered by The City to be a "Warehouse, Portion of a Single Economic Unit." This Single Economic Unit includes Assessor Parcel Numbers (hereinafter "APN") 25-690-11 (1305 31st Ave.), 25-690-10 (1315 31st Ave.) and 25-690-9 (3703 International Blvd). The structures have been owned, since 1988, by Chor Ng. The buildings sit at the corner of 31st Avenue and International Blvd., and run almost the complete length of the block on 31st Avenue between International Blvd. and East 13th Street.

2

As part of the consolidated Single Economic Unit, there is an undeveloped yard on the south side between the structure on 1305 31st Ave. and the residence at 1301 31st Ave.: APN No 25-690-5.

APN 25-690-11 was commonly referred to as the "Ghost Ship" by its occupants and in various promotions of the illegal cabaret which operated there. Graffiti painted on the front of it on the 31st Street side said "GHOSTSHIP." The building, at various times, also went by other names including but not limited to the Satya Yuga Collective. At times, APN 25-690-11 has been misidentified as 1315 31st Ave. The building was covered in graffiti, and debris obstructed the sidewalk and ingress/egress creating a dangerous condition of public property for those seeking to enter or exit the building. From the outside, it was evident that the windows were blocked by debris stacked from floor to ceiling and numerous metal objects were attached to the exterior of the building in a dangerous manner.

APN 25-690-11 is reported to have been constructed in the early 1900s. Prior to December 2, 2016, numerous unpermitted modifications to the entire Single Economic Unit had occurred on numerous occasions including, but not limited to: a new electric service; new meters and sub meters; construction of illegal residential units; toilettes, kitchens and showers; inter and intra building passageways to access bathrooms; structural changes in the exterior and interior walls; and unpermitted and shared electrical systems.

The electrical system was overloaded with excessive use by the dozens of people who lived and worked at the Ghost Ship, including artists, musicians and tattoo artists that used electrical equipment, as well as the musicians and groups that performed public events held at the Ghost Ship. There were often sparks from the electrical system that smelled and circuit breakers blew out often. Overloaded electrical lines at the rear of the Ghost Ship likely contributed to the fire.

There had been fires inside the Ghost Ship prior to December 2, 2016. The most recent fire occurred the day before, on December 1, 2016, when a refrigerator caught on fire.

Dangerous and flammable materials, including industrial and art supplies, propane tanks that fueled camping stoves and recreational vehicles and their components, were located throughout the interior of the Ghost Ship.

Evidence exists that The City knew about such conditions and failed to fulfill its mandatory duties with to abate them and render the property safe. For example, complaints made to OPBD, for hazardous and unsafe conditions, including, but not limited to, the building being used illegally for residential purposes:

- November 14, 2016: "Illegal interior building structure"
- November 13, 2016: "There are a ton of garbage piling up on the property on 1305 31st Avenue. Also, a lot of items are left on the sidewalk near the property. Some trash was hazardous. This property is a storage but the owner turned it to become trash recycle site. the [sic] yard became a trash collection site and the

3

main building was remodel for residential. The change causes our neighborhood looks very bad and creates health issue."

- October 7, 2014: "Constructing house/structure without permits"
- September 30, 2014: "Pallets, construction materials blocking sidewalk"
- June 4, 2014: "trash & debris, construction debris, vector issues"

The City, through its agents, employees, officials, departments and contractors, was aware that the Ghost Ship was being used as a cabaret, for unpermitted business purposes and unlawful residences for numerous inhabitants, including children, and was a public nuisance. The City was aware of numerous violations of State and local statutes, ordinances and codes, including but not limited to: The California Health and Safety Code, The California Building Code, The California Fire Code, The California Electrical Code, The California Mechanical Code, The California Code of Regulations, The California Administrative Code and Oakland Municipal Codes (hereinafter collectively referred to as "Laws"). These Laws created mandatory duties for The City, its employees, agents, officials, departments and contractors to undertake affirmative actions to make the premises safe or shut it down. Said mandatory duties were obligatory and not discretionary or permissive and included, but were not limited to, requirements to investigate buildings and structures and enforce the applicable Laws to protect against the particular kind of injury that was suffered by Claimant.

The Ghost Ship had an open, obvious and known history of having public events and parties inside, outside and on the roof top, and charging an entrance fee to the events.

The nearest fire station was very close to the Ghost Ship. Employees, agents and/or representatives of the OFD attended and held a music event at the Ghost Ship before December 2, 2016.

It is undeniable that the OPD knew, for many years, that an illegal cabaret/rave was being held, and that alcohol was being sold illegally, yet they did nothing to shut it down. There were numerous complaints of excessive noise and debris made to the OPD when events were occurring. On numerous occasions, OPD had been inside and seen the substandard conditions and fire hazards firsthand.

The City, despite its employees' knowledge of these dangers claims that OPD had no responsibility to either take action to protect the occupants or to report the same to other agencies and employees within The City (OFD and/or the OBPD.) Mayor Schaff's office stated it isn't the job of police to enforce building codes. "In the instances where officers visited the warehouse … they were on site to deal specifically with the rave and potentially dangerous activities." Police Union President Barry Donelan said cops "are not the code enforcement guys, we are the police, we deal with the immediate problem. The questions for me aren't in the police department; they are elsewhere in the city." This bureaucratic passing of the buck flies in the face of the established law of agency (California Civil Code Section 2295 et. seq.). Each employee of The City, whether they be with OPD, OFD or OBPD is an agent (employee) of The City who is their principal (employer). The City was deemed to have notice of whatever

4

their agents knew and was obliged, under law, in good faith and the exercise of ordinary care and diligence, to have its agents and departments communicate among themselves.  (California Civil Code Section 2332.)

> **B.**    **Applicable Laws Placed Mandatory Duties on The City to Identify and Remedy Dangerous Conditions**
>
> > **1.**    **Oakland's Commercial Inspection Program Mandated Yearly Inspections**

Up and through the date of the fatal fire on December 2, 2016, The City's official website, <u>Oakland Fire Department Inspection Services</u> represented the following:

**Commercial Inspections**

"**The Commercial Inspection Program** *mandates* **that** *annual inspections* **of all commercial facilities and multi-family residences (apartments, hotels, motels, etc.) be conducted as designated by the State of California Health and Safety Code, and City of Oakland ordinance.** These annual field inspections, that are managed and directed by the Fire Prevention Bureau, are conducted by the members of the OFD Operations Division **annually . . .**" https://web.archive.org/web/20161106233449/http://www2.oaklandnet.com/government/o/ OFD/s/Inspections/index.htm (emphasis added.)

The City enacted a program which mandated that the OFD take affirmative action to inspect all commercial facilities and multi-family residences.  The public was expressly informed that commercial buildings, including the Ghost Ship, were annually inspected and, therefore, safe.

> > **2.**    **The Following Laws Set Forth The City's Mandatory Duties to Protect Against the Particular Kind of Injury that Was Suffered by Claimant**

> > > **a.**    **The City, by Ordinance, Adopted the Following Statewide Codes**

**California Building Code.**  The International Building Code as amended and adopted by the State of California and is another name for the body of regulations known as the California Code of Regulations (C.C.R.), Title 24, Part 2; a portion of the "California Building Standards Code," as defined in the "California Building Standards Law" commencing with Section 18901 of the Health and Safety Code.

**California Electric Code.**  The National Electric Code as amended and adopted by the State of California and is another name for the body of regulations known as the California Code of

5

Regulations (C.C.R.), Title 24, Part 3; a portion of the "California Building Standards Code," as defined in the "California Building Standards Law" commencing with Section 18901 of the Health and Safety Code.

**California Mechanical Code.** The Uniform Mechanical Code as amended and adopted by the State of California and is another name for the body of regulations known as the California Code of Regulations (C.C.R.), Title 24, Part 4; a portion of the "California Building Standards Code," as defined in the "California Building Standards Law" commencing with Section 18901 of the Health and Safety Code.

**California Plumbing Code.** The Uniform Plumbing Code as amended and adopted by the State of California and is another name for the body of regulations known as the California Code of Regulations (C.C.R.), Title 24, Part 5; a portion of the "California Building Standards Code," as defined in the "California Building Standards Law" commencing with Section 18901 of the Health and Safety Code.

**California Residential Code.** The International Residential Building Code as amended and adopted by the State of California and is another name for the body of regulations known as the California Code of Regulations (C.C.R.), Title 24, Part 2.5; a portion of the "California Building Standards Code," as defined in the "California Building Standards Law" commencing with Section 18901 of the Health and Safety Code 4.075.

### b. The City's Municipal Code Created Numerous Mandatory Duties

- **The Ghost Ship was known by The City to be operating an illegal cabaret and the OPD had a duty to report all new businesses to the Chief of Police.**

**5.12.010 – Definitions.** Cabaret "shall be construed to include any place where the general public is admitted, for a fee, entertainment is provided, and alcohol is served. A place that does not charge for admission but where the general public is admitted, alcohol is served, dancing is permitted, and the venue operates past 11:00 p.m. shall also be construed as a cabaret. A business that conducts cabaret activity shall be allowed to conduct such activity under the following conditions:
(a) The business applies for and is approved by the City Administrator for the cabaret permit;
(b) The business maintains the permit by paying the annual fee;
(c) **The business successfully completes an annual inspection by the Fire Department;**
(d) The business does not create a public nuisance, adversely affect the health, safety, and general welfare of the public, or negatively impact City resources. . . ." (emphasis added.)

6

**5.70.020 – Police Officers have a mandatory duty to report all new businesses** on their beats to the Chief of Police including, but not limited to, the license number, date of opening, nature of business, owners name etc.

There was no Cabaret License for APN 25-690-11: OPD knew about the danger, but took no enforcement action and failed to report it to the OFD or OBPD.

- **The Ghost Ship did not have adequate security pursuant to 8.04.030, 8.04.050, 8.04.110 and 8.04.160 (Commercial Building Security Enforcement).**

- **Chapter 15.08 (Oakland Building Maintenance Code) establishes what constitutes a "substandard condition" and mandates affirmative action to protect life and safety:**

**15.08.020 – Purpose.**  The purpose of this Code is to **provide *minimum standards* to safeguard life or limb, health, property, and public welfare** by regulations and controlling the use and occupancy, locations, and maintenance of all residential and non-residential buildings, structures, portions thereof, and real property within the City of Oakland.  (emphasis added.)

**15.08.090 – Substandard and public nuisance buildings and real property.**  Buildings, structures, portions thereof, and real property that are determined to be substandard as defined in Article X of this Code are hereby declared to Public Nuisances and **shall have the Certificate of Occupancy revoked and shall be abated either by repair and rehabilitation or demolition and may be ordered vacated** in accordance with the procedure specified in Article XI of this Code.  (emphasis added.)

**15.08.120 – General.**  No building or structure regulated by this Code shall be erected, constructed, enlarged, altered, repaired, moved, improved, removed, converted, or demolished unless separate permits for each building or structure have first been obtained from the Building Official in the manner and according to the applicable conditions prescribed in the Oakland Building Construction Code and the Oakland Planning Code.

**Article X - Substandard and Public Nuisance Buildings**

**15.08.340:**

**(A) General.**  Any residential or non-residential building, structure, or portion thereof which is determined to be an Unsafe in accordance with the Oakland Building Construction Code; or any residential or non-residential building, structure or portion thereof, including but not limited to any dwelling unit, guest room or suite of rooms, commercial office or retail sales space, classroom or associated locker room or toilet room, assembly space, or any real property in which there exists any of the conditions referenced in this Section to an extent that is Unsafe to

7

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Exhibit 4
132 of 251
Page 132 of 251

the life, limb, health, property, safety or welfare of the public or the occupants thereof **shall be deemed and hereby is declared to be Substandard and a Public Nuisance.** (emphasis added.)
**(B) Inadequate Sanitation.** Residential and non-residential buildings, structures, or portions **thereof shall be deemed Substandard and a Public Nuisance** when they are unsanitary. (emphasis added.)

**(C) Structural Hazards.** Residential and non-residential buildings or structures or portions **thereof shall be deemed Substandard and a Public Nuisance** when they are or contain structural hazard and deemed Substandard and a Public Nuisance when they are or contain structural hazards. (emphasis added.)

**(E) Hazardous Electrical Wiring and Equipment.** Electrical wiring and equipment which was installed in violation of code requirements in effect at the time of installation or electrical wiring and equipment not installed in accordance with generally accepted construction practices in area where no codes were in effect or which has not been maintained in good conditions or which is not being used in a safe manner **shall be considered Substandard and a Public Nuisance.** (emphasis added.)

**(G) Hazardous Mechanical Equipment. Mechanical equipment which was installed in violation of code requirements** in effect at the time of installation or mechanical equipment not installed in accordance with generally accepted construction practices in areas where no codes were in effect, or which has not been maintained in good and safe condition, **shall be considered Substandard and a Public Nuisance**. (emphasis added.)

**(I) Fire Hazard. Any residential or non-residential building, structure, or portion thereof, device, apparatus, equipment,** combustible waste or vegetation which, is in such a condition as to cause a fire or explosion or provide a ready fuel to augment the spread and intensity of fire or explosion arising from any cause **shall be considered a Substandard and a Public Nuisance**. (emphasis added.)

**(J) Faulty Materials of Construction. The use of materials of construction, except those which are specifically allowed or approved by this Code** and the Oakland Building Construction Code, and which have been adequately maintained in good and safe condition, **shall cause a residential or non-residential building or structure to be Substandard and a Public Nuisance**. (emphasis added.)

**(K) Hazardous or Unsanitary Premises**. The accumulation of weeds, vegetation, junk, dead organic matter, debris, garbage, offal, rat harborages, stagnant water, combustible materials, surface or subsurface toxic substances, storage or use of chemicals, gas, oil or toxic or flammable liquids, and similar materials or conditions on a premises constitutes fire, health or safety hazards which **shall be abated in accordance with the procedure specified in Section 15.08.350 of this Code**. (emphasis added.)

8

**(L) Inadequate Exits.** Except for those buildings or structures or portions thereof which have been provided with adequate exit facilities conforming to the provisions of this Code, residential and non-residential buildings or structures or portions thereof whose existing facilities where installed in violation of code requirements in effect at the time of their construction or whose exit facilities have not been increased in number or width in relation to any increase in occupant load due to alterations, additions or change in use or occupancy subsequent to the time of construction **shall be considered Substandard and a Public Nuisance.** (emphasis added.)

Notwithstanding compliance with code requirements in effect at the time their construction, residential and non-residential buildings or structures or portions thereof shall be considered Substandard and a Public Nuisance when the Building Official finds that an unsafe condition exists through an improper location of or length of travel to required exits, or a lack of an adequate number or width of required exits, or when other conditions exist which are dangerous to human life including, but not limited to, lack of or unapproved or improperly installed or improperly maintained illumination of required exits, directional signage to required exits, door and window release and security devises, and other obstructions to or within the exiting path of travel or emergency escape.

**(M) Inadequate Fire-Protection or Firefighting Equipment.** Residential and non-residential buildings or structures or portions thereof **shall be considered Substandard and a Public Nuisance** when they are not provided with the fire-resistive construction or fire-extinguishing systems or equipment required by this Code, except those buildings or structures or portions thereof which conformed with all applicable laws at the time of their construction and whose fire-resistive integrity and fire-extinguishing systems or equipment have been adequately maintained and improved in relation to any increase in occupant load, alteration or addition, or any change in occupancy. (emphasis added.)

**(N) Improper Occupancy.** All residential and non-residential buildings or structures or portions thereof which were not designed or intended to be used or approved for their current occupancies **shall be considered Substandard and a Public Nuisance.** (emphasis added.)
**Article XI – Declaration of Public Nuisance—Substandard: Mandatory Action by the OBPD Is Required.**

**15.08.350 – Commencement of Proceedings.** When the Building Official has inspected or caused to be inspected residential or non-residential buildings or structures or portions thereof and has found and determined that such buildings or structures or portions thereof are substandard and a public nuisance, the **Building Official shall commence proceedings to cause the vacation and either the repair and rehabilitation or demolition of the building or structure or portion thereof.** (emphasis added.)

**15.08.370 – Repair and rehabilitation or demolition:**
A. Any building or structure declared substandard and a public nuisance under this Code **shall be made to comply** with one of the following:

9

1. The building or structure shall be repaired and rehabilitated in accordance with the current edition of the Oakland Building Construction Code and other current codes applicable to the type of substandard conditions requiring repair; or
**2. The building or structure shall be demolished.**  (emphasis added.)

**15.08.380 – Order to vacate:**

**B. Dangerous Building or Structure:** Whenever a building or structure declared substandard and a public nuisance under this Code is in such unsafe condition as to make it dangerous either to life and limb of the occupants or to private or public property or to health or safety of the public, <u>it shall be ordered to be vacated and secured and maintained against unauthorized entry.</u>  (emphasis added.)

**15.12.010 – 2013 California Fire Code is Adopted and Amended:**

A. The 2013 California Fire Code, including referenced National Fire Protection Association Standards and other standards as adopted by the California State Fire Marshal, is hereby adopted and made a part of this chapter as though fully set forth herein, subject to the modifications thereto set forth in this chapter.

B. This chapter shall be known as the "Oakland Fire Code" and shall be referred to in this chapter as "this chapter," "this Code" or "the Oakland Fire Code."

**Amend 101.2.2 – General Provision.**  Failure to comply with any of the provisions of this Code, including failure to provide, obtain or maintain valid permits, certifications, tests, listings, affixed labeling, inspection approvals, or other conditions of permit; failure to repair, demolish, remove, or rehabilitate unsafe materials, appliances, fixtures, equipment or other property; or failure to prevent, restrain, correct, or abate conditions unsafe or hazardous for egress or fire protection or health due to inadequate maintenance, excess loading, dilapidation, or abandonment **shall be and is declared to be prima facie evidence of an existing and continuing hazard to life or limb, property or public welfare.**  (emphasis added.)

**Amend 109.1 – Unlawful acts.**  It shall be unlawful for a person, firm or corporation to erect, construct, alter, repair, remove, demolish or utilize a building, occupancy, premise(s), or system regulated by this code, or cause a public nuisance, potential fire or health hazard, or cause same to be done, in conflict with or in violation of any of the provisions of this code.

**Add 109.1.2 – Blight or Hazardous Condition.**  Any commercially or residentially zoned parcel, lot or premise on which flammable materials as defined by this Code are openly stored or abandoned, causing blight or hazardous conditions, so as to constitute a potential fire or health hazard **shall constitute a public nuisance and shall be ordered cleaned** by the issuance of an Administrative Citation to the property owner in accordance with Section 106.1 of this Code.

10

**Amend 109.4.1 – Powers To Abate.** The Fire Chief is authorized to abate a fire or life hazard when necessary to protect life or property. This may include, but is not limited to, confiscation of flammable liquids, fireworks, the removal of hazardous electrical wiring, temporary closure of commercial occupancies, extinguishing unsafe or illegal fires and any other similar hazards, determining no smoking areas, and ceasing operation of any type apparatus that poses an imminent danger to property or life.

**Add 115.2 – Fire Hazard.** Any residential or non-residential building or structure or portion thereof, device, apparatus, equipment, combustible waste or vegetation which, in the opinion of the Fire code official, is in such a condition as to cause a fire or explosion or provide a ready fuel to augment the spread and intensity of fire or explosion arising from any cause **shall be considered Substandard and a Public Nuisance.** (emphasis added.)

**Add 115.3 – Faulty Materials of Construction.** The use of materials of construction, except those which are specifically allowed or approved by this Code and the Oakland Building Code, and which have not been adequately maintained in good and safe condition, **shall cause a residential or non-residential building or structure to be Substandard and a Public Nuisance.** (emphasis added.)

**Add 115.4 – Inadequate Exits.** Except for those buildings or structures or portions thereof which have been provided with adequate exit facilities conforming to the provisions of this Code, residential and non-residential buildings or structures or portions thereof whose existing facilities where installed in violation of code requirements in effect at the time of their construction or whose exit facilities have not been increased in number or width in relation to any increase in occupant load due to alterations, additions or change in use or occupancy subsequent to the time of construction **shall be considered Substandard and a Public Nuisance.** (emphasis added.)

**Add 115.5 – Inadequate Fire Protection or Firefighting Equipment.** Residential and non-residential buildings or structures or portions thereof shall **be considered Substandard and a Public Nuisance when they are not provided with the fire-resistive construction or fire-extinguishing systems or equipment** required by this Code. (emphasis added.)

**Add Section 116 – Declaration of Public Nuisance—Substandard:**
Any violations of the Oakland Fire Code deemed to be substandard and a public nuisance by the Fire code official or Building Official **shall be subject to the enforcement and other proceedings set forth in the Oakland Building Code, Oakland Municipal Code Chapter 15.08.** (emphasis added.)


///
///
///

11

- **The California Health and Safety Code Defines "Substandard Building Conditions"**

Health and Safety Code Section 17920.3 defines substandard conditions to be, including but not limited to:

    -Inadequate sanitation lavatory, or bathtub or shower in a dwelling unit;
    -General dilapidation or improper maintenance;
    -Structural hazards;
    -All wiring, except that which conformed with all applicable laws in effect at the time of installation if it is currently in good and safe condition and working properly;
    -All materials of construction, except those that are specifically allowed or approved by this Code and that have been adequately maintained in good and safe condition;
    -All buildings or portions thereof not provided with adequate exit facilities;
    -All buildings or portions thereof that are not provided with the fire-resistive construction or fire-extinguishing systems or equipment required;
    -All buildings or portions thereof occupied for living, sleeping, cooking, or dining purposes that were not designed or intended to be used for those occupancies.

3. **The California Health and Safety Code and Administrative Code Sections 24 & 25, Require that The City, Its Agents and Employees, Including, But Not Limited to the OFD, OPD and OPBD, Enforce the State Building Standards Code**

**Health and Safety Code Section 13145: Enforcement of building standards and regulations.** The State Fire Marshal, **the chief of any city**, county, or city and county fire department or district providing fire protection services, or a Designated Campus Fire Marshal, and their authorized representatives, **shall enforce in their respective areas building standards relating to fire and panic safety adopted by the State Fire Marshal and published in the California Building Standards Code** and other regulations that have been formally adopted by the State Fire Marshal **for the prevention of fire or for the protection of life and property against fire or panic**. (emphasis added.)

**25 CCR § 54 Nuisances — Notices.** Whenever any building or portion thereof, has become substandard as described in Section 17920.3 or is a building as described in 17920.10, of the Health and Safety Code, and when determined to be a nuisance as defined in Section 17920 of the Health and Safety Code by the enforcement agency, the following shall apply:

The enforcement agency **shall notify the owner** of the building and any mortgagee or beneficiary under any deed of trust, of record, as follows. The notice shall state the conditions causing the building to become substandard or in violation of Section 17920.10 of the Health and Safety Code, **and shall order the building, or portion thereof, vacated and shall institute**

12

proceedings for the correction or abatement thereof, either by demolition, closing or repair, within 30 days after the date of the notice. (emphasis added.)

> ### 4. State Law Imposes a Mandatory Duty upon The City to Protect Against Danger from Fire

- **Health and Safety Code Section 13146 Imposes a Mandatory Duty upon The City to Protect Against Danger from Fire**

**§ 13146: The responsibility for enforcement of building standards** adopted by the State Fire Marshal and published in the California Building Standards Code relating to fire and panic safety and other regulations of the State Fire Marshal **shall be as follows:**

> (a) The city, county, or city and county with jurisdiction in the area affected by the standard or regulation shall delegate the enforcement of the building standards relating to fire and panic safety and other regulations of the State Fire Marshal as they relate to R-3 dwellings, as described in Section 310.5 of Part 2 of the California Building Standards Code, to either of the following:
> (1) **The chief of the fire authority of the city**, county, or city and county, or his or her authorized representative.
> (2) **The chief building official of the city**, county, or city and county, or his or her authorized representative.
> (b) **The chief of any city**, county, or city and county **fire department** or of any fire protection district, and their authorized representatives, **shall enforce within its jurisdiction the building standards and other regulations of the State Fire Marshal**. (emphasis added.)

- **The California Fire Code (CFC) Imposes a Mandatory Duty upon The City to Safeguard the Public Health and General Welfare Against Danger from Fire**

**§ 1.1.2 – The Purpose of this code is to establish the minimum requirements to safeguard the public health and general welfare** through structural strength, means of egress facilities. . . safety to life and property from fire and other hazards attributed to the built environment. . . . (emphasis added.)

**§ 1.8.3.1 – Duties and Powers. The *building department* of every city, county, or city and county shall enforce all provisions of this this Code [CBC/CBSC].** (emphasis added.)

**§ 1.11.2.1.1 – Enforcement. The responsibility for enforcement of building standards adopted by the State Fire Marshal** and published in the California Building Standards Code relating to fire and panic safety **is as follows:**

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Exhibit 4
Page 138 of 251

1.  The City, County, or city and county with jurisdiction in the area affected by the standard or regulation by either of the following:
    **1.1 The chief of the fire authority**. . .
    **1.2 The chief building official of the city**. . . .(emphasis added.)

**§ 1.12 – Enforcement Agency** [California Code of Regulations, Title 19, Division 1, § 3.12 - Enforcement Agency]:

(a) The provisions of these regulations, California Code of Regulations Title 19, Division 1, **shall be enforced by** the State Fire Marshal, **the chief of any city or county fire** department or fire protection district, and their authorized representatives, in their respective areas of jurisdiction.

(b) The division of authority for the enforcement of these regulations shall be in accordance with the following:

**(1) The chief of any city or county fire department** or fire protection district, and their authorized representatives **shall enforce the rules and regulations in t**heir **respective areas**. (emphasis added.)

**§ 3.07 – Clearances.** (a) General. No combustible material shall be placed or stored within 10 feet of any building or structure.

**§ 3.11 – Exits, Aisles, Ramps, Corridors and Passageways**:

(a) **No person shall install, place or permit the installation or placement of any bed, chair, equipment, concession, turnstile, ticket office or anything whatsoever, in any manner which would block or obstruct the required width of any exit. (b) No person shall install, place or permit the installation or placement of any combustible material or equipment in or exposed to any exit.** Exceptions:

(1) Furniture or equipment constructed of wood or other material of similar combustibility may be permitted in an exit or exposed to an exit when approved by the enforcing agency.

(2) When approved by the enforcing agency, combustible materials may be permitted in exit foyers and lobbies.

(3) No person shall install, place or permit the installation or placement of any storage material of any kind in any exit regardless of the required width of such exit. (emphasis added.)

**§ 3.14 – Fire Hazard.** No person, including but not limited to the State and its political subdivisions, operating any occupancy subject to these regulations shall permit any fire hazard, as defined in this article, to exist on premises under their control, or fail to take immediate action to abate a fire hazard when requested to do so by the enforcing agency. Note: "Fire Hazard" as used in these regulations means any condition, arrangement, or act which will increase, or may cause an increase of, the hazard or menace of fire to a greater degree than customarily recognized as normal by persons in the public service of preventing, suppressing or extinguishing fire; or which may obstruct, delay, or hinder, or may become the cause of obstruction, delay or hindrance to the prevention, suppression, or extinguishment of fire.

14

**§ 104.3 – Right of entry.** Whenever it is necessary to make an inspection to enforce the provisions of this code, or whenever the fire code official has reasonable cause to believe that there exists in a building or upon any premises any conditions or violations of this code which make the building or premises unsafe, dangerous or hazardous, the fire code official shall have the authority to enter the building or premises at all reasonable times to inspect or to perform the duties imposed upon the fire code official by this code. . . .

