WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C. (*pro hac vice*)
(ray.schrock@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Theodore E. Tsekerides (*pro hac vice*)
(theodore.tsekerides@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Peter J. Benvenutti (#60566)
(pbenvenutti@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>Debtors. | Case Nos. 19-30088 (DM)<br><br>(Lead Case) (Jointly Administered)<br><br>Chapter 11<br><br>**DEBTORS' BRIEF REGARDING UTILITY FUNDED DEBT CLAIMS' ENTITLEMENT TO MAKE-WHOLE PREMIUMS AND JOINDER OF PG&E SHAREHOLDERS**<br><br>Date: January 14, 2019<br>Time: 10:00 a.m. (Pacific Time)<br>Place: United States Bankruptcy Court<br>        Courtroom 17, 16th Floor<br>        San Francisco, CA 94102<br><br>**Opposition Deadline**: December 20, 2019 |

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), respectfully submit this Brief Regarding the Utility Funded Debt Claims' Entitlement to Make-Whole Premiums. For the reasons set forth herein, the Class 3B creditors under the Debtors' Plan (as defined below) that hold Utility Funded Debt Claims (the "**Noteholders**") are not entitled to any make-whole or other premiums as part of their allowed claims because: (i) no such premiums are payable under the relevant indentures; and (ii) even if otherwise payable under the indentures, any such premiums are disallowed under section 502(b)(2) of the Bankruptcy Code as unmatured interest.

The PG&E Shareholders[1] join this Brief and reserve the right to participate in argument of the matter.

---

[1] The PG&E Shareholders are the entities identified on Exhibit A to the *Fourth Amended Verified Statement Of Jones Day Pursuant To Federal Rule Of Bankruptcy Procedure 2019*, ECF 4366, excluding Fidelity Management & Research Company, on behalf of certain funds and accounts, Monarch Alternative Capital LP, on its own behalf and on behalf of its advisory clients, and Paulson & Co., Inc., on behalf of certain funds and accounts. The PG&E Shareholders are acting in their individual capacities but authorized the filing of this single submission for the purpose of administrative efficiency. Each of the PG&E Shareholders is expressing its independent views, and counsel does not have the actual or apparent authority to obligate any one entity to act in concert with any other entity with respect to PG&E equity securities. The PG&E Shareholders have not agreed to act in concert with respect to their respective interests in PG&E equity securities.

# **TABLE OF CONTENTS**

I.   Preliminary Statement ........................................................................................1

II.  Jurisdiction ......................................................................................................2

III. Background .......................................................................................................2

    A.   The Indentures and Notes ..........................................................................2

    B.   The Acceleration Clauses ...........................................................................3

    C.   The Optional Redemption Provisions ........................................................4

IV.  No Make-Whole Premiums Are Due Under The Indentures ....................................6

    A.   Legal Standard ..........................................................................................6

    B.   The Noteholders Have No Contractual Right To Make-Whole Premiums ............7

        1.   The Optional Redemption Provisions Cannot Give Rise To Make-Whole Premiums After A Chapter 11 Filing ...............................7

        2.   Other Indenture Provisions Confirm That The Make-Whole Premiums Are Not Payable ...................................................11

    C.   Section 502(b)(2) Of The Bankruptcy Code Disallows The Make-Whole Premiums As Unmatured Interest ......................................13

        1.   The Make-Whole Premiums Are "Unmatured Interest" ..........................13

            a.   The Make-Whole Premiums Are The Economic Equivalent Of Interest......................................................................13

            b.   The Make-Whole Premiums Were Unmatured On The Petition Date ...........................................................................14

        2.   The Debtors' Solvency Is Not A Basis To Ignore Section 502(b)(2)........15

V.   Conclusion ......................................................................................................16

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re AMR Corp.*,
  730 F.3d 88 (2d Cir. 2013).................................................................................. *passim*

*Bank of the W. v. Superior Court*,
  2 Cal. 4th 1254 (1992) ...............................................................................................7

*Burrill v. Robert Marsh & Co.*,
  138 Cal. App. 101 (Cal. Ct. App. 1934) ....................................................................8

*In re Cardelucci*,
  285 F.3d 1231 (9th Cir. 2002) ..................................................................................16

*In re Chateaugay Corp.*,
  961 F.2d 378 (2d Cir. 1992).....................................................................................13

*Chesapeake Energy Corp. v. Bank of N.Y. Mellon*,
  773 F.3d 110 (2d Cir. 2014).....................................................................................10

*Cortlandt St. Recovery Corp. v. Bonderman*,
  31 N.Y.3d 30 (2018) .................................................................................................12

*In re Doctors Hosp. of Hyde Park, Inc.*,
  508 B.R. 697 (Bankr. N.D. Ill. 2014) .............................................................13, 14, 15

*In re Energy Future Holdings Corp.*,
  842 F.3d 247 (3d Cir. 2016).....................................................................................10

*Fed. Nat. Mortg. Ass'n v. Miller*,
  473 N.Y.S.2d 743 (Sup. Ct. Nassau Cty. 1984)........................................................10

*Hotel Mgmt. & Assocs., Inc. v. Hansen, Hansen & Johnson*,
  902 F.2d 39 (9th Cir. 1990) ........................................................................................6

*HSBC Bank USA v. Calpine Corp.*,
  No. 07 CIV 3088 GBD, 2010 U.S. Dist. LEXIS 96792 (S.D.N.Y. Sep. 14, 2010)...............14, 15

*Matter of LHD Realty Corp.*,
  726 F.2d 327 (7th Cir. 1984) ....................................................................................14

*In re Linn Energy, L.L.C.*,
  927 F.3d 350 (5th Cir. 2019) ....................................................................................11

*Matter of MPM Silicones, L.L.C.*,
  874 F.3d 787 (2d Cir. 2017)...............................................................................8, 9, 10

