> **THIS AGREEMENT IS NOT, AND SHALL NOT BE DEEMED, A SOLICITATION FOR CONSENTS TO ANY CHAPTER 11 PLAN OF REORGANIZATION PURSUANT TO SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE OR A SOLICITATION TO TENDER OR EXCHANGE ANY CLAIMS OR INTERESTS. EACH CONSENTING CREDITOR'S VOTE ON THE PLAN SHALL NOT BE SOLICITED UNLESS AND UNTIL SUCH CONSENTING CREDITOR HAS RECEIVED A DISCLOSURE STATEMENT AND RELATED BALLOT(S), AS APPROVED BY THE BANKRUPTCY COURT.**

## SECOND AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT

This Second Amended and Restated Restructuring Support Agreement (as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "Agreement") dated as of ~~November 1~~[●], 2019, is entered into by and among the following parties: (i) PG&E Corporation and Pacific Gas and Electric Company, as debtors and debtors in possession (each, a "Debtor" and collectively, the "Company" or the "Debtors") in the Chapter 11 Cases (as defined below), and (ii) each of the undersigned creditors party hereto from time to time solely in each such creditor's capacity as a holder of Subrogation Claims (as defined below) (including Transferees and Joining Parties (each as defined below), collectively the "Consenting Creditors"), and this Agreement shall not be binding on any such holder in its capacity as the holder of any claim or interest other than a Subrogation Claim.  The Company and the Consenting Creditors are referred to herein as the "Parties" and each individually as a "Party."

### RECITALS:

**WHEREAS,** on January 29, 2019, (the "Petition Date"), the Debtors commenced voluntary cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court"), which Chapter 11 Cases have been consolidated by order of the Bankruptcy Court for procedural purposes only and are being jointly administered under case number 19-30088 (DM);

**WHEREAS**, as of the date hereof, the Consenting Creditors have asserted certain Subrogation Claims against the Company;

**WHEREAS**, before the date hereof, the Parties and their representatives have engaged in arms' length, good-faith negotiations regarding a settlement of the Subrogation Claims against the Company on the terms set forth herein, including the allowance of Subrogation Claims at the Allowed Subrogation Claim Amount (each as defined below), which allowance will survive termination of this Agreement in certain circumstances, as expressly set forth herein, and the treatment of the Subrogation Claims with the Aggregate Subrogation Recovery (as defined below) on the Effective Date of the Plan (each as defined below) (the "Settlement");

**WHEREAS**, the Parties have agreed to take certain actions in support of the Settlement on the terms and conditions set forth in this Agreement; and

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment with respect to the Settlement, the Plan, and the other matters discussed hereunder.

**NOW, THEREFORE**, in consideration of the promises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and incorporating and affirming the accuracy of the Recitals stated above, the Parties, intending to be legally bound, agree as follows:

1.    **DEFINITIONS; RULES OF CONSTRUCTION.**

(a)    <u>Definitions</u>.  The following terms shall have the following definitions:

"<u>A.B. 1054</u>" means California Assembly Bill No. 1054, approved by the Governor on July 12, 2019.

"<u>Ad Hoc Subrogation Group</u>" means that certain ad hoc group of holders of Subrogation Claims, each in their capacities as such, represented by Willkie Farr & Gallagher LLP, Diemer & Wei LLP and Rothschild & Co US Inc., the members of which are disclosed in that certain Verified Statement of the Ad Hoc Group of Subrogation Claim Holders Pursuant to Bankruptcy Rule 2019 [Dkt. No. 971] as such statement may be amended from time to time.

"<u>Ad Hoc Professionals</u>" means (i) Willkie Farr & Gallagher LLP, (ii) Rothschild & Co. US Inc., (iii) Diemer & Wei LLP, (iv) Kekst and Company Incorporated d/b/a Kekst CNC, and (v) Wilson Public Affairs.

"<u>Agreement</u>" has the meaning set forth in the preamble hereof.

"<u>Aggregate Subrogation Recovery</u>" means the payment of $11 billion in full in cash (subject to replacing a portion of the cash with Non-Cash Recovery in accordance with Section 3(a)(ix) hereof) to a trust to be established pursuant to the Plan for the benefit of holders of Subrogation Claims.

"<u>Allowance Termination Notice</u>" has the meaning set forth in <u>Section 5(d)</u> hereof.

"<u>Allowed Subrogation Claim Amount</u>" has the meaning set forth in in <u>Section 4</u> hereof.

"<u>Alternative Restructuring</u>" has the meaning set forth in <u>Section 2(a)(iii)</u>.

"<u>Bankruptcy Code</u>" has the meaning set forth in the recitals hereof.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals hereof.

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, applicable to the Chapter 11 Cases, and any Local Rules of the Bankruptcy Court.

- 2 -

"Business Day" means any day other than Saturday, Sunday, and any day that is a legal holiday or a day on which banking institutions in New York, New York are authorized by law or other governmental action to close.

"Chapter 11 Cases" has the meaning set forth in the recitals hereof.

"Claim" has the meaning ascribed to such term under section 101(5) of the Bankruptcy Code.

"Company" has the meaning set forth in the preamble hereof.

"Confidential Claims Information" has the meaning set forth in Section 3(a)(vii) hereof.

"Confirmation Order" means an order entered by the Bankruptcy Court confirming the Plan.

"Consenting Creditors" has the meaning set forth in the preamble hereof.

**"Creditor Insolvency Termination" has the meaning set forth in Section 5(c) hereof.**

"Creditor Termination Event" has the meaning set forth in Section 5(d) hereof.

"Debtor Termination Event" has the meaning set forth in Section 5(e) hereof.

**"Debtor Insolvency Termination" has the meaning set forth in Section 5(c) hereof.**

"Debtors" has the meaning set forth in the preamble hereof.

"Definitive Documents" means (i) the Plan and the Confirmation Order, (ii) the Disclosure Statement and the Disclosure Statement Order, (iii) the Plan Supplement, (iv) the RSA Approval Order, (v) any motions or pleadings filed by the Debtors in the Chapter 11 Cases seeking approval or confirmation of the foregoing, and (vi) any exhibits, appendices, or schedules contemplated by the foregoing clause (i) – (v).

"Disclosure Statement" means the Debtors' disclosure statement, including any exhibits, appendices, or ballots attached thereto or contemplated thereby, and any procedures related to the solicitation of votes to accept or reject the Plan, in each case, as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof.

"Disclosure Statement Order" means an order entered by the Bankruptcy Court approving the Disclosure Statement and related solicitation materials, including with respect to Section 2(a)(ii) hereof.

"Effective Date" means the effective date of the Plan or an Insolvent Plan.

- 3 -

"Estimation Proceedings" means any court proceedings related to the estimation or allowance of IP Claims (in the aggregate) (whether in the Bankruptcy Court, California state court, Federal District Court or any other forum, including any state court proceedings related to the Tubbs Fire), including the pending wildfire claims estimation proceeding before the Hon. James Donato in the Northern District of California, Case No. 19-cv-05257-JD, and the pending coordination proceeding in the Superior Court of the State of California for the County of San Francisco before the Hon. Teri L. Jackson, the California North Bay Fire Cases JCCP 4955.

