

Signed and Filed: December 3, 2019

_____
**DENNIS MONTALI**
U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION,<br><br>   - and -<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>   Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case<br>No. 19-30088-DM<br><br>Chapter 11<br><br>Jointly Administered |

## MEMORANDUM REGARDING CERTIFICATION FOR DIRECT APPEAL TO COURT OF APPEALS

### I. INTRODUCTION

This Memorandum Regarding Certification For Direct Appeal To Court Of Appeals is issued concurrently with the court's Certification For Direct Appeal To Court Of Appeals and is the document required by Fed. R. Bankr. P. 8006(b) and (e)(1).

UNITED STATES BANKRUPTCY COURT for the Northern District of California

The Memorandum Decision that is the subject of this Certification was entered on November 27, 2019 (Dkt. # 4895), and the court's order was entered on December 3, 2019. No notice of appeal has been filed yet. This court is the court to make and file the Certification For Direct Appeal. Fed. R. Bankr. P. 8006(d).

Fed. R. Bankr. P. 8006(e)(1) requires that the court making a certification on its own shall provide in a memorandum accompanying that certification the information required by Fed. R. Bankr. P. 8006(f)(2)(A)-(D). That subdivision provides that a request for certification shall include the following:

(A) the facts necessary to understand the question presented;

(B) the question itself;

(C) the relief sought;

(D) the reasons why the direct appeal should be allowed, including why a circumstance specified in 28 U.S.C. § 158(d)(2)(A)(i)-(iii) applies; and

(E) a copy of the judgment, order or decree and any related opinion or memorandum.

Attached is a copy of the court's Memorandum Decision Regarding Inverse Condemnation. The facts necessary to understand the question presented, the question itself, the relief sought, and the reasons why the appeal should be allowed follow.

## II. FACTS NECESSARY TO UNDERSTAND THE QUESTION PRESENTED

On January 29, 2019, PG&E Corporation and its wholly owned subsidiary, Pacific Gas and Electric Company (collectively, "Debtors") filed voluntary petitions under Chapter 11 of the Bankruptcy Code in this court. They continue as debtors in possession, as no trustees have been appointed. At the time of their filing, their joint cases represented one of the largest bankruptcies in United States history and possibly the largest of a public utility. Their filings appear to have been a result of devastating wildfires in Northern California in 2015, 2017, and 2018 that resulted in billions of dollars of claims filed or threatened against them for wrongful death, personal and property damages and numerous other theories of liability.

In the recent months, this court has dealt with several legal matters related to estimation of the wildfire claims that precipitated this bankruptcy. A portion of the estimation will be handled in the San Francisco Superior Court in connection with the Tubbs Fire litigation. Another portion of the estimation will be handled in the District Court (Case no. 3:19-cv-05257-JD) dealing with the personal injury and wrongful death claims and property claims apart from those arising under inverse condemnation.

One of the issues that remained for this court was whether the doctrine of inverse condemnation, as found in the California Constitution, should apply to Debtors. By Order Establishing Pre-Confirmation Briefing and Hearing Schedule for Certain Legal Issues (Dkt. #4540), the court scheduled argument and pre-argument briefing on the inverse condemnation issue, in anticipation of issuing a ruling in time to facilitate the District Court's consideration of that ruling in its own proceedings. The court then ruled in its Memorandum Decision that inverse condemnation applies to privately-owned utilities such as Debtors. This ruling is based on the holdings in two intermediate appellate state court decisions, as laid out in detail in the attached Memorandum Decision. The court's accompanying Order on Applicability of Inverse Condemnation; Rule 54(b) Certification rendered the decision final pursuant to Federal Rule of Civil Procedure 54(b).

**III. QUESTION PRESENTED**

Would the California Supreme Court hold that the doctrine of inverse condemnation applies to privately-owned utilities such as Debtors?

**IV. RELIEF SOUGHT**

Debtors sought a ruling that inverse condemnation did not apply to them, and this court ruled against them in holding that inverse condemnation does apply to privately-owned utilities such as Debtors. The court will assume that on appeal Debtors will seek reversal; several other parties, including the Official Committee of Tort Claimants, will likely argue for this decision to be affirmed.

