1        UNITED STATES BANKRUPTCY COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3                    -oOo-

4   In Re:                        ) Case No. 19-30088
                                  ) Chapter 11
5   PG&E CORPORATION AND PACIFIC  )
    GAS AND ELECTRIC COMPANY,     ) San Francisco, California
6                                 ) Wednesday, December 4, 2019
                        Debtor.   ) 10:00 AM
7   _____
                                  DEBTORS' MOTION PURSUANT TO
8                                 11 U.S.C. SECTIONS 363(B) AND
                                  105(A) AND FED. R. BANKR. P.
9                                 6004 AND 9019 FOR ENTRY OF AN
                                  ORDER (I) AUTHORIZING THE
10                                DEBTORS TO ENTER INTO
                                  RESTRUCTURING SUPPORT
11                                AGREEMENT WITH THE CONSENTING
                                  SUBROGATION CLAIMHOLDERS,
12                                (II) APPROVING THE TERMS OF
                                  SETTLEMENT WITH SUCH
13                                CONSENTING SUBROGATION
                                  CLAIMHOLDERS, INCLUDING THE
14                                ALLOWED SUBROGATION AMOUNT,
                                  AND (III) GRANTING RELATED
15                                RELIEF [3992]

16              TRANSCRIPT OF PROCEEDINGS
              BEFORE HONORABLE DENNIS MONTALI
17             UNITED STATES BANKRUPTCY JUDGE

18  APPEARANCES:
    For the Debtors:            STEPHEN KAROTKIN, ESQ.
19                              Weil, Gotshal & Manges LLP
                                767 Fifth Avenue
20                              New York, NY 10153
                                (212) 310-8000
21
    For the Official Committee  ANDREW LEBLANC, ESQ.
22  of Unsecured Creditors:     Milbank LLP
                                1850 K Street, NW
23                              Suite 1100
                                Washington, DC 20006
24                              (202) 835-7500

25

(973) 406-2250 | operations@escribers.net | www.escribers.net

```
 1   For the Official Committee   GREGORY A. BRAY, ESQ.
     of Unsecured Creditors       Milbank LLP
 2   (cont'd.):                   2029 Century Park East
                                  33rd Floor
 3                                Los Angeles, CA 90067
                                  (424) 386-4000
 4
     For the Official Committee   ROBERT A. JULIAN, ESQ.
 5   of Tort Claimants:           Baker & Hostetler LLP
                                  11601 Wilshire Boulevard
 6                                Suite 1400
                                  Los Angeles, CA 90025
 7                                (310) 442-8887

 8   For the Ad Hoc Group of      MATTHEW A. FELDMAN, ESQ.
     Subrogation Claim Holders:   Willkie Farr & Gallagher LLP
 9                                787 Seventh Avenue
                                  New York, NY 10019
10                                (212) 728-8651

11   For the Ad Hoc Committee     MICHAEL S. STAMER, ESQ.
     of Senior Unsecured          Akin Gump Strauss Hauer & Feld LLP
12   Noteholders:                 One Bryant Park
                                  New York, NY 10036
13                                (212) 872-1000

14                                ABID QURESHI, ESQ.
                                  Akin Gump Strauss Hauer & Feld LLP
15                                One Bryant Park
                                  New York, NY 10036
16                                (212) 872-8027

17   For Gov. Gavin Newsom:       NANCY MITCHELL, ESQ.
                                  O'Melveny & Myers LLP
18                                7 Times Square
                                  New York, NY 10036
19                                (212) 326-2000

20   For Adventist Health         REBECCA J. WINTHROP, ESQ.
     System/West and Feather      Norton Rose Fulbright US LLP
21   River Hospital:              555 South Flower Street
                                  41st Floor
22                                Los Angeles, CA 90071
                                  (213) 892-9200
23

24

25
```

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

```
 1   Court Recorders:              LORENA PARADA

 2   Transcriber:                  CLARA RUBIN
                                   eScribers, LLC
 3                                 7227 N. 16th Street
                                   Suite #207
 4                                 Phoenix, AZ 85020
                                   (973)406-2250
 5
     Proceedings recorded by electronic sound recording;
 6   transcript provided by transcription service.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

eScribers
(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    SAN FRANCISCO, CALIFORNIA, WEDNESDAY, DECEMBER 4, 2019,

2    10:00 AM

3    -oOo-

4    (Call to order of the Court.)

5    THE CLERK:  All rise.  Court is now in session, the

6    Honorable Dennis Montali presiding.

7    THE COURT:  Good morning, everyone.  Welcome back.

8    IN UNISON:  Good morning.

9    THE CLERK:  Matter of PG&E Corporation.

10    THE COURT:  Mr. Karotkin, you've been missing in

11    action for a while.

12    MR. KAROTKIN:  Only one hearing, sir.

13    THE COURT:  Well, that's one.  Well, I got a couple of

14    housekeeping.  You have a --

15    MR. KAROTKIN:  No; go ahead.

16    THE COURT:  Well, the housekeeping -- two things,

17    obviously.  Some parties have said, because we have to -- I

18    have to decide the support-agreement issue today, I can't

19    decide or can't brief the issue on whether the subrogation

20    group is impaired or not.  And I agree.  That seems to be an

21    open issue.  So unless there's some opposition from you, Mr.

22    Karotkin or the debtor's side, I'll wait until I make a ruling

23    on today's matter, and then decide whether that moots the

24    briefing for the legal issue or whether we should just adjust

25    the deadlines.  That make sense from -- you follow me?  Am I

PG&E Corp., Pacific Gas & Electric Co.

1  confusing you?

2      MR. KAROTKIN:  I know we filed an initial brief on

3  that --

4      THE COURT:  Right.

5      MR. KAROTKIN:  -- and I don't -- the other people did

6  not.

7      THE COURT:  No, the other people said it's too

8  premature because the RSA issue hasn't been resolved.  And I --

9  if I were to approve your motion on the RSA, it seems to me

10 that frames the issue on whether the subrogation group is

11 impaired or not and, if I deny it, it kind of moots it.  So --

12     MR. KAROTKIN:  That's fine.

13     THE COURT:  Yeah, okay.  And then the other question

14 is this flurry of papers yesterday from the committee and

15 others, about continuing the exit-financing motion.  Does the

16 debtor have opposition to that?

17     MR. KAROTKIN:  We're not prepared to consent to that

18 today.  We do have a December 20th deadline to get the

19 approval, and we would need to consult with the equity

20 providers before we would be in a position to agree to adjourn

21 that.

22     THE COURT:  Well, but I -- I mean, how could I insist

23 on going forward on a hearing in thirteen days if they haven't

24 even gotten their discovery out of the way?  I mean, I guess I

25 can defer it a little bit, take it up at the hearing next week,

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    but that's --

2          MR. KAROTKIN:  If you could defer it a couple of days,

3    we may be able to get consent to that.

4          THE COURT:  Okay.  Mr. LeBlanc, you want to address

5    that?  And I do need you to state your name for the record,

6    even though I recognize you.

7          MR. LEBLANC:  Andrew LeBlanc, Milbank, on behalf of

8    the official committee, Your Honor.

9          We filed the letter yesterday --

10         THE COURT:  Right.

11         MR. LEBLANC:  -- knowing that we had this hearing

12   today, and -- because the debtors have told us that they'll

13   make their witness available on Friday; so, two days from now.

14   We haven't received a single document.  I don't think -- they

15   haven't provided what their actual plan, lowercase P, is with

16   respect to the equity commitments that have changed

17   fundamentally from what they filed.

18         THE COURT:  Right.

19         MR. LEBLANC:  So I just don't know how we can defer

20   the issue, because if we can't take the deposition -- if we

21   don't have the documents, we can't take the deposition.  If we

22   don't take the deposition, I don't know how we file an

23   opposition on the 10th when it is due, based on the current

24   schedule.

25         And so I just don't think this is something that we

PG&E Corp., Pacific Gas & Electric Co.

1   can defer.  Obviously, we think the right answer is just take

2   it off the calendar and then we don't have to worry about the

3   discovery, and they -- when they're ready, they can go forward

4   with their motion and provide us with the documents.  We think

5   that --

6         THE COURT:  Well, we have a hearing scheduled here in

7   this courtroom --

8         MR. LEBLANC:  Yeah.

9         THE COURT:  -- a week from today, on the pre-petition

10   interest -- I mean post -- excuse me, post-petition- --

11         MR. LEBLANC:  Yes.

12         THE COURT:  -- interest issue.  And I could right now

13   extend any response by the committee to a day or two after

14   that, and we can revisit this on Wednesday if there's an

15   agreement.  Does that make sense?

16         MR. LEBLANC:  The only portion of that that is

17   concerning, Your Honor, is we do need discovery, including

18   documents and a deposition, before -- and more than one

19   deposition; there're depositions scheduled by other parties, as

20   well.

21         THE COURT:  Right.  Right.

22         MR. LEBLANC:  We need that before we file our

23   opposition.  We can't take the depositions until we get

24   documents.

25         THE COURT:  No, I got it.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          MR. LEBLANC:  And so I'm fine -- I'm going to be back

2   here next week in any event, and I'm fine talking about it next

3   week, but I will tell the Court that, if we don't get the -- if

4   we can't do it on the schedule that exists now in any event,

5   because we can't take a deposition on Friday, having not been

6   provided any documents yet --

7          THE COURT:  Well, you could, but you wouldn't --

8          MR. LEBLANC:  Yeah, we could; it just wouldn't be

9   very --

10         THE COURT:  -- wouldn't be very effective.

11         MR. LEBLANC:  -- effective.  Yeah.  It would not be

12  the first time --

13         THE COURT:  But it'd be quick.

14         MR. LEBLANC:  I'm not sure that's true even.  It'd be

15  a lot of questions about what are you guys actually doing, that

16  I'm not sure anyone can answer.

17         So that's fine -- I'm fine addressing it again next

18  week, but I will tell the Court that, given where things sit

19  today, only thirteen days before that scheduled hearing, the

20  fact that we've received no documents, we will not be in a

21  position, consistent with due process, to proceed with a motion

22  that seeks to incur almost a billion dollars of commitment fees

23  against this estate.

24         THE COURT:  Well, Mr. Karotkin, I understand you have

25  to answer, and you have to communicate with, a large group of

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    people, and they can't instantly respond.  But, I mean, I --

2    seasoned lawyers would recognize, trial judges give time for

3    people to get discovery done.  So is that a clue to say I'll

4    probably grant an extension -- or do you want me to keep it

5    open so you can stipulate to an extension?

6         MR. KAROTKIN:  You're not giving me much of a choice.

7    I would prefer if you keep it open.

8         THE COURT:  Well, local counsel, Ms. Kim, locally, has

9    been in touch with my clerk about alternate days that are

10   available on my calendar, and there are -- I'm here.  And many

11   of you who travel and want to observe holidays; obviously, I'm

12   mindful of that.  But, I mean, there are a couple of days prior

13   to the January 14th date, which is getting kind of full with a

14   lot of stuff anyway.  So I could move a hearing from December

15   17th to something like Friday, January 3rd, without a great

16   inconvenience.  But I'm also willing to take a chance of

17   letting it simmer for a day or two if you can respond by then,

18   Mr. Karotkin.

19        Why don't we leave it at this:  that why don't you --

20   can you commit to me and to Mr. LeBlanc to file something in

21   terms of either a voluntary continuance to some date, or

22   opposition, in which case I guess I'll have to make a ruling on

23   it?  Is that okay?

24        MR. KAROTKIN:  Yeah, so we could do that by tomorrow

25   close of business.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1       THE COURT:  Well, I was going to say Friday.

2       MR. KAROTKIN:  Friday's even better.

3       THE COURT:  Okay.  So -- well --

4       MR. LEBLANC:  And --

5       THE COURT:  -- you go ahead with your -- I mean, also

6  you want to get your information, and --

7       MR. LEBLANC:  We do.  And the one note I would make is

8  they've offered up only Friday for their witness, and we're

9  obviously not going to take that deposition on Friday, given

10  where things sit today.  So, fine having Mr. Karotkin take

11  couple of days, submit his response, but we're -- I don't want

12  anyone to think we're going to show up in New York for Mr.

13  Ziman's deposition on Friday.

14       THE COURT:  I'm going to be mindful and optimistic

15  that seasoned counsel will come up with some --

16       MR. LEBLANC:  Yes.

17       THE COURT:  -- sensible resolution of it and I won't

18  have to be involved.  But I'll make a ruling on it after I --

19  if I get a no-movement position from the debtor, I'll decide

20  what to do about it.

21       MR. LEBLANC:  Thank you, Your Honor.

22       THE COURT:  Okay?  So, according to my calculation,

23  Mr. Karotkin, unless you have another thinking, the only matter

24  left to attend to today is the continued hearing on the RSA

25  agreement (sic).  And I previously indicated about a one-hour

PG&E Corp., Pacific Gas & Electric Co.

1  allocation to either side.  I will tell you that certain

2  unnamed people have criticized me for conducting marathon

3  hearings and trying to starve people to death.  I have sources

4  telling me that people are bringing food supplies out into the

5  attorney conference room.  So I intend to take a break at some

6  point this morning for the benefit of any members of my staff

7  that might be suffering from something.  But on the other hand,

8  if we can continue -- if we can stick with the estimated "a

9  couple of hours", then we ought to be able to do it.

10         So do you have anything else you want to raise today,

11  that we need to deal with?

12         MR. KAROTKIN:  No, sir.

13         THE COURT:  Okay, then the way -- consistent with my

14  preliminary statement, your side has an hour.

15         MR. STAMER:  Your Honor, I apologize.  For the record,

16  Mike Stamer from Akin Grump, on behalf of the --

17         THE COURT:  Mr. Stamer.

18         MR. STAMER:  -- ad hoc committee.

19         There is some housekeeping that I'd like to discuss.

20         THE COURT:  Okay.

21         MR. STAMER:  I think it's probably best discussed

22  after the RSA motion.

23         THE COURT:  Well, I don't intend to rule from the

24  bench.  I intend to take it under advisement.

25         MR. STAMER:  It actually doesn't relate to the RSA

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    motion.  It relates to the competitive plan process and the

2    lack of information flow from the company.  Again, I think it

3    would inform the Court and be helpful to the parties if you go

4    forward with the RSA motion; you'll hear from the various

5    parties, and then I'll get up at the end.  I just wanted to let

6    Your Honor know we do have an issue we'd like to talk to you

7    about, but we're happy to let the RSA motion go first.

8          THE COURT:  Well, we also have on schedule, coming up,

9    a day to talk about the whole confirmation process.  But --

10         MR. STAMER:  Your Honor, therein lies the rub.  If

11    you'd like, I can give you a preview right now.

12         THE COURT:  I don't care.  Well, I'll do it your way.

13    I mean, we'll go the way you suggest; we'll --

14         MR. STAMER:  Okay.

15         THE COURT:  -- do it at the end of the day.

16         MR. STAMER:  Thank you, Your Honor.

17         THE COURT:  Okay, Mr. Karotkin, are you going to go

18    first?

19         MR. KAROTKIN:  Yes, sir.

20         THE COURT:  It'd be helpful -- I mean, I want you to

21    say whatever you want to say, but I'd like you to be -- focus

22    on, to some extent, the statements made by Mr. Julian in the

23    papers he filed yesterday about this two-consent process and

24    whether what you're advocating with the RSA is in direct

25    contravention of controlling Ninth Circuit law.

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          MR. KAROTKIN:  I think that, Your Honor, Mr. Feldman

2  will be addressing --

3          THE COURT:  Okay.

4          MR. KAROTKIN:  -- most of those issues.  But I will

5  say one thing:  that the opt-in consents to releases that are

6  provided in our plan and the RSA are almost precisely the same

7  language as contained in the ad hoc committee and the TCC plan.

8  So, frankly I don't -- when I read that, I couldn't quite

9  comprehend what Mr. Julian was referring to.

10         THE COURT:  Well, I have on my list of questions for

11  him -- is whether their plan violates the Ninth Circuit law

12  also, but --

13         MR. KAROTKIN:  Well, yeah, I mean, I think, Your

14  Honor, if you --

15         THE COURT:  And if we're going to violate the Ninth

16  Circuit, we might as well be consistent about it.

17    (Laughter.)

18         MR. KAROTKIN:  Exactly.  I mean, since they want to

19  violate the Ninth Circuit on interest, they might as well try

20  to violate it on other grounds as well.

21         THE COURT:  Might as well.

22         MR. KAROTKIN:  But I think that the cases that Mr.

23  Julian cites, and I'm sure Mr. Feldman will get into that,

24  don't even come close to resembling the issue before the Court,

25  and are completely miscited for propositions that are even

(973)406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    relevant to what you're considering today.

2            THE COURT:  Okay.

3            MR. KAROTKIN:  But let me go back and make a brief

4    statement as to where we are, because I think, Your Honor, it's

5    very important to put today's motion into the context of these

6    cases and where they are.  And, Your Honor, in what you, Your

7    Honor, have characterized as major progress -- and again, using

8    your words, "major progress" -- in these cases the debtors,

9    pursuant to the RSA, have settled twenty billion dollars of

10   subrogation claims, for eleven billion dollars; a forty-five-

11   percent discount.  And perhaps equally important, the

12   settlement fully complies with the requirements of 1054.

13           And I think it's important to note, Your Honor, that

14   the requirements of 1054 do not apply just to personal-injury

15   claims.  The requirements apply to the insurance

16   subrogations --

17           THE COURT:  Yes, the whole --

18           MR. KAROTKIN:  -- expressly as well.

19           THE COURT:  -- fire issue, right.

20           MR. KAROTKIN:  Right.  So this settlement complies

21   with 1054 in accordance with its terms.  It's been memorialized

22   in the restructuring-support agreement, with customary and

23   typical terms and provisions, that all of the objecting parties

24   have themselves proposed and advocated routinely, routinely, in

25   other Chapter 11 cases around this country and, as Your Honor

PG&E Corp., Pacific Gas & Electric Co.

1    noted in your recent statement that you filed, include common

2    features; your words, "common features".

3          To convince the Court to terminate the debtors'

4    exclusive periods, Your Honor, about two months ago, both the

5    tort-claimants committee and ad hoc noteholders adopted the

6    economic terms of the subrogation settlement wholesale, thereby

7    acknowledging its reasonableness and how the TCC can continue

8    to argue otherwise or that the settlement doesn't comply with

9    the applicable standards of compromise and settlements, whether

10   under 9019 or the fair-and-equitable rule.  Frankly, Your

11   Honor, totally mystifies me how they can --

12         THE COURT:  Well, they -- but in fairness, they

13   hadn't, and then they probably couldn't have, brought it on as

14   a 9019 motion, but they certainly could set it up as a plan

15   issue, right?

16         MR. KAROTKIN:  Again, they've adopted that economic

17   settlement in their plan.

18         THE COURT:  Right.

19         MR. KAROTKIN:  It's there.  They've agreed -- and Mr.

20   Stamer -- on the record of the hearing before this Court, they

21   agreed in their plan to pay the subrogation claimants eleven

22   billion dollars in cash.

23         THE COURT:  Right.

24         MR. KAROTKIN:  That's on the record.

25         THE COURT:  That's right.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1      MR. KAROTKIN:  Whether -- what their plan -- the mish-

2  mosh that their plan provides and how they try to finesse that

3  issue is another issue.  But on the record before this Court,

4  they said that.

5      THE COURT:  I can hear you.

6      MR. KAROTKIN:  Okay.

7      THE COURT:  There's a hearing going on in Washington

8  where people yell at each other, but we're not going to do it

9  here.  We're too civilized.

10     MR. KAROTKIN:  Okay, Your Honor.  The only evidence

11  before the Court that is completely unchallenged is Mr. Wells'

12  declaration, the CFO of --

13     THE COURT:  Yeah, I was going to say --

14     MR. KAROTKIN:  -- of the company.

15     THE COURT:  -- Ms. Winthrop, I believe, from the

16  Adventists, took issue with whether there's any evidence to

17  support Mr. Wells' statement.

18     MR. KAROTKIN:  Well, Mr. Wells is here today.  His

19  declaration is in evidence.  There's -- no one's -- to my

20  understanding, has challenged that.  It's undisputed.  And as

21  set forth in that declaration, it demonstrates that the

22  settlement reflected in the RSA is the product of literally

23  months of hard-fought, arm's-length negotiations, with the

24  assistance and advice of the debtors' retained professionals,

25  including an analysis of the claims, the risks of litigation,

escribers
(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   the impact on the successful and timely administration of these

2   cases, and, of course, Your Honor, the substantial discount

3   achieved in the settlement.

4           And I'll note for the record that the subrogation

5   claims filed are well in excess of twenty billion dollars.  And

6   I think the Court can take judicial notice of that.  And those

7   claims were filed prior to the bar date.

8           THE COURT:  Can you help me understand the expert

9   testimony or the declaration of -- I can't -- Buntler (ph.) --

10  not pronouncing the gentleman's name correctly -- that was

11  filed yesterday for the TCC?

12          MR. KAROTKIN:  I cannot.  I don't understand --

13          THE COURT:  I don't quite understand what his analysis

14  is telling me, but it --

15          MR. KAROTKIN:  I don't either.

16          THE COURT:  Well, okay, but it, bottom line, seems to

17  be that the claims, that he's perceived at least, are well

18  under that; they're in the ten-billion-dollar range.  And I --

19          MR. KAROTKIN:  I think what he's saying is those that

20  match actual --

21          THE COURT:  Right.

22          MR. KAROTKIN:  -- claims filed by individuals are ten

23  billion dollars.  I don't know what that means.

24          THE COURT:  Okay.

25          MR. KAROTKIN:  Okay?  And I think he said it's --

PG&E Corp., Pacific Gas & Electric Co.

1          THE COURT:  That makes two of us.

2          MR. KAROTKIN:  -- incomplete.  I don't know if he's

3    here today.  I mean, we saw that yesterday for the first time

4    as well.  And we didn't -- frankly, we didn't even know that

5    person had been involved in this case or retained by anybody.

6          THE COURT:  Well, I understand.

7          MR. KAROTKIN:  Okay.

8          THE COURT:  That's a different issue.  I mean, I'm not

9    here to criticize him.  I'm just saying I don't quite

10   understand it, and you're saying the same thing.

11         MR. KAROTKIN:  Yeah, I don't understand --

12         THE COURT:  Mr. Julian or --

13         MR. KAROTKIN:  Frankly, I don't understand the entire

14   pleading, but that's --

15         THE COURT:  -- someone on the other side can --

16         MR. KAROTKIN:  I'm sure Mr. Julian will try to explain

17   that to you.

18         THE COURT:  Okay.

19         MR. KAROTKIN:  So as I said, claims in excess of

20   twenty billion dollars have been filed.  And I think if Your

21   Honor were to look at the claims record, they're in excess of

22   thirty-five billion dollars.

23         And perhaps it's important to note that this

24   compromise and settlement frees up substantial value to be

25   distributed to other claimants in these cases and, perhaps more

(973)406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    importantly, greatly facilitates the ability of the debtors to

2    emerge from Chapter 11 successfully as solvent debtors and to

3    comply with the requirements of 1054.

4         THE COURT:  The question, though -- the question is

5    does it violate controlling federal law?  And that's the issue.

6    That's gets back to the whole point about Lowenschuss and

7    third-party releases and what have you.

8         MR. KAROTKIN:  And again, Your Honor, Mr. Feldman will

9    address that.

10        THE COURT:  Right.

11        MR. KAROTKIN:  The third-party releases are

12   consistent, I think, with what you've approved previously.

13        THE COURT:  Right.

14        MR. KAROTKIN:  They are purely voluntary releases.

15   And again, the cases cited by Mr. Julian don't even relate to

16   the issues before that court -- before the Court.  They have

17   nothing to do with voluntary releases; absolutely nothing.  And

18   he misquotes them and miscites them.

19        The subrogation-claims settlement, Your Honor, meets

20   the standards for approval, whether under Bankruptcy Rule 9019

21   or the fair-and-equitable standard.  Indeed, Your Honor, no

22   party other -- no party other than the tort-claimants committee

23   has argued that that standard has not been met.  And I

24   already -- and as I already noted, having adopted the economic

25   terms of the settlement in their competing plan, that argument

PG&E Corp., Pacific Gas & Electric Co.

1    as to the reasonableness of the settlement or whether it

2    comports with applicable standards cannot be taken seriously.

3         Under the undisputed facts present here, Your Honor,

4    where the subrogation claimants already have paid fire victims

5    well in excess of fifteen billion, have reserves for billions

6    of more payments, had filed claims for twenty billion dollars,

7    and have agreed to a forty-five-percent discount, under these

8    circumstances, Your Honor, no one can challenge the

9    reasonableness of the settlement, much less seriously contend

10   that it falls below the lowest point in the range of

11   reasonableness.

12        And moreover, as demonstrated in Mr. Wells'

13   declarations, even if the fair-and-equitable test were

14   applicable, those standards are met as well.  The settlement

15   takes into account a comprehensive analysis and assessment of

16   the probabilities and risks of the litigation; professional

17   advice on these matters, including the risks associated with

18   estimation hearings; jury trials in San Francisco; and the

19   amounts already paid by the subrogation claimants and validated

20   by the Insurance Department.  The settlement takes into account

21   an analysis of the complexity of the litigation and the

22   expenses and delay associated with continuing with that

23   litigation, including evidence as to twenty-two wildfires,

24   causation, liability, and damages, and thousands of underlying

25   loss claims, including different views as to causation relating

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

                PG&E Corp., Pacific Gas & Electric Co.

1   to the Tubbs fire.

2           And the settlement plainly is in the interest of

3   creditors and all parties in this case, by reason of the

4   substantial discount.  As I mentioned, the freeing up of

5   consideration for other creditor constituencies in these

6   cases --

7           THE COURT:  Well, the TCC has argued more than once

8   that this deal sucks all the cash out and leaves them with

9   noncash.  Is that something I need to focus on today?

10          MR. KAROTKIN:  No.

11          THE COURT:  And is it true?

12          MR. KAROTKIN:  It's not true.  And in fact -- Your

13  Honor, again, they've adopted the settlement.

14          THE COURT:  Well, I understand.

15          MR. KAROTKIN:  Okay?

16          THE COURT:  I understand.

17          MR. KAROTKIN:  I don't know how they can -- at some

18  point they can't have it both ways.  I mean, that's sort of a

19  consistent position they've taken in these cases from the

20  start.  They want it both ways.  They can't have it both ways.

21  Okay?

22          And the fact that -- as Your Honor noted, this

23  settlement resolves a major contingency in these cases and, as

24  I said, in full compliance with the requirements of AB 1054,

25  and will greatly facilitate getting these cases confirmed by

PG&E Corp., Pacific Gas & Electric Co.

1   June 30th, 2020, consistent with the requirements of AB 1054,

2   so that the reorganized debtors can take advantage of the go-

3   forward --

4           THE COURT:  Well, isn't it true -- isn't it true,

5   though, that if this RSA is not approved, that Tubbs goes

6   forward, Judge Donato's hearings go forward, unless there's

7   some other, of course, change of course?  And at the end of

8   those two processes, there will be a figure of an estimation.

9   The bottom line, as I see it, is Judge Donato is tasked with

10  coming up with an estimation number.  And if the RSA is

11  approved, there's a plug-in, eleven billion.  It's not a --

12  it's not a squishy number.  It's a hard number.  If there is

13  not approval, then he or it, at court, and the jury in Tubbs,

14  has to come up -- I mean, really not the jury in Tubbs.  The

15  jury in Tubbs does what it does, then Judge Donato factors

16  in --

17          MR. KAROTKIN:  Right.

18          THE COURT:  -- that data point and all the other data

19  points, including the twenty billion-plus claims of the subro

20  group --

21          MR. KAROTKIN:  Exactly.

22          THE COURT:  -- and plugs in a number.

23          MR. KAROTKIN:  That's correct.

24          THE COURT:  So the eleven's --

25          MR. KAROTKIN:  And that -- and this settlement --

PG&E Corp., Pacific Gas & Electric Co.

1          THE COURT:  The eleven's already there, right?

2          MR. KAROTKIN:  Right.  And that settlement

3     eliminates -- this settlement eliminates the risk --

4          THE COURT:  Right.

5          MR. KAROTKIN:  -- of the estimation of that number,

6     taking into account the 20 billion dollars of claims; taking

7     into account they've already spent 15.8 billion dollars; taking

8     into account the reserves.

9          THE COURT:  Does the decision on inverse condemnation

10    change anything in terms of setting a floor of no less than

11    some number that's not known but it's -- it starts with a B.

12    Right?

13         MR. KAROTKIN:  I think, Your Honor, that your decision

14    on inverse condemnation only buttresses their ability to

15    approve the twenty billion dollars.

16         THE COURT:  Well, but what I'm getting at --

17         MR. KAROTKIN:  And in that --

18         THE COURT:  -- is it puts a -- it puts a not-less-than

19    figure, no matter what; right?

20         MR. KAROTKIN:  Correct.  And --

21         THE COURT:  Right.  Okay.

22         MR. KAROTKIN:  -- again, your decision on inverse only

23    makes this settlement better from the standpoint of the

24    estates.

25         THE COURT:  Okay.  Flesh that out a bit.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    MR. KAROTKIN:  Pardon me?

2    THE COURT:  Just explain that a little more --

3    MR. KAROTKIN:  I'll let Mr. --

4    THE COURT:  -- to me.

5    MR. KAROTKIN:  I'll let Mr. Feldman --

6    THE COURT:  Okay.

7    MR. KAROTKIN:  -- explain that to you.

8    So, Your Honor, from the debtors' standpoint and from

9    the estate's standpoint, we think the issue before the Court is

10   quite straightforward and the path to take is very clear.  And

11   this is even more the case in view of how in the recent

12   pleading filed by the subrogation claimants that we have joined

13   in -- addresses the few issues that you have raised and, we

14   believe, has resolved those issues.

15   THE COURT:  Oh, you mean the revised worksheet?

16   MR. KAROTKIN:  That's correct.

17   THE COURT:  Yeah.  Okay.

18   MR. KAROTKIN:  And so we think, Your Honor, the path

19   forward is quite simple:  approval of the settlement, which,

20   again, you have appropriately noted is a significant step

21   forward in these cases, and a settlement in an amount that

22   competing plan proponents have embraced, or the alternative,

23   Your Honor, is jettisoning the settlement, resurrecting twenty

24   billion dollars in claims, and jeopardizing the entire

25   success --

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT: What happens if I --

2    MR. KAROTKIN: -- of these cases.

3    THE COURT: What if I don't jettison or approve it, I

4 just hold it, decide and -- because some have asked me to

5 consider -- I believe that was one of the positions by the

6 governor's office or some other party -- then just hold it? I

7 mean, I realize I don't -- my job is to make decisions that are

8 presented to me, not to sit on them, but sometimes judges do

9 that anyway, intentionally or unintentionally.

10    MR. KAROTKIN: Your Honor --

11    THE COURT: What's the downside of doing that?

12    MR. KAROTKIN: I assume you're aware of the fact there

13 is a drop-dead date in the RSA.

14    THE COURT: Well, there is.

15    MR. KAROTKIN: And it's a serious drop-dead date.

16 They have agreed to extend it a number of times. You can speak

17 with Mr. Feldman. It's my understanding that this Friday is a

18 hard date for them. And they want this resolved. We want this

19 resolved. There are estimation proceedings going forward.

20 People are spending money. We want it resolved so we can move

21 forward in these cases.

22    THE COURT: But I also -- again, I don't want to turn

23 this into I'm playing chicken with Mr. Feldman. If I need more

24 than Friday to make a decision, I suspect it'll be okay. But

25 I'm -- and I'm not -- I was actually suggesting another

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  alternative of -- and I think you've answered it and Mr.

2  Feldman answered it.  If I just say, "I think I'll just let

3  this simmer until we get to confirmation," then obviously he

4  could tell me that all bets are off.  And --

5          MR. KAROTKIN:  Your Honor --

6          THE COURT:  -- more importantly, I don't know what he

7  would tell Judge Donato.

8          MR. KAROTKIN:  Your Honor, from the debtors'

9  perspective, we think this is a very, very, very reasonable and

10  good deal.  And from the debtors' perspective, and as

11  fiduciaries for all parties-in-interest, we don't want to take

12  the risk that this thing blows up.  We don't think that's

13  appropriate.  We think it has to be determined within the time

14  frames in the agreement.

15          As I mentioned, we and the subrogation claimants have

16  reviewed your recent statement and considerations.  We filed a

17  pleading.  We believe that that pleading addresses all of your

18  concerns, clarifies issues that you may have had issues or

19  problems with.  We have filed with that an amended and restated

20  proposed RSA that incorporates that.  And we believe, under

21  those circumstances, that this settlement should be approved.

22          I would like to mention one thing.  I was asked by one

23  of the plaintiff lawyers to mention something on the record to

24  make sure it's --

25          THE COURT:  Okay.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          MR. KAROTKIN:  -- abundantly clear.

2          THE COURT:  All right.

3          MR. KAROTKIN:  So if I -- I would like to make it

4    clear that no one in the RSA is taking the position that the

5    fire victims are releasing their insurance contract, coverage,

6    or bad-faith claims as part of any proposed settlement with

7    any --

8          THE COURT:  Well, all they're releasing is the make-

9    whole things, right?

10         MR. KAROTKIN:  Only if they voluntarily agree to

11   settle --

12         THE COURT:  No, I understand --

13         MR. KAROTKIN:  -- their claims.

14         THE COURT:  -- but that --

15         MR. KAROTKIN:  Okay.

16         THE COURT:  -- that's the way I have gone through the

17   revised version, and particularly this chart.

18         MR. KAROTKIN:  Right.

19         THE COURT:  That seems to be the only thing that's

20   released.  Isn't that --

21         MR. KAROTKIN:  That is the only thing released,

22   unless --

23         THE COURT:  -- what you're restating?

24         MR. KAROTKIN:  -- unless, Your Honor, they voluntarily

25   opt in.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  Well, but if they opt in, what have they

2  opted into?  In other words, what is the -- and let's assume

3  that some of them will opt in.  What are they releasing?

4    MR. KAROTKIN:  They've opt (sic) in to releasing third

5  parties in connection with the -- claims against third parties

6  in connection with the administration of the estates.  It's

7  clearly set forth in the plan, what they would opt into.  And

8  again, entirely consistent with the competing plan filed by the

9  TCC and the ad hoc group.

10    Again, voluntary, consistent with your ruling in the

11  prior PG&E case --

12    THE COURT:  Well, that gets a lot of mileage, but that

13  was a very discrete, one-on-one, one-off-type arrangement.

14    So walk me through another step.  And if you want to

15  pass this off on your colleague, you can, but --

16    MR. KAROTKIN:  Depends on how hard the question is.

17    THE COURT:  Well, it's a question that I want Mr.

18  Julian or someone on the other side to answer too, and that's

19  as follows:  what happens to a victim -- let's say a victim who

20  is -- a victim who is expecting to get a payment of -- pick a

21  number -- 100,000 dollars.  If the person opts in and the plan

22  gets confirmed, when and how does that person get some money?

23  You don't -- you can't predict that; can you?

24    MR. KAROTKIN:  That claim is channeled to the trust --

25    THE COURT:  It sounds in trust.

PG&E Corp., Pacific Gas & Electric Co.

1          MR. KAROTKIN:  -- which will be administered by the

2   trustee.

3          THE COURT:  Right.

4          MR. KAROTKIN:  And that claim will be paid in

5   accordance with the trust procedures.

6          THE COURT:  But do we have any idea when that means?

7   Because Mr. Julian makes the argument that, if you don't opt

8   in, you'll be waiting for ten years.

9          MR. KAROTKIN:  The same trust procedures that they

10  would have under their plan --

11         THE COURT:  I know, but --

12         MR. KAROTKIN:  -- as well.

13         THE COURT:  -- help me -- what's the -- how does it

14  work?  In other words --

15         MR. KAROTKIN:  Typically the way the trust would be

16  set up is it would -- there would be a matrix to enable people

17  to get their money very quickly if they wanted to get it

18  quickly.  They also reserve their rights to have a jury trial

19  if they want a jury trial.

20         THE COURT:  But if -- but this goes back to a hearing

21  that we had way, way back early on.  What does it mean to get a

22  jury trial?  If the jury -- if the jury comes in with a million

23  dollars, you don't necessarily get a million dollars; you get a

24  million into the pool --

25         MR. KAROTKIN:  But again, Your Honor --

PG&E Corp., Pacific Gas & Electric Co.

1          THE COURT:  -- right?

2          MR. KAROTKIN:  -- the way that the trust is set up,

3     and the way that the funding of the trust is set up, it's

4     designed to be in accordance with the estimation ruling.  It's

5     got to be funded in accordance with the estimation ruling.

6          THE COURT:  Right.  It's got to be funded in

7     accordance with the estimation ruling, which --

8          MR. KAROTKIN:  And that is why you have said, and I

9     believe Judge Donato have (sic) said, you're going to be

10    conservative in those decisions.

11         THE COURT:  Well, that's not my call anymore.

12         MR. KAROTKIN:  Okay, well --

13         THE COURT:  But my point is that Judge Donato has to

14    make a -- has to pick a number, and that is the number.  That's

15    in concrete at that point.  Right?

16         MR. KAROTKIN:  That's correct.

17         THE COURT:  And so --

18         MR. KAROTKIN:  Under both plans.

19         THE COURT:  Yeah, I know that.  But we're only talking

20    about the impact on this one today.  So what I'm trying to

21    understand more clearly is that -- let's go back to our

22    hypothetical claimant who says, "I'm in.  I'll release

23    everybody."  Is there any way of predicting how and when that

24    person will get money, compared to what if the person opts out?

25    Is there any way of understanding that from the trust

PG&E Corp., Pacific Gas & Electric Co.

1  structure?  I don't know -- I don't understand it.  I'm not

2  trying to set you up for a quick question --

3         MR. KAROTKIN:  The claims will be --

4         THE COURT:  -- a trick question here.

5         MR. KAROTKIN:  The trust procedures have not yet been

6  fully developed.  As I understand how they will work, there'll

7  be a matrix pursuant to which people can settle their claims

8  quickly --

9         THE COURT:  Um-hum.

10        MR. KAROTKIN:  -- and get paid.

11        THE COURT:  And get paid quickly.

12        MR. KAROTKIN:  And get paid quickly.  If they're not

13 happy with that, they can go to mediation, they can go to

14 arbitration.  If at the end of the day they're not happy, they

15 have a right to have -- to go to trial and have their claim

16 adjudicated.

17        THE COURT:  Right, and they can --

18        MR. KAROTKIN:  That's how it typically works.

19        THE COURT:  -- they can sue everybody for everything

20 they want.

21        MR. KAROTKIN:  And if they -- and if they opt out of

22 the releases, they can sue anybody who they choose to sue.

23        THE COURT:  Well, leaving aside suing third parties

24 either in another forum or maybe in this forum, the point is

25 they don't get any money; no money gets freed up until that's

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    over with; isn't that correct?

2              MR. KAROTKIN:  That's correct.  They --

3              THE COURT:  Okay.

4              MR. KAROTKIN:  They either settle or they litigate.

5              THE COURT:  They settle --

6              MR. KAROTKIN:  That's correct.

7              THE COURT:  -- or they litigate.  And so -- okay,

8    that's what I thought.  Okay.

9              MR. KAROTKIN:  And now I would like to cede the podium

10   to Mr. Feldman.

11             THE COURT:  Okay.  Good morning, Mr. Feldman.

12             MR. FELDMAN:  Good morning, Your Honor.  Again for

13   the --

14             THE COURT:  You used to sit on that side of the room.

15             MR. FELDMAN:  Oh, that was --

16             THE COURT:  What happened?

17             MR. FELDMAN:  They just -- they occupied me.

18             THE COURT:  You're known by the company you keep, you

19   know.

20             MR. FELDMAN:  Then I'm on the wrong side.

21             For the record, Your Honor, Matthew Feldman, Willkie

22   Farr & Gallagher, on behalf of the ad hoc group of subrogation

23   claimants.

24             Your Honor, I want to pick up where you left off with

25   Mr. Karotkin on how the releases work, because I think it's a

PG&E Corp., Pacific Gas & Electric Co.

1    little bit conflated still. And I want to try to take you

2    through it more simply. Although, I will completely confess

3    and acknowledge upfront, I don't know how the trust mechanics

4    are going to work, because, as far as I know, they don't exist.

5    And as far as I'm concerned, unless this Court rules in certain

6    ways today, we don't have any intention of being involved in

7    those trust mechanics that really should be between the company

8    and the --

9            THE COURT: No, I understand. And --

10           MR. FELDMAN: -- and the TCC.

11           THE COURT: And I think you even made the point

12   before, either to me or maybe it was to Judge Donato, that if

13   this RSA gets approved, you're out of the picture, to some

14   extent.

15           MR. FELDMAN: We're on the sidelines.

16           THE COURT: Yeah, okay.

17           MR. FELDMAN: There are actually two separate types of

18   releases contemplated by the RSA. Let me deal with the

19   simpler --

20           THE COURT: And that's what --

21           MR. FELDMAN: -- one first.

22           THE COURT: -- Mr. Julian focused on.

23           MR. FELDMAN: Yes. Let me deal with the --

24           THE COURT: Okay.

25           MR. STAMER: Let me deal with the simpler one first.

PG&E Corp., Pacific Gas & Electric Co.

1    The RSA says that the plan that's going to be proposed by the

2    company will include -- as Mr. Karotkin characterized it, as a

3    standard release of third-party claims, for people's

4    participation in the bankruptcy.  It's somewhat of an

5    exculpation-type release.  You have to opt into that release in

6    order to be bound by it.

7         So, not checking the box, you haven't opted in.

8    Checking the box that you're opting out, you haven't opted in.

9    So that release will only apply to those people who actually

10   opt in.  And carved out of that release, as Mr. Karotkin said,

11   is what I will shorthand to "ordinary-course claims" you may

12   have against your insurance company for acting in bad faith,

13   for not paying the amount they should pay.  They have all of

14   those state-law rights and can pursue their insurance company

15   for those types of claims.

16        The much more important, from my client's perspective,

17   provision in the RSA deals with a circumstance which we all

18   hope to be the case:  the company is solvent and it is

19   confirming a solvent plan.  Judge Donato, state-court judge in

20   Tubbs -- they've made whatever rulings they've made.  The

21   individual plaintiffs' claims, who we're fully supportive -- I

22   can't stress this enough -- of being paid in full-- that there

23   is enough value here to pay them in full.

24        In that circumstance, what would happen outside of

25   bankruptcy is, as a condition to receiving that payment, you

PG&E Corp., Pacific Gas & Electric Co.

1    would enter into a release of your made-whole rights, because

2    you're being paid --

3            THE COURT:  Because you're paid --

4            MR. FELDMAN:  -- in full.

5            THE COURT:  -- in full.  I mean --

6            MR. FELDMAN:  Exactly.

7            THE COURT:  -- you're made whole, therefore you don't

8    have to --

9            MR. FELDMAN:  Therefore, why do you need to --

10           THE COURT:  -- you don't need a made-whole --

11           MR. FELDMAN:  -- retain that right.

12           THE COURT:  -- right if you're made whole.

13           MR. FELDMAN:  Correct.

14           THE COURT:  Right?  Okay.

15           MR. FELDMAN:  Correct.  And so --

16           THE COURT:  But it still -- but you need the company

17   solvent and that figure of --

18           MR. FELDMAN:  Let me get to that.

19           THE COURT:  -- the estimation --

20           MR. FELDMAN:  That's what I was going to get to next.

21           THE COURT:  Okay.

22           MR. FELDMAN:  So there are going to be two types of

23   individual plaintiffs, who will participate in receiving

24   distributions under the trust, that matter to this made-whole

25   discussion.  They will all have insurance.  Some of them will

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  agree with the matrix that is proposed by the TCC and the

2  company.  So to use your example, I'm entitled to 100,000

3  dollars under the plan.  I agree; 100,000 dollars is fine.  I'm

4  totally good with that.  Maybe I thought I was worth -- maybe I

5  thought I was due 110,000, maybe I thought I was due 90-, but,

6  you know what, I'm good with 100,000 dollars.  I --

7          THE COURT:  Take the money and run.

8          MR. FELDMAN:  Take the money and run.  If you decide

9  to take the money and run, you are releasing your made-whole

10 claim against your insurance company, and now, based on

11 feedback we had received at previous hearings, the insurance

12 company is releasing you as well.

13         THE COURT:  Right.

14         MR. FELDMAN:  So there's a mutuality of release --

15         THE COURT:  Mutuality of release.

16         MR. FELDMAN:  -- in that circumstance.

17         THE COURT:  And so my hypothetical victim gets his

18 check for 100,000 and that's the end of you, and --

19         MR. FELDMAN:  That's the end of it.

20         THE COURT:  -- your client and he have the divorce.

21         MR. FELDMAN:  And I don't know --

22         THE COURT:  It's done.

23         MR. FELDMAN:  -- exactly how quickly that will be, but

24 presumably it will be quickly, because at consummation,

25 presumably this matrix will exist --

PG&E Corp., Pacific Gas & Electric Co.

1          THE COURT:  Well, I'm sure, to the victims --

2          MR. FELDMAN:  -- and people'll have the right to do

3     it.

4          THE COURT:  -- nothing is quick.  But the point is --

5          MR. FELDMAN:  Appreciate that.

6          THE COURT:  -- it isn't the ten-to-twelve-year

7     doomsday scenario that Mr. Julian described.

8          MR. FELDMAN:  So let me go into the doomsday scenario.

9          THE COURT:  Okay.

10          MR. FELDMAN:  I look at the matrix and I am entitled

11     to 100,000 dollars under the matrix.  But I think that that is

12     woefully inadequate because I suffered all of these additional

13     damages.  And so as a result of that, I want to exercise my

14     litigation rights, whether that's mediation, arbitration --

15          THE COURT:  Or you opt out.

16          MR. FELDMAN:  -- or ultimately --

17          THE COURT:  Opt out, or you --

18          MR. FELDMAN:  You don't even have to opt out.

19          THE COURT:  Or you don't opt in.

20          MR. FELDMAN:  You don't take the money.  You don't

21     cash the check, in that circumstance.  I go pursue that claim,

22     and I pursue it for five years, all the way up to the

23     California Supreme Court, and I get a judgment for 1,000,000

24     dollars, when there was only 100,000 dollars.  I now send my

25     judgment to the trust.  If the trust has sufficient funds to

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    pay, however that works with the trust -- and I don't have an

2    answer to that, Judge -- they'll pay the million dollars.  But

3    let's not worry about that scenario, because that's the easy

4    scenario.  That's where someone's going to be paid in full and

5    there is no made-whole because they've been paid in full, and

6    they are deemed to have released the made-whole and the insurer

7    is deemed to have released them.

8         Now the trust doesn't have the 1,000,000 dollars; they

9    have 750,000 dollars, because everybody's gotten 1,000,000-

10   dollar judgments when it said 100,000 dollars.  And so in fact

11   you are exposed; there's a delta.  In that circumstance you

12   have not released your made-whole claim against your insurer.

13   And if you believe you have made-whole rights, you are entitled

14   to pursue those made-whole rights.  And that's unrelated to

15   whether you've opted in or not opted into the plan releases,

16   because those plan releases don't go to made-whole.

17        THE COURT:  Well, suppose that's what happens.

18   Suppose our hypothetical person has decided to roll the dice

19   and sue everybody and there's enough -- there's not enough

20   money in the trust.  What -- has AB 1054 been ignored, or was

21   it complied with but then subsequently things changed?

22        MR. FELDMAN:  I think it's the latter.  I think the

23   Court's going to have to make a finding, in connection with

24   confirmation, that it's being complied with and --

25        THE COURT:  But it doesn't -- again, I realize we're a

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  little off the subject, but --

2         MR. FELDMAN:  Um-hum.

3         THE COURT:  -- it doesn't mean that our hypothetical

4  judgment creditor can go back to the company and --

5         MR. FELDMAN:  Correct.

6         THE COURT:  -- and say, "You're out there in the real

7  world again and, therefore, I want to collect from you,"

8  because you can't, because of --

9         MR. FELDMAN:  That's correct, Your Honor.

10        THE COURT:  -- the discharge.  Okay.

11        MR. FELDMAN:  And if we want to wait for that, then we

12 should all go home and come back in ten years.  But that's not

13 how bankruptcy works.  But that hypothetical creditor is not

14 giving up its rights.  Now --

15        THE COURT:  Okay.

16        MR. FELDMAN:  -- the insurer has its defenses --

17        THE COURT:  No, I understand.

18        MR. FELDMAN:  -- to made-whole, and they have their

19 rights to made-whole, and that's --

20        THE COURT:  So why --

21        MR. FELDMAN:  -- not going to be heard in this court.

22        THE COURT:  So why does this scenario -- let's -- we

23 have the person who chooses the 100,000, and he or she is gone.

24 We have the person who waits for years and gets his million

25 dollars.  He's gone.  Now we have the person who waits and gets

PG&E Corp., Pacific Gas & Electric Co.

1    his judgment for a million, but there isn't a million to pay

2    him.  Has the law -- the Ninth Circuit been violated if I

3    approve this RSA to set the stage to make that situation

4    happen?

5             MR. FELDMAN:  Absolutely not.  And --

6             THE COURT:  Okay.

7             MR. FELDMAN:  -- before we get to why the law of the

8    Ninth Circuit hasn't been violated, I want to remind Your Honor

9    that when you ruled on estimation and authorized people to go

10   forward with estimation, you yourself made statements from the

11   bench about that's the way bankruptcy works.

12            THE COURT:  Well, I know.

13            MR. FELDMAN:  That is what it is.

14            THE COURT:  That's what I thought.  But I want to --

15   but I'm reading these briefs --

16            MR. FELDMAN:  That --

17            THE COURT:  -- that act like something else might

18   happen.

19            MR. FELDMAN:  So --

20            THE COURT:  So I -- that's the way I understood it to

21   work.

22            MR. FELDMAN:  Yes.  And you understood it correctly.

23            So let's go through some of the cases that were cited

24   yesterday by Mr. Julian in his pleading; I forget if it was

25   yesterday or the day before, but recently.  Whatever day it

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  was.

2      THE COURT:  Time stops.  It's all together.  We got

3  it.

4      MR. FELDMAN:  Yeah.

5      THE COURT:  So, three Ninth Circuit cases.

6      MR. FELDMAN:  So he cites to Underhill that held that

7  Bankruptcy Code Section 524(e) lacks jurisdiction to approve a

8  plan that contains a release between two nondebtor parties.

9  And in that circumstance, that is a release where there is no

10  consent being given.  In my hypothetical where the person

11  thinks 100,000 dollars is a pretty good deal, "Let me take the

12  check," they are consenting to giving up their made-whole

13  rights by taking that check, and we are releasing them --

14      THE COURT:  And there's not a whole lot of --

15      MR. FELDMAN:  -- as well.

16      THE COURT:  -- case law on that, I believe.  There's a

17  case --

18      MR. FELDMAN:  Not a lot of case law, but --

19      THE COURT:  Judge Klein has a decision from

20  Sacramento.

21      MR. FELDMAN:  Not a lot of case law but, if you don't

22  want -- if you don't want to give up your made-whole rights,

23  you have a path, and that is -- that is what is important in

24  the Ninth Circuit.  And Underhill does not address that, Your

25  Honor.

PG&E Corp., Pacific Gas & Electric Co.

1    In Union Carbide -- which -- actually, the provision

2  of the Bankruptcy Code cited by the court in Union Carbide has

3  been changed --

4    THE COURT:  Right.

5    MR. FELDMAN:  -- and so its precedent was sort of

6  thrown out by the Seventh Circuit.  But even if we want to --

7  even if we want to pretend that Union Carbide matters, again,

8  it is a compelled release; it is not a voluntary release.  If

9  you disagree with my statement that by accepting the check you

10  are voluntarily releasing your made-whole, then I think what

11  Mr. Julian's saying has traction.  I just don't think that is

12  in fact how the law works.

13    THE COURT:  So in my response to -- in my so-called

14  musings about your chart here, I said hard choices are still

15  choices.  Is that true?

16    MR. FELDMAN:  That is --

17    THE COURT:  Why isn't this a compelled release?  Why

18  isn't it a compelled release, practically speaking?  The

19  victims have gone through nightmarish -- and now they're told,

20  well, you're going to have to release the insurance company if

21  you want your 100,000 dollars.

22    MR. FELDMAN:  It's not a compelled release, because we

23  have to go back to where you started, Your Honor, which is, if

24  you are allowed to estimate claims, then it can't be deemed to

25  be a compelled release.  It can't be that you can both satisfy

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   AB 1054, treat the company as solvent, pay the bondholders in

2   full, including potentially post-petition interest and make-

3   whole, not made-whole, pay the -- purportedly pay the TCC's

4   clients in full, and then say, "Oh, by the way, the other

5   impaired class, the subrogation" -- "holders of subrogation

6   claims, you can wait for the next five years to see whether or

7   not you've been paid in full, because either people will come

8   after you or they won't come after you, because I think you're

9   compelling them to release made-whole."  That's not how

10  bankruptcy works.  That's not how estimation works.  No, by the

11  way, that's not how it works outside of bankruptcy either.

12          This idea that if you take what you're entitled to

13  under the matrix, you are being paid in full, exists in these

14  cases all the time.  There's nothing unusual about it, except

15  we have a --

16          THE COURT:  Well, it exists in the --

17          MR. FELDMAN:  -- bankruptcy judge --

18          THE COURT:  -- real world, in the marketplace too,

19  right?

20          MR. FELDMAN:  It's the way -- it's the way it works.

21          THE COURT:  If you take your broken machine back to

22  Amazon, you get what you paid; you don't get your lost profits.

23          MR. FELDMAN:  Correct.

24          THE COURT:  Right?  Okay.

25          MR. FELDMAN:  Correct.  And so I think, when you look

escribers
(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    at the case law that's been cited by the TCC for the idea that

2    we've done something improper, I think in all of those

3    circumstances it's just fundamentally different.  Those cases

4    involved -- those cases involved nonconsensual third-party

5    releases.

6           I would point out, Your Honor, also, and I don't

7    think -- I think this -- I think what we're talking about right

8    now is relevant for the RSA approval.  But I would point out,

9    that first release that we talk about, that plan release --

10          THE COURT:  Um-hum.

11          MR. FELDMAN:  -- where you have to opt out, that's

12   really something for the Court to consider in conjunction with

13   confirmation.  You're going to look at that release and decide

14   whether that is, in fact, as Mr. Karotkin said, an ordinary

15   plan release or not --

16          THE COURT:  Well, I --

17          MR. FELDMAN:  -- that you can opt into --

18          THE COURT:  -- I already gave you a clue --

19          MR. FELDMAN:  -- or not opt into.

20          THE COURT:  -- on that:  we got go have a careful

21   disclosure and proper notice and no tricks.

22          MR. FELDMAN:  Agreed.

23          THE COURT:  Okay.

24          MR. FELDMAN:  And the fact that it's an opt-in should

25   give the Court a lot of comfort --

PG&E Corp., Pacific Gas & Electric Co.

1          THE COURT:  Well, it's a good start.

2          MR. FELDMAN:  -- as well.  It is a good start.

3          If Your Honor has more questions on what Mr. Julian

4   filed, I will confess, I don't fully understand the affidavit

5   or the declaration either.  But what I would point out is, what

6   the declaration demonstrates, to me, is that there are both

7   insured individual plaintiff creditors and uninsured individual

8   plaintiff creditors.  The idea that that doesn't total twenty

9   billion dollars is really of no moment.  If you look at the

10  proofs of claim that have been filed in the case -- and we're

11  happy to produce a schedule of those proofs of claim, and I

12  think the Court can take --

13         THE COURT:  And listen --

14         MR. FELDMAN:  -- judicial notice of it.

15         THE COURT:  -- I read what Mr. Kasolas filed

16  yesterday.  I mean, there's so much claim activity going on.

17  Here it's December 4th; we've got twenty-seven more days, and

18  there're going to be a lot more claims, perhaps.

19         MR. FELDMAN:  Lot more claims.

20         THE COURT:  Yeah, so --

21         MR. FELDMAN:  And it's unrefuted that we have paid out

22  actually almost sixteen billion dollars now to victims and have

23  reserves and IBNR totaling in excess of twenty billion.

24         And Your Honor asked what has changed.  I think this

25  is a really critical piece of this.  And you talked a little

PG&E Corp., Pacific Gas & Electric Co.

1   bit about playing chicken.  I think this is another critical

2   piece of this.  Since we signed -- since we agreed to this deal

3   in August -- and I don't remember, as I stand here, whether we

4   signed it in August or September, but the motion was filed in

5   early September -- the deal has just gotten better for the

6   company and worse for the subrogation claims.  And let me

7   explain a couple --

8              THE COURT:  Well, you haven't --

9              MR. FELDMAN:  -- reasons why.

10             THE COURT:  -- bailed out yet, have you?

11             MR. FELDMAN:  We haven't bailed out, but I want to --

12             THE COURT:  Okay.

13             MR. FELDMAN:  -- explain why --

14             THE COURT:  Okay.

15             MR. FELDMAN:  -- we are sort of at the end of the

16  road.  And again, I'm not playing chicken with Your Honor

17  either.  If you tell me you need more time than Friday to issue

18  a decision, you're not going to have a problem with me.  But if

19  you decide to park this to the end of the case --

20             THE COURT:  Yeah, I don't intend to do that.

21             MR. FELDMAN:  -- I think that's going to be an issue.

22             The reason I say that it has gotten better is things

23  like what Mr. Karotkin said that Judge Donato said, where he's

24  going to take a very conservative approach -- the Tubbs

25  trial -- we are on the precipice of the Tubbs trial --

escribers
(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  I know.

2    MR. FELDMAN:  -- which I think is scheduled for

3    January 7 --

4    THE COURT:  It's -- January 7th.

5    MR. FELDMAN:  -- or something like that.

6    THE COURT:  See what happened to the trial judge,

7    though; trial judge gets appointed to the Court of Appeal.

8    MR. FELDMAN:  Right.

9    THE COURT:  You know, maybe they'll do that here.

10    (Laughter.)

11    MR. FELDMAN:  I think it'd be the Ninth Circuit for

12    you, Your Honor, so -- I don't think you want the Court of

13    Appeals.

14    THE COURT:  Take that up with Podus (ph.).

15    MR. FELDMAN:  I'll leave that to somebody else.

16    So, between those issues where there is a feeling

17    among at least my constituents that the opportunity to get a

18    higher number is better, that is a complication to keeping the

19    deal at eleven billion dollars.  The inverse-condemnation rule,

20    which provides for seven-percent pre-judgment interest, which

21    is not a component to our twenty billion dollars, not to

22    mention the liability issue related to inverse condemnation,

23    also means that there is a view among some of my constituents

24    that we get a better deal pulling out of this settlement and

25    going and litigating these claims.  So that's why I say this

PG&E Corp., Pacific Gas & Electric Co.

1    deal has gotten better and better for the company.  And I don't

2    think we will hold it together long-term.

3             And there's one other component, Your Honor; I just

4    want to get this one out.

5             THE COURT:  You tell Mr. Karotkin that his client just

6    did better by the adverse -- inverse-condemnation ruling, and

7    he may not agree with you.

8             MR. FELDMAN:  Yeah.

9             THE COURT:  He may not have been surprised, either.

10            MR. FELDMAN:  There is another component to this, that

11   we have mentioned before, which is that there is an allocation

12   agreement among the subrogation -- 110 subrogation insurers.

13   That allegation (sic) agreement is specific to this deal.  If

14   this deal goes away, we're back at the drawing board.

15            THE COURT:  Okay.

16            MR. FELDMAN:  And that's an important component,

17   because we do have a number of insurers who don't have exposure

18   across twenty-three fires.  We have a number of insurers who

19   only have Tubbs exposure or only have Camp exposure.  Getting

20   them back to a place that works feels very unlikely to me, and

21   certainly unlikely at eleven --

22            THE COURT:  Well, I have to decide --

23            MR. FELDMAN:  -- billion dollars.

24            THE COURT:  -- whether this is a good deal, not

25   whether your clients might get second thoughts later on.

PG&E Corp., Pacific Gas & Electric Co.

1    They're in for today, and --

2            MR. FELDMAN:  Agreed, but I don't --

3            THE COURT:  -- and it's for right now.

4            MR. FELDMAN:  -- but I think the complexity of what

5    we're talking about is a component under the --

6            THE COURT:  Well --

7            MR. FELDMAN:  -- fair-and-equitable --

8            THE COURT:  -- I think I know that, and I think the

9    fact that this didn't get continued again gave me a signal that

10   somebody wants to either make this go or go away.  I want you

11   to be able to reserve -- you and Mr. Karotkin --

12           MR. FELDMAN:  I --

13           THE COURT:  -- to reserve some time --

14           MR. FELDMAN:  I'm done with my presentation.

15           THE COURT:  Okay.

16           MR. FELDMAN:  Unless Your Honor has questions, I'd

17   like to reserve the --

18           THE COURT:  No.

19           MR. FELDMAN:  -- rest of the time in rebuttal.

20           THE COURT:  No.

21           Was there anyone else, Mr. Karotkin, lined up on your

22   side, that wanted to make argument here?  I mean, I'd rather

23   not take more time, but I'm not going to say no.

24           MR. KAROTKIN:  No, I don't believe so.

25           THE COURT:  Okay.  So, Mr. Julian, are you going to

PG&E Corp., Pacific Gas & Electric Co.

1 take off the lead -- take the lead here, or are you going to

2 share it with --

3    MR. JULIAN: Yes, Your Honor.

4    THE COURT: What's the plan?

5    MR. FELDMAN: I'm sorry, Bob, one --

6    MR. JULIAN: Yeah.

7    THE COURT: Yeah.

8    MR. FELDMAN: Your Honor, we did resolve one objection

9 of the municipal entities. I'm supposed to just read something

10 into the record --

11    THE COURT: Okay.

12    MR. FELDMAN: -- really quickly. I apologize. And

13 again, I think this is actually consistent with what's in the

14 RSA, but this was on the chart as number 1 and number 2. And

15 I'm going to read in. "For the" --

16    THE COURT: Oh, on the -- yeah. Okay. Go ahead.

17    MR. FELDMAN: "For the avoidance of doubt, the RSA's

18 definition of 'IP Claims' does not include (1) wildfire claims

19 held by governmental units or (2) public entities' wildfire

20 claims." Thank you.

21    THE COURT: One of the things I've learned, in this

22 case, that's new to me is to use the phrase "for the avoidance

23 of doubt". I'm going to decide to put that in anything I say

24 to anybody. You know, my wife asks me if I want to do the

25 dishes, I'll say, "For avoidance of doubt".

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    Mr. Julian, are you up?

2    MR. JULIAN:  I am, Your Honor.  Good morning.  For the

3    record, Robert Julian of Baker Hostetler, for the tort

4    committee, Your Honor.  And after I present today, Ms. Mitchell

5    for the governor is going to have less than five minutes --

6    THE COURT:  Okay.

7    MR. JULIAN:  -- and then the UCC, less than ten; the

8    ad hoc committee of bondholders, less than ten.  And the

9    Adventist Hospital counsel has about eight minutes.

10    THE COURT:  Okay.  Fine.  Thank you.

11    MR. JULIAN:  Your Honor, what -- I would like to help

12    today and first correct the record and then address four topics

13    for you, solely on the release.  And the four topics are going

14    to be -- I want you to learn real-time what's going on in this

15    case that establishes why resolution of the release dispute is

16    important, and why it's stopping this case from being

17    resolved -- like, in my opinion, could be resolved tonight if

18    you resolve this release the right way -- the whole case,

19    setting aside the make-whole and interest issues.

20    The second item I'm going to discuss is how the

21    resolution trust really should run.  And you've heard everyone

22    say, we don't know.  And I'm going to explain to you how these

23    resolution trusts should run and why it's important that it run

24    a certain way in this case, and how it impacts your decision

25    today.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  Well, yeah, that's what you need to do is

2  tie it into today's --

3    MR. JULIAN:  Yes.

4    THE COURT:  -- proceeding, because --

5    MR. JULIAN:  Absolutely.  The third is I'd like to

6  discuss the law a little bit, although I understand you've read

7  my brief and understand how I feel about it.  And the fourth is

8  I'd like to offer a solution of how the lawyers would have done

9  this if they had done it the right way and done it

10 collaboratively rather than just having the insurance company

11 saying, "Me, me, me.  This is what I want."

12    So first to correct the record, I'd like to draw your

13 attention -- I don't suppose you have it in front of you, but I

14 will read from --

15    THE COURT:  I have most everything in front of me, but

16 what do I need?

17    MR. JULIAN:  This is the -- I didn't understand that

18 this was going to be an argument today.  So the joint plan of

19 the TCC and the ad hoc committee --

20    THE COURT:  Oh.

21    MR. JULIAN:  -- of senior unsecured noteholders

22 filed --

23    THE COURT:  That I do not have in front of me, but

24 I've reviewed it.

25    MR. JULIAN:  -- October 17.  It's docket number --

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          THE COURT:  No, I know what it is.  I mean -- go ahead

2     and say what --

3          MR. JULIAN:  Yeah --

4          THE COURT:  -- say what it is, but --

5          MR. JULIAN:  Yeah.  4257.  And on page 24 of the filed

6     document, Footnotes 5 and 6, the release is explained.  You've

7     heard counsel represent to you that, in the TCC plan, the TCC

8     gives the same release that they're requiring.  And I'd like to

9     read you Footnotes 5 and 6 to the release in our plan.  5 says,

10    quote, "The exculpation and release provisions of this plan

11    currently do not apply to the holders of subrogation wildfire

12    claims or the consenting subrogation creditors, and are to be

13    determined."  Footnote 6 reads, and I quote, "The exculpation

14    and release provisions of this plan currently do not apply to

15    the holders of subrogation wildfire claims or the consenting

16    subrogation creditors, and are to be determined."

17         So, Your Honor, it is not true that the TCC and the

18    bondholders have proposed the same release.  I understand that

19    in a former draft they may have done that, but then I went to

20    Mr. Stamer and told him it was illegal under Ninth Circuit law.

21    And they revised it according to my request.  Way back when,

22    before this even -- issue even came up, they had to agree to

23    revise it, before I saw what the subrogation claimants were

24    trying to do with the debtors in this case.

25         So for my first topic I'd like to talk about

PG&E Corp., Pacific Gas & Electric Co.

1    resolution of the release.  Your Honor, there're about six or

2    seven law firms who represent, eh, about sixty, sixty-five

3    percent of the wildfire claimants of this case, as the claims

4    are currently filed -- that's our estimate -- and who control

5    basically, if they all vote the same way -- that's an "if" --

6    any ability of my firm and the many fine lawyers in here, in

7    this case, to -- in a mediation pending before Judge Newsome,

8    to reach a deal or, in voting in this case, to approve a plan,

9    or, in a settlement agreement, to approve a settlement.

10            And these lawyers have a problem advising their

11   clients to -- in advance, to agree that when they settle and

12   get money from this trust, that they're to give up their claims

13   to made-whole, before they know whether they're made whole in

14   the trust.  And I'm going to explain to you why the

15   representations on how the trust would work don't work that way

16   and how made-whole will not be determined until the end of the

17   trust administration.

18            So that's the problem.  And I -- it's my opinion that

19   if you were to strike down this one-sided release today, this

20   case resolves by the end of the week, totally.  We would have a

21   consensual plan, is my prediction, in this case.

22            The second point I'd like to address is the resolution

23   trust.  Your Honor, we are in a unique type of case here, which

24   needs a unique type of resolution trust.  And so everyone's

25   right; it has not been drafted.  So I get to say my view of the

(971) 703-5365 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  resolution trust based upon my experience in the world and how

2  it's fair here, then show you why it's fair.

3          Look, we've got AB 1054, but AB 1054 cannot with

4  precision permit you to say everyone is going to be paid in

5  full no matter what the estimation is.  There's going to be

6  wide variations in the trust, according to how payments are

7  made.  We don't even know if Judge Donato is going to say he's

8  certain, in his estimation, that people'll be paid in full.  He

9  may qualify it.  He may give a cushion.  He may do a lot of

10 things.  I don't want to predict what he's going to do, but I

11 have a lot of ideas on how I would run the --

12         THE COURT:  Well, but --

13         MR. JULIAN:  -- litigation.

14         THE COURT:  -- but don't you know, just generally,

15 even in the simplest of all simple cases of estimation, it's

16 still a guess as to what the outcome should be, based upon all

17 the factors?

18         MR. JULIAN:  Yes.  And let me give you a different

19 scenario.

20         THE COURT:  And this factor's likelihood of

21 prevailing, controlling law, facts, et cetera, et cetera, et

22 cetera.

23         MR. JULIAN:  Let me give you a different scenario.

24         THE COURT:  Okay.

25         MR. JULIAN:  Suppose hypothetically you appointed

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    Judge Newsome to be mediator.  Well, actually we know that to

2    be true now.  And suppose hypothetically that the L.A. Times --

3              THE COURT:  Don't --

4              MR. JULIAN:  -- is true

5              THE COURT:  Don't tell me anything about what's going

6    on --

7              MR. JULIAN:  Well --

8              THE COURT:  -- with them.

9              MR. JULIAN:  -- suppose we've reached a number.

10   Suppose we've reached a number --

11             THE COURT:  Right.

12             MR. JULIAN:  -- at some point.

13             THE COURT:  Um-hum.

14             MR. JULIAN:  You want us to reach a number at some

15   point.  I want us to reach a number at some point.

16             THE COURT:  Well, your side already did reach a

17   number.

18             MR. JULIAN:  13.5.

19             THE COURT:  That's right.

20             MR. JULIAN:  And it may not be payment in full, but it

21   may be, because there's only 13.5 left in the case --

22             THE COURT:  Oh, I know.

23             MR. JULIAN:  -- after they took 11, that that's all

24   the cash that's left.  By "cash", I mean stock.  Right?

25   Because if there's a 61-billion-dollar value of this added up,

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   the most you can get out of this case for the victims is 13.5.

2   And if we don't want to blow this thing up with an insolvency,

3   maybe good lawyers would recommend in a plan that 13.5 is the

4   number.

5           THE COURT:  Well, I'm assuming good lawyers on your

6   side have already recommended that to the --

7           MR. JULIAN:  That's right.

8           THE COURT:  -- their clients, and that's why you

9   haven't withdrawn your plan.  That is --

10          MR. JULIAN:  So --

11          THE COURT:  -- your plan.

12          MR. JULIAN:  So, because we have a lot of victims --

13  and they're growing week by week now, because people were

14  impaired and couldn't file their plan -- their claims in time.

15  We don't know yet how many people we're going to have, and we

16  don't know the total number of claims --

17          THE COURT:  No, but I think it was 78,000, or so, this

18  week; right?

19          MR. JULIAN:  Well -- I think it's --

20          THE COURT:  I mean, Mr. Kasolas has filed it and --

21  filed his papers and -- whatever.  It's in that range.

22          MR. JULIAN:  It's in that range.

23          THE COURT:  Okay.

24          MR. JULIAN:  There's some duplicates in there, but

25  maybe 73,000 --

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  Okay.

2    MR. JULIAN:  -- without the duplicates.

3    So here's the point:  My envision (sic) of this

4  resolution trust is to have installment payments.  That's what

5  they typically do, often in these cases.  That is to say, Your

6  Honor, you look at the 74,000, 75,000 claims that come in, you

7  get your experts to figure out how many dollars you think they

8  are, and then if you're pushing the 13.5 and it's really 14.5,

9  you pay off everyone either in a matrix, mediation,

10  arbitration, or a state-court trial -- an arbitration trial or

11  a state-court trial; you get the dollars as they go through the

12  resolution trust, and you pay them $0.70 on the dollar, in the

13  beginning.  And you hold off the capping, thirty percent or

14  twenty percent or ten percent.  There're installments to

15  everybody, till the end of the case, because you don't want the

16  last victim to come into the proceeding --

17    (Telephonic noise broadcasting over speaker.)

18    MR. JULIAN:  -- getting his claim resolved in a matrix

19  or a mediation or an arbitration or a trial, to be left with

20  only $0.20 on the dollar, because you don't know.

21    So that's the discussion in this case, among the good

22  fiduciaries, of how this resolution trust would be run.  And

23  you don't know until the end.  And so the lawyers, who have to

24  recommend things to their clients, would normally run a mass

25  tort case this way:  you wait till the end of the case and, at

PG&E Corp., Pacific Gas & Electric Co.

1    that time after you get money -- remember, there's claims

2    coming into the resolution trust, against tree trimmers.  So

3    it's not just --

4              THE COURT:  No, I know that.

5              MR. JULIAN:  -- the stock and the cash.

6              THE COURT:  I know that.  I know that.

7              MR. JULIAN:  So you don't want the victim, early on in

8    the case, signing a release that admits, as they require, that

9    he's been made whole, that he's -- because you don't know till

10   the end of the case whether he's been made whole.  And that's

11   even if he takes the money out of the matrix.  Sure, they could

12   take the money and go home, but --

13             By the way, let me stop at this point and say this

14   about the -- we have not seen the document that says this is a

15   mutual release.  So far --

16             THE COURT:  I --

17             MR. JULIAN:  -- it's a one- --

18             THE COURT:  I thought I read it in the -- in the

19   outline.  Anyway, it may not --

20             MR. JULIAN:  We --

21             THE COURT:  -- it may not be drafted in the detail --

22             MR. JULIAN:  We --

23             THE COURT:  -- that you'd expect.

24             MR. JULIAN:  We've asked for it.  We haven't seen it.

25   But that brings up my point.

PG&E Corp., Pacific Gas & Electric Co.

1          THE COURT:  But it --

2          MR. JULIAN:  Here's how it should run --

3          THE COURT:  But wasn't that in the chart --in the

4     revised chart, that that was dealt --

5          MR. JULIAN:  The words "mutual release" are there.  I

6     don't know the contours of the mutual release.

7          THE COURT:  I don't either.  But I took it as they --

8     what the drafters, Mr. Feldman's side, called "the solution".

9     So --

10          MR. JULIAN:  It's -- by the way, I'm going to come to

11     the solution.  That's my solution, that it's got to be --

12          THE COURT:  Well, you have a different solution.

13          MR. JULIAN:  But it's got to be by consent.  It's got

14     to be truly by consent, because at the end of the case, those

15     lawyers who do these mass tort cases, they want the release for

16     Mr. Feldman's client, because they want clean title to the

17     money they get out of the bankruptcy case.  So -- but at that

18     time --

19          THE COURT:  Well, wait a minute.  Stop there.  What is

20     "clean title to money"?  There's no indication left, my mind,

21     that any money that's paid out could be clawed back.  What

22     makes you think it could be --

23          MR. JULIAN:  The insurance company --

24          THE COURT:  -- clawed back?

25          MR. JULIAN:  -- has a claim that the victim may have

PG&E Corp., Pacific Gas & Electric Co.

1    been overpaid on his claim --

2            THE COURT:  And I read it in here to have it -- that's

3    waived.  Mr. Feldman can confirm it --

4            MR. JULIAN:  I --

5            THE COURT:  -- when he speaks.

6            MR. JULIAN:  We haven't -- again, we haven't seen

7    that --

8            THE COURT:  I -- look, I'll accept that these are

9    complicated documents, and I can't expect you to observe and

10   memorize every word of it.  But Mr. Feldman can -- when he's up

11   here for closing, he can make -- clarify that issue.

12           MR. JULIAN:  I'd appreciate that, Your Honor.

13           THE COURT:  Okay.

14           MR. JULIAN:  Again, the devil's in the details of the

15   scope of that release.

16           THE COURT:  I know.

17           MR. JULIAN:  Now, here's what's going to happen if the

18   victims are forced to give a release during what I would call

19   the first installment payment rather than the fourth

20   installment payment.

21           THE COURT:  Are forced to, or make a hard decision?

22           MR. JULIAN:  Make a hard decision.

23           THE COURT:  I -- those are my words that I made up.

24   Hard decisions are still decisions.

25           MR. JULIAN:  Yeah.  I'm going to -- and I disagree,

PG&E Corp., Pacific Gas & Electric Co.

1  but I'm going to --

2          THE COURT:  Okay.

3          MR. JULIAN:  -- address it as though it's true.  Let's

4  say that the victim makes the hard decision with his lawyer to

5  give the release at that point and forego the third

6  installments; they're not going to do that.  They're not going

7  to want to know whether or not they've been paid in full,

8  versus all the other victims.  And so what they're going to do

9  is they're going to opt to try the cases.  If you try 70,000

10  cases through arbitration -- that's not big jury trials, Your

11  Honor; it'd be an arbitration.

12          THE COURT:  Well, it doesn't matter.

13          MR. JULIAN:  Streamlined.

14          THE COURT:  It'll be a -- it'll be a process.  Your

15  response yesterday says ten to twelve years.

16          MR. JULIAN:  I'm now going to --

17          THE COURT:  Okay?

18          MR. JULIAN:  -- explain that.

19          THE COURT:  I'll accept that that's your judgment.

20  I'm not -- you don't even have -- you can explain it or not.

21  I'm just saying that sounds like a bad option.  But --

22          MR. JULIAN:  I'm going to explain that.

23          THE COURT:  Okay.

24          MR. JULIAN:  What really -- because we've been talking

25  about this, right?  I got all these lawyers, sixty law firms,

PG&E Corp., Pacific Gas & Electric Co.

1    in here talking about how they're going to run this trust and

2    the problems (sic).  I'm being honest with you right now;

3    what's happening.  And here's what's happening:  Faced with

4    this obstance (sic) choice -- there're a lot of discussions --

5    and the possibility that these clients are going to have to do

6    some sort of litigation -- and when you do that, two things

7    happen to the resolution trust:  the costs of the

8    administration, lawyers' fees to defend the trustee, to process

9    these arbitrations -- not state-court trials -- to process the

10   arbitrations, to get the final judgment in, so they don't have

11   to give the release, so that they can find out if they get

12   money from the tree trimmer, or some other money at the end of

13   the case, is going to increase the costs of this trust

14   administration horribly -- I don't have an estimate for you

15   right now, but I can tell you it's hundreds of millions of

16   dollars -- and it will prolong the litigation interminably.

17           They're right; they're right about one thing.  The

18   resolution trusts are drafted in a way to make the matrix so

19   appealing that people come into the queue early on and they get

20   out of the queue and they go home and they have their money.

21   Here's the problem with that, with your logical point about

22   choice:  I'll take the woman that I interviewed, that we filed

23   a declaration on, that got the bar date extended.  I can't even

24   get her into the deposition in Judge Donato's case now, because

25   she's in the hospital.  And we've gone out -- and many victims

(970) 6-2105   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    are getting deposed now.  The stories are unbelievable.  They

2    all have hardship.  They all have hospital problems.

3         Here's the point:  They are impaired, and they do not

4    have voluntary choice when they need money for the hospital or

5    to get into a real home rather than living in -- I can show you

6    pictures of a trailer with holes in the floor, on a parcel --

7    this guy was deposed just the other day -- with burnt trees all

8    around it.

9         THE COURT:  But I'm going to interrupt you for -- not

10   because this isn't important but because I think you're talking

11   to the wrong person.  The kind of argument you're making, and

12   the kind of proof that you can put on, is why you need Judge

13   Donato to give you a bigger number rather than a --

14        MR. JULIAN:  No, Your Honor.

15        THE COURT:  -- smaller number.  Well, that's where --

16   you have to explain to me what --

17        MR. JULIAN:  I'm going to explain to you.  There'll be

18   pressure --

19        THE COURT:  -- what I'm supposed to do about it.

20        MR. JULIAN:  There'll be pressure -- it's up to you.

21   There'll be pressure on that claimant to ignore his or her

22   lawyer's advice and to take the money that does not make them

23   even half-whole, because they need that money so desperately.

24   And that's not choice.

25        We are not dealing with a typical creditor in this --

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  But I don't even know, and Mr. Feldman

2  couldn't tell me, when even that person is going to get any

3  money.  You can't tell me, none of us in this room can tell me,

4  what that trust is going to work and look like.  When does the

5  first check come out the door?  Not for a long time.

6    MR. JULIAN:  Precisely, and that's why you --

7    THE COURT:  Right?

8    MR. JULIAN:  -- can't evaluate whether this forced

9  release is --

10    THE COURT:  Well, I understand, but couldn't I --

11    MR. JULIAN:  -- is fair.

12    THE COURT:  But why couldn't I then deal with it as a

13  confirmation issue --

14    MR. JULIAN:  You could.  You could.

15    THE COURT:  -- and let this agreement be in place?

16  Because --

17    MR. JULIAN:  No.

18    THE COURT:  I don't want to cut into your time,

19  because I want you to take the time; this is important.  But

20  you also want me to violate the bird-in-the-hand rule and let

21  this eleven-billion-dollar bird fly away, and maybe have a

22  twenty-billion-dollar replacement --

23    MR. JULIAN:  I would love a line-item veto like you

24  did with the term of the term sheet, that said -- or the RSA,

25  that said they couldn't talk to anyone.  You struck that one.

PG&E Corp., Pacific Gas & Electric Co.

1      THE COURT:  Yeah.  I know.  Do you think it works?

2  Did it make a difference?  I mean, it was a line-item veto, but

3  they -- it wasn't a veto; it was my reaction and they said,

4  okay, we'll do it.  But --

5      MR. JULIAN:  I think you had --

6      THE COURT:  -- I can't -- but my point is -- and I'm

7  not faulting Mr. Feldman; he's not playing chicken with me.

8  But I -- if I decide that you are so right that this agreement

9  should be disapproved, maybe nothing will change, but maybe

10  there will be a twenty-billion-dollar or twenty-five-billion-

11  dollar set of claims instead of eleven.  And that's a huge

12  consequence to everyone, including perhaps the insolvency

13  determination.

14      MR. JULIAN:  Correct.

15      THE COURT:  And that's not a good thing for anybody --

16      MR. JULIAN:  No.

17      THE COURT:  -- right?  So in other words, you're

18  suggesting to me not-good things for your constituents, but so

19  far the alternatives seem worse rather than better --

20      MR. JULIAN:  No, because the alternative --

21      THE COURT:  -- because -- no, but, Mr. Julian, I have

22  to say, I don't discredit your fervor here or the way you're

23  advocating for the causes that you represent, but I can't make

24  those people get their money sooner.  But it's worse for (sic)

25  that to say, by disapproving it, I might make it all the worse

PG&E Corp., Pacific Gas & Electric Co.

1    for them.  And so --

2              MR. JULIAN:  Well --

3              THE COURT:  You tell me.  Tell me what to do.

4              MR. JULIAN:  Well, first --

5              THE COURT:  You had some four points, so --

6              MR. JULIAN:  I'm going to address --

7              THE COURT:  And you --

8              MR. JULIAN:  -- try to address them one at a time.

9    The first one is, what about the bird in the hand?  Common

10   sense should prevail in this case.

11             THE COURT:  Okay.

12             MR. JULIAN:  They're at eleven billion.  Think the

13   first day I was in front of you in this case, I said, look,

14   it's in the range, the eleven billion.  Even though I agree

15   with Adventist, they haven't proven it up.  Putting in a

16   declaration of Homer Parkhill, the Ref A (ph.), saying that

17   letters were exchanged saying what the claims amount to, and

18   having Mr. Karotkin today say, trust me, there's twenty

19   million -- twenty billion on file, when I can't count them up,

20   twenty billion, is not evidence.

21             Put that aside.  Eleven -- should be nine billion, but

22   eleven billion's in the range.  But the problem is they took

23   the cash -- and you've already addressed that by doing your

24   subordination-claim-by-claim thing.  I'm happy with that.  But

25   we're left with this release.  And I'm telling -- I'm shooting

PG&E Corp., Pacific Gas & Electric Co.

1    straight here, Your Honor:  this case is not resolving.  I

2    can't get lawyers to agree to any plan in this case, or

3    mediation with Judge Newsome, or anything, because they can't

4    recommend something that they can't recommend under the law.

5    And that's the problem.

6            And the Ninth Circuit has given you cover.  I disagree

7    with them that these cases aren't on point.  Well, sure,

8    they're not exactly on point, because you don't have -- but

9    think about what they're saying.  They're saying that the

10   Court's lack of jurisdiction to approve a plan term that deals

11   with the releases is outside the Court's jurisdiction.  Now, if

12   they wanted to have the release consensual, they could have

13   done it.  But they're asking you to put your imprimatur on it.

14   You're forcing this release down our throats.  Those victims

15   have no choice at the -- well, I'm going to be more accurate.

16   Half of those victims probably do have a choice.  But I'm

17   telling you, Your Honor, I've interviewed some of these people,

18   as you know, and some of them don't have a choice.  They're

19   going to be so desperate, they might sign that.  And they won't

20   be made whole and we won't know it until the end of the trust

21   resolution.  And that's the problem we have --

22           THE COURT:  So --

23           MR. JULIAN:  -- with this.

24           THE COURT:  -- tell me how to fix it here.  How does

25   denying this motion do anything but create more chaos, more

PG&E Corp., Pacific Gas & Electric Co.

1 confusion, and, frankly, a step backwards rather than -- some

2 of us believe maybe a step forward?

3    MR. JULIAN:  I didn't anticipate that question, but

4 that's a perfect question.  I have to think about how I can

5 answer that without revealing what's going on in the mediation.

6 So if you'll forgive me; let me have thirty seconds here.

7    THE COURT:  Okay, I will forgive you, but also

8 remember you're sharing the podium here with your colleagues,

9 so --

10    MR. JULIAN:  Yeah.  I'm wrapping up.

11    I offer -- well --

12    THE COURT:  I mean, I got to tell you -- and counsel

13 for the governor might convince me otherwise -- I was

14 interested to see the public statement, the governor

15 disapproving what was progress.  And I thought, the last time I

16 checked, when you settle a major piece of litigation, that's

17 progress.  Now, the question is --

18    MR. JULIAN:  And they're in the mediation.  They know

19 what's going on.

20    THE COURT:  But I don't -- I'm not in the mediation.

21 Okay?

22    MR. JULIAN:  But they are.

23    THE COURT:  I had one role in the mediation:  is to

24 appoint the mediator, period.

25    MR. JULIAN:  Read between the lines.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1        THE COURT:  I don't want to know what's happening or

2   not happening.

3        MR. JULIAN:  Let me tell you what the solution is.

4   The solution is a true consensual release where someone -- no

5   one wordsmiths the Ninth Circuit's decision about consent not

6   vitiating the problem with jurisdiction to --

7        THE COURT:  What would it say?

8        MR. JULIAN:  -- approve a release.

9        THE COURT:  How would it read?

10        MR. JULIAN:  That would be a mutual release -- because

11   I got to tell you, these plaintiffs' lawyers, they want the

12   release.

13        THE COURT:  Tell me --

14        MR. JULIAN:  And it would be at the end of the trust

15   administration.

16        THE COURT:  Tell me, as a bankruptcy lawyer, what is

17   the fix that you think will work?  I don't want you to --

18        MR. JULIAN:  The plan should --

19        THE COURT:  -- tell me what the plaintiffs' lawyers

20   are saying.

21        MR. JULIAN:  The plan should contain a term that

22   states that, at the end of trust administration, when the

23   victim receives his or her final payment, the victim and the

24   insurers will exchange mutual releases if they think it's in

25   their best interest to do so.  And what I'm telling you is, it

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    is in their best interest to do so, and that will happen in

2    this case, I am convinced of it.  What was missing from this

3    case is a collaboration where lawyers get together and

4    negotiate that mutual release.  Instead, the first draft, as

5    you know, that came before you was one-sided.  I still haven't

6    seen the mutual-release form.  But it should be consensual.

7            And the Ninth Circuit cases -- in the Ninth Circuit

8    cases that talk about Union Carbide, which is a Seventh Circuit

9    case, even though it was an act (ph.) case -- let me just go

10   through the case law just --

11           THE COURT:  Well, I mean, look, Underhill v. Royal has

12   been the seminal Ninth Circuit case.  Lowenschuss and American

13   Hardwoods -- it's a trilogy.  I know what they are.  I know

14   what they say.  I also know what Judge Klein's dicta in his

15   Mount Shasta, or whatever Mount -- whatever case it was -- I

16   mean, he said you can do it.  I mean --

17           MR. JULIAN:  And there's one in Las Vegas --

18           THE COURT:  Yeah.

19           MR. JULIAN:  -- about it, too.

20           THE COURT:  I mean, it can be done.  You know it can

21   be done.

22           MR. JULIAN:  Well, it's not --

23           THE COURT:  I mean, look --

24           MR. JULIAN:  It's not legal.

25           THE COURT:  -- you're just advocating a way it could

PG&E Corp., Pacific Gas & Electric Co.

1    be done.  So would we be violating the Ninth --

2              MR. JULIAN:  Because it's consensual.

3              THE COURT:  Well, that's right, it's consensual.  So

4    we're --

5              MR. JULIAN:  By both sides.

6              THE COURT:  -- we're back to the question of whether

7    the RSA includes something that is really not consensual.  And

8    you're making an argument that it's really not, and the other

9    side has said, yes, it is.  And that's what I have to think

10   about.

11             MR. JULIAN:  And it's -- Your Honor, the reason for

12   filing the declaration, that apparently no one could follow --

13             THE COURT:  I didn't say -- I mean, look, it was new

14   stuff.  I just didn't understand it.  It --

15             MR. JULIAN:  This is what it -- the only purpose was

16   this --

17             THE COURT:  The gentleman is very knowledgeable in an

18   area that I'm not familiar with.

19             MR. JULIAN:  The only purpose was this; I asked him to

20   address one question:  can you figure out how many claims --

21   subrogation claims are on file and how many victim claims are

22   on file, and relate them --

23             THE COURT:  And he said --

24             MR. JULIAN:  -- so that I --

25             THE COURT:  And he said, I've got about ten billion

PG&E Corp., Pacific Gas & Electric Co.

1   now, but I'm still doing it --

2           MR. JULIAN:  Yeah.

3           THE COURT:  -- I'm still working.

4           MR. JULIAN:  But his first answer was, I can't tell

5   from the claims on file, so I have to use the debtors'

6   summaries from their experts.

7           THE COURT:  Okay.

8           MR. JULIAN:  We don't know if they're accurate but, if

9   they are accurate, it's about 10.5 billion today, and counting.

10  So --

11          THE COURT:  And counting.  Right.

12          MR. JULIAN:  -- my only point is, this issue that

13  deals with the release involves billions of dollars.

14          THE COURT:  I know.

15          MR. JULIAN:  And just as you said with the inverse

16  case involving billions of dollars, which certified to the

17  Ninth Circuit, we think this one is so important, it should be

18  certified too.

19          THE COURT:  Well, listen, you're -- I don't want to

20  criticize you, but you're throwing this "certified" thing a

21  little bit too cavalierly.  I have two options.  As a trial

22  judge, I can recommend an interlocutory order or a final order

23  for direct appeal.  And all I do is recommendation.  Somebody

24  has to then file an appeal; somebody has to ask the Ninth

25  Circuit to take it.  The Ninth Circuit has to agree to take it.

PG&E Corp., Pacific Gas & Electric Co.

1      Secondly, separately, I have authority, when I issue

2   an order that isn't final, to put a 54(c) -- 54(b)

3   certification on it that just turns it into final.

4      MR. JULIAN:  Oh, don't get me wrong.

5      THE COURT:  Here -- that's all I do.  In other words,

6   if I certify something as final and no one files an appeal,

7   that's -- we're done; it's finished.

8      MR. JULIAN:  Well, an order --

9      THE COURT:  It's final and finished.

10      MR. JULIAN:  An order approving a settlement is a

11   final order.  I'm not concerned about that.  I just would like

12   to pass -- bypass Judge Donato and get to the Ninth Circuit,

13   just because there's a lot --

14      THE COURT:  Well, it's --

15      MR. JULIAN:  -- short time.

16      THE COURT:  -- it might not even be Judge Donato.  But

17   let's leave that for another day.  I've made a certification in

18   the FERC case, and the Ninth Circuit took it.  I've made a

19   certification in this case and, if someone files an appeal and

20   someone asks the Ninth Circuit to consider it, they will.  They

21   don't just get it from me.  I don't call up the Ninth Circuit

22   and say, "Would you please take this?"

23      MR. JULIAN:  I understand.

24      THE COURT:  Somebody has to do it.  So you're asking

25   me, if I disapprove -- or, excuse me, if I approve the --

PG&E Corp., Pacific Gas & Electric Co.

1          MR. JULIAN:  Yes, Your Honor.

2          THE COURT:  -- RSA, to certify for direct appeal.

3  Okay, I'll think about it, but I haven't -- today you want me

4  to -- not to approve it.  So --

5          MR. JULIAN:  Correct.

6          THE COURT:  You don't want me to certify, then, do

7  you?

8          MR. JULIAN:  I would -- no.  I would like you to --

9          THE COURT:  Okay.

10          MR. JULIAN:  I would like you to -- well, because I

11  think the law's so clear.

12          THE COURT:  Okay.

13          MR. JULIAN:  People --

14          THE COURT:  Let's go to your colleagues.  Thank you --

15          MR. JULIAN:  Yeah.

16          THE COURT:  -- Mr. Julian.  I appreciate your -- well,

17  you had one solution.  What's my --

18          MR. JULIAN:  Well, the solution is --

19          THE COURT:  The solution is tell Mr. Feldman go back

20  to the drawing board, get together with the plaintiffs'

21  lawyers, and come up with a mutual release that will --

22          MR. JULIAN:  A mutual release that's done at the end

23  of trust administration, they want to do it, but it's

24  consensual --

25          THE COURT:  And what does it mean -- one more thing.

PG&E Corp., Pacific Gas & Electric Co.

1    You're the guy that has to meet with these very capable

2    plaintiffs' lawyers, who probably don't like being in the

3    bankruptcy court, but you and I like being here in the

4    bankruptcy court.  So how do you predict when is the

5    administration over with?  Is it -- does it violate the rule

6    against perpetuities?  I mean, when is it going to be over?

7    When will this event of finality occur?

8            MR. JULIAN:  I don't have enough data yet on that.

9            THE COURT:  But it's years and years, right?

10           MR. JULIAN:  It's years, but the idea is you'd --

11           THE COURT:  It's years.

12           MR. JULIAN:  The most needy --

13           THE COURT:  It's years.

14           MR. JULIAN:  The most needy get their -- the way I

15   would do it, the most needy get their economics first, to

16   rebuild and cut -- and fix the trees.  And they've got other

17   claims for other things; won't go into them.  And those lag --

18           THE COURT:  But what I'm --

19           MR. JULIAN:  -- but they have choices.

20           THE COURT:  But what I'm getting is I can't -- I can

21   disapprove it if it doesn't have a mutual release, but you're

22   suggesting a mutual release that I can't even envision when it

23   would become operative.  That's --

24           MR. JULIAN:  Correct.  So you leave it up to the

25   parties to do.  All I can say is these are capable lawyers;

PG&E Corp., Pacific Gas & Electric Co.

1   they're going to want a mutual release at the end of trust

2   administration, or in the beginning if someone truly does sign

3   the settlement agreement or accepts the award, without an

4   appeal.

5          THE COURT:  Well, but you're also suggesting that a

6   number of the lawyers you're working with can't make this

7   recommendation.  But on the other hand, as much as you don't --

8   you're sympathetic to the plight of the victims here, it is a

9   good solution if they get a satisfactory payment.  And --

10         MR. JULIAN:  Yes.

11         THE COURT:  -- again, we're back to the wisdom, or the

12  lack of wisdom, in Judge Donato and the implication or the

13  interpretation of AB 1054.  And you're the one that made the

14  point to me when you were telling me earlier about the Portland

15  cases and the Dow Corning case, which -- and you have the

16  experience with the Robins case -- is that if the estimation is

17  really high, that's how you protect the victims.

18  Unfortunately, it might doom the reorganization effort.

19         MR. JULIAN:  Correct.

20         THE COURT:  And that's the gamble here, isn't it?

21  So --

22         MR. JULIAN:  And --

23         THE COURT:  -- is your 13.5 the right number?  So what

24  if Donato puts a higher number?  What --

25         MR. JULIAN:  I --

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          THE COURT:  -- happens to your plan?

2          MR. JULIAN:  I get that question all the time.

3          THE COURT:  But what's the answer?  What happens?

4   What happens if Judge Donato says, "You know, I listened to

5   what the jury said in Tubbs, I look at the experts that Mr.

6   Julian brought in here, and I pick an estimation number of"

7   blank, and "blank" is well higher than your plan number.  Then

8   what happens?

9          MR. JULIAN:  We deal with it.

10         THE COURT:  Yeah, we deal with it.  Okay.  Let's hear

11  from your colleagues.

12         MR. JULIAN:  But --

13         THE COURT:  Thank you, Mr. Julian.

14         MR. JULIAN:  But --

15         THE COURT:  I -- listen, I couldn't --

16         MR. JULIAN:  You have a --

17         THE COURT:  -- I couldn't agree more.  I'd like this

18  case to settle, as -- almost as much as you, but I can't --

19         MR. JULIAN:  This release is --

20         THE COURT:  -- make the rule --

21         MR. JULIAN:  -- holding us up.

22         THE COURT:  I understand your point about that.  And

23  the lawyers on both sides know what to do.  If they can fix

24  it -- I can't order them to do it.

25         MR. JULIAN:  And I would just make one last point; it

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    was the first point I ever made to you in the hearing weeks

2    ago.  You have great legitimate questions; most of them can't

3    be answered today; they need to be answered in the plan

4    construct, when you know -- when I know what the estimation is,

5    when I know how much cash is over here, when I know what's

6    happening with PE.  There's just too many unknowns to be able

7    to do --

8              THE COURT:  I --

9              MR. JULIAN:  -- what they want to do today.

10             THE COURT:  I share with you that --

11             MR. JULIAN:  Thank you, Your Honor.

12             THE COURT:  -- concern.  Thank you, Mr. Julian.

13             All right, so, Ms. Mitchell, are you up first?

14             MS. MITCHELL:  I think I'm up next --

15             THE COURT:  Good morning.

16             MS. MITCHELL:  -- Your Honor.

17             THE COURT:  All right.

18             MS. MITCHELL:  Nancy Mitchell of O'Melveny & Myers, on

19   behalf of Governor Gavin Newsom.

20             THE COURT:  I didn't mean to criticize your client,

21   but he did seem to be dissing what looked like is progress.

22   But --

23             MS. MITCHELL:  Your Honor, everybody quotes my client

24   regularly, and they have a lot of opinions about him.  I think

25   he's fine and very much appreciates the efforts --

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          THE COURT:  Does he remind him that he --

2          MS. MITCHELL:  -- that you're making.

3          THE COURT:  -- doesn't have an E on the end of his

4   name like the other --

5          MS. MITCHELL:  We also have that issue now.  We have a

6   lot of Newsoms floating around the case.

7          Your Honor, I will be brief.  And I'm not going to

8   address the technicalities of the release point; I will leave

9   that for people much smarter than I am.  But I do think, from

10  Your Honor's perspective, it may be helpful for you to

11  understand why the governor expressed his concern about the

12  fact that the subrogation settlement is, in his view,

13  premature, in light of the fact that it locks the subrogation

14  claimants into an equity-sponsored plan, at the expense of any

15  other alternative, and at a time when we have significant

16  questions about whether that plan is confirmable.

17         And, Your Honor, I want --

18         THE COURT:  But no one says it is confirmable.

19         MS. MITCHELL:  No, I understand, Your Honor --

20         THE COURT:  Okay.

21         MS. MITCHELL:  -- but I want to be clear that this

22  case is a little different in the sense -- you probably know

23  that by now -- in that in a normal case, right, you would build

24  momentum around a settlement, like the subrogation settlement.

25         THE COURT:  Um-hum.

(973)406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    MS. MITCHELL:  And I get that.  You sign an RSA, you

2  have a party on board, everybody else begins to negotiate.

3  That may happen here.  And I think Judge Newsome is working

4  hard at that.  But none of that matters in this context if the

5  plan is not able to comply with the requirements of AB 1054 --

6    THE COURT:  Right.  I understand.

7    MS. MITCHELL:  -- because there is simply no feasible

8  plan.

9    So from my perspective, what has happened to us -- and

10  this is --

11    THE COURT:  What -- excuse me.  What you -- what?  You

12  say that if I approve the RSA, I say there can be no feasible

13  plan?

14    MS. MITCHELL:  No.  If the plan can confirm -- can

15  comply with AB 1054, it will not be feasible.  If they can't

16  get into the wildfire fund, there is no feasible plan here.

17    THE COURT:  Well, I --

18    MS. MITCHELL:  The settlement itself --

19    THE COURT:  -- I agree, if they can't get into the

20  wildfire --

21    MS. MITCHELL:  Correct.

22    THE COURT:  -- fund, then it's a whole new ball game.

23    MS. MITCHELL:  The settlement itself does not violate

24  AB 1054.  What the settlement does is lock in twelve -- eleven

25  billion dollars -- sorry, I was giving Mr. Feldman an extra

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    billion  -- eleven billion dollars of cash to the subrogation

2    claimants, in one plan, which is the equity-sponsored plan.

3         THE COURT:  Right.

4         MS. MITCHELL:  There is no competitive process here,

5    despite Your Honor's best efforts to exclusivity.  The debtors

6    have moved through the plan process with one goal, and that is

7    to get an equity-sponsored plan done.  And it has become clear

8    in that process that the parties need additional guidance to

9    understand what the requirements of AB 1054 mean to them in

10   practical terms.  The CPUC can't do that.  The CPUC has a

11   public process that they have go through before they can make

12   final determinations.

13        So two weeks ago the governor stepped in and shared

14   with the plan proponents his view of what was necessary to

15   comply with AB 1054.  And our goal was to help the plan

16   proponents shape plans of reorganization that are not

17   predestined to fail, and we are continuing to work with the

18   plan proponents to do that.

19        I think, Your Honor, though, that it was clear in

20   those conversations that some of the parties may have

21   misunderstood that in developing their plans, compliance with

22   AB 1054 was not going to be a rubber stamp.  AB 1054 is going

23   to require that any plan sponsor make significant investments

24   in infrastructure and that the emerging company be a completely

25   transformed utility that is safe and can meet the needs of

PG&E Corp., Pacific Gas & Electric Co.

1   California for the future.

2          And to do that, Your Honor, it is going to have to

3   have a flexible and sustainable capital structure.  And I will

4   tell you that those requirements are a heavy lift for the

5   debtors and for any plan proponent.

6          So the debtors are moving forward with an equity plan.

7   They want to lock up the subro votes.  I get that.  Then we

8   have an equity-sponsored plan with one party sort of sitting

9   there.  And the debtors are doing that at a time that we have

10  told them explicitly that we have serious concerns about

11  whether that plan does or can be modified to meet the terms of

12  AB 1054.

13         THE COURT:  But let me stop you there.

14         MS. MITCHELL:  Um-hum.

15         THE COURT:  Don't you therefore believe that even if I

16  approve this, if the course is fatally flawed, you or somebody

17  will persuade me of that, and there is another plan that is in

18  the pipeline.  And if there's one plan that's confirmable and

19  one that isn't, then there's an easy solution.

20         Now, maybe you have your own views about the

21  alternative plan, but my -- I guess what I'm saying is that if

22  Mr. Karotkin and his client and Mr. Feldman and his clients get

23  the clear message from the governor's office and anyone else --

24  CPUC -- pick some other authority -- who says your plan is not

25  confirmable, and they get the clue --

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          MS. MITCHELL:  Oh, I actually think it --

2          THE COURT:  -- don't you think -- don't you think

3     they'll fix it?

4          MS. MITCHELL:  Oh, I don't think so.  I actually --

5          THE COURT:  Well, then the plan will fail.

6          MS. MITCHELL:  But let me say what I actually think --

7          THE COURT:  Okay.

8          MS. MITCHELL:  -- what they're trying to do.

9          THE COURT:  Okay.

10         MS. MITCHELL:  I mean, I don't -- to some extent, I

11    don't think we should be having this hearing, because I think

12    we should actually be able to resolve some of these issues, and

13    I think that there is a limited amount of time that it would

14    take to address some of these issues.  But I actually think

15    that's exactly what they want to have happen.

16         Look, Your Honor, we heard at the beginning of these

17    cases, AB 1054, they'll extend the date to June.  I don't --

18    they'll extend the June date; I don't really care.

19         THE COURT:  But we don't know.  I --

20         MS. MITCHELL:  We talked about --

21         THE COURT:  -- can't -- maybe you know.  I don't know.

22         MS. MITCHELL:  Well, no.  Well, I probably do know,

23    because I had to go through it once, and I don't think we're

24    going through it again.

25         There have been, at various points, suggestions that

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    they were coming to us for money.  The reality is that they

2    want to lock up the votes, and then they want to say, okay,

3    State, you have no choice.  Because that's how the equity, in a

4    case that is not clearly, Your Honor, in my view, a solvent

5    case, is going to have the maximum leverage.

6          And this settlement is about leverage.  It is not

7    about a debtor who is acting as a fiduciary, who understands

8    that their case and their plan is not confirmable at present,

9    under AB 1054, and is trying to do the right thing.

10         THE COURT:  So how do I make a determination that --

11   on this record -- your plan is not confirmable, therefore your

12   motion for implementation of a piece of your plan is denied?

13   How do I do that?

14         MS. MITCHELL:  Well, Your Honor, I think that in my

15   view, the debtor couldn't, if they were exercising their

16   appropriate fiduciary duty, ever have come to you and said that

17   this settlement makes sense in light of the fact that --

18         THE COURT:  Well, someone who doesn't like --

19         MS. MITCHELL:  -- they don't know they have a

20   confirmable plan.

21         THE COURT:  -- their fiduciary duty knows how -- knows

22   the tools in the toolbox to deal with that.

23         MS. MITCHELL:  I do, Your Honor.  And if --

24         THE COURT:  No, but listen.  I want to stop you.

25         You weren't on the -- you weren't around for the first

PG&E Corp., Pacific Gas & Electric Co.

1    case, but you know about the first case.

2        MS. MITCHELL:  That is correct; I wasn't.

3        THE COURT:  And in the first case, Mr. Karotkin's

4    predecessor had this great idea of their plan, and I

5    disapproved the disclosure statement because I thought the plan

6    was unconfirmable as a matter of law.  And after the district

7    court needed to be straightened out, the Ninth Circuit agreed

8    with me, and we ended up with a consensual plan.

9        Now, I don't have -- if you have the basis, the legal

10   basis, to say the RSA should be disapproved because it's based

11   upon an unconfirmable plan, I don't hear the argument.  Mr.

12   Julian's made the argument about the releases, and he's

13   somewhat persuasive.  I'm not sure I'm going to agree with him

14   or not.  I have to think about it.

15       MS. MITCHELL:  Yeah.

16       THE COURT:  Where do you -- where is the -- where's

17   your silver bullet that tells Mr. Karotkin:  your plan is DOA

18   therefore the RSA fails?

19       MS. MITCHELL:  Well, we've told Mr. Karotkin that his

20   plan, at present, is DOA.  Not --

21       THE COURT:  I mean, on -- I mean, on the record --

22       MS. MITCHELL:  I can't --

23       THE COURT:  -- that I can act on.

24       MS. MITCHELL:  -- I can't give you that.

25       THE COURT:  I can only act on -- I've got an up or

PG&E Corp., Pacific Gas & Electric Co.

1   down on this motion, or the in-between up or down is defer it,

2   which you heard me talk to Mr. Feldman --

3           MS. MITCHELL:  I appreciate that, Your Honor.

4           THE COURT:  -- I'm not going to do that.

5           MS. MITCHELL:  Well, I understand --

6           THE COURT:  My job is to make decisions, right or

7   wrong.  It's not to become "Judge Hamlet" and not make

8   decisions.

9           MS. MITCHELL:  I appreciate that, Your Honor.  And I

10  don't really think you should have been put in this position in

11  the first place.  That's the parties' choice.

12          The governor's concern is that that eleven billion

13  dollars of cash in this settlement is then not available in

14  order to meet the other requirements of 1054, and that what we

15  are doing, in an effort to preserve equity value in a company

16  that may not have it, is driving us into a situation where,

17  yes, Your Honor, if you had the next two or three years, you

18  could do a consensual plan.  But we have until June 30th.

19          THE COURT:  Well --

20          MS. MITCHELL:  That is our concern.

21          THE COURT:  -- well, I'm supposed to -- I'm supposed

22  to assume that Mr. Feldman and his 110 insurance companies

23  can't read the tea leaves about what is the downside of an

24  unconfirmed plan or a plan that the judge just said I think if

25  you -- insolvency ought to trigger something else, which they

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    responded.

2             MS. MITCHELL:  That's correct.

3             THE COURT:  So it would seem to me that unless

4    everybody on that side of the room is playing games here --

5    mind games -- and they can't possibly comply with 1054 and

6    don't intend to, then I have to give them the benefit of the

7    doubt --

8             MS. MITCHELL:  I --

9             THE COURT:  -- that they're moving towards that goal.

10            MS. MITCHELL:  So I appreciate that, Your Honor.  And

11   I actually think Mr. Feldman is doing a good job of locking in

12   eleven billion dollars for his client.  I don't have an issue

13   with --

14            THE COURT:  But Ms. Mitchell --

15            MS. MITCHELL:  -- with that.  That's his job.

16            THE COURT:  -- what's going to happen if we come to

17   the point where that's the killer on confirmation?  Don't you

18   think that's the kind of thing that financial institutions like

19   insurance companies know how to fix?

20            MS. MITCHELL:  Well, it may be.

21            THE COURT:  Like turn it into noncash?

22            MS. MITCHELL:  It --

23            THE COURT:  And a healthy company might be quite

24   marketable and worth quite more than real cash, if it's

25   tradable, marketable securities.

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1      MS. MITCHELL:  So I agree with you, Your Honor.  But

2  I'm concerned -- we are concerned about two things.  And one is

3  that this plan and the momentum that gets behind this plan is

4  actually keeping us from being able to fairly evaluate and get

5  the information necessary to evaluate the alternative plan,

6  because the debtor is pushing only one plan.  And they are not

7  providing the information necessary for the other plan.

8      But the other issue, Your Honor, is this.  This debtor

9  has limited assets.  And so I appreciate your view that yeah,

10  we'll get to confirmation and everybody will fix it.  It's just

11  not clear they have enough money to fix it.  And that's a case

12  that gets lost.

13      THE COURT:  Okay.

14      MS. MITCHELL:  And look, I appreciate the point that

15  you're making and I appreciate where Your Honor is.  The

16  governor did not feel that he could let this hearing go by

17  without providing you his perspective.

18      THE COURT:  And I'm not trying to pin you down or

19  criticize you or the governor at all.

20      MS. MITCHELL:  Right.

21      THE COURT:  It's not my place to do that.  I can joke

22  about -- I thought it was progress.  You've made an argument --

23      MS. MITCHELL:  We would disagree.

24      THE COURT:  -- about how it's not.

25      I don't know that I have an option but to say yes or

PG&E Corp., Pacific Gas & Electric Co.

1    no on this motion.  I don't have -- it's unlike the last case

2    where I can say the plan is unconfirmable as a matter of law,

3    therefore the -- you're dead.  I can't say that about the

4    debtors' plan, at the moment.

5            MS. MITCHELL:  So I appreciate that, Your Honor.

6            THE COURT:  Okay.

7            MS. MITCHELL:  And in the event that you have to make

8    that decision today, we would ask you to say no.

9            THE COURT:  Okay, thanks, Ms. Mitchell.  I appreciate

10   your time.

11           All right, creditors' committee?  Mr. Bray?

12           MR. BRAY:  Good morning, Your Honor.  Gregory Bray,

13   Milbank, LLP, counsel for the creditors' committee.

14           Your Honor, when I appeared before you last on this

15   matter, we expressed our concerns that there were a number of

16   provisions in the RSA that were really designed to wreak havoc

17   on, if not destroy, the competitive plan process that the

18   Court, in fact, ordered.  Our concerns remain.

19           But I do want to emphasize to the Court, especially

20   having just heard the comments of the governor, that the

21   committee believes it's probably more important than ever that

22   we maintain a level, fair, competitive plan process, because it

23   is possible, like it or not, the debtors' plan might fail.  And

24   it is possible that the TCC ad hoc plan might fail.  So we

25   can't have ourselves locked in, at this point, to one

PG&E Corp., Pacific Gas & Electric Co.

1    particular path over another or have an RSA adopted that

2    essentially tilts the playing field in a way that surcharges or

3    doesn't make a settlement like this benefit the entire estate.

4           And I'll get to that in a minute, but I just wanted to

5    clarify a comment in your tentative, and you've made it several

6    times.  And if I understood you right, if you were to approve

7    the RSA -- and we're asking you not to -- but if you do, it's

8    subject to 1129 in the sense that you're not resolving

9    confirmation issues created through the RSA, if I understand it

10   correctly.

11          THE COURT:  Right.  I mean, it's like a simple case

12   where a debtor-in-possession says I can settle this piece of

13   litigation because I think it will facilitate my ability to

14   confirm my plan.  If it turns out it will destroy any plan

15   chances, you have to disapprove it.

16          So as I just said to Ms. Mitchell, nobody has told

17   me -- Mr. Julian is making a pitch on the third-party releases,

18   but no one has told me that this plan is fatally -- is fatally

19   tainted by virtue of the RSA, if approved.

20          MR. BRAY:  And I understand your point --

21          THE COURT:  And you're not saying that either, I

22   guess.

23          MR. BRAY:  No, I'm not.  But I'm flipping it around

24   the other way.

25          THE COURT:  Okay.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    MR. BRAY:  I guess because I'm a pessimist.  Until I

2    am told by both parties they've waived all material conditions

3    to confirmation, I have to assume the possibility of failure

4    and try and keep a process open that maximizes the recovery for

5    creditors in that event.

6        THE COURT:  But from my point of view, a big vote for

7    non-failure is eliminating -- eliminating -- eleven billion --

8        MR. BRAY:  Well --

9        THE COURT:  -- twelve, or whatever the number is --

10       MR. BRAY:  Then let's jump to that.

11       THE COURT:  -- of claims that are going to fly out --

12   go away.

13       MR. BRAY:  Let's test that.

14       THE COURT:  Well, okay.

15       MR. BRAY:  Because the way we read the RSA, maybe

16   you're half eliminating them, but probably not even that.  Mr.

17   Karotkin has told you, in no uncertain terms, this is a good

18   deal.  I think that's probably an understatement.  And you were

19   also told it eliminates the need for estimation.

20       If it's that good a deal, it should be available to

21   benefit the estate as a whole and not just a particular plan

22   proponent.  Said another way, the RSA has embedded in it

23   negative covenants that essentially prohibit the competitive

24   plan, the TCC ad hoc plan, from using the settlement to pay the

25   subro claimants.  That doesn't make any sense.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    If it's a good deal and it benefits the estate and

2    we're trying to do what you just said, which is whittle down

3    alleged twenty billion dollars down to eleven, how can it be

4    that that settlement is only available to one plan and not the

5    other?  And if --

6    THE COURT:  I'm not following you.  Doesn't the other

7    plan have the same treatment?

8    MR. BRAY:  It does.  But the RSA you're being asked to

9    sign, in section 2, specifically prohibits the subrogation

10   claimants from accepting that treatment in the plan or from

11   implementing or taking the settlement in the plan.  They

12   actually have to oppose the terms they're settling on.  They're

13   contractually obligated to stand before you and object to that

14   treatment.

15   And that's what troubles us.  I can show you the

16   sections, if you'd like, Your Honor.

17   THE COURT:  Just tell me the section number.

18   MR. BRAY:  It's section 2(a).  These actually are

19   affirmative covenants, I misspoke, not negative covenants.

20   2(a), clause ii, clause iii, and then 2(b).

21   THE COURT:  Okay, wait one second.

22   MR. BRAY:  Sure.

23   THE COURT:  2 -- yeah, well, I mean, I think --

24   MR. BRAY:  I'm just going to focus you on --

25   THE COURT:  -- I think --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1           MR. BRAY: -- let's make it simple. Let's just look

2 at section 2(b), negative covenants.

3           THE COURT: Okay. Got it. Negative covenants. "The

4 consenting creditors shall not". What can't they do?

5           MR. BRAY: They cannot vote to accept the TCC ad hoc

6 plan without violating the RSA.

7           THE COURT: Oh.

8           MR. BRAY: Even it offers the same treatment.

9           THE COURT: You're talking in 2 little (i)?

10           MR. BRAY: Yes.

11           THE COURT: Oh, no, (ii). Yes, to vote directly or

12 indirectly, file, propose, support, solicit, assist, or

13 participate. Okay.

14           MR. BRAY: So that's been our concern all along, Your

15 Honor. We don't object, per se, to a settlement at eleven

16 million dollars. The number is in the range. We get that.

17 But if you're going to approve it, and the goal is to have

18 peace in the valley, then let's have it be applicable equally

19 to both plans. Otherwise, if it's only going to be applicable

20 to one plan, we're not resolving estimation, because logic

21 would suggest that we still need to estimate the subro claims

22 to keep the other plan on an equal footing.

23           Said another way, if the eleven-billion-dollar

24 settlement is only for their plan and not for their plan, then

25 we need to estimate the subro claims for their plan, so that

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    they have a number to plug into their disclosure statement and

2    plan, when they go out to solicit.  And that seems to be,

3    frankly, ridiculous.

4         If it's eleven billion dollars, it's eleven billion

5    dollars.  And let's -- and especially if it's cash.  If it's

6    eleven billion dollars in cash, where does it matter where the

7    cash comes from?  It's eleven billion dollars.

8         THE COURT:  So you're --

9         MR. BRAY:  I'll find the other sections, Your Honor.

10        THE COURT:  Well, but I'm looking at little (ii), and

11   the third line is "or vote".  So leave aside solicitation,

12   participation, all that other stuff.  You're saying the words

13   "or vote" --

14        MR. BRAY:  I'm saying --

15        THE COURT:  -- "or vote", the subros --

16        MR. BRAY:  -- they can tell me I'm wrong.  I will

17   stand back.

18        This plan -- this RSA prohibits the subrogation

19   claimants from voting to accept the same eleven billion dollars

20   in cash that the debtor is offering them in the TCC ad hoc

21   plan.  I may have cited to you --

22        THE COURT:  No, I mean --

23        MR. BRAY:  -- the wrong provision.

24        THE COURT:  -- I mean, I'm looking at the very same

25   words.

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    MR. BRAY:  I --

2    THE COURT:  And so that means if the senior

3 bondholders' plan -- TCC plan is up for a vote, Mr. Feldman's

4 clients --

5    MR. BRAY:  Um-hum.

6    THE COURT:  -- are contractually prohibited from

7 voting for it.

8    MR. BRAY:  That's right.

9    THE COURT:  That doesn't mean it can't be confirmed.

10    MR. BRAY:  It says --

11    THE COURT:  It doesn't mean I can't be confirmed, it

12 means they can't vote it.

13    MR. BRAY:  Well, how -- if they can term --

14    THE COURT:  But they just could do nothing.

15    MR. BRAY:  -- if they can terminate the settlement for

16 a plan -- the document says:  if you don't confirm the plan --

17 and "the plan" is defined as the debtors' plan -- we can

18 terminate the settlement.  If they can terminate the settlement

19 if you don't confirm the debtors' plan, even if it's the same

20 treatment -- and this is in the termination provision -- then

21 we either have to go forward with estimation, so we know what

22 the number is in the event of termination, or it's twenty

23 billion dollars; which is effectively a nine-billion-dollar

24 surcharge, because the Court wants to confirm the creditor

25 plan.

operations@escribers.net | www.escribers.net
(973) 406-2250

PG&E Corp., Pacific Gas & Electric Co.

1    And it's even worse.  There's another provision that

2    says if you determine to not allow the debtors to solicit their

3    plan -- and I'm not saying that's likely; but let's say there's

4    a slight chance, for whatever reason, the debtors' plan should

5    not be solicited -- if you don't allow that plan to be

6    solicited, the subrogation claimants can terminate the

7    settlement and assert the twenty-billion-dollar claim.

8    It's a very conditional settlement, and it's

9    conditioned one way.  It gives the subrogation claimants a

10   number of outs, and it locks the debtor in.  And the debtor's

11   willing to make that bargain -- it's a Faustian bargain --

12   because they get to freeze out the competing plan from the

13   benefits of the settlement.

14   THE COURT:  So if I approve this, presumably Mr.

15   Feldman will tell Judge Donato next time, by the way, we're not

16   going to be there for estimation, and he'll have to say, but we

17   really will be there for estimation for the competing plan.

18   MR. BRAY:  Yeah.

19   THE COURT:  That's what you say?

20   MR. BRAY:  I --

21   THE COURT:  And we'll see what he says.

22   MR. BRAY:  Well, I don't know what he's going to --

23   THE COURT:  Well, we're going to ask him --

24   MR. BRAY:  Right, but our point --

25   THE COURT:  -- I'll ask him to clarify.

(97) operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    MR. BRAY:  -- is if they don't estimate the -- they

2    should be compelled to estimate.  In other words, they could

3    say no, I'm not going to estimate it, I'm going to just simply

4    stand on twenty billion dollars.  But that defeats the whole

5    purpose.

6         If you're not going to let the settlement be

7    applicable to the competing plan, then what choice is there but

8    for the court to continue to order estimation.  And if they say

9    I'm not going to participate in estimation, what does that

10   mean?  Someone files an objection to their claim and they're

11   just going to dig in and become intransigent as part of this

12   process?  That doesn't make any sense.

13        THE COURT:  Okay, I got you.

14        MR. BRAY:  Thank you, Your Honor.

15        THE COURT:  Someone's talking on the microphone.  We

16   need to get you -- if you're going to talk, don't talk near the

17   microphone, please.  Ms. --

18        MS. DUMAS:  I'm so sorry, Your Honor.

19        THE COURT:  -- Dumas, are you the guilty party there?

20        MS. DUMAS:  My apologies.

21        THE COURT:  Well, you can talk all you want, but not

22   on the microphone.

23        Okay, good morning.

24        MR. QURESHI:  Good morning, Your Honor.  For the

25   record, Abid Qureshi, Akin Gump Strauss --

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          THE COURT:  Mr. Qureshi.

2          MR. QURESHI:  -- Hauer & Feld.

3          THE COURT:  Good morning; welcome back.

4          MR. QURESHI:  Thank you.  On behalf of the ad hoc

5    noteholder committee.

6          Your Honor, I'm going to confine my comments to the

7    same issues that Mr. Bray just addressed.  I'm just going to

8    put a more precise point on a couple of them.

9          But first let me start with what our plan provides,

10   because I think that was misstated by Mr. Karotkin.  Our plan

11   does not provide for the payment of eleven billion dollars in

12   cash --

13         THE COURT:  Yeah, no, I understood that.

14         MR. QURESHI:  -- to the subrogation.  It provides for

15   an allowed claim, and the form of consideration -- so an

16   allowed claim of eleven billion dollars, but the form of

17   consideration cash versus equity --

18         THE COURT:  Yeah.

19         MR. QURESHI:  -- to be determined.

20         THE COURT:  Yeah.

21         MR. QURESHI:  But it's not set in the --

22         THE COURT:  That's how --

23         MR. QURESHI:  -- plan.

24         THE COURT:  -- that's how I read it.

25         MR. QURESHI:  And what we have said repeatedly before

PG&E Corp., Pacific Gas & Electric Co.

1    the Court is that we would like to engage with the subrogation

2    holders in a negotiation concerning the form of that

3    consideration, but that is precluded by the RSA.

4           THE COURT:  We're getting some static here.  Do we

5    know where that's coming from?

6           It stopped.

7           Well, they did take -- they changed a word or two,

8    then can still negotiate without --

9           MR. QURESHI:  And I will get to that, Your Honor --

10          THE COURT:  Okay.

11          MR. QURESHI:  -- because I think that fix does not

12   accomplish what I believe --

13          THE COURT:  Yeah, I --

14          MR. QURESHI:  -- Your Honor intended.

15          THE COURT:  I understand.

16          MR. QURESHI:  So let me start with what Mr. Bray

17   talked about, the voting provisions.  And if I could point Your

18   Honor first to -- in the RSA it is the affirmative covenant.

19   It's section 2(a) subsection (iii).  And what Your Honor will

20   see there is a requirement --

21          THE COURT:  I'm sorry --

22          MR. QURESHI:  -- that --

23          THE COURT:  -- say that again.  It's --

24          MR. QURESHI:  2(a)(iii).  So it's on page 7 of the

25   document.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          THE COURT:  Yeah, okay.

2          MR. QURESHI:  And what you will see there is that the

3     subros are required to timely vote their RSA against any plan

4     that does not adopt their settlement.  That is the provision,

5     Your Honor, that is problematic.

6          And let me be clear, Your Honor, what we are asking

7     the Court to do.  We have no trouble with an RSA that requires

8     the subros to vote in favor of the debtors' plan when the

9     debtors' plan adopts their settlement.  Of course they can do

10    that.  That's not an issue.

11         But, Your Honor, they ought to be affirmatively

12    obligated to vote in favor of any plan that adopts their

13    settlement, so that if the alternative plan adopts the same

14    settlement and says eleven billion on cash --

15         THE COURT:  What about the same release options -- the

16    same release provisions?

17         MR. QURESHI:  The same settlement.

18         THE COURT:  Same settlement.

19         MR. QURESHI:  Same settlement.  If the same

20    settlement --

21         THE COURT:  Verbatim?

22         MR. QURESHI:  -- is contained in another plan, or if

23    the parties agree otherwise, of course -- but if the same

24    settlement is adopted in another plan, they must be required --

25    not free to but required -- to vote in favor of that other

PG&E Corp., Pacific Gas & Electric Co.

1    plan.  It can't be the case, Your Honor, that eleven billion

2    dollars is good enough only if it comes from the debtors but

3    not if it comes from the creditor plan.  That just doesn't make

4    sense.

5              THE COURT:  Well, but again, how do I -- I mean,

6    again, we have this cash -- at the moment, the debtors' plan

7    says all cash.  Your plan doesn't say.

8              MR. QURESHI:  Correct.

9              THE COURT:  I realize it could be negotiated, but --

10             MR. QURESHI:  It --

11             THE COURT:  -- how do you vote for something without

12   knowing what you're getting?

13             MR. QURESHI:  Well, what the RSA as we suggested be

14   modified, Your Honor, would simply provide that if and only if

15   that settlement -- eleven billion in cash -- is adopted in our

16   plan, they are obligated to vote in favor of it.  If it's

17   not -- if we end up not adopting that settlement, they have no

18   obligation to vote in favor of our plan.  In that circumstance,

19   Your Honor, we can of course negotiate with them and see if we

20   can come to some other resolution that is acceptable to them,

21   and then it would be a different settlement in our plan.

22             And alternatively, if we can't reach a resolution,

23   then I suppose, Your Honor, the issue would be left for

24   confirmation.  But so I don't think, Your Honor, that the

25   choice here is limited to Your Honor approving or disapproving

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   the RSA.  I think it is well within the Court's jurisdiction to

2   say look, I will only approve it if --

3          THE COURT:  No, I know I can do that.

4          MR. QURESHI:  -- certain modifications are made.

5          THE COURT:  I mean, I can do that.  Of course.

6          MR. QURESHI:  Okay.

7          THE COURT:  But what's the legal theory that you could

8   articulate that would -- that says that the debtors' -- the

9   proposal that's on the table --

10          MR. QURESHI:  Sure.

11          THE COURT:  -- is legally infirm?

12          Now, Mr. Julian argues it's legally infirm because of

13   the releases.  Is there any legal infirmity in what you're

14   talking about?

15          MR. QURESHI:  The legal infirmity, quite simply, Your

16   Honor, is that it's not in the best interests of the estate.

17   Quite to the contrary.  The debtors -- and Ms. Mitchell said it

18   perfectly -- they are not acting as fiduciaries here.  They

19   tout the benefits of this settlement, they talk about what a

20   terrific job they did getting this great win and taking a

21   twenty-billion-dollar claim, which they say is the number, and

22   reducing to eleven billion dollars.  But then they say but only

23   for us.  And that settlement somehow isn't good enough if it's

24   in somebody else's plan.

25          Your Honor, that is not a settlement that is in the

PG&E Corp., Pacific Gas & Electric Co.

1    best interests of the estate.  That is not a debtor that is

2    acting like a fiduciary.

3            And, Your Honor, Mr. Karotkin points to a raft of RSAs

4    in other cases that many law firms in this courtroom have

5    agreed to on, on both sides.  And we don't dispute that RSAs

6    with voting provisions like this are quite common and that they

7    can be, in the right circumstances, a tool to get to consensus.

8    But not here, Your Honor, because not one of those cases -- not

9    a single one -- had competing plans.

10           Of all of those cases but two, the debtor had

11   exclusivity.  In the two --

12           THE COURT:  Well, not in the first PG&E case, it

13   didn't.

14           MR. QURESHI:  And I'll come back to that one.

15           THE COURT:  Okay.

16           MR. QURESHI:  That's a great example.

17           THE COURT:  But that was hardly the same in terms of

18   the --

19           MR. QURESHI:  Right.

20           THE COURT:  -- the consent.

21           MR. QURESHI:  So, Your Honor, in the two cases, Exide

22   and SeraCare, that are cited by the debtors as examples of

23   these type of voting provisions are okay even when exclusivity

24   has been terminated, not so.  Because in those cases, although

25   exclusivity had been terminated, there was no competing plan.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    So there wasn't the concern that we have here, where you have a

2    settlement that, as Ms. Mitchell said, it's being used as

3    leverage.

4         THE COURT:  So you're saying that when a fiduciary --

5    and the DIP is a fiduciary -- when the fiduciary proposes a

6    plan, it can't take a position is contrary to an alternative

7    plan that has the same -- it can't turn its back on an

8    alternative plan.  But -- you know --

9         MR. QURESHI:  Well, but, Your Honor, it -- eleven

10   billion dollars is either a favorable settlement for the estate

11   or it's not.  It just doesn't make sense to say it's only good

12   for the estate if that eleven billion dollars gets paid in the

13   context of an equity-sponsored plan, but somehow not if that

14   eleven billion dollars is coming from a creditor-sponsored

15   plan.  That just doesn't make sense, Your Honor.

16        And in PG&E I, obviously I was not involved in that,

17   but, Your Honor, my understanding is that what happened there

18   is that a motion was filed seeking approval of a settlement

19   along with a support agreement.  That motion was filed shortly

20   after this Court terminated exclusivity with respect to the

21   CPUC, as best as we can tell from the docket --

22        THE COURT:  Right.

23        MR. QURESHI:  -- about a week later.

24        THE COURT:  That's what happened.

25        MR. QURESHI:  And when it was filed, that motion

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  included provisions requiring the senior debt holders to vote

2  in favor of the debtor's plan and preventing them from meeting

3  with the CPUC concerning an alternative plan.

4  What happened?  A hearing was held by this Court and

5  subsequent to that hearing -- and we don't have a transcript,

6  Your Honor, so I don't know what happened at the hearing -- but

7  what I do know is that subsequent to that hearing, a revised

8  settlement and support agreement was submitted to the Court.

9  What went away in the revised agreement?  The voting

10  restrictions that almost every party in the case objected to.

11  The senior debt holders were permitted to meet and confer with

12  other parties and to discuss, negotiate, and consider the

13  alternative plan of reorganization.  And the requirement that

14  the senior debt holders fully support the debtor plan was also

15  removed.

16  So, Your Honor, I think the legal basis here is that

17  it is simply not, under any circumstances, in the best

18  interests of these estates, and therefore consistent with any

19  version of the applicable standard of review under 9019, to

20  approve that settlement.

21  And, Your Honor, we talked about leverage and how this

22  is all about leverage.  Well, I think there's a reason why the

23  debtors are doing it this way, and it is about their plan.

24  Your Honor, Baupost has arguably a blocking position, based on

25  the last 2019 that we saw, in the subrogation group.  And

PG&E Corp., Pacific Gas & Electric Co.

1  they're also a large equity holder of the debtor.  So this is

2  all about leverage to try to push through the equity-sponsored

3  plan and get a recovery for old equity.  It is not about the

4  debtor acting as a fiduciary.

5          If they were, we wouldn't even be having this

6  argument, Your Honor.

7          THE COURT:  Okay.

8          MR. QURESHI:  Now, Your Honor, if I can briefly turn

9  to the provision in the RSA concerning negotiations, because I

10 don't think, Your Honor, that as modified, it addresses the

11 concern that the Court raised in the tentative ruling.

12         THE COURT:  Well, the tentative ruling was just a

13 knee-jerk reaction to a table.  It wasn't any thoughtful

14 analysis.  But go ahead, show me --

15         MR. QURESHI:  Sure, so --

16         THE COURT:  -- where you think it doesn't do the

17 trick --

18         MR. QURESHI:  -- Your Honor --

19         THE COURT:  -- in the RSA?

20         MR. QURESHI:  -- it's on page -- it's on page 8.

21         THE COURT:  8 of the --

22         MR. QURESHI:  Of the RSA.

23         THE COURT:  Of the RSA, okay.

24         MR. QURESHI:  It is section 2(b)(ii).

25         THE COURT:  Well, that's the same one where we were a

PG&E Corp., Pacific Gas & Electric Co.

1    moment ago for the --

2              MR. QURESHI:  It is the same one where we were --

3              THE COURT:  -- vote.

4              MR. QURESHI:  -- a moment ago.

5              THE COURT:  Yeah, okay.

6              MR. QURESHI:  And how the debtors, in the black-line

7    that I'm looking at, how they modified it, is they simply

8    said -- they struck "debtors and the ad hoc subrogation group".

9              So remember, Your Honor, in the tentative ruling, what

10   the Court said is the provision requiring the subros and the

11   debtors to "negotiate together" was inappropriate.

12             THE COURT:  Right.

13             MR. QURESHI:  And Your Honor suggested in the

14   tentative ruling that that provision be struck.  And the debtor

15   does, indeed, strike that provision.  But the way they modified

16   this one, Your Honor, it doesn't make sense; because what it

17   says is that the ad hoc subrogation group is free to negotiate

18   with other creditor constituencies or participate in mediation

19   "to achieve global consensus."

20             The restriction on their ability to do anything to

21   propose, suppose, solicit, encourage, or participate in the

22   formulation of an alternative plan, it remains.  It's still in

23   here.

24             THE COURT:  Well, I'm having a little trouble, because

25   the document that I'm looking at for the revised one -- are you

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1     looking at --

2          MR. QURESHI:  I'm looking at docket --

3          THE COURT:  -- 4554-1 that was --

4          MR. QURESHI:  I'm looking at 4921.

5          THE COURT:  Okay.

6          MR. QURESHI:  Docket 4921 --

7          THE COURT:  4921 is the chart.

8          MR. QURESHI:  And it has attached to it a copy of the

9     RSA --

10         THE COURT:  Okay, you know --

11         MR. QURESHI:  -- itself, which is black-lined.

12         THE COURT:  -- you know what that's -- okay.

13    Unfortunately, I didn't get -- I didn't catch up with the

14    actual RSA.  I mean, I have it somewhere.  But I'm just looking

15    at the table with the quote, and it says -- it's got that same

16    little 2(b)(ii) --

17         MR. QURESHI:  Right.

18         THE COURT:  -- and that's the one that crosses out

19    "the debtors and".  But you're saying --

20         MR. QURESHI:  It doesn't solve the problem, Your

21    Honor, because even in the black-line version of the RSA,

22    section 2(b) subsection (iii) continues to contain a

23    prohibition for the subros to -- I'm sorry, it's subsection

24    (ii); I misspoke.

25         THE COURT:  Yeah, (ii).

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1         MR. QURESHI:  It's 2(b)(ii).

2         THE COURT:  Yes.

3         MR. QURESHI:  And it continues to contain a

4 prohibition on the subros to propose, support, solicit, assist,

5 encourage, participate in the formulation of any alternative

6 plan.  That prohibition remains.

7         What they are permitted by these changes to do is to

8 negotiate without the debtors -- because they struck "the

9 debtors" from it -- but to negotiate or participate in

10 mediation "to achieve global consensus".

11         THE COURT:  Well, you're not worried about the "to

12 achieve global consensus"?

13         MR. QURESHI:  No, that's fine.  It just can't be

14 restrictive.

15         THE COURT:  Okay.

16         MR. QURESHI:  It can't be restrictive.

17         THE COURT:  All right.  Listen, I need to wrap you up.

18         MR. QURESHI:  Two last points, Your Honor, and they'll

19 be very, very quick.

20         Your Honor struck the provision about requiring them

21 to negotiate together in the mediation.  Striking that

22 provision, respectfully Your Honor, is meaningless, if they are

23 still obligated to vote against any other plan.

24         THE COURT:  Yeah, no, I --

25         MR. QURESHI:  So we --

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          THE COURT:  -- got it.

2          MR. QURESHI:  Okay.

3          THE COURT:  Of course.

4          MR. QURESHI:  Last point --

5          THE COURT:  I mean, that was clear.

6          MR. QURESHI:  Last point, Your Honor.  We agree with

7     Mr. Bray that if Your Honor were to approve the RSA in its

8     present form, as submitted, with the obligation of the subros

9     to vote against any other plan, that their claims must continue

10    to be estimated, because again, if the debtors' plan falls down

11    for any reason, and that settlement goes away, there is no

12    agreement with us, and we need to know for purposes of our plan

13    what that claim is.  And therefore it must be estimated.

14          So in closing, Your Honor, this is about leverage.

15    This is about advantaging one plan over another.  And this is

16    not about a fiduciary doing what they should do.  Thank you,

17    Your Honor.

18          THE COURT:  Thank you, Mr. Qureshi.

19          All right, Ms. Winthrop, are you the closer?

20          MS. WINTHROP:  Looks like we're batting cleanup, Your

21    Honor.

22          THE COURT:  You're the closer.  Good morning.

23          MS. WINTHROP:  Good morning, Your Honor.  Rebecca

24    Winthrop of Norton Rose Fulbright, on behalf of Adventist

25    Health System/West and Feather River Hospital, which was the

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    hospital that was burnt down in Paradise.

2            We have two issues that we'd like to point the Court

3    to, to consider.  Going back to that infamous release, debtors'

4    counsel and the subrogation claimants claim that they have

5    addressed Underhill, because this is a fully consensual

6    release.

7            Putting aside the issue of whether Underhill even

8    permits fully consensual releases, which we would assert it

9    does not -- but let's assume that that is the state of the

10   law -- these are not fully consensual.  These are neither

11   reciprocal nor symmetrical releases, for two reasons.

12           First of all, it has not fixed the problem for fire

13   victims with nonsettling insurers.  So if you may recall, we

14   have no evidence that our carrier is one of the parties in Mr.

15   Feldman's consortium.  We have asked whether our insurer is

16   part of the group, and the committee never responded.

17           And in fact, it readily admits that it doesn't

18   represent one hundred percent of the insurance companies here.

19   So we have a situation where we cannot get -- assuming we do

20   decide to settle, we have a situation where we cannot get the

21   protections that are promised all the other fire victims with

22   settling insurers.

23           THE COURT:  You mean, like a reciprocal?

24           MS. WINTHROP:  Yeah.

25           THE COURT:  Well, but I mean --

PG&E Corp., Pacific Gas & Electric Co.

1      MS. WINTHROP:  It's just simply not reciprocal.

2      THE COURT:  -- but the issue of not knowing if

3  somebody's in the group can't be insurmountable.  I mean, isn't

4  there -- isn't there a simple way to determine that?

5      MS. WINTHROP:  Your Honor --

6      THE COURT:  You can't just simply informally ask, and

7  if that's no good, formally ask who's not --

8      MS. WINTHROP:  Your Honor, we've looked through the

9  claims register.  They are not listed here.  So if they decide

10  they don't want to settle and they don't want to be part of

11  this ad hoc group, doesn't want to limit their subrogation

12  claims, nothing affords us the benefits that supposedly are

13  going to be built into --

14      THE COURT:  But --

15      MS. WINTHROP:  -- the confirmation order.

16      THE COURT:  -- but you as an attorney representing

17  your client can know not to consent to something if you don't

18  know who is on the other side of the table with you.

19      MS. WINTHROP:  Right.  If I -- I can certainly elect

20  not to settle --

21      THE COURT:  Right.

22      MS. WINTHROP:  -- and just take this to trial and

23  litigate.  And that is -- I would assert -- is not a fully

24  consensual release.

25      THE COURT:  No, I understand your point.  But can you

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    not, at least, make as a formal request, a -- look, a discovery

2    request, interrogatory number 1:  Mr. Feldman, is XYZ Company

3    in your group, yes or no?

4            If he says yes, that's a good indication, right?  If

5    he says no, that's --

6            MS. WINTHROP:  We could just ask him right now --

7            THE COURT:  -- that's good --

8            MS. WINTHROP:  -- Your Honor.

9            THE COURT:  No, I understand.  Of course you -- and I

10   don't want -- we don't do it on the record.  I guess I don't

11   know why you can't ascertain that fact.  But anyway.

12           MS. WINTHROP:  But let's assume -- because they have

13   not changed the representations to the Court -- and it's not

14   just our problem; you've got fifteen percent, as I

15   understand -- they only have eighty-five percent of the

16   insurers signed up.  This applies to any fire victim that does

17   not have a settling insurance carrier.  They will not get the

18   benefit that is purportedly given, and therefore they are put

19   in the impermissible situation of facing litigation as the only

20   way to avoid --

21           THE COURT:  Well, but see, you're saying it's not a

22   good choice.  But the point is, if you don't -- if you can't be

23   told who is at the other side of the table, there's no -- the

24   choice is obvious.  You don't agree to anything.  So therefore

25   nothing is binding on you, right?  You're not releasing

escribers
(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   anything.

2           MS. WINTHROP:  But that is not the definition of a

3   consensual -- I would assert that is exactly what Underhill and

4   its progeny were trying to avoid, is the mandatory release

5   or --

6           THE COURT:  I get --

7           MS. WINTHROP:  -- a nonconsensual mandatory release.

8           THE COURT:  But what I'm saying is if you,

9   representing your client, don't know if the insurance company

10  that you want to bind isn't even there to be bound, how are you

11  forced to do anything?  You're not forced to do anything.

12          You'll vote against the plan, and if the plan is

13  approved, you're --

14          MS. WINTHROP:  Yeah, I mean, but this is the --

15          THE COURT:  -- that's not Underhill.

16          MS. WINTHROP:  -- issue with the release, not the opt-

17  in/opt-out.

18          THE COURT:  But the point is, you're not releasing

19  anybody?

20          MS. WINTHROP:  Yes, I am, Your Honor.

21          THE COURT:  Oh.

22          MS. WINTHROP:  I guess this goes back to if I want to

23  accept a settlement -- so in the case of your hypo, I want to

24  be that 100,000-dollar -- the person who gets the 100,000

25  dollars, takes 100,000 dollars, and knows, when he goes home,

PG&E Corp., Pacific Gas & Electric Co.

1   it's done.  But that's not what's going to happen here.

2           THE COURT:  You don't think that if you get the check

3   that you will have an agreement by the party who is producing

4   your share of the check?

5           Okay, look, I got your point.

6           MS. WINTHROP:  Okay.

7           THE COURT:  Maybe that's a flaw.  What's the other

8   point?

9           MS. WINTHROP:  The other problem is even the form of

10  the release which is being proposed is not symmetrical, because

11  while it does address the issue of gee, this release is only

12  related to make-whole, they then take it one step further and

13  they demand that the victims stipulate to payment -- payment

14  received is payment in full and it fully satisfies the

15  releaser's losses.

16          So while the release may restrict the release to just

17  the issue of make-whole, it then demands that the claimant give

18  up all other rights.  So if you've got -- so let's put this in

19  a real-world scenario.  If you've got ongoing disputes with

20  your insurer over the scope of your insurance policy and you're

21  figuring, well, if I put a chunk of money I get from the

22  liquidating trust with a chunk of this together, and if I can

23  continue fighting together, I can put it all together and I can

24  be paid in full, this requires us to agree that we have no

25  further losses.

PG&E Corp., Pacific Gas & Electric Co.

1      So it is possible that someone -- a third party could

2  then come in and use that admission -- that stipulation -- to

3  deny it any further rights.  That was well beyond what is

4  necessary to give the insurance carriers the purported

5  protection that they demand, which is just that they know they

6  get to keep your money.  Well, you know, Your Honor, when I

7  settle, I want to keep my money too.

8      THE COURT:  I guess I -- Ms. Winthrop, I need you to

9  help me understand which paragraph doesn't fix it.  I thought

10  that they acknowledged your reciprocity.  That's why I --

11      MS. WINTHROP:  No, Your Honor.

12      THE COURT:  -- was persuaded.  Well, what specific

13  provision are you --

14      MS. WINTHROP:  They said --

15      THE COURT:  -- pointing to?

16      MS. WINTHROP:  -- they would be willing to talk to us

17  and remove offending language.  As of today's date, they assert

18  they've done whatever is necessary.

19      THE COURT:  Can you tell me which provision is the

20  offending language on this point?  Because I --

21      MS. WINTHROP:  Yes, Your Honor.

22      THE COURT:  -- I can't memorize all of these terms.

23      MS. WINTHROP:  We have been inundated with paper as

24  well, Your Honor.

25      THE COURT:  Okay, so which one?

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          MS. WINTHROP:  So the only form of release that we've

2    got is the release that is on page 144 of 150 in document

3    number 4554-1.

4          THE COURT:  Okay, page 154?

5          MS. WINTHROP:  Yes -- sorry, 144 of 150, document

6    number 4554-1, that was filed on 11/2.

7          THE COURT:  Yeah, so that one's already been

8    superseded.

9          MS. WINTHROP:  Not that I have seen, Your Honor.

10         THE COURT:  Okay.  All right.  So there's the release.

11         MS. WINTHROP:  So in there it has both of the

12   offending provisions, which state, payment of the claim amount

13   fully satisfies the releasor's losses resulting or arising from

14   the wildfire; and that victims must stipulate that payment of

15   the claim amount -- which is defined as the claim that you

16   filed in the plan -- which in our case is the full amount of

17   our damages -- constitutes payment in full.

18         So if I want to go against those tree trimmers or if I

19   want to go against my insurance carrier for the rest of the

20   policy that they owe me, I can't -- or there's an argument that

21   I have given up my rights.  That is well beyond what is

22   necessary to protect the insurance carriers.

23         THE COURT:  Okay.  I mean, I --

24         MS. WINTHROP:  And that was not required by any of the

25   other settlements that the Court -- that the carriers provided

PG&E Corp., Pacific Gas & Electric Co.

1    under seal. So those are -- and I would also assert that is

2    well beyond what was required in PG&E number one --

3            THE COURT: No, it's obviously completely different.

4            MS. WINTHROP: Yeah. In footnote 26. And in fact,

5    the Court carved out our exact situation from what is

6    protected.

7            Thank you, Your Honor.

8            THE COURT: Thank you, Ms. Winthrop.

9            MS. WINTHROP: I appreciate your time.

10           THE COURT: All right, I'm going to stick with our --

11           MR. JULIAN: One point to clarify, Your Honor, if I

12   may?

13           THE COURT: Mr. Julian.

14           MR. JULIAN: The press has already picked up yours and

15   my colloquy, quoting -- or characterizing what I was saying

16   that the TCC has agreed to a 13.5-billion-dollar claims number

17   with PG&E debtors. And I need to clarify that's not true. If

18   I said it, I misspoke.

19           When I was referring to the 13.5 billion dollars that

20   the TCC have agreed to, I was referring to the 13.5 billion

21   dollars that the TCC agreed to in the joint plan with the

22   bondholders --

23           THE COURT: Well, that's --

24           MR. JULIAN: -- at section 1.9.

25           THE COURT: -- that's what I -- that's what I

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  understood.

2          MR. JULIAN:  That's what you understood, Your Honor?

3          THE COURT:  I don't know what the media's reporting.

4  That's how I understood you to --

5          MR. JULIAN:  Okay.

6          THE COURT:  -- be referring to that figure.

7          MR. JULIAN:  Well, everyone's asked me to clarify it,

8  and so --

9          THE COURT:  Okay, so you clarified it.

10          MR. JULIAN:  -- when I referred to the 13.5 it was the

11  14.5 in the TCC bondholder plan as the best that we can

12  negotiate at that time.

13          THE COURT:  Okay.  Mr. Karotkin and Mr. Feldman, I'm

14  going to give you fifteen minutes to conclude, and then I'll

15  let Mr. Stamer do his housekeeping, and then we're going to

16  call it a day.

17          MR. KAROTKIN:  Thank you, Your Honor.  Stephen

18  Karotkin, Weil, Gotshal & Manges, for the debtors.  I'll try to

19  be very brief and not even take up the fifteen minutes.

20          First, with respect to Ms. Mitchell's comments, first

21  the debtors take umbrage at any assertion that they're not

22  exercising their fiduciary duties.  There's no evidence of that

23  in the record.  There's no evidence of that in the conduct of

24  these cases.  And I think that what you said to Ms. Mitchell

25  was appropriate, that if that's what the governor's office

PG&E Corp., Pacific Gas & Electric Co.

1    feels, they know what the appropriate remedies are.

2           I will point out that the debtors have been meeting

3    with the governor's office and its representatives on a regular

4    basis to address concerns they've raised with respect to the

5    debtors' plans.  In fact, there was a meeting yesterday that

6    was very constructive, and they have been addressing, on an

7    ongoing basis, information requests that the governor's office

8    has made.  And that information is being provided on a timely

9    basis.

10           I will also point out that many of the concerns that

11   Ms. Mitchell is referring to were raised only just last week.

12   And I think the record needs to be clear about that.

13           The debtors are not hell-bent on an equity-sponsored

14   plan.  What they are hell-bent on is having the best plan, the

15   financeable plan, that is fair to all of the debtors' economic

16   stakeholders and will get these debtors out of Chapter 11 on a

17   timely basis, so they can participate in a go-forward Wildfire

18   Fund; and that is the singular goal of the debtors and the

19   board.

20           With respect to some of the comments made by Mr. Bray

21   and Mr. Qureshi, I think as Mr. Qureshi acknowledged, as he

22   must, the provisions in the RSA that they are complaining about

23   are customary and typical.  They acknowledge that every RSA

24   they have been involved with, virtually every one has those

25   very same provisions.

PG&E Corp., Pacific Gas & Electric Co.

1    Frankly, I don't understand Mr. Qureshi's position or

2  his statements that they're not done in a competing plan

3  process or where there's competing plans.  Those provisions are

4  meaningless unless there are competing plans, so obviously

5  that's what they address.

6    If there was no competing-plan situation, those

7  provisions would be meaningless, or why are they there?

8    THE COURT:  Well, but come on, that's -- I mean, if

9  the vast majority of RSAs are without competing plans, the fact

10 that there's a prohibition on voting for other competing plans

11 is belt-and-suspenders, but it's of no consequence.

12    MR. KAROTKIN:  No, but, Your Honor --

13    THE COURT:  But here --

14    MR. KAROTKIN:  -- it addresses --

15    THE COURT:  -- but here we have --

16    MR. KAROTKIN:  -- the situation where exclusivity

17 could be terminated.

18    THE COURT:  I know.  But here it has been terminated

19 and we have a competing plan.  So the question is for real.

20    MR. KAROTKIN:  And it's no different.

21    THE COURT:  Well, to me it is different because of

22 those two facts.  Exclusivity has been terminated, therefore --

23 and another plan had been filed.  So what do I do about that?

24 In other words, why is it good for the estate to have this

25 provision that only operates for your client and isn't good for

PG&E Corp., Pacific Gas & Electric Co.

1    both sides?

2         MR. KAROTKIN:  The debtors negotiated a deal with the

3    subrogation claimants in the context of moving forward with a

4    plan --

5         THE COURT:  Right.

6         MR. KAROTKIN:  -- that they believe is in the best

7    interests of these estates.  It's not an opportunity for the

8    subrogations to go out and shop the plan and shop that deal to

9    other people.  That's not how it works.

10        THE COURT:  I got you.

11        MR. KAROTKIN:  And if you look at the case law that

12   we've cited in our responsive pleadings --

13        THE COURT:  Nobody is suggesting that the subros --

14        MR. KAROTKIN:  -- that's what they address.

15        THE COURT:  -- have been shopping it.  The question is

16   what is wrong with an exact replica that is put on the table by

17   another group?  Why should the subrogation group be

18   contractually prohibited from even voting -- I'm not suggesting

19   they should go man the -- go to the rally and hold up the sign,

20   but why can't they just vote for the exact same economic

21   consequence?

22        MR. KAROTKIN:  Your Honor, the agreement that we

23   negotiated with them is in the context of our plan.  They made

24   a conscious decision that they want to support our plan going

25   forward.  They've obviously decided that our plan has the best

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    chance of moving forward and being confirmed on a timely basis.

2    And that's the bargain that was struck in the context of these

3    cases.

4           THE COURT:  Okay.

5           MR. KAROTKIN:  And I think, Your Honor, you put it

6    very clearly.  The choice before the Court is clear:  either

7    you have the ability to approve this and approve a compromise

8    of a claim that you yourself have said many times is a

9    substantial benefit to these estates, or we can go down another

10   path where the settlement is jettisoned, twenty billion dollars

11   of claims arise, and in the context of that, we will not

12   achieve confirmation of these cases by June 30th --

13          THE COURT:  Well, I understand.  But, Mr. Karotkin,

14   come on.  In fairness, if this had been a simple motion to

15   settle with one disputed group to have them reduce a claim from

16   20 million to -- call it 20,000 dollars to 11,000 dollars --

17   you can add the millions if you want to or the billions -- in

18   and of itself -- and I think Mr. Julian or one of the other

19   lawyers conceded -- by itself, it's in the range of a

20   compromise.

21          But this is much more than that.  I rejected the

22   argument that some had made that is a sub rosa plan, but it

23   does have a lot of ramifications that go beyond just the 9019

24   compromise, which gets back to the fair-and-equitable, which

25   gets back to if it's good for you, why isn't it good for your

PG&E Corp., Pacific Gas & Electric Co.

1   opponent.  That's the question that I have to decide.  That's

2   all.

3            MR. KAROTKIN:  Your Honor, it's a --

4            THE COURT:  I know what you want for me to say.

5            MR. KAROTKIN:  -- it's a comprehensive, complicated

6   settlement that involves a lot of terms, a lot of negotiations.

7   That's what we've agreed to.  That's what's being presented to

8   the Court.  We think it's in the best interests of the estates.

9            With respect to the argument raised that estimation

10  doesn't go away with respect to these claims, that's not the

11  case.  Estimation will stop with respect to the subrogation

12  claims if these --

13           THE COURT:  Well, but is that true?

14           MR. KAROTKIN:  -- if the settlement is --

15           THE COURT:  I mean, look, come on, what if -- what if

16  all we have to do is go with the TCC plan?  Won't there be an

17  estimation of the subrogation claims under this --

18           MR. KAROTKIN:  Your Honor --

19           THE COURT:  -- under this arrangement?

20           MR. KAROTKIN:  -- if that hap -- in the unlikely event

21  that that happens, you can do that in the context of

22  confirmation, because you don't have the same issues you have

23  with personal-injury claims.

24           THE COURT:  Well, that's probably true.

25           MR. KAROTKIN:  Okay?  So you can address it that way.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  But that doesn't make it -- that doesn't

2  mean there isn't an awful lot of preparation, a lot --

3    MR. KAROTKIN:  Your Honor --

4    THE COURT:  -- of work that has to be done.

5    MR. KAROTKIN:  -- I'm quite convinced that if we reach

6  that scenario, and these people have already agreed to an

7  eleven-billion-dollar claim, I'm quite sure how you're going to

8  come out on estimation.

9    THE COURT:  Well, but why aren't you quite sure --

10  well, never mind.  I've got it.

11    Mr. Feldman --

12    MR. KAROTKIN:  Okay, thank you.

13    THE COURT:  -- you're the closer.  And I'd like you to

14  talk specifically about Ms. Winthrop's concern about the

15  release and anything else you want to add.  But has she

16  misunderstood the latest iteration of the release on page 144

17  of 150?

18    MR. FELDMAN:  No, I think Ms. Winthrop's right, and I

19  think we need to work with her between now and confirmation to

20  either resolve her issue --

21    THE COURT:  Well, but I might have to --

22    MR. FELDMAN:  -- or ask the Court to approve it --

23    THE COURT:  -- work on it -- I might have to do

24  something if I'm going to --

25    MR. FELDMAN:  No, but --

PG&E Corp., Pacific Gas & Electric Co.

1          THE COURT:  -- rule --

2          MR. FELDMAN:  -- Your Honor, the --

3          THE COURT:  -- that this is a good deal.

4          MR. FELDMAN:  I'm sorry, Your Honor.  I apologize

5  for --

6          THE COURT:  Well, no, you don't have to --

7          MR. FELDMAN:  -- talking over you.

8          THE COURT:  -- apologize.  I'm just saying if you're

9  going to work with Ms. Winthrop, that's great.  But what do I

10  do in the meantime?  Do I -- you don't want me just to sit on

11  this for a while?

12          MR. FELDMAN:  No, no.  But, Your Honor, remember, the

13  releases have to be proposed by the company.  You have to

14  approve the releases in conjunction with confirmation.

15          Obviously we don't want to propose a release that this

16  Court can't approve, which is why we have every incentive to

17  work with Ms. Winthrop, which -- and I don't want to get into

18  it in public --

19          THE COURT:  No.

20          MR. FELDMAN:  -- but she has a somewhat unique

21  situation as compared to the 70,000 or so other victims who

22  also need to be resolved as part of this.

23          THE COURT:  No, I understand.  And but -- and she

24  represents one client -- a significant one.

25          MR. FELDMAN:  Significant, though, Your Honor.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1        THE COURT:  But if she doesn't know --

2        MR. FELDMAN:  Yeah.

3        THE COURT:  -- who the insurer on the other side of

4   the table is, that's important.  But Mr. Julian certainly made

5   other arguments about the wisdom of locking this release in

6   place now.

7        MR. FELDMAN:  Well, Mr. Julian's arguments, Your

8   Honor, are really not correct.  First of all, the releases are

9   mutual; and the language is contained in the RSA itself, Your

10  Honor, at section 3(a)(iii), where it says "the confirmation

11  order shall deem each holder of a subrogation claim that is a

12  beneficiary of a release and waiver of made-whole claims

13  executed by a holder of an IP claim as set forth ... to have

14  released such holder of an IP claim from any claim to such

15  holder's recovery from the debtors on account of such settled

16  IP claim."

17       So there is a mutuality.

18       THE COURT:  So why does --

19       MR. FELDMAN:  If you are releasing us on --

20       THE COURT:  -- why does it --

21       MR. FELDMAN:  -- made-whole, we're releasing you back.

22       THE COURT:  But why does he think his constituents of

23  personal-injury lawyers can't agree to this, if that's --

24       MR. FELDMAN:  I don't --

25       THE COURT:  -- how that language works?

PG&E Corp., Pacific Gas & Electric Co.

1      MR. FELDMAN:  -- know.  I disagree with the idea put

2  forward by Mr. Julian that if Your Honor, with the stroke of a

3  pen, says no to this, that this case will settle.  In fact, I

4  am quite confident that we will be here months and months from

5  now.

6      THE COURT:  If I thought it would, I might just say no

7  just to call you on it.

8      MR. FELDMAN:  So -- exactly.

9      THE COURT:  But my point is, are you of the view

10 that -- again, I'm -- let me rephrase this.  You believe that

11 3(a)(iii) has a presently -- I mean, when it becomes effective

12 it's an operative mutual release?

13     MR. FELDMAN:  The language itself has to be in the

14 confirmation order, but the concept is in the RSA, and it has

15 to be a mutual release between the insurer and the insured to

16 the extent the insured is releasing made-whole.  There's a

17 mutual release being given by the insurance company, yes.

18     THE COURT:  Well, okay.  But the many personal-injury

19 lawyers that Mr. Julian talks to and communicates with

20 presumably have the same dilemma.  Why would they advise a

21 client to opt in without knowing what the ramifications are of

22 that release --

23     MR. FELDMAN:  Well, the --

24     THE COURT:  -- of giving up -- you're giving up the

25 made-whole if you want the money.  If you're in the hospital

PG&E Corp., Pacific Gas & Electric Co.

1    and sick and can't get your life together, but here's 100,000

2    dollars, but by the way, you have to release something that you

3    don't know about, what are we --

4            MR. FELDMAN:  There --

5            THE COURT:  -- why is that a good thing?

6            MR. FELDMAN:  There's two answers to that, Your Honor.

7    And the first is what it is, which is if we were not in Chapter

8    11 -- and all of the individual plaintiffs' lawyers know this,

9    and all the subrogation lawyers on our side know this -- this

10   is exactly how it would work and it has worked in many, many

11   other wildfire cases.  So let's not pretend that we're

12   inventing something new just because we're in your courtroom.

13           But there's a much more important component to this.

14   What Mr. Julian really is saying -- I'm going to use his 13.5

15   billion dollars.  I have no idea if he's negotiating a number

16   with the creditors -- I'm sorry, with the company -- but if Mr.

17   Julian's claim is for 13.5 billion dollars, and he has it his

18   way, we are now his insurance company on his client's claims.

19   It's not 13.5, it's 13.5 plus 11, because if somehow some of

20   his clients come up short, they just turn around and sue their

21   insurance companies.

22           That's not a deal we're going to do at eleven billion

23   dollars, cash, stock, promissory notes.  That was something we

24   specifically negotiated for with the company.  It's a critical

25   component to this 9019, as are all of the various elements.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    So I want to get back to what Mr. Qureshi said in a

2  moment.  So the idea that this is going to settle in a way that

3  allows individual plaintiffs to go after their -- they enter

4  the matrix, they go in for their 100,000 dollars, they get

5  their 100,000 dollars, but oh, by the way, it turns out I had

6  more damages than I thought I had, now I want to go sue my

7  insurance company; that's not going to work.

8    THE COURT:  That's not going to happen.

9    MR. FELDMAN:  Yeah, that seems just fundamentally

10  unfair.  And I said it earlier:  in a case that's solvent,

11  where everybody is supposed to be paid:  including the bonds,

12  which is a huge source of payment; including the individual

13  plaintiffs, who we want to be paid -- we want this company to

14  be solvent; then the insurance companies should get their

15  eleven billion dollars, and with the few exceptions of people

16  who want to go litigate their claims and come back on made-

17  whole, sure, we understand that's a risk.  But that should be

18  the -- that should be the boundary of the risk.

19    In terms of Mr. Qureshi's point about estimation and

20  why can't we vote, to me, the voting is -- and Mr. Bray's

21  point -- the voting is a red herring.

22    Your Honor is going to have two plans in front of you.

23  Sure, we voted for the company's plan, but you've got an

24  impaired accepting class in the other plan.  As Mr. Karotkin

25  said, you're going to wave your pen, and we're going to get the

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  same treatment.  That's just seems like a complete red herring.

2        Whether Mr. Karotkin wants to release us or not

3  release us from the -- from the lock-up provisions, not

4  relevant, as long as we can go negotiate and talk with people.

5  It really is not, Judge.  That's something --

6        THE COURT:  No, I guess I don't --

7        MR. FELDMAN:  -- you're going to determine in the

8  context of competing plans.

9        THE COURT:  -- I mean, I -- I mean, I guess I'm not

10 sure I follow you.  So if you -- if I take your literally by

11 saying you can negotiate, so you go sit down and negotiate with

12 Mr. Julian.  And one of the things he says is, well, I want you

13 to vote for our plan --

14       MR. FELDMAN:  I can't do that.

15       THE COURT:  -- you can't do that.

16       MR. FELDMAN:  Correct.

17       THE COURT:  So why is that a good thing?

18       MR. FELDMAN:  It may not be a good thing, but it's

19 also not a bad thing.  He doesn't need -- that plan doesn't

20 need a vote from the subrogation holders.

21       THE COURT:  Well, but then it's one of those things

22 where --

23       MR. FELDMAN:  If --

24       THE COURT:  -- sometimes how appearances work too.  I

25 mean, locking up votes is just sort of -- it doesn't seem

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    right.  It doesn't seem democratic, if you will.

2          MR. FELDMAN:  It's the way you get to deals in Chapter

3    11, Judge --

4          THE COURT:  Well, maybe.

5          MR. FELDMAN:  -- which is why -- which is why there

6    are RSAs in many, many cases today.  We get what we want; the

7    company gets what it wants, as a fiduciary.

8          THE COURT:  Okay.

9          MR. FELDMAN:  Your Honor, in terms of -- and unless

10    you have questions, I'm coming --

11          THE COURT:  No, I don't.

12          MR. FELDMAN:  -- quickly to the end.

13          THE COURT:  I don't.

14          MR. FELDMAN:  In terms of leverage, I just really want

15    to put that issue to bed.

16          To date, the ad hoc committee has always moved through

17    unanimous consent.  We don't have fights going on among one

18    type of subrogation holder versus another type of subrogation

19    holder.  And I would point out -- and Your Honor has pointed it

20    out also -- we are not trying to leverage anybody in this case.

21    As I said, we have every incentive and every desire for this

22    company to remain solvent, for the victims to get paid in full,

23    for us to get paid our eleven billion dollars.

24          But if -- and this goes really to Ms. Mitchell's

25    point, and then I will sit down -- if it turns out that the

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    company can't meet AB 1054 or is otherwise rendered insolvent

2    under the governor's views of the company's ability to go

3    forward, we have the opportunity to be released from the RSA --

4             THE COURT:  Right.

5             MR. FELDMAN:  -- and the company has the opportunity

6    to be released from the RSA.

7             THE COURT:  Well, I mean, it's all bets are off for

8    the most part.

9             MR. FELDMAN:  It's all bets are off.

10            THE COURT:  Right.

11            MR. FELDMAN:  Exactly.  So the idea that the governor

12   may decide something better for the company ought to be the

13   path they should go down, that'll happen, and we'll exercise

14   our remedies.

15            THE COURT:  Okay, thank you, Mr. Feldman.

16            MR. FELDMAN:  Thank you.

17            THE COURT:  All right, the stands submitted.  I want

18   to thank all Counsel for the arguments and putting it all in

19   one place.  The ball's in my court.  My intention will be to

20   make a ruling, not to defer a ruling.  I can't promise you how

21   soon it'll be.  I'm trying to keep the decisions coming out.

22   So I'll do my best.

23            With that, I'll ask Mr. Stamer to raise his

24   housekeeping issues, and then we're going to wrap up the

25   hearing.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1      MR. STAMER:  Your Honor, do you want to take a break
2   first, or no?
3           THE COURT:  No.
4           MR. STAMER:  Okay.
5           THE COURT:  Because you promised to be brief.
6           MR. STAMER:  I do promise.
7           Again, for the record, Mike Stamer from Akin Gump, on
8   behalf of the ad hoc noteholder committee.
9           Your Honor, I'm glad that, in fact, I waited, because
10  I think the comments that you heard from the governor's office,
11  from my colleague, Abid Qureshi, from Greg Bray at Milbank,
12  they all develop a theme.  And in fact, believe it or not, I
13  think some of the comments Mr. Karotkin made are helpful to
14  understanding the issue I'm going to put before the Court.
15          So without repeating what was said with respect to the
16  RSA, we do very firmly believe that the debtors' support and
17  insistence on the restrictive provisions of the RSA is actually
18  inconsistent with their fiduciary duty.
19          THE COURT:  Well, that's the same argument that's been
20  made.  I mean --
21          MR. STAMER:  It is.  But it dovetails into what I'm
22  going to talk to Your Honor about.  And Mr. Karotkin stood up
23  and said just because you say it doesn't make it so.  There's
24  no evidence that the debtors are violating their fiduciary
25  duty, which Your Honor, I strongly disagree with, but, Your

PG&E Corp., Pacific Gas & Electric Co.

1    Honor, maybe I can provide you with some concrete evidence that

2    the debtors are, in fact, violating their fiduciary duty.  And

3    I have a series of correspondence which most of the principal

4    people in the court have.

5             I can hand that up to you.  I can talk about it.  I

6    can hand it up to you afterwards.  Why don't I give you some

7    background, and then you'll figure out, Your Honor, whether you

8    want --

9             MR. KAROTKIN:  Excuse me, Your Honor.  Is this sort of

10   a motion that Mr. Stamer is making, because --

11            THE COURT:  I don't know.

12            MR. KAROTKIN:  -- he's unhappy with some

13   correspondence I sent him?

14            THE COURT:  I thought it was housekeeping, so --

15            MR. KAROTKIN:  I mean, if he --

16            MR. STAMER:  Your Honor, it is -- it is housekeeping.

17            MR. KAROTKIN:  -- has some relief he's seeking, he

18   should proceed by appropriate motion where we can --

19            THE COURT:  Well, I think he's right.  I mean --

20            MR. KAROTKIN:  -- respond.

21            MR. STAMER:  Your Honor, that's classic.

22            THE COURT:  Well --

23            MR. STAMER:  Let me get directly to the substance.

24            THE COURT:  But I'm running the courtroom, he's not.

25            MR. STAMER:  I understand.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          THE COURT:  What is the substance?

2          MR. STAMER:  Here's the housekeeping.  Your Honor,

3    there's a competitive plan process going on right now.

4          THE COURT:  Correct.

5          MR. STAMER:  And you heard from the governor's office

6    that they are actively engaged.  They have leaned in.  And we

7    believe and I think everyone in the courtroom believes, that

8    the governor's office is going to express more concrete

9    preferences -- if I can phrase it that way -- with respect to

10   which plan is viable, which plan satisfies 1054 and which does

11   not, and we think that's going to happen within the next two

12   weeks.

13         THE COURT:  Okay.

14         MR. STAMER:  We have been asking Mr. Karotkin for

15   basic financial information -- this is supposed to be an equal

16   playing field, competition is good.  We have been asking him

17   for basic financial information for a while, and we skinnied it

18   down in a letter that went to him, I believe it was, November

19   26th.

20         One page, that's what the request was.  I had a

21   spirited discussion with Mr. Karotkin during the day, but

22   ultimately he asked for a list of information; we gave him one

23   page.

24         Yesterday -- yesterday I got an email from Mr.

25   Karotkin, which I can provide you --

(971) 406-2505   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1        THE COURT:  Is this a discovery dispute?

2        MR. STAMER:  It's not, Your Honor.  It's actually --

3        THE COURT:  I mean, what is it?

4        MR. STAMER:  -- it's consistent with what Your Honor

5    said in the ruling with respect to scheduling.  And the email

6    that Mr. Karotkin sent me was:  let's wait until December 17th,

7    the status conference, for us to talk about the information you

8    need.  Okay?

9        It's the perfect example of an attempted pocket veto,

10   because everybody who's been involved in the discussions with

11   the governor's office, including the governor's staff,

12   understands that this is the debtors, yet again, putting their

13   finger on the scale for the benefit of the equity plan, to the

14   detriment of the estate.  And --

15       THE COURT:  What do you -- what do you want me to do?

16       MR. STAMER:  Your Honor, I would like you to say,

17   consistent with what you have ordered previously, that the

18   debtor should act like a fiduciary.  They should give us the

19   information that we have requested so that a competitive plan

20   process can proceed.

21       Your Honor, we didn't want to do this.  Of course, Mr.

22   Karotkin says, is this a motion?  He would like me to file a

23   motion, and by the time we got a ruling, the judge would have

24   made its decision and the competitive process would have

25   suffered.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1         THE COURT:  Are you going to -- but are you asking me

2 to defer my decision on the RSA?

3         MR. STAMER:  Your Honor, I -- what I --

4         THE COURT:  I haven't decided what I'm going to do

5 yet, by the way.

6         MR. STAMER:  I understand.

7         THE COURT:  So --

8         MR. STAMER:  Your Honor, this is -- it's unrelated to

9 the RSA in many ways.  It's a consistent theme.

10         What we are asking, Your Honor, is in furtherance of

11 your prior order or in clarification of your prior orders, that

12 you order the debtor to comply with the information request

13 that we've made.

14         We've also asked -- again, not in the litigation

15 context -- this is in the competitive plan process --

16 consistent with the parallel paths and the even playing

17 field --

18         THE COURT:  Understood.

19         MR. STAMER:  -- we would like the debtors to

20 immediately comply with the information requests we made, and

21 make Ken Ziman from Lazard and Jim Mesterharm from

22 AlixPartners, available --

23         THE COURT:  Mr. Stamer, I --

24         MR. KAROTKIN:  Yes, sir.

25         THE COURT:  -- as long as I've been on the bench, I

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    think I have had a procedure.  If you are bogged down on

2    discovery, whether it's more formal as litigators have or more

3    informal as bankruptcy lawyers do, you make a simple request.

4    You tee it up.  You give me an opportunity to read what you

5    have in mind, and the other side a chance to respond, and I'll

6    respond instantly or quickly -- at a hearing.

7         But I can't just do this on the fly.  I mean, can you

8    give me a brief summary or email to my staff as to what you

9    want, and I'll schedule a hearing, if necessary, in a day or

10   two, if Mr. Karotkin is opposing it.

11        MR. STAMER:  Your Honor, we can send your staff an

12   email with the relevant information this afternoon.

13        THE COURT:  I mean, look, I followed a rule that I

14   thought was -- that I expect counsel to cooperate on exchange

15   of information so as not to get bogged down on formal discovery

16   motions.

17        I had another matter recently where I had a stranger

18   to the practice, and he was citing all these federal rules of

19   discovery, and I had to remind him, this isn't the way we do it

20   in the bankruptcy, because we do it quickly -- quickly like in

21   a day or two or three.  And this guy's citing me thirty days

22   and formal response to discovery.

23        Well, guess what?

24        MR. STAMER:  Your Honor, we had hoped that it wouldn't

25   come to this.

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  Mr. Karotkin, I will ask you to meet and

2    confer with your colleague, Mr. Stamer, to see if you can reach

3    a consensus as to what he wants.  And if you cannot, I'll

4    authorize him to exchange to my courtroom deputy, and a copy to

5    you, a formal summary.

6    Now, listen gentlemen.  A brief summary is not a 37-

7    page brief with a copy of 150-page interrogatories that you

8    served.  A brief paragraph or two or three of what is the

9    issue, and I will have you on a phone conference promptly.

10    MR. STAMER:  Your Honor, we appreciate that.

11    THE COURT:  Okay.

12    MR. STAMER:  We can be -- yes, Your Honor.

13    We have another discovery --

14    THE COURT:  Mr. Karotkin --

15    MR. STAMER:  -- issue which we may or may not need to

16    take up with Your Honor --

17    THE COURT:  Okay.

18    MR. STAMER:  -- related to information we've requested

19    from the subros, the backup for their claim.  I don't think I

20    need to spend any time with Your Honor here.

21    If we can't make progress on that, we'll include that

22    in the email or there'll be a separate email.

23    THE COURT:  Yeah.  By the way, for those of you that

24    are following, I mean, I am not sitting in on Judge Donato's

25    hearings, but I'd like to see what he does, and I notice that

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    he seems to act on these discovery things also quickly, like, I

2    want that done in two days.  So I can follow the same thing.

3            So, Mr. Karotkin, you don't have to respond, but I

4    will invite you to give your colleague what he's looking for,

5    and if not, I'll deal with it on an expedited basis.

6            MR. KAROTKIN:  May I just make a couple of comments?

7            THE COURT:  Quickly, and then we're quitting.

8            MR. KAROTKIN:  That's fine.

9            THE COURT:  Yes, sir.

10           MR. KAROTKIN:  Just so the record's clear, Mr. Stamer

11   said he's requested basic financial information for a while --

12   "for a while".  I got a letter from him on November 26th, less

13   than a week ago, okay.

14           THE COURT:  That's a while.

15           MR. KAROTKIN:  That's not a while.  And he says the

16   debtor should act like a fiduciary and give them whatever they

17   want.  Okay?

18           THE COURT:  Come on, I'm not going to --

19           MR. KAROTKIN:  He's requested --

20           THE COURT:  -- I'm not going to give you --

21           MR. KAROTKIN:  -- ten items of proprietary and

22   confidential information.

23           THE COURT:  Okay, meet and confer and exchange; and

24   the matter stands submitted.  I will do my best to get

25   something out on the RSA question as soon as I can.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          Thank you, everyone.

2          IN UNISON:  Thank you, Your Honor.

3          THE COURT:  So, Mr. Karotkin, I'll wait to hear from

4   you about whether we're going to continue the exit financing,

5   otherwise I'll see you all -- many of you on the 11th for

6   the --

7          MR. KAROTKIN:  Yes, sir, thank you.

8          THE COURT:  -- interest question.

9      (Whereupon these proceedings were concluded at 12:28 PM)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

(973) 406-2250 | operations@escribers.net | www.escribers.net

1                 C E R T I F I C A T I O N

2

3   I, Clara Rubin, certify that the foregoing transcript is a true

4   and accurate record of the proceedings.

5

6

7

8

9

10

11   _____

12   /s/ CLARA RUBIN

13

14   eScribers

15   7227 N. 16th Street, Suite #207

16   Phoenix, AZ 85020

17

18   Date:  December 5, 2019

19

20

21

22

23

24

25

(973) 406-2250 | operations@escribers.net | www.escribers.net

**$**

**$0.20 (1)**
58:20
**$0.70 (1)**
58:12

**A**

**AB (18)**
21:24;22:1;38:20;
43:1;55:3,3;77:13;
81:5,15,24;82:9,15,22,
22;83:12;84:17;85:9;
134:1
**Abid (2)**
98:25;135:11
**ability (7)**
19:1;23:14;54:6;
91:13;108:20;124:7;
134:2
**able (7)**
6:3;11:9;49:11;79:6;
81:5;84:12;89:4
**absolutely (3)**
19:17;40:5;52:5
**abundantly (1)**
27:1
**accept (5)**
61:8;62:19;94:5;
95:19;115:23
**acceptable (1)**
102:20
**accepting (3)**
42:9;93:10;131:24
**accepts (1)**
77:3
**accomplish (1)**
100:12
**accordance (5)**
14:21;29:5;30:4,5,7
**according (3)**
10:22;53:21;55:6
**account (6)**
20:15,20;23:6,7,8;
128:15
**accurate (3)**
68:15;73:8,9
**achieve (4)**
108:19;110:10,12;
124:12
**achieved (1)**
17:3
**acknowledge (2)**
33:3;121:23
**acknowledged (2)**
117:10;121:21
**acknowledging (1)**
15:7
**across (1)**
48:18
**act (7)**

40:17;71:9;86:23,25;
138:18;142:1,16
**acting (5)**
34:12;85:7;103:18;
104:2;107:4
**action (1)**
4:11
**actively (1)**
137:6
**activity (1)**
45:16
**actual (3)**
6:15;17:20;109:14
**actually (20)**
8:15;11:25;25:25;
33:17;34:9;42:1;45:22;
50:13;56:1;84:1,4,6,12,
14;88:11;89:4;93:12,
18;135:17;138:2
**ad (17)**
11:18;13:7;15:5;
28:9;32:22;51:8;52:19;
90:24;92:24;94:5;
95:20;99:4;108:8,17;
113:11;133:16;135:8
**add (2)**
124:17;126:15
**added (1)**
56:25
**additional (2)**
37:12;82:8
**address (16)**
6:4;19:9;41:24;
51:12;54:22;62:3;67:6,
8;72:20;80:8;84:14;
116:11;121:4;122:5;
123:14;125:25
**addressed (3)**
67:23;99:7;112:5
**addresses (4)**
24:13;26:17;107:10;
122:14
**addressing (3)**
8:17;13:2;121:6
**adjourn (1)**
5:20
**adjudicated (1)**
31:16
**adjust (1)**
4:24
**administered (1)**
29:1
**administration (10)**
17:1;28:6;54:17;
63:8,14;70:15,22;
75:23;76:5;77:2
**admission (1)**
117:2
**admits (2)**
59:8;112:17
**adopt (1)**
101:4
**adopted (7)**

15:5,16;19:24;21:13;
91:1;101:24;102:15
**adopting (1)**
102:17
**adopts (3)**
101:9,12,13
**advance (1)**
54:11
**advantage (1)**
22:2
**advantaging (1)**
111:15
**Adventist (3)**
51:9;67:15;111:24
**Adventists (1)**
16:16
**adverse (1)**
48:6
**advice (3)**
16:24;20:17;64:22
**advise (1)**
129:20
**advisement (1)**
11:24
**advising (1)**
54:10
**advocated (1)**
14:24
**advocating (3)**
12:24;66:23;71:25
**affidavit (1)**
45:4
**affirmative (2)**
93:19;100:18
**affirmatively (1)**
101:11
**affords (1)**
113:12
**afternoon (1)**
140:12
**afterwards (1)**
136:6
**again (32)**
8:17;12:2;14:7;
15:16;19:8,15;21:13;
23:22;24:20;25:22;
28:8,10;29:25;32:12;
38:25;39:7;42:7;46:16;
49:9;50:13;61:6,14;
77:11;84:24;100:23;
102:5,6;111:10;
129:10;135:7;138:12;
139:14
**against (13)**
8:23;28:5;34:12;
36:10;38:12;59:2;76:6;
101:3;110:23;111:9;
115:12;118:18,19
**ago (6)**
15:4;79:2;82:13;
108:1,4;142:13
**agree (20)**
4:20;5:20;27:10;

36:1,3;48:7;53:22;
54:11;67:14;68:2;
73:25;78:17;81:19;
86:13;89:1;101:23;
111:6;114:24;116:24;
128:23
**agreed (14)**
15:9,21;20:7;25:16;
44:22;46:2;49:2;86:7;
104:5;119:16,20,21;
125:7;126:6
**agreement (16)**
7:15;10:25;14:22;
26:14;48:12,13;54:9;
65:15;66:8;77:3;
105:19;106:8,9;
111:12;116:3;123:22
**ahead (5)**
4:15;10:5;50:16;
53:1;107:14
**Akin (3)**
11:16;98:25;135:7
**AlixPartners (1)**
139:22
**allegation (1)**
48:13
**alleged (1)**
93:3
**allocation (2)**
11:1;48:11
**allow (2)**
97:2,5
**allowed (3)**
42:24;99:15,16
**allows (1)**
131:3
**almost (5)**
8:22;13:6;45:22;
78:18;106:10
**along (2)**
94:14;105:19
**alternate (1)**
9:9
**alternative (13)**
24:22;26:1;66:20;
80:15;83:21;89:5;
101:13;105:6,8;106:3,
13;108:22;110:5
**alternatively (1)**
102:22
**alternatives (1)**
66:19
**Although (3)**
33:2;52:6;104:24
**always (1)**
133:16
**Amazon (1)**
43:22
**amended (1)**
26:19
**American (1)**
71:12
**among (5)**

47:17,23;48:12;
58:21;133:17
**amount (7)**
24:21;34:13;67:17;
84:13;118:12,15,16
**amounts (1)**
20:19
**analysis (5)**
16:25;17:13;20:15,
21;107:14
**Andrew (1)**
6:7
**answered (4)**
26:1,2;79:3,3
**anticipate (1)**
69:3
**anymore (1)**
30:11
**apologies (1)**
98:20
**apologize (4)**
11:15;50:12;127:4,8
**apparently (1)**
72:12
**Appeal (7)**
47:7;73:23,24;74:6,
19;75:2;77:4
**appealing (1)**
63:19
**Appeals (1)**
47:13
**appearances (1)**
132:24
**appeared (1)**
90:14
**applicable (7)**
15:9;20:2,14;94:18,
19;98:7;106:19
**applies (1)**
114:16
**apply (5)**
14:14,15;34:9;53:11,
14
**appoint (1)**
69:24
**appointed (2)**
47:7;55:25
**Appreciate (13)**
37:5;61:12;75:16;
87:3,9;88:10;89:9,14,
15;90:5,9;119:9;
141:10
**appreciates (1)**
79:25
**approach (1)**
46:24
**appropriate (5)**
26:13;85:16;120:25;
121:1;136:18
**appropriately (1)**
24:20
**approval (6)**
5:19;19:20;22:13;

Min-U-Script®
Case: 19-30088    Doc# 4992    Filed: 12/05/19    Entered: 12/05/19 10:22:14    Page 145
of 165

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(1) $0.20 - approval

24:19;44:8;105:18

**approve (24)**
5:9;23:15;25:3;40:3;
41:7;54:8,9;68:10;
70:8;74:25;75:4;81:12;
83:16;91:6;94:17;
97:14;103:2;106:20;
111:7;124:7,7;126:22;
127:14,16
**approved (7)**
19:12;22:5,11;26:21;
33:13;91:19;115:13
**approving (2)**
74:10;102:25
**arbitration (7)**
31:14;37:14;58:10,
10,19;62:10,11
**arbitrations (2)**
63:9,10
**area (1)**
72:18
**arguably (1)**
106:24
**argue (1)**
15:8
**argued (2)**
19:23;21:7
**argues (1)**
103:12
**argument (14)**
19:25;29:7;49:22;
52:18;64:11;72:8;
86:11,12;89:22;107:6;
118:20;124:22;125:9;
135:19
**arguments (3)**
128:5,7;134:18
**arise (1)**
124:11
**arising (1)**
118:13
**arm's-length (1)**
16:23
**around (7)**
14:25;64:8;80:6,24;
85:25;91:23;130:20
**arrangement (2)**
28:13;125:19
**articulate (1)**
103:8
**ascertain (1)**
114:11
**aside (5)**
31:23;51:19;67:21;
95:11;112:7
**assert (6)**
97:7;112:8;113:23;
115:3;117:17;119:1
**assertion (1)**
120:21
**assessment (1)**
20:15
**assets (1)**

89:9
**assist (2)**
94:12;110:4
**assistance (1)**
16:24
**associated (2)**
20:17,22
**assume (6)**
25:12;28:2;87:22;
92:3;112:9;114:12
**assuming (2)**
57:5;112:19
**attached (1)**
109:8
**attempted (1)**
138:9
**attend (1)**
10:24
**attention (1)**
52:13
**attorney (2)**
11:5;113:16
**August (2)**
46:3,4
**authority (2)**
74:1;83:24
**authorize (1)**
141:4
**authorized (1)**
40:9
**available (6)**
6:13;9:10;87:13;
92:20;93:4;139:22
**avoid (2)**
114:20;115:4
**avoidance (1)**
50:17,22,25
**award (1)**
77:3
**aware (1)**
25:12
**away (7)**
48:14;49:10;65:21;
92:12;106:9;111:11;
125:10
**awful (1)**
126:2

**B**

**back (30)**
4:7;8:1;14:3;19:6;
29:20,21;30:21;39:4,
12;42:23;43:21;48:14,
20;53:21;60:21,24;
72:6;75:19;77:11;
95:17;99:3;104:14;
105:7;112:3;115:22;
124:24,25;128:21;
131:1,16
**background (1)**
136:7
**backup (1)**

141:19
**backwards (1)**
69:1
**bad (3)**
34:12;62:21;132:19
**bad-faith (1)**
27:6
**bailed (2)**
46:10,11
**Baker (1)**
51:3
**ball (1)**
81:22
**ball's (1)**
134:19
**Bankruptcy (16)**
19:20;34:4,25;39:13;
40:11;41:7;42:2;43:10,
11,17;60:17;70:16;
76:3,4;140:3,20
**bar (2)**
17:7;63:23
**bargain (1)**
97:11,11;124:2
**based (6)**
6:23;36:10;55:1,16;
86:10;106:24
**basic (3)**
137:15,17;142:11
**basically (1)**
54:5
**basis (9)**
86:9,10;106:16;
121:4,7,9,17;124:1;
142:5
**batting (1)**
111:20
**Baupost (1)**
106:24
**become (4)**
76:23;82:7;87:7;
98:11
**becomes (1)**
129:11
**bed (1)**
133:15
**beginning (3)**
58:13;77:2;84:16
**begins (1)**
81:2
**behalf (7)**
6:7;11:16;32:22;
79:19;99:4;111:24;
135:8
**behind (1)**
89:3
**believes (2)**
90:21;137:7
**below (1)**
20:10
**belt-and-suspenders (1)**
122:11
**bench (3)**

11:24;40:11;139:25
**beneficiary (1)**
128:12
**benefit (7)**
11:6;88:6;91:3;
92:21;114:18;124:9;
138:13
**benefits (4)**
93:1;97:13;103:19;
113:12
**best (15)**
11:21;70:25;71:1;
82:5;103:16;104:1;
105:21;106:17;120:11;
121:14;123:6,25;
125:8;134:22;142:24
**bets (3)**
26:4;134:7,9
**better (11)**
10:2;23:23;46:5,22;
47:18,24;48:1,1,6;
66:19;134:12
**beyond (4)**
117:3;118:21;119:2;
124:23
**big (3)**
62:10;92:6
**bigger (1)**
64:13
**billion (59)**
8:22;14:9,10;15:22;
17:5,23;18:20,22;20:5,
6;22:11;23:6,7,15;
24:24;45:9,22,23;
47:19,21;48:23;67:12,
14,19,20,21;72:25;
73:9;81:25;82:1,1;
87:12;88:12;92:7;93:3;
95:4,4,6,7,19;96:23;
98:4;99:11,16;101:14;
102:1,15;103:22;
105:10,12,14;119:19,
20;124:10;130:15,17,
22;131:15;133:23
**billion-plus (1)**
22:19
**billions (4)**
20:5;73:13,16;
124:17
**billion's (1)**
67:22
**bind (1)**
115:10
**binding (1)**
114:25
**bird (2)**
65:21;67:9
**bird-in-the-hand (1)**
65:20
**bit (6)**
5:25;23:25;33:1;
46:1;52:6;73:21
**black-line (2)**

108:6;109:21
**black-lined (1)**
109:11
**blank (2)**
78:7,7
**blocking (1)**
106:24
**blow (1)**
57:2
**blows (1)**
26:12
**board (4)**
48:14;75:20;81:2;
121:19
**Bob (1)**
50:5
**bogged (2)**
140:1,15
**bondholder (1)**
120:11
**bondholders (4)**
43:1;51:8;53:18;
119:22
**bondholders' (1)**
96:3
**bonds (1)**
131:11
**both (14)**
15:4;21:18,20,20;
30:18;42:25;45:6;72:5;
78:23;92:2;94:19;
104:5;118:11;123:1
**bottom (2)**
17:16;22:9
**bound (2)**
34:6;115:10
**boundary (1)**
131:18
**box (2)**
34:7,8
**Bray (40)**
90:11,12,12;91:20,
23;92:1,8,10,13,15;
93:8,18,22,24;94:1,5,8,
10,14;95:9,14,16,23;
96:1,5,8,10,13,15;
97:18,20,22,24;98:1,
14;99:7;100:16;111:7;
121:20;135:11
**Bray's (1)**
131:20
**break (2)**
11:5;135:1
**brief (11)**
4:19;5:2;14:3;52:7;
80:7;120:19;135:5;
140:8;141:6,7,8
**briefing (1)**
4:24
**briefly (1)**
107:8
**briefs (1)**
40:15

Min-U-Script®

Case: 19-30088    Doc# 4992    Filed: 12/05/19    Entered: 12/05/19 10:22:14    Page 146
of 165

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.com

(2) approve - briefs

**bringing (1)**
  11:4
**brings (1)**
  59:25
**broadcasting (1)**
  58:17
**broken (1)**
  43:21
**brought (2)**
  15:13;78:6
**build (1)**
  80:23
**built (1)**
  113:13
**bullet (1)**
  86:17
**Buntler (1)**
  17:9
**burnt (2)**
  64:7;112:1
**business (1)**
  9:25
**buttresses (1)**
  23:14
**bypass (1)**
  74:12

**C**

**calculation (1)**
  10:22
**calendar (2)**
  7:2;9:10
**CALIFORNIA (3)**
  4:1;37:23;83:1
**Call (7)**
  4:4;30:11;61:18;
  74:21;120:16;124:16;
  129:7
**called (1)**
  60:8
**came (2)**
  53:22;71:5
**Camp (1)**
  48:19
**can (114)**
  5:25;6:19;7:1,3,14;
  8:16;9:5,17,20;11:8,8;
  12:11;15:7,11;16:5;
  17:6,8;18:15;20:8;
  21:17;22:2;25:16,20;
  28:15,23;31:7,13,13,
  17,19,22;34:14;39:4;
  42:25;43:6;44:17;
  45:12;57:1;61:3,10,11;
  62:20;63:11,15;64:5,
  12;65:3;69:4;71:16,20,
  20;72:20;73:22;76:20,
  25;78:23;81:12,14,14;
  82:11,25;83:11;86:23,
  25;89:21;90:2;91:12;
  93:3,15;95:16;96:13,
  15,17,18;97:6;98:21;

**100**:8;101:9;102:19,
  20;103:3,5;104:7;
  105:21;107:8;113:17,
  19,25;116:22,23,23;
  117:19;120:11;121:17;
  124:9,17;125:21,25;
  132:4,11;136:1,5,5,6,
  18;137:9,25;138:20;
  140:7,11;141:2,12;
  142:2,25
**capable (2)**
  76:1,25
**capital (1)**
  83:3
**capping (1)**
  58:13
**Carbide (4)**
  42:1,2,7;71:8
**care (2)**
  12:12;84:18
**careful (1)**
  44:20
**carrier (3)**
  112:14;114:17;
  118:19
**carriers (3)**
  117:4;118:22,25
**carved (2)**
  34:10;119:5
**case (76)**
  9:22;18:5;21:3;
  24:11;28:11;34:18;
  41:16,17,18,21;44:1;
  45:10;46:19;50:22;
  51:15,16,18,24;53:24;
  54:3,7,8,20,21,23;
  56:21;57:1;58:15,21,
  25,25;59:8,10;60:14,
  17;63:13,24;67:10,13;
  68:1,2;71:2,3,9,9,10,
  12,15;73:16;74:8,19;
  77:15,16;78:18;80:6,
  22,23;85:4,5,8;86:1,1,
  3;89:11;90:1;91:11;
  102:1;104:12;106:10;
  115:23;118:16;123:11;
  125:11;129:3;131:10;
  133:20
**cases (39)**
  13:22;14:6,8,25;
  17:2;18:25;19:15;21:6,
  19,23,25;24:21;25:2,
  21;40:23;41:5;43:14;
  44:3,4;55:15;58:5;
  60:15;62:9,10;68:7;
  71:7,8;77:15;84:17;
  104:4,8,10,21,24;
  120:24;124:3,12;
  130:11;133:6
**cash (22)**
  15:22;21:8;37:21;
  56:24,24;59:5;67:23;
  79:5;82:1;87:13;88:24;

**95**:5,6,7,20;99:12,17;
  101:14;102:6,7,15;
  130:23
**catch (1)**
  109:13
**causation (2)**
  20:24,25
**causes (1)**
  66:23
**cavalierly (1)**
  73:21
**cede (1)**
  32:9
**certain (5)**
  11:1;33:5;51:24;
  55:8;103:4
**certainly (4)**
  15:14;48:21;113:19;
  128:4
**certification (3)**
  74:3,17,19
**certified (3)**
  73:16,18,20
**certify (3)**
  74:6;75:2,6
**cetera (3)**
  55:21,21,22
**CFO (1)**
  16:12
**challenge (1)**
  20:8
**challenged (1)**
  16:20
**chance (4)**
  9:16;97:4;124:1;
  140:5
**chances (1)**
  91:15
**change (3)**
  22:7;23:10;66:9
**changed (6)**
  6:16;38:21;42:3;
  45:24;100:7;114:13
**changes (1)**
  110:7
**channeled (1)**
  28:24
**chaos (1)**
  68:25
**Chapter (5)**
  14:25;19:2;121:16;
  130:7;133:2
**characterized (2)**
  14:7;34:2
**characterizing (1)**
  119:15
**chart (6)**
  27:17;42:14;50:14;
  60:3,4;109:7
**check (8)**
  36:18;37:21;41:12,
  13;42:9;65:5;116:2,4
**checked (1)**

**69**:16
**checking (2)**
  34:7,8
**chicken (4)**
  25:23;46:1,16;66:7
**choice (15)**
  9:6;63:4,22;64:4,24;
  68:15,16,18;85:3;
  87:11;98:7;102:25;
  114:22,24;124:6
**choices (3)**
  42:14,15;76:19
**choose (1)**
  31:22
**chooses (1)**
  39:23
**chunk (2)**
  116:21,22
**Circuit (24)**
  12:25;13:11,16,19;
  40:2,8;41:5,24;42:6;
  47:11;53:20;68:6;71:7,
  7,8,12;73:17,25,25;
  74:12,18,20,21;86:7
**Circuit's (1)**
  70:5
**circumstance (7)**
  34:17,24;36:16;
  37:21;38:11;41:9;
  102:18
**circumstances (5)**
  20:8;26:21;44:3;
  104:7;106:17
**cited (7)**
  19:15;40:23;42:2;
  44:1;95:21;104:22;
  123:12
**cites (2)**
  13:23;41:6
**citing (2)**
  140:18,21
**civilized (1)**
  16:9
**claim (32)**
  28:24;29:4;31:15;
  36:10;37:21;38:12;
  45:10,11,16;58:18;
  60:25;61:1;97:7;98:10;
  99:15,16;103:21;
  111:13;112:4;118:12,
  15,15;124:8,15;126:7;
  128:11,13,14,14,16;
  130:17;141:19
**claimant (3)**
  30:22;64:21;116:17
**claimants (18)**
  15:21;18:25;20:4,19;
  24:12;26:15;32:23;
  53:23;54:3;80:14;82:2;
  92:25;93:10;95:19;
  97:6,9;112:4;123:3
**claims (61)**
  14:10,15;16:25;17:5,

**7**,17,22;18:19,21;20:6,
  25;22:19;23:6;24:24;
  27:6,13;28:5;31:3,7;
  34:3,11,15,21;42:24;
  43:6;45:18,19;46:6;
  47:25;50:18,20;53:12,
  15;54:3,12;57:14,16;
  58:6;59:1;66:11;67:17;
  72:20,21,21;73:5;
  76:17;92:11;94:21,25;
  111:9;113:9,12;
  119:16;124:11;125:10,
  12,17,23;128:12;
  130:18;131:16
**Claims' (1)**
  50:18
**clarification (1)**
  139:11
**clarified (1)**
  120:9
**clarifies (1)**
  26:18
**clarify (6)**
  61:11;91:5;97:25;
  119:11,17;120:7
**class (2)**
  43:5;131:24
**classic (1)**
  136:21
**clause (1)**
  93:20,20
**clawed (2)**
  60:21,24
**clean (2)**
  60:16,20
**cleanup (1)**
  111:20
**clear (14)**
  24:10;27:1,4;75:11;
  80:21;82:7,19;83:23;
  89:11;101:6;111:5;
  121:12;124:6;142:10
**clearly (4)**
  28:7;30:21;85:4;
  124:6
**CLERK (3)**
  4:5,9;9:9
**client (12)**
  36:20;48:5;60:16;
  79:20,23;83:22;88:12;
  113:17;115:9;122:25;
  127:24;129:21
**clients (9)**
  43:4;48:25;54:11;
  57:8;58:24;63:5;83:22;
  96:4;130:20
**client's (2)**
  34:16;130:18
**close (2)**
  9:25;13:24
**closer (1)**
  111:19,22;126:13
**closing (2)**

Case: 19-30088    Doc# 4992    Filed: 12/05/19    Entered: 12/05/19 10:22:14    Page 147
of 165

61:11;111:14
**clue (3)**
9:3;44:18;83:25
**Code (2)**
41:7;42:2
**collaboration (1)**
71:3
**collaboratively (1)**
52:10
**colleague (4)**
28:15;135:11;141:2;
142:4
**colleagues (3)**
69:8;75:14;78:11
**collect (1)**
39:7
**colloquy (1)**
119:15
**comfort (1)**
44:25
**coming (8)**
12:8;22:10;59:2;
85:1;100:5;105:14;
133:10;134:21
**comment (1)**
91:5
**comments (7)**
90:20;99:6;120:20;
121:20;135:10,13;
142:6
**commit (1)**
9:20
**commitment (1)**
8:22
**commitments (1)**
6:16
**committee (17)**
5:14;6:8;7:13;11:18;
13:7;15:5;19:22;51:4,
8;52:19;90:11,13,21;
99:5;112:16;133:16;
135:8
**common (4)**
15:1,2;67:9;104:6
**communicate (1)**
8:25
**communicates (1)**
129:19
**companies (5)**
87:22;88:19;112:18;
130:21;131:14
**company (36)**
12:2;16:14;32:18;
33:7;34:2,12,14,18;
35:16;36:2,10,12;39:4;
42:20;43:1;46:6;48:1;
52:10;60:23;82:24;
87:15;88:23;114:2;
115:9;127:13;129:17;
130:16,18,24;131:7,13;
133:7,22;134:1,5,12
**company's (2)**
131:23;134:2

**compared (2)**
30:24;127:21
**compelled (6)**
42:8,17,18,22,25;
98:2
**compelling (1)**
43:9
**competing (15)**
19:25;24:22;28:8;
97:12,17;98:7;104:9,
25;122:2,3,4,9,10,19;
132:8
**competing-plan (1)**
122:6
**competition (1)**
137:16
**competitive (9)**
12:1;82:4;90:17,22;
92:23;137:3;138:19,
24;139:15
**complaining (1)**
121:22
**complete (1)**
132:1
**completely (5)**
13:25;16:11;33:2;
82:24;119:3
**complexity (2)**
20:21;49:4
**compliance (2)**
21:24;82:21
**complicated (2)**
61:9;125:5
**complication (1)**
47:18
**complied (2)**
38:21,24
**complies (2)**
14:12,20
**comply (8)**
15:8;19:3;81:5,15;
82:15;88:5;139:12,20
**component (7)**
47:21;48:3,10,16;
49:5;130:13,25
**comports (1)**
20:2
**comprehend (1)**
13:9
**comprehensive (2)**
20:15;125:5
**compromise (5)**
15:9;18:24;124:7,20,
24
**conceded (1)**
124:19
**concept (1)**
129:14
**concern (8)**
79:12;80:11;87:12,
20;94:14;105:1;
107:11;126:14
**concerned (4)**

33:5;74:11;89:2,2
**concerning (4)**
7:17;100:2;106:3;
107:9
**concerns (6)**
26:18;83:10;90:15,
18;121:4,10
**conclude (1)**
120:14
**concluded (1)**
143:9
**concrete (3)**
30:15;136:1;137:8
**condemnation (3)**
23:9,14;47:22
**condition (1)**
34:25
**conditional (1)**
97:8
**conditioned (1)**
97:9
**conditions (1)**
92:2
**conduct (1)**
120:23
**conducting (1)**
11:2
**confer (3)**
106:11;141:2;142:23
**conference (3)**
11:5;138:7;141:9
**confess (2)**
33:2;45:4
**confident (1)**
129:4
**confidential (1)**
142:22
**confine (1)**
99:6
**confirm (6)**
61:3;81:14;91:14;
96:16,19,24
**confirmable (7)**
80:16,18;83:18,25;
85:8,11,20
**confirmation (17)**
12:9;26:3;38:24;
44:13;65:13;88:17;
89:10;91:9;92:3;
102:24;113:15;124:12;
125:22;126:19;127:14;
128:10;129:14
**confirmed (5)**
21:25;28:22;96:9,11;
124:1
**confirming (1)**
34:19
**conflated (1)**
33:1
**confusing (1)**
5:1
**confusion (1)**
69:1

**conjunction (2)**
44:12;127:14
**connection (3)**
28:5,6;38:23
**conscious (1)**
123:24
**consensual (15)**
54:21;68:12;70:4;
71:6;72:2,3,7;75:24;
86:8;87:18;112:5,8,10;
113:24;115:3
**consensus (5)**
104:7;108:19;
110:10,12;141:3
**consent (9)**
5:17;6:3;41:10;
60:13,14;70:5;104:20;
113:17;133:17
**consenting (4)**
41:12;53:12,15;94:4
**consents (1)**
13:5
**consequence (3)**
66:12;122:11;123:21
**conservative (2)**
30:10;46:24
**consider (5)**
25:5;44:12;74:20;
106:12;112:3
**consideration (4)**
21:5;99:15,17;100:3
**considerations (1)**
26:16
**considering (1)**
14:1
**consistent (14)**
8:21;11:13;13:16;
19:12;21:19;22:1;28:8,
10;50:13;106:18;
138:4,17;139:9,16
**consortium (1)**
112:15
**constituencies (2)**
21:5;108:18
**constituents (4)**
47:17,23;66:18;
128:22
**constitutes (1)**
118:17
**construct (1)**
79:4
**constructive (1)**
121:6
**consult (1)**
5:19
**consummation (1)**
36:24
**contain (3)**
70:21;109:22;110:3
**contained (3)**
13:7;101:22;128:9
**contains (1)**
41:8

**contemplated (1)**
33:18
**contend (1)**
20:9
**context (10)**
14:5;81:4;105:13;
123:3,23;124:2,11;
125:21;132:8;139:15
**contingency (1)**
21:23
**continuance (1)**
9:21
**continue (6)**
11:8;15:7;98:8;
111:9;116:23;143:4
**continued (2)**
10:24;49:9
**continues (2)**
109:22;110:3
**continuing (3)**
5:15;20:22;82:17
**contours (1)**
60:6
**contract (1)**
27:5
**contractually (3)**
93:13;96:6;123:18
**contrary (2)**
103:17;105:6
**contravention (1)**
12:25
**control (1)**
54:4
**controlling (3)**
12:25;19:5;55:21
**conversations (1)**
82:20
**convince (2)**
15:3;69:13
**convinced (2)**
71:2;126:5
**cooperate (1)**
140:14
**copy (3)**
109:8;141:4,7
**Corning (1)**
77:15
**Corporation (1)**
4:9
**correctly (3)**
17:10;40:22;91:10
**correspondence (2)**
136:3,13
**costs (2)**
63:7,13
**counsel (9)**
9:8;10:15;51:9;53:7;
69:12;90:13;112:4;
134:18;140:14
**count (1)**
67:19
**counting (2)**
73:9,11

Case: 19-30088    Doc# 4992    Filed: 12/05/19    Entered: 12/05/19 10:22:14    Page 148
of 165

**country (1)**
14:25
**couple (8)**
4:13;6:2;9:12;10:11;
11:9;46:7;99:8;142:6
**course (11)**
17:2;22:7,7;83:16;
101:9,23;102:19;
103:5;111:3;114:9;
138:21
**Court (667)**
4:4,5,7,10,13,16;5:4,
7,13,22;6:4,10,18;7:6,
9,12,21,25;8:3,7,10,13,
18,24;9:8;10:1,3,5,14,
17,22;11:13,17,20,23;
12:3,8,12,15,17,20;
13:3,10,15,21,24;14:2,
17,19;15:3,12,18,20,
23,25;16:3,5,7,11,13,
15;17:6,8,13,16,21,24;
18:1,6,8,12,15,18;19:4,
10,13,16,16;21:7,11,
14,16;22:4,13,18,22,
24;23:1,4,9,16,18,21,
25;24:2,4,6,9,15,17;
25:1,3,11,14,22;26:6,
25;27:2,8,12,14,16,19,
23;28:1,12,17,25;29:3,
6,11,13,20;30:1,6,11,
13,17,19;31:4,9,11,17,
19,23;32:3,5,7,11,14,
16,18;33:5,9,11,16,20,
22,24;35:3,5,7,10,12,
14,16,19,21;36:7,13,
15,17,20,22;37:1,4,6,9,
15,17,19,23;38:17,25;
39:3,6,10,15,17,20,21,
22;40:6,12,14,17,20;
41:2,5,14,16,19;42:2,4,
13,17;43:16,18,21,24;
44:10,12,16,18,20,23,
25;45:1,12,13,15,20;
46:8,10,12,14,20;47:1,
4,6,7,9,12,14;48:5,9,15,
22,24;49:3,6,8,13,15,
18,20,25;50:4,7,11,16,
21;51:6,10;52:1,4,15,
20,23;53:1,4;55:12,14,
20,24;56:3,5,8,11,13,
16,19;22;57:5,8,11,17,
20,23;58:1;59:4,6,16,
18,21,23;60:1,3,7,12,
19,24;61:2,5,8,13,16,
21,23;62:2,12,14,17,
19,23;64:9,15,19;65:1,
7,10,12,15,18;66:1,6,
15,17,21;67:3,5,7,11;
68:22,24;69:7,12,20,
23;70:1,7,9,13,16,19;
71:11,18,20,23,25;
72:3,6,13,17,23,25;
73:3,7,11,14,19;74:5,9,

14,16,24;75:2,6,9,12,
14,16,19,25;76:3,4,9,
11,13,18,20;77:5,11,
20,23;78:1,3,10,13,15,
17,20,22;79:8,10,12,
15,17,20;80:1,8,20,22,
25;81:6,11,17,19,22;
82:3;83:13,15;84:2,5,7,
9,19,21;85:10,18,21,
24;86:3,7,16,21,23,25;
87:4,6,19,21;88:3,9,14,
16,21,23;89:13,18,21,
24;90:6,9,18,19;91:11,
21,25;92:6,9,11,14;
93:6,17,21,23,25;94:3,
7,9,11;95:8,10,15,22,
24;96:2,6,9,11,14,24;
97:14,19,21,23,25;
98:8,13,15,19,21;99:1,
3,13,18,20,22,24;
100:1,4,10,13,15,21,
23;101:1,7,15,18,21;
102:5,9,11;103:3,5,7,
11;104:12,15,17,20;
105:4,20,22,24;106:4,
8;107:7,11,12,16,19,
21,23,25;108:3,5,10,
12,24;109:3,5,7,10,12,
18,25;110:2,11,15,17,
24;111:1,3,5,18,22;
112:2,23,25;113:2,6,
14,16,21,25;114:7,9,
13,21;115:6,8,15,18,
21;116:2,7;117:8,12,
15,19,22,25;118:4,7,
10,23,25;119:3,5,8,10,
13,23,25;120:3,6,9,13;
122:8,13,15,18,21;
123:5,10,13,15;124:4,
6,13;125:4,8,13,15,19,
24;126:1,4,9,13,21,22,
23;127:1,3,6,8,16,19,
23;128:1,3,18,20,22,
25;129:6,9,18,24;
130:5;131:8;132:6,9,
15,17,21,24;133:4,8,
11,13;134:4,7,10,15,
17,19;135:3,5,14,19;
136:4,11,14,19,22,24;
137:1,4,13;138:1,3,15;
139:1,4,7,18,23,25;
140:13;141:1,11,14,17,
23;142:7,9,14,18,20,
23;143:3,8
**courtroom (6)**
7:7;104:4;130:12;
136:24;137:7;141:4
**Court's (4)**
38:23;68:10,11;
103:1
**covenant (1)**
100:18
**covenants (5)**

92:23;93:19,19;94:2,
3
**cover (1)**
68:6
**coverage (1)**
27:5
**CPUC (5)**
82:10,10;83:24;
105:21;106:3
**create (1)**
68:25
**created (1)**
91:9
**creditor (7)**
21:5;39:4,13;64:25;
96:24;102:3;108:18
**creditors (8)**
21:3;45:7,8;53:12,
16;92:5;94:4;130:16
**creditors' (2)**
90:11,13
**creditor-sponsored (1)**
105:14
**critical (3)**
45:25;46:1;130:24
**criticize (4)**
18:9;73:20;79:20;
89:19
**criticized (1)**
11:2
**crosses (1)**
109:18
**current (1)**
6:23
**currently (3)**
53:11,14;54:4
**cushion (1)**
55:9
**customary (2)**
14:22;121:23
**cut (2)**
65:18;76:16

**D**

**damages (4)**
20:24;37:13;118:17;
131:6
**data (3)**
22:18,18;76:8
**date (11)**
9:13,21;17:7;25:13,
15,18;63:23;84:17,18;
117:17;133:16
**day (14)**
7:13;9:17;12:9,15;
31:14;40:25,25;64:7;
67:13;74:17;120:16;
137:21;140:9,21
**days (10)**
5:23;6:2,13;8:19;9:9,
12;10:11;45:17;
140:21;142:2

**dead (1)**
90:3
**deadline (1)**
5:18
**deadlines (1)**
4:25
**deal (28)**
11:11;21:8;26:10;
33:18,23,25;41:11;
46:2,5;47:19,24;48:1,
13,14,24;54:8;65:12;
78:9,10;85:22;92:18,
20;93:1;123:2,8;127:3;
130:22;142:5
**dealing (1)**
64:25
**deals (4)**
34:17;68:10;73:13;
133:2
**dealt (1)**
60:4
**death (1)**
11:3
**debt (1)**
106:1,11,14
**debtor (17)**
5:16;10:19;85:7,15;
89:6,8;95:20;97:10;
104:1,10;106:14;
107:1,4;108:14;
138:18;139:12;142:16
**debtor-in-possession (1)**
91:12
**debtors (34)**
6:12;14:8;19:1,2;
22:2;53:24;82:5;83:5,
6,9;97:2;102:2;103:17;
104:22;106:23;108:6,
8,11;109:19;110:8,9;
119:17;120:18,21;
121:2,13,16,18;123:2;
128:15;135:24;136:2;
138:12;139:19
**debtors' (20)**
15:3;16:24;24:8;
26:8,10;73:5;90:4,23;
96:17,19;97:4;101:8,9;
102:6;103:8;111:10;
112:3;121:5,15;135:16
**debtor's (3)**
4:22;97:10;106:2
**DECEMBER (5)**
4:1;5:18;9:14;45:17;
138:6
**decide (15)**
4:18,19,23;10:19;
25:4;36:8;44:13;46:19;
48:22;50:23;66:8;
112:20;113:9;125:1;
134:12
**decided (3)**
38:18;123:25;139:4
**decision (15)**

23:9,13,22;25:24;
41:19;46:18;51:24;
61:21,22;62:4;70:5;
90:8;123:24;138:24;
139:2
**decisions (7)**
25:7;30:10;61:24,24;
87:6,8;134:21
**declaration (9)**
16:12,19,21;17:9;
45:5,6;63:23;67:16;
72:12
**declarations (1)**
20:13
**deem (1)**
128:11
**deemed (3)**
38:6,7;42:24
**defeats (1)**
98:4
**defend (1)**
63:8
**defenses (1)**
39:16
**defer (7)**
5:25;6:2,19;7:1;
87:1;134:20;139:2
**defined (2)**
96:17;118:15
**definition (2)**
50:18;115:2
**delay (1)**
20:22
**delta (1)**
38:11
**demand (2)**
116:13;117:5
**demands (1)**
116:17
**democratic (1)**
133:1
**demonstrated (1)**
20:12
**demonstrates (2)**
16:21;45:6
**denied (1)**
85:12
**Dennis (1)**
4:6
**deny (2)**
5:11;117:3
**denying (1)**
68:25
**Department (1)**
20:20
**Depends (1)**
28:16
**deposed (2)**
64:1,7
**deposition (9)**
6:20,21,22;7:18,19;
8:5;10:9,13;63:24
**depositions (2)**

Min-U-Script®

Case: 19-30088    Doc# 4992    Filed: 12/05/19    Entered: 12/05/19 10:22:14    Page 149
of 165

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(5) country - depositions

7:19,23
**deputy (1)**
141:4
**described (1)**
37:7
**designed (2)**
30:4;90:16
**desire (1)**
133:21
**desperate (1)**
68:19
**desperately (1)**
64:23
**despite (1)**
82:5
**destroy (2)**
90:17;91:14
**detail (1)**
59:21
**details (1)**
61:14
**determination (2)**
66:13;85:10
**determinations (1)**
82:12
**determine (3)**
97:2;113:4;132:7
**determined (5)**
26:13;53:13,16;
54:16;99:19
**detriment (1)**
138:14
**develop (1)**
135:12
**developed (1)**
31:6
**developing (1)**
82:21
**devil's (1)**
61:14
**dice (1)**
38:18
**dicta (1)**
71:14
**difference (1)**
66:2
**different (11)**
18:8;20:25;44:3;
55:18,23;60:12;80:22;
102:21;119:3;122:20,
21
**dig (1)**
98:11
**dilemma (1)**
129:20
**DIP (1)**
105:5
**direct (3)**
12:24;73:23;75:2
**directly (2)**
94:11;136:23
**disagree (6)**
42:9;61:25;68:6;

89:23;129:1;135:25
**disapprove (3)**
74:25;76:21;91:15
**disapproved (3)**
66:9;86:5,10
**disapproving (3)**
66:25;69:15;102:25
**discharge (1)**
39:10
**disclosure (3)**
44:21;86:5;95:1
**discount (4)**
14:11;17:2;20:7;
21:4
**discovery (12)**
5:24;7:3,17;9:3;
114:1;138:1;140:2,15,
19,22;141:13;142:1
**discredit (1)**
66:22
**discrete (1)**
28:13
**discuss (4)**
11:19;51:20;52:6;
106:12
**discussed (1)**
11:21
**discussion (3)**
35:25;58:21;137:21
**discussions (2)**
63:4;138:10
**dishes (1)**
50:25
**dispute (3)**
51:15;104:5;138:1
**disputed (1)**
124:15
**disputes (1)**
116:19
**dissing (1)**
79:21
**distributed (1)**
18:25
**distributions (1)**
35:24
**district (1)**
86:6
**divorce (1)**
36:20
**DOA (2)**
86:17,20
**docket (4)**
52:25;105:21;109:2,
6
**document (8)**
6:14;53:6;59:14;
96:16;100:25;108:25;
118:2,5
**documents (7)**
6:21;7:4,18,24;8:6,
20;61:9
**dollar (4)**
38:10;58:12,20;

66:11
**dollars (74)**
8:22;14:9,10;15:22;
17:5,23;18:20,22;20:6;
23:6,7,15;24:24;28:21;
29:23,23;36:3,3,6;
37:11,24,24;38:2,8,9,
10;39:25;41:11;42:21;
45:9,22;47:19,21;
48:23;58:7,11;63:16;
73:13,16;81:25;82:1;
87:13;88:12;93:3;
94:16;95:4,5,6,7,19;
96:23;98:4;99:11,16;
102:2;103:22;105:10,
12,14;115:25,25;
119:19,21;124:10,16,
16;130:2,15,17,23;
131:4,5,15;133:23
**Donato (16)**
22:9,15;26:7;30:9,
13;33:12;34:19;46:23;
55:7;64:13;74:12,16;
77:12,24;78:4;97:15
**Donato's (3)**
22:6;63:24;141:24
**done (20)**
9:3;36:22;44:2;
49:14;52:8,9,9;53:19;
68:13;71:20,21;72:1;
74:7;75:22;82:7;116:1;
117:18;122:2;126:4;
142:2
**doom (1)**
77:18
**doomsday (2)**
37:7,8
**door (1)**
65:5
**doubt (4)**
50:17,23,25;88:7
**dovetails (1)**
135:21
**Dow (1)**
77:15
**down (16)**
54:19;68:14;87:1,1;
89:18;93:2,3;111:10;
112:1;124:9;132:11;
133:25;134:13;137:18;
140:1,15
**downside (2)**
25:11;87:23
**draft (2)**
53:19;71:4
**drafted (3)**
54:25;59:21;63:18
**drafters (1)**
60:8
**draw (1)**
52:12
**drawing (2)**
48:14;75:20

**driving (1)**
87:16
**drop-dead (2)**
25:13,15
**due (4)**
6:23;8:21;36:5,5
**DUMAS (3)**
98:18,19,20
**duplicates (2)**
57:24;58:2
**during (2)**
61:18;137:21
**duties (1)**
120:22
**duty (5)**
85:16,21;135:18,25;
136:2

**E**

**earlier (2)**
77:14;131:10
**early (4)**
29:21;46:5;59:7;
63:19
**easy (2)**
38:3;83:19
**economic (5)**
15:6,16;19:24;
121:15;123:20
**economics (1)**
76:15
**effective (3)**
8:10,11;129:11
**effectively (1)**
96:23
**effort (2)**
77:18;87:15
**efforts (2)**
79:25;82:5
**eh (1)**
54:2
**eight (1)**
51:9
**eighty-five (1)**
114:15
**either (19)**
9:21;11:1;17:15;
31:24;32:4;33:12;43:7,
11;45:5;46:17;48:9;
49:10;58:9;60:7;91:21;
96:21;105:10;124:6;
126:20
**elect (1)**
113:19
**elements (1)**
130:25
**eleven (34)**
14:10;15:21;22:11;
47:19;48:21;66:11;
67:12,14,21,22;81:24;
82:1;87:12;88:12;92:7;
93:3;94:15;95:4,4,6,7,

19;99:11,16;101:14;
102:1,15;103:22;
105:9,12,14;130:22;
131:15;133:23
**eleven-billion-dollar (3)**
65:21;94:23;126:7
**eleven's (2)**
22:24;23:1
**eliminates (3)**
23:3,3;92:19
**eliminating (3)**
92:7,7,16
**else (8)**
11:10;40:17;47:15;
49:21;81:2;83:23;
87:25;126:15
**else's (1)**
103:24
**email (6)**
137:24;138:5;140:8,
12;141:22,22
**embedded (1)**
92:22
**embraced (1)**
24:22
**emerge (1)**
19:2
**emerging (1)**
82:24
**emphasize (1)**
90:19
**enable (1)**
29:16
**encourage (2)**
108:21;110:5
**end (24)**
12:5,15;22:7;31:14;
36:18,19;46:15,19;
54:16,20;58,15,23,25;
59:10;60:14;63:12;
68:20;70:14,22;75:22;
77:1;80:3;102:17;
133:12
**ended (1)**
86:8
**engage (1)**
100:1
**engaged (1)**
137:6
**enough (8)**
34:22,23;38:19,19;
76:8;89:11;102:2;
103:23
**enter (2)**
35:1;131:3
**entire (3)**
18:13;24:24;91:3
**entirely (1)**
28:8
**entities (1)**
50:9
**entities' (1)**
50:19

Min-U-Script®
Case: 19-30088    Doc# 4992    Filed: 12/05/19    Entered: 12/05/19 10:22:14    Page 150
of 165
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(6) deputy - entities'

**entitled (2)**
36:2;37:10;38:13;
43:12
**envision (2)**
58:3;76:22
**equal (2)**
94:22;137:15
**equally (2)**
14:11;94:18
**equity (9)**
5:19;6:16;83:6;85:3;
87:15;99:17;107:1,3;
138:13
**equity-sponsored (7)**
80:14;82:2,7;83:8;
105:13;107:2;121:13
**especially (2)**
90:19;95:5
**essentially (2)**
91:2;92:23
**establishes (1)**
51:15
**estate (8)**
8:23;91:3;92:21;
93:1;103:16;104:1;
105:10,12;122:24;
138:14
**estates (6)**
23:24;28:6;106:18;
123:7;124:9;125:8
**estate's (1)**
24:9
**estimate (8)**
42:24;54:4;63:14;
94:21,25;98:1,2,3
**estimated (3)**
11:8;111:10,13
**estimation (30)**
20:18;22:8,10;23:5;
25:19;30:4,5,7;35:19;
40:9,10;43:10;55:5,8,
15;77:16;78:6;79:4;
92:19;94:20;96:21;
97:16,17;98:8,9;125:9,
11,17;126:8;131:19
**et (3)**
55:21,21,21
**evaluate (3)**
65:8;89:4,5
**even (42)**
5:24;6:6;8:14;10:2;
13:24,25;18:4;19:15;
20:13;24:11;33:11;
37:18;42:6,7;53:22,22;
55:7,15;59:11;62:20;
63:23;64:23;65:1,2;
67:14;71:9;74:16;
76:22;83:15;92:16;
94:8;96:19;97:1;
104:23;107:5;109:21;
112:7;115:10;116:9;
120:19;123:18;139:16
**event (7)**

8:2,4;76:7;90:7;
92:5;96:22;125:20
**everybody (10)**
30:23;31:19;38:19;
58:15;79:23;81:2;88:4;
89:10;131:11;138:10
**everybody's (1)**
38:9
**everyone (7)**
4:7;51:21;55:4;58:9;
66:12;137:7;143:1
**everyone's (2)**
54:24;120:7
**evidence (8)**
16:10,16,19;20:23;
67:20;112:14;120:22,
23;135:24;136:1
**exact (3)**
119:5;123:16,20
**Exactly (10)**
13:18;22:21;35:6;
36:23;68:8;84:15;
115:3;129:8;130:10;
134:11
**example (3)**
36:2;104:16;138:9
**examples (1)**
104:22
**except (1)**
43:14
**exceptions (1)**
131:15
**excess (5)**
17:5;18:19,21;20:5;
45:23
**exchange (4)**
70:24;140:14;141:4;
142:23
**exchanged (1)**
67:17
**exclusive (1)**
15:4
**exclusivity (7)**
82:5;104:11,23,25;
105:20;122:16,22
**exculpation (2)**
53:10,13
**exculpation-type (1)**
34:5
**excuse (4)**
7:10;74:25;81:11;
136:9
**executed (1)**
128:13
**exercise (2)**
37:13;134:13
**exercising (2)**
85:15;120:22
**Exide (1)**
104:21
**exist (2)**
33:4;36:25
**exists (3)**

8:4;43:13,16
**exit (1)**
143:4
**exit-financing (1)**
5:15
**expect (3)**
59:23;61:9;140:14
**expecting (1)**
28:20
**expedited (1)**
142:5
**expense (1)**
80:14
**expenses (1)**
20:22
**experience (2)**
55:1;77:16
**expert (1)**
17:8
**experts (3)**
58:7;73:6;78:5
**explain (12)**
18:16;24:2,7;46:7,
13;51:22;54:14;62:18,
20,22;64:16,17
**explained (1)**
53:6
**explicitly (1)**
83:10
**exposed (1)**
38:11
**exposure (3)**
48:17,19,19
**express (1)**
137:8
**expressed (2)**
80:11;90:15
**expressly (1)**
14:18
**extend (4)**
7:13;25:16;84:17,18
**extended (1)**
63:23
**extension (2)**
9:4,5
**extent (4)**
12:22;33:14;84:10;
129:16
**extra (1)**
81:25

F

**Faced (1)**
63:3
**facilitate (2)**
21:25;91:13
**facilitates (1)**
19:1
**facing (1)**
114:19
**fact (22)**
8:20;21:12,22;25:12;

38:10;42:12;44:14,24;
49:9;80:12,13;85:17;
90:18;112:17;114:11;
119:4;121:5;122:9;
129:3;135:9,12;136:2
**factors (2)**
22:15;55:17
**factor's (1)**
55:20
**facts (3)**
20:3;55:21;122:22
**fail (4)**
82:17;84:5;90:23,24
**fails (1)**
86:18
**failure (1)**
92:3
**fair (5)**
55:2,2;65:11;90:22;
121:15
**fair-and-equitable (5)**
15:10;19:21;20:13;
49:7;124:24
**fairly (1)**
89:4
**fairness (2)**
15:12;124:14
**faith (1)**
34:12
**falls (2)**
20:10;111:10
**familiar (1)**
72:18
**far (4)**
33:4,5;59:15;66:19
**Farr (1)**
32:22
**fatally (1)**
83:16;91:18,18
**faulting (1)**
66:7
**Faustian (1)**
97:11
**favor (6)**
101:8,12,25;102:16,
18;106:2
**favorable (1)**
105:10
**feasible (4)**
81:7,12,15,16
**Feather (1)**
111:25
**features (2)**
15:2,2
**federal (2)**
19:5;140:18
**feedback (1)**
36:11
**feel (2)**
52:7;89:16
**feeling (1)**
47:16
**feels (2)**

38:10;42:12;44:14,24;
49:9;80:12,13;85:17;
90:18;112:17;114:11;
119:4;121:5;122:9;
129:3;135:9,12;136:2
**factors (2)**
22:15;55:17
**factor's (1)**
55:20
**facts (3)**
20:3;55:21;122:22
**fail (4)**
82:17;84:5;90:23,24
**fails (1)**
86:18
**failure (1)**
92:3
**fair (5)**
55:2,2;65:11;90:22;
121:15
**fair-and-equitable (5)**
15:10;19:21;20:13;
49:7;124:24
**fairly (1)**
89:4
**fairness (2)**
15:12;124:14
**faith (1)**
34:12
**falls (2)**
20:10;111:10
**familiar (1)**
72:18
**far (4)**
33:4,5;59:15;66:19
**Farr (1)**
32:22
**fatally (1)**
83:16;91:18,18
**faulting (1)**
66:7
**Faustian (1)**
97:11
**favor (6)**
101:8,12,25;102:16,
18;106:2
**favorable (1)**
105:10
**feasible (4)**
81:7,12,15,16
**Feather (1)**
111:25
**features (2)**
15:2,2
**federal (2)**
19:5;140:18
**feedback (1)**
36:11
**feel (2)**
52:7;89:16
**feeling (1)**
47:16
**feels (2)**

48:20;121:1
**fees (2)**
8:22;63:8
**Feld (1)**
99:2
**Feldman (151)**
13:1,23;19:8;24:5;
25:17,23;26:2;32:10,
11,12,15,17,20,21;
33:10,15,17,21,23;
35:4,6,9,11,13,15,18,
20,22;36:8,14,16,19,
21,23;37:2,5,8,10,16,
18,20;38:22;39:2,5,9,
11,16,18,21;40:5,7,13,
16,19,22;41:4,6,15,18,
21;42:5,16,22;43:17,
20,23,25;44:11,17,19,
22,24;45:2,14,19,21;
46:9,11,13,15,21;47:2,
5,8,11,15;48:8,10,16,
23;49:2,4,7,12,14,16,
19;50:5,8,12,17;61:3,
10,65:1;66:7;75:19;
81:25;83:22;87:2,22;
88:11;97:15;114:2;
120:13;126:11,18,22,
25;127:2,4,7,12,20,25;
128:2,7,19,21,24;
129:1,8,13,23;130:4,6;
131:9;132:7,14,16,18,
23;133:2,5,9,12,14;
134:5,9,11,15,16
**Feldman's (4)**
60:8;16;96:3;112:15
**FERC (1)**
74:18
**fervor (1)**
66:22
**few (2)**
24:13;131:15
**fiduciaries (3)**
26:11;58:22;103:18
**fiduciary (16)**
85:7,16,21;104:2;
105:4,5,5;107:4;
111:16;120:22;133:7;
135:18,24;136:2;
138:18;142:16
**field (3)**
91:2;137:16;139:17
**fifteen (3)**
20:5;114:14;120:14,
19
**fighting (1)**
116:23
**fights (1)**
133:17
**figure (7)**
22:8;23:19;35:17;
58:7;72:20;120:6;
136:7
**figuring (1)**

Case: 19-30088    Doc# 4992    Filed: 12/05/19    Entered: 12/05/19 10:22:14    Page 151
of 165

116:21
**file (11)**
6:22;7:22;9:20;
57:14;67:19;72:21,22;
73:5,24;94:12;138:22
**filed (31)**
5:2;6:9,17;12:23;
15:1;17:5,7,11,22;
18:20;20:6;24:12;
26:16,19;28:8;45:4,10,
15;46:4;52:22;53:5;
54:4;57:20,21;63:22;
105:18,19,25;118:6,16;
122:23
**files (3)**
74:6,19;98:10
**filing (1)**
72:12
**final (9)**
63:10;70:23;73:22;
74:2,3,6,9,11;82:12
**finality (1)**
76:7
**financeable (1)**
121:15
**financial (4)**
88:18;137:15,17;
142:11
**financing (1)**
143:4
**find (2)**
63:11;95:9
**finding (1)**
38:23
**fine (12)**
5:12;8:1,2,17,17;
10:10;36:3;51:10;54:6;
79:25;110:13;142:8
**finesse (1)**
16:2
**finger (1)**
138:13
**finished (2)**
74:7,9
**fire (7)**
14:19;20:4;21:1;
27:5;112:12,21;114:16
**fires (1)**
48:18
**firm (1)**
54:6
**firmly (1)**
135:16
**firms (3)**
54:2;62:25;104:4
**first (33)**
8:12;12:7,18;18:3;
33:21,25;44:9;51:12;
52:12;53:25;61:19;
65:5;67:4,9,13;71:4;
73:4;76:15;79:1,13;
85:25;86:1,3;87:11;
99:9;100:18;104:12;

112:12;120:20,20;
128:8;130:7;135:2
**five (3)**
37:22;43:6;51:5
**fix (10)**
68:24;70:17;76:16;
78:23;84:3;88:19;
89:10,11;100:11;117:9
**fixed (1)**
112:12
**flaw (1)**
116:7
**flawed (1)**
83:16
**Flesh (1)**
23:25
**flexible (1)**
83:3
**flipping (1)**
91:23
**floating (1)**
80:6
**floor (2)**
23:10;64:6
**flow (1)**
12:2
**flurry (1)**
5:14
**fly (3)**
65:21;92:11;140:7
**focus (3)**
12:21;21:9;93:24
**focused (1)**
33:22
**follow (4)**
4:25;72:12;132:10;
142:2
**followed (1)**
140:13
**following (2)**
93:6;141:24
**follows (1)**
28:19
**food (1)**
11:4
**footing (1)**
94:22
**Footnote (2)**
53:13;119:4
**Footnotes (2)**
53:6,9
**forced (5)**
61:18,21;65:8;
115:11,11
**forcing (1)**
68:14
**forego (1)**
62:5
**forget (1)**
40:24
**forgive (2)**
69:6,7
**form (7)**

71:6;99:15,16;100:2;
111:8;116:9;118:1
**formal (5)**
114:1;140:2,15,22;
141:5
**formally (1)**
113:7
**former (1)**
53:19
**formulation (2)**
108:22;110:5
**forth (3)**
16:21;28:7;128:13
**forty-five- (1)**
14:10
**forty-five-percent (1)**
20:7
**forum (2)**
31:24,24
**forward (19)**
5:23;7:3;12:4;22:3,6,
6;24:19,21;25:19,21;
40:10;69:2;83:6;96:21;
123:3,25;124:1;129:2;
134:3
**four (3)**
51:12,13;67:5
**fourth (2)**
52:7;61:19
**frames (2)**
5:10;26:14
**FRANCISCO (2)**
4:1;20:18
**frankly (7)**
13:8;15:10;18:4,13;
69:1;95:3;122:1
**free (2)**
101:25;108:17
**freed (1)**
31:25
**freeing (1)**
21:4
**frees (1)**
18:24
**freeze (1)**
97:12
**Friday (10)**
6:13;8:5;9:15;10:1,8,
9,13;25:17,24;46:17
**Friday's (1)**
10:2
**front (5)**
52:13,15,23;67:13;
131:22
**Fulbright (1)**
111:24
**full (20)**
9:13;21:24;34:23;
35:4,5;38:4,5;43:2,4,7,
13;55:5,8;56:20;62:7;
116:14,24;118:16,17;
133:22
**full- (1)**

34:22
**fully (11)**
14:12;31:6;34:21;
45:4;106:14;112:5,8,
10;113:23;116:14;
118:13
**fund (3)**
81:16,22;121:18
**fundamentally (3)**
6:17;44:3;131:9
**funded (2)**
30:5,6
**funding (1)**
30:3
**funds (1)**
37:25
**further (3)**
116:12,25;117:3
**furtherance (1)**
139:10
**future (1)**
83:1

**G**

**Gallagher (1)**
32:22
**gamble (1)**
77:20
**game (1)**
81:22
**games (2)**
88:4,5
**gave (3)**
44:18;49:9;137:22
**Gavin (1)**
79:19
**gee (1)**
116:11
**generally (1)**
55:14
**gentleman (1)**
72:17
**gentleman's (1)**
17:10
**gentlemen (1)**
141:6
**gets (16)**
19:6;28:12,22;31:25;
33:13;36:17;39:24,25;
47:7;89:3,12;105:12;
115:24;124:24,25;
133:7
**given (7)**
8:18;10:9;41:10;
68:6;114:18;118:21;
129:17
**gives (2)**
53:8;97:9
**giving (6)**
9:6;39:14;41:12;
81:25;129:24,24
**glad (1)**

135:9
**global (3)**
108:19;110:10,12
**go- (1)**
22:2
**goal (5)**
82:6,15;88:9;94:17;
121:18
**goes (7)**
22:5;29:20;48:14;
111:11;115:22,25;
133:24
**go-forward (1)**
121:17
**Good (44)**
4:7,8;26:10;32:11,
12;36:4;6;41:11;45:1,
2;48:24;51:2;57:3,5;
58:21;66:15;77:9;
79:15;88:1;90:12;
92:17,20;93:1;98:23,
24;99:3;102:2;103:23;
105:11;111:22,23;
113:7;114:4,7,22;
122:24,25;124:25,25;
127:3;130:5;132:17,
18;137:16
**Gotshal (1)**
120:18
**governmental (1)**
50:19
**governor (10)**
51:5;69:13,14;79:19;
80:11;82:13;89:16,19;
90:20;134:11
**governor's (12)**
25:6;83:23;87:12;
120:25;121:3,7;134:2;
135:10;137:5,8;
138:11,11
**grant (1)**
9:4
**great (6)**
9:15;79:2;86:4;
103:20;104:16;127:9
**greatly (2)**
19:1;21:25
**Greg (1)**
135:11
**Gregory (1)**
90:12
**grounds (1)**
13:20
**group (16)**
4:20;5:10;8:25;
22:20;28:9;32:22;
106:25;108:8,17;
112:16;113:3,11;
114:3;123:17,17;
124:15
**growing (1)**
57:13
**Grump (1)**

Case: 19-30088    Doc# 4992    Filed: 12/05/19    Entered: 12/05/19 10:22:14    Page 152
of 165

11:16
**guess (12)**
5:24;9:22;55:16;
83:21;91:22;92:1;
114:10;115:22;117:8;
132:6,9;140:23
**guidance (1)**
82:8
**guilty (1)**
98:19
**Gump (2)**
98:25;135:7
**guy (2)**
64:7;76:1
**guys (1)**
8:15
**guy's (1)**
140:21

**H**

**Half (2)**
68:16;92:16
**half-whole (1)**
64:23
**Hamlet (1)**
87:7
**hand (5)**
11:7;67:9;77:7;
136:5,6
**hap (1)**
125:20
**happen (13)**
34:24;40:4,18;61:17;
63:7;71:1;81:3;84:15;
88:16;116:1;131:8;
134:13;137:11
**happened (7)**
32:16;47:6;81:9;
105:17,24;106:4,6
**happening (5)**
63:3,3;70:1,2;79:6
**happens (8)**
25:1;28:19;38:17;
78:1,3,4,8;125:21
**happy (5)**
12:7;31:13,14;45:11;
67:24
**hard (9)**
22:12;25:18;28:16;
42:14;61:21,22,24;
62:4;81:4
**hard-fought (1)**
16:23
**hardly (1)**
104:17
**hardship (1)**
64:2
**Hardwoods (1)**
71:13
**Hauer (1)**
99:2
**havoc (1)**

90:16
**Health (1)**
111:25
**healthy (1)**
88:23
**hear (5)**
12:4;16:5;78:10;
86:11;143:3
**heard (8)**
39:21;51:21;53:7;
84:16;87:2;90:20;
135:10;137:5
**hearing (21)**
4:12;5:23,25;6:11;
7:6;8:19;9:14;10:24;
15:20;16:7;29:20;79:1;
84:11;89:16;106:4,5,6,
7;134:25;140:6,9
**hearings (5)**
11:3;20:18;22:6;
36:11;141:25
**heavy (1)**
83:4
**held (5)**
41:6;50:19;106:4
**hell-bent (2)**
121:13,14
**help (5)**
17:8;29:13;51:11;
82:15;117:9
**helpful (4)**
12:3,20;80:10;
135:13
**here's (8)**
58:3;60:2;61:17;
63:3,21;64:3;130:1;
137:2
**herring (2)**
131:21;132:1
**high (1)**
77:17
**higher (3)**
47:18;77:24;78:7
**hoc (17)**
11:18;13:7;15:5;
28:9;32:22;51:8;52:19;
90:24;92:24;94:5;
95:20;99:4;108:8,17;
113:11;133:16;135:8
**hold (5)**
25:4,6;48:2;58:13;
123:19
**holder (6)**
107:1;128:11,13,14;
133:18,19
**holders (8)**
43:5;53:11,15;100:2;
106:1,11,14;132:20
**holder's (1)**
128:15
**holding (1)**
78:21
**holes (1)**

64:6
**holidays (1)**
9:11
**home (5)**
39:12;59:12;63:20;
64:5;115:25
**Homer (1)**
67:16
**honest (1)**
63:2
**Honor (190)**
6:8;7:17;10:21;
11:15;12:6,10,16;13:1,
14;14:4,6,7,13,25;15:4,
11;16:10;17:2;18:21;
19:8,19,21;20:3,8;
21:13,22;23:13;24:8,
18,23;25:10;26:5,8;
27:24;29:25;32:12,21,
24;39:9;40:8;41:25;
42:23;44:6;45:3,24;
46:16;47:12;48:3;
49:16;50:3,8;51:2,4,
11;53:17;54:1,23;58:6;
61:12;62:11;64:14;
68:1,17;72:11;75:1;
79:11,16,23;80:7,17,
19;82:19;83:2;84:16;
85:4,14,23;87:3,9,17;
88:10;89:1,8,15;90:5,
12,14;93:16;94:15;
95:9;98:14,18,24;99:6;
100:9,14,18,19;101:5,
6,11;102:1,14,19,23,
24,25;103:16,25;104:3,
8,21;105:9,15,17;
106:6,16,21,24;107:6,
8,10,18;108:9,13,16;
109:21;110:18,20,22;
111:6,7,14,17,21,23;
113:5,8;114:8;115:20;
117:6,11,21,24;118:9;
119:7,11;120:2,17;
122:12;123:22;124:5;
125:3,18;126:3;127:2,
4,12,25;128:8,10;
129:2;130:6;131:22;
133:9,19;135:1,9,22,
25;136:1,7,9,16,21;
137:2;138:2,4,16,21;
139:3,8,10;140:11,24;
141:10,12,16,20;143:2
**Honorable (1)**
4:6
**Honor's (2)**
80:10;82:5
**hope (1)**
34:18
**hoped (1)**
140:24
**horribly (1)**
63:14
**Hospital (7)**

51:9;63:25;64:2,4;
111:25;112:1;129:25
**Hostetler (1)**
51:3
**hour (1)**
11:14
**hours (1)**
11:9
**housekeeping (8)**
4:14,16;11:19;
120:15;134:24;136:14,
16;137:2
**huge (2)**
66:11;131:12
**hundred (1)**
112:18
**hundreds (1)**
63:15
**hypo (1)**
115:23
**hypothetical (6)**
30:22;36:17;38:18;
39:3,13;41:10
**hypothetically (2)**
55:25;56:2

**I**

**IBNR (1)**
45:23
**idea (10)**
29:6;43:12;44:1;
45:8;76:10;86:4;129:1;
130:15;131:2;134:11
**ideas (1)**
55:11
**ignore (1)**
64:21
**ignored (1)**
38:20
**ii (5)**
93:20;94:11;95:10;
109:24,25
**iii (3)**
93:20;100:19;109:22
**illegal (1)**
53:20
**immediately (1)**
139:20
**impact (2)**
17:1;30:20
**impacts (1)**
51:24
**impaired (6)**
4:20;5:11;43:5;
57:14;64:3;131:24
**impermissible (1)**
114:19
**implementation (1)**
85:12
**implementing (1)**
93:11
**implication (1)**

77:12
**important (15)**
14:5,11,13;18:23;
34:16;41:23;48:16;
51:16,23;64:10;65:19;
73:17;90:21;128:4;
130:13
**importantly (2)**
19:1;26:6
**imprimatur (1)**
68:13
**improper (1)**
44:2
**in/opt-out (1)**
115:17
**inadequate (1)**
37:12
**inappropriate (1)**
108:11
**in-between (1)**
87:1
**incentive (2)**
127:16;133:21
**include (4)**
15:1;34:2;50:18;
141:21
**included (1)**
106:1
**includes (1)**
72:7
**including (11)**
7:17;16:25;20:17,23,
25;22:19;43:2;66:12;
131:11,12;138:11
**incomplete (1)**
18:2
**inconsistent (1)**
135:18
**inconvenience (1)**
9:16
**incorporates (1)**
26:20
**increase (1)**
63:13
**incur (1)**
8:22
**Indeed (2)**
19:21;108:15
**indicated (1)**
10:25
**indication (2)**
60:20;114:4
**indirectly (1)**
94:12
**individual (7)**
34:21;35:23;45:7,7;
130:8;131:3,12
**individuals (1)**
17:22
**infamous (1)**
112:3
**infirm (2)**
103:11,12

Min-U-Script®
Case: 19-30088    Doc# 4992    Filed: 12/05/19    Entered: 12/05/19 10:22:14    Page 153
of 165
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.com
(9) guess - infirm

**infirmity (2)**
103:13,15
**inform (1)**
12:3
**informal (1)**
140:3
**informally (1)**
113:6
**information (18)**
10:6;12:2;89:5,7;
121:7,8;137:15,17,22;
138:7,19;139:12,20;
140:12,15;141:18;
142:11,22
**infrastructure (1)**
82:24
**initial (1)**
5:2
**insist (1)**
5:22
**insistence (1)**
135:17
**insolvency (3)**
57:2;66:12;87:25
**insolvent (1)**
134:1
**installment (3)**
58:4;61:19,20
**installments (2)**
58:14;62:6
**instantly (2)**
9:1;140:6
**instead (2)**
66:11;71:4
**institutions (1)**
88:18
**insurance (25)**
14:15;20:20;27:5;
34:12,14;35:25;36:10,
11;42:20;52:10;60:23;
87:22;88:19;112:18;
114:17;115:9;116:20;
117:4;118:19,22;
129:17;130:18,21;
131:7,14
**insured (3)**
45:7;129:15,16
**insurer (7)**
38:6,12;39:16;
112:15;116:20;128:3;
129:15
**insurers (7)**
48:12,17,18;70:24;
112:13,22;114:16
**insurmountable (1)**
113:3
**intend (5)**
11:5,23,24;46:20;
88:6
**intended (1)**
100:14
**intention (2)**
33:6;134:19

**intentionally (1)**
25:9
**interest (10)**
7:10,12;13:19;21:2;
43:2;47:20;51:19;
70:25;71:1;143:8
**interested (1)**
69:14
**interests (5)**
103:16;104:1;
106:18;123:7;125:8
**interlocutory (1)**
73:22
**interminably (1)**
63:16
**interpretation (1)**
77:13
**interrogatories (1)**
141:7
**interrogatory (1)**
114:2
**interrupt (1)**
64:9
**interviewed (2)**
63:22;68:17
**into (37)**
11:4;13:23;14:5;
20:15,20;23:6,7,8;
25:23;28:2,7;29:24;
34:5;35:1;37:8;38:15;
44:17,19;50:10;52:2;
58:16;59:2;63:19,24;
64:5;65:18;74:3;76:17;
80:14;81:16,19;87:16;
88:21;95:1;113:13;
127:17;135:21
**intransigent (1)**
98:11
**inundated (1)**
117:23
**inventing (1)**
130:12
**inverse (5)**
23:9,14,22;47:22;
73:15
**inverse-condemnation (2)**
47:19;48:6
**investments (1)**
82:23
**invite (1)**
142:4
**involved (8)**
10:18;18:5;33:6;
44:4,4;105:16;121:24;
138:10
**involves (2)**
73:13;125:6
**involving (1)**
73:16
**IP (4)**
50:18;128:13,14,16
**issue (41)**
4:18,19,21,24;5:8,

10;6:20;7:12;12:6;
13:24;14:19;15:15;
16:3,3,16;18:8;19:5;
24:9;46:17,21;47:22;
53:22;61:11;65:13;
73:12;74:1;80:5;88:12;
89:8;101:10;102:23;
112:7;113:2;115:16;
116:11,17;126:20;
133:15;135:14;141:9,
15
**issues (15)**
13:4;19:16;24:13,14;
26:18,18;47:16;51:19;
84:12,14;91:9;99:7;
112:2;125:22;134:24
**item (1)**
51:20
**items (2)**
142:21
**iteration (1)**
126:16

**J**

**January (4)**
9:13,15;47:3,4
**jeopardizing (1)**
24:24
**jettison (1)**
25:3
**jettisoned (1)**
124:10
**jettisoning (1)**
24:23
**Jim (1)**
139:21
**job (5)**
25:7;87:6;88:11,15;
103:20
**joined (1)**
24:12
**joint (2)**
52:18;119:21
**joke (1)**
89:21
**Judge (35)**
22:6,9,15;26:7;30:9,
13;33:12;34:19,19;
38:2;41:19;43:17;
46:23;47:6,7;54:7;
55:7;56:1;63:24;64:12;
68:3;71:14;73:22;
74:12,16;77:12;78:4;
81:3;87:7,24;97:15;
132:5;133:3;138:23;
141:24
**judges (2)**
9:2;25:8
**judgment (6)**
37:23,25;39:4;40:1;
62:19;63:10
**judgments (1)**

38:10
**judicial (2)**
17:6;45:14
**Julian (171)**
12:22;13:9,23;18:12,
16;19:15;28:18;29:7;
33:22;37:7;40:24;45:3;
49:25;50:3,6;51:1,2,3,
7,11;52:3,5,17,21,25;
53:3,5;55:13,18,23,25;
56:4,7,9,12,14,18,20,
23;57:7,10,12,19,22,
24;58:2,18;59:5,7,17,
20,22,24;60:2,5,10,13,
23,25;61:4,6,12,14,17,
22,25;62:3,13,16,18,
22,24;64:14,17,20;
65:6,8,11,14,17,23;
66:5,14,16,20,21;67:2,
4,6,8,12;68:23;69:3,10,
18,22,25;70:3,8,10,14,
18,21;71:17,19,22,24;
72:2,5,11,15,19,24;
73:2,4,8,12,15;74:4,8,
10,15,23;75:1,5,8,10,
13,15,16,18,22;76:8,
10,12,14,19,24;77:10,
19,22,25;78:2,6,9,12,
13,14,16,19,21,25;
79:9,11,12;91:17;
103:12;119:11,13,14,
24;120:2,5,7,10;
124:18;128:4;129:2,
19;130:14;132:12
**Julian's (4)**
42:11;86:12;128:7;
130:17
**jump (1)**
92:10
**June (5)**
22:1;84:17,18;87:18;
124:12
**jurisdiction (5)**
41:7;68:10,11;70:6;
103:1
**jury (1)**
20:18;22:13,14,15;
29:18,19,22,22,22;
62:10;78:5

**K**

**Karotkin (173)**
4:10,12,15,22;5:2,5,
12,17;6:2;8:24;9:6,18,
24;10:2,10,23;11:12;
12:17,19;13:1,4,13,18,
22;14:3,18,20;15:16,
19,24;16:1,6,10,14,18;
17:12,15,19,22,25;
18:2,7,11,13,16,19;
19:8,11,14;21:10,12,
15,17;22:17,21,23,25;

23:2,5,13,17,20,22;
24:1,3,5,7,16,18;25:2,
10,12,15;26:5,8,27:1,3,
10,13,15,18,21,24;
28:4,16,24;29:1,4,9,12,
15,25;30:2,8,12,16,18;
31:3,5,10,12,18,21;
32:2,4,6,9,25;34:2,10;
44:14;46:23;48:5;
49:11,21,24;67:18;
83:22;86:17,19;92:17;
99:10;104:3;120:13,
17,18;122:12,14,16,20;
123:2,6,11,14,22;
124:5,13;125:3,5,14,
18,20,25;126:3,5,12;
131:24;132:2;135:13,
22;136:9,12,15,17,20;
137:14,21,25;138:6,22;
139:24;140:10;141:1,
14;142:3,6,8,10,15,19,
21;143:3,7
**Karotkin's (1)**
86:3
**Kasolas (2)**
45:15;57:20
**keep (8)**
9:4,7;32:18;92:4;
94:22;117:6,7;134:21
**keeping (2)**
47:18;89:4
**Ken (1)**
139:21
**killer (1)**
88:17
**Kim (1)**
9:8
**kind (5)**
5:11;9:13;64:11,12;
88:18
**Klein (1)**
41:19
**Klein's (1)**
71:14
**knee-jerk (1)**
107:13
**knowing (4)**
6:11;102:12;113:2;
129:21
**knowledgeable (1)**
72:17
**known (2)**
23:11;32:18
**knows (3)**
85:21,21;115:25

**L**

**LA (1)**
56:2
**lack (3)**
12:2;68:10;77:12
**lacks (1)**

Min-U-Script®
Case: 19-30088    Doc# 4992    Filed: 12/05/19    Entered: 12/05/19 10:22:14    Page 154
of 165
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(10) infirmity - lacks

41:7
**lag (1)**
76:17
**language (6)**
13:7;117:17,20;
128:9,25;129:13
**large (2)**
8:25;107:1
**Las (1)**
71:17
**last (10)**
58:16;69:15;78:25;
90:1,14;106:25;
110:18;111:4,6;121:11
**later (2)**
48:25;105:23
**latest (1)**
126:16
**latter (1)**
38:22
**Laughter (2)**
13:17;47:10
**law (22)**
12:25;13:11;19:5;
40:2,7;41:16,18,21;
42:12;44:1;52:6;53:20;
54:2;55:21;62:25;68:4;
71:10;86:6;90:2;104:4;
112:10;123:11
**law's (1)**
75:11
**lawyer (2)**
62:4;70:16
**lawyers (25)**
9:2;26:23;52:8;54:6,
10;57:3,5;58:23;60:15;
62:25;68:2;70:11,19;
71:3;75:21;76:2,25;
77:6;78:23;124:19;
128:23;129:19;130:8,
9;140:3
**lawyers' (1)**
63:8
**lawyer's (1)**
64:22
**Lazard (1)**
139:21
**lead (2)**
50:1,1
**leaned (1)**
137:6
**learn (1)**
51:14
**learned (1)**
50:21
**least (3)**
17:17;47:17;114:1
**leave (6)**
9:19;47:15;74:17;
76:24;80:8;95:11
**leaves (2)**
21:8;87:23
**leaving (1)**

31:23
**LeBlanc (18)**
6:4,7,7,11,19;7:8,11,
16,22;8:1,8,11,14;9:20;
10:4,7,16,21
**left (8)**
10:24;32:24;56:21,
24;58:19;60:20;67:25;
102:23
**legal (7)**
4:24;71:24;86:9;
103:7,13,15;106:16
**legally (2)**
103:11,12
**legitimate (1)**
79:2
**less (6)**
20:9;23:10;51:5,7,8;
142:12
**letter (3)**
6:9;137:18;142:12
**letters (1)**
67:17
**letting (1)**
9:17
**level (1)**
90:22
**leverage (9)**
85:5,6;105:3;106:21,
22;107:2;111:14;
133:14,20
**liability (2)**
20:24;47:22
**lies (1)**
12:10
**life (1)**
130:1
**lift (1)**
83:4
**light (2)**
80:13;85:17
**likelihood (1)**
55:20
**likely (1)**
97:3
**limit (1)**
113:11
**limited (3)**
84:13;89:9;102:25
**line (3)**
17:16;22:9;95:11
**lined (1)**
49:21
**line-item (2)**
65:23;66:2
**lines (1)**
69:25
**liquidating (1)**
116:22
**list (2)**
13:10;137:22
**listed (1)**
113:9

**listen (6)**
45:13;73:19;78:15;
85:24;110:17;141:6
**listened (1)**
78:4
**literally (2)**
16:22;132:10
**litigate (4)**
32:4,7;113:23;
131:16
**litigating (1)**
47:25
**litigation (12)**
16:25;20:16,21,23;
37:14;55:13;63:6,16;
69:16;91:13;114:19;
139:14
**litigators (1)**
140:2
**little (12)**
5:25;24:2;33:1;39:1;
45:25;52:6;73:21;
80:22;94:9;95:10;
108:24;109:16
**living (1)**
64:5
**LLP (1)**
90:13
**local (1)**
9:8
**locally (1)**
9:8
**lock (3)**
81:24;83:7;85:2
**locked (1)**
90:25
**locking (3)**
88:11;128:5;132:25
**locks (2)**
80:13;97:10
**lock-up (1)**
132:3
**logic (1)**
94:20
**logical (1)**
63:21
**long (3)**
65:5;132:4;139:25
**long-term (1)**
48:2
**look (23)**
18:21;37:10;43:25;
44:13;45:9;55:3;58:6;
61:8;65:4;67:13;71:11,
23;72:13;78:5;84:16;
89:14;94:1;103:2;
114:1;116:5;123:11;
125:15;140:13
**looked (2)**
79:21;113:8
**looking (9)**
95:10,24;108:7,25;
109:1,2,4,14;142:4

**Looks (1)**
111:20
**loss (1)**
20:25
**losses (3)**
116:15,25;118:13
**lost (2)**
43:22;89:12
**lot (21)**
8:15;9:14;28:12;
41:14,18,21;44:25;
45:18,19;55:9,11;
57:12;63:4;74:13;
79:24;80:6;124:23;
125:6,6;126:2,2
**love (1)**
65:23
**Lowenschuss (2)**
19:6;71:12
**lowercase (1)**
6:15
**lowest (1)**
20:10

## M

**machine (1)**
43:21
**made- (1)**
131:16
**made-whole (23)**
35:1,10,24;36:9;
38:5,6,12,13,14,16;
39:18,19;41:12,22;
42:10;43:3,9;54:13,16;
128:12,21;129:16,25
**maintain (1)**
90:22
**major (4)**
14:7,8;21:23;69:16
**majority (1)**
122:9
**make- (1)**
27:8;43:2
**makes (6)**
18:1;23:23;29:7;
60:22;62:4;85:17
**make-whole (3)**
51:19;116:12,17
**making (6)**
64:11;72:8;82:2;
89:15;91:17;136:10
**man (1)**
123:19
**mandatory (2)**
115:4,7
**Manges (1)**
120:18
**many (18)**
9:10;54:6;57:15;
58:7;63:25;72:20,21;
79:6;104:4;121:10;
124:8;129:18;130:10,

10;133:6,6;139:9;
143:5
**marathon (1)**
11:2
**marketable (2)**
88:24,25
**marketplace (1)**
43:18
**mass (2)**
58:24;60:15
**match (1)**
17:20
**material (1)**
92:2
**matrix (12)**
29:16;31:7;36:1,25;
37:10,11;43:13;58:9,
18;59:11;63:18;131:4
**Matter (13)**
4:9,23;10:23;23:19;
35:24;55:5;62:12;86:6;
90:2,15;95:6;140:17;
142:24
**matters (3)**
20:17;42:7;81:4
**Matthew (1)**
32:21
**maximizes (1)**
92:4
**maximum (1)**
85:5
**may (28)**
6:3;26:18;34:11;
48:7,9;53:19;55:9,9,9;
56:20,21;59:19,21;
60:25;80:10;81:3;
82:20;87:16;88:20;
95:21;112:13;116:16;
119:12;132:18;134:12;
141:15,15;142:6
**maybe (18)**
31:24;33:12;36:4,4,
5;47:9;57:3,25;65:21;
66:9,9;69:2;83:20;
84:21;92:15;116:7;
133:4;136:1
**mean (70)**
5:22,24;7:10;9:1,12;
10:5;12:13,20;13:13,
18;18:3,8;21:18;22:14;
24:15;25:7;29:21;35:5;
39:3;45:16;49:22;53:1;
56:24;57:20;66:2;
69:12;71:11,16,16,20,
23;72:13;75:25;76:6;
79:20;82:9;84:10;
86:21,21;91:11;93:23;
95:22,24;96:9,11;
98:10;102:5;103:5;
109:14;111:5;112:23,
25;113:3;115:14;
118:23;122:8;125:15;
126:2;129:11;132:9,9,

Case: 19-30088    Doc# 4992    Filed: 12/05/19    Entered: 12/05/19 10:22:14    Page 155
of 165

25;134:7;135:20;
136:15,19;138:3;
140:7,13;141:24
**meaningless (3)**
110:22;122:4,7
**means (5)**
17:23;29:6;47:23;
96:2,12
**meantime (1)**
127:10
**mechanics (2)**
33:3,7
**media's (1)**
120:3
**mediation (13)**
31:13;37:14;54:7;
58:9,19;68:3;69:5,18,
20,23;108:18;110:10,
21
**mediator (2)**
56:1;69:24
**meet (8)**
76:1;82:25;83:11;
87:14;106:11;134:1;
141:1;142:23
**meeting (3)**
106:2;121:2,5
**meets (1)**
19:19
**members (1)**
11:6
**memorialized (1)**
14:21
**memorize (2)**
61:10;117:22
**mention (3)**
26:22,23;47:22
**mentioned (3)**
21:4;26:15;48:11
**message (1)**
83:23
**Mesterharm (1)**
139:21
**met (2)**
19:23;20:14
**microphone (2)**
98:15,17,22
**might (17)**
11:7;13:16,19,21;
40:17;48:25;66:25;
68:19;69:13;74:16;
77:18;88:23;90:23,24;
126:21,23;129:6
**Mike (2)**
11:16;135:7
**Milbank (3)**
6:7;90:13;135:11
**mileage (1)**
28:12
**million (10)**
29:22,23,24;38:2;
39:24;40:1,1;67:19;
94:16;124:16

**millions (2)**
63:15;124:17
**mind (2)**
60:20;88:5;126:10;
140:5
**mindful (2)**
9:12;10:14
**minute (2)**
60:19;91:4
**minutes (4)**
51:5,9;120:14,19
**miscited (1)**
13:25
**miscites (1)**
19:18
**mish- (1)**
16:1
**misquotes (1)**
19:18
**missing (2)**
4:10;71:2
**misspoke (3)**
93:19;109:24;119:18
**misstated (1)**
99:10
**misunderstood (2)**
82:21;126:16
**Mitchell (57)**
51:4;79:13,14,16,18,
18,23;80:2,5,19,21;
81:1,7,14,18,21,23;
82:4;83:14;84:1,4,6,8,
10,20,22;85:14,19,23;
86:2,15,19,22,24;87:3,
5,9,20;88:2,8,10,14,15,
20,22;89:1,14,20,23;
90:5,7,9;91:16;103:17;
105:2;120:24;121:11
**Mitchell's (2)**
120:20;133:24
**modifications (1)**
103:4
**modified (2)**
83:11;102:14;
107:10;108:7,15
**moment (6)**
45:9;90:4;102:6;
108:1,4;131:2
**momentum (2)**
80:24;89:3
**money (32)**
25:20;28:22;29:17;
30:24;31:25,25;36:7,8,
9;37:20;38:20;54:12;
59:1,11,12;60:17,20,
21;63:12,12,20;64:4,
22,23;65:3;66:24;85:1;
89:11;116:21;117:6,7;
129:25
**Montali (1)**
4:6
**months (4)**
15:4;16:23;129:4,4

**moots (2)**
4:23;5:11
**more (31)**
7:18;18:25;20:6;
21:7;24:2,11;25:23;
26:6;30:21;33:2;34:16;
45:3,17,18,19;46:17;
49:23;68:15,25,25;
75:25;78:17;88:24;
90:21;99:8;124:21;
130:13;131:6;137:8;
140:2,2
**moreover (1)**
20:12
**morning (13)**
4:7,8;11:6;32:11,12;
51:2;79:15;90:12;
98:23,24;99:3;111:22,
23
**mosh (1)**
16:2
**most (9)**
13:4;52:15;57:1;
76:12,14,15;79:2;
134:8;136:3
**motion (23)**
5:9,15;7:4;8:21;
11:22;12:1,4,7;14:5;
15:14;46:4;68:25;
85:12;87:1;90:1;
105:18,19,25;124:14;
136:10,18;138:22,23
**motions (1)**
140:16
**Mount (2)**
71:15,15
**move (2)**
9:14;25:20
**moved (2)**
82:6;133:16
**moving (4)**
83:6;88:9;123:3;
124:1
**much (11)**
9:6;20:9;34:16;
45:16;77:7;78:18;79:5,
25;80:9;124:21;130:13
**municipal (1)**
50:9
**musings (1)**
42:14
**must (5)**
101:24;111:9,13;
118:14;121:22
**mutual (15)**
59:15;60:5,6;70:10,
24;71:4;75:21,22;
76:21,22;77:1;128:9;
129:12,15,17
**mutuality (3)**
36:14,15;128:17
**mutual-release (1)**
71:6

**Myers (1)**
79:18
**mystifies (1)**
15:11

# N

**name (3)**
6:5;17:10;80:4
**Nancy (1)**
79:18
**near (1)**
98:16
**necessarily (1)**
29:23
**necessary (7)**
82:14;89:5,7;117:4,
18;118:22;140:9
**need (33)**
5:19;6:5;7:17,22;
11:11;21:9;25:23;35:9,
10,16;46:17;52:1,16;
64:4,12,23;79:3;82:8;
92:19;94:21,25;98:16;
110:17;111:12;117:8;
119:17;126:19;127:22;
132:19,20;138:8;
141:15,20
**needed (1)**
86:7
**needs (3)**
54:24;82:25;121:12
**needy (3)**
76:12,14,15
**negative (4)**
92:23;93:19;94:2,3
**negotiate (14)**
71:4;81:2;100:8;
102:19;106:12;108:11,
17;110:8,9,21;120:12;
132:4,11,11
**negotiated (4)**
102:9;123:2,23;
130:24
**negotiating (1)**
130:15
**negotiation (1)**
100:2
**negotiations (3)**
16:23;107:9;125:6
**neither (1)**
112:10
**New (5)**
10:12;50:22;72:13;
81:22;130:12
**Newsom (1)**
79:19
**Newsome (4)**
54:7;56:1;68:3;81:3
**Newsoms (1)**
80:6
**next (10)**
5:25;8:2,2,17;35:20;

43:6;79:14;87:17;
97:15;137:11
**nightmarish (1)**
42:19
**nine (1)**
67:21
**nine-billion-dollar (1)**
96:23
**Ninth (24)**
12:25;13:11,15,19;
40:2,8;41:5,24;47:11;
53:20;68:6;70:5;71:7,
7,12;72:1;73:17,24,25;
74:12,18,20,21;86:7
**nobody (2)**
91:16;123:13
**noise (1)**
58:17
**no-movement (1)**
10:19
**noncash (2)**
21:9;88:21
**nonconsensual (2)**
44:4;115:7
**nondebtor (1)**
41:8
**none (2)**
65:3;81:4
**non-failure (1)**
92:7
**nonsettling (1)**
112:13
**nor (1)**
112:11
**normal (1)**
80:23
**normally (1)**
58:24
**Norton (1)**
111:24
**note (4)**
10:7;14:13;17:4;
18:23
**noted (4)**
15:1;19:24;21:22;
24:20
**noteholder (2)**
99:5;135:8
**noteholders (2)**
15:5;52:21
**notes (1)**
130:23
**not-good (1)**
66:18
**notice (4)**
17:6;44:21;45:14;
141:25
**not-less-than (1)**
23:18
**November (2)**
137:18;142:12
**number (44)**
22:10,12,12,22;23:5,

Min-U-Script®

Case: 19-30088    Doc# 4992    Filed: 12/05/19    Entered: 12/05/19 10:22:14    Page 156
of 165

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.com

(12) meaningless - number

11;25:16;28:21;30:14,
14;47:18;48:17,18;
50:14,14;52:25;56:9,
10,14,15,17;57:4,16;
64:13,15;77:6,23,24;
78:6,7;90:15;92:9;
93:17;94:16;95:1;
96:22;97:10;103:21;
114:2;118:3,6;119:2,
16;130:15

## O

**object (2)**
93:13;94:15
**objected (1)**
106:10
**objecting (1)**
14:23
**objection (2)**
50:8;98:10
**obligated (4)**
93:13;101:12;
102:16;110:23
**obligation (2)**
102:18;111:8
**observe (2)**
9:11;61:9
**obstance (1)**
63:4
**obvious (1)**
114:24
**obviously (10)**
4:17;7:1;9:11;10:9;
26:3;105:16;119:3;
122:4;123:25;127:15
**occupied (1)**
32:17
**occur (1)**
76:7
**October (1)**
52:25
**off (10)**
7:2;26:4;28:15;
32:24;39:1;50:1;58:9,
13;134:7,9
**offending (3)**
117:17,20;118:12
**offer (2)**
52:8;69:11
**offered (1)**
10:8
**offering (1)**
95:20
**offers (1)**
94:8
**office (9)**
25:6;83:23;120:25;
121:3,7;135:10;137:5,
8;138:11
**official (1)**
6:8
**often (1)**

58:5
**old (1)**
107:3
**O'Melveny (1)**
79:18
**once (2)**
21:7;84:23
**one (73)**
4:12,13;7:18;10:7;
13:5;20:8;25:5;26:22,
22;27:4;30:20;33:21,
25;48:3,4;50:5,8,21;
63:17;65:25;67:8,9;
69:23;70:5;71:17;
72:12,20;73:17;74:6;
75:17,25;77:13;78:25;
80:18;82:2,6;83:8,18,
19;89:2,6;90:25;91:18;
93:4,21;94:20;97:9;
104:8,9,14;107:25;
108:2,16,25;109:18;
111:15;112:14,18;
116:12;117:25;119:2,
11;121:24;124:15,18;
127:24,24;132:12,21;
133:17;134:19;137:20,
22
**one- (1)**
59:17
**one-hour (1)**
10:25
**one-off-type (1)**
28:13
**one-on-one (1)**
28:13
**one's (2)**
16:19;118:7
**one-sided (2)**
54:19;71:5
**ongoing (2)**
116:19;121:7
**Only (37)**
4:12;7:16;8:19;10:8,
23;16:10;23:14,22;
27:10,19,21;30:19;
34:9;37:24;48:19,19;
56:21;58:20;72:15,19;
73:12;86:25;89:6;93:4;
94:19,24;102:2,14;
103:2,22;105:11;
114:15,19;116:11;
118:1;121:11;122:25
**oOo- (1)**
4:3
**open (4)**
4:21;9:5,7;92:4
**operates (1)**
122:25
**operative (2)**
76:23;129:12
**opinion (2)**
51:17;54:18
**opinions (1)**

79:24
**opponent (1)**
125:1
**opportunity (5)**
47:17;123:7;134:3,5;
140:4
**oppose (1)**
93:12
**opposing (1)**
140:10
**opposition (5)**
4:21;5:16;6:23;7:23;
9:22
**opt (18)**
27:25;28:1,3,4,7;
29:7;31:21;34:5,10;
37:15,17,18,19;44:11,
17,19;62:9;129:21
**opt- (1)**
115:16
**opted (5)**
28:2;34:7,8;38:15,15
**optimistic (1)**
10:14
**opt-in (2)**
13:5;44:24
**opting (1)**
34:8
**option (2)**
62:21;89:25
**options (2)**
73:21;101:15
**opts (2)**
28:21;30:24
**order (16)**
4:4;34:6;73:22,22;
74:2,8,10,11;78:24;
87:14;98:8;113:15;
128:11;129:14;139:11,
12
**ordered (2)**
90:18;138:17
**orders (1)**
139:11
**ordinary (1)**
44:14
**ordinary-course (1)**
34:11
**others (1)**
5:15
**otherwise (6)**
15:8;69:13;94:19;
101:23;134:1;143:5
**ought (4)**
11:9;87:25;101:11;
134:12
**ourselves (1)**
90:25
**out (52)**
5:24;11:4;21:8;
23:25;30:24;31:21;
33:13;34:8,10;37:15,
17,18;39:6;42:6;44:6,

8,11;45:5,21;46:10,11;
47:24;48:4;57:1;58:7;
59:11;60:17,21;63:11,
20,25;65:5;72:20;86:7;
91:14;92:11;95:2;
97:12;109:18;119:5;
121:2,10,16;123:8;
126:8;131:5;133:19,
20,25;134:21;136:7;
142:25
**outcome (1)**
55:16
**outline (1)**
59:19
**outs (1)**
97:10
**outside (3)**
34:24;43:11;68:11
**over (9)**
32:1;58:17;76:5,6;
79:5;91:1;111:15;
116:20;127:7
**overpaid (1)**
61:1
**owe (1)**
118:20
**own (1)**
83:20

## P

**page (10)**
53:5;100:24;107:20,
20;118:2,4;126:16;
137:20,23;141:7
**paid (25)**
20:4;19;29:4;31:10,
11,12;34:22;35:2,3;
38:4,5;43:7,13,22;
45:21;55:4,8;60:21;
62:7;105:12;116:24;
131:11,13;133:22,23
**paper (1)**
117:23
**papers (3)**
5:14;12:23;57:21
**Paradise (1)**
112:1
**paragraph (2)**
117:9;141:8
**parallel (1)**
139:16
**parcel (1)**
64:6
**Pardon (1)**
24:1
**park (1)**
46:19
**Parkhill (1)**
67:16
**part (6)**
27:6;98:11;112:16;
113:10;127:22;134:8

**participate (8)**
35:23;94:13;98:9;
108:18,21;110:5,9;
121:17
**participation (2)**
34:4;95:12
**particular (2)**
91:1;92:21
**particularly (1)**
27:17
**parties (17)**
4:17;7:19;12:3,5;
14:23;21:3;28:5,5;
31:23;41:8;76:25;82:8,
20;92:2;101:23;
106:12;112:14
**parties' (1)**
87:11
**parties-in-interest (1)**
26:11
**party (9)**
19:22,22;25:6;81:2;
83:8;98:19;106:10;
113:6;117:1
**pass (2)**
28:15;74:12
**path (6)**
24:10,18;41:23;91:1;
124:10;134:13
**paths (1)**
139:16
**pay (12)**
15:21;34:13,23;38:1,
2;40:1;43:1,3,3;58:9,
12;92:24
**paying (1)**
34:13
**payment (15)**
28:20;34:25;56:20;
61:19,20;70:23;77:9;
99:11;116:13,13,14;
118:12,14,17;131:12
**payments (3)**
20:6;55:6;58:4
**PE (1)**
79:6
**peace (1)**
94:18
**pen (2)**
129:3;131:25
**pending (1)**
54:7
**people (26)**
5:5,7;9:1,3;11:2,3,4;
16:8;25:20;29:16;31:7;
34:9;40:9;43:7;57:13,
15;63:19;66:24;68:17;
75:13;80:9;123:9;
126:6;131:15;132:4;
136:4
**people'll (2)**
37:2;55:8
**people's (1)**

Min-U-Script®
Case: 19-30088    Doc# 4992    Filed: 12/05/19    Entered: 12/05/19 10:22:14    Page 157
of 165

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(13) object - people's

34:3
**per (1)**
  94:15
**perceived (1)**
  17:17
**percent (8)**
  14:11;54:3;58:13,14,
  14;112:18;114:14,15
**perfect (2)**
  69:4;138:9
**perfectly (1)**
  103:18
**perhaps (5)**
  14:11;18:23,25;
  45:18;66:12
**period (1)**
  69:24
**periods (1)**
  15:4
**permit (1)**
  55:4
**permits (1)**
  112:8
**permitted (2)**
  106:11;110:7
**perpetuities (1)**
  76:6
**person (13)**
  18:5;28:21,22;30:24,
  24;38:18;39:23,24,25;
  41:10;64:11;65:2;
  115:24
**personal-injury (4)**
  14:14;125:23;
  128:23;129:18
**perspective (6)**
  26:9,10;34:16;80:10;
  81:9;89:17
**persuade (1)**
  83:17
**persuaded (1)**
  117:12
**persuasive (1)**
  86:13
**pessimist (1)**
  92:1
**PG&E (6)**
  4:9;28:11;104:12;
  105:16;119:2,17
**ph (4)**
  17:9;47:14;67:16;
  71:9
**phone (1)**
  141:9
**phrase (2)**
  50:22;137:9
**pick (5)**
  28:20;30:14;32:24;
  78:6;83:24
**picked (1)**
  119:14
**picture (1)**
  33:13

**pictures (1)**
  64:6
**piece (5)**
  45:25;46:2;69:16;
  85:12;91:12
**pin (1)**
  89:18
**pipeline (1)**
  83:18
**pitch (1)**
  91:17
**place (6)**
  48:20;65:15;87:11;
  89:21;128:6;134:19
**plainly (1)**
  21:2
**plaintiff (3)**
  26:23;45:7,8
**plaintiffs (3)**
  35:23;131:3,13
**plaintiffs' (6)**
  34:21;70:11,19;
  75:20;76:2;130:8
**plan (189)**
  6:15;12:1;13:6,7,11;
  15:14,17,21;16:1,2;
  19:25;24:22;28:7,8,21;
  29:10;34:1,19;36:3;
  38:15,16;41:8;44:9,15;
  50:4;52:18;53:7,9,10,
  14;54:8,21;57:3,9,11,
  14;68:2,10;70:18,21;
  78:1,7;79:3;80:14,16;
  81:5,8,13,14,16;82:2,2,
  6,7,14,15,18,23;83:5,6,
  8,11,17,18,21,24;84:5;
  85:8,11,12,20;86:4,5,8,
  11,17,20;87:18,24,24;
  89:3,3,5,6,7;90:2,4,17,
  22,23,24;91:14,14,18;
  92:21,24,24;93:4,7,10,
  11;94:6,20,22,24,24,
  25;95:2,18,21;96:3,3,
  16,16,17,17,19,25;
  97:3,4,5,12,17;98:7;
  99:9,10,23;101:3,8,9,
  12,13,22,24;102:1,3,6,
  7,16,18,21;103:24;
  104:25;105:6,7,8,13,
  15;106:2,3,13,14,23;
  107:3;108:22;110:6,
  23;111:9,10,12,15;
  115:12,12;118:16;
  119:21;120:11;121:14,
  14,15;122:2,19,23;
  123:4,8,23,24,25;
  124:22;125:16;131:23,
  24;132:13,19;137:3,10,
  10;138:13,19;139:15
**plans (12)**
  30:18;82:16,21;
  94:19;104:9;121:5;
  122:3,4,9,10;131:22;

132:8
**playing (8)**
  25:23;46:1,16;66:7;
  88:4;91:2;137:16;
  139:16
**pleading (5)**
  18:14;24:12;26:17,
  17;40:24
**pleadings (1)**
  123:12
**please (2)**
  74:22;98:17
**plight (1)**
  77:8
**plug (1)**
  95:1
**plug-in (1)**
  22:11
**plugs (1)**
  22:22
**plus (1)**
  130:19
**PM (1)**
  143:9
**pocket (1)**
  138:9
**podium (2)**
  32:9;69:8
**Podus (1)**
  47:14
**point (57)**
  11:6;19:6;20:10;
  21:18;22:18;30:13,15;
  31:24;33:11;37:4;44:6,
  8;45:5;54:22;56:12,15,
  15;58:3;59:13,25;62:5;
  63:21;64:3;66:6;68:7,
  8;73:12;77:14;78:22,
  25;79:11;80:8;88:17;
  89:14;90:25;91:20;
  92:6;97:24;99:8;
  100:17;111:4,6;112:2;
  113:25;114:22;115:18;
  116:5,8;117:20;
  119:11;121:2,10;
  129:9;131:19,21;
  133:19,25
**pointed (1)**
  133:19
**pointing (1)**
  117:15
**points (5)**
  22:19;67:5;84:25;
  104:3;110:18
**policy (2)**
  116:20;118:20
**pool (1)**
  29:24
**portion (1)**
  7:16
**Portland (1)**
  77:14
**position (9)**

5:20;8:21;10:19;
  21:19;27:4;87:10;
  105:6;106:24;122:1
**positions (1)**
  25:5
**possibility (2)**
  63:5;92:3
**possible (3)**
  90:23,24;117:1
**possibly (1)**
  88:5
**post (1)**
  7:10
**post-petition (1)**
  43:2
**post-petition- (1)**
  7:10
**potentially (1)**
  43:2
**practical (1)**
  82:10
**practically (1)**
  42:18
**practice (1)**
  140:18
**precedent (1)**
  42:5
**precipice (1)**
  46:25
**precise (1)**
  99:8
**precisely (2)**
  13:6;65:6
**precision (1)**
  55:4
**precluded (1)**
  100:3
**predecessor (1)**
  86:4
**predestined (1)**
  82:17
**predict (3)**
  28:23;55:10;76:4
**predicting (1)**
  30:23
**prediction (1)**
  54:21
**prefer (1)**
  9:7
**preferences (1)**
  137:9
**pre-judgment (1)**
  47:20
**preliminary (1)**
  11:14
**premature (2)**
  5:8;80:13
**preparation (1)**
  126:2
**prepared (1)**
  5:17
**pre-petition (1)**
  7:9

**present (4)**
  20:3;51:4;85:8;
  86:20;111:8
**presentation (1)**
  49:14
**presented (2)**
  25:8;125:7
**presently (1)**
  129:11
**preserve (1)**
  87:15
**presiding (1)**
  4:6
**press (1)**
  119:14
**pressure (3)**
  64:18,20,21
**presumably (4)**
  36:24,25;97:14;
  129:20
**pretend (2)**
  42:7;130:11
**pretty (1)**
  41:11
**prevail (1)**
  67:10
**prevailing (1)**
  55:21
**preventing (1)**
  106:2
**preview (1)**
  12:11
**previous (1)**
  36:11
**previously (3)**
  10:25;19:12;138:17
**principal (1)**
  136:3
**prior (5)**
  9:12;17:7;28:11;
  139:11,11
**probabilities (1)**
  20:16
**probably (11)**
  9:4;11:21;15:13;
  68:16;76:2;80:22;
  84:22;90:21;92:16,18;
  125:24
**problem (12)**
  46:18;54:10,18;
  63:21;67:22;68:5,21;
  70:6;109:20;112:12;
  114:14;116:9
**problematic (1)**
  101:5
**problems (3)**
  26:19;63:2;64:2
**procedure (1)**
  140:1
**procedures (3)**
  29:5,9;31:5
**proceed (3)**
  8:21;136:18;138:20

Case: 19-30088   Doc# 4992   Filed: 12/05/19   Entered: 12/05/19 10:22:14   Page 158
of 165

**proceeding (2)**
52:4;58:16
**proceedings (2)**
25:19;143:9
**process (20)**
8:21;12:1,9,23;
62:14;63:8,9;82:4,6,8,
11;90:17,22;92:4;
98:12;122:3;137:3;
138:20,24;139:15
**processes (1)**
22:8
**produce (1)**
45:11
**producing (1)**
116:3
**product (1)**
16:22
**professional (1)**
20:16
**professionals (1)**
16:24
**profits (1)**
43:22
**progeny (1)**
115:4
**progress (7)**
14:7,8;69:15,17;
79:21;89:22;141:21
**prohibit (1)**
92:23
**prohibited (2)**
96:6;123:18
**prohibition (4)**
109:23;110:4,6;
122:10
**prohibits (2)**
93:9;95:18
**prolong (1)**
63:16
**promise (2)**
134:20;135:6
**promised (2)**
112:21;135:5
**promissory (1)**
130:23
**promptly (1)**
141:9
**pronouncing (1)**
17:10
**proof (1)**
64:12
**proofs (2)**
45:10,11
**proper (1)**
44:21
**proponent (2)**
83:5;92:22
**proponents (4)**
24:22;82:14,16,18
**proposal (1)**
103:9
**propose (4)**

94:12;108:21;110:4;
127:15
**proposed (8)**
14:24;26:20;27:6;
34:1;36:1;53:18;
116:10;127:13
**proposes (1)**
105:5
**propositions (1)**
13:25
**proprietary (1)**
142:21
**protect (2)**
77:17;118:22
**protected (1)**
119:6
**protection (1)**
117:5
**protections (1)**
112:21
**proven (1)**
67:15
**provide (5)**
7:4;99:11;102:14;
136:1;137:25
**provided (5)**
6:15;8:6;13:6;
118:25;121:8
**providers (1)**
5:20
**provides (4)**
16:2;47:20;99:9,14
**providing (2)**
89:7,17
**provision (15)**
34:17;42:1;95:23;
96:20;97:1;101:4;
107:9;108:10,14,15;
110:20,22;117:13,19;
122:25
**provisions (16)**
14:23;53:10,14;
90:16;100:17;101:16;
104:6,23;106:1;
118:12;121:22,25;
122:3,7;132:3;135:17
**public (4)**
50:19;69:14;82:11;
127:18
**pulling (1)**
47:24
**purely (1)**
19:14
**purported (1)**
117:4
**purportedly (2)**
43:3;114:18
**purpose (3)**
72:15,19;98:5
**purposes (1)**
111:12
**pursuant (2)**
14:9;31:7

**pursue (4)**
34:14;37:21,22;
38:14
**push (1)**
107:2
**pushing (2)**
58:8;89:6
**put (17)**
14:5;50:23;64:12;
67:21;68:13;74:2;
87:10;99:8;111:18;
116:18,21,23;123:16;
124:5;129:1;133:15;
135:14
**puts (3)**
23:18,18;77:24
**Putting (4)**
67:15;112:7;134:18;
138:12

**Q**

**qualify (1)**
55:9
**queue (2)**
63:19,20
**quick (4)**
8:13;31:2;37:4;
110:19
**quickly (14)**
29:17,18;31:8,11,12;
36:23,24;50:12;
133:12;140:6,20,20;
142:1,7
**quite (14)**
13:8;17:13;18:9;
24:10,19;88:23,24;
103:15,17;104:6;
126:5,7,9;129:4
**quitting (1)**
142:7
**quote (3)**
53:10,13;109:15
**quotes (1)**
79:23
**quoting (1)**
119:15
**QURESHI (65)**
98:24,25;99:1,2,4,14,
19,21,23,25;100:9,11,
14,16,22,24;101:2,17,
19,22;102:8,10,13;
103:4,6,10,15;104:14,
16,19,21;105:9,23,25;
107:8,15,18,20,22,24;
108:2,4,6,13;109:2,4,6,
8,11,17,20;110:1,3,13,
16,18,25;111:2,4,6,18;
121:21,21;131:1;
135:11
**Qureshi's (2)**
122:1;131:19

**R**

**raft (1)**
104:3
**raise (2)**
11:10;134:23
**raised (5)**
24:13;107:11;121:4,
11;125:9
**rally (1)**
123:19
**ramifications (2)**
124:23;129:21
**range (8)**
17:18;20:10;57:21,
22;67:14,22;94:16;
124:19
**rather (7)**
49:22;52:10;61:19;
64:5,13;66:19;69:1
**reach (7)**
54:8;56:14,15,16;
102:22;126:5;141:2
**reached (2)**
56:9,10
**reaction (2)**
66:3;107:13
**read (15)**
13:8;45:15;50:9,15;
52:6,14;53:9;59:18;
61:2;69:25;70:9;87:23;
92:15;99:24;140:4
**readily (1)**
112:17
**reading (1)**
40:15
**reads (1)**
53:13
**ready (1)**
7:3
**real (5)**
39:6;43:18;64:5;
88:24;122:19
**reality (1)**
85:1
**realize (3)**
25:7;38:25;102:9
**really (21)**
22:14;33:7;44:12;
45:9,25;50:12;51:21;
58:8;62:24;72:7,8;
77:17;84:18;87:10;
90:16;97:17;128:8;
130:14;132:5;133:14,
24
**real-time (1)**
51:14
**real-world (1)**
116:19
**reason (6)**
21:3;46:22;72:11;
97:4;106:22;111:11

**reasonable (1)**
26:9
**reasonableness (4)**
15:7;20:1,9,11
**reasons (2)**
46:9;112:11
**Rebecca (1)**
111:23
**rebuild (1)**
76:16
**rebuttal (1)**
49:19
**recall (1)**
112:13
**received (4)**
6:14;8:20;36:11;
116:14
**receives (1)**
70:23
**receiving (2)**
34:25;35:23
**recent (3)**
15:1;24:11;26:16
**recently (2)**
40:25;140:17
**reciprocal (3)**
112:11,23;113:1
**reciprocity (1)**
117:10
**recognize (2)**
6:6;9:2
**recommend (5)**
57:3;58:24;68:4,4;
73:22
**recommendation (2)**
73:23;77:7
**recommended (1)**
57:6
**record (20)**
6:5;11:15;15:20,24;
16:3;17:4;18:21;26:23;
32:21;50:10;51:3,12;
52:12;85:11;86:21;
98:25;114:10;120:23;
121:12;135:7
**record's (1)**
142:10
**recovery (3)**
92:4;107:3;128:15
**red (2)**
131:21;132:1
**reduce (1)**
124:15
**reducing (1)**
103:22
**Ref (1)**
67:16
**referred (1)**
120:10
**referring (5)**
13:9;119:19,20;
120:6;121:11
**reflected (1)**

16:22
**register (1)**
  113:9
**regular (1)**
  121:3
**regularly (1)**
  79:24
**rejected (1)**
  124:21
**relate (3)**
  11:25;19:15;72:22
**related (3)**
  47:22;116:12;141:18
**relates (1)**
  12:1
**relating (1)**
  20:25
**release (87)**
  30:22;34:3,5,5,9,10;
  35:1;36:14,15;41:8,9;
  42:8,8,17,18,20,22,25;
  43:9;44:9,9,13,15;
  51:13,15,18;53:6,8,9,
  10,14,18;54:1,19;58:9,
  15;60:5,6,15;61:15,18;
  62:5;63:11;65:9;67:25;
  68:12,14;70:4,8,10,12;
  71:4;73:13;75:21,22;
  76:21,22;77:1;78:19;
  80:8;101:15,16;112:3,
  6;113:24;115:4,7,16;
  116:10,11,16,16;118:1,
  2,10;126:15,16;
  127:15;128:5,12;
  129:12,15,17,22;130:2;
  132:2,3
**released (8)**
  27:20,21;38:6,7,12;
  128:14;134:3,6
**releaser's (1)**
  116:15
**releases (21)**
  13:5;19:7,11,14,17;
  31:22;32:25;33:18;
  38:15,16;44:5;68:11;
  70:24;86:12;91:17;
  103:13;112:8,11;
  127:13,14;128:8
**releasing (13)**
  27:5,8;28:3,4;36:9,
  12;41:13;42:10;
  114:25;115:18;128:19,
  21;129:16
**releasor's (1)**
  118:13
**relevant (4)**
  14:1;44:8;132:4;
  140:12
**relief (1)**
  136:17
**remain (2)**
  90:18;133:22
**remains (2)**

108:22;110:6
**remedies (2)**
  121:1;134:14
**remember (5)**
  46:3;59:1;69:8;
  108:9;127:12
**remind (3)**
  40:8;80:1;140:19
**remove (1)**
  117:17
**removed (1)**
  106:15
**rendered (1)**
  134:1
**reorganization (3)**
  77:18;82:16;106:13
**reorganized (1)**
  22:2
**repeatedly (1)**
  99:25
**repeating (1)**
  135:15
**rephrase (1)**
  129:10
**replacement (1)**
  65:22
**replica (1)**
  123:16
**reporting (1)**
  120:3
**represent (4)**
  53:7;54:2;66:23;
  112:18
**representations (2)**
  54:15;114:13
**representatives (1)**
  121:3
**representing (2)**
  113:16;115:9
**represents (1)**
  127:24
**request (6)**
  53:21;114:1,2;
  137:20;139:12;140:3
**requested (4)**
  138:19;141:18;
  142:11,19
**requests (2)**
  121:7;139:20
**require (2)**
  59:8;82:23
**required (5)**
  101:3,24,25;118:24;
  119:2
**requirement (2)**
  100:20;106:13
**requirements (10)**
  14:12,14,15;19:3;
  21:24;22:1;81:5;82:9;
  83:4;87:14
**requires (2)**
  101:7;116:24
**requiring (4)**

53:8;106:1;108:10;
  110:20
**resembling (1)**
  13:24
**reserve (4)**
  29:18;49:11,13,17
**reserves (3)**
  20:5;23:8;45:23
**resolution (17)**
  10:17;51:15,21,23;
  54:1,22,24;55:1;58:4,
  12,22;59:2;63:7,18;
  68:21;102:20,22
**resolve (4)**
  50:8;51:18;84:12;
  126:20
**resolved (9)**
  5:8;24:14;25:18,19,
  20;51:17,17;58:18;
  127:22
**resolves (2)**
  21:23;54:20
**resolving (3)**
  68:1;91:8;94:20
**respect (11)**
  6:16;105:20;120:20;
  121:4,20;125:9,10,11;
  135:15;137:9;138:5
**respectfully (1)**
  110:22
**respond (5)**
  9:1,17;136:20;140:5,
  6;142:3
**responded (2)**
  88:1;112:16
**response (5)**
  7:13;10:11;42:13;
  62:15;140:22
**responsive (1)**
  123:12
**rest (2)**
  49:19;118:19
**restated (1)**
  26:19
**restating (1)**
  27:23
**restrict (1)**
  116:16
**restriction (1)**
  108:20
**restrictions (1)**
  106:10
**restrictive (3)**
  110:14,16;135:17
**restructuring-support (1)**
  14:22
**result (1)**
  37:13
**resulting (1)**
  118:13
**resurrecting (1)**
  24:23
**retain (1)**

35:11
**retained (2)**
  16:24;18:5
**revealing (1)**
  69:5
**review (1)**
  106:19
**reviewed (2)**
  26:16;52:24
**revise (1)**
  53:23
**revised (7)**
  24:15;27:17;53:21;
  60:4;106:7,9;108:25
**revisit (1)**
  7:14
**ridiculous (1)**
  95:3
**Right (99)**
  5:4;6:10,18;7:1,12,
  21,21;12:11;14:19,20;
  15:15,18,23,25;17:21;
  19:10,13;22:17;23:1,2,
  4,12,19,21;27:2,9,18;
  29:3;30:1,6,15;31:15,
  17;35:11,12,14;36:13;
  37:2;42:4;43:19,24;
  44:7;47:8;49:3;51:18;
  52:9;54:25;56:11,19,
  24;57:7,18;62:25;63:2,
  15,17,17;65:7;66:8,17;
  72:3;73:11;76:9;77:23;
  79:13,17;80:23;81:6;
  82:3;85:9;87:6;89:20;
  90:11;91:6,11;96:8;
  97:24;104:7,19;
  105:22;108:12;109:17;
  110:17;111:19;113:19,
  21;114:4,6,25;118:10;
  119:10;123:5;126:18;
  133:1;134:4,10,17;
  136:19;137:3
**rights (13)**
  29:18;34:14;35:1;
  37:14;38:13,14;39:14,
  19;41:13,22;116:18;
  117:3;118:21
**rise (1)**
  4:5
**risk (4)**
  23:3;26:12;131:17,
  18
**risks (3)**
  16:25;20:16,17
**River (1)**
  111:25
**road (1)**
  46:16
**Robert (1)**
  51:3
**Robins (1)**
  77:16
**role (1)**

69:23
**roll (1)**
  38:18
**room (4)**
  11:5;32:14;65:3;
  88:4
**rosa (1)**
  124:22
**Rose (1)**
  111:24
**routinely (2)**
  14:24,24
**Royal (1)**
  71:11
**RSA (65)**
  5:8,9;10:24;11:22,
  25;12:4,7,24;13:6;
  14:9;16:22;22:5,10;
  25:13;26:20;27:4;
  33:13,18;34:1,17;40:3;
  44:8;50:14;65:24;72:7;
  75:2;81:1,12;86:10,18;
  90:16;91:1,7,9,19;
  92:15,22;93:8;94:6;
  95:18;100:3,18;101:3,
  7;102:13;103:1;107:9,
  19,22,23;109:9,14,21;
  111:7;121:22,23;
  128:9;129:14;134:3,6;
  135:16,17;139:2,9;
  142:25
**RSAs (4)**
  104:3,5;122:9;133:6
**RSA's (1)**
  50:17
**rub (1)**
  12:10
**rubber (1)**
  82:22
**rule (9)**
  11:23;15:10;19:20;
  47:19;65:20;76:5;
  78:20;127:1;140:13
**ruled (1)**
  40:9
**rules (2)**
  33:5;140:18
**ruling (16)**
  4:22;9:22;10:18;
  28:10;30:4,5,7;48:6;
  107:11,12;108:9,14;
  134:20,20;138:5,23
**rulings (1)**
  34:20
**run (11)**
  36:7,8,9;51:21,23,
  23;55:11;58:22,24;
  60:2;63:1
**running (1)**
  136:24

**S**

Min-U-Script®

Case: 19-30088    Doc# 4992    eScribers, LLC | (973) 406-2250
Filed: 12/05/19   operations@escribers.net | www.escribers.net   Entered: 12/05/19 10:22:14

Page 160

(16) register - running

of 165

**Sacramento (1)**
41:20
**safe (1)**
82:25
**same (32)**
13:6;18:10;29:9;
53:8,18;54:5;93:7;
94:8;95:19,24;96:19;
99:7;101:13,15,16,17,
18,19,19,23;104:17;
105:7;107:25;108:2;
109:15;121:25;123:20;
125:22;129:20;132:1;
135:19;142:2
**SAN (2)**
4:1;20:18
**satisfactory (1)**
77:9
**satisfies (3)**
116:14;118:13;
137:10
**satisfy (1)**
42:25
**saw (3)**
18:3;53:23;106:25
**saying (24)**
17:19;18:9,10;42:11;
52:11;62:21;67:16,17;
68:9,9;70:20;83:21;
91:21;95:12,14;97:3;
105:4;109:19;114:21;
115:8;119:15;127:8;
130:14;132:11
**scale (1)**
138:13
**scenario (9)**
37:7,8;38:3,4;39:22;
55:19,23;116:19;126:6
**schedule (5)**
6:24;8:4;12:8;45:11;
140:9
**scheduled (4)**
7:6,19;8:19;47:2
**scheduling (1)**
138:5
**scope (2)**
61:15;116:20
**se (1)**
94:15
**seal (1)**
119:1
**seasoned (2)**
9:2;10:15
**second (4)**
48:25;51:20;54:22;
93:21
**Secondly (1)**
74:1
**seconds (1)**
69:6
**Section (10)**
41:7;93:9,17,18;
94:2;100:19;107:24;

109:22;119:24;128:10
**sections (2)**
93:16;95:9
**securities (1)**
88:25
**seeking (2)**
105:18;136:17
**seeks (1)**
8:22
**seem (5)**
66:19;79:21;88:3;
132:25;133:1
**seems (8)**
4:20;5:9;17:16;
27:19;95:2;131:9;
132:1;142:1
**seminal (1)**
71:12
**send (2)**
37:24;140:11
**senior (5)**
52:21;96:2;106:1,11,
14
**sense (12)**
4:25;7:15;67:10;
80:22;85:17;91:8;
92:25;98:12;102:4;
105:11,15;108:16
**sensible (1)**
10:17
**sent (2)**
136:13;138:6
**separate (2)**
33:17;141:22
**separately (1)**
74:1
**September (2)**
46:4,5
**SeraCare (1)**
104:22
**series (1)**
136:3
**serious (2)**
25:15;83:10
**seriously (2)**
20:2,9
**served (1)**
141:8
**session (1)**
4:5
**set (11)**
15:14;16:21;28:7;
29:16;30:2,3;31:2;
40:3;66:11;99:21;
128:13
**setting (2)**
23:10;51:19
**settle (15)**
27:11;31:7;32:4,5;
54:11;69:16;78:18;
91:12;112:20;113:10,
20;117:7;124:15;
129:3;131:2

**settled (2)**
14:9;128:15
**settlement (78)**
14:12,20;15:6,8,17;
16:22;17:3;18:24;
19:19,25;20:1,9,14,20;
21:2,13,23;22:25;23:2,
3,23;24:19,21,23;
26:21;27:6;47:24;54:9,
9;74:10;77:3;80:12,24,
24;81:18,23,24;85:6,
17;87:13;91:3;92:24;
93:4,11;94:15,24;
96:15,18,18;97:7,8,13;
98:6;101:4,9,13,14,17,
18,19,20,24;102:15,17,
21;103:19,23,25;105:2,
10,18;106:8,20;
111:11;115:23;124:10;
125:6,14
**settlements (2)**
15:9;118:25
**settling (3)**
93:12;112:22;114:17
**seven (1)**
54:2
**seven-percent (1)**
47:20
**Seventh (2)**
42:6;71:8
**several (1)**
91:5
**shall (2)**
94:4;128:11
**shape (1)**
82:16
**share (3)**
50:2;79:10;116:4
**shared (1)**
82:13
**sharing (1)**
69:8
**Shasta (1)**
71:15
**sheet (1)**
65:24
**shooting (1)**
67:25
**shop (2)**
123:8,8
**shopping (1)**
123:15
**short (2)**
74:15;130:20
**shorthand (1)**
34:11
**shortly (1)**
105:19
**show (5)**
10:12;55:2;64:5;
93:15;107:14
**sic (8)**
10:25;28:4;30:9;

48:13;58:3;63:2,4;
66:24
**sick (1)**
130:1
**side (18)**
4:22;11:1,14;18:15;
28:18;32:14,20;49:22;
56:16;57:6;60:8;72:9;
88:4;113:18;114:23;
128:3;130:9;140:5
**sidelines (1)**
33:15
**sides (4)**
72:5;78:23;104:5;
123:1
**sign (5)**
68:19;77:2;81:1;
93:9;123:19
**signal (1)**
49:9
**signed (3)**
46:2,4;114:16
**significant (5)**
24:20;80:15;82:23;
127:24,25
**signing (1)**
59:8
**silver (1)**
86:17
**simmer (2)**
9:17;26:3
**simple (7)**
24:19;55:15;91:11;
94:1;113:4;124:14;
140:3
**simpler (2)**
33:19,25
**simplest (1)**
55:15
**simply (9)**
33:2;81:7;98:3;
102:14;103:15;106:17;
108:7;113:1,6
**single (2)**
6:14;104:9
**singular (1)**
121:18
**sit (7)**
8:18;10:10;25:8;
32:14;127:10;132:11;
133:25
**sitting (2)**
83:8;141:24
**situation (9)**
40:3;87:16;112:19,
20;114:19;119:5;
122:6,16;127:21
**six (1)**
54:1
**sixteen (1)**
45:22
**sixty (2)**
54:2;62:25

**sixty-five (1)**
54:2
**skinnied (1)**
137:17
**slight (1)**
97:4
**smaller (1)**
64:15
**smarter (1)**
80:9
**so-called (1)**
42:13
**solely (1)**
51:13
**solicit (5)**
94:12;95:2;97:2;
108:21;110:4
**solicitation (1)**
95:11
**solicited (2)**
97:5,6
**solution (12)**
52:8;60:8,11,11,12;
70:3,4;75:17,18,19;
77:9;83:19
**solve (1)**
109:20
**solvent (9)**
19:2;34:18,19;35:17;
43:1;85:4;131:10,14;
133:22
**somebody (7)**
47:15;49:10;73:23,
24;74:24;83:16;103:24
**somebody's (1)**
113:3
**somehow (3)**
103:23;105:13;
130:19
**someone (9)**
18:15;28:18;70:4;
74:19,20;77:2;85:18;
98:10;117:1
**someone's (2)**
38:4;98:15
**sometimes (2)**
25:8;132:24
**somewhat (3)**
34:4;86:13;127:20
**somewhere (1)**
109:14
**soon (2)**
134:21;142:25
**sooner (1)**
66:24
**sorry (8)**
50:5;81:25;98:18;
100:21;109:23;118:5;
127:4;130:16
**sort (7)**
21:18;42:5;46:15;
63:6;83:8;132:25;
136:9

Case: 19-30088    Doc# 4992    Filed: 12/05/19    Entered: 12/05/19 10:22:14    Page 161
of 165

**sounds (2)**
28:25;62:21
**source (1)**
131:12
**sources (1)**
11:3
**speak (1)**
25:16
**speaker (1)**
58:17
**speaking (1)**
42:18
**speaks (1)**
61:5
**specific (2)**
48:13;117:12
**specifically (3)**
93:9;126:14;130:24
**spend (1)**
141:20
**spending (1)**
25:20
**spent (1)**
23:7
**spirited (1)**
137:21
**sponsor (1)**
82:23
**squishy (1)**
22:12
**staff (4)**
11:6;138:11;140:8,
11
**stage (1)**
40:3
**stakeholders (1)**
121:16
**STAMER (43)**
11:15,16,17,18,21,
25;12:10,14,16;15:20;
33:25;53:20;120:15;
134:23;135:1,4,6,7,21;
136:10,16,21,23,25;
137:2,5,14;138:2,4,16;
139:3,6,8,19,23;
140:11,24;141:2,10,12,
15,18;142:10
**stamp (1)**
82:22
**stand (4)**
46:3;93:13;95:17;
98:4
**standard (4)**
19:21,23;34:3;
106:19
**standards (4)**
15:9;19:20;20:2,14
**standpoint (3)**
23:23;24:8,9
**stands (2)**
134:17;142:24
**start (5)**
21:20;45:1,2;99:9;

**100:16**
**started (1)**
42:23
**starts (1)**
23:11
**starve (1)**
11:3
**state (4)**
6:5;85:3;112:9;
118:12
**state-court (4)**
34:19;58:10,11;63:9
**state-law (1)**
34:14
**statement (9)**
11:14;14:4;15:1;
16:17;26:16;42:9;
69:14;86:5;95:1
**statements (3)**
12:22;40:10;122:2
**states (1)**
70:22
**static (1)**
100:4
**status (1)**
138:7
**step (5)**
24:20;28:14;69:1,2;
116:12
**Stephen (1)**
120:17
**stepped (1)**
82:13
**stick (2)**
11:8;119:10
**still (12)**
33:1;35:16;42:14;
55:16;61:24;71:5;73:1,
3;94:21;100:8;108:22;
110:23
**stipulate (3)**
9:5;116:13;118:14
**stipulation (1)**
117:2
**stock (3)**
56:24;59:5;130:23
**stood (1)**
135:22
**stop (5)**
59:13;60:19;83:13;
85:24;125:11
**stopped (1)**
100:6
**stopping (1)**
51:16
**stops (1)**
41:2
**stories (1)**
64:1
**straight (1)**
68:1
**straightened (1)**
86:7

**straightforward (1)**
24:10
**stranger (1)**
140:17
**Strauss (1)**
98:25
**Streamlined (1)**
62:13
**stress (1)**
34:22
**strike (2)**
54:19;108:15
**Striking (1)**
110:21
**stroke (1)**
129:2
**strongly (1)**
135:25
**struck (6)**
65:25;108:8,14;
110:8,20;124:2
**structure (2)**
31:1;83:3
**stuff (3)**
9:14;72:14;95:12
**sub (1)**
124:22
**subject (2)**
39:1;91:8
**submit (1)**
10:11
**submitted (4)**
106:8;111:8;134:17;
142:24
**subordination-claim-by-claim (1)**
67:24
**subro (5)**
22:19;83:7;92:25;
94:21,25
**subrogation (46)**
4:19;5:10;14:10;
15:6,21;17:4;20:4,19;
24:12;26:15;32:22;
43:5,5;46:6;48:12,12;
53:11,12,15,16,23;
72:21;80:12,13,24;
82:1;93:9;95:18;97:6,
9;99:14;100:1;106:25;
108:8,17;112:4;
113:11;123:3,17;
125:11,17;128:11;
130:9;132:20;133:18,
18
**subrogation-claims (1)**
19:19
**subrogations (2)**
14:16;123:8
**subros (9)**
95:15;101:3,8;
108:10;109:23;110:4;
111:8;123:13;141:19
**subsection (3)**
100:19;109:22,23

**subsequent (2)**
106:5,7
**subsequently (1)**
38:21
**substance (2)**
136:23;137:1
**substantial (4)**
17:2;18:24;21:4;
124:9
**success (1)**
24:25
**successful (1)**
17:1
**successfully (1)**
19:2
**sucks (1)**
21:8
**sue (6)**
31:19,22,22;38:19;
130:20;131:6
**suffered (2)**
37:12;138:25
**suffering (1)**
11:7
**sufficient (1)**
37:25
**suggest (2)**
12:13;94:21
**suggested (2)**
102:13;108:13
**suggesting (6)**
25:25;66:18;76:22;
77:5;123:13,18
**suggestions (1)**
84:25
**suing (1)**
31:23
**summaries (1)**
73:6
**summary (3)**
140:8;141:5,6
**superseded (1)**
118:8
**supplies (1)**
11:4
**support (8)**
16:17;94:12;105:19;
106:8,14;110:4;
123:24;135:16
**support-agreement (1)**
4:18
**supportive (1)**
34:21
**suppose (9)**
38:17,18;52:13;
55:25;56:2,9,10;
102:23;108:21
**supposed (6)**
50:9;64:19;87:21,21;
131:11;137:15
**supposedly (1)**
113:12
**Supreme (1)**

**37:23**
**surcharge (1)**
96:24
**surcharges (1)**
91:2
**sure (17)**
8:14,16;13:23;18:16;
26:24;37:1;59:11;68:7;
86:13;93:22;103:10;
107:15;126:7,9;
131:17,23;132:10
**surprised (1)**
48:9
**suspect (1)**
25:24
**sustainable (1)**
83:3
**symmetrical (2)**
112:11;116:10
**sympathetic (1)**
77:8
**System/West (1)**
111:25

**T**

**table (7)**
103:9;107:13;
109:15;113:18;114:23;
123:16;128:4
**tainted (1)**
91:19
**talk (17)**
12:6,9;44:9;53:25;
65:25;71:8;87:2;98:16,
16,21;103:19;117:16;
126:14;132:4;135:22;
136:5;138:7
**talked (4)**
45:25;84:20;100:17;
106:21
**talking (11)**
8:2;30:19;44:7;49:5;
62:24;63:1;64:10;94:9;
98:15;103:14;127:7
**talks (1)**
129:19
**tasked (1)**
22:9
**TCC (22)**
13:7;15:7;17:11;
21:7;28:9;33:10;36:1;
44:1;52:19;53:7,7,17;
90:24;92:24;94:5;
95:20;96:3;119:16,20,
21;120:11;125:16
**TCC's (1)**
43:3
**tea (1)**
87:23
**technicalities (1)**
80:8
**tee (1)**

Case: 19-30088    Doc# 4992    Filed: 12/05/19    Entered: 12/05/19 10:22:14    Page 162
of 165

140:4
**Telephonic (1)**
58:17
**telling (6)**
11:4;17:14;67:25;
68:17;70:25;77:14
**tells (1)**
86:17
**ten (9)**
17:22;29:8;39:12;
51:7,8;58:14;62:15;
72:25;142:21
**ten-billion-dollar (1)**
17:18
**tentative (5)**
91:5;107:11,12;
108:9,14
**ten-to-twelve-year (1)**
37:6
**term (5)**
65:24,24;68:10;
70:21;96:13
**terminate (5)**
15:3;96:15,18,18;
97:6
**terminated (6)**
104:24,25;105:20;
122:17,18,22
**termination (2)**
96:20,22
**terms (16)**
9:21;14:21,23;15:6;
19:25;23:10;82:10;
83:11;92:17;93:12;
104:17;117:22;125:6;
131:19;133:9,14
**terrific (1)**
103:20
**test (2)**
20:13;92:13
**testimony (1)**
17:9
**thanks (1)**
90:9
**that'll (1)**
134:13
**theme (2)**
135:12;139:9
**theory (1)**
103:7
**thereby (1)**
15:6
**therefore (12)**
35:7,9;39:7;83:15;
85:11;86:18;90:3;
106:18;111:13;114:18,
24;122:22
**therein (1)**
12:10
**there'll (5)**
31:6;64:17,20,21;
141:22
**there're (5)**

7:19;45:18;54:1;
58:14;63:4
**thinking (1)**
10:23
**third (7)**
28:4,5;31:23;52:5;
62:5;95:11;117:1
**third-party (5)**
19:7,11;34:3;44:4;
91:17
**thirteen (2)**
5:23;8:19
**thirty (3)**
58:13;69:6;140:21
**thirty-five (1)**
18:22
**though (9)**
6:6;19:4;22:5;47:7;
62:3;67:14;71:9;82:19;
127:25
**thought (14)**
32:8;36:4,5,5;40:14;
59:18;69:15;86:5;
89:22;117:9;129:6;
131:6;136:14;140:14
**thoughtful (1)**
107:13
**thoughts (1)**
48:25
**thousands (1)**
20:24
**three (4)**
41:5;87:17;140:21;
141:8
**throats (1)**
68:14
**throwing (1)**
73:20
**thrown (1)**
42:6
**tie (1)**
52:2
**till (3)**
58:15,25;59:9
**tilts (1)**
91:2
**timely (5)**
17:1;101:3;121:8,17;
124:1
**times (4)**
25:16;56:2;91:6;
124:8
**title (2)**
60:16,20
**today (27)**
4:18;5:18;6:12;7:9;
8:19;10:10,24;11:10;
14:1;16:18;18:3;21:9;
30:20;33:6;49:1;51:4,
12,25;52:18;54:19;
67:18;73:9;75:3;79:3,
9;90:8;133:6
**today's (4)**

4:23;14:5;52:2;
117:17
**together (10)**
41:2;48:2;71:3;
75:20;108:11;110:21;
116:22,23,23;130:1
**told (11)**
6:12;42:19;53:20;
83:10;86:19;91:16,18;
92:2,17,19;114:23
**tomorrow (1)**
9:24
**tonight (1)**
51:17
**took (5)**
16:16;56:23;60:7;
67:22;74:18
**tool (1)**
104:7
**toolbox (1)**
85:22
**tools (1)**
85:22
**topic (1)**
53:25
**topics (2)**
51:12,13
**tort (3)**
51:3;58:25;60:15
**tort-claimants (2)**
15:5;19:22
**total (2)**
45:8;57:16
**totaling (1)**
45:23
**totally (3)**
15:11;36:4;54:20
**touch (1)**
9:9
**tout (1)**
103:19
**towards (1)**
88:9
**traction (1)**
42:11
**tradable (1)**
88:25
**trailer (1)**
64:6
**transcript (1)**
106:5
**transformed (1)**
82:25
**travel (1)**
9:11
**treat (1)**
43:1
**treatment (6)**
93:7,10,14;94:8;
96:20;132:1
**tree (1)**
59:2;63:12;118:18
**trees (2)**

64:7;76:16
**trial (15)**
9:2;29:18,19,22;
31:15;46:25,25;47:6,7;
58:10,10,11,19;73:21;
113:22
**trials (3)**
20:18;62:10;63:9
**trick (2)**
31:4;107:17
**tricks (1)**
44:21
**trigger (1)**
87:25
**trilogy (1)**
71:13
**trimmer (1)**
63:12
**trimmers (2)**
59:2;118:18
**trouble (2)**
101:7;108:24
**troubles (1)**
93:15
**true (14)**
8:14;21:11,12;22:4,
4;42:15;53:17;56:2,4;
62:3;70:4;119:17;
125:13,24
**truly (2)**
60:14;77:2
**trust (41)**
28:24,25;29:5,9,15;
30:2,3,25;31:5;33:3,7;
35:24;37:25,25;38:1,8,
20;51:21;54:12,14,15,
17,23,24;55:1,6;58:4,
12,22;59:2;63:1,7,13;
65:4;67:18;68:20;
70:14,22;75:23;77:1;
116:22
**trustee (2)**
29:2;63:8
**trusts (2)**
51:23;63:18
**try (10)**
13:19;16:2;18:16;
33:1;62:9,9;67:8;92:4;
107:2;120:18
**trying (11)**
11:3;30:20;31:2;
53:24;84:8;85:9;89:18;
93:2;115:4;133:20;
134:21
**Tubbs (10)**
21:1;22:5,13,14,15;
34:20;46:24,25;48:19;
78:5
**turn (5)**
25:22;88:21;105:7;
107:8;130:20
**turns (4)**
74:3;91:14;131:5;

133:25
**twelve (3)**
62:15;81:24;92:9
**twenty (18)**
14:9;17:5;18:20;
20:6;22:19;23:15;
24:23;45:8,23;47:21;
58:14;67:18,19,20;
93:3;96:22;98:4;
124:10
**twenty-billion-dollar (4)**
65:22;66:10;97:7;
103:21
**twenty-five-billion- (1)**
66:10
**twenty-seven (1)**
45:17
**twenty-three (1)**
48:18
**twenty-two (1)**
20:23
**two (30)**
4:16;6:13;7:13;9:17;
15:4;18:1;22:8;33:17;
35:22;41:8;63:6;73:21;
82:13;87:17;89:2;
100:7;104:10,11,21;
110:18;112:2,11;
122:22;130:6;131:22;
137:11;140:10,21;
141:8;142:2
**two-consent (1)**
12:23
**type (5)**
54:23,24;104:23;
133:18,18
**types (3)**
33:17;34:15;35:22
**typical (3)**
14:23;64:25;121:23
**Typically (3)**
29:15;31:18;58:5

## U

**UCC (1)**
51:7
**ultimately (2)**
37:16;137:22
**umbrage (1)**
120:21
**Um-hum (7)**
31:9;39:2;44:10;
56:13;80:25;83:14;
96:5
**unanimous (1)**
133:17
**unbelievable (1)**
64:1
**uncertain (1)**
92:17
**unchallenged (1)**
16:11

Min-U-Script®
Case: 19-30088    Doc# 4992    Filed: 12/05/19    Entered: 12/05/19 10:22:14    Page 163
of 165
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(19) Telephonic - unchallenged

**unconfirmable (3)**
86:6,11;90:2
**unconfirmed (1)**
87:24
**under (23)**
11:24;15:10;17:18;
19:20;20:3,7;26:20;
29:10;30:18;35:24;
36:3;37:11;43:13;49:5;
53:20;68:4;85:9;
106:17,19;119:1;
125:17,19;134:2
**Underhill (7)**
41:6,24;71:11;112:5,
7;115:3,15
**underlying (1)**
20:24
**understands (2)**
85:7;138:12
**understatement (1)**
92:18
**understood (8)**
40:20;22;91:6;99:13;
120:1,2,4;139:18
**undisputed (2)**
16:20;20:3
**unfair (1)**
131:10
**Unfortunately (2)**
77:18;109:13
**unhappy (1)**
136:12
**uninsured (1)**
45:7
**unintentionally (1)**
25:9
**Union (4)**
42:1,2,7;71:8
**unique (3)**
54:23,24;127:20
**UNISON (2)**
4:8;143:2
**units (1)**
50:19
**unknowns (1)**
79:6
**unless (10)**
4:21;10:23;22:6;
27:22,24;33:5;49:16;
88:3;122:4;133:9
**unlike (1)**
90:1
**unlikely (3)**
48:20,21;125:20
**unnamed (1)**
11:2
**unrefuted (1)**
45:21
**unrelated (2)**
38:14;139:8
**unsecured (1)**
52:21
**unusual (1)**

43:14
**up (67)**
5:25;10:8,12,15;
12:5,8;15:14;18:24;
21:4;22:10,14;26:12;
29:16;30:2,3;31:2,25;
32:24;37:22;39:14;
41:12,22;47:14;49:21;
51:1;53:22;54:12;
56:25;57:2;59:25;
61:10,23;64:20;67:15,
19;69:10;74:21;75:21;
76:24;78:21;79:13,14;
83:7;85:2;86:8,25;
87:1;96:3;102:17;
109:13;110:17;114:16;
116:18;118:21;119:14;
120:19;123:19;129:24,
24;130:20;132:25;
134:24;135:22;136:5,
6;140:4;141:16
**upfront (1)**
33:3
**upon (3)**
55:1,16;86:11
**use (5)**
36:2;50:22;73:5;
117:2;130:14
**used (2)**
32:14;105:2
**using (2)**
14:7;92:24
**utility (1)**
82:25

**V**

**validated (1)**
20:19
**valley (1)**
94:18
**value (4)**
18:24;34:23;56:25;
87:15
**variations (1)**
55:6
**various (3)**
12:4;84:25;130:25
**vast (1)**
122:9
**Vegas (1)**
71:17
**Verbatim (1)**
101:21
**version (3)**
27:17;106:19;109:21
**versus (3)**
62:8;99:17;133:18
**veto (1)**
65:23;66:2,3;138:9
**viable (1)**
137:10
**victim (12)**

28:19,19,20;36:17;
58:16;59:7;60:25;62:4;
70:23,23;72:21;114:16
**victims (20)**
20:4;27:5;37:1;
42:19;45:22;57:1,12;
61:18;62:8;63:25;
68:14,16;77:8,17;
112:13,21;116:13;
118:14;127:21;133:22
**view (10)**
24:11;47:23;54:25;
80:12;82:14;85:4,15;
89:9;92:6;129:9
**views (3)**
20:25;83:20;134:2
**violate (7)**
13:15,19,20;19:5;
65:20;76:5;81:23
**violated (2)**
40:2,8
**violates (1)**
13:11
**violating (4)**
72:1;94:6;135:24;
136:2
**virtually (1)**
121:24
**virtue (1)**
91:19
**vitiating (1)**
70:6
**voluntarily (3)**
27:10,24;42:10
**voluntary (6)**
9:21;19:14,17;28:10;
42:8;64:4
**vote (25)**
54:5;92:6;94:5,11;
95:11,13,15;96:3,12;
101:3,8,12,25;102:11,
16,18;106:1;108:3;
110:23;111:9;115:12;
123:20;131:20;132:13,
20
**voted (1)**
131:23
**votes (3)**
83:7;85:2;132:25
**voting (11)**
54:8;95:19;96:7;
100:17;104:6,23;
106:9;122:10;123:18;
131:20,21

**W**

**wait (8)**
4:22;39:11;43:6;
58:25;60:19;93:21;
138:6;143:3
**waited (1)**
135:9

**waiting (1)**
29:8
**waits (2)**
39:24,25
**waived (2)**
61:3;92:2
**waiver (1)**
128:12
**walk (1)**
28:14
**wants (5)**
49:10;96:24;132:2;
133:7;141:3
**Washington (1)**
16:7
**wave (1)**
131:25
**way (53)**
5:24;11:13;12:12,13;
27:16;29:15,21,21;
30:2,3,23,25;37:22;
40:11,20;43:4,11,20,
20;51:18,24;52:9;
53:21;54:5,15;58:25;
59:13;60:10;63:18;
66:22;71:25;76:14;
91:2,24;92:15,22;
94:23;97:9,15;106:23;
108:15;113:4;114:20;
125:25;130:2,18;
131:2,5;133:2;137:9;
139:5;140:19;141:23
**ways (5)**
21:18,20,20;33:6;
139:9
**WEDNESDAY (2)**
4:1;7:14
**week (12)**
5:25;7:9;8:2,3,18;
54:20;57:13,13,18;
105:23;121:11;142:13
**weeks (3)**
79:1;82:13;137:12
**Weil (1)**
120:18
**Welcome (2)**
4:7;99:3
**Wells (1)**
16:18
**Wells' (3)**
16:11,17;20:12
**weren't (2)**
85:25,25
**What's (20)**
25:11;29:13;50:4,13;
51:14;56:5;61:17;63:3,
3;69:5,19;70:1;75:17;
78:3;79:5;88:16;103:7;
116:1,7;125:7
**where's (1)**
86:16
**Whereupon (1)**
143:9

**whittle (1)**
93:2
**whole (17)**
12:9;14:17;19:6;
27:9;35:7,12;41:14;
43:3;51:18;54:13;59:9,
10;68:20;81:22;92:21;
98:4;131:17
**wholesale (1)**
15:6
**who's (2)**
113:7;138:10
**wide (1)**
55:6
**wife (1)**
50:24
**wildfire (10)**
50:18,19;53:11,15;
54:3;81:16,20;118:14;
121:17;130:11
**wildfires (1)**
20:23
**willing (3)**
9:16;97:11;117:16
**Willkie (1)**
32:21
**win (1)**
103:20
**Winthrop (39)**
16:15;111:19,20,23,
24;112:24;113:1,5,8,
15,19,22;114:6,8,12;
115:2,7,14,16,20,22;
116:6,9;117:8,11,14,
16,21,23;118:1,5,9,11,
24;119:4,8,9;127:9,17
**Winthrop's (2)**
126:14,18
**wisdom (3)**
77:11,12;128:5
**withdrawn (1)**
57:9
**within (3)**
26:13;103:1;137:11
**without (12)**
9:15;58:2;69:5;77:3;
89:17;94:6;100:8;
102:11;110:8;122:9;
129:21;135:15
**witness (2)**
6:13;10:8
**woefully (1)**
37:12
**woman (1)**
63:22
**word (2)**
61:10;100:7
**words (12)**
14:8;15:2;28:2;
29:14;60:5;61:23;
66:17;74:5;95:12,25;
98:2;122:24
**wordsmiths (1)**

Case: 19-30088    Doc# 4992    Filed: 12/05/19    Entered: 12/05/19 10:22:14    Page 164
of 165

70:5
**work (18)**
29:14;31:6;32:25;
33:4;40:21;54:15,15;
65:4;70:17;82:17;
126:4,19,23;127:9,17;
130:10;131:7;132:24
**worked (1)**
130:10
**working (3)**
73:3;77:6;81:3
**works (13)**
31:18;38:1;39:13;
40:11;42:12;43:10,10,
11,20;48:20;66:1;
123:9;128:25
**worksheet (1)**
24:15
**world (3)**
39:7;43:18;55:1
**worried (1)**
110:11
**worry (2)**
7:2;38:3
**worse (5)**
46:6;66:19,24,25;
97:1
**worth (2)**
36:4;88:24
**wrap (2)**
110:17;134:24
**wrapping (1)**
69:10
**wreak (1)**
90:16
**wrong (7)**
32:20;64:11;74:4;
87:7;95:16,23;123:16

**X**

**XYZ (1)**
114:2

**Y**

**years (12)**
29:8;37:22;39:12,24;
43:6;62:15;76:9,9,10,
11,13;87:17
**yell (1)**
16:8
**yesterday (12)**
5:14;6:9;12:23;
17:11;18:3;40:24,25;
45:16;62:15;121:5;
137:24,24
**York (1)**
10:12

**Z**

**Ziman (1)**

139:21
**Ziman's (1)**
10:13

**1**

**1 (3)**
50:14,18;114:2
**1,000,000 (2)**
37:23;38:8
**1,000,000- (1)**
38:9
**1.9 (1)**
119:24
**10.5 (1)**
73:9
**100,000 (16)**
28:21;36:2,3,6,18;
37:11,24;38:10;39:23;
41:11;42:21;115:24,
25;130:1;131:4,5
**100,000-dollar (1)**
115:24
**1054 (25)**
14:12,14,21;19:3;
21:24;22:1;38:20;43:1;
55:3,3;77:13;81:5,15,
24;82:9,15,22,22;
83:12;84:17;85:9;
87:14;88:5;134:1;
137:10
**10th (1)**
6:23
**11 (7)**
14:25;19:2;56:23;
121:16;130:8,19;133:3
**11,000 (1)**
124:16
**11/2 (1)**
118:6
**110 (2)**
48:12;87:22
**110,000 (1)**
36:5
**1129 (1)**
91:8
**11th (1)**
143:5
**12:28 (1)**
143:9
**13.5 (13)**
56:18,21;57:1,3;
58:8;77:23;119:19,20;
120:10;130:14,17,19,
19
**13.5-billion-dollar (1)**
119:16
**14.5 (2)**
58:8;120:11
**144 (3)**
118:2,5;126:16
**14th (1)**
9:13

**15.8 (1)**
23:7
**150 (3)**
118:2,5;126:17
**150-page (1)**
141:7
**154 (1)**
118:4
**17 (1)**
52:25
**17th (2)**
9:15;138:6

**2**

**2 (5)**
50:14,19;93:9,23;
94:9
**20 (2)**
23:6;124:16
**20,000 (1)**
124:16
**2019 (2)**
4:1;106:25
**2020 (1)**
22:1
**20th (1)**
5:18
**24 (1)**
53:5
**26 (1)**
119:4
**26th (2)**
137:19;142:12
**2a (3)**
93:18,20;100:19
**2aiii (1)**
100:24
**2b (3)**
93:20;94:2;109:22
**2bii (3)**
107:24;109:16;110:1

**3**

**30th (3)**
22:1;87:18;124:12
**37- (1)**
141:6
**3aiii (2)**
128:10;129:11
**3rd (1)**
9:15

**4**

**4 (1)**
4:1
**4257 (1)**
53:5
**4554-1 (3)**
109:3;118:3,6
**4921 (3)**

109:4,6,7
**4th (1)**
45:17

**5**

**5 (3)**
53:6,9,9
**524e (1)**
41:7
**54b (1)**
74:2
**54c (1)**
74:2

**6**

**6 (3)**
53:6,9,13
**61-billion-dollar (1)**
56:25

**7**

**7 (2)**
47:3;100:24
**70,000 (2)**
62:9;127:21
**73,000 (1)**
57:25
**74,000 (1)**
58:6
**75,000 (1)**
58:6
**750,000 (1)**
38:9
**78,000 (1)**
57:17
**7th (1)**
47:4

**8**

**8 (2)**
107:20,21

**9**

**90- (1)**
36:5
**9019 (6)**
15:10,14;19:20;
106:19;124:23;130:25

Min-U-Script®
Case: 19-30088    Doc# 4992    Filed: 12/05/19    Entered: 12/05/19 10:22:14    Page 165
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
of 165
(21) work - 9019