AKIN GUMP STRAUSS HAUER & FELD LLP
Michael S. Stamer (*pro hac vice*)
Ira S. Dizengoff (*pro hac vice*)
David H. Botter (*pro hac vice*)
Abid Qureshi (*pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Email: mstamer@akingump.com
idizengoff@akingump.com
dbotter@akingump.com
aqureshi@akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
Ashley Vinson Crawford (SBN 257246)
580 California Street
Suite 1500
San Francisco, CA 94104
Telephone: (415) 765-9500
Facsimile: (415) 765-9501
Email: avcrawford@akingump.com

*Counsel to the Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION,<br><br>-and-<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>*All papers shall be filed in the Lead Case, No. 19-30088 (DM) | Bankruptcy Case No. 19-30088 (DM)<br><br>Chapter 11<br><br>(Lead Case)<br><br>(Jointly Administered)<br><br>**LIMITED OBJECTION OF THE AD HOC COMMITTEE OF SENIOR UNSECURED NOTEHOLDERS TO DEBTORS' MOTION TO ENTER INTO RESTRUCTURING SUPPORT AGREEMENT WITH THE OFFICIAL COMMITTEE OF TORT CLAIMANTS, CONSENTING FIRE CLAIMANT PROFESSIONALS AND SHAREHOLDER PROPONENTS**<br><br>**Hearing**<br>Date: December 17, 2019<br>Time: 10:00 a.m. (Pacific Time)<br>Place: Courtroom 17<br>450 Golden Gate Ave, 16th Floor<br>San Francisco, CA 94102<br><br>**Re: Docket Nos. 5038** |

The Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company (the "Ad Hoc Committee")[1] in the above-captioned chapter 11 cases of Pacific Gas and Electric Company (the "Utility") and PG&E Corporation ("PG&E" and, together with the Utility, the "Debtors"), by its undersigned counsel, Akin Gump Strauss Hauer & Feld LLP, hereby submits this limited objection (the "Limited Objection") to the *Debtors' Motion Pursuant to 11 U.S.C. §§ 363(b) and 105(a) and Fed. R. Bankr. P. 6004 and 9019 for Entry of an Order (I) Authorizing the Debtors and TCC to Enter into Restructuring Support Agreement with the TCC, Consenting Fire Claimant Professionals, and Shareholder Proponents, and (II) Granting Related Relief* [Docket No. 3992] (the "Motion").[2] In support of this Limited Objection, the Ad Hoc Committee respectfully states the following:

## LIMITED OBJECTION

1. The Debtors have, at last, committed to compensating fire victims and putting an end to an expensive and now unnecessary estimation process by settling the Fire Victim Claims for $13.5 billion (the "Fire Victim Claims Settlement"), which is the same aggregate claim amount agreed to earlier in these cases by the Ad Hoc Committee and the Official Committee of Tort Claimants (the "TCC"). The Debtors have represented to this Court that the terms of the Fire Victim Claims Settlement contained in the restructuring support agreement with the TCC and Consenting Fire Claimant Professionals (the "Debtor/TCC RSA") are "fair and reasonable and in the best interests of the Debtors, their estates, creditors, and all other stakeholders." *See Declaration of Jason P. Wells in Support of Debtors' Motion Pursuant to 11 U.S.C. §§ 363(b) and 105(a) and Fed. R. Bankr. P. 6004 and 9019 for Entry of an Order (I) Authorizing the Debtors and TCC to Enter into Restructuring Support Agreement with the TCC, Consenting Fire Claimant Professionals, and Shareholder Proponents, and (II) Granting Related Relief* [Docket No. 5039], 5:4-5. Thus, the amount to be paid to the holders of Fire Victim Claims from the estates is no longer in dispute and the need for estimation of such claims, under any plan of reorganization, has been foreclosed. The settlement and liquidation

---

[1] The Ad Hoc Committee filed an amended verified statement pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure on October 21, 2019 [Docket No. 4369].

