Dennis F. Dunne (admitted *pro hac vice*)
Samuel A. Khalil (admitted *pro hac vice*)
MILBANK LLP
55 Hudson Yards
New York, New York 10001-2163
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

and

Gregory A. Bray (SBN 115367)
Thomas R. Kreller (SBN 161922)
MILBANK LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000
Facsimile: (213) 629-5063

*Counsel for the Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br>　　　　　　　　　　**Debtors.**<br><br>☐　Affects PG&E Corporation<br>☐　Affects Pacific Gas and Electric Company<br>☑　Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Case No. 19-30088 (DM)<br><br>Chapter 11<br><br>(Lead Case)<br><br>(Jointly Administered)<br><br>**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS REGARDING DEBTORS' MOTION FOR APPROVAL OF RESTRUCTURING SUPPORT AGREEMENT WITH TCC, CONSENTING FIRE CLAIMANT PROFESSIONALS AND SHAREHOLDER PROPONENTS**<br><br>Date:　　December 17, 2019<br>Time:　　10:00 a.m. (Pacific Time)<br>Place:　　United States Bankruptcy Court<br>　　　　　Courtroom 17, 16th Floor<br>　　　　　450 Golden Gate Avenue<br>　　　　　San Francisco, CA 94102<br><br>Re:　　　Docket No. 5038 |

　　　　The Official Committee of Unsecured Creditors (the "UCC") appointed in the chapter 11 cases of the above-captioned debtors in possession (the "Debtors") respectfully submits this

objection (this "Objection") to the Debtors' *Motion Pursuant to 11 U.S.C. §§ 363(b) and 105(a) and Fed. R. Bankr. P. 6004 and 9019 for Entry of an Order (I) Authorizing the Debtors and TCC to Enter into Restructuring Support Agreement with the TCC, Consenting Fire Claimant Professionals, and Shareholder Proponents, and (II) Granting Related Relief* [Docket No. 5038] (the "TCC RSA Motion").[1]

**OBJECTION**

1. The TCC RSA Motion seeks approval of a restructuring support agreement (the "TCC RSA") that would obligate the Debtors, the Official Committee of Tort Claimants (the "TCC"), the Consenting Fire Claim Professionals and the Shareholder Proponents to work together to pursue confirmation of a plan of reorganization, the terms of which are described in the TCC RSA (the "Amended Plan").

2. Section 3(a)(iii) of the TCC RSA provides that the TCC RSA shall automatically terminate if Governor Newsom advises the Debtors on or before December 13, 2019 that:

> (A) the Amended Plan and the restructuring transactions provided therein do not in his sole judgment comply with AB1054 and (B) describes with particularity how the Amended Plan and the restructuring transactions provided therein do not comply with AB1054; provided, that such termination shall not occur if the Debtors have modified the Amended Plan in a manner acceptable to the Governor in his sole discretion by a date that is the earlier of (Y) the commencement of the hearing on the RSA Approval Motion or (Z) December 17, 2019

TCC RSA § 3(a)(iii).

3. By letter dated December 13, 2019 (the "Governor's Letter," a copy of which is attached hereto as Exhibit A), the Governor explained, with particularity, why he does not believe the Amended Plan complies with AB 1054. Given the nature and extent of the Governor's critique of the Amended Plan, it does not appear that the Debtors will have the ability to cure the identified deficiencies in time to avoid automatic termination. Moreover, even if the TCC RSA Parties were

---

[1] Terms not otherwise defined herein have the meaning ascribed to them in the TCC RSA Motion.

to waive the requirements described above, the Governor's determination that the Amended Plan does not comply with AB 1054, and therefore does not qualify to participate in the Wildfire Fund, renders the Amended Plan not feasible.

