Andrew I. Silfen (*pro hac vice*)
Beth M. Brownstein (*pro hac vice*)
**ARENT FOX LLP**
1301 Avenue of the Americas, 42nd Floor
New York, New York 10019
Telephone:	(212) 484-3900
Facsimile:	(212) 484-3990
Email:	andrew.silfen@arentfox.com
	beth.brownstein@arentfox.com

Aram Ordubegian (SBN 185142)
**ARENT FOX LLP**
55 Second Street, 21st Floor
San Francisco, CA 94105
Telephone:	(415) 757-5500
Facsimile:	(415) 757-5501
Email:	aram.ordubegian@arentfox.com

*Counsel for BOKF, NA, solely in its capacity as Indenture Trustee*

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re:<br><br>**PG&E CORPORATION,**<br><br>- and –<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br>                                            **Debtors.**<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br>* *All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Case No. 19-30088 (DM)<br><br>Chapter 11<br><br>(Lead Case)<br><br>(Jointly Administered)<br><br>**OBJECTION OF BOKF, NA AS INDENTURE TRUSTEE TO DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 363(b) AND 105(a) AND FED. R. BANKR. P. 6004 AND 9019 FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS AND TCC TO ENTER INTO RESTRUCTURING SUPPORT AGREEMENT WITH THE TCC, CONSENTING FIRE CLAIMANT PROFESSIONALS, AND SHAREHOLDER PROPONENTS, AND (II) GRANTING RELATED RELIEF.** |

**Hearing**
Date: December 17, 2019
Time: 2:00 p.m. (Pacific time)
Place: Courtroom 17
450 Golden Gate Ave, 16th Floor
San Francisco, CA 94102

**Objection Deadline: December 16, 2019**
           12:00 p.m. (Pacific Time)

BOKF, NA ("BOKF"), in its capacity as successor indenture trustee (the "Trustee") under the Indentures dated as of (i) April 22, 2005 Supplementing, Amending and Restating the Indenture of Mortgage Dated March 11, 2004 (ii) November 29, 2017 and (iii) August 6, 2018, each as supplemented or amended, pursuant to which Pacific Gas and Electric Company issued the senior notes (the "Senior Notes"), by and through its counsel, Arent Fox LLP, hereby objects the *Debtors' Motion Pursuant to 11 U.S.C. §§ 363(b) and 105(a) and Fed. R. Bankr. P. 6004 and 9019 for Entry of an Order (I) Authorizing the Debtors and TCC to Enter Into Restructuring Support Agreement with the TCC, Consenting Fire Claimant Professionals, and Shareholder Proponents, and (II) Granting Related Relief* [Docket No. 5038] (the "Motion").[1] In support of its objection, BOKF states as follows:

## PRELIMINARY STATEMENT

The Governor's letter to the Debtors' CEO dated December 13, 2019, (the "Governor Letter") articulates extensive concerns and the reasons why in his judgement, the Debtors' Amended Plan does not comply with AB 1054. Given the sheer nature of these issues and the fact that the Governor advised the Debtors of them in advance of entry into the Tort Claimants RSA (the "TCC RSA"), it does not appear they will or could be resolved prior the hearing on the Motion (or even in the near future), resulting in an automatic termination event under Section 3(a)(iii) of the TCC RSA. This reason alone warrants denial of the TCC RSA.

Further, contrary to the Debtors' contention in their Motion that "no real obstacles remain," the process is not over. The Amended Plan faces numerous obstacles to confirmation, some of which arise from the Debtors' own insistence on pursuing a strategy that enriches equity

---
[1] Capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the Motion.

- 2 -

AFDOCS/21434885.5
Case: 19-30088  Doc# 5135  Filed: 12/16/19  Entered: 12/16/19 12:26:41  Page 2 of 7

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

holders at the expense of creditors and, ultimately, the Debtors' long-term viability. In fact, the Amended Plan still appears to be inferior to the Alternative Plan. The dual-plan process and mediation must continue in order to foster further negotiations and a global resolution, while providing the Court with the ability to confirm the *best* plan available as opposed to the *only* plan left when it is too late to change course. The TCC RSA should be consistent with these goals and should not attempt to lock up votes against the Alternative Plan or preclude the TCC or other Parties to the TCC RSA from negotiating to reach a global resolution of these chapter 11 cases.

## OBJECTION

### A. The TCC RSA Undermines and Runs Afoul of, the Dual–Plan and Related Processes Implemented by this Court

The TCC RSA requires the signatory Parties to vote against any alternative plan and restricts the Parties, including the TCC and the Shareholder Proponents, from participating in the formulation of any kind of alternative plan structure, including with the TCC's original co-plan proponent. TCC RSA, § 2(n)-(o). The Court terminated exclusivity and ordered mediation in order to foster negotiation and consensus-building through a dual-plan process. That process appears to be working. It must continue with more urgency and not end amid considerable uncertainty. Under the time constraints imposed by AB 1054, there is no more room for error. A global resolution cannot occur if the Parties to the TCC RSA cannot engage with the other creditor constituencies, including the TCC's former co-plan proponent, to formulate an alternative path, whether or not such alternative is a modified Amended Plan or some variation of the Alternative Plan.

