William B. Abrams
end2endconsulting@gmail.com
1519 Branch Owl Place
Santa Rosa, CA, 95409
Tel: 707 397 5727

*Claimant*

FILED

DEC 16 2019

UNITED STATES BANKRUPTCY COURT
SAN FRANCISCO, CA

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

In re:

PG&E CORPORATION,

    -and-

PACIFIC GAS AND ELECTRIC
COMPANY,

           Debtors.

☐ Affects PG&E Corporation
☐ Affects Pacific Gas and Electric Company
☑ Affects both Debtors

\* *All papers shall be filed in the lead case,
No. 19-30088 (DM)*

Bankr. Case No. 19-30088 (DM)
Chapter 11
(Lead Case)
(Jointly Administrated)

**OBJECTION TO DEBTORS'
MOTION PURSUANT TO 11 U.S.C.
§§ 363(b) AND 105(a) AND FED. R.
BANKR. P. 6004 AND 9019 FOR
ENTRY OF AN ORDER (I)
AUTHORIZING THE DEBTORS
AND TCC TO ENTER INTO
RESTRUCTURING SUPPORT
AGREEMENT WITH THE TCC,
CONSENTING FIRE CLAIMANT
PROFESSIONALS, AND
SHAREHOLDER PROPONENTS,
AND (II) GRANTING RELATED
RELIEF [DOCKET NO. 5038]**

<u>Hearing</u>
Date:    October 17, 2019
Time:    10:00 a.m. (Pacific Time)
Place:   Courtroom 17
        450 Golden Gate Ave., 16th Floor
        San Francisco, CA, 94102

William B. Abrams ("Claimant") hereby objects to Debtors' Motion Pursuant to 11 U.S.C. §§ 363(b) and 105(a) and FED. R. BANKR. P. 6004 and 9019 for entry of an order (I) Authorizing the Debtors and TCC to enter into restructuring support agreement ("RSA") with the TCC, consenting fire claimant professionals, and shareholder proponents, and (II) Granting related relief. As set forth in more detail below, the RSA is unreasonable for the Debtor to propose and not a prudent exercise of business judgment.

## OBJECTION

**1. Claimant objects to the current motion because the RSA calls for a plan that would violate 11 U.S.C§ 1123(a)(4), the "Made-Whole" doctrine and Section 509(c) of the Bankruptcy Code thus endangering the Debtors' ability to timely exit bankruptcy.**

Claimant objects to the currently proposed RSA because if approved it would violate 11 U.S.C§ 1123(a)(4). The Debtors' statement that it "*treats all victims fairly*" is a misstatement to the extreme. This $13.5B "jump ball" was initially described by the debtor as just for individual wildfire survivor claimants but is recast in the RSA to include many other agencies including FEMA, Cal Fire and Cal OES with little consideration of prioritization. This means that claimants will likely be paid for damages pennies on the dollar and wildfire survivors will be left far from "made-whole". Of course, all of these governmental and residential claimants are owed just compensation and we shouldn't be forced to compromise just payouts from one to benefit another. Victims from the PG&E wildfires should certainly not be put in the same bucket as the agencies that helped save them from the fires and helped them with the post PG&E wildfire recovery process. If this RSA structure remains, it would be inhumane, imprudent and would demonstrate a lack of understanding regarding the emotional hardships of claimants.

Consider that the proposed plan of reorganization is far from just for Tubbs Fire survivors who would not see their day in court to hold PG&E accountable given the mountain of new evidence. It has already been established by this court that a jury trial is needed to provide "a just resolution" for Tubbs Fire victims. This was correctly decided and in keeping with 28 U.S.C§ 1334(c)(1), which indicates that a US Bankruptcy Court referral to civil court can and should be sought if it is in the interest of justice. In support of this and prior to the Tort Claimants Committee (TCC) letting justice give way to PG&E through this RSA several attorneys made statements in court regarding the need for a trial including the following:

- Michael Kelly, TCC attorney representing Tubbs Fire survivors "*We believe that from a justice and transparency point of view ... the people who suffered these losses are entitled to have this trial be public*"

- Frank Pitre, TCC Attorney representing Tubbs Fire survivors said the trial "*means everything ... it means that they have a chance to be able to prove their case in a court with transparency and in a form that allows 12 reasonable people in their community to decide the facts ... That is what we have always wanted: Give us the chance to present our case to ordinary citizens who can decide this disputed issue.*"

So, it is clear from these statement and those from countless victims of the Tubbs Fire that a trial is needed to provide justice. <u>Any RSA must be rejected as a false start and unreliable if it eliminates a court trial for the Tubbs Fire</u>. Expediency for plan approval so that PG&E can avoid the uncertainty of further liability and damages should not outweigh the need for justice. Therefore, I must further object to RSA on the grounds that it does not provide any reasonable sense of justice for claimants.

**2. Claimant objects to the current motion because the RSA puts forwards an unreasonable governance structure that does not match the environment in which PG&E operates.**

Claimant objects to the RSA as it would inevitably lead to an imprudent and unreasonable plan that does not consider a revised governance structure that addresses near-term financial risks and internal structural deficiencies that led the company into bankruptcy. Simply stated, the financial projections in the RSA have no basis in reality and the plan has not articulated how it will address the growing wildfire and climate change risks. This RSA puts PG&E on an imprudent shortsighted path to an untenable and infeasible financial position.

