UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

-oOo-

In Re:                              ) Case No. 19-30088
                                    ) Chapter 11
PG&E CORPORATION AND PACIFIC        )
GAS AND ELECTRIC COMPANY,           ) San Francisco, California
                                    ) Tuesday, December 17, 2019
                         Debtors.   ) 10:00 AM
_____     )
                                    MOTION FOR RELIEF FROM STAY
                                    FILED BY PLAINTIFF'S
                                    EXECUTIVE COMMITTEE [4875]

                                    MOTION FOR RELIEF FROM STAY
                                    FILED BY TODD HEARN [4820]

                                    MOTION FOR RELIEF FROM STAY
                                    FILED BY GEORGE VLAZAKIS
                                    [4846]

                                    DEBTORS' MOTION PURSUANT TO
                                    11 U.S.C. SECTIONS 363(B) AND
                                    105(A) AND FED. R. BANKR. P.
                                    6004 AND 9019 FOR ENTRY OF AN
                                    ORDER (I) AUTHORIZING THE
                                    DEBTORS AND TCC TO ENTER INTO
                                    RESTRUCTURING SUPPORT
                                    AGREEMENT WITH THE TCC,
                                    CONSENTING FIRE CLAIMANT
                                    PROFESSIONALS, AND
                                    SHAREHOLDER PROPONENTS AND
                                    (II) GRANTING RELATED RELIEF
                                    [5038]

                    TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE DENNIS MONTALI
                UNITED STATES BANKRUPTCY JUDGE

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

```
 1

 2   APPEARANCES:
     For the Debtors:          STEPHEN KAROTKIN, ESQ.
 3                             THEODORE E. TSEKERIDES, ESQ.
                               Weil, Gotshal & Manges, LLP
 4                             767 Fifth Avenue
                               New York, NY 10153
 5                             (212)310-8000

 6                             PETER J. BENVENUTTI, ESQ.
                               Keller & Benvenutti, LLP
 7                             650 California Street
                               19th Floor
 8                             San Francisco, CA 94108
                               (415)364-6798

 9
     For PG&E Corporation:     KEVIN J. ORSINI, ESQ.
10                             PAUL H. ZUMBRO, ESQ.
                               Cravath, Swaine & Moore, LLP
11                             825 Eighth Avenue
                               New York, NY 10019
12                             (212)474-1000

13   For Executive Committee in ESTELA O. PINO, ESQ.
     Ghost Ship litigation:    Pino & Associates, LLP
14                             1520 Eureka Road
                               Suite 101
15                             Roseville, CA 95661
                               (916)641-2288

16
     For Official Committee of ROBERT A. JULIAN, ESQ.
17   Tort Claimants:           CECILY ANN DUMAS, ESQ.
                               Baker & Hostetler, LLP
18                             600 Montgomery Street
                               Suite 3100
19                             San Francisco, CA 94111
                               (415)659-2600

20
     For Ghost Ship Warehouse  MARY E. ALEXANDER, ESQ.
21   Plaintiffs' Executive     Mary Alexander & Associates, P.C.
     Committee:                44 Montgomery Street
22                             Suite 1303
                               San Francisco, CA 94104
23                             (415)433-0440

24

25
```

(973) 406-2250 | operations@escribers.net | www.escribers.net

```
 1

 2   For Sam Maxwell:          WILLIAM GORDON KAUPP, ESQ.
                               Kaupp & Feinberg, LLP
 3                             One Sansome Street
                               Floor 35
 4                             San Francisco, CA 94104
                               (415)896-4588
 5

 6   For Todd Hearn:           ANNE COSTIN, ESQ.
                               Costin Law, Inc.
 7                             315 Montgomery Street
                               10th Floor
 8                             San Francisco, CA 94104
                               (415)977-0400
 9
     For Adventist Health      REBECCA J. WINTHROP, ESQ.
10   System/West and Feather   Norton Rose Fulbright US, LLP
     River Hospital:           555 South Flower Street
11                             41st Floor
                               Los Angeles, CA 90071
12                             (213)892-9200

13   For Ad Hoc Committee      ABID QURESHI, ESQ.
     of Senior Unsecured       MICHAEL S. STAMER, ESQ.
14   Noteholders:             Akin Gump Strauss Hauer & Feld LLP
                               One Bryant Park
15                             New York, NY 10036
                               (212)872-8027
16
     For George Vlazakis:      RONALD F. BERESTKA, JR., ESQ.
17                             Stone & Associates
                               A Professional Corporation
18                             2125 Ygnacio Valley Road
                               Suite 101
19                             Walnut Creek, CA 94598
                               (925)938-1555
20

21   For Governor Gavin Newsom: NANCY MITCHELL, ESQ.
                               O'Melveny & Myers, LLP
22                             7 Times Square
                               New York, NY 10036
23                             (212)326-2000

24   For Ad Hoc Group of       MATTHEW A. FELDMAN, ESQ.
     Subrogation Claim Holders: Willkie Farr & Gallagher, LLP
25                             787 7th Avenue
```

escribers
(973)-406-2250 | operations@escribers.net | www.escribers.net

```
 1

 2                                  New York, NY 10019
                                   (212)728-8000
 3    For Camp Fire Claimants:     KENNETH PAUL ROYE, ESQ.
                                   Law Offices of Kenneth P. Roye
 4                                 142 West 2nd Street
                                   Suite B
 5                                 Chico, CA 95928
                                   (530)893-2398
 6
                                   JOSEPH FEIST, ESQ.
 7                                 Law Office of Joseph Feist
                                   2611 Esplanade
 8                                 Chico, CA 95973
                                   (530)433-0233
 9
      For Wildfire Victims:        DARIO DE GHETALDI, ESQ.
10                                 Corey, Luzaich, De Ghetaldi &
                                   Riddle, LLP
11                                 700 El Camino Real
                                   Millbrae, CA 94030
12                                 (650)871-5666

13    For California State         PAUL J. PASCUZZI, ESQ.
      Agencies:                    Felderstein Fitzgerald Willoughby
14                                 Pascuzzi & Rios, LLP
                                   500 Capitol Mall
15                                 Suite 2250
                                   Sacramento, CA 95814
16                                 (916)329-7400

17    For United States of         MATTHEW JORDAN TROY, ESQ.
      America:                     US Department of Justice, Civil
18                                 Division
                                   P.O. Box 875
19                                 Ben Franklin Station
                                   Washington, DC 20044
20                                 (202)514-9038

21
      For Andy R. Vara, Acting     GREG M. ZIPES, ESQ.
22    United States Trustee:       United States Department of
                                   Justice
23                                 Office of the U.S. Trustee
                                   450 Golden Gate Avenue
24                                 Suite 05-0153
                                   San Francisco, CA 94102
25                                 (415)705-3333
```

escribers
(973)-852-0600 | operations@escribers.net | www.escribers.net

```
 1

 2    For California Public      ALAN W. KORNBERG, ESQ.
      Utilities Commission:      Paul, Weiss, Rifkind, Wharton &
 3                               Garrison, LLP
                                 1285 Avenue of the Americas
 4                               New York, NY 10019
                                 (212)373-3000
 5
      For Official Committee of  GREGORY A. BRAY, ESQ.
 6    Unsecured Creditors:       Milbank, Tweed, Hadley & McCloy
                                 2029 Century Park East
 7                               33rd Floor
                                 Los Angeles, CA 90067
 8                               (424)386-4000

 9    For BOKF, NA, solely in    BETH M. BROWNSTEIN, ESQ.
      its capacity as Indenture  Arent Fox, LLP
10    Trustee:                   1301 Avenue of the Americas
                                 42nd Floor
11                               New York, NY 10019
                                 (212)484-3900
12
      For The City of San Jose:  JENNIFER MACHLIN CECIL, ESQ.
13                               Winston & Strawn, LLP
                                 101 California Street
14                               35th Floor
                                 San Francisco, CA 94111
15                               (415)591-1000

16
      For Individual Plaintiffs  FRANK PITRE, ESQ.
17    Executive Committee        Cochett, Pitre & McCarthy, LLP
      Appointed by the           San Francisco Airport Office
18    California Superior        Center
      Court in the North Bay     840 Malcolm Road
19    Fire Cases:                Suite 200
                                 Burlingame, CA 94010
20                               (650)697-6000

21    For Davey Tree Expert Co.: JEFFREY M. REISNER, ESQ.
                                 McDermott Will & Emery
22                               2049 Century Park East
                                 Suite 3200
23                               Los Angeles, CA 90067
                                 (310)277-4110
24

25
```

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1

2  For PG&E Shareholders:          BRUCE BENNETT, ESQ.
                                   Jones Day
3                                  555 South Flower Street
                                   Fiftieth Floor
4                                  Los Angeles, CA 90071
                                   (213)489-3939
5

6

7

8

9

10

11

12

13

14

15

16

17

    Court Recorder:                ANKEY THOMAS
18                                 United States Bankruptcy
                                   Court
19                                 450 Golden Gate Ave.
                                   San Francisco, CA 94102
20

21  Transcriber:                   SHARONA SHAPIRO
                                   eScribers, LLC
22                                 7227 N. 16th Street
                                   Suite #207
23                                 Phoenix, AZ 85020
                                   (973)406-2250
24

    Proceedings recorded by electronic sound recording;
25  transcript provided by transcription service.

(973) 406-2250 | operations@escribers.net | www.escribers.net

1

2                         I N D E X

3   RULINGS:                                    PAGE LINE

4   Motion for relief from stay granted          59    23

5   Restructuring support agreements approved    302    7

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

(973)-693-0 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    SAN FRANCISCO, CALIFORNIA, TUESDAY, DECEMBER 17, 2019, 10:00 AM

2                                -oOo-

3         (Call to order of the Court.)

4              THE CLERK:  All rise.  Court is now in session.  The

5    Honorable Dennis Montali presiding.

6              THE COURT:  Good morning, everyone.

7              IN UNISON:  Good morning, Your Honor.

8              THE CLERK:  Matter of PG&E Corporation.

9              THE COURT:  Mr. Tsekerides, you're in the first chair.

10   Are you in charge today?

11             MR. TSEKERIDES:  Just for the undercard.  So we have

12   three lift-stay motions.  The Ghost Ship, I believe, through

13   agreement, is going to go first and then one from Mr. Hearn.

14             THE COURT:  Right.

15             MR. TSEKERIDES:  And then Vlazakis.

16             THE COURT:  And you'd like to have me take those three

17   in order?

18             MR. TSEKERIDES:  If that would please the Court, yes.

19             THE COURT:  Okay.  So let me -- okay, I'll do that.

20             MR. TSEKERIDES:  Great.

21             THE COURT:  One second.  For today's calendar, I don't

22   know whether we'll run or not long, but I know a number of you

23   need to be in Judge Donato's court at 1.  And if we're not

24   finished, I will break no later than 12:30 and then resume a

25   few minutes -- maybe fifteen minutes after Judge Donato ends.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    If we finish before then, obviously that's not a matter.

2         So with that, I'll ask the clerk to call the calendar

3    starting with the Ghost Ship fire motion.

4         MR. TSEKERIDES:  And I think it's their motion, so

5    they'll go first.

6         THE COURT:  It is.  And the gentleman that asked to be

7    heard out of order, are you here?  Yes.  Okay.

8         Well, let's -- is your counsel with you?

9         MS. COSTIN:  I represent Todd Hearn, and we've agreed

10   that the Ghost Ship can be heard first.

11        THE COURT:  Right, but we have a request from one

12   counsel to be heard.

13        Well, let's get the appearance.  Who's appearing for

14   the moving party?  Good morning.

15        MS. PINO:  Good morning, Your Honor.  Estella Pino, of

16   Pino & Associates, on behalf of the executive committee in the

17   Ghost Ship litigation.

18        Your Honor, our motion has been joined in and

19   supported by the TCC.  And given the opposition and the issues

20   raised in the opposition, relative to the restructuring support

21   agreement with the TCC, we're going to have Mr. Julian address

22   those issues first, and then we'll take up the balance of the

23   arguments.  Is that all right with the Court?

24        THE COURT:  That's fine.

25        MS. PINO:  Thank you, Your Honor.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          THE COURT:  Good morning, Mr. Julian.

2          MR. JULIAN:  Good morning, Your Honor.  Robert Julian

3     of Baker & Hostetler, appearing on behalf of the official tort

4     committee.

5          Your Honor, PG&E's opposition to the motion for relief

6     from stay for the Ghost Ship claimants alleges that relief from

7     stay for Ghost Ship is flatly inconsistent with the resolution

8     trust and plan that the TCC and the fire claimants negotiated

9     with the debtors and equity, with Judge Newsome's help, who I

10    believe is in the court today.  And I'd like to point out the

11    background of why that is not true and address the three legal

12    arguments of why, legally, relief from stay benefits not only

13    Ghost Ship but the wildfire victims.

14         This is an important day in this bankruptcy case.  The

15    75,000 wildfire victims are much closer to obtaining their

16    distributions in this case because the 13.5 billion in asset

17    claims that have been assigned have been agreed to by the

18    debtor and equity.  The resolution trust has been set up for

19    that in the plan.  But Your Honor, the Ghost Ship --

20         THE COURT:  But the details are not --

21         MR. JULIAN:  Right.

22         THE COURT:  -- known.  Okay.

23         MR. JULIAN:  But the Ghost Ship claimants are exactly

24    where they were before the settlement, and in fact they're a

25    little bit behind where they were.  This is not a good day for

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   the Ghost Ship claimants.

2           As the papers show, there's plenty of insurance to go

3   around for the only claimants against the 2016 policy of PG&E.

4           THE COURT:  Well, is there plenty?  I mean, there's

5   insurance, but is there plenty?  How do we know what the

6   definition of "plenty" is?  There's a deductible of some

7   substantial amount, and then beyond that, I don't know if -- go

8   ahead, but I mean, "plenty" is a relative term, right?

9           MR. JULIAN:  Well, I know the number.

10          THE COURT:  Okay.

11          MR. JULIAN:  And there's no dispute that the Ghost

12  Ship claimants, in their papers, have essentially shown that

13  they want to make a policy limits demand.

14          So a policy limits demand is a red-letter day in tort

15  litigation, Your Honor, because it says that the plaintiffs,

16  here seventy plaintiffs, are agreeing to take whatever the

17  limits are that they share with the Valero refinery who Your

18  Honor gave relief from stay to go against the same policy.

19  Those are the only claimants that the debtor and the TCC knows

20  about against PG&E.  And any good fiduciary -- which PG&E is a

21  fiduciary, and the trust would be a fiduciary -- would simply

22  turn to the insurance carrier and say:  get us out of this

23  case; pay your limits.  And that's what should be going on

24  here.

25          So let me go over the background a little bit.  By the

(973) 406- operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    way, before I --

2             THE COURT:  Just clarify one thing that you've said,

3    and maybe I missed it in the papers.  Are the moving parties

4    agreeing to limit their recovery to the insurance?

5             MR. JULIAN:  They said that their claims are within

6    the insurance.

7             THE COURT:  Well, but that's not what I asked.

8             MR. JULIAN:  I'll let them address that, Your Honor.

9    I just --

10            THE COURT:  I mean, I didn't see it in the papers, so

11   somebody needs to make sure that is the deal if that is the

12   deal.

13            MR. JULIAN:  I'll let them address that, Your Honor.

14            THE COURT:  Okay.

15            MR. JULIAN:  But actually, before I do go on, I would

16   like to introduce two of our members from Ghost Ship who are

17   here today:  Sue Slocomb --

18            THE COURT:  Good morning.

19            MR. JULIAN:  -- is here.

20            THE COURT:  Thank you for coming, Ms. Slocomb.

21            MR. JULIAN:  She lost her thirty-two-year-old

22   daughter, Donna Kellogg, in the fire a few years ago.

23            And with me today is Sam Maxwell, here in court with

24   his parents --

25            THE COURT:  Good morning, Mr. Maxwell.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    MR. JULIAN:  -- Bill and Wendy.  Sam was one of the

2    last to get out of the fire, breathing the air, and it's

3    incapacitated him for life.  And their presence on our

4    committee is a daily reminder of the problems that the Ghost

5    Ship claimants have getting to payment.  And so that's why

6    we're here today.

7         Your Honor, one of the statements made by PG&E in

8    their papers was that the Ghost Ship claimants could have done

9    this earlier.  And I think what they did is they respected the

10   standard practice in a case such as this, which you recognized

11   in May in your decision on Valero, which is it was simply too

12   early.

13        When you granted relief from stay for Valero to go

14   against PG&E on that refinery's fire damages, the Ghost Ship

15   claimant's executive committee got together and decided,

16   inasmuch as you had said the time was right for Valero to go

17   forward and seek recovery against that insurance policy,

18   essentially, it was only a matter of fairness for them to go

19   forward too, and they filed their motion and the TCC joined.

20        THE COURT:  You don't remember that Valero got sent

21   away the first time around.

22        MR. JULIAN:  I do.

23        THE COURT:  Okay.

24        MR. JULIAN:  On the ground that it was too early.

25        The Ghost Ship claimants, including our member Sam

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    Maxwell, need the cash now, not later.

2            Here's what the PG&E is suggesting happen.  PG&E is

3    suggesting that because it would be burdensome for them to look

4    at interrogatory answers in their own documents to defend this

5    case, that this case be channeled, which it will be, to the

6    resolution trust, where a new trustee, who knows nothing about

7    PG&E's business, will take over the same documents and try to

8    make sense of this and work with the insurance company, and

9    where that trustee will do exactly what PG&E would do, tender

10   to the insurance company, and at that point, it's the insurance

11   company's financial liability; they will make all the

12   decisions, Your Honor.  And the insurance company's float their

13   money; they do not pay until there's a trial date.

14           THE COURT:  Well, we're circling back to the question

15   that you couldn't answer, and that is:  do the plaintiffs limit

16   their recovery to the insurance?  And I understand you're going

17   to ask somebody else to answer that, but if they don't, then

18   we're back to the question of the trust, right?

19           MR. JULIAN:  Correct.

20           THE COURT:  All right.

21           MR. JULIAN:  And so the rest of the trust

22   beneficiaries, the wildfire victims, I believe their lawyers

23   would take the position that it's their interest to have a

24   policy limits demand whereby the Ghost Ship claimants are

25   agreeing to proceed against the insurance.

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  Well, I don't disagree with you.  If

2  there's any recovery from an insurer, whether it's one dollar

3  or the policy limits, that's some relief from the trust

4  otherwise, of course, right, dollar for dollar.

5    MR. JULIAN:  Correct.

6    THE COURT:  Right?  Okay.  But one of the things that

7  confuses me -- maybe you can help me, but maybe you don't want

8  to tell me about what was the product of the mediation, but if

9  I got the history of this issue in Ghost Ship, in the first

10  version of the plan of the debtors, but also the alternate

11  plan, the Ghost Ship claims passed through, which to me means

12  they rise or fall on their own merits apart from any trust.

13    Then along comes the RSA that's been negotiated, and

14  it seems that, as I read the papers, the Ghost Ship recovery's

15  back into the trust.  So one of the things that I've struggled

16  in my mind today was:  can I even make a ruling on the Ghost

17  Ship motion until I find out what's the fate of the RSA, given

18  the last four days, including last night's development?

19    So you tell me, if I were to grant relief from stay --

20  and let's assume that there may be -- first of all, no

21  liabilities been established, but if liability is established,

22  at least above the deductible, there's an insurance.  But what

23  happens after that?  I mean, where do I -- what happens if the

24  RSA's approved, and what happens if it's not approved?  Where

25  do we come out on that?

(973)406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          MR. JULIAN:  If the RSA is approved, we still have a

2    confirmation hearing months later.

3          THE COURT:  Right.

4          MR. JULIAN:  And if there's relief from stay, the

5    Ghost Ship claimants would go against PG&E, which is really

6    going against their insurance company.

7          THE COURT:  Right.

8          MR. JULIAN:  So PG&E, in my view, is out of it; they

9    have to handle some discovery.

10         THE COURT:  But what happens if there is no agreement

11   by the plaintiffs and Ghost Ship to limit their recovery to the

12   insurance?  That's what I don't know.  In other words, so you

13   tell me -- again, if you think we should defer that question

14   until someone can answer it, fine.  I tell you, this is a much

15   easier question to answer if the plaintiffs agree the recovery

16   is limited to insurance.

17         MR. JULIAN:  I agree.  I read their papers to say

18   they're making a policy limits demand.  I'm going to let them

19   argue that.

20         THE COURT:  And what are you looking at?  Maybe I

21   missed it in the motion.

22         MR. JULIAN:  I think paragraphs 23 and 30 of Ms.

23   Alexander's declaration.

24         THE COURT:  Well, in 23, she says she's informed that

25   there's ample insurance.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          MR. JULIAN:  Hold on, I may --

2          THE COURT:  Pardon?  What?

3          MR. JULIAN:  Yes, go ahead, Your Honor.

4          THE COURT:  Well, I'm just summarizing how paragraph

5    23 begins.  And you said the other?

6          MR. JULIAN:  30.

7          THE COURT:  30?  I mean, if Ms. Alexander's here, she

8    can clarify that.

9          MR. JULIAN:  30 says there's ample insurance to cover

10   the claims.  She knows what she's doing.

11         THE COURT:  I know she knows what she's doing.  Of

12   course she does.  But lots of lawyers come to this Court and

13   ask for relief from stay and start out by saying:  and we'll

14   limit our recovery to the policy.

15         Ms. Alexander, good morning.

16         MS. ALEXANDER:  Good morning.

17         THE COURT:  And I recognize you.  Just state your name

18   for the record, though.

19         MS. ALEXANDER:  Mary Alexander.  Good morning, Your

20   Honor.  I thought it might be helpful --

21         THE COURT:  So what's the answer to that question?

22         MS. ALEXANDER:  -- yes, to help answer that question.

23         THE COURT:  Yeah.

24         MS. ALEXANDER:  Yes.

25         THE COURT:  I mean, it's very critical, obviously.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    MS. ALEXANDER:  Right, yes.  The plaintiffs and Ghost

2  Ship are willing to limit their recovery to the total tower of

3  the insurance policies for the 2016 year.

4    THE COURT:  So that means, if the jury or some other

5  way there is a large recovery that exceeds the policy limits,

6  that there's no recovery from the debtor.

7    MS. ALEXANDER:  That's correct.

8    THE COURT:  I'll leave aside the deductibles that come

9  before the policy kicks in.

10    MS. ALEXANDER:  Right.

11    THE COURT:  That's your understanding, and that's what

12  they're prepared to do?

13    MS. ALEXANDER:  Yes, I just want to be clear it's

14  policies.  There is a tower.

15    THE COURT:  Okay.  But let's --

16    MS. ALEXANDER:  Yes.

17    THE COURT:  -- put it in simple terms.  Somebody

18  called insurance company or companies would pay the bill; the

19  debtor would not.

20    MS. ALEXANDER:  Correct.

21    THE COURT:  Right?

22    MS. ALEXANDER:  Correct.

23    THE COURT:  Okay.  Thank you for clarifying that.

24    MR. JULIAN:  So Your Honor, the real party-in-interest

25  here, in a policy limits demand case, is the insurance company.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   We ought to be doing everything we can to place the burdens on

2   the insurance company and away from PG&E and the resolution

3   trust.  We ought not saddle the resolution trust with this, or

4   PG&E.  And secondly, they've been waiting three years.  Sam --

5           THE COURT:  No, I understand they've been waiting

6   three years.  And again, one of the frustrations is that -- and

7   though I'm very aware of the timing, but I don't know how even

8   granting relief from stay, and even if the matter goes to a

9   jury in the county court, where it translates to in recovery

10  from the debtor.  If it's a recovery from insurer, that's a

11  different story, obviously.  But that wasn't clear until now.

12          MR. JULIAN:  Thank you.  Yep, I agree.

13          Secondly, you've allowed Valero to proceed, again,

14  against PG&E and the insurance policies.  And we think it's

15  fundamentally fair that all claimants be permitted to proceed

16  at the same time.  Right now a refinery has preference --

17          THE COURT:  Well --

18          MR. JULIAN:  -- over Sam Maxwell.

19          THE COURT:  -- Mr. Julian, that's not quite the way it

20  was presented.  If I had Mr. Maxwell and the other victims and

21  the refinery side by side, maybe it would have come out

22  differently --

23          MR. JULIAN:  I understand.

24          THE COURT:  -- but I think to -- I only am supposed to

25  respond to requests.  And today --

(972) 588-3334 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          MR. JULIAN:  This is not about you, Your Honor.

2          THE COURT:  Okay.

3          MR. JULIAN:  This is about --

4          THE COURT:  Okay.

5          MR. JULIAN:  Your Honor, let me be clear.  Let me

6   clarify.

7          THE COURT:  Okay.

8          MR. JULIAN:  PG&E's response to the Valero continued

9   motion in September was a stipulation.

10         THE COURT:  Well, a stipulation to go to mediation, if

11  I recall.

12         MR. JULIAN:  It's a stipulation to go to mediation.

13         THE COURT:  Right.

14         MR. JULIAN:  And if mediation fails, which it has,

15  relief from --

16         THE COURT:  Well, I don't know that.  I'll take your

17  word for it, but I don't know that.

18         MR. JULIAN:  Valero refineries -- Mr. Weissmann (ph.),

19  did you raise your hand?  Valero Refinery's counsel is here and

20  can confirm for the Court, as he told me moments ago, mediation

21  has failed, and the stipulation, docket number 3815, states at

22  paragraph 5 -- it's a stipulation between Valero and PG&E:  "In

23  the event that the mediation fails to result in a settlement of

24  all claims in the district court action, Valero's motion shall

25  be deemed granted, without further order of the Court, to allow

(973) operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    the completion of pre-trial proceedings, trial, post-trial

2    motions, and any appellate proceedings in or in connection with

3    the district court action."

4            THE COURT:  Well, but unlike the Ghost Ship situation,

5    I don't recall and don't think that the Valero stipulation --

6    and I really don't want to get bogged down on it -- is limited

7    to some policy limits.  The point is -- and maybe it's a

8    nonissue.

9            But here's a question for you, and "you", not Ms.

10   Alexander, but you in your role as negotiating whatever came

11   about with the RSA, do I assume that, if the RSA gets passed

12   today, that it should itself be amended to say that Ghost Ship

13   is simply not part of this whole analysis; it's just out of the

14   trust?  Isn't that --

15           MR. JULIAN:  I can't say that.  I didn't negotiate

16   that term.  That was between --

17           THE COURT:  But isn't that consistent?  Wouldn't that

18   be what has to be conceptually -- conceptually; that's all I'm

19   getting.  So whether it's any victim, of any size or shape, in

20   Camp or Tubbs or elsewhere, they are not sharing the recovery

21   with anything that the Ghost Ship --

22           MR. JULIAN:  Correct.

23           THE COURT:  -- claimants may recover.  And that, to

24   me, is what's important.

25           MR. JULIAN:  Correct.  And let me explain to you my

PG&E Corp., Pacific Gas & Electric Co.

1   view of how that would work.  PG&E hotly disputes liability in

2   this case.

3           THE COURT:  Correct.

4           MR. JULIAN:  I believe any trustee is going to have

5   his hands tied.  The trustee is going to have to dispute

6   liability -- any resolution trustee, dispute liability, and

7   send it off to state court and allow the insurance company and

8   the Ghost Ship claimants to battle it out.  Why put them

9   through the delay of waiting until August to start that

10  litigation, or September of next year, when they can start now?

11          THE COURT:  Well, the Ghost Ship fire is much

12  different, obviously, for any number of reasons, and there's no

13  point in debating why it's different.  It's different.  But

14  every claim that doesn't get resolved by mediation or metrics

15  or formulas has to get resolved somewhere else.  And until Ms.

16  Alexander clarified what she did, it still goes into the pot,

17  if you will, the thirteen-and-a-half-billion-dollar pot.

18          If the Ghost Ship motion is granted today and the

19  Ghost Ship trial goes forward, whether it's in May or some

20  other date, and PG&E is found to be liable at all, the recovery

21  for the victims from PG&E are simply outside of the trust and

22  outside of any provision that's dealt with even in the plan,

23  right?

24          MR. JULIAN:  Right.

25          THE COURT:  So even a plan -- even if there was no

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    trust and the company said we are going to deal with Ghost Ship

2    liability on our own as though there is no bankruptcy, that has

3    an asterisk meaning, but the insurance companies will have to

4    pay above the deductibles, right?

5           MR. JULIAN:  If the SIR is enforced while the

6    company's in bankruptcy.  It's a solvent case.  I know the

7    arguments.  But yes, there is that issue of the deductible.

8           THE COURT:  Well, I understand the deductible, but --

9           MR. JULIAN:  The SIR.  Now, they said --

10          THE COURT:  Well, I know what SIR means, but why don't

11   you explain it for the benefit of people that aren't so

12   familiar.  What does that mean to you, in your terms, SIR?

13          MR. JULIAN:  I think there's a self-insured retention

14   or a deductible of --

15          THE COURT:  Right.

16          MR. JULIAN:  -- ten million.

17          THE COURT:  Right.

18          MR. JULIAN:  And what they haven't told you is there's

19   a -- whatever it is, 1.7 drawn down on Ghost Ship, but they

20   haven't explained --

21          THE COURT:  No, I think they have, actually, and I

22   think, in their response, they did indicate something in the

23   neighborhood of eight million dollars.  Mr. Tsekerides can

24   clarify that when he comes up to the podium.

25          But Mr. Julian, let's get back to the bigger question.

PG&E Corp., Pacific Gas & Electric Co.

1    If a jury comes in with a hundred million dollars against PG&E

2    in the Ghost Ship trial, and the insurance limits are fifty

3    million or sixty million or ten million, the rest of that

4    matter is gone; there's no recovery, right?

5              MR. JULIAN:  Under the --

6              THE COURT:  No recovery if the debtor confirms a plan

7    and the Ghost Ship is left to fend for itself, the plaintiffs

8    accept, to the extent they've agreed to recovery of deductible

9    plus insurance.

10             MR. JULIAN:  Correct.

11             THE COURT:  Right?

12             MR. JULIAN:  Correct.

13             THE COURT:  I want to make sure that's very, very

14   clear.

15             MR. JULIAN:  That's how I see it.

16             THE COURT:  Okay.  Well, and more importantly, that's

17   how Ms. Alexander and other lawyers representing the Ghost Ship

18   plaintiffs do, because I don't want to make a decision here

19   that is misinterpreted.

20             But you and I both know when a moving party says I

21   will look only to insurance -- again, forget deductibles for

22   the moment -- that means a lot.  And hopefully for the victims,

23   if they recover a judgment, they'll be paid promptly by the

24   insurer.  But if insurer doesn't pay or can't pay or the award

25   is greater, there is no recovery from the company if it

PG&E Corp., Pacific Gas & Electric Co.

1    confirms its plan.

2              MR. JULIAN:  That's the way I understand it.

3              THE COURT:  Okay.

4              MR. JULIAN:  So for the three reasons, Your Honor,

5    first, that they've waited long enough, we shouldn't put them

6    off until later in the resolution trust.  That's number one.

7              Number two, Valero has relief from stay and is

8    proceeding.  Their claim is seventy million, was I understand,

9    Valero's claim.

10             And three, the burdens on the resolution trustee would

11   be even greater than the burdens on PG&E because he would have

12   to start from new with the insurance company and looking at the

13   evidence to contest liability.  Right?  PG&E has the documents.

14             THE COURT:  Well, again, let's go back to timing.  If

15   I denied today's motion but grant it at some date in the

16   future, it's the same outcome unless the plaintiff changed

17   their strategy.  But I would -- that's for another day.  If I

18   grant it today, they, through their representative, have

19   expressed themselves.  And if I were to deny the motion today,

20   for whatever reason, but revisit it later, I would assume that

21   plaintiffs would take the same point of view.  But they're not

22   bound to.  I'm not suggesting that it's an open-ended offer,

23   but it's an offer that they made or a position that they've

24   just articulated through their representative.

25             MR. JULIAN:  Yeah.

PG&E Corp., Pacific Gas & Electric Co.

1       THE COURT:  Okay.

2       MR. JULIAN:  You know, Your Honor, most importantly, I

3  think the -- I understand the debtors have agreed to mediation.

4  In this case, those Ghost Ship claims should be sent to

5  mediation.  I'll leave that up to them.

6       THE COURT:  Well, that's for the trial court to do if

7  I grant relief from stay.  And if I deny relief from stay, then

8  I guess the question you need to help me with is:  why is this

9  different from Tubbs?  I mean, I made a decision for Tubbs when

10  liability was not conceded, not even causal, you'll recall.

11  And I made a decision to facilitate at least one piece of the

12  very difficult estimation process.

13      You were persuasive, in part, in that decision

14  making -- me making that decision.  But why wouldn't this be

15  revisiting the same question?  I mean, it seems to me it's not

16  appropriate to do it without this insurance clarification.  I

17  mean, what would happen -- let's try it a different way.

18  Suppose Ms. Alexander were not able to make that concession,

19  why would I depart from what I did when I granted relief from

20  stay in Tubbs for the purpose of pinning down the estimation?

21       MR. JULIAN:  Your Honor, I haven't analyzed that

22  because it's so clear here.  There's 900 million dollars of

23  insurance, Your Honor; Valero's 70 million.

24      The idea of this debtor protecting that insurance

25  because they don't want bad publicity is an anathema to me.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    But I'm going to answer your question.  There's 2.2 billion

2    dollars of liability insurance that covered Tubbs, Camp, and

3    the other twenty-one fires.  That insurance, under the plan, is

4    being paid to PG&E.  PG&E and equity is coming up with the cash

5    to put into the trust.  The answer is that Tubbs and Camp fire

6    claims dwarfed the insurance available.

7            THE COURT:  Right.

8            MR. JULIAN:  So the deal there was insurance goes to

9    the debtor, debtor pays the cash to the trust.

10           THE COURT:  Right.  Right.

11           MR. JULIAN:  Here the insurance dwarfs these claims,

12   and it is simply unfair to have these folks have to wait to

13   deal with the resolution trustee when that insurance is sitting

14   there and the insurance companies are making the float by not

15   paying out any money.  And even defense costs --

16           THE COURT:  Well, I don't disagree with that, but what

17   I'm getting at is that this is the first time, I think, that

18   the focus has been only on insurance and not --

19           MR. JULIAN:  Correct.

20           THE COURT:  -- on, one, the very important point of

21   compensating victims if the debtor is culpable, and secondly,

22   facilitating the bigger picture of estimation, as complex as it

23   is, which is why my decision was made in Tubbs.  But it wasn't

24   a question presented to me for the Ghost Ship fire.

25           MR. JULIAN:  Well, first of all, if you may recall,

PG&E Corp., Pacific Gas & Electric Co.

1    and I think we all forget it, the debtor left Ghost Ship out of

2    the estimation motion, not in the estimation motion.

3         THE COURT:  Because they were going to pass through.

4         MR. JULIAN:  Right.

5         THE COURT:  That's my point; that's how this has

6    evolved.

7         MR. JULIAN:  But they were passing it through, Your

8    Honor, for a reason.  Come on.  The reason was because they had

9    plenty of insurance.

10        THE COURT:  Mr. Julian, I'd like to think of it a

11   different way.  If there hadn't been the 2015, 2017, and 2018

12   wildfires, the company wouldn't have filed bankruptcy.  But the

13   Ghost Ship fire happened for whatever reason it happened, and

14   PG&E is or isn't liable.  But I don't think Ghost Ship, by

15   itself, drove PG&E into bankruptcy.  It may be, but I doubt it

16   because of the insurance and because of other things.

17        And so it seems to me that when the company filed its

18   plan originally, and Ghost Ship passed through, that was

19   consistent with the notion of what I just described.  And why

20   the bankruptcy?  Because of the Camp and Tubbs and other fires.

21   That's all.

22        MR. JULIAN:  I get it.

23        THE COURT:  We are where we are, and we have to deal

24   with what we have to deal with.  Look, let me hear from the

25   other parties and --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          MR. JULIAN:  Thank you, Your Honor.

2          THE COURT:  -- and then I'll hear from the debtor on

3     this.  Okay?

4          Ms. Pina, do you want to be heard further on the

5     motion?  I mean, the motion's pretty well identified, and I

6     really need to know what the debtors' position is on the

7     insurance issue.

8          MS. PINO:  Yes, Your Honor.  I did want to clarify

9     that we -- in our motion, I thought that -- English is my

10    second language, and I apologize if I did not make it clear,

11    sir, but we were seeking relief from the automatic stay to

12    establish liability, obtain judgment, and collect any judgments

13    obtained against the debtors, to the extent of available

14    insurance proceeds.  And we filed a separate motion that just

15    stated what the relief we seek, and I just wanted to make that

16    clarification to the Court.  And I'm so glad that Ms. --

17         THE COURT:  Well, I'll not quarrelling with your

18    language.  I've known you, and you've appeared in many cases

19    before me, and I've never had one doubt about understanding

20    exactly what you said.  But I just simply didn't recall seeing

21    in here, and if it's in here and I missed it, then I missed it.

22    But --

23         MS. PINO:  I actually filed a separate motion, Your

24    Honor, which is kind of what we tend to do in the Eastern

25    District, to just very succinctly state the relief we sought.

PG&E Corp., Pacific Gas & Electric Co.

1    And you're right, I would reserve my time for rebuttal

2    to the debtor.  And I join in Mr. Julian's comments.  And I

3    think it's very telling that the TCC and the wildfire victims

4    support our motion.

5    THE COURT:  Well, apart from doing the right thing for

6    the benefit of your constituents, they also do the right thing

7    to relive any pressure on the settlement trust, if there is

8    indeed going to be a settlement trust.

9    Let me ask you a question more specific to the

10   question in hand.  As I recall, there's been a motion on this

11   Friday to continue the matter, by the City of Oakland.  Is that

12   being opposed by the plaintiffs?

13   MS. PINO:  That was opposed by the plaintiffs, Your

14   Honor, but I have been authorized by the executive committee to

15   represent to the Court that, if relief from stay is granted,

16   the executive committee will request a continuance of that

17   hearing to allow PG&E to voice its opinion as to when this

18   trial should take place.

19   THE COURT:  So what you're saying is if I grant relief

20   from stay, PG&E will have an opportunity to go to Superior

21   Court and argue, if it chooses to argue for a continuance.

22   MS. PINO:  For a continuance and weigh in on what it

23   believes would be an appropriate date for the trial.

24   THE COURT:  Well, but the --

25   MS. PINO:  This is the perfect opportunity to do that.

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  But the flip side is if I deny today's

2    motion. Judge Seligman would just have to make a decision on

3    whether he's going to go forward on the trial and schedule for

4    the other defendants, right?

5    MS. PINO:  That's correct, Your Honor.  I think that

6    if you deny this motion today, what we're facing under the

7    amended plan is that the plan itself is an objection to the

8    claim, and it doesn't get resolved --

9    THE COURT:  Wait, I don't understand that.

10   MS. PINO:  Yes.

11   THE COURT:  You have to tell me that again.

12   MS. PINO:  Okay.

13   THE COURT:  How is the plan an objection to the claim?

14   The claim is deemed allowed unless objected to, so --

15   MS. PINO:  No, actually, Your Honor, if you look at

16   the amended plan that was filed by PG&E --

17   THE COURT:  Well, I've been looking at a lot of things

18   lately.

19   MS. PINO:  I bet you have.

20   THE COURT:  Okay.  So --

21   MS. PINO:  But let me make this easy for you.  The

22   plan provisions actually state that --

23   THE COURT:  Mr. Tsekerides, I have to ask you not to

24   talk on -- I mean, if you want a moment, I'll give you a

25   moment, but you're coming up on the microphone here.

PG&E Corp., Pacific Gas & Electric Co.

1      Okay.  All right.  Go ahead, Ms. Pino.

2      MS. PINO:  -- that the plan states, at section 7.1,

3  objections to claims, that the plan shall be deemed an

4  objection to such claims, the wildfire victim claims, which now

5  include the Ghost Ship, to such claims under Bankruptcy Rule

6  3007.  So --

7      THE COURT:  Well, they didn't tell me that.  But sure,

8  the plan says what it says, but it's a nonissue, isn't it?  In

9  other words, the debtor has a right to object to a claim even

10 if the claim is going to be defended on the merits somewhere

11 else, I would think.  But I don't have to worry about that

12 detail.  I don't think -- well, let's try it this way.  Do you

13 believe that that amended plan, that was just filed a few days

14 ago, is the equivalent of a claim objection?

15     MS. PINO:  Under the rule, no.

16     THE COURT:  Okay.  So what does the --

17     MS. PINO:  Yeah.

18     THE COURT:  So what does the law say about your

19 client's claim?

20     MS. PINO:  My client's claim is allowed unless --

21     THE COURT:  Deemed allowed.

22     MS. PINO:  -- objected to --

23     THE COURT:  Deemed allowed, right.

24     MS. PINO:  -- and --

25     THE COURT:  Okay.

PG&E Corp., Pacific Gas & Electric Co.

1   MS. PINO:  But of course my client's claims are

2   unliquidated.

3   THE COURT:  Well, but still an objection triggers the

4   "deemed allowance" concept --

5   MS. PINO:  Concept.

6   THE COURT:  -- and rebuts it.  But that's not the

7   point.  Do you share and agree, in your role as counsel for the

8   committee, executive committee, with Ms. Alexander's

9   representation that the executive committee, as a committee,

10  understands that relief from stay, if granted, limits your

11  recovery to the deductible plus any recovery from insurance and

12  not anything in the trust, if the trust goes into place, or

13  against the reorganized company going forward?

14  MS. PINO:  I better agree; I take my orders from them.

15  THE COURT:  I'm not trying to --

16  MS. PINO:  I think that --

17  THE COURT:  -- trap you.  I'm trying to make sure --

18  MS. PINO:  No, no, I think that --

19  THE COURT:  I'm trying to make sure that if I issue an

20  order that it will say that, and the order will be binding on

21  everyone, that that is the outcome.  And that, again, is not

22  unusual for simple cases, for automobile cases and slip-and-

23  fall cases, where all the moving party wants to do is to go

24  against insurance.  And frequently we -- and I'm sure you do

25  this in your practice; courts grant relief with that proviso.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    So --

2           MS. PINO:  That --

3           THE COURT:  -- it's consistent with your

4    understanding?

5           MS. PINO:  It is consistent with my understanding of

6    the relief sought and the instructions I have from the

7    executive committee.  And you're right, Your Honor, we see this

8    more in the concept of a Chapter 7, not so much in a --

9           THE COURT:  Right.

10          MS. PINO:  -- Chapter 11.  But as Mr. Julian

11   represented, the amount of the insurance for 2016 is such that

12   the executive committee felt that it was appropriate and

13   prudent to do that.

14          THE COURT:  Okay.  Thank you, Ms. Pino.  And I'll let

15   you reserve a little -- we're trying to move along here.

16          Is Mr. Kaupp here?

17          MR. KAUPP:  Yes, Your Honor.

18          THE COURT:  Do you want to be heard, Mr. Kaupp?  You

19   asked permission --

20          MR. KAUPP:  I do briefly, Your Honor.

21          THE COURT:  You asked to appear for your client --

22          MS. PINO:  Thank you.

23          THE COURT:  -- so I'd like you to be very brief,

24   because we didn't anticipate taking things other than what was

25   on the schedule.

PG&E Corp., Pacific Gas & Electric Co.

1    MR. KAUPP:  Thank you, Your Honor.  And I --

2    THE COURT:  And I appreciate your client coming here.

3    I wish him well in his recovery, and I'm sorry about the fact

4    that he's here in the first place.

5    MR. KAUPP:  Thank you.  And I'm speaking to the Court

6    today on behalf of the Ghost Ship executive committee and on

7    behalf of Mr. Maxwell, and not in his capacity on the TCC.

8    There are just two things that haven't been mentioned yet that

9    I wanted to say.

10    THE COURT:  Wait.  Excuse me.  Okay, we need your

11    appearance on the record.

12    MR. KAUPP:  Gordon Kaupp, K-A-U-P-P, for Sam Maxwell.

13    This Court's order today will have a cascading effect

14    in the Superior Court action.  What we want from Judge Seligman

15    on Friday is a realistic trial date.  And that's why we're

16    willing to agree to kick that hearing over so that PG&E can be

17    there in order to voice its position as to what a realistic

18    trial date is to give it due process.

19    THE COURT:  Well, but if I deny today's motion, I

20    presume Judge Seligman will decide whether he's going to

21    bifurcate and go forward, either on schedule or at whatever

22    deferred time requested by the City of Oakland.

23    MR. KAUPP:  Yes, Your Honor.

24    THE COURT:  Okay.

25    MR. KAUPP:  But if today's motion is denied, and then

PG&E Corp., Pacific Gas & Electric Co.

1    it's granted at a later date, what that will effectively do is

2    take any trial date that's in place from Judge Seligman on

3    Friday and kick it off even further --

4         THE COURT:  Well, how do you know that?  He might

5    bifurcate.

6         MR. KAUPP:  He could bifurcate.

7         THE COURT:  Unless the plaintiffs decline the

8    invitation.

9         MR. KAUPP:  I think what we'd likely see, if trial has

10   not occurred, that PG&E would enter that case and say we need

11   more time.

12        THE COURT:  No, but what I'm saying is that if I were

13   to deny today's motion, the plaintiffs will have to decide

14   whether they want the Superior Court to bifurcate and drop PG&E

15   aside and go forward against the other defendants.

16        MR. KAUPP:  That's one possibility.

17        THE COURT:  They may choose not to do that, or they

18   may choose to do that.  I'm mindful of the lack of appeal of

19   putting the plaintiffs through two prosecutions of the same

20   lawsuit.  And that's a factor, but it's still a possibility.

21        MR. KAUPP:  It is a possibility.  It would be a big

22   burden for the plaintiffs.  It also could result in

23   inconsistent judgments.  It could result in inconsistent

24   damages verdicts.  And that could be a real problem.

25        THE COURT:  Well, that's true any time we do that when

PG&E Corp., Pacific Gas & Electric Co.

1    there's a bankruptcy.  The question is whether it's just an

2    unfair burden to the plaintiffs to have to put them through the

3    prosecution of it twice.  That's all.

4          MR. JULIAN:  And three years into litigation has been

5    quite a burden for them, and we certainly hope that the Court

6    does lift the stay so we can move forward.  I also wanted to

7    address PG&E's argument about prejudice, which I think actually

8    counseled toward lifting the stay sooner rather than later.

9          A lot of their argument is about how parachuting into

10   the state court action today would put them at a significant

11   disadvantage because of how much litigation has happened since

12   January.  But the truth of the matter is, if the stay was

13   lifted later, that prejudice would only be greater, and I think

14   that really counsels toward lifting the stay immediately,

15   giving the Ghost Ship plaintiffs the ability to get a realistic

16   trial date from Judge Seligman and to resolve those claims.

17         What we know about PG&E is they really do dispute

18   liability here, as they did in Tubbs.  And what we need to do

19   is to get discovery to make our case, in order to resolve those

20   claims, even at mediation.  And so what we'll be doing, if

21   there is no stay that's lifted, and we have to wait until the

22   resolution of the bankruptcy -- we will be in a position of

23   then having to litigate those claims.

24         PG&E's position and the insurance carrier's position

25   before the RSA and after the RSA has been the same, and that is

PG&E Corp., Pacific Gas & Electric Co.

1   there's no liability.  So we know we're going to have to

2   litigate --

3          THE COURT:  Well, PG&E does have a right to take that

4   position, right?

5          MR. JULIAN:  They do have a right --

6          THE COURT:  Okay, well --

7          MR. JULIAN:  -- to take the position, and they're

8   taking the position.  And the reality is the Ghost Ship

9   plaintiffs are going to have to litigate these claims and

10  complete discovery.  And sooner rather than later is really

11  what's preferred, because there are dependents in the case who

12  have lost parents and who need that money.

13         Mr. Maxwell's family spends over a hundred hours a

14  week doing self-care because they only have an attendant eight

15  hours a day, for seven days a week.  Medi-Cal does not cover

16  approximately 6,000 dollars each month of their out-of-pockets.

17         THE COURT:  Okay.  I want to stop, not because I'm not

18  sympathetic to Mr. Maxwell's situation.  But none of this is in

19  the pleadings, and it's not fair to present it now.  I'm

20  mindful of it, and I accept it.  But I don't want to get into a

21  discussion about whether we have to have that kind of evidence.

22  It's not relevant.  I'll make my decision on the way the

23  arguments have been framed and presented.

24         MR. JULIAN:  Thank you, Your Honor.

25         THE COURT:  Okay?  Ms. Alexander, do you want to be

PG&E Corp., Pacific Gas & Electric Co.

1  heard further?  I want to not cut you off, but I want to hear

2  from the debtor because --

3          MS. ALEXANDER:  Understood.

4          THE COURT:  -- I don't know whether we have a major

5  issue or not with his insurance.  Go ahead.

6          MS. ALEXANDER:  Understood.  Thank you, Your Honor.

7  Mary Alexander.  And I am the liaison counsel in the civil

8  Ghost Ship case and therefore serve on that executive

9  committee.  And I have the honor of representing Sue Slocomb,

10  who serves on the TCC --

11          THE COURT:  Okay.

12          MS. ALEXANDER:  -- and Sue lost her daughter, Donna,

13  at thirty-two years of age.  I do want to just briefly mention

14  that not all of the people who died in the Ghost Ship were

15  young.  They were educated.  They did not live there -- all but

16  one.  They were there that night for a party, and they lost

17  their lives.

18          I do want to reiterate to Your Honor that we are

19  willing to and are agreeing to limit the recovery to the

20  900,000-plus --

21          THE COURT:  900,000?

22          MS. ALEXANDER:  -- insurance policies.

23          THE COURT:  I think it's more than 900,000.

24          MS. ALEXANDER:  900 million.

25          THE COURT:  Yeah.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          MS. ALEXANDER:  And for once, that number doesn't

2   start with a B in this case.

3          THE COURT:  It's close.

4          MS. ALEXANDER:  Right.  So we are asking you to lift

5   the stay.  The defendants have agreed, to their credit, to

6   mediate with us in January, and --

7          THE COURT:  Now, say that again.  To do what?

8          MS. ALEXANDER:  To mediate --

9          THE COURT:  Oh, okay.

10         MS. ALEXANDER:  -- with the Ghost Ship plaintiffs --

11         THE COURT:  Oh, okay.  I was not aware of that.

12         MS. ALEXANDER:  -- in January.  That's different from

13  our papers, because this has occurred since we filed our

14  papers.  They have agreed to mediate in the end of January and

15  agreed to have their insurance carriers there.  And so, if by

16  some chance -- I hope you won't, but if you are inclined not to

17  grant the motion with the stay, we would ask that you at least

18  lift it for the purposes of mediation, in that regard.

19         One other point I do want to make is that we have,

20  throughout this year, been serving the defendants, PG&E -- both

21  defendants -- on everything that's happened in the case:  all

22  the pleadings, all the requests for documents, interrogatories,

23  all the responding documents, all the motions, everything.  And

24  they have access to our document repository.

25         We left all that in place while they have been gone,

PG&E Corp., Pacific Gas & Electric Co.

1    and they monitor the criminal trial every day.  They well know

2    what is going on in this case.  It's much different than some

3    cases where the debtor has not been provided all that

4    information.

5            So we would respectfully request, Your Honor, that you

6    grant our motion to lift the stay and let these families, who

7    have suffered so much, go back with PG&E to seek compensation.

8    Thank you.

9            THE COURT:  Okay, thank you, Ms. Alexander.

10           Mr. Tsekerides?

11           And keep in mind that -- I don't know about what you

12   knew, but what I heard today was the first time it's been

13   clarified about an agreement on limitation.  And that seems to

14   me to be quite relevant.  So if --

15           MR. TSEKERIDES:  Right.

16           THE COURT:  -- you can tell me why, in the face of

17   that --

18           MR. TSEKERIDES:  Sure.

19           THE COURT:  -- I should not just simply grant the

20   motion.

21           MR. TSEKERIDES:  Ted Tsekerides from Weil Gotshal for

22   the debtors.  It's not in the papers, Your Honor.  We didn't

23   see it either, but I appreciate that it was said on the record

24   today.  But --

25           THE COURT:  But you're aware of it now if you --

PG&E Corp., Pacific Gas & Electric Co.

1          MR. TSEKERIDES:  Well, I just heard it --

2          THE COURT:  Oh, okay.

3          MR. TSEKERIDES:  -- today, yeah, just as you did.

4          THE COURT:  All right.

5          MR. TSEKERIDES:  So I think there's still two

6    reasons -- at least two reasons why you shouldn't lift the

7    stay, but I did want to address first the points that Mr.

8    Julian made.  And I think it's important also for the Court to

9    know, the reason why the claimants haven't been paid yet is not

10   because of PG&E.  We didn't try to extend the stay to that

11   case.  That case has been going on in state court all the

12   while.  We were supposed to go to trial in October of this

13   year, and it didn't happen, but not because of us.

14          So they could have moved to lift the stay to put us in

15   then, and they didn't.  The holdup is not because of us.  So

16   the fact that they're waiting -- I appreciate it's a burden,

17   but we're not holding up recoveries that they might get against

18   other defendants.  So the waiting too long -- I appreciate

19   that, but it's not our fault.

20          Valero, you know, is very different.  Valero was just

21   us and them, and here you have fifty-three lawsuits, seventy

22   plaintiffs, over ten defendants.  It's a very different case,

23   very complex.

24          THE COURT:  But there are, by my count -- and I'm not

25   involved in the case -- there are only two nonindividual

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    entities, or there are two corporate entities.  One's the City

2    of Oakland, and one's the debtor, right?  Everyone else --

3                MR. TSEKERIDES:  As far as I know.

4                THE COURT:  -- they're just individuals?

5                MR. TSEKERIDES:  But given --

6                THE COURT:  And maybe they have insurance; maybe they

7    don't.  I don't know.

8                MR. TSEKERIDES:  Right.  But given their statement, I

9    think, and what you did in Valero, I mean, one way you could

10   slice this -- and we're not opposed to mediation -- in fact,

11   today we made that clear -- is to not lift the stay today.  We

12   have the mediation with the plaintiffs' counsel, the executive

13   committee, and see where we end up.

14               But lifting the stay -- there is still a little over

15   eight-and-a-half million dollars that will come out of pocket

16   of the estate, and for what purpose?  If everyone's talking

17   about insurance being there, why are we going to spend money

18   ramping up to get ready for a trial?  We've had no discovery.

19   It's nice that people send us documents, but we're not

20   reviewing them, because we don't want to spend the money.  Why

21   spend that eight million dollars when we don't have to?

22               Let's have a mediation.  Let's see how it happens and

23   then come back to court.  But if you left the stay --

24               THE COURT:  Something tells me that that eight million

25   dollars will get used up, if not through defense costs, at

PG&E Corp., Pacific Gas & Electric Co.

1    least through the mediation process.

2          MR. TSEKERIDES:  Right.  But at least we're going

3    towards a mediation process --

4          THE COURT:  Well, I understand.

5          MR. TSEKERIDES:  -- with the insurers there --

6          THE COURT:  I understand.

7          MR. TSEKERIDES:  -- and we're putting good money in to

8    try to get a good settlement.  But if we don't have a

9    settlement and you lift the stay today, we're going to have to

10   ramp up, and we can't control --

11         THE COURT:  But what --

12         MR. TSEKERIDES:  -- what happens in state court.

13         THE COURT:  I know you can't control, but what's the

14   message I send to Judge Seligman?  It's okay to go mediate, but

15   he can't schedule his trial?

16         MR. TSEKERIDES:  He can still -- until they file this

17   motion, whatever was happening in state court was happening in

18   state court.

19         THE COURT:  And I understand that.

20         MR. TSEKERIDES:  So --

21         THE COURT:  I understand that.

22         MR. TSEKERIDES:  So I don't think you're really

23   sending any message other than, we still have a debtor that's

24   dealing with a lot of things right now.

25         THE COURT:  But no, I don't think you're hearing my

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   question.

2        MR. TSEKERIDES:  Okay.

3        THE COURT:  I don't know what arguments are being

4   presented to him by the City of Oakland, but if you simply read

5   the docket, you'd see that it's set to go to trial in May.

6        MR. TSEKERIDES:  Correct.

7        THE COURT:  Right?  And one defendant has asked the

8   court to give it more time.  If the judge knows -- and

9   obviously the judge does know that PG&E's in bankruptcy -- if

10  he thinks that PG&E is still stayed, that will influence his

11  decision perhaps --

12       MR. TSEKERIDES:  Perhaps.

13       THE COURT:  -- or perhaps not.  If he knows that the

14  bankruptcy is no longer an impediment, he will make the

15  decision, presumably, the way he should be making it, namely,

16  without regard to the bankruptcy.

17       MR. TSEKERIDES:  Right.  And my point was that I don't

18  think he's looking at it as the bankruptcy being an impediment.

19  Whatever arguments are being made by the City of Oakland, we

20  have not been involved in that case the entire year.  They've

21  been moving along at whatever pace --

22       THE COURT:  I understand.

23       MR. TSEKERIDES:  -- they're moving along.

24       THE COURT:  I got you.

25       MR. TSEKERIDES:  He's got to resolve the City of

PG&E Corp., Pacific Gas & Electric Co.

1    Oakland's motion on its merits, whether they're entitled to an

2    extension or not.

3           THE COURT:  But how could -- but it's still going to

4    be relevant to his decision.  I mean, it's just human nature to

5    think, how can I make a decision without knowing if this very

6    deep-pocket defendant -- and it is a deep-pocket defendant --

7    is going to be in the courtroom or not, and when the trial

8    resumes --

9           MR. TSEKERIDES:  Well, to be sure.

10          THE COURT:  -- or whenever --

11          MR. TSEKERIDES:  Well, I mean, if you lift --

12          THE COURT:  -- not resumes -- whenever the trial

13   begins?

14          MR. TSEKERIDES:  Well, to be sure, if you lifted the

15   stay, there's no way we could have a trial in May.

16          THE COURT:  Well, that's for him to --

17          MR. TSEKERIDES:  So I think the only thing that could

18   happen --

19          THE COURT:  That's for Judge Seligman to decide,

20   right?

21          MR. TSEKERIDES:  Well, but see, that's exactly my

22   point.  You should be helping us with that, sending us to

23   mediation, not sort of letting the debtor have to spend eight

24   million dollars --

25          THE COURT:  Mr. Tsekerides, you don't push too hard,

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1 because the argument that the plaintiffs should have known,

2 they could have asked earlier, can be responded by, the

3 defendants clearly should have known; they should have been

4 preparing earlier.

5 MR. TSEKERIDES: Well, why would a debtor defendant be

6 preparing for trial in a case that's stayed?

7 THE COURT: Because --

8 MR. TSEKERIDES: That's the whole point of 362, Judge.

9 THE COURT: Because the debtor is represented by

10 experienced bankruptcy counsel, with an experienced bankruptcy

11 judge, and knows how these things sometimes play out.

12 MR. TSEKERIDES: Well, sometimes, but not over the

13 past few months. Maybe today --

14 THE COURT: I know, but this isn't a collection

15 action. It isn't even a refinery fire. This is a thing

16 involving fifty-three lawsuits and dozens of victims and --

17 MR. TSEKERIDES: But --

18 THE COURT: -- a major tragedy.

19 MR. TSEKERIDES: Fair enough, Judge. But the

20 suggestion that we should have been preparing for a trial

21 during the past year -- I mean, I take issue with that.

22 THE COURT: Okay, you can.

23 MR. TSEKERIDES: Okay, I did.

24 THE COURT: Why should I deny relief from stay? You

25 already made virtually a stipulation that it can go to

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  mediation -- not exactly, but virtually.  So why not the next

2  step?  What difference does it make?

3         MR. TSEKERIDES:  Well, I think --

4         THE COURT:  All the more reason to have a good result

5  in the mediation.

6         MR. TSEKERIDES:  Well, but I'm not sure that that's

7  right, Your Honor.  I think, well, one would be the money.  I

8  mean --

9         THE COURT:  Okay.

10         MR. TSEKERIDES:  -- money that doesn't need to be

11  spent --

12         THE COURT:  Okay.

13         MR. TSEKERIDES:  -- will be spent.  And two, people

14  who are currently working on other things and trying to get

15  this bankruptcy, the larger Chapter 11, done -- it's not just

16  outside counsel.  You --

17         THE COURT:  I don't know.  Yeah, I understand.  I

18  understand --

19         MR. TSEKERIDES:  Yeah.

20         THE COURT:  -- your point.  And certainly, in some of

21  the other motions, I've heard from in-house counsel and others

22  the things people work.  I don't doubt that they're working on

23  it.  But look, let's switch topics --

24         MR. TSEKERIDES:  Sure.

25         THE COURT:  -- a little bit.  And let's pretend that

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    somehow, between December 17th and June 30th --

2           MR. TSEKERIDES:  Um-hum.

3           THE COURT:  -- the governor's position and the PUC's

4    position and the AB 1054's position is such that we might have

5    a confirmed plan by the end of May or June.  What happens to

6    the Ghost Ship fire then?

7           MR. TSEKERIDES:  Well, I mean --

8           THE COURT:  That one has to go to trial, right, unless

9    it's mediated to a result?

10          MR. TSEKERIDES:  Well, if, as it currently stands,

11   that it's part of the channeling injunction --

12          THE COURT:  It's not.

13          MR. TSEKERIDES:  Well --

14          THE COURT:  Not from what I just heard today.

15          MR. TSEKERIDES:  Well, I don't know that that's true,

16   Your Honor.  I think that --

17          THE COURT:  Well, what is it -- what do you draw --

18   what inference do you draw from two counsel, Ms. Pino and Ms.

19   Alexander -- they confirmed it twice on the record.  They'll

20   look only to insurance.  So what does that --

21          MR. TSEKERIDES:  Well --

22          THE COURT:  What's left with the channeling

23   injunction?

24          MR. TSEKERIDES:  Well, looking to insurance is

25   different from what process what process it's going to go

PG&E Corp., Pacific Gas & Electric Co.

1   through.  So let's say you don't lift the stay.  Well, I'll

2   explain why, Your Honor.  I mean, you can still have claims

3   going -- you're not going to be looking to the debtor, is my

4   point.  They're saying it's insurance.  I appreciate that.  But

5   you can still have the trustee, and it's no burden, because the

6   trustee is going to be sitting there with the same pot of money

7   that we're sitting with.

8           THE COURT:  Why?  What is the role with -- if this

9   goes -- if relief from stay is granted, and the plaintiffs

10  agree not to look to the company or the trust, what is the role

11  of the trust trustee, vis a vis the Ghost Ship action?

12          MR. TSEKERIDES:  Well --

13          THE COURT:  To me, it's --

14          MR. TSEKERIDES:  If the --

15          THE COURT:  It's different -- okay.

16          MR. TSEKERIDES:  If the stay were lifted, you're

17  right.  But I'm --

18          THE COURT:  No.

19          MR. TSEKERIDES:  I'm arguing --

20          THE COURT:  Either way.

21          MR. TSEKERIDES:  Well, I'm not sure that that's right,

22  Your Honor.

23          THE COURT:  No.  Well, what am I missing?  You just

24  heard two counsel say, we'd like to look only to insurance,

25  plus deductible.  So my question to you --

PG&E Corp., Pacific Gas & Electric Co.

1          MR. TSEKERIDES:  Well, that's the part -- "plus

2   deductible".  I mean, we still have the eight million --

3          THE COURT:  Well, that is the eight million, right?

4          MR. TSEKERIDES:  Yeah.

5          THE COURT:  That's the eight million.

6          MR. TSEKERIDES:  It's an SIR, but yeah.

7          THE COURT:  And you'll get the debtor's own defense

8   costs -- eat that first, don't they?

9          MR. TSEKERIDES:  No, we would have to pay for that.

10          THE COURT:  No, I know you have to pay for it, but --

11          MR. TSEKERIDES:  But see, we wouldn't have those costs

12   if it was in a trust.

13          THE COURT:  Look, let me rephrase my question.  If we

14   had a mediation this afternoon in the attorney conference room,

15   and the Ghost Ship plaintiffs agreed to settle with PG&E, most

16   of that eight million probably would still be intact.  But --

17          MR. TSEKERIDES:  Probably.

18          THE COURT:  But if there is mediation or pre-trial

19   after a relief from stay or something, that eight million will

20   be the burning candle concept.  It's a burning candle type

21   policy, right?  And when the candle's burnt, gone, it's gone.

22   So my question for you is, if PG&E is treating Ghost Ship as a

23   passthrough, why is it part of the trust anymore?

24          MR. TSEKERIDES:  Well --

25          THE COURT:  In other words, doesn't the RSA get

PG&E Corp., Pacific Gas & Electric Co.

1  amended to say, the Ghost Ship plaintiffs do not participate in

2  the trust because they --

3          MR. TSEKERIDES:  Well, we weren't -- Your Honor,

4  again, in fairness, we weren't treating it as a passthrough in

5  the plan that just most recently got filed.  That's not -- it

6  was --

7          THE COURT:  It was in the first time.

8          MR. TSEKERIDES:  -- a passthrough, but it's not in the

9  current one that's on paper right now.  And my only point is,

10  if you don't lift the stay, then we, the debtors, are not going

11  to be spending the money.  The trustee will be dealing with

12  whatever the trustee's going to be dealing with, and the

13  insurance company will be paying --

14          THE COURT:  Okay, let's --

15          MR. TSEKERIDES:  -- the limits.

16          THE COURT:  Let's try it a different way.  I'll take

17  your word for it that what the two counsel for the Ghost Ship

18  plaintiffs said was news to you and news to me, but they said

19  it.

20          MR. TSEKERIDES:  They did.

21          THE COURT:  They said it more than once.

22          MR. TSEKERIDES:  Um-hum.

23          THE COURT:  So if I were to grant an order for relief

24  from stay, the order would say, relief from stay granted,

25  provided, however, plaintiffs' sole recourse is the SIR, to the

PG&E Corp., Pacific Gas & Electric Co.

1  extent it exists, and insurance, which is another way of

2  saying, no claim against the debtor.

3          Now, let's suppose that's the order.  Now fast forward

4  to we have a claims trust in place.  What is the role of that

5  claims trustee, vis a vis Ghost Ship?

6          MR. TSEKERIDES:  Well, under your hypothetical, you

7  lifted the stay, right?

8          THE COURT:  Yeah, right.

9          MR. TSEKERIDES:  I don't know that it has a role --

10         THE COURT:  No role.

11         MR. TSEKERIDES:  -- because if you lifted the stay,

12  they're going to state court.  We're going to be defending it

13  in the meantime -- lawyers, and the company's going to have to

14  get documents and defend a case.

15         THE COURT:  I got it.  But the trustee -- the

16  liquidation trust --

17         MR. TSEKERIDES:  Or whatever that trustee -- yeah.

18         THE COURT:  -- has no role to play.

19         MR. TSEKERIDES:  Under that hypothetical, you would be

20  right.

21         THE COURT:  Okay.  But why isn't that a good result,

22  both for the rest of the people, whether it be victims, fire

23  victims, or governmental agencies, or anyone else who is going

24  to look to that thirteen-and-a-half-billion-dollar trust,

25  assuming we have one?  Why isn't that a good result, to take

PG&E Corp., Pacific Gas & Electric Co.

1    the Ghost Ship potential out of the equation?

2            MR. TSEKERIDES:  Well, it's not a good result because,

3    for the debtor right now, we would have to then start gearing

4    up, spending money on a trial, when we could be mediating and

5    trying to use that money -- not spend the eight million dollars

6    and --

7            THE COURT:  Okay.

8            MR. TSEKERIDES:  -- and get it done that way.

9            THE COURT:  Okay.  So we're dealing -- it seems to me

10   that you and I are now debating how to best spend that eight

11   million dollars.

12           MR. TSEKERIDES:  Ultimately.  And --

13           THE COURT:  Well, sir, what other reason do you have

14   for --

15           MR. TSEKERIDES:  Well, and the impact to the debtors

16   in the meantime while we -- you know, as you know, there's a

17   lot going on.

18           THE COURT:  There's a lot going on.  But the point is,

19   what else has to get dealt with vis a vis Ghost Ship if I grant

20   the kind of order I've just described?

21           MR. TSEKERIDES:  Well, we would -- I mean --

22           THE COURT:  No, in the bankruptcy.

23           MR. TSEKERIDES:  Oh, in the bankruptcy.  Okay, yeah.

24           THE COURT:  I'm mindful that lots of lawyers and lots

25   of professionals -- nonlawyers -- will work to defend the

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   company in the Ghost Ship fire, and they're entitled to do

2   that.  And the plaintiffs have to understand that that's what

3   it is.  It's like there had not been a bankruptcy.  We're back

4   to my discussion with Mr. Julian.  If the wildfires hadn't

5   occurred, the Ghost Ship trial would have gone its course.

6            MR. TSEKERIDES:  Right.

7            THE COURT:  We can all --

8            MR. TSEKERIDES:  We wouldn't be here.

9            THE COURT:  We wouldn't be here.  You and I would

10  never have met.

11           MR. TSEKERIDES:  My loss, it would have been.

12           THE COURT:  My loss.

13           MR. TSEKERIDES:  Yeah.

14           THE COURT:  But the point is, the insurance would have

15  been what it was.

16           MR. TSEKERIDES:  Um-hum.

17           THE COURT:  The coverage would have been what it was.

18           MR. TSEKERIDES:  Right.

19           THE COURT:  The Valero litigation would have --

20           MR. TSEKERIDES:  Would have still been there.  Yeah.

21           THE COURT:  The Valero fire didn't drive PG&E into

22  bankruptcy either.

23           MR. TSEKERIDES:  Nope.

24           THE COURT:  Or not a fire --

25           MR. TSEKERIDES:  The explosion.

escribers
(973) 406- operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1        THE COURT:  -- the meltdown --

2        MR. TSEKERIDES:  Whatever.

3        THE COURT:  -- whatever it was --

4        MR. TSEKERIDES:  Yeah.

5        THE COURT:  -- the shutdown.  So what I'm getting at

6   is that, other than maybe spend or reallocate an eight-million-

7   dollar insurance fund, I don't know any other reason not to

8   grant relief from stay.  You have to give me another reason.

9        MR. TSEKERIDES:  Right.  Well, I think I gave you two.

10       THE COURT:  Okay.

11       MR. TSEKERIDES:  One is, I mean, it is going to have

12  an impact on people who are working on both the reorganization

13  process and that would have to be involved in gathering

14  documents and supporting --

15       THE COURT:  Right.

16       MR. TSEKERIDES:  -- what is a major complex -- they

17  even said it's a complex litigation.

18       THE COURT:  I have no doubt.

19       MR. TSEKERIDES:  It's been granted complex status.

20  And why?  I mean, 362 is there for a reason, to protect

21  debtors.

22       THE COURT:  Well --

23       MR. TSEKERIDES:  And --

24       THE COURT:  Those same people won't be working quite

25  so hard on the estimation in the Superior Court or --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          MR. TSEKERIDES:  That's true.

2          THE COURT:  -- or in Judge Domato's court if --

3          MR. TSEKERIDES:  Assuming you say yes to our motion.

4          THE COURT:  Well, that's right.

5          MR. TSEKERIDES:  Yeah.

6          THE COURT:  But the point is, if the RSA kicks in, an

7   awful lot of folks at PG&E might have less to do.

8          MR. TSEKERIDES:  Less to do, but you still have the

9   OII going on.

10         THE COURT:  I know, and you know what?

11         MR. TSEKERIDES:  And those are five-day turnarounds on

12  discovery.

13         THE COURT:  And we'll still have our Chapter 11 with

14  all the things we have to do.

15         MR. TSEKERIDES:  Yes.

16         THE COURT:  Anyway, go ahead.  Anything else you want

17  to make?  I want to --

18         MR. TSEKERIDES:  No, I don't think so.

19         THE COURT:  -- wrap it up --

20         MR. TSEKERIDES:  I don't think so.

21         THE COURT:  -- because we do have a lot to cover

22  today.

23         MR. TSEKERIDES:  We spent a lot of -- and we have more

24  to do, right.

25         THE COURT:  All right.

PG&E Corp., Pacific Gas & Electric Co.

1          MR. TSEKERIDES:  Thank you.

2          THE COURT:  Anyone else want to be heard on the Ghost

3     Ship motion?

4          All right.  First of all, I want to thank Ms. Slocomb

5     and Mr. Maxwell for coming.  I can't imagine the horror that

6     you've gone through -- both of you and your families, and all

7     the other victims.  And that's certainly true that we've had to

8     experience here, with all the wildfires and the Ghost Ship

9     fire.  It may not have been a wildfire, but it's still a

10    devastating and tragic event.  And it's too bad that you had to

11    be here and lose your family members, in Mr. Maxwell's case,

12    for such a personal tragedy.

13         I'm satisfied.  And frankly, to be honest -- well, to

14    be honest -- whenever someone says, "to be honest with you",

15    you wonder, why do they have to say that?  So I withdraw my "to

16    be honest with you", which is not saying I'm going to be

17    dishonest with you.

18         When I prepared for today and I saw the events over

19    the last few days, with the governor's position and then the

20    response and then the most recent development from the company,

21    it had significant impact on me to figure, well, what should I

22    do about Ghost Ship?  And I was not certain about what to do

23    about the Ghost Ship, if we were going to be dealing with this

24    trustee, either with the RSA or without the RSA.

25         But based upon the representations of two counsel,

PG&E Corp., Pacific Gas & Electric Co.

1    which I will respect their position that they speak with

2    authority, to me that is the right result -- is to let the

3    Ghost Ship trial go forward or not, depending upon the Superior

4    Court judge's decision as to timing -- I'm not suggesting that

5    it won't go forward, unless it's mediated to a successful

6    conclusion -- is that -- to go back to my own philosophy, is

7    let's try to do what would have happened if there hadn't been a

8    bankruptcy. And we can't unwrite history, but one thing we can

9    do is put the Ghost Ship victims back where they were, before

10   the bankruptcy occurred, and let them have their day in court

11   and either mediate to a proper result or not.

12          And although I'm not cavalier and casual about

13   spending eight million dollars of the debtor's money, the point

14   is there are ways to redirect that. And what counsel has

15   explained to me is so traditional in lots of cases that are

16   smaller that I preside over -- and all bankruptcy courts do --

17   is to get that stay out of the way, if there is an insurance

18   recovery. This is not an anti-insurance company position.

19   It's a practical solution in bankruptcy.

20          So I'm satisfied that the plaintiffs will be well-

21   served by having their day in court. If PG&E is burdened by

22   having to prepare, PG&E should make a pitch to Judge Seligman

23   on Friday for more time, and he will use his judgment and

24   discretion and make that call.

25          I'm going to grant the motion for relief from stay but

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  make it clear, for Ms. Alexander and Ms. Pino, that the order

2  that I sign will specifically and unequivocally say that, in

3  granting relief from stay, the Court has relied upon the

4  representations of the moving parties, such that -- and again,

5  I will let Mr. Tsekerides and opposing counsel craft the right

6  specific words, but the concept is, you get to recover what is

7  self-insured under what we call the SIR and nothing else from

8  Pacific Gas & Electric Company or PG&E Corporation through its

9  bankruptcy, whether it be under a trust or under some other

10 situation, and that the recovery is without recourse to them

11 but solely to insurance -- again, with the proper terminology.

12         So it's the deductible, in layman's terms -- the

13 deductible plus whatever you recover from the insurance.  So

14 with that, I'll conclude this motion and look forward to

15 getting an order.  Thank you all for your time on that.

16         We'll move to the next motion.

17         Mr. Tsekerides, where do you want me to go?

18         Well, actually, it would be Mr. Hearns (sic), I

19 believe?

20         MR. TSEKERIDES:  Yeah, Mr. Karotkin is jumping out of

21 his seat.  We'll have to work out -- on the deductible piece,

22 I'm not sure that they're entitled to the deductible as well,

23 but we'll work it out in the order.

24         THE COURT:  No, they may not be, but the point is, the

25 limitation is --

PG&E Corp., Pacific Gas & Electric Co.

1          MR. TSEKERIDES:  Right.

2          THE COURT:  -- limited.

3          MR. TSEKERIDES:  Agreed.

4          THE COURT:  Sure.  I'm not asking you to give away

5    money that --

6          MR. TSEKERIDES:  Okay.

7          THE COURT:  -- you don't have to give away.

8          MR. TSEKERIDES:  Thank you.  We're just going to --

9    well, we'll deal with that in the order drafting.

10         THE COURT:  Ms. Pino, you don't have any trouble

11   articulating the ruling, right?

12         MS. PINO:  I do not.  Thank you, Your Honor.  And

13   thank you very much for your ruling.

14         THE COURT:  Okay.  Thank you.

15         MR. TSEKERIDES:  So I think the Hearn motion is next.

16         THE COURT:  All right.  Who's appearing on the Hearn

17   motion?  Is that Ms. Costin?

18         MS. COSTIN:  Yes, Your Honor.  Anne Costin for Todd

19   Hearn.

20         THE COURT:  So I guess the short question to you --

21   and I've read the papers, and I'll give you time if you need --

22   but why would I grant relief here, when you've got this whole

23   resolution process in place?

24         MS. COSTIN:  Sure.  So --

25         THE COURT:  Mediation and arbitration.  And if Mr.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   Hearn is unsuccessful, that should be the end of it, I think,

2   and if he's successful, maybe he should have relief from stay

3   beyond that.  But it's hard for me to -- this is not like the

4   fire.  I mean, obviously, Mr. Hearn's rights are important to

5   him.  I'm not minimizing that.  But there already is a claims

6   resolution process in place.

7           MS. COSTIN:  Yes, Your Honor.  As a whistleblower,

8   someone who stood up and complained about unsafe devices at

9   PG&E, Todd Hearn is protected by California state statutory

10  law.

11          THE COURT:  Right.

12          MS. COSTIN:  And California state statutory law is not

13  subject to PG&E's collective bargaining agreement.  It is not

14  subject to mandatory arbitration.

15          THE COURT:  Well, then shouldn't the arbitrator make

16  that decision?

17          MS. COSTIN:  No.  In fact, the Napa County Superior

18  Court should hear Mr. Hearn's statutory claims, his

19  whistleblower claims.  And if PG&E wishes to file a motion to

20  compel arbitration or argue preemption of some sort, it should

21  occur in a state court, as these are state law claims, and the

22  issues of preemption and arbitration are also state law issues.

23          THE COURT:  So you weren't required to file an

24  opposition to their reply.  Your reply is that your client is

25  not subject to it, and you need a court to determine that.  Why

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    can't I determine that?

2           MS. COSTIN:  Well --

3           THE COURT:  Why can't I determine that -- and I don't

4    mean on this oral record, but I mean, with a short brief, that

5    if you're right -- I don't question what you're saying -- if

6    the law is clear that Mr. Hearn's remedies can't be dealt with

7    here, maybe that helps me make a decision.  But I don't know

8    that until you say something.

9           MS. COSTIN:  Certainly.  If the Court is at all

10   inclined to deny the motion for stay on this basis, on the

11   basis that there is this alternate union bargaining grievance

12   procedure, then I would absolutely request the ability to

13   provide briefing -- substantive briefing --

14          THE COURT:  Yeah.

15          MS. COSTIN:  -- to demonstrate to the Court that they

16   cannot make the arguments that they're making.

17          THE COURT:  Well, under our procedures -- I don't know

18   how familiar you are with our procedures here, but we don't

19   even require, in regular cases, even any opposition to motions

20   for relief from stay.  For PG&E, I had to educate my colleagues

21   from the East Coast that, even though we say we don't want

22   responses, I want preliminary responses.  That's why PG&E filed

23   something called a preliminary opposition.  But when I read the

24   opposition, I thought, well, why isn't this governed by the

25   arbitration and mediation procedure -- the claims resolution?

PG&E Corp., Pacific Gas & Electric Co.

1    And so you're saying that it's true.

2            Okay.  So let's assume that, if I don't deny this

3    motion, I'll give you an opportunity to explain yourself.  But

4    switch topics.  What do I do about the fact that your client

5    filed a proof of claim, and we have a claims resolution process

6    that is in place, apart from anything else that's in the state

7    court system?  He filed a proof of claim, right?  And it's --

8            MS. COSTIN:  Correct.

9            THE COURT:  -- deemed allowed until someone objects.

10   And so if the debtor objects to his claim, he's --

11           MS. COSTIN:  And --

12           THE COURT:  I don't believe Mr. Hearn's situation is

13   in the wildfire trust.  He's just what we call a passthrough,

14   the same way he would be tested if there were no bankruptcy.

15           MS. COSTIN:  Correct.  As the Court indicated this

16   morning, someone is going to have to adjudicate whether there's

17   liability and damages on this matter.  And with PG&E's

18   opposition to our motion for relief from stay, they absolutely

19   did object to his proof of claim.  Stacy Campos, PG&E's in-

20   house employment lawyer, clearly stated in her declaration that

21   they asserted that he was not fired for being a whistleblower.

22           THE COURT:  Right, right.  That's right.

23           MS. COSTIN:  Not surprising.

24           THE COURT:  That's right.

25           MS. COSTIN:  And therefore they're contesting

PG&E Corp., Pacific Gas & Electric Co.

1  liability completely.

2       THE COURT:  Well, but the debtor did not file an

3  objection to the proof of claim.  That doesn't --

4       MS. COSTIN:  It may not have that name on it --

5       THE COURT:  Right.  Well, that's right.

6       MS. COSTIN:  -- but I would certainly expect that they

7  will not be agreeing that they terminated Mr. Hearn because he

8  complained that there were unsafe devices on the power lines.

9  I doubt that PG&E will take that approach.

10       THE COURT:  But why couldn't that be adjudicated as

11  part of the claims objection process?

12       MS. COSTIN:  Well, I think that, with a whistleblower

13  claim in particular, it presents a unique situation that is

14  best handled by a state court.

15       THE COURT:  Well, why is that so?

16       MS. COSTIN:  Because we have complex issues of motive,

17  pretext, and we need significant discovery.  Someone is going

18  to have to dig into this case, and it should be handled by --

19       THE COURT:  But tell me --

20       MS. COSTIN:  -- employment attorneys.

21       THE COURT:  But tell me why.  Again, I know that a lot

22  of people and lawyers with more state court experience than

23  bankruptcy court always like to say, this is all governed by

24  state law, which is another way of saying, we think those

25  Superior Court judges know this body of law better than the

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  bankruptcy judges.  And sometimes that's true, and sometimes

2  it's not true.

3       So why is it unique?  Why couldn't the bankruptcy

4  court make that determination on a claims objection?

5       MS. COSTIN:  I think that -- I'm not saying that it's

6  impossible, but the way I envision proving liability here is

7  through significant discovery, with motions to compel, with

8  depositions of human resources people for people that were out

9  on the field, hearing Todd Hearn stand up in meetings and --

10      THE COURT:  Well, those go to the merits.  I

11  understand.

12      MS. COSTIN:  Right.  I just think it's a burdensome

13  process, and --

14      THE COURT:  But your argument is a legal argument

15  though.  We're back to the point that you'd like to brief why

16  the arbitration and mediation procedures are preempted by the

17  name of -- or not preempted -- are replaced by the applicable

18  law that you rely on.

19      MS. COSTIN:  I'm sorry, I didn't understand the

20  Court's question.

21      THE COURT:  You're restating what you said in your

22  opening comments, that PG&E's response you can defeat by the

23  legal argument that they can't impose on your client the

24  mediation and arbitration procedure.

25      MS. COSTIN:  I understand, so --

of 358
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  I mean, the grievance -- grievance is the

2    better word, not mediation.

3    MS. COSTIN:  Right.

4    THE COURT:  Grievance and arbitration.

5    MS. COSTIN:  I suppose I'd say one of the factors this

6    Court should consider, obviously, is, where's the appropriate

7    forum?  And they're saying, we're going to proceed anyway, Your

8    Honor, through the forum that we choose, which is a private,

9    secret arbitration, where Mr. Hearn doesn't have a lawyer,

10   doesn't have discovery --

11   THE COURT:  Well, it's a grievance.  I mean, isn't

12   there a negotiated labor concept that's well-established for

13   lots of employees who have grievances?

14   MS. COSTIN:  For many employees who have grievances

15   that arise out of the bargaining agreement, but not for

16   whistleblowers that bring state claims.

17   THE COURT:  Well, what about employees who pad their

18   time records?  I mean, again, there are two sides of the story

19   here, right?

20   MS. COSTIN:  Right.

21   THE COURT:  And that's PG&E's theory.  So if your

22   client hadn't done what people call whistleblower but had been

23   terminated for padding his hours, that would be litigated or

24   resolved through the grievance procedure, wouldn't it?

25   MS. COSTIN:  Correct, but that's not --

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1        THE COURT:  Okay.

2        MS. COSTIN:  -- the situation we're in, right?  The

3    situation we're in, the CBA doesn't have any waiver of a jury

4    trial.  It doesn't reference any statutory claims.  And the

5    case law is quite clear that PG&E doesn't get, under these

6    circumstances, to dictate the forum.  This Court may be able to

7    dictate the forum, but PG&E doesn't get to choose arbitration

8    through a grievance process over state court.

9        THE COURT:  So -- okay.  Well, let me --

10       MS. COSTIN:  And --

11       THE COURT:  Let me see what --

12       MS. COSTIN:  Sure.

13       THE COURT:  -- the debtor has to say.  I won't oust

14   you.

15       MS. COSTIN:  Okay.

16       THE COURT:  Go ahead.  You want to add something

17   further?

18       MS. COSTIN:  One final comment, which is, the other

19   factor we haven't considered here is the balance of harm.  And

20   Mr. Hearn, when PG&E fired him from his job of twenty-two

21   years -- he lost his wages.  He lost his health benefits.  But

22   they also took something else away from him, which was his

23   ability to work in Northern California.

24       THE COURT:  Well, I understand.  And that itself is

25   contested.  But let me try this one more question, though.

PG&E Corp., Pacific Gas & Electric Co.

1        MS. COSTIN:  Sure.

2        THE COURT:  Leave aside the whistleblower allegations

3   that you say aren't within the grievance process.  If Mr. Hearn

4   does go through with the grievance process and prevails,

5   doesn't he get reinstated?

6        MS. COSTIN:  He would have limited remedies.  One of

7   those might be reinstatement and past wage loss, but he would

8   not be able to seek the remedies that would be available to him

9   in state court, which would include punitive damages, key in

10  this process obviously, and also emotional distress damages.

11  Those are not available through the grievance process.

12       And I'll just note that, at no point in time in the

13  grievance process to date, has Mr. Hearn ever raised this state

14  law retaliation claim.  It simply has not been adjudicated at

15  all to this point, because it's not part of the CBA process.

16  So PG&E is not going to be affected at all by adjudicating this

17  claim in state court, as opposed to doing so in a different

18  forum.

19       THE COURT:  So what happens if I were to deny this

20  motion?  What happens next?

21       MS. COSTIN:  You would be placing Mr. Hearn in an

22  extremely difficult position --

23       THE COURT:  Well, I --

24       MS. COSTIN:  -- because --

25       THE COURT:  I don't --

(973) operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          MS. COSTIN:  Right.

2          THE COURT:  -- intend to do that, if the law doesn't

3    permit it, but what happens next procedurally?

4          MS. COSTIN:  Well, Mr. --

5          THE COURT:  Doesn't he then go through the grievance

6    process?

7          MS. COSTIN:  He would have to make a decision --

8          THE COURT:  Or make a --

9          MS. COSTIN:  -- about --

10         THE COURT:  Yeah.

11         MS. COSTIN:  Because he would have to make a decision

12   about whether or not to pursue his grievance.  And the danger

13   there is, if he chooses to pursue his claims through this

14   grievance process, he would be forced to raise this retaliation

15   whistleblower claim there, without a lawyer, without discovery.

16         Let's say he lost.  Well, then we have a real problem,

17   and PG&E has a collateral estoppel argument.  So it's really

18   tying his hands, and then we would have double litigation.

19   Then we would, then at the end of the grievance process, be

20   revisiting the entire case in state court.

21         THE COURT:  Does he have a right to counsel at the

22   arbitration stage?

23         MS. COSTIN:  No, no.

24         THE COURT:  No?  All the way through arbitration?

25         MS. COSTIN:  No, they do not, but PG&E does have a

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    team of in-house employment lawyers, as set forth in Ms.

2    Campos's declaration, that would be able to represent PG&E.

3            THE COURT:  So if he got an adverse ruling, you're

4    saying that that would be dispositive or not?  I mean, again,

5    this --

6            MS. COSTIN:  I'm saying that PG&E would argue that it

7    would be dispositive.

8            THE COURT:  Well, what would you argue?  Suppose you

9    hadn't come on the scene, and Mr. Hearn got through the drill.

10   And finally, some other arbitrator said, sorry, Mr. Hearn,

11   you're out of luck; you padded the books, and you -- no help.

12   And then he came to you.  Would you have a remedy?

13           MS. COSTIN:  There is California law that argues

14   against collateral estoppel and indicates that, even if a

15   matter has already been grieved, it can be revisited in state

16   court.  I can give the Court the citation to that case, if it

17   would like.

18           THE COURT:  Well, you can put it in your --

19           MS. COSTIN:  Okay.

20           THE COURT:  -- in your further brief.  But your point

21   is there is at least a remedy to try to get relief from that?

22           MS. COSTIN:  Yes, but the remedy would be starting a

23   statutory state court employment action, so we'd be back at the

24   starting point now --

25           THE COURT:  Okay.  No, I understand.

of 358
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    MS. COSTIN:  -- that we're at.  So I think it's just,

2    when you look at judicial economy, if that's what this process

3    is supposed to be about, it makes no sense to say, go ahead,

4    Mr. Hearn, and go through a year-long union grievance CBA

5    adjudication, and then at the end of it, start over with a

6    state court statutory claim.

7    THE COURT:  Okay.  Mr. Tsekerides?

8    MS. COSTIN:  Thank you.

9    THE COURT:  What have you got to say?

10   MR. TSEKERIDES:  Well, first of all, it's not PG&E --

11   Ted Tsekerides for the debtors -- imposing its will.  It was a

12   collective bargaining agreement with the IBEW, and the IBEW has

13   lawyers.  So I don't know the point that he's unrepresented --

14   THE COURT:  Well, but does the employee have a right

15   to have a lawyer at the table with him or her at the --

16   MR. TSEKERIDES:  I don't know, but we can look into

17   that while we're doing the briefing.  But I know the IBEW, and

18   he's represented by somebody, is my point.  And we can look

19   into that when we do the briefing, but this has been going on

20   since January.  The grievance was filed in January.  This is

21   not a pending lawsuit.  They want you to --

22   THE COURT:  Right.  No, I understand that.

23   MR. TSEKERIDES:  -- lift the stay to sue us, and

24   presumably they had these rights -- they won, and this is the

25   first time he's attempted to bring this lawsuit.  So there's a

PG&E Corp., Pacific Gas & Electric Co.

1  CBA --

2        THE COURT:  Well, again, this is similar to the point

3  of --

4        MR. TSEKERIDES:  Yeah.

5        THE COURT:  -- he could have filed his motion earlier,

6  and you would have argued it's too early.  So --

7        MR. TSEKERIDES:  Well, no I would have argued there's

8  a CBA --

9        THE COURT:  Yeah.

10        MR. TSEKERIDES:  -- is what I would have argued --

11        THE COURT:  No, I understand.

12        MR. TSEKERIDES:  -- which is what I'm arguing right

13  now.  And there's a reason for that, and that's a process that

14  the union agreed to.  And if it's working its way through,

15  there's no reason to then have another path, creating again out

16  of whole cloth brand new.  And he'll have whatever rights, and

17  if he was found to have been wrongfully terminated, they can

18  put him back in.  And I'm sure there are other remedies that

19  are available.  I'm not a labor lawyer.

20        But my point is that there is a grievance process

21  already underway.  It's not like it's just starting.  It's

22  already underway, and I think they're in step three of five.

23  So primarily, that's the reason to deny it right now, but also

24  then we shouldn't have another path.  But there is a CBA.

25        THE COURT:  Okay.  Ms. Costin, how much time do you

PG&E Corp., Pacific Gas & Electric Co.

1   want to file a supplemental brief and address this issue?  And

2   I'll really put the ball in your court, and you can tell me two

3   days or two months.  I don't care.

4           MS. COSTIN:  Two weeks would be great, Your Honor.

5           THE COURT:  Okay.  Mr. Tsekerides, do you need to

6   reply, or do you --

7           MR. TSEKERIDES:  I think we would need to reply, yes.

8   I don't know what's in there, so I would like the opportunity

9   to reply.

10          THE COURT:  Okay.  I'm going to take this -- I'm going

11  to put this on or take it with the following:  two weeks for a

12  supplemental -- we'll call it a reply by Ms. Costin for her

13  clients, and two weeks after that from the debtor.  Debtor

14  shall reply -- or whatever the right name is -- and then it's

15  submitted.

16          MR. TSEKERIDES:  Okay.  So we don't have to have

17  further argument on that?

18          THE COURT:  No.  Well, I'll tell you what.  It'll be

19  submitted, and if I need argument, I will put it on the

20  calendar.  If not, I'll issue a ruling.

21          MR. TSEKERIDES:  Very good.

22          THE COURT:  Okay, thank you.

23          MR. TSEKERIDES:  And I think there was one more.

24          MS. COSTIN:  Thank you.

25          MR. TSEKERIDES:  Vlazakis is the last one.

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  Well, there is, but I just want -- okay,

2    Ms. Costin, anything --

3    MR. TSEKERIDES:  Oh, sorry.

4    THE COURT:  -- anything else?  Do you want to --

5    MS. COSTIN:  Thank you, Your Honor.

6    THE COURT:  You clear on this?

7    MS. COSTIN:  We appreciate the Court's time.

8    THE COURT:  Okay.  Thank you for your time.  Thank you

9    for coming.

10    Thank you, Mr. Hearn.

11    Okay.  Then yes, first, Vlazakis.  Do we have counsel

12    here for that?

13    Good morning.

14    MR. BERESTKA:  Good morning, Your Honor.

15    THE COURT:  I need a name.

16    UNIDENTIFIED SPEAKER:  Your Honor, would you mind if I

17    was excused?  Your Honor, can I be excused?

18    THE COURT:  Yeah, sure.  Of course.

19    UNIDENTIFIED SPEAKER:  Thank you.

20    MR. BERESTKA:  Good morning, Your Honor.  Ron Berestka

21    on behalf of the -- I'd like to call them the Vlazakis family,

22    who are defendants in the case filed by PG&E in the state

23    court.  George Vlazakis --

24    THE COURT:  Yeah.  And if -- Mr. Benvenutti, are you

25    presenting the defense here?

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    MR. BENVENUTTI:  Yes, I am, Your Honor.

2    THE COURT:  I just have a quick question for you.  I'm

3    going to take the time to move fast.  Do you agree that this is

4    a compulsory counterclaim?

5    MR. BENVENUTTI:  I'm sorry?

6    THE COURT:  They have a -- is the -- are the three --

7    the debtor is conceding the relief from stay for the causes 4

8    through 7 but not as to 1 through -- 1, 2, and 3.  Right?

9    MR. BENVENUTTI:  Correct.

10    THE COURT:  But my question to you is, do 1, 2, and 3

11    constitute a compulsory counterclaim under state law?

12    MR. BENVENUTTI:  Your Honor, I can't answer that

13    question.  What I can say is the debtor -- the claimant has

14    filed a proof of claim, and --

15    THE COURT:  I understand.

16    MR. BENVENUTTI:  -- and I'm reasonably certain that

17    the law is that, for stay purposes, the Court views a claim

18    against the debtor standing on its own right under the terms of

19    the stay, without reference to what state law characterizes it

20    as.

21    THE COURT:  Well -- but this is a situation where,

22    what happens if they didn't file the proof of claim?  They're

23    even worse off.  It's got to be protected.  My problem is this.

24    The debtor started this lawsuit.  There's a wall that somebody

25    wants to tear down, and the way I read the debtors' papers, the

escribers
(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   debtor says, well, we'll go forward with causes 4 through 9,

2   and we'll -- or 4 through 7, and we'll tear the wall down.  And

3   then of course, the plaintiff's out of luck; the building's

4   just -- is essentially damaged beyond repair, right?

5          Counsel, isn't that what it amounts to?

6          MR. BERESTKA:  Your Honor, you hit the nail on the

7   head with that.  That's exactly our position.  We -- and we're

8   a little unique here.  We're not actually a plaintiff in the

9   underlying suit.

10          THE COURT:  No.

11          MR. BERESTKA:  We're a defendant.

12          THE COURT:  I know that.  You're a defendant.

13          MR. BERESTKA:  And we've been dragged into court --

14          THE COURT:  And you want to defend --

15          MR. BERESTKA:  -- by PG&E.

16          THE COURT:  But more importantly, this isn't about

17   money; this is about tearing the wall down.

18          MR. BERESTKA:  Well, that's the --

19          THE COURT:  Or something like that.

20          MR. BERESTKA:  That's the interesting part about the

21   preliminary opposition, is they try to distinguish between

22   title claims and contract claims when the breach of contract

23   claim is about the title.

24          THE COURT:  But what are you going to do if the debtor

25   moves to reject the contract?  Because that's the real

PG&E Corp., Pacific Gas & Electric Co.

1 question.

2          MR. BERESTKA:  Well --

3          THE COURT:  If there's a legal matter, if Mr.

4 Benvenutti says, by the way, we just filed our motion to reject

5 the agreement --

6          MR. BERESTKA:  Well --

7          THE COURT:  -- then what?

8          MR. BERESTKA:  We're going to oppose it and see where

9 we land on that.

10          THE COURT:  Yeah, but those are --

11          MR. BERESTKA:  That's --

12          THE COURT:  -- very tough to oppose.

13          MR. BERESTKA:  Well, there's a couple issues here.

14 One is they're looking to get out of their obligations under

15 the contract, which they've already indicated that they would

16 be rejecting.

17          THE COURT:  Well -- but that's the point.  In other

18 words, they -- the debtor maybe shouldn't have filed the

19 lawsuit.  Be careful what you asked for.  But if, instead of

20 filing the lawsuit, they were already in bankruptcy, if they

21 filed a motion to reject the contract, I wonder whether you

22 would have had any remedy and -- any defense, I should say.

23          MR. BERESTKA:  Well, it's -- that -- we'll have to

24 cross that bridge when we come to it, to be quite honest, Your

25 Honor.  I -- that's not --

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  Well, I know, but I don't want to -- I

2    don't want to make things worse.  I mean, to me, if I -- even

3    if I were to grant your motion for relief from stay, because it

4    sounds to me like it could be a compulsory cross-complaint, and

5    I am -- proof of claim -- the deadline's run, and they run, and

6    there's great penalty if you don't hit that deadline.  But if

7    the debtor says, well, we're going to reject the contract, then

8    it seems to me you're right back in the soup.

9    MR. BERESTKA:  Well --

10    THE COURT:  And that's a problem.

11    MR. BERESTKA:  -- part of it is -- part of it is we're

12    looking for the specific performance to own the property and

13    the --

14    THE COURT:  I know --

15    MR. BERESTKA:  -- obtain the title.

16    THE COURT:  -- but that's the point.  That's the

17    contract they'll try to reject.

18    MR. BERESTKA:  Exactly.  But that's the -- that's kind

19    of where we're kind of caught in between here.  And that's why

20    we're caught in between with the state court in this case.

21    We're trying to assert our right to have this jury trial, and

22    we're met at every corner by PG&E saying, well, you can't have

23    it, you can't file a cross-complaint, you can't do anything.

24    THE COURT:  Okay.  Let me try it again from your point

25    of view, Mr. Berestka.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          MR. BERESTKA:  Sure.

2          THE COURT:  If I deny relief from stay and the

3    plaintiff -- leave aside the bankruptcy tactic of a motion to

4    reject your contract.  And you're at trial now in the superior

5    court on Counts 4 through 7.  And the judge rules in favor of

6    PG&E.  What's left?  What happens to the wall?

7          MR. BERESTKA:  Well, unless we have our contract

8    claims, we're done.

9          THE COURT:  You have a claim for damages; that's all

10   you have.

11         MR. BERESTKA:  Correct.

12         THE COURT:  You're right back to the situation.  So --

13         MR. BERESTKA:  Well, that's putting the cart before

14   the horse, though, because if we have to go to trial on those

15   other issues, we may have had a right to the wall.  That's the

16   problem.

17         THE COURT:  Oh, well, that's the problem that I'm

18   having.  The debtor maybe shouldn't -- if the debtor chooses to

19   file suit, they should be prepared to take the consequences of

20   what happens when you sue somebody; you get sued back.  But

21   this isn't about money, per se.  It's about the wall coming

22   down or --

23         MR. BERESTKA:  Yes.

24         THE COURT:  -- staying up or being reinforced or

25   whatever.  And here, if the debtor rejects the contract, which

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    they -- it presumably has the right to do, then maybe the state

2    court won't solve your problem.

3          In other words, try it differently.  If I granted

4    relief from stay and you're over in superior court, and Mr.

5    Benvenutti says to the judge, we just moved to reject the

6    contract, I wonder whether the state judge would have any

7    option but to take the consequences of, well, reject the

8    contract is a lawful breach.  It's -- we're going to breach the

9    contract.  So how can the judge order specific performance of a

10   contract that's been breached?

11         MR. BERESTKA:  Well, that's the problem we face.

12         THE COURT:  So how do I solve it?

13         MR. BERESTKA:  I -- well, the --

14         THE COURT:  I can't take away their right to move

15   the -- reject it unless --

16         MR. BERESTKA:  No --

17         THE COURT:  -- they don't have the right.

18         MR. BERESTKA:  No, we don't.  And I don't know that

19   right now.  I don't know the extent of that right.  They have

20   it -- this is the first time I had heard of them mentioning a

21   right to reject.  They've, all along, said, no, you don't --

22   you've got to go to the bankruptcy court and get relief from

23   stay because the stay bars your actions.

24         THE COURT:  Well, I understand.  But the preliminary

25   opposition was where they raised it.  I didn't --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   MR. BERESTKA:  Oh, no, no.  I understand, Your Honor.

2   THE COURT:  I didn't make it up.  I mean, it's your --

3   you're over here because the state judge said, I'm not going to

4   let you amend the complaint until the bankruptcy court says I

5   can.

6   MR. BERESTKA:  Yes.

7   THE COURT:  Well, Mr. Benvenutti, when are you going

8   to commit to file a motion to reject?  Because it seems to me,

9   I've got to -- we've got to break this logjam somehow.

10   MR. BENVENUTTI:  Your Honor, the motion is in

11   preparation.  We have both authorization and direction from the

12   client to file it.  I believe this is the first contract

13   rejection motion in the case, so we're -- to some extent, we're

14   plowing uncharted territory here.  But --

15   THE COURT:  Well, it isn't as though you're a novice

16   at rejecting contracts.

17   MR. BENVENUTTI:  No.

18   THE COURT:  You may not --

19   MR. BENVENUTTI:  That's certainly true, Your Honor.

20   THE COURT:  You may not --

21   MR. BENVENUTTI:  That's certainly true.

22   THE COURT:  -- have had occasion to reject one that

23   has a wall coming down.

24   MR. BENVENUTTI:  No.

25   THE COURT:  I feel like --

(973) 406 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1        MR. BENVENUTTI:  No.

2        THE COURT:  -- I'm in Ronald Reagan, saying, take down

3   that wall.

4        MR. BENVENUTTI:  Well -- and Your Honor, let me

5   clarify something, too.  I mean, the short answer is, yes, if

6   the con -- the motion is -- we started preparing it.  We will

7   get it on file in due course.  There are a number of people

8   that have to review things like this before they get filed.

9   But -- so if it were the usual case, I could tell you you could

10  have it done within a week.  This is not the usual case; it may

11  take a little longer.  But it is in preparation, and it will be

12  moving forward.

13       But let me put this into -- let me clarify something.

14  What the rejection motion will do is excuse the debtor -- we

15  believe it should be granted, and we believe that the legal

16  consequence of that is to excuse the debtor from any burden of

17  specific performance under the contract.

18       THE COURT:  Right.  Right.  That's right.  That's what

19  I would assume you --

20       MR. BENVENUTTI:  All right.

21       THE COURT:  -- would want.

22       MR. BENVENUTTI:  So independent of the contract, the

23  contract was entered into as an effort to try and solve this

24  dilemma of the encroachment.  All right?  Before the --

25       THE COURT:  Correct.

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    MR. BENVENUTTI:  Before the contract -- before the

2    contract --

3    MR. VLAZAKIS:  If I may be heard, Your Honor?  I'm Mr.

4    Vlazakis.  That's not a true statement.  We --

5    THE COURT:  Well, I'm going to let -- your lawyer is

6    speaking for you, sir.

7    MR. VLAZAKIS:  It's not --

8    THE COURT:  I'll let you have a moment to talk to --

9    MR. VLAZAKIS:  -- a -- it's a misrepresentation to the

10   Court.

11   THE COURT:  Okay.  I understand that, but I'm not

12   going to -- you'll have a chance to speak with your counsel.

13   Excuse me.  Go ahead, Mr. Benvenutti.

14   MR. BENVENUTTI:  The contract was entered into in

15   November of 2017 in response to PG&E discovering that there was

16   this encroachment.

17   THE COURT:  Right.  Got it.

18   MR. BENVENUTTI:  It was an attempt to resolve the

19   issue with the encroachment.  The encroachment presented a

20   problem.  The problem was that PG&E was prevented by the

21   encroachment from being able to construct its intended purpose

22   for this property when it bought the property from the City of

23   Oakland, unaware of the encroachment, which is to enhance the

24   safety of its natural gas distribution system.  All right?  So

25   underlying all of this is the objective of being able to

PG&E Corp., Pacific Gas & Electric Co.

1   enhance the safe operation of the natural gas system, which is

2   a pretty big deal.

3           In any event -- in any event, to the specifics of this

4   situation, encroachment causes a problem.  PG&E would like to

5   be able to deal with the encroachment in a way that permits the

6   project that it has in mind to go forward without having a

7   dispute with the neighboring landowner.

8           THE COURT:  Understood.

9           MR. BENVENUTTI:  A contract is entered into; it's not

10  performed.  There is a dispute over whether PG&E breached the

11  contract, whether conditions weren't met that excused PG&E from

12  performing.  There is a dispute over what the contract means

13  and whether it should be enforced outside of bankruptcy.

14          THE COURT:  And whether it's rejectable.

15          MR. BENVENUTTI:  And whether -- well, there may be an

16  issue of that, too.

17          THE COURT:  Because it may not be rejectable.

18          MR. BENVENUTTI:  There may be an issue of that, too.

19  I don't think --

20          THE COURT:  Right.

21          MR. BENVENUTTI:  -- that's the case, but it hasn't

22  been briefed.

23          THE COURT:  Well, no -- but you -- there's an -- okay.

24  So what should I do?

25          MR. BENVENUTTI:  Well, what I think you should do,

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  Your Honor, is take what we have -- accept what -- please, take

2  what we've offered, which is to separate the contract issue,

3  which I think is severable, particularly if specific

4  performance is not available, which we believe it will not be

5  when the contract is rejected.  We had no opposition to the

6  issues relating to title that are independent of the contract

7  being litigated.  If they have a jury trial right with respect

8  to those, they can be litigated.  We -- I think, as we said in

9  the papers, that they will not have a jury trial right with

10 respect to them.

11        But be that as it may, it is what it is.  But the

12 contract dispute, because of its nature, if it's litigated in

13 the state court, as part of the disposition of title, threatens

14 to bog this litigation down significantly and further delay a

15 project that's already been delayed a long time, that has, as

16 its objective --

17        THE COURT:  Well, I understand --

18        MR. BENVENUTTI:  -- enhancing safety.

19        THE COURT:  Listen, I understand.  The objectives are

20 commendable.  I don't believe that the -- that Mr. Vlazakis and

21 his family, if they contest the objectives, that's something

22 different.  The question is their legal rights.  And what

23 struck me as I read the papers is, here, for the second time

24 this morning, I have to decide whether to ask a superior court

25 judge in the same Alameda County to figure out what to do.  And

PG&E Corp., Pacific Gas & Electric Co.

1    if I said, well, you can go ahead and try this case, but by the

2    way, you can only try a portion of it.  And if the remedy is

3    such that the moving -- the defendant here, who is the moving

4    party today, but didn't even invite the lawsuit, is without a

5    remedy because the Court has granted the relief that PG&E seeks

6    before the -- before they have a right to be heard, then

7    there's something wrong with that.

8            So -- and to my mind -- again, I might be

9    oversimplifying, but it sounds to me like the superior court

10   judge, if he goes your way, would, in effect, take away the

11   alternative that the counterparty is facing and asking for in

12   the form of specific performance.

13           So the right thing for me to do, I believe, is to let

14   you, Mr. Benvenutti, explain and convince me that you have the

15   right to reject.  And if you do, then maybe I have to deny this

16   motion for that reason.  But the flip side is, if you don't

17   have the right to reject, then this thing ought to get resolved

18   in one forum, which is another way of saying, I think I'd give

19   you a period of time to show me why the motion -- excuse me,

20   the executory contract is rejectable, which would, therefore,

21   moot the relief sought by the moving party.

22           And then I'll give them a similar amount of time to

23   respond.  And much like the last case, I'll take it under

24   the -- on the papers and make a ruling or, if necessary, have a

25   hearing.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    MR. BENVENUTTI:  Well, we could do that, or we could

2   file the motion to reject.

3        THE COURT:  well -- but I think you have to.  In other

4   words, I -- if I give you a deadline -- but it's got to be more

5   than that.  It's got to be a response that says, we -- here is

6   our motion to reject, and this is why you must deny the motion

7   for relief from stay as to Counts 1, 2, and 3.

8        MR. BENVENUTTI:  Very well.

9        THE COURT:  And I give the other side an opportunity

10   to respond.  Any problem with that?

11        MR. BERESTKA:  Actually, it sounds great, Your Honor,

12   but it creates a little bit of a logistical problem because we

13   have a state court that's struggling with the notion of what to

14   do with our case and our trial.

15        THE COURT:  Well, you need to tell that judge that the

16   bankruptcy judge is going to solve her problems for her,

17   partly.

18        MR. BERESTKA:  Well, what I was going to suggest is

19   lifting the stay with that caveat that they're going to file

20   this motion, and then the trial court -- if it's granted, we go

21   back --

22        THE COURT:  That gets even -- that gets even worse.

23   To me, the worse thing to do is to ask a superior court judge

24   to start to interpret and understand what we're doing in this

25   crazy bankruptcy world --

(973) operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          MR. BERESTKA:  Well --

2          THE COURT:  -- because we have our own little world

3    that we live in.

4          MR. BERESTKA:  I understand.  The reason I say that is

5    because some of the other claims -- for example, the

6    prescriptive easement claim -- also entitle us to a jury trial.

7    It would give the superior court the heads up that we can't

8    have a bench trial, that she needs to set it for a jury trial,

9    because we have the prescriptive easement claim.

10         THE COURT:  Well, what is the current state of

11   affairs?  When's the next hearing?

12         MR. BERESTKA:  The next hearing in that case?

13         THE COURT:  Yeah.

14         MR. BERESTKA:  Is December 24th.

15         THE COURT:  And what is the nature of the hearing?

16         MR. BERESTKA:  Well, it's to hear our motion to leave

17   to file the cross-complaint --

18         THE COURT:  But --

19         MR. BERESTKA:  -- which the court set.  They required

20   us to file the motion.

21         THE COURT:  But couldn't there be a stipulation that

22   says, we followed -- we did what you said, we put the matter to

23   the bankruptcy court; the bankruptcy court wants further

24   briefing and a continuance?

25         MR. BERESTKA:  That's fine.  I'm just getting caught

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  in the position where PG&E is arguing prejudice and delay, and

2  we've got a May trial date.  And I'm trying to juggle a couple

3  things here to keep everybody happy.

4       THE COURT:  Mr. Berestka, I understand your point.

5  And I'm sympathetic to your dilemma and inclined to grant

6  relief, except if the debtor has a right under the Bankruptcy

7  Code to reject, I can't take away that right.  If the contract

8  isn't rejectable because it's already been breached and it's no

9  longer executory, then maybe Mr. Benvenutti can't make his

10 case, and you have an opportunity to persuade me that I should

11 grant relief because they can't do what they want.

12       And then it's easy.  Then I say, fine, Superior Court,

13 do your thing across the board, right or wrong.  But I can't,

14 just on the fly here, say to Mr. Benvenutti, sorry you don't

15 have this tool in the toolbox called "reject" if, indeed, he

16 maybe does have it.

17       So I don't want to complicate things for another

18 court.  But my own view is it simplifies it if we clarify what

19 the ground rules are.  And that's my thinking on it.  So --

20       MR. BERESTKA:  That's fine, Your Honor.

21       THE COURT:  -- Mr. --

22       MR. BERESTKA:  I was just offering something else up.

23       THE COURT:  I understand.

24       Mr. Benvenutti, on the last case, your client's

25 opponent asked for two weeks.  Do you want two weeks, or do you

PG&E Corp., Pacific Gas & Electric Co.

1   want more?

2       (Counsel confer.)

3           THE COURT:  So I could -- I'm going to get a -- I'm

4   going to get further opposition to the relief from stay,

5   coupled with the motion to reject.

6       (Counsel confer.)

7           MR. BENVENUTTI:  Your Honor, if --

8       (Counsel confer.)

9           THE COURT:  Unless you want to mediate a resolution

10  here.

11          MR. BENVENUTTI:  Your Honor, if we could have until

12  the Monday after New Year's, that would be helpful.

13          THE COURT:  Mr. Berestka, you're going to -- you can

14  ask the superior court judge to give you more time, and I

15  suspect that she will be agreeable.  If he files by January

16  3rd, can you file by the --

17          MR. BENVENUTTI:  I think that's the 6th, Your Honor.

18          THE COURT:  Oh.  You said the Monday -- oh, you say

19  Monday after New Year's?

20          MR. BENVENUTTI:  Yes.

21          THE COURT:  Yeah, 6th.  Okay.  Would January 20th be

22  sufficient for you, two weeks?

23          MR. BERESTKA:  That's fine, Your Honor.

24          MR. BENVENUTTI:  Your Honor, hold on a second.

25      (Counsel confer.)

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    MR. BERESTKA:  The only thing I would ask is that, if

2  PG&E's willing to stipulate with the trial court that we are to

3  move this hearing, I need that agreement from them.

4    THE COURT:  Okay.  Let's see if we can agree with

5  that.

6    (Counsel confer.)

7    MR. BENVENUTTI:  All right.  That's fine.  So it's --

8    THE COURT:  Are you willing to enter into a stip -- or

9  your co-counsel on a stip to submit to the superior court to

10 just continue the January 20 -- whatever the hearing is?

11    MR. BENVENUTTI:  December 24th, Your Honor.

12    THE COURT:  Yeah.  Would you be willing -- are you

13 willing to stip on the record here that you'll enter a stip

14 with Counsel --

15    MR. BENVENUTTI:  Well, I --

16    THE COURT:  -- to put that over?

17    MR. BENVENUTTI:  I don't have -- I don't have explicit

18 authority to do that, Your Honor, but I think if the Court made

19 it part of the deal we're talking about here, I think I would

20 implicit authority.

21    THE COURT:  I think if I were able to communicate with

22 the superior court judge, I would say, I'm -- I think we can

23 solve some of this problem, but I need more time.  And so we'd

24 like you to continue your matter until after -- until late

25 January or early February.

PG&E Corp., Pacific Gas & Electric Co.

1          MR. BENVENUTTI:  All right, Your Honor.  And may I

2    have the date again of Mr. Berestka's response?

3          THE COURT:  Two weeks after -- so the debtor -- PG&E,

4    debtors, are going to file what is a further opposition to the

5    motion for relief from stay and motion to reject.  And Mr.

6    Berestka's response to that -- excuse me, that's January 6th.

7          MR. BENVENUTTI:  Um-hum.

8          THE COURT:  Mr. Berestka's response to that is January

9    20th.

10          And --

11          MR. BENVENUTTI:  Very well.

12          THE COURT:  -- Mr. Berestka, you don't have to

13    respond -- I mean, your response should be a combined why the

14    contract isn't rejectable or, if it is, why it shouldn't be

15    rejected.  Okay?  That's a bit of a time -- I'm changing the

16    procedures a little bit, but we're going to make this things

17    go.

18          MR. BERESTKA:  Perfect.  Thank you, Your Honor.

19          THE COURT:  Okay.  Good luck.  Thank you for your

20    time.

21          MR. BENVENUTTI:  Very well.  Thank you, Your Honor.

22          THE COURT:  Okay.  Now, we're down to the RSA.  I

23    think it's time to take a break.

24          But Mr. Karotkin, are you on duty for that today?

25          MR. KAROTKIN:  Yes, sir.

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  What's your pleasure?  A short break or --

2    remember what I said before.  I didn't realize we'd go quite so

3    long today, but we did.  So what would you like me to do?

4    MR. KAROTKIN:  Whatever you're -- whatever you

5    suggest, Your Honor, is fine.

6    THE COURT:  Well, tell me -- well, let's do a heads-up

7    for me.  Last night -- I won't tell you what time -- I looked

8    at the docket and saw nothing had happened.  And this morning,

9    I found that the debtor and the TCC had entered into an

10   amendment to the RSA.  So what is your belief is the

11   appropriate thing to do today, Mr. Karotkin?  In other words,

12   what do you want me to do when we -- whether it's in the next

13   two minutes or after a break?

14   MR. KAROTKIN:  You could approve the RSA in the next

15   two minutes.

16   THE COURT:  And Mr. Julian, what do you want me to do?

17   MS. DUMAS:  Your Honor, Ms. Dumas will be --

18   THE COURT:  Never mind.  Or Ms. --

19   MS. DUMAS:  -- handling the RSA.

20   THE COURT:  Ms. Dumas, what do you want -- what do you

21   want me to do if Mr. Karotkin asks me to approve the RSA, as

22   amended, in the last few hours?

23   MS. DUMAS:  The TCC would strongly urge the Court to

24   approve the RSA.

25   THE COURT:  Okay.  Is Ms. Mitchell here?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1      UNIDENTIFIED SPEAKER:  Your Honor, so would the

2   professionals.

3      THE COURT:  Ms. Mitchell, could you just give me a

4   clue on what the governor's position is on this late

5   development?  I'm not -- I'm going to have more argument when I

6   figure out what's the right thing to do.  I'm not going to turn

7   this into a death camp for endless hearings, and I'm not going

8   to keep people from going to Judge Donato's court at 1 o'clock.

9   So give me a clue on what --

10      MS. MITCHELL:  So all --

11      THE COURT:  -- the governor's --

12      MS. MITCHELL:  -- I was going to say today, absent

13   having to correct anything on the record after Mr. Karotkin

14   gets done, was going to take about -- was going to take about

15   three minutes.

16      I'm Nancy Mitchell.  I'm from O'Melveny & Myers, on

17   behalf of Governor Gavin Newsom.

18      So maybe I'll just tell you where the governor is, and

19   that may clarify things.

20      THE COURT:  I was hoping you'd bring him here today.

21   I think lawyers are invited to bring their clients to the

22   bankruptcy court.  He's welcome here at any time.

23      MS. MITCHELL:  I'll convey that to him.

24      THE COURT:  Okay.

25      MS. MITCHELL:  So the -- Your Honor, I think I'm going

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    to start with the end, and then I'll give you a little bit of

2    background.  So the governor obviously has been, I think, very

3    clear that he is concerned that we do not currently have an AB-

4    1054 compliant plan --

5              THE COURT:  Right.

6              MS. MITCHELL:  -- because it doesn't include the

7    governance, because it doesn't meet the financial requirements,

8    et cetera.

9              Having said that, we do believe that an AB-1054

10   compliant plan can be developed in these cases.  I'm not going

11   to tell you it's this plan.  We think the parties need to

12   recognize that AB-1054 is not a rubberstamp, and we need to get

13   to the changes that are necessary.  And that's a high bar for

14   people.  And so we have continued to believe that we would be

15   better off if the settlements in these cases did, in fact,

16   apply to all plans.  So I think that that is probably our one

17   issue that we would take up an argument, if we chose to.

18             Having said that, I think that, at the end of the

19   day -- and we conveyed this to the TCC yesterday before they

20   made the decision to amend the RSA -- the governor does respect

21   the TCC's decision, as a fiduciary, to move forward on the

22   victim settlement today.  We do support the fact that they

23   believe that this distribution is fair treatment for them and

24   would not stand in the way of that being considered today.

25             THE COURT:  Well, I'm glad you said that, because

PG&E Corp., Pacific Gas & Electric Co.

1    here's my dilemma.  And first of all, I don't like -- I mean, I

2    like progress, and there are different opinions as to what's

3    progress.  But I don't like eight hours before the hearing

4    progress that impacts so many people before anyone can even

5    think about it.  So one of the things that I wanted to ask you,

6    personally, and not even your client, if he were here, is the

7    following.

8             So I read -- I read the governor's statement --

9             MS. MITCHELL:  Um-hum.

10            THE COURT:  -- as I'm sure everyone in Northern

11   California did, and I got the message.  But then when I read

12   the document that you filed at 12:44 yesterday, I saw a number

13   of things that didn't surprise me.  But what left me in doubt

14   was the last sentence.

15            "Therefore, to the extent the proposed settlement

16   proceeds, the Bankruptcy Court should require amendments that

17   allow TCC and consenting fire claim professionals to support

18   any alternative restructuring or deem the fire victim claims

19   unimpaired."

20            Well, I don't think there's any ability for me to deem

21   them unimpaired.  It sounds like a wish list that I can't

22   fulfill.  But it seemed to me that, notwithstanding the strong

23   words of the governor's letter, the governor's lawyers are

24   saying, but go ahead and approve the RSA, with one tweak.

25            So -- do I read that correctly?

operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    MS. MITCHELL:  Yes, Your Honor.  I will say, I don't

2  say much for the governor without him being okay with it, in

3  pleadings or otherwise.  And I think, Your Honor, our view is

4  and has been consistently that for this debtor to get out of

5  bankruptcy and for the state to avoid the other actions it

6  might have to take, that this case has to get to conclusion and

7  with AB-1054 compliance.

8    THE COURT:  Right.

9    MS. MITCHELL:  And that is very, very important to us,

10 and that's not going to change, regardless of what happens here

11 today.  We --

12   THE COURT:  Correct.

13   MS. MITCHELL:  -- believe that as a result --

14   THE COURT:  I agree.

15   MS. MITCHELL:  -- of that --

16   THE COURT:  I agree with you.

17   MS. MITCHELL:  -- more optionality rather than less is

18 good for us.

19   THE COURT:  Right.  But what I -- what was interesting

20 about --

21   MS. MITCHELL:  Um-hum.

22   THE COURT:  -- reading your response and, frankly, all

23 the responses to the RSA, there were a number of reserved

24 positions, which are understandable; there were a couple of

25 very specific questions that I know Mr. Karotkin can deal with.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  But there weren't many -- there wasn't much of anybody really

2  saying this is a bad --

3          MS. MITCHELL:  Right.

4          THE COURT:  -- economic resolution or settlement.

5          And so I thought, well, do we defy the governor?

6  "We".  The governor doesn't purport to administer bankruptcy

7  laws, nor do I purport to administer state law.  And it would

8  seem to me that if I accept the recommendation that I approve

9  the RSA, I'm not -- it's not defying the governor.  It's

10 acknowledging that the governor's responsibility is broader

11 than the Bankruptcy Court's.  And by approving the RSA, I'm not

12 saying AB-1054 has been complied with or corporate governance

13 is fine or the wildfires or climate change or all the other

14 panoply of things that are not bankruptcy issues are being

15 dealt with.

16         None of them are.  In fact, I believe even your

17 position is clear that not even the alternative plan, at the

18 moment, complies with AB-1054.

19         MS. MITCHELL:  That is correct, Your Honor.

20         THE COURT:  And so it's sort of like, okay, then maybe

21 what I ought to do is listen to the substantive challenges to

22 the RSA and not -- and I don't -- let me try it this way.  I --

23 if I grant today's motion, I don't want it -- and it's not a

24 power play saying I know more than the governor does.  It's not

25 my role.  My role is to enforce the bankruptcy rules.  He's got

PG&E Corp., Pacific Gas & Electric Co.

1    some bigger fish to fry.  We've got a very big fish but not the

2    whole kettle.  Right?

3              MS. MITCHELL:  Well, it's a lot of fish.

4              THE COURT:  Yeah, a lot of fish; I agree.  And I'm

5    not -- I haven't been asked to approve corporate governance.  I

6    haven't been asked to approve climate or curative measures or a

7    hundred things.

8              MS. MITCHELL:  Your Honor, I think that's actually

9    right, and that is why we conveyed to the TCC that, at the end

10   of the day, we thought that they should exercise their

11   fiduciary duty.  And the governor did not intend to stand in

12   the way of the TCC doing that or ask Your Honor not to do the

13   job of administering the bankruptcy.

14             THE COURT:  I'm neither criticizing the governor nor

15   his counsel.  I'm clarifying what the deal is.

16             MS. MITCHELL:  No, I wanted you to know that is where

17   we came out as well.

18             THE COURT:  And you and I know, and every experienced

19   lawyer in this room knows, that I still have a responsibility

20   at some point -- not today, but at some point -- to make a

21   finding of feasibility, including the critical finding that

22   confirmation of whichever plan is not likely to be followed by

23   a need for further reorganization.

24             So that's sort of the clue that I got from the

25   governor's letter, is that the governor, among other things,

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  says, I don't think that the deal is doable.  But he didn't

2  say, but it's a bad result of the fire victims or the

3  subrogation group.

4          MS. MITCHELL:  That's correct.

5          THE COURT:  Yeah.

6          MS. MITCHELL:  Nor did he say that the debtor could

7  not, at some point, develop a confirmable AB-1054 compliant

8  plan.  We just don't think it's this plan.

9          THE COURT:  Right.  That's right.  So if I could turn

10 it around to you the way I'm interpreting the governor's

11 letter, as modified by your legal statement on his behalf, is

12 that if I approve the RSA because I'm satisfied for the

13 bankruptcy issues that have been addressed -- and there are

14 issues; there are releases and lockups and all these other

15 things -- somebody still has a lot of work to do, a lot of

16 heavy lifting at the OII, and then in the political arena, in

17 the marketplace.  And they have to come back and get a

18 confirmable plan.

19          And the governor, at the moment, doesn't believe there

20 is a confirmable plan.  But that isn't the issue today.

21          MS. MITCHELL:  That is correct, Your Honor.

22          THE COURT:  Okay.  All right.  Thank you, Ms.

23 Mitchell.

24          So Mr. Karotkin, what I propose is the following.

25 I -- and I'm sure you have gone through all the oppositions.

PG&E Corp., Pacific Gas & Electric Co.

1    And I have two, and I want to hear from you and from the

2    opponents.  But I have a short list of just my own questions.

3            And so I thought if I gave you my questions, then it

4    would be appropriate to perhaps take the break.  And then we

5    could resume after Judge Donato's hearing.  And I would go down

6    the list of any -- for any of the counsel -- and there are

7    several -- who want to be heard on specific objections.

8            Is that -- does that work for you, or would you like

9    to do it some other way?  I want you to tell me what you want

10   to do.

11           MR. KAROTKIN:  I know that, Your Honor, I would like

12   to at least make an opening argument.  I'm -- and I'm happy to

13   address -- and hear what your questions are and address your

14   questions as well.  I know that --

15           THE COURT:  Well, some of them are very detailed.  I

16   mean, just -- look, I went through the thing, and I just had to

17   circle, like, what does this mean, and what does that mean.  I

18   mean, there probably -- you might -- half of them, you might

19   say, well, didn't you read the thing, dummy?  And I read -- a

20   lot of reading.

21           MR. KAROTKIN:  Yeah.

22           THE COURT:  Okay.

23           MR. KAROTKIN:  I don't think -- I don't think I would

24   say that.

25           THE COURT:  Go ahead and make your opening statement

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    then.

2            MR. KAROTKIN:  Do you want me to -- do you want do

3    that before you break?

4            THE COURT:  No, you make -- well --

5            MR. KAROTKIN:  It's up to you.

6            THE COURT:  Why don't you -- why don't you tell the

7    world, tell me, the audience, the media, the public, what --

8    where are now based upon the response by the debtor and the TCC

9    to the governor's -- I won't say veto -- the governor's

10   disapproval, but now, as we've heard from his counsel, not

11   quite a -- not quite a veto?  Not --

12           MR. KAROTKIN:  Yes.

13           THE COURT:  -- that he had the -- he doesn't have the

14   veto to veto what I have to do, but he has the veto to tell the

15   rest of us and citizens of California what AB-1054 needs to --

16   how it needs to be dealt with more specifically.

17           MR. ORSINI:  Right.  And I think, Your Honor, you've

18   put your finger on it, and I think Ms. Mitchell confirmed that

19   the governor is not saying that the debtor's plan cannot move

20   forward.  In fact, saying quite the opposite.  And as I will

21   mention, there are ongoing constructive, as we've reported,

22   conversations with the representatives of the governor's office

23   to address the concerns he raised.  And I think as you just

24   commented, and as Ms. Mitchell confirmed, those issues can be

25   addressed later.  And if you were to rule to approve the RSA,

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    it certainly does not foreclose those issues.  And we intend to

2    file a plan that is AB 1054 compliant at the end of the day,

3    and the CPUC --

4            THE COURT:  You don't mean literally the end of the

5    day.

6            MR. ORSINI:  Not at the end of the day, and the CPUC,

7    but we are convinced, Your Honor, and I think it's clear -- I

8    think it's clear, Your Honor, that by reason of the fact that

9    the tort claimants' committee and the professionals who signed

10   the RSA agreed to the amendment yesterday, agreed to the

11   amendment to eliminate the provision that gave an automatic

12   termination right based on the governor's report.  I think

13   they've made it very clear, Your Honor, that they have

14   confidence in the debtor's plan.  They want to move forward

15   with the debtor's plan, and they believe that the debtor's plan

16   will be AB 1054 compliant, will address the governor's

17   concerns, will address the CPUC's concerns, and they, Your

18   Honor, together with the other parties to the RSA, as well as

19   Mr. Feldman's clients -- and I would urge you to approve the

20   subrogation RSA as well -- they've all made the determination

21   with the debtor.  And again, those are all of the impaired

22   classes in these cases.  They have all made the determination

23   that they want to move forward with this.

24           THE COURT:  Well, remember, you and I both know, but

25   some people may not know, impaired classes -- excuse me,

(970) 384-0504 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    unimpaired classes don't get to vote --

2             MR. ORSINI:  Right.

3             THE COURT:  -- but they still can object.

4             MR. ORSINI:  They still can object --

5             THE COURT:  Okay.  Okay.

6             MR. ORSINI:  -- on the basis of the inability of the

7    plan to satisfy the requirements of Section 1129 of the

8    Bankruptcy Code.

9             THE COURT:  Right.  That's correct.

10            MR. ORSINI:  But again, Your Honor, I think it's clear

11   by where we are today that the impaired classes --

12            THE COURT:  We're losing you -- you're a little far

13   away from the mic.

14            MR. ORSINI:  I'm sorry.  That the impaired classes

15   support moving forward together with the debtor's plan.  And

16   again, are confident that that plan is confirmable, will be

17   confirmable, will be 1054 compliant, and will be able to

18   address any of the concerns that the CPUC has raised.

19            And I'd like to point out, Your Honor, that the RSA is

20   the product of extensive arms' length negotiations among the

21   parties under the auspices of the mediator that you, Your

22   Honor, appointed, retired bankruptcy Judge Newsome, and fully

23   achieves the goals Your Honor sought in appointing the

24   mediator, a global comprehensive resolution of these Chapter 11

25   cases with the debtors reaching a settlement to be implemented

(971) 770-0500  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    pursuant to the plan with the last remaining fire claimant

2    constituency.

3            And with this resolution, as I mentioned, now all

4    impaired classes have coalesced around the debtor's plan paving

5    the way for a successful expeditious successful administration

6    of these cases well within the AB 1054 deadline, and also a

7    result that, again, the TCC and the fire claimants and their

8    attorneys believe is the best way to expedite distributions to

9    their claimants and to other creditors in these cases.

10           I'd also like to point out, Your Honor, that with the

11   assistance of bankruptcy judge -- retired bankruptcy Judge

12   Newsome, the parties, with his help resolved the issue with

13   respect to the release and the subrogation claimants' RSA.

14   That was the dispute between the tort committee and the

15   subrogation claimants with respect to how that release would be

16   worded.  That has been fully resolved and is incorporated in

17   the plan so there are no issues between the tort claimants and

18   the subrogation claimants with respect to that RSA at all.

19           THE COURT:  The release question is still waiting for

20   my ruling on the subrogation --

21           MR. ORSINI:  It is, but there was a --

22           THE COURT:  -- and it's related.  I know they're

23   different but --

24           MR. ORSINI:  There was a particular provision that was

25   objected to by the tort claimants' committee.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          THE COURT:  Right.

2          MR. ORSINI:  I think you mentioned that people are

3  free to sign releases.  That issue as to the terms of that --

4          THE COURT:  But I think you'll see that on my short

5  list of questions --

6          MR. ORSINI:  Okay.

7          THE COURT:  -- is one of the ones that I think relates

8  to that, yeah.

9          MR. ORSINI:  And again, all I'm telling you, Your

10  Honor, is the parties, with the help of Judge Newsome have

11  resolved that --

12          THE COURT:  Don't -- you don't have to give him more

13  credit.  You said three times about -- good things about him.

14  That's all he gets; three.

15          MR. ORSINI:  I've got several more pages to praise

16  him.

17          THE COURT:  Just make sure he has an "e" at the end of

18  his name.

19          MR. ORSINI:  Yes.  There's no confusion here.

20          And again, with respect to impairment, as we made very

21  clear to Your Honor last week during the discussion and

22  argument on post-petition interests, in the event you were to

23  determine that the unsecured creditors were entitled to post-

24  petition interest at a rate other than the federal judgment

25  rate, or that they're entitled to the make whole that will be

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  argued before the Court next month, the plan will be amended to

2  address your rulings, and will be revised to make it absolutely

3  and abundantly clear that those claimants will be rendered

4  unimpaired under all circumstances.

5           THE COURT:  Just an aside, I'm working on a draft

6  written disposition on the post-petition interest.  Needless to

7  say, I've been a little bit busy.  I'm also prepared at some

8  point, maybe today, to issue an oral ruling on the subrogation

9  group RSA --

10          MR. ORSINI:  Okay.

11          THE COURT:  -- that I want -- I really needed to make

12  sure I understand what we're doing here, and there are,

13  obviously, a number of questions still about today's motion,

14  not only my questions but, obviously, the objector's question.

15  So go ahead and you want to continue with your statement?

16          MR. ORSINI:  Yes, if you don't mind.

17          THE COURT:  Sure.

18          MR. ORSINI:  And of course you're aware as you

19  mentioned, the governor's letter that was issued on Friday, and

20  as I mentioned the parties to the RSA have amended it to do

21  away with the automatic termination right.

22          THE COURT:  Well, if I read it correctly, because it

23  was the world's shortest amendment.  It just says we take out

24  3I, but 3I just means that between the debtors and the TCC and

25  the professionals, the governor's signoff isn't required.

(973) operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1        MR. ORSINI:  Not for purposes of today's hearing.

2        THE COURT:  But the governor --

3        MR. ORSINI:  Exactly.

4        THE COURT:  That's right.  And as Ms. Mitchell

5   confirmed, and I state, 1054 is still up there and has to be

6   complied with like all the other provisions of the Bankruptcy

7   Code.

8        MR. ORSINI:  No question, nor are anyone's rights

9   being prejudiced with respect to those issues.

10       THE COURT:  But the governor has expressed both in

11  his -- excuse me -- in his letter and in his counsel statement

12  concerns about the lockup.  So I and you're going to --

13       MR. ORSINI:  And I'm happy to address that as well.

14       THE COURT:  Well, whenever you get to it on your list,

15  because I -- that, to me, is one of the significant issues

16  and -- that I have to deal with today and that's a today

17  question.

18       MR. ORSINI:  Yes, sir, I understand that.

19       THE COURT:  Okay.

20       MR. ORSINI:  And as I mentioned before, and I think

21  Ms. Mitchell would confirm, we have been engaged in

22  constructive dialogue with the governor's representatives to

23  address the issues he's raising.  Those discussions will

24  continue.  In fact, there was a meeting with the governor's

25  office this past Saturday in Sacramento with the debtors in

(972) 503-3372 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  order to address those concerns that he's raised.

2          And as I mentioned, and I don't mean to repeat this,

3  but I think it's important that the parties through the RSA,

4  obviously, believe -- otherwise they would not have agreed to

5  the amendment -- that the debtors and the plan proponents are

6  capable of meeting the government's demands, and that this case

7  can move forward.

8          I will note that the tort claimants RSA, Your Honor,

9  fully resolves this Chapter 11 plan treatment of the remaining

10  fire constituency claims, the debtors already having resolved

11  the claims of the public entities and the subrogation

12  claimants.

13          The RSA achieves a comprehensive resolution and

14  eliminates any reason, Your Honor, to continue the competing

15  plan process.

16          As I mentioned before, impaired classes have agreed to

17  support our plan.  One plan, the debtor's plan.  There is no

18  longer support for the ad hoc committee's plan.

19          THE COURT:  What do I do about it?

20          MR. ORSINI:  I'll get to that as well.

21          And the RSA eliminates the substantial cost associated

22  with the estimation proceedings both before Judge Donato in the

23  Tubbs trial in Superior Court.  And with all other classes of

24  claims being unimpaired, moving forward and approving the RSA

25  presents a clear path to an expedited successful confirmation

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  of these cases well within the June 30, 2020 deadline.

2          Your Honor, I'd like to point out, we have

3  accomplished -- and again, I don't -- I'll have to give some

4  praise to the mediator again -- with the help of the mediator

5  exactly what you asked us to accomplish; exactly.  You

6  appointed the mediator to achieve a global resolution; that's

7  what has been achieved.

8          Now, I know the creditors' committee and the

9  bondholders will get up and say well, we're not happy with the

10 plan, you haven't addressed our issues.  Well, Your Honor,

11 they're unimpaired.  They will be paid in full.  There are no

12 issues to address.  They have nothing to complain about.

13         And for the senior -- the ad hoc senior noteholders'

14 committee to assert in its objection filed yesterday that its

15 joint plan is superior, to use their words, to the debtor's

16 plan simply ignores the facts, and let's talk about the facts.

17         Their purported joint plan no longer has the support

18 of the tort claimants' committee, and I might remind you, Your

19 Honor, that support was fundamental in your decision to

20 terminate exclusivity.

21         THE COURT:  It was.

22         MR. ORSINI:  That was the reason you terminated, and

23 that support no --

24         THE COURT:  It's what turned it around.  You'll recall

25 that I extended it first.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    MR. ORSINI:  I did, and I read your opinion again this

2    morning.  That support no longer exists.  That plan never had

3    the support of the subrogation claimants or the public

4    entities; never.  And as indicated by Ms. Mitchell and in the

5    governor's pleading filed yesterday, that plan does not satisfy

6    the requirements of AB 1054.

7    THE COURT:  Well, but there were no specifics.  It was

8    just a throwaway like there's another one out there.  But --

9    MR. ORSINI:  Well, I wouldn't call -- if you ask Ms.

10   Mitchell --

11   THE COURT:  Throwaway is the wrong word.

12   MR. ORSINI:  -- I wouldn't call it a throwaway.

13   THE COURT:  There was no elaboration, and I'm sure

14   that Ms. Mitchell and Mr. Stamer have had a dialogue on that

15   subject.  It wasn't something that needed to be explicated

16   today, that's all.

17   MR. ORSINI:  I'm not sure of the extent of those

18   discussions.

19   THE COURT:  Okay.

20   MR. ORSINI:  Not surprisingly, Your Honor, the only

21   parties that support the ad hoc plan are the bondholders which

22   have no fiduciary duties to anybody, and the reason's quite

23   obvious because they stand to receive in that plan an economic

24   windfall at the expense of rate payers to the tune of three or

25   four billion dollars as I think they even acknowledge in their

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    papers.

2          Your Honor, the tort claimants' committee with

3    fiduciary duties to all tort claimants and the subrogation

4    claimants represented by Mr. Feldman have made, as I said, a

5    determination that the debtor's plan that encompasses a global

6    resolution is the best way to proceed to get to a successful

7    conclusion of these cases and distributions to their respective

8    constituencies.

9          The only remaining issues, Your Honor, are your

10   rulings with respect to post-petition interest and make whole,

11   which again we'll address.  And as I mentioned, of course,

12   we'll address any of the concerns of the governor and the CPUC

13   going forward.

14         Now, with respect to the objections, if you'd like me

15   to get to the objections --

16         THE COURT:  Yeah, I'd like --

17         MR. ORSINI:  -- I can do that now or later.

18         THE COURT:  Why don't -- why don't we go to my

19   questions, and then I want to hear from Mr. Julian or Ms.

20   Dumas.  So listen, let's go to my questions.  Their discrete as

21   I say.  I won't be offended if you tell me that the answer was

22   obvious.

23         So I'm looking at the actual -- the actual RSA, not

24   the term sheet.  And I'm looking at page -- starting with page

25   3.  There is a reference to, and a definitional term, for the

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    estimation approval order.  Well, I think I know what that

2    order's supposed to do, but I want to know what -- when does

3    that happen and what relief will that order, when granted,

4    provide?

5              MR. ORSINI:  That will happen -- I believe there's a

6    time --

7              THE COURT:  There's some deadlines later.

8              MR. ORSINI:  There's a deadline.  I believe it's in

9    March --

10             THE COURT:  Okay.

11             MR. ORSINI:  -- or prior to the disclosure statement

12   hearing.

13             THE COURT:  But what was that -- what would that order

14   say?

15             MR. ORSINI:  That order will estimate the amount of

16   the tort liability for purposes of the plan.

17             THE COURT:  But isn't that the same -- the very same

18   numbers that are already in the stock?

19             MR. ORSINI:  It will be the very same numbers.

20             THE COURT:  So --

21             MR. ORSINI:  So that will be brough before the Court

22   for a final determination.

23             THE COURT:  But my question, then, is what is there to

24   think about?  I mean, what would an objection be that the

25   estimation is the right number, the wrong number?  In other

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    words, I -- what I'm trying to do is figure out whether it's an

2    action item or kind of a formality.

3           MR. ORSINI:  I think that, frankly, it would be more

4    of a formality.

5           THE COURT:  Yeah.  I mean, there may be an objection

6    to it, but the point is --

7           MR. ORSINI:  There could be an objection that, I

8    suppose someone -- some party could say we don't believe

9    it's --

10          THE COURT:  But the way I --

11          MR. ORSINI:  -- reasonable.

12          THE COURT:  -- the way I read the RSA, if I approve

13   the RSA today and particularly if at the same time or

14   concurrently I approve the subrogation RSA, that just fixes in

15   stone the thirteen and a half billion and the eleven billion.

16          MR. ORSINI:  Subject to plan confirmation.

17          THE COURT:  Yes, of course, subject to plan -- and

18   subject to anything else going on.

19          MR. ORSINI:  And voting on the plan.

20          THE COURT:  And some other things happening;

21   insolvency or things, but at least on the face of it --

22          MR. ORSINI:  And I think we would need a determination

23   by the Court that that's a reasonable number at that point.

24          THE COURT:  Okay.  But -- all right.

25          So then -- so going down on the same page, what is the

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  current status of the exit financing?  Is that going to be back

2  on track on a calendar item?  If I approve the RSA now, will

3  there be a hearing on the exit financing --

4          MR. ORSINI:  Yes.

5          THE COURT:  -- in January?

6          MR. ORSINI:  I believe it's currently scheduled for

7  the 14th.

8          THE COURT:  The 14th.  That's right.

9          MR. ORSINI:  Yes.

10         THE COURT:  Okay.  Simple question.

11         So now -- okay.  So on the next page, there -- again,

12 it was easy for me to go to the definitions.  And so the subro

13 RSA motion, my question really is more for Mr. Julian, I guess,

14 and that is when does the TCC withdraw its objection to the

15 subro motion, and I think I probably know the answer; it's

16 consistent with this approval.

17         Ms. Dumas, can you confirm that?  That's just a --

18 again, a formality, right.  If I approve today's motion, then

19 your clients withdraw their objection to the subrogation

20 motion?

21         MS. DUMAS:  Yes, sir.  That is correct.  If you'd like

22 further amplification, Mr. Julian can provide it.

23         THE COURT:  No, no.  I mean, look, there was spirited

24 opposition to the subrogation RSA, and by others as well, but

25 particularly by the TCC.  But the RSA TCC motion resolves that

escribers

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   dispute between the TCC and the subrogation group.

2        MS. DUMAS:  That is correct.

3        THE COURT:  That's all I need for now.

4        And the same -- the same -- now, Mr. Karotkin, I don't

5   want you to tell me what I'm not supposed to know about, but

6   I'm confused as to how the next paragraph and the

7   implementation in 2(a) of the negotiations and discussions with

8   the Tubbs plaintiffs works.  So don't disclose what I'm not

9   supposed to know, but how does that get implemented?  I don't

10  know what happens.

11       MR. KAROTKIN:  The Tubbs settlements will be

12  negotiated.  Settlements --

13       THE COURT:  Well, it's supposed to have already been

14  negotiated.

15       MR. KAROTKIN:  Right.  I believe that -- and Mr.

16  Orsini can address that.  I believe that those have been

17  negotiated and will -- I think they will be fully documented.

18       THE COURT:  Okay.  So let -- again, I don't want --

19       MR. KAROTKIN:  They will be brought to this Court for

20  approval.

21       THE COURT:  I don't want specifics.

22       MR. KAROTKIN:  I'm not going to tell you numbers.

23       THE COURT:  But if there's a Tubbs plaintiff, Mr. X,

24  and Mr. X agrees to be paid a certain amount of money, does he

25  get paid a certain amount of money or does that amount go into

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1     the pool for what constitutes his claim in the trust?

2           MR. KAROTKIN:  That would be a claim to be dealt with

3     by the trust and to be paid pursuant to the trust

4     administration proceedings.

5           THE COURT:  It just quantifies his claim.

6           MR. KAROTKIN:  It just quantifies his amount.

7           THE COURT:  So -- well, as you know, one of the

8     objections by one -- the party or two of the parties today by

9     individual claimants is that that's unfair to other victims.

10    That it seems to me if I read it correctly, and you can confirm

11    this, it simply quantifies that for purposes of knowing what

12    that particular claimant's entitlement is one of the pool of

13    the thousands of people who are beneficiaries of the trust.

14          MR. KAROTKIN:  That's correct.

15          THE COURT:  And if all goes well and RSA -- excuse me,

16    AB 1054 is honored, then Mr. X will get his money and so will

17    Ms. Y and Ms. E who aren't in the Tubbs fire but whose amounts

18    are estimated or calculated --

19          MR. KAROTKIN:  Correct.

20          THE COURT:  -- right?

21          MR. KAROTKIN:  Yes.

22          THE COURT:  Okay.  And what happens if the, God

23    forbid, the trust comes up short?  Is it prorated among all the

24    beneficiaries including that individual?

25          MR. KAROTKIN:  I believe, and again, the trust

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  procedures haven't been documented yet, and, of course, they

2  will be part of further proceedings before the Court for Your

3  Honor to consider.  I believe there would be mechanisms, and I

4  think Mr. Julian referred to it last week, there will be

5  mechanisms in the trust distribution procedures to assure that

6  there are sufficient funds to address all the claims.

7          THE COURT:  Okay.  So now go back to the individuals

8  that are -- until they reach an immediate settlement in Tubbs

9  will be going to trial next month.  What will be the relief

10 sought by this Court?  In other words, what -- the motion --

11 this goes over to the next page, page 5 in subparagraph (h), it

12 says that there'll be matters brought before the Court for

13 approval, but what would the Court be approving; just a sealed

14 number of dollar amounts attributable to the named plaintiffs?

15         MR. KAROTKIN:  Yes, sir.

16         THE COURT:  The named -- not the named plaintiffs --

17 the named preference plaintiffs, who are the ones --

18         MR. KAROTKIN:  Yes, sir.

19         THE COURT:  -- the short number of people going to

20 trial.  And again, that's not going to be public, though,

21 right?

22         MR. KAROTKIN:  Correct.

23         THE COURT:  That'll be sealed, correct?

24         MR. KAROTKIN:  Yes, sir.

25         THE COURT:  I'm right?

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1        MR. KAROTKIN:  Yes, sir.

2        THE COURT:  Okay.  And Mr. Julian or Ms. Dumas, if Mr.

3   Karotkin says something that you think is incorrect or

4   incomplete, just interrupt because all I'm doing is trying to

5   clarify --

6        MS. DUMAS:  Yeah.

7        THE COURT:  -- this document.

8        MS. DUMAS:  Thank you, Your Honor.  And having been

9   involved in the granular -- at a granular level of those

10  discussions regarding the Tubbs preference claims, I'd be happy

11  to amplify --

12       THE COURT:  No, you don't need to --

13       MS. DUMAS:  -- if the Court requires further.

14       THE COURT:  -- as long as -- I don't want to turn this

15  into a long hearing about something that isn't really critical

16  to today.  So I don't --

17       MS. DUMAS:  No, so far, so good.  Mr. Karotkin is

18  doing great.  There --

19       THE COURT:  Hey.

20       MR. KAROTKIN:  That's the first time she's said that

21  in a year, by the way.

22       THE COURT:  Yeah, get her to say it.  Get her to --

23  get her to sign your -- autograph your program here.

24       Okay, next page, Mr. Karotkin, page 7, the very bottom

25  of the page, I take it the culprit of section 4.19(f)(ii) has

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  been fixed?

2          MR. KAROTKIN:  That's what I referred to earlier.

3  Yes, sir.

4          THE COURT:  Okay.

5          Ms. Winthrop, did you --

6          MS. WINTHROP:  Yes, Your Honor, if I may be heard on

7  that issue.

8          THE COURT:  Yeah.  I mean, I'm trying to -- I'm trying

9  to just do my preliminary, but if you want -- if there's

10  something you can just add -- I mean, I know you said you

11  agreed to -- for your client, some of the resolution.  But go

12  ahead.

13          MS. WINTHROP:  Your Honor, Rebecca Winthrop on behalf

14  of the Adventist claimants.  Yes, we've had very productive

15  discussions with counsel for the ad hoc subrogation committee.

16  However, we thought we had reached an agreement on the form of

17  the stipulation this past Friday, but the debtor made changes.

18  And now, we've received a whole new round of changes.

19          THE COURT:  Okay.

20          MS. WINTHROP:  So an agreement has not yet been

21  released.  But the idea is to exempt Adventist from that

22  section.

23          THE COURT:  Okay, but on this particular point, this

24  is an agreement that need to be resolved by the TCC and their

25  professionals.  I mean, it's a more specific reference to a

PG&E Corp., Pacific Gas & Electric Co.

1    section.  Doesn't --

2         MS. WINTHROP:  It's my understanding we're talking

3    about the release section, Your Honor.  Are we not?  Did I miss

4    my reference?

5         THE COURT:  No, I think you did, but I think the

6    numbers changed.  I mean, I -- listen, you -- let's -- let me

7    run through my short list.  And if there's an issue here, we'll

8    come back to it later.

9         MS. WINTHROP:  Thank you, Your Honor.

10        THE COURT:  Okay?

11        All right, so Mr. Karotkin -- okay, I think those are

12   my immediate questions.

13        So I'm not in a position to give you a ruling without

14   hearing from everyone.  What's going to happen when you send

15   Mr. Orsini upstairs?  What are you going to tell the judge

16   upstairs, Judge Donato?

17        Mr. Orsini, what are you going to tell Judge Donato,

18   that Montali's working on it?

19        MR. ORSINI:  I'm certainly not going to presume to

20   tell him how you're going to rule.  I think what we expect --

21        THE COURT:  No, I said working on it.  I didn't say --

22        MR. ORSINI:  -- I think what we expect to tell Judge

23   Donato is that the issues are still before this Court, that --

24   you'll tell me if you disagree with this statement.  But I

25   think that Judge Montali understands the urgency of addressing

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  the RSA motion and that I certainly believe it's the debtors'

2  position and, I believe, the TCC and the subrogation claimants

3  agree that, for the time being, as Your Honor works on the

4  motion, we ought to leave the estimation proceedings paused.

5  And once we get an order from this Court on approval of the

6  RSA, if that's how the Court resolves the current motion, the

7  estimation proceedings will forever be on pause.

8         And if, for some reason, this Court were to decide not

9  to approve the RSA, then we can come back to Judge Donato to

10 discuss what that means in terms of the schedule --

11         THE COURT:  Well --

12         MS. WINTHROP:  -- going forward.

13         THE COURT:  -- I didn't know that we would take as

14 long as we did, even this morning.  And if we hadn't taken the

15 time for Ghost Ship, particularly, maybe we'd be done.  I don't

16 know.  But I'm not going to rush it.  This is something that's

17 changing by the hour.  And I have about ten objections, some of

18 which perhaps are not really objections.  They're reserves.

19 But there are a couple of substantive objections, particularly

20 from the OCC and the ad hoc bond committee.  And I want to hear

21 them.

22         So it may well be that, at 1 o'clock, you'll have to

23 say that you'll back down here around 2 o'clock.

24         MR. ORSINI:  We're still working.

25         THE COURT:  And -- but I read it correctly if I -- and

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  you confirm this -- if I say yes, I will approve the RSA, then

2  leaving aside when I actually sign an order, presumably that

3  means the estimation is off and the Tubbs trial estimation is

4  off.

5        MR. ORSINI:  That's correct, Your Honor.

6        THE COURT:  Correct?  Okay.

7        MR. ORSINI:  Correct.

8        MR. FELDMAN:  Your Honor, just very --

9        THE COURT:  Yes.

10        MR. FELDMAN:  -- briefly --

11        THE COURT:  Yes, Mr. --

12        MR. FELDMAN:  -- obviously, there are two RSAs --

13        THE COURT:  Name -- I know your name, but get it on

14  the record.

15        MR. FELDMAN:  Sure.  For the record, Matthew Feldman

16  on behalf of the ad hoc group of subrogation claimants.  I

17  don't want to -- I don't want to be overlooked in this, Your

18  Honor.

19        THE COURT:  You won't be.

20        MR. FELDMAN:  We are also a party to a subrogation.

21  We are also a party to Tubbs.  So the rulings need to be with

22  respect to both --

23        THE COURT:  Mr. Feldman --

24        MR. FELDMAN:  -- motions.

25        THE COURT:  -- you might recall, I asked if you wanted

PG&E Corp., Pacific Gas & Electric Co.

1    me to withhold on ruling --

2           MR. FELDMAN:  I did, and we did --

3           THE COURT:  -- and you told me --

4           MR. FELDMAN:  -- Your Honor, through Friday.

5           THE COURT:  -- you told me to wait till Friday.

6           MR. FELDMAN:  Yes, yes.

7           THE COURT:  Well, it's not Friday.  It's Tuesday.  And

8    you --

9           MR. FELDMAN:  That was last Friday, though, Your

10   Honor.

11          THE COURT:  I know.  So has it been extended?  Have

12   your hundred insurance companies all agreed to give me a little

13   more time?

14          MR. FELDMAN:  We have extended through tomorrow, Your

15   Honor.  And if you need more time, we will.  But I will argue

16   this afternoon why you should not take that time.

17          THE COURT:  As far as I'm concerned, the matter stands

18   submitted, and it's waiting for me to announce a ruling.  And

19   the question has to do with whether I've heard anything today

20   on the TCC RSA that would influence me.  And I intend to issue

21   orally on both of them later this afternoon unless something

22   goes off the rails here.

23          MR. FELDMAN:  Thank you, Your Honor.

24          THE COURT:  Okay, all right.  So let me do -- okay.

25          So Mr. Orsini, let's stop on that.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1        So here's what I'm going to do.  I'm going to run

2   through a brief roll call, if you will, of the objections that

3   were filed in the last few days.  And I will not necessarily

4   invite oral argument at this point because I want to stick with

5   my commitment to give people a humanitarian break.  I'm told by

6   my staff that I shouldn't use the word "personal convenience".

7   I believe Chairman Nadler used the term humanitarian break, so

8   I'm going to channel Chairman Nadler and do it his way and have

9   humanitarian breaks.

10        But I've looked at all the objections and considered

11  them.  And here's how I read them.  I have one from Attorney

12  Astelford (phonetic) for some of the file claimants, and his

13  objection really seems to be more about the different treatment

14  of the Tubbs victims compared to others.  And I believe that

15  that's been dealt with, for the most part, by Mr. Karotkin's

16  explanation and answer to my questions.  But if Counsel wishes

17  to be heard, I'll take that up after the break.

18        Mr. Feist, representing other victims, had once again

19  raised the question of equal treatment and treating the Tubbs

20  plaintiffs differently.  And I don't think that they really are

21  treated differently, as he had said, but I will -- if he wants

22  to be heard on that, I'll listen to it.

23        The next in order -- and by the way, I kind of sorted

24  the objectors out in terms of function, for my own thinking.

25  So then, I come to the Adventist, Feather Canyon (sic)

PG&E Corp., Pacific Gas & Electric Co.

1    claimants.  And there are a number of things that their

2    counsel, Ms. Winthrop, has raised.  And I think, for the most

3    part, her objections go to time to review the plan, and I

4    agree.  None of us have had time to review the plan and to get

5    more involved in understanding about the fire victim trust and

6    the resolution procedures.  Those are all good questions.  I

7    don't think they are action items for today.

8        She wants the TCC to be involved more in terms of

9    creating the terms and the ground rules on the trust and the

10   TCC to have an oversight function.  Again, I don't read her

11   objections to being very specific to today's motion.

12       And then, finally, I thought she had a good

13   suggestion, but perhaps more for counsel to discuss offline,

14   not in my presence, as to whether there should be some sort of

15   a temporary allowance procedure for voting purposes.  But I

16   don't think that's relevant to today's motion.

17       For the Cal agencies, again, there's a reservation of

18   position and no specific opposition to the TSA, although Mr.

19   Pascuzzi, I believe, stated that if the parties waive the

20   governor's termination right -- they want to reserve their

21   rights -- well, he's -- the parties have waived it, and the

22   state agencies can reserve their rights.  Same, largely, with

23   the United States, FEMA -- Mr. Troy for FEMA and the other

24   federal agencies, that it didn't seem to me there was any

25   substantive objections to the RSA, but more a reservation of

PG&E Corp., Pacific Gas & Electric Co.

1    rights and familiarity with the procedures on estimation.  And

2    I second-guessed that.  I can't expect, in this time frame that

3    we're dealing with, anybody's had a chance to even absorb those

4    things, let alone spell them out.

5            The United States Trustee objected about the timing of

6    the motion.  I will overrule that objection.  And we're

7    considering this motion today on a short notice.  But the

8    United States Trustee did have a substantive objection about

9    not to circumvent the plan process.  And I believe that that's

10   not a -- I don't believe the plan process is in jeopardy.

11           And the United States Trustee has also raised

12   questions about the application of the releases.  I will

13   address the releases when I hear from counsel and when I deal

14   with the question of releases a little later this afternoon.

15           The California Public Utilities Commission has once

16   again not opposed the merits of the RSA but -- so much -- and

17   as I read in CPUC's papers, a deference to the debtors'

18   business judgment, but reserving the right to raise the kind of

19   issues that are both confirmation issues or, more importantly

20   for the CPUC, the OII proceeding pending before that agency,

21   and also anything that might implicate classification.

22           Getting more substantively, the official creditors

23   committee focuses, I think, largely on the lockup issue and the

24   question of whether it's appropriate to approve an agreement

25   that locks up the professionals and the OC -- excuse me -- the

(971) 909-3580  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  TCC to commit it to this plan.  And I'll hear about that, any

2  further argument on that.

3       The official creditors committee also has identified

4  the -- and raised the question of the assignment of the causes

5  of action against third parties, questioning whether that's

6  appropriate since those -- their very same third parties are

7  necessary for the company to comply with its future obligations

8  under California law.  And I think that's part and parcel of

9  the governor's mission and the message from AB 1054.

10      The official creditors committee also raises the

11  question that I think is a nonissue, but I'll hear from them.

12  And that is an insolvency out.  Well, I don't know that I could

13  find a particular insolvency out in the TCC RSA, but there is

14  an insolvency out in the subro RSA.  And there is an insolvency

15  out in the applicable law.  So I think that if -- and then

16  maybe there's some specific saving language in the TCC RSA.

17  But I believe if the situation were -- presented itself that we

18  had an insolvent situation, that as a matter of course, that I

19  don't think the RSA could survive.

20      And the OCC raises the question about should the

21  estimation proceedings begin?  And the answer is, obviously,

22  back to the question.  One of the debates that I have to

23  struggle with is what happens if I approve the TCC RSA, and

24  then it goes off the track and no longer is on track to

25  confirm?  Well, that's a question that we all have to deal

(972) 459-9100 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    with.  But I don't think the fact that the TCC RSA may stumble

2    down the road is reason enough to deny approval of it today,

3    unless it's a foregoing conclusion that it can't possibly

4    survive.  That's another question.

5          The ad hoc noteholders committee raised some of the

6    same questions about wanting to keep the estimation in place

7    and also takes issue with the lockup, and that will be

8    something we attend to after the break.

9          I would add further that the ad hoc noteholders also

10   seem to revisit the whole question of post-petition interest

11   and the make whole provisions.  And I don't think those are

12   relevant to today.

13         Excuse me.  I misspoke.  Those are objections that are

14   raised more by BOKF, not so much by the ad hoc committee.

15         So the securities plaintiffs have reserved their

16   position.  The City of San Jose has stated its views on what

17   ought to be, depending on how the Court should be focusing on

18   safety and health issues and operational issues, but I didn't

19   read from the City of San Jose a specific challenge to the

20   particulars of the TCC RSA.

21         And Mr. Abrams, who filed a late opposition, once

22   again takes issue with including the governmental agencies into

23   the pool, the -- what we'll call the thirteen-and-a-half-

24   billion-dollar pool.  And he also seems to want to let the

25   Tubbs fire victims have their day in court.  I'm not prepared

(971) 222-0810 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    to be persuaded by that argument, particularly in view of the

2    role played by the TCC and the professionals, to the extent

3    that they are a functioning group that is separate from the

4    TCC.  And I then would not be inclined to be persuaded to

5    carry -- change my -- excuse me -- to adhere to Mr. Abrams'

6    suggestion.

7         And the final list of objections that I reviewed are

8    the governor's comments, which I've already addressed.

9         So unless, Mr. Karotkin, you want to add anything

10   further at this point -- well, actually, having said that, Mr.

11   Julian or Ms. Dumas, is there something you want to say now,

12   before we break, about what should happen and why I should

13   approve the TCC RSA and, in effect, not keep the TCC locked

14   into the plan that, until nine days ago, they were supporting,

15   the alternative plan?

16        And this is brief -- just brief because -- I won't cut

17   anybody off.  I just want to stick with our time schedule here.

18        MS. DUMAS:  Absolutely.  Thank you, Your Honor.

19   Cecily Dumas of Baker and Hostetler on behalf of the official

20   committee of tort claimants.  Two quick points.  One is a point

21   of clarification.  I think Mr. Karotkin clarified it, but I'm

22   not sure whether the objecting parties on Tubbs understood that

23   the RSA contemplates only the settlement of those sixteen

24   preference actions.

25        THE COURT:  That's what I understood.

(9705) operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    MS. DUMAS:  And it appeared from one of the objections

2   that the party who represents Camp victims may have believed it

3   extended beyond that.  I just wanted to make that --

4    THE COURT:  But do you -- did I get it right that

5   those sixteen people, they will agree to amounts that are

6   sealed, but they don't get a check?  They don't get paid.

7   Those amounts are included as part of their entitlement.  And

8   actually, that liquid -- excuse me -- liquidates their claim

9   that participates in the trust.

10    MS. DUMAS:  That's absolutely correct, Your Honor.

11   There is no immediate payment.  The idea behind this portion of

12   the RSA -- and it's a critical portion -- is that these people

13   are, in order to qualify for preference on the trial calendar,

14   are elderly.  And it was felt that it's in -- both the debtor

15   and the TCC and the claimants' counsel agreed that it would be

16   best to allow them to have their claims liquidated through

17   settlement at this point in time.

18    And the other aspect of that, besides their personal

19   circumstances, was the fact that, as of January 7th, a Tubbs

20   liability and damages trial would start in --

21    THE COURT:  Right.

22    MS. DUMAS:  -- San Francisco Superior Court.

23    THE COURT:  But it would stop -- it would stop under

24   this, but Mr. X and Ms. Y --

25    MS. DUMAS:  Yes.

of 353
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  -- they would have in hand an order that

2  says they have a claim of X dollars --

3    MS. DUMAS:  That's absolutely correct.

4    THE COURT:  -- negotiated but confidential, at this

5  point --

6    MS. DUMAS:  Yes.

7    THE COURT:  -- number.

8    MS. DUMAS:  And not to be set for the debtors, not to

9  be set as precedential with respect to liability for any other

10  Tubbs issues.  And the concept is is that these individuals who

11  went out ahead of everybody else have their settlements, but if

12  the whole thing falls apart, which we deeply hope it does not,

13  then Tubbs liability and damages would be rolled into the

14  estimation proceedings, and resulting in San Francisco Superior

15  Court proceedings ending once and for all with the

16  settlement --

17    THE COURT:  And if I --

18    MS. DUMAS:  -- of these sixteen cases.

19    THE COURT:  -- and if I read the document correctly,

20  no matter what happens in the confirmation process, the

21  superior court's role ends.

22    MS. DUMAS:  Ends.  That's --

23    THE COURT:  And if those --

24    MS. DUMAS:  -- that's right.

25    THE COURT:  -- sixteen people or anyone else, if Tubbs

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    fire is litigated, it'll then be litigated here in the

2    district -- or estimated in the district court.

3         MS. DUMAS:  That is correct, Your Honor.  I don't

4    believe we've told Judge Donato about his added role, yet, but

5    that's what's contemplated by the RSA.

6         THE COURT:  Why don't you tell him that you're hopeful

7    that the Court will confirm a plan and --

8         MS. DUMAS:  We --

9         THE COURT:  -- that it will be feasible?

10        MS. DUMAS:  -- we sincerely hope that it won't be

11   necessary for him to hear estimation proceedings.

12        The other point I wanted to make before argument is

13   simply to let the parties who have come to the courtroom -- and

14   we greatly appreciate the high attendance, it's an important

15   hearing for all Tort claimants today -- is that the settlement

16   among the equity sponsors, the debtors, and the tort claimants

17   and TCC was very difficult, took many weeks, hard-fought, a lot

18   of compromise.  It has, at this point, been supported by over

19   seventy percent of the -- lawyers who represent over seventy

20   percent of tort claimants.  So it's not only the official tort

21   committee, which has a fiduciary obligation to all tort

22   claimants, but the lawyers who represent the vast majority in

23   number of claimants are strongly in support of this.

24        We see this as the most expedient path for the tort

25   claims to be estimated in an allowed amount.  And for the

PG&E Corp., Pacific Gas & Electric Co.

1   debtor, we took the Court's concerns earlier in the case at

2   heart, to have the timing of AB 1054 met.  This is by no means

3   a perfect solution.  It was by no means the intention for those

4   who objected to this portion of the tort claimants to take

5   almost twenty percent of the stock in reorganized PG&E or

6   payments over time, but we have done so in the interest of

7   allowing this entire case to move forward.

8            This was not an easy decision.  It was not an easy

9   negotiation.  And we -- I simply wanted the Court to understand

10  that many, many, many individuals have been agonizing over this

11  compromise, and strongly urge the Court to consider everything

12  that went into where we hopefully are today.

13           THE COURT:  Okay.  Thank you, Ms. Dumas.

14           All right.  Mr. Orsini, your homework assignment is to

15  go upstairs and show up in Judge Donato's court at 1 o'clock

16  and do whatever you want to do.  And tell him that, as soon as

17  he lets you out, fifteen minutes later, you're on duty here.

18  But when he first lets you out, please notify Ms. Barata

19  (phonetic) and anyone else.

20           So my intention here is to adjourn this hearing now

21  and to resume it fifteen minutes or twenty minutes or so after

22  Judge Donato's hearing on the nineteenth floor are concluded.

23  And my intention, unless there's somebody who wishes to do it a

24  different way, I will have -- and I'll give each of the

25  objectors that I named, in order, an opportunity to be heard.

PG&E Corp., Pacific Gas & Electric Co.

1          But I will ask the objectors, use your time

2    efficiently and officiously, in the sense that I don't want you

3    to reinvent the wheel.  And if I've already indicated that

4    there seems to be a resolution or simply noted that you are

5    reserving your client's petition, you don't need to say that

6    again.  So I really want to hear substantive challenges from

7    parties for their clients who think that I should disapprove

8    the TCC RSA.  That's the critical issue on the table today.

9          I'll see you at sometime after 1 o'clock, probably

10   more like around 1:45.  Thank you all.

11      (Recess from 12:28 p.m. until 1:36 p.m.)

12          THE CLERK:  All rise.

13          THE COURT:  Okay.  Good afternoon again, everyone.

14   Please be seated.

15          So Mr. Karotkin, by my calculation, I said I would go

16   through the list of the opponents to the RSA.  So unless you

17   have any other desires, I'll do that.

18          But let's start with --

19          MR. KAROTKIN:  That's fine.  Of course, we will

20   respond, sir.

21          THE COURT:  Sure.

22          Mr. Astleford, are you here, or do you wish to be

23   heard?

24          MR. ROYE:  Your Honor, Ken Roye.

25          THE COURT:  All right, Mr. Roye.  Uh-huh.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    MR. ROYE:  Joseph's colleague.  I'd like to address a

2    few comments to you.

3    THE COURT:  Yeah, briefly.  Uh-huh.

4    MR. ROYE:  We have practiced in Chico, California for

5    years.  We've sued PG&E eight separated times in seven

6    counties.  We took them to trial in Tehama County in 1995

7    successfully in the Campbell complex fire, which, at that time,

8    was the fifth largest fire in California history.  It was over

9    139,000-acre fire.

10   We've sued them in eight counties in California.  And

11   when we learned that the RSA included provisions that our fire

12   clients had to accept stock in the company that ruined their

13   lives, we thought that was both callous and unthought-out.  It

14   seems like the committee was in a rush to get anything done.

15   It didn't consider what we're going to have to do when we tell

16   those people.  As you indicated earlier -- what if something

17   catastrophic happens between now and the end of the bankruptcy?

18   What if Napa gets burned to the ground or Cloverdale or some

19   other -- Paradise before this ends?  What do we think that

20   stock's going to be worth then?

21   When we arrived here in town yesterday, the first

22   thing we saw on the news was that after the governor made his

23   statement, the stock plummeted fourteen percent.  In the

24   meantime, the RSA for the subros, they don't have to bear the

25   stock.  They have a small amount of stock compared to this.

(970) 703-8358 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   And yet, those companies, when the underwriters told them to go

2   ahead and sell these fire policies in areas where PG&E is

3   providing electrical service to their insureds, they went ahead

4   and took the risk.  They also have gigantic portfolios of their

5   own, and they're in a much better position to absorb the loss

6   than the fire clients are.

7          The last thing is we're going to have to go tell them

8   that the best we could do for them was to get stock in the

9   company that ruined their lives.  So we object to that.

10          THE COURT:  What happens if the company successfully

11   confirms its plan and the Court makes a finding that the plan

12   is feasible and finds that the company does not need further

13   reorganization?  Don't you think maybe the stock will go up?

14          MR. ROYE:  Well, I'm --

15          THE COURT:  Isn't that likely?

16          MR. ROYE:  I don't play the stock market, for that --

17          THE COURT:  No, I don't, either.

18          MR. ROYE:  -- reason, Your Honor.

19          THE COURT:  But isn't that predictable, if that

20   happens?

21          MR. ROYE:  I have no way of knowing that, Your Honor,

22   and I don't think that will happen.

23          THE COURT:  Okay.  Well --

24          MR. ROYE:  I know --

25          THE COURT:  -- but what do you want me to do?

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          MR. ROYE:  Well --

2          THE COURT:  If I disapprove it, this is the product of

3    negotiated and mediated tradeoffs.  And I understand your

4    concerns about what the subrogation group is getting.  But the

5    TCC and the debtor struck a deal.  If I disapprove it, what's

6    next?

7          MR. ROYE:  Well, we were not privy to that as we're

8    not on the committee.  I'm sure they did the best that they

9    could.  However, we have to look at this.  Our community --

10   that fire burned right into the edge of our community.  We have

11   about 100,000 people at our -- we have a beautiful city.

12         THE COURT:  You do.  I agree.

13         MR. ROYE:  Our neighbors in Paradise, 30,000 of them

14   were displaced overnight.  We had to absorb 15 or 20,000 of

15   them, and the rest are scattered to the four winds.  And now,

16   we go and tell them, well, here's what we got you.  We got you

17   half of your payment.  It's going to come from the company that

18   ruined your life.  Now, there's something wrong with that.

19         THE COURT:  But Mr. Roye, just one more point.  Do you

20   think I should disapprove it and take what happens next?  Which

21   I don't know what happens next.  I don't know that you know

22   what happens next.

23         MR. ROYE:  What I would ask you to do, Your Honor, if

24   this is going to be renegotiated, to use your good offices to

25   make sure this doesn't happen.

PG&E Corp., Pacific Gas & Electric Co.

1          THE COURT:  Okay.

2          MR. ROYE:  Okay?  The last point we made was about

3     Tubbs because all of our claims are in the Camp fire.

4          THE COURT:  Did you hear that conversation I had this

5     morning?

6          MR. ROYE:  Yes, I did, Your Honor.  And --

7          THE COURT:  But that didn't satisfy you?

8          MR. ROYE:  -- I think it -- well, it may not suffice.

9     But our idea was that, based on our experience -- we've also

10    litigated in three different states besides California against

11    utilities, and we've represented thousands of people.  And my

12    thinking is -- and this has been our experience -- when you

13    have two points of origin, when you have battling causation

14    questions, the proof and the persuasion gets very difficult.

15         So I just hope -- and what's going to transpire next,

16    that those are key factors in the amount that is going to be

17    allocated to the Tubbs stakeholders.

18         THE COURT:  Well --

19         MR. ROYE:  It won't be fair to the remaining victims.

20         THE COURT:  Well, there's no --

21         MR. ROYE:  They get a free ride --

22         THE COURT:  -- there's no issue today on how, if I

23    approve this, the thirteen and a half billion are allocated

24    among the fire claimants.  That's for another day and another

25    process.  There just is not -- there's nothing here on the

PG&E Corp., Pacific Gas & Electric Co.

1   table.

2       MR. ROYE:  Oh, I know.

3       THE COURT:  Okay.

4       MR. ROYE:  I understand that.  I'm making the comments

5   just in the hope that I can influence your thinking as this

6   process plays out.

7       THE COURT:  Okay.  Thank you, Mr. Roye.

8       MR. ROYE:  Thank you, Your Honor.

9       THE COURT:  Debtor want to respond or submit a matter?

10      MR. KAROTKIN:  Would it be easier if we just responded

11  at the end, Your Honor?

12      THE COURT:  No, I'd rather -- because they -- if you

13  don't mind, let's do it in step because this is -- as I said

14  before, I consider the objections into sort of different

15  categories.  And so let's do it this way.

16      MR. KAROTKIN:  Well, I think Your Honor responded

17  appropriately.  In any event, there will be a right to vote on

18  this plan by the fire claimants.  And if they're unhappy, they

19  can express it through their vote.

20      THE COURT:  Okay.  I'm going to withhold -- I'm not

21  going to make a ruling one by one.  I'm going to take them all

22  down.

23      Let's go with Mr. Feist.

24      MR. DE GHETALDI:  Your Honor, Your Honor --

25      THE COURT:  Yes?

(973) operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1        MR. DE GHETALDI:  Could I just clarify one thing about

2   the --

3        THE COURT:  For the record -- I know your name, but

4   you need to state it.

5        MR. DE GHETALDI:  Thank you, Your Honor.  Dario de

6   Ghetaldi on behalf of fire claimants.  Mr. Roye, among others,

7   has not quite understood the cash and stock components of the

8   plan.

9        There's nothing in the RSA, and we do not contemplate

10  at all, forcing victims to take stock.  They will have the

11  opportunity to take all cash or a mixture.

12       THE COURT:  And am I right if the market -- if the

13  company emerges and the market goes up, that's good for the

14  trust, right?

15       MR. DE GHETALDI:  Yes, Your Honor.

16       THE COURT:  Okay.

17       MR. DE GHETALDI:  And we've been told that it could go

18  up as much as thirty percent.

19       THE COURT:  Well, if I make a determination that the

20  company is likely to be reorganized and likely to need further

21  relief, I probably won't be able to confirm the plan, will I?

22       MR. DE GHETALDI:  Right.

23       THE COURT:  Okay.

24       MR. DE GHETALDI:  Thank you.

25       THE COURT:  Thank you.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          All right.  Mr. Feist, are you here for your client?

2          MR. FEIST:  Yes, Your Honor.

3          THE COURT:  All right.  Again, I don't want to

4    reinvent the wheel, but let me see what you want to say.

5          MR. FEIST:  Joe Feist, appearing on behalf of Camp

6    fire victims.  As specified in our rule 2019 disclosure, in

7    light of information provided me after the filing of the

8    objection as well as argument here today, we'd like to withdraw

9    our objection.

10          THE COURT:  Thank you.

11          MR. FEIST:  Thank you, Your Honor.

12          THE COURT:  All right.  Ms. Winthrop, I had you next.

13    And as I said, you covered a lot of these items.  So tell me

14    what you want to revisit.

15          MS. WINTHROP:  Thank you, Your Honor.  I just wanted

16    to correct a couple of misstatements -- or a couple of

17    statements that have been made on the record.  I also want to

18    express my appreciation to Your Honor because you, frankly,

19    filled in some of the gaps that we've had in terms of how this

20    is all going to work.

21          First of all, there was a statement by the debtors of

22    the fire claimants believe that this is the best way to proceed

23    and that they have support of all of the fire victims.  So

24    Adventist Health has over a billion dollars' worth of claims.

25    Feather Canyon (sic) has ninety-five million dollars.  We are

PG&E Corp., Pacific Gas & Electric Co.

1    two of the largest property damage claimants.  While the debtor

2    may have support in numerosity, there's no indication that the

3    property damage claimants are in fully support of the plan as,

4    apparently, the personal injury claimants.

5            So I just wanted to correct that for the record.

6            THE COURT:  But remind me, did you object to the

7    subrogation RSA?  I can't --

8            MS. WINTHROP:  Yes, we did, Your Honor.

9            THE COURT:  -- I can't keep track of them all.

10           MS. WINTHROP:  Yes, we did.

11           THE COURT:  Okay.  But largely on the reliefs issue,

12   as I recall.

13           MS. WINTHROP:  Yes, we did.

14           THE COURT:  Yeah, okay.

15           MS. WINTHROP:  Yes, we did.  And we have been

16   successful in resolving that piece of the pie, Your Honor.

17           THE COURT:  Right, right.

18           But what about your other suggestions that -- isn't

19   that for another day, the victims to get the TCC more involved

20   in the creation of the trust and the implementation?

21           MS. WINTHROP:  Well, we would like to -- so first, we

22   have two concerns in that regard where we'd like the Court to

23   consider now.  So first of all, the RSA requires all parties to

24   support and not seek to change the amended plan that's being

25   proposed.  The amended plan puts the selection of the trustee,

(972) 239-6000 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    the documentation, and creation of the procedures, and the

2    trust amendment all in the hands of the thirteen personal

3    injury claimant lawyers.

4          What we understand of the thirteen personal injury

5    claimant lawyers who signed off on the RSA and the TCC -- while

6    we are very glad to see that the TCC is still involved in the

7    process, we think that it's very important to have a property

8    damage claimant, preferably one as large as the parties that I

9    represent, to be involved in the process, and if the parties

10   cannot seek to agree, then that process be submitted to

11   mediation just as much as this RSA apparently has done.

12         So it isn't just enough to make the TCC part of the

13   process.  We think property damage claimants should be a part

14   of the process, as well.

15         THE COURT:  But how do I make that part of the ruling

16   today?  And how do I have that flexibility?

17         MS. WINTHROP:  Well, first of all, the parties should

18   have the flexibility to make changes to the plan.  For example,

19   we did note that the plan have got some items in bracket.  That

20   should be subject to further negotiation among the parties.

21   And the Court could order that to mediation, just like they

22   ordered the parties into mediation at this point.

23         THE COURT:  Well, I mean, there's no limit.  That's

24   there already.  If the party -- if the mediator believes it's

25   important to do it, I don't think that it takes another order

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   to do that.  I mean --

2            MS. WINTHROP:  Okay.

3            THE COURT:  -- but my point is I have to make an up or

4   down decision, I guess, today or a qualified -- say I'll

5   approve it if.  And it seems to me it gets awful difficult to

6   start cutting and dicing every single provision in a very

7   complicated agreement.

8            MS. WINTHROP:  And I appreciate that, Your Honor.  But

9   these pieces of the pie, if you will, are so important that

10  they go to the very heart of the agreement being approved today

11  because it pervades not only the voting procedures, how the

12  entire trust is going to run.

13           THE COURT:  But there are two trusts, aren't there?

14  And one trust deals with the subrogation claim --

15           MS. WINTHROP:  Yes, Your Honor.  My --

16           THE COURT:  -- and the property damage claim.

17           MS. WINTHROP:  I'm sorry?

18           THE COURT:  Well, where does the property damage -- in

19  your mind, in your view -- the property damage claim not

20  covered by insurance is in the --

21           MS. WINTHROP:  Is in the TC- --

22           THE COURT:  -- in what we'll call the big trust --

23           MS. WINTHROP:  Yes.

24           THE COURT:  -- the thirteen-and-a-half-billion-dollar

25  trust?

(973)239-6002 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    MS. WINTHROP:  Correct.

2    THE COURT:  Okay.  You're correct.

3    Go ahead.

4    MS. WINTHROP:  And even that, we at one point had

5 started to read the settlement agreement as requiring -- or the

6 RSA as requiring multiple trusts within the trust, even knowing

7 that there's just going to be two trusts, the insurer's

8 subrogation trust and the big trust.  Even that is helpful to

9 understand, but that the parties should have further

10 involvement of all constituencies in the documentation and

11 procedures that are going to govern the big trust.

12    THE COURT:  Okay.  How about -- and do you want to say

13 anything more about your suggestion of temporary allowance?  I

14 mean, the law permits it if somebody asks for temporary

15 allowance.

16    MS. WINTHROP:  Yes, Your Honor.  And I appreciate that

17 your comment -- Your Honor's comments earlier this morning

18 when -- because as it stands right now -- and again, this feeds

19 into the concern that we have, that this is -- that we are

20 going to be, in essence, be disenfranchised -- is that the way

21 the plan is set up now is that the plan itself acts as an

22 objection to our claim, thereby shifting the burden of proof to

23 us -- or to claimants, to all fire victim claimants.

24    That is not the pace -- and that the parties are

25 willing to work together to come up with some sort of procedure

PG&E Corp., Pacific Gas & Electric Co.

1  so that I don't -- now do not have 400 or so property damage

2  claimants coming in and saying hey, temporary allow my claims

3  for voting purposes.  I think that's an important aspect to be

4  addressed.

5          THE COURT:  But we're back to one of the issues that's

6  still alive for your client, and that is are you even subject

7  to the estimation to begin with.  Because you believe that some

8  of your claims are liquidated, right?  Some are not; that's for

9  another day.  As I recall, refresh my memory, but your side and

10  the debtor and the two big governmental agencies have all put

11  the estimation liquidation question on hold, pending this

12  resolution.  So if I approve these, then we have to go back and

13  revisit that question.

14          MS. WINTHROP:  Yes, Your Honor.

15          THE COURT:  So to the extent you contend either that

16  the debtors concede, or you contend successfully and persuade

17  me, that your claims are liquidated, then you get a presumption

18  of allowance, unless somebody seeks to disallow, for voting

19  purposes.

20          MS. WINTHROP:  But only a portion of our claims are

21  liquidated.

22          THE COURT:  Understood.

23          MS. WINTHROP:  Yes.

24          THE COURT:  But do you think the Court can temporarily

25  allow an unliquidated claim?  I haven't thought about it.  I

PG&E Corp., Pacific Gas & Electric Co.

1  can look, see what the Rule says.  We temporarily allowed

2  disputed claims.  And if there's an objection to your

3  unliquidated claim, I guess there is a provision for

4  temporarily allowing it.  It may be a non-issue if the votes

5  come in correctly, right?  It doesn't matter if you're --

6         MS. WINTHROP:  Well, then, that raises even more

7  concerns about the provision in the debtors' plan that

8  determines that all claims -- now all fire claimants are all

9  disputed claims.  Interesting, disputed, unliquidated claim.

10        THE COURT:  I don't know how a paragraph in a plan

11 that hasn't been approved even for disclosure purposes, let

12 alone for the res judicata consequences of a confirmed plan,

13 can suddenly supplant a provision in a rule that says there's a

14 presumption of allowance.  Now, I've got enough to deal with

15 today than to worry about that one, but let's see what the

16 debtors' counsel says about that one, and see if we have a non-

17 issue or an issue.

18        Let me just take one look at what -- I ought to be

19 able to answer quickly on temporary allowance claims.  I

20 thought I knew these rules.

21        Mr. Karotkin, what's the rule on temporary allowance?

22 Can we do a temporary allowance to an unliquidated claim?

23        MR. KAROTKIN:  I think the Court has the authority to

24 temporary allow a claim for voting purposes, whether it's

25 liquidated or unliquidated or disputed.

PG&E Corp., Pacific Gas & Electric Co.

1          THE COURT:  Yeah, it's in 3018(a).

2          MR. KAROTKIN:  I was just going to say that.

3          THE COURT:  Yeah.  Which sentence, do you remember?

4          Well, I haven't thought, and I don't want to take the

5     time to think about it.

6          Well, is it your view that your plan, as filed on the

7     12th, is the equivalent of an objection to claim?  That's a

8     stretch, I think.

9          MR. KAROTKIN:  I think that's a stretch, and I think

10    you put your finger on it when you said, well, the plan isn't

11    effective until it's effective, so --

12         THE COURT:  Right.

13         MR. KAROTKIN:  -- it's sort of putting the cart before

14    the horse.

15         Look, we intend to file a voting procedures motion

16    where all of this can be addressed, as is typical in a Chapter

17    11 case like this.  And to the extent that Counsel has issues,

18    we can address those issues.

19         I'd just like to make clear another point that -- and

20    I think Counsel will confirm this -- that we have settled the

21    Adventist objection to the subro RSA --

22         THE COURT:  Right.

23         MR. KAROTKIN:  -- with respect to the release.

24         MS. WINTHROP:  Yes.

25         MR. KAROTKIN:  Okay.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1        MS. WINTHROP:  I have already stated that point.

2        MR. KAROTKIN:  Okay.

3        THE COURT:  Yeah, no.  I think we've got that.

4        MR. KAROTKIN:  And I really think, to the extent that

5   Counsel has objections, or may have objections to the claims

6   resolution procedures or other items that are going to be

7   drafted and presented to the Court, either in the plan

8   supplement or the disclosure statement, she will have ample

9   opportunity to do that.

10       THE COURT:  But I think Ms. Winthrop's the only

11   counsel representing objectors who have raised this question

12   about the procedures for formulating the trust rules and these

13   other things.  How do I let them have a seat at the table?  Do

14   I send it back to Judge Newsome, or is that something that can

15   be done in -- you know, should I not worry about it for now?

16       MR. KAROTKIN:  I don't think there's any reason to

17   worry about it now.  Typically, that would be negotiated among

18   the committees and the debtor.  And again, that, as I recall

19   the RSA, that is going to be a document filed relatively

20   shortly.

21       THE COURT:  Well, Ms. --

22       MR. KAROTKIN:  Ms. Dumas is going to --

23       THE COURT:  -- Dumas, can you help me?

24       MR. KAROTKIN:  And people can be heard, and they can

25   have a right to complain about it.  But to have drafting by all

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   sorts of people, it doesn't make sense in a case like this.

2            THE COURT:  Ms. Dumas, how are we going to solve this

3   procedural dilemma here?

4            MS. DUMAS:  Easy.  Easy-peasy, Your Honor.  Cecily

5   Dumas, on behalf of the official committee of tort claimants.

6            First, it was not -- I saw Ms. Winthrop look over her

7   shoulder pointedly at the debtor.  The plan provision that has

8   a statement that claims are disputed is a case management, it's

9   an administrative provision requested by the TCC because there

10  are 70,000 claims, and we could spend tens of thousands and

11  hundreds of thousands of dollars doing individual claims

12  objections.  We will set that up administratively in whatever

13  manner the Court wants, but that was not intended to

14  disenfranchise anyone, in particular Ms. Winthrop's clients.

15           Second, Adventist has been robustly involved in these

16  proceedings, and the extent to which the TCC did not include

17  her clients in the mediation process, it's certainly willing to

18  bring her clients in, and have their input in the temporary

19  allowance process and the plan process, and any other way in

20  which they want to be involved in the case.  Second -- and I

21  hope we make that clear, that there was not any intent to leave

22  Adventist out of a very difficult settlement.

23           But second, yes, there will have to be a mechanism to

24  allow voting for estimation, or allowance of claims for voting

25  purposes.  The TCC has had discussions with the debtors and the

(970) 239-0900 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   other plan proponents about how that is going to work.  We've

2   had discussions with the mediator about how that's going to

3   work.  It's a not easy -- we can't do a one vote per claimant

4   case because of the potential for the government entities to

5   basically swamp the vote for 70,000 individual and business

6   claimants.

7           So it will be proposed.  It will be brought before the

8   Court for approval.  There will be the opportunity for all the

9   affected parties to object, or have input in that process.

10          I want to focus us back on what we're here for today,

11  which is simply to approve an RSA.  I understand there's many

12  voting and confirmation issues that Adventist has raised.

13  Respectfully, they're premature for today's purposes.

14          THE COURT:  Yeah, and that may be true, but I just

15  don't want a situation where if I were to sign an order

16  approving this, it would sort of be a gotcha for everything

17  else that might have been raised.  And again, I don't want to

18  have lawyers go home saying, my God, I should have filed a

19  reservation of rights objection.  You've got to object to

20  what's on the table, not what's not on the table.  So I'm

21  satisfied.  Are you satisfied with that explanation for now,

22  Ms. Winthrop?

23          MS. WINTHROP:  Yes, Your Honor.  And we appreciate the

24  TCC's willingness to put all of this on the record, and look

25  forward to working with them closely on these procedures.

PG&E Corp., Pacific Gas & Electric Co.

1          THE COURT:  Okay.  Ms. Dumas, you don't need to come

2     back up to the podium, just a quick question.  I should have

3     put this on my first list that I asked Mr. Karotkin to go

4     through, when I had my short questions.  Just summarize if you

5     can for me, post-confirmation, what is the role of the Court

6     when there are disputes or matters that have to do with trust

7     administration?  And I don't mean -- well, yeah.  I mean,

8     generally, does the Court jurisdiction continue, or does it

9     end?

10          MS. DUMAS:  Yes.  Briefly, as has been described to

11    the Court, the resolution trust agreement and a matrix which

12    describes the treatment of individual claims within the

13    resolution trust will be brought before this Court.  Many

14    parties are working on it.  It's not an easy document to put

15    together.  But that will be filed with the Court and subject to

16    review and approval.  That will be the mechanism for how the

17    trust is administered.

18          Among the provisions in that resolution trust

19    agreement, and I believe in the plan, is a reservation of this

20    Court's jurisdiction, the extent to which Your Honor is

21    inclined to take it among the resolution procedures.  But in

22    broad brush, so that parties who represent claimants who have

23    not been involved in these many negotiations can understand,

24    the concept is a transparent and objective and easy to

25    understand matrix that allows claimants to see what the

(972) 692-3560  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    standard settlement would be, based on their circumstances and

2    their losses.

3            The option of, rather than accepting that amount,

4    going into a mediation proceeding -- again, supervised by the

5    resolution trustee and his professionals -- and absent the

6    desire to reach a mediated resolution, every tort claimant is

7    preserving their ability to go to trial and have their claim

8    resolved in state or --

9            THE COURT:  No, I understand.  That's been something

10   that you and Mr. Julian have made clear --

11           MS. DUMAS:  Yes.

12           THE COURT:  -- from day one.  But the question was,

13   really, the role of the Court.

14           Let's move on to today's agenda.  You've answered my

15   question for now.

16           MR. STAMER:  Excuse me, Your Honor.

17           THE COURT:  Mr. Pascuzzi, or -- oh.  Wait.

18           MR. STAMER:  Your Honor, I apologize to be taken out

19   of turn.

20           THE COURT:  Okay.

21           MR. STAMER:  And I'm not going to --

22           THE COURT:  Name --

23           MR. STAMER:  Again, for the record, Mike Stamer --

24           THE COURT:  Mr. Stamer.

25           MR. STAMER:  -- from Akin Gump, on behalf of the ad

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  hoc committee.  Although I brought my package of materials, I'm

2  not here to argue my substantive objection.

3          Everyone in the courtroom who appeared before Judge

4  Donato, and now everyone that didn't appear before Judge

5  Donato, other than Your Honor, and now the public -- because

6  there's press reports about it -- understand that Judge Donato

7  made some pronouncements from the bench.  I wasn't there.  I'm

8  actually a little surprised the debtors didn't start the

9  afternoon hearing reporting what went on.  I think it's

10  significant to, kind of, where things stand.  And all I would

11  ask is, before the objections continue -- and we can do point-

12  counterpoint; I won't do either, because I wasn't there -- but

13  I think Your Honor should be in the loop as to what Judge

14  Donato observed.

15          THE COURT:  Okay.  That's a fair question.

16          MR. STAMER:  Thank you, Your Honor.

17          THE COURT:  Mr. Orsini, do you want to respond to

18  that?  We'll take the -- we'll put on hold the individual

19  objectors to the RSA here.

20          MR. ORSINI:  Yes, Your Honor.  Judge Donato did not

21  make any sort of finding --

22          THE COURT:  Name.

23          MR. ORSINI:  -- or pronouncement.

24          THE COURT:  Name.

25          MR. ORSINI:  Oh, sorry, Your Honor.  Kevin Orsini,

PG&E Corp., Pacific Gas & Electric Co.

1   from Cravath.

2           THE COURT:  Well, I'm sure he didn't make a finding,

3   but he --

4           MR. ORSINI:  Judge Donato raised the question, in the

5   context of discussing whether or not he should continue to stay

6   the estimation proceedings, pending Your Honor's resolution of

7   the RSA.  He raised the question of, well, why doesn't he just

8   take them completely off calendar, because isn't it at least

9   arguable that at this point -- because we have a proposed

10  thirteen-and-a-half billion-dollar settlement -- that is the

11  number for estimation purposes, even if the settlement does not

12  get approved.

13          What I explained to Judge Donato is that there are

14  circumstances in which we may have to go to estimation.  I

15  believe I also said that everyone in that courtroom, and I

16  think everybody in this courtroom, hopes that's never the case.

17  But the thirteen and a half billion dollars, as I explained to

18  Judge Donato, is a settled value of the claims.

19          THE COURT:  Right.

20          MR. ORSINI:  It is an amount that is part of a whole

21  series of give and takes --

22          THE COURT:  No, I understand that.

23          MR. ORSINI:  -- as part of an extensive negotiation of

24  puts and calls.

25          But I think that the point you say you understand,

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   Judge Montali, I think is the key point, that in the, I hope,

2   unlikely event that the Court does not approve this settlement,

3   or if this Court does approve the settlement and then for some

4   reason none of us ever wants to encounter, that settlement

5   agreement is terminated.  At that point, the thirteen and a

6   half billion dollars is gone.  And there will be a requirement

7   for estimation proceedings.  The TCC --

8         THE COURT:  Well, it's going -- excuse me.  It's gone

9   because the language of the TCC RSA says it's gone.

10        MR. ORSINI:  That's precisely right, Your Honor.

11        THE COURT:  Okay.

12        MR. ORSINI:  At which point, all parties have reserved

13  all rights to make whatever arguments they might have otherwise

14  made, absent this settlement, about what the value of the tort

15  claim is.

16        THE COURT:  Right.  The same with the subro.

17        MR. ORSINI:  That's exactly right, Your Honor.

18        THE COURT:  The same with the subro settlement, right?

19        MR. ORSINI:  That's precisely right, Your Honor.

20        THE COURT:  Right.

21        MR. ORSINI:  So the fact that we were willing to

22  agree, as part of an overall negotiation, that thirteen and a

23  half billion dollars is an appropriate number to settle the

24  claims, does not dictate that the estimated amount ultimately

25  has to be 13.5 if we're in a litigated context, not a settled

(973) operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  context.

2         And at the end of the day, what I proposed to Judge

3  Donato that he ultimately agreed to, was that rather than take

4  the estimation hearing completely off calendar, given the

5  possibility that there were scenarios in which we may have to

6  estimate, that he stay the proceedings for a further four days,

7  until the end of this week, because his original stay expired

8  today, I suggested to him, and he ultimately agreed, he would

9  extend that stay until Friday.  And that if Your Honor does

10  approve the RSA, either today or sometime before Friday, Mr.

11  Julian and I will work out a proposed stipulated order to take

12  estimation off calendar before Judge Donato.  And if this Court

13  does not approve the RSA, then we'll have to go back to Judge

14  Donato and talk about where we go from there.

15         THE COURT:  Okay.  But let's play that out a little

16  bit more.  Suppose I rule this afternoon that the RSA is

17  approved, then -- and leave aside appeals or reconsiderations

18  or anything else -- in terms of an operative event, that means

19  estimation is over, and --

20         MR. ORSINI:  Unless and until --

21         THE COURT:  No, no, no.

22         MR. ORSINI:  Sorry, Your Honor.

23         THE COURT:  Over, unless -- I mean, over as long as

24  this thing stays on track and ends up in confirmation.

25         MR. ORSINI:  Precisely.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1      THE COURT:  If it goes off the rails, for whatever

2  reason, or -- including the competing plan, if the competing

3  plan is on the table.  Something might happen, and then it will

4  be up to Judge Donato to take over, and do what has to be done.

5      MR. ORSINI:  That's exactly right, Your Honor.

6      THE COURT:  And also, if I'm right -- and I think we

7  touched on this this morning -- if I approve the TCC RSA, the

8  superior court's role in San Francisco ends.

9      MR. ORSINI:  That's --

10     THE COURT:  And the issue of what do we do now, in

11  case it goes off the rail is back before Judge Donato.

12     MR. ORSINI:  That's precisely right, Your Honor.

13     THE COURT:  Okay.

14     MR. ORSINI:  Thank you.

15     THE COURT:  Okay.  Got it.

16     So Mr. Stamer, I didn't hear anything that

17  surprised -- I mean, I got a clarification, but I hope that's

18  what you were looking for.

19     Mr. Qureshi, do you want something I'm not --

20     MR. QURESHI:  If I could, Your Honor.  Again, for the

21  record, Abid Qureshi, Akin Gump Strauss Hauer & Feld, on behalf

22  of the ad hoc note holders' committee.

23     And Your Honor, I was in the courtroom before Judge

24  Donato.  And while Mr. Orsini's, of course, correct in terms of

25  reporting the outcome, which is that the stay was extended --

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   and I tread very carefully, Your Honor, in terms of reporting

2   to this Court what Judge Donato said.  There will be a

3   transcript soon enough.  But the thrust of Judge Donato's

4   comment was that the parties -- and I apologize for looking at

5   my phone, but there are press reports that quote him, and I

6   want to make sure I get it right.

7         THE COURT:  As long as you're not calling anybody at

8   home.

9         MR. QURESHI:  But Your Honor, the thrust of Judge

10   Donato's comment was the debtor's on the one hand, and the TCC

11   on the other have agreed to settle those claims for 13.5

12   billion, and therefore, they've been estimated.  He referenced

13   the fact that a key part of the proceedings before him had been

14   to identify other settlements that are relevant precedence for

15   purposes of these estimation proceedings.

16         Then he said, so the parties here have actually agreed

17   to 13.5.  So it doesn't matter what happens to the settlement

18   agreement.  You've estimated the claim.  So basically what he

19   was saying, Your Honor, was whether this Court approves or does

20   not approve the RSA doesn't matter because, if it ends up back

21   in front of him, Judge Donato will say, well, you have

22   agreed --

23         THE COURT:  Well --

24         MR. QURESHI:  -- to 13.5.

25         THE COURT:  -- look, my job is to do what I'm supposed

PG&E Corp., Pacific Gas & Electric Co.

1   to do, and if I am persuaded to approve the RSA today, then I

2   am going to wait until somebody tells me that it's off the

3   rail, to my metaphor, and if that's the case, then someone will

4   have to make the pitch to Judge Donato that either it's a done

5   deal, or it isn't a done deal.

6            MR. QURESHI:  Your Honor --

7            THE COURT:  Right?

8            MR. QURESHI:  I will defer to Mr. Stamer when he gets

9   up to make our argument as to the relevance of those in the

10  context of Your Honor's decision.

11           THE COURT:  Okay.

12           MR. QURESHI:  Thank you.

13           THE COURT:  I'm going to go back to my roll call on

14  the objectors.

15           Mr. Pascuzzi, are you here?

16           MR. PASCUZZI:  I am.

17           THE COURT:  You are.  Thank you for being patient.

18  And did I correctly summarize your position earlier today?

19           MR. PASCUZZI:  Your Honor, Paul Pascuzzi.  My firm is

20  co-counsel with the California Attorney General's Office for

21  the California State Agencies with fire-related claims.

22           We did file a reservation of rights at docket 5123.

23           THE COURT:  Right.

24           MR. PASCUZZI:  Your Honor, to -- and that is all we're

25  doing.  As far as I've heard, we're not deciding confirmation

PG&E Corp., Pacific Gas & Electric Co.

1   issues.  We also have issues with the governance of the trust

2   because obviously the government claims are going to be part of

3   this fire victim's trust, and similar to Adventist, you know,

4   we have very large claims.

5           So we did put some statements in our pleadings about

6   being involved in the process of figuring out the governance of

7   the trust.  Our particular claims have not been settled, the

8   state agency fire claims.  And in fact, the tort committee has

9   told us they do not view the government entities as part of the

10  tort committee's constituents.

11          So I just wanted to make those points and reserve the

12  rights as to the trust governance, the confirmation issues, but

13  we're not opposing the motion.

14          THE COURT:  Well, and presumably you will be invited,

15  if you wish to or not, to participate in the discussions about

16  the trust instruments if we get to that point, you know?

17          MR. PASCUZZI:  We do wish to, Your Honor.

18          THE COURT:  Yeah, okay.

19          MR. PASCUZZI:  And we'll have similar issues as

20  Adventist with the voting.

21          THE COURT:  The same.  The same.

22          MR. PASCUZZI:  So we look forward to those to dealing

23  with those issues.

24          THE COURT:  Okay.  All right.

25          MR. PASCUZZI:  Thank you, Your Honor.

(972) 305-7100 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          THE COURT:  Thank you.

2          Mr. Troy, are you here for the federal government?

3  And I believe your position is much the same, but you tell me

4  if that's the case, after you tell me your name.

5          MR. TROY:  Yes, Matthew Troy, Department of Justice,

6  Civil Division on behalf of various federal agencies.

7          Yes, Your Honor.  I don't have too much to add to what

8  Mr. Pascuzzi said and would echo those comments.  We filed the

9  reservation.  You've seen it.  You've read it.  You know what

10  it says.

11          THE COURT:  Right.

12          MR. TROY:  We also filed a statement with respect to

13  the confirmation hearing, status conference, that was set for

14  today as well, that was filed last week --

15          THE COURT:  Yes.

16          MR. TROY:  -- that raised more or less similar issues

17  as to what was filed in response to the TCC RSA motion.  I

18  would just simply observe that there's -- reservations speak

19  for itself, but there's a lot of heavy lifting to be done in

20  this case, and there's a lot of issues that need to be resolved

21  or ruled upon by Your Honor.  And we reserve all rights with

22  respect to those matters that still need to come before Your

23  Honor.

24          THE COURT:  Okay.  Thanks, Mr. Troy.

25          MR. TROY:  Thank you.

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  And I believe next on the list is the

2   United States Trustee.  Is there an appearance by the U.S.

3   Trustee today?  No?

4    MR. ZIPES:  Yes, Your Honor.  Greg Zipes with the U.S.

5   Trustee's Office, and I appeared before Your Honor at least one

6   time before in this hearing --

7    THE COURT:  Yes, you did, Mr. Zipes.

8    MR. ZIPES:  -- on the executive compensation hearing.

9    THE COURT:  Yes.

10    MR. ZIPES:  And I appreciate that you're allowing me

11   to appear by phone.

12    I can be very brief, Your Honor.  My office raised

13   three issues, and you've already disposed of one of them which

14   was the notice issues, and that was a concern of our office,

15   that many of the tort claimants who are going to be directly

16   affected by this RSA didn't get actual notice of this, but this

17   Court has ruled on that, and I can just move on.

18    The other two points really deal with the plan

19   process, and I think there have been many statements on the

20   record today already that all the plan-type confirmation issues

21   are being reserved and are not a part of this RSA.  So parties

22   objecting on the basis of feasibility or on the basis of

23   absolute priority rule, or something like that, that all will

24   be reserved.

25    THE COURT:  Right.  And I think you also just raised a

(970) 712-0060 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1 protective position about the releases, and of course you've

2 made the pitch on the releases with the subrogation RSA, and to

3 the extent that they're applicable here, it's the same

4 argument, I believe, right?

5 MR. ZIPES: Sure.

6 THE COURT: Right? Isn't that correct?

7 MR. ZIPES: Correct.

8 THE COURT: Correct. Yeah.

9 MR. ZIPES: Yes.

10 THE COURT: Okay. All right. Thank you, Mr. Zipes.

11 MR. ZIPES: Okay. Thank you.

12 THE COURT: Mr. Karotkin, I kind of took the last

13 three counsel in order, but they were really holding their

14 position. Do you want to say anything on any of them? Because

15 you don't need to if you don't want to.

16 MR. KAROTKIN: No, sir.

17 THE COURT: All right.

18 Mr. Kornberg, are you here for the CPUC? And I think

19 I should've -- CPUC seemed to be in a similar -- maintain the

20 status quo reserve that you speak for.

21 MR. KORNBERG: Alan Kornberg from Paul, Weiss,

22 Rifkind, Wharton & Garrison for the PUC.

23 Your Honor, we filed a reservation of rights. I think

24 it speaks for itself. Unless you have questions for me, I

25 really didn't plan on saying anything today.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1        THE COURT:  No, I don't.  Okay, thanks.  No, I am not
2   in --
3        MR. KORNBERG:  Thank you.
4        THE COURT:  All right.  We'll next go to the official
5   creditors' committee.  Mr. -- is it Mr. Bray or Mr. Dunn?  Mr.
6   Bray, you're up today?
7        MR. BRAY:  Me today, Your Honor.
8        THE COURT:  Yeah, and you've got a number of issues.
9        MR. BRAY:  Yes, good afternoon, Your Honor.
10       Gregory Bray, Milbank, LLP, counsel for the official
11  committee of unsecured creditors.
12       THE COURT:  It seems to me that, if I may anticipate
13  it, you're still very concerned about the lockup and what you
14  call the lock of the insolvency out, but --
15       MR. BRAY:  The insolvency out, you've dealt with.
16       THE COURT:  It's sort of there.
17       MR. BRAY:  And I don't disagree --
18       THE COURT:  It's kind of in through the back door,
19  right?
20       MR. BRAY:  Your comments satisfied our concern there.
21       THE COURT:  Okay, okay.
22       MR. BRAY:  I am more focused on the same issues that I
23  was focused on with you a couple of weeks ago with respect to
24  the subro RSA.  Principally, the -- our urging of the Court to
25  maintain a competitive process and to not approve the anti-

escribers
(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    competitive provisions, essentially the -- what I call the

2    "poison pill" provisions in the RSAs.

3              They're virtually identical to the ones that are in

4    the subro RSA, so I --

5              THE COURT:  See, let me stop you there.

6              MR. BRAY:  Sure.

7              THE COURT:  I thought about that a lot in whatever

8    time I had in the last twelve hours.  I don't think they are

9    identical, and let me tell you why --

10             MR. BRAY:  Okay.

11             THE COURT:  -- and then you tell me what's different.

12   By my count -- and Mr. Feldman could give us exacts -- we're

13   talking about 100 or 110 probably financial institutions or

14   banks or insurance companies.  That's a lot different -- and

15   all of whom probably have in-house counsel or outside counsel,

16   and all of them are spending a lot of time and a lot of money

17   dealing with these issues.

18             But contrasting that with 70,000 people, many

19   thousands of which don't have counsel, never have had counsel,

20   and we're dealing with something that hopefully, and likely,

21   they have never encountered before in their lives, voting on a

22   Chapter 11 plan.

23             MR. BRAY:  Right.

24             THE COURT:  So to me, it's much different, at least

25   conceptually, on how we set the table.  So tell me why --

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          MR. BRAY:  Well, the RSA doesn't bind --

2          THE COURT:  -- they're the same.  Huh?

3          MR. BRAY:  -- isn't binding the 70,000 or so victims.

4          THE COURT:  No, that's right.

5          MR. BRAY:  Yeah.  Right.

6          THE COURT:  That's right.  So what is it doing?  What

7    does the RSA do -- the lockup?  What does it prevent by --

8          MR. BRAY:  What it's doing -- it's killing off the

9    competing plan.

10          THE COURT:  Well --

11          MR. BRAY:  That's the underlying purpose of tying the

12    lockup provision to the settlement.  No one disputes.  The UCC

13    doesn't dispute, with the exception of the assignment of the

14    vendor claims, which you flagged -- let me just set that aside

15    for a moment, because it's a significant issue, and it does

16    raise its own set of 1054 issues and the possibility of

17    litigation that essentially thwarts a company's ability to

18    proceed with its remediation efforts.

19          But setting that aside for a minute, the competitive

20    process is what's gotten us to this point.  Essentially, the --

21    what the company has done, for all intents and purposes, is

22    piggyback onto the settlement that was agreed to between the

23    bondholders and the TCC.  And frankly, there's something

24    disingenuous, and that's the word -- I shouldn't say that

25    frankly.  It implies not of frankness other times, as you said.

PG&E Corp., Pacific Gas & Electric Co.

1    My point is that it's disingenuous to some extent for the

2    debtor to now to seek to co-op --

3            THE COURT:  Well, that's fair.  Use that word --

4            MR. BRAY:  -- and to take the exclusive benefit --

5            THE COURT:  -- you use that word in your papers, and

6    by co-op, that's usually not a complimentary term.

7            MR. BRAY:  Well, but they're basically -- what's

8    happened is the debtor has taken someone else's settlement and

9    said I am going to make it mine and not allow anyone else to

10   use it.  And the irony is they said the exact opposite with

11   respect to the subrogation settlement -- is I settled that;

12   therefore, it belongs to me and no one else can use it.

13           So we're sort of getting both sides played off the

14   middle here.  And again, the purpose, as we see it, is to

15   somewhat stifle, if not stop, a competitive process --

16           THE COURT:  But the --

17           MR. BRAY:  -- but Your Honor --

18           THE COURT:  -- but the victims through their

19   representative have agreed to it.  What do I do about that?

20           MR. BRAY:  Well, the --

21           THE COURT:  The same victims who complained about the

22   last one have now gone to support this one.

23           MR. BRAY:  I am not going to speak for the victims.

24           THE COURT:  Well --

25           MR. BRAY:  Experience suggests --

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          THE COURT:  -- they're --

2          MR. BRAY:  I agree with you.  Experience suggests that

3     they would be just as happy going forward without being locked

4     up to a plan, as long as the 13.5-million-dollar claim is --

5     that's what they want.  And that's what the Court wants to do,

6     and we want you to do it, too.

7          No one objects to the liquidation of both claims

8     today, the 11 billion dollars, and the 13.5 billion dollars,

9     again with the caveat about the assignment of the vendor

10    claims.

11         There's no dispute about that.  It's the right thing

12    to do.  The debtor has unequivocally stated it's in the best

13    interest of the estate to settle at those numbers.

14         THE COURT:  And then your client, I hate to say it,

15    has also not opposed that --

16         MR. BRAY:  We don't oppose --

17         THE COURT:  Right.

18         MR. BRAY:  -- the liquidation of the claims of those

19    numbers.

20         THE COURT:  Right.

21         MR. BRAY:  We accept that that's a good thing, a good

22    thing for the wildfire victims, a good thing in the best

23    interest of the estates and the creditors.

24         What we don't accept is that the "price to be paid"

25    for the settlement is a lockup that tethers the parties to a

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    plan that the governor has unequivocally stated in its current

2    form is not compliant with 1054 and, therefore, unconfirmable.

3    To bind the parties to an unconfirmable plan is not in the best

4    interest of the estate or its creditors.  It simply isn't.  And

5    they may get there.  And to maintain the competitive process, I

6    hope they do, because competition works both ways.

7           So as long as -- I would much rather see two potential

8    plans, get to the finish line, and creditors vote, than one.  I

9    think it's far better.  But approving a lockup that essentially

10   defangs a competing plan in favor of a plan that the governor

11   has unequivocally said doesn't work is -- again, I know I am

12   repeating myself -- is not in the best interest of the estate.

13          THE COURT:  Well, the governor's letter closes with a

14   suggestion that there not be a lockup.

15          MR. BRAY:  That's right.

16          THE COURT:  And as counsel's comments this morning

17   were not inconsistent with that, the question is --

18          MR. BRAY:  Agreed.

19          THE COURT:  -- what happens if I won't approve the

20   lockup?  Does it kill the deal?  Again, I don't want to ask

21   anybody else.  I am just asking you about it today, and I have

22   to ask myself is the -- look, we've got to go back -- you were

23   here, I think, when I made the first decision about exclusivity

24   and then changed --

25          MR. BRAY:  Um-hum.

(973)406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  -- because of things changed.

2    MR. BRAY:  Right.

3    THE COURT:  But what was the most important ingredient

4  was the position of the tort committee's counsel and

5  representative.  If you're asking me to say I believed you

6  then, but I am not going to believe you or trust you now, so --

7    MR. BRAY:  I'm asking you to keep your options open.

8    THE COURT:  -- am I taking a gamble by saying I can't

9  approve what you've agreed to, TCC?

10    MR. BRAY:  I think the bigger gamble isn't cutting off

11  one of the tracks at not keeping a competitive process open

12  because that's -- again, that's how we've gotten here.  Had you

13  not terminated exclusivity, had the bondholders not engaged

14  with the TCC and reached the settlement they've reached, I

15  highly doubt we would be here today --

16    THE COURT:  No, I understand.

17    MR. BRAY:  -- so we should keep the process going.  We

18  don't have the luxury of giving the debtor a chance to go to

19  the end of the line and then say, whoops, I didn't make it.

20    THE COURT:  What would happen?

21    MR. BRAY:  I was wrong.

22    THE COURT:  What would happen if -- I used this bad

23  expression earlier about off the rails.  What would happen if

24  there was an insolvency or the OII procedures are such that the

25  plan as now sponsored by the debtors and supported by the TCC

PG&E Corp., Pacific Gas & Electric Co.

1    is unconfirmable?  Is there some reason to believe that that

2    lockup on all these other terms would carry over?

3             MR. BRAY:  No, they wouldn't -- well --

4             THE COURT:  They would self-destruct --

5             MR. BRAY:  That's my other point, Your Honor.

6             THE COURT:  -- wouldn't they but just like the

7    insolvency out has the same concept.

8             MR. BRAY:  But that puts us back to square one.  The

9    document is drafted -- it's really a provisional settlement.

10   It's a settlement that says --

11            THE COURT:  Correct.

12            MR. BRAY:  -- as long, Your Honor, as you confirm my

13   plan, the debtor's shareholder plan, then the settlement is

14   applicable and we don't have to estimate.

15            THE COURT:  Well, yeah --

16            MR. BRAY:  If you decide --

17            THE COURT:  Okay.

18            MR. BRAY:  -- you don't want to confirm that plan, all

19   bets are off, the settlement is terminated, and the words are

20   of no force and effect and --

21            THE COURT:  Well, it's not a question --

22            MR. BRAY:  -- estimation --

23            THE COURT:  -- of whether I want to.  It's a question

24   of whether --

25            MR. BRAY:  I agree.

PG&E Corp., Pacific Gas & Electric Co.

1          THE COURT:  First of all, if we get to that point,

2  it's where the law compels it, but long before that -- long in

3  terms of days or weeks or months -- something else might happen

4  that --

5          MR. BRAY:  Agreed.

6          THE COURT:  -- makes the plan not confirmable, in

7  which case, you know, it's of no force and effect, pretty much

8  so, right?

9          MR. BRAY:  But the problem with that is the document

10  requires -- and these are more or less the words; I'm

11  paraphrasing it -- the immediate recommencement of estimation.

12          So let's go with your scenario.  Let's say we get to

13  the disclosure statement.  I think which is set for February or

14  March -- late February, early March.

15          THE COURT:  Yeah, I think that's in the --

16          MR. BRAY:  Okay.

17          THE COURT:  -- it's in the RSA when it's supposed to

18  happen.

19          MR. BRAY:  So let's play that out.  Let's assume we

20  get there, and the Court concludes I can't approve the

21  disclosure statement for the debtor's plan, because there is

22  something --

23          THE COURT:  For whatever reason.

24          MR. BRAY:  Whatever reason.

25          THE COURT:  Whatever reason.

of 353
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          MR. BRAY:  The RSA terminates.  We're at the end of

2  February, early March, and we have to restart estimation.  As

3  Mr. Orsini said, all bets are off.

4          THE COURT:  But what if, at that same time, the senior

5  bondholder's plan is ready to be approved --

6          MR. BRAY:  It won't be --

7          THE COURT:  -- or the disclosure?

8          MR. BRAY:  -- because --

9          THE COURT:  Well, why?

10        MR. BRAY:  -- because estimation --

11        THE COURT:  The lock --

12        MR. BRAY:  -- was stayed.

13        THE COURT:  Well, no, no, but what I am saying is

14  the -- well, are we talking about the lockup or the --

15        MR. BRAY:  Well, they go together, Your Honor.  That's

16  my point.

17        THE COURT:  No, but this is why I --

18        MR. BRAY:  I understand.

19        THE COURT:  Well, Mr. Bray, this is why I had trouble

20  with what you wrote because you and others were very emphatic

21  about lockups, and lockups have, you know -- again, they

22  usually mean there are some consequences, but then you said the

23  estimation proceedings which should begin -- well, does that

24  mean I approve the RSA and estimation goes forward all at the

25  same time?  That can't be right.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    MR. BRAY:  Let me explain myself.

2    THE COURT:  Yeah.

3    MR. BRAY:  Setting aside for a minute, the -- the

4  lockups channel the settlement through the debtor-shareholder

5  plan.

6    THE COURT:  Through the debtor -- that's correct.

7    MR. BRAY:  That's right.  That's the only way that it

8  can really be consummated, and it binds the parties --

9    THE COURT:  Well, I am going to stop you again.  Does

10  it really, or does it gag the professionals and others from

11  speaking in favor of an alternate plan versus it doesn't --

12    MR. BRAY:  It requires them to instruct their clients

13  to vote for --

14    THE COURT:  The clients make decisions.

15    MR. BRAY:  They do.

16    THE COURT:  And the ad hoc senior bondholders can

17  promote their plan as long as 1125 isn't implicated, and if

18  their disclosure is approved, they can do whatever they can.  I

19  mean, they're -- the victims here are the critical voting

20  constituents.

21    MR. BRAY:  I agree with you.

22    THE COURT:  I know that the subrogation group,

23  according to some, should be treated as unimpaired so they

24  don't get a vote.  It's hard for me to imagine that I would

25  ever confirm a plan that is voted down by the victims?

PG&E Corp., Pacific Gas & Electric Co.

1          MR. BRAY:  I completely understand.

2          THE COURT:  Okay.

3          MR. BRAY:  So let me try and answer that.

4          THE COURT:  So what happens?  Why is this lockup so

5    fatal to the senior bondholder's alternative plan if they get

6    to a point where they're the only show in town, obviously?

7          MR. BRAY:  Two reasons -- one, your earlier comment to

8    me that the -- most of the wildfire victims are utterly

9    unfamiliar with this process.

10         THE COURT:  Correct.

11         MR. BRAY:  And they are highly dependent upon, as they

12   should be, upon the advice of their counsel.

13         THE COURT:  Correct.

14         MR. BRAY:  You know in this RSA what that advice is.

15   As a practical matter --

16         THE COURT:  Yes, that's true.

17         MR. BRAY:  -- we also know it is highly unlikely that

18   these people are going to discount the advice of their lawyers.

19   That's my first point.  So we pretty much know what the answer

20   is.

21         The second point is estimation has been stayed, and

22   the way the lockup works, the bondholder plan is not permitted

23   to take advantage of the settlement.  It only channels through

24   the debtor plan.

25         So let's just say your scenario where you want to

PG&E Corp., Pacific Gas & Electric Co.

1    confirm the bondholder plan, there are several obstacles if you

2    sign the RSA.  First, the settlement under the terms isn't

3    applicable to the bondholder plan.

4          THE COURT:  That's right.

5          MR. BRAY:  Second, we haven't estimated those claims

6    because estimation was stayed.  So you're at confirmation, the

7    disclosure statement, wherever you are in the process, and you

8    want to proceed with the bondholder plan, there's significant

9    structural impediments to doing that.

10         That's why I said, if you approve the RSA, if you want

11   to keep a competing plan process alive -- and I hope you do

12   because we do -- it doesn't -- the RSA doesn't solve the issue

13   in the totality of estimation because the bondholder plan -- it

14   isn't applicable to the bondholder plan.

15         Our ultimate point being as it was with several RSA,

16   if we're going to settle the claims, the settlements should be

17   for all purposes and applicable to any plan proponents.

18         THE COURT:  Well, that was the point you made about

19   make it a 9019 and it's a nonissue.

20         MR. BRAY:  That's right.  That's right.  And I'm going

21   to try and go back to the other question you asked me:  Well,

22   what happens -- if I don't approve those, will the deal fall

23   away?  And the answer is maybe, but given a choice of approving

24   an RSA that really isn't in the best interest of the estates to

25   favor one plan over another, particularly when the plan at

PG&E Corp., Pacific Gas & Electric Co.

1    issue is being promoted by the party that has told the Court

2    it's a fiduciary for all parties and told the Court

3    unequivocally the settlement, the dollar settlement, the

4    numbers, are in the best interest of the estate, I think that's

5    highly unlikely.  How could a fiduciary do that?

6         THE COURT:  Well, okay, but still we'll go back to the

7    point.  Am I supposed to play chicken with the TCC and the

8    professionals by saying I can't approve a lockup, so roll the

9    dice and blow the thing up if you want or not?  I mean --

10        MR. BRAY:  Well, I don't think it's the TCC that's

11   going to blow it up over that.  I think it's the debtor.

12        THE COURT:  But the TCC agreed to it.

13        MR. BRAY:  The TCC agreed to it, but they're asking

14   you to approve it.  So ultimately, the question is before you,

15   are those terms in the best interest of the estates and

16   unsecured creditors as a whole?  And I know I am being

17   repetitive, but the answer to us is an emphatic no.

18        Even the governor has said to you, albeit not as

19   strongly perhaps as we have, that the governor would like to

20   see competition continue and the governor would like to see the

21   lockups removed.

22        Every party other than the settling parties is, for

23   lack of a better term, expressing severe reservations about the

24   structure of the RSA.  And even on an unrelated matter, you've

25   heard how many government agencies stand up and make a

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    reservation of rights?

2         THE COURT:  Yeah.

3         MR. BRAY:  There's a lot of wood to chop.

4         THE COURT:  But I've also have enough confidence in

5    the professionals and the mediator and everybody else to come

6    to a good solution to those things that aren't on the table

7    today.

8         In other words, it is a very huge task to do that

9    trust correctly and the procedures correctly and the management

10   of it, but that's why we have the best and the brightest doing

11   it on this case.  And so what's wrong with that?

12        MR. BRAY:  And we think the best way to motivate the

13   best and the brightest has been the way you have done it so

14   far:  through a competitive plan process.  That keeps everybody

15   honest on both sides of the plan process.

16        And our ultimate point to you is to urge you to

17   maintain that process because we don't know what's going to

18   happen.  What we do know is it changes every day.  And I mean,

19   the last four days, you know --

20        THE COURT:  It has --

21        MR. BRAY:  -- have been a whirlwind.

22        THE COURT:  I haven't checked --

23        MR. BRAY:  So I don't know when I am going to wake up.

24        THE COURT:  -- my phone lately.

25        MR. BRAY:  Yeah.  Every time I look, now I see Judge

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    Donato has said -- I mean, every day is different.  So if

2    there's anything to take away from this, is that options --

3    keeping our options open is a good thing, not a bad thing, and

4    that settling these claims is a good thing.  Liquidating them

5    at the agreed-upon numbers is a good thing.  But it's not

6    necessarily a good thing -- we're taking a risk -- if we lock

7    up those settlements and channel them through one particular

8    plan and we get down the road and we find out that that plan,

9    for whatever reason, doesn't satisfy the governor's concerns,

10   the CPUC's concerns, it doesn't satisfy Your Honor's standards

11   under 1129.

12        THE COURT:  So once again, I am going to restate it

13   because you've apologized for repeating yourself.  I am

14   repeating myself.  If I disapprove it as is --

15        MR. BRAY:  Um-hum.

16        THE COURT:  -- and tell you I will approve it only if

17   the lockup is out --

18        MR. BRAY:  Um-hum.

19        THE COURT:  -- and I'm focusing on this plan -- no, I

20   mean, excuse me, this RSA, not --

21        MR. BRAY:  I understand.

22        THE COURT:  -- the subro because to me it's --

23        MR. BRAY:  They're different.

24        THE COURT:  -- they're much different.  In my mind,

25   they're much different.  So if I disapprove it, unless the

PG&E Corp., Pacific Gas & Electric Co.

1   lockup is removed, obviously the debtor and the TCC can solve

2   that problem in two seconds by taking it out --

3          MR. BRAY:  They could.

4          THE COURT:  -- and so that takes that out of the way,

5   but the question is, then, if they don't, then we're back to

6   well -- I don't know, not square one but --

7          MR. BRAY:  No, we -- estimation, depending upon what

8   Judge Donato said -- and I don't want to put words in any of

9   the judge's mouths by any stretch.  I don't know what happened

10  there.  It sounds like Judge Donato was pretty emphatic about

11  where estimation is going to land.  What would happen is the

12  process would continue.  Estimation would go forward.  People

13  would prepare, just like they wanted to do, and we'll continue

14  with the competing plan process.  There will be potentially

15  other settlement opportunities --

16         THE COURT:  And --

17         MR. BRAY:  -- but it's not the end of the world.

18         THE COURT:  Okay.  And what in your mind would happen

19  if I approve it, what happened -- what is the -- and Mr. Stamer

20  and his colleague can tell me more specific, but what do you

21  think, as a neutral party here, what their options are at that

22  point?

23         MR. BRAY:  If you approve the RSA?

24         THE COURT:  They obviously control their ten, and go

25  home, but if they press their plan --

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          MR. BRAY:  I don't -- I think --

2          THE COURT:  They can still without any prohibition,

3     and leaving aside 1125 --

4          MR. BRAY:  Um-hum.

5          THE COURT:  -- and when (indiscernible), they can

6     still make the pitch that their plan is better for a lot of --

7          MR. BRAY:  But what's the number --

8          THE COURT:  Well --

9          MR. BRAY:  But what number do they put in their plan

10    for treatment?

11         THE COURT:  It's the same.

12         MR. BRAY:  How can they do that?

13         THE COURT:  It's in their plan.  It's in their plan

14    now.

15         MR. BRAY:  But it hasn't been estimated.

16         THE COURT:  I understand it hasn't been estimated.

17    But it's the same number that's been floating around since they

18    first put it out there, and the only thing that's changed since

19    the bondholders put that 13.5 on the table is the debtor's side

20    came up to 13.5.

21         So those numbers are sort of not in concrete, but

22    they're there --

23         MR. BRAY:  Let --

24         THE COURT:  -- on the table.

25         MR. BRAY:  If you're going to allow, as a practical

PG&E Corp., Pacific Gas & Electric Co.

1    matter, the bondholders to effectively solicit on the same or

2    perhaps even better plan treatment, I guess I would need to

3    think about that, and I will let them address it.  I suspect

4    the debtors will not agree that that's permissible.

5         THE COURT:  Well, I want to hear that.

6         MR. BRAY:  Yeah.

7         THE COURT:  So let's reserve that.  I am going to

8    depart from my procedural steps by -- and a little while ago, I

9    told Mr. Karotkin and Mr. Orsini I --

10        MR. BRAY:  And let me just make one more comment on

11   that.  I just thought about it.  If that's what you're going to

12   do, as a practical matter, let them use the settlement, then

13   why have the lockup at all?

14        THE COURT:  Well, that's obviously, I'm thinking about

15   that because, again, my job is to make decisions on disputes.

16   It isn't to play chicken with people, but I could sit here and

17   think oh, well, they'll back down.  I'll just take this out.

18   That's not the role that I'm supposed to play.

19        MR. BRAY:  Agreed.

20        THE COURT:  But what I am trying to do is to think

21   about well, what happens if -- what other ramifications?  Does

22   the sky fall or not?  And I want Mr. Stamer and counsel for the

23   BOKF to address those issues because they have both raised

24   their concerns about those, and what I was about to say is I

25   previously told Mr. Karotkin -- I'd kind of go and forth on

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   these issues, but to me, what you're saying, and what the

2   bondholders and the BOKF have put together are rally variations

3   on the same argument.  So I am going to let each of their

4   counsel speak, and then I will let Mr. Karotkin and Mr. Stamer,

5   whoever wants to speak, to all the issues, so -- because, I

6   mean, really the question about lockup is really, really the

7   big question right now in my mind, so -- and that's certainly

8   the point on your mind.

9        MR. BRAY:  It is, Your Honor, and just one final

10  comment back to the assignment of the vendor claims.

11       THE COURT:  Yeah, right.

12       MR. BRAY:  I don't have an answer for you about this

13  today, or a proposed solution, other than it's a significant

14  problem, and we think it may actually going to the ability by

15  1054 --

16       THE COURT:  Well, and that's right, and if the debtor

17  and TCC worked a deal that chancers away the debtor's ability

18  to comply with 1054, then do you know what?  Be careful what

19  you wish for.  But that's not a today issue, I don't think.

20       MR. BRAY:  It's really more of a plan, 1054 issue.

21       THE COURT:  Yeah, right.

22       MR. BRAY:  I just want to make sure it doesn't get

23  lost in the shuffle.

24       THE COURT:  It's not lost in the shuffle.

25       MR. BRAY:  Thank you, Your Honor.

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          THE COURT:  So Mr. Karotkin, I will come back to you

2     but I want to let Mr. --

3          MR. KAROTKIN:  Your Honor, I do want to respond to the

4     assignment argument.

5          THE COURT:  Yeah, but let's hold that because this

6     lockup -- you're going -- you or Ms. Dumas are going to have to

7     address the lockup, particularly because of the change --

8          MR. KAROTKIN:  Sure.

9          THE COURT:  -- of position from the other plan to

10    yours.

11         So Mr. Stamer, again I know who you are, but please

12    state your name for the record.

13         MR. STAMER:  But I am happy to give it for the record.

14    Mike Stamer from Akin Gump on behalf of the ad hoc senior

15    noteholder committee.

16         Your Honor, as you know, the senior noteholder

17    committee holds approximately  thirteen billion dollars of debt

18    of the company, and we just so happen to be a co-proponent for

19    now of a competing plan of reorganization.

20         THE COURT:  You might be an only proponent in a few

21    minutes but --

22         MR. STAMER:  And Your Honor, that's actually a great

23    place to start.  So I want to make two points:  One is that we

24    support a thirteen-and-a-half-billion-dollar settlement for the

25    TCC, unequivocally.  We got there first.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1      What I think is lost --

2      THE COURT:  You might have even set the mark,

3  therefore, then the match, right, just by coincidence.

4      MR. STAMER:  And that's okay.  The subtlety which is

5  not actually brought up by the debtors is, and I realize this

6  is a little self-serving, but our plan is better, from their

7  perspective.

8          So if you were to put a truth serum in their financial

9  advisor, they would tell you that the treatment for the tort

10  claimants under our plan is worth more than a billion dollars

11  more than the debtor's.

12         And I'll go through why our plan is --

13     THE COURT:  What would they say about if you get that

14  adverse ruling on the post-petition interest?

15     MR. STAMER:  I don't think it would impact --

16     THE COURT:  Well, it would reduce the billion by half.

17     MR. STAMER:  It would actually -- if less money went

18  out the door to pay post-petition interest, there would be more

19  money that came into the estate.  They're -- under our plan --

20     THE COURT:  Okay.

21     MR. STAMER:  -- they're getting thirteen-and-a-half,

22  and they're getting half equity, and half cash -- half cash on

23  the barrel head --

24     THE COURT:  Right.

25     MR. STAMER:  And the equity is issued by, very simply,

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   issued by a company that has less debt.

2          THE COURT:  That's --

3          MR. STAMER:  Seven billion dollars less debt.  So it's

4   more valuable.  So Your Honor, this is -- like everyone in the

5   courtroom -- and Judge Donato picked up on this.  Now I think

6   Judge Donato is in agreement.  Everybody in the courtroom

7   believes that the tort claims should settle for thirteen-and-a-

8   half billion dollars.

9          What the lockup does is Mr. Karotkin got up and said

10  we're done.  It's all over.  We've settled with all the

11  impaired creditors.  You can do away with the other plan.  We

12  actually believe that's inaccurate and somewhat reckless.

13         So from our perspective -- and this is -- it's clear

14  from what Mr. Karotkin says.  They want to end competition.  He

15  said it from the podium.  They want to end competition, and the

16  way they want to do that, it started with the public entities,

17  the billion-dollar settlement that didn't come across your

18  bench.

19         THE COURT:  Right.

20         MR. STAMER:  Then it went to the subros, and now it's

21  with the torts.  With the torts, it's even worse because not

22  only are they -- did they demand as part of these negotiations

23  that they agreed to support their plan, only plan, and no one

24  else's plan, they are requiring the torts to pull out of our

25  plan.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1        THE COURT:  Right.

2        MR. STAMER:  And what's coming next is them to argue,

3    Your Honor, you terminated -- actually, they already argued it.

4    You terminated exclusivity so that those two can file a plan,

5    and now that we have required the torts to pull from the

6    bondholder plan, exclusivity is back in place.  They want to

7    destroy competition, which from our perspective is bad on every

8    single level.

9        So Your Honor, if we can -- there's a few things we

10   can talk about.  We are obviously supportive of the settlement.

11   We are supportive of taking out any of the lockups, both with

12   respect to the subro plan and with respect to the TCC plan, but

13   Your Honor asked a very important question -- it's the ultimate

14   question -- which is, if you were to do as everybody other than

15   maybe the TCC, although they may want to do this in their heart

16   of hearts, if you were to play chicken, if you were to say, I

17   will approve the settlement, it's a fair settlement, but it's

18   not a fair settlement without removing the lockup, what would

19   happen?

20       We can look at the transcript, but I think Mr. Feldman

21   alluded at the last hearing, counsel for the subros, that

22   that's really the debtor's issue.  That's not something they

23   would insist upon.  So our assumption is they're not blowing up

24   this deal if, in fact, there's competition for purposes of

25   their treatment.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    And with respect to the TCC, Your Honor, the TCC, they

2    left us, or in the process of trying to leave us, and walk away

3    from in excess of a billion dollars of value.  They did it

4    because they want certainty.  They want to make sure that

5    estimation is over.  They can stop spending money, spending

6    time, and risking what's happened with estimation.

7    Your Honor, you should read the transcript.  Again, I

8    wasn't there but I read the news articles.  If you take the

9    lockout up, and equity forces the debtor to go back to

10   estimation, estimation will be over, I would say, within hours.

11   Because Judge Donato heard that everybody in the case wants to

12   settle this for thirteen-and-a-half billion dollars, and

13   settlements are actually relevant to an estimation, he is going

14   to end up at thirteen-and-a-half billion dollars.

15   THE COURT:  Well again, I am not going to speculate on

16   what his thought process would be or whether he needs more or

17   less information.  I am the one that has to make the call on

18   this issue, and you know, that's -- and I am not going to go

19   reading what someone said to Judge Donato an hour ago because

20   that's not the point.

21   But my point -- let's go --

22   MR. STAMER:  Your Honor, let me add a little context.

23   I think it will be helpful, and I will try not to take up too

24   much time, and I am not going to speak --

25   THE COURT:  Take as much time as you want.

escribers
(973) operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    MR. STAMER:  -- for the governor's office, but I

2  understand the governor is going to get back up when I am done,

3  or the governor's counsel.

4    THE COURT:  Well, I did invite him but he has --

5    MR. STAMER:  So the governor's here yet, as far as I

6  know.

7    THE COURT:  As near as I can tell, I haven't seen him

8  come in the last couple of hours.

9    MR. STAMER:  Elvis is not in the room.

10    Your Honor, the debtors -- there's a bunch of

11  undisputed facts.  The debtors need billions of dollars to

12  emerge.  They need to raise a tremendous amount of capital.  In

13  order for them to raise the billions of dollars, tens of

14  billions of dollars, they need to qualify for the fire fund.

15    THE COURT:  Yeah, of course, I know.

16    MR. STAMER:  If in fact -- in order for them to

17  qualify for the fire fund, they need to satisfy the obligations

18  of AB 1054.  I don't think anyone disagrees.  If they can't

19  satisfy the obligations under AB -- if they're not AB 1054

20  compliant, the plan is not feasible.  And Your Honor --

21    THE COURT:  Well, that's the same is true with your

22  side.

23    MR. STAMER:  It is, and we -- you're right.

24    THE COURT:  Okay.

25    MR. STAMER:  And we have had conversations with the

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    governor's office.  We actually think our plan is more

2    attractive, not only to the torts, but to everyone, and I'll

3    touch on it briefly.

4              THE COURT:  No, but you can touch on it, but you've

5    made it abundantly clear.  That's what you believe, and I am --

6    you're making the pitch.  I understand.

7              MR. STAMER:  Fair enough, Your Honor.

8              THE COURT:  Presumably if there is no lockup, you'll

9    make the pitch to the voters, or their counsel, but it's the

10   same.  I mean, what else happened?  In other words, let's try

11   it a different way.

12             MR. STAMER:  Sure.  Sure.

13             THE COURT:  Walk me through what happens with your

14   plan if I approve this TCC.  What's the lockup -- or I don't

15   approve it -- I don't approve the lockup, but it goes forward

16   anyway.  Walk me through how those play out.

17             MR. STAMER:  If you approve it without the lockup --

18             THE COURT:  Yeah.

19             MR. STAMER:  -- which means the TCC has the --

20             THE COURT:  They're not prohibited from talking about

21   it.

22             MR. STAMER:  From being a co-proponent of our plan?

23             THE COURT:  Well, I don't know about being co-

24   proponent, but they're not prohibited from speaking out against

25   it or urging people to vote one plan versus the other.

(979)239-7200 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    MR. STAMER:  Objectively.  And again, I -- my hope is

2    that the TCC will confirm this if they stand up.  Objectively,

3    if you take out the lockup, they will vote for -- I think

4    they'll vote for both plans, but if they were only allowed to

5    vote for one plan, it would -- they would -- logic would

6    dictate that they would vote for our plan.  Our plan

7    provides --

8    THE COURT:  But wait a minute.

9    MR. STAMER:  Sure.

10   THE COURT:  You say if they're only allowed to vote

11   for one plan.  Nobody is prohibiting you from voting.  The

12   question is whether they're under the TCC debtor's lockup --

13   MR. STAMER:  Right.

14   THE COURT:  -- the people who tell the -- educate the

15   people who are unfamiliar with these procedures what it all

16   means, but the bottom line, what it all means is you get your

17   share of 13.5 million either way, right?  And one way you have

18   the existing management, and the other way you have perhaps a

19   change of, not only management, but shareholder control, or a

20   major piece of shareholders.

21   MR. STAMER:  There's a number of variables, Judge.

22   THE COURT:  Right.

23   MR. STAMER:  And one variable is whether either plan

24   can satisfy AB 1114 --

25   THE COURT:  1054.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          MR. STAMER:  1054, thank you.  Thank you.

2          THE COURT:  Hey, I memorized it.

3          MR. STAMER:  Your Honor, it's -- I assume what they

4     would do, if you took out the provision that prohibited them

5     from voting for supporting any plan of reorganization, they

6     vote in favor of our plan.  Maybe they hedge both bets.

7          THE COURT:  Maybe they vote for both plans.

8          MR. STAMER:  And maybe they -- that would be okay.

9     The issue is whether or not the debtors are ever going to be

10    able to satisfy AB 1054, but locking the TCC and the subros and

11    the PEs to just this plan -- in the face of the governor's

12    letter, December 13th.  You've heard Mr. Karotkin talk about

13    well, we're meeting and we're making progress, Your Honor

14    that's too big a risk.  If you shut down competition here, Mr.

15    Karotkin said, like he says at every hearing, ignore them.

16    They're going to get paid in full.

17         Okay.  We have issue with respect to what paid in full

18    means, but setting that aside, if he is wrong, if he can't get

19    there with the governor, then this case is going to turn upside

20    down and the creditors are going to be impaired.

21         THE COURT:  Well, I understand.

22         MR. STAMER:  Including the torts.

23         THE COURT:  I understand.  But look, at the moment,

24    under the debtor's plan, your clients are unimpaired.  You have

25    complained about the treatment of post-petition interest, but

(972) 406-5500 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    that's a discrete legal question, same with the make hold

2    provisions.

3            MR. STAMER:  Correct.

4            THE COURT:  And even if you got all of that, that's

5    not the point.  You're allowed to speak.  The First Amendment

6    says what you can say.  You and your clients can pitch your

7    plan anytime you want.  The question is whether critical folks

8    like the lawyers, and the personal injury lawyers particularly,

9    and your fighting against the gag order that the debtor would

10   have me place on them, vis-a-vis your plan, right?  Isn't that

11   what it comes down to?

12           MR. STAMER:  Yes, it's a little -- yes, but it's a

13   little more subtle than that.

14           THE COURT:  It's a little more subtle.

15           MR. STAMER:  Maybe it's subtle like a sledgehammer.

16   So if you were to say, I disregard everything that people on

17   this side of the table are saying, and I am approving the RSA,

18   I am approving the subro RSA, and I'm leaving in all the

19   lockup, what the debtors -- what they said from the -- what Mr.

20   Karotkin said from the podium is our plan disappears.

21   Competition is over.

22           THE COURT:  But you don't believe that, do you?  Do

23   you?

24           MR. STAMER:  I would ask the Court in the, hopefully,

25   unlikely event that you're going to approve any of the lockup

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    that you clarify your exclusivity hearings, such that -- or

2    exclusivity decision, that our plan is still alive and well.

3    Exclusivity is terminated as to us.  Notwithstanding, we may

4    have lost our partner.  At the --

5         THE COURT:  Well, I mean, is there any doubt about

6    that?  I mean, has anyone said to the contrary?  Have --

7         MR. STAMER:  Actually, yes.

8         THE COURT:  Who?  Well, I haven't seen it in any

9    papers.  I mean, let me try it a different way.  If I were to

10   agree with the debtor/TCC approach, I have no knowledge of how

11   that would take away your client's entitlement to push its plan

12   to -- and you're the one that wanted to be ready for disclosure

13   statement earlier.  And I said, no, you're going to have to

14   wait.  And to me, the only immediate impact if this lockup

15   occurs, is that it limits the ability to promote your plan by

16   certain players.  TCC members and counsel and tort claimants.

17   No one else.

18        MR. STAMER:  Two things, subros --

19        THE COURT:  I mean, the debtors can't pay.

20        MR. STAMER:  -- they have to vote against our plan.

21   And anybody that's a signatory to the RSA needs to vote against

22   the plan.  And as Mr. Bray said, I think very accurately, that

23   the 70,000 claimants here who are the principal focus of this

24   chapter 11, this is hopefully their first time and their last

25   time doing this.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  Correct.

2    MR. STAMER:  And when -- every once in a while, I get

3    ballots because I have a claimant in a bankruptcy case or a

4    class-action -- I have a hard time figuring it out.

5    THE COURT:  You're going to find out you're going to

6    get $5.95 and a coupon for blue jeans.

7    MR. STAMER:  And -- right, and most of it goes to the

8    lawyers.

9    THE COURT:  Okay.

10    MR. STAMER:  That's exactly right.

11    THE COURT:  Yeah.  But for what?

12    MR. STAMER:  But Your Honor --

13    THE COURT:  It's not our point.

14    MR. STAMER:  Your Honor, fundamentally, we have an

15    opportunity here.  We have -- we have an opportunity to make

16    this a fully consensual case, and we have an opportunity to

17    make this a competitive process.  Competition -- we said from

18    the very beginning, competition is good, competition is good,

19    and time is very short.

20    THE COURT:  I know.

21    MR. STAMER:  If Your Honor allows any restrictions,

22    I'll go back to the fiduciary issues again, Your Honor, and

23    I'll tread a little bit lightly, but I have a very difficult

24    time.  So the fiduciary thing to do here from the perspective

25    of the company is to have the settlements be applicable to both

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    plans.  Allow -- we call it portability.  The --

2         THE COURT:  Well, what you're really saying is just

3    treat them like standalone 9019 motion and just approve it.  Be

4    done.

5         MR. STAMER:  That's exactly right.

6         THE COURT:  Yeah.

7         MR. STAMER:  And everyone, other than the equity

8    here -- and again, equity appointed to the majority of the

9    board that the governor has said based upon their performance

10   is going to have to be gone by the time this case is over.

11   Your Honor, what they should be doing is driving to a

12   consensual value maximizing process, which is not what they're

13   doing.  The debtors have not engaged with us in terms of any

14   negotiations since the beginning of these cases, and I had to

15   stand up and do the song and dance just to get basic financial

16   information, which, ultimately, we got some, but there's still

17   more to go.

18        THE COURT:  Let me switch topics.

19        MR. STAMER:  Sure.

20        THE COURT:  Why -- you made your point for the fire

21   victims.  Why is it a big deal one way or the other on the

22   lockup on the subros?  Again, you heard me say to Mr. Bray,

23   we're talking about 100 and something financial or institutions

24   or banks or people with good counsel and experience.  What can

25   they do to hurt you if there's a lockup as to that class?

PG&E Corp., Pacific Gas & Electric Co.

1          MR. STAMER:  Your Honor, they could vote against our

2     plan --

3          THE COURT:  Yeah.

4          MR. STAMER:  -- which would require us to confirm over

5     their objection ---

6          THE COURT:  But do you really think the --

7          MR. STAMER:  -- or they could -- if, for example, the

8     RSA gets approved, and for whatever reason, either the debtors

9     plan falls away or even it lags behind, they would have the

10    ability to terminate and push this back into estimation.

11         THE COURT:  But that's not an issue -- a lockup issue.

12    That's just a contractual issue.  In other words, under the

13    subro RSA, there's a right to terminate based upon insolvency.

14    That's the critical issue.  We're all starting over again if we

15    get -- if insolvency is a certainty, right?

16         MR. STAMER:  It --

17         THE COURT:  I mean, how can it possibly be otherwise?

18         MR. STAMER:  Your Honor, I think that's right.  It

19    depends upon the level of insolvency, what caused it in the --

20         THE COURT:  But wait a minute.  You're either

21    insolvent or you're not.  One dollar and you're out of the

22    money.

23         MR. STAMER:  They're -- right.  They -- the --

24         THE COURT:  And you get -- all your post-petition

25    interest is gone bye-bye.

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          MR. STAMER:  The lynchpin of the subro settlement,

2    among other things, is they don't want to have their recovery

3    diluted by the torts reaching into their pocket using the Made

4    Whole Doctrine.  We -- this has been briefed --

5          THE COURT:  I understand.  I understand.

6          MR. STAMER:  -- and the issue is as to whether it's an

7    involuntary release or a voluntary release.  Under our plan,

8    and maybe it has changed, but because it was giving the tort so

9    much more value, at least that compared to the other one, the

10   debtors earlier plan, the torts are willing to give blanket

11   releases based upon a 13.5 billion dollar bucket available for

12   the tort claims.  So again, they are now -- the torts are now

13   subject to a restrictive RSA, which prevents us from talking to

14   our plan partners about how to move the process over.

15         THE COURT:  I'm not following you on that.  If the

16   plan is capped at 13.5 billion, it is what it is, right?  And

17   so even for your plan, the voters need to vote in favor of it,

18   but it doesn't guarantee that they're, in fact, going to be

19   paid in full.  It's an estimation and a prediction that they

20   will.  And a prediction that AB 1054 has been satisfied, right?

21   But it's no guarantee.

22         MR. STAMER:  No, no.  I believe the 13.5 billion

23   dollar settlement, at least under our plan, notwithstanding

24   that the torts have asserted, now thirty-six billion dollars of

25   claims, that they believe -- they have stipulated that putting

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    13.5 billion dollars into a resolution trust -- half stock,

2    half cash -- would satisfy the requirement of paying tort

3    claimants in full.  And I think you heard Mr. Feldman say if,

4    in fact, someone was willing to pay him eleven billion

5    dollars -- his clients, although he'd take it, I'm sure --

6    eleven billion dollars in cash, that's something they would

7    accept.

8         Again, Your Honor, based upon the restrictive nature

9    of lockups -- again, now we're going back to the subros, and I

10   don't mean to reargue subro, we have been unable to have any

11   discussions with them.  We know because their biggest -- the

12   largest subro claimholder, which is Baupost, is also, I

13   believe, the largest anchor tenant in the twelve-billion-dollar

14   equity investment.  That is the lynchpin of the company's plan.

15   So there are people in the subros that want stock.  We haven't

16   had an opportunity --

17        MR. TSEKERIDES:  Is Mr. Stamer testifying now?  Is

18   there an affidavit or a declaration in evidence to support

19   anything he's saying?

20        THE COURT:  No.  He's -- he's making --

21        MR. STAMER:  Your Honor, there's a -- there's a --

22        THE COURT:  -- he's making an argument.

23        MR. STAMER:  Right.  And all of this stuff is --

24        THE COURT:  I'm not making any findings.

25        MR. STAMER:  All of this is publicly available.  It's

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    the 2019.  It's also the backstop commitments.

2         So again, back to the fiduciary duty, Your Honor.

3    Consistent with the board's fiduciary duty, what they should be

4    doing is they should be settling these cases and having the

5    cases be available to a competitive plan process.  And what

6    they're doing is they're threatening everybody in the case that

7    if they don't get what they want, then they're going to force

8    this back to estimation.  And if they -- again, Your Honor,

9    we'll ultimately read the transcript.  I wasn't there.  There's

10   news articles everywhere.  I think it's very clear what happens

11   if, in fact, this goes back to to estimation in front of Judge

12   Donato.  We are supportive of the underlying settlement with

13   the Court.

14        THE COURT:  And you know I wasn't there.  I don't

15   necessarily know if I'll read the transcript, but it's hard for

16   me to imagine in a hearing that only took minutes that anything

17   he made would be -- any decision he announced would be the

18   equivalent of a factual finding that is binding.  I mean, I

19   would be more inclined to think that somebody said, they got

20   this hearing going down on 16 and the judge is deciding whether

21   to approve a deal that locks in this 13.5 billion.  And we need

22   to have a further stay, and Judge Montali will be done with it

23   shortly.  And he probably said, good, let's wait and see what

24   he does.  Period.  That's probably what happened.

25        MR. STAMER:  Again, Your Honor, I wasn't there.  I

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    haven't been --

2              THE COURT:  I wasn't either.

3              MR. STAMER:  I haven't been to any of his hearings,

4    but my understanding is Judge Donato is very much to the point.

5              THE COURT:  Well, of course.

6              MR. STAMER:  Judge Donato is concise, and when he has

7    something on his mind, he communicates it.  And ultimately --

8    look, we'll provide -- we'll file it on the docket because I

9    think it's worth the Court seeing exactly what Judge Donato

10   said.  The only reason we raise it, Judge, is because this game

11   of chicken they're playing, there's a least a little bit of a

12   safety net in front of Judge Donato, that, ultimately, we think

13   that he's going to end up at 13.5, whether you approve this RSA

14   or not.

15             THE COURT:  Yeah, but look -- okay.  Let's move on.

16   I'm not going to make a decision today based on what Judge

17   Donato, in a fifteen-minute hearing, announced.  Because, first

18   of all, I don't think it was -- it was nothing more than a

19   status conference.  If TCC and the debtor's counsel want to

20   say, yes, there's a stipulation; we got a value, that's one

21   thing.  But I doubt that that happened.  So my job is to decide

22   whether today to approve this RSA that has a -- pegs that 13.5

23   million for the TCC with or without a lockup.  Let me --

24             MR. STAMER:  Your Honor, I just -- finish with one

25   question.

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          THE COURT:  Yes.

2          MR. STAMER:  And I'll rely on my papers with respect

3    to why our plan, as filed, is better than the debtor's plan.

4    In addition to the additional value to the TCC.

5          THE COURT:  But that's not a question that I'm asked

6    today.

7          MR. STAMER:  No.  I only say it because -- again, this

8    is about the torts, and this is about getting them as much

9    value as possible as quickly as possible.

10          THE COURT:  Yes, it is.

11          MR. STAMER:  And they're settling for less value

12    because they want certainty.  I only end with a question.  And

13    the question is:  Why -- ignoring the influence that equity has

14    had on these cases, what would be the harm to the debtors?

15    What would be the harm to the debtors if the RSA were approved

16    without -- and the subro RSA were approved without any of the

17    lockup provisions?  There may be damage to equity, and that's

18    because equity has been using estimation as a cudgel, as a

19    stick.  And that's how they got, at least for the time being,

20    the torts to migrate towards certainty.  There is no answer to

21    that question.  There is no damage.

22          THE COURT:  But I asked the question --

23          MR. STAMER:  Sure.

24          THE COURT:  -- a few weeks ago.  And one my musings is

25    are we going to have to deal with it anyway if there's a

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    cramdown and equity argues that you're getting overpaid if it's

2    your plan.  How do we -- it's the same question, isn't it?

3            MR. STAMER:  It's a great point.  So --

4            THE COURT:  Well, it's the same question, isn't it?

5            MR. STAMER:  It's a great point.  And the point is if

6    you were to say, I am approving the settlements, but I am not

7    approving the lockups.  And for whatever reason, equity goes

8    off the rails.  They decide to be very litigious.  They are

9    protected by 1129(b).  And therefore, if there is overpayment

10   of anyone, you don't need to deal with Judge Donato -- although

11   I think we know the punchline there -- they are protected by

12   1129(b) and they will have time.  They will have -- we've all

13   done this litigation a bunch of times.  They will have the

14   ability to try to establish that the torts are being overpaid;

15   that somehow, other creditors are being overpaid --

16           THE COURT:  But it still takes -- you still have to

17   value the claims that are being paid in some fashion, right?

18   In other words, if we --

19           MR. STAMER:  Not if you settle them 13.5.  Not if you

20   approve -- if you say I agree to the RSA; I take out the

21   lockup --

22           THE COURT:  Does that -- you --

23           MR. STAMER:  Let me take it one step further.  So if,

24   in fact, you were to find that the settlements -- the RSAs are

25   in the best interest of the estate; they are reasonable, but

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  they're not if they have the lockup provisions, right?  Our

2  anticipation is the company, consistent with its fiduciary

3  duty, would say, okay, we, the company, will sign on to the

4  modified RSA.  To not do that, to step away from these

5  negotiations, to revert back to Judge Donato to try to litigate

6  these issues, would be the cherry on top of a litany of

7  breeches of their fiduciary duty.

8          THE COURT:  But you haven't answered my question.  If

9  I --

10          MR. STAMER:  I'm glad I entertain.

11          THE COURT:  If you here at confirmation and you are

12  promoting and asking me to confirm your client's plan, what do

13  you when Mr. Bennett or someone on the shareholder's side says

14  you're overpaid, you're violating absolute priority rule, we

15  need evaluations?  What are you going to do?  Say well, Judge

16  Donato already made the findings?  Is that what you're going to

17  argue?  Is that what you believe has locked them in, and

18  therefore, there's nothing to talk about?

19          MR. STAMER:  Again, regardless if it's Donato --

20  whether it's Judge Donato, whether it's this Court -- if you

21  approve the settlement as a reasonable prospect, as above the

22  lowest point in the range of reasonables --

23          THE COURT:  Range of reasonables.

24          MR. STAMER:  Yeah.

25          THE COURT:  But is that a finding that is binding on

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   the equity for cramdown purposes?

2          MR. STAMER:  Is it a --

3          THE COURT:  Well, is it binding?  I mean, does it --

4   is it law -- is it something -- pick a legal term.  Does it

5   lock in the equity and prove as a matter of law that the

6   proponent isn't underpaying equity or overpaying somebody.  I

7   mean, what's the consequence, vis a vis the equity?  The equity

8   is an impaired class under the plan, right?

9          MR. STAMER:  Yeah.

10         THE COURT:  And they're entitled to protection.  So

11  don't you have to do evaluation?

12         MR. STAMER:  Your Honor, the answer is no.  I don't

13  think you have to do evaluation.  And fundamentally, Judge,

14  equity has supported this settlement.  Equity is a co-proponent

15  of a plan that is proposing to settle these claims for 13.5.

16         THE COURT:  Okay.

17         MR. STAMER:  And for them to back away and say, 13.5

18  is outrageous; you're overpaying them.  It would be both

19  disingenuous and inconsistent with everything they've said up

20  to this point with respect to being a co-proponent of the plan.

21         THE COURT:  Okay.  I understand your point.  Let me go

22  to BOKF and then I'll see what -- and then we'll probably take

23  a short break and let the debtors and the -- well, and the TCC.

24  I need to hear from them.

25         MR. STAMER:  Thank you for the time, Your Honor.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1      THE COURT:  Thank you, Mr. Stamer.

2      This is the bank?  You're here to speak for the bank,

3  Counsel?

4      MS. BROWNSTEIN:  Good afternoon, Beth Brownstein from

5  Arent Fox on behalf of BOKF as indenture trustee for the senior

6  notes and the outstanding principal amount of 17.5 billion

7  dollars.

8      THE COURT:  Thank you, Ms. Brownstein.

9      MS. BROWNSTEIN:  I'm not going to repeat what the

10  other arguments were.  I'm going to state the obvious, which is

11  competition has been good.  It is why we are here.  And there

12  is no reason why we should end competition now.

13      I think we also all know, based on the hearing today,

14  that there are significant uncertainties, execution risks, and

15  legal hurdles with the debtor equity plan.  I don't think

16  anyone disputes that.  I think the governor's letter

17  articulated in detail the kinds of issues with the amended

18  plan.  Whether it's corporate governance, the liquidity issues,

19  the ability of the proposed reorganized debtor to access the

20  capital it needs to meet AB 1054.  Those are all issues we all

21  know exist.

22      So one of the concerns we have with the very broad

23  nature of the lockup is this idea that no signatory party can

24  participate in the formulation of any other plan, other than

25  the amended plan.  But we know that the amended plan is not the

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    plan because it's not confirmable.  So it is hard to understand

2    how anyone benefits from that kind of broad lockup --

3          THE COURT:  Well, isn't that taking it a little bit

4    too literally?  In other words --

5          MS. BROWNSTEIN:  I don't have a --

6          THE COURT:  -- wouldn't that be kind of an anomaly if

7    I say I'm going to approve this, but by the way, the plan is

8    unconfirmable, but you can't do anything to fix it?

9          MS. BROWNSTEIN:  I agree, Your Honor.

10         THE COURT:  I mean, that seems a little bit weird.

11         MS. BROWNSTEIN:  I actually agree, which is why --

12         THE COURT:  But they really -- what they really lockup

13    is they don't want -- they don't want Mr. Stamer's client to

14    get lobbied or they don't want the voting public to be

15    influenced one way or the other.  That, to me, is what the real

16    lockup is going on here.  It doesn't mean that good lawyers

17    can't fix something that needs to be fixed.

18         MS. BROWNSTEIN:  Well, maybe amongst each other, but

19    I'm talking about the other parties who are not signatories who

20    are affected by the plan.  So for example --

21         THE COURT:  But legally, your client is not affected

22    by it.  You client is unimpaired, right?

23         MS. BROWNSTEIN:  Well, I think we have -- that issue

24    is out there whether or not we're unimpaired.

25         THE COURT:  The -- well --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          MS. BROWNSTEIN:  And the debtor's ability, I know --

2          THE COURT:  Wait a minute.  Excuse me.

3          MS. BROWNSTEIN:  Sorry.  Go ahead.

4          THE COURT:  How is it out there?  Where are you

5   impaired?  Not being paid post-petition interest or if you deny

6   it -- and I haven't made a ruling yet --

7          MS. BROWNSTEIN:  Right.

8          THE COURT:  -- that's not impairment in a legal sense.

9   And same with the keepwells.  I mean, what are you impaired as

10  a legal matter?

11         MS. BROWNSTEIN:  Well, I think we've argued that the

12  proposed treatment actually renders us impaired.  But I won't

13  address the impairment or the unimpairment --

14         THE COURT:  Okay.

15         MS. BROWNSTEIN:  -- which I know are for another day.

16         THE COURT:  Okay.

17         MS. BROWNSTEIN:  But for example, if our notes are

18  reinstated, right, the noteholders will be a very significant

19  creditor going forward of the debtors and obviously have an

20  interest in ensuring that there's long-term viability of the

21  debtors --

22         THE COURT:  And --

23         MS. BROWNSTEIN:  -- as all creditors.

24         THE COURT:  -- as I said before, you may not be

25  voting, but you have a right to object and raise these are

PG&E Corp., Pacific Gas & Electric Co.

1  delay arguments all you want, right?

2       MS. BROWNSTEIN:  Absolutely.

3       THE COURT:  Okay.

4       MS. BROWNSTEIN:  So I'm just reading the -- I didn't

5  write the RSA, so I'm just reading the words, which says, "They

6  shall not participate in the formulation of any restructuring

7  that's not the amended plan."  So I'm just reading what I see,

8  and from what I see, that provision, in addition to all the

9  other anti-competitive provisions, are problematic from our

10 prospective.

11      So you had asked about the lockup, so I just wanted to

12 raise that one issue, which hadn't been raised for Your Honor.

13      THE COURT:  Okay.  It strikes me that that can't

14 possibly operate against proponents.  So they can't fix

15 something that needs to be fixed, nor can it operate against

16 parties who -- individual creditors that say there's a problem.

17 Like take the Adventist interest of the billion dollars.  If

18 their counsel says, look, there's a problem here; we need to do

19 this or that or the other thing.  I don't think that we're

20 violating -- anybody's violating any lockup by fixing things in

21 that way.

22      MS. BROWNSTEIN:  And so I guess my question -- so

23 would mediation continue and negotiations continue where other

24 parties -- they would be able to engage with noteholders, in

25 terms of formulating a confirmable plan with a global

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    resolution --

2          THE COURT:  Well, I don't know.  If I --

3          MS. BROWNSTEIN:  -- or is that off the table, based on

4    the finding?

5          THE COURT:  I haven't really thought about that.

6          MS. BROWNSTEIN:  Yeah.

7          THE COURT:  If I approve this agreement as is, I guess

8    the lockups are what they are until people come up with a way.

9    Come on; that wasn't what we meant.  If I don't approve the

10   lockup, then obviously it's not an issue.

11         MS. BROWNSTEIN:  Right.  Thank you.

12         THE COURT:  Okay.

13         MS. BROWNSTEIN:  I just want to point out that this

14   side of the room, obviously, it wants to be involved to

15   continue mediation and continue the formulation of a potential

16   global resolution.  We would hope that these lockup provisions

17   don't preclude that.

18         THE COURT:  Okay.  Thank you, Ms. Brownstein.

19         MS. BROWNSTEIN:  Thank you, Your Honor.

20         THE COURT:  I'm going to take a break for everyone's

21   convenience for a few minutes.  Oh, unless, Ms. Mitchell, do

22   you want to --

23         MS. MITCHELL:  I did.

24         THE COURT:  -- say something now.  Because what I was

25   going to say is I want to hear from the governor's office and

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    also the TCC and then I'm going to let the proponent -- the

2    debtor's side say what they want to say.  I don't mean to cut

3    off the City of San Jose or Mr. Abrams, and I'll acknowledge

4    either of them for a moment.  I just want to take a break for

5    everyone's convenience.

6              So Ms. Mitchell -- but your role is --

7              MS. MITCHELL:  No.  I'm happy to go --

8              THE COURT:  -- important here.

9              MS. MITCHELL:  I'm happy to go after because I think

10   it might be better.

11             THE COURT:  Okay.  The gentleman who was standing up,

12   were you here for the City of San Jose?

13             MR. ABRAMS:  Sorry.  Mr. Abrams, I --

14             THE COURT:  Oh, Mr. Abrams.  Okay.  Mr. Abrams, yeah,

15   go ahead if you want to make a brief statement.  I mean, I --

16             MR. ABRAMS:  Sure.

17             THE COURT:  A lot of your arguments really aren't

18   something that I can deal with today.  You don't want the

19   governmental agencies participating with the tort claimants,

20   and that's really not for today's --

21             MR. ABRAMS:  Sure.

22             THE COURT:  -- discussion.  And you don't like the

23   corporate structure.  That's not for today either.

24             MR. ABRAMS:  Sure.

25             THE COURT:  The governor's got that on his plate.  His

PG&E Corp., Pacific Gas & Electric Co.

1 counsel does. And it's something that might very well be dealt

2 with at confirmation. And similarly, the treatment of the Tubb

3 Fire victims versus someone else. Those all seem to be

4 important issues, but not relevant to today's issues. So just

5 tell me what today is for.

6 MR. ABRAMS: Yes. Thank you, Your Honor. My name is

7 Will Abrams. I am a Tubbs Fire survivor, which brings me to

8 this court. And I'm here; I'm sort of independent of the TCC

9 because I'm concerned that what is before us in the RSA is

10 leaning towards and expedient plan, but not an effective plan.

11 And so I wanted to put forward some things relevant to the RSA.

12 THE COURT: But I don't want you to turn this into an

13 argument about confirmation.

14 MR. ABRAMS: No, no, no.

15 THE COURT: If you have a theory that approving the

16 RSA is -- will, itself, be detrimental to the plan process,

17 I'll listen to you. But beyond that, I don't want to turn it

18 into something that isn't on the table here today.

19 MR. ABRAMS: Understood.

20 THE COURT: Go ahead.

21 MR. ABRAMS: And I appreciate the process as I learn

22 it as I go here. But what concerns me is the time element of

23 this, right? So AB 1054 is there, June 30th, got to get it

24 done. If we're down the road and June 30th is approaching and

25 we have an uneffective (sic) plan, but we need to take some

(979) operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    expedient shortcuts, that's a concern for me.

2           As I look at the RSA, one of the things that strikes

3    me as I look at how it should be reviewed, is that it needs to

4    show signs of restructuring.  And there's nothing in the RSA

5    that points to --

6           THE COURT:  Isn't that exactly what the governor's

7    letter says?  Doesn't the governor's letter -- did you read the

8    governor's letter?

9           MR. ABRAMS:  I read the governor's letter, and --

10          THE COURT:  It says, get your act together at the

11   corporate level.  And --

12          MR. ABRAMS:  Absolutely, Your Honor.  Yes.

13          THE COURT:  And I'm not doing that today, okay?

14          MR. ABRAMS:  Absolutely.  But --

15          THE COURT:  So listen, Mr. Abrams, I don't mean to be

16   impatient with you.  These are complicated.  But if Mr.

17   Karotkin stood up and said, guess what, there's been a hundred

18   percent change of the board, so would you please approve the

19   RSA?  I'd say, it doesn't matter if the board changed or not,

20   the RSA has to be tested on its own merits, not who the

21   corporate officers are --

22          MR. ABRAMS:  I'll leave that --

23          THE COURT:  -- running the show, okay?

24          MR. ABRAMS:  I'll leave that alone.  You know, I have

25   concerns that that is not going to take place, but I'll leave

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  that alone.

2  The other point here, which I think is the business

3  judgment.  Part of what needs to be in here is to show sound

4  business judgment.  And so what I don't see in this RSA is

5  sound business judgment.  This is more of the same.  This is

6  not changing anything and expecting things to be different.

7  That is not --

8  THE COURT:  Mr. Abrams -- Mr. Abrams --

9  MR. ABRAMS:  That is not --

10  THE COURT:  -- the committee that represents you in a

11  representative capacity has --

12  MR. ABRAMS:  They don't.

13  THE COURT:  I know they don't individually.

14  MR. ABRAMS:  Yes.

15  THE COURT:  And you have a right to be heard.  I'm not

16  denying that.  That committee, represented with experienced

17  counsel and experienced advisors, have recommended a proposal

18  that creates this 13.5-billion-dollar fund to compensate people

19  such as you.

20  MR. ABRAMS:  Yes.

21  THE COURT:  And if you don't like that treatment, you

22  have a right to be heard.  But that doesn't go to the question

23  of whether I disapprove this particular RSA.  Remember what the

24  letters RSA stand for.  Restructuring Support Agreement.

25  MR. ABRAMS:  And that's why I didn't see any

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    restructuring in it, which is why I was concerned.

2              The last point I will make -- or actually two last

3    points if I can is one, that -- part of this is, does it have a

4    reasonable chance of success?  So I thought that that was part

5    of what needs to be looked at here.  And again, if it's just

6    looked at from that standpoint, it does to me appear that it's

7    heading in the opposite direction from that.  So I'm concerned,

8    and I think it should be a concern of the Court.

9              THE COURT:  Well, you stated in your paper that there

10   were corporate structure issues and climate risks.  And again,

11   we all want the climate risk to be resolved, but those aren't

12   things that I have any say about today, so it --

13             MR. ABRAMS:  It's just directional.  I'm not saying it

14   needs --

15             THE COURT:  Okay.

16             MR. ABRAMS:  -- to be solved today, but if they're

17   headed in this direction, and the right prudent path, as a

18   reasonable manager is in that direction, then this is going in

19   the wrong direction --

20             THE COURT:  Okay.

21             MR. ABRAMS:  -- and that, to me, means it shouldn't be

22   approved.

23             THE COURT:  Okay.

24             MR. ABRAMS:  And one last point I would say as has

25   been brought up before, competition is a good thing for

(973)   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   wildfire survivors.  This one-billion-dollar number that was

2   discussed that is unknown to wildfire survivors is part of the

3   problem.

4           THE COURT:  Which billion do you mean?

5           MR. ABRAMS:  So part of what was -- I heard these --

6           THE COURT:  You mean the Butte County settlement?

7           MR. ABRAMS:  No.  What I heard being said is that the

8   opposing plan comes forward with a better package for wildfire

9   survivors, but they will never see it.  They will never know it

10  exists because they're only being represented by the TCC; can't

11  dig into the plans.  The attorneys from the TCC have to

12  represent that this is the best thing since sliced bread.  And

13  that will give the wildfire survivors very little information

14  to make a very complicated decision.  And I think short of

15  having a disclosure statement that has all sorts of bells and

16  whistles that do not lead to a good result, I think that this

17  is a -- leaves them impaired, which is why I'm --

18          THE COURT:  Okay.  I'm going to stop you by telling

19  you this is not approval of a disclosure statement, okay?

20          MR. ABRAMS:  I understand, but my -- I understand.

21  But again, so the RSA itself and the fact that there's no

22  competition associated with the RSA, I think leaves wildfire

23  survivors impaired down the line.

24          THE COURT:  Okay.

25          MR. ABRAMS:  And the fact that this needs to be in the

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    direction of a reasonably approved plan, I think is a problem.

2            THE COURT:  Okay.  Mr. Abrams, thank you very much for

3    your comments.

4            MR. ABRAMS:  Thank you.  I appreciate it.

5            THE COURT:  Does the City of San Jose wish to be

6    heard -- it's representative?

7            MS. CECIL:  Your Honor, Jennifer Cecil, on behalf of

8    the City.

9            THE COURT:  I need you at the microphone.  And then

10   I'm going to take a break, after I hear from you, ma'am.  So

11   just state you name again, please.

12           MS. CECIL:  Yes, Your Honor.  Jennifer Cecil on behalf

13   of the City of San Jose.  We had one question that we had put

14   in our statement relating to how the aggregate fire victim

15   consideration was being calculated, but in the amendment that

16   was filed last night, that appears to have been addressed.  So

17   we just reserve our rights at this point as to the

18   confirmation.

19           THE COURT:  Okay.  Thank you, Ms. Cecil.

20           MS. CECIL:  Thank you.

21           THE COURT:  All right.  I'm going to take a fifteen-

22   minute break, and then I'd like to hear from the TCC and then

23   the opponents to the plan.

24       (Recess from 3:15 p.m., until 3:35 p.m.)

25           THE CLERK:  All rise.

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1        THE COURT:  Please be seated, everyone.

2        Ms. Dumas, are you going to do the honors, or Mr.

3   Julian?

4        MR. JULIAN:  Both.

5        MS. DUMAS:  I'll start it.  I'll start us off.

6        THE COURT:  Okay.

7        MS. DUMAS:  Good afternoon, Your Honor.  Cecily Dumas,

8   Baker Hostetler, on behalf of the official committee of tort

9   claimants.  Thank you for the opportunity to address the Court

10  as the non-planned proponent party to this RSA.

11       The first thing I'd like to clarify, Your Honor, is

12  that this process of the tort claimants' committee, as well as

13  the legal representatives of over seventy percent of tort

14  claimants, was not a process undertaken lightly.

15       We were sincere when we came to the Court before you,

16  a couple of months ago and asked you to lift exclusivity in

17  order that a competing plan be permitted to go forward.  We

18  understand the -- we believe we understand the economic terms

19  of a competing plan.  We believe we understand what the

20  creditor plan offers tort claimants.  We believe that we

21  understand the governor's explanation of the current

22  infirmities of the debtors' plan, as well as the governor's

23  current belief that the bondholder plan fails to comply with AB

24  1054 at the moment.

25       The TCC has no incentive whatsoever, nor do the

PG&E Corp., Pacific Gas & Electric Co.

1    consenting fire claimant professionals have any incentive, to

2    agree to anything other than the best treatment of all tort

3    claimants that can be achieved under complex circumstances.  So

4    I want to make sure that everyone understands, including those

5    laypeople to the extent I can explain in those lay terms, that

6    we took into account a lot of different things that laypeople

7    may not understand when we reached our decision to enter into

8    an RSA with the debtors.

9         We understand that the sponsors of the bondholder plan

10   are well-capitalized, sophisticated financial institutions.  We

11   understand that the ideal terms of an agreement may not include

12   stock.  We would have loved to get cash in an amount adequate

13   to address tort claims, as of the effective date.

14        Based on this case, the amount of cash this debtor in

15   possession could conceivably raise, the existence of the

16   subrogation settlement that preceded the TCC settlement, which

17   took eleven million in cash, and this Court has heard and all

18   of us have debated again and again and again the wisdom of the

19   debtors having put all cash in front of the subrogation claim

20   holders and not the tort claimants; we have not missed any of

21   these points.  We have taken them into consideration, along

22   with other considerations that are not economic, not purely

23   economic.

24        We understand, because we are in this business, that

25   this case is an extremely complicated case, that Your Honor is

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    being asked to confirm in seventeen months from the petition

2    date, a mass tort case that has -- it's never been done before,

3    and we truly appreciate and respect Your Honor's diligent

4    efforts to do so.

5            AB 1054 provides benefits to the three major investor-

6    owned utilities that the State of California made available to

7    PG&E only if it emerges from bankruptcy by June 30, 2020.  So

8    we were operating within those constraints of trying to get

9    this done promptly, to have reorganized PG&E have availability

10   to a substantial fund.

11           We are also extremely cognizant of the fact that some

12   of the victims, some of the tort claimants, have been waiting

13   for payment from losses incurred as early as 2015.  And as we

14   saw from the Ghost Ship claimants, 2016, but particularly the

15   wildfire claimants of 2017 and in particular 2018, those

16   claimants, those victims who we've come into court and the

17   Court has acknowledged, still have temporary housing and need

18   money.  So we understand that people need to start rebuilding

19   their lives, and in order to do that, they need some money

20   available, made available from this bankruptcy case, to get in

21   their pockets as expeditiously as we can accomplish that.

22           As part of that and something that is -- those goals,

23   and something that is not immediately comprehensible to

24   laypeople, is the concept of a fair and equitable plan, and

25   that the equity security holders have rights in this case, and

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   that it was our considered conclusion in reaching this RSA that

2   the time in which we would love to achieve confirmation and

3   payment is easier with a debtor-sponsored plan.  It's not to

4   say anything criticizing the creditor plan.  We are, at the

5   moment, coproponents of a creditor plan.  But we understand

6   that one of the facts of life is that it is very difficult for

7   a creditor plan to get through contested confirmation,

8   contested by equity security holders, and a regulatory process

9   in the time frame we all have.

10          As I said in my comments this morning, we are in an

11  imperfect world, an imperfect world in which I and my

12  colleagues, who represent TCC members, we're not alone.  When

13  we engaged in settlement discussions with the equity security

14  holders and the debtor, there were lawyers in the room who, as

15  I said this morning, represent the vast majority of TCC, the

16  tort claimants.  They not only represent personal injury

17  claimants but, to correct Ms. Winthrop's comments this morning,

18  they represent parties with substantial property damages

19  claims, in the aggregate in excess of Adventist property damage

20  claims.

21          We think that in view of the participation of numerous

22  law firms who represent thousands of clients, to whom they owe

23  their individual fiduciary duties, signing onto this, whether

24  or not the TCC signed, I mean, we fortunately were able to

25  stick together, but these law firms, which represent in the

PG&E Corp., Pacific Gas & Electric Co.

1    tens of thousands of claimants, could have carried the tort

2    claim vote without the TCC's recommendation of this RSA.  As I

3    said, we didn't want to do it that way, and fortunately we were

4    able to all jointly reach, after difficult discussions, an

5    agreement with the debtor and the equity security holders that

6    satisfied the requirements of thousands of individually

7    represented tort claimants, and the fiduciaries to all tort

8    claimants, the TCC.

9         This has not been an easy process.  It has not been

10   one in which we didn't think of any of the concerns that have

11   been raised by various parties who came to the podium today.

12   And with respect to those parties who made those observations,

13   we agree completely.  We would prefer not to have stock.

14        Some of the -- actually, some of the individual

15   victims believe that they will be distributed stock, so we've

16   been backpedaling saying, no, the trust will be distributed

17   stock, but that stock will be liquidated -- and hopefully at a

18   gain, not a loss -- and be deposited in the resolution trust

19   for the cash distributions to victims.

20        We are, unfortunately, having worked around the clock

21   for several weeks now, not able today to present the Court and

22   the parties with what that resolution trust looks like, what

23   the procedures for payments of individual claimants may look

24   like, and they are dying to know.  We know our work isn't done.

25   We have endeavored to commit in the RSA to have, by January

PG&E Corp., Pacific Gas & Electric Co.

1    20th, the resolution trust agreement, and the claim procedures.

2          All I can say now is that, based on my own personal

3    involvement in that process and the involvement of the other

4    lawyers who are engaged in it, it is intended to be

5    transparent, it is intended to be consistent, nobody is going

6    to be left out, claims will be evaluated by the resolution

7    trustee, professionals on behalf of the resolution trustee, so

8    that claimants are treated fairly and consistently.  And we

9    hope, as best as our damages experts have been able to tell us,

10   the TCC, that we hope that we will be able to satisfy victim

11   claims from that trust.

12         We hope that we will not have a shortfall.  We've done

13   our best to negotiate the best number we can, with the belief

14   that it will not result in a shortfall.  So --

15         THE COURT:  So it's just predicting an outcome that

16   might have been predicted, or might have been an outcome with a

17   formal estimation trial, and a summation has to cover all those

18   claims --

19         MS. DUMAS:  Yes, sir.

20         THE COURT:  -- not just the victims' claims.

21         MS. DUMAS:  Yes, sir.  And we thank the Court for

22   extending the bar date for those individuals who were unable to

23   participate, but we've drawn data and we've drawn conclusions

24   from the claims that are in the system, and we remain

25   cautiously optimistic, with no promises, but cautiously

operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  optimistic.

2       And I'm going to stop right here to -- Mr. Julian is

3  going to reserve just a minute on the assigned causes of action

4  because they think those --

5       THE COURT:  But I need one of you, one of the two of

6  you, to talk to the question of the lockup, and --

7       MS. DUMAS:  That's going to me.

8       THE COURT:  -- and the switching over for the --

9       MS. DUMAS:  Yeah.  That's going to me.

10      THE COURT:  Last month, you were opposed to the lockup

11  on the other side, right?

12      MS. DUMAS:  Yeah.  We --

13      THE COURT:  Go for it.

14      MS. DUMAS:  We are nothing if not self-interested in

15  this process, Your Honor.  We understand where the bond holders

16  are coming from.  But I will reserve one minute for Mr. Julian

17  to address the assigned claims, and then --

18      THE COURT:  I'm not --

19      MS. DUMAS:  -- I'm going to come to the meat of the

20  coconut.

21      THE COURT:  -- I'm not going to give him a time limit.

22  I'm going to let him have as much time as he wants, but do

23  you --

24      MS. DUMAS:  Thank you, sir.

25      THE COURT:  -- do you want to pass to him now?  Do you

operations@escribers.net | www.escribers.net
(973) 406-2250

PG&E Corp., Pacific Gas & Electric Co.

1    want him to go to that coconut?

2            MS. DUMAS:  No.  I'm going to finish up --

3            THE COURT:  Okay.

4            MS. DUMAS:  -- on really what the Court wants to

5    understand, what the UCC wants to understand, what the bond

6    holders want to understand, which is why we had a joint plan,

7    which we believed, sincerely, had beneficial economics for tort

8    claimants, and why, having done that just two months ago, are

9    we switching over to support a debtor plan.

10           One of the reasons is one I've already described,

11   which is in practicalities, a debtor plan is going to be easier

12   to get to a faster confirmation.  That's not the only reason.

13           We believe that, based on the improvements of the

14   value of the proposal coming from the debtors and the equity

15   security holders, together with the uncertainties associated

16   with the bond holder proposal, that this is the -- we are

17   fulfilling our fiduciary duties at this point in time by

18   signing on to an integrated contract with the debtors and the

19   equity security holders, recognizing that it is an integrated

20   contract that includes provisions that require the TCC and the

21   signing law firms to agree to support this plan.

22           Now, why do I say that?  For one reason, I think we

23   are taking our cues in this case, in part, from the parties who

24   will be before you, giving you their best estimate as to

25   whether this plan is confirmable within the requirements of the

PG&E Corp., Pacific Gas & Electric Co.

1  State of California.

2  THE COURT:  You mean at a confirmation hearing, or --

3  MS. DUMAS:  Yes. --

4  THE COURT:  -- disclosure statement hearing?

5  MS. DUMAS:  We believe that the California Public

6  Utilities Commission bankruptcy OII process, as supervised or

7  monitored by the governor's office, is a process which we trust

8  will bring the debtors' plan to the point of improvement, based

9  on what we know today, that will allow the Court to confirm a

10  plan that is sponsored by the debtors.  It may not be this

11  plan, and as you said before the break, there's nothing that

12  prevents the debtors from improving or modifying this plan, if

13  it's required by the regulators and the governor's office, to

14  comply with state law.

15  THE COURT:  So the lockup doesn't gag you, or --

16  MS. DUMAS:  So the lockup --

17  THE COURT:  -- the folks on the debtors' side, right?

18  MS. DUMAS:  -- the lockup is part of an integrated

19  agreement, Your Honor.

20  THE COURT:  Right.  But it doesn't --

21  MS. DUMAS:  They gave stuff up --

22  THE COURT:  -- it doesn't prevent you and your

23  colleagues on that table from sitting with those folks on the

24  debtors' side and improving the plan.

25  MS. DUMAS:  I think that we are not adverse to,

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   really, the guidance of the parties whose responsibility it is

2   to the State of California, to have this debtor emerge

3   financially, and financially capable, and having the governance

4   integrity that the governor is demanding.

5           And Your Honor, I had the pleasure of meeting him in

6   Sacramento.  I was summoned to a meeting.  He didn't know I was

7   there, but that doesn't matter.

8           THE COURT:  How do you know?

9           MS. DUMAS:  He's an impressive guy.

10          THE COURT:  How do you know he didn't know?

11          MS. DUMAS:  Well, I don't stand out in a crowd, Your

12  Honor.

13          But he is, as in words that I'm not inventing myself,

14  I've been told this, he is all-in.  This is not a -- as his

15  papers indicate, this is not a rubber stamp.  It is up to

16  parties who have the overall interests of the State of

17  California in this reorganization, the debtors' fiduciary

18  duties to proceed forward.

19          And there may be a point in time at which the

20  financial holders who are outside the process get invited into

21  the process.  There may be a point in time in the future where

22  the bond holders get married into the equity plan.  There may

23  be, as the Court suggested, a time in the future, I hope not,

24  that the debtors' plan falls over and the bond holders' plan is

25  left standing.  But based on what we know now, based on what

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  we've been able to tell from the regulators, the governor's

2  office, and all the circumstances that we are aware of right

3  now, with what we're facing in the next couple of months --

4  Tubbs trial on January 7th, the estimation starting in

5  February, and the June 30 looming deadline -- the TCC and the

6  consenting fire claimant professionals have elected to enter

7  into this RSA with what we believe to be the best application

8  of our fiduciary duty we can apply as of today.  So we --

9       THE COURT:  So -- so what do you say about the lockup?

10  The challenge to the lockup, and particularly the -- I was just

11  looking for my version of the governor's letter, his -- the

12  last sentence in his letter seems to suggest that the lockup is

13  still on his mind.

14       MS. DUMAS:  Yes, he does.  And Your Honor may take the

15  objections of the governor and the official committee of

16  unsecured creditors and the bond holders and strike the lockup.

17  I believe we would be back at square one.  I think the debtor

18  and the equity security holders can tell you where they would

19  come out on that.

20       THE COURT:  But I need to know what your clients --

21       MS. DUMAS:  We went into the agreement --

22       THE COURT:  -- your clients want that lockup.

23       MS. DUMAS:  -- knowing there is a lockup.

24       THE COURT:  So you're good colleague, Mr. Julian, who

25  you're going to make him get up in a minute, he was fighting

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    against the lockup when I was considering the subro plan.

2    What --

3              MS. DUMAS:  Yes.  Well, I was raising my voice to you

4    two months ago, asking you to terminate exclusivity.

5              THE COURT:  Right.

6              MS. DUMAS:  So --

7              THE COURT:  And I did.

8              MS. DUMAS:  And we appreciate it.  And it helped us

9    get where we are.  But we negotiated these terms.  These terms

10   include a lockup.  It's an integrated deal.  We understand

11   that.

12             THE COURT:  But let's back up for a minute and not

13   talk about the sophisticated bankruptcy professionals that

14   you've been working with and the nonbankruptcy but

15   sophisticated professionals, the plaintiffs' lawyers and so on,

16   and let's switch topics to the fire victim out there in

17   Paradise, California, or somewhere else.  And leave aside just

18   that one little difference about do you get stock or money.

19             From the victims' point of view, which plan -- why

20   does it matter which plan?  The same amount of money, the same

21   fund, the same damage claim that that person suffers, the same

22   matrix and mediation process will hopefully crank out for that

23   victim a check.  What difference does it make if we lock up one

24   alternative?  Not completely.  It's not as though we literally

25   lock it up, but at least lock up the ability of the lawyers

(972) 406-5060 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    that you're working with to explain and perhaps recommend a

2    vote for both plans?  Why is that a good thing rather than a

3    bad thing?

4            MS. DUMAS:  Oh, that's certainly a good question, and

5    one in which I, personally, have had dozens if not hundreds of

6    conversations with individuals about that very topic.  We think

7    it's a false comparison.  We don't think there's a apples to

8    apples comparison between a plan proposed by the debtors and a

9    plan proposed by creditors, especially when you have an

10   impaired class that has made it known that they will challenge

11   that.  And the elimination of the Tubbs trial and estimation is

12   of great value because it enables this case to move through

13   Chapter 11 more quickly.  There is more certainty with the

14   debtor plan.

15           Now, we have heard that there is a second plan, which

16   we -- should be considered apples to apples, but respectfully,

17   with the way that we analyzed the entire bankruptcy situation,

18   we don't believe that, presently, to be the case.

19           THE COURT:  Well, I'm sorry, you're talking about a

20   third plan?

21           MS. DUMAS:  No, no, no.  I'm talking about -- we don't

22   believe they're -- that a debtor plan and a creditor plan are

23   not apples to apples --

24           THE COURT:  Okay.

25           MS. DUMAS:  -- routes for tort claimants.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  But why is that so?  Again, visualize

2    you're explaining this to a victim, and the victim says I've

3    got Mr. Stamer's plan, and I've got Mr. Karotkin's plan, or

4    whoever wants to take the credit for it, which one shall I

5    pick?  Why wouldn't you say pick them both?  They have the same

6    result for you.  Unless you want to do like Mr. Abrams did and

7    complain about the corporate structure, which he's entitled to

8    do.  And somebody else might just hate PG&E, they'd be happy to

9    get rid of all of them, and that's -- I can understand that,

10   too.  But in terms of what a victim gets by way of recovery,

11   why does it matter?  In other words, why does it matter such

12   that I have to ignore the official creditors' committee -- now,

13   and I'm not ignoring Mr. Stamer.

14   MS. DUMAS:  No, no, no.  I understand.

15   THE COURT:  But the official creditors' committee has,

16   from day one, played sort of a middle-of-the-road player here,

17   and Mr. Bray couldn't have been more emphatic about what he

18   worries about.

19   MS. DUMAS:  Um-hum.

20   THE COURT:  Why shouldn't I worry about that and at

21   least make sure that the choices stay as open as possible?

22   MS. DUMAS:  I believe that, in a general sense,

23   competition, or strengthening -- I prefer to refer to it as

24   strengthening -- reorganized PG&E is a good thing.  When

25   somebody asks me why don't we vote for a creditor plan as

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  opposed to a debtor plan, I say, would you like to be paid in

2  two to three years, without the benefit of AB 1054, after a

3  contested confirmation, or would you like to try to get through

4  with the same or similar terms?

5         THE COURT:  But why -- the same AB 1054 applies

6  regardless of who the sponsor of the plan is.  And if Mr.

7  Stamer and his group can't satisfy AB 1054, they won't even get

8  invited to try to convince me.  So why would their plan take

9  two more years to get your constituents their money?

10        MS. DUMAS:  Because I don't think --

11        THE COURT:  Excuse me.  Because of the lockup.

12        MS. DUMAS:  Yeah, yeah.

13        THE COURT:  In other words, lock it --

14        MS. DUMAS:  So --

15        THE COURT:  -- relate the lockup to --

16        MS. DUMAS:  Yes.

17        THE COURT:  -- what might follow from that.

18        MS. DUMAS:  So I will defer to counsel for the debtor.

19  My belief is that when he comes to the podium, he will tell you

20  that this RSA will evaporate without all the integrated terms.

21  So we will not -- my belief is that we will not have an RSA

22  with the debtors in equity if the lockup is removed.

23        THE COURT:  They're not playing chicken?

24        MS. DUMAS:  I don't think they're playing chicken,

25  Your Honor.

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          THE COURT:  With you or me, either one of us.

2          MS. DUMAS:  I don't know that they --

3          THE COURT:  Okay.  Again, I don't want you to --

4          MS. DUMAS:  -- they shouldn't play chicken with you --

5          THE COURT:  I don't want --

6          MS. DUMAS:  -- but they may be playing chicken with

7   me --

8          THE COURT:  I don't want you to reveal --

9          MS. DUMAS:  -- but I don't want to take that risk.

10          THE COURT:  I don't you to reveal confidences,

11   obviously, but am I supposed to really think that might happen?

12   I mean, really?  Do you think that I have -- I'm supposed to

13   think that is what will happen?

14          MS. DUMAS:  I think --

15          THE COURT:  I mean, all we're talking about, I

16   think -- again, I'll oversimplify to illustrate the point --

17   we're just saying if I say no lockup, of course Mr. Bennett and

18   his clients, and Mr. Karotkin, they can all fold their tents

19   and say see you later, and go back up to Judge Donato and say,

20   when do we start the estimation trial?  But they might also

21   say, let's just go with our plan and sell the more attractive

22   plan, and the plan that people will vote for.

23          So why should I just -- why should I close the option

24   of a fallback, in case the debtors' plan runs aground, for

25   whatever reason?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1      MS. DUMAS:  The way we addressed that answer to that

2  question in the agreement itself, is through the fiduciary out

3  of the TCC.  So the TCC, if it believes that there is a

4  superior -- paragraph 17 -- if it believes that a superior plan

5  develops, if Ms. Mitchell stands up now and says I've just

6  talked to my client, and the bond holder plan is AB 1054

7  compliant, the TCC has a fiduciary out from this RSA.

8      THE COURT:  Which one?  Tell me again, that --

9      MS. DUMAS:  I'm sorry, Your Honor.

10     THE COURT:  Paragraph 19?

11     MS. DUMAS:  Paragraph 17.

12     THE COURT:  17, yeah.  I think it's one that got --

13  changed its number slightly, right?

14     MS. DUMAS:  Oh, I'm sorry.  19.

15     THE COURT:  19.

16     MS. DUMAS:  Yes.  I apologize, it did get -- it's

17  paragraph 19, page 14 --

18     THE COURT:  Yeah, no.

19     MS. DUMAS:  -- of the RSA.

20     THE COURT:  I saw that in there, but you know -- so

21  again, tell me in layman's terms what does that mean?  Because

22  I know what fiduciary duty means, but why is it a safety valve

23  if something goes wrong here?

24     MS. DUMAS:  It's our best judgment today that -- in

25  our fiduciary obligations to all the tort claimants, it's our

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    best judgment today that we can actually realize those payments

2    under a plan that complies with AB 1054's timing requirements,

3    through the debtors' plan.  That is our best judgment today.

4    That is why the last sentence appears in that.  That is why,

5    notwithstanding the fact that the governor is sending nasty

6    grams to PG&E every few days, we have not lost hope that the

7    debtor will be able to -- as it advises us, it will be able to

8    improve the plan to a point where it is AB 1054 compliant and

9    can be confirmed.

10         If it does not, and again, we're taking our guidance

11   from the state regulators and the governor of the state, who

12   oversee this process -- if it does not, then we are no longer

13   bound by this agreement, if we receive clear indications that

14   the bond holder plan is the only plan that can go forward.

15         THE COURT:  So let's suppose that you have some event

16   that persuades you -- and again, I'll personalize it for you --

17         MS. DUMAS:  Sure.

18         THE COURT:  -- because I'm talking to you, but the

19   committee -- the committee believes that it's no longer in its

20   fiduciary -- consistent with its fiduciary duties to advocate

21   the debtors' plan.  Does that suddenly free you from any

22   lockup, and you can call up Mr. Stamer and say, sorry to have

23   dumped you back in December, but we'd like to get back into the

24   deal again; is that what you're saying?

25         MS. DUMAS:  Yes, I believe it does.  And that would

PG&E Corp., Pacific Gas & Electric Co.

1    have to be -- and we would do that advisedly, if circumstances

2    occurred that -- they would have to be material, such as the

3    commitment letters fall out.  I mean, something could happen in

4    the future --

5              THE COURT:  Yeah.  I'm talking about something that --

6              MS. DUMAS:  -- but we're talking about --

7              THE COURT:  -- something that any experienced

8    bankruptcy lawyer would say, that plan is not confirmable.

9    Whether it's 1054 or just some bankruptcy code provision.

10             MS. DUMAS:  Yes.

11             THE COURT:  Right?

12             MS. DUMAS:  Yes.  We believe that enables us.  And the

13   way we would handle it is we would go to the debtor first, and

14   we would say, we believe that X, Y, Z event has triggered the

15   TCC's obligation, its fiduciary obligation, to rereview the

16   circumstances based on these events which have transpired after

17   the entry of the RSA.

18             THE COURT:  Okay.  So I'm going to go back to the

19   question that you answered a moment ago.  You said that maybe

20   the ad hoc bond holders' plan would take longer, but let's

21   assume that they, along with the debtor, both get disclosure

22   statement approval and they both go out for solicitation and

23   vote.  Why do you think that payment, under their version, if

24   that plan were confirmed, would be delayed?  Leaving aside

25   appeals, because appeals are always going to be an issue, and

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   we know how to deal with appeals sometimes, but why would there

2   be a different timing?

3          MS. DUMAS:  Yeah.  I think that the answer to that,

4   and I may have said it less clearly than I could have, I think

5   that if this goes away, which I think it would, without a

6   lockup, then I don't think there's 13.5 on the table from the

7   debtors and the equity security holders.  I think they have

8   agreed to that number, notwithstanding whatever I'm told was

9   said upstairs, I think they have agreed to that number based on

10  this integrated agreement.

11         THE COURT:  Is there 13.5 on the table from the bond

12  holders?

13         MS. DUMAS:  Yes, it is.

14         THE COURT:  Nothing wrong with that.  Same 13.5.

15         MS. DUMAS:  Nothing wrong with that, except that the

16  equity security holders have a right to be heard --

17         THE COURT:  They do.

18         MS. DUMAS:  -- and they have a right to contest

19  confirmation, and they have a right to require the parties, I

20  believe, to go through the estimation proceedings.

21         THE COURT:  So you agree that -- I raised the question

22  before, and I think I talked about it earlier, leaving aside

23  whatever Judge Donato may have meant, and if that is not

24  relevant, then the bond holder -- I mean, excuse me, the equity

25  holders -- have a right to make sure there's not an unfair

escribers
(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1 valuation that overpays the tort claimants, right?

2 MS. DUMAS: I believe that is correct, Your Honor.

3 And I believe that bond holders' counsel will confirm that, and

4 I believe that the debtors also interpret the agreement in the

5 manner I've suggested, which is, if this integrated agreement

6 isn't approved, our deal is off the table, the 13-5 is off the

7 table, we're back with the grouchy Honorable Randall Newsome,

8 trying to get us into mediation again.

9 THE COURT: Is that with an E?

10 MS. DUMAS: And he's tough.

11 THE COURT: Is there an E on his name there?

12 MS. DUMAS: No, no. The one without an E is never

13 grouchy, but the one with an E is consistently grouchy because

14 he's trying to get a deal done.

15 THE COURT: He's right behind you. You better be

16 careful what you say.

17 MS. DUMAS: No, I know he's here. I greeted him. And

18 we had many, many difficult hours together.

19 We stand by this RSA, Your Honor. I understand you

20 want to turn over every rock to see if there's anything that

21 could be done differently, and you may say --

22 THE COURT: No, no.

23 MS. DUMAS: -- I won't approve this with the lockup,

24 and we're cognizant of that.

25 THE COURT: Right. But I have to figure out if that's

PG&E Corp., Pacific Gas & Electric Co.

1  a risk that is worth taking from my point of view, and we have

2  the anomaly again of the notion that -- I don't think we've

3  heard a single person today really say it's a bad settlement.

4  In fact, you'll recall that -- I believe it was Mr. Bray,

5  again, said why don't we just carve out and set aside this

6  lockup stuff and turn this into a 9019 motion both ways, and I

7  say done deal?  Lockup -- 13.5 is good for the goose and good

8  for the gander, and we're done with that issue.

9          MS. DUMAS:  We would absolutely be thrilled with sauce

10  for the goose is sauce for the -- we would love to have this

11  13.5 chiseled in stone or etched in your podium.  We would love

12  to be able to do nothing more than leave the stage in this case

13  knowing that we have secured this number for the victims.

14          THE COURT:  Okay.

15          MS. DUMAS:  Thank you, Your Honor.

16          THE COURT:  Thank you, Ms. Dumas.

17          Mr. Julian, your partner gave you one minute; I'll

18  give you more time, if you want.

19          MR. JULIAN:  I think it's better to have Mr. Pitre go

20  first.

21          THE COURT:  Oh, Mr. Pitre?  Okay.

22          MR. PITRE:  Thank you, Your Honor.

23          MR. JULIAN:  Stay on the same subject.

24          MR. PITRE:  Frank Pitre.

25          THE COURT:  Mr. Pitre, I didn't know I was going to

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    hear from you today.

2              MR. PITRE:  I will try to brief, but I --

3              MS. DUMAS:  Take your time.

4              MR. PITRE:  -- I do -- I do think it's important on

5    this last issue about the lockup and the agreement between the

6    tort victims.

7              THE COURT:  Between the tort victims' lawyers.

8              MR. PITRE:  Correct.

9              THE COURT:  I don't want to diss the lawyers, but it

10   is the lawyers who made the agreement.

11             MR. PITRE:  That is correct.

12             THE COURT:  Okay.

13             MR. PITRE:  Consistent with our fiduciary obligations

14   to our clients, there was a group of lawyers, not just me --

15             THE COURT:  No, I know.

16             MR. PITRE:  -- but Mike Kelly, Steve Campora, Amanda

17   Riddle, Dario de Ghetaldi, Mikal Watts, Jerry Singleton,

18   individuals with vast experience in these cases, who came

19   together.

20             And I must tell you, Judge Newsome is no wilted

21   flower, that's for sure.  And he made it very clear --

22             THE COURT:  I sent out the A team, you know.

23             MR. PITRE:  You did.  And we got the A team, and we

24   got an education in bankruptcy.

25             THE COURT:  Where do you think he learned it?

(97) operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    MR. PITRE:  Well, I'll let him answer that.  But I

2  will tell you that those were very difficult negotiations, and

3  there were a lot of factors that we had to take into account.

4  And although I've had my disagreements with Bruce Bennett, one

5  of the things I will say about him, is he is a very worthy

6  advocate.

7    And this issue of a lockup was a very tough issue to

8  deal with.  We went back and forth, yelled and screamed, and

9  did everything that one can do to test, to use Your Honor's

10  words, was this playing chicken?  Well, I can tell you without

11  any uncertainty, this was not chicken.  This deal was not going

12  forward without a lockup.  And he can confirm that one way or

13  the other, and so can Judge Newsome.

14    THE COURT:  No, I don't want -- certainly don't want

15  Judge Newsome to say one word.

16    MR. PITRE:  Well, I'm just saying this was an

17  immovable object.  And the other thing that was immovable is

18  that without that provision, we were going to trial on Tubbs.

19  And Mr. Orsini was well aware of that and told us.  And we

20  said, in no uncertain terms that we either had a deal where

21  Tubbs was going to be resolved as part of this, or not, because

22  if we had to go through a Tubbs trial and go through all of the

23  expense, the anxiety, all of the uncertainties, one way or the

24  other -- this was a case where it was a lose-lose, no matter

25  who won.  And I mean that sincerely because we felt very

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    strongly we were going to win Tubbs.

2         THE COURT:  No, you certainly did.

3         MR. PITRE:  And if that happened, we were looking at

4    Chapter 7.

5         So we've had these discussions with our own clients.

6    Why did we decide to go forward with this deal?  Because when

7    we used all of the vast experience of all the lawyers in

8    exercising our fiduciary duties, this was the best deal that

9    could be cut, with a lockup.  And there is no doubt in my mind

10   over that.  None.

11        Not the amount -- we didn't leave one billion dollars

12   on the table like somebody suggested.  We had financial

13   analysts that told us that that wasn't true.  So nobody left

14   money on the table, and it is not within our wherewithal as

15   trial lawyers, to leave money on the table.  We did the best

16   thing we could do.

17        THE COURT:  Well, you know, you don't deal with

18   companies in bankruptcy very often, either --

19        MR. PITRE:  That's exactly right, Your Honor.

20        THE COURT:  -- because the rules change a little bit

21   there, don't they?

22        MR. PITRE:  Yes, they did, and we got --

23        THE COURT:  We'll bring you into the next one, where

24   it's clearly insolvent, and see what you like about that one.

25        MR. PITRE:  Well, Judge Newsome made us aware of the

operations@escribers.net | www.escribers.net
(973) 406-2250

PG&E Corp., Pacific Gas & Electric Co.

1  fact that we were not playing on the same football field when

2  we were in bankruptcy court.  And I can tell you that his

3  guidance, in terms of the traps and wherewithals of bankruptcy,

4  led us to take notice --

5          THE COURT:  I don't even want to ask you what he said

6  about me, so --

7          MR. PITRE:  Well --

8          THE COURT:  -- don't say.

9          MR. PITRE:  I won't say anything that's --

10         THE COURT:  Don't say --

11         MR. PITRE:  -- covered by the mediation privilege.

12         THE COURT:  Don't say a word.

13         MR. PITRE:  But there is no doubt in my mind, Your

14  Honor, that on this deal, it is the best that it gets.  This is

15  not playing chicken.  Chicken games are over.  We got to the

16  bottom line, and I just want to thank Judge Newsome for all the

17  guidance he had.

18         THE COURT:  But I'm going to stop giving him

19  strokes --

20         MR. PITRE:  Okay.

21         THE COURT:  -- and go back to you.

22         MR. PITRE:  Yes.

23         THE COURT:  You're of the opinion that the alternative

24  plan, which in many respects, has the same economic outcome, is

25  still subject to these other kinds of concerns that motivates

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  you.  And you, as an experienced professional, believe that

2  it's the right outcome, and you will be recommending it to

3  these hundreds and thousands of victims, and your fellow

4  cocounsel will be, too.  And this isn't just lawyers lining up

5  their fees, it's doing the right thing for those thousands of

6  victims who didn't ask to be tied up in the bankruptcy process,

7  right?

8       MR. PITRE:  I would be the first person to answer your

9  question directly, yes.

10      THE COURT:  Well, I knew you'd say that, but I wanted

11 to hear it from you because, again, this whole day isn't about

12 whether 13.5 should be 14.5 or 12.5, it's about this lockup.

13 As I say, there don't appear to be any real challenges to the

14 economics of this settlement, not even from the governor's

15 point of view.

16      MR. PITRE:  You are correct.  We understood the

17 lockup, and indeed, we have already begun the discussions with

18 clients, and as this Court could imagine, given the press, the

19 letters, and everything that has went on in the last week,

20 there have been so many questions, so many meetings with people

21 to try to get them -- to give some comfort, because this has

22 just reopened all the wounds.  They thought they had a deal,

23 then they heard they didn't have a deal, then they heard the

24 governor wasn't happy about the deal.  And to be able to

25 finally give these folks some kind of confidence that there is

PG&E Corp., Pacific Gas & Electric Co.

1    light at the end of the tunnel and a path forward and a

2    framework, is something that will be, in my humble view, a red-

3    letter date in their lives toward closure and resolution, by

4    approving this RSA.

5            THE COURT:  Okay.

6            MR. PITRE:  Thank you, Your Honor.

7            THE COURT:  Thank you, Mr. Pitre.

8            Mr. Julian.

9            MR. JULIAN:  I think I just should point out that I

10   believe the courtroom here hasn't heard the words lockup or

11   lock them up as many times in one day as the presidential

12   election from several years ago.

13           THE COURT:  Oh, well listen:  The President wrote a

14   six-page letter to the Speaker today.  I mean, you ought to

15   read that, if you want to read some interesting stuff.  I

16   actually did read it during the break.  See, I wasn't reading

17   the RSA during the lunch break.

18           MR. JULIAN:  Your Honor, briefly I would just like to

19   respond to the UCC's objection to the assignment.  I

20   acknowledge Your Honor's point that that's a subject to be

21   taken up at plan confirmation time; we intend to do that, but I

22   can't let their comments go unresponded to because impressions

23   can be made, and I make only three points about it.

24           The first is the assignment of those claims was

25   material to the TCC's and the consenting professionals' view

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    that the consideration of 13.5 billion, plus the assignments,

2    made this AB 1054 compliant.

3         THE COURT:  And that plus has a dollar sign that you

4    can't know what it is, but it should be something, right?

5         MR. JULIAN:  But we've looked at it.  We've looked at

6    it, and that brings up a good point, Your Honor.  You know,

7    some of those claims are against the tree trimmers who the

8    plaintiffs have sued previously.  In fact, you may remember, it

9    was way back -- it was April, May, and June.  I was in this

10   court, at this podium, trying to get those tree trimmer

11   contracts.  And I told you there was going to come a day --

12        THE COURT:  Um-hum.

13        MR. JULIAN:  -- where we were going to look for those

14   assignments of those claims to put into a resolution trust, to

15   increase the pot for the victims in this case.  So we've been

16   true to our word.

17        And I might point out point two.  The lead defendant

18   in those cases that the plaintiffs have sued was Davey Trees

19   (sic).  And that's my point number two.  Davey Tree is a member

20   of the creditors' committee.  This is the same creditors

21   committee, with Davey Tree, that supported the bond holder plan

22   for three months, with the same assignment of the claims

23   against Davey Tree, and never once came to me and said the

24   assignment of the claims against Davey Tree is problematic.

25   When they were supporting their other brethren, who are part of

(972) operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    the creditors' committee constituency, on their plan.  And it

2    is just hypocrisy, in my view, for them to come in today as

3    Johnny-come-latelies, and object to this suit, to benefit the

4    member of their committee, Davey Tree.

5         THE COURT:  Well, but I -- I mean, that might be the

6    hidden agenda.  And I'm not going to ask Mr. Bray or anybody

7    else to even address that.  I'm focusing on does this somehow

8    undermine the reorganized company's ability to be compliant, in

9    terms of the kind of things that you were so adamant about for

10   months, and I'm sure in Judge Alsup's court particularly.  I

11   don't imagine that's true, but tell me why isn't it true.

12        MR. JULIAN:  Well, we are going to present evidence on

13   that, and we will get the insurance policies from Davey Tree

14   that show they are fully insured for these claims that we will

15   bring against them, and that's going to be the proof.

16        THE COURT:  Well, but whether you bring claims against

17   them or not, the question is will they be -- or will someone in

18   their place, if they're not the ones -- in a position to do

19   what the company needs to do to satisfy the governor and the

20   CPUC about all the remediation that's necessary to avoid 2020

21   and 2021 fires, and beyond.

22        MR. JULIAN:  Your Honor, our constituency will have

23   20.9 percent of the common stock of this company.  We are very

24   focused on making sure this company is wildfire safe, and that

25   its vendors are not overburdened with litigation.  So we have

(97??)??? operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   the eye on the ball.  We will present evidence to you, though,

2   at plan confirmation, after taking the deposition of Davey Tree

3   and the rest of them, over their insurance policies -- that

4   will show that this will not impact the reorganized debtor.

5           THE COURT:  Well, but if I approve this today, those

6   things are gone, unless the TCC RSA itself fails, or whether it

7   be Section 19 that Ms. Dumas described, or some other event

8   that knocks it off.

9           MR. JULIAN:  Well, the assignment of the claims are in

10  both plans.  They're in the bond holder plan, and they're in

11  the debtors' plan.

12          THE COURT:  Well, I didn't remember that point about

13  the other plan, but the point is that's not on the table today,

14  so --

15          MR. JULIAN:  Not on the table, Your Honor.

16          THE COURT:  -- so by asking me, as you are, to approve

17  the RSA today, that -- listen.  I don't mean listen, let me

18  state the obvious.  If I thought it was a done certainty that

19  PG&E would fail, I would hardly be approving this RSA today.

20  So I have to have a belief that this does facilitate rather

21  than impede --

22          MR. JULIAN:  Exactly.

23          THE COURT:  -- the reorganization effort.

24          MR. JULIAN:  Exactly.

25          THE COURT:  But so implicit in that is that your view,

PG&E Corp., Pacific Gas & Electric Co.

1   and your client's view, is that the reorganized company --

2   we're not at confirmation yet, but we're taking a big step

3   towards it, and at least as to the assignment issue, that's not

4   a negative.  That's not a -- that doesn't impair the ability of

5   the company to reorganize.

6           MR. JULIAN:  And it's a positive, and I'll tell you

7   why.  It helps the company.  Those vendors are better off with

8   one lawsuit against them rather than 70,000.  And today, the

9   70,000 claimants have standing to sue those tree trimmers and

10  other vendors and inspectors.  In fact, Mr. Campora, whose

11  client is on the TCC, was sued in the first TRO case in this

12  case, to stop him from suing Davey's (sic) Tree.

13          And so my point is this.  It -- look, we've got

14  seventy percent of the travelers, representing seventy percent

15  of the victims recommending this.  They're playing ball in this

16  case.  And it's better to have one lawsuit against them than to

17  have 70,000.  My point being --

18          THE COURT:  Well, I don't think it will be 70,000, but

19  I understand your point about the economic --

20          MR. JULIAN:  Yeah.  My point being if it wasn't the

21  Resolution Trust suing them, I could guarantee you that the Mr.

22  Camporas of this world will be out there filing seriatim

23  lawsuits, and that's not good for the Resolution Trust or PG&E.

24  What's good is to have everything centralized under the

25  umbrella of the Resolution Trust subject to your jurisdiction.

(972) 406-5222 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1      THE COURT:  What you say -- now, this is Ms. Dumas'

2  argument, but you were the one that stood there during the

3  subrogation RSA and told me how the lockup was a bad thing.

4      MR. JULIAN:  Did I say that?

5      THE COURT:  I think so.  Yeah.  What happened?

6      MR. JULIAN:  Your Honor, we've talked about this.

7  There's a life to the case.  I say this all the time, and it

8  was emphasized -- this point was emphasized to me at the break

9  by Ms. Riddle, Amanda Riddle, Dario's partner.  And that is the

10  victims are being used as a pawn by almost everybody in this

11  case.  The victims and their lawyers are kind of chess piece.

12  The governor uses us when they want to.  The bondholders use

13  them.  We'd like to be in one place so that we can move forward

14  and get our evidence together for confirmation rather than beep

15  bopping around from place to place.  That's the answer.

16      THE COURT:  Okay.  Thank you.

17      MR. JULIAN:  And at one point in time, it was a bad

18  idea.  At this point in time, I can see the rational basis for

19  it.  So thank you, Your Honor.

20      MR. BRAY:  I have to say something.

21      MR. JULIAN:  No, no, no, no.

22      THE COURT:  Wait, wait, wait.  Hold on.  I'm going to

23  call the shots.  I'll give you a chance, Mr. Bray.

24      The gentleman in the back.  I saw you standing.  Did

25  you wish to be heard?  And I don't know your name.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1       MR. REISNER:  Creditors' committee, Your Honor.

2       THE COURT:  Who are you, and why do you want to be

3   heard?

4       MR. REISNER:  Your Honor, I'm Jeffrey Reisner,

5   McDermott Will & Emery, and I represent Davey Tree.  And I --

6       THE COURT:  Davey Tree is not at issue here.  They're

7   just statements made.  So you don't need to defend them.  I

8   can't act on it.  I'm not going to act on anything.  So I'd

9   rather not waste time.  It's 4:20.  We want to get this hearing

10  done.  So I'll assume that you want to defend Davey Tree.  I --

11      MR. REISNER:  You're --

12      THE COURT:  So I'll stipulate it.

13      MR. REISNER:  You're absolutely right, Your Honor.

14      THE COURT:  Okay.

15      MR. REISNER:  And if hypocrisy lives anyplace, it

16  lives there.

17      THE COURT:  Okay.  Ms. Mitchell, I need to hear from

18  you.  I need to hear the governor's point of view, and then

19  I'll see who else needs to be heard.

20      MS. MITCHELL:  So Your Honor, I think -- Nancy

21  Mitchell of O'Melveny & Myers on behalf of Governor Gavin

22  Newsom.  I think, Your Honor, we were pretty clear in our

23  pleadings, and I would leave it to you for questions.  I did

24  want to clarify a couple of things.  We have worked very hard

25  to try to evaluate the plans that are currently out there to

PG&E Corp., Pacific Gas & Electric Co.

1    see if they're AB 1054 compliant to provide us -- in our view,

2    to provide as much feedback as we can about with the governor,

3    and the legislative leader's view is important in a 1054

4    context, and I just didn't want, when Your Honor is making what

5    is obviously a very important decision, for there to be a

6    misunderstanding around where we are.

7         All of the plan proponents have been cooperative in

8    getting us information.  I should say I'm going to say

9    something nice about the debtors' management.  They have been

10   tremendous in trying to work on getting the plan closer.  We

11   are not there, and I can't stand here and tell Your Honor that

12   two weeks from now or a month from now that this plan is going

13   to be AB 1054 compliant.

14        THE COURT:  No.  And that's what we talked about this

15   morning.

16        MS. MITCHELL:  Right.

17        THE COURT:  I'm really focusing on where we have been

18   spending a lot of time --

19        MS. MITCHELL:  Right.

20        THE COURT:  -- and that is this last -- second to last

21   line of what you filed yesterday.

22        MS. MITCHELL:  Yes.  So we --

23        THE COURT:  I want -- you want the Court to allow TCC

24   and the consenting professionals to support any alternative

25   restructuring.  Do you still adhere to that?  Again, I'll make

PG&E Corp., Pacific Gas & Electric Co.

1    the call --

2         MS. MITCHELL:  Your Honor, I think that --

3         THE COURT:  I just want to know what you and the

4    governor's --

5         MS. MITCHELL:  I think the governor's point in his

6    papers is where he is.  I will say that I understand the

7    concern that the victims have about the settlement being pulled

8    away from them.  It has been -- notwithstanding Mr. Julian's

9    last comment.  It has been the governor's -- one of the

10   governor's North Stars in this case, the victims be taken care

11   of.

12        Our concern about competition, and frankly about

13   whatever decision Your Honor makes today, is that it be made in

14   light of realizing that we have a limited amount of time in

15   this case, and if we get to a point where we determine that the

16   plan is not AB 1054 compliant and can't be made to do so with

17   the equity still being happy with where we are, we may be in a

18   position where the victims end up being impaired.  We just want

19   to make sure that however this process plays out, it is played

20   out in a way that that 13.5 with the trust structures

21   ultimately will be approved by Your Honor is available for

22   victims in all scenarios.

23        THE COURT:  Again, you misuse the word impaired and

24   unimpaired.  They are impaired as a legal matter.

25        MS. MITCHELL:  Sorry.

PG&E Corp., Pacific Gas & Electric Co.

1        THE COURT:  So we need to focus on --

2        MS. MITCHELL:  Impaired from where we stand today.

3        THE COURT:  Impaired from where we stand today.

4        MS. MITCHELL:  Yes.

5        THE COURT:  And I assume what the governor is saying

6   is do whatever advances the ball towards getting those victims

7   paid.  I think I said it in January -- or maybe it was the

8   first hearing in February, and frankly, I don't know that

9   anyone has been advocating a way to slow down the payment of

10  the victims.  It's all these other things that are going on

11  about it.  And certainly, the TCC has been motivated to that

12  goal primarily.

13       Okay.  I gotcha, Ms. Mitchell.

14       MS. MITCHELL:  Thank you, Your Honor.

15       Mr. Bray, I know you feel offended about what was

16  said.  I want to focus on the issue today.  So I'm going to ask

17  the debtors' counsel to respond to all the arguments we've

18  heard today, and then I guess I'll make a call to see if I need

19  to hear from anybody else.

20       And Mr. Feldman, you may want to be heard, too.

21       MR. FELDMAN:  I'd like to be heard for one minute,

22  Your Honor --

23       THE COURT:  Yeah.

24       MR. FELDMAN:  -- on the lockup issue.

25       THE COURT:  Okay.  Okay.  Let me do it in this way,

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    I'll hear from Mr. Feldman.  Mr. Bennett wants to be heard, and

2    then I'll hear from Mr. Karotkin or whoever wants to speak for

3    the debtor.

4            MR. FELDMAN:  Your Honor, Matthew Feldman on behalf of

5    the Ad Hoc Group of Subrogation Claimants.  Your Honor, I want

6    to emphasize something that I think has been lost a little bit,

7    and it goes to both the lockup issue and the timing of this

8    Court's ruling, and we have as you know been, in my opinion at

9    least, very patient about getting to today, and we are excited

10   that the Court has two RSAs in front of it, which ultimately

11   resolve the claims of both the victims, which is clearly the

12   most important, but also my group's claims as well.

13           And Your Honor is faced with a very stark decision.

14   Do you approve those settlements and count on the fact that the

15   plan will change as you've said yourself from time to time on

16   the bench to become AB 1054 compliant, or do you just simply

17   reopen the door?  And contrary to what Mr. Stamer told you, if

18   you reopen the door, Your Honor, you are reopening the door to

19   both litigation as well as estimation.

20           There is a Tubbs trial set to start in the first half

21   of January --

22           THE COURT:  Right.

23           MR. FELDMAN:  -- that if the Court is not prepared to

24   approve, the RSAs will go forward.  Once the Tubb trial goes

25   forward, you cannot put the genie back in the box.

(972) 955-9000 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  I know.

2    MR. FELDMAN:  These are settlements.  13.5 won't be

3 13.5.  Eleven won't be eleven.  They'll be bigger.  They'll be

4 smaller.  But they will be different.  The lockups, Your Honor,

5 are critical to bring everybody to the table so that we can

6 approve two RSAs; we can attempt to solve the governor's issues

7 AB 1054.  We thank the governor for having come forward early

8 because if we're not able to solve the governor's issues and

9 the CPUC's issues, we will know that soon enough and other

10 opportunities will arise to figure out how to get these

11 companies out of Chapter 11.

12    THE COURT:  Don't go away.  Don't go away.  You're

13 starting to pack up.  I won't let you go.

14    So I took your -- the subro RSA under advisement a

15 couple weeks ago, and I send a signal, do you want me to

16 withhold the ruling, and I was told to wait, and then of

17 course, a lot of things happened that you know as well as I do.

18 And so my question to you is not how am I going to rule, but on

19 what -- what happens if I, in your mind, if I approve the

20 subrogation RSA and not the TCC RSA?

21    MR. FELDMAN:  Yeah.

22    THE COURT:  I mean, doesn't that at least still

23 lock -- pin you down and your clients and give you certainty?

24    MR. FELDMAN:  Let me back up one step.  When we asked

25 you to wait until last Friday to rule, it's because we knew we

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  had a mediation session Thursday and we knew we had an open

2  issue between ourselves and the TCCs and the IPs.

3       THE COURT:  Well, and I didn't know specifically, but

4  I also knew that when I announced the ruling -- and again,

5  I'm -- absolutely.  You don't know what my ruling is.  I know

6  what I'm going to do, but I didn't tell anybody, and so -- but

7  nevertheless, when the combination of the governor's position

8  and the letter and the deadlines and the days that happened

9  after -- well, it was a week ago Friday when the first

10 settlement was announced, right?

11      And so I'm still asking you this question:  Ms. Dumas

12 made it very clear -- and I think Mr. Pitre did about what

13 happens if I just do not approve the TCC RSA, but is there an

14 adverse consequence to your clients if I approve the

15 subrogation RSA and not the TCC RSA?

16      MR. FELDMAN:  The adverse consequences to the case and

17 to the extent that we view the cases being in a less positive

18 position, and we would view that as being in a much less

19 positive position, that's the adverse consequence.

20      THE COURT:  But it --

21      MR. FELDMAN:  It may not be an adverse consequence --

22      THE COURT:  But today --

23      MR. FELDMAN:  -- in terms of our recovery.

24      THE COURT:  Well, okay.  I want to go to the goal of

25 making us getting closer to the goal line, right?  So today

PG&E Corp., Pacific Gas & Electric Co.

1  there is no TSA (sic) approved, and if I approve the

2  subrogation TSA (sic), and for whatever reason don't approve

3  the TCC, it does seem to me that that still advances the ball,

4  not as far as some would want --

5          MR. FELDMAN:  Not necessarily, Your Honor.

6          THE COURT:  Okay.

7          MR. FELDMAN:  Let's --

8          THE COURT:  I want to -- that's right.  Walk me

9  through the bad --

10         MR. FELDMAN:  Let's live with that hypothetical.

11         THE COURT:  -- the bad side of that.

12         MR. FELDMAN:  We have an approved RSA and an eleven

13  billion dollar claim payable in cash.

14         THE COURT:  Correct.

15         MR. FELDMAN:  Of course, the bond holders in their

16  plan don't pay us in cash, just to clear.  That said, Your

17  Honor, the TCC and the individual plaintiffs now don't have a

18  deal.

19         I don't believe in playing chicken, period, with

20  judges, with victims, with anyone.  And so the debtors, the

21  equity, as Mr. Pitre pointed out, they walk away from the deal.

22  The Tubbs trial is now or --

23         THE COURT:  Or they don't walk away in the deal.

24  Again --

25         MR. FELDMAN:  The Tubbs trial is now going forward.

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  -- I don't know whether they walk away or

2 not, but they might.

3    MR. FELDMAN:  I don't believe in chicken.  They walk

4 away from the deal, the Tubbs trial goes forward, the IP

5 lawyers are enormously successful.  Now we have an insolvent

6 company.  Now I'm terminating my RSA and we're back to square

7 one and we are certainly not getting out of bankruptcy by June

8 30th.

9    A settlement is a settlement for a reason.  Not

10 because it's necessarily the right number, because it takes

11 into account the risks of going forward versus the benefits of

12 going forward and people settle.  Those settlements have to get

13 approved if we're going to move this case forward.

14    If we're going to litigate, we should all go litigate

15 and we can talk in a year as to what we should do.

16    THE COURT:  Okay, same question.

17    MR. FELDMAN:  And the lockup is a critical

18 component --

19    THE COURT:  Well, that was the second --

20    MR. FELDMAN:  -- to it.

21    THE COURT:  -- question, and a long time ago, sometime

22 earlier today, before or after Donato, I can't remember which,

23 I asked --

24    MR. FELDMAN:  PD and PD, we call it.

25    THE COURT:  I --

eScribers
(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          MR. FELDMAN:  Pre Donato, Post Donato.

2          THE COURT:  I think -- yeah, I've been told more than

3    once that Judge Donato gets quickly to the point and here I am

4    in my fifth hour on this hearing.  I should do it his way and

5    be done in twelve minutes, right?

6          Why is the lockup so important to your group, your

7    deal?  As I said, observe, there are a hundred insurance

8    companies; who cares?  How can the lockup make a difference

9    either way?

10          MR. FELDMAN:  110 insurance companies, Your Honor.

11          THE COURT:  All right, 110.

12          MR. FELDMAN:  Look.  We believe, and we believe

13    correctly, that we got the best deal we could get as part of an

14    integrated deal that included a lockup.  But we also think the

15    lockup is the right thing to do for the company and for its

16    emergence and for its ability to concentrate on AB 1054.  This

17    is the most important component.

18          You want to talk about competition; the competition is

19    not between a bond holder plan and a company plan.  The

20    competition is between the company plan and the governor in

21    terms of how do you satisfy that.

22          And frankly, I don't want to revisit history as to how

23    we got our deal and how the TCC got the 13.5 billion.

24          THE COURT:  No.  I don't want you to.

25          MR. FELDMAN:  But it wasn't based on competing plans.

PG&E Corp., Pacific Gas & Electric Co.

1   It was based on people making first moves, and first moves

2   include lockups.  This is a very ordinary course event, Your

3   Honor --

4          THE COURT:  No, everybody --

5          MR. FELDMAN:  -- for a Chapter 11 case that you're

6   struggling over.

7          THE COURT:  Mr. Feldman, the people in your end of the

8   country must think those of us out here in California only get

9   Chapter 11s when PG&E files every thirteen years.

10          MR. FELDMAN:  Absolutely not, Your Honor.  That's

11   neither true nor fair.

12          THE COURT:  But some of your colleagues have said

13   they're very common, and I believe one of the colloquies we

14   had -- it might have been with Mr. Karotkin; I don't remember

15   which lawyer -- was well, but it might be different if

16   exclusivity is broken because one of our phenomena out here is

17   frequently, exclusivity gets broken.  So I think the

18   question -- the significance of a lockup changes dramatically

19   if you break exclusivity, so I broke exclusivity for a reason,

20   and now I'm being asked to enforce the lockup for a reason.  I

21   just need to have a better appreciation for the ramifications

22   of it.

23          And I want you to know, and everybody in the room to

24   know, I'm making the decision up or down on each of these two

25   motions on the merits, not on -- just because I like lockups or

PG&E Corp., Pacific Gas & Electric Co.

1   don't like them.  So the point is that I still don't quite know

2   why a lockup makes a big difference to your clients, and so

3   that's really what I'm struggling with.

4          MR. FELDMAN:  You know, there's a reason -- and I

5   apologize, I'm going to go a little bit off topic to prove the

6   point.

7          There's a reason that debtor in possession financing

8   is not done through a competitive process.  A debtor is

9   entitled to pick who its lender should be.  Parties under plans

10  should be able to pick which group they want to lock up to.

11  That's just sort of fundamental, so that you can build trust,

12  you can work together.

13         This plan is going to be amended.  There's very little

14  doubt in my mind and the willingness of my group to be at the

15  table and participating in that is based on them being tied to

16  one or the other group.  In this circumstance, we've chosen to

17  be tied to the company equity plan, but not all plans are

18  created equal, Your Honor.

19         THE COURT:  Okay, got it.  Thank you, Mr. Feldman.

20         MR. FELDMAN:  Thank you.

21         THE COURT:  Mr. Bennett?

22         MS. DUMAS:  Just one moment, sir.  I appreciate it.

23  Your Honor, Cecily Dumas, just one clarification.

24         Your Honor asked Mr. Feldman what happens if the subro

25  RSA is approved and the TCC RSA is not approved.  I'll just add

PG&E Corp., Pacific Gas & Electric Co.

1     the point that the TCC has an outstanding objection to the

2     subro RSA which would not be withdrawn.  It will be withdrawn

3     if they're both approved.

4           So I don't want to go back into the history of the

5     case by case made-whole rule and all that, but that is part

6     of --

7           THE COURT:  I feel like we're playing --

8           MS. DUMAS:  -- our deal.

9           THE COURT:  -- we're playing chess and --

10          MS. DUMAS:  Yeah, I just --

11          THE COURT:  Which hand do you want to pick?  You want

12    to take this one or this one?

13          MS. DUMAS:  I know, I just thought that -- I didn't

14    want that to slip everyone's mind.  Thank you, Your Honor.

15          THE COURT:  Mr. Bennett?

16          MR. BENNETT:  I'll try to be brief, Your Honor.  In

17    one respect I want to repeat something that was said earlier

18    because I think it's important and it tends to get lost in a

19    hearing this long, and it's where Mr. Karotkin started the

20    hearing, which is that what you have before you today, between

21    the two RSAs, plus the RSA that you didn't see which is the

22    municipal claimants' RSA, you have an opportunity that is

23    supported by all impaired classes to take a big step forward to

24    resolve these Chapter 11 cases.

25          I have to say that I'm not sure I ever thought this

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1 would be possible, and we have the extraordinary situation

2 where the principal objectors to the terms and conditions that

3 the actual parties negotiated are all creditors who are

4 unimpaired.

5 And frankly, in a case where everyone acknowledges,

6 for the time being, that it is solvent, the unimpaired

7 creditors should not be the loudest voice; they should not be a

8 loud voice at all.

9 They in fact, as Your Honor noted, have rights that

10 will be determined in the context of a confirmation hearing or

11 these hearings that you've set up in advance of confirmation to

12 give them some space, which I think was a great idea.

13 THE COURT: But I think you've proved --

14 MR. BENNETT: And so that's a --

15 THE COURT: Wait a minute, I think you proved too

16 much, because they're unimpaired when the plan's confirmed.

17 They're not unimpaired before the plan is confirmed; they're

18 being asked to weigh in on what is essentially a transaction

19 that is not a plan confirmation. It's a step earlier, like --

20 MR. BENNETT: It's --

21 THE COURT: -- like if a debtor was selling Blackacre,

22 could a creditor say, I can't object because I'm going to be

23 unimpaired and under the plan? That's not right.

24 MR. BENNETT: That's not quite true, Your Honor. One

25 of the things that happened in this case, which was also

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1   unusual -- and again, it was basically an insistence by the

2   Elliott-led bondholder group -- was the idea that no plan was

3   credible without financing.  And so what you have, Your Honor,

4   behind this plan -- it's not like the ordinary case where you

5   just have a plan and maybe you're going to get to the end and

6   maybe you're not.  Maybe the money is going to be there and

7   maybe you're not.  I know you've been in cases where the money

8   didn't show up.  I've been in cases where the money didn't show

9   up.

10          Here you have commitments, 12 billion to be precise,

11  and you've got a hearing set, which I continued because of

12  discovery things, so it's not -- it didn't necessarily

13  happen --

14          THE COURT:  Right, right.

15          MR. BENNETT:  -- to happen this way.

16          THE COURT:  I know, I know.

17          MR. BENNETT:  But that's a matter of weeks away.  So

18  your principal outstanding issue is the negotiations with the

19  governor and the CPUC concerning 1054.

20          You've heard that there are constructive negotiations

21  with respect to that, and Your Honor's point that if it blows

22  up, there are exit ramps because none of these things are

23  performable, I think is accurate.

24          But I want to come back to my first point.  Let's

25  remember where we are in the map.  Okay, in all of the

PG&E Corp., Pacific Gas & Electric Co.

1   interesting discussions about the intricacies of what are

2   called lockups -- and we're going to talk in a second as to

3   whether that's what they really are.  Whatever we want to call

4   them, lockups, we have to remember where we are.

5           We are -- every impaired constituency in this case

6   prepared to agree to the same plan structure; almost

7   unimaginable that we would be talking about this in the year

8   2019.  That's number one.

9           Number two, there's kind of an idea that's been

10  floating around the courtroom.  When we go back into

11  transcript, we're going to see it almost in these words.  That

12  the RSA that was negotiated is a claim settlement and a lockup.

13  And of course, that's actually an oversimplification.  The way

14  that this document works is that the parties agree to certain

15  things upfront and then they do more and more things together.

16          The allowance of the claim only happens after a motion

17  is filed after the disclosure statement is approved, and only

18  happens at a hearing that gets commenced at the confirmation

19  hearing.

20          THE COURT:  You're talking about the thing that I

21  asked Mr. Karotkin about earlier today?

22          MR. BENNETT:  Yes, yes.

23          THE COURT:  But he also said it was almost a

24  formality.

25          MR. BENNETT:  Well, I think what he meant was, is that

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  by the time we get there, it should be almost a formality

2  because the votes will already be in.  The idea, Your Honor, is

3  to make it a formality.  The way it becomes a formality is that

4  the process that is built -- and if Your Honor wants the exact

5  references --

6          THE COURT:  No, I have them.  I have it right here.

7          MR. BENNETT:  The deadline for filing is in one place.

8  The deadline for filing is in 3(ii), but the process for

9  getting the estimation approval done is in 2E.

10          And so that's the way it was designed.  It was that

11  the parties would be working together, and they would get to

12  the finish line together and wouldn't make commitments to each

13  other earlier --

14          THE COURT:  But I think you misstated your own

15  agreement, because this little paragraph, E -- 2E says the

16  debtors will file the estimation approval motion within three

17  days after approval of the disclosure statement.

18          MR. BENNETT:  Correct.

19          THE COURT:  But you also said the votes will already

20  be in.

21          MR. BENNETT:  No, no, keep going.

22          THE COURT:  But they won't be in if the disclosure

23  statement has just been approved.

24          MR. BENNETT:  Keep reading.

25          THE COURT:  Yeah, keep reading.

PG&E Corp., Pacific Gas & Electric Co.

1        MR. BENNETT:  And the estimation approval motion shall

2   be heard at or before the beginning of the confirmation

3   hearing.

4        THE COURT:  At or before the beginning, so --

5        MR. BENNETT:  Right, the --

6        THE COURT:  -- it's not clear when it's heard.

7        MR. BENNETT:  I think the idea, Your Honor, is that

8   the commitment by the debtors to actually get it heard will be

9   dependent upon everything happening the way it's supposed to

10  happen.

11       THE COURT:  Yeah, but we're back to whether it's a

12  formality or not.  There won't be an estimation hearing if they

13  don't have the votes, and if they do have the votes, what is

14  there to have a discussion about?

15       MR. BENNETT:  I think that's the --

16       THE COURT:  But there's nothing to it, unless somebody

17  wants to recount the ballots, like they do in other parts of

18  the country.

19       MR. BENNETT:  Well, the estimation will be necessary

20  to protect the plan and to protect the trust.  But yes, Your

21  Honor, the intention is that by the time you get there, it is a

22  formality.  That's the intention; that's what is designed to

23  occur.

24       THE COURT:  I guess I don't see how it's important,

25  but I'm not going to second guess you on that.  The point is,

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    it's a process that has to happen, but what does that have to

2    do with the lockup question?

3              MR. BENNETT:  What I'm saying is the agreements in

4    this document, all of the agreements are in fact integrated

5    with each other.

6              THE COURT:  Yeah.

7              MR. BENNETT:  They've not severable, separate things.

8              THE COURT:  That's clear.

9              MR. BENNETT:  And they were designed intentionally to

10   be that way.  It's not fair to describe it as a document that

11   includes a 9019 settlement and a lockup; it is a document that

12   includes many things that work together over time --

13             THE COURT:  Mr. Bennett, come on; I wasn't born

14   yesterday.  It's a complicated document, but if there's one

15   thing wrong with it, I can say I'm not going to approve it.

16             MR. BENNETT:  No, I --

17             THE COURT:  And so I --

18             MR. BENNETT:  No, I don't doubt --

19             THE COURT:  Okay.

20             MR. BENNETT:  I don't doubt that.

21             THE COURT:  Okay.

22             MR. BENNETT:  I just wanted to make sure it was fairly

23   described.

24             THE COURT:  Well --

25             MR. BENNETT:  You absolutely --

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  It's very difficult and complex, but it's

2  well described, yes.  It just takes a lot of time and a lot of

3  counting on your fingers and a lot of cross references, but

4  it's --

5    MR. BENNETT:  Okay.

6    THE COURT:  It is what it is, and I understand it.

7    MR. BENNETT:  All right.  My next point really is

8  about things that people don't really disagree about, and one

9  of them is that there was an extensive mediation.  More than

10  six full days I'm remembering, and lots of meetings that

11  occurred in between.  The participants to the mediation, Your

12  Honor, included the bondholders.  So the bondholders said

13  something, but no one was listening to them, they didn't talk

14  to people; people didn't hear what they had to say.

15    UNIDENTIFIED SPEAKER:  Your Honor, this is completely

16  inappropriate for him to be --

17    THE COURT:  Yeah.

18    UNIDENTIFIED SPEAKER:  -- referencing what went on

19  with respect to the meeting.

20    THE COURT:  It is, I agree.

21    MR. BENNETT:  I'm going to respect -- just what

22  everybody else did.

23    THE COURT:  But don't talk about what happened; it's

24  not relevant.

25    MR. BENNETT:  I'm just saying they were there, period.

PG&E Corp., Pacific Gas & Electric Co.

1        THE COURT:  There was a mediation; leave it at that.

2        UNIDENTIFIED SPEAKER:  Well, just to be clear, to the

3   extent we were there, we were there for very limited parts of

4   it.

5        THE COURT:  Okay.

6        UNIDENTIFIED SPEAKER:  Not by our volition or

7   decision.

8        THE COURT:  Mr. Bennett, yes, go on to the next

9   subject.

10       MR. BENNETT:  Okay, I will assume then that he

11   excluded the mediation when he made that representation.

12       THE COURT:  I -- Mr. Bennett, move to the next

13   subject, please.

14       MR. BENNETT:  Okay.  The process of generating the

15   RSA -- this one and the subrogation one -- were extensive

16   negotiations with lots of very well represented people.  People

17   worked really hard; they made hard decisions.  That's why you

18   have deals.

19       Your Honor, it was also said that for some reason that

20   it should matter that the equity holders were involved in

21   discussions.  We certainly were.  Everyone in this case says

22   it's a solvent case, including the people who are claiming vast

23   amounts of post-petition interest.  In such a case, equity

24   clearly has a voice.  And I want to repeat something that Mr.

25   Feldman said, because it's exactly right.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1         The RSAs that have been presented here are utterly

2  conventional.  In fact, in a lot of ways, they're softer, they

3  accord more flexibility to parties, they have more exit ramps

4  than most RSAs that you see in the commercial world.  And so,

5  Your Honor, we believe that the combination of both RSAs -- and

6  we kind of think they go together, just like the committee

7  does, but I suppose we support either or both.  They form a

8  great foundation for moving forward in this case.  They don't

9  ask unreasonable things of anybody and they ought to be

10  approved.

11         THE COURT:  Okay, thank you.  Mr. Karotkin, do you

12  want to close?

13         MR. KAROTKIN:  Yes, Your Honor, I'll close.  I assume

14  there will -- if other people -- if you're going to let other

15  people make comments, I'd like to wait until they are finished,

16  but if I'm closing --

17         THE COURT:  Mr. Stamer, do you want to be heard

18  anymore?  I'm not -- I'm really going to close the discussion

19  under the principal players, so I'll --

20         MR. STAMER:  Your Honor, how could I turn down an

21  opportunity?

22         THE COURT:  Well, you can pretend I'm Judge --

23         MR. STAMER:  Donato?

24         THE COURT:  -- Donato, and the --

25         MR. STAMER:  Actually, that's a perfect segue to --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          THE COURT:  -- hearing's already over with.

2          MR. STAMER:  -- to where I want to start.  Again for

3    the record, Mike Stamer from Akin Gump for the ad hoc senior

4    noteholder committee.

5          Your Honor, we filed twenty minutes ago a copy of the

6    twelve-page transcript from Judge Donato's hearing earlier

7    today.  I could stand up here and read you really good

8    snippets.  It's twelve pages.  We would ask that it be part of

9    the record and that the Court, before you render your decision,

10   please consider the transcript.

11         Your Honor --

12         THE COURT:  You've got to understand.  It's not that I

13   can't go read twelve pages.  It's very almost unprecedented.

14   There's another judicial officer presiding over another phase

15   of this case, and as far as I know, it was a status conference.

16   So whatever he said is what he said.  It's important what he

17   said, but I don't know why it's relevant for my decision.  It

18   can be relevant for the record, but not --

19         MR. STAMER:  Your Honor, it --

20         THE COURT:  -- the decision.  He may be an article

21   from a district judge, but I'm not --

22         MR. STAMER:  I --

23         THE COURT:  -- bound by his ruling.

24         MR. STAMER:  I understand the point.  I think it's

25   relevant to your decision, because Your Honor had asked on

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  several occasions what happens if you decide that the lockup

2  provisions, the anticompetitive stuff, should be taken out.

3  This shows you at least the mindset, based upon a status

4  conference, as to exactly where Judge Donato is and what would

5  likely occur if, in fact, this were to fall down and we were to

6  head back out to estimation as it relates to the tort claims.

7         Your Honor, I --

8         THE COURT:  So you want me to glean from that --

9         MR. STAMER:  Yeah.

10         THE COURT:  -- whether I read it or not is that in

11  these twelve pages Judge Donato made a statement that you

12  believe means he's made up his mind that there's a thirteen-

13  and-a-half-billion-dollar estimation in place.

14         MR. STAMER:  Would you like me to read a short

15  excerpt?

16         THE COURT:  Well, no.  I want you to know whether Mr.

17  Feldman and Mr. Bennett and Mr. Karotkin all signed up and

18  said, yeah, we agree to all that --

19         MR. STAMER:  No, Your Honor, that's why we --

20         THE COURT:  -- because I don't imagine they did.

21         MR. STAMER:  -- filed it on the docket.  It's docket

22  number 5154.  Your Honor, again, what we're dealing with here

23  is probability -- is there's no certainty in life, but this

24  should be factored into how you view upside, downside, and the

25  importance of moving forward in our view with a competitive

(979) 704-5000  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    process.

2          So I'm going to jump around a little bit, and I won't

3    take too much time.

4          THE COURT:  Okay.

5          MR. STAMER:  First of all, Your Honor, Ms. Dumas said

6    very eloquently, we wish we had more cash; we wish we had more

7    cash for the benefit of the tort claims.  Your Honor, if the

8    torts want more cash, our plan as it exists proposes more cash.

9    But if they want more cash, it should be a competitive process.

10   The most likely outcome in terms of getting more cash to the

11   torts and getting higher value to the torts is a competitive

12   process.

13         Your Honor, Ms. Dumas went through her thought

14   process, as did Mr. Pitre, with respect to why, in fact,

15   they've agreed to this settlement.  And they talked about

16   certainty and the ability of people to object and delay.  Your

17   Honor, there's no indication in the record or otherwise that

18   the TCC ad hoc plan has a lesser likelihood of being confirmed

19   of satisfying 1054.  They made their decision.  I was genuinely

20   surprised to hear someone stand up and disagree with my number,

21   that our proposal to the torts is a billion dollar more.  Your

22   Honor, I stand by my statement, and if we need to submit

23   additional information for the Court, we're happy to do so.

24         Your Honor, everyone has seen the letter.  I think

25   you've received four or five copies of the judge's letter.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    THE COURT:  You mean the governor's letter?

2    MR. STAMER:  The governor's letter.  The governor has

3  outlined fifteen -- whatever the problems are with the debtor's

4  plan.  We're referenced in a footnote.  It says our plan is in

5  AB 1054 compliant.  But Your Honor, our plan for so many

6  reasons is a better plan.  It's a better plan for the state of

7  California.  It's a better plan for the creditors.  It's a

8  better plan for the torts.  It preserves NOLs.  There's less

9  leverage.  There's more money to be invested to harden the

10 system.  I can go on and on.

11   THE COURT:  You don't need to.  I mean --

12   MR. STAMER:  No, I --

13   THE COURT:  -- you made the point on your paper.

14   MR. STAMER:  Again, I'm just trying to, again, lay the

15 background.  The reason why the equity is insisting upon a

16 lockup is because they can't compete.  They can't compete --

17 Ms. Dumas said, apples to apples; they're different.  She's

18 right.  They are different.  The fundamental linchpin of the

19 equity plan is the fact that they need to preserve -- pick a

20 number, five, six, seven billion dollars of equity value.  We

21 don't.  We think whatever equity value is there we have settled

22 with the torts, and we've given basically all the equity value

23 there.  So fundamentally, they need the lockup, because their

24 plan inherently is inferior.

25   THE COURT:  Oh, I understand the ramifications and the

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  consequences.

2  MR. STAMER:  And Your Honor, again, with the lockup,

3  when I say "they need the lockup," only the equity needs the

4  lockup.  The debtor doesn't need the lockup.  The debtor should

5  be -- as I said before, this should be an open and competitive

6  process.  It benefits --

7  THE COURT:  But --

8  MR. STAMER:  -- everyone.

9  THE COURT:  -- listen.  One of the things that I think

10  Mr. Bennett made a comment at a prior hearing, not today but

11  earlier, where do unimpaired creditors, parties -- and even

12  though I'm the one that said they're not unimpaired until

13  there's a plan.  But if we were confirming the debtor's plan

14  today, your client's unimpaired, where do you get off in

15  saying, I've got a better deal for you?  The law doesn't permit

16  that, does it?

17  MR. STAMER:  Your Honor, I think you actually answered

18  it --

19  THE COURT:  Well, no, but the law might say to a voter

20  in an impaired class that there's a better deal out there for

21  you, and the only question here is whether individual people

22  and individual representatives can lobby one way or the other.

23  But you're not prohibited and your client's not prohibited from

24  trying to sell their plan to the voters.  It's like somebody

25  running for office.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          MR. STAMER:  Actually, the --

2          THE COURT:  The guy running for office --

3          MR. STAMER:  No, I --

4          THE COURT:  -- I didn't have enough money to get on

5    the national debate, but I can tell you I'm the better

6    candidate.

7          MR. STAMER:  Two things, Your Honor.  One, the lockup

8    I believe as drafted would prevent us from doing just that.

9          THE COURT:  Well, how would --

10          MR. STAMER:  Would prevent us from negotiating with

11    the subros, would --

12          THE COURT:  How about selling your plan to the voters?

13          MR. STAMER:  Selling, well --

14          THE COURT:  Convincing the individuals --

15          MR. STAMER:  Yeah.

16          THE COURT:  -- the people in the impaired class, the

17    victims -- how about convincing the victims that your plan is

18    better for them?  Why --

19          MR. STAMER:  And --

20          THE COURT:  Who says you can't do that?

21          MR. STAMER:  And Your Honor, if there's a level

22    playing field after this is --

23          THE COURT:  Mr. Stamer, can you answer --

24          MR. STAMER:  Yeah.

25          THE COURT:  -- my question?  If we come to a point

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    where the debtor's plan and more importantly disclosure

2    statement is inconsiderate and so is yours and I approve both

3    disclosure statements and maybe Mr. Karotkin and his colleagues

4    can't do anything to speak against your plan, but you and your

5    clients can lobby in favor of your plan to the voters, right?

6            MR. STAMER:  Your Honor, we --

7            THE COURT:  What's wrong with that?

8            MR. STAMER:  We absolutely can, and --

9            THE COURT:  Okay.

10           MR. STAMER:  -- by approving the lockup, you would be

11   requiring us to convince individual tort claimants that we know

12   better than their lawyers.  Regardless of whether we do or

13   not --

14           THE COURT:  Make a more convincing argument for them

15   to make the vote.  That's simple dollars and cents.

16           MR. STAMER:  Your Honor, again, as you had raised

17   before -- someone has raised before the vast majority of the

18   70,000 claimants have never done this before, hopefully will

19   never do this again.

20           THE COURT:  Right.

21           MR. STAMER:  We can do a broad solicitation.  What we

22   would ask, Your Honor, is to allow the process to continue.  In

23   response to your question about impairment, Your Honor, if we

24   were standing here on the effective date of the plan, or even

25   at the confirmation hearing, and they had long-term financing

(972) 640-operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    lined up, which they don't have.  They have twelve billion

2    dollars of equity, and they've got commitments for a --

3              THE COURT:  I know, and you can make --

4              MR. STAMER:  -- twelve-month bridge, which the CPUC's

5    never going to approve.

6              THE COURT:  And you can make an argument that the plan

7    is not feasible.  You have a right to object that the plan's

8    not feasible.

9              MR. STAMER:  Your Honor, at that point it's too late.

10   The problem with that is, if you get into March -- February,

11   March, whenever it happens, the company needs to confirm a plan

12   by --

13             THE COURT:  I know that.

14             MR. STAMER:  -- by June.

15             THE COURT:  I know when it has to confirm the plan.

16   Okay.  I --

17             MR. STAMER:  Your Honor, if they get AB 1054 approval,

18   if they get long-term financing, if they jump through the

19   twenty hoops that the governor has asked them and the CUPC will

20   ask them to jump through, if at the end of the day all of this

21   happens, are we potentially -- and we lose on all of our

22   litigation with respect to interest and make whole and the

23   like.  If all that happens, we'll have nothing to say.  Our

24   problem is, as Your Honor said it, we are not unimpaired --

25   double negative -- we are not unimpaired unless things go

PG&E Corp., Pacific Gas & Electric Co.

1    wrong, and the only indication we have as to whether this is

2    going to go right or wrong is the governor's letter of December

3    13th, which says --

4           THE COURT:  I know.

5           MR. STAMER:  -- they're not compliant.  The plan's

6    not --

7           THE COURT:  But again, we're --

8           MR. STAMER:  -- confirmed.

9           THE COURT:  -- going around in circles, Mr. Stamer.

10   My issue is the following.  I'll state it again.  If your

11   opponent files a plan that's patently unconfirmable, you have a

12   right to object to that plan, and I have publicly and in the

13   prior PG&E case have been affirmed by disapproving a disclosure

14   statement for a plan that's unconfirmable.  So there are ways

15   to attack the matter head on, and we don't -- and so we're

16   still back to the question, do I issue an order that approves

17   this RSA and has people like Mr. Pitre and his colleagues that

18   said you guys can't say anything bad about the other plan.  I

19   mean, it's not really like a gag order, but it's effectively a

20   gag order.  And not a question of who can negotiate with whom,

21   but who communicates with the voters, and the voters are the

22   critical people in my opinion.  And I'll grant you there is

23   some ramification there, but with an adequate approved

24   disclosure statement, you have the ability to solicit those

25   votes just like anybody else.  And the best result obviously,

PG&E Corp., Pacific Gas & Electric Co.

1  from my point of view, would be to get both plans accepted on

2  the requisites, and then we come down to the -- you know what

3  follows after that.

4          MR. STAMER:  Yeah, yeah.

5          THE COURT:  Anyway, I think all this point about what

6  the governor's letter says and what all the hoops that PG&E has

7  to jump through, your client will be well served if they

8  stumble on the first hoop.  But at the moment they haven't, and

9  so they have in fact the reverse from what the debtors' counsel

10  and the TCC's counsel have made the point today that the RSAs

11  are steps forward, even with the integrated provisional lockup.

12  Anyway --

13          MR. STAMER:  Your Honor --

14          THE COURT:  -- we're going around --

15          MR. STAMER:  -- our humble belief is the governor's

16  letter is the ultimate stumble, because that's the linchpin to

17  this company getting out, and all we're asking for is to avoid

18  a potential train wreck and leave people where it's too late

19  and too little in order for us to pick up the pieces.

20          THE COURT:  I understand.

21          MR. STAMER:  Okay.

22          THE COURT:  Okay.

23          MR. STAMER:  Thank you.

24          THE COURT:  Mr. Karotkin, I'm going to hear from

25  you -- or Mr. Orsini, one of -- are you both going to do it,

PG&E Corp., Pacific Gas & Electric Co.

1    or --

2         MR. KAROTKIN:  Well, we'll be very short.

3         THE COURT:  Does that mean you're both going to talk?

4         MR. KAROTKIN:  Yes, sir.

5         MR. ORSINI:  I'm getting homework assignments from

6    everywhere today, Your Honor.

7         THE COURT:  Okay.  Mr. Orsini --

8         MR. ORSINI:  I will be short.

9         THE COURT:  -- I want you to recite verbatim the

10   twelve lines -- the twelves work pages that Judge Donato

11   stated.

12        MR. ORSINI:  I don't need to, Your Honor.  We were

13   upstairs, as you noted, for a status conference on the question

14   of, what do we do with estimation right now.  Judge Donato did

15   make some observations about, well, might this number not be a

16   number I can use if the deal falls apart, and the answer is --

17   I want to be very clear on two things.  Number one, what he

18   didn't have in front of him was this settlement agreement, the

19   RSA itself, which explicitly says in Section 18 that the RSA,

20   just like most settlement agreements, cannot be used as any

21   sort of admission by either side as to what the right number is

22   for these claims if you don't approve this RSA and if we're

23   back in estimation.  So the document itself will establish that

24   you can't just use a thirteen and a half number, point number

25   one.

PG&E Corp., Pacific Gas & Electric Co.

1    Point number two -- and I think Mr. Pitre made this

2  point, and I just want to amplify it -- if we don't have an RSA

3  approved here, it's not a simple matter of just allowing Judge

4  Donato to rubber-stamp a 13.5, because the first thing that Mr.

5  Pitre and I are going to do is walk down the street and battle

6  for two and a half months in front of a jury as to what happens

7  with the Tubbs liability.  If he wins, the estimation will look

8  one way.  If I win, the estimation will look --

9    THE COURT:  No, I know.  We've --

10    MR. ORSINI:  -- another way.  And on top --

11    THE COURT:  -- known that all --

12    MR. ORSINI:  -- of all that --

13    THE COURT:  We've known --

14    MR. ORSINI:  -- Your Honor --

15    THE COURT:  We've known that all.

16    MR. ORSINI:  -- to be very clear, if we're back in the

17  estimation, I'm going to be putting in expert reports that are

18  extensively analyzed, documented, and will be proven up that

19  say the number is not 13.5, even if Mr. Pitre beats me.  The

20  only point is, Your Honor, I understand the bond holders are

21  trying to keep their piece alive, and they're trying to seize

22  upon a musing during a status conference that maybe we'll just

23  use the 13.5.  That is not what's going to happen.  It's not

24  what the document says is going to happen and ignores the

25  reality of everything that will happen from tomorrow forward if

PG&E Corp., Pacific Gas & Electric Co.

1    this RSA's not approved, and I just wanted to rise to make that

2    point clear.

3          Thank you, Your Honor.

4          THE COURT:  Thank you, Mr. Orsini.

5          Mr. Karotkin?

6          MR. KAROTKIN:  Thank you, Your Honor.  Stephen

7    Karotkin, Weil, Gotshal & Manges for the debtors.  I will try

8    to be fairly brief.

9          THE COURT:  That's what they all say.

10         MR. KAROTKIN:  No, I --

11         THE COURT:  You can do it, too.

12         MR. KAROTKIN:  I will.  It's getting late, and people

13   are getting tired.

14         A couple of things that Mr. Stamer said.  He said the

15   debtors continue to breach their fiduciary duties.  He said

16   that a number of times before Your Honor, and I'll ask the

17   question, Your Honor:  What is inappropriate for a debtor?  And

18   Mr. Bennett alluded to it.  A debtor, where everyone in this

19   courtroom acknowledges that it's the sovereign debtor, what is

20   inappropriate about the debtor coming to this Court with a

21   global consensus among all impaired classes that it wants to

22   move forward with and protect all of the economic stakeholders

23   who have an economic interest in this case?  What is wrong with

24   that?  And he said -- Mr. Stamer said, but we're threatening

25   and the equity is threatening the tort lawyers and the TCC.

escribers
(973)406-2250 | operations@escribers.net | www.escribers.net

Your Honor, I think Ms. Dumas and the tort lawyers can assure you nobody was threatened and nobody forced them to enter into an agreement, which they have made very clear today, Your Honor, they believe is in the best interest of their clients for a number of reasons, including they believe it is the most expeditious way to get these cases successfully completed, to get the debtors out of Chapter 11, to fund a trust, and to get payments to their clients, and that's a rational and reasonable decision. And as Mr. Pitre said and as Mr. Orsini just mentioned, the lockup was key to this negotiation. It was key to getting a consensus among all of the parties, and without that lockup, the thirteen and a half billion vaporizes. And Mr. Feldman's agreement to the eleven billion dollars will vaporize as well, and we will be back in extensive estimation proceedings.

And if I may continue, as everyone has acknowledged, what we have here is the RSA and the compromises provided in the RSA constitute a comprehensive settlement that resolve a number of issues, including claims treatment of all impaired classes. It resolves the estimation proceedings before Judge Donato, and it resolves the Tubbs trial. It is based not only on the treatment of the tort claimants or on the treatment of the subrogation claimants, but it's based on the treatment of all constituencies in this case. And eliminating one element of it would cause the whole thing to fall apart. It would

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    undermine the negotiation, the balance that was achieved

2    through the negotiation, and the willingness of the parties to

3    compromise and give up rights.  They gave up rights only with

4    the certainty that they would achieve the deal they negotiated.

5    And without the lockup, there is no certainty that they will

6    get the deal they negotiated, and that is the reason, Your

7    Honor, that all RSAs have lockups.  This is nothing new.  It

8    doesn't matter that exclusivity was terminated.  I know you

9    raised this issue last time, and as I said last time, RSAs

10   don't make any sense.  They contemplate that exclusivity will

11   be terminated.  Otherwise, the provisions don't mean anything.

12   They contemplate that occurring, and that is why they have the

13   lockup provisions.  The --

14         THE COURT:  But they sometimes get in place, even when

15   they're hasn't been a termination of exclusivity, right?

16         MR. KAROTKIN:  But --

17         THE COURT:  And then --

18         MR. KAROTKIN:  But they anticipate -- they're

19   anticipating --

20         THE COURT:  Yeah, I understand that --

21         MR. KAROTKIN:  -- that eventuality --

22         THE COURT:  I --

23         MR. KAROTKIN:  -- otherwise the provisions would be

24   meaningless.

25         THE COURT:  I understand.

PG&E Corp., Pacific Gas & Electric Co.

1    MR. KAROTKIN:  So what we have here, Your Honor -- we

2    have -- they complain about the competition, and they assert

3    that we need to have competition.  And that's really the thrust

4    of what the creditors' committee has said, what the thrust of

5    the last sentence in the governor's letter says, what the

6    thrust of the ad hocs say.  Well, as I said before, we have had

7    the competition.  You appointed the mediator.  That was the

8    competition, and the result of the competition is the

9    comprehensive settlement that we have achieved.  As I said at

10   the outset, we have achieved precisely what you asked us to

11   achieve, a settlement among all impaired classes.

12   Sophisticated parties agreed that and have called as to how

13   they think these cases should proceed from now until

14   confirmation, including, Your Honor, the TCC who, in your

15   words, are fiduciaries for, and I quote what you said in your

16   decision to terminate exclusivity:  the parties most deserving

17   of consideration.  These parties have agreed to this global

18   consensus.  They have agreed to the lockup.  They believe it's

19   appropriate, and they believe, as they've said, that this is

20   the way to get these cases done.  And they are confident, as I

21   said earlier, Your Honor, that the debtors' plan will fully

22   comply with AB 1054, will timely be confirmed, and will get the

23   benefits of the go forward wildfire fund.

24        This compromising global resolution, Your Honor, as

25   you know, is the essence of Chapter 11.  And there's no reason

(973) operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    why the debtors' business judgment, the business judgment of

2    the tort claimants committee, the business judgment of the

3    other parties who are party to the RSA should be questioned,

4    particularly when they have fiduciary duties -- the tort

5    committee has fiduciary duties to the in excess of 70,000

6    claimants who filed claims in these cases.

7           That shouldn't be second guessed -- much less, Your

8    Honor, second guessed by parties whose claims will be

9    unimpaired and satisfied in full under the debtors' plan.

10          Your Honor, we are at a critical crossroads in these

11   cases.  We have brought to you a comprehensive settlement.  We

12   think the path is clear.  We think it is imperative that you

13   approve that settlement today.  To jettison that settlement

14   would put us back in a litigation morass, back in estimation,

15   the subrogation claims settlement in the amount of eleven

16   billion dollars.

17          As Mr. Feldman assured you, they will be seeking

18   twenty billion dollars of claims.  And I can assure you, if

19   that scenario unfolds, we will never meet the June 30th

20   deadline, and the thirteen and a half billion dollars for the

21   tort claimants will not be there.

22          And we urge you to approve the motion.

23          THE COURT:  Okay.  Thank you Mr. Karotkin.

24          Just give me a moment, please.

25          If those of you are getting hot, you think it's

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    because the intensity of the argument; it's because GSA has a

2    little deterrent called turn the fan off around here, so I have

3    no control over that.

4            I have obviously spent a lot of time on this, and all

5    of you have spent a lot of time on it.  And one of the things

6    that I thought I would do is take a lot of time to give you a

7    long drawn out ruling, but I'm not going to do that.  I'm going

8    to go ahead and give you an oral ruling right now on both

9    motions.  And just bear with me while I make sure I keep my

10   thoughts in order.

11           But so there's no surprises, I'm going approve both

12   RSAs with the lockup language.  But I will explain myself.

13           For both of them -- and so I have kept the subrogation

14   RSA under advisement for a couple of weeks, for reasons that I

15   touched on earlier.  And if nothing had happened -- if Judge

16   Newsome and the parties who met with him in the prior weeks

17   hadn't reached the resolution that they reached, and if the

18   governor hadn't written his letter, and if the company hadn't

19   filed what it filed yesterday -- but Mr. Feldman -- or Mr.

20   Karotkin said give me the ruling on the RSA, I would have given

21   it the way I've been thinking about it.  And I'm -- so

22   therefore, to some extent, this is all been thought through as

23   I've gone through it.

24           However, in the events of the past few days, the way

25   things have changed so dramatically, I've had to take into

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1  account all these -- the very things that many of the able

2  lawyers have explained and argued today.

3           So to some extent, I'm going to address a couple of

4  issues that really didn't spend a lot of time -- we didn't

5  spend a lot of time on today.  But the first one, particularly,

6  it was focused in the subrogation RSA, had to do with the

7  third-party releases.  And to the extent that the third-party

8  releases showed up in the TCC RSA, the points are the same.

9  And that is that the United States Trustee, and certainly

10 previously when the TCC was opposing the subrogation RSA, we

11 had the colloquy for some length about that subject.

12          And I'm not going to bore you all at this hour with

13 reciting a whole bunch of cases.  But the fact is, in the 9th

14 circuit, where we are governed, there are at least three

15 seminal decisions -- I guess you can't have multiple seminal

16 decisions.  There are three circuit decisions:  Lowenschuss,

17 Underhill v. Royal, and American Hardwoods, that clearly, over

18 and over and over again, send the signal to the bankruptcy

19 courts, in this circuit at least, that you can't do third-party

20 releases.

21          I note for the lawyers who spend a lot of time in

22 Delaware, that just in the last few weeks there's been a

23 difference of opinion among the Delaware judges about third-

24 party releases -- interesting reading, which I spent.

25          But the cases are many in our circuit. Rohnert Park

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    Auto Parts back in 1990; In re Keller in 1993, the same concept

2    that carried over.  And I think Underhill v. Royal was the true

3    seminal one in that point.

4         And I think at the outset that the releases would have

5    been flawed, but I think the evolution of the releases, as they

6    have gone through the iterations of the RSA -- excuse me, the

7    subrogation RSA, are such that they truly are consensual now,

8    and they are opt in rather than opt out traps for the unwary.

9         And we have a district court -- I mean a bankruptcy

10   court decision by my colleague Judge Klein, that some of you

11   are familiar with, In re Hotel Mt. Lassen way back in 1997.

12   And Judge Klein's decisions are not binding, but I respect his

13   view and hopefully he respects mine.  And he does suggest that

14   there are opportunities for consensual releases, and in that

15   case that I'm going to stick that a voluntary agreement can be

16   sufficient.

17        So I'm -- and there's another case from -- I believe

18   it was Judge -- I forget who the judge was -- in the Station

19   Casino's case in 2011 in Nevada, which is unreported, but much

20   consistent with that.

21        And so in our case the -- I made a comment in one of

22   my earlier rulings that a tough decision is not a coerced

23   decision, or in my mind, a unlawful decision.  So I'm satisfied

24   that the way the RSAs have played out with the releases that

25   they're permissible under the both documents.

(972) 786-3950  operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    The second point that goes more to the arguments that

2  were made by, I believe, Mr. Qureshi and others, in opposition

3  to the subrogation RSA, wasn't really focused quite so much

4  today, but it's much the same.  And I believe that there was

5  this notion of leverage -- and -- leverage.

6    Well, leverage is one of those things and leverage

7  isn't a bad thing unless you don't have it.  When you have it,

8  it's a good thing.  And what I've heard some of the lawyers

9  arguing here, and previously, is that there's somehow a breach

10  of fiduciary duty for a debtor to be doing things that might be

11  done.

12    Well, I might agree with that in many cases, but I've

13  been thinking back in my own experience when debtors take

14  positions that maybe are inconsistent with what might be a

15  fiduciary duty, but that doesn't mean they're impermissible.

16  That doesn't mean that the debtors are not entitled to use

17  leverage.

18    So leverage might be having a favorable case in your

19  favor, like whether you'll have to pay contract interest versus

20  post-petition interest.  Or leverage might be having

21  exclusivity with a judge that doesn't readily break it.  Those

22  are leverages that are legal and permissible, and frankly good

23  lawyers should be taking advantage of leverage, not fault it

24  for breaching fiduciary duty.

25    Now, that's easy for me to say.  But I think back to

PG&E Corp., Pacific Gas & Electric Co.

1    my own experience with -- when are debtors and their counsel

2    allowed to take positions adverse to something that somebody

3    else wants.  Well, the answer is often, when somebody wants to

4    do something that the debtor in its judgment doesn't think is

5    appropriate, like sell Blackacre when the debtor wants to

6    operate Blackacre.  Or, worse yet, when people move to remove

7    the debtor in possession and insert a trustee.  Is that a

8    breach of fiduciary duty to oppose a motion like that?  Well,

9    on certain facts it might be.  On certain other facts it might

10   not be.

11        Those of you who know me, know that I love

12   hypotheticals, so I'm hesitant to make many, but there are some

13   football fans in this case and it's leverage if you win the

14   coin toss at overtime in the Superbowl, because if you win the

15   coin toss and score, you win the game and guess who doesn't get

16   the ball?  The other team.

17        So I don't think that in a solvent case -- and we are

18   operating under the assumption that the debtors are solvent,

19   everything is built around that fact.  I don't think it's fair

20   to say that the debtor and the debtors' representatives are

21   somehow breaching fiduciary duty by advocating a position that

22   some constituents might oppose, whether it be an impaired class

23   or an unimpaired without even getting down into that details.

24        And certainly, you'll recall that when I raised issues

25   and responded to some of the complaints about the subrogation

(977) 999-9250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    RSA, I took issue with the way the solvency situation was teed

2    up.  I'm not sure that I would have drafted the solution that I

3    got, but there is a solution there, and Mr. Bray I think even

4    alluded today to the insolvency out, and I think that's

5    obviously applicable in the subrogation RSA.  I don't know that

6    it's technically directly applicable in the words of the TCC

7    RSA but certainly the concept.

8          So my point of all this is that exercising a position

9    of leverage is not a bad thing.  If you control the -- if the

10   stock of a solvent company you have leverage that people who

11   want to be control of the stock might not have.  And so I'm not

12   about to say that exercise or implementation of -- or

13   utilization of leverage is a bad thing.

14         So then we get to well, what's happened in the last

15   few days?  So at the -- when the RSA, subrogation RSA, was up

16   for decision, I was focusing and recalled the arguments that

17   Mr. Julian and Ms. Dumas made about the lockup provision there,

18   but again, influenced by, to some extent, the very concepts

19   I've identified here.

20         But what happened in the last few days?  The mediated

21   resolution, publicity about it, an offer by the proponents to

22   see what the governor says.  The governor perhaps to some gave

23   a position that was a surprise, maybe to others was no surprise

24   at all.  Doesn't matter.  That led to the next question of

25   well, now what happens?  And we learned yesterday what happened

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    is what the debtors chose to do and the proponents.

2         And so what it comes down to is what do I make of this

3    question of lockup, whether it's I'm defining it correctly or

4    not isn't the point.  Ms. Dumas and Mr. Julian, and Mr. Pitre

5    made it very clear what the lockup means to them.  Mr. Karotkin

6    and Mr. Bennett certainly made it from their point of view.

7    And I don't discount Mr. Stamer and the other parties'

8    arguments against it, but it's back to two guiding principles

9    here that one of them goes way back, again, to one of the very

10   first hearings we had in this case.

11        I said it before; I don't have to say it, but I will

12   say it because everybody in this room knows it:  There are

13   billions of dollars' worth of claims represented by experienced

14   lawyers in this courtroom whose clients chose to be lenders and

15   were in it for a profit.  There are tens of thousands of

16   victims whose lawyers are in this room who just want to go

17   about their life and their homes, and their lives were upended

18   by the devastating wildfires.  They didn't choose to be

19   predators and didn't choose to be anything other than people

20   that live their lives normally.

21        And so what was the goal for everyone, me, and the

22   lawyers?  And again, I don't suggest that there's a responsible

23   person in this courtroom, lawyer or nonlawyer, who wished ill

24   will on the victims or to make it worse for them.

25        But the question comes down to what advances the cause

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    more, moving forward or moving backwards?  I had the colloquy

2    with Ms. Dumas months ago about exclusivity.  I didn't continue

3    it the first time.  I then terminated it.  I remember the

4    conversation we had about that and whether she and her clients

5    wanted a mediator or not and the outcome of that.  And in all

6    of those decisions, I had to think to myself, do I know better

7    than the lawyers representing the victims know best for their

8    clients, and I haven't changed my view today, to this day.  To

9    today, I don't think that I have the wisdom or the knowledge or

10   the -- frankly, it's my role to second-guess the decisions of

11   those victims who have told their lawyers, this is how we want

12   to go with the plan.

13         So my view comes down to do I really call Mr. Bennett

14   or his clients' bluff or Mr. Karotkin's?  No.  The answer is

15   that's not my role.  Was it permissible, legally permissible,

16   to have the lockup?  Well, lawyers with a lot of experience in

17   a lot of complicated cases tell me lockups are routine.  Well,

18   that might be true.  I don't know how routine they are in cases

19   of mass tragedies with tens of thousands of victims, but I'm

20   not going to worry about whether the lockup is routine or not

21   routine.  It's sui generis in my experience in this case, but

22   I'm not going to second-guess the judgment call of the lawyers

23   who then conferred with their committee.

24         I'm sure you all know the committee is very active,

25   and the governor's observation about is it better to have open

(970) 703-8000   operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1    the door.  Mr. Bray's arguments, Mr. Stamer's arguments, Ms.

2    Mitchell's statements, not quite as the advocate for -- that

3    sounds wrong.  She's very much the advocate for her client, but

4    I'm saying the governor's perspective is not quite that same as

5    the lawyers representing parties-in-interest here.

6         And so I've concluded that whether it's the exercise

7    of leverage or being in the right place at the right time, the

8    law permits the parties, whether a company is -- excuse me --

9    whether the classes are impaired or unimpaired, it permits the

10   litigants to do things like insist on lockups.  Because I'm

11   persuaded that the chances of getting to the goal of

12   confirmation are enhanced rather than impeded, I'm sticking

13   with their advice and their recommendation.

14        The fact that Mr. Julian and his clients switched

15   sides or switched allegiances isn't the point.  Their job is to

16   do what they think is right for their constituents, and they've

17   chosen to go -- to roll their dice with the plan sponsored by

18   the debtor in equity.  I'm still comforted by the fact that

19   they have a fallback position in case that plan doesn't

20   succeed.

21        So I said that I wanted to have a follow-up hearing

22   with the principle counsel about confirmation issues.  I've

23   decided we're not going to do that.  I will do it at some point

24   in the future.  I will issue orders that I'll ask Mr. Feldman,

25   Mr. Karotkin, and Ms. Dumas to upload for orders that recite

PG&E Corp., Pacific Gas & Electric Co.

1   for the reasons stated on the record, and it's just my oral

2   record.  I don't intend to do a written findings and

3   conclusions.  I hope my thinking has been clear, and if there's

4   any questions or ambiguity, I'll ask you to tell me you want me

5   to clarify it, but for the record then I'm overruling the

6   objections by the various parties who asserted them today, and

7   I am approving the two separate RSAs for the reasons that I've

8   attempted to articulate in my oral comments, and I will

9   issue -- and I'd like to do it at the same time.  So I will --

10   and my intention will be to get those orders in from counsel, I

11   will sign them, and anybody who wishes to seek review, they'll

12   have it sooner rather than the later.

13        And with that, I will then invite Mr. Karotkin to

14   confer with Mr. Stamer and others in the near future -- but

15   that doesn't have to mean Christmas week -- but in the near

16   future if we have to have another hearing before January 14th

17   to talk about whether to proceed with confirmation, I'll be

18   happy to do that earlier, but if not, we'll put it over for

19   January 14th.

20        So with that, I will thank -- I will let you speak,

21   but I will thank you for a long day and hard work and

22   appreciate your efforts.

23        Mr. Stamer?

24        MR. STAMER:  Thank you, Your Honor.  I understand your

25   ruling, but I just have one question.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          THE COURT:  Yes, sir.

2          MR. STAMER:  It's a clarification.  And I think I -- I

3   hope I know the answer.  The bondholders without the TCC as

4   coproponent are still free to prosecute our plan.  This is --

5          THE COURT:  Of course.  Absolutely.

6          MR. STAMER:  Okay.  Thank you very much.

7          THE COURT:  Absolutely.  Your plan, in fact -- well,

8   that's why you're invited to confer with --

9          MR. STAMER:  I --

10          THE COURT:  -- me and --

11          MR. STAMER:  I just wanted to make sure on the record

12   that --

13          THE COURT:  Absolutely on the record.

14          MR. STAMER:  -- this wasn't impacting the termination

15   of exclusivity.  Thank you, Your Honor.

16          THE COURT:  Yes, sir.

17          Yes, sir?

18          MR. ZUMBRO:  Good afternoon, Your Honor.

19          THE COURT:  Yeah.

20          MR. ZUMBRO:  My apologies.  One quick housekeeping --

21          THE COURT:  Again, I know your name.  Just state it.

22          MR. ZUMBRO:  Paul Zumbro from Cravath, Swain & Moore.

23          THE COURT:  Mr. Zumbro.

24          MR. ZUMBRO:  First of all, thank you for your

25   thoughtful, and more importantly, favorable ruling.  But one

PG&E Corp., Pacific Gas & Electric Co.

1    housekeeping matter, the Court had entered a docket text order

2    on the compromises that the fee examiner had reached, and just

3    because today is the last omnibus hearing that is here --

4        THE COURT:  Wait, wait.  One of my law clerks is

5    working on the order that I was hoping to issue today.

6        MR. ZUMBRO:  Oh, okay.

7        THE COURT:  But just so that they're no surprises,

8    look, I'm not going to publicly go into details of what

9    prompted me to do what I did.  Leave it -- suffice it to say

10   that I had a different point of view than the examiner did

11   about how it was supposed to be teed up.

12       MR. ZUMBRO:  Okay.

13       THE COURT:  So probably tomorrow there will be an

14   order -- there will be two documents, one just amends the fee

15   and an examiner procedural order, another sets hearings in the

16   January calendar with deadlines.  The problem -- the short

17   answer is there needed to be an opportunity for people to

18   object and be heard and not one week, no objection period.  So

19   there are no surprises.  You'll get that shortly.  And if

20   you're any particular firm that was -- felt picked on because

21   there is a slight delay, all I can say is you've got your

22   eighty percent -- I mean, twenty percent withhold.  It's not --

23   so you'll have to live with it.

24       MR. ZUMBRO:  Okay.  Thank you, Your Honor.

25       THE COURT:  Okay.

PG&E Corp., Pacific Gas & Electric Co.

1      Anyone else have a question about -- or clarification?

2      Mr. Karotkin?

3      MR. KAROTKIN:  I have a question about some -- it has

4  nothing to do with the ruling.  Your Honor had --

5      THE COURT:  Oh, come on.

6      MR. KAROTKIN:  Your Honor had scheduled briefing on

7  whether the subrogation claims were impaired.

8      THE COURT:  Right.

9      MR. KAROTKIN:  And we submitted a brief, and I think

10 that a couple of the parties didn't submit formal opposition

11 but reserved their rights, I think pending --

12     THE COURT:  Yeah.  I think they want to --

13     MR. KAROTKIN:  -- whether you were going to approve

14 the RSA.  So I think we need to get --

15     THE COURT:  Well, you still believe --

16     MR. KAROTKIN:  -- back on the schedule.

17     THE COURT:  -- that they're impaired, right?

18     MR. KAROTKIN:  Of course, yes.

19     THE COURT:  Yeah.

20     MR. KAROTKIN:  So I guess we need to get that back on

21 schedule.  I can confer with counsel on that and come back to

22 you?

23     THE COURT:  Well, and also we need to get back on

24 calendar the question of the liquidated versus the unliquidated

25 disputed claims.  So I would ask you, Mr. Karotkin, to take

PG&E Corp., Pacific Gas & Electric Co.

1   that up in the first case with the people that are advocating

2   for the --

3           MR. KAROTKIN:  Yes.

4           THE COURT:  -- impaired, not impaired, and we have a

5   schedule and I think we can live with it, or if necessary, we

6   can move it.  I'm trying to avoid having you have multiple

7   hearings, but you --

8           MR. KAROTKIN:  No, no.

9           THE COURT:  -- have to have the holidays, but I'm

10  also -- I don't -- this is a long day for everybody.  And so I

11  want to avoid these big calendar congestions, and January 14th

12  got a lot of stuff on it.

13          MR. KAROTKIN:  Right.

14          THE COURT:  So we can accommodate you.

15          MR. KAROTKIN:  Okay.

16          THE COURT:  I'm going to be here.  You guys are the

17  ones that are going -- not to be here.

18          MR. KAROTKIN:  Okay.  The only reason I asked about

19  the subrogation because it was calendared for Friday, but

20  there's really no point in go forward with that --

21          THE COURT:  Right.

22          MR. KAROTKIN:  -- but we'll confer with counsel.

23          THE COURT:  Correct.

24          MR. KAROTKIN:  Okay.

25          THE COURT:  So on both issues, though?

PG&E Corp., Pacific Gas & Electric Co.

1      MR. KAROTKIN:  Yes, sir.

2      THE COURT:  On both?

3      MR. KAROTKIN:  Yes, sir.  Yes.  Thank --

4      THE COURT:  Anyone else want to raise a question?

5  Yes, sir, in the back?  Did you want me, or someone else?  Mr.

6  Pascuzzi, I'm sorry.  I couldn't recognize you.

7      MR. PASCUZZI:  I'm sorry, Your Honor --

8      THE COURT:  Now, I can.

9      MR. PASCUZZI:  You brought up the -- Paul Pascuzzi,

10 cocounsel with the Attorney General's Office for California

11 State Agencies.  You brought up the liquidated, unliquidated

12 issue.

13     THE COURT:  Yeah.

14     MR. PASCUZZI:  I think that's off, and under our

15 stipulation, the only way that goes back on is if the

16 estimation proceeding gets going again because --

17     THE COURT:  Well, I guess I -- maybe I missed that.  I

18 thought -- well, what -- what then -- you clarify for me.  What

19 happens to a claim by either one of your agencies or FEMA for a

20 fire that isn't within the twenty-two on the list?

21     MR. PASCUZZI:  It would be in the unimpaired class of

22 the plan.

23     THE COURT:  Is that right?  Mr. Karotkin, is that

24 correct or Mr. Orsini?  Unimpaired.  In other words, if a

25 California agency has a fire damage claim arising out of one of

PG&E Corp., Pacific Gas & Electric Co.

1    the fires that's not on Exhibit A, does there need to be

2    another estimation or not?  I mean, what do you -- I mean, it

3    still come down to the question is it liquidated or

4    unliquidated?  So you follow me on the question?  I don't want

5    to trap you late in the day.  I just want to make sure we

6    clarify it.

7              MR. ZUMBRO:  Sorry.  Paul Zumbro, Your Honor.  I think

8    that's correct.  I think those would be general unsecured

9    claims because they're not part of the fire trails, but we --

10   the issue that had been briefed was really specifically whether

11   these claims were to be part of the estimation proceedings

12   under Judge Donato, and I think what Mr. Pascuzzi was saying

13   that we mutually agree that given that the settlement has

14   occurred that Your Honor has approved the RSAs for, there was

15   no longer the need to brief that issue about whether those

16   claims were liquidated for purposes of --

17             THE COURT:  Well, then --

18             MR. ZUMBRO:  -- the estimation.

19             THE COURT:  -- the answer to the question then.  So

20   let's go back to one of the fires that is not on the twenty-

21   two -- or twenty-one on Exhibit A, right?  And there are a

22   handful of fires.

23             MR. ORSINI:  I think I can answer your question, Your

24   Honor.  Kevin Orsini, from Cravath.  I think you're right that

25   there are a small number of fires that are not part of the

PG&E Corp., Pacific Gas & Electric Co.

1    seventeen or eighteen fires that are not the Butte fire, and

2    therefore as a technical matter are not part of the resolution

3    or the post-trust.

4          THE COURT:  The estimation that has now gone into the

5    trust, right?

6          MR. ORSINI:  That's exactly right, Your Honor.

7          THE COURT:  Okay.

8          MR. ORSINI:  Those claims, I think are general

9    unsecured claims.  Complete candor, I don't think anyone in

10   this room has spent a whole lot of time focusing on those

11   claims, not to say that they're not important claims.

12         THE COURT:  Ms. Winthrop has.

13         MR. ORSINI:  But I think ultimately what the -- what I

14   would suggest especially at 5:30 is let all of us confer about

15   the best path forward with those.  Those may be claims that

16   there is some merit in using Judge Newsome with an E or not to

17   see if there is a way to resolve them so we can avoid briefing

18   we don't need to have and --

19         THE COURT:  Mr. Orsini, you're turning --

20         MR. ORSINI:  -- and we can come back.

21         THE COURT:  -- into California, and I thought you'd

22   tell me it's 8:30.

23         But the point is if Mr. Pascuzzi's client filed a

24   claim for fire such and such, it's deemed allowed even if it's

25   unliquidated, but you have to object to it unless you want to

PG&E Corp., Pacific Gas & Electric Co.

1    let it go, but if it's liquidated, then you don't do anything,

2    but obviously, if Judge Newsome or the parties want to

3    stipulate around it, fine.  We just need to deal with it one

4    way or the other.

5              MR. ORSINI:  And I think we should all discuss how

6    best to deal with that because that hasn't been the focus.

7              THE COURT:  And Ms. Winthrop needs to be part of this

8    conversation.  She's got some very significant clients.

9              MS. WINTHROOP:  Sorry, Your Honor.  Actually, I was

10   going to suggest what Mr. Orsini said, which is I would like

11   an -- I did not bring it with me today.  I would like an

12   opportunity to think about how this all plays out, and I think

13   the parties should meet and confer with respect to how best to

14   resolve these issues.

15             THE COURT:  Okay.  And Mr. Troy, you're standing back

16   there.  It's the same for you.  I mean, you three counsel are

17   the three major players on this issue on the other side of

18   the --

19             MR. TROY:  Yes.  That's true, Your Honor, and I would

20   agree with Mr. Orsini.  We just need to sit down and talk about

21   those and perhaps they could be part of a mediation session.

22             THE COURT:  You're more than welcome for me to impose

23   on Judge Newsome with an E to put him -- make him work some

24   more, but if he doesn't want to, I'll do it.

25             MR. TROY:  Very good, Your Honor.

(972) 406-0001 operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas & Electric Co.

1          THE COURT:  Okay.

2          IN UNISON:  Thank you, Your Honor.

3          THE COURT:  Anyone else?  All right.  Thank you,

4    everyone, for your long day and your hard work and efforts.

5    Happy Holiday, everyone.

6          IN UNISON:  You, too, Your Honor.  Thank you.

7        (Whereupon these proceedings were concluded at 5:32 PM)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

(973) 406-2250 | operations@escribers.net | www.escribers.net

1                    C E R T I F I C A T I O N

2

3    I, Sharona Shapiro, certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5

6

7    *[signature: Sharona Shapiro]*

8

9

10   _____

11   /s/ SHARONA SHAPIRO, CET-492

12

13   eScribers

14   7227 N. 16th Street, Suite #207

15   Phoenix, AZ 85020

16

17   Date:  December 19, 2019

18

19

20

21

22

23

24

25

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

**$**

**$5.95 (1)**
198:6

**A**

**AB (34)**
49:4;104:2,16;106:6;
112:6;118:16;129:9;
135:2;192:18,19,19;
194:24;195:10;201:20;
209:20;215:23;221:23;
223:5;235:2,5,7;237:6;
238:2,8;249:2;255:1,
13;256:16;258:16;
259:7;263:16;279:5;
283:17;291:22
**AB- (1)**
96:3
**AB-1054 (7)**
96:9;12;98:7;99:12,
18;101:7;103:15
**Abid (1)**
160:21
**ability (19)**
37:15;63:12;68:23;
97:20;155:7;169:17;
186:14;17;197:15;
200:10;206:14;209:19;
211:1;232:25;250:8;
252:4;263:16;278:16;
284:24
**able (26)**
26:18;68:6;69:8;
71:2;84:21,25;85:5;
92:21;105:17;142:21;
149:19;195:10;212:24;
224:24;225:4,21;
226:9,10;231:1;238:7,
7;242:12;247:24;
259:8;265:10;294:1
**above (1)**
15:22;23:4;207:21
**Abrams (38)**
130:21;214:3,13,13,
14,14,16,21,24;215:6,
7,14,19,21;216:9,12,
14,15,22,24;217:8,8,9,
12,14,20,25;218:13,16,
21,24;219:5,7,20,25;
220:2,4;234:6
**Abrams' (1)**
131:5
**absent (3)**
95:12;155:5;158:14
**absolute (2)**
165:23;207:14
**absolutely (18)**
63:12;64:18;108:2;
131:18;132:10;133:3;
212:2;216:12,14;

242:9;254:13;260:5;
264:10;272:25;282:8;
303:5,7,13
**absorb (3)**
128:3;138:5;139:14
**abundantly (2)**
108:3;193:5
**accept (8)**
24:8;38:20;86:1;
99:8;137:12;171:21,
24;202:7
**accepted (1)**
285:1
**accepting (1)**
155:3
**access (2)**
40:24;209:19
**accommodate (1)**
306:14
**accomplish (2)**
111:5;223:21
**accomplished (1)**
111:3
**accord (1)**
275:3
**according (1)**
177:23
**account (4)**
222:6;244:3;262:11;
294:1
**accurate (1)**
268:23
**accurately (1)**
197:22
**achieve (4)**
111:6;224:2;290:4;
291:11
**achieved (5)**
111:7;222:3;290:1;
291:9,10
**achieves (2)**
105:23;110:13
**acknowledge (3)**
112:25;214:3;248:20
**acknowledged (2)**
223:17;289:16
**acknowledges (2)**
267:5;288:19
**acknowledging (1)**
99:10
**across (2)**
90:13;189:17
**act (3)**
216:10;254:8,8
**action (11)**
20:24;21:3;35:14;
37:10;47:15;50:11;
71:23;115:2;127:7;
129:5;227:3
**actions (3)**
81:23;98:5;131:24
**active (1)**
300:24

**acts (1)**
147:21
**actual (4)**
113:23,23;165:16;
267:3
**actually (36)**
12:15;23:21;29:23;
31:15,22;37:7;60:18;
77:8;88:11;100:8;
124:2;131:10;132:8;
156:8;161:16;186:14;
187:22;188:5,17;
189:12;190:3;191:13;
193:1;197:7;210:11;
211:12;218:2;225:14;
238:1;248:16;269:13;
271:8;275:25;280:17;
281:1;310:9
**ad (18)**
110:18;111:13;
112:21;121:15;123:20;
124:16;130:5,9,14;
155:25;160:22;177:16;
187:14;239:20;258:5;
276:3;278:18;291:6
**adamant (1)**
250:9
**add (7)**
68:16;121:10;130:9;
131:9;164:7;191:22;
265:25
**added (1)**
134:4
**addition (2)**
205:4;212:8
**additional (2)**
205:4;278:23
**address (34)**
9:21;10:11;12:8,13;
37:7;42:7;74:1;102:13,
13;103:23;104:16,17;
105:18;108:2;109:13,
23;110:1;111:12;
113:11,12;117:16;
119:6;128:13;137:1;
150:18;185:3,23;
187:7;211:13;221:9;
222:13;227:17;250:7;
294:3
**addressed (8)**
101:13;103:25;
111:10;131:8;148:4;
150:16;220:16;237:1
**addressing (1)**
122:25
**adequate (2)**
222:12;284:23
**adhere (2)**
131:5;255:25
**adjourn (1)**
135:20
**adjudicate (1)**
64:16

**adjudicated (2)**
65:10;69:14
**adjudicating (1)**
69:16
**adjudication (1)**
72:5
**administer (2)**
99:6,7
**administered (1)**
154:17
**administering (1)**
100:13
**administration (3)**
106:5;118:4;154:7
**administrative (1)**
152:9
**administratively (1)**
152:12
**admission (1)**
286:21
**advance (1)**
267:11
**advances (2)**
257:6;261:3;299:25
**advantage (2)**
178:23;296:23
**Adventist (12)**
121:14,21;126:25;
143:24;150:21;152:15,
22;153:12;163:3,20;
212:17;224:19
**adverse (8)**
71:3;188:14;229:25;
260:14,16,19,21;297:2
**advice (4)**
178:12,14,18;301:13
**advisedly (1)**
239:1
**advisement (2)**
259:14;293:14
**advises (1)**
238:7
**advisor (1)**
188:9
**advisors (1)**
217:17
**advocate (4)**
238:20;244:6;301:2,
3
**advocating (3)**
257:9;297:21;306:1
**affairs (1)**
89:11
**affected (5)**
69:16;153:9;165:16;
210:20,21
**affidavit (1)**
202:18
**affirmed (1)**
284:13
**afternoon (11)**
51:14;125:16,21;
128:14;136:13;156:9;

159:16;167:9;209:4;
221:7;303:18
**again (112)**
16:13;119:6,13;24:21;
25:14;31:11;33:21;
40:7;52:4;60:4,11;
65:21;67:18;71:4;73:2,
15;79:24;87:8;93:2;
104:21;105:10,16;
106:7;107:9,20;111:3,
4;112:1;113:11;
116:11,18;117:18;
118:25;119:20;126:18;
127:10,17;128:16;
130:22;136:6,13;
143:3;147:18;151:18;
153:17;155:4,23;
160:20;170:14;171:9;
172:11,20;173:12;
176:21;177:9;182:12;
185:15;187:11;191:7,
15;194:1;198:22;
199:8,22;200:14;
201:12;202:8,9;203:2,
8,25;205:7;207:19;
218:5,10;219:21;
220:11;222:18,18,18;
234:1;236:3,16;237:8,
21;238:10,16,24;
241:8;242:2,5;247:11;
255:25;256:23;260:4;
261:24;268:1;276:2;
277:22;279:14,14;
280:2;282:16,19;
284:7,10;294:18;
298:18;299:9,22;
303:21;307:16
**against (37)**
11:3,18,20;13:14,17;
14:25;16:5,6;19:14;
24:1;29:13;33:13,24;
36:15;42:17;53:2;
71:14;76:18;129:5;
140:10;193:24;196:9;
197:20,21;200:1;
212:14,15;232:1;
249:7,23,24;250:15,16;
252:8,16;282:4;299:8
**age (1)**
39:13
**agencies (12)**
53:23;127:17,22,24;
130:22;148:10;162:21;
164:6;180:25;214:19;
307:11,19
**agency (3)**
128:20;163:8;307:25
**agenda (2)**
155:14;250:6
**aggregate (2)**
220:14;224:19
**ago (18)**
12:22;20:20;32:14;

Min-U-Script®

Case: 19-30088    Doc# 5169    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 313
of 353

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(1) $5.95 - ago

131:14;167:23;185:8;
191:19;205:24;221:16;
228:8;232:4;239:19;
248:12;259:15;260:9;
262:21;276:5;300:2
**agonizing (1)**
135:10
**agree (37)**
16:15,17;19:12;33:7,
14;35:16;50:10;76:3;
92:4;98:14,16;100:4;
123:3;127:4;132:5;
139:12;145:10;158:22;
171:2;174:25;177:21;
185:4;197:10;206:20;
210:9,11;222:2;
225:13;228:21;240:21;
269:6,14;273:20;
277:18;296:12;308:13;
310:20
**agreeable (1)**
91:15
**agreed (37)**
9:9;10:17;24:8;26:3;
40:5,14,15;51:15;61:3;
73:14;104:10,10;
110:4,16;121:11;
125:12;132:15;159:3,
8;161:11,16,22;
169:22;170:19;172:18;
173:9;175:5;180:12,
13;185:19;189:23;
240:8,9;278:15;
291:12,17,18
**agreed-upon (1)**
182:5
**agreeing (5)**
11:16;12:4;14:25;
39:19;65:7
**agreement (40)**
8:13;9:21;16:10;
41:13;62:13;67:15;
72:12;78:5;92:3;
121:16,20,24;128:24;
146:7,10;147:5;
154:11,19;158:5;
161:18;189:6;213:7;
217:24;222:11;225:5;
226:1;229:19;231:21;
237:2;238:13;240:10;
241:4,5;243:5,10;
270:15;286:18;289:3,
13;295:15
**agreements (3)**
272:3,4;286:20
**agrees (1)**
117:24
**aground (1)**
236:24
**ahead (21)**
11:8;17:3;32:1;39:5;
57:16;68:16;72:3;
84:13;87:1;97:24;

102:25;108:15;121:12;
133:11;138:2,3;147:3;
211:3;214:15;215:20;
293:8
**air (1)**
13:2
**Akin (4)**
155:25;160:21;
187:14;276:3
**Alameda (1)**
86:25
**Alan (1)**
166:21
**albeit (1)**
180:18
**Alexander (32)**
17:15,16,19,19,22,
24;18:1,7,10,13,16,20,
22;21:10;22:16;24:17;
26:18;38:25;39:3,6,7,
12,22,24;40:1,4,8,10,
12;41:9;49:19;60:1
**Alexander's (3)**
16:23;17:7;33:8
**alive (4)**
148:6;179:11;197:2;
287:21
**allegations (1)**
69:2
**alleges (1)**
10:6
**allegiances (1)**
301:15
**all-in (1)**
230:14
**allocated (2)**
140:17,23
**allow (15)**
20:25;22:7;30:17;
97:17;132:16;148:2,
25;149:24;152:24;
170:9;184:25;199:1;
229:9;255:23;282:22
**allowance (12)**
33:4;127:15;147:13,
15;148:18;149:14,19,
21,22;152:19,24;
269:16
**allowed (13)**
19:13;31:14;32:20,
21,23;64:9;134:25;
149:1;194:4,10;196:5;
297:2;309:24
**allowing (4)**
135:7;149:4;165:10;
287:3
**allows (2)**
154:25;198:21
**alluded (3)**
190:21;288:18;298:4
**almost (7)**
135:5;253:10;269:6,
11,23;270:1;276:13

**alone (5)**
128:4;149:12;
216:24;217:1;224:12
**along (7)**
15:13;34:15;45:21,
23;81:21;222:21;
239:21
**Alsup's (1)**
250:10
**alternate (3)**
15:10;63:11;177:11
**alternative (8)**
87:11;97:18;99:17;
131:15;178:5;232:24;
246:23;255:24
**although (7)**
59:12;127:18;156:1;
190:15;202:5;206:10;
244:4
**always (2)**
65:23;239:25
**Amanda (2)**
243:16;253:9
**ambiguity (1)**
302:4
**amend (2)**
82:4;96:20
**amended (15)**
21:12;31:7,16;32:13;
52:1;94:22;108:1,20;
144:24,25;209:17,25,
25;212:7;265:13
**amendment (8)**
94:10;104:10,11;
108:23;110:5;145:2;
196:5;220:15
**amendments (1)**
97:16
**amends (1)**
304:14
**American (1)**
294:17
**among (15)**
100:25;105:20;
118:23;134:16;140:24;
142:6;145:20;151:17;
154:18,21;201:2;
288:21;289:11;291:11;
294:23
**amongst (1)**
210:18
**amount (22)**
11:7;34:11;87:22;
114:15;117:24,25,25;
118:6;134:25;137:25;
140:16;155:3;157:20;
158:24;192:12;209:6;
222:12,14;232:20;
245:11;256:14;292:15
**amounts (6)**
77:5;118:17;119:14;
132:5,7;274:23
**ample (3)**

16:25;17:9;151:8
**amplification (1)**
116:22
**amplify (2)**
120:11;287:2
**analysis (1)**
21:13
**analysts (1)**
245:13
**analyzed (3)**
26:21;233:17;287:18
**anathema (1)**
26:25
**anchor (1)**
202:13
**and-a-half-billion-dollar (1)**
277:13
**Anne (1)**
61:18
**announce (1)**
125:18
**announced (4)**
203:17;204:17;
260:4,10
**anomaly (2)**
210:6;242:2
**answered (4)**
155:14;207:8;
239:19;280:17
**anti- (1)**
167:25
**anticipate (3)**
34:24;167:12;290:18
**anticipating (1)**
290:19
**anticipation (1)**
207:2
**anticompetitive (1)**
277:2
**anti-competitive (1)**
212:9
**anti-insurance (1)**
59:18
**anxiety (1)**
244:23
**anymore (2)**
51:23;275:18
**anyplace (1)**
254:15
**apart (6)**
15:12;30:5;64:6;
133:12;286:16;289:25
**apologies (1)**
303:20
**apologize (5)**
29:10;155:18;161:4;
237:16;265:5
**apologized (1)**
182:13
**apparently (2)**
144:4;145:11
**appeal (1)**
36:18

**appeals (4)**
159:17;239:25,25;
240:1
**appear (5)**
34:21;156:4;165:11;
218:6;247:13
**appearance (3)**
9:13;35:11;165:2
**appeared (4)**
29:18;132:1;156:3;
165:5
**appearing (4)**
9:13;10:3;61:16;
143:5
**appears (2)**
220:16;238:4
**appellate (1)**
21:2
**apples (8)**
233:7,8,16,16,23,23;
279:17,17
**applicable (10)**
66:17;129:15;166:3;
174:14;179:3,14,17;
198:25;298:5,6
**application (1)**
128:12;231:7
**applies (1)**
235:5
**apply (2)**
96:16;231:8
**appointed (4)**
105:22;111:6;199:8;
291:7
**appointing (1)**
105:23
**appreciate (17)**
35:2;41:23;42:16,18;
50:4;75:7;134:14;
146:8;147:16;153:23;
165:10;215:21;220:4;
223:3;232:8;265:22;
302:22
**appreciation (2)**
143:18;264:21
**approach (2)**
65:9;197:10
**approaching (1)**
215:24
**appropriate (11)**
26:16;30:23;34:12;
67:6;94:11;102:4;
128:24;129:6;158:23;
291:19;297:5
**appropriately (1)**
141:17
**approval (15)**
114:1;116:16;
117:20;119:13;123:5;
130:2;153:8;154:16;
219:19;239:22;270:9,
16,17;271:1;283:17
**approve (77)**

Min-U-Script®

Case: 19-30088    Doc# 5169    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 314
of 353

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(2) agonizing - approve

94:14,21,24;97:24;
99:8;100:5,6;101:12;
103:25;104:19;115:12,
14;116:2,18;123:9;
124:1;128:24;129:23;
131:13;140:23;146:5;
148:12;153:11;158:2,
3;159:10,13;160:7;
161:20;162:1;167:25;
172:19;173:9;175:20;
176:24;179:10,22;
180:8,14;182:16;
183:19,23;190:17;
193:14,15,15,17;
196:25;199:3;203:21;
204:13,22;206:20;
207:21;210:7;213:7,9;
216:18;241:23;251:5,
16;258:14,24;259:6,
19;260:13,14;261:1,2;
272:15;282:2;283:5;
286:22;292:13,22;
293:11;305:13

**approved (29)**
15:24,24;16:1;
146:10;149:11;157:12;
159:17;176:5;177:18;
200:8;205:15,16;
218:22;220:1;241:6;
256:21;261:1,12;
262:13;265:25,25;
266:3;269:17;270:23;
275:10;284:23;287:3;
288:1;308:14

**approves (2)**
161:19;284:16

**approving (15)**
99:11;110:24;
119:13;153:16;172:9;
179:23;196:17,18;
206:6,7;215:15;248:4;
251:19;282:10;302:7

**approximately (2)**
38:16;187:17

**April (1)**
249:9

**arbitration (12)**
61:25;62:14,20,22;
63:25;66:16,24;67:4,9;
68:7;70:22,24

**arbitrator (2)**
62:15;71:10

**areas (1)**
138:2

**arena (1)**
101:16

**Arent (1)**
209:5

**arguable (1)**
157:9

**argue (10)**
16:19;30:21,21;
62:20;71:6,8;125:15;

**156:2;190:2;207:17**

**argued (7)**
73:6,7,10;108:1;
190:3;211:11;294:2

**argues (2)**
71:13;206:1

**arguing (4)**
50:19;73:12;90:1;
296:9

**argument (28)**
37:7,9;47:1;66:14,
14,23;70:17;74:17,19;
95:5;96:17;102:12;
107:22;126:4;129:2;
131:1;134:12;143:8;
162:9;166:4;186:3;
187:4;202:22;215:13;
253:2;282:14;283:6;
293:1

**arguments (17)**
9:23;10:12;23:7;
38:23;45:3,19;63:16;
158:13;209:10;212:1;
214:17;257:17;296:1;
298:16;299:8;301:1,1

**arise (2)**
67:15;259:10

**arising (1)**
307:25

**arms' (1)**
105:20

**around (18)**
11:3;13:21;101:10;
106:4;111:24;123:23;
136:10;184:17;225:20;
253:15;255:6;269:10;
278:2;284:9;285:14;
293:2;297:19;310:3

**arrived (1)**
137:21

**article (1)**
276:20

**articles (2)**
191:8;203:10

**articulate (1)**
302:8

**articulated (2)**
25:24;209:17

**articulating (1)**
61:11

**aside (16)**
18:8;36:15;69:2;
80:3;108:5;124:2;
159:17;169:14,19;
177:3;184:3;195:18;
232:17;239:24;240:22;
242:5

**aspect (2)**
132:18;148:3

**assert (3)**
79:21;111:14;291:2

**asserted (3)**
64:21;201:24;302:6

**asset (1)**
10:16

**assigned (3)**
10:17;227:3,17

**assignment (12)**
129:4;135:14;
169:13;171:9;186:10;
187:4;248:19,24;
249:22,24;251:9;252:3

**assignments (3)**
249:1,14;286:5

**assistance (1)**
106:11

**associated (3)**
110:21;219:22;
228:15

**Associates (1)**
9:16

**assume (12)**
15:20;21:11;25:20;
64:2;83:19;175:19;
195:3;239:21;254:10;
257:5;274:10;275:13

**assuming (2)**
53:25;57:3

**assumption (2)**
190:23;297:18

**assure (3)**
119:5;289:2;292:18

**assured (1)**
292:17

**Astelford (1)**
126:12

**asterisk (1)**
23:3

**Astleford (1)**
136:22

**attack (1)**
284:15

**attempt (2)**
84:18;259:6

**attempted (2)**
72:25;302:8

**attend (1)**
130:8

**attendance (1)**
134:14

**attendant (1)**
38:14

**attorney (4)**
51:14;126:11;
162:20;307:10

**attorneys (3)**
65:20;106:8;219:11

**attractive (2)**
193:2;236:21

**attributable (1)**
119:14

**audience (1)**
103:7

**August (1)**
22:9

**auspices (1)**

**105:21**

**authority (4)**
59:2;92:18,20;
149:23

**authorization (1)**
82:11

**authorized (1)**
30:14

**Auto (1)**
295:1

**autograph (1)**
120:23

**automatic (3)**
29:11;104:11;108:21

**automobile (1)**
33:22

**availability (1)**
223:9

**available (13)**
27:6;29:13;69:8,11;
73:19;86:4;201:11;
202:25;203:5;223:6,
20,20;256:21

**avoid (6)**
98:5;250:20;285:17;
306:6,11;309:17

**award (7)**
19:7;40:11;41:25;
108:18;231:2;244:19;
245:25

**aware (7)**
19:7;40:11;41:25;
108:18;231:2;244:19;
245:25

**away (28)**
13:21;19:2;61:4,7;
68:22;81:14;87:10;
90:7;105:13;108:21;
179:23;182:2;186:17;
189:11;191:2;197:11;
200:9;207:4;208:17;
240:5;256:8;259:12,
12;261:21,23;262:1,4;
268:17

**awful (2)**
57:7;146:5

---

**B**

**back (93)**
14:14,18;15:15;
23:25;25:14;41:7;
43:23;55:3;59:6,9;
66:15;71:23;73:18;
79:8;80:12,20;88:21;
101:17;116:1;119:7;
122:8;123:9,23;
129:22;148:5,12;
151:14;153:10;154:2;
159:13;160:11;161:20;
162:13;167:18;172:22;
174:8;179:21;180:6;
183:5;185:17;186:10;
187:1;190:6;191:9;
192:2;198:22;200:10;

**202:9;203:2,8,11;**
207:5;208:17;231:17;
232:12;236:19;238:23,
23;239:18;241:7;
244:8;246:21;249:9;
253:24;258:25;259:24;
262:6;266:4;268:24;
269:10;271:11;277:6;
284:16;286:23;287:16;
289:14;292:14,14;
295:1,11;296:13,25;
299:8,9;305:16,20,21,
23;307:5,15;308:20;
309:20;310:15

**background (4)**
10:11;11:25;96:2;
279:15

**backpedaling (1)**
225:16

**backstop (1)**
203:1

**backwards (1)**
300:1

**bad (17)**
26:25;58:10;99:2;
101:2;173:22;182:3;
190:7;233:3;242:3;
253:3,17;261:9,11;
284:18;296:7;298:9,13

**Baker (3)**
10:3;131:19;221:8

**balance (3)**
9:22;68:19;290:1

**ball (6)**
74:2;251:1;252:15;
257:6;261:3;297:16

**ballots (2)**
198:3;271:17

**bank (2)**
209:2,2

**bankruptcy (70)**
10:14;23:2,6;28:12,
15,20;32:5;37:1,22;
45:9,14,16,18;47:10,
10;48:15;54:22,23;
55:3,22;59:8,10,16,19;
60:9;64:14;65:23;66:1,
3,7;8:20;80:3;81:22;
82:4;85:13;88:16,25;
89:23,23;90:6;95:22;
97:16;98:5;99:6,11,14,
25;100:13;101:13;
105:8,22;106:11,11;
109:6;137:17;198:3;
223:7,20;229:6;
232:13;233:17;239:8,
9;243:24;245:18;
246:2,3;247:6;262:7;
294:18;295:9

**banks (2)**
168:14;199:24

**bar (2)**
96:13;226:22

Case: 19-30088    Doc# 5169    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 315
of 353

**Barata (1)**
135:18
**bargaining (4)**
62:13;63:11;67:15;
72:12
**barrel (1)**
188:23
**bars (1)**
81:23
**based (26)**
58:25;103:8;104:12;
140:9;155:1;199:9;
200:13;201:11;202:8;
204:16;209:13;213:3;
222:14;226:2;228:13;
229:8;230:25,25;
239:16;240:9;263:25;
264:1;265:15;277:3;
289:21,23
**basic (1)**
199:15
**basically (5)**
153:5;161:18;170:7;
268:1;279:22
**basis (6)**
63:10,11;105:6;
165:22,22;253:18
**battle (2)**
22:8;287:5
**battling (1)**
140:13
**Baupost (1)**
202:12
**bear (2)**
137:24;293:9
**beats (1)**
287:19
**beautiful (1)**
139:11
**become (1)**
258:16
**becomes (1)**
270:3
**beep (1)**
253:14
**begin (3)**
129:21;148:7;176:23
**beginning (4)**
198:18;199:14;
271:2,4
**begins (2)**
17:5;46:13
**begun (1)**
247:17
**behalf (24)**
9:16;10:3;35:6,7;
75:21;95:17;101:11;
121:13;124:16;131:19;
142:6;143:5;152:5;
155:25;160:21;164:6;
187:14;209:5;220:7,
12;221:8;226:7;
254:21;258:4

**behind (5)**
10:25;132:11;200:9;
241:15;268:4
**belief (7)**
94:10;221:23;
226:13;235:19,21;
251:20;285:15
**believes (6)**
30:23;145:24;189:7;
237:3,4;238:19
**bells (1)**
219:15
**belongs (1)**
170:12
**bench (4)**
89:8;156:7;189:18;
258:16
**beneficial (1)**
228:7
**beneficiaries (3)**
14:22;118:13,24
**benefit (6)**
23:11;30:6;170:4;
235:2;250:3;278:7
**benefits (7)**
10:12;68:21;210:2;
223:5;262:11;280:6;
291:23
**Bennett (45)**
207:13;236:17;
244:4;258:1;265:21;
266:15,16;267:14,20,
24;268:15,17;269:22,
25;270:7,18,21,24;
271:1,5,7,15,19;272:3,
7,9,13,16,18,20,22,25;
273:5,7,21,25;274:8,
10,12,14;277:17;
280:10;288:18;299:6;
300:13
**Benvenutti (47)**
75:24;76:1,5,9,12,
16;78:4;81:5;82:7,10,
17,19,21,24;83:1,4,20,
22;84:1,13,14,18;85:9,
15,18,21,25;86:18;
87:14;88:1,8;90:9,14,
24;91:7,11,17,20,24;
92:7,11,13,17;93:1,7,
11,21
**BERESTKA (48)**
75:14,20,20;77:6,11,
13,15,18,20;78:2,6,8,
11,13,23;79:9,11,15,
18,25;80:1,7,11,13,23;
81:11,13,16,18;82:1,6;
88:11,18;89:1,4,12,14,
16,19,25;90:4,20,22;
91:13,23;92:1;93:12,
18
**Berestka's (3)**
93:2,6,8
**besides (2)**

132:18;140:10
**best (39)**
54:10;65:14;106:8;
113:6;132:16;138:8;
139:8;143:22;171:12,
22;172:3,12;179:24;
180:4,15;181:10,12,13;
206:25;219:12;222:2;
226:9,13,13;228:24;
231:7;237:24;238:1,3;
245:8,15;246:14;
263:13;284:25;289:4;
300:7;309:15;310:6,13
**bet (1)**
31:19
**Beth (1)**
209:4
**bets (3)**
174:19;176:3;195:6
**better (29)**
33:14;65:25;67:2;
96:15;138:5;172:9;
180:23;184:6;185:2;
188:6;205:3;214:10;
219:8;241:15;242:19;
252:7,16;264:21;
279:6,6,7,8;280:15,20;
281:5,18;282:12;
300:6,25
**beyond (6)**
11:7;62:3;77:4;
132:3;215:17;250:21
**bifurcate (4)**
35:21;36:5,6,14
**big (14)**
36:21;85:2;100:1;
146:22;147:8,11;
148:10;186:7;195:14;
199:21;252:2;265:2;
266:23;306:11
**bigger (5)**
23:25;27:22;100:1;
173:10;259:3
**biggest (1)**
202:11
**Bill (2)**
13:1;18:18
**billion (45)**
10:16;27:1;112:25;
115:15,15;140:23;
143:24;157:17;158:6,
23;161:12;171:8,8;
187:17;188:10,16;
189:3,8;191:3,12,14;
201:11,16,22,24;202:1,
4,6;203:21;209:6;
212:17;219:4;245:11;
249:1;261:13;263:23;
268:10;278:21;279:20;
283:1;289:13,14;
292:16,18,20
**billion-dollar (3)**
130:24;157:10;

189:17
**billions (4)**
192:11,13,14;299:13
**bind (2)**
169:1;172:3
**binding (6)**
33:20;169:3;203:18;
207:25;208:3;295:12
**binds (1)**
177:8
**bit (7)**
10:25;11:25;48:25;
88:12;93:15,16;96:1;
108:7;159:16;198:23;
204:11;210:3,10;
245:20;258:6;265:5;
278:2
**Blackacre (3)**
267:21;297:5,6
**blanket (1)**
201:10
**blow (2)**
180:9,11
**blowing (1)**
190:23
**blows (1)**
268:21
**blue (1)**
198:6
**bluff (1)**
300:14
**board (4)**
90:13;199:9;216:18,
19
**board's (1)**
203:3
**body (1)**
65:25
**bog (1)**
86:14
**bogged (1)**
21:6
**BOKF (5)**
130:14;185:23;
186:2;208:22;209:5
**bond (18)**
123:20;227:15;
228:5,16;230:22,24;
231:16;237:6;238:14;
239:20;240:11,24;
241:3;249:21;251:10;
261:15;263:19;287:20
**bondholder (10)**
178:22;179:1,3,8,13,
14;190:6;221:23;
222:9;268:2
**bondholders (12)**
111:9;112:21;
169:23;173:13;177:16;
184:19;185:1;186:2;
253:12;273:12,12;
303:3
**bondholder's (2)**

176:5;178:5
**books (1)**
71:11
**bopping (1)**
253:15
**bore (1)**
294:12
**born (1)**
272:13
**both (48)**
24:20;40:20;53:22;
56:12;58:6;82:11;
104:24;109:10;110:22;
124:22;125:21;128:19;
132:14;137:13;170:13;
171:7;172:6;181:15;
185:23;190:11;194:4;
195:6,7;198:25;
208:18;221:4;233:2;
234:5;239:21,22;
242:6;251:10;258:7,
11,19;266:3;275:5,7;
282:2;285:1,25;286:3;
293:8,11,13;295:25;
306:25;307:2
**bottom (3)**
120:24;194:16;
246:16
**bought (1)**
84:22
**bound (3)**
25:22;238:13;276:23
**box (1)**
258:25
**bracket (1)**
145:19
**brand (1)**
73:16
**Bray (110)**
167:5,6,7,9,10,15,17,
20,22;168:6,10,23;
169:1,3,5,8,11;170:4,7,
17,20,23,25;171:2,16,
18,21;172:15,18,25;
173:2,7,10,17,21;
174:3,5,8,12,16,18,22,
25;175:5,9,16,19,24;
176:1,6,8,10,12,15,18,
19;177:1,3,7,11,14,17;
179:5,20;180:10,13;
181:3,12,21,23,25;
182:15,18,21,23;183:3,
7,17,23;184:1,4,7,9,12,
15,23,25;185:6,10,19;
186:9,12,20,22,25;
197:21;199:22;234:17;
242:4;250:6;253:20,
23;257:15;298:3
**Bray's (1)**
301:1
**breach (6)**
77:22;81:8,8;288:15;

Min-U-Script®

Case: 19-30088    Doc# 5169    eScribers, LLC | (973) 406-2250
Filed: 12/19/19    operations@escribers.net | www.escribers.net    Entered: 12/19/19 07:35:08    Page 316
of 353

(4) Barata - breach

296:9;297:8

**breached (3)**
81:10;85:10;90:8

**breaching (2)**
296:24;297:21

**bread (1)**
219:12

**break (23)**
8:24;82:9;93:23;
94:1,13;102:4;103:3;
126:5,7,17;130:8;
131:12;208:23;213:20;
214:4;220:10,22;
229:11;248:16,17;
253:8;264:19;296:21

**breaks (1)**
126:9

**breathing (1)**
13:2

**breeches (1)**
207:7

**brethren (1)**
249:25

**bridge (2)**
78:24;283:4

**brief (15)**
34:23;63:4;66:15;
71:20;74:1;126:2;
131:16,16;165:12;
214:15;243:2;266:16;
288:8;305:9;308:15

**briefed (3)**
85:22;201:4;308:10

**briefing (7)**
63:13,13;72:17,19;
89:24;305:6;309:17

**briefly (7)**
34:20;39:13;124:10;
137:3;154:10;193:3;
248:18

**brightest (2)**
181:10,13

**bring (11)**
67:16;72:25;95:20,
21;152:18;229:8;
245:23;250:15,16;
259:5;310:11

**brings (2)**
215:7;249:6

**broad (4)**
154:22;209:22;
210:2;282:21

**broader (1)**
99:10

**broke (1)**
264:19

**broken (2)**
264:16,17

**brough (1)**
114:21

**brought (10)**
117:19;119:12;
153:7;154:13;156:1;

188:5;218:25;292:11;
307:9,11

**BROWNSTEIN (25)**
209:4,4,8,9;210:5,9,
11,18,23;211:1,3,7,11,
15,17,23;212:2,4,22;
213:3,6,11,13,18,19

**Bruce (1)**
244:4

**brush (1)**
154:22

**bucket (1)**
201:11

**build (1)**
265:11

**building's (1)**
77:3

**built (2)**
270:4;297:19

**bunch (3)**
192:10;206:13;
294:13

**burden (7)**
36:22;37:2,5;42:16;
50:5;83:16;147:22

**burdened (1)**
59:21

**burdens (3)**
19:1;25:10,11

**burdensome (2)**
14:3;66:12

**burned (2)**
137:18;139:10

**burning (2)**
51:20,20

**burnt (1)**
51:21

**business (10)**
14:7;128:18;153:5;
217:2,4,5;222:24;
292:1,1,2

**busy (1)**
108:7

**Butte (2)**
219:6;309:1

**bye-bye (1)**
200:25

---

## C

**Cal (1)**
127:17

**calculated (2)**
118:18;220:15

**calculation (1)**
136:15

**calendar (11)**
8:21;9:2;74:20;
116:2;132:13;157:8;
159:4,12;304:16;
305:24;306:11

**calendared (1)**
306:19

**CALIFORNIA (26)**
8:1;62:9,12;68:23;
71:13;97:11;103:15;
128:15;129:8;137:4,8,
10;140:10;162:20,21;
223:6;229:1,5;230:2,
17;232:17;264:8;
279:7;307:10,25;
309:21

**Call (26)**
8:3;9:2;59:24;60:7;
64:13;67:22;74:12;
75:21;112:9,12;126:2;
130:23;146:22;162:13;
167:14;168:1;191:17;
199:1;238:22;253:23;
256:1;257:18;262:24;
269:3;300:13,22

**called (6)**
18:18;63:23;90:15;
269:2;291:12;293:2

**calling (1)**
161:7

**callous (1)**
137:13

**calls (1)**
157:24

**came (9)**
21:10;71:12;100:17;
184:20;188:19;221:15;
225:11;243:18;249:23

**Camp (8)**
21:20;27:2,5;28:20;
95:7;132:2;140:3;
143:5

**Campbell (1)**
137:7

**Campora (2)**
243:16;252:10

**Camporas (1)**
252:22

**Campos (1)**
64:19

**Campos's (1)**
71:2

**can (154)**
9:10;15:7,16;16:14;
17:8;19:1;20:20;22:10;
23:23;35:16;37:6;
41:16;44:16;46:5;47:2,
22,25;50:2,5;55:7;
59:8;66:22;71:15,16,
18;72:16,18;73:17;
74:2;75:17;76:13;81:9;
82:5;86:8;87:1,2;
91:13,16;92:4,22;
96:10;97:4;98:25;
103:24;105:3,4;110:7;
113:17;116:17,22;
117:16;118:10;121:10;
123:9;127:22;141:5,
19;148:24;149:1,13,
22;150:16,18;151:14,

23,24,24;154:5,23;
156:11;165:12,17;
170:12;177:8,16,18,18;
183:1,20;184:2,5,12;
189:11;190:4,9,10,20;
191:5;192:7;193:4;
194:24;196:6,6;
199:24;200:17;209:23;
212:15;214:18;218:3;
222:3,5;223:21;226:2,
13;231:8,18;234:9;
236:18;238:1,9,14,22;
244:9,10,12,13;246:2;
248:23;253:13,18;
255:2;259:5,6;262:15;
263:8;265:11,12;
272:15;275:22;276:18;
279:10;280:22;281:5,
23;282:5,8,21;283:3,6;
284:20;286:16;288:11;
289:1;292:18;295:15;
304:21;305:21;306:5,
6,14;307:8;308:23;
309:17,20

**candidate (1)**
281:6

**candle (2)**
51:20,20

**candle's (1)**
51:21

**candor (1)**
309:9

**Canyon (2)**
126:25;143:25

**capable (2)**
110:6;230:3

**capacity (2)**
35:7;217:11

**capital (2)**
192:12;209:20

**capped (1)**
201:16

**care (2)**
74:3;256:10

**careful (3)**
78:19;186:18;241:16

**carefully (1)**
161:1

**cares (1)**
263:8

**carried (2)**
225:1;295:2

**carrier (1)**
11:22

**carriers (1)**
40:15

**carrier's (1)**
37:24

**carry (2)**
131:5;174:2

**cart (2)**
80:13;150:13

**carve (1)**

242:5

**cascading (1)**
35:13

**case (111)**
10:14,16;11:23;
13:10;14:5,5;18:25;
22:2;23:6;26:4;36:10;
37:19;38:11;39:8;40:2,
21;41:2;42:11,11,22,
25;45:20;47:6;53:14;
58:11;65:18;68:5;
70:20;71:16;75:22;
79:20;82:13;83:9,10;
85:21;87:1,23;88:14;
89:12;90:10,24;98:6;
110:6;135:1,7;150:17;
152:1,8,20;153:4;
157:16;160:11;162:3;
164:4,20;175:7;
181:11;191:11;195:19;
198:3,16;199:10;
203:6;222:14,25,25;
223:2,20,25;228:23;
233:12,18;236:24;
242:12;244:24;249:15;
252:11,12,16;253:7,11;
256:10,15;260:16;
262:13;264:5;266:5,5;
267:5,25;268:4;269:5;
274:21,22,23;275:8;
276:15;284:13;288:23;
289:24;295:15,17,19,
21;296:18;297:13,17;
299:10;300:21;301:19;
306:1

**cases (36)**
29:18;33:22,22,23;
41:3;59:15;63:19;
96:10,15;104:22;
105:25;106:6,9;111:1;
113:7;133:18;199:14;
203:4,5;205:14;
243:18;249:18;260:17;
266:24;268:7,8;289:6;
291:13,20;292:6,11;
294:13,25;296:12;
300:17,18

**cash (22)**
14:1;27:4,9;142:7,
11;188:22,22;202:2,6;
222:12,14,17,19;
225:19;261:13,16;
278:6,7,8,8,9,10

**Casino's (1)**
295:19

**casual (1)**
59:12

**catastrophic (1)**
137:17

**categories (1)**
141:15

**caught (3)**
79:19,20;89:25

Min-U-Script®

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(5) breached - caught

Case: 19-30088    Doc# 5169    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 317
of 353

**causal (1)**
26:10
**causation (1)**
140:13
**cause (2)**
289:25;299:25
**caused (1)**
200:19
**causes (5)**
76:7;77:1;85:4;
129:4;227:3
**cautiously (1)**
226:25,25
**cavalier (1)**
59:12
**caveat (2)**
88:19;171:9
**CBA (6)**
68:3;69:15;72:4;
73:1,8,24
**CECIL (6)**
220:7,7,12,19,20
**Cecily (4)**
131:19;152:4;221:7;
265:23
**centralized (1)**
252:24
**cents (1)**
282:15
**certain (8)**
58:22;76:16;117:24,
25;197:16;269:14;
297:9,9
**certainly (22)**
37:5;48:20;58:7;
63:9;65:6;82:19,21;
104:1;122:19;123:1;
152:17;186:7;233:4;
244:14;245:2;257:11;
262:7;274:21;294:9;
297:24;298:7;299:6
**certainty (11)**
191:4;200:15;
205:12,20;233:13;
251:18;259:23;277:23;
278:16;290:4,5
**cetera (1)**
96:8
**chair (1)**
8:9
**Chairman (2)**
126:7,8
**challenge (3)**
130:19;231:10;
233:10
**challenges (3)**
99:21;136:6;247:13
**chance (6)**
40:16;84:12;128:3;
173:18;218:4;253:23
**chancers (1)**
186:17
**chances (1)**

301:11
**change (9)**
98:10;99:13;131:5;
144:24;187:7;194:19;
216:18;245:20;258:15
**changed (10)**
25:16;122:6;172:24;
173:1;184:18;201:8;
216:19;237:13;293:25;
300:8
**changes (6)**
96:13;121:17,18;
145:18;181:18;264:18
**changing (3)**
93:15;123:17;217:6
**channel (3)**
126:8;177:4;182:7
**channeled (1)**
14:5
**channeling (2)**
49:11,22
**channels (1)**
178:23
**Chapter (17)**
34:8,10;48:15;57:13;
105:24;110:9;150:16;
168:22;197:24;233:13;
245:4;259:11;264:5,9;
266:24;289:7;291:25
**characterizes (1)**
76:19
**charge (1)**
8:10
**check (2)**
132:6;232:23
**checked (1)**
181:22
**cherry (1)**
207:6
**chess (2)**
253:11;266:9
**chicken (14)**
180:7;185:16;
190:16;204:11;235:23,
24;236:4,6;244:10,11;
246:15,15;261:19;
262:3
**Chico (1)**
137:4
**chiseled (1)**
242:11
**choice (1)**
179:23
**choices (1)**
234:21
**choose (6)**
36:17,18;67:8;68:7;
299:18,19
**chooses (3)**
30:21;70:13;80:18
**chop (1)**
181:3
**chose (3)**

96:17;299:1,14
**chosen (2)**
265:16;301:17
**Christmas (1)**
302:15
**circle (1)**
102:17
**circles (1)**
284:9
**circling (1)**
14:14
**circuit (4)**
294:14,16,19,25
**circumstance (1)**
265:16
**circumstances (9)**
68:6;108:4;132:19;
155:1;157:14;222:3;
231:2;239:1,16
**circumvent (1)**
128:9
**citation (1)**
71:16
**citizens (1)**
103:15
**City (15)**
30:11;35:22;43:1;
45:4,19,25;84:22;
130:16,19;139:11;
214:3,12;220:5,8,13
**civil (2)**
39:7;164:6
**claim (60)**
22:14;25:8,9;31:8,
13,14;32:9,10,14,19,
20;53:2;64:5,7,10,19;
65:3,13;69:14,17;
70:15;72:6;76:14,17,
22;77:23;79:5;80:9;
89:6,9;97:17;118:1,2,
5;132:8;133:2;146:14,
16,19;147:22;148:25;
149:3,9,22,24;150:7;
155:7;158:15;161:18;
171:4;222:19;225:2;
226:1;232:21;261:13;
269:12,16;307:19,25;
309:24
**claimant (10)**
76:13;106:1;145:3,5,
8;153:3;155:6;198:3;
222:1;231:6
**claimants (91)**
10:6,8,23;11:1,3,12,
19;13:5,8,25;14:24;
16:5;19:15;21:23;22:8;
42:9;106:7,9,15,17,18;
108:3;110:8,12;112:3;
113:3,4;118:9;121:14;
123:2;124:16;126:12;
127:1;131:20;134:15,
16,20,22,23;135:4;
140:24;141:18;142:6;

143:22;144:1,3,4;
145:13;147:23,23;
148:2;149:8;152:5;
153:6;154:22,25;
165:15;188:10;197:16,
23;202:3;214:19;
221:9,14,20;222:3,20;
223:12,14,15,16;
224:16,17;225:1,7,8,
23;226:8;228:8;
233:25;237:25;241:1;
252:9;258:5;282:11,
18;289:22,23;292:2,6,
21
**claimants' (8)**
104:9;106:13,25;
111:18;113:2;132:15;
221:12;266:22
**claimant's (2)**
13:15;118:12
**claimholder (1)**
202:12
**claiming (1)**
274:22
**claims (118)**
10:17;12:5;15:11;
17:10;20:24;26:4;27:6,
11;32:3,4,4,5;33:1;
37:16,20,23;38:9;50:2;
53:4,5;62:5,18,19,21;
63:25;64:5;65:11;66:4;
67:16;68:4;70:13;
77:22,22;80:8;89:5;
97:18;110:10,11,24;
119:6;120:10;132:16;
134:25;140:3;143:24;
148:2,8,17,20;149:2,8,
9,19;151:5;152:8,10,
11,24;154:12;157:18;
158:24;161:11;162:21;
163:2,4,7,8;169:14;
171:7,10,18;179:5,16;
182:4;186:10;189:7;
201:12,25;206:17;
208:15;222:13;224:19,
20;226:6,11,18,20,24;
227:17;248:24;249:7,
14,22,24;250:14,16;
251:9;258:11,12;
277:6;278:7;286:22;
289:19;292:6,8,15,18;
299:13;305:7,25;
308:9,11,16;309:8,9,
11,11,15
**clarification (7)**
26:16;29:16;131:21;
167:10;265:23;303:2;
305:1
**clarified (3)**
22:16;41:13;131:21
**clarify (17)**
12:2;17:8;20:6;
23:24;29:8;83:5,13;

90:18;95:19;120:5;
142:1;197:1;221:11;
254:24;302:5;307:18;
308:6
**clarifying (2)**
18:23;100:15
**class (7)**
199:25;208:8;
233:10;280:20;281:16;
297:22;307:21
**class-action (1)**
198:4
**classes (13)**
104:22,25;105:1,11,
14;106:4;110:16,23;
266:23;288:21;289:20;
291:11;301:9
**classification (1)**
128:21
**clear (41)**
18:13;19:11;20:5;
24:14;26:22;29:10;
43:11;60:1;63:6;68:5;
75:6;96:3;99:17;104:7,
8,13;105:10;107:21;
108:3;110:25;150:19;
152:21;155:10;189:13;
193:5;203:10;238:13;
243:21;254:22;260:12;
261:16;271:6;272:8;
274:2;286:17;287:16;
288:2;289:3;292:12;
299:5;302:3
**clearly (7)**
47:3;64:20;240:4;
245:24;258:11;274:24;
294:17
**CLERK (5)**
8:4,8;9:2;136:12;
220:25
**clerks (1)**
304:4
**client (20)**
34:21;35:2;62:24;
64:4;66:23;67:22;
82:12;97:6;121:11;
143:1;148:6;171:14;
210:13,21,22;237:6;
252:11;285:7;301:3;
309:23
**clients (33)**
74:13;95:21;104:19;
116:19;136:7;137:12;
138:6;152:14,17,18;
177:12,14;195:24;
196:6;202:5;224:22;
231:20,22;236:18;
243:14;245:5;247:18;
259:23;260:14;265:2;
282:5;289:5,8;299:14;
300:4,8;301:14;310:8
**clients' (1)**
300:14

Case: 19-30088    Doc# 5169    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 318
of 353

**client's (10)**
32:19,20;33:1;90:24;
136:5;197:11;207:12;
252:1;280:14,23
**climate (4)**
99:13;100:6;218:10,
11
**clock (1)**
225:20
**close (5)**
40:3;236:23;275:12,
13,18
**closely (1)**
153:25
**closer (3)**
10:15;255:10;260:25
**closes (1)**
172:13
**closing (1)**
275:16
**closure (1)**
248:3
**cloth (1)**
73:16
**Cloverdale (1)**
137:18
**clue (3)**
95:4,9;100:24
**co- (1)**
193:23
**coalesced (1)**
106:4
**Coast (1)**
63:21
**coconut (2)**
227:20;228:1
**cocounsel (2)**
247:4;307:10
**co-counsel (2)**
92:9;162:20
**Code (4)**
90:7;105:8;109:7;
239:9
**coerced (1)**
295:22
**cognizant (2)**
223:11;241:24
**coin (2)**
297:14,15
**coincidence (1)**
188:3
**collateral (2)**
70:17;71:14
**colleague (4)**
137:1;183:20;
231:24;295:10
**colleagues (6)**
63:20;224:12;
229:23;264:12;282:3;
284:17
**collect (1)**
29:12
**collection (1)**

**47:14**
**collective (2)**
62:13;72:12
**colloquies (1)**
264:13
**colloquy (2)**
294:11;300:1
**combination (2)**
260:7;275:5
**combined (1)**
93:13
**comfort (1)**
247:21
**comforted (1)**
301:18
**coming (13)**
12:20;27:4;31:25;
35:2;58:5;75:9;80:21;
82:23;148:2;190:2;
227:16;228:14;288:20
**commenced (1)**
269:18
**commendable (1)**
86:20
**comment (10)**
68:18;147:17;161:4,
10;178:7;185:10;
186:10;256:9;280:10;
295:21
**commented (1)**
103:24
**comments (15)**
30:2;66:22;131:8;
137:2;141:4;147:17;
164:8;167:20;172:16;
220:3;224:10,17;
248:22;275:15;302:8
**commercial (1)**
275:4
**Commission (2)**
128:15;229:6
**commit (3)**
82:8;129:1;225:25
**commitment (3)**
126:5;239:3;271:8
**commitments (4)**
203:1;268:10;
270:12;283:2
**committee (62)**
9:16;10:4;13:4,15;
30:14,16;33:8,8,9,9;
34:7,12;35:6;39:9;
43:13;104:9;106:14,
25;111:8,14,18;113:2;
121:15;123:20;128:23;
129:3,10;130:5,14;
131:20;134:21;137:14;
139:8;152:5;156:1;
160:22;163:8;167:5,
11;187:15,17;217:10,
16;221:8,12;231:15;
234:12,15;238:19,19;
249:20,21;250:1,4;

**254:1;275:6;276:4;**
291:4;292:2,5;300:23,
24
**committees (1)**
151:18
**committee's (3)**
110:18;163:10;173:4
**common (2)**
250:23;264:13
**communicate (1)**
92:21
**communicates (2)**
204:7;284:21
**community (4)**
139:9,10
**companies (10)**
18:18;23:3;27:14;
125:12;138:1;168:14;
245:18;259:11;263:8,
10
**company (49)**
14:8,10;16:6;18:18,
25;19:2;22:7;23:1;
24:25;25:12;28:12,17;
33:13;50:10;52:13;
55:1;58:20;59:18;60:8;
129:7;137:12;138:9,
10,12;139:17;142:13,
20;169:21;187:18;
189:1;198:25;207:2,3;
250:19,23,24;252:1,5,
7;262:6;263:15,19,20;
265:17;283:11;285:17;
293:18;298:10;301:8
**company's (7)**
14:11,12;23:6;53:13;
169:17;202:14;250:8
**compared (3)**
126:14;137:25;201:9
**comparison (2)**
233:7,8
**compel (2)**
62:20;66:7
**compels (1)**
175:2
**compensate (1)**
217:18
**compensating (1)**
27:21
**compensation (2)**
41:7;165:8
**compete (2)**
279:16,16
**competing (11)**
110:14;160:2,2;
169:9;172:10;179:11;
183:14;187:19;221:17,
19;263:25
**competition (25)**
172:6;180:20;
189:14,15;190:7,24;
195:14;196:21;198:17,
18,18;209:11,12;

**218:25;219:22;234:23;**
256:12;263:18,18,20;
291:2,3,7,8,8
**competitive (14)**
167:25;168:1;
169:19;170:15;172:5;
173:11;181:14;198:17;
203:5;265:8;277:25;
278:9,11;280:5
**complain (4)**
111:12;151:25;
234:7;291:2
**complained (4)**
62:8;65:8;170:21;
195:25
**complaint (1)**
82:4
**complaints (1)**
297:25
**complete (2)**
38:10;309:9
**completed (1)**
289:7
**completely (7)**
65:1;157:8;159:4;
178:1;225:13;232:24;
273:15
**completion (1)**
21:1
**complex (9)**
27:22;42:23;56:16,
17,19;65:16;137:7;
222:3;273:1
**compliance (1)**
98:7
**compliant (18)**
96:4,10;101:7;104:2,
16;105:17;172:2;
192:20;237:7;238:8;
249:2;250:8;255:1,13;
256:16;258:16;279:5;
284:5
**complicate (1)**
90:17
**complicated (6)**
146:7;216:16;
219:14;222:25;272:14;
300:17
**complied (2)**
99:12;109:6
**complies (2)**
99:18;238:2
**complimentary (1)**
170:6
**comply (5)**
129:7;186:18;
221:23;229:14;291:22
**component (2)**
262:18;263:17
**components (1)**
142:7
**comprehensible (1)**
223:23

**comprehensive (5)**
105:24;110:13;
289:18;291:9;292:11
**compromise (3)**
134:18;135:11;290:3
**compromises (2)**
289:17;304:2
**compromising (1)**
291:24
**compulsory (3)**
76:4,11;79:4
**con (1)**
83:6
**concede (1)**
148:16
**conceded (1)**
26:10
**conceding (1)**
76:7
**conceivably (1)**
222:15
**concentrate (1)**
263:16
**concept (12)**
33:4,5;34:8;51:20;
60:6;67:12;133:10;
154:24;174:7;223:24;
295:1;298:7
**concepts (1)**
298:18
**conceptually (3)**
21:18,18;168:25
**concern (7)**
147:19;165:14;
167:20;216:1;218:8;
256:7,12
**concerned (6)**
96:3;125:17;167:13;
215:9;218:1,7
**concerning (1)**
268:19
**concerns (19)**
103:23;104:17,17;
105:18;109:12;110:1;
113:12;135:1;139:4;
144:22;149:7;182:9,
10;185:24;209:22;
215:22;216:25;225:10;
246:25
**concession (1)**
26:18
**concise (1)**
204:6
**conclude (1)**
60:14
**concluded (3)**
135:22;301:6;311:7
**concludes (1)**
175:20
**conclusion (5)**
59:6;98:6;113:7;
130:3;224:1
**conclusions (2)**

Min-U-Script®

Case: 19-30088    Doc# 5169    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 319
of 353

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(7) client's - conclusions

226:23;302:3

**concrete (1)**
  184:21
**concurrently (1)**
  115:14
**conditions (2)**
  85:11;267:2
**confer (11)**
  91:2,6,8,25;92:6;
  302:14;303:8;305:21;
  306:22;309:14;310:13
**conference (7)**
  51:14;164:13;
  204:19;276:15;277:4;
  286:13;287:22
**conferred (1)**
  300:23
**confidence (3)**
  104:14;181:4;247:25
**confidences (1)**
  236:10
**confident (2)**
  105:16;291:20
**confidential (1)**
  133:4
**confirm (22)**
  20:20;109:21;
  116:17;118:10;124:1;
  129:25;134:7;142:21;
  150:20;174:12,18;
  177:25;179:1;194:2;
  200:4;207:12;223:1;
  229:9;241:3;244:12;
  283:11,15
**confirmable (10)**
  101:7,18,20;105:16,
  17;175:6;210:1;
  212:25;228:25;239:8
**confirmation (37)**
  16:2;100:22;110:25;
  115:16;128:19;133:20;
  153:12;159:24;162:25;
  163:12;164:13;165:20;
  179:6;207:11;215:2,
  13;220:18;224:2,7;
  228:12;229:2;235:3;
  240:19;248:21;251:2;
  252:2;253:14;267:10,
  11,19;269:18;271:2;
  282:25;291:14;301:12,
  22;302:17
**confirmed (13)**
  49:5,19;103:18,24;
  109:5;149:12;238:9;
  239:24;267:16,17;
  278:18;284:8;291:22
**confirming (1)**
  280:13
**confirms (3)**
  24:6;25:1;138:11
**confused (1)**
  117:6
**confuses (1)**

15:7
**confusion (1)**
  107:19
**congestions (1)**
  306:11
**connection (1)**
  21:2
**consensual (4)**
  198:16;199:12;
  295:7,14
**consensus (3)**
  288:21;289:11;
  291:18
**consenting (5)**
  97:17;222:1;231:6;
  248:25;255:24
**consequence (5)**
  83:16;208:7;260:14,
  19,21
**consequences (6)**
  80:19;81:7;149:12;
  176:22;260:16;280:1
**consider (7)**
  67:6;119:3;135:11;
  137:15;141:14;144:23;
  276:10
**consideration (4)**
  220:15;222:21;
  249:1;291:17
**considerations (1)**
  222:22
**considered (5)**
  68:19;96:24;126:10;
  224:1;233:16
**considering (2)**
  128:7;232:1
**consistent (11)**
  21:17;28:19;34:3,5;
  116:16;203:3;207:2;
  226:5;238:20;243:13;
  295:20
**consistently (3)**
  98:4;226:8;241:13
**constituencies (3)**
  113:8;147:10;289:24
**constituency (5)**
  106:2;110:10;250:1,
  22;269:5
**constituents (6)**
  30:6;163:10;177:20;
  235:9;297:22;301:16
**constitute (2)**
  76:11;289:18
**constitutes (1)**
  118:1
**constraints (1)**
  223:8
**construct (1)**
  84:21
**constructive (3)**
  103:21;109:22;
  268:20
**consummated (1)**

177:8
**contemplate (3)**
  142:9;290:10,12
**contemplated (1)**
  134:5
**contemplates (1)**
  131:23
**contend (2)**
  148:15,16
**contest (3)**
  25:13;86:21;240:18
**contested (4)**
  68:25;224:7,8;235:3
**contesting (1)**
  64:25
**context (7)**
  157:5;158:25;159:1;
  162:10;191:22;255:4;
  267:10
**continuance (4)**
  30:16,21,22;89:24
**continue (20)**
  30:11;92:10,24;
  108:15;109:24;110:14;
  154:8;156:11;157:5;
  180:20;183:12,13;
  212:23,23;213:15,15;
  282:22;288:15;289:16;
  300:2
**continued (3)**
  20:8;96:14;268:11
**contract (34)**
  77:22,22,25;78:15,
  21;79:7,17;80:4,7,25;
  81:6,8,9,10;82:12;
  83:17,22,23;84:1,2,14;
  85:9,11,12;86:2,5,6,12;
  87:20;90:7;93:14;
  228:18,20;296:19
**contracts (2)**
  82:16;249:11
**contractual (1)**
  200:12
**contrary (2)**
  197:6;258:17
**contrasting (1)**
  168:18
**control (7)**
  44:10,13;183:24;
  194:19;293:3;298:9,11
**convenience (3)**
  126:6;213:21;214:5
**conventional (1)**
  275:2
**conversation (3)**
  140:4;300:4;310:8
**conversations (3)**
  103:22;192:25;233:6
**convey (1)**
  95:23
**conveyed (2)**
  96:19;100:9
**convince (3)**

87:14;235:8;282:11
**convinced (1)**
  104:7
**Convincing (3)**
  281:14,17;282:14
**co-op (2)**
  170:2,6
**cooperative (1)**
  255:7
**copies (1)**
  278:25
**coproponent (1)**
  303:4
**co-proponent (4)**
  187:18;193:22;
  208:14,20
**coproponents (1)**
  224:5
**copy (1)**
  276:5
**corner (1)**
  79:22
**corporate (9)**
  43:1;99:12;100:5;
  209:18;214:23;216:11,
  21;218:10;234:7
**Corporation (2)**
  8:8;60:8
**correctly (11)**
  97:25;108:22;
  118:10;123:25;133:19;
  149:5;162:18;181:9,9;
  263:13;299:3
**cost (1)**
  110:21
**COSTIN (59)**
  9:9;61:17,18,18,24;
  62:7,12,17;63:2,9,15;
  64:8,11,15,23,25;65:4,
  6,12,16,20;66:5,12,19,
  25;67:3,5,14,20,25;
  68:2,10,12,15,18;69:1,
  6,21,24;70:1,4,7,9,11,
  23,25;71:6,13,19,22;
  72:1,8;73:25;74:4,12,
  24;75:2,5,7
**costs (4)**
  27:15;43:25;51:8,11
**counsel (71)**
  9:8,12;20:19;33:7;
  39:7;43:12;47:10;
  48:16,21;49:18;50:24;
  52:17;58:25;59:14;
  60:5;70:21;75:11;77:5;
  84:12;91:2,6,8,25;92:6,
  14;100:15;102:6;
  103:10;109:11;121:15;
  126:16;127:2,13;
  128:13;132:15;149:16;
  150:17,20;151:5,11;
  166:13;167:10;168:15,
  15,19,19;173:4;
  178:12;185:22;186:4;

190:21;192:3;193:9;
  197:16;199:24;204:19;
  209:3;212:18;215:1;
  217:17;235:18;241:3;
  257:17;285:9,10;
  297:1;301:22;302:10;
  305:21;306:22;310:16
**counseled (1)**
  37:8
**counsels (1)**
  37:14
**counsel's (1)**
  172:16
**count (3)**
  42:24;168:12;258:14
**counterclaim (2)**
  76:4,11
**counterparty (1)**
  87:11
**counterpoint (1)**
  156:12
**counties (2)**
  137:6,10
**counting (1)**
  273:3
**country (2)**
  264:8;271:18
**Counts (2)**
  80:5;88:7
**county (5)**
  19:9;62:17;86:25;
  137:6;219:6
**couple (16)**
  78:13;90:2;98:24;
  123:19;143:16,16;
  167:23;192:8;221:16;
  231:3;254:24;259:15;
  288:14;293:14;294:3;
  305:10
**coupled (1)**
  91:5
**coupon (1)**
  198:6
**course (24)**
  15:4;17:12;33:1;
  55:5;75:18;77:3;83:7;
  108:18;113:11;115:17;
  119:1;129:18;136:19;
  160:24;166:1;192:15;
  204:5;236:17;259:17;
  261:15;264:2;269:13;
  303:5;305:18
**Court (1338)**
  8:3,4,6,9,14,16,18,
  19,21,23;9:6,11,23,24;
  10:1,10,20,22;11:4,10;
  12:2,7,10,14,18,20,23,
  25;13:20,23;14:14,20;
  15:1,6,16:3,7,10,20,24;
  17:2,4,7,11,12,17,21,
  23,25;18:4,8,11,15,17,
  21,23;19:5,9,17,19,24;
  20:2,4,7,10,13,16,20,

Min-U-Script®

Case: 19-30088   Doc# 5169   Filed 12/19/19   Entered: 12/19/19 07:35:08   Page 320
of 353

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(8) concrete - Court

24,25;21:3,4,17,23;
22:3,7,11,25;23:8,10,
15,17,21;24:6,11,13,
16;25:3,14;26:1,6,6;
27:7,10,16,20;28:3,5,
10,23;29:2,16,17;30:5,
15,19,21,24;31:1,9,11,
13,17,20,23;32:7,16,
18,21,23,25;33:3,6,15,
17,19;34:3,9,14,18,21,
23;35:2,5,10,14,19,24;
36:4,7,12,14,17,25;
37:5,10;38:3,6,17,25;
39:4,11,21,23,25;40:3,
7,9,11;41:9,16,19,25;
42:2,4,8,11,24;43:4,6,
23,24;44:4,6,11,12,13,
17,18,19,21,25;45:3,7,
8,13,22,24;46:3,10,12,
16,19,25;47:7,9,14,18,
22,24;48:4,9,12,17,20,
25;49:3,8,12,14,17,22;
50:8,13,15,18,20,23;
51:3,5,7,10,13,18,25;
52:7,14,16,21,23;53:8,
10,12,15,18,21;54:7,9,
13,18,22,24;55:7,9,12,
14,17,19,21,24;56:1,3,
5,10,15,18,22,24,25;
57:2,2,4,6,10,13,16,19,
21,25;58:2;59:4,10,21;
60:3,24;61:2,4,7,10,14,
16,20,25;62:11,15,18,
21,23,25;63:3,9,14,15,
17;64:7,9,12,15,22,24;
65:2,5,10,14,15,19,21,
22,23,25;66:4,10,14,
21;67:1,4,6,11,17,21;
68:1,6,8,9,11,13,16,24;
69:2,9,17,19,23,25;
70:2,5,8,10,20,21,24;
71:3,8,16,16,18,20,23,
25;72:6,7,9,14,22;73:2,
5,9,11,25;74:2,5,10,18,
22;75:1,4,6,8,15,18,23,
24;76:2,6,10,15,17,21;
77:10,12,13,14,16,19,
24;78:3,7,10,12,17;
79:1,10,14,16,20,24;
80:2,5,9,12,17,24;81:2,
4,12,14,17,22,24;82:2,
4,7,15,18,20,22,25;
83:2,18,21,25;84:5,8,
10,11,17;85:8,14,17,
20,23;86:13,17,19,24;
87:5,9;88:3,9,13,15,20,
22,23;89:2,7,10,13,15,
18,19,21,23,23;90:4,
12,18,21,23;91:3,9,13,
14,18,21;92:2,4,8,9,12,
16,18,21,22;93:3,8,12,
19,22;94:1,6,16,18,20,
23,25;95:3,8,11,20,22,

24;96:5,25;97:10,16;
98:8,12,14,16,19,22;
99:4,20;100:4,14,18;
101:5,9,22;102:15,22,
25;103:4,6,13;104:4,
24;105:3,5,9,12;
106:19,22;107:1,4,7,
12,17;108:1,5,11,17,
22;109:2,4,10,14,19;
110:19,23;111:21,24;
112:7,11,13,19;113:16,
18;114:7,10,13,17,20,
21,23;115:5,10,12,17,
20,23,24;116:5,8,10,
23;117:3,13,18,19,21,
23;118:5,7,15,20,22;
119:2,7,10,12,13,16,19,
23,25;120:2,7,12,13,
14,19,22;121:4,8,19,
23;122:5,10,21,23;
123:5,6,8,11,13,25;
124:6,9,11,13,19,23,
25;125:3,5,7,11,17,24;
130:17,25;131:25;
132:4,21,22,23;133:1,
4,7,15,17,19,23,25;
134:2,6,7,9;135:9,11,
13,15;136:13,21,25;
137:3;138:10,11,15,17,
19,23,25;139:2,12,19;
140:1,4,7,18,20,22;
141:3,7,9,12,20,25;
142:3,12,16,19,23,25;
143:3,10,12;144:6,9,
11,14,17,22;145:15,21,
23;146:3,13,16,18,22,
24;147:2,12;148:5,15,
22,24,24;149:10,23;
150:1,3,12,22;151:3,7,
10,21,23;152:2,13;
153:8,14;154:1,5,8,11,
13,15;155:9,12,13,17,
20,22,24;156:15,17,22,
24;157:2,19,22;158:2,
3,8,11,16,18,20;
159:12,15,21,23;160:1,
6,10,13,15;161:2,7,19,
23,25;162:7,11,13,17,
23;163:14,18,21,24;
164:1,11,15,24;165:1,
7,9,17,25;166:6,8,10,
12,17;167:1,4,8,12,16,
18,21,24;168:5,7,11,
24;169:2,4,6,10;170:3,
5,16,18,21,24;171:1,5,
14,17,20;172:13,16,19;
173:1,3,8,16,20,22;
174:4,6,11,15,17,21,
23;175:1,6,15,17,20,
23,25;176:4,7,9,11,13,
17,19;177:2,6,9,14,16,
22;178:2,4,10,13,16;
179:4,18;180:1,2,6,12;

181:2,4,20,22,24;
182:12,16,19,22,24;
183:4,16,18,24;184:2,
5,8,11,13,16,24;185:5,
7,14,20;186:11,16,21,
24;187:1,5,9,20;188:2,
13,16,20,24;189:2,19;
190:1;191:15,25;
192:4,7,15,21,24;
193:4,8,13,18,20,23;
194:8,10,14,22,25;
195:2,7,21,23;196:4,
14,22,24;197:5,8,19;
198:1,5,9,11,13,20;
199:2,6,18,20;200:3,6,
11,17,20,24;201:5,15;
202:20,22,24;203:13,
14;204:2,5,9,15;205:1,
5,10,22,24;206:4,16,
22;207:8,11,20,23,25;
208:3,10,16,21;209:1,
8;210:3,6,10,12,21,25;
211:2,4,8,14,16,22,24;
212:3,13;213:2,5,7,12,
18,20,24;214:8,11,14,
17,22,25;215:8,12,15,
20;216:6,10,13,15,23;
217:8,10,13,15,21;
218:8,9,15,20,23;
219:4,6,18,24;220:2,5,
9,19,21;221:1,6,9,15;
222:17;223:16,17;
225:21;226:15,20,21;
227:5,8,10,13,18,21,
25;228:3,4;229:2,4,9,
15,17,20,22;230:8,10,
23;231:9,20,22,24;
232:5,7,12;233:19,24;
234:1,15,20;235:5,11,
13,15,17,23;236:1,3,5,
8,10,15;237:8,10,12,
15,18,20;238:15,18;
239:5,7,11,18;240:11,
14,17,21;241:9,11,15,
22,25;242:14,16,21,25;
243:7,9,12,15,22,25;
244:14;245:2,17,20,23;
246:2,5,8,10,12,18,21,
23;247:10,18;248:5,7,
13;249:3,10,12;250:5,
10,16;251:5,12,16,23,
25;252:18;253:1,5,16,
22;254:2,6,12,14,17;
255:14,17,20,23,23;
256:3,23;257:1,3,5,23,
25;258:10,22,23;259:1,
12,22;260:3,20,22,24;
261:6,8,11,14,23;
262:1,16,19,21,25;
263:2,11,24;264:4,7,
12;265:19,21;266:7,9,
11,15;267:13,15,21;
268:14,16;269:20,23;

270:6,14,19,22,25;
271:4,6,11,16,24;
272:6,8,13,17,19,21,
24;273:1,6,17,20,23;
274:1,5,8,12;275:11,
17,22,24;276:1,9,12,
20,23;277:8,10,16,20;
278:4,23;279:1,11,13,
25;280:7,9,19;281:2,4,
9,12,14,16,20,23,25;
282:7,9,14,20;283:3,6,
13,15;284:4,7,9;285:5,
14,20,22,24;286:3,7,9;
287:9,11,13,15;288:4,
9,11,20;290:14,17,20,
22,25;292:23;295:9,
10;303:1,5,7,10,13,16,
19,21,23;304:1,4,7,13,
25;305:5,8,12,15,17,
19,23;306:4,9,14,16,
21,23,25;307:2,4,8,13,
17,23;308:17,19;309:4,
7,12,19,21;310:7,15,
22;311:1,3

courtroom (13)
46:7;134:13;156:3;
157:15,16;160:23;
189:5,6;248:10;
269:10;288:19;299:14,
23

courts (3)
33:25;59:16;294:19

Court's (9)
35:13;66:20;75:7;
99:11;133:21;135:1;
154:20;160:8;258:8

cover (4)
17:9;38:15;57:21;
226:17

coverage (1)
55:17

covered (4)
27:2;143:13;146:20;
246:11

CPUC (9)
104:3,6;105:18;
113:12;128:20;166:18,
19;250:20;268:19

CPUC's (5)
104:17;128:17;
182:10;259:9;283:4

craft (1)
60:5

cramdown (2)
206:1;208:1

crank (1)
232:22

Cravath (3)
157:1;303:22;308:24

crazy (1)
88:25

created (1)
265:18

creates (2)
88:12;217:18

creating (2)
73:15;127:9

creation (2)
144:20;145:1

credible (1)
268:3

credit (3)
40:5;107:13;234:4

creditor (8)
211:19;221:20;
224:4,5,7;233:22;
234:25;267:22

creditors (22)
106:9;107:23;
128:22;129:3,10;
167:11;171:23;172:4,
8;180:16;189:11;
195:20;206:15;211:23;
212:16;231:16;233:9;
249:20;267:3,7;279:7;
280:11

creditors' (8)
111:8;167:5;234:12,
15;249:20;250:1;
254:1;291:4

criminal (1)
41:1

critical (12)
17:25;100:21;
120:15;132:12;136:8;
177:19;196:7;200:14;
259:5;262:17;284:22;
292:10

criticizing (2)
100:14;224:4

cross (2)
78:24;273:3

cross-complaint (3)
79:4,23;89:17

crossroads (1)
292:10

crowd (1)
230:11

cudgel (1)
205:18

cues (1)
228:23

culpable (1)
27:21

culprit (1)
120:25

CUPC (1)
283:19

curative (1)
100:6

current (7)
52:9;89:10;116:1;
123:6;172:1;221:21,23

currently (5)
48:14;49:10;96:3;
116:6;254:25

Min-U-Script®
Case: 19-30088    Doc# 5169    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 321
of 353

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(9) courtroom - currently

**cut (4)**
39:1;131:16;214:2;
245:9
**cutting (2)**
146:6;173:10

# D

**daily (1)**
13:4
**damage (13)**
144:1,3;145:8,13;
146:16,18,19;148:1;
205:17,21;224:19;
232:21;307:25
**damaged (1)**
77:4
**damages (10)**
13:14;36:24;64:17;
69:9,10;80:9;132:20;
133:13;224:18;226:9
**dance (1)**
199:15
**danger (1)**
70:12
**Dario (2)**
142:5;243:17
**Dario's (1)**
253:9
**data (1)**
226:23
**date (17)**
14:13;22:20;25:15;
30:23;35:15,18;36:1,2;
37:16;69:13;90:2;93:2;
222:13;223:2;226:22;
248:3;282:24
**daughter (2)**
12:22;39:12
**Davey (11)**
249:18,19,21,23,24;
250:4,13;251:2;254:5,
6,10
**Davey's (1)**
252:12
**day (32)**
10:14,25;11:14;
25:17;38:15;41:1;
59:10,21;96:19;
100:10;104:2,5,6;
130:25;140:24;144:19;
148:9;155:12;159:2;
181:18;182:1;211:15;
234:16;247:11;248:11;
249:11;283:20;300:8;
302:21;306:10;308:5;
311:4
**days (17)**
15:18;32:13;38:15;
58:19;74:3;126:3;
131:14;159:6;175:3;
181:19;238:6;260:8;
270:17;273:10;293:24;

298:15,20
**DE (9)**
141:24;142:1,5,5,15,
17,22,24;243:17
**deadline (9)**
79:6;88:4;106:6;
111:1;114:8;231:5;
270:7,8;292:20
**deadlines (3)**
114:7;260:8;304:16
**deadline's (1)**
79:5
**deal (63)**
12:11,12;23:1;27:8,
13;28:23,24;61:9;85:2,
5;92:19;98:25;100:15;
101:1;109:16;128:13;
129:25;139:5;149:14;
162:5,5;165:18;
172:20;179:22;186:17;
190:24;199:21;203:21;
205:25;206:10;214:18;
232:10;238:24;240:1;
241:6,14;242:7;244:8,
11,20;245:6,8,17;
246:14;247:22,23,24;
261:18,21,23;262:4;
263:7,13,14,23;266:8;
280:15,20;286:16;
290:4,6;310:3,6
**dealing (10)**
44:24;52:11,12;54:9;
58:23;128:3;163:22;
168:17,20;277:22
**deals (2)**
146:14;274:18
**dealt (9)**
22:22;54:19;63:6;
99:15;103:16;118:2;
126:15;167:15;215:1
**death (1)**
95:7
**debate (1)**
281:5
**debated (1)**
222:18
**debates (1)**
129:22
**debating (2)**
22:13;54:10
**debt (3)**
187:17;189:1,3
**debtor (102)**
10:18;11:19;18:6,19;
19:10;24:6;26:24;27:9,
9,21;28:1;29:2;30:2;
32:9;39:2;41:3;43:2;
44:23;46:23;47:5,9;
50:3;53:2;54:3;64:10;
65:2;68:13;74:13,13;
76:7,13,18,24;77:1,24;
78:18;79:7;80:18,18,
25;83:14,16;90:6;93:3;

94:9;98:4;101:6;103:8;
104:21;121:17;132:14;
135:1;139:5;141:9;
144:1;148:10;151:18;
152:7;170:2,8;171:12;
173:18;177:6;178:24;
180:11;183:1;186:16;
191:9;196:9;209:15,
19;222:14;224:14;
225:5;228:9,11;230:2;
231:17;233:14,22;
235:1,18;238:7;
239:13,21;251:4;
258:3;265:7,8;267:21;
280:4,4;288:17,18,19,
20;296:10;297:4,5,7,
20;301:18
**debtor/TCC (1)**
197:10
**debtors (58)**
10:9;15:10;26:3;
29:13;41:22;52:10;
54:15;56:21;72:11;
93:4;105:25;108:24;
109:25;110:5,10;
133:8;134:16;143:21;
148:16;152:25;156:8;
173:25;185:4;188:5;
192:10,11;195:9;
196:19;197:19;199:13;
200:8;201:10;205:14,
15;208:23;211:19,21;
222:8,19;228:14,18;
229:10,12;233:8;
235:22;240:7;241:4;
261:20;270:16;271:8;
288:7,15;289:7;
296:13,16;297:1,18;
299:1
**debtors' (23)**
29:6;76:25;123:1;
128:17;149:7,16;
221:22;229:8,17,24;
230:17,24;236:24;
238:3,21;251:11;
255:9;257:17;285:9;
291:21;292:1,9;297:20
**debtor's (27)**
51:7;59:13;103:19;
104:14,15,15;105:15;
106:4;110:17;111:15;
113:5;161:10;174:13;
175:21;184:19;186:17;
188:11;190:22;194:12;
195:24;204:19;205:3;
211:1;214:2;279:3;
280:13;282:1
**debtor-shareholder (1)**
177:4
**debtor-sponsored (1)**
224:3
**DECEMBER (7)**
8:1;49:1;89:14;

92:11;195:12;238:23;
284:2
**decide (10)**
35:20;36:13;46:19;
86:24;123:8;174:16;
204:21;206:8;245:6;
277:1
**decided (2)**
13:15;301:23
**deciding (2)**
162:25;203:20
**decision (47)**
13:11;24:18;26:9,11,
13,14;27:23;31:2;
38:22;45:11,15;46:4,5;
59:4;62:16;63:7;70:7,
11;96:20,21;111:19;
135:8;146:4;162:10;
172:23;197:2;203:17;
204:16;219:14;222:7;
255:5;256:13;258:13;
264:24;274:7;276:9,
17,20,25;278:19;
289:9;291:16;295:10,
22,23,23;298:16
**decisions (10)**
14:12;177:14;
185:15;274:17;294:15,
16,16;295:12;300:6,10
**declaration (4)**
16:23;64:20;71:2;
202:18
**decline (1)**
36:7
**deductible (13)**
11:6;15:22;23:7,8,
14;24:8;33:11;50:25;
51:2;60:12,13,21,22
**deductibles (3)**
18:8;23:4;24:21
**deem (2)**
97:18,20
**deemed (8)**
20:25;31:14;32:3,21,
23;33:4;64:9;309:24
**deeply (1)**
133:12
**deep-pocket (2)**
46:6,6
**defangs (1)**
172:10
**defeat (1)**
66:22
**defend (6)**
14:4;53:14;54:25;
77:14;254:7,10
**defendant (8)**
45:7;46:6,6;47:5;
77:11,12;87:3;249:17
**defendants (9)**
31:4;36:15;40:5,20,
21;42:18,22;47:3;
75:22

**defended (1)**
32:10
**defending (1)**
53:12
**defense (5)**
27:15;43:25;51:7;
75:25;78:22
**defer (3)**
16:13;162:8;235:18
**deference (1)**
128:17
**deferred (1)**
35:22
**defining (1)**
299:3
**definition (1)**
11:6
**definitional (1)**
113:25
**definitions (1)**
116:12
**defy (1)**
99:5
**defying (1)**
99:9
**Delaware (1)**
294:22,23
**delay (6)**
22:9;86:14;90:1;
212:1;278:16;304:21
**delayed (2)**
86:15;239:24
**demand (6)**
11:13,14;14:24;
16:18;18:25;189:22
**demanding (1)**
230:4
**demands (1)**
110:6
**demonstrate (1)**
63:15
**denied (2)**
25:15;35:25
**Dennis (1)**
8:5
**deny (16)**
25:19;26:7;31:1,6;
35:19;36:13;47:24;
63:10;64:2;69:19;
73:23;80:2;87:15;88:6;
130:2;211:5
**denying (1)**
217:16
**depart (2)**
26:19;185:8
**Department (1)**
164:5
**dependent (2)**
178:11;271:9
**dependents (1)**
38:11
**depending (3)**
59:3;130:17;183:7

Case: 19-30088    Doc# 5169    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 322
of 353

**depends (1)**
200:19
**deposited (1)**
225:18
**deposition (1)**
251:2
**depositions (1)**
66:8
**describe (1)**
272:10
**described (7)**
28:19;54:20;154:10;
228:10;251:7;272:23;
273:2
**describes (1)**
154:12
**deserving (1)**
291:16
**designed (3)**
270:10;271:22;272:9
**desire (1)**
155:6
**desires (1)**
136:17
**destroy (1)**
190:7
**detail (2)**
32:12;209:17
**detailed (1)**
102:15
**details (3)**
10:20;297:23;304:8
**determination (7)**
66:4;104:20,22;
113:5;114:22;115:22;
142:19
**determine (5)**
62:25;63:1,3;107:23;
256:15
**determined (1)**
267:10
**determines (1)**
149:8
**deterrent (1)**
293:2
**detrimental (1)**
215:16
**devastating (2)**
58:10;299:18
**develop (1)**
101:7
**developed (1)**
96:10
**development (3)**
15:18;58:20;95:5
**develops (1)**
237:5
**devices (2)**
62:8;65:8
**dialogue (2)**
109:22;112:14
**dice (2)**
180:9;301:17

**dicing (1)**
146:6
**dictate (4)**
68:6;7;158:24;194:6
**died (1)**
39:14
**difference (6)**
48:2;232:18,23;
263:8;265:2;294:23
**different (39)**
19:11;22:12,13,13;
26:9,17;28:11;40:12;
41:2;42:20,22;49:25;
50:15;52:16;69:17;
86:22;97:2;106:23;
126:13;135:24;140:10;
141:14;168:11,14,24;
182:1,23,24,25;193:11;
197:9;217:6;222:6;
240:2;259:4;264:15;
279:17,18;304:10
**differently (5)**
19:22;81:3;126:20,
21;241:21
**difficult (12)**
26:12;69:22;134:17;
140:14;146:5;152:22;
198:23;224:6;225:4;
241:18;244:2;273:1
**dig (2)**
65:18;219:11
**dilemma (4)**
83:24;90:5;97:1;
152:3
**diligent (1)**
223:3
**diluted (1)**
201:3
**direction (6)**
82:11;218:7,17,18,
19;220:1
**directional (1)**
218:13
**directly (3)**
165:15;247:9;298:6
**disadvantage (1)**
37:11
**disagree (6)**
15:1;27:16;122:24;
167:17;273:8;278:20
**disagreements (1)**
244:4
**disagrees (1)**
192:18
**disallow (1)**
148:18
**disappears (1)**
196:20
**disapproval (1)**
103:10
**disapprove (7)**
136:7;139:2,5,20;
182:14,25;217:23

**disapproving (1)**
284:13
**disclose (1)**
117:8
**disclosure (21)**
114:11;143:6;
149:11;151:8;175:13,
21;176:7;177:18;
179:7;197:12;219:15,
19;229:4;239:21;
269:17;270:17,22;
282:1,3;284:13,24
**discount (2)**
178:18;299:7
**discovering (1)**
84:15
**discovery (10)**
16:9;37:19;38:10;
43:18;57:12;65:17;
66:7;67:10;70:15;
268:12
**discrete (2)**
113:20;196:1
**discretion (1)**
59:24
**discuss (3)**
123:10;127:13;310:5
**discussed (1)**
219:2
**discussing (1)**
157:5
**discussion (6)**
38:21;55:4;107:21;
214:22;271:14;275:18
**discussions (15)**
109:23;112:18;
117:7;120:10;121:15;
152:25;153:2;163:15;
202:11;224:13;225:4;
245:5;247:17;269:1;
274:21
**disenfranchise (1)**
152:14
**disenfranchised (1)**
147:20
**dishonest (1)**
58:17
**disingenuous (3)**
169:24;170:1;208:19
**displaced (1)**
139:14
**disposed (1)**
165:13
**disposition (2)**
86:13;108:6
**dispositive (2)**
71:4,7
**dispute (12)**
11:11;22:5,6;37:17;
85:7,10,12;86:12;
106:14;117:1;169:13;
171:11
**disputed (6)**

149:2,9,9,25;152:8;
305:25
**disputes (5)**
22:1;154:6;169:12;
185:15;209:16
**disregard (1)**
196:16
**diss (1)**
243:9
**distinguish (1)**
77:21
**distress (1)**
69:10
**distributed (2)**
225:15,16
**distribution (3)**
84:24;96:23;119:5
**distributions (4)**
10:16;106:8;113:7;
225:19
**district (7)**
20:24;21:3;29:25;
134:2,2;276:21;295:9
**Division (1)**
164:6
**doable (1)**
101:1
**docket (8)**
20:21;45:5;94:8;
162:22;204:8;277:21,
21;304:1
**Doctrine (1)**
201:4
**document (15)**
40:24;97:12;120:7;
133:19;151:19;154:14;
174:9;175:9;269:14;
272:4,10,11,14;286:23;
287:24
**documentation (2)**
145:1;147:10
**documented (3)**
117:17;119:1;287:18
**documents (10)**
14:4,7;25:13;40:22,
23;43:19;53:14;56:14;
295:25;304:14
**dollar (12)**
15:2,4,4;56:7;
119:14;180:3;200:21;
201:11,23;249:3;
261:13;278:21
**dollars (45)**
23:23;24:1;26:22;
27:2;38:16;43:15,21,
25;46:24;54:5,11;
59:13;112:25;133:2;
143:25;152:11;157:17;
158:6,23;171:8,8;
187:17;188:10;189:3,
8;191:3,12,14;192:11,
13,14;201:24;202:1,5,
6;209:7;212:17;

245:11;279:20;282:15;
283:2;289:14;292:16,
18,20
**dollars' (2)**
143:24;299:13
**Domato's (1)**
57:2
**Donato (7)**
8:25;110:22;122:16,
17,23;123:9;134:4;
156:4,5,6,14,20;157:4,
13,18;159:3,12,14;
160:4,11,24;161:2,21;
162:4;182:1;183:8,10;
189:5,6;191:11,19;
203:12;204:4,6,9,12,
17;206:10;207:5,16,19,
20;236:19;240:23;
262:22;263:1,1,3;
275:23,24;277:4,11;
286:10,14;287:4;
289:21;308:12
**Donato's (8)**
8:23;95:8;102:5;
135:15,22;161:3,10;
276:6
**done (41)**
13:8;48:15;54:8;
67:22;80:8;83:10;
95:14;123:15;135:6;
137:14;145:11;151:15;
160:4;162:4,5;164:19;
169:21;181:13;189:10;
192:2;199:4;203:22;
206:13;215:24;223:2,
9;225:24;226:12;
228:8;241:14,21;
242:7,8;251:18;
254:10;263:5;265:8;
270:9;282:18;291:20;
296:11
**Donna (2)**
12:22;39:12
**door (6)**
167:18;188:18;
258:17,18,18;301:1
**double (2)**
70:18;283:25
**doubt (14)**
28:15;29:19;48:22;
56:18;65:9;97:13;
173:15;197:5;204:21;
245:9;246:13;265:14;
272:18,20
**down (39)**
21:6;23:19;26:20;
76:25;77:2,17;80:22;
82:23;83:2;86:14;
93:22;102:5;115:25;
123:23;130:2;141:22;
146:4;177:25;182:8;
185:17;195:14,20;
196:11;203:20;215:24;

Min-U-Script®
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(11) depends - down

Case: 19-30088    Doc# 5169    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 323
of 353

219:23;257:9;259:23;
264:24;275:20;277:5;
285:2;287:5;297:23;
299:2,25;300:13;
308:3;310:20
**downside (1)**
277:24
**dozens (2)**
47:16;233:5
**draft (1)**
108:5
**drafted (4)**
151:7;174:9;281:8;
298:2
**drafting (2)**
61:9;151:25
**dragged (1)**
77:13
**dramatically (2)**
264:18;293:25
**draw (2)**
49:17,18
**drawn (4)**
23:19;226:23,23;
293:7
**drill (1)**
71:9
**drive (1)**
55:21
**driving (1)**
199:11
**drop (1)**
36:14
**drove (1)**
28:15
**due (2)**
35:18;83:7
**Dumas (125)**
94:17,17,19,20,23;
113:20;116:17,21;
117:2;120:2,6,8,13,17;
131:11,18,19;132:1,10,
22,25;133:3,6,8,18,22,
24;134:3,8,10;135:13;
151:22,23;152:2,4,5;
154:1,10;155:11;
187:6;221:2,5,7,7;
226:19,21;227:7,9,12,
14,19,24;228:2,4;
229:3,5,16,18,21,25;
230:9,11;231:14,21,23;
232:3,6,8;233:4,21,25;
234:14,19,22;235:10,
12,14,16,18,24;236:2,
4,6,9,14;237:1,9,11,14,
16,19,24;238:17,25;
239:6,10,12;240:3,13,
15,18;241:2,10,12,17,
23;242:9,15,16;243:3;
251:7;260:11;265:22,
23;266:8,10,13;278:5,
13;279:17;289:1;
298:17;299:4;300:2;

301:25
**Dumas' (1)**
253:1
**dummy (1)**
102:19
**dumped (1)**
238:23
**Dunn (1)**
167:5
**during (6)**
47:21;107:21;
248:16,17;253:2;
287:22
**duties (10)**
112:22;113:3;
224:23;228:17;230:18;
238:20;245:8;288:15;
292:4,5
**duty (14)**
93:24;100:11;
135:17;203:2,3;207:3,
7;231:8;237:22;
296:10,15,24;297:8,21
**dwarfed (1)**
27:6
**dwarfs (1)**
27:11
**dying (1)**
225:24

**E**

**earlier (25)**
13:9;47:2,4;73:5;
121:2;135:1;137:16;
147:17;162:18;173:23;
178:7;197:13;201:10;
240:22;262:22;266:17;
267:19;269:21;270:13;
276:6;280:11;291:21;
293:15;295:22;302:18
**early (8)**
13:12,24;73:6;92:25;
175:14;176:2;223:13;
259:7
**easement (2)**
89:6,9
**easier (4)**
16:15;141:10;224:3;
228:11
**East (1)**
63:21
**Eastern (1)**
29:24
**easy (11)**
31:21;90:12;116:12;
135:8,8;152:4;153:3;
154:14,24;225:9;
296:25
**Easy-peasy (1)**
152:4
**eat (1)**
51:8

**echo (1)**
164:8
**economic (9)**
99:4;112:23;221:18;
222:22,23;246:24;
252:19;288:22,23
**economics (2)**
228:7;247:14
**economy (1)**
72:2
**edge (1)**
139:10
**educate (2)**
63:20;194:14
**educated (1)**
39:15
**education (1)**
243:24
**effect (5)**
35:13;87:10;131:13;
174:20;175:7
**effective (5)**
150:11,11;215:10;
222:13;282:24
**effectively (3)**
36:1;185:1;284:19
**efficiently (1)**
136:2
**effort (2)**
83:23;251:23
**efforts (4)**
169:18;223:4;
302:22;311:4
**eight (16)**
23:23;38:14;43:21,
24;46:23;51:2,3,5,16,
19;54:5,10;59:13;97:3;
137:5,10
**eight-and-a-half (1)**
43:15
**eighteen (1)**
309:1
**eight-million- (1)**
56:6
**eighty (1)**
304:22
**either (26)**
35:21;41:23;50:20;
55:22;58:24;59:11;
138:17;148:15;151:7;
156:12;159:10;162:4;
194:17,23;200:8,20;
204:2;214:4,23;236:1;
244:20;245:18;263:9;
275:7;286:21;307:19
**elaboration (1)**
112:13
**elderly (1)**
132:14
**elected (1)**
231:6
**election (1)**
248:12

**Electric (1)**
60:8
**electrical (1)**
138:3
**element (2)**
215:22;289:24
**eleven (9)**
115:15;202:4,6;
222:17;259:3,3;
261:12;289:13;292:15
**eliminate (1)**
104:11
**eliminates (2)**
110:14,21
**eliminating (1)**
289:24
**elimination (1)**
233:11
**Elliott-led (1)**
268:2
**eloquently (1)**
278:6
**else (39)**
14:17;22:15;32:11;
43:2;53:23;54:19;
57:16;58:2;60:7;64:6;
68:22;75:4;90:22;
115:18;133:11,25;
135:19;153:17;159:18;
170:9,12;172:21;
175:3;181:5;193:10;
197:17;215:3;232:17;
234:8;250:7;254:19;
257:19;273:22;284:25;
297:3;305:1;307:4,5;
311:3
**else's (2)**
170:8;189:24
**elsewhere (1)**
21:20
**Elvis (1)**
192:9
**emerge (2)**
192:12;230:2
**emergence (1)**
263:16
**emerges (2)**
142:13;223:7
**Emery (1)**
254:5
**emotional (1)**
69:10
**emphasize (1)**
258:6
**emphasized (2)**
253:8,8
**emphatic (4)**
176:20;180:17;
183:10;234:17
**employee (1)**
72:14
**employees (3)**
67:13,14,17

**employment (4)**
64:20;65:20;71:1,23
**enables (2)**
233:12;239:12
**encompasses (1)**
113:5
**encounter (1)**
158:4
**encountered (1)**
168:21
**encroachment (8)**
83:24;84:16,19,19,
21,23;85:4,5
**end (32)**
40:14;43:13;49:5;
62:1;70:19;72:5;96:1,
18;100:9;104:2,4,6;
107:17;137:17;141:11;
154:9;159:2,7;173:19;
176:1;183:17;189:14,
15;191:14;204:13;
205:12;209:12;248:1;
256:18;264:7;268:5;
283:20
**endeavored (1)**
225:25
**ending (1)**
133:15
**endless (1)**
95:7
**ends (5)**
8:25;133:21,22;
137:19;159:24;160:8;
161:20
**enforce (2)**
99:25;264:20
**enforced (2)**
23:5;85:13
**engage (1)**
212:24
**engaged (5)**
109:21;173:13;
199:13;224:13;226:4
**English (1)**
29:9
**enhance (2)**
84:23;85:1
**enhanced (1)**
301:12
**enhancing (1)**
86:18
**enormously (1)**
262:5
**enough (10)**
25:5;47:19;130:2;
145:12;149:14;161:3;
181:4;193:7;259:9;
281:4
**ensuring (1)**
211:20
**enter (6)**
36:10;92:8,13;222:7;
231:6;289:3

Case: 19-30088    Doc# 5169    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 324
of 353

**entered (5)**
83:23;84:14;85:9;
94:9;304:1
**entertain (1)**
207:10
**entire (5)**
45:20;70:20;135:7;
146:12;233:17
**entities (7)**
43:1,1;110:11;112:4;
153:4;163:9;189:16
**entitle (1)**
89:6
**entitled (9)**
46:1;55:1;60:22;
107:23,25;208:10;
234:7;265:9;296:16
**entitlement (3)**
118:12;132:7;197:11
**entry (1)**
239:17
**envision (1)**
66:6
**equal (2)**
126:19;265:18
**equation (1)**
54:1
**equitable (1)**
223:24
**equity (49)**
10:9,18;27:4;134:16;
188:22,25;191:9;
199:7,8;202:14;
205:13,17,18;206:1,7;
208:1,5,6,7,7,14,14;
209:15;223:25;224:8,
13;225:5;228:14,19;
230:22;231:18;235:22;
240:7,16,24;256:17;
261:21;265:17;274:20,
23;279:15,19,20,21,22;
280:3;283:2;288:25;
301:18
**equivalent (3)**
32:14;150:7;203:18
**especially (2)**
233:9;309:14
**essence (2)**
147:20;291:25
**essentially (8)**
11:12;13:18;77:4;
168:1;169:17,20;
172:9;267:18
**establish (3)**
29:12;206:14;286:23
**established (2)**
15:21,21
**estate (7)**
43:16;171:13;172:4,
12;180:4;188:19;
206:25
**estates (3)**
171:23;179:24;

180:15
**Estella (1)**
9:15
**estimate (4)**
114:15;159:6;
174:14;228:24
**estimated (9)**
118:18;134:2,25;
158:24;161:12,18;
179:5;184:15,16
**estimation (77)**
26:12,20;27:22;28:2,
2;56:25;110:22;114:1,
25;123:4,7;124:3,3;
128:1;129:21;130:6;
133:14;134:11;148:7,
11;152:24;157:6,11,
14;158:7;159:4,12,19;
161:15;174:22;175:11;
176:2,10,23,24;178:21;
179:6,13;183:7,11,12;
191:5,6,10,10,13;
200:10;201:19;203:8,
11;205:18;226:17;
231:4;233:11;236:20;
240:20;258:19;270:9,
16;271:1,12,19;277:6,
13;286:14,23;287:7,8,
17;289:15,20;292:14;
307:16;308:2,11,18;
309:4
**estoppel (2)**
70:17;71:14
**et (1)**
96:8
**etched (1)**
242:11
**evaluate (1)**
254:25
**evaluated (1)**
226:6
**evaluation (2)**
208:11,13
**evaluations (1)**
207:15
**evaporate (1)**
235:20
**even (57)**
15:16;19:7,8;22:22,
25,25;25:11;26:10;
27:15;32:9;36:3;37:20;
47:15;56:17;63:19,19,
21;71:14;76:23;79:2;
87:4;88:22,22;97:4,6;
99:16,17;112:25;
123:14;128:3;147:4,6,
8;148:6;149:6,11;
157:11;180:18,24;
185:2;188:2;189:21;
196:4;200:9;201:17;
235:7;246:5;247:14;
250:7;280:11;282:24;
285:11;287:19;290:14;

297:23;298:3;309:24
**event (13)**
20:23;58:10;85:3,3;
107:22;141:17;158:2;
159:18;196:25;238:15;
239:14;251:7;264:2
**events (3)**
58:18;239:16;293:24
**eventuality (1)**
290:21
**everybody (16)**
90:3;133:11;157:16;
181:5,14;189:6;
190:14;191:11;203:6;
253:10;259:5;264:4,
23;273:22;299:12;
306:10
**everyone (23)**
8:6;33:21;43:2;
97:10;122:14;136:13;
156:3,4;157:15;189:4;
193:2;199:7;221:1;
222:4;267:5;274:21;
278:24;280:8;288:18;
289:16;299:21;311:4,5
**everyone's (4)**
43:16;213:20;214:5;
266:14
**everywhere (2)**
203:10;286:6
**evidence (6)**
25:13;38:21;202:18;
250:12;251:1;253:14
**evolution (1)**
295:5
**evolved (1)**
28:6
**exact (2)**
170:10;270:4
**exactly (22)**
10:23;14:9;29:20;
46:21;48:1;77:7;79:18;
109:3;111:5,5;158:17;
160:5;198:10;199:5;
204:9;216:6;245:19;
251:22,24;274:25;
277:4;309:6
**exacts (1)**
168:12
**examiner (3)**
304:2,10,15
**example (5)**
89:5;145:18;200:7;
210:20;211:17
**exceeds (1)**
18:5
**except (2)**
90:6;240:15
**exception (1)**
169:13
**excerpt (1)**
277:15
**excess (3)**

191:3;224:19;292:5
**excited (1)**
258:9
**excluded (1)**
274:11
**exclusive (1)**
170:4
**exclusivity (21)**
111:20;172:23;
173:13;190:4,6;197:1,
2,3;221:16;232:4;
264:16,17,19,19;290:8,
10,15;291:16;296:21;
300:2;303:15
**Excuse (21)**
35:10;83:14,16;
84:13;87:19;93:6;
104:25;109:11;118:15;
128:25;130:13;131:5;
132:8;155:16;158:8;
182:20;211:2;235:11;
240:24;295:6;301:8
**excused (3)**
75:17,17;85:11
**execution (1)**
209:14
**executive (12)**
9:16;13:15;30:14,16;
33:8,9;34:7,12;35:6;
39:8;43:12;165:8
**executory (2)**
87:20;90:9
**exempt (1)**
121:21
**exercise (3)**
100:10;298:12;301:6
**exercising (2)**
245:8;298:8
**Exhibit (2)**
308:1,21
**exist (1)**
209:21
**existence (1)**
222:15
**existing (1)**
194:18
**exists (4)**
53:1;112:2;219:10;
278:8
**exit (4)**
116:1,3;268:22;
275:3
**expect (4)**
65:6;122:20,22;
128:2
**expecting (1)**
217:6
**expedient (3)**
134:24;215:10;216:1
**expedite (1)**
106:8
**expedited (1)**
110:25

**expeditious (2)**
106:5;289:6
**expeditiously (1)**
223:21
**expense (2)**
112:24;244:23
**experience (13)**
58:8;65:22;140:9,12;
170:25;171:2;199:24;
243:18;245:7;296:13;
297:1;300:16,21
**experienced (8)**
47:10,10;100:18;
217:16,17;239:7;
247:1;299:13
**expert (1)**
287:17
**experts (1)**
226:9
**expired (1)**
159:7
**explain (9)**
21:25;23:11;50:2;
64:3;87:14;177:1;
222:5;233:1;293:12
**explained (5)**
23:20;59:15;157:13,
17;294:2
**explaining (1)**
234:2
**explanation (3)**
126:16;153:21;
221:21
**explicated (1)**
112:15
**explicit (1)**
92:17
**explicitly (1)**
286:19
**explosion (1)**
55:25
**express (2)**
141:19;143:18
**expressed (2)**
25:19;109:10
**expressing (1)**
180:23
**expression (1)**
173:23
**extend (2)**
42:10;159:9
**extended (5)**
111:25;125:11,14;
132:3;160:25
**extending (1)**
226:22
**extension (1)**
46:2
**extensive (5)**
105:20;157:23;
273:9;274:15;289:15
**extensively (1)**
287:18

Case: 19-30088    Doc# 5169    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 325
of 353

**extent (22)**
24:8;29:13;53:1;
81:19;82:13;97:15;
112:17;131:2;148:15;
150:17;151:4;152:16;
154:20;166:3;170:1;
222:5;260:17;274:3;
293:22;294:3,7;298:18
**extraordinary (1)**
267:1
**extremely (3)**
69:22;222:25;223:11
**eye (1)**
251:1

# F

**face (4)**
41:16;81:11;115:21;
195:11
**faced (1)**
258:13
**facilitate (2)**
26:11;251:20
**facilitating (1)**
27:22
**facing (3)**
31:6;87:11;231:3
**fact (44)**
10:24;35:3;42:16;
43:10;62:17;64:4;
96:15,22;99:16;
103:20;104:8;109:24;
130:1;132:19;158:21;
161:13;163:8;190:24;
192:16;201:18;202:4;
203:11;206:24;219:21,
25;223:11;238:5;
242:4;246:1;249:8;
252:10;258:14;267:9;
272:4;275:2;277:5;
278:14;279:19;285:9;
294:13;297:19;301:14,
18;303:7
**factor (2)**
36:20;68:19
**factored (1)**
277:24
**factors (3)**
67:5;140:16;244:3
**facts (6)**
111:16,16;192:11;
224:6;297:9,9
**factual (1)**
203:18
**fail (1)**
251:19
**failed (1)**
20:21
**fails (4)**
20:14,23;221:23;
251:6
**fair (14)**

**extent (22)**
19:15;38:19;47:19;
96:23;140:19;156:15;
170:3;190:17,18;
193:7;223:24;264:11;
272:10;297:19
**fairly (3)**
226:8;272:22;288:8
**fairness (2)**
13:18;52:4
**fall (7)**
15:12;33:23;179:22;
185:22;239:3;277:5;
289:25
**fallback (2)**
236:24;301:19
**falls (4)**
133:12;200:9;
230:24;286:16
**false (1)**
233:7
**familiar (3)**
23:12;63:18;295:11
**familiarity (1)**
128:1
**families (2)**
41:6;58:6
**family (4)**
38:13;58:11;75:21;
86:21
**fan (1)**
293:2
**fans (1)**
297:13
**far (10)**
43:3;105:12;120:17;
125:17;162:25;172:9;
181:14;192:5;261:4;
276:15
**fashion (1)**
206:17
**fast (2)**
53:3;76:3
**faster (1)**
228:12
**fatal (1)**
178:5
**fate (1)**
15:17
**fault (2)**
42:19;296:23
**favor (8)**
80:5;172:10;177:11;
179:25;195:6;201:17;
282:5;296:19
**favorable (2)**
296:18;303:25
**feasibility (2)**
100:21;165:22
**feasible (5)**
134:9;138:12;
192:20;283:7,8
**Feather (2)**
126:25;143:25

**February (7)**
92:25;175:13,14;
176:2;231:5;257:8;
283:10
**federal (4)**
107:24;127:24;
164:2,6
**fee (2)**
304:2,14
**feedback (1)**
255:2
**feeds (1)**
147:18
**feel (3)**
82:25;257:15;266:7
**fees (1)**
247:5
**Feist (7)**
126:18;141:23;
143:1,2,5,5,11
**Feld (1)**
160:21
**Feldman (57)**
113:4;124:8,10,12,
15,15,20,23,24;125:2,
4,6,9,14,23;168:12;
190:20;202:3;257:20,
21,24;258:1,4,4,23;
259:2,21,24;260:16,21,
23;261:5,7,10,12,15,
25;262:3,17,20,24;
263:1,10,12,25;264:5,
7,10;265:4,19,20,24;
274:25;277:17;292:17;
293:19;301:24
**Feldman's (2)**
104:19;289:13
**fellow (1)**
247:3
**felt (4)**
34:12;132:14;
244:25;304:20
**FEMA (3)**
127:23,23;307:19
**fend (1)**
24:7
**few (17)**
8:25;12:22;32:13;
47:13;58:19;94:22;
126:3;137:2;187:20;
190:9;205:24;213:21;
238:6;293:24;294:22;
298:15,20
**fiduciaries (2)**
225:7;291:15
**fiduciary (37)**
11:20,21,21;96:21;
100:11;112:22;113:3;
134:21;180:2,5;
198:22,24;203:2,3;
207:2,7;224:23;
228:17;230:17;231:8;
237:2,7,22,25;238:20,

20;239:15;243:13;
245:8;288:15;292:4,5;
296:10,15,24;297:8,21
**field (3)**
66:9;246:1;281:22
**fifteen (4)**
8:25;135:17,21;
279:3
**fifteen- (1)**
220:21
**fifteen-minute (1)**
204:17
**fifth (2)**
137:8;263:4
**fifty (1)**
24:2
**fifty-three (2)**
42:21;47:16
**fighting (2)**
196:9;231:25
**figure (6)**
58:21;86:25;95:6;
115:1;241:25;259:10
**figuring (2)**
163:6;198:4
**file (24)**
44:16;62:19,23;65:2;
74:1;76:22;79:23;
80:19;82:8,12;83:7;
88:2,19;89:17,20;
91:16;93:4;104:2;
126:12;150:15;162:22;
190:4;204:8;270:16
**filed (44)**
13:19;28:12,17;
29:14,23;31:16;32:13;
40:13;52:5;63:22;64:5,
7;72:20;73:5;75:22;
76:14;78:4,18,21;83:8;
97:12;111:14;112:5;
126:3;130:21;150:6;
151:19;153:18;154:15;
164:8,12,14,17;166:23;
205:3;220:16;255:21;
269:17;276:5;277:21;
292:6;293:19,19;
309:23
**files (3)**
91:15;264:9;284:11
**filing (5)**
78:20;143:7;252:22;
270:7,8
**filled (1)**
143:19
**final (4)**
68:18;114:22;131:7;
186:9
**finally (3)**
71:10;127:12;247:25
**financial (9)**
14:11;96:7;168:13;
188:8;199:15,23;
222:10;230:20;245:12

**financially (2)**
230:3,3
**financing (6)**
116:1,3;265:7;268:3;
282:25;283:18
**find (5)**
15:17;129:13;182:8;
198:5;206:24
**finding (6)**
100:21,21;138:11;
156:21;157:2;203:18;
207:25;213:4
**findings (3)**
202:24;207:16;302:2
**finds (1)**
138:12
**fine (11)**
9:24;16:14;89:25;
90:12,20;91:23;92:7;
94:5;99:13;136:19;
310:3
**finger (2)**
103:18;150:10
**fingers (1)**
273:3
**finish (5)**
9:1;172:8;204:24;
228:2;270:12
**finished (2)**
8:24;275:15
**fire (59)**
9:3;10:8;12:22;13:2,
14;22:11;27:5,24;
28:13;47:15;49:6;
53:22;55:1,21,24;58:9;
62:4;97:17,18;101:2;
106:1,7;110:10;
118:17;127:5;130:25;
134:1;137:7,8,9,11;
138:2,6;139:10;140:3,
24;141:18;142:6;
143:6,22,23;147:23;
149:8;163:3,8;192:14,
17;199:20;215:3,7;
220:14;222:1;231:6;
232:16;307:20,25;
308:9;309:1,24
**fired (2)**
64:21;68:20
**fire-related (1)**
162:21
**fires (8)**
27:3;28:20;250:21;
308:1,20,22,25;309:1
**firm (2)**
162:19;304:20
**firms (3)**
224:22,25;228:21
**first (62)**
8:9,13;9:5,10,22;
13:21;15:9,20;25:5;
27:17,25;35:4;41:12;
42:7;51:8;52:7;58:4;

Case: 19-30088    Doc# 5169    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 326
of 353

72:10,25;75:11;81:20;
82:12;97:1;111:25;
120:20;135:18;137:21;
143:21;144:21,23;
145:17;152:6;154:3;
172:23;175:11;178:19;
179:2;184:18;187:25;
196:5;197:24;204:17;
221:11;239:13;242:20;
247:8;248:24;252:11;
257:8;258:20;260:9;
264:1,1;268:24;278:5;
285:8;287:4;294:5;
299:10;300:3;303:24;
306:1

**fish (4)**
100:1,1,3,4

**five (3)**
73:22;278:25;279:20

**five-day (1)**
57:11

**fix (3)**
210:8,17;212:14

**fixed (3)**
121:1;210:17;212:15

**fixes (1)**
115:14

**fixing (1)**
212:20

**flagged (1)**
169:14

**flatly (1)**
10:7

**flawed (1)**
295:5

**flexibility (3)**
145:16,18;275:3

**flip (2)**
31:1;87:16

**float (2)**
14:12;27:14

**floating (2)**
184:17;269:10

**floor (1)**
135:22

**flower (1)**
243:21

**fly (1)**
90:14

**focus (6)**
27:18;153:10;
197:23;257:1,16;310:6

**focused (5)**
167:22,23;250:24;
294:6;296:3

**focuses (1)**
128:23

**focusing (6)**
130:17;182:19;
250:7;255:17;298:16;
309:10

**fold (1)**
236:18

**folks (6)**
27:12;57:7;196:7;
229:17,23;247:25

**follow (2)**
235:17;308:4

**followed (2)**
89:22;100:22

**following (5)**
74:11;97:7;101:24;
201:15;284:10

**follows (1)**
285:3

**follow-up (1)**
301:21

**football (2)**
246:1;297:13

**footnote (1)**
279:4

**forbid (1)**
118:23

**force (3)**
174:20;175:7;203:7

**forced (2)**
70:14;289:2

**forces (1)**
191:9

**forcing (1)**
142:10

**foreclose (1)**
104:1

**foregoing (1)**
130:3

**forever (1)**
123:7

**forget (3)**
24:21;28:1;295:18

**form (4)**
87:12;121:16;172:2;
275:7

**formal (2)**
226:17;305:10

**formality (9)**
115:2,4;116:18;
269:24;270:1,3,3;
271:12,22

**formulas (1)**
22:15

**formulating (2)**
151:12;212:25

**formulation (3)**
209:24;212:6;213:15

**forth (3)**
71:1;185:25;244:8

**fortunately (2)**
224:24;225:3

**forum (6)**
67:7,8;68:6,7;69:18;
87:18

**forward (59)**
13:17,19;22:19;31:3;
33:13;35:21;36:15;
37:6;53:3;59:3,5;
60:14;77:1;83:12;85:6;

96:21;103:20;104:14,
23;105:15;110:7,24;
113:13;123:12;135:7;
153:25;163:22;171:3;
176:24;183:12;193:15;
211:19;215:11;219:8;
221:17;230:18;238:14;
244:12;245:6;248:1;
253:13;258:24,25;
259:7;261:25;262:4,
11,12,13;266:23;
275:8;277:25;285:11;
287:25;288:22;291:23;
300:1;306:20;309:15

**found (3)**
22:20;73:17;94:9

**foundation (1)**
275:8

**four (6)**
15:18;112:25;
139:15;159:6;181:19;
278:25

**fourteen (1)**
137:23

**Fox (1)**
209:5

**frame (2)**
128:2;224:9

**framed (1)**
38:23

**framework (1)**
248:2

**FRANCISCO (4)**
8:1;132:22;133:14;
160:8

**Frank (1)**
242:24

**frankly (12)**
58:13;98:22;115:3;
143:18;169:23,25;
256:12;257:8;263:22;
267:5;296:22;300:10

**frankness (1)**
169:25

**free (4)**
107:3;140:21;
238:21;303:4

**frequently (2)**
33:24;264:17

**Friday (15)**
30:11;35:15;36:3;
59:23;108:19;121:17;
125:4,5,7,9;159:9,10;
259:25;260:9;306:19

**front (7)**
161:21;203:11;
204:12;222:19;258:10;
286:18;287:6

**frustrations (1)**
19:6

**fry (1)**
100:1

**fulfill (1)**

97:22

**fulfilling (1)**
228:17

**full (7)**
111:11;195:16,17;
201:19;202:3;273:10;
292:9

**fully (8)**
105:22;106:16;
110:9;117:17;144:3;
198:16;250:14;291:21

**function (2)**
126:24;127:10

**functioning (1)**
131:3

**fund (8)**
56:7;192:14,17;
217:18;223:10;232:21;
289:7;291:23

**fundamental (3)**
111:19;265:11;
279:18

**fundamentally (4)**
19:15;198:14;
208:13;279:23

**funds (1)**
119:6

**further (25)**
20:25;29:4;36:3;
39:1;68:17;71:20;
74:17;86:14;89:23;
91:4;93:4;100:23;
116:22;119:2;120:13;
129:2;130:9;131:10;
138:12;142:20;145:20;
147:9;159:6;203:22;
206:23

**future (8)**
25:16;129:7;230:21,
23;239:4;301:24;
302:14,16

## G

**gag (5)**
177:10;196:9;
229:15;284:19,20

**gain (1)**
225:18

**gamble (2)**
173:8,10

**game (2)**
204:10;297:15

**games (1)**
246:15

**gander (1)**
242:8

**gaps (1)**
143:19

**Garrison (1)**
166:22

**Gas (3)**
60:8;84:24;85:1

**gathering (1)**
56:13

**gave (8)**
11:18;56:9;102:3;
104:11;229:21;242:17;
290:3;298:22

**Gavin (2)**
95:17;254:21

**gearing (1)**
54:3

**general (3)**
234:22;308:8;309:8

**generally (1)**
154:8

**General's (2)**
162:20;307:10

**generating (1)**
274:14

**generis (1)**
300:21

**genie (1)**
258:25

**gentleman (3)**
9:6;214:11;253:24

**genuinely (1)**
278:19

**George (1)**
75:23

**gets (16)**
21:11;88:22,22;
95:14;107:14;137:18;
140:14;146:5;162:8;
200:8;234:10;246:14;
263:3;264:17;269:18;
307:16

**GHETALDI (9)**
141:24;142:1,5,6,15,
17,22,24;243:17

**Ghost (68)**
8:12;9:3,10,17;10:6,
7,13,19,23;11:1,11;
12:16;13:4,8,14,25;
14:24;15:9,11,14,16;
16:5,11;18:1;21:4,12,
21;22:8,11,18,19;23:1,
19;24:2,7,17;26:4;
27:24;28:1,13,14,18;
32:5;35:6;37:15;38:8;
39:8,14;40:10;49:6;
50:11;51:15,22;52:1,
17;53:5;54:1,19;55:1,
5;58:2,8,22,23;59:3,9;
123:15;223:14

**gigantic (1)**
138:4

**given (10)**
9:19;15:17;43:5,8;
159:4;179:23;247:18;
279:22;293:20;308:13

**giving (5)**
37:15;173:18;201:8;
228:24;246:18

**glad (4)**

Case: 19-30088    Doc# 5169    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 327
of 353

29:16;96:25;145:6;
207:10
**glean (1)**
277:8
**global (8)**
105:24;111:6;113:5;
212:25;213:16;288:21;
291:17,24
**goal (5)**
257:12;260:24,25;
299:21;301:11
**goals (2)**
105:23;223:22
**God (2)**
118:22;153:18
**goes (27)**
19:8;22:16,19;27:8;
33:12;50:9;87:10;
118:15;119:11;125:22;
129:24;142:13;160:1,
11;176:24;193:15;
198:7;203:11;206:7;
237:23;240:5;258:7,
24;262:4;296:1;299:9;
307:15
**Good (65)**
8:6,7;9:14,15;10:1,2,
25;11:20;12:18,25;
17:15,16,19;44:7,8;
48:4;53:21,25;54:2;
74:21;75:13,14,20;
93:19;98:18;107:13;
120:17;127:6,12;
136:13;139:24;142:13;
167:9;171:21,21,22;
181:6;182:3,4,5,6;
198:18,18;199:24;
203:23;209:4,11;
210:16;218:25;219:16;
221:7;231:24;233:2,4;
234:24;242:7,7;249:6;
252:23,24;276:7;
296:8,22;303:18;
310:25
**goose (2)**
242:7,10
**Gordon (1)**
35:12
**gotcha (2)**
153:16;257:13
**Gotshal (2)**
41:21;288:7
**govern (1)**
147:11
**governance (8)**
96:7;99:12;100:5;
163:1,6,12;209:18;
230:3
**governed (3)**
63:24;65:23;294:14
**government (5)**
153:4;163:2,9;164:2;
180:25

**governmental (4)**
53:23;130:22;
148:10;214:19
**government's (1)**
110:6
**Governor (44)**
95:17,18;96:2,20;
98:2;99:5,6,9,24;
100:11,14,25;101:19;
103:19;109:2,10;
113:12;137:22;172:1,
10;180:18,19,20;
192:2;195:19;199:9;
230:4;231:15;238:5,
11;247:24;250:19;
253:12;254:21;255:2;
257:5;259:7;263:20;
268:19;279:2;283:19;
293:18;298:22,22
**governor's (60)**
49:3;58:19;95:4,11;
97:8,23,23;99:10;
100:25;101:10;103:9,
9,22;104:12,16;108:19,
25;109:22,24;112:5;
127:20;129:9;131:8;
172:13;182:9;192:1,3,
5;193:1;195:11;
209:16;213:25;214:25;
216:6,7,8,9;221:21,22;
229:7,13;231:1,11;
247:14;254:18;256:4,
5,9,10;259:6,8;260:7;
279:1,2;284:2;285:6,
15;291:5;300:25;301:4
**grams (1)**
238:6
**grant (19)**
15:19;25:15,18;26:7;
30:19;33:25;40:17;
41:6,19;52:23;54:19;
56:8;59:25;61:22;79:3;
90:5,11;99:23;284:22
**granted (15)**
13:13;20:25;22:18;
26:19;30:15;33:10;
36:1;50:9;52:24;56:19;
81:3;83:15;87:5;88:20;
114:3
**granting (2)**
19:8;60:3
**granular (2)**
120:9,9
**Great (11)**
8:20;74:4;79:6;
88:11;120:18;187:22;
206:3,5;233:12;
267:12;275:8
**greater (3)**
24:25;25:11;37:13
**greatly (1)**
134:14
**greeted (1)**

241:17
**Greg (1)**
165:4
**Gregory (1)**
167:10
**grievance (18)**
63:11;67:1,1,4,11,
24;68:8;69:3,4,11,13;
70:5,12,14,19;72:4,20;
73:20
**grievances (2)**
67:13,14
**grieved (1)**
71:15
**grouchy (3)**
241:7,13,13
**ground (4)**
13:24;90:19;127:9;
137:18
**group (15)**
101:3;108:9;117:1;
124:16;131:3;139:4;
177:22;235:7;243:14;
258:5;263:6;265:10,
14,16;268:2
**group's (1)**
258:12
**GSA (1)**
293:1
**guarantee (3)**
201:18,21;252:21
**guess (16)**
26:8;61:20;116:13;
146:4;149:3;185:2;
212:22;213:7;216:17;
257:18;271:24,25;
294:15;297:15;305:20;
307:17
**guessed (2)**
292:7,8
**guidance (4)**
230:1;238:10;246:3,
17
**guiding (1)**
299:8
**Gump (4)**
155:25;160:21;
187:14;276:3
**guy (2)**
230:9;281:2
**guys (2)**
284:18;306:16

**H**

**half (19)**
102:18;115:15;
139:17;140:23;157:17;
158:6,23;188:16,22,22,
22;189:8;202:1,2;
258:20;286:24;287:6;
289:12;292:20
**hand (5)**

20:19;30:10;133:1;
161:10;266:11
**handful (1)**
308:22
**handle (2)**
16:9;239:13
**handled (2)**
65:14,18
**handling (1)**
94:19
**hands (3)**
22:5;70:18;145:2
**happen (31)**
14:2;26:17;42:13;
46:18;114:3,5;122:14;
131:12;138:22;139:25;
160:3;173:20,22,23;
175:3,18;181:18;
183:11,18;187:18;
190:19;236:11,13;
239:3;268:13,15;
271:10;272:1;287:23,
24,25
**happened (23)**
28:13,13;37:11;
40:21;59:7;94:8;170:8;
183:9,19;191:6;
193:10;203:24;204:21;
245:3;253:5;259:17;
260:8;267:25;273:23;
293:15;298:14,20,25
**happening (4)**
44:17,17;115:20;
271:9
**happens (43)**
15:23,23,24;16:10;
43:22;44:12;49:5;
69:19,20;70:3;76:22;
80:6,20;98:10;117:10;
118:22;129:23;133:20;
137:17;138:10,20;
139:20,21,22;161:17;
172:19;178:4;179:22;
185:21;193:13;203:10;
259:19;260:13;265:24;
269:16,18;277:1;
283:11,21,23;287:6;
298:25;307:19
**happy (15)**
90:3;102:12;109:13;
111:9;120:10;171:3;
187:13;214:7,9;234:8;
247:24;256:17;278:23;
302:18;311:5
**hard (12)**
46:25;56:25;62:3;
177:24;198:4;203:15;
210:1;254:24;274:17,
17;302:21;311:4
**harden (1)**
279:9
**hard-fought (1)**
134:17

**hardly (1)**
251:19
**Hardwoods (1)**
294:17
**harm (3)**
68:19;205:14,15
**hate (2)**
171:14;234:8
**Hauer (1)**
160:21
**head (4)**
77:7;188:23;277:6;
284:15
**headed (1)**
218:17
**heading (2)**
218:7
**heads (1)**
89:7
**heads-up (1)**
94:6
**health (3)**
68:21;130:18;143:24
**hear (31)**
28:24;29:2;39:1;
62:18;89:16;102:1,13;
113:19;123:20;128:13;
129:1,11;134:11;
136:6;140:4;160:16;
185:5;208:24;213:25;
220:10,22;243:1;
247:11;254:17,18;
257:19;258:1,2;
273:14;278:20;285:24
**heard (56)**
9:7,10,12;29:4;
34:18;39:1;41:12;42:1;
48:21;49:14;50:24;
58:2;81:20;84:3;87:6;
102:7;103:10;121:6;
125:19;126:17,22;
135:25;136:23;151:24;
162:25;180:25;191:11;
195:12;199:22;202:3;
217:15,22;219:5,7;
220:6;222:17;233:15;
240:16;242:3;247:23,
23;248:10;253:25;
254:3,19;257:18,20,21;
258:1;268:20;271:2,6,
8;275:17;296:8;304:18
**hearing (51)**
16:2;30:17;35:16;
44:25;66:9;87:25;
89:11,12,15;92:3,10;
97:3;102:5;109:1;
114:12;116:3;120:15;
122:14;134:15;135:20,
22;156:9;159:4;
164:13;165:6,8;
190:21;195:15;203:16,
20;204:17;209:13;
229:2,4;254:9;257:8;

Min-U-Script®
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
**(16) glean - hearing**

Case: 19-30088    Doc# 5169    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 328
of 353

263:4;266:19,20;
267:10;268:11;269:18,
19;271:3,12;276:6;
280:10;282:25;301:21;
302:16;304:3
**hearings (7)**
95:7;197:1;204:3;
267:11;299:10;304:15;
306:7
**hearing's (1)**
276:1
**Hearn (18)**
8:13;9:9;61:15,16,
19;62:1,9;65:7;66:9;
67:9;68:20;69:3,13,21;
71:9;10;72:4;75:10
**Hearns (1)**
60:18
**Hearn's (4)**
62:4,18;63:6;64:12
**heart (3)**
135:2;146:10;190:15
**hearts (1)**
190:16
**heavy (2)**
101:16;164:19
**hedge (1)**
195:6
**help (9)**
10:9;15:7;17:22;
26:8;71:11;106:12;
107:10;111:4;151:23
**helped (1)**
232:8
**helpful (4)**
17:20;91:12;147:8;
191:23
**helping (1)**
46:22
**helps (2)**
63:7;252:7
**Here's (6)**
14:2;21:9;97:1;
126:1,11;139:16
**hesitant (1)**
297:12
**Hey (3)**
120:19;148:2;195:2
**hidden (1)**
250:6
**high (2)**
96:13;134:14
**higher (1)**
278:11
**highly (4)**
173:15;178:11,17;
180:5
**history (5)**
15:9;59:8;137:8;
263:22;266:4
**hit (2)**
77:6;79:6
**hoc (17)**

110:18;111:13;
112:21;121:15;123:20;
124:16;130:5,9,14;
156:1;160:22;177:16;
187:14;239:20;258:5;
276:3;278:18
**hocs (1)**
291:6
**Hold (7)**
17:1;91:24;148:11;
156:18;187:5;196:1;
253:22
**holder (7)**
228:16;237:6;
238:14;240:24;249:21;
251:10;263:19
**holders (20)**
222:20;223:25;
224:8,14;225:5;
227:15;228:6,15,19;
230:20,22;231:16,18;
240:7,12,16,25;261:15;
274:20;287:20
**holders' (4)**
160:22;230:24;
239:20;241:3
**holding (2)**
42:17;166:13
**holds (1)**
187:17
**holdup (1)**
42:15
**Holiday (1)**
311:5
**holidays (1)**
306:9
**home (3)**
153:18;161:8;183:25
**homes (1)**
299:17
**homework (2)**
135:14;286:5
**honest (6)**
58:13,14,14,16;
78:24;181:15
**Honor (348)**
8:7;9:15,18,25;10:2,
5,19;11:15,18;12:8,13;
13:7;14:12;17:3,20;
18:24;20:1,5;25:4;
26:2,21,23;28:8;29:1,8,
24;30:14;31:5,15;34:7,
17,20;35:1,23;38:24;
39:6,9,18;41:5,22;
48:7;49:16;50:2,22;
52:3;61:12,18;62:7;
67:8;74:4;75:5,14,16,
17,20;76:1,12;77:6;
78:25;82:1,10,19;83:4;
84:3;86:1;88:11;90:20;
91:7,11,17,23,24;
92:11,18;93:1,18,21;
94:5,17;95:1,25;98:1,

3;99:19;100:8,12;
101:21;102:11;103:17;
104:7,8,13,18;105:10,
19,22,23;106:10;
107:10,21;110:8,14;
111:2,10,19;112:20;
113:2,9;119:3;120:8;
121:6,13;122:3,9;
123:3;124:5,8,18;
125:4,10,15,23;131:18;
132:10;134:3;136:24;
138:18,21;139:23;
140:6;141:8,11,16,24,
24;142:5,15;143:2,11,
15,18;144:8,16;146:8,
15;147:16;148:14;
152:4;153:23;154:20;
155:16,18;156:5,13,16,
20,25;158:10,17,19;
159:9,22;160:5,12,20,
23;161:1,9,19;162:6,
19,24;163:17,25;164:7,
21,23;165:4,5,12;
166:23;167:7,9;
170:17;174:5,12;
176:15;186:9,25;
187:3,16,22;189:4;
190:3,9,13;191:1,7,22;
192:10,20;193:7;
195:3,13;198:12,14,21,
22;199:11;200:1,18;
202:8,21;203:2,8,25;
204:24;208:12,25;
210:9;212:12;213:19;
215:6;216:12;220:7,
12;221:7,11;222:25;
227:15;229:19;230:5,
12;231:14;235:25;
237:9;241:2,19;
242:15,22;245:19;
246:14;248:6,18;
249:6;250:22;251:15;
253:6,19;254:1,4,13,
20,22;255:4,11;256:2,
13,21;257:14,22;258:4,
5,13,18;259:4;261:5,
17;263:10;264:3,10;
265:18,23,24;266:14,
16;267:9,24;268:3;
270:2,4;271:7,21;
273:12,15;274:19;
275:5,13,20;276:5,11,
19,25;277:7,19,22;
278:5,7,13,17,22,24;
279:5;280:2,17;281:7,
21;282:6,16,22,23;
283:9,17,24;285:13;
286:6,12;287:14,20;
288:3,6,16,17;289:1,4;
290:7;291:1,14,21,24;
292:8,10;302:24;
303:15,18;304:24;
305:4,6;307:7;308:7,

14,24;309:6;310:9,19,
25;311:2,6
**Honorable (2)**
8:5;241:7
**honored (1)**
118:16
**honors (1)**
221:2
**Honor's (8)**
147:17;157:6;
162:10;182:10;223:3;
244:9;248:20;268:21
**hoop (1)**
285:8
**hoops (2)**
283:19;285:6
**hope (20)**
37:5;40:16;133:12;
134:10;140:15;141:5;
152:21;158:1;160:17;
172:6;179:11;194:1;
213:16;226:9,10,12;
230:23;238:6;302:3;
303:3
**hopeful (1)**
134:6
**hopefully (9)**
24:22;135:12;
168:20;196:24;197:24;
225:17;232:22;282:18;
295:13
**hopes (1)**
157:16
**hoping (2)**
95:20;304:5
**horror (1)**
58:5
**horse (2)**
80:14;150:14
**Hostetler (3)**
10:3;131:19;221:8
**hot (1)**
292:25
**Hotel (1)**
295:11
**hotly (1)**
22:1
**hour (4)**
123:17;191:19;
263:4;294:12
**hours (9)**
38:13,15;67:23;
94:22;97:3;168:8;
191:10;192:8;241:18
**house (1)**
64:20
**housekeeping (2)**
303:20;304:1
**housing (1)**
223:17
**huge (1)**
181:8
**Huh (1)**

169:2
**human (2)**
46:4;66:8
**humanitarian (1)**
126:5,7,9
**humble (2)**
248:2;285:15
**hundred (6)**
24:1;38:13;100:7;
125:12;216:17;263:7
**hundreds (3)**
152:11;233:5;247:3
**hurdles (1)**
209:15
**hurt (1)**
199:25
**hypocrisy (2)**
250:2;254:15
**hypothetical (3)**
53:6,19;261:10
**hypotheticals (1)**
297:12

**I**

**IBEW (3)**
72:12,12,17
**idea (11)**
26:24;121:21;
132:11;140:9;209:23;
253:18;267:12;268:2;
269:9;270:2;271:7
**ideal (1)**
222:11
**identical (2)**
168:3,9
**identified (3)**
29:5;129:3;298:19
**identify (1)**
161:14
**ignore (2)**
195:15;234:12
**ignores (2)**
111:16;287:24
**ignoring (2)**
313;234:13
**ill (1)**
299:23
**illustrate (1)**
236:16
**imagine (6)**
58:5;177:24;203:16;
247:18;250:11;277:20
**immediate (5)**
119:8;122:12;
132:11;175:11;197:14
**immediately (2)**
37:14;223:23
**immovable (2)**
244:17,17
**impact (6)**
54:15;56:12;58:21;
188:15;197:14;251:4

Min-U-Script®

Case: 19-30088    Doc# 5169    eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 329
of 353

(17) hearings - impact

**impacting (1)**
303:14

**impacts (1)**
97:4

**impair (1)**
252:4

**impaired (33)**
104:21,25;105:11,
14;106:4;110:16;
189:11;195:20;208:8;
211:5,9,12;219:17,23;
233:10;256:18,23,24;
257:2,3;266:23;269:5;
280:20;281:16;288:21;
289:19;291:11;297:22;
301:9;305:7,17;306:4,
4

**impairment (4)**
107:20;211:8,13;
282:23

**impatient (1)**
216:16

**impede (1)**
251:21

**impeded (1)**
301:12

**impediment (2)**
45:14,18

**impediments (1)**
179:9

**imperative (1)**
292:12

**imperfect (2)**
224:11,11

**impermissible (1)**
296:15

**implementation (3)**
117:7;144:20;298:12

**implemented (2)**
105:25;117:9

**implicate (1)**
128:21

**implicated (1)**
177:17

**implicit (2)**
92:20;251:25

**implies (1)**
169:25

**importance (1)**
277:25

**important (26)**
10:14;21:24;27:20;
42:8;62:4;98:9;110:3;
134:14;145:7,25;
146:9;148:3;173:3;
190:13;214:8;215:4;
243:4;255:3,5;258:12;
263:6,17;266:18;
271:24;276:16;309:11

**importantly (6)**
24:16;26:2;77:16;
128:19;282:1;303:25

**impose (2)**

**imposing (1)**
72:11

**impossible (1)**
66:6

**impressions (1)**
248:22

**impressive (1)**
230:9

**improve (1)**
238:8

**improvement (1)**
229:8

**improvements (1)**
228:13

**improving (2)**
229:12,24

**in- (1)**
64:19

**inability (1)**
105:6

**inaccurate (1)**
189:12

**inappropriate (3)**
273:16;288:17,20

**inasmuch (1)**
13:16

**incapacitated (1)**
13:3

**incentive (2)**
221:25;222:1

**inclined (6)**
40:16;63:10;90:5;
131:4;154:21;203:19

**include (7)**
32:5;69:9;96:6;
152:16;222:11;232:10;
264:2

**included (4)**
132:7;137:11;
263:14;273:12

**includes (3)**
228:20;272:11,12

**including (12)**
13:25;15:18;100:21;
118:24;130:22;160:2;
195:22;222:4;274:22;
289:5,19;291:14

**incomplete (1)**
120:4

**inconsiderate (1)**
282:2

**inconsistent (6)**
10:7;36:23,23;
172:17;208:19;296:14

**incorporated (1)**
106:16

**incorrect (1)**
120:3

**increase (1)**
249:15

**incurred (1)**
223:13

**indeed (3)**
30:8;90:15;247:17

**indenture (1)**
209:5

**independent (3)**
83:22;86:6;215:8

**indicate (2)**
23:22;230:15

**indicated (5)**
64:15;78:15;112:4;
136:3;137:16

**indicates (1)**
71:14

**indication (3)**
144:2;278:17;284:1

**indications (1)**
238:13

**indiscernible (1)**
184:5

**individual (14)**
118:9,24;152:11;
153:5;154:12;156:18;
212:16;224:23;225:14,
23;261:17;280:21,22;
282:11

**individually (2)**
217:13;225:6

**individuals (8)**
43:4;119:7;133:10;
135:10;226:22;233:6;
243:18;281:14

**inference (1)**
49:18

**inferior (1)**
279:24

**infirmities (1)**
221:22

**influence (4)**
45:10;125:20;141:5;
205:13

**influenced (2)**
210:15;298:18

**information (7)**
41:4;143:7;191:17;
199:16;219:13;255:8;
278:23

**informed (1)**
16:24

**ingredient (1)**
173:3

**inherently (1)**
279:24

**in-house (3)**
48:21;71:1;168:15

**injunction (2)**
49:11,23

**injury (5)**
144:4;145:3,4;196:8;
224:16

**input (2)**
152:18;153:9

**insert (1)**
297:7

**insist (2)**
190:23;301:10

**insistence (1)**
268:1

**insisting (1)**
279:15

**insolvency (13)**
115:21;129:12,13,
14,14;167:14,15;
173:24;174:7;200:13,
15,19;298:4

**insolvent (4)**
129:18;200:21;
245:24;262:5

**inspectors (1)**
252:10

**instead (1)**
78:19

**institutions (3)**
168:13;199:23;
222:10

**instruct (1)**
177:12

**instructions (1)**
34:6

**instruments (1)**
163:16

**insurance (71)**
11:2,5,22;12:4,6;
13:17;14:8,10,10,12,
16,25;15:22;16:6,12,
16,25;17:9;18:3,18,25;
19:2,14;22:7;23:3;
24:2,9,21;25:12;26:16,
23,24;27:2,3,6,8,11,13,
14,18;28:9,16;29:7,14;
33:11,24;34:11;37:24;
39:5,22;40:15;43:6,17;
49:20,24;50:4,24;
52:13;53:1;55:14;56:7;
59:17;60:11,13;
125:12;146:20;168:14;
250:13;251:3;263:7,10

**insured (1)**
250:14

**insureds (1)**
138:3

**insurer (4)**
15:2;19:10;24:24,24

**insurers (1)**
44:5

**insurer's (1)**
147:7

**intact (1)**
51:16

**integrated (10)**
228:18,19;229:18;
232:10;235:20;240:10;
241:5;263:14;272:4;
285:11

**integrity (1)**
230:4

**intend (7)**

70:2;100:11;104:1;
125:20;150:15;248:21;
302:2

**intended (4)**
84:21;152:13;226:4,
5

**intensity (1)**
293:1

**intent (1)**
152:21

**intention (6)**
135:3,20,23;271:21,
22;302:10

**intentionally (1)**
272:9

**intents (1)**
169:21

**interest (27)**
14:23;107:24;108:6;
113:10;130:10;135:6;
171:13,23;172:4,12;
179:24;180:4,15;
188:14,18;195:25;
200:25;206:25;211:5,
20;212:17;274:23;
283:22;288:23;289:4;
296:19,20

**interesting (6)**
77:20;98:19;149:9;
248:15;269:1;294:24

**interests (2)**
107:22;230:16

**interpret (2)**
88:24;241:4

**interpreting (1)**
101:10

**interrogatories (1)**
40:22

**interrogatory (1)**
14:4

**interrupt (1)**
120:4

**into (63)**
15:15;22:16;27:5;
28:15;33:12;37:4,9;
38:20;55:21;65:18;
72:16,19;77:13;83:13,
23;84:14;85:9;92:8;
94:9;95:7;117:25;
120:15;130:22;131:14;
133:13;135:12;139:10;
141:14;145:22;147:19;
155:4;188:19;200:10;
201:3;202:1;215:12,
18;219:11;222:6,7,21;
223:16;230:20,22;
231:7,21;238:23;
241:8;242:6;244:3;
245:23;249:14;262:11;
266:4;269:10;277:24;
283:10;289:3;293:25;
297:23;304:8;309:4,21

**intricacies (1)**

Min-U-Script®

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(18) impacting - intricacies

Case: 19-30088    Doc# 5169    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 330
of 353

269:1
**introduce (1)**
12:16
**inventing (1)**
230:13
**invested (1)**
279:9
**investment (1)**
202:14
**investor- (1)**
223:5
**invitation (1)**
36:8
**invite (4)**
87:4;126:4;192:4;
302:13
**invited (5)**
95:21;163:14;
230:20;235:8;303:8
**involuntary (1)**
201:7
**involved (15)**
42:25;45:20;56:13;
120:9;127:5,8;144:19;
145:6,9;152:15,20;
154:23;163:6;213:14;
274:20
**involvement (3)**
147:10;226:3,3
**involving (1)**
47:16
**IP (1)**
262:4
**IPs (1)**
260:2
**irony (1)**
170:10
**issue (69)**
15:9;23:7;29:7;
33:19;39:5;47:21;74:1,
20;84:19;85:16,18;
86:2;96:17;101:20;
106:12;107:3;108:8;
121:7;122:7;125:20;
128:23;130:7,22;
136:8;140:22;144:11;
149:17,17;160:10;
169:15;179:12;180:1;
186:19,20;190:22;
191:18;195:9,17;
200:11,11,12,14;201:6;
210:23;212:12;213:10;
239:25;242:8;243:5;
244:7,7;252:3;254:6;
257:16,24;258:7;
260:2;268:18;284:10,
16;290:9;298:1;
301:24;302:9;304:5;
307:12;308:10,15;
310:17
**issued (3)**
108:19;188:25;189:1
**issues (64)**

9:19,22;62:22,22;
65:16;78:13;80:15;
86:6;99:14;101:13,14;
103:24;104:1;106:17;
109:9,15,23;111:10,12;
113:9;122:23;128:19,
19;130:18,18;133:10;
148:5;150:17,18;
153:12;163:1,1,12,19,
23;164:16,20;165:13,
14,20;167:8,22;
168:17;169:16;185:23;
186:1,5;198:22;207:6;
209:17,18,20;215:4,4;
218:10;259:6,8,9;
289:19;294:4;297:24;
301:22;306:25;310:14
**item (2)**
115:2;116:2
**items (4)**
127:7;143:13;
145:19;151:6
**iterations (1)**
295:6

## J

**January (22)**
37:12;40:6,12,14;
72:20,20;91:15,21;
92:10,25;93:6,8;116:5;
132:19;225:25;231:4;
257:7;258:21;302:16,
19;304:16;306:11
**jeans (1)**
198:6
**Jeffrey (1)**
254:4
**Jennifer (2)**
220:7,12
**jeopardy (1)**
128:10
**Jerry (1)**
243:17
**jettison (1)**
292:13
**job (6)**
68:20;100:13;
161:25;185:15;204:21;
301:15
**Joe (1)**
143:5
**Johnny-come-latelies (1)**
250:3
**join (1)**
30:2
**joined (2)**
9:18;13:19
**joint (3)**
111:15,17;228:6
**jointly (1)**
225:4
**Jose (6)**

130:16,19;214:3,12;
220:5,13
**Joseph's (1)**
137:1
**Judge (116)**
8:23,25;10:9;31:2;
35:14,20;36:2;37:16;
44:14;45:8,9;46:19;
47:8,11,19;57:2;59:22;
80:5;81:5,6,9;82:3;
86:25;87:10;88:15,16,
23;91:14;92:22;95:8;
102:5;105:22;106:11,
11;107:10;110:22;
122:15,16,17,22,25;
123:9;134:4;135:15,
22;151:14;156:3,4,6,
13,20;157:4,13,18;
158:1;159:2,12,13;
160:4,11,23;161:2,3,9,
21;162:4;181:25;
183:8,10;189:5,6;
191:11,19;194:21;
203:11,20,22;204:4,6,
9,10,12,16;206:10;
207:5,15,20;208:13;
236:19;240:23;243:20;
244:13,15;245:25;
246:16;250:10;263:3;
275:22;276:6,21;
287:3;289:20;293:15;
295:10,12,18,18;
296:21;308:12;309:16;
310:2,23
**judges (4)**
65:25;66:1;261:20;
294:23
**judge's (3)**
59:4;183:9;278:25
**judgment (16)**
24:23;29:12;59:23;
107:24;128:18;217:3,
4,5;237:24;238:1,3;
292:1,1,2;297:4;
300:22
**judgments (2)**
29:12;36:23
**judicata (1)**
149:12
**judicial (2)**
72:2;276:14
**juggle (1)**
90:2
**Julian (114)**
9:21;10:1,2,2,21,23;
11:9,11;12:5,8,13,15,
19,21;13:1,22,24;
14:19,21;15:5;16:1,4,8,
17,22;17:1,3,6,9;18:24;
19:12,18,19,20;20:1,3,
5,8,12,14,18;21:15,22,
25;22:4,24;23:5,9,13,

16,18,25;24:5,10,12,
15;25:2,4,25;26:2,21;
27:8,11,19,25;28:4,7,
10,22;29:1;34:10;37:4;
38:5,7,24;42:8;55:4;
94:16;113:19;116:13,
22;119:4;120:2;
131:11;155:10;159:11;
221:3,4;227:2,16;
231:24;242:17,19,23;
248:8,9,18;249:5,13;
250:12,22;251:9,15,22,
24;252:6,20;253:4,6,
17,21;298:17;299:4;
301:14
**Julian's (2)**
30:2;256:8
**jump (4)**
2:8;283:18,20;
285:7
**jumping (1)**
60:20
**June (11)**
49:1,5;111:1;215:23,
24;223:7;231:5;249:9;
262:7;283:14;292:19
**jurisdiction (3)**
154:8,20;252:25
**jury (10)**
18:4;19:9;24:1;68:3;
79:21;86:7,9;89:6,8;
287:6
**Justice (1)**
164:5

## K

**Karotkin (117)**
60:20;93:24,25;94:4,
11,14,21;95:13;98:25;
101:24;102:11,21,23;
103:2,5,12;117:4,11,
15,19,22;118:2,6,14,
19,21,25;119:15,18,22,
24;120:1,3,17,20,24;
121:2;122:11;131:9,
21;136:15,19;141:10,
16;149:21,23;150:2,9,
13,23,25;151:2,4,16,
22,24;154:3;166:12,
16;185:9,25;186:4;
187:1,3,8;189:9,14;
195:12,15;196:20;
216:17;236:18;258:2;
264:14;266:19;269:21;
275:11,13;277:17;
282:3;285:24;286:2,4;
288:5,6,7,10,12;
290:23;293:20;299:5;
301:25;302:13;305:2,
3,6,9,13,16,18,20,25;
306:3,8,13,15,18,22,

16,18,25;24:5,10,12,
15;25:2,4,25;26:2,21;
27:8,11,19,25;28:4,7,
10,22;29:1;34:10;37:4;
38:5,7,24;42:8;55:4;
94:16;113:19;116:13,
22;119:4;120:2;
131:11;155:10;159:11;
221:3,4;227:2,16;
231:24;242:17,19,23;
248:8,9,18;249:5,13;
250:12,22;251:9,15,22,
24;252:6,20;253:4,6,
17,21;298:17;299:4;
301:14
**Karotkin's (3)**
126:15;234:3;300:14
**Kaupp (14)**
34:16,17,18,20;35:1,
5,12,12,23,25;36:6,9,
16,21
**K-A-U-P-P (1)**
35:12
**keep (14)**
41:11;90:3;95:8;
130:6;131:13;144:9;
173:7,17;179:11;
270:21,24,25;287:21;
293:9
**keeping (2)**
173:11;182:3
**keeps (1)**
181:14
**keepwells (1)**
211:9
**Keller (1)**
295:1
**Kellogg (1)**
12:22
**Kelly (1)**
243:16
**Ken (1)**
136:24
**kept (1)**
293:13
**kettle (1)**
100:2
**Kevin (2)**
156:25;308:24
**key (6)**
69:9;140:16;158:1;
161:13;289:10,11
**kick (2)**
35:16;36:3
**kicks (2)**
18:9;57:6
**kill (1)**
172:20
**killing (1)**
169:8
**kind (19)**
29:24;38:21;54:20;
79:18,19;115:2;
126:23;128:18;156:10;
166:12;167:18;185:25;
210:2,6;247:25;250:9;
253:11;269:9;275:6
**kinds (2)**
209:17;246:25
**Klein (1)**
295:10
**Klein's (1)**
295:12
**knew (6)**
41:12;149:20;
247:10;259:25;260:1,4
**knocks (1)**

24;307:1,3,23

Min-U-Script®

Case: 19-30088    Doc# 5169    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 331
of 353

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(19) introduce - knocks

251:8
**knowing (6)**
46:5;118:11;138:21;
147:6;231:23;242:13
**knowledge (2)**
197:10;300:9
**known (8)**
10:22;29:18;47:1,3;
233:10;287:11,13,15
**knows (9)**
11:19;14:6;17:10,11;
45:8,13;47:11;100:19;
299:12
**Kornberg (4)**
166:18,21,21;167:3

**L**

**labor (2)**
67:12;73:19
**lack (2)**
36:18;180:23
**lags (1)**
200:9
**land (2)**
78:9;183:11
**landowner (1)**
85:7
**language (5)**
29:10,18;129:16;
158:9;293:12
**large (3)**
18:5;145:8;163:4
**largely (3)**
127:22;128:23;
144:11
**larger (1)**
48:15
**largest (4)**
137:8;144:1;202:12,
13
**Lassen (1)**
295:11
**last (45)**
13:2;15:18,18;58:19;
74:25;87:23;90:24;
94:7,22;97:14;106:1;
107:21;119:4;125:9;
126:3;138:7;140:2;
164:14;166:12;168:8;
170:22;181:19;190:21;
192:8;197:24;218:2,2,
24;220:16;227:10;
231:12;238:4;243:5;
247:19;255:20,20;
256:9;259:25;290:9,9;
291:5;294:22;298:14,
20;304:3
**late (8)**
92:24;95:4;130:21;
175:14;283:9;285:18;
288:12;308:5
**lately (2)**

31:18;181:24
**later (18)**
8:24;14:1;16:2;25:6,
20;36:1;37:8,13;38:10;
103:25;113:17;114:7;
122:8;125:21;128:14;
135:17;236:19;302:12
**law (31)**
32:18;62:10,12,21,
22;63:6;65:24,25;
66:18;68:5;69:14;70:2;
71:13;76:11,17,19;
99:7;129:8,15;147:14;
175:2;208:4,5;224:22,
25;228:21;229:14;
280:15,19;301:8;304:4
**lawful (1)**
81:8
**laws (1)**
99:7
**lawsuit (9)**
36:20;72:21,25;
76:24;78:19,20;87:4;
252:8,16
**lawsuits (3)**
42:21;47:16;252:23
**lawyer (10)**
64:20;67:9;70:15;
72:15;73:19;84:5;
100:19;239:8;264:15;
299:23
**lawyers (48)**
14:22;17:12;24:17;
53:13;54:24;65:22;
71:1;72:13;95:21;
97:23;134:19,22;
145:3,5;153:18;
178:18;196:8,8;198:8;
210:16;224:14;226:4;
232:15,25;243:7,9,10,
14;245:7,15;247:4;
253:11;262:5;282:12;
288:25;289:1;294:2,
21;296:8,23;299:14,16,
22;300:7,11,16,22;
301:5
**lay (2)**
222:5;279:14
**layman's (2)**
60:12;237:21
**laypeople (3)**
222:5,6;223:24
**lead (2)**
219:16;249:17
**leader's (1)**
255:3
**leaning (1)**
215:10
**learn (1)**
215:21
**learned (2)**
137:11;243:25;
298:25

least (24)
15:22;26:11;40:17;
42:6;44:1,2;71:21;
102:12;115:21;157:8;
165:5;168:24;201:9,
23;204:11;205:19;
232:25;234:21;252:3;
258:9;259:22;277:3;
294:14,19
**leave (20)**
18:8;26:5;69:2;80:3;
89:16;123:4;152:21;
159:17;191:2;216:22,
24,25;232:17;242:12;
245:11,15;254:23;
274:1;285:18;304:9
**leaves (2)**
219:17,22
**leaving (5)**
124:2;184:3;196:18;
239:24;240:22
**led (2)**
246:4;298:24
**left (11)**
24:7;28:1;40:25;
43:23;49:22;80:6;
97:13;191:2;226:6;
230:25;245:13
**legal (15)**
10:11;66:14,23;78:3;
83:15;86:22;101:11;
196:1;208:4;209:15;
211:8,10;221:13;
256:24;296:22
**legally (3)**
10:12;210:21;300:15
**legislative (1)**
255:3
**lender (1)**
265:9
**lenders (1)**
299:14
**length (2)**
105:20;294:11
**less (15)**
57:7,8;98:17;164:16;
175:10;188:17;189:1,
3;191:17;205:11;
240:4;260:17,18;
279:8;292:7
**lesser (1)**
278:18
**lets (2)**
135:17,18
**letter (26)**
97:23;100:25;
101:11;108:19;109:11;
172:13;195:12;209:16;
216:7,7,8,9;231:11,12;
248:3,14;260:8;
278:24,25;279:1,2;
284:2;285:6,16;291:5;
293:18

**letters (3)**
217:24;239:3;247:19
**letting (1)**
46:23
**level (5)**
120:9;190:8;200:19;
216:11;281:21
**leverage (14)**
279:9;296:5,5,6,6,17,
18,20,23;297:13;298:9,
10,13;301:7
**leverages (1)**
296:22
**liabilities (1)**
15:21
**liability (20)**
14:11;15:21;22:1,6,
6;23:2;25:13;26:10;
27:2;29:12;37:18;38:1;
64:17;65:1;66:6;
114:16;132:20;133:9,
13;287:7
**liable (2)**
22:20;28:14
**liaison (1)**
39:7
**life (6)**
13:3;139:18;224:6;
253:7;277:23;299:17
**lift (13)**
37:6;40:4,18;41:6;
42:6,14;43:11;44:9;
46:11;50:1;52:10;
72:23;221:16
**lifted (6)**
37:13,21;46:14;
50:16;53:7,11
**lifting (6)**
37:8,14;43:14;88:19;
101:16;164:19
**lift-stay (1)**
8:12
**light (3)**
143:7;248:1;256:14
**lightly (2)**
198:23;221:14
**likelihood (1)**
278:18
**likely (8)**
36:9;100:22;138:15;
142:20,20;168:20;
277:5;278:10
**limit (8)**
12:4;14:15;16:11;
17:14;18:2;39:19;
145:23;227:21
**limitation (2)**
41:13;60:25
**limited (6)**
16:16;21:6;61:2;
69:6;256:14;274:3
**limits (14)**
11:13,14,17,23;

14:24;15:3;16:18;18:5,
25;21:7;24:2;33:10;
52:15;197:15
**linchpin (1)**
279:18;285:16
**line (8)**
172:8;173:19;
194:16;219:23;246:16;
255:21;260:25;270:12
**lined (1)**
283:1
**lines (2)**
65:8;286:10
**lining (1)**
247:4
**liquid (1)**
132:8
**liquidated (11)**
132:16;148:8,17,21;
149:25;225:17;305:24;
307:11;308:3,16;310:1
**liquidates (1)**
132:8
**Liquidating (1)**
182:4
**liquidation (4)**
53:16;148:11;171:7,
18
**liquidity (1)**
209:18
**list (11)**
97:21;102:2,6;107:5;
109:14;122:7;131:7;
136:16;154:3;165:1;
307:20
**Listen (11)**
86:19;99:21;113:20;
122:6;126:22;215:17;
216:15;248:13;251:17,
17;280:9
**listening (1)**
273:13
**litany (1)**
207:6
**literally (3)**
104:4;210:4;232:24
**litigants (1)**
301:10
**litigate (6)**
37:23;38:2,9;207:5;
262:14,14
**litigated (8)**
67:23;86:7,8,12;
134:1,1;140:10;158:25
**litigation (15)**
9:17;11:15;22:10;
37:4,11;55:19;56:17;
70:18;86:14;169:17;
206:13;250:25;258:19;
283:22;292:14
**litigious (1)**
206:8
**little (37)**

Min-U-Script®

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(20) knowing - little

Case: 19-30088    Doc# 5169    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 332
of 353

10:25;11:25;34:15;
43:14;48:25;77:8;
83:11;88:12;89:2;
93:16;96:1;105:12;
108:7;125:12;128:14;
156:8;159:15;185:8;
188:6;191:22;196:12,
13,14;198:23;204:11;
210:3,10;219:13;
232:18;245:20;258:6;
265:5,13;270:15;
278:2;285:19;293:2
**live (6)**
39:15;89:3;261:10;
299:20;304:23;306:5
**lives (10)**
39:17;137:13;138:9;
168:21;223:19;248:3;
254:15,16;299:17,20
**LLP (1)**
167:10
**lobbied (1)**
210:14
**lobby (2)**
280:22;282:5
**lock (11)**
167:14;176:11;
182:6;208:5;232:23,
25,25;235:13;248:11;
259:23;265:10
**locked (3)**
131:13;171:3;207:17
**locking (1)**
195:10
**lockout (1)**
191:9
**locks (2)**
128:25;203:21
**lockup (111)**
109:12;128:23;
130:7;167:13;169:7,
12;171:25;172:9,14,
20;174:2;176:14;
178:4,22;180:8;
182:17;183:1;185:13;
186:6;187:6,7;189:9;
190:18;193:8,14,15,17;
194:3,12;196:19,25;
197:14;199:22,25;
200:11;204:23;205:17;
206:21;207:1;209:23;
210:2,12,16;212:11,20;
213:10,16;227:6,10;
229:15,16,18;231:9,10,
12,16,22,23;232:1,10;
235:11,15,22;236:17;
238:22;240:6;241:23;
242:6,7;243:5;244:7,
12;245:9;247:12,17;
248:10;253:3;257:24;
258:7;262:17;263:6,8,
14,15;264:18,20;
265:2;269:12;272:2,

11;277:1;279:16,23;
280:2,3,4,4;281:7;
282:10;285:11;289:10,
12;290:5,13;291:18;
293:12;298:17;299:3,
5;300:16,20
**lockups (17)**
101:14;176:21,21;
177:4;180:21;190:11;
202:9;206:7;213:8;
259:4;264:2,25;269:2,
4;290:7;300:17;301:10
**logic (1)**
194:5
**logistical (1)**
88:12
**logjam (1)**
82:9
**long (22)**
8:22;25:5;42:18;
86:15;94:3;120:14,15;
123:14;159:23;161:7;
171:4;172:7;174:12;
175:2,2;177:17;
262:21;266:19;293:7;
302:21;306:10;311:4
**longer (11)**
45:14;83:11;90:9;
110:18;111:17;112:2;
129:24;238:12,19;
239:20;308:15
**long-term (3)**
211:20;282:25;
283:18
**look (40)**
14:3;24:21;28:24;
31:15;48:23;49:20;
50:10,24;51:13;53:24;
60:14;72:2,16,18;
102:16;116:23;139:9;
149:1,18;150:15;
152:6;153:24;161:25;
163:22;172:22;181:25;
190:20;195:23;204:8,
15;212:18;216:2,3;
225:23;249:13;252:13;
263:12;287:7,8;304:8
**looked (6)**
94:7;126:10;218:5,6;
249:5,5
**looking (14)**
16:20;25:12;31:17;
45:18;49:24;50:3;
78:14;79:12;113:23,
24;160:18;161:4;
231:11;245:3
**looks (1)**
225:22
**looming (1)**
231:5
**loop (1)**
156:13
**lose (2)**

58:11;283:21
**lose-lose (1)**
244:24
**losing (1)**
105:12
**loss (5)**
55:11,12;69:7;138:5;
225:18
**losses (2)**
155:2;223:13
**lost (14)**
12:21;38:12;39:12,
16;68:21,21;70:16;
186:23,24;188:1;
197:4;238:6;258:6;
266:18
**lot (44)**
24:22;31:17;37:9;
44:24;54:17,18;57:7,
21,23;65:21;100:3,4;
101:15,15;102:20;
134:17;143:13;164:19,
20;168:7,14,16,16;
181:3;184:6;214:17;
222:6;244:3;255:18;
259:17;273:2,2,3;
275:2;293:4,5,6;294:4,
5,21;300:16,17;
306:12;309:10
**lots (7)**
17:12;54:24,24;
59:15;67:13;273:10;
274:16
**loud (1)**
267:8
**loudest (1)**
267:7
**love (4)**
224:2;242:10,11;
297:11
**loved (1)**
222:12
**Lowenschuss (1)**
294:16
**lowest (1)**
207:22
**luck (3)**
71:11;77:3;93:19
**lunch (1)**
248:17
**luxury (1)**
173:18
**lynchpin (2)**
201:1;202:14

## M

**ma'am (1)**
220:10
**made-whole (1)**
266:5
**maintain (4)**
166:19;167:25;

172:5;181:17
**major (6)**
39:4;47:18;56:16;
194:20;223:5;310:17
**majority (4)**
134:22;199:8;
224:15;282:17
**makes (5)**
72:3;138:11;175:6;
256:13;265:2
**making (17)**
16:18;26:14,14;
27:14;45:15;63:16;
141:4;193:6;195:13;
202:20,22,24;250:24;
255:4;260:25;264:1,24
**management (5)**
152:8;181:9;194:18,
19;255:9
**manager (1)**
218:18
**mandatory (1)**
62:14
**Manges (1)**
288:7
**manner (2)**
152:13;241:5
**many (27)**
29:18;67:14;97:4;
99:1;134:17;135:10,
10,10;153:11;154:13,
23;165:15,19;168:18;
180:25;241:18,18;
246:24;247:20,20;
248:11;272:12;279:5;
294:1,25;296:12;
297:12
**map (1)**
268:25
**March (6)**
114:9;175:14,14;
176:2;283:10,11
**mark (1)**
188:2
**market (3)**
138:16;142:12,13
**marketplace (1)**
101:17
**married (1)**
230:22
**Mary (2)**
17:19;39:7
**mass (2)**
223:2;300:19
**match (1)**
188:3
**material (2)**
239:2;248:25
**materials (1)**
156:1
**matrix (3)**
154:11,25;232:22
**Matter (40)**

172:5;181:17
**major (6)**
[continued]
8:8;9:1;13:18;19:8;
24:4;30:11;37:12;
64:17;71:15;78:3;
89:22;92:24;125:17;
129:18;133:20;141:9;
149:5;161:17,20;
178:15;180:24;185:1,
12;208:5;211:10;
216:19;230:7;232:20;
234:11,11;244:24;
256:24;268:17;274:20;
284:15;287:3;290:8;
298:24;304:1;309:2
**matters (3)**
119:12;154:6;164:22
**Matthew (3)**
124:15;164:5;258:4
**maximizing (1)**
199:12
**Maxwell (8)**
12:23,25;14:1;19:18,
20;35:7,12;58:5
**Maxwell's (3)**
38:13,18;58:11
**May (68)**
13:11;15:20;17:1;
21:23;22:19;27:25;
28:15;36:17,18;45:5;
46:15;49:5;58:9;60:24;
65:4;68:6;80:15;82:18,
20;83:10;84:3;85:15,
17,18;86:11;90:2;93:1;
95:19;104:25;115:5;
121:6;123:22;130:1;
132:2;140:8;144:2;
149:4;151:5;153:14;
157:14;159:5;167:12;
172:5;186:14;190:15;
197:3;205:17;211:24;
222:7,11;225:23;
229:10;230:19,21,22;
231:14;236:6;240:4,
23;241:21;249:8,9;
256:17;257:20;260:21;
276:20;289:16;309:15
**maybe (44)**
8:25;12:3;15:7,7;
16:20;19:21;21:7;43:6,
6;47:13;56:6;62:2;
63:7;78:18;80:18;81:1;
87:15;90:9,16;95:18;
99:20;108:8;123:15;
129:16;138:13;179:23;
190:15;195:6,7,8;
196:15;201:8;210:18;
239:19;257:7;268:5,6,
6,7;282:3;287:22;
296:14;298:23;307:17
**McDermott (1)**
254:5
**mean (106)**
11:4,8;12:10;15:23;
17:7,25;23:12;26:9,15,

Min-U-Script®

Case: 19-30088    Doc# 5169    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 333
of 353

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(21) live - mean

17;29:5;31:24;43:9;
46:4,11;47:21;48:8;
49:7;50:2;51:2;54:21;
56:11,20;62:4;63:4,4;
67:1,11,18;71:4;79:2;
82:2;83:5;93:13;97:1;
102:16,17,17,18;104:4;
110:2;114:24;115:5;
116:23;121:8,10,25;
122:6;145:23;146:1;
147:14;154:7,7;
159:23;160:17;176:22,
24;177:19;180:9;
181:18;182:1,20;
186:6;193:10;197:5,6,
9,19;200:17;202:10;
203:18;208:3,7;
210:10,16;211:9;
214:2,15;216:15;
219:4,6;224:24;229:2;
236:12,15;237:21;
239:3;240:24;244:25;
248:14;250:5;251:17;
259:22;279:1,11;
284:19;286:3;290:11;
295:9;296:15,16;
302:15;304:22;308:2,
2;310:16

**meaning (1)**
23:3

**meaningless (1)**
290:24

**means (19)**
15:11;18:4;23:10;
24:22;85:12;108:24;
123:10;124:3;135:2,3;
159:18;193:19;194:16,
16;195:18;218:21;
237:22;277:12;299:5

**meant (3)**
213:9;240:23;269:25

**meantime (3)**
53:13;54:16;137:24

**measures (1)**
100:6

**meat (1)**
227:19

**mechanism (2)**
152:23;154:16

**mechanisms (2)**
119:3,5

**media (1)**
103:7

**mediate (6)**
40:6,8,14;44:14;
59:11;91:9

**mediated (5)**
49:9;59:5;139:3;
155:6;298:20

**mediating (1)**
54:4

**mediation (42)**
15:8;20:10,12,14,20,

23;22:14;26:3,5;37:20;
40:18;43:10,12,22;
44:1,3;46:23;48:1,5;
51:14,18;61:25;63:25;
66:16,24;67:2;145:11,
21,22;152:17;155:4;
212:23;213:15;232:22;
241:8;246:11;260:1;
273:9,11;274:1,11;
310:21

**mediator (10)**
105:21,24;111:4,4,6;
145:24;153:2;181:5;
291:7;300:5

**Medi-Cal (1)**
38:15

**meet (4)**
96:7;209:20;292:19;
310:13

**meeting (6)**
109:24;110:6;
195:13;230:5,6;273:19

**meetings (3)**
66:9;247:20;273:10

**meltdown (1)**
56:1

**member (3)**
13:25;249:19;250:4

**members (4)**
12:16;58:11;197:16;
224:12

**memorized (1)**
195:2

**memory (1)**
148:9

**mention (2)**
39:13;103:21

**mentioned (10)**
35:8;106:3;107:2;
108:19,20;109:20;
110:2,16;113:11;
289:10

**mentioning (1)**
81:20

**merit (1)**
309:16

**merits (7)**
15:12;32:10;46:1;
66:10;128:16;216:20;
264:25

**message (4)**
44:14,23;97:11;
129:9

**met (5)**
55:10;79:22;85:11;
135:2;293:16

**metaphor (1)**
162:3

**metrics (1)**
22:14

**mic (1)**
105:13

**microphone (2)**

31:25;220:9

**middle (1)**
170:14

**middle-of-the-road (1)**
234:16

**might (44)**
17:20;36:4;42:17;
49:4;57:7;69:7;87:8;
98:6;102:18,18;
111:18;124:25;128:21;
153:17;158:13;160:3;
175:3;187:20;188:2;
214:10;215:1;226:16,
16;234:8;235:17;
236:11,20;249:17;
250:5;262:2;264:14,
15;280:19;286:15;
296:10,12,14,18,20;
297:9,9,22;298:11;
300:18

**migrate (1)**
205:20

**Mikal (1)**
243:17

**Mike (4)**
155:23;187:14;
243:16;276:3

**Milbank (1)**
167:10

**million (26)**
23:16,23;24:1,3,3,3;
25:8;26:22,23;39:24;
43:15,21,24;46:24;
51:2,3,5,16,19;54:5,11;
59:13;143:25;194:17;
204:23;222:17

**mind (22)**
15:16;41:11;75:16;
85:6;87:8;94:18;
108:16;141:13;146:19;
182:24;183:18;186:7,
8;204:7;231:13;245:9;
246:13;259:19;265:14;
266:14;277:12;295:23

**mindful (3)**
36:18;38:20;54:24

**mindset (1)**
277:3

**mine (2)**
170:9;295:13

**minimizing (1)**
62:5

**minute (13)**
169:19;177:3;194:8;
200:20;211:2;220:22;
227:3,16;231:25;
232:12;242:17;257:21;
267:15

**minutes (13)**
8:25,25;94:13,15;
95:15;135:17,21,21;
187:21;203:16;213:21;
263:5;276:5

**misinterpreted (1)**
24:19

**misrepresentation (1)**
84:9

**miss (1)**
122:3

**missed (6)**
12:3;16:21;29:21,21;
222:20;307:17

**missing (1)**
50:23

**mission (1)**
129:9

**misspoke (1)**
130:13

**misstated (1)**
270:14

**misstatements (1)**
143:16

**misunderstanding (1)**
255:6

**misuse (1)**
256:23

**Mitchell (50)**
94:25;95:3,10,12,16,
23,25;96:6;97:9;98:1,
9,13,15,17,21;99:3,19;
100:3,8,16;101:4,6,21,
23;103:18,24;109:4,
21;112:4,10,14;213:21,
23;214:6,7,9;237:5;
254:17,20,21;255:16,
19,22;256:2,5,25;
257:2,4,13,14

**Mitchell's (1)**
301:2

**mixture (1)**
142:11

**modified (2)**
101:11;207:4

**modifying (1)**
229:12

**moment (15)**
24:22;31:24,25;84:8;
99:18;101:19;169:15;
195:23;214:4;221:24;
224:5;239:19;265:22;
285:8;292:24

**moments (1)**
20:20

**Monday (3)**
91:12,18,19

**money (36)**
14:13;27:15;38:12;
43:17,20;44:7;48:7,10;
50:6;52:11;54:4,5;
59:13;61:5;77:17;
80:21;117:24,25;
118:16;168:16;188:17,
19;191:5;200:22;
223:18,19;232:18,20;
235:9;245:14,15;
268:6,7,8;279:9;281:4

**monitor (1)**
41:1

**monitored (1)**
229:7

**Montali (4)**
8:5;122:25;158:1;
203:22

**Montali's (1)**
122:18

**month (5)**
38:16;108:1;119:9;
227:10;255:12

**months (13)**
16:2;47:13;74:3;
175:3;221:16;223:1;
228:8;231:3;232:4;
249:22;250:10;287:6;
300:2

**Moore (1)**
303:22

**moot (1)**
87:21

**morass (1)**
292:14

**more (90)**
24:16;30:9;34:8;
36:11;39:23;45:8;48:4;
52:21;57:23;59:23;
65:22;68:25;74:23;
77:16;88:4;91:1,14;
92:23;95:5;98:17;
99:24;103:16;107:12,
15;115:3;116:13;
121:25;125:13,15;
126:13;127:5,8,13,25;
128:19,22;130:14;
136:10;139:19;144:19;
147:13;149:6;159:16;
164:16;167:22;175:10;
183:20;185:10;186:20;
188:10,11,18;189:4;
191:16;193:1;196:13,
14;199:17;201:9;
203:19;204:18;217:5;
233:13,13;234:17;
235:9;236:21;242:12,
18;263:2;269:15,15;
273:9;275:3,3;278:6,6,
8,8,9,10,21;279:9;
282:1,14;296:1;300:1;
303:25;310:22,24

**morning (27)**
8:6,7;9:14,15;10:1,2;
12:18,25;17:15,16,19;
64:16;75:13,14,20;
86:24;94:8;112:2;
123:14;140:5;147:17;
160:7;172:16;224:10,
15,17;255:15

**most (17)**
26:2;51:15;52:5;
58:20;126:15;127:2;
134:24;173:3;178:8;

Min-U-Script®

Case: 19-30088   Doc# 5169   Filed: 12/19/19   Entered: 12/19/19 07:35:08   Page 334
of 353

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(22) meaning - most

198:7;258:12;263:17;
275:4;278:10;286:20;
289:6;291:16
**motion (88)**
9:3,4,18;10:5;13:19;
15:17;16:21;20:9,24;
22:18;25:15,19;28:2,2;
29:5,9,14,23;30:4,10;
31:2,6;35:19,25;36:13;
40:17;41:6,20;44:17;
46:1;57:3;58:3;59:25;
60:14,16;61:15,17;
62:19;63:10;64:3,18;
69:20;73:5;78:4,21;
79:3;80:3;82:8,10,13;
83:6,14;87:16,19;88:2,
6,6,20;89:16,20;91:5;
93:5,5;99:23;108:13;
116:13,15,18,20,25;
119:10;123:1,4,6;
127:11,16;128:6,7;
150:15;163:13;164:17;
199:3;242:6;269:16;
270:16;271:1;292:22;
297:8
**motions (9)**
8:12;21:2;40:23;
48:21;63:19;66:7;
124:24;264:25;293:9
**motion's (1)**
29:5
**motivate (1)**
181:12
**motivated (1)**
257:11
**motivates (1)**
246:25
**motive (1)**
65:16
**mouths (1)**
183:9
**move (23)**
34:15;37:6;60:16;
76:3;81:14;92:3;96:21;
103:19;104:14,23;
110:7;135:7;155:14;
165:17;201:14;204:15;
233:12;253:13;262:13;
274:12;288:22;297:6;
306:6
**moved (2)**
42:14;81:5
**moves (3)**
77:25;264:1,1
**moving (17)**
9:14;12:3;24:20;
33:23;45:21,23;60:4;
83:12;87:3,3,21;
105:15;110:24;275:8;
277:25;300:1,1
**Mt (1)**
295:11
**much (42)**

10:15;16:14;22:11;
34:8;37:11;41:2,7;
61:13;73:25;87:23;
98:2;99:1;128:16;
130:14;138:5;142:18;
145:11;164:3,7;
168:24;172:7;175:7;
178:19;182:24,25;
191:24,25;201:9;
204:4;205:8;220:2;
227:22;255:2;260:18;
267:16;278:3;292:7;
295:19;296:3,4;301:3;
303:6
**multiple (3)**
147:6;294:15;306:6
**municipal (1)**
266:22
**musing (1)**
287:22
**musings (1)**
205:24
**must (3)**
88:6;243:20;264:8
**mutually (1)**
308:13
**Myers (2)**
95:16;254:21
**myself (7)**
172:12,22;177:1;
182:14;230:13;293:12;
300:6

# N

**Nadler (2)**
126:7,8
**nail (1)**
77:6
**name (19)**
17:17;65:4;66:17;
74:14;75:15;107:18;
124:13,13;142:3;
155:22;156:22,24;
164:4;187:12;215:6;
220:11;241:11;253:25;
303:21
**named (5)**
119:14,16,16,17;
135:25
**namely (1)**
45:15
**Nancy (2)**
95:16;254:20
**Napa (2)**
62:17;137:18
**nasty (1)**
238:5
**national (1)**
281:5
**natural (2)**
84:24;85:1
**nature (5)**

46:4;86:12;89:15;
202:8;209:23
**near (3)**
192:7;302:14,15
**necessarily (6)**
126:3;182:6;203:15;
261:5;262:10;268:12
**necessary (7)**
87:24;96:13;129:7;
134:11;250:20;271:19;
306:5
**need (76)**
8:23;14:1;26:8;29:6;
35:10;36:10;37:18;
38:12;48:10;61:21;
62:25;65:17;74:5,7,19;
75:15;88:15;92:3,23;
96:11,12;100:23;
115:22;117:3;120:12;
121:24;124:21;125:15;
136:5;138:12;142:4,
20;154:1;164:20,22;
166:15;185:2;192:11,
12,14,17;201:17;
203:21;206:10;207:15;
208:24;212:18;215:25;
220:9;223:17,18,19;
227:5;231:20;254:7,
17,18;257:1,18;
264:21;278:22;279:11,
19,23;280:3,4;286:12;
291:3;305:14,20,23;
308:1,15;309:18;
310:3,20
**needed (3)**
108:11;112:15;
304:17
**Needless (1)**
108:6
**needs (19)**
12:11;89:8;103:15,
16;191:16;197:21;
209:20;210:17;212:15;
216:3;217:3;218:5,14;
219:25;250:19;254:19;
280:3;283:11;310:7
**negative (2)**
252:4;283:25
**negotiate (2)**
21:15;226:13;284:20
**negotiated (14)**
10:8;15:13;67:12;
117:12,14,17;133:4;
139:3;151:17;232:9;
267:3;269:12;290:4,6
**negotiating (2)**
21:10;281:10
**negotiation (7)**
135:9;145:20;
157:23;158:22;289:11;
290:1,2
**negotiations (11)**
105:20;117:7;

154:23;189:22;199:14;
207:5;212:23;244:2;
268:18,20;274:16
**neighborhood (1)**
23:23
**neighboring (1)**
85:7
**neighbors (1)**
139:13
**neither (2)**
100:14;264:11
**net (1)**
204:12
**neutral (1)**
183:21
**Nevada (1)**
295:19
**nevertheless (1)**
260:7
**new (7)**
14:6;25:12;73:16;
91:12,19;121:18;290:7
**news (5)**
52:18,18;137:22;
191:8;203:10
**Newsom (2)**
95:17;254:22
**Newsome (14)**
105:22;106:12;
107:10;151:14;241:7;
243:20;244:13,15;
245:25;246:16;293:16;
309:16;310:2,23
**Newsome's (1)**
10:9
**next (32)**
22:10;48:1;60:16;
61:15;69:20;70:3;
89:11,12;94:12,14;
108:1;116:11;117:6;
119:9,11;120:24;
126:23;139:6,20,21,22;
140:15;143:12;165:1;
167:4;190:2;231:3;
245:23;273:7;274:8,
12;298:24
**nice (2)**
43:19;255:9
**night (3)**
39:16;94:7;220:16
**night's (1)**
15:18
**nine (1)**
131:14
**nineteenth (1)**
135:22
**ninety-five (1)**
143:25
**Nobody (5)**
194:11;226:5;
245:13;289:2,2
**NOLs (1)**
279:8

**non- (1)**
149:16
**nonbankruptcy (1)**
232:14
**none (6)**
38:18;99:16;127:4;
158:4;245:10;268:22
**nonindividual (1)**
42:25
**nonissue (4)**
21:8;32:8;129:11;
179:19
**non-issue (1)**
149:4
**nonlawyer (1)**
299:23
**nonlawyers (1)**
54:25
**non-planned (1)**
221:10
**Nope (1)**
55:23
**nor (3)**
99:7;100:14;101:6;
109:8;212:15;221:25;
264:11
**normally (1)**
299:20
**North (1)**
256:10
**Northern (2)**
68:23;97:10
**note (5)**
69:12;110:8;145:19;
160:22;294:21
**noted (3)**
136:4;267:9;286:13
**noteholder (3)**
187:15,16;276:4
**noteholders (4)**
130:5,9;211:18;
212:24
**noteholders' (1)**
111:13
**notes (2)**
209:6;211:17
**notice (3)**
128:7;165:14,16;
246:4
**notify (1)**
135:18
**notion (4)**
28:19;88:13;242:2;
296:5
**notwithstanding (6)**
97:22;197:3;201:23;
238:5;240:8;256:8
**November (1)**
84:15
**novice (1)**
82:15
**number (51)**
8:22;11:9;20:21;

Case: 19-30088    Doc# 5169    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 335
of 353

22:12;25:6,7;40:1;
83:7;97:12;98:23;
108:13;114:25,25;
115:23;119:14,19;
127:1;133:7;134:23;
157:11;158:23;167:8;
184:7,9,17;194:21;
219:1;226:13;237:13;
240:8,9;242:13;
249:19;262:10;269:8,
9;277:22;278:20;
279:20;286:15,16,17,
21,24,24;287:1,19;
288:16;289:5,19;
308:25

**numbers (9)**
114:18,19;117:22;
122:6;171:13,19;
180:4;182:5;184:21

**numerosity (1)**
144:2

**numerous (1)**
224:21

## O

**Oakland (6)**
30:11;35:22;43:2;
45:4,19;84:23

**Oakland's (1)**
46:1

**object (17)**
32:9;64:19;105:3,4;
138:9;144:6;153:9,19;
211:25;244:17;250:3;
267:22;278:16;283:7;
284:12;304:18;309:25

**objected (5)**
31:14;32:22;106:25;
128:5;135:4

**objecting (2)**
131:22;165:22

**objection (29)**
31:7,13;32:4,14;
33:3;65:3,11;66:4;
111:14;114:24;115:5,
7;116:14,19;126:13;
128:6,8;143:8,9;
147:22;149:2;150:7,
21;153:19;156:2;
200:5;248:19;266:1;
304:18

**objections (23)**
32:3;102:7;113:14,
15;118:8;123:17,18,
19;126:2,10;127:3,11,
25;130:13;131:7;
132:1;141:14;151:5,5;
152:12;156:11;231:15;
302:6

**objective (3)**
84:25;86:16;154:24

**Objectively (2)**

194:1,2

**objectives (2)**
86:19,21

**objectors (7)**
126:24;135:25;
136:1;151:11;156:19;
162:14;267:2

**objector's (1)**
108:14

**objects (3)**
64:9,10;171:7

**obligation (3)**
134:21;239:15,15

**obligations (6)**
78:14;129:7;192:17,
19;237:25;243:13

**observation (1)**
300:25

**observations (2)**
225:12;286:15

**observe (2)**
164:18;263:7

**observed (1)**
156:14

**obstacles (1)**
179:1

**obtain (2)**
29:12;79:15

**obtained (1)**
29:13

**obtaining (1)**
10:15

**obvious (4)**
112:23;113:22;
209:10;251:18

**obviously (29)**
9:1;17:25;19:11;
22:12;45:9;62:4;67:6;
69:10;96:2;108:13,14;
110:4;124:12;129:21;
163:2;178:6;183:1,24;
185:14;190:10;211:19;
213:10,14;236:11;
255:5;284:25;293:4;
298:5;310:2

**OC (1)**
128:25

**OCC (2)**
123:20;129:20

**occasion (1)**
82:22

**occasions (1)**
277:1

**occur (3)**
62:21;271:23;277:5

**occurred (7)**
36:10;40:13;55:5;
59:10;239:2;273:11;
308:14

**occurring (1)**
290:12

**occurs (1)**
197:15

**o'clock (5)**
95:8;123:22,23;
135:15;136:9

**October (1)**
42:12

**off (36)**
22:7;25:6;36:3;39:1;
76:23;96:15;124:3,4;
125:22;129:24;131:17;
145:5;157:8;159:4,12;
160:1,11;162:2;169:8;
170:13;173:10,23;
174:19;176:3;206:8;
213:3;214:3;221:5;
241:6,6;251:8;252:7;
265:5;280:14;293:2;
307:14

**offended (2)**
113:21;257:15

**offer (3)**
25:22,23;298:21

**offered (1)**
86:2

**offering (1)**
90:22

**offers (1)**
221:20

**office (15)**
103:22;109:25;
162:20;165:5,12,14;
192:1;193:1;213:25;
229:7,13;231:2;
280:25;281:2;307:10

**officer (1)**
276:14

**officers (1)**
216:21

**offices (1)**
139:24

**official (13)**
10:3;128:22;129:3,
10;131:19;134:20;
152:5;167:4,10;221:8;
231:15;234:12,15

**officiously (1)**
136:2

**offline (1)**
127:13

**often (2)**
245:18;297:3

**OII (5)**
57:9;101:16;128:20;
173:24;229:6

**O'Melveny (2)**
95:16;254:21

**omnibus (1)**
304:3

**once (12)**
40:1;52:21;123:5;
126:18;128:15;130:21;
133:15;182:12;198:2;
249:23;258:24;263:3

**one (182)**

8:13,21;9:11;12:2;
13:1,7;15:2,6,15;19:6;
25:6;26:11;27:20;
29:19;36:16;39:16;
40:19;43:9;45:7;48:7;
49:8;52:9;53:25;56:11;
59:8;67:5;68:18,25;
69:6;74:23,25;78:14;
82:22;87:18;96:16;
97:5,24;107:7;109:15;
110:17;112:8;118:7,8,
12;126:11;129:22;
131:20;132:1;139:19;
141:21,21;142:1;
145:8;146:14;147:4;
148:5;149:15,16,18;
153:3;155:12;161:10;
165:5,13;169:12;
170:12,22,22;171:7;
172:8;173:11;174:8;
178:7;179:25;182:7;
183:6;185:10;186:9;
187:23;189:23;191:17;
193:25;194:5,11,17,23;
197:12,17;199:21;
200:21;201:9;204:20,
24;205:24;206:23;
209:22;210:15;212:12;
216:2;218:3,24;
220:13;224:6;225:10;
227:5,5,16;228:10,10,
22;231:17;232:18,23;
233:5;234:4,16;236:1;
237:8,12;241:12,13;
242:17;244:4,9,12,15,
23;245:11,23,24;
248:11;252:8,16;
253:2,13,17;256:9;
257:21;259:24;262:7;
264:13,16;265:16,22,
23;266:12,12,17;
267:24;269:8;270:7;
272:14;273:8,13;
274:15,15;280:9,12,22;
281:7;285:25;286:17,
25;287:8;289:24;
293:5;294:5;295:3,21;
296:6;299:9,9;302:25;
303:20,25;304:4,14,18;
307:19,25;308:20;
310:3

**one-billion-dollar (1)**
219:1

**ones (5)**
107:7;119:17;168:3;
250:18;306:17

**One's (2)**
43:1,2

**ongoing (1)**
103:21

**only (58)**
10:12;11:3,19;13:18;
19:24;24:21;27:18;

37:13;38:14;42:25;
46:17;49:20;50:24;
52:9;87:2;92:1;108:14;
112:20;113:9;131:23;
134:20;146:11;148:20;
151:10;177:7;178:6,
23;182:16;184:18;
187:20;189:22,23;
193:2;194:4,10,19;
197:14;203:16;204:10;
205:7,12;219:10;
223:7;224:16;228:12;
238:14;248:23;264:8;
269:16,17;280:3,21;
284:1;287:20;289:21;
290:3;306:18;307:15

**onto (2)**
169:22;224:23

**oOo- (1)**
8:2

**open (7)**
173:7,11;182:3;
234:21;260:1;280:5;
300:25

**open-ended (1)**
25:22

**opening (3)**
66:22;102:12,25

**operate (3)**
212:14,15;297:6

**operating (2)**
223:8;297:18

**operation (1)**
85:1

**operational (1)**
130:18

**operative (1)**
159:18

**opinion (6)**
30:17;112:1;246:23;
258:8;284:22;294:23

**opinions (1)**
97:2

**opponent (2)**
90:25;284:11

**opponents (3)**
102:2;136:16;220:23

**opportunities (3)**
183:15;259:10;
295:14

**opportunity (19)**
30:20,25;64:3;74:8;
88:9;90:10;135:25;
142:11;151:9;153:8;
198:15,15,16;202:16;
221:9;266:22;275:21;
304:17;310:12

**oppose (5)**
78:8,12;171:16;
297:8,22

**opposed (8)**
30:12,13;43:10;
69:17;128:16;171:15;

Min-U-Script®

Case: 19-30088    Doc# 5169    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 336
of 353

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(24) numbers - opposed

227:10;235:1
**opposing (4)**
60:5;163:13;219:8;
294:10
**opposite (3)**
103:20;170:10;218:7
**opposition (18)**
9:19,20;10:5;62:24;
63:19,23,24;64:18;
77:21;81:25;86:5;91:4;
93:4;116:24;127:18;
130:21;296:2;305:10
**oppositions (1)**
101:25
**opt (2)**
295:8,8
**optimistic (2)**
226:25;227:1
**option (3)**
81:7;155:3;236:23
**optionality (1)**
98:17
**options (4)**
173:7;182:2,3;
183:21
**oral (6)**
63:4;108:8;126:4;
293:8;302:1,8
**orally (1)**
125:21
**order (48)**
8:3,17;9:7;20:25;
33:20,20;35:13,17;
37:19;52:23,24;53:3;
54:20;60:1,15,23;61:9;
81:9;110:1;114:1,3,13,
15;123:5;124:2;
126:23;132:13;133:1;
135:25;145:21,25;
153:15;159:11;166:13;
192:13,16;196:9;
221:17;223:19;284:16,
19,20;285:19;293:10;
304:1,5,14,15
**ordered (1)**
145:22
**orders (4)**
33:14;301:24,25;
302:10
**order's (1)**
114:2
**ordinary (2)**
264:2;268:4
**origin (1)**
140:13
**original (1)**
159:7
**originally (1)**
28:18
**ORSINI (101)**
103:17;104:6;105:2,
4,6,10,14;106:21,24;
107:2,6,9,15,19;

108:10,16,18;109:1,3,
8,13,18,20;110:20;
111:22;112:1,9,12,17,
20;113:17;114:5,8,11,
15,19,21;115:3,7,11,
16,19,22;116:4,6,9;
117:16;122:15,17,19,
22;123:24;124:5,7;
125:25;135:14;156:17,
20,23,25,25;157:4,20,
23;158:10,12,17,19,21;
159:20,22,25;160:5,9,
12,14;176:3;185:9;
244:19;285:25;286:5,
7,8,12;287:10,12,14,
16;288:4;289:10;
307:24;308:23,24;
309:6,8,13,19,20;
310:5,10,20
**Orsini's (1)**
160:24
**others (9)**
48:21;116:24;
126:14;142:6;176:20;
177:10;296:2;298:23;
302:14
**otherwise (8)**
15:4;98:3;110:4;
158:13;200:17;278:17;
290:11,23
**ought (9)**
19:1,3;87:17;99:21;
123:4;130:17;149:18;
248:14;275:9
**ourselves (1)**
260:2
**oust (1)**
68:13
**out (110)**
9:7;10:10;11:22;
13:2;15:17,25;16:8;
17:13;19:21;21:13;
22:8;27:15;28:1;43:15;
47:11;54:1;59:17;
60:20,21,23;66:8;
67:15;71:11;73:15;
77:3;78:14;86:25;95:6;
98:4;100:17;105:19;
106:10;108:23;111:2;
112:8;115:1;126:24;
128:4;129:12,13,14,15;
133:11;135:17,18;
141:6;152:22;155:18;
159:11,15;163:6;
167:14,15;174:7;
175:19;182:8,17;
183:2,4;184:18;
185:17;188:18;189:24;
190:11;193:16,24;
194:3;195:4;198:4,5;
200:21;206:20;210:24;
211:4;213:13;226:6;
230:11;231:19;232:16,

22;237:2,7;239:3,22;
241:25;242:5;243:22;
248:9;249:17;252:22;
254:25;256:19,20;
259:10,11;261:21;
262:7;264:8,16;277:2,
6;280:20;285:17;
289:7;293:7;295:8,24;
298:4;307:25;310:12
**outcome (9)**
25:16;33:21;160:25;
226:15,16;246:24;
247:2;278:10;300:5
**outlined (1)**
279:3
**out-of-pockets (1)**
38:16
**outrageous (1)**
208:18
**outset (2)**
291:10;295:4
**outside (6)**
22:21,22;48:16;
85:13;168:15;230:20
**outstanding (3)**
209:6;266:1;268:18
**over (58)**
11:25;14:7;19:18;
35:16;38:13;42:22;
43:14;47:12;58:18;
59:16;68:8;72:5;81:4;
82:3;85:10,12;92:16;
119:11;134:18,19;
135:6,10;137:8;
143:24;152:6;159:19,
23,23;160:4;174:2;
179:25;180:11;189:10;
191:5,10;196:21;
199:10;200:4,14;
201:14;221:13;227:8;
228:9;230:24;241:20;
245:10;246:15;251:3;
264:6;272:12;276:1,
14;293:3;294:17,18,
18;295:2;302:18
**overall (2)**
158:22;230:16
**overburdened (1)**
250:25
**overlooked (1)**
124:17
**overnight (1)**
139:14
**overpaid (4)**
206:1,14,15;207:14
**overpaying (2)**
208:6,18
**overpayment (1)**
206:9
**overpays (1)**
241:1
**overrule (1)**
128:6

**overruling (1)**
302:5
**oversee (1)**
238:12
**oversight (1)**
127:10
**oversimplification (1)**
269:13
**oversimplify (1)**
236:16
**oversimplifying (1)**
87:9
**overtime (1)**
297:14
**owe (1)**
224:22
**own (19)**
14:4;15:12;23:2;
51:7;59:6;76:18;79:12;
89:2;90:18;102:2;
126:24;138:5;169:16;
216:20;226:2;245:5;
270:14;296:13;297:1
**owned (1)**
223:6

**P**

**pace (2)**
45:21;147:24
**Pacific (1)**
60:8
**pack (1)**
259:13
**package (2)**
156:1;219:8
**pad (1)**
67:17
**padded (1)**
71:11
**padding (1)**
67:23
**page (10)**
113:24,24;115:25;
116:11;119:11,11;
120:24,24,25;237:17
**pages (5)**
107:15;276:8,13;
277:11;286:10
**paid (16)**
24:23;27:4;42:9;
111:11;117:24,25;
118:3;132:6;171:24;
195:16,17;201:19;
206:17;211:5;235:1;
257:7
**panoply (1)**
99:14
**paper (3)**
52:9;218:9;279:13
**papers (22)**
11:2,12;12:3,10;
13:8;15:14;16:17;

40:13,14;41:22;61:21;
76:25;86:9,23;87:24;
113:1;128:17;170:5;
197:9;205:2;230:15;
256:6
**parachuting (1)**
37:9
**Paradise (3)**
137:19;139:13;
232:17
**paragraph (9)**
17:4;20:22;117:6;
149:10;237:4,10,11,17;
270:15
**paragraphs (1)**
16:22
**paraphrasing (1)**
175:11
**parcel (1)**
129:8
**Pardon (1)**
17:2
**parents (2)**
12:24;38:12
**Park (1)**
294:25
**part (47)**
21:13;26:13;49:11;
51:1,23;65:11;69:15;
77:20;79:11,11;86:13;
92:19;119:2;126:15;
127:3;129:8;132:7;
145:12,13,15;157:20,
23;158:22;161:13;
163:2,9;165:21;
189:22;217:3;218:3,4;
219:2,5;223:22;
228:23;229:18;244:21;
249:25;263:13;266:5;
276:8;308:9,11,25;
309:2;310:7,21
**participants (1)**
273:11
**participate (5)**
52:1;163:15;209:24;
212:6;226:23
**participates (1)**
132:9
**participating (2)**
214:19;265:15
**participation (1)**
224:21
**particular (11)**
65:13;106:24;
118:12;121:23;129:13;
152:14;163:7;182:7;
217:23;223:15;304:20
**particularly (14)**
86:3;115:13;116:25;
123:15,19;131:1;
179:25;187:7;196:8;
223:14;231:10;250:10;
292:4;294:5

Case: 19-30088    Doc# 5169    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 337
of 353

**particulars (1)**
130:20
**parties (69)**
12:3;28:25;60:4;
96:11;104:18;105:21;
106:12;107:10;108:20;
110:3;112:21;118:8;
127:19,21;129:5,6;
131:22;134:13;136:7;
144:23;145:8,9,17,20,
22;147:9,24;153:9;
154:14,22;158:12;
161:4,16;165:21;
171:25;172:3;177:8;
180:2,22;210:19;
212:16,24;224:18;
225:11,12,22;228:23;
230:1,16;240:19;
265:9;267:3;269:14;
270:11;275:3;280:11;
289:12;290:2;291:12,
16,17;292:3,8;293:16;
301:8;302:6;305:10;
310:2,13
**parties' (1)**
299:7
**parties-in-interest (1)**
301:5
**partly (1)**
88:17
**partner (3)**
197:4;242:17;253:9
**partners (1)**
201:14
**parts (3)**
271:17;274:3;295:1
**party (19)**
9:14;24:20;33:23;
39:16;87:4,21;115:8;
118:8;124:20,21;
132:2;145:24;180:1,
22;183:21;209:23;
221:10;292:3;294:24
**party-in-interest (1)**
18:24
**Pascuzzi (19)**
127:19;155:17;
162:15,16,19,19,24;
163:17,19,22,25;164:8;
307:6,7,9,9,14,21;
308:12
**Pascuzzi's (1)**
309:23
**pass (2)**
28:3;227:25
**passed (3)**
15:11;21:11;28:18
**passing (1)**
28:7
**passthrough (4)**
51:23;52:4,8;64:13
**past (6)**
47:13,21;69:7;

109:25;121:17;293:24
**patently (1)**
284:11
**path (8)**
73:15,24;110:25;
134:24;218:17;248:1;
292:12;309:15
**patient (2)**
162:17;258:9
**Paul (5)**
162:19;166:21;
303:22;307:9;308:7
**pause (1)**
123:7
**paused (1)**
123:4
**paving (1)**
106:4
**pawn (1)**
253:10
**pay (13)**
11:23;14:13;18:18;
23:4;24:24,24;51:9,10;
188:18;197:19;202:4;
261:16;296:19
**payable (1)**
261:13
**payers (1)**
112:24
**paying (3)**
27:15;52:13;202:2
**payment (7)**
13:5;132:11;139:17;
223:13;224:3;239:23;
257:9
**payments (4)**
135:6;225:23;238:1;
289:8
**pays (1)**
27:9
**PD (2)**
262:24,24
**pegs (1)**
204:22
**penalty (1)**
79:6
**pending (5)**
72:21;128:20;
148:11;157:6;305:11
**people (67)**
23:11;39:14;43:19;
48:13,22;53:22;56:12,
24;65:22;66:8,8;67:22;
83:7;95:8;96:14;97:4;
104:25;107:2;118:13;
119:19;126:5;132:5,
12;133:25;137:16;
139:11;140:11;151:24;
152:1;168:18;178:18;
183:12;185:16;193:25;
194:14,15;196:16;
199:24;202:15;213:8;
217:18;223:18;236:22;

247:20;262:12;264:1,
7;273:8,14,14;274:16,
16,22;275:14,15;
278:16;280:21;281:16;
284:17,22;285:18;
288:12;297:6;298:10;
299:19;304:17;306:1
**per (2)**
80:21;153:3
**percent (12)**
134:19,20;135:5;
137:23;142:18;216:18;
221:13;250:23;252:14,
14;304:22,22
**perfect (4)**
30:25;93:18;135:3;
275:25
**performable (1)**
268:23
**performance (6)**
79:12;81:9;83:17;
86:4;87:12;199:9
**performed (1)**
85:10
**performing (1)**
85:12
**perhaps (12)**
45:11,12,13;102:4;
123:18;127:13;180:19;
185:2;194:18;233:1;
298:22;310:21
**period (5)**
87:19;203:24;
261:19;273:25;304:18
**permissible (5)**
185:4;295:25;
296:22;300:15,15
**permission (1)**
34:19
**permit (2)**
70:3;280:15
**permits (4)**
85:5;147:14;301:8,9
**permitted (3)**
19:15;178:22;221:17
**person (4)**
232:21;242:3;247:8;
299:23
**personal (9)**
58:12;126:6;132:18;
144:4;145:2,4;196:8;
224:16;226:2
**personalize (1)**
238:16
**personally (2)**
97:6;233:5
**perspective (5)**
188:7;189:13;190:7;
198:24;301:4
**persuade (2)**
90:10;148:16
**persuaded (4)**
131:1,4;162:1;

301:11
**persuades (1)**
238:16
**persuasion (1)**
140:14
**persuasive (1)**
26:13
**pervades (1)**
146:11
**PEs (1)**
195:11
**petition (3)**
107:24;136:5;223:1
**PG&E (83)**
8:8;11:3,20,20;13:7,
14;14:2,2,9;16:5,8;
19:2,4,14;20:22;22:1,
20,21;24:1;25:11,13;
27:4,4;28:14,15;30:17,
20;31:16;35:16;36:10,
14;37:17;38:3,40:20;
41:7;42:10;45:10;
51:15,22;55:21;57:7;
59:21,22;60:8;62:9,19;
63:20,22;65:9;68:5,7,
20;69:16;70:17,25;
71:2,6;72:10;75:22;
77:15;79:22;80:6;
84:15,20;85:4,10,11;
87:5;90:1;93:3;135:5;
137:5;138:2;223:7,9;
234:8,24;238:6;
251:19;252:23;264:9;
284:13;285:6
**PG&E's (12)**
10:5;14:7;20:8;37:7,
24;45:9;62:13;64:17,
19;66:22;67:21;92:2
**ph (1)**
20:18
**phase (1)**
276:14
**phenomena (1)**
264:16
**philosophy (1)**
59:6
**phone (3)**
161:5;165:11;181:24
**phonetic (1)**
126:12;135:19
**pick (8)**
208:4;234:5,5;265:9,
10;266:11;279:19;
285:19
**picked (2)**
189:5;304:20
**picture (1)**
27:22
**pie (2)**
144:16;146:9
**piece (6)**
26:11;60:21;144:16;
194:20;253:11;287:21

**pieces (2)**
146:9;285:19
**piggyback (1)**
169:22
**pill (1)**
168:2
**pin (1)**
259:23
**Pina (1)**
29:4
**pinning (1)**
26:20
**Pino (36)**
9:15,15,16,25;29:8,
23;30:13,22,25;31:5,
10,12,15,19,21;32:1,2,
15,17,20,22,24;33:1,5,
14,16,18;34:2,5,10,14,
22;49:18;60:1;61:10,
12
**pitch (7)**
59:22;162:4;166:2;
184:6;193:6,9;196:6
**Pitre (38)**
242:19,21,22,24,24,
25;243:2,4,8,11,13,16,
23;244:1,16;245:3,19,
22,25;246:7,9,11,13,
20,22;247:8,16;248:6,
7;260:12;261:21;
278:14;284:17;287:1,
5,19;289:9;299:4
**place (23)**
19:1;30:18;33:12;
35:4;36:2;40:25;53:4;
61:23;62:6;64:6;130:6;
187:23;190:6;196:10;
216:25;250:18;253:13,
15,15;270:7;277:13;
290:14;301:7
**placing (1)**
69:21
**plaintiff (4)**
25:16;77:8;80:3;
117:23
**plaintiffs (36)**
11:15,16;14:15;
16:11,15;18:1;24:7,18;
25:21;30:12,13;36:7,
13,19,22;37:2,15;38:9;
40:10;42:22;47:1;50:9;
51:15;52:1,18;55:2;
59:20;117:8;119:14,
16,17;126:20;130:15;
249:8,18;261:17
**plaintiffs' (3)**
43:12;52:25;232:15
**plaintiff's (1)**
77:3
**plan (327)**
10:8;19;15:10,11;
22:22,25;24:6;25:1;
27:3;28:18;31:7,7,13,

Min-U-Script®
Case: 19-30088    Doc# 5169    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 338
of 353
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(26) particulars - plan

16,22;32:2,3,8,13;49:5;
52:5;96:4,10,11;99:17;
100:22;101:8,8,18,20;
103:19;104:2,14,15,15;
105:7,15,16;106:1,4,
17;108:1;110:5,9,15,
17,17,17,18;111:10,15,
16,17;112:2,5,21,23;
113:5;114:16;115:16,
17,19;127:3,4;128:9,
10;129:1;131:14,15;
134:7;138:11,11;
141:18;142:8,21;
144:3,24,25;145:18,19;
147:21,21;149:7,10,12;
150:6,10;151:7;152:7,
19;153:1;154:19;
160:2,3;165:18;
166:25;168:22;169:9;
171:4;172:1,3,10,10;
173:25;174:13,13,18;
175:6,21;176:5;177:5,
11,17,25;178:5,22,24;
179:1,3,8,11,13,14,17,
25,25;181:14,15;182:8,
8,19;183:14,25;184:6,
9,13,13;185:2;186:20;
187:9,19;188:6,10,12,
19;189:11,23,23,24,25;
190:4,6,12,12;192:20;
193:1,14,22,25;194:5,
6,6,11,23;195:5,6,11,
24;196:7,10,20;197:2,
11,15,20,22;200:2,9;
201:7,10,14,16,17,23;
202:14;203:5;205:3,3;
206:2;207:12;208:8,
15,20;209:15,18,24,25,
25;210:1,7,20;212:7,
25;215:10,10,16,25;
219:8;220:1,23;
221:17,19,20,22,23;
222:9;223:24;224:3,4,
5,7;228:6,9,11,21,25;
229:8,10,11,12,24;
230:22,24,24;232:1,19,
20;233:8,9,14,15,20,
22,22;234:3,3,25;
235:1,6,8;236:21,22,
22,24;237:4,6;238:2,3,
8,14,14,21;239:8,20,
24;246:24;248:21;
249:21;250:1;251:2,
10,11,13;255:7,10,12;
256:16;258:15;261:16;
263:19,19,20;265:13,
17;267:17,19,23;268:2,
4,5;269:6;271:20;
278:8,18;279:4,4,5,6,6,
7,8,19,24;280:13,13,
24;281:12,17;282:1,4,
5,24;283:6,11,15;
284:11,12,14,18;

291:21;292:9;300:12;
301:17,19;303:4,7;
307:22
**plans (13)**
96:16;172:8;194:4;
195:7;199:1;219:11;
233:2;251:10;254:25;
263:25;265:9,17;285:1
**plan's (3)**
267:16;283:7;284:5
**plan-type (1)**
165:20
**plate (1)**
214:25
**play (12)**
47:11;53:18;99:24;
138:16;159:15;175:19;
180:7;185:16,18;
190:16;193:16;236:4
**played (5)**
131:2;170:13;
234:16;256:19;295:24
**player (1)**
234:16
**players (3)**
197:16;275:19;
310:17
**playing (12)**
204:11;235:23,24;
236:6;244:10;246:1,
15;252:15;261:19;
266:7,9;281:22
**plays (3)**
141:6;256:19;310:12
**pleading (1)**
112:5
**pleadings (5)**
38:19;40:22;98:3;
163:5;254:23
**please (11)**
8:18;86:1;135:18;
136:14;187:11;216:18;
220:11;221:1;274:13;
276:10;292:24
**pleasure (2)**
94:1;230:5
**plenty (6)**
11:2,4,5,6,8;28:9
**plowing (1)**
82:14
**plummeted (1)**
137:23
**plus (8)**
24:9;33:11;50:25;
51:1;60:13;249:1,3;
266:21
**pm (5)**
136:11,11;220:24,
24;311:7
**pocket (2)**
43:15;201:3
**pockets (1)**
223:21

**podium (8)**
23:24;154:2;189:15;
196:20;225:11;235:19;
242:11;249:10
**point (151)**
10:10;14:10;21:7;
22:13;25:21;27:20;
28:5;33:7;40:19;45:17;
46:22;47:8;48:20;50:4;
52:9;54:18;55:14;57:6;
59:13;60:24;66:15;
69:12,15;71:20,24;
72:13,18;73:2,20;
78:17;79:16,24;90:4;
100:20,20;101:7;
105:19;106:10;108:8;
111:2;115:6,23;
121:23;126:4;131:10,
20;132:17;133:5;
134:12,18;139:19;
140:2;145:22;146:3;
147:4;150:19;151:1;
157:9,25;158:1,5,12;
163:16;169:20;170:1;
174:5;175:1;176:16;
178:6,19,21;179:15,18;
180:7;181:16;183:22;
186:8;191:20,21;
196:5;198:13;199:20;
204:4;206:3,5,5;
207:22;208:20,21;
213:13;217:2;218:2,
24;220:17;228:17;
229:8;230:19,21;
232:19;236:16;238:8;
242:1;247:15;248:9,
20;249:6,17,17,19;
251:12,13;252:13,17,
19,20;253:8,17,18;
254:18;256:5,15;
263:3;265:1,6;266:1;
268:21,24;271:25;
273:7;276:24;279:13;
281:25;283:9;285:1,5,
10;286:24;287:1,2,20;
288:2;295:3;296:1;
298:8;299:4,6;301:15,
23;304:10;306:20;
309:23
**point- (1)**
156:11
**pointed (1)**
261:21
**pointedly (1)**
152:7
**points (11)**
42:7;131:20;140:13;
163:11;165:18;187:23;
216:5;218:3;222:21;
248:23;294:8
**poison (1)**
168:2
**policies (7)**

18:3,14;19:14;39:22;
138:2;250:13;251:3
**policy (14)**
11:3,13,14,18;13:17;
14:24;15:3;16:18;
17:14;18:5,9,25;21:7;
51:21
**political (1)**
101:16
**pool (4)**
118:1,12;130:23,24
**portability (1)**
199:1
**portfolios (1)**
138:4
**portion (5)**
87:2;132:11,12;
135:4;148:20
**position (41)**
14:23;25:23;29:6;
35:17;37:22,24,24;
38:4,7,8;49:3,4,4;
58:19;59:1,18;69:22;
77:7;90:1;95:4;99:17;
122:13;123:2;127:18;
130:16;138:5;162:18;
164:3;166:1,14;173:4;
187:9;250:18;256:18;
260:7,18,19;297:21;
298:8,23;301:19
**positions (3)**
98:24;296:14;297:2
**positive (3)**
252:6;260:17,19
**possession (3)**
222:15;265:7;297:7
**possibility (5)**
36:16,20,21;159:5;
169:16
**possible (4)**
205:9,9;234:21;
267:1
**possibly (3)**
130:3;200:17;212:14
**Post (1)**
263:1
**post- (1)**
107:23
**post-confirmation (1)**
154:5
**post-petition (11)**
107:22;108:6;
113:10;130:10;188:14,
18;195:25;200:24;
211:5;274:23;296:20
**post-trial (1)**
21:1
**post-trust (1)**
309:3
**pot (4)**
22:16,17;50:6;
249:15
**potential (5)**

54:1;153:4;172:7;
213:15;285:18
**potentially (2)**
183:14;283:21
**power (2)**
65:8;99:24
**practical (4)**
59:19;178:15;
184:25;185:12
**practicalities (1)**
228:11
**practice (2)**
13:10;33:25
**practiced (1)**
137:4
**praise (2)**
107:15;111:4
**Pre (1)**
263:1
**preceded (1)**
222:16
**precedence (1)**
161:14
**precedential (1)**
133:9
**precise (1)**
268:10
**precisely (5)**
158:10,19;159:25;
160:12;291:10
**preclude (1)**
213:17
**predators (1)**
299:19
**predictable (1)**
138:19
**predicted (1)**
226:16
**predicting (1)**
226:15
**prediction (2)**
201:19,20
**preempted (2)**
66:16,17
**preemption (2)**
62:20,22
**prefer (1)**
225:13;234:23
**preferably (1)**
145:8
**preference (5)**
19:16;119:17;
120:10;131:24;132:13
**preferred (1)**
38:11
**prejudice (3)**
37:7,13;90:1
**prejudiced (1)**
109:9
**preliminary (5)**
63:22,23;77:21;
81:24;121:9
**premature (1)**

Min-U-Script®

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(27) plans - premature

Case: 19-30088    Doc# 5169    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 339
of 353

153:13

**preparation (2)**
82:11;83:11

**prepare (2)**
59:22;183:13

**prepared (7)**
18:12;58:18;80:19;
108:7;130:25;258:23;
269:6

**preparing (4)**
47:4,6,20;83:6

**prescriptive (2)**
89:6,9

**presence (2)**
13:3;127:14

**present (4)**
38:19;225:21;
250:12;251:1

**presented (8)**
19:20;27:24;38:23;
45:4;84:19;129:17;
151:7;275:1

**presenting (1)**
75:25

**presently (1)**
233:18

**presents (2)**
65:13;110:25

**preserve (1)**
279:19

**preserves (1)**
279:8

**preserving (1)**
155:7

**preside (1)**
59:16

**President (1)**
248:13

**presidential (1)**
248:11

**presiding (2)**
8:5;276:14

**press (4)**
156:6;161:5;183:25;
247:18

**pressure (1)**
30:7

**presumably (6)**
45:15;72:24;81:1;
124:2;163:14;193:8

**presume (2)**
35:20;122:19

**presumption (2)**
148:17;149:14

**pretend (2)**
48:25;275:22

**pretext (1)**
65:17

**pre-trial (2)**
21:1;51:18

**pretty (6)**
29:5;85:2;175:7;
178:19;183:10;254:22

**prevails (1)**
69:4

**prevent (4)**
169:7;229:22;281:8,
10

**prevented (1)**
84:20

**prevents (1)**
201:13;229:12

**previously (4)**
185:25;249:8;
294:10;296:9

**price (1)**
171:24

**primarily (2)**
73:23;257:12

**principal (5)**
197:23;209:6;267:2;
268:18;275:19

**Principally (1)**
167:24

**principle (1)**
301:22

**principles (1)**
299:8

**prior (4)**
114:11;280:10;
284:13;293:16

**priority (2)**
165:23;207:14

**private (1)**
67:8

**privilege (1)**
246:11

**privy (1)**
139:7

**probability (1)**
277:23

**probably (13)**
51:16,17;96:16;
102:18;116:15;136:9;
142:21;168:13,15;
203:23,24;208:22;
304:13

**problem (24)**
36:24;70:16;76:23;
79:10;80:16,17;81:2,
11;84:20,20;85:4;
88:10,12;92:23;175:9;
183:2;186:14;212:16,
18;219:3;220:1;
283:10,24;304:16

**problematic (2)**
212:9;249:24

**problems (3)**
13:4;88:16;279:3

**procedural (3)**
152:3;185:8;304:15

**procedurally (1)**
70:3

**procedure (6)**
63:12,25;66:24;
67:24;127:15;147:25

**procedures (21)**
63:17,18;66:16;
93:16;119:1,5;127:6;
128:1;145:1;146:11;
147:11;150:15;151:6,
12;153:25;154:21;
173:24;181:9;194:15;
225:23;226:1

**proceed (11)**
14:25;19:13,15;67:7;
113:6;143:22;169:18;
179:8;230:18;291:13;
302:17

**proceeding (4)**
25:8;128:20;155:4;
307:16

**proceedings (23)**
21:1,2;110:22;118:4;
119:2;123:4,7;129:21;
133:14,15;134:11;
152:16;157:6;158:7;
159:6;161:13,15;
176:23;240:20;289:15,
20;308:11;311:7

**proceeds (2)**
29:14;97:16

**process (89)**
26:12;35:18;44:1,3;
49:25,25;56:13;61:23;
62:6;64:5;65:11;66:13;
68:8;69:3,4,10,11,13,
15;70:6,14,19;72:2;
73:13,20;110:15;
128:9,10;133:20;
140:25;141:6;145:7,9,
10,13,14;152:17,19,19;
153:9;163:6;165:19;
167:25;169:20;170:15;
172:5;173:11,17;
178:9;179:7,11;
181:14,15,17;183:12,
14;191:2,16;198:17;
199:12;201:14;203:5;
215:16,21;221:12,14;
224:8;225:9;226:3;
227:15;229:6,7;
230:20,21;232:22;
238:12;247:6;256:19;
265:8;270:4,8;272:1;
274:14;278:1,9,12,14;
280:6;282:22

**product (3)**
15:8;105:20;139:2

**productive (1)**
121:14

**professional (1)**
247:1

**professionals (18)**
54:25;95:2;97:17;
104:9;108:25;121:25;
128:25;131:2;155:5;
177:10;180:8;181:5;
222:1;226:7;231:6;

232:13,15;255:24

**professionals' (1)**
248:25

**profit (1)**
299:15

**program (1)**
120:23

**progress (4)**
97:2,3,4;195:13

**prohibited (5)**
193:20,24;195:4;
280:23,23

**prohibiting (1)**
194:11

**prohibition (1)**
184:2

**project (2)**
85:6;86:15

**promises (1)**
226:25

**promote (2)**
177:17;197:15

**promoted (1)**
180:1

**promoting (1)**
207:12

**prompted (1)**
304:9

**promptly (2)**
24:23;223:9

**pronouncement (1)**
156:23

**pronouncements (1)**
156:7

**proof (10)**
64:5,7,19;65:3;
76:14,22;79:5;140:14;
147:22;250:15

**proper (2)**
59:11;60:11

**property (13)**
79:12;84:22,22;
144:1,3;145:7,13;
146:16,18,19;148:1;
224:18,19

**proponent (5)**
187:20;193:24;
208:6;214:1;221:10

**proponents (7)**
110:5;153:1;179:17;
212:14;255:7;298:21;
299:1

**proposal (4)**
217:17;228:14,16;
278:21

**propose (1)**
101:24

**proposed (11)**
97:15;144:25;153:7;
157:9;159:2,11;
186:13;209:19;211:12;
233:8,9

**proposes (1)**

278:8

**proposing (1)**
208:15

**prorated (1)**
118:23

**prosecute (1)**
303:4

**prosecution (1)**
37:3

**prosecutions (1)**
36:19

**prospect (1)**
207:21

**prospective (1)**
212:10

**protect (4)**
56:20;271:20,20;
288:22

**protected (4)**
62:9;76:23;206:9,11

**protecting (1)**
26:24

**protection (1)**
208:10

**protective (1)**
166:1

**prove (2)**
208:5;265:5

**proved (2)**
267:13,15

**proven (1)**
287:18

**provide (6)**
63:13;114:4;116:22;
204:8;255:1,2

**provided (4)**
41:3;52:25;143:7;
289:17

**provides (2)**
194:7;223:5

**providing (1)**
138:3

**proving (1)**
66:6

**provision (15)**
22:22;104:11;
106:24;146:6;149:3,7,
13;152:7,9;169:12;
195:4;212:8;239:9;
244:18;298:17

**provisional (2)**
174:9;285:11

**provisions (17)**
31:22;109:6;130:11;
137:11;154:18;168:1,
2;196:2;205:17;207:1;
212:9;213:16;228:20;
277:2;290:11,13,23

**proviso (1)**
33:25

**prudent (2)**
34:13;218:17

**public (9)**

Case: 19-30088    Doc# 5169    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 340
of 353

103:7;110:11;112:3;
119:20;128:15;156:5;
189:16;210:14;229:5
**publicity (2)**
26:25;298:21
**publicly (3)**
202:25;284:12;304:8
**PUC (1)**
166:22
**PUC's (1)**
49:3
**pull (2)**
189:24;190:5
**pulled (1)**
256:7
**punchline (1)**
206:11
**punitive (1)**
69:9
**purely (1)**
222:22
**purport (2)**
99:6,7
**purported (1)**
111:17
**purpose (5)**
26:20;43:16;84:21;
169:11;170:14
**purposes (19)**
40:18;76:17;109:1;
114:16;118:11;127:15;
148:3;19;149:11,24;
152:25;153:13;157:11;
161:15;169:21;179:17;
190:24;208:1;308:16
**pursuant (2)**
106:1;118:3
**pursue (2)**
70:12,13
**push (3)**
46:25;197:11;200:10
**put (38)**
18:17;22:8;25:5;
27:5;37:2,10;42:14;
59:9;71:18;73:18;74:2,
11,19;83:13;89:22;
92:16;103:18;148:10;
150:10;153:24;154:3,
14;156:18;163:5;
183:8;184:9,18,19;
186:2;188:8;215:11;
220:13;222:19;249:14;
258:25;292:14;302:18;
310:23
**puts (3)**
144:25;157:24;174:8
**putting (6)**
36:19;44:7;80:13;
150:13;201:25;287:17

### Q

**qualified (1)**

146:4
**qualify (3)**
132:13;192:14,17
**quantifies (3)**
118:5,6,11
**quarrelling (1)**
29:17
**quick (4)**
76:2;131:20;154:2;
303:20
**quickly (4)**
149:19;205:9;
233:13;263:3
**quite (17)**
19:19;37:5;41:14;
56:24;68:5;78:24;94:2;
103:11,11,20;112:22;
142:7;265:1;267:24;
296:3;301:2,4
**quo (1)**
166:20
**quote (2)**
161:5;291:15
**Qureshi (9)**
160:19,20,21;161:9,
24;162:6,8,12;296:2

### R

**rail (2)**
160:11;162:3
**rails (4)**
125:22;160:1;
173:23;206:8
**raise (11)**
20:19;70:14;128:18;
169:16;192:12,13;
204:10;211:25;212:12;
222:15;307:4
**raised (28)**
9:20;69:13;81:25;
103:23;105:18;110:1;
126:19;127:2;128:11;
129:4;130:5,14;
151:11;153:12,17;
157:4,7;164:16;
165:12,25;185:23;
212:12;225:11;240:21;
282:16,17;290:9;
297:24
**raises (3)**
129:10,20;149:6
**raising (2)**
109:23;232:3
**rally (1)**
186:2
**ramification (1)**
284:23
**ramifications (3)**
185:21;264:21;
279:25
**ramp (1)**
44:10

**ramping (1)**
43:18
**ramps (2)**
268:22;275:3
**Randall (1)**
241:7
**range (2)**
207:22,23
**rate (3)**
107:24,25;112:24
**rather (15)**
37:8;38:10;98:17;
141:12;155:3;159:3;
172:7;233:2;251:20;
252:8;253:14;254:9;
295:8;301:12;302:12
**rational (2)**
253:18;289:9
**re (2)**
295:1,11
**reach (3)**
119:8;155:6;225:4
**reached (7)**
121:16;173:14,14;
222:7;293:17,17;304:2
**reaching (1)**
105:25;201:3;224:1
**read (38)**
15:14;16:17;45:4;
61:21;63:23;76:25;
86:23;97:8,8,11,25;
102:19,19;108:22;
112:1;115:12;118:10;
123:25;126:11;127:10;
128:17;130:19;133:19;
147:5;164:9;191:7,8;
203:9,15;216:7,9;
248:15,15,16;276:7,13;
277:10,14
**readily (1)**
296:21
**reading (10)**
98:22;102:20;
191:19;212:4,5,7;
248:16;270:24,25;
294:24
**ready (3)**
43:18;176:5;197:12
**Reagan (1)**
83:2
**real (6)**
18:24;36:24;70:16;
77:25;210:15;247:13
**realistic (3)**
35:15,17;37:15
**reality (2)**
38:8;287:25
**realize (3)**
94:2;188:5;238:1
**realizing (1)**
256:14
**reallocate (1)**
56:6

**really (58)**
16:5;21:6;29:6;
37:14,17;38:10;44:22;
70:17;74:2;99:1;
108:11;116:13;120:15;
123:18;126:13,20;
136:6;151:4;155:13;
165:18;166:13,25;
174:9;177:8,10;
179:24;186:6,6,6,20;
190:22;199:2;200:6;
210:12,12;213:5;
214:17,20;228:4;
230:1;236:11,12;
242:3;255:17;265:3;
269:3;273:7,8;274:17;
275:18;276:7;284:19;
291:3;294:4;296:3;
300:13;306:20;308:10
**reargue (1)**
202:10
**reason (47)**
25:20;28:8,8,13;
42:9;48:4;54:13;56:7,
8,20;73:13,15,23;
87:16;89:4;104:8;
110:14;111:22;123:8;
130:2;138:18;151:16;
158:4;160:2;174:1;
175:23,24,25;182:9;
200:8;204:10;206:7;
209:12;228:12,22;
236:25;261:2;262:9;
264:19,20;265:4,7;
274:19;279:15;290:6;
291:25;306:18
**reasonable (7)**
115:11,23;206:25;
207:21;218:4,18;289:9
**reasonables (2)**
207:22,23
**reasonably (2)**
76:16;220:1
**reasons (11)**
22:12;25:4;42:6,6;
178:7;228:10;279:6;
289:5;293:14;302:1,7
**reason's (1)**
112:22
**Rebecca (1)**
121:13
**rebuilding (1)**
223:18
**rebuts (1)**
33:6
**rebuttal (1)**
30:1
**recall (13)**
20:11;21:5;26:10;
27:25;29:20;30:10;
111:24;124:25;144:12;
148:9;151:18;242:4;
297:24

**recalled (1)**
298:16
**receive (2)**
112:23;238:13
**received (2)**
121:18;278:25
**recent (1)**
58:20
**recently (1)**
52:5
**Recess (2)**
136:11;220:24
**recite (2)**
286:9;301:25
**reciting (1)**
294:13
**reckless (1)**
189:12
**recognize (3)**
17:17;96:12;307:6
**recognized (1)**
13:10
**recognizing (1)**
228:19
**recommencement (1)**
175:11
**recommend (1)**
233:1
**recommendation (3)**
99:8;225:2;301:13
**recommended (1)**
217:17
**recommending (2)**
247:2;252:15
**reconsiderations (1)**
159:17
**record (27)**
17:18;35:11;41:23;
49:19;63:4;92:13;
95:13;124:14,15;
142:3;143:17;144:5;
153:24;155:23;160:21;
165:20;187:12,13;
276:3,9,18;278:17;
302:1,2,5;303:11,13
**records (1)**
67:18
**recount (1)**
271:17
**recourse (2)**
52:25;60:10
**recover (4)**
21:23;24:23;60:6,13
**recoveries (1)**
42:17
**recovery (27)**
12:4;13:17;14:16;
15:2;16:11,15;17:14;
18:2,5,6;19:9,10;
21:20;22:20;24:4,6,8,
25;33:11,11;35:3;
39:19;59:18;60:10;
201:2;234:10;260:23

Min-U-Script®

Case: 19-30088    Doc# 5169    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 341
of 353

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(29) publicity - recovery

recovery's (1)
15:14
red- (1)
248:2
redirect (1)
59:14
red-letter (1)
11:14
reduce (1)
188:16
refer (1)
234:23
reference (5)
68:4;76:19;113:25;
121:25;122:4
referenced (2)
161:12;279:4
references (2)
270:5;273:3
referencing (1)
273:18
referred (2)
119:4;121:2
refineries (1)
20:18
refinery (4)
11:17;19:16,21;
47:15
refinery's (2)
13:14;20:19
refresh (1)
148:9
regard (3)
40:18;45:16;144:22
regarding (1)
120:10
regardless (4)
98:10;207:19;235:6;
282:12
regular (1)
63:19
regulators (3)
229:13;231:1;238:11
regulatory (1)
224:8
reinforced (1)
80:24
reinstated (2)
69:5;211:18
reinstatement (1)
69:7
reinvent (2)
136:3;143:4
REISNER (6)
254:1,4,4,11,13,15
reiterate (1)
39:18
reject (20)
77:25;78:4,21;79:7,
17;80:4;81:5,7,15,21;
82:8,22;87:15,17;88:2,
6;90:7,15;91:5;93:5
rejectable (5)

85:14,17;87:20;90:8;
93:14
rejected (2)
86:5;93:15
rejecting (2)
78:16;82:16
rejection (2)
82:13;83:14
rejects (1)
80:25
relate (1)
235:15
related (1)
106:22
relates (2)
107:7;277:6
relating (2)
86:6;220:14
relative (2)
9:20;11:8
relatively (1)
151:19
release (7)
106:13,15,19;122:3;
150:23;201:7,7
released (1)
121:21
releases (16)
101:14;107:3;
128:12,13,14;166:1,2;
201:11;294:7,8,20,24;
295:4,5,14,24
relevance (1)
162:9
relevant (14)
38:22;41:14;46:4;
127:16;130:12;161:14;
191:13;215:4,11;
240:24;273:24;276:17,
18,25
relied (1)
60:3
relief (51)
10:5,6,12;11:18;
13:13;15:3,19;16:4;
17:13;19:8;20:15;25:7;
26:7,7,19;29:11,15,25;
30:15,19;33:10,25;
34:6;47:24;50:9;51:19;
52:23,24;56:8;59:25;
60:3;61:22;62:2;63:20;
64:18;71:21;76:7;79:3;
80:2;81:4,22;87:5,21;
88:7;90:6,11;91:4;
93:5;114:3;119:9;
142:21
reliefs (1)
144:11
relive (1)
30:7
rely (2)
66:18;205:2
remain (1)

226:24
remaining (4)
106:1;110:9;113:9;
140:19
remediation (2)
169:18;250:20
remedies (4)
63:6;69:6,8;73:18
remedy (6)
71:12,21,22;78:22;
87:2,5
remember (12)
13:20;94:2;104:24;
150:3;217:23;249:8;
251:12;262:22;264:14;
268:25;269:4;300:3
remembering (1)
273:10
remind (2)
111:18;144:6
reminder (1)
13:4
remove (1)
297:6
removed (3)
180:21;183:1;235:22
removing (1)
190:18
render (1)
276:9
rendered (1)
108:3
renders (1)
211:12
renegotiated (1)
139:24
reopen (2)
258:17,18
reopened (1)
247:22
reopening (1)
258:18
reorganization (7)
56:12;100:23;
138:13;187:19;195:5;
230:17;251:23
reorganize (1)
252:5
reorganized (9)
33:13;135:5;142:20;
209:19;223:9;234:24;
250:8;251:4;252:1
repair (1)
77:4
repeat (4)
110:2;209:9;266:17;
274:24
repeating (3)
172:12;182:13,14
repetitive (1)
180:17
rephrase (1)
51:13

replaced (1)
66:17
reply (7)
62:24,24;74:6,7,9,12,
14
report (1)
104:12
reported (1)
103:21
reporting (3)
156:9;160:25;161:1
reports (3)
156:6;161:5;287:17
repository (1)
40:24
represent (15)
9:9;30:15;71:2;
134:19,22;145:9;
154:22;219:12;224:12,
15,16,18,22,25;254:5
representation (2)
33:9;274:11
representations (2)
58:25;60:4
representative (6)
25:18,24;170:19;
173:5;217:11;220:6
representatives (5)
103:22;109:22;
221:13;280:22;297:20
represented (10)
34:11;47:9;72:18;
113:4;140:11;217:16;
219:10;225:7;274:16;
299:13
representing (5)
24:17;39:9;126:18;
151:11;252:14;300:7;
301:5
represents (2)
132:2;217:10
request (4)
9:11;30:16;41:5;
63:12
requested (2)
35:22;152:9
requests (2)
19:25;40:22
require (5)
63:19;97:16;200:4;
228:20;240:19
required (5)
62:23;89:19;108:25;
190:5;229:13
requirement (2)
158:6;202:2
requirements (6)
96:7;105:7;112:6;
225:6;228:25;238:2
requires (4)
120:13;144:23;
175:10;177:12
requiring (4)

147:5,6;189:24;
282:11
requisites (1)
285:2
rereview (1)
239:15
res (1)
149:12
reservation (8)
127:17,25;153:19;
154:19;162:22;164:9;
166:23;181:1
reservations (2)
164:18;180:23
reserve (11)
30:1;34:15;127:20,
22;163:11;164:21;
166:20;185:7;220:17;
227:3,16
reserved (6)
98:23;130:15;
158:12;165:21,24;
305:11
reserves (1)
123:18
reserving (2)
128:18;136:5
resolution (50)
10:7,18;14:6;19:2,3;
22:6;25:6,10;27:13;
37:22;61:23;62:6;
63:25;64:5;91:9;99:4;
105:24;106:3;110:13;
111:6;113:6;121:11;
127:6;136:4;148:12;
151:6;154:11,13,18,21;
155:5,6;157:6;202:1;
213:1,16;225:18,22;
226:1,6,7;248:3;
249:14;252:21,23,25;
291:24;293:17;298:21;
309:2
resolve (9)
37:16,19;45:25;
84:17;258:11;266:24;
289:18;309:17;310:14
resolved (14)
22:14,15;31:8;67:24;
87:17;106:12,16;
107:11;110:10;121:24;
155:8;164:20;218:11;
244:21
resolves (5)
110:9;116:25;123:6;
289:20,21
resolving (1)
144:16
resources (1)
66:8
respect (34)
59:1;86:7,10;96:20;
106:13,15,18;107:20;
109:9;113:10,14;

Min-U-Script®

Case: 19-30088    Doc# 5169    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 342
of 353

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(30) recovery's - respect

124:22;133:9;150:23;
164:12,22;167:23;
170:11;190:12,12;
191:1;195:17;205:2;
208:20;223:3;225:12;
266:17;268:21;273:19,
21;278:14;283:22;
295:12;310:13
**respected (1)**
13:9
**respectfully (3)**
41:5;153:13;233:16
**respective (1)**
113:7
**respects (2)**
246:24;295:13
**respond (10)**
19:25;87:23;88:10;
93:13;136:20;141:9;
156:17;187:3;248:19;
257:17
**responded (4)**
47:2;141:10,16;
297:25
**responding (1)**
40:23
**response (14)**
20:8;23:22;58:20;
66:22;84:15;88:5;93:2,
6,8,13;98:22;103:8;
164:17;282:23
**responses (3)**
63:22,22;98:23
**responsibility (3)**
99:10;100:19;230:1
**responsible (1)**
299:22
**rest (6)**
14:21;24:3;53:22;
103:15;139:15;251:3
**restart (1)**
176:2
**restate (1)**
182:12
**restating (1)**
66:21
**restrictions (1)**
198:21
**restrictive (2)**
201:13;202:8
**restructuring (7)**
9:20;97:18;212:6;
216:4;217:24;218:1;
255:25
**result (18)**
20:23;36:22,23;48:4;
49:9;53:21,25;54:2;
59:2,11;98:13;101:2;
106:7;219:16;226:14;
234:6;284:25;291:8
**resulting (1)**
133:14
**resume (3)**

8:24;102:5;135:21
**resumes (2)**
46:8,12
**retaliation (2)**
69:14;70:14
**retention (1)**
23:13
**retired (2)**
105:22;106:11
**reveal (2)**
236:8,10
**reverse (1)**
285:9
**revert (1)**
207:5
**review (5)**
83:8;127:3,4;154:16;
302:11
**reviewed (2)**
131:7;216:3
**reviewing (1)**
43:20
**revised (1)**
108:2
**revisit (5)**
25:20;130:10;
143:14;148:13;263:22
**revisited (1)**
71:15
**revisiting (2)**
26:15;70:20
**rid (1)**
234:9
**Riddle (3)**
243:17;253:9,9
**ride (1)**
140:21
**Rifkind (1)**
166:22
**Right (313)**
8:14;9:11,23;10:21;
11:8;13:16;14:18,20;
15:4,6;16:3,7;18:1,10,
21;19:16;20:13;22:23,
24;23:4,15,17;24:4,11;
25:13;27:7,10,10;28:4;
30:1,5,6;31:4;32:1,9,
23;34:7,9;38:3,4,5;
40:4;41:15;42:4;43:2,
8;44:2,24;45:7,17;
46:20;48:7;49:8;50:17,
21;51:3,21;52:9;53:7,
8,20;54:3;55:6,18;
56:9,15;57:4,24,25;
58:4;59:2;60:5;61:1,
11,16;62:11;63:5;64:7,
22,22,22,24;65:5,5;
66:12;67:3,19,20;68:2;
70:1,21;72:14,22;
73:12,23;74:14;76:8,
18;77:4;79:8,21;80:12,
15;81:1,14,17,19,19,
21;83:18,18,18,20,24;

84:17,24;85:20;86:7,9;
87:6,13,15,17;90:6,7,
13;92:7;93:1;95:6;
96:5;98:8,19;99:3;
100:2,9;101:9,9,22;
103:17;104:12;105:2,
9;107:1;108:21;109:4;
114:25;115:24;116:8,
18;117:15;118:20;
119:21,25;122:11;
125:24;127:20;128:18;
132:4,21;133:24;
135:14;136:25;139:10;
141:17;142:12,14,22;
143:1,3,12;144:17,17;
147:18;148:8;149:5;
150:12,22;151:25;
157:19;158:10,16,17,
18,19,20;160:5,6,12;
161:6;162:7,23;
163:24;164:11;165:25;
166:4,6,10,17;167:4,
19;168:23;169:4,5,6;
171:11,17,20;172:15;
173:2;175:8;176:25;
177:7;179:4,20,20;
186:7,11,16,21;188:3,
24;189:19;190:1;
192:23;194:13,17,22;
196:10;198:7,10;
199:5;200:13,15,18,23;
201:16,20;202:23;
206:17;207:1;208:8;
210:22;211:7,18,25;
212:1;213:11;215:23;
217:15,22;218:17;
220:21;227:2,11;
229:17,20;231:2;
232:5;237:13;239:11;
240:16,18,19,25;241:1,
15,25;245:19;247:2,5,
7;249:4;254:13;
255:16,19;258:22;
260:10,25;261:8;
262:10;263:5,11,15;
267:23;268:14,14;
270:6;271:5;273:7;
274:25;279:18;282:5,
20;283:7;284:2,12;
286:14,21;290:15;
293:8;301:7,7,16;
305:8,17;306:13,21;
307:23;308:21,24;
309:5,6;311:3
**rights (21)**
62:4;72:24;73:16;
86:22;109:8;127:21,
22;128:1;153:19;
158:13;162:22;163:12;
164:21;166:23;181:1;
220:17;223:25;267:9;
290:3,3;305:11
**rise (5)**

8:4;15:12;136:12;
220:25;288:1
**risk (6)**
138:4;182:6;195:14;
218:11;236:9;242:1
**risking (1)**
191:6
**risks (3)**
209:14;218:10;
262:11
**road (3)**
130:2;182:8;215:24
**Robert (1)**
10:2
**robustly (1)**
152:15
**rock (1)**
241:20
**Rohnert (1)**
294:25
**role (20)**
21:10;33:7;50:8,10;
53:4,9,10,18;99:25,25;
131:2;133:21;134:4;
154:5;155:13;160:8;
185:18;214:6;300:10,
15
**roll (4)**
126:2;162:13;180:8;
301:17
**rolled (1)**
133:13
**Ron (1)**
75:20
**Ronald (1)**
83:2
**room (9)**
51:14;100:19;192:9;
213:14;224:14;264:23;
299:12,16;309:10
**round (1)**
121:18
**routes (1)**
233:25
**routine (4)**
300:17,18,20,21
**Royal (2)**
294:17;295:2
**Roye (25)**
136:24,24,25;137:1,
4;138:14,16,18,21,24;
139:1,7,13,19,23;
140:2,6,8,19,21;141:2,
4,7,8;142:6
**RSA (187)**
15:13,17;16:1;21:11,
11;37:25,25;51:25;
57:6;58:24,24;93:22;
94:10,14,19,21,24;
96:20;97:24;98:23;
99:9,11,22;101:12;
103:25;104:10,18,20;
105:19;106:13,18;

108:9,20;110:3,8,13,
21,24;113:23;115:12,
13,14;116:2,13,24,25;
118:15;123:1,6,9;
124:1;125:20;127:25;
128:16;129:13,14,16,
19,23;130:1,20;131:13,
23;132:12;134:5;
136:8,16;137:11,24;
142:9;144:7,23;145:5,
11;147:6;150:21;
151:19;153:11;156:19;
157:7;158:9;159:10,
13,16;160:7;161:20;
162:1;164:17;165:16,
21;166:2;167:24;
168:4;169:1,7;175:17;
176:1,24;178:14;
179:2,10,12,15,24;
180:24;182:20;183:23;
196:17,18;197:21;
200:8,13;201:13;
204:13,22;205:15,16;
206:20;207:4;212:5;
215:9,11,16;216:2,4,
19,20;217:4,23,24;
219:21,22;221:10;
222:8;224:1;225:2,25;
231:7;235:20,21;
237:7,19;239:17;
241:19;248:4,17;
251:6,17,19;253:3;
259:14,20,20;260:13,
15,15;261:12;262:6;
265:25,25;266:2,21,22;
269:12;274:15;284:17;
286:19,19,22;287:2;
289:17,18;292:3;
293:14,20,20;294:6,8,10;
295:6,7;296:3;298:1,5,
7,15,15;305:14
**RSAs (17)**
124:12;168:2;
206:24;258:10,24;
259:6;266:21;275:1,4,
5;285:10;290:7,9;
293:12;295:24;302:7;
308:14
**RSA's (2)**
15:24;288:1
**rubber (1)**
230:15
**rubberstamp (1)**
96:12
**rubber-stamp (1)**
287:4
**ruined (3)**
137:12;138:9;139:18
**Rule (14)**
32:5,15;103:25;
122:20;143:6;149:1,
13,21;159:16;165:23;
207:14;259:18,25;

Min-U-Script®

Case: 19-30088    Doc# 5169    eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 343
of 353

(31) respected - Rule

266:5
**ruled (2)**
164:21;165:17
**rules (7)**
80:5;90:19;99:25;
127:9;149:20;151:12;
245:20
**ruling (26)**
15:16;61:11,13;71:3;
74:20;87:24;106:20;
108:8;122:13;125:1,
18;141:21;145:15;
188:14;211:6;258:8;
259:16;260:4,5;
276:23;293:7,8,20;
302:25;303:25;305:4
**rulings (4)**
108:2;113:10;
124:21;295:22
**run (6)**
8:22;79:5,5;122:7;
126:1;146:12
**running (3)**
216:23;280:25;281:2
**runs (1)**
236:24
**rush (2)**
123:16;137:14

**S**

**Sacramento (2)**
109:25;230:6
**saddle (1)**
19:3
**safe (2)**
85:1;250:24
**safety (5)**
84:24;86:18;130:18;
204:12;237:22
**Sam (5)**
12:23;13:1,25;19:4,
18;35:12
**same (66)**
11:18;14:7;19:16;
25:16,21;26:15;36:19;
37:25;50:6;56:24;
64:14;86:25;114:17,
17,19;115:13,25;117:4,
4;127:22;129:6;130:6;
158:16,18;163:21,21;
164:3;166:3;167:22;
169:2;170:21;174:7;
176:4,25;184:11,17;
185:1;186:3;192:21;
193:10;196:1;206:2,4;
211:9;217:5;232:20,
20,21,21;234:5;235:4,
5;240:14;242:23;
246:1,24;249:20,22;
262:16;269:6;294:8;
295:1;296:4;301:4;
302:9;310:16

**SAN (10)**
8:1;130:16,19;
132:22;133:14;160:8;
214:3,12;220:5,13
**satisfied (10)**
58:13;59:20;101:12;
153:21,21;167:20;
201:20;225:6;292:9;
295:23
**satisfy (14)**
105:7;112:5;140:7;
182:9,10;192:17,19;
194:24;195:10;202:2;
226:10;235:7;250:19;
263:21
**satisfying (1)**
278:19
**Saturday (1)**
109:25
**sauce (2)**
242:9,10
**saving (1)**
129:16
**saw (8)**
58:18;94:8;97:12;
137:22;152:6;223:14;
237:20;253:24
**saying (44)**
17:13;30:19;36:12;
50:4;53:2;58:16;63:5;
64:1;65:24;66:5;67:7;
71:4,6;79:22;83:2;
87:18;97:24;99:2,12,
24;103:19,20;148:2;
153:18;161:19;166:25;
173:8;176:13;180:8;
186:1;196:17;199:2;
202:19;218:13;225:16;
236:17;238:24;244:16;
257:5;272:3;273:25;
280:15;301:4;308:12
**scattered (1)**
139:15
**scenario (3)**
175:12;178:25;
292:19
**scenarios (2)**
159:5;256:22
**scene (1)**
71:9
**schedule (9)**
31:3;34:25;35:21;
44:15;123:10;131:17;
305:16,21;306:5
**scheduled (2)**
116:6;305:6
**score (1)**
297:15
**screamed (1)**
244:8
**se (1)**
80:21
**sealed (3)**

119:13,23;132:6
**seat (2)**
60:21;151:13
**seated (2)**
136:14;221:1
**second (17)**
8:21;29:10;86:23;
91:24;152:15,20,23;
178:21;179:5;233:15;
255:20;262:19;269:2;
271:25;292:7,8;296:1
**second-guess (2)**
300:10,22
**second-guessed (1)**
128:2
**secondly (3)**
19:4,13;27:21
**seconds (1)**
183:2
**secret (1)**
67:9
**section (8)**
32:2;105:7;120:25;
121:22;122:1,3;251:7;
286:19
**secured (1)**
242:13
**securities (1)**
130:15
**security (9)**
223:25;224:8,13;
225:5;228:15,19;
231:18;240:7,16
**seeing (2)**
29:20;204:9
**seek (8)**
13:17;29:15;41:7;
69:8;144:24;145:10;
170:2;302:11
**seeking (2)**
29:11;292:17
**seeks (2)**
87:5;148:18
**seem (5)**
99:8;127:24;130:10;
215:3;261:3
**seemed (2)**
97:22;166:19
**seems (16)**
15:14;26:15;28:17;
41:13;54:9;79:8;82:8;
118:10;126:13;130:24;
136:4;137:14;146:5;
167:12;210:10;231:12
**segue (1)**
275:25
**seize (1)**
287:21
**selection (1)**
144:25
**self-care (1)**
38:14
**self-destruct (1)**

174:4
**self-insured (2)**
23:13;60:7
**self-interested (1)**
227:14
**self-serving (1)**
188:6
**Seligman (8)**
31:2;35:14,20;36:2;
37:16;44:14;46:19;
59:22
**sell (4)**
138:2;236:21;
280:24;297:5
**selling (3)**
267:21;281:12,13
**seminal (3)**
294:15,15;295:3
**send (7)**
22:7;43:19;44:14;
122:14;151:14;259:15;
294:18
**sending (3)**
44:23;46:22;238:5
**senior (9)**
111:13,13;176:4;
177:16;178:5;187:14,
16;209:5;276:3
**sense (7)**
14:8;72:3;136:2;
152:1;211:8;234:22;
290:10
**sent (3)**
13:20;26:4;243:22
**sentence (5)**
97:14;150:3;231:12;
238:4;291:5
**separate (6)**
29:14,23;86:2;131:3;
272:7;302:7
**separated (1)**
137:5
**September (2)**
20:9;22:10
**seriatim (1)**
252:22
**series (1)**
157:21
**serum (1)**
188:8
**serve (1)**
39:8
**served (2)**
59:21;285:7
**serves (1)**
39:10
**service (1)**
138:3
**serving (1)**
40:20
**session (3)**
8:4;260:1;310:21
**set (19)**

10:18;45:5;71:1;
89:8;19;133:8,9;
147:21;152:12;164:13;
168:25;169:14,16;
175:13;188:2;242:5;
258:20;267:11;268:11
**sets (1)**
304:15
**setting (3)**
169:19;177:3;195:18
**settle (10)**
51:15;158:23;
161:11;171:13;179:16;
189:7;191:12;206:19;
208:15;262:12
**settled (7)**
150:20;157:18;
158:25;163:7;170:11;
189:10;279:21
**settlement (77)**
10:24;20:23;30:7,8;
44:8,9;96:22;97:15;
99:4;105:25;119:8;
131:23;132:17;133:16;
134:15;147:5;152:22;
155:1;157:10,11;
158:2,3,4,14,18;
161:17;169:12,22;
170:8,11;171:25;
173:14;174:9,10,13,19;
177:4;178:23;179:2;
180:3,3;183:15;
185:12;187:24;189:17;
190:10,17,17,18;201:1,
23;203:12;207:21;
208:14;219:6;222:16,
16;224:13;242:3;
247:14;256:7;260:10;
262:9,9;269:12;
272:11;278:15;286:18,
20;289:18;291:9,11;
292:11,13,13,15;
308:13
**settlements (14)**
96:15;117:11,12;
133:11;161:14;179:16;
182:7;191:13;198:25;
206:6,24;258:14;
259:2;262:12
**settling (4)**
180:22;182:4;203:4;
205:11
**seven (4)**
38:15;137:5;189:3;
279:20
**seventeen (2)**
223:1;309:1
**seventy (8)**
11:16;25:8;42:21;
134:19,19;221:13;
252:14,14
**severable (2)**
86:3;272:7

Min-U-Script®

Case: 19-30088    Doc# 5169    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 344
of 353

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(32) ruled - severable

**several (7)**
102:7;107:15;179:1,
15;225:21;248:12;
277:1
**severe (1)**
180:23
**shall (6)**
20:24;32:3;74:14;
212:6;234:4;271:1
**shape (1)**
21:19
**share (3)**
11:17;33:7;194:17
**shareholder (2)**
174:13;194:19
**shareholders (1)**
194:20
**shareholder's (1)**
207:13
**sharing (1)**
21:20
**sheet (1)**
113:24
**shifting (1)**
147:22
**Ship (68)**
8:12;9:3,10,17;10:6,
7,13,19,23;11:1,12;
12:16;13:5,8,14,25;
14:24;15:9,11,14,17;
16:5,11;18:2;21:4,12,
21;22:8,11,18,19;23:1,
19;24:2,7,17;26:4;
27:24;28:1,13,14,18;
32:5;35:6;37:15;38:8;
39:8,14;40:10;49:6;
50:11;51:15,22;52:1,
17;53:5;54:1,19;55:1,
5;58:3,8,22,23;59:3,9;
123:15;223:14
**short (18)**
61:20;63:4;83:5;
94:1;102:2;107:4;
118:23;119:19;122:7;
128:7;154:4;198:19;
208:23;219:14;277:14;
286:2,8;304:16
**shortcuts (1)**
216:1
**shortest (1)**
108:23
**shortfall (2)**
226:12,14
**shortly (3)**
151:20;203:23;
304:19
**shots (1)**
253:23
**shoulder (1)**
152:7
**show (11)**
11:2;87:19;135:15;
178:6;216:4,23;217:3;

250:14;251:4;268:8,8
**showed (1)**
294:8
**shown (1)**
11:12
**shows (1)**
277:3
**shuffle (2)**
186:23,24
**shut (1)**
195:14
**shutdown (1)**
56:5
**sic (8)**
60:18;126:25;
143:25;215:25;249:19;
252:12;261:1,2
**side (18)**
19:21,21;31:1;87:16;
88:9;148:9;184:19;
192:22;196:17;207:13;
213:14;214:2;227:11;
229:17,24;261:11;
286:21;310:17
**sides (4)**
67:18;170:13;
181:15;301:15
**sign (9)**
60:2;107:3;120:23;
124:2;153:15;179:2;
207:3;249:3;302:11
**signal (2)**
259:15;294:18
**signatories (1)**
210:19
**signatory (2)**
197:21;209:23
**signed (4)**
104:9;145:5;224:24;
277:17
**significance (1)**
264:18
**significant (12)**
37:10;58:21;65:17;
66:7;109:15;156:10;
169:15;179:8;186:13;
209:14;211:18;310:8
**significantly (1)**
86:14
**signing (3)**
224:23;228:18,21
**signoff (1)**
108:25
**signs (1)**
216:4
**similar (7)**
73:2;87:22;163:3,19;
164:16;166:19;235:4
**similarly (1)**
215:2
**simple (5)**
18:17;33:22;116:10;
282:15;287:3

**simplifies (1)**
90:18
**simply (19)**
11:21;13:11;21:13;
22:21;27:12;29:20;
41:19;45:4;69:14;
111:16;118:11;134:13;
135:9;136:4;153:11;
164:18;172:4;188:25;
258:16
**sincere (1)**
221:15
**sincerely (3)**
134:10;228:7;244:25
**single (3)**
146:6;190:8;242:3
**Singleton (1)**
243:17
**sit (2)**
185:16;310:20
**sitting (4)**
27:13;50:6,7;229:23
**situation (16)**
21:4;38:18;60:10;
64:12;65:13;68:2,3;
76:21;80:12;85:4;
129:17,18;153:15;
233:17;267:1;298:1
**six (2)**
273:10;279:20
**six-page (1)**
248:14
**sixteen (4)**
131:23;132:5;
133:18,25
**sixty (1)**
24:3
**size (1)**
21:19
**sky (1)**
185:22
**sledgehammer (1)**
196:15
**slice (1)**
43:10
**sliced (1)**
219:12
**slight (1)**
304:21
**slightly (1)**
237:13
**slip (1)**
266:14
**slip-and- (1)**
33:22
**Slocomb (4)**
12:17,20;39:9;58:4
**slow (1)**
257:9
**small (2)**
137:25;308:25
**smaller (2)**
59:16;259:4

**snippets (1)**
276:8
**softer (1)**
275:2
**sole (1)**
52:25
**solely (1)**
60:11
**solicit (2)**
185:1;284:24
**solicitation (2)**
239:22;282:21
**solution (6)**
59:19;135:3;181:6;
186:13;298:2,3
**solve (10)**
81:2,12;83:23;88:16;
92:23;152:2;179:12;
183:1;259:6,8
**solved (1)**
218:16
**solvency (1)**
298:1
**solvent (6)**
23:6;267:6;274:22;
297:17,18;298:10
**somebody (20)**
12:11;14:17;18:17;
72:18;76:24;80:20;
101:15;135:23;147:14;
148:18;162:2;203:19;
208:6;234:8,25;
245:12;271:16;280:24;
297:2,3
**somehow (6)**
49:1;82:9;206:15;
250:7;296:9;297:21
**someone (17)**
16:14;58:14;62:8;
64:9,16;65:17;115:8;
162:3;170:8;191:19;
202:4;207:13;215:3;
250:17;278:20;282:17;
307:5
**sometime (3)**
136:9;159:10;262:21
**sometimes (6)**
47:11,12;66:1,1;
240:1;290:14
**somewhat (2)**
170:15;189:12
**somewhere (3)**
22:15;32:10;232:17
**song (1)**
199:15
**soon (3)**
135:16;161:3;259:9
**sooner (3)**
37:8;38:10;302:12
**sophisticated (4)**
222:10;232:13,15;
291:12
**sorry (21)**

35:3;66:19;71:10;
75:3;76:5;90:14;
105:14;146:17;156:25;
159:22;211:3;214:13;
233:19;237:9,14;
238:22;256:25;307:6,
7;308:7;310:9
**sort (17)**
46:23;62:20;99:20;
100:24;127:14;141:14;
147:25;150:13;153:16;
156:21;167:16;170:13;
184:21;215:8;234:16;
265:11;286:21
**sorted (1)**
126:23
**sorts (2)**
152:1;219:15
**sought (5)**
29:25;34:6;87:21;
105:23;119:10
**sound (2)**
217:3,5
**sounds (6)**
79:4;87:9;88:11;
97:21;183:10;301:3
**soup (1)**
79:8
**sovereign (1)**
288:19
**space (1)**
267:12
**speak (13)**
59:1;84:12;164:18;
166:20;170:23;186:4,
5;191:24;196:5;209:2;
258:2;282:4;302:20
**SPEAKER (8)**
75:16,19;95:1;
248:14;273:15,18;
274:2,6
**speaking (4)**
35:5;84:6;177:11;
193:24
**speaks (1)**
166:24
**specific (15)**
30:9;60:6;79:12;
81:9;83:17;86:3;87:12;
98:25;102:7;121:25;
127:11,18;129:16;
130:19;183:20
**specifically (4)**
60:2;103:16;260:3;
308:10
**specifics (3)**
85:3;112:7;117:21
**specified (1)**
143:6
**speculate (1)**
191:15
**spell (1)**
128:4

Min-U-Script®
Case: 19-30088    Doc# 5169    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 345
of 353
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(33) several - spell

**spend (11)**
43:17,20,21;46:23;
54:5,10;56:6;152:10;
294:4,5,21
**spending (7)**
52:11;54:4;59:13;
168:16;191:5,5;255:18
**spends (1)**
38:13
**spent (7)**
48:11,13;57:23;
293:4,5;294:24;309:10
**spirited (1)**
116:23
**sponsor (1)**
235:6
**sponsored (3)**
173:25;229:10;
301:17
**sponsors (2)**
134:16;222:9
**square (4)**
174:8;183:6;231:17;
262:6
**Stacy (1)**
64:19
**staff (1)**
126:6
**stage (2)**
70:22;242:12
**stakeholders (2)**
140:17;288:22
**Stamer (159)**
112:14;155:16,18,
21,23,23,24,25;156:16;
160:16;162:8;183:19;
185:22;186:4;187:11,
13,14,22;188:4,15,17,
21,25;189:3,20;190:2;
191:22;192:1,5,9,16,
23,25;193:7,12,17,19,
22;194:1,9,13,21,23;
195:1,3,8,22;196:3,12,
15,24;197:7,18,20;
198:2,7,10,12,14,21;
199:5,7,19;200:1,4,7,
16,18,23;201:1,6,22;
202:17,21,23,25;
203:25;204:3,6,24;
205:2,7,11,23;206:3,5,
19,23;207:10,19,24;
208:2,9,12,17,25;
209:1;234:13;235:7;
238:22;258:17;275:17,
20,23,25;276:2,3,19,
22,24;277:9,14,19,21;
278:5;279:2,12,14;
280:2,8,17;281:1,3,7,
10,13,15,19,21,23,24;
282:6,8,10,16,21;
283:4,9,14,17;284:5,8,
9;285:4,13,15,21,23;
288:14,24;299:7;

302:14,23,24;303:2,6,
9,11,14
**Stamer's (3)**
210:13;234:3;301:1
**stamp (1)**
230:15
**stand (17)**
66:9;96:24;100:11;
112:23;156:10;180:25;
194:2;199:15;217:24;
230:11;241:19;255:11;
257:2,3;276:7;278:20,
22
**standalone (1)**
199:3
**standard (2)**
13:10;155:1
**standards (1)**
182:10
**standing (7)**
76:18;214:11;
230:25;252:9;253:24;
282:24;310:15
**standpoint (1)**
218:6
**stands (4)**
49:10;125:17;
147:18;237:5
**stark (1)**
258:13
**Stars (1)**
256:10
**start (20)**
17:13;22:9,10;25:12;
40:2;54:3;72:5;88:24;
96:1;132:20;136:18;
146:6;156:8;187:23;
221:5,5;223:18;
236:20;258:20;276:2
**started (5)**
76:24;83:6;147:5;
189:16;266:19
**starting (8)**
9:3;71:22,24;73:21;
113:24;200:14;231:4;
259:13
**state (61)**
17:17;22:7;29:25;
31:22;37:10;42:11;
44:12,17,18;53:12;
62:9,12,21,21,22;64:6;
65:14,22,24;67:16;
68:8;69:9,13,17;70:20;
71:15,23;72:6;75:22;
76:11,19;79:20;81:1,6;
82:3;86:13;88:13;
89:10;98:5;99:7;109:5;
127:22;142:4;155:8;
162:21;163:8;187:12;
209:10;220:11;223:6;
229:1,14;230:2,16;
238:11,11;251:18;
279:6;284:10;303:21;

307:11
**stated (10)**
29:15;64:20;127:19;
130:16;151:1;171:12;
172:1;218:9;286:11;
302:1
**statement (32)**
43:8;84:4;97:8;
101:11;102:25;108:15;
109:11;114:11;122:24;
137:23;143:21;151:8;
152:8;164:12;175:13,
21;179:7;197:13;
214:15;219:15,19;
220:14;229:4;239:22;
269:17;270:17,23;
277:11;278:22;282:2;
284:14,24
**statements (7)**
13:7;143:17;163:5;
165:19;254:7;282:3;
301:2
**states (9)**
20:21;32:2;127:23;
128:5,8,11;140:10;
165:2;294:9
**Station (1)**
295:18
**status (9)**
56:19;116:1;164:13;
166:20;204:19;276:15;
277:3;286:13;287:22
**statutory (6)**
62:9,12,18;68:4;
71:23;72:6
**stay (72)**
10:6,7,12;11:18;
13:13;15:19;16:4;
17:13;19:8;25:7;26:7,
7,20;29:11;30:15,20;
33:10;37:6,8,12,14,21;
40:5,17;41:6;42:7,10,
14;43:11,14,23;44:9;
46:15;47:24;50:1,9,16;
51:19;52:10,24,24;
53:7,11;56:8;59:17,25;
60:3;62:2;63:10,20;
64:18;72:23;76:7,17,
19;79:3;80:2;81:4,23,
23;88:7,19;91:4;93:5;
157:5;159:6,7,9;
160:25;203:22;234:21;
242:23
**stayed (5)**
45:10;47:6;176:12;
178:21;179:6
**staying (1)**
80:24
**stays (1)**
159:24
**step (9)**
48:2;73:22;141:13;
206:23;207:4;252:2;

259:24;266:23;267:19
**Stephen (1)**
288:6
**steps (2)**
185:8;285:11
**Steve (1)**
243:16
**stick (5)**
126:4;131:17;
205:19;224:25;295:15
**sticking (1)**
301:12
**stifle (1)**
170:15
**still (52)**
16:1;22:16;33:3;
36:20;42:5;43:14;
44:16,23;45:10;46:3;
50:2,5;51:2,16;55:20;
57:8,13;58:9;100:19;
101:15;105:3,4;
106:19;108:13;109:5;
122:23;123:24;145:6;
148:6;164:22;167:13;
180:6;184:2,6;197:2;
199:16;206:16,16;
223:17;231:13;246:25;
255:25;256:17;259:22;
260:11;261:3;265:1;
284:16;301:18;303:4;
305:15;308:3
**stip (4)**
92:8,9,13,13
**stipulate (3)**
92:2;254:12;310:3
**stipulated (2)**
159:11;201:25
**stipulation (11)**
20:9,10,12,21,22;
21:5;47:25;89:21;
121:17;204:20;307:15
**stock (22)**
114:18;135:5;
137:12,23,25,25;138:8,
13,16;142:7,10;202:1,
15;222:12;225:13,15,
17,17;232:18;250:23;
298:10,11
**stock's (1)**
137:20
**stone (2)**
115:15;242:11
**stood (3)**
62:8;216:17;253:2
**stop (12)**
38:17;125:25;
132:23,23;168:5;
170:15;177:9;191:5;
219:18;227:2;246:18;
252:12
**story (2)**
19:11;67:18
**strategy (1)**

25:17
**Strauss (1)**
160:21
**street (1)**
287:5
**strengthening (2)**
234:23,24
**stretch (3)**
150:8,9;183:9
**strike (1)**
231:16
**strikes (2)**
212:13;216:2
**strokes (1)**
246:19
**strong (1)**
97:22
**strongly (5)**
94:23;134:23;
135:11;180:19;245:1
**struck (2)**
86:23;139:5
**structural (1)**
179:9
**structure (5)**
180:24;214:23;
218:10;234:7;269:6
**structures (1)**
256:20
**struggle (1)**
129:23
**struggled (1)**
15:15
**struggling (5)**
88:13;264:6;265:3
**stuff (6)**
202:23;229:21;
242:6;248:15;277:2;
306:12
**stumble (3)**
130:1;285:8,16
**subject (18)**
62:13,14,25;112:15;
115:16,17,18;145:20;
148:6;154:15;201:13;
242:23;246:25;248:20;
252:25;274:9,13;
294:11
**submit (4)**
92:9;141:9;278:22;
305:10
**submitted (5)**
74:15,19;125:18;
145:10;305:9
**subparagraph (1)**
119:11
**subro (20)**
116:12,15;129:14;
150:21;158:16,18;
167:24;168:4;182:22;
190:12;196:18;200:13;
201:1;202:10,12;
205:16;232:1;259:14;

Min-U-Script®

Case: 19-30088    Doc# 5169    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 346
of 353

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(34) spend - subro

265:24;266:2
**subrogation (45)**
101:3;104:20;
106:13,15,18,20;108:8;
110:11;112:3;113:3;
115:14;116:19,24;
117:1;121:15;123:2;
124:16,20;139:4;
144:7;146:14;147:8;
166:2;170:11;177:22;
222:16,19;253:3;
258:5;259:20;260:15;
261:2;274:15;289:23;
292:15;293:13;294:6,
10;295:7;296:3;
297:25;298:5,15;
305:7;306:19
**subros (9)**
137:24;189:20;
190:21;195:10;197:18;
199:22;202:9,15;
281:11
**substantial (4)**
11:7;110:21;223:10;
224:18
**substantive (7)**
63:13;99:21;123:19;
127:25;128:8;136:6;
156:2
**substantively (1)**
128:22
**subtle (3)**
196:13,14,15
**subtlety (1)**
188:4
**succeed (1)**
301:20
**success (1)**
218:4
**successful (8)**
59:5;62:2;106:5,5;
110:25;113:6;144:16;
262:5
**successfully (4)**
137:7;138:10;
148:16;289:6
**succinctly (1)**
29:25
**suddenly (2)**
149:13;238:21
**Sue (6)**
12:17;39:9,12;72:23;
80:20;252:9
**sued (6)**
80:20;137:5,10;
249:8,18;252:11
**suffered (1)**
41:7
**suffers (1)**
232:21
**suffice (2)**
140:8;304:9
**sufficient (3)**

91:22;119:6;295:16
**suggest (7)**
88:18;94:5;231:12;
295:13;299:22;309:14;
310:10
**suggested (4)**
159:8;230:23;241:5;
245:12
**suggesting (4)**
14:2,3;25:22;59:4
**suggestion (5)**
47:20;127:13;131:6;
147:13;172:14
**suggestions (1)**
144:18
**suggests (2)**
170:25;171:2
**sui (1)**
300:21
**suing (2)**
252:12,21
**suit (3)**
77:9;80:19;250:3
**summarize (2)**
154:4;162:18
**summarizing (1)**
17:4
**summation (1)**
226:17
**summoned (1)**
230:6
**Superbowl (1)**
297:14
**Superior (25)**
30:20;35:14;36:14;
56:25;59:3;62:17;
65:25;80:4;81:4;86:24;
87:9;88:23;89:7;90:12;
91:14;92:9,22;110:23;
111:15;132:22;133:14,
21;160:8;237:4,4
**supervised (2)**
155:4;229:6
**supplant (1)**
149:13
**supplement (1)**
151:8
**supplemental (2)**
74:1,12
**support (27)**
9:20;30:4;96:22;
97:17;105:15;110:17,
18;111:17,19,23;112:2,
3,21;134:23;143:23;
144:2,3,24;170:22;
187:24;189:23;202:18;
217:24;228:9,21;
255:24;275:7
**supported (6)**
9:19;134:18;173:25;
208:14;249:21;266:23
**supporting (1)**
56:14;131:14;195:5;

249:25
**supportive (3)**
190:10,11;203:12
**Suppose (8)**
26:18;53:3;67:5;
71:8;115:8;159:16;
238:15;275:7
**supposed (15)**
19:24;42:12;72:3;
114:2;117:5,9,13;
161:25;175:17;180:7;
185:18;236:11,12;
271:9;304:11
**sure (63)**
12:11;24:13;32:7;
33:17,19,24;41:18;
46:9,14;48:6,24;50:21;
60:22;61:4,24;68:12;
69:1;73:18;75:18;80:1;
97:10;101:25;107:17;
108:12,17;112:13,17;
124:15;131:22;136:21;
139:8,25;157:2;161:6;
166:5;168:6;186:22;
187:8;191:4;193:12,
12;194:9;199:19;
202:5;205:23;214:16,
21,24;222:4;234:21;
238:17;240:25;243:21;
250:10,24;256:19;
266:25;272:22;293:9;
298:2;300:24;303:11;
308:5
**surprise (3)**
97:13;298:23,23
**surprised (3)**
156:8;160:17;278:20
**surprises (3)**
293:11;304:7,19
**surprising (1)**
64:23
**surprisingly (1)**
112:20
**survive (2)**
129:19;130:4
**survivor (1)**
215:7
**survivors (5)**
219:1,2,9,13,23
**suspect (2)**
91:15;185:3
**Swain (1)**
303:22
**swamp (1)**
153:5
**switch (4)**
48:23;64:4;199:18;
232:16
**switched (2)**
301:14,15
**switching (2)**
227:8;228:9
**sympathetic (2)**

38:18;90:5
**system (5)**
64:7;84:24;85:1;
226:24;279:10

**T**

**table (26)**
72:15;136:8;141:1;
151:13;153:20,20;
160:3;168:25;181:6;
184:19,24;196:17;
213:3;215:18;229:23;
240:6,11;241:6,7;
245:12,14,15;251:13,
15;259:5;265:15
**tactic (1)**
80:3
**talk (17)**
31:24;84:8;111:16;
159:14;190:10;195:12;
207:18;227:6;232:13;
262:15;263:18;269:2;
273:13,23;286:3;
302:17;310:20
**talked (5)**
237:6;240:22;253:6;
255:14;278:15
**talking (17)**
43:16;92:19;122:2;
168:13;116:14;193:20;
199:23;201:13;210:19;
233:19,21;236:15;
238:18;239:5,6;269:7,
20
**task (1)**
181:8
**TC- (1)**
146:21
**TCC (113)**
9:19,21;10:8;11:19;
13:19;30:3;35:7;39:10;
94:9,23;96:19;97:17;
100:9,12;103:8;106:7;
108:24;116:14,25,25;
117:1;121:24;123:2;
125:20;127:8,10;
129:1,13,16,23;130:1,
20;131:2,4,13,13;
132:15;134:17;136:8;
139:5;144:19;145:5,6,
12;152:9,16,25;158:7,
9;160:7;161:10;
164:17;169:23;173:9,
14,25;180:7,10,12,13;
183:1;186:17;187:25;
190:12,15;191:1,1;
193:14,19;194:2,12;
195:10;197:16;204:19,
23;205:4;208:23;
214:1;215:8;219:10,
11;220:22;221:25;
222:16;224:12,15,24;

225:8;226:10;228:20;
231:5;237:3,3,7;251:6;
252:11;255:23;257:11;
259:20;260:13,15;
261:3,17;263:23;
265:25;266:1;278:18;
288:25;291:14;294:8,
10;298:6;303:3
**TCCs (1)**
260:2
**TCC's (6)**
96:21;153:24;225:2;
239:15;248:25;285:10
**team (4)**
71:1;243:22,23;
297:16
**tear (2)**
76:25;77:2
**tearing (1)**
77:17
**technical (1)**
309:2
**technically (1)**
298:6
**Ted (2)**
41:21;72:11
**teed (1)**
298:1;304:11
**Tehama (1)**
137:6
**telling (3)**
30:3;107:9;219:18
**tells (2)**
43:24;162:2
**temporarily (3)**
148:24;149:1,4
**temporary (10)**
127:15;147:13,14;
148:2;149:19,21,22,24;
152:18;223:17
**ten (5)**
23:16;24:3;42:22;
123:17;183:24
**tenant (1)**
202:13
**tend (1)**
29:24
**tender (1)**
14:9
**tends (1)**
266:18
**tens (5)**
152:10;192:13;
225:1;299:15;300:19
**tents (1)**
236:18
**term (8)**
11:8;21:16;113:24,
25;126:7;170:6;
180:23;208:4
**terminate (3)**
111:20;200:10,13;
232:4;291:16

Min-U-Script®
Case: 19-30088    Doc# 5169    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 347
of 353

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(35) subrogation - terminate

**terminated (13)**
65:7;67:23;73:17;
111:22;158:5;173:13;
174:19;190:3,4;197:3;
290:8,11;300:3
**terminates (1)**
176:1
**terminating (1)**
262:6
**termination (5)**
104:12;108:21;
127:20;290:15;303:14
**terminology (1)**
60:11
**terms (35)**
18:17;23:12;60:12;
76:18;107:3;123:10;
126:24;127:8,9;
143:19;159:18;160:24;
161:1;174:2;175:3;
179:2;180:15;199:13;
212:25;221:18;222:5,
11;232:9,9;234:10;
235:4,20;237:21;
244:20;246:3;250:9;
260:23;263:21;267:2;
278:10
**territory (1)**
82:14
**test (1)**
244:9
**tested (2)**
64:14;216:20
**testifying (1)**
202:17
**tethers (1)**
171:25
**Thanks (2)**
164:24;167:1
**That'll (1)**
119:23
**theory (2)**
67:21;215:15
**thereby (1)**
147:22
**therefore (12)**
39:8;64:25;87:20;
97:15;161:12;170:12;
172:2;188:3;206:9;
207:18;293:22;309:2
**there'll (1)**
119:12
**thinking (8)**
90:19;126:24;
140:12;141:5;185:14;
293:21;296:13;302:3
**third (3)**
129:5,6;233:20
**third- (1)**
294:23
**third-party (3)**
294:7,7,19
**thirteen (12)**

115:15;140:23;
145:2,4;157:17;158:5,
22;187:17;264:9;
286:24;289:12;292:20
**thirteen- (1)**
277:12
**thirteen-and-a- (1)**
189:7
**thirteen-and-a-half (4)**
157:10;188:21;
191:12,14
**thirteen-and-a-half- (1)**
130:23
**thirteen-and-a-half-billion-dollar (4)**
22:17;53:24;146:24;
187:24
**thirty (1)**
142:18
**thirty-six (1)**
201:24
**thirty-two (1)**
39:13
**thirty-two-year-old (1)**
12:21
**though (14)**
17:18;19:7;23:2;
63:21;66:15;68:25;
80:14;82:15;119:20;
125:9;232:24;251:1;
280:12;306:25
**thought (26)**
17:20;29:9;63:24;
99:5;100:10;102:3;
121:16;127:12;137:13;
148:25;149:20;150:4;
168:7;185:11;191:16;
213:5;218:4;247:22;
251:18;266:13,25;
278:13;293:6,22;
307:18;309:21
**thoughtful (1)**
303:25
**thoughts (1)**
293:10
**thousands (12)**
118:13;140:11;
152:10,11;168:19;
224:22;225:1,6;247:3,
5;299:15;300:19
**threatened (1)**
289:2
**threatening (3)**
203:6;288:24,25
**threatens (1)**
86:13
**three (26)**
8:12,16;10:11;19:4,
6;25:4,10;37:4;73:22;
76:6;95:15;107:13,14;
112:24;140:10;165:13;
166:13;223:5;235:2;
248:23;249:22;270:16;
294:14,16;310:16,17

**thrilled (1)**
242:9
**throughout (1)**
40:20
**throwaway (3)**
112:8,11,12
**thrust (5)**
161:3,9;291:3,4,6
**Thursday (1)**
260:1
**thwarts (1)**
169:17
**tied (4)**
22:5;247:6;265:15,
17
**till (1)**
125:5
**timely (1)**
291:22
**times (6)**
107:13;137:5;
169:25;206:13;248:11;
288:16
**timing (8)**
19:7;25:14;59:4;
128:5;135:2;238:2;
240:2;258:7
**tired (1)**
288:13
**title (5)**
77:22,23;79:15;86:6,
13
**today (130)**
8:10;10:10;12:17,23;
13:6;15:16;19:25;
21:12;22:18;25:18,19;
31:6;35:6,13;37:10;
41:12,24;42:3;43:11,
11;44:9;47:13;49:14;
57:22;58:18;87:4;
93:24;94:3,11;95:12,
20;96:22,24;98:11;
100:20;101:20;105:11;
108:8;109:16,16;
112:16;115:13;118:8;
120:16;125:19;127:7;
128:7;130:2,12;
134:15;135:12;136:8;
140:22;143:8;145:16;
146:4,10;149:15;
153:10;159:8,10;
162:1,18;164:14;
165:3,20;166:25;
167:6,7;171:8;172:21;
173:15;181:7;186:13,
19;204:16,22;205:6;
209:13;214:18,23;
215:5,18;216:13;
218:12,16;225:11,21;
229:9;231:8;237:24;
238:1,3;242:3;243:1;
248:14;250:2;251:5,
13,17,19;252:8;

256:13;257:2,3,16,18;
258:9;260:22,25;
262:22;266:20;269:21;
276:7;280:10,14;
285:10;286:6;289:3;
292:13;294:2,5;296:4;
298:4;300:8,9;302:6;
304:3,5;310:11
**today's (16)**
8:21;25:15;31:1;
35:19,25;36:13;99:23;
108:13;109:1;116:18;
127:11,16;153:13;
155:14;214:20;215:4
**Todd (4)**
9:9;61:18;62:9;66:9
**together (19)**
13:15;104:18;
105:15;147:25;154:15;
176:15;186:2;216:10;
224:25;228:15;241:18;
243:19;253:14;265:12;
269:15;270:11,12;
272:12;275:6
**told (23)**
20:20;23:18;125:3,5;
126:5;134:4;138:1;
142:17;163:9;180:1,2;
185:9,25;230:14;
240:8;244:19;245:13;
249:11;253:3;258:17;
259:16;263:2;300:11
**tomorrow (3)**
125:14;287:25;
304:13
**took (12)**
68:22;134:17;135:1;
137:6;138:4;166:12;
195:4;203:16;222:6,
17;259:14;298:1
**tool (1)**
90:15
**toolbox (1)**
90:15
**top (2)**
207:6;287:10
**topic (2)**
233:6;265:5
**topics (4)**
48:23;64:4;199:18;
232:16
**tort (61)**
10:3;11:14;104:9;
106:14,17,25;110:8;
111:18;113:2,3;
114:16;131:20;134:15,
16,20,20,21,24;135:4;
152:5;155:6;158:14;
163:8,10;165:15;
173:4;188:9;189:7;
197:16;201:8,12;
202:2;214:19;221:8,
12,13,20;222:2,13,20;

223:2,12;224:16;
225:1,7,7;228:7;
233:25;237:25;241:1;
243:6,7;277:6;278:7;
282:11;288:25;289:1,
22;292:2,4,21
**torts (19)**
189:21,21,24;190:5;
193:2;195:22;201:3,
10,12,24;205:8,20;
206:14;278:8,11,11,21;
279:8,22
**toss (2)**
297:14,15
**total (1)**
18:2
**totality (1)**
179:13
**touch (2)**
193:3,4
**touched (2)**
160:7;293:15
**tough (4)**
78:12;241:10;244:7;
295:22
**toward (2)**
37:8,14;248:3
**towards (5)**
44:3;205:20;215:10;
252:3;257:6
**tower (2)**
18:2,14
**town (2)**
137:21;178:6
**track (5)**
116:2;129:24,24;
144:9;159:24
**tracks (1)**
173:11
**tradeoffs (1)**
139:3
**traditional (1)**
59:15
**tragedies (1)**
300:19
**tragedy (2)**
47:18;58:12
**tragic (1)**
58:10
**trails (1)**
308:9
**train (1)**
285:18
**transaction (1)**
267:17
**transcript (8)**
161:3;190:20;191:7;
203:9,15;269:11;
276:6,10
**translates (1)**
19:9
**transparent (2)**
154:24;226:5

Min-U-Script®

Case: 19-30088    Doc# 5169    eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net    (36) terminated - transparent

Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 348
of 353

transpire (1)
140:15
transpired (1)
239:16
trap (2)
33:17;308:5
traps (2)
246:3;295:8
travelers (1)
252:14
tread (2)
161:1;198:23
treat (1)
199:3
treated (3)
126:21;177:23;226:8
treating (3)
51:22;52:4;126:19
treatment (18)
96:23;110:9;126:13,
19;154:12;184:10;
185:2;188:9;190:25;
195:25;211:12;215:2;
217:21;222:2;289:19,
22,22,23
tree (14)
249:7,10,19,21,23,
24;250:4,13;251:2;
252:9,12;254:5,6,10
Trees (1)
249:18
tremendous (2)
192:12;255:10
trial (61)
14:13;21:1;22:19;
24:2;26:6;30:18,23;
31:3;35:15,18;36:2,9;
37:16;41:1;42:12;
43:18;44:15;45:5;46:7,
12,15;47:6,20;49:8;
54:4;55:5;59:3;68:4;
79:21;80:4,14;86:7,9;
88:14,20;89:6,8,8;
90:2;92:2;110:23;
119:9,20;124:3;
132:13,20;137:6;
155:7;226:17;231:4;
233:11;236:20;244:18,
22;245:15;258:20,24;
261:22,25;262:4;
289:21
triggered (1)
239:14
triggers (1)
33:3
trimmer (1)
249:10
trimmers (2)
249:7;252:9
TRO (1)
252:11
trouble (2)
61:10;176:19

Troy (11)
127:23;164:2,5,5,12,
16,24,25;310:15,19,25
true (23)
10:11;36:25;49:15;
57:1;58:7;64:1;66:1,2;
82:19,21;84:4;153:14;
178:16;192:21;245:13;
249:16;250:11,11;
264:11;267:24;295:2;
300:18;310:19
truly (2)
223:3;295:7
trust (81)
10:8,18;11:21;14:6,
18,21;15:3,12,15;19:3,
3;21:14;22:21;23:1;
25:6;27:5,9;30:7,8;
33:12,12;50:10,11;
51:12,23;52:2;53:4,16,
24;60:9;64:13;118:1,3,
3,13,23,25;119:5;
127:5,9;132:9;142:14;
144:20;145:2;146:12,
14,22,25;147:6,8,8,11;
151:12;154:6,11,13,17,
18;163:1,3,7,12,16;
173:6;181:9;202:1;
225:16,18,22;226:1,11;
229:7;249:14;252:21,
23,25;256:20;265:11;
271:20;289:8;309:5
trustee (27)
14:6,9;22:4,5,6;
25:10;27:13;50:5,6,11;
52:11;53:5,15,17;
58:24;128:5,8,11;
144:25;155:5;165:2,3;
209:5;226:7,7;294:9;
297:7
trustee's (2)
52:12;165:5
trusts (3)
146:13;147:6,7
truth (2)
37:12;188:8
try (31)
14:7;26:17;32:12;
42:10;44:8;52:16;59:7;
68:25;71:21;77:21;
79:17,24;81:3;83:23;
87:1,2;99:22;178:3;
179:21;191:23;193:10;
197:9;206:14;207:5;
235:3,8;243:2;247:21;
254:25;266:16;288:7
trying (24)
33:15,17,19;34:15;
48:14;54:5;79:21;90:2;
115:1;120:4;121:8,8;
185:20;191:2;223:8;
241:8,14;249:10;
255:10;279:14;280:24;

287:21,21;306:6
TSA (3)
127:18;261:1,2
Tsekerides (136)
8:9,11,15,18,20;9:4;
23:23;31:23;41:10,15,
18,21,21;42:1,3,5;43:3,
5,8;44:2,5,7,12,16,20,
22;45:2,6,12,17,23,25;
46:9,11,14,17,21,25;
47:5,8,12,17,19,23;
48:3,6,10,13,19,24;
49:2,7,10,13,15,21,24;
50:12,14,16,19,21;
51:1,4,6,9,11,17,24;
52:3,8,15,20,22;53:6,9,
11,17,19;54:2,8,12,15,
21,23;55:6,8,11,13,16,
18,20,23,25;56:2,4,9,
11,16,19,23;57:1,3,5,8,
11,15,18,20,22;58:1;
60:5,17,20;61:1,3,6,8,
15;72:7,10,11,16,23;
73:4,7,10,12;74:5,7,16,
21,23,25;75:3;202:17
Tubb (2)
215:2;258:24
Tubbs (41)
21:20;26:9,9,20;
27:2,5,23;28:20;37:18;
110:23;117:8,11,23;
118:17;119:8;120:10;
124:3,21;126:14,19;
130:25;131:22;132:19;
133:10,13,25;140:3,17;
215:7;231:4;233:11;
244:18,21,22;245:1;
258:20;261:22,25;
262:4;287:7;289:21
TUESDAY (2)
8:1;125:7
tune (1)
112:24
tunnel (1)
248:1
turn (12)
11:22;95:6;101:9;
120:14;155:19;195:19;
215:12,17;241:20;
242:6;275:20;293:2
turnarounds (1)
57:11
turned (1)
111:24
turning (1)
309:19
tweak (1)
97:24
twelve (7)
168:8;263:5;276:8,
13;277:11;283:1;
286:10
twelve-billion-dollar (1)

202:13
twelve-month (1)
283:4
twelve-page (1)
276:6
twelves (1)
286:10
twenty (6)
135:5,21;276:5;
283:19;292:18;304:22
twenty- (1)
308:20
twenty-one (2)
27:3;308:21
twenty-two (2)
68:20;307:20
twice (2)
37:3;49:19
two (65)
12:16;25:7;35:8;
36:19;42:5,6,25;43:1;
48:13;49:18;50:24;
52:17;56:9;58:25;
67:18;74:2,3,4,11,13;
90:25,25;91:22;93:3;
94:13,15;102:1;118:8;
124:12;131:20;140:13;
144:1,22;146:13;
147:7;148:10;165:18;
172:7;178:7;183:2;
187:23;190:4;197:18;
218:2;227:5;228:8;
232:4;235:2,9;249:17,
19;255:12;258:10;
259:6;264:24;266:21;
269:9;281:7;286:17;
287:1,6;299:8;302:7;
304:14;308:21
tying (2)
70:18;169:11
type (1)
51:20
typical (1)
150:16
Typically (1)
151:17

U

UCC (2)
169:12;228:5
UCC's (1)
248:19
ultimate (4)
179:15;181:16;
190:13;285:16
Ultimately (12)
54:12;158:24;159:3,
8;180:14;199:16;
203:9;204:7,12;
256:21;258:10;309:13
umbrella (1)
252:25

Um-hum (12)
49:2;52:22;55:16;
93:7;97:9;98:21;
172:25;182:15,18;
184:4;234:19;249:12
unable (2)
202:10;226:22
unaware (1)
84:23
uncertain (1)
244:20
uncertainties (3)
209:14;228:15;
244:23
uncertainty (1)
244:11
uncharted (1)
82:14
unconfirmable (6)
172:2,3;174:1;210:8;
284:11,14
Under (47)
24:5;27:3;31:6;32:5,
15;53:6,19;60:7,9,9;
63:17;68:5;76:11,18;
78:14;83:17;87:23;
90:6;105:21;108:4;
129:8;132:23;179:2;
182:11;188:10,19;
192:19;194:12;195:24;
200:12;201:7,23;
208:8;222:3;238:2;
239:23;252:24;259:14;
265:9;267:23;275:19;
292:9;293:14;295:25;
297:18;307:14;308:12
undercard (1)
8:11
Underhill (2)
294:17;295:2
underlying (4)
77:9;84:25;169:11;
203:12
undermine (2)
250:8;290:1
underpaying (1)
208:6
understandable (1)
98:24
understands (3)
33:10;122:25;222:4
Understood (9)
39:3,6;85:8;131:22,
25;142:7;148:22;
215:19;247:16
undertaken (1)
221:14
underway (2)
73:21,22
underwriters (1)
138:1
undisputed (1)
192:11

Case: 19-30088    Doc# 5169    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 349
of 353

**uneffective (1)**
215:25
**unequivocally (6)**
60:2;171:12;172:1,
11;180:3;187:25
**unfair (4)**
27:12;37:2;118:9;
240:25
**unfamiliar (2)**
178:9;194:15
**unfolds (1)**
292:19
**unfortunately (1)**
225:20
**unhappy (1)**
141:18
**UNIDENTIFIED (7)**
75:16,19;95:1;
273:15,18;274:2,6
**unimaginable (1)**
269:7
**unimpaired (26)**
97:19,21;105:1;
108:4;110:24;111:11;
177:23;195:24;210:22,
24;256:24;267:4,6,16,
17,23;280:11,12,14;
283:24,25;292:9;
297:23;301:9;307:21,
24
**unimpairment (1)**
211:13
**union (3)**
63:11;72:4;73:14
**unique (3)**
65:13;66:3;77:8
**UNISON (3)**
8:7;311:2,6
**United (6)**
127:23;128:5,8,11;
165:2;294:9
**unknown (1)**
219:2
**unlawful (1)**
295:23
**unless (26)**
25:16;31:14;32:20;
36:7;49:8;59:5;80:7;
81:15;91:9;125:21;
130:3;131:9;135:23;
136:16;148:18;159:20,
23;166:24;182:25;
213:21;234:6;251:6;
271:16;283:25;296:7;
309:25
**unlike (1)**
21:4
**unlikely (4)**
158:2;178:17;180:5;
196:25
**unliquidated (10)**
33:2;148:25;149:3,9,
22,25;305:24;307:11;

308:4;309:25
**unprecedented (1)**
276:13
**unreasonable (1)**
275:9
**unrelated (1)**
180:24
**unreported (1)**
295:19
**unrepresented (1)**
72:13
**unresponded (1)**
248:22
**unsafe (2)**
62:8;65:8
**unsecured (6)**
107:23;167:11;
180:16;231:16;308:8;
309:9
**unsuccessful (1)**
62:1
**unthought-out (1)**
137:13
**unusual (2)**
33:22;268:1
**unwary (1)**
295:8
**unwrite (1)**
59:8
**up (104)**
9:22;10:18;23:24;
26:5;27:4;31:25;42:17;
43:13,18,25;44:10;
54:4;57:19;62:8;66:9;
80:24;82:2;89:7;90:22;
96:17;103:5;109:5;
111:9;118:23;126:17;
128:25;135:15;138:13;
142:13,18;146:3;
147:21,25;152:12;
154:2;159:24;160:4;
161:20;162:9;167:6;
171:4;180:9,11,25;
181:23;182:7;184:20;
188:5;189:5,9;190:23;
191:9,14,23;192:2;
194:2;199:15;204:13;
208:19;213:8;214:11;
216:17;218:25;228:2;
229:21;230:15;231:25;
232:12,23,25,25;
236:19;237:5;238:22;
247:4,6;248:11,21;
249:6;256:18;259:13,
24;264:24;265:10;
267:11;268:8,9,22;
276:7;277:12,17;
278:20;283:1;285:19;
287:18;290:3,3;294:8;
298:2,15;304:11;
306:1;307:9,11
**upended (1)**
299:17

**upfront (1)**
269:15
**upload (1)**
301:25
**upon (18)**
58:25;59:3;60:3;
103:8;164:21;178:11,
12;183:7;190:23;
199:9;200:13,19;
201:11;202:8;271:9;
277:3;279:15;287:22
**upside (2)**
195:19;277:24
**upstairs (5)**
122:15,16;135:15;
240:9;286:13
**urge (5)**
94:23;104:19;
135:11;181:16;292:22
**urgency (1)**
122:25
**urging (2)**
167:24;193:25
**use (13)**
54:5;59:23;111:15;
126:6;136:1;139:24;
170:3,5,10,12;185:12;
244:9;253:12;286:16,
24;287:23;296:16
**used (6)**
43:25;126:7;173:22;
245:7;253:10;286:20
**uses (1)**
253:12
**using (3)**
201:3;205:18;309:16
**usual (2)**
83:9,10
**usually (2)**
170:6;176:22
**Utilities (4)**
128:15;140:11;
223:6;229:6
**utilization (1)**
298:13
**utterly (2)**
178:8;275:1

## V

**Valero (17)**
11:17;13:11,13,16,
20;19:13;20:8,18,19,
22;21:5;25:7;42:20,20;
43:9;55:19,21
**Valero's (3)**
20:24;25:9;26:23
**valuable (1)**
189:4
**valuation (1)**
241:1
**value (16)**
157:18;158:14;

191:3;199:12;201:9;
204:20;205:4,9,11;
206:17;228:14;233:12;
278:11;279:20,21,22
**valve (1)**
237:22
**vaporize (1)**
289:14
**vaporizes (1)**
289:13
**variable (1)**
194:23
**variables (1)**
194:21
**variations (1)**
186:2
**various (3)**
164:6;225:11;302:6
**vast (6)**
134:22;224:15;
243:18;245:7;274:22;
282:17
**vendor (3)**
169:14;171:9;186:10
**vendors (3)**
250:25;252:7,10
**verbatim (1)**
286:9
**verdicts (1)**
36:24
**version (3)**
15:10;231:11;239:23
**versus (6)**
177:11;193:25;
215:3;262:11;296:19;
305:24
**veto (5)**
103:9,11,14,14,14
**viability (1)**
211:20
**victim (13)**
21:19;32:4;96:22;
97:18;127:5;147:23;
220:14;226:10;232:16,
23;234:2,2,10
**victims (61)**
10:13,15;14:22;
19:20;22:21;24:22;
27:21;30:3;47:16;
53:22,23;58:7;59:9;
101:2;118:9;126:14,
18;130:25;132:2;
140:19;142:10;143:6,
23;144:19;169:3;
170:18,21,23;171:22;
177:19,25;178:8;
199:21;215:3;223:12,
16;225:15,19;242:13;
243:6;247:3,6;249:15;
252:15;253:10,11;
256:7,10,18,22;257:6,
10;258:11;261:20;
281:17,17;299:16,24;

300:7,11,19
**victims' (3)**
226:20;232:19;243:7
**victim's (1)**
163:3
**view (32)**
16:8;22:1;25:21;
79:25;90:18;98:3;
131:1;146:19;150:6;
163:9;224:21;232:19;
242:1;247:15;248:2,
25;250:2;251:25;
252:1;254:18;255:1,3;
260:17,18;277:24,25;
285:1;295:13;299:6;
300:8,13;304:10
**views (2)**
76:17;130:16
**violating (3)**
207:14;212:20,20
**virtually (3)**
47:25;48:1;168:3
**vis (8)**
50:11,11;53:5,5;
54:19,19;208:7,7
**vis-a-vis (1)**
196:10
**visualize (1)**
234:1
**Vlazakis (10)**
8:15;74:25;75:11,21,
23;84:3,4,7,9;86:20
**voice (5)**
30:17;35:17;232:3;
267:7,8;274:24
**volition (1)**
274:6
**voluntary (2)**
201:7;295:15
**vote (26)**
105:1;141:17,19;
153:3,5;172:8;177:13,
24;193:25;194:3,4,5,6,
10;195:6,7;197:20,21;
200:1;201:17;225:2;
233:2;234:25;236:22;
239:23;282:15
**voted (1)**
177:25
**voter (1)**
280:19
**voters (7)**
193:9;201:17;
280:24;281:12;282:5;
284:21,21
**votes (4)**
149:4;270:2,19;
271:13,13;284:25
**voting (17)**
115:19;127:15;
146:11;148:3,18;
149:24;150:15;152:24,
24;153:12;163:20;

Case: 19-30088    Doc# 5169    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 350
of 353

168:21;177:19;194:11;
195:5;210:14;211:25

**W**

**wage (1)**
69:7
**wages (1)**
68:21
**wait (21)**
27:12;31:9;35:10;
37:21;125:5;155:17;
162:2;194:8;197:14;
200:20;203:23;211:2;
253:22,22,22;259:16,
25;267:15;275:15;
304:4,4
**waited (1)**
25:5
**waiting (8)**
19:4,5;22:9;42:16,
18;106:19;125:18;
223:12
**waive (1)**
127:19
**waived (1)**
127:21
**waiver (1)**
68:3
**wake (1)**
181:23
**walk (9)**
191:2;193:13,16;
261:8,21,23;262:1,3;
287:5
**wall (8)**
76:24;77:2,17;80:6,
15,21;82:23;83:3
**wants (8)**
33:23;76:25;89:23;
126:21;127:8;152:13;
158:4;171:5;186:5;
191:11;213:14;227:22;
228:4,5;234:4;258:1,2;
270:4;271:17;288:21;
297:3,3,5
**waste (1)**
254:9
**Watts (1)**
243:17
**way (95)**
12:1;18:5;19:19;
25:2;26:17;28:11;
32:12;38:22;43:9;
45:15;46:15;50:20;
52:16;53:1;54:8;59:17;
64:14;65:24;66:6;
70:24;73:14;76:25;
78:4;85:5;87:2,10,18;
96:24;99:22;100:12;
101:10;102:9;106:5,8;
113:6;115:10,12;
120:21;126:8,23;

135:24;138:21;141:15;
143:22;147:20;152:19;
177:7;178:22;181:12,
13;183:4;189:16;
193:11;194:17,17,18;
197:9;199:21;210:7,
15;212:21;213:8;
225:3;233:17;234:10;
237:1;239:13;244:12,
23;249:9;256:20;
257:9,25;263:4,9;
268:15;269:13;270:3,
10;271:9;272:10;
280:22;287:8,10;
289:6;291:20;293:21,
24;295:11,24;298:1;
299:9;307:15;309:17;
310:4
**ways (5)**
59:14;172:6;242:6;
275:2;284:14
**week (11)**
38:14,15;83:10;
107:21;119:4;159:7;
164:14;247:19;260:9;
302:15;304:18
**weeks (18)**
74:4,11,13;90:25,25;
91:22;93:3;134:17;
167:23;175:3;205:24;
225:21;255:12;259:15;
268:17;293:14,16;
294:22
**weigh (2)**
30:22;267:18
**Weil (2)**
41:21;288:7
**weird (1)**
210:10
**Weiss (1)**
166:21
**Weissmann (1)**
20:18
**welcome (2)**
95:22;310:22
**well- (1)**
59:20
**well-capitalized (1)**
222:10
**well-established (1)**
67:12
**Wendy (1)**
13:1
**weren't (5)**
52:3,4;62:23;85:11;
99:1
**Wharton (1)**
166:22
**what's (32)**
15:17;17:21;21:24;
38:11;44:13;49:22;
74:8;80:6;94:1;95:6;
97:2;122:14;134:5;

139:5;140:15;149:21;
153:20,20;168:11;
169:20;170:7;181:11,
17;184:7;190:2;191:6;
193:14;208:7;252:24;
282:7;287:23;298:14
**whatsoever (1)**
221:25
**wheel (2)**
136:3;143:4
**whenever (5)**
46:10,12;58:14;
109:14;283:11
**When's (1)**
89:11
**whereby (1)**
14:24
**where's (1)**
67:6
**Whereupon (1)**
311:7
**wherever (1)**
179:7
**wherewithal (1)**
245:14
**wherewithals (1)**
246:3
**whichever (1)**
100:22
**whirlwind (1)**
181:21
**whistleblower (7)**
62:7;19;64:21;65:12;
67:22;69:2;70:15
**whistleblowers (1)**
67:16
**whistles (1)**
219:16
**whole (19)**
21:13;47:8;61:22;
73:16;100:2;107:25;
113:10;121:18;130:10,
11;133:12;157:20;
180:16;201:4;247:11;
283:22;289:25;294:13;
309:10
**whoops (1)**
173:19
**Who's (2)**
9:13;61:16
**whose (6)**
118:17;230:1;
252:10;292:8;299:14,
16
**wildfire (17)**
10:13,15;14:22;30:3;
32:4;58:9;64:13;
171:22;178:8;219:1,2,
8,13,22;223:15;
250:24;291:23
**wildfires (3)**
28:12;55:4;58:8;
99:13;299:18

**willing (12)**
18:2;35:16;39:19;
92:2,8,12,13;147:25;
152:17;158:21;201:10;
202:4
**willingness (3)**
153:24;265:14;290:2
**wilted (1)**
243:20
**win (5)**
245:1;287:8;297:13,
14,15
**windfall (1)**
112:24
**winds (1)**
139:15
**wins (1)**
287:7
**WINTHROOP (1)**
310:9
**Winthrop (37)**
121:5,6,13,13,20;
122:2,9;123:12;127:2;
143:12,15;144:8,10,13,
15,21;145:17;146:2,8,
15,17,21,23;147:1,4,
16;148:14,20,23;
149:6;150:24;151:1;
152:6;153:22,23;
309:12;310:7
**Winthrop's (3)**
151:10;152:14;
224:17
**wisdom (2)**
222:18;300:9
**wish (10)**
35:3;97:21;136:22;
163:15,17;186:19;
220:5;253:25;278:6,6
**wished (1)**
299:23
**wishes (4)**
62:19;126:16;
135:23;302:11
**withdraw (4)**
58:15;116:14,19;
143:8
**withdrawn (2)**
266:2,2
**withhold (4)**
125:1;141:20;
259:16;304:22
**within (13)**
12:5;69:3;83:10;
106:6;111:1;147:6;
154:12;191:10;223:8;
228:25;245:14;270:16;
307:20
**without (33)**
20:25;26:16;45:16;
46:5;58:24;60:10;
70:15,15;76:19;85:6;
87:4;98:2;122:13;

171:3;184:2;190:18;
193:17;204:23;205:16,
16;225:2;235:2,20;
240:5;241:12;244:10,
12,18;268:3;289:12;
290:5;297:23;303:3
**won (2)**
72:24;244:25
**wonder (3)**
58:15;78:21;81:6
**wood (1)**
181:3
**word (12)**
20:17;52:17;67:2;
112:11;126:6;169:24;
170:3,5;244:15;
246:12;249:16;256:23
**worded (1)**
106:16
**words (30)**
16:12;32:9;51:25;
60:6;78:18;81:3;88:4;
94:11;97:23;111:15;
115:1;119:10;174:19;
175:10;181:8;183:8;
193:10;200:12;206:18;
210:4;212:5;230:13;
234:11;235:13;244:10;
248:10;269:11;291:15;
298:6;307:24
**work (23)**
14:8;22:1;48:22;
54:25;60:21,23;68:23;
101:15;102:8;143:20;
147:25;153:1,3;
159:11;172:11;225:24;
255:10;265:12;272:12;
286:10;302:21;310:23;
311:4
**worked (4)**
186:17;225:20;
254:24;274:17
**working (15)**
48:14,22;56:12,24;
73:14;108:5;122:18,
21;123:24;153:25;
154:14;232:14;233:1;
270:11;304:5
**works (5)**
117:8;123:3;172:6;
178:22;269:14
**world (8)**
88:25;89:2;103:7;
183:17;224:11,11;
252:22;275:4
**world's (1)**
108:23
**worries (1)**
234:18
**worry (6)**
32:11;149:15;
151:15,17;234:20;
300:20

Min-U-Script®

Case: 19-30088    Doc# 5169    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 351
of 353

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

**(39) wage - worry**

**worse (7)**
76:23;79:2;88:22,23;
189:21;297:6;299:24
**worth (6)**
137:20;143:24;
188:10;204:9;242:1;
299:13
**worthy (1)**
244:5
**wounds (1)**
247:22
**wrap (1)**
57:19
**wreck (1)**
285:18
**write (1)**
212:5
**written (3)**
108:6;293:18;302:2
**wrong (18)**
87:7;90:13;112:11;
114:25;139:18;173:21;
181:11;195:18;218:19;
237:23;240:14,15;
272:15;282:7;284:1,2;
288:23;301:3
**wrongfully (1)**
73:17
**wrote (2)**
176:20;248:13

**Y**

**year (9)**
18:3;22:10;40:20;
42:13;45:20;47:21;
120:21;262:15;269:7
**year-long (1)**
72:4
**years (11)**
12:22;19:4,6;37:4;
39:13;68:21;137:5;
235:2,9;248:12;264:9
**Year's (2)**
91:12,19
**yelled (1)**
244:8
**Yep (1)**
19:12
**yesterday (10)**
96:19;97:12;104:10;
111:14;112:5;137:21;
255:21;272:14;293:19;
298:25
**young (1)**
39:15

**Z**

**Zipes (10)**
165:4,4,7,8,10;166:5,
7,9,10,11
**ZUMBRO (12)**
303:18,20,22,22,23,
24;304:6,12,24;308:7,
7,18

**1**

**1 (9)**
8:23;76:8,8,10;88:7;
95:8;123:22;135:15;
136:9
**1.7 (1)**
23:19
**1:36 (1)**
136:11
**1:45 (1)**
136:10
**100 (2)**
168:13;199:23
**100,000 (1)**
139:11
**1054 (44)**
96:4;104:2,16;
105:17;106:6;109:5;
112:6;118:16;129:9;
135:2;169:16;172:2;
186:15,18,20;192:18,
19;194:25;195:1,10;
201:20;209:20;215:23;
221:24;223:5;235:2,5,
7;237:6;238:8;239:9;
249:2;255:1,3,13;
256:16;258:16;259:7;
263:16;268:19;278:19;
279:5;283:17;291:22
**1054's (2)**
49:4;238:2
**11 (15)**
34:10;48:15;57:13;
105:24;110:9;150:17;
168:22;171:8;197:24;
233:13;259:11;264:5;
266:24;289:7;291:25
**110 (3)**
168:13;263:10,11
**1114 (1)**
194:24
**1125 (2)**
177:17;184:3
**1129 (2)**
105:7;182:11
**1129b (2)**
206:9,12
**11s (1)**
264:9
**12 (1)**
268:10
**12.5 (1)**
247:12
**12:28 (1)**
136:11
**12:30 (1)**
8:24
**12:44 (1)**
97:12
**12th (1)**
150:7
**13.5 (33)**
10:16;158:25;
161:11,17,24;171:8;
184:19,20;194:17;
201:11,16,22;202:1;
203:21;204:13,22;
206:19;208:15,17;
240:6,11,14;242:7,11;
247:12;249:1;256:20;
259:2,3;263:23;287:4,
19,23
**13.5-billion-dollar (1)**
217:18
**13.5-million-dollar (1)**
171:4
**13-5 (1)**
241:6
**139,000-acre (1)**
137:9
**13th (2)**
195:12;284:3
**14 (1)**
237:17
**14.5 (1)**
247:12
**14th (5)**
116:7,8;302:16,19;
306:11
**15 (1)**
139:14
**16 (1)**
203:20
**17 (4)**
8:1;237:4,11,12
**17.5 (1)**
209:6
**17th (1)**
49:1
**18 (1)**
286:19
**19 (5)**
237:10,14,15,17;
251:7
**1990 (1)**
295:1
**1993 (1)**
295:1
**1995 (1)**
137:6
**1997 (1)**
295:11

**2**

**2 (4)**
76:8,10;88:7;123:23
**2.2 (1)**
27:1
**20 (1)**
92:10
**20,000 (1)**
139:14
**20.9 (1)**
250:23
**2011 (1)**
295:19
**2015 (2)**
28:11;223:13
**2016 (4)**
11:3;18:3;34:11;
223:14
**2017 (3)**
28:11;84:15;223:15
**2018 (2)**
28:11;223:15
**2019 (4)**
8:1;143:6;203:1;
269:8
**2020 (3)**
111:1;223:7;250:20
**2021 (1)**
250:21
**20th (3)**
91:21;93:9;226:1
**23 (3)**
16:22,24;17:5
**24th (2)**
89:14;92:11
**2a (1)**
117:7
**2E (2)**
270:9,15

**3**

**3 (4)**
76:8,10;88:7;113:25
**3:15 (1)**
220:24
**3:35 (1)**
220:24
**30 (7)**
16:22;17:6,7,9;
111:1;223:7;231:5
**30,000 (1)**
139:13
**3007 (1)**
32:6
**3018a (1)**
150:1
**30th (5)**
49:1;215:23,24;
262:8;292:19
**362 (2)**
47:8;56:20
**3815 (1)**
20:21
**3I (2)**
108:24,24
**3ii (1)**
270:8
**3rd (1)**
91:16

**4**

**4 (4)**
76:7;77:1,2;80:5
**4.19fii (1)**
120:25
**4:20 (1)**
254:9
**400 (1)**
148:1

**5**

**5 (2)**
20:22;119:11
**5:30 (1)**
309:14
**5:32 (1)**
311:7
**5123 (1)**
162:22
**5154 (1)**
277:22

**6**

**6,000 (1)**
38:16
**6th (3)**
91:17,21;93:6

**7**

**7 (6)**
34:8;76:8;77:2;80:5;
120:24;245:4
**7.1 (1)**
32:2
**70 (1)**
26:23
**70,000 (11)**
152:10;153:5;
168:18;169:3;197:23;
252:8,9,17,18;282:18;
292:5
**75,000 (1)**
10:15
**7th (2)**
132:19;231:4

**8**

**8:30 (1)**
309:22

**9**

**9 (1)**
77:1
**900 (2)**
26:22;39:24
**900,000 (2)**

Min-U-Script®

Case: 19-30088    Doc# 5169    eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 352
of 353

(40) worse - 900,000

39:21,23
**900,000-plus (1)**
39:20
**9019 (4)**
179:19;199:3;242:6;
272:11
**9th (1)**
294:13

Case: 19-30088    Doc# 5169    Filed: 12/19/19    Entered: 12/19/19 07:35:08    Page 353
of 353