Nicholas A. Carlin, State Bar No. 112532
Brian S. Conlon, State Bar No. 303456
PHILLIPS, ERLEWINE, GIVEN & CARLIN LLP
39 Mesa Street, Suite 201 - The Presidio
San Francisco, CA 94129
Telephone: 415-398-0900
Fax:      415-398-0911
Email:    nac@phillaw.com
          bsc@phillaw.com

Attorneys for Plaintiff

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: | **Case No. 19-30088 (DM)** |
| | **Chapter 11** |
| PG&E CORPORATION | **(Lead Case)** |
| | **(Jointly Administered)** |
| -and- | |
| | |
| PACIFIC GAS AND ELECTRIC COMPANY, | |
| | |
| Debtors | |
| | |
| ANTHONY GANTNER, individually and on behalf of all those similarly situated, | **Adv. Pro. No. 19-_____ (DM)** |
| | |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| vs. | |
| | |
| PG&E CORPORATION, a California Corporation, and PACIFIC GAS & ELECTRIC COMPANY, a California Corporation, | |
| | |
| Defendants. | |

PHILLIPS, ERLEWINE, GIVEN & CARLIN, LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA  94129
(415) 398-0900

1

CLASS ACTION COMPLAINT

## I.    SUMMARY OF THE CASE

1.    Plaintiff brings this action for damages against Defendants PG&E CORPORATION, a California Corporation, and PACIFIC GAS & ELECTRIC COMPANY, a California Corporation (collectively, "PG&E") for damages Plaintiff and the Class suffered arising out of PG&E's planned outages in Northern California on Oct. 9-12, Oct. 23-Nov. 1, and Nov. 20-22 (the "Outages").

2.    The necessity for the Outages was caused by PG&E's own negligence in failing, over many years, to properly maintain or replace old transmission lines, leaving them vulnerable to failing and sparking deadly wildfires.

3.    Because of the Outages, Plaintiff and the Class were without power for many days, in some cases up to 17 days total and upwards of 10 days in a row.  Plaintiff was without power himself for 8-9 days total and up to 5 days in a row.  As a result, Plaintiff and the Class suffered various losses including loss of habitability of their dwellings, loss of food items in their refrigerators, expenses for alternate means of lighting and power, such as candles, flashlights, batteries, and gas generators, loss of cell phone connectivity, dangerous dark conditions, lack of running water, and loss of productivity and business.

4.    Plaintiff and the Class seek compensation for their losses, and also injunctive relief to require PG&E to properly maintain and inspect its power grid, so that planned outages will not be necessary in the future.

## II.    JURISDICTION AND VENUE

5.    This adversary proceeding arises in and relates to PG&E's Chapter 11 Case.  The Court has jurisdiction to consider this adversary proceeding and over the claims against PG&E pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b). Plaintiff consents to the entry of a final order by the Court in connection with this adversary proceeding to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

PHILLIPS, ERLEWINE, GIVEN & CARLIN, LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA  94129
(415) 398-0900

Case: 19-30088    Doc# 5171    Filed: 12/19/19    Entered: 12/19/19 13:52:48    Page 2 of 24

PHILLIPS, ERLEWINE, GIVEN & CARLIN, LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA 94129
(415) 398-0900

## III.   THE PARTIES

### A.   PLAINTIFF ANTHONY GANTNER

6.      At all relevant times herein, Anthony Gantner ("Mr. Gantner") was an owner and/or occupant of real property located in St. Helena, California, serviced by PG&E.  Gantner is currently a resident of St. Helena, California.

### B.   DEFENDANTS

7.      Defendant PG&E Corporation is an energy-based holding company headquartered in San Francisco, California.  It is the parent company of Defendant Pacific Gas & Electric Company.

8.      Defendant Pacific Gas & Electric Company is incorporated in California and is headquartered in San Francisco, California.  Defendant Pacific Gas & Electric Company provides public utility services that include the generation, transmission, and distribution of electricity to millions of customers in Northern and Central California, including the residents of St. Helena.  Pacific Gas & Electric Company is a convicted felon.

9.      PG&E is jointly and severally liable for each other's negligence, misconduct, and wrongdoing as alleged herein, because at all relevant times, each of the Defendants were the partners, principals, agents, employees, servants, and joint venturers of each other, and in doing the things alleged in this Complaint were acting within the course and scope of their authority and relationship as partners, principals, agents, employees, servants and joint venturers with the permission, knowledge, and consent of each other.

## IV.   THE FACTS

### A.   PG&E IS REQUIRED TO SAFELY DESIGN, OPERATE, AND MAINTAIN ITS ELECTRICAL SYSTEMS

10.      PG&E owns, installs, constructs, operates, and maintains overhead power lines, together with supporting towers and appurtenances throughout Northern and Central California to transmit and distribute electricity to the general public for profit.

PHILLIPS, ERLEWINE, GIVEN & CARLIN, LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA 94129
(415) 398-0900

11.     Electrical infrastructure is inherently dangerous and hazardous, and PG&E recognizes that. The transmission and distribution of electricity requires PG&E to exercise an increased level of care in line with the increased risk of the associated danger.

12.     At all times PG&E had and continues to have a duty to properly construct, inspect, repair, maintain, manage, and/or operate its transmission lines and other electrical equipment and to keep vegetation properly trimmed and maintained so as to prevent foreseeable contact with such electrical equipment.

13.     In the construction, inspection, repair, maintenance, management, ownership, and/or operation of its power lines and other electrical equipment, PG&E had an obligation to comply with various statutes, regulations, and standards, including the following.

14.     Pursuant to California Public Utilities Code § 451, "Every public utility shall furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities . . . as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public."

15.     To meet this safety and service mandate, PG&E is required to comply with design standards for its electrical equipment, as stated in CPUC General Order 95. In extreme fire areas, PG&E also must ensure that its power lines can withstand winds of up to 92 miles per hour.

