WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C. (*pro hac vice*)
(ray.schrock@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Theodore E. Tsekerides (*pro hac vice*)
(theodore.tsekerides@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

*Attorneys for Debtors*
*and Debtors in Possession*

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Peter J. Benvenutti (#60566)
(pbenvenutti@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re:<br><br>**PG&E CORPORATION,**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>Debtors. | Case Nos. 19-30088 (DM) (Lead Case)<br>(Jointly Administered)<br><br>**DEBTORS' OPPOSITION TO THE CONSOLIDATED OPENING BRIEF OF CERTAIN CREDITOR GROUPS AND REPRESENTATIVES REGARDING THE ENTITLEMENT OF HOLDERS OF UTILITY FUNDED DEBT CLAIMS TO OPTIONAL EARLY REDEMPTION, MAKE-WHOLE, OR SIMILAR AMOUNTS IN A SOLVENT DEBTOR CASE; JOINDER OF PG&E SHAREHOLDERS**<br><br>Date:  January 14, 2020<br>Time:  10:00 a.m. (Pacific Time)<br>Place:  United States Bankruptcy Court<br>         Courtroom 17, 16th Floor<br>         San Francisco, CA 94102 |

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), respectfully submit this Opposition to the *Consolidated Opening Brief Of Certain Creditor Groups And Representatives Regarding The Entitlement Of Holders Of Utility Funded Debt Claims To Optional Early Redemption, Make-Whole, Or Similar Amounts In A Solvent Debtor Case* [ECF No. 4902] (the "**Noteholders' Opening Brief**" or "**Noteholders' Br.**").[1]

The PG&E Shareholders join this Brief and reserve the right to participate in argument of the matter.[2]

---

[1] Capitalized terms not defined herein have the same meaning ascribed to them in the *Debtors' Brief Regarding Utility Funded Debt Claims' Entitlement to Make-Whole Premiums and Joinder of PG&E Shareholders* [ECF No. 4896] (the "**Debtors' Opening Brief**" or "**Debtors' Br.**").

[2] The PG&E Shareholders are the entities identified on Exhibit A to the *Fifth Amended Verified Statement Of Jones Day Pursuant To Federal Rule Of Bankruptcy Procedure 2019* [ECF 5142], excluding Monarch Alternative Capital LP, on its own behalf and on behalf of its advisory clients. The PG&E Shareholders are acting in their individual capacities but authorized the filing of this single submission for the purpose of administrative efficiency. Each of the PG&E Shareholders is expressing its independent views, and counsel does not have the actual or apparent authority to obligate any one entity to act in concert with any other entity with respect to PG&E equity securities. The PG&E Shareholders have not agreed to act in concert with respect to their respective interests in PG&E equity securities.

# **TABLE OF CONTENTS**

I.      Preliminary Statement.................................................................................1

II.     The Noteholders are Not Entitled to the Make-Whole Premiums ........................2

        A.      The Indentures Do Not Provide for Make-Whole Premiums upon a Chapter 11
                Filing .............................................................................................2

                1.      The Acceleration Clauses Preclude the Make-Whole Premiums in
                        Bankruptcy .............................................................................3

                2.      The Optional Redemption Provisions Do Not Give Rise to Make-
                        Whole Premiums in Bankruptcy.................................................8

                3.      No Other Provision in the Indentures Provides for a Premium in
                        Bankruptcy.............................................................................15

        B.      Section 502(b)(2) of the Bankruptcy Code Disallows Claims for the Make-
                Whole Premiums as Unmatured Interest .............................................16

                1.      The Make-Whole Premiums are "Unmatured Interest"....................17

                2.      The Make-Whole Premiums were Not "Matured" on the Petition Date ...19

                3.      There is No Solvent-Debtor Exception to Section 502(b)(2) ...............19

III.    Conclusion ..............................................................................................23

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

ii

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re 1141 Realty Owner LLC*,
  598 B.R. 534 (Bankr. S.D.N.Y. 2019) ................................................................7

*In re 433 S. Beverly Drive*,
  117 B.R. 563 (Bankr. C.D. Cal. 1990) ...........................................................7, 18

*In re AMR Corp.*,
  485 B.R. 279 (Bankr. S.D.N.Y. 2013), *aff'd*, 730 F.3d 88 (2d Cir. 2013) ...............2, 15

*In re AMR Corp.*,
  730 F.3d 88 (2d Cir. 2013)...........................................................................6, 9

*Anderson v. Heart Fed. Sav. & Loan Assn.*,
  208 Cal. App. 3d 202 (1989), *reh'g denied and opinion modified* (Mar. 28, 1989).....................15

*Block v. eBay, Inc.*,
  747 F.3d 1135 (9th Cir. 2014) .......................................................................13

*BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*,
  778 F. Supp. 2d 375 (S.D.N.Y. 2011)................................................................3

*In re Capitol Food Corp. of Fields Corner*,
  490 F.3d 21 (1st Cir. 2007)...........................................................................20

*In re Cardelucci*,
  285 F.3d 1231 (9th Cir. 2002) .......................................................................20

*Carman v. Alvord*,
  644 P.2d 192 (Cal. 1982) ..............................................................................8

*In re Cent. Jersey Airport Servs., LLC*,
  282 B.R. 176 (Bankr. D.N.J. 2002) .................................................................20

*In re Chateaugay Corp.*,
  961 F.2d 378 (2d Cir. 1992)..........................................................................17

*In re Chemtura Corp.*,
  439 B.R. 561 (Bankr. S.D.N.Y. 2010)..........................................................18, 22

*In re Chi., Milwaukee, St. Paul & Pac. R.R. Co.*,
  791 F.2d 524 (7th Cir. 1986) .........................................................................21

*Debentureholders Protective Committee of Continental Inv. Corp. v. Continental Inv. Corp.*,
  679 F.2d 264 (1st Cir. 1982)..........................................................................21

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

*In re Doctors Hosp. of Hyde Park, Inc.*,
    508 B.R. 697 (Bankr. N.D. Ill. 2014) ................................................................19

*In re Dow Corning*,
    456 F.3d 668 (6th Cir. 2006) .............................................................................22

*In re Energy Future Holdings Corp.*,
    842 F.3d 247 (3d Cir. 2016)........................................................................5, 8, 18

*Matter of Federated Dep't Stores, Inc.*,
    131 B.R. 808 (S.D. Ohio 1991) ........................................................................20

*Matter of Federated Dep't Stores, Inc.*,
    No. BR 1-90-00130, 1991 WL 12008527 (Bankr. S.D. Ohio Jan. 28, 1991)..............20

*Felin v. Kyle*,
    102 F.2d 349 (3d Cir. 1939)........................................................................10, 11

*Heine v. Signal Cos., Inc.*,
    No. 74 CIV. 3036, 1977 WL 930 (S.D.N.Y. Mar. 4, 1977) ...........................10, 11

*HSBC Bank USA, Nat. Ass'n v. Calpine Corp. ("Calpine II")*,
    No. 07 CIV 3088 GBD, 2010 WL 3835200 (S.D.N.Y. Sept. 15, 2010) .............3, 5, 10

*In re Imperial Coronado Partners, Ltd.*,
    96 B.R. 997 (B.A.P. 9th Cir. 1989)....................................................................9, 18

*Johnson v. Norris*,
    190 F. 459 (5th Cir. 1911) ................................................................................21

*In re Lappin Elec. Co.*,
    245 B.R. 326 (Bankr. E.D. Wis. 2000) ..............................................................18

*Matter of LHD Realty Corp.*,
    726 F.2d 327 (7th Cir. 1984) ............................................................................18

*In re Lipper Holdings, LLC*,
    1 A.D.3d 170 (N.Y. App. Div. 2003) ..................................................................13

*In re Los Angeles Dodgers LLC*,
    465 B.R. 18 (D. Del. 2011)................................................................................22

*In re Marshall*,
    298 B.R. 670 (Bankr. C.D. Cal. 2003)................................................................21

*In re Matco-Norca, Inc.*,
    802 N.Y.S.2d 707 (App. Div. 2005) ....................................................................4

*In re MPM Silicones, L.L.C.*,
    874 F.3d 787 (2d Cir. 2017)........................................................................*passim*

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*NML Capital v. Republic of Arg.*,
17 N.Y.3d 250 (2011) ...............................................................................6, 10

*Nw. Mut. Life Ins. Co. v. Uniondale Realty Assocs.*,
816 N.Y.S.2d 831 (Sup. Ct. Nass. Cty. 2006) ...............................................6

*In re Planvest*,
94 B.R. 644 (Bankr. D. Ariz. 1988) ...............................................................18

*Quadrant Structured Prod. Co. v. Vertin*,
23 N.Y.3d 549 (2014) ....................................................................................4

