Yosef Peretz (SBN 209288)
yperetz@peretzlaw.com
Shane Howarter (SBN 311970)
showarter@peretzlaw.com
PERETZ & ASSOCIATES
22 Battery Street, Suite 200
San Francisco, CA 94111
Telephone:    415.732.3777
Facsimile:    415.732.3791

Attorneys for CARA FENEIS

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

|  |  |
|---|---|
| In re<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>                  Debtor. | Case No.  19-30089 (DM)<br><br>Chapter 11<br><br>**CARA FENEIS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF HER MOTION FOR RELIEF FROM THE AUTOMATIC STAY**<br><br>**Date:**    January 29, 2020<br>**Time:**    10:00 a.m.<br>**Ctrm:**    17<br>**Judge:** Hon. Dennis Montali |

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

Pursuant to Rule 201 of the Federal Rules of Evidence, Cara Feneis ("Feneis") respectfully asks that the Court take judicial notice of documents from the case styled *Cara Feneis v. Pacific Gas and Electric Company* (Case No. RG17866484), currently pending in the Superior Court of California, County of Alameda ("Alameda Superior"), listed below in connection with Feneis' concurrently-filed Motion for Relief from the Automatic Stay:

EXHIBIT "A":                    Complaint for Damages, filed on July 5, 2017 with the State of California, Superior Court of the County of Alameda.

Case: 19-30088    Doc# 5207-4    Filed: 12/26/19    Entered: 12/26/19 16:55:40    Page 1 of 38

Fed. R. Evid. 201 allows district courts to take judicial notice of facts that are either generally known within their territorial jurisdiction, or that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. The rule allows courts to take judicial notice of court filings and other matters of public record. See *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F. 3d 741, 746 n. 6 (9th Cir. 2006).

Feneis requests this Court take judicial notice of court document in the State of California, County of Alameda Superior Court. This document is appropriate subjects of a Request for Judicial Notice because they are publicly available, and there can be no question as to its authenticity.

Accordingly, Feneis requests that the Court take judicial notice of Exhibit A, which is attached as exhibit to this Request for Judicial Notice filed in support of Feneis' Motion for Relief from the Automatic Stay.

Dated: December 26, 2019    PERETZ & ASSOCIATES

By: _____
    Yosef Peretz
    Shane Howarter
    Attorneys for CARA FENEIS

# EXHIBIT A

1  MARTIN M. HOROWITZ (SBN 79073)
   STEPHANIE RUBINOFF (SBN 98229)
2  HOROWITZ & RUBINOFF
   1440 Broadway, Suite 607
3  Oakland, CA 94612-2026
   Telephone:   (510) 444-7717
4  Email:       srubinoff@h-rlegal.com

5  YOSEF PERETZ (SBN 209288)
   SUMY KIM (SBN 290082)
6  PERETZ & ASSOCIATES
   22 Battery Street, Suite 202
7  San Francisco, CA 94111
   Telephone:   (415) 732-3777
8  Facsimile:   (415) 732-3791
   Email:       yperetz@peretzlaw.com
9
   Attorneys for Plaintiff
10 CARA FENEIS

ENDORSED
FILED
ALAMEDA COUNTY

JUL 0 5 2017

SUE PESKO

By _____

11              SUPERIOR COURT OF CALIFORNIA
                    COUNTY OF ALAMEDA
12              UNLIMITED CIVIL JURISDICTION

13 CARA FENEIS,                    CASE NO.   RG17866484

14             Plaintiff,

15      vs.

16 PACIFIC GAS AND ELECTRIC
   COMPANY, a California
17 corporation; and DOES 1 through 20,
   inclusive,
18
               Defendants.
19 _____/

20

21              COMPLAINT FOR DAMAGES
                AND OTHER APPROPRIATE RELIEF
22              (JURY TRIAL DEMANDED)

23      1.   Retaliation in Violation of Labor Code §1102.5(b)
        2.   Age Discrimination in Violation of the FEHA
24      3.   Sex Discrimination in Violation of the FEHA
        4.   Wrongful Termination in Violation of Public Policy
25

26

27

28

Plaintiff CARA FENEIS complains of defendants and for causes of action alleges:

1.      Plaintiff CARA FENEIS ("FENEIS") is a competent female adult of 48 years of age who is a citizen of the United States, and, at all times material herein, has been a resident of the County of Alameda, California.

2.      The matter in controversy exceeds, exclusive of interest and costs, Twenty-Five Thousand Dollars ($25,000.00).

3.      Defendant PACIFIC GAS AND ELECTRIC COMPANY ("PG&E") is and, at all times material herein, has been an active California corporation under the laws of the state of California.

4.      Jurisdiction and venue are proper in this court because Alameda County is where the liability arose.

5.      Defendant PG&E is a corporation which acts through its employees and agents.

6.      At all times material herein, the conduct alleged herein was taken by agents or employees of defendant PG&E, each of whom was acting within the course and scope of his or her agency or employment and each act was authorized and ratified by defendant PG&E.

7.      The true names and capacities of defendants sued as DOES 1 through 20 are unknown to plaintiff. Plaintiff prays leave to amend to allege their true names and capacities when ascertained.

8.      Plaintiff is informed and believes and thereon alleges that each and every fictitious defendant is responsible in some manner for the conduct alleged herein, and the plaintiff's injuries were proximately caused thereby.

9.      Plaintiff has satisfied the statutory jurisdictional prerequisites for filing the instant lawsuit and such suit is timely filed. On November 17, 2016, plaintiff timely filed discrimination complaint no. 134219-260241 with the California Department of Fair Employment and Housing ("DFEH") against respondent (and defendant herein) PG&E. This complaint alleged discrimination, harassment, retaliation and termination on the basis of age, sex, and family care or medical leave in violation of the California Fair Employment and Housing Act (FEHA), Government Code §12900 *et seq.* A true and correct copy of said complaint is attached hereto as Attachment A and is incorporated herein by reference. The DFEH issued a letter to plaintiff "RE: Notice of Case Closure and Right

COMPLAINT FOR DAMAGES AND OTHER APPROPRIATE RELIEF

1

1 to Sue" on November 17, 2016, permitting the filing of a private civil action within one year of the
2 date of this letter. A true and correct copy of said DFEH letter to plaintiff is attached hereto as
3 Attachment B and is incorporated herein by reference. The instant action is timely filed pursuant to
4 Government Code §12965(b).

5       10.     With regard to internal administrative remedies of defendant PG&E, such internal
6 remedies are not applicable to the causes of action alleged herein and plaintiff is not, therefore, subject
7 to a requirement that she exhaust such remedies prior to resort to suit on these claims. In the
8 alternative, defendant is estopped from asserting that plaintiff failed to exhaust her internal remedies
9 or defendant has waived its right to insist that plaintiff must first resort to such internal remedies.

10       11.     The circumstances which give rise to the causes of action asserted herein are as follows.

11         a.     On March 19, 2015, defendant PG&E offered plaintiff FENEIS, by email and
12 attached offer letter, employment in the position of Business Finance Analyst. Plaintiff accepted,
13 completed her pre-employment screenings by March 30, 2015, and began work on April 6, 2015.
14 Plaintiff spent her first day of employment participating in the New Employee Orientation Workshop,
15 a one-day workshop which covers the industry, the company history, its "vision and values,"
16 products, safety and diversity. On April 7, 2015, she reported to her immediate supervisor, Gregory
17 J. Malman, Supervisor, Business Finance.

18         b.     As described by PG&E attorney Philip Simpkins in his January 21, 2016 letter
19 brief to Mark Marchione, Regional Supervisory Investigator with the U.S. Department of Labor,
20 Occupational Safety and Health Administration ("federal OSHA"), defendant's Business Finance Gas
21 Operations department provides "operating finance support to PG&E's various lines of business in
22 order to guide business decisions, capitalize on investment opportunities, reduce costs, and enhance
23 operational effectiveness."

24         c.     Plaintiff supported PG&E's Gas Operations Technology Department and her
25 duties included communications with managers and directors, review of cost variances, and analysis
26 of budget forecast. The primary duties of plaintiff's position are stated in detail in the job posting of
27 Business Finance Analyst of October 19, 2015 (Requisition #: 52862027-102). These duties include
28 the following: supporting initiatives related to business planning; developing and reporting key

COMPLAINT FOR DAMAGES AND OTHER APPROPRIATE RELIEF

2

1 departmental performance metrics in the areas of budgeting, planning and forecasting; performing
2 budget planning and forecasting; operational performance analyses; strategic planning and analysis;
3 and monitoring, controlling and accounting costs. Plaintiff possessed substantially greater
4 qualifications than both the stated minimum qualifications and the stated desired qualifications.

5 d. Defendant PG&E implemented a standardized reporting system which itemizes
6 costs by department, costs per category (such as travel/lodging, meals, rewards and recognitions,
7 training, smart devices, telephones and other employee-related costs), costs per employee, and the top
8 25 contracts by vendors (which includes monthly charges by the highest spending employees/vendors
9 as well as the year to date totals for each). This reporting was compiled the first week of each month
10 and then reviewed by the Technology Supervisor, Caroline Veys, the Senior Manager, Khaled Fustok,
11 and the Director, initially Paul Caffrey and then Joe Sanzo.

12 e. In approximately mid-May 2015, Mr. Malman informed plaintiff that he wanted
13 to promote her within nine to twelve months of her date of hire.

