AKIN GUMP STRAUSS HAUER & FELD LLP

Michael S. Stamer (*pro hac vice*)
Ira S. Dizengoff (*pro hac vice*)
David H. Botter (*pro hac vice*)
Abid Qureshi (*pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Email: mstamer@akingump.com
idizengoff@akingump.com
dbotter@akingump.com
aqureshi@akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP

Ashley Vinson Crawford (SBN 257246)
580 California Street
Suite 1500
San Francisco, CA 94104
Telephone: (415) 765-9500
Facsimile: (415) 765-9501
Email: avcrawford@akingump.com

*Counsel to the Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>-and-<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>*All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | Bankruptcy Case No. 19-30088 (DM)<br><br>Chapter 11<br><br>(Lead Case)<br><br>(Jointly Administered)<br><br>**MOTION OF THE AD HOC COMMITTEE OF SENIOR UNSECURED NOTEHOLDERS FOR RECONSIDERATION AND RELIEF FROM ORDERS PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 59(e) AND 60(b)**<br><br><u>Hearing</u><br>Date: January 21, 2020<br>Time: 10:00 a.m. (Pacific Time)<br>Place: Courtroom 17<br>      450 Golden Gate Ave, 16th Floor<br>      San Francisco, CA 94102<br><br><u>**Objection Deadline**</u>: January 14, 2020 |

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND .................................................................................................................2

ARGUMENT .......................................................................................................................8

    A.    Legal Standard. ..................................................................................................8

    B.    In Light of New Factual Developments, the Court Should Reconsider its Rulings on the Anticompetitive Provisions in the TCC RSA and Subro RSA. ..........................................................9

        1.    The Anticompetitive Provisions in the TCC RSA Should Be Removed. ................................................................................9

        2.    The Anticompetitive Provisions in the Subro RSA Should be Removed. ...............................................................................11

CONCLUSION ..................................................................................................................12

# TABLE OF AUTHORITIES

**Cases**                                                **Page(s)**

*City of L.A., Harbor Div. v. Santa Monica Baykeeper*,
    254 F.3d 882 (9th Cir. 2001) ............................................................................... 8, 11

*In re Kr*ow,
    No. BR 12-31601DM, 2016 WL 4167966 (Bankr. N.D. Cal. Aug. 4, 2016) ......................... 8

*McDowell v. Calderon*,
    197 F.3d 1253 (9th Cir. 1999) ................................................................................... 8

*Reynoso v. All Power Mfg. Co.*,
    No. SACV 16-1037 JVS (JCGx), 2018 WL 5906645 (C.D. Cal. Apr. 30, 2018) ............. 8, 11

*Sch. Dist. No. 1J, Multnomah Cty., Or. v. ACandS, Inc.*,
    5 F.3d 1255 (9th Cir. 1993) ....................................................................................... 8

*Sierra Club v. City & Cnty. of Honolulu*,
    No. CV 04-00463 DAE-BMK, 2008 WL 515963 (D. Haw. Feb. 26, 2008) ................... 8, 11

**Statutes and Rules**

Fed. R. Bankr. P. 9023 ................................................................................................ 8

Fed. R. Bankr. P. 9024 ................................................................................................ 8

Fed. R. Civ. P. 59 ....................................................................................................... 8

Fed. R. Civ. P. 60 ....................................................................................................... 8

**Other Authorities**

11 Charles Alan Wright et al., Federal Practice and Procedure § 2810.1 (2d ed. 1995) ……….. 8

1. The Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company (the "AHC") by its undersigned counsel, Akin Gump Strauss Hauer & Feld LLP, hereby submits this motion (the "Motion") pursuant to Federal Rules of Civil Procedure 59 and 60, as incorporated by Federal Rules of Bankruptcy Procedure 9023 and 9024, for an order (i) vacating the orders granting the TCC RSA Motion [Dkt. No. 5174] and the Subro RSA Motion [Dkt. No. 5173] (as defined below) in their entirety or, in the alternative, (ii) vacating the orders and conditioning approval of the applicable restructuring support agreements on removal of the anticompetitive provisions contained therein.

