# United States Bankruptcy Court, Northern District of California

**Fill in this information to identify the case (Select only one Debtor per claim form):**

[ ] PG&E Corporation (19-30088)

[X] Pacific Gas and Electric Company (19-30089)

RECEIVED

OCT 18 2019

PRIME CLERK LLC

## Official Form 410

# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

Unless an exception in the Bar Date Order applies to you, you should not use this form to submit a claim that arises out of or relates to the fires that occurred in Northern California prior to January 29, 2019.

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

MUFG Union Bank, N.A. (formerly known as Union Bank, N.A.)

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

[X] No

[ ] Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

MUFG Union Bank, N.A.
John Lilly
1221 Avenue of the Americas, 7th Floor
New York, NY 10020

Contact phone 212-782-5964

Contact email jlilly@us.mufg.jp

Where should payments to the creditor be sent? (if different)

[✓] Date Stamped Copy Returned
[ ] No Self-Addressed Stamped Envelope
[ ] No Copy Provided

Contact phone _____

Contact email _____

**4. Does this claim amend one already filed?**

[X] No

[ ] Yes. Claim number on court claims registry (if known) _____

Filed on _____ MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

[X] No

[ ] Yes. Who made the earlier filing? _____



| | |
|---|---|
| **6. Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____ |

**7. How much is the claim?**    $ 74,574,215.20, plus additional unliquidated and contingent amounts

**Does this amount include interest or other charges?**
☐ No
☒ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Please see the attached Addendum.

**9. Is all or part of the claim secured?**

☑ No
☐ Yes. The claim is secured by a lien on property.

Nature of property:

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*
☐ Motor vehicle
☐ Other. Describe: _____

Basis for perfection: _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:    $_____

Amount of the claim that is secured:    $_____

Amount of the claim that is unsecured:   $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:    $_____

Annual Interest Rate (when case was filed) _____%
☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☑ No
☐ Yes. Amount necessary to cure any default as of the date of the petition.    $_____

**11. Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: _____

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 2 of 295

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

☑ No

☐ Yes. *Check one:*

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

**Amount entitled to priority**

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).    $_____

☐ Up to $2,850 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).    $_____

☐ Wages, salaries, or commissions (up to $12,850) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).    $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).    $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).    $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(____) that applies.    $_____

\* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3:    Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    10/10/2019    (mm/dd/yyyy)

_____
Signature

Print the name of the person who is completing and signing this claim:

Name    John Lilly
First name _____ Middle name _____ Last name _____

Title    Director

Company    MUFG Union Bank, N.A.
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address    1221 Avenue of the Americas, 7th Floor
Number        Street
New York                    NY        10020
City                        State    ZIP Code

Contact phone    212-782-5964    Email    jlilly@us.mufg.jp

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 3
of 295

**Addendum to Proof of Claim of MUFG Union Bank, N.A.**
*In re Pacific Gas and Electric Company*, **Index No. 19-30089**
**United States Bankruptcy Court for the Northern District of California**

1.      **Name of Debtor**. On January 29, 2019 (the "Petition Date"), Pacific Gas and Electric Company (the "Debtor") filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in the above-referenced court.

2.      **Name of Creditor.** This proof of claim ("Proof of Claim") is made by and on behalf of MUFG Union Bank, N.A. (formerly known as Union Bank, N.A.) ("MUFG") against the Debtor.

3.      **The Reimbursement Agreement**. MUFG asserts all claims and rights under applicable law or principals of equity, whether such claims and rights are contingent, liquidated, unliquidated, matured, unmatured, known, unknown or otherwise, that MUFG has or may hereafter have against the Debtor and its affiliates, successors and assigns (collectively, the "Claim"), relating to or arising out of, *inter alia*, that certain Reimbursement Agreement (Series 2009B) dated as of June 5, 2014, by and between the Debtor and MUFG (as amended, restated and otherwise supplemented, the "Reimbursement Agreement").[1]  Each capitalized term used but not defined herein shall have the meaning ascribed thereto in the Reimbursement Agreement.

4.      **Amount of Claim**. The Claim was fixed in part and contingent in part as of the Petition Date, and is fixed and liquidated in part and contingent and unliquidated in part as of the filing date of this Proof of Claim. The full amount of the Claim includes, without limitation, the Debtor's "Reimbursement Obligations" and commissions, fees and expenses payable pursuant to the Reimbursement Agreement, plus interest thereon at the contractual rate (including, without limitation, prepetition interest, postpetition interest and default interest, compounded monthly from the date such amounts become due and payable) until paid in full; *provided, however*, this Claim does not include a separate and distinct claim for indemnification of the attorneys' fees and legal expenses of McGuireWoods LLP as counsel to MUFG incurred by MUFG in connection with the Reimbursement Agreement

---

[1] A true and correct copy of the Reimbursement Agreement is attached hereto as Ex. 1.

prior to June 7, 2019, which total $122,210.20 (the "Excluded Legal Fee Amount"), which will be the subject of a separate proof of claim filed by MUFG against the Debtor in this bankruptcy case. As of the filing date of this Proof of Claim, the Claim includes, at a minimum, the following components:

| | |
|---|---|
| $201,966.95 | February 2019 Annex A Draw |
| $74,311,628.77 | February 2019 Annex E Draw |
| $60,619.48 | Commission (January 1 - 29, 2019) |
| **$74,574,215.20** | **Total** |
| $ TBD | Commission after January 29, 2019 until full payment |
| $ TBD | Default Interest after January 29, 2019 until full payment |
| $ TBD | Fees and Costs after January 29, 2019 until full payment |
| $ TBD | Indemnification Obligations |

MUFG reserves the right to amend this Proof of Claim to correct, supplement or otherwise modify the foregoing.

5. **Background of Claim.** The Reimbursement Agreement was entered into to induce MUFG to issue that certain Irrevocable Direct-Pay Letter of Credit No. S326841M issued on June 5, 2014 (the "Letter of Credit")[2], by MUFG in favor of Deutsche Bank National Trust Company, in its capacity as Trustee and Tender Agent (the "Trustee"), as beneficiary thereunder on behalf of the holders of California Infrastructure and Economic Development Bank (the "Issuer") Refunding Revenue Bonds (Pacific Gas and Electric Company) Series 2009B (the "Bonds").

6. The Trustee is trustee under that certain Indenture of Trust dated as of August 1, 2009 (as amended and supplemented from time to time, the "Indenture"),[3] which governs the

---

[2] A true and correct copy of the Letter of Credit is attached hereto as Ex. 2.

[3] A true and correct copy of the Indenture is attached hereto as Ex. 3.

2

Bonds. Pursuant to the Indenture, the Issuer issued the Bonds in the initial principal amount of $74,275,000. In connection with the issuance of the Bonds, the Issuer loaned the proceeds of the Bonds to the Debtor pursuant to that certain Loan Agreement, dated as of August 1, 2009, by and between the Issuer and the Trustee relating to the Bonds (the "Loan Agreement").[4]

7.     MUFG issued the Letter of Credit as credit enhancement and liquidity support for the Bonds. In turn, the Debtor agreed to repay any and all amounts drawn upon the Letter of Credit pursuant to the Reimbursement Agreement, commissions (including commissions payable quarterly in arrears as set forth in Section 2(b) of the Reimbursement Agreement through the Termination Date), and fees and all reasonable out-of-pocket costs and expenses incurred in connection with enforcement of rights under the Reimbursement Agreement, in each case, *plus* interest on all unpaid amounts at the default rate specified in Section 2(a)(iv) of the Reimbursement Agreement, compounded monthly on the first business day of each month.

8.     The filing of the Debtor's bankruptcy petition was an Event of Default under the Reimbursement Agreement. Pursuant to the Indenture, on the first business day of each month, the Trustee is required to make an interest payment on the Bonds. Accordingly, on January 31, 2019, the Trustee made a draw request on the Letter of Credit pursuant to Annex A of the Letter of Credit (an "Annex A Draw") for payment of the total unpaid interest amount. MUFG honored the Annex A Draw request by payment of funds to the Trustee in the amount of $201,966.95 on February 1, 2019 (the "February 2019 Annex A Draw").[5]

9.     Due to its bankruptcy filing, the Debtor did not reimburse MUFG for the February 2019 Annex A Draw. The Letter of Credit provides that the total amount of the Letter of Credit is not reduced by an Annex A Draw, rather, the amount of the Annex A Draw is reinstated upon reimbursement by the Debtor to MUFG. In accordance with the terms of the Letter of Credit, MUFG provided notice to the Trustee that the amount would not be reinstated due to the Debtor's failure to reimburse the amount of the February 2019 Annex A Draw pursuant

---

[4] A true and correct copy of the Loan Agreement is attached hereto as Ex. 4.
[5] A true and correct copy of the February 2019 Annex A Draw is attached hereto as Ex. 5.

3

DB3/ 202924996.5

to that certain Notice of No Reinstatement, dated as of February 4, 2019 (the "Notice of No Reinstatement").

10. The Notice of No Reinstatement constituted an Event of Default under the Indenture that immediately and automatically accelerated the Bonds and the principal and interest of the Bonds became due and payable. As a result, the Trustee issued that certain Notice of Declaration of Acceleration of Principal and Interest dated as of February 4, 2019. Also on February 4, 2019, the Trustee made a draw request on the Letter of Credit pursuant to Annex E of the Letter of Credit in the full amount of the outstanding principal and interest on the Bonds, $74,311,628.77 (the "February 2019 Annex E Draw"),[6] which amount was wired to the Trustee on February 5, 2019.

11. The amount of the February 2019 Annex A Draw and the amount of the February 2019 Annex E Draw became a portion of the "Reimbursement Obligations" as defined in the Reimbursement Agreement. Pursuant to Section 2(a) of the Reimbursement Agreement, the Debtor is obligated to pay interest at the default rate specified in Section 2(a)(iv) of the Reimbursement Agreement on any Reimbursement Obligations unpaid by the Debtor when due under the Reimbursement Agreement from the date such amounts become due until payment in full, compounded monthly on the first business day of each month. In addition, Section 2(a) of the Reimbursement Agreement requires the Debtor to pay any and all reasonable expenses incurred by MUFG in enforcing any rights it may have against the Debtor under the Reimbursement Agreement.

12. As a result of the foregoing, the amount of MUFG's Claim against the Debtor (excluding the Excluded Legal Fee Amount), as of the filing date of this Proof of Claim, is as specified in paragraph 4 above.

13. This Proof of Claim is filed under compulsion pursuant to Federal Rule of Bankruptcy Procedure 3003, B.L.R. 3003-1, and the *Order Pursuant to 11 U.S.C. §§ 502(b)(9) and 105(a), Fed. R. Bankr. P. 2002, 3003(c)(3), 5005, and 9007, and L.B.R. 3003-1 (I)*

---

[6] A true and correct copy of the February 2019 Annex E Draw is attached hereto as Ex. 6.

4

*Establishing Deadline for Filing Proofs of Claim, (II) Establishing the Form and Manner of Notice Thereof, and (III) Approving Procedures for Providing Notice of Bar Date and Other Information to All Creditors and Potential Creditors* [Dkt. No. 2806] to prevent any potential forfeiture by MUFG of the Claim. Filing this Proof of Claim does not constitute, is not intended to be and should not be deemed or construed as (i) a waiver of any of MUFG's rights and remedies against any other person or entity who may be liable for all or part of the Claims set forth herein, whether an affiliate of the Debtor, an assignee, a guarantor or otherwise; (ii) a waiver of any obligation owed to MUFG, or any right to any security that may be determined to be held by it or for its benefit; (iii) a waiver of any past, present or future defaults (or events of default) by the Debtor or others in connection with the Claim and related documents; (iv) an election of remedies (including, but not limited to, an election of remedies that waives or otherwise affects any other remedies); (v) consent by MUFG to the jurisdiction of this Court with respect to any proceeding commenced against or otherwise involving MUFG; (vi) consent by MUFG to the treatment of any non-core claim against it as a core claim; (vii) a waiver of the right to move to withdraw the reference with respect to the claims or otherwise, including, without limitation, any objection or other proceedings commenced with respect thereto, or any other proceedings commenced against or otherwise involving MUFG; (viii) a waiver of any right to the subordination, in favor of MUFG, of indebtedness or liens held by other creditors of the Debtor; (ix) a waiver of any right to arbitration or other alternative dispute resolution mechanism that is, or becomes, available; (x) consent by MUFG to a jury trial, or waiver of MUFG's right to a trial by jury, in each case, in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto, whether or not the same be designated legal, public or private rights, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial is pursuant to statute or the United States Constitution; (xi) a consent by MUFG to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy, or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (xii) a waiver of MUFG's right to have final orders in matters for which the Bankruptcy Court is not

5

constitutionally authorized to enter final orders, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), entered only after de novo review by a District Court judge or, if applicable, the Ninth Circuit Court of Appeals; (xiii) an admission by MUFG that any property held by the Debtor constitutes property of the Debtor's estates or (xiv) a waiver or limitation of any procedural or substantive rights, or any procedural or substantive defenses, to any claim that may be asserted against MUFG. In addition, MUFG reserves the right to withdraw this Proof of Claim with respect to any or all parts of the Claim set forth herein and/or with respect to the Debtor, for any reason whatsoever. MUFG does not waive any of its rights to any claims asserted herein by not ascribing a specific dollar amount thereto at this time. MUFG (a) expressly reserves and does not waive any right or remedy, at law or in equity, of MUFG, including, without limitation, any and all rights of setoff, recoupment or counterclaim, howsoever arising, any right to any security held by or for it or them, or any right to claim an interest in specific assets or any other rights or causes of action that MUFG has, or may have, against the Debtor, or any other persons or entities, and expressly reserves all such rights; (b) reserves the right to file additional proofs of claim and to further amend or supplement this Proof of Claim in any respect, including, without limitation, by (1) asserting claims arising from, or relating to, the avoidance of transfers made to MUFG or any other entity, (2) further amending, quantifying or correcting the dollar amount of any part of the Claim, (3) adding or including any other debtor entity or any other entity, including, but not limited, to any entity that may become a debtor or debtor-in-possession in these jointly administered bankruptcy cases, (4) providing additional detail regarding the Claim set forth herein, and/or (5) adding or amending categories of payments or liabilities; and (c) reserves the right to assert that all or any part of the Claim described herein is an administrative expense entitled to a first priority under sections 507(a)(2) and 507(b) of the Bankruptcy Code, including, but not limited to, costs and expenses (including attorneys' fees and disbursements, but excluding the Excluded Legal Fee Amount) incurred by MUFG that remain unpaid. This Proof of Claim is filed without prejudice to the filing by MUFG or any of its affiliates of additional proofs of claim with respect to any other liability or indebtedness of the Debtor.

6

DB3/ 202924996.5

14.     **Headings**. Section headings used herein are for convenience only and are not to affect the construction of, or to be taken into consideration in interpreting, this Proof of Claim.

15.     **Notices**. All notices, court orders, and payments with respect to this Proof of Claim, and any requests for further information regarding this Claim, should be sent to:

MUFG Union Bank, N.A.
John Lilly
1221 Avenue of the Americas, 7th Floor
New York, NY 10020
Phone: 212-782-5964
Email: jlilly@us.mufg.jp

With a copy to:

Aaron McCollough
McGuireWoods LLP
77 W. Wacker Dr., Ste. 4100
Chicago, IL 60601
Phone: 312-849-8256
Email: amccollough@mcguirewoods.com

7

D83/ 202924996.5

**Exhibit 1**
**Reimbursement Agreement**

REIMBURSEMENT AGREEMENT
(Series 2009B)

Between

PACIFIC GAS AND ELECTRIC COMPANY

and

UNION BANK, N.A.

Dated as of June 5, 2014

# Table of Contents

Page

SECTION 1. Definitions; Construction. .................................................................................1

SECTION 2. Reimbursement; Overdue Payments; Other Payments; Loans. ........................14

SECTION 3. Conditions Precedent. .....................................................................................22

SECTION 4. Reduction and Reinstatement. ..........................................................................23

SECTION 5. Obligations Absolute: ......................................................................................23

SECTION 6. Representations and Warranties. .......................................................................24

SECTION 7. Covenants. ........................................................................................................28

SECTION 8. Events of Default: ............................................................................................31

SECTION 9. Amendments and Waivers. ...............................................................................34

SECTION 10. Notices ............................................................................................................34

SECTION 11. No Waiver; Remedies. ...................................................................................35

SECTION 12. Setoff. .............................................................................................................35

SECTION 13. Indemnification. .............................................................................................36

SECTION 14. Continuing Obligation. ..................................................................................37

SECTION 15. Transfer of the Letter of Credit. ....................................................................37

SECTION 16. Confirmation of Lien; Pledge. .......................................................................37

SECTION 17. Limited Liability of the Lender. .....................................................................37

SECTION 18. Costs, Expenses and Taxes. ...........................................................................38

SECTION 19. Severability. ....................................................................................................38

SECTION 20. **GOVERNING LAW.** ...............................................................................38

SECTION 21. Headings. ........................................................................................................38

SECTION 22. Assignments and Participations. ....................................................................39

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 13
of 295

SECTION 23. Execution in Counterparts................................................................................42

SECTION 24. **WAIVER OF JURY TRIAL; JUDICIAL REFERENCE.** ...............................42

SECTION 25. No Third Party Beneficiaries. ........................................................................43

SECTION 26. Survival of Representations and Warranties....................................................43

SECTION 27. Integration. ....................................................................................................43

SECTION 28. Submission To Jurisdiction; Waivers .............................................................43

SECTION 29. Acknowledgments...........................................................................................43

SECTION 30. Confidentiality. ...............................................................................................44

SECTION 31. USA Patriot Act Notice....................................................................................44

## ANNEXES

Annex 1        Irrevocable Letter of Credit

## EXHIBITS

Exhibit A        Form of Compliance Certificate
Exhibit B        Form of Closing Certificate
Exhibit C        Form of Legal Opinion of Orrick, Herrington & Sutcliffe LLP
Exhibit D        Forms of U.S. Tax Compliance Certificates

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 14
of 295

This REIMBURSEMENT AGREEMENT (Series 2009B) is dated as of June 5, 2014, by and between PACIFIC GAS AND ELECTRIC COMPANY, a California corporation (the "Borrower"), and UNION BANK, N.A., a national banking association (the "Lender").

## WITNESSETH:

WHEREAS, the Borrower has requested the Lender to issue an irrevocable direct-pay letter of credit to provide credit and liquidity support for certain revenue bonds issued by the California Infrastructure and Economic Development Bank (the "Bank") on behalf of the Borrower whilst they bear interest at Daily Rates and/or Weekly Rates; and

WHEREAS, the Lender is willing to issue such letter of credit upon the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals, the mutual promises contained herein and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Borrower and the Lender hereby agree as follows:

SECTION 1. Definitions: Construction.

(a)     Definitions. The following terms, as used herein, have the following respective meanings:

"Adjusted Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Base Rate in effect on such day; (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1%; and (c) the LIBOR Market Index Rate for such date.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agreement" means this Reimbursement Agreement, as the same may from time to time be amended, supplemented or modified.

"Bank" has the meaning assigned to that term in the first recital paragraph of this Agreement.

"Base Rate" means the rate announced by the Lender from time to time at its corporate headquarters as the 'Reference Rate'. The Reference Rate is an index rate determined by the Lender from time to time as a means of pricing certain extensions of credit and is neither directly tied to any external rate of interest or index nor necessarily the lowest rate of interest charged by the Lender at any given time.

"Beneficial Owner" has the meaning assigned to that term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Sections 13(d) and 14(d) of the Exchange Act), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only upon the occurrence of a subsequent condition. The terms "Beneficially Owns" and "Beneficially Owned" have correlative meanings.

1

"Board" means the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Bond Counsel" has the meaning assigned to that term in the Bond Indenture.

"Bond Indenture" means the Indenture of Trust between the Bank and the Bond Trustee, in its capacity as trustee for the holders of the Bonds, pursuant to which the Bonds are to be issued.

"Bond Loan Agreement" means the Loan Agreement between the Bank and the Borrower related to the Bonds.

"Bond Trustee" means, as of any date of determination, the Person which on such date is serving as trustee for the holders of the Bonds. The initial Bond Trustee is DBNTC.

"Bonds" means the California Infrastructure and Economic Development Bank Refunding Revenue Bonds (Pacific Gas and Electric Company) Series 2009B issued in the initial principal amount of $74,275,000.

"Borrower" has the meaning assigned to that term in the introductory paragraph of this Agreement.

"Business Day" means any day other than a Saturday, Sunday, or a day on which commercial banks in New York, New York, Los Angeles, California or San Francisco, California are authorized by law to close; provided that such day is also a day on which the New York Stock Exchange is open.

"Capital Stock" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"Change of Control" means PCG and its Subsidiaries shall at any time not be the Beneficial Owner, directly or indirectly, of at least 80% of the common stock or 70% of the voting Capital Stock of the Borrower; provided that any such event shall not constitute a Change of Control if, after giving effect to such event, the Borrower's senior, unsecured, non credit-enhanced debt ratings shall be at least the higher of (1) Baa3 from Moody's and BBB- from S&P and (2) the ratings by such rating agencies of such debt in effect immediately before the earlier of the occurrence or the public announcement of such event.

"Change of Law" means the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation, statute, treaty, policy, guideline or directive by any Governmental Authority, (b) any change in any law, rule, regulation, statute, treaty, policy, guideline or directive or in the application, interpretation, promulgation, implementation, administration or enforcement thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or

2

directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change of Law", regardless of the date enacted, adopted or issued.

"Closing Date" means the date on which the conditions precedent set forth in Section 3(a) shall have been satisfied or waived.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Commitment" means the obligation of the Lender to make Loans and issue the Letter of Credit in an aggregate principal and/or face amount not to exceed $75,251,767.13, as the same may be changed from time to time pursuant to the terms hereof.

"Commitment Fee Percentage" means, for any day, the percentage determined pursuant to the grid set forth below, based upon the Ratings then in effect:

| Level | Rating S&P/Moody's | Commitment Fee Percentage |
|-------|--------------------|--------------------------|
| 1 | A/A2 or better | 0.600% |
| 2 | A-/A3 | 0.700% |
| 3 | BBB+/Baa1 | 0.8500 |
| 4 | BBB/Baa2 | 1.000% |
| 5 | BBB-/Baa3 or lower | 1.200% |

Subject to the provisions of this paragraph regarding split ratings, changes in the Commitment Fee Percentage shall become effective on the date on which S&P and/or Moody's changes its relevant Rating. In the event the Ratings of S&P and Moody's are in different levels set forth in the grid above, the higher of the two Ratings (i.e., the Rating set forth in the grid above opposite the lower numerical level number) shall govern. In the event that, at any time, a Rating is not available from one of such rating agencies, the Commitment Fee Percentage shall be determined on the basis of the Rating from the other rating agency. In the event that, at any time, Ratings from each such rating agency are not available for companies generally, the Commitment Fee Percentage shall be determined on the basis of the last Rating(s) made available. In the event that, at any time, such Ratings are not available for the Borrower but are generally available for other companies, then the Commitment Fee Percentage shall be the percentage set forth above opposite level 5.

"Commonly Controlled Entity" means an entity, whether or not incorporated, that is under common control with the Borrower within the meaning of Section 4001 of ERISA or is part of a group that includes the Borrower and that is treated as a single employer under Section 414 of the Code.

"Compliance Certificate" means a certificate duly executed by a Responsible Officer substantially in the form of Exhibit A.

3

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated Capitalization" means, on any date of determination, the sum of (a) Consolidated Total Debt on such date, plus without duplication, (b) (i) the amounts set forth opposite the captions "common shareholders' equity" (or any similar caption) and "preferred stock" (or any similar caption) on the consolidated balance sheet, prepared in accordance with GAAP, of the Borrower and its Subsidiaries as of such date, and (ii) the outstanding principal amount of any junior subordinated deferrable interest debentures or other similar securities issued by the Borrower or any of its Subsidiaries after the Closing Date.

"Consolidated Capitalization Ratio" means, on any date of determination, the ratio of (a) Consolidated Total Debt to (b) Consolidated Capitalization.

"Consolidated Total Debt" means, at any date, the aggregate principal amount of all obligations of the Borrower and its Significant Subsidiaries at such date that in accordance with GAAP would be classified as debt on a consolidated balance sheet of the Borrower, and without duplication all Guarantee Obligations of the Borrower and its Significant Subsidiaries at such date in respect of obligations of any other Person that in accordance with GAAP would be classified as debt on a consolidated balance sheet of such Person; provided that, the determination of "Consolidated Total Debt" shall exclude, without duplication, (a) the Securitized Bonds, (b) Indebtedness of the Borrower and its Significant Subsidiaries in an amount equal to the amount of cash held as cash collateral for any fully cash collateralized letter of credit issued for the account of the Borrower or any Significant Subsidiary, (c) imputed Indebtedness of the Borrower or any Significant Subsidiary incurred in connection with power purchase and fuel agreements, (d) any junior subordinated deferrable interest debentures or other similar securities issued by the Borrower or any of its Subsidiaries after the Closing Date and (e) as of a date of determination, the amount of any securities included within the caption "preferred stock" (or any similar caption) on the consolidated balance sheet, prepared in accordance with GAAP, of the Borrower and its Subsidiaries as of such date.

"Contractual Obligation" means as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"CPUC" means the California Public Utilities Commission or its successor.

"DBNTC" means Deutsche Bank National Trust Company and its successors.

"Default" means any of the events specified in Section 8, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

4

"Designated Jurisdiction" means any country or territory to the extent that such country or territory itself is the subject of any Sanction.

"Disposition" means, with respect to any property, any sale, lease, sale and leaseback, assignment, conveyance, transfer or other disposition thereof. The terms "Dispose" and "Disposed of" shall have correlative meanings.

"Dollars" and "$" means dollars in lawful currency of the United States.

"Drawing" means any drawing made under the Letter of Credit.

"Environmental Laws" means any and all foreign, federal, state, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, requirements of any Governmental Authority or other Requirements of Law (including common law) regulating, relating to or imposing liability or standards of conduct concerning protection of human health or the environment, as now or may at any time hereafter be in effect.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Event of Default" means any of the events specified in Section 8; provided that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to the Lender or required to be withheld or deducted from a payment to the Lender, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of the Lender being organized under the laws of, or having its principal office or its lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of the Lender with respect to any Loan, Letter of Credit or the Commitment pursuant to a law in effect on the Closing Date, (c) Taxes attributable to the Lender's failure to comply with Sections 2(f)(iv) and (d) any U.S. federal withholding Taxes imposed pursuant to FATCA.

"Existing Letter of Credit" means the direct-pay letter of credit issued by Mizuho Corporate Bank, Ltd., acting through its New York Branch, on May 31, 2011 to provide credit and liquidity support for the Bonds, together with all amendments and modifications thereto and extensions thereof.

"Existing Reimbursement Agreement" means the Reimbursement Agreement, dated as of May 31, 2011, among the Borrower, the lenders party thereto, Mizuho Corporate Bank, Ltd., acting through its New York Branch, in its capacity as issuing lender, and Banco Bilbao Vizcaya Argentaria, S.A., New York Branch, in its capacity as administrative agent, together with all amendments and modifications thereto.

"Extension Notice" has the meaning assigned to that term in Section 2(i).

5

"FATCA" means Sections 1471 through 1474 of the Code, as of Closing Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"Federal Funds Effective Rate" means for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day of such transactions received by the Lender from three federal funds brokers of recognized standing selected by it.

"Fee Payment Date" means (a) the fifth Business Day following the last day of each March, June, September and December prior to the Termination Date, (b) the Termination Date and (c) the last day of each March, June, September and December after the Termination Date, so long as any principal amount of any Loans or any Reimbursement Obligations remain outstanding after the Termination Date.

"Foreign Participant" means a Participant that is not a U.S. Person.

"FPA" means the Federal Power Act, as amended from time to time, and the rules and regulations promulgated thereunder.

"Funding Office" means the office of the Lender specified in Section 10 or such other office as may be specified from time to time by the Lender as its funding office by written notice to the Borrower.

"GAAP" means generally accepted accounting principles in the United States as in effect from time to time, except as noted below. In the event that any "Change in Accounting Principles" (as defined below) shall occur and such change results in a change in the method of calculation of financial covenants, standards or terms in this Agreement, then, upon the request of the Borrower or the Lender, the Borrower and the Lender agree to enter into negotiations in order to amend such provisions of this Agreement so as to reflect equitably such Change in Accounting Principles with the desired result that the criteria for evaluating the Borrower's financial condition shall be the same after such Change in Accounting Principles as if such Change in Accounting Principles had not been made. Until such time as such an amendment shall have been executed and delivered by the Borrower and the Lender, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Change in Accounting Principles had not occurred. "Change in Accounting Principles" refers to changes in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or any successor thereto, the SEC or, if applicable, the Public Company Accounting Oversight Board.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization (including the National Association of

6

Insurance Commissioners and supra-national bodies such as the European Union or the European Central Bank).

"Guarantee Obligation" means as to any Person (the "guaranteeing person"), any obligation, including a reimbursement, counterindemnity or similar obligation, of the guaranteeing person that guarantees any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation, (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof or (v) to reimburse or indemnify an issuer of a letter of credit, surety bond or guarantee issued by such issuer in respect of primary obligations of a primary obligor other than the Borrower or any Significant Subsidiary; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"Indebtedness" means, of any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables, including under energy procurement and transportation contracts, incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all obligations of such Person as lessee which are capitalized in accordance with GAAP, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under or in respect of acceptances, letters of credit, surety bonds or similar arrangements (other than reimbursement obligations, which are not due and payable on such date, in respect of documentary letters of credit issued to provide for the payment of goods and services in the ordinary course of business), (g) the liquidation value of all mandatorily redeemable preferred Capital Stock of such Person, (h) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above, (i) all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right,

7

contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation (provided, that if such Person is not liable for such obligation, the amount of such Person's Indebtedness with respect thereto shall be deemed to be the lesser of the stated amount of such obligation and the value of the property subject to such Lien), and (j) for the purposes of Section 8(e) only, all obligations of such Person in respect of Swap Agreements, provided that Indebtedness as used in this Agreement shall exclude any Non-Recourse Debt. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under this Agreement, the Letter of Credit or any Liquidity Provider Bond and (b) to the extent not otherwise described in (a), Other Taxes.

"Indenture" means the Indenture, dated as of April 22, 2005 (which supplemented, amended and restated the Indenture of Mortgage, dated as of March 11, 2004, between the Borrower and the Indenture Trustee, as supplemented by the First Supplemental Indenture, dated as of March 23, 2004, the Second Supplemental Indenture, dated as of April 12, 2004), as supplemented by the First Supplemental Indenture, dated as of March 13, 2007, as further supplemented by the Second Supplemental Indenture, dated as of December 4, 2007, as further supplemented by the Third Supplemental Indenture, dated as of March 3, 2008, as further supplemented by the Fourth Supplemental Indenture, dated as of October 15, 2008, as further supplemented by the Fifth Supplemental Indenture, dated as of November 18, 2008, as further supplemented by the Sixth Supplemental Indenture, dated as of March 6, 2009, as further supplemented by the Seventh Supplemental Indenture, dated as of June 11, 2009, as further supplemented by the Eighth Supplemental Indenture, dated as of November 18, 2009, as further supplemented by the Ninth Supplemental Indenture, dated as of April 1, 2010, as further supplemented by the Tenth Supplemental Indenture, dated as of September 15, 2010, as further as supplemented by the Eleventh Supplemental Indenture, dated as of October 12, 2010, as further supplemented by the Twelfth Supplemental Indenture, dated as of November 18, 2010, as further supplemented by the Thirteenth Supplemental Indenture, dated as of May 13, 2011, as further supplemented by the Fourteenth Supplemental Indenture, dated as of September 12, 2011, as further supplemented by the Fifteenth Supplemental Indenture, dated as of November 22, 2011, as further supplemented by the Sixteenth Supplemental Indenture, dated as of December 1, 2011, as further supplemented by the Seventeenth Supplemental Indenture, dated as of April 16, 2012, as further supplemented by the Eighteenth Supplemental Indenture, dated as of August 16, 2012, as further amended by the Nineteenth Supplemental Indenture, dated as of June 14, 2013, as further amended by the Twentieth Supplemental Indenture, dated as of November 12, 2013, as further amended by the Twenty-First Supplemental Indenture, dated as of February 21, 2014, as further amended by the Twenty-Second Supplemental Indenture, dated as of May 12, 2014, and as further supplemented or amended from time to time.

8

"Indenture Trustee" means The Bank of New York Mellon Trust Company, N.A., as successor by merger to The Bank of New York Trust Company, N.A., as successor to BNY Western Trust Company, and any successor thereto as trustee under the Indenture.

"Insolvency" means with respect to any Multiemployer Plan, the condition that such Plan is insolvent within the meaning of Section 4245 of ERISA.

"Insolvent" means pertaining to a condition of Insolvency.

"IRS" means the United States Internal Revenue Service.

"knowledge of the Borrower" means the actual knowledge of any Responsible Officer of the Borrower.

"Lender" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"Letter of Credit" means the irrevocable transferable direct-pay letter of credit issued by the Lender on the Closing Date, the form of which is attached as Annex 1 hereto, together with any amendment, waiver, supplement or other modification thereto.

"Letter of Credit Amount" means, initially, $75,251,767.13 as such amount may be reduced and reinstated from time to time as provided in the Letter of Credit, or as such amount may be reduced permanently (and not subject to reinstatement).

"LIBOR Market Index Rate" means the rate for deposits in U.S. dollars with a one month maturity which appears on the Reuters Screen LIBOR01 Page (or such other page as may replace that page on that service, or such other service as may be nominated by the ICE Benchmark Administration, for the purpose of displaying London interbank offered rates for U.S. dollar deposits) as of 11:00 a.m., London time, on the date of determination, except that, if such rate does not appear on such page on the date of determination, LIBOR shall be determined by an alternate method that is designed to produce a rate as similar as possible to LIBOR which alternate method shall be reasonably selected by the Lender.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing).

"Liquidity Provider Bond" has the meaning assigned to that term in the Bond Indenture.

"Loans" has the meaning assigned to that term in Section 2(c).

"Material Adverse Effect" means (a) a change in the business, property, operations or financial condition of the Borrower and its Subsidiaries taken as a whole that could reasonably be expected to materially and adversely affect the Borrower's

9

ability to perform its obligations under this Agreement or (b) a material adverse effect on the validity or enforceability of this Agreement.

"Materials of Environmental Concern" means any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products or any hazardous or toxic substances, materials or wastes, defined or regulated as such in or under any Environmental Law, including asbestos, polychlorinated biphenyls and urea-formaldehyde insulation.

"Moody's" means Moody's Investors Service, Inc.

"Multiemployer Plan" means a Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Non-Recourse Debt" means Indebtedness of the Borrower or any of its Significant Subsidiaries that is incurred in connection with the acquisition, construction, sale, transfer or other disposition of specific assets, to the extent recourse, whether contractual or as a matter of law, for non-payment of such Indebtedness is limited (a) to such assets, or (b) if such assets are (or are to be) held by a Subsidiary formed solely for such purpose, to such Subsidiary or the Capital Stock of such Subsidiary.

"Obligations" means the unpaid principal of and interest on (including, without limitation, interest accruing after the maturity of the Loans and Reimbursement Obligations and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) the Loans, the Reimbursement Obligations and all other obligations and liabilities of the Borrower to the Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement or any other document made, delivered or given in connection herewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including, without limitation, all fees, charges and disbursements of counsel to the Lender that are required to be paid by the Borrower pursuant hereto) or otherwise.

"OECD" means the countries constituting the "Contracting Parties" to the Convention on the Organisation for Economic Co-operation and Development, as such term is defined in Article 4 of such Convention.

"OFAC" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"Offering Circular" means the offering circular with respect to the remarketing of the Bonds (including any documents incorporated therein by reference and any amendments or supplements thereto) upon the substitution of the Letter of Credit for the Existing Letter of Credit.

"Other Connection Taxes" means, with respect to the Lender, Taxes imposed as a result of a present or former connection between the Lender and the jurisdiction imposing such Tax (other than connections arising from the Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or

10

perfected a security interest under, engaged in any other transaction pursuant to or enforced this Agreement, the Letter of Credit or any Liquidity Provider Bond, or sold or assigned an interest in any Loan, participation interest in the Letter of Credit, this Agreement or any Liquidity Provider Bond).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, this Agreement, the Letter of Credit or any Liquidity Provider Bond, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"Participant" has the meaning assigned to that term in Section 22(b).

"Participant Register" has the meaning assigned to that term in Section 22(b)(iii).

"PBGC" means the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

"PCG" means PG&E Corporation, a California corporation and the holder of all of the issued and outstanding voting Capital Stock of the Borrower on the Closing Date.

"Person" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Plan" means, at a particular time, any employee benefit plan that is covered by ERISA and in respect of which the Borrower or a Commonly Controlled Entity is (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Purchase Drawing" means a "C Drawing" as that term is defined in the Letter of Credit.

"Rating" means each rating announced by S&P and Moody's in respect of the Borrower's senior unsecured non credit-enhanced debt.

"Reimbursement Obligation" means the obligation of the Borrower to the Lender pursuant to Section 2(a) for amounts drawn under the Letter of Credit.

"Related Documents" mean the Bonds, the Bond Loan Agreement, the Bond Indenture, the Remarketing Agreement, the Tender Agent Agreement and any other agreement or instrument relating thereto.

"Remarketing Agent" means, as of any date of determination, the Person which on such date is serving as remarketing agent for the Bonds.

"Remarketing Agreement" means, as of any date of determination, the remarketing agreement between the Borrower and the Remarketing Agent related to the Bonds.

11

"Reorganization" means with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the thirty day notice period is waived under subsections .27, .28, .29, .30, .31, .32, .34 or .35 of PBGC Reg. § 4043.

"Requirement of Law" means, as to any Person, the articles of incorporation and bylaws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Responsible Officer" means the chief executive officer, president, chief financial officer, treasurer or assistant treasurer of the Borrower, but in any event, with respect to financial matters, the chief financial officer, treasurer or assistant treasurer of the Borrower.

"Sanction(s)" means any international economic sanction administered or enforced by the United States Government (including without limitation, OFAC), the United Nations Security Council, the European Union, Her Majesty's Treasury or other relevant sanctions authority.

"S&P" means Standard & Poor's Ratings Services.

"Scheduled Termination Date" means the fifth anniversary of the Closing Date (or, if such date is not a Business Day, the Business Day immediately preceding the fifth anniversary of the Closing Date), as such date may be extended in accordance with Section 2(h).

"SEC" means the Securities and Exchange Commission, any successor thereto and any analogous Governmental Authority.

"Securitized Bonds" means any securitized bonds or similar asset-backed securities that are non-recourse to the Borrower, are issued by a special purpose subsidiary of the Borrower and are payable from a specific or dedicated rate-component.

"Significant Subsidiary" has the meaning assigned to that term in Article 1, Rule 1-02(w) of Regulation S-X of the Exchange Act as of the Closing Date, provided that notwithstanding the foregoing, PG&E Energy Recovery Funding LLC and any other special purpose finance subsidiary shall not constitute a Significant Subsidiary. Unless otherwise qualified, all references to a "Significant Subsidiary" or to "Significant Subsidiaries" in this Agreement shall refer to a Significant Subsidiary or Significant Subsidiaries of the Borrower.

"Single Employer Plan" means any Plan that is covered by Title IV of ERISA, but that is not a Multiemployer Plan.

"Special Lender Event" means the date of the delivery by the Lender to the Borrower of an opinion of United States counsel nationally recognized to have expertise in banking or securities law matters to the effect that, (a) on the basis of a change after

12

the date of this Agreement (i) in the laws, rules or regulations applicable to the Lender or (ii) in the interpretation of such laws, rules or regulations by a Governmental Authority of the United States, or (b) due to a ruling after the date of this Agreement by a United States court of competent jurisdiction or other United States Governmental Authority, the issuance or maintenance of the Letter of Credit by the Lender or the making of Loans by the Lender (all as contemplated by this Agreement) is or will be a violation of the laws, rules and regulations applicable to the Lender and as specifically provided in this definition, or requires or will require the Lender to register as a securities dealer (or in any similar capacity) under United States law, if not otherwise so registered.

"Specified Exchange Act Filings" means the Borrower's Form 10-K annual report for the year ended December 31, 2013 and each and all of the Form 10-Ks, Form 10-Qs and Form 8-Ks (and to the extent applicable proxy statements) filed by the Borrower or PCG with the SEC after December 31, 2013 and prior to the date that is one Business Day before the date of this Agreement.

"Subsidiary" means as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or any of its Subsidiaries shall be a "Swap Agreement".

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Tender Agent" means, as of any date of determination, the Person which on such date is serving as tender agent for the Bonds. The initial Tender Agent for the Bonds is DBNTC.

"Tender Agent Agreement" means, as of any date of determination, the tender agent agreement between the Borrower and the Tender Agent related to the Bonds.

"Termination Date" unless terminated earlier pursuant to Section 2(h), means, the earliest of (i) the Scheduled Termination Date, (ii) the date on which the Bond Trustee makes the last drawing available to be made under the Letter of Credit, or (iii) the date on which the Bond Trustee surrenders the Letter of Credit to the Lender for cancellation.

13

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

(b)     Other Definitional Provisions. Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the Letter of Credit or any certificate or other document made or delivered pursuant hereto or thereto. The words "hereof", "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule, Annex and Exhibit references are to this Agreement unless otherwise specified. The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(c)     Interpretation. As used herein, in the Letter of Credit, and any certificate or other document made or delivered pursuant hereto or thereto, except as otherwise provided therein, (i) accounting terms relating to the Borrower and its Significant Subsidiaries defined in Section 1(a) and accounting terms partly defined in Section 1(a), to the extent not defined, shall have the respective meanings given to them under GAAP, (ii) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", (iii) the word "incur" shall be construed to mean incur, create, issue, assume or become liable in respect of (and the words "incurred" and "incurrence" shall have correlative meanings), (iv) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities, revenues, accounts, leasehold interests and contract rights, and (v) references to agreements or other Contractual Obligations shall, unless otherwise specified, be deemed to refer to such agreements or Contractual Obligations as amended, supplemented, restated or otherwise modified from time to time.

(d)     Significant Subsidiaries. The Borrower shall not be required to perform, nor shall it be required to guarantee the performance of, any of the affirmative covenants set forth in Section 7(a) that apply to any of its Significant Subsidiaries nor shall any of the Borrower's Significant Subsidiaries be required to perform, nor shall any of such Significant Subsidiaries be required to guarantee the performance of, any of the Borrower's affirmative covenants set forth in Section 7(a) or any of the affirmative covenants set forth in Section 7(a) that apply to any other Significant Subsidiary; provided, that nothing in this Section 1(d) shall prevent the occurrence of a Default or an Event of Default arising out of the Borrower's failure to cause any Significant Subsidiary to comply with the provisions of this Agreement applicable to such Significant Subsidiary.

SECTION 2.     Reimbursement; Overdue Payments; Other Payments; Loans.

(a)     Reimbursement; Overdue Payments; Other Payments. The Borrower agrees to pay to the Lender (i) immediately after (and on the same Business Day as) any amount is drawn under the Letter of Credit a sum (and interest on such amount as provided in clause (iv) below) equal to the amount so drawn (whether by cash or, in the case of a Purchase Drawing, by means of a Loan pursuant to Section 2(c)); (ii) upon notice from the Lender and within 30 days from the date of such notice any and all normal and customary costs and expenses as are incurred or charged by the Lender in issuing, negotiating, effecting payment under, amending or otherwise administering the Letter of Credit (and interest on such amount as provided in clause (iv) below); (iii) upon notice from the Lender of the amount thereof, and within 30 days from the date of such notice, upon each transfer of the Letter of Credit in accordance with its terms, a sum

14

(and interest on such sum as provided in clause (iv) below) in such amount as shall be necessary to cover the reasonable costs and expenses of the Lender incurred in connection with such transfer; (iv) interest on any Reimbursement Obligations, principal of any Loans, interest and fees unpaid by the Borrower when due hereunder (excluding, for the avoidance of doubt, any overdue indemnities and expenses) from the date such amounts become due until payment in full payable on demand, at a default rate per annum equal to the interest rate that would otherwise be applicable to outstanding Loans plus 2%; and (v) any and all reasonable expenses incurred by the Lender in enforcing any rights it may have against the Borrower under this Agreement.

(b)    Commissions and Fees. The Borrower agrees it will pay to the Lender (i) for the period from the Closing Date to the Termination Date, a commission with respect to the Letter of Credit computed (on the basis of a year of 360 days for the actual number of days elapsed) at the rate per annum equal to the applicable Commitment Fee Percentage on the Letter of Credit Amount, payable quarterly in arrears on each Fee Payment Date, commencing with the first such date after the Closing Date; (ii) in addition to the payment of default interest described in Section 2(a)(iv) above, if the principal amount of any Loan, or any Reimbursement Obligations under the Letter of Credit shall remain outstanding and unpaid after the Termination Date, a commission with respect to the Letter of Credit computed (on the basis of a year of 360 days for the actual number of days elapsed) at the rate per annum equal to the Commitment Fee Percentage on the principal amount of the Loan or Reimbursement Obligation Amount, as the case may be, payable quarterly in arrears on each Fee Payment Date, commencing on the first such date after the Termination Date; and (iii) the fees and expenses set forth in that certain fee letter agreement dated June 5, 2014, between the Borrower and the Lender, at the times set forth therein.

(c)    Loans.

(i)    Commitment. Subject to satisfaction of the conditions set forth in Section 3(b) and the other terms and conditions contained in this Agreement, the Lender agrees at any time and from time to time after the Closing Date and prior to the Termination Date to make loans in Dollars (the "Loans") to the Borrower. The Loans shall not exceed in aggregate principal amount at any time outstanding, the aggregate amount of all Purchase Drawings which have not been repaid to the Lender.

(ii)    Purpose of Loan. The Borrower may obtain a Loan under this Agreement only for the purpose of converting the obligation of the Borrower under Section 2(a)(i) to reimburse the Lender for a Purchase Drawing from an obligation due on the relevant drawing date to an obligation due as provided in this Section 2(c). The obtaining of any Loan for such purpose shall not constitute a reimbursement of the amount of the relevant Purchase Drawing which would result in the reinstatement of the Letter of Credit Amount. No Loans will be made for the purpose of converting the obligation of the Borrower under Section 2(a)(i) to reimburse the Lender for the amount of any Drawing other than a Purchase Drawing or for any other purpose.

(iii)    Loan Procedure. In the event that the Borrower does not otherwise reimburse the Lender in cash in accordance with the provisions of Section 2(a) of this Agreement for the amount of any Purchase Drawing prior to the time for payment specified in Section 2(e), subject to the satisfaction of the conditions set forth in Section 3(b), the Borrower will be deemed to have requested a Loan in an amount equal to the amount of such Purchase Drawing for the purposes specified in Section 2(c)(ii).

15

(iv)    Loans. Each Loan shall be in a principal amount equal to the relevant Purchase Drawing. Each Loan, together with all accrued and unpaid interest thereon, shall be paid by the Borrower upon the earliest of (A) the remarketing of the Bonds purchased with the proceeds of the Purchase Drawing that gave rise to such Loan pursuant to the Remarketing Agreement, (B) the Termination Date and (C) sixty (60) days following the occurrence of a Special Lender Event.

(v)    Interest on Loans. Each Loan shall bear interest on its outstanding principal amount at a fluctuating daily rate per annum equal to (A) the Adjusted Base Rate plus the Commitment Fee Percentage for the first ninety days, (B) the Adjusted Base Rate plus the Commitment Fee Percentage plus one percent (1%) for the second ninety days and (C) the Adjusted Base Rate plus the Commitment Fee Percentage plus two percent (2%) for each day thereafter. Interest shall be payable monthly in arrears on the first Business Day of each month commencing on the first such day to occur following the relevant Purchase Drawing date, and on the maturity of such Loan. Computations of interest shall be made on the basis of a year of 360 days, with respect to Loans bearing interest at a rate based on the Federal Funds Effective Rate or the LIBOR Market Index Rate, and on the basis of a year of 365 or 366 days, as appropriate, with respect to Loans bearing interest at the Base Rate, in each case for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest is payable.

(vi)    Voluntary Prepayments. The Borrower shall have the right to prepay the Loans in whole or in part, without premium or penalty, from time to time pursuant to this Section 2(c)(vi) on the following terms and conditions: (A) the Borrower shall give the Lender prior written notice or telephonic notice (confirmed in writing), no later than 5:00 P.M., New York City time, one Business Day prior thereto, of its intent to prepay Loans, the amount of such prepayment and the identities of the Loans (by specifying the date and original amount of the respective Loans) to be prepaid; (B) each prepayment of a Loan (other than the portion of a Loan equal to the amount of the relevant Purchase Drawing representing accrued interest on Bonds) shall be in a principal amount of $100,000 or any larger amount that is a whole multiple of $1,000 (or, if less, the amount then remaining outstanding in respect of such Loan); and (C) at the time of any prepayment, the Borrower shall pay all interest accrued on the principal amount of such prepayment.

(vii)    Liquidity Provider Bonds. Payments, if any, received by the Lender as a holder of Liquidity Provider Bonds shall be credited against the Loan made in respect of the Purchase Drawing used to purchase such Liquidity Provider Bonds. Any such payment shall be credited first against interest and then against the principal balance of such Loan. The Lender agrees to release Liquidity Provider Bonds that are being remarketed pursuant to the Remarketing Agreement to the extent that the Lender receives reimbursement in cash of the principal and, if applicable, interest amounts, of the Purchase Drawing related to the purchase of such Liquidity Provider Bonds in a manner which will permit the reinstatement of the Letter of Credit Amount in respect of such Liquidity Provider Bonds in accordance with the terms of the Letter of Credit.

(viii)    Payment by the Borrower. The Lender agrees to release, or cause the Trustee to release, Liquidity Provider Bonds to the Borrower in an amount equal to the principal amount of the Purchase Drawing made to acquire such Liquidity Provider

16

Bonds that is not repaid from remarketing proceeds upon (A) payment to the Lender by the Borrower of the full amount of such Purchase Drawing (or the Loan made in respect thereof), together with accrued and unpaid interest thereon and (B) receipt from the Bond Trustee of an instruction to permanently reduce the amount of the Letter of Credit by the principal amount of the Liquidity Provider Bonds to be released, together with a pro rata reduction in the interest coverage of the Letter of Credit.

(ix)     Excess Payments. Payments, if any, received by the Lender as a holder of Liquidity Provider Bonds shall, if no Loans are outstanding, be credited against other amounts, if any, that are then owing by the Borrower hereunder. If no amounts are then due and owing by the Borrower hereunder, or if an amount in excess of all amounts due and owing by the Borrower hereunder remains following the payment of such due and owing amounts, so long as no Event of Default has occurred and is continuing, such remaining amounts shall be immediately returned to the Borrower in accordance with its written directions. Payments, if any, described under this clause (ix) shall not be construed as prepayments that are subject to the limitations of clause (vi) above.

(d)     Increased Costs, Reduced Return.

(i)     If a Change of Law shall:

(A)     subject the Lender or any Participant to any Taxes (other than (I) Indemnified Taxes, (II) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (III) Connection Income Taxes) with respect to the Letter of Credit, any Loan or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

(B)     impose, modify or hold applicable any reserve, special deposit, compulsory loan, Federal Deposit Insurance Corporation insurance charge or other similar insurance charge or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, any office of the Lender or any Participant, which requirements are generally applicable to advances, loans and other extensions of credit made by the Lender or such Participant; or

(C)     impose on the Lender any other condition that is generally applicable to loans made by the Lender or letters of credit issued by the Lender;

and the result of any of the foregoing is to increase the cost to the Lender or such Participant by an amount that the Lender or such Participant deems to be material, of issuing or maintaining the Letter of Credit, committing to make the Loans or making the Loans, or, in the case of a Participant, its interest therein, or to reduce any amount receivable hereunder in respect thereof, then, in any such case, the Borrower shall promptly pay the Lender or such Participant, within ten Business Days after its demand, any additional amounts necessary to compensate the Lender or such Participant for such increased cost or reduced amount receivable. If the Lender or any Participant becomes entitled to claim any additional amounts pursuant to this paragraph, it shall promptly notify the Borrower of the event by reason of which it has become so entitled; provided, however, that neither the Lender nor any Participant shall be entitled to demand such

17

compensation more than 90 days following the repayment of the Loan in respect of which such demand is made, and the Lender shall not be entitled to demand such compensation more than 90 days following the expiration or termination (by Drawing or otherwise) of the Letter of Credit.

(ii)     If the Lender or any Participant shall have determined that a Change of Law regarding capital or liquidity requirements shall have the effect of reducing the rate of return on the Lender's capital, such Participant's capital or the capital of any corporation Controlling the Lender or such Participant as a consequence of its obligations hereunder or under or in respect of the Letter of Credit to a level below that which the Lender, such Participant or such corporation could have achieved but for such Change of Law (taking into consideration the Lender's, such Participant's or such corporation's policies with respect to capital adequacy) by an amount deemed by the Lender or such Participant to be material, then from time to time, after submission by the Lender or such Participant to the Borrower of a written request therefor, the Borrower shall pay to the Lender or such Participant such additional amount or amounts as will compensate the Lender, such Participant or such corporation for such reduction.

(iii)     A certificate as to any additional amounts payable pursuant to this Section submitted by the Lender or any Participant to the Borrower shall constitute prima facie evidence of such costs or amounts. Notwithstanding anything to the contrary in this Section, the Borrower shall not be required to compensate the Lender or any Participant pursuant to this Section for any amounts incurred more than six months prior to the date that the Lender or such Participant notifies the Borrower of the Lender's or such Participant's intention to claim compensation therefor; provided that, if the circumstances giving rise to such claim have a retroactive effect, then such six-month period shall be extended to include the period of such retroactive effect not to exceed twelve months. The obligations of the Borrower pursuant to this Section shall survive for 90 days after the termination of this Agreement, the termination of the Letter of Credit and the payment of all amounts then due and payable hereunder.

(e)     Payment Procedures. Same day reimbursement of drawings made under the Letter of Credit shall be made by the Borrower hereunder, without setoff or counterclaim, and shall be made prior to 3:00 P.M., New York City time, to the Lender for its own account to the account specified in writing by the Lender to the Borrower from time to time in Dollars and in immediately available funds, in each case, unless converted to a Loan pursuant to Section 2(c). Notwithstanding anything to the contrary herein, except as provided in the preceding sentence, all payments (including prepayments) to be made by the Borrower hereunder, whether on account of principal, Reimbursement Obligations, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 5:00 P.M., New York City time, on the due date thereof to the Lender at the Funding Office, in Dollars and in immediately available funds. If any payment hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment past the Termination Date, in which event such payment shall be made on the immediately preceding Business Day. In the case of any extension of any payment of principal pursuant to the preceding sentence, interest thereon shall be payable at the then applicable rate during such extension. Notwithstanding anything to the contrary contained in this Agreement, the Borrower shall make all payments of amounts due and payable under this Agreement directly to the parties to whom such payments are payable in accordance with the terms hereof.

18

(f)    Net Payments.

(i)    Any and all payments by or on account of any obligation of the Borrower under this Agreement, the Letter of Credit and any Liquidity Provider Bond shall be made without deduction or withholding for any Taxes, except as required by applicable laws. If any applicable laws (as determined in the good faith discretion of the Borrower) require the deduction or withholding of any Tax from any such payment by the Borrower, then (A) the Borrower shall withhold or make such deductions as are determined by the Borrower to be required, (B) the Borrower shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with such laws, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the Borrower shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section 2(f)) the Lender receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(ii)   Without limiting the provisions of subsection (f)(i) above, the Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Lender timely reimburse it for the payment of, any Other Taxes.

(iii)  (A) The Borrower shall, and does hereby, indemnify the Lender, and shall make payment in respect thereof within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2(f)) payable or paid by the Lender or required to be withheld or deducted from a payment to the Lender, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by the Lender shall be conclusive absent manifest error.

(B)    If the Lender is entitled to an exemption from or reduction of withholding Tax with respect to payments made under this Agreement, the Lender shall deliver to the Borrower, at the time or times reasonably requested by the Borrower, such properly completed and executed documentation reasonably requested by the Borrower as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, if reasonably requested by the Borrower, the Lender shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower as will enable the Borrower to determine whether or not the Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Sections 2(f)(iv)(C)(I) and (II) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject the Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of the Lender.

(C)    Without limiting the generality of the foregoing,

19

(I) from time to time upon the reasonable request of the Borrower, the Lender will deliver to the Borrower, executed originals of IRS Form W-9 certifying that the Lender is exempt from U.S. federal backup withholding tax; and

(II) if a payment made to the Lender under this Agreement, the Letter of Credit or any Liquidity Provider Bond would be subject to U.S. federal withholding Tax imposed by FATCA if the Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), the Lender shall deliver to the Borrower at the time or times prescribed by law and at such time or times reasonably requested by the Borrower such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower as may be necessary for the Borrower to comply with its obligations under FATCA and to determine that the Lender has complied with the Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (IV), "FATCA" shall include any amendments made to FATCA after the Closing Date.

(D) The Lender agrees that if any form or certification it previously delivered pursuant to this Section 2(f) expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower in writing of its legal inability to do so.

(iv) If the Lender determines, in its sole discretion, that it has received a refund of, or credit with respect to, any Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2(f) (any such refund or credit, a "Tax Benefit") , it shall pay to the Borrower an amount equal to such Tax Benefit (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 2(f) with respect to the Taxes giving rise to such Tax Benefit), net of all out-of-pocket expenses (including Taxes) incurred by the Lender, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such Tax Benefit), provided that the Borrower, upon the request of the Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Lender in the event the Lender is required to repay such Tax Benefit to such Governmental Authority. Notwithstanding anything to the contrary in this subsection, in no event will the Lender be required to pay any amount to the Borrower pursuant to this subsection the payment of which would place the Lender in a less favorable net after-Tax position than the Lender would have been in if the Tax subject to indemnification and giving rise to such Tax Benefit had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This subsection shall not be construed to require the Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrower or any other Person.

(v) The agreements in this Section shall survive for one year after the termination of this Agreement and the payment of all amounts payable hereunder.

20

(g)    Change of Lending Office. The Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2(d) or 2(f)(i) with respect to the Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of the Lender) to designate another lending office with the object of avoiding the consequences of such event; provided, that such designation is made on terms that, in the sole but reasonable judgment of the Lender, cause the Lender and its lending office to suffer no unreimbursed, economic disadvantage or any legal or regulatory disadvantage, and provided, further, that nothing in this Section shall affect or postpone any of the obligations of the Borrower or the rights of the Lender pursuant to Section 2(d) or 2(f)(i).

(h)    Termination; Extension of Scheduled Termination Date; Reduction of Commitments.

(i)    The Borrower shall have the right, upon not less than three Business Days' notice to the Lender, to terminate the Commitments and the Letter of Credit; provided that (A) no such termination shall be permitted if after giving effect thereto, any Reimbursement Obligations of the Borrower with respect to the Letter of Credit or any Loans remain outstanding and (B) the Bond Trustee shall have surrendered the Letter of Credit to the Lender without any further Drawing thereon. No termination of the Commitments shall release the Borrower from its obligation to pay amounts due hereunder.

(ii)    The Borrower may, by written notice to the Lender (such notice being an "Extension Notice") given no more frequently than once in each calendar year and not less than one hundred twenty (120) days prior to the then current Scheduled Termination Date, request the Lender to consider an extension of the then applicable Scheduled Termination Date to a later date. The Lender shall notify the Borrower whether it wishes to extend the then applicable Scheduled Termination Date not later than thirty days after the date of such Extension Notice. Any failure by the Lender to expressly notify the Borrower prior to the expiration of such thirty-day period that it wishes to so extend the then applicable Scheduled Termination Date shall be deemed to have rejected the Borrower's request for extension of such Scheduled Termination Date. If the Lender elects (in its sole and absolute discretion) to so extend the Scheduled Termination Date, the Lender shall deliver to the Bond Trustee an amendment of the Letter of Credit which extends the Scheduled Termination Date thereof. Any extension of the Letter of Credit hereunder shall be on the same terms and conditions as set forth herein. Upon the delivery of an Extension Notice and upon the extension of the Scheduled Termination Date pursuant to this Section, the Borrower shall be deemed to have represented and warranted on and as of the date of such Extension Notice and the effective date of such extension, as the case may be, that no Default or Event of Default has occurred and is continuing. Notwithstanding anything contained in this Agreement to the contrary, the Lender shall not have any obligation to extend the Scheduled Termination Date, and the Lender may at its option, unconditionally and without cause, decline to extend the Scheduled Termination Date.

(iii)    If the Scheduled Termination Date shall have been extended in accordance with this Section, all references herein to the "Scheduled Termination Date" shall refer to the Scheduled Termination Date as so extended.

21

(iv)    If the Amount of the Letter of Credit (as defined in the Letter of Credit) is permanently reduced pursuant to the terms of the Letter of Credit, the amount of the Commitment shall automatically be permanently reduced to the Amount of the Letter of Credit as so reduced.

SECTION 3.    Conditions Precedent.

(a)    Conditions to the Closing Date. The Lender shall issue the Letter of Credit on the first date that the following conditions precedent are satisfied (the "Closing Date"):

(i)    Consents and Approvals. All governmental and third party consents and approvals necessary in connection with this Agreement and the transactions contemplated hereby shall have been obtained and be in full force and effect; and the Lender shall have received a certificate of a Responsible Officer to the foregoing effect.

(ii)    Fees. The Lender shall have received all fees required to be paid, and all expenses for which invoices have been presented (including the reasonable fees and expenses of legal counsel), on or before the Closing Date.

(iii)    Closing Certificate; Certified Articles of Incorporation; Good Standing Certificates. The Lender shall have received (A) a certificate of the Borrower, dated the Closing Date, substantially in the form of Exhibit B, with appropriate insertions and attachments, including the articles of incorporation of the Borrower certified by the Secretary of State of the State of California, and containing a confirmation by the Borrower that the conditions precedent set forth in this Section 3(a) have been satisfied and (B) a good standing certificate for the Borrower from the Secretary of State of the State of California.

(iv)    Legal Opinion. The Lender shall have received the legal opinion of Orrick, Herrington & Sutcliffe LLP, counsel to the Borrower, substantially in the form of Exhibit C.

(v)    Representations and Warranties. Each of the representations and warranties made by the Borrower in this Agreement that does not contain a materiality qualification shall be true and correct in all material respects on and as of the Closing Date, and each of the representations and warranties made by the Borrower in this Agreement that contains a materiality qualification shall be true and correct on and as of the Closing Date (or, to the extent such representations and warranties specifically relate to an earlier date, that such representations and warranties were true and correct in all material respects, or true and correct, as the case may be, as of such earlier date).

(vi)    No Default. No Default or Event of Default shall have occurred and be continuing or would result from the issuance of the Letter of Credit. .

(vii)    Related Documents. The Lender shall have received executed copies (or duplicates thereof) of the Related Documents together will all amendments, supplements, modifications and waivers thereto, each of which shall be in form and substance satisfactory to the Lender.

(viii)    Ratings. The Bonds have been assigned a short-term rating of "VMIG 1" by Moody's and "A-1" by S&P.

22

(ix) Offering Circular. The Offering Circular shall be in form and substance reasonably satisfactory to the Lender.

(x) Remarketing Deliverables. Receipt by the Lender of executed copies of each other agreement, document, instrument, certificate or opinion (other than the opinion of counsel to the Remarketing Agent delivered to the Remarketing Agent and any negative assurance letter from counsel) required to be delivered by any Person to the Remarketing Agent in connection with the substitution of the Letter of Credit for the Existing Letter of Credit, each of which shall be in form and substance satisfactory to the Lender and, in the case of such opinion, a letter addressed to the Lender from the counsel rendering such opinion stating that the Lender is entitled to rely upon such opinion as if such opinion were addressed to it.

(xi) Termination of Existing Letter of Credit and Existing Reimbursement Agreement. The Lender shall be satisfied that the Existing Letter of Credit will terminate on the Business Day following the Closing Date and that all amounts owing to the administrative agent (if any), the issuing lender and lenders under the Existing Reimbursement Agreement have been paid in full.

(b) Conditions to Loans. The obligation of the Lender to make a Loan in respect of any Purchase Drawing is subject to the following conditions:

(i) Representations and Warranties. Each of the representations and warranties made by the Borrower in or pursuant to this Agreement that does not contain a materiality qualification (other than, with respect to any Loan made after the Closing Date, the representations and warranties set forth in Section 6(b), Section 6(f)(ii) and Section 6(m)) shall be true and correct in all material respects on and as of the date of such extension of credit as if made on and as of such date, and each of the representations and warranties made by the Borrower in this Agreement that contains a materiality qualification (other than, with respect to any Loan made after the Closing Date, the representations and warranties set forth in Section 6(b), Section 6(f)(ii) and Section 6(m)) shall be true and correct on and as of such date (or, to the extent such representations and warranties specifically relate to an earlier date, that such representations were true and correct in all material respects, or true and correct, as the case may be, as of such earlier date).

(ii) No Default. No Default, Event of Default or Special Lender Event shall have occurred and be continuing on such date or after giving effect to the Loans requested to be made on such date.

(iii) Related Documents. No "Event of Default" under the Bond Indenture or the Bond Loan Agreement shall have occurred and be continuing.

SECTION 4. Reduction and Reinstatement. The Letter of Credit Amount shall be automatically reduced or reinstated, as the case may be, as specified in the Letter of Credit.

SECTION 5. Obligations Absolute. The obligations of the Borrower under this Agreement shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement, under all circumstances whatsoever, including without limitation the following circumstances:

23

(a)     any lack of validity or enforceability of the Letter of Credit, this Agreement or any of the Related Documents;

(b)     any amendment or waiver of or any consent to departure from all or any of this Agreement, the Letter of Credit or any Related Document;

(c)     the existence of any claim, set-off, defense or other rights which the Borrower may have at any time against the Bond Trustee, any beneficiary, or any transferee of the Letter of Credit (or any persons or entities for whom the Bond Trustee, any such beneficiary or any such transferee may be acting), the Lender or any other person or entity, whether in connection with this Agreement, the Letter of Credit or the Related Documents, or any unrelated transactions; provided that nothing herein shall prevent the assertion of any such claim by separate suit or compulsory counterclaim;

(d)     any statement or any other document presented under the Letter of Credit proving to be forged, fraudulent, invalid, or insufficient in any respect or any statement therein being untrue or inaccurate in any respect whatsoever;

(e)     payment by the Lender under the Letter of Credit against presentation of a draft or certificate which does not comply with the terms of the Letter of Credit, except where such payment was due to the willful misconduct or gross negligence of the Lender; or

(f)     any other circumstance or happening whatsoever, whether or not similar to any of the foregoing.

SECTION 6. Representations and Warranties. To induce the Lender to enter into this Agreement and to issue the Letter of Credit and make Loans, the Borrower hereby represents and warrants to the Lender, on the date hereof, on the Closing Date and on the date of each borrowing of a Loan, that:

(a)     Financial Condition. The audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as of December 31, 2013, and the related consolidated statements of operations and cash flows for the fiscal year ended on such date, reported on by Deloitte & Touche LLP, present fairly in all material respects the consolidated financial condition of the Borrower and its consolidated Subsidiaries as of such date, and the consolidated results of its operations and its consolidated cash flows for the fiscal year then ended. All such financial statements, including the related schedules and notes thereto, have been prepared in accordance with GAAP applied consistently throughout the periods involved.

(b)     No Change. Since December 31, 2013, there has been no development or event that has had or could reasonably be expected to have a Material Adverse Effect, except as disclosed in the Specified Exchange Act Filings.

(c)     Existence; Compliance with Law. Each of the Borrower and its Significant Subsidiaries (i) is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, (ii) has the corporate power and corporate authority to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently engaged, (iii) is duly qualified as a foreign corporation or other organization and in good standing under the laws of each jurisdiction

24

where its ownership, lease or operation of property or the conduct of its business requires such qualification except to the extent that the failure to so qualify could not reasonably be expected to have a Material Adverse Effect and (iv) is in compliance with all Requirements of Law except for any Requirements of Law being contested in good faith by appropriate proceedings and except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

(d)    Power; Authorization; Enforceable Obligations. The Borrower has the corporate power and corporate authority to make, deliver and perform this Agreement and to obtain the extensions of credit hereunder. The Borrower has taken all necessary corporate action to authorize the execution, delivery and performance of this Agreement and to authorize the extensions of credit on the terms and conditions of this Agreement. No consent or authorization of, filing with, notice to or other act by or in respect of, any Governmental Authority or any other Person is required in connection with the extensions of credit hereunder or with the execution, delivery, performance, validity or enforceability of this Agreement, except (i) consents, authorizations, filings and notices which have been obtained or made and are in full force and effect, (ii) any consent, authorization or filing that may be required in the future the failure of which to make or obtain could not reasonably be expected to have a Material Adverse Effect and (iii) applicable regulatory requirements (including the approval of the CPUC) prior to foreclosure under the Indenture (to the extent that there is any pledge of property under or pursuant to the Indenture). This Agreement has been duly executed and delivered. This Agreement constitutes a legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms, except as enforceability may be limited by (x) applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally, laws of general application related to the enforceability of securities secured by real estate and by general equitable principles (whether enforcement is sought by proceedings in equity or at law) and (y) applicable regulatory requirements (including the approval of the CPUC) prior to foreclosure under the Indenture (to the extent that there is any pledge of property under or pursuant to the Indenture).

(e)    No Legal Bar. The execution, delivery and performance of this Agreement and the Related Documents to which the Borrower is a party, the issuance of the Letter of Credit, the borrowings hereunder and the use of the proceeds thereof will not violate in any material respect any Requirement of Law or any Contractual Obligation of the Borrower or any of its Significant Subsidiaries and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any Requirement of Law or any such Contractual Obligation (other than any Lien created hereunder).

(f)    Litigation.

(i)    No litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of the Borrower, threatened in writing by or against the Borrower or any of its Significant Subsidiaries or against any of their respective material properties or revenues with respect to this Agreement.

25

(ii)　No litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of the Borrower, threatened in writing by or against the Borrower or any of its Significant Subsidiaries or against any of their material respective properties or revenues, except as disclosed in the Specified Exchange Act Filings, that could reasonably be expected to have a Material Adverse Effect.

(g)　No Default. No Default or Event of Default has occurred and is continuing.

(h)　Taxes. The Borrower and each of its Significant Subsidiaries has filed or caused to be filed all Federal and state returns of income and franchise taxes imposed in lieu of net income taxes and all other material tax returns that are required to be filed and has paid all taxes shown to be due and payable on said returns or with respect to any claims or assessments for taxes made against it or any of its property by any Governmental Authority (other than (i) any amounts the validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the Borrower or any of its Significant Subsidiaries, as applicable, and (ii) claims which could not reasonably be expected to have a Material Adverse Effect). No tax Liens have been filed against the Borrower or any of its Significant Subsidiaries other than (A) Liens for taxes which are not delinquent or (B) Liens for taxes which are being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the Borrower or any of its Significant Subsidiaries, as applicable.

(i)　Federal Regulations. No part of the proceeds of any Loans, and no other extensions of credit hereunder, will be used for "buying" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U as now and from time to time hereafter in effect or for any purpose that violates the provisions of the Regulations of the Board.

(j)　ERISA. No Reportable Event has occurred during the five year period prior to the date on which this representation is made or deemed made with respect to any Plan, and each Plan has complied with the applicable provisions of ERISA and the Code, except, in each case, to the extent that any such Reportable Event or failure to comply with the applicable provisions of ERISA or the Code could not reasonably be expected to result in a Material Adverse Effect. During the five year period prior to the date on which this representation is made or deemed made, there has been no (i) failure to make a required contribution to any Plan that would result in the imposition of a lien or other encumbrance or the provision of security under Section 430 of the Code or Section 303 or 4068 of ERISA, or the arising of such a lien or encumbrance; or (ii) "unpaid minimum required contribution" or "accumulated funding deficiency" (as defined or otherwise set forth in Section 4971 of the Code or Part 3 of Subtitle B of Title I of ERISA), whether or not waived, except, in each case, to the extent that such event could not reasonably be expected to result in a Material Adverse Effect. No termination of a Single Employer Plan has occurred, and no Lien in favor of the PBGC or a Plan has arisen, during such five-year period. The present value of all accrued benefits under each Single Employer Plan (based on those assumptions used to fund such Plans) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made,

exceed the value of the assets of such Plan allocable to such accrued benefits, except as could not reasonably be expected to result in a Material Adverse Effect. Neither the Borrower nor any Commonly Controlled Entity has had a complete or partial withdrawal from any Multiemployer Plan during the five year period prior to the date on which this representation is made or deemed made that has resulted or could reasonably be expected to result in a material liability under ERISA, and neither the Borrower nor any Commonly Controlled Entity would become subject to any liability under ERISA if the Borrower or any such Commonly Controlled Entity were to withdraw completely from all Multiemployer Plans as of the valuation date most closely preceding the date on which this representation is made or deemed made, except as could not reasonably be expected to result in a Material Adverse Effect. No such Multiemployer Plan is in Reorganization or Insolvent.

(k) Investment Company Act; Other Regulations. The Borrower is not an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended. On the date hereof, the Borrower is not subject to regulation under any Requirement of Law (other than (i) Regulation X of the Board and (ii) Sections 701, 817-830, and 851 of the California Public Utilities Code) that limits its ability to incur Indebtedness under this Agreement.

(l) Use of Proceeds. The proceeds of any Drawing shall be used in accordance with the terms of the Letter of Credit to pay (i) the principal of the Bonds when due (at maturity or upon redemption, purchase in lieu of redemption and/or purchase in lieu of acceleration, or acceleration), (ii) the purchase price of Bonds tendered and not remarketed and (iii) accrued interest on the Bonds.

(m) Environmental Matters. Except as disclosed in the Specified Exchange Act Filings, the Borrower and its Significant Subsidiaries do not have liabilities under Environmental Laws or relating to Materials of Environmental Concern that would reasonably be expected to have a Material Adverse Effect, and, to the knowledge of the Borrower, there are no facts, circumstances or conditions that could reasonably be expected to give rise to such liabilities.

(n) Regulatory Matters. Solely by virtue of the execution, delivery and performance of, or the consummation of the transactions contemplated by this Agreement, the Lender shall not be or become subject to regulation (i) under the FPA or (ii) as a "public utility" or "public service corporation" or the equivalent under any Requirement of Law.

(o) Sanctions. Neither the Borrower, nor any of its Subsidiaries, nor, to the knowledge of the Borrower and its Subsidiaries, any director, officer, employee, agent, affiliate or representative thereof, is an individual or entity currently the subject of any Sanctions, nor is the Borrower or any Subsidiary located, organized or resident in a Designated Jurisdiction.

(p) Bond Loan Agreement. The representations and warranties of the Borrower set forth in the Bond Loan Agreement were true and correct in all material respects as of the date when made.

27

SECTION 7. Covenants.

    (a)    Affirmative Covenants. The Borrower hereby agrees that, so long as the Commitment remains in effect or the Letter of Credit, any Loan, any interest on any Loan or any fee payable to the Lender hereunder remains outstanding, or any other amount then due and payable is owing to the Lender, the Borrower shall and, with respect to Sections 7(a)(iii) and 7(a)(vi)(B), shall cause its Significant Subsidiaries to:

    (i)    Financial Statements. Furnish to the Lender:

    (A)    as soon as available, but in any event within 120 days after the end of each fiscal year of the Borrower, a copy of the audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such year and the related audited consolidated statements of operations and cash flows for such year, setting forth in each case in comparative form the figures for the previous year, reported on without a "going concern" or like qualification or exception, or qualification arising out of the scope of the audit, by Deloitte & Touche LLP or other independent certified public accountants of nationally recognized standing; and

    (B)    as soon as available, but in any event not later than 60 days after the end of each of the first three quarterly periods of each fiscal year of the Borrower, the unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such quarter and the related unaudited consolidated statements of operations and cash flows for such quarter and the portion of the fiscal year through the end of such quarter, setting forth in each case in comparative form the figures for the previous year, certified by a Responsible Officer as being fairly stated in all material respects (subject to normal year end audit adjustments).

All such financial statements shall be complete and correct in all material respects and shall be prepared in reasonable detail and in accordance with GAAP applied (except as approved by such accountants or officer, as the case may be, and disclosed in reasonable detail therein) consistently throughout the periods reflected therein and with prior periods. The Borrower shall be deemed to have delivered the financial statements required to be delivered pursuant to this Section 7(a)(i) upon the filing of such financial statements by the Borrower through the SEC's EDGAR system (or any successor electronic gathering system that is publicly available free of charge) or the publication by the Borrower of such financial statements on its website.

    (ii)    Certificates; Other Information. Furnish to the Lender:

    (A)    within two days after the delivery of any financial statements pursuant to Section 7(a)(i), (1) a certificate of a Responsible Officer stating that such Responsible Officer has obtained no knowledge of any Default or Event of Default except as specified in such certificate and (2) in the case of quarterly or annual financial statements, a Compliance Certificate, substantially in the form of Exhibit A, containing all information and calculations reasonably necessary for determining

28

compliance by the Borrower with the provisions of this Agreement referred to therein as of the last day of the fiscal quarter or fiscal year of the Borrower, as the case may be;

(B)    within five days after the same are sent, copies of all financial statements and reports that the Borrower sends to the holders of any class of its debt securities or public equity securities, provided that, such financial statements and reports shall be deemed to have delivered upon the filing of such financial statements and reports by the Borrower through the SEC's EDGAR system (or any successor electronic gathering system that is publicly available free of charge) or publication by the Borrower of such financial statements and reports on its website; and

(C)    promptly, such additional financial and other information as the Lender may from time to time reasonably request.

(iii)    Payment of Taxes. Pay all taxes due and payable or any other tax assessments made against the Borrower or any of its Significant Subsidiaries or any of their respective property by any Governmental Authority (other than (A) any amounts the validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the Borrower or any of its Significant Subsidiaries, as applicable, or (B) where the failure to effect such payment could not reasonably be expected to have a Material Adverse Effect).

(iv)    Maintenance of Existence; Compliance. (A)(1) Preserve, renew and keep in full force and effect its organizational existence; provided that the foregoing shall not prohibit any merger, consolidation or amalgamation permitted under Section 7(b)(iii) and (2) take all reasonable action to maintain all rights, privileges and franchises necessary or desirable in the normal conduct of its business, except, in each case, as otherwise permitted by Section 7(b)(iii) and except, in the case of clause (2) above, to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; (B) comply with all Contractual Obligations except to the extent that failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect and (C) comply with all Requirements of Law except for any Requirements of Law being contested in good faith by appropriate proceedings and except to the extent that failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

(v)    Maintenance of Property; Insurance. (A) Keep all property useful and necessary in its business in good working order and condition, ordinary wear and tear excepted, except to the extent that failure to do so could not, in the aggregate, reasonably be expected to have a Material Adverse Effect, and (B) maintain with financially sound and reputable insurance companies insurance on all its material property in at least such amounts and against at least such risks as are usually insured against in the same general area by companies engaged in the same or a similar business of comparable size and financial strength and owning similar properties in the same general areas in which the Borrower operates, which may include self-insurance, if determined by the Borrower to be reasonably prudent.

29

(vi)     Inspection of Property; Books and Records; Discussions.  (A)
Keep proper books of records and account in which full, true and correct entries in
conformity with GAAP and all Requirements of Law shall be made of all dealings and
transactions in relation to its business and activities and (B) unless a Default or Event of
Default has occurred and is continuing, not more than once a year and after at least five
Business Days' notice, (1) permit representatives of the Lender to visit and inspect any of
its properties and examine and make abstracts from any of its books and records at any
reasonable time to discuss the business, operations, properties and financial and other
condition of the Borrower and its Significant Subsidiaries with officers and employees of
the Borrower and its Significant Subsidiaries and (2) use commercially reasonable efforts
to provide for the Lender (in the presence of representatives of the Borrower) to meet
with the independent certified public accountants of the Borrower and its Subsidiaries;
provided, that any such visits or inspections shall be subject to such conditions as the
Borrower and each of its Significant Subsidiaries shall deem necessary based on
reasonable considerations of safety and security; and provided, further, that neither the
Borrower nor any Significant Subsidiary shall be required to disclose to the Lender or its
agents or representatives any information which is subject to the attorney-client privilege
or attorney work-product privilege properly asserted by the applicable Person to prevent
the loss of such privilege in connection with such information or which is prevented from
disclosure pursuant to a confidentiality agreement with third parties.

(vii)    Notices.  Promptly give notice to the Lender:

(A)     when known to a Responsible Officer, the occurrence of
any Default or Event of Default;

(B)     any change in the Rating issued by either S&P or Moody's;
and

(C)     the following events, as soon as possible and in any event
within 30 days after the Borrower knows thereof: (1) the occurrence of
any Reportable Event with respect to any Plan which has not been waived,
a failure to make any required minimum contribution to a Plan under
Section 412 or 430 of the Code, the creation of any Lien in favor of the
PBGC with respect to a Plan or any withdrawal by the Borrower or any
Commonly Controlled Entity from, or the termination, Reorganization or
Insolvency of, any Multiemployer Plan or (2) the institution of
proceedings or the taking of any other material action by the PBGC or the
Borrower or any Commonly Controlled Entity or any Multiemployer Plan
with respect to the withdrawal from, or the termination, Reorganization or
Insolvency of, any Plan.

(viii)   Maintenance of Licenses, etc.  Maintain in full force and effect any
authorization, consent, license or approval of any Governmental Authority necessary for
the conduct of the Borrower's business as now conducted by it or necessary in connection
with this Agreement, except to the extent the failure to do so could not reasonably be
expected to have a Material Adverse Effect.

(b)     Negative Covenants.  The Borrower hereby agrees that, so long as the
Commitment remains in effect or the Letter of Credit, any Loan, any interest on any Loan or any

fee payable to the Lender hereunder remains outstanding, or any other amount then due and payable is owing to the Lender, the Borrower shall not and, with respect to Section 7(b)(ii), shall not permit its Significant Subsidiaries to:

      (i)     Consolidated Capitalization Ratio. Permit the Consolidated Capitalization Ratio on the last day of any fiscal quarter, from and after the last day of the first fiscal quarter ending after the Closing Date, to exceed 0.65 to 1.00.

      (ii)    Liens. Create, incur, assume or suffer to exist any Lien upon any assets of the Borrower or any Significant Subsidiary, whether now owned or hereafter acquired, except for (A) Liens securing the Borrower's obligations to the Lender and (B) Liens permitted by the Bond Indenture.

      (iii)   Fundamental Changes. Enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of all or substantially all of its property or business, except that the Borrower may be merged, consolidated or amalgamated with another Person or Dispose of all or substantially all of its property or business so long as, after giving effect to such transaction, (A) no Default or Event of Default shall have occurred and be continuing, (B) either (1) the Borrower is the continuing or surviving corporation of such merger, consolidation or amalgamation or (2) the continuing or surviving corporation of such merger, consolidation or amalgamation, if not the Borrower or the purchaser, as the case may be, shall have assumed all obligations of the Borrower under this Agreement pursuant to arrangements reasonably satisfactory to the Lender and (C) the ratings by Moody's and S&P of the continuing or surviving corporation's or purchaser's, as the case may be, senior, unsecured, non credit-enhanced debt shall be at least the higher of (1) Baa3 from Moody's and BBB- from S&P and (2) the ratings by such rating agencies of the Borrower's senior, unsecured, non credit-enhanced debt in effect before the earlier of the occurrence or the public announcement of such event.

      (iv)   Amendment of Related Documents. The Borrower will not enter into or consent to any amendment of any of the Related Documents without the prior written consent of the Lender.

      (v)    Optional Redemption of Bonds. The Borrower shall not instruct the Bond Trustee to cause an optional redemption of all or a portion of the Bonds unless either (A) the Lender shall have consented thereto in writing; provided, however, that the Lender shall consent to such redemption so long as the Borrower demonstrates to the Lender that it has adequate funds available to reimburse the Lender for a Drawing to pay the redemption price of such Bonds or (B) the Borrower provides the Bond Trustee with Available Amounts (as such term is defined in the Bond Indenture), other than amounts drawn or to be drawn under the Letter of Credit, sufficient to pay the redemption price of the Bonds to be redeemed.

SECTION 8. Events of Default. If any of the following events shall occur and be continuing on or after the Closing Date:

      (a)    the Borrower shall fail to pay any principal of any Loan or any Reimbursement Obligation when due in accordance with the terms hereof; or the Borrower shall fail to pay any interest on any Loan or Reimbursement Obligation, or any other amount payable

31

hereunder, within five Business Days after any such interest or other amount becomes due in accordance with the terms hereof; or

(b)    any representation or warranty made or deemed made by the Borrower herein or that is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with this Agreement shall prove to have been inaccurate in any material respect on or as of the date made or deemed made, unless, as of any date of determination, the facts or circumstances to which such representation or warranty relates have changed with the result that such representation or warranty is true and correct in all material respects on such date; or

(c)    the Borrower shall default in the observance or performance of any agreement contained in Section 7(b)(i), Section 7(b)(iii) or Section 7(b)(iv) of this Agreement; or

(d)    the Borrower shall default in the observance or performance of any other agreement contained in this Agreement (other than as provided in paragraphs (a) through (c) of this Section), and such default shall continue unremedied for a period of 30 days after notice to the Borrower from the Lender; or

(e)    the Borrower or any of its Significant Subsidiaries shall (i) default in making any payment of any principal of any Indebtedness (including any Guarantee Obligation, but excluding the Letter of Credit and the Loans) on the due date with respect thereto (after giving effect to any period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created); or (ii) default in making any payment of any interest on any such Indebtedness beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created; or (iii) default in the observance or performance of any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or (in the case of all Indebtedness other than Indebtedness under any Swap Agreement) to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity or (in the case of any such Indebtedness constituting a Guarantee Obligation) to become payable; provided, that a default, event or condition described in clause (i), (ii) or (iii) of this paragraph (e) shall not at any time constitute an Event of Default unless, at such time, one or more defaults, events or conditions of the type described in clauses (i), (ii) and (iii) of this paragraph (e) shall have occurred and be continuing with respect to Indebtedness the outstanding principal amount of which exceeds in the aggregate $100,000,000; provided further, that unless payment of the Loans hereunder has already been accelerated, if such default shall be cured by the Borrower or such Significant Subsidiary or waived by the holders of such Indebtedness and any acceleration of maturity having resulted from such default shall be rescinded or annulled, in each case, in accordance with the terms of such agreement or instrument, without any modification of the terms of such Indebtedness requiring the Borrower or such Significant Subsidiary to furnish security or additional security therefor, reducing the average life to maturity thereof or increasing the principal amount thereof, or any agreement by the Borrower or such Significant Subsidiary to furnish security or additional security therefor or to issue in lieu thereof Indebtedness secured by additional or other collateral or with a shorter average life to maturity or in a greater principal amount, then any Default hereunder by reason thereof shall be deemed likewise to have been thereupon cured or waived; or

32

(f)    (i) the Borrower or any of its Significant Subsidiaries shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or the Borrower or any of its Significant Subsidiaries shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against the Borrower or any of its Significant Subsidiaries any case, proceeding or other action of a nature referred to in clause (i) above that (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of 60 days; or (iii) there shall be commenced against the Borrower or any of its Significant Subsidiaries any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets that results in the entry of an order for any such relief that shall not have been vacated, discharged, or stayed or bonded pending appeal within 60 days from the entry thereof; or (iv) the Borrower or any of its Significant Subsidiaries shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; or

(g)    a trustee shall be appointed to administer any Plan under Section 4042 of ERISA, or the PBGC shall institute proceedings to terminate, or to have a trustee appointed to administer any Plan and such proceedings shall continue undismissed or unstayed and in effect for a period of 60 days, but only if any such event could reasonably be expected to result in a Material Adverse Effect; or

(h)    one or more judgments or decrees shall be entered against the Borrower or any of its Significant Subsidiaries by a court of competent jurisdiction involving in the aggregate a liability (not paid or, subject to customary deductibles, fully covered by insurance as to which the relevant insurance company has not denied coverage) of $100,000,000 or more, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within 30 days from the entry thereof unless, in the case of a discharge, such judgment or decree is due at a later date in one or more payments and the Borrower or such Subsidiary satisfies the obligation to make such payment or payments on or prior to the date such payment or payments become due in accordance with such judgment or decree; or

(i)    there shall have occurred a Change of Control;

then, and in any such event, (A) if such event is an Event of Default specified in clause (i) or (ii) of paragraph (f) above with respect to the Borrower, automatically the Commitment shall immediately terminate and all amounts owing under this Agreement (including all amounts then undrawn and unexpired under the Letter of Credit and the aggregate amount of unreimbursed Drawings, whether or not the Bond Trustee shall have presented the documents required thereunder) shall immediately become due and payable, and (B) if such event is any other Event of Default, either or both of the following actions may be taken: (i) the Lender may by notice to the Borrower declare the Commitment to be terminated forthwith, whereupon the Commitment shall immediately terminate; and (ii) the Lender may by notice to the Borrower, (1) declare all amounts owing under this Agreement (including all amounts then undrawn and unexpired under the Letter of Credit and the aggregate amount of unreimbursed Drawings, whether or not the Bond Trustee shall have presented the documents required thereunder) to be due and payable

33

forthwith, whereupon the same shall immediately become due and payable and (2) give written notice to the Bond Trustee of such occurrence, with the effect contemplated by Section 7.01 of the Bond Indenture. With respect to the Letter of Credit with respect to which presentment for honor shall not have occurred at the time of an acceleration pursuant to this paragraph, the Borrower shall at such time deposit in a cash collateral account opened by the Lender an amount equal to the aggregate then undrawn and unexpired amount of the Letter of Credit. Amounts held in such cash collateral account shall be applied by the Lender for the payment of drafts drawn under the Letter of Credit in accordance with the terms hereof, and the unused portion thereof after the Letter of Credit shall have expired or been fully drawn upon, if any, shall be applied to repay other obligations of the Borrower hereunder. After the Letter of Credit shall have expired or been fully drawn upon, all Reimbursement Obligations shall have been satisfied and all other obligations of the Borrower hereunder shall have been paid in full, the balance, if any, in any cash collateral account established for the Letter of Credit shall be returned to the Borrower (or such other Person as may be lawfully entitled thereto). Except as expressly provided above in this Section, presentment, demand, protest and all other notices of any kind are hereby expressly waived by the Borrower.

SECTION 9. Amendments and Waivers. Neither this Agreement nor any terms hereof may be amended, supplemented or modified except in a writing executed by the Borrower and the Lender. No term of this Agreement may be waived unless such waiver is in a writing executed by the waiving party. Any such waiver and any such amendment, supplement or modification shall be binding upon the Borrower, the Lender and all future holders of the Loans. In the case of any waiver, the Borrower and the Lender shall be restored to their former position and rights hereunder, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

SECTION 10. Notices. All notices, requests and demands to or upon the parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three Business Days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice, when received, addressed as follows, or to such other address as may be hereafter notified by the parties hereto:

Borrower:               Pacific Gas and Electric Company
                            c/o PG&E Corporation
                            77 Beale Street
                            P.O. Box 770000
                            San Francisco, CA 94177
                            Attention: Treasurer
                            Telecopy:   415-973-9771
                            Telephone: 415-973-8968

| with a copy to: | Pacific Gas and Electric Company |
| | c/o PG&E Corporation |
| | 77 Beale Street |
| | P.O. Box 770000 |
| | San Francisco, CA 94177 |
| | Attention: General Counsel |
| | Telecopy: 415- 973-4377 |
| | Telephone: 415-973-5520 |
| | |
| Lender: | Union Bank, N.A. |
| | 445 South Figueroa Street |
| | 15th Floor |
| | Los Angeles, CA 90071 |
| | Attention: Power & Utilities |
| | Telephone: 213-236-4222 |
| | |
| with a copy to: | Mitsubishi UFJ Financial Group |
| | 1251 Avenue of the Americas |
| | New York, NY 10020 |
| | Attention: Power & Utilities |

provided that any notice, request or demand to or upon the Lender shall not be effective until received.

The Lender or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

SECTION 11. No Waiver; Remedies. No failure to exercise and no delay in exercising, on the part of the Lender, any right, remedy, power or privilege hereunder or under the Letter of Credit shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

SECTION 12. Setoff. To the extent the existence or exercise of such right under the circumstances and at the time described below would be a basis for enjoining or otherwise limiting or delaying or avoiding any payment under the Letter of Credit or the presentation of documents or making a demand thereunder, the Lender hereby waives any right to setoff and apply any and all deposits (general or special, time or demand, provisional or final) or collateral at any time held and other indebtedness at any time owing by the Lender to or for the credit or the account of the Borrower if there shall be a Drawing at any time during the pendency of any proceeding by or against the Borrower seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency, or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver,

35

custodian, trustee, or other similar official for it or for any substantial part of its property, against any and all of the obligations of the Borrower now or hereafter existing in respect of the Reimbursement Obligation of the Borrower set forth in paragraph (a) of Section 2 hereof. This Section shall not constitute a waiver of any right of setoff if there shall be a Drawing at any time other than that described above. Except as may otherwise be provided above, in addition to any rights and remedies of the Lender provided by law, including other rights of set-off, the Lender shall have the right, without prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by the Borrower hereunder (whether at the stated maturity, by acceleration or otherwise), after any applicable grace period, to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by the Lender or any branch or agency thereof to or for the credit or the account of the Borrower. The Lender agrees promptly to notify the Borrower after any such setoff and application made by the Lender, provided that the failure to give such notice shall not affect the validity of such setoff and application

SECTION 13. Indemnification. The Borrower agrees to pay, indemnify, and hold the Lender and its officers, directors, employees, affiliates, agents and Affiliates (each, an "Indemnitee") harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever, whether brought by the Borrower or any other Person, (a) by reason of any untrue statement or alleged untrue statement of any material fact contained or incorporated by reference in the Offering Circular, or in any supplement or amendment thereof, or the omission or alleged omission to state therein a material fact necessary to make such statements, in the light of the circumstances under which they are or were made, not misleading, or (b) with respect to the execution, delivery, enforcement and performance of this Agreement, the Letter of Credit and any such other documents, including any of the foregoing relating to the use of proceeds of the Loans or Drawings under the Letter of Credit or (c) with respect to the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations of the Borrower and its Significant Subsidiaries or any of the facilities and properties owned, leased or operated by the Borrower and its Significant Subsidiaries and the reasonable fees and expenses of one legal counsel in connection with claims, actions or proceedings by any Indemnitee against the Borrower under this Agreement (all the foregoing, collectively, the "Indemnified Liabilities"), provided, that the Borrower shall have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities (i) to the extent such Indemnified Liabilities resulted from the gross negligence or willful misconduct of such Indemnitee as determined in a final judgment by a court of competent jurisdiction or (ii) incurred by reason of any untrue statement contained in information furnished in writing by the Lender or any Indemnitee to the Company expressly for use in the Offering Circular. Without limiting the foregoing, and to the extent permitted by applicable law, the Borrower agrees not to assert and to cause its Significant Subsidiaries not to assert, and hereby waives and agrees to cause its Significant Subsidiaries to waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws, that any of them might have by statute or otherwise against any Indemnitee. All amounts due under this Section 13 shall be payable not later than 30 days after written demand therefor, subject to the Borrower's receipt of reasonably detailed invoices relating thereto. Statements payable by the Borrower pursuant to this Section 13 shall be submitted to Treasurer (Telephone No. 415-817-8199/415-267-7000) (Telecopy No.

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 50 of 295

415-267-7265/7268), at the address of the Borrower set forth in Section 10 with a copy to Chief Counsel, Corporate (Telephone No. (415) 817-8200) (Telecopy No. (415) 817-8225), or to such other Person or address as may be hereafter designated by the Borrower in a written notice to the Lender. The agreements in this Section 13 shall survive for two years after the termination of this Agreement and repayment of the Loans and all other amounts payable hereunder. This Section 13 shall not apply with respect to Taxes, other than Taxes that represent claims, damages, losses, liabilities, costs or expenses arising from non-Tax claims.

SECTION 14. Continuing Obligation. The obligations of the Borrower under this Agreement shall continue until the later of (a) the Termination Date or (b) the date upon which all amounts due and owing to the Lender hereunder shall have been paid in full.

SECTION 15. Transfer of the Letter of Credit. The Letter of Credit may be transferred in accordance with the provisions set forth therein.

SECTION 16. Confirmation of Lien; Pledge. The Borrower hereby grants to the Lender, to secure payment by the Borrower of sums due hereunder arising from Drawings made under the Letter of Credit or Loans arising from any such Drawing to the Lender, a lien on moneys or instruments which the Borrower has an interest in or title to now or hereafter held in the Bond Fund (as such term is defined in the Bond Indenture) or otherwise by the Bond Trustee under any provision of the Bond Indenture or the Bond Loan Agreement (other than amounts in such Bond Fund that are, or that if instructed by the Borrower would be, deposited in the Rebate Fund (as such term is defined in the Bond Indenture)) and in the right of the Borrower to receive any such moneys or instruments. The Lender hereby confirms that such lien is and shall be junior and subordinate to the lien on such moneys in favor of the holders of the Bonds, the Bond Trustee and the Tender Agent. The Borrower also hereby grants to the Lender, to secure payment by the Borrower of sums due hereunder to the Lender with respect to the reimbursement of amounts drawn on the Letter of Credit for the payment of the purchase price of Bonds purchased in lieu of redemption pursuant to Section 4.06 of Appendix B to the Bond Indenture, a first priority security interest in all right, title and interest of the Borrower in the Bonds that are deemed purchased by the Borrower pursuant to Section 4.06 of Appendix B to the Bond Indenture.

SECTION 17. Limited Liability of the Lender. The Borrower assumes all risks of the acts or omissions of the Bond Trustee and all transferees of the Letter of Credit with respect to its or their use of the Letter of Credit. Neither the Lender nor any of its officers or directors shall be liable or responsible for: (a) the use which may be made of the Letter of Credit or for any acts or omissions of the Bond Trustee and any beneficiary or transferee in connection therewith; (b) the validity, sufficiency, or genuineness of documents, or of any endorsements thereon, even if such documents should in fact prove to be in any or all respects invalid, insufficient, fraudulent, or forged; (c) payment by the Lender against presentation of documents which do not comply with the terms of the Letter of Credit, including failure of any documents to bear any reference or adequate reference to the Letter of Credit; or (d) any other circumstances whatsoever in making or failing to make payment under the Letter of Credit; provided that the Borrower shall have a claim against the Lender, and the Lender shall be liable to the Borrower, to the extent, but only to the extent, of any direct, as opposed to consequential, damages suffered by the Borrower which the Borrower proves were caused by (i) the Lender's willful misconduct or gross negligence in determining whether documents presented under the Letter of Credit comply with the terms thereof or (ii) the Lender's willful failure to pay under the Letter of Credit after the presentation to it by the Bond Trustee (or a successor trustee under the Bond Indenture to whom the Letter of Credit has been transferred in accordance with its terms) of a demand and certificate

37

strictly complying with the terms and conditions of the Letter of Credit. In furtherance and not in limitation of the foregoing, or the provisions of the International Standby Practices, ICC Publication No. 590, as amended and restated from time to time) and New York Uniform Commercial Code Section 5114, the Lender may accept drawing certificates and demands for payment under the Letter of Credit that appear on their face to be in order, without responsibility for further investigation, regardless of any other notice or information to the contrary, unless the Bond Trustee and the Borrower have notified the Lender in writing sufficiently in advance of the time that the Lender must respond to such drawing certificates and demand for payments that such drawing certificates and demands for payment do not comply with the Letter of Credit, or that other discrepancies in the drawing certificates and demands for payment exist. -

SECTION 18. Costs, Expenses and Taxes. The Borrower agrees to pay or reimburse the Lender (a) for all its reasonable out-of-pocket costs and expenses incurred in connection with the development, preparation and execution of, and any amendment, supplement or modification to, this Agreement and the Letter of Credit and any other documents prepared in connection herewith or therewith, and the consummation of the transactions contemplated hereby and thereby, including the reasonable fees and disbursements of only one counsel and special California regulatory counsel to the Lender and filing and recording fees and expenses, with statements with respect to the foregoing to be submitted to the Borrower prior to the Closing Date (in the case of amounts to be paid on the Closing Date) and from time to time thereafter on a quarterly basis or such other periodic basis as the Lender shall deem appropriate and (b) for all its costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, the Letter of Credit and any such other documents, including the fees and disbursements of only one counsel to the Lender. All amounts due under this Section 18 shall be payable not later than 30 days after written demand therefor, subject to the Borrower's receipt of reasonably detailed invoices relating thereto. The agreements in this Section 18 shall survive for two years after the termination of this Agreement and repayment of the Loans and all other amounts payable hereunder. This Section 18 shall not apply with respect to Taxes, other than Taxes that represent claims, damages, losses, liabilities, costs or expenses arising from non-Tax claims.

SECTION 19. Severability. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

SECTION 20. **GOVERNING LAW. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.**

SECTION 21. Headings. Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

SECTION 22. Assignments and Participations.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) the Lender may not assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section.

(b)    (i) The Lender may, without the consent of the Borrower, sell participations to one or more banks or other entities (a "Participant") in all or a portion of the Lender's rights and obligations under this Agreement (including all or a portion of its Commitment); provided that (A) the Lender's obligations under this Agreement shall remain unchanged, (B) the Lender shall remain solely responsible to the Borrower for the performance of such obligations and (C) the Borrower shall continue to deal solely and directly with the Lender in connection with the Lender's rights and obligations under this Agreement. Any agreement pursuant to which the Lender sells such a participation shall provide that the Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement may provide that the Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that directly affects such Participant. Subject to paragraph (c)(ii) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2(d) and 2(f) to the same extent as if it were the Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section.

(ii)    Notwithstanding anything to the contrary herein, a Participant shall not be entitled to receive any greater payment under Section 2(d) or 2(f) than the Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent to such greater payments. A Participant shall not be entitled to the benefits of Section 2(f) unless such Participant complies with Section 22(b)(ii).

(ii)    (A) If a Participant is entitled to an exemption from or reduction of withholding Tax with respect to payments made under this Agreement, the Participant shall deliver to the Borrower, at the time or times reasonably requested by the Borrower, such properly completed and executed documentation reasonably requested by the Borrower as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, if reasonably requested by the Borrower, the Participant shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower as will enable the Borrower to determine whether or not the Participant is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Sections 22(b)(iii)(B)(I) and (II) below) shall not be required if in the Participant's reasonable judgment such completion, execution or submission would subject the Participant to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of the Participant.

39

(B)  Without limiting the generality of the foregoing,

(I)  if a Participant is a U.S. Person, from time to time upon the reasonable request of the Borrower, such Participant will deliver to the Borrower, executed originals of IRS Form W-9 certifying that such Participant is exempt from U.S. federal backup withholding tax;

(II)  any Foreign Participant shall, to the extent it is legally entitled to do so, deliver to the Borrower (in such number of copies as shall be requested by the Borrower) on or prior to the date on which such Foreign Participant becomes a Participant under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower), whichever of the following is applicable:

(1)  in the case of a Foreign Participant claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under this Agreement, the Letter of Credit or any Liquidity Provider Bond executed originals of IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under this Agreement, IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)  executed originals of IRS Form W-8ECI;

(3)  in the case of a Foreign Participant claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit D-1 to the effect that such Foreign Participant is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed originals of IRS Form W-8BEN;

(4)  to the extent a Foreign Participant is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, a U.S. Tax Compliance Certificate substantially in the form of Exhibit D-2, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Participant is a partnership and one or more direct or indirect partners of such Foreign Participant are claiming the portfolio interest exemption, such Foreign Participant may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit D-2 on behalf of each such direct and indirect partner; or

40

(5)    notwithstanding anything to the contrary set forth in this Section 22(b)(iii), each Foreign Participant shall deliver to the Borrower, on or prior to the date on which such Foreign Participant becomes a Participant under this Agreement, forms described in Sections 22(b)(iii)(B)(II)(1), (2), (3) or (4), as applicable, establishing a complete exemption from U.S. federal withholding Tax with respect to amounts payable to such Foreign Participant under this Agreement, the Letter of Credit or any Liquidity Provider Bond; provided, however, that a Foreign Participant shall not be required to deliver forms establishing a complete exemption from U.S. federal withholding Tax with respect to amounts payable to such Foreign Participant under this Agreement, the Letter of Credit or any Liquidity Provider Bond pursuant to this Section 22(b)(iii)(B)(II)(5) to the extent that, due to a Change of Law, such Foreign Participant is unable to do so.

(III)    any Foreign Participant shall, to the extent it is legally entitled to do so, deliver to the Borrower (in such number of copies as shall be requested by the Borrower) on or prior to the date on which such Foreign Participant becomes a Participant under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower to determine the withholding or deduction required to be made and

(IV)    if a payment made to a Participant under this Agreement, the Letter of Credit or any Liquidity Provider Bond would be subject to U.S. federal withholding Tax imposed by FATCA if the Participant were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Participant shall deliver to the Borrower at the time or times prescribed by law and at such time or times reasonably requested by the Borrower such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower as may be necessary for the Borrower to comply with its obligations under FATCA and to determine that such Participant has complied with the Participant's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (IV), "FATCA" shall include any amendments made to FATCA after the Closing Date.

(C)    Each Participant agrees that if any form or certification it previously delivered pursuant to this Section 22(b) expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower in writing of its legal inability to do so.

41

(iii)     If the Lender sells any participation it shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans and other Obligations under this Agreement (the "Participant Register"); provided that the Lender shall have no obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Loans and other Obligations under this Agreement) to any Person except to the extent that such disclosure is necessary to establish that such Loan or other Obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and the Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(c)     The Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of the Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank having jurisdiction over the Lender, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release the Lender from any of its obligations hereunder or substitute any such pledgee or assignee for the Lender as a party hereto.

(d)     The Borrower, upon receipt of written notice from the Lender, agrees to issue a promissory note or promissory notes to the Lender to facilitate transactions of the type described in paragraph (c) above.

SECTION 23. Execution in Counterparts. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof. A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Lender.

SECTION 24. **WAIVER OF JURY TRIAL; JUDICIAL REFERENCE. TO THE FULLEST EXTENT PERMITTED BY LAW, THE BORROWER AND THE LENDER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR THE LETTER OF CREDIT AND FOR ANY COUNTERCLAIM THEREIN.**

If any action or proceeding is filed in a court of the State of California by or against any party hereto in connection with any of the transactions contemplated by this Agreement, the Letter of Credit or any Related Document, (i) the court shall, and is hereby directed to, make a general reference pursuant to California Code of Civil Procedure Section 638 to a referee (who shall be a single active or retired judge) to hear and determine all of the issues in such action or proceeding (whether of fact or of law) and to report a statement of decision, provided that at the option of any party to such proceeding, any such issues pertaining to a "provisional remedy" as defined in California Code of Civil Procedure Section 1281.8 shall be heard and determined by the court, and (ii) without limiting the generality of Section 18, the Borrower shall be solely responsible to pay all fees and expenses of any referee appointed in such action or proceeding.

42

SECTION 25. No Third Party Beneficiaries. Each party agrees that this Agreement shall not benefit or create any right or cause of action in or on behalf of any person other than the parties hereto.

SECTION 26. Survival of Representations and Warranties. All representations and warranties made hereunder and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans and other extensions of credit hereunder.

SECTION 27. Integration. This Agreement represents the entire agreement of the Borrower and the Lender with respect to the subject matter hereof, and there are no promises, undertakings, representations or warranties by the Lender relative to the subject matter hereof not expressly set forth or referred to herein.

SECTION 28. Submission To Jurisdiction; Waivers. The Borrower hereby irrevocably and unconditionally:

(a)  submits for itself and its property in any legal action or proceeding relating to this Agreement, the Letter of Credit and the Related Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the courts of the City of New York, Borough of Manhattan, State of New York, the courts of the United States for the Southern District of New York, and appellate courts from any thereof;

(b)  consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)  agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to the Borrower at its address set forth in Section 10 or at such other address of which the Lender shall have been notified pursuant thereto;

(d)  agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(e)  waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding relating to this Agreement or the Letter of Credit any special, exemplary, punitive or consequential damages.

SECTION 29. Acknowledgments. The Borrower hereby acknowledges that:

(a)  it has been advised by counsel in the negotiation, execution and delivery of this Agreement;

(b)  the Lender has no fiduciary relationship with or duty to the Borrower arising out of or in connection with this Agreement, and the relationship between the Lender, on one hand, and the Borrower, on the other hand, in connection herewith is solely that of debtor and creditor; and

43

(c)    no joint venture is created hereby or otherwise exists by virtue of the transactions contemplated hereby between the Lender and the Borrower.

SECTION 30. Confidentiality. The Lender agrees to keep confidential in accordance with such party's customary practices (and in any event in compliance with applicable law regarding material non-public information) all non-public information provided to it by the Borrower pursuant to or in connection with this Agreement that is designated by the provider thereof as confidential; provided that nothing herein shall prevent the Lender from disclosing any such information (a) to any Affiliate of the Lender, (b) subject to an agreement to comply with the provisions of this Section or substantially equivalent provisions, to any actual or prospective Participant or any direct or indirect counterparty to any Swap Agreement (or any professional advisor to such counterparty), (c) to its employees, directors, agents, attorneys, accountants and other professional advisors or those of any of its affiliates (as long as such attorneys, accountants and other professional advisors are subject to confidentiality requirements substantially equivalent to this Section), (d) upon the request or demand of any Governmental Authority, (e) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, (f) if requested or required to do so in connection with any litigation or similar proceeding, (g) that has been publicly disclosed, (h) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about the Lender's investment portfolio in connection with ratings issued with respect to the Lender, or (i) in connection with the exercise of any remedy hereunder or under the Letter of Credit, provided that, in the case of clauses (d), (e) and (f) of this Section 30, with the exception of disclosure to bank regulatory authorities, the Borrower (to the extent legally permissible) shall be given prompt prior notice so that it may seek a protective order or other appropriate remedy.

SECTION 31. USA Patriot Act Notice. The Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107 56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow the Lender to identify the Borrower in accordance with the Act.

[Remainder of page intentionally left blank.]

44

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

PACIFIC GAS AND ELECTRIC COMPANY

By: _____

Name: Nicholas M. Bijur
Title: Vice President and Treasurer

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 59 of 295

UNION BANK, N.A.

By:_____

Name:  Dennis Blank
Title:  Vice President

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 60
of 295

## FORM OF LETTER OF CREDIT

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 61 of 295

## FORM OF COMPLIANCE CERTIFICATE

This Compliance Certificate is delivered pursuant to Section 7(a)(ii)(A) of the Reimbursement Agreement (Series 2009B), dated as of June 5, 2014 (as amended, supplemented or otherwise modified from time to time, the "Reimbursement Agreement"), between Pacific Gas and Electric Company, a California corporation (the "Borrower"), and Union Bank, N.A., a national banking association (the "Lender"). Terms defined in the Reimbursement Agreement are used herein as therein defined.

The undersigned hereby certifies to the Lender as follows:

1.  I am the duly elected, qualified and acting [Chief Financial Officer] [Treasurer] [Assistant Treasurer] of the Borrower.

2.  I have reviewed and am familiar with the contents of this Certificate.

3.  To the knowledge of the undersigned, during the fiscal period covered by the financial statements attached hereto as Attachment 1, no Default or Event of Default has occurred and is continuing [, except as set forth below:].

4.  Attached hereto as Attachment 2 are the computations showing compliance with the covenant set forth in Section 7(b)(i) of the Reimbursement Agreement.

*[Remainder of page intentionally left blank. Schedule 1 to follow.]*

IN WITNESS WHEREOF, the undersigned has executed this Compliance Certificate as of the date set forth below.

PACIFIC GAS AND ELECTRIC COMPANY

By: _____
    Name:
    Title:

Date: _____, 20__

Financial Statements
Period Ended _____, 20__

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 64
of 295

The information described herein is as of _____, 20__.

[Set forth Covenant Calculation]

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 65
of 295

## FORM OF CLOSING CERTIFICATE

This Closing Certificate is delivered pursuant to Section 3(a)(iii) of the Reimbursement Agreement (Series 2009B), dated as of June 5, 2014 (as amended, supplemented or otherwise modified from time to time, the "Reimbursement Agreement"), between Pacific Gas and Electric Company, a California corporation (the "Borrower"), and Union Bank, N.A., a national banking association (the "Lender"). Unless otherwise defined herein, terms defined in the Reimbursement Agreement and used herein shall have the meanings given to them in the Reimbursement Agreement.

The undersigned Vice President and Treasurer of the Borrower hereby certifies as follows:

1.     Wendy S. Lee is a duly elected and qualified Assistant Corporate Secretary of the Borrower and the signature set forth for such officer below is such officer's true and genuine signature.

2.     That the conditions precedent set forth in Section 3(a) of the Reimbursement Agreement have been satisfied as of the Closing Date.

The undersigned Assistant Corporate Secretary of the Borrower hereby certifies as follows:

1.     Attached hereto as Annex 1 is a true and complete copy of resolutions duly adopted by the Board of Directors of the Borrower on December 19, 2007; such resolutions have not in any way been amended, modified, revoked or rescinded, have been in full force and effect since their adoption to and including the date hereof and are now in full force and effect and are the only corporate proceedings of the Borrower now in force relating to or affecting the Reimbursement Agreement.

2.     Attached hereto as Annex 2 is a true and complete copy of the Bylaws of the Borrower as in effect on the date hereof.

3.     Attached hereto as Annex 3 is a true and complete copy of the Articles of Incorporation of the Borrower as in effect on the date hereof, and such Articles of Incorporation have not been amended, repealed, modified or restated.

4.     The following person is now a duly elected and qualified officer of the Borrower holding the office indicated next to his name below, and that the facsimile signature affixed next to his name below is the facsimile signature of such officer, and such officer is duly authorized to execute and deliver on behalf of the Borrower the Reimbursement Agreement and any certificate or other document to be delivered by the Borrower pursuant to the Reimbursement Agreement:

| Name | Office | Signature |
|------|--------|-----------|

Nicholas M. Bijur      Vice President and Treasurer    _____

This Certificate may be executed in counterpart and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

[Signature Page Follows]

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 67 of 295

IN WITNESS WHEREOF, the undersigned have executed this Closing Certificate as of the date set forth below.

Name: Nicholas M. Bijur
Title:  Vice President and Treasurer

Name: Wondy S. Lee
Title:  Assistant Corporate Secretary

Date: June___, 2014

[Board Resolutions]

[Bylaws of the Borrower]

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 70 of 295

[Articles of Incorporation]

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 71
of 295

EXHIBIT C

FORM OF LEGAL OPINION OF ORRICK, HERRINGTON & SUTCLIFFE LLP

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**

(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Reimbursement Agreement (Series 2009B), dated as of June 5, 2014 (as amended, supplemented or otherwise modified from time to time, the "Reimbursement Agreement"), between Pacific Gas and Electric Company, a California corporation (the "Borrower"), and Union Bank, N.A., a national banking association (the "Lender"). Unless otherwise defined herein, terms defined in the Reimbursement Agreement and used herein shall have the meanings given to them in the Reimbursement Agreement.

Pursuant to the provisions of Section 22(b)(iii) of the Reimbursement Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of an undivided interest in the Loans and other Obligations set forth in the Participant Register opposite the name of the undersigned, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and (2) the undersigned shall have at all times furnished the Borrower with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF PARTICIPANT]

By: _____
Name: _____
Title: _____
Date: _____, 20[ ]

## FORM OF
## U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Reimbursement Agreement (Series 2009B), dated as of June 5, 2014 (as amended, supplemented or otherwise modified from time to time, the "Reimbursement Agreement"), between Pacific Gas and Electric Company, a California corporation (the "Borrower"), and Union Bank, N.A., a national banking association (the "Lender"). Unless otherwise defined herein, terms defined in the Reimbursement Agreement and used herein shall have the meanings given to them in the Reimbursement Agreement.

Pursuant to the provisions of Section 22(b)(iii) of the Reimbursement Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of an undivided interest in the Loans and other Obligations set forth in the Participant Register opposite the name of the undersigned, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loans and other Obligations, (iii) with respect to the extension of credit pursuant to the Reimbursement Agreement or any other Related Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower, and (2) the undersigned shall have at all times furnished the Borrower with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF PARTICIPANT]

By: _____
Name: _____
Title: _____
Date: _____ __, 20[ ]

Exhibits
Reimbursement Agreement
(Series 2009B)

LOSANGELES 513768 (2X)

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 74
of 295

**Exhibit 2**
**Letter of Credit**



## IRREVOCABLE LETTER OF CREDIT

June 5, 2014
Letter of Credit No. S326841M

Deutsche Bank National Trust Company,
as Trustee and Tender Agent
1761 East Street, Andrew Place
Santa Ana, California 92705
Attn: Trust & Securities Services

Ladies and Gentlemen:

We hereby establish in your favor as beneficiary on behalf of the holders of the California Infrastructure and Economic Development Bank Refunding Revenue Bonds (Pacific Gas and Electric Company) Series 2009B (the "Bonds") at the request and for the account of Pacific Gas and Electric Company (the "Applicant") our irrevocable letter of credit in the amount of U.S. $75,251,767.13 (Seventy Five Million Two Hundred Fifty One Thousand Seven Hundred Sixty Seven Dollars and Thirteen Cents) in connection with the Bonds available with ourselves by sight payment against presentation of one or more signed and dated demands addressed by you to Union Bank, N.A., Trade Service Operations, each in the form of Annex A (an "A Drawing"), Annex B (a "B Drawing"), Annex C (a "C Drawing"), Annex D (a "D Drawing") or Annex E (an "E Drawing") hereto, with all instructions in brackets therein being complied with. Each such demand must be presented to us in its original form at the Presentation Office (as hereinafter defined) or by facsimile transmission of such original form to us (323) 720-2773.

Each such presentation must be made at or before 12:00 p.m. Los Angeles time on a Business Day (as hereinafter defined) to our Letter of Credit Operations Office in Monterey Park, California, presently located at 1980 Saturn Street, V02-906, Monterey Park, CA 91755 Attn: Standby Letter of Credit Unit (the "Presentation Office").

This Letter of Credit expires at our Presentation Office on June 5, 2019 or, if such date is not a Business Day, then on the first (1st) succeeding Business Day thereafter (the "Scheduled Expiration Date"). If we chose to do so, prior to the Scheduled Expiration Date, we may extend the Scheduled Expiration Date from time to time at the request of the Applicant by delivering to you an amendment to this Letter of Credit in the form of Annex H hereto designating the date to which the Scheduled Expiration Date is being extended. Each such extension of the Scheduled Expiration Date shall become effective on the date we send you such an amendment and thereafter all references in this Letter of Credit to the Scheduled Expiration Date` shall be deemed to be references to the date designated as such in the most recent such amendment we have sent you. Any date to which the Scheduled Expiration Date has been extended as herein provided may be extended in a like manner.

As used herein the term "Business Day" means any day on which our Presentation Office is open for business but excludes any (i) Saturday, (ii) Sunday or (iii) other day on which the New York Stock Exchange or banks are authorized or obligated by law or executive order to close in New York, New York, or Los Angeles, California.

By honoring any such demand we make no representation as to the correctness of the amount demanded.



We hereby agree with you that each demand presented hereunder in full compliance with the terms hereof will be duly honored by our payment to you of the amount of such demand, in immediately available funds of Union Bank, N.A.:

(i) not later than 10:00 a.m., Los Angeles time, on the Business Day following the Business Day on which such demand is presented to us as aforesaid if such presentation is made to us at or before 12:00 p.m., Los Angeles time, or

(ii) not later than 10:00 a.m., Los Angeles time, on the second Business Day following the Business Day on which such demand is presented to us as aforesaid, if such presentation is made to us after 12:00 p.m., Los Angeles time.

Notwithstanding the foregoing, any demand presented hereunder, in full compliance with the terms hereof, for a C Drawing and/or a D Drawing will be duly honored (i) not later than 11:30 a.m., Los Angeles time, on the Business Day following the Business Day on which such demand is presented to us as aforesaid if such presentation is made to us at or before 9:00 a.m., Los Angeles time, and (ii) not later than 11:30 a.m., Los Angeles time, on the Business Day following the Business Day on which such demand is presented to us as aforesaid if such presentation is made to us after 9:00 a.m., Los Angeles time.

With respect to any demand that is honored hereunder, the total amount of this Letter of Credit shall be reduced as follows:

(A) With respect to each A Drawing paid by us, the total amount of this Letter of Credit shall be reduced by the amount of such A Drawing with respect to all demands presented to us after the time we receive such A Drawing; provided, however, that the amount of such A Drawing shall be automatically reinstated on the fourth (4ᵗʰ) Business Day following the date such A Drawing is honored by us, unless (i) you shall have previously received notice from us sent to you at your above address by express courier or registered mail, or by authenticated SWIFT message to the SWIFT Address, or by facsimile transmission to the Fax Number that there shall be no such reinstatement because a drawing has been made under this Letter of Credit for which we have not been reimbursed in full by the Applicant, or (ii) such fourth (4ᵗʰ) Business Day falls after the Scheduled Expiration Date;

(B) With respect to each B Drawing paid by us, the total amount of this Letter of Credit shall be reduced by the amount of such B Drawing with respect to all demands presented to us after the time we receive such B Drawing and shall not be reinstated;

(C) With respect to each C Drawing paid by us, the total amount of this Letter of Credit shall be reduced with respect to all demands presented to us after the time we receive such C Drawing by the sum of (1) the amount inserted as principal in paragraph 4(A) of the C Drawing plus (2) the greater of (a) the amount inserted as interest in paragraph 4(B) of the C Drawing and (b) interest on the amount inserted as principal in paragraph 4(A) of the C Drawing calculated for 40 days at the rate of 12 percent per annum based on a year of 365 days (with any fraction of a cent being rounded upward to the nearest whole cent); provided, however, that in the event we are reimbursed for a C Drawing from proceeds of the remarketing of Bonds or from other moneys, the amount of this Letter of Credit shall be reinstated by an amount which equals the sum of (i) the amount paid to us from such remarketing proceeds or other moneys in reimbursement of the principal component of such C Drawing and (ii) interest on such amount described in clause (i)



above calculated for the same number of days, at the same interest rate, and on the basis of a year of the same number of days as is specified in (2)(b) of this paragraph (C) (with any fraction of a cent being rounded upward to the nearest whole cent), with such reinstatement and its amount being promptly advised to you; provided, however, that in no event will the total amount of all C Drawing reinstatements exceed the total amount of all Letter of Credit reductions made pursuant to this paragraph (C).

Upon presentation to us of a D Drawing or an E Drawing in compliance with the terms of this Letter of Credit, no further demand whatsoever may be presented hereunder.

No A Drawing which we honor shall be for an amount more than U.S. $976,767.13.

It is a condition of this Letter of Credit that the amount available for drawing under this Letter of Credit shall be decreased automatically without amendment upon our receipt of each reduction authorization in the form of Annex F to this Letter of Credit (with all instructions therein in brackets being complied with) sent to us at the Presentation Office as a signed and dated original form or sent to us as an authenticated SWIFT message at our SWIFT address BOFCUS33LAX.

This Letter of Credit is subject to, and engages us in accordance with the terms of, the Uniform Customs and Practice for Documentary Credits (2007 Revision), Publication No. 600 of the International Chamber of Commerce (the "UCP"); provided, however, that if any provision of the UCP contradicts a provision of this Letter of Credit such provision of the UCP will not be applicable to this Letter of Credit. Notwithstanding anything to the contrary contained in the second sentence of Article 36 of the UCP, if this Letter of Credit expires during an interruption of business as described in Article 36, the Bank will honor drawings under this Letter of Credit that are made within ten (10) Business Days after the resumption of business by the Bank. Notwithstanding anything to the contrary contained in Article 32 of the UCP, this Letter of Credit will not terminate because of any failure to make any permitted drawing under this Letter of Credit. Notwithstanding anything to the contrary contained in Article 38 of the UCP, this Letter of Credit may be transferred to any transferee who has succeeded you as Trustee and Tender Agent under the Indenture and may be so transferred on more than one occasion. Furthermore, as provided in the first sentence of Article 36 of the UCP, we assume no liability or responsibility for consequences arising out of the interruption of our business by Acts of God, riots, civil commotions, insurrections, wars, acts of terrorism, or by any strikes or lockouts, or any other causes beyond our control. Matters related to this Letter of Credit which are not covered by the UCP will be governed by the laws of the State of New York, including, without limitation, the Uniform Commercial Code as in effect in the State of New York, except to the extent such laws are inconsistent with the provisions of the UCP or this Letter of Credit.

This Letter of Credit is transferable and may be transferred more than once, but in each case only in the amount of the full unutilized balance hereof to any single transferee who you shall have advised us pursuant to Annex G has succeeded Deutsche Bank National Trust Company or a successor trustee and tender agent as Trustee and Tender Agent under the Indenture of Trust dated as of August 1, 2009 as supplemented from time to time (the "Indenture") between the California Infrastructure and Economic Development Bank (the "Issuer") and Deutsche Bank National Trust Company, as Trustee and Tender Agent, pursuant to which the Bonds were issued. Transfers may be effected without charge to the transferor and only through ourselves and only upon presentation to us at the Presentation Office of a duly executed instrument of transfer in the form attached hereto as Annex G. Any transfer of this

 **Union**Bank

Letter of Credit as aforesaid must be endorsed by us on the reverse hereof and may not change the place of presentation of demands from our Letter of Credit Operations Office in Monterey Park, California.

Your failure to make a drawing hereunder with respect to any payment of principal of, or interest on, or redemption price or purchase price of, the Bonds required to be made under the Indenture will not, in and of itself, result in this Letter of Credit ceasing to be available for drawings with respect to future payments. All drawings under this Letter of Credit will be paid with our own funds without any requirement that you, the holders of the Bonds or we make any prior claims against the Applicant.

This Letter of Credit sets forth in full our undertaking, and such undertaking shall not in any way be modified, amended, amplified or limited by reference to any document, instrument or agreement referred to herein (including, without limitation, the Bonds and the Indenture), except the UCP to the extent the UCP is not inconsistent with or made inapplicable by this Letter of Credit; and any such reference shall not be deemed to incorporate herein by reference any document, instrument or agreement except the UCP.

Union Bank, N.A.

# SPECIMEN

By:

Name: Beth McClellan

Title: Senior Vice President

UNION BANK, N.A.
TRADE SERVICE OPERATIONS
1980 SATURN STREET, V02-906
MONTEREY PARK, CA 91755
ATTN: STANDBY LETTER OF CREDIT UNIT

**FOR THE URGENT ATTENTION OF LETTER OF CREDIT MANAGER**

[INSERT NAME OF BENEFICIARY], IN ITS CAPACITY AS TRUSTEE AND TENDER AGENT (THE "BENEFICIARY"), HEREBY CERTIFIES TO UNION BANK, N.A. (THE "BANK") WITH REFERENCE TO IRREVOCABLE LETTER OF CREDIT NO. S326841M (THE "LETTER OF CREDIT"; THE TERMS THE "BONDS", "BUSINESS DAY", THE "INDENTURE", AND THE "PRESENTATION OFFICE" USED HEREIN SHALL HAVE THEIR RESPECTIVE MEANINGS SET FORTH IN THE LETTER OF CREDIT) THAT:

(1)    THE BENEFICIARY IS THE TRUSTEE AND TENDER AGENT OR A SUCCESSOR TRUSTEE AND TENDER AGENT UNDER THE INDENTURE.

(2)    THE BENEFICIARY IS MAKING A DEMAND UNDER THE LETTER OF CREDIT FOR PAYMENT, ON AN INTEREST PAYMENT DATE (AS DEFINED IN APPENDIX B TO THE INDENTURE), OF UNPAID INTEREST ON THE BONDS.

(3)    THE AMOUNT HEREBY DEMANDED UNDER THE LETTER OF CREDIT IS $[INSERT AMOUNT].

(4)    THE AMOUNT OF THIS DEMAND FOR PAYMENT WAS COMPUTED IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF THE BONDS AND THE INDENTURE AND IS DEMANDED IN ACCORDANCE WITH THE INDENTURE, WHICH AMOUNT PLEASE REMIT TO THE UNDERSIGNED AS FOLLOWS:

        [INSERT REMITTANCE INSTRUCTIONS].

(5)    THE BENEFICIARY HAS CONTACTED OR ATTEMPTED TO CONTACT BY TELEPHONE AN OFFICER OF THE BANK AT THE PRESENTATION OFFICE REGARDING THE AMOUNT OF THIS DEMAND AND THE DATE AND TIME BY WHICH PAYMENT IS DEMANDED; HOWEVER, SUCH CONTACT, WHETHER OR NOT ATTEMPTED OR MADE, IS NOT A CONDITION TO HONORING THE DEMAND FOR PAYMENT MADE PURSUANT HERETO.

(6)    IF THIS DEMAND IS RECEIVED AT THE PRESENTATION OFFICE BY YOU AT OR BEFORE 12:00 P.M., LOS ANGELES TIME ON A BUSINESS DAY, YOU MUST MAKE PAYMENT ON THIS DEMAND AT OR BEFORE 10:00 A.M., LOS ANGELES TIME, ON THE NEXT BUSINESS DAY. IF THIS DEMAND IS

SPECIMEN

**Union**Bank

RECEIVED BY YOU AT THE PRESENTATION OFFICE AFTER-12:00 P.M.,
LOS ANGELES TIME, ON A BUSINESS DAY, YOU MUST MAKE PAYMENT
ON THIS DEMAND AT OR BEFORE 10:00 A.M., LOS ANGELES
CITY TIME, ON THE SECOND BUSINESS DAY FOLLOWING SUCH
BUSINESS DAY.

(7)  NO AMOUNT OF THIS DEMAND IS BEING DRAWN TO PAY THE INTEREST
ON LIQUIDITY PROVIDER BONDS (AS DEFINED IN THE INDENTURE) OR
BONDS REGISTERED IN THE NAME OF THE APPLICANT.

[INSERT NAME OF BENEFICIARY]

[INSERT SIGNATURE AND DATE]

# SPECIMEN



UNION BANK, N.A.
TRADE SERVICE OPERATIONS
1980 SATURN STREET, V02-906
MONTEREY PARK, CA 91755
ATTN: STANDBY LETTER OF CREDIT UNIT

**FOR THE URGENT ATTENTION OF LETTER OF CREDIT MANAGER.**

[INSERT **NAME OF BENEFICIARY**], IN ITS CAPACITY AS TRUSTEE AND TENDER AGENT (THE "BENEFICIARY"), HEREBY CERTIFIES TO UNION BANK, N.A. (THE "BANK") WITH REFERENCE TO IRREVOCABLE LETTER OF CREDIT NO. S326841M (THE "LETTER OF CREDIT"; THE TERMS THE "BONDS", "BUSINESS DAY", THE "INDENTURE", AND THE "PRESENTATION OFFICE" USED HEREIN SHALL HAVE THEIR RESPECTIVE MEANINGS SET FORTH IN THE LETTER OF CREDIT) THAT:

(1)  THE BENEFICIARY IS THE TRUSTEE AND TENDER AGENT OR A SUCCESSOR TRUSTEE AND TENDER AGENT UNDER THE INDENTURE.

(2)  THE BENEFICIARY IS MAKING A DEMAND UNDER THE LETTER OF CREDIT FOR PAYMENT OF THE PRINCIPAL AMOUNT OF AND THE UNPAID INTEREST ON, REDEEMED BONDS UPON AN OPTIONAL AND/OR MANDATORY REDEMPTION OF LESS THAN ALL OF THE BONDS CURRENTLY OUTSTANDING.

(3)  THE AMOUNT HEREBY DEMANDED UNDER THE LETTER OF CREDIT IS $[INSERT **AMOUNT WHICH IS THE SUM OF THE TWO AMOUNTS INSERTED IN PARAGRAPH 4 BELOW**].

(4) THE AMOUNT HEREBY DEMANDED IS EQUAL TO THE SUM OF (A) $[INSERT **AMOUNT**] BEING DRAWN WITH RESPECT TO THE PAYMENT OF THE PRINCIPAL OF THE REDEEMED BONDS AND (B) $[INSERT **AMOUNT**] BEING DRAWN WITH RESPECT TO THE PAYMENT OF THE UNPAID INTEREST ON THE REDEEMED BONDS.

(5)  THE AMOUNT OF THIS DEMAND FOR PAYMENT WAS COMPUTED IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF THE BONDS AND THE INDENTURE AND IS DEMANDED IN ACCORDANCE WITH THE INDENTURE, WHICH AMOUNT PLEASE REMIT TO THE UNDERSIGNED AS FOLLOWS:

**[INSERT REMITTANCE INSTRUCTIONS].**

(6)  THE BENEFICIARY HAS CONTACTED OR ATTEMPTED TO CONTACT BY TELEPHONE AN OFFICER OF THE BANK AT THE PRESENTATION OFFICE REGARDING THE AMOUNT OF THIS DEMAND AND THE DATE AND TIME BY WHICH PAYMENT IS DEMANDED; HOWEVER, SUCH CONTACT,



WHETHER OR NOT ATTEMPTED OR MADE, IS NOT A CONDITION TO HONORING THE DEMAND FOR PAYMENT MADE PURSUANT HERETO.

(7)    IF THIS DEMAND IS RECEIVED BY YOU AT THE PRESENTATION OFFICE AT OR BEFORE 12:00 P.M., LOS ANGELES TIME ON A BUSINESS DAY, YOU MUST MAKE PAYMENT ON THIS DEMAND AT OR BEFORE 10:00 A.M., LOS ANGELES TIME, ON THE NEXT BUSINESS DAY. IF THIS DEMAND IS RECEIVED BY YOU AT THE PRESENTATION OFFICE AFTER 12:00 P.M., LOS ANGELES TIME, ON A BUSINESS DAY, YOU MUST MAKE PAYMENT ON THIS DEMAND AT OR BEFORE 10:00 A.M., LOS ANGELES TIME, ON THE SECOND BUSINESS DAY FOLLOWING SUCH BUSINESS DAY.

(8)    NO AMOUNT OF THIS DEMAND IS BEING DRAWN TO PAY THE PRINCIPAL OF, OR INTEREST ON, LIQUIDITY PROVIDER BONDS (AS DEFINED IN THE INDENTURE) OR BONDS REGISTERED IN THE NAME OF THE APPLICANT.

[INSERT NAME OF BENEFICIARY]

[INSERT SIGNATURE AND DATE]

# SPECIMEN

 **Union**Bank

UNION BANK, N.A.
TRADE SERVICE OPERATIONS
1980 SATURN STREET, V02-906
MONTEREY PARK, CA 91755
ATTN: STANDBY LETTER OF CREDIT UNIT

**FOR THE URGENT ATTENTION OF LETTER OF CREDIT MANAGER.**

[INSERT NAME OF BENEFICIARY], IN ITS CAPACITY AS TRUSTEE AND TENDER AGENT (THE "BENEFICIARY"), HEREBY CERTIFIES TO UNION BANK, N.A. (THE "BANK") WITH REFERENCE TO IRREVOCABLE LETTER OF CREDIT NO. S326841M (THE "LETTER OF CREDIT"; THE TERMS THE "BONDS", "BUSINESS DAY", THE "INDENTURE", AND THE "PRESENTATION OFFICE" USED HEREIN SHALL HAVE THEIR RESPECTIVE MEANINGS SET FORTH IN THE LETTER OF CREDIT) THAT:

(1)  THE BENEFICIARY IS THE TRUSTEE AND TENDER AGENT OR A SUCCESSOR TRUSTEE AND TENDER AGENT UNDER THE INDENTURE.

(2)  THE BENEFICIARY IS MAKING A DEMAND UNDER THE LETTER OF CREDIT FOR PAYMENT OF THE PRINCIPAL AMOUNT OF, AND INTEREST DUE ON, THOSE BONDS

   (A)  TENDERED FOR PURCHASE AT THE OPTION OF THE HOLDER THEREOF PURSUANT TO SECTION 2.02(a) OF APPENDIX B TO THE INDENTURE (OPTIONAL TENDERS) AND FOR WHICH INSUFFICIENT FUNDS ARE ON DEPOSIT IN THE REMARKETING ACCOUNT (AS DEFINED IN THE INDENTURE) OF THE BOND PURCHASE FUND (AS DEFINED IN THE INDENTURE),

   (B)  TENDERED FOR PURCHASE PURSUANT TO SECTION 2.02(b)(i)(A) OF APPENDIX B TO THE INDENTURE AS A RESULT OF AN ADJUSTMENT OF THE RATE PERIOD (AS DEFINED IN THE INDENTURE) FROM A DAILY RATE PERIOD (AS DEFINED IN THE INDENTURE) TO A WEEKLY RATE PERIOD (AS DEFINED IN THE INDENTURE) OR FROM A WEEKLY RATE PERIOD (AS DEFINED IN THE INDENTURE) TO A DAILY RATE PERIOD (AS DEFINED IN THE INDENTURE) AND FOR WHICH INSUFFICIENT FUNDS ARE ON DEPOSIT IN THE REMARKETING ACCOUNT (AS DEFINED IN THE INDENTURE) OF THE BOND PURCHASE FUND (AS DEFINED IN THE INDENTURE),

   (C)  TO BE PURCHASED IN LIEU OF REDEMPTION PURSUANT TO SECTION 4.06 OF ANNEX B TO THE INDENTURE, OR

SPECIMEN

**Union**Bank

(D) TO BE PURCHASED IN LIEU OF ACCELERATION PURSUANT TO SECTION 7.01(d) OF ANNEX B TO THE INDENTURE AS A RESULT OF AN ACCELERATION OF ALL BONDS FOR ANY REASON OTHER THAN OUR RECEIPT OF NOTICE FROM YOU OF THE OCCURRENCE OF AN EVENT OF DEFAULT UNDER THE REIMBURSEMENT AGREEMENT, DATED AS OF JUNE 5, 2014, BETWEEN PACIFIC GAS AND ELECTRIC COMPANY AND THE BANK.

(3) THE AMOUNT HEREBY DEMANDED UNDER THE LETTER OF CREDIT IS $[INSERT AMOUNT WHICH IS THE SUM OF THE TWO AMOUNTS INSERTED IN PARAGRAPH 4 BELOW].

(4) THE AMOUNT OF THIS DEMAND IS EQUAL TO THE SUM OF (A) $[INSERT AMOUNT] BEING DRAWN WITH RESPECT TO THE PAYMENT OF PRINCIPAL OF THE BONDS AND (B) $[INSERT AMOUNT] BEING DRAWN WITH RESPECT TO THE PAYMENT OF INTEREST DUE ON THE BONDS.

(5) THE AMOUNT OF THIS DEMAND FOR PAYMENT WAS COMPUTED IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF THE BONDS AND THE INDENTURE AND IS DEMANDED IN ACCORDANCE WITH THE INDENTURE, WHICH AMOUNT PLEASE REMIT TO THE UNDERSIGNED AS FOLLOWS: [INSERT REMITTANCE INSTRUCTIONS].

SPECIMEN

(6) THE BENEFICIARY HAS CONTACTED OR ATTEMPTED TO CONTACT BY TELEPHONE AN OFFICER OF THE BANK AT THE PRESENTATION OFFICE REGARDING THE AMOUNT OF THIS DEMAND AND THE DATE AND TIME BY WHICH PAYMENT IS DEMANDED; HOWEVER, SUCH CONTACT, WHETHER OR NOT ATTEMPTED OR MADE, IS NOT A CONDITION TO HONORING THE DEMAND FOR PAYMENT MADE PURSUANT HERETO.

(7) IF THIS DEMAND IS RECEIVED BY YOU AT THE PRESENTATION OFFICE AT OR BEFORE 9:00 A.M., LOS ANGELES TIME ON A BUSINESS DAY, YOU MUST MAKE PAYMENT ON THIS DEMAND AT OR BEFORE 11:30 A.M., LOS ANGELES TIME, ON SAID BUSINESS DAY. IF THIS DEMAND IS RECEIVED BY YOU AT THE PRESENTATION OFFICE AFTER 9:00 A.M., LOS ANGELES TIME, ON A BUSINESS DAY, YOU MUST MAKE PAYMENT ON THIS DEMAND AT OR BEFORE 11:30 A.M., LOS ANGELES TIME, ON THE BUSINESS DAY FOLLOWING SAID BUSINESS DAY.

(8) NO AMOUNT OF THIS DEMAND IS BEING DRAWN TO PAY THE PRINCIPAL OF, OR INTEREST ON, LIQUIDITY PROVIDER BONDS (AS DEFINED IN THE INDENTURE) OR BONDS REGISTERED IN THE NAME OF THE APPLICANT.

[INSERT NAME OF BENEFICIARY]

[INSERT SIGNATURE AND DATE]



UNION BANK, N.A.
TRADE SERVICE OPERATIONS
1980 SATURN STREET, V02-906
MONTEREY PARK, CA 91755
ATTN: STANDBY LETTER OF CREDIT UNIT

**FOR THE URGENT ATTENTION OF LETTER OF CREDIT MANAGER.**

[INSERT NAME OF BENEFICIARY], IN ITS CAPACITY AS TRUSTEE AND TENDER AGENT (THE "BENEFICIARY"), HEREBY CERTIFIES TO UNION BANK, N.A. (THE "BANK") WITH REFERENCE TO IRREVOCABLE LETTER OF CREDIT NO. S326841M (THE "LETTER OF CREDIT"; THE TERMS THE "BONDS", "BUSINESS DAY", THE "INDENTURE", AND THE "PRESENTATION OFFICE" USED HEREIN SHALL HAVE THEIR RESPECTIVE MEANINGS SET FORTH IN THE LETTER OF CREDIT) THAT:

(1) THE BENEFICIARY IS THE TRUSTEE AND TENDER AGENT OR A SUCCESSOR TRUSTEE AND TENDER AGENT UNDER THE INDENTURE.

(2) THE BENEFICIARY IS MAKING A DEMAND UNDER THE LETTER OF CREDIT FOR PAYMENT OF THE TOTAL UNPAID PRINCIPAL OF AND UNPAID INTEREST ON, ALL OF THE BONDS WHICH ARE CURRENTLY OUTSTANDING UPON THE MANDATORY TENDER OF ALL SUCH BONDS PURSUANT TO:

    (A) SECTION 2.02(b)(i)(A) OF APPENDIX B TO THE INDENTURE AS A RESULT OF AN ADJUSTMENT OF THE RATE PERIOD (AS DEFINED IN THE INDENTURE) FOR SUCH BONDS (OTHER THAN AN ADJUSTMENT FROM A DAILY RATE PERIOD (AS DEFINED IN THE INDENTURE) TO A WEEKLY RATE PERIOD (AS DEFINED IN THE INDENTURE) OR FROM A WEEKLY RATE PERIOD (AS DEFINED IN THE INDENTURE) TO A DAILY RATE PERIOD (AS DEFINED IN THE INDENTURE)) AND FOR WHICH INSUFFICIENT FUNDS ARE ON DEPOSIT IN THE REMARKETING ACCOUNT (AS DEFINED IN THE INDENTURE) OF THE BOND PURCHASE FUND (AS DEFINED IN THE INDENTURE),

    (B) SECTION 2.02(b)(i)(C) OF APPENDIX B TO THE INDENTURE AS A RESULT OF IMPENDING TERMINATION OF THIS LETTER OF CREDIT IN ACCORDANCE WITH ITS TERMS OR

    (C) SECTION 2.02(b)(i)(D) OF APPENDIX B TO THE INDENTURE AS A RESULT OF THE IMPENDING PROVISION OF A NEW CREDIT FACILITY (AS DEFINED IN THE INDENTURE) OR LIQUIDITY FACILITY (AS DEFINED IN THE INDENTURE) FOR THE BONDS.



(3) THE AMOUNT HEREBY DEMANDED UNDER THE LETTER OF CREDIT IS $[INSERT AMOUNT WHICH IS THE SUM OF THE TWO AMOUNTS SET FORTH IN PARAGRAPH 4, BELOW].

(4) THE AMOUNT OF THIS DEMAND IS EQUAL TO THE SUM OF (A) $[INSERT AMOUNT] BEING DRAWN WITH RESPECT TO THE PAYMENT OF THE UNPAID PRINCIPAL OF THE OUTSTANDING BONDS AND (B) $[INSERT AMOUNT] BEING DRAWN WITH RESPECT TO THE PAYMENT OF THE UNPAID INTEREST ON THE OUTSTANDING BONDS.

(5) THE AMOUNT OF THIS DEMAND FOR PAYMENT WAS COMPUTED IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF THE BONDS AND THE INDENTURE AND IS DEMANDED IN ACCORDANCE WITH THE INDENTURE, WHICH AMOUNT PLEASE REMIT TO THE UNDERSIGNED AS FOLLOWS:

[INSERT REMITTANCE INSTRUCTIONS].

(6) THE BENEFICIARY HAS CONTACTED OR ATTEMPTED TO CONTACT BY TELEPHONE AN OFFICER OF THE BANK AT THE PRESENTATION OFFICE REGARDING THE AMOUNT OF THIS DEMAND AND THE DATE AND TIME BY WHICH PAYMENT IS DEMANDED; HOWEVER, SUCH CONTACT, WHETHER OR NOT ATTEMPTED OR MADE, IS NOT A CONDITION TO HONORING THE DEMAND FOR PAYMENT MADE PURSUANT HERETO.

(7) IF THIS DEMAND IS RECEIVED BY YOU AT THE PRESENTATION OFFICE AT OR BEFORE 9:00 A.M., LOS ANGELES TIME ON A BUSINESS DAY, YOU MUST MAKE PAYMENT ON THIS DEMAND AT OR BEFORE 11:30 A.M., LOS ANGELES TIME, ON SAID BUSINESS DAY. IF THIS DEMAND IS RECEIVED BY YOU AT THE PRESENTATION OFFICE AFTER 9:00 A.M., LOS ANGELES TIME, ON A BUSINESS DAY, YOU MUST MAKE PAYMENT ON THIS DEMAND AT OR BEFORE 11:30 A.M., LOS ANGELES TIME, ON THE BUSINESS DAY FOLLOWING SAID BUSINESS DAY.

(8) NO AMOUNT OF THIS DEMAND IS BEING DRAWN TO PAY THE PRINCIPAL OF, OR INTEREST ON, LIQUIDITY PROVIDER BONDS (AS DEFINED IN THE INDENTURE) OR BONDS REGISTERED IN THE NAME OF THE APPLICANT.

[INSERT NAME OF BENEFICIARY]

[INSERT SIGNATURE AND DATE]

 **Union**Bank

UNION BANK, N.A.
TRADE SERVICE OPERATIONS
1980 SATURN STREET, V02-906
MONTEREY PARK, CA 91755
ATTN: STANDBY LETTER OF CREDIT UNIT

**FOR THE URGENT ATTENTION OF LETTER OF CREDIT MANAGER.**

[INSERT NAME OF BENEFICIARY], IN ITS CAPACITY AS TRUSTEE AND TENDER AGENT (THE "BENEFICIARY"), HEREBY CERTIFIES TO UNION BANK, N.A. (THE "BANK") WITH REFERENCE TO IRREVOCABLE LETTER OF CREDIT NO. S326841M (THE "LETTER OF CREDIT"; THE TERMS THE "BONDS", "BUSINESS DAY", THE "INDENTURE", AND THE "PRESENTATION OFFICE" USED HEREIN SHALL HAVE THEIR RESPECTIVE MEANINGS SET FORTH IN THE LETTER OF CREDIT) THAT:

(1) THE BENEFICIARY IS THE TRUSTEE AND TENDER AGENT OR A SUCCESSOR TRUSTEE AND TENDER AGENT UNDER THE INDENTURE.

(2) THE BENEFICIARY IS MAKING A DEMAND UNDER THE LETTER OF CREDIT FOR PAYMENT OF THE TOTAL UNPAID PRINCIPAL OF, AND UNPAID INTEREST ON, ALL OF THE BONDS WHICH ARE CURRENTLY OUTSTANDING UPON:

    (A) THE STATED MATURITY OF ALL SUCH BONDS,

    (B) THE ACCELERATION OF ALL SUCH BONDS FOLLOWING AN EVENT OF DEFAULT UNDER THE INDENTURE,

    (C) THE REDEMPTION OF ALL SUCH BONDS, OR

    (D) THE PURCHASE IN LIEU OF ACCELERATION OF ALL SUCH BONDS AS A RESULT OF OUR RECEIPT OF NOTICE FROM YOU OF THE OCCURRENCE OF AN EVENT OF DEFAULT UNDER THE REIMBURSEMENT AGREEMENT, DATED AS OF JUNE 5, 2014, BETWEEN PACIFIC GAS AND ELECTRIC COMPANY AND THE BANK.

(3) THE AMOUNT HEREBY DEMANDED UNDER THE LETTER OF CREDIT IS $[INSERT AMOUNT WHICH IS THE SUM OF THE TWO AMOUNTS SET FORTH IN PARAGRAPH 4, BELOW].

(4) THE AMOUNT OF THIS DEMAND IS EQUAL TO THE SUM OF (A) $[INSERT AMOUNT] BEING DRAWN WITH RESPECT TO THE PAYMENT OF THE UNPAID PRINCIPAL OF THE OUTSTANDING BONDS AND (B) $[INSERT AMOUNT] BEING DRAWN WITH RESPECT TO THE PAYMENT OF THE UNPAID INTEREST ON THE OUTSTANDING BONDS.



(5) THE AMOUNT OF THIS DEMAND FOR PAYMENT WAS COMPUTED IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF THE BONDS AND THE INDENTURE AND IS DEMANDED IN ACCORDANCE WITH THE INDENTURE, WHICH AMOUNT PLEASE REMIT TO THE UNDERSIGNED AS FOLLOWS:

[INSERT REMITTANCE INSTRUCTIONS].

(6) THE BENEFICIARY HAS CONTACTED OR ATTEMPTED TO CONTACT BY TELEPHONE AN OFFICER OF THE BANK AT THE PRESENTATION OFFICE REGARDING THE AMOUNT OF THIS DEMAND AND THE DATE AND TIME BY WHICH PAYMENT IS DEMANDED; HOWEVER, SUCH CONTACT, WHETHER OR NOT ATTEMPTED OR MADE, IS NOT A CONDITION TO HONORING THE DEMAND FOR PAYMENT MADE PURSUANT HERETO.

(7) IF THIS DEMAND IS RECEIVED BY YOU AT THE PRESENTATION OFFICE AT OR BEFORE 12:00 P.M., LOS ANGELES TIME ON A BUSINESS DAY, YOU MUST MAKE PAYMENT ON THIS DEMAND AT OR BEFORE 10:00 A.M., LOS ANGELES TIME, ON THE NEXT BUSINESS DAY. IF THIS DEMAND IS RECEIVED BY YOU AT THE PRESENTATION OFFICE AFTER 12:00 P.M., LOS ANGELES TIME, ON A BUSINESS DAY, YOU MUST MAKE PAYMENT ON THIS DEMAND AT OR BEFORE 10:00 A.M., LOS ANGELES TIME, ON THE SECOND BUSINESS DAY FOLLOWING SUCH BUSINESS DAY.

(8) NO AMOUNT OF THIS DEMAND IS BEING DRAWN TO PAY THE PRINCIPAL OF, OR INTEREST ON, LIQUIDITY PROVIDER BONDS (AS DEFINED IN THE INDENTURE) OR BONDS REGISTERED IN THE NAME OF THE APPLICANT.

**SPECIMEN**

[INSERT NAME OF BENEFICIARY]

[INSERT SIGNATURE AND DATE]

 **Union**Bank

UNION BANK, N.A.
TRADE SERVICE OPERATIONS
1980 SATURN STREET, V02-906
MONTEREY PARK, CA 91755
ATTN: STANDBY LETTER OF CREDIT UNIT

**FOR THE URGENT ATTENTION OF LETTER OF CREDIT MANAGER**

### LETTER OF CREDIT REDUCTION AUTHORIZATION

**[INSERT NAME OF BENEFICIARY]**, WITH REFERENCE TO LETTER OF CREDIT NO. S326841M ISSUED BY UNION BANK, N.A. (THE "BANK"), HEREBY UNCONDITIONALLY AND IRREVOCABLY REQUESTS THAT THE BANK DECREASE THE AMOUNT AVAILABLE FOR DRAWING UNDER THE LETTER OF CREDIT BY $[INSERT AMOUNT].

# SPECIMEN

**[FOR SIGNED REDUCTION AUTHORIZATIONS ONLY]**

[INSERT NAME OF BENEFICIARY]

By: _____
TITLE: [INSERT TITLE]

DATE: [INSERT DATE]

SIGNATURE GUARANTEED BY

[INSERT NAME OF BANK]

By: _____
[INSERT NAME AND TITLE]

**Union**Bank

UNION BANK, N.A.
TRADE SERVICE OPERATIONS
1980 SATURN STREET, V02-906
MONTEREY PARK, CA 91755
ATTN: STANDBY LETTER OF CREDIT UNIT

**FOR THE URGENT ATTENTION OF LETTER OF CREDIT MANAGER**

**[INSERT DATE]**

Subject: Your Letter of Credit No. S326841M

Ladies and Gentlemen:

For value received, we hereby irrevocably assign and transfer all of our rights under the above-captioned Letter of Credit, as heretofore and hereafter amended, extended, increased or reduced to:

[Name of Transferee]



[Address of Transferee]

By this transfer, all of our rights in the Letter of Credit are transferred to the transferee, and the transferee shall have sole rights as beneficiary under the Letter of Credit, including sole rights relating to any amendments, whether increases or extensions or other amendments, and whether now existing or hereafter made. You are hereby irrevocably instructed to advise future amendment(s) of the Letter of Credit to the transferee without our consent or notice to us.

The original Letter of Credit is returned with all amendments to this date. Please notify the transferee in such form as you deem advisable of this transfer and of the terms and conditions to this Letter of Credit, including amendments as transferred.

You are hereby advised that the transferee named above has succeeded Deutsche Bank National Trust Company or a successor trustee and tender agent, as Trustee and Tender Agent under the Indenture of Trust dated as of August 1, 2009 as supplemented from time to time (the "Indenture") between the California Infrastructure and Economic Development Bank (the "Issuer") and Deutsche Bank National Trust Company, as Trustee and Tender Agent, pursuant to which the Bonds were issued.

Very truly yours,

**Union**Bank

[Insert Name of Transferor]

By: _____
       [Insert Name and Title]

**TRANSFEROR'S SIGNATURE GUARANTEED**

By: _____
       [Bank Name]

By: _____
       [Insert Name and Title]

By its signature below, the undersigned transferee acknowledges that it has duly succeeded
_____ or a successor trustee and tender agent as Trustee and
Tender Agent under the Indenture.

[Insert Name of Transferee]

By: _____
       [Insert Name and Title]

SPECIMEN



DATE: **[INSERT DATE]**

AMENDMENT TO CREDIT NO. S326841M

AMENDMENT NUMBER:

APPLICANT:
Pacific Gas and Electric Company
77 Beale Street
San Francisco, CA 94177

BENEFICIARY:
**[INSERT NAME AND ADDRESS OF BENEFICIARY]**

THIS AMENDMENT IS TO BE CONSIDERED AS PART OF THE ABOVE CREDIT AND MUST BE
ATTACHED THERETO.

THE ABOVE MENTIONED CREDIT IS AMENDED AS FOLLOWS:

**SPECIMEN**

THE SCHEDULE EXPIRATION DATE IS EXTENDED TO: **[INSERT NEW SCHEDULED EXPIRATION DATE]**.

ALL OTHER TERMS UNCHANGED.

UNION BANK, N.A.

By: _____
Authorized Signature

PLEASE CONTACT LETTER OF CREDIT UNIT BY TELEPHONE AT (323) 720-7957 OR BY
FAX AT (323) 720-2773 REGARDING ANY INQUIRIES.

Exhibit 3
Indenture

INDENTURE OF TRUST

Between

CALIFORNIA INFRASTRUCTURE AND
ECONOMIC DEVELOPMENT BANK

And

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee

Dated as of August 1, 2009

Relating to

$74,275,000
California Infrastructure and Economic Development Bank
Refunding Revenue Bonds
(Pacific Gas and Electric Company)
Series 2009B

LA1 1628093

# ARTICLE I

## DEFINITIONS

Section 1.01. Definitions ........................................................................................... 3
Section 1.02. Number and Gender ............................................................................. 14
Section 1.03. Articles, Sections, Etc. ......................................................................... 14
Section 1.04. Content of Certificates and Opinions .................................................. 14
Section 1.05. Multi-Mode Annex .............................................................................. 15

# ARTICLE II

## THE BONDS

Section 2.01. Authorization and Terms of Bonds .................................................. 15
Section 2.02. Execution of Bonds ............................................................................. 17
Section 2.03. Transfer and Exchange of Bonds ........................................................ 18
Section 2.04. Bond Register ...................................................................................... 18
Section 2.05. Temporary Bonds ................................................................................ 18
Section 2.06. Bonds Mutilated, Lost, Destroyed or Stolen ...................................... 19

# ARTICLE III

## ISSUANCE OF BONDS

Section 3.01. Authentication and Delivery of Bonds ................................................ 19
Section 3.02. Application of Proceeds of Bonds ....................................................... 19

# ARTICLE IV

## REDEMPTION AND PURCHASE OF BONDS

Section 4.01. Redemption of Bonds .......................................................................... 20
Section 4.02. Purchase of Bonds .............................................................................. 20

# ARTICLE V

## REVENUES

Section 5.01. Pledge of Revenues ............................................................................. 20
Section 5.02. Bond Fund ........................................................................................... 20
Section 5.03. Trustee Authorized to Realize Moneys Under any Credit Facility; Tender
              Agent Authorized to Realize Moneys Under any Liquidity Facility ...... 21
Section 5.04. Investment of Moneys ......................................................................... 22
Section 5.05. Assignment to Trustee; Enforcement of Obligations .......................... 23
Section 5.06. Repayment to Borrower ...................................................................... 23
Section 5.07. Rebate Fund ........................................................................................ 23

LA1 1032093

# ARTICLE VI

## COVENANTS OF THE ISSUER

Section 6.01. Punctual Payment ................................................................. 25
Section 6.02. Extension of Payment of Bonds ............................................. 25
Section 6.03. Against Encumbrances .......................................................... 26
Section 6.04. Power to Issue Bonds and Make Pledge and Assignment ......... 26
Section 6.05. Accounting Records and Reports ............................................ 26
Section 6.06. Tax Covenants ...................................................................... 27
Section 6.07. Other Covenants ................................................................... 27
Section 6.08. Waiver of Laws ..................................................................... 27
Section 6.09. Further Assurances ............................................................... 27
Section 6.10. Continuing Disclosure ........................................................... 27

# ARTICLE VII

## DEFAULT

Section 7.01. Events of Default; Acceleration, Rescission of Acceleration; Purchase in
             Lieu of Acceleration .............................................................. 28
Section 7.02. Institution of Legal Proceedings by Trustee ............................ 33
Section 7.03. Application of Moneys Collected by Trustee ........................... 33
Section 7.04. Effect of Delay or Omission to Pursue Remedy ....................... 34
Section 7.05. Remedies Cumulative ........................................................... 34
Section 7.06. Covenant to Pay Bonds in Event of Default ............................ 34
Section 7.07. Trustee Appointed Agent for Bondholders .............................. 35
Section 7.08. Power of Trustee to Control Proceedings ............................... 35
Section 7.09. Limitation on Bondholders' Right to Sue ................................ 35
Section 7.10. Limitation of Liability to Revenues ........................................ 36
Section 7.11. Right of Credit Provider to Control Remedial Proceedings ........ 36

# ARTICLE VIII

## THE TRUSTEE, THE REGISTRAR, THE TENDER AGENT, THE REMARKETING
## AGENT AND THE PAYING AGENT

Section 8.01. Duties, Immunities and Liabilities of Trustee and Registrar ....... 37
Section 8.02. Right of Trustee and Registrar to Rely upon Documents, Etc ..... 38
Section 8.03. Trustee and Registrar Not Responsible for Recitals .................. 39
Section 8.04. Right of Trustee and Registrar to Acquire Bonds ..................... 39
Section 8.05. Moneys Received by Trustee and Registrar to Be Held in Trust ... 39
Section 8.06. Compensation and Indemnification of Trustee and Registrar ...... 39
Section 8.07. Qualifications of Trustee and Registrar ................................... 40
Section 8.08. Resignation and Removal of Trustee or Registrar and Appointment of
             Successor Trustee or Registrar ............................................... 40
Section 8.09. Acceptance of Trust by Successor Trustee ............................. 41

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 97
of 295

Section 8.10. Merger or Consolidation of Trustee or Registrar ............................... 42
Section 8.11. Registrars ..................................................................................... 42
Section 8.12. Tax Certificate and Agreement ....................................................... 42
Section 8.13. Notices to the Issuer ...................................................................... 42
Section 8.14. Appointment of Co-Trustee ............................................................. 43
Section 8.15. Appointment, Duties and Qualifications of Tender Agent .................. 44
Section 8.16. Appointment, Duties and Qualifications of Remarketing Agent .......... 45
Section 8.17. Appointment, Duties and Qualifications of Paying Agent ................... 46
Section 8.18. Several Capacities ........................................................................... 46

## ARTICLE IX

## MODIFICATION OF INDENTURE, DOCUMENTS

Section 9.01. Modification Without Consent of Bondholders ................................... 46
Section 9.02. Modification With Consent of Bondholders ....................................... 48
Section 9.03. Effect of Supplemental Indenture or Amendment .............................. 49
Section 9.04. Required and Permitted Opinions of Counsel .................................... 49
Section 9.05. Notation of Modification on Bonds; Preparation of New Bonds ........... 49

## ARTICLE X

## DEFEASANCE

Section 10.01. Discharge of Indenture .................................................................. 50
Section 10.02. Discharge of Liability on Bonds ..................................................... 51
Section 10.03. Payment of Bonds after Discharge of Indenture ............................... 51
Section 10.04. Deposit of Money or Securities with Trustee ................................... 51

## ARTICLE XI

## MISCELLANEOUS

Section 11.01. Liability of Issuer Limited to Revenues ........................................... 52
Section 11.02. Successor Is Deemed Included in All References to Predecessor ........ 52
Section 11.03. Limitation of Rights ...................................................................... 53
Section 11.04. Waiver of Notice ........................................................................... 53
Section 11.05. Severability of Invalid Provisions ................................................... 53
Section 11.06. Notices ........................................................................................ 53
Section 11.07. Evidence of Rights of Bondholders ................................................ 55
Section 11.08. Disqualified Bonds ........................................................................ 55
Section 11.09. Money Held for Particular Bonds ................................................... 56
Section 11.10. Funds and Accounts ...................................................................... 56
Section 11.11. Waiver of Personal Liability ........................................................... 56
Section 11.12. Publication of Notices ................................................................... 56
Section 11.13. Governing Law; Venue .................................................................. 56
Section 11.14. Execution in Several Counterparts .................................................. 57

LA1 1638903

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 98
of 295

Section 11.15. Authorized Borrower Representative ............................................. 57
Section 11.16. Third Party Beneficiaries ........................................................ 57

APPENDIX A       FORM OF BOND ............................................................. A-1
APPENDIX B       MULTI-MODE ANNEX ........................................................ B-1
APPENDIX C       FORM OF TENDER AGENT AGREEMENT ....................................... C-1

LAI 1620003

iv

THIS INDENTURE OF TRUST, made and entered into as of August 1, 2009, by and between the CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK, an entity within the Business, Transportation and Housing Agency of the State of California (herein called the "Issuer"), and DEUTSCHE BANK NATIONAL TRUST COMPANY, a national banking association organized and existing under the laws of the United States of America with its principal corporate trust office in Santa Ana, California, being qualified to accept and administer the trusts hereby created (herein called the "Trustee").

## WITNESSETH:

WHEREAS, the Issuer was established pursuant to the Bergeson-Peace Infrastructure and Economic Development Bank Act, constituting Division 1 of Title 6.7 of the California Government Code (commencing with Section 63000), as now in effect and as it may be amended or supplemented (the "Act"); and

WHEREAS, pursuant to Section 63045(c) of the Act, the Issuer is authorized to issue tax exempt revenue bonds to provide financing for economic development projects compatible with the public interest as specified in Section 63046 of the Act; and

WHEREAS, pursuant to Section 63081 of the Act, the Issuer is authorized to issue bonds for the purpose of refunding any bonds, notes or other securities of the Issuer then outstanding, including the payment of any interest accrued, or to accrue, on their earliest of any subsequent date of redemption, purchase, or maturity of these bonds; and

WHEREAS, pursuant to Section 63025.1(j) of the Act, the Issuer is authorized to make loans to any sponsor, in accordance with an agreement between the Issuer and the sponsor to refinance indebtedness incurred by the sponsor in connection with projects undertaken and completed prior to any agreement with the Issuer or expectation that the Issuer would provide financing pursuant to the Act; and

WHEREAS, the Issuer issued its Revenue Refunding Bonds (Pacific Gas and Electric Company) Series 2008A (AMT), in the aggregate principal amount of $74,275,000; its Revenue Refunding Bonds (Pacific Gas and Electric Company) Series 2008B (AMT), in the aggregate principal amount of $74,275,000 (the "Series 2008B Bonds"); its Revenue Refunding Bonds (Pacific Gas and Electric Company) Series 2008C (AMT), in the aggregate principal amount of $80,000,000; and its Revenue Refunding Bonds (Pacific Gas and Electric Company) Series 2008D (AMT), in the aggregate principal amount of $80,000,000 (collectively, the "2008A-D Bonds"), and upon issuance, the 2008A-D Bonds were exchanged for certain refunding revenue bonds previously issued by the Issuer, the proceeds of which refunding revenue bonds were loaned to Pacific Gas and Electric Company (the "Borrower"); and

WHEREAS, the American Recovery and Reinvestment Tax Act of 2009 (the "Act") allows the 2008A-D Bonds, the interest on which is an item of tax preference for purposes of the Alternative Minimum Tax (the "AMT"), to be refinanced with the proceeds of refunding revenue bonds, the interest on which is not an item of tax preference for purposes of the AMT; and

WHEREAS, to take advantage of this aspect of the Act, the Borrower has requested the Issuer to issue its refunding revenue bonds for the purpose of refinancing the 2008A-D Bonds

through the purchase in lieu of redemption by the Borrower of the 2008A-D Bonds, using the proceeds of such refunding revenue bonds and the immediate cancellation of the 2008A-D Bonds so purchased, and the Issuer, after due investigation and deliberation, has adopted a resolution approving said request; and

WHEREAS, pursuant to the Act, the Issuer has determined to issue and sell one or more series of its refunding revenue bonds as provided herein (collectively, the "Bonds") and to lend the proceeds thereof to the Borrower pursuant to the Loan Agreement, dated as of August 1, 2009 (the "Agreement"), by and between the Issuer and the Borrower for the purpose of purchasing the Series 2008B Bonds by the Borrower from the proceeds of the Bonds in lieu of their redemption and the immediate cancellation of the Series 2008B Bonds so purchased thereby assisting the Borrower in the refinancing of a portion of the costs of certain air and water pollution control and sewage and solid waste disposal facilities located at the Diablo Canyon Nuclear Power Plant (the "Diablo Canyon Project"); and

WHEREAS, the issuance and sale of the Bonds and the loan of the proceeds thereof to the Borrower to refinance the Series 2008B Bonds and the Diablo Canyon Project as aforesaid will serve the purposes of the Issuer and the Act and in all respects conform to the provisions and requirements of the Act; and

WHEREAS, in order to provide for the authentication and delivery of the Bonds, to establish and declare the terms and conditions upon which the Bonds are to be issued and secured and to secure the payment of the principal thereof and of the interest and premium, if any, thereon, the Issuer has authorized the execution and delivery of this Indenture; and

WHEREAS, the Bonds are to be issued in the aggregate principal amount of $74,275,000, and the Bonds are to be sold and delivered to provide proceeds, as a loan to the Borrower, to refinance the Series 2008B Bonds for the foregoing purposes; and

WHEREAS, the proceeds of the Bonds will be used solely to purchase the Series 2008B Bonds purchased in lieu of redemption on behalf of the Borrower, and the Series 2008B Bonds so purchased will be immediately cancelled, all as provided in more detail in the Purchase Protocol, among the Trustee, the Issuer, the Borrower, the representative of the underwriters of the Bonds and Deutsche Bank National Trust Company, as tender agent for the Series 2008B Bonds and will not be applied in any other manner or used for any other purpose; and

WHEREAS, all Bonds issued under this Indenture will be secured by a pledge and assignment of the Issuer's rights under the Agreement (except Retained Rights) and other security instruments; and

WHEREAS, all acts and proceedings required by law necessary to make the Bonds when executed by the Issuer, authenticated and delivered by the Trustee and duly issued, the valid and binding limited obligations of the Issuer, and to constitute this Indenture a valid and binding agreement for the uses and purposes herein set forth, in accordance with its terms, have been done and taken; and the execution and delivery of this Indenture has been in all respects duly authorized; and

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 101 of 295

NOW, THEREFORE, THIS INDENTURE WITNESSETH, that in order to secure the payment of the principal of, and the interest and premium, if any, on, all Bonds issued and Outstanding under this Indenture, according to their tenor, and to secure the performance and observance of all the covenants and conditions therein and herein set forth, and to declare the terms and conditions upon and subject to which the Bonds are to be issued and received, and for and in consideration of the premises and of the mutual covenants herein contained and of the purchase and acceptance of the Bonds by the Holders thereof, and for other valuable consideration, the receipt whereof is hereby acknowledged, the Issuer covenants and agrees with the Trustee, for the equal and proportionate benefit of the respective Holders from time to time of the Bonds, as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01. Definitions. Any terms not defined herein shall have the meanings as set forth in the Multi-Mode Annex attached hereto. Unless the context otherwise requires, the terms defined in this Section 1.01 shall, for all purposes of this Indenture and of the Agreement and of any supplemental indenture or agreement supplemental thereto, have the meanings herein specified, as follows:

"Act" means the Bergeson-Peace Infrastructure and Economic Development Bank Act, constituting Division 1 of Title 6.7 of the California Government Code (commencing with Section 63000), as now in effect and as it may be amended or supplemented hereafter from time to time.

"Act of Bankruptcy" of the Borrower means any of the following with respect to the Borrower: (a) the commencement by the Borrower of a voluntary case under the federal bankruptcy laws, as now in effect or hereafter amended, or any other applicable federal or state bankruptcy, insolvency or similar laws, or (b) failure by the Borrower to timely controvert the filing of a petition with a court having jurisdiction over the Borrower to commence an involuntary case against the Borrower under the federal bankruptcy laws, as now in effect or hereafter amended, or any other applicable federal or state bankruptcy, insolvency or similar laws, or (c) the Borrower shall admit in writing its inability to pay its debts generally as they become due, or (d) a receiver, trustee or liquidator of the Borrower shall be appointed in any proceeding brought against the Borrower, or (e) assignment by the Borrower for the benefit of its creditors, or (f) the entry by the Borrower into an agreement of composition with its creditors.

"Additional Payments" means payments to the Issuer or the Trustee pursuant to Sections 4.2(b)(i), 4.2(c), 5.4, 6.3, 8.2 and 8.3 of the Agreement.

"Agreement" means the Loan Agreement, of even date herewith, between the Issuer and the Borrower and relating to the loan of the proceeds of the Bonds, as originally executed or as it may from time to time be supplemented or amended.

"Authorized Issuer Representative" means the Executive Director, the Chair or the Chair Designee of the Issuer, or any Person who at the time and from time to time may be designated

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 102 of 295

by the Chair or the Executive Director of the Issuer by written certificate furnished to the Trustee, any Credit Provider and any Liquidity Provider, as a Person authorized to act on behalf of the Issuer.

"Available Moneys" means (1) proceeds of the Bonds received from the original issuance and sale of the Bonds; (2) proceeds from the remarketing of any Bonds tendered for purchase pursuant to this Indenture and purchased by any Person other than the Issuer or the Borrower (or any "insider," as defined in the United States Bankruptcy Code, of the Issuer or the Borrower); (3) moneys derived from drawings under a Liquidity Facility or Credit Facility that are not commingled with any other moneys; (4) moneys held by the Trustee in funds and accounts established under this Indenture (other than in the Rebate Fund, moneys realized under a Liquidity Facility or Credit Facility to make timely payment of principal of and premium, if any, and interest on the Bonds or as described in Section 11.09 hereof) for a period of at least 124 days and not commingled with any moneys so held for less than said period and during and prior to which period no petition in bankruptcy was filed by or against, and no receivership, insolvency, assignment for the benefit of creditors or other similar proceeding has been commenced by or against, the Issuer or the Borrower (or any "insider," as defined in the United States Bankruptcy Code, of the Issuer or the Borrower), unless such petition or proceeding was dismissed and all applicable appeal periods have expired without an appeal having been filed; (5) investment income derived from the investment of moneys described in clause (1), (2), (3), or (4); or (6) moneys as to which there has been delivered to the Trustee an opinion of nationally recognized bankruptcy counsel in a form acceptable to each Rating Agency to the effect that the payment of such moneys to the Holders would not constitute transfers avoidable under 11 U.S.C. Section 547(b) and recoverable from the Holders under 11 U.S.C. Section 550(a) should the Issuer or the Borrower (or any "insider," as defined in the United States Bankruptcy Code, of the Issuer or the Borrower) be the debtor in a case under the United States Bankruptcy Code.

"Bond" or "Bonds" means any bond designated as provided in Section 2.01(a) hereof.

"Bond Counsel" means any attorney at law or firm of attorneys, of nationally recognized standing in matters pertaining to the federal tax exemption of interest on bonds issued by states and political subdivisions, and duly admitted to practice law before the highest court of any state of the United States, but shall not include general counsel for the Borrower.

"Bond Fund" means the California Infrastructure and Economic Development Bank/Pacific Gas and Electric Company Series 2009B Bond Fund established pursuant to Section 5.02 hereof.

"Bond Purchase Fund" means the fund by that name established pursuant to the Tender Agent Agreement.

"Bond Year" means the one-year period commencing on the Issue Date and ending the day preceding the first anniversary of the Issue Date and each one-year period commencing on successive anniversaries of the Issue Date, the last of which ends on the date the last of the Bonds is retired.

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 103 of 295

"Borrower" means (i) Pacific Gas and Electric Company, a corporation organized under the laws of the State of California, and its successors and assigns, and (ii) any surviving, resulting or transferee corporation as provided in Section 5.1 of the Agreement.

"Business Day" means any day on which banks located in the cities in which the Principal Offices of the Trustee, the Registrar, the Paying Agent, the Tender Agent, the Remarketing Agent, any Marketing Party, any Credit Provider and any Liquidity Provider are located are not required or authorized to remain closed and on which the New York Stock Exchange is not closed, and in the case of action to be taken by the Borrower, which is not a day on which banks in San Francisco, California are required or authorized to be closed.

"Certificate of the Issuer" means a certificate signed by an Authorized Issuer Representative. If and to the extent required by the provisions of Section 1.04 hereof, each Certificate of the Issuer shall include the statements provided for in Section 1.04 hereof.

"Certified Resolution" means a copy of a resolution of the Issuer certified by the Secretary of the Issuer to have been duly adopted by the Issuer and to be in full force and effect on the date of such certification.

"Code" means the Internal Revenue Code of 1986, as amended, and the regulations issued thereunder, as the same may be amended from time to time, and any successor provisions of law. Reference to a particular section of the Code shall be deemed to be a reference to any successor to any such section.

"Credit Agreement" means, with respect to any Credit Facility, any agreement between the Borrower and any Credit Provider pursuant to which any Credit Facility is provided to the Trustee.

"Credit Facility" means (i) the Letter of Credit; and (ii) any letter of credit, guarantee or insurance policy provided by a financial institution or insurance company, or any other credit support provided pursuant to Section 4.6 of the Agreement and Section 5.01 of the Multi-Mode Annex and any letter of credit, guarantee, insurance policy or other credit support provided in substitution therefor or for the Letter of Credit, guaranteeing or supporting the payment of the principal of and interest on the Bonds; provided, however, "Credit Facility" shall not include any Liquidity Facility, debentures or other debt obligations of the Borrower. A single letter of credit, guarantee, insurance policy or credit support may constitute both a Credit Facility and a Liquidity Facility hereunder.

"Credit Provider" means the provider of any Credit Facility, if any.

"Defeasance Securities" means:

(1)     Cash (insured at all times by the Federal Deposit Insurance Corporation);

(2)     Obligations of, or obligations guaranteed as to principal and interest by, the U.S. or any agency or instrumentality thereof, when such obligations are backed by the full faith and credit of the U.S. including:

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 104 of 295

- U.S. treasury obligations
- All direct or fully guaranteed obligations
- Farmers Home Administration
- General Services Administration
- Guaranteed Title XI financing
- Government National Mortgage Association (GNMA)
- State and Local Government Series;

(3)    Any certificates, receipts, securities or other obligations evidencing ownership of, or the right to receive, a specified portion of one or more interest payments or principal payments, or any combination thereof, to be made on any bond, note, or other obligation described above in clause (2) of this definition.

Any Defeasance Security must provide for the timely payment of principal and interest and cannot be callable or prepayable prior to maturity or earlier redemption of the rated debt (excluding securities that do not have a fixed par value and/or whose terms do not promise a fixed dollar amount at maturity or call date).

"Determination of Taxability" means a determination that interest payable on any Bond is or may become includable in the gross income for federal income tax purposes of the Holder of such Bond (other than a Holder who is a "substantial user" of the Diablo Canyon Project or Geysers Project or a "related person" within the meaning of Section 147(a) of the Code or Section 103(b)(13) of the 1954 Code). Such determination shall be deemed to have been made upon (i) the date on which, due to the action or inaction by the Borrower or any owner of the Diablo Canyon Project or Geysers Project, or the untruth or inaccuracy of any representation or warranty made by the Borrower in the Agreement, or in connection with the offer and sale of the Bonds, or the breach of any covenant or warranty of the Borrower contained in the Agreement, interest on the Bonds, or any of them, is determined to be includable or may become includable in the gross income for federal income tax purposes of the Holders thereof (other than a Holder who is a "substantial user" of the Diablo Canyon Project or Geysers Project or a "related person" within the meaning of Section 147(a) of the Code or Section 103(b)(13) of the 1954 Code) by a final administrative determination of the Internal Revenue Service or judicial decision of a court of competent jurisdiction or (ii) the date on which an Opinion of Bond Counsel obtained by the Borrower is delivered to the Trustee to the effect that as a result of the action or inaction by the Borrower or any owner of the Diablo Canyon Project or Geysers Project or the failure by the Borrower to observe or perform any covenant, condition or agreement on its part to be observed or performed under the Agreement or as a result of the inaccuracy of any representation or warranty made by the Borrower under the Agreement, the interest payable on any Bond is or will become includable in the gross income for federal income tax purposes of the Holders thereof (other than a Holder who is a "substantial user" of the Diablo Canyon Project or Geysers Project or a "related person" within the meaning of Section 147(a) of the Code or Section 103(b)(13) of the 1954 Code).

"Diablo Canyon Project" means those facilities, including real property, structures, buildings, fixtures or equipment, described in Exhibit A to the Agreement, originally financed in part by the proceeds of the sale of the Prior Bonds and subsequently refinanced in part by a portion of the proceeds of the Series 2008B Bonds, and which facilities are being refinanced, in

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page
105 of 295

whole or in part, from the proceeds of the sale of the Bonds, and any real property, structures, buildings, fixtures or equipment acquired in substitution for, as a renewal or replacement of, or a modification or improvement to, all or any part of the facilities described in said Exhibit A.

"DTC" means The Depository Trust Company and its successors and assigns.

"DTC Participants" means those broker-dealers, banks and other financial institutions from time to time for which DTC holds Bonds as securities depository.

"Eligible Account" means an account that is maintained with the corporate trust department of a federal depository institution or state chartered depository institution, which, in either case, has corporate trust powers and is acting in its fiduciary capacity.

"Event of Default" has the meaning specified in Section 7.01(a) hereof.

"Geysers Project" means those facilities, including real property, structures, buildings, fixtures or equipment, originally financed in part by the proceeds of the sale of the Prior Bonds and subsequently refinanced in part by a portion of the proceeds of the Series 2008A-D Bonds, and which facilities are being refinanced, in whole or in part, in connection with the issuance of the Bonds, and any real property, structures, buildings, fixtures or equipment acquired in substitution for, as a renewal or replacement of, or a modification or improvement to, all or any part of such facilities.

"Government Obligations" means bonds, notes, certificates of indebtedness, treasury bills or other securities constituting direct obligations of, or obligations the full and timely payment of which is guaranteed by, the United States of America, or securities evidencing ownership interests in such obligations or in specified portions thereof (which may consist of specific portions of the principal of or interest on such obligations), or repurchase agreements continuously secured and collateralized by any of the foregoing.

"Holder" or "Bondholder" means the registered owner of any Bond; provided that, at any time the Bonds are held in book-entry only form as provided in Section 2.01(d) hereof, such terms shall also mean any beneficial owner of Bonds, or any nominee of such beneficial owner, for purposes of tendering Bonds for purchase pursuant to Section 2.02(a) of the Multi-Mode Annex, but not for purposes of receiving payment thereon or notices with respect thereto.

"Indenture" means this Indenture of Trust, as originally executed or as it may from time to time be supplemented, modified or amended by any supplemental indenture entered into pursuant to the provisions hereof.

"Initial Rate Period" means the Rate Period for the Bonds on the Issue Date as specified in Section 2.01(c) of the Multi-Mode Annex.

"Investment Security" or "Investment Securities" means, individually or collectively:

(a)    Defeasance Securities;

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page
106 of 295

(b)     obligations of any of the following federal agencies which obligations represent the full faith and credit of the United States of America, including:

-Export-Import Bank
-Rural Economic Community Development Administration
-U.S. Maritime Administration
-Small Business Administration
-U.S. Department of Housing & Urban Development (PHAs)
-Federal Housing Administration
-Federal Financing Bank;

(c)     direct obligations of any of the following federal agencies which obligations are not fully guaranteed by the full faith and credit of the United States of America:

-Senior debt obligations issued by the Federal National Mortgage Association (FNMA) or Federal Home Loan Mortgage Corporation (FHLMC).
-Obligations of the Resolution Funding Corporation (REFCORP)
-Senior debt obligations of the Federal Home Loan Bank System
-Senior debt obligations of other Government Sponsored Agencies approved by each Credit Provider;

(d)     U.S. dollar denominated deposit accounts, federal funds and bankers' acceptances with domestic commercial banks which have a rating on their short term certificates of deposit on the date of purchase of "P-1" by Moody's and "A-1" or "A-1+" by S&P and maturing not more than 360 calendar days after the date of purchase (ratings on holding companies are not considered as the rating of the bank);

(e)     commercial paper which is rated at the time of purchase in the single highest classification, "P-1" by Moody's and "A-1+" by S&P and which matures not more than 270 calendar days after the date of purchase;

(f)     investments in a money market fund rated "AAAm" or "AAAm-G" or better by S&P.

(g)     pre-refunded Municipal Obligations defined as follows: any bonds or other obligations of any state of the United States of America or of any agency, instrumentality or local governmental unit of any such state which are not callable at the option of the obligor prior to maturity or as to which irrevocable instructions have been given by the obligor to call on the date specified in the notice; and

(i)     which are rated, based on an irrevocable escrow account or fund (the "escrow"), in the highest rating category of Moody's or S&P or any successors thereto; or

(ii)     (A) which are fully secured as to principal and interest and redemption premium, if any, by an escrow consisting only of cash or obligations described in paragraph (2) of the definition of Defeasance Securities, which escrow may be applied only to the payment of such principal of and interest and

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 107 of 295

redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (B) which escrow is sufficient, as verified by a nationally recognized independent certified public accountant, to pay principal of and interest and redemption premium, if any, on the bonds or other obligations described in this paragraph on the maturity date or dates specified in the irrevocable instructions referred to above, as appropriate;

(h) Municipal Obligations rated "Aaa/AAA" or general obligations of States with a rating of "A2/A" or higher by both Moody's and S&P;

(i) Investment Agreements approved in writing by each Credit Provider (supported by appropriate opinions of counsel); and

(j) other forms of investments (including repurchase agreements) approved in writing by each Credit Provider.

The value of the above investments shall be determined as follows:

a) For the purpose of determining the amount in any fund, all Investment Securities credited to such fund shall be valued at fair market value. To the extent the Trustee holds such Investment Securities, the Trustee shall determine the fair market value based on accepted industry standards and from accepted industry providers. Accepted industry providers shall include but are not limited to pricing services provided by Financial Times Interactive Data Corporation and Morgan Stanley & Co. Incorporated.

b) As to certificates of deposit and bankers' acceptances: the face amount thereof, plus accrued interest thereon; and

c) As to any investment not specified above: the value thereof established by prior agreement among the Issuer, the Trustee, and each Credit Provider.

"Issuance Certificate" shall have the meaning set forth in Section 2.01(c) hereof.

"Issue Date" means September 1, 2009, the date of issuance and delivery of the Bonds.

"Issuer" means the California Infrastructure and Economic Development Bank, and any successor or assignee to its functions.

"Letter of Credit" means the Irrevocable, Direct Pay Transferable Letter of Credit No. NZS630256 issued October 29, 2008 by Wells Fargo Bank, N.A., as amended by the Amendment to Irrevocable Letter of Credit No. NZS630256 Amendment No. 1 dated as of September 1, 2009 by Wells Fargo Bank, N.A. The Letter of Credit is a Credit Facility and a Liquidity Facility hereunder.

"Liquidity Agreement" means, with respect to any Liquidity Facility, any agreement between the Borrower and any Liquidity Provider pursuant to which any Liquidity Facility is provided to the Trustee.

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 108 of 295

"Liquidity Facility" means (i) the Letter of Credit; and (ii) any letter of credit, guarantee, insurance policy or standby purchase agreement provided by a financial institution or insurance company, or any other liquidity support provided pursuant to Section 4.7 of the Agreement and Section 5.02 of the Multi-Mode Annex (including any letter of credit, guarantee, insurance policy, standby purchase agreement or other liquidity support provided in substitution therefor), guaranteeing or supporting the payment when due of the Purchase Price of the Bonds tendered for purchase pursuant to the Multi-Mode Annex to the extent moneys in the Bond Purchase Fund are not available for such payment in accordance with the Tender Agent Agreement; provided, however, "Liquidity Facility" shall not include any Credit Facility, first mortgage bonds, debentures or other debt obligations of the Borrower. A single letter of credit, guarantee or insurance policy may constitute both a Credit Facility and a Liquidity Facility hereunder.

"Liquidity Provider" means the provider of any Liquidity Facility.

"Loan" means the loan of the proceeds of the Bonds by Issuer to the Borrower pursuant to the Agreement.

"Loan Default Event" means any of the events specified in Section 6.1 of the Agreement.

"Marketing Party" means any auction agent, broker-dealer, remarketing agent, tender agent or other such party designated pursuant to the Multi-Mode Annex.

"Moody's" means Moody's Investors Service, Inc., a corporation organized and existing under the laws of the State of Delaware, its successors and their assigns, or, if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, any other nationally recognized securities rating agency designated by the Issuer by notice to the Trustee with the approval of the Borrower.

"Multi-Mode Annex" means the Multi-Mode Annex attached hereto as Appendix B, which shall for all purposes hereof be deemed to be incorporated in this Indenture.

"Nominee" shall have the meaning set forth in Section 2.01 hereof.

"1954 Code" means the Internal Revenue Code of 1954, as amended.

"Notice by Mail" or "notice" of any action or condition "by Mail" shall mean a written notice meeting the requirements of this Indenture mailed by first-class mail to the Holders of specified Bonds, at the addresses shown on the registration books maintained pursuant to Section 2.04 hereof.

"Opinion of Bond Counsel" means a written opinion of Bond Counsel addressed to the Issuer, the Trustee, the Borrower and each Credit Provider.

"Opinion of Counsel" means a written opinion of counsel (who may be counsel for the Borrower) who is acceptable to the Borrower and each Credit Provider. If and to the extent required by the provisions of Section 1.04 hereof, each Opinion of Counsel shall include the statements provided for in Section 1.04 hereof.

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 109 of 295

"Outstanding" means, when used as of any particular time with reference to Bonds (subject to the provisions of Section 11.08 hereof), all Bonds theretofore authenticated and delivered by the Trustee under this Indenture except:

(a) Bonds theretofore cancelled by the Trustee or surrendered to the Trustee for cancellation;

(b) Bonds in lieu of or in substitution for which other Bonds shall have been authenticated and delivered by the Trustee pursuant to the terms of Section 2.06 hereof;

(c) Bonds with respect to which the liability of the Issuer and the Borrower have been discharged to the extent provided in, and pursuant to the requirements of, Section 10.02 hereof; and

(d) Bonds deemed purchased pursuant to Section 2.02(c)(ii) of the Multi-Mode Annex but not delivered to the Tender Agent by the former Holder of such Bonds.

"Paying Agent" means any paying agent appointed as provided in Section 8.17 hereof, or any successor thereto.

"Person" means an individual, a corporation, a partnership, a trust, an unincorporated organization or a government or any agency or political subdivision thereof.

"Principal Office" (i) of the Registrar or the Paying Agent means the office thereof designated in writing by the Registrar or the Paying Agent, as the case may be, to the Issuer, the Trustee, the Tender Agent, the Borrower and the Marketing Parties, (ii) of the Trustee means the principal corporate trust office of the Trustee set forth in Section 11.05 or at such other address specified in writing by the Trustee from time to time, (iii) of any Credit Provider or any Liquidity Provider means the office thereof designated in writing by such Credit Provider or such Liquidity Provider to the Issuer, the Trustee, the Tender Agent, the Borrower and the Marketing Parties, and (iv) of any Marketing Party means the office thereof designated in writing by such Marketing Party to the other Marketing Parties, the Issuer, the Trustee, the Tender Agent, the Registrar, the Paying Agent and the Borrower.

"Prior Bonds" means the California Pollution Control Financing Authority Pollution Control Revenue Bonds (Pacific Gas and Electric Company) 1997 Series C, issued in the original aggregate principal amount of $148,550,000.

"Purchase Contract" means the Bond Purchase Contract, dated August 31, 2009, by and among the Underwriters, the Issuer and the Treasurer of State, and accepted and agreed to by the Borrower, providing for the purchase of the Bonds by the Underwriters.

"Purchase in Lieu of Acceleration Date" means the date on which Bonds are purchased in lieu of acceleration by the Borrower, in accordance with Section 7.01(d) hereof, which shall be the date set forth in a written notice from the Borrower to the Issuer, the Trustee, the Tender Agent and each Credit Provider, if any, as provided in Section 7.01(d)(i) hereof.

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page
110 of 295

"Purchase Protocol" means the Purchase Protocol, dated August 31, 2009, relating to the Bonds, among the Trustee, the Tender Agent for the 2008A-D Bonds, the Borrower, the Issuer and the representative of the Underwriters.

"Qualified Newspaper" means *The Wall Street Journal* (New York edition) or *The Bond Buyer* or any other newspaper or journal containing financial news, printed in the English language and customarily published on each Business Day, of general circulation in New York, New York, and selected by the Borrower (whose selection shall be final and conclusive) and designated to the Trustee by the Borrower.

"Rating Agency" means Moody's or S&P, or in the event that Moody's or S&P no longer maintains a rating on the Bonds, any other nationally recognized rating agency then maintaining a rating on the Bonds.

"Rebate Fund" means the California Infrastructure and Economic Development Bank/Pacific Gas and Electric Company Series 2009B Rebate Fund established and held by the Trustee in accordance with Section 5.07 hereof.

"Rebate Requirement" means the amount directed by the Borrower to be remitted to the United States Government from time to time pursuant to the Tax Certificate and Agreement.

"Registrar" means any registrar appointed as provided in Section 8.11 hereof, or any successor thereto.

"Remarketing Agent" means any remarketing agent appointed as provided in Section 8.16 hereof, or any successor thereto.

"Remarketing Agreement" means any agreement which meets the requirements of Section 8.16(b) hereof.

"Repayment Installment" means any amount that the Borrower is required to pay directly to the Trustee pursuant to Section 4.2(a) of the Agreement as a repayment of the loan made by the Issuer under the Agreement, which amount is determined in accordance with Section 4.2(a) thereof.

"Responsible Officer" of the Trustee means and includes every officer and assistant officer of the Trustee with responsibility for matters related to the administration of this Indenture.

"Retained Rights" of the Issuer means (i) the Issuer's right to obtain notices, reports and opinions and Additional Payments and indemnification; (ii) the Issuer's right to provide approvals and consents; and (iii) the Issuer's nonexclusive right to enforce the provisions of the Tax Certificate and Agreement, provided, that the Issuer shall retain the exclusive right, as the taxpayer pursuant to the Internal Revenue Service Form 8038, which shall be completed by or on behalf of the Issuer in connection with the issuance of the Bonds, to communicate with the Internal Revenue Service in any investigation of the Bonds by the Internal Revenue Service.

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 111 of 295

"Revenues" means all rents, receipts, installment payments and other income derived by the Issuer or the Trustee under the Agreement, amounts drawn under any Credit Facility, or income otherwise derived by the Issuer or the Trustee in respect of the loan of the proceeds of the Bonds to the Borrower pursuant to the Agreement, and any income or revenue derived from the investment of any money in any fund or account established pursuant to this Indenture (except the Bond Purchase Fund, the Rebate Fund and the accounts therein), including all Repayment Installments and any other payments made by the Borrower pursuant to the Agreement; but such term shall not include (i) Additional Payments, (ii) moneys deposited into the Borrower Account for the payment of the Purchase Price of Bonds pursuant to Section 4.2(b)(ii) or 4.2(d) of the Agreement, (iii) any remarketing proceeds or amounts drawn under a Liquidity Facility or (iv) any amounts on deposit in the Bond Purchase Fund, the Rebate Fund and the accounts therein.

"Rule 15c2-12" means Rule 15c2-12 adopted by the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended.

"S&P" means Standard and Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., a corporation organized and existing under the laws of the State of New York, its successors and their assigns, or, if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, any other nationally recognized securities rating agency designated by the Issuer by notice to the Trustee with the approval of the Borrower.

"Securities Depository" means the following registered securities depositories: The Depository Trust Company, 55 Water Street, New York, New York 10041-0099 (for notices of redemption -- Attn: Call Notification Department, Redemption Notice Enclosed, Fax-(212) 855-7232, 7233, 7234 or 7235; for notices of tender – Attn: Put Bonds Unit, Put Notice Enclosed, Fax-(212) 855-5235); or, in accordance with then-current guidelines of the Securities and Exchange Commission, such other securities depositories, or no such depositories, as the Issuer may indicate in a Certificate of the Issuer delivered to the Trustee.

"Series 2008A Bonds" has the meaning assigned to such term in the recitals to this Indenture.

"State" means the State of California.

The term "supplemental indenture" or "indenture supplemental hereto" means any indenture hereafter duly authorized and entered into between the Issuer and the Trustee in accordance with the provisions of this Indenture.

"Tax Certificate and Agreement" means the Tax Certificate and Agreement dated the date of issuance of the Bonds, between the Issuer and the Borrower, concerning certain matters pertaining to the use and investment of proceeds of the Bonds, including any and all exhibits attached thereto.

"Tax-Exempt" means, with respect to interest on any obligations of a state or local government, including the Bonds, that such interest is excluded from gross income for federal income tax purposes (other than interest on a Bond while such Bond is held by a "substantial

user" or a "related person" within the meaning of Section 147(a) of the Code and Section 103(b)(13) of the 1954 Code), whether or not such interest is includable as an item of tax preference or otherwise includable directly or indirectly for purposes of calculating other tax liabilities, including any alternative minimum tax under the Code.

"Tender Agent" means any tender agent appointed as provided in Section 8.15 hereof, or any successor thereto.

"Tender Agent Agreement" means any agreement that meets the requirements of Section 8.15(a) hereof.

"Treasury Regulations" has the meaning assigned to such term in Section 5.07(a) hereof.

"Trustee" means Deutsche Bank National Trust Company, a national banking association organized and existing under the laws of the United States of America, or its successor as Trustee hereunder as provided in Section 8.08 hereof.

"2008A-D Bonds" has the meaning assigned to such term in the recitals to this Indenture.

"Underwriters" means Morgan Stanley & Co. Incorporated, Merrill Lynch, Pierce, Fenner & Smith Incorporated and Wachovia Bank, National Association.

"Written Order of the Issuer" and "Written Request of the Issuer" mean, respectively, a written consent, order, request or requisition signed by or on behalf of the Issuer by an Authorized Issuer Representative.

"Yield" shall have the meaning ascribed to such term by Section 148(h) of the Code.

Section 1.02. Number and Gender. The singular form of any word used herein, including the terms defined in Section 1.01, shall include the plural, and vice versa. The use herein of a word of any gender shall include all genders.

Section 1.03. Articles, Sections, Etc. All references herein to "Articles," "Sections" and other subdivisions are to the corresponding Articles, Sections or subdivisions of this Indenture as originally executed; and the words "herein," "hereof," "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or subdivision hereof. The headings or titles of the several Articles and Sections hereof, and any table of contents appended to copies hereof, shall be solely for convenience of reference and shall not affect the meaning, construction or effect of this Indenture.

Section 1.04. Content of Certificates and Opinions. Every certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture or the Agreement (except for the certificate of destroyed Bonds provided for in Section 2.06 hereof) shall include (a) a statement that the Person or Persons making or giving such certificate or opinion have read such covenant or condition and the definitions herein relating thereto; (b) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based; (c) a statement that, in the opinion of the signers, they have made or caused to be made such examination or

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 113 of 295

investigation as is necessary to enable them to express an informed opinion as to whether or not such covenant or condition has been complied with; and (d) a statement as to whether, in the opinion of the signers, such condition or covenant has been complied with.

Any such certificate or opinion made or given by an official of the Issuer or the Borrower may be based, insofar as it relates to legal matters, upon a certificate or opinion of or representations by counsel, unless such official knows that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion may be based as aforesaid are erroneous, or in the exercise of reasonable care should have known that the same were erroneous. Any such certificate or opinion made or given by counsel may be based, insofar as it relates to factual matters (with respect to which information is in the possession of the Issuer or the Borrower), upon the certificate or opinion of or representations by an official of the Issuer or the Borrower, as applicable, unless such counsel knows that the certificate or opinion or representations with respect to the matters upon which his opinion may be based as aforesaid are erroneous, or in the exercise of reasonable care should have known that the same were erroneous.

Section 1.05. Multi-Mode Annex. The Multi-Mode Annex shall for all purposes be deemed to be a part of this Indenture to which it is attached as Appendix B hereto.

## ARTICLE II

## THE BONDS

Section 2.01. Authorization and Terms of Bonds.

(a) Authorization. Bonds designated as "California Infrastructure and Economic Development Bank Refunding Revenue Bonds (Pacific Gas and Electric Company) Series 2009B" (the "Bonds") may be issued under this Indenture. The aggregate principal amount of Bonds which may be issued and Outstanding under this Indenture shall not exceed Seventy-Four Million Two Hundred Seventy-Five Thousand Dollars ($74,275,000).

(b) General Terms. The Bonds shall be issued as fully registered Bonds, without coupons, in Authorized Denominations and shall all be dated as of the Issue Date. The Bonds shall mature, subject to prior redemption as provided in Article IV, upon the terms and conditions hereinafter set forth, on November 1, 2026. The Bonds shall initially bear interest as provided in Section 2.01(c) of the Multi-Mode Annex, which may be adjusted as provided therein.

(c) Delivery of Bonds. Upon the execution and delivery of this Indenture, the Issuer shall execute and deliver to the Trustee, and the Trustee shall authenticate, the Bonds and shall deliver them to or for the account of the Underwriters as directed by the Issuer as hereinafter provided. Prior to the delivery by the Trustee of any of the Bonds, the Trustee shall have received a certificate signed by a duly authorized officer of the representative of the Underwriters setting forth the initial Interest Payment Date and the initial interest rate for the Initial Rate Period (the "Issuance Certificate").

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 114 of 295

(d)    Form of Bonds. The Bonds and the certificate of authentication to be executed thereon shall be in substantially the form attached hereto as Appendix A, with such appropriate variations, omissions and insertions as are permitted or required by this Indenture. The Bonds shall be numbered consecutively from 1 upward. Pursuant to recommendations promulgated by the Committee on Uniform Security Identification Procedures, "CUSIP" numbers may be printed on the Bonds. The Bonds may bear such endorsement or legend relating thereto as may be required to conform to usage or law with respect thereto. In connection with any adjustment of the Rate Period to any new Rate Period, the Issuer shall execute and the Trustee shall authenticate and deliver a new Bond or Bonds in substantially the form attached hereto as Appendix A, with such appropriate variations, omissions and insertions as required to reflect the new Rate Period.

(e)    Book-Entry System. Unless otherwise determined by the Issuer, the Bonds shall be issued in the form of a separate single certificated fully registered Bond registered in the name of Cede & Co., as nominee of DTC, or any successor nominee (the "Nominee"). Except as provided in paragraph (iii) below, all of the Outstanding Bonds shall be so registered in the registration books kept by the Registrar, and the provisions of this subsection (d) shall apply thereto.

(i)    With respect to Bonds registered on the registration books kept by the Registrar in the name of the Nominee, the Issuer, the Paying Agent and the Trustee shall have no responsibility or obligation to any DTC Participant or to any Person on behalf of which a DTC Participant holds an interest in the Bonds. Without limiting the immediately preceding sentence, the Issuer, the Borrower, the Paying Agent and the Trustee shall have no responsibility or obligation with respect to (1) the accuracy of the records of DTC, the Nominee or any DTC Participant with respect to any ownership interest in the Bonds, (2) the delivery to any DTC Participant or any other Person, other than a Bondholder, as shown in the registration books kept by the Registrar, of any notice with respect to the Bonds, including any notice of redemption, or (3) the payment to any DTC Participant or any other Person, other than a Bondholder, as shown in the registration books kept by the Registrar, of any amount with respect to principal of, premium, if any, or interest on the Bonds. The Issuer, the Paying Agent and the Trustee may treat and consider the Person in whose name each Bond is registered in the registration books kept by the Registrar as the Holder and absolute owner of such Bond for the purpose of payment of principal, premium and interest with respect to such Bond, for the purpose of giving notices of redemption and other matters with respect to such Bond, for the purpose of registering transfers with respect to such Bond, and for all other purposes whatsoever. The Paying Agent shall pay all principal of, premium, if any, and interest on the Bonds only to or upon the order of the respective Bondholders, as shown in the registration books kept by the Registrar, or their respective attorneys duly authorized in writing, and all such payments shall be valid and effective to fully satisfy and discharge the Issuer's obligations with respect to payment of principal of, premium, if any, and interest on the Bonds to the extent of the sum or sums so paid. No Person other than a Bondholder, as shown in the registration books kept by the Registrar, shall receive a certificated Bond evidencing the obligation of the Issuer to make payments of principal, premium, if any, and interest pursuant to this Indenture.

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 115 of 295

(ii)     The Issuer, the Paying Agent and the Trustee shall execute and deliver to DTC a letter of representation in customary form with respect to the Bonds in book-entry form (the "Representation Letter"), but such Representation Letter shall not in any way limit the provisions of the foregoing paragraph (i) or in any other way impose upon the Issuer any obligation whatsoever with respect to Persons having interests in the Bonds other than the Bondholders, as shown on the registration books kept by the Registrar. The Trustee and the Paying Agent shall take all action reasonably necessary for all representations of the Issuer in the Representation Letter with respect to the Trustee and the Paying Agent to be complied with at all times.

(iii)     DTC may determine to discontinue providing its services with respect to the Bonds at any time by giving reasonable notice to the Issuer, the Borrower, the Paying Agent and the Trustee and discharging its responsibilities with respect thereto under applicable law. The Issuer, with the consent of the Borrower, may terminate the services of DTC with respect to the Bonds. Upon the discontinuance or termination of the services of DTC with respect to the Bonds, unless a substitute securities depository is appointed to undertake the functions of DTC hereunder, the Issuer, at the expense of the Borrower, is obligated to deliver Bond certificates to the beneficial owners of such Bonds, as described in this Indenture, and such Bonds shall no longer be restricted to being registered in the registration books kept by the Registrar in the name of Cede & Co., as nominee of DTC, but may be registered in whatever name or names Bondholders transferring or exchanging Bonds shall designate, in accordance with the provisions of this Indenture.

(iv)     Notwithstanding any other provision of this Indenture to the contrary, so long as any Bond is registered in the name of Cede & Co., as nominee of DTC, all payments with respect to principal or, premium, if any, and interest on such Bond and all notices with respect to such Bond shall be made and given, respectively, in the manner provided in the Representation Letter and in the event of partial redemption of the Bonds, Bonds shall be selected for redemption by lot by DTC in accordance with its customary practices. Bondholders shall have no lien or security interest in any rebate or refund paid by DTC to the Paying Agent which arises from the payment by the Paying Agent of principal of, premium, if any, or interest on the Bonds in immediately available funds to DTC.

Section 2.02.  Execution of Bonds.  The Bonds shall be signed in the name and on behalf of the Issuer with the manual or facsimile signature of the Executive Director, the Chair or the Chair's Designee of the Issuer.  The Bonds shall then be delivered to the Trustee for authentication by the Trustee.  In case any official who shall have signed any of the Bonds shall cease to be such official before the Bonds so signed shall have been authenticated or delivered by the Trustee, or issued by the Issuer, such Bonds may nevertheless be authenticated, delivered and issued and, upon such authentication, delivery and issuance, shall be as binding upon the Issuer as though those who signed the same had continued to be such officials of the Issuer.  Also, any Bond may be signed on behalf of the Issuer by such persons as on the actual date of the execution of such Bond shall be the proper officials although on the nominal date of such Bond any such person shall not have been such official.

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page
116 of 295

Only such of the Bonds as shall bear thereon a certificate of authentication in the form recited in Appendix A hereto, manually executed by the Trustee, shall be valid or obligatory for any purpose or entitled to the benefits of this Indenture, and such certificate of the Trustee shall be conclusive evidence that the Bonds so authenticated have been duly authenticated and delivered hereunder and are entitled to the benefits of this Indenture.

Upon authentication of any Bond, the Trustee shall set forth on such Bond (1) the date of such authentication and (2) in the case of a Bond bearing interest at a Flexible Rate (unless such Bond is to be held in book-entry only form as provided in Section 2.01(d) hereof), such Flexible Rate, the day succeeding the last day of the applicable Flexible Segment, the number of days comprising such Flexible Segment and the amount of interest to accrue during such Flexible Segment.

Unless the Issuer shall otherwise direct with the advice and consent of the Borrower, the Tender Agent shall serve as co-authenticating agent for the Bonds.

Section 2.03. Transfer and Exchange of Bonds. Registration of any Bond may, in accordance with the terms of this Indenture, be transferred, upon the books of the Registrar required to be kept pursuant to the provisions of Section 2.04 hereof, by the Person in whose name it is registered, in person or by his duly authorized attorney, upon surrender of such Bond for cancellation, accompanied by a written instrument of transfer in a form acceptable to the Trustee, duly executed. Whenever any Bond shall be surrendered for registration of transfer, the Issuer shall execute and the Trustee shall authenticate and deliver a new Bond or Bonds of the same tenor of Authorized Denominations. No registration of transfer of Bonds shall be required to be made for a period of fifteen (15) days preceding the date on which the Trustee gives any notice of redemption, nor shall any registration of transfer of Bonds called for redemption be required.

Bonds may be exchanged at the Principal Office of the Trustee for a like aggregate principal amount of Bonds of the same tenor in Authorized Denominations. The Trustee shall require the payment by the Bondholder requesting such exchange of any tax or other governmental charge required to be paid with respect to such exchange, and there shall be no other charge to any Bondholders for any such exchange. Except with respect to Bonds purchased pursuant to Section 2.02 of the Multi-Mode Annex, no exchange of Bonds shall be required to be made for a period of fifteen (15) days preceding the date on which the Trustee gives notice of redemption, nor shall any exchange of Bonds called for redemption be required.

Section 2.04. Bond Register. The Registrar will keep or cause to be kept at its Principal Office sufficient books for the registration and the registration of transfer of the Bonds, which shall at all times be open to inspection by the Issuer, the Trustee and the Borrower during normal business hours and upon reasonable notice; and, upon presentation for such purpose, the Registrar shall, under such reasonable regulations as it may prescribe, register the transfer or cause to be registered the transfer, on said books, of Bonds as hereinbefore provided.

Section 2.05. Temporary Bonds. The Bonds may be issued initially in temporary form exchangeable for definitive Bonds when ready for delivery. The temporary Bonds may be printed, lithographed or typewritten, shall be of such denominations as may be determined by the

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 117 of 295

Borrower and may contain such reference to any of the provisions of this Indenture as may be appropriate. Every temporary Bond shall be executed by the Issuer and be authenticated and registered by the Trustee upon the same conditions and in substantially the same manner as the definitive Bonds. If the Issuer issues temporary Bonds, it will execute and furnish definitive Bonds without delay, and thereupon the temporary Bonds may be surrendered, for cancellation, in exchange therefor at the Principal Office of the Trustee, and the Trustee shall authenticate and deliver in exchange for such temporary Bonds an equal aggregate principal amount of definitive Bonds of the same tenor in Authorized Denominations. Until so exchanged, the temporary Bonds shall be entitled to the same benefits under this Indenture as definitive Bonds authenticated and delivered hereunder.

Section 2.06. Bonds Mutilated, Lost, Destroyed or Stolen. If any Bond shall become mutilated, the Issuer, upon the request and at the expense of the Holder of said Bond, shall execute, and the Trustee shall thereupon authenticate and deliver, a new Bond of the same tenor and number in exchange and substitution for the Bond so mutilated, but only upon surrender to the Trustee of the Bond so mutilated. Every mutilated Bond so surrendered to the Trustee shall be cancelled by it and destroyed and, upon the Written Request of the Issuer, a certificate evidencing such destruction shall be delivered to the Issuer. If any Bond issued hereunder shall be lost, destroyed or stolen, evidence of such loss, destruction or theft may be submitted to the Issuer, the Borrower and the Trustee, and if such evidence be satisfactory to them and indemnity satisfactory to them shall be given, the Issuer, at the expense of the Holder, shall execute, and the Trustee shall thereupon authenticate and deliver, a new Bond of the same tenor in lieu of and in substitution for the Bond so lost, destroyed or stolen (or if any such Bond shall have matured, instead of issuing a substitute Bond the Trustee may pay the same without surrender thereof). The Issuer may require payment of a reasonable fee for each new Bond issued under this Section and payment of the expenses which may be incurred by the Issuer and the Trustee. Any Bond issued under the provisions of this Section in lieu of any Bond alleged to be lost, destroyed or stolen shall constitute an original additional contractual obligation on the part of the Issuer whether or not the Bond so alleged to be lost, destroyed or stolen be at any time enforceable by anyone, and shall be equally and proportionately entitled to the benefits of this Indenture with all other Bonds secured by this Indenture.

## ARTICLE III

## ISSUANCE OF BONDS

Section 3.01. Authentication and Delivery of Bonds. Forthwith upon the execution and delivery of this Indenture, upon the execution of the Bonds by the Issuer and delivery thereof to the Trustee, as hereinabove provided, and without any further action on the part of the Issuer, the Trustee shall authenticate the Bonds in an aggregate principal amount of Seventy-Four Million Two Hundred Seventy-Five Thousand Dollars ($74,275,000) and shall deliver the Bonds to or upon the Written Order of the Issuer.

Section 3.02. Application of Proceeds of Bonds. The proceeds of the sale of the Bonds shall be transferred by the Trustee, immediately upon receipt thereof, to Deutsche Bank National Trust Company, as tender agent for the Series 2008B Bonds, and applied solely to the payment of the purchase price of the Series 2008B Bonds purchased in lieu of redemption on behalf of the

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 118 of 295

Borrower, and the Series 2008B Bonds so purchased shall be immediately cancelled, all as provided in more detail in the Purchase Protocol. The Trustee is hereby directed to enter into and perform the Purchase Protocol described in the preceding sentence. Notwithstanding any other provision of this Indenture, the Purchase Protocol, or the Bonds, the proceeds of the Bonds shall not be applied in any other manner or used for any other purpose.

## ARTICLE IV

### REDEMPTION AND PURCHASE OF BONDS

Section 4.01. Redemption of Bonds. The Bonds shall be subject to redemption at the option of the Borrower at the times, in the amounts and at the prices as provided in Article IV of the Multi-Mode Annex.

Section 4.02. Purchase of Bonds. The Bonds shall be subject to tender for purchase at the option of the Borrower or mandatory tender for purchase at the times, in the amounts and at the prices as provided in Section 2.02 of the Multi-Mode Annex.

## ARTICLE V

### REVENUES

Section 5.01. Pledge of Revenues.

(a) Subject only to the provisions of this Indenture permitting the application thereof for the purposes and on the terms and conditions set forth herein, all of the Revenues, to the extent the Issuer has any interest therein, are hereby irrevocably pledged to the punctual payment of the principal of and interest and premium, if any, on the Bonds, and Revenues shall not be used for any other purpose, except as provided in the last paragraph of Section 5.02 hereof, while any of the Bonds remain Outstanding. Said pledge shall constitute a first and exclusive lien on the Revenues for the payment of the Bonds in accordance with the terms hereof and thereof.

(b) The Borrower may at its sole discretion from time to time deliver to the Trustee such additional or other security interests permitted by this Indenture or the Issuer to secure the payment of the principal of and interest and premium, if any, on the Bonds and any such additional or other security delivered by the Borrower shall be pledged to any such payment, provided that the delivery of such additional or other security does not adversely affect the Tax-Exempt status of interest on the Bonds.

(c) The Bonds shall not constitute a debt or liability, or a pledge of the faith, credit or power of the State, but shall be payable solely from the funds herein provided therefor. No owner of any Bond shall have any right to demand payment of the principal of, premium, if any, or interest on, the Bonds by the Issuer, the State or any political subdivision thereof out of any funds to be raised by taxation or appropriation.

Section 5.02. Bond Fund. Upon the receipt thereof, the Trustee shall deposit all Revenues in the "California Infrastructure and Economic Development Bank/Pacific Gas and Electric Company Series 2009B Bond Fund" (herein called the "Bond Fund"), which the Trustee

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 119 of 295

is hereby directed to establish and maintain and hold in trust for the benefit of the Holders of the Bonds, and which shall be disbursed and applied only as hereinafter authorized. The Bond Fund and each account and subaccount therein shall be an Eligible Account.

The Trustee shall create within the Bond Fund an account called the "Letter of Credit Account," into which all moneys drawn under the Letter of Credit (or any other letter of credit constituting a Credit Facility hereunder) to pay principal, interest, or redemption price (including premium, if any) of the Bonds shall be deposited and disbursed. Neither the Borrower nor the Issuer shall have any rights to or interest in the Letter of Credit Account. The Trustee is hereby directed to establish and maintain and hold in trust the Letter of Credit Account for the benefit of the Holders of the Bonds, and the Trustee shall have the exclusive and sole right of withdrawal of funds from the Letter of Credit Account for the exclusive benefit of the Holders of the Bonds.

Except as provided below, moneys in the Bond Fund shall be used solely for the payment of the principal of, premium, if any, and interest on the Bonds as the same shall become due and payable at maturity, upon redemption or otherwise. Funds for such payments of the principal of, premium, if any, and interest on the Bonds shall be derived from the following sources in the order of priority indicated:

      (i)     from moneys realized by the Trustee under any Credit Facility; and

      (ii)    from amounts paid by the Borrower pursuant to the provisions of Section 4.2(a) of the Agreement.

So long as no Event of Default (or any event which would be an Event of Default hereunder with the passage of time or the giving of notice) exists hereunder, on the day after each Interest Payment Date, the Trustee shall return to the Borrower any moneys then on deposit in the Bond Fund or shall deposit such funds in the Rebate Fund if so instructed by the Borrower pursuant to Section 5.07(b) hereof.

Section 5.03. Trustee Authorized to Realize Moneys Under any Credit Facility; Tender Agent Authorized to Realize Moneys Under any Liquidity Facility. The Issuer hereby authorizes and directs the Trustee, and the Trustee hereby agrees, to take such actions as the Trustee determines are necessary to realize moneys under any Credit Facility (including any actions set forth in Section 7.01 of the Multi-Mode Annex) and as shall be necessary to make timely payment of principal of and premium, if any, and interest on, or the redemption price of, the Bonds (other than Bonds owned by or for the account of the Borrower or the Liquidity Provider) whether at maturity, upon redemption or acceleration or otherwise. The Trustee shall deposit all moneys realized by the Trustee under any Credit Facility to pay principal of and premium, if any, and interest on the Bonds in the Letter of Credit Account in the Bond Fund. At any time the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility hereunder) is in effect with respect to the Bonds, if the Trustee has not realized sufficient moneys under the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility hereunder) as shall be necessary to make timely payment of principal of and premium, if any, and interest on, or the redemption price of, the Bonds (other than Bonds owned by or for the account of the Borrower or the Liquidity Provider) and deposited such amounts in the Letter of

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 120 of 295

Credit Account in the Bond Fund at 1:00 p.m. (New York City time) on the date any such principal of, and premium, if any, and interest on, or the redemption price of, the Bonds shall become due and payable at maturity, upon redemption or acceleration or otherwise, or if the Trustee has actual knowledge that the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility hereunder) has been repudiated, the Trustee shall immediately notify the Borrower by telephone, confirmed in writing, of such insufficiency and request payment of such amounts in immediately available funds by 4:00 p.m. (New York City time) on such date. The Issuer hereby authorizes and directs the Tender Agent, and pursuant to the Tender Agent Agreement, the Tender Agent agrees, to take such actions as the Tender Agent determines are necessary to realize moneys under any Liquidity Facility and as shall be necessary to make timely payment of the Purchase Price of the Bonds tendered for purchase pursuant to the Multi-Mode Annex to the extent moneys in the Bond Purchase Fund are not available for such payment in accordance with Section 2.02(e) of the Multi-Mode Annex. At any time the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility hereunder) is in effect with respect to the Bonds, the Trustee shall draw on the Credit Facility only for Bonds in a Rate Period then supported by such Credit Facility and the Tender Agent shall draw on the Liquidity Facility only for Bonds in a Rate Period then supported by such Liquidity Facility.

Section 5.04. Investment of Moneys. Except as otherwise provided herein and subject to Section 6.06 hereof, any moneys in any of the funds and accounts to be established by the Trustee pursuant to this Indenture shall be invested upon the written direction of the Borrower, by the Trustee, if and to the extent then permitted by law, in Investment Securities. The Trustee shall be entitled to rely conclusively upon the written direction of the Borrower directing investment in any particular investment as to the fact that such investment is permitted by law and constitutes an Investment Security, and the Trustee shall not be required to make further investigation with respect thereto. In the absence of such direction, the Trustee shall invest solely in units of a money market portfolio restricted to obligations issued by, or guaranteed by the full faith and credit of, the United States of America, which may include proprietary money market funds of the Trustee. Moneys in any fund or account shall be invested in accordance with the written direction of the Borrower in Investment Securities with respect to which payments of principal thereof and interest thereon are scheduled to be paid or are otherwise payable (including Investment Securities payable at the option of the Holder) not later than the date on which such moneys will be required by the Trustee. Moneys comprising proceeds of a draw on a Credit Facility shall be held uninvested. Available Moneys held for the payment of the purchase price of Bonds purchased in lieu of redemption pursuant to the provisions of Section 4.06 of the Multi-Mode Annex or purchased in lieu of acceleration pursuant to the provisions of Section 7.01(d) hereof shall be held uninvested or shall be invested in Investment Securities with a rating no lower than the highest rating on the Bonds then maintained by any Rating Agency. Moneys comprising proceeds of a draw on a Liquidity Facility and other moneys held for the payment of the purchase price of Bonds pursuant to Section 2.02 of the Multi-Mode Annex shall be held uninvested.

Any interest, profit or loss on such investments shall be credited or charged to the respective funds from which such investments are made. The Trustee shall sell or present for redemption any obligations so purchased whenever it shall be necessary in order to provide moneys to meet any payment required under this Indenture. In no event shall the Trustee be

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page
121 of 295

liable or responsible for any loss resulting from any investment made at the written direction of the Borrower or otherwise in accordance with this Indenture. Unless otherwise directed in writing by the Borrower, the Trustee may make any investment permitted under this Section 5.04 through or with its own commercial banking or investment departments.

Section 5.05. Assignment to Trustee; Enforcement of Obligations. The Issuer hereby transfers, assigns and sets over to the Trustee all of the Revenues and any and all rights and privileges it has under the Agreement (with the exception of the Retained Rights of the Issuer) and any such rights under any Credit Facility relating to the Bonds. The Trustee also shall be entitled to and, subject to the provisions of this Indenture, shall take all steps, actions and proceedings reasonably necessary in its judgment (1) to enforce the terms, covenants and conditions of, and preserve and protect the priority of its interest in and under, the Agreement, any Credit Facility, any Liquidity Facility and any other security agreement with respect to the Bonds, and (2) to assure compliance with all covenants, agreements and conditions on the part of the Issuer contained in this Indenture with respect to the Revenues.

Section 5.06. Repayment to Borrower. When there are no longer any Bonds Outstanding or provision for payment of the Bonds has been made in accordance with Article X hereof, and all reasonable fees, charges and expenses of the Issuer, the Trustee, the Registrar, the Tender Agent, any Credit Provider, the Remarketing Agent and any Paying Agent due and owing in accordance with this Indenture, the Agreement and any Credit Agreement have been paid or provided for, payment of the full amount owing the United States Government, as determined under Section 5.6 of the Agreement, Section 6.06 hereof and the Tax Certificate and Agreement, all expenses of the Issuer relating to the Diablo Canyon Project and this Indenture have been paid or provided for, and all other amounts payable hereunder and under the Agreement and any Credit Agreement have been paid, and this Indenture has been discharged and satisfied, the Trustee shall pay to the Borrower any amounts remaining in any fund established and held hereunder upon the written direction of the Borrower.

Section 5.07. Rebate Fund.

(a)    General. The Trustee is hereby directed to establish a special fund designated the "California Infrastructure and Economic Development Bank/Pacific Gas and Electric Company Series 2009B Rebate Fund" (the "Rebate Fund"). All amounts at any time on deposit in the Rebate Fund shall be held by the Trustee in trust for payment to the United States of America, to the extent required to satisfy the requirement to make rebate payments to the United States (the "Rebate Requirement") pursuant to Section 148 of the Code and the Treasury Regulations promulgated thereunder (the "Treasury Regulations"), unless and to the extent that the Borrower delivers to the Trustee and the Issuer an Opinion of Bond Counsel that the exclusion from gross income for federal income tax purposes of interest on the Bonds will not be adversely affected if such requirements are not satisfied. Such amounts shall be free and clear of any lien under this Indenture and shall be governed by this Section and Section 6.06 of this Indenture and by the Tax Certificate and Agreement. The Trustee shall be deemed conclusively to have complied with the Rebate Requirement if it follows the written directions of the Borrower, and shall have no independent responsibility to, or liability resulting from its failure to, enforce compliance by the Borrower or the Issuer with the Rebate Requirement.

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 122 of 295

(b)     Deposits.

(i)     Within 45 days of the end of each Bond Year (as such term is defined in the Tax Certificate and Agreement), (1) the Borrower shall calculate or cause to be calculated with respect to the Bonds the amount that would be considered the "rebate amount" within the meaning of Section 1.148-3 of the Treasury Regulations, using as the "computation date" for this purpose the end of such Bond Year, and (2) upon the Borrower's written direction, the Trustee shall deposit to the Rebate Fund from deposits from the Borrower, if and to the extent required, amounts sufficient to cause the balance in the Rebate Fund to be equal to the "rebate amount" so calculated.

(ii)     The Trustee shall not be required to deposit any amount to the Rebate Fund in accordance with subparagraph (i) above if the amount on deposit in the Rebate Fund prior to the deposit required to be made under this subsection (b) equals or exceeds the "rebate amount" calculated in accordance with subparagraph (i) above. Such excess may be withdrawn from the Rebate Fund to the extent permitted under subsection (g) of this Section.

(iii)     The Borrower shall not be required to calculate the "rebate amount," and the Trustee shall not be required to deposit any amount to the Rebate Fund in accordance with this subsection (b), with respect to all or a portion of the proceeds of the Bonds (including amounts treated as proceeds of the Bonds) (1) to the extent such proceeds satisfy the expenditure requirements of Section 148(f)(4)(B) or Section 148(f)(4)(C) of the Code or Section 1.148-7(d) of the Treasury Regulations, whichever is applicable, and otherwise qualify for the exception to the Rebate Requirement pursuant to whichever of said sections is applicable, (2) to the extent such proceeds are subject to an election by the Borrower under Section 148(f)(4)(C)(vii) of the Code to pay a 1½% penalty in lieu of arbitrage rebate in the event any of the percentage expenditure requirements of Section 148(f)(4)(C) are not satisfied, or (3) to the extent such proceeds qualify for the exception to arbitrage rebate under Section 148(f)(4)(A)(ii) of the Code for amounts in a "bona fide debt service fund." In such event, and with respect to such amounts, the Borrower shall provide written direction to the Trustee, with a copy to the Issuer, that the Trustee shall not be required to deposit any amount to the Rebate Fund in accordance with this subsection (b). The Borrower shall retain a rebate calculation firm acceptable to the Issuer in order to comply with this Section.

(c)     Withdrawal Following Payment of Bonds. Any funds remaining in the Rebate Fund after redemption of all the Bonds and any amounts described in paragraph (2) of subsection (d) of this Section, or provision made therefor satisfactory to the Trustee, including accrued interest and payment of any applicable fees to the Trustee and the Issuer, shall be withdrawn by the Trustee and remitted to the Borrower upon the written direction of the Borrower.

(d)     Withdrawal for Payment of Rebate. Upon the Borrower's written direction, but subject to the exceptions contained in subsection (b) of this Section to the requirement to calculate the "rebate amount" and make deposits to the Rebate Fund, the Trustee shall pay to the United States, from amounts on deposit in the Rebate Fund,

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 123 of 295

(1)     not later than 60 days after the end of (i) the fifth Bond Year, and (ii) each fifth Bond Year thereafter, an amount that, together with all previous rebate payments, is equal to at least 90% of the "rebate amount" calculated as of the end of such Bond Year in accordance with Section 1.148-3 of the Treasury Regulations; and

(2)     not later than 60 days after the payment of all Bonds, an amount equal to 100% of the "rebate amount" calculated as of the date of such payment (and any income attributable to the "rebate amount" determined to be due and payable) in accordance with Section 1.148-3 of the Treasury Regulations.

(e)     Rebate Payments. Each payment required to be made pursuant to subsection (d) of this Section shall be made to the Internal Revenue Service Center, Ogden, Utah 84201 on or before the date on which such payment is due, and shall be accompanied by Internal Revenue Service Form 8038, which shall be completed by or on behalf of the Issuer and provided to the Trustee.

(f)     Deficiencies in the Rebate Fund. In the event that, prior to the time any payment is required to be made from the Rebate Fund, the amount in the Rebate Fund is not sufficient to make such payment when such payment is due, the Borrower shall calculate the amount of such deficiency and direct the Trustee to deposit an amount received from the Borrower equal to such deficiency into the Rebate Fund prior to the time such payment is due.

(g)     Withdrawals of Excess Amounts. In the event that immediately following the calculation required by subsection (b) of this Section, but prior to any deposit made under said subsection, the amount on deposit in the Rebate Fund exceeds the "rebate amount" calculated in accordance with said subsection, upon written instructions from the Borrower, the Trustee shall withdraw the excess from the Rebate Fund and credit such excess to the Bond Fund.

(h)     Record Keeping. The Borrower shall retain records of all determinations made hereunder until six years after payment in full or defeasance of the Bonds.

(i)     Survival of Defeasance. Notwithstanding anything in this Indenture to the contrary, the Rebate Requirement shall survive the payment in full or defeasance of the Bonds.

## ARTICLE VI

## COVENANTS OF THE ISSUER

Section 6.01. Punctual Payment. The Issuer shall punctually pay or cause to be paid the principal, premium, if any, and interest to become due in respect of all the Bonds, in strict conformity with the terms of the Bonds and of this Indenture, according to the true intent and meaning thereof, but only out of Revenues and other assets pledged for such payment as provided in this Indenture. When and as paid in full, all Bonds, if any, shall be delivered to the Trustee, shall forthwith be cancelled and destroyed, and, upon a Written Request of the Issuer, a certificate of such destruction shall thereafter be delivered to the Issuer.

Section 6.02. Extension of Payment of Bonds. The Issuer shall not directly or indirectly extend or assent to the extension of the maturity of any of the Bonds or the time of payment of any

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page
124 of 295

claims for interest by the purchase or funding of such Bonds or claims for interest or by any other arrangement and in case the maturity of any of the Bonds or the time of payment of any such claims for interest shall be extended, such Bonds or claims for interest shall not be entitled, in case of any default hereunder, to the benefits of this Indenture, except subject to the prior payment in full of the principal of all of the Bonds then Outstanding and of all claims for interest thereon which shall not have been so extended. Nothing in this Section shall be deemed to limit the right of the Issuer to issue bonds for the purpose of refunding any Outstanding Bonds, and such issuance shall not be deemed to constitute an extension of maturity of Bonds.

Section 6.03. Against Encumbrances. The Issuer shall not create, or permit the creation of, any pledge, lien, charge or other encumbrance upon the Revenues and other assets pledged or assigned under this Indenture while any of the Bonds are Outstanding, except the pledge and assignment created by this Indenture. Subject to this limitation, the Issuer expressly reserves the right to enter into one or more other indentures for any of its authorized purposes, including other programs under the Act, and reserves the right to issue other obligations for such purposes.

Section 6.04. Power to Issue Bonds and Make Pledge and Assignment. The Issuer is duly authorized pursuant to law to issue the Bonds and to enter into this Indenture and to pledge and assign the Revenues and other assets purported to be pledged and assigned, respectively, under this Indenture in the manner and to the extent provided in this Indenture. The Bonds and the provisions of this Indenture are and will be the valid and binding limited obligations of the Issuer in accordance with their terms, and the Issuer and Trustee shall at all times, to the extent permitted by law, defend, preserve and protect said pledge and assignment of Revenues and other assets and all the rights of the Bondholders under this Indenture against all claims and demands of all Persons whomsoever, subject to the limitations set forth in Article VIII hereof relating to the Trustee.

Section 6.05. Accounting Records and Reports. The Trustee and Registrar shall keep proper books of record and account in accordance with industry standards in which complete and correct entries shall be made of all transactions made by the Trustee relating to the receipt, investment, disbursement, allocation and application of the Revenues and the proceeds of the Bonds. To the extent the Borrower directs the Trustee with respect to the investment of moneys in any fund or account, the Borrower shall provide the Trustee with the records required by this Section 6.05. Such records shall specify the account or fund to which each investment (or portion thereof) held by the Trustee is to be allocated and shall set forth, in the case of each Investment Security, (a) its purchase price, (b) its value at maturity or its sale price, as the case may be, (c) the amounts and dates of any payments to be made with respect thereto and (d) such documentation and evidence as is required to be obtained by the Borrower to establish that the requirements of Part E of the Tax Certificate and Agreement have been met. Such records shall be open to inspection by the Issuer, the Borrower and any Bondholder at any reasonable time during regular business hours on reasonable notice. The Trustee shall furnish to the Issuer, upon its request, monthly statements of all investments made by the Trustee and all funds and accounts held by the Trustee. The Trustee shall not be responsible for the preparation or filing of any UCC financing statements or continuation statements under this Indenture. The Trustee shall retain all accounting records and reports until six years after there are no longer any Bonds outstanding.

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page
125 of 295

Section 6.06. Tax Covenants.

(a)     General.   The Issuer hereby covenants with the Holders of the Bonds that, notwithstanding any other provisions of this Indenture, it shall not take any action, or fail to take any action, if any such action or failure to take action would adversely affect the exclusion from gross income of interest on the Bonds under Section 103 of the Code or the 1954 Code, as applicable.

(b)     Compliance with Tax Certificate and Agreement.   In furtherance of the foregoing tax covenants of this Section 6.06, the Issuer covenants that it will comply with the provisions of the Tax Certificate and Agreement, which is incorporated herein as if fully set forth herein. These covenants shall survive payment in full or defeasance of the Bonds.

Section 6.07. Other Covenants.

(a)     The Trustee shall promptly collect all amounts due from the Borrower pursuant to the Agreement, shall perform all duties imposed upon it pursuant to the Agreement and shall diligently enforce, and take all steps, actions and proceedings reasonably necessary for the enforcement of all of the rights of the Issuer and all of the obligations of the Borrower pursuant to the Agreement.

(b)     The Issuer shall not purchase Bonds from the Remarketing Agent or otherwise.

Section 6.08. Waiver of Laws.   The Issuer shall not at any time insist upon or plead in any manner whatsoever, or claim or take the benefit or advantage of, any stay or extension law now or at any time hereafter in force that may affect the covenants and agreements contained in this Indenture or in the Bonds, and all benefit or advantage of any such law or laws is hereby expressly waived by the Issuer to the extent permitted by law.

Section 6.09. Further Assurances.   The Issuer will make, execute and deliver any and all such further indentures, instruments and assurances as may be reasonably necessary or proper to carry out the intention or to facilitate the performance of this Indenture and for the better assuring and confirming unto the Holders of the Bonds of the rights and benefits provided in this Indenture.

Section 6.10. Continuing Disclosure.   Pursuant to Section 5.7 of the Agreement, the Borrower shall, at any time while any Bonds are in an Auction Rate Period or at any time while any Bonds are in a Term Rate Period for a duration of nine months or greater, undertake the continuing disclosure requirements promulgated under Rule 15c2-12, as it may from time to time hereafter be amended or supplemented, and the Issuer shall have no liability to the Holders of the Bonds or any other Person with respect to such disclosure matters. Notwithstanding any other provision of this Indenture, failure of the Borrower to comply with the requirements of Rule 15c2-12, as it may from time to time hereafter be amended or supplemented, shall not be considered an Event of Default hereunder or a Loan Default Event under the Agreement; however, the Trustee at the written request of any Credit Provider or any Remarketing Agent or the Holders of at least 25% aggregate principal amount of Outstanding Bonds, shall, but only to the extent indemnified to its satisfaction from and against any cost, liability or expense of any kind whatsoever related thereto, including, without limitation, reasonable fees and expenses of its attorneys and advisors and additional reasonable fees and expenses of the Trustee, or any Bondholder or beneficial owner of any Bonds, may take such

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page
126 of 295

actions as may be necessary and appropriate, including seeking mandate or specific performance by court order, to cause the Borrower to comply with its obligations under Section 5.7 of the Agreement.

## ARTICLE VII

### DEFAULT

Section 7.01. Events of Default; Acceleration; Rescission of Acceleration; Purchase in Lieu of Acceleration.

(a)     Events of Default. Each of the following events shall constitute an "Event of Default" hereunder:

(i)     failure to make due and punctual payment of any installment of interest upon any Bond on the date such installment shall have been due;

(ii)     failure to make due and punctual payment of the principal of and premium, if any, on any Bond at the stated maturity thereof, or upon proceedings for redemption thereof or upon the maturity thereof by declaration, or failure by the Borrower to make any required payment pursuant to Section 4.2(d) of the Agreement to purchase Bonds tendered for purchase pursuant to Section 2.02(a) or (b) of the Multi-Mode Annex;

(iii)     The occurrence of a "Loan Default Event" under the Agreement, as specified in Section 6.1 thereof;

(iv)     Default by the Issuer in the performance or observance of any other of the covenants, agreements or conditions on its part contained in this Indenture or in the Bonds, and the continuance of such default for a period of sixty (60) days after written notice thereof, specifying such default and requiring the same to be remedied, shall have been given to the Issuer, the Borrower and each Credit Provider, if any, by the Trustee, or to the Issuer, the Borrower and the Trustee by the Holders of not less than twenty-five percent (25%) in aggregate principal amount of the Bonds at the time Outstanding or to the Issuer, the Borrower and the Trustee by any Credit Provider;

(v)     (x) If at any time the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility hereunder) is in effect with respect to the Bonds and the Borrower shall have elected to cause the Purchase Price of such Bonds to be paid from moneys realized under the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility hereunder), failure to make payment of the Purchase Price of any Bond purchased in lieu of redemption pursuant to the provisions of Section 4.06 of the Multi-Mode Annex or purchased in lieu of acceleration pursuant to the provisions of Section 7.01(d) hereof for a period of one (1) Business Day after the same shall have become due and payable, or (y) if at any time the Borrower shall have elected to cause the Purchase Price of such Bonds to be paid as set forth in clause (2) of Section 4.06(a) of the Multi-Mode Annex or clause (B) of Section 7.01(d)(i) hereof or at

Case: 19-30088     Doc# 5252-2     Filed: 01/02/20     Entered: 01/02/20 21:06:44     Page 127 of 295

any time other than when the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility hereunder) is in effect with respect to the Bonds, failure to make payment of the Purchase Price of any Bond purchased in lieu of redemption pursuant to the provisions of Section 4.06 of the Multi-Mode Annex or purchased in lieu of acceleration pursuant to the provisions of Section 7.01(d) hereof when the same shall have become due and payable; or

(vi) The receipt by the Trustee of written notice from any Credit Provider that (i) an event of default under the applicable Credit Agreement has occurred and is continuing and directing the acceleration of the Bonds or (ii) the Credit Provider has not reinstated the interest component of the Credit Facility to the amount required to be maintained pursuant to this Indenture.

No default specified in (iv) above shall constitute an Event of Default unless the Issuer shall have failed to correct such default within the applicable 60-day period; provided, however, that if the default shall be such that it can be corrected, but cannot be corrected within such period, it shall not constitute an Event of Default if corrective action is instituted by the Issuer within the applicable period and diligently pursued until the default is corrected. With regard to any alleged payment default with respect to the principal of, premium, if any, and interest on the Bonds concerning which notice is given to the Borrower and the Issuer under the provisions of this Section, to the extent permitted by applicable law, the Issuer hereby grants the Borrower full authority to make such payment in the name and on behalf of the Issuer. Notwithstanding such grant, the Borrower shall not have any obligation to cure any default of the Issuer.

(b) Acceleration. Upon the occurrence and continuation of an Event of Default under Section 7.01(a)(i), (ii), (iii), (iv) or (v) hereunder, the Trustee may with the consent of each Credit Provider, if any, and upon the written request of any Credit Provider or the Holders of not less than a majority in aggregate principal amount of Bonds then Outstanding with the consent of each Credit Provider, if any, shall, by notice in writing delivered to the Borrower and each Credit Provider, if any, with copies of such notice being sent to the Issuer, declare the principal of all Bonds then Outstanding and the interest accrued thereon immediately due and payable, and such principal and interest shall thereupon become and be immediately due and payable. Upon the occurrence of an Event of Default under Section 7.01(a)(vi) hereunder, the principal of the Bonds shall immediately become due and payable without need of any action by the Trustee and thereafter the Trustee shall give written notice to the Borrower, the Issuer and each Credit Provider, if any. Interest on the Bonds shall cease to accrue from and after the date of declaration of any such acceleration. Notwithstanding the foregoing, the Trustee shall not be required to take any action upon the occurrence and continuation of an Event of Default under Section 7.01(a)(iv) above until a Responsible Officer of the Trustee has actual notice or knowledge of such Event of Default. After such declaration of acceleration or automatic acceleration, except to the extent the Borrower has exercised its right to purchase the Bonds in lieu of acceleration paid as set forth in clause (B) of paragraph (d) below, the Trustee shall immediately take such actions as necessary to realize moneys under the applicable Credit Facility or the applicable Liquidity Facility, as appropriate, for payment upon such acceleration or purchase in lieu of acceleration, as applicable. At any time the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility hereunder) is in effect with respect to the Bonds, if the Trustee has not realized sufficient

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 128 of 295

moneys under the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility hereunder) as shall be necessary to make timely payment of such accelerated principal of and interest on Bonds (other than Bonds owned by or for the account of the Borrower or the Liquidity Provider) and deposited such amounts in the Letter of Credit Account in the Bond Fund at 1:00 p.m. (New York City time) on the Business Day following date of declaration of any such acceleration, or if the Trustee has actual knowledge that the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility hereunder) has been repudiated, the Trustee shall provide notice to the Borrower as required by Section 5.03 hereof. Except to the extent the Borrower has exercised its right to purchase the Bonds in lieu of acceleration pursuant to paragraph (d) below, the Trustee shall thereupon declare all indebtedness payable under Section 4.2(a) of the Agreement to be immediately due and payable in accordance with Section 6.2 of the Agreement and may exercise and enforce such rights as exist under the Agreement.

(c)     Rescission of Acceleration. The provisions of Section 7.01(b) hereof are subject to the condition that if, at any time after the principal of the Bonds shall have been so declared due and payable, and before any judgment or decree for the payment of the moneys due shall have been obtained or entered as hereinafter provided, there shall have been deposited with the Trustee a sum which, together with any other amounts then held in the Bond Fund, is sufficient to pay all the principal of the Bonds matured prior to such declaration and all matured installments of interest (if any) upon all the Bonds, with interest on such overdue installments of principal as provided in the Agreement, and the reasonable fees and expenses (including, but not limited to those of its attorneys) of the Trustee, and any and all other defaults known to the Trustee (other than in the payment of principal of and interest on the Bonds due and payable solely by reason of such declaration) shall have been made good or cured to the satisfaction of the Trustee or provision deemed by the Trustee to be adequate shall have been made therefor, then, and in every such case, any Credit Provider or the Holders of at least a majority in aggregate principal amount of the Bonds then Outstanding, by written notice to the Issuer and to the Trustee, may, on behalf of the Holders of all the Bonds, rescind and annul such declaration and its consequences and waive such default, provided that no such rescission and annulment shall extend to or shall affect any subsequent default, or shall impair or exhaust any right or power consequent thereon; provided, further, that no rescission and annulment of such declaration may become effective unless the Trustee has received written notice from the Credit Provider that the Credit Facility has been fully reinstated to the amount required to be maintained pursuant to this Indenture and that any notice from the Credit Provider described in Section 7.01(a)(vi) hereof has been rescinded by the Credit Provider.

(d)     Purchase in Lieu of Acceleration.

(i)     The provisions of Section 7.01(b) hereof are further subject to the condition that if at any time after the principal of the Bonds shall have been so declared due and payable, and before the Trustee shall have made payment on the Bonds upon such acceleration and before any judgment or decree for the payment of moneys due shall have been obtained or entered as hereinafter provided, the Borrower shall have elected to purchase all of the Bonds in lieu of such acceleration on the Purchase In Lieu of Acceleration Date and shall have elected to cause the Purchase Price of such Bonds on

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 129 of 295

the Purchase in Lieu of Acceleration Date to be paid from either (A) moneys realized from a draw under the applicable Liquidity Facility or (B) amounts paid by the Borrower to the Tender Agent by 11:30 a.m. (New York City time) on the Purchase in Lieu of Acceleration Date in immediately available funds, as set forth in a written notice to the Issuer, Trustee, the Tender Agent and each Credit Provider, if any, and (x) in the case the Borrower has elected to cause the Purchase Price of such Bonds on the Purchase in Lieu of Acceleration Date to be paid as set forth in clause (A) above proceeds from a drawing under the Liquidity Facility shall be on deposit in an amount equal to the Purchase Price of the Bonds then Outstanding on or prior to the Purchase in Lieu of Acceleration Date, or (y) in the case the Borrower has elected to cause the Purchase Price of such Bonds on the Purchase in Lieu of Acceleration Date to be paid as set forth in clause (B) above the Borrower shall have paid to the Tender Agent for deposit in the Borrower Account by 11:30 a.m. (New York City time) on the Purchase in Lieu of Acceleration Date an amount equal to the Purchase Price of the Bonds then Outstanding on or prior to the Purchase in Lieu of Acceleration Date, then, and in every such case, the acceleration of the principal and accrued interest on the Bonds hereunder shall be automatically rescinded and annulled without further action of the Trustee and without satisfaction of any requirements under Section 7.01(c) hereof and interest on the Bonds from and after the date of declaration of any such acceleration, to the Purchase in Lieu of Acceleration Date shall not accrue), and the Bonds shall be deemed to be purchased in lieu of acceleration on the Purchase in Lieu of Acceleration Date at the Purchase Price thereof without notice to or further act of the former Holders of such Bonds. If the Borrower so elects to cause the Purchase Price of such Bonds to be paid as set forth in clause (B) above but the Tender Agent shall not have received such amounts by 11:30 a.m. (New York City time) on the Purchase in Lieu of Acceleration Date, the Tender Agent shall take such actions as the Tender Agent determines are necessary to realize moneys under any Liquidity Facility to pay such Purchase Price. At any time the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility hereunder) is in effect with respect to the Bonds, if the Borrower so elects to cause the Purchase Price of such Bonds to be paid as set forth in clause (A) above, but the Tender Agent shall have not received such amounts by 2:30 p.m. (New York City time) on the Purchase in Lieu of Acceleration Date, or if the Tender Agent has actual knowledge that any such instrument has been repudiated, the Tender Agent shall immediately notify the Borrower by telephone, confirmed in writing, of such insufficiency and request payment of such Purchase Price, including interest from and after the Purchase in Lieu of Acceleration Date until such Purchase Price is paid in full, by 4:00 p.m. (New York City time) on the following Business Day, in immediately available funds (which need not constitute Available Moneys), and such notice shall constitute a Notice of Borrower Purchase. So long as a Liquidity Facility is in effect, the Purchase in Lieu of Acceleration Date shall be a date no later than the Business Day following the date that principal of the Bonds has been accelerated pursuant to Section 7.01(b) hereof. The Tender Agent shall pay the Purchase Price of such Bonds pursuant to the payment provisions of Sections 2.02(c), (d) and (e) of the Multi-Mode Annex. Bonds to be purchased but which are not delivered to the Tender Agent on the Purchase in Lieu of Acceleration Date shall be deemed to have been purchased pursuant to the provisions of this Section 7.01(d). Bonds purchased in lieu of acceleration

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 130 of 295

pursuant to this Section 7.01(d) from moneys provided under a Liquidity Facility, if any, shall become Liquidity Provider Bonds and if subsequently transferred to the Borrower thereafter shall be deemed to be purchased by the Borrower and the Borrower shall be the Holder of such Bonds for all purposes under this Indenture, and interest accruing on such Bonds on and after the Purchase in Lieu of Acceleration Date shall be payable solely to Borrower. Bonds purchased in lieu of acceleration pursuant to this Section 7.01(d) paid as set forth in clause (B) above shall be deemed to be purchased by the Borrower and the Borrower shall be the Holder of such Bonds for all purposes under this Indenture, and interest accruing on such Bonds on and after the Purchase in Lieu of Acceleration Date shall be payable solely to Borrower. Except as set forth above when the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility hereunder) has been dishonored or repudiated, so long as a Liquidity Facility is in effect and has not been dishonored or repudiated, Bonds purchased in lieu of acceleration to be paid as set forth in clause (A) or (B) above shall be purchased with Available Moneys.

(ii)     It is the intention of the parties hereto that the purchase of the Bonds pursuant to the provisions of this paragraph shall not constitute a prepayment of the loan of Bond proceeds made to the Borrower pursuant to the Agreement or a merger or extinguishment of the indebtedness of the Borrower thereunder or the Bonds so purchased and that such Bonds shall for all purposes continue to be regarded as Outstanding hereunder.

(iii)     Notwithstanding any other provision of this Indenture, the Multi-Mode Annex or the Agreement, in the event that the Borrower purchases all of the Outstanding Bonds by the purchase in lieu of acceleration of all of the Outstanding Bonds pursuant to this Section 7.01(d), any such Bonds shall no longer be registered in the name of Cede & Co., as nominee of DTC, and shall be registered in the name of the Borrower and shall not be remarketed or otherwise transferred, assigned or sold to any person other than the Borrower unless (i) the prior written approval of the Borrower, in its sole discretion, is obtained, and (ii) the Trustee shall have received written notice from the Borrower that the Borrower has furnished to the Issuer and to the Remarketing Agent, for use in remarketing the Bonds, a current offering or disclosure document which includes a description of the security for the Bonds, or such amendment or supplement to the official statement then used in connection with remarketing the Bonds as shall, in the opinion of the Borrower, be necessary in order for the description of the security for the Bonds set forth therein to constitute an accurate summary of the matters therein set forth.

(iv)     If moneys sufficient to pay the Purchase Price of Bonds to be purchased in lieu of acceleration pursuant to this Section 7.01(d) shall be held by the Tender Agent on the Purchase in Lieu of Acceleration Date, such Bonds shall be deemed to have been purchased for all purposes of this Indenture, irrespective of whether or not such Bonds shall have been delivered to the Tender Agent, and neither the former Holder of such Bonds nor any other person shall have any claim thereon, under this Indenture or otherwise, for any amount other than the Purchase Price thereof.

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 131 of 295

(v)   In the event of non-delivery of any Bond to be purchased in lieu of acceleration pursuant to this Section 7.01(d), the Tender Agent shall segregate and hold uninvested the moneys for the Purchase Price of such Bonds in trust, without liability for interest thereon, for the benefit of the former Holders of such Bonds, who shall, except as provided in the following sentence, thereafter be restricted exclusively to such moneys for the satisfaction of any claim for the Purchase Price of such Bonds. Any moneys which the Tender Agent shall segregate and hold in trust for the payment of the Purchase Price of any Bond and remaining unclaimed for two (2) years after the Purchase in Lieu of Acceleration Date shall be paid, upon the Borrower's written request, to the Borrower. After the payment of such unclaimed moneys to the Borrower, the former Holder of such Bond shall look only to the Borrower for the payment thereof.

Section 7.02. Institution of Legal Proceedings by Trustee. Subject to the provisions of Section 7.11 hereof and Section 7.01(a) of the Multi-Mode Annex, in addition, if one or more of the Events of Default shall happen and be continuing, the Trustee in its discretion may, and upon the written request of any Credit Provider or the Holders of a majority in principal amount of the Bonds then Outstanding and upon being indemnified to its satisfaction therefor (except that no indemnification shall be required before making payments of principal and interest on the Bonds as they become due or causing an acceleration of the Bonds or realizing moneys under any Credit Facility or Liquidity Facility) shall, proceed to protect or enforce its rights or the rights of the Holders of Bonds under the Act or under this Indenture, by a suit in equity or action at law, either for the specific performance of any covenant or agreement contained herein, or in aid of the execution of any power herein granted, or by mandamus or other appropriate proceeding for the enforcement of any other legal or equitable remedy as the Trustee shall deem most effectual in support of any of its rights or duties hereunder. Without limiting the foregoing, each Credit Provider shall be entitled to (i) notify any applicable receiver of the occurrence of an Event of Default and (ii) request the Trustee or such receiver to intervene in judicial proceedings that affect the Bonds or the security therefor.

Section 7.03. Application of Moneys Collected by Trustee. Any moneys collected by the Trustee on or after the occurrence of an Event of Default shall be applied in the order following, at the date or dates fixed by the Trustee and, in the case of distribution of such moneys on account of principal (or premium, if any) or interest, upon presentation of the Bonds, and stamping thereon the payment, if only partially paid, and upon surrender thereof, if fully paid:

First: To the payment of reasonable costs and expenses of collection, just and reasonable compensation to the Trustee for its own services and for the services of counsel, agents and employees by it properly engaged and employed, and all other reasonable expenses and liabilities incurred, and for advances made pursuant to the provisions of this Indenture with interest on all such advances at the rate of interest then borne by the Bonds (provided that no amounts drawn under the Credit Facility shall be applied to the payment of such costs, expenses, liabilities or advances).

Second: In case the principal of none of the Bonds shall have become due and remains unpaid, to the payment of interest in default in the order of the maturity thereof,

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page
132 of 295

such payments to be made ratably and proportionately to the Persons entitled thereto without discrimination or preference, except as specified in Section 6.02 hereof.

Third: In case the principal of any of the Bonds shall have become due by declaration or otherwise and remains unpaid, first to the payment of principal of all Bonds then due and unpaid, then to the payment of interest in default in the order of maturity thereof, and then to the payment of the premium thereon, if any; in every instance such payment to be made ratably to the Persons entitled thereto without discrimination or preference, except as specified in Section 6.02 hereof.

Fourth: In case all principal of the Bonds and all interest and premium, if any, thereon and all other sums payable hereunder shall have been paid in full, to the payment of any amounts due and payable to each Credit Provider, if any, under any applicable Credit Agreement.

Fifth: In case all amounts described above in First through Fourth, inclusive, shall have been paid in full, to the payment of any Additional Payments due and payable to the Issuer.

Section 7.04. Effect of Delay or Omission to Pursue Remedy. No delay or omission of the Trustee or of any Holder of Bonds to exercise any right or power arising from any default shall impair any such right or power or shall be construed to be a waiver of any such default or acquiescence therein, and every power and remedy given by this Article VII to the Trustee or to the Holders of Bonds may be exercised from time to time and as often as shall be deemed expedient. In case the Trustee shall have proceeded to enforce any right under this Indenture, and such proceedings shall have been discontinued or abandoned because of waiver or for any other reason, or shall have been determined adversely to the Trustee, then and in every such case the Issuer, the Trustee and the Holders of the Bonds, severally and respectively, shall be restored to their former positions and rights hereunder in respect to the trust estate; and all remedies, rights and powers of the Issuer, the Trustee and the Holders of the Bonds shall continue as though no such proceedings had been taken.

Section 7.05. Remedies Cumulative. No remedy herein conferred upon or reserved to the Trustee or to any Holder of the Bonds is intended to be exclusive of any other remedy, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity.

Section 7.06. Covenant to Pay Bonds in Event of Default. The Issuer covenants that, upon the happening of any Event of Default, the Issuer will pay to the Trustee upon demand, but only out of the Revenues, for the benefit of the Holders of the Bonds, the whole amount then due and payable thereon (by declaration or otherwise) for interest or for principal and premium, or both, as the case may be, and all other sums which may be due hereunder or secured hereby, including reasonable compensation to the Trustee, its agents and counsel, and any reasonable expenses or liabilities incurred by the Trustee hereunder. In case the Issuer shall fail to pay the same forthwith upon such demand, the Trustee in its own name and on behalf of, and for the equal and ratable benefit of, the Bondholders, shall be entitled to institute proceedings at law or in equity in any court of competent jurisdiction to recover judgment for the whole amount due

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 133 of 295

and unpaid, together with reasonable costs and attorneys' fees, subject, however, to the condition that such judgment, if any, shall be limited to, and payable solely out of, Revenues as herein provided and not otherwise. The Trustee shall be entitled to recover such judgment as aforesaid, either before or after or during the pendency of any proceedings for the enforcement of this Indenture, and the right of the Trustee to recover such judgment shall not be affected by the exercise of any other right, power or remedy for the enforcement of the provisions of this Indenture.

Section 7.07. Trustee Appointed Agent for Bondholders. The Trustee is hereby appointed the agent and attorney of the Holders of all Bonds Outstanding hereunder for the purpose of filing any claims relating to the Bonds.

Section 7.08. Power of Trustee to Control Proceedings. In the event that the Trustee, upon the happening of an Event of Default, shall have taken any action, by judicial proceedings or otherwise, pursuant to its duties hereunder, whether upon its own discretion or upon the request of any Credit Provider or the Holders of the Bonds, it shall have full power, in the exercise of its discretion for the best interests of the Credit Providers or the Holders of the Bonds, with respect to the continuance, discontinuance, withdrawal, compromise, settlement or other disposal of such action; provided, however, that the Trustee shall not, unless there no longer continues an Event of Default hereunder, discontinue, withdraw, compromise or settle, or otherwise dispose of any litigation pending at law or in equity, if at the time there has been filed with it a written request signed by each Credit Provider or the Holders of at least a majority in principal amount of the Bonds Outstanding hereunder opposing such discontinuance, withdrawal, compromise, settlement or other disposal of such litigation.

All rights of action under this Indenture or under any of the Bonds secured hereby which are enforceable by the Trustee may be enforced by it without the possession of any of the Bonds, or the production thereof at the trial or other proceedings relative thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name as Trustee on behalf of, and for the equal and ratable benefit of, the Bondholders, subject to the provisions of this Indenture.

Section 7.09. Limitation on Bondholders' Right to Sue. No Holder of any Bond issued hereunder shall have the right to institute any suit, action or proceeding at law or in equity, for any remedy under or upon this Indenture, unless (a) such Holder shall have previously given to the Trustee written notice of the occurrence of an Event of Default hereunder; (b) the Holders of at least a majority in aggregate principal amount of all the Bonds then Outstanding shall have made written request upon the Trustee to exercise the powers hereinbefore granted or to institute such action, suit or proceeding in its own name; (c) said Holders shall have tendered to the Trustee reasonable indemnity against the reasonable costs, expenses and liabilities to be incurred in compliance with such request; and (d) the Trustee shall have refused or omitted to comply with such request for a period of thirty (30) days after such written request shall have been received by, and said tender of indemnity shall have been made to, the Trustee.

Such notification, request, tender of indemnity and refusal or omission are hereby declared, in every case, to be conditions precedent to the exercise by any Holder of Bonds of any remedy hereunder; it being understood and intended that no one or more Holders of Bonds shall

have any right in any manner whatever by his or their action to enforce any right under this Indenture, except in the manner herein provided, and that all proceedings at law or in equity to enforce any provision of this Indenture shall be instituted, had and maintained in the manner herein provided and for the equal benefit of all Holders of the Outstanding Bonds, subject to the provisions of this Indenture (including Section 6.02 hereof and the following paragraph).

The right of any Holder of any Bond to receive payment of the principal of (and premium, if any) and interest on such Bond out of Revenues, as herein and therein provided, on and after the respective due dates expressed in such Bond, or to institute suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder, notwithstanding the foregoing provisions of this Section or Section 7.08 hereof or any other provision of this Indenture.

Section 7.10. <u>Limitation of Liability to Revenues</u>. Notwithstanding anything in this Indenture contained, the Issuer shall not advance any moneys derived from the proceeds of taxes collected by the State or by any governmental body or political subdivision of the State or of any local agency or from any source of income of the State or any governmental body or political subdivision of the State or any local agency or from any source of income of the Issuer other than the Revenues, for any of the purposes in this Indenture mentioned, whether for the payment of the principal of or interest on the Bonds or for any other purpose of this Indenture. The Bonds are not general obligations of the Issuer, and are payable from and secured by the Revenues only. The Issuer has no taxing power.

Section 7.11. <u>Right of Credit Provider to Control Remedial Proceedings</u>. Notwithstanding anything to the contrary in this Article VII, so long as any Credit Facility is in effect and no default in the payment obligations of the applicable Credit Provider under such Credit Facility shall have occurred and be continuing, no Event of Default under this Indenture shall be declared nor any remedies exercised with respect thereto by the Trustee or by the Bondholders and no Event of Default under this Indenture shall be waived by the Trustee or the Bondholders to the extent they may otherwise be permitted hereunder, without, in any case, the prior written consent of such Credit Provider; provided, however, that the Issuer and the Trustee may exercise any and all remedies under this Indenture and the Agreement (except acceleration) to collect any fees, expenses and indemnification from the Borrower without obtaining such consent of such Credit Provider. In addition, so long as any Credit Facility is in effect and no default in the payment obligations of the applicable Credit Provider under such Credit Facility shall have occurred and be continuing, the Trustee shall declare Events of Default and exercise remedies hereunder at the direction of such Credit Provider, so long as any such action shall not, in the opinion of the Trustee (based on an Opinion of Counsel), have a materially adverse effect on the interests of the Bondholders; provided, however, that each Credit Provider shall not be deemed to be the sole Holder of the Bonds secured by the applicable Credit Facility for purposes of such determination.

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 135 of 295

## ARTICLE VIII

## THE TRUSTEE, THE REGISTRAR, THE TENDER AGENT, THE REMARKETING AGENT AND THE PAYING AGENT

Section 8.01. Duties, Immunities and Liabilities of Trustee and Registrar. The Trustee and the Registrar shall, prior to an Event of Default, and after the curing of all Events of Default which may have occurred, perform such duties and only such duties as are specifically set forth in this Indenture. The Trustee shall, during the existence of any Event of Default (which has not been cured), exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as prudent Persons would exercise or use under the circumstances in the conduct of their own affairs.

No provision of this Indenture shall be construed to relieve the Trustee or the Registrar from liability for its own negligent action or its own negligent failure to act, except that:

(a)     Prior to such an Event of Default hereunder and after the curing of all Events of Default which may have occurred,

(1)     the covenants, duties and obligations of the Trustee and the Registrar, as the case may be, shall be determined solely by the express provisions of this Indenture; the Trustee or the Registrar, as the case may be, shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Indenture; and no other covenants, duties or obligations of the Trustee or the Registrar shall be implied into this Indenture; and

(2)     in the absence of negligence or willful misconduct on the part of the Trustee or the Registrar, as the case may be, the Trustee or the Registrar, as the case may be, may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificate or opinion furnished to the Trustee or the Registrar, as the case may be, conforming to the requirements of this Indenture; but in the case of any such certificate or opinion which by any provision hereof is specifically required to be furnished to the Trustee or the Registrar, as the case may be, the Trustee or the Registrar, as the case may be, shall be under a duty to examine the same to determine whether or not it conforms to the requirements of this Indenture; and

(b)     At all times, regardless of whether or not any Event of Default shall exist,

(1)     the Trustee and the Registrar shall not be liable for any error of judgment made by a Responsible Officer or Officers of the Trustee or the Registrar unless it shall be proved that the Trustee or the Registrar, as the case may be, was negligent in ascertaining the pertinent facts; and

(2)     neither the Trustee nor the Registrar shall be liable with respect to any action taken or omitted to be taken by it in accordance with the direction of any Credit Provider or the Holders of not less than a majority, or such other percentage as may be required or provided for hereunder, in aggregate principal

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 136 of 295

amount of the Bonds at the time Outstanding relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee or Registrar, or exercising any trust or power conferred upon the Trustee or the Registrar under this Indenture; and

(c) The Trustee may execute any of the trusts or powers hereof and perform the duties required of it hereunder by or through attorneys, agents or receivers, and shall be entitled to conclusively rely on the advice of counsel concerning all matters of trust and concerning its duties hereunder, and the Trustee shall not be answerable for the acts or omissions of any such attorney, agent, or receiver selected by it with reasonable care.

None of the provisions contained in this Indenture shall require the Trustee or Registrar to expend or risk its own funds or otherwise incur individual financial liability in the performance of any of its duties or in the exercise of any of its rights or powers. The Trustee shall have no responsibility with respect to any information, statement, or recital in any official statement, offering memorandum or any other disclosure material prepared or distributed with respect to the Bonds. The Trustee shall not be deemed to have knowledge of an Event of Default hereunder, a Loan Default Event under the Agreement or a default or event of default under any other document related to the Bonds unless it shall have actual knowledge at its Principal Office. The immunities extended to the Trustee also extend to its directors, officers, employees and agents. The permissive right of the Trustee to perform acts enumerated in this Indenture or the Agreement shall not be construed as a duty or obligation hereunder.

Section 8.02. Right of Trustee and Registrar to Rely upon Documents, Etc. Except as otherwise provided in Section 8.01 hereof:

(a) The Trustee and the Registrar may rely and shall be protected in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, Bond or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties, and the Trustee or the Registrar, as the case may be, shall not be required to make any independent investigation into the facts or matters contained therein;

(b) Any notice, request, direction, election, order or demand of the Issuer mentioned herein shall be sufficiently evidenced by an instrument signed in the name of the Issuer by an Authorized Issuer Representative, and any resolution of the Issuer may be evidenced to the Trustee or the Registrar by a Certified Resolution;

(c) The Trustee and the Registrar may consult with counsel (who may include counsel for the Issuer or Bond Counsel) and the opinion of such counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it hereunder in the absence of negligence or willful misconduct on its part and in accordance with the opinion of such counsel; and

(d) Whenever in the administration of the trusts of this Indenture the Trustee or the Registrar shall deem it necessary or desirable that a matter be proved or established prior to taking or suffering any action hereunder, such matter (unless other evidence in

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 137 of 295

respect thereof be herein specifically prescribed) may, in the absence of negligence or willful misconduct on the part of the Trustee or the Registrar, as the case may be, be deemed to be conclusively proved and established by a Certificate of the Issuer; and such Certificate of the Issuer shall, in the absence of negligence or willful misconduct on the part of the Trustee or the Registrar, as the case may be, be full warrant to the Trustee or the Registrar, as the case may be, for any action taken or suffered by it under the provisions of this Indenture upon the faith thereof.

Section 8.03. Trustee and Registrar Not Responsible for Recitals. The recitals contained herein and in the Bonds shall be taken as the statements of the Issuer, and the Trustee and the Registrar shall bear no responsibility for the correctness of the same except (with respect to the Trustee) for the Certificate of Authentication thereon. The Trustee and the Registrar make no representations as to the validity or sufficiency of this Indenture or of the Bonds. The Trustee and the Registrar shall not be accountable for the use or application by the Issuer of any of the Bonds authenticated or delivered hereunder or of the proceeds of such Bonds except to the extent specifically provided in this Indenture.

Section 8.04. Right of Trustee and Registrar to Acquire Bonds. The Trustee, the Registrar and their officers and directors (either as principal or agent) may acquire and hold, or become the pledgee of, Bonds and otherwise engage in or be interested in any financial or other transaction with the Issuer in the manner and to the same extent and with like effect as though it were not Trustee or Registrar, as the case may be, hereunder.

Section 8.05. Moneys Received by Trustee and Registrar to Be Held in Trust. Subject to the provisions of Section 10.03 hereof, all moneys received by the Trustee and the Registrar shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, but need not be segregated from other funds except to the extent required by law. The Trustee and the Registrar shall not be liable to pay interest on any moneys received by them hereunder, but shall be liable only to account for earnings on funds that have been invested pursuant to Section 5.04 hereof. Any moneys held by the Trustee or the Registrar may be deposited by it in its banking department and invested as provided herein.

Section 8.06. Compensation and Indemnification of Trustee and Registrar. The Trustee and the Registrar shall be entitled to reasonable compensation from the Borrower for all services rendered by it in the execution of the trusts created and in the exercise and performance of any of the powers and duties hereunder of the Trustee or the Registrar, as the case may be, which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust, and the Agreement will require the Borrower to pay or reimburse the Trustee or the Registrar, as the case may be, upon its request for all reasonable expenses, disbursements and advances incurred or made by the Trustee or the Registrar, as the case may be, in accordance with any of the provisions of this Indenture (including the reasonable compensation and the reasonable expenses and disbursements of its counsel and of all Persons not regularly in its employ) except any such expense, disbursement or advance as may arise from its negligence or willful misconduct. If any property, other than cash, shall at any time be held by the Trustee or the Registrar, as the case may be, subject to this Indenture, or any supplemental indenture, as security for the Bonds, the Trustee or the Registrar, as the case may be, if and to the extent authorized by a receivership, bankruptcy or other court of competent jurisdiction or by the

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 138 of 295

instrument subjecting such property to the provisions of this Indenture as such security for the Bonds, shall be entitled (but not required) to make advances for the purpose of preserving such property or of discharging tax liens or other prior liens or encumbrances thereon. The Agreement will also require the Borrower to indemnify the Trustee or the Registrar, as the case may be, for, and to hold it harmless against, any loss, liability, expense or advance incurred or made without negligence or willful misconduct on the part of the Trustee or the Registrar, as the case may be, arising out of or in connection with the acceptance or administration of this trust, including the reasonable costs and expenses of defending itself against any claim of liability in the premises.

Section 8.07. Qualifications of Trustee and Registrar. There shall at all times be a trustee and a registrar hereunder which shall be financial institutions organized and doing business under the laws of the United States or of a state thereof, authorized under such laws to exercise corporate trust powers and act in a fiduciary capacity, having a combined capital and surplus of at least Fifty Million Dollars ($50,000,000), and be subject to supervision or examination by federal or state authorities. If such financial institutions publish reports of condition at least annually, pursuant to law or to the requirements of any supervising or examining authority above referred to, then for the purposes of this Section the combined capital and surplus of such financial institutions shall be deemed to be their combined capital and surplus as set forth in their most recent reports of conditions so published. In case at any time the Trustee or the Registrar shall cease to be eligible in accordance with the provisions of this Section or cease to be qualified to maintain Eligible Accounts, the Trustee or the Registrar, as the case may be, shall resign immediately in the manner and with the effect specified in Section 8.08 hereof.

Section 8.08. Resignation and Removal of Trustee or Registrar and Appointment of Successor Trustee or Registrar.

(a)     Subject to the provisions of subsection (d) below, the Trustee or the Registrar may at any time resign by giving written notice to the Issuer and the Borrower and by giving to the Bondholders notice by first class mail sent to such Bondholders. The Trustee or the Registrar, as the case may be, shall also mail a copy of any such notice of its resignation to each Rating Agency. Upon receiving such notice of resignation, the Issuer, following consultation with the Borrower and each Credit Provider, shall promptly appoint a successor trustee or registrar, as the case may be, by an instrument in writing. If no successor trustee or registrar, as the case may be, shall have been so appointed and have accepted appointment within thirty days after the giving of such notice of resignation, the resigning trustee or registrar, as the case may be, may petition any court of competent jurisdiction for the appointment of a successor trustee or registrar, as the case may be, or any Bondholder who has been a bona fide Holder of a Bond for at least six months may, on behalf of himself and others similarly situated, petition any such court for the appointment of a successor trustee or registrar, as the case may be. Such court may thereupon, after such notice, if any, as it may deem proper and may prescribe, appoint a successor trustee or registrar, as the case may be.

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 139 of 295

(b)     In case at any time either of the following shall occur:

(1)     the Trustee or Registrar shall cease to be eligible in accordance with the provisions of Section 8.07 hereof and shall fail to resign after written request therefor by the Issuer or by any Bondholder who has been a bona fide Holder of a Bond for at least six months, or

(2)     the Trustee or Registrar shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or a receiver of the Trustee or Registrar or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or Registrar or of its property or affairs for the purpose of rehabilitation, conservation or liquidation,

then, in any such case, the Issuer, following consultation with the Borrower and each Credit Provider may remove the Trustee or Registrar, as the case may be, and appoint a successor trustee acceptable to the Issuer and each Credit Provider, or any Bondholder may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee or Registrar, as the case may be, and the appointment of a successor trustee or registrar, as the case may be. Such court may thereupon, after such notice, if any, as it may deem proper and may prescribe, remove the Trustee or Registrar, as the case may be, and appoint a successor trustee or registrar, as the case may be.

(c)     The Issuer may remove the Trustee or Registrar, as the case may be, at any time upon its own decision or at the request of the Borrower, and shall remove the Trustee or Registrar, as the case may be, if at any time requested by the Holders of a majority in aggregate principal amount of the Bonds at the time Outstanding, and thereupon, the Issuer, following consultation with the Borrower and each Credit Provider, shall appoint a successor trustee or registrar, as the case may be, by an instrument or concurrent instruments in writing signed by the Issuer or such Bondholders, as the case may be.

(d)     Any resignation or removal of the Trustee or Registrar, as the case may be, and appointment of a successor trustee or registrar, as the case may be, pursuant to any of the provisions of this Section shall become effective upon acceptance of appointment by the successor trustee or registrar, as the case may be, as provided in Section 8.09 hereof. The successor trustee or successor registrar, as the case may be, shall mail written notice of its appointment to each Rating Agency.

Section 8.09. Acceptance of Trust by Successor Trustee.    Any successor trustee appointed as provided in Section 8.08 hereof shall execute, acknowledge and deliver to the Issuer, the Borrower and to its predecessor trustee an instrument accepting such appointment hereunder, and thereupon the resignation or removal of the predecessor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts, duties and obligations of its predecessor in the trusts hereunder, with like effect as if originally named as Trustee herein; but, nevertheless, on the Written Request of the Issuer or the request of the successor trustee, the trustee ceasing to act shall execute and deliver an instrument transferring to such successor trustee, upon the trusts herein expressed, all the rights, powers and trusts of the trustee so ceasing to act. Upon request

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page
140 of 295

of any such successor trustee, the Issuer shall execute any and all instruments in writing necessary or desirable for more fully and certainly vesting in and confirming to such successor trustee all such rights, powers and duties. Any trustee ceasing to act shall, nevertheless, retain a lien upon all property or funds held or collected by such trustee to secure the amounts due it as compensation, reimbursement, expenses and indemnity afforded to it by Section 8.06 hereof.

No successor trustee shall accept appointment as provided in this Section 8.09 unless at the time of such acceptance such successor trustee shall be eligible under the provisions of Section 8.07 hereof.

Upon acceptance of appointment by a successor trustee as provided in this Section, the Issuer or such successor trustee shall give Bondholders notice of the succession of such trustee to the trusts hereunder in the manner prescribed in Section 8.08 hereof for the giving of notice of resignation of the Trustee.

Section 8.10. Merger or Consolidation of Trustee or Registrar. Any financial institution into which the Trustee may be merged or with which it may be consolidated, or any financial institution resulting from any merger or consolidation to which the Trustee or Registrar shall be a party, or any financial institution succeeding to substantially all of the corporate trust business of the Trustee or Registrar, shall be the successor of the Trustee or Registrar hereunder without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding, provided that such successor trustee or registrar shall be eligible under the provisions of Section 8.07 hereof.

Section 8.11. Registrars. The Issuer, with the consent of the Borrower, shall appoint a registrar for the Bonds. Each Registrar shall be a bank, trust company, national banking association or other financial institution which meets the qualifications of Section 8.07 hereof, willing and able to accept the office on reasonable and customary terms and authorized by law to perform all the duties imposed upon it hereby. Each Registrar shall signify its acceptance of the duties and obligations imposed upon it hereby by executing and delivering to the Issuer and the Trustee a written acceptance thereof. The Registrar initially appointed hereunder is the Trustee. Unless otherwise provided by the Issuer with the consent of the Borrower and the Trustee, the Trustee shall serve as the Registrar under this Indenture.

Section 8.12. Tax Certificate and Agreement. The Trustee covenants and agrees that it will comply with all written instructions of the Borrower given pursuant to the Tax Certificate and Agreement. The Trustee acknowledges receipt of the Tax Certificate and Agreement and acknowledges that the provisions of the Tax Certificate and Agreement are incorporated herein by reference as provided in Section 6.06 hereof; provided, however, that the Trustee makes no representation or warranty with respect to the current or future federal tax status of interest on the Bonds.

Section 8.13. Notices to the Issuer. The Trustee shall provide the Issuer with the following:

(a) On or before January 15 of each year, commencing January 15, 2010, during which any of the Bonds are Outstanding, or upon any significant change that occurs which would

adversely impact the Trustee's ability to perform its duties under the Indenture, a written disclosure of any such change, or if applicable, of any conflicts that the Trustee may have as a result of other business dealings between the Trustee and the Borrower; and

(b)     If there is a failure to pay any amount of principal or Purchase Price of, premium, if any, or interest on any Bond when due; or if there is an occurrence of an Event of Default hereunder, of which the Trustee has knowledge, the Trustee shall provide written notice to the Issuer and the Borrower within five Business Days of such occurrence and such notice shall include a statement setting forth the steps the Trustee is taking to remedy such failure or Event of Default, as applicable.

Section 8.14. Appointment of Co-Trustee. In the event the Trustee deems that by reason of any present or future law of any jurisdiction it may not exercise any of the powers, rights or remedies herein granted to the Trustee or hold title to the properties, in trust, as herein granted, or take any other action which may be desirable or necessary in connection therewith, it may be necessary that the Trustee appoint an additional institution as a separate trustee or co-trustee. The appointment of any such separate trustee or co-trustee shall be subject to the approval of the Issuer, the Borrower and each Credit Provider. The following provisions of this Section are adapted to these ends.

(a)     In the event that the Trustee appoints an additional institution as a separate trustee or co-trustee, each and every remedy, power, right, claim, demand, cause of action, immunity, estate, interest or lien expressed or intended by this Indenture to be exercised by or vested in or conveyed to the Trustee with respect thereto shall be exercisable by and vest in such separate trustee or co-trustee but only to the extent necessary to enable such separate trustee or co-trustee to exercise such powers, rights and remedies, and every covenant and obligation necessary to the exercise thereof by such separate trustee or co-trustee shall run to and be enforceable by either of them. Such co-trustee may be removed by the Trustee at any time, with or without cause.

(b)     Should any instrument in writing from the Issuer be required by the separate trustee or co-trustee so appointed by the Trustee for more fully and certainly vesting in and confirming to it such properties, rights, powers, trusts, duties and obligations, any and all such instruments in writing shall, on request, be executed, acknowledged and delivered by the Issuer. In case any separate trustee or co-trustee, or a successor to either, shall become incapable of acting, resign or be removed, all the estates, properties, rights, powers, trusts, duties and obligations of such separate trustee or co-trustee, so far as permitted by law, shall vest in and be exercised by the Trustee until the appointment of a successor to such separate trustee or co-trustee.

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 142 of 295

Section 8.15.  Appointment, Duties and Qualifications of Tender Agent.

(a)    In order to carry out the duties and obligations of the Tender Agent contained in the Tender Agent Agreement, this Indenture and the Agreement, the Borrower shall, at any time any Bonds bear interest at a rate other than an Auction Rate or a Term Rate, appoint a Tender Agent or Tender Agents in order to carry out such duties and obligations, subject to the conditions set forth below. At any time the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility hereunder) is in effect with respect to the Bonds, the Trustee shall at all times be the Tender Agent hereunder. Each Tender Agent shall designate to the Trustee its Principal Office (which designation shall be delivered to the other Marketing Parties, in addition to the other parties so required in this paragraph) and signify its acceptance of the duties and obligations imposed upon it under the Indenture by entering into a Tender Agent Agreement substantially in the form of Appendix C attached hereto with the Borrower and such other parties as shall be appropriate, which may be combined with a Remarketing Agreement into a single document, delivered to the Issuer, the Trustee, the Borrower and the Remarketing Agent, under which each Tender Agent shall agree, particularly (but without limitation): (i) to perform the duties and comply with the requirements imposed upon it by the Tender Agent Agreement, this Indenture and the Agreement; and (ii) to keep such books and records with respect to its activities as Tender Agent as shall be consistent with prudent industry practice and to make such books and records available for inspection by the Issuer, the Trustee and the Borrower at all reasonable times. In addition, if a Purchase Date shall occur in connection with any adjustment from an Auction Rate Period or a Term Rate Period to a different Rate Period (or any continuation of a Term Rate Period), a Tender Agent or Tender Agents shall be appointed and shall accept its duties and obligations pursuant to a Tender Agent Agreement not later than 15 days prior to any such Purchase Date.

(b)    Each Tender Agent shall be a financial institution organized and doing business under the laws of the United States or of a state thereof, authorized under such laws to exercise corporate trust powers and act in a fiduciary capacity, having a combined capital and surplus of at least Fifty Million Dollars ($50,000,000), and subject to supervision or examination by federal or state authority. If such financial institution publishes a report of condition at least annually, pursuant to law or to the requirements of any supervising or examining authority above referred to, then for the purposes of this Section the combined capital and surplus of such financial institution shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published.

(c)    The Tender Agent may resign by notifying the Issuer, the Borrower, the Trustee, each Credit Provider, each Liquidity Provider, the Remarketing Agent and the Bondholders at least thirty (30) days before the effective date of such resignation. The Borrower may remove the Tender Agent at any time upon its own decision and thereupon, the Borrower shall appoint a successor by notifying the Tender Agent, the Issuer, the Remarketing Agent, each Credit Provider, each Liquidity Provider and the Trustee, and the Borrower shall enter into an agreement in substantially the form of the Tender Agent Agreement with a successor Tender Agent. No resignation or removal shall be effective until the successor has delivered an acceptance of its appointment to the Issuer, the Borrower, the Trustee and the predecessor Tender Agent. In the event of the resignation or removal of the Tender Agent, such Tender Agent shall pay over, assign and deliver any moneys held by it as Tender Agent to its successor,

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 143 of 295

or if there is no successor, to the Trustee. In the event that for any reason there shall be a vacancy in the office of Tender Agent, the Trustee shall act as such Tender Agent to the extent it has operational capacity to perform such tasks.

Section 8.16. Appointment, Duties and Qualifications of Remarketing Agent.

(a)     In order to carry out the duties and obligations contained in the Indenture, the Borrower shall, at any time any Bonds bear interest at a rate other than an Auction Rate or a Term Rate, appoint a Remarketing Agent or Remarketing Agents for Bonds issued bearing interest at or to be converted to a Daily Rate, a Weekly Rate or Flexible Rate, subject to the conditions set forth below. Any Remarketing Agent shall be a bank, trust company or member of the National Association of Securities Dealers, Inc. organized and doing business under the laws of the United States or any state or the District of Columbia. In addition, if a Purchase Date shall occur in connection with any adjustment from an Auction Rate Period or a Term Rate Period to a different Rate Period (or any continuation of a Term Rate Period), a Remarketing Agent or Remarketing Agents shall be appointed and shall accept its duties and obligations pursuant to a Remarketing Agreement not later than 15 days prior to any such Purchase Date.

(b)     In order to provide for the remarketing of the Bonds, the Borrower shall enter into a Remarketing Agreement or Remarketing Agreements with each Remarketing Agent and such other parties as shall be appropriate, which may be combined with a Tender Agent Agreement into a single document, under which each Remarketing Agent shall designate its Principal Office (which designation shall be delivered to the other Marketing Parties, in addition to the other parties so required in this paragraph), signify its acceptance of the duties and obligations imposed upon it hereunder and agree, particularly (but without limitation): (i) to perform the duties and comply with the requirements imposed upon it by the Remarketing Agreement, this Indenture and the Agreement; and (ii) to keep such books and records with respect to its activities as Remarketing Agent as shall be consistent with prudent industry practice and to make such books and records available for inspection by the Issuer, the Trustee and the Borrower at all reasonable times.

(c)     The Borrower shall furnish a copy of the Remarketing Agreement to the Trustee, each Credit Provider, each Liquidity Provider and the Tender Agent.

(d)     The Remarketing Agent may resign at any time by written notice to the Issuer, the Trustee, the Tender Agent, the Borrower, each Credit Provider and each Liquidity Provider at least 60 days before the effective date of such resignation and the Borrower shall appoint a successor by notifying the Issuer, the Trustee, the Tender Agent, each Credit Provider and each Liquidity Provider. The Borrower may remove the Remarketing Agent at any time upon its own decision and the Borrower shall appoint a successor by notifying the Remarketing Agent, each Credit Provider, each Liquidity Provider, the Issuer, the Trustee and the Tender Agent. No removal shall be effective until the successor has delivered an acceptance of its appointment to the Trustee.

(e)     The appointment of any Remarketing Agent pursuant to this Section 8.16 may terminate (subject to renewal by the Borrower or replacement by a successor Remarketing Agent as provided in this Section) only after the commencement of any Auction Rate Period, or any Term

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 144 of 295

Rate Period of three years' or longer duration, of any Bonds for which such Remarketing Agent was appointed.

Section 8.17. Appointment, Duties and Qualifications of Paying Agent. The Issuer, with the written approval of the Trustee and the Borrower, may appoint and at all times have a Paying Agent in such place or places as the Issuer may designate, for the payment of the principal of, and the interest (and premium, if any) on, the Bonds. It shall be the duty of the Trustee to make such arrangements with any such Paying Agent as may be necessary to assure, to the extent of the moneys held by the Trustee for such payment, the prompt payment of the principal of and interest and premium, if any, on the Bonds when due. The Paying Agent initially appointed hereunder is the Trustee.

Section 8.18. Several Capacities. Anything herein to the contrary notwithstanding, the same entity may serve hereunder as the Trustee, the Paying Agent or a Co-Paying Agent, the Registrar, the Tender Agent, any Auction Agent, a Broker-Dealer and the Remarketing Agent, and in any combination of such capacities to the extent permitted by law. Any such entity may in good faith buy, sell, own, hold and deal in any of the Bonds and may join in any action which any Bondholders may be entitled to take with like effect as if such entity were not appointed to act in such capacity hereunder.

## ARTICLE IX

## MODIFICATION OF INDENTURE, DOCUMENTS

Section 9.01. Modification Without Consent of Bondholders. The Issuer and the Trustee, without the consent of any Bondholders but with the consent of each Credit Provider, if any, and the Borrower, from time to time and at any time, and subject to the conditions and restrictions in this Indenture contained, may enter into an indenture or indentures supplemental hereto, which indenture or indentures thereafter shall form a part hereof, and the Trustee, without the consent of any Bondholders but with the consent of each Credit Provider, if any, and the Borrower, from time to time and at any time, may consent to an amendment or modification to the Agreement, in each case for any one or more of the following purposes:

(a)     to add to the covenants and agreements of the Issuer contained in this Indenture, or of the Borrower contained in the Agreement, other covenants and agreements thereafter to be observed, or to assign or pledge additional security for the Bonds, or to surrender any right or power reserved to or conferred upon the Issuer herein or the Borrower in the Agreement; provided, that no such covenant, agreement, assignment, pledge or surrender shall materially adversely affect the interests of the Holders of the Bonds (which determination may be based upon an Opinion of Bond Counsel);

(b)     to make such provisions for the purpose of curing any ambiguity, inconsistency or omission, or of curing, correcting or supplementing any defective provision contained in this Indenture or in the Agreement, or in regard to matters or questions arising under this Indenture or the Agreement, as the Issuer may deem necessary or desirable and not inconsistent with this Indenture and which shall not

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 145 of 295

materially adversely affect the interests of the Holders of the Bonds (which determination may be based upon an Opinion of Bond Counsel);

(c)     to modify, amend or supplement this Indenture or any supplemental indenture in such manner as to permit the qualification hereof or thereof under the Trust Indenture Act of 1939, as amended, or any similar federal statute hereafter in effect, and, if they so determine, to add to this Indenture or any supplemental indenture such other terms, conditions and provisions as may be permitted by said Trust Indenture Act of 1939, as amended, or similar federal statute, and which shall not adversely affect the interests of the Holders of the Bonds (which determination may be based upon an Opinion of Bond Counsel);

(d)     to provide for any additional procedures, covenants or agreements necessary to maintain the exclusion of interest on the Bonds from gross income for federal income tax purposes;

(e)     to provide for, modify or eliminate a book-entry registration system for the Bonds;

(f)     to provide for the procedures required to permit any Bondholder to separate the right to receive interest on the Bonds from the right to receive principal thereof and to sell or dispose of such rights, as contemplated by Section 1286 of the Code;

(g)     to provide for the appointment of a co-trustee or the succession of a new Trustee, Registrar, Paying Agent, Tender Agent, Auction Agent or Remarketing Agent;

(h)     to change Exhibit A to the Agreement in accordance with the provisions thereof;

(i)     to provide for or to substitute one or more Credit Facilities or to provide for or substitute one or more Liquidity Facilities;

(j)     in connection with any other change which, in the judgment of the Trustee, may be based upon an Opinion of Bond Counsel, will not adversely affect the security for the Bonds or the exclusion from gross income of interest thereon for federal income tax purposes or otherwise materially adversely affect the Holders of the Bonds (which determination may be based upon an Opinion of Bond Counsel); or

(k)     to modify, alter, amend or supplement this Indenture or the Agreement in any other respect, including modifications, alterations, amendments or supplements which would otherwise be described in Section 9.02 hereof, if the effective date of such modification, alteration, amendment or supplement is a date on which all Bonds affected thereby are subject to mandatory tender for purchase pursuant to Section 2.02(b) of the Multi-Mode Annex or if Notice by Mail of the proposed supplemental indenture or amendment is given to Holders of the affected Bonds at least thirty (30) days before the effective date thereof and, on or before such effective date, such Bondholders have the

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page
146 of 295

right to demand purchase of their Bonds pursuant to Section 2.02(a) of the Multi-Mode Annex.

Notwithstanding any of the provisions of Section 9.02 hereof (i) the Trustee shall not be obligated to enter into any such supplemental indenture which affects the Trustee's own rights, duties or immunities under this Indenture or otherwise; (ii) so long as no Event of Default shall have occurred and be continuing, the Trustee shall not enter into any such supplemental indenture or amendment which affects the rights or obligations of the Borrower hereunder or under the Agreement without first obtaining the written consent of the Borrower; and (iii) the Issuer shall not be obligated to enter into any such supplemental, amended or modified indenture. The Trustee will give notice of the provisions of any supplemental indenture authorized by the provisions of this Section to each Bondholder at its address as it appears on the registration books of the Registrar and to the Rating Agencies.

Section 9.02. Modification With Consent of Bondholders. With the consent of each Credit Provider, if any, the Borrower and the Holders of not less than sixty-six and two-thirds percent (66-2/3%) in aggregate principal amount of the Bonds at the time Outstanding, evidenced as provided in Section 11.07 hereof, (i) the Issuer and the Trustee may from time to time and at any time enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Indenture or of any supplemental indenture; or (ii) the Trustee may consent to an amendment to or modification of the Agreement; provided, however, that, except as provided in Section 9.01 hereof, no such amendment or modification will have the effect of extending the time for payment or reducing any amount due and payable by the Borrower pursuant to the Agreement without the consent of all the Holders of the Bonds; and that no such supplemental indenture shall (1) extend the fixed maturity of any Bond or reduce the rate of interest thereon or extend the time of payment of interest, or reduce the amount of the principal thereof, or reduce any premium payable on the redemption thereof, or change the terms of the tender and purchase thereof, without the consent of the Holder of each Bond so affected, or (2) reduce the aforesaid percentage of Holders of Bonds whose consent is required for the execution of such supplemental indenture, or permit the creation of any lien on the Revenues prior to or on a parity with the lien of this Indenture, except as permitted herein, or permit the creation of any preference of any Bondholder over any other Bondholder or deprive the Holders of the Bonds of the lien created by this Indenture upon the Revenues, without the consent of the Holders of all the Bonds then Outstanding. Nothing in this paragraph shall be construed as making necessary the approval of any Bondholder of any supplemental indenture permitted by the provisions of Section 9.01 hereof. Each Credit Provider shall be deemed to be the sole Holder of the Bonds secured by the applicable Credit Facility for purposes of any consent of Holders of the Bonds to any of the matters for which consent of the Holders is required under this Section 9.02 (other than any matters requiring the consent of the Holder of each Bond so affected or the consent of all of the Holders of the Bonds) if and for so long as such Credit Facility is in effect and no default in the payment obligations of such Credit Provider under such Credit Facility shall have occurred and be continuing.

Upon receipt by the Trustee of a request for the execution of any such supplemental indenture or amendment, and upon the filing with the Trustee of evidence of the consent of each Credit Provider, the Borrower and the Bondholders, as aforesaid, the Trustee shall join with the

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 147 of 295

Issuer in the execution of such supplemental indenture or shall consent to such amendment, unless such supplemental indenture affects the Trustee's own rights, duties or immunities under this Indenture or otherwise, in which case the Trustee may in its discretion, but shall not be obligated to, enter into such supplemental indenture.

It shall not be necessary for the consent of the Bondholders under this Section to approve the particular form of any proposed supplemental indenture or amendment, but it shall be sufficient if such consent shall approve the substance thereof.

Promptly after the execution by the parties thereto of any supplemental indenture or amendment to the Agreement as provided in this Section, the Trustee shall mail a notice (prepared by the Borrower), setting forth in general terms the substance of such supplemental indenture or such amendment, to each Bondholder at the address contained in the bond register maintained by the Registrar and to each Marketing Party and the Rating Agencies. Any failure of the Trustee to give such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such supplemental indenture or such amendment.

Section 9.03. Effect of Supplemental Indenture or Amendment. Upon the execution of any supplemental indenture or any amendment to the Agreement pursuant to the provisions of this Article IX, this Indenture or the Agreement, as the case may be, shall be and be deemed to be modified and amended in accordance therewith, and the respective rights, duties and obligations under this Indenture and the Agreement of the Issuer, the Trustee, the Borrower, each Credit Provider and all Holders of Outstanding Bonds shall thereafter be determined, exercised and enforced hereunder and under the Agreement subject in all respects to such modifications and amendments, and all the terms and conditions of any such supplemental indenture or amendment shall be part of the terms and conditions of this Indenture or the Agreement, as the case may be, for any and all purposes.

Section 9.04. Required and Permitted Opinions of Counsel. Subject to the provisions of Section 8.01 hereof, the Trustee and the Issuer may receive an Opinion of Counsel as conclusive evidence that any supplemental indenture or amendment executed pursuant to the provisions of this Article IX complies with the requirements of this Article IX. No supplemental indenture or amendment or modification executed pursuant to Sections 9.01(a), (b), (c), or (d) of the Indenture shall be effective unless the Trustee shall have received an opinion of Bond Counsel to the effect that such supplement or amendment or modification is permitted under the provisions of this Article IX. No supplemental indenture or amendment or modification to the Agreement or any other document relating to the Diablo Canyon Project or the Bonds shall be effective until the Issuer, the Trustee and each Credit Provider shall have received an Opinion of Bond Counsel to the effect that such supplemental indenture or such amendment or modification is permitted by the Act and will not adversely affect the exclusion of interest on the Bonds from gross income for federal income tax purposes.

Section 9.05. Notation of Modification on Bonds; Preparation of New Bonds. The Issuer or the Trustee may require that Bonds authenticated and delivered after the execution of any supplemental indenture pursuant to the provisions of this Article IX bear a notation, in form approved by the Trustee, as to any matter provided for in such supplemental indenture, and if such supplemental indenture shall so provide, new Bonds, so modified as to conform, in the

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page
148 of 295

opinion of the Trustee and the Issuer, to any modification of this Indenture contained in any such supplemental indenture, shall be prepared by the Issuer, authenticated by the Trustee and delivered without cost to the Holders of the Bonds then Outstanding, upon surrender for cancellation of such Bonds in equal aggregate principal amounts.

## ARTICLE X

## DEFEASANCE

Section 10.01. Discharge of Indenture. If the entire indebtedness on all Bonds Outstanding shall be paid and discharged in any one or more of the following ways:

(a)     by the payment of the principal of, and premium, if any, and interest on all Bonds Outstanding, as and when the same become due and payable; or

(b)     by the delivery to the Trustee, for cancellation by it, of all Bonds Outstanding;

and if all other sums payable hereunder by and to the Issuer shall be paid and discharged, then thereupon this Indenture shall cease, terminate and become null and void, and thereupon the Trustee shall, upon Written Request of the Issuer, and upon receipt by the Trustee of a Certificate of the Issuer and an Opinion of Bond Counsel, each stating that in the opinion of the signers all conditions precedent to the satisfaction and discharge of this Indenture have been complied with, forthwith execute proper instruments acknowledging satisfaction of and discharging this Indenture. The Trustee shall mail written notice of such payment and discharge to each Rating Agency. The satisfaction and discharge of this Indenture shall be without prejudice to the rights of the Trustee and the Issuer to charge and be reimbursed by the Borrower for any expenditures which it may thereafter incur in connection herewith.

Any Bond or Authorized Denomination thereof shall be deemed to be paid within the meaning of this Indenture when (a) payment of the principal of and premium, if any, on such Bond or Authorized Denomination thereof, plus interest thereon to the due date thereof (whether such due date is by reason of maturity or upon redemption as provided herein) either (i) shall have been made or caused to be made in accordance with the terms thereof, or (ii) shall have been provided for by irrevocably depositing with the Trustee in trust and irrevocably setting aside exclusively for such payment (1) moneys sufficient to make such payment and/or (2) nonprepayable, noncallable Government Obligations maturing as to principal and interest in such amounts and at such times as will insure the availability of sufficient moneys to make such payment, and (b) all necessary and proper and reasonable fees, compensation and expenses of the Trustee and the Issuer pertaining to any such deposit shall have been paid or the payment thereof provided for to the satisfaction of the Trustee and the Issuer; provided that no Bond shall be deemed to be paid within the meaning of this Indenture unless arrangements satisfactory to the Trustee shall have been made to assure that Bonds tendered for purchase in accordance with Section 2.02(a) or 2.02(b) of the Multi-Mode Annex can be paid and redeemed from such moneys and/or Government Obligations. At such time as a Bond or Authorized Denomination thereof shall be deemed to be paid hereunder, as aforesaid, such Bond or Authorized

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 149 of 295

Denomination thereof shall no longer be secured by or entitled to the benefits of this Indenture, except for the purposes of any such payment from such moneys or Government Obligations.

The Issuer or the Borrower may at any time surrender to the Trustee for cancellation by it any Bonds previously authenticated and delivered which the Issuer or the Borrower lawfully may have acquired in any manner whatsoever, and such Bonds, upon such surrender and cancellation, shall be deemed to be paid and retired.

Section 10.02. Discharge of Liability on Bonds. Upon the deposit with the Trustee, in trust, at or before maturity, of money or securities in the necessary amount (as provided in Section 10.04 hereof) to pay or redeem Outstanding Bonds (whether upon or prior to their maturity or the redemption date of such Bonds), provided that, if such Bonds are to be redeemed prior to the maturity thereof, notice of such redemption shall have been given as provided in Article IV of the Multi-Mode Annex or provision satisfactory to the Trustee shall have been made for giving such notice, all liability of the Issuer and the Borrower in respect of such Bonds shall cease, terminate and be completely discharged, except that the Issuer and Borrower shall remain liable for such payment but only from, and the Bondholders shall thereafter be entitled only to payment (without interest accrued thereon after such redemption date or maturity date) out of, the money deposited with the Trustee as aforesaid for their payment, subject, however, to the provisions of Sections 6.06 and 10.03 hereof; provided that no Bond shall be deemed to be paid within the meaning of this Indenture unless arrangements satisfactory to the Trustee shall have been made to assure that Bonds tendered for purchase in accordance with Section 2.02(a) or (b) of the Multi-Mode Annex can be paid and redeemed from such moneys and/or Government Obligations.

Section 10.03. Payment of Bonds after Discharge of Indenture. Notwithstanding any provisions of this Indenture, and subject to applicable laws of the State, any moneys deposited with the Trustee or any Paying Agent, in trust for the payment of the principal of, or interest or premium on, any Bonds remaining unclaimed for two years after the principal of all the Outstanding Bonds has become due and payable (whether at maturity or upon call for redemption or by declaration as provided in this Indenture), shall then be repaid to the Borrower upon its written request, and the Holders of such Bonds shall thereafter be entitled to look only to the Borrower for payment thereof, and all liability of the Issuer, the Trustee or any Paying Agent with respect to such moneys shall thereupon cease; provided, however, that before the repayment of such moneys to the Borrower as aforesaid, the Trustee or Paying Agent, as the case may be, shall (at the request and cost of the Borrower) first publish at least once in a Qualified Newspaper a notice, in such form as may be deemed appropriate by the Borrower and the Trustee, in respect of the Bonds so payable and not presented and in respect of the provisions relating to the repayment to the Borrower of the moneys held for the payment thereof. In the event of the repayment of any such moneys to the Borrower as aforesaid, the Holders of the Bonds in respect of which such moneys were deposited shall thereafter be deemed to be unsecured creditors of the Borrower for amounts equivalent to the respective amounts deposited for the payment of such Bonds and so repaid to the Borrower (without interest thereon).

Section 10.04. Deposit of Money or Securities with Trustee. Whenever in this Indenture it is provided or permitted that there be deposited with or held in trust by the Trustee money or securities in the necessary amount to pay or redeem any Bonds, the money or securities so to be

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 150 of 295

deposited or held may include money or securities held by the Trustee in the funds and accounts established pursuant to this Indenture and shall be:

    (a)    lawful money of the United States of America in an amount equal to the principal amount of such Bonds and all unpaid interest thereon to maturity, except that, in the case of Bonds which are to be redeemed prior to maturity and in respect of which notice of such redemption shall have been given as provided in Article IV the Multi-Mode Annex or provision satisfactory to the Trustee shall have been made for the giving of such notice, the amount to be deposited or held shall be the principal amount or redemption price of such Bonds and all unpaid interest thereon to the redemption date; or

    (b)    nonprepayable, noncallable Government Obligations the principal of and the interest on which when due will provide money sufficient to pay the principal or redemption price of and all unpaid interest to maturity, or to the redemption date, as the case may be, on the Bonds to be paid or redeemed, as such principal or redemption price and interest become due, provided that, in the case of Bonds which are to be redeemed prior to the maturity thereof, notice of such redemption shall have been given as provided in Article IV of the Multi-Mode Annex or provision satisfactory to the Trustee shall have been made for the giving of such notice;

provided, in each case, that the Trustee shall have been irrevocably instructed (by the terms of this Indenture or by Written Request of the Issuer) to apply such money to the payment of such principal or redemption price and interest with respect to such Bonds; provided, further, in the case of Bonds in a Daily Rate Period or a Weekly Rate Period, the rating on the Bonds, as determined in writing and furnished to the Trustee by each Rating Agency then rating the Bonds, shall be no lower than the rating on the Bonds then in effect maintained by each such Rating Agency immediately prior to the effective date of such defeasance.

## ARTICLE XI

## MISCELLANEOUS

    Section 11.01. Liability of Issuer Limited to Revenues. The Bonds do not constitute a debt or liability of the State or of any political subdivision thereof, other than the limited obligation of the Issuer, and shall be payable solely from the funds as described herein. Neither the full faith and credit nor the taxing power of the State or any political subdivision thereof or any local agency is pledged to the payment of the principal of, premium, if any, or interest on the Bonds. The Issuer has no taxing power. Notwithstanding anything in this Indenture or in the Bonds contained, the Issuer shall not be required to advance any moneys derived from any source other than the Revenues and other assets pledged under this Indenture for any of the purposes in this Indenture mentioned, whether for the payment of the principal of or interest on the Bonds or for any other purpose of this Indenture.

    Section 11.02. Successor Is Deemed Included in All References to Predecessor. Whenever in this Indenture any of the Issuer, any Credit Provider, any Liquidity Provider or the Trustee is named or referred to, such reference shall be deemed to include the successors or assigns thereof, and all the covenants and agreements in this Indenture contained by or on behalf of the Issuer, any

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 151 of 295

Credit Provider, any Liquidity Provider or the Trustee shall bind and inure to the benefit of the respective successors and assigns thereof whether so expressed or not. All the covenants, stipulations, promises and agreements in this Indenture contained, by or on behalf of the Issuer, shall bind and inure to the benefit of its successors and assigns, whether so expressed or not. If any of the powers or duties of the Issuer shall hereafter be transferred by any law of the State, and if such transfer shall relate to any matter or thing permitted or required to be done under this Indenture by the Issuer, then the body or official of the State who shall succeed to such powers or duties shall act and be obligated in the place and stead of the Issuer as in this Indenture provided.

Section 11.03. Limitation of Rights. Nothing in this Indenture or in the Bonds expressed or implied is intended or shall be construed to give to any Person other than the Issuer, the Trustee, the Borrower, any Credit Provider, any Liquidity Provider and the Holders of the Bonds issued hereunder any legal or equitable right, remedy or claim under or in respect of this Indenture or any covenant, condition or provision therein or herein contained; and all such covenants, conditions and provisions are and shall be held to be for the sole and exclusive benefit of the Issuer, the Trustee, the Borrower, each Credit Provider, each Liquidity Provider and the Holders of the Bonds issued hereunder.

Section 11.04. Waiver of Notice. Whenever in this Indenture the giving of notice by mail or otherwise is required, the giving of such notice may be waived in writing by the Person entitled to receive such notice and in any such case the giving or receipt of such notice shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

Section 11.05. Severability of Invalid Provisions. In case any one or more of the provisions contained in this Indenture or in the Bonds shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Indenture, but this Indenture shall be construed as if such invalid or illegal or unenforceable provision had never been contained herein.

Section 11.06. Notices. It shall be sufficient service of any notice, request, complaint, demand or other paper on the Issuer, the Trustee or the Borrower if the same shall be duly mailed by first class mail, postage prepaid, addressed as follows:

To the Issuer:                California Infrastructure and Economic
                              Development Bank
                              980 9th Street, Suite 900
                              Sacramento, California 95814
                              Attention: Bond Manager

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 152 of 295

<table>
<tr><td>To the Trustee:</td><td>Deutsche Bank National Trust Company<br>1761 East Street, Andrew Place<br>Santa Ana, California 92705<br>Attention: Trust & Securities Services</td></tr>
<tr><td></td><td>with a copy to:</td></tr>
<tr><td></td><td>Deutsche Bank Trust Company Americas<br>25 DeForest Avenue<br>Second Floor, MS SUM01-0105<br>Summit, New Jersey 07901<br>Attention: Trust and Securities Services (Municipal Group)</td></tr>
<tr><td>To the Borrower:</td><td>Pacific Gas and Electric Company<br>c/o PG&E Corporation<br>One Market, Spear Tower, Suite 2400<br>San Francisco, California 94105<br>Attention: Treasurer</td></tr>
</table>

A notice, request, complaint, demand or other paper to any Marketing Party shall be given by first class mail, postage prepaid, addressed to such Marketing Party at its Principal Office. The Issuer, the Trustee, the Borrower and any Credit Provider may, by notice given hereunder, designate any further or different addresses to which subsequent notices, certificates or other communications shall be sent. A duplicate copy of each notice, certificate or other communication given hereunder by the Issuer or the Trustee to the other shall also be given to the Borrower and each Credit Provider. Unless otherwise requested by the Issuer, the Trustee or the Borrower, any notice required to be given hereunder in writing may be given, except to the Issuer, by any form of telephonic or electronic transmission capable of making a written record and shall be deemed sufficiently given on the day of such telephonic or electronic transmission.

A notice relating to any of the following matters shall be sent to each Rating Agency: (a) any change in Trustee, Remarketing Agent, Paying Agent or Tender Agent, if applicable; (b) any changes to this Indenture (including without limitation the Multi-Mode Annex), the Agreement, any Remarketing Agreement, the applicable Credit Facility, if any, or the applicable Liquidity Facility, if any; (c) the expiration, termination, substitution or extension of the Credit Facility; (d) any adjustment of the Rate Period, (e) redemption or defeasance of the Bonds; (f) any mandatory tenders; (g) any acceleration; and (h) any other information that any Rating Agency may reasonably request in order to maintain the rating on the Bonds. Any notice required to be given hereunder to the Rating Agencies, as well as a duplicate copy of each notice given hereunder by the Trustee to the Holders of the Bonds, shall be given by the Trustee via first-class mail to the following two Rating Agencies at the following respective addresses (or at such different addresses as may be specified in writing to the Trustee by the respective Rating Agencies): Standard & Poor's Ratings Services, 55 Water Street, New York, New York 10041-0099, Attention: Corporate Ratings Department with a copy to Attention: Letter of Credit Group; Moody's Investors Service, 7 World Trade Center at 250 Greenwich Street, New York, New York 10007, Attention: Corporate Department. Notwithstanding the foregoing, it is expressly

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 153 of 295

understood and agreed that failure to provide any such notice to any Rating Agency pursuant to this Section or any other provision of this Indenture or the Agreement or any defect therein will not affect the validity of any action with respect to which notice is to be given or the effectiveness of any such action.

Section 11.07. Evidence of Rights of Bondholders.

(a)    Any request, consent or other instrument required by this Indenture to be signed and executed by Bondholders may be in any number of concurrent writings of substantially similar tenor and may be signed or executed by such Bondholders in person or by agent or agents duly appointed in writing.   Proof of the execution of any such request, consent or other instrument or of a writing appointing any such agent, shall be sufficient for any purpose of this Indenture and shall be conclusive in favor of the Trustee, the Registrar and the Issuer if made in the manner provided in this Section.

(b)    The fact and date of the execution by any Person of any such request, consent or other instrument or writing may be proved by the affidavit of a witness of such execution or by the certificate of any notary public or other officer of any jurisdiction, authorized by the laws thereof to take acknowledgments of deeds, certifying that the Person signing such request, consent or other instrument or writing acknowledged to him the execution thereof.

(c)    The ownership of registered Bonds shall be proved by the bond register maintained by the Registrar pursuant to Section 2.04 hereof.  The fact and the date of execution of any request, consent or other instrument may also be proved in any other manner which the Trustee may deem sufficient.  The Trustee may nevertheless, in its discretion, require further proof in cases where it may deem further proof desirable.

Any request, consent or vote of the Holder of any Bond shall bind every future Holder of the same Bond and the Holder of any Bond issued in exchange therefor or in lieu thereof, in respect of anything done or suffered to be done by the Trustee or the Issuer in pursuance of such request, consent or vote.

Section 11.08. Disqualified Bonds.  In determining whether the Holders of the requisite aggregate principal amount of Bonds have concurred in any demand, request, direction, consent or waiver under this Indenture, Bonds which are owned or held by or for the account of the Issuer or the Borrower, or by any other obligor on the Bonds, or by any Person directly or indirectly controlling or controlled by, or under direct or indirect common control with, the Issuer or the Borrower or any other obligor on the Bonds, shall be disregarded and deemed not to be Outstanding for the purpose of any such determination provided that, for the purpose of determining whether the Trustee shall be protected in relying on any such demand, request, direction, consent or waiver, only Bonds which the Trustee knows to be so owned shall be disregarded; and provided further that Bonds purchased in lieu of redemption pursuant to Section 4.06 of the Multi-Mode Annex or purchased in lieu of acceleration pursuant to Section 7.01(d) hereof shall not be so disregarded or deemed not to be Outstanding for the purpose of any such determination.  The Trustee shall not be deemed to have knowledge that any Bond is disqualified unless the Issuer or the Borrower is the registered Holder or the Trustee has received written notice of a Bond so owned or disqualified. Bonds so owned which have been pledged in good faith may be regarded as Outstanding for the

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 154 of 295

purposes of this Section if the pledgee shall establish to the satisfaction of the Trustee the pledgee's right to vote such Bonds and that the pledgee is not a Person directly or indirectly controlling or controlled by, or under direct or indirect common control with, the Issuer or the Borrower or any other obligor on the Bonds. Upon written request of the Trustee, the Issuer and the Borrower shall specify to the Trustee those Bonds disqualified pursuant to this Section of which they have actual knowledge, and the Trustee may conclusively rely on such certificates. Notwithstanding the foregoing, with respect to the Certificate of the Issuer, the Issuer shall be required to specify only those Bonds that are owned or held by or for the account of the Issuer or any Person directly or indirectly controlling or controlled by, or under direct or indirect common control with, the Issuer, if any, of which the official signing the certificate on behalf of the Issuer has actual knowledge. In case of a dispute as to such right, any decision by the Trustee taken upon the advice of counsel shall be full protection to the Trustee.

Section 11.09. Money Held for Particular Bonds. The money held by the Trustee for the payment of the interest, principal, premium or Purchase Price due on any date with respect to particular Bonds (or portions of Bonds in the case of registered Bonds redeemed or tendered in part only) shall, on and after such date and pending such payment, be set aside on its books and held by it uninvested in trust for the Holders of the Bonds entitled thereto, subject, however, to the provisions of Section 10.04 hereof.

Section 11.10. Funds and Accounts. Any fund or account required by this Indenture to be established and maintained by the Trustee may be established and maintained in the accounting records of the Trustee, either as a fund or an account, and may, for the purposes of such records, any audits thereof and any reports or statements with respect thereto, be treated either as a fund or as an account; but all such records with respect to all such funds and accounts shall at all times be maintained in accordance with corporate trust industry standards and with due regard for the requirements of Section 6.05 hereof and for the protection of the security of the Bonds and the rights of every Holder thereof. The Trustee may establish and maintain for as long as necessary one or more temporary funds or accounts under this Indenture in order to carry out the purposes set forth therein.

Section 11.11. Waiver of Personal Liability. No member, official, agent or employee of the Issuer, and no official, official agent or employee of the State or any department, board or agency of the foregoing shall be individually or personally liable for the payment of the principal of or premium or interest on the Bonds or be subject to any personal liability or accountability by reason of the issuance thereof; but nothing herein contained shall relieve any such member, official, agent or employee from the performance of any official duty provided by law or by this Indenture.

Section 11.12. Publication of Notices. Any publication of notice to be made under the provisions of this Indenture may be made in each instance upon any Business Day of the week, and, except as provided in Section 10.03 hereof, no such publication shall be required if such notice is given by first class mail to the Holders of all Bonds then Outstanding.

Section 11.13. Governing Law; Venue. This Indenture shall be construed in accordance with and governed by the Constitution and laws of the State applicable to contracts made and performed in the State. This Indenture shall be enforceable in the State, and any action arising out

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 155 of 295

of this Indenture shall be filed and maintained in the Sacramento County Superior Court, Sacramento, California, unless the Issuer waives this requirement.

Section 11.14. Execution in Several Counterparts. This Indenture may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original; and all such counterparts, or as many of them as the Issuer and the Trustee shall preserve undestroyed, shall together constitute but one and the same instrument.

Section 11.15. Authorized Borrower Representative. Whenever under the provisions of this Indenture the approval of the Borrower is required or some action is required hereunder at the request of the Borrower, such approval or such request shall be given on behalf of the Borrower by the Authorized Borrower Representative, and the Issuer and the Trustee shall be authorized to act on any such approval or request and neither party hereto shall have any complaint against the other as a result of any such action taken.

Section 11.16. Third Party Beneficiaries. To the extent that any provision of this Indenture expressly confers rights upon the Borrower (including, without limitation, rights to provide consents or directions or to give or receive notices) the parties hereto agree and acknowledge that the Borrower is a third party beneficiary of such provision and that the Borrower may enforce such provision against the other parties hereto.

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 156 of 295

IN WITNESS WHEREOF, the Issuer has caused this Indenture to be signed in its name and attested by its duly authorized officials, respectively, and the Trustee, in token of its acceptance of the trust created hereunder, has caused this Indenture to be signed in its name by its duly authorized officer, all as of the day and year first above written.

CALIFORNIA INFRASTRUCTURE AND
ECONOMIC DEVELOPMENT BANK

By _____
Stanton C. Hazelroth, Executive Director

Attest:

By: _____
Secretary

DEUTSCHE BANK NATIONAL TRUST
COMPANY, as Trustee

By _____
Authorized Officer

By _____
Authorized Officer

LA1 1628003                     S-1                     INDENTURE OF TRUST
                                                        SERIES 2009B

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 157 of 295

IN WITNESS WHEREOF, the Issuer has caused this Indenture to be signed in its name and attested by its duly authorized officials, respectively, and the Trustee, in token of its acceptance of the trust created hereunder, has caused this Indenture to be signed in its name by its duly authorized officer, all as of the day and year first above written.

CALIFORNIA INFRASTRUCTURE AND
ECONOMIC DEVELOPMENT BANK

By _____
Stanton C. Hazelroth, Executive Director

Attest:

By: _____
Secretary

DEUTSCHE BANK NATIONAL TRUST
COMPANY, as Trustee

By _____
Authorized Officer

By _____
Authorized Officer

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 158 of 295

## APPENDIX A

## FORM OF BOND

**UNLESS THIS BOND IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY REPLACEMENT BOND ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.**

$_____.00                                                            No. _____

## UNITED STATES OF AMERICA
## STATE OF CALIFORNIA
## CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK
## REFUNDING REVENUE BOND
## (PACIFIC GAS AND ELECTRIC COMPANY)
## SERIES 2009B

THIS BOND DOES NOT CONSTITUTE A DEBT OR LIABILITY OF THE STATE OF CALIFORNIA OR OF ANY POLITICAL SUBDIVISION THEREOF, OTHER THAN THE LIMITED OBLIGATION OF THE ISSUER, AND SHALL BE PAYABLE SOLELY FROM THE FUNDS AS DESCRIBED HEREIN. NEITHER THE FULL FAITH AND CREDIT NOR THE TAXING POWER OF THE STATE OF CALIFORNIA OR ANY POLITICAL SUBDIVISION THEREOF OR ANY LOCAL AGENCY IS PLEDGED TO THE PAYMENT OF THE PRINCIPAL OF OR PREMIUM, IF ANY, OR INTEREST ON THIS BOND. THE ISSUER HAS NO TAXING POWER.

| DATED DATE | INTEREST RATE | MATURITY DATE | CUSIP |
|------------|---------------|---------------|-------|
|            | Variable Rate |               |       |

REGISTERED HOLDER:     CEDE & CO.

PRINCIPAL AMOUNT:     _____ DOLLARS

CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK, an entity within the Business, Transportation and Housing Agency of the State of California (the "Issuer"), for value received, hereby promises to pay (but only out of the sources as hereinafter provided) to the registered Holder identified above or registered assigns, on the maturity date set forth above, the principal amount set forth above and to pay (but only out of the sources

hereinafter provided) interest on each Interest Payment Date (as hereinafter defined) on the balance of said principal amount from time to time remaining unpaid from and including the date hereof until payment of said principal amount has been made or duly provided for, at the rates and on the dates determined as described herein and in the Indenture (as hereinafter defined), and to pay (but only out of the sources hereinafter provided) interest on overdue principal, except as the provisions hereinafter set forth with respect to redemption, tender, or acceleration prior to maturity may become applicable hereto. The principal of and premium, if any, and interest on this Bond are payable in lawful money of the United States of America at the principal office (the "Principal Office") of Deutsche Bank National Trust Company, or its successors and assigns, as Paying Agent (the "Paying Agent"), which office is initially located at 25 DeForest Avenue, Second Floor, MS SUM01-0105, Summit, New Jersey 07901. Interest payments on this Bond shall be made by the Paying Agent to the registered Holder hereof as provided in the Indenture.

This Bond is one of a duly authorized issue of bonds of the Issuer designated as the "California Infrastructure and Economic Development Bank Refunding Revenue Bonds (Pacific Gas and Electric Company) Series 2009B" (the "Bonds"), limited in aggregate principal amount as provided in, and issued under and secured by, an Indenture of Trust, dated as of August 1, 2009 (as the same may be amended and supplemented as therein permitted, the "Indenture"), between the Issuer and Deutsche Bank National Trust Company, as trustee (the "Trustee"). Reference is hereby made to the Indenture for a description of the rights thereunder of the registered Holders of the Bonds, of the nature and extent of the security, of the rights, duties and immunities of the Trustee and of the rights and obligations of the Issuer thereunder, to all of the provisions of which Indenture the Holder of this Bond, by acceptance hereof, assents and agrees. All capitalized terms used and not otherwise defined herein shall have the meanings for such terms as are set forth in the Indenture.

The Bonds are authorized to be issued pursuant to the provisions of the Bergeson-Peace Infrastructure and Economic Development Bank Act, constituting Division 1 of Title 6.7 of the California Government Code (commencing with Section 63000), as now in effect and as it may be amended and supplemented (the "Act"). The Bonds are limited obligations of the Issuer and, as and to the extent set forth in the Indenture, are payable solely from, and secured by a pledge of and lien on, the Revenues (as that term is defined in the Indenture), consisting primarily of loan repayments made by Pacific Gas and Electric Company (the "Borrower") under the terms of a Loan Agreement, dated as of August 1, 2009 (the "Agreement"), between the Issuer and the Borrower. The Bonds are all issued under and equally and ratably secured by and entitled to the benefits of the Indenture, including the security of a pledge and assignment of the rights and privileges of the Issuer under the Agreement with respect to the Bonds, and all receipts of the Trustee credited under the provisions of the Indenture against such payments and from any other moneys held by the Trustee under the Indenture for such purpose, and there shall be no other recourse against the Issuer or any property now or hereafter owned by it.

The Borrower has caused a Credit Facility and a Liquidity Facility to be in effect, which is a letter of credit provided by Wells Fargo Bank, National Association.

The Bonds are issuable as fully registered Bonds, without coupons. During the Daily Rate Period, the Bonds are issuable in denominations of $100,000 or any integral multiple of

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 160 of 295

$5,000 in excess thereof ("Authorized Denominations"). Subject to the limitations as hereinbefore provided and upon payment of the charges, if any, provided in the Indenture, Bonds may be exchanged at the Principal Office of the Trustee for a like aggregate principal amount of Bonds of the same tenor in Authorized Denominations. The Trustee shall require the payment by the Holders requesting such exchange of any tax or other governmental charge required to be paid with respect to such exchange, and there shall be no other charge to any Holders for such exchange. Except with respect to Bonds purchased pursuant to mandatory tender for purchase, no exchange of Bonds shall be required to be made for a period of fifteen (15) days preceding the date on which the Trustee gives notice of redemption, nor shall any exchange of Bonds called for redemption be required.

Subject to the limitations as hereinbefore provided, the transfer of this Bond is registrable, upon the books of the Registrar required to be kept pursuant to the provisions of the Indenture, by the Person in whose name it is registered, in person or by his duly authorized attorney, upon surrender of such Bond for cancellation, accompanied by a written instrument of transfer in a form acceptable to the Trustee, duly executed. Upon the surrender for registration of transfer, the Issuer shall execute and the Trustee shall authenticate and deliver a new Bond or Bonds of the same tenor in Authorized Denominations. No registration of transfer of Bonds shall be required to be made for a period of fifteen (15) days preceding the date on which the Trustee gives any notice of redemption, nor shall any registration of transfer of Bonds called for redemption be required.

*Interest.* The Rate Period for the Bonds shall be a Daily Rate Period. During each Daily Rate Period, the Bonds shall bear interest at the Daily Rate, determined by the Remarketing Agent on a Business Day no later than the first day of such Daily Rate Period and on each Business Day thereafter during which there is active trading in Tax-Exempt obligations comparable to such Bonds for such Business Day. Interest on the Bonds during the Daily Rate Period shall be computed upon the basis of a 365- or 366-day year, as applicable, for the actual number of days elapsed. In no event shall the interest rate on this Bond be greater than 12% per annum or such lower maximum rate as may hereafter be imposed by law.

The Interest Payment Dates for this Bond during the Daily Rate Period shall be the first Business Day of each calendar month, any date on which there is an adjustment in a Rate Period for such Bond, and the final maturity date of such Bond.

The Rate Period for the Bonds may be adjusted to a Weekly Rate Period, Term Rate Period, Flexible Rate Period, or an Auction Rate Period, with the Bonds bearing interest at a Weekly Rate, Term Rate, Flexible Rate(s), or an Auction Rate, as provided in the Indenture. Upon an adjustment to a different Rate Period, a new bond form will be issued containing the appropriate provisions.

This Bond shall bear interest from the Interest Payment Date preceding the date of authentication hereof unless this Bond is authenticated on or after a Record Date and on or prior to the related Interest Payment Date, in which event it shall bear interest from such Interest Payment Date, or unless this Bond is registered and authenticated before the Record Date for the first Interest Payment Date, in which event this Bond shall bear interest from the date of issuance hereof; provided, however, that if, as shown by the records of the Paying Agent, interest on this

A-3

Bond shall be in default, Bonds issued in exchange for this Bond surrendered for registration of transfer or exchange shall bear interest from the last date to which interest has been paid in full or duly provided for on this Bond, or, if no interest has been paid or duly provided for on this Bond, from the date of issuance hereof. This Bond shall bear interest until final payment of the principal or redemption price hereof shall have been made or provided for in accordance with the provisions of the Indenture, whether at maturity, upon redemption or acceleration or otherwise.

REFERENCE IS MADE TO THE FURTHER PROVISIONS RELATING TO THE DETERMINATION OF THE RATE AND AMOUNT OF INTEREST ON THIS BOND SET FORTH IN THE INDENTURE, WHICH PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS THOUGH FULLY SET FORTH HEREIN.

*Redemption Upon Optional Prepayment Upon Certain Extraordinary Events.* The Bonds are subject to redemption in whole or in part, at any time, at a redemption price equal to the principal amount thereof plus accrued interest to the date of redemption upon receipt by the Trustee of written notice from the Borrower that one or more extraordinary events as provided in the Indenture has or have occurred within the preceding one year and of the Borrower's intention to exercise its option to prepay the payments due under the Agreement in whole or in part to the extent of such prepayments.

*Redemption Upon Optional Prepayment At Option of Borrower.* The Bonds during the Daily Rate Period are subject to redemption upon prepayment of the Repayment Installments at the option of the Borrower, in whole or in part by lot, prior to their maturity, on any Business Day at a redemption price equal to 100% of the principal amount thereof plus accrued interest, if any, to the date of redemption.

*Redemption Upon Mandatory Prepayment Upon Certain Extraordinary Events.* The Bonds are subject to mandatory redemption in whole on any date at a redemption price equal to the principal amount thereof plus interest accrued to the date of redemption, from amounts which are required to be prepaid by the Borrower under the Agreement (a) if, as a result of any changes in the Constitution of the State of California or in the Constitution of the United States of America or of legislative, judicial or administrative action (whether state or federal), or by final decree, judgment or order of any court or administrative body (whether state or federal) entered after the contest thereof by the Borrower in good faith, the Agreement shall have become void or unenforceable or impossible of performance in accordance with the intent and purposes of the parties as expressed in the Agreement, or shall have been declared unlawful, or (b) upon the occurrence of a Determination of Taxability; provided that if, in the Opinion of Bond Counsel delivered to the Trustee, the redemption of a specified portion of the Bonds Outstanding less than the whole thereof would have the result that interest payable on the Bonds remaining Outstanding after such redemption would not be includable for federal income tax purposes in the gross income of any Holders of a Bond (other than a Holder who is a "substantial user" of the Diablo Canyon Project or Geysers Project or a "related person" within the meaning of Section 147(a) of the Code or Section 103(b)(13) of the 1954 Code), then the Bonds shall be redeemed in part by lot (in Authorized Denominations), in such amount as Bond Counsel in such opinion shall have determined is necessary to accomplish that result.

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page
162 of 295

*Notice of Redemption.* Notice of redemption shall be given by the Trustee by first-class mail, postage prepaid, not less than fifteen (15) days nor more than sixty (60) days prior to the redemption date, to the Holder of any Bonds designated for redemption at the address shown on the registration books of the Registrar on the date such notice is mailed. Each such notice shall also state that, unless the Borrower exercises its right to purchase Bonds in lieu of redemption as provided in the Indenture and deposits with the Trustee the required funds, on said date, there will become due and payable on each of said Bonds the principal amount thereof to be redeemed, interest accrued thereon, if any, to the redemption date and the premium, if any, thereon (such premium to be specified) and shall require that such Bonds be then surrendered at the address or addresses of the Paying Agent specified in the redemption notice and that if the Borrower exercises its right to purchase Bonds in lieu of redemption as provided in the Indenture and timely deposits with the Trustee the required funds, such Bonds shall be deemed to have been purchased on the Purchase in Lieu of Redemption Date. Notwithstanding the foregoing, failure to mail the notices as prescribed in the Indenture to any Holder of any Bonds designated for redemption or to the Securities Depository or any such information service, or any defect in any notice so mailed, shall not affect the validity of the proceedings for redemption or purchase in lieu of redemption of any other Bonds and shall not extend the period for making elections or in any way change the rights of the Holders of the Bonds to elect to have their Bonds purchased as provided in the Indenture.

With respect to any notice of optional redemption of Bonds pursuant to the Indenture, unless upon the giving of such notice such Bonds shall be deemed to have been paid within the meaning of the Indenture, such notice shall state that such redemption shall be conditional upon the receipt by the Trustee on or prior to the date fixed for such redemption of amounts sufficient to pay the principal of, and premium, if any, and interest on, such Bonds to be redeemed, and that if such amounts shall not have been so received said notice shall be of no force and effect and such Bonds shall not be subject to redemption on such date. In the event that such notice of redemption contains such a condition and such amounts are not so received, the redemption shall not be made and the Trustee shall within a reasonable time thereafter give notice, to the persons and in the manner in which the notice of redemption was given, that such amounts were not so received and the redemption was not made.

With respect to any redemption upon prepayment at the option of the Borrower, any notice of redemption shall be null and void and of no further force and effect upon the receipt by the Trustee of notice from the Borrower that the Borrower will purchase all or a portion of the Bonds in lieu of redemption and upon the purchase of such Bonds pursuant to the Indenture.

Notice of redemption having been duly given as aforesaid, and moneys for payment of the redemption price being held by the Trustee, the Bonds so called for redemption shall, unless the Borrower has exercised its right to purchase Bonds in lieu of redemption as specified herein and in the Indenture, on the redemption date designated in such notice, become due and payable at the redemption price specified in such notice, interest on the Bonds so called for redemption shall cease to accrue, said Bonds shall cease to be entitled to any lien, benefit or security under the Indenture, and the Holders of said Bonds shall have no rights in respect thereof except to receive payment of the redemption price thereof.

*Purchase In Lieu of Redemption.* In the event that the Bonds are called for optional redemption pursuant to the Indenture, such Bonds, or any portion thereof, may be purchased in lieu of redemption, at the direction of the Borrower on the date on which such Bonds were to have been otherwise redeemed (the "Purchase in Lieu of Redemption Date") at the purchase price equal to 100% of the principal amount thereof, plus accrued and unpaid interest, if any, to but not including the date of purchase ("Purchase Price"). In the event the Borrower desires to purchase Bonds that have previously been called for redemption, then not less than one Business Day prior to the designated Purchase in Lieu of Redemption Date, the Borrower shall give written notice to the Issuer, the Trustee and the Tender Agent of its election to cause such purchase in lieu of redemption and its election to cause the Purchase Price of such Bonds on the Purchase in Lieu of Redemption Date to be paid either from (1) moneys realized from a draw under the applicable Liquidity Facility or (2) amounts paid by the Borrower to the Tender Agent by 11:30 a.m. (New York City time) on the Purchase in Lieu of Redemption Date in immediately available funds. If the Borrower so elects to cause the Purchase Price of such Bonds to be paid as set forth in clause (2) above but the Tender Agent shall not have received such amounts by 11:30 a.m. (New York City time) on the Purchase in Lieu of Redemption Date, the Tender Agent shall take such actions as the Tender Agent determines are necessary to receive moneys under any Liquidity Facility to pay such Purchase Price. Upon such election, the Tender Agent shall pay the Purchase Price of such Bonds on the Purchase in Lieu of Redemption Date pursuant to the payment provisions of the Indenture applicable to the tender and purchase of Bonds.

At any time the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility under the Indenture) is in effect with respect to the Bonds, if the Borrower so elects to cause the Purchase Price of such Bonds to be paid as set forth in clause (1) above, but the Tender Agent shall have not received such amounts by 2:30 p.m. (New York City time) on the Purchase in Lieu of Redemption Date, or if the Tender Agent has actual knowledge that any such instrument has been repudiated, the Tender Agent shall immediately notify the Borrower by telephone, confirmed in writing, of such insufficiency and request payment of such Purchase Price, including interest from and after the Purchase in Lieu of Redemption Date until such Purchase Price is paid in full, by 4:00 p.m. (New York City time) on the following Business Day, in immediately available funds (which need not constitute Available Moneys), and such notice shall constitute a Notice of Borrower Purchase. Bonds to be purchased but which are not delivered to the Tender Agent on the Purchase in Lieu of Redemption Date shall be deemed to have been purchased pursuant to this provision.

Bonds purchased in lieu of redemption pursuant to this provision from moneys realized from a draw under the applicable Liquidity Facility shall become Liquidity Provider Bonds and if subsequently transferred to the Borrower, shall thereafter be deemed to be purchased by the Borrower, the Borrower shall thereupon be and become the Holder of such Bonds for all purposes under the Indenture, and interest accruing on such Bonds on and after the Purchase in Lieu of Redemption Date shall be payable solely to Borrower. Bonds purchased in lieu of redemption pursuant to this provision as set forth in clause (2) in the second preceding paragraph shall be deemed to be purchased by the Borrower, the Borrower shall thereupon be and become the owner of such Bonds for all purposes under the Indenture, and interest accruing on such Bonds on and after the Purchase in Lieu of Redemption Date shall be payable solely to Borrower. Except as set forth in the preceding paragraph when the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 164 of 295

Facility under the Indenture) has been dishonored or repudiated, so long as a Liquidity Facility is in effect and has not been dishonored or repudiated, Bonds purchased in lieu of redemption to be paid as set forth in clause (1) or (2) in the second preceding paragraph shall be purchased with Available Moneys.

Upon surrender of any Bond redeemed in part only or purchased in lieu of redemption in part only, the Registrar shall exchange the Bond redeemed or purchased for a new Bond of like tenor and in an Authorized Denomination without charge to the Holder of the Bond in the principal amount of the portion of the Bond not redeemed. The Issuer and the Trustee shall be fully released and discharged from all liability to the extent of payment of the redemption price for such partial redemption.

If an Event of Default shall occur and be continuing, the principal of all Bonds then Outstanding and the interest accrued thereon may be accelerated upon the conditions, in the manner and with the effect provided in the Indenture. The Indenture provides that in certain events such acceleration and its consequences may be rescinded, including upon election of the Borrower to purchase all of the Bonds in lieu of such acceleration as described below.

*Purchase In Lieu of Acceleration.* If at any time after the principal of the Bonds shall have been so declared due and payable upon the occurrence and continuation of an Event of Default, and before the Trustee shall have made payment on the Bonds upon such acceleration and before any judgment or decree for the payment of moneys due shall have been obtained or entered as provided in the Indenture, the Borrower shall have elected to purchase all of the Bonds in lieu of such acceleration on the date set forth in the notice described below (the "Purchase In Lieu of Acceleration Date") and shall have elected to cause the Purchase Price of such Bonds on the Purchase in Lieu of Acceleration Date to be paid from either (A) moneys realized from a draw under the applicable Liquidity Facility or (B) amounts paid by the Borrower to the Tender Agent by 11:30 a.m. (New York City time) on the Purchase in Lieu of Acceleration Date in immediately available funds, as set forth in a written notice to the Issuer, Trustee, the Tender Agent and each Credit Provider, if any, and (x) in the case the Borrower has elected to cause the Purchase Price of such Bonds on the Purchase in Lieu of Acceleration Date to be paid as set forth in clause (A) above, proceeds from a drawing under the Liquidity Facility shall be on deposit in an amount equal to the Purchase Price of the Bonds then Outstanding on or prior to the Purchase in Lieu of Acceleration Date, or (y) in the case the Borrower has elected to cause the Purchase Price of such Bonds on the Purchase in Lieu of Acceleration Date to be paid as set forth in clause (B) above, the Borrower shall have paid to the Tender Agent for deposit in the Borrower Account by 11:30 a.m. (New York City time) on the Purchase in Lieu of Acceleration Date an amount equal to the Purchase Price of the Bonds then Outstanding on or prior to the Purchase in Lieu of Acceleration Date, then, and in every such case, the acceleration of the principal and accrued interest on the Bonds under the Indenture shall be automatically rescinded and annulled without further action of the Trustee and without satisfaction of any requirements under the Indenture (and interest on the Bonds from and after the date of declaration of any such acceleration to the Purchase in Lieu of Acceleration Date shall not accrue), and the Bonds shall be deemed to be purchased in lieu of acceleration on the Purchase in Lieu of Acceleration Date at the Purchase Price thereof without notice to or further act of the former Holders of such Bonds. If the Borrower so elects to cause the Purchase Price of such Bonds to be paid as set forth in clause (B) above but the Tender Agent shall not have received

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 165 of 295

such amounts by 11:30 a.m. (New York City time) on the Purchase in Lieu of Acceleration Date, the Tender Agent shall take such actions as the Tender Agent determines are necessary to receive moneys under any Liquidity Facility to pay such Purchase Price.

At any time the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility under the Indenture) is in effect with respect to the Bonds, if the Borrower so elects to cause the Purchase Price of such Bonds to be paid as set forth in clause (A) of the preceding paragraph, but the Tender Agent shall have not received such amounts by 2:30 p.m. (New York City time) on the Purchase in Lieu of Acceleration Date, or if the Tender Agent has actual knowledge that any such instrument has been repudiated, the Tender Agent shall immediately notify the Borrower by telephone, confirmed in writing, of such insufficiency and request payment of such Purchase Price, including interest from and after the Purchase in Lieu of Acceleration Date until such Purchase Price is paid in full, by 4:00 p.m. (New York City time) on the following Business Day, in immediately available funds (which need not constitute Available Moneys), and such notice shall constitute a Notice of Borrower Purchase.

So long as a Liquidity Facility is in effect, the Purchase in Lieu of Acceleration Date shall be a date no later than the Business Day following the date that principal of the Bonds has been accelerated pursuant to the Indenture. The Tender Agent shall pay the Purchase Price of such Bonds pursuant to the payment provisions of the Indenture.

Bonds to be purchased but which are not delivered to the Tender Agent on the Purchase in Lieu of Acceleration Date shall be deemed to have been purchased pursuant to this provision. Bonds purchased in lieu of acceleration pursuant to this provision from moneys provided under a Liquidity Facility, if any, shall become Liquidity Provider Bonds and if subsequently transferred to the Borrower, shall thereafter be deemed to be purchased by the Borrower, the Borrower shall thereupon be and become the Holder of such Bonds for all purposes under the Indenture, and interest accruing on such Bonds on and after the Purchase in Lieu of Acceleration Date shall be payable solely to Borrower. Bonds purchased in lieu of acceleration pursuant to this provision paid as set forth in clause (B) in the third preceding paragraph shall be deemed to be purchased by the Borrower, the Borrower shall thereupon be and become the Holder of such Bonds for all purposes under the Indenture, and interest accruing on such Bonds on and after the Purchase in Lieu of Acceleration Date shall be payable solely to Borrower. Except as set forth in the second preceding paragraph when the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility under the Indenture) has been dishonored or repudiated, so long as a Liquidity Facility is in effect and has not been dishonored or repudiated, Bonds purchased in lieu of acceleration to be paid as set forth in clause (A) or (B) above shall be purchased with Available Moneys.

*Holder's Option to Tender for Purchase.* During any Daily Rate Period, any Bond or portion thereof in an Authorized Denomination shall be purchased on any Business Day at the Purchase Price thereof upon (A) delivery to the Tender Agent at its Principal Office of an irrevocable notice by written notice or by telephone promptly confirmed by telecopy or other writing, by 11:00 a.m. New York City time on such Business Day, which states the principal amount of such Bond to be tendered for purchase on such date ("Purchase Date"), and (B) delivery of such Bond to the Tender Agent at its Principal Office, accompanied by an

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 166 of 295

instrument of transfer thereof, in a form satisfactory to the Tender Agent, executed in blank by the Holder thereof with the signature of such Holder guaranteed by a guarantor institution participating in a guarantee program acceptable to the Tender Agent, at or prior to 1:00 p.m., New York City time, on the Purchase Date. The Tender Agent shall keep a written record of the notice described in clause (A).

*Mandatory Tender For Purchase.* The Bonds during the Daily Rate Period shall be subject to mandatory tender for purchase at the Purchase Price on: (i) the effective date of any adjustment (including any automatic adjustment relating to a rescission of election to adjust a Rate Period or a failed adjustment of a Rate Period) in a Rate Period for such Bond; (ii) the Business Day preceding the termination or expiration of any Credit Facility or any Liquidity Facility with respect to such Bonds; (iii) sixty days after written notice of resignation is given by the Remarketing Agent pursuant to and under the terms, conditions and limitations set forth in the Indenture; and (iv) the Business Day preceding the providing or substitution of any Credit Facility or any Liquidity Facility with respect to the Bonds.

If moneys sufficient to pay the Purchase Price of Bonds to be purchased pursuant to the Indenture upon optional or mandatory tender for purchase shall not be held by the Tender Agent as provided in the Indenture on the Purchase Date and if the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility under the Indenture) is in effect with respect to the Bonds, it shall constitute an Event of Default under the Indenture or a Loan Default Event if the Bonds are not purchased upon tender no later than one (1) Business Day after any Purchase Date due to such insufficiency, and the Bonds shall bear interest at the rate in effect immediately prior to and on such Purchase Date, from and after the Purchase Date until such Purchase Price is paid in full.

The Trustee shall give notice by mail to the Holders of the Bonds at their addresses shown on the registration books kept by the Registrar, of any mandatory tender of Bonds, not less than fifteen (15) days prior to such required tender, which notice shall state, among other things, the date of such tender and that the Bonds are required to be tendered for purchase on such date.

No Holder of any Bond subject to mandatory tender as provided in the Indenture shall have the option to retain such Bond.

No recourse shall be had for the payment of the principal of and premium, if any, or interest on any of the Bonds or for any claim based thereon or upon any obligation, covenant or agreement in the Indenture contained, against any past, present or future member, director, officer, employee or agent of the Issuer, or through the Issuer, or any successor to the Issuer, under any rule of law or equity, statute or constitution or by the enforcement of any assessment or penalty or otherwise, and all such liability of any such member, director, officer, employee or agent as such is hereby expressly waived and released as a condition of and in consideration for the execution of the Indenture and the issuance of any of the Bonds.

The Holder of this Bond shall have no right to enforce the provisions of the Indenture or to institute action to enforce the covenants therein, or to take any action with respect to any Event of Default, or to institute, appear in or defend any suit or other proceedings with respect

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 167 of 295

thereto, except as provided in the Indenture. If an Event of Default occurs and is continuing, the principal of all Bonds then Outstanding issued under the Indenture may be declared due and payable upon the conditions and in the manner and with the effect provided in the Indenture.

The Issuer, the Trustee, the Paying Agent and any agent of the Issuer, the Trustee or Paying Agent may treat the Person in whose name this Bond is registered as the Holder hereof for the purpose of receiving payment as herein provided and for all other purposes, whether or not this Bond be overdue, and none of the Issuer, the Trustee, the Paying Agent or any such agent shall be affected by notice to the contrary.

The Indenture contains provisions permitting the Issuer and the Trustee to execute supplemental indentures amending the Indenture or consent to an amendment or modification to the Agreement under terms and conditions set forth in the Indenture, in certain cases without the consent of any holders of the Bonds.

The Indenture prescribes the manner in which it may be discharged and all liability of the Issuer and the Borrower in respect of the Bonds shall cease, terminate and be completely discharged under terms and conditions set forth in the Indenture.

No member, officer, agent or employee of the Issuer, and no officer, official, agent or employee of the State of California or any department, board or agency of the State of California shall be individually or personally liable for the payment of the principal of or premium, if any, or interest on the Bonds or be subject to any personal liability or accountability by reason of the issuance of the Bonds; but nothing contained herein or in the Indenture shall relieve any such member, officer, agent or employee from the performance of any official duty provided by law or by the Indenture.

It is hereby certified that all of the conditions, things and acts required to exist, to have happened and to have been performed precedent to and in the issuance of this Bond do exist, have happened and have been performed in due time, form and manner as required by the Act and by the Constitution and statutes of the State of California and that the amount of this Bond, together with all other indebtedness of the Issuer, does not exceed any limit prescribed by the Constitution or statutes of the State of California.

This Bond shall not be entitled to any benefit under the Indenture, or become valid or become obligatory for any purpose, until the certificate of authentication hereon endorsed shall have been signed by the Trustee.

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 168 of 295

IN WITNESS WHEREOF, the Issuer has caused this Bond to be executed in its name and on its behalf by the facsimile signature of its Executive Director, all as of the Dated Date set forth above.

CALIFORNIA INFRASTRUCTURE AND
ECONOMIC DEVELOPMENT BANK

By _____

Executive Director

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page
169 of 295

[FORM OF CERTIFICATE OF AUTHENTICATION]

This Bond is one of the Bonds described in the within-mentioned Indenture of Trust.

Date of Authentication: _____

DEUTSCHE BANK NATIONAL
TRUST COMPANY, as Trustee

By _____

Authorized Signatory

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 170 of 295

## [ABBREVIATIONS]

The following abbreviations, when used in the inscription on the face of the within bond and in the assignment below, shall be construed as though they were written out in full according to applicable laws or regulations.

TEN COM-- as tenants in common

TEN ENT-- as tenants by the entireties

JT TEN-- as joint tenants with right of survivorship and not as tenants in common

Additional abbreviations may also be used though not in the above list.

UNIF GIFT/TRAN MIN ACT-- _____ Custodian _____
                                  (Cust)                         (Minor)

Under Uniform Gifts/Transfer to Minors Act

_____

(State)

## [FORM OF ASSIGNMENT]

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers unto _____

(Please Print or Typewrite Name and Address of Assignee

and Social Security or Other Identifying Number of Assignee)

the within Bond and hereby irrevocably constitutes and appoints _____

_____

attorney to register the transfer of said Bond on the books kept for registration thereof, with full power of substitution in the premises.

Dated: _____

Signature: _____

SIGNATURE GUARANTEED:

_____

NOTICE: Signature(s) must be guaranteed by a guarantor institution participating in the Securities Transfer Agents Medallion Program or in such other guarantee program acceptable to the Trustee.

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 171 of 295

# APPENDIX B

## MULTI-MODE ANNEX

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page
172 of 295

APPENDIX B

MULTI-MODE ANNEX

Relating to

$74,275,000
California Infrastructure and Economic Development Bank
Refunding Revenue Bonds
(Pacific Gas and Electric Company)
Series 2009B

LA1 1628023

# TABLE OF CONTENTS

## ARTICLE I

## DEFINITIONS

Section 1.01. Definitions ........................................................................................... 1

## ARTICLE II

## INTEREST PROVISIONS; TENDER PROVISIONS

Section 2.01. Terms of Bonds. ................................................................................... 8
Section 2.02. Tender and Purchase of Bonds. ........................................................... 25

## ARTICLE III

## AUCTION PROVISIONS

Section 3.01. Orders by Existing Owners and Potential Owners. ............................. 39
Section 3.02. Submission of Orders by Broker-Dealers to Auction Agent. ............. 41
Section 3.03. Determination of Sufficient Clearing Bids, Winning Bid Rate and Auction Rate. ..................................................................................................................... 43
Section 3.04. Acceptance and Rejection of Submitted Bids and Submitted Sell Orders and Allocation of Bonds .......................................................................................... 45
Section 3.05. Adjustment in Auction Period or Auction Date. ................................ 47
Section 3.06. Adjustment in Percentage. .................................................................. 49
Section 3.07. Modification of Auction Procedures .................................................. 50
Section 3.08. Appointment of Auction Agent; Qualifications of Auction Agent; Resignation; Removal .............................................................................................. 50
Section 3.09. Appointment of Broker-Dealers ........................................................ 50
Section 3.10. Several Capacities ............................................................................... 51

## ARTICLE IV

## REDEMPTION OF BONDS

Section 4.01. Redemption of Bonds .......................................................................... 51
Section 4.02. Selection of Bonds for Redemption .................................................... 54
Section 4.03. Partial Redemption of Bonds .............................................................. 54
Section 4.04. Effect of Redemption ........................................................................... 55
Section 4.05. Notice of Redemption ......................................................................... 55
Section 4.06. Purchase In Lieu of Redemption. ....................................................... 56

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page
174 of 295

## ARTICLE V

## CREDIT FACILITY; LIQUIDITY FACILITY

Section 5.01. Credit Facility ................................................................................................. 58
Section 5.02. Liquidity Facility ............................................................................................. 59

## ARTICLE VI

## EVENTS OF DEFAULT

Section 6.01. Notice of Event of Default During Auction Rate Period ............................... 60

## ARTICLE VII

## PROVISIONS RELATING TO CREDIT FACILITY AND LIQUIDITY FACILITY

Section 7.01. Provisions Relating to Credit Facility and Liquidity Facility ........................ 60

This Multi-Mode Annex shall for all purposes be deemed to be a part of the Indenture to which it is attached as an Appendix.

## ARTICLE I

## DEFINITIONS

Section 1.01. Definitions. Unless otherwise defined, all terms in this Multi-Mode Annex shall have the meanings given thereto in the Indenture. In addition, the following terms as used in this Multi-Mode Annex shall have the following meanings, unless the context otherwise requires.

"Affiliate" means any Person controlled by, in control of or under common control with the Borrower; provided that no Broker-Dealer shall be deemed an Affiliate solely because a director or executive officer of such Broker-Dealer or of any person controlling, controlled by or under common control with such Broker-Dealer is also a director of the Borrower.

"Agent Member" means a member of, or a direct participant in, the Securities Depository under the Indenture.

"Auction" means each periodic implementation of the Auction Procedures with respect to the Bonds.

"Auction Agent" means any entity appointed as such in accordance with Section 3.08 hereof and an Auction Agent Agreement, and its successors and assigns.

"Auction Agent Agreement" means an agreement among the Auction Agent, the Trustee and the Borrower pursuant to which the Auction Agent agrees to follow the procedures specified in the Auction Procedures while the Bonds bear interest at an Auction Rate, as such agreement may from time to time be amended or supplemented.

"Auction Date" means with respect to each Auction Period during an Auction Rate Period, the fifth (5th) Monday of the immediately preceding Auction Period, if any; provided, however, that if such day is not a Business Day, the Auction Date with respect to such Auction Period shall be the next preceding Business Day; and provided, further, that in the case of an Auction Period nominally of less than seven days, the Auction Date in respect thereof shall be the first day of such Auction Period.

"Auction Period" means a period within an Auction Rate Period (i) during which the Bonds bear interest at a single Auction Rate and (ii) which is established as provided in Section 3.05 hereof; it being understood that

(a)    each Auction Period shall commence on, and include, (1) the first Business Day following the end of the next preceding Auction Period or (2) in the case of the first Auction Period in any Auction Rate Period, the date of the initial authentication and delivery of the Bonds or the effective date of an adjustment to an Auction Rate Period, as the case may be;

LA1 1628025

(b)     each Auction Period shall end on, and include, the date established as the last day of such Auction Period as provided in Section 3.05 hereof, whether or not such day shall be a Business Day; provided, however, that if such day shall not be immediately followed by a Business Day, then the last day of such Auction Period shall be the next succeeding day that is immediately followed by a Business Day; and

(c)     any Auction Period may consist of any number of days and shall begin on an Interest Payment Date and end no later than the final scheduled maturity date of the Bonds.

"Auction Procedures" means with respect to the Bonds during an Auction Rate Period the procedures set forth in Article III hereof.

"Auction Rate" means the interest rate on the Bonds established pursuant to Section 2.01(c)(v)(i) hereof and the Auction Procedures.

"Auction Rate Adjustment Date" means the date on which the Bonds adjust from an interest rate period other than an Auction Rate Period and begin to bear interest at an Auction Rate.

"Auction Rate Period" means each period during which an Auction Rate is in effect.

"Authorized Borrower Representative" means any person who at the time and from time to time may be designated, by written certificate furnished to the Issuer and the Trustee, as the person authorized to act on behalf of the Borrower. Such certificate shall contain the specimen signature of such person, shall be signed on behalf of the Borrower by any officer and shall designate an alternate or alternates.

"Authorized Denomination" means (i) with respect to Bonds during any Term Rate Period, $5,000 or any integral multiple thereof; (ii) with respect to Bonds during any Daily Rate Period and any Weekly Rate Period, $100,000 or any integral multiple of $5,000 in excess of $100,000; (iii) with respect to Bonds during any Flexible Rate Period, $100,000 or any integral multiple of $5,000 in excess of $100,000; and (iv) with respect to Bonds during any Auction Rate Period, $25,000 or any integral multiple thereof.

"Available Bonds" has the meaning specified in Section 3.03(a)(i) hereof.

"Available Moneys" has the meaning assigned to such term in Section 1.01 of the Indenture.

"Bid" has the meaning specified in Section 3.01(a) hereof.

"Bidder" has the meaning specified in Section 3.01(a) hereof.

"Bond Purchase Fund" has the meaning assigned to such term in Section 1.01 of the Indenture.

"Borrower Account" means the account by that name established within the Bond Purchase Fund pursuant to the Tender Agent Agreement.

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 177 of 295

"Broker-Dealer" means any entity permitted by law to perform the functions required of a Broker-Dealer set forth in the Auction Procedures (i) that is an Agent Member (or an affiliate of an Agent Member), (ii) that has been selected by the Borrower and (iii) that has entered into a Broker-Dealer Agreement with the Auction Agent that remains effective.

"Broker-Dealer Agreement" means each agreement among a Broker-Dealer, the Auction Agent and the Borrower pursuant to which such Broker-Dealer, among other things, agrees to participate in Auctions as set forth in the Auction Procedures, as from time to time amended and supplemented.

"Change of Preference Law" means any amendment to the Code or other existing statute enacted by the Congress of the United States, or the enactment by the Congress of a new statute, or the promulgation by the United States Treasury of any temporary, proposed or final regulation, after the date of the initial authentication and delivery of the Bonds which (a) changes or would change any deduction, credit or other allowance allowable in computing liability for any federal tax with respect to or (b) imposes, or would impose, reduces or would reduce, or increases or would increase any federal tax (including, but not limited to, preference or excise taxes) upon, any interest earned by any Holder of bonds the interest on which is excludible from federal gross income under Section 103 of the Code.

"Credit Provider Event of Insolvency" means the occurrence and continuance of one or more of the following events: (a) the issuance of an order of rehabilitation, liquidation or dissolution of the Credit Provider; (b) the commencement by the Credit Provider of a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect including, without limitation, the appointment of a trustee, receiver, liquidator, custodian or other similar official for itself or any substantial part of its property; (c) the consent of the Credit Provider to or the acquiescence by the Credit Provider in any case or proceeding described in the preceding clause (b) that is commenced against it; (d) the making by the Credit Provider of an assignment for the benefit of creditors; (e) the failure of the Credit Provider or the admission by the Credit Provider in writing of its inability to generally pay its debts or claims as they become due; (f) the initiation by the Credit Provider of any actions to authorize any of the foregoing; (g) the commencement of an involuntary case or other proceeding against the Credit Provider seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case remaining undismissed and unstayed for a period of 60 days; or (h) the entering of an order for relief against the Credit Provider under the federal bankruptcy laws as now or hereafter in effect.

"Daily Put Bonds" has the meaning specified in Section 2.02(a)(vi)(A) hereof.

"Daily Rate" means the variable interest rate on any Bonds established in accordance with Section 2.01(c)(i) hereof.

"Daily Rate Adjustment Date" means the date on which the Bonds begin to bear interest at a Daily Rate.

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 178 of 295

"Daily Rate Period" means each period during which a Daily Rate is in effect.

"Default Rate" means, in respect of any Auction Period, a per annum rate equal to 12% of the Reference Rate determined on the Auction Date next preceding the first day of such Auction Period; provided, however, that in no event shall the Default Rate be greater than the Maximum Rate.

"Delayed Remarketing Period" has the meaning specified in Section 2.02(c)(iv) hereof.

"Event of Default" has the meaning specified in Section 7.01(a) of the Indenture.

"Existing Owner" means (a) with respect to and for the purpose of dealing with the Auction Agent in connection with an Auction, a Person who is a Broker-Dealer listed in the records of the Auction Agent at the close of business on the Business Day immediately preceding the Auction Date for such Auction and (b) with respect to and for the purpose of dealing with a Broker-Dealer in connection with an Auction, a Person who is a beneficial owner of the Bonds in the records of the Auction Agent.

"Flexible Rate" means, with respect to any Bond, the non-variable rate associated with such Bond established in accordance with Section 2.01(c)(iv) hereof.

"Flexible Rate Adjustment Date" means the date on which the Bonds begin to bear interest at a Flexible Rate.

"Flexible Rate Period" means each period comprised of Flexible Segments during which Flexible Rates are in effect.

"Flexible Segment" means, with respect to each Bond bearing interest at a Flexible Rate, the period established in accordance with Section 2.01(c)(iv) hereof.

"Hold Order" has the meaning specified in Section 3.01(a) hereof.

"Initial Rate Period" means the Rate Period for the Bonds on the Issue Date as specified in Section 2.01(c) hereof.

"Interest Payment Date" means (a) with respect to any Daily or Weekly Rate Period, the first Business Day of each calendar month, (b) with respect to any Term Rate Period, the first day of the sixth month following the commencement of the Term Rate Period and the first day of each sixth month period thereafter, (c) with respect to any Flexible Segment, the Business Day succeeding the last day of such Flexible Segment, (d) with respect to any Bond in a Daily Rate Period, Weekly Rate Period, Term Rate Period or Flexible Segment during a Delayed Remarketing Period, in addition to any Interest Payment Date specified in clauses (a)-(c) above, the last day of the Delayed Remarketing Period, (e) any date on which there is an adjustment in (or with respect to any Bond in a Term Rate Period, a continuation of) a Rate Period for such Bond, (f) with respect to any Auction Rate Period, the Business Day following each Auction Date, and (g) the final maturity date of such Bond.

"Interest Period" shall mean the period from and including any Interest Payment Date to and including the day immediately preceding the next following Interest Payment Date, except that the first Interest Period shall be the period from and including the date of the first authentication and delivery of the Bonds to and including the day immediately preceding the first Interest Payment Date relating to such Bonds.

"Liquidity Facility Purchase Account" means the account by that name established within the Bond Purchase Fund pursuant to the Tender Agent Agreement.

"Liquidity Provider Bonds" means any Bonds purchased with payments made under a Liquidity Facility and registered in the name of, or as otherwise directed by, any Liquidity Provider and delivered to or upon the order of, or as otherwise directed by, any Liquidity Provider as provided in Section 2.02(d) hereof.

"Liquidity Provider Event of Insolvency" means the occurrence and continuance of one or more of the following events: (a) the issuance of an order of rehabilitation, liquidation or dissolution of the Liquidity Provider; (b) the commencement by the Liquidity Provider of a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect including, without limitation, the appointment of a trustee, receiver, liquidator, custodian or other similar official for itself or any substantial part of its property; (c) the consent of the Liquidity Provider to or the acquiescence by the Liquidity Provider in any case or proceeding described in the preceding clause (b) that is commenced against it; (d) the making by the Liquidity Provider of an assignment for the benefit of creditors; (e) the failure of the Liquidity Provider or the admission by the Liquidity Provider in writing of its inability to generally pay its debts or claims as they become due; (f) the initiation by the Liquidity Provider of any actions to authorize any of the foregoing; (g) the commencement of an involuntary case or other proceeding against the Liquidity Provider seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case remaining undismissed and unstayed for a period of 60 days; or (h) the entering of an order for relief against the Liquidity Provider under the federal bankruptcy laws as now or hereafter in effect.

"Mandatory Put Bonds" has the meaning specified in Section 2.02(b)(vi)(A) hereof.

"Maximum Rate" means 12% per annum or such lower maximum rate as may hereafter be imposed by law.

"Minimum Auction Rate" means, as of any date of determination, 55% of the Reference Rate.

"New Purchasers" has the meaning specified in Section 2.02(a)(vi)(B) hereof.

"Notice of Borrower Purchase" means a notice given by the Tender Agent to the Borrower (i) pursuant to Sections 2.02(a)(vi)(C) or (D), 2.02(a)(vii)(C) or (D), 2.02(b)(vi)(C) or (D) hereof indicating that the Remarketing Agent has remarketed less than all of the Bonds to be purchased on such Purchase Date and as a result, amounts on deposit in the Bond Purchase Fund are

insufficient to pay the Purchase Price of the Bonds to be purchased on such Purchase Date, (ii) pursuant to Section 4.06 hereof indicating that the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility under the Indenture) is in effect with respect to the Bonds and the Borrower has exercised its right to purchase Bonds in lieu of redemption pursuant to Section 4.06 of the Multi-Mode Annex and has elected to cause the Purchase Price of such Bonds on the Purchase in Lieu of Redemption Date to be paid from moneys realized under the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility under the Indenture), and the amounts on deposit in the Bond Purchase Fund are insufficient to pay the Purchase Price of any Bonds tendered for purchase on such Purchase in Lieu of Redemption Date or (iii) pursuant to Section 7.01(d) of the Indenture indicating that the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility under the Indenture) is in effect with respect to the Bonds and the Borrower has exercised its right to purchase Bonds in lieu of acceleration pursuant to Section 7.01(d) of the Indenture and has elected to cause the Purchase Price of such Bonds on the Purchase in Lieu of Acceleration Date to be paid from moneys realized under the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility under the Indenture), and the amounts on deposit in the Bond Purchase Fund are insufficient to pay the Purchase Price of any Bonds tendered for purchase on such Purchase in Lieu of Acceleration Date, and in each case, specifying the principal amount and Purchase Price of such Bonds not so remarketed including interest from and after the Purchase Date, Purchase in Lieu of Redemption Date or Purchase in Lieu of Acceleration Date, as applicable, until such Purchase Price is to be paid in full on the following Business Day.

"Order" has the meaning specified in Section 3.01(a) hereof.

"Potential Owner" means any Person, including any Existing Owner, who may be interested in acquiring a beneficial interest in the Bonds in addition to the Bonds currently owned by such Person, if any.

"Purchase Date" means any date on which any Bond is required to be purchased pursuant to Section 2.02(a) or (b) hereof, purchased in lieu of redemption pursuant to Section 4.06 hereof or purchased in lieu of acceleration pursuant to Section 7.01(d) of the Indenture.

"Purchase in Lieu of Redemption Date" means the date on which Bonds are purchased in lieu of redemption in accordance with Section 4.06 hereof, which shall be the date on which such Bonds were to have been otherwise redeemed in accordance with the provisions of Article IV of this Multi-Mode Annex.

"Purchase Price" means (i) an amount equal to 100% of the principal amount of any Bond (or the portion thereof) purchased or deemed purchased by the Tender Agent pursuant to Section 2.02(a), 2.02(b) or 4.06 hereof, plus accrued and unpaid interest thereon to but not including the date of purchase, if any, and plus, with respect to any Bond (or portion thereof) in a Term Rate Period tendered to the Trustee for purchase pursuant to Section 2.02(b) hereof, an amount equal to any premium which would have been payable on such day had the Borrower directed redemption of such Bond pursuant to Section 4.01(a)(2)(iv) hereof, if any and (ii) an amount equal to 100% of the principal amount of any Bond purchased or deemed purchased by

the Tender Agent pursuant to Section 7.01(d) of the Indenture, plus accrued and unpaid interest thereon to but not including the date of acceleration, if any.

"Rate Period" means any Auction Rate Period, Daily Rate Period, Weekly Rate Period, Flexible Rate Period or Term Rate Period.

"Record Date" means (a) with respect to any Interest Payment Date in respect of any Daily Rate Period, Weekly Rate Period, Auction Rate Period or Flexible Segment, the Business Day preceding such Interest Payment Date; and (b) with respect to any Interest Payment Date in respect of any Term Rate Period, the fifteenth day of the month preceding such Interest Payment Date.

"Reference Rate" means, as of any date of determination with respect to Bonds in any Auction Period of 35 days or less the greater of (a) the offered rate for deposits in U.S. dollars for a one-month period (LIBOR) which appears on the MoneyLine Telerate Page 3750 at approximately 11:00 A.M., London time, on such date, or if such date is not a date on which dealings in U.S. dollars are transacted in the London interbank market, then on the next preceding day on which such dealings were transacted in such market, or (b) the SIFMA Index at approximately 9:30 a.m., New York City time, on such date. The Reference Rate with respect to Bonds in any Auction Period of more than 35 days shall be the rate on Treasury securities having a maturity which most closely approximates the length of the Auction Period, as last published in *The Wall Street Journal*. If either rate is unavailable, the Reference Rate shall be an index or rate agreed to by all Broker-Dealers and consented to by the Borrower.

"Remarketing Account" means the account by that name established within the Bond Purchase Fund pursuant to the Tender Agent Agreement.

"Sell Order" has the meaning specified in Section 3.01(a) hereof.

"SIFMA" means the Security Industry and Financial Markets Association, its successors and assigns.

"SIFMA Index" means the "SIFMA Municipal Swap Index" (such index previously known as the "BMA Municipal Swap Index") announced by Municipal Market Data from time to time and based upon the weekly interest rate resets of tax-exempt variable rate issues included in a database maintained by Municipal Market Data which meets specified criteria established by the SIFMA. The SIFMA Index shall be based upon current yields of high-quality weekly adjustable variable rate demand bonds which are subject to tender upon seven days' notice, the interest on which is tax-exempt and not subject to any personal "alternative minimum tax" or similar tax under the Code unless all tax-exempt securities are subject to such tax.

"Standard Auction Period" initially means an Auction Period of 35 days, unless the length of the Standard Auction Period shall be changed pursuant to Section 3.05 hereof, all subject, however, to the provisions contained in the definition of the term Auction Period.

"Standing Payment Instructions" has the meaning specified in Section 2.02(a)(vi)(A) hereof.

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 182 of 295

"Submission Deadline" means 1:00 p.m., New York City time, on any Auction Date or such other time on any Auction Date by which Broker-Dealers are required to submit Orders to the Auction Agent as specified by the Auction Agent from time to time.

"Submitted Bid" has the meaning specified in Section 3.03(a) hereof.

"Submitted Hold Order" has the meaning specified in Section 3.03(a) hereof.

"Submitted Order" has the meaning specified in Section 3.03(a) hereof.

"Submitted Sell Order" has the meaning specified in Section 3.03(a) hereof.

"Sufficient Clearing Bids" has the meaning specified in Section 3.03(a)(ii) hereof.

"Term Rate" means a non-variable interest rate on any Bonds established in accordance with Section 2.01(c)(iii) hereof.

"Term Rate Adjustment Date" means the date on which the Bonds begin to bear interest at a Term Rate.

"Term Rate Period" means each period during which a Term Rate is in effect.

"Weekly Put Bonds" has the meaning specified in Section 2.02(a)(vii)(A) hereof.

"Weekly Rate" means the variable interest rate on any Bonds established in accordance with Section 2.01(c)(ii) hereof.

"Weekly Rate Adjustment Date" means the date on which the Bonds begin to bear interest at a Weekly Rate.

"Weekly Rate Period" means each period during which a Weekly Rate is in effect.

"Winning Bid Rate" has the meaning specified in Section 3.03(a)(iii) hereof.

## ARTICLE II

## INTEREST PROVISIONS; TENDER PROVISIONS

Section 2.01. Terms of Bonds.

(a)     General. Each Bond shall bear interest from the Interest Payment Date preceding the date of authentication thereof unless it is authenticated on or after a Record Date and on or prior to the related Interest Payment Date, in which event it shall bear interest from such Interest Payment Date, or unless it is authenticated before the Record Date for the first Interest Payment Date, in which event they shall bear interest from the Issue Date; provided, however, that if, as shown by the records of the Paying Agent, interest on the Bonds shall be in default, Bonds issued in exchange for Bonds surrendered for registration of transfer or exchange shall bear interest from the last date to which interest has been paid in full or duly provided for on the Bonds, or, if no interest has been paid or duly provided for on the Bonds, from the Issue Date. Interest on the

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page
183 of 295

Bonds with respect to the immediately preceding Interest Period shall be paid as provided below, provided that if any Interest Payment Date is not a Business Day, such interest shall be mailed or wired pursuant to this Section 2.01 on the next succeeding Business Day, with the same effect as if made on the day such payment was due. The Bonds shall bear interest until maturity thereof or earlier redemption or acceleration thereof. Payment of the interest on any Bond shall be made to the person appearing on the bond register of the Registrar as the Holder thereof as of the close of business on the Record Date, such interest to be paid by the Paying Agent to such Holder in respect of Bonds which are then held in book-entry form as provided in Section 2.01(d) of the Indenture, in immediately available funds, and otherwise (i) by check mailed by first class mail on the Interest Payment Date, to such Holder's address as it appears on the registration books of the Registrar on Record Date or (ii) during any Rate Period other than a Term Rate Period in immediately available funds, but in respect of any Holder of Bonds in a Daily Rate Period or a Weekly Rate Period only, which Holder owns Bonds in an aggregate principal amount of at least $1,000,000 on the Record Date, by wire transfer to an account in the United States or deposit to the account of the Holder if such account is maintained with the Paying Agent, according to the instructions given by such Holder to the Paying Agent or, if no such instructions have been provided at least 10 days prior to the Record Date, by check mailed by first class mail to the Holder at such Holder's address as it appears as of the Record Date on the registration books of the Registrar; except, in each case, that, if and to the extent that there shall be a default in the payment of the interest due on such Interest Payment Date, such defaulted interest shall be paid to the Holders in whose respective names any such Bonds are registered as of a special record date to be fixed by the Trustee, notice of which shall be given by first-class mail to such Holders not less than 10 days prior thereto. Both the principal of and premium, if any, on the Bonds shall be payable upon surrender thereof in lawful money of the United States of America at the Principal Office of the Paying Agent. Notwithstanding the foregoing, interest on any Bond bearing a Flexible Rate (except any such Bond held in book-entry form as provided in Section 2.01(d) of the Indenture) shall be paid only upon presentation to the Tender Agent of the Bond on which such payment is due.

(b)     Interest Rates and Rate Periods. During any Rate Period other than an Auction Rate Period or a Term Rate Period, interest on the affected Bonds shall be computed upon the basis of a 365- or 366-day year, as applicable, for the actual number of days elapsed. During any Term Rate Period, interest on the affected Bonds shall be computed upon the basis of a 360-day year, consisting of twelve 30-day months. During any Auction Rate Period, interest on the affected Bonds shall be computed upon the basis of a 360-day year for the actual number of days elapsed. The Bonds shall bear interest for the periods and at the rates set forth in this Section. Except as provided in Section 2.01(c)(iv)(D)(2) hereof, all of the Bonds of a Series must have the same Rate Period at the same time. Liquidity Provider Bonds shall bear interest for the periods and at the rates set forth in the applicable Liquidity Agreement. The Trustee hereby agrees to give telephonic notice to the Borrower on each Record Date of the amount of interest to be due and payable on the next succeeding Interest Payment Date.

(c)     Rate Periods; Initial Rate Period. The term of the Bonds shall be divided into consecutive Rate Periods during which such Bonds shall bear interest at the Auction Rate, Daily Rate, Weekly Rate, Flexible Rate(s) or Term Rate; provided, however, that, to the extent transitioned to the succeeding Rate Period in accordance with Section 2.01(c)(iv)(D)(2) hereof, a portion of the Bonds may bear interest at a Daily Rate, a Weekly Rate or a Term Rate while

Case: 19-30088     Doc# 5252-2     Filed: 01/02/20     Entered: 01/02/20 21:06:44     Page
184 of 295

other Bonds continue to bear interest at Flexible Rates. The Initial Rate Period for the Bonds shall be a Daily Rate Period. The initial Interest Payment Date and the initial interest rate for the Initial Rate Period, as established by the Underwriters, shall be set forth in the Issuance Certificate.

    (i)   <u>Daily Rate</u>.

    (A)   <u>Determination of Daily Rate</u>. During each Daily Rate Period, the Bonds shall bear interest at the Daily Rate, determined by the Remarketing Agent on a Business Day (or on the preceding Business Day for any day that is not a Business Day) during which there shall be active trading in Tax-Exempt obligations comparable to such Bonds for such Business Day. The Daily Rate shall be the rate determined by the Remarketing Agent (based on the examination of Tax-Exempt obligations comparable to the Bonds known by the Remarketing Agent to have been priced or traded under then prevailing market conditions) to be the lowest rate which would enable the Remarketing Agent to sell the Bonds on the effective date of such rate at a price (without regard to accrued interest) equal to 100% of the principal amount thereof. If the Remarketing Agent shall not have determined a Daily Rate for any day, the Daily Rate shall be the same as the Daily Rate for the immediately preceding day. In no event shall the Daily Rate be greater than the Maximum Rate. Upon determination of each Daily Rate, the Remarketing Agent shall provide notice to the Trustee and the Tender Agent of such Daily Rate. If a Daily Rate for the first day of such Daily Rate Period is not determined by the Remarketing Agent, the Daily Rate for the first day of such Daily Rate Period shall be one hundred twenty percent (120%) of the most recent SIFMA Index theretofore published in The Bond Buyer or, in the event that such SIFMA Index is not published or is otherwise unavailable, one hundred twenty percent (120%) of such other comparable index as selected by the Borrower, and such Daily Rate shall be communicated to the Trustee and Paying Agent by or on behalf of the Borrower.

    (B)   <u>Adjustment to Daily Rate</u>. Subject to Section 2.01(c)(ix), at any time (subject to the provisions of (1)(b) of this paragraph), the Borrower, by written notice to the Issuer, the Trustee, the Paying Agent and each Marketing Party, may elect that the Bonds shall bear interest at a Daily Rate. Such notice (1) shall specify the effective date of such adjustment to a Daily Rate, which shall be (a) a Business Day not earlier than 15 days (30 days if the then current Rate Period shall be a Term Rate Period) following the third Business Day after the date of receipt by the Trustee and the Paying Agent of such notice (or such shorter period after the date of such receipt as shall be acceptable to the Trustee and the Paying Agent); (b) additionally in the case of an adjustment from a Term Rate Period, a day on which the Bonds would be permitted to be redeemed at the option of the Borrower pursuant to Section 4.01(a)(2)(iv) hereof or the day immediately following the last day of the then current Term Rate Period; (c) additionally in the case of an adjustment from an Auction Rate Period, the day immediately following the end of the then current Auction Rate Period; and (d) additionally in the case of an adjustment from a Flexible Rate Period, either

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 185 of 295

(i) the day immediately following the last day of the then current Flexible Rate Period as determined in accordance with Section 2.01(c)(iv)(D)(1) hereof, or (ii) the day immediately following the last day of the last Flexible Segment for such Bond in the then current Flexible Rate Period as determined in accordance with Section 2.01(c)(iv)(D)(2) hereof; provided, however, that if prior to the Borrower's making such election, any Bonds shall have been called for redemption and such redemption shall not have theretofore been effected, the effective date of such Daily Rate Period for the Bonds shall not precede such redemption date; and (2) if the adjustment is from a Term Rate Period, shall be accompanied by an Opinion of Bond Counsel to the effect that such adjustment (a) is authorized or permitted by the Indenture and the Act, and (b) will not adversely affect the Tax-Exempt status of the interest on the Bonds. If required by any Credit Provider, a Liquidity Facility meeting the requirements of Section 5.02 hereof shall be in effect on the Daily Rate Adjustment Date.

(C)     Notice of Adjustment to Daily Rate. The Trustee shall give notice by mail of an adjustment to a Daily Rate Period to the Holders of the affected Bonds, the Issuer, the Paying Agent and the Remarketing Agent not less than 15 days (30 days if the then current Rate Period shall be a Term Rate Period) prior to the effective date of such Daily Rate Period. Such notice shall state (1) that the interest rate on such Bonds will be adjusted to a Daily Rate, (2) the effective date of the Daily Rate Period, (3) that such Bonds are subject to mandatory tender for purchase on such effective date, (4) the procedures for such mandatory tender, and (5) that the Holders of such Bonds do not have the right to retain their Bonds on such effective date. Notwithstanding the foregoing, following a failed remarketing as described in Section 2.02(c)(v), such notice shall be reduced to five Business Days prior to the effective date of a new Rate Period as provided in such section.

(ii)     Weekly Rate.

(A)     Determination of Weekly Rate. During each Weekly Rate Period, the Bonds shall bear interest at the Weekly Rate, determined by the Remarketing Agent on a Business Day no later than the first day of such Weekly Rate Period and thereafter no later than Tuesday of each week during such Weekly Rate Period (or on the Business Day preceding such Tuesday for any such Tuesday that is not a Business Day) during which there shall be active trading in Tax-Exempt obligations comparable to such Bonds for such Business Day. The Weekly Rate shall be the rate determined by the Remarketing Agent (based on the examination of Tax-Exempt obligations comparable to the Bonds known by such Remarketing Agent to have been priced or traded under then prevailing market conditions) to be the lowest rate which would enable the Remarketing Agent to sell such Bonds on the effective date of such rate at a price (without regarding accrued interest) equal to 100% of the principal amount thereof. If the Remarketing Agent shall not have determined a Weekly Rate for any period, the Weekly Rate shall be the same as the immediately preceding Weekly Rate. In no event shall any Weekly Rate be greater than the Maximum Rate. The first Weekly Rate determined for

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 186 of 295

each Weekly Rate Period shall apply to the period commencing on the first day of such Rate Period and ending on the succeeding Tuesday. Thereafter, each Weekly Rate shall apply to the period commencing on each Wednesday and ending on the succeeding Tuesday, unless such Weekly Rate Period shall end (including without limitation upon the final maturity date of the Bonds) on a day other than Tuesday, in which event the last Weekly Rate for such Weekly Rate Period shall apply to the period commencing on the Wednesday preceding the last day of such Weekly Rate Period and ending on such last day. Upon determination of each Weekly Rate, the Remarketing Agent shall provide notice to the Trustee and the Tender Agent of such Weekly Rate. If a Weekly Rate for the first week of such Weekly Rate Period is not determined by the Remarketing Agent, the Weekly Rate for the first week of such Weekly Rate Period shall be one hundred twenty percent (120%) of the most recent SIFMA Index theretofore published in The Bond Buyer or, in the event that such SIFMA Index is not published or is otherwise unavailable, one hundred twenty percent (120%) of such other comparable index as selected by the Borrower, and such Weekly Rate shall be communicated to the Trustee and Paying Agent by or on behalf of the Borrower.

(B)    Adjustment to Weekly Rate. Subject to Section 2.01(c)(ix), the Borrower, by written notice to the Issuer, the Trustee, the Paying Agent, the Credit Provider, if any, and the Liquidity Provider, if any, and each Marketing Party, may at any time (subject to the provisions of (1)(b) of this paragraph) elect that the Bonds shall bear interest at a Weekly Rate. Such notice (1) shall specify the effective date of such adjustment to a Weekly Rate, which shall be (a) a Business Day not earlier than 15 days (30 days if the then current Rate Period shall be a Term Rate Period) following the third Business Day after the date of receipt by the Trustee and the Paying Agent of such notice (or such shorter period after the date of such receipt as shall be acceptable to the Trustee and the Paying Agent); (b) additionally in the case of an adjustment from a Term Rate Period, a day on which the Bonds would be permitted to be redeemed at the option of the Borrower pursuant to Section 4.01(a)(2)(iv) hereof or the day immediately following the last day of the then current Term Rate Period; (c) additionally in the case of an adjustment from an Auction Rate Period, the day immediately following the end of the then current Auction Rate Period; and (d) additionally in the case of an adjustment from a Flexible Rate Period either (i) the day immediately following the last day of the then current Flexible Rate Period as determined in accordance with Section 2.01(c)(iv)(D)(1) hereof, or (ii) the day immediately following the last day of the last Flexible Segment for such Bond in the then current Flexible Rate Period as determined in accordance with Section 2.01(c)(iv)(D)(2) hereof; provided, however, that if prior to the Borrower's making such election, any Bonds shall have been called for redemption and such redemption shall not have theretofore been effected, the effective date of such Weekly Rate Period for all Bonds shall not precede such redemption date; and (2) if the adjustment is from a Term Rate Period shall be accompanied by an Opinion of Bond Counsel to the effect that such adjustment (a) is authorized or permitted by the Indenture and the Act, and (b) will not

adversely affect the Tax-Exempt status of interest on the Bonds. If required by any Credit Provider, a Liquidity Facility meeting the requirements of Section 5.02 hereof shall be in effect on the Weekly Rate Adjustment Date.

(C)    Notice of Adjustment to Weekly Rate.  The Trustee shall give notice by mail of an adjustment to a Weekly Rate Period to the Holders of the affected Bonds, the Issuer, the Paying Agent and the Remarketing Agent not less than 15 days (30 days if the then current Rate Period shall be a Term Rate Period) prior to the effective date of such Weekly Rate Period.  Such notice shall state (1) that the interest rate on such Bonds will be adjusted to a Weekly Rate, (2) the effective date of such Weekly Rate Period, (3) that such Bonds are subject to mandatory tender for purchase on such effective date, (4) the procedures for such mandatory tender, and (5) that the Holders of such Bonds do not have the right to retain their Bonds on such effective date.  Notwithstanding the foregoing, following a failed remarketing as described in Section 2.02(c)(v), such notice shall be reduced to five Business Days prior to the effective date of a new Rate Period as provided in such section.

(iii)    Term Rate.

(A)    Determination of Term Rate.  During each Term Rate Period applicable to the Bonds, the Bonds shall bear interest at the Term Rate, which shall be determined by the Remarketing Agent on a Business Day selected by the Remarketing Agent during which there shall be active trading in Tax-Exempt obligations comparable to such Bonds for such Business Day, but not more than 30 days prior to and not later than 12:00 noon (New York City time) on the Business Day prior to the Term Rate Period Adjustment Date.  The Term Rate shall be the rate determined by the Remarketing Agent on such date, and communicated not later than 5:00 p.m., New York City time, on such date to the Trustee, the Paying Agent and the Borrower, by written notice or by telephone promptly confirmed by telecopy or other writing, as being the lowest rate (based on the examination of Tax-Exempt obligations comparable to the Bonds known by the Remarketing Agent to have been priced or traded under then prevailing market conditions) which would enable the Remarketing Agent to sell the Bonds on the effective date of such Term Rate Period at a price (without regard to accrued interest) equal to 100% of the principal amount thereof.  In no event shall any Term Rate be greater than the Maximum Rate.  Upon determination of each Term Rate, the Remarketing Agent shall provide notice to the Trustee and the Tender Agent of such Term Rate.  If a Term Rate for a Term Rate Period is not determined by the Remarketing Agent, the Term Rate for such Term Rate Period shall be determined as set forth in Section 2.01(c)(viii)(B) hereof.

(B)    Adjustment to or Continuation of Term Rate.  Subject to Section 2.01(c)(ix), at any time (subject to the provisions of (2) of this paragraph), the Borrower, by written notice to the Issuer, the Trustee, the Paying Agent and each Marketing Party, may elect that the Bonds bearing interest at a Daily Rate, Weekly Rate, Flexible Rate, Term Rate or Auction Rate shall bear or continue to

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 188 of 295

bear interest at a Term Rate. Such notice shall specify the effective date of each Term Rate Period, which shall be (1) a Business Day not earlier than 15 days (30 days if the then current Rate Period is a Term Rate Period) following the seventh Business Day after the date of receipt by the Trustee and the Paying Agent of such notice (or such shorter period after the date of such receipt as shall be acceptable to the Trustee and the Paying Agent); (2) additionally in the case of a continuation of a Term Rate Period, a day on which the Bonds would be permitted to be redeemed at the option of the Borrower pursuant to Section 4.01(a)(2)(iv) hereof or the day immediately following the last day of the then current Term Rate Period; (3) additionally in the case of an adjustment from an Auction Rate Period, the day immediately following the end of the then current Auction Rate Period; and (4) additionally in the case of an adjustment from a Flexible Rate Period either (i) the day immediately following the last day of the then current Flexible Rate Period as determined in accordance with Section 2.01(c)(iv)(D)(1) hereof, or (ii) for each Bond, the day immediately following the last day of the last Flexible Segment for such Bond in the then current Flexible Rate Period as determined in accordance with Section 2.01(c)(iv)(D)(2) hereof; provided, however, that if prior to the Borrower's making such election, any Bonds shall have been called for redemption and such redemption shall not have theretofore been effected, the effective date of such Term Rate Period for all Bonds shall not precede such redemption date. If required by any Credit Provider, a Liquidity Facility meeting the requirements of Section 5.02 hereof shall be in effect on the Term Rate Adjustment Date.

On or before the Business Day preceding the effective date specified in the Borrower's notice of an adjustment to or continuation of a Term Rate Period, the Borrower shall give written notice to the Issuer, the Trustee, the Paying Agent and each Marketing Party, which notice (1) shall specify the last day of such Term Rate Period, (2) may specify two or more consecutive Term Rate Periods and the duration of each such Term Rate Period, (3) may elect that such Term Rate Period shall be automatically renewed for successive Term Rate Periods each having the same duration as the Term Rate Period so specified; provided, however that if the last day of any such successive Term Rate Period shall not be a day immediately preceding a Business Day, then such successive Term Rate Period shall end on the first day immediately preceding the Business Day succeeding such day, or if such day would be after the day preceding the final maturity date of such Bonds, such succeeding Term Rate Period shall end on the day preceding the final maturity date of the Bonds; and provided, further, that such election must be accompanied by an Opinion of Bond Counsel to the effect that such continuing automatic renewals of such Term Rate Period (a) are authorized or permitted by the Indenture and the Act, and (b) will not adversely affect the Tax-Exempt status of interest on the Bonds, and (4) subject to the provisions of Section 4.01(a)(4) hereof, may specify for such Term Rate Period(s) optional redemption provisions, prices and periods different from those set out in Section 4.01(a) hereof.

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 189 of 295

Unless a Term Rate Period immediately succeeds a Term Rate Period of the same duration and is subject to the same optional redemption rights under Section 4.01(a)(2)(iv) hereof as the preceding Term Rate Period, the notice described in the immediately preceding paragraph shall be accompanied by an Opinion of Bond Counsel to the effect that the adjustment to such Term Rate Period (a) is authorized or permitted by the Indenture and the Act, and (b) will not adversely affect the Tax-Exempt status of interest on the Bonds. If the Borrower elects automatic renewals of the Term Rate Period as described in clause (3) of the immediately preceding paragraph, no Opinion of Bond Counsel shall be required in connection with the commencement of each successive Term Rate Period determined in accordance with such election.

(C)    Notice of Adjustment to or Continuation of Term Rate.    The Trustee shall give notice by mail of an adjustment to or continuation of a Term Rate Period to the Holders of the affected Bonds, the Issuer, the Paying Agent and each Marketing Party not less than 15 days (30 days if the then current Rate Period is a Term Rate Period) prior to the effective date of such Term Rate Period. Such notice shall state (1) that the interest rate on such Bonds will be adjusted to, or continue to be, a Term Rate, (2) the effective date of the Term Rate Period, (3) that such Bonds shall be subject to mandatory tender for purchase on such effective date, (4) the procedures for such mandatory tender, and (5) that the Holders of such Bonds do not have the right to retain their Bonds on such effective date. Notwithstanding the foregoing, following a failed remarketing as described in Section 2.02(c)(v), such notice shall be reduced to five Business Days prior to the effective date of a new Rate Period as provided in such section.

(iv)    Flexible Rate.

(A)    Determination of Flexible Segments and Flexible Rates.    During each Flexible Rate Period applicable to the Bonds, the Bonds shall bear interest during each Flexible Segment for such Bond at the Flexible Rate for such Bond as described herein. Each Flexible Segment and Flexible Rate for each Bond shall be the Flexible Segment and Flexible Rate determined by the Remarketing Agent by agreement with the purchaser of such Bond. Each Flexible Segment for any Bond shall be a period, of not less than one nor more than 270 days, determined by the Remarketing Agent to be, in its judgment, the period which, together with all other Flexible Segments for all Bonds then Outstanding, is likely to result in the lowest overall net interest expense on the Bonds; provided, however, that any such Bond purchased on behalf of the Borrower and remaining unsold in the hands of the Remarketing Agent as of the close of business on the effective date of the Flexible Segment for such Bond shall have a Flexible Segment of one day or, if such Flexible Segment would not end on a day immediately preceding a Business Day, a Flexible Segment of more than one day ending on the day immediately preceding the next Business Day; provided, further, however, that (1) each Flexible Segment shall end on a day which immediately precedes a Business Day and no Flexible Segment shall extend beyond the day preceding the final maturity date of the Bonds, and (2) if for any reason the Remarketing Agent

fails or is unable to determine a Flexible Segment on any Bond, the Flexible Segment for such Bond shall be one day, unless such Flexible Segment would end on a day which does not precede a Business Day, in which case such Flexible Segment shall end on the first day immediately preceding the Business Day succeeding such day.

The Flexible Rate for each Flexible Segment for each Bond shall be the rate determined by the Remarketing Agent (based on the examination of Tax-Exempt obligations comparable to the Bonds known by the Remarketing Agent to have been priced or traded under then prevailing market conditions) no later than the first day of such Flexible Segment (and in the case of a Flexible Segment of one day, no later than 2:00 p.m. New York City time, on such date) to be the lowest rate which would enable the Remarketing Agent to sell the Bonds on the effective date of such rate at a price (without regarding accrued interest) equal to 100% of the principal amount thereof. If a Flexible Rate for a Flexible Segment is not determined or effective, the Flexible Rate for such Flexible Segment shall be one hundred twenty percent (120%) of the most recent SIFMA Index theretofore published in *The Bond Buyer* or, in the event that such SIFMA Index is not published or is otherwise unavailable, one hundred twenty percent (120%) of such other comparable index as selected by the Borrower, and such Flexible Rate shall be communicated to the Trustee and Paying Agent by or on behalf of the Borrower. In no event shall the Flexible Rate for any Bond exceed the Maximum Rate. Upon determination of each Flexible Rate, the Remarketing Agent shall provide notice to the Trustee and the Tender Agent of such Flexible Rate.

(B)     Adjustment to Flexible Rates. Subject to Section 2.01(c)(ix), at any time (subject to the provisions of (1)(b) of this paragraph), the Borrower, by written notice to the Issuer, the Trustee, the Paying Agent and each Marketing Party, may elect that the Bonds shall bear interest at Flexible Rates. Such notice (1) shall specify the effective date of the Flexible Rate Period during which the Bonds shall bear interest at Flexible Rates, which shall be (a) an Interest Payment Date not earlier than the tenth (10th) Business Day after the date of receipt by the Trustee and the Paying Agent of such notice (or such shorter period after the date of such receipt as shall be acceptable to the Trustee and the Paying Agent), (b) additionally in the case of an adjustment from an Auction Rate Period, the day immediately following the end of the then current Auction Rate Period, and (c) additionally in the case of an adjustment from a Term Rate Period, a day on which the Bonds would be permitted to be redeemed at the option of the Borrower pursuant to Section 4.01(a)(2)(iv) hereof or the day immediately following the last day of the then current Term Rate Period; provided, however, that if prior to the Borrower making such election any of the Bonds shall have been called for redemption and such redemption shall not have theretofore been effected, the effective date of such Flexible Rate Period for all Bonds shall not precede such redemption date; and (2) shall be accompanied by an Opinion of Bond Counsel to the effect that such adjustment (a) is authorized or permitted by the Indenture and the Act and (b) will not adversely affect the Tax-Exempt status of interest on the

Case: 19-30088     Doc# 5252-2     Filed: 01/02/20     Entered: 01/02/20 21:06:44     Page 191 of 295

Bonds. If required by any Credit Provider, a Liquidity Facility meeting the requirements of Section 5.02 hereof shall be in effect on the Flexible Rate Adjustment Date.

(C)     Notice of Adjustment to Flexible Rates. The Trustee shall give notice by mail of an adjustment to a Flexible Rate Period to the Holders of the affected Bonds, the Issuer, the Paying Agent and the Remarketing Agent not less than 15 days (30 days if the then current Rate Period shall be a Term Rate Period) prior to the effective date of such Flexible Rate Period. Such notice shall state (1) that the interest rate on such Bonds will be adjusted to Flexible Rates, (2) the effective date of such Flexible Rate Period, (3) that such Bonds are subject to mandatory tender for purchase on the effective date of such Flexible Rate Period, (4) the procedures for such mandatory tender, and (5) that the Holders of such Bonds do not have the right to retain their Bonds on such effective date. Notwithstanding the foregoing, following a failed remarketing as described in Section 2.02(c)(v), such notice shall be reduced to five Business Days prior to the effective date of a new Rate Period as provided in such section.

(D)     Adjustment from Flexible Rates. At any time during a Flexible Rate Period, the Borrower may elect that the Bonds shall no longer bear interest at Flexible Rates and shall instead bear interest as otherwise permitted under the Indenture. The Borrower shall notify the Issuer, the Trustee, the Paying Agent and the Remarketing Agent of such election and shall specify the Rate Period to follow with respect to such Bonds upon cessation of the Flexible Rate Period and instruct the Remarketing Agent to (1) determine Flexible Segments of such duration that, as soon as possible, all Flexible Segments shall end on the last day of the then current Flexible Rate Period, and, upon the establishment of such Flexible Segments the day succeeding the last day of all such Flexible Segments shall be the effective date of the Auction Rate Period, Term Rate Period, Weekly Rate Period or Daily Rate Period elected by the Borrower; or (2) determine Flexible Segments that will in the judgment of the Remarketing Agent best promote an orderly transition to the succeeding Rate Period to apply to such Bonds. If the alternative in clause (2) above is selected by the Borrower, the day succeeding the last day of the Flexible Segment for each Bond shall be the effective date of the Rate Period elected by the Borrower. The Borrower, promptly upon the determination thereof, shall give written notice of such last and such effective dates to the Remarketing Agent, the Trustee and the Paying Agent. During any transitional period from a Flexible Rate Period to the succeeding Rate Period in accordance with clause (2) above, the provisions of the Indenture shall be deemed to apply to the Bonds as follows: the Bonds continuing to bear interest at Flexible Rates shall have applicable to them the provisions hereunder theretofore applicable to such Bonds as if all Bonds were continuing to bear interest at Flexible Rates and the Bonds bearing interest at the interest rate to which the transition is being made will have applicable to them the provisions hereunder as if all Bonds were bearing interest at such interest rate.

Case: 19-30088     Doc# 5252-2     Filed: 01/02/20     Entered: 01/02/20 21:06:44     Page
192 of 295

(v)　Auction Rate.

(A)　Determination of Auction Rate. During each Auction Rate Period, the Bonds shall bear interest at the Auction Rate, which shall be determined by the Auction Agent promptly after the Submission Deadline on the Auction Date in accordance with the Auction Procedures; provided that the initial interest rate for the first Auction Period commencing on an Auction Rate Adjustment Date shall be the rate established by the Broker-Dealers as the minimum rate of interest necessary, in the judgment of the Broker-Dealers, taking into account then prevailing market conditions, to enable the Broker-Dealers to sell the Bonds on the Auction Rate Adjustment Date at a price (without regard to accrued interest) equal to 100% of the principal amount thereof. If on any Auction Date, the Auction Agent shall fail to take any action necessary to determine, or shall take any action which effectively prevents the determination of, a rate of interest pursuant to the Auction Procedures or if there is not a duly appointed Auction Agent, or during which there is no duly appointed Broker-Dealer (i) if the preceding Auction Period was a period of 35 days or less, the new Auction Period shall be the same as the preceding Auction Period and the Auction Rate for the new Auction Period shall be the same as the Auction Rate for the preceding Auction Period, and (ii) if the preceding Auction Period was a period of greater than 35 days, the new Auction Period shall be a seven-day Auction Period and the Auction Rate for the new Auction Period shall be the same as the Auction Rate for the preceding Auction Period. In no event shall any Auction Rate be greater than the Maximum Rate.

Upon the Auction Agent's receipt of written notice from the Trustee of the occurrence of an Event of Default under clause (i) or (ii) of Section 7.01(a) of the Indenture in accordance with Section 6.01 hereof, the Auction Procedures shall be suspended. The Auction Rate for each Auction Period commencing after the occurrence of an Event of Default under clauses (i) or (ii) of Section 7.01(a) of the Indenture to and including the Auction Period, if any, during which or commencing less than two Business Days after such Event of Default has been cured or waived shall be equal to the Default Rate as determined for each such Auction Period. The Auction Procedures shall resume two Business Days after the Auction Agent receives written notice from the Trustee that any such Event of Default has been cured or waived in accordance with Section 6.01 hereof, with the next Auction to occur on the next regularly scheduled Auction Date occurring after such cure or waiver. If the Bonds are no longer registered in the book-entry system pursuant to Section 2.01(d) of the Indenture, no further Auctions will be held and the interest rate on the Bonds for each subsequent Auction Period commencing after the delivery of Bond certificates will equal the Maximum Rate as determined by the Borrower on the Business Day immediately preceding the first day of such Auction Period.

(B)　Adjustment to Auction Rate Period. Subject to Section 2.01(c)(ix), at the option of the Borrower, the Bonds may be adjusted from a Daily Rate

Case: 19-30088　　Doc# 5252-2　　Filed: 01/02/20　　Entered: 01/02/20 21:06:44　　Page 193 of 295

Period, Weekly Rate Period, a Flexible Rate Period or a Term Rate Period to an Auction Rate Period. Any such adjustment shall be made as follows:

(1)     The Auction Rate Adjustment Date shall be (x) a Business Day not earlier than 15 days following the third Business Day after the date of receipt by the Trustee of such notice (or such shorter period after the date of such receipt as shall be acceptable to the Trustee); (y) additionally in the case of an adjustment from a Term Rate Period, a day on which the Bonds would be permitted to be redeemed at the option of the Borrower pursuant to Section 4.01(a)(2)(iv) hereof or the day immediately following the last day of the then-current Term Rate Period; and (z) additionally in the case of an adjustment from a Flexible Rate Period, either (I) the day immediately following the last day of the then-current Flexible Rate Period as determined in accordance with Section 2.01(c)(iv)(D)(1) hereof, or (II) for each Bond, the day immediately following the last day of the last Flexible Segment for such Bond in the then-current Flexible Rate Period (as determined in accordance with Section 2.01(c)(iv)(D)(2) hereof); provided, however, that if prior to the Company making such election, any Bond shall have been called for redemption and such redemption shall not have theretofore been effected, the effective date of such Auction Rate Period shall not precede such redemption date.

(2)     Not later than 5:00 p.m., New York City time, on the date of determination of the Auction Rate, the Auction Agent shall notify the Trustee, the Borrower and the Broker-Dealers of the Auction Rate by telephone, promptly confirmed in writing.

(3)     The Borrower may revoke its election to effect an adjustment of the interest rate on any Bonds to an Auction Rate by giving written notice of such revocation to the Trustee, the Issuer, the Paying Agent, each Marketing Party, each Credit Provider and the applicable Liquidity Provider at any time prior to the setting of the Auction Rate by the Auction Agent.

(4)     No Bonds may be adjusted to the Auction Rate when the Bonds would not then be held by a Securities Depository in book-entry form.

(C)     Notice of Adjustment to Auction Rate Period. The Borrower shall give written notice of any such adjustment to the Issuer, the Trustee, the Paying Agent, each Marketing Party, each Credit Provider and the applicable Liquidity Provider not less than seven (7) Business Days prior to the date on which the Trustee is required to notify the Holders of the affected Bonds of the adjustment pursuant to the paragraph below. Such notice shall specify the Bonds to be adjusted, the Auction Rate Adjustment Date and the length of the first Auction Period. Together with such notice, the Borrower shall file with the Issuer and the

Case: 19-30088     Doc# 5252-2     Filed: 01/02/20     Entered: 01/02/20 21:06:44     Page 194 of 295

Trustee an Opinion of Bond Counsel to the effect that the adjustment of the Bonds to an Auction Rate Period (1) is authorized or permitted by the Indenture and the Act and (2) will not adversely affect the Tax-Exempt status of interest on the Bonds. No such change to an Auction Rate Period shall become effective unless the Borrower shall also file, with the Issuer and the Trustee, an Opinion of Bond Counsel to the same effect dated the Auction Rate Adjustment Date.

The Trustee shall give notice by mail of an adjustment to an Auction Rate Period to the Holders of the affected Bonds not less than 15 days (30 days if the then current Rate Period shall be a Term Rate Period) prior to the effective date of such Auction Rate Period. Such notice shall state (1) that the interest rate on such Bonds will be adjusted to an Auction Rate (subject to the receipt of the Opinion of Bond Counsel dated the Auction Rate Adjustment Date referred to in the immediately preceding paragraph and to the Borrower's ability to rescind its election as described in Section 2.01(c)(v)(B)(3) hereof), (2) the effective date of such Auction Rate Period, (3) that such Bonds are subject to mandatory tender for purchase on the effective date of such Auction Rate Period, (4) the procedures for such mandatory tender, (5) that the Holders of such Bonds do not have the right to retain their Bonds on such effective date, and (6) the identity of the Auction Agent.

(D)     Adjustment from Auction Rate Period. At the option of the Borrower, the Bonds may be adjusted from an Auction Rate Period to a Daily Rate Period, Weekly Rate Period, Term Rate Period or a Flexible Rate Period. Any such adjustment shall be made as follows:

(1)     The Daily Rate Adjustment Date, Weekly Rate Adjustment Date, Term Rate Adjustment Date or Flexible Rate Adjustment Date shall be the Interest Payment Date immediately following the end of the final Auction Period.

(2)     The Borrower shall give written notice of any such adjustment to the Issuer, the Trustee, the Paying Agent, each Marketing Party, each Credit Provider and the applicable Liquidity Provider not less than seven (7) Business Days prior to the date on which the Trustee is required to notify the Holders of the adjustment pursuant to subparagraph (3) below. Such notice shall specify the Bonds to be adjusted, the Daily Rate Adjustment Date, Weekly Rate Adjustment Date, Term Rate Adjustment Date or Flexible Rate Adjustment Date, as the case may be, and the length of any Term Rate Period or Flexible Rate Period, as the case may be, to which the adjustment will be made. Together with such notice, the Borrower shall file with the Issuer and the Trustee an Opinion of Bond Counsel to the effect that the adjustment of the Bonds to be adjusted to a Daily Rate, Weekly Rate, Term Rate or a Flexible Rate (a) is authorized or permitted by the Indenture and the Act and (b) will not adversely affect the Tax-Exempt status of interest on the Bonds. No change to a Daily Rate, Weekly Rate, Term Rate or Flexible Rate shall

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 195 of 295

become effective unless the Borrower shall also file, with the Issuer and the Trustee, an Opinion of Bond Counsel to the same effect dated the Daily Rate Adjustment Date, Weekly Rate Adjustment Date, Term Rate Adjustment Date or Flexible Rate Adjustment Date, as the case may be.

(3)     The Trustee shall mail a written notice of the adjustment to the Holders of all Bonds to be adjusted, each Marketing Party, the Issuer, the Paying Agent, each Credit Provider and the applicable Liquidity Provider specifying the Daily Rate Adjustment Date, Weekly Rate Adjustment Date, Term Rate Adjustment Date or Flexible Rate Adjustment Date as provided in the notice provisions regarding adjustment to the respective Rate Period.

(4)     At any time prior to 10:00 a.m. New York City time on the Business Day immediately preceding the Daily Rate Adjustment Date, Weekly Rate Adjustment Date, Term Rate Adjustment Date or the Flexible Rate Adjustment Date the Borrower may withdraw its notice of adjustment and the Auction for such Bonds will be held on such Auction Date as if no adjustment notice had ever been given. If on a Daily Rate Adjustment Date, Weekly Rate Adjustment Date, Term Rate Adjustment Date or a Flexible Rate Adjustment Date there has been a timely withdrawal of the adjustment notice as set forth in the preceding sentence or any condition precedent to such adjustment is not satisfied, the Trustee will give written notice by first class mail postage prepaid as soon as practicable and in any event not later than the next succeeding Business Day to the Holders of the Bonds to have been adjusted, the Issuer, the Paying Agent, each Credit Provider, the applicable Liquidity Provider and each Marketing Party that such adjustment has not occurred, that the Bonds will not be subject to mandatory tender on the failed Daily Rate Adjustment Date, Weekly Rate Adjustment Date, Term Rate Adjustment Date or Flexible Rate Adjustment Date, that the Auction Agent will continue to implement the Auction Procedures on the Auction Dates with respect to such Bonds which otherwise would have been adjusted excluding however, the Auction Date falling on the Business Day next preceding the failed Daily Rate Adjustment Date, Weekly Rate Adjustment Date, Term Rate Adjustment Date or Flexible Rate Adjustment Date, and that the interest rate will continue to be the Auction Rate; provided, however, that the interest rate borne by the Bonds which otherwise would have been adjusted on such failed Daily Rate Adjustment Date, Weekly Rate Adjustment Date, Term Rate Adjustment Date or Flexible Rate Adjustment Date will determined as set forth in Section 2.01(c)(v)(A) and the Auction Period will be the seven-day Auction Period until changed pursuant to the Auction Procedures.

(5)     If required by any Credit Provider, a Liquidity Facility meeting the requirements of Section 5.02 hereof shall be in effect on the

Case: 19-30088     Doc# 5252-2     Filed: 01/02/20     Entered: 01/02/20 21:06:44     Page 196 of 295

Daily Rate Adjustment Date, Weekly Rate Adjustment Date, Term Rate Adjustment Date or Flexible Rate Adjustment Date, as the case may be.

(vi)  Determination Conclusive. The determination of (i) any Flexible Rate, Daily Rate, Weekly Rate and Term Rate and each Flexible Segment by the Remarketing Agent or (ii) any Auction Rate pursuant to the Auction Procedures, shall be conclusive and binding upon each Marketing Party, the Trustee, the Paying Agent, the Issuer, each Credit Provider and the applicable Liquidity Provider, the Borrower and the Holders of the affected Bonds.

(vii)  Rescission of Election. Notwithstanding anything herein to the contrary, the Borrower may rescind any election by it to adjust to or continue a Rate Period pursuant to Section 2.01(c)(i)(B), 2.01(c)(ii)(B), 2.01(c)(iii)(B), 2.01(c)(iv)(B) or 2.01(c)(v)(B) hereof prior to the effective date of such adjustment or continuation by giving written notice thereof to the Issuer, the Trustee, each Marketing Party, each Credit Provider and the applicable Liquidity Provider prior to such effective date. If the Trustee receives notice of such rescission prior to the time the Trustee has given notice to the Holders of the Bonds pursuant to Section 2.01(c)(i)(C), 2.01(c)(ii)(C), 2.01(c)(iii)(C), 2.01(c)(iv)(C) or 2.01(c)(v)(C), as applicable, then such notice of adjustment or continuation shall be of no force and effect. If the Trustee receives notice from the Borrower of rescission of an adjustment to or continuation of a Rate Period after the Trustee has given notice to the Holders of the Bonds pursuant to Section 2.01(c)(i)(C), 2.01(c)(ii)(C), 2.01(c)(iii)(C), 2.01(c)(iv)(C) or 2.01(c)(v)(C), as applicable, then the Rate Period for the Bonds shall automatically adjust to a Flexible Rate Period with a Flexible Segment of one day (unless such Flexible Segment would end on a day which does not precede a Business Day, in which case such Flexible Segment shall end on the first day immediately preceding the Business Day succeeding such day) and a Flexible Rate as determined pursuant to Section 2.01(c)(iv)(A) hereof on the date originally scheduled for such adjustment or continuation, except that for Bonds bearing interest at an Auction Rate an Auction for such Bond will be held on such date as if no notice of adjustment had ever been given. The Trustee shall notify the Borrower as soon as practicable (and in any event not later than the next succeeding Business Day following receipt of such notice from the Borrower) that such automatic adjustment will occur on the date originally scheduled for such adjustment or continuation.

(viii)  Failure to Elect New Rate Period At End of Term Rate Period; Failure to Determine New Rate; Delayed Remarketing Period; Failed Adjustment.

(A)  Failure to Elect New Rate Period At End of Term Rate Period. If the Bonds are in a Term Rate Period and if, by the date required to give notice to Holders pursuant to Section 2.01(c)(i)(C), 2.01(c)(ii)(C), 2.01(c)(iii)(C), 2.01(c)(iv)(C) or 2.01(c)(v)(C), as applicable, the Trustee shall not have received notice of the Borrower's election that the Rate Period for the Bonds shall be adjusted to a Daily Rate Period, a Weekly Rate Period, a Flexible Rate Period or an Auction Rate Period, or the Borrower's election to continue in the Term Rate Period, accompanied by appropriate Opinion of Bond Counsel, the Bonds shall automatically adjust to a Flexible Rate Period with a Flexible Segment of one day

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page
197 of 295

(unless such Flexible Segment would end on a day which does not precede a Business Day, in which case such Flexible Segment shall end on the first day immediately preceding the Business Day succeeding such day) and a Flexible Rate as determined pursuant to Section 2.01(c)(iv)(A) hereof. The Trustee shall notify the Borrower as soon as practicable (and in any event not later than the next succeeding Business Day following the date the Trustee is required to give notice to Holders pursuant to Section 2.01(c)(i)(C), 2.01(c)(ii)(C), 2.01(c)(iii)(C), 2.01(c)(iv)(C) or 2.01(c)(v)(C), as applicable, as described in the preceding sentence) that such automatic adjustment will occur on the day following the last day of the current Term Rate Period. No Opinion of Bond Counsel shall be required in connection with the automatic adjustment to a Flexible Rate Period pursuant to this Section 2.01(c)(viii)(A).

(B) <u>Failure to Determine New Rate At End of Term Rate Period;</u> <u>Delayed Remarketing Period</u>. If the Bonds are in a Term Rate Period and for any reason the new rate for another Rate Period (including a new Term Rate Period) cannot be determined on or before the last day of the current Term Rate Period, then the Bonds shall remain subject to mandatory tender pursuant to Section 2.02(b)(i)(A) hereof and the Bonds shall automatically adjust to a Flexible Rate Period with a Flexible Segment of one day (unless such Flexible Segment would end on a day which does not precede a Business Day, in which case such Flexible Segment shall end on the first day immediately preceding the Business Day succeeding such day) and a Flexible Rate equal to 10% per annum, unless the Bonds have been purchased by or on behalf of a Liquidity Provider, in which event such Bonds will bear interest as provided in the applicable Liquidity Facility, or unless the Bonds are in default, in which event the Bonds will bear interest at the Maximum Rate. The Trustee shall notify the Borrower as soon as practicable (and in any event not later than the last day of the current Term Rate Period) that such automatic adjustment will occur on the day following the last day of the current Term Rate Period. In the event the Bonds are not required to be purchased by the Borrower and have been returned to the Holders as described in Section 2.02(c)(iv)(A) hereof, the Borrower will cause the Remarketing Agent to continue to use its best efforts to remarket the Bonds as described in Section 2.02(c)(v) hereof. No Opinion of Bond Counsel shall be required in connection with the automatic adjustment to a Flexible Rate Period pursuant to this Section 2.01(c)(viii)(A).

(C) <u>Failed Adjustment</u>. If on any proposed Daily Rate Adjustment Date, Weekly Rate Adjustment Date, Term Rate Adjustment Date, Flexible Rate Adjustment Date or Auction Rate Adjustment Date, as applicable, any condition precedent to such adjustment is not satisfied, then (1) Bonds in an Auction Rate Period shall not be adjusted and shall continue be subject to the Auction Procedures on the Auction Dates with respect to the Bonds which otherwise would have been adjusted, excluding however, the Auction Date falling on the Business Day next preceding the failed Daily Rate Adjustment Date, Weekly Rate Adjustment Date, Term Rate Adjustment Date or Flexible Rate Adjustment Date, and the interest rate shall continue to be the Auction Rate; provided, however, that

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 198 of 295

the interest rate borne by the Bonds during the Auction Period commencing on such failed Daily Rate Adjustment Date, Weekly Rate Adjustment Date, Term Rate Adjustment Date or Flexible Rate Adjustment Date will be the Maximum Rate, and the Auction Period will be the seven-day Auction Period, until changed pursuant to the Auction Procedures; and (2) other Bonds (except Bonds in an Auction Rate Period), shall automatically adjust to a Flexible Rate Period with a Flexible Segment of one day (unless such Flexible Segment would end on a day which does not precede a Business Day, in which case such Flexible Segment shall end on the first day immediately preceding the Business Day succeeding such day) and a Flexible Rate as determined pursuant to Section 2.01(c)(iv)(A) hereof, and the Trustee shall give written notice by first class mail postage prepaid as soon as practicable and in any event not later than the next succeeding Business Day to the Holders thereof, the Issuer, each Credit Provider, the Liquidity Provider, if any, and each Marketing Party that such adjustment has not occurred, that the Rate Period for the Bonds was automatically adjusted to a Flexible Rate Period with a Flexible Segment of one day (unless such Flexible Segment would end on a day which does not precede a Business Day, in which case such Flexible Segment shall end on the first day immediately preceding the Business Day succeeding such day) and a Flexible Rate as determined pursuant to Section 2.01(c)(iv)(A) hereof on such failed Daily Rate Adjustment Date, Weekly Rate Adjustment Date, Term Rate Adjustment Date, Flexible Rate Adjustment Date or Auction Rate Adjustment Date, as applicable. The Trustee shall notify the Borrower as soon as practicable (and in any event not later than such failed Daily Rate Adjustment Date, Weekly Rate Adjustment Date, Term Rate Adjustment Date or Flexible Rate Adjustment Date, as applicable) that such automatic adjustment will occur on such failed Daily Rate Adjustment Date, Weekly Rate Adjustment Date, Term Rate Adjustment Date or Flexible Rate Adjustment Date, as applicable. No Opinion of Bond Counsel shall be required in connection with the automatic adjustment to a Flexible Rate Period pursuant to this Section 2.01(c)(viii)(C).

(ix)    Bonds shall not be adjusted to a Daily Rate Period, a Weekly Rate Period, a Term Rate Period, a Flexible Rate Period or an Auction Rate Period unless on the effective date of such Rate Period the Bonds are rated "A" or better (without regard to "+"s or "-"s or numerical designations) by a Rating Agency; provided, however, that this Section 2.01(c)(ix) shall not be applicable if:

(A)    the interest rate both immediately prior to and on such effective date is a Term Rate, or

(B)    the interest rate both immediately prior to and on such effective date is a Flexible Rate, or

(C)    the Bonds are adjusted to a Flexible Rate Period with a Flexible Segment of one day pursuant to Section 2.01(c)(vii) or Section 2.01(c)(viii) hereof and Bonds bearing interest at a Flexible Rate at all times since that

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 199 of 295

adjustment are beneficially owned either by the Borrower or by the Liquidity Provider, if any, or

(D)  the Bonds previously have been adjusted to a Flexible Rate Period with a Flexible Segment of one day pursuant to Section 2.01(c)(vii) or Section 2.01(c)(viii) hereof, the Bonds with a Flexible Segment of one day pursuant to Section 2.01(c)(vii) or Section 2.01(c)(viii) hereof at all times since that adjustment have been beneficially owned either by the Borrower or the Liquidity Provider, if any, and the Bonds are adjusted from a Flexible Rate Period back to the same Rate Period that applied to the Bonds immediately prior to the adjustment to a Flexible Rate Period with a Flexible Segment of one day pursuant to Section 2.01(c)(vii) or Section 2.01(c)(viii) hereof.

Section 2.02.  Tender and Purchase of Bonds.

(a)  Holder's Option to Tender for Purchase.

(i)  During any Daily Rate Period, any Bond or portion thereof in an Authorized Denomination shall be purchased on any Business Day at the Purchase Price thereof upon (A) delivery to the Tender Agent at its Principal Office, by no later than 11:00 a.m., New York City time, on such Business Day, of an irrevocable notice by written notice or by telephone promptly confirmed by telecopy or other writing, which states the principal amount of such Bond to be tendered for purchase and the Purchase Date, and (B) delivery of such Bond tendered for purchase to the Tender Agent at its Principal Office, accompanied by an instrument of transfer thereof, in a form satisfactory to the Tender Agent, executed in blank by the Holder thereof with the signature of such Holder guaranteed by a guarantor institution participating in a guarantee program acceptable to the Tender Agent, at or prior to 1:00 p.m., New York City time, on the Purchase Date. The Tender Agent shall keep a written record of the notice described in clause (A).

(ii)  During any Weekly Rate Period, any Bond or portion thereof in an Authorized Denomination shall be purchased on any Business Day at the Purchase Price thereof upon (A) delivery to the Tender Agent at its Principal Office of an irrevocable notice by written notice or by telephone promptly confirmed by telecopy or other writing, by 5:00 p.m. New York City time on any Business Day, which states the principal amount of such Bond to be tendered for purchase and the Purchase Date, which date shall not be prior to the seventh day succeeding the date of the delivery of such notice to the Tender Agent, and (B) delivery of such Bond to the Tender Agent at its Principal Office, accompanied by an instrument of transfer thereof, in a form satisfactory to the Tender Agent, executed in blank by the Holder thereof with the signature of such Holder guaranteed by a guarantor institution participating in a guarantee program acceptable to the Tender Agent, at or prior to 1:00 p.m., New York City time, on the Purchase Date. The Tender Agent shall keep a written record of the notice described in clause (A).

Case: 19-30088     Doc# 5252-2     Filed: 01/02/20     Entered: 01/02/20 21:06:44     Page 200 of 295

(iii)  If any Bond is to be purchased in part pursuant to Section 2.02(a)(i) or 2.02(a)(ii) hereof, the amount so purchased and the amount not so purchased must each be an Authorized Denomination.

(iv)  The Tender Agent shall accept any notice of optional tender pursuant to this subsection from any beneficial owner of any Bond held in book-entry form, or any nominee of such beneficial owner, but shall make payment of the Purchase Price thereof only to the Holder of such Bond.

(v)  Notwithstanding any other provision of this Multi-Mode Annex or the Indenture to the contrary, so long as any Bond is held in book-entry form, such Bond need not be physically delivered in connection with any tender pursuant to this Section, and all references in this Section to physical delivery of Bonds shall be ineffective.  In such case, payment of the Purchase Price in connection with such tender shall be made to the Holder of such Bonds on the date designated for such payment, without further action by the beneficial owner who delivered the tender notice, and transfer of beneficial ownership shall be made in book-entry form as provided in Section 2.01(d) of the Indenture in accordance with the procedures of the Nominee.

(vi)  Remarketing Mechanics For Holder's Option to Tender for Purchase During Daily Rate Period.

(A)  Promptly upon receipt, and, in any event, not later than 11:15 a.m. (New York City time) on each Business Day on which the Tender Agent receives a notice from a Holder of a Bond pursuant to Section 2.02(a)(i) hereof, the Tender Agent shall give notice by written notice or by telephone promptly confirmed by telecopy or other writing to the Remarketing Agent, the Registrar and the Trustee specifying the principal amount of, and accrued but unpaid interest to, but excluding the requested Purchase Date on Bonds for which it has received such notice (the "Daily Put Bonds") (such amount being the aggregate Purchase Price of such Daily Put Bonds), the Purchase Date and, in the case of the Remarketing Agent and the Registrar, the names of the Holders thereof and any change in such owner's current instructions to the Registrar regarding the payment of its Bonds (the "Standing Payment Instructions"), if such change has been requested of the Tender Agent by the Holder thereof.

(B)  The Remarketing Agent shall, pursuant to the Remarketing Agreement, use its best efforts to sell any Daily Put Bonds tendered for purchase to new purchasers.  Not later than 11:30 a.m. (New York City time) on each Purchase Date with respect to Daily Put Bonds, the Tender Agent shall telephonically confirm with the Trustee the aggregate principal amount of, and the aggregate amount of the interest payable as of the Purchase Date on, such Daily Put Bonds.  Not later than 11:30 a.m. (New York City time) on any such Purchase Date the Remarketing Agent shall give notice by telephone or telecopy to the Tender Agent, of (1) the principal amount of Daily Put Bonds which have been remarketed and the portion of the Purchase Price which shall be deposited in the Remarketing Account on such Purchase Date by or on behalf of the purchasers

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 201 of 295

(the "New Purchasers") of the Daily Put Bonds, and (2) any change in the name, tax identification number and any requested Standing Payment Instructions (such information is hereinafter referred to as "New Registration Information") necessary for the Registrar to prepare replacement certificates for the New Purchasers. If insufficient funds are on deposit in the Remarketing Account of the Bond Purchase Fund to pay the Purchase Price of the tendered Daily Put Bonds on such Purchase Date, the Trustee shall draw upon the applicable Liquidity Facility, if any, in accordance with Section 2.02(d)(iv)(A) hereof.

(C)    If the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility under the Indenture) is in effect with respect to the Bonds and the Remarketing Agent's notice pursuant to subsection (B) above indicates that the Remarketing Agent has remarketed less than all of the Daily Put Bonds to be purchased on such Purchase Date, the Tender Agent shall give as soon as practicable but no later than 12:00 noon (New York City time) on such Purchase Date telephonic notice to the Borrower specifying the principal amount and Purchase Price of such Daily Put Bonds not so remarketed including interest from and after the Purchase Date until such Purchase Price is to be paid in full on the following Business Day, such notice to be confirmed immediately by telecopy. In addition, the Tender Agent shall give, as soon as practicable but no later than 2:45 p.m. (New York City time) on such Purchase Date, a second telephonic notice to the Borrower in the event that the Tender Agent has not received sufficient moneys under the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility under the Indenture) by 2:30 p.m. (New York City time) to pay the Purchase Price of the tendered Daily Put Bonds on such Purchase Date or if the Tender Agent has actual knowledge that any such instrument has been repudiated and specifying the amount of the insufficiency of amounts on deposit in the Bond Purchase Fund to pay the Purchase Price of the Daily Put Bonds to be purchased on such Purchase Date, such second notice to be confirmed immediately by telecopy and shall constitute a Notice of Borrower Purchase.

(D)    If no Credit Facility or Liquidity Facility is in effect with respect to the Bonds and the Remarketing Agent's notice pursuant to subsection (B) above indicates that the Remarketing Agent has remarketed less than all of the Daily Put Bonds to be purchased on such Purchase Date and as a result amounts on deposit in the Bond Purchase Fund are insufficient to pay the Purchase Price of the Daily Put Bonds to be purchased on such Purchase Date, the Tender Agent shall give as soon as practicable but no later than 12:00 noon (New York City time) on such Purchase Date telephonic notice to the Borrower specifying the principal amount and Purchase Price of such Daily Put Bonds not so remarketed, such notice to be confirmed immediately by telecopy and shall constitute a Notice of Borrower Purchase.

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 202 of 295

(vii)　Remarketing Mechanics For Holder's Option to Tender for Purchase During Weekly Rate Period.

(A)　Not later than 10:15 a.m. (New York City time) on each Business Day succeeding a day on which the Tender Agent receives a notice from a Holder of a Bond pursuant to Section 2.02(a)(ii) hereof, the Tender Agent shall give notice by written notice or by telephone promptly confirmed by telecopy or other writing to the Remarketing Agent, the Registrar and the Trustee specifying the principal amount of, and accrued but unpaid interest to but excluding the requested Purchase Date on, Bonds for which it has received such notice (the "Weekly Put Bonds") (such amount being the aggregate Purchase Price of such Weekly Put Bonds), the date on which such Weekly Put Bonds are to be purchased in accordance with Section 2.02(a)(ii) hereof, and, in the case of the Remarketing Agent and the Registrar, the names of the Holders thereof and any change in the Standing Payment Instructions applicable to such Weekly Put Bonds, if such change has been requested of the Tender Agent by the Holder thereof.

(B)　The Remarketing Agent shall, pursuant to the Remarketing Agreement, use its best efforts to sell any Weekly Put Bonds tendered for purchase to new purchasers. Not later than 11:30 a.m. (New York City time) on each Purchase Date with respect to Weekly Put Bonds, the Tender Agent shall by telephone confirm with the Trustee the aggregate principal amount of, and the aggregate amount of interest payable as of the Purchase Date on, such Weekly Put Bonds. Not later than 11:30 a.m. (New York City time) on any Purchase Date, the Remarketing Agent shall give notice to the Tender Agent by telephone or telecopy of (1) the principal amount of Weekly Put Bonds which have been remarketed and the portion of the Purchase Price which shall be deposited in the Remarketing Account on the Purchase Date by or on behalf of the New Purchasers of such Weekly Put Bonds, and (2) New Registration Information necessary for the Registrar to prepare replacement certificates for the New Purchasers. If insufficient funds are on deposit in the Remarketing Account of the Bond Purchase Fund to pay the Purchase Price of the tendered Weekly Put Bonds on such Purchase Date, the Trustee shall draw upon the applicable Liquidity Facility, if any, in accordance with Section 2.02(d)(iv)(A) hereof.

(C)　If the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility under the Indenture) is in effect with respect to the Bonds and the Remarketing Agent's notice referred to in subsection (B) above indicates that the Remarketing Agent has remarketed less than all of the Weekly Put Bonds to be purchased on such Purchase Date, as soon as practicable thereafter but no later than 12:00 noon (New York City time) on such Purchase Date, the Tender Agent shall give telephonic notice to the Borrower specifying the principal amount and Purchase Price of such Weekly Put Bonds not so remarketed including interest from and after the Purchase Date until such Purchase Price is to be paid in full on the following Business Day, such notice to be confirmed immediately by telecopy. In

Case: 19-30088　Doc# 5252-2　Filed: 01/02/20　Entered: 01/02/20 21:06:44　Page 203 of 295

addition, the Tender Agent shall give, as soon as practicable but no later than 2:45 p.m. (New York City time), on such Purchase Date a second telephonic notice to the Borrower in the event that the Tender Agent has not received sufficient moneys under the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility under the Indenture) by 2:30 p.m. (New York City time) to pay the Purchase Price of the tendered Weekly Put Bonds on such Purchase Date or if the Tender Agent has actual knowledge that any such instrument has been repudiated and specifying the amount of the insufficiency of amounts on deposit in the Bond Purchase Fund to pay the Purchase Price of the Weekly Put Bonds to be purchased on such Purchase Date, such second notice to be confirmed immediately by telecopy and shall constitute a Notice of Borrower Purchase.

(D) If no Credit Facility or Liquidity Facility is in effect with respect to the Bonds and the Remarketing Agent's notice referred to in subsection (B) above indicates that the Remarketing Agent has remarketed less than all of the Weekly Put Bonds to be purchased on such Purchase Date and as a result amounts on deposit in the Bond Purchase Fund are insufficient to pay the Purchase Price of the Weekly Put Bonds to be purchased on such Purchase Date, as soon as practicable thereafter but no later than 12:00 noon (New York City time) on such Purchase Date, the Tender Agent shall give telephonic notice to the Borrower specifying the principal amount and Purchase Price of such Weekly Put Bonds not so remarketed, such notice to be confirmed immediately by telecopy and such notice shall constitute a Notice of Borrower Purchase.

(b) Mandatory Tender for Purchase. (i) Bonds shall be subject to mandatory tender for purchase at the Purchase Price thereof upon the occurrence of any of the events stated below:

(A) as to any Bond, on the effective date of any adjustment (including any automatic adjustment pursuant to Section 2.01(c)(vii), 2.01(c)(viii)(A) or 2.01(c)(viii)(C) hereof) in (or with respect to any Bond in a Term Rate Period, a continuation of) a Rate Period for such Bond;

(B) as to each Bond in a Flexible Rate Period, on the day succeeding the last day of any Flexible Segment with respect to such Bond;

(C) as to all Bonds, on the Business Day preceding the expiration or termination of any Credit Facility or any Liquidity Facility with respect to such Bonds;

(D) as to all Bonds, on the Business Day preceding the providing or substitution of any Credit Facility or any Liquidity Facility with respect to the Bonds; and

(E) on the 60th day (or the preceding Business Day if such 60th day is not a Business Day) following written notice of resignation of the Remarketing Agent given in accordance with Section 8.16 of the Indenture, but only if (x) a

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page
204 of 295

Liquidity Facility is not in effect with respect to the Bonds and (y) a successor Remarketing Agent has not accepted its duties as Remarketing Agent before such day;

(ii)    Bonds in a Term Rate Period shall also be subject to mandatory tender for purchase on a day that such Bonds would be subject to redemption pursuant to Section 4.01(a)(2)(iv) hereof, at the Purchase Price thereof if the Borrower gives notice to the Trustee on the day prior to the redemption date that it elects to have the Bonds purchased in lieu of redemption. If the Bonds are purchased on or prior to the Record Date, the Purchase Price shall include accrued interest from the Interest Payment Date next preceding the date of purchase to the date of purchase (unless the date of purchase shall be an Interest Payment Date, in which case the Purchase Price shall be equal to the amount specified in the preceding sentence). If the Bonds are purchased after the Record Date, the Purchase Price shall not include accrued interest.

(iii)    The Trustee shall give notice by mail to the Holders of the Bonds (other than Bonds in a Term Rate Period or a Flexible Rate Period) at their addresses shown on the registration books kept by the Registrar, of any mandatory tender of Bonds (other than Bonds in a Term Rate Period or a Flexible Rate Period), not less than fifteen days prior to such required tender, which notice shall state the date of such tender and that the Bonds are required to be tendered for purchase on such date.

(iv)    No Holder of any Bond subject to mandatory tender as provided herein shall have the option to retain such Bond.

(v)    Notwithstanding any other provision of this Multi-Mode Annex or the Indenture to the contrary, so long as any Bond is held in book-entry form, such Bond need not be physically delivered in connection with any tender pursuant to this Section, and all references in this Section to physical delivery of Bonds shall be ineffective. In such case, payment of the Purchase Price in connection with such tender shall be made to the Holder of such Bonds on the date designated for such payment, without further action by the beneficial owner thereof, and transfer of beneficial ownership shall be made in book-entry form as provided in Section 2.01(d) of the Indenture in accordance with the procedures of the Nominee.

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 205 of 295

(vi)    Remarketing Mechanics For Mandatory Tender for Purchase.

(A)    Not later than 10:15 a.m. (New York City time) on each Purchase Date specified pursuant to Section 2.02(b)(i) hereof for the mandatory tender of Bonds, the Tender Agent shall give notice by written notice or by telephone promptly confirmed by telecopy or other writing to the Remarketing Agent, the Trustee and the Registrar specifying the principal amount of all Outstanding Bonds (the "Mandatory Put Bonds") and the Purchase Price for such Mandatory Put Bonds, and, in the case of the Remarketing Agent and the Registrar, the names of the Holders of the Mandatory Put Bonds and any change in the Standing Payment Instructions, if such change has been requested of the Tender Agent by the Holder thereof.

(B)    The Remarketing Agent shall, pursuant to the Remarketing Agreement, use its best efforts to sell any Mandatory Put Bonds tendered for purchase to new purchasers. Not later than 11:30 a.m. (New York City time) on any Purchase Date with respect to Mandatory Put Bonds, the Remarketing Agent shall give notice to the Tender Agent by telephone of (1) the principal amount of Mandatory Put Bonds which have been remarketed and the portion of the Purchase Price which shall be deposited in the Remarketing Account within the Bond Purchase Fund by or on behalf of the New Purchasers of the Mandatory Put Bonds, and (2) the New Registration Information necessary for the Registrar to prepare replacement certificates for such New Purchasers. If insufficient funds are on deposit in the Remarketing Account of the Bond Purchase Fund to pay the Purchase Price of the Mandatory Put Bonds on such Purchase Date, the Trustee shall draw upon the applicable Liquidity Facility, if any, in accordance with Section 2.02(d)(iv)(A) hereof.

(C)    If the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility under the Indenture) is in effect with respect to the Bonds and the Remarketing Agent's notice referred to in subsection (B) above indicates that the Remarketing Agent has remarketed less than all the Mandatory Put Bonds to be purchased on such Purchase Date, as soon as practicable after receipt of such notice but no later than 12:00 noon (New York City time) on such Purchase Date, the Tender Agent shall give notice by telephone to the Borrower specifying the Purchase Price of such Mandatory Put Bonds not so remarketed including interest from and after the Purchase Date until such Purchase Price is to be paid in full on the following Business Day, such notice to be confirmed immediately by telecopy. In addition, the Tender Agent shall give, as soon as practicable but no later than 2:45 p.m. (New York City time), on such Purchase Date a second telephonic notice to the Borrower in the event that the Tender Agent has not received sufficient moneys under the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility under the Indenture) by 2:30 p.m. (New York City time) to pay the Purchase Price of the Mandatory Put Bonds on such Purchase Date or if the Tender Agent has actual knowledge that any such instrument has been repudiated and specifying the

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 206 of 295

amount of the insufficiency of amounts on deposit in the Bond Purchase Fund to pay the Purchase Price of the Mandatory Put Bonds to be purchased on such Purchase Date, such second notice to be confirmed immediately by telecopy and shall constitute a Notice of Borrower Purchase.

(D)     If no Credit Facility or Liquidity Facility is in effect with respect to the Bonds and the Remarketing Agent's notice referred to in subsection (B) above indicates that the Remarketing Agent has remarketed less than all the Mandatory Put Bonds to be purchased on such Purchase Date and as a result amounts on deposit in the Bond Purchase Fund are insufficient to pay the Purchase Price of the Mandatory Put Bonds to be purchased on such Purchase Date, as soon as practicable after receipt of such notice but no later than 12:00 noon (New York City time) on such Purchase Date, the Tender Agent shall give notice by telephone to the Borrower specifying the Purchase Price of such Mandatory Put Bonds not so remarketed, such notice to be confirmed immediately by telecopy and shall constitute a Notice of Borrower Purchase.

(c)     Payment of Purchase Price.

(i)     If the Bonds to be purchased pursuant to Section 2.02(a), Section 2.02(b) or Section 4.06 hereof or pursuant to Section 7.01(d) of the Indenture are remarketed, the Tender Agent shall pay the Purchase Price of such Bonds by drawing upon the moneys deposited therefor according to the terms of this Section 2.02(c). The Registrar shall register new Bonds as directed by the Remarketing Agent and make such Bonds available for delivery as provided herein on the date of such purchase. Payment of the Purchase Price of any Bond shall be made in immediately available funds upon presentation and surrender of such Bond to the Tender Agent, unless such Bonds are then held in book-entry form as provided in Section 2.01(d) of the Indenture. Payment of the Purchase Price of any Bonds held in book-entry form as provided in Section 2.01(d) of the Indenture shall be made in immediately available funds by 3:00 p.m. (New York City time).

(ii)     If moneys sufficient to pay the Purchase Price of Bonds to be purchased pursuant to Section 2.02(a), Section 2.02(b) or Section 4.06 hereof or pursuant to Section 7.01(d) of the Indenture shall be held by the Tender Agent on the date such Bonds are to be purchased, such Bonds shall be deemed to have been purchased and shall be purchased according to the terms hereof, for all purposes of the Indenture, irrespective of whether or not such Bonds shall have been delivered to the Tender Agent, and the former Holder of such Bonds shall have no claim thereon, under the Indenture or otherwise, for any amount other than the Purchase Price thereof.

(iii)     In the event any Bonds purchased according to the terms of this Multi-Mode Annex or pursuant to Section 7.01(d) of the Indenture shall not be presented to the Tender Agent, the Tender Agent shall segregate and hold the moneys for the Purchase Price of such Bonds in trust, without liability for interest thereon, for the benefit of the former Holders of such Bonds, who shall, except as provided in the following sentence, thereafter be restricted exclusively to such moneys for the satisfaction of any claim for

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page
207 of 295

the Purchase Price of such Bonds. Any moneys which the Tender Agent shall segregate and hold in trust for the payment of the Purchase Price of any Bond and remaining unclaimed for two (2) years after the date of purchase shall, upon the Borrower's written request to the Tender Agent, be paid to the Borrower. After the payment of such unclaimed moneys to the Borrower, the former Holder of such Bond shall look only to the Borrower for the payment thereof.

(iv)    If moneys sufficient to pay the Purchase Price of Bonds to be purchased pursuant to Section 2.02(a) or 2.02(b) hereof shall not be held by the Tender Agent by 3:00 p.m. (New York City time) on the date such Bonds are to be purchased and:

(A)    if a Credit Facility or a Liquidity Facility (other than the Letter of Credit or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility under the Indenture) is in effect with respect to the Bonds, it shall not constitute an Event of Default under the Indenture or a Loan Default Event if the Bonds are not purchased upon tender on any Purchase Date due to such insufficiency and (x) no purchase shall be consummated on such Purchase Date (and Holders shall no longer be entitled to receive payment of the Purchase Price of tendered Bonds on such Purchase Date) and the Tender Agent shall, after any applicable grace period, (1) return all tendered Bonds to the Holders thereof and (2) return all remarketing proceeds to the Remarketing Agent for return to the Persons providing such moneys; and (y) such Bonds shall bear interest during the period of time from and including the applicable Purchase Date to (but not including) the date that all such Bonds are successfully remarketed (the "Delayed Remarketing Period"), at the rate specified for such Bonds in Section 2.01(c) hereof as being applicable in the event a rate is not determined by the Remarketing Agent or the Auction Agent, as applicable, for the then applicable Rate Period, but in no event shall such rate be greater than the Maximum Rate; or

(B)    if the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility under the Indenture) is in effect with respect to the Bonds, it shall constitute an Event of Default under the Indenture or a Loan Default Event if the Bonds are not purchased upon tender no later than one (1) Business Day after any Purchase Date due to such insufficiency, and the Bonds shall bear interest at the rate in effect immediately prior to and on such Purchase Date, from and after the Purchase Date until such Purchase Price is paid in full; or

(C)    if no Credit Facility or Liquidity Facility is in effect with respect to the Bonds, it shall constitute an Event of Default under the Indenture or a Loan Default Event if the Bonds are not purchased upon tender on any Purchase Date due to such insufficiency, and the Bonds shall bear interest at the Maximum Rate from and after the Purchase Date until such Purchase Price is paid in full.

(v)    If a Credit Facility or a Liquidity Facility (other than the Letter of Credit or a single letter of credit, guarantee or insurance policy constituting both a Credit

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 208 of 295

Facility and a Liquidity Facility under the Indenture) is in effect with respect to the Bonds and the Bonds were not purchased upon tender on such Purchase Date due to the insufficiency described in Section 2.02(c)(iv) above, on each Business Day during the Delayed Remarketing Period following the failed remarketing until the date that all such Bonds are successfully remarketed, the Remarketing Agent shall continue to use its best efforts to remarket such Bonds. Once the Remarketing Agent has advised the Trustee that it has a good faith belief that it is able to remarket all of the Bonds into the designated Rate Period, the Trustee, at the direction of the Borrower, will give notice by mail to the Holders of the Bonds not later than five Business Days prior to the last day of the Delayed Remarketing Period, which notice will state (A) that the interest rate on the Bonds will continue to be, or will be adjusted to, a Daily Rate, Weekly Rate, Term Rate, Flexible Rate or Auction Rate on and after the last day of the Delayed Remarketing Period; (B) that such Bonds will be subject to mandatory tender for purchase on the last day of the Delayed Remarketing Period; (C) the procedures for such mandatory tender; (D) the Purchase Price of the Bonds on the Purchase Date (expressed as a percentage of the principal amount thereof); and (E) the consequences of a failed remarketing as set forth in Section 2.02(c)(iv)(A) above.

(vi)     During the Delayed Remarketing Period, the Trustee may, upon direction of the Borrower, apply amounts available for redemption of the Bonds pursuant to Section 4.01 of the Indenture to the redemption of the Bonds as a whole or in part on any Business Day during the Delayed Remarketing Period, at a redemption price equal to the principal amount thereof, together with interest accrued thereon to the date fixed for redemption, without premium.

(vii)    During the Delayed Remarketing Period, interest on such Bonds shall be paid to the Holders thereof on the first Business Day of each calendar month occurring during the Delayed Remarketing Period and on the last day of the Delayed Remarketing Period. Payment of such interest shall be made by the Trustee from the Bond Fund pursuant to this Multi-Mode Annex.

(d)     Bond Purchase Fund.

(i)     The Tender Agent shall create, establish and maintain the Bond Purchase Fund, the Remarketing Account, the Liquidity Facility Purchase Account and the Borrower Account therein in accordance with the provisions of the Tender Agent Agreement.

(ii)     The moneys in the Bond Purchase Fund shall be used solely to acquire Bonds as provided herein (or to reimburse the applicable Liquidity Provider, if any, for payments made under the applicable Liquidity Facility for such purpose) and may not be used for any other purposes. All amounts held in the Bond Purchase Fund and the Liquidity Facility Purchase Account, the Remarketing Account and the Borrower Account therein shall be held uninvested and in trust by the Tender Agent for the benefit of the holders of Bonds purchased or deemed purchased by the Tender Agent pursuant to Section 2.02(a), 2.02(b) or 4.06 hereof or Section 7.01(d) of the Indenture (provided that any amounts held in a Remarketing Account which are derived from the remarketing of

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 209 of 295

Liquidity Provider Bonds shall be held in trust for the benefit of the applicable Liquidity Provider).

(iii)    Deposits into Remarketing Account.

(A)    The terms of any sale by the Remarketing Agent of tendered Bonds shall provide for the payment of the Purchase Price for tendered Bonds by the Remarketing Agent to the Tender Agent for deposit in the Remarketing Account of the Bond Purchase Fund in immediately available funds at or before 11:45 a.m. (New York City time) on the Purchase Date. Except pursuant to Section 4.06 hereof or pursuant to Section 7.01(d) of the Indenture or the purchase of any Bonds by the Borrower with payments under Section 4.2(d) of the Agreement, the Remarketing Agent shall not sell any Bonds to the Issuer or the Borrower (or any "insider," as defined in the United States Bankruptcy Code, of the Issuer or the Borrower) so long as a Liquidity Facility is in effect unless payment of the Purchase Price is made from Available Moneys. The Remarketing Agent shall cause to be paid to the Tender Agent at or before 11:45 a.m. (New York City time) on each Purchase Date for tendered Bonds all amounts representing proceeds of the remarketing of such Bonds.

(B)    If insufficient funds are on deposit in the Remarketing Account of the Bond Purchase Fund at 11:45 a.m. (New York City time) on the Purchase Date to pay the Purchase Price of any tendered Bonds, the Tender Agent shall draw upon the applicable Liquidity Facility pursuant to Section 2.02(d)(iv) hereof. The Tender Agent agrees to notify the Borrower immediately by telephone, confirmed in writing, of such insufficiency and the amount, if any, to be drawn upon the applicable Liquidity Facility pursuant to Section 2.02(d)(iv) hereof.

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 210 of 295

(iv)    Draws on Liquidity Facility; Deposits to Liquidity Facility Purchase Account; Liquidity Provider Bonds.

(A)    If insufficient funds are on deposit in the Remarketing Account of the Bond Purchase Fund at 11:45 a.m. (New York City time) on the Purchase Date to pay the Purchase Price of any tendered Bonds, the Tender Agent shall draw upon the applicable Liquidity Facility, if any, in an amount, together with remarketing proceeds on deposit in the Remarketing Account, sufficient to provide funds for such payment by 2:30 p.m. (New York City time) on the date such Bonds are to be purchased. In no event shall the Tender Agent draw upon the applicable Liquidity Facility for the payment of the Purchase Price of any tendered Bonds owned by or for the account of the Borrower or the Liquidity Provider. The proceeds of each such draw under the applicable Liquidity Facility for payment of the Purchase Price of Bonds tendered pursuant to Section 2.02(a), 2.02(b) or 4.06 hereof or pursuant to Section 7.01(d) of the Indenture shall be deposited in the Liquidity Facility Purchase Account in the Bond Purchase Fund, and used in the order of priority established by Section 2.02(c) hereof, as applicable.

(B)    Any Bonds purchased with payments made under any Liquidity Facility shall be registered in the name of, or as otherwise directed by, the applicable Liquidity Provider and delivered to or upon the order of, or as otherwise directed by, such Liquidity Provider. The Tender Agent shall direct DTC to cause any Bonds purchased with the proceeds of such demand to be transferred to such account at DTC, as directed by such Liquidity Provider, and such Bonds shall be held in the name of or for the account of such Liquidity Provider or as may be directed by such Liquidity Provider. In the event such Liquidity Provider so requests, the Borrower shall secure a new CUSIP number for Liquidity Provider Bonds.

(C)    Liquidity Provider Bonds shall be remarketed by the Remarketing Agent in accordance with the terms of the Remarketing Agreement. Upon (i) receipt by the Trustee and the Tender Agent of written notification from any Liquidity Provider that the applicable Liquidity Facility (if any is then in effect) has been fully reinstated with respect to principal and interest or will terminate because either a new Liquidity Facility with a new Liquidity Provider has replaced the existing Liquidity Facility or the Bonds have been adjusted to a new Interest Rate Period, and (ii) release by any Liquidity Provider of any Liquidity Provider Bonds which the Remarketing Agent has remarketed, such Bonds shall be made available to the purchasers thereof and shall no longer constitute Liquidity Provider Bonds. The proceeds of any remarketing of Liquidity Provider Bonds shall be paid to the applicable Liquidity Provider on such remarketing date in immediately available funds.

(D)    The Tender Agent agrees that it will, immediately upon receipt, send to such Liquidity Provider (by telephonic or electronic notice) a copy of every notice received by it hereunder relating to any Liquidity Provider Bonds.

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 211 of 295

(E)     Notwithstanding anything to the contrary herein or in the Bonds, all obligations of the Tender Agent under or in connection with any Liquidity Facility (including, without limitation, reimbursement obligations of the Trustee to the applicable Liquidity Provider with respect to such Liquidity Facility) shall be governed by the terms of such Liquidity Facility.

(F)     The Tender Agent shall not surrender any Liquidity Facility except in connection with an event requiring a mandatory tender pursuant to Section 2.02(b)(i)(C) hereof.

(v)     Deposits into Borrower Account.

(A)     The Borrower has agreed in Section 4.2(d) of the Agreement to pay to the Tender Agent in immediately available funds (i)(x) the Purchase Price for tendered Bonds by 2:30 p.m. (New York City time) on any Purchase Date in the amount specified in the Notice of Borrower Purchase in the event that no Credit Facility or Liquidity Facility is in effect with respect to the Bonds and if the amounts on deposit in the Bond Purchase Fund are insufficient to pay the Purchase Price of any Bonds tendered for purchase on any Purchase Date and (y) the Purchase Price for tendered Bonds by 2:30 p.m. (New York City time) one (1) Business Day after any Purchase Date in the amount specified in the Notice of Borrower Purchase if the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility under the Indenture) is in effect with respect to the Bonds and if the amounts on deposit in the Bond Purchase Fund are insufficient to pay the Purchase Price of any Bonds tendered for purchase on any Purchase Date and (ii) the amount of premium, if any, due with respect to the Mandatory Put Bonds on any Purchase Date for Mandatory Put Bonds described in Section 2.02(b)(ii) hereof.   The amounts received by the Tender Agent from the Borrower pursuant to Section 4.2(d) of the Agreement shall be deposited in the Borrower Account in the Bond Purchase Fund, and used in the order of priority established by Section 2.02(e) hereof, as applicable.

(B)     The Borrower has agreed in Section 4.2(b)(ii)(A) of the Agreement to pay or cause to be deposited in the Borrower Account (i) by 2:30 p.m. (New York City time) on any Purchase in Lieu of Redemption Date or Purchase in Lieu of Acceleration Date, as applicable, in immediately available funds the Purchase Price for tendered Bonds in the event that the Borrower exercises its right to purchase Bonds in lieu of redemption pursuant to Section 4.06 hereof or exercises its right to purchase Bonds in lieu of acceleration pursuant to Section 7.01(d) of the Indenture and elects to cause the Purchase Price of such Bonds on the Purchase in Lieu of Redemption Date or Purchase in Lieu of Acceleration Date, as applicable, to be paid from amounts paid by the Borrower to the Tender Agent in immediately available funds and the amount on deposit in the Borrower Account is insufficient to pay the Purchase Price of any such Bonds tendered for purchase on any Purchase in Lieu of Redemption Date or Purchase in Lieu of Acceleration Date, as applicable and (ii) by 2:30 p.m. (New York City time) one

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 212 of 295

(1) Business Day after any Purchase in Lieu of Redemption Date or Purchase in Lieu of Acceleration Date, as applicable, in immediately available funds the Purchase Price for tendered Bonds if at any time the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility under the Indenture) is in effect with respect to the Bonds and the Borrower exercises its right to purchase Bonds in lieu of redemption pursuant to Section 4.06 hereof or exercises its right to purchase Bonds in lieu of acceleration pursuant to Section 7.01(d) of the Indenture and elects to cause the Purchase Price of such Bonds on the Purchase in Lieu of Redemption Date to be paid from moneys realized under the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility under the Indenture) and if the amounts on deposit in the Bond Purchase Fund are insufficient to pay the Purchase Price of any Bonds tendered for purchase on any Purchase in Lieu of Redemption Date or Purchase in Lieu of Acceleration Date, as applicable. The amounts received by the Trustee from the Borrower pursuant to Section 4.2(b)(ii) of the Agreement shall be deposited in the Borrower Account, and used as set forth in Section 2.02(e) hereof.

(C)     The Tender Agent agrees to notify the Borrower immediately by telephone of the amount, if any, in the Borrower Account which is not so used to purchase (or deemed to purchase) any Bonds tendered for purchase on such Purchase Date by 5:00 p.m. (New York City time) on such Purchase Date. Any moneys remaining in the Borrower Account after use in the order of priority established by Section 2.02(e) hereof, if any, shall be wired to such account as may be designated by the Borrower as promptly as practicable thereafter.

(D)     Any Bonds purchased with funds in the Borrower Account shall be registered in the name of, or as otherwise directed by, the Borrower and delivered to or upon the order of, or as otherwise directed by, the Borrower. The Registrar shall direct DTC to cause any Bonds purchased with the proceeds of such demand to be transferred to such account at DTC, as directed by the Borrower, and such Bonds shall be held in the name of or for the account of the Borrower or as may be directed by the Borrower. Bonds purchased with funds in the Borrower Account shall be remarketed by the Remarketing Agent in accordance with the terms of the Remarketing Agreement. The Remarketing Agent shall, pursuant to the Remarketing Agreement, use its best efforts to sell any Bonds purchased with funds in the Borrower Account to new purchasers.

(e)     Disbursements from the Bond Purchase Fund.

(i)     Application of Moneys. Moneys in the Bond Purchase Fund (other than the proceeds of any remarketing of Liquidity Provider Bonds which shall be paid to the applicable Liquidity Provider on the remarketing date) shall be applied at or before 3:00 p.m. (New York City time) to the purchase of Bonds as provided herein by the Tender Agent, on each Purchase Date, as follows:

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page
213 of 295

First -- Moneys constituting funds in the Remarketing Account shall be used by the Tender Agent on any Purchase Date to purchase tendered Bonds at the Purchase Price thereof;

Second -- In the event such moneys in the Remarketing Account on any Purchase Date are insufficient to purchase all tendered Bonds, moneys in the Liquidity Facility Purchase Account on such Purchase Date shall be used by the Tender Agent at that time to purchase such remaining tendered Bonds at the Purchase Price thereof; and

Third -- In the event such moneys in the Remarketing Account on any Purchase Date are insufficient to purchase all tendered Bonds and no Credit Facility or Liquidity Facility is in effect with respect to the Bonds or if the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility under the Indenture) is in effect with respect to the Bonds, moneys in the Borrower Account on such Purchase Date or one (1) Business Day after such Purchase Date, as applicable, shall be used by the Tender Agent at that time to purchase such remaining tendered Bonds at the Purchase Price thereof.

Notwithstanding anything to the contrary in this Section, if the Bonds are held in book-entry form as provided in Section 2.01(d) of the Indenture, payment of the Purchase Price for tendered Bonds shall be made in accordance with the rules and procedures of DTC.

(f) _Limitation on Remarketing After Automatic Adjustment._ Notwithstanding anything to the contrary contained herein or in the Indenture, Bonds, including Liquidity Provider Bonds, in a Flexible Rate Mode and to which Section 2.01(c)(ix)(C) or Section 2.01(c)(ix)(D) hereof is applicable shall not be remarketed other than to the Borrower or the Liquidity Provider, if any, unless at the time of such remarketing the Bonds are rated "A" or better (without regard to "+"s or "-"s or numerical designations) by a Rating Agency.

## ARTICLE III

## AUCTION PROVISIONS

Section 3.01. _Orders by Existing Owners and Potential Owners._

(a) Auctions shall be conducted on each Auction Date in the manner described in this Section 3.01 and in Sections 3.02, 3.03 and 3.04 hereof. Prior to the Submission Deadline on each Auction Date during an Auction Rate Period:

(i) each Existing Owner may submit to the applicable Broker-Dealer information as to:

(A) the principal amount of Bonds, if any, held by such Existing Owner which such Existing Owner desires to continue to hold without regard to the Auction Rate for the next succeeding Auction Period;

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 214 of 295

(B)     the principal amount of Bonds, if any, held by such Existing Owner which such Existing Owner (1) offers to continue to hold if the Auction Rate for the next succeeding Auction Period shall not be less than the rate per annum specified by such Existing Owner and (2) if such offer to hold shall not be accepted in whole, offers to sell as and to the extent provided in subsection (b)(i) of this Section 3.01; and/or

(C)     the principal amount of Bonds, if any, held by such Existing Owner which such Existing Owner offers to sell without regard to the Auction Rate for the next succeeding Auction Period.

(ii)     one or more Broker-Dealers may contact Potential Owners to determine the principal amount of Bonds which each such Potential Owner offers to purchase if the Auction Rate for the next succeeding Auction Period shall not be less than the interest rate per annum specified by such Potential Owner.

For the purposes hereof, the communication to a Broker-Dealer of information referred to in clause (i)(A), (i)(B) and/or (i)(C) or (ii) above is hereinafter referred to as an "Order" and each Existing Owner and Potential Owner placing an Order is hereinafter referred to as a "Bidder"; an Order containing the information referred to in clause (i)(A) above is hereinafter referred to as a "Hold Order"; an Order containing the information referred to in clause (i)(B) or clause (ii) above is hereinafter referred to as a "Bid"; and an Order containing the information referred to in clause (i)(C) above is hereinafter referred to as a "Sell Order."

(b)     (i) Subject to the provisions of Section 3.02 hereof, a Bid by an Existing Owner, to the extent not accepted under subsection (a)(i)(B)(1) above, shall be deemed to have been rejected and, thereupon, to constitute an irrevocable offer to sell:

(A)     the principal amount of Bonds specified in such Bid if the Auction Rate determined pursuant to the Auction Procedures on such Auction Date shall be less than the interest rate per annum specified therein; or

(B)     such principal amount or a lesser principal amount of Bonds to be determined as set forth in subsection (a)(iv) of Section 3.04 hereof if the Auction Rate determined pursuant to the Auction Procedures on such Auction Date shall be equal to the interest rate per annum specified therein; or

(C)     such principal amount of Bonds if the interest rate per annum specified therein shall be higher than the Maximum Rate or such principal amount or a lesser principal amount of Bonds to be determined as set forth in subsection (b)(iii) of Section 3.04 hereof if such specified rate shall be higher than the Maximum Rate and Sufficient Clearing Bids do not exist.

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 215 of 295

(ii)     Subject to the provisions of Section 3.02 hereof, a Sell Order by an Existing Owner shall constitute an irrevocable offer to sell:

(A)     the principal amount of Bonds specified in such Sell Order; or

(B)     such principal amount or a lesser principal amount of Bonds as set forth in subsection (b)(iii) of Section 3.04 hereof if Sufficient Clearing Bids do not exist.

(iii)     Subject to the provisions of Section 3.02 hereof, a Bid by a Potential Owner shall constitute an irrevocable offer to purchase:

(A)     the principal amount of Bonds specified in such Bid if the Auction Rate determined on such Auction Date shall be higher than the rate specified therein; or

(B)     such principal amount or a lesser principal amount of Bonds as set forth in subsection (a)(v) of Section 3.04 hereof if the Auction Rate determined on such Auction Date shall be equal to such specified rate.

Section 3.02.  Submission of Orders by Broker-Dealers to Auction Agent.

(a)     During an Auction Rate Period, each Broker-Dealer shall submit in writing to the Auction Agent prior to the Submission Deadline on each Auction Date during the Auction Rate Period, all Orders obtained by such Broker-Dealer and shall specify with respect to each such Order:

(i)     the aggregate principal amount of Bonds that are subject to such Order;

(ii)     to the extent that such Bidder is an Existing Owner:

(A)     the principal amount of Bonds, if any, subject to any Hold Order placed by such Existing Owner;

(B)     the principal amount of Bonds, if any, subject to any Bid placed by such Existing Owner and the rate specified in such Bid; and

(C)     the principal amount of Bonds, if any, subject to any Sell Order placed by such Existing Owner; and

(iii)     to the extent such Bidder is a Potential Owner, the rate and principal amount of Bonds specified in such Potential Owner's Bid.

(b)     If any rate specified in any Bid contains more than three figures to the right of the decimal point, the Auction Agent shall round such rate up to the next highest one thousandth (.001) of 1%.

(c)     If an Order or Orders covering all Bonds held by an Existing Owner is not submitted to the Auction Agent prior to the Submission Deadline, the Auction Agent shall deem a Hold Order to have been submitted on behalf of such Existing Owner covering the principal amount of Bonds held by such Existing Owner and not subject to Orders submitted to the Auction Agent. None of the Issuer, the Borrower, the Trustee and the Auction Agent shall be responsible for any failure of a Broker-Dealer to submit an Order to the Auction Agent on behalf of any Existing Owner or Potential Owner.

(d)     If any Existing Owner submits through a Broker-Dealer to the Auction Agent one or more Orders covering in the aggregate more than the principal amount of Bonds held by such Existing Owner, such Orders shall be considered valid as follows and in the following order of priority:

(i)     all Hold Orders shall be considered valid, but only up to and including the principal amount of Bonds held by such Existing Owner, and, if the aggregate principal amount of Bonds subject to such Hold Orders exceeds the aggregate principal amount of Bonds held by such Existing Owner, the aggregate principal amount of Bonds subject to each such Hold Order shall be reduced pro rata to cover the aggregate principal amount of Bonds held by such Existing Owner;

(ii)     (A) any Bid shall be considered valid up to and including the excess of the principal amount of Bonds held by such Existing Owner over the aggregate principal amount of Bonds subject to any Hold Orders referred to in paragraph (i) above;

(B)     subject to clause (A) above, if more than one Bid with the same rate is submitted on behalf of such Existing Owner and the aggregate principal amount of Bonds subject to such Bids is greater than such excess, such Bids shall be considered valid up to and including the amount of such excess, and the principal amount of Bonds subject to each Bid with the same rate shall be reduced pro rata to cover the principal amount of Bonds equal to such excess;

(C)     subject to clauses (A) and (B) above, if more than one Bid with different rates is submitted on behalf of such Existing Owner, such Bids shall be considered valid in the ascending order of their respective rates until the highest rate is reached at which such excess exists and then at such rate up to and including the amount of such excess; and

(D)     in any such event, the aggregate principal amount of Bonds, if any, subject to Bids not valid under this paragraph (ii) shall be

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 217 of 295

treated as subject to a Bid by a Potential Owner at the rate therein specified; and

(iii)    all Sell Orders shall be considered valid up to and including a principal amount of Bonds equal to the excess of (A) the principal amount of Bonds held by such Existing Owner over (B) the sum of the principal amount of Bonds subject to valid Hold Orders referred to in paragraph (i) above and the principal amount of Bonds subject to valid Bids referred to in paragraph (ii) above.

(e)    If more than one Bid for Bonds is submitted on behalf of any Potential Owner, all Bids of such Potential Owner with the same rate may be aggregated and considered a single Bid of such Potential Owner with the rate and aggregate principal amount therein specified and each Bid submitted with a different rate shall be considered a separate Bid with the rate and aggregate principal amount therein specified.

(f)    Any Bid or Sell Order submitted by an Existing Owner covering an aggregate principal amount of Bonds not equal to an Authorized Denomination shall be rejected and shall be deemed a Hold Order.  Any Bid submitted by a Potential Owner covering an aggregate principal amount of Bonds not equal to an Authorized Denomination shall be rejected.

(g)    Any Bid submitted by an Existing Owner or Potential Owner specifying a rate lower than the Minimum Auction Rate shall be treated as a Bid specifying the Minimum Auction Rate.

(h)    Any Order submitted by a Broker-Dealer to the Auction Agent shall be irrevocable.

Section 3.03.  Determination of Sufficient Clearing Bids, Winning Bid Rate and Auction Rate.

(a)    Not earlier than the Submission Deadline on each Auction Date during the Auction Rate Period, the Auction Agent shall assemble all valid Orders submitted or deemed submitted to it by the Broker-Dealers (each such Order as submitted or deemed submitted by a Broker-Dealer being hereinafter referred to as a "Submitted Hold Order," a "Submitted Bid" or a "Submitted Sell Order," as the case may be, or as a "Submitted Order") and shall determine:

(i)    the excess, if any, of the total principal amount of Bonds over the aggregate principal amount of Bonds subject to Submitted Hold Orders (such excess being hereinafter referred to as the "Available Bonds"); and

(ii)    from the Submitted Orders whether or not the aggregate principal amount of Bonds subject to Submitted Bids by Potential Owners specifying one or more rates not higher than the Maximum Rate exceeds or is equal to the sum of:

(A)    the aggregate principal amount of Bonds subject to Submitted Bids by Existing Owners specifying one or more rates higher than the Maximum Rate; and

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 218 of 295

(B)    the aggregate principal amount of Bonds subject to Submitted Sell Orders;

(it being understood that, in the event of such excess or such equality (other than because the sum of the principal amounts of Bonds in clauses (A) and (B) above is zero because all of the Bonds are subject to Submitted Hold Orders), there shall be deemed to exist, and such Submitted Bids by Potential Owners shall be hereinafter called, collectively, "Sufficient Clearing Bids"); and

(iii)    if Sufficient Clearing Bids exist, the lowest rate specified in the Submitted Bids (the "Winning Bid Rate") which if:

(A)    (I) each Submitted Bid from Existing Owners specifying such lowest rate and (II) all other Submitted Bids from Existing Owners specifying lower rates were accepted, thus entitling such Existing Owners to continue to hold the Bonds that are the subject of such Submitted Bids; and

(B)    (I) each Submitted Bid from Potential Owners specifying such lowest rate and (II) all other Submitted Bids from Potential Owners specifying lower rates were accepted, thus entitling and requiring such Potential Owners to purchase the Bonds that are the subject of such Submitted Bids;

would result in such Existing Owners described in clause (A) above continuing to hold an aggregate principal amount of Bonds which, when added to the aggregate principal amount of Bonds to be purchased by such Potential Owners described in clause (B) above, would equal not less than the Available Bonds.

(b)    Promptly after the Auction Agent has made the determinations pursuant to subsection (a) of this Section 3.03, the Auction Agent by facsimile or electronic transmission, or by telephone (promptly confirmed by such means), shall advise the Borrower, the applicable Broker-Dealer, the Securities Depository and the Trustee of the Maximum Rate and the Minimum Auction Rate and the components thereof on the Auction Date and, based on such determinations, the Auction Rate for the next succeeding Auction Period as follows:

(i)    if Sufficient Clearing Bids exist, that the Auction Rate for the next succeeding Auction Period therefor shall be equal to the Winning Bid Rate so determined;

(ii)    if Sufficient Clearing Bids do not exist (other than because all of the Bonds are the subject of Submitted Hold Orders), that the Auction Rate for the next succeeding Auction Period therefor shall be equal to the Maximum Rate; and

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 219 of 295

(iii)    if all of the Bonds are subject to Submitted Hold Orders, that the Auction Rate for the next succeeding Auction Period therefor shall be equal to the Minimum Auction Rate.

Section 3.04. Acceptance and Rejection of Submitted Bids and Submitted Sell Orders and Allocation of Bonds. Existing Owners shall continue to hold the principal amounts of Bonds that are subject to Submitted Hold Orders, and, based on the determinations made pursuant to subsection (a) of Section 3.03 hereof, the Submitted Bids and Submitted Sell Orders shall be accepted or rejected, and the Auction Agent shall take such other actions, as set forth below:

(a)    If Sufficient Clearing Bids have been made, all Submitted Sell Orders shall be accepted and, subject to the provisions of paragraphs (e) and (f) of this Section 3.04, Submitted Bids shall be accepted or rejected as follows in the following order of priority and all other Submitted Bids shall be rejected:

(i)    Existing Owners' Submitted Bids specifying any rate that is higher than the Winning Bid Rate shall be rejected, thus requiring each such Existing Owner to sell the aggregate principal amount of Bonds subject to such Submitted Bids;

(ii)    Existing Owners' Submitted Bids specifying any rate that is lower than the Winning Bid Rate shall be accepted, thus entitling each such Existing Owner to continue to hold the aggregate principal amount of Bonds subject to such Submitted Bids;

(iii)    Potential Owners' Submitted Bids specifying any rate that is lower than the Winning Bid Rate shall be accepted, thus entitling and requiring each such Potential Owner to purchase the aggregate principal amount of Bonds subject to such Submitted Bids;

(iv)    each Existing Owner's Submitted Bid specifying a rate that is equal to the Winning Bid Rate shall be accepted, thus entitling such Existing Owner to continue to hold the aggregate principal amount of Bonds subject to such Submitted Bid, unless the aggregate principal amount of Bonds subject to all such Submitted Bids shall be greater than the principal amount of Bonds (the "Remaining Principal Amount") equal to the excess of the Available Bonds over the aggregate principal amount of the Bonds subject to Submitted Bids described in paragraphs (ii) and (iii) of this subsection (a), in which event such Submitted Bid of such Existing Owner shall be accepted in part only, and such Existing Owner shall be entitled to continue to hold the Bonds subject to such Submitted Bid only in the principal amount obtained by multiplying the Remaining Principal Amount by a fraction, the numerator of which shall be the principal amount of Bonds held by such Existing Owner subject to such Submitted Bid and the denominator of which shall be the sum of the principal amounts of Bonds subject to such Submitted Bids made by all such Existing Owners that specified a rate equal to the Winning Bid Rate; and the remainder of such Submitted Bid shall be rejected, thus requiring such

Existing Owner to sell the excess principal amount of Bonds as to which such Submitted Bid shall not have been accepted as aforesaid;

(v)     each Potential Owner's Submitted Bid specifying a rate that is equal to the Winning Bid Rate shall be accepted but only in an amount equal to the principal amount of Bonds obtained by multiplying the excess of the Available Bonds over the aggregate principal amount of Bonds subject to Submitted Bids described in paragraphs (ii), (iii) and (iv) of this subsection (a) by a fraction the numerator of which shall be the aggregate principal amount of Bonds subject to such Submitted Bid of such Potential Owner and the denominator of which shall be the sum of the principal amount of Bonds subject to Submitted Bids made by all such Potential Owners that specified a rate equal to the Winning Bid Rate; and the remainder of such Submitted Bid shall be rejected; and

(vi)     each Potential Owner's Submitted Bid specifying a rate that is higher than the Winning Bid Rate shall be rejected.

(b)     If Sufficient Clearing Bids have not been made (other than because all of the Bonds are subject to Submitted Hold Orders), subject to the provisions of subsection (e) of this Section 3.04, Submitted Orders shall be accepted or rejected as follows in the following order of priority and all other Submitted Bids shall be rejected:

(i)     Existing Owners' Submitted Bids specifying any rate that is equal to or lower than the Maximum Rate shall be accepted, thus entitling each such Existing Owner to continue to hold the aggregate principal amount of Bonds subject to such Submitted Bids;

(ii)     Potential Owners' Submitted Bids specifying any rate that is equal to or lower than the Maximum Rate shall be accepted, thus entitling and requiring each such Potential Owner to purchase the aggregate principal amount of Bonds subject to such Submitted Bids;

(iii)     each Existing Owner's Submitted Bid specifying any rate that is higher than the Maximum Rate shall be rejected, and each Existing Owner's Submitted Sell Order shall be accepted, thus requiring each Existing Owner that submitted any such Submitted Bid and/or Submitted Sell Order to sell the Bonds subject to such Submitted Bid and/or Submitted Sell Order, but in both cases only in an amount equal to the aggregate principal amount of Bonds obtained by multiplying the aggregate principal amount of Bonds subject to Submitted Bids described in paragraph (ii) of this subsection (b) by a fraction, the numerator of which shall be the aggregate principal amount of Bonds held by such Existing Owner subject to such Submitted Bid and/or Submitted Sell Order and the denominator of which shall be the aggregate principal amount of Bonds subject to all such Submitted Bids and Submitted Sell Orders; and the remainder of such Existing Owner's Submitted Bid and/or Submitted Sell Order shall be deemed to be, and shall be deemed to be accepted as, a Hold Order thus entitling such Existing Owner to continue to hold such excess principal amount of Bonds as to which such Submitted Bid

shall not have been rejected, and/or such Submitted Sell Order shall not have been accepted, as aforesaid; and

        (iv)    each Potential Owner's Submitted Bid specifying a rate that is higher than the Maximum Rate shall be rejected.

        (c)    If all Bonds are subject to Submitted Hold Orders, all Submitted Bids shall be rejected.

        (d)    If, as a result of the procedures described in subsection (a) or (b) of this Section 3.04, any Existing Owner would be required to sell, or any Potential Owner would be required to purchase, a principal amount of Bonds that is not equal to an Authorized Denomination, the Auction Agent shall, in such manner as, in its sole discretion, it shall determine, round up or down the principal amount of such Bonds to be purchased or sold by any Existing Owner or Potential Owner so that the principal amount purchased or sold by each Existing Owner or Potential Owner shall be equal to an Authorized Denomination.

        (e)    If, as a result of the procedures described in subsection (a) of this Section 3.04, any Potential Owner would be required to purchase less than $25,000 in aggregate principal amount of Bonds, the Auction Agent shall, in such manner as, in its sole discretion, it shall determine, allocate Bonds for purchase among Potential Owners so that only Bonds in principal amounts equal to an Authorized Denomination are purchased by any Potential Owner, even if such allocation results in one or more of such Potential Owners not purchasing any Bonds.

        (f)    Based on the results of each Auction, the Auction Agent shall determine the aggregate principal amounts of Bonds to be purchased and the aggregate principal amounts of Bonds to be sold by Potential Owners and Existing Owners on whose behalf each Broker-Dealer submitted Bids or Sell Orders and, with respect to each Broker-Dealer, to the extent that such amounts differ, determine to which other Broker-Dealer or Broker-Dealers acting for one or more purchasers of Bonds such Broker-Dealer shall deliver, or from which other Broker-Dealer or Broker-Dealers acting for one or more sellers of Bonds such Broker-Dealer shall receive, as the case may be, Bonds.

        (g)    None of the Issuer, the Borrower and any Affiliate thereof may submit an Order in any Auction except as set forth in the next sentence. Any Broker-Dealer that is an Affiliate of the Borrower or the Issuer may submit Orders in an Auction but only if such Orders are not for its own account, except that if such affiliated Broker-Dealer holds Bonds for its own account, it must submit a Sell Order on the next Auction Date with respect to such Bonds. The Auction Agent shall have no duty or liability with respect to monitoring or enforcing the provisions of this paragraph.

Section 3.05. <u>Adjustment in Auction Period or Auction Date</u>.

        (a)    Each Auction Period shall be a Standard Auction Period unless a different Auction Period is established as herein provided and each Auction Period which immediately succeeds a non-Standard Auction Period shall be a Standard Auction Period unless a different Auction Period is established as herein provided. On any Interest Payment Date for any Auction

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page
222 of 295

Period, the Borrower may change the length of a single Auction Period or designate the Standard Auction Period by written notice delivered at least 10 days but not more than 60 days prior to the Auction Date for such Auction Period to the Trustee, the applicable Broker-Dealer, the Auction Agent, the Issuer, each Credit Provider and the Securities Depository. If such Auction Period will be less than seven (7) days, such notice shall be effective only if it is accompanied by a written statement of the Registrar, the Paying Agent, the Trustee, the applicable Broker-Dealer, the Auction Agent and the Securities Depository to the effect that they are capable of performing their duties hereunder and under the applicable Broker-Dealer Agreement and the Auction Agent Agreement with respect to such Auction Period. The length of an Auction Period or the Standard Auction Period may not be changed unless Sufficient Clearing Bids existed at both the Auction, if any, immediately preceding the date the notice of such change was given and the Auction immediately preceding such changed Auction Period. The change in length of an Auction Period or the Standard Auction Period shall take effect only if (X) the Trustee and the Auction Agent receive, by 11:00 a.m. (New York City time) on the Business Day immediately preceding the Auction Date for such Auction Period, a certificate from the Borrower by telecopy notice, authorizing the change in the length of the Standard Auction Period, which shall be specified in such certificate, and confirming that Bond Counsel expects to be able to give an opinion on the first day of such Auction Period to the effect that the change in the Auction Period is authorized by this Multi-Mode Annex, is authorized or permitted by the Act and will not adversely affect the Tax-Exempt status of interest on the Bonds, (Y) Sufficient Clearing Bids exist at the Auction on the Auction Date for such Auction Period, and (Z) the Trustee and the Auction Agent receive by 9:30 a.m. (New York City time) on the first day of such Auction Period, an Opinion of Bond Counsel to the effect that the change in the Auction Period is authorized or permitted by the Act and authorized by this Multi-Mode Annex and will not adversely affect the Tax-Exempt status of interest on the Bonds. If either of the conditions referred to in (X) or (Z) above is not met, the Auction Rate for the next succeeding Auction Period shall be determined pursuant to the Auction Procedures and the next succeeding Auction Period shall be a Standard Auction Period. If the condition referred to in (Y) above is not met, the Auction Rate for the next succeeding Auction Period shall equal the Maximum Rate as determined as of the Auction Date for such Auction Period and the next succeeding Auction Period shall be a seven-day Auction Period until changed pursuant to the Auction Procedures.

(b) During an Auction Rate Period, the Auction Agent, at the written direction of the Borrower, may change, in order to conform with then-current market practice with respect to similar securities or to accommodate economic and financial factors that may affect or be relevant to the day of the week constituting an Auction Date, the Auction Date for all future Auction Periods to a different day, so long as the first such Auction Date will be a Business Day in the calendar week in which the next succeeding Auction Date is then scheduled to occur. If a change in an Auction Date is undertaken in conjunction with a change in an Auction Period and the conditions for the establishment of such change in Auction Period are not met, the Auction Date may be, and the next succeeding Auction Period may be adjusted to end, on a Business Day in the calendar week in which such Auction Date was scheduled to occur and such Auction Period was scheduled to end to accommodate the change in the Auction Date. The Auction Agent shall communicate the change in Auction Date by means of a written notice delivered at least 10 days prior to the Auction Date immediately preceding such Auction Date to the Issuer, the Trustee, the applicable Broker-Dealer, the Borrower and

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 223 of 295

the Securities Depository which shall state the date to which such Auction Date shall be changed. If, after any proposed change in the Auction Date, any Auction Period would be less than seven (7) days in duration, such notice shall be effective only if it is accompanied by a written statement of the Registrar, the Paying Agent, the Trustee, the applicable Broker-Dealer, the Auction Agent and the Securities Depository to the effect that they are capable of performing their duties hereunder and under the applicable Broker-Dealer Agreement and Auction Agent Agreement with respect to any such Auction Period.

Section 3.06. Adjustment in Percentage.

(a)     The applicable Broker-Dealer may from time to time adjust the percentage set forth in the definition of the Minimum Auction Rate if any such adjustment is necessary, in the judgment of such Broker-Dealer, to reflect the effect of any Change of Preference Law. In making any such adjustment, the applicable Broker-Dealer shall consider the following factors, as in existence both before and after such Change of Preference Law: (i) short-term taxable and tax-exempt market rates and indices of such short-term rates, (ii) the market supply and demand for short-term tax-exempt securities, (iii) yield curves for short-term and long-term tax-exempt securities or obligations having a credit rating that is comparable to the Bonds, (iv) general economic conditions and (v) economic and financial factors present in the securities industry that may affect or that may be relevant to the Bonds.

(b)     The Broker-Dealer shall communicate its determination to adjust any of such percentages pursuant to subsection (a) hereof by means of a written notice delivered at least 10 days prior to the Auction Date on which the applicable Broker-Dealer desires to effect the change to the Issuer, the Trustee, the Auction Agent and the Borrower. Such notice shall be effective only if it is accompanied by the form of Opinion of Bond Counsel that Bond Counsel expects to be able to give on such Auction Date to the effect that such adjustment (x) is authorized or permitted by the Indenture and the Act and (y) will not have an adverse effect on the Tax-Exempt status of interest on the Bonds.

(c)     Any such adjustment shall take effect on an Auction Date only if (A) the Trustee and the Auction Agent receive, by 11:00 a.m. (New York City time) on the Business Day immediately preceding such Auction Date, a certificate from the applicable Broker-Dealer by telecopy or similar means, (i) authorizing such adjustment which shall be specified in such authorization, and (ii) confirming that Bond Counsel expects to be able to give an Opinion of Bond Counsel on such Auction Date to the effect that such adjustment (x) is authorized or permitted by the Indenture and the Act and (y) will not have an adverse effect on the Tax-Exempt status of interest on the Bonds, and (B) the Trustee and the Auction Agent receive by 9:30 a.m. (New York City time) on such Auction Date, an Opinion of Bond Counsel to such effect. If the condition referred to in (A) above is not met, the existing percentage used in the definition of Minimum Auction Rate shall remain in effect and the Auction Rate for the next succeeding Auction Period shall be determined pursuant to the Auction Procedures. If the condition referred to in (B) above is not met, such percentages shall remain in effect and the Auction Rate for the next succeeding Auction Period shall equal the Maximum Rate as determined on such Auction Date.

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 224 of 295

Section 3.07. Modification of Auction Procedures. If there shall have been delivered to the Issuer and the Trustee an instrument, executed by the Borrower, the Auction Agent and each Broker-Dealer, setting forth one or more modifications to the Auction Procedures, together with a certificate of the applicable Broker-Dealer to the effect that such modifications are desirable in order to minimize the effective interest cost of the Bonds in light of prevailing financial market conditions, then the Auction Procedures shall be deemed, without further action, to have been modified and amended to the extent, and as of the effective date, set forth in such instrument; provided, however, that no such certificate shall be required if such modification is solely for the purpose of curing or correcting any ambiguity, omission or defective provision; and provided, further, that there shall also have been delivered to the Issuer and the Trustee an Opinion of Bond Counsel to the effect that such modification is permitted by applicable law and will not have an adverse effect on the excludability of the interest on the Bonds from the gross income of the owners or Beneficial Owners thereof for federal income tax purposes.

Section 3.08. Appointment of Auction Agent; Qualifications of Auction Agent; Resignation; Removal. On or before the effective date of an adjustment to an Auction Rate Period, or upon the resignation or removal of the Auction Agent, an Auction Agent shall be appointed by the Borrower. The Auction Agent shall evidence its acceptance of such appointment by entering into an Auction Agent Agreement with the Trustee and the Borrower. The Auction Agent shall be (a) a bank or trust company duly organized under the laws of the United States of America or any state or territory thereof and having a combined capital and surplus of at least $30,000,000 or (b) a member of the National Association of Securities Dealers, Inc., having a capitalization of at least $30,000,000 and, in either case, authorized by law to perform all the duties imposed upon it under the Auction Agent Agreement. Any Auction Agent Agreement shall provide that the Auction Agent may at any time resign and be discharged of the duties and obligations created by this Multi-Mode Annex by giving at least 90 days' notice to the Trustee, the Borrower, the applicable Broker-Dealer, the Remarketing Agent, if any, and the Issuer; provided, that if the Auction Agent has not been compensated for its services, following demand for such compensation, for a period of 60 days, the Auction Agent may resign upon 30 days' notice to the Trustee, the Borrower, each Marketing Party and the Issuer. Any Auction Agent Agreement shall provide that the Auction Agent may be removed at any time by the Borrower upon at least 15 days' notice and thereupon the Borrower shall appoint a successor Auction Agent by notifying the Borrower, the Issuer, the Trustee, each Credit Provider and the applicable Broker-Dealer and entering into an agreement in substantially the form of the Auction Agent Agreement with the Trustee and a successor Auction Agent. Except as set forth above, no resignation or removal shall be effective until the successor Auction Agent has delivered an acceptance of its appointment to the Borrower, the Issuer, the Trustee, each Credit Provider and the applicable Broker-Dealer. The Trustee shall, within 25 days of the resignation or removal of the Auction Agent or the appointment of a successor Auction Agent give notice thereof to the Holders of the Bonds and each Credit Provider. The Auction Agent shall designate its Principal Office in writing to the Borrower, the Issuer, the Trustee and each other Marketing Party.

Section 3.09. Appointment of Broker-Dealers. The Auction Agent shall enter into a Broker-Dealer Agreement with each Broker-Dealer. The Borrower may, from time to time, approve one or more additional Persons to serve as Broker-Dealers pursuant to Broker-Dealer Agreements and shall be responsible for providing copies of such Broker-Dealers Agreements to

the Trustee and the Auction Agent. No such Person shall constitute a Broker-Dealer until a fully executed Broker-Dealer Agreement is delivered to the Trustee and the Auction Agent. Any Broker-Dealer may be removed at any time by the Auction Agent at the written request of the Borrower.

Section 3.10. Several Capacities. Anything herein to the contrary notwithstanding, the same entity may serve hereunder or under the Indenture as the Trustee, the Paying Agent or a Co-Paying Agent, the Registrar, the Tender Agent, the Auction Agent, a Broker-Dealer and the Remarketing Agent, and in any combination of such capacities to the extent permitted by law. Any such entity may in good faith buy, sell, own, hold and deal in any of the Bonds and may join in any action which any Holders may be entitled to take with like effect as if such entity were not appointed to act in such capacity hereunder or under the Indenture.

## ARTICLE IV

## REDEMPTION OF BONDS

Section 4.01. Redemption of Bonds. The Bonds are subject to redemption if and to the extent the Borrower is entitled or required to make and makes a prepayment pursuant to Article VII of the Agreement, at the times and prices as provided in the Indenture, and according to the terms of this section. The Trustee shall not give notice of any redemption under Section 4.01(a) hereof unless directed in accordance with Section 7.4 of the Agreement.

The Bonds shall be redeemed upon the following terms:

(a)    Redemption Upon Optional Prepayment.    (1) The Bonds shall be redeemed in whole or in part, at any time at a redemption price equal to the principal amount thereof plus accrued interest to the redemption date upon receipt by the Trustee of a written notice from the Borrower stating that any of the following events has occurred within the preceding one year and that the Borrower intends to exercise its option to prepay the payments due under the Agreement in whole or in part pursuant to Section 7.2 of the Agreement and thereby effect the redemption of Bonds in whole or in part to the extent of such prepayments:

(A)    The Diablo Canyon Project or a portion thereof the original cost of which is equal to or greater than $500,000 shall have been damaged or destroyed to such extent that, in the opinion of the Borrower (as expressed in a certificate of an Authorized Borrower Representative filed with the Issuer and the Trustee) (a) it is not practicable or desirable to rebuild, repair or restore the Diablo Canyon Project or such portion thereof within a period of six consecutive months following such damage or destruction, (b) the Borrower is or will be thereby prevented from carrying on its normal operations at the Diablo Canyon Project or such portion thereof for a period of six consecutive months, or (c) the cost of restoration thereof would substantially exceed the net proceeds of insurance carried thereon;

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 226 of 295

(B)   Title to, or the temporary use of, the Diablo Canyon Project or a portion thereof the original cost of which is equal to or greater than $500,000 shall have been taken under the exercise of the power of eminent domain, including such a taking as results (or is likely to result) in the Borrower being prevented from carrying on normal operations at the Diablo Canyon Project or such portion thereof for a period of six months or as renders the Diablo Canyon Project or such portion thereof unsuitable for use by the Borrower;

(C)   Unreasonable burdens or excessive liabilities, in the opinion of the Borrower (expressed in a certificate of an Authorized Borrower Representative filed with, and supported by such additional evidence as may be required by, the Issuer and the Trustee), shall have been imposed on the Borrower, including, without limitation, the imposition of federal, state or other ad valorem, property, income or other taxes not imposed on the date of the Agreement, which imposition shall have resulted in a cessation of all or substantially all of its normal operations at the Diablo Canyon Project or a portion thereof the original cost of which is equal to or greater than $500,000 for a period of six consecutive months; or

(D)   Any court or administrative body shall enter a judgment, order or decree requiring the Borrower to cease all or any substantial part of its operations at the Diablo Canyon Project or a portion thereof the original cost of which is equal to or greater than $500,000, to such an extent that, in the opinion of the Borrower (expressed in a certificate of an Authorized Borrower Representative filed with, and supported by such additional evidence as may be required by, the Issuer and the Trustee) it is or will be thereby prevented from carrying on its normal operations at the Diablo Canyon Project or such portion thereof for a period of six consecutive months.

(2)   The Bonds shall be subject to redemption upon prepayment of the Repayment Installments at the option of the Borrower, in whole, or in part by lot, prior to their maturity dates, as follows:

(i)   During any Flexible Rate Period, each Bond shall be subject to such redemption on the Business Day succeeding the last day of each Flexible Segment for such Bond at a redemption price equal to 100% of the principal amount thereof.

(ii)   During any Daily Rate Period or Weekly Rate Period, the Bonds shall be subject to such redemption on any Business Day at a redemption price equal to 100% of the principal amount thereof plus accrued interest, if any, to the date of redemption.

(iii)   During any Auction Period, the Bonds shall be subject to such redemption on any Interest Payment Date, at a redemption price equal to 100% of the principal amount thereof plus accrued interest, if any, to the date of redemption; provided that after any such redemption the aggregate principal

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 227 of 295

amount of Bonds bearing interest at an Auction Rate shall be in an Authorized Denomination unless otherwise consented to by the applicable Broker-Dealer.

(iv) During any Term Rate Period, the Bonds shall be subject to such redemption at any time on or after the 10th anniversary of the effective date of such Rate Period at a redemption price (expressed as a percentage of principal amount) equal to 102%, declining by 1% annually thereafter to 100%.

Notwithstanding the foregoing, the Borrower and the Remarketing Agent may, not later than fifteen (15) days before the first day of any Term Rate Period, give notice to the Issuer and the Trustee setting forth a redemption schedule different from that set forth in subparagraph (iv) above, accompanied by (i) the written consent of each Credit Provider for such Term Rate Period, and (ii) an Opinion of Bond Counsel to the effect that such change will not adversely affect the Tax-Exempt status of interest on the Bonds; and upon such notice and delivery of the consent, if any, and the opinion, such different redemption schedule shall apply to any redemption pursuant to this paragraph for such Term Rate Period, without further action by any party.

(3) During any Term Rate Period, the Bonds shall be subject to redemption in whole, or in part by lot, on any date prior to the applicable first date for optional redemption as set forth in Section 4.01(a)(2)(iv) above, at a redemption price equal to the applicable redemption price that would be in effect on such first date for optional redemption, plus interest accrued thereon to the date fixed for redemption, if the Borrower delivers to the Trustee a written certificate to the effect that (i) by reason of a change in use of the Diablo Canyon Project or Geysers Project or any portion of either of such projects, the Borrower has been unable, after reasonable effort, to obtain an Opinion of Bond Counsel that it is more likely than not that Section 150 of the Code will not prevent interest payable under the Agreement from being deductible for federal income tax purposes, and (ii) as a result, the Borrower has elected to prepay Repayment Installments in an amount equal to the principal amount of Bonds to be redeemed. In such case, the Borrower may only direct the Trustee to redeem such principal amount of Bonds as the Borrower determines is necessary to assure that the Borrower retains its right to all such deductions otherwise allowable or, if a partial redemption will not enable the Borrower to retain the right to deduct such interest, the Borrower may direct the Trustee to redeem all the Outstanding Bonds or any portion thereof.

(b) Redemption Upon Mandatory Prepayment. The Bonds shall be subject to redemption upon mandatory prepayment required by Section 7.2 of the Agreement, as set forth below. In the event of a failure by the Borrower to give any notice of mandatory prepayment required by Section 7.4 of the Agreement, such notice may be given by the Issuer, by the Trustee, by any Credit Provider, if any, or any Holder or Holders of ten percent (10%) or more in aggregate principal amount of Bonds Outstanding not less than 180 days after the occurrence of an event specified in clause (1) or (2) below. In the event that a Responsible Officer of the Trustee has actual knowledge of the occurrence of any event specified in clause (1) or (2) below and the Trustee shall not have received a notice of mandatory prepayment under the Agreement within 180 days of an event specified in clause (1) or (2) below, the Trustee shall give the notice of mandatory

prepayment required by Section 7.4 of the Agreement. In each case, the Trustee shall give notice of such redemption as provided in Section 4.05 of this Multi-Mode Annex.

     (1)    The Bonds shall be redeemed in whole on any date at a redemption price equal to the principal amount thereof plus interest accrued to the redemption date if, as a result of any changes in the Constitution of the State of California or in the Constitution of the United States of America or of legislative, judicial or administrative action (whether state or federal), or by final decree, judgment or order of any court or administrative body (whether state or federal) entered after the contest thereof by the Borrower in good faith, the Agreement shall have become void or unenforceable or impossible of performance in accordance with the intent and purposes of the parties as expressed in the Agreement, or shall have been declared unlawful.

     (2)    The Bonds shall be redeemed in whole on any date at a redemption price equal to the principal amount thereof plus interest accrued to the redemption date upon the occurrence of a Determination of Taxability; provided that if, in the Opinion of Bond Counsel delivered to the Trustee, the redemption of a specified portion of the Bonds Outstanding less than the whole thereof would have the result that interest payable on the Bonds remaining Outstanding after such redemption would not be includable for federal income tax purposes in the gross income of any Holders of a Bond (other than a Holder who is a "substantial user" of the Diablo Canyon Project or Geysers Project or a "related person" within the meaning of Section 147(a) of the Code or Section 103(b)(13) of the 1954 Code), then the Bonds shall be redeemed in part by lot (in Authorized Denominations), in such amount as Bond Counsel in such opinion shall have determined is necessary to accomplish that result.

For purposes of paragraph (1) above, the Trustee shall not be required to give notice of mandatory prepayment unless a Responsible Officer of the Trustee shall have actual knowledge that the Agreement shall have become void, unenforceable or impossible of performance or shall have been declared unlawful as described in said paragraph.

Section 4.02. Selection of Bonds for Redemption. If less than all of the Bonds are called for redemption, the Trustee shall select the Bonds or any given portion thereof to be redeemed, from the Outstanding Bonds or such given portion thereof not previously called for redemption, by lot (except during any transitional period from a Flexible Rate Period to a succeeding Rate Period, then among such Bonds in different Rate Periods as directed by the Borrower, and by lot within such Rate Period). For the purpose of any such selection the Trustee shall assign a separate number for each minimum Authorized Denomination of each Bond of a denomination of more than such minimum; provided that following any such selection, both the portion of such Bond to be redeemed and the portion remaining shall be in Authorized Denominations. The Trustee shall promptly notify the Issuer and the Borrower in writing of the numbers of the Bonds or portions thereof so selected for redemption.

Section 4.03. Partial Redemption of Bonds. Upon surrender of any Bond redeemed in part only or purchased in lieu of redemption in part only, the Registrar shall exchange the Bond

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 229 of 295

redeemed for a new Bond of like tenor and in an Authorized Denomination without charge to the Holder in the principal amount of the portion of the Bond not redeemed. The Issuer and the Trustee shall be fully released and discharged from all liability to the extent of payment of the redemption price for such partial redemption.

Section 4.04. Effect of Redemption. Notice of redemption having been duly given as aforesaid, and moneys for payment of the redemption price being held by the Trustee, the Bonds so called for redemption shall, unless the Borrower has exercised its right to purchase Bonds in lieu of redemption in accordance with Section 4.06 hereof, on the redemption date designated in such notice, become due and payable at the redemption price specified in such notice, interest on the Bonds so called for redemption shall cease to accrue, said Bonds shall cease to be entitled to any lien, benefit or security under the Indenture, and the Holders of said Bonds shall have no rights in respect thereof except to receive payment of the redemption price thereof.

All Bonds fully redeemed pursuant to the provisions of this Article IV shall be cancelled upon surrender thereof and destroyed by the Registrar, which shall, upon the written request of the Issuer, deliver to the Issuer a certificate evidencing such destruction.

Section 4.05. Notice of Redemption. The Trustee, for and on behalf of the Issuer, shall give Notice of any redemption by Mail, postage prepaid, not less than fifteen (15) days (thirty (30) days if the then current Rate Period shall be a Term Rate Period) nor more than sixty (60) days prior to the redemption date, to (i) the Holder of such Bond at the address shown on the registration books of the Registrar on the date such notice is mailed; (ii) the Securities Depository; and (iii) one or more information services as shall be designated in a certificate of the Borrower. Notice of redemption to the Securities Depository and such information services shall be given by telecopy confirmed by first-class mail. Each notice of redemption shall state the date of such notice, the date of issue of the Bonds to be redeemed, the redemption date, the redemption price, the place of redemption (including the name and appropriate address or addresses of the Paying Agent), the source of the funds to be used for such redemption, the principal amount, the CUSIP number (if any) of the maturity, such other information as may be required by the Securities Depository or any such information service, and, if less than all, the distinctive certificate numbers of the Bonds to be redeemed and, in the case of Bonds to be redeemed in part only, the respective portions of the principal amount thereof to be redeemed. Each such notice shall also state that, unless the Borrower exercises its right to purchase Bonds in lieu of redemption as provided in Section 4.06 hereof and deposits with the Trustee the required funds, the interest on the Bonds designated for redemption shall, if sufficient funds for the payment of the redemption price are then held by the Trustee, cease to accrue from and after such redemption date and that on said date there will become due and payable on each of said Bonds the principal amount thereof to be redeemed, interest accrued thereon, if any, to the redemption date and the premium, if any, thereon (such premium to be specified) and shall require that such Bonds be then surrendered at the address or addresses of the Paying Agent specified in the redemption notice and that if the Borrower exercises its right to purchase Bonds in lieu of redemption as provided in Section 4.06 hereof and timely deposits with the Trustee the required funds, such Bonds shall be deemed to have been purchased on the Purchase in Lieu of Redemption Date. Notwithstanding the foregoing, failure to mail the notices required by this paragraph to any Holder of any Bonds designated for redemption or to the Securities Depository or any such information service, or any defect in any notice so mailed, shall not affect the

validity of the proceedings for redemption or purchase in lieu of redemption of any other Bonds and shall not extend the period for making elections or in any way change the rights of the Holders of the Bonds to elect to have their Bonds purchased as provided herein.

With respect to any notice of optional redemption of Bonds pursuant to Section 4.01(a), unless upon the giving of such notice such Bonds shall be deemed to have been paid within the meaning of Article X of the Indenture, such notice shall state that such redemption shall be conditional upon the receipt by the Trustee on or prior to the date fixed for such redemption of amounts sufficient to pay the principal of, and premium, if any, and interest on, such Bonds to be redeemed, and that if such amounts shall not have been so received said notice shall be of no force and effect and such Bonds shall not be subject to redemption on such date. In the event that such notice of redemption contains such a condition and such amounts are not so received, the redemption shall not be made and the Trustee shall within a reasonable time thereafter give notice, to the persons and in the manner in which the notice of redemption was given, that such amounts were not so received and the redemption was not made.

If upon the expiration of thirty (30) days succeeding any redemption date, any Bonds so called for redemption shall not have been presented to the Trustee for payment, the Trustee shall no later than sixty (60) days following such redemption date send a second Notice of such redemption by Mail in the form prescribed by the first paragraph of this Section 4.05 to the Holder of each Bond not so presented.

With respect to any optional redemption of Bonds pursuant to Section 4.01(a) of this Multi-Mode Annex, in the event that the Trustee receives notice from the Borrower pursuant to Section 4.06 hereof that the Borrower will purchase all or a portion of the Bonds in lieu of redemption, then, upon the purchase of such Bonds pursuant to said Section 4.06, the notice of redemption of such Bonds shall be null and void and of no further force and effect.

Section 4.06. Purchase In Lieu of Redemption.

(a)    In the event that the Bonds are called for optional redemption pursuant to Section 4.01(a) of this Multi-Mode Annex, such Bonds, or any portion thereof, may be purchased in lieu of redemption, at the direction of the Borrower on the Purchase in Lieu of Redemption Date therefor at the Purchase Price thereof. In the event the Borrower desires to cause a purchase of Bonds that have previously been called for redemption, then not less than one Business Day prior to the designated Purchase in Lieu of Redemption Date, the Borrower shall give written notice to the Issuer, the Trustee and the Tender Agent of its election to cause such purchase in lieu of redemption and its election to cause the Purchase Price of such Bonds on the Purchase in Lieu of Redemption Date to be paid either from (1) moneys realized from a draw under the applicable Liquidity Facility or (2) amounts paid by the Borrower to the Tender Agent by 11:30 a.m. (New York City time) on the Purchase in Lieu of Redemption Date in immediately available funds. If the Borrower so elects to cause the Purchase Price of such Bonds to be paid as set forth in clause (2) above but the Tender Agent shall not have received such amounts by 11:30 a.m. (New York City time) on the Purchase in Lieu of Redemption Date, the Tender Agent shall take such actions as the Tender Agent determines are necessary to receive moneys under any Liquidity Facility to pay such Purchase Price. Upon such election, the Tender Agent shall

pay the Purchase Price of such Bonds on the Purchase in Lieu of Redemption Date pursuant to the payment provisions of Sections 2.02(c), (d) and (e) hereof.

At any time the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility under the Indenture) is in effect with respect to the Bonds and if the Borrower so elects to cause the Purchase Price of such Bonds to be paid as set forth in clause (1) above, but the Tender Agent shall have not received such amounts by 2:30 p.m. (New York City time) on the Purchase in Lieu of Redemption Date, or if the Tender Agent has actual knowledge that any such instrument has been repudiated, the Tender Agent shall immediately notify the Borrower by telephone, confirmed in writing, of such insufficiency and request payment of such Purchase Price including interest from and after the Purchase in Lieu of Redemption Date until such Purchase Price is paid in full by 4:00 p.m. (New York City time) on the following Business Day, in immediately available funds (which need not constitute Available Moneys), and such notice shall constitute a Notice of Borrower Purchase. Bonds to be purchased but which are not delivered to the Tender Agent on the Purchase in Lieu of Redemption Date shall be deemed to have been purchased pursuant to the provisions of this Section 4.06.

Bonds purchased in lieu of redemption pursuant to this Section 4.06 from moneys realized from a draw under the applicable Liquidity Facility shall become Liquidity Provider Bonds and if subsequently transferred to the Borrower thereafter shall be deemed to be purchased by the Borrower and the Borrower thereafter shall be the owner of such Bonds for all purposes under this Multi-Mode Annex, and interest accruing on such Bonds on and after the Purchase in Lieu of Redemption Date shall be payable solely to Borrower. Bonds purchased in lieu of redemption pursuant to this Section 4.06 as set forth in clause (2) in the second preceding paragraph shall be deemed to be purchased by the Borrower, the Borrower shall be the owner of such Bonds for all purposes under this Multi-Mode Annex, and interest accruing on such Bonds on and after the Purchase in Lieu of Redemption Date shall be payable solely to Borrower. Except as set forth in the preceding paragraph when the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility under the Indenture) has been dishonored or repudiated, so long as a Liquidity Facility is in effect and has not been dishonored or repudiated, Bonds purchased in lieu of redemption to be paid as set forth in clause (1) or (2) in the second preceding paragraph shall be purchased with Available Moneys.

(b)     It is the intention of the parties hereto that the purchase of the Bonds pursuant to this Section 4.06 shall not constitute a prepayment of the loan of Bond proceeds made to the Borrower pursuant to the Agreement or a merger or extinguishment of the indebtedness of the Borrower thereunder or the Bonds so purchased and that such Bonds shall for all purposes be regarded as Outstanding hereunder.

(c)     Notwithstanding any other provision of this Multi-Mode Annex, the Indenture or the Agreement, in the event that the Borrower purchases all of the Outstanding Bonds by the purchase in lieu of redemption of all of the Outstanding Bonds pursuant to this Section 4.06, such Bonds shall not be remarketed or otherwise transferred, assigned or sold to any person other than the Borrower unless (i) the prior written approval of the Borrower, in its sole discretion, is obtained, and (ii) the Trustee shall have received written notice from the Borrower that the

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 232 of 295

Borrower has furnished to the Issuer and to the Remarketing Agent, for use in remarketing the Bonds, a current offering or disclosure document which includes a description of the security for the Bonds, or such amendment or supplement to the official statement then used in connection with remarketing the Bonds as shall, in the opinion of the Borrower, be necessary in order for the description of the security for the Bonds set forth therein to constitute an accurate summary of the matters therein set forth.

(d)     If moneys sufficient to pay the Purchase Price of Bonds to be purchased in lieu of redemption pursuant to this Section 4.06 shall be held by the Tender Agent on the date such Bonds are to be purchased, such Bonds shall be deemed to have been purchased for all purposes of this Multi-Mode Annex, irrespective of whether or not such Bonds shall have been delivered to the Tender Agent, and neither the former Holder of such Bonds nor any other person shall have any claim thereon, under this Multi-Mode Annex or otherwise, for any amount other than the Purchase Price thereof.

(e)     In the event of non-delivery of any Bond to be purchased in lieu of redemption pursuant to this Section 4.06, the Tender Agent shall segregate and hold uninvested the moneys for the Purchase Price of such Bonds in trust, without liability for interest thereon, for the benefit of the former Holders of such Bonds, who shall, except as provided in the following sentence, thereafter be restricted exclusively to such moneys for the satisfaction of any claim for the Purchase Price of such Bonds. Any moneys which the Tender Agent shall segregate and hold in trust for the payment of the Purchase Price of any Bond and remaining unclaimed for two (2) years after the date of purchase shall be paid, upon the Borrower's written request, to the Borrower. After the payment of such unclaimed moneys to the Borrower, the former Holder of such Bond shall look only to the Borrower for the payment thereof.

(f)     In the event that Borrower exercises its right to purchase Bonds in lieu of redemption pursuant to this Section 4.06, the Tender Agent agrees to accept and hold all Bonds delivered to it for purchase in lieu of redemption in trust for the benefit of the respective Holders which shall have so delivered such Bonds until the Purchase Price of such Bonds shall have been delivered to or for the account of or to the order of such Holders pursuant to this Section 4.06. Any Bonds registered for transfer to the Borrower and delivered to the Tender Agent pursuant to this Section 4.06 hereof shall be held in trust by the Tender Agent for the benefit of the Borrower until delivery to the Borrower.

## ARTICLE V

## CREDIT FACILITY; LIQUIDITY FACILITY

Section 5.01. Credit Facility. Except as provided in the next sentence, the Trustee acknowledges the right of the Borrower at any time to provide and to subsequently terminate or substitute one or more Credit Facilities with respect to the Bonds; provided that no such termination or substitution may be effected with respect to any Bond during any Term Rate Period or Flexible Segment with respect to such Bond unless the mandatory tender date for such Bond is a day on which such Bond would be permitted to be redeemed at the option of the Borrower pursuant to Section 4.01(a)(2) hereof; and provided further that each substitution of a Credit Facility must result in the Bonds being rated at the time of delivery "A" or better (without

regard to "+"s or "-"s or numerical designations) by a Rating Agency. The Borrower may not provide a Credit Facility during any Term Rate Period unless the mandatory tender date for such Bonds is a day on which the Bonds would be permitted to be redeemed at the option of the Borrower pursuant to Section 4.01(a)(2) hereof. Prior to the provision or termination by the Borrower of any Credit Facility (whether in connection with the substitution of an existing Credit Facility or otherwise), there shall be delivered to the Issuer and the Trustee an Opinion of Bond Counsel to the effect that the delivery or termination, as the case may be, of such Credit Facility is permitted under the Act and the Agreement and complies with the terms of the Agreement and that the delivery or termination, as the case may be, of such Credit Facility will not adversely affect the Tax-Exempt status of interest on the Bonds. Upon provision of a Credit Facility to the Trustee and the foregoing Opinion of Bond Counsel to the Issuer and the Trustee, the Trustee shall accept such Credit Facility and, if so directed by the Borrower, upon the effective date of the Credit Facility promptly surrender the previously held Credit Facility, if any, in accordance with the respective terms thereof for cancellation, but only after payment by the applicable Credit Provider shall have been made for any and all draws by the Trustee on such Credit Facility effected on or before such effective date. If at any time there shall cease to be any Bonds Outstanding hereunder secured by a Credit Facility or provision for payment of such Bonds has been made in accordance with Article X of the Indenture, the Trustee shall promptly surrender such Credit Facility in accordance with the terms of the Credit Facility for cancellation. The Trustee shall comply with the procedures set forth in the Credit Facility relating to the termination thereof.

Section 5.02. Liquidity Facility. The Trustee acknowledges the right of the Borrower at any time to provide and to subsequently terminate or substitute one or more Liquidity Facilities with respect to any Bonds; provided that no such termination or substitution may be effected with respect to any Bond during any Term Rate Period or Flexible Segment with respect to such Bond; provided further that the effective date of each Liquidity Facility so provided shall be a day on which the Bonds would be permitted to be redeemed at the option of the Borrower pursuant to Section 4.01(a)(2) hereof and provided further that each substitution of a Liquidity Facility must result in the Bonds having a short-term rating at the time of delivery in the highest short-term rating category (without regard to "+"s or "-"s or numerical designations) by a Rating Agency. Prior to the provision or termination by the Borrower of any Liquidity Facility (whether in connection with the substitution of an existing Liquidity Facility or otherwise), there shall be delivered to the Issuer and the Trustee an Opinion of Bond Counsel to the effect that the delivery or termination, as the case may be, of such Liquidity Facility is permitted under the Act and the Agreement and complies with the terms of the Agreement and that the delivery or termination, as the case may be, of such Liquidity Facility will not adversely affect the Tax-Exempt status of interest on the Bonds. Upon provision of a Liquidity Facility to the Tender Agent, the consent of each Credit Provider, if any, and the foregoing Opinion of Bond Counsel to the Issuer and the Trustee, the Tender Agent shall accept such Liquidity Facility and, if so directed by the Borrower, upon the effective date of the Liquidity Facility promptly surrender the previously held Liquidity Facility, if any, in accordance with the respective terms thereof for cancellation. If at any time there shall cease to be any Bonds Outstanding hereunder supported by a Liquidity Facility or provision for payment of such Bonds has been made in accordance with Article X of the Indenture, the Tender Agent shall promptly surrender such Liquidity Facility in accordance with the terms of the Liquidity Facility for cancellation, but only after payment by the applicable Liquidity Provider shall have been made for any and all draws by the Trustee on such Liquidity

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 234 of 295

Facility effected on or before such effective date. The Tender Agent shall comply with the procedures set forth in the Liquidity Facility relating to the termination thereof. If required by any Credit Provider, a Liquidity Facility meeting the requirements of this Section shall be in effect on any Daily Rate Adjustment Date, Weekly Rate Adjustment Date, Term Rate Adjustment Date or Flexible Rate Adjustment Date, as the case may be, to and including the last day of such Daily Rate Period, Weekly Rate Period, Term Rate Period or Flexible Rate Period, as the case may be.

## ARTICLE VI

## EVENTS OF DEFAULT

Section 6.01. Notice of Event of Default During Auction Rate Period. Upon the occurrence of an Event of Default under clause (i) or (ii) of Section 7.01(a) of the Indenture during an Auction Rate Period, the Trustee shall forthwith notify the Auction Agent of the same and the Auction Procedures shall be suspended commencing on the date of the Auction Agent's receipt of notice of any such Event of Default from the Trustee. If any such Event of Default is later cured or waived, the Trustee shall forthwith notify the Auction Agent of the same. As set forth in Section 2.01(c)(v)(A) hereof, the Auction Rate for each Auction Period commencing after the occurrence of an Event of Default under clauses (i) or (ii) of Section 7.01(a) of the Indenture to and including the Auction Period, if any, during which or commencing less than two Business Days after such Event of Default has been cured or waived shall be equal to the Maximum Rate as determined for each such Auction Period. Further, as set forth in Section 2.01(c)(v)(A) hereof, the Auction Procedures shall resume two Business Days after the Auction Agent receives notice from the Trustee that any such Event of Default has been cured or waived in accordance with this provision, with the next Auction to occur on the next regularly scheduled Auction Date occurring after such cure or waiver.

## ARTICLE VII

## PROVISIONS RELATING TO CREDIT FACILITY AND LIQUIDITY FACILITY

Section 7.01. Provisions Relating to Credit Facility and Liquidity Facility.

(a)     Provisions Relating to Credit Provider.

(i)     All provisions of the Indenture regarding consents, approvals, directions, appointments or requests by or notices from a Credit Provider shall be deemed not to require or permit such consents, approvals, directions, appointments or requests by or notices from such Credit Provider during any time in which such Credit Provider has failed to honor a draft presented to it in strict conformance with the applicable provisions of the applicable Credit Facility, or after the applicable Credit Facility shall at any time for any reason cease to be valid and binding on such Credit Provider or while such Credit Provider is denying further liability or obligation under the applicable Credit Facility (unless such Credit Facility has been fully drawn or to the extent that the conditions to making a demand for payment thereunder have not been strictly satisfied) or after such

Case: 19-30088     Doc# 5252-2     Filed: 01/02/20     Entered: 01/02/20 21:06:44     Page
235 of 295

Credit Provider has rescinded, repudiated or terminated the applicable Credit Facility or upon a Credit Provider Event of Insolvency.

(ii)     All provisions in the Indenture relating to such Credit Provider (other than the provisions described in clause (i) above) shall be of no force and effect with respect to such Credit Provider if the applicable Credit Facility is not in effect, and all amounts owing to such Credit Provider under the Indenture have been paid.  For all purposes of the Indenture, a Credit Facility shall be treated as in effect for its full stated term, including any extensions agreed upon by the Credit Provider and the Borrower, unless earlier terminated by mutual written agreement of the Credit Provider and the Borrower, notwithstanding any attempted unilateral rescission, repudiation or termination of the Credit Facility by the Credit Provider or the Borrower, notwithstanding the occurrence of any Credit Provider Event of Insolvency and notwithstanding any failure of the Credit Provider to honor any prior or current draw on the Credit Facility.

(b)     Provisions Relating to Liquidity Provider.

(i)     All provisions of the Indenture regarding consents, approvals, directions, appointments or requests by or notices from the Liquidity Provider, if any, shall be deemed not to require or permit such consents, approvals, directions, appointments or requests by or notices from such Liquidity Provider during any time in which such Liquidity Provider has failed to honor a demand for payment presented to it in strict conformance with the applicable provisions of the Liquidity Facility, or after the Liquidity Facility shall at any time for any reason cease to be valid and binding on such Liquidity Provider or while such Liquidity Provider is denying further liability or obligation under the Liquidity Facility (unless such Liquidity Facility has been fully drawn or to the extent that the conditions to making a demand for payment thereunder have not been strictly satisfied) or after such Liquidity Provider has rescinded, repudiated or terminated the Liquidity Facility or upon a Liquidity Provider Event of Insolvency.

(ii)     All provisions in the Indenture relating to the Liquidity Provider, if any (other than the provisions described in clause (i) above) shall be of no force and effect with respect to such Liquidity Provider if the Liquidity Facility is not in effect, there are no related Liquidity Provider Bonds and all amounts owing to such Liquidity Provider under the Liquidity Agreement have been paid.  For all purposes of the Indenture, a Liquidity Facility shall be treated as in effect for its full stated term, including any extensions agreed upon by the Liquidity Provider and the Borrower, unless earlier terminated by mutual written agreement of the Liquidity Provider and the Borrower, notwithstanding any attempted unilateral rescission, repudiation or termination of the Liquidity Facility by the Liquidity Provider or the Borrower, notwithstanding the occurrence of any Liquidity Provider Event of Insolvency and notwithstanding any failure of the Liquidity Provider to honor any prior or current draw on the Liquidity Facility.

Case: 19-30088     Doc# 5252-2     Filed: 01/02/20     Entered: 01/02/20 21:06:44     Page 236 of 295

# APPENDIX C

## FORM OF TENDER AGENT AGREEMENT

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page
237 of 295

TENDER AGENT AGREEMENT

Between

PACIFIC GAS AND ELECTRIC COMPANY

and

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Tender Agent

relating to

$74,275,000
California Infrastructure and Economic Development Bank
Refunding Revenue Bonds
(Pacific Gas and Electric Company)
Series 2009B

Dated as of August 1, 2009

LA1 1628066

# ARTICLE I

## DEFINITIONS

Section 1.01. Definitions..................................................................................................... 1

# ARTICLE II

## REPRESENTATIONS AND WARRANTIES

Section 2.01. Representations and Warranties of the Borrower................................................ 1
Section 2.02. Representations and Warranties of the Tender Agent ......................................... 2

# ARTICLE III

## GENERAL PROVISION RELATING TO TENDERS

Section 3.01. Appointment of Tender Agent.......................................................................... 2
Section 3.02. Tender and Purchase of Bonds; Remarketing.................................................... 3
Section 3.03. Delivery of Tendered Bonds............................................................................ 3
Section 3.04. Bond Purchase Fund ...................................................................................... 3
Section 3.05. Deposit of Bonds........................................................................................... 4
Section 3.06. Remarketing of Tendered Bonds ..................................................................... 4
Section 3.07. Delivery of Bonds.......................................................................................... 5
Section 3.08. Return of Incomplete or Improperly Completed Transfer Documents.................... 6
Section 3.09. Bonds and Moneys to be Held in Escrow.......................................................... 6
Section 3.10. Other Duties of the Tender Agent.................................................................... 6

# ARTICLE IV

## GENERAL

Section 4.01. Maintenance of Books and Records ................................................................. 6
Section 4.02. Resignation or Removal of the Tender Agent .................................................... 7
Section 4.03. Payment of Tender Agent; Indemnification ...................................................... 7
Section 4.04. Tender Agent's Performance; Duty of Care ...................................................... 7
Section 4.05. Source of Payments........................................................................................ 8
Section 4.06. Term of Agreement......................................................................................... 8
Section 4.07. Amendments .................................................................................................. 8
Section 4.08. Other Borrower Rights.................................................................................... 8
Section 4.09. Notices ......................................................................................................... 8
Section 4.10. Successors and Assigns................................................................................... 9
Section 4.11. Governing Law; Venue.................................................................................... 9

LA1 1628346

i

# Table of Contents
(continued)

Section 4.12. Captions ............................................................................................ 9
Section 4.13. Payments or Notices Due on Holidays .................................................. 9
Section 4.14. Execution in Several Counterparts........................................................ 9
Section 4.15. Third Party Beneficiaries ..................................................................... 9
Section 4.16. Liquidity Provider ............................................................................... 10
Section 4.17. Repayment to Borrower....................................................................... 10

## TENDER AGENT AGREEMENT

THIS TENDER AGENT AGREEMENT, dated as of August 1, 2009 (this "Tender Agent Agreement"), is made and entered into between PACIFIC GAS AND ELECTRIC COMPANY, a corporation organized and existing under the laws of the State of California (the "Borrower"), and DEUTSCHE BANK NATIONAL TRUST COMPANY, appointed as tender agent (the "Tender Agent") in connection with the California Infrastructure and Economic Development Bank Refunding Revenue Bonds (Pacific Gas and Electric Company) Series 2009B in the aggregate principal amount of $74,275,000 (the "Bonds").

## ARTICLE I

## DEFINITIONS

Section 1.01. Definitions. Capitalized terms used in this Tender Agent Agreement shall, unless otherwise defined herein or the context clearly requires otherwise, have the respective meanings assigned to them in that certain Indenture of Trust, dated as of August 1, 2009 (as originally executed or as it may from time to time be supplemented or amended as provided therein and including the Multi-Mode Annex attached thereto, the "Indenture"), by and between California Infrastructure and Economic Development Bank, an entity within the Business, Transportation and Housing Agency of the State of California (the "Issuer") and Deutsche Bank National Trust Company, as trustee (the "Trustee"), pursuant to which the Bonds will be issued. The execution by the Tender Agent of this Tender Agent Agreement shall serve as the written instrument of acceptance required by Section 8.15 of the Indenture and copies hereof may be delivered as therein specified to the Issuer, the Trustee, the Borrower and the Remarketing Agent and the Marketing Parties in addition thereto.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES

Section 2.01. Representations and Warranties of the Borrower. The Borrower makes the following representations and warranties to the Tender Agent:

(i)     The Borrower is a corporation duly organized and validly existing under the laws of the State of California, is in good standing in the State of California, has full legal right, power and authority to enter into this Tender Agent Agreement and to carry out and consummate all transactions contemplated by this Tender Agent Agreement, and by proper corporate action has duly authorized the execution and delivery of this Tender Agent Agreement.

(ii)     The execution and delivery of this Tender Agent Agreement and the consummation of the transactions contemplated herein and in the Indenture will not conflict with or constitute on the part of the Borrower, a breach of or default under its organizational documents, or any statute, indenture, mortgage, deed of trust, lease, note agreement or other agreement or instrument to which the Borrower is a party or by which it or its properties are bound, or any order, rule or regulation of any court, governmental

LA1 1628046

agency or body having jurisdiction over the Borrower or any of its activities or properties, which breach might have a material adverse effect on the ability of the Borrower to perform its duties and obligations under this Tender Agent Agreement.

Section 2.02. Representations and Warranties of the Tender Agent. The Tender Agent makes the following representations and warranties to the Borrower:

      (i)     The Tender Agent is a national banking association, authorized under the laws of the United States of America to exercise corporate trust powers, has full legal right, power and authority to enter into this Tender Agent Agreement and to carry out and consummate all transactions contemplated by this Tender Agent Agreement, and by proper corporate action has duly authorized the execution and delivery of this Tender Agent Agreement. The Tender Agent has a combined capital and surplus of at least $50,000,000 and is subject to supervision or examination by federal or state authority. If the Tender Agent publishes a report of condition at least annually, pursuant to law or to the requirements of any supervising or examining authority above referred to, then for purposes of this Section 2.02(i) the combined capital and surplus of the Tender Agent shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. The Tender Agent will continue to meet the qualifications imposed by Section 8.15 of the Indenture throughout the term of this Tender Agent Agreement.

      (ii)    The execution and delivery of this Tender Agent Agreement and the consummation of the transactions contemplated herein and in the Indenture will not conflict with or constitute on the part of the Tender Agent, a breach of or default under its charter documents, its bylaws, or any statute, indenture, mortgage, deed of trust, lease, note agreement or other agreement or instrument to which the Tender Agent is a party or by which it or its properties are bound, or any order, rule or regulation of any court, governmental agency or body having jurisdiction over the Tender Agent or any of its activities or properties, which breach might have a material adverse effect on the ability of the Tender Agent to perform its duties and obligations under this Tender Agent Agreement.

## ARTICLE III

## GENERAL PROVISION RELATING TO TENDERS

Section 3.01. Appointment of Tender Agent. For the purposes hereinafter described and upon the terms and subject to the conditions hereinafter set forth, Deutsche Bank National Trust Company has been appointed by the Borrower to serve as Tender Agent under the Indenture and hereby accepts such appointment. The Tender Agent hereby agrees to assume and perform the duties and obligations contemplated hereunder and under the Indenture to be performed by the Tender Agent.

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 242 of 295

Section 3.02. Tender and Purchase of Bonds; Remarketing.

(A)     Holder's Option to Tender for Purchase. The Bonds shall be subject to tender for purchase at the option of the Holder thereof as set forth in Section 2.02(a) of the Multi-Mode Annex.

(B)     Mandatory Tender for Purchase. The Bonds shall be subject to mandatory tender for purchase as set forth in Section 2.02(b) of the Multi-Mode Annex.

(C)     Payment of Purchase Price. If the Bonds to be purchased pursuant to Section 2.02(a), 2.02(b) or 4.06 of the Multi-Mode Annex or pursuant to Section 7.01(d) of the Indenture are remarketed, the Tender Agent shall pay the Purchase Price of such Bonds by drawing upon the moneys deposited therefor according to the terms of Section 2.02(c) of the Multi-Mode Annex.

(D)     Bonds Held in Book-Entry Form. Notwithstanding any other provision of this Tender Agent Agreement or the Indenture to the contrary, so long as any Bond is held in book-entry form, such Bond need not be delivered in connection with any tender pursuant to Section 2.02(a), 2.02(b) or 4.06 of the Multi-Mode Annex or pursuant to Section 7.01(d) of the Indenture, and all references to physical delivery of the Bonds shall be ineffective. In such case, payment of the Purchase Price shall be made to the registered holder of such Bonds on the Purchase Date, without further action by the beneficial owner, and transfer of beneficial ownership shall be made in accordance with the procedures of the Nominee (as defined in the Indenture).

Section 3.03. Delivery of Tendered Bonds. With respect to any Bond held in book-entry form as provided in Section 2.01(d) of the Indenture, delivery of such Bond to the Tender Agent in connection with any optional or mandatory tender pursuant to Section 2.02(a) or 2.02(b) of the Multi-Mode Annex, any purchase in lieu of redemption pursuant to Section 4.06 of the Multi-Mode Annex or any purchase in lieu of acceleration pursuant to Section 7.01(d) of the Indenture shall be effected by the making of, or the irrevocable authorization to make, appropriate entries on the books of DTC or any DTC Participant to reflect the transfer of the beneficial ownership interest in such Bond to the account of the Tender Agent, or to the account of a DTC Participant acting on behalf of the Tender Agent. With respect to any Bond which is not held in book-entry form as provided in Section 2.01(d) of the Indenture, delivery of such Bond to the Tender Agent in connection with any optional or mandatory tender pursuant to Section 2.02(a) or 2.02(b) of the Multi-Mode Annex, any purchase in lieu of redemption pursuant to Section 4.06 of the Multi-Mode Annex or any purchase in lieu of acceleration pursuant to Section 7.01(d) of the Indenture shall be effected by the surrender of such Bond to the Tender Agent at its Principal Office, by 1:00 p.m. (New York City time) on the Purchase Date, accompanied by an instrument of transfer thereof, in a form satisfactory to the Tender Agent, executed in blank by the holder thereof with the signature of such holder guaranteed in accordance with the guidelines set forth by one of the nationally recognized medallion signature programs.

Section 3.04. Bond Purchase Fund. There shall be created and established with the Tender Agent for the Bonds a trust fund designated the "Bond Purchase Fund" (the "Bond Purchase Fund"). The Bond Purchase Fund and each account and subaccount therein shall be an

Eligible Account and shall be subject to and administered in accordance with Section 2.02(d) of the Multi-Mode Annex. There shall also be created and established three separate accounts in the Bond Purchase Fund designated the "Remarketing Account," the "Liquidity Facility Purchase Account" and the "Borrower Account." The Tender Agent shall create and maintain separate subaccounts within each account referred to in the previous sentence for each Series or subseries of Bonds supported by a separate Liquidity Facility.

(A)     Remarketing Account. All moneys received by the Tender Agent on behalf of purchasers of Bonds pursuant to Section 3.06 hereof, other than the Trustee, shall be (i) deposited in the appropriate subaccount in the Remarketing Account within the Bond Purchase Fund, (ii) held in trust in accordance with the provisions hereof and (iii) paid out in accordance with Section 2.02(e) of the Multi-Mode Annex.

(B)     Liquidity Facility Purchase Account. All moneys received by the Tender Agent from the Trustee as payments under any Liquidity Facility for the purchase of Bonds shall be (i) deposited in the appropriate subaccount in the Liquidity Facility Purchase Account within the Bond Purchase Fund, (ii) held in trust in accordance with the provisions hereof and (iii) paid out in accordance with Section 2.02(e) of the Multi-Mode Annex.

(C)     Borrower Account. All moneys received by the Tender Agent from the Borrower as payments under Section 4.2(d) of the Agreement (x) in the amount specified in the Notice of Borrower Purchase or (y) in the amount of premium, if any, due with respect to Mandatory Put Bonds on any Purchase Date for Mandatory Put Bonds described in Section 2.02(b)(ii) of the Multi-Mode Annex, together with all moneys received by the Tender Agent from the Borrower as payments under Section 7.1 of the Agreement, shall be (i) deposited in the appropriate subaccount in the Borrower Account within the Bond Purchase Fund, (ii) held in trust in accordance with the provisions hereof and (iii) paid out in accordance with Section 2.02(e) of the Multi-Mode Annex. Any Available Moneys received by the Tender Agent from the Borrower as payments under Section 4.2(b)(ii) of the Agreement shall be deposited in a separate subaccount in the Borrower Account within the Bond Purchase Fund and shall not be commingled with any other moneys in the Borrower Account.

Section 3.05. Deposit of Bonds. The Tender Agent has agreed to accept and hold all Bonds delivered to it pursuant to this Tender Agent Agreement in trust for the benefit of the respective Holders which shall have so delivered such Bonds until the Purchase Price of such Bonds shall have been delivered to or for the account of or to the order of such Holders. Any Bonds registered for transfer to new purchasers and delivered to the Tender Agent as described in Section 3.07 hereof shall be held in trust by the Tender Agent for the benefit of such new purchasers until delivery to such new purchasers.

Section 3.06. Remarketing of Tendered Bonds. The Remarketing Agent and the Tender Agent shall arrange for remarketing of the Bonds as provided in the Remarketing Agreement. The Remarketing Agreement shall provide that (a) all Bonds must be remarketed at the Purchase Price thereof, and (b) no Bonds may be remarketed to the Issuer or the Borrower (or any "insider," as defined in the United States Bankruptcy Code, of the Issuer or the Borrower) so long as a Liquidity Facility is in effect unless payment of the Purchase Price is made from Available Moneys, provided that this clause (b) shall not apply to the purchase of any Bonds by the

Liquidity Provider under the Liquidity Facility or the purchase of Bonds in lieu of redemption pursuant to Section 4.06 of the Multi-Mode Annex or the purchase of Bonds in lieu of acceleration pursuant to Section 7.01(d) of the Indenture or the purchase of any Bonds by the Borrower with payments under Section 4.2(d) of the Agreement. For all purposes of this Tender Agent Agreement, a Liquidity Facility shall be treated as in effect for its full stated term, including any extensions agreed upon by the Liquidity Provider and the Borrower, unless earlier terminated by mutual written agreement of the Liquidity Provider and the Borrower, notwithstanding any attempted unilateral rescission, repudiation or termination of the Liquidity Facility by the Liquidity Provider or the Borrower, notwithstanding the occurrence of any Liquidity Provider Event of Insolvency and notwithstanding any failure of the Liquidity Provider to honor any prior or current draw on the Liquidity Facility.

Section 3.07. Delivery of Bonds.

(A) If the Bonds are not held in book-entry form as provided in Section 2.01(d) of the Indenture, a principal amount of Bonds equal to the amount of Bonds successfully remarketed by the Remarketing Agent shall be delivered to the Registrar for registration of transfer to such persons as shall be designated by the Remarketing Agent. Such Bonds shall then be delivered to the office of the Tender Agent and shall be picked up by the Remarketing Agent at or after 1:30 p.m. (New York City time) on the Purchase Date against delivery of funds for deposit into the Remarketing Account of the Bond Purchase Fund equal to the Purchase Price of such Bonds that have been remarketed. If the Bonds are held in book-entry form as provided in Section 2.01(d) of the Indenture, transfer of ownership of the remarketed Bonds shall be effected in accordance with the procedures of DTC and the DTC Participants against delivery of funds for deposit into the Remarketing Account of the Bond Purchase Fund equal to the Purchase Price of such Bonds that have been remarketed.

(B) Bonds purchased with funds in the Liquidity Facility Purchase Account of the Bond Purchase Fund shall be delivered and held in accordance with Section 2.02(d)(iv) of the Multi-Mode Annex. Such Bonds shall be held available for registration of transfer and delivery by the Registrar in such manner as may be agreed between the Registrar and the Liquidity Provider.

(C) Bonds purchased with funds in the Borrower Account shall be delivered and held in accordance with Section 2.02(d)(v) of the Multi-Mode Annex. Such Bonds shall be held available for registration of transfer and delivery by the Registrar in such manner as may be agreed between the Registrar and the Borrower.

(D) The Tender Agent shall, as to any Bonds which have not been delivered to it as required by this Section 3.07, (i) notify the Remarketing Agent in writing of such nondelivery and (ii) direct the Registrar to place a stop transfer instruction against an appropriate amount of Bonds registered in the name of the holder of such Bonds on the bond register maintained by the Registrar. The Registrar shall place and maintain such stop transfer instruction commencing with the lowest serial number Bond registered in the name of such holder upwards until stop transfer instructions apply to the principal amount of such undelivered Bonds until such times as such undelivered Bonds are delivered to the Registrar. Upon such delivery, the Registrar shall make any necessary adjustments to the bond register maintained by the Registrar.

(E)     In the event any Bonds purchased according to the terms of the Multi-Mode Annex shall not be presented to the Tender Agent, the Tender Agent shall segregate and hold the moneys for the Purchase Price of such Bonds in trust, without liability for interest thereon, for the benefit of the former Holders of such Bonds, who shall, except as provided in the following sentence, thereafter be restricted exclusively to such moneys for the satisfaction of any claim for the Purchase Price of such Bonds. Any moneys which the Tender Agent shall segregate and hold in trust for the payment of the Purchase Price of any Bond and remaining unclaimed for two (2) years after the applicable Purchase Date shall, upon the Borrower's written request to the Tender Agent, be paid to the Borrower. After the payment of such unclaimed moneys to the Borrower, the former Holder of such Bond shall look only to the Borrower for the payment of the Purchase Price thereof.

Section 3.08. <u>Return of Incomplete or Improperly Completed Transfer Documents</u>. The Tender Agent shall promptly return any incomplete or improperly completed notice(s) of tender (together with the Bond(s) submitted therewith) to the person or persons submitting such notice(s) and Bond(s) upon surrender of the receipt, if any, issued therefor. The Tender Agent's determination of whether a notice of tender is properly completed and the time of delivery of any notice of tender or Bond shall be binding on the Issuer, the Borrower and the Holder of the Bond submitted therewith.

Section 3.09. <u>Bonds and Moneys to be Held in Escrow</u>. The Tender Agent will hold all Bonds delivered to it for purchase pursuant to the terms of the Indenture and this Tender Agent Agreement as agent and bailee of, and in escrow for the benefit of, the Bondholders who have so delivered such Bonds until moneys representing the Purchase Price of such Bonds shall have been delivered to or for the account of or to the order of such Bondholders. The Tender Agent will hold all moneys delivered to it hereunder for the purchase of Bonds (other than moneys delivered to it by the Borrower for the purchase of Bonds) as agent and bailee of, and in escrow for the benefit of, the person or entity which shall have so delivered such moneys until the Bonds purchased with such moneys shall have been delivered to or for the account of such person or entity. The Tender Agent will hold all moneys delivered to it hereunder by the Borrower for the purchase of Bonds as agent and bailee of, and in escrow for the benefit of, the Bondholders who shall deliver Bonds to it for purchase until the Bonds purchased with such moneys shall have been delivered to or for the account of the Borrower.

Section 3.10. <u>Other Duties of the Tender Agent</u>. In addition to those duties specifically enumerated in the preceding Sections of this Article III, the Tender Agent shall also perform such other duties and discharge such other obligations as are imposed on the Tender Agent by the terms of the Indenture, and in the event of any conflict between this Tender Agent Agreement and any of the terms or provisions of the Indenture, the terms and provisions of the Indenture shall control.

## ARTICLE IV

## GENERAL

Section 4.01. <u>Maintenance of Books and Records</u>. The Tender Agent shall keep such books and records relating to the performance of its duties hereunder as shall be consistent with

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 246 of 295

prudent industry practice and will make such books and records available for inspection by the Issuer, the Trustee and the Borrower during regular business hours.

Section 4.02. Resignation or Removal of the Tender Agent. The Tender Agent may resign by notifying the Issuer, the Trustee, the Borrower, the Credit Provider, if any, the Liquidity Provider, if any, the Remarketing Agent and the Bondholders at least thirty (30) days before the effective date of such resignation. The Borrower may remove the Tender Agent at any time. No resignation or removal shall be effective until the successor has delivered an acceptance of its appointment to the Issuer, the Borrower, the Trustee and the predecessor Tender Agent. In the event of the resignation or removal of the Tender Agent, such Tender Agent shall pay over, assign and deliver any moneys held by it as Tender Agent to its successor, or if there is no successor, to the Trustee. In the event that for any reason there shall be a vacancy in the office of Tender Agent, the Trustee shall act as such Tender Agent to the extent it has operational capacity to perform such tasks.

Section 4.03. Payment of Tender Agent; Indemnification. The Borrower shall pay all fees, charges and expenses of the Tender Agent for acting under and pursuant to this Tender Agent Agreement. In addition, the Borrower shall indemnify the Tender Agent and its directors, officers, employees and agents (the "Indemnified Parties") against and save them harmless from any and all losses, costs, charges, expenses, judgments and liabilities incurred in connection with any action taken, omitted to be taken or suffered by an Indemnified Party in good faith to carry out the transactions contemplated by this Tender Agent Agreement, but only to the extent that such loss, cost, charge, expense, judgment or liability is not caused by the negligent action, negligent failure to act or willful misconduct of such Indemnified Party.

Section 4.04. Tender Agent's Performance; Duty of Care. The Tender Agent consents and agrees to perform and comply with all of the terms and provisions on its part contained in this Tender Agent Agreement and in the Indenture. No provision of this Tender Agent Agreement or the Indenture shall be construed to relieve the Tender Agent from liability for its own negligent action, its own negligent failure to act or its own willful misconduct or that of its officers or employees, except that the duties and obligations of the Tender Agent shall be determined solely by the provisions of this Tender Agent Agreement and the Indenture, and the Tender Agent shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Tender Agent Agreement and in the Indenture and, in the absence of bad faith on the part of the Tender Agent, the Tender Agent may conclusively rely, as to the truth of the statements expressed therein, upon any document furnished to the Tender Agent and conforming to the requirements of this Tender Agent Agreement and the Indenture and the Tender Agent may rely and shall be protected in acting upon any document believed by it to be genuine and to have been signed or presented by the proper party or parties; provided that in the case of any such document which by any provision of this Tender Agent Agreement or the Indenture is specifically required to be furnished to the Tender Agent, the Tender Agent shall be under a duty to examine the same to determine whether or not it conforms to the requirements of this Tender Agent Agreement and the Indenture.

The Tender Agent may perform any of the duties hereunder by either agents or attorneys.

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 247 of 295

Section 4.05. Source of Payments. Any provisions of this Tender Agent Agreement or any statute to the contrary notwithstanding, the Tender Agent hereby waives any rights to, or liens for, its fees, charges and expenses for services hereunder from funds or obligations delivered to the Tender Agent pursuant to Article II of the Multi-Mode Annex as described in Article III of this Tender Agent Agreement. The Tender Agent will be reimbursed and compensated for its fees, charges and expenses for acting under and pursuant to this Tender Agent Agreement only from payments to be made by the Borrower pursuant to Section 4.2 of the Agreement.

Section 4.06. Term of Agreement. Unless sooner terminated as provided, this Tender Agent Agreement shall remain in full force and effect until the earlier of (i) such time as the principal of and premium, if any, and interest or Purchase Price on all Bonds outstanding under the Indenture shall have been paid and (ii) the date next succeeding the day on which any Rate Period ending on the maturity date of the Bonds during which the Bonds are not permitted to be redeemed at the option of the Borrower pursuant to Section 4.01(a) of the Multi-Mode Annex shall have been established; provided, however, that in each case the Borrower and the Tender Agent shall have fulfilled all their respective obligations hereunder, whereupon this Tender Agent Agreement shall terminate.

Section 4.07. Amendments. This Tender Agent Agreement may not be amended so as to affect adversely the right of any of the Holders to deliver Bonds to the Tender Agent for purchase pursuant to this Tender Agent Agreement and the Indenture without the consent of each Holder so affected. Subject to the foregoing, this Tender Agent Agreement may not be amended except by a writing signed by the parties hereto.

Section 4.08. Other Borrower Rights. Nothing contained in this Tender Agent Agreement shall be construed or deemed to be in any way in derogation of the right of the Borrower to purchase Bonds outside the scope of this Tender Agent Agreement upon such terms and conditions as it may desire and not in contravention with the terms of the Indenture.

Section 4.09. Notices. Unless otherwise specified, any notices required, or other communications given or made under or pursuant to this Tender Agent Agreement, shall be made in writing and shall be deemed to have been validly given or made when delivered or mailed, registered or certified mail, as follows:

if to the Borrower:        Pacific Gas and Electric Company
c/o PG&E Corporation
One Market, Spear Tower, Suite 2400
San Francisco, California 94105
Attention: Treasurer

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 248 of 295

|                        |                                          |
|------------------------|------------------------------------------|
| if to the Tender Agent: | Deutsche Bank Trust Company Americas    |
|                        | 25 DeForest Avenue                       |
|                        | Second Floor, MS SUM01-0105              |
|                        | Summit, New Jersey 07901                 |
|                        | Attention: Trust and Securities Services |
|                        | (Municipal Group)                        |
| if to the Issuer:      | California Infrastructure and Economic    |
|                        | Development Bank                         |
|                        | 980 9th Street, Suite 900               |
|                        | Sacramento, California 95814            |
|                        | Attention: Bond Manager                 |

All notices to be given by the Borrower under this Tender Agent Agreement shall be signed by an Authorized Borrower Representative and the Tender Agent may rely and shall be protected in acting upon any instrument believed in good faith by it to have been signed by such an officer.

Section 4.10. Successors and Assigns. The rights, duties and obligations of the Borrower and the Tender Agent hereunder shall inure, without further act, to their respective successors and assigns; provided, however, that (i) the Tender Agent may not assign its obligations under this Tender Agent Agreement without the prior written consent of the Borrower and (ii) any successor or assignee of the Tender Agent must be authorized by law to perform the duties of the Tender Agent hereunder and under the Indenture.

Section 4.11. Governing Law; Venue. This Tender Agent Agreement shall be construed in accordance with and governed by the Constitution and laws of the State applicable to contracts made and performed in the State. This Tender Agent Agreement shall be enforceable in the State, and any action arising out of this Tender Agent Agreement shall be filed and maintained in the Sacramento County Superior Court, Sacramento, California.

Section 4.12. Captions. The captions in this Tender Agent Agreement are for convenience only and do not define or limit the scope or intent of any provisions or Sections of this Tender Agent Agreement.

Section 4.13. Payments or Notices Due on Holidays. If any date on which a payment is to be made, notice given or other action taken is Saturday, Sunday or a legal holiday in the place where such payment is to be made, notice given or other action taken, then such payment, notice or other action shall be made, given or taken in accordance with the provisions of the Indenture.

Section 4.14. Execution in Several Counterparts. This Tender Agent Agreement may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original; and all such counterparts, or as many of them as the Borrower and the Tender Agent shall preserve undestroyed, shall together constitute but one and the same instrument.

Section 4.15. Third Party Beneficiaries. To the extent that any provision of this Tender Agreement expressly confers rights upon the Issuer, the Trustee or the Liquidity Provider

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 249 of 295

(including, without limitation, rights to provide consents or directions or to give or receive notices) the parties hereto agree and acknowledge that the Issuer, the Trustee or the Liquidity Provider, as applicable, is a third party beneficiary of such provision and that the Issuer, the Trustee or the Liquidity Provider, as applicable, may enforce such provision against the other parties hereto.

Section 4.16. Liquidity Provider. All provisions hereof regarding consents, approvals, directions, appointments or requests by the Liquidity Provider shall be deemed not to require or permit such consents, approvals, directions, appointments or requests by such Liquidity Provider during any time in which the Liquidity Provider has failed to honor a draft presented to it in strict conformance with the applicable provisions of the Liquidity Facility, or after the Liquidity Facility shall at any time for any reason cease to be valid and binding on the Liquidity Provider or while such Liquidity Provider is denying further liability or obligation under the Liquidity Facility (unless such Liquidity Facility has been fully drawn or to the extent that the conditions to making a demand for payment thereunder have not been strictly satisfied) or after the Liquidity Provider has rescinded, repudiated or terminated the Liquidity Facility.

All provisions herein relating to the Liquidity Provider shall be of no force and effect with respect to the Liquidity Provider if the Liquidity Facility and Liquidity Agreement are not in effect, there are no related Liquidity Provider Bonds and all amounts owing to such Liquidity Provider under the Liquidity Agreement have been paid.

Section 4.17. Repayment to Borrower. When there are no longer any Bonds Outstanding or provision for payment of the Bonds has been made in accordance with Article X of the Indenture, and all reasonable fees, charges and expenses of the Trustee, the Registrar, the Tender Agent, any Credit Provider, any Liquidity Provider, the Remarketing Agent and any Paying Agent due and owing in accordance with the Indenture, the Agreement and any Credit Agreement or Liquidity Agreement have been paid or provided for, the full amount owing to the United States Government, as determined under Section 5.4 of the Agreement, Section 6.06 of the Indenture and the Tax Certificate and Agreement has been paid, all expenses of the Issuer relating to the Indenture or the Bonds have been paid or provided for, and all other amounts payable under the Indenture and under the Agreement and any Credit Agreement or Liquidity Agreement have been paid, and the Indenture has been discharged and satisfied, the Tender Agent shall pay to the Trustee any amounts remaining in the Bond Purchase Fund or any other fund or account established and held hereunder for disbursement in accordance with the provisions of the Indenture.

[Remainder of page intentionally left blank]

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 250 of 295

IN WITNESS WHEREOF, the Borrower and the Tender Agent have caused this Tender Agent Agreement to be executed in their respective corporate names, all as of the date first above written.

PACIFIC GAS AND ELECTRIC COMPANY

By _____
                                    Treasurer

Attest:

By _____
      Assistant Corporate Secretary

DEUTSCHE BANK NATIONAL TRUST COMPANY, as Tender Agent

By: _____
                              Authorized Officer

By: _____
                              Authorized Officer

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 251 of 295

Exhibit 4
Loan Agreement

LOAN AGREEMENT

Between

CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK

and

PACIFIC GAS AND ELECTRIC COMPANY

relating to

$74,275,000
California Infrastructure and Economic Development Bank
Refunding Revenue Bonds
(Pacific Gas and Electric Company)
Series 2009B

Dated as of August 1, 2009

# LOAN AGREEMENT

## TABLE OF CONTENTS

## ARTICLE I

### DEFINITIONS

SECTION 1.1. DEFINITION OF TERMS ........................................................................ 3
SECTION 1.2. NUMBER AND GENDER ..................................................................... 3
SECTION 1.3. ARTICLES, SECTIONS, ETC. ............................................................. 3

## ARTICLE II

### REPRESENTATIONS

SECTION 2.1. REPRESENTATIONS OF THE ISSUER ............................................... 3
SECTION 2.2. REPRESENTATIONS OF THE BORROWER ...................................... 4

## ARTICLE III

### ISSUANCE OF THE BONDS; APPLICATION OF PROCEEDS

SECTION 3.1. AGREEMENT TO ISSUE BONDS; APPLICATION OF
            PROCEEDS ........................................................................................... 6
SECTION 3.2. INVESTMENT OF MONEYS IN FUNDS ............................................ 6

## ARTICLE IV

### LOAN TO BORROWER; REPAYMENT PROVISIONS

SECTION 4.1. LOAN TO BORROWER; ISSUANCE OF BONDS ................................ 7
SECTION 4.2. REPAYMENT AND PAYMENT OF OTHER AMOUNTS
            PAYABLE ............................................................................................. 7
SECTION 4.3. UNCONDITIONAL OBLIGATION ..................................................... 11
SECTION 4.4. ASSIGNMENT OF ISSUER'S RIGHTS .............................................. 12
SECTION 4.5. AMOUNTS REMAINING IN FUNDS ................................................. 12
SECTION 4.6. CREDIT FACILITIES ........................................................................... 12
SECTION 4.7. LIQUIDITY FACILITIES ...................................................................... 13

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page
254 of 295

## ARTICLE V

### SPECIAL COVENANTS AND AGREEMENTS

SECTION 5.1.  THE BORROWER'S MAINTENANCE OF ITS EXISTENCE;
ASSIGNMENTS..............................................................................13
SECTION 5.2.  RECORDS AND FINANCIAL STATEMENTS OF BORROWER.........15
SECTION 5.3.  QUALIFICATION IN CALIFORNIA................................................15
SECTION 5.4.  TAX-EXEMPT STATUS OF INTEREST ON BONDS .......................15
SECTION 5.5.  NOTICE OF RATE PERIODS ..........................................................16
SECTION 5.6.  REMARKETING OF THE BONDS; PROVISIONS RELATING TO
BONDS DURING AUCTION RATE PERIOD. ................................16
SECTION 5.7.  CONTINUING DISCLOSURE..........................................................17
SECTION 5.8.  INDENTURE REQUIREMENTS.......................................................17
SECTION 5.9.  USE OF BOND PROCEEDS .............................................................17

## ARTICLE VI

### LOAN DEFAULT EVENTS AND REMEDIES

SECTION 6.1.  LOAN DEFAULT EVENTS................................................................17
SECTION 6.2.  REMEDIES ON DEFAULT ...............................................................18
SECTION 6.3.  AGREEMENT TO PAY ATTORNEYS' FEES AND EXPENSES .........21
SECTION 6.4.  NO REMEDY EXCLUSIVE ..............................................................21
SECTION 6.5.  NO ADDITIONAL WAIVER IMPLIED BY ONE WAIVER..................21

## ARTICLE VII

### PREPAYMENT

SECTION 7.1.  OPTIONS TO PREPAY INSTALLMENTS...........................................21
SECTION 7.2.  MANDATORY PREPAYMENT...........................................................22
SECTION 7.3.  AMOUNT OF PREPAYMENT............................................................22
SECTION 7.4.  NOTICE AND DATE OF PREPAYMENT..........................................23

## ARTICLE VIII

### NON-LIABILITY OF ISSUER; EXPENSES; INDEMNIFICATION

SECTION 8.1.  NON-LIABILITY OF ISSUER.............................................................23
SECTION 8.2.  EXPENSES........................................................................................24
SECTION 8.3.  INDEMNIFICATION .........................................................................24

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page
255 of 295

# TABLE OF CONTENTS
### (continued)

## ARTICLE IX

## MISCELLANEOUS

SECTION 9.1. NOTICES ................................................................................................ 25
SECTION 9.2. SEVERABILITY ..................................................................................... 25
SECTION 9.3. EXECUTION OF COUNTERPARTS ................................................... 25
SECTION 9.4. AMENDMENTS, CHANGES AND MODIFICATIONS ...................... 25
SECTION 9.5. GOVERNING LAW; VENUE ................................................................ 25
SECTION 9.6. AUTHORIZED BORROWER REPRESENTATIVE ............................ 26
SECTION 9.7. TERM OF THE AGREEMENT .............................................................. 26
SECTION 9.8. BINDING EFFECT ................................................................................ 26
SECTION 9.9. SURVIVAL OF FEE OBLIGATION .................................................... 26
SECTION 9.10. PROVISIONS RELATING TO CREDIT PROVIDER AND
LIQUIDITY PROVIDER .......................................................................... 26

EXHIBIT A    Description of the Diablo Canyon Project ................................................ A-1

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page
256 of 295

## LOAN AGREEMENT

THIS LOAN AGREEMENT, dated as of August 1, 2009 (this "Agreement"), by and between CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK, an entity within the Business, Transportation and Housing Agency of the State of California (herein called the "Issuer"), and PACIFIC GAS AND ELECTRIC COMPANY, a corporation organized and existing under the laws of the State of California (the "Borrower").

### WITNESSETH:

WHEREAS, the Issuer was established pursuant to the Bergeson-Peace Infrastructure and Economic Development Bank Act, constituting Division 1 of Title 6.7 of the California Government Code (commencing with Section 63000), as now in effect and as it may be amended or supplemented (the "Act"); and

WHEREAS, pursuant to Section 63045(c) of the Act, the Issuer is authorized to issue tax exempt revenue bonds to provide financing for economic development projects compatible with the public interest as specified in Section 63046 of the Act; and

WHEREAS, pursuant to Section 63081 of the Act, the Issuer is authorized to issue bonds for the purpose of refunding any bonds, notes or other securities of the Issuer then outstanding, including the payment of any interest accrued, or to accrue, on their earliest of any subsequent date of redemption, purchase, or maturity of these bonds; and

WHEREAS, pursuant to Section 63025.1(j) of the Act, the Issuer is authorized to make loans to any sponsor, in accordance with an agreement between the Issuer and the sponsor to refinance indebtedness incurred by the sponsor in connection with projects undertaken and completed prior to any agreement with the Issuer or expectation that the Issuer would provide financing pursuant to the Act; and

WHEREAS, the Issuer issued its Revenue Refunding Bonds (Pacific Gas and Electric Company) Series 2008A (AMT), in the aggregate principal amount of $74,275,000; its Revenue Refunding Bonds (Pacific Gas and Electric Company) Series 2008B (AMT), in the aggregate principal amount of $74,275,000 (the "Series 2008B Bonds"); its Revenue Refunding Bonds (Pacific Gas and Electric Company) Series 2008C (AMT), in the aggregate principal amount of $80,000,000; and its Revenue Refunding Bonds (Pacific Gas and Electric Company) Series 2008D (AMT), in the aggregate principal amount of $80,000,000 (collectively, the "2008A-D Bonds"); and

WHEREAS, upon issuance, the Series 2008B Bonds were exchanged for a series of refunding revenue bonds previously issued by the Issuer, the proceeds of which series of refunding revenue bonds were loaned to the Borrower to refinance a portion of a revolving loan and thereby assist the Borrower in the refinancing of a portion of the costs of certain air and water pollution control and sewage and solid waste disposal facilities located at the Diablo Canyon Nuclear Power Plant (the "Diablo Canyon Project"), which are "exempt facilities" under Section 103(b)(4) of the 1954 Code and which are owned and operated by the Borrower; and

LA1 1828038

WHEREAS, the American Recovery and Reinvestment Tax Act of 2009 (the "Act") allows the 2008A-D Bonds, the interest on which is an item of tax preference for purposes of the Alternative Minimum Tax (the "AMT"), to be refinanced with the proceeds of refunding revenue bonds, the interest on which is not an item of tax preference for purposes of the AMT; and

WHEREAS, to take advantage of this aspect of the Act, the Borrower has requested the Issuer to issue its refunding revenue bonds for the purpose of refinancing the 2008A-D Bonds through the purchase in lieu of redemption by the Borrower of the 2008A-D Bonds using the proceeds of such refunding revenue bonds and the immediate cancellation of the 2008A-D Bonds so purchased, and the Issuer, after due investigation and deliberation, has adopted a resolution approving said request; and

WHEREAS, pursuant to Section 63081 of the Act the Issuer has authorized and undertaken the issuance of its California Infrastructure and Economic Development Bank Refunding Revenue Bonds (Pacific Gas and Electric Company) Series 2009B in the aggregate principal amount of $74,275,000 (the "Bonds"), for the purpose of purchasing the Series 2008B Bonds by the Borrower from the proceeds of the Bonds in lieu of their redemption and the immediate cancellation of the Series 2008B Bonds so purchased thereby assisting the Borrower in the refinancing of a portion of the costs of the Diablo Canyon Project; and

WHEREAS, Bond Counsel has determined that no allocation of a share of the State ceiling on private activity bonds is required in connection with the issuance of the Bonds; and

WHEREAS, the Issuer proposes to loan the proceeds of the Bonds to the Borrower and the Borrower desires to borrow the proceeds of the Bonds upon the terms and conditions set forth herein; and

WHEREAS, the proceeds of the Bonds will be used solely to purchase the Series 2008B Bonds purchased in lieu of redemption on behalf of the Borrower, and the Series 2008B Bonds so purchased will be immediately cancelled, all as provided in more detail in the Purchase Protocol, among the Trustee, the Issuer, the Borrower, the representative of the underwriters of the Bonds and Deutsche Bank National Trust Company, as tender agent for the Series 2008B Bonds; and the proceeds of the Bonds will not be applied in any other manner or used for any other purpose; and

WHEREAS, all Bonds issued under the Indenture (as hereinafter defined) will be secured by a pledge and assignment of the Issuer's rights under this Agreement (except Retained Rights); and

WHEREAS, the Issuer and the Borrower each has duly authorized the execution and delivery of this Agreement;

NOW, THEREFORE, in consideration of the premises and the respective representations and covenants herein contained, the parties hereto agree as follows:

# ARTICLE I

## DEFINITIONS

SECTION 1.1. DEFINITION OF TERMS. Unless the context otherwise requires, the terms used in this Agreement shall have the meanings set forth herein, or if not defined herein, in Section 1.01 of the Indenture of Trust of even date herewith (the "Indenture"), by and between the Issuer and Deutsche Bank National Trust Company, as trustee (the "Trustee"), pursuant to which the Bonds will be issued, as originally executed or as it may from time to time be supplemented or amended as provided therein, or in the Multi-Mode Annex attached thereto.

SECTION 1.2. NUMBER AND GENDER. The singular form of any word used herein, including the terms defined in Section 1.01 of the Indenture, or in the Multi-Mode Annex attached thereto, shall include the plural, and vice versa. The use herein of a word of any gender shall include all genders.

SECTION 1.3. ARTICLES, SECTIONS, ETC. Unless otherwise specified, references to Articles, Sections and other subdivisions of this Agreement are to the designated Articles, Sections and other subdivisions of this Agreement as originally executed. The words "hereof," "herein," "hereunder" and words of similar import refer to this Agreement as a whole. The headings or titles of the several articles and sections, and the table of contents appended to copies hereof, shall be solely for convenience of reference and shall not affect the meaning, construction or effect of the provisions hereof.

# ARTICLE II

## REPRESENTATIONS

SECTION 2.1. REPRESENTATIONS OF THE ISSUER. The Issuer makes the following representations as of the Issue Date as the basis for its undertakings herein contained:

    (a)    The Issuer is an entity within the Business, Transportation and Housing Agency of the State. Under the provisions of the Act, the Issuer has the power to enter into the transactions contemplated by this Agreement and the Indenture and to carry out its obligations hereunder. By proper action, the Issuer has been duly authorized to execute, deliver and duly perform its obligations under this Agreement and the Indenture.

    (b)    On November 23, 2004, a public hearing with respect to the Bonds was held in accordance with the provisions of the Internal Revenue Code of 1986, as amended (the "Code"). On July 28, 2009, the Issuer adopted its resolution approving the issuance of the Bonds and the loan of the proceeds thereof to the Borrower pursuant to this Agreement to purchase the Series 2008B Bonds by the Borrower from the proceeds of the Bonds in lieu of their redemption and the immediate cancellation of the 2008B Bonds so purchased and thereby assist the Borrower in the refinancing of a portion of the costs of the Diablo Canyon Project.

(c)     The Issuer has not pledged and will not pledge its interest in this Agreement for any purpose other than as provided in the Indenture.

(d)     The Issuer is not in default under any of the provisions of the laws of the State which default would affect its existence or its powers referred to in subsection (a) of this Section 2.1.

(e)     The Issuer has found and determined and hereby finds and determines that (i) the Loan to be made hereunder with the proceeds of the Bonds will promote the purposes of the Act by providing funds to refinance the Series 2008B Bonds thereby assisting the Borrower in the refinancing of a portion of the costs of the Diablo Canyon Project through the purchase and cancellation of the Series 2008B Bonds purchased in lieu of redemption on behalf of the Borrower and the payment of such purchase price from the proceeds of the Bonds; (ii) said Loan is in the public interest, serves the public purposes and meets the requirements of the Act; (iii) all requirements of the Act with respect to the issuance of the Bonds and the execution of this Agreement have been complied with; and (iv) the entering into of this Agreement and the Indenture will be in furtherance of the Act.

(f)     The execution and delivery of this Agreement, the Indenture, the Purchase Contract or the Tax Certificate and Agreement, the consummation of the transactions contemplated hereby or thereby, and the fulfillment of or compliance with the terms and conditions of this Agreement, the Indenture, the Purchase Contract or the Tax Certificate and Agreement, do not conflict with or result in a breach of any of the terms, conditions or provisions of any restriction or any agreement or instrument to which the Issuer is now a party or by which it is bound or constitute a default under any of the foregoing or result in the creation or imposition of any prohibited lien, charge or encumbrance of any nature whatsoever upon any of the property or assets of the Issuer under the terms of any instrument or agreement.

SECTION 2.2.  REPRESENTATIONS OF THE BORROWER.  The Borrower makes the following representations as of the Issue Date as the basis for its undertakings herein contained:

(a)     The Borrower is a corporation duly organized and existing under the laws of the State, is in good standing in the State and has the power to enter into and has duly authorized, by proper action, the execution and delivery of this Agreement, the Tender Agent Agreement, if any, the Remarketing Agreement, if any, and the Tax Certificate and Agreement (collectively, the "Borrower Documents").

(b)     The execution and delivery of this Agreement nor any other Borrower Document, the consummation of the transactions contemplated hereby and thereby, and the fulfillment of or compliance with the terms and conditions hereof and thereof, does not conflict with or results in a breach of any of the terms, conditions or provisions of the Borrower's organizational documents or of any material actions or of any material agreement or instrument to which the Borrower is now a party or by which it is bound, or constitutes a default (with due notice or the passage of time or both) under any of the

foregoing, or results in the creation or imposition of any prohibited lien, charge or encumbrance whatsoever upon any of the property or assets of the Borrower under the terms of any material instrument or agreement to which the Borrower is now a party or by which it is bound.

(c)     The costs of the Diablo Canyon Project are as set forth (or incorporated by reference) in the Tax Certificate and Agreement and have been determined in accordance with standard engineering/construction and accounting principles. All the information and representations in the Tax Certificate and Agreement are true and correct as of the date thereof.

(d)     The Diablo Canyon Project consists of various equipment and facilities described in Exhibit A.

(e)     No event has occurred and no condition exists that would constitute an Event of Default or that, with the passing of time or with the giving of notice or both, would become an Event of Default.

(f)     The officers of the Borrower executing the Borrower Documents are duly and properly in office and have the requisite authority to execute the same.

(g)     The Borrower Documents have been duly authorized, executed and delivered by the Borrower.

(h)     This Agreement constitutes the legal, valid and binding agreement of the Borrower, enforceable against the Borrower in accordance with its terms, and any rights of the Issuer and obligations of the Borrower not assigned to the Trustee constitute the legal, valid and binding agreements of the Borrower, enforceable against the Borrower in accordance with their terms, except as enforcement may be limited by bankruptcy, insolvency or other laws affecting the enforcement of creditors' rights generally and by the application of equitable principles if equitable remedies are sought.

(i)     No consent or approval of any trustee or holder of any indebtedness of the Borrower, and no consent, permission, authorization, order or license of, or filing or registration with, any governmental authority, is necessary in connection with the execution and delivery of this Agreement or for the consummation of any transaction herein contemplated, except such as have been obtained or made and as are in full force and effect.

(j)     Except as disclosed in the Official Statement dated August 21, 2009 relating to the Bonds (the "Official Statement"), there is no action, suit, proceeding or investigation before or by any court or federal, state, municipal or other government authority pending or, to the knowledge of the Borrower, threatened in writing against the Borrower or against any of its material properties or operations which, if determined adversely to the Borrower or its interests, would have a material and adverse effect upon the consummation by the Borrower of the transactions contemplated by or the validity of this Agreement, or upon the financial condition, assets, properties or operations of the Borrower, and the Borrower is not in default with respect to any order or decree of any

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page
261 of 295

court or any order, regulation or demand of any federal, state, municipal or other governmental authority, which default would reasonably be expected to have consequences that would materially and adversely affect the consummation of the transactions to be undertaken by the Borrower contemplated by this Agreement, or would materially and adversely affect the financial condition, assets, properties or operations of the Borrower.

(k)     The Diablo Canyon Project is consistent with all applicable local or regional comprehensive plans. Because the Act does not define "local or regional comprehensive plans," the Borrower makes this representation based on the fact that the Diablo Canyon Project is consistent with the general plan of San Luis Obispo County adopted pursuant to California Government Code Section 65300 et seq.

(l)     None of the Bond proceeds will be used for construction purposes under a construction contract entered into by the Borrower. In case any Bond proceeds are used for construction purposes under a construction contract entered into by the Borrower, the Borrower shall determine that the contractors engaged to construct the Diablo Canyon Project are properly licensed by the Contractors' State License Board.

## ARTICLE III

### ISSUANCE OF THE BONDS; APPLICATION OF PROCEEDS

SECTION 3.1. AGREEMENT TO ISSUE BONDS; APPLICATION OF PROCEEDS. To provide funds to refinance the Series 2008B Bonds and thereby assist the Borrower in the refinancing of a portion of the costs of the Diablo Canyon Project through the purchase in lieu of redemption on behalf of the Borrower of the Series 2008B Bonds, the payment of the purchase price of the Series 2008B Bonds so purchased from the proceeds of the Bonds and the immediate cancellation of the Series 2008B Bonds so purchased, the Issuer agrees that it will issue under the Indenture, sell and cause to be delivered to the purchasers thereof, the Bonds, bearing interest as provided and maturing on the date set forth in the Indenture. The Issuer will thereupon apply the proceeds received from the sale of the Bonds as provided in the Indenture.

SECTION 3.2. INVESTMENT OF MONEYS IN FUNDS. Any moneys in any fund held by the Trustee shall, to the extent permitted under the Indenture, at the written request of an Authorized Borrower Representative, be invested or reinvested by the Trustee as provided in the Indenture. Such investments shall be deemed at all times a part of the fund from which such investments were made, and the interest accruing thereon and any profit or loss realized therefrom shall, except as otherwise provided in the Indenture, be credited or charged to such fund.

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 262 of 295

## ARTICLE IV

## LOAN TO BORROWER; REPAYMENT PROVISIONS

SECTION 4.1. LOAN TO BORROWER; ISSUANCE OF BONDS. The Issuer covenants and agrees, upon the terms and conditions in this Agreement, to loan the proceeds of the sale of the Bonds to the Borrower for the purpose of refinancing the Series 2008B Bonds and thereby assist the Borrower in the refinancing of a portion of the costs of the Diablo Canyon Project through the purchase in lieu of redemption on behalf of the Borrower of the Series 2008B Bonds, the payment of the purchase price of the Series 2008B Bonds so purchased from the proceeds of the Bonds and the immediate cancellation of the Series 2008B Bonds so purchased. Pursuant to said covenant and agreement, the Issuer will issue the Bonds upon the terms and conditions contained in this Agreement and the Indenture. The Issuer and the Borrower agree that the application of the proceeds of sale of the Bonds as aforesaid will be deemed to be and will be treated for all purposes as a loan to the Borrower of an amount equal to the aggregate principal amount of the Bonds. The Borrower hereby approves the Indenture, the assignment thereunder to the Trustee of the right, title and interest of the Issuer (with the exception of the Retained Rights of the Issuer) in this Agreement, and the issuance thereunder by the Issuer of the Bonds.

## SECTION 4.2. REPAYMENT AND PAYMENT OF OTHER AMOUNTS PAYABLE.

(a)     The Borrower covenants and agrees to pay to the Trustee (as assignee of the Issuer) as a Repayment Installment, on or before each date provided in or pursuant to the Indenture for the payment of principal (whether at maturity or upon redemption or acceleration) of and premium, if any, and interest on, the Bonds, until such principal, premium, if any, and interest shall have been fully paid or provision for the payment thereof shall have been made in accordance with the Indenture, in immediately available funds, for deposit in the Bond Fund, a sum equal to the amount then payable as principal (whether at maturity or upon redemption or acceleration) of, premium, if any, and interest on, the Bonds as provided in the Indenture.

Each payment made by the Borrower pursuant to this Section 4.2(a) shall at all times be sufficient to pay the total amount of principal (whether at maturity or upon redemption or acceleration) of, and interest and premium, if any, then payable on, the Bonds; provided that any amount held by the Trustee in the Bond Fund on any due date for a Repayment Installment hereunder shall be credited against the installment due on such date, to the extent available for such purpose; and provided further that, subject to the provisions of this paragraph, if at any time the amounts held by the Trustee in the Bond Fund are sufficient to pay all of the principal of, and interest and premium, if any, on, the Bonds as such payments become due, the Borrower shall be relieved of any obligation to make any further payments with respect to the Bonds under the provisions of this Section. Notwithstanding the foregoing, at any time the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility under the Indenture) is in effect with respect to the Bonds and if the Trustee has not realized sufficient moneys under the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility under the Indenture) as shall be necessary to make timely payment of principal of and premium, if any, and interest on the Bonds (other than Bonds owned by or for the account of the Borrower or the

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 263 of 295

Liquidity Provider) and deposited such amounts in the Letter of Credit Account in the Bond Fund at 1:00 p.m. (New York City time) on the date any such principal of, premium, if any, and interest on the Bonds shall become due and payable at maturity, upon redemption or otherwise, or if the Trustee has actual knowledge that the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility under the Indenture) has been repudiated, the Borrower shall forthwith pay such deficiency as a Repayment Installment hereunder as described in Section 5.03 of the Indenture.

(b)     The Borrower also covenants and agrees to pay:

(i)     to the Trustee until the principal of, and interest and premium, if any, on, the Bonds shall have been fully paid or provision for the payment thereof shall have been made as required by the Indenture, (A) the reasonable annual fee of the Trustee for its ordinary services rendered as trustee, and its reasonable ordinary expenses incurred under the Indenture, as and when the same become due, (B) the reasonable fees, charges and expenses of the Registrar, the Paying Agent, any Auction Agent, any Remarketing Agent and any Tender Agent, as and when the same become due, (C) the reasonable fees, charges and expenses of the Trustee for the necessary extraordinary services rendered by it and reasonable extraordinary expenses (including reasonable attorneys' fees) incurred by it under the Indenture, as and when the same become due, (D) the cost of printing any Bonds required to be furnished by the Issuer pursuant to the Indenture, and (E) any amounts required to be deposited in the Rebate Fund to comply with the provisions of Section 5.4 hereof and Section 6.06 of the Indenture. The Trustee's compensation shall not be limited by any provision of law regarding the compensation of a Trustee of an express trust. The Borrower agrees that the provisions of this Section 4.2(b)(i) shall survive the discharge of the Indenture and the retirement of the Bonds or the resignation or removal of the Trustee; and

(ii)    in the event that:

(A)    the Borrower exercises its right to purchase Bonds in lieu of redemption pursuant to Section 4.06 of the Multi-Mode Annex or to purchase Bonds in lieu of acceleration pursuant to Section 7.01(d) of the Indenture and elects to cause the Purchase Price of such Bonds on the Purchase in Lieu of Redemption Date or Purchase in Lieu of Acceleration Date, as applicable, to be paid from amounts paid by the Borrower to the Tender Agent in immediately available funds and the amount on deposit in the Borrower Account is insufficient to pay the Purchase Price of any such Bonds tendered for purchase on any Purchase in Lieu of Redemption Date or Purchase in Lieu of Acceleration Date, as applicable, to the Tender Agent for deposit in the Borrower Account by 11:30 a.m. (New York City time) on any Purchase in Lieu of Redemption Date or Purchase in Lieu of Acceleration Date, as applicable, sufficient money (if pursuant to Section 4.06 of the Multi-Mode Annex, in immediately available funds) to pay the Purchase Price of any such Bonds tendered for purchase or required to be purchased on such date pursuant to Section 4.06 of the Multi-Mode Annex or Section 7.01(d) of the Indenture, as applicable. If a Liquidity Facility shall be in effect, the Borrower shall pay or cause the Purchase Price of the Bond

so purchased as described in this paragraph to be paid from Available Moneys. It is the intention of the parties hereto that the purchase of the Bonds pursuant to Section 4.06 of the Multi-Mode Annex or Section 7.01(d) of the Indenture, as applicable, shall not constitute a prepayment of the loan of Bond proceeds made to the Borrower pursuant to this Agreement or a merger or extinguishment of the indebtedness of the Borrower hereunder or the Bonds so purchased and that such Bonds shall for all purposes continue to be regarded as Outstanding under the Indenture.

(B)     if at any time the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility under the Indenture) is in effect with respect to the Bonds and the Borrower exercises its right to purchase Bonds in lieu of redemption pursuant to Section 4.06 of the Multi-Mode Annex or to purchase Bonds in lieu of acceleration pursuant to Section 7.01(d) of the Indenture and elects to cause the Purchase Price of such Bonds on the Purchase in Lieu of Redemption Date or Purchase in Lieu of Acceleration Date, as applicable, to be paid from moneys realized under the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility under the Indenture) and if the amounts on deposit in the Bond Purchase Fund are insufficient to pay the Purchase Price of any Bonds tendered for purchase on any Purchase in Lieu of Redemption Date or Purchase in Lieu of Acceleration Date, as applicable, the Borrower covenants to pay or cause to be deposited in the Borrower Account in the Bond Purchase Fund sufficient moneys in immediately available funds (which need not constitute Available Moneys) to pay the Purchase Price of any such Bonds tendered for purchase or required to be purchased by 4:00 p.m. (New York City time) one (1) Business Day after such Purchase in Lieu of Redemption Date or Purchase in Lieu of Acceleration Date, as applicable, in the amount specified in the Notice of Borrower Purchase.

(c)     The Borrower also covenants and agrees to pay:

(i)     All taxes and assessments of any type or character charged to the Issuer affecting the amount available to the Issuer from payments to be received hereunder or in any way arising due to the transactions contemplated hereby (including taxes and assessments assessed or levied by any public agency or governmental authority of whatsoever character having power to levy taxes or assessments); provided, however, that the Borrower shall have the right to protest any such taxes or assessments which it in good faith believes are not due and owing and to require the Issuer, at the Borrower's expense, to protest and contest any such taxes or assessments levied upon them and that the Borrower shall have the right to withhold payment of any such taxes or assessments pending disposition of any such protest or contest unless such withholding, protest or contest would adversely affect the rights or interests of the Issuer or the Holders hereunder, under the Indenture or otherwise with respect to the Bonds;

(ii)     The reasonable fees and expenses of such accountants, consultants, attorneys and other experts as may be engaged by the Issuer or the Trustee to prepare

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 265 of 295

audits, financial statements, reports, opinions or provide such other services required under this Agreement or the Indenture (provided that the Issuer will give advance notice to the Borrower if it engages any accountants, consultants, attorneys or other experts to provide services required under this Agreement or the Indenture, and provided further that the Borrower acknowledges that failure of the Issuer to give such notice shall not affect the Issuer's right to engage any such Persons or seek payment for the fees and expenses thereof under this subsection);

(iii)   The reasonable fees and costs incurred by the Issuer, including but not limited to Issuer staff costs and costs of the Attorney General of the State and any other attorney or consultant representing the Issuer in connection with this Agreement (including pursuant to Section 8.3 hereof), the Tax Certificate and Agreement, the Bonds or the Indenture, including any and all expenses incurred in connection with the authorization, issuance, sale and delivery of any such Bonds (except for actions arising solely from statements or information in the sections of the Official Statement entitled "THE ISSUER" and "ABSENCE OF MATERIAL LITIGATION—The Issuer"), or in connection with the inspection of the Borrower, its properties, assets or operations (provided that the Issuer will give advance notice to the Borrower if it engages any such attorney or consultant; and provided further that the Borrower acknowledges that failure of the Issuer to give such notice shall not affect the Issuer's right to engage any such attorney or consultant or seek payment for the fees and expenses thereof under this subsection); and

(iv)   An annual fee of $500, payable to the Issuer on or before September 1 of any year in which Bonds are Outstanding, commencing September 1, 2010; provided that the payment of such annual fee in any year under any loan agreement between the Issuer and the Borrower relating to any of the Issuer's Refunding Revenue Bonds (Pacific Gas and Electric Company) Series 2009A, Series 2009C or Series 2009D (collectively, the "Other Loan Agreements") shall satisfy the Borrower's payment obligation under this Section 4.2(c)(iv) for such year and payment by the Borrower of the annual fee under this Section 4.2(c)(iv) in any year shall satisfy the Borrower's payment obligation under Section 4.2(c)(iv) of the Other Loan Agreements in such year; and

(v)   Any rebate or other amount required to be paid pursuant to the Tax Certificate and Agreement.

(d)   If no Credit Facility or Liquidity Facility is in effect with respect to the Bonds, if the amounts on deposit in the Bond Purchase Fund are insufficient to pay the Purchase Price of any Bonds tendered for purchase under Section 2.02(a) or 2.02(b) of the Multi-Mode Annex on any Purchase Date, the Borrower covenants to pay or cause to be deposited in the Bond Purchase Fund sufficient moneys to pay (i) the Purchase Price of any Bonds tendered for purchase or required to be purchased under Section 2.02(a) or 2.02(b) of the Multi-Mode Annex and (ii) the amount of premium, if any, due with respect to the Mandatory Put Bonds on any Purchase Date for Mandatory Put Bonds described in Section 2.02(b)(ii) of the Multi-Mode Annex, in immediately available funds by 2:30 p.m. (New York City time) on such Purchase Date in the amount specified in the Notice of Borrower Purchase. If at any time the Letter of Credit (or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a

Liquidity Facility under the Indenture) is in effect with respect to the Bonds and if the amounts on deposit in the Bond Purchase Fund are insufficient to pay the Purchase Price of any Bonds tendered for purchase under Section 2.02(a) or 2.02(b) of the Multi-Mode Annex on any Purchase Date, the Borrower covenants to pay or cause to be deposited in the Bond Purchase Fund sufficient moneys to pay (i) the Purchase Price of any Bonds tendered for purchase or required to be purchased under Section 2.02(a) or 2.02(b) of the Multi-Mode Annex and (ii) the amount of premium, if any, due with respect to the Mandatory Put Bonds on any Purchase Date for Mandatory Put Bonds described in Section 2.02(b)(ii) of the Multi-Mode Annex, in immediately available funds by 2:30 p.m. (New York City time) one (1) Business Day after such Purchase Date in the amount specified in the Notice of Borrower Purchase. The Borrower shall not be required to provide moneys to pay the Purchase Price of Bonds tendered for purchase under Section 2.02(a) or 2.02(b) of the Multi-Mode Annex on any Purchase Date if a Credit Facility or Liquidity Facility (other than the Letter of Credit or a single letter of credit, guarantee or insurance policy constituting both a Credit Facility and a Liquidity Facility under the Indenture) is in effect with respect to the Bonds. For all purposes of this Agreement, a Credit Facility shall be treated as in effect for its full stated term, including any extensions agreed upon by the Credit Provider and the Borrower, unless earlier terminated by mutual written agreement of the Credit Provider and the Borrower, notwithstanding any attempted unilateral rescission, repudiation or termination of the Credit Facility by the Credit Provider or the Borrower, notwithstanding the occurrence of any Credit Provider Event of Insolvency and notwithstanding any failure of the Credit Provider to honor any prior or current draw on the Credit Facility. For all purposes of this Agreement, a Liquidity Facility shall be treated as in effect for its full stated term, including any extensions agreed upon by the Liquidity Provider and the Borrower, unless earlier terminated by mutual written agreement of the Liquidity Provider and the Borrower, notwithstanding any attempted unilateral rescission, repudiation or termination of the Liquidity Facility by the Liquidity Provider or the Borrower, notwithstanding the occurrence of any Liquidity Provider Event of Insolvency and notwithstanding any failure of the Liquidity Provider to honor any prior or current draw on the Liquidity Facility.

(e)     In the event the Borrower should fail to make any of the payments required by subsection (a), (b), (c) or (d) of this Section, such payments shall continue as obligations of the Borrower until such amounts shall have been fully paid. The Borrower agrees to pay overdue payments under subsection (a) (other than for the payment of interest on the Bonds), (b), (c) or (d) of this Section, together with interest thereon until paid, to the extent permitted by law, at the rate of interest per annum borne by the Bonds or, if less, at the Maximum Rate. Interest on overdue payments required under subsection (a) (other than the payment of the portion of any Repayment Installment for the payment of interest on the Bonds), subsection (b)(ii) and subsection (d) of this Section shall be applied as provided in Section 5.02 of the Indenture.

SECTION 4.3. UNCONDITIONAL OBLIGATION. The obligations of the Borrower to make the payments required by Section 4.2 hereof and to perform and observe the other agreements on its part contained herein shall be absolute and unconditional, irrespective of any defense or any rights of set-off, recoupment or counterclaim it might otherwise have against the Issuer, and during the term of this Agreement, the Borrower shall pay absolutely the payments to be made on account of the loan as prescribed in Section 4.2 hereof and all other payments required hereunder, free of any deductions and without abatement, diminution or set-off. Until such time as the principal of, premium, if any, and interest on the Bonds shall have been fully

paid, or provision for the payment thereof shall have been made as required by the Indenture, the Borrower (i) will not suspend or discontinue any payments provided for in Section 4.2 hereof with respect to the Bonds; (ii) will perform and observe all of its other covenants contained in this Agreement with respect to the Bonds and the Diablo Canyon Project; and (iii) except as provided in Article VII hereof, will not terminate this Agreement for any cause, including, without limitation, the occurrence of any act or circumstances that may constitute failure of consideration, destruction of or damage to the Diablo Canyon Project, commercial frustration of purpose, any change in the tax or other laws of the United States of America or of the State or any political subdivision of either of these, or any failure of the Issuer or the Trustee to perform and observe any covenant, whether express or implied, or any duty, liability or obligation arising out of or connected with this Agreement or the Indenture, except to the extent permitted by this Agreement.

SECTION 4.4. ASSIGNMENT OF ISSUER'S RIGHTS. As security for the payment of the Bonds, the Issuer hereby assigns to the Trustee any and all rights and privileges it has under this Agreement (with the exception of the Retained Rights of the Issuer) and any such rights under any Credit Facility relating to the Bonds, and the Issuer hereby directs the Borrower to make the payments required hereunder (except Additional Payments owed to the Issuer) directly to the Trustee. The Borrower hereby assents to such assignment and agrees to make payments directly to the Trustee without defense or set-off by reason of any dispute between the Borrower and the Issuer or the Trustee.

The Issuer hereby acknowledges that the Borrower may be obligated to reimburse a Liquidity Provider for amounts provided under a Liquidity Facility to purchase Bonds which are tendered for purchase and not remarketed pursuant to any Remarketing Agreement, and acknowledges that any and all proceeds of any subsequent remarketing of the Bonds so purchased will be paid to such Liquidity Provider in order to discharge the Borrower's reimbursement obligation (or any loan by such Liquidity Provider to finance such reimbursement obligation) to such Liquidity Provider.

SECTION 4.5. AMOUNTS REMAINING IN FUNDS. It is agreed by the parties hereto that any amounts remaining in any fund held by the Trustee under the Indenture after payment in full of (i) the Bonds, or after provision for such payment shall have been made as provided in the Indenture, (ii) the reasonable fees, charges and expenses of the Trustee, the Issuer, the Registrar, any Credit Provider, any Auction Agent, any Tender Agent, any Remarketing Agent and any Paying Agent due and owing in accordance with this Agreement, the Indenture, the Tax Certificate and Agreement and any Credit Agreement, (iii) the Rebate Requirement and (iv) all other amounts required to be paid under this Agreement, the Indenture, the Tax Certificate and Agreement and any Credit Agreement, shall be applied as provided in Section 5.06 of the Indenture.

SECTION 4.6. CREDIT FACILITIES.

(a) On the Issue Date, the Borrower shall deliver (or cause to be delivered) to the Trustee the Letter of Credit as a Credit Facility.

(b)    The Borrower may provide and subsequently terminate or substitute one or more Credit Facilities with respect to the Bonds pursuant to the provisions of Section 5.01 of the Multi-Mode Annex.

(c)    Not less than 25 days prior to the delivery, termination or substitution of any such Credit Facility with respect to the Bonds, the Borrower shall send by first class mail written notice of such delivery, termination or substitution to the Trustee. Not less than 15 days prior to the delivery of any Credit Facility or substitute Credit Facility for the Bonds, the Borrower shall send by first class mail written notice of such delivery to each Rating Agency.

## SECTION 4.7. LIQUIDITY FACILITIES.

(a)    On the Issue Date, the Borrower shall deliver (or cause to be delivered) to the Trustee the Letter of Credit as a Liquidity Facility.

(b)    The Borrower may provide and subsequently terminate or substitute one or more Liquidity Facilities with respect to the Bonds pursuant to the provisions of Section 5.02 of the Multi-Mode Annex.

(c)    Not less than 25 days prior to the delivery, termination or substitution of any such Liquidity Facility with respect to the Bonds, the Borrower shall send by first class mail written notice of such delivery, termination or substitution to the Trustee. Not less than 15 days prior to the delivery of any Liquidity Facility or substitute Liquidity Facility for the Bonds, the Borrower shall send by first class mail written notice of such delivery to each Rating Agency.

## ARTICLE V

## SPECIAL COVENANTS AND AGREEMENTS

### SECTION 5.1. THE BORROWER'S MAINTENANCE OF ITS EXISTENCE; ASSIGNMENTS.

(a)    To the extent permitted by law and its articles of incorporation, the Borrower covenants and agrees that during the term of this Agreement it will (1) maintain its corporate existence, (2) continue to maintain its status as a corporation in good standing in the State, and (3) not dissolve or otherwise dispose of all or substantially all of its assets, not consolidate with or merge into another person or permit one or more persons to consolidate or merge into it; provided, however, that if the Borrower has obtained the prior written consent of each Credit Provider (provided that such written consent will not be required if the Borrower has provided to the Issuer a certificate of the Borrower that the consent of such Credit Provider, if any, is not contractually required and the dissolution, sale, disposition, combination, consolidation or merger without the consent of such Credit Provider, if any, will not result in a termination of such Credit Facility), or if the Borrower plans to merge with or transfer substantially all of its assets to a wholly-owned subsidiary of the Borrower, the Borrower may so combine, consolidate with or merge into another person legally existing under the laws of one of the states of the United States, or permit one or more persons to consolidate with or merge into it, or sell or otherwise transfer to another person all or substantially all of its assets (any such action referred

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 269 of 295

to hereafter in this Section 5.1(a) as a "Transaction"). If consent of any Credit Provider, if any, is required, such consent (which shall not be unreasonably withheld) shall be given within thirty (30) days after written evidence acceptable to the Issuer is provided by the Borrower (the thirty (30) day period will be extended for an additional thirty (30) days from the date of receipt of any substantial change to the initial request) to demonstrate that:

        (i)    the surviving, resulting or transferee person, as the case may be, (A) assumes and agrees in writing to pay and perform all of the obligations of the Borrower hereunder, and (B) is qualified to do business in the State;

        (ii)    the existing Credit Facility will remain in full force and effect or an additional Credit Facility will be timely provided, in either case meeting the requirements of this Agreement;

        (iii)    the credit rating on the Bonds, as determined by any Rating Agency then rating the Bonds, shall be no lower than the rating level of the Bonds immediately prior to the effective date of such transaction; and

        (iv)    the transaction does not result in a Loan Default Event.

The Borrower, however, need not comply with any of the provisions of this Section 5.1(a) if, at the time of such transaction, the Bonds will be defeased as provided in Article X of the Indenture. Following any such combination, consolidation, merger or transfer in accordance with Section 5.1(a), all references in this Agreement to the Borrower shall mean the surviving, resulting or transferee person, as the case may be.

        (b)    The rights and obligations of the Borrower under this Agreement may be assigned by the Borrower to any Person in whole or in part, provided, however, that any assignment other than pursuant to Section 5.1(a) hereof shall be subject to each of the following conditions:

        (i)    No such assignment shall relieve the Borrower from primary liability for any of its obligations hereunder, and the Borrower shall continue to remain primarily liable for the payments specified in Section 4.2 hereof and for performance and observance of the other agreements herein provided to be performed and observed by it.

        (ii)    Any such assignment from the Borrower shall retain for the Borrower such rights and interests as will permit it to perform its obligations under this Agreement, and any assignee from the Borrower shall assume in writing the obligations of the Borrower hereunder to the extent of the interest assigned.

        (iii)    The Borrower shall, within thirty (30) days after the delivery thereof, furnish or cause to be furnished to the Issuer, the Trustee and each Credit Provider, if any a true and complete copy of each such assignment together with an instrument of assumption.

        (iv)    The Borrower shall cause to be delivered to the Issuer and the Trustee an Opinion of Bond Counsel to the effect that such assignment will not, in and of itself, adversely affect the Tax-Exempt status of interest on the Bonds.

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 270 of 295

(o)     If a transaction is effected as provided in this Section, all provisions of this Section shall continue in full force and effect and no further merger, consolidation, sale or transfer shall be effected except in accordance with the provisions of this Section.

## SECTION 5.2.  RECORDS AND FINANCIAL STATEMENTS OF BORROWER.

(a)     The Borrower shall, within 120 days after the close of each fiscal year, submit to the Trustee and upon request, the Issuer, audited financial statements with respect to the Borrower for such fiscal year.

(b)     The Borrower covenants and agrees at all times to keep, or cause to be kept, proper books of record and account, prepared in accordance with generally accepted accounting principles, in which complete and accurate entries shall be made of all transactions of or in relation to the business, properties and operations of the Borrower; provided, however, that the Borrower shall not be required to prepare audited financial statements pursuant to this Section. Such books of record and account shall be available for inspection by the Issuer or the Trustee, and the duly authorized agents of either of them, at reasonable hours and under reasonable circumstances.  Such books of record and account, including auction records, shall be maintained by the Borrower until six years after payment in full or defeasance of the Bonds.

SECTION 5.3. QUALIFICATION IN CALIFORNIA.    The Borrower agrees that throughout the term of this Agreement it, or any successor or assignee as permitted by Section 5.1 hereof, will be qualified to do business in the State.

SECTION 5.4. TAX-EXEMPT STATUS OF INTEREST ON BONDS.    It is the intention of the parties hereto that interest on the Bonds shall be and remain Tax-Exempt, and to that end, the covenants and agreements of the Borrower in this Section and the Tax Certificate and Agreement are for the benefit of the Trustee and each and every person that at any time will be a Holder of the Bonds.

(a)     General.  The Borrower hereby covenants with the Holders of the Bonds that, notwithstanding any other provisions of this Agreement, it shall not take any action, or fail to take any action, if any such action or failure to take action would adversely affect the exclusion from gross income of interest on the Bonds under Section 103 of the Code or the Internal Revenue Code of 1954, as amended (the "1954 Code"), as applicable, including the Treasury Regulations promulgated thereunder (the "Treasury Regulations").

(b)     Qualification as Exempt Facility Bonds.  The Borrower shall not take any action, or fail to take any action, if any such action or failure to take action would cause the Bonds to be other than "exempt facility bonds" within the meaning of Part IV of Subchapter B of Chapter 1 of the Code, as amended through the date of issuance of the Bonds, and in furtherance thereof, shall not make any use of the proceeds of the Bonds, or of any of the facilities financed or refinanced with the proceeds of the Bonds, or any portion thereof, that would cause the Bonds not to qualify for purposes of Part IV of Subchapter B of Chapter 1 of the Code, and all applicable Treasury Regulations, as amended through the date of issuance of the Bonds, as "exempt facility bonds".  (With respect to Bonds that satisfy the transition rules set forth in

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 271 of 295

Sections 1312 and/or 1313(a) of the Tax Reform Act of 1986, Section 103(b)(4) of the 1954 Code shall be substituted for the above reference to Part IV of Subchapter B of Chapter 1 of the Code.) To that end, so long as any Bonds are outstanding, the Borrower, with respect to such proceeds and property and such other funds, will comply with the requirements of the Code and the 1954 Code, as amended through the date of issuance of the Bonds, as applicable, and all applicable Treasury Regulations. To the extent reasonably within its control, the Borrower shall establish reasonable procedures necessary to ensure continued compliance with the aforementioned portions of the Code (or, if applicable, the 1954 Code), as amended through the date of issuance of the Bonds, and the continued qualification of the facilities financed or refinanced with the proceeds of the Bonds.

(c)     Arbitrage. The Borrower shall not, directly or indirectly, use or permit the use of any proceeds of any Bonds, or of any property financed or refinanced thereby, or other funds of the Borrower, or take or omit to take any action, that would cause the Bonds to be "arbitrage bonds" within the meaning of Section 148 of the Code. To that end, the Borrower shall comply with all requirements of Section 148 of the Code and all applicable Treasury Regulations.

(d)     Federal Guarantee. The Borrower shall not make any use of the proceeds of the Bonds or any other funds of the Borrower, or take or omit to take any other action, that would cause the Bonds to be "federally guaranteed" within the meaning of Section 149(b) of the Code.

(e)     Compliance with Tax Certificate and Agreement. In furtherance of the foregoing tax covenants of this Section 5.4, the Borrower covenants that it will comply fully at all times with the provisions of the Tax Certificate and Agreement, which is incorporated herein as if fully set forth herein, and will not take any action, or omit to take any action, which, if taken or omitted, respectively, would violate the Tax Certificate and Agreement, and that the information, representations and warranties contained in the Tax Certificate and Agreement are true and correct. These covenants shall survive payment in full or defeasance of the Bonds.

SECTION 5.5. NOTICE OF RATE PERIODS. The Borrower shall designate and give timely written notice to the Issuer and the Trustee as required by the Indenture prior to any change in Rate Periods for the Bonds. In addition, if the Borrower shall elect to change Rate Periods in accordance with the Indenture under circumstances requiring the delivery of an Opinion of Bond Counsel, the Borrower shall deliver such opinion to the Issuer and the Trustee concurrently with the giving of notice with respect thereto.

SECTION 5.6. REMARKETING OF THE BONDS; PROVISIONS RELATING TO BONDS DURING AUCTION RATE PERIOD.

(a)     The Borrower agrees to perform all obligations and duties required of it by the Indenture, the Multi-Mode Annex, any Auction Agent Agreement, any Tender Agreement and any Remarketing Agreement with respect to the remarketing of the Bonds.

(b)     The Borrower acknowledges that Bonds, including Liquidity Provider Bonds, in a Flexible Rate Mode and to which Section 2.01(c)(ix)(C) or Section 2.01(c)(ix)(D) of the Multi-Mode Annex is applicable shall not be remarketed other than to the Borrower or the Liquidity Provider, if any, unless at the time of such remarketing the Bonds are rated "A" or better

(without regard to "+"s or "-"s or numerical designations) by a Rating Agency. Unless at the time of remarketing the Bonds are rated "A" or better (without regard to "+"s or "-"s or numerical designations) by a Rating Agency, whenever the Rate Period for the Bonds is to automatically adjust to a Flexible Rate Period and a Flexible Rate under circumstances described in Section 2.01(c)(vii) or Section 2.01(c)(viii) of the Multi-Mode Annex, the Borrower shall direct the Remarketing Agent not to remarket the Bonds to any Person other than the Borrower or the Liquidity Provider. The Borrower shall deliver that direction to the Remarketing Agent by telephone prior to any such automatic adjustment, such telephonic notice to be confirmed in writing.

SECTION 5.7. CONTINUING DISCLOSURE. The Borrower hereby covenants and agrees, so long as the Bonds bear interest at a Term Rate or an Auction Rate, to undertake the continuing disclosure requirements for the Bonds as promulgated under Rule 15c2-12, as it may from time to time hereafter be amended or supplemented. Notwithstanding any other provision of this Agreement, failure of the Borrower to comply with the requirements of Rule 15c2-12 applicable to the Bonds, as it may from time to time hereafter be amended or supplemented, shall not be considered a Loan Default Event hereunder or an Event of Default under the Indenture; however, the Trustee may (and, at the request of any Credit Provider, if any or any Remarketing Agent or the Holders of in excess of 50% of the aggregate principal amount of Outstanding Bonds and upon receipt of indemnity satisfactory to the Trustee, shall), or any Bondholder or beneficial owner of any Bonds may, take such actions as may be necessary and appropriate, including seeking mandate or specific performance by court order, to cause the Borrower to comply with its obligations pursuant to this Section 5.7.

SECTION 5.8. INDENTURE REQUIREMENTS. In furtherance of its obligations with respect to the Bonds, the Borrower hereby covenants that it will perform and observe those provisions of the Indenture imposing obligations upon, or affecting the rights of, the Borrower as if such provisions were fully set forth herein.

SECTION 5.9. USE OF BOND PROCEEDS. The Borrower acknowledges and agrees that, notwithstanding any other provision of this Agreement, (i) the Trustee shall, immediately upon receipt of the proceeds of the Bonds, transfer all such proceeds to Deutsche Bank National Trust Company, as tender agent for the Series 2008B Bonds, and such proceeds shall be applied solely to the payment of the purchase price of the Series 2008B Bonds purchased in lieu of redemption on behalf of the Borrower, and the Series 2008B Bonds so purchased shall be immediately cancelled, all as provided in more detail in the Purchase Protocol; (ii) the proceeds of the Bonds shall not be applied in any other manner or used for any other purpose; and (iii) the Borrower shall have no right to receive, or direct the use or disposition of, any proceeds of the Bonds.

## ARTICLE VI

## LOAN DEFAULT EVENTS AND REMEDIES

SECTION 6.1. LOAN DEFAULT EVENTS. Any one of the following which occurs and continues shall constitute a Loan Default Event under this Agreement:

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page
273 of 295

(a)     failure by the Borrower to pay any amounts required to be paid under Section 4.2(a) hereof, Section 4.2(b)(ii) hereof or Section 4.2(d) hereof when due, which failure causes an Event of Default under the Indenture; or

(b)     failure of the Borrower to observe and perform any covenant, condition or agreement on its part required to be observed or performed under this Agreement, other than a failure to make the payments referred to in (a) above, which failure continues for a period of 30 days after written notice from the Trustee or the Issuer, which notice shall specify such failure and request that it be remedied, unless the Issuer and the Trustee shall agree in writing to an extension of such time period; provided, however, that if the failure stated in the notice cannot be corrected within such period, the Issuer and the Trustee will not unreasonably withhold their consent to an extension of such time period if corrective action is instituted within such period and diligently pursued; or

(c)     an Act of Bankruptcy of the Borrower, but solely in the event that no Credit Facility is in effect for the Bonds or the Borrower is the Credit Provider; or

(d)     the occurrence of an Event of Default under the Indenture.

The provisions of subsection (b) of the preceding paragraph are subject to the limitation that the Borrower shall not be deemed in default if and so long as the Borrower is unable to carry out its agreements hereunder by reason of strikes, lockouts or other industrial disturbances; acts of public enemies; acts of terrorism; orders of any kind of the government of the United States or of the State or any of their departments, agencies, or officials, or any civil or military authority; insurrections; riots; epidemics; landslides; lightning; earthquake; fire; hurricanes; storms; floods; washouts; droughts; arrests; restraint of government and people; civil disturbances; explosions; substantial breakage or accident to machinery, transmission pipes or canals; partial or entire failure of utilities; or any other cause or event not reasonably within the control of the Borrower; it being agreed that the settlement of strikes, lockouts and other industrial disturbances shall be entirely within the discretion of the Borrower, and the Borrower shall not be required to make settlement of strikes, lockouts and other industrial disturbances by acceding to the demands of the opposing party or parties when such course is, in the judgment of the Borrower, unfavorable to the Borrower. This limitation shall not apply to any default under subsection (a), (c) or (d) of this Section.

In determining whether any failure to make due and punctual payment of any amount described in (a) above has occurred, no effect shall be given to payment of any such amount with funds provided under the applicable Credit Facility.

SECTION 6.2.  REMEDIES ON DEFAULT.  Whenever any Loan Default Event shall have occurred and shall continue:

(a)     The Trustee, by notice in writing delivered to the Borrower (with copies of such notice being sent to the Issuer and each Credit Provider, if any) and with the prior consent of each Credit Provider, if any, may declare the unpaid balance of the loan payable under Section 4.2(a) of this Agreement with respect to which a Loan Default Event has occurred, in an amount equal to the Outstanding principal amount of the

Bonds, together with the interest accrued thereon, to be immediately due and payable, and shall do so if the Bonds have been accelerated as provided in the Indenture. After any such declaration of acceleration or automatic acceleration of the Bonds, except to the extent the Borrower has exercised its right to purchase the Bonds in lieu of acceleration paid as set forth in clause (B) of Section 7.01(d) of the Indenture, the Trustee shall immediately take such actions as necessary to realize moneys under the applicable Credit Facility or the applicable Liquidity Facility, as appropriate, for payment upon such acceleration or purchase in lieu of acceleration, as applicable.

(b)     The Issuer or the Trustee may take whatever action at law or in equity as may be necessary or desirable to collect the payments and other amounts then due and thereafter to become due or to enforce performance and observance of any obligation, agreement or covenant of the Borrower under this Agreement.

The provisions of subsection (a) of the preceding paragraph, however, are subject to the condition that if, at any time after any portion of the loan shall have been so declared due and payable, and before any judgment or decree for the payment of the moneys due shall have been obtained or entered, there shall have been deposited with the Trustee a sum sufficient to pay all the principal of the Bonds matured prior to such declaration and all matured installments of interest (if any) upon all such Bonds, with interest on such overdue installments of principal as provided herein, and the reasonable expenses of the Trustee, and any and all other defaults actually known to the Trustee (other than in the payment of principal of and interest on such Bonds due and payable solely by reason of such declaration) shall have been made good or cured to the satisfaction of the Trustee or provision deemed by the Trustee to be adequate shall have been made therefor, then, and in every such case, any Credit Provider, if any or the Holders of at least a majority in aggregate principal amount of the Bonds then Outstanding, by written notice to the Issuer and to the Trustee accompanied by the written consent of each Credit Provider, if any, may, on behalf of the Holders of all the Bonds, rescind and annul such declaration and its consequences and waive such default; provided that no such rescission and annulment shall extend to or shall affect any subsequent default, or shall impair or exhaust any right or power consequent thereon.

The provisions of subsection (a) of the second preceding paragraph, however, are further subject to the condition that if, at any time after any portion of the loan shall have been so declared due and payable, and before any judgment or decree for the payment of the moneys due shall have been obtained or entered as hereinafter provided, the Borrower shall have elected to purchase all of the Bonds in lieu of such acceleration by written notice to the Issuer, Trustee and the Tender Agent and the Borrower shall have deposited with the Tender Agent for deposit in the Borrower Account an amount equal to the Purchase Price of the Bonds on the Purchase In Lieu of Acceleration Date, then, and in every such case, the acceleration of the principal and interest on the Bonds hereunder shall be automatically rescinded and annulled without further action of the Trustee and the Bonds shall be purchased in lieu of such acceleration on the Purchase in Lieu of Acceleration Date pursuant to Section 7.01(d) of the Indenture, whereupon the Bonds will be deemed purchased by the Borrower from the former Holders without notice to or further act of such Holders; provided that no such rescission and annulment shall extend to or shall affect any subsequent default, or shall impair or exhaust any right or power consequent thereon.

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 275 of 295

In case the Trustee, the Issuer or any Credit Provider, if any shall have proceeded to enforce its rights under this Agreement and such proceedings shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Trustee, the Issuer or any Credit Provider, if any, then, and in every such case, the Borrower, the Trustee, the Issuer and each Credit Provider, if any shall be restored respectively to their several positions and rights hereunder, and all rights, remedies and powers of the Borrower, the Trustee, the Issuer and each Credit Provider, if any shall continue as though no such action had been taken (provided, however, that any settlement of such proceedings duly entered into by the Borrower, the Trustee, the Issuer or any Credit Provider, if any shall not be disturbed by reason of this provision).

The Borrower covenants that, in case a Loan Default Event shall occur with respect to the payment of any Repayment Installment payable under Section 4.2(a) hereof, then, upon demand of any Credit Provider, if any or the Trustee, the Borrower shall pay to the Trustee the whole amount that then shall have become due and payable under said Section.

In case the Borrower shall fail forthwith to pay such amounts upon such demand, any Credit Provider, if any or the Trustee shall be entitled and empowered to institute any action or proceeding at law or in equity for the collection of the sums so due and unpaid, and may prosecute any such action or proceeding to judgment or final decree, and may enforce any such judgment or final decree against the Borrower and collect in the manner provided by law the moneys adjudged or decreed to be payable.

Upon the occurrence of a Loan Default Event described in Section 6.1(d) hereof, any Credit Provider, if any or the Trustee shall be entitled and empowered, by intervention in such proceedings or otherwise, to file and prove a claim or claims for the whole amount owing and unpaid pursuant to this Agreement and, in case of any judicial proceedings, to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have such claims of such Credit Provider, if any or the Trustee with respect to this Agreement allowed in such judicial proceedings relative to the Borrower, its creditors or its property, and to collect and receive any moneys or other property payable or deliverable on any such claims, and to distribute such amounts as provided in the Indenture after the deduction of its reasonable charges and expenses. Any receiver, assignee or trustee in bankruptcy or reorganization is hereby authorized to make such payments to the Trustee, and to pay to the Trustee any amount due it for reasonable compensation and expenses, including reasonable expenses and fees of counsel incurred by it up to the date of such distribution.

Notwithstanding anything to the contrary in this Article VI, so long as any Credit Facility is in effect and no default in the payment obligations of the applicable Credit Provider, if any under such Credit Facility shall have occurred and be continuing, no Loan Default Event shall be declared nor any remedies exercised with respect thereto by the Trustee or by the Bondholders (except in a case resulting from the failure of the Borrower to pay the Issuer's or the Trustee's fees and expenses or to indemnify the Trustee) and no Loan Default Event shall be waived by the Trustee or the Bondholders to the extent they may otherwise be permitted hereunder, without, in any case, the prior written consent of such Credit Provider, if any; provided, however, that no consent of any Credit Provider, if any shall be required with respect to the exercise of any remedy (other than acceleration) provided herein seeking enforcement of Additional Payments. In addition, so long as any Credit Facility is in effect and no default in the payment obligations of the

applicable Credit Provider under such Credit Facility, the Trustee shall declare Loan Default Events and exercise remedies hereunder at the direction of such Credit Provider. The Issuer and the Trustee may exercise any and all remedies under the Indenture and this Agreement (except acceleration) to collect any fees, expenses and indemnification from the Borrower without obtaining the consent of any Credit Provider, if any.

SECTION 6.3. AGREEMENT TO PAY ATTORNEYS' FEES AND EXPENSES. In the event the Borrower should default under any of the provisions of this Agreement and the Issuer or the Trustee should employ attorneys or incur other reasonable expenses for the collection of the payments due under this Agreement or the enforcement of performance or observance of any obligation or agreement on the part of the Borrower herein contained, the Borrower agrees to pay to the Issuer or the Trustee the reasonable fees and expenses of such attorneys, such other reasonable expenses so incurred by the Trustee and such other expenses so incurred by the Issuer.

SECTION 6.4. NO REMEDY EXCLUSIVE. No remedy herein conferred upon or reserved to the Issuer, the Trustee or any Credit Provider, if any is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Agreement or now or hereafter existing at law or in equity or by statute. No delay or omission to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient. In order to entitle the Issuer, the Trustee or any Credit Provider, if any to exercise any remedy reserved to it in this Article, it shall not be necessary to give any notice, other than such notice as may be herein expressly required. Such rights and remedies as are given the Issuer hereunder (with the exception of the Retained Rights of the Issuer) shall also extend to the Trustee. The Trustee and the Holders of the Bonds shall be deemed third party beneficiaries of all covenants and agreements herein contained. Without limiting the foregoing, to the extent that any covenants and agreements in this Agreement expressly grant rights to any Credit Provider, if any, such Credit Provider, if any shall be deemed a third party beneficiary of such covenants and agreements. Without limiting the foregoing, to the extent that any covenants and agreements in this Agreement expressly grant rights to any Liquidity Provider, any Liquidity Provider shall be deemed a third party beneficiary of such covenants and agreements.

SECTION 6.5. NO ADDITIONAL WAIVER IMPLIED BY ONE WAIVER. In the event any agreement or covenant contained in this Agreement should be breached by the Borrower and thereafter waived by the Issuer or the Trustee, such waiver shall be limited to the particular breach so waived and shall not be deemed to waive any other breach hereunder.

## ARTICLE VII

## PREPAYMENT

SECTION 7.1. OPTIONS TO PREPAY INSTALLMENTS. The Borrower shall have the option to prepay the amounts payable under Section 4.2(a) hereof by paying to the Trustee, for deposit in the Bond Fund (or if the Borrower exercises its right to purchase, or cause to be

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 277 of 295

purchased, all Bonds Outstanding in lieu of redemption pursuant to Section 4.06 of the Multi-Mode Annex, for deposit in the Borrower Account), the amount set forth in Section 7.3 hereof, under the circumstances set forth in Section 4.01(a) of the Multi-Mode Annex; provided, however, that if any event specified in Section 4.01(a)(1)(A) through (D) of the Multi-Mode Annex gives rise to the Borrower's exercise of its option to prepay such amounts payable hereunder, the amount of such loan payment prepaid shall not exceed the original cost of the portion of the Diablo Canyon Project affected by such event.

SECTION 7.2. MANDATORY PREPAYMENT. The Borrower shall have and hereby accepts the obligation to prepay Repayment Installments to the extent mandatory redemption of any of the Bonds is required pursuant to Section 4.01(b) of the Multi-Mode Annex or to the extent the maturity of any of the Bonds shall have been accelerated pursuant to Section 7.01(b) of the Indenture and the Borrower has not elected to purchase the Bonds in lieu of acceleration pursuant to Section 7.01(d) of the Indenture. The Borrower shall satisfy its obligation hereunder by prepaying such Repayment Installments (a) within 180 days after the occurrence of any event set forth in paragraph (1) of said Section 4.01(b), (b) subject to any notice requirements contained in the Indenture with respect to the mandatory redemption of the Bonds, immediately upon the occurrence of any event set forth in paragraph (2) of said Section 4.01(b) giving rise to such required prepayment, and (c) unless the Borrower has elected to purchase the Bonds in lieu of acceleration pursuant to Section 7.01(d) of the Indenture, immediately upon receipt of notice from the Trustee of any acceleration of the maturity of the Bonds pursuant to Section 7.01(b) of the Indenture. The amount payable by the Borrower in the event of a prepayment required by this Section shall be determined as set forth in Section 7.3 hereof and shall be deposited in the Bond Fund.

SECTION 7.3. AMOUNT OF PREPAYMENT. In the case of a prepayment of the entire amount due hereunder pursuant to Section 7.1 or 7.2 hereof, the amount to be paid shall be a sum sufficient, together with other funds and the yield on any securities deposited with the Trustee and available for such purpose, to pay (1) the principal of all Outstanding Bonds on the redemption date specified in the notice of redemption (or, if the Borrower exercises its right to purchase, or cause to be purchased, all Bonds Outstanding in lieu of redemption, on the applicable Purchase in Lieu of Redemption Date, as permitted under the Indenture), plus interest accrued and to accrue to the payment or redemption date of the Bonds, plus premium, if any, pursuant to the Indenture, (2) all reasonable fees and expenses of the Tender Agent, the Registrar, the Remarketing Agent and any Paying Agent accrued and to accrue through final payment of the Bonds, (3) payment of all amounts required pursuant to the Tax Certificate and Agreement, and (4) all other liabilities of the Borrower accrued and to accrue under this Agreement with respect to the Bonds.

In the case of partial prepayment of the Repayment Installments with respect to the Bonds, the amount payable shall be a sum sufficient, together with other funds deposited with the Trustee and available for such purpose, to pay the principal amount of and premium, if any, and accrued interest on the Bonds to be redeemed (or with respect to Bonds that may be purchased in lieu of redemption under the Indenture, if the Borrower exercises its right to purchase, or cause to be purchased, Bonds in lieu of redemption, the principal amount of and premium, if any, and accrued interest on the Bonds to be purchased in lieu of redemption), as provided in the Indenture, and to pay expenses of redemption (or purchase in lieu of redemption)

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page
278 of 295

of such Bonds. All partial prepayments by the Borrower shall be applied in the inverse order of the due dates thereof; provided, however, that any payments by the Borrower of the Purchase Price of the Bonds shall be used solely to pay the Purchase Price of the Bonds as provided in Section 4.06 of the Multi-Mode Annex or Section 7.01(d) of the Indenture, as applicable, and may not be used for any other purpose.

SECTION 7.4. NOTICE AND DATE OF PREPAYMENT. In the event of a prepayment pursuant to this Article VII, the Borrower shall give, at least 15 days prior to the last day by which the Trustee is permitted to give notice of redemption pursuant to Section 4.05 of the Multi-Mode Annex, written notice to the Issuer and the Trustee specifying the date upon which any prepayment will be made, provided that the Issuer and the Trustee may agree to waive their respective rights to receive such notice or may agree to a shorter notice period. If in the case of a mandatory prepayment pursuant to Section 7.2 hereof, the Borrower fails to give such notice of a prepayment required by this Section 7.4, such notice may be given by the Issuer, by the Trustee, by any Credit Provider, if any, or any Holder or Holders of 10% or more in aggregate principal amount of the Outstanding Bonds not less than 180 days after the occurrence of an event specified in clause (1) or (2) of Section 4.01(b) of the Multi-Mode Annex. The Issuer and the Trustee, at the request of the Borrower, any Credit Provider, if any or Bondholders, shall forthwith take all steps necessary under the Indenture (except that the Issuer shall not be required to make payment of any money required for such redemption other than from Revenues) to effect redemption of all or part of the then Outstanding Bonds, as the case may be, (a) in the case of redemption upon optional prepayment, on the date specified in such notice or if no such date is specified on the earliest practicable date thereafter on which such redemption may be made under applicable provisions of the Indenture and (b) in the case of redemption upon mandatory prepayment, on the earliest practicable date thereafter on which such redemption may be made under the applicable provisions of the Indenture.

Notwithstanding anything to the contrary in this Agreement, each notice contemplated in this Section 7.4 that is given with respect to an optional prepayment pursuant to Section 7.1 hereof shall state that it is subject to and conditional upon receipt by the Trustee on or prior to the proposed prepayment date of amounts sufficient to effect such prepayment and such notice shall be of no force and effect and the prepayment need not be made and the Repayment Installments will not become due and payable on the proposed prepayment date unless such amounts are so received on or prior to the proposed prepayment date.

## ARTICLE VIII

### NON-LIABILITY OF ISSUER; EXPENSES; INDEMNIFICATION

SECTION 8.1. NON-LIABILITY OF ISSUER. The Bonds, together with premium, if any, and interest thereon, shall not be deemed to constitute a debt, liability or general obligation of the State or any agency or instrumentality of the State or the lending of credit of the State or any political subdivision thereof or a pledge of the faith and credit or taxing power of the State or any agency or instrumentality of the State, but shall be payable solely from the funds provided therefor pursuant to this Agreement. The loan of the proceeds of the Bonds by the Issuer, as provided herein, is only a special, limited obligation of Issuer as provided by the Act, and the

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page
279 of 295

Issuer shall under no circumstances be obligated to pay the principal of, or premium, if any, or interest on the Bonds, or other costs incident thereto, except from Revenues. Neither the State nor any agency or instrumentality of the State is in any manner obligated to make any appropriation for such Revenues. No tax funds or governmental revenue may be used to pay the principal of, premium, if any, or interest on the loan of the proceeds of the Bonds by the Issuer. The Issuer has no taxing powers. The Borrower hereby agrees that if the payments to be made hereunder shall ever prove insufficient to pay all principal of, and premium, if any, and interest on the Bonds as the same shall become due (whether by maturity, redemption, acceleration or otherwise), then upon notice from the Trustee, the Borrower shall pay such amounts as are required from time to time to prevent any deficiency or default in the payment of such principal, premium or interest, including, but not limited to, any deficiency caused by acts, omissions, nonfeasance or malfeasance on the part of the Trustee, the Borrower, the Issuer or any third party.

SECTION 8.2. EXPENSES. The Borrower covenants and agrees to pay and to indemnify the Issuer and the Trustee against all costs and charges, including reasonable fees and disbursements of attorneys, accountants, consultants and other experts, incurred in good faith in connection with this Agreement, the Bonds, the Tax Certificate and Agreement or the Indenture.

SECTION 8.3. INDEMNIFICATION. The Borrower releases the Issuer, the Tender Agent, the Paying Agent, the Registrar and the Trustee from, and covenants and agrees that none of them shall be liable for, and covenants and agrees, to the extent permitted by law, to indemnify and hold harmless the Issuer, the Tender Agent, the Paying Agent, the Registrar and the Trustee and their officers, employees and agents from and against, any and all losses, claims, damages, liabilities or expenses, of every conceivable kind, character and nature whatsoever arising out of, resulting from or in any way connected with (1) the Diablo Canyon Project, or the conditions, occupancy, use, possession, conduct or management of, or work done in or about, or from the planning, design, acquisition, installation, rehabilitation or construction of the Diablo Canyon Project or any part thereof; (2) the issuance of any Bonds or any certifications or representations made in connection therewith and the carrying out of any of the transactions contemplated by the Bonds and this Agreement; (3) the Trustee's and the Tender Agent's acceptance or administration of the trusts under the Indenture, or the exercise or performance of any of their or the Issuer's powers or duties under the Indenture, the Tax Certificate and Agreement or this Agreement; (4) any untrue statement or alleged untrue statement of any material fact or omission or alleged omission to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, in any official statement or other offering circular utilized by the Issuer or any underwriter or placement agent in connection with the sale or remarketing of any Bonds or in any disclosure made by the Borrower to comply with the requirements of Rule 15c2-12; provided that no indemnification shall be required by this Section with respect to the sections of the Official Statement entitled "THE ISSUER" and "ABSENCE OF MATERIAL LITIGATION—The Issuer"; or (5) any violation of any environmental law, rule or regulation or the release of any hazardous or toxic substance on or near the Diablo Canyon Project; provided that such indemnity shall not be required for damages that result from negligence or willful misconduct on the part of the party seeking such indemnity. The indemnity required by this Section shall be only to the extent that any loss sustained by any indemnified party hereunder exceeds the net proceeds any such indemnified party receives from any insurance carried by the Borrower with respect to the loss sustained. The Borrower further covenants and agrees, to the extent permitted by law, to pay or to reimburse each indemnified party hereunder for any and all reasonable costs, attorneys fees and expenses, liabilities

Case: 19-30088   Doc# 5252-2   Filed: 01/02/20   Entered: 01/02/20 21:06:44   Page 280 of 295

or other expenses incurred (without duplication) in connection with investigating, defending against or otherwise in connection with any such losses, claims, damages, liabilities, expenses or actions, except to the extent that the same arise out of the negligence or willful misconduct of the party claiming such payment or reimbursement. The provisions of this Section and Section 4.2(b)(i) hereof shall survive any resignation or removal of the Trustee and the retirement of the Bonds.

## ARTICLE IX

## MISCELLANEOUS

SECTION 9.1. NOTICES. All notices, certificates or other communications shall be deemed sufficiently given on the second day following the day on which the same have been mailed by first class mail, postage prepaid, addressed to the Issuer, the Borrower, the Trustee, the Registrar, the Paying Agent, the Tender Agent, the Remarketing Agent, each Credit Provider, if any, each Liquidity Provider or the Rating Agencies, as the case may be, at the addresses set forth in Section 11.06 of the Indenture. A duplicate copy of each notice, certificate or other communication given hereunder by either the Issuer or the Borrower to the other shall also be given to the Trustee and each Credit Provider, if any. Any notice required to be given hereunder in writing may be given by first class mail, postage prepaid, or express delivery. The Issuer, the Borrower, the Trustee, any Credit Provider, if any and any Liquidity Provider may, by notice given hereunder, designate any different addresses to which subsequent notices, certificates or other communications shall be sent.

SECTION 9.2. SEVERABILITY. If any provision of this Agreement shall be held or deemed to be, or shall in fact be, illegal, inoperative or unenforceable, the same shall not affect any other provision or provisions herein contained or render the same invalid, inoperative, or unenforceable to any extent whatsoever.

SECTION 9.3. EXECUTION OF COUNTERPARTS. This Agreement may be simultaneously executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument; provided, however, that for purposes of perfecting a security interest in this Agreement under Article 9 of the California Uniform Commercial Code, only the counterpart delivered, pledged, and assigned to the Trustee shall be deemed the original.

SECTION 9.4. AMENDMENTS, CHANGES AND MODIFICATIONS. Except as otherwise provided in this Agreement or the Indenture, this Agreement may not be effectively amended, changed, modified, altered or terminated except in accordance with Article IX of the Indenture.

SECTION 9.5. GOVERNING LAW; VENUE. This Agreement shall be construed in accordance with and governed by the Constitution and laws of the State applicable to contracts made and performed in the State. This Agreement shall be enforceable in the State, and any action arising out of this Agreement shall be filed and maintained in the Sacramento County Superior Court, Sacramento, California, unless the Issuer waives this requirement.

SECTION 9.6. AUTHORIZED BORROWER REPRESENTATIVE. Whenever under the provisions of this Agreement the approval of the Borrower is required or some action is required under the Indenture at the request of the Borrower, such approval or such request shall be given on behalf of the Borrower by the Authorized Borrower Representative, and the Issuer and the Trustee shall be authorized to act on any such approval or request and neither party hereto shall have any complaint against the other or against the Trustee as a result of any such action taken.

SECTION 9.7. TERM OF THE AGREEMENT. This Agreement shall be in full force and effect with respect to the Bonds from the date hereof and shall continue in effect until the latest of the following: (i) none of the Bonds are Outstanding, (ii) the satisfaction in full of the Borrower's obligations hereunder, or (iii) the Trustee no longer holds any moneys under the Indenture. All representations and certifications by the Borrower as to all matters affecting the Tax-Exempt status of interest on the Bonds shall survive the termination of this Agreement.

SECTION 9.8. BINDING EFFECT. This Agreement shall inure to the benefit of and shall be binding upon the Issuer, the Borrower and their respective successors and assigns; subject, however, to the limitations contained in Section 5.1 hereof.

SECTION 9.9. SURVIVAL OF FEE OBLIGATION. The right of the Issuer, the Trustee, each Credit Provider, if any and each Liquidity Provider to receive any fees or be reimbursed for any expenses incurred pursuant to this Agreement, and the right of the Trustee to be protected from any liability as provided in this Agreement, shall survive the retirement of the Bonds.

SECTION 9.10. PROVISIONS RELATING TO CREDIT PROVIDER AND LIQUIDITY PROVIDER.

(a)     Provisions Relating to Credit Provider.

(i)     All provisions hereof regarding consents, approvals, directions, appointments or requests by any Credit Provider, if any shall be deemed not to require or permit such consents, approvals, directions, appointments or requests by such Credit Provider, if any during any time in which such Credit Provider, if any has failed to honor a draft presented to it in strict conformance with the applicable provisions of the applicable Credit Facility, or after such Credit Facility shall at any time for any reason cease to be valid and binding on such Credit Provider, if any or while such Credit Provider, if any is denying further liability or obligation under such Credit Facility (unless such Credit Facility has been fully drawn or to the extent that the conditions to making a demand for payment thereunder have not been strictly satisfied) or after such Credit Provider, if any has rescinded, repudiated or terminated such Credit Facility; and

(ii)     All provisions herein relating to any Credit Provider, if any shall be of no force and effect with respect to such Credit Provider, if any if the applicable Credit Facility is not in effect, and all amounts owing to such Credit Provider, if any under the applicable Credit Agreement have been paid.

(b)    Provisions Relating to Liquidity Provider.

(i)    All provisions hereof regarding consents, approvals, directions, appointments or requests by any Liquidity Provider shall be deemed not to require or permit such consents, approvals, directions, appointments or requests by such Liquidity Provider during any time in which such Liquidity Provider has failed to honor a demand for payment presented to it in strict conformance with the applicable provisions of the applicable Liquidity Facility, or after such Liquidity Facility shall at any time for any reason cease to be valid and binding on such Liquidity Provider or while such Liquidity Provider is denying further liability or obligation under such Liquidity Facility (unless such Liquidity Facility has been fully drawn or to the extent that the conditions to making a demand for payment thereunder have not been strictly satisfied) or after such Liquidity Provider has rescinded, repudiated or terminated such Liquidity Facility.

(ii)    All provisions herein relating to any Liquidity Provider shall be of no force and effect with respect to such Liquidity Provider if the applicable Liquidity Facility is not in effect, there are no related Liquidity Provider Bonds and all amounts owing to such Liquidity Provider under the applicable Liquidity Agreement have been paid.

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 283 of 295

IN WITNESS WHEREOF, the Issuer has caused this Agreement to be executed in its name and attested by its duly authorized officials, and the Borrower has caused this Agreement to be executed in its name and attested by its duly authorized officers, all as of the date first above written.

CALIFORNIA INFRASTRUCTURE AND
ECONOMIC DEVELOPMENT BANK

By _Stanton C. Hazelroth_

Stanton C. Hazelroth, Executive Director

Attest:

By _____

Secretary

PACIFIC GAS AND ELECTRIC COMPANY

By _____

Nicholas M. Bijur, Treasurer

Attest:

By _____

Assistant Corporate Secretary

LOAN AGREEMENT
SERIES 2009B

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 284 of 295

IN WITNESS WHEREOF, the Issuer has caused this Agreement to be executed in its name and attested by its duly authorized officials, and the Borrower has caused this Agreement to be executed in its name and attested by its duly authorized officers, all as of the date first above written.

CALIFORNIA INFRASTRUCTURE AND
ECONOMIC DEVELOPMENT BANK

By _____

Stanton C. Hazelroth, Executive Director

Attest:

By _____

          Secretary

PACIFIC GAS AND ELECTRIC COMPANY

By _____

Nicholas M. Bijur, Treasurer

Attest:

By _____

    Assistant Corporate Secretary

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page
285 of 295

## EXHIBIT A

### Description of the Diablo Canyon Project

The Diablo Canyon Project consists of the following: the acquisition, installation, construction, reconstruction, improvement, relocating, equipping and other costs of certain air and water pollution control, sewage disposal and solid waste disposal facilities for the Diablo Canyon Nuclear Power Plant (the "Diablo Canyon Plant"). The Diablo Canyon Plant is located on the west side of Pacific Coast Highway approximately nine miles northwest of Avila Beach near San Luis Obispo, California.

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 286 of 295

Exhibit 5
February 2019 Annex A Draw

Annex A to
Irrevocable Letter of Credit No. S326841M

UNION BANK, N.A.
TRADE SERVICE OPERATIONS
1980 SATURN STREET, V02-906
MONTEREY PARK, CA 91755
ATTN: STANDBY LETTER OF CREDIT UNIT

## FOR THE URGENT ATTENTION OF LETTER OF CREDIT MANAGER

**DEUTSCHE BANK NATIONAL TRUST COMPANY**, IN ITS CAPACITY AS TRUSTEE AND TENDER AGENT (THE "BENEFICIARY"), HEREBY CERTIFIES TO UNION BANK, N.A. (THE "BANK") WITH REFERENCE TO IRREVOCABLE LETTER OF CREDIT NO. S326841M (THE "LETTER OF CREDIT"; THE TERMS THE "BONDS", "BUSINESS DAY", THE "INDENTURE", AND THE "PRESENTATION OFFICE" USED HEREIN SHALL HAVE THEIR RESPECTIVE MEANINGS SET FORTH IN THE LETTER OF CREDIT) THAT:

(1)  THE BENEFICIARY IS THE TRUSTEE AND TENDER AGENT OR A SUCCESSOR TRUSTEE AND TENDER AGENT UNDER THE INDENTURE.

(2)  THE BENEFICIARY IS MAKING A DEMAND UNDER THE LETTER OF CREDIT FOR PAYMENT, ON AN INTEREST PAYMENT DATE (AS DEFINED IN APPENDIX B TO THE INDENTURE), OF UNPAID INTEREST ON THE BONDS.

(3)  THE AMOUNT HEREBY DEMANDED UNDER THE LETTER OF CREDIT IS **$201,966.95.**

(4)  THE AMOUNT OF THIS DEMAND FOR PAYMENT WAS COMPUTED IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF THE BONDS AND THE INDENTURE AND IS DEMANDED IN ACCORDANCE WITH THE INDENTURE, WHICH AMOUNT PLEASE REMIT TO THE UNDERSIGNED AS FOLLOWS:

> **DEUTSCHE BANK TRUST COMPANY AMERICAS**
> **ABA-021-001-033**
> **Acct- 01419647**
> **Attention: Kathryn Fischer**
> **Reference: PG&E 2009 Series B**

THE AMOUNT HEREBY DEMANDED UNDER THE LETTER OF CREDIT IS **$201,966.95 on February 1, 2019.**

(5)  THE BENEFICIARY HAS CONTACTED OR ATTEMPTED TO CONTACT BY TELEPHONE AN OFFICER OF THE BANK AT THE PRESENTATION OFFICE REGARDING THE AMOUNT OF THIS DEMAND AND THE DATE AND TIME BY WHICH PAYMENT IS DEMANDED; HOWEVER, SUCH CONTACT, WHETHER OR NOT ATTEMPTED OR MADE, IS NOT A CONDITION TO HONORING THE DEMAND FOR PAYMENT MADE PURSUANT HERETO.

(6)    IF THIS DEMAND IS RECEIVED AT THE PRESENTATION OFFICE BY YOU AT OR
BEFORE 12:00 P.M., LOS ANGELES TIME ON A BUSINESS DAY, YOU MUST
MAKE PAYMENT ON THIS DEMAND AT OR BEFORE 10:00 A.M., LOS ANGELES
TIME, ON THE NEXT BUSINESS DAY. IF THIS DEMAND IS RECEIVED BY YOU
AT THE PRESENTATION OFFICE AFTER 12:00 P.M., LOS ANGELES TIME, ON A
BUSINESS DAY, YOU MUST MAKE PAYMENT ON THIS DEMAND AT OR BEFORE
10:00 A.M., LOS ANGELES CITY TIME, ON THE SECOND BUSINESS DAY
FOLLOWING SUCH BUSINESS DAY.

(7)    NO AMOUNT OF THIS DEMAND IS BEING DRAWN TO PAY THE INTEREST ON
LIQUIDITY PROVIDER BONDS (AS DEFINED IN THE INDENTURE) OR BONDS
REGISTERED IN THE NAME OF THE APPLICANT.

**Deutsche Bank National Trust Company**
**As Trustee**

*Kathryn Fischer*

Kathryn Fischer
Assistant Vice President

Exhibit 6
February 2019 Annex E Draw



Deutsche Bank

Union Bank, N.A
1980 Saturn Street V02-906
Monterey Park, CA 91755
ATTENTION: TRADE SERVICE OPERATIONS
Telephone: 323 720 2270
**Facsimile: 323-720-2773**

## URGENT- Letter of Credit Draws-PG&E 2009 A and B

I am delivering via fax our drafts for payment on**, February 5, 2019** on the attached
Letters of Credit. Please wire transfer through the Federal Reserve Bank no later than 11:00 a.m.
EST on **February 5, 2019**. Funds are due as follows:

Deutsche Bank Trust Company Americas
Trust and Securities Services
ABA # 021001033
A/C # 01419647
Attn: Kathryn Fischer

Please confirm transfer by telephone to 201-593-2238.

Sincerely,

*Kathryn Fischer*

UNION BANK, N.A.
TRADE SERVICE OPERATIONS
1980 SATURN STREET, V02-906
MONTEREY PARK, CA 91755
ATTN: STANDBY LETTER OF CREDIT UNIT

**FOR THE URGENT ATTENTION OF LETTER OF CREDIT MANAGER.**

**DEUTSCHE BANK NATIONAL TRUST COMPANY**, IN ITS CAPACITY AS TRUSTEE AND TENDER AGENT (THE "<u>BENEFICIARY</u>"), HEREBY CERTIFIES TO UNION BANK, N.A. (THE "<u>BANK</u>") WITH REFERENCE TO IRREVOCABLE LETTER OF CREDIT NO. S326841M (THE "<u>LETTER OF CREDIT</u>"; THE TERMS THE "<u>BONDS</u>", "<u>BUSINESS DAY</u>", THE "<u>INDENTURE</u>", AND THE "<u>PRESENTATION OFFICE</u>" USED HEREIN SHALL HAVE THEIR RESPECTIVE MEANINGS SET FORTH IN THE LETTER OF CREDIT) THAT:

(1) THE BENEFICIARY IS THE TRUSTEE AND TENDER AGENT OR A SUCCESSOR TRUSTEE AND TENDER AGENT UNDER THE INDENTURE.

(2) THE BENEFICIARY IS MAKING A DEMAND UNDER THE LETTER OF CREDIT FOR PAYMENT OF THE TOTAL UNPAID PRINCIPAL OF, AND UNPAID INTEREST ON, ALL OF THE BONDS WHICH ARE CURRENTLY OUTSTANDING UPON:

   ☐ THE STATED MATURITY OF ALL SUCH BONDS,

   ☒ THE ACCELERATION OF ALL SUCH BONDS FOLLOWING AN EVENT OF DEFAULT UNDER THE INDENTURE,

   ☐ THE REDEMPTION OF ALL SUCH BONDS, OR

   ☐ THE PURCHASE IN LIEU OF ACCELERATION OF ALL SUCH BONDS AS A RESULT OF OUR RECEIPT OF NOTICE FROM YOU OF THE OCCURRENCE OF AN EVENT OF DEFAULT UNDER THE REIMBURSEMENT AGREEMENT, DATED AS OF JUNE 5, 2014, BETWEEN PACIFIC GAS AND ELECTRIC COMPANY AND THE BANK.

(3) THE AMOUNT HEREBY DEMANDED UNDER THE LETTER OF CREDIT IS **$74,311,628.77.**

(4) THE AMOUNT OF THIS DEMAND IS EQUAL TO THE SUM OF (A) **$74,275,000.00** BEING DRAWN WITH RESPECT TO THE PAYMENT OF THE UNPAID PRINCIPAL OF THE OUTSTANDING BONDS AND (B) **$36,628.77** BEING DRAWN WITH RESPECT TO THE PAYMENT OF THE UNPAID INTEREST ON THE OUTSTANDING BONDS.

(5) THE AMOUNT OF THIS DEMAND FOR PAYMENT WAS COMPUTED IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF THE BONDS AND THE INDENTURE AND IS DEMANDED IN ACCORDANCE WITH THE INDENTURE, WHICH AMOUNT PLEASE REMIT TO THE UNDERSIGNED AS FOLLOWS:

> **DEUTSCHE BANK TRUST COMPANY AMERICAS**
> **ABA-021-001-033**
> **Acct- 01419647**
> **Attention: Kathryn Fischer**
> **Reference: PG&E 2009 Series B**

> THE AMOUNT HEREBY DEMANDED UNDER THE LETTER OF CREDIT IS **$74,311,628.77 on February 5, 2019.**

(6) THE BENEFICIARY HAS CONTACTED OR ATTEMPTED TO CONTACT BY TELEPHONE AN OFFICER OF THE BANK AT THE PRESENTATION OFFICE REGARDING THE AMOUNT OF THIS DEMAND AND THE DATE AND TIME BY WHICH PAYMENT IS DEMANDED; HOWEVER, SUCH CONTACT, WHETHER OR NOT ATTEMPTED OR MADE, IS NOT A CONDITION TO HONORING THE DEMAND FOR PAYMENT MADE PURSUANT HERETO.

(7) IF THIS DEMAND IS RECEIVED BY YOU AT THE PRESENTATION OFFICE AT OR BEFORE 12:00 P.M., LOS ANGELES TIME ON A BUSINESS DAY, YOU MUST MAKE PAYMENT ON THIS DEMAND AT OR BEFORE 10:00 A.M., LOS ANGELES TIME, ON THE NEXT BUSINESS DAY. IF THIS DEMAND IS RECEIVED BY YOU AT THE PRESENTATION OFFICE AFTER 12:00 P.M., LOS ANGELES TIME, ON A BUSINESS DAY, YOU MUST MAKE PAYMENT ON THIS DEMAND AT OR BEFORE 10:00 A.M., LOS ANGELES TIME, ON THE SECOND BUSINESS DAY FOLLOWING SUCH BUSINESS DAY.

(8) NO AMOUNT OF THIS DEMAND IS BEING DRAWN TO PAY THE PRINCIPAL OF, OR INTEREST ON, LIQUIDITY PROVIDER BONDS (AS DEFINED IN THE INDENTURE) OR BONDS REGISTERED IN THE NAME OF THE APPLICANT.

> **Deutsche Bank National Trust Company**
> **As Trustee**

> *Kathryn Fischer*

> _____
> **Authorized Signer**

Case: 19-30088    Doc# 5252-2    Filed: 01/02/20    Entered: 01/02/20 21:06:44    Page 293 of 295

**PG&E Corporation**
**Claims Processing Center**
**850 3rd Ave**
**Suite Suite 412**
**Brooklyn,NY, 11232**

Received
OCT 18 2019
Prime Clerk LLC

# Pr■me Clerk 

## <u>Brooklyn</u>

### CLAIM/BALLOT HAND DELIVERY
### CONFIRMATION SHEET

DATE RECEIVED: _10 - 18 - 19_

CASE: _PG + E_

NO. OF CLAIMS: _1_

NO. OF BALLOTS: _0_

COPIES: _Returned_

RECEIVED BY: _Christine_