WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C. (*pro hac vice*)
(ray.schrock@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

CRAVATH, SWAINE & MOORE LLP
Paul H. Zumbro (*pro hac vice*)
(pzumbro@cravath.com)
Kevin J. Orsini (*pro hac vice*)
(korsini@cravath.com)
Omid H. Nasab (*pro hac vice*)
(onasab@cravath.com)
825 Eighth Avenue
New York, NY 10019
Tel: 212 474 1000
Fax: 212 474 3700

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>**Debtors.**<br><br>☐ Affects PG&E Corporation<br><br>☐ Affects Pacific Gas and Electric Company<br><br>☒ Affects both Debtors<br><br>* *All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case No. 19-30088 (DM)<br>Chapter 11 (Lead Case) (Jointly Administered)<br><br>**DEBTORS' AMENDED MOTION FOR ENTRY OF ORDERS (I) APPROVING TERMS OF, AND DEBTORS' ENTRY INTO AND PERFORMANCE UNDER, EQUITY BACKSTOP COMMITMENT LETTERS, (II) APPROVING TERMS OF, AND DEBTORS' ENTRY INTO AND PERFORMANCE UNDER, DEBT FINANCING COMMITMENT LETTERS AND (III) AUTHORIZING INCURRENCE, PAYMENT AND ALLOWANCE OF RELATED FEES AND/OR PREMIUMS, INDEMNITIES, COSTS AND EXPENSES AS ADMINISTRATIVE EXPENSE CLAIMS**<br><br>**[Related to Docket No. 4446]**<br><br>Date:   January 21, 2020<br>Time:  10:00 a.m. (Pacific Time)<br>Place:  United States Bankruptcy Court<br>          Courtroom 17, 16th Floor<br>          San Francisco, CA 94102<br><br>Objection Deadline: January 14, 2020, 4:00 p.m. (PT) |

## Purpose of the Amendment

On October 23, 2019, the Debtors (as defined below) filed the *Debtors' Motion for Entry of Orders (i) Approving Terms of, and Debtors' Entry into and Performance Under, Exit Financing Commitment Letters and (ii) Authorizing Incurrence, Payment and Allowance of Related Fees and/or Premiums, Indemnities, Costs and Expenses as Administrative Expense Claims* (the "**Motion**") [Docket No. 4446] seeking approval of the Exit Financing Commitment Letters (as defined below). Subsequently, the Debtors entered into amended or superseding (as the case may be) Exit Financing Commitment Letters. Accordingly, the Debtors amend[1] the Motion as set forth below.

## The Amended Motion

PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession (collectively, "**PG&E**" or the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this amended motion (the "**Amended Motion**"), pursuant to sections 105(a), 363(b), 503(b) and 507(a)(2) of title 11 of the United States Code (the "**Bankruptcy Code**"), and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for entry of orders (i) approving the terms of, and the Debtors' entry into and performance under, the Equity Backstop Commitment Letters (as defined below), (ii) approving the terms of, and the Debtors' entry into and performance under, the Debt Financing Commitment Letters (as defined below, and together with the Equity Backstop Commitment Letters, the "**Exit Financing Commitment Letters**") and (iii) authorizing the incurrence, payment and allowance of all related fees and/or premiums, indemnities, costs and expenses (the "**Exit Financing Obligations**") as administrative expense claims.

In support of the Amended Motion, the Debtors respectfully submit the Amended Declaration of Kenneth S. Ziman (the "**Ziman Declaration**"), filed contemporaneously herewith.

---

[1] The Debtors file this Amended Motion in an abundance of caution and do not concede that every present or future amendment to the Exit Financing Commitment Letters requires an amended motion.

1  Proposed forms of orders granting the relief requested herein with respect to the Equity Backstop
2  Commitment Letters and the Debt Financing Commitment Letters are attached to this Amended
3  Motion as **<u>Exhibit A</u>** and **<u>Exhibit B</u>**, respectively (collectively, the "**Proposed Orders**").
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................... v

I.      PRELIMINARY STATEMENT ........................................................................................ 1

II.     JURISDICTION ................................................................................................................ 8

III.    BACKGROUND ............................................................................................................... 8

        A.      The Debtors' Plan ................................................................................................. 8

        B.      The Equity Backstop Commitment Letters......................................................... 10

        C.      The Debt Financing Commitment Letters ........................................................... 12

        D.      Certain Key Terms and Provisions of the Exit Financing Commitment Letters
                and the Proposed Orders ...................................................................................... 14

IV.     BASIS FOR RELIEF REQUESTED .............................................................................. 29

        A.      Entry into the Exit Financing Commitment Letters is a Sound Exercise of the
                Debtors' Business Judgment and is in the Best Interests of Their Estates. ......... 29

        B.      Payment and Allowance of the Exit Financing Obligations as Administrative
                Expense Claims Should Be Approved Because They are Reasonable, Market-
                Based and Essential Terms of the Exit Financing Commitment Letters. ............. 32

V.      WAIVER OF BANKRUPTCY RULE 6004(h) ............................................................... 36

VI.     NOTICE............................................................................................................................ 37

# TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

*In re AbitibiBowater Inc.*,
   418 B.R. 815 (Bankr. D. Del. 2009) ...................................................................................30

*In re Adelphia Commc'ns Corp.*,
   No. 02-41729 (REG), 2004 WL 1634538 (Bankr. S.D.N.Y. June 22, 2004) ...........................3, 5

*Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns- Manville Corp.)*,
   60 B.R. 612 (Bankr. S.D.N.Y. 1986) ...........................................................................30

*Crystalin, L.L.C. v. Selma Props. Inc. (In re Crystalin, L.L.C.)*,
   293 B.R. 455 (B.A.P. 8th Cir. 2003) .............................................................................30

*In re Excel Innovations, Inc.*,
   502 F.3d 1086 (9th Cir. 2007) ....................................................................................30

*Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*,
   107 F.3d 558 (8th Cir. 1997) ......................................................................................30

*In re Hexion Holdings LLC*,
   No. 19-10684 (KG), (Bankr. D. Del. May 15, 2019) ...................................31, 33, 35, 36

*In re Integrated Resources, Inc.*,
   147 B.R. 650 (Bankr. S.D.N.Y. 1992) ...........................................................................30

*In re Monitronics International, Inc.*,
   No. 19-33650 (DRJ) (Bankr. S.D. Tex. July 30, 2019) ...............................................33

*In re Montgomery Ward Holding Corp.*,
   242 B.R. 147 (D. Del. 1999) ........................................................................................30

*In re Pacific Drilling S.A.*,
   No. 17-13193 (MEW) (Bankr. S.D.N.Y. Sept. 25, 2018) ...........................................34

*In re Robles*,
   No. 14-51812 (ASW), 2014 WL 3715092 (Bankr. N.D. Cal. July 24, 2014) ...............................30

*Smith v. Van Gorkom*,
   488 A.2d 858 (Del. 1985) ..........................................................................................30

*In re Station Casinos, Inc.*,
   No. BK-09-52477 (GWZ), 2010 Bankr. LEXIS 5447 (Bankr. D. Nev. Feb. 2, 2010) ........................................................................................................................30

*In re Ultra Petroleum Corp.*,
    No. 16-32202 (MI) (Bankr. S.D. Tex. Feb. 13, 2017) ...................................................3, 5

*In re Utah 7000, L.L.C.*,
    No. 08-21869 (JB), 2008 WL 2654919 (Bankr. D. Utah July 3, 2008) .........................................3

**Statutes & Rules**

11 U.S.C. § 105 ...................................................................................................................29, 31

11 U.S.C. § 105(a) ....................................................................................................................30

11 U.S.C. § 362 ........................................................................................................................29

11 U.S.C. § 363 ...................................................................................................................29, 31

11 U.S.C. § 363(b) ....................................................................................................................30

11 U.S.C. § 363(b)(1) ...............................................................................................................29

11 U.S.C. § 364 ........................................................................................................................29

11 U.S.C. § 503 ........................................................................................................................29

11 U.S.C. § 503(b) ....................................................................................................................36

11 U.S.C. § 507 ........................................................................................................................29

11 U.S.C. § 507(a)(2) ...............................................................................................................33

11 U.S.C. § et seq. ...............................................................................................................passim

28 U.S.C. § 157 ..........................................................................................................................8

28 U.S.C. § 157(b) ......................................................................................................................8

28 U.S.C. § 1334 ........................................................................................................................8

28 U.S.C. § 1408 ........................................................................................................................8

28 U.S.C. § 1409 ........................................................................................................................8

Fed. R. Bankr. P. 2002 .........................................................................................................29, 37

Fed. R. Bankr. P. 4001 ..............................................................................................................29

Fed. R. Bankr. P. 6004 ..............................................................................................................29

Fed. R. Bankr. P. 6004(h) ..........................................................................................................36

Fed. R. Bankr. P. 9014 ..............................................................................................................29

Internal Revenue Code Section 382 .................................................................................16

Rule 5011-1(a) .........................................................................................................8

Rule 5110 ...............................................................................................................27

**Other Authorities**

California Assembly Bill 1054 ...................................................................... passim

*Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General
    Order 24 (N.D. Cal.) ...............................................................................8

United States Constitution Article III ...........................................................................8

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   PRELIMINARY STATEMENT

On September 9, 2019, the Debtors filed their initial Joint Chapter 11 Plan of Reorganization [Docket No. 3841]. The Plan, which was subsequently amended to reflect an $11 billion settlement with holders of subrogation claims [Docket No. 3966] and a $13.5 billion settlement with wildfire tort claimants [Docket No. 5101] (as so amended, and as may be further amended or supplemented, the "**Debtors' Plan**"), will (a) satisfy all prepetition wildfire claims in full compliance with California Assembly Bill 1054 ("**AB 1054**"), (b) achieve a rate-neutral solution, on average, for customers, (c) meet the June 30, 2020 deadline for Plan confirmation established by AB 1054, (d) facilitate all necessary regulatory approvals, (e) support California's clean energy goals and (f) ensure that the reorganized Debtors have sufficient liquidity and other resources upon emergence to continue providing safe, clean and reliable electricity and natural gas to California residents.

Notably, the Debtors' Plan has the support of the Official Committee of Tort Claimants (the "**TCC**"), the attorneys representing individuals holding approximately 70% in number of prepetition wildfire claims filed against the Debtors, the Ad Hoc Committee of Subrogation Claimants, and the public entities that also have resolved their claims as provided in the Debtors' Plan. Indeed, the Debtors' Plan embodies a comprehensive resolution of these Chapter 11 Cases, with all impaired classes fully supporting the Debtors' Plan, and the Debtors' Plan provides a clear and expeditious path for the Debtors' successful and timely emergence from chapter 11 well in advance of the June 30, 2020 deadline established by AB 1054.

In order to satisfy the objectives of the Debtors' Plan, the Debtors must have sufficient financing to consummate the Debtors' Plan. The Debtors' Plan contemplates multiple sources of funding, the foundations of which are the issuance of up to $12 billion in reorganized PG&E Corp. common stock ("**New PG&E Corp. Common Stock**"), to be used to fund payments under the Debtors' Plan to trusts that will make payments to wildfire tort claimants and insurance subrogation claimants, and the incurrence of up to $34.35 billion in senior debt obligations (the "**New Debt**"), to,

among other things, satisfy in full pre-petition high-coupon Utility bonds and other prepetition obligations, and to fund the payment in full, in cash, of the Debtors' obligations under their debtor-in-possession financing facilities and other administrative expenses.

