| | |
|---|---|
| WEIL, GOTSHAL & MANGES LLP<br>Stephen Karotkin (*pro hac vice*)<br>(stephen.karotkin@weil.com)<br>Ray C. Schrock, P.C. (*pro hac vice*)<br>(ray.schrock@weil.com)<br>Jessica Liou (*pro hac vice*)<br>(jessica.liou@weil.com)<br>Matthew Goren (*pro hac vice*)<br>(matthew.goren@weil.com)<br>767 Fifth Avenue<br>New York, NY 10153-0119<br>Tel: 212 310 8000<br>Fax: 212 310 8007 | CRAVATH, SWAINE & MOORE LLP<br>Paul H. Zumbro (*pro hac vice*)<br>(pzumbro@cravath.com)<br>Kevin J. Orsini (*pro hac vice*)<br>(korsini@cravath.com)<br>Omid H. Nasab (*pro hac vice*)<br>(onasab@cravath.com)<br>825 Eighth Avenue<br>New York, NY 10019<br>Tel: 212 474 1000<br>Fax: 212 474 3700 |

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors*
*and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY**<br><br>Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>* *All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case No. 19-30088 (DM)<br>Chapter 11 (Lead Case) (Jointly Administered)<br><br>**DECLARATION OF KENNETH S. ZIMAN IN SUPPORT OF DEBTORS' AMENDED MOTION FOR ENTRY OF ORDERS (I) APPROVING TERMS OF, AND DEBTORS' ENTRY INTO AND PERFORMANCE UNDER, EQUITY BACKSTOP COMMITMENT LETTERS, (II) APPROVING TERMS OF, AND DEBTORS' ENTRY INTO AND PERFORMANCE UNDER, DEBT FINANCING COMMITMENT LETTERS AND (III) AUTHORIZING INCURRENCE, PAYMENT AND ALLOWANCE OF RELATED FEES AND/OR PREMIUMS, INDEMNITIES, COSTS AND EXPENSES AS ADMINISTRATIVE EXPENSE CLAIMS**<br><br>Date: January 21, 2020<br>Time: 10:00 a.m. (Pacific Time)<br>Place: United States Bankruptcy Court<br>   Courtroom 17, 16th Floor<br>   San Francisco, CA 94102<br>Objection Deadline: January 14, 2020 |

I, Kenneth S. Ziman, hereby declare under penalty of perjury as follows:

1. I am a Managing Director in the Restructuring Group at Lazard Frères & Co. LLC ("**Lazard**"), an investment banking firm that has its principal office at 30 Rockefeller Plaza, New York, New York 10112. Lazard is the primary U.S. operating subsidiary of a preeminent international investment banking, financial advisory, and asset management firm. Together with its predecessors and affiliates, Lazard has been advising clients around the world for over 165 years. Lazard and its professionals have considerable expertise and experience in providing investment banking and financial advisory services to financially distressed companies and to creditors, equity holders and other constituencies in reorganization proceedings and complex financial restructurings, both in and out of court. In addition, Lazard's investment banking professionals have extensive experience in advising debtors in chapter 11 cases and have served as investment bankers to numerous debtors, chapter 11 trustees, creditors' committees and buyers in chapter 11 cases. Since 1990, Lazard professionals have been involved in over 250 restructurings, representing over $1 trillion in debtor assets.

2. At Lazard, I specialize in advising public and private companies and creditor groups in complex financial restructurings and in raising capital for, selling, or acquiring financially distressed businesses. I have nearly 30 years of experience in corporate finance and restructuring. I joined Lazard in March 2016 after a more than 25-year career as a bankruptcy and restructuring lawyer, previously as a partner at Simpson Thacher & Bartlett LLP and most recently as the Deputy Practice Leader of Skadden, Arps, Slate, Meagher & Flom LLP's Corporate Restructuring department. Throughout my career I have represented debtors, individual creditors, official creditors' committees, unofficial bondholder committees, and other parties in interest in numerous in-court and out-of-court restructurings and recapitalizations involving companies in multiple industries, including those of Takata Corporation, Cobalt International Energy, Inc., ManorCare Inc., SunEdison, Inc., CGG Holdings (U.S.) Inc., Millennium Health, LLC, Dendreon Corporation, Exide Technologies, Savient Pharmaceuticals, Inc., Energy Future Holdings Corporation, Residential Capital, LLC, Select Staffing, iPayment, Inc. and MF Global Holdings

1. Ltd. I have submitted declarations and/or affidavits or have had testimony proffered in CGG, SunEdison and GCX Limited, among other cases.

