Dennis F. Dunne (admitted *pro hac vice*)
Samuel A. Khalil (admitted *pro hac vice*)
MILBANK LLP
55 Hudson Yards
New York, New York 10001-2163
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

and

Gregory A. Bray (SBN 115367)
Thomas R. Kreller (SBN 161922)
MILBANK LLP
2029 Century Park East, 33rd Floor
Los Angeles, California 90067
Telephone: (424) 386-4000
Facsimile: (213) 629-5063

*Counsel for the Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>\* *All papers shall be filed in the Lead Case, No. 19-30088 (DM)*. | Case No. 19-30088 (DM)<br><br>Chapter 11<br><br>(Lead Case)<br><br>(Jointly Administered)<br><br>**RESPONSE AND RESERVATION OF RIGHTS OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' AND AD HOC SUBROGATION GROUP'S JOINT BRIEF IN SUPPORT OF THE SUBROGATION WILDFIRE CLAIMS AS IMPAIRED CLASSES FOR ALL PURPOSES UNDER THE DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**<br><br>Date: January 29, 2020<br>Time: 10:00 a.m. (Pacific Time)<br>Place: United States Bankruptcy Court<br>Courtroom 17, 16th Floor<br>450 Golden Gate Avenue<br>San Francisco, CA 94102<br><br>Re: Docket Nos. 4540, 4897, 4886 & 5173 |

In accordance with the Court's *Order Establishing Pre-Confirmation Briefing and Hearing*

*Schedule for Certain Legal Issues* (the "Briefing Order") [Docket No. 4540], the Official Committee of Unsecured Creditors (the "UCC") appointed in the chapter 11 cases of the above-captioned debtors (the "Debtors") filed a statement and reservation of rights on November 27, 2019 (the "Initial ROR") with respect to "whether HoldCo Subrogation Wildfire Claims or Utility Subrogation Wildfire Claims that are settled and allowed as provided in the Subrogation Claims Settlement . . . are impaired for chapter 11 plan purposes." See Docket No. 4897. Among other things, the Initial ROR stated that any briefing by the UCC on the Subrogation Claim Impairment Issue (as defined in the Briefing Order) would be premature prior to the Court rendering a final decision on the RSA Motion.

On December 19, 2019, the Court approved the RSA Motion. See Docket No. 5173. As now approved, it is the restructuring support agreement (the "Subro RSA")[1]—not the Debtors' anticipated plan of reorganization (the "Debtors' Plan")—that both allows the claims of the Subrogation Claimants and mandates their treatment. The Debtors' Plan merely affords the Subrogation Claimants the very bundle of rights they bargained for and obtained under the Subro RSA. Because the Debtors' Plan does not alter or modify any of those rights in any way, the Subrogation Claims are not impaired under the Debtors' Plan as presently proposed.

In their *Joint Brief in Support of the Subrogation Wildfire Claims as Impaired Classes for all Purposes Under the Debtors' Joint Chapter 11 Plan of Reorganization* [Docket No. 4886], the Debtors and the Subrogation Claimants (together, the "Settlement Proponents") argue that the concessions made by the Subrogation Claimants in the Subro RSA amount to impairment under the Debtors' Plan, but the Subro RSA makes it clear that the Subrogation Claimants bargained away the rights at issue when they signed the Subro RSA and that their decision to do so was ***not*** contingent upon confirmation of the Debtors' Plan. Specifically:

---

[1] Capitalized terms not defined herein have the meanings ascribed to them in the Subro RSA.

- The Subro RSA *immediately* grants the Subrogation Claimants an allowed $11 billion claim *for all purposes* in these cases;

- The allowance of the Subrogation Claims at $11 billion expressly is not contingent on confirmation of the Debtors' Plan, because that allowance *expressly survives* termination of the Subro RSA, even when that termination occurs because the Debtors' Plan is *not* confirmed;

- While the Settlement Proponents try to blur the line between the effects of the Subro RSA and the Debtors' Plan by suggesting that there is a variety of circumstances under which the allowance of the Subrogation Claims may be unwound, the truth is that the *sole* instance where this unwinding is in the Debtors' control is the termination of the Subro RSA as a result of the Subrogation Claimants' breach thereof. Otherwise, the right to unwind the claim allowance rests solely with the **Subrogation Claimants**, who reserved for themselves the ability to opt out of the settlement (Subro RSA § 5(f)(iii)(D)); and

- The Settlement Proponents point to the Subro RSA provision that allows the Debtors to file a plan that diverges from the terms of the Subro RSA in the event the Debtors are insolvent. But even in that circumstance, the allowance of the Subrogation Claims survives for all purposes and remains binding on all parties unless *the Subrogation Claimants* decide otherwise.

