**DIEMER & WEI, LLP**
Kathryn S. Diemer (#133977)
100 West San Fernando Street, Suite 555
San Jose, CA 95113
Telephone: 408-971-6270
Facsimile: 408-971-6271
Email: kdiemer@diemerwei.com

**WILLKIE FARR & GALLAGHER LLP**
Matthew A. Feldman (*pro hac vice*)
Joseph G. Minias (*pro hac vice*)
Benjamin P. McCallen (*pro hac vice*)
Daniel I. Forman (*pro hac vice*)
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email: mfeldman@willkie.com
       jminias@willkie.com
       bmccallen@willkie.com
       dforman@willkie.com

*Counsel for Ad Hoc Group of Subrogation Claim Holders*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re:<br><br>**PG&E CORPORATION,**<br><br>　　-and-<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br>　　　　　　Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☑ Affects both Debtors<br><br>* *All papers shall be filed in the lead case, No. 19-30088 (DM)* | Chapter 11<br>Bankr. Case No. 19-30088 (DM)<br>(Jointly Administered)<br><br>**OBJECTION OF THE AD HOC GROUP OF SUBROGATION CLAIM HOLDERS TO THE MOTION OF THE AD HOC COMMITTEE OF SENIOR UNSECURED NOTEHOLDERS FOR RECONSIDERATION AND RELIEF FROM ORDERS PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 59(e) AND 60(b)**<br><br>Date:　　January 21, 2020<br>Time:　　10:00 a.m. (Pacific Time)<br>Place:　　United States Bankruptcy Court<br>　　　　　Courtroom 17, 16th Floor<br>　　　　　San Francisco, CA 94102 |

# TABLE OF CONTENTS

|  | Page |
|---|---|
| OBJECTION | 1 |
| ARGUMENT | 3 |
|    I. There is no "newly discovered evidence" that justifies relief under FRCP 59 or 60. | 3 |
|    II. Granting the Bondholders' Motion Would Threaten Progress, Ensure Litigation and Jeopardize the Timeline for Confirming a Plan by June 30, 2020 | 8 |
|    III. The Bondholders Present No Basis at All for Reconsidering the Subrogation RSA | 10 |
| CONCLUSION | 10 |

# TABLE OF AUTHORITIES

**Cases**                                                            **Page(s)**

*Allied Prof'ls Ins. Co. v. Anglesey*,
 No. 14-cv-00665 (CBM/SH), 2015 WL 13449659 (C.D. Cal. Nov. 25, 2015)...................3

*Contempo Metal Furniture Co. of California v. East Texas Motor Freight Lines, Inc.*,
 661 F.2d 761 (9th Cir. 1981) ......................................................................................................6

*Corex Corp. v. United States*,
 638 F.2d 119 (9th Cir. 1981) ......................................................................................................4

*Fantasyland Video, Inc. v. County of San Diego*,
 505 F.3d 996 (9th Cir. 2007) ......................................................................................................4

*Harvest v. Castro*,
 531 F.3d 737 (9th Cir. 2008) ...............................................................................................4, 7

*Hawaii Stevedores, Inc. v. HT & T Co.*,
 363 F. Supp. 2d 1253 (D. Haw. 2005) ......................................................................................6

*Jones v. Aero/Chem Corp.*,
 921 F.2d 875 (9th Cir. 1990) ......................................................................................................3

*Latshaw v. Trainer Wortham & Co.*,
 452 F.3d 1097 (9th Cir. 2006) ....................................................................................................4

*Meyer v. Lenox (In re Lenox)*,
 902 F.2d 737 (9th Cir. 1990) ......................................................................................................7

*Phelps v. Alameida*,
 569 F.3d 1120 (9th Cir. 2009) ....................................................................................................4

*Saxena v. Abud (In re Nabilsi Yunes Abud)*,
 BAP No. CC-14-1444-KuPeTa, 2015 Bankr. LEXIS 2984
 (B.A.P. 9th Cir. Sep. 3, 2015) ....................................................................................................4

*Sch. Dist. No. 1J v. ACandS, Inc.*,
 5 F.3d 1255 (9th Cir. 1993) ........................................................................................................3

*Shoen v. Shoen*,
 933 F. Supp. 871 (D. Ariz. 1996) ..............................................................................................4

