WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C. (*pro hac vice*)
(ray.schrock@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:** <br><br> **PG&E CORPORATION,** <br><br> - and - <br><br> **PACIFIC GAS AND ELECTRIC COMPANY,** <br><br> Debtors. <br><br> ☐ Affects PG&E Corporation <br> ☐ Affects Pacific Gas and Electric Company <br> ☒ Affects both Debtors <br><br> * *All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case No. 19-30088 (DM) <br><br> Chapter 11 <br> (Lead Case) (Jointly Administered) <br><br> **DECLARATION OF JEANNE C. FINEGAN (I) REGARDING IMPLEMENTATION OF THE DEBTORS' NOTICE PROCEDURES AND SUPPLEMENTAL NOTICE PLAN AND (II) IN SUPPORT OF THE DEBTORS' OBJECTION TO CLASS REPRESENTATIVE'S MOTION TO EXTEND APPLICATION OF FEDERAL RULE OF CIVIL PROCEDURE 23 TO PROOF OF CLAIM** <br> Re: Dkt. Nos.: 5042 <br> Date: January 29, 2020 <br> Time: 10:00 a.m. (Pacific Time) <br> Place: United States Bankruptcy Court <br> Courtroom 17, 16th Floor <br> San Francisco, CA 94102 <br> Judge: Hon. Dennis Montali |

Pursuant to 28 U.S.C. § 1746, I, Jeanne C. Finegan, hereby declare as follows under penalty of perjury:

## I. INTRODUCTION

1. I am the Vice President of Notice Media Solutions at Prime Clerk LLC ("**Prime Clerk**"), the Debtors' court-appointed claims and noticing agent in these chapter 11 cases, and Chief Media Officer of HF Media LLC, an affiliate of Prime Clerk.[1] Except as otherwise noted, this Declaration is based upon my personal knowledge of the matters set forth herein, my review of relevant documents, and information provided to me by PG&E Corporation and Pacific Gas and Electric Company (collectively, the "**Debtors**") and their agents and professionals, including professionals at Weil, Gotshal & Manges LLP, Cravath, Swaine & Moore LLP, AlixPartners LLP, and Prime Clerk, and my prior experience in bankruptcy and class action noticing, and if called and sworn as a witness, I could and would testify competently thereto.

2. I submit this Declaration (i) to provide the Court with a report regarding the successful and timely implementation of the Debtors' robust multi-faceted plan and procedures for providing notice of the Bar Date and the procedures for filing proofs of claims to known and unknown claimants in the Debtors' Chapter 11 Cases, including Known and Unknown Fire Claimants[2] (the "**Notice Procedures**"), and (ii) in support of the Debtors' objection, filed contemporaneously herewith, to the *Securities Lead Plaintiff's Motion to apply Bankruptcy Rule 7023 to Class Proof of Claim* [Docket No. 5042]. In accordance with the Bar Date Order, the Debtors commenced implementation of their Notice Procedures on July 1, 2019 and continued their efforts through the Court-approved Bar Date of October 21, 2019 at 5:00 p.m. Pacific Time.

---

[1] In July 2019, Heffler Claims Group, including its media division HF Media LLC, was acquired by Prime Clerk's parent company.

[2] Capitalized terms used but not otherwise herein defined shall have the meaning ascribed to them in the *Order Pursuant to 11 U.S.C. Section 502(b)(9) and 105(a), Fed. R. Bankr. P. 2002, 3003(C)(3), 5005, and 9007, And L.B.R. 3003-1(I) Establishing Deadline for Filing Proofs of Claim, (II) Establishing the Form and Manner of Notice Thereof, And (III) Approving Procedures for Providing Notice of Bar Date and Other Information to All Creditors and Potential Creditors* [Docket No. 2806] (the "**Bar Date Order**").

