# EXHIBIT H

| | |
|---|---|
| WEIL, GOTSHAL & MANGES LLP<br>Stephen Karotkin (*pro hac vice*)<br>(stephen.karotkin@weil.com)<br>Ray C. Schrock, P.C. (*pro hac vice*)<br>(ray.schrock@weil.com)<br>Jessica Liou (*pro hac vice*)<br>(jessica.liou@weil.com)<br>Theodore E. Tsekerides (*pro hac vice*)<br>(theodore.tsekerides@weil.com)<br>767 Fifth Avenue<br>New York, NY 10153-0119<br>Tel: 212 310 8000<br>Fax: 212 310 8007 | KELLER & BENVENUTTI LLP<br>Tobias S. Keller (#151445)<br>(tkeller@kellerbenvenutti.com)<br>Peter J. Benvenutti (#60566)<br>(pbenvenutti@kellerbenvenutti.com)<br>Jane Kim (#298192)<br>(jkim@kellerbenvenutti.com)<br>650 California Street, Suite 1900<br>San Francisco, CA 94108<br>Tel: 415 496 6723<br>Fax: 650 636 9251 |

*Attorneys for Plaintiffs (Debtors and Debtors in Possession)*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION**,<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>Debtors. | Case Nos. 19-30088 (DM)<br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br><br><br>Adv. Pro. No. 19-_____ (DM) |
| **PG&E CORPORATION and PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>Plaintiffs,<br><br>v.<br><br>**PUBLIC EMPLOYEES RETIREMENT ASSOCIATION OF NEW MEXICO and YORK COUNTY**<br><br>Defendants. | **DEBTORS' COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AS TO *IN RE PG&E CORP. SECURITIES LITIG.*, 18-CV-03509 (N.D. CAL.)** |

In accordance with 28 U.S.C. § 1334, section 105 of title 11 of the United States Code (the "**Bankruptcy Code**"), and Federal Rules of Bankruptcy Procedure 7001(7) and 7065, PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), and as plaintiffs in the above-captioned adversary proceeding (the "**Adversary Proceeding**"), allege for their complaint for preliminary and permanent injunctive relief (the "**Complaint**") as to *In re PG&E Corp. Securities Litig.*, 18-cv-03509 (the "**Wildfire Securities Action**"), an action commenced by the Lead Plaintiff Public Employees Retirement Association of New Mexico ("**PERA**"), and York County, acting on behalf of the County of York Retirement Fund, City of Warren Police and Fire Retirement System and Mid-Jersey Trucking Industry & Local No. 701 Pension Fund ("**York**", and together with PERA, the "**Securities Plaintiffs**"), upon knowledge of their own acts and upon information and belief as to other matters, as follows:

## NATURE OF THE ACTION

1. The Debtors seek to preliminarily and permanently enjoin the prosecution of the Wildfire Securities Action against those of the Debtors' current and former directors and officers that are named as defendants (the "**Individual Defendants**"), and the underwriters of certain of the Debtors' notes offerings (the "**Underwriter Defendants**" and collectively with the Individual Defendants, the "**Non-Debtor Defendants**"), with the same effect and to the same extent as would be the case if section 362(a) of the Bankruptcy Code applied.

2. Based on the facts alleged herein, the Court's exercise of its powers under section 105 of the Bankruptcy Code to preliminarily and permanently enjoin the continued prosecution of the Wildfire Securities Action is appropriate and in the best interests of the estates.

## THE PARTIES

3. PG&E Corp. is a holding company whose primary operating subsidiary is the Utility, an electricity and natural gas utility operating in northern and central California.

4. Upon information and belief, PERA is a qualified retirement plan under section 401(a) of the Internal Revenue Code, with its headquarters at 2500 Louisiana Blvd. NE #420, Albuquerque, New Mexico, 87110.

5. Upon information and belief, York is the county government for York County, Pennsylvania, with its offices at 28 East Market Street, York, Pennsylvania, 17401.