**Section 110 – Unsafe Buildings**

**§ 110.1 – General.** If during the inspection of a premises, **a building or structure, or any building system, in whole or in part, constitutes a clear and inimical threat to human life, safety or health, the fire code official shall issue such notice** or orders to remove or remedy the conditions as shall be deemed necessary in accordance with this section, **and shall refer the building to the building department** for any repairs, alterations, remodeling, removing or demolition required. (emphasis added.)

**§ 110.1.1 – Unsafe conditions.** Structures or existing equipment that are or hereafter become unsafe or deficient because **of inadequate means of egress or which constitute** a **fire hazard**, or are otherwise dangerous to human life or the public welfare, **or which involve illegal or improper occupancy or inadequate maintenance, shall be deemed an unsafe condition.** (emphasis added.)

**§ 110.1.2 – Structural hazards.** When an apparent structural hazard is caused by the faulty installation, operation or malfunction of any of the items or devices governed by this code, **the fire code official shall immediately notify the building code official** in accordance with Section 110.1. (emphasis added.)

**§ 110.2 – Evacuation.** The fire code official or the fire department official in charge of an incident shall be authorized to order immediate evacuation of any occupied building deemed unsafe where such building has hazardous conditions that present imminent danger to building occupants.

**§ 110.3 – Summary abatement.** Where conditions exist that are deemed hazardous to life and property, the fire code official or fire department official in charge of the incident is authorized to abate summarily such hazardous conditions that are in violation of this code.

**Section 605 – Electrical Equipment, Wiring and Hazards:**

**605.1 – Abatement of electrical hazards. Identified electrical hazards shall be abated. Identified hazardous electrical conditions in permanent wiring shall be brought to the attention of the responsible code official.** Electrical wiring, devices, appliances and other equipment that is modified or damaged and constitutes an electrical shock or fire hazard shall not be used. (emphasis added.)

15

**Electrical hazards include:**

>    605.4 Multiplug adapters
>
>    605.5 Extension cords.
>
>    605.10 Portable electric space heaters.

**Chapter 7 Fire-Resistance-Rated Construction**

**701.2 – Unsafe conditions.** Where any components in this chapter are not maintained and do not function intended or do not have the fire resistance required by the code under which the building was constructed, remodeled or altered, such component(s) or portion thereof shall be deemed an unsafe condition, in accordance with Section 110.1.1. Components or portions thereof determined to be unsafe shall be repaired or replaced to conform to that code under which the building was constructed, remodeled, altered or this chapter, as deemed appropriate by the fire code official. **Where the extent of the conditions of components is such that any building, structure or portion thereof presents an imminent danger to** the **occupants of** the **building, structure or portion thereof, the fire code official shall act in accordance with Section 110.2 [evacuation].** (emphasis added.)

- **The City and Its Fire Chief Had a Mandatory Duty to Enforce Fire Safety Standards**

**Health and Safety Code § 13145 — Enforcement of building standards and regulations:** The State Fire Marshal**, the chief of any city,** county, or city and county fire department or district providing fire protection services, or a Designated Campus Fire Marshal, and their authorized representatives, **shall enforce** in their respective areas **building standards relating to fire and panic** safety adopted by the State Fire Marshal and published in the California Building Standards Code and other regulations that have been formally adopted by the State Fire Marshal for the prevention of fire or for the protection of life and property against fire or panic. (emphasis added.)

**Various Attorney General opinions confirm the mandatory duty of the fire marshal and the local fire department chief:**

**Health and Safety Code § 13145 and § 13146 provide mandatory direction to fire marshal to enforce rules and regulations** he promulgates under authority vested in § 13143. (20 Ops.Atty.Gen. 31.)

**Health and Safety Code § 13145 imposes a positive statutory duty** (cf. 67 Ops.Cal.Atty.Gen. 331, 332-333 (1984)), upon both the State Fire Marshal and "the chief of any...district providing fire protection services" **to enforce the former's building standards and other regulations relating to fire and panic safety. (Health & Saf. Code, § 16 ["shall" is mandatory];** People v.

16

McGee (1977) 19 Cal.3d 948, 958-959; 20 Ops.Cal.Atty.Gen. 31, 36-37; 7 Ops.Cal.Atty.Gen. 274, 279-280.)

Health and Safety Code Section § 13146.5 provides that the foregoing provisions,…of Sections 13145, 13146 and 13146.3 shall so far as practicable, be carried out at the local level by persons who are regular full-time members of a regularly organized fire department of a city, county, or district providing fire protection services, and shall not be carried out by other persons pursuant to Section 34004 of the Government Code.

- **The California Building Standards Commission's California Building Standards Code (CCR Title 24) Imposes Mandatory Duties on The City to Prevent Injury and Death and to Enforce the California Building Code**

Duty of investigator when she/he determines there is an unsafe condition, includes:

California Building Code - Title 24, Part 10

**Section 1.1.2 – Power.** The purpose of this code is to establish the minimum requirements to safeguard the public heath, safety and general welfare through structural strength, means of egress facilities, stability. . . safety to life and property from fire and other hazards attributed to the built environment. . . .

**Section 1.8.3 – Local Enforcing Agency. The Building department of every city, county, and council shall enforce all of the provisions of law, this code,** and all other rules and regulations promulgated by the Department of Housing and Community Development . . . . (emphasis added.)

**Section – 104 Duties and Powers of Code Official 104.1.** The code official is hereby authorized and directed to enforce the provisions of this code.
**104.4 – Inspections.** The code official shall make the required inspections . . .

The code official in Oakland is the Oakland Planning and Building Department (OPBD), including but not limited to Building Permits, Inspections and Code Enforcement Services.

## 5.    The City Failed to Comply with Mandatory Child Abuse and Neglect Reporting Requirements

The City, through the OFD and OPD, knew that the lessees and property managers, Derick Almena and Micah Allison, were illegally living in the dangerous and unsafe Ghost Ship with their three minor children. Employees and/or agents of the OFD and OPD, who are mandatory reporters under Cal. Penal Code Section 11165.7, however, failed to comply with their mandatory child abuse and neglect reporting requirements under Cal. Penal Code Section 11166(a), which specifically provides that a report must be made when the mandated reporter

17

"has knowledge of or observes a child" whom the reporter "knows or reasonably suspects has been the victim of child abuse or neglect." Such report shall be made to the Alameda County Social Services Agency immediately by telephone. A written report shall be filed within 36 hours documenting the information. These reporting requirements are mandatory, and the failure to report constitutes the breach of mandatory duty by a government agency. *See B.H. v. County of San Bernardino* (2015) 62 Cal.4th 168. *See also* Penal Code Sections 11166.05; 11165.2; 11165.3; 11165.4; 11165.6; 11165.9.

> 6.     The Facts Show that The City knew, in the Exercise of Their Mandatory Duties, of the Unsafe, Substandard, Hazardous Conditions, and Failed to act as Mandated by Laws to Abate Them

**OFD** fail**ed to execute its mandatory annual inspection program which would have identified the substandard and hazardous conditions.** As stated *supra,* OFD stated, on its own website, under the Inspection page that it had an annual Commercial Inspection Program. The Program and the representations to the public regarding the program created a special duty to inspect commercial structures including APNs 25-690-10 & 11. The City breached this duty to conduct an annual mandatory annual inspection program. Furthermore, the City, knowing of the fact that APN 25-690-11 was being used as an unlicensed, unpermitted, cabaret and had not been inspected in 30 years, owed a duty to the public to advise them that, contrary to their public assertions, no inspection for safety had been undertaken.

The failure of OFD's Commercial Inspection Program has been established as a matter of law. The Oakland Civil Grand Jury, in its June 23, 2014, Grand Jury Final Report found that OFD was in breach of its requirement to inspect all commercial activities. Grand Jury's findings were succinctly stated:

> **Finding 14-24:** The city of Oakland's website states that the commercial inspection program mandates annual inspections of all commercial facilities. **This provides the public with the false impression that all commercial businesses are inspected annually.** The Grand Jury learned that **approximately 4,000 (out of approximately 11,000) go un-inspected each year**. (emphasis added.)

On September 24, 2014, Mayor Jean Quan responded to the Grand Jury Report *and agreed with the finding*. She then tried to rationalize the failure and misrepresentation claiming economic difficulties led to the "browning out" of two fire stations in 2012 and 2013. Prior to Mayor Quan's response, more than two years before the deadly Ghost Ship fire, OFD had returned to a full complement of fire stations and, therefore, had no excuse for not inspecting this facility. The City responded to the Grand Jury's finding of misleading the public by stating "The OFD website requires an overhaul. The OFD will work with Information Department Technology Department and the Communications Unit of the City Administrator's office making sure the Citizens of Oakland are able to get the correct information needed regarding the FPB."

18

This was just political rhetoric. The City made no effort to correct the false promise so the public continued to reasonably believe that structures, including the Ghost Ship, had been inspected and found safe. After 36 people died on December 2nd, The City shamelessly rushed to change its website.

**OFD's failure to conduct mandatory annual inspections caused it to breach its mandatory duty to institute mandatory procedures under section 15.08.020 of the Oakland Building Maintenance Code for abatement by repair and rehabilitation or by demolition and vacation**. This is demonstrated by the fact that when the City entered the Ghost Ship after the fire, it made determinations on December 22, 2016 of statutorily defined substandard conditions under section 15.08.340, subds. (C)(Structural Hazards), (D)(Nuisance), (E)(Hazardous Electrical Wiring), and (F)(Hazardous Plumbing) that it did not have the discretion to ignore. These findings imposed a mandatory duty under 15.08.020 to institute abatement procedures of the substandard conditions by repair and rehabilitation or by demolition and vacation. The City's failure to conduct mandatory annual inspections resulted in its failure to institute mandatory abatement, rehabilitation or demolition and vacation orders that would have prevented the deaths of 36 people and catastrophic injury to at least one survivor.

**When OFD was in the structure, it knew of the dangerous/substandard conditions and breached its duty to abate them.** OFD was present, inside the Ghost Ship and the other contiguous buildings and was aware that there was an illegal occupancy and unpermitted businesses riddled with unsafe, unsanitary, hazardous and substandard conditions. As far back as August of 2005, OFD and reported/recorded that the "Property Use" was a "1-2 family dwelling." In April 2014, the City was informed of large structures inside the property that were not strapped down or stable. In October2014, the City received notice of structural construction without permits at the property. In September 2015, OFD was again present inside the Ghost Ship and reported/recorded that the "Property Use **was a** 1-2 family dwelling." And, in November 2016, the City was on notice that the property had been converted to a residence. Clearly, this was an unauthorized and illegal occupancy: OFD/The City knew about it and failed to exercise their mandatory duty to abate the danger.

**OFD, when in the building, ignored statutorily defined substandard conditions and fire hazards.** OFD inspected parts of the "Single Economic Business Unit" on the following occasions: 1-12-2010; 3-15-2010; 7-11-2011; 2-19-12; 1-10-2012; 1-10-2012; 3-7-12; 2-19-16; and 3-2-16. In several of these inspections the conditions were "non-compliant" and the facility failed two or more times. Conditions which, by law, made the facilities substandard, hazardous and dangerous were open and obvious. For example, in APN 25-690-10, another unlawful housing unit had been created with illegal and unsafe electrical wiring. This was connected to the same electrical panel the Ghost Ship was connected to. The mechanical room at in APN 25-690-09 contained conditions which, by law, were dangerous and a threat to human life and safety.

A reasonable and diligent City employee, fulfilling mandatory duties pursuant to statute, code, regulation, enactment or ordinance, should have recognized that the electrical services were

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Exhibit 4
144 of 251
Page 144 of 251

traversing boundary walls of APN 25-690-9, 10 & 11 in a hazardous and substandard manner and should have abated them as required by Law. Despite knowledge of these conditions, OFD failed not only to take any action in abatement; it breached its mandatory duty to refer the building to the Building Department or Code official. This conduct was inadequate, unreasonable, lacking in diligence and therefore negligent/negligent per se.

**OFD and OPD failed to meet their statutory duties to report child abuse and neglect.** Knowing of the unsafe and hazardous conditions to children living in the Ghost Ship, which amount to abuse and neglect, breached their mandatory duty to report to the conditions to the Alameda County Social Services Agency.

**OPD failed to meet its statutory duty to advise OBDP of the conditions.** The OPD, knowing of an unlawful business use/retail establishment, unlawful residence and underground cabaret venue which was illegally selling and furnishing alcohol, breached their mandatory duty to report the unlawful activity to the Chief of the OPD, the OFD and/or the OBPD.

**OBPD, when in the building, ignored statutorily defined substandard conditions and fire hazards.** Claimant is informed and believes that the OBPD was in APNs 25-690-10 & 11 on one or more occasions when there was an unlawful living unit, with out-of-code wiring, inadequate emergency signage, inadequate/blocked exits, inadequate fire protection equipment, structural hazards, faulty materials and construction, and improperly placed combustible materials. The OBPD failed to meet its mandatory duty to be reasonably diligent to examining the conditions of the building to identify, locate and abate hazardous and substandard conditions. Had they done so they would have clearly been aware of the unlawful residential occupancy, the electrical panel which had been "hacked into" with only 2 breakers providing electricity for the entire Ghost Ship/Satya Yuga, unsafe and structurally unsound perforations in the joint wall of APD 25-690-10 & 11 including the conduit encasing the power as well as a doorway sized hole on the second floor which was used by inhabitants of the Ghost Ship to access bathrooms in 25-690-10.

Attached to the panel in which the "Satya Yuga" breakers resided, was an unsafe out-of-code transformer. It should have been apparent to even a careless, negligent, OBPD or OFD official that the breakers, panel and transformer had been constructed without permits and were inappropriate for their intended purpose and were, therefore, hazardous, substandard conditions presenting an imminent risk of fire and danger to life, health and safety.

The City/OBPD, did identify and record unlawful and deadly conditions in APN25-690-11, including but not limited to those enumerated in in the Laws referenced above. These conditions included violations which created a threat to life from fire including, but not limited to, an unlawful conversion to residential use, unpermitted businesses, improper fuel conditions which created a risk of fire, improper smoke detectors and/or unsafe bedroom security bars, and blocked exits. Likewise, The City/OBPD was informed of those same unlawful conditions by members of the public including clear and unambiguous notice that APN 25-690-11 had unlawfully been converted to residential use and that the conditions therein were hazardous to

20

life and safety. The City failed to exercise their statutory obligations to further evaluate, identify remedy, abate, or make safe the structures although it had the legal authority to enter, repair, order the buildings vacated and even have them torn down.

**The City, OPD, OFD and OPBD breached their mandatory duties.** The City knew or should have known that the Ghost Ship APN 11-690-11 and Parcels 11-690-9 & 10 were rife with violations which triggered a mandatory duty to act and abate, which they failed to do. The City, through the OFD, OBPD and OPD, and other agents, employees and contractors of The City were present at the Ghost Ship on numerous occasions, including emergency calls for service for other fires, medical emergencies, claims of people being falsely imprisoned, etc. The City also took, and received from others, photographic evidence (even some provided by the owner's representative) showing the existence of substandard conditions in and around the Ghost Ship. These photos, some taken by OBPD employees demonstrate that The City had actual knowledge of the dangerous conditions, including those on the sidewalk, with sufficient time to have acted to prevent this tragedy.

The City should have acted immediately to abate conditions which posed an imminent, hazard to life, limb and public welfare by declaring the property substandard, unsafe, unsanitary, a public nuisance and unfit for habitation or operation. As has been confirmed by this tragedy, it posed a serious, imminent, hazard to life, limb and public welfare. The City had a mandatory duty to order the conditions immediately abated and that the building to be vacated and secured against unauthorized entry. The City failed to do so.

As referenced above, the City did fail to meet its mandatory duties and was in breach of its duty to act reasonably. The City's breaches of duty were a substantial factor in the injuries suffered by the Claimant. The City's negligence in failing to meet its duties established under the Laws is why the substandard and dangerous conditions at the Ghost Ship were allowed to develop and exist. This was a substantial factor in causing Claimant's injuries and damages. Had The City fulfilled its mandatory duties established under the Laws, the Claimant would not have been in a dangerous, substandard, hazardous building on December 2, 2016, and would not have been injured and/or killed.

### 7. The City Failed to Comply with Mandatory Work/Live Unit Ordinances

Based on its long use as a work/live unit prior to the date of the incident, the Ghost Ship falls under the City of Oakland Planning Ordinances ("COPO") definition of an "enclosed nonresidential facility." *See* COPO Section 17.10.720. Such facilities are specifically intended to accommodate, "Civic, Commercial, Industrial, or Agricultural or Extractive Activities and which are separated from adjacent areas on all sides by walls pierced only by windows, vents, or customary entrances and exits." *Ibid*.

21

The City of Oakland Planning and Building Code does not allow persons to reside in nonresidential industrial buildings unless said building has been properly designated and permitted as a "live/work" building. Such facilities must comply with all provisions of City of Oakland Live/Work Building Code and the California State Building Code. As a preliminary condition of occupation by residents, such buildings must first be properly zoned for such use.

The Ghost Ship was not so zoned. Had the City of Oakland enforced applicable zoning requirements, the Ghost Ship would not have been occupied by residents, their gear and their personal property at the time of the subject fire. This would have eliminated the dangerous use of chains of "power strips" throughout the building to provide electrical power to personal devices, including personal heaters, refrigerators, computers, televisions, stereos, lights, small appliances, portable air conditioners, and a wide range of other electrical devices.

Also per the Code, establishment of a work/live unit shall only be permitted if the building's design complies with all applicable building codes, including those related to building egress, safety, structural integrity, access, fire safety, electrical, plumbing and ventilation. This includes without limitation all applicable California building codes and regulations that govern life safety issues, includes rules regarding structural and fire safety as well as myriad other aspects of actual physical construction intended to protect building occupants. This also includes provisions of the California Fire Code, part of the California Code of Regulations, Title 24, Parts 9 and 10, et seq. As set forth herein, the Ghost Ship did not comply with any regulations intended to protect human life.

### C.     The City Is Liable for Failing to Warn of Hazardous Conditions

As a result of the aforementioned knowledge and conduct, a special relationship existed between employees, agents and/or representatives of The City and Claimant as a member of a foreseeable, known and identifiable group of individuals, including attendees of music events inside the Ghost Ship.

As a result of the foregoing, The City knew or should have known of the unsafe and dangerous conditions at the Ghost Ship, which could result in imminent peril to a foreseeable group of individuals at the Ghost Ship, which was not readily discoverable by them.

The unsafe and dangerous conditions included a foreseeable threat of harm to those who would be entering the Ghost Ship to attend music events and those staying at the Ghost Ship. Despite knowledge of the unsafe and dangerous conditions inside the Ghost Ship, The City failed to warn this foreseeable, known and identifiable group of the unsafe and dangerous conditions.

///
///
///

22

**D.    The City Is Liable for Dangerous Condition of Public Property**

The City of Oakland owns and/or controls the sidewalk and the surrounding and adjacent property to the Ghost Ship and adjacent buildings and property at the incident site.  In addition to the other statutes set forth herein, The City is liable for Claimant's injuries and damages pursuant to Government Code Sections 818.6, 830 & 835 et seq., including without limitation Section 835.2.

As set forth in Section 830(a), '"Dangerous condition' means a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used." '"Protect against' includes repairing, remedying or correcting a dangerous condition, providing safeguards against a dangerous condition, or warning of a dangerous condition."  (Section 830(b).)

The City, as a public entity with ownership and/or control over the sidewalk had a duty to protect the public against harms caused by the negligent design, construction, operation, existence, maintenance, inspection, modification and/or repair of its sidewalk and the adjacent property.

The City had duties under the Oakland Code of Ordinances, including Chapter 12.08 "Encroachments," with respect to placement, removal and abatement of sidewalk encroachments in front of the Ghost Ship.  In fact, The City had a mandatory duty under section 12.08.140(d) to remove the encroachments that existed on the sidewalk.  This section (which also applies to The City's liability in Section 1(B), *supra*) provides that when the encroachment is not properly abated, the "*the Director of Public Works shall order city forces to remove said encroachment and/or restore the public area* and shall charge all costs incurred by the city for such removal and/or restoration plus twenty (20) percent to the permittee or owner of record."  (emphasis added.)

Here, there was a dangerous condition of public property that created a substantial risk of injury to members of the public, which include the Ghost Ship victims, when they used the City's property and the adjacent property, including the Ghost Ship, with reasonable care and in a reasonably foreseeable manner at the time of the incident.

Claimant is within the general class of persons that one reasonably would anticipate might be threatened by the City's conduct; and the harm suffered by Claimant is within the general class of harms that one reasonably would anticipate might result from the City's conduct.

///
///
///

23

## 2. THE NAME OR NAMES OF PUBLIC EMPLOYEE OR EMPLOYEES CAUSING THE INJURY, DAMAGE, OR LOSS, IF KNOWN:

Claimant does not know the identity and/or extent of involvement of all City personnel involved, but they include employees, agents and/or representatives of the OPD, OFD, and OPBD. Investigation is just beginning and shall continue.

Claimant notes that she or he has been denied the opportunity to inspect the property before or contemporaneously with the inspection conducted by the OFD and Bureau of Alcohol, Tobacco and Firearms ("ATF") at the behest of City of Oakland. As a result, Claimant has been denied the opportunity to identify, categorize and inspect any of the objects, materials, documents or other evidence removed by ATF or OFD as part of their investigation; denied the opportunity to photograph or otherwise document the relative position of those objects in situ before their removal, and denied the opportunity for inspection of the property in situ by experts in the fields of arson, electrical systems, construction, building planning and building codes, architecture, and the like. At the time this Master Claim was filed, Claimants have yet to receive a copy of the OFD or ATF Report on its investigation, or any portion thereof. To the extent this information was and remains unavailable at the time this Master Claim was filed, Claimant's ability to articulate all possible violations of mandatory duties, including negligence in the exercise of ministerial duties, has been compromised for reasons beyond the control of Claimant. In light of this, Claimant, who had no control over or access to the subject property prior to the OFD and ATF's inspection and removal of critical materials, should not be prejudiced with respect to any future pleadings in this matter, including any Complaint filed against the City that alleges additional violations of duties that could not reasonably have been known to Claimants at the time this Claim was filed and served.

**All of the statements made in this claim are upon information and belief.**

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Page
149 of 251

Exhibit 4
Page 149 of 251

(1) **PROOF OF SERVICE**

*Gregory v. Chor Nar Siu Ng, et al.*
*RG16843631et al.*

I, Christina Ayala, declare that:

      I am employed in the County of San Francisco, State of California. I am over the age of 18 and not a party to the within action. My business address is 1438 Market St., San Francisco, CA 94102

      On the date stated below, I served the foregoing document described as:

**MASTER CLAIM AGAINST THE CITY OF OAKLND (GOV'T CODE SECTION 910);**

**NOTICE OF ADOPTION OF MASTER CLAIM AGAINST THE CITY OF OAKLAND RE: CLAIMANTS, Carol Cidlik, individually and as successor-in-interest to Nicole Reane Siegrist; Richard Allen Runnels, individually and as successor-in-interest to Benjamin Runnels; Lorraine Marie Runnels, individually and as successor-in-interest to Benjamin Runnels; John Georges Igaz individually and as successor-in-interest to John Nicholas Igaz; Judy Hough, individually and as successor-in-interest to Travis Hough; Brian Hough, individually and as successor-in-interest to Travis Hough.**

***

in this action by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

| |
|---|
| Raymond C. Marshall<br>Sheppard Mullin Richter & Hampton LLP<br>Four Embarcadero Center, 17th Floor<br>San Francisco, CA 94111 |

/XX / (**BY PERSONAL SERVICE**) By placing a true copy thereof enclosed in a sealed envelope. I caused each such envelope to be delivered by hand to the addressee(s) noted above.

      I declare under penalty of perjury under the laws of the State of California that the above is true and correct and that this declaration was executed on May 24, 2017 in San Francisco, CA.

_____
Christina Ayala

-1-<br>PROOF OF SERVICE



# Exhibit 2

Exhibit 4
Page 151 of 251



RECEIVED

APR 28 2017

CLERK & BOARD
OF SUPERVISORS

**Case No. RG17843691 and Related/Consolidated Claims**
**In Re the Ghost Ship Incident**
**Master Claim Against the County of Alameda (Gov't Code Section 910)**
To Be Used with Notice of Adoption of Master Claim Form

## I.    DESCRIBE HOW ACCIDENT/LOSS OCCURRED:

On the evening of December 2, 2016, Injury Claimant and/or Decedent Claimant (hereinafter
"Claimant") was at 1305 31st Avenue in Oakland when a deadly fire broke out during a publicly
promoted commercial music event and "gathering." As a result of numerous violations of
countless State and local laws and ordinances, 36 people were killed and many more were
injured. This was the largest loss of life in a fire in Oakland history and the deadliest building
fire in California since the 1906 earthquake.

At approximately 11:15 pm on December 2, 2016, over 100 invitees were at the music event when
the fire started inside the Ghost Ship. These invitees, along with artists performing at the event and
residents, were plunged into darkness and smoke and tried to exit the unsafe structure. The interior
of the 10,000 square-foot Ghost Ship was a death trap that contained a maze of makeshift rooms,
alcoves and partitions. It was cluttered with carvings, mannequins, paintings, artwork, scraps of
wood, pianos, furniture, tapestries and several recreational vehicles.

The Ghost Ship lacked a safe means of access between the upper floor where the music event
was and the exit on the ground floor. The Ghost Ship lacked adequate and sufficient fire safety
measures and was not up to fire protection and life-safety codes, including, but not limited to, not
having adequate and sufficient smoke alarms, fire extinguishers, overhead sprinklers, exit signs,
emergency lighting, exit lights and a safe means of ingress and egress.

Thirty-six (36) people were unable to exit and were trapped in the inferno inside. These victims
suffered injuries from the fire, including from smoke inhalation, while trying to escape. The victims
who perished were alive and feared for their safety. They were eventually overcome by the fire and
smoke, and subsequently died inside the Ghost Ship. They did not die instantaneously when the fire
broke out. They were injured and suffered from the injuries caused by the fire and smoke for many
minutes before dying.

The County of Alameda, formed by Charter, was founded in 1853. The County functions
through the actions of its agents, employees, officials and heads of its various departments and
agencies. These include, but are not limited to, the Sheriff's Office, Social Services Agency,
Planning Department, Vector Control Services District and Fire Department. These agents,
employees, officials and departments are hereinafter collectively referred to as "The County."

Claimant claims that The County was under a mandatory duty to protect the public from the very
type of conditions and harm which led to the deadly structure fire on December 2, 2016.
Claimant alleges that The County is liable for damages pursuant to, but not limited to, California
Gov't Code Sections 815, 815.2, 815.4, 815.6 & 840.2. Claimant claims that The County,
through its statements, actions and deeds, as well as pursuant to statute, created and established a
special relationship/duty, which required that they take affirmative action to protect the Claimant
from the very risk of harm and/or death, which they suffered on December 2, 2016. Claimant
claims that The County failed to perform these obligations entirely or, where they engaged in

1

such actions, they failed to exercise reasonable diligence in discharging those duties, thereby constituting negligence and/or negligence per se.