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

*In re PPI Enters. (U.S.), Inc.*,
  324 F.3d 197 (3d Cir. 2003)..................................................................................7

*Quadrant Structured Prod. Co. v. Vertin*,
  23 N.Y.3d 549 (2014)..................................................................................7, 11

*In re Ridgewood Apartments of DeKalb Cty., Ltd.*,
  174 B.R. 712 (Bankr. S.D. Ohio 1994)..................................................13, 14, 15

*In re Ritter Ranch Dev., L.L.C.*,
  255 B.R. 760 (B.A.P. 9th Cir. 2000).........................................................7

*In re Robinson*,
  567 B.R. 644 (Bankr. N.D. Ga. 2017) ......................................................16

*Safeco Ins. Co. of Am. v. Robert S.*,
  26 Cal. 4th 758 (2001) ...............................................................................12

*In re Skyler Ridge*,
  80 B.R. 500 (Bankr. C.D. Cal. 1987).........................................................14

*In re Solutia Inc.*,
  379 B.R. 473 (Bankr. S.D.N.Y. 2007) ................................................. *passim*

*Tan v. California Fed. Sav. & Loan Assn.*,
  140 Cal. App. 3d 800 (Ct. App. 1983).....................................................9, 10

*In re Tenderloin Health*,
  No. 15-CV-01173-JSW, 2015 WL 7015559 (N.D. Cal. Nov. 12, 2015) ............12

*Thrifty Oil Co. v. Bank of Am. Nat. Tr. & Sav. Ass'n*,
  322 F.3d 1039 (9th Cir. 2003) ...............................................................13, 14

*Travelers Cas. & Sur. Co. of Am. V. Pac. Gas & Elec. Co.*,
  549 U.S. 443 (2007).....................................................................................7

*Treasurer of New Jersey v. U.S. Dep't of Treasury*,
  684 F.3d 382 (3d Cir. 2012)........................................................................10

*In re Ultra Petroleum Corp.*,
  No. 17-20793, 2019 WL 6318074 (5th Cir. Nov. 26, 2019) ..........................7

*In re Yates Dev., Inc.*,
  256 F.3d 1285 (11th Cir. 2001) .................................................................12

**Statutes**

11 U.S.C. § 502................................................................................... *passim*

11 U.S.C. § 726.........................................................................................16

28 U.S.C. § 157...........................................................................................2

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

28 U.S.C. § 1334 ............................................................................................................... 2

Cal. Civ. Code § 1638 ....................................................................................................... 7

Cal. Civ. Code § 1639 ....................................................................................................... 7

Cal. Civ. Code § 1645 ....................................................................................................... 9

**Other Authorities**

Barron's Dictionary of Finance and Investment Terms 587 (8th ed. 2010) ....................... 9

Encyclopedia of Banking & Finance 993 (9th ed. 1991) ................................................... 9

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    PRELIMINARY STATEMENT

The Utility Senior Notes, on an aggregate basis, bear interest at rates that exceed current market rates. Accordingly, the Debtors' Joint Chapter 11 Plan of Reorganization dated November 4, 2019, ECF No. 4563 (the "**Debtors' Plan**"),[2] provides for the Debtors to refinance twenty-nine series of Utility Senior Notes issued between 2004 and 2018 (the "**Notes**") with new market-rate debt, thereby saving over $800 million in comparison to the plan proposed by the Ad Hoc Committee of Senior Noteholders and the Tort Claimants Committee that reinstates substantially all of the Notes. Under the Debtors' Plan, the Noteholders will receive cash payments equal to the full principal amount of the Notes, plus all interest accrued prior to the Petition Date at the applicable contract rates, and postpetition interest at the federal judgment rate.[3]

The Noteholders, however, will *not* receive under the Debtors' Plan, nor are they entitled to receive, payment of more than $5.1 billion[4] in Make-Whole Premiums (as defined below) claimed by the Noteholders. This is appropriate for two reasons. First, no Make-Whole Premiums are payable under the terms of the Indentures. The Indentures provide for Make-Whole Premiums only when the Utility redeems the Notes (*i.e.*, pays them off), prior to their maturity. The commencement of these Chapter 11 Cases automatically accelerated the maturity of the Notes, making the principal immediately due and payable on the Petition Date. Thus, payment of the Notes under the Debtors' Plan will occur *after* their maturity and, therefore, no Make-Whole Premiums are payable under the plain language of the Indentures.

This plain language reading of the Indentures is confirmed by their different treatment of defaults resulting from a bankruptcy filing and defaults for other reasons. Upon a bankruptcy default, the outstanding principal—but not any premium—becomes immediately due and payable. In contrast, upon a default for other reasons, the principal *and any premium* becomes due and payable. This

---

[2]    Capitalized terms used but not defined in this Brief have the meanings given in the Debtors' Plan.

[3]    The parties have separately briefed the issue as to the appropriate rate of postpetition interest on allowed unsecured claims, including the Allowed Utility Funded Debt Claims.

[4]    The actual amount of the Make-Whole Premiums at issue is subject to change, for reasons explained *infra* note 9.

distinction makes clear that the Noteholders simply did not bargain for the ability to recover Make-Whole Premiums in the context of a chapter 11 filing and automatic acceleration of the Notes.

*Second*, even if Make-Whole Premiums were not precluded by the terms of the Indentures, they nevertheless would be disallowed as "unmatured interest" under section 502(b)(2) of the Bankruptcy Code. The Indentures make clear that the Make-Whole Premiums were intended to compensate the Noteholders for interest payments they expected to receive in the future. However characterized, the Make-Whole Premiums are nothing more than lump-sum payments of interest that have not yet matured—precisely the type of claim disallowed under section 502(b)(2) of the Bankruptcy Code. Accordingly, neither the relevant Indentures nor the Bankruptcy Code entitle the Noteholders to any Make-Whole Premiums as part of their Allowed Utility Funded Debt Claims.