"Findings and Orders" has the meaning set forth in Section 3(a)(v) hereof.

"Insolvency ~~Termination~~Determination" has the meaning set forth in Section 5(c) hereof.

"Insolvent Plan" has the meaning set forth in Section 3(a)(i) hereof.

"IP Claims" means any Wildfire Claim that is not a Public Entities Wildfire Claim, a Subrogation Claim or any Wildfire Claim asserted by any Governmental Unit (as defined in section 101(27) of the Bankruptcy Code).

"Joinder" has the meaning set forth in Section 26 hereof.

"Joining Party" has the meaning set forth in Section 26 hereof.

"Non-Cash Recovery" has the meaning set forth in Section 3(a)(ix) hereof.

"Paid Claims" as such term is used herein, means payments and legally recoverable expenses made to or on behalf of insureds in connection with the Wildfires and the insuring agreement between a holder of Subrogation Claims (or an insurer from whom such holder directly or indirectly acquired Subrogation Claims) and its insured, but not including payments of any personal injury or death claims, non-recoverable expenses (including deductibles voluntarily refunded), damages unrelated to the Wildfires and/or arising from the insurer's negligence or bad faith. For the avoidance of doubt, Paid Claims shall also include payments and recoverable expenses made by a Claimholder to or for the benefit of insureds in connection with Wildfires required by California law as a result of an insurer's insolvency.

"Parties" has the meaning set forth in the preamble hereof.

"Person" has the meaning ascribed to such term under section 101(41) of the Bankruptcy Code.

"Petition Date" has the meaning set forth in the recitals hereof.

"Plan" means the Debtors' joint chapter 11 plan of reorganization, as such may be amended, supplemented, or modified from time to time in accordance with Section 9 hereof. The draft of the Plan attached hereto as Exhibit A incorporates the terms of the Settlement and otherwise does not adversely affect the Settlement or the rights of the Parties hereto. The Debtors shall file the Plan with the Bankruptcy Court in the form attached no later than November

- 4 -

4, 2019, which Plan, date, or deadline may be amended, modified, or extended by agreement of the Parties pursuant to Section 9 herein. For the avoidance of doubt, the Plan and the applicable Definitive Documents shall incorporate the terms of the Settlement including any conditions thereto, and shall not otherwise adversely affect the Settlement, or the rights of the Parties to this Agreement. For the further avoidance of doubt, references to the Plan herein shall not include an Insolvent Plan.

"Plan Supplement" means the supplement to the Plan to be filed in the Chapter 11 Cases, that includes forms of certain documents effectuating the transaction contemplated in the Plan and shall be filed with the Bankruptcy Court no later than fourteen (14) days prior to the deadline set to file objections to the confirmation of the Plan.

"Public Entities Wildfire Claim" means any Wildfire Claim against the Debtors held by any of the Public Entities (as defined in the Plan), including any Claim pleaded or asserted or that could have been pleaded or asserted by the Public Entities based on the factual allegations set forth in the Public Entities Operative Complaints (as defined in the Plan) or that were filed or could be filed by the Public Entities in connection with the Chapter 11 Cases whether arising under California law or any other applicable law of the United States (state or federal) or any other jurisdiction, in each case whether such claims are absolute or contingent, direct or indirect, known or unknown, foreseen or unforeseen, in contract, tort or in equity, under any theory of law.

"Requisite Consenting Creditors" means, as of any time of determination, Consenting Creditors holding at least 66 2/3% of RSA Claims (measured by dollar amount).

"Reserved Claims" means projected payments relating to Subrogation Claims reserved but not paid, as of the date of measurement.

"RSA Approval Order" means the order, in form and substance reasonably acceptable to the Debtors and the Requisite Consenting Creditors, approving the Debtors' entry into this Agreement, which shall (i) be entered by the Bankruptcy Court no later than the RSA Deadline, and (ii) allow the Subrogation Claims in the aggregate allowed amount of $11 billion pursuant to Bankruptcy Rule 9019 as provided herein.

"RSA Claims" means Subrogation Claims held by Consenting Creditors.

"RSA Deadline" means ~~November 14~~ December 6, 2019, which date may be amended or extended by agreement of the Debtors and the Requisite Consenting Creditors pursuant to Section 9 herein.

"Settlement" has the meaning set forth in the recitals hereof.

"Settlement Payment Condition" has the meaning set forth in Section 3(a)(iii) hereof.

"Subrogation Claims" means all claims (as such term is defined in section 101(5) of the Bankruptcy Code) against the Debtors related to or in any way arising from the Wildfires

- 5 -

that arise from subrogation (whether such subrogation is contractual, equitable or statutory), assignment (whether such assignment is contractual, equitable or statutory), or otherwise in connection with payments made or to be made by the applicable insurer to insured tort victims, and whether arising as a matter of state or federal law, including Section 509 of the Bankruptcy Code, including attorneys' fees and interest, and shall include Paid Claims and Reserved Claims. For the avoidance of doubt, Subrogation Claims shall not include the claims of any Governmental Unit (as defined in section 101(27) of the Bankruptcy Code) and any such claims shall not be the subject of, or compromised under, this Agreement.

"Support Period" means the period commencing on the date the conditions set forth in Section 27 herein have been satisfied and ending on the earlier of (i) termination of this Agreement in accordance with Section 5 hereof, and (ii) the Effective Date.

"Transfer" has the meaning set forth in Section 7(a) hereto.

"Transferee" has the meaning set forth in Section 7(a) hereto.

"Wildfire Claims" means Claims against the Debtors resulting from or in any way relating to the Wildfires.

"Wildfires" means the wildfires listed on Schedule 1 hereto.

(b)    Rules of Construction.  Each reference in this Agreement to "this Agreement", "hereunder", "hereof", "herein", or words of like import shall mean and be a reference to this Agreement.  Including shall mean "including without limitation." Additionally, for all references to written notices or other writings described herein, electronic mail to the Parties as set forth in Section 18 shall be sufficient.  When a reference is made in this Agreement to a Section, Exhibit, or Schedule, such reference shall be to a Section, Exhibit, or Schedule, respectively, of or attached to this Agreement unless otherwise indicated.  Unless the context of this Agreement otherwise requires, (i) words using the singular or plural number also include the plural or singular number, respectively, (ii) the words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (iii) the word "or" shall not be exclusive and shall be read to mean "and/or."  The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding, or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

2.    **COMMITMENT OF THE CONSENTING CREDITORS.**

(a)    Affirmative Covenants.  Subject to the terms and conditions hereof, for the duration of the Support Period, each Consenting Creditor shall:

(i)    Support and cooperate with the Debtors to obtain confirmation of the Plan, provided that, notwithstanding anything to the contrary herein, nothing in this Agreement shall be deemed to (A) create an obligation to (1) take any actions outside the Chapter 11 Cases, or in the Chapter 11 Cases unrelated to the

- 6 -

treatment of Subrogation Claims, (2) take actions inconsistent with any legal or contractual obligation or duty that the Consenting Creditor reasonably believes that it has under the law, or (3) assist the Company in connection with any regulatory or legislative action, or (B) limit the right of a Consenting Creditor to object to a provision of the Plan unrelated to the Settlement or implementation of the Settlement, which objection shall be limited and not seek to preclude or delay confirmation of the Plan;