## V. REASONS WHY DIRECT APPEAL SHOULD BE ALLOWED

In certifying a direct appeal on its own motion, this court is directed to state whether any of the circumstances set forth in subsections (i), (ii), or (iii) of 28 U.S.C. § 158(d)(2)(A) exist. *See* 28 U.S.C. § 158(d)(2)(B). This court believes two exist.[1]

### (i) The judgment involves a question of law as to which there is no controlling decision of this circuit or of the Supreme Court of the United States, or involves a matter of public importance. 28 U.S.C. § 158(d)(2)(A)(i).

The question here is whether inverse condemnation under the California Constitution applies to privately-owned utilities, and this question has not been addressed by any reported Ninth Circuit decision or by the United States Supreme Court. At issue are potentially billions of dollars of claims that may or not be included in this case, depending on whether this doctrine applies to Debtors. If inverse condemnation does apply to Debtors, they could reduce their liability drastically and only proceed to trial on issues of negligence or other theories.

In addition, a ruling on whether inverse condemnation applies to privately-owned utilities is of great public importance at this point in this state's history. Wildfires in California are growing in size and frequency and privately-owned utilities must soon know for certain whether they are strictly liable for their roles in these fires. An answer to this question will also guide the California state legislature in its ongoing discussions regarding state takeover of privately-owned utilities or a change in inverse condemnation law. Moreover, media and other reports show that Californians are particularly concerned with the role of these utilities in recent, and ongoing, wildfires. A definitive ruling on this issue will not resolve the public's concerns but could inform the community and narrow its anxieties. This court would see fit to certify this question to the California Supreme Court, but the California Rules of Court do not permit such a certification from a trial court. *See* Cal. R. Ct. 8.548. Thus, this court urges prompt consideration of this issue by the Ninth Circuit, which may or may not decide to certify the question to the California Supreme Court.

---

[1] The court does not believe appropriate circumstances exist under 28 U.S.C. § 158(d)(2)(A)(ii), which asks whether the judgment involves a question of law requiring resolution of conflicting decisions. Here, there are no conflicting decisions. Instead, there is an absence of a California Supreme Court decision, with the lower courts all in agreement.

**(i)** **Immediate appeal of the judgment may advance the progress of these cases or proceedings in which the appeal is taken. 28 U.S.C. § 158(d)(2)(A)(iii).**

Related estimation and other proceedings are slated to begin in the coming months, and a resolution of this issue will greatly impact those proceedings and the overall shape of this case. The Tubbs Fire trial will begin in January 2020. Estimation of wildfire claims will begin in February 2020. The bankruptcy case is scheduled to move towards confirmation starting in spring 2020. The California legislature has set a deadline of June 30, 2020 for Debtors to exit bankruptcy if they want to enjoy the benefits of A.B. 1054. Debtors and their creditors need to know whether they will move forward with or without theories of strict liability because the answer to this question will greatly change the nature of how much is owed and to whom. A resolution of this issue will change the financial landscape of this case and could eliminate or establish an entire, huge, category of debt.

**\*\*\*END OF MEMORANDUM REGARDING CERTIFICATION\*\*\***

**Entered on Docket**
**November 27, 2019**
EDWARD J. EMMONS, CLERK
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA



Signed and Filed: November 27, 2019

_____
**DENNIS MONTALI**
**U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | Bankruptcy Case No. 19-30088-DM |
| PG&E CORPORATION, | Chapter 11 |
| - and - | Jointly Administered |
| PACIFIC GAS AND ELECTRIC COMPANY, | Date: November 19, 2019 |
| Debtors. | Time: 10:00 AM |
| ☐ Affects PG&E Corporation | Place: Courtroom 17, 450 Golden Gate Ave., 16th Floor, San Francisco, CA |
| ☐ Affects Pacific Gas and Electric Company | |
| ☒ Affects both Debtors | |
| * All papers shall be filed in the Lead Case, No. 19-30088 (DM). | |