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

of the Fire Victim Claims and the termination of the estimation process, which the Debtors and their equity holders have used to hold these chapter 11 cases hostage, now clears the way for an evaluation of the competing plans purely on the basis of their merits and their ability to satisfy the requirements of A.B. 1054.

2. Since the filing of the Motion, the Governor's office declared that the plan jointly filed by the Debtors and certain equity holder co-proponents on December 12, 2019 (the "Debtor/Equity Plan") [Docket No. 5101] fails to satisfy A.B. 1054. Specifically, in a letter (the "December 13 Letter") addressed to the Debtors' chief executive officer, and attached hereto as **Exhibit A**, Governor Newsom set forth with particularity how the Debtor/Equity Plan "falls woefully short" of meeting the requirements of A.B. 1054. December 13 Letter at 3. Because the Debtor/Equity Plan does not comply with A.B. 1054, the Debtor/Equity Plan is not feasible, as the reorganized Debtors will be "without access to the wildfire fund established under AB 1054." *Id.* at 5. In addition, pursuant to its express terms, unless the Debtors resolve the numerous identified deficiencies in the Debtor/Equity Plan by Tuesday, December 17, the Debtor/TCC RSA will be automatically terminated by the time the hearing on the Motion commences. *See* Debtor/TCC RSA, § 3(a)(iii). However, even if the Debtor/TCC RSA is not automatically terminated, the Debtor/Equity Plan is a manifestly inferior plan of reorganization for all stakeholders, including constituents of the State of California, other than the equity holders who control the Debtors' boards of directors.

3. The superiority of the plan of reorganization filed jointly by the TCC and the Ad Hoc Committee (the "TCC/AHC Plan") [Docket No. 4257], now that all relevant parties in interest are in agreement with respect to the allowance of the Fire Victim Claims, should be obvious to this Court and all parties in interest. *First*, the TCC/AHC Plan delivers to the holders of the Fire Victim Claims (x) more upfront cash and (y) more valuable equity in the reorganized Debtors based upon materially less debt and a far healthier capital structure for the reorganized Debtors. The TCC/AHC Plan provides victims with significantly more favorable consideration while also providing the reorganized Debtors with the billions of dollars of new capital required to modernize and "harden" their electrical grid against the risk of future catastrophic wildfires without the need to pass off these costs to ratepayers, as

required by A.B. 1054.  *Second*, the TCC/AHC Plan continues to be backed by fully-committed financing, while the Debtor/Equity Plan has enormous execution risk, relying in large part on over $34 billion of so-called "bridge" financing that will need to be refinanced within a year of emergence, leaving the Debtors exposed to near-term financial failure.  *Third*, the TCC/AHC Plan provides for a complete overhaul and reimagining of the management and corporate governance of the Debtors, yet another requirement of A.B. 1054.  In contrast, the Debtor/Equity Plan will entrench the individuals and governance structures that were in place during the disastrous wildfires that led to the Debtors' chapter 11 cases, and more recently, the "public safety power shutoff events."

4. Moreover, approval of the Fire Victim Claims Settlement does not render the Debtor/Equity Plan the sole confirmable plan as the Debtors would have the Court believe.  Rather, the Debtor/Equity Plan remains unconfirmable even with the support of the TCC, as the Governor's office has clearly stated that the Debtor/Equity Plan fails to comply with A.B. 1054.  In addition, approval of the Fire Victim Claims Settlement does not render the TCC/AHC Plan unconfirmable.  In fact, if the "anti-competitive" provisions (as described in more detail below) of the Debtor/TCC RSA are removed, it is difficult to believe that any holders of Fire Victim Claims would accept a plan that pays less on account of their claims and is less certain to be confirmed and actually pay anything to them at all.