4. In light of both the likely automatic termination of the TCC RSA by its terms and the fact that the Governor's Letter makes clear that the Amended Plan is not viable, pursuit of the Amended Plan via the TCC RSA, including the attempt to contractually obligate parties to support it and no other plan, is futile and not in the best interests of the estates or unsecured creditors. Moreover, even if the Amended Plan were still somehow viable and worth further consideration, the TCC RSA contains the same problematic anticompetitive and other provisions that the UCC objected to in the Restructuring Support Agreement between the Debtors and the Ad Hoc Group of Subrogation Claim Holders (the "Subrogation RSA").[2]

5. These provisions are as follows: the $13.5 billion settlement (the "TCC Settlement") may be consummated only through the Amended Plan co-sponsored by the Debtors and certain of their shareholders; voting lock-ups;[3] and the lack of an "insolvency out."[4]

---

[2] See UCC's *Objection to the Debtors' Subrogation Settlement and RSA Motion* [Docket No. 4236] and *Supplemental Objection to the Debtors' Subrogation Settlement and RSA Motion* [Docket No. 4643].

[3] Specifically, each of the non-Debtor TCC RSA Parties are required not to: (i) object to, delay, impede, or take any other action to interfere with acceptance, confirmation, or implementation of the Amended Plan, including, without limitation, support any request to terminate the Debtors' exclusive periods to file or solicit a plan of reorganization; (ii) directly or indirectly solicit approval or acceptance of, encourage, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets, merger, workout, or plan of reorganization for the Debtors other than the Amended Plan, including, without limitation, the Alternative Plan or any other plan of reorganization proposed by the Ad Hoc Committee; or (iii) otherwise take any action that would interfere with, delay, impede, or postpone: (a) the solicitation of acceptances, consummation, or implementation of the Amended Plan, or (b) the entry or effectiveness of the Approval Orders (other than as a result of the failure of the Consenting Fire Claimant Threshold to occur). See TCC RSA ¶ 2(o).

[4] The TCC RSA also contemplates assigning to the Fire Trust certain causes of action against third parties, including the Debtors' existing vendors, suppliers, third-party contractors, and consultants. Such individuals are the very same people that the Debtors will rely on to carry out the various programs to make the grid more resilient and to prevent future wildfires. Such an assignment would appear to be inconsistent with the Debtors' stated goal of improving the safety of its operations and wildfire mitigation capabilities and the UCC reserves all rights to raise this issue as well before the Court.

6. Moreover, as was the case in the Subrogation RSA, the Debtors and their Shareholder Proponents only provisionally terminate estimation in order to confirm their plan. See TCC RSA §§ 2(d), 3(d)(ii)(B). Indeed, if the TCC RSA is terminated, the TCC Settlement is no longer effective and estimation proceedings must begin again. See id. § 3(d)(ii)-(iii) ("Upon termination of this Agreement . . . the Estimation Matters shall immediately recommence . . . ."). In other words, estimation still needs to continue with respect to the competing plan and as a hedge against the distinct possibility that the Amended Plan cannot or should not be confirmed, or that the Debtors and their shareholders use the last minute threat of termination of the TCC RSA to extract additional concessions as the June 30 deadline approaches.

7. When such provisions are viewed in the context of these cases (and not some inapposite precedent), it cannot credibly be argued that any such provisions are in the best interests of the estates or unsecured creditors. It is particularly disingenuous, to say the least, for the Debtors and the Shareholder Proponents to seek to co-opt for themselves on an exclusive basis the terms of a settlement that were already agreed upon between the Ad Hoc Committee of Senior Secured Noteholders and the TCC and are reflected in the competing plan that has been on file now for several months [Docket No. 4257]. If the Amended Plan and the TCC RSA Motion are still pursued, the UCC reserves all rights to assert those same objections as well as others before the Court.