Fixing the value of the Fire Victim Trust and avoiding the uncertainty of estimation is a positive development. The settlement itself is a benefit. But the Debtors are severely restricting the mechanisms for achieving both a global resolution and a confirmable plan that will satisfy AB 1054, leave the Debtors adequately capitalized, and enable a viable and safer reorganized entity moving forward. This is not only senseless, it is harmful. Indeed, the Governor has already highlighted many of the reasons why the Amended Plan is deficient and requires substantial revisions. Having a competing plan process is likely to facilitate fixes and improvements to the Amended Plan and could lead to a global resolution. However, if the

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

Debtors continue to ignore the Governor and avoid the proper treatment of unsecured creditors, including the holders of Senior Notes, their actions should not be allowed to hold up moving forward with the Alternative Plan.

The Amended Plan may or may not be the better plan if the Alternative Plan can honor the same obligations and among other things, result in more appropriately capitalized entity with access to the capital it needs to achieve the goals of AB 1054. In the event both the Amended Plan and the Alternative Plan meet the requirements for confirmation, the "court shall consider the preferences of creditors and equity security holders in determining which plan to confirm." 11 U.S.C. § 1129(c). Thus, it is the Court who is the ultimate gatekeeper. Allowing the Debtors to consummate the TCC RSA (as well as the Subrogation RSA) as presently structured would undermine the dual-plan process and the Bankruptcy Code's mechanisms for considering multiples plans because the RSA's require the Parties not only to oppose the Alternative Plan, but also to refrain from participating in negotiations with the Ad Hoc Noteholder Committee. Thus, the anti-competitive restrictions in both the TCC and Subrogation RSA are fundamentally inconsistent with this Court's expressed desire to achieve one consensual plan, have two plans with one as a back-up or to utilize an 1129(c) determination. The estates as a whole can still benefit from the two settlements and move towards emergence if the Fire Victims and the Subrogation Claim amounts are fixed but not tied *only* to the Debtors' Amended Plan and inapplicable under the Alternative Plan.

Notably, the TCC previously opposed a lock-up provision in the pending RSA with Subrogation Claimants ("Subrogation RSA") [Doc. No. 4232, p. 5]. BOKF objects to the TCC RSA for the same reason the TCC objected to the Subrogation RSA: because lock-up restrictions of this nature are not in best interests of the estate or creditors as a whole. *See In re Braniff Airways, Inc.*, 700 F.2d 935, 939-940 (5th Cir. 1983) (plan support agreement that dictated votes and terms of plan not authorized by § 363(b)). The Debtors can lock up support for their own plan, but they should not be permitted to undermine the Court's Order terminating exclusivity or the operation of § 1129(c) by precluding parties from negotiating with the other constituencies about alternative restructurings. *See also In re TCI 2 Holdings LLC*, 428 B.R. 117, 137 (Bankr.

Arent Fox LLP
Attorneys At Law
Los Angeles

- 4 -

N.J. 2010) (debtor may not use settlement to perform end-run around Bankruptcy Code). Such anti-competitive provisions are not in the best interest of creditors or the estate given the unique circumstances present here. *See In re MGS Marketing*, 111 B.R. 264, 267 (B.A.P. 9th Cir. 1990) (compromises under Rule 9019 must be in the best interest of the estate and fair and equitable to creditors). *See also In re 240 North Brand Partners, Ltd.*, 200 B.R. 653, 659 (B.A.P. 9th Cir. 1996) ("requirements of section 363(b) protect the creditors' interest in the assets of the estate").

### B. The Debtors' Plan Is Fraught with Uncertainty, Legal Hurdles and Execution Risk

The termination of exclusivity led to the Alternative Plan and a mediation process that substantially increased the Debtors' value proposition to wildfire victims.[2] That was not, however, the "last obstacle" to confirmation of the Debtors' Amended Plan. Obviously the Amended Plan has yet to be approved by the CPUC and the Governor has already declared that it fails to meet the requirements of AB 1054. The Debtors do not yet have the support of the Unsecured Creditors' Committee or the Ad Hoc Noteholder Committee. Moreover, the TCC RSA intensifies existing concerns about the Debtors' liquidity. The Governor points out that the significant issues with the reorganized debtor's capital structure arise in part from the Debtors' use of a "combination of holdco debt, secured debt, securitization and monetization of net operating losses in order to make plan distributions leaving the reorganized entity with limited tools to finance itself when it needs access to capital to make billions of dollars in safety investments." Governor Letter at 4. There are no disclosures or analyses about "Tax Benefits Payment Agreement" that will fund $1.35 billion in payments. The Governor also raises a valid concern about the Debtors' reliance on "expensive and short-term bridge financing." *Id*. The Debtors have not disclosed whether their auditors will raise a going concern issue if more than $34 billion in debt will need to be refinanced within a year of exiting chapter 11. If the goal is to emerge financially stronger in order protect the public from future harm, fix the errors of the