The proposed RSA has not articulated in any meaningful way how it will restructure its corporate governance to address these external risks. I submit for the record that on April 15, 2019 Richard Kelly, former Chairman of the Board of the Debtor testified before the CPUC that the company had no plans to realign the board of directors or internal incentive structures to further promote safety or address risks post-bankruptcy (see exhibit A).[1] In this same proceeding Mr. Kelly expressed that PG&E had a strong incentive structure at the top but "We need to get more involvement by the individual employees… We set great goals at the corporate level, the executive management buys into it, but we are not doing a good job getting down to the individual worker level." Given these statements and other clear evidence that safety has not permeate PG&E at any level, the RSA should not be considered reasonable unless it contains a complete rework of its incentive structures from top to bottom to address shareholder/ratepayer risks.

**3. Claimant objects to the RSA because it is foundationally flawed for not having considered structural deficiencies of PG&E infrastructure and growing external climate change risks.**

Since the passage of AB1054 by the California Legislature on July 11, 2019 and approval by the Governor, PG&E has caused extensive wildfires likely including the most recent Kincade Fire on October 23, 2019.[2] Please consider that if it wasn't for the heroism of our California Firefighters, there would be many more claimants in the courtroom. Over the past 6 years, PG&E has caused over 1,500 wildfires. This RSA provides a capital structure that even with the $21B wildfire fund established in AB1054 leaves PG&E highly exposed to considerable near-term financial risks necessitating a reentry into bankruptcy within the next two (2) years. Unless the RSA provides a basis for adequately measuring risk and risk mitigation tactics, it is unreasonable as a basis for consideration.

---

[1] See transcript of Richard Kelly comments in transcript dated April 15, 2019 of CPUC Proceeding I.15-08-019, and "Comments of William B. Abrams on Proposed Decision to Inform and Regulate a Safety Oriented Management and Governance Structure within Pacific Gas and Electric Company", filed on May 28, 2019 with the California Public Utilities Docket Office as part of proceeding I.15-08-019.

[2] California Assembly Bill No. 1054, Published July 12, 2019, Signed by Governor Newsom on July 12, 2019

Please consider that on February 6, 2019, PG&E published their "Pacific Gas and Electric Company's Wildfire Mitigation Plan" through CPUC proceeding R.18-10-007 with zero measured risk reduction. Subsequently, on April 25, 2019 PG&E filed a "Second Amendment to Pacific Gas and Electric Company's (U 39 E) Wildfire Mitigation Plan" and while rejected by the Commission it further demonstrated their structural inability to manage their infrastructure and associated wildfire risk mitigation tactics even to this low bar ahead of the 2019 wildfire season. This provides further proof that Governor Newsom was on-point when stating that this proposed RSA falls "woefully short". Indeed the RSA is imprudent or not reasonable if it does not consider post-bankruptcy wildfire risks and climate change adaptation risks more broadly. This claimant contends that these factors unless addressed directly in the RSA will put PG&E back on the path to re-enter bankruptcy within 2 years.

### Conclusion

This RSA puts PG&E on an imprudent path that does not have a reasonable chance of success because it does not address systemic governance, financial, operational and structural issues and does NOT treat claimants fairly and in accordance with 11 U.S.C§ 1123(a)(4), the "Made-Whole" doctrine and Section 509(c). Moreover, the RSA leaves the inadequate and misaligned governance and associated corporate incentive structures intact that led PG&E into bankruptcy. If the RSA does not indicate a reasonable path that ties risk mitigation, performance metrics and safety to corporate financials it is a non-starter. This RSA outlines an inadequate capital structure with fanciful financial projections that even with the AB1054 provided $21B wildfire fund will be insufficient to prop up the company's credit rating and support access to capital at reasonable rates. This RSA represents a pathway to the next PG&E bankruptcy where PG&E wildfires leave the company insolvent and claimants left with little to no recourse. I urge the court to send the Debtor and the TCC back to the negotiating table to work out a prudent RSA that has a reasonable chance of success.

Dated: December 16, 2019

Respectfully submitted,

William B. Abrams
Claimant

**Exhibit A**

# BEFORE THE PUBLIC UTILITIES COMMISSION
# OF THE STATE OF CALIFORNIA

| | |
|---|---|
| Order Instituting Investigation on the Commission's Own Motion to Consider the Ratemaking and Other Implications of a Proposed Plan for Resolution of Voluntary Case filed by Pacific Gas and Electric Company, pursuant to Chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court, Northern District of California, San Francisco Division, In re Pacific Gas and Electric Corporation and Pacific Gas and Electric Company, Case No. 19-30088. | Investigation 19-09-016 (Filed September 16, 2019) |

**WILLIAM B. ABRAMS OPENING TESTIMONY ON NON-FINANCIAL ISSUES
RELATED TO PROPOSED PLAN FOR RESOLUTION OF VOLUNTARY CASE
PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE
BY PACIFIC GAS AND ELECTRIC COMPANY**

William B. Abrams
California Resident
1519 Branch Owl Place
Santa Rosa, CA, 95409
(707) 397-5727
Email: end2endconsulting@gmail.com

December 13, 2019

1

## TABLE OF CONTENTS

I.      Introduction.................................................................Page 3

II.     Non-Financial Issues.....................................……............  Page 6

        3.1 Governance Structure: Safety.........................................  Page 7

        3.2 Governance Structure: Criminal Probation........................ Page 9

        3.3 Climate.......................................................................Page 10

        3.4 Section 854 Issues.......................................................Page 11

        Other Non-Financial Issues...............................................  Page 13

III.    Summary and Conclusion...........................................……... Page 19

Pursuant to the Assigned Commissioner's November 14, 2019 Scoping Memo, William B. Abrams respectfully submits this opening testimony on non-financial issues to inform the commission decisions relative to the evaluation and approval of proposed plans for Pacific Gas and Electric Company Pursuant to Chapter 11 of the Bankruptcy Code. William B. Abrams received party status via oral ruling at the prehearing conference held on October 23, 2019.