16.     PG&E must also follow standards to protect the public from the consequences of vegetation and/or trees coming into contact with its power lines and other electrical equipment. Under California Public Resources Code § 4292, PG&E is required to "maintain around and adjacent to any pole or tower which supports a switch, fuse, transformer, lightning arrester, line junction, or dead end or corner pole, a firebreak which consists of a clearing of not less than 10 feet in each direction from the outer circumference of such pole or tower."

17.     California Public Resources Code § 4293 mandates that PG&E must maintain clearances of four to ten feet for all of its power lines, depending on voltage. Under § 4293, "Dead trees, old decadent or rotten trees, trees weakened by decay or disease and trees or

4

CLASS ACTION COMPLAINT

PHILLIPS, ERLEWINE, GIVEN & CARLIN, LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA 94129
(415) 398-0900

1  portions thereof that are leaning toward the line which may contact the line from the side or may

2  fall on the line shall be felled, cut, or trimmed so as to remove such hazard."

3      18.     CPUC General Order 165 requires PG&E to inspect its distribution facilities to

4  maintain a safe and reliable electric system.  Specifically, PG&E must conduct "detailed

5  inspections of all of its overhead transformers in urban areas at least every five years."  PG&E is

6  also required to conduct "intrusive" inspection of its wooden poles that have not already been

7  inspected and are over 15 years old, every 10 years.

8      19.     PG&E knew or should have known that such standards and regulations were

9  minimum standards and that PG&E has a duty to identify vegetation which posed a foreseeable

10  hazard to power lines and/or other electrical equipment, and manage the growth of vegetation

11  near its power lines and equipment so as to prevent the foreseeable danger of contact between

12  vegetation and power lines starting a fire.  Further, PG&E has a duty to manage, maintain,

13  repair, and/or replace its aging infrastructure to protect public safety.  These objectives could

14  and should have been accomplished in a number of ways, including, by not limited to, putting

15  electrical equipment in wildfire-prone areas underground, increasing inspections, modernizing

16  infrastructure, and/or obtaining an independent audit of its risk management programs to ensure

17  effectiveness.

18      20.     PG&E may not, consistent with its obligations under California Public Utilities

19  Code § 451, ignore the above-referenced safety mandates until it becomes an emergency, and

20  then pass the burden on to its consumers by shutting off their power every time weather

21  conditions indicate an increased risk of wildfire.  As California Public Utilities Code § 451

22  states, PG&E must "furnish and maintain such adequate, efficient, just, and reasonable service"

23  to its customers.  The Outages are a blatant breach of this obligation.

24  **B.     PG&E'S INEXCUSABLE HISTORY OF SAFETY FAILURES**

25      21.     PG&E's safety record is an abomination.  Over the last forty years, it has been

26  the root cause of numerous and increasingly deadly fires in California, including: San Francisco

27  Gas Explosion (1981); Santa Rosa Gas Explosion (1991); Trauner Fire (1994); Mission

28  Substation Electrical Fire (1996); Pendola Fire (1999); Mission Substation Electrical Fire

5

---

CLASS ACTION COMPLAINT

(2003); Rancho Cordova Explosion (2008); Sims Fire (2004); Freds Fire (2004); Power Fire (2004); San Francisco Electrical Explosion (2005); Whiskey Fire (2008); San Francisco Electrical Explosion (2009); San Bruno Gas Explosion (2010); Cupertino Explosion (2011); Carmel Gas Explosion (2014); San Francisco Electrical Explosion (2015); Butte Fire in Calaveras County (2015); North Bay Fires (2017); Camp Fire (2018); Kincade Fire (2019)

22.     These fires have resulted in billions in dollars in fines and criminal convictions against PG&E for its criminally negligent maintenance of its power lines.

## C.     PG&E'S CORPORATE CULTURE IS THE CAUSE OF THE OUTAGES

23.     PG&E is a virtual monopoly in the provision of gas and electric services to the general public in almost all counties and cities across Northern and Central California.[1]

24.     Over the past thirty-plus years, PG&E has been subject to numerous fines, penalties, and/or convictions as a result of its failure to abide by safety rules and regulations. Despite these recurring punishments, PG&E continues to display a shocking degree of arrogant complacency, refuses to modify its behavior, and continues to conduct its business with a conscious disregard for the safety and well-being of the public, including Plaintiff.

25.     Rather than spend the money it obtains from customers for infrastructure maintenance and safety, PG&E funnels this funding to boost its own corporate profits and compensation.  This pattern and practice of favoring profits over having a solid and well-maintained infrastructure left PG&E vulnerable to an increased risk of catastrophic events such as the myriad of wildfires its unsafe system has caused in recent years.

26.     Many tragedies have resulted from PG&E's enduring failure to protect the public from the dangers associated with its operations.  PG&E power lines, transformers, conductors, poles, insulators, and/or other electrical equipment have repeatedly started wildfires due to PG&E's ongoing failure to create, manage, implement, and/or maintain effective vegetation management programs for the areas near and around its electrical equipment.  Further, PG&E's aging infrastructure has caused multiple disasters throughout California.

_____

[1] A few cities like Palo Alto and Sacramento provide their own gas and electric utility services.

PHILLIPS, ERLEWINE, GIVEN & CARLIN, LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA  94129
(415) 398-0900

6

CLASS ACTION COMPLAINT

**1. PG&E's Aging and Unsafe Infrastructure and Its Negligent Failure to Fix it**

27. On May 6, 2013, a report was sent to the Safety and Enforcement Division of the CPUC from the Liberty Consulting Group, retained to conduct an independent review of capital and operations and maintenance expenditures proposed by PG&E (hereinafter the "2013 Liberty Report").[2] The 2013 Liberty Report concluded that: "several aspects of the PG&E distribution system present significant safety issues." It also found: (a) "addressing risks associated with electrical distribution components has been overshadowed by electric transmission and gas facilities;" and (b) "addressing aging infrastructure and adding SCADA to the system comprise the major focuses of safety initiatives for the distribution system."