*In re Read-Rite Corp.*,
No. 03-43576 RN7, 2005 WL 2210659 (Bankr. N.D. Cal. Aug. 11, 2005)...............................18

*In re Ridgewood Apartments of DeKalb Cty., Ltd.*,
174 B.R. 712 (Bankr. S.D. Ohio 1994)...................................................17, 19

*In re Robinson*,
567 B.R. 644 (Bankr. N.D. Ga. 2017) ............................................................21

*Ruskin v. Griffiths*,
269 F.2d 827 (2d Cir. 1959).............................................................................21

*Ruttenberg v. Davidge Data Sys. Corp.*,
215 A.D.2d 191 (N.Y. App. Div. 1995) ....................................................5, 13

*In re S. Side House, LLC*,
470 B.R. 659 (Bankr. E.D.N.Y. 2012) ...........................................................13

*Safeco Ins. Co. of Am. v. Robert S.*,
26 Cal. 4th 758 (2001) ....................................................................................4

*In re School Specialty, Inc.*,
No. 13-10125, 2013 Bankr. LEXIS 1897 (Bankr. D. Del. Apr. 22, 2013) ...............................18

*In re Skyler Ridge*,
80 B.R. 500 (Bankr. C.D. Cal. 1987)..............................................................18

*In re Sylmar Plaza, L.P.*,
314 F.3d 1070 (9th Cir. 2002) ..................................................................20, 21

*In re Tara Retail Grp., LLC*,
No. 17-BK-57, 2018 WL 4501136 (Bankr. N.D.W. Va. Sept. 19, 2018) .......................9

*Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*,
322 F.3d 1039 (9th Cir. 2003) ..................................................................17, 19

*In re Trico Marine Servs., Inc.*,
450 B.R. 474 (Bankr. D. Del. 2011)..........................................................18, 19

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

*U.S. Bank Nat. Ass'n v. S. Side House, LLC*,
No. 11-CV-4135 ARR, 2012 WL 273119 (E.D.N.Y. Jan. 30, 2012) .........................5, 6

*In re Ultra Petroleum Corp. ("Ultra II")*,
943 F.3d 758 (5th Cir. 2019) ...........................................................7, 17, 22, 23

*In re Ultra Petroleum Corp.*,
913 F.3d 533 (5th Cir. 2019) .........................................................................17

*United Savings Assoc. v. Timbers of Inwood Forest*,
484 U.S. 365 (1988) .......................................................................................20

*UPS Capital Bus. Credit v. Gencarelli (In re Gencarelli)*,
501 F.3d 1 (1st Cir. 2007) ..............................................................................22

*Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.*,
1 N.Y.3d 470 (2004) ........................................................................................3

*Vons Cos., Inc. v. United States Fire Ins. Co.*,
78 Cal. App. 4th 52 (2000), *as modified* (Mar. 6, 2000) .............................6, 12

*Wells Fargo Bank, N.A. v. Renz*,
795 F. Supp. 2d 898 (N.D. Cal. 2011) ...............................................................6

*Wilmington Savs. Fund Soc'y, FSB v. Cash Am. Int'l, Inc.*,
No. 15-cv-5027 (JMF), 2016 WL 5092594 (S.D.N.Y. Sept. 19, 2016) ...................5

**Statutes**

11 U.S.C. § 502 .........................................................................................*passim*

11 U.S.C. § 506 .............................................................................................18

11 U.S.C. § 726 .............................................................................................20

11 U.S.C. § 1124 ...........................................................................................23

Cal. Civ. Proc. Code § 1858 ............................................................................3

**Other Authorities**

Scott K. Charles & Emil A. Kleinhaus, *Prepayment Clauses in Bankruptcy*, 15 Am.
Bankr. Inst. L. Rev. 537 (2007) .....................................................................17

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    PRELIMINARY STATEMENT

In an effort to obtain a windfall of more than $5 billion,[3] the Noteholders ask the Court to ignore both the plain language of the Indentures and section 502(b) of the Bankruptcy Code. But the amorphous equitable principles and supposed solvency exception cited by the Noteholders cannot overcome two controlling facts: (1) the Indentures do not provide for a Make-Whole Premium under the facts of these cases; and (2) even if they did, any claim for a Make-Whole Premium would be disallowed as unmatured interest.[4]

First and foremost, the Noteholders have no contractual right to a Make-Whole Premium. Under both California and New York law, a loan agreement must clearly and expressly provide for payment of a premium upon acceleration in order to give rise to an enforceable right to such payment. No such provision is found in the Indentures. To the contrary, the plain language of the Acceleration Clauses confirms that only "the principal amount" of the Notes is payable in the event of a bankruptcy filing. The Noteholders' assertion that they are entitled to a Make-Whole Premium because the Indentures do not expressly provide otherwise has the analysis entirely backwards.

Further, payment of the accelerated Notes through a plan of reorganization in these Chapter 11 Cases is neither "optional" nor a "redemption" under any of the Indentures, whether they provide for an Optional Redemption Premium upon payment before "Maturity," before a specified date prior to Maturity, or at "any time" before Maturity. There is no question that the Notes have accelerated and "Maturity" of the Notes has occurred. The obvious and recognized plain meaning of the term "redemption" is payment of a debt *before* maturity.

Independently, even if the Indentures did give rise to a right to payment for the Make-Whole Premiums, such claims would be disallowed as "unmatured interest" under section 502(b)(2) of the Bankruptcy Code. The Indentures make clear that the Make-Whole Premiums are intended to compensate the Noteholders for interest payments they expected to receive *in the future*. Despite the

---

[3] The actual amount of the Make-Whole Premiums at issue is subject to change for the reasons explained in the Debtors' Opening Brief. *See* Debtors' Br. at 5 n.9.

[4] The Noteholders refer to the Make-Whole Premiums as "Optional Redemption Premiums" in their brief. *Compare* Debtors' Br. at 5, *with* Noteholders' Br. at 6.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Noteholders' efforts to characterize them differently, their claims for Make-Whole Premiums are nothing more than claims for lump-sum payments of interest that have not yet matured—precisely the kind of claim disallowed by section 502(b)(2). The fact that the Debtors are solvent does not nullify section 502(b)(2) or change the fact that what the Noteholders seek is payment of more than $5 billion on account of interest that, had the Chapter 11 Cases not been filed, would have been payable for decades into the future. Accordingly, neither the relevant Indentures nor the Bankruptcy Code entitle the Noteholders to an allowed claim for the Make-Whole Premiums.

The Debtors, unlike the Noteholders, are fiduciaries for all economic stakeholders. They hardly can be faulted or criticized for relying on the terms of their contracts and the applicable provisions of the Bankruptcy Code in determining the treatment to be provided to the Noteholders' claims. Indeed, for the Debtors to pay more on claims than is legally required would be patently irresponsible.

## II. THE NOTEHOLDERS ARE NOT ENTITLED TO THE MAKE-WHOLE PREMIUMS

### A. The Indentures Do Not Provide for Make-Whole Premiums upon a Chapter 11 Filing

The Noteholders have not identified a single provision in the Indentures providing for a Make-Whole Premium in the event of a bankruptcy. That is because no such right exists. The Utility's chapter 11 filing triggered the Acceleration Clauses, which caused "the principal amount" of the Notes—and *only* the principal amount—to become "due and payable immediately" on the Petition Date. Debtors' Br. at 4; *see In re MPM Silicones, L.L.C.*, 874 F.3d 787, 803 (2d Cir. 2017) ("[T]he make-whole premium is not due pursuant to the Acceleration Clauses' reference to 'premium, if any,' for the simple reason that the more specific Optional Redemption Clauses which grant the make-whole are not triggered and thus no premium has been generated."); *In re AMR Corp.*, 485 B.R. 279, 284 (Bankr. S.D.N.Y. 2013), *aff'd*, 730 F.3d 88 (2d Cir. 2013) ("[T]he Court agrees with the Debtors that the prepetition financing transactions by their terms do not require payment of the Make-Whole Amount where, as here, the obligations have been accelerated by virtue of the Debtors' filing for bankruptcy.").

The Noteholders ignore the actual language of the Acceleration Clauses, which makes a clear and unambiguous distinction between what is due on acceleration after bankruptcy ("the principal amount") and what is due on acceleration after other Events of Default ("the principal amount . . . together with premium, if any"). Their gauzy reading of the text renders the actual language of these provisions superfluous and ignores their own admonition that "[i]nterpretations that render contract provisions superfluous should [] be avoided." *See* Noteholders' Br. at 18.