14 f. By May 2015, plaintiff observed that significant cost overruns were present in
15 several categories. Moreover, for some departments these overruns were in the millions of dollars.
16 In a conversation with Mr. Malman in or about the third week of May 2015 plaintiff asked, and Mr.
17 Malman answered, questions regarding, *inter alia*, PG&E's policies regarding covered employee
18 expenses.

19 g. In or about mid-June of 2015 plaintiff pulled the SAP PCC230 report for month-
20 end May 2015 and discovered additional significant cost overruns which concerned her. As a
21 consequence, she performed a more refined analysis of the data contained in this SAP PCC230 report.
22 Having identified excessive expenditures across all lines of the Technology Group, plaintiff, pursuant
23 to her forensic accounting training, first segregated out the ten employees with the highest
24 expenditures and then focused on the top three employees who consistently charged the most expenses,
25 Senior Manager Amy Barsnick, Supervisor Jesse Jennings, and Business Analyst Nahida Bahir. Her
26 analysis generated charts broken down by category of expenditure (e.g., Airfare & Employee Travel),
27 vendor, date of expenditure, and the amount of the expenditure. When plaintiff analyzed Ms. Bahir's
28 expenditures, "red flags" emerged throughout the record. Plaintiff observed not only excessive

1  expenditures but expenditures that appeared to be for personal, non-work-related items.  In or about

2  the third week in June 2015 plaintiff gave Mr. Malman her refined analysis.  He responded that he

3  had previously had problems with Ms. Bahir in the prior year when she was a contractor charging

4  what he characterized as excessive overtime which could not be adequately substantiated.  Mr.

5  Malman further advised plaintiff that he had informed Ms. Veys and Mr. Fustok of Ms. Bahir's

6  conduct at that time.  He explained that thereafter the excessive charges lessened but continued.  He

7  also stated that he had been "surprised" when Ms. Bahir was thereafter hired as a full-time employee.

8           h.      Thereafter, however, plaintiff encountered resistance from Mr. Malman, Ms.

9  Veys and Mr. Fustok to the concerns about financial malfeasance that she expressed in several

10  communications by email or in-person discussions.

11          i.      On or about July 8, 2015, plaintiff provided excerpts of her refined analysis to

12  Mr. Malman, Ms. Veys and Mr. Fustok that showed suspicious purchases made by Nahida Bahir

13  during the period of November 2014 through June 2015.  Plaintiff received no response.

14          j.      In or about the second week of July 2015, after a meeting with Mr. Fustok, Ms.

15  Veys, Mr. Malman and plaintiff, Mr. Fustok said that he had spoken with Nahida Bahir and that she

16  had advised him that a contract worker had used her business expense card to stay at The Lodge at

17  Tiburon. He expressed his satisfaction with this excuse.  There was no discussion of any of the other

18  excessive charges disclosed by plaintiff.  This flippant response to the improper use of a corporate

19  credit card and the fact that Ms. Veys and Mr. Fustok were responsible for approving Ms. Bahir's

20  charges caused plaintiff great concern.

21          k.      During the week of August 10, 2015, plaintiff pulled data to create a report for

22  the period from January 1, 2014 through July 31, 2015, which showed each project portfolio and

23  expenses by cost center as well as the variances.  She was shocked to discover that in July 2015 Ms.

24  Bahir had purchased over $15,000.00 of Software as a Service ("SaaS").  This purchase not only

25  violated PG&E's policy that a contract should be in place for this kind of purchase but also appeared

26  to be a brazen effort to circumvent copyright and licensing law.

27          l.      In or about August 2015, plaintiff received her 2015 mid-year performance

28  appraisal covering the first three months of her employment.  At no time prior to this review had

COMPLAINT FOR DAMAGES AND OTHER APPROPRIATE RELIEF

4

1  plaintiff been informed that her performance was less than satisfactory or that her acclimation to

2  PG&E was tardy. Nor did Mr. Malman assert at any time during his evaluation meeting with plaintiff

3  that she lacked skills. Plaintiff was rated better than satisfactory in that she was respectively rated,

4  in the jargon of PG&E, as "Target" and "Successful" in her "Overall Goals" and "Overall

5  Competencies." This mid-year evaluation stated, *inter alia,* as follows:

6        Cara is on target for goals for 2014 [sic-2015] mid-year. In Cara's first
          three month's [sic] with the Company she has made good progress in
7         learning the cost model, standardized reporting, and posting journal entries.
          She has also shown the desire to get up to speed quickly through the
8         trainings she has completed and signed up for.

9  (Mid-year Evaluation, "Manager's Evaluation of Goals," p. 1.) In addition, this evaluation stated:

10       Cara is successful at demonstrating competencies through her first three
          months of employment. She has acted safely and shared material with
11        others to encourage safety throughout the team. As Cara continues to get
          up to speed in her role, I look forward to her effectively working with her
12        teammates and business partners by successfully demonstrating PG&E
          competencies.

13

14  (*Id.,* "Manager's Evaluation of Competencies," p. 3.)

15            m.      On August 19, 2015, plaintiff was present in defendant's San Francisco General

16  Office. She approached her Senior Manager, Morgan Uptergrove, who was in the presence of Mr.

17  Malman, to express her concerns and disclose the facts about improper billing practices and apparent

18  theft. However, when she began to explain to Mr. Uptergrove, Mr. Malman interrupted her, stating,

19  "The Technology Group has already worked on this issue." Mr. Uptergrove, upon hearing that

20  explanation, stated, "Okay," and left.

21            n.      Because plaintiff's superiors remained indifferent to her disclosures, on August

22  24, 2015, she contacted Principal Internal Auditor James Moore, disclosed her reasonable belief that

23  employees were making unauthorized purchases with their company credit cards, and requested that

24  he review her findings.[1] After her private conversation with Mr. Moore, she provided him with the

25

26        [1] "Findings" is a term of art to indicate significant issues and potential noncompliance which are identified during
          the course of an audit. Findings include the criteria for determining that a problem exists, a condition or situation that was
27        observed, the effect or impact of the condition, and the root cause of the problem to the extent that it can be determined.
          Findings should result in recommendations which resolve the issue to the benefit of management. (See, Statements on
28        Auditing Standards ("AU") published by the American Institute of Certified Public Accountants ("AICPA"), at AU Section
          325.) The AU specifically identifies "[m]isstatements arising from misappropriation of assets" as a type of misstatement
          relevant to an auditor's consideration of fraud. (See AU Section 316, "Consideration of Fraud in a Financial Statement

Case: 19-30088    Doc# 5207-4    Filed: 12/26/19    Entered: 12/26/19 16:55:40    Page 9
of 38
COMPLAINT FOR DAMAGES AND OTHER APPROPRIATE RELIEF

5

1   documentation of the misconduct she had uncovered. Plaintiff also advised Mr. Moore that she
2   believed that Mr. Fustok, Mr. Malman, Ms. Veys and possibly their directors were in "collusion"
3   in either the commission or, at least, the coverup of these unlawful acts. He initially encouraged her
4   to anonymously report her findings to PG&E's Corporate Security division. In response, plaintiff
5   expressed her concern that she would be subjected to retaliation if she made such a report. Mr.
6   Moore then encouraged her to report her findings to his colleague, Principal Internal Auditor Larissa
7   Ionin. Plaintiff, however, remained concerned about possible retaliation.

8           o.      However, on or about August 26, 2015, Principal Internal Auditor Larissa Ionin
9   contacted plaintiff directly and requested that she forward to Ms. Ionin the information plaintiff had
10  accumulated and the reports she had pulled regarding the perceived financial irregularities and
11  illegalities. During this conversation plaintiff emphasized that she wanted to remain anonymous and
12  Ms. Ionin repeatedly reassured her that she would remain anonymous. Thereafter, plaintiff provided
13  Ms. Ionin with her findings regarding the excessive and improper expenditures.

14          p.      By email to plaintiff on August 27, 2015, Ms. Ionin thanked plaintiff and
15  advised her that Ms. Ionin had "documented" the case and that she was "referring the matter to
16  Corporate Security for review and [to] conduct [an] investigation."

17          q.      On September 9, 2015, Mr. Moore pulled plaintiff into a private room. He
18  informed her that her findings and suspicions of illegality had been precisely correct about Ms. Bahir.
19  He stated that Ms. Ionin's investigation had not only confirmed the fraud and theft that plaintiff had
20  disclosed, but had found extensive fraud beginning in 2011 when Ms. Bahir was an independent
21  contractor. Ms. Bahir had thus been "stealing" for over four years. Also on September 9, 2015,
22  Mallik Angalakudati, Vice President, Gas Business Management, invited plaintiff to meet for coffee
23  on September 11, 2015.

24          r.      In response to Ms. Ionin's emailed request on September 10, 2015, plaintiff on

25

26  Audit," at 316.05-316.12; see also, Financial Accounting Standards Board ("FASB") Accounting Standards Codification,
27  "the source of authoritative generally accepted accounting principles (GAAP) recognized by the FASB to be applied to
    nongovernmental entities.") Although plaintiff did not possess a California Certified Public Accountant ("CPA") license,
28  she was qualified to evaluate PG&E's financial practices and reach the conclusions she did because, by virtue of her
    education and experience, she met the standards for certification as a Certified Internal Auditor ("CIA"), Certified Fraud
    Examiner ("CFE"), and California CPA.