**PRELIMINARY STATEMENT**

2. All major constituents in these chapter 11 cases agree that the full, prompt, and fair payment of wildfire victims' claims is paramount. To promote that goal, this Court terminated exclusivity and allowed for a competing plan process. Such a process was, and still is, critical to facilitating the best possible outcome for wildfire victims.

3. The competing plan process triggered by the termination of exclusivity has worked as intended, providing significant benefits to the wildfire victims. After this Court terminated exclusivity, the AHC and TCC put forth a competing plan that guaranteed the wildfire victims $13.5 billion. At the time, this settlement far exceeded the $8.4 billion sum to be paid to wildfire victims under the Debtor plan. Eventually, faced with the impending Tubbs trial and estimation hearings, which were highly likely to result in substantial wildfire claims, the Debtors and equity holders finally and begrudgingly matched the allowed claim amount set forth in the AHC plan and settled with the TCC and other wildfire victims for $13.5 billion.

4. New developments, not before this Court at the time it approved the Subro RSA and TCA RSA, demonstrate that this competitive process is continuing to unfold. In particular, the AHC, on December 20, 2019, announced that under their proposed plan of reorganization, wildfire victims would be paid $13.5 billion *in cash* up front on the effective date of the plan. The AHC plan thus directly addresses a major shortcoming in the Debtors' payment of such claims: wildfire victims will be forced to take stock in the very company that caused their devastating losses. The AHC plan also provides significantly greater certainty and value. Of the

1

$6.75 billion to be paid in cash under the Debtor plan, over $1 billion will be paid to wildfire victims over the course of the next two years, if and when the Debtors generate additional funds from NOLs.

5. The orders granting the TCC RSA Motion and Subro RSA Motion, however, short-circuit this competitive process. Through anticompetitive provisions that prevent key constituencies from voting for, or even negotiating with, the AHC regarding a plan, those RSAs stifle competition rather than promote it. Of particular concern is the provision in the TCC RSA that forces the fiduciaries of wildfire victim claimants to refrain from encouraging, supporting, or even participating in the formulation of *any* plan other than the Debtor plan. This and other anticompetitive provisions contained in the RSAs undercut all benefits that typically accompany a competitive process—namely, consensus building and outcome optimization. There is simply no reason to bind wildfire victims to the Debtors' current settlement offer when a preferable alternative already exists and there is good reason to continue to allow competition given the fact that the Debtor plan is unlikely to pass muster under AB 1054.

6. Federal Rules of Civil Prodcedure 59 and 60 exist precisely to enable this Court to address the still-changing landscape of the treatment of wildfire victim claims. In the face of the AHC's new offer, allowing the RSAs' anticompetitive provisions to render the competitive process essentially meaningless not only undermines the Court's prior order terminating exclusivity, but also ensures that wildfire victims' concern about the Debtors' treatment of their claims cannot and will not be addressed.

7. Accordingly, the AHC requests that the Court grant the motion for reconsideration, vacate the orders approving the TCC RSA and Subro RSA, or, in the alternative, vacate the orders and condition subsequent approval on removal of the anticompetitive provisions.

## BACKGROUND

8. On September 24, 2019, the Debtors filed a motion (the "Subro RSA Motion") to approve an RSA (the "Subro RSA") with entities representing approximately 85% of insurance subrogation claims (the "Consenting Creditors"). (*See Subrogation Settlement and RSA Motion*

2

[Dkt. No. 3992].) Among other things, the Subro RSA provides for $11 billion in cash to be paid to settle all subrogation claims on the effective date of the plan. (Subro RSA, Section 4.) The Subro RSA also includes several anticompetitive provisions that bind the subrogation claimholders to support the Debtors' proposed plan of reorganization (the "Debtor Plan") and the Debtor Plan alone. Specifically, the Subro RSA requires each Consenting Creditor to support and cooperate with the Debtors to obtain confirmation of the Plan, and to timely vote or cause to be voted all of its subrogation claims to accept the Plan. (Subro RSA, Section 2(a)(ii).) Further, the Subro RSA requires each Consenting Creditor to vote *against* any other proposed plan, regardless of whether such plan offers subrogation claimholders the same or better treatment than the Debtor Plan. (Subro RSA, Section 2(a)(iii).)