The Debtors anticipate effectuating the equity and debt issuances contemplated by the Debtors' Plan through market transactions in order to obtain the most favorable pricing and other terms. However, the Debtors have obtained "backstop" commitments to ensure that sufficient funds at an acceptable price will be available on the effective date of the Debtors' Plan (the "**Effective Date**") even if market conditions deteriorate and the contemplated exit financing cannot be obtained on more favorable terms. Specifically, in the exercise of their business judgment, the Debtors have obtained equity and debt financing commitments to provide assurances that the New PG&E Corp. Common Stock and New Debt will be fully financed on the Effective Date, guaranteeing the Debtors access to sufficient capital to consummate the Debtors' Plan. Under the equity commitment letters executed by PG&E Corp. (each in substantially the form attached to this Amended Motion as **Exhibit C**, and collectively, the "**Equity Backstop Commitment Letters**"), the parties identified on **Exhibit D** hereof (collectively, the "**Equity Backstop Parties**") have severally committed to purchase up to $12 billion in New PG&E Corp. Common Stock (collectively, the "**Equity Backstop Commitments**") on the Effective Date, on the terms and subject to the conditions set forth in the Equity Backstop Commitment Letters. Under the backstop debt commitment letters entered into by PG&E Corp. and the Utility on October 11, 2019, as supplemented on October 28, 2019 and December 2, 2019 and as amended on November 18, 2019 and December 20, 2019 (collectively, the "**Debt Commitment Letters**")[2], certain money-center banks have agreed to backstop the New Debt incurrences contemplated by the Debtors' Plan (collectively, the "**Debt Commitments**" and, together with the Equity Backstop Commitments, the "**Exit Financing Commitments**"), on the terms and subject to the conditions set forth in the Debt Commitment Letters.

---

[2]   Conformed copies of the Debt Commitment Letters entered into by PG&E Corp. and the Utility reflecting all amendments made through December 20, 2019 are attached to this Amended Motion as **Exhibit E** and **Exhibit F**, respectively.

2

By this Amended Motion, the Debtors seek approval of the terms of, and their entry into and performance under, these Exit Financing Commitments, including the payment of all fees and expenses provided for in the Exit Financing Commitments. Under the Bankruptcy Code, the decision of a debtor-in-possession to obtain financing commitments is entitled to deference under the business judgment rule. *See, e.g.*, *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG), 2004 WL 1634538, at *2 (Bankr. S.D.N.Y. June 22, 2004); *In re Ultra Petroleum Corp.*, No. 16-32202 (MI) (Bankr. S.D. Tex. Feb. 13, 2017) (ECF No. 1126); *In re Utah 7000, L.L.C.*, No. 08-21869 (JB), 2008 WL 2654919, at *2–3 (Bankr. D. Utah July 3, 2008). The soundness of the Debtors' business judgment is amply demonstrated here, where the Exit Financing Commitments have been obtained on favorable terms and in amounts sufficient to allow the Debtors to successfully emerge from chapter 11 in the event— albeit unlikely—market financing on better terms is unavailable. Given the critical importance of meeting the June 30, 2020 deadline to allow the reorganized Debtors to participate in the statewide wildfire fund established under AB 1054, the Debtors have determined that obtaining backstop debt and equity financing commitments now and on the terms provided in the Exit Financing Commitments is in the best interests of all stakeholders.

**The Equity Backstop Commitment Letters.** The terms of the Equity Backstop Commitment Letters afford the Debtors significant flexibility in financing their emergence from the Chapter 11 Cases. (Ziman Decl. ¶¶ 16–17.) Although equity backstop commitment letters often require a debtor to consummate a particular type of equity offering—typically, a rights offering—the Equity Backstop Commitments here provide the Debtors with the flexibility to raise market-priced equity from other providers in the public and private markets while still ensuring that the needed capital will be available if those offerings are not consummated in time for the Debtors to emerge in accordance with the timelines in AB 1054. Specifically:

- At equity valuations above a 13.5x implied price-to-earnings multiple (subject to adjustment based on changes in utility market indices), the Debtors are afforded discretion as to the type of primary equity offering that is consummated.

3

- Even at certain lower valuations, the Debtors may raise up to 20% of the equity proceeds in a widely-syndicated equity offering or, subject to certain consent rights, a private offering, with the remainder raised through a rights offering.

Importantly, the Equity Backstop Commitment Letters (and the contemplated equity issuances and rights offerings) are structured in a manner that permits the Debtors to monetize their significant net operating loss carryforwards and other tax attributes, which is important to maximizing the value of the Debtors' estates.[3] (*Id*. ¶ 16.)

The Debtors also negotiated for significant flexibility as to the length of the Equity Backstop Commitments. Subject to the terms of the Equity Backstop Commitment Letters, the commitments may be maintained for over 240 days from original signing and more than seven months post-approval, in either case an extended duration for a transaction of this complexity. Given the length of the commitments, the Equity Backstop Parties required certain termination rights and conditions precedent to their funding obligations, principally regarding (i) changes to the Debtors' Plan that have not been approved by the Equity Backstop Parties (including changes to post Effective Date capital structure), (ii) unexpected material adverse events such as pre-petition wildfire claims exceeding an agreed threshold, adverse regulatory determinations, significant post-petition wildfires, material non-ordinary course asserted administrative expense claims and the insolvency of the Debtors, (iii) the monetization of the tax position of the Debtors and (iv) any transfer of the license and operating assets of the Utility to the State of California or a third party. With that in mind, the Debtors negotiated for reductions[4] to the commitment premiums in the event that the Equity Backstop

---

[3] In the unlikely event that both the Equity Backstop Commitments are drawn and the Debtors do not complete a Tax Benefits Monetization Transaction, then the economic value of the Debtors' wildfire-related tax benefits in excess of $1.35 billion would be transferred to a trust held for the benefit of the Equity Backstop Parties. Otherwise, the Debtors would retain the tax benefits and would be able to use them to, among other things, fund other aspects of the Debtors' Plan.

[4] These reductions are referred to as "clawbacks" in the Equity Backstop Commitment Letters. Although no commitment premiums are paid until the Effective Date, the full 6.364% commitment premium is "earned" by the Equity Backstop Parties upon Court approval of the Equity Backstop Commitment Letters. However, in the event an Equity Backstop Party terminates its commitment, a

4

Parties exercise any termination rights. This reduction mechanism is intended to incentivize the Equity Backstop Parties to remain in the backstop in the event of a potential termination event (for example, by negotiating a waiver or amendment to address the potential termination event). (*Id*. ¶ 18.) If an Equity Backstop Party nevertheless terminates its Equity Backstop Commitment Letter prior to specific dates, the Debtors will retain the applicable specified portion of the commitment premium that was subject to reduction, which the Debtors can then use to attract a replacement Equity Backstop Party (including by asking existing Equity Backstop Parties to upsize their commitments). Subject to the occurrence of the Effective Date, the commitment premiums will be paid in New PG&E Corp. Common Stock.

            **The Debt Financing Commitment Letters.** In addition to the Equity Backstop Commitments, PG&E Corp. and the Utility have executed the Debt Commitment Letters with certain money-center banks, which provide that, in the event that the New Debt is not issued on or prior to the Effective Date for any reason (including market disruptions that would make the pricing on the New Debt too expensive), such banks will fund investment grade 364-day[5] "bridge" loan facilities (the "**Backstop Debt Facilities**") in aggregate amounts of up to $7.0 billion for PG&E Corp. and $27.35 billion for the Utility. In addition, the Debtors have executed fee letters (the "**Backstop Debt Fee Letters**"), which provide for, among other things, the payment of certain fees associated with the

---

portion of this commitment premium is forfeited or "clawed back" and will not be paid to the Equity Backstop Party on the Effective Date.

[5]     The 364-day period begins with the funding of the Backstop Debt Facilities. As noted above, the Debtors do not expect to draw upon the Backstop Debt Facilities, but instead expect to avail themselves of market financing that will be funded on the Effective Date. (Ziman Decl. ¶ 22.) Even if the Backstop Debt Facilities were to be funded, they are expected to be refinanced well in advance of their 364-day maturity. (*Id.*) Courts in other large, complex chapter 11 cases have approved debtors' entry into bridge facilities to enable debtors to emerge from chapter 11. *See, e.g.*, *In re Adelphia Commc'ns Corp.*, 2004 WL 1634538, at *7 (Bankr. S.D.N.Y. June 22, 2004) (approving commitment letters providing for a bridge facility with a one year maturity); *In re Ultra Petroleum Corp.*, No. 16-32202 (MI) (Bankr. S.D. Tex. Feb. 13, 2017) (ECF No. 1126) (same).

5

Backstop Debt Facilities, and engagement letters (the "**Debt Financing Engagement Letters**")[6], which engage the same banks to arrange (*i.e.*, market) the New Debt.[7]  The Debtors do not currently anticipate drawing on the Backstop Debt Facilities, but instead expect to issue new long-term bonds and incur new credit facilities on market terms at or prior to emergence.  (*Id.* ¶ 22.)  Nevertheless, the Backstop Debt Facilities provide assurance that sufficient funds at an acceptable price will be available if these debt financings cannot be consummated—effectively an insurance policy for market pricing and timing risk, which is necessitated here by the requirement to exit chapter 11 on a specific timeline under AB 1054.  (*Id.* ¶¶ 22, 26.)

The Debt Financing Commitment Letters, like the Equity Backstop Commitment Letters, afford the Debtors significant flexibility in structuring the New Debt.  The Debtors, in their business judgment, may incur debt securities and bank credit facilities at any time on or prior to the Effective Date, allowing the Debtors to avail themselves of attractive market conditions that may arise during the pendency of these cases.[8]  The Debt Commitments will be reduced on a dollar-for-dollar basis by the net cash proceeds of any such incurrences.  The Debt Financing Commitment Letters also permit the Debtors to incur the revolving credit facilities contemplated by the Debtors' Plan to ensure adequate liquidity at emergence, without any corresponding reduction to the Debt Commitments.

---

[6]     The Debt Financing Engagement Letters, the Debt Commitment Letters and the Backstop Debt Fee Letters are collectively referred to in this Motion as the "**Debt Financing Commitment Letters**".

[7]     Pursuant to the Court's order of October 28, 2019 [Docket No. 4501] (the "**Sealing Order**"), redacted copies of the Debt Financing Engagement Letters were previously filed as Docket No. 4446-7 (the "**Bank Financing Engagement Letter**") and Docket No. 4446-8 (the "**Securities Engagement Letter**"), while unredacted copies of the Bank Financing Engagement Letter [Docket No. 4453] and the Securities Financing Engagement Letter [Docket No. 4454] along with the sealed Backstop Debt Fee Letters [Docket No. 4452] were submitted to the Bankruptcy Court, the Office of the United States Trustee and advisors to the Official Committee of Unsecured Creditors and Official Committee of Tort Claimants on a confidential and professionals' eyes only basis.

[8]     The Debt Financing Commitment Letters also allow the Debtors to reinstate all or a portion of their pre-petition funded indebtedness.

6

The Debt Commitments, like the Equity Backstop Commitments, extend through August 29, 2020, on terms that are consistent with (or better than) market (*Id.* ¶ 26, 28). The significant duration of the Debt Commitments comes with conditionality and termination rights, which broadly align with those under the Equity Backstop Commitment Letters and are otherwise limited to customary backstop debt financing conditions. The Debtors negotiated the Backstop Debt Facilities so that most of the associated fees are incurred over time as conditionality and termination rights fall away. (*Id.* ¶ 28.)