3. I graduated from Colgate University with a B.A. and I have a law degree from the University of Pennsylvania Law School.

4. I submit this Declaration in support of the *Debtors' Amended Motion for Entry of Orders (i) Approving Terms of, and Debtors' Entry into and Performance Under, Equity Backstop Commitment Letters, (ii) Approving Terms of, and Debtors' Entry into and Performance Under, Debt Financing Commitment Letters and (iii) Authorizing Incurrence, Payment and Allowance of Related Fees and/or Premiums, Indemnities, Costs and Expenses as Administrative Expense Claims* (the "**Amended Motion**").[1]

5. Lazard is a long-time advisor to PG&E Corporation ("**PG&E Corp.**"), and its primary operating subsidiary, Pacific Gas and Electric Company (the "**Utility**"; together with PG&E Corp., "**PG&E**", the "**Company**" or the "**Debtors**"), with the initial engagement for advisory services starting in 2011. Since that time, Lazard has provided financial advisory and investment banking services to PG&E Corp. with respect to a variety of matters, including, without limitation: analysis of the financial condition of the Company, evaluation of potential transactions that the Company may pursue, assessment of financing options, and shareholder advisory services. Given Lazard's long history with PG&E Corp., Lazard has significant familiarity with and knowledge of the Debtors' business, operations, and financial challenges.

6. Lazard currently serves as advisor to the Debtors in their Chapter 11 Cases. In such capacity, Lazard assists the Company in its assessment of the Company's ability to raise capital and its evaluation of the sources of financing required in order to successfully emerge from chapter 11. During the course of these cases, Lazard has engaged in dialogue with the legal counsel and advisors to a number of significant shareholders, including in regards to their willingness to invest in the Company to finance its emergence from chapter 11.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Amended Motion.

7. Along with management, Lazard has also engaged in communications with certain money-center banks regarding the Company's ability to access capital from the traditional equity markets. Feedback received from these discussions indicated that regular-way equity markets access would require resolution of the Company's 2020 general rate case and cost of capital proceedings, as well as a clear understanding of the aggregate wildfire claims liability, how those claims will be treated under a chapter 11 plan and the plan's compliance with AB 1054. Feedback received further indicated that banks would potentially be willing to commit, at the time, to a volume underwriting of any equity financing; this would mean that while a bank might guarantee an amount of equity proceeds, there would not be a floor price at which that equity would be raised, thereby presenting unlimited dilution risk to current shareholders.

8. In connection with efforts to terminate the Debtors' exclusivity by the Ad Hoc Committee of Senior Unsecured Noteholders (the "**Ad Hoc Noteholder Committee**") and the Ad Hoc Group of Subrogation Claim Holders in July and August 2019, two large shareholders of PG&E Corp., Knighthead Capital Management ("**Knighthead**") and Abrams Capital Management ("**Abrams**"; together with Knighthead, the "**13D Parties**"), submitted a letter to the Chair of PG&E Corp. setting forth an unsolicited financing proposal to provide $1.5 billion of equity capital commitments in support of the Company's Plan of Reorganization (as defined below) (the "**Initial Equity Backstop Commitment Letter**"). This proposal was made public by the 13D Parties on August 8, 2019, through a Schedule 13D filing with the Securities and Exchange Commission. The 13D Parties' proposal contemplated raising up to $15 billion of equity, with the additional capital being provided by other shareholders. Subsequently, without any active solicitation the Company received equity capital commitments from more than 35 investors, representing equity backstop commitments in excess of $14 billion in the aggregate.