In short, the now Court-approved Subro RSA establishes, many months in advance of confirmation and on a virtually irrevocable basis *vis a vis* the Debtors, the respective rights and obligations of the Debtors and the Subrogation Claimants with respect to the Subrogation Claims: in exchange for the allowance "for all purposes" of the $11 billion Subrogation Claims, the Subrogation Claimants agreed to the treatment of those claims as specified in the Subro RSA. As proposed, the Debtors' Plan does not alter or modify those bargained-for rights in any manner. It is the Subro RSA, not the Debtors' Plan, that "did the work" here to modify the rights of the Subrogation Claimants. Accordingly, as long as the Debtors honor their Court-approved obligations under the Subro RSA, the Subrogation Claims are not impaired.

**I. The Subrogation Claims Are Unimpaired Under the Debtors' Plan Because the Debtors' Plan Provides the Subrogation Claimants with Precisely the Rights for Which the Subrogation Claimants Bargained in the Subro RSA.**

The Subro RSA leaves no doubt that the Settlement Proponents' intent was that the settlement would be effective immediately upon its approval by the Court. See Subro RSA § 27

("this Agreement shall be effective and binding on all Parties upon (a) execution and delivery of signature pages to the Company of Consenting Creditors . . . and (b) entry of the RSA Approval Order.").

Furthermore, the Subro RSA is unambiguous that the agreed-upon allowance of the Subrogation Claims is to be "for all purposes" and "binding on all parties:"

- Subro RSA § 4: "The Parties agree to settle the Subrogation Claims for an aggregate allowed claim amount of $11 billion pursuant to Bankruptcy Rule 9019 (the "Allowed Subrogation Claim Amount"). *The Allowed Subrogation Claim Amount, shall be binding the Chapter 11 Cases, and shall survive termination of this Agreement,* except as otherwise expressly provided in this Agreement";

- Subro RSA § 5(b): "For the avoidance of doubt, following a termination pursuant to this Section 5(b) [Automatic Termination] *the Allowed Subrogation Claim Amount shall be binding in the Chapter 11 Cases, and shall survive termination of this Agreement*";

- Subro RSA § 5(e)(ii): "For the avoidance of doubt, following a termination pursuant to this Section 5(e)(ii), unless otherwise ordered by a court of competent jurisdiction or governmental entity, *the Allowed Subrogation Claim Amount shall be binding in the Chapter 11 Cases, and shall survive such termination of this Agreement*, subject to the right of the Requisite Consenting Creditors to deliver an Allowance Termination Notice as set forth above"; and

- Subro RSA § 5(f)(iii)(D): "[A]bsent the delivery of an Allowance Termination Notice, the occurrence of an Insolvency Termination, or termination by the Debtors of this Agreement in accordance with Section 5(e)(i) hereof, *the Allowed Subrogation Claim Amount, and each holder's share thereof, shall remain an allowed claim and binding in these Chapter 11 Cases even if a Debtor is in breach of this Agreement*."

The net result of these provisions is that the only circumstance under which the allowance of the Subrogation Claims can be unwound are upon a decision *by the Subrogation Claimants* to terminate the Subro RSA or a decision by the Debtors to terminate only as a result of a breach by the Subrogation Claimants.

On December 19, 2019, the Court entered its order approving the Subro RSA (the "Subro RSA Order"). See Docket No. 5173. The Subro RSA Order further reinforces the immediate effects of the Subro RSA:

> The Subrogation Claims are hereby allowed in the aggregate amount of $11 billion. The allowance of the Subrogation Claims in the aggregate as set forth herein shall be binding in the Chapter 11 Cases (including following conversion to cases under chapter 7 of the Bankruptcy Code or appointment of a chapter 7 or chapter 11 trustee) ***for all purposes including following termination or annulment of the [Subro] RSA***, except as expressly set forth in the [Subro] RSA.

Subro RSA Order ¶ 7 (emphasis added).