*United States v. Washington*,
 98 F.3d 1159 (9th Cir. 1996) ......................................................................................................4

The Ad Hoc Group of Subrogation Claim Holders (the "**Ad Hoc Subrogation Group**") in the above-captioned chapter 11 cases of PG&E Corporation and Pacific Gas and Electric Company (collectively, the "**Debtors**"), by its attorneys Willkie Farr & Gallagher LLP and Diemer & Wei, LLP, hereby objects (the "**Objection**") to the *Motion of the Ad Hoc Committee of Senior Unsecured Noteholders (the "**Bondholders**") for Reconsideration and Relief from Orders Pursuant to Federal Rules of Civil Procedure 59(e) and 60(b)* [Docket No. 5241] (the "**Motion**").[1] In support of this Objection, the Ad Hoc Subrogation Group respectfully represents as follows:

## OBJECTION

The standard for reconsideration of a Court order in the 9th Circuit is well-established and strict. It requires the presentation of newly-discovered evidence that was in existence at the time of the Court order but was not known by the Court, which otherwise would have affected the disposition of the issue. There is no such new evidence presented to the Court through this Motion. Instead, the Bondholders seek to portray their conscious, strategic decision to wait until after the Court approved the RSAs to announce their intention to amend their plan as "new evidence." But the terms of the Bondholder plan, and the timing of their offers, were and have always been under their control. Thus, the Motion is nothing more than an attempted do-over, founded on post-hearing "developments" solely of their own making, impermissibly cloaked as a motion for reconsideration under Federal Rules of Civil Procedure 59 and 60.

All of the evidence and arguments the Bondholders put forward in their Motion were already presented to, and considered by, this Court in connection with its approval of the RSAs. The "lock up" provisions the Bondholders seek to unwind specifically were discussed at length in the briefing and oral argument at the December 17 hearing. Counsel for the settling parties explained why these provisions were a necessary part of reaching a deal with the Debtors and equity. The parties and Court understood at that time that the terms of the competing Bondholder plan could change in the future and that the lock up provisions nevertheless would require the RSA

---

[1] Capitalized terms used but not defined shall have the meanings ascribed in the Motion.

parties to support the Debtors' plan. In fact, the Bondholders explicitly stated that they may amend their proposed plan depending on the Court's decision with respect to the Subrogation RSA. *See* Bondholders' Joint Chapter 11 Plan at 10 n.1 [Docket No. 4257] ("The terms set forth in this Plan relating to the Subrogation RSA…are subject to change based on the Bankruptcy Court's disposition of the Debtors' motion to approve the Subrogation Claims RSA…."). Those parties agreed to the RSAs (and the Court approved them) because the trade-off was a part of a global resolution of all disputes between the Debtors and the only impaired classes in these cases, which would maximize claimant recoveries, eliminate wasteful litigation and fees, and move these cases on a straight line towards confirmation before A.B. 1054's June 30, 2020 deadline. The Bondholders have come nowhere near meeting their burden of demonstrating that the Court's December 19 orders approving the subrogation and individual wildfire victim RSAs should be disturbed.

The thrust of the Bondholders' argument is that dismantling the RSAs to remove one provision — the lock up provision, which is standard in plan support agreements — would purportedly increase competition. As an initial matter, that argument already was carefully considered by the Court after extensive briefing and argument on the RSAs, and was rejected. Moreover, that argument soft pedals the consequences of a reversal of the Court's prior determination. Among other things, the Debtors would have the right to terminate the RSAs and restart estimation, which would now include the highly-contentious Tubbs fire (the Tubbs-related state court trial dates having been vacated), only adding to the length and complexity of any estimation proceedings. Indeed, without the RSAs, these cases will be thrown back to the state they were in months ago, with all parties litigating all of the issues that were resolved by those settlements — except that there will be less time within which to resolve that revived litigation within the constraints of A.B. 1054. It is not "competition" the Bondholders offer the Court, it is chaos.