## II. NOTICE EXPERTISE AND QUALIFICATIONS

3. A comprehensive description of my credentials, expertise, and experience that qualify me to provide an expert opinion and advice regarding notice in these Chapter 11 Cases, which include more than 30 years of communications and advertising experience, specifically in the bankruptcy and class action notice context is set forth in detail the *Declaration of Jeanne C. Finegan in Support of the Debtors' Bar Date Motion and in Response to the Tort Committee's Bar Date Motion and Related Filings* [Docket No. 2642] (the "**Original Finegan Declaration**"), which is incorporated herein by reference in its entirety.

## III. SUMMARY OF THE RESULTS OF THE DEBTORS' NOTICE PROCEDURES AND SUPPLEMENTAL NOTICE PLAN

4. As set forth in the Original Finegan Declaration, and the November 11, 2019 *Declaration of Jeanne C. Finegan (i) Regarding Implementation of the Debtors' Notice Procedures and Supplemental Notice Plan and (ii) in Support of Debtors' Objection to Class Representative's Motion to Extend Application of Federal Rule of Civil Procedure 23 to Class Proof of Claim* (the "**Supplemental Finegan Declaration**"), which is incorporated herein by reference in its entirety, at the time I submitted my Original Declaration, it was my opinion that the Debtors' Notice Procedures, including, the Supplemental Notice Plan, were reasonable, effective, and went well-beyond the requirements of applicable law and due process. Based on my experience, I believed that the Debtors' Notice Procedures, and in particular the Supplemental Notice Plan, were broad, multi-faceted, and designed to have the greatest possible reach to all creditors and parties in interest, including those who may have relocated as a result of the Northern California fires. Indeed, at the time I submitted my Original Declaration, it was my further belief that the Debtors' Supplemental Notice Plan, which was amended prior to entry of the Bar Date Order to incorporate certain additional aspects at the request of the TCC, was one of the largest and most comprehensive notice and media campaigns recommended in chapter 11 history. As set forth in further detail below, the Notice Procedures, as implemented, have been a resounding success and have **exceeded** the estimated and projected results set forth in my Original Declaration. Specifically, the Supplemental Notice Plan, as implemented, has exceeded the reach and frequency estimates set forth in my Original Declaration, as follows:

| Target Audience | Estimated Reach/ Frequency | Final Reach/ Frequency |
|---|---|---|
| Adults 18+ in the 4 DMAs | 95% Reach / 8x | 98% Reach / 16x |
| Adults 18+ in CA | 81% Reach / 5x | 88% Reach / 11x |
| Adults 18+ outside of CA and moved in the last 4 years | 78% Reach / 2.3x | 80% Reach / 3x |

5. For context, the Debtors' Supplemental Notice Plan exceeds the combined reach and frequency levels of even the largest, most recent class action campaigns that had similar local, regional, and national outreach.

| Case Name | Reach | Frequency |
|---|---|---|
| *Takata Auto Airbag Products Liability Settlement* | 95% | 4x |
| *BP Deepwater Horizon*[3] | 95% | 4x |
| *Cook et. al v. Rockwell International Corp. and the Dow Chemical Co.*[4] | 96% | 7x |
| *In re Payment Card Interchange Fee and Merchant Discount Antitrust* | 82% | 2.7x |
| *In re Air Cargo Shipping Services Canadian Antitrust* | 77% | 2.7x |
| *Spotify Publishing Settlement* | 74% | 2.6x |
| *Red Bull False Advertising Class Action* | 72% | 3.9x |
| *New Balance "Made in the USA" Class Action* | 70% | 4.1x |

6. The Debtors' Notice Procedures were broad and multi-faceted, and were designed and implemented to maximize reach to all claimants in a variety of ways, including through (i) direct mailings to known claimants, (ii) multiple local and national newspaper and magazine publication notices, (iii) digital advertising, including social media, social influencers, and other paid Internet search listings, (iv) television and radio advertising, (v) press releases, and (vi) extensive community and boots