**JURISDICTION AND VENUE**

6. The Adversary Proceeding arises in and relates to the Chapter 11 Cases. The Court has jurisdiction to consider the Adversary Proceeding and over the claims asserted by the Debtors against PERA and York herein pursuant to 28 U.S.C. §§ 157 and 1334; the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.); and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California.

7. This is a core proceeding under 28 U.S.C. § 157(b). The Debtors consent to the entry of a final order by the Court in connection with this Adversary Proceeding to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

8. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**FACTUAL BACKGROUND**

**The Chapter 11 Cases**

9. The Debtors commenced these Chapter 11 Cases on January 29, 2019, in response to a confluence of factors resulting from the separate, catastrophic and tragic wildfires that occurred in Northern California in 2017 and 2018. The single most important issue in the Debtors' Chapter 11 Cases is the ultimate resolution of the thousands of wildfire-related claims against the Debtors. Addressing these claims in a piecemeal manner in state or federal court proceedings while continuing to serve over 16 million customers was not feasible, and was the primary factor precipitating the Debtors' need to seek relief under chapter 11.

**The Wildfire Securities Action**

10. The subject of this Adversary Proceeding is the Wildfire Securities Action, a securities lawsuit that was filed after the scope of the Debtors' potential liabilities for the wildfire claims became clear. PERA, as lead plaintiff, initiated the Wildfire Securities Action on June 12, 2018, asserting claims against the Debtors and certain of the Individual Defendants under the

Securities Exchange Act of 1934 (the "**Exchange Act**"). After commencing these Chapter 11 Cases, the Debtors initiated an adversary proceeding on February 15, 2019 and sought to preliminarily and permanently enjoin PERA's prosecution of the Wildfire Securities Action as against all non-debtor defendants named at that time. York then filed a separate complaint, based on similar allegations, asserting claims under the Securities Act of 1933 (the "**Securities Act**") against more of the Debtors' current and former directors and officers as well as the Underwriter Defendants. The Debtors, the Non-Debtor Defendants, and the Securities Plaintiffs then stipulated that the Debtors would dismiss their pending adversary proceeding without prejudice; that PERA and York would consolidate York's action with the Wildfire Securities Action; that the Securities Plaintiffs would file a TAC in the Wildfire Securities Action; that the Debtors would commence this Adversary Proceeding, and that the Non-Debtor Defendants' deadline to respond to the TAC would be tolled pending the outcome of this Adversary Proceeding. The Securities Plaintiffs filed the TAC on May 28, 2019.

11. The Wildfire Securities Action is, by its own terms, an action against the Debtors. The TAC names the Debtors themselves as defendants on the Exchange Act claims, which were filed before these Chapter 11 Cases were commenced, and alleges that "[b]ut for the automatic stay of proceedings, the [Debtors] would be named as a defendant" on the subsequently added Securities Act claims as well. The 228-page TAC broadly alleges that the Debtors, acting through the Individual Defendants, made false and misleading statements during the period from April 29, 2015 through November 15, 2018 with the intent to conceal deficiencies in the Debtors' wildfire safety practices, including numerous and widespread violations of California safety regulations related to power lines. Current directors and officers that are named as Individual Defendants include Julie M. Kane, Senior Vice President, Chief Ethics and Compliance Officer, and Deputy General Counsel; Dinyar B. Mistry, Senior Vice President, Human Resources and Chief Diversity Officer; David S. Thomason, Vice President and Chief Financial Officer of the Utility and Controller of PG&E; Fred J. Fowler, Director; and Eric D. Mullins, Director. The Securities Plaintiffs further allege that these allegedly deficient wildfire safety practices caused the 2017 wildfire and 2018 wildfires, which, in turn, caused significant financial losses to the Debtors' security holders.

12. The Securities Plaintiffs' allegations thus concern the exact same events—the 2017 wildfires and 2018 wildfires—that precipitated the Debtors seeking protection under chapter 11, and involve issues of causation that are at the core of the Debtors' reorganization efforts.