Despite notice of the unsafe and dangerous conditions, The County, among other things, negligently failed to investigate, negligently failed to respond to complaints, negligently failed to protect the public, negligently failed to train, supervise and monitor its agents, employees and/or independent contractors, negligently failed to abate an impending peril, negligently failed to warn the public of the dangerous and unsafe conditions, negligently failed to abate a public nuisance, and is liable for failing to stop the ultra-hazardous activities occurring.

The County's agents, employees and/or independent contractors failed to exercise reasonable diligence in discharge of their duties. Said agents, employees and/or independent contractors were negligent in carrying out investigations, protective and safety responsibilities. The negligent acts and omissions and wrongful conduct of The County's agents, employees and/or independent contractors were committed within the scope of their employment. The County is liable for any tortious act or omission of an independent contractor of the public entity to the same extent that the public entity would be subject to such liability if it were a private person.

Claimant is within the general class of persons that one reasonably would anticipate might be threatened by The County's acts and omissions. The County breached its duties under California law, and as a proximate and direct legal result of The County's negligence and breach of duties, Claimant was caused to suffer injuries and damages. The extent of Claimant's injuries and damages are more fully set forth in the Notice of Adoption of Master Claim Form.

A.  **Facts Supporting Claimant's Claims**

1305 31st Avenue is a structure located in an R-30 Zone, yet it is considered by The County to be a "Warehouse, Portion of a Single Economic Unit." This Single Economic Unit includes Assessor Parcel Numbers (hereinafter "APN") 25-690-11 (1305 31st Ave.), 25-690-10 (1315 31st Ave.) and 25-690-9 (3703 International Blvd). The structures have been owned, since 1988, by Chor Ng. The buildings sit at the corner of 31st Avenue and International Blvd., and run almost the complete length of the block on 31st Avenue between International Blvd. and East 13th Street. As part of the consolidated Single Economic Unit, there is an undeveloped yard on the south side between the structure on 1305 31st Ave. and the residence at 1301 31st Ave.: APN No 25-690-5.

APN 25-690-11 was commonly referred to as the "Ghost Ship" by its occupants and in various promotions of the illegal cabaret and business that operated there. Graffiti painted on the front of it on the 31st Avenue side said "GHOSTSHIP." The building, at various times, also went by other names including but not limited to the Satya Yuga Collective. At times, APN 25-690-11 has been misidentified as 1315 31st Ave. The building was covered in graffiti, and debris obstructed the sidewalk and ingress/egress creating a dangerous condition of public property for those seeking to enter or exit the building. From the outside, it was evident that the windows were blocked by debris stacked from floor to ceiling and numerous metal objects were attached to the exterior of the building in a dangerous manner.

APN 25-690-11 is reported to have been constructed in the early 1900s. Prior to December 2, 2016, numerous unpermitted modifications to the entire Single Economic Unit had occurred on

2

numerous occasions including, but not limited to: a new electric service; new meters and sub meters; construction of illegal residential units; toilettes, kitchens and showers; inter and intra building passageways to access bathrooms; structural changes in the exterior and interior walls; and unpermitted and shared electrical systems.

The Ghost Ship and the adjoining structures at APN 25-690-10 had an open, obvious and known history of having public events and parties inside, outside and on the roof top, and charging an entrance fee to the events.

The electrical system was overloaded with excessive use by the dozens of people who lived and worked at the Ghost Ship, including artists, musicians and tattoo artists that used electrical equipment, as well as the musicians and groups that performed public events held at the Ghost Ship. There were often sparks from the electrical system that smelled and circuit breakers blew out often. Overloaded electrical lines at the rear of the Ghost Ship likely contributed to the fire.

There had been fires inside the Ghost Ship prior to December 2, 2016. The most recent fire occurred the day before, on December 1, 2016, when a refrigerator caught on fire. Dangerous and flammable materials, including industrial and art supplies, propane tanks that fueled camping stoves and recreational vehicles and their components, were located throughout the interior of the Ghost Ship.

Evidence exists that The County knew about such conditions and failed to fulfill its mandatory duties with reasonable diligence to abate them and render the property safe.

It is undeniable that The County knew, for many years, that an illegal cabaret/rave was being held, and that alcohol was being sold illegally, yet they did nothing to shut it down. There were numerous complaints of excessive noise and debris made to law enforcement when events were occurring. Employees, agents and/or representatives of The County responded to and visited the Ghost Ship and buildings comprising the Single Economic Unit and saw the substandard conditions and fire hazards firsthand.

Employees, agents and/or representatives of The County knew that the lessees and property managers, Derick Almena and Micah Allison were illegally living in the dangerous and unsafe Ghost Ship with their three minor children. Said employees, agents and/or representatives of The County, however, failed to comply with their mandatory child abuse and neglect reporting requirements.

The County, through its agents, employees, officials, departments and contractors, was aware that the Ghost Ship was being used as a cabaret, for business purposes (including a tattoo parlor)[1] and unlawful residences for numerous inhabitants, including children, and was a public nuisance. The County was aware of numerous violations of State and local statutes, ordinances and codes, including but not limited to: The California Health and Safety Code, The California Building Code, The California Fire Code, The California Electrical Code, The California Mechanical Code, The California Code of Regulations, The California Administrative Code and Alameda County General Ordinance and Administrative Codes (hereinafter collectively referred

---

[1]Tattoo parlors are regulated in The County General Ordinance Code, Chapter 6.116 "General Provisions for Body Art (Tattooing), Body Piercing, and Permanent Cosmetics."

3

to as "Laws"). These Laws created mandatory duties for The County, its employees, agents, officials, departments and contractors to undertake affirmative actions to make the premises safe or shut it down. Said mandatory duties were obligatory and not discretionary or permissive and included, but were not limited to, requirements to investigate buildings and structures and enforce the applicable Laws to protect against the particular kind of injury that was suffered by Claimant.

It is important to note that the fire on December 2, 2016 did not happen in a vacuum, or due to a discrete, single, unforeseeable event. Rather, it happened because a wide swath of County departments and individuals repeatedly ignored overwhelming evidence of building code violations, illegal and improper use as a residence and cabaret, and other businesses, dangerous conditions that created an obvious and immediate risk of fire, and conduct that alerted County employees to a toxic environment that exposed residents, occupants and visitors to imminent harm.

An ongoing failure to act by The County foreseeably and inexorably led to the conditions that sparked a fire trapping a crowd of people inside a building that was a veritable maze, without safety features, safe egress, suitable exits, working fire equipment, adequate ventilation or lighting, and that was itself a 10,000 square foot fire trap filled with flammable material, electrical hazards and building code violations well known to County officials for far too long. In what can only be regarded as a pattern of deliberate neglect, County departments and personnel closed their collective eyes to a plethora of building, safety, enforcement, and fire code violations that, for a period of years exposed persons to the risk of death or serious injury.

Each of these various departments, and individual employees acting in the course and scope of their employment, had prior notice that the Ghost Ship was being illegally occupied and used; that it did not comply with mandatory building, fire and safety codes; and that is posed an ongoing hazard to building visitors and occupants. Each of these various departments negligently failed to comply with mandatory duties that required them to identify, report, and/or require repairs and modifications of the building to comply with requisite building, fire and safety ordinances, regulations and codes, or negligently failed to determine the building as unfit for human occupation and vacated in order to protect life and property.

## B. Applicable Laws Placed Mandatory Duties on The County to Identify and Remedy Dangerous Conditions and to Protect Against the Particular Kind of Injury that Was Suffered by Claimant

### 1. The County Failed to Comply with Mandatory Child Abuse and Neglect Reporting Requirements

The County knew that the lessees and property managers, Derick Almena and Micah Allison, were illegally living in the dangerous and unsafe Ghost Ship with their three minor children. Employees, agents and/or representatives of The County, including those from the Alameda County Sheriff's Department, Alameda County Probation Department and/or Alameda County Social Services Agency, are mandatory reporters under Cal. Penal Code Section 11165.7. They, however, failed to comply with their mandatory child abuse and neglect reporting requirements under Cal. Penal Code Section 11166(a), which specifically provides that a report must be made when the mandated reporter "has knowledge of or observes a child" whom the reporter "knows

4

or reasonably suspects has been the victim of child abuse or neglect." Such report shall be made to the Social Services Agency immediately by telephone. A written report shall be filed within 36 hours documenting the information. These reporting requirements are mandatory, and the failure to report constitutes the breach of mandatory duty by a government agency. *See B.H. v. County of San Bernardino* (2015) 62 Cal.4th 168. *See also* Penal Code Sections 11166.05; 11165.2; 11165.3; 11165.4; 11165.6; and 11165.9.

Once a child is under protection of The County's Social Services Agency, CPS regulations require frequent visits with the children. The visits are mandatory and there is no discretion on the frequency of the visits. *See, e.g., Scott v. County of Los Angeles* (1994) 27 Cal.App.4th 125 [holding that the CPS regulations requiring monthly face-to-face conduct created mandatory duty, which left no discretion on the frequency of visits.]

On various occasions prior to the December 2, 2016 fire, County employees, agents and/or representatives received and responded to reports of child abuse and neglect against Ghost Ship lessee Almena and his wife, Allison. As part of numerous investigations into misconduct by Almena and Allison, various investigators visited and inspected their Ghost Ship home for the specific purpose of determining whether that environment constituted a safe abode for the three minor children.

Investigations by The County compelled a mandatory consideration of whether the Almena/Allison children could safely remain in their residence. This consideration included a determination of whether allowing the child(ren) to remain in the residence "would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." Welf. & Inst. Code Sections 361.5, 366.22 & 366.25. *See also* Welf. & Inst. Code Section 306, which compels a mandatory consideration as to whether a child can safely remain in his or her residence. Further, Welf. & Inst. Code Section 328 imposes a mandatory duty on social workers to conduct an investigation to determine whether proceedings to remove the minor from parental custody should be instituted. Such investigation necessarily requires an inspection of the minor's residence. *See, e.g.*, Welf. & Inst. Code Sections 361.5, 366.22 and 366.25. Also, social workers are under a mandatory duty to update prior findings at least once every six months. *See* Welf. & Inst. Code Section 16501.1. Again, such update necessarily depends on an evaluation of the minor's residence.

These ongoing and periodic investigations are conducted against a statutory definition of what constitutes a "safe" home or residence setting. *See* Welf. & Inst. Code Section 16501.15 and Penal Code Section 11165.5, which defines such residence as one that is "free from abuse or neglect." Similarly, Welf. & Inst. Code Section 16504 compels social workers to consider appropriate services to consider whether physical or emotional health or safety is jeopardized should the minor remain at home. These determinations require in-home evaluations and the creation of a comprehensive assessment and case plan detailing conditions that endanger the minor, and documentation of each such contact. *See* Welf. & Inst. Code Section 16504; Department of Social Services Manuals of Policies and Procedures 31-125; 31-201; and 31-320. Individual employees of the department failed to conduct, document and report such evaluations, and failed to prepare and/or submit an assessment and case plan.

It would have been a clear violation of any applicable statutory standard related to the health and safety of a minor for any social worker employed by The County and acting in the course and

scope of such employment to have reached an objective determination that any minor residing in the Ghost Ship was "free from abuse or neglect," or was in any way "safe" given the many dangers to human life and safety that existed in the Ghost Ship at all relevant times.

On each visit by such employee to the Ghost Ship and/or the buildings comprising the Single Economic Unit, the conditions that existed therein constituted a risk to the health and safety of any minor in residence there. These conditions put the County on notice of dangerous conditions and illegal residents well in advance of the subject incident, on numerous prior occasions. These agencies had a mandatory and ministerial duty to cross-report allegations and information related to child abuse. *See Alejo v. Alhambra* (1999) 75 Cal.App.4th 1180, 1192 [holding section 11166 creates mandatory duty on police to investigate and cross-report child abuse.] Every County employee who participated in such investigations and inspections negligently failed to report said dangerous conditions, negligently failed to cross-report known, dangerous conditions, and negligently failed to take any affirmative steps to protect the minor children, and thereby other residents, from the obvious risks of fire hazards and dangerous conditions that were substantial factors in causing the fire.

Although The County's employees, agents and/or representatives did remove Almena and Allison's children for several months, they negligently failed to notify any other agencies of the dangers that existed in the Ghost Ship and the buildings comprising the Single Economic Unit that continued to expose other residents, occupants and visitors to an imminent risk of injury or death. This is an unusual and negligent departure from protocol from an agency that regularly interacts with sheriff, fire and other departments on discovery of dangerous conditions that jeopardize human life, especially in a setting where so many persons were exposed to risks of unsafe, unsanitary and life-threatening conditions.

        2.      **The California Fire Code (CFC) Imposes a Mandatory Duty upon The County to Safeguard the Public Health and General Welfare Against Danger from Fire**

The County adopted the CFC in Chapter 6.04 of the Alameda County General Ordinance Code with amendments in Section 6.04.010. Section 109.3 – Notice of Violation was amended and provides: "In cases of extreme danger to persons or property, immediate compliance **shall be required**...." (emphasis added.) The CFC includes the following provisions that relate to The County's duties and The County being on notice of the applicable fire and life-safety codes and standards when at the Ghost Ship or any building comprising the Single Economic Unit.

§ 1.1.2 – **The Purpose of this code is to establish the minimum requirements to safeguard the public health and general welfare** through structural strength, means of egress facilities... safety to life and property from fire and other hazards attributed to the built environment. . . . (emphasis added.)

§ 1.8.3.1 – **Duties and Powers. The *building department* of every city, county, or city and county shall enforce all provisions of this this Code [CBC/CBSC].** (emphasis added.)

§ 1.11.2.1.1 – **Enforcement. The responsibility for enforcement of building standards adopted by the State Fire Marshal** and published in the California Building Standards Code relating to fire and panic safety **is as follows:**

6

1. The City, **County**, or city and **county** with jurisdiction in the area affected by the standard or regulation by either of the following:

1.1 The chief of the fire authority of the city, county or city and county, or an authorized representative.

1.2 The chief building official of the city, county, or city and county, or an authorized representative (emphasis added.)

**§ 1.12 – Enforcement Agency** [California Code of Regulations, Title 19, Division 1, § 3.12 - Enforcement Agency]**:**

(a) The provisions of these regulations, California Code of Regulations Title 19, Division 1, **shall be enforced by** the State Fire Marshal, **the chief of any city or county fire** department or fire protection district, and their authorized representatives, in their respective areas of jurisdiction.

(b) The division of authority for the enforcement of these regulations shall be in accordance with the following:

**(1) The chief of any city or county fire department** or fire protection district, and their authorized representatives **shall enforce the rules and regulations in their respective areas**. (emphasis added.)

**§ 3.07 – Clearances.** (a) General. No combustible material shall be placed or stored within 10 feet of any building or structure.

**§ 3.11 – Exits, Aisles, Ramps, Corridors and Passageways:**

(a) **No person shall install, place or permit the installation or placement of any bed, chair, equipment, concession, turnstile, ticket office or anything whatsoever, in any manner which would block or obstruct the required width of any exit. (b) No person shall install, place or permit the installation or placement of any combustible material or equipment in or exposed to any exit.** Exceptions:

(1) Furniture or equipment constructed of wood or other material of similar combustibility may be permitted in an exit or exposed to an exit when approved by the enforcing agency.

(2) When approved by the enforcing agency, combustible materials may be permitted in exit foyers and lobbies.

(3) No person shall install, place or permit the installation or placement of any storage material of any kind in any exit regardless of the required width of such exit. (emphasis added.)

**§ 3.14 – Fire Hazard.** No person, including but not limited to the State and its political subdivisions, operating any occupancy subject to these regulations shall permit any fire hazard, as defined in this article, to exist on premises under their control, or fail to take immediate action to abate a fire hazard when requested to do so by the enforcing agency. Note: "Fire Hazard" as used in these regulations means any condition, arrangement, or act which will increase, or may cause an increase of, the hazard or menace of fire to a greater degree than customarily recognized as normal by persons in the public service of preventing, suppressing or extinguishing fire; or which may obstruct, delay, or hinder, or may become the cause of obstruction, delay or hindrance to the prevention, suppression, or extinguishment of fire.

7

§ 104.3 – Right of entry.  Whenever it is necessary to make an inspection to enforce the provisions of this code, or whenever the fire code official has reasonable cause to believe that there exists in a building or upon any premises any conditions or violations of this code which make the building or premises unsafe, dangerous or hazardous, the fire code official shall have the authority to enter the building or premises at all reasonable times to inspect or to perform the duties imposed upon the fire code official by this code. . . .

### Section 110 – Unsafe Buildings

§ 110.1 – General.  If during the inspection of a premises, **a building or structure, or any building system, in whole or in part, constitutes a clear and inimical threat to human life, safety or health, the fire code official shall issue such notice** or orders to remove or remedy the conditions as shall be deemed necessary in accordance with this section, **and shall refer the building to the building department** for any repairs, alterations, remodeling, removing or demolition required.  (emphasis added.)

§ 110.1.1 – Unsafe conditions.  Structures or existing equipment that are or hereafter become unsafe or deficient because **of inadequate means of egress or which constitute a fire hazard**, or are otherwise dangerous to human life or the public welfare, **or which involve illegal or improper occupancy or inadequate maintenance, shall be deemed an unsafe condition.** (emphasis added.)

§ 110.1.2 – Structural hazards.  When an apparent structural hazard is caused by the faulty installation, operation or malfunction of any of the items or devices governed by this code, **the fire code official shall immediately notify the building code official** in accordance with Section 110.1.  (emphasis added.)

§ 110.2 – Evacuation.  The fire code official or the fire department official in charge of an incident shall be authorized to order immediate evacuation of any occupied building deemed unsafe where such building has hazardous conditions that present imminent danger to building occupants.

§ 110.3 – Summary abatement.  Where conditions exist that are deemed hazardous to life and property, the fire code official or fire department official in charge of the incident is authorized to abate summarily such hazardous conditions that are in violation of this code.

### Section 605 – Electrical Equipment, Wiring and Hazards:

**605.1 – Abatement of electrical hazards.  Identified electrical hazards shall be abated. Identified hazardous electrical conditions in permanent wiring shall be brought to the attention of the responsible code official**.  Electrical wiring, devices, appliances and other equipment that is modified or damaged and constitutes an electrical shock or fire hazard shall not be used.  (emphasis added.)

> **Electrical hazards include:**
> 605.4 Multiplug adapters
> 605.5 Extension cords.
> 605.10 Portable electric space heaters.

8

**Chapter 7 Fire-Resistance-Rated Construction**

**701.2 – Unsafe conditions.** Where any components in this chapter are not maintained and do not function as intended or do not have the fire resistance required by the code under which the building was constructed, remodeled or altered, such component(s) or portion thereof shall be deemed an unsafe condition, in accordance with Section 110.1.1. Components or portions thereof determined to be unsafe shall be repaired or replaced to conform to that code under which the building was constructed, remodeled, altered or this chapter, as deemed appropriate by the fire code official. **Where the extent of the conditions of components is such that any building, structure or portion thereof presents an imminent danger to the occupants of the building, structure or portion thereof, the fire code official shall act in accordance with Section 110.2 [evacuation].** (emphasis added.)

        3.      **The California Health & Safety Code, Which Includes the Uniform Housing Code Adopted by The County, Establishes What Constitutes "Substandard Building Conditions" and Mandates Affirmative Action to Eliminate Health and Safety Risks**

The following provisions relate to The County's duties and The County being on notice of the fire, life-safety and housing laws and requirements when County employees, agents and/or representatives were at the Ghost Ship or any building comprising the Single Economic Unit before the December 2, 2016 fire.

Health and Safety Code Section 17920.3 defines substandard conditions to be, among other things:

    -Inadequate sanitation lavatory, or bathtub or shower in a dwelling unit;
    -General dilapidation or improper maintenance;
    -Structural hazards;
    -All wiring, except that which conformed with all applicable laws in effect at the time of installation if it is currently in good and safe condition and working properly;
    -All materials of construction, except those that are specifically allowed or approved by this Code and that have been adequately maintained in good and safe condition;
    -All buildings or portions thereof not provided with adequate exit facilities;
    -All buildings or portions thereof that are not provided with the fire-resistive construction or fire-extinguishing systems or equipment required;
    -All buildings or portions thereof occupied for living, sleeping, cooking, or dining purposes that were not designed or intended to be used for those occupancies.

In Ordinance **15.24**, The County adopted the– **Uniform Housing Code Chapter 10, Substandard Buildings**, which contains the following provisions (as amended 15.24.020):

**1001.1 – General.** Any building or portion thereof that is determined to be an unsafe building in accordance with AC Section 15.08.170, or any building or portion thereof, including any dwelling unit, guest room or suite of rooms, or the premises on which the same is located, in which there exists any of the conditions referenced in this section to an extent that endangers the life, limb, health, property, safety or welfare of the public or the occupants thereof, shall be deemed and hereby are declared to be substandard buildings. The building official shall

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10  Exhibit 4
160 of 251
Page 160 of 251

commence proceedings to cause repair, rehabilitation, vacation or demolition of substandard buildings in accordance with AC Section 15.08.150 of this title.

**1001.2 – Inadequate Sanitation.** Buildings or portions thereof **shall be deemed substandard** when they are unsanitary. Inadequate sanitation shall include, but not be limited to, the following: . . .

    -Lack of or improper water closet, lavatory, bathtub or shower in a dwelling unit or lodging house;
    -Room and space dimensions less than required by this code;
    -Lack of required electrical lighting;
    -General dilapidation or improper maintenance. (emphasis added.)

**1001.4 – Nuisance.** Buildings or portions thereof in which there exists any nuisance as defined in this title are deemed substandard buildings.

**1001.5 – Hazardous Electrical Wiring.** Electrical wiring that was installed in violation of code requirements in effect at the time of installation or electrical wiring not installed in accordance with generally accepted construction practices in areas where no codes were in effect or that has not been maintained in good condition or that is **not being used in a safe manner shall be considered substandard.** (emphasis added.)

**1001.9 – Fire Hazard.** Any building or portion thereof, device, apparatus, equipment, combustible waste, or vegetation that, in the opinion of the chief of the fire department is in such a condition as to cause a fire or explosion or provide a ready fuel to augment the spread and intensity of fire or explosion arising from any cause **shall be considered substandard**. (emphasis added.)

**1001.10 – Faulty Materials of Construction.** The use of materials of construction, except those that are specifically allowed or approved by this code and the Building Code, and that have been adequately maintained in good and safe condition, **shall cause a building to be substandard**. (emphasis added.)

**1001.12 – Inadequate Exits.** Except for those buildings or portions thereof that have been provided with adequate exit facilities conforming to the provisions of this code, buildings or portions thereof whose exit facilities were installed in violation of code requirements in effect at the time of their construction **or whose exit facilities have not been increased in number or width in relation to any increase in occupant load due to alterations, additions or change in use or occupancy** subsequent to the time of construction **shall be considered substandard**. Notwithstanding compliance with code requirements in effect at the time of their construction, **buildings or portions thereof shall be considered substandard when** the building official finds that an unsafe condition exists through an **improper location of exits, a lack of an adequate number or width of exits, or when other conditions exist that are dangerous to human life.** (emphasis added.)

**1001.13 – Inadequate Fire-protection or Firefighting Equipment.** Buildings or portions thereof shall be considered substandard when they are not provided with the fire-resistive construction or fire-extinguishing systems or equipment required by this code, except those buildings or portions thereof that conformed with all applicable laws at the time of their

10

construction and whose fire-resistive integrity and fire-extinguishing systems or equipment have been adequately maintained and improved in relation to any increase in occupant load, alteration or addition, or any change in occupancy.

**1001.14 – Improper Occupancy. All buildings or portions thereof occupied for living, sleeping, cooking or dining purposes that were not designed or intended to be used for such occupancies shall be considered substandard.** (emphasis added.)

> **4.    The California Health & Safety Code and Regulations Impose a Mandatory Duty upon The County to Enforce Fire Safety and Building Code Standards and Prevent Injury and Death**

The following provisions relate to The County's duties and The County being on notice of the applicable fire, life-safety and substandard conditions when County employees, agents and/or representatives were at the Ghost Ship or any building comprising the Single Economic Unit before the December 2, 2016 fire.

**Health & Safety Code § 13145 — Enforcement of building standards and regulations requires:**
The State Fire Marshal, **the chief of any** city, **county**, or city and **county fire department** or district providing fire protection services, or a Designated Campus Fire Marshal, and their authorized representatives, **shall enforce** in their respective areas **building standards relating to fire and panic** safety adopted by the State Fire Marshal and published in the California Building Standards Code and other regulations that have been formally adopted by the State Fire Marshal for the prevention of fire or for the protection of life and property against fire or panic. (emphasis added.)

**Health & Safety Code § 13146:  The responsibility for enforcement of building standards** adopted by the State Fire Marshal and published in the California Building Standards Code relating to fire and panic safety and other regulations of the State Fire Marshal **shall be as follows**:

> (a) The city, county, or city and county with jurisdiction in the area affected by the standard or regulation shall delegate the enforcement of the building standards relating to fire and panic safety and other regulations of the State Fire Marshal as they relate to R-3 dwellings, as described in Section 310.5 of Part 2 of the California Building Standards Code, to either of the following:
> (1) The chief of the fire authority of the city, county, or city and county, or his or her authorized representative.
> (2) The chief building official of the city, county, or city and county, or his or her authorized representative.
> (b) The chief of any city, county, or city and county fire department or of any fire protection district, and their authorized representatives, shall enforce within its jurisdiction the building standards and other regulations of the State Fire Marshal. (emphasis added.)

///
///
///

11

**Various Attorney General opinions confirm the mandatory duty of the fire marshal and the local fire department chief:**

- **Health & Safety Code § 13145 and § 13146 provide mandatory direction to fire marshal to enforce rules and regulations** he promulgates under authority vested in § 13143. (20 Ops.Atty.Gen. 31.)
- **Health & Safety Code § 13145 imposes a positive statutory duty** (cf. 67 Ops.Cal.Atty.Gen. 331, 332-333 (1984)), upon both the State Fire Marshal and "the chief of any . . . district providing fire protection services" **to enforce the former's building standards and other regulations relating to fire and panic safety. (Health & Saf. Code § 16 ["shall" is mandatory];** *People v. McGee* (1977) 19 Cal.3d 948, 958-959; 20 Ops.Cal.Atty.Gen. 31, 36-37; 7 Ops.Cal.Atty.Gen. 274, 279-280.)
- Health & Safety Code § 13146.5 provides that the foregoing provisions, . . . of Sections 13145, 13146 and 13146.3 **shall so far as practicable, be carried out at the local level by persons who are regular full-time members of a regularly organized fire department of a city, county,** or district providing fire protection services, and shall not be carried out by other persons pursuant to Section 34004 of the Gov't Code.

Provisions to be enforced in the **California Building Code - Title 24, Part 10, include:**

**Section 1.1.2 – Power.** The purpose of this code is to establish the minimum requirements to safeguard the public health, safety and general welfare through structural strength, means of egress facilities, stability. . . safety to life and property from fire and other hazards attributed to the built environment. . . .

**Section 1.8.3 – Local Enforcing Agency. The Building department of every city, county, and council shall enforce all of the provisions of law, this code,** and all other rules and regulations promulgated by the Department of Housing and Community Development . . . . (emphasis added.)

**Section – 104 Duties and Powers of Code Official 104.1.** The code official is hereby authorized and directed to enforce the provisions of this code.
**104.4 – Inspections.** The code official shall make the required inspections . . .