## II. JURISDICTION

This Court has jurisdiction to consider these issues pursuant to 28 U.S.C. §§ 157 and 1334; the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.); and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California.

## III. BACKGROUND

### A. The Indentures and Notes

Between 2004 and 2018, the Utility issued twenty-nine series of Notes with a total principal amount of approximately $17.5 billion, all of which were outstanding on the Petition Date. The Notes are governed by one of three base indentures and, in most cases, a specific supplemental indenture (collectively, the "**Indentures**"). For the Court's convenience, Appendix A, attached hereto, provides a list of each series of Notes along with their stated maturity dates, principal amounts, interest rates, as well as each Note's governing indenture(s).

The Indenture dated April 22, 2005 ("the **2005 Base Indenture**," attached as Exhibit 1) forms the foundation for most of the Notes and alone governs the first series of Notes set forth in Appendix A.[5] Pursuant to Section 3.01 of the 2005 Base Indenture, the Utility issued twenty-four additional

---

[5] Although originally established on March 23, 2004, the 6.05% Notes due March 1, 2034 (the "**6.05% Notes**") were "continued under" the 2005 Base Indenture and, accordingly, are "governed by and subject to the provisions" of the 2005 Base Indenture. Ex. 1 §§ 4.01(a), 4.01(e), 4.02(d).

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

series of Notes by executing various supplemental indentures between 2007 and 2017 (each, a "**Supplemental Indenture**").[6] In 2017 and 2018, the Utility entered into two new base indentures— the Indenture dated November 29, 2017 (the "**2017 Base Indenture**," attached as Exhibit 5), and the Indenture dated August 6, 2018 ("**2018 Base Indenture**," attached as Exhibit 6,[7] and together with the 2005 Base Indenture and 2017 Base Indenture, the "**Base Indentures**"). The 2017 Base Indenture governs two series of Notes, and the 2018 Base Indenture, along with a supplemental indenture executed pursuant thereto, governs the two other series of Notes, as set forth in Appendix A.

As demonstrated below, the Utility's rights and obligations as they relate to each of the Notes are identical in all relevant respects with respect to the Make-Whole Premiums claimed by the Noteholders.

### B. The Acceleration Clauses

First, all of the Base Indentures specify various "Events of Default" and provide for acceleration upon the occurrence of certain defaults. Relevant here, Section 9.01(e) of all of the Base Indentures provides that "the commencement by the [Utility] of a voluntary case or proceeding under any applicable federal or state bankruptcy, insolvency, reorganization or other similar law" constitutes an Event of Default. Ex. 1 § 9.01(e); Ex. 5 § 9.01(e); Ex. 6 § 9.01(e).

Section 9.02 of the Base Indentures has two separate provisions for the acceleration of the Notes upon the occurrence of an Event of Default (the "**Acceleration Clauses**"), as follows:

> If an Event of Default shall have occurred and be continuing, then in every such case the Trustee or the Holders of not less than thirty-three percent (33%) in aggregate principal amount of Bonds then

---

All references to "Ex." or "Exhibit" herein refer to exhibits attached to the *Declaration of Theodore E. Tsekerides in Support of Debtors' Moving Brief Regarding Utility Funded Debt Claims' Entitlement to Make-Whole Premiums*, dated November 27, 2019.

[6] For example, the 6.25% Notes due March 1, 2039 were established by the Sixth Supplemental Indenture dated March 6, 2009 (attached as Exhibit 2); the 3.50% Notes due October 1, 2020 were established by the Tenth Supplemental Indenture dated September 15, 2010 (attached as Exhibit 3); and the 3.40% Notes were established by the Twenty-Third Supplemental Indenture dated August 18, 2014 (attached as Exhibit 4). California law governs the Notes issued under the 2005 Base Indenture and related Supplemental Indentures. Ex. 1 § 1.12; Ex. 2, at A-9; Ex. 3, at A-9; Ex. 4, at A-9.

[7] New York law governs the Notes issued under the 2017 and 2018 Base Indentures and the related supplemental indenture.

Outstanding, considered as one class, may declare the principal amount (or, if any of the Bonds are Discount Bonds, such portion of the principal amount of such Bonds as may be specified in the terms thereof as contemplated by Section 3.01) of all Bonds then Outstanding to be due and payable immediately, by a notice in writing to the Company (and to the Trustee if given by Holders), and **upon such declaration *such principal amount . . . together with premium, if any*, and accrued interest, if any, thereon, shall become immediately due and payable; provided, however, that with respect to an Event of Default described in Section 9.01(d) or (e), *the principal amount . . .* of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or Holders**.

Ex. 1 § 9.02; Ex. 5 § 9.02; Ex. 6 § 9.02 (emphasis added in each). This emphasized language is significant, as it draws a distinction between (i) general Events of Default, as to which acceleration occurs only upon a declaration of the indenture trustee or holders of 33% of outstanding principal amount of Notes, and (ii) Events of Default under Sections 9.01(d) or (e), as to which acceleration occurs automatically upon a voluntary bankruptcy filing (or with the passage of time after an involuntary bankruptcy filing). Significantly, as set forth above, acceleration for the first category of defaults requires payment of principal "together with premium, if any" while the second category of defaults requires only payment of "principal" without a reference to a "premium."

Additionally, the Acceleration Clauses cause the Notes to "mature." The Base Indentures define the term "Maturity" as "the date on which the principal of such [Note] . . . becomes due and payable . . . whether at the Stated Maturity, by declaration of acceleration, upon call for redemption or otherwise." Ex. 1 § 1.01; Ex. 5 § 1.01; Ex. 6 § 1.01. The Base Indentures define "Stated Maturity" to mean "the date on which the principal of such obligation or such installment of principal or interest is stated to be due and payable (without regard to any provisions for redemption, prepayment, acceleration, purchase or extension)." Ex. 1 § 1.01; Ex. 5 § 1.01; Ex. 6 § 1.01. Thus, a Note may reach Maturity at its Stated Maturity Date (*e.g.*, March 1, 2034, for the 6.05% Notes), or upon the earlier acceleration of outstanding principal resulting from an Event of Default, such as a bankruptcy filing.