(ii) timely vote or cause to be voted (when solicited to do so in accordance with this Agreement after receipt of a Disclosure Statement approved by the Bankruptcy Court and by the applicable deadline for doing so) all of its RSA Claims to accept the Plan, and not to change or withdraw such vote (or cause or direct such vote to be changed or withdrawn) prior to the voting deadline to accept or reject the Plan; provided that such vote may, upon written notice to the Debtors and the other Parties, be revoked (and, upon such revocation, deemed void *ab initio*) by any Consenting Creditor at any time following the expiration of the Support Period with respect to such Consenting Creditor, provided further that if the ~~Court determines the~~ Debtors ~~are insolvent~~**make an Insolvency Determination** and the Debtors file an Insolvent Plan, the Consenting Creditors shall be free to vote for or against such Insolvent Plan, **object to confirmation of (and/or solicitation of votes for) such Insolvent Plan on any grounds,** and, subject to the Consenting Creditors' rights to terminate the RSA and seek a higher claim amount as set forth below, the Subrogation Claims will continue to be allowed in the Allowed Subrogation Claim Amount;

(iii) timely vote (or cause to be voted) its RSA Claims against any plan, plan proposal, restructuring proposal, offer of dissolution, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Company other than the Plan (each, an "Alternative Restructuring"), provided that if the ~~Court determines the~~ Debtors ~~are insolvent~~**make an Insolvency Determination** and the Debtors file an Insolvent Plan, the Consenting Creditors shall be free to vote for or against any Alternative Restructuring, including an Insolvent Plan;

(iv) cooperate in good faith with respect to any subpoena served on the holders of the RSA Claims or their counsel (whether prior to or after the effectiveness of this Agreement) in connection with or related to Estimation Proceedings; and

(v) enter into a joint stipulation with the Debtors in any Estimation Proceedings that (A) informs the relevant court that the Debtors are no longer moving to estimate the Subrogation Claims and (B) withdraws the Consenting Creditors and the Ad Hoc Professionals from any such proceeding (as applicable), without prejudice, when the RSA Approval Order is entered by the Bankruptcy Court.

- 7 -

(b)     Negative Covenants.  Subject to the terms and conditions hereof, for the duration of the Support Period, each Consenting Creditor shall not:

(i)     delay, impede, or take any other action to interfere with the acceptance or implementation of the Plan, including to vote any RSA Claims to reject, the Plan; provided that (A) objecting to a provision of the Plan unrelated to the Settlement or implementation of the Settlement (which objection shall be limited and not seek to preclude or delay confirmation of the Plan), and (B) participating in any ordinary course governmental processes in a manner unrelated to the treatment of Subrogation Claims and the terms of the Settlement, in each case, shall not be deemed to delay, impede, or interfere with confirmation of the Plan; provided that taking any action under either clause (A) or (B) of this Section 2(b)(i) shall not in any way be a basis for a Consenting Creditor to not vote RSA Claims to accept the Plan (it being agreed by the Debtors that the vote of a Consenting Creditor to accept the Plan shall not be deemed to waive or otherwise limit its right to object to a provision of the Plan under clause (A) of this Section 2(b)(i));

(ii)     subject to the proviso in Section 2(a)(iii) hereof as to voting, directly or indirectly, file, propose, support, solicit, assist, encourage, or participate in the formulation of or vote for any Alternative Restructuring or settlement of the Subrogation Claims other than as set forth herein, provided that nothing herein precludes the ~~Debtors and the~~ Ad Hoc Subrogation Group from negotiating ~~together~~ with any other creditor constituencies or participating in mediation to achieve global consensus;

(iii)     take any action to delay, impede, or contest any Estimation Proceedings; or

(iv)     directly or indirectly, encourage any entity to undertake any action prohibited by this Section 2(b).

Nothing in this Agreement shall prohibit any Consenting Creditor from (A) taking any action with regard to any Claims or interests it holds that are not RSA Claims, (B) appearing as a party-in-interest in any matter arising in the Chapter 11 Cases, and (C) taking or directing any action to be taken relating to maintenance, protection, preservation or defense of any Claims and interests; provided that, in each case, any such action is not inconsistent with such Consenting Creditor's obligations hereunder; and nothing in this Agreement shall prohibit any Consenting Creditor from (X) enforcing any right, remedy, condition, consent, or approval requirement under this Agreement or any Definitive Documents, or (Y) taking any action to oppose any Alternative Restructuring.  For the avoidance of doubt, notwithstanding the foregoing sentence, nothing in this Agreement shall prohibit any Consenting Creditor from taking any action with regard to any administrative expense claims that it holds against the Debtors, or the Debtors from taking any action with respect thereto.

3. **COVENANTS OF THE COMPANY.**

      (a)    <u>Affirmative Covenants of the Company</u>.  Subject to the terms and conditions hereof, for the duration of the Support Period, the Company shall:

      (i)    use commercially reasonable efforts to propose and pursue the Plan and seek the entry of a Confirmation Order, which incorporate the terms of the Settlement including any conditions thereto (including all of the terms hereof relating to the treatment of, and distributions on Subrogation Claims and the Aggregate Subrogation Recovery), <u>provided</u> <u>that</u> if the ~~Bankruptcy Court determines the~~ Debtors ~~are insolvent~~<u>make an Insolvency Determination</u>, the Debtors may file a revised plan that does not pay subrogation claimants $11 billion in cash on $11 billion of allowed claims~~, provided, however, that such revised plan shall not subordinate the class of Subrogation Claims to the class of IP Claims~~ (an "<u>Insolvent Plan</u>");

      (ii)    use commercially reasonable efforts to support, implement, and complete the Settlement and all transactions contemplated under this Agreement, including incorporating the Settlement into the applicable Definitive Documents;

      (iii)    upon entry into any settlement with any holder or holders of IP Claims that fixes the amount or terms for satisfaction of an IP Claim, including with respect to rights against a post-Effective Date trust established for the resolution and payment of such Claims, require, as a condition to payment or other distribution to or for the benefit of such holder pursuant to such settlement or other agreement, that the holder of the IP Claim contemporaneously execute and deliver a release and waiver of any potential made-whole claims against present and former holders of Subrogation Claims substantially in the form attached hereto as <u>Exhibit B</u> (the "<u>Settlement Payment Condition</u>"), <u>provided</u> <u>that</u> the Confirmation Order shall deem each holder of a Subrogation Claim that is a beneficiary of a release and waiver of made-whole claims executed by a holder of an IP Claim as set forth herein to have released such holder of an IP Claim from any claim to such holder's recovery from the Debtors on account of such settled IP Claim; <u>provided</u> <u>further</u> <u>that</u> if the ~~Bankruptcy Court determines the~~ Debtors ~~are insolvent~~<u>make an Insolvency Determination</u>, the Debtors will no longer be required to condition payments or other distributions pursuant to such a settlement on the holder of the IP Claim contemporaneously executing a release of made whole claims for the portion of their allowed claims against the Debtors' estates that are not fully satisfied under the revised plan;

      (iv)    use commercially reasonable best efforts to seek confirmation of the Plan on or prior to automatic termination of this Agreement pursuant to <u>Section 5(b)</u> hereof);