## MEMORANDUM DECISION ON INVERSE CONDEMNATION

**I.   INTRODUCTION**

PG&E Corporation and Pacific Gas & Electric Company ("Debtors"), joined by the Official Committee of Unsecured Creditors and certain Shareholders of PG&E Corporation, challenge the application of the doctrine of inverse condemnation in connection with the 2015,

-1-

2017, and 2018 California wildfires (the "Wildfires"). The Official Committee of Tort Claimants, the Ad Hoc Group of Subrogation Claim Holders, and other parties aligned with them support the continued application of the doctrine. While Debtors take issue with a long-standing principle of strict no-fault liability applied to private utilities, they focus their primary attack on a 2017 change in policy by their regulator that they contend undermines their ability to spread liabilities from causes such as the Wildfires to their customers, the California rate payers. They stress repeatedly that the underlying policy of inverse condemnation as reflected in numerous cases is the distribution of losses throughout the community.[1]

For the reasons explained below, the court concludes that the doctrine of inverse condemnation applies to Debtors in these Chapter 11[2] cases. The court also predicts that the California Supreme Court would reject the Debtors' pleas and reach the same conclusion.

## II. PROCEDURAL BACKGROUND

Debtors filed these chapter 11 cases on January 29, 2019. Over the months since, the court has dealt with several scheduling matters, including proceedings for estimation of unliquidated claims arising from the Wildfires under § 502(c). A portion of the estimation will be handled in the San Francisco Superior Court in connection with the Tubbs Fire litigation. Another portion of the estimation will be handled in the District Court (Case No. 3:19-cv-05257-JD) dealing with the personal injury and wrongful death claims and property claims apart from those arising solely under inverse condemnation. By Order Establishing Pre-Confirmation Briefing and Hearing Schedule for Certain Legal Issues (Dkt. 4540), the court retained for itself a decision on the legal question of the applicability of inverse condemnation. The court and all parties expect the District Court to take that ruling into account in its February, 2020 scheduled estimation proceedings.

---

[1] Joint Brief of Debtors and The Official Committee of Unsecured Creditors, etc., (Dkt. 4485), at 11.

[2] Unless specified otherwise, all chapter, code and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

-2-

## III. DISCUSSION

### A. Inverse Condemnation Rooted in the California Constitution

The California Constitution provides that private property may be taken or damaged for a public use as long as just compensation is paid to the owner. Cal. Const. Art. 1, § 19.[3] This section does not mention liable parties, cost recovery, or socialization of costs. In short, the California Constitution imposes strict liability in favor of the owner of property that has been taken or damaged through a public use or purpose and does not concern itself with the rights or liabilities of whom or what did the damage. It is a form of strict liability imposed on the party causing, or whose equipment caused, the damage. Inverse condemnation does not require any breach of a standard of care, a finding of negligence, foreseeability, or other similar factual finding. *See Aetna Life & Casualty Co. v. City of Los Angeles*, 170 Cal. App. 3d 865, 873 (1985). Instead, the operative inquiry is merely whether there was "actual physical injury to real property proximately caused by a public improvement as deliberately designed and constructed." *Id.*[4] Debtors have admitted that their equipment was the <u>cause</u> of all the Wildfires except the Tubbs Fire; they have not admitted <u>liability</u> for any of them.

### B. Inverse Condemnation Not Limited to Public Entities

Since at least 1894, Californian courts have not limited the application of inverse condemnation to public entities. The California Supreme Court in *Eachus v. Los Angeles Consolidated Electric Railway Co.* held that, because the plaintiff's property was damaged for "public use" by a privately-owned railroad company, he was entitled to just compensation pursuant to the doctrine of inverse condemnation under the former takings clause of the California Constitution. 103 Cal. 614, 621 (1894). Little consideration was given to the defendant's status as a private entity in that case. In 1911, the same court reached a similar

---

[3] Section 19 provides, in part:

> (a) Private property may be taken or damaged for a public use and only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner.

[4] A thorough overview of inverse condemnation can be found at Van Alstyne, *Inverse Condemnation: Unintended Physical Damage*, 20 Hastings L.J. 431 (1969).