5. While the Ad Hoc Committee does not oppose the approval of the Fire Victim Claims Settlement to the extent it liquidates the Fire Victim Claims for the benefit of the estates, as with the restructuring support agreement between the Debtors and the Ad Hoc Subrogation Group, it objects to the approval of the "anti-competitive" provisions of the Debtor/TCC RSA that seek to foreclose the competitive plan process mandated by this Court and unfairly disadvantage the TCC/AHC Plan.  These "anti-competitive" provisions exist solely to benefit the Debtors' controlling equity holders but harm the interests of every other stakeholder of the Debtors, including the *victims* themselves.  Specifically, the following provisions of the Debtor/TCC RSA[3] should not be approved:

---

[3] The Ad Hoc Committee previously opposed similar provisions with respect to the restructuring support agreement between the Debtors and the Ad Hoc Subrogation Group, which remain subject to a decision of the Court.  *See Objection*

4

a. **Section 2(b)** – Section 2(b) requires the TCC to file a notice withdrawing as a proponent of the TCC/AHC Plan upon the entry of an order approving the Debtor/TCC RSA. Aside from the TCC's potential breach of fiduciary duty by supporting a plan of reorganization that provides for inferior treatment for their constituents, this provision of the Debtor/TCC RSA appears to be intended to take away the TCC's constituents' ability to choose the better plan and harms all other parties in interest.

b. **Section 2(n)** – Section 2(n) requires each party to the Debtor/TCC RSA, including the Consenting Fire Claimant Professionals to "oppose efforts and procedures to (i) solicit acceptances by any creditors of, and (ii) seek confirmation, consummation or implementation of the Alternative Plan." This provision appears to be designed to prevent the TCC/AHC Plan from proceeding to solicitation and confirmation and may also require the Consenting Fire Claimant Professionals to encourage the holders of Fire Victim Claims they represent to vote against the TCC/AHC Plan.

c. **Section 2(l)** – Section 2(l) requires the Requisite Consenting Fire Claimant Professionals to provide non-consenting counsel and their clients with written information to "facilitate" these holders making "a meaningful and informed participation and voting decision on the [Debtor/Equity Plan]." This appears to be disguised solicitation in violation of section 1125(d) of the Bankruptcy Code, designed to provide an unfair advantage to the Debtor/Equity Plan. Such communications should await the approval of a joint disclosure statement on the competing plans so as to ensure a level playing field.

d. **Sections 3(a)(ii), (d)(ii)** – Section 3(a)(ii) provides, in relevant part, that the Debtor/TCC RSA will automatically terminate if the Debtor/Equity Plan is not confirmed by June 30, 2020. Pursuant to section 3(d)(ii), the estimation proceeding will immediately recommence if the Debtor/TCC RSA is terminated. Collectively, these provisions make clear that the Fire Victim Claims Settlement would not be binding if the TCC/AHC Plan is confirmed.

6. As the Ad Hoc Committee argued in the Subrogation RSA Objection, court approval of a settlement pursuant to Bankruptcy Rule 9019 binds the *estate* to the terms of the compromise entered into by the debtor in possession. *In re Flores*, 2013 WL 6186262, at *8 (Bankr. C.D. Cal. Nov. 25, 2013) ("The purpose and effect of seeking court approval of a compromise under Rule 9019 is to bind the bankruptcy estate to the terms of any bargain struck by a trustee or debtor-in-possession."). This is because a debtor-in-possession acts in a fiduciary capacity to the estate, not in its own interest or the interest of its equity holders. Therefore, any settlement approved by this Court must benefit the estates as a whole, not just the Debtors and their equity holders, and must be able to be incorporated into the

---

*of the Ad Hoc Committee of Senior Unsecured Noteholders to Debtors' Motion to Enter into Restructuring Support Agreement with the Consenting Subrogation Claimholders* [Docket No. 4241] (the "<u>Subrogation RSA Objection</u>").

5

plan of reorganization that is determined to be in the best interests of all and is ultimately confirmed by the Court. The Court must, therefore, remove any provision from the Debtor/TCC RSA that conditions the Fire Victim Settlement on confirmation of the Debtor/Equity Plan, which clearly provides the Debtors and their equity holders with an unfair advantage and is inconsistent with the Debtors' fiduciary duties.