8. While the TCC RSA Motion should be denied, the UCC nonetheless believes that the TCC Settlement has merit. Coupled with the proposed settlement of the subrogation claims included in the Subrogation RSA, the allowance of those settlements under Bankruptcy Rule 9019 could potentially establish two important cornerstones for the development of a comprehensive plan of reorganization that complies with AB 1054, including better addressing the issues raised in the Governor's Letter. The UCC believes that the Court should review these two settlements,

upon notice and hearing, in the context of a Bankruptcy Rule 9019 motion, rather than being tethered to any particular plan or plan proponent.[5] If those settlements are approved, such approval would serve the dual purposes of avoiding the cost and delay of an estimation proceeding, while also freeing up the parties in interest to focus their efforts on developing a chapter 11 plan that will include appropriate, necessary and feasible financing and otherwise address the issues raised in the Governor's Letter. The Debtors have unequivocally represented that both of these settlements are in the best interests of the estates and satisfy Bankruptcy Rule 9019. Requiring the Debtors to make the settlements available for all purposes in these cases, including parties who have standing to file a competing plan, does not change this conclusion to a true fiduciary. In fact, it only validates the argument.

9. Given the fluidity of the situation the UCC reserves all rights to present additional arguments as the situation evolves.

Dated: December 16, 2019

**MILBANK LLP**

*/s/ Gregory A. Bray*
DENNIS F. DUNNE
SAMUEL A. KHALIL
GREGORY A. BRAY
THOMAS R. KRELLER

*Counsel for the Official Committee of Unsecured Creditors*

---

[5] The UCC reserves all rights with respect to such settlements.

# EXHIBIT A

**Governor's Letter**



OFFICE OF THE GOVERNOR

December 13, 2019

William D. Johnson
Chief Executive Officer
PG&E Corporation
77 Beale Street
San Francisco, CA 94177

RE: Draft Amended Plan of Reorganization for PG&E Corporation ("Corp") and Pacific Gas and Electric Company (the "Utility" and, collectively with Corp, "PG&E") dated as of December 6, 2019 (the "Amended Plan")

Dear Mr. Johnson:

Since the day PG&E decided to file for bankruptcy protection, I have been clear about the state's objectives. Californians must have access to safe, reliable, and affordable service. Victims and employees must be treated fairly. And California must continue to make forward progress on our climate change goals. These objectives were codified into law in Assembly Bill 1054 (Holden, Chapter 79, Statutes of 2019) and must be satisfied as part of any emergence from bankruptcy.

To facilitate an expeditious resolution of the chapter 11 cases that achieves the state's objectives, my office has undertaken a review of the Amended Plan and the materials submitted in support of such plan to determine whether, in my sole judgment, the Amended Plan and the restructuring transactions contemplated therein comply with AB 1054. I appreciate the efforts of the management team to provide my office information to assist in that review.

I have determined that the Amended Plan and the restructuring transactions contemplated therein do not comply with AB 1054. In my judgment, the Amended Plan and the restructuring transactions do not result in a reorganized company positioned to provide safe, reliable, and affordable service to its customers, as required by AB 1054.

PG&E's chapter 11 cases punctuate more than two decades of mismanagement, misconduct, and failed efforts to improve its safety culture. PG&E caused the devastating San Bruno gas pipeline explosion, which killed 8 people, caused 58 injuries, and destroyed approximately 38 homes. PG&E has caused multiple catastrophic wildfires in the last three years, including the Camp Fire, which we know killed 85 people, destroyed the town of Paradise and resulted in billions of dollars in economic losses to the region.

PG&E's recent management of the public safety power shutoffs did not restore public confidence. Instead, PG&E caused extreme uncertainty and harm for Californians who rely on power for their health care and for their livelihoods. For too long, PG&E has been mismanaged, failed to make adequate investments in fire safety and fire prevention, and neglected critical infrastructure. PG&E has simply violated the public trust.

It is against this backdrop that compliance with AB 1054 must be measured. To access the state's wildfire fund, AB 1054 requires:

- PG&E to resolve its insolvency proceeding by June 30, 2020;

- The bankruptcy court to determine that the plan of reorganization fairly satisfies pre-petition wildfire claims;

- The California Public Utilities Commission (the "CPUC") to determine that the reorganization plan and other documents are consistent with the state's climate goals and neutral, on average, to ratepayers; and

- The CPUC to determine that the plan of reorganization, other plan documents, and the resulting governance structure be acceptable to the CPUC taking into account PG&E's safety history, criminal probation, recent financial condition, and other relevant factors in order for the reorganized company to access the wildfire fund.