---

[2] Value to the Fire Victims and Subrogation Claimants combined increased by $7.6 billion, or 42%, as a result of the dual-track competitive process.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

Case: 19-30088    Doc# 5135    Filed: 12/16/19    Entered: 12/16/19 12:26:41    Page 5 of 7

past, timely pay Fire Victims, and leave unsecured creditors as though there was no filing, some of the Debtors' decisions are questionable.

The Debtors have elected to litigate for the benefit of equity holders, the enforceability of their contractual obligations to pay (i) contract rate interest post-petition and (ii) optional redemption premiums in light of the Debtors' own decision to refinance rather than reinstate the Senior Notes. This litigation has created more uncertainty and risk around the viability of the Amended Plan and continues to polarize key stakeholders. Rather than trying to build consensus around these two creditor disputes, the Debtors are pursuing an all or nothing litigation strategy that benefits equity. Not only does this strategy put the entire case at risk, it is inconsistent with the Debtors' repeatedly stated goals in these cases: to address wildfire liability and leave other unsecured creditors unaffected. The Debtors have gone so far as to question why they should even negotiate with creditors who the Debtors allege are being paid in full. If that were the case, the Debtors should honor their contractual obligations and pay post-petition interest at the contract rate and either reinstate the Senior Notes or pay the optional redemption premiums due in the event they elect to refinance. The reality is that unsecured creditors have not been paid during these cases (and under the Amended Plan will not be paid in accordance with their contractual rights) and have faced costly litigation initiated by the Debtors on behalf of equity for Debtors' refusal to honor their contractual obligations, despite their ability and story to do so. If these cases are not about unsecured creditors, then the Debtors should stop litigating with them and instead engage and make an effort to build consensus. The time to do so is now.

Perhaps the Debtors/equity perspective is that they might as well try to create a windfall for equity or at least obtain leverage in negotiations. The estates though, pay a high price for a strategy that increases uncertainty and puts confirmation at risk. Even if the Debtors prevail on one or both issues before this Court, unsecured creditors will appeal and litigation will continue. The Debtors will then need to set aside a reserve with sufficient funds in order to confirm their Amended Plan by June 30, 2020. It is far from clear that the Debtors will have more than $500 million to reserve for payments at the contractual interest rate or more than $5 billion to reserve to pay optional redemption premiums. If the creditors prevail (or frankly even if the Debtors'

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 6 -

Case: 19-30088   Doc# 5135   Filed: 12/16/19   Entered: 12/16/19 12:26:41   Page 6 of 7

temporarily prevail and appeals are pending at confirmation), the Debtors will likely need to reinstate some or all of the Senior Notes or will need additional funding.3 Given that it is more likely than not that this Court or an appellate court will rule in favor of unsecured creditors, including the noteholders (particularly in light of the Debtors' proclamation that the Debtors are solvent and these cases are not about unsecured creditors), the Debtors should end the litigation, eliminate the related financing risks and contingencies, and fix the Amended Plan to address these issues.

## CONCLUSION

In the event the Debtors' gambit fails or simply presents a less attractive bargain, the Court and all stakeholders should have the opportunity to go with or to select an alternative plan. There is no reason or rational basis why the Alternative Plan should not be able to offer Fire Victims and the Subrogation Claimants the same or better treatment that is afforded under the Debtors' Amended Plan.

Based on the foregoing, the TCC RSA in its current form should not be approved at this time. Assuming the TCC RSA has not been terminated by its own terms or that the Court nonetheless considers its approval, the Court should only approve the TCC RSA if it is modified to be consistent with the goals and processes created by this Court.

Dated: December 16, 2019     **ARENT FOX LLP**

By: /s/ Aram Ordubegian
Aram Ordubegian (SBN 185142)
Andrew I. Silfen (*pro hac vice*)
Beth M. Brownstein (*pro hac vice*)

*Counsel for BOKF, NA, solely in its capacity as Indenture Trustee*

---

3 The Debtors have pushed a narrative that they will easily be able to refinance the Senior Notes at lower interest rates that will result in lower yearly interest expense. If that were true, it is unclear why the Debtors would need the approximately $34 billion in 364-day bridge financing and to incur the administrative fees associated with it. After, calculating those fees, it is not clear that refinancing is even preferable to reinstatement. In fact, it is quite possible that the costs and risks of the bridge loan may be more expensive than reinstatement.

- 7 -