2

# I. Introduction

**Q: Please state your name and address.**

A: William B. Abrams, 1519 Branch Owl Place, Santa Rosa, CA, 95409

**Q: What is your background and qualifications related to this proceeding?**

A: I have been working in executive, managerial and consulting roles across business, government and nonprofit sectors. I have developed and executed turnaround strategies, risk mitigation strategies and communication strategies for diverse organizations and within complex political and regulated environments. I have also managed quality assurance and risk management teams across these sectors, implemented complex public safety systems, managed strategic communication programs for large telecommunications companies, managed diverse nonprofit programs serving families and people with disabilities and owned several entrepreneurial small businesses. Throughout these experiences, I have recognized that when organizations like Pacific Gas and Electric (PG&E) face mounting internal and external risks it often takes intervention and outreach to individuals with transferrable skills and experience to collaboratively contribute to solutions and turnaround strategies. While it is important for the commission to ensure that subject matter experts (SMEs) with 30+ years of utility experience are at the table, it is equally important that new/different professional perspectives are represented in this proceeding. It is with this diverse business expertise and in this collaborative spirit that I provide testimony.

3

1    **Q: What is the purpose of your testimony?**

2

3    A:  While I bring these diverse professional experiences, it is my personal and

4    community volunteer experience that I hope will bring a ground-truth perspective to

5    this proceeding.  While the commission considers "ratepayer" interests it must

6    understand and appreciate that ratepayers are also US citizens, California residents

7    and yes include a growing number of wildfire survivors like me.  I have subject matter

8    expertise and first-hand experience running through flames with my family and know

9    this bankruptcy exit MUST put us on a better path to recovery and resiliency.  Here is

10   a picture of my home after the 2017 PG&E caused wildfires and a picture of my

11   survivor/fighter daughter on Halloween 3-weeks after the fires:

12



13

14

15   Please, consider these pictures as reflective of my PG&E wildfire experience and

16   reflective of the larger ratepayer interests in this proceeding.  We must consider the

17   fate of future wildfire survivors and our children as primary drivers of these decisions.

18   Through this testimony, I hope to provide context that ensures we consider not only

19   the financial interests of PG&E shareholders and investors but also the interests of

20   residents, our communities and our families.  The questions that we must ask and

21   answer in this proceeding are as follows:

4

1

2 • **Q: Does this PG&E restructuring plan provide the needed public**

3 **confidence that will allow us to live in our homes or rebuild our homes**

4 **with a sense of financial and personal safety if we are near PG&E**

5 **infrastructure?**

6

7 • **Q: Will this PG&E restructuring plan provide a path to safety and**

8 **security for our families today and for our children tomorrow?**

9

10 Along with many of my neighbors, I am an active member of many wildfire recovery-

11 oriented "block captain" groups and contributing like many to the resiliency of our

12 community. I am a member of a local Community Wildfire Protection Plan (CWPP)

13 Steering Committee and have been active in our Ad Hoc Recovery and Resiliency

14 Group. Additionally, I have worked on post-PG&E wildfire initiatives that include

15 alert/warning, vegetation management and home hardening. I have actively

16 participated in and contributed to the state legislative processes associated with this

17 proceeding.

18

19 Additionally, I have been following the bankruptcy proceeding closely as a claimant

20 and have submitted advisory letters to the court regarding the feasibility requirements

21 that I believe should be considered for plan approval. There are many regulatory

22 matters that must be considered in this proceeding that are parallels to feasibility

23 Section 1129 bankruptcy court determinations. Understanding how these efforts can

24 either support a common direction or subvert a otherwise well-intentioned plan are

25 important for the commission to consider. To those ends, please consider the

26 following testimony on non-financial issues:

27

28

29

Case: 19-30088    Doc# 5139    Filed: 12/16/19    Entered: 12/16/19 14:50:53    Page 9 of
25

**II. Non-Financial Issues**

**Q: What is your overall impression of the PG&E Amended Plan of Reorganization as seen in the recently released RSA, 8-K and summary?**

This plan as outlined is unconfirmable by the bankruptcy court on feasibility grounds, not approvable by the CPUC and the Governor on just and reasonable grounds, imprudent of PG&E and the TCC to propose, unjust for wildfire survivors and exposes California ratepayers to extreme and unnecessary risks. Some may argue that this plan is a compromise for all parties. I fully support the right compromises and meeting on common ground given that there is a lot of that to be had through this bankruptcy exit process but this is not it. If this was a plan that sought common ground for the mutual interests of PG&E, claimants, ratepayers and residents across California here are the three principles that would be the basis of the restructuring agreement:

- **Feasible** – If this was a feasible plan, it would provide a clear measurable strategy for PG&E stability, risk mitigation as well as safety for Californians.
- **Just and Reasonable** – If this was a just and reasonable plan, it would give Tubbs Fire survivors their day in court, provide claimants with just compensation for damages and ensure the public can live and thrive in California with a reasonable expectation that PG&E will contribute as a good corporate citizen to a safe and secure environment.
- **Prudent** – If this was a prudent plan, it would address the growing wildfire and climate change risks to ensure financial stability for longer-term PG&E investors by implementing new investment tools and incentive programs aligned to corporate risk mitigation and innovation.

I submit for the commission's consideration, that the recently released documents by PG&E and the TCC indicate that this plan does NOT meet these threshold criteria.