28. In a January 17, 2019 Order issued by federal judge, the Honorable William Alsup of the Northern District of California, in a criminal case against PG&E, Judge Alsup found "the single most recurring cause of the large 2017 and 2018 wildfires attributable to PG&E's equipment has been the susceptibility of PG&E's distribution lines to trees or limbs falling onto them during high-wind events. This has most often occurred in rural areas where distribution lines use thirty-five to fifty-foot single poles and run through grass, brush, oak and pines. The power conductors are almost always uninsulated. When the conductors are pushed together by falling trees or limbs, electrical sparks drop into the vegetation below. During the wildfire season when the vegetation is dry, these electrical sparks pose as extreme danger of igniting wildfire."

29. The 2013 Liberty Report found that PG&E had a "large amount of small size obsolete conductor[s] remaining on PG&E's system." PG&E has 113,000 miles of conductors, and over 60% of those conductors are and were highly susceptible to failure because of its size or composition. These obsolete conductors are relatively small and more susceptible to failure. As the conductor ages, it becomes even more likely to break. Extreme weather conditions, like wind and lightning, wear more on small conductors than the more modern larger ones. For these

---

[2] http://docs.cpuc.ca.gov/publisheddocs/efile/g000/m065/k394/65394210.pdf

PHILLIPS, ERLEWINE, GIVEN & CARLIN, LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA 94129
(415) 398-0900

Case: 19-30088   Doc# 5171   Filed: 12/19/19   Entered: 12/19/19 13:52:48   Page 7 of 24

PHILLIPS, ERLEWINE, GIVEN & CARLIN, LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA  94129
(415) 398-0900

reasons, "[t]his conductor was once popular, but is now recognized as obsolete, due to its small size."

30.     In addition, since prior to 1996, PG&E has known or should have known that its choice of chemical treatments for its poles can also make its equipment unsafe.  For example, PG&E uses and has used poles treated with pentachlorophenol in liquefied petroleum gas by the Cellon® process.  Those poles generally experience surface decay below ground regardless of the type of wood the poles are made of.  As a result, to be safe, digging inspections are required for poles treated like that.  But PG&E failed to conduct proper inspections and, when PG&E has been advised of necessary repairs, PG&E has failed to do so in a timely fashion.  These failures are a breach of PG&E's obligations to the public and have caused fires.

31.     According to a report from the Wall Street Journal from July 2019, prior to the deadly November 2018 Camp Fire, PG&E executives knew that 49 of its steel towers needed to be replaced but were not.[3]

32.     An internal presentation given in 2017 stated that the average age of its transmission towers was 68 years old and that its oldest towers were 108 years old.  The mean life expectancy of those towers is 65 years.  In other words, the average transmission tower PG&E used was older than the average life of those towers.

33.     In that 2017 internal presentation, PG&E recognized that it needed a plan to replace those towers and better manage its lines to prevent "structure failure resulting [in] conductor on ground causing fire."

34.     But PG&E repeatedly delayed upgrading its oldest transmission lines, ranking them as low-risk projects, while spending billions of dollars on other less-pressing projects, issuing dividends to its investors, and spending millions on campaign contributions.

35.     Until the deadly Camp Fire, PG&E was not regularly climbing its towers to inspect them, despite outside consultants suggesting that the company do just that.

_____

[3] https://www.wsj.com/articles/pg-e-knew-for-years-its-lines-could-spark-wildfires-and-didnt-fix-them-11562768885

PHILLIPS, ERLEWINE, GIVEN & CARLIN, LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA  94129
(415) 398-0900

36.     In June 2019, PG&E announced that its towers and lines needed thousands of repairs and shut down the Caribou Palermo line which was the root cause of the Camp Fire. However, that line was just one of many unreasonably dangerous lines PG&E maintained and continues to maintain.  Indeed, in 2018, when PG&E proposed a spending plan to federal regulators for thousands of transmission-line upgrades, its risk-based system had nearly 600 projects estimated at $2.7 billion as a higher risk priority than the Caribou Palermo line which caused the Camp Fire and is now shut down.

37.     PG&E's treatment of the Caribou-Palermo line is indicative of its treatment of all of its outdated and dangerous equipment.  Instead of fixing the problem in 2013 when PG&E was aware of it, it delayed safety work on that line for more than five years, failing to replace 49 steel towers and the hardware and aluminum line on 57 towers.

38.     The Ignacio-Mare Island line, which, on information and belief, delivers power to parts of Marin County which were impacted by the Power Outage, contains at least 28 towers which have been in place since 1921.  Work on this line designed to increase the heights of the towers so the lines would be far enough away from the ground was supposed to be complete by 2015 but is now not scheduled to start until 2020.

39.     Similarly, lines which carry power through the Eldorado and Stanislaus national forests that were scheduled to be complete by 2016 is expected to start late 2020 and a line in the Los Padres National Forest which was to be upgraded in 2015 is now scheduled to start in 2021.

40.     In 2010, PG&E used a consulting firm, Quanta Technology, to assess the age and transmission of its structures.  The returns were staggering.  It was unable to determine the age of 6,900 towers, 3,500 were installed in the 1900s and 1910s and 60% of its structures in the 230-kiolvolt system were built between 1920 and 1950.  Quanta suggested that PG&E climb at least a sample of those towers but PG&E didn't do that until after the Camp Fire.

41.     PG&E's failure to conduct proper and regular inspections of its equipment and failure to make necessary repairs contributed to the cause of the deadly wildfires in California and were the reason Outages in the fall of 2019.