The Noteholders suggest that they are entitled to receive the Make-Whole Premiums unless the Indentures expressly provide otherwise. *See* Noteholders' Br. at 2, 22–23, 26. This turns contract law on its head and runs directly contrary to the terms of the Indentures as drafted. The absence of any express provision guaranteeing the right to receive a premium in bankruptcy demonstrates that the Noteholders are *not* entitled to the Make-Whole Premiums in these Chapter 11 Cases. *See* Cal. Civ. Proc. Code § 1858 ("In the construction of a statute or instrument, the office of the Judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted . . . ."); *Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004) ("[C]ourts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include."); *see also BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 778 F. Supp. 2d 375, 394 (S.D.N.Y. 2011) (a contract's "provisions establish the rights of the parties and prevail over conclusory allegations") (quoting *805 Third Ave. Co. v. M.W. Realty Assocs.*, 58 N.Y.2d 447, 461 (1983)).

Reading the Optional Redemption Provisions with the Acceleration Clauses and the Indentures as a whole, plainly demonstrates that no Make-Whole Premiums are due and payable in bankruptcy. Accordingly, the Court should decline the Noteholders' invitation to rewrite the Indentures to provide them a windfall for which they never bargained, and to which they are not entitled. *See HSBC Bank USA, Nat. Ass'n v. Calpine Corp. ("Calpine II")*, No. 07 CIV 3088 GBD, 2010 WL 3835200, at *4 (S.D.N.Y. Sept. 15, 2010) ("[A] bankruptcy court does not have the power to rewrite contracts.")

       1.    <u>The Acceleration Clauses Preclude the Make-Whole Premiums in Bankruptcy</u>

The Acceleration Clauses foreclose the possibility that the Noteholders are entitled to any premium in the event of a repayment following a bankruptcy filing. As explained in the Debtors'

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Opening Brief, the Acceleration Clauses provide for acceleration of principal *and* "premium, if any" upon *non-bankruptcy* Events of Default. In contrast, the Acceleration Clauses provide for acceleration of principal alone upon *bankruptcy* Events of Default. *See* Debtors' Br. at 11–12; Tsekerides Decl., Ex. 1 § 9.02, Ex. 5 § 9.02, Ex. 6 § 9.02. Though the Acceleration Provisions provide for the payment of principal along with "premium, if any" when acceleration occurs outside of bankruptcy, this language is conspicuously absent when acceleration is triggered by a bankruptcy.

This distinction is critical. The parties clearly knew how to provide for the payment of a premium upon default, but they expressly chose not to do so in the case of a bankruptcy filing. By omitting any reference to "premium" and specifying that only "the principal amount" would be due and payable in the event of bankruptcy, the Acceleration Clauses preclude any claim for a Make-Whole Premium after a bankruptcy filing. *See Quadrant Structured Prod. Co. v. Vertin*, 23 N.Y.3d 549, 560 (2014) ("[I]f parties to a contract omit terms—particularly, terms that are readily found in other, similar contracts—the inescapable conclusion is that the parties intended the omission."); *In re Matco-Norca, Inc.*, 802 N.Y.S.2d 707, 708–09 (App. Div. 2005) ("[A] court may not write into a contract conditions the parties did not insert by adding or excising terms under the guise of construction, nor may it construe the language in such a way as would distort the contract's apparent meaning."); *Safeco Ins. Co. of Am. v. Robert S.*, 26 Cal. 4th 758, 763–64 (2001) (reading omitted term into contract "would violate the fundamental principle that in interpreting contracts . . . courts are not to insert what has been omitted") (citing Cal. Civ. Proc. Code § 1858).

The Noteholders all but ignore this critical point, relegating their discussion of it to a single footnote. They suggest that "the omission of 'premium' in connection with the automatic acceleration in bankruptcy makes practical sense" because "[i]t is not certain at the outset of a bankruptcy case whether the Debtors would elect to cash out or reinstate the Senior Notes." Noteholders' Br. at 22 n.22. But this fails to explain why the Indentures treat bankruptcy differently from other Events of Default, where acceleration causes the principal amount, "together with premium, if any . . . [to] become immediately due and payable." *See, e.g.*, Tsekerides Decl., Ex. 1 § 9.02. It also fails to explain why the Utility could only "cash out" the Notes at a premium (in this case, to the tune of $5 billion) when the parties explicitly agreed that only "the principal amount" would be payable. Far

from making "practical sense," the Noteholders' interpretation ignores the text—the Acceleration Clauses provide for "the principal amount" to become "due and payable *immediately*" in the event of a bankruptcy filing. It is crystal clear "at the outset" that the debt is due. By suggesting that the Utility, in bankruptcy, could only choose between "cashing out" at a premium or paying interest as scheduled—the same options the Utility had *before* bankruptcy—the Noteholders act as though acceleration had never occurred. The Noteholders' interpretation thus renders the Acceleration Clauses' distinct treatment of bankruptcy-related Events of Default a nullity—a result that must be avoided under basic principles of contract interpretation. *See Ruttenberg v. Davidge Data Sys. Corp.*, 215 A.D.2d 191, 196 (N.Y. App. Div. 1995).[5]

The Noteholders' contention that the Indentures were required to disclaim the Make-Whole Premiums upon bankruptcy acceleration is also wrong. Noteholders' Br. at 23. It is the *absence* of any provision providing for the right to receive a premium upon acceleration in bankruptcy that is fatal to the Noteholders' claims. "Where, as here, the [agreements] do not unambiguously require a prepayment premium upon acceleration and default, a claim for prepayment consideration must be disallowed." *U.S. Bank Nat. Ass'n v. S. Side House, LLC*, No. 11-CV-4135 ARR, 2012 WL 273119, at *7 (E.D.N.Y. Jan. 30, 2012) (collecting cases); *see Calpine II*, 2010 WL 3835200, at *4 ("[T]he notes could have provided for the payment of premiums in the event of payment pursuant to acceleration. . . . Without such a provision, however, no damages are recoverable after acceleration.") (citations omitted); *see also Wilmington Savs. Fund Soc'y, FSB v. Cash Am. Int'l, Inc.*, No. 15-cv-5027 (JMF), 2016 WL 5092594, at *6 (S.D.N.Y. Sept. 19, 2016) ("[O]nce a debt is accelerated, lenders may not collect a prepayment or make-whole fee (absent provision to the contrary in the indenture, of

---

[5] Nor do the Noteholders acknowledge that the Acceleration Clauses are strikingly different from those found in their headline case, *In re Energy Future Holdings Corp.*, 842 F.3d 247 (3d Cir. 2016). In *EFH*, the first-lien indenture provided that in the event of a bankruptcy "all outstanding Notes shall be due and payable immediately without further action or notice," *id.* at 255, while the second-lien indenture provided that a bankruptcy filing would cause "all principal of and premium, if any, interest . . . [,] and any other monetary obligations on the outstanding [Second Lien] Notes [to] be[come] due and payable immediately," *id.* at 257. Unlike the non-specific language of the first-lien indenture in *EFH*, the Acceleration Clauses here specify that only "the principal amount" alone shall be payable in the event of a bankruptcy (as opposed to "all outstanding Notes"). Similarly, unlike the provisions of the second-lien indenture in *EFH*, the Acceleration Clauses here make no mention of "premium" or "other monetary obligations," and provide only for payment of principal and nothing more.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

course).”); *NML Capital v. Republic of Arg.*, 17 N.Y.3d 250, 262 (2011) (“parties to a loan agreement are free to include provisions directing what will happen in the event of default or acceleration of the debt,” and may “direct that a party pay a prepayment premium and *specify* that the premium obligation will be triggered if there is a default and acceleration of the [debt]”) (citation omitted) (emphasis added); *Nw. Mut. Life Ins. Co. v. Uniondale Realty Assocs.*, 816 N.Y.S.2d 831, 836 (Sup. Ct. Nass. Cty. 2006) (“[S]ubstantial authority[ ] requires an explicit agreement to allow a premium after acceleration.”).

“This rule not only ensures that courts will enforce no more than the clear agreement between the parties but sounds in common sense and basic fairness.” *S. Side House, LLC*, 2012 WL 273119, at *5. Tellingly, the Noteholders do not cite to a single provision in the Indentures that explicitly guarantees them the right to receive premiums in bankruptcy. In the absence of any such provision, the Noteholders have no right to receive Make-Whole Premiums in these Chapter 11 Cases. *See MPM Silicones*, 874 F.3d at 802 (noteholders not entitled to make-whole premium where “under the [indentures] the make-whole premium would be due only in the case of an ‘optional redemption’ and not in the case of an acceleration brought about by a bankruptcy filing”).