COMPLAINT FOR DAMAGES AND OTHER APPROPRIATE RELIEF

6

that date presented the "backstory," providing the general outline of her inquiries and prior disclosures to Mr. Malman. She also explained her reasons for suspecting that Mr. Fustok and Ms. Veys had participated in the misconduct of Ms. Bahir. In another email on that date she disclosed that the Signavio Software licensing was purchased illegally by Ms. Bahir. She explained that there was no license, no service contract, no invoices and no paper trail, all in violation of Sarbanes-Oxley requirements. These disclosures directly implicated both Technology Supervisor Veys and Senior Manager Fustok. Given Ms. Bahir's job duties, Ms. Veys' approval was necessary for purchases up to a certain limit and Mr. Fustok's approval was necessary for purchases above that limit. These purchases simply could not have been made by Ms. Bahir without their approval.

        s.      Plaintiff is informed and believes and thereon alleges that on or about September 10, 2015, Ms. Bahir was escorted from the building and terminated.

        t.      During plaintiff's brief coffee break with Mr. Angalakudati on September 11, 2015, Mr. Angalakudati warned her to "be very careful of the Business Finance leadership" because they are a powerful group and she should not get on their bad side. He also stated that they were a very "gossipy group" and met frequently to discuss whatever person was "on their radar." By this time, plaintiff was extremely fearful because it appeared that the investigation was now active and linked to her disclosures. Moreover, she had made prior multiple disclosures to her immediate supervisor Mr. Malman and to Mr. Fustok, Ms. Veys and Mr. Uptergrove, all to no avail.

        u.      By mid-September 2015, plaintiff had received further month-end finance reports as well as reports which she had pulled which provided greater detail about the irregularities which she had discerned. By this time, it was clear to her that the misconduct of Ms. Bahir and the variances that she was observing by department necessarily involved misbehavior by higher management. She made further disclosures to Ms. Ionin of what she perceived to be financial misconduct by Senior Manager Amy Barsnick, Supervisor Jesse Jennings, and the contract workers placed with PG&E by the Adecco staffing agency, as well as disclosing irregularities in certain technology accounts payable wire payments from employees whom she had not yet identified.

        v.      Beginning during the week of September 14, 2015, and immediately after her disclosures about Ms. Barsnick and Mr. Jennings, plaintiff perceived a shift in management's

COMPLAINT FOR DAMAGES AND OTHER APPROPRIATE RELIEF

7

treatment of her from resistance to outright hostility and isolation. On September 24, 2015, her suspicions deepened when she was ostracized at the ostensible "team building" activity of attending an Oakland A's game. Her perceptions were later confirmed by PG&E's overt adverse actions culminating in her termination.

      w.     On September 17, 2015, plaintiff sent an email to Ms. Ionin presenting data and explicitly stating,

> As you review [the attached report], I am hoping you understand why I have asked some very pointed questions regarding the two other individuals [Barsnick and Jennings] and the lack of accountability over controls (and my suspicion about sweeping it under the carpet). The "issue" was continuously in front of them since before I came to the company-as you can see from the attached report.

Plaintiff was now clearly focused on the misconduct of middle and upper management rather than that of Ms. Bahir. At that time, plaintiff also discussed with Ms. Ionin her desire for a transfer in order to avoid retaliation. Ms. Ionin attempted to "counsel" her, stating that since plaintiff had been at PG&E less than a year, it would be difficult to move. Ms. Ionin, however, attempted to reassure plaintiff by stating that plaintiff had "done the right thing" and that "if there was even a breath [of] retaliation," she should notify Ms. Ionin and Mr. Moore immediately. However, when plaintiff attempted to address the "other individuals also performing fraud," notably Ms. Barsnick, Mr. Jennings and the Adecco contract workers, Ms. Ionin evaded the issue. Ms. Ionin's sole reply, that plaintiff should get a mentor, was non-responsive.

      x.     By email of September 18, 2015, Ms. Ionin rationalized the conduct plaintiff had disclosed regarding Supervisor Jesse Jennings, stating "[t]he trip looks unusual but he might have been meeting with san diego [sic] gas and electric or another party on Pathfinder and the trip was approved by Sr Manager." Ms. Ionin also stated that the expenses for recovered hard drives "could" be legitimate expenses. (In plaintiff's experience, recovery of hard drives is the exclusive province of security and IT.) Although Ms. Ionin conceded that the hard drive recovery purchase was "outside policy," she concluded that "it's not fraud." Ms. Ionin, however, conspicuously ignored plaintiff's identification of the Adecco contract workers who were expensing unusual items. To plaintiff's knowledge, no action whatsoever had then been taken against others whose malfeasance she disclosed,

COMPLAINT FOR DAMAGES AND OTHER APPROPRIATE RELIEF

8

most notably, Supervisor Jennings and Senior Manager Barsnick. Ms. Barsnick had multiple inappropriate charges such as going to Hollywood, California and staying at a hotel which was not approved by PG&E, and going to Orlando, Florida, where it appears that she charged PG&E for airline tickets and Disneyland resort tickets for her spouse and children.

        y.    Immediately after receiving Ms. Ionin's rationalizations, plaintiff wrote to Mr. Moore, providing him with the reports she had emailed to Ms. Ionin on September 17 and 18, 2015, and stating, "to be honest . . .it has me scratching my head (disgusting actually) and as I stated, this is literally a hamster habitrail. I sure don't see the Hollywood Westin on our travel guide."[2]

        z.    Beginning in early September 2015, plaintiff first observed anomalous and inappropriate expenditures associated with LinkSource Technologies, LLC ("LinkSource"). She conducted a review, analyzing the Linksource expenditures for the next several weeks. Plaintiff had discovered this LinkSource issue because she initially observed unusual charges in the PCC23O report. She then investigated by reviewing both reporting not normally employed and the supply chain group to further inquire as to whether there was a master service agreement, a contract and invoicing. None of these were uploaded into the SAP system. The audit controls established pursuant to the Sarbanes-Oxley Act require this type of internal audit trail. Here, there was no appropriate documentation, just a Statement of Work from four years before in the sum of $70,000.00. It was highly irregular to have automatic payments to a "regular vendor" with no necessary documentation in place. Plaintiff made several disclosures concerning LinkSource. For example, in her email to Business Finance Analyst Kristen Dean on September 25, 2015, plaintiff advised that the majority of computer software purchases were done in a manner which did not conform to PG&E's obligation to retain proofs of purchase of all software pursuant to federal copyright laws and contractual obligations imposed by the software vendors, exposing it to fines ranging from $200.00 to $30,000.00 per software product. As to "Services (Contracting)," plaintiff advised of deviations from the mandates that professional services required an executed contract for an amount over $2,500.00 and that construction services work also required a contract. The LinkSource expenditures demonstrated

---

[2] Ms. Barsnick had charged her stay at the Hollywood Westin to her company credit card.

COMPLAINT FOR DAMAGES AND OTHER APPROPRIATE RELIEF

9

extraordinary misconduct. Plaintiff believed that she had discovered major internal control issues if not outright wire fraud. Because of plaintiff's concerns, she researched her rights and protections under the relevant whistleblower protection statutes, both state and federal.

aa.     On September 30, 2015, the weekly meeting was held with Mr. Uptergrove, Mr. Malman, Senior Business Analyst Brad Howell, Associate Analyst Michelle Felmlee-Gartner, and plaintiff. Mr. Uptergrove looked at plaintiff and stated, "Technology seems to be having some internal control issues." Plaintiff construed this to mean that Mr. Uptergrove concurred in her view that she had uncovered apparent illegalities. Mr. Uptergrove had been a Management Internal Auditor for PriceWaterhouseCooper before his hire at PG&E. This statement by a former utilities auditor regarding the internal control issues she disclosed confirmed her suspicions.

bb.     Defendant PG&E's contention that regular one-on-one meetings with plaintiff were initiated on some unstated date for the purpose of correcting her persistent errors is erroneous. (See PG&E's letter brief, p. 4.) These meetings were originally scheduled as informational meetings in order to rapidly acquaint plaintiff with the SAP Financial System which was specifically adjusted for PG&E. The first meeting occurred in or about June 2015 and further meetings were scheduled for every other week. Initially, these meetings were conducted by Mr. Malman in a professional manner and were productive. However, in October 2015, after plaintiff's September 2015 disclosures, Mr. Malman began conducting these meetings three to four times per week for an hour or more each as a vehicle for him to rant at and harass plaintiff.

cc.     Mr. Malman initiated his one-on-one meeting with plaintiff on October 1, 2015, with criticisms of, and hostility toward, her. When plaintiff attempted to explain that she wanted to meet with senior management to discuss the illegalities she had discovered, he became irate and cut her off. He stated that "there [were] internal control issues" regarding invoices and "potential staff changes occurring in Technology." As defendant PG&E conceded in its January 21, 2016 letter brief, during this meeting Mr. Malman notified plaintiff that he was considering terminating her employment. Mr. Malman then stated that there had been recent complaints from within the "LOB" (line of business), specifically from the Technology Group, and that Mr. Fustok and Ms. Veys did not wish to work with plaintiff. He expressly stated that if "they don't want to work with [plaintiff]

there is no reason to keep [her] employed." With regard to the LOB, Mr. Malman asserted that "they do not want to work with [plaintiff] and only want to deal with [Mr. Malman] and for this reason leadership is in a conversation to terminate [plaintiff's] employment." The Finance Group leadership was scheduled to meet on October 2, 2015. Mr. Malman then directed plaintiff to schedule a meeting with him on October 5, 2015, so that he could inform her as to whether PG&E had decided to terminate her.