9. On October 9, 2019, the Court terminated exclusivity solely as to the then-joint proposed plan of the Official Committee of Tort Claimants (the "TCC") and the AHC. (*See Order Granting Joint Motion of the TCC and AHC to Terminate the Debtors' Exclusive Period Pursuant to Section 1121(d)(1) of the Bankruptcy Code* [Dkt. No. 4167].) In granting the TCC and AHC's motion to terminate exclusivity, the Court noted that if both plans are confirmable "the voters will make their choice or leave the court with the task of picking one of them." (*Id.*)

10. On October 16, 2019, several groups, including the UCC and the AHC, filed objections to the Subro RSA Motion. (*See Objection of the Official Committee of Unsecured Creditors to the Debtors' Subrogation Settlement and RSA Motion* [Dkt. No. 4236] (the "UCC Objection"); *Objection of the Ad Hoc Committee of Senior Unsecured Noteholders to Debtors' Subrogation Settlement and RSA Motion* [Dkt. No. 4241] (the "AHC Objection").) Citing the recently terminated exclusivity, both the UCC and AHC objected to the provisions of the Subro RSA that forced Consenting Creditors to vote against any competing plan. (UCC Objection ¶ 9; AHC Objection ¶ 5.) Governor Gavin Newsom also filed an objection to the Subro RSA challenging the anticompetitive provisions. (*See Objection of Governor Gavin Newsom to the Debtors' Subrogation Settlement and RSA Motion* [Dkt. No. 4640], ¶ 11.) As Governor Newsom, the AHC, and UCC argued, requiring the Consenting Creditors to vote against the AHC Plan,

3

even if the AHC Plan provided the same or better terms as the Debtor Plan, is contrary to a competing plan process.

11. On October 17, 2019, the TCC and AHC filed their competing plan of reorganization (the "AHC Plan") [Dkt. No. 4257]. Like the deal memorialized in the Subro RSA, the deal in the AHC Plan provided subrogation claimholders with $11 billion of value. The AHC Plan also provided for $13.5 billion to be paid to the victims of PG&E-caused wildfires in a mix of cash and stock.

12. Over the course of the next several weeks, the Subro RSA was repeatedly amended. Among other changes, the anticompetitive terms were amended to permit the subrogation claimants to vote against the Debtor Plan, if (and only if) the Debtors determine that they are insolvent *and* the Debtors file an insolvent plan that does not pay subrogation claimants $11 billion in cash. (*See Proposed Second Amended and Restated Restructuring Support Agreement* [Dkt. No. 4921].) Aside from this revision, the fundamental anticompetitive provisions remained in the Subro RSA.

13. On December 4, 2019, the Court heard argument on the Subro RSA and took the matter under advisement.

14. On December 6, 2019, the Debtors entered into a settlement and RSA with certain attorneys representing wildfire victims (the "Consenting Fire Claimant Professionals") and the TCC (the "TCC RSA" and together with the Subro RSA, the "RSAs").[1] Per the settlement agreement, the Debtors took advantage of the hard-fought settlement negotiations between the AHC and TCC and matched their $13.5 billion allowed claim amount. The $13.5 billion is to be paid in consideration consisting of half common stock and half cash. Of the $6.75 billion cash component, $5.4 billion is to be paid on the effective date, with the remaining $1.35 billion to be funded from anticipated tax benefits and paid in January of 2021 and 2022. If the Debtors do not

---

[1] The precise terms of the TCC RSA were laid out in the motion for approval filed on December 9, 2019. (*See Tort Claimants RSA Motion* [Dkt. No. 5038] (the "TCC RSA Motion").)