**The Exit Financing Obligations.** As discussed further below, the aggregate fees payable by the Debtors pursuant to the Equity Backstop Commitment Letters and Debt Financing Commitment Letters will depend on a variety of factors. However, both the maximum Equity Commitment Premium (as defined below) and aggregate fees payable under the Backstop Debt Fee Letters that would be owing are in line with market. (*Id.* ¶¶ 18, 26, 28.) Conservatively, if the full amounts of both the Equity Backstop Commitments and Debt Commitments, $12 billion and $34.35 billion respectively, are maintained until June 30, 2020 (*i.e.*, no premium reductions are triggered under the Equity Backstop Commitment Letters and no New Debt is incurred prior to the statutory deadline), the aggregate fees payable by the Debtors would be approximately $764 million (6.364% Equity Commitment Premium of $12 billion) payable in New PG&E Corp. Common Stock to the Equity Backstop Parties and approximately $210 million payable in cash to the Backstop Debt Commitment Parties. The Debt Financing Commitment Letters provide for certain additional fees in the event that (i) the Backstop Debt Facilities are funded or (ii) the New Debt financings are consummated. As discussed above, the Equity Backstop Commitment Letters provide that in certain circumstances a portion of the economic value of Debtors' wildfire-related tax benefits may be held in trust for the benefit of the Equity Backstop Parties. Both the Equity Backstop Commitment Letters and the Debt Financing Commitment Letters provide for the reimbursement of professional fees and expenses (in the case of the Equity Backstop Parties, subject to a cap of $17 million in the case of counsel and $19 million in the case of the financial advisor). The Exit Financing Obligations are

7

necessary and market-based compensation for the Equity Backstop Parties and Backstop Debt Commitment Parties. (*Id.* ¶¶ 18–19, 26, 28.)

The Equity Backstop Commitment Letters and the Debt Financing Commitment Letters benefit the estates and all stakeholders by providing assurances of the Debtors' ability to fund the distributions contemplated by the Debtors' Plan and the Debtors' timely emergence from chapter 11. For all the above reasons and as discussed further below, the Debtors have determined, in their business judgment, that the Equity Backstop Commitment Letters and the Debt Financing Commitment Letters are in the best interests of their estates, creditors, shareholders and all parties in interest. The Debtors respectfully request the Court's approval of the terms of, and the Debtors' entry into and performance under, the Equity Backstop Commitment Letters and Debt Financing Commitment Letters, and authority to incur and pay the obligations set forth therein.

## II.     JURISDICTION

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.), and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409. The Debtors submit that the Court may enter the Proposed Orders as final orders consistent with Article III of the United States Constitution.

## III.    BACKGROUND

### A.      The Debtors' Plan

On September 9, 2019, the Debtors filed their original chapter 11 Plan [Docket No. 3841], and concurrently filed a Summary of the Key Elements of the Debtors' Plan [Docket No. 3844].

On September 13, 2019, the Debtors announced an agreement in principle with entities holding approximately 85% of insurance subrogation claims to resolve all insurance subrogation claims arising out of the 2017 and 2018 wildfires for $11 billion pursuant to the Debtors' Plan (the

8

"**Subrogation Settlement**").  On September 22, 2019, the Debtors executed a Restructuring Support Agreement (as amended, the "**Subrogation RSA**") with those entities, reflecting the Subrogation Settlement.  The Subrogation Settlement followed the Debtors' June 18, 2019 settlement with certain local public entities (the "**Public Entities Settlement**"), which provides for an aggregate of $1 billion to be paid under the Debtors' Plan to such public entities in full satisfaction of their claims against the Debtors' estates.  The Subrogation Settlement was incorporated into an amended chapter 11 Plan filed by the Debtors on September 23, 2019 [Docket No. 3966] and further amended on November 4, 2019 [Docket No. 4563].

On December 6, 2019, the Debtors announced an agreement with the TCC and attorneys representing a substantial portion of the wildfire tort claimants to resolve all those claimants' prepetition fire claims pursuant to the Debtors' Plan.  On December 9, 2019, the Debtors, certain shareholders, the TCC and such attorneys executed a Restructuring Support Agreement (the "**Tort Claimants RSA**") reflecting a $13.5 billion settlement of their claims (the "**Tort Claimants Settlement**").  The Tort Claimants RSA was incorporated into the Debtors' Plan filed by the Debtors on December 12, 2019 [Docket No. 5101].  On December 17, 2019, the Court approved both the Subrogation RSA and the Tort Claimants RSA.

In addition to the Subrogation Settlement, the Public Entities Settlement and the Tort Claimants Settlement, the Debtors' Plan, as amended, provides for (i) payment in full, with interest at the legal rate, of all prepetition funded debt obligations, all prepetition trade claims and employee-related claims, (ii) assumption of all power purchase agreements and community choice aggregation servicing agreements, (iii) assumption of all pension obligations, other employee obligations and collective bargaining agreements with labor, (iv) future participation in the state wildfire insurance fund (the "**Go-Forward Wildfire Fund**") established by AB 1054 and (v) satisfaction of the legislative requirements of AB 1054.[9]  As stated, the Debtors' Plan has the support of all impaired

---

[9]      The Debtors continue to engage in constructive dialogue with the Governor in light of the AB 1054 compliance concerns raised by the Governor in his letter of December 13, 2019 [Docket No. 5138-1].  The Debtors believe that the Debtors' Plan will be fully AB 1054 compliant.

9

classes and constitutes a comprehensive global resolution that will expedite the successful and timely conclusion of these cases.

The Debtors' Plan contemplates various sources of funding, including (a) new equity issuances, (b) the issuance or incurrence of new debt at both the PG&E Corp. and Utility levels, (c) the monetization of the Debtors' wildfire-related tax assets and (d) cash on hand.

**B.      The Equity Backstop Commitment Letters**

In August 2019, the Debtors began a dialogue with two current PG&E Corp. shareholders, Knighthead Capital Management, LLC ("**Knighthead**") and Abrams Capital Management, L.P. ("**Abrams**"), who had publicly expressed interest in providing equity backstop commitments to allow the Debtors to fund their Debtors' Plan. (Ziman Decl. ¶ 8.) Subsequently, the Debtors received substantially similar equity capital commitments from more than 35 investors, representing equity backstop commitments in excess of $14 billion in the aggregate. (*Id.*)

The Debtors also engaged in discussions with certain money-center banks to determine whether such banks would be willing to provide equity backstop commitments on the same or better terms as those proposed by the shareholders. The Debtors found that such banks might be willing to guarantee the necessary equity proceeds to the Debtors (*i.e.*, a volume underwriting), but were unable to agree to a floor price at which such equity would be raised. (*Id.* ¶ 7.) The arrangement proposed by these banks would present a significant risk that PG&E Corp. would be required to issue a substantially greater percentage of its common shares for the same aggregate proceeds received by the Debtors under the Equity Backstop Commitment Letters. (*Id.*) Accordingly, in consultation with their financial advisors, the Debtors determined the backstop commitments offered by Knighthead and Abrams, which offered both a guarantee of necessary equity proceeds *and* a floor price (with *no* "market" out), were the better course for the Debtors and their stakeholders. (*Id.* ¶¶ 7–9.)

Over the course of extensive negotiations with Knighthead, Abrams and their advisors, the Debtors improved upon many of the terms initially proposed, including structure, conditionality, length of commitment and flexibility to pursue a variety of equity financing options. (*Id.* ¶ 9.) On

10

September 9, 2019, PG&E Corp. executed the equity backstop commitment letters with Knighthead and Abrams as initial Equity Backstop Parties (the "**September Equity Backstop Commitment Letters**"). (*Id.*) The September Equity Backstop Commitment Letters were subsequently amended and restated on September 13 to, among other things, take into account the terms of the Subrogation Settlement. (*Id.* ¶ 10.)

After September 13, the Debtors engaged with other parties, including other current shareholders and others (including bondholders and parties not currently invested in the Debtors' equity or debt securities), to obtain commitments from such parties as well. By September 20, the Debtors had received more than the $14 billion in Equity Backstop Commitments. (*Id.* ¶¶ 11–12.)

On November 16, 2019 the September Equity Backstop Commitment Letters were superseded and replaced as the Debtors entered into new equity backstop commitment letters with Knighthead, Abrams and additional Equity Backstop Parties that contemplated reduced total commitments of $12 billion (the "**November Equity Backstop Commitment Letters**"). (*Id.* ¶ 13.) This reduced commitment amount reflected that a portion of the trust that will satisfy claims held by the wildfire victims would be funded in stock. However, the November Equity Backstop Commitment Letters also permitted a higher overall amount of compensation to be paid to the wildfire tort claimants trust. On December 6, the Debtors announced they had reached the commitment objective of $12 billion under the November Equity Backstop Commitment Letters. (*Id.*)

On December 13, 2019, and in view of the Tort Claimants RSA, the Debtors announced they were seeking an extension of the deadline for Court approval of the equity backstop commitment letters. In connection with this extension, on December 23, the Debtors entered into the Equity Backstop Commitment Letters with the Equity Backstop Parties that superseded and replaced the November Equity Backstop Commitment Letters. (*Id.* ¶ 14.)

The Equity Backstop Commitment Letters require the Equity Backstop Parties to purchase up to $12 billion in New PG&E Corp. Common Stock, on the terms and subject to the conditions thereof, at a price per share that would imply a price-to-earnings multiple of 10x (subject

to certain adjustments) based on Normalized Estimated Net Income for 2021. *See* Equity Backstop Commitment Letters § 1(a)(iv). The Debtors are not obligated under all circumstances to issue such shares to the Equity Backstop Parties, but instead are permitted, at higher implied price-to-earnings multiples, to consummate other equity offerings (including primary equity offerings and rights offerings). *See id.* at §§ 1(a)(i), (ii). In the event that such other equity offerings (together with other permitted capital sources) do not raise $12 billion of proceeds in the aggregate, the Debtors must draw on the Equity Backstop Commitments, subject to the satisfaction or waiver of the conditions in the Equity Backstop Commitment Letters. *See id.* at § 1(a)(iv).

Certain key terms and provisions of the Equity Backstop Commitment Letters are summarized in Section III.D below.

### C. The Debt Financing Commitment Letters

Since the second quarter of 2019, the Debtors and their financial advisors have maintained a dialogue with several prominent money-center banks regarding debt financing alternatives for the Debtors' emergence from chapter 11. (Ziman Decl. ¶ 21.) These conversations culminated in several banks providing illustrative financing structures and terms in the third quarter of 2019. Incorporating the feedback received from these banks, the Debtors developed an exit financing strategy that they believe maximizes the value of their estates for the benefit of all stakeholders—incurring new, less expensive long-term debt in place of the Debtors' pre-petition high-coupon debt. As stated, new long-term debt at the Utility as the Debtors have proposed could save the Debtors $1.5 billion in interest expense over the weighted average life of the existing high-coupon bonds, resulting in meaningful savings for ratepayers. (*Id.* ¶ 20.) As of the date of their most recent Verified Statement [Docket No. 4369 Ex. A], the Ad Hoc Group of Senior Unsecured Noteholders (the "**Ad Hoc Noteholder Committee**") held approximately $11.2 billion in these bonds (which holdings *increased by over $1.5 billion* since the Ad Hoc Noteholder Committee's prior Verified Statement [Docket No. 3083 Ex. A], filed before the termination of exclusivity). Accordingly, the plan of reorganization proposed by the Ad Hoc Noteholder Committee needlessly provides for the

12

reinstatement of the long-term Utility bonds, which only serves to enrich the members of the Ad Hoc Noteholder Committee to the detriment of the Debtors' other stakeholders. [Docket No. 4257.] The Debtors' Plan refinances these high-coupon bonds with new, cheaper debt to maximize the value of their estates for the benefit of *all* stakeholders.