9. Starting on August 17, and continuing through September, the Company and its financial and legal advisors engaged in negotiations with the 13D Parties concerning the terms of the Initial Equity Backstop Commitment Letter. Over the course of these discussions, the Debtors improved upon several of the terms initially proposed by the 13D Parties, including with respect

to structure, conditionality, length and flexibility to pursue a variety of equity financing options. At a board meeting on September 8, the PG&E Corp. board (the "**Board**") authorized PG&E Corp. to enter into backstop commitment letters that had been revised to reflect the outcome of these discussions and negotiations (as revised, the "**September Equity Backstop Commitment Letters**") with affiliates of the 13D Parties. On September 9, PG&E Corp. entered into the September Equity Backstop Commitment Letters with certain affiliates of the 13D Parties for aggregate commitments of $1.5 billion, and such backstop commitment letters were filed with the Court as an exhibit to the Debtors' "Summary of Key Elements of Debtors' Joint Chapter 11 Plan of Reorganization". [Docket No. 3844]

10. Shortly after entering into the September Equity Backstop Commitment Letters, the Debtors reached a settlement with the Ad Hoc Group of Subrogation Claim Holders. As the September Equity Backstop Commitment Letters did not incorporate this settlement, the Company and the 13D Parties negotiated a revised form of the September Equity Backstop Commitment Letters that was publicly disclosed on September 13, 2019 via a Current Report on Form 8-K, which, among other matters, reflected contemplated amendments to the Company's Plan of Reorganization to incorporate the subrogation settlement.

11. On September 14, 2019, the Company initiated a process to obtain an additional $12.5 billion of equity commitments from current shareholders and others. Of the $14 billion of Equity Backstop Commitments sought during this process, 60% was available only to shareholders who offered Equity Backstop Commitments to the Company, to be further allocated among such shareholders based on shareholdings. The other 40% of the Equity Backstop Commitments was made available to shareholders and non-shareholders who offered Equity Backstop Commitments to the Company, which was to be further allocated pro rata based on the amount of Equity Backstop Commitments offered by such parties. All parties were permitted to include in their shareholdings shares purchased between the time they delivered their commitments and the allocation date.

12. As part of this process, Lazard distributed the form backstop agreement to a diverse group of accredited investors (as defined in Rule 501 of Regulation D under the Securities Act of

1933, as amended).  The Debtors actively engaged with non-shareholders during this process and, overall, provided non-shareholders with a meaningful opportunity to participate in the Equity Backstop Commitments.  In addition, the Company made a presentation available on its website that described the backstop commitment structure and other key information about the Debtors and the Chapter 11 Cases.  The Company also hosted an informational meeting on September 17, 2019 and the Company and Lazard engaged with potential investors via individual phone calls and one-on-one meetings.  Any accredited investors that expressed interest to the Company or Lazard in participating in the backstop received a copy of the form of September Equity Backstop Commitment Letters.  The Company addressed comments to the September Equity Backstop Commitment Letters from certain of these investors in an amendment distributed on September 20, 2019 to parties that received the September Equity Backstop Commitment Letters.  Subsequently, the Company received equity capital commitments from more than 50 investors, representing equity backstop commitments in excess of $14 billion in the aggregate.

13.  As a result of negotiations with representatives of the wildfire victims, the Debtors amended their Plan of Reorganization to, among other things, accommodate a higher wildfire claim settlement amount.  This amendment necessitated that negotiations be re-opened around the equity backstop commitments to raise the wildfire claim cap therein.  On November 16, 2019, the September Equity Backstop Commitment Letters were superseded and replaced as the Debtors entered into new Equity Backstop Commitment Letters with Knighthead, Abrams and additional Equity Backstop Parties that contemplated reduced total commitments of $12 billion (the "**November Equity Backstop Commitment Letters**").  This reduced commitment amount reflected that a portion of the claims held by the wildfire victims was expected to be paid in stock. However, the November Equity Backstop Commitment Letters also permitted a higher overall amount of compensation to be paid to the wildfire victims.  On November 17, 2019, the Debtors began soliciting more broadly for additional commitments, and on December 6, 2019 the Debtors announced they had reached the commitment objective of $12 billion under the November Equity Backstop Commitment Letters.

14. On December 13, 2019, the Debtors announced they were seeking an extension of the Court approval deadline for the November Equity Backstop Commitment Letters. In connection with this extension, on December 13, the Board authorized PG&E Corp. to enter into new Equity Backstop Commitment Letters with the Equity Backstop Parties, which the Debtors then entered into on December 23, that superseded and replaced the prior Equity Backstop Commitment Letters (the "**Final Equity Backstop Commitment Letters**" and, together with the Initial Equity Backstop Commitment Letter, September Equity Backstop Commitment Letters and the November Equity Backstop Commitment Letters, as applicable, the "**Equity Backstop Commitment Letters**").