The terms of the Subro RSA and the Subro RSA Order make clear that when the Court approved the Subro RSA, the parties' rights and obligations with respect to the Subrogation Claims were fixed as consensually altered. The parties had agreed upon—and the Court allowed—the $11 billion in Subrogation Claims. The parties had further agreed, with the Court's approval, that: (a) the Debtors would be obligated to treat the Subrogation Claims as provided in the Subro RSA, and (b) so long as the Subro RSA remained in effect, the rights the Subrogation Claimants had on account of the Subro RSA were defined by that agreement. While the Debtors' ability to implement the agreed-upon treatment through the ultimate distributions was necessarily conditioned upon the confirmation and effectiveness of a plan, the parties' rights with respect to enforcement of the Subrogation Claims and their treatment were effectively settled. As long as the Debtors abide by the Subro RSA and confirm a plan that conforms therewith, the rights of the Subrogation Claimants that were fixed when the Subro RSA Order was entered will be fully respected—and therefore unimpaired.

Ignoring this reality, the Debtors' Plan classifies the Subrogation Claims as impaired and gives the Subrogation Claimants the right to vote. This obvious ploy to try to ensure that the Debtors are able to obtain at least one impaired accepting class for the Debtors' Plan, however, is contrary to the well-established principle that claims that are settled pre-confirmation are not impaired as long as the settlement terms are honored under a subsequently confirmed plan.

In re Drexel Burnham Lambert Grp., 130 B.R. 910 (S.D.N.Y. 1991) ("Drexel I"), aff'd, 960 F.2d 285 (2d Cir. 1992) ("Drexel II"), is particularly instructive. The Drexel debtors filed for

bankruptcy protection following a settlement of a massive securities fraud litigation, which required the creation of a $350 million fund to be administered by the SEC for the benefit of the holders of securities litigation claims against Drexel (the "SEC Fund"). Drexel I, 130 B.R. at 913. After funding only $200 million of the SEC Fund, Drexel filed for bankruptcy protection. Id. Postpetition, in light of the impracticability of estimating tens of thousands of individual securities litigation claims, with the strong encouragement of the District Court (which had withdrawn the reference with respect to the estimation of these claims), the Drexel debtors, the SEC and representatives of securities litigation claimants negotiated a settled estimation of the securities litigation claims (the "Postpetition Settlement") to be effectuated through a plan of reorganization on agreed terms (the "Drexel Plan").

Pursuant to the Postpetition Settlement, the Drexel debtors agreed to fund the remaining $150 million into the SEC Fund, and all securities litigation claims were to be channeled to the SEC Fund to be satisfied pursuant to complex procedures the parties agreed to (with no recourse to the estates). Drexel II, 960 F.2d at 288. Eight securities litigation claimants objected to the Postpetition Settlement and asserted that their claims were impaired by the Drexel Plan. Id. at 289.

The District Court both approved the Postpetition Settlement and ruled that the claims of the objectors were not impaired by the Drexel Plan. Drexel I, 130 B.R. at 928. Specifically, the District Court held that: (i) once finally approved, the Postpetition Settlement will "establish the legal, equitable and contractual rights" of all securities litigation claimants, and (ii) the Drexel Plan gives the securities litigation claimants "precisely the consideration the [Postpetition] Settlement establishes to be the collective rights of the Class, thereby leaving the Class unimpaired." Id.

The Second Circuit affirmed, agreeing with the District Court's finding that it was the Postpetition Settlement that established the rights of the securities litigation claimants, while the Drexel Plan "would not alter or otherwise infringe the class members' rights," thus leaving them

6

Case: 19-30088    Doc# 5342    Filed: 01/10/20    Entered: 01/10/20 14:37:21    Page 6 of 9

"unimpaired within the meaning of 11 U.S.C. § 1124(1)." Id. at 290. Accord In re SM 104 Ltd., 160 B.R. 202, 215 n.25 (Bankr. S.D. Fla. 1993) (explaining that, where the claimant's rights had been modified by a settlement, and the plan simply incorporated the settlement's terms, the claim was unimpaired).

Indeed, as the Settlement Proponent themselves point out, in In Matter of Wabash Valley Power Ass'n., 72 F.3d 1305 (7th Cir. 1996), the Seventh Circuit has made a distinction between claims that have been finally settled *prior to* confirmation (these are unimpaired when a plan simply implements the settlement terms) and those whose settlement is *contingent on* plan confirmation (these are impaired). See id. at 1310, 1321 (finding claim impaired where the settlement provided that the future plan "shall allow" it in a certain amount, but stating that where "a claim has been settled prior to confirmation of a reorganization plan . . . confirmation . . . leaves the parties' rights unaffected."). Accord In re Lower Bucks Hosp., 471 B.R. 419, 457 (Bankr. E.D. Pa. 2012) (finding a settlement to be "inextricably linked" to the plan where its enforceability was expressly contingent on the occurrence of the plan's effective date); In re Save Our Springs (S.O.S.) Alliance, Inc., 388 B.R. 202, 239 (Bankr. W.D. Tex. 2008) (finding claim to be impaired where its settlement was "contingent upon confirmation").