The Bondholders attempt to brush aside the disruption that would result if their Motion were granted by arguing that Judge Donato already has decided to estimate wildfire claims at their RSA

settlement value and, in any event, that he has removed the matters from his calendar, so there is no real threat of estimation proceedings. These arguments fail for several reasons. First, the import of Judge Donato's comments was presented and considered at the December 17 hearing. The Debtors and the Bondholders disagree about the course the estimation proceedings would take absent the RSAs, but regardless of how Judge Donato ultimately rules, no Court can strip the Debtors of their right to demand estimation and to contend (based on, among other things, the language of the RSAs and Federal Rule of Evidence 408) that the settlement amounts set forth in the RSAs may not be considered for purposes of estimation. Second, if Judge Donato is unavailable to hear the estimation proceeding promptly, as the Bondholders threaten, the consequence will not be estimation without a trial — rather, it will be estimation too late to comply with A.B. 1054. (Judge Donato Dec. 17 Hr'g Tr. at 10:8-9) ("…I will not have you in by June 30th."). The estimation proceedings and Tubbs trial schedules that were carefully crafted to comply with A.B. 1054 have already been lost due to those proceedings being removed from their respective calendars, which was done in reliance on the orders approving the RSAs. This was foreseeable and anticipated by all parties when the approval of the RSAs was before this Court in the first instance. The Bondholders should not be allowed to manipulate that fact in their favor.

The Debtors have achieved significant progress by settling the claims of the only two impaired creditor classes, putting them on track to meet the timetable established by A.B. 1054, and compensating the wildfire victims fairly. Those achievements should not be put at risk. The Motion should be denied.

## ARGUMENT

*I.    There is no "newly discovered evidence" that justifies relief under FRCP 59 or 60.*

Bankruptcy courts may grant a motion pursuant to Federal Rule of Civil Procedure 59(e) or 60—which are explicitly incorporated into the Federal Rules of Bankruptcy Procedure by Bankruptcy Rules 9023 and 9024, respectively—under limited circumstances, including if they are presented with "newly discovered evidence." *Sch. Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993). Motions for reconsideration on the basis of newly discovered evidence are

3

reviewed under the same standard whether they are made under Rule 59(e) or Rule 60(b)(2). *Jones v. Aero/Chem Corp.*, 921 F.2d 875, 878 (9th Cir. 1990); *Allied Prof'ls Ins. Co. v. Anglesey*, No. 14-cv-00665 (CBM/SH), 2015 WL 13449659, at *3 n.1 (C.D. Cal. Nov. 25, 2015). Under both Rules, the newly discovered evidence must have been in existence at the time of the initial ruling – it cannot be evidence related to events that occur after the issue is decided. *Corex Corp. v. United States*, 638 F.2d 119, 121 (9th Cir. 1981) ("Cases construing 'newly discovered evidence,' either under 60(b)(2) or Rule 59, uniformly hold that evidence of events occurring after the trial is not newly discovered evidence within the meaning of the rules."); *see also Fantasyland Video, Inc. v. County of San Diego*, 505 F.3d 996, 1005 (9th Cir. 2007).

Furthermore, courts have discretion to grant a motion for reconsideration under Rule 60(b)(6) when "any other reason justifies relief," but only in extraordinary circumstances. The Ninth Circuit has held that Rule 60(b)(6) relief is to be used "sparingly" and that cases exhibiting the type of "extraordinary circumstances" necessary to justify this relief are "rare." *United States v. Washington*, 98 F.3d 1159, 1163 (9th Cir. 1996); *see also Shoen v. Shoen*, 933 F. Supp. 871, 875-876 (D. Ariz. 1996) (collecting cases for the proposition that Courts of Appeal disfavor Rule 60(b) motions).

Notably, a party seeking relief under Rule 60(b)(6) must show there are extraordinary circumstances "beyond the movant's control." *Saxena v. Abud (In re Nabilsi Yunes Abud)*, BAP No. CC-14-1444-KuPeTa, 2015 Bankr. LEXIS 2984, at*10 (B.A.P. 9th Cir. Sept. 3, 2015); *Harvest v. Castro*, 531 F.3d 737, 749 (9th Cir. 2008); *Latshaw v. Trainer Wortham & Co.*, 452 F.3d 1097, 1102-03 (9th Cir. 2006). The Ninth Circuit has specifically stated that "Rule 60(b)(6) relief is less warranted when the final judgment being challenged has caused one or more of the parties to change his legal position in reliance on that judgment." *Phelps v. Alameida*, 569 F.3d 1120, 1138 (9th Cir. 2009).