---

[3] Decl. of Cameron Azari, Rec. Doc. 7113-1, ¶¶ 5, 6.
[4] Decl. of Jeanne C. Finegan dated March 30, 2017, Doc. No. 2432, at ¶¶ 30-31.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

on the ground outreach efforts. Through these comprehensive efforts, the Notice Procedures delivered more than 730,000,000 impressions,[5] *i.e.* opportunities to see the Bar Date Notice, as follows:

| Media Channel | Estimated Impressions |
|---|---|
| Direct Mailings | 6,200,000 |
| Social Media | 411,505,264 |
| Display Online | 50,571,921 |
| Magazine | 53,489,000 |
| Influencer | 1,225,191 |
| Out of Home (Billboards) | 10,520,351 |
| Over the Top TV ("**OTT**") | 1,437,291 |
| Streaming Radio | 3,179,525 |
| Terrestrial Radio | 23,774,300 |
| National Cable Television | 105,427,161 |
| Local Cable Television | 8,535,909 |
| Local Broadcast Television | 32,037,000 |
| Newspaper Publication (National) | 14,442,223 |
| Newspaper Publication (Local) | 8,553,710 |
| ***Estimated Total Impressions*** | ***730,898,846*** |

7. An impression translates into an opportunity to see a message in a given medium. Here, it measures each time the Bar Date Notice is displayed and potentially viewed by claimants. For example, each direct mailing of the Bar Date Notice sent out to Known Claimants constitutes one impression. Every time, the Bar Date was displayed in a television advertisement similarly constitutes one impression for each person estimated to be viewing the advertisement at the time of airing. Similarly, every time someone had the opportunity to view the Bar Date Notice in one of the nearly 30 newspapers in which the Debtors' published notice of the Bar Date constituted an impression. **The Debtors' delivered**

---

[5] As explained below, every time an advertisement is displayed, that instance is considered one impression. One person may be exposed to numerous impressions.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

**impressions, or opportunities to see the Bar Date Notice, actually exceeded the TCC's projected impressions (620,000,000) in connection with its competing bar date motion.**[6]

8. The increase in media delivery under the Supplemental Notice Plan is due in large part to our continuous active campaign management. The media team and Prime Clerk, in consultation with the Debtors, actively managed and optimized all media channels to minimize waste and to increase audience visibility and engagement. As the Supplemental Notice Plan progressed, the Debtors continued to refine the media being used to provide notice of the Bar Date and related procedures by shifting budgets away from under-performing channels and toward the more effective media channels and targeting that objectively delivered the greatest results. Optimization decisions were based on, among other things, data from attribution sources (*e.g.* Google Analytics) and other sources including social and general media tools (*e.g.* Cision[7] and Socialbakers[8]). These tools provide detailed, real-time insight regarding the performance of an ongoing media campaign and allowed us to improve performance on a continuous and evolving basis.

### IV. THE SUPPLEMENTAL NOTICE PLAN SUMMARY

9. The Debtors' Notice Procedures were generally divided into two categories: (i) direct mailings of the Court-approved Bar Date Notices, including customized Bar Date Notices that were mailed to, among other parties, Known Fire Claimants and all of the Debtors' millions of Customers; and (ii) the robust and unprecedented Supplemental Notice Plan designed to reach and provide constructive notice to unknown claimants, including Unknown Fire Claimants, that included extensive national and local newspaper publications and utilized other customized media tools. The summaries below focus on the results of the Debtors' Supplemental Notice Plan.[9] In accordance with the Bar Date Order, the Debtors' Supplemental Notice Plan included the following noticing methods:

- Publication of the Bar Date Notice in three (3) nationally distributed magazines;

---

[6] In reporting estimated impressions of 684,000,000, the TCC miscalculated its local impressions. Thus, the TCC's total should have been 620,000,000.
[7] *See* https://www.cision.com/us/.
[8] *See* https://www.socialbakers.com/.
[9] An in-depth discussion of the results of direct mailing campaign completed by Prime Clerk at the direction of the Debtors is set forth in the *Declaration of Benjamin P.D. Schrag (i) Regarding Implementation of the Debtors' Notice Procedures and Supplemental Notice Plan and (ii) in Support of Debtors' Objection to Class Representative's Motion to Extend Application of Federal Rule of Civil Procedure 23 to Class Proof of Claim* [Docket No. 4687].