**<u>Preliminary and Permanently Enjoining the Wildfire Securities Action is Appropriate</u>**

13. The Court has "related to" jurisdiction over the Wildfire Securities Action because it is beyond doubt that, if it continues, it could have an effect the Debtors' estates by altering the Debtors' rights, liabilities, options, or freedom of actions (either positively or negatively). The TAC's allegations against both the Debtors and the Non-Debtor Defendants involve the very facts that led the Debtors to file for chapter 11. The Wildfire Securities Action falls within this Court's "related to" jurisdiction because of, among other things, the strains that the non-bankruptcy litigation of the wildfire claims would impose on the Debtors' reorganization process; the threats that the Wildfire Securities Action could drain the Debtors' assets by one means or another; the potential preclusive or prejudicial effects it could have on the Debtors; and the distractions that it would impose on the Debtors and their key personnel.

14. The Debtors have made tangible progress in their reorganization. They have secured the Court's approval of $5.5 billion in debtor-in-possession financing; stabilized business operations and relationships with suppliers, vendors and other key business partners; engaged in ongoing mediation to resolve Wildfire Claims pursuant to a plan of reorganization; obtained a Court order extending the plan filing exclusivity periods; and, more recently, filed a motion seeking to establish a bar date and approving related procedures for providing notice to all known and unknown creditors, including the Debtors' 16 million customers and any current or potential wildfire claimants.

15. It is clear that under all circumstances the Debtors' business operations will continue, and that a successful reorganization is accordingly not only reasonably likely, but a near certainty.

16. Although non-debtors are also defendants in the Wildfire Securities Action, the action effectively seeks damages from the Debtors, for conduct allegedly undertaken by the Debtors, provable only with discovery from the Debtors, with consequences that directly impact the Debtors, all at a time when all wildfire-related actions are stayed against the Debtors. Such an action would

proceed, in function and in all but name, against the Debtors. The automatic stay, however, paused all litigation among the Debtors and their creditors, including with respect to wildfire claims. Permitting the Securities Plaintiffs to repackage the wildfire claims as securities claims purportedly brought against the Debtors' directors, officers, and underwriters undermines the Debtors' protections under the Bankruptcy Code while actively harming their ability to bring these Chapter 11 Cases to an equitable and prompt negotiated resolution.

17. Continued prosecution of the Wildfire Securities Action would further implicate the Debtors' indemnification obligations, impact the Debtors' insurance coverage, risk preclusive rulings regarding the Debtors' alleged responsibility for the wildfires, and burden and distract the Debtors as they strive toward an efficient resolution and administration of their estates. Each of these harms alone are sufficient to extend the stay to the Non-Debtor Defendants.

18. A primary driver for the Chapter 11 Cases is the Debtors' need to avail themselves of a single, consolidated forum that will enable them to address and resolve fairly and expeditiously the thousands of wildfire claims that they are facing.

19. The continued prosecution of the Wildfire Securities Action, which would proceed outside the supervision of the Bankruptcy Court, threatens to undermine that goal. Virtually all of the allegations concern actions allegedly taken by the Debtors, their agents, or certain of their current or former directors and officers. The Individual Defendants are sued in their official capacities as instrumentalities of the Debtors. The allegations against the Individual Defendants, and the consequences that flow from them, are coterminous with those brought against the Debtors. The Individual Defendants, for example, are alleged to have exercised "their high-level positions of control and authority as senior executive officers of PG&E" over a vast spectrum of corporate activities, a degree of supervision interchangeable with that of the entire PG&E corporate form.

20. As for the Underwriter Defendants, their potential liability too flows entirely from alleged misstatements and omissions made by the Debtors. Therefore, proving any claim against the Underwriter Defendants necessarily requires first establishing alleged misstatements or omissions by the Debtors concerning, among other things, the Debtors' wildfire safety practices in place in 2017 and/or 2018. Thus, the TAC devotes pages to alleged misstatements in the Debtors' offering

documents regarding the Debtors' safety practices and response to the 2017 wildfires, but just one paragraph to the Underwriter Defendants' role in making those statements, alleging principally that they "fail[ed] to conduct an adequate due diligence investigation."