**The duties of investigator when she/he determines there is an unsafe condition, include declaring the structure illegal and abating it under The County General Ordinance Code.** The County Ordinance **Chapter15.08** Building Code with amendments in Article 1, includes:

> § 114.1.1 Illegal buildings [BID]. {Added} Any building, structure, equipment, or portion thereof, erected, constructed, enlarged, altered, repaired, moved, improved, removed, converted, demolished, or equipped without a permit when such permit is required by this code **shall be declared to be illegal and shall be abated** by being made to conform to this code and to all pertinent laws, rules, regulations, or ordinances, by demolition and removal as specified in AC Chapter 15.28 of this title, or by any other remedy available at law. (emphasis added.)

///
///
///

12

Under 25 CCR § 54 Nuisances — Notices, the building shall be ordered vacated:

> Whenever any building or portion thereof, has become substandard as described in Section 17920.3 or is a building as described in 17920.10, of the Health and Safety Code, and when determined to be a nuisance as defined in Section 17920 of the Health and Safety Code by the enforcement agency, the following shall apply:

> The enforcement agency **shall notify the owner** of the building and any mortgagee or beneficiary under any deed of trust, of record, as follows. The notice shall state the conditions causing the building to become substandard or in violation of Section 17920.10 of the Health and Safety Code, **and shall order the building, or portion thereof, vacated and shall institute proceedings for the correction or abatement thereof, either by demolition, closing or repair**, within 30 days after the date of the notice. (emphasis added.)

### C. The County Is Liable for Failing to Warn of Hazardous Conditions

As a result of the aforementioned knowledge and conduct, a special relationship existed between employees, agents and/or representatives of The County and Claimant as a member of a foreseeable, known and identifiable group of individuals, including attendees of music events inside the Ghost Ship.

As a result of the foregoing, The County knew or should have known of the unsafe and dangerous conditions at the Ghost Ship, which could result in imminent peril to a foreseeable group of individuals at the Ghost Ship, which was not readily discoverable by them.

The unsafe and dangerous conditions included a foreseeable threat of harm to those who would be entering the Ghost Ship to attend music events and those staying at the Ghost Ship. Despite knowledge of the unsafe and dangerous conditions inside the Ghost Ship, The County failed to warn this foreseeable, known and identifiable group of the unsafe and dangerous conditions.

### 2. NAME OF PUBLIC EMPLOYEE(S) CAUSING INJURY/DAMAGE/LOSS, IF KNOWN:

Claimant does not know the identity of all County personnel involved, but they include employees, agents and/or representatives of the Sheriff's Office, Social Services Agency, Planning Department, Vector Control Services District and Fire Department. Investigation is continuing.

Claimant notes that she or he has been denied the opportunity to inspect the property before or contemporaneously with the inspection conducted by the OFD and Bureau of Alcohol, Tobacco and Firearms ("ATF"). As a result, Claimant has been denied the opportunity to identify, categorize and inspect any of the objects, materials, documents or other evidence removed by ATF or OFD as part of their investigation; denied the opportunity to photograph or otherwise document the relative position of those objects in situ before their removal, and denied the opportunity for inspection of the property in situ by experts in the fields of arson, electrical systems, construction, building planning and building codes, architecture, and the like. At the time this Master Claim was filed, Claimant has yet to receive a copy of the OFD or ATF Report

13

on its investigation, or any portion thereof. To the extent this information was and remains unavailable at the time this Master Claim was filed, Claimant's ability to articulate all possible violations of mandatory duties, including negligence in the exercise of ministerial duties, has been compromised for reasons beyond the control of Claimant. In light of this, Claimant, who had no control over or access to the subject property prior to the OFD and ATF's inspection and removal of critical materials, should not be prejudiced with respect to any future pleadings in this matter, including any Complaint filed against the County that alleges additional violations of duties that could not reasonably have been known to Claimant at the time this Claim was filed and served.

**All of the statements made in this claim are upon information and belief.**

## CERTIFICATE OF SERVICE

I am over the age of 18 years and not a party to the within entitled action. I am employed at Mary Alexander & Associates, P.C., 44 Montgomery Street, Suite 1303, San Francisco, California 94104.

On April 28, 2017, I served the within

**Case No. RG17843691 and Related/Consolidated Claims**
**In Re the Ghost Ship Incident**
**Master Claim Against the County of Alameda (Gov't Code Section 910)**
**To Be Used with Notice of Adoption of Master Claim Form**

on the following persons:

Clerk, Board of Supervisors Office
Administration Building
1221 Oak Street, Room 536
Oakland, CA 94612

[ ]     BY MAIL (CERTIFIED, RETURN RECEIPT): I caused true and correct copies of the above documents to be placed and sealed in an envelope (or envelopes) addressed to the addressee(s) with postage thereon fully prepaid, and I further caused said envelope(s) to be placed in the United States mail, in the City and County of San Francisco, California.

[X]     BY PERSONAL SERVICE: I caused true and correct copies of the above documents to be placed and sealed in an envelope (or envelopes) addressed to the addressee(s) and I caused such envelope(s) to be delivered by hand on the office(s) of the addressee(s).

[ ]     BY FEDERAL EXPRESS: I caused true and correct copies of the above documents to be placed and sealed in an envelope (or envelopes) addressed to the addressee(s) and I used such envelope(s) to be delivered to Federal Express overnight courier service to the office(s) of the addressee(s).

[ ]     BY FACSIMILE: I caused a copy (or copies) of such document(s) to be sent via facsimile transmission to the office(s) of the address(s).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on April 28, 2017, at San Francisco, California.

_____
MADISON MILLER

- 1 -

PROOF OF SERVICE

# Exhibit 3

Exhibit 4
Page 167 of 251

STATE OF CALIFORNIA - DEPARTMENT OF GENERAL SERVICES
**Government Claim Form**
DGS ORIM 06 (Rev. 05/2016)

**Government Claims Program**
**Office of Risk and Insurance Management**
**Department of General Services**
**P.O. Box 989052, MS 414**
**West Sacramento, CA 95798-9052**



For Office Use Only

*Government Claims Program*

MAY 1 1 2017

RECEIVED

1-800-955-0045 • www.dgs.ca.gov/orim/Programs/GovernmentClaims.aspx

17004610

| Clear Form | Print Form |

*Is your claim complete?*

| | |
|---|---|
| ☑ | **Include a check or money order for $25 payable to the State of California.** |
| ☑ | Complete all sections relating to this claim and sign the form. Please print or type all information. |
| ☑ | Attach copies of any documentation that supports your claim. Please do not submit originals. |

*Claimant Information* Use name of business or entity if claimant is not an individual

| 1 | Gregory | David; see attachment. | | 2 | Tel: 415-433-4440 |
|---|---|---|---|---|---|
| | *Last name* | *First Name* | *MI* | 3 | Email: See attachment. |

| 4 | 44 Montgomery Street, Suite 1303 | | San Francisco | | CA | 94104 |
|---|---|---|---|---|---|---|
| | *Mailing Address* | | *City* | | *State* | *Zip* |

| 5 | Inmate or patient number, if applicable: | | |
|---|---|---|---|
| 6 | Is the claimant under 18? Some | If Yes, please give date of birth: See attachment. | |
| 7 | | | |

*If you are an insurance company claiming subrogation, please provide your insured's name in section 7.*

| 8 | |
|---|---|

*If your claim relates to another claim or claimant, please provide the claim number or claimant's name in section 8.*

**Attorney or Representative Information**

| 9 | See attachment. | | | 10 | Tel: |
|---|---|---|---|---|---|
| | *Last name* | *First Name* | *MI* | 11 | Email: |

| 12 | See attachment. | | | | |
|---|---|---|---|---|---|
| | *Mailing Address* | | *City* | *State* | *Zip* |
| 13 | Relationship to claimant: Attorney | | | | |

*Claim Information* Please add attachments as necessary

| 14 | Is your claim for a stale-dated warrant (uncashed check)? ○ Yes ⦿ No | *If No, skip to Step 15.* |
|---|---|---|
| | State agency that issued the warrant: | |
| | Dollar amount of warrant: | Date of issue: |
| | | *MM/DD/YYYY* |

| 15 | Date of Incident: December 2, 2016 | | |
|---|---|---|---|
| | Was the incident more than six months ago? | ○ Yes | ⦿ No |
| | If YES, did you attach a separate sheet with an explanation for the late filing? | ○ Yes | ○ No |

| 16 | State agencies or employees against whom this claim is filed: |
|---|---|
| | See attachment. |

| 17 | Dollar amount of claim: In excess of $10,000. |
|---|---|
| | If the amount is more than $10,000, indicate the type of civil case: | ○ Limited civil case ($25,000 or less) ⦿ Non-limited civil case (over $25,000) |
| | Explain how you calculated the amount: |
| | See attachment. |

| 18 | Location of the incident:<br>See attachment. |
|---|---|
| 19 | Describe the specific damage or injury<br>See attachment. |
| 20 | Explain the circumstances that led to the damage or injury:<br><br>See attachment. |
| 21 | Explain why you believe the state is responsible for the damage or injury:<br>See attachment. |
| 22 | Does the claim involve a state vehicle?    ○ Yes    ◉ No |
|    | If YES, provide the vehicle license number, if known: |

## Auto Insurance Information

| 23 | Not applicable. |
|---|---|

| *Name of Insurance Carrier* | | | | |
|---|---|---|---|---|
| *Mailing Address* | *City* | | *State* | *Zip* |
| Policy Number: | | Tel: | | |
| Are you the registered owner of the vehicle? | | ○ Yes | | ○ No |
| If NO, state name of owner: | | | | |
| Has a claim been filed with your insurance carrier, or will it be filed? | | ○ Yes | | ○ No |
| Have you received any payment for this damage or injury? | | ○ Yes | | ○ No |
| If yes, what amount did you receive? | | | | |
| Amount of deductible, if any: | | | | |
| Claimant's Drivers License Number: | | Vehicle License Number: | | |
| Make of Vehicle: | Model: | Year: | | |
| Vehicle ID Number: | | | | |

## Notice and Signature

| 24 | I declare under penalty of perjury under the laws of the State of California that all the information I have provided is true and correct to the best of my information and belief. I further understand that if I have provided information that is false, intentionally incomplete, or misleading I may be charged with a felony punishable by up to four years in state prison and/or a fine of up to $10,000 (Penal Code section 72). |
|---|---|
|   | *Mary E. Alexander*     Mary E. Alexander, Esq.     Date: May 8, 2017<br>*Signature of Claimant or Representative*     *Printed Name* |
| 25 | Mail this form and all attachments with the $25 filing fee or the "Filing Fee Waiver Request" to: Government Claims Program, P.O. Box 989052, MS 414, West Sacramento, CA 95798-9052. Forms can also be delivered to the Office of Risk and Insurance Management, 707 3rd street, 1st Floor ORIM, West Sacramento, CA 95605. |

Page 5 of 5

## Attachment to Claim Against the State of California

### 1.    Claimant Information

David Gregory, Individually, as Personal Representative of the Estate of Michela Gregory and as Successor in Interest of Michela Gregory

Kimberly Gregory, Individually and as Successor in Interest of Michela Gregory

Leisa Askew, individually and as heir of Cash Askew, deceased

Natalie Jahanbani, Individually, as Personal Representative of the Estate of Matthew Bohlka (also known as Em Bohlka) and as Successor in Interest of Matthew Bohlka (also known as Em Bohlka)

Jack Bohlka, individually and as heir to Matthew Bohlka (also known as Em Bohlka), deceased

Margaret Bohlka, individually and as heir to Matthew Andrew Bohlka aka Em Bohlka, deceased

Carol Louise Cidlik

Rodney Clark, individually and as personal representative of the estate of Barrett Clark

Bruce Fritz, Individually, as Personal Representative of the Estate of Justin Fritz (also known as Riley Fritz) and as Successor in Interest of Justin Fritz (also known as Riley Fritz)

Nancye Fritz, Individually and as Successor in Interest of Justin Fritz (also known as Riley Fritz)

Christopher Danemayer

Pamela Krueger

Gretchen Porter, Individually, as Personal Representative of the Estate of William Dixon and as Successor in Interest of William Dixon

John Dixon, Individually and as Successor in Interest of William Dixon

Colleen Dolan, individually and as successor in interest to the estate of Chelsea Dolan

Alexandria Ghassan, Individually and as Successor in Interest of Alex Ghassan, by and through her Guardian ad Litem, Lesley Moran

Lucienne Ghassan, Individually and as Successor in Interest of Alex Ghassan, by and through her Guardian ad Litem, Lesley Moran

Lesley Moran as Personal Representative of the Estate of Alex Ghassan

1

Emilie Grandchamps, Individually and as Personal Representative of the Estate of Alex Ghassan

Farzaneh Farsoudi-Hoda, individually and as heir to Sara Hoda, deceased

Brian Hough

Judy Hough

Susan Slocum, Individually, as Personal Representative of the Estate of Donna Kellogg and as Successor in Interest of Donna Kellogg

George D. Kellogg, Individually and as Successor in Interest of Donna Kellogg, deceased

Yraina L. Kopelman, individually, and as successor-in-interest to Edmond William Lapine, II, Deceased

Robert E. Lapine, Individually and as Successor-in-Interest to Edmond W. Lapine, II, Deceased

Michael Madden, Individually, as Personal Representative of the Estate of Griffin Madden and as Successor in Interest of Griffin Madden

Catherine Madden, Individually and as Successor in Interest of Griffin Madden

Samuel Maxwell

Gene McCarty, Individually and as Personal Representative of the Estate of Jason McCarty

Colleen McCarty, Individually and as Personal Representative of the Estate of Jason McCarty

Phil and Tammy McGill, parents of Draven McGill, a Minor

Michael Morris, Individually, as Personal Representative of the Estate of Jennifer Morris and as Successor in Interest of Jennifer Morris

Toshiko Morris, Individually and as Successor in Interest of Jennifer Morris

Valerie Plotkin

Gary Plotkin

Yrjö Timonen, Individually and as Personal Representative of the Estate of Hanna Ruax

Kirsi Piha-Timonen, Individually and as Personal Representative of the Estate of Hanna Ruax

Lorraine Marie Runnels

Richard Allen Runnels

Jeffrey Sylvan

Ursula Sylvan

Maria Vega, individually and as heir to Alex Vega, deceased

Manuel Vega, individually and as heir to Alex Vega, deceased

Maria Vega and Manuel Vega as co-representatives of the Estate of Alex Vega

Edward Wadsworth, Individually, as Personal Representative of the Estate of Peter Wadsworth and as Successor in Interest of Peter Wadsworth

Suzanne Wadsworth, Individually and as Successor in Interest of Peter Wadsworth

James Walrath, individually and as heir to Nicholas Walrath, deceased

Deborah Walrath, individually and as heir to Nicholas Walrath, deceased

James Walrath and Deborah Walrath as co-representatives of the Estate of Nicholas Walrath

Ivannia Chavarria, Individually, as Personal Representative of the Estate of Brandon Chase Wittenauer and as Successor in Interest of Brandon Chase Wittenauer

Please note: The majority of the claims are being brought as a result of individuals being injured then subsequently dying as a result of the injuries sustained in the Ghost Ship fire under California wrongful death and/or survivor statutes. Some of those claimants have or may have damages arising from negligent infliction of emotional distress. Samuel Maxwell is the only claimant that was inside the Ghost Ship when the fire started and survived.

**2.     Telephone Number**

For purposes of presentation of this claim, the telephone number of Plaintiffs' Liaison Counsel is (415) 433-4440.

**3.     Email**

For purposes of presentation of this claim, the email address of Plaintiffs' Liaison Counsel is:

Mary Alexander:     malexander@maryalexanderlaw.com
Jennifer Fiore:       jfiore@maryalexanderlaw.com
Sophia Aslami:      saslami@maryalexanderlaw.com

///
///
///

3

4.      **Mailing Address**

For purposes of presentation of this claim, the mailing address of Plaintiffs' Liaison Counsel is:

Mary Alexander & Associates, P.C.
44 Montgomery Street, Suite 1303
San Francisco, CA 94104

**6. & 7.  Is the Claimant Under 18?**

Alexandria Ghassan is presently age 4; Date of birth is May 25, 2012.  Lucienne Ghassan is presently age 4; Date of birth is May 25, 2012.

Draven McGill was a minor at the time of the Ghost Ship fire; Date of birth is August 22, 1995.

**9. - 12. Attorney or Representative Information**

The following claimants are represented by Mary Alexander & Associates, P.C.:

David Gregory, Individually, as Personal Representative of the Estate of Michela Gregory and as Successor in Interest of Michela Gregory

Kimberly Gregory, Individually and as Successor in Interest of Michela Gregory

Natalie Jahanbani, Individually, as Personal Representative of the Estate of Matthew Bohlka (also known as Em Bohlka) and as Successor in Interest of Matthew Bohlka (also known as Em Bohlka)

Bruce Fritz, Individually, as Personal Representative of the Estate of Justin Fritz (also known as Riley Fritz) and as Successor in Interest of Justin Fritz (also known as Riley Fritz)

Nancye Fritz, Individually and as Successor in Interest of Justin Fritz (also known as Riley Fritz)

Gretchen Porter, Individually, as Personal Representative of the Estate of William Dixon and as Successor in Interest of William Dixon

John Dixon, Individually and as Successor in Interest of William Dixon

Alexandria Ghassan, Individually and as Successor in Interest of Alex Ghassan, by and through her Guardian ad Litem, Lesley Moran

Lucienne Ghassan, Individually and as Successor in Interest of Alex Ghassan, by and through her Guardian ad Litem, Lesley Moran

Lesley Moran as Personal Representative of the Estate of Alex Ghassan

4

Susan Slocum, Individually, as Personal Representative of the Estate of Donna Kellogg and as Successor in Interest of Donna Kellogg

Michael Madden, Individually, as Personal Representative of the Estate of Griffin Madden and as Successor in Interest of Griffin Madden

Catherine Madden, Individually and as Successor in Interest of Griffin Madden

Michael Morris, Individually, as Personal Representative of the Estate of Jennifer Morris and as Successor in Interest of Jennifer Morris

Toshiko Morris, Individually and as Successor in Interest of Jennifer Morris
Edward Wadsworth, Individually, as Personal Representative of the Estate of Peter Wadsworth and as Successor in Interest of Peter Wadsworth

Suzanne Wadsworth, Individually and as Successor in Interest of Peter Wadsworth

Ivannia Chavarria, Individually, as Personal Representative of the Estate of Brandon Chase Wittenauer and as Successor in Interest of Brandon Chase Wittenauer

Contact:
Mary E. Alexander, Esq.
Jennifer L. Fiore, Esq.
Sophia M. Aslami, Esq.
Mary Alexander & Associates, P.C.
44 Montgomery Street, Suite 1303
San Francisco, CA 94104
Tel.: (415) 433-4440
Email: malexander@maryalexanderlaw.com
        jfiore@maryalexanderlaw.com
        saslami@maryalexanderlaw.com

The following claimant(s) are represented by The Veen Firm, P.C.:

Leisa Askew, individually and as heir of Cash Askew, deceased

Contact:
Craig M. Peters, Esq.
David L. Winnett, Esq.
The Veen Firm, P.C.
711 Van Ness Avenue, Suite 220
San Francisco, CA 94102
Tel.: (415) 673-4800
Email: C.Peters@veenfirm.com
        D.Winnett@veenfirm.com

5

The following claimant(s) are represented by The Law Offices of Joshua Cohen Slatkin:

Jack Bohlka, individually and as heir to Matthew Bohlka (also known as Em Bohlka), deceased

Contact:
Joshua Cohen Slatkin, Esq.
Law Office of Joshua Cohen Slatkin
2001 Wilshire Blvd., Suite 320
Santa Monica, CA 90403
Tel.: (310) 627-2699
Email: jcohenslatkin@jcslaw4you.com

The following claimant(s) are represented by Thon Beck Vanni Callahan & Powell:

Margaret Bohlka, individually and as heir to Matthew Andrew Bohlka aka Em Bohlka, deceased

Contact:
Gregory Vanni, Esq.
Raffi H. Ohanian, Esq.
Thon Beck Vanni Callahan & Powell
1100 East Green Street
Pasadena, CA 91106-2513
Tel.: (626) 795-8333
Email: gvanni@thonbeck.com
        rohanian@thonbeck.com

The following claimant(s) are represented by Dolan Law Firm, PC:

Carol Louise Cidlik

Brian Hough

Judy Hough

Lorraine Marie Runnels

Richard Allen Runnels

Contact:
Christopher B. Dolan, Esq.
Isabelle Tan, Esq.
Dolan Law Firm PC
1438 Market Street
San Francisco, CA 94102
Tel.: (415) 421-2800
Email: chris@dolanlawfirm.com
        isabelle.tan@dolanlawfirm.com

6

The following claimant(s) are represented by Rouda Feder Tietjen McGuinn:

Christopher Danemayer

Pamela Krueger

Contact:
John M. Feder, Esq.
Mandissa Logan, Esq.
Rouda Feder Tietjen McGuinn
44 Montgomery Street, Suite 400
San Francisco, CA 94104
Tel.: (415) 398-5398
Email: jfeder@rftmlaw.com
        mlogan@rftmlaw.com

The following claimant(s) are represented by The Brandi Law Firm:

Rodney Clark, individually and as personal representative of the estate of Barrett Clark

Colleen Dolan, individually and as successor in interest to the estate of Chelsea Dolan

Contact:
Thomas J. Brandi, Esq.
Brian J. Malloy, Esq.
The Brandi Law Firm
354 Pine Street, Third Floor
San Francisco, CA 94104
Tel.: (415) 989-1800
Email: tjb@brandilaw.com
        bjm@brandilaw.com

The following claimant(s) are represented by Girardi Keese and The Cochran Firm:

Emilie Grandchamps, Individually and as Personal Representative of the Estate of Alex Ghassan

Gene McCarty, Individually and as Personal Representative of the Estate of Jason McCarty

Colleen McCarty, Individually and as Personal Representative of the Estate of Jason McCarty

Yrjö Timonen, Individually and as Personal Representative of the Estate of Hanna Ruax

Kirsi Piha-Timonen, Individually and as Personal Representative of the Estate of Hanna Ruax

///
///

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Exhibit 4
                        176 of 251
                                                        Page
                                              Page 176 of 251

Contact:
Christopher T. Aumais, Esq.
Kelly Winter, Esq.
Girardi Keese
1126 Wilshire Blvd.
Los Angeles, CA 90017
Tel.: (213) 977-0211
Email: caumais@girardikeese.com
       kwinter@girardikeese.com

Ibiere N. Seck, Esq.
Marcelis Morris, Esq.
The Cochran Firm – California
4929 Wilshire Boulevard, Suite 1010
Los Angeles, CA 90010
Tel.: (323) 435-8205
Email: iseck@cochranfirm.com

The following claimant(s) are represented by Gwilliam, Ivary, Chiosso, Cavalli & Brewer:

Farzaneh Farsoudi-Hoda

Contact:
J. Gary Gwilliam, Esq.
Winston W. Moody, Esq.
Gwilliam, Ivary, Chiosso, Cavalli & Brewer
1999 Harrison St. Ste. 1600
Oakland, CA 94612
Tel.: (510) 832-5411
Email: ggwilliam@giccb.com
       wmoody@giccb.com

The following claimant(s) are represented by the Law Offices of John R. Browne III:

George D. Kellogg, Individually and as Successor in Interest of Donna Kellogg, deceased

Contact:
Law Offices of John R. Browne III
A Professional Corporation
50 California Street, Suite 3500
San Francisco, CA 94111
Tel.: (415) 421-6700
Email: johnrbrowne@sbcglobal.net

///
///

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Exhibit 4
177 of 251
Page 177 of 251

The following claimant(s) are represented by Matiasic & Johnson, LLP:

Yraina L. Kopelman, individually, and as successor-in-interest to Edmond William Lapine, II, Deceased

Contact:
Paul A. Matiasic, Esq.
Hannah E. Mohr, Esq.
Matiasic & Johnson LLP
44 Montgomery Street, Suite 3850
San Francisco, CA 94104
Tel.: (415) 675-1089
Email: matiasic@mjlawoffice.com
       mohr@mjlawoffice.com

The following claimant(s) are represented by Baum Hedlund Aristei Goldman, PC:

Robert E. Lapine, Individually and as Successor-in-Interest to Edmond W. Lapine, II, Deceased

Contact:
Ronald Goldman, Esq.
Timothy Loranger, Esq.
Diane Moore, Esq.
Baum Hedlund Aristei Goldman, PC
12100 Wilshire Blvd., Ste. 950
Los Angeles, CA 90025
Tel.:  (310) 207-3233
Email: RGoldman@baumhedlundlaw.com
       tloranger@baumhedlundlaw.com
       dmargermoore@baumhedlundlaw.com

The following claimant(s) are represented by Kaupp & Feinberg LLP and Bracamontes & Vlasak, P.C.:

Samuel Maxwell

Contact:
W. Gordon G. Kaupp, Esq.
Kaupp & Feinberg LLP
870 Market Street, Suite 646
San Francisco, CA 94102
Tel.: (415) 896-4588
Email: gordon@kauppfeinberg.com

///
///

9

Ryan J. Vlasak, Esq.
Bracamontes & Vlasak, P.C.
220 Montgomery Street, Suite 870
San Francisco, CA 94104
Tel.: (415) 835-6777
Email: rvlasak@bvlawsf.com

The following claimant(s) are represented by Dreyer Babich Buccola Wood, LLP:

Phil and Tammy McGill, parents of Draven McGill, a Minor

Robert B. Bale, Esq.
Dreyer Babich Buccola Wood, LLP
20 Bicentennial Circle
Sacramento, CA 95826
Tel: (916) 379-3500
Email: rbale@dbbwlaw.com

The following claimant(s) are represented by The Arns Law Firm:

Valerie Plotkin

Gary Plotkin

Contact:
Robert S. Arns, Esq.
Kevin M. Osborne, Esq.
Robert C. Foss, Esq.
The Arns Law Firm
515 Folsom St. 3rd Floor
San Francisco, CA 94105
Tel: (415) 495-7800
Email: RSA@arnsaw.com
        KMO@arnslaw.com
        RCF@arnslaw.com

The following claimant(s) are represented by the Law Office of Randall F. Blair

Jeffrey Sylvan

Ursula Sylvan


///
///
///

10

Contact:
Randal F. Blair, Esq.
Law Office of Randal F. Blair
770 Warfield Avenue, 1st Flr.
Oakland, CA 94610
Tel: (415) 205-3766
Email: rfb-law@comcast.net

The following claimant(s) are represented by Cotchett, Pitre & McCarthy, LLP:

Maria Vega, individually and as heir to Alex Vega, deceased

Manuel Vega, individually and as heir to Alex Vega, deceased

Maria Vega and Manuel Vega as co-representatives of the Estate of Alex Vega

James Walrath, individually and as heir to Nicholas Walrath, deceased

Deborah Walrath, individually and as heir to Nicholas Walrath, deceased

James Walrath and Deborah Walrath as co-representatives of the Estate of Nicholas Walrath

Contact :
Frank M. Pitre, Esq.
Alison E. Cordova, Esq.
John Thyken, Esq.
Cotchett, Pitre & McCarthy, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Tel.: (650) 697-6000
Email: fpitre@cpmlegal.com
      acordova@cpmlegal.com
      jthyken@cpmlegal.com

16.    **State Agencies or Employees Against Whom this Claim Is Filed:**

The State of California functions through the actions of its agents, employees, officials, department heads, and chiefs of its various departments and agencies. Claimants do not know the identity and/or extent of involvement of all State personnel involved, but they include employees, agents and/or representatives of the Office of the State Fire Marshal and the Department of Forestry and Fire Protection, and their agents, employees and departments, including the State Fire Marshall on or before December 2, 2016. Investigation is just beginning and shall continue.