## C.     The Optional Redemption Provisions

Each of the Indentures has an "Optional Redemption" provision (the "**Optional Redemption Provision**"), that allowed the Utility to redeem the Notes before their maturity by paying a

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

"Redemption Price." For each Note, the Redemption Price is the greater of: (i) 100% of the principal amount of the Note to be redeemed (commonly referred to as the Note's "face value"); or (ii) the present value of "Remaining Scheduled Payments,"[8] which includes future payments of interest and principal of the Note to be redeemed, discounted to the "Redemption Date" at the "Adjusted Treasury Rate," plus 15 to 25 basis points. *See, e.g.*, Ex. 1 § 4.03(d). For purposes of this Memorandum and the current dispute, the term "**Make-Whole Premiums**" refers to the amount by which the Redemption Price exceeds the face value of the Note.

The 2005 Base Indenture, for example, provides that the Utility had the option of redeeming the 6.05% Notes:

> in whole or in part at any time after the Initial Issuance Date and prior to Maturity, at a Redemption Price equal to the greater of:
>
> (i) 100% of the principal amount of the 6.05% Senior Notes to be redeemed; or
>
> (ii) as determined by the Independent Investment Banker, the sum of the present values of the Remaining Scheduled Payments on the 6.05% Senior Notes to be so redeemed (not including any portion of such payments of interest accrued to the Redemption Date) discounted to the Redemption Date on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) at the Adjusted Treasury Rate, plus 0.25%,
>
> plus, in either of the above cases, accrued and unpaid interest on the principal amount of the 6.05% Senior Notes being redeemed to but not including the Redemption Date.

Ex. 1 § 4.03(d). Assuming, *arguendo*, that the 6.05% Notes were deemed to be "redeemed" under the Debtors' Plan on June 30, 2020, the Redemption Price would include the present value of the twenty-seven remaining interest payments, plus the present value of the principal. In this scenario, the Redemption Price for the 6.05% Notes would be approximately $4.39 billion (calculated as if the principal had not been accelerated), resulting in a Make-Whole Premium of almost $1.4 billion for the 6.05% Notes alone.[9]

---

[8] "Remaining Scheduled Payments" is a defined term used in all of the Indentures, with the exception of the 2018 Base Indenture and the first supplemental indenture thereto.

[9] The actual amount of the Make-Whole Premiums may vary, subject to the actual Redemption Date, if any, and the applicable Adjusted Treasury Rate. This Memorandum uses June 30, 2020, as the Redemption Date and the Adjusted Treasury Rate as of November 25, 2019, as proxies for illustrative and explanatory purposes only. Nothing in this Memorandum or its accompanying

Each of the Notes are subject to similar Optional Redemption Provisions, although the phrasing varies slightly. As noted above, Section 4.03(d) of the 2005 Base Indenture provides that the 6.05% Notes are redeemable "at any time after the Initial Issuance Date and *prior to Maturity*." Ex. 1 § 4.03(d) (emphasis added). Certain Supplemental Indentures provide that the Notes are redeemable "at any time," *see, e.g.*, Ex. 2 § 301, although the Notes to be issued pursuant thereto still state that they are redeemable "prior to Maturity," *see, e.g.*, Ex. 2, at A-6. Other Supplemental Indentures provide that the Notes are redeemable "at any time prior to [a specific date]." *See, e.g.*, Ex. 3 § 301; Ex. 4 § 301. While the exact phrasing of the Optional Redemption Provisions varies among the Indentures, they all uniformly address circumstances where the Notes are voluntarily paid off before the principal outstanding on the Notes is due, *i.e.*, before maturity of the Notes.

## IV. NO MAKE-WHOLE PREMIUMS ARE DUE UNDER THE INDENTURES

The Debtors' Plan compensates the Noteholders in full for their allowed Utility Funded Debt Claims in respect of the Notes. As stated, under the Debtors' Plan, the Noteholders will receive the principal amount of their Notes plus all accrued and unpaid interest that was owed as of the Petition Date, plus postpetition interest at the Federal Judgment Rate. *See* Debtors' Plan § 4.16(a). The Noteholders contend that they also are entitled to Make-Whole Premiums calculated with reference to the Optional Redemption Provision in the applicable Indentures. As demonstrated below, under both the terms of the relevant Indentures as well as the operation of law under section 502(b)(2) of the Bankruptcy Code, the Noteholders have no allowable claims in respect of the Make-Whole Premiums.

### A. Legal Standard

In order to have an allowable claim in bankruptcy, a party must first have a valid and enforceable obligation under nonbankruptcy law. 11 U.S.C. § 502(b)(1) (disallowing claim to the extent "unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured"); *see also Hotel Mgmt. & Assocs., Inc. v. Hansen, Hansen & Johnson*, 902 F.2d 39 (9th Cir. 1990) (claim properly disallowed under section 502(b)(1) where creditors' "rights to demand payment under the . . . contracts depended

submissions should be interpreted as a waiver or concession as to the Noteholders' entitlement to any Make-Whole Premiums under any of the Notes or Indentures at issue.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

on the occurrence of two conditions precedent," neither of which had occurred); *In re Ritter Ranch Dev., L.L.C.*, 255 B.R. 760, 766 (B.A.P. 9th Cir. 2000) (claim properly disallowed where bondholders had no contractual right to payment from the debtor).