      (v)    propose and pursue the Plan and seek entry of a Confirmation Order that contain (and any plan and confirmation order pursued by the Debtors

- 9 -

shall contain) the following provisions, findings and orders, as applicable in substantially the form set forth below (the "Findings and Orders"), provided that, if the ~~Bankruptcy Court determines the~~ Debtors ~~are insolvent~~**make an Insolvency Determination**, the Debtors will not be required to pursue a plan or confirmation order with the finding set forth in Section 3(a)(v)(A) below:

> (A)    the Bankruptcy Court "has determined that the resolution of the insolvency proceeding provides funding or establishes reserves for, provides for assumption of, or otherwise provides for satisfying any prepetition wildfire claims asserted against the electrical corporation in the insolvency proceeding in the amounts agreed upon in any pre-insolvency proceeding settlement agreements or any post-insolvency settlement agreements, authorized by the court through an estimation process or otherwise allowed by the court;" and

> (B)    any settlement or other agreement with any holder or holders of an IP Claim that fixes the amount or terms for satisfaction of an IP Claim, including with a post-Effective Date trust established for the resolution and payment of such claims, shall contain the Settlement Payment Condition, subject to the provisos of Section 3(a)(iii);

(vi)    use commercially reasonable efforts to promptly notify or update counsel to the Ad Hoc Subrogation Group upon becoming aware of any of the following occurrences:  (A) a Creditor Termination Event has occurred, or (B) any event that would reasonably be expected to materially impede or prevent implementation of the Settlement;

(vii)    unless the Company obtains the prior written consent of a Consenting Creditor: (A) use the information regarding any Subrogation Claims owned at any time by such Consenting Creditor (the "Confidential Claims Information") solely in connection with this Agreement (including any disputes relating thereto); and (B) except as required by law, rule, or regulation or by order of a court, including the Bankruptcy Court, or as requested or required by the Securities and Exchange Commission or by any other federal or state regulatory, judicial, governmental, or supervisory authority or body, keep the Confidential Claims Information strictly confidential and not disclose the Confidential Claims Information to any other Person.  In the event that the Company is required (by law, rule, regulation, deposition, interrogatories, requests for information or documents in legal or administrative proceedings, subpoena, civil investigative demand or other similar process, or by any governmental, judicial, regulatory, or supervisory body) to disclose the Confidential Claims Information or the contents thereof, the Company shall, to the extent legally permissible, provide affected Consenting Creditors with prompt notice of any such request or requirement so that such Consenting Creditors may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this section at such Consenting Creditor's sole cost and expense.  In no event shall this Agreement be

- 10 -

construed to impose on a Consenting Creditor an obligation to disclose the price for or terms pursuant to which it acquired or disposed of any Subrogation Claim. The Company's obligations under this section shall survive termination of this Agreement;

(viii)    (A) pay the reasonable documented and contractual fees of the Ad Hoc Professionals invoiced following entry of the RSA Approval Order on a monthly basis promptly following receipt of summary invoices; and (B) on the Effective Date, pay or reimburse the members of the Ad Hoc Subrogation Group for the reasonable, documented and contractual professional fees and expenses invoiced through entry of the RSA Approval Order by the Ad Hoc Professionals up to an aggregate amount of $55 million (which cap shall apply to fees and expenses invoiced before and after entry of the RSA Approval Order and which shall include success fees, transaction fees or similar fees);

(ix)    negotiate in good faith to provide each holder of Subrogation Claims the opportunity to receive on account of its Subrogation Claim any equity distribution (other than a rights offering) offered under the Plan on the same terms and at the same valuation as offered to any holder of an unsecured claim (including, an unsecured IP Claim or unsecured IP Claims as a class) in satisfaction of the Allowed Subrogation Claim in lieu of cash (the "Non-Cash Recovery");

(x)    enter into a joint stipulation with the Consenting Creditors in any Estimation Proceedings that (A) informs the relevant court that the Debtors are no longer moving to estimate the Subrogation Claims and (B) withdraws the Consenting Creditors and the Ad Hoc Professionals from any such proceeding (as applicable) without prejudice when the RSA Approval Order is entered by the Bankruptcy Court; and

(xi)    cause each of its direct and indirect subsidiaries, whether a Party to this Agreement or not, to comply with the terms of this Agreement as if such entity were a Debtor entity party hereto.

(b)    Negative Covenants of the Company.  Subject to the terms and conditions hereof, for the duration of the Support Period, the Company shall not, directly or indirectly:

(i)    propose, pursue, or support any Plan or Confirmation Order that does not incorporate the terms of the Settlement, including the Findings and Orders, and is not otherwise consistent with the terms hereof (except for an Insolvent Plan if the ~~Bankruptcy Court determines the~~ Debtors ~~are insolvent~~make an Insolvency Determination);

(ii)    propose, support, solicit, encourage, or participate in any chapter 11 plan or settlement of the Subrogation Claims other than as set forth herein

- 11 -

3473341.2

(except for an Insolvent Plan if the ~~Bankruptcy Court determines the~~ Debtors ~~are insolvent~~**make an Insolvency Determination**);

   (iii) enter into any settlement with any party or include any provisions in a Plan or Confirmation Order that (A) incorporates any priority of payments or waterfall provision that prioritizes recoveries on any other non-priority unsecured claims ahead of Subrogation Claims, (B) otherwise materially impairs the Debtors' ability to pay the Aggregate Subrogation Recovery in cash on the Effective Date, or (C) expressly reserves the right of any holder of IP Claims to pursue made-whole claims against holders of Subrogation Claims;

   (iv) directly or indirectly, take any actions, or fail to take any actions, where such taking or failing to take actions would be, in either case, (A) inconsistent with this Agreement or (B) otherwise inconsistent with, or reasonably expected to prevent, interfere with, delay or impede the implementation or consummation of, the Plan or the Settlement; or

   (v) directly or indirectly, encourage any entity to undertake any action prohibited by this <u>Section 3(b)</u>.

  **4.** **ALLOWED SUBROGATION CLAIM AMOUNT.** The Parties agree to settle the Subrogation Claims for an aggregate allowed claim amount of $11 billion pursuant to Bankruptcy Rule 9019 (the "<u>Allowed Subrogation Claim Amount</u>").  The Allowed Subrogation Claim Amount, shall be binding in the Chapter 11 Cases, and shall survive termination of this Agreement, except as otherwise expressly provided in this Agreement.  Notwithstanding the allowance of Subrogation Claims as provided herein, the right of the Ad Hoc Subrogation Group to object to proofs of claim filed by individual holders of Subrogation Claims that are not parties to this Agreement shall be expressly reserved.  At any time the Allowed Subrogation Claim Amount remains binding pursuant to the terms hereof, whether prior to or subsequent to the termination of this Agreement, absent the consent of the Requisite Consenting Creditors, the Debtors shall not (a) settle any Subrogation Claims, including with respect to the allowed amount of such Claim, or (b) object to any Subrogation Claim.

  **5.** **<u>TERMINATION.</u>**

   (a) <u>Individual Consenting Creditor Termination</u>.  Any individual holder of Subrogation Claims shall be entitled to terminate this Agreement as to itself if the Aggregate Subrogation Recovery is modified.