-3-

result in *Gurnsey v. Northern California Power Co.*, 160 Cal. 699 (1911), when it decided that a land owner was entitled to compensation after a private power company misused an easement over his land. In both cases, the California Supreme Court recognized a property owner's right to be compensated for property damage caused by private entities that provided a public utility service. Although not dispositive, these cases shed light on the California Supreme Court's policy objectives and its treatment of inverse condemnation as a doctrine focused on public use.

More recent cases have continued to emphasize this as the doctrine's purpose. *See Barham v. Southern California Edison Co.*, 74 Cal. App. 4th 744, 753 (1999) ("*Barham")* and *Pacific Bell Telephone Co. v. Southern California Edison Co.*, 208 Cal. App. 4th 1400 (2012) ("*Pac. Bell*").

C. Limitation of Extent of Strict Liability under Inverse Condemnation

Inverse condemnation does not extend beyond property damage and is subject to some limitations, including a police power exception and some exceptions for flooding. *See* 8 Witkin Sum. Cal. Law Const Law § 1272. In some cases, damage to personal property may be recoverable. *Id*. The effect of the damage is also relevant. For example, real property damage can said to have been sustained "only when the market value of property is diminished by the public use." *Eachus*, 103 Cal. at 620. None of these limitations on inverse condemnation is relevant here.[5]

D. Cost Recovery

Central to Debtors' argument against applying inverse condemnation to them is the role played by the California Public Utilities Commission ("CPUC"). The CPUC regulates private utilities such as Debtors. *See* Cal. Const. Art. XII. The CPUC has broad regulatory authority, including the power to fix rates, establish and enforce rules, hold hearings, etc.[6] To raise rates, private utilities must apply to the CPUC for approval of the rate increase.

---

[5] Attorneys' fees and costs are recoverable by the parties successfully prosecuting inverse condemnation actions. *See* Cal. Civ. Pro. § 1036.

[6] Cal. Pub. Util. Code §§ 701-853.

-4-

When fixing rates, the CPUC is bound by the Public Utilities Code. Section 451 of the Public Utilities Code provides, in relevant part:

> "[a]ll charges demanded or received by any public utility, or by any two or more public utilities, for any product or commodity furnished or to be furnished or any service rendered or to be rendered shall be <u>just and reasonable.</u> Every unjust or unreasonable charge demanded or received for such product or commodity or service is unlawful." (*Emphasis added*).

As such, a private utility's ability to spread costs by increasing rates is governed by a reasonableness standard. Through case law, the CPUC has developed this standard to be a 'prudent manager' standard, by which a private utility's ability to raise rates to reimburse it for losses incurred through inverse condemnation is judged by whether the utility acted as a prudent manager. *See e.g. Re S. California Edison Co.*, 24 CPUC 2d 476 (June 15, 1987) (stating the need for the utility to behave as a prudent manager); *Decision Denying Application of San Diego Gas & Elec. Co. (U902E) for Authorization to Recover Costs Related to the 2007 S. California Wildfires Recorded in the Wildfire Expense Memorandum Account (Wema).*, (the "SDG&E Decision").[7] Essentially, the CPUC evaluates a private utility's behavior to ensure that it has comported with best practices before it is able to pass on costs to the ratepayers.

Debtors assert that this regulatory process now severely prejudices them because the SDG&E Decision deemed inverse condemnation "not relevant" to rate setting, and thus Debtors are not guaranteed the ability to pass on their inverse condemnation losses by recovery from ratepayers. *Id*. at 20-21. Nothing has been submitted to show that Debtors have ever been denied cost recovery under this principle when they have been found prudent.

E. Controlling Law

The California Supreme Court has yet to rule whether inverse condemnation applies to a privately-owned utility. Two intermediate appellate court decisions are directly relevant. First, *Barham* held that inverse condemnation was applicable to a privately-owned utility, stating that the inverse condemnation portion of the California Constitution and case law "have as their

---

[7] Found at: http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M200/K045/200045020.PDF.