7. Now that the Debtors have agreed to the amount of consideration to be paid to the holders of Fire Victim Claims, the central question left to answer in these chapter 11 cases is which plan is in the best interests of the Debtors' estates and creditors, delivers the financing necessary for the Debtors to pay their obligations and to fund critical infrastructure improvements on a going-forward basis and implements the fundamental, top-down organizational change required by A.B. 1054. The answer is clear that only the TCC/AHC Plan accomplishes this. The Court should, therefore, require that the settlement contained in the Debtor/TCC RSA be available to the estates and all of their constituents so that these cases may move forward to conclusion prior to June 30, 2020. The Court should not approve the provisions of the Debtor/TCC RSA that would unduly prejudice the competing plan process and jeopardize the TCC/AHC Plan to the detriment of the Debtors' estates and creditors.

# CONCLUSION

8. For the foregoing reasons, the Ad Hoc Committee respectfully requests that the Court deny the Motion unless the modifications requested herein are made and grant such other relief as the Court deems appropriate.

Dated: December 16, 2019        **AKIN GUMP STRAUSS HAUER & FELD LLP**

By: /s/ *Ashley Vinson Crawford*
Ashley Vinson Crawford (SBN 257246)
Michael S. Stamer (*pro hac vice*)
Ira S. Dizengoff (*pro hac vice*)
David H. Botter (*pro hac vice*)
Abid Qureshi (*pro hac vice*)

*Counsel to the Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company*

**Exhibit A**

December 13, 2019 Letter from Office of the Governor



# OFFICE OF THE GOVERNOR

December 13, 2019

William D. Johnson
Chief Executive Officer
PG&E Corporation
77 Beale Street
San Francisco, CA 94177

RE: Draft Amended Plan of Reorganization for PG&E Corporation ("Corp") and Pacific Gas and Electric Company (the "Utility" and, collectively with Corp, "PG&E") dated as of December 6, 2019 (the "Amended Plan")

Dear Mr. Johnson:

Since the day PG&E decided to file for bankruptcy protection, I have been clear about the state's objectives. Californians must have access to safe, reliable, and affordable service. Victims and employees must be treated fairly. And California must continue to make forward progress on our climate change goals. These objectives were codified into law in Assembly Bill 1054 (Holden, Chapter 79, Statutes of 2019) and must be satisfied as part of any emergence from bankruptcy.

To facilitate an expeditious resolution of the chapter 11 cases that achieves the state's objectives, my office has undertaken a review of the Amended Plan and the materials submitted in support of such plan to determine whether, in my sole judgment, the Amended Plan and the restructuring transactions contemplated therein comply with AB 1054. I appreciate the efforts of the management team to provide my office information to assist in that review.

I have determined that the Amended Plan and the restructuring transactions contemplated therein do not comply with AB 1054. In my judgment, the Amended Plan and the restructuring transactions do not result in a reorganized company positioned to provide safe, reliable, and affordable service to its customers, as required by AB 1054.

PG&E's chapter 11 cases punctuate more than two decades of mismanagement, misconduct, and failed efforts to improve its safety culture. PG&E caused the devastating San Bruno gas pipeline explosion, which killed 8 people, caused 58 injuries, and destroyed approximately 38 homes. PG&E has caused multiple catastrophic wildfires in the last three years, including the Camp Fire, which we know killed 85 people, destroyed the town of Paradise and resulted in billions of dollars in economic losses to the region.

PG&E's recent management of the public safety power shutoffs did not restore public confidence. Instead, PG&E caused extreme uncertainty and harm for Californians who rely on power for their health care and for their livelihoods. For too long, PG&E has been mismanaged, failed to make adequate investments in fire safety and fire prevention, and neglected critical infrastructure. PG&E has simply violated the public trust.

It is against this backdrop that compliance with AB 1054 must be measured. To access the state's wildfire fund, AB 1054 requires:

- PG&E to resolve its insolvency proceeding by June 30, 2020;

- The bankruptcy court to determine that the plan of reorganization fairly satisfies pre-petition wildfire claims;

- The California Public Utilities Commission (the "CPUC") to determine that the reorganization plan and other documents are consistent with the state's climate goals and neutral, on average, to ratepayers; and

- The CPUC to determine that the plan of reorganization, other plan documents, and the resulting governance structure be acceptable to the CPUC taking into account PG&E's safety history, criminal probation, recent financial condition, and other relevant factors in order for the reorganized company to access the wildfire fund.