The CPUC's review of the plan of reorganization is not a rubber stamp – it is a critical component of AB 1054.

To be approved under AB 1054, any plan of reorganization must position the emerging new entity for transformation. Such plan should include stringent governance and management requirements, enforcement mechanisms, and a capital structure that allows the company to make critical safety investments. In addition to the feedback set forth below, my team will provide your advisors with additional information to further clarify my views on specific features of the plan.

## Governance and Management Requirements

The resolution of this bankruptcy must yield a radically restructured and transformed utility that is responsible and accountable. To that end, my office previously informed you that any acceptable plan under AB 1054 must provide for major changes in governance and incorporate enforcement mechanisms. PG&E has failed to address most of the issues we previously raised on governance.

The governance and enforcement mechanisms that I believe are necessary include the following:

1. Changes that will result in a more qualified and independent board of directors that understands its obligation to achieve the goals of AB 1054. A transformed company should be governed by a board of directors selected based on a pre-determined set of qualifications, include members with extensive safety experience, and be comprised of a majority of Californians. To facilitate transformation, the board that will lead the reorganized company should be acceptable to me and approved by the CPUC and identified in the Amended Plan. I do not expect that the post-confirmation board of directors will include the current directors.

2. Strict, clearly defined operational and safety metrics to which the reorganized company will be held accountable.

3. An escalating enforcement process that provides for greater oversight of the reorganized company if it fails to meet the defined operational and safety metrics. Because of this company's history, the license to operate should be conditioned on it agreeing to this process. This should also include a streamlined process for transferring the license and the operating assets to the state or a third-party when circumstances warrant.

4. Escalating enforcement should include governance changes that protect California in the event that the reorganized company fails to meet the operational and safety metrics or commits other bad acts including a subsequent bankruptcy filing.

The Amended Plan does not incorporate any mechanisms to address these issues. Thus, I believe the Amended Plan falls woefully short of the requirements of AB 1054.

The Amended Plan must provide, as a non-waivable condition, that the confirmation order is entered by June 30, 2020 and the effective date occur by August 29, 2020. In the event either of these dates are not met, the Bankruptcy Court should appoint a chapter 11 trustee acceptable to the CPUC to manage the debtors and dispose of their assets and/or operations.

**Capital Structure**

To achieve safe and reliable service and make critical safety and infrastructure investments, the emerging company's capital structure must be stable, flexible, and position the company to attract long-term capital. Based on the financial information provided by PG&E, the reorganized company would not compare favorably to its peers on critical financial metrics. The Amended Plan also leaves the company with limited ability to withstand future financial and operational headwinds.

These issues arise, in part, because the Amended Plan contemplates using a combination of holdco debt, secured debt, securitization, and monetization of the net operating losses in order to make plan distributions – leaving the reorganized entity with limited tools to finance itself when it needs to access capital to make billions of dollars in safety investments. I am also concerned that the Amended Plan relies on expensive and short-term bridge financing. All of this contributes to a reorganized company that, in my judgment, will not be positioned to provide safe, reliable, and affordable electric service.

---

Without providing an exhaustive list of other issues, the Amended Plan must meet the AB 1054 requirements to treat victims fairly, including providing for the assumption of any pre-petition settlement agreements related to Fire Claims including the Butte Fire settlement. The Amended Plan should also provide that all environmental obligations and related agreements, all obligations and agreements related to the Diablo Canyon project, and all state tax obligations be assumed by the reorganized entity and be unimpaired.

The state remains focused on meeting the needs of Californians including fair treatment of victims – not on which Wall Street financial interests fund an exit from bankruptcy.

PG&E's current plan is not feasible without access to the wildfire fund established under AB 1054. PG&E's board of directors and management have a responsibility to immediately develop a feasible plan. Anything else is irresponsible, a breach of fiduciary duties, and a clear violation of the public trust.

Sincerely,

Gavin Newsom
Governor of California