6

## 3.1 Governance Structure: Safety

**Q: How should the commission ensure that any plan of reorganization supports a PG&E governance structure that promotes safety?**

A: First there must be an acknowledgement that PG&E safety rhetoric has not matched their actions for far too long. That said, I am not providing testimony to shake my finger but to look ahead. My only point here is that there is a cavernous trust gap for PG&E that they must overcome with verifiable legally-binding commitments and measurable metrics. The governance structure articulated in any restructuring plan must be a product of and represent a commitment to this type of orientation.

In my opening comments to the Organization Culture and Safety Proceeding, I made it clear that asking for "safety" qualifications on the board was insufficient and ineffectual for furthering a safety-oriented governance structure at PG&E.[1] We must ensure that PG&E incorporates independently regulatable safety incentives on their board that are connected to executive compensation and an overall corporate incentive structure. The commission needs to ensure these are well defined, measurable and clearly articulated in any plan of reorganization if is to be deemed reasonable, confirmable or reliable.

Furthermore, the incentive structure articulated in the restructuring plan must not be just for executives. In the April 15, 2019 workshop associated with the PG&E Safety Culture proceeding, Richard Kelly, Former Board Chair indicated what he felt that PG&E had a strong incentive structure at the top but "We need to get more involvement by the individual employees… We set great goals at the corporate level, the executive management buys into it, but we are not doing a good job getting down to the individual worker level". Given this statement and the clear evidence that safety does not permeate PG&E, the commission must make sure that any proposed plan restructures these incentives to ensure they get down to this "individual worker level".

---

[1] Opening Comments of William B. Abrams on Proposals to Improve the Safety Culture of Pacific Gas and Electric Company and PG&E Corporation, Filed July 19, 2019, I.15-08-019

7

1
2     I urge the commission to consider that given the reckless safety track record of PG&E, this is
3     the only reasonable approach to ensure proper motivation. Yes, there are many employees at
4     PG&E that are doing wonderful safe work but aligning incentive structures up and down
5     PG&E will ensure there is alignment towards common goals. The commission should use
6     every legal means available to strengthen the regulatory tools to ensure PG&E is on a path
7     that promotes safety and security for employees and customers. I recommend that a broad
8     range of measures be leveraged as incentives but this does not mean that I am advocating for
9     more metrics/levers. On the contrary by using a diversified application of incentives, there
10    will likely need to be fewer metrics because the incentives would work in conjunction with
11    one another.
12
13    As an example, in the health care industry a patient may have a particular set of metrics to
14    encourage good body system health (weight-loss goal, exercise goal, diet, etc.). This could be
15    seen as analogous to the goals we need to see in the PG&E plan for reorganization. The
16    restructuring plan must demonstrate performance-based metrics around wildfire mitigation,
17    worker safety and other key performance indicators (KPIs). Now, in the health care system
18    doctors, administrators and the hospital itself have metrics that complement the system health
19    of the individual patient but they are not the same. These are often described as "health
20    outcomes" which are measures of certain health care investments or interventions such as
21    out-patient practices after a heart attack to prevent death or repeat incident. These health
22    outcomes are leveraged throughout a hospital system from the employees that sweep the
23    floors up and through the executives that drive healthcare policy. I submit to the commission
24    for consideration that they need to similarly verify how performance-based metrics and
25    associated incentive structures are defined in the restructuring plan and governance policies
26    to ensure a safety culture at Pacific Gas and Electric Company. This should not be
27    considered just a prudent regulatory approach but a required one given the feasibility
28    requirements in bankruptcy and the historic lack of safety within PG&E.
29
30
31

8

**3.2 Governance Structure: Criminal Probation**

**Q: How should PG&E's criminal probation affect the decisions of the commission and the criteria for plan approval?**

A: The ninth circuit in *United States vs. Tham* in 1989 seemed to indicate that a probation period beyond the 5-year statutory maximum could not be imposed even if a company like PG&E had earned an extension through mismanagement and negligence. So, where does that leave the commission given the significant lack of safety accountability within PG&E since the January, 2017 ruling and their excessive number of utility-caused fires since that date? Short of putting PG&E on "Double Secret Probation" as articulated in the 1978 classic movie "Animal House", I suggest that the commission takes steps to ensure that requirements of the PG&E probation are ingrained in their plan.

Judge William Alsup ruled on April 2, 2019 that PG&E must comply with the California Public Utilities Commission (CPUC) wildfire safety standards or risk violating their probation. However, the Judge's remedies for addressing these violations are limited to financial penalties and symbolic ones like ordering PG&E executives to walk around Paradise, CA. Only, the CPUC has the duty and authority to impose more stringent regulatory controls to address these probation violations. It is well within the commission's authority to ensure that metrics that promote safe and reliable service are legally binding and incorporated into the restructuring agreement. The commission should not lose this opportunity to impose these requirements on plan approval as they are key to the viability and feasibility of the PG&E path forward.

Simply stated, PG&E creditors, insurers and investors rely on performance-metrics and the company's ability to mitigate risks when they evaluate PG&E. The commission has an opportunity to align these stakeholder interests with those of ratepayers. Only a strategically sound and measurable plan that quantifies risk reduction should be acceptable. Moreover, if the restructuring plan does not quantify strategic and measured risk reduction it cannot be relied upon and therefore should not be approved. The commission need not create or