9

CLASS ACTION COMPLAINT

PHILLIPS, ERLEWINE, GIVEN & CARLIN, LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA  94129
(415) 398-0900

**2.     PG&E Did Not Track the Conditions of Its Aging Electrical Assets as an Enterprise-Level Risk as the 2013 Liberty Report Required**

42.     Another recommendation of the 2013 Liberty Report was "the establishment of a formal asset management program in Electric Operations."  According to the report, "aging infrastructure is best addressed by having a strategic asset management program in place.  These types of programs, such as the PAS 55 program, force a detailed and thorough condition assessment survey of the major assets.  These types of formal programs also take failure modes into consideration.  Long term sustainable plans can then be prepared to address the asset conditions.  A sustainable asset management will mitigate system safety risks from aging infrastructure, which constituted a major portion of the safety items in this GRC."

43.     The 2013 Liberty Report specifically recommended that "PG&E treat aging infrastructure as an enterprise-level risk."

44.     After the release of the 2013 Liberty Report, PG&E began to publicly state that it was treating wildfires as an enterprise-level risk.  However, the methodology used by PG&E to evaluate the severity of that risk was and is unscientific and was and is not based on valid statistical methodology.  Instead, PG&E's method is to engage in a group discussion where an agreement is reached on a specific risk level based on personal opinion, anecdotal evidence, and factual misconceptions.  This process has led to PG&E's failure to properly evaluate the frequency and severity of the risk posed by wildfires.

45.     PG&E's failure to treat its aging infrastructure as an enterprise-level risk in a reasonable manner contributed to PG&E being unable to trust that its aging equipment would not create or exacerbate ongoing wildfires in Northern California and caused it to cut power to millions of its customers for days at a time.

**3.     PG&E's "Run to Failure" Approach to Maintenance**

46.     PG&E's failure to address the "significant safety hazards" identified by the 2013 Liberty Report, failure to treat the conditions of its aging infrastructure as an enterprise-level risk, failure to inspect, maintain, repair or replace its aging equipment, failure to conduct an inventory of its electrical assets, and failure to ensure its infrastructure could withstand

CLASS ACTION COMPLAINT

foreseeable weather conditions as required by law are all indicative of what has been called PG&E's "run to failure" approach to its infrastructure.

47.     PG&E has a well-documented history of implementing this "run to failure" approach with its aging infrastructure, ignoring necessary maintenance in order to line its own pockets with excessive profits.  According to a filing by Office of Ratepayer Advocates with the CPUC in May 2013:

> "However, as we saw in Section V.F.3 above, the Overland Audit explains how PG&E systematically underfunded GT&S integrity management and maintenance operations for the years 2008 through 2010. PG&E engaged in a 'run to failure' strategy whereby it deferred needed maintenance projects and changed the assessment method for several pipelines from ILI to the less informative ECDA approach – all to increase its profits even further beyond its already generous authorized rate of return, which averaged 11.2% between 1996 and 2010.

> "Given PG&E's excessive profits over the period of the Overland Audit, there is no reason to believe that Overland's example regarding GT&S operations between 2008 and 2010 was unique. The IRP Report supplements the Overland Audit findings with additional examples of PG&E management's commitment to profits over safety. Thus, it is evident that while the example of GT&S underfunding between 2008 and 2010 might be extreme, it was not an isolated incident; rather, it represents the culmination of PG&E management's long standing policy to squeeze every nickel it could from PG&E gas operations and maintenance, regardless of the long term 'run to failure' impacts. And PG&E has offered no evidence to the contrary."[4]

48.     PG&E's failure to address this "run to failure" approach to maintenance contributed to the wildfires that have plagued California and caused it to shut off power to its customers rather than risk another corporate-negligence-induced disaster.

### 4.     PG&E Continually Impedes and Ignores CPUC Safety Efforts

49.     In 2007, the CPUC began working to tighten regulations on utilities and force them to create maps that detail where power lines present the highest risk for wildfires.  As of 2017, a decade later, the maps were still incomplete.  And the CPUC had not adopted strict new regulations.

---

[4] ftp://ftp2.cpuc.ca.gov/PG&E20150130ResponseToA1312012Ruling/2013/03/SB_GT&S_0039691.pdf

11

Case: 19-30088   Doc# 5171   Filed: 12/19/19   Entered: 12/19/19 13:52:48   Page 11 of 24

PHILLIPS, ERLEWINE, GIVEN & CARLIN, LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA  94129
(415) 398-0900

PHILLIPS, ERLEWINE, GIVEN & CARLIN, LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA  94129
(415) 398-0900

50.     PG&E repeatedly asked to slow down these very necessary safety efforts.  In October 2016, PG&E complained that CPUC's plans to complete the map by March 2017 was "too aggressive."  In July 2017, the utility called a proposed regulation to increase the wind speed that power poles must withstand "arbitrary," and that certain proposed regulations would "add unnecessary costs to construction and maintenance projects in rural areas."  On Oct. 6, 2017—two days before the deadly North Bay Fires—two administrative law judges assigned to oversee the project granted PG&E and other utilities yet another requested delay.

51.     In response to PG&E's repeated failure to correct its behavior and the 2010 San Bruno explosion, the CPUC's Safety and Enforcement Division commissioned a report, prepared by NorthStar Consulting Group, to determine whether PG&E's "organizational culture and governance prioritize safety and adequately direct resources to promote accountability and achieve safety goals and standards."  The NorthStar report concluded that while PG&E purportedly made efforts to reduce incidents and increase safety after the 2010 San Bruno explosion, "these efforts had been somewhat reactionary" and were not driven by a "comprehensive enterprise-wide approach to addressing safety."

52.     On April 26, 2018, PG&E agreed to pay $97.5 million because it engaged in prohibited communications with the CPUC and failed to timely report ex parte communications from 2010 to 2014, in violation of CPUC rules.  All this, despite the fact that PG&E had been found guilty of a felony for interfering with the federal investigation of the 2010 San Bruno explosion.