The Noteholders dismiss *MPM Silicones* by claiming that the Second Circuit’s decision was “wrong” for relying on *In re AMR Corp.*, 730 F.3d 88 (2d Cir. 2013), because the acceleration provision at issue in *AMR* “explicitly disclaimed the availability of make-whole amounts otherwise due under the note if the issuer voluntarily filed for bankruptcy.” *See* Noteholders’ Br. at 26. But this merely highlights a fundamental flaw in the Noteholders’ argument. Loan agreements need not explicitly *disclaim* the right to make-whole amounts upon acceleration, as the Noteholders repeatedly suggest. *See* Noteholders’ Br. at 2, 22, 23, 26. Indeed, the acceleration clause in *AMR* only did so “*for the avoidance of doubt*.” *See* 730 F.3d at 99 (emphasis added). Far from being “wrong,” *MPM Silicones* is consistent with the universal and uncontroversial principle that an express provision is necessary to give rise to, rather than to disclaim, contractual rights—including purported rights to a make-whole premium upon acceleration. *See, e.g.*, *Wells Fargo Bank, N.A. v. Renz*, 795 F. Supp. 2d 898, 913 (N.D. Cal. 2011) (“It is well settled that the Court cannot impose contractual obligations which are absent from the parties’ agreement.”); *Vons Cos., Inc. v. United States Fire Ins. Co.*, 78 Cal.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

App. 4th 52, 59 (2000), *as modified* (Mar. 6, 2000) ("We do not have the power to create for the parties a contract that they did not make and cannot insert language that one party now wishes were there.").

Of course, the Noteholders could have negotiated for the right to receive a Make-Whole Premium in the event of bankruptcy. For example, they could have negotiated acceleration clauses providing that "the principal amount *and the Make-Whole Premium*" of the Notes "shall be due and payable" in the event of a bankruptcy, as did the parties in *Ultra Petroleum*. *See, e.g.*, *In re Ultra Petroleum Corp. ("Ultra II")*, 943 F.3d 758, 761 (5th Cir. 2019) ("Under the Note Agreement, petitioning for bankruptcy automatically renders the outstanding principal, any accrued interest, *and the Make-Whole Amount* 'immediately due and payable.'") (emphasis added). Instead, they negotiated for Acceleration Clauses that provide that only "the principal amount" shall be payable in bankruptcy, making this an even easier case than *MPM Silicones*. *See* 874 F.3d at 803 (court disallowed make-whole premium where bankruptcy caused "the principal" and "*premium, if any*," to be immediately due and payable) (emphasis added).

The Noteholders also could have negotiated Optional Redemption Provisions that expressly provided for Make-Whole Premiums upon *any* repayment following default and acceleration, as parties frequently do in their loan agreements. *See, e.g.*, *In re 1141 Realty Owner LLC*, 598 B.R. 534, 539 (Bankr. S.D.N.Y. 2019) ("[A]ny payment following an Event of Default was deemed a 'voluntary prepayment' requiring the payment of the Yield Maintenance Default Premium."); *In re 433 S. Beverly Drive*, 117 B.R. 563, 568–69 (Bankr. C.D. Cal. 1990) (prepayment premium due "in the event of acceleration of the [n]ote at any time and subsequent involuntary or voluntary payment"). Here, unlike in those other cases,[6] there is nothing in the Optional Redemption Provisions that even suggests that the provisions apply in the context of a chapter 11 reorganization, where the principal amount of the debt is automatically accelerated and can no longer be redeemed voluntarily. *See MPM Silicones*, 874 F.3d at 802.

---

[6] A chart comparing relevant language of the PG&E Indentures with other loan agreements that expressly provided for a make-whole or other premium on default is attached as Appendix A.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

### 2. The Optional Redemption Provisions Do Not Give Rise to Make-Whole Premiums in Bankruptcy

A holistic reading of the Indentures confirms that the Optional Redemption Provisions do not apply after automatic acceleration upon a bankruptcy filing.

#### a. Satisfaction of the Notes under the Debtors' Plan is Neither "Optional" Nor a "Redemption"

The Acceleration Clauses' restriction on payment of a premium after bankruptcy is perfectly consistent with the Optional Redemption Provisions themselves because, upon a bankruptcy filing, payment of the Notes is not optional or a redemption.

To start, payment of the Notes as a claim in bankruptcy is not "optional" within the meaning of the Indentures. The Noteholders argue that "[t]he Utility is not, by virtue of the bankruptcy filing, or sections 9.01(e) and 9.02 of the Indentures, *required* to redeem the Senior Notes." Noteholders' Br. at 14. But this ignores the clear text of the Indentures. Upon the bankruptcy filing, the principal amount of the Notes "*shall* be due and payable immediately." "A payment made mandatory by operation of an automatic acceleration clause is not one made at [the Utility's] option." *See MPM Silicones*, 874 F.3d at 803 (citations omitted).

Further, payment of the accelerated Notes under the Debtors' Plan does not constitute a "redemption" because the Notes already have matured. As predicted, the Noteholders rely on the Third Circuit's opinion in *EFH* for the proposition that "redemption" can occur post-maturity. *See* Noteholders' Br. at 20. In *EFH*, however, the Court conducted no separate analysis of the issue and the cases it cited do not support the conclusion. *See* Debtors' Br. at 10. The Noteholders make the same mistakes. *Compare* Noteholders' Br. at 20,[7] *with EFH*, 842 F.3d at 255; *see also* Debtors' Br. at 10.

---

[7] In addition to the cases cited in *EFH*, the Noteholders cite *Carman v. Alvord*, 644 P.2d 192 (Cal. 1982), to suggest that redemption may occur after maturity. *Carman* is completely off point. In *Carman*, the court addressed an exception to California's constitutional limit on ad valorem taxes for taxes levied to pay "the interest and redemption charges on any indebtedness approved by the voters . . . ." *Id.* at 194. In construing this provision, the court concluded that an "indebtedness" includes both matured and unmatured obligations. *Id.* at 196. The court had no reason to, and did not, state that the redemption of a note for borrowed money could occur after the debt reached maturity. It merely found that the term "interest and redemption charges" could apply to all obligations, including pension obligations. *Id.* at 197.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

In fact, *EFH* has no application here because it is best characterized as an "Intentional Evasion" case. Under the "Intentional Evasion" doctrine, borrowers may not trigger acceleration for the purpose of evading payment of a premium. In *EFH*, six months before the petition date, in an effort to leverage an out-of-court settlement, the debtor had made public its intention to "file for bankruptcy and refinance the Notes without paying any make-whole amount" if no compromise was reached. 874 F.3d at 251. In that context, the Court found that the "[e]vents leading up to [bankruptcy] demonstrate[d] that the redemption was very much at [the debtors'] option." *Id.* at 255; *see also Imperial Coronado Partners, Ltd.*, 96 B.R. 997, 998–99 (B.A.P. 9th Cir. 1989) (allowing claim for prepayment penalty where debtor filed for bankruptcy to prevent the loss of property underlying promissory note through foreclosure and then sold the property pursuant to a bankruptcy sale). Here, it is patently clear that the Debtors did not file for bankruptcy in order to avoid payment of the Make-Whole Premiums.

Absent such extraordinary facts, Courts have reached the opposite conclusion of *EFH*, holding that a make-whole premium is due after an automatic acceleration *only* if the contract expressly requires it to be paid. *See, e.g.*, *MPM Silicones*, 874 F.3d at 801–04; *AMR*, 730 F.3d at 103–05; *In re Tara Retail Grp., LLC*, No. 17-BK-57, 2018 WL 4501136, at *3 (Bankr. N.D.W. Va. Sept. 19, 2018) ("[Lender] has not directed the court to any contractual language that provides for a make-whole premium post-acceleration such as a separate redemption provision that would apply regardless of acceleration as was present in [*EFH*]. Thus there is no cause to depart from the general rule that acceleration neuters a make-whole provision and no offense is given to the contractual language for which the parties bargained.").

Indeed, after *EFH* the Second Circuit specifically held that, under New York law and consistent with the common understanding of "redemption" in the finance industry, redemption can occur only "*at or before* maturity." *MPM Silicones*, 874 F.3d at 803. Here, because the Utility's chapter 11 filing caused the Notes to reach "Maturity" as defined in the Indentures on the Petition Date, "any payment on the accelerated notes following a bankruptcy filing would be a *post*-maturity payment" and not a redemption of the Notes. *Id.*; *see also AMR*, 730 F.3d at 103 ("[The debtor]'s attempt to repay the debt in October 2012 was not a voluntary prepayment because '[p]repayment can

only occur prior to the maturity date.'") (quoting *In re Solutia, Inc.*, 379 B.R. 473, 488 (Bankr. S.D.N.Y. 2007)); *Calpine II*, 2010 WL 3835200, at *4 ("Debtor's repayment of the notes also did not occur prior to maturity, because accelerated debts are mature.").