        dd.     Plaintiff was shocked by Mr. Malman's attack and the threat to terminate her. In the early afternoon on October 1, 2015, she sent an email to Ms. Ionin, conveying the content of her dialogue with Mr. Malman and expressing how "stunned" and "anxious" she was that her attempt to "do the right thing" by reporting ongoing financial issues had resulted in the Technology Group no longer wanting to work with her and the threat of termination. Plaintiff also met with Mr. Moore on October 1, 2015. She explained the content of her meeting with Mr. Malman and his threat to terminate her. Mr. Moore responded that it was "retaliation" and an effort by Mr. Malman, Joseph Marshman, Business Finance Director (and plaintiff's Director), and Senior Manager Uptergrove to "cover their butts," and stated that Mr. Malman had "screwed the pooch." Mr. Moore immediately notified Ms. Ionin who then contacted plaintiff.

        ee.     On October 1, 2015, plaintiff filed two whistleblower complaints, one with the U.S. Occupational Safety and Health Administration ("OSHA") and the other with the U.S. Securities and Exchange Commission ("SEC").

        ff.     On October 2, 2015, Mr. Moore initiated another meeting with plaintiff. Mr. Moore informed her that during the evening of October 1, 2015, Ms. Ionin had filed an internal ethics and compliance complaint on plaintiff's behalf that was based on plaintiff's October 1, 2015 report to him. This complaint alleged that plaintiff was being subjected to retaliation. Mr. Moore also advised plaintiff that Vice President of Audit Stephen Cairns had informed plaintiff's Vice President, Vice President of Finance Jason Wells, of the threats made by Mr. Malman to plaintiff and that Mr. Cairns had directed Mr. Wells not to do "anything stupid." On behalf of Mr. Cairns, Mr. Moore requested that plaintiff provide him with the information she had discovered regarding LinkSource. Via an email to Mr. Moore on October 2, 2015, plaintiff complied, providing audit reports and emails

1    showing the absence of invoices and the paper trails required by the Sarbanes-Oxley Act of 2002.

2                gg.      Via an email to plaintiff on October 2, 2016, Mr. Malman stated that he had

3 "additional information" he wished to discuss with her as a "follow up" to their one-on-one meeting

4 and scheduled a meeting with her on October 7, 2015.

5                hh.      In a meeting with Mr. Malman and Heather Johnson, an HR functionary, on

6 October 7, 2015, plaintiff was placed on a 30-day Performance Improvement Plan ("PIP"). Mr.

7 Malman told plaintiff that he would be monitoring her during this PIP period and that if she did not

8 satisfy his standards, she would be terminated for "poor performance."

9                ii.      Later that morning, Mr. Malman emailed plaintiff a written PIP document,

10 dated October 5, 2015, that ostensibly outlined his earlier discussion with her. Significantly, his

11 cover email stated, *inter alia*, "Regarding [plaintiff's] comments made during our meeting on the topic

12 of illegal behavior, I encourage you to bring these topics up with me, one of the other leaders in our

13 group, or with the Compliance & Ethics Helpline . . . ." Since Mr. Malman had been, prior to the

14 October 7, 2015 PIP meeting, well aware of plaintiff's several disclosures, this statement was merely

15 a transparent effort to sanitize his adverse actions. The written PIP document enumerated three areas

16 for improvement and emphasized that if plaintiff did not show "meaningful progress" *during* the 30-

17 day period, "[she would] be subject to immediate termination." Moreover, this document suggested

18 that there might be "non-work related issues" that were "impacting" plaintiff's performance and

19 proposed that she seek the assistance of PG&E's Employee Assistance Program ("EAP"). By the

20 terms of PG&E's written policy, EAP is available to employees with drug or alcohol abuse issues or

21 other mental health issues. Plaintiff was, therefore, deeply offended by the false implication that she

22 suffered from some addiction or had mental health issues. By the express terms of the October 5,

23 2015 PIP document, the 30-day PIP period would expire on Wednesday, November 4, 2015.

24                jj.      From the date of the imposition of the PIP until plaintiff's termination, Mr.

25 Malman became increasingly tyrannical toward her. He evidently believed that the PIP gave him

26 license to harass, needle, nitpick, intimidate, and berate plaintiff. For example, on October 8, 2015,

27 immediately after the imposition of the PIP, the weekly one-on-one meeting scheduled for thirty

28 minutes devolved to an hour and ten minutes of Mr. Malman berating plaintiff at her desk in the

presence of her colleagues and superior. Present were the following: the director responsible for the Supply Chain Group; Mr. Moore at his desk; Kristen Dean, Senior Business Analyst, in her cubicle; Miranda Rising, Senior Manager; and Michelle Felmlee-Gartner, Business Analyst. He also imposed patently differential standards upon plaintiff as compared to other employees. For example, plaintiff's colleagues were permitted to take two-hour lunch breaks, work from home, come in late and leave early. Although plaintiff was always conspicuously present at her desk, Mr. Malman nevertheless improperly rejected her time sheets and harassed her when she submitted them. Plaintiff spoke with Mr. Moore, but declined his invitation to leave her desk for a conversation with him because she feared Mr. Malman's imminent return. She explained that, by Mr. Malman's directives, she was now forbidden from discussing her beliefs of unlawful activities. She also said she felt blacklisted, berated, threatened, intimidated and harassed. Mr. Moore responded that this was PG&E's methodology to isolate and force out those who do not conform.

kk.     By an email of October 8, 2015 to plaintiff, Jeannie Hermoso advised that she was the HR Representative who had been assigned to plaintiff's recently filed complaint with the Compliance & Ethics Department and requested a meeting. By an email of October 14, 2015, Ms. Hermoso advised that she would be available on Monday, October 19, 2015. During the interim, plaintiff made every effort to comply with the terms of the PIP despite her view that it was unwarranted and retaliatory.

ll.     On or about October 19, 2015, only 12 days after plaintiff had been placed on the 30-day PIP, her position was posted by defendant PG&E in a Job Opening Requisition.

mm.     On October 19, 2015, plaintiff had her scheduled interview with Ms. Hermoso. During that interview plaintiff disclosed that she had filed complaints with federal OSHA and the SEC on October 1, 2015. Plaintiff also informed Ms. Hermoso that she was being constantly harassed and publicly berated by Mr. Malman in evident retaliation for her disclosures. Plaintiff identified numerous witnesses to this hostile conduct. Thereafter, plaintiff further cooperated in the ostensible investigation of retaliation for her whistleblowing activities. For example, via an email on October 20, 2015, plaintiff provided Ms. Hermoso with her mid-year review and the PIP document, as Ms. Hermoso had requested, and informed her that plaintiff "[has] felt set up for weeks to fail," describing

COMPLAINT FOR DAMAGES AND OTHER APPROPRIATE RELIEF

13

how Mr. Malman had publicly berated her for attending a long-scheduled training session on October 19, 2015, which she needed in order to complete a project due on October 30, 2015, when it conflicted with the monthly Technology Portfolio Review meeting that had been rescheduled at the very last minute. By another email to Ms. Hermoso on October 20, 2015, plaintiff expressed the view that Mr. Malman's implication in the PIP that she had some sort of personal problem that required her to participate in the EAP was "nothing more than slanderous behavior put into print."

nn.     Further examples of Mr. Malman's relentless misconduct toward plaintiff are present in his patronizing, nitpicking and bullying emails of October 20, 2015, and his conduct on October 21, 2015. On October 21, 2015, Mr. Malman engaged plaintiff in his fourth one-on-one session with her that week, a 50-minute telephone conversation in which he insulted and belittled her (e.g., plaintiff "can't process asking a question and write at the same time"; although other employees "catch on," plaintiff "just [doesn't] get it and [seems] to fall apart"), and asserted that her colleagues shared his disdain for her. He knew that her work station was next to the cubicles for upper management and her colleagues. This conversation was notably lacking in substance relating to the performance of her duties. Mr. Malman also attempted to compel plaintiff to cancel her long-scheduled vacation commencing on November 1, 2015, on the ostensible ground that it overlapped with her 30-day PIP despite knowing that this vacation had been scheduled since May of 2015 and that plaintiff would lose a significant sum of money if she canceled it. Plaintiff immediately reported this conduct to Ms. Hermoso by an email labeled "Today's Verbal Beating via Phone."

oo.     By an email to plaintiff dated October 21, 2015, Mr. Malman purported to summarize his telephone conversation with plaintiff earlier that day. Mr. Malman stated therein that although plaintiff had "satisfactorily completed a handful of deliverables," he did not believe that she had "made noticeable progress on developing the competencies outlined in [her] 30 day notice letter." His criticisms of plaintiff's performance were unwarranted, including his accusation that her absence from the monthly Technology Portfolio Review meeting on October 19, 2015 was unjustified. On October 23, 2015, plaintiff forwarded Mr. Malman's October 21, 2015 email to Ms. Hermoso and Mr. Moore, stating that she "will not be bullied" and expressing her belief that Mr. Malman's behavior was condoned and encouraged by her supervisors Senior Manager Uptergrove and Director

1 | Marshman.