4

generate sufficient tax benefits to meet these payment obligations, the fire victim trust will receive a letter of credit.

15. Like the Subro RSA, the TCC RSA includes a series of anticompetitive provisions that prevent the signatories to the RSA from supporting any plan other than the Debtor Plan. Specifically:

- The Consenting Fire Claimant Professionals must use all reasonable efforts to advise their existing and future clients to support and vote to accept the Debtor Plan;

- The TCC must create a letter (the contents of which are to be approved by the Debtors and the equity plan proponents), to be distributed with the solicitation materials to the Debtor Plan, advising all holders of wildfire claims to vote to accept the Debtor Plan;

- Each party to the TCC RSA must oppose efforts and procedures to seek confirmation, consummation or implementation of the AHC Plan; and

- Each party to the TCC RSA must not solicit approval or acceptance of, encourage, propose, file, support, participate in the formulation of or vote for any restructuring other than the Debtors Plan, including the AHC Plan or any other plan of reorganization proposed by the Ad Hoc Committee.

(*See* TCC RSA, Section 2.)

16. As with the Subro RSA Motion, the AHC, UCC, and others objected to the anticompetitive provisions. The AHC and UCC argued that the terms of the RSA undermine the competing plan process by requiring the TCC and Consenting Fire Claimant Professionals to recommend that wildfire victims vote for the Debtor Plan, even if the AHC Plan provides more to wildfire victims. (*See Objection of the Official Committee of Unsecured Creditors to Debtors' TCC RSA Motion* [Dkt. No. 5132]; *Objection of the Ad Hoc Committee of Senior Unsecured Noteholders to Debtors' TCC RSA Motion* [Dkt. No. 5131].)

17. Governor Newsom echoed the arguments of the AHC and UCC in a statement to the Court regarding the TCC RSA Motion. Governor Newsom noted that the TCC RSA "contains provisions limiting competition and precluding the TCC and Consenting Fire Claimant Professionals from supporting any other competing plan of reorganization—even one that provides identical treatment of the fire victims' claims." (*See Statement of Governor Gavin Newsom Regarding the TCC RSA Motion* [Dkt. No. 5138].) Accordingly, Governor Newsom

5

requested that the Court require amendments to the RSA allowing the TCC and Consenting Fire Claimant Professionals to support any alternative restructuring. (*Id.*)

18. On December 17, 2019, the Court heard argument on the TCC RSA Motion. At the hearing, representatives of the TCC and wildfire victims expressed displeasure that they were receiving stock and deferred cash payments as consideration for the settlement. Notably, counsel for the TCC stated:

> "**We would have loved to get cash in an amount adequate to address tort claims, as of the effective date**. . . . . And with respect to those parties who made those observations, we agree completely. **We would prefer not to have stock.**"

(Hr'g Tr. at 222:10-225:13, December 17, 2019 (No. 19-30088).) The court also heard from counsel to individual wildfire victims who objected to the fact that his clients were being forced to accept a settlement that would pay stock in the very company that caused his clients so much suffering. (*Id.* at 137:10-138:9.) Despite the TCC and wildfire victims' stated preference for cash over stock, as of the December 17 hearing on the TCC RSA Motion, both the Debtor Plan and AHC Plan provided for a mix of cash and stock to the wildfire victims.

19. At the conclusion of the hearing, the Court orally granted the Subro RSA Motion and TCC RSA Motion. (*Id.* at 292:23-302:22.) Notably, the Court emphasized that the goal of the chapter 11 cases was to provide recoveries for the tens of thousands of wildfire victims who are involuntary creditors in these cases. (*See id.* at 299:11-24.)