On September 25 and 26, the Debtors and their financial advisors contacted several money-center banks requesting initial proposals for backstop debt financing commitments to provide certainty that sufficient funds at an acceptable price will be available on the Effective Date if market financing is either more expensive or unavailable at that time. (Ziman Decl. ¶¶ 22–23.) All the banks contacted delivered proposals by October 1. (*Id.* ¶ 23.) The Debtors, in consultation with their legal and financial advisors, evaluated these proposals based on a number of metrics, including the proposed terms and fees, the cost and certainty of the commitments, the experience and reputations of the parties and the ability of such banks to work collaboratively with the Debtors. (*Id.* ¶ 24.) The Debtors developed and shared a counterproposal with all the banks. After discussions with the banks, the Debtors selected JPMorgan Chase Bank, N.A. ("**JPMorgan**"), Bank of America, N.A. ("**BANA**"), BofA Securities, Inc. ("**BofA**" and, together with BANA, "**Bank of America**"), Barclays Bank PLC ("**Barclays**"), Citigroup Global Markets Inc. ("**Citi**"), Goldman Sachs Bank USA ("**GS Bank**") and Goldman Sachs Lending Partners LLC (together with GS Bank, "**Goldman Sachs**"; JPMorgan, Bank of America, Barclays, Citi and Goldman Sachs, collectively, the "**Initial Backstop Debt Commitment Parties**"[10]) to act as initial commitment parties with respect to the contemplated backstop debt facilities. (*Id.*)

Following extensive negotiations during the week of September 30 with the Initial Backstop Debt Commitment Parties, which negotiations improved on many of the terms initially proposed by such banks (including pricing, fees, flexibility, conditionality and "alternate transaction"

---

[10]    The Initial Backstop Debt Commitment Parties, together with any other parties that become party to the Debt Commitment Letters as additional "**Commitment Parties**", are collectively referred to as the "**Backstop Debt Commitment Parties**", and the Backstop Debt Commitment Parties and the Equity Backstop Parties are collectively referred to as the "**Exit Commitment Parties**".

13

provisions), the Initial Backstop Debt Commitment Parties delivered signed Debt Financing Commitment Letters on October 4, 2019. [Docket No. 4119-2.] On October 11, following deliberations, the Boards of Directors of each of PG&E Corp. and the Utility approved the Debtors' entry into the Debt Financing Commitment Letters, which were executed by the Debtors on the same day. (Ziman Decl. ¶ 24.) The Debt Financing Commitment Letters executed on October 11, 2019 contemplated obtaining Court approval by November 20, 2019.

On October 28, 2019, the Debtors joined BNP Paribas ("**BNP**"), Credit Suisse AG, Cayman Islands Branch ("**Credit Suisse**"), Morgan Stanley Bank, N.A. ("**Morgan Stanley**"), MUFG Union Bank, N.A. ("**MUFG**") and Wells Fargo Bank, National Association ("**Wells Fargo**"), as additional Commitment Parties to the Debt Commitment Letters. (*Id.* ¶ 25.) On November 18, 2019, the Debtors amended the Debt Commitment Letters to extend the deadline for obtaining Court approval from November 20, 2019 to December 20, 2019. On December 2, 2019, the Debtors joined Mizuho Bank, Ltd. ("**Mizuho**") as an additional Commitment Party to the Debt Commitment Letters. (*Id.*) On December 20, 2019, the Debtors further amended the Debt Commitment Letters to, among other things, extend the deadline for obtaining Court approval from December 20, 2019 to January 31, 2020. (*Id.*)

Certain key terms and provisions of the Debt Financing Commitment Letters are summarized in Section III.D below.

### D. Certain Key Terms and Provisions of the Exit Financing Commitment Letters and the Proposed Orders

Certain key terms and provisions of the Equity Backstop Commitment Letters are summarized as follows:[11]

---

[11]    This summary is qualified in its entirety by reference to the provisions of the Equity Backstop Commitment Letters. To the extent that any discrepancies exist between the summary described in this Motion and the terms of the Equity Backstop Commitment Letters, the Equity Backstop Commitment Letters shall govern. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Equity Backstop Commitment Letters.

14

| | |
|---|---|
| **Equity Backstop Commitments** *See* Equity Backstop Commitment Letters § 2(a); Exhibit A to Equity Backstop Commitment Letters. | In the aggregate, the Equity Backstop Parties have severally committed to fund up to $12 billion to PG&E Corp. on the Effective Date to finance the payments to wildfire victims contemplated by the Debtors' Plan, in consideration of the issuance of New PG&E Corp. Common Stock to the Equity Backstop Parties on the Effective Date, subject to the terms and conditions set forth in each Equity Backstop Commitment Letter. The price at which any such new shares would be issued to the Equity Backstop Parties (the "**Equity Backstop Price**") would equal (a) 10 (subject to downward adjustment based on changes in the Applicable Utility Index Multiple), *times* (b) PG&E Corp.'s consolidated Normalized Estimated Net Income, *divided by* (c) the number of fully diluted shares of PG&E Corp. that will be outstanding on the Effective Date (assuming the Equity Backstop Commitments are fully drawn). |
| **Equity Offerings** *See* Equity Backstop Commitment Letters § 1(a). | Permitted Equity Offering. Subject to an aggregate cap of $12 billion of net cash proceeds, PG&E Corp. will be permitted to conduct any primary offering of its common stock (including public offerings and private placements) in order to finance the Debtors' Plan, as long as the Implied P/E Multiple for such offering equals or exceeds 13.5 (subject to upward adjustment based on changes in the Applicable Utility Index Multiple, the "**Permitted Equity Offering Threshold**").

Rights Offering. If PG&E Corp. conducts an equity offering with an Implied P/E Multiple of at least 12 (subject to downward adjustment based on changes in the Applicable Utility Index Multiple, the "**Rights Offering Minimum Multiple**") but less than the Permitted Equity Offering Threshold, then PG&E Corp. must structure such equity offering so that at least 80% of the aggregate cash proceeds are raised through a rights offering to holders of shares of common stock of PG&E Corp. (the "**Rights Offering**"). Rights issued to PG&E Corp. shareholders in a Rights Offering would have an exercise price equal to the per share price implied by the Rights Offering Minimum Multiple. If PG&E Corp. conducts a Rights Offering, it would also be permitted to raise up to 20% of the aggregate cash proceeds through another form of primary equity offering, subject to the approval of a majority of the holders of Equity Backstop Commitments as to the identity of the purchaser in such other equity offering if it is not a broadly syndicated underwritten public offering.

Equity Backstop Funding. If PG&E Corp. is unable to conduct an equity offering with an Implied P/E Multiple at least equal to the Rights Offering Minimum Multiple, then PG&E Corp. would be required to draw upon the Equity Backstop Commitments. |

15

| | | |
|---|---|---|
| **Net Operating Losses** *See* Equity Backstop Commitment Letters § 1. | Any Permitted Equity Offering or Rights Offering, and the organizational documents of reorganized PG&E Corp., may include such terms and conditions as are reasonably advisable in order to avoid an "ownership change" within the meaning of Section 382 of the Internal Revenue Code and the Treasury Regulations promulgated thereunder or to otherwise preserve the ability of the Debtors to utilize their net operating loss carryforwards and other tax attributes. | |
| **Reduction of Commitments** *See* Equity Backstop Commitment Letters § 7. | In the event that the Debtors (a) receive binding commitments providing for funding from any Additional Capital Sources that satisfy the criteria set forth in the Equity Backstop Commitment Letters or (b) actually obtain funding from any Additional Capital Sources, the aggregate amount of Equity Backstop Commitments will be reduced by the amount of such Additional Capital Sources. "**Additional Capital Sources**" means, generally, (i) the principal amount of debt that is issued by PG&E Corp. in excess of $7 billion in connection with the Debtors' Plan; (ii) the proceeds of any preferred stock issued by the Utility; (iii) the proceeds of any third-party transactions based upon or related to the utilization or monetization of (x) any net operating loss carryforwards or other tax attributes or (y) tax deductions, in each case arising from the payment of prepetition wildfire-related claims that are not otherwise utilized in the Debtors' Plan (a "**Tax Benefits Monetization Transaction**"); and (iv) the principal amount of any other debt that is issued or reinstated by the Utility and its subsidiaries in excess of $27.35 billion in connection with the Debtors' Plan. During the term of the Equity Backstop Commitment Letters, PG&E Corp. may not issue any senior equity securities. | |
| **Tax Benefits Monetization Transaction** *See* Equity Backstop Commitment Letters §§ 1, 2; Exhibit A to Equity Backstop Commitment Letters. | If the Equity Backstop Commitment is drawn and a Tax Benefits Monetization Transaction is not expected to occur on the Effective Date, each Equity Backstop Party will receive, for no additional consideration (other than payment of the Backstop Price), a pro rata share of interests in a trust to be established by the Utility to monetize the Debtors' wildfire-related tax benefits in excess of $1.35 billion for the benefit of the Equity Backstop Parties.<br><br>Backstop Parties who are shareholder proponents agree to use commercially reasonable efforts to assist the Debtors to facilitate a Tax Benefits Monetization Transaction no later than May 31, 2020. | |
| **Equity Commitment Premiums and Expense Reimbursement** *See* Equity Backstop Commitment Letters §§ 2(c), 6, 11; Exhibit A | The Equity Commitment Premium for the Equity Backstop Commitments is 6.364% of the amount of the Equity Backstop Commitments. The Equity Commitment Premium is earned in full upon entry by the Court of an order approving the Equity Backstop Commitment Letters, subject to reduction under certain circumstances set forth in the Equity Backstop Commitment Letters.<br><br>If the Debtors terminate the Equity Backstop Commitment Letters in connection with certain proposals to acquire at least 50% of the outstanding shares of PG&E Corp. common stock, the Equity Commitment Premium shall | |

16

| | | |
|---|---|---|
| to Equity Backstop Commitment Letters. | be paid in cash if elected by the applicable Equity Backstop Party. Additionally, in the event that a plan of reorganization other than the Debtors' Plan is confirmed, then the Equity Commitment Premium shall be paid in cash if elected by the applicable Equity Backstop Party. Except as described in the immediately preceding sentences, all Equity Commitment Premiums are payable in shares of New PG&E Corp. Common Stock, and the number of such shares to be paid as Equity Commitment Premiums will be calculated using the Equity Backstop Price described above. |
| | Additionally, the Debtors agreed to reimburse on a regular basis the Equity Backstop Parties for the reasonable fees and expenses of Jones Day and a financial advisor incurred prior to the termination of the Equity Backstop Commitment Letters, subject to overall caps on reimbursement of $17 million in the case of Jones Day and $19 million in the case of the financial advisor. |
| **Reduction of Equity Commitment Premiums** *See* Equity Backstop Commitment Letters §§ 2(c), 11; Exhibit A to Equity Backstop Commitment Letters. | If (i) (except as described below) an Equity Backstop Party terminates its commitments or (ii) PG&E Corp. terminates the Equity Backstop Commitment Letter either (x) in the event of a breach of a representation or warranty by an Equity Backstop Party or (y) in the event that an Equity Backstop Party repudiates the Equity Backstop Commitment Letter and invalidly terminates it, then the relevant Equity Backstop Party's Equity Commitment Premium will be reduced by (1) 85% if the commitments are terminated on or prior to January 20, 2020, (2) 60% if the commitments are terminated after January 20, 2020 and on or prior to April 30, 2020 and (3) 10% if the commitments are terminated after April 30, 2020 and prior to the Effective Date. |
| | If an Equity Backstop Party terminates its commitments pursuant to the termination right that would be triggered if at any time after the first day of the confirmation hearing, either asserted administrative expense claims in the Chapter 11 Cases exceed $250 million, excluding all ordinary course administrative expense claims, all professional fee claims, all disallowed administrative expense claims and the portion of an administrative expense claim that is covered by insurance (collectively, the "**Excluded Administrative Expense Claims**"), or the Debtors have reserved for and/or paid more than $250 million in the aggregate for administrative expense claims, excluding the Excluded Administrative Expense Claims, then the relevant Equity Backstop Party's Equity Commitment Premium will be reduced by 75%. |
| | If an Equity Backstop Party terminates its commitments in connection with PG&E Corp.'s receipt of written waivers or specified amendments from entities holding 60% or more of the Equity Backstop Commitments to permit the aggregate amount of Additional Capital Sources *plus* the aggregate amount of proceeds of any Equity Offering *plus* the aggregate amount of proceeds funded under the Equity Backstop Commitments to exceed $12 billion, then the relevant Equity Backstop Party's Equity Commitment Premium will be reduced by (1) 75% if the commitments are terminated on or prior to April 30, 2020, (2) 50% if the commitments are terminated after April 30, 2020 and on or prior to May 31, 2020 and (3) 25% if the commitments are terminated after May 31, 2020. |