15. Under the Final Equity Backstop Commitment Letters, the Company accepted commitments from a total of 80 Equity Backstop Parties, which aggregated to a combined commitment of $12.6 billion, before giving effect to the allocation provisions in the Final Equity Backstop Commitment Letters that provided for an automatic reduction of Equity Backstop Commitments to an aggregate amount of $12 billion. As before, the Debtors actively engaged with non-shareholders during this process and, overall, provided non-shareholders with ample opportunity to participate in the Equity Backstop Commitments.

16. Over the multiple iterations of the Equity Backstop Commitment Letters, the Company and its advisors were able to negotiate terms within the Final Equity Backstop Commitment Letters to the Company's advantage relative to the terms of the Initial Equity Backstop Commitment Letter. The Debtors simplified the equity offering mechanics from the Initial Equity Backstop Commitment Letter, which are structured in the Final Equity Backstop Commitment Letters based on the price-to-earnings multiple the Debtors are able to achieve with respect to the future equity raises contemplated to occur closer to the Effective Date of the Debtors' Plan of Reorganization. In the event that the price-to-earnings multiple implied by an equity raise is equal to or exceeds 13.5x[2], the Debtors can pursue a Permitted Equity Offering (*i.e.*, raise equity at best terms / structure available in the market). If the price-to-earnings multiple implied by an

---

[2] Subject to adjustment in accordance with the Final Equity Backstop Commitment Letters.

equity raise is less than $13.5x^2$ but equals or exceeds $12.0x^2$, then the Debtors must raise at least 80% of equity proceeds through a Rights Offering, but may still consummate certain Permitted Equity Offerings for up to 20% of equity proceeds. The features of the Rights Offering, including freely tradeable rights and oversubscription privileges, are intended to allow all stakeholders to participate in the capital raise. At any multiple lower than the Rights Offering threshold multiple, the Debtors will rely on the Backstop Commitments, which are priced at $10.0x^2$. This structure affords the Debtors significant flexibility in financing their emergence from the Chapter 11 Cases, while ensuring that the Debtors will be able to raise the anticipated necessary equity capital in time for the Debtors to emerge in accordance with the timelines in AB 1054. Absent the Backstop Commitments, the Debtors could face a situation where they seek to raise equity financing upon emergence from chapter 11 with no guarantee of availability or price. As ultimately negotiated, the Backstop Commitments mitigate this downside risk and provide flexibility for the Debtors to also raise equity financing at higher prices via a Rights Offering or a Permitted Equity Offering if there is sufficient demand in the public markets. Importantly, the equity investment contemplated by the Final Equity Backstop Commitment Letters is also structured in a manner that permits the Debtors to monetize their significant net operating loss carryforwards and other tax attributes, an important component to maximizing the value of the Debtors' estates.

17. As described above, the Debtors negotiated in the Final Equity Backstop Commitment Letters such that in the event of a Rights Offering, the Company maintains the option of raising up to 20% of the total equity proceeds through another form of primary equity offering (*e.g.*, a private placement), subject to certain consent rights of the Equity Backstop Parties in the case of equity offerings that are not broadly syndicated. This flexibility could be valuable in bringing long-term utility investors back into the stock and allowing the Company to diversify its shareholder base immediately upon emergence from chapter 11. The Initial Equity Backstop Commitment Letter featured no such option.

18. While the Equity Commitment Premium increased as compared to the Initial Equity Backstop Commitment Letter, the Debtors negotiated changes to the structure of the Equity

Commitment Premium to provide for a rolling premium clawback reduction schedule that allows the Equity Commitment Premium to be significantly reduced with respect to an Equity Backstop Party in the event that such party terminates its commitments. Generally, the terminating Equity Backstop Party's Equity Commitment Premium will be reduced by:

    i) 85% if the commitments are terminated on or prior to January 20, 2020;

    ii) 60% if the commitments are terminated after January 20, 2020 and on or prior to April 30, 2020; and

    iii) 10% if the commitments are terminated after April 30, 2020 and prior to the Effective Date.