## II. The Debtors' Attempts to Obfuscate the Immediate and Practically Irrevocable Effects of the Subro RSA Are Belied by the Very Terms of that Agreement.

Ignoring the clear import of the rights that were cemented when the Court approved the Subro RSA – and especially the fact that the allowance of the Subrogation Claims expressly survives even if the Debtors' Plan is *not* confirmed, the Settlement Proponents assert that "the Subrogation Claims Settlement is plainly *conditioned on*, and *inextricably intertwined with*, confirmation and consummation of the Debtors' Plan," and that "under certain circumstances, there is no requirement to pay the $11 billion Allowed Claim Amount in cash, and/or the Allowed Claim Amount no longer would be binding on anyone in the Chapter 11 Cases. See RSA §§

7

2(a)(ii)-(iii), 3(a)(i), 4, 5(c). Debtors' Brief at 14 (Docket No. 4886) (emphasis added).

However, the specific Subro RSA provisions they cite in support of these assertions in no way make the Subro RSA conditioned or otherwise dependent on the confirmation of the Debtors' Plan (in fact, they have the opposite effect):

- Sections 2(a)(ii)-(iii) merely require the Subrogation Claimants to affirmatively vote in favor of the Debtors' Plan, with a carve-out in the event the Debtors pivot to a different plan;

- Section 3(a)(i) merely requires the Debtors to file the Debtors' Plan with a carve-out that permits the Debtors to deviate from the Subro RSA if they are insolvent (but does not unwind the allowance of the Subrogation Claims);

- Section 4 simply provides for the allowance of the Subrogation Claims in the amount of $11 billion and states that: "[t]he Allowed Subrogation Claim Amount shall be binding in the Chapter 11 Cases, and shall survive termination of this Agreement, except as otherwise expressly provided in this Agreement" (*i.e.*, subject solely to the Subrogation Claimants' limited election rights); and

- Section 5(c) provides that the Allowed Subrogation Claim Amount will survive termination of the Subro RSA unless the Subrogation Claimants elect otherwise.

Furthermore, the litany of the various ways in which the Debtors' Plan allegedly "alters the legal, equitable, or contractual rights of holders of Subrogation Wildfire Claims," *i.e.*, the substitution of the Subrogation Wildfire Trust as the new obligor, the non-payment of postpetition interest on the Allowed Subrogation Claim Amount, and a delay in the distribution, changes nothing. By agreeing to the Subro RSA, the Subrogation Claimants have agreed to **all** of the settlement terms, including those they list as supposedly indictive of "impairment." The fact that the plan simply incorporates the terms the parties have previously agreed to does not transform the alteration of rights through their settlement agreement into a plan impairment. See, e.g., Drexel I, 130 B.R. at 928 (where the reorganization plan gives the claimants "precisely the consideration the Settlement establishes to be the[ir] collective rights," the plan does not impair their claims); In re SM 104 Ltd., 160 B.R. at 215 n.25 ("The fact that the plan purports to incorporate [the settlement terms] is irrelevant. The plan merely confirms the [settled terms] and in no way alters any rights"

set forth in the settlement agreement).

Based on all of the foregoing, given that the Subrogation Claims have already been allowed for all purposes in these cases regardless of whether the Debtors' Plan is ultimately approved, the Subrogation Claims are clearly unimpaired.

III.     **UCC Reservation of Rights.**

The UCC continues to challenge the Debtors' position that the Subrogation Claims are impaired. However, to the extent the Court holds otherwise, the UCC respectfully submits that any impairment determination should be expressly limited to the Subro RSA as approved by the Court and the Debtors' Plan as currently on file. To the extent the Subro RSA or the applicable provisions of the Debtors' Plan are modified, the UCC reserves its rights to ask the Court to revisit the Subrogation Claim Impairment Issue under then-applicable facts.

Dated: January 10, 2020

**MILBANK LLP**

*/s/ Thomas R. Kreller*
DENNIS F. DUNNE
SAMUEL A. KHALIL
GREGORY A. BRAY
THOMAS R. KRELLER

*Counsel for the Official Committee of Unsecured Creditors*