Here, the Bondholders do not come close to satisfying the test for relief on the basis of *newly discovered evidence*. *First*, their all-cash proposal was not in existence at the time the orders

4

were announced or entered, thus it has not been (and could not be) recently "discovered."[2]  In fact, the current circumstances are solely a matter of the Bondholders' creation: the reason their offer was not previously known was because they waited to make it until after they knew the results of the RSA hearing.[3]

The proposition upon which the Motion is premised — that the Bondholders did not know the TCC would have preferred an all-cash deal until the December 17 hearing — is simply not credible.  Everyone was aware of the TCC's preference for cash well before the hearing to approve the RSAs, as the TCC stated this preference repeatedly in the months leading up to the RSAs being signed and approved.  In the TCC's October 16 objection to the Subrogation RSA, they argued that the subrogation settlement should be rejected because it "pays $11 billion in cash to subrogation claimants while the Fire Victims' trust is funded with stocks, bonds, or other non-cash alternatives."  TCC Objection at 1:14-15 [Docket No. 4232].  Then again at the November 19 hearing, counsel for the TCC stated on the record that if the Subrogation RSA were disapproved the "case will resolve promptly" because under the terms of the settlement "[t]hey took the cash."  Nov. 19 Hr'g Tr. at 12:17-23.

There is also nothing "new" about the challenges to the lock up provisions that the Bondholders repeat in the Motion.  The effect that the lock up provisions could have on future plan negotiations was at the forefront of the arguments over whether the Court should approve the RSAs, as reflected by comments to this Court by one of the lead counsel for the individual wildfire victims in the Tubbs trial:

---

[2] The Bondholders have not in fact put forth any comprehensive proposal worthy of consideration — they have not (i) disclosed their plan financing or commitment letters; (ii) identified the revised treatment for subrogation claimants; or (iii) even filed a formal term sheet or an amended plan that incorporates their cash "proposal" to the individual wildfire victims — and the Bondholders have lost the only other party that supported their plan when the TCC settled with the Debtors.

[3] The Ad Hoc Subrogation Group has served discovery requests on the Bondholders concerning the precise timing of when the Bondholders considered making their revised offer.  The Ad Hoc Subrogation Group's 30(b)(6) deposition of the Bondholders in connection with the Motion, scheduled for the afternoon of January 14, was adjourned following the adjournment of the proceedings then presently before the Court.  The Ad Hoc Subrogation Group reserves its right to supplement the Objection following the continuation of the deposition and as new information comes to light, including at the hearing on the Motion.

5

> MR. PITRE: This deal was not going forward without a lock up . . . without that provision, we were going to trial on Tubbs . . . this was the best deal that could be cut, with a lock up. And there is no doubt in my mind over that. None….
>
> THE COURT: You're of the opinion that the alternative plan, which in many respects, has the same economic outcome, is still subject to these other kinds of concerns that motivates you. And you…believe that it's the right outcome, and you will be recommending it to these hundreds and thousands of victims…?
>
> MR. PITRE: I would be the first person to answer your question directly, yes.
>
> THE COURT: …again, this whole day isn't about whether 13.5 should be 14.5 or 12.5, it's about this lock up. As I say, there don't appear to be any real challenges to the economics of this settlement, not even from the governor's point of view.
>
> MR. PITRE: You are correct. We understood the lock up….

Dec. 17 Hr'g Tr. at 243:4-247:17. The lock up provisions were also the primary focus of the opposition to the RSAs of the Bondholders and the UCC at the December 17 hearing. *See* Dec. 17 Hr'g Tr. at 190:11-12, 191:8-10, 194:1-7, 202:8-11, 205:15-17, 280:2-6. Even the ability of the individual wildfire victims to evaluate an all-cash offer was already considered by the Court when the argument was raised by the Bondholders at the December 17 hearing. (Dec. 17 Hr'g Tr. at 278:7-9) (MR. STAMER: "if the torts want more cash, our plan as it exists proposes more cash. But if they want more cash, it should be a competitive process."). In sum, all of these issues were presented to the Court previously. Rearguing the same objection presented prior to the Court's decision to approve the RSAs is insufficient grounds to grant a motion to reconsider. *Hawaii Stevedores, Inc. v. HT & T Co.*, 363 F. Supp. 2d 1253, 1269 (D. Haw. 2005) ("Mere disagreement with a previous order is an insufficient basis for reconsideration . . ." and ". . . reconsideration may not be based on evidence and legal arguments that could have been presented at the time of the challenged decision."). In the present case the majority of the Bondholders' arguments in support of reconsideration not only could have been argued in opposition to the original approval, they were in fact argued and rejected by the Court.