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

- Multiple publications of the Bar Date Notice in two (2) nationally circulated newspapers;
- Multiple publications of the Bar Date Notice in twenty-seven (27) local newspapers;
- Online display advertising in English and Spanish;
- Social media advertising on Facebook, Instagram and Twitter;
- Social Influencers;
- Google keyword searches;
- Out of Home advertising (*e.g.*, static billboards and digital boards);
- Online video advertising;
- Radio advertisements
  - Terrestrial local radio advertisements (English and Spanish)
  - Streaming radio advertisements
- Television advertising
  - Nationwide cable television advertisements in English
  - Local market cable television advertisements in English and Spanish
  - Local broadcast television advertisements in English
  - OTT television advertisements in English and Spanish
- Press Releases in English and Spanish distributed nationally
- Community outreach to over 230 groups in Northern California, including:
  - Boots-on-the-ground in person distribution of the flyer to:
    - FEMA camps
    - Community events
    - 70 PG&E service centers
    - 6 PG&E claim centers
- Informational websites in English, Spanish, Chinese and Vietnamese
- Informational toll-free telephone

10. The results of each of the specific subcategories of the Supplemental Notice Plan are discussed in further detail below.

### A. PRINT – MAGAZINE

11. The Supplemental Notice Plan included publication of a one-half page, black and white notice one (1) time in the national editions of *People Magazine*, *Sport's Illustrated* and *Sunset Magazine*, which have a combined circulation of 6,680,000, with over 48,000,000 readers.[10] The magazine advertisements were written in plain English and contained a Spanish sub-headline that directed Spanish-speaking claimants to the Debtors' claim websites for more information in Spanish. The advertisements were published in accordance with the below schedule:

---

[10] Readership for both newspaper and magazines are calculated based on a pass-along factor. This is a reader in addition to the subscriber that browses that title. For example, the pass along factor for a newspaper is 2.11, the pass along factor for *People Magazine* is 10.21. That means for every subscriber there is an average of 10.21 people who also read the title.

| Magazine | Issue | On Sale | Circulation |
|---|---|---|---|
| *People Magazine* | August 5, 2019 | July 26, 2019 | 3,031,000 |
| *Sport's Illustrated* | August 26, 2019 | August 22, 2019 | 2,715,000 |
| *Sunset Magazine* | September/October | August 23, 2019 | 934,000 |

12. Attached as **Exhibit A** to the Supplemental Finegan Declaration are proof of publication tear sheets of the published notice in these magazines.

### B. PRINT - NEWSPAPER

13. The complete Standard Bar Date Notice was published in two (2) nationally circulated newspapers:

  A. *The Wall Street Journal* - The Bar Date Notice was published one (1) time in black and white on July 17, 2019. The Wall Street Journal's circulation is 2,069,000.

  B. *USA Today* - The Bar Date Notice was published three (3) times in black and white on July 17, 2019, August 22, 2019 and September 26, 2019. USA Today's circulation is 1,591,000.

14. To further enhance the outreach efforts, the full Bar Date Notice was published three (3) times during the notice period in 27 local newspapers as a half-page, black and white notice written in plain English and featured a Spanish sub-headline. The additional papers were included to provide more thorough coverage of Northern California. Attached as **Exhibit B** to the Supplemental Finegan Declaration is a chart listing the newspapers and insertion dates as well as proof of publication affidavits from each newspaper.