21. The TAC makes clear that the Debtors are its real targets. Allegations against the Non-Debtor Defendants amount to a mere fraction of the TAC. Counting the relevant terminology in the TAC, the word "director" appears 81 times; "officer" yields 63 hits; "individual" garners 79 mentions; and "underwriter" turns up 40 times. But the big bull's eye—the focus of the Wildfire Securities Action—is "PG&E," which appears 2,088 times, nearly ten times per page, a sum that increases by 258 once the alternative moniker "Utility" is factored in, and by an additional 384 once "Company" is tallied. In sum, roughly 91% of the references to the defendants in the TAC are actually references to the Debtors.

22. In reality, the Debtors are the only *real* party in interest here. The central issue in the Wildfire Securities Action is the same one at the heart of the thousands of wildfire claims subject to the automatic stay, i.e., whether Debtors caused the 2017 wildfires and/or the 2018 wildfires.

23. The TAC includes the following allegations: "The false and misleading nature of this statement was further revealed in a series of events from November 8–15, 2018, as evidence emerged that PG&E's safety violations caused the Camp Fire."; "PG&E caused the North Bay Fires"; "The Offering Documents for the April 2018 Notes Offering . . . misled investors by insinuating that PG&E may not have caused and might not be liable for the destruction of life and property resulting from fires that PG&E caused, or the costs associated with wildfires."; "[The Debtors' 10-K] misleadingly represented that it was only a possibility that PG&E caused or would face liability for the fires."; "[T]his statement materially omitted the true risk that PG&E would cause wildfires serious enough to imperil the Company's financial condition."

24. Likewise, the cause of the alleged stock drops—*i.e.*, loss causation—cannot be divorced from the cause of the wildfires. To prove loss causation, the Securities Plaintiffs must establish, among other things, their allegation that wildfires were a "materialization of the concealed risk." But the wildfires did not reveal anything about a "concealed risk" of allegedly deficient wildfire safety practices; what they revealed, and what the post-wildfires reports revealed, was that

there was a risk that PG&E would be held liable if PG&E in fact caused any of the wildfires. It is for this reason that nearly the entirety of the Securities Plaintiffs' "Loss Causation" section of the TAC focuses on whether PG&E caused the Northern California wildfires. The TAC includes the following allegations: "PG&E's Safety Violations Caused the Devastating North Bay Fires."; "PG&E's Safety Violations Caused the Devastating Camp Fire."; "It was not until Thursday, October 12, 2017 that the market began to understand that PG&E's safety regulation violations were likely a proximate cause of the North Bay Fires."; "This was the first disclosure indicating that PG&E caused any of the North Bay Fires. In response to this news, PG&E's share price declined 6.7%."; "On this news that PG&E would likely bear at least some responsibility for the fires, PG&E's stock dropped $4.65 per share."

25. Allowing some of the most important issues of the Chapter 11 Cases to be resolved in a forum other than the Bankruptcy Court, and one where the Debtors would not be participating as a defendant, would undermine the Debtors' efforts to achieve a comprehensive resolution of claims arising from the 2017 wildfires and 2018 wildfires. Parallel litigation of the Wildfire Securities Action in a different forum, when the action involves issues of causality that are central to the Chapter 11 Cases, could significantly impair the Debtors' chapter 11 process.