///

11

17. **Dollar Amount of Claim:**

The amount of each Claimant's claim is in excess of $10,000. Each claim would be an unlimited civil case. Claimants seek damages, including:
   A. Economic damages according to proof, including, but not limited to, past and future, medical and incidental expenses, loss of earnings and/or diminution in earning capacity, loss of household services, the financial support Decedent would have contributed to the family, funeral and burial expenses, and/or property damage.
   B. Noneconomic damages according to proof associated with wrongful death, including, but not limited to, past and future loss of consortium, love, companionship, comfort, care, assistance, protection, affection, social, moral support, training and guidance.
   C. Noneconomic damages according to proof associated with personal injuries, including, but not limited to, past and future physical pain, mental suffering, loss of enjoyment of life, disfigurement, physical impairment, inconvenience, grief, anxiety, humiliation and/or emotional distress.
   D. Pre- and post-judgment interest on all damages as allowed by the law.
   E. Attorneys' fees, costs and other damages as permitted under applicable laws.

18. **Location of the Incident:**

1305 31st Avenue in Oakland, California. 1305 31st Ave. is a structure located in an R-30 Zone, yet it is considered by the County of Alameda to be a "Warehouse, Portion of a Single Economic Unit." This Single Economic Unit includes Assessor Parcel Numbers (hereinafter "APN") 25-690-11 (1305 31st Ave.), 25-690-10 (1315 31st Ave.) and 25-690-9 (3703 International Blvd). The structures have been owned, since 1988, by Chor Ng. The buildings sit at the corner of 31st Avenue and International Blvd., and run almost the complete length of the block on 31st Avenue between International Blvd. and East 13th Street. As part of the consolidated Single Economic Unit, there is an undeveloped yard on the south side between the structure on 1305 31st Ave. and the residence at 1301 31st Ave.: APN No 25-690-5.

APN 25-690-11 was commonly referred to as the "Ghost Ship" by its occupants and in various promotions of the illegal cabaret which operated there. Graffiti painted on the front of it on the 31st Ave. side said "GHOSTSHIP." The building, at various times, also went by other names including but not limited to the Satya Yuga Collective. At times, APN 25-690-11 has been misidentified as 1315 31st Ave. The building was covered in graffiti, and debris obstructed the sidewalk and ingress/egress creating a dangerous condition of public property for those seeking to enter or exit the building. From the outside, it was evident that the windows were blocked by debris stacked from floor to ceiling and numerous metal objects were attached to the exterior of the building in a dangerous manner.

APN 25-690-11 is reported to have been constructed in the early 1900s. Prior to December 2, 2016, numerous unpermitted modifications to the entire Single Economic Unit had occurred on numerous occasions including, but not limited to: a new electric service; new meters and sub meters; construction of illegal residential units; toilettes, kitchens and showers; inter and intra building passageways to access bathrooms; structural changes in the exterior and interior walls; and unpermitted and shared electrical systems.

12

19. **Describe the Specific Damage or Injury:**

On the evening of December 2, 2016, Injury Claimant and/or Decedent Claimant (hereinafter "Claimants") were at 1305 31st Avenue in Oakland when a deadly fire broke out during a publicly promoted commercial music event and "gathering." As a result of numerous violations of countless State and local laws and ordinances, 36 people were killed and many more were injured. This was the largest loss of life in a fire in Oakland history and the deadliest building fire in California since the 1906 earthquake.

Thirty-six (36) people were unable to exit and were trapped in the inferno inside. These victims suffered injuries from the fire, including from smoke inhalation, while trying to escape. The victims who perished were alive and feared for their safety. They were eventually overcome by the fire and smoke, and subsequently died inside the Ghost Ship. They did not die instantaneously when the fire broke out. They were injured and suffered from the injuries caused by the fire and smoke for many minutes before dying.

20. **Explain the Circumstances that Led to the Damage or Injury**

At approximately 11:15 pm on December 2, 2016, over 100 invitees were at the music event when the fire started inside the Ghost Ship. These invitees, along with artists performing at the event and residents, were plunged into darkness and smoke and tried to exit the unsafe structure.
The interior of the 10,000 square-foot Ghost Ship was a death trap that contained a maze of makeshift rooms, alcoves and partitions. It was cluttered with carvings, mannequins, paintings, artwork, scraps of wood, pianos, furniture, tapestries and several recreational vehicles.

The Ghost Ship lacked a safe means of access between the upper floor where the music event was and the warehouse exit on the ground floor. The Ghost Ship lacked adequate and sufficient fire safety measures and was not up to fire protection and life safety codes, including, but not limited to, not having adequate and sufficient smoke alarms, fire extinguishers, overhead sprinklers, exit signs, emergency lighting, exit lights and a safe means of ingress and egress.

The electrical system was overloaded with excessive use by the dozens of people who lived and worked at the Ghost Ship, including artists, musicians and tattoo artists that used electrical equipment, as well as the musicians and groups that performed public events held at the Ghost Ship. There were often sparks from the electrical system that smelled and circuit breakers blew out often. Overloaded electrical lines at the rear of the Ghost Ship likely contributed to the fire.

There had been fires inside the Ghost Ship prior to December 2, 2016. The most recent fire occurred the day before, on December 1, 2016, when a refrigerator caught on fire.

Dangerous and flammable materials, including industrial and art supplies, propane tanks that fueled camping stoves and recreational vehicles and their components, were located throughout the interior of the Ghost Ship.

///
///

13

21.  **Explain Why You Believe the State Is Responsible for the Damage or Injury**

A. **INTRODUCTION**

The State of California functions through the actions of its agents, employees, officials, department heads, and chiefs of its various departments and agencies. These include, but are not limited to, the Office of the State Fire Marshal and the Department of Forestry and Fire Protection, and their agents, employees and departments, including the State Fire Marshal on or before December 2, 2016; all of which are hereinafter collectively referred to as "The State".

Claimants claim that The State was under a mandatory duty to protect the public from the very type of conditions and harm which led to the tragedy on December 2, 2016: a deadly structure fire, including: 1) substandard, hazardous, out of code, structural components; 2) wiring and utilities, inadequate fire protection; 3) insufficient, blocked, and unmarked fire exits; and 4) improper occupancy and use as a residence and cabaret.

Claimants allege that The State is liable for damages pursuant to, but not limited to, California Government Code Sections 815, 815.2, 815.4, 815.6, 822.2 & 840.2. Claimants claim that The State, through its statements, actions and deeds, as well as pursuant to statute, created and established a special relationship/duty which required that they take affirmative action to protect the Claimants from the very risk of harm and/or death, which they suffered on December 2, 2016. Claimants claim that The State failed to perform these obligations entirely or, where they engaged in such actions, they failed to exercise reasonable diligence in discharging those duties, thereby constitution negligence and/or negligence per se.

Despite notice of the unsafe and dangerous conditions, the State, among other things, negligently failed to investigate, negligently failed to respond to complaints, negligently failed to protect the public, negligently failed to train, supervise and monitor its agents, employees and/or independent contractors, negligently failed to abate an impending peril, negligently failed to warn the public of the dangerous and unsafe conditions, negligently failed to abate a public nuisance, and is liable for failing to stop the ultra-hazardous activities occurring.

The State's agents, agents and/or independent contractors failed to exercise reasonable diligence in discharge of their duties. Said agents, employees and/or independent contractors were negligent in carrying out investigations, protective and safety responsibilities. The negligent acts and omissions and wrongful conduct of The State's agents, employees and/or independent contractors were committed within the scope of their employment. The State is liable for any tortious act or omission of an independent contractor of the public entity to the same extent that the public entity would be subject to such liability if it were a private person.

Claimants are within the general class of persons that one reasonably would anticipate might be threatened by The State's acts and omissions. The State breached its duties under California law, and as a proximate and direct legal result of The State's negligence and breach of duties, Claimants were caused to suffer injuries and damages.

14

The State, through its agents, employees, officials, departments and contractors, was aware or should have been aware that the Ghost Ship was being used as a cabaret, for unpermitted business purposes and unlawful residences for numerous inhabitants, including children, and was a public nuisance. The State was aware or should have been aware of numerous violations of State and local statutes, ordinances and codes, including but not limited to: The California Health and Safety Code, The California Building Code, The California Fire Code, The California Electrical Code, The California Mechanical Code, The California Plumbing Code and California Code of Regulations (hereinafter collectively referred to as "Laws"). These Laws created mandatory duties for The State, its employees, agents, officials, departments and contractors to undertake affirmative actions to make the premises safe or shut it down. Said mandatory duties were obligatory and not discretionary or permissive and included, but were not limited to, requirements to investigate buildings and structures and enforce the applicable Laws to protect against the particular kind of injury that was suffered by Claimants.

The Ghost Ship had an open, obvious and known history of having public events and parties inside, outside and on the roof top, and charging an entrance fee to the events.

### B. APPLICABLE LAWS PLACED MANDATORY DUTIES ON THE STATE TO IDENTIFY AND REMEDY DANGEROUS CONDITIONS

#### 1. The California Fire Code (CFC) Imposes a Mandatory Duty upon The State to Safeguard the Public Health and General Welfare Against Danger from Fire

Relevant sections of the CFC include the following:

**§ 1.1.2 – The Purpose of this code is to establish the minimum requirements to safeguard the public health and general welfare** through structural strength, means of egress facilities. . . safety to life and property from fire and other hazards attributed to the built environment. . . . (emphasis added.)

**§ 1.11.1 SFM-Office of the State Fire Marshal.** Specific scope of application of the agency responsible for enforcement, the enforcement agency and the specific authority to adopt and enforce such provisions of this code, unless otherwise stated.

The specific scope of application includes "Assembly or similar place of assemblage" like the Ghost Ship "where 50 or more persons may gather together in a building, room or structure for the purpose of amusement, entertainment, instruction, deliberation, worship, drinking or dining, . . ."

**§ 1.11.2.1.1 – Enforcement. The responsibility for enforcement of building standards adopted by the State Fire Marshal** and published in the California Building Standards Code relating to fire and panic safety **is as follows:**
   **4. The State Fire Marshal shall have authority to enforce the building standards and other regulations of the State Fire Marshal** in corporate cities and districts

Case: 19-30088   Doc# 4877-4   Filed: 11/26/19   Entered: 11/26/19 20:03:10   Page 4
184 of 251

Exhibit 4
Page 184 of 251

providing fire protection services on request of the chief fire official or the governing body…. (emphasis added.)

**§ 1.12 – Enforcement Agency** [California Code of Regulations, Title 19, Division 1, § 3.12 - Enforcement Agency]:

> (a) The provisions of these regulations, California Code of Regulations Title 19, Division 1, **shall be enforced by the State Fire Marshal,** the chief of any city or county fire department or fire protection district, and their authorized representatives, in their respective areas of jurisdiction….
>
> (b)(3) **The State Fire Marshal shall have authority** to enforce the rules and regulations in corporate cities and county fire protection districts upon request of the chief fire official or the governing body. (emphasis added.)

**§ 3.07 – Clearances.** (a) General. No combustible material shall be placed or stored within 10 feet of any building or structure.

**§ 3.11 – Exits, Aisles, Ramps, Corridors and Passageways:**

> (a) **No person shall install, place or permit the installation or placement of any bed, chair, equipment, concession, turnstile, ticket office or anything whatsoever, in any manner which would block or obstruct the required width of any exit. (b) No person shall install, place or permit the installation or placement of any combustible material or equipment in or exposed to any exit.** Exceptions:
>
> (1) Furniture or equipment constructed of wood or other material of similar combustibility may be permitted in an exit or exposed to an exit when approved by the enforcing agency.
>
> (2) When approved by the enforcing agency, combustible materials may be permitted in exit foyers and lobbies.
>
> (3) No person shall install, place or permit the installation or placement of any storage material of any kind in any exit regardless of the required width of such exit. (emphasis added.)

**§ 3.14 – Fire Hazard.** No person, including but not limited to the State and its political subdivisions, operating any occupancy subject to these regulations shall permit any fire hazard, as defined in this article, to exist on premises under their control, or fail to take immediate action to abate a fire hazard when requested to do so by the enforcing agency. Note: "Fire Hazard" as used in these regulations means any condition, arrangement, or act which will increase, or may cause an increase of, the hazard or menace of fire to a greater degree than customarily recognized as normal by persons in the public service of preventing, suppressing or extinguishing fire; or which may obstruct, delay, or hinder, or may become the cause of obstruction, delay or hindrance to the prevention, suppression, or extinguishment of fire.

**§ 104.3 – Right of entry.** Whenever it is necessary to make an inspection to enforce the provisions of this code, or whenever the fire code official has reasonable cause to believe that there exists in a building or upon any premises any conditions or violations of this code which make the building or premises unsafe, dangerous or hazardous, the fire code official shall have

16

the authority to enter the building or premises at all reasonable times to inspect or to perform the duties imposed upon the fire code official by this code. . . .

**Section 110 – Unsafe Buildings**

**§ 110.1 – General.** If during the inspection of a premises, **a building or structure, or any building system, in whole or in part, constitutes a clear and inimical threat to human life, safety or health, the fire code official shall issue such notice** or orders to remove or remedy the conditions as shall be deemed necessary in accordance with this section, **and shall refer the building to the building department** for any repairs, alterations, remodeling, removing or demolition required.  (emphasis added.)

**§ 110.1.1 – Unsafe conditions.**  Structures or existing equipment that are or hereafter become unsafe or deficient because **of inadequate means of egress or which constitute a fire hazard**, or are otherwise dangerous to human life or the public welfare, **or which involve illegal or improper occupancy or inadequate maintenance, shall be deemed an unsafe condition.** (emphasis added.)

**§ 110.1.2 – Structural hazards.  When an apparent structural hazard** is caused by the faulty installation, operation or malfunction of any of the items or devices governed by this code, **the fire code official shall immediately notify the building code official** in accordance with Section 110.1.  (emphasis added.)

**§ 110.2 – Evacuation.**  The fire code official or the fire department official in charge of an incident shall be authorized to order immediate evacuation of any occupied building deemed unsafe where such building has hazardous conditions that present imminent danger to building occupants.

**§ 110.3 – Summary abatement.**  Where conditions exist that are deemed hazardous to life and property, the fire code official or fire department official in charge of the incident is authorized to abate summarily such hazardous conditions that are in violation of this code.

**Section 605 – Electrical Equipment, Wiring and Hazards:**

**605.1 – Abatement of electrical hazards.  Identified electrical hazards shall be abated. Identified hazardous electrical conditions in permanent wiring shall be brought to the attention of the responsible code official.**  Electrical wiring, devices, appliances and other equipment that is modified or damaged and constitutes an electrical shock or fire hazard shall not be used.  (emphasis added.)

**Electrical hazards include:**
      605.4 Multiplug adapters
      605.5 Extension cords.
      605.10 Portable electric space heaters.

///

**Chapter 7 Fire-Resistance-Rated Construction**

**701.2 – Unsafe conditions.** Where any components in this chapter are not maintained and do not function intended or do not have the fire resistance required by the code under which the building was constructed, remodeled or altered, such component(s) or portion thereof shall be deemed an unsafe condition, in accordance with Section 110.1.1. Components or portions thereof determined to be unsafe shall be repaired or replaced to conform to that code under which the building was constructed, remodeled, altered or this chapter, as deemed appropriate by the fire code official. **Where the extent of the conditions of components is such that any building, structure or portion thereof presents an imminent danger to the occupants of the building, structure or portion thereof, the fire code official shall act in accordance with Section 110.2 [evacuation].** (emphasis added.)

  2. **Mandatory Duties Under California Building, Electrical, Mechanical, Plumbing and Residential Codes and Health and Safety Code for Substandard Buildings**

   a. **Relevant sections of these codes include the following:**

**California Building Code.** The International Building Code as amended and adopted by the State of California and is another name for the body of regulations known as the California Code of Regulations (C.C.R.), Title 24, Part 2; a portion of the "California Building Standards Code," as defined in the "California Building Standards Law" commencing with Section 18901 of the Health and Safety Code.

**California Electric Code.** The National Electric Code as amended and adopted by the State of California and is another name for the body of regulations known as the California Code of Regulations (C.C.R.), Title 24, Part 3; a portion of the "California Building Standards Code," as defined in the "California Building Standards Law" commencing with Section 18901 of the Health and Safety Code.

**California Mechanical Code.** The Uniform Mechanical Code as amended and adopted by the State of California and is another name for the body of regulations known as the California Code of Regulations (C.C.R.), Title 24, Part 4; a portion of the "California Building Standards Code," as defined in the "California Building Standards Law" commencing with Section 18901 of the Health and Safety Code.

**California Plumbing Code.** The Uniform Plumbing Code as amended and adopted by the State of California and is another name for the body of regulations known as the California Code of Regulations (C.C.R.), Title 24, Part 5; a portion of the "California Building Standards Code," as defined in the "California Building Standards Law" commencing with Section 18901 of the Health and Safety Code.

**California Residential Code.** The International Residential Building Code as amended and adopted by the State of California and is another name for the body of regulations known as the California Code of Regulations (C.C.R.), Title 24, Part 2.5; a portion of the "California Building

Case: 19-30088 Doc# 4877-4 Filed: 11/26/19 Entered: 11/26/19 20:03:10 Exhibit 4
187 of 251
Page 187 of 251

Standards Code," as defined in the "California Building Standards Law" commencing with Section 18901 of the Health and Safety Code 4.075.

        **b.  The California Health and Safety Code Defines "Substandard Building Conditions"**

Health and Safety Code Section 17920.3 defines substandard conditions to be, including but not limited to:

      -Inadequate sanitation, water closet, lavatory, bathtub or shower in a dwelling unit;
      -General dilapidation or improper maintenance;
      -Structural hazards;
      -All wiring, except that which conformed with all applicable laws in effect at the time of installation if it is currently in good and safe condition and working properly;
      -All materials of construction, except those that are specifically allowed or approved by this Code and that have been adequately maintained in good and safe condition;
      -All buildings or portions thereof not provided with adequate exit facilities;
      -All buildings or portions thereof that are not provided with the fire-resistive construction or fire-extinguishing systems or equipment required;
      -All buildings or portions thereof occupied for living, sleeping, cooking, or dining purposes that were not designed or intended to be used for those occupancies.

        **c.  The California Health and Safety Code and Administrative Code Sections 24 & 25, Require that The State Enforce the State Building Standards Code**

**Health and Safety Code Section 13145:  Enforcement of building standards and regulations. The State Fire Marshal**, the chief of any city, county, or city and county fire department or district providing fire protection services, or a Designated Campus Fire Marshal, and their authorized representatives, **shall enforce in their respective areas building standards relating to fire and panic safety adopted by the State Fire Marshal and published in the California Building Standards Code** and other regulations that have been formally adopted by the State Fire Marshal **for the prevention of fire or for the protection of life and property against fire or panic.**  (emphasis added.)

**25 CCR § 54 Nuisances — Notices.**  Whenever any building or portion thereof, has become substandard as described in Section 17920.3 or is a building as described in 17920.10, of the Health and Safety Code, and when determined to be a nuisance as defined in Section 17920 of the Health and Safety Code by the enforcement agency, the following shall apply:

The enforcement agency **shall notify the owner** of the building and any mortgagee or beneficiary under any deed of trust, of record, as follows. The notice shall state the conditions causing the building to become substandard or in violation of Section 17920.10 of the Health and Safety Code, **and shall order the building, or portion thereof, vacated and shall institute proceedings for the correction or abatement thereof, either by demolition, closing or repair,** within 30 days after the date of the notice.  (emphasis added.)

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10   Exhibit 4
Page 188 of 251

Health and Safety Code Section 13146 imposes a mandatory duty upon The State to protect against danger from fire:

**§ 13146: The responsibility for enforcement of building standards** adopted by the State Fire Marshal and published in the California Building Standards Code relating to fire and panic safety and other regulations of the State Fire Marshal **shall be as follows**:
> (d) **The State Fire Marshal shall have authority to enforce the building standards and other regulations of the State Fire Marshal** in corporate cities and districts providing fire protection services upon request of the chief fire official or the governing body. (emphasis added.)

**Health and Safety Code § 13145 — Enforcement of building standards and regulations: The State Fire Marshal,** the chief of any city, county, or city and county fire department or district providing fire protection services, or a Designated Campus Fire Marshal, and their authorized representatives, **shall enforce** in their respective areas **building standards relating to fire and panic** safety adopted by the State Fire Marshal and published in the California Building Standards Code and other regulations that have been formally adopted by the State Fire Marshal for the prevention of fire or for the protection of life and property against fire or panic. (emphasis added.)

Various Attorney General opinions confirm the mandatory duty of the State Fire Marshal:

**Health and Safety Code § 13145 and § 13146 provide mandatory direction to fire marshal to enforce rules and regulations** he promulgates under authority vested in § 13143. (20 Ops.Atty.Gen. 31.)

**Health and Safety Code § 13145 imposes a positive statutory duty** (cf. 67 Ops.Cal.Atty.Gen. 331, 332-333 (1984)), upon both the State Fire Marshal and "the chief of any...district providing fire protection services" **to enforce the former's building standards and other regulations relating to fire and panic safety. (Health & Saf. Code, § 16 ["shall" is mandatory];** *People v. McGee* (1977) 19 Cal.3d 948, 958-959; 20 Ops.Cal.Atty.Gen. 31, 36-37; 7 Ops.Cal.Atty.Gen. 274, 279-280.) (emphasis added.)

### 3. Failure to Comply with Mandatory Child Abuse and Neglect Reporting Requirements

To the extent that The State knew that the lessees and property managers, Derick Almena and Micah Allison, were illegally living in the dangerous and unsafe Ghost Ship with their three minor children, The State is liable for the failure of its employees and/or agents to comply with mandatory child abuse and neglect reporting laws, which include reporting requirements under Cal. Penal Code Section 11166(a). That section specifically provides that a report must be made when the mandated reporter "has knowledge of or observes a child" whom the reporter "knows or reasonably suspects has been the victim of child abuse or neglect." Such report shall be made to the Alameda County Social Services Agency immediately by telephone. A written report shall be filed within 36 hours documenting the information. These reporting requirements are mandatory, and the failure to report constitutes the breach of mandatory duty by a government

agency. *See B.H. v. County of San Bernardino* (2015) 62 Cal.4th 168. *See also* Penal Code Sections 11166.05; 11165.2; 11165.3; 11165.4; 11165.6; and 11165.9.

### C. THE STATE MAY BE LIABLE FOR FAILING TO WARN OF HAZARDOUS CONDITIONS

To the extent that The State knew of the hazardous and dangerous conditions, a special relationship existed between employees, agents and/or representatives of The State and Claimants as members of a foreseeable, known and identifiable group of individuals, including attendees of music events inside the Ghost Ship.

As a result of the foregoing, The State knew or should have known of the unsafe and dangerous conditions at the Ghost Ship, which could result in imminent peril to a foreseeable group of individuals at the Ghost Ship, which was not readily discoverable by them.

The unsafe and dangerous conditions included a foreseeable threat of harm to those who would be entering the Ghost Ship to attend music events and those staying at the Ghost Ship. Despite knowledge of the unsafe and dangerous conditions inside the Ghost Ship, The State failed to warn this foreseeable, known and identifiable group of the unsafe and dangerous conditions.

Claimants note that they have been denied the opportunity to inspect the property before or contemporaneously with the inspection conducted by the Oakland Fire Department ("OFD") and Bureau of Alcohol, Tobacco and Firearms ("ATF") at the behest of City of Oakland. As a result, Claimants have been denied the opportunity to identify, categorize and inspect any of the objects, materials, documents or other evidence removed by ATF or OFD as part of their investigation; denied the opportunity to photograph or otherwise document the relative position of those objects in situ before their removal, and denied the opportunity for inspection of the property in situ by experts in the fields of arson, electrical systems, construction, building planning and building codes, architecture, and the like. At the time this Claim was filed, Claimants have yet to receive a copy of the OFD or ATF Report on their investigations, or any portion thereof. To the extent this information was and remains unavailable at the time this Claim was filed, Claimants' ability to articulate all possible violations of mandatory duties, including negligence in the exercise of ministerial duties, has been compromised for reasons beyond the control of Claimants. In light of this, Claimants, who had no control over or access to the subject property prior to the OFD and ATF's inspection and removal of critical materials, should not be prejudiced with respect to any future pleadings in this matter, including any Complaint filed against The State that alleges additional violations of duties that could not reasonably have been known to Claimants at the time this Claim was filed and served.

**All of the statements made in this claim are upon information and belief.**

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Page 4
190 of 251

Exhibit 4
Page 190 of 251

# Exhibit 4

Exhibit 4
Page 191 of 251

**Oakland Fire Department**

**Origin and Cause Report**

**Incident # 2016-085231**

**December 2, 2016**

**1315 31st Avenue**

March 18, 2017 edited May 11 2017

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Exhibit 4
192 of 251

**TABLE OF CONTENTS**

SUMMARY                                                          3

PARTICIPATING FIRE INVESTIGATORS                                 3

WEATHER CONDITIONS                                               4

PROPERTY OWNER                                                   4

SCENE SECURITY                                                   4

LEGAL PRESENCE                                                   4

INSURANCE                                                        4

FIRE PROTECTION SYSTEMS                                          4

FIRE DISCOVERY                                                   5

FIREFIGHTER OBSERVATIONS                                         5

SYNOPSIS OF INITIAL SCENE INTERVIEWS                             7

SYNOPSIS OF FORMAL WITNESS INTERVIEWS                            8

BUILDING CONSTRUCTION                                           10

ELECTRIC SERVICE                                                11

INTERIOR CONDITIONS PRIOR TO FIRE                               13

EXTERIOR SCENE EXAMINATION                                      18

EXPOSURE BUILDING                                               22

INTERIOR SCENE EXAMINATION                                      22

ANALYSIS OF FIRE PATTERNS/ INDICATORS                           35

EXAMINATION OF POTENTIAL HEAT SOURCES                           39

EVIDENCE                                                        41

FATALITIES                                                      41

KNOWN INJURIES                                                  46

CONCLUSION                                                      46

DIAGRAMS                                                        47

TENANT SKETCH, FIRST FLOOR                                      50

## SUMMARY:

On Friday, December 2, 2016, at approximately 11:24 PM, Oakland firefighters responded to a reported fire at 1315 31st Avenue (commonly known as the Ghost Ship Warehouse). Upon arrival, fire crews found heavy smoke coming from the two-story warehouse. The building was an occupied structure divided into live/work spaces. The space was also used that evening for a music event being held on the second floor. The fire progressed to a third alarm assignment requiring approximately 52 firefighters to bring it under control. The estimated dollar loss of the structure is $ 1,235,000. [1] The fire resulted in 36 fatalities.