Independently, the party's claim also must not be subject to disallowance under the various provisions of the Bankruptcy Code. *See Travelers Cas. & Sur. Co. of Am. V. Pac. Gas & Elec. Co.*, 549 U.S. 443, (2007) ("[c]reditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, *subject to any qualifying or contrary provisions of the Bankruptcy Code*") (emphasis added); *In re Ultra Petroleum Corp.*, No. 17-20793, 2019 WL 6318074, at *2 (5th Cir. Nov. 26, 2019) (following "the monolithic mountain of authority holding the Code—not the reorganization plan—defines and limits the claim."); *In re PPI Enters. (U.S.), Inc.*, 324 F.3d 197, 207 (3d Cir. 2003) ("creditor's rights must be ascertained with regard to applicable statutes," including the Bankruptcy Code).

**B.     The Noteholders Have No Contractual Right To Make-Whole Premiums**

Under both California and New York law, the Indentures are to be interpreted according to their plain meaning. *See* Cal. Civ. Code §§ 1638, 1639; *Bank of the W. v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992) ("If contractual language is clear and explicit, it governs."); *see also Quadrant Structured Prod. Co. v. Vertin*, 23 N.Y.3d 549, 559–60 (2014) ("In construing a contract we look to its language, for 'a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.'") (citing cases). The plain language of the Indentures clearly and explicitly demonstrates that the Noteholders are not entitled to Make-Whole Premiums as part of their Utility Funded Debt Claims.

    1.   The Optional Redemption Provisions Cannot Give Rise To Make-Whole Premiums After A Chapter 11 Filing

The Noteholders are likely to contend that payment of Utility Funded Debt Claims under the Debtors' Plan triggers the Optional Redemption Provisions, thereby entitling them to the Make-Whole Premiums. But there are no Make-Whole Premiums due under the Optional Redemption Provisions— and there never will be—because the Notes have reached maturity, thus rendering the Optional Redemption Provisions inoperative.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

The Optional Redemption Provisions were designed to provide the Utility the flexibility to repay before maturity and when to make such payments, provided it followed the specific terms and paid the pre-negotiated premium in exchange for its exercise of that right. Under the Indentures, the Utility, therefore, had the right to voluntarily elect to pay some or all of the Notes early, if it paid the Make-Whole Premiums. Based on the plain language of the Optional Redemption Provisions, however, the Make-Whole Premiums only become payable if the Utility makes a voluntary election to pay off some or all of the outstanding debt *before* the applicable maturity date. In contrast, *after* maturity, the Utility is obligated to repay all of the debt under the terms of the Indentures—payment no longer is optional—and it therefore makes perfect sense that no such premiums would be payable.

Under Section 9.02 of the Base Indentures, the entire principal amount of the Notes automatically became immediately due and payable when the Debtors filed their chapter 11 petitions. *See* Ex. 1 § 9.02; Ex. 5 § 9.02; Ex. 6 § 9.02. The chapter 11 filing accelerated all of the various dates when the Notes were otherwise set to mature to the Petition Date. Under the Indentures, each Note reaches Maturity at "the date on which *the principal* of such [Note] . . . *becomes due and payable* as provided in such [Note] or in this Indenture, whether at the Stated Maturity, by declaration of acceleration, upon call for redemption or otherwise." Ex. 1 § 1.01; Ex. 5 § 1.01; Ex. 6 § 1.01 (emphasis added). The Indentures explicitly provide that, upon a bankruptcy filing, "the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders." Ex. 1 § 9.02; Ex. 5 § 9.02; Ex. 6 § 9.02. Thus, because the principal of the Notes automatically became due and payable on the Petition Date, the Notes have reached Maturity.

Consistent with this contractual language, courts applying New York and California law have recognized that acceleration "changes the date of maturity of the accelerated notes to the date of the petition." *See, e.g., Matter of MPM Silicones, L.L.C.*, 874 F.3d 787, 802 (2d Cir. 2017) (citation omitted); *In re AMR Corp.*, 730 F.3d 88, 103 (2d Cir. 2013) ("[A]cceleration changed the date of maturity from some point in the future to an earlier date based on the debtor's default under the contract.") (quotation omitted); *In re Solutia Inc.*, 379 B.R. 473, 489 (Bankr. S.D.N.Y. 2007) ("Acceleration occurred under the clause [as a result of the chapter 11 filing] and has altered the maturity or 'due' date, as also provided by New York law."); *Burrill v. Robert Marsh & Co.*, 138 Cal.

App. 101, 106 (Cal. Ct. App. 1934) (rejecting argument that maturity could only be construed to mean the due date specified in the note, and concluding "that the term 'maturity,' as here used, should be construed to mean the date when the holder of the notes had a legal right to begin action to force payment thereof").

This is important because the Indentures make clear that an Optional Redemption can only occur prior to the Maturity of the Notes. That has not occurred, and cannot occur here. Simply put, if a redemption does not take place prior to Maturity, there can be no event post-maturity that triggers a Make-Whole Premium. Although the Notes do not define "redemption," the term, as used in the finance industry, customarily means the "repayment of a debt security or preferred stock issue, *at or before maturity*."[10] Barron's Dictionary of Finance and Investment Terms 587 (8th ed. 2010) (emphasis added); *see also* Encyclopedia of Banking & Finance 933 (9th ed. 1991) ("redemption" is "[t]he act of redeeming a debt; payment of a debt; retirement of an issue of bonds or notes; the cancellation of a debt, whether on a date prior to maturity or upon the date of obligatory maturity").