   (b) <u>Automatic Termination</u>:  This Agreement will terminate automatically if, (i) the Plan is not confirmed by June 30, 2020 (or such later date as may be authorized by any amendment to A.B. 1054), or (ii) the Effective Date does not occur prior to December 31, 2020 (or six months following the deadline for confirmation of the Plan if such deadline is extended by any amendment to A.B. 1054); <u>provided</u>, the deadlines set forth in items (i) and (ii) of the foregoing may be extended by mutual written consent of the Debtors and Consenting Creditors holding at least 51% of the dollar amount of the RSA Claims then party to this Agreement.  For

the avoidance of doubt, following a termination pursuant to this <u>Section 5(b)</u> the Allowed Subrogation Claim Amount shall be binding in the Chapter 11 Cases, and shall survive termination of this Agreement.

      (c)    <u>Insolvency Termination</u>.

      **(i)**    The Requisite Consenting Creditors may terminate this Agreement if, upon the advice of the Ad Hoc Professionals (after consultation with the Debtors' professionals), they reasonably determine in good faith at any time prior to confirmation of the Plan, that the Debtors are (i) insolvent (whether as a result of judicial findings arising from the Estimation Proceedings, litigation related to the IP Claims, the incurrence of post-petition wildfire liabilities, or otherwise), or (ii) unable to raise sufficient capital to pay the Aggregate Subrogation Recovery in cash and any agreed upon Non-Cash Recovery on the Effective Date; <u>provided</u> that the Debtors shall retain the right to promptly contest any such determination with the dispute to be determined by the Bankruptcy Court whose determination shall be binding for purposes of this Agreement.  If the Requisite Consenting Creditors elect to terminate this Agreement following either of the foregoing determinations, subject to the Bankruptcy Court's ruling if such determination is disputed by the Debtors, (~~and~~ a "**Creditor** Insolvency Termination") then the Allowed Subrogation Claim Amount shall no longer be binding in the Chapter 11 Cases, and the holders of Subrogation Claims, the Debtors and other parties in interest shall have all rights reserved, including with respect to the amount, future allowability and treatment of all Subrogation Claims.

      **(ii)**    **The Debtors may terminate this Agreement if, upon the advice of the Debtors' professionals (after consultation with the Ad Hoc Professionals), the Debtors reasonably determine in good faith at any time prior to confirmation of the Plan, that the Debtors are insolvent for all purposes in the Chapter 11 Cases as of the time such determination is made (whether as a result of judicial findings arising from the Estimation Proceedings, litigation related to the IP Claims, the incurrence of post-petition wildfire liabilities or otherwise) (such determination, subject to the Requisite Consenting Creditors' right to promptly contest any such determination with the dispute to be determined by the Bankruptcy Court whose determination shall be binding for purposes of this Agreement, an "Insolvency Determination").  If the Debtors make an Insolvency Determination and elect to terminate this Agreement (a "Debtor Insolvency Termination"), the Allowed Subrogation Claim Amount shall be binding in the Chapter 11 Cases, and shall survive termination of this Agreement unless the Requisite Consenting Creditors elect to pursue a higher claim amount as set forth below.**

      (d)    <u>Requisite Consenting Creditors Termination Events</u>.  The Requisite Consenting Creditors may terminate this Agreement, in each case, upon delivery of written notice

3473341.2

to the Company at any time after the occurrence of or during the continuation of any of the following events (each, a "Creditor Termination Event"):

> (i)     the breach by the Company of any of its obligations, representations, warranties, or covenants set forth in this Agreement;

> (ii)     The Debtors at any time either (A) fail to propose and pursue a Plan and Confirmation Order that contain the terms of the Settlement, including the Findings and Orders, and are otherwise consistent with the terms hereof, or (B) propose, pursue or support or announce in writing or in court an intention to propose, pursue or support a Plan or Confirmation Order inconsistent with the terms of the Settlement, the Findings and Orders, or the terms hereof;

> (iii)     The Plan proposed and pursued by the Debtors does not treat the IP Claims consistent with the provisions of A.B. 1054;

> (iv)     The Bankruptcy Court allows a plan proponent other than the Debtors to commence soliciting votes on a plan other than the Plan incorporating the Settlement, and the Debtors have not already solicited, or are not simultaneously soliciting, votes on the Plan incorporating the Settlement;

> (v)     The Bankruptcy Court confirms a plan other than the Plan incorporating the Settlement;

> (vi)     The Plan is, or is modified to be, inconsistent with the Settlement;

> (vii)     The issuance, promulgation, or enactment by any governmental entity, including any regulatory or licensing authority or court of competent jurisdiction (including, without limitation, an order of the Bankruptcy Court which has not been stayed), of any statute, regulation, ruling or order declaring the Plan or any material portion thereof (in each case, to the extent it relates to the Settlement or the terms hereof) to be unenforceable or enjoining or otherwise restricting the consummation of any material portion of the Plan (to the extent it relates to the Settlement) or the Settlement, and such ruling, judgment, or order has not been stayed, reversed, or vacated, within fifteen (15) calendar days after issuance;

> (viii)     a trustee under section 1104 of the Bankruptcy Code or an examiner with expanded powers shall have been appointed in the Chapter 11 Cases; or

> (ix)     an order for relief under chapter 7 of the Bankruptcy Code shall have been entered in the Chapter 11 Cases, or the Chapter 11 Cases shall have been dismissed, in each case by order of the Bankruptcy Court.

Notwithstanding the foregoing, the Debtors shall have ten (10) days from the receipt of any such written notice of termination from the Requisite Consenting Creditors specifying the purported

- 14 -

default or Creditor Termination Event to cure any purported default or Creditor Termination Event under this section and no termination of this Agreement shall be effective unless and until the expiration of such ten (10) day period without such purported default or Creditor Termination Event being waived or cured, <u>provided that</u> such ten (10) day period shall not be applicable to the extent passage of such period would materially impair the rights of Consenting Creditors to object to, vote against, or appear in Court with respect to the Plan, which actions shall be permitted following written notice of termination from the Requisite Consenting Creditors only if the deadline to object to or vote on the Plan, or a court hearing on the Plan, occurs within such ten (10) day period.  The Requisite Consenting Creditors may elect to pursue a higher claim amount by written notice to the Debtors of such election within ten (10) days of **(a)** termination following a Creditor Termination Event**, or (b) a Debtor Insolvency Termination** (the "<u>Allowance Termination Notice</u>").  Following the delivery of an Allowance Termination Notice, the Allowed Subrogation Claim Amount shall no longer be binding in the Chapter 11 Cases, and the holders of Subrogation Claims, the Debtors and other parties in interest shall have all rights reserved, including with respect to the amount, future allowability and treatment of all Subrogation Claims.