-5-

principal focus the concept of public use, as opposed to the nature of the entity appropriating the property." 74 Cal. App. 4th at 753. There, the plaintiffs' home was damaged after the utility's power line broke in high Santa Ana winds, resulting in a fire. *Id*. at 748. The court explained that adopting the utility's position would require it to "differentiate between damage resulting from the operation of a utility based solely upon whether the utility is operated by a governmental entity or by a privately owned public utility." *Id*. The court found no significant differences between the two for purposes of inverse condemnation damages. *Id*. The issue, the court iterated, was whether the plaintiffs' property had been taken for public use. *Id.* at 754.

Second, *Pac. Bell* substantially relied on *Barham* to hold the same privately-owned utility liable for inverse condemnation. 208 Cal. App. 4th 1400 (2012). There the plaintiff sued a utility after a large bird came into contact with an energized power line and several telephone cables were subsequently damaged. *Id*. at 1403. The court clarified that the utility's state-derived monopolistic or quasi-monopolistic authority distinguished the utility's action from cases against private parties that did not have monopolistic authority from the state. *Id*. at 1406. Both cases are unequivocal that inverse condemnation may apply to privately-owned utilities. Debtors do not appear to contest this interpretation of the holdings. Instead, they claim that the decisions were incorrectly decided then and "even more obviously wrong" in light of the SDG&E Decision.

Finally, although they are not intermediate court decisions, other courts have denied Debtors' attempts to revisit the applicability of inverse condemnation within the context of the Wildfires. In 2017, a trial court ruled that Debtors may be held liable for inverse condemnation in connection with the 2015 fire in Butte county. *Butte Fire Cases*, 2017 WL 9832289, at *1 (June 22, 2017). In 2018, in response to a renewed motion by Debtors after the SDG&E Decision, the same court again confirmed that Debtors are liable for inverse condemnation damages. *See* Rivkin Decl. Ex. B, *Butte Fire Cases*, No. JCCP 4853 (Cal. Super. Ct. Sacramento County May 1, 2018) (Dkt. 4775). That court scrutinized the SDG&E Decision and held that the CPUC's statement in the decision that inverse condemnation principles are "not relevant" to its review did not distinguish the case from *Barham* or *Pac. Bell*. *Id*. The

-6-

UNITED STATES BANKRUPTCY COURT for the Northern District of California

court also stated that it was not persuaded that either *Barham* or *Pac. Bell* rested on the assumption that the utility there would be able to spread costs and found that the SDG&E Decision did not affect its inverse condemnation analysis. *Id*. Debtors petitioned the California Court of Appeal and California Supreme Court and both petitions were denied. *See* Joint Brief of Debtors and The Official Committee of Unsecured Creditors, etc., (Dkt. 4485), at 9.

In 2018, a trial court in San Francisco in the North Bay Fires proceeding overruled Debtors' demurrer, concluding that Debtors could not dismiss that case based on inapplicability of inverse condemnation. *Harrison v PG&E Corp.*, 2018 WL 2447104 (May 21, 2018). Debtors again petitioned the California Court of Appeal and California Supreme Court and both petitions were denied. *See* Joint Brief of Debtors and The Official Committee of Unsecured Creditors, etc., (Dkt. 4485), at 8.

F. Role of Federal Court

In the absence of a controlling California Supreme Court decision, this court must predict how the California Supreme Court would decide the issue using intermediate appellate court decisions, statutes, decisions from other jurisdictions, and treatises and restatements as guidance. *See Security Pac. Nat'l Bank v. Kirkland et al. (In re Kirkland)*, 915 F.2d 1236, 1239 (9th Cir. 1990). It must follow the state's intermediate appellate decisions. *Id*. (citations omitted). Further, as discussed by the United States Supreme Court in *West v. American Telephone & Telegraph. Co.*, in directing how a federal court should act in the absence of a decision from the highest state court, an intermediate appellate state court decision is a "datum" for ascertaining state law. That decision is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise. 311 U.S. 223, 237 (1940).[8]

---

[8] *West* also emphasized that a state supreme court's refusal to review a lower court's decision fortifies the lower court's decision. *Id*. *West* was specific that the refusal was in the context of a phase of the same litigation that was being decided there, but this line of reasoning could be extended here, where the California Supreme Court has twice declined Debtors' petitions to review this issue, albeit in different cases.