The CPUC's review of the plan of reorganization is not a rubber stamp – it is a critical component of AB 1054.

To be approved under AB 1054, any plan of reorganization must position the emerging new entity for transformation. Such plan should include stringent governance and management requirements, enforcement mechanisms, and a capital structure that allows the company to make critical safety investments. In addition to the feedback set forth below, my team will provide your advisors with additional information to further clarify my views on specific features of the plan.

## Governance and Management Requirements

The resolution of this bankruptcy must yield a radically restructured and transformed utility that is responsible and accountable. To that end, my office previously informed you that any acceptable plan under AB 1054 must provide for major changes in governance and incorporate enforcement mechanisms. PG&E has failed to address most of the issues we previously raised on governance.

The governance and enforcement mechanisms that I believe are necessary include the following:

1. Changes that will result in a more qualified and independent board of directors that understands its obligation to achieve the goals of AB 1054. A transformed company should be governed by a board of directors selected based on a pre-determined set of qualifications, include members with extensive safety experience, and be comprised of a majority of Californians. To facilitate transformation, the board that will lead the reorganized company should be acceptable to me and approved by the CPUC and identified in the Amended Plan. I do not expect that the post-confirmation board of directors will include the current directors.

2. Strict, clearly defined operational and safety metrics to which the reorganized company will be held accountable.

3. An escalating enforcement process that provides for greater oversight of the reorganized company if it fails to meet the defined operational and safety metrics. Because of this company's history, the license to operate should be conditioned on it agreeing to this process. This should also include a streamlined process for transferring the license and the operating assets to the state or a third-party when circumstances warrant.

4. Escalating enforcement should include governance changes that protect California in the event that the reorganized company fails to meet the operational and safety metrics or commits other bad acts including a subsequent bankruptcy filing.

The Amended Plan does not incorporate any mechanisms to address these issues. Thus, I believe the Amended Plan falls woefully short of the requirements of AB 1054.

The Amended Plan must provide, as a non-waivable condition, that the confirmation order is entered by June 30, 2020 and the effective date occur by August 29, 2020. In the event either of these dates are not met, the Bankruptcy Court should appoint a chapter 11 trustee acceptable to the CPUC to manage the debtors and dispose of their assets and/or operations.

**Capital Structure**

To achieve safe and reliable service and make critical safety and infrastructure investments, the emerging company's capital structure must be stable, flexible, and position the company to attract long-term capital. Based on the financial information provided by PG&E, the reorganized company would not compare favorably to its peers on critical financial metrics. The Amended Plan also leaves the company with limited ability to withstand future financial and operational headwinds.

These issues arise, in part, because the Amended Plan contemplates using a combination of holdco debt, secured debt, securitization, and monetization of the net operating losses in order to make plan distributions – leaving the reorganized entity with limited tools to finance itself when it needs to access capital to make billions of dollars in safety investments. I am also concerned that the Amended Plan relies on expensive and short-term bridge financing. All of this contributes to a reorganized company that, in my judgment, will not be positioned to provide safe, reliable, and affordable electric service.

---

Without providing an exhaustive list of other issues, the Amended Plan must meet the AB 1054 requirements to treat victims fairly, including providing for the assumption of any pre-petition settlement agreements related to Fire Claims including the Butte Fire settlement. The Amended Plan should also provide that all environmental obligations and related agreements, all obligations and agreements related to the Diablo Canyon project, and all state tax obligations be assumed by the reorganized entity and be unimpaired.

The state remains focused on meeting the needs of Californians including fair treatment of victims – not on which Wall Street financial interests fund an exit from bankruptcy.

PG&E's current plan is not feasible without access to the wildfire fund established under AB 1054. PG&E's board of directors and management have a responsibility to immediately develop a feasible plan. Anything else is irresponsible, a breach of fiduciary duties, and a clear violation of the public trust.

Sincerely,

Gavin Newsom
Governor of California