Case: 19-30088    Doc# 5139    Filed: 12/16/19    Entered: 12/16/19 14:50:53    Page 13 of 25

| | |
|---|---|
| 1 | mandate certain metrics to ensure this. Rather, the commission need just evaluate the degree |
| 2 | to which the PG&E plan has these measured risk-reduction metrics ingrained in their plan. If |
| 3 | these metrics are measurable, independently verifiable and drive the appropriate level of |
| 4 | regulatory oversight, they can be considered sufficient. |
| 5 | |
| 6 | **3.3 Climate** |
| 7 | |
| 8 | **Q: What factors should the commission consider to ensure any plan or reorganization is** |
| 9 | **consistent with the state's climate goals?** |
| 10 | |
| 11 | If this plan does not address wildfire mitigation and climate change head-on it is a recipe for |
| 12 | near-term PG&E insolvency, financial devastation for ratepayers and an unsafe environment |
| 13 | for the residents of California. This plan cannot just describe a happy picture of a PG&E |
| 14 | tackling these tough issues particularly since they have neglected these corporate |
| 15 | responsibilities for so long as seen in their delipidated infrastructure. The plan must provide |
| 16 | measurable climate change adaptation metrics in-line with California's climate goals and tied |
| 17 | to PG&E bottom-line financial metrics. |
| 18 | |
| 19 | In order to build regulator trust and confidence, this plan must provide these performance- |
| 20 | metrics tied to Return on Equity (ROE) and overall PG&E profitability. These are NOT the |
| 21 | same as those activity-metrics described in their recently released RSA or current Wildfire |
| 22 | Mitigation Plan (WMP). Of course, adherence to the California Renewables Portfolio |
| 23 | Standard Program is a must but that alone is insufficient. PG&E climate change adaptation |
| 24 | strategy must balance the near-term wildfire risk mitigation due to their decades of neglect |
| 25 | along with a drive to renewables, microgrids and other tactics to slow global warming and |
| 26 | get to decarbonization and net-zero emissions. Please, refer to my filed comments in the |
| 27 | Wildfire Mitigation Plan proceeding that outline metrics and methodologies for how |
| 28 | performance could be incorporated into a real strategy for reorganization focused on risk |

10

1    reduction and climate change adaptation.[2]  Of course, there are many ways to measure risk

2    reduction, provide real quality controls and measure the relative success of climate change

3    adaptation goals but all of these must be verifiable by the commission and tied to bottom line

4    PG&E financials.

5

6    **3.4 Section 854 (non-financial)**

7

8    I will limit my testimony to those Section 854 provisions ruled as in scope by Judge Allen's

9    ruling issued on November 27, 2019.  However, please consider my brief on those issues for

10   background and direct applicability to the following testimony:[3]

11

12   **Q:  How does Section 854(c)(1) apply to maintain or improve the financial condition of**

13   **the resulting public utility doing business in the state?**

14

15   A: If we are to look to the future as required by Section 854, investment structures with

16   longer time horizons must be the commission's focus.  Plans should consider and stipulate

17   the types of investment mechanisms that would encourage this type of longer-term outlook.

18   This might be premium debt classifications (greater yield with longer investment time

19   horizons) for R&D and risk mitigation tactics or other investment tools which would be

20   carved out and identified in competing plans. The commission should evaluate these

21   proposed tools to ensure both investor interests and public safety interests are in alignment.

22   In the end, we must realize that PG&E like all corporations will be motivated by bottom-line

23   investor metrics so the commission must consider how these investor goals align with public

24   safety and climate change adaptation as prerequisites for plan approval. Plans should fully

25   support strong PG&E financials, high investor return and high ratepayer value demonstrated

---

[2] "Opening Comments of William B. Abrams in Response to the proposed Electric Utility
Wildfire Mitigation Plans", Published March 13, 2019.
http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M273/K147/273147198.PDF

[3] "William B. Abrams Brief on Public Utilities Code Section 854 Issues Related to Proposed
Plans for Pacific Gas and Electric Company Pursuant to Chapter 11 of the Bankruptcy Code",
Published November 22, 2019.

1    through safe, reliable and affordable service. Please, refer to my comments in proceeding

2    R.19-01-006 for other ways to align the financial interests of investors and ratepayers.[4]

3

4    **Q: How does Sections 854(c)(2) to "maintain or improve the quality of service to public**

5    **utility ratepayers in the state" and Section 854(c)(3) to "maintain or improve the**

6    **quality of management of the resulting public utility doing business in the state" apply**

7    **to this proceeding?**

8

9    A: Some may argue that PG&E has set such a low-bar relative to these sections that any plan

10    for restructuring the company would be an improvement. I suggest that the commission not

11    assume this to be the case. Instead, the commission should compare and contrast proposed

12    plans based upon the quality of service (QoS) they propose. Proposed plans should include a

13    Service Level Agreement (SLA) that defines specific QoS metrics and an associated Total

14    Quality Management (TQM) plan. This is business-as-usual in competitive industries and

15    should not be excluded here from consideration. QoS metrics might include measures of

16    uptime (fewer and shorter PSPS events), customer satisfaction measures, response time or

17    other measures. SLAs and TQM Plans that commit to and promote higher standards and

18    more comprehensive QoS measures should be weighted more favorably by the commission.

19

20    **Q: How does Section 854(c)(6) apply to this proceeding "Be beneficial on an overall**

21    **basis to state and local economies, and to the communities in the area served by the**

22    **resulting public utility."?**

23

24    A: Similar to how the commission has determined a "customer harm threshold" in the past, I

25    suggest a "community harm threshold" be set within this proceeding. Plans should be

26    evaluated based upon the degree to which they will benefit state and local economies. As an

27    example, one measure might be the degree to which the plans will impact the effects on

28    business and homeowner insurance rates. As we have seen, PG&E caused wildfires have

29    caused rates to increase and insurance scarcity to skyrocket across their service territory. The

---

[4] "Opening Comments of William B. Abrams in response to The Staff Proposed Stress Test Framework", Published April 24, 2019

12

1  state imposed 1-year moratorium mandating insurance in wildfire effected areas is of little

2  solace to those in the PG&E service area wondering if their home will remain insurable.