### 5.     PG&E Repeatedly and Continuously Diverted Safety Funds

53.     In an investigation covering 1994 to 1998, CPUC staff accused PG&E of more than 500,000 counts of violating state laws requiring utilities to keep trees pruned a safe distance from overhead electric lines.  Much of the incriminating information cited by CPUC investigators was culled from the electric utility's own records.

54.     In another investigation by the CPUC and Overland (an independent auditing company) covering 1997 to 2012, it was uncovered that PG&E diverted more than $100 million

CLASS ACTION COMPLAINT

PHILLIPS, ERLEWINE, GIVEN & CARLIN, LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA 94129
(415) 398-0900

in gas safety and operations money collected from customers and spent it for other purposes, including profit for stockholders and bonuses for executives.

55.     According to the audit, from 1999 to 2010, PG&E also collected $430 million more than its guaranteed revenue from its gas-transmission and -storage operations.

56.     In another report, the CPUC concluded that in the three years leading up to the 2010 San Bruno explosion, the company spent $56 million annually on an incentive plan for executives and "non-employee directors," including stock awards, performance shares and deferred compensation.

57.     In 2016, PG&E reported $498 million worth of fines, $412 million of which were for "safety-related cost disallowances."

58.     In 2017, the year of the deadly North Bay Fires, PG&E's CEO, Geisha Williams earned $8.6 million, a 106% raise over the previous year.  The COO, Nicholas Stavropoulos earned $6.4 million, a raise of 88.9% over the year before.

59.     A July 2018 investigation by CPUC investigators found that PG&E kept $246 million dollars over the last 17 years that was meant to pay for undergrounding powerlines, which can help prevent wildfires.

60.     PG&E's advertising campaigns highlight that avoiding accountability—and not public safety—is its top priority.  Instead of allocating all available resources to maintenance and fire safety, PG&E spent millions on advertising designed to distract the public from the fact that PG&E is a six-time felon.

61.     Prior to its recent bankruptcy, PG&E distributed almost five billion dollars in dividends to its investors despite knowing that its system was in unreasonably dangerous condition and was the cause of deadly California wildfires.

62.     From January 1, 2017 to December 31, 2018, PG&E donated $5.3 million to political candidates, political parties, political action committees (PACs) and ballot measures, while large swaths of the State of California burned due to its negligence and its aging and dangerous infrastructure continued to age and become even more dangerous.

<hr>

13

CLASS ACTION COMPLAINT

PHILLIPS, ERLEWINE, GIVEN & CARLIN, LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA 94129
(415) 398-0900

**D. THE POWER OUTAGES**

63. On or about October 9, 2019, PG&E began preemptively turning off power to roughly 800,000 customers in Northern and Central California, impacting more than two million people who rely on PG&E for their electricity. (PG&E counts customers on a household or business basis, so one PG&E customer impacted may impact many individuals.)

64. The Outage—the first of many which PG&E calls "Public Safety Power Shutoff(s)"—impacted over 35 counties, including, Alameda, Alpine, Amador, Butte, Calaveras, Colusa, Contra Costa, El Dorado, Glenn, Humboldt, Kern, Lake, Marin, Mariposa, Mendocino, Merced, Napa, Nevada, Placer, Plumas, San Joaquin, San Mateo, Santa Clara, Santa Cruz, Shasta, Sierra, Siskiyou, Solano, Sonoma, Stanislaus, Tehama, Trinity, Tuolumne, Yolo, Yuba, Fresno, Madera, Sacramento, San Benito, San Louis Obispo, and Santa Barbara. According to PG&E, the sole purpose of the power shutdown was to "reduce the risk of catastrophic wildfire in the communities that we serve."

65. Upon the urging of Governor Newsom, PG&E agreed to provide a "one-time bill credit" for customers impacted by the October 9 Outage, in the amount of $100 for residents and $250 for business customers due to the "website and call center communications issues" which "exacerbated" the hardship caused by the October 9 Outage.[5] On information and belief, many PG&E customers had no notice whatsoever of the October 9 Outage.

66. On October 10, PG&E returned power to approximately 426,000 customers because of improving weather conditions, but 312,000 customers remained without power. This despite PG&E's weather services issuing an "all-clear" signal on Thursday afternoon. PG&E's website indicated that wind gusts exceeded 70 mph on the evening of October 9 to 10. Notably, there is no indication that it ever came close to the 92 miles per hour threshold established by CPUC General Order 95.

---

[5] https://www.pgecurrents.com/2019/10/29/pge-statement-on-oct-9-public-safety-power-shutoff-customer-bill-credit/

14

CLASS ACTION COMPLAINT

67. By noon on Oct. 11, PG&E had restored power to 543,000 customers, but about 195,000 customers still did not have power. By that evening 21,000 customers remained without power.

68. It was not until about 6 p.m. on October 12 that PG&E reported that power was restored to all the customers who were impacted by the October 9 Outage.

69. On October 23, 2019, PG&E once again began shutting off power to its customers to mitigate potential wildfires which might spark due to its negligently maintained power system.

70. The October 23 Outage began with PG&E shutting off power to about 1,000 customers in San Mateo and Kern Counties in the middle of the night (around 1:00 a.m.). By mid-day PG&E had shut off power to approximately 179,000 customers in 17 counties, including, Alpine, Amador, Butte, Calaveras, El Dorado, Kern, Lake Mendocino, Napa, Nevada, Placer, Plumas, San Mateo, Sierra, Sonoma, Tehama, and Yuba.

71. That night, the Kincaid Fire started northeast of Geyserville in Sonoma County in an area where the power had not been shut off. Preliminary reports indicate that the fire started when PG&E's 230,000-volt transmission line failed (a broken jumper wire was found on that transmission tower near the point of ignition). That fire was not fully contained until November 6, 2019, burned 77,758 acres of land, and damaged 120 buildings. Nearly 200,000 residents of Sonoma County were evacuated to mitigate the risk of the wildfire caused by PG&E.