The Noteholders concede that "acceleration provisions do advance maturity" but contend that the Acceleration Clauses "do not provide a basis for reading other provisions out of" the Indentures. *See* Noteholders' Br. at 21 (citing *NML Capital*, 17 N.Y.3d 250). But a conclusion that "redemption" cannot occur after the Notes reach "Maturity" does not read the Optional Redemption Provisions out of the Indentures. It simply makes them inapplicable in the context of these Chapter 11 Cases. In fact, it is the Noteholders' interpretation that would read the distinctly different Acceleration Clauses out of the Indentures. As discussed above, if the Debtors' only options in bankruptcy were to "cash out" the Notes with payment of a Make-Whole Premium or to "reinstate" the Notes as the Noteholders suggest, the precisely drawn Acceleration Clauses—which distinguish between bankruptcy and non-bankruptcy events of default—would be a nullity, as the Utility would be left with exactly the same two options it had outside of bankruptcy. *See supra* § I.A.1. The Noteholders' interpretation would leave **no** conceivable circumstance where the Acceleration Clauses would have any meaning or impact in the event of bankruptcy.

In any event, *NML Capital* has no application here. That case did not involve an optional redemption, make-whole, or other prepayment premium. The question in *NML* was whether Argentina's obligation to make interest payments continued after its default caused the principal of its bond debt to be accelerated. The court concluded that it did, but only because the parties had included *specific contractual language* requiring Argentina to "pay interest . . . until the principal [t]hereof is paid or made available for payment." *See NML Capital*, 17 N.Y.3d at 260–62. Indeed, the court acknowledged that, "[a]bsent such language, the contract rate ceases to be applicable when the loan matures." *Id.* at 261. Given the absence of any contractual provision for payment of the Make-Whole Premiums in bankruptcy, *NML* does not support the Noteholders' claim here.[8] Rather, *NML* stands

---

[8] The Noteholders also cite *Heine v. Signal Cos., Inc.*, No. 74 CIV. 3036, 1977 WL 930 (S.D.N.Y. Mar. 4, 1977), and *Felin v. Kyle*, 102 F.2d 349 (3d Cir. 1939), for the proposition that redemption equates to any payment of debt. Noteholders' Br. at 16. If anything, those cases undermine the

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

for the proposition that indentures should be interpreted based on the words they actually contain. In the case of the Indentures here, there simply are no words stating that a Make-Whole Premium is payable following a bankruptcy acceleration. No matter how much the Noteholders may wish the indentures contained such words, they do not.

b.    <i>Differences in the Optional Redemption Provisions are Not Relevant</i>

In an effort to divert attention from the Acceleration Clauses and the absence of any express provision providing for a Make-Whole Premium in bankruptcy, the Noteholders attempt to draw distinctions among the Notes based upon certain language relating to the timing of redemption (*e.g.*, prior to maturity, "at any time," or on a specific date prior to maturity). *See* Noteholders' Br. at 17–19. These purported distinctions are meaningless in this context.

To start, the Noteholders concede that each Optional Redemption Provision follows "the same structure." Noteholders' Br. at 6. Just as these provisions would operate in similar fashion outside of bankruptcy (where they were designed to apply), they are all equally inapplicable in a bankruptcy context. This is true regardless of whether the Notes are redeemable prior to "Maturity," "at any time," or prior to a "Fixed Date." In no case can there be a "redemption" after the Notes have matured. *MPM Silicones* is directly on point in this regard. There, the optional redemption provision specified that the notes at issue were redeemable with payment of a redemption premium prior to a specified date. The debtor filed for bankruptcy and satisfied the notes, without a premium, pursuant to its chapter 11 plan prior to the date specified in the indentures, and the Second Circuit disallowed the noteholders' claim for a make-whole premium. *MPM Silicones*, 874 F.3d at 792, 801–04. *MPM Silicones* thus confirms that the specific period during which the Notes are redeemable is not the relevant criterion. The dispositive factor is whether the loan agreement explicitly provides for a make-whole premium following acceleration—which the Indentures here do not.

Noteholders' argument, as both declined to extend "redemption" beyond its plain meaning. *See Heine*, 1977 WL 930, at *14 n.8 (rejecting plaintiffs' "broad interpretation" of "redemption," which would render other provisions of listing agreement "largely superfluous"); *Felin*, 102 F.2d at 350 (rejecting assertion that "redemption" of notes constituted "a sale or exchange" within the meaning of the Revenue Act of 1932).

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Moreover, the Noteholders concede that what they call the "2034 Notes" (*i.e.*, the "6.05% Notes" referred to in the Debtors' Opening Brief) expressly state they are "redeemable . . . prior to Maturity." *See* Noteholders' Br. at 18; *see also* Tsekerides Decl., Ex. 1 § 4.03(d). And, while the Noteholders claim that the so-called "Any Time Notes" are redeemable "at any time," *see* Noteholders' Br. at 17–18, the actual Notes themselves provide for redemption "prior to Maturity." *See* Silfen Decl., Ex. A-1 at 93, Ex. A-3 at 146, Ex. A-6 at 218, Ex. A-8 at 262. The only consistent, holistic reading of the "Any Time Notes" is that redemption may only occur "at any time" "prior to Maturity."

The Noteholders contend that, if "prior to Maturity" were read literally, it would lead to absurd results because no redemption can occur until "Maturity." *See* Noteholders' Br. at 18–19. The Noteholders are both confused and wrong. They would have the Court conclude that, even though the 2005 Base Indenture refers to the defined term "Maturity" nineteen times (often in contexts other than acceleration), the drafters made a mistake in this one particular instance, and must have meant "Stated Maturity" instead of "Maturity." There is no basis for such speculation, and the Court must assume that the drafters meant "Maturity" when they said "Maturity." *See Vons*, 78 Cal. App. 4th at 59 ("[W]ords used in a certain sense in one part of a contract are deemed to have been used in the same sense elsewhere.").

Moreover, the Noteholders are simply wrong in asserting that "[r]equiring redemption to occur 'prior to Maturity,' as opposed to 'Stated Maturity,' renders the 2034 Notes' Optional Redemption Provision superfluous." *See* Noteholders' Br. at 18–19. The Indentures define "Maturity" to mean the date on which the principal of a Note "becomes due and payable, whether at the Stated Maturity, by declaration of acceleration, upon a call for redemption, or otherwise." *See* Tsekerides Decl., Ex. 1 § 1.01. The Noteholders assert that "Maturity" thus occurs whenever the Utility exercises it right to redeem the Notes, allegedly making it impossible for redemption to occur before Maturity. Noteholders' Br. at 19. But the Notes to be redeemed do not become "due and payable" until the stated "Redemption Date," at which time redemption occurs. Tsekerides Decl., Ex. 1 § 6.05. Accordingly, outside of bankruptcy, redemption occurs prior to Maturity and a Make-Whole Premium is owed. In contrast, after bankruptcy the entire principal is immediately due—*i.e.*, the Maturity is

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

accelerated—making it impossible to redeem the Notes prior to Maturity. This does not render the Optional Redemption Provision "superfluous." It simply and unequivocally confirms that, under the circumstances of a bankruptcy filing, there is no Optional Redemption (or any Make-Whole Premiums) contemplated at all. Therefore, far from producing an anomalous result, the Debtors' interpretation of the Indentures harmonizes the Acceleration Clauses and the Optional Redemption Provisions and demonstrates that no Make-Whole Premiums are due in the event of a bankruptcy.[9]

### c. No Make-Whole Premium is Due in Any Event

Finally, even if the Optional Redemption Provisions otherwise were applicable after a bankruptcy event of default (which they are not), there would be no Make-Whole Premium due in respect of the Notes. As explained in the Debtors' Opening Brief, the Optional Redemption Provisions do not automatically give rise to a Make-Whole Premium upon redemption. Rather, they require the Utility to pay a "Redemption Price" calculated as the greater of (a) 100% of the principal amount of the Notes to be redeemed (known as the "face value") or (b) the sum of the present values of the "Remaining Scheduled Payments" on the Notes to be redeemed, discounted to the "Redemption Date." *See* Debtors' Br. at 4–5, n.8; *see also* Noteholders' Br. at 6. Thus, there is no Make-Whole Premium unless the net present values of the "Remaining Scheduled Payments" exceed the face value of the applicable Note that is redeemed. *See* Debtors' Br. at 4–5; Noteholders' Br. at 6.