2 |     pp. By October 21, 2015, when plaintiff printed a screen shot of LinkSource
3 | expenditures over time, she was able to demonstrate that these expenses, which were initially
4 | approximately $1,500.00, had escalated to $437,750.00, all in the form of automatic payments. She
5 | found that $2.3 million had been paid by automatic payments with no master service agreements, no
6 | contracts, and no identifiable invoicing. Moreover, she discerned that, with regard to a Statement of
7 | Work for $70,000.00, a total of $2.7 million had, in fact, been transferred to a BNYMellon account.
8 | The BNYMellon account was an investment account, not a business account. On October 21, 2015,
9 | plaintiff made disclosures to Supply Chain Administrator Corey Lee who supports directors and senior
10 | managers on issues concerning underlying master service agreements for LinkSource. Plaintiff
11 | disclosed to Ms. Lee that she could not find a master service agreement for LinkSource despite the
12 | extraordinary expenditures that she was discovering on that account. Ms. Lee confirmed to plaintiff
13 | that there was no master service agreement.

14 |     qq. Ms. Hermoso, by an email on November 6, 2015, advised plaintiff that PG&E
15 | had conducted an investigation into her "concerns and allegations that Greg Malman retaliated against
16 | [plaintiff] after bringing up concerns and filing a complaint regarding expense fraud." After
17 | interviewing five persons including plaintiff, Ms. Hermoso "was not able to substantiate [plaintiff's]
18 | allegations and was not able to identify a Code of Conduct or policy violation." Ms. Hermoso then
19 | thanked plaintiff "for bringing [her] concerns to our attention." At no time did plaintiff receive the
20 | content of the investigation or any substantive summary of the investigation. To this date, she does
21 | not even know which employees were interviewed, what documents were reviewed, what policies
22 | were examined or any other facts pertinent to the issuance of this purported "finding."

23 |     rr. As discussed above, Mr. Malman had attempted to compel plaintiff to cancel
24 | her long-scheduled vacation, but she had refused due to the severe cancellation expenses. In his email
25 | to plaintiff on October 28, 2015, Mr. Malman contended that he was attempting to extend the 30-day
26 | PIP period to "account for [her] vacation days." However, upon plaintiff's return to work from
27 | vacation on November 12, 2015, she was smugly told by Mr. Malman that "the decision" had been
28 | made, but not the substance of that decision.

COMPLAINT FOR DAMAGES AND OTHER APPROPRIATE RELIEF

15

ss. By an email to plaintiff on November 12, 2015 entitled, "Are you in today?," Mr. Malman stated that there was a "Finance Emergency training this morning and I don't see you." This meeting was not a mandatory meeting and had been placed by Mr. Malman on plaintiff's calendar while she was on vacation. She was simply unaware of it. In any event, several affected employees did not attend.

tt. Mr. Malman scheduled a meeting with plaintiff to be held on November 18, 2015, in the conference room. Mr. Malman did not inform plaintiff as to the nature of this meeting. When plaintiff arrived at work on November 18, 2015, Mr. Malman immediately took her to the conference room, handed her a letter of termination dated November 18, 2015, and stated that she was being terminated. The termination letter stated the following grounds for plaintiff's termination:

> Your employment is being terminated as your performance as a business finance analyst has not met PG&E's expectations. We provided you with notice as of October 7th of your performance issues, and we did not see the expected level of improvement.

Plaintiff was terminated effective immediately. Mr. Malman took plaintiff's laptop computer and her employee identification badge. Plaintiff then left the building.

12. At all times pertinent herein, plaintiff satisfactorily performed the duties of her position.

### FIRST CAUSE OF ACTION AGAINST DEFENDANT PG&E
(Retaliation in Violation of Labor Code §1102.5(b))

13. Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation of paragraphs 1 through 12, inclusive, of this complaint

14. Plaintiff is an "employee" within the meaning of Labor Code §1106 and for the purposes of Labor Code §1102.5(b).

15. Defendant PG&E is an "employer" for the purposes of Labor Code §1102.5(b) and is not immune to liability under Labor Code §1102.5(b).

16. Pursuant to Labor Code §1104, defendant PG&E is responsible for the acts of its managers, officers, agents, and employees in violation of Labor Code §1102.5(b).

17. Defendant PG&E believed that plaintiff disclosed or might disclose information to a

COMPLAINT FOR DAMAGES AND OTHER APPROPRIATE RELIEF

16

1 government or law enforcement agency, to a person with authority over plaintiff or to another
2 employee who had the authority to investigate, discover, or correct defendant's violation of a state
3 or federal statute, or violation of or noncompliance with a local, state or federal rule or regulation
4 regarding the participation of PG&E's employees in illegal and fraudulent financial activities.

5        18.    Plaintiff FENEIS made protected disclosures of information which included the
6 following: (1) in or about the third week of June 2015, plaintiff provided an analysis to Gregory J.
7 Malman, Supervisor, Business Finance, which disclosed that certain employees had made excessive
8 expenditures and expenditures for personal, non-work-related items; (2) plaintiff's July 8, 2015
9 disclosure to Mr. Malman, Technology Supervisor Caroline Veys, and Senior Manager Khaled Fustok
10 of suspicious purchases by Business Analyst Nahida Bahir; (3) plaintiff's August 19, 2015 verbal
11 disclosure to Mr. Malman and Senior Manager Morgan Uptergrove of improper billing practices and
12 apparent theft; (4) plaintiff's August 24, 2015 disclosure to Principal Internal Auditor James Moore
13 that employees were making unauthorized purchases with their company credit cards; (5) plaintiff's
14 disclosure on August 27, 2015 to Principal Internal Auditor Larissa Ionin of employees' excessive and
15 improper expenditures; (6) plaintiff's several disclosures to Ms. Ionin on September 10, 2015, which
16 included her prior disclosures to Mr. Malman, facts supporting that Ms. Veys and Mr. Fustok had
17 participated in the misconduct of Ms. Bahir, and that Ms. Bahir had illegally purchased the Signavio
18 Software licensing; (7) plaintiff's disclosures to Ms. Ionin in or about mid-September 2015, of
19 perceived financial misconduct by Senior Manager Amy Barsnick, Supervisor Jesse Jennings, and the
20 Adecco contract workers, and of irregularities in certain technology accounts payable wire payments
21 from employees whom plaintiff had not yet identified; (8) plaintiff's disclosures of financial
22 improprieties to Ms. Ionin on September 17 and 18, 2015; (9) plaintiff's disclosure to Principal
23 Internal Auditor James Moore on or about September 18, 2015, of the reports she had disclosed to
24 Ms. Ionin on September 17 and 18, 2015; (10) plaintiff's several disclosures concerning PG&E's
25 expenditures for LinkSource computer software, including plaintiff's email to Business Finance
26 Analyst Kristen Dean on September 25, 2015; (11) plaintiff's disclosure to Ms. Ionin on October 1,
27 2015, that Mr. Malman had threatened her with termination for her disclosures of financial
28 misconduct; (12) plaintiff's disclosure to Mr. Moore on October 1, 2015, that Mr. Malman had

COMPLAINT FOR DAMAGES AND OTHER APPROPRIATE RELIEF
17

1  threatened her with termination for her disclosures of financial misconduct; (13) plaintiff's disclosures
2  in her whistleblower complaint filed with the U.S. Occupational Safety and Health Administration on
3  October 1, 2015; (14) plaintiff's disclosures in her whistleblower complaint filed with the U.S.
4  Securities and Exchange Commission on October 1, 2015; (15) the internal ethics and compliance
5  complaint filed by Ms. Ionin on plaintiff's behalf on October 1, 2015, alleging retaliation against
6  plaintiff; (16) plaintiff's disclosures to Mr. Moore on October 8, 2015, of Mr. Malman's continuing
7  retaliation against her; (17) plaintiff's disclosures to Jeannie Hermosa, HR Representative, on October
8  19, 2015 and thereafter regarding Mr. Malman's retaliatory treatment of her; and (18) plaintiff's
9  disclosures on October 21, 2015, to Supply Chain Administrator Corey Lee of the extraordinary
10 expenditures made for LinkSource computer software and the absence of the required underlying
11 master service agreements for LinkSource.

12      19.    Plaintiff had reasonable cause to believe that the information she disclosed to defendant
13 PG&E disclosed a violation of state or federal statute, or a violation or noncompliance with a local,
14 state, or federal rule or regulation, including but not limited to: (1) California Business and
15 Professions Code §17200, proscribing unlawful, unfair or fraudulent business acts or practices; (2)
16 California Civil Code §§1709-1710, proscribing fraudulent misrepresentations; (3) California Penal
17 Code §484, proscribing theft; (4) California Penal Code §487, proscribing grand theft; (5) California
18 Penal Code §§503-504, proscribing embezzlement; (6) 17 U.S.C. §1201, proscribing circumvention
19 of copyright protection systems; (7) 18 U.S.C. §1341, proscribing mail fraud; (8) 18 U.S.C. §1343,
20 proscribing wire fraud; and (9) the Sarbanes-Oxley Act of 2002, codified and amended at 15 U.S.C.
21 §7201 *et seq.*, mandating strict reforms to improve financial disclosures from corporations and prevent
22 accounting fraud.

23      20.    As set forth above, defendant PG&E subjected plaintiff to adverse employment actions
24 and otherwise engaged in conduct that, taken as a whole, materially and adversely affected the terms
25 and conditions of plaintiff's employment. These adverse actions included, but are not limited to, the
26 following.

27          a.    Defendant PG&E failed and refused to promote plaintiff despite PG&E's
28 promise that plaintiff would be quickly promoted due to her qualifications which exceeded even the

COMPLAINT FOR DAMAGES AND OTHER APPROPRIATE RELIEF
18

1    desired qualifications stated for her position.