20. Also on December 17, 2019, U.S. District Court Judge James Donato held a status conference in the estimation proceedings. During the hearing, the Debtors informed Judge Donato that they reached a $13.5 billion settlement with the TCC and representatives of other wildfire claimants. In response, Judge Donato concluded that there was nothing left to do with regards to estimation: "**the settlement gets approved, you're done. Settlement is not approved, you have effectively estimated the loss at 13.5 billion**. So what else is there to do?" (Hr'g Tr. at 6:18-23, December 17, 2019 (No. 19-5257).) When counsel for the Debtors

6

attempted to push back on this assessment, noting that if the settlement is not approved the Debtors may return to argue the value of the claims, Judge Donato countered:

> "[W]e started this estimation process by looking at other settlements and inferring from those other settlements what the value would be here. Now we have the gold standard. You have actually settled. So I don't have to even infer. You've put – **you've put the ink on the paper and you have said it's 13.5 billion. I just can't imagine that you would ever be allowed to revisit that**. Maybe we don't have to get into it, but, you know, whether -- **settlement or not, you have both estimated the value to be 13.5 billion**. So that figure is here."

(*Id.* at 9:2-11.)

21. The Court issued formal orders granting the motions and approving the RSAs on December 19, 2019. [*See* Dkt. Nos. 5173, 5174.]

22. One day later, on December 20, 2019, the AHC presented a letter and revised term sheet for an amended plan of reorganization to Governor Newsom (the "New AHC Plan"). (*See* Ad Hoc Committee, Letter to Governor Gavin Newsom, Dec. 20, 2019 (the "AHC Letter"), attached hereto as **Exhibit A**.) Most significantly, and in contrast to the Debtor Plan, the New AHC Plan committed to pay victims **"their full claim of $13.5 billion in cash up front on the effective date of the plan**." (*Id.*)

23. The AHC Letter also set forth corporate governance, capital structure, safety, and other changes to bring the AHC Plan in alignment with Governor Newsom's requirements for an AB 1054-compliant plan. (*Id.*) Among other things, the AHC committed to changes to the public safety power shutoff ("PSPS") procedures, better treatment for PG&E's employees, rate growth caps, an overhaul of the board of directors, and an escalating enforcement process culminating in the State of California having the option to purchase the reorganized PG&E.

24. Also on December 20, 2019, Judge Donato entered an order staying the district court estimation proceedings and vacating all hearing dates. [*See* Estimation Dkt. No. 276.]

7

25. On December 26, 2019, California Superior Court Judge Andrew Cheng entered an order vacating all future dates in the Tubbs litigation and setting a hearing to show cause on dismissal of the litigation for March 2, 2020. [*See California North Bay Fire Cases* JCCP 4995.]

## ARGUMENT

A. <u>Legal Standard.</u>

26. Beyond "inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient," *City of L.A., Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001) (emphasis omitted), the Federal Rules of Civil and Bankruptcy Procedure provide specific mechanisms for revisiting issued orders. Under Federal Rule of Civil Procedure 59(e), as incorporated by Federal Rule of Bankruptcy Procedure 9023, a motion for reconsideration may be granted if the court "(1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law[,]" though "[t]here may also be other, highly unusual, circumstances warranting reconsideration." *See Sch. Dist. No. 1J, Multnomah Cty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993). The court has "considerable discretion" when hearing such a motion. *See McDowell v. Calderon*, 197 F.3d 1253, 1254 n.1 (9th Cir. 1999) (citing 11 Charles Alan Wright et al., Federal Practice and Procedure § 2810.1 (2d ed. 1995)). Courts have also granted motions for reconsideration in light of new factual developments—the basis for the current motion. *See Reynoso v. All Power Mfg. Co.*, No. SACV 16-1037 JVS (JCGx), 2018 WL 5906645, at *2 (C.D. Cal. Apr. 30, 2018); *see also Sierra Club v. City & Cnty. of Honolulu*, No. CV 04-00463 DAE-BMK, 2008 WL 515963, at *4 (D. Haw. Feb. 26, 2008); *In re Krow*, No. BR 12-31601DM, 2016 WL 4167966, at *1 (Bankr. N.D. Cal. Aug. 4, 2016).