| | | |
|---|---|---|
| **Conditions to the Obligations of the Equity Backstop Parties**<br>*See* Equity Backstop Commitment Letters § 4. | The Equity Backstop Parties' funding obligations under the Equity Backstop Commitment Letters are subject to the satisfaction or waiver of specified conditions, including (i) approval of the Equity Backstop Commitment Letters by the Court; (ii) satisfaction or waiver of all conditions precedent to the Effective Date set forth in the Debtors' Plan; (iii) entry by the Court of an order (the "**Confirmation Order**") confirming the Debtors' Plan, with such amendments, modifications, changes and consents to the Debtors' Plan as approved by parties holding a majority of the Equity Backstop Commitments (such approval not to be unreasonably withheld, conditioned or delayed), which Confirmation Order shall be unstayed and in full force and effect; (iv) the weighted average earning rate base of the Debtors for estimated 2021 being no less than 95% of $48 billion (*i.e.*, $45.6 billion); and (v) absence of a Material Adverse Effect. | |
| **Termination Events**<br>*See* Equity Backstop Commitment Letters §§ 5–6. | <u>Equity Backstop Parties</u>. The Equity Backstop Parties may terminate the Equity Backstop Commitment Letters if, among other things: (i) the Debtors' Plan (including as may be amended, modified or otherwise changed) filed by the Debtors does not include Knighthead and Abrams as plan proponents and is not in a form acceptable to each of Knighthead and Abrams, or does not provide for substantially the same classification and treatment, including releases, of all Claims (other than Holdco Other Wildfire Claims and Utility Other Wildfire Claims) as provided in the Debtors' Joint Chapter 11 Plan of Reorganization filed with the Bankruptcy Court on November 4, 2019; (ii) the Court has not entered an order approving the Equity Backstop Commitment Letters on or before January 31, 2020; (iii) the Debtors' Plan is amended, modified or changed without the consent of entities holding a majority of the Equity Backstop Commitments (not to be unreasonably withheld, conditioned or delayed), or any plan supplement or other plan document is filed or finalized without the consent of entities holding a majority of the Equity Backstop Commitments (not to be unreasonably withheld, conditioned or delayed); (iv) the Confirmation Order has not been entered by the Court on or before June 30, 2020; (v) the Effective Date has not occurred on or before 60 days after entry of the Confirmation Order; (vi) the Debtors have failed to perform any of their obligations in the Equity Backstop Commitment Letters, which failure to perform would give rise to the failure of certain conditions precedent; (vii) wildfires occur in the Utility's service area in 2019 that damage or destroy in excess of 500 dwellings or commercial structures ("**Structures**") in the aggregate that are asserted to arise out of the Debtors' activities; (viii) wildfires occur in the Utility's service area in 2020 that damage or destroy in excess of 500 Structures in the aggregate at a time when the portion of the Utility's system at the location of such wildfire was not successfully de-energized; (ix) the Debtors' aggregate liability with respect to prepetition wildfire-related claims is determined to exceed $25.5 billion; (x) the CPUC fails to issue all necessary approvals prior to June 30, 2020; (xi) there is in effect an order or law permanently prohibiting the consummation of the Debtors' Plan; (xii) at any time after the first day of the confirmation hearing, either asserted administrative expense claims in the Chapter 11 Cases exceed $250 million, excluding the Excluded Administrative Expense Claims, or the Debtors have reserved for and/or paid more than $250 million in the aggregate for administrative expense claims, excluding the Excluded Administrative Expense Claims; (xiii) the Utility does | |

18

| | | |
|---|---|---|
| | | not participate in the Go-Forward Wildfire Fund; (xiv) the Court at any time determines that the Debtors are insolvent; (xv) the Debtors or any of their subsidiaries enter into any Tax Benefits Monetization Transaction, and the net cash proceeds thereof to the Debtors (or such subsidiary) are less than $3 billion (excluding $1.35 billion of tax benefits utilized in the Debtors' Plan); or (xvi) the Debtors' Plan, any plan supplement or any plan document has been amended, modified or changed, in each case without the consent of the entities holding at least 66 2/3% of the Aggregate Backstop Commitments to include a process for transferring the license and operating assets of the Utility to the State of California or a third party (a "**Transfer**") or PG&E effects a Transfer other than pursuant to the Debtors' Plan. |
| | | PG&E Corp.  Among other circumstances, PG&E Corp. may terminate an Equity Backstop Commitment Letter in the event (i) the applicable Equity Backstop Party repudiates, invalidly purports to terminate or fails to fund its Equity Backstop Commitment when required; or (ii) of certain proposals to acquire at least 50% of the outstanding shares of PG&E Corp. common stock. |
| | **Plan Support** *See* Equity Backstop Commitment Letters §§ 14, 18. | Until the termination of the Equity Backstop Commitment Letters, subject to certain limitations, the Equity Backstop Parties must (i) use all reasonable efforts to support the Debtors' Plan with respect to the treatment of their PG&E Corp. common shares and to act in good faith with respect to any permitted equity offering, (ii) vote all of their PG&E Corp. common shares and claims to accept the Debtors' Plan, and (iii) vote their PG&E Corp. common shares and claims to reject any plan of reorganization other than the Debtors' Plan.  If the Debtors provide another creditor holding a funded debt claim a more favorable treatment than provided to an Equity Backstop Party with a similar funded debt claim, the Debtors shall take all actions so that the more favorable treatment applies to such Equity Backstop Party's similar funded debt claim. |
| | | Nothing in the Equity Backstop Commitment Letters prohibits any party from appearing as a party-in-interest in the Chapter 11 Cases, so long as such appearance and the positions advocated are consistent with the Equity Backstop Commitment Letters and the Debtors' Plan, and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying or preventing the consummation of the transactions contemplated by the Debtors' Plan. |

Certain key terms and provisions of the Debt Financing Commitment Letters are summarized as follows (subject, in the case of the Backstop Debt Facilities, to the "market flex" terms contained in the Backstop Debt Fee Letters):[12]

---

[12]     This summary is qualified in its entirety by reference to the provisions of the Debt Financing Commitment Letters.  To the extent that any discrepancies exist between the summary described in this Motion and the terms of the Debt Financing Commitment Letters, the Debt Financing

19

| | Debt Commitment Letters | |
|---|---|---|
| | **PG&E Corp. Backstop Debt Facility** | **Utility Backstop Debt Facility** |
| **Borrower** | PG&E Corp. | Utility |
| **Backstop Debt Facility** | Up to $7,000 million 364-day senior unsecured "bridge" term loan credit facility | Up to $27,350 million 364-day senior secured "bridge" term loan credit facility |
| **Roles**<br>*See* Debt Commitment Letters, § 1; Schedule I to Debt Commitment Letters. | JPMorgan will act as administrative agent and, solely for the Utility Backstop Debt Facility, as collateral agent. JPMorgan, BofA, Barclays, Citi and GS Bank will act as joint bookrunners and, along with BNP, Credit Suisse, Morgan Stanley, MUFG, Wells Fargo and Mizuho (or, in each case, its designated affiliate), joint lead arrangers and co-documentation agents. | |
| **Interest Rate**<br>*See* Debt Commitment Letters, Annex A-I. | At the option of PG&E Corp. or the Utility, as applicable, (a) the Adjusted LIBO Rate plus the Applicable Margin set forth below or (b) ABR plus the Applicable Margin set forth below minus 1.00% (but not less than 0.00%). | |

Applicable Margin: 1.75% - 3.00%

| Public debt rating | Rate |
|---|---|
| BB+ / Ba1 | 1.75% |
| BB / Ba2 | 2.00% |
| BB- / Ba3 | 2.125% |
| B+ / B1 or worse | 2.25% |

Each of the foregoing increases by 0.25% each 90 day period after the Closing Date.

Applicable Margin: 1.125% - 2.50%

| Public debt rating | Rate |
|---|---|
| BBB+ / Baa1 | 1.125% |
| BBB / Baa2 | 1.375% |
| BBB- / Baa3 | 1.50% |
| BB+ / Ba1 or worse | 1.75% |

Commitment Letters shall govern. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Debt Financing Commitment Letters.

|  |  | Each of the foregoing increases by 0.25% each 90 day period after the Closing Date. |
|---|---|---|
| **Security**<br>*See* Debt Commitment Letters, Annex A. | Unsecured | Secured by a first-priority security interest in substantially all Utility assets (subject to permitted liens and other customary exceptions and limitations on perfection steps and thresholds to be agreed). |
| **Facility Fees and "Alternate Transaction"**<br>*See* Debt Commitment Letters, Annex A-1; Backstop Debt Fee Letters. | <u>Ticking Fees</u>. 0.30% per annum times the actual daily undrawn commitments accruing during the period commencing 90 days after the date of the PG&E Corp. Debt Commitment Letter and ending on and including the earlier of (x) the Closing Date and (y) the date of termination of the commitments, for the account of each lender, payable quarterly in arrears and on certain other specified dates.<br><br><u>Duration Fees</u>. For the ratable benefit of the lenders, in an amount equal to (i) 0.50% of the aggregate principal amount of the loans outstanding on the 90th day after the Closing Date; (ii) 0.75% of the aggregate principal amount of the loans outstanding on the 180th day after the Closing Date; and (iii) 1.00% of the aggregate principal amount of the loans outstanding on the 270th day after the Closing Date.<br><br><u>Other Fees / "Alternate Transaction"</u>. Set forth in the Backstop Debt Fee Letter, unredacted copies of which are to be provided under seal to the | <u>Ticking Fees</u>. 0.175% per annum times the actual daily undrawn commitments accruing during the period commencing 90 days after the date of the Utility Debt Commitment Letter and ending on and including the earlier of (x) the Closing Date and (y) the date of termination of the commitments, for the account of each lender, payable quarterly in arrears and on certain other specified dates.<br><br><u>Duration Fees</u>. For the ratable benefit of the lenders, in an amount equal to (i) 0.50% of the aggregate principal amount of the loans outstanding on the 90th day after the Closing Date; (ii) 0.75% of the aggregate principal amount of the loans outstanding on the 180th day after the Closing Date; and (iii) 1.00% of the aggregate principal amount of the loans outstanding on the 270th day after the Closing Date.<br><br><u>Other Fees / "Alternate Transaction"</u>. Set forth in the Backstop Debt Fee Letter, unredacted copies of which are |

Case: 19-30088    Doc# 5267    Filed: 01/03/20    Entered: 01/03/20 20:08:09    Page 28 of 45

| | | |
|---|---|---|
| | Court, the Office of the United States Trustee and advisors to the Official Committee of Unsecured Creditors and Official Committee of Tort Claimants on a confidential and professionals' eyes only basis. | to be provided under seal to the Court, the Office of the United States Trustee and advisors to the Official Committee of Unsecured Creditors and Official Committee of Tort Claimants on a confidential and professionals' eyes only basis. |
| **Mandatory Prepayments and Commitment Reductions** *See* Debt Commitment Letters, Annex A. | The aggregate commitments in respect of the applicable Backstop Debt Facility shall be automatically and permanently reduced, and after the Closing Date, the aggregate principal amount of loans under the applicable Backstop Debt Facility shall be prepaid, in each case without penalty or premium and on a dollar-for-dollar basis, by: | |

a) 100% of the Net Cash Proceeds of all non-ordinary course asset sales or dispositions or any insurance or condemnation proceeds (subject to certain exceptions set forth in the Debt Commitment Letters);

b) 100% of the Net Cash Proceeds received from (i) incurrences of debt securities or other debt (including pursuant to any bank or other credit facility) (other than Excluded Debt and amounts referred to in clause (c) below) and (ii) issuances of equity securities (including shares of common stock or preferred equity or equity-linked securities) (other than Excluded Equity Offerings); and

c) 100% of the committed amount under Qualifying Bank Financings (subject to certain exceptions);

*provided*, *however*, that until such time as the Equity Backstop Commitments have been reduced to $0, except as provided in the Debt Commitment Letters, the Debt Commitments are not reduced by any cash proceeds from any Additional Capital Source (as defined in the Equity Backstop Commitment Letters) to the extent that such cash proceeds also reduce the Equity Backstop Commitments.