However, if an Equity Backstop Party terminates its commitments because (i) asserted administrative expense claims in the Chapter 11 Cases exceed $250 million, excluding all ordinary course administrative expense claims, all professional fee claims, all disallowed administrative expense claims and the portion of an administrative expense claim that is covered by insurance (collectively, the "**Excluded Administrative Expense Claims**"), or (ii) the Debtors have reserved for and/or paid more than $250 million in the aggregate for administrative expense claims, excluding the Excluded Administrative Expense Claims, then the relevant Equity Backstop Party's Equity Commitment Premium will be reduced by 75%. Additionally, if an Equity Backstop Party terminates its commitments in connection with PG&E Corp.'s receipt of written waivers or specified amendments from entities holding 60% or more of the Equity Backstop Commitments, then the relevant Equity Backstop Party's Equity Commitment Premium will be reduced by:

    i) 75% if the commitments are terminated on or prior to April 30, 2020;

    ii) 50% if the commitments are terminated after April 30, 2020 and on or prior to May 31, 2020; and

    iii) 25% if the commitments are terminated after May 31, 2020.

I believe that these features of the Final Equity Backstop Commitment Letters benefit the Debtors by incentivizing the Equity Backstop Parties to maintain their commitments in the event that

termination rights are triggered.[3] Moreover, the clawback features enables the Debtors to retain any portion of the Equity Commitment Premiums that was subject to clawback, which the Debtors could then use as consideration to attract a replacement Equity Backstop Party. Such fees are necessary and market-based compensation for the Equity Backstop Parties; absent the Equity Commitment Premium, the Equity Backstop Parties would not have been willing to provide the Equity Backstop Commitments on present terms. Based upon analysis conducted by Lazard of equity backstop commitments provided since 2016, the Equity Commitment Premium (6.364%) appears comparable to, or less than, other equity backstop commitment premiums that have been agreed and approved by other Bankruptcy Courts in order to finance chapter 11 plans.

19. Furthermore, the reimbursement of reasonable fees and expenses of Jones Day, legal advisor to certain of the Equity Backstop Parties, of up to $17.0 million and a financial advisor to certain of the Equity Backstop Parties of up to $19.0 million, as contemplated by the Final Equity Backstop Commitment Letters, is a necessary component of the agreement and without which the equity capital would not otherwise have been provided on the present terms. Based on the totality of the circumstances, I believe that the full Equity Commitment Premium of 6.364%, in addition to the expense reimbursement structure described above, is fair and reasonable.

20. In addition to the work on the Final Equity Backstop Commitment Letters, the Debtors have been working in parallel with money-center banks to ensure needed access to debt capital at emergence. The Debtors' Joint Chapter 11 Plan of Reorganization filed on September 9, 2019 and amended on September 23, 2019, November 4, 2019 and December 12, 2019 (the "**Plan of Reorganization**") contemplates up to $34.35 billion of new debt financing, consisting of $27.35 billion at the Utility and $7.0 billion at PG&E Corp. to refinance their current capital structure and fund their emergence from chapter 11. The Plan of Reorganization contemplates debt financing at both the Utility and PG&E Corp. to establish a capital structure upon emergence

---

[3] The termination rights are exercisable on an individual basis—one Equity Backstop Party's decision to exercise its termination right does not terminate the commitments of the other Equity Backstop Parties.

consistent with other peer utilities. The Plan of Reorganization seeks to maximize the value of the Debtors' estates by refinancing pre-petition Utility debt with less expensive secured bonds at market rates where practical to do so. With respect to pre-petition long-term bonds at the Utility, refinancing certain or all bonds with this new debt could save the Debtors (and by extension ratepayers) up to $1.5 billion in interest expense over the weighted average life of the bonds.

21. Since the second quarter of 2019, the Debtors and their advisors have maintained ongoing dialogue with money-center banks to discuss debt financing options relative to the Debtors' emergence from chapter 11. These conversations ultimately culminated in five banks providing highly confident letters ("**HCLs**") relative to raising debt and equity financing at emergence; the Debtors provided these HCLs to the Court as part of the September 9, 2019 filing of their Plan of Reorganization. Furthermore, throughout the course of the third quarter of 2019, several banks developed illustrative debt financing structures and term sheets for presentation to the Debtors, to assist the Debtors in considering exit financing options.