*Second*, not only do the Bondholders fail to present anything "new," the revised proposal

also is not even "evidence." The Bondholders tacitly acknowledge that they have no new evidence by repeatedly characterizing the basis for the Motion as "new developments" rather than "new evidence." But the law requires evidence that the Court could have heard previously, not new factual developments. For example, in *Contempo Metal Furniture Co. of California v. East Texas Motor Freight Lines, Inc.*, 661 F.2d 761 (9th Cir. 1981), a furniture manufacturer sued a freight company for delivering damaged products. After plaintiff was awarded damages at trial, the defendant filed a motion for relief under Rule 59, arguing that, after trial, plaintiff had destroyed the subject goods, preventing defendant from selling them and mitigating damages. *Id.* at 767. The district court denied the motion and the Ninth Circuit affirmed on appeal. The Ninth Circuit explained that for a Rule 59 motion to be granted, "the newly discovered evidence must be of facts existing at the time of trial." *Id.* at 766. In other words, facts about new developments occurring after adjudication do not justify reconsideration.

Even the "developments" cited by the Bondholders fail to be concrete. All that the Bondholders have done is send a letter to Governor Newsom with an informal term sheet, which contains no detail on the treatment of the subrogation claims, and no detail on the management of the wildfire victim trust — which was a critical component of the TCC RSA. Indeed, as of the time of this Objection — *six weeks* after the TCC signed the RSA, *one month* after the RSA hearings, *over three weeks* after the Bondholders publicized their new proposal to wildfire victims and their letter to the Governor with much fanfare, and *two weeks* after the Motion — the Bondholders still have not filed an amended plan.

*Finally*, the Bondholders' unilateral decision to change a provision of their plan does not constitute the "extraordinary circumstances" necessary for reconsideration under Rule 60(b)(6) or Rule 59 — such changes have occurred multiple times throughout the course of these chapter 11 cases with respect to both the Bondholders' and Debtors' proposed plans. The decision of whether to offer individual wildfire victims an all-cash recovery prior to the hearing on the RSAs and then to make such an offer only after the hearing was completely within the Bondholders' control and therefore not grounds for granting the Motion. *Harvest v. Castro*, 531 F.3d at 749 (holding that a

7

movant's failure to take action at an earlier time could not constitute "circumstances beyond its control"). This is particularly true where other parties have taken action in reliance on the approval of the RSAs — *e.g.* staying the estimation proceedings and Tubbs trial — and it would be prejudicial to vacate those orders because it would risk non-compliance with the June 30 deadline. *Meyer v. Lenox (In re Lenox)*, 902 F.2d 737, 739-40 (9th Cir. 1990) (holding that bankruptcy courts "have the power to reconsider, modify or vacate their previous orders so long as no intervening rights have become vested in reliance on the orders"). At the end of the day, the Bondholders are seeking relief from their own tactical judgment (*i.e.* waiting until after the ruling on the RSAs to revise their proposal), which they now regret. Such relief is not the function of Rule 59 or 60.

    II. *Granting the Bondholders' Motion Would Threaten Progress, Ensure Litigation and Jeopardize the Timeline for Confirming a Plan by June 30, 2020*

The underlying premise of the Motion is that granting the Motion will foster competition and ultimately benefit all claimholders. Competition should be directed towards a plan process — not more strategic litigation. The Bondholders' request that the Court vacate its order approving the Subrogation RSA so that the Bondholders can "negotiate" with the holders of subrogation claims is Kafkaesque. When the Ad Hoc Subrogation Group served discovery on the Bondholders with respect of their Motion, the Bondholders refused to produce documents reflecting, and indicated that their deponent would not testify regarding, how they intend to treat the Subrogation Group, despite the fact that they also seek to unwind the Subrogation RSA through their Motion. It is clear that the "competition" the Bondholders seek to foster is a standoff between a Debtor plan with the support of subrogation claimants and equity, and what they hope will be a Bondholder plan supported by the Bondholders and individual wildfire claimants — in other words, exactly the state of affairs that existed two months ago.