### C. ONLINE NOTICE

15. In total, the online component of the Debtors' Supplemental Notice Plan served more than 50,000,000 impressions to reach potential claimants. The Debtors' online notice campaign targeted potential claimants based on considerations such as, among other things, geography and the target audiences' characteristics, such as having recently moved from or previously lived in California. Banner advertisements were served in English and Spanish across a whitelist[11] of approximately 4,000 websites,

---

[11] A whitelist is a custom list of acceptable websites where advertising content may be served. This allows the Debtors to control the quality of advertising inventory that is served to creditors. The creation of a whitelist helps to ensure that advertisements are targeted to real websites where actual (human) creditors are likely to visit, rather than serving advertisements to websites and fraudsters who are

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

including top-tier news websites, local news websites, and Spanish language websites, among numerous others, and across multiple platforms, including desktops, laptops, and mobile devices.

16. The Supplemental Finegan Declaration provides a complete description of the Debtors' online notice campaign.

### D. SOCIAL MEDIA

17. The Debotrs deployed numerous and comprehensive tactics for providing notice on multiple social media platforms. In total, more than 411,000,000 social media impressions were served under the Debtors' Supplemental Notice Plan, which resulted in over 50,000 "likes" and 30,000 reactions.

| Property | Estimated Impressions | Engagement (likes, comments, shares) |
|---|---|---|
| Facebook/Instagram | 406,481,000 | 50,000 |
| Twitter | 2,673,000 | 4,699 |
| YouTube (English) | 1,577,000 | 382 |
| YouTube (Spanish) | 774,000 | 171 |
| **Total** | **411,505,000** | **55,252** |

18. The Supplemental Finegan Declaration provides a complete description of the Debtors' social media campaign.

### E. SOCIAL INFLUENCERS

19. In order to leverage the highest indexing media to the youngest creditors, at the Debtors' direction the media team and Prime Clerk engaged social media influencers to post and share information about the Bar Date on Instagram and Facebook. This effort reached over 1,200,000 followers and resulted in nearly 20,000 social engagements (i.e. clicks, comments and shares). The Supplemental Finegan Declaration provides a complete description of the Debtors' engagement with social influencers.

---

attempting to fraudulently earn advertising revenue from the campaign, and thereby depriving actual creditors of their opportunity to see the Bar Date Notice. Further, the whitelist helps to ensure that advertisements will not appear next to offensive or objectionable content. The whitelist is actively maintained over the campaign with site-level reporting of brand safety during campaign and culling of improper or suspicious activity on websites. Further, as a measure of privacy, all advertisements feature AdChoices icons whenever available.

## F. SEARCH TERMS

20. The Supplemental Notice Plan utilized Google AdWords and keyword search terms to target potential Fire Claimants. When users entered on Google's search engine, target phrases and keywords identified by the Debtors' Supplemental Notice Plan, informational advertisements with links to the Debtors' Case Website appeared on the search result pages. Attached as **Exhibit F** to the Supplemental Finegan Declaration is a full list of the keyword search terms utilized in the Supplemental Notice Plan.

## G. OUT OF HOME

21. The Debtors expanded the Supplemental Notice Plan to utilize 17 static or digital billboards in Butte, Humboldt, Mendocino, Napa and Sonoma counties. The billboards appeared for nine (9) weeks and delivered more than 10,520,000 impressions as reported by GeoPath[12] using data provided by the Traffic Audit Bureau. Attached as **Exhibit G** to the Supplemental Finegan Declaration is a map of the board locations and a copy of how they appeared.