26. This Court has previously recognized the unique status of the wildfire claims in the Debtors' Chapter 11 Cases and the paramount importance of confirming a plan. This Court has stated that: "[The] Debtors' many challenging tasks include figuring out the structure and implementation methods of any viable reorganization, not the least of which task is the liquidation or aggregate estimation of countless claims from the recent wildfires, other tort liabilities and billions of dollars of contractual liabilities of all types."; "[T]here is too much at stake in needing to craft the contours of the reorganization than to require a debtor this soon to tackle specific individual cases." The Court's concerns, expressed in connection with relatively minor, non-wildfire related disputes, are even more applicable here. Permitting the Wildfire Securities Action to proceed at this time would not only contravene the fundamental purposes of the automatic stay, but also would undermine a comprehensive resolution of the wildfire claims by favoring the Securities Plaintiffs

over all other wildfire claimants, all at the expense of the Debtors' comprehensive reorganization and all economic stakeholders.

27. Not only are the Debtors the true targets of the Wildfire Securities Action, but they also will ultimately bear, directly or indirectly, attorneys' fees and other losses associated with the claims against the Non-Debtor Defendants due to the Debtors' indemnification obligations. Thus, if allowed to proceed, any recovery obtained by the Securities Plaintiffs outside of the claims administration process may ultimately be paid from the estates' assets, or from insurance coverage in which the Debtors have an interest. This threatened indirect exploitation of the Debtors' assets would irreparably harm their reorganization efforts.

28. The Securities Plaintiffs' continued prosecution of the Wildfire Securities Action will irreparably harm the Debtors by further implicating their indemnification obligations to the Non-Debtor Defendants.

29. Pursuant to Resolutions of the Debtors' Boards of Directors, the Debtors must indemnify their current and former directors and officers for any "costs, charges, expenses, liabilities, and losses (including, without limitation, attorneys' fees [and] judgments)" incurred "by reason of the fact that he or she . . . is or was a director or officer" of the Debtors. Pursuant to these obligations, the Debtors are reimbursing the Individual Defendants for any attorneys' fees they incur in connection with the Wildfire Securities Action. The Debtors will also reimburse the Individual Defendants for any other losses they incur in connection with the Wildfire Securities Action, subject to applicable law. Similarly, the underwriting agreements require that for each of the Debtors' relevant notes offerings require the Debtors to indemnify the Underwriter Defendants for "any and all losses, claims, damages or liabilities, joint or several to which they or any of them may become subject under the [Securities] Act, the Exchange Act or other Federal or state statutory law or regulation," as well as "for any legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability or action." The Debtors expect that, if the Wildfire Securities Action is permitted to proceed, the Underwriter Defendants will seek to avail themselves of these indemnification rights for the claims asserted against them in that action. The Non-Debtor Defendants' indemnity claims have already begun to accrue, and, in

light of the vast scope of the allegations set forth in the TAC, they will grow substantially if the Court allows the Wildfire Securities Action to proceed.

30. The Debtors maintain insurance policies to help cover any indemnification obligations that arose in 2017 or 2018 to their current and former directors and officers, as relates to, among other things, actions such as the Wildfire Securities Action (the "**D&O Policies**").

31. The D&O Policies provide coverage both to the Individual Defendants, and to the Debtors themselves, up to specified amounts. The portion of this coverage that is shared amongst the Debtors and the Individual Defendants—which constitutes the majority of the coverage available under the D&O Policies—provides coverage: (i) to the Individual Defendants for any non-indemnified losses incurred in their capacity as officers or directors of the Debtors (the "**Side A Coverage**"); (ii) to the Debtors for any losses arising from their indemnification obligations owed to the Individual Defendants (the "**Side B Coverage**"); and (iii) to the Debtors for any direct losses the Debtors incur as a result of securities claims made directly against them (the "**Side C Coverage**"). Importantly, the shared coverage available under the D&O Policies is subject to an aggregate limit of liability, such that when proceeds are paid out under any one coverage part, the remaining available shared coverage is reduced. Once the Debtors' payment to or on behalf of the Individual Defendants for or of losses (including defense costs) incurred by the Individual Defendants in connection with the Wildfire Securities Action reaches a self-insured retention applicable to the Side B Coverage of the D&O Policies, the Debtors will be entitled to payment under the Side B Coverage for further payment by the Debtors to or on behalf of the Individual Defendants for or of losses (including defense costs) incurred by the Individual Defendants in connection with the Wildfire Securities Action, above that self-insured retention. The Debtors' recovery of insurance proceeds under the Side B Coverage would reduce the coverage available to the Debtors under the D&O Policies.