## PARTICIPATING FIRE INVESTIGATORS:

| | |
|---|---|
| Weldon Clemons | Oakland Fire Department |
| Maria Sabatini | Oakland Fire Department |
| Javan Smith | Oakland Fire Department |
| Cynthia Chang | Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) |
| Brian Parker | Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) |
| Barbara Maxwell | Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) |
| Jeremy Neagle | Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) |
| Michael Abraham | Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) |
| Adam St. John | Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) |
| Michael Marquardt | Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) |
| Jeffery Laverman | Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) |
| Melvin Robin | Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) |
| Wayne Dutchover | Alameda County Arson Task Force |
| Nick Bartlett | Alameda County Arson Task Force |
| Gina Stewart | Alameda County Arson Task Force |
| Greg Hughes | Alameda County Arson Task Force |
| Paul Balzouman | Alameda County Arson Task Force |

[1] $125 per square foot replacement cost, total square footage: 9,880

Note: In addition to Oakland Fire Department personnel, mutual response firefighters from neighboring agencies, and members of the Alameda County Coroner's Bureau assisted with debris removal.

**WEATHER CONDITIONS:**

www.wunderground.com reported the following weather conditions in Oakland, California on December 2, 2016, at approximately 10:53 PM: the temperature was 48.9 degrees Fahrenheit, the dew point was 46 degrees Fahrenheit, humidity was 59%. Visibility was 10 miles and the winds were variable at 3.5 miles per hour.

**PROPERTY OWNER**:

The Alameda County Assessor lists the Chor N. Ng Trust as owner of 1315 31st Avenue Oakland, CA 94601. Parcel # (APN): 025-0690-010-00.  The property is managed by Kai Ng. Mr. Ng can be reached at ███████████.

The warehouse leaseholder ██ Mr. Derrick Ion Almena: ███████████.

**SCENE SECURITY:**

The integrity of the scene was maintained by the Oakland Fire Department, The Bureau of Alcohol, Tobacco, Firearms and Explosives, the Oakland Police Department and the Alameda County Sheriff's Office throughout the scene investigation.

**LEGAL PRESENCE:**

The fire scene investigation was conducted under the authority of the Oakland Fire Department. A search warrant was obtained and signed on December 4, 2016, by Alameda County Superior Court Judge Kimberly Colwell.

**INSURANCE:**

Commercial Industrial Buildings Owners Alliance (CIBA) Insurance Company insured the building. Their business address is 655 North Central Avenue, Suite 2100, Glendale, CA 91203. The phone number is (818) 638-8525.  The policy number is P00028927.

**FIRE PROTECTION SYSTEMS:**

The building was not equipped with an automatic fire suppression system (sprinklers) or an automatic fire detection system. Several fire extinguishers were located throughout the warehouse. One battery operated smoke detector was found in the debris.

**FIRE DISCOVERY:**

The first 911 call was from an occupant of 1315 31ˢᵗ Avenue, Carmen Brito, using cellular phone number ███████████ People fleeing the warehouse also ran to Oakland Fire Department Station #13, located at 1225 Derby Avenue, which is one block, approximately 472 feet according to Google maps, from the fire building. According to firefighters, people were knocking on the fire station doors when the firefighters were getting ready to respond to the fire, having received notification from Oakland Fire Dispatch. Carmen Brito told investigators she was in her living space, as she had gone to bed around 10:00 PM. Brito stated around 11:20 PM. she woke up and noticed her space was filled with smoke and she could see an orange glow outside of her living space. Brito stated she got up and put on her shoes and coat but felt like her movements were sluggish. Brito stated she walked down her steps and noticed the living space of "Swan" (Leah Vega) and "Dragon" (David Calvera) was on fire. She believed the flames were approximately 8 feet high. Brito stated she went to the front of the warehouse and called 911. (See "Witness Interviews" for additional information)

**FIREFIGHTER OBSERVATIONS:**

*(The front elevation of the building faces south and was denoted the "A-side." Further reference to B- C- and D- sides is clockwise from that cardinal point.)*

On Thursday, December 8, 2016, Oakland Fire Department (OFD) Firefighter (FF) Brooke Meredith and OFD Paramedic Brian Hicks, met with fire investigators to discuss their observations as the first-in firefighters at 1315 31st Avenue.

In summary, their observations are as follows:

• They heard dispatch announcing a fire at a warehouse on 31st Avenue. As they were getting ready, they also heard people knocking on their doors, yelling about a fire. Upon pulling out of the bay, they could see smoke coming from the area of the warehouse one block away.

• Engine 13 pulled directly in front of the rollup door at the front of the warehouse, into which a smaller man-door had been cut (only the man-door was open, left side of rollup door, and partially ajar/not fully open). Some people were outside the warehouse, stating there were still people inside. However, nobody seemed overly excited or distraught.

• They saw thick dark grey smoke coming out the first-level windows, as well as from the top of the rollup door. A small amount of smoke was coming out of the 2nd level window at the A/B corner (top-left). They called into the man-door for a response from people possibly inside but got no answer. They then closed the man-door to prevent oxygen from further fueling the fire. Paramedic Hicks said he never heard anything but crackling from the fire (he was in front of FF Meredith).

• Upon entering down low on the ground through the man-door, they encountered flames and sprayed a narrow stream of water upward. They noted when the water droplets descended, they weren't too hot. Smoke was at about face level as they crawled in on their hands and knees. They saw a glow behind, and to the right of, a large statue located just in front of the man-door.

• They got to what they described as a wall in front of them, then made a left turn, encountering a hallway on their right lined by pianos. There was thick smoke down the hallway and they could see flames in front of them to the right, behind what they made out to be a piano. This was past the front stairs along the east wall.

• They were flowing water intermittently. They felt they were knocking down the flames, but not the seat of the fire because the ceiling kept igniting. The fire was also getting behind them [meaning it was getting up and over them heading toward the front of the building].

• They then lost some pressure, thought to have been when they switched from engine-supplied water, to hydrant-supplied. They then got low-air alarms, and had to withdraw. Both recalled having to follow the hose out, as visibility was poor due to smoke conditions.

• When they went back in, they chocked the man-door open because it had been swinging freely. They entered with the crew from Engine 17, focusing on the kitchen area along the left side immediately after entering the man-door. At that time, they were operating a 2.5" hose line.

• The Chief then gave an evacuation order.

Battalion Chief James Bowron's observations:

• He had a view from the A/B corner (southwest). There was heavy smoke from the A-side (south) and B- side (west), and he saw no doorways along the B-side. He thought victim survivability was low due to the smoke conditions he observed, which he further described as heavy pressurized grey smoke pumping out of the structure. The crews were utilizing large diameter hose at this point, and then he saw the B/C corner (northwest) start to take off. He said the majority of working fire was initially occurring at the A/B area, and that the 2nd floor had a tremendous amount of smoke, but no fire visible. He recalled the fire quickly reaching a 2nd alarm, and then a 3rd alarm.

• Engine 23 had 2.5" lines on the B-side where a large lot was located. The lot was full of cars, trees, junk, a makeshift RV "house," etc. He said they focused on limiting the exposures along this side. They also found a "chipped out/carved out" door along the mid-way point of the B-side wall.

• Truck 2 and Truck 6 worked the roof and were the "vent group." He recalled a large truss along the roofline, and that they cut large holes to serve as ventilation points. The fire had not vented through the roof at that point.

• The next thing he recalled was the fire flashed out the A-side (south), and 3 windows blew out from around the A/B (southwest) corner, from what he called a small smoke explosion. There was then heavy pressurized smoke venting through the roof, and he saw the second floor light off.

• At this point they all pulled out and went defensive. They set up two ladder pipes flowing approximately 1,000 gpm each. They also fought the D-side (east) exposure, which shared an adjoining wall with the fire building, for about 30-40 minutes, because they realized a mezzanine of sorts connected the two spaces, and they wanted to prevent further extension.

**SYNOPSIS OF INITIAL SCENE INTERVIEWS:**

Mr. Kai Ng ████████████ stated his family has owned the building where the fire occurred and the adjoining structures for about 25 years. He stated the warehouse is solely leased to Derrick Ion (Almena), who has sublet spaces to several artists for the purpose of working and hanging out. He stated Ion was informed no one he sublets to is supposed to live there. He stated Ion has leased the space from him for a period of about 2 ½ years. Ng stated about 3 years ago he invested about $30,000 on electrical upgrades in the warehouse and was unaware of any current electrical problems. He stated he has not physically been inside the structure for at least 1 ½ years. Ng stated his mother is the listed owner but he manages the property due to language barriers.

Anthony Penrault ████████████ stated he was next to the patio door (west side) when he began to hear raised voices. He stated he heard people yelling "fire" and when he investigated, he saw flames touching the ceiling of the first floor. He stated he tried to use an extinguisher but it was no use. He stated "Bob" told him to get out and he evacuated. He stated he had been familiar with the building having electrical problems like power outages for a while. He thought the fire may have been associated with that.

Nikki Kelber, DOB: ████████, ████████████ stated after hearing the sound of the fire, she observed flames coming from the rear of the building, walking across the ceiling. Kelber stated she saw heavy black smoke as well and she opened some of the windows in her space, which is located on the lower level of the building in the front. She stated she hoped that was the right thing to do. She stated the power immediately went out as she was evacuating. Kelber stated 25 people lived in the building.

Bob Mulé, DOB: ████████, ████████████ stated he and others were having a party, which started at about 9:00 PM but started slowly. He stated the party started to pick up at about 10:30 - 11:00 PM. He stated while he was at the front door he believed he had let in at least 40 to 50 people. He stated he was notified about smoke at about 11:35 PM. He stated he smelled smoke near a light outlet with an adapter connected to the lamp. No fire was detected. He stated he and "Farris" (Aaron Marin) began disconnecting plugged in appliances from electrical outlets. He

stated due to previous electrical issues, like power outages, they began to disconnect things that were energized in that area. He stated they began to look for the source of the smoke. He stated in the left rear corner (northwest) of the structure, he saw flames. He started yelling for people to get out of the building. He stated an occupant in the rear, Pete Wadsworth, had broken his ankle and he was trying to help him get out but he (Wadsworth) was too heavy. He stated he was not sure if Pete was able to get out.

Chris Nechodom, DOB: ██████ stated he was sitting on a couch when he heard people yelling fire and he evacuated the building. Nechodom offered nothing further.

Carmen Brito, DOB: ██████, ██████████████ stated she lived in a space on the lower level in the rear of the warehouse (northwest). She stated she woke up to thick black smoke. She said she shouted for help and saw flames in the space next to hers. She stated the flames were in the area where a refrigerator was recently installed, against the wishes of many of the tenants, due to the many electrical problems in the building. She stated when she saw the glow, and then the flames, she put on her shoes and began to evacuate. She stated seconds after she started to leave the power cut off. She stated all of the different spaces were partitioned with wood that is treated with antiquing stain. She stated each space had a lot of electronics and power outages. She stated after the refrigerator was added two power outages occurred. She stated the fire started right where the refrigerator would have been.

**SYNOPSIS OF FORMAL WITNESS INTERVIEWS:**

On December 3, 2016, Bob Mulé, who lived at 1315 31st Avenue in Oakland, California and was at the location when the fire started, provided the following:

 Mulé stated he had just returned to his living space after being in Zach (Zachary Pinto) and Lilo's (Liona Tuuhetoka) space when Ferin (Aaron Marin) came in and said he thought he smelled smoke. Ferin and Mulé went to a light fixture on the landing of the northeast stairwell. Mulé unplugged some lights that were plugged into the light fixture. Mulé then noticed a haze and went to check the different levels of his living space and found smoke in the second level. Mulé then went to the first level and saw a glow coming from the area between the back of Swan's (Leah Vega) trailer and the north wall of the structure.

Mulé obtained a fire extinguisher from Zach and Lilo's space but was unable to work it. Mulé then heard another resident, Pete (Peter Wadsworth), and attempted to help him from the building because Pete's ankle was broken. Mulé stated the fire was intense and he was forced to leave Pete. Mulé showed investigators the back of his jacket, which was burned.

On December 12, 2016, investigators interviewed Aaron Marin. Marin was at 1315 31st Avenue visiting Derick Ion Almena and had been staying there for about two weeks prior to the fire. Marin stated he had been upstairs, in the back studio, when he smelled smoke, and went

downstairs (using the back stairwell) where he met up with Mulé. Marin and Mulé checked out the light fixture on the landing of the back stairwell and it felt hotter than normal. Mulé took out the light bulb, and while using the light from his phone, they could see "light" smoke. Marin stated he ran upstairs and Mulé ran downstairs. Marin stated there was smoke in the upstairs, rear studio, and when he went into the area where the party was located, he noticed flames by the DJ's turntable. Marin stated he then noticed that the flames were coming from under the floor. Marin stated he tried to use a water bottle to put out the flames but realized it wasn't going to help. Marin stated people were then starting to realize there was a fire and started making their way to the front staircase. Marin stated he also started to go to the staircase and noticed people coming back up stating that the staircase wasn't good. Marin stated he knew the kitchen had windows and he started to yell, "Kitchen, Kitchen!" Marin stated at that point the lights went out. Marin stated the smoke was much thicker and it was getting harder to breathe. Marin stated the kitchen was blocked by a blow up screen, but he knew the kitchen was located in that area, so he just felt his way to the window. Marin stated he got the window opened and yelled for a ladder. Marin stated Mulé and another person were attempting to get in the locked gate and get a ladder to him but he decided to just hang and drop. Marin stated he told the people on the outside there were more people inside and they did put up the ladder by the window, but no one else came through the window. Marin stated if a person hadn't been in the space before they would not have known there were windows because there were items in front of the windows so the windows weren't visible.

On December 7, 2016, investigators interviewed Max Harris. Harris resided at 1315 31st Avenue in Oakland, CA for over two years. Harris stated he was kind of seen as the "creative director" for the tenants. Harris stated he would collect rents and handle any disagreements between tenants. Harris also stated if something didn't work, he would be the person the tenants came to for help. Harris stated they didn't allow smoking, candles, incense, or space heaters in the warehouse. Harris stated they did have electrical problems and had complained to the landlord about the issue. Harris stated the warehouse was supplied electricity from the body shop next door so if one of the fuses blew, they would have to wait for the body shop to open to restore power. Harris stated the breaker and the fuses "popped" a few days prior to the fire.

On December 9, 2016, investigators interviewed Carmen Brito, who resided at 1315 31st Avenue in Oakland, CA. Brito was at home on the night of the fire. Brito stated she went to bed around 10:00 PM and awoke at around 11:20 PM. Brito stated she thought she woke herself up coughing. Brito stated she noticed her space was filled with smoke and she could see an orange glow. Brito stated she got up and put on her shoes and coat but felt like her movements were sluggish. Brito stated she walked down her steps and noticed the front wall of "Swan" (Leah Vega) and "Dragon" (David Calvera's) living space was on fire. She believed the flames were approximately 8 feet high. Brito stated she went to the front of the warehouse and called 911. Brito believed about a minute after she exited the building the lights went off. Brito also confirmed they had lost power a day or two prior to the fire.

On December 4, 2016, investigators interviewed Adam Kennon, who resided at 1315 31st Avenue in Oakland, CA. Kennon stated he was on the patio when he heard someone yell, "fire." Kennon stated he ran into the warehouse to see what was going on. Kennon stated he was standing by Hunter's space and looked down towards Swan (Leah Vega) and Dragon's (David Calvera) space. Kennon stated he could see a large orange glow with occasional flames coming out of it. Kennon stated he could see the door to their space and knew they were not at home because it was locked on the outside. Kennon stated he and a few other people left through the west door and then squeezed through the fence gate to get out to the street. Kennon stated he then ran to the fire station to let them know about the fire.

On December 13, 2016, Leah Vega (Swan) came to the scene to meet with investigators. Vega and her boyfriend, David Calvera (Dragon) had also met with investigators at the scene location on the evening of December 5, 2016. Vega and Calvera both resided at 1315 31st Avenue in Oakland, California.

Both Vega and Calvera were not at home at the time of the fire. They work for ███████ ███████ and were at an event that evening. Vega estimated they left their space at approximately 2:00 PM on the afternoon of the fire. Vega stated because of the electrical issues the warehouse had been having, they unplugged most things in their living space when they leave. They had two refrigerators, one small and one larger, plugged in when they left. There was also an extension cord that went into their trailer and was connected to a second extension cord that had two lights plugged into it. Vega believed the lights were off. In their "office" space, Vega said there might have been a battery pack charger for a new drill she had recently purchased.

Vega and Calvera explained how they had their living space set up and what was plugged in. They explained there was one receptacle mounted on a wooden post in the kitchen area (west side of the space) and another receptacle hanging down from the ceiling (east side of the space). Vega stated they tried to unplug anything that wasn't being used and had purposely bought power strips that contained a switch, so if something went wrong, it would turn off. Vega and Calvera stated they were not sure where the power for their living space came from because previous tenants constructed the spaces prior to their occupancy. They didn't know if some extension cords were plugged directly into a receptacle or daisy chained from another extension cord. Calvera stated most people didn't know what was behind the walls of their spaces.

**BUILDING CONSTRUCTION:**

The affected structure was a 2-story, concrete block warehouse built in 1930. According to public record, the combined square footage of both floors is 9,880 sq. ft. The front of the building faced 31st Avenue and was denoted the south direction, or the "A-side." All reference to direction is clockwise from that cardinal point. It should be noted that the exterior dimensions did not form a complete rectangle. Those dimensions were as follows:

A-side (south), approximately 59'1"
B-side (west), approximately 99'2"
C-side (north), approximately 48'8"
D-side (east), approximately 94'1"

The roof was a wooden gable, built upon steel trusses, with the ridgeline running in a north-south orientation, covered in composite rolled roofing material. A large garage-type metal roll-up door was situated on the ground floor just east of the midline on the front (south) of the structure, approximately 9'8" in width. Within the roll-up door (positioned on the left side) was a single man-door that functioned as the entrance to the warehouse. A single man-door was also situated approximately midway along the B-side (west) wall. It allowed occupants to access an empty lot where a smoking area had been designated.

The interior of the structure consisted of steel frame and wooden structural members. The ground level flooring was concrete. The second level flooring was constructed of wood. The interior dimensions were as follows:

-ground floor to bottom of truss supporting 2nd-floor, approximately 11'6"
-truss itself, approximately 13"
-ground floor to peak height of the roof, approximately 20'6"

**ELECTRIC SERVICE:**

On December 9, 2016, investigators performed an examination in conjunction with Electrical Engineers of the Bureau of Alcohol, Tobacco, Firearms and Explosives. The summary follows:

Fixed Electrical Components Supplying the Structure:

Electrical service to the building was provided via an overhead service drop from a pole (#23480) near the intersection of International Boulevard and 31st Avenue. From the pole, conductors supplied a main electric service panel, protected by 400 amp fuses, inside a meter room on the second floor of 3071 International Boulevard - the Boost Mobile Store. In this room were two meters. Meter # 1009481008 served 1315 31st Avenue and an adjacent auto shop marked "1309" 31st Avenue. A second meter, # 1009657850, served 3071 International Boulevard.

From the main electric panel in the meter room of the Boost Mobile Store, electric supply traveled through conduit and subpanels to 1315 31st Avenue. The main subpanel for 1315 31st Avenue was located in a rear room on the ground floor of the auto shop marked as 1309 31st Avenue. In this main electric subpanel, engineers identified two-2 pole 50 amp circuit breakers in the tripped, or center position. Handwriting on the inside of the panel door identified these as,

*Satya Yuga Main s* [sic]  and *Satya Yuga Upstairs*.  The service continued from this main subpanel through conduit to the west interior wall of the auto shop, at which point service entered the fire building (1315 31st Avenue); each of the two floors of the fire building was served by an additional subpanel.  The first floor and second floor subpanels were located on the east wall of the fire building at the northeast corner of the building.  These panels were both heavily fire-damaged.

Following are observations of the aforementioned electrical service:

- The events that tripped the two-2 pole 50 amp circuit breakers in the main subpanel resulted in the loss of electric supply to the entire fire building.

- The visual examination of the entire configuration revealed modifications to the electrical systems, completed at mostly unknown dates between original construction and the time of the investigation.  Within the main electric subpanel for the fire building, located on the ground floor of the auto shop next door, conductors in the subpanel were dated November 2014.

- In a second floor room above the auto shop, in a portion of the electric service not related to the fire building, investigators observed a former electric feed not currently in use and not connected to a meter.  Statements from some occupants who spoke of a former "pirated" electric supply for an alleged marijuana grow were probably referring to this illicit configuration.  Its presence was determined to be of no consequence in this event.


Interior Fixed Electrical Systems of Building of Origin:

On the first floor of the fire building, electrical conduit containing insulated conductors and outlets were found along the masonry walls of the building.  The occupant who lived in the area of origin (the northwest area of the first floor) stated the outlets were not in use, and she says she was not even aware of their presence before the fire.

As part of the scene examination, the conductors were removed from the conduit and examined.  The portion most heavily affected by heat was located along the west wall near the northwest corner of the building, in an area the occupants described as a small office.  In this area, the conductors inside the conduit were exposed to heat sufficient to consume their insulating material. There was no evidence of arc-melting on the conductors.

Non-Fixed Interior Electrical Systems Within Building of Origin:

Instead of using the fixed electrical components of the building, such as outlets, the occupants explained power strips were used to supply electricity to lamps and appliances.  The occupants of the area of origin said they used power strips to energize items in their possession. Due to the

crowded, complicated association of the rooms and adjoining rooms, they did not know where all power supplies originated. (See both "Interviews" sections of this report for descriptions of extension cords and power strips in use at the time of the fire.)

In the area of origin, occupants described an overhead light in a small common area just outside their room that was always "on." The occupants reported they did not know where the power for this light originated. Two heavily damaged temporary power distribution boxes, or "spider boxes," were found in the fire debris and were observable remains of part of a makeshift system that supplied areas of the building with electricity. Witnesses stated one box was in use upstairs wired directly to the 2nd floor subpanel. The other box was described as a spare, not in use at the time of the fire.

**INTERIOR CONDITIONS PRIOR TO FIRE:**

Ground Floor:

The main entrance to the ground floor was through the man-door on 31st Avenue. From there, makeshift hallways led erratically deeper into the building. The hallways were not constructed of traditional materials such as drywall-covered, wood-framed walls. Instead, the walls of the hallways were assembled together from aggregates of salvaged and scavenged materials, such as pianos, organs, windows, wood benches, lumber, and innumerable other items stacked next to and on top of each other. (see photo below)



The warehouse was further divided into individual "cubicle" live-work spaces by a conglomeration of makeshift items including but not limited to: wooden studs, steel beams, doors, window frames, bedframes, railings, pianos, benches, chairs, intact motorhomes and trailers, portions of trailers, corrugated metal sheeting, tapestries, plywood, sculptures, tree stumps and tree limbs. Tenants described several live-work units that were constructed of multiple levels to the height of the first floor ceiling. The elevated units were variously described as lofts, perches, and tree forts, constructed of actual tree stumps and large dimensional lumber.

Two rudimentary bathrooms were between the front roll up door and the base of the east wall staircase.

Inside the front door to the west was an area the residents referred to as "the kitchen." West of the kitchen, in the southwest corner of the building, four people had live-work spaces. (see photo below)



Further into the warehouse, going north along the east wall, there was a tenant whose living space was a small travel camper. To the north of the travel camper, also on the east wall, was another living space. At the approximate middle of the warehouse, there were two recreational vehicles. One was perpendicular to the east wall and the second was perpendicular to the west wall, just to the north of the west door opening. The space between these two vehicles formed another hallway/walkway to the back of the warehouse. A few feet to the north of the vehicles was a raised platform. The platform had been built against the front wall of a travel trailer that extended out, perpendicularly, from the middle of the north wall. The platform divided the

direction of travel to the rear of the warehouse towards more living units at the northeast and northwest areas of the first floor. The northwest area contained four living spaces. The northeast area contained two living spaces and a stairway to the second floor.

Some of the living spaces contained multiple levels. For example, the recreational vehicle along the east wall had a space built on top of the vehicle where the tenant would sleep. The large travel trailer located off of the middle of the north wall had a space above it where an occupant slept. These elevated areas extended to within a couple of feet of the first floor ceiling.

<u>Stairways</u>:

There were two stairways to the second floor.

The front staircase was located along the east wall at the front of the structure. It was constructed of various wooden planks and wooden studs, as well as portions of wooden pallets at its top where it accessed the second floor. One of two bathrooms was elevated slightly off ground level where the lower staircase landing was located. The orientation of the staircase was such that it first led eastward where it bordered the east wall, then turned north (rearward), where it then turned slightly west at the very top of the staircase at the second floor.
(see photos below)





The rear stairway was constructed of wood and located in the northeast corner of the building. A run of stairs ascended the north wall, to a landing against the east wall, and another run of stairs ascended the east wall to a landing on the second floor. Occupants said the second floor access to this stairway was concealed behind contents and furnishings. The electric subpanel serving the second floor was located on the east wall at the top of the stairway.

Neither stairway exited to the exterior of the building.

<u>Second Floor</u>:

The second story contained fewer living spaces and hallways, and an open area for events was the predominant feature. A family lived in a space at the south end and two other tenants were reported to have living spaces on the second floor; one along the east wall and one in the northwest corner. Most of the space was open with areas of couches and chairs for people to socialize. There was an area at the north end of the second floor where musicians or disc jockeys set up when events took place. (See photos below)





**EXTERIOR SCENE EXAMINATION:**

A systematic approach was used. Examination proceeded from outside to inside and from areas having the least damage to areas with heavier damage with emphasis on recognition, identification and analysis of fire intensity and movement patterns, and in accordance *with NFPA 921 Guide to Fire and Explosion Investigations.*

The exterior scene examination was conducted in a clockwise manner, starting at the front of the building that faced 31st Avenue, denoted the "A-side" (south).

*-A-side of Structure/Front (south)*

The front of the structure faced 31st Avenue. The exterior wall of 1315 31st Avenue was partitioned into 3 vertical sections, running from top to bottom. Windows were present in each section, on the first and second floors, with the exception of the east section that contained a metal roll-up door, with windows above. The roll-up door contained a man-door. No intact glass was present on either level. There was smoke staining above the windows in the middle section on the first and second floors as well as above the roll-up door. There was minimal smoke

staining above the windows in the east section on the second floor. Minor smoke staining was noted above the windows in the west section of the wall. (See photos below for the layout and location of the openings in the south wall of the structure.)

 

***-B-side of Structure/Left-side (west)***

The B-side of the building bordered an open lot containing a large amount of discarded items. A non-permanent structure used as living quarters and fashioned out of various materials was located toward the north (see photo below). Windows were present on the B-side on the first and second levels, along the rear (north) two–thirds of the building. The only window with any glass remaining was the first floor southernmost window. The second floor rear-most (north) window contained metal mesh over the window opening. In the right-most (south) first and second floor windows, the upper pane was in an open position, swung outward from the top hinge.

*(Blank Space)*



A single door-opening (created by removing concrete blocks from the wall) was present along the ground floor, at approximately the midway point (see below-circled). Fire and smoke damage was heaviest above the middle windows on the 1st and 2nd floors. (see photo below)



*Page 20*

Additionally, the fire pattern above the single man-door intersected with fire patterns around the windows above and slightly to the right of the doorway.
(see photo below)



### -C-side of Structure/Rear (north)

This was the rear of the building, behind which a parking lot was located. There were no windows or doors on this side of the builidng. No fire damage was present.

### -D-side of Structure/Right-side (east)

This side of the structure was a zero-lot line with the auto shop in the adjacent space and shared a common wall. Some fire extension was observed into the interior of the auto shop, to be discussed in the "Exposure Building" section below.