Because "redemption" can only occur "***at or before maturity***," "any payment on the accelerated notes following a bankruptcy filing would be a *post*-maturity payment," and not a redemption of the Notes. *MPM Silicones*, 874 F.3d at 803; *see AMR*, 730 F.3d at 103 ("American's attempt to repay the debt in October 2012 was not a voluntary prepayment because prepayment can only occur *prior* to the maturity date.") (quotation omitted); *Solutia*, 379 B.R. at 488 ("Because the 2009 Notes were automatically accelerated, any payment [after the chapter 11 filing] would not be a prepayment. Prepayment can only occur prior to the maturity date."); *Tan v. California Fed. Sav. & Loan Assn.*, 140 Cal. App. 3d 800, 809 (Ct. App. 1983) ("[Lender] having exercised the due-on-sale clause, accelerated the due date of the loan and demanded full payment, the entire unpaid balance was due under the terms of the note itself and there was no prepayment to which the prepayment penalty would attach."). Thus, because the Utility's chapter 11 filing automatically caused the Notes to mature and to become due and payable on the Petition Date, any "Redemption" became impossible, and the

---

[10] Cal. Civ. Code § 1645 ("Technical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense.")

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

right to any Make-Whole Premiums as a consequence of an optional redemption was immediately extinguished.

Despite this plain contractual language, the Noteholders are likely to rely on the Third Circuit's decision in *In re Energy Future Holdings Corp.*, 842 F.3d 247, 255 (3d Cir. 2016) ("*EFH*"), where the Court stated that "New York and federal courts deem 'redemption' to include both pre- and post-maturity repayments of debt." Any such reliance, however, would be misplaced. First, *EFH* confirms that where, as here, the contractual language is clear, the Court need only "follow the text." *Id.* at 256 ("*AMR* is the easy case; just follow the text."). Second, the *EFH* Court reached its conclusion without analysis, and the cases it relied on do not support the conclusion. For instance, the *EFH* Court relied on *Chesapeake Energy Corp. v. Bank of N.Y. Mellon*, 773 F.3d 110, 116 (2d Cir. 2014), but the issue in *Chesapeake* was whether "redeem" meant the reacquisition of a security or the giving of notice of redemption—the Court did not address whether redemption could occur post-maturity. In fact, the Second Circuit in *Chesapeake* quoted Barron's Dictionary of Finance and Investment Terms 587 (8th ed. 2010) for the definition of "redemption" as "repayment of a debt security or preferred stock issue, *at or before maturity*." *Id.* (emphasis added). The other cases cited in *EFH* are similarly unavailing, as none analyze a borrower's ability to take advantage of an optional redemption provision after the debt had been accelerated. *Treasurer of New Jersey v. U.S. Dep't of Treasury*, 684 F.3d 382, 388 (3d Cir. 2012) (addressing government regulations allowing owners of United States Savings Bonds to redeem the bonds after their stated maturities), and *Fed. Nat. Mortg. Ass'n v. Miller*, 473 N.Y.S.2d 743, 744 (Sup. Ct. Nassau Cty. 1984) (noting the rule in New York that a mortgagor may cure a default by paying the accelerated debt prior to sale of the property).

Moreover, the Second Circuit has confirmed that the "plain meaning of the term 'redeem' is to 'repay[] . . . a debt security . . . *at or before* maturity,'" *see MPM Silicones*, 874 F.3d at 803 (citation omitted); *see also AMR*, 730 F.3d at 103 (no make-whole premium is payable after bankruptcy petition date because "[p]repayment can only occur *prior* to the maturity date"); *Tan*, 140 Cal. App. 3d at 809–10 (finding no prepayment penalty warranted after lender "accelerated the due date of the loan" and demanded full payment).

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Finally, the Optional Redemption Provisions themselves say nothing about payment of a Make-Whole Premium after a bankruptcy. This is telling, because courts have required explicit indenture language before concluding that noteholders are entitled to such a premium. *See, e.g.*, *Solutia*, 379 B.R. at 488 (no make-whole was due where redemption provision lacked "the explicitness that would be expected in a typical post-acceleration yield-maintenance clause") (citation omitted).

2.  Other Indenture Provisions Confirm That The Make-Whole Premiums Are Not Payable

Other provisions in the Indentures support the conclusion that no Make-Whole Premiums are payable in the context of a chapter 11 case.

As noted above, the Acceleration Clauses draw a sharp distinction between an event of default based on a bankruptcy filing and those based on other events. Section 9.02 of the Base Indentures expressly states that upon the occurrence of an Event of Default relating to bankruptcy, "the principal amount shall be due and payable immediately." In contrast, for other Events of Default the Trustee or a class of Holders "may declare" the Notes due and payable, including the "principal amount (or specified amount), *together with premium, if any*." *See* Ex. 1 § 9.02; Ex. 5 § 9.02; Ex. 6 § 9.02. This was a sensible and logical bargain for the parties to strike. "[T]he automatic acceleration provision here is not solely for the benefit of one party, but simultaneously affords potential benefits to both: it accelerates the amount presently due for the purpose of the [N]oteholders' claims against [the Utility] in bankruptcy and it excludes any Make-Whole [Premiums] from [the Utility]'s obligations, to [the Utility]'s benefit." *See AMR*, 730 F.3d at 101.

Of course, the Noteholders could have negotiated provisions that expressly provided for a premium in the event of a Utility bankruptcy,[11] but no such right appears in the Indentures. It is clear from this omission of any reference to "premium" in the Acceleration Clauses in the context of a bankruptcy that no premium is payable upon the Utility's chapter 11 filing. *See Quadrant Structured*

---

[11]   *See, e.g.*, *HSBC Bank*, 2010 WL 3835200, at *4 (recognizing that parties can contract for damages in the event of acceleration) (citing cases); *Solutia*, 379 B.R. at 488 ("It is possible to provide contractually for post-acceleration 'yield maintenance' of some sort."). Of course, this assumes that the Bankruptcy Code even permits such relief, which it does not for the reasons discussed *infra* IV.C.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

*Prod.*, 23 N.Y.3d at 560 ("Even where there is ambiguity, if parties to a contract omit terms—particularly, terms that are readily found in other, similar contracts—the inescapable conclusion is that the parties intended the omission."); *see also In re Linn Energy, L.L.C.*, 927 F.3d 350, 354–55 (5th Cir. 2019) (finding that the "failure to make specific mention of 'default interest' . . . indicates that the parties intended the omission") (New York law); *Cortlandt St. Recovery Corp. v. Bonderman*, 31 N.Y.3d 30, 46 (2018) ("If the parties to the indenture intended to limit the trustee to actions against the issuer and guarantor only—as defendants maintain—the signatories to the indenture could have easily said so. They did not."); *Safeco Ins. Co. of Am. v. Robert S.*, 26 Cal. 4th 758, 763–64 (2001) (reading omitted term into contract "would violate the fundamental principle that in interpreting contracts . . . courts are not to insert what has been omitted") (citing Cal. Civ. Proc. Code § 1858 (in construing instrument, "the office of the Judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted")).