> (e)  <u>Debtors Termination</u>.  The Debtors may terminate this Agreement by written notice to the Ad Hoc Professionals upon (each, a "<u>Debtor Termination Event</u>"):

>> (i)  the breach by Consenting Creditors holding at least 5% of the RSA Claims then party to this Agreement (measured either by dollar amount or number of holders) of any of their undertakings, obligations, representations, warranties, or covenants set forth in this Agreement and thereafter the Allowed Subrogation Claim Amount shall no longer be binding in the Chapter 11 Cases, and the holders of Subrogation Claims, the Debtors and other parties in interest shall have all rights reserved, including with respect to the amount, future allowability and treatment of all Subrogation Claims; or

>> (ii)  (A) The Bankruptcy Court confirms a plan other than the Plan incorporating the Settlement, or (B) the issuance, promulgation, or enactment by any governmental entity, including any regulatory or licensing authority or court of competent jurisdiction (including, without limitation, an order of the Bankruptcy Court which has not been stayed), of any statute, regulation, ruling or order declaring the Plan or any material portion thereof (in each case, to the extent it relates to the Settlement or the terms hereof) to be unenforceable or enjoining or otherwise restricting the consummation of any material portion of the Plan (to the extent it relates to the Settlement) or the Settlement, and such ruling, judgment, or order has not been stayed, reversed, or vacated, within fifteen (15) calendar days after issuance.  For the avoidance of doubt, following a termination pursuant to this <u>Section 5(e)(ii)</u>, unless otherwise ordered by a court of competent jurisdiction or governmental entity, the Allowed Subrogation Claim Amount shall be binding in the Chapter 11 Cases, and shall survive such termination of this Agreement, subject to the right of the Requisite Consenting Creditors to deliver an Allowance Termination Notice as set forth above.

3473341.2

Notwithstanding the foregoing, the Consenting Creditors shall have ten (10) days from the receipt of any such written notice of termination from the Debtors specifying the purported default or Debtor Termination Event to cure any purported default or Debtor Termination Event under this section and no termination of this Agreement shall be effective unless and until the expiration of such ten (10) day period without such purported default or Debtor Termination Event being waived or cured. The Debtor Termination Event set forth in Section 5(e)(i) shall be deemed cured if, ten (10) days after receipt of the termination notice, non-breaching Consenting Creditors then party to this Agreement (A) hold at least 95% of the RSA Claims (in dollar amount), and (B) out number RSA Claim holders breaching this Agreement by a ratio of 19-1.

      (f)    Termination Generally.

         (i)    No Party may terminate this Agreement based on an event caused by such Party's own failure to perform or comply in all material respects with the terms and conditions of this Agreement (unless such failure to perform or comply arises as a result of another Party's actions or inactions).

         (ii)    Upon termination of this Agreement in accordance with this Section 5, all Parties shall be released from any prospective commitments, undertakings, and agreements under or related to this Agreement other than obligations under this Agreement which by their terms expressly survive termination.

         (iii)    For the avoidance of doubt, (A) termination of this Agreement shall not relieve any Party of any liability on account of any breach hereof, including any breach of covenants, and the Parties may pursue remedies at law or in equity, (B) without limiting the foregoing, termination does not relieve any Consenting Creditor from liability to any other Consenting Creditor for any intentional or knowing breach hereof, (C) notwithstanding anything herein to the contrary, the delivery of the Allowance Termination Notice to the Debtors shall not be required upon the occurrence of ~~an~~a Creditor Insolvency Termination in order for the holders of RSA Claims, the Debtors or other parties in interest to exercise all of their respective rights, including with respect to the amount, future allowability and treatment of all Subrogation Claims, and (D) absent the delivery of an Allowance Termination Notice, the occurrence of ~~an~~a Creditor Insolvency Termination, or termination by the Debtors of this Agreement in accordance with Section 5(e)(i) hereof, the Allowed Subrogation Claim Amount, and each holder's share thereof, shall remain an allowed claim and binding in these Chapter 11 Cases even if a Debtor is in breach of this Agreement.

## 6.    MUTUAL REPRESENTATIONS, WARRANTIES.

Each of the Parties, severally and not jointly, represents and warrants to each other Party that the following statements are true, correct, and complete as of the date hereof (or, if later, the date that such Party first became or becomes a Party) but, solely with respect to the Company, subject

- 16 -

to any limitations or approvals arising from, or required by, the commencement of the Chapter 11 Cases:

      (a)    it is validly existing and in good standing under the laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

      (b)    except as expressly provided in this Agreement or as may be required for disclosure by the Securities and Exchange Commission, no material consent or approval of, or any registration or filing with, any governmental authority or regulatory body is required for it to carry out the Settlement contemplated by, and perform its obligations under, this Agreement;

      (c)    except as expressly provided in this Agreement, it has all requisite organizational power and authority to enter into this Agreement and to carry out the Settlement contemplated by, and perform its obligations under, this Agreement;

      (d)    the execution and delivery by it of this Agreement, and the performance of its obligations hereunder, have been duly authorized by all necessary organizational action on its part;

      (e)    it has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement; and

      (f)    the execution, delivery, and performance by such Party of this Agreement does not and will not (i) violate any provision of law, rule, or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, (ii) conflict with, result in a breach of, or constitute (with or without notice or lapse of time or both) a default under any material debt for borrowed money to which it or any of its subsidiaries is a party, or (iii) violate any order, writ, injunction, decree, statute, rule, or regulation.

## 7.     <u>TRANSFER OF CLAIMS</u>

      (a)    Each Consenting Creditor agrees that it shall not sell, assign, grant, transfer, convey, hypothecate or otherwise dispose of (each, a "<u>Transfer</u>") any RSA Claims now owned or hereafter acquired, or any option thereon or any right or interest (voting or otherwise) in any or all of its RSA Claims, except to a party that (i) is a Consenting Creditor, or (ii), as a condition subsequent to the effectiveness of any such Transfer, executes and delivers a Transfer Agreement in the form attached hereto as <u>Exhibit C</u> to counsel to the Ad Hoc Subrogation Group, the Company, and to Weil, Gotshal & Manges LLP no more than five (5) Business Days after the settlement of the relevant Transfer (a "<u>Transferee</u>"), and any such RSA Claim automatically shall be deemed to be subject to the terms of this Agreement. With respect to any Transfers effectuated in accordance with clause (ii) above, (A) such Transferee shall be deemed to

- 17 -

be a Consenting Creditor for purposes of this Agreement, and (B) the Company shall be deemed to have acknowledged such Transfer.

(b) This Agreement shall in no way be construed to preclude any Consenting Creditor from acquiring additional Subrogation Claims against the Company; provided, that, (i) any such additional Subrogation Claims automatically shall be deemed to be RSA Claims and shall be subject to all of the terms of this Agreement and (ii) each such Consenting Creditor agrees that such additional RSA Claims shall be subject to this Agreement.

(c) Any Transfer of RSA Claims that does not comply with this Section 7 shall be deemed null and void *ab initio* in all respects and without further action by any Party.

(d) Notwithstanding anything herein to the contrary, to the extent that a Consenting Creditor effects the Transfer of all of its Subrogation Claims in accordance with this Agreement, including, for the avoidance of doubt, in accordance with the foregoing portion of this Section 7, such Consenting Creditor shall cease to be a Party to this Agreement in all respects and shall have no further obligations hereunder.