-7-

1  Debtors maintain that *West* means that an appellate court's ruling is one datum, which
2  means this court may look at other data that could override the appellate court decision and
3  control the outcome. For this, Debtors cite *American Tower Corp. v. City of San Diego*, 763
4  F.3d 1035, 1047 (9th Cir. 2014), where the court decided to disregard an appellate court
5  decision. In that case, the Ninth Circuit acknowledged a California Court of Appeal decision on
6  point but determined that the court had incorrectly interpreted and applied the applicable statute.
7  *Id*. at 1047-48. The court faulted the state court for its very obvious error—a powerful datum:

> By reading out the qualifying phrase "[i]f the applicant chooses to provide
> public notice," the California Court of Appeal violated the "fundamental canon of
> statutory construction that a statute should not be construed so as to render any of
> its provisions mere surplusage." (citations omitted) (restating "the settled
> principle of statutory construction that we must give effect ... to every word of the
> statute"). We do not believe the California Supreme Court would do the same and
> therefore reject *Mahon's* interpretation of "public notice required by law.".

At oral argument, Debtors urged a similar analysis of *Barham* and *Pac. Bell*.
Specifically, Debtors assert that, as the appellate court cited in *American Tower* misinterpreted
a statute, the *Barham* and *Pac. Bell* courts misapplied case law when they cited to *Gay Law
Students Ass'n v. Pacific Telephone & Telegraph Co*., 24 Cal. 3d 458 (1979). The alleged
misapplication stems from the fact that *Gay Law Students* dealt primarily with whether a private
entity should be treated as public for the purposes of applying hiring and anti-discrimination
laws.

As a preliminary matter, neither *Barham* nor *Pac. Bell* relied exclusively on *Gay Law
Students* for their holdings. Unlike the misreading of a key statute, all that is at issue here is
whether one case, partially relied upon, was correctly interpreted. Both *Barham* and *Pac. Bell*
cited *Gay Law Students* for the proposition that a public utility's monopolistic authority derives
directly from its exclusive franchise provided by the state. *See Pac. Bell*, 208 Cal. App. 4th at
1406; *see also* Barham, 74 Cal. App. 4th at 753 ("[w]ere we to adopt SCE's position, we would
be required to differentiate between damage resulting from the operation of a utility based
solely upon whether the utility is operated by a governmental entity or by a privately owned
public utility."). This analysis helped the courts distinguish between private parties without

-8-

state-granted monopolies and private parties with those monopolies. *Pac. Bell*, 208 Cal. App. 4th at 1406. The *Barham* and *Pac. Bell* courts did not deal with the anti-discrimination aspect of the *Gay Law Students* decision. They simply echoed the philosophical underpinnings of relevant case law—that a private utility can be tied to the state. *See Gay Law Students*, 24 Cal. 3d at 469 ("the breadth and depth of governmental regulation of a public utility's business practices inextricably ties the state to a public utility's conduct, both in the public's perception and in the utility's day-to-day activities.") (language also quoted by *Pac. Bell*). Because they did not misapply the case law or misread a statute, this court has no reason to discount those two decisions.

G. Markers to Guide Court's Decision

Debtors do not appear to contest seriously the legal landscape of inverse condemnation, which is soundly against them. Instead, they argue that the SDG&E Decision renders prior decisions incorrect and that the policy considerations of inverse condemnation demand a result in their favor. The SDG&E Decision was issued on November 30, 2017, approximately five years after *Pac. Bell* and eighteen years after *Barham*.

In 2015, San Diego Gas & Electric Company applied to the CPUC to recover costs incurred in settling damage claims arising from three wildfires that occurred in 2007. The CPUC denied this application in 2017, finding that the utility did not "reasonably manage and operate its facilities" prior to the 2007 fires. In other words, the CPUC found that the utility had failed the prudent manager standard applied to all private utilities seeking rate increases for reimbursement of inverse condemnation losses.