3

4  The degree to which proposed plans can demonstrate mitigation for insurer risks would be

5  one important measure. The commission might also look at the relative contribution of

6  electric rates to resident cost-of-living. Perhaps a Cost of Living Adjustment (COLA)

7  measure within proposed plans as the basis for evaluating community benefits might be

8  appropriate. I urge the commission to reconsider community impacts of these proposals as

9  key to their decision-making criteria.  As a wildfire survivor, I know first-hand how PG&E's

10  ill-conceived strategies and negligence has caused real financial harms to our communities. If

11  we do not take the opportunity in this proceeding to consider these impacts, the opportunity

12  costs to our communities will be significant.

13

14  **3.5 Other Non-Financial Issues**

15

16  I would like to take an opportunity in this section of my testimony to analyze the summary of

17  the amended plan that was released the evening of December 12, 2019 (only one day prior to

18  the due date of this testimony.[5]  The implications of this plan are far reaching and parties to

19  this proceeding had less than one day to consider its implications.  Unfortunately, this rush to

20  confirm the plan by PG&E to avoid the implications of the Tubbs trial, avoid competing

21  plans and to hurriedly qualify for the wildfire fund is likely due to the same reason the plan is

22  so deficient. Yes, PG&E continues to de-prioritize a thoughtful strategy to fortify the short-

23  term financial interests of their investors.  Please, consider the following initial one-evening

24  analysis of the summary released one-day prior to testimony:

25

---

[5] PG&E Files Amended Plan of Reorganization; Remains on Track to Achieve Confirmation of Plan Before June 30 Deadline, Released December 12, 2019,
https://www.pgecurrents.com/2019/12/12/pg-remains-on-track-to-achieve-confirmation-of-plan-before-june-30-deadline/

13

1    **Q: Does the recently released summary of the "Amended Plan of Reorganization"**

2    **provide an indication on whether or not the plan should be approved by the**

3    **commission?**

4

5    A: Yes, the summary of the plan seems to indicate that the underlying structure and direction

6    of the plan is fundamentally flawed and unconfirmable. Please, consider the following

7    section-by-section review of the plan summary as an indication of the degree to which the

8    plan is not in-line with California's goals and objectives and not in-line with AB1054:

9

   Posted on December 12, 2019

# PG&E Files Amended Plan of Reorganization; Remains on Track to Achieve Confirmation of Plan Before June 30 Deadline

10

11    Clearly, based on the PG&E headline description of this release, the primary objective of the

12    amended plan is to meet the June 30th deadline. No, it does not lead with "PG&E Files

13    Amended Plan that Makes-Whole Claimants and Prioritizes Safety and Security for

14    California". This headline is not a communications accident. The primary objective of this

15    plan from the start has been to hurry up and meet the June 30th date. Quick before a jury has

16    an opportunity to review the new evidence through a Tubbs Fire trial and really hold PG&E

17    accountable! Quick before another investor group provides a better plan for Californians!

18    Quick before investors miss out on the $11.5B from ratepayers to cover a small portion of the

19    damages from the next round of wildfires. If the commission similarly rushes judgements

20    and confirms the plan prematurely we will not have given this matter the important analysis

21    and consideration it deserves. The speedy confirmation of the plan for PG&E investors

22    should not outweigh the interests of claimants, wildfire survivors and the resident ratepayers

23    across California.

24

1    The next section of the PG&E plan summary is as follows:

> PG&E Corporation and Pacific Gas and Electric Company (together, "PG&E") today filed an amended
> Plan of Reorganization with the Bankruptcy Court in its Chapter 11 cases. The Plan reflects PG&E's
> settlements with all major groups of wildfire claimants and keeps PG&E on track to achieve regulatory
> approval and Bankruptcy Court confirmation in advance of the June 30, 2020, statutory deadline for
> participation in the state's new wildfire fund.
>
> The company believes its Plan is confirmable, satisfies all requirements of Assembly Bill 1054 (AB 1054)
> and complies with the Bankruptcy Code. It is the product of extensive negotiations, treats all victims
> fairly, protects customers and employees, and will enable PG&E to emerge from Chapter 11 as a
> financially sound utility positioned to serve California for the long term.
>
> "Today's filing brings us one step closer to successfully concluding PG&E's Chapter 11 cases so that the
> wildfire victims can be compensated as quickly as possible. We appreciate the extensive work by many
> stakeholders that went into this Plan, in particular the efforts of our state leaders to encourage all parties
> to work quickly to find common ground," said CEO and President of PG&E Corporation Bill Johnson.
>
> "We believe our Plan is the best solution for all constituencies, and we look forward to bringing these
> complex proceedings to their conclusion. In the meantime, we continue to make meaningful changes
> and additional investments throughout the company to reduce the risk of wildfire and help us continue to
> deliver safe, reliable energy to our customers," Johnson said.
>
> The company is committed to working with all stakeholders to confirm support for the Plan, to obtaining
> regulatory approval from the California Public Utilities Commission consistent with AB 1054, and to
> achieving confirmation of the Plan by the Bankruptcy Court in advance of June 30, 2020.