72. PG&E restored power to 93% of its affected-customers by 9 p.m. on October 24 and 99% by October 25, but power remained out for certain customers in Sonoma County near the Kincade Fire.

73. On October 26, 2019, PG&E began its largest shutdown yet, shutting off power to 973,000 customers in portions of 37 counties in response to wind and dry conditions it feared might spark or exacerbate ongoing wildfires caused by its unreasonably dangerous infrastructure. An estimated 2.5 to 2.8 million people were impacted by the Outage. PG&E announced that it would institute this Outage in phases beginning around 5 p.m. The following counties were affected: Amador, Butte, Colusa, El Dorado, Glenn, Nevada, Placer, Plumas, An

15

CLASS ACTION COMPLAINT

Case: 19-30088   Doc# 5171   Filed: 12/19/19   Entered: 12/19/19 13:52:48   Page 15 of 24

PHILLIPS, ERLEWINE, GIVEN & CARLIN, LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA 94129
(415) 398-0900

Joaquin, Sierra, Siskiyou, Shasta, Tehama, Yuba, Lake, Marin, Mendocino, Napa, Solano, Sonoma, Yolo, Alameda, Alpine, Calaveras, Contra Costa, Humboldt, Mariposa, Mendocino, Monterey, San Benito, San Mateo, Santa Clara, Santa Cruz, Stanislaus, Tuolumne, Siskiyou, Trinity, Kern, Fresno, and Madera.

74.     By 10 p.m. on October 28, 57% of the 970,000 customers had their power restored, but PG&E was announcing yet another Outage to begin in the early morning of October 29. No sooner had power been restored to some PG&E customers than PG&E once again threatened another impending Outage.

75.     On October 29, PG&E announced that it had shut off power to approximately 540,000 more customers in portions of 27 counties while at the same time announcing that it restored power to ¾ of the 973,000 customers impacted by the October 26 Outage.

76.     As of 4 p.m. on October 30, 168,500 customers remained without power. By 10 a.m. on October 31, 36,745 customers were still without power. On November 1 at 4 p.m. there were still 200 customers who had not had their power turned back on by PG&E.

77.     In total, nearly 1.1 million customers were impacted by the October 26 and October 29 Outages.

78.     On November 20, 2019, PG&E shut off power to approximately 50,000 customers in Butte, Colusa, Glenn, Lake, Mendocino, Napa, Shasta, Solano, Sonoma, Tehama, and Yolo counties to protect against expected high winds. Power was not restored for most of those customers for a day and a half even though winds did not approach the 92-mph threshold established by CPUC General Order 95.

79.     In brief, instead of addressing its crumbling infrastructure to protect against wildfires, PG&E has decided to mitigate that risk by shifting its duty to provide safe power onto its customers to live without power for days or weeks at a time so it can avoid another catastrophic wildfire and the attendant liabilities which come with it. Years of corporate greed and criminal negligence have caught up to PG&E but that does not entitle it to pass the cost of its negligence onto its consumers who did nothing but pay their bills and expect to be able to turn their lights on so they can live their lives and conduct their businesses.

Case: 19-30088    Doc# 5171    Filed: 12/19/19    Entered: 12/19/19 13:52:48    Page 16 of 24

### E.    PLAINTIFF'S LOSSES

82.    Mr. Gantner is a resident of St. Helena, California.  He grows wine grapes on his property and sells them to local wineries there.  PG&E shut off Mr. Gantner's power as part of the Outages described above from on or about October 9 to October 12, 2019, from on or about October 26 to October 31, 2019, and from on or about November 21 to November 22, 2019.

83.    During the October 9 to Oct. 12 Outage described above, Mr. Gantner was scheduled to harvest his Cabernet Sauvignon grapes in St. Helena, California.  This harvest was significantly interfered with and disrupted as a consequence of the of October 9-12 Outage.  During this time, many wineries, including the winery to which Mr. Gantner was to deliver his grapes, were unable to regularly process the delivery of grapes, as received, because PG&E had shut off their power.  Mr. Gantner, who was scheduled to have his grapes picked and delivered on October 11, 2019, was required on an emergency basis to reschedule the harvesting of his grapes, including the arranging of a new grape picking crew and hauling of said grapes, until October 13, 2019, a Sunday, which is not a regular day for harvesting and delivery of grapes. The costs of labor increased about $500 because of the Sunday harvest.  Upon delivery of Mr. Gantner's 5.5 tons of grapes, the ongoing backlog for grape processing at the winery was such that they were not crushed and processed for an additional period of approximately 16 hours, during which time the quality of those grapes and the wine produced therefrom were materially diminished.  Plaintiff estimates that this diminution in value of the grapes is approximately $2,500.

80.    In addition to the disruption in the distribution of his wine grapes, Mr. Gantner suffered loss of habitability of his house for every day PG&E shut off his power.

81.    Mr. Gantner did not have cell phone connectivity and the darkness at night was dangerous.  The combination of the dangerous condition and the lack of an ability to reach emergency services if needed caused Mr. Gantner and those similarly situated to suffer emotional distress.

82.    Mr. Gantner also suffered a lack of running water because his well-water pump which needed electricity to function, was shut off.

PHILLIPS, ERLEWINE, GIVEN & CARLIN, LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA  94129
(415) 398-0900

PHILLIPS, ERLEWINE, GIVEN & CARLIN, LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA 94129
(415) 398-0900

83.     Mr. Gantner also suffered from lack of use of his home office, which was unusable without electricity which was supposed to be provided by PG&E.

84.     Mr. Gantner also suffered various other losses including, loss of food items in his refrigerator, and expenses for alternate means of lighting and power, such as candles, flashlights, batteries, and gas generators.