What the Noteholders fail to acknowledge is that the "Remaining Scheduled Payments" in clause (b) above are defined as "the remaining scheduled payments of principal and interest *that would be due after the applicable Redemption Date* if" the Notes at issue "were not redeemed." *See, e.g.,*

---

[9] This reading is consistent with the rule of contract interpretation that courts should interpret contracts to give provisions full effect. *In re Lipper Holdings, LLC*, 1 A.D.3d 170, 171 (N.Y. App. Div. 2003) ("A contract should not be interpreted to produce a result that is absurd."); *Block v. eBay, Inc.*, 747 F.3d 1135, 1138 (9th Cir. 2014) ("[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.") (quoting Cal. Civ. Code § 1641) (alteration in original); *Ruttenberg*, 215 A.D.2d at 196 ("It is a recognized rule of construction that a court should not adopt an interpretation which will operate to leave a provision of a contract . . . without force and effect. An interpretation that gives effect to all the terms of an agreement is preferable to one that ignores terms or accords them an unreasonable interpretation.") (internal quotation marks and citation omitted); *In re S. Side House, LLC*, 470 B.R. 659, 672 (Bankr. E.D.N.Y. 2012) ("General canons of contract construction require that where two seemingly conflicting contract provisions reasonably can be reconciled, a court is required to do so and to give both effect.") (internal quotation marks and citation omitted).

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Tsekerides Decl., Ex. 1 § 1.01, Ex. 2, art. I (emphasis added). Thus, while the Optional Redemption Provisions give rise to a Make-Whole Premium outside of bankruptcy when the Utility chooses to redeem the debt before Maturity, the Acceleration Clauses alter the equation.

Under those provisions, when the Utility filed for bankruptcy the principal became due "immediately," long before any conceivable "Redemption Date" allegedly occurring by virtue of payment of Notes under the Debtors' Plan. Accordingly, the "Remaining Scheduled Payments" no longer include "the principal amount" of the Notes because the entire principal became immediately due and payable and thus is not "due *after* the applicable Redemption Date." Acceleration took "the principal amount" out of the equation.

As a result, the "Redemption Price," when calculated after acceleration, does not include a Make-Whole Premium. Because "the principal amount" became due and payable on the Petition Date, the only "Remaining Scheduled Payments" for purposes of clause (b) are the future interest payments and, for each of the Notes, the net present values of future interest payments alone is not greater than the face value of the Notes. *See* App'x B.[10] This means that, after acceleration, none of these Notes' Redemption Prices could include any Make-Whole Premium, even if the Optional Redemption Provisions were applicable.

For example, as shown on Appendix B, a Make-Whole Premium can only be payable in respect of the 6.05% Notes (referred to as the "2034 Notes" by the Noteholders) if the Redemption Price is greater than $3 billion, the face value of such Notes. If those Notes had been redeemed prior to bankruptcy (*i.e.*, when no acceleration had occurred), the sum of the present values of the "Remaining Scheduled Payments" (principal and interest) would equal approximately $4.39 billion, resulting in a Make-Whole Premium of almost $1.4 billion. Debtors' Br. at 5. Now, however, if an "Optional Redemption" somehow could occur after the Petition Date—when "the principal amount" became automatically due—the net present values of the future unmatured interest payments (the only

---

[10]  Appendix B is a chart showing that, for each of the Notes, the net present values of the remaining scheduled interest payments are always less than the Note's face value. These calculations use June 30, 2020, as the Redemption Date and the Adjusted Treasury Rate as of November 25, 2019, as proxies for demonstrative purposes only.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

"Remaining Scheduled Payments" under the 6.05% Notes) would be only $2.1 billion.[11]   App'x B. Because that amount is less than the face value, the Redemption Price therefore would equal $3 billion, because that is "the greater of" the two amounts provided for in the calculation of the Redemption Price, and thus there is no Make-Whole Premium.

Accordingly, the Optional Redemption Provisions cannot result in any Make-Whole Premiums once the Acceleration Clauses have been triggered.[12]   Indeed, the Make-Whole Premiums could only be due if the Court were to ignore the Acceleration Clauses altogether.  But, in the Noteholders' own words, "[i]nterpretations that render contract provisions superfluous should [] be avoided." Noteholders' Br. at 18.

3.     No Other Provision in the Indentures Provides for a Premium in Bankruptcy

The Noteholders rely on various provisions of the Indentures that contain the words "premium, if any," to contend that a premium must be owed.  *See* Noteholders' Br. at 23.  But none of the provisions cited by the Noteholders independently provides a right to a premium in bankruptcy.  To the contrary, the use of the qualifying phrase "if any" necessarily means that there are circumstances where no premium is due.  *See AMR*, 485 B.R. at 303 ("The Court instead reads 'if any' to mean that payment of the Make-Whole Amount is not automatic and there are some circumstances under which a Make-Whole Amount will not be payable."); *see also Anderson v. Heart Fed. Sav. & Loan Assn.*, 208 Cal. App. 3d 202, 205 (1989), *reh'g denied and opinion modified* (Mar. 28, 1989) (assertions qualified by "if any" were insufficient "to state that a default 'has occurred'").  Thus, for example, the Noteholders' "unconditional" right "to receive payment of . . . premium, ***if any***," *see, e.g.*, Tsekerides

---

[11] As noted below, even if the Make-Whole Premiums were available under the Indentures in the context of a bankruptcy filing, they would be disallowed as unmatured interest under section 502(b)(2) of the Bankruptcy Code.  *See infra* § II.B.

[12] The added language appearing in the Twenty-Third through Twenty-Ninth Supplemental Indentures, as well as the 2017 Base Indenture, requiring that the Redemption Price be "calculated as if the Maturity Date of the [applicable] Notes was [fixed date] (the date that is [three/six] months prior to the Maturity Date)," *see, e.g.*, Tsekerides Decl., Ex. 4 § 301, alters the Notes' "Stated Maturity" for purposes of the Redemption Price calculation, but does not affect when the Notes reach "Maturity."

The 2018 Indenture does not use "Remaining Scheduled Payments" as a defined term and instead calculates "the sum of the present values of the remaining scheduled payments of principal and interest" as "if the [2023/2028] Notes matured on the [2023/2028] Par Call Date."  Silfen Decl., Ex. C-1 §§ 208, 308.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Decl., Ex. 1 § 9.08 (emphasis added), and the Trustee's ability "to file and prove a claim for . . . premium, *if any*,"[13] *see, e.g., id.*, Ex. 1 § 9.05 (emphasis added), are both contingent on the Noteholders actually having the right to a premium in the first place.[14]

Because the Noteholders have no right to a Make-Whole Premium in bankruptcy, the generalized references to "premium, if any" are irrelevant here. *See MPM Silicones*, 874 F.3d at 803 (acceleration clauses' reference to "premium, if any" did not render make-whole premium due "for the simple reason that the more specific Optional Redemption Clauses which grant the make-whole are not triggered and thus no premium has been generated").

### B. Section 502(b)(2) of the Bankruptcy Code Disallows Claims for the Make-Whole Premiums as Unmatured Interest

Even if the Indentures otherwise provided for Make-Whole Premiums in bankruptcy, the Noteholders' claims for a premium would be disallowed by the Bankruptcy Code. Section 502(b)(2) of the Code disallows claims for "unmatured interest." 11 U.S.C. § 502(b)(2). Despite the Noteholders' efforts to characterize them otherwise, the Make-Whole Premiums sought here are exactly that. They are calculated with reference to interest (compensation to lenders for future interest payments) that is unmatured (not due and payable at the time of filing). The Noteholders' citations to inapposite precedent and a purported solvent-debtor exception that has no application under the Bankruptcy Code cannot avoid this straightforward conclusion.

---

[13] The Noteholders assert that "Section 9.05 . . . would be superfluous were premiums denied in bankruptcy." Noteholders' Br. at 22 n.22. Not so. There are circumstances in which the Trustee properly could file a claim for a premium, such as where a premium was due but not paid prior to bankruptcy, or if a supplemental indenture or note had contemplated some other type of premium.

[14] Further, these provisions could refer to any number of the various premiums contemplated by the Base Indentures. For example, a premium could have arisen "pursuant to a sinking fund or other mandatory redemption provision or at the option of a Holder thereof." *See* Tsekerides Decl., Ex. 1 § 3.01(h), Ex. 6 § 3.01(h). The Utility also could have issued bonds that were not redeemable at all, which could have provided "for the payment of a 'make-whole', yield-maintenance or similar premium in connection with the redemption of Bonds of such series during a 'no-call' or other period during which such Bonds are generally not subject to optional redemption by the Company." *See id.*, Ex. 1 § 3.01(g), Ex. 6 § 3.01(g). That would explain the use of "if any." Significant here is that the parties did not provide for a premium in the event of a bankruptcy filing. That is not reflective of shortcoming in the drafting but rather a conscious decision by the parties not to provide for any premium in this specific context.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

1.     The Make-Whole Premiums are "Unmatured Interest"

In an effort to avoid section 502(b)(2), the Noteholders label the Make-Whole Premiums as "charges" or "liquidated damages." *See* Noteholders' Br. at 28. But changing the label cannot change the substance or mask the reality that the Make-Whole Premiums constitute unmatured interest. "Interest is money paid to compensate for the delay and risk involved in the ultimate repayment of monies loaned." *Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039, 1046 (9th Cir. 2003) (citation omitted). Whether a claim qualifies as unmatured interest under section 502(b)(2) turns on "the substance of the claim, not its form" or label. *Id.* at 1047; *see In re Chateaugay Corp.*, 961 F.2d 378, 381 (2d Cir. 1992) ("The word 'interest' in the statute is clearly sufficient to encompass . . . what in economic fact is interest[.]") (citation omitted).