2              b.     Commencing in or about the week of September 14, 2015, immediately
3    following plaintiff's disclosures concerning the financial misconduct of Senior Manager Amy Barsnick
4    and Supervisor Jesse Jennings, and continuing thereafter, defendant PG&E's managers subjected
5    plaintiff to outright hostility, isolation and ostracism.

6              c.     Commencing in or about October 2015 and continuing thereafter, Mr. Malman
7    conducted one-on-one meetings with plaintiff three to four times per week for an hour or more each
8    wherein he was overtly hostile to her and berated and criticized her throughout without justification.

9              d.     In a one-on-one meeting with plaintiff on October 1, 2015, Mr. Malman
10   threatened plaintiff with termination.

11             e.     In a meeting on October 7, 2015, Mr. Malman placed plaintiff on an
12   unwarranted 30-day Performance Improvement Plan ("PIP"), and threatened that she would be
13   terminated for "poor performance" if she did not satisfy his standards.

14             f.     On October 7, 2015, Mr. Malman emailed plaintiff a written PIP document,
15   dated October 5, 2015, which enumerated three areas for improvement and emphasized that if plaintiff
16   did not show "meaningful progress" *during* the 30-day period, "[she would] be subject to immediate
17   termination." Moreover, this document suggested that there might be "non-work related issues" that
18   were "impacting" plaintiff's performance and proposed that she seek the assistance of PG&E's
19   Employee Assistance Program ("EAP"), falsely implying that plaintiff suffered from some drug
20   addiction or had mental health issues.

21             g.     Following his imposition of the 30-day PIP, Mr. Malman became even more
22   hostile and tyrannical toward plaintiff. For example, on October 8, 2015, Mr. Malman publicly
23   berated plaintiff at her desk for 70 minutes in the presence of employees and managers. Mr. Malman
24   also sought to compel plaintiff to cancel her upcoming vacation which had been previously scheduled
25   for the period of November 2 through 9, 2015.

26             h.     On October 19, 2015, defendant PG&E posted plaintiff's position even though
27   she was only 12 days into the 30-day PIP period.

28             i.     During a 50-minute telephone conversation on October 21, 2015, which was

COMPLAINT FOR DAMAGES AND OTHER APPROPRIATE RELIEF

Mr. Malman's fourth one-on-one discussion with plaintiff during that week, Mr. Malman insulted and belittled her (e.g., plaintiff "can't process asking a question and write at the same time"; although other employees "catch on," plaintiff "just [doesn't] get it and [seems] to fall apart"), and asserted that her colleagues shared his disdain for her.

        j.     By an email to plaintiff dated October 21, 2015, Mr. Malman purported to summarize his telephone conversation with plaintiff earlier that day. Mr. Malman stated therein that although plaintiff had "satisfactorily completed a handful of deliverables," he did not believe that she had "made noticeable progress on developing the competencies outlined in [her] 30 day notice letter." His criticisms of plaintiff's performance were unwarranted, including his accusation that her absence from the monthly Technology Portfolio Review meeting on October 19, 2015 was unjustified.

        k.     On November 12, 2015, the day plaintiff returned to work from her vacation, Mr. Malman harassed plaintiff for her absence from a Finance Emergency training meeting even though attendance at this meeting was not mandatory and plaintiff had not known about the meeting because he had placed it on plaintiff's calendar while she was out of the office on vacation.

        l.     On November 18, 2015, defendant PG&E terminated plaintiff, effective immediately, for her purported failure to improve her performance pursuant to the October 7, 2015 PIP.

21.    Plaintiff's disclosure of information was a contributing factor in defendant PG&E's decision to terminate her effective November 18, 2015, and in defendant's other adverse actions against plaintiff, as described above.

22.    Plaintiff was harmed by defendant PG&E's conduct.

23.    Defendant PG&E's conduct was a substantial factor in causing plaintiff's harm.

24.    As a direct and proximate result of defendant's conduct, plaintiff has suffered lost and future wages, benefits and other valuable incidents to employment, and severe pain and suffering, all to plaintiff's damage in an amount to be ascertained at trial. Plaintiff claims the aforesaid amounts as damages together with prejudgment interest pursuant to Civil Code §3287 and/or any other provision of law allowing for prejudgment interest.

25.    Defendant committed the acts alleged herein maliciously, fraudulently and oppressively

COMPLAINT FOR DAMAGES AND OTHER APPROPRIATE RELIEF

20

1 with the wrongful intention of injuring plaintiff, and from an improper and evil motive amounting to
2 malice and conscious disregard for plaintiff's rights. Plaintiff is thus entitled to recover punitive
3 damages from defendant in an amount to be ascertained at trial.

4 <center>SECOND CAUSE OF ACTION AGAINST DEFENDANT PG&E</center>
<center>(Age Discrimination in Violation of the FEHA)</center>
5

6      26.     Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation
7 of paragraphs 1 through 12, inclusive, of this complaint.

8      27.     Defendant PG&E was at all times relevant herein an "employer" within the meaning
9 of the California Fair Employment and Housing Act ("FEHA"), Government Code §12900 *et seq*.

10      28.     Plaintiff was an employee of defendant PG&E.

11      29.     Throughout the course of her employment with defendant PG&E, plaintiff was the
12 oldest non-managerial employee out of the approximately 30 employees who worked in defendant's
13 Business Finance Gas Operations. The vast majority of employees in Business Finance Gas
14 Operations were in their twenties. Plaintiff's direct supervisor, Gregory J. Malman, Supervisor,
15 Business Finance, was in his late twenties.

16      30.     Defendant PG&E subjected plaintiff to adverse employment actions, as follows.

17           a.     Defendant PG&E failed and refused to promote plaintiff despite PG&E's
18 promise that plaintiff would be quickly promoted due to her qualifications which exceeded even the
19 desired qualifications stated for her position and despite her 2015 mid-year performance appraisal,
20 received in or about August 2015, wherein she was rated better than satisfactory in that she was
21 respectively rated, in the jargon of PG&E, as "Target" and "Successful" in her "Overall Goals" and
22 "Overall Competencies." In or about October 2015, defendant promoted Brian Diemer, an Analyst
23 in Business Finance Gas Operations, to the position of Senior Financial Analyst even though he had
24 been employed with defendant for less than one year and plaintiff possessed substantially greater
25 qualifications than he did. Mr. Diemer was in his mid-twenties and substantially younger than
26 plaintiff.

27           b.     Commencing in or about the week of September 14, 2015, and continuing
28 thereafter, defendant PG&E's managers subjected plaintiff to outright hostility, isolation and

COMPLAINT FOR DAMAGES AND OTHER APPROPRIATE RELIEF

1    ostracism.

2          c.    Commencing in or about October 2015 and continuing thereafter, Mr. Malman
3    conducted one-on-one meetings with plaintiff three to four times per week for an hour or more each
4    wherein he was overtly hostile to her and berated and criticized her throughout without justification.
5    Mr. Malman did not subject younger employees to such conduct.

6          d.    In a one-on-one meeting with plaintiff on October 1, 2015, Mr. Malman
7    threatened plaintiff with termination.

8          e.    In a meeting on October 7, 2015, Mr. Malman placed plaintiff on an
9    unwarranted 30-day Performance Improvement Plan ("PIP"), and threatened that she would be
10   terminated for "poor performance" if she did not satisfy his standards.

11         f.    On October 7, 2015, Mr. Malman emailed plaintiff a written PIP document,
12   dated October 5, 2015, which enumerated three areas for improvement and emphasized that if plaintiff
13   did not show "meaningful progress" *during* the 30-day period, "[she would] be subject to immediate
14   termination." Moreover, this document suggested that there might be "non-work related issues" that
15   were "impacting" plaintiff's performance and proposed that she seek the assistance of PG&E's
16   Employee Assistance Program ("EAP"), falsely implying that plaintiff suffered from some drug
17   addiction or had mental health issues.

18         g.    Following his imposition of the 30-day PIP, Mr. Malman became even more
19   hostile and tyrannical toward plaintiff. For example, on October 8, 2015, Mr. Malman publicly
20   berated plaintiff at her desk for 70 minutes in the presence of employees and managers. Mr. Malman
21   also sought to compel plaintiff to cancel her upcoming vacation which had been previously scheduled
22   for the period of November 2 through 9, 2015.

23         h.    On October 19, 2015, defendant PG&E posted plaintiff's position even though
24   she was only 12 days into the 30-day PIP period.

25         i.    During a 50-minute telephone conversation on October 21, 2015, which was
26   Mr. Malman's fourth one-on-one discussion with plaintiff during that week, Mr. Malman insulted
27   and belittled her (e.g., plaintiff "can't process asking a question and write at the same time"; although
28   other employees "catch on," plaintiff "just [doesn't] get it and [seems] to fall apart"), and asserted

1 | that her colleagues shared his disdain for her.

2 |         j.     By an email to plaintiff dated October 21, 2015, Mr. Malman purported to
3 | summarize his telephone conversation with plaintiff earlier that day. Mr. Malman stated therein that
4 | although plaintiff had "satisfactorily completed a handful of deliverables," he did not believe that she
5 | had "made noticeable progress on developing the competencies outlined in [her] 30 day notice letter."
6 | His criticisms of plaintiff's performance were unwarranted, including his accusation that her absence
7 | from the monthly Technology Portfolio Review meeting on October 19, 2015 was unjustified.