27. Under Federal Rule of Civil Procedure 60(b), as incorporated by Federal Rule of Bankruptcy Procedure 9024, a court may grant relief from an order or proceeding when "any other reason . . . justifies relief."

### B. In Light of New Factual Developments, the Court Should Reconsider its Rulings on the Anticompetitive Provisions in the TCC RSA and Subro RSA.

28. As the AHC's newly disclosed plan readily demonstrates, the anticompetitive provisions of the RSAs cannot coexist with a competitive plan process. Instead, the anticompetitive provisions hinder a resolution of these chapter 11 cases that provides the best recovery for wildfire victims, other constituents, and the State of California. The Court's decisions to approve the anticompetitive provisions of the Subro RSA and TCC RSA therefore warrants reconsideration under both Rule 59(e) and 60(b).

29. The AHC disclosed the New AHC Plan to Governor Newsom on December 20, 2019, following the entry of the orders approving the Subro RSA and TCC RSA. As noted above, the New AHC Plan will provide wildfire victims with $13.5 billion in cash on the effective date, and it contains further commitments designed to satisfy the requirements of AB 1054, addressing deficiencies in the Debtors' corporate governance and enhancing safety and accountability, among other things. The AHC believes that the New AHC Plan is demonstrably superior to the Debtor Plan in its treatment of wildfire victims. And, although the Governor and CPUC ultimately will have to decide, the AHC further believes that the New AHC Plan is better for all constituents, including the State of California.

#### 1. The Anticompetitive Provisions in the TCC RSA Should Be Removed.

30. The anticompetitive provisions in the TCC RSA prohibit the TCC from supporting a superior plan and effectively prevent the New AHC Plan from receiving the required votes. In keeping with the overarching goal in these chapter 11 cases to provide wildfire victims with full and fair compensation, the New AHC Plan now provides wildfire victims with $13.5 billion in cash on the effective date. This consideration is objectively better than the mix of stock, upfront cash payments, and deferred cash payments under the Debtor Plan. Counsel for the TCC recognized this point, noting that "we would have loved to get cash in an amount adequate to address tort claims, as of the effective date. . . . We would prefer not to have stock." (Hr'g Tr. at 222:10-225:13, December 17, 2019 (No. 19-30088).)

31. Yet, the TCC RSA requires the TCC and Consenting Fire Claimant Professionals to go to extreme lengths not only to advocate against the New AHC Plan that they would prefer,

9

but to affirmatively defeat it. Under the TCC RSA, the Consenting Fire Claimant Professionals must advise their clients to "support" and vote for the inferior Debtor Plan. (TCC RSA, Section 2(g).) Separately, the TCC must create a letter (the contents of which are to be approved by the Debtors and certain equity interests), to be distributed with solicitation materials advising all holders of wildfire claims to vote to accept the inferior Debtor Plan. (TCC RSA, Section 2(k).) All parties to the TCC RSA must not "solicit approval or acceptance of, encourage, propose, file, support, participate in the formulation of or vote for any restructuring . . . other than the [Debtor] Plan, including, without limitation" the New AHC Plan "or any other plan of reorganization proposed by the Ad Hoc Committee." (TCC RSA, Section 2(o).) Finally, all parties to the TCC RSA must oppose "efforts and procedures to . . . seek confirmation, consummation or implementation" of the New AHC Plan. (TCC RSA, Section 2(n).) Those provisions make no sense given that the crux of AHC participation in the plan process has been to foster competition and provide a better choice to wildfire victims and others.