The obligations of the Backstop Debt Commitment Parties to fund on the Closing Date shall be automatically and permanently reduced, without penalty or premium and on a dollar-for-dollar basis, by the aggregate principal amount of any roll-over, "take-back" or reinstated debt of PG&E Corp. or the Utility, as applicable.

In addition, the Debt Commitment Letters require that the proceeds of any **"Included Securitization Transaction"** (defined as any securitization transaction of PG&E Corp., the Utility or their subsidiaries other than any non-recourse pass-through securitization transaction contemplated by AB 1054, but including, for the avoidance of doubt, any securitization that includes credits or rebates to customers) be applied, on or prior to the closing date of the Backstop Debt Facilities, as follows: (i) *first*, to finance the

22

| | |
|---|---|
| | Fire Victim Trust as contemplated by the Plan, up to $1.35 billion, (ii) *second*, to reduce commitments under the PG&E Corp. Backstop Debt Facility, up to $2.0 billion, (iii) *third*, to be deposited as cash on the balance sheet of the Debtors, up to $650 million, (iv) *fourth*, at the Debtors' election, to reduce the minimum equity requirement under the Backstop Debt Facilities, up to $4.0 billion and (v) *fifth*, as the Debtors may otherwise direct (but without further reduction to such minimum equity requirement). |
| **Expense Reimbursement** *See* Debt Commitment Letters, § 5. | The Backstop Debt Commitment Parties and their respective affiliates will be reimbursed for out-of-pocket expenses incurred in connection with the Backstop Debt Facilities and any related documentation or the administration, amendment, modification or waiver thereof. |
| **Indemnification** *See* Debt Commitment Letters, § 5. | Subject to certain exceptions set forth in the Debt Commitment Letters, the Backstop Debt Commitment Parties and their related parties will be indemnified from any losses, claims, damages, liabilities and related expenses to which any such indemnified person may become subject arising out of or in connection with the Debt Commitment Letters, the Backstop Debt Facilities, the use of the proceeds thereof or any related transaction or any Proceeding, and will be reimbursed for reasonable, documented and invoiced out-of-pocket legal expenses (subject to the Counsel Limitation) or other reasonable, documented and invoiced out-of-pocket expenses incurred in connection with investigation or defense. |
| **Conditions Precedent** *See* Debt Commitment Letters, Annex B. | The obligations of the lenders to lend under the Backstop Debt Facilities are subject to satisfaction or waiver of certain condition precedents (or the absence of certain termination rights) substantially similar to those described above with respect to the Equity Backstop Commitment Letters and certain other conditions, including: (i) entry by the Court of (a) the Approval Order (as defined below) and (b) a confirmation order confirming the Debtors' Plan in form and substance reasonably satisfactory to the Required Commitment Parties by no later than June 30, 2020, with each order in full force and effect, final and non-appealable and not subject to a stay; (ii) none of the Debtors' Plan, the Confirmation Order or the Approval Order shall have been amended or modified or any condition therein waived without the consent of the Required Commitment Parties (not to be unreasonably withheld, conditioned or delayed); (iii) compliance in all material respects with the Confirmation Order; (iv) all documents necessary to implement the Debtors' Plan and the financings and distributions contemplated thereunder shall have been executed (each of which shall either (a) not be adverse to the interests of the Backstop Debt Commitment Parties or (b) be in form and substance reasonably acceptable to the Required Commitment Parties); (v) delivery of specified historical and pro forma financial information; |

23

| | | |
|---|---|---|
| | | (vi) accuracy of representations and warranties and lack of default or event of default; (vii) execution of definitive documentation for the Backstop Debt Facilities; (viii) delivery of customary legal opinions, corporate organizational documents and solvency certificates and payment of all fees; (ix) delivery of documents and information under applicable "know your customer" and anti-money laundering rules; (x) solely with respect to the Utility Backstop Debt Facility, execution and delivery of all documents and instruments required to perfect the security interests in the Collateral and completion of flood insurance due diligence; (xi) receipt by the Utility of investment grade senior secured debt ratings with a stable or better outlook; (xii) absence of a Material Adverse Effect since June 30, 2019; (xiii) receipt by PG&E Corp. of at least $12,000 million of proceeds from the issuance of equity (which amount may be reduced by up to $4,000 million from the proceeds of any Included Securitization Transaction on terms reasonably satisfactory to the Backstop Debt Commitment Parties subject to compliance with the Closing Date Securitization Waterfall); (xiv) the economic benefit of the net operating loss carryforwards of PG&E Corp or its subsidiaries shall not have been transferred except on terms that could not reasonably be expected to negatively impact the cash flow of PG&E Corp or its subsidiaries; (xv) ownership by PG&E Corp. of 100% of the Utility common stock; and (xvi) delivery by the Utility of a financial model satisfactory to the Arrangers reflecting sources and uses and capital structure, together with a certification by the Utility that such financial model demonstrates compliance with all regulatory requirements (including all CPUC approvals). |
| | **Termination Rights**<br>*See* Debt Commitment Letters, § 11. | The Backstop Debt Commitment Parties' commitments and agreements with respect to the Backstop Debt Facilities are subject to termination rights, including (i) certain termination rights that are substantially similar to termination rights described above with respect to the Equity Backstop Commitment Letters or conditions precedent described above with respect to the Equity Backstop Commitment Letters or the Debt Commitment Letters, (ii) the occurrence of the Effective Date without using the applicable Backstop Debt Facility; (iii) the dismissal or conversion of the Chapter 11 Cases or the appointment of a trustee or examiner with enlarged powers; and (iv) if the Court shall not have entered an order approving the Debt Financing Commitment Letters (the "**Approval Order**"), in form and substance reasonably satisfactory to the Backstop Debt Commitment Parties, on or before January 31, 2020. |

| | **Bank Financing Engagement Letter** |
|---|---|
| **Bank Engagement**<br>*See* Bank Financing Engagement Letter, § 1. | JPMorgan, BofA, Barclays, Citi and GS Bank (or their designated affiliates) are engaged to act as joint lead arrangers and joint bookrunners for (a) a $500 million PG&E Corp. revolving credit facility, (b) a $3,500 million Utility revolving credit facility, (c) a senior secured PG&E Corp. term loan facility and (d) any other bank loan or credit facility (other than a securitization facility) (clauses (a)-(d), collectively, the "**Bank Financing**"), in each case in connection with the financing of the transactions and distributions contemplated by the Debtors' Plan, the refinancing or replacement of the Backstop Debt Facilities or other interim debt financing for the transactions and distributions contemplated by the Debtors' Plan, or any permanent revolving or term credit facility or other financing entered into in connection with the Debtors' Plan (collectively, the "**Exit Financing**"). |
| **Cooperation**<br>*See* Bank Financing Engagement Letter, § 2. | PG&E Corp. and the Utility have agreed to actively assist the Arrangers in achieving a mutually satisfactory syndication of any syndicated Bank Financing. |
| **Termination**<br>*See* Bank Financing Engagement Letter, § 3. | The engagement may be terminated by any Arranger (as to itself) at any time on written notice. PG&E Corp. and the Utility may terminate the engagement on the earliest of (a) twelve months after the date of the Bank Financing Engagement Letter, if the Effective Date has not occurred, (b) the Effective Date, if the Backstop Debt Facilities or other interim exit financing were not used and if any Bank Financing consummated prior to or concurrently with the Effective Date complied with the Bank Financing Engagement Letter, (c) the first anniversary of the Effective Date and (d) the date of receipt by PG&E Corp. and the Utility of aggregate cash proceeds equal to outstanding obligations under the Backstop Debt Facilities or any other interim Exit Financing from the incurrence of Bank Financing in a transaction in which each Arranger acts in its titled capacity and receives its Requisite Economics (as defined below), if the Bank Financing is consummated after the Effective Date. |
| **Indemnification /<br>Expense Reimbursement**<br>*See* Bank Financing Engagement Letter, § 4. | Set forth in the Bank Financing Engagement Letter. |
| **Alternate Financing**<br>*See* Bank Financing Engagement Letter, § 5(b). | If during the period commencing on the date of the Bank Financing Engagement Letter and ending 12 months following its termination, PG&E Corp., the Utility or any of their respective affiliates obtain Exit Financing or any other exit financing in connection with a plan of reorganization other than the Debtors' Plan (any such financing, |

25

| | |
|---|---|
| | an "**Alternate Financing**") without an Arranger acting in its titled capacity in connection therewith and without receiving at least the percentage of minimum economics of such financing under the Bank Financing Engagement Letter (the "**Requisite Economics**"), then PG&E Corp. and the Utility have agreed to pay to such Arranger an amount equal to 50% (or, if such Alternate Financing refinances or replaces any outstanding Backstop Debt Facility, 100%) of the fees that would have been payable to such Arranger if such Arranger acted in its titled capacity with the Requisite Economics for such Alternate Financing; *provided* that no fee is payable to any Arranger that has been offered the opportunity to act in a titled capacity with the Requisite Economics and has elected not to do so (unless in connection with an Alternate Financing in connection with a plan other than the Debtors' Plan). |
| **Minimum Economics/Fees** | Set forth in the Bank Financing Engagement Letter, unredacted copies of which were previously provided to the Court [**Docket No. 4453**], the Office of the United States Trustee and advisors to the Official Committee of Unsecured Creditors and Official Committee of Tort Claimants on a confidential and professionals' eyes only basis. |
| **Securities Engagement Letter** | |
| **Securities Engagement** <br> *See* Securities Engagement Letter, § 1. | J.P. Morgan Securities LLC, BofA, Barclays Capital Inc., Citi and Goldman Sachs & Co. LLC (or their designated affiliates) (collectively, the "**Securities Engagement Parties**") are engaged to act as joint bookrunning managers and joint lead underwriters, joint lead placement agents or joint lead initial purchasers, as applicable, in respect of any offering (each, an "**Offering**") by PG&E Corp., the Utility or any of their respective affiliates of debt securities (other than (x) any convertible debt, (y) any commercial paper programs and (z) any securitization) (the "**Securities**"), whether completed prior to, on or after the Effective Date, including the contemplated issuance of (a) at least $7,000 million aggregate principal amount of PG&E Corp. senior notes and (b) at least $27,350 million aggregate principal amount of Utility senior notes (clause (a) and (b) collectively, the "**Proposed Financing**"), in each case in connection with the financing of the transactions and distributions contemplated by the Debtors' Plan, and the refinancing or replacement of the Backstop Debt Facilities or other interim debt financing for the transactions and distributions contemplated by the Debtors' Plan (collectively, the "**Exit Financing**"). |
| **Matters Relating to Securities Engagement** <br> *See* Securities Engagement Letter, § 2. | PG&E Corp. and the Utility will not initiate, solicit or enter into any discussions or negotiations for the issuance, offering or sale of Securities to any third parties, except through the Securities Engagement Parties. If PG&E Corp. or the Utility receive any inquiry concerning the Securities, PG&E Corp. and the Utility will |

Case: 19-30088    Doc# 5267    Filed: 01/03/20    Entered: 01/03/20 20:08:09    Page 33 of 45

promptly inform the Securities Engagement Parties. In addition, PG&E Corp. and the Utility have agreed that, during the term of the Securities Engagement Letter, they will not offer, sell, contract to sell or otherwise dispose of any securities substantially similar to the Securities without the prior written consent of the Securities Engagement Parties.