22. In late September 2019, following the filing of the second motion of the Ad Hoc Noteholder Committee to terminate the Debtors' exclusive periods, the Board determined that the Company should seek to obtain committed debt financing to bolster the confidence of claimants, financial creditors, equityholders, ratepayers and other stakeholders that the Debtors' Plan of Reorganization, the best available alternative, can be consummated in accordance with statutory requirements (both under the Bankruptcy Code and AB 1054). Much like the Final Equity Backstop Commitment Letters, committed debt financing would act as a backstop for the debt capital necessary to effectuate the Debtors' Plan of Reorganization at an acceptable price. The Debtors sought debt commitments in the form of investment grade "bridge" financing, which is short-term in nature (usually with a maturity within one year) and commonly used to provide certainty of execution on large, complex transactions by offering protection against market dislocation that could frustrate access to regular-way capital markets transactions at the specific dates or periods required by the transaction terms. As is typical, it is not expected that the Debt Commitments (as defined below) will be drawn—rather, they serve as an insurance policy to

ensure that adequate funds at an acceptable price will be available when the Debtors need them. However, even if funded, the backstop debt facilities would be expected to be refinanced well in advance of their 364-day maturity. Given this expectation (coupled with the fact that the Debt Commitments are not expected to be drawn), I do not believe that the 364-day maturity raises any feasibility issues with respect to the Debtors' Plan of Reorganization. In light of this, the Debtors determined in their business judgment that a 364-day debt commitment struck the right balance between certainty and cost, as a longer term commitment if even available would come with much higher fees. The Debt Commitments will allow the Debtors to proceed with the prosecution and consummation of their Plan of Reorganization in a manner that will allow them to successfully emerge from chapter 11.

23. Following the Company's decision to obtain backstop debt commitments, the Debtors and their advisors commenced negotiations regarding backstop debt commitments, with the intention of finalizing the commitments by October 4, 2019, in advance of the October 7, 2019 hearing on the motion to terminate the Debtors' exclusivity. As such, the Debtors and their advisors contacted money-center banks on September 25 and 26 requesting initial proposals for backstop debt commitments. The Company and Lazard contacted nine leading banks and requested term sheet proposals for total Utility backstop debt commitments of $27.35 billion and PG&E Corp. backstop debt commitments of $7.0 billion. All of the aforementioned banks delivered proposals by October 1, 2019.

24. After analysis of the initial proposals, which the Debtors evaluated based on a number of metrics, including the proposed terms and fees, the cost and certainty of the commitments, the experience and reputations of the parties and the ability of such banks to work collaboratively with the Debtors, the Debtors developed and shared a counterproposal based on anticipated market-clearing terms and selected JPMorgan, Citi, Bank of America, Barclays and Goldman Sachs as initial commitment parties (the "**Initial Backstop Debt Commitment**

**Parties**")[4]. The Board approved the Debtors' entry into the backstop debt commitments on October 11, 2019; the Debtors executed the backstop debt commitments on the same day (the "**Debt Commitments**"). The Debt Financing Commitment Letters executed on October 11, 2019 contemplated obtaining Court approval by November 20, 2019.

25. On October 28, 2019, the Debtors joined BNP Paribas, Credit Suisse AG, Cayman Islands Branch, Morgan Stanley Bank, N.A., MUFG Union Bank, N.A. and Wells Fargo Bank, National Association, as additional Commitment Parties to the Debt Commitment Letters. On November 18, 2019, the Debtors amended the Debt Commitment Letters to extend the deadline for obtaining Court approval from November 20, 2019 to December 20, 2019. On December 2, 2019, the Debtors joined Mizuho Bank, Ltd. as an additional Commitment Party to the Debt Commitment Letters. On December 20, 2019, the Debtors further amended the Debt Commitment Letters to, among other things, extend the deadline for obtaining Court approval from December 20, 2019 to January 31, 2020.