While the approved RSAs offer a straight-line path to confirmation and compliance with A.B. 1054, reconsideration promises only to reverse the substantial progress made over the past few months. This will manifest itself most significantly in the litigation likely to be spawned by a granting of the Motion:

- **Resumption of Estimation Litigation**. If the Motion is granted, and the Debtors lose the critical, negotiated, "locked-in" global consensus, the Debtors and equity will proceed with renewed estimation proceedings, which significantly increases the risk of the Debtors' insolvency.

- **The Debtors' Inability to Satisfy the A.B. 1054 Deadline**. The Bondholders concede that Judge Donato's calendar may not be able to accommodate an estimation trial in the coming months. Thus, the granting of the Motion would significantly increase the likelihood that the Debtors would be unable to meet the June 30, 2020 deadline. This risk would be compounded by the fact that, now that the previously-scheduled trial dates for the Tubbs trial have been vacated in reliance on the order approving the TCC RSA, Tubbs-related estimation (including as to the issue of causation) would have to be folded into the District Court estimation proceeding. Failure to qualify to participate in the Wildfire Fund would destroy value for all parties.

- **Revival of Intercreditor Disputes.** Granting the Motion could reopen otherwise resolved intercreditor disputes including the TCC's "made whole" adversary proceeding against the Ad Hoc Subrogation Group. Reviving such litigation would serve no practical purpose, waste estate resources, risk irreparably driving the parties further apart from a global settlement, and increase the risk that no plan is confirmed by June 30, 2020.

The Bondholders may respond that certain of these issues will have to be addressed in connection with the prosecution of the Bondholders' plan whether or not the Court reconsiders its approval of the RSAs. However, as long as the RSAs remain in effect, the Debtors plan is on track for confirmation, and the creditor body will have the opportunity to express which plan better addresses these issues through voting. Leaving the RSAs in place will maximize the likelihood that there will be one plan supported by the impaired creditor classes by June 30. Vacating the RSAs risks derailing the Debtors' plan, plunging the case into a litigation quagmire that jeopardizes the

possibility that any plan will be confirmable by June 30 — all for no good purpose.

### III. The Bondholders Present No Basis at All for Reconsidering the Subrogation RSA

The Bondholders present no justification (because none exists) for the Court to reconsider the order approving the Subrogation RSA. The Bondholders admit as much in the Motion, noting that "the New AHC Plan does not at this time provide more favorable treatment to holders of subrogation claims," and offer instead only vague, unsupported and speculative claims that "future developments may occur that make the AHC plan more favorable…." Motion at 11. But the Court already stated that the considerations for the lock up provisions in the Subrogation RSA are different than those for the TCC RSA. (Dec. 17 Hr'g Tr. at 182:14-25) ("If I…tell you I'll approve it only if the lock up is out…and I'm focusing on this…RSA, not…the subro because to me…they're much different."). The Bondholders' request that the Court reconsider the order approving the Subrogation RSA is nothing more than an afterthought and should be denied.

## **CONCLUSION**

For the foregoing reasons, the Motion should be denied.

Dated: January 14, 2020

**WILLKIE FARR & GALLAGHER LLP**

/s/ *Matthew A. Feldman*
Matthew A. Feldman (*pro hac vice*)
Joseph G. Minias (*pro hac vice*)
Benjamin P. McCallen (*pro hac vice*)
Daniel I. Forman (*pro hac vice*)
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email:   mfeldman@willkie.com
         jminias@willkie.com
         bmccallen@willkie.com
         dforman@willkie.com

**DIEMER & WEI, LLP**
Kathryn S. Diemer (#133977)
100 West San Fernando Street, Suite 555
San Jose, CA 95113
Telephone: (408) 971-6270
Facsimile: (408) 971-6271
Email: kdiemer@diemerwei.com

*Counsel for Ad Hoc Group of Subrogation Claim Holders*