## H. TERRESTRIAL AND STREAMING RADIO

22. Terrestrial radio aired in English and Spanish in the 6 MSAs. A total of 24 local English radio stations and 10 Hispanic stations were chosen to air approximately 2,680 terrestrial radio advertisements. Attached as **Exhibit H** to the Supplemental Finegan Declaration is a complete list of stations, their formats, broadcast language and markets.

| Radio | Spots Planned | Spots Delivered | Increase from Planned to Delivered |
|---|---|---|---|
| English | 360 | 1,888 | 525% |
| Hispanic | 180 | 792 | 440% |
| **Total** | **540** | **2,680** | **496%** |

23. To further enhance notice and in consultation with the TCC, the Supplemental Notice Plan was expanded to include streaming audio advertisements (i.e. digital radio played via an internet

---

[12] Geopath generates standard audience measurements for out of home media. It provides demographic-specific impressions, rating points, and reach & frequency measures for over a million pieces of out of home inventory. https://geopath.org.

connection), which ran on Pandora with 30-second spots. In many instances, a digital banner advertisement appeared while the audio spot was aired, allowing a user to click on the banner and be taken to the dedicated case website. Over 1.6 million streaming audio impressions ran.

### I. TELEVISION

24. The Supplemental Finegan Declaration contains a complete description of the Debtors efforts to notice potential claimaints via 30-second commercials on local broadcast, local cable, and nationwide cable television.

25. **Local Broadcast TV.** A total of 2,010 commercials aired across approximately 14 local broadcast television stations, generating approximately 32,037,000 impressions to potential claimants in Lake, Sonoma, Napa, Mendocino, Nevada, Butte, and Humboldt counties. The commercials aired across a variety of dayparts,[13] including morning, daytime, early news, and prime/syndicated prime to reach potential claimants with differing television viewing habits.

26. **Local Cable TV.** 2,025 commercials aired on local cable channels and generated approximately 8,535,909 impressions to expand awareness of the Bar Date to potential claimants and other parties. Attached as **Exhibit I** to the Supplemental Finegan Declaration is a list of the local and cable stations in each market utilized by the Supplemental Notice Plan.

27. **Nationwide Cable TV.** To reach those claimants who may have moved within the last four years, 59 nationwide cable television commercials aired across CNN, FOX NEWS, History Channel and TNT networks resulting in 105,427,161 impressions.

### J. ADDITIONAL METHODS OF OUTREACH

28. In addition to paid media outlets, the Supplemental Notice Plan employed earned media and various avenues of public relations to amplify awareness of the Bar Date.

29. The Supplemental Finegan Declaration provides a complete description of the Debtors' additional outreach through earned media, community outreach, temporary housing outreach, and efforts at the Paradise Revival Festival.

---

[13] A "daypart" is a term traditionally used when buying television but is also used for radio; it is a block of time that divides the day into segments for purchase, scheduling and delivery (*e.g.*, primetime, or for radio "drive time"). The dayparting method is often used to tailor content to specific audiences throughout the day.

### K. ONLINE QUALITY CONTROL - ADVERTISEMENT FRAUD IDENTIFICATION, MITIGATION AND REPORTING

30. As described in my Original Declaration, the Debtors' Supplemental Notice Plan incorporated state of the art quality control mechanisms to ensure that the Debtors' online advertisements were properly targeted to real websites where actual humans are likely to visit, rather than serving advertisements to websites and fraudsters that attempt to steal advertising revenue from the campaign (thereby depriving actual Fire Claimants of their opportunity to see the Bar Date Notice).

31. The Supplemental Notice Plan included in-advertisement, log, and site level monitoring and management, utilizing one of the leading cyber security advertisement fraud expert service providers in the country. I am pleased to report to the Court that less than one percent invalid impressions was detected in this campaign, which is a remarkable achievement even when compared to large brand campaigns. This invalid traffic has been excluded from the final reach calculations.

### V. CONCLUSION

32. In my opinion, the robust and comprehensive outreach efforts employed for the Debtors' Noticing Procedures, including the Supplemental Notice Plan, are unmatched in any chapter 11 case. The efforts reflected a particularly appropriate, highly targeted, efficient and modern way to provide notice to potential claimants. The Debtors' Supplemental Notice Plan was broad and multi-faceted and more than achieved its goal of maximizing reach to the target audiences.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed on January 14, 2020, in Tigard, Oregon.

*Jeanne C. Finegan*

Jeanne C. Finegan

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119