32. Should the Court decline to issue the requested injunction, it will result in a real, immediate and continuing harm to the Debtors. Given that the potential exposure in the Wildfire Securities Action far exceeds the limits of liability in the D&O Policies, losses incurred by the Individual Defendants in connection therewith may completely exhaust the proceeds available under the D&O Policies. And the concern that the Debtors may ultimately need to rely on this coverage is

particularly acute here, where the Securities Plaintiffs' claims against the Debtors implicate the Side C Coverage. Moreover, depletion of this coverage could force the Debtors to satisfy the remainder of their indemnification obligations using funds of their estates. Further, depletion of the D&O Policies' coverage, in which the Debtors have an interest, could further harm them by impacting their ability to retain management and the willingness of managers to make strong decisions if they lack insurance protection.

33. Judgments entered against the Individual Defendants—all alleged to be acting in their official capacities on behalf of the Debtors—risk the possibility of binding PG&E itself. Another court could find that the Wildfire Securities Action, if litigated to conclusion against the Individual Defendants, precludes the Debtors from relitigating important issues in cases against the Debtors, when the Debtors were deprived of the opportunity to defend themselves.

34. Regardless of whether such judgments would be binding on the Debtors, a judgment against the Non-Debtor Defendants—including the Underwriter Defendants, who are facing the same set of allegations and who may be held jointly liable for any misstatements that the Securities Plaintiffs can prove—risks severely prejudicing the Debtors in later litigation.

35. This risk of prejudice to the Debtors extends to every phase of the proceedings in the Wildfire Securities Action. For example, an adverse ruling against the Non-Debtor Defendants at the pleading stage raises the risk that the court will later find that those rulings are the law of the case, which generally precludes reconsideration of an issue that has already been decided by the same court.

36. Similarly, discovery in the Wildfire Securities Action exposes the Debtors to record taint, as any discovery undertaken therein could have a potential impact upon any claim or suit against them. The Wildfire Securities Action thus puts the Debtors in the untenable position of either sitting on the sidelines and risking the development of a legal and factual record that could prejudice them in future proceedings, or abandoning the benefits granted by section 362 of the Bankruptcy Code.

37. Regardless of whether the rulings and evidentiary record developed in the Wildfire Securities Action would prejudice the Debtors, the same issues still would need to be adjudicated twice.

38. The Wildfire Securities Action presents a unique burden to the Debtors across all aspects of their business. If allowed to go forward, the Wildfire Securities Action will draw the Debtors' employees, at all levels of the company, away from the administration of the Chapter 11 Cases and related issues. The Debtors, their directors, officers, and other employees currently are already engaged in the following tasks, among others, that are critical to their reorganization effort: (i) stabilizing the Debtors' business, which requires managing relationships with and responding to innumerable inquiries from employees, the public, vendors, regulators, the official committees, and other key parties in interest, as well as attending to their day-to-day ordinary course responsibilities; (ii) assisting the Debtors' advisors in preparing for bi-weekly hearings, many of which are contested, and overseeing and reviewing, on expedited timeframes, multiple lengthy and complex documents for filing with the Court; (iii) responding to various demands from the Official Committee of Unsecured Creditors and the Tort Claimants' Committee; (iv) conducting ongoing negotiations with multiple constituencies with respect to various matters related to the successful prosecution of these Chapter 11 Cases; (v) managing the wildfire safety programs key to the Debtors' ongoing operations; and (vi) fulfilling obligations related to *United States v. Pac. Gas & Elec. Co.*, Crim. No. 14-00175-WHA (N.D. Cal.).