Fire damage to the exterior surfaces of 1315 31st Avenue is consistent with a fire that originated within the structure. No external causes or heat sources were identified on the exterior of the building of origin.

*Page 21*

**EXPOSURE BUILDING:**

1309 31st Avenue was examined. This is the adjoining structure on the D-side of the building of origin and according to Alameda County records is actually a part of 3073 International Boulevard. Fire damage to this building occurred in an area at its northwest corner, on the second floor. This damage corresponded to an opening between the two buildings. Witness statements indicated at an undetermined date before the fire, a bricked-in window was opened to allow access between the two buildings. Fire patterns around this opening and on the walls of the second floor of the auto shop were consistent with fire and heat originating in 1315 31st Avenue and spreading via normal fire progression to the adjacent building.

**INTERIOR SCENE EXAMINATION:**

Overview:

The fire in the building of origin was extinguished by firefighters after a prolonged period of free-burning. During the fire, the roof was largely consumed. Parts of the roof that were not consumed were either knocked down into the structure by large quantities of water during the fire attack, or collapsed under their own weight. Fire damage throughout the building was extensive.

 Comparative analysis of fire damage to the interior of the structure showed a greater degree of destruction to materials at the north end of the building. Based on fire patterns, fire damage, and witness statements, an area of origin was identified in the northwest area of the building. ("Northwest area of the building" is defined as an area bordered by the east edge of the travel trailer perpendicular to the north wall, the west wall of the building, and then the south edge of the travel trailer.) Access to the northwest area of the building for investigators was only possible with the removal of debris between door openings and this area of interest.

Examination:

On December 3, 2016, Oakland Fire Department Fire Investigators, Deputies with Alameda County Coroner's Bureau, Alameda County Arson Task Force members and Alcohol, Tobacco Firearms and Explosives Certified Fire Investigators met to discuss how the scene was to be processed, realizing the expediency of victim recovery, while simultaneously maintaining evidence for the origin and cause examination..

The following plan was developed:

Investigators decided scene processing would begin at the 31st Avenue front door and proceed northward for recovery of visible victims on the first and second floors; the victims on an intact section of the second floor would be recovered first, followed by the ground floor victims. Following that, the man-door on the west side of the building would be enlarged to allow

equipment to be brought into the scene as needed. Investigators would then enter the west side opening and process the scene from the west to the east side of the building and then in the direction of the northeast corner, where the back staircase would have been located. Investigators and firefighters would use five gallon buckets to remove debris by hand as victims were recovered and the search for evidence was conducted.

Interior examination started with overhead views of the entire building obtained from the roof of the adjacent structure

On December 3, 2016, entry was made into the 31st Avenue door opening.  Directly inside was a large wooden bird-like statue (see photo below.)  The statue was intact but sustained heat damage at its top. This statue created an impedance to movement and directed entering occupants to the left.  To the left (west) was the room the tenants describe as the kitchen area. This room sustained some heat, soot and water damage but was in relatively good condition. To the west of the kitchen were living spaces.



A portion of the 2nd floor had collapsed into the southwest, first floor living space. Fire patterns in this area indicated the fire traveled from the north end of the building.

To the north of the door opening, left of the statue, was a passageway lined with pianos and other items. These items exhibited some heat damage to upper portions of the contents but the lower level items (pianos, wooden benches, chairs) were intact. To the east was location of the front (south) staircase to the second floor. The bottom steps to the mid-section of the staircase were intact. The upper section of the staircase and the second floor surrounding the staircase had collapsed onto the first floor. (see photo below)



At the base of the staircase was a small sitting area. To the north of the lower steps was a restaurant style booth covered in a leather type material. The booth was in good condition. Next to the booth was a rattan chair. The upper portion of the chair sustained fire damage but the lower area was intact.

To the north of the sitting area was the first living space, a travel trailer. The 2nd floor of the warehouse had collapsed into this area. Fire damage to the trailer was heavy, with only the lower aluminum base and tires intact. Debris was on top of the trailer and around the sides.

The first area of victim recovery was upon an intact portion of the 2nd floor. Access was made by placing a ladder adjacent to the burned travel trailer on the 1st floor. Seven victims were

located in this portion of the 2nd floor. A large wooden couch was just to the south of the victims. The couch was intact and did not sustain any fire damage. The floor in the area of the seven victims was covered in soot and some debris but did not sustain fire damage. Floor surfaces beneath the victims were unburned and clean. The second floor, in the areas to the north, west and east of the area upon which the victims were found, had collapsed onto the first floor creating a platform. The area to the south had been a family's living space and the roof had collapsed into this space at the southwest end.

Two more victims were recovered from an area on the first floor, just to the west of the location where the seven victims were found on the 2nd floor. These two victims were determined to have fallen from above with the collapse of the second floor. In this area, contents of the first floor space did not sustain fire damage; a white leather-like upholstered chair, a wooden headboard, and a wood piano were all completely intact. It was determined that materials in this area had fallen with the collapse of the second floor, protecting the contents of the 1st floor, and exposing the fallen materials to fire damage.

Following the recovery of the visible and accessible victims, an operational decision was made to enlarge the door on the west side of the building to allow the removal of debris into the side lot at 1305 31st Avenue, to bring in equipment as needed and to allow investigators into the area without overhead hazards and obstacles.

On the evening of December 3, investigators began scene excavation into the warehouse from the enlarged door opening on the west side of the building. Debris was carried out by hand and in five-gallon buckets. Investigators observed the debris as it was removed.

A victim was located within 10 feet of the west wall door opening, under a large amount of debris. Fire damage to nearby contents was significant; this was considered a normal effect due to the ventilation opening of the nearby door. Due to the amount of debris beneath the victim, it was undetermined whether this victim was located on the ground floor at the time of the fire.

Debris removal and scene investigation continued to the east. As large debris was removed, one floor-level victim became visible to the north of the area being processed. The overhead presence of large portions of flooring and other debris made recovery of this victim impossible until a path was cleared in that direction. (Recovery of this victim was accomplished on December 4).

As the investigation progressed further east into the warehouse, two victims were located. Their positions at floor level beneath second floor debris indicated they were on the ground floor at the time of second floor collapse. This location was near the travel trailer along the east wall. Fire damage here was extensive.

At approximately 3:00 AM on December 4, the area from the west to the east wall had been cleared of debris so that the floor was visible. The scene processing continued, as investigators started clearing debris in a northerly direction.

A center pathway between two motorhomes was revealed as debris was removed. One motorhome was positioned perpendicular to the west wall. The other motorhome was positioned perpendicular to the east wall. The motorhome on the west wall sustained fire damage to its top portions but the lower portions of the vehicle were intact with paint remaining and the tires intact. Items from the second floor had collapsed into the motorhome; sections of a large carpet and a yellow couch were visible and intact. The rug and couch appeared to have soot damage but were in otherwise good condition.

The motorhome on the east wall was also beneath the collapsed 2nd floor and its contents. The 2nd floor surface of the wood flooring was unburned. However, the sub-surface (ceiling of 1st floor), exposed to the ground floor, was charred. (see photo below) The motorhome aluminum sides were intact with paint present. The rear of the motorhome had the most damage due to collapse of the 2nd floor. The front of the motorhome, which faced the west wall, had a wooden pallet vertically mounted to it and a bike mounted to the pallet. The top of the pallet was charred approximately a third of the way down. The bicycle seat was consumed and there was melting to the top exposed rubber of the tire but the rest of the tire was in good condition. Another bicycle was leaned up against the motorhome; this bicycle was in good condition.



In the space between the two motorhomes a large area rug was suspended among partially collapsed debris from the second floor. Eight victims were recovered from within this rug and next to it.

To the north of the west wall motorhome were two pianos. The second floor had collapsed in this area and some music equipment and furniture from the second story were in this area. The equipment and furniture had some heat damage but were not heavily flame damaged. Roofing material was also found in this area with heavy damage to the wood members. Four victims were recovered from this area.

To the northeast of this area of collapse was a wooden raised platform. Upon it was debris from the 2nd floor collapse. Among the debris, three victims were found. Five victims were found directly south of that location, on the 1st floor. It was determined that all eight victims had fallen from the 2nd floor. The platform base was in good condition with the paint still present. Remaining wood members that would have formed walls for the space were consumed or heavily charred. On top of the platform, items from the second floor were identified, including music equipment and extension cords. The cords were in good condition with insulation intact and the plugs remaining. This indicated to investigators that the fire was above the platform yet below the 2nd floor.

Investigators began to clear the area to the east of the platform making their way to the rear staircase. This area sustained extensive damage. The roof and second floor had collapsed into the area resulting in charring to wood members and furnishings. It was noted that during suppression efforts, this portion of the building was most difficult to access. Investigators cleared the area leading to the rear (north) steps finding the first four steps intact and in good condition. The remaining steps were consumed. (see photo next page)

Along the north wall, to the west of the steps, investigators examined a leather booth and a piano. The top leather of the booth sustained heat damage exposing the cushion material. The seat of the booth sustained some heat damage and was less damaged than the back and top of the booth. The rear of the piano rested against the travel trailer that was perpendicular to the north wall. The piano sustained heat damage with considerably heavier damage to the top than the bottom. (see photo next page)



Once investigators cleared the area to the east of the raised platform the scene processing returned to the contents of the previously mentioned motorhomes in the center of the warehouse. Atop the motorhome on the west wall, a large rug containing a yellow couch and an octagonal coffee table had collapsed from the 2nd floor into the motorhome. These items did not sustain fire damage. Three victims were found within the large rug. The motorhome on the east wall was also examined. The second floor and roof had collapsed into the motorhome. Fire patterns present on the motorhome indicated top-down burning.

Attention next focused on the northwest area of the building, identified as the area of origin based on multiple witness statements, firefighter observations and fire patterns. An area approximately twice as large as the identified potential area of origin was protected for the origin and cause investigation. This began with daylight on December 5. Small debris was collected by hand and placed in buckets for removal from the area of origin. Large debris was visually examined and placed on tarps for removal.

The second floor and roof had collapsed into this area. The top of the wood flooring from the 2nd floor was in good condition. The underside of the flooring exhibited heavy charring. Furniture and music equipment from the 2nd floor were also observed with varying degrees of heat damage.

As investigators layered debris out of the northwest area, they relocated discernable electrical items and wiring into grids that had been marked out with green paint in the cleared out northeast

section, to correspond with the areas from which they had been removed. The collapse of the second floor onto the first floor made it difficult to distinguish the floor of origin of many items. Heat damaged items found in the debris were included for possible further examination.

Along the west wall, immediately north of the motorhome, a raised living space was revealed, with wood tree stumps that were the steps to the living space. The wood stumps and the wood platform for the space were in good condition. The upper wood members that would have made up the walls for this space were consumed. Also completely consumed was a sleeping area elevated above the platform toward the north, along the west wall.

Next to this living space was a partial travel trailer, altered by previous tenants to customize the layout of the space. Reportedly, the south wall of the trailer was removed and replaced with a wooden wall that extended to the ceiling of the first story. The partial travel trailer sustained extensive fire damage. In addition, the roof and 2nd floor had collapsed onto it. Investigators identified and processed the space between the partial trailer on the west wall and the travel trailer against the north wall. Previous information from interviews indicated this was a lounge area. Witnesses had reported seeing flames in this area during the early stages of the fire. This space sustained extensive fire damage. Couches found in this area were more heavily damaged on their upper portions compared to lower portions. (see comparative photos below and next page)





*(Blank space)*

A makeshift wall that reportedly separated the lounge area from a living space located against the north wall of the building was consumed. A section of the door that accessed the living space was located in the debris. The door was heavily charred. (see photo below)

Directly inside the living space along the north wall, investigators removed debris, layer by layer, to uncover a kitchen table and chairs. The table had collapsed onto the metal chairs. The backrests for the chairs were consumed. Wood beneath the chairs' cushions was present but the majority of the cushion material was consumed. (see photo next page)





To the north of the table and chairs were two refrigerators, positioned against the north wall. One refrigerator was full-sized and the other was dorm-room sized. The full-sized refrigerator sustained fire damage, of which the greatest damage was on the west side. The dorm-room sized refrigerator also sustained fire damage. Both refrigerators were examined visually. Fire damage indicated the flames impinged on the appliances but did not originate from within them.

To the left of the refrigerators were several milk crates containing kitchen items. The milk crates were mostly intact. Behind the crates were two wooden storage cabinets placed against the north wall. The tops of the storage cabinets exhibited fire damage that diminished with proximity to the floor. (see photo next page)



Behind the large refrigerator, investigators located a metal duplex receptacle box. Plugged into one socket of the receptacle box was a relocatable power tap. The insulating material of the power tap's cord was consumed. The power tap was slightly warped, sustaining heat damage, but otherwise was in good condition. A melted plug was observed in the other socket. The cord was no longer present. The receptacle was fastened to flexible metal conduit. Due to the destruction of the building, the origin of the conduit could not be determined.

At this time scene examination was suspended to allow investigators to interview occupants of the area of origin. The occupants were asked to describe the location of their belongings and to describe their actions on the day of the fire.

Scene examination resumed in the area west of the kitchen. The tenants referred to this area as an office. The building's second floor and roof had collapsed into this area. The area was examined layer by layer. Investigators found the remains of a makeshift wall, which separated the kitchen area from the office area. In the debris in front of the kitchen side of the wall, a metal duplex receptacle was found. The receptacle box had sustained extensive fire damage leaving only the metal components remaining. The occupants stated that electronics from the office were supplied by this receptacle. On the office side of the wall was a small futon couch. The couch was in good condition with the cloth and cushion present. (see photo below)



According to the occupant, there was a desk and a chair along the west wall, toward the south end of the office space. The metal frame of the chair was located. The backrest and seat were consumed. The only remains of the desk were heavily charred pieces of wood.

The tenant indicated that a laptop computer, a desk lamp and a charger for a cordless drill were on top of the desk. Remains of the lamp and laptop were located. There was also a metal bookshelf on the west wall, just north of the desk. A second desk was located in the northwest corner along the north wall. This desk was in good condition. The top surface of the desk was protected from heat by household items. The top portions of the desk exhibited minor char which lessened toward the ground.

Electrical engineers removed the conductors from conduit along west and north wall in the northwest corner. Investigators noticed that the wiring's insulation was more damaged in the area above the desk on the west wall. Beneath the conduit was an area of clean burn on the concrete wall. A wireless computer keyboard was discovered in the debris in this area and left in place, as were other melted electrical items that appeared to have been on the table.

Above the office and kitchen space, but below the second story floor, was another living space once used by former occupants. The current occupants indicated they had stored some

household items, including music equipment, in this upper space. The occupants stated there was a lamp in this upper space but they did not know where the power source for that lamp originated. Investigators did not find any intact portions of the upper living space.

To the east of the kitchen area was the travel trailer positioned perpendicular to the north wall. The occupants used this trailer as a sleeping area. The occupants also stated above the trailer was another sleeping space for a previous tenant. Investigators were not able to find any intact portions of this living space.

The remains of the trailer east of the kitchen area were examined layer by layer. There were numerous pieces of music equipment, furniture, and two temporary power distribution boxes, or "spider boxes," found in the debris from the second story collapsing onto the trailer. Within the debris inside of the trailer, investigators found the remains of a floor lamp and table lamp and numerous pieces of unburned clothing and rugs.

**ANALYSIS OF FIRE PATTERNS/INDICATORS:**

Within the structure, fire patterns were examined and evaluated with respect to the burning characteristics of the materials involved. Each pattern was then evaluated in context, and in relation to all of the patterns observed and the mechanisms of heat transfer that led to the formation of the patterns. The conclusion is that the fire originated at the northwest area of the first floor and progressed throughout the building, growing in size and intensity.

The following indicators, as referenced *in 2014 NFPA 921, Kirks Fire Investigation 7th Edition,* and *Forensic Fire Scene Reconstruction*, which were documented with photographs, are among those that support the findings in this report:

1. The sequential pattern analysis of the fire effects and patterns, including char analysis, heat and flame vector analysis, and the movement and intensity patterns, indicate the fire originated in the northwest area of the first floor:

The second floor was of wood beam construction; its underside, the ceiling of the ground floor, was open wooden studs, with no drop ceiling or other partition present. (see photo next page) More severe charring was observed to the underside of the second-floor (i.e. ceiling of the first floor.)



The upper wooden surface of the remaining second-floor was not as charred as its underside (see photo next page). Of the remaining intact portions of the second floor, investigators observed burn damage to be from bottom up. Some areas of the second-floor wooden members were minimally fire damaged, having been protected by either large carpets and furniture, or from roof collapse. The second-floor completely collapsed in the rear half of the structure (north). Fire investigators observed less damage to the structure as distance from the rear portion of the building increased.



Overall, less damage was observed within the front (south) half of the warehouse, on both levels. Despite the collapse of the rear half of the second floor, investigators were able to observe burn patterns to be more severe on the undersides of the collapsed floor of the second floor, indicating more flame impingement from below.

2.  Clean burning of the concrete walls was visible in the northwest corner of the first floor at multiple elevated locations:

Investigators observed that items in the northwest corner had less fire damage at their lower points that were closest to the ground (see photo next page), and areas of pink paint were still visible on the concrete block walls. A wooden chest and storage cabinet were minimally fire damaged toward ground level, as were plastic crates to the east. All exhibited more fire damage above floor level. This was similarly observed on a dorm-sized refrigerator and a full-sized refrigerator along the north wall and east of the crates. (see right photo next page) Fire damage on the refrigerators was concentrated up high, versus down at floor level. An area of clean burn

was observed along the west wall, several feet from the northwest corner. (see left photo below)



3. No floor level burn patterns were observed in the northeast section. Fire patterns indicate flames burned above floor level.

Once the northeast corner was cleared of debris, investigators observed remnants of a rear wooden staircase ascending the north and east walls. (see photo next page) Soot deposits were observed upon the concrete block north and east walls around the staircase. However, the first four wooden stairs were still in place, and in this same area (to the west of the stairs) a portion of pink paint was still visible on the north wall. Additionally, more fire damage was observed several feet above floor level, and extending upward. Less damage was observed to items down low, including a decorative piano and pieces of wood to the west of the stairwell. Blue paint was still visible on the lower portions of the pieces of wood. Yellow paint was observable on the piano. (see photo below)





**EXAMINATION OF POTENTIAL HEAT SOURCES:**

Candles/incense: The use of candles and incense was examined as a possible heat source of the fire. Witness statements indicated all the occupants were strongly discouraged from the use of these items. The occupants of the area of origin were aware of the hazards associated with candles and incense and adamantly denied using them. No remains of candles or incense were found in the living areas in general, or in the area of origin. Due to the degree of destruction in the area of origin, the use of candles and/or incense cannot be eliminated.

Smoking materials: The use of smoking materials was considered as a possible heat source of the fire. Witness statements of occupants indicate smoking was strongly discouraged and only allowed outside. No occupants were identified who openly defied this rule and no one was observed using smoking materials in the area of origin before the fire. No remains of smoking materials were found during the scene investigation. The use of carelessly discarded or unattended smoking materials cannot be eliminated.

Natural gas systems:  There is no natural gas supply in the building.  There were no natural gas appliances in the building. Natural gas systems and appliances can be eliminated as the heat source of the fire.

Propane systems:  A portable propane heater was observed on the second floor but it was not within the area of origin. No portions or components of a propane system were found within the area of origin.  Propane systems and appliances can be eliminated as a potential heat source.

Intentionally Introduced Heat Source:  Criminal activity was considered as a possible cause of the fire.  The scene investigation did not reveal any indications of an intentionally set fire. Interviews did not reveal any motives for an intentionally set fire.  First floor occupants near the area of origin prior to the discovery of the fire reported that there were no unauthorized persons in that area.  However, the introduction of an open flame, either intentionally or carelessly, cannot be eliminated.

Electrical Systems:  Throughout the warehouse, extensive use of power taps and extension cords was noted.  Occupants indicated that the fixed receptacles on the 1st floor were not operational. It is not known if the fixed receptacles on the 2nd floor were operational.  Occupants at the north end of the warehouse used temporary wiring to energize the devices in their living units. Within the area of origin, all remains of extension cords, power taps, electrical conductors, wires, appliances and their associated power cords were placed aside for further examination.  Forensic examination of items was performed but did not reveal a fault or failure that resulted in the fire.

Within the area of origin, two receptacles were located and examined.  The occupant reported that one receptacle hung from the ceiling.  She stated that the other receptacle was fixed to a wood beam at the opposite end of the kitchen area. Both receptacles were attached to flexible conduit yet she was unaware of their origin.  These receptacles supplied a series of power taps with which they energized all the devices in their unit. The occupant said that they used the small on/off switches located on the power taps to control their lamps and small appliances.

The occupant indicated that a relocatable power tap was plugged into the hanging receptacle and the large refrigerator was plugged into the power tap. Also plugged into the power tap was another extension cord that supplied power to the smaller refrigerator.  The extension cord was draped over the top of the large refrigerator. The occupant also told investigators that the other socket of the hanging receptacle contained an extension cord that went into the travel trailer and attached to another extension cord and a relocatable power tap that supplied power to a floor lamp and a table lamp.

The occupant also stated there was another light hanging just inside the door to her living space but she was unsure where the hanging light was plugged in.

Investigators were not able to determine how many electrical receptacles or appliances were in the building, nor how they were powered. Investigators did examine the two breaker panels located on the 1st and 2nd floors, but due to extensive fire damage, were unable to determine what, specifically, the panels powered.

Due to the nature of the electrical supply within the building, both fixed and temporary, a fault or failure of the electrical system cannot be eliminated.

Spontaneous Combustion: According to occupants' statements, wood-working and painting projects performed within the building resulted in the presence of materials prone to spontaneous combustion such as lacquers, thinners and paints. However, no indications of the storage or use of such materials was noted in the area of origin.

**EVIDENCE:**

Digital photographs were taken by Investigators from the Oakland Fire Department, Investigators from the Bureau of Alcohol, Tobacco, Firearms and Explosives, and Evidence Technicians of the Oakland Police Department and Alameda County Sheriff's Office.

No physical evidence was collected into custody by the Oakland Fire Department.

**FATALITIES:**

There were 36 fatalities associated with this fire. The victims' legal names and causes of death are listed below. The complete autopsy reports can be found in the case file.

The following autopsies were conducted by Dr. Thomas Rogers:

Alameda County (ALCO) Coroner case number 2016-03663

Jennifer Kiyomi Tanouye, (DOB: 4/25/1985) Tanouye had soot in the upper and lower respiratory system and had a carboxyhemoglobin level of 49%. Tanouye 's cause of death was smoke inhalation.

ALCO Coroner case number 2016-03661

Michela Angelina Gregory, (DOB: 3/14/1996) Gregory had smoke and soot in the upper and lower respiratory system and had a carboxyhemoglobin level of 40%. Gregory's cause of death was smoke inhalation.

ALCO Coroner case number 2016-03623

Sara Hoda, (DOB: 11/01/1986) Hoda had soot and smoke in her upper and lower respiratory system and had a carboxyhemoglobin level of 56%. Hoda's cause of death was smoke inhalation.

ALCO Coroner case number 2016-03625

Travis Samuel Hough, (DOB: 1/17/1981) Hough had smoke and soot in the upper and lower respiratory system and had a carboxyhemoglobin level of 43%. Hough's cause of death was smoke inhalation.

ALCO Coroner case number 2016-03630

Joseph Hudson Matlock, (DOB: 5/7/1980) Matlock had smoke and soot in the upper and lower respiratory system and had a carboxyhemoglobin level of 44% and a blood cyanide of 1.0 MG/L. Matlock's cause of death was smoke inhalation.

ALCO Coroner case number 2016-03649

Ara Christina Jo, (DOB: 9/11/1987) Jo had smoke and soot in the upper and lower respiratory system and had a carboxyhemoglobin level of 49%. Jo's cause of death was smoke inhalation.

ALCO Coroner case number 2016-03660

Alex Benjamin Vega, (DOB: 11/21/1994) Vega had smoke and soot in the upper and lower respiratory system and had a carboxyhemoglobin level of 46%.  Vega's cause of death was smoke inhalation.

ALCO Coroner case number 2016-03658

Nicholas Day Walrath, (DOB: 2/1/1985) Walrath had smoke and soot in the upper and lower respiratory system and had a carboxyhemoglobin level of 48%. Walrath's cause of death was smoke inhalation.

ALCO Coroner case number 2016-03653

Edmond William Lapine II, (DOB: 10/1/1982) Lapine had smoke and soot in the upper and lower respiratory system and had a carboxyhemoglobin level of 54%.  Lapine's cause of death was smoke inhalation.

The following autopsies were conducted by Dr. Paul W. Herrmann:

ALCO Coroner case number 2016-03651

Wolfgang G. Renner, (DOB: 8/2/1955) Renner had extensive inhalation of smoke and soot into the airways. The autopsy report does not list the carboxyhemoglobin level. Renner's cause of death was smoke inhalation.

ALCO Coroner case number 2016-03636

Chelsa Faith Dolan, (DOB:9/14/1983) Dolan had heavy soot present in the airway and major bronchi. No carboxyhemoglobin level was listed in autopsy. Dolan's cause of death was smoke inhalation.

ALCO Coroner case number 2016-03635

Jennifer Ann Mendiola, (DOB: 3/2/1981) Mendiola had soot in the airway and bronchi. No carboxyhemoglobin level was listed in the autopsy. Mendiola's cause of death was smoke inhalation.

ALCO Coroner case number 2016-03668

Amanda Emma Kershaw, (DOB: 9/20/1982) Kershaw had prominent soot deposition in the larynx, trachea, and bronchi. No carboxyhemoglobin level was noted in the autopsy report. Kershaw's cause of death was smoke inhalation.

ALCO Coroner case number 2016-03665

Vanessa Grace Quintos Plotkin, (DOB: 9/18/1995) Plotkin had a thick layer of soot in the oral cavity, larynx and major bronchi. No carboxyhemoglobin level was listed in the autopsy report. Plotkin's cause of death was smoke inhalation.

ALCO Coroner case number 2016-03631

Peter N. Wadsworth, (DOB: 3/14/1978) Wadsworth had soot in his mouth and larynx. No carboxyhemoglobin level was noted in the autopsy report. Wadsworth's cause of death was smoke inhalation.

ALCO Coroner case number 2016-03654

Alex Ghassan, (DOB: 10/7/1981) Ghassan had soot in the airways. No carboxyhemoglobin was noted in autopsy report. Ghassan's cause of death was smoke inhalation.

ALCO Coroner case number 2016-03634

Griffin Sean Madden, (DOB: 7/15/1993) Madden had soot in the airways. No carboxyhemoglobin was noted in autopsy report. Madden's cause of death was smoke inhalation.

The following autopsies were conducted by Dr. Michael Joseph Ferenc:

ACLO Coroner case number 2016-03662

Barret Chubb Clark, (DOB: 4/4/1981) Clark had evidence of smoke inhalation. Clark's carboxyhemoglobin level was 35%. Clark's cause of death was smoke inhalation.

ACLO Coroner case number 2016-03626

Justin Riley Fritz, (DOB: 6/29/1987) Fritz had evidence of smoke inhalation. Fritz's carboxyhemoglobin level was 58%. Fritz's cause of death was smoke inhalation.

ACLO Coroner case number 2016-03622

Donna Eileen Kellogg, (DOB: 7/18/1984) Kellogg had evidence of smoke inhalation. Kellogg's carboxyhemoglobin level was 64%. Kellogg's cause of death was smoke inhalation.