Viewed as a whole, the terms of the Indentures demonstrate that the Noteholders did not bargain for the right to receive any Make-Whole Premiums in a Utility bankruptcy case. Rather, the language of the Indentures demonstrates that the Noteholders "made a decision to give up their future income stream in favor of having an immediate right to collect their entire debt." *See Solutia*, 379 B.R. at 488; *see also In re Tenderloin Health*, No. 15-CV-01173-JSW, 2015 WL 7015559, at *2 (N.D. Cal. Nov. 12, 2015) (affirming Bankruptcy Court's finding that "bankruptcy proceedings clause served to define the scope of actions" to which the creditor "would be entitled"). No matter how much the Noteholders might now wish they could redraft their contractual arrangements, they are not entitled to receive more than what they bargained for or what the Bankruptcy Code allows. *See Solutia*, 379 B.R. at 489 ("The time and place to have obtained the additional rights the 2009 Noteholders seek was at the bargaining table."); *see also In re Yates Dev., Inc.*, 256 F.3d 1285, 1290 (11th Cir. 2001) ("[I]t is never the role of a . . . court to rewrite a contract to make it more reasonable for one of the parties or to relieve a party from what turns out to be a bad bargain.").

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

### C. Section 502(b)(2) Of The Bankruptcy Code Disallows The Make-Whole Premiums As Unmatured Interest

Even if the Indentures themselves provided for payment of Make-Whole Premiums after the Utility's chapter 11 filing, any claim for such premiums nevertheless would be disallowed as unmatured interest under section 502(b)(2) of the Bankruptcy Code.

#### 1. The Make-Whole Premiums Are "Unmatured Interest"

The Make-Whole Premiums are based upon and calculated pursuant to interest payments on the Notes scheduled to be made after the Petition Date. As shown below, those future installments of interest are the very essence of claims disallowed by section 502(b)(2) of the Bankruptcy Code. The fact that those unmatured interest payments arise under the "Redemption Price" formula is irrelevant, as the scope and intent of section 502(b)(2) cannot be so easily evaded.

Courts look to substance over form, discarding labels to consider whether a claim actually *is* unmatured interest. *See, e.g.*, *Thrifty Oil Co. v. Bank of Am. Nat. Tr. & Sav. Ass'n*, 322 F.3d 1039, 1047 (9th Cir. 2003) ("In deciding whether a claim includes unmatured interest, federal courts generally focus on the substance of the claim, not its form, and may rely on evidence outside the parties' agreement."); *see also In re Chateaugay Corp.*, 961 F.2d 378, 380 (2d Cir. 1992) (claims for unamortized original issue discount are, "as a matter of economic definition," claims for "unmatured interest"); *In re Doctors Hosp. of Hyde Park, Inc.*, 508 B.R. 697, 705 (Bankr. N.D. Ill. 2014) ("[C]ourts look to the economic substance of the transaction to determine what counts as interest.").

#### a. The Make-Whole Premiums Are The Economic Equivalent Of Interest

For each of the Notes, the Make-Whole Premiums are calculated by subtracting the Notes' face value from "the sum of the present values of the Remaining Scheduled Payments" of principal and interest on the Notes to be redeemed, not including principal and interest accrued as of the Redemption Date, with the sum "discounted to the Redemption Date" on a semi-annual basis at the Adjusted Treasury Rate, plus 15 to 25 basis points. *See supra* at III.3. The Make-Whole Premiums thus capture the value of the interest payments that would have become due and payable in respect of the Notes had there been a voluntary payment prior to maturity—rendered impossible by the Utility's chapter 11 filing. As such, the Make-Whole Premiums are no different from the make-whole, prepayment, redemption, and "yield maintenance" premiums that courts have disallowed as unmatured

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

interest under section 502(b)(2) of the Bankruptcy Code. *See HSBC Bank USA v. Calpine Corp.*, No. 07 CIV 3088 GBD, 2010 U.S. Dist. LEXIS 96792 (S.D.N.Y. Sep. 14, 2010); *Doctors Hosp. of Hyde Park*, 508 B.R. at 706; *In re Ridgewood Apartments of DeKalb Cty., Ltd.*, 174 B.R. 712, 720-21 (Bankr. S.D. Ohio 1994).