8. **COOPERATION.** Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to the pursuit, approval, negotiation, execution, delivery, and implementation of the Settlement and the Plan, subject to the same provisos contained in Sections 2(a)(i) and 2(b) of this Agreement. The Company shall use commercially reasonable efforts to provide counsel for the Ad Hoc Subrogation Group drafts of all motions, applications, and other substantive pleadings (including Plan and/or Disclosure Statement amendments) the Company intends to file with the Bankruptcy Court to implement the Settlement (or that could reasonably be expected to affect implementation of the Settlement) at least three (3) calendar days before the date when the Company intends to file such pleading, unless such advance notice is impossible or impracticable under the circumstances, in which case the Company shall use commercially reasonable efforts to notify telephonically or by electronic mail counsel to the Ad Hoc Subrogation Group to advise them as such and, in any event, shall provide such drafts as soon as reasonably practicable.

9. **AMENDMENTS.** Unless otherwise specifically provided herein, no amendment, modification, waiver, or other supplement of the terms of this Agreement or Sections 4.6, 4.19, 6.4, 6.5, 6.6 or 10.9 of the Plan (to the extent such Sections impact Subrogation Claims or holders of Subrogation Claims), and any defined terms used or operative documents referenced therein, shall be valid unless such amendment, modification, waiver, or other supplement is in writing and has been signed by the Company and the Requisite Consenting Creditors; provided, however, that (a) any amendment to this Agreement to (i) the defined term "Requisite Consenting Creditors" and any defined term used in that definition, (ii) the defined term "RSA Approval Order," (iii) Section 5(a) hereof and any defined term used in that Section, (iv) the conditions to the effectiveness of this Agreement set forth in Section 27, and (v) this Section 9, shall require the written consent of the Company and each Consenting Creditor, (b) any amendment to this Agreement that disproportionately affects any Consenting Creditor or modifies any Consenting Creditor's obligations under Sections 2 or 8 hereof shall require the written consent of such Consenting Creditor, and (c) so long as the Plan and the Definitive Documents incorporate the

- 18 -

terms of the Settlement, including the Findings and Orders, and do not adversely affect the Settlement or the rights of the Parties under this Agreement no consent of any Consenting Creditor shall be required to amend or otherwise modify the terms of the Plan or any other Definitive Document subject to the first sentence of this Section 9, and provided that Section 10.10 of the Plan shall not be deemed to authorize the subordination of Subrogation Claims. Notwithstanding anything herein to the contrary, any material modifications or amendments to this Agreement shall be subject to Bankruptcy Court approval on not less than ~~five~~twenty-one (~~5~~21) ~~Business Days~~days' notice, subject to the right of any Party to move for shortened notice.

10.     **ENTIRE AGREEMENT**.  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all other prior negotiations, agreements and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement; provided, however, that any confidentiality agreement executed by any Consenting Creditor or Ad Hoc Professionals shall survive this Agreement and shall continue to be in full force and effect in accordance with their terms.

11.     **SURVIVAL OF AGREEMENT.**  Notwithstanding the termination of this Agreement, the agreements and obligations of the Parties that expressly survive termination by their terms and those in Sections 10 through 27 (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect in accordance with the terms hereof, and any liability of a Party for failure to comply with the terms of this Agreement shall survive termination.

12.     **NO WAIVER OF PARTICIPATION AND PRESERVATION OF RIGHTS**.  Except as specifically provided in Sections 4 and 5 with respect to the Allowed Subrogation Claim Amount, if the transactions contemplated herein are not consummated, or following the occurrence of the termination of this Agreement with respect to all Parties, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, remedies, claims, and defenses and the Parties expressly reserve any and all of their respective rights, remedies, claims and defenses.

13.     **COUNTERPARTS**.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this Agreement may be delivered by electronic mail in portable document format (pdf.), facsimile or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

14.     **HEADINGS**.  The headings of the Sections, paragraphs, and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

15.     **RELATIONSHIP AMONG PARTIES**.  Notwithstanding anything herein to the contrary, the duties and obligations of the Consenting Creditors under this Agreement shall be several, not joint.  No Consenting Creditor shall, as a result of its entering into

- 19 -

3473341.2

and performing its obligations under this Agreement, be deemed to be part of a "group" (as that term is used in section 13(d) of the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder) with any of the other Consenting Creditors. It is understood and agreed that no Consenting Creditor has any duty of trust or confidence in any kind or form with any other Consenting Creditor, and, except as expressly provided in this Agreement, there are no commitments among or between them. No prior history, pattern, or practice of sharing confidences among or between the Consenting Creditors shall in any way affect or negate this understanding and agreement.

       16.    **REMEDIES**. It is understood and agreed by the Parties that, without limiting any other remedies available at law or equity, money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party (including non-breaching Consenting Creditors, if the breaching Party is another Consenting Creditor) shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder, without the necessity of proving the inadequacy of money damages as a remedy. Each of the Parties hereby waives any defense that a remedy at law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance, or other equitable remedies.

       17.    **JURY TRIAL, GOVERNING LAW AND DISPUTE RESOLUTION**.

       (a)    This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York and applicable federal law, without giving effect to the conflicts of law principles thereof.

       (b)    Each Party irrevocably agrees that any legal action, suit or proceeding arising out of or relating to this Agreement brought by any party or its successors or assigns shall be brought and determined in the Bankruptcy Court and each Party hereby irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, Courts of the State of California and of the United States District Court of the Northern District of California, and any appellate court from any thereof, for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement. Each Party further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient. Each Party hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any proceeding arising out of or relating to this Agreement, (i) any claim that it is not personally subject to the jurisdiction of the Bankruptcy Court as described herein for any reason, (ii) that it or its property is exempt or immune from jurisdiction of such court or from any legal process commenced in such court (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (iii) that (A) the proceeding in such court is brought in an inconvenient forum, (B) the venue of such

- 20 -

proceeding is improper or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such court.

(c)     **EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

18.     **NOTICES**.  All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, facsimile, courier or by certified mail (return receipt requested) to the following addresses and facsimile numbers:

PG&E Corporation
77 Beale Street
San Francisco, CA 94105
Attention: Janet Loduca (j1lc@pge.com)

With a copy to:

Weil, Gotshal & Manges LLP 767 Fifth Avenue
New York, NY 10153
Attention: Stephen Karotkin, Jessica Liou, and Matthew Goren
(stephen.karotkin@weil.com, jessica.liou@weil.com, matthew.goren@weil.com)

- and -

Cravath, Swaine & Moore LLP 825 8th Avenue
New York, NY 10019
Attention: Kevin Orsini and Paul Zumbro (korsini@cravath.com, pzumbro@cravath.com)

If to a Consenting Creditor, to the address set forth beneath such creditor's signature block, and, if to a member of the Ad Hoc Subrogation Group, with a copy to:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019

3473341.2

Attention: Matthew A. Feldman, Joseph G. Minias, and Daniel I. Forman (mfeldman@willkie.com, jminias@willkie.com, and dforman@willkie.com)

For the avoidance of doubt when written notice or approval from Requisite Consenting Creditors is required by this Agreement, electronic mail from Requisite Consenting Creditors' counsel to Company's counsel shall be sufficient. Any notice given by mail or courier shall be effective when received. Any notice given by facsimile or electronic mail shall be effective upon oral, machine or electronic mail (as applicable) confirmation of transmission.