San Diego Gas & Electric Company also asked the CPUC to consider inverse condemnation, and argued that, because the utility would be held strictly liable for the costs it sought to be reimbursed, the CPUC should approve the costs regardless of whether the utility met the prudent manager standard. In response, the CPUC stated that inverse condemnation principles were not relevant to its reasonableness review under that standard. Debtors interpret this to mean that the CPUC will never pass on inverse condemnation costs to the ratepayers, and that this inability mandates a result in their favor.

Case: 19-30088    Doc# 4953    Filed: 12/03/19    Entered: 12/03/19 10:23:26    Page 14 of 116
Case: 19-30088    Doc# 4895    Filed: 11/27/19    Entered: 11/27/19 14:30:41    Page 9 of 16

First, Debtors seem to misread the SDG&E Decision regarding inverse condemnation. The case merely restates that the prudent manager standard operates without regard to inverse condemnation or traditional tort negligence. It does not state that inverse condemnation costs will never be passed on to ratepayers. In fact, the prudent manager standard virtually guarantees cost spreading if the utility acted prudently, which is a far more lenient standard than strict liability. Thus, Debtors are likely guaranteed cost spreading if they act prudently. In any case, as Debtors have yet to ask the CPUC for permission to raise rates as a result of the Wildfires, this amounts to speculation of how the CPUC will act. Debtors' argument does not offer a datum to predict a California Supreme Court decision here.

Second, there is nothing to show that *Barham* or *Pac. Bell* were decided on principles of cost spreading. Both cases focused primarily on the concept of public use. Therefore, any statement by the CPUC about its cost spreading analysis in the SDG&E Decision would not serve to undermine or call into question the holdings of those cases.

Finally, the remainder of Debtors' argument boils down to their contention that they *should* not be treated as public entities for these purposes. However, this court is not tasked to determine what the law should be and is merely tasked with interpreting what the law is and has been for one hundred twenty-five years. The California legislature has not taken up Debtors' cause to their satisfaction, and this court will not attempt to take its place.[9]

## IV. CONCLUSION

What Debtors advocate here is to set aside a well-seasoned principle of strict liability. Failing that, they are seeking a solution, fire cost reimbursement, in search of a problem, CPUC's refusal or unwillingness to allow recovery by a blameless (prudent) investor-owned utility. As noted, they cite no instance when the CPUC denied inverse condemnation cost reimbursement to a prudent operator. And it is the role of the legislative branch, not the judicial

---

[9] *See* Governor Newsom's Strike Force, *Wildfires And Climate Change: California's Energy Future* (Apr. 12, 2019) (Orsini Declaration, Ex. A) (Dkt. 4486). The report recommends a change to the inverse condemnation rules, but the legislature has yet to act. Notably, the California legislature did not change the law in its recently enacted Assembly Bill No. 1054.

-10-

branch, to fix problems in advance.  As recently as this past July, the California legislature refused Debtors' request to restrict inverse condemnation.  There is simply no reason to suggest that this court can expect the California Supreme Court to step up and do it.  If the problem could be alleviated or eliminated by an amendment to the Public Utilities Code to relax or eliminate the prudent operator standard, that too is for the legislature not the court.

Debtors have not provided persuasive data to justify deviation from the intermediate appellate court cases discussed above.  Nor have they shown how this court could predict that the California Supreme Court would either narrow the reach of inverse condemnation or impose on the CPUC a different standard for reimbursement of related costs.  Thus, this court concludes that the doctrine of inverse condemnation is applicable to Debtors and the California Supreme Court would likewise leave it in place.

The court will issue an order consistent with this Memorandum Decision in the coming days and will include its determination that the order be deemed final for the purposes of Federal Rule of Civil Procedure 54(b), made applicable by Federal Rule of Bankruptcy Procedure 7054.   At the same time, it will certify this decision for direct appeal to the Ninth Circuit Court of Appeals.

**\*\*END OF MEMORANDUM DECISION\*\***

Case: 19-30088    Doc# 4953    Filed: 12/03/19    Entered: 12/03/19 10:30:26    Page 16 of 16