2
3    This plan summary is not in keeping with AB1054. Specifically and most importantly, the
4    plan is not aligned with the following section of the legislation:
5
6    *Section 1(a)5(b) - It is the intent of the Legislature to provide a mechanism that*
7    *allows electrical corporations that are safe actors to guard against impairment of*
8    *their ability to provide safe and reliable service because of the financial effects of*
9    *wildfires in their service territories using mechanisms that are more cost*
10   *effective than traditional insurance, to the direct benefit of ratepayers and*
11   *prudent electrical corporations.*
12
13   PG&E is universally recognized as an unsafe actor. The criminal, civil and regulatory
14   proceedings over the past 10+ years point to this fact. Furthermore, the commission just in
15   the past 6-months has identified many managerial and operational failings where PG&E has
16   not been prudent including how it has handled PSPS events throughout the 2019 wildfire
17   season. The commission cannot on the one hand point to a pattern of repeated unsafe and

15

1    imprudent acts including within the past few weeks AND on the other hand deem PG&E a
2    safe actor and prudent under AB1054.
3
4    The next section of the PG&E plan summary is as follows:
5

### PG&E's Plan: Best Path Forward

PG&E's Plan prioritizes getting wildfire victims paid soonest by resolving outstanding litigation and eliminating the need for a Tubbs Fire trial and a costly and uncertain estimation process. PG&E assumes its obligations to its employees and creditors without impairments, making sure all parties are treated fairly.

The plan put forward by the Ad Hoc Bondholders group (the Elliott plan) is a last-ditch effort to derail the wildfire victims' settlements, and force costly, uncertain and protracted litigation. That plan would enrich those firms backing it by charging interest rates on debt that are both above market rate and higher than required by law, rather than putting those ratepayer dollars toward safety, reliability and clean energy investments.

### Major Settlements Reached

As announced last week, PG&E reached a settlement valued at approximately $13.5 billion to resolve all remaining wildfire claims, including individual claims, relating to the 2015 Butte Fire, 2016 Ghost Ship Fire, 2017 Northern California Wildfires (including the 2017 Tubbs Fire), and the 2018 Camp Fire pursuant to the terms of PG&E's Plan. PG&E's Plan has the support of the Official Committee of Tort Claimants and firms representing approximately 70% of wildfire victims.

PG&E previously reached settlements with two major groups of wildfire claim holders, including a $1 billion settlement with cities, counties, and other public entities, and an $11 billion agreement with insurance companies and other entities that have already paid insurance coverage for claims relating to the 2017 and 2018 wildfires.

Today, PG&E also resolved the disputed release provisions between the wildfire victims and insurance companies, which was a condition to the settlement with the wildfire victims.

6
7    The PG&E proclamation that the plan "*treats all victims fairly*" is a misstatement to the
8    extreme.  This $13.5B "jump ball" was initially described by PG&E as just for individual
9    wildfire survivor claimants but seems to be recast to include many other agencies including
10   FEMA, Cal Fire and Cal OES.  This means that claimants will likely be paid for damages
11   pennies on the dollar and not leave wildfire survivors anything close to whole.  All of these
12   governmental and residential claimants are owed just compensation and shouldn't be forced

16

1  to compromise payouts for one to benefit another. It has been described that many wildfire
2  survivors are likely to be in litigation 10+ years trying to resolve disputed claims with their
3  insurance companies that may need to sign-off on the disbursements for those underinsured
4  which are the vast majority of wildfire survivor claimants.
5
6  Also, this is far from just and reasonable for Tubbs Fire survivors who will not see their day
7  in court to hold PG&E accountable given the new evidence. Prior to letting justice give way
8  to PG&E demands for exediency, here are just a few quotes from those engaged in the
9  bankruptcy proceeding regarding the need for the court trial:
10
11      • Michael Kelly, TCC attorney representing Tubbs Fire survivors "We believe that
12          from a justice and transparency point of view… the people who suffered these
13          losses are entitled to have this trial be public"
14
15      • Frank Pitre, TCC Attorney representing Tubbs Fire survivors said the trial "means
16          everything… it means that they have a chance to be able to prove their case in a
17          court with transparency and in a form that allows 12 reasonable people in their
18          community to decide the facts… That is what we have always wanted: Give us
19          the chance to present our case to ordinary citizens who can decide this disputed
20          issue."
21
22      • Judge Dennis Montali, Presiding US Bankruptcy Judge stated that the trial was
23          needed to provide "a just resolution" for victims.
24
25  So, it is clear from these statement and those from countless victims of the Tubbs Fire that a
26  trial was needed to provide justice. Then what happened? Why was this justice denied?
27  Clearly, this justice was revoked in this PG&E/TCC RSA compromise so PG&E would not
28  have to face further liability and damages. Given this, I now urge the commission to not
29  approve the plan given that it is not just and reasonable.
30
31

17

1    Here is the section in the plan overview that addresses safety and "strengthen its operations":

2

PG&E has taken and continues to take critical actions to improve safety and strengthen its operations, including:

- Completing enhanced and accelerated inspections of more than 700,000 transmission, distribution and substation assets of its electric infrastructure in high fire-threat areas and addressing immediate safety risks;

- Conducting enhanced vegetation management, including meeting and exceeding important state standards regarding clearances around power lines in high fire-threat areas;

- Conducting system hardening and resiliency, including replacing wood poles with more resilient poles, replacing bare overhead conductor with covered conductor, targeted undergrounding, and establishing temporary microgrids;

- Upgrading its Wildfire Safety Operations Center, which serves as PG&E's 24/7 hub for monitoring wildfire risks and coordinating prevention and response efforts across Northern and Central California;

- Installing more than 600 weather stations and 130 high-definition cameras across its service area. PG&E will continue to expand these networks in high fire-threat areas to enhance weather forecasting and modeling and improve the company's ability to predict and respond to extreme wildfire danger;

- Naming Bill Johnson as Chief Executive Officer and President of PG&E Corporation;

- Naming Andrew M. Vesey as Chief Executive Officer and President of Pacific Gas and Electric Company, with responsibility for all aspects of Utility operations;

- Appointing new leaders in Electric Operations and Gas Operations;

- Establishing a $105 million Wildfire Assistance Fund to aid those displaced by the 2017 Northern California wildfires and 2018 Camp Fire who are either uninsured or need assistance with the cost of substitute or temporary housing or other urgent needs; and

- Continuing to invest in PG&E's systems, infrastructure and critical safety efforts while delivering safe natural gas and electric service to its millions of customers.