## V.     CLASS ACTION ALLEGATIONS

85.     Mr. Gantner brings this lawsuit as a class action on behalf of himself and all California residents and business owners who had their power shutoff due to PG&E's October 9, October 23, October 26, October 28, and November 20 Outages and any subsequent voluntary Outages PG&E imposes on its customers.  The proposed class is defined as:  All California residents and business owners who had their power shutoff by PG&E during the October 9, October 23, October 26, October 28, or November 20, 2019 Outages and any subsequent voluntary Outages PG&E imposes on its customers during the course of litigation.  Defendants, their subsidiaries, officers, directors, managing agents and members of those persons' immediate families, the Court, Court personnel, and legal representatives, heirs, successors or assigns of any excluded person or entity are excluded from the Class.

86.     The Class Period is defined as the period beginning October 9, 2019 and ending at the time this action proceeds to final judgment or settles (the "Class Period").

87.     Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint.  Plaintiff further reserves the right to name additional Class representatives and to identify subclasses as necessary and appropriate.

88.     **Numerosity**.  The Class for whose benefit this action is brought is so numerous that joinder of all Class Members is unfeasible and impracticable.  While Plaintiff does not presently know the exact number of Class Members, Plaintiff is informed and believes that the entire Class consists of potentially millions of individuals and that those Class Members can be readily determined and identified through Defendants' files and other documents maintained by Defendant and, if necessary, through appropriate discovery.

---

18

CLASS ACTION COMPLAINT

89.   **Typicality**.  Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff, like all Class Members, was subject to PG&E power outages due to PG&E's negligence and suffered damages as a result.  Furthermore, the factual bases of Defendants' misconduct are common to all Class Members and represent a common thread of unlawful conduct resulting in injury to all members of the Class.

90.   **Commonality**.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members.  Issues of law and fact common to the Class include:

a.   Whether PG&E's conduct in maintaining its power system violated the duty of care owed to its customers;

b.   What duty of care, PG&E owes to its customers;

c.   Whether Class Members have been damaged by Defendants' actions or conduct;

d.   The effect upon and the extent of injuries suffered by the Class and the appropriate amount of compensation;

e.   Whether declaratory and injunctive relief are appropriate to curtail Defendants' conduct as alleged herein; and

f.   Whether Defendants' acted with malice, oppression and/or fraud thereby justifying an award of punitive damages;

91.   **Adequacy**.  Mr. Gantner will fairly and adequately represent the interests of the Class and has no interests adverse to or in conflict with other Class Members.  Mr Gantner's retained counsel will vigorously prosecute this case, have previously been designated class counsel in cases in the State and Federal courts of California, and are highly experienced in consumer, class and complex, multi-party litigation.

92.   **Superiority**.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy since, among other things, joinder of all Class Members is impracticable, and a class action will reduce the risk of inconsistent adjudications or repeated litigation on the same conduct.  Further, the expense and burden of individual lawsuits would make it virtually impossible for Class Members, Defendants, or the Court to cost-

CLASS ACTION COMPLAINT

PHILLIPS, ERLEWINE, GIVEN & CARLIN, LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA  94129
(415) 398-0900

effectively redress separately the unlawful conduct alleged. Thus, absent a class action, Defendants would unjustly retain the benefits of its wrongdoing and Class Members would go without redress for the illegal and reprehensible discrimination they suffered. Plaintiff knows of no difficulties to be encountered in the management of this action that would preclude its maintenance as a class action, either with or without sub-classes.

93. Adequate notice can be given to Class Members directly using information maintained in Defendants' records, or through notice by publication.

94. Accordingly, class certification is appropriate under Fed. R. Civ. P. 23.

## VI. CLAIM FOR RELIEF

### FIRST CLAIM FOR RELIEF
### NEGLIGENCE
### (Against All Defendants)

95. Plaintiff hereby realleges and incorporates by reference each and every allegation contained above as though the same were set forth herein in full.

96. The California Public Utilities Code, section 451 provides a heightened standard of care for public utility companies like PG&E, it states: "Every public utility shall furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities . . . as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public."

97. Defendants have a virtual monopoly over the transmission and distribution of electrical power to the areas affected by the Outages and have individual contracts with all resident and businesses in those areas to whom it distributes that electrical power. The communities affected by the Outages are all dependent upon the safe transmission and distribution of that electrical for continuous residential and commercial usage, and PG&E has contractual, statutory, and public duties to provide that electrical power in a manner that promotes those individual and public interests.

98. The Outages were a direct and legal result of the negligence, carelessness, recklessness, and/or unlawfulness of Defendants, and/or each of them. Defendants, and/or each of them, breached their respective duties owed individually and/or collectively to Plaintiff and

CLASS ACTION COMPLAINT

PHILLIPS, ERLEWINE, GIVEN & CARLIN, LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA 94129
(415) 398-0900

the Class by, including but not limited to: (1) failing to comply with the applicable statutory, regulatory, and/or professional standards of care; (2) failing to timely and properly maintain, manage, inspect, and/or monitor the subject power lines, electrical equipment, and/or adjacent vegetation; (3) failing to make the overhead lines safe under all the exigencies created by surrounding circumstances and conditions; (4) failing to properly cut, trim, prune, and/or otherwise keep vegetation at a sufficient distance to avoid foreseeable contact with power lines; (5) failing to trim and/or prune vegetation so as to avoid creation of a safety hazard with close proximity of the subject power lines; (6) failing to conduct adequate, reasonably prompt, proper, effective, and/or frequent inspections of the electrical transmission lines, wires, and/or associated equipment; (7) failing to design, construct, monitor, and/or maintain high voltage electrical transmission, and/or distribution power lines in a manner that avoids the potential to ignite a fire during long, dry seasons by allowing vegetation to grow in an unsafe manner; (8) failing to install the equipment necessary and/or to inspect and/or repair the equipment installed, to prevent electrical transmission and distribution lines from improperly sagging, operating, and/or making contact with other metal wires placed on its poles and igniting fires; (9) failing to keep equipment in a safe condition and/or manage equipment to prevent fire at all times; (10) failing to update outdated and dangerous equipment; (11) failing to properly train and to supervise employees and agents responsible for maintenance and inspection of the transmission lines and/or vegetation areas nearby these lines; and (12) shutting off power to millions of customers to avoid further wildfires caused by its corporate negligence. Instead of doing any of these necessary and reasonable steps to mitigate or eliminate the risk of a wildfire occurring or spreading as a result of its outdated and unreasonably dangerous power system, PG&E breached its duty of care to millions of its customers by shutting off their power for days at a time, sometimes without notice.