There can be no serious debate that the Make-Whole Premiums, which are calculated with specific reference to the present value of remaining interest payments on the Notes, are unmatured interest. *See* Debtors' Br. at 13–14; *see also* Scott K. Charles & Emil A. Kleinhaus, *Prepayment Clauses in Bankruptcy*, 15 Am. Bankr. Inst. L. Rev. 537, 581 (2007) ("Reading section 502(b)(2) to disallow a claim for unmatured interest, but not a claim for the present value of that interest, is difficult to defend."). Courts considering similar prepayment premiums—and other more varied forms of interest—have reached this precise conclusion. *See, e.g.*, *In re Ridgewood Apartments of DeKalb Cty., Ltd.*, 174 B.R. 712, 721 (Bankr. S.D. Ohio 1994) ("As an attempt to compensate the lender for potential loss in interest income, [a] claim for a prepayment penalty is not allowed under 11 U.S.C. §502(b)(2)."); *see generally* Debtors' Br. at 13–14 (collecting cases). While no appellate court has specifically addressed the issue,[15] multiple courts of appeals have described make-whole premiums as substitutes for unmatured interest. *See MPM Silicones*, 874 F.3d at 801–02 ("The make-whole premium was intended to ensure that the [noteholders] received additional compensation to make up for the interest they would not receive[.]"); *see also EFH*, 842 F.3d at 251 (same); *Matter of LHD Realty Corp.*, 726 F.2d 327, 330 (7th Cir. 1984) (same).

---

[15] The Fifth Circuit's original opinion in *In re Ultra Petroleum Corp.* specifically concluded that "the Make-Whole Amount is the economic equivalent of 'interest.'" 913 F.3d 533, 547–48 (5th Cir. 2019), *withdrawn*, 943 F.3d 758 (5th Cir. 2019). That Court's opinion on rehearing expressed no view on the question, instead remanding to the Bankruptcy Court to determine the issue in the first instance. *See Ultra II*, 943 F.3d at 765.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Avoiding the text of the Indentures and section 502(b)(2), the Noteholders cite cases purportedly "h[olding], either expressly or implicitly[ ], that the Bankruptcy Code does not disallow make-whole premiums." Noteholders' Br. at 27. But the Noteholders' cases involve a different Bankruptcy Code section, radically different prepayment premiums, or both. For example, the Noteholders cite *Imperial Coronado*, but that case addresses section 506(b), which authorizes payments to *oversecured* creditors, *including claims in respect of unmatured interest*. *See* 11 U.S.C. § 506(b) (allowing "interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose").[16] That Courts have permitted certain contractual payments on oversecured claims says nothing about whether *unsecured* claims for the Make-Whole Premiums must be disallowed under section 502(b)(2). Other cases cited by the Noteholders likewise address section 506(b) without mentioning section 502(b)(2). *See In re Read-Rite Corp.*, No. 03-43576 RN7, 2005 WL 2210659, at *2 (Bankr. N.D. Cal. Aug. 11, 2005); *433 S. Beverly Drive*, 117 B.R. at 568–69; *In re Planvest*, 94 B.R. 644, 645 (Bankr. D. Ariz. 1988). The Notes here are unsecured notes, to which section 506(b) is inapplicable.

The Noteholders' remaining cases fare no better. Some are ambivalent on the question. *See In re Chemtura Corp.*, 439 B.R. 561, 604 (Bankr. S.D.N.Y. 2010) ("the issue must be regarded as still open"); *In re Skyler Ridge*, 80 B.R. 500, 503 (Bankr. C.D. Cal. 1987) (noting that the parties' stipulated "classification of the prepayment premium . . . is not altogether certain"). And the others repeat the Noteholders' own error: arguing by unexamined citation rather than careful, context-specific analysis. *See, e.g.*, *In re Trico Marine Servs., Inc.*, 450 B.R. 474, 480 (Bankr. D. Del. 2011) ("This Court is persuaded by the soundness of [other courts'] interpretation . . . ."); *In re School Specialty, Inc.*, No. 13-10125, 2013 Bankr. LEXIS 1897, at *19 (Bankr. D. Del. Apr. 22, 2013) ("agree[ing] with" *Trico Marine* without further analysis). Those cases treat a "liquidated damages" label as dispositive without considering whether the payments are substantively equivalent to unmatured interest for the purposes

---

[16] The Noteholders also falsely equate the Make-Whole Premiums with the fixed "charge" at issue in *Imperial Coronado*. Noteholders' Br. at 28; *see Imperial Coronado*, 96 B.R. at 999; *see also In re Lappin Elec. Co.*, 245 B.R. 326, 328–29 (Bankr. E.D. Wis. 2000) (considering a fixed termination fee). Unlike a fixed "charge," the Make-Whole Premiums only arise pursuant to a yield maintenance formula that calculates the present value of *all* unmatured interest payments—payments that must be disallowed by section 502(b)(2).

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

of section 502(b)(2). *See In re Doctors Hosp. of Hyde Park, Inc.*, 508 B.R. 697, 706 (Bankr. N.D. Ill. 2014) ("Nothing about the nature of liquidated damages necessarily excludes interest, or vice versa.").

Here, there is nothing to support the notion that the Make-Whole Premiums are liquidated damages or charges. The Indentures make plain that, in the circumstances when the Optional Redemptions Provisions actually apply, a Make-Whole Premium is compensation for unmatured interest that would have been paid in the future. This is precisely the type of unmatured future interest payment disallowed by section 502(b)(2).

### 2. The Make-Whole Premiums were Not "Matured" on the Petition Date

The Noteholders next contend that the Make-Whole Premiums are "fully matured" because they are "grounded in pre-petition contracts [and] become due by reason of repayment of debt under a plan." Noteholders' Br. at 29. This is nonsensical.

The Ninth Circuit has explained that interest is unmatured unless it is "due and payable at the time the debtor filed its bankruptcy petition." *Thrifty Oil*, 322 F.3d, at 1046; *see* 11 U.S.C. § 502(b) (claims determined "as of the date of the filing of the petition"). There is nothing in the Indentures to support a conclusion that any Make-Whole Premiums were payable on the Petition Date. *See* Debtors' Br. at 15; *Ridgewood Apartments*, 174 B.R. at 720 ("Absent actual prepayment" a "claim for a prepayment penalty could be no more than" a "contingent claim [ ] for interest which is not yet due.").

Finding no support in the law, the Noteholders insist that the Make-Whole Premiums were negotiated "to compensate the Noteholders in precisely these circumstances." *See* Noteholders' Br. at 29. This mischaracterizes the parties' bargain (as explained above) and cannot be squared with the unambiguous meaning of "unmatured" in section 502(b)(2). The Bankruptcy Code's text and purpose cannot be so easily circumvented.

### 3. There is No Solvent-Debtor Exception to Section 502(b)(2)

The Noteholders rely heavily on out-of-circuit authority, much of which predates the Bankruptcy Code, in support of an alleged "solvent debtor exception" to section 502(b)(2) of the Bankruptcy Code. *See* Noteholders' Br. at 29–31. But, other than for specific exceptions not applicable here, the solvent debtor exception is a relic of the past, and the Noteholders have not

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

identified any provision of the Bankruptcy Code that exempts the creditors of a solvent debtor from the application of section 502(b).