8 |         k.     On November 12, 2015, the day plaintiff returned to work from her vacation,
9 | Mr. Malman harassed plaintiff for her absence from a Finance Emergency training meeting even
10 | though attendance at this meeting was not mandatory and plaintiff had not known about the meeting
11 | because he had placed it on plaintiff's calendar while she was out of the office on vacation.

12 |         l.     On November 18, 2015, defendant PG&E terminated plaintiff, effective
13 | immediately, for her purported failure to improve her performance pursuant to the October 7, 2015
14 | PIP.

15 |      31.     Plaintiff was age 40 or older at the time of her termination and the other adverse
16 | employment actions alleged above.

17 |      32.     At the time of the aforementioned adverse actions plaintiff was satisfactorily performing
18 | in her position.

19 |      33.     Plaintiff's age was a substantial motivating reason for the aforementioned adverse
20 | employment actions.

21 |      34.     Defendant PG&E's conduct as alleged above constitutes intentional age discrimination
22 | in violation of Government Code §12940(a).

23 |      35.     Plaintiff was harmed by defendant's conduct.

24 |      36.     Defendant's conduct was a substantial factor in causing plaintiff's harm.

25 |      37.     As a direct and proximate result of defendant's conduct, plaintiff has suffered lost and
26 | future wages, benefits and other valuable incidents to employment, and severe pain and suffering, all
27 | to plaintiff's damage in an amount to be ascertained at trial. Plaintiff claims the aforesaid amounts
28 | as damages together with prejudgment interest pursuant to Civil Code §3287 and/or any other

COMPLAINT FOR DAMAGES AND OTHER APPROPRIATE RELIEF

23

1 | provision of law allowing for prejudgment interest.

2 | 38. Defendant committed the acts alleged herein maliciously, fraudulently and oppressively
3 | with the wrongful intention of injuring plaintiff, and from an improper and evil motive amounting to
4 | malice and conscious disregard for plaintiff's rights. Plaintiff is thus entitled to recover punitive
5 | damages from defendant in an amount to be ascertained at trial.

6 | <div align="center">THIRD CAUSE OF ACTION AGAINST DEFENDANT PG&E<br>(Sex Discrimination in Violation of the FEHA)</div>

8 | 39. Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation
9 | of paragraphs 1 through 12, inclusive, of this complaint.

10 | 40. Plaintiff is a female and was, throughout her employment with defendant PG&E, the
11 | mother of three young children.

12 | 41. Defendant PG&E was at all times relevant herein an "employer" within the meaning
13 | of the California Fair Employment and Housing Act ("FEHA"), Government Code §12900 et seq.

14 | 42. Plaintiff was an employee of defendant PG&E.

15 | 43. Throughout the course of her employment with defendant PG&E, plaintiff was one of
16 | the few female employees in defendant PG&E's Business Finance Gas Operations who had young
17 | children. Plaintiff's direct supervisor, Gregory J. Malman, Supervisor, Business Finance, was in his
18 | late twenties and did not have any children.

19 | 44. Defendant PG&E subjected plaintiff to adverse employment actions, as follows.

20 | a. Defendant PG&E failed and refused to promote plaintiff despite PG&E's
21 | promise that plaintiff would be quickly promoted due to her qualifications which exceeded even the
22 | desired qualifications stated for her position and despite her 2015 mid-year performance appraisal,
23 | received on or about August 12, 2015, wherein she was rated better than satisfactory in that she was
24 | respectively rated, in the jargon of PG&E, as "Target" and "Successful" in her "Overall Goals" and
25 | "Overall Competencies." In or about October 2015, defendant promoted Brian Diemer, an Analyst
26 | in Business Finance Gas Operations, to the position of Senior Financial Analyst even though he had
27 | been employed with defendant for less than one year and plaintiff possessed substantially greater
28 | qualifications than he did. Mr. Diemer was in his mid-twenties and did not have any children.

COMPLAINT FOR DAMAGES AND OTHER APPROPRIATE RELIEF

24

b. Mr. Malman was the primary coordinator of all team-building exercises for PG&E's Business Finance Gas Operations which predominantly consisted of stereotypical male activities such as sporting events and go kart racing. Mr. Malman required plaintiff to attend these activities. However, during these activities plaintiff was excluded and ostracized by Mr. Malman and the male employees.

c. On those occasions when plaintiff was unexpectedly required to leave the workplace to attend to a family emergency involving one of her children who was sick or injured, Mr. Malman became irate and condescending toward plaintiff and publicly rebuked her for her absence. To plaintiff's knowledge, Mr. Malman did not similarly treat employees without children when they were required to be absent from the workplace.

d. Commencing in or about the week of September 14, 2015, and continuing thereafter, defendant PG&E's managers subjected plaintiff to outright hostility, isolation and ostracism.

e. Commencing in or about October 2015 and continuing thereafter, Mr. Malman conducted one-on-one meetings with plaintiff three to four times per week for an hour or more each wherein he was overtly hostile to her and berated and criticized her throughout without justification. Mr. Malman did not subject male employees to such conduct nor did he subject female employees who did not have children to such conduct.

f. In a one-on-one meeting with plaintiff on October 1, 2015, Mr. Malman threatened plaintiff with termination.

g. In a meeting on October 7, 2015, Mr. Malman placed plaintiff on an unwarranted 30-day Performance Improvement Plan ("PIP"), and threatened that she would be terminated for "poor performance" if she did not satisfy his standards.

h. On October 7, 2015, Mr. Malman emailed plaintiff a written PIP document, dated October 5, 2015, which enumerated three areas for improvement and emphasized that if plaintiff did not show "meaningful progress" *during* the 30-day period, "[she would] be subject to immediate termination." Moreover, this document suggested that there might be "non-work related issues" that were "impacting" plaintiff's performance and proposed that she seek the assistance of PG&E's

Case: 19-30088    Doc# 5207-4    Filed: 12/26/19    Entered: 12/26/19 16:55:40    Page 29
of 38

Employee Assistance Program ("EAP"), falsely implying that plaintiff suffered from some drug addiction or had mental health issues.

i.      Following his imposition of the 30-day PIP, Mr. Malman became even more hostile and tyrannical toward plaintiff. For example, on October 8, 2015, Mr. Malman publicly berated plaintiff at her desk for 70 minutes in the presence of employees and managers. Mr. Malman also sought to compel plaintiff to cancel her upcoming vacation which had been previously scheduled for the period of November 2 through 9, 2015.

j.      On October 19, 2015, defendant PG&E posted plaintiff's position even though she was only 12 days into the 30-day PIP period.

k.      During a 50-minute telephone conversation on October 21, 2015, which was Mr. Malman's fourth one-on-one discussion with plaintiff during that week, Mr. Malman insulted and belittled her (e.g., plaintiff "can't process asking a question and write at the same time"; although other employees "catch on," plaintiff "just [doesn't] get it and [seems] to fall apart"), and asserted that her colleagues shared his disdain for her.

l.      By an email to plaintiff dated October 21, 2015, Mr. Malman purported to summarize his telephone conversation with plaintiff earlier that day. Mr. Malman stated therein that although plaintiff had "satisfactorily completed a handful of deliverables," he did not believe that she had "made noticeable progress on developing the competencies outlined in [her] 30 day notice letter." His criticisms of plaintiff's performance were unwarranted, including his accusation that her absence from the monthly Technology Portfolio Review meeting on October 19, 2015 was unjustified.

m.      On November 12, 2015, the day plaintiff returned to work from her vacation, Mr. Malman harassed plaintiff for her absence from a Finance Emergency training meeting even though attendance at this meeting was not mandatory and plaintiff had not known about the meeting because he had placed it on plaintiff's calendar while she was out of the office on vacation.

n.      On November 18, 2015, defendant PG&E terminated plaintiff, effective immediately, for her purported failure to improve her performance pursuant to the October 7, 2015 PIP.

45.    At the time of the aforementioned adverse actions plaintiff was satisfactorily performing

COMPLAINT FOR DAMAGES AND OTHER APPROPRIATE RELIEF

1  in her position.

2      46.   Plaintiff's gender, female, and/or her status as the mother of young children was a

3  substantial motivating reason for the aforementioned adverse employment actions.

4      47.   Defendant PG&E's conduct as alleged above constitutes intentional sex discrimination

5  in violation of Government Code §12940(a).

6      48.   Plaintiff was harmed by defendant's conduct.

7      49.   Defendant's conduct was a substantial factor in causing plaintiff's harm.

8      50.   As a direct and proximate result of defendant's conduct, plaintiff has suffered lost and

9  future wages, benefits and other valuable incidents to employment, and severe pain and suffering, all

10  to plaintiff's damage in an amount to be ascertained at trial.  Plaintiff claims the aforesaid amounts

11  as damages together with prejudgment interest pursuant to Civil Code §3287 and/or any other

12  provision of law allowing for prejudgment interest.

13      51.   Defendant committed the acts alleged herein maliciously, fraudulently and oppressively

14  with the wrongful intention of injuring plaintiff, and from an improper and evil motive amounting to

15  malice and conscious disregard for plaintiff's rights.  Plaintiff is thus entitled to recover punitive

16  damages from defendant in an amount to be ascertained at trial.

17              FOURTH CAUSE OF ACTION AGAINST DEFENDANT PG&E
               (Wrongful Termination in Violation of Public Policy)
18

19      52.   Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation

20  of paragraphs 1 through 12, 17 through 21, 27 through 34, and 40 through 47, inclusive, of this

21  complaint.

22      53.   Plaintiff was employed by defendant PG&E.