32. In response, the TCC, Debtors, and equity plan proponents likely will point to the "fiduciary out" contained in the TCC RSA. (TCC RSA, Section 19.) But the fiduciary out does not resolve the issues identified in this Motion. First, the fiduciary out only applies to the TCC, so the Consenting Fire Claimant Professionals, who are also fiduciaries, are still contractually bound to advise their clients to vote for the inferior Debtor Plan. (*Id.*) Second, reliance on the fiduciary out rests on the faulty premise that the TCC RSA should have been approved. But the TCC RSA should not have been approved, and the TCC should never have been made to bear the burden of potentially blowing up the settlement or making a determination that its obligations under TCC RSA are inconsistent with its fiduciary duties. Instead, the Court should have recognized that the anticompetitive provisions are contrary to a competing plan process and required the Debtors to remove those provisions. Finally, even if the TCC determines that the New AHC Plan does not trigger the fiduciary out, additional amendments could be made to further improve the plan for the wildfire victims, the State of California, and other stakeholders.

This was precisely the point of having a competitive plan process, and wildfire victims should not be foreclosed from voting for more favorable plans that may be proposed later on.[2]

33.  Where, as here, a court "has jurisdiction over the case, then it possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." *City of L.A.*, 254 F.3d at 885 (emphasis omitted). Moreover, case law is clear that, under the Federal Rules of Civil and Bankruptcy Procedure, this Court is able to take into account the changed circumstances of the New AHC Plan and the developments in the Tubbs and estimation proceedings and alter its order approving the TCC RSA in order to further the competitive process for the benefit of wildfire victims and all other constituencies. *See Reynoso*, 2018 WL 5906645, at *2 (accepting argument that "motion for reconsideration is warranted because new material facts emerged after RBC filed its motion for decertification that the Court did not consider"); *Sierra Club*, 2008 WL 515963, at *4 ("For the reasons set forth below, the Court holds that its 2005 Order dismissing Plaintiffs' First and Second Claims based on *res judicata* should be reconsidered in light of current circumstances."). The new developments in this case provide ample justification for this Court to provide the requested relief.

2.  **The Anticompetitive Provisions in the Subro RSA Should be Removed.**

34.  Although the New AHC Plan does not at this time provide more favorable treatment to holders of subrogation claims, the anticompetitive provisions in the Subro RSA nevertheless should be removed for the same reasons. The AHC plan continues to evolve and future developments may occur that make the AHC plan more favorable to subrogation claimholders than the Debtor Plan. Yet, under the terms of the Subro RSA, the subrogation claimants must vote *against* any plan that is not the Debtor Plan. (Subro RSA, Section 2(iii).)

---

[2] It is likely that the Debtors will also argue that if the anticompetitive provisions are stricken, the Debtors will back out of their settlement with the wildfire victims and proceed with estimation. This is an empty threat. In Judge Donato's own words, "settlement or not, [the Debtors and TCC] have both estimated the value to be 13.5 billion." (Hr'g Tr. at 9:10-11, December 17, 2019 (No. 19-5257).) Further, all future hearing dates in both the district court estimation proceedings and state court Tubbs litigation have been vacated, and Judge Donato has made clear that his calendar cannot accommodate estimation until after June 30. As such, any attempt by the Debtors to blow up the settlement and re-open estimation will be futile.

# CONCLUSION

35.     For the foregoing reasons, the Court should grant the AHC's Motion and vacate the orders approving the RSAs, or, in the alternative, vacate the orders and condition subsequent approval of the RSAs on the removal of the anticompetitive provisions contained therein.

Dated:  December 31, 2019          **AKIN GUMP STRAUSS HAUER & FELD LLP**

By: _____/s/ Ashley Vinson Crawford_____

Ashley Vinson Crawford (SBN 257246)
Michael S. Stamer (*pro hac vice*)
Ira S. Dizengoff (*pro hac vice*)
David H. Botter (*pro hac vice*)
Abid Qureshi (*pro hac vice*)

*Counsel to the Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company*