PG&E Corp. and the Utility shall not (except through the Securities Engagement Parties or as otherwise consented to by the Securities Engagement Parties) sell or offer to sell any Securities (or any substantially similar securities) during the term of the Securities Engagement Letter, and shall not offer or sell any security that would be integrated with the sale of any Securities that are not being offered or sold in a registered Offering in a manner that would require such Securities to be registered under the Act.

| **Termination**<br>*See* Securities Engagement Letter, § 3. | The engagement may be terminated by any Securities Engagement Party (as to itself) on written notice. PG&E Corp. and the Utility may terminate the engagement on the earliest of (a) twelve months after the date of the Securities Engagement Letter, if the Effective Date has not occurred, (b) the Effective Date, if the Backstop Debt Facilities or other interim exit financing were not used and if any Offering consummated prior to or concurrently with the Effective Date complied with the Securities Engagement Letter, (c) the first anniversary of the Effective Date and (d) the date of receipt by PG&E Corp. and the Utility of aggregate cash proceeds equal to outstanding obligations under the Backstop Debt Facilities or any other interim Exit Financing from the sale of Securities in a transaction in which each Securities Engagement Party acts in a titled capacity and receives its Requisite Economics, if such transaction is consummated after the Effective Date. Additionally, PG&E Corp. and the Utility may terminate the Securities Engagement Letter "for cause" with respect to any Rule 5110 Offering. |
| --- | --- |
| **Indemnification /**<br>**Expense Reimbursement**<br>*See* Securities Engagement Letter, § 4 and Annex A. | Set forth in the Securities Engagement Letter. |
| **Alternate Financing**<br>*See* Securities Engagement Letter, § 5(c). | If during the period commencing on the date of the Securities Engagement Letter and ending 12 months following its termination, PG&E Corp., the Utility or any of their respective affiliates obtain Exit Financing or any other exit financing in connection with a plan of reorganization other than the Debtors' Plan (other than bank or syndicated credit financing) (any such financing, an **"Alternate Financing"**) without a Securities Engagement Party acting in its titled capacity under the Securities Engagement Letter in connection therewith and without receiving at least the percentage of minimum economics of such financing under the Securities |

27

| | |
|---|---|
| | Engagement Letter (the "**Requisite Economics**"), then PG&E Corp. and the Utility have agreed to pay to such Securities Engagement Party an amount equal to 50% (or, if such Alternate Financing refinances or replaces any outstanding Backstop Debt Facility, 100%) of the fees that would have been payable to such Securities Engagement Party if such Securities Engagement Party acted in its titled capacity with the Requisite Economics for such Alternate Financing; *provided* that no fee is payable to any Securities Engagement Party that has been offered the opportunity to act in a titled capacity with the Requisite Economics and has elected not to do so (unless in connection with an Alternate Financing in connection with a plan other than the Debtors' Plan). |
| **Disclosure** <br> *See* Securities Engagement Letter, § 6. | PG&E Corp. and the Utility shall furnish the Securities Engagement Parties with all financial and other information concerning the Debtors, the Debtors' Plan, the financing thereof and related matters that the Securities Engagement Parties may reasonably request for inclusion in any Offering Document or otherwise. |
| **Minimum Economics/Fees** | Set forth in the Securities Engagement Letter, unredacted copies of which were previously provided to the Court [Docket No. 4454], the Office of the United States Trustee and advisors to the Official Committee of Unsecured Creditors and Official Committee of Tort Claimants on a confidential and professionals' eyes only basis. |

Certain additional provisions of the Proposed Orders are summarized as follows:[13]

| | |
|---|---|
| **Nature of Exit Financing Obligations** <br> *See* Proposed Orders, ¶ 4. | The Exit Financing Obligations shall be treated as allowed administrative expenses of the Debtors whether or not the Exit Financing Commitments are funded, and none of such amounts shall be discharged, modified, or otherwise affected by any chapter 11 plan of any of the Debtors, subject to and in accordance with the Exit Financing Commitment Letters. |
| **Amendments** <br> *See* Proposed Orders, ¶ 7. | The Proposed Orders provide that the Debtors and the Exit Commitment Parties may enter into any nonmaterial amendment, modification or supplement of any provision of the Exit Financing Commitment Letters without further notice, hearing or order of the Court. In the case of any material amendment, modification or supplement to the Exit Financing Commitment Letters that is adverse to the Debtors (a "**Material Amendment**"), the Debtors |

---

[13] This summary is qualified in its entirety by reference to the Proposed Orders. To the extent that any discrepancies exist between the summary described in this Motion and the Proposed Orders, the Proposed Orders shall govern.

28

| | | |
|---|---|---|
| | | shall provide notice to the Notice Parties (as defined below), each of whom shall have five (5) calendar days from the date of receipt of such notice to object in writing to the Debtors and the applicable Exit Commitment Parties to such Material Amendment. If no objections are timely received (or if the Notice Parties indicate via electronic mail that they have no objection) to a Material Amendment, the Debtors are authorized to execute such Material Amendment. If a Notice Party timely objects and such objection is not resolved prior to the date upon which such objection is scheduled to be heard by the Court, approval of the Court (which may be sought on an expedited basis) will be necessary to execute a Material Amendment.<br><br>This provision is substantially similar to paragraph 26 of that certain *Final Order Pursuant to 11 U.S.C. §§ 105, 362, 363, 364, 503 and 507 and Fed. R. Bankr. P. 2002, 4001, 6004 and 9014 (i) Authorizing Debtors to Obtain Senior Secured, Superpriority, Postpetition Financing, (ii) Granting Liens and Superpriority Claims, (iii) Modifying the Automatic Stay, and (iv) Granting Related Relief* [Docket No. 1091]. |
| | **No Imposition of Liability** *See* Proposed Orders, ¶ 8. | Nothing in the Proposed Orders, the Exit Financing Commitment Letters or any other documents related to the transactions contemplated thereby shall in any way be construed or interpreted to impose or allow the imposition upon any Exit Commitment Party of any liability for any claims arising from the post-petition activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts. |
| | **Automatic Stay** *See* Proposed Orders, ¶ 13. | The Proposed Orders provide for the modification of the automatic stay under section 362 of the Bankruptcy Code to the extent necessary to enable the Exit Commitment Parties to perform under the Exit Financing Commitment Letters and to exercise any and all of their contractual rights thereunder. |

## IV.  BASIS FOR RELIEF REQUESTED

### A.  Entry into the Exit Financing Commitment Letters is a Sound Exercise of the Debtors' Business Judgment and is in the Best Interests of Their Estates.

Section 363(b)(1) of the Bankruptcy Code provides that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate". 11 U.S.C. § 363(b)(1). "Such use, sale or lease must be based upon a debtor's sound business judgment. The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the

29

action was in the best interests of the company.'" *In re Station Casinos, Inc.*, No. BK-09-52477 (GWZ), 2010 Bankr. LEXIS 5447, at *7 (Bankr. D. Nev. Feb. 2, 2010) (quoting *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992)).

Courts emphasize that the business judgment rule is not an onerous standard and may be satisfied "as long as the proposed action *appears* to enhance the debtor's estate". *Crystalin, L.L.C. v. Selma Props. Inc. (In re Crystalin, L.L.C.)*, 293 B.R. 455, 464 (B.A.P. 8th Cir. 2003) (emphasis in original, alterations and internal quotation marks omitted) (quoting *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 566 n.16 (8th Cir. 1997)); *see also In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (stating the business judgment standard is "not a difficult standard to satisfy"). Once a debtor articulates a valid business justification, a presumption arises that the debtor's decision was made on an informed basis, in good faith and with the belief that the decision was in the best interests of the debtor's estate. *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

Section 105(a) of the Bankruptcy Code further supports entry of an order approving the Exit Financing Commitment Letters by providing that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [title 11]." 11 U.S.C. § 105(a); *see also In re Excel Innovations, Inc.*, 502 F.3d 1086, 1093 (9th Cir. 2007); *In re Robles*, No. 14-51812 (ASW), 2014 WL 3715092, at *1 (Bankr. N.D. Cal. July 24, 2014). Together, sections 363(b) and 105(a) of the Bankruptcy Code give the Court sufficient authority to grant the relief requested herein. *See In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (stating courts should permit use of assets outside the ordinary course of business if "sound business purpose justifies such actions"); *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns- Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

30

1        Courts have routinely relied on such sections of the Bankruptcy Code when approving

2    relief similar to that sought herein.  *See, e.g.*, *In re Hexion Holdings LLC*, No. 19-10684 (KG), at 4

3    (Bankr. D. Del. May 15, 2019) (ECF No. 367) ("The Equity Backstop Agreement and the terms and

4    provisions included therein are approved in their entirety pursuant to sections 105 and 363 of the

5    Bankruptcy Code."); *In re Hexion Holdings LLC*, No. 19-10684 (KG), at 4 (Bankr. D. Del. May 15,

6    2019) (ECF No. 368) ("The Debt Backstop Agreement and the terms and provisions included therein

7    are approved in their entirety pursuant to sections 105 and 363 of the Bankruptcy Code.").

8        As noted above, the Debtors have reached a major milestone in these Chapter 11 Cases.

9    With the assistance of the Court-appointed mediator, the Debtors have achieved a comprehensive

10    global consensus that has been embodied in the Debtors' Plan.  The Debtors' Plan has the

11    overwhelming support of all classes of wildfire constituencies, the only impaired classes, and will

12    enable the Debtors to emerge from chapter 11 successfully, well within the June 30, 2020 timeframe

13    and perhaps, most importantly, expedite distributions to wildfire claimants—the Debtors' primary goal

14    when seeking relief under chapter 11.  The Exit Financing Commitments Letters will ensure that the

15    financial commitments will be available (on market or better than market terms) to ensure that this

16    comprehensive consensus will be timely implemented and that these cases are brought to a successful

17    conclusion.   Under these circumstances the relief requested in this Amended Motion plainly

18    constitutes a valid exercise of the Debtors' business judgment.

19        The equity financings backstopped by the Equity Backstop Commitment Letters are an

20    important component of the Debtors' successful emergence from chapter 11, since they will allow the

21    Debtors to fund payments to the wildfire tort claimants trust contemplated by the Debtors' Plan and

22    required by AB 1054.  Given the possibility that the price of PG&E Corp. shares may decrease or that

23    market conditions could deteriorate between now and confirmation of the Debtors' Plan, it is important

24    to the Debtors to lock in a reasonable baseline share price that can be improved if the Debtors' market

25    value and market conditions permit.  (*See* Ziman Decl. ¶ 16.)