26. Subject to the terms of the Debt Commitment Letters and Backstop Debt Fee Letters, the Debtors are obligated to pay certain fees (the "**Backstop Debt Fees**") to the Backstop Debt Commitment Parties to compensate them for their Debt Commitments. Similar to the Equity Commitment Premiums in the Final Equity Backstop Commitment Letters, the Backstop Debt Fees are necessary and market-based compensation for the Backstop Debt Commitment Parties, and, absent the Backstop Debt Fees, the Backstop Debt Commitment Parties would not be willing to provide the Debt Commitments. If the entire $34.35 billion in Debt Commitments remain open until June 30, 2020 (*i.e.*, the statutory confirmation deadline), the aggregate Backstop Debt Fees payable by the Debtors with respect to such Debt Commitments would be approximately $210 million. While significant in dollar terms, on a percentage basis this represents 0.61% of the committed debt quantum, which Lazard's analysis shows to be consistent with or below market rates for bridge commitments. The Debt Commitments provide certainty of financing within a

---

[4] The Initial Backstop Debt Commitment Parties are also engaged to act as arrangers and underwriters for market-based "take-out financing" through a combination of bank debt and bond placement at both PG&E Corp. and the Utility.

range of pricing outcomes. Absent the Debt Commitments, the Company could be forced to raise exit financing at prevailing terms during a time of market dislocation. The incremental interest cost of raising debt financing in the absence of a debt backstop could expose the Company to increased interest costs that exceed the fees on the Debt Commitments. By agreeing to a fee of up to $210 million, the Company is buying insurance; a 100 basis points increase in interest rate spreads across its capital structure results in more than $340 million of incremental annual interest expense for the Company.

27. In addition to the Backstop Debt Fees, the Debtors would be required to pay additional amounts (including fees and interest) if the Debt Commitments are actually drawn at emergence from chapter 11. The pricing of the Debt Commitments, summarized below, provides certainty to the Debtors of the availability and cost of debt capital if the Debt Commitments are utilized upon exit from chapter 11. Furthermore, the Debt Commitments have added significance here given the importance of timely emergence to obtain the benefits of the AB 1054 wildfire fund and limited ability to delay emergence to allow credit markets to settle if there is volatility in the markets at the time the Debtors must emerge from chapter 11 to meet the AB 1054 and related deadlines. The interest rates associated with the Debt Commitments are as follows:

    i) for the Utility: $L^5$+112.5-175 bps (subject to a credit rating grid); 25 bps increase every 90 days after funding; maximum 75 bps increase; and

    ii) for PG&E Corp.: $L^5$+175-225 bps (subject to a credit rating grid); 25 bps increase every 90 days after funding; maximum 75 bps increase.

28. As a result of negotiations led by the Company and Lazard, the Backstop Debt Fees were negotiated down relative to the initial proposals and are structured so that payment is staggered over time. Also, the Debt Commitments can be reduced or terminated to the extent there are changes to the financing needs or the Debtors' Plan of Reorganization, including any

---

[5] The interest rate under the facilities will be, at the option of the Utility or PG&E Corp., as applicable, (a) the Adjusted LIBO Rate (as defined in the Debt Commitment Letters) <u>plus</u> the specified margin or (b) the ABR (as defined in the Debt Commitment Letters) <u>plus</u> the specified margin, and <u>minus</u> 100 bps.

determination to reinstate pre-petition debt or utilize Additional Capital Sources, as defined in the Equity Backstop Commitment Letters. Based on analysis conducted by Lazard of financing fees for large bridge financing transactions since 2014, the terms are consistent with (or better than) those for similarly large, complex transactions. I believe that the Backstop Debt Fees were the subject of arms'-length and good faith negotiations between the Debtors and the Initial Backstop Debt Commitment Parties, are integral components of the overall terms of the Debt Commitments, were required by the Initial Backstop Debt Commitment Parties as consideration for the extension of the Debt Commitments and are reasonable under the circumstances, including the unique timing requirements of these Chapter 11 Cases.

29. I believe the Equity Backstop Commitments and the Debt Commitments align the incentives of the Debtors with those of leading financial institutions in favor of the ultimate success of the Debtors' Plan of Reorganization. These financial institutions have committed significant capital to ensure the viability of the Debtors' Plan of Reorganization and I believe therefore have an interest in seeing it through to completion. I believe these commitments also enhance the confidence of claimants, financial creditors, equityholders, ratepayers and other stakeholders that the Debtors will timely emerge from chapter 11 as a financially sound utility.

1 | I declare under penalty of perjury that, to the best of my knowledge and after
2 | reasonable inquiry, the foregoing is true and correct.

Dated: January 3, 2020

_____
Kenneth S. Ziman