39. Should it proceed, the Wildfire Securities Action will materially divert the Debtors and their directors, officers, and employees from these tasks in numerous ways. Prosecution of the Wildfire Securities Action against the Non-Debtor Defendants will likely force the Debtors to respond to broad and burdensome discovery. The allegations contained in the Securities Plaintiffs' 228-page TAC implicate potentially millions of pages of documents relating to transactions and events that span decades, and involve many of the Debtors' current directors, officers, and employees, several of whom would likely be deposed. Moreover, given the Debtors' indemnification obligations, and because the Securities Plaintiffs' claims are ultimately directed at the Debtors, the Debtors' in-house legal team would need to monitor the litigation closely, and

would potentially be required to intervene to protect their interests, again undermining the automatic stay.

40. These concerns are only heightened here, where the Debtors are already engaged in discovery in the Chapter 11 Cases regarding wildfire-related issues. Now is not the time for the Debtors to address further—and potentially conflicting discovery demands in a separate forum. Given the substantial overlap between the Wildfire Securities Action and the subject matter of the Debtors' reorganization, there is a very real risk that its prosecution and attendant discovery would ultimately divert the debtor's resources and attention from the bankruptcy process, and possibly deprive this Court of control over issues central to its administration of the estates. Continuation of the Wildfire Securities Action would result in both immediate and irreparable harm to the Debtors by causing their personnel to be distracted from participating in the reorganization process.

41. There is no prejudice to the Securities Plaintiffs from applying the stay to the Non-Debtor Defendants. Any information in the Debtors' possession that may be relevant to the Securities Plaintiffs' claims is already being preserved, and is not subject to deterioration. Moreover, the Securities Plaintiffs have not expended significant resources to date in prosecuting the Wildfire Securities Action, with the case still at the pleadings stage and no discovery undertaken.

42. The public interest in a successful reorganization is particularly prevalent here, where the claims of those injured by the wildfires and the provision of safe electricity to the Debtors' customers must take precedence to the Securities Plaintiffs' attempts to recover for purported investment losses. A fair and equitable resolution of the wildfire claims is most likely to be achieved in a single forum, this Court, and not through fragmented litigation across the country. That the Debtors are a utility that provides electricity and natural gas to approximately 16 million customers further demonstrates the public interest in a successful reorganization here. The Debtors also employ over 24,000 employees and provide work for countless contractors, who go on to incorporate additional people and resources into the state's workforce.

# COUNT ONE

## (Section 105 Preliminary and Permanent Injunction)

1. The Debtors repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

2. A Bankruptcy Court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

3. A Bankruptcy Court may, in its discretion, issue injunctive relief under section 105 of the Bankruptcy Code in order to restrain activities that threaten the reorganization process or impair the court's jurisdiction with respect to the case before it.

4. This Court has "related to" jurisdiction and authority to enjoin the Wildfire Securities Action under section 105(a) of the Bankruptcy Code because the Wildfire Securities Actions could have an effect the Debtors' estates.

5. The Debtors are reasonably likely to reorganize successfully.

6. The Securities Plaintiffs' continued prosecution of the Wildfire Securities Action against the Non-Debtor Defendants will cause the Debtors to suffer immediate, irreparable harm.

7. The balance of hardships favors an injunction as the irreparable harm to the Debtors outweighs any potential harm to Securities Plaintiffs.

8. The requested injunctive relief will serve the public interest.

9. Preliminary and permanent injunctive relief pursuant to section 105 of the Bankruptcy Code enjoining the Wildfire Securities Action is therefore necessary and appropriate.