ACLO Coroner case number 2016-03621

Jason Adrian McCarty, (DOB: 6/14/1980) McCarty had evidence of smoke inhalation. McCarty's carboxyhemoglobin level was 47%. McCarty's cause of death was smoke inhalation.

ACLO Coroner case number 2016-03655

Michele Marie Sylvan, (DOB: 8/27/1979) Sylvan had evidence of smoke inhalation. Sylvan's carboxyhemoglobin level was 59%. Sylvan's cause of death was smoke inhalation.

ACLO Coroner case number 2016-03633

Benjamin Joel Runnels, (DOB: 9/6/1984) Runnels had evidence of smoke inhalation. Runnels's carboxyhemoglobin level was 69%. Runnels's cause of death was smoke inhalation.

ACLO Coroner case number 2016-03632

Nicole Renae Siegrist, (DOB: 4/2/1987) Siegrist had evidence of smoke inhalation. Siegrist's carboxyhemoglobin level was 62%. Siegrist's cause of death was smoke inhalation.

ACLO Coroner case number 2016-03656

Matthew Andrew Bohlka, (DOB: 6/7/1983) Bohlka had evidence of smoke inhalation. Bohlka's carboxyhemoglobin level was 61%.  Bohlka's cause of death was smoke inhalation.

ACLO Coroner case number 2016-03650

Draven McGill, (DOB: 8/22/1999) McGill had soot in the larynx and trachea. McGill had a carboxyhemoglobin of 60%.  McGill's cause of death was smoke inhalation.

ALCO Coroner case number 2016-03666

William Emerson Dixon, (DOB: 11/18/1981) Dixon had soot in the larynx and trachea. Dixon had a carboxyhemoglobin of 56%. Dixon's cause of death was smoke inhalation.

ALCO Coroner case number 2016-03659

Jonathan Michael Bernbaum, (DOB: 6/17/1982) Bernbaum had soot in the trachea and larynx. Bernbaum had a carboxyhemoglobin of 43%. Bernbaum's cause of death was smoke inhalation.

The following autopsies were conducted by Dr. Judy Melinek:

ACLO Coroner case number 2016-03667

John Nicholas Igaz, (DOB: 12/24/1981) Igaz had soot in the nares, oropharynx and trachea. Igaz's carboxyhemoglobin level was 67%. Igaz's cause of death was smoke inhalation.

ACLO Coroner case number 2016-03627

David Riley Cline, (DOB: 11/5/1992) Cline had soot the nares, oral cavity and trachea. Cline's carboxyhemoglobin level was 51%. Cline's cause of death was smoke inhalation.

ACLO Coroner case number 2016-03652

Micah Krueger Danemayer, (DOB: 6/23/1988) Danemayer had soot in the nares, oral cavity, oropharynx and trachea. Danemayer's carboxyhemoglobin rate was 52%. Danemayer's cause of death was smoke inhalation.

ACLO Coroner case number 2016-03624

Nicolas Gomez Hall, (DOB: 11/1/1986) Hall had soot in the nares, oral cavity and trachea. Hall's carboxyhemoglobin level was 53%. Hall's cause of death was smoke inhalation.

ACLO Coroner case number 2016-03628

Brandon Chase Wittenauer, (DOB: 11/5/1984) Wittenauer had soot in the oral cavity, nares, and trachea. Wittenauer's carboxyhemoglobin level was 55%. Wittenauer's cause of death was smoke inhalation.

ACLO Coroner case number 2016-03657

Hanna Henriikka Ruax, DOB: 6/6/1984) Ruax had soot in the nares, oropharynx and trachea. Ruax's carboxyhemoglobin level was 52%. Ruax's cause of death was smoke inhalation.

ACLO Coroner case number 2016-03629

Cash Collins Askew, (DOB: 2/22/1994) Askew had soot in the nares, oral cavity and trachea. Askew's carboxyhemoglobin level was 65%. Askew's cause of death was smoke inhalation.

ACLO Coroner case number 2016-03664

Jennifer Akiko Morris, (DOB: 12/20/1994) Morris had soot in the nares, oral cavity, larynx and trachea. Morris's carboxyhemoglobin level was 81%. Morris's cause of death was smoke inhalation.

**KNOWN INJURIES:**

Samuel Maxwell was seriously injured and remains hospitalized at the time of this report. His eyewitness account of the event is not available.

**CONCLUSION:**

No witnesses to the incipient stage of the fire were located. Based on witness statements and analysis of fire patterns, an area of origin was identified in the northwest area of the ground floor of the warehouse. In support of this hypothesis, fire patterns and fire behavior were considered, including ventilation effects of door openings, and the fuel load, consisting of large amounts of non-traditional building materials. This analysis was challenged with alternate hypotheses of fire origins, away from, or communicating to an area remote from, the immediate area of fire origin. Several potential ignition sources were considered. No conclusive determination of the initial heat source or the first materials ignited was made. The fire classification is UNDETERMINED.









<u>CERTIFICATE OF SERVICE</u>

I am over the age of 18 years and not a party to the within entitled action.  I am employed at Mary Alexander & Associates, P.C., 44 Montgomery Street, Suite 1303, San Francisco, California 94104.

I served the documents(s) listed below as follows:

Date Served:            January 19, 2018

Documents Served:       **IN RE GHOST SHIP FIRE LITIGATION SECOND
                        AMENDED MASTER COMPLAINT**

Parties Served:         See attached list.

[X]   **BY MAIL:**  I placed a true and correct copy of the documents(s) in a sealed envelope with first class postage fully prepaid in the United States Mail at San Francisco, California, addressed as shown on the attached list.  **As to Defendant Max Harris only.**

[ ]   **BY PERSONAL SERVICE:**  I served a true and correct copy of the above document(s) by delivering them to the persons shown on the attached list.

[ ]   **BY FEDERAL EXPRESS:**  I sent a true and correct copy of the document(s) for delivery to the persons shown on the attached list in accordance with standard Federal Express Overnight delivery procedures.

[ ]   **BY FACSIMILE:**  I transmitted by facsimile a true and correct copy of the document(s) to the persons shown on the attached list.

[X]   **BY E-MAIL OR ELECTRONIC TRANSMISSION:**  I e-mailed a true and correct copy of the document(s) addressed to the persons shown on the attached list.  **All parties except Defendant Max Harris.**

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on January 19, 2018, at San Francisco, California.

_____
CARLA JIMENEZ

PROOF OF SERVICE

| Mary E. Alexander, Esq. | Plaintiffs' Liaison Counsel for all related actions and Attorneys for Plaintiffs in: |
|---|---|
| Jennifer L. Fiore, Esq. | |
| Sophia M. Aslami, Esq. | |
| Casey A. Gee, Esq. | *Avalos v. Ng, et al.* Alameda County Superior Court Case No. RG17866659 ; |
| Mary Alexander & Associates, P.C. | |
| 44 Montgomery Street, Suite 1303 | *Barmby, et al. v. Ng, et al.* Alameda County Superior Court Case No. RG17869155; |
| San Francisco, CA 94104 | |
| Phone: (415) 433-4440 | *Brito v. Ng, et al.* Alameda County Superior Court Case No. RG17861366 ; |
| Facsimile: (415) 433-5440 | |
| malexander@maryalexanderlaw.com | *Calvera v. Ng, et al.* Alameda County Superior Court Case No. RG17869151; |
| jfiore@maryalexanderlaw.com | |
| saslami@maryalexanderlaw.com | *Chavarria v. Ng, et al.* Alameda County Superior Case No. RG17872007; |
| cgee@maryalexanderlaw.com | |
| | *Fritz, et al. V. Ng, et al.* Alameda County Superior Court Case No. RG17853255 ; |
| | *Ghassan, et al. V. Ng, et al.* Alameda County Superior Court Case No. RG17848401; |
| | *Gregory, et al. v. Ng, et al.* Alameda County Superior Court Case No. RG16843631; |
| | *Jahanbani v. Ng, et al.* Alameda County Superior Court Case No. RG17848158; |
| | *Kelber v. Ng, et al.* Alameda County Superior Court Case No. RG17861368; |
| | *Kennon v. Ng, et al.* Alameda County Superior Court Case No. RG17866657 |
| | *Kershaw, et al. v. Ng, et al.* Alameda County Superior Court Case No. RG17861362; |
| | *Madden, et al. v. Ng, et al.* Alameda County Superior Court Case No. RG16843633; |
| | *Morris, et al. v Ng, et al.* Alameda County Superior Court Case No. RG17845655; |
| | *Morton v. Ng, et al.* Alameda County Superior Court Case No. RG17871997; |
| | *O'Brien v. Ng, et al.* Alameda County Superior Court Case No. RG17881032; |
| | *Porter, et al. v. Ng, et al.* Alameda County Superior Court Case No. RG17860470; |
| | *Ruiz, et al. v. Ng, et al.* Alameda County Superior Court Case No. RG17877854 |
| | *Russell v. Ng* Alameda County Superior Court Case No. RG17872021; |

| | |
|---|---|
| | *Slocum. V. Ng, et al.*, Alameda County Superior Court Case No. RG17854977; *Vega v. Ng, et al.* Alameda County Superior Court Case No. RG17866652; *Wadsworth, et al. v. Ng, et al.* Alameda County Superior Court Case No. RG16843856 |
| Bobby Thompson, Esq.<br>Thompson Law Offices, P.C.<br>700 Airport Blvd., Suite 160<br>Burlingame, CA 94010<br>Phone: (650) 513-6111<br>Facsimile: 650-513-6071<br>bobby@tlopc.com | Attorneys for Plaintiffs in:<br><br>*Avalos v. Ng, et al.* Alameda County Superior Court Case No. RG17866659 ;<br>*Barmby, et al. v. Ng, et al.* Alameda County Superior Court Case No. RG17869155;<br>*Brito v. Ng, et al.* Alameda County Superior Court Case No. RG17861366 ;<br>*Calvera v. Ng, et al.* Alameda County Superior Court Case No. RG17869151;<br>*Chavarria v. Ng, et al.* Alameda County Superior Case No. RG17872007;<br>*Fritz, et al. V. Ng, et al.* Alameda County Superior Court Case No. RG17853255 ;<br>*Ghassan, et al. V. Ng, et al.* Alameda County Superior Court Case No. RG17848401;<br>*Gregory, et al. v. Ng, et al.* Alameda County Superior Court Case No. RG16843631;<br>*Jahanbani v. Ng, et al.* Alameda County Superior Court Case No. RG17848158;<br>*Kelber v. Ng, et al.* Alameda County Superior Court Case No. RG17861368;<br>*Kennon v. Ng, et al.* Alameda County Superior Court Case No. RG17866657<br>*Kershaw, et al. v. Ng, et al.* Alameda County Superior Court Case No. RG17861362;<br>*Madden, et al. v. Ng, et al.* Alameda County Superior Court Case No. RG16843633;<br>*Morris, et al. v Ng, et al.* Alameda County Superior Court Case No. RG17845655;<br>*Morton v. Ng, et al.* Alameda County Superior Court Case No. RG17871997;<br>*O'Brien v. Ng, et al.* Alameda County Superior Court Case No. RG17881032 |

2

| | | |
|---|---|---|
| 1 | | *Porter, et al. v. Ng, et al.* Alameda County Superior Court Case No. RG17860470; |
| 2 | | *Ruiz, et al. v. Ng, et al.* Alameda County Superior Court Case No. RG17877854 |
| 3 | | *Russell v. Ng* Alameda County Superior Court Case No. RG17872021; |
| 4 | | *Slocum. V. Ng, et al.*, Alameda County Superior Court Case No. RG17854977; |
| 5 | | *Vega v. Ng, et al.* Alameda County Superior Court Case No. RG17866652; |
| 6 | | *Wadsworth, et al. v. Ng, et al.* Alameda County Superior Court Case No. RG16843856 |
| 7 | | |
| 8 | | |
| 9 | Joshua Cohen Slatkin, Esq.<br>Law Office of Joshua Cohen Slatkin<br>2001 Wilshire Blvd., Suite 320<br>Santa Monica, CA 90403<br>Phone: (310) 627-2699<br>Facsimile: (310) 943-2757<br>jcohenslatkin@jcslaw4you.com | Attorneys for Plaintiff in:<br><br>*Jack Bohlka v. Ng, et al.* Alameda County Superior Court Case No. RG17846748 |
| 14 | Gregory Vanni, Esq.<br>Raffi H. Ohanian, Esq.<br>Thon Beck Vanni Callahan & Powell<br>1100 East Green Street<br>Pasadena, CA 91106-2513<br>Phone: (626) 795-8333<br>Facsimile: (626) 449-9933<br>gvanni@thonbeck.com<br>rohanian@thonbeck.com | Attorneys for Plaintiff in:<br><br>*Margaret Bohlka v. Ng. et al.* Alameda County Superior Court Case No. RG17851011 |
| 19 | Thomas Brandi, Esq.<br>Brian Malloy, Esq.<br>The Brandi Law Firm<br>354 Pine Street, 3rd floor<br>San Francisco, CA 94104<br>Phone: (415) 989-1800<br>Facsimile: (415) 989-1801<br>tjb@brandilaw.com<br>bjm@brandilaw.com | Attorneys for Plaintiff<br><br>*Clark v. Ng, et al.* Alameda County Superior Court Case No. RG17854628<br>*Dolan v. Ng, et al.* Alameda County Superior Court Case No. RG17860682 |
| 25 | Christopher T. Aumais, Esq.<br>Ashkahn Mohamadi, Esq.<br>Kelly Winter, Esq.<br>Daniel C. Ghyczy, Esq. | Attorneys for Plaintiffs in:<br><br>*Dennis v. Ng, et al.* Alameda County Superior Court Case No. RG17863866 |

3

SERVICE LIST GHOST SHIP LITIGATION

| | |
|---|---|
| Girardi Keese<br>1126 Wilshire Blvd.<br>Los Angeles, CA 90017<br>Phone: (213) 977-0211<br>Facsimile: (213) 481-1554<br>caumais@girardikeese.com<br>amohamadi@girardikeese.com<br>kwinter@girardikeese.com<br>dghyczy@girardikeese.com | *Grandchamps, et al. v. Ng, et al.* Alameda County Superior Court Case No. RG17849318;<br>*Jacobitz v. Ng, et al.* Alameda County Superior Court Case No. RG17863858<br>*Marin v. Ng, et al.* Alameda County Superior Court Case No. RG17863850<br>*McCarty, et al. v. Ng, et al.* Alameda County Superior Court Case No. RG17856893<br>*Timonen, et al. v. Ng., et al.* Alameda County Superior Court Case No. RG17851540 |
| Ibiere N. Seck, Esq.<br>Marcelis Morris, Esq.<br>The Cochran Firm<br>4929 Wilshire Blvd., Suite 1010<br>Los Angeles, CA 90010<br>Phone: (323) 435-8205<br>Facsimile: (323) 282-5280<br>iseck@CochranFirm.com<br>Mmorris@CochranFirm.com | Attorneys for Plaintiffs in:<br><br>*Grandchamps, et al. v. Ng, et al.* Alameda County Superior Court Case No. RG17849318;<br>*McCarty, et al. v. Ng, et al.* Alameda County Superior Court Case No. RG17856893<br>*Timonen, et al. v. Ng., et al.* Alameda County Superior Court Case No. RG17851540 |
| Robert S. Arns, Esq.<br>Jonathan E. Davis, Esq.<br>Kevin M. Osborne, Esq.<br>Robert C. Foss, Esq.<br>The Arns Law Firm<br>515 Folsom St., 3rd Floor<br>San Francisco, CA 94105<br>Phone: (415) 495-7800<br>Facsimile: (415) 495-7888<br>rsa@arnslaw.com<br>jed@arnslaw.com<br>kmo@arnslaw.com<br>rcf@arnslaw.com | Attorneys for Plaintiffs in:<br><br>*Plotkin, et al. v Ng, et al.* Alameda County Superior Court Case No. RG17850334 |
| Paula K. Canny, Esq.<br>Law Offices of Paula Canny<br>840 Hinckley Road, Suite 101<br>Burlingame, CA 94010<br>Phone : (650) 652-7862<br>Facsimile : (650) 652-7835<br>defensedog@aol.com | Attorneys for Plaintiffs in:<br><br>*Cline, et al. V. Ng, et al.* Alameda County Superior Court Case No. RG17862635<br>*Vega, et al. v Ng, et al.* Alameda County Superior Court Case No. RG17845597;<br>*Walrath, et al. V. Ng, et al.* Alameda County Superior Court Case No. RG17854654 |

4

SERVICE LIST GHOST SHIP LITIGATION

| | | |
|---|---|---|
| 1 | W. Gordon Kaupp, Esq.<br>Kaupp & Feinberg LLP<br>One Sansome Street, 35th Floor<br>San Francisco, CA 94104<br>Phone: (415) 896-4588<br>Facsimile: (415) 294-9127<br>gordon@kauppfeinberg.com | Attorneys for Plaintiff in:<br><br>*Samuel Maxwell v. Ng, et al.* Alameda County Superior Court Case No. RG17853077 |
| 5 | Ryan J. Vlasak, Esq.<br>Bracamontes & Vlasak, P.C.<br>220 Montgomery Street, Suite 870<br>San Francisco, CA 94104<br>Phone: (415) 835-6777<br>Facsimile: (415) 835-6780<br>rvlasak@bvlawsf.com | Attorneys for Plaintiff in:<br><br>*Samuel Maxwell v. Ng, et al.* Alameda County Superior Court Case No. RG17853077 |
| 9 | Ronald Goldman, Esq.<br>Timothy Loranger, Esq.<br>Diane Moore, Esq.<br>Baum Hedlund Aristei Goldman, PC<br>12100 Wilshire Blvd., Ste. 950<br>Los Angeles, CA 90025<br>Phone: (310) 207-3233<br>Rgoldman@baumhedlundlaw.com<br>tloranger@baumhedlundlaw.com<br>dmargermoore@baumhedlundlaw.com | Attorneys for Plaintiff in:<br><br>*Robert Lapine v. Ng, et al.* Alameda County Superior Court Case No. RG17854328 |
| 15 | Paul A. Matiasic, Esq.<br>Hannah E. Mohr, Esq.<br>Matiasic & Johnson LLP<br>44 Montgomery Street, Suite 3850<br>San Francisco, CA 94104<br>Phone: (415) 675-1089<br>Facsimile: (415) 675-1103<br>matiasic@mjlawoffice.com<br>mohr@mjlawoffice.com | Attorneys for Plaintiff in:<br><br>*Yraina L. Kopelman v. Ng, et al.* Alameda County Superior Court Case No. RG17854105<br>*Matlock, et al. v. Ng, et al.* Alameda County Superior Court Case No. RG17864342<br>*Wittenauer. V. Ng, et al.* Alameda County Superior Court Case No. RG17864346 |
| 20 | John R. Browne, III, Esq.<br>Law Offices of John R. Browne, III<br>50 California Street, Suite 3500<br>San Francisco, CA 94111<br>Phone: (415) 421-6700<br>Facsimile: (415) 398-2438<br>johnrbrowne@sbcglobal.net | Attorneys for Plaintiff in:<br><br>*Kellogg v. Ng, et al.* Alameda County Superior Court Case No. RG17857948 |
| 24 | Christopher Dolan, Esq.<br>Isabelle Tan, Esq.<br>Aimee Kirby, Esq.<br>Dolan Law Firm PC | Attorneys for Plaintiff in:<br><br>*Cidlik v. Ng, et al.* Alameda County Superior Court Case No. RG17860699 |

5

SERVICE LIST GHOST SHIP LITIGATION

| | |
|---|---|
| 1438 Market Street<br>San Francisco, CA 94102<br>Phone: (415) 636-8160<br>Facsimile: (415) 421-2830<br>chris@cbdlaw.com<br>isabelle.tan@dolanlawfirm.com<br>aimee.kirby@dolanlawfirm.com | *Hough v. Ng, et al.* Alameda County Superior Court Case No. RG17860697<br>*Igaz v. Ng, et al.* Alameda County Superior Court Case No. RG17863541<br>*Runnels v. Ng, et al.* Alameda County Superior Court Case No. RG17860700 |
| John M. Feder, Esq.<br>Rouda Feder Tietjen McGuinn<br>44 Montgomery Street, Suite 750<br>San Francisco, CA 94104<br>Phone: (415) 398-5398<br>Facsimile: (415) 398-8169<br>jfeder@rftmlaw.com | Attorneys for Plaintiff in:<br><br>*Danemayer, et al. v. Ng, et al.* Alameda County Superior Court Case No. RG17861609 |
| Robert B. Bale, Esq.<br>Dreyer Babich Buccola Wood Campora, LLP<br>20 Bicentennial Circle<br>Sacramento, CA 95826<br>Phone: (916) 379-3500<br>Facsimile: (916) 379-3599<br>rbale@dbbwc.com | Attorneys for Plaintiffs in:<br><br>*McGill, et al. v. Ng, et al.* Alameda County Superior Court Case No. RG17869439 |
| Do Kim, Esq.<br>Law Offices of Do Kim APLC<br>3435 Wilshire Blvd Ste 2700<br>Los Angeles, CA 90010-2013<br>Phone: (213) 251-5440<br>Facsimile: (213) 232-4919<br>dkim@dokimlaw.com | Attorneys for Plaintiffs in:<br><br>*Jo, et al. v. Ng, et al.* Alameda County Superior Court Case No. RG17871131 |
| J. Gary Gwilliam, Esq.<br>Winston W. Moody, Esq.<br>Gwilliam, Ivary, Chiosso, Cavalli & Brewer<br>1999 Harrison Street, Suite 1600<br>Oakland, CA 94612<br>Phone: (510) 832-5411<br>Facsimile: (510) 832-1918<br>ggwilliam@giccb.com<br>wmoody@giccb.com | Attorneys for Plaintiff in:<br><br>*Farsoudi-Hoda. V. Ng, et al.* Alameda County Superior Court Case No. RG17871774 |
| Dan Siegel, Esq.<br>Siegel & Yee<br>499 14th Street, Suite 300<br>Oakland, CA 94612<br>Phone: (510) 839-1200<br>Facsimile: (510) 444-6698 | Attorneys for Plaintiff in:<br><br>*Farsoudi-Hoda. V. Ng, et al.* Alameda County Superior Court Case No. RG17871774 |

6

SERVICE LIST GHOST SHIP LITIGATION

| | |
|---|---|
| dansiegel@siegelyee.com | |
| Sandra Ribera Speed, Esq.<br>Ribera Law Firm<br>157 West Portal Avenue, Suite 2<br>San Francisco, CA 94127<br>Phone: (415) 576-1600<br>Facsimile: (415) 842-0321<br>sribera@riberalaw.com | Attorneys for Plaintiff in:<br><br>*Christopher Askew v. Ng, et al.* Alameda County Superior Court Case No. RG17873709 |
| Craig M. Peters, Esq.<br>David L. Winnett, Esq.<br>The Veen Firm, P.C.<br>711 Van Ness Avenue, Suite 220<br>San Francisco, CA 94102<br>P.O. Box 7296<br>San Francisco, CA 94120<br>Phone: (415) 673-4800<br>Facsimile: (415) 771-5845<br>C.P.Team@VeenFirm.com | Attorneys for Plaintiff in:<br><br>*Leisa Askew v. Ng, et al.* Alameda County Superior Court Case No. RG1783957 |
| Paul L. Alaga, Esq.<br>Law Office of Paul L. Alaga<br>885 Bryant St., 2nd Floor<br>San Francisco, CA 94103<br>Phone: (415) 581-0885<br>Facsimile: (415) 581-0887<br>paulalaga@sflaw.net | Attorneys for Plaintiff in:<br><br>*Anthony Perrault v. Ng, et al.* Alameda County Superior Court Case No. RG17884460 |
| Raymond Meyer, Jr., Esq.<br>Stephen C. Dreher, Esq.<br>Keith G. Bremer, Esq.<br>Bremer Whyte Brown & O'Meara LLP<br>300 Frank H. Ogawa Plaza<br>The Rotunda Building, Suite 355<br>Oakland, CA 94612<br>Phone: (510) 540-4881<br>Facsimile: (510) 540-4889<br>rmeyer@bremerwhyte.com<br>sdreher@bremerwhyte.com<br>kbremer@bremerwhyte.com | Defendants' Liaison Counsel for all related actions and Attorneys for Defendants Chor Nar Siu Ng, Individually and as Trustee of the Chor Nar Siu Ng Revocable Trust Dated September 28, 2007 and Eva Ng |
| Raymond Marshall, Esq.<br>Krystal Bowen, Esq,<br>Sheppard Mullin Richter & Hampton LLP<br>Four Embarcadero Center, 17th Floor<br>San Francisco, CA 94111-4109<br>Phone: (415) 774-3167 | Attorneys for City of Oakland |

7

SERVICE LIST GHOST SHIP LITIGATION

| | |
|---|---|
| Facsimile: (415) 403-6230<br>RMarshall@sheppardmullin.com<br>kbowen@sheppardmullin.com | |
| Orestes Alexander Cross, Esq.<br>Valor Legal, P.C.<br>2600 Tenth Street, Ste. 435<br>Berkeley, CA 94710<br>Phone: (415) 545-8394<br>Facsimile: (415) 520-9695<br>E-mail: ocross@valorlegal.com | Attorneys for Defendant and Cross-Complainant Jonathan Hrabko |
| S. Dean Ruiz, Esq.<br>Harris, Perisho & Ruiz<br>Brookside Corporate Center<br>3439 Brookside Road, Suite 210<br>Stockton, CA 95129<br>Phone: (209) 957-4254<br>Facsimile: (209) 957-5338<br>E-mail: dean@hprlaw.net | Attorneys for Defendant Daniel Lopez |
| Kate Dyer, Esq.<br>Clarence Dyer & Cohen LLP<br>899 Ellis Street<br>San Francisco, CA 94109<br>Phone: (415) 749-1800<br>Facsimile: (415) 749-1694<br>E-mail: kdyer@clarencedyer.com | Attorneys for Defendants Pacific Gas & Electric Company and PG&E Corporation |
| Laurie Edelstein, Esq.<br>Seth Sias, Esq.<br>Steptoe & Johnson LLP<br>One Market Street<br>Steuart Tower, Suite 1800<br>San Francisco, CA 94105<br>Phone: (415) 365-6700<br>Facsimile: (415) 365-6699<br>E-mail: ledelstein@steptoe.com<br>ssias@steptoe.com | Attorneys for Defendants Pacific Gas & Electric Company and PG&E Corporation |
| D. Mark Jackson, Esq.<br>Bassi Edlin Huie & Blum<br>500 Washington Street, Suite 700<br>San Francisco, CA 94111<br>Phone: (415) 397-9006<br>Facsimile: (415) 397-1339<br>E-mail: mjackson@behlaw.com | Attorneys for Defendant Russell E.L. Butler aka Black Jeans |

8

SERVICE LIST GHOST SHIP LITIGATION

Case: 19-30088    Doc# 4877-4    Filed: 11/26/19    Entered: 11/26/19 20:03:10    Exhibit 4
Page 250 of 251

Page 250 of 251

| | |
|---|---|
| Max Harris, # BLM855<br>Santa Rita Jail<br>5325 Broder Blvd.<br>Dublin, CA 94568 | Defendant, In Pro Per |

9

SERVICE LIST GHOST SHIP LITIGATION