Courts have recognized that, despite their label, yield maintenance formulas, original issue discounts, and make-whole, no-call, or redemption premiums or penalties all operate with a common goal: to compensate a lender for anticipated interest payments that would accrue in the future. *See, e.g.*, *Matter of LHD Realty Corp.*, 726 F.2d 327, 330 (7th Cir. 1984) (a prepayment premium compensates for "anticipated interest a lender will not receive if a loan is paid off prematurely"); *Doctors Hosp. of Hyde Park*, 508 B.R. at 705 (yield maintenance premium "compensates the lender for possible changes in the interest rate in the future, and is thus part of the price of the money loaned now in terms of money to be paid back in the future"); *In re Skyler Ridge*, 80 B.R. 500, 504–05 (Bankr. C.D. Cal. 1987) ("The usual purpose of a prepayment premium provision in a loan agreement is to assure that the lender will receive the contractual rate of return for the life of the loan, or the equivalent thereof.").[12]

Allowing Noteholders to recover Make-Whole Premiums here would be no different than allowing them a claim for interest payments over the life of the Notes, a result indisputably prohibited by section 502(b)(2).

b. *The Make-Whole Premiums Were Unmatured On The Petition Date*

In *Thrifty Oil*, the Ninth Circuit held that "[i]nterest is 'unmatured' when it [is] not yet due and payable at the time the debtor filed its bankruptcy petition." *Thrifty Oil*, 322 F.3d at 1047 (citation and footnote omitted). The Make-Whole Premiums here are *unmatured* interest because they were not due and payable on the Petition Date. Rather, because the Utility did not redeem any of the Notes

---

[12] The *Skyler Ridge* court also noted in dicta that "[l]iquidated damages, including prepayment premiums . . . do not represent unmatured interest." *Skyler Ridge*, 80 B.R. at 508 (Bankr. C.D. Cal. 1987). This is wrong for all the reasons stated above, and not instructive to the Court's analysis of the issue here. In fact, the Court in *Skyler Ridge* only characterized the prepayment premium as liquidated damages because "the parties had agreed upon" it, and, even then, recognized that "[t]he classification of the prepayment premium language as a liquidated damages provision is not altogether certain." *Id*. at 503.

prior to the commencement of its chapter 11 case, it is not possible for any claims for Make-Whole Premiums to have accrued prior to the Petition Date.

Courts consistently have held that make-whole premiums that accrue after the petition date are unmatured interest. In *Ridgewood Apartments*, for example, the debtor paid notes after a bankruptcy filing. *See* 174 B.R. at 720. The court held that, "[a]bsent actual prepayment by the [d]ebtor, [the creditor's] claim for a prepayment penalty could be no more than a contingent liability" and, "because the contingent claim is for interest *which is not yet due at the time the bankruptcy was filed (because prepayment had not occurred)*, it would not be allowed to an under-secured creditor." *Id.* (emphasis added); *see also Doctors Hosp.*, 508 B.R. at 706 ("At the time the [debtor's] bankruptcy case was filed, the Yield Maintenance Premium was not due, and thus the interest was still unmatured."); *HSBC Bank*, 2010 U.S. Dist. LEXIS 96792 (disallowing "claim for damages equal to the full amount of interest due over the life of the loans, but not yet due as of the petition date" because the "amount was unmatured when Debtor filed for bankruptcy, and therefore [could] not be recovered").

Thus, because the Make-Whole Premiums consist of future interest payments that were not yet due and payable on the Petition Date, the Make-Whole Premiums constitute unmatured interest that is not permitted as part of an allowed claim under section 502(b) of the Bankruptcy Code.

2. The Debtors' Solvency Is Not A Basis To Ignore Section 502(b)(2)

The Noteholders may cite pre-Bankruptcy Code case law in support of a "solvent debtor exception" to section 502(b)(2) of the Bankruptcy Code. But the solvent debtor exception is a relic of the past. Under the Bankruptcy Code, section 502(b)(2) applies with full force regardless of a debtor's solvency, and the Bankruptcy Code contains no provision exempting the creditors of a solvent debtor from the provisions of section 502(b).

The Noteholders might argue that the solvent debtor exception survived the Code's enactment. Any such argument, however, is unavailing, as Congress has spoken on the Code's treatment of both unmatured interest and solvent debtors. When Congress enacted the Bankruptcy Code, it specifically prohibited in section 502(b)(2) the allowance of claims for unmatured interest and established two narrow exceptions: (i) section 506(b), which allows a secured claim for postpetition interest where the value of collateral exceeds the allowed amount of the claim, *see Timbers*, 484 U.S. at 372; and

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

(ii) section 726(a)(5), which provides for recovery of postpetition interest *on*, but not as *part of*, an allowed claim at a specified "legal rate" when the debtor is solvent. *See* 11 U.S.C. § 726(a)(5); *In re Cardelucci*, 285 F.3d 1231, 1234-35 (9th Cir. 2002); *In re Robinson*, 567 B.R. 644, 649-50 (Bankr. N.D. Ga. 2017) ("Post-petition interest is not part of the allowed claim pursuant to Section 502(b)(2), but the Code provides when and at what rate that post-petition interest can be paid on the allowed claim pursuant to Section 726(a)(5).").  By enacting section 726(a)(5), Congress replaced the pre-Code solvent debtor exception with something entirely new.  Under these circumstances, where Congress has specified these two narrow exceptions when a creditor may recover postpetition interest, there is no basis to conclude that the amorphous pre-Code solvent debtor exception has any vitality under the Bankruptcy Code.

Moreover, even *if* the solvent debtor exception survived Congress's enactment of section 502(b)(2), which it clearly did not, that exception still would provide no basis for including the Make-Whole Premiums as part of an allowed claim in respect of the Notes.  While the common law exception allowed interest to continue accruing against a solvent debtor *during* bankruptcy, it did not allow interest to continue accruing *after* bankruptcy.  But that is precisely what the Make-Whole Premiums seek to accomplish.  The Optional Redemption Provisions require the Debtors to pay the present value of *all* future interest payments, consisting in many instances of interest payments that will not come due for more than twenty years from now.  This would go well beyond what the pre-Code solvent debtor exception permitted, even if by some means that exception still has any relevance.

## V.     CONCLUSION

For all the foregoing reasons, the Court should find that the Noteholders are not entitled to any Make-Whole Premiums as part of their Allowed Utility Funded Debt Claims.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Dated: November 27, 2019

**WEIL, GOTSHAL & MANGES LLP**

**KELLER & BENVENUTTI LLP**

By: ___/s/ *Theodore E. Tsekerides*___
       Theodore E. Tsekerides

*Attorneys for Debtors and Debtors in
Possession*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119