19. **NO ASSIGNMENTS; THIRD-PARTY BENEFICIARIES**. Except as expressly provided herein, this Agreement may not be assigned by any Party. The terms and provisions of this Agreement are intended solely for the benefit of the Parties hereto and their respective successors, and it is not the intention of the Parties to confer third-party beneficiary rights upon any other Person.

20. **[RESERVED]**.

21. **SETTLEMENT DISCUSSIONS**. This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties hereto. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement.

22. **GOOD-FAITH COOPERATION; FURTHER ASSURANCES**. Subject to the terms and conditions hereof, the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Party to carry out the purposes and intent of this Agreement.

23. **QUALIFICATION ON CONSENTING CREDITOR REPRESENTATIONS**. The Parties acknowledge that all representations, warranties, covenants, and other agreements made by any Consenting Creditor are made solely in such creditor's capacity as a holder of Subrogation Claims. The Parties further acknowledge that all representations, warranties, covenants, and other agreements made by any Consenting Creditor that is a separately managed account of an investment manager are being made only with respect to the Claims managed by such investment manager (in the amount identified on the signature pages hereto), and shall not apply to (or be deemed to be made in relation to) any Claims that may be beneficially owned by such Consenting Creditor that are not held through accounts managed by such investment manager.

24. **PUBLICITY**. The Company shall use commercially reasonable efforts to submit drafts to the Ad Hoc Professionals of any press releases and public documents that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least three (3) Business Days prior to making any such disclosure, and shall

- 22 -

afford them a reasonable opportunity under the circumstances to comment on such documents and disclosures and shall incorporate any such reasonable comments in good faith.

25.    **SEVERABILITY.**  If any provision of this Agreement, or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

26.    **ADDITIONAL CONSENTING CREDITORS.**  Any holder of Subrogation Claims may at any time become a party to this Agreement as a Consenting Creditor (a "Joining Party") by executing a joinder agreement (the "Joinder") substantially in the form attached as Exhibit D hereto, pursuant to which such Joining Party represents and warrants to the Company and the other Consenting Creditors that it agrees to be bound by the terms of this Agreement as a Consenting Creditor hereunder.

27.    **EFFECTIVENESS OF THE RESTRUCTURING SUPPORT AGREEMENT**.

Except as set forth in the immediately succeeding sentence, this Agreement shall be effective and binding on all Parties upon (a) execution and delivery of signature pages to the Company of Consenting Creditors holding, as reflected on the signature pages hereto, at least 70% in dollar amount  of all Subrogation Claims, including at least 70% of the dollar amount of all Subrogation Claims and more than 50% in number of holders for each of the asterisked Northern California wildfires listed in Schedule 1 hereto, and (b) entry of the RSA Approval Order.  Upon execution of this Agreement by such Consenting Creditors and the Debtors until the earlier of entry of the RSA Approval Order and the RSA Deadline, the Debtors shall proceed in good faith to seek Bankruptcy Court approval of this Agreement and the Parties shall not, directly or indirectly, propose, file, support, solicit, encourage or participate in any chapter 11 plan or settlement of the Subrogation Claims other than as set forth herein.  This Agreement shall be null and void, and of no further force or effect, if the RSA Approval Order is not entered by the RSA Deadline.

**[Signature Pages Follow]**

3473341.2

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**PG&E CORPORATION**

By:      _____

Name:   _____

Title:   _____


Telephone:   _____

Facsimile:   _____


**PACIFIC GAS AND ELECTRIC COMPANY**

By:      _____

Name:   _____

Title:   _____


Telephone:   _____

Facsimile:   _____

- 24 -

3473341.2

CONSENTING CREDITOR:

_____

By: _____

Name: _____

Title: _____

Telephone: _____

Facsimile: _____

Subrogation Claims (Including Paid and Reserved Claims):  $_____

NOTICE ADDRESS:

_____

_____

Attention: _____

Facsimile: _____

E-mail: _____

## **Schedule 1**

1. 2017 North Bay Wildfires
   a. 37
   b. Atlas*
   c. Blue
   d. Cascade/LaPorte Complex*
   e. Cherokee*
   f. Honey*
   g. Lobo*
   h. Maacama
   i. McCourtney*
   j. Nuns Complex (including Adobe, Norrbom, Nuns, Partrick, Pressley, Pythian/Oakmont)*
   k. Pocket*
   l. Point*
   m. Redwood/Potter Valley Complex*
   n. Sullivan
   o. Sulphur*
   p. Tubbs*

2. 2018 Camp Fire*

3473341.2

**Exhibit A**

**Plan**

3473341.2

**Exhibit B**

**Form of Release**

3473341.2

**Exhibit C**

**Transfer Agreement**

3473341.2

**TRANSFER AGREEMENT**

The undersigned (together with its affiliates, the "Transferee") (a) hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ 2019 (the "Agreement"),[1] by and among the Company and each of the Consenting Creditors party thereto, (b) desires to acquire the Claims described below (the "Transferred Claims") from one of the Consenting Creditors (the "Transferor"), (c) agrees to abide by and join any allocation agreement previously entered into by and among the Consenting Creditors, and (d) hereby irrevocably agrees that it and its affiliates shall be bound by the terms and conditions of the Agreement to the same extent Transferor was thereby bound with respect to the Transferred Claims, and it and its affiliates shall be deemed a Consenting Creditor for all purposes under the Agreement.

The Transferee hereby specifically and irrevocably agrees (i) to be bound by the terms and conditions of the Agreement, (ii) to be bound by the vote of the Transferor if cast prior to the effectiveness of the transfer of the Transferred Claims, except as otherwise provided in the Agreement and (iii) that each of the Parties shall be an express third-party beneficiary of this Transfer Agreement and shall have the same recourse against the Transferee under the Agreement as such Party would have had against the Transferor with respect to the Transferred Claims.

**TRANSFEREE**

_____

By:
Name:
Title:

Subrogation Claims:

$_____

Notice Address:

_____

Attn: _____

Fax: _____

Email: _____

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Agreement.

3473341.2

**Exhibit D**

**Joinder**

3473341.2

# JOINDER

The undersigned (together with its affiliates, the "Joining Party") (a) hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ 2019 (the "Agreement"),[1] by and among the Company and each of the Consenting Creditors party thereto, (b) desires to join and hereby irrevocably agrees that it and its affiliates shall be bound by the terms and conditions of the Agreement in all respects, and it and its affiliates shall be deemed a Consenting Creditor for all purposes under the Agreement, and (c) agrees to abide by and join any allocation agreement previously entered into by and among the Consenting Creditors.

## JOINING PARTY

_____

By:
Name:
Title:


Subrogation Claims

$_____

Notice Address:

_____

Attn: _____

Fax: _____

Email: _____


---

[1] Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Agreement.

| Summary report:<br>Litéra® Change-Pro TDC 10.1.0.300 Document comparison done on<br>12/2/2019 12:05:20 PM | |
|---|---|
| **Style name:** Standard | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://NYCDMS/NewYork/29767812/45 | |
| **Modified DMS:** iw://NYCDMS/NewYork/32188712/10 | |
| **Changes:** | |
| **Add** | 30 |
| **Delete** | 27 |
| Move From | 0 |
| Move To | 0 |
| **Table Insert** | 0 |
| **Table Delete** | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 57 |