3

4    Given this overview from PG&E, please consider the following questions:

5

6    **Q: Are these the same "accelerated inspections" that PG&E didn't complete this year**

7    **and are passing off as "acceleration" with this plan?**

8    A: Yes.

9

10   **Q: Are these the same "enhanced vegetation management" goals which were at**

11   **approximately 30% of goal prior to the 2019 Kincade fires?**

12   A: Yes.

18

1

2    **Q: Do any of these goals quantify any risk mitigation so that creditors, insurers for**

3    **PG&E and residents will be able to rely on this plan?**

4    A: No.

5

6    **Q: Is this the same "Wildfire Safety Operations Center" that leveraged PSPS as a first**

7    **resort and not a "last resort" after failing to achieve other mitigation goals?**

8    A: Yes.

9

10   **Q: Is "naming new leaders" a step forward if they have the same qualifications as the**

11   **old leaders and the same undefined and unmeasurable tactics in their toolbox?**

12   A: No.

13

14   **Q: Does this reflect the primary recommendation of Governor Newsom's Strike Force**

15   **report for utilities to provide "specific performance-based risk mitigation metrics that**

16   **are independently and scientifically verified"?[6]**

17   A: No.

18

19   **III. Summary and Conclusion**

20

21   **Q: What is at stake with this PG&E plan of reorganization?**

22

23   A: There is much at stake with this plan of reorganization. It will likely either provide a path

24   for a model utility that can rise to the increasing challenges posed by their neglected

25   infrastructure and climate change or provide a utility that spins further out of control to

26   devastate the California economy leaving a trail of wildfire victims in its wake.

27   Unfortunately, even with the oversight of Federal Monitors, Judge Alsup, Judge Montali and

28   this commission we have seen proof that PG&E is not on a path for change.  Consider the

---

[6] "Wildfires and Climate Change: California's Energy Future", A Report from Governor Newsom's Strike Force, April 12, 2019, page 11

19

following sample of headlines just in the last few weeks that demonstrate that PG&E rhetoric does not match their actions to date:

- *"PG&E responds to fired lineman who claims utility ignored safety warnings"*, San Francisco Chronicle, December 12, 2019
- *"Californians want to end PG&E Operations as they Exist Now, New Pole Says"*, Los Angeles Times, December 10, 2019
- *"PG&E diverted millions from putting lines underground, audit finds"*, San Francisco Chronicle, December 11, 2019
- *"Revealed: The PG&E hook that started the Camp Fire"*, San Francisco Chronicle, December 5, 2019
- *"Report Detailing PG&E's Failures Raises New Hurdles for Utility"*, The New York Times, December 3, 2019
- ***"PG&E's Stock Rockets after Bloomberg Report that a deal to pay $13.5 Billion Wildfire Survivors is in the Works"***, Marketwatch, December 4, 2019

This pattern of headlines will get worse unless this restructuring plan is reworked and ties PG&E performance around safety and climate change adaptation to the financial metrics of the company. I urge the commission to resist the political pressures to hurry up and approve a plan that is not in the best interests of Californians.

**Q: Does this conclude your testimony?**

A: No. I respectfully ask the commission to review the Press Democrat article "Remembering the Victims of the North Bay Fires" published on December 27, 2017 that lists the victims of the PG&E wildfires of 2017.[7] After that please review the KQED article "In Remembrance: The Names of Those Lost in the Camp Fire" published on June 27, 2019

---

[7] "Remembering the Victims of the North Bay Fires", The Press Democrat, December 27, 2019, The Press Democrat Staff. https://www.pressdemocrat.com/news/7808264-181/remembering-the-victims-of-the

Case: 19-30088    Doc# 5139    Filed: 12/16/19    Entered: 12/16/19 14:50:53    Page 24 of 25

1    that lists the victims of the PG&E Camp Fire of 2018.[8]  Please, also consider how lucky we

2    are to have heroes and first responders like our California Fire Fighters that saved us from

3    more loss of life in these fires and from the Kincade Fire this year.  Wildfire survivors know

4    that it is the heroism of these professionals and not ill-conceived and ill-executed PG&E

5    PSPS events that prevented loss of life this year.  Are we going to demand a solid plan of

6    reorganization to save and realign PG&E or rely more and more on our first responders to

7    save our lives in the face of growing PG&E caused wildfires?  I am confident that the

8    commission with the help of parties to this proceeding can encourage and approve a

9    confirmable plan with much PG&E rework to the current agreement.

10

11   A: Yes, this now concludes my opening testimony but I may provide reply testimony

12   depending on the testimony of other parties and ongoing developments in the PG&E

13   bankruptcy proceeding.

14

15   Dated:

16   December 13, 2019

17   Respectfully submitted,

18

19   /s/  William B. Abrams
20   California Resident
21   1519 Branch Owl Place
22   Santa Rosa, CA, 95409
23   Tel: (707) 397-5727
24   E-mail: end2endconsulting@gmail.com

---

[8] "In Remembrance: The Names of Those Lost in the Camp Fire", KQED, June 27, 2019, Dan
Brekke. https://www.kqed.org/news/11710884/list-of-those-who-died-in-butte-county-paradise-
camp-fire

21