99. As a direct and legal result of Defendants' actions and/or omissions, Plaintiff and Class Members suffered various losses including loss of habitability of their dwellings, loss of food items in their refrigerators, expenses for alternate means of lighting and power, such as

Case: 19-30088    Doc# 5171    Filed: 12/19/19    Entered: 12/19/19 13:52:48    Page 21 of 24

PHILLIPS, ERLEWINE, GIVEN & CARLIN, LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA  94129
(415) 398-0900

candles, flashlights, batteries, gas generators, loss of cell phone connectivity, dangerous dark conditions, lack of running water, and loss of productivity and business.

100. As a further direct and legal result of Defendants' actions and/or omissions, Plaintiff and Class Members have suffered and/or continue to suffer great mental pain and suffering, including worry, emotional distress, humiliation, embarrassment, anguish, anxiety, and nervousness. Plaintiff is informed and believe, and upon such information and belief allege, that such injuries have resulted in debilitating injuries in an amount according to proof at trial.

101. As a direct and legal result of the Defendants' actions and/or omissions, Plaintiff and Class Members have suffered a loss of income, loss of earning capacity, loss of profits, increased expenses due to displacement, and/or other consequential economic losses in an amount according to proof at trial.

102. As a further direct and legal result of the Defendants' actions and/or omissions, Plaintiff and Class Members have suffered damage to and/or a loss of personal property, including but not limited to items of peculiar value to Plaintiff and Class Members in an amount according to proof at trial.

103. As detailed above, Defendants' safety record is inexcusably bad. Defendants have had several incidents that caused injury and death to California residents, and destroyed properties, and has been subject to numerous penalties, including, but not limited to record fines following the San Bruno Explosion, as a result of their failure to comply with safety standards, rules and regulations. Despite these fines and punishments, Defendants failed to modify their behavior, continuing their practice of placing their own profits over safety and conducting their business with a conscious disregard for the safety and well-being of the public and property.

104. The potential harms to Plaintiff from Power Outages were objectively foreseeable both in nature and in scope and were subjectively known to PG&E.

105. As set forth above and as will be shown by proof, there is a high degree of certainty that Plaintiff and the Class has suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and Defendants' conduct. A high degree of moral blame is attached to Defendants' conduct, and the policy of preventing

Case: 19-30088    Doc# 5171    Filed: 12/19/19    Entered: 12/19/19 13:52:48    Page 22 of 24

PHILLIPS, ERLEWINE, GIVEN & CARLIN, LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA  94129
(415) 398-0900

PHILLIPS, ERLEWINE, GIVEN & CARLIN, LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA 94129
(415) 398-0900

1   future harm justifies both the recognition of the existence of a duty of care owed by Defendants

2   to Plaintiff and the Class and the imposition of all damages described above.

3       106.    At all times prior to the subject incident, the conduct of Defendants, by act and/or

4   omission, acted with oppression, fraud, malice, and/or with a knowing, conscious disregard for

5   the rights and/or safety of others. The wrongful conduct of Defendants was more than just

6   inadvertence, error of judgment or negligence. Rather, Defendants conduct was despicable and

7   showed malice as defined by California Civil Code § 3294. As a result, Plaintiff requests that

8   the trier of fact, in the exercise of sound discretion of the rights and safety of others, such that

9   additional damages for the sake of example and sufficient to punish said Defendants for their

10  despicable conduct, in an amount reasonably related to Plaintiff's and Class Members' actual

11  damages and Defendants' wealth, yet sufficiently large enough to be an example to others and to

12  deter Defendants and others from engaging in similar conduct in the future.

13                               **<u>PRAYER</u>**

14       WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as

15  follows:

16       a.      For special and general damages in an amount according to proof, but at least

17  $2,500,000,000.

18       b.      For punitive and exemplary damages in an amount according to proof as allowed

19  under California Civil Code § 3294;

20       c.      For punitive and exemplary damages in an amount according to proof as allowed

21  under California Public Utilities Code § 2106;

22       d.      For an injunction ordering that Defendants, and each of them, stop continued

23  violation of: (a) General Order No. 95, Rules 31.1-31.5, 35, 38, 43, 43.2, 44.1-44.4, and 48-48.1;

24  (b) General Order No. 165; (c) California Public Resources Code §§ 4292, 4293; and (d)

25  California Public Utilities Code § 451;

26       e.      For attorney's fees allowed under California Code of Civil Procedure § 1021.5;

27       f.      For prejudgment interest;

28       g.      For punitive damages as allowed by law;

23
CLASS ACTION COMPLAINT

h.    For all costs of suit incurred herein; and

i.    For such other and further relief as the Court deems just and proper.

Dated: December 19, 2019              PHILLIPS, ERLEWINE, GIVEN & CARLIN LLP

By: /s/ Nicholas A. Carlin
Nicholas A. Carlin
Brian S. Conlon
Attorneys for Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a trial by jury of all issues so triable.

Dated: December 19, 2019              PHILLIPS, ERLEWINE, GIVEN & CARLIN LLP

By: /s/ Nicholas A. Carlin
Nicholas A. Carlin
Brian S. Conlon
Attorneys for Plaintiff

PHILLIPS, ERLEWINE, GIVEN & CARLIN, LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA 94129
(415) 398-0900

24

CLASS ACTION COMPLAINT