When Congress enacted section 502(b)(2) of the Bankruptcy Code, it specifically prohibited the allowance of claims for unmatured interest, subject to two narrow exceptions: (i) section 506(b), which allows a secured claim for postpetition interest where the value of collateral exceeds the allowed amount of the claim, *see United Savings Assoc. v. Timbers of Inwood Forest*, 484 U.S. 365, 372 (1988); and (ii) section 726(a)(5), which provides for recovery of postpetition interest *on*, but not as *part of*, an allowed claim at a specified "legal rate" when the debtor is solvent. *See* 11 U.S.C. § 726(a)(5); *In re Cardelucci*, 285 F.3d 1231, 1234–35 (9th Cir. 2002).[17]

Following the enactment of the Bankruptcy Code, Courts have *not* recognized a solvent debtor exception to other provisions of the Bankruptcy Code, and there is no reason for the Court to treat section 502(b)(2) any differently. For example, Courts unwaveringly uphold a solvent debtor's ability to assume or reject leases and executory contracts under section 365 of the Bankruptcy Code. *See, e.g.*, *In re Cent. Jersey Airport Servs., LLC*, 282 B.R. 176, 183–84 (Bankr. D.N.J. 2002) (granting solvent debtor's motion to reject an agreement); *Matter of Federated Dep't Stores, Inc.*, No. BR 1-90-00130, 1991 WL 12008527, at *4 (Bankr. S.D. Ohio Jan. 28, 1991) (a debtor's "solvency status does not influence whether this Court should authorize lease rejection"). Similarly, courts have applied section 502(b)(6)'s cap on damages arising from a solvent debtor's rejection of a lease. *See Matter of Federated Dep't Stores, Inc.*, 131 B.R. 808, 817 (S.D. Ohio 1991) ("There is simply nothing in the plain language of § 502(b)(6) to suggest that a bankruptcy court may depart from the application of the cap on a lessor's claim any time the debtor is solvent . . . ."). Other Courts have permitted solvent debtors to invoke Bankruptcy Code provisions permitting the debtor to cure a default, *see In re Sylmar Plaza, L.P.*, 314 F.3d 1070, 1075 (9th Cir. 2002), and to benefit from the protections of the automatic stay, *see In re Capitol Food Corp. of Fields Corner*, 490 F.3d 21, 22 (1st Cir. 2007) (affirming denial of creditor's motion to dismiss solvent chapter 11 petition and, in the alternative, for relief from automatic stay, over creditor's objection).

---

[17] *See Brief Regarding Applicable Rate of Postpetition Interest*, ECF No. 4624 and *Brief in Opposition to Consolidated Opening Brief of Unsecured Creditors*, ECF No. 4849.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

More generally, the Ninth Circuit has recognized that, "[i]n enacting the Bankruptcy Code, Congress made a determination that an eligible debtor should have the opportunity to avail itself of a number of Code provisions which adversely alter creditors' contractual and nonbankruptcy rights." *Sylmar Plaza*, 314 F.3d at 1075 (quoting *In re PPI Enters., Inc.*, 228 B.R. 339, 344–45 (Bankr. D. Del. 1998)) (internal quotations omitted). The Bankruptcy Code does not condition access to the protections of chapter 11 on insolvency. *See In re Marshall*, 298 B.R. 670, 682–83 (Bankr. C.D. Cal. 2003) ("[I]nsolvency is not a requirement for a chapter 11 filing.").

Despite the sparse authority they cite that actually analyzes the Bankruptcy Code (as opposed to the Bankruptcy Act),[18] the Noteholders assert that there exists an "overwhelming" consensus among courts that solvent debtors are obligated to pay contractual obligations like the Make-Whole Premiums, "even where such amounts may be disallowed in an insolvent debtor case." Noteholders' Br. at 29. This is wrong twice over. Not only do the Noteholders grossly mischaracterize the law (there is no such consensus), the cited cases are inapposite. In fact, the Noteholders' authority variously involves prepayment penalties, "no shop" provisions, and settlement approvals. They do not involve make-whole premiums intended to compensate creditors for unmatured interest.

For example, *In re Dow Corning*, 456 F.3d 668, 678–79 (6th Cir. 2006), the Court considered the appropriate rate of postpetition interest on allowed claims in a solvent debtor case—an entirely different question than the disallowance of claims for Make-Whole Premiums as unmatured interest.[19]

---

[18] In contrast to the common law solvent debtor exception that existed pre-Code, the Bankruptcy Code only recognizes two limited exceptions to section 502(b)(2)—sections 506(b) and 726(a)(5). *See In re Robinson*, 567 B.R. 644, 649 (Bankr. N.D. Ga. 2017) ("Congress eliminated the subjectivity of pre–Code discretion and specifically prohibited allowance of postpetition interest by enacting Section 502(b) and specifically mandated allowance of such interest in enacting 506(b) and 726(a)(5). The concept that postpetition interest is a matter of the bankruptcy court's equitable discretion has been superseded by statute." (quoting *In re Manchester Gas Storage, Inc.*, 309 B.R. 354, 384–85 (Bankr. N.D. Okla. 2004)). In light of this, cases decided prior to the enactment of the Bankruptcy Code offer little if any guidance for the Court on the question of whether section 502(b)(2) of the Bankruptcy Code disallows the Make-Whole Premiums as unmatured interest. Accordingly, much of the authority relied on by the Noteholders is inapposite. *See In re Chi., Milwaukee, St. Paul & Pac. R.R. Co.*, 791 F.2d 524, 528 (7th Cir. 1986) (analyzing Bankruptcy Act); *Debentureholders Protective Committee of Continental Inv. Corp. v. Continental Inv. Corp.*, 679 F.2d 264, 270 (1st Cir. 1982) (same); *Ruskin v. Griffiths*, 269 F.2d 827, 832 (2d Cir. 1959) (same); *Johnson v. Norris*, 190 F. 459, 466 (5th Cir. 1911) (same).

[19] *See supra* note 17 and accompanying text.

Similarly, *Gencarelli* involved a "prepayment penalty" claimed by an oversecured creditor. *See UPS Capital Bus. Credit v. Gencarelli (In re Gencarelli)*, 501 F.3d 1, 3 (1st Cir. 2007). There, the First Circuit held that, even if claims for "prepayment penalties" are found to be unreasonable under section 506(b) of the Bankruptcy Code, the "prepayment penalties" could nevertheless be allowed as unsecured claims . . . *so long as they are valid under section 502*" of the Bankruptcy Code. *Id*. at 7 (emphasis added). The Court emphasized that the solvent debtor would be relieved of its obligation to pay the prepayment penalties if "one of the section 502 exceptions applies." *Id*. at 8. Notably, *Gencarelli* involved a fixed prepayment penalty, *see id*., not a make-whole provision intended to compensate for lost unmatured interest.[20]

Similarly, the debtors in *Chemtura* settled potential make-whole claims as part of a proposed plan of reorganization. *Chemtura*, 439 B.R. at 570. The Court made no ruling about whether the make-whole claims would have been allowed or disallowed under section 502(b)(2) of the Bankruptcy Code. *Id*. at 596. Instead, the Court held that a settlement of the make-whole claims for approximately 42% of their asserted value was within the range of reasonableness. *Id*. at 606. The Court also acknowledged the inconsistent rulings on whether section 502(b)(2) disallows make-whole premiums as unmatured interest. *Id*. at 604–05.

Finally, the dicta in *Ultra II* suggesting that, "when a debtor is solvent, it is the role of the bankruptcy court to enforce the creditors' contractual rights" provides no guidance here. *Ultra II*, 943 F.3d at 765 (citing *Dow Corning*, 456 F.3d at 679). In *Ultra II*, unlike here, the loan agreement expressly provided that the filing of the debtors' chapter 11 petitions automatically triggered the obligation to pay the make-whole premiums. *Id*. at 761. Given that apparently unambiguous set of contractual rights, the Fifth Circuit speculated that equitable considerations might provide a solvent debtor exception to section 502(b)(2). While "expressing no view" on the matter, the Fifth Circuit hypothesized that a bankruptcy court's equitable power to enforce a solvent debtor exception could be "moored" in section 1124 of the Bankruptcy Code. *Id*. at 766 n.2 Tempering this speculation,

---

[20] Likewise, *In re Los Angeles Dodgers LLC*, 465 B.R. 18, 22–23 (D. Del. 2011), involved a "no shop" provision of contract for telecast rights relating to the Los Angeles Dodgers. A "no shop" provision for telecast rights to baseball games is nothing like the Optional Redemption Provisions at issue here.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

however, the Fifth Circuit noted the Supreme Court's "command" that any "equitable powers [that] remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." *Id*. (quoting *Law v. Siegel*, 571 U.S. 415, 421 (2014)) (alteration in original). Thus, the contours of any solvent debtor exception—to the extent one is recognized by a Bankruptcy Court— would necessarily be limited by the Bankruptcy Code, including the express command of section 502(b)(2).

## III.    CONCLUSION

For all the foregoing reasons, and those set forth in the Debtors' Opening Brief, the Court should find that the Noteholders are not entitled to any Make-Whole Premiums as part of their Allowed Utility Funded Debt Claims.

Dated:  December 20, 2019

**WEIL, GOTSHAL & MANGES LLP**

**KELLER & BENVENUTTI LLP**

By:  /s/ *Theodore E. Tsekerides*
     Theodore E. Tsekerides

*Attorneys for Debtors and Debtors in Possession*