23      54.   Defendant PG&E discharged plaintiff effective November 18, 2015.

24      55.   Plaintiff's disclosures regarding the participation of defendant PG&E's employees in

25  illegal and fraudulent financial activities, plaintiff's age, plaintiff's gender and/or plaintiff's

26  motherhood was a substantial motivating reason for plaintiff's discharge.  Defendant PG&E's

27  discharge of plaintiff violated fundamental, substantial and well-established public policies that are

28  delineated or embodied in statutes of the United States and the state of California and that benefit the

COMPLAINT FOR DAMAGES AND OTHER APPROPRIATE RELIEF

27

public at large rather than private interests. Said public policies are set forth in: (1) California Labor Code §1102.5(b), proscribing retaliation for disclosing information to a government agency or law enforcement agency, to a person with authority over plaintiff or to another employee who had the authority to investigate, discover, or correct defendant's violation of statute or regulation where the employee has reasonable cause to believe that the information discloses a violation of statute or regulation; (2) the California Fair Employment and Housing Act ("FEHA"), Government Code §12900 *et seq.*, proscribing discrimination in employment on the basis of age, gender and motherhood (California Government Code §12940(a)); (3) Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000e *et seq.*, proscribing discrimination in employment on the basis of sex; (4) the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§621-634 ("ADEA"), proscribing employment discrimination on the basis of age; and (5) California Business and Professions Code §17200, proscribing fraudulent business activities.

56.     Defendant PG&E's discharge of plaintiff caused plaintiff harm.

57.     As a direct and proximate result of defendant's conduct, plaintiff has suffered lost and future wages, benefits and other valuable incidents to employment, and severe pain and suffering, all to plaintiff's damage in an amount to be ascertained at trial. Plaintiff claims the aforesaid amounts as damages together with prejudgment interest pursuant to Civil Code §3287 and/or any other provision of law allowing for prejudgment interest.

58.     Defendant committed the acts alleged herein maliciously, fraudulently and oppressively with the wrongful intention of injuring plaintiff, and from an improper and evil motive amounting to malice and conscious disregard for plaintiff's rights. Plaintiff is thus entitled to recover punitive damages from defendant in an amount to be ascertained at trial.

<div align="center">REQUEST FOR JURY TRIAL</div>

59.     Plaintiff requests a trial by jury.

<div align="center">PRAYER FOR RELIEF</div>

WHEREFORE, plaintiff prays for judgment as follows:

1.     For a permanent injunction restraining defendant from further unlawful conduct;

2.     For damages for lost and future wages, benefits and other compensation in an amount

COMPLAINT FOR DAMAGES AND OTHER APPROPRIATE RELIEF

1 | exceeding Twenty-Five Thousand Dollars ($25,000.00), such an amount to be proven at trial;

2 |     3.     For special and consequential damages in an amount to be proven at trial;

3 |     4.     For punitive damages against defendant PG&E on the First, Second, Third and Fourth

4 | Causes of Action;

5 |     5.     For prejudgment interest according to law, including, but not limited to, Civil Code

6 | §3287;

7 |     6.     For costs and reasonable attorney's fees; and

8 |     7.     For such other and further relief as the court deems just and proper.

9 |                           HOROWITZ & RUBINOFF

10 |

11 | Dated: June 30 , 2017         By_____

12 |                           STEPHANIE RUBINOFF
                          Attorneys for Plaintiff
                          CARA FENEIS

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

COMPLAINT FOR DAMAGES AND OTHER APPROPRIATE RELIEF

# COMPLAINT OF EMPLOYMENT DISCRIMINATION

## BEFORE THE STATE OF CALIFORNIA

## DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING
### Under the California Fair Employment and Housing Act
### (Gov. Code, § 12900 et seq.)

In the Matter of the Complaint of         DFEH No. 134219-260241
Cara Feneis, Complainant.
1190 Beethoven Common #308
Fremont, California 94538

vs.

PGandE, Respondent.
77 Beale Street
San Francisco, California 94105

Complainant alleges:

1. Respondent **PGandE** is a subject to suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.). Complainant believes respondent is subject to the FEHA.

2. On or around **November 18, 2015**, complainant alleges that respondent took the following adverse actions against complainant: **Discrimination, Harassment, Retaliation Terminated,** . Complainant believes respondent committed these actions because of their: **Age - 40 and over, Family Care or Medical Leave, Sex - Gender, Other Disparate Impact and treatment based on age.**.

3. Complainant **Cara Feneis** resides in the City of **Fremont**, State of **California**. If complaint includes co-respondents please see below.

*Complaint ± DFEH No. 134219-260241*

Date Filed: November 17, 2016

**ATTACHMENT A**

**Additional Complaint Details:**

Ms. Feneis was discriminated and eventually terminated by her employer, PGandE, due to her age, gender and family status. Ms. Feneis also suffered disparate impact and treatment in being terminated due to her age.

Ms. Feneis is 48 years old and was the oldest non-managerial employee out of approximately 30 employees who worked PGandEs Business Finance Operations. The vast majority of employees in this department was in their twenties. The other two older employees were hi-level Principles who generally worked remotely. Ms. Feneis was also one of the few female employees at PGandEs Business Finance Operations, and she was one of the few employees who had children.

In the first few months of Ms. Feneis employment, Ms. Feneis was rated better than satisfactory in that she was respectively rated, in the jargon of PGandE, as Target and Successful in her Overall Goals and Overall Competencies on a mid-year performance appraisal for the period of April through June 2015.

However, after this appraisal, Ms. Feneis began to feel a shift in managements treatment of her from resistance to outright hostility and isolation despite her successful performance. Ms. Feneis believes this conduct was, in part,due to her gender, age and family status.

Her immediate supervisor, Greg Malman, was in his late-twenties and did not have any children. Mr. Malman was responsible for coordinating all the team-building exercises for the PGandE Business Finance Operations and required Ms. Feneis to attend male-dominating activities, such as sporting events, go-karting and the like. During these events, Ms. Feneis seemed to be generally excluded by Mr. Malman and the male employees particularly because she did not drink shots or beers or talk sports like one of the guys.

Ms. Feneis is the mother of three young children. Throughout her employment, Ms. Feneis would have unexpected family care emergencies wherein she would have to leave the office to pick up her sick or injured children early from school or the like. Whenever these situations would occur, Mr. Malman began to be irate, condescending and rebuke Ms. Feneis for her absence. Ms. Feneis believes that no other employee was subject to this type of treatment by Mr. Malman as the vast majority of the handful of females did not have children and were all in their mid-twenties.

In contrast, during the same time, another male analyst who had been with PGandE for less than a year in his mid-twenties was promoted even though Ms. Feneis possessed substantially greater qualifications than the stated minimum and even the stated-desired

*Complaint ±DFEH No. 134219-260241*

Date Filed: November 17, 2016

DFEH 802-1

qualifications and despite PGandEs initial promises that she would be quickly promoted during her interview process due to her qualifications.

Beginning in October 2015, Mr. Malman conducted one-one meeting three to four times per week for an hour or more each as a vehicle for him to rant at and harass Ms. Feneis despite having no previous performance issues. No other employee of Mr. Malman suffered from the same conduct and Malman appeared to target her as one of the oldest employee on the team. By November 2015, Mr. Malmans treatment of Ms. Feneis worsened without cause as he became increasingly tyrannical towards her, intensifying his harassment to needle, nitpick, intimidate, and berate Ms. Feneis. On November 18, 2015, Ms. Feneis was terminated on ostensibly claiming that her performance as a business finance analyst has not met PGandEs expectations. This was not true because Ms. Feneis performed well at her job.

*Complaint ± DFEH No. 134219-260241*

Date Filed: November 17, 2016

DFEH 902-1

VERIFICATION

I, **Yosef Peretz**, am the Attorney for Complainant in the above-entitled complaint.   I have read the foregoing complaint and know the contents thereof.  The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe it to be true.

On November 17, 2016, I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

                                                                     San Francisco, CA
                                                                     **Yosef Peretz**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

DFEH 903-1

-8-

*Complaint ±DFEH No. 134219-260241*

Date Filed: November 17, 2016

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**
2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
800-884-1684 | TDD 800-700-2320
www.dfeh.ca.gov | email: contact.center@dfeh.ca.gov

GOVERNOR EDMUND G. BROWN JR.

DIRECTOR KEVIN KISH

November 17, 2016

Cara Feneis
1190 Beethoven Common #308
Fremont, California 94538

RE: **Notice of Case Closure and Right to Sue**
DFEH Matter Number: 134219-260241
Right to Sue: Feneis / PGandE

Dear Cara Feneis,

This letter informs you that the above-referenced complaint was filed with the Department of Fair
Employment and Housing (DFEH) has been closed effective November 17, 2016 because an immediate
Right to Sue notice was requested. DFEH will take no further action on the complaint.

This letter is also your Right to Sue notice. According to Government Code section 12965, subdivision
(b), a civil action may be brought under the provisions of the Fair Employment and Housing Act against
the person, employer, labor organization or employment agency named in the above-referenced
complaint. The civil action must be filed within one year from the date of this letter.

To obtain a federal Right to Sue notice, you must visit the U.S. Equal Employment Opportunity
Commission (EEOC) to file a complaint within 30 days of receipt of this DFEH Notice of Case Closure
or within 300 days of the alleged discriminatory act, whichever is earlier.

Sincerely,

Department of Fair Employment and Housing

**ATTACHMENT B**