26

27

28

31

Similarly, the Debt Commitment Letters backstop the Debtors' incurrence of new long-term debt to refinance all or a portion of Debtors' pre-petition high-coupon debt, which, in the case of the Utility bonds, could save the Debtors up to $1.5 billion in interest expense over the weighted average life of the bonds. (*Id.* ¶ 20.) As with the Equity Backstop Commitment Letters, the Debt Financing Commitment Letters provide assurances that sufficient funds will be available on the Effective Date in the event that market financings cannot be consummated at that time.

Recognizing, however, that the Debtors may be able to consummate financings on more attractive terms than those contemplated by the Exit Financing Commitment Letters as they near emergence, the Debtors negotiated for flexibility around structure and timing of exit financings. This flexibility allows the Debtors to pursue exit financings that maximize the value of their estates for the benefit of all stakeholders.

Moreover, the Exit Financing Commitment Letters align the incentives of the Debtors with those of leading financial institutions toward the ultimate success of the Debtors' Plan. (*Id.* ¶ 29.) These financial institutions have committed significant capital to ensure the viability of the Debtors' Plan and therefore have an interest in seeing it through to completion. (*Id.*) These commitments also enhance the confidence of claimants, financial creditors, equityholders, ratepayers and other stakeholders that the Debtors will be able to fund the contemplated payments on the Effective Date and emerge from chapter 11 as a financially sound utility. (*Id.*)

For all the above reasons, the Debtors have concluded that the Exit Financing Commitment Letters are best designed to maximize the value of their estates and the likelihood of their successful emergence from the Chapter 11 Cases in accordance with the terms of the Debtors' Plan. Accordingly, the Amended Motion should be approved.

**B.** **Payment and Allowance of the Exit Financing Obligations as Administrative Expense Claims Should Be Approved Because They are Reasonable, Market-Based and Essential Terms of the Exit Financing Commitment Letters.**

The Exit Financing Obligations are essential components of the Exit Financing Commitment Letters. These fees, premiums, indemnities, costs and expenses are necessary and

32

reasonable compensation for the substantial undertakings of the Exit Commitment Parties, and are favorable for the Debtors when compared to fees in cases of similar size and complexity. (*See* Ziman Decl. ¶¶ 18–19, 26, 28.) Absent the Debtors' agreement to pay the Exit Financing Obligations, the Exit Commitment Parties would not have been willing to provide the Exit Financing Commitments. (*Id.* ¶¶ 18, 26.) Without the Exit Financing Commitments, the Debtors have no assurances that they will have access to the financing proceeds required to fund the payments contemplated by the Debtors' Plan, including the satisfaction in full of wildfire claims and pre- and post-petition funded debt obligations. (*Id.* ¶¶ 16, 22.)

For these reasons, the Debtors determined, in their business judgment and in consultation with their advisors, that their agreements to pay the Exit Financing Obligations were essential and an appropriate means to obtain the Exit Financing Commitments. Compared to the substantial value provided by the Exit Financing Commitment Letters, and the significant duration of the Exit Financing Commitments, the Exit Financing Obligations are a reasonable use of estate resources and should be accorded administrative expense priority under section 507(a)(2) of the Bankruptcy Code. The Exit Financing Obligations are actual and necessary costs, not only for preserving the Debtors' estates, but also for maximizing their value and enhancing overall stakeholder recoveries.

The commitment premiums (the "**Equity Commitment Premiums**") under the Equity Backstop Commitment Letters (6.364%, subject to reductions that diminish as conditionality and termination rights fall away or are otherwise resolved) and the Debtors' agreement to pay reasonable fees and expenses of counsel and a financial advisor to the Equity Backstop Parties, subject to caps of $17 million and $19 million, respectively, are market-based and comparable to, or less than, those that courts have approved in other recent chapter 11 cases. *See, e.g.*, *In re Monitronics International, Inc.*, No. 19-33650 (DRJ) (Bankr. S.D. Tex. July 30, 2019) (ECF No. 159) (approving debtors' assumption of put option agreement providing for an 8.0 percent backstop put option premium for a 115 day commitment term and expense reimbursement of the backstop parties' advisors); *In re Hexion*

33

*Holdings LLC*, No. 19-10684 (KG) (Bankr. D. Del. May 15, 2019) (ECF No. 367) (approving backstop premium equal to 8.0 percent of the rights offering amount for a 126 day term and expense reimbursement of the backstop parties' advisors); *In re Pacific Drilling S.A.*, No. 17-13193 (MEW) (Bankr. S.D.N.Y. Sept. 25, 2018) (ECF No. 616) (approving backstop premium equal to 5.3 percent of the aggregate rights offering amount for a 66 day term and expense reimbursement of the backstop parties' advisors). Further, subject to the occurrence of the Effective Date, the Equity Commitment Premiums are payable in shares of New PG&E Corp. Common Stock, which minimizes the cash outflow on the Effective Date. In the event that the Court confirms a plan of reorganization for the Debtors that is not the Debtors' Plan, then the Equity Commitment Premium will be payable in cash or shares of New PG&E Corp. Common Stock, at the election of each Equity Backstop Party.

Moreover, as described above, the Equity Commitment Premiums have been structured so that the premiums may be reduced by significant percentages in the event an Equity Backstop Party terminates its commitment. For instance, termination between January 20, 2020 and April 30, 2020, will result in a 60% reduction. Termination between April 30, 2020 and June 30, 2020, which coincides with the confirmation date required by AB 1054 (and the associated Equity Backstop Commitment Letter termination right in favor of the Equity Backstop Parties), will result in a 10% reduction. The rolling premium reduction schedule was specifically designed to accommodate the administration of these Chapter 11 Cases—as the potential for termination events diminishes, and as uncertainty related to the Equity Backstop Commitment conditions is resolved. However, even if the Equity Backstop Commitments are maintained through August 29, 2019, the maximum Equity Commitment Premium that would be owing is still in line with those paid in the market, even without considering the significant amount of time that the Equity Backstop Commitments would remain outstanding. (Ziman Decl. ¶ 18.)

Like the Equity Commitment Premiums, the fees, expense reimbursements and indemnities owing by the Debtors under the Backstop Debt Fee Letters and the Debt Financing Engagement Letters are reasonable under the circumstances, are the product of arms'-length

34

negotiations and are comparable to, or better than, market. (*Id.* ¶¶ 26, 28.) The Debtors and their advisors negotiated the fees down relative to the initial proposals and developed a mechanism to stage fees over time, which is atypical for "bridge" facilities. (*Id.* ¶ 28) This structure allows the Debtors to maximize the value of their estates by proceeding with their Debtors' Plan, while minimizing the fees incurred by the Debtors until closer to the Effective Date (when associated conditionality and termination rights have been reduced or eliminated). Moreover, the Backstop Debt Facilities are intended to serve only as a backstop for lower-cost "take-out" financing. As and when such lower-cost financing is incurred, the Debt Commitments are reduced dollar-for-dollar. If the entire $34.35 billion in Debt Commitments remain outstanding until June 30, 2020 (*i.e.*, the statutory confirmation deadline), the aggregate fees payable by the Debtors with respect to such Debt Commitments would be approximately $210 million.[14] Based on analyses conducted by the Debtors' financial advisors, this quantum of commitment fees is comparable to, or less than, those charged in other large complex "bridge" financing transactions over the last five years. (*Id.* ¶¶ 26, 28.)

Treatment of the Exit Financing Obligations as administrative expenses of the estate is also well within market parameters and is a customary term in exit financing commitment letters. *See, e.g.*, *In re Hexion Holdings LLC*, No. 19-10684 (KG), at 5 (Bankr. D. Del. May 15, 2019) (ECF No. 367) ("The . . . expenses provided for or permitted by the Equity Backstop Agreement (including . . . the Equity Expense Reimbursement . . . ) are hereby approved as reasonable, [and] shall constitute

---

[14] In addition to such commitment fees, the Debt Commitment Letters and Backstop Debt Fee Letters provide for the payment of fees if the Backstop Debt Facilities are funded and on certain specified dates thereafter depending on the amount of the Backstop Debt Facilities outstanding as of such dates. As described above, the Backstop Debt Commitment Parties have also been engaged to arrange permanent bank and debt securities exit financings, which, if consummated, would result in the payment by the Debtors of certain additional fees. In the event the Debtors fail to use the Backstop Debt Commitment Parties in connection with the financings for which they have been engaged, the Backstop Debt Commitment Parties would be entitled to customary alternate transaction fees. The aggregate fees payable by the Debtors pursuant to the Debt Financing Commitment Letters will depend on a variety of factors, including the length of time the Debt Commitments and/or Backstop Debt Facilities remain outstanding, the amount of the Backstop Debt Facilities funded and the type and size of the applicable exit financing or alternate transaction.

35

allowed administrative expense claims pursuant to section 503(b) of the Bankruptcy Code . . . ."); *In re Hexion Holdings LLC*, No. 19-10684 (KG), at 5 (Bankr. D. Del. May 15, 2019) (ECF No. 368) ("The fees, premiums, and . . . expenses provided for or permitted by the Debt Backstop Agreement (including . . . the Debt Backstop Commitment Premium, the Additional Premium, the Debt Expense Reimbursement, and the Debt Backstop Indemnity Obligations) are hereby approved as reasonable, [and] shall constitute allowed administrative expense claims pursuant to section 503(b) of the Bankruptcy Code . . . .").

In exchange for the Debtors' agreement to pay the Exit Financing Obligations, the Debtors will receive substantial benefits. The Exit Financing Obligations are necessary, appropriate and customary inducements for the Exit Commitment Parties to enter into the Exit Financing Commitment Letters and are favorable relative to market. (Ziman Decl. ¶¶ 18, 26.) Given the magnitude of the commitments of the Exit Commitment Parties, the Debtors have determined, in their business judgment, to incur the Exit Financing Obligations to provide assurances of their ability to consummate their Debtors' Plan on the Effective Date.

For the foregoing reasons, the Debtors respectfully submit that approval of the Exit Financing Commitment Letters is in the best interest of their estates and an appropriate exercise of their business judgment.

## V.  WAIVER OF BANKRUPTCY RULE 6004(h)

To implement the foregoing, the Debtors respectfully request the waiver of the 14-day stay under Bankruptcy Rule 6004(h). Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise". Fed. R. Bankr. P. 6004(h). For the reasons described above, the relief requested herein allows the Debtors to achieve greater certainty around the financing of their Debtors' Plan.

36

## VI. NOTICE

Notice of this Amended Motion will be provided to (i) the Office of the United States Trustee for Region 17 (Attn: Andrew Vara, Esq. and Timothy Laffredi, Esq.); (ii) counsel to the Creditors Committee; (iii) counsel to the Tort Claimants Committee; (iv) the Securities and Exchange Commission; (v) the Internal Revenue Service; (vi) the Office of the California Attorney General; (vii) the California Public Utilities Commission; (viii) the Nuclear Regulatory Commission; (ix) the Federal Energy Regulatory Commission; (x) the Office of the United States Attorney for the Northern District of California; (xi) counsel for the agent under the Debtors' debtor-in-possession financing facilities; (xii) counsel for the Equity Backstop Parties; (xiii) counsel for the Initial Backstop Debt Commitment Parties; and (xiv) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**"). The Debtors respectfully submit that no further notice is required.

No previous request for the relief sought herein, other than as set forth in the original Motion, has been made by the Debtors.

37

WHEREFORE the Debtors respectfully request entry of the proposed orders granting (i) the relief requested herein and (ii) such other and further relief as the Court may deem just and appropriate.

Dated: January 3, 2020

**WEIL, GOTSHAL & MANGES LLP**
**CRAVATH, SWAINE & MOORE LLP**
**KELLER & BENVENUTTI LLP**


_____/s/ *Paul H. Zumbro*_____
Paul H. Zumbro


*Attorneys for Debtors and Debtors in Possession*

38