WHEREFORE, the Debtors respectfully request relief as follows:

a. That this Court exercise its powers under section 105 of the Bankruptcy Code to preliminarily and permanently enjoin the Securities Plaintiffs' prosecution of the Wildfire Securities Action against the Non-Debtor Defendants with the same effect and to the same extent as would be the case if section 362(a) of the Bankruptcy Code applied.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

1  Dated: June 18, 2019

**WEIL, GOTSHAL & MANGES LLP**

**KELLER & BENVENUTTI LLP**

By: */s/ Theodore E. Tsekerides*
      Theodore E. Tsekerides

*Attorneys for Plaintiffs (Debtors and Debtors in Possession)*

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|
| **PLAINTIFFS**<br>PG&E Corporation<br>Pacific Gas & Electric Co. | **DEFENDANTS**<br>Public Employees Retirement Association of New Mexico;<br>York County |
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Weil, Gotshal & Manges LLP    Keller & Benvenutti LLP<br>767 Fifth Avenue    650 California Ave., Suite 1900<br>New York, NY 10153-0119    San Francisco, CA 94108<br>(212) 310 8000 | **ATTORNEYS** (If Known)<br>Lowenstein Sandler LLP<br>One Lowenstein Drive<br>Roseland, New Jersey 07068 |
| **PARTY** (Check One Box Only)<br>☒ Debtor    ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor    ☐ Other<br>☐ Trustee | **PARTY** (Check One Box Only)<br>☐ Debtor    ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor    ☒ Other<br>☐ Trustee |
| **CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)<br>Pursuant to 28 U.S.C. § 1334 and 11 U.S.C. §§ 105, Plaintiffs bring this adversary proceeding for preliminary and permanent injunctive relief against the above-named Defendants. ||

| NATURE OF SUIT |
|---|
| (Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.) |

| | |
|---|---|
| **FRBP 7001(1) – Recovery of Money/Property**<br>☐ 11-Recovery of money/property - §542 turnover of property<br>☐ 12-Recovery of money/property - §547 preference<br>☐ 13-Recovery of money/property - §548 fraudulent transfer<br>☐ 14-Recovery of money/property - other<br>**FRBP 7001(2) – Validity, Priority or Extent of Lien**<br>☐ 21-Validity, priority or extent of lien or other interest in property<br>**FRBP 7001(3) – Approval of Sale of Property**<br>☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)<br>**FRBP 7001(4) – Objection/Revocation of Discharge**<br>☐ 41-Objection / revocation of discharge - §727(c),(d),(e)<br>**FRBP 7001(5) – Revocation of Confirmation**<br>☐ 51-Revocation of confirmation<br>**FRBP 7001(6) – Dischargeability**<br>☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims<br>☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud<br>☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny<br>(continued next column) | **FRBP 7001(6) – Dischargeability (continued)**<br>☐ 61-Dischargeability - §523(a)(5), domestic support<br>☐ 68-Dischargeability - §523(a)(6), willful and malicious injury<br>☐ 63-Dischargeability - §523(a)(8), student loan<br>☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)<br>☐ 65-Dischargeability - other<br>**FRBP 7001(7) – Injunctive Relief**<br>☐ 71-Injunctive relief – imposition of stay<br>☒ 72-Injunctive relief – other<br>**FRBP 7001(8) Subordination of Claim or Interest**<br>☐ 81-Subordination of claim or interest<br>**FRBP 7001(9) Declaratory Judgment**<br>☐ 91-Declaratory judgment<br>**FRBP 7001(10) Determination of Removed Action**<br>☐ 01-Determination of removed claim or cause<br>**Other**<br>☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et. seq.*<br>☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case) |
| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
| ☐ Check if a jury trial is demanded in complaint | Demand $ |
| Other Relief Sought<br>Injunctive Relief ||

| B1040 (FORM 1040) (12/15) | | | |
|---|---|---|---|
| **BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES** | | | |
| NAME OF DEBTOR<br>PG&E Corporation and Pacific Gas and Electric Company | | BANKRUPTCY CASE NO.<br>19-30088 (DM) (Jointly Administered) | |
| DISTRICT IN WHICH CASE IS PENDING<br>Northern District of California | | DIVISION OFFICE<br>San Francisco | NAME OF JUDGE<br>Montali |
| **RELATED ADVERSARY PROCEEDING (IF ANY)** | | | |
| PLAINTIFF | DEFENDANT | | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br>/s/ Thomas B. Rupp | | | |
| DATE<br>06/18/2019 | | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Thomas B. Rupp | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.