# EXHIBIT J

WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C. (*pro hac vice*)
(ray.schrock@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Theodore E. Tsekerides (*pro hac vice*)
(theodore.tsekerides@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Peter J. Benvenutti (#60566)
(pbenvenutti@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

Attorneys for Plaintiffs (Debtors
and Debtors in Possession)

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION**,<br><br>    - and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY**,<br><br>                 **Debtors**. | Case Nos. 19-30088 (DM)<br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br><br>  Adv. Pro. No. 19-03039 (DM) |
| **PG&E CORPORATION and PACIFIC GAS AND ELECTRIC COMPANY**,<br><br>                 **Plaintiffs**,<br><br>v.<br><br>**PUBLIC EMPLOYEES RETIREMENT ASSOCIATION OF NEW MEXICO and YORK COUNTY**<br><br>                 **Defendants**. | **DECLARATION OF ELIZABETH COLLIER IN SUPPORT OF DEBTORS' MOTION FOR A PRELIMINARY INJUNCTION AS TO** *IN RE PG&E CORP. SECURITIES LITIG.*, **18-CV-03509 (N.D. CAL.)** |

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

I, Elizabeth Collier, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am employed as Managing Counsel, Litigation in the legal department of Pacific Gas and Electric Company (the "**Utility**"), a wholly-owned subsidiary of PG&E Corporation ("**PG&E Corp.**" and together with Utility, the "**Debtors**").  In my current role, I am responsible for the development and successful implementation of strategy for the active and potential litigation facing the Debtors.  I joined the Utility in 2001 and have held various positions of increasing responsibility working on litigation, regulatory, and commercial matters, since that time.  I obtained my Juris Doctorate from University of California, Hastings College of the Law in 1990 and was admitted to the State Bar of California that same year.

2.      I submit this declaration in support of the Debtors' Motion for Preliminary Injunction (the "**Motion**") as to *In re PG&E Corp. Securities Litig.*, Civ. No. 18-03509 (N.D. Cal.) (the "**Wildfire Securities Action**").  If called upon, I would testify to the facts set forth in this declaration.  I am authorized to submit this declaration on behalf of the Debtors.

3.      Except as otherwise indicated herein, the facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtors, or my opinion based upon experience, knowledge, and information concerning the matters discussed herein.

### Wildfire Securities Action Complaint

4.      Attached hereto as Exhibit A is a true and correct copy of Third Amended Complaint in the matter of *In re PG&E Corp. Sec. Litig.*, No. 18-cv-03509 (N.D. Cal.).

### The Debtors' Indemnification Obligations and Insurance Policies

5.      Attached hereto as Exhibits B and C are true and correct copies of certain Restated Articles of Incorporation of the Utility and PG&E Corp., dated April 12, 2004 and May 29, 2002, respectively (together, the "**Articles of Incorporation**"), which state identically in relevant part: "The liability of the directors of the corporation for monetary damages shall be eliminated to the fullest extent permissible under California law." Ex. B § 2; Ex. C § 2.  The Articles of Incorporation

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

1  further state in relevant part: "The Corporation is authorized to provide indemnification of agents

2  (as defined in Section 317 of the California Corporations Code) through bylaws, resolutions,

3  agreements with agents, votes of shareholders or disinterested directors, or otherwise, in excess of

4  the indemnification otherwise permitted by Section 317 of the California Corporations Code, subject

5  only to the applicable limits set forth in Section 204 of the California Corporations Code." *Id.*

6        6.      Attached hereto as Exhibits D and E are true and correct copies of certain Resolutions

7  of the Board of Directors of the Utility and PG&E Corp. dated July 19, 1995 and December 18,

8  1996, respectively (together, the "**Resolutions**"), which state identically in relevant part: "Each

9  person who was or is a party or is threatened to be made a party to, or who is involved in any

10  threatened, pending, or completed action, suit, or proceeding . . . by reason of the fact that he or she .

11  . . is or was a director or officer of the Corporation . . . shall, subject to the terms of any agreement

12  between the Corporation and such a person, be indemnified and held harmless by the Corporation to

13  the fullest extent permissible under California law and the Corporation's Articles of Incorporation,

14  against all costs, charges, expenses, liabilities, and losses (including, without limitation, attorneys'

15  fees, judgments, fines, ERISA excise taxes, or penalties and amounts paid or to be paid in

16  settlement) reasonably incurred or suffered by such person in connection therewith, and such

17  indemnification shall continue as to a person who has ceased to be a director or officer . . . ." Ex. D

18  § 1, Ex. E § 1.[1]  Pursuant to their indemnification obligations under the Article of Incorporation and

19  Resolutions, the Debtors are reimbursing the Individual Defendants for any attorneys' fees they

20  incur in connection with the Wildfire Securities Action.  Pursuant to those same obligations, the

21  Debtors will also reimburse the Individual Defendants for any other losses they incur in connection

22  with the Wildfire Securities Action, subject to applicable law.

23        7.      The Debtors maintain insurance policies to help cover any indemnification

24  obligations that arose in 2017 or 2018 to their current and former directors and officers, as relates to,

25  among other things, actions such as the Wildfire Securities Action (the "**D&O Policies**").  The D&O

26  Policies provide coverage both to the Individual Defendants, and to the Debtors themselves, up to

27

28  _____
[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

specified amounts. The portion of this coverage that is shared amongst the Debtors and the Individual Defendants—which constitutes the majority of the coverage available under the D&O Policies—provides coverage: (i) to the Individual Defendants for any non-indemnified losses incurred in their capacity as officers or directors of the Debtors (the "**Side A Coverage**"); (ii) to the Debtors for any losses arising from their indemnification obligations owed to the Individual Defendants (the "**Side B Coverage**"); and (iii) to the Debtors for any direct losses the Debtors incur as a result of securities claims made directly against them (the "**Side C Coverage**"). The shared coverage available under the D&O Policies is subject to an aggregate limit of liability, such that when proceeds are paid out under any one coverage part, the remaining available shared coverage is reduced. Attached hereto as Exhibits F and G are the primary D&O Policies.

8. Once the Debtors' payment to or on behalf of the Individual Defendants for or of losses (including defense costs) incurred by the Individual Defendants in connection with the Wildfire Securities Action reaches a self-insured retention applicable to the Side B Coverage of the D&O Policies, the Debtors will be entitled to payment under the Side B Coverage for further payment by the Debtors to or on behalf of the Individual Defendants for or of losses (including defense costs) incurred by the Individual Defendants in connection with the Wildfire Securities Action, above that self-insured retention. The Debtors' recovery of insurance proceeds under the Side B Coverage would reduce the coverage available to the Debtors under the D&O Policies.

9. Based on the Securities Plaintiffs' purported investment losses, the alleged potential exposure in the Wildfire Securities Action far exceeds the limits of liability in the D&O Policies.

10. Attached hereto as Exhibits H, I and J are true and correct copies of Underwriting Agreements between the Utility and the Underwriter Defendants, dated February 23, 2016, November 28, 2016, and March 7, 2017, respectively (collectively, the "**Underwriting Agreements**"), which state identically in relevant part: "The Company agrees to indemnify and hold harmless each Underwriter, the directors, officers, employees and agents of each Underwriter and each person who controls any Underwriter within the meaning of either the [Securities] Act or the Exchange Act and each affiliate of any Underwriter within the meaning of Rule 405 under the Securities Act against any and all losses, claims, damages or liabilities, joint or several, to which

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

they or any of them may become subject under the [Securities] Act, the Exchange Act or other Federal or state statutory law or regulation, at common law or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon any untrue statement or alleged untrue statement of a material fact contained in the Registration Statement or in any subsequent amendment thereof, or in the Base Prospectus, any Preliminary Prospectus or any other preliminary prospectus supplement relating to the Securities, the Final Prospectus, any Issuer Free Writing Prospectus or the information contained in the final term sheets required to be prepared and filed pursuant to Section 5(b) hereto, or in any amendment thereof or supplement thereto, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and agrees to reimburse each such indemnified party, as incurred, for any legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability or action . . . ." Ex. H § 8, Ex. I § 8, Ex. J § 8. The Debtors expect that, if the Wildfire Securities Action is permitted to proceed, the Underwriter Defendants will seek to avail themselves of these indemnification rights for the claims asserted against them in that action.

### The Debtors' Focus on the Chapter 11 Cases

11. The Debtors, their directors, officers, and other employees currently are already engaged in the following tasks, among others, that are critical to their reorganization effort: (i) stabilizing the Debtors' business, which requires managing relationships with and responding to innumerable inquiries from employees, the public, vendors, regulators, the official committees, and other key parties in interest, as well as attending to their day-to-day ordinary course responsibilities; (ii) assisting the Debtors' advisors in preparing for bi-weekly hearings, many of which are contested, and overseeing and reviewing, on expedited timeframes, multiple lengthy and complex documents for filing with the Court; (iii) responding to various demands from the Official Committee of Unsecured Creditors and the Tort Claimants' Committee; (iv) conducting ongoing negotiations with multiple constituencies with respect to various matters related to the successful prosecution of these Chapter 11 Cases; (v) managing the wildfire safety programs key to the Debtors' ongoing

1  operations; and (vi) fulfilling obligations related to *United States v. Pac. Gas & Elec. Co.*, Crim. No.

2  14-00175-WHA (N.D. Cal.).

3       12.     Should it proceed, the Wildfire Securities Action will materially divert the Debtors

4  and their directors, officers, and employees from these tasks in numerous ways. Prosecution of the

5  Wildfire Securities Action against the Non-Debtor Defendants will likely force the Debtors to

6  respond to broad and burdensome discovery. The TAC's allegations implicate potentially millions

7  of pages of documents relating to transactions and events that span decades, and involve many of the

8  Debtors' current directors, officers, and employees, several of whom would likely be deposed.

9  Moreover, given the Debtors' indemnification obligations, and because the Securities Plaintiffs'

10  claims are ultimately directed at the Debtors, the Debtors' in-house legal team would need to

11  monitor the Wildfire Securities Action closely, and would potentially be required to intervene to

12  protect their interests.

13  Executed on June 18, 2019

14

15

16                   By: _____

17                         Elizabeth Collier

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

1  **LABATON SUCHAROW LLP**
   THOMAS A. DUBBS (*pro hac vice*)
2  LOUIS GOTTLIEB (*pro hac vice*)
   JEFFREY A. DUBBIN (#287199)
3  ARAM BOGHOSIAN (*pro hac vice*)
   140 Broadway
4  New York, New York 10005
   Telephone: (212) 907-0700
5  Facsimile: (212) 818-0477
   Email: tdubbs@labaton.com
6  lgottlieb@labaton.com
   jdubbin@labaton.com
7  aboghosian@labaton.com

8  *Counsel for Lead Plaintiff the Public Employees Retirement*
   *Association of New Mexico and Lead Counsel for the Class*
9
   **WAGSTAFFE, VON LOEWENFELDT, BUSCH & RADWICK, LLP**
10 JAMES M. WAGSTAFFE (#95535)
   FRANK BUSCH (#258288)
11 100 Pine Street, Suite 725
   San Francisco, California 94111
12 Telephone: (415) 357-8900
   Facsimile: (415) 371-0500
13 Email: wagstaffe@wvbrlaw.com
   busch@wvbrlaw.com
14
   *Liaison Counsel for the Class*
15

16              **UNITED STATES DISTRICT COURT**
              **NORTHERN DISTRICT OF CALIFORNIA**
17                **SAN FRANCISCO DIVISION**

18

19                                    Civil Action No. 3:18-cv-03509-EJD

20 IN RE PG&E CORPORATION              THIRD AMENDED CONSOLIDATED CLASS
   SECURITIES LITIGATION               ACTION COMPLAINT FOR VIOLATION OF
                                       THE FEDERAL SECURITIES LAWS
21

22                                     JURY TRIAL DEMANDED

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

I.     INTRODUCTION ................................................................................................. 1

3

II.    NATURE OF THE CASE ..................................................................................... 4

4

III.   JURISDICTION AND VENUE ........................................................................... 5

5

IV.    OVERVIEW OF THE EXCHANGE ACT VIOLATIONS ................................. 5

6

       A.  PG&E's Failure to Comply with Safety Regulations Proximately Caused
           Wildfires in 2017 and Investors' Consequent Losses ........................................ 6

7

8

       B.  PG&E's Failure to Prioritize Safety Continued Unabated, Proximately
           Causing a Disastrous Wildfire in November 2018 as Well as Further Investor
           Losses ................................................................................................................... 8

9

10

           1.  After the North Bay Fires, PG&E Continued to Make False and
               Misleading Statements and Omissions ......................................................... 8

11

           2.  PG&E's Continuing Noncompliance With Safety Regulations Caused the
               Camp Fire ..................................................................................................... 10

12

13

       C.  Exchange Act Claims Being Asserted ................................................................. 12

       V.     THE EXCHANGE ACT PARTIES .................................................................... 13

14

       VI.    SUBSTANTIVE ALLEGATIONS SUPPORTING THE EXCHANGE ACT CLAIMS 15

15

       A.  PG&E Operates Within a Robust Legal Regime ................................................. 15

16

           1.  California Law Required PG&E to Maintain a Safe Distance Between Its
               Electrical Equipment and Nearby Vegetation ............................................. 15

17

           2.  California Law Required PG&E to Safely Maintain Its Electrical
               Equipment and Infrastructure ...................................................................... 16

18

19

           3.  PG&E Is Regulated by the CPUC ................................................................ 17

20

               (a)  CPUC's General Orders 95 and 165 Impose Strict Safety
                    Regulations on PG&E ............................................................................. 17

21

22

               (b)  CPUC's Resolution ESRB-8 Imposes on PG&E an Obligation to
                    Adopt, Promulgate and Follow the ESRB-8 Shutoff Protocol ............... 19

23

               (c)  PG&E Must Follow CPUC's Regulations Under Penalty of Law ........... 20

24

           4.  Cal Fire Is the Duly Authorized Investigative Arm of the State of
               California for Wildfires ................................................................................. 20

25

           5.  Under California's Inverse Condemnation Law, PG&E Would Not Bear
               the Cost of Wildfires It Causes if It Could Prove That It Acted Reasonably
               and Prudently ............................................................................................... 21

26

27

           6.  Federal Law Also Requires PG&E to Follow Minimum Safety Standards ........ 21

28

B.  PG&E's Vegetation Management Expenditures Did Not Materially Change from Year to Year During the Class Period, Let Alone Double at Any Point ............ 22

C.  PG&E's Tree Trimming and Removal Did Not Come Close to Doubling During the Class Period ........................................................................................... 24

D.  After the North Bay Fires, PG&E Started Reporting Inflated Numbers for Tree Removal ................................................................................................. 25

E.  PG&E Concealed Its Unsafe Use of Reclosers During the Class Period .................. 25

    1.  PG&E Used Reclosers to Prioritize Convenience Over Safety ........................... 25

    2.  PG&E Concealed Its Use of Reclosers from Investors During the Class Period ........................................................................................................ 27

F.  PG&E Engaged in an Unsafe Pattern of Noncompliance with Safety Requirements Before and Throughout the Class Period ............................................ 28

    1.  PG&E Was Convicted of Negligence for Starting a Wildfire in 1994 ............... 28

    2.  PG&E Unsafely Flouts Safety Regulations ....................................................... 28

    3.  PG&E's Unsafe, Noncompliant Vegetation Management Caused the Butte Fire in 2015 ............................................................................................... 30

    4.  PG&E's Insufficient Safety Practices Allowed Numerous, Company-Wide Vegetation Management and Other Safety Violations During the Class Period ........................................................................................................ 30

        (a)  PG&E Documented and Tolerated Thousands of Dangerous Safety Violations Across Its Territory During the Class Period ............................ 30

        (b)  PG&E Had Actual Knowledge That Its Insufficient Safety Practices Had the Potential to Allow for Dangerous Safety Violations on the Order of Hundreds of Thousands to a Million Wildfire Hazards ............... 32

G.  Investors Could Not Have Reasonably Expected the Extent of PG&E's Unsafe Pattern of Noncompliance that Caused the North Bay Fires and the Camp Fire ........ 33

    1.  PG&E's Noncompliance with Vegetation Management and Pole Integrity Requirements Caused the North Bay Fires ......................................... 33

    2.  PG&E's Noncompliance with Vegetation Management and Pole Integrity Requirements Caused the Camp Fire ................................................ 34

        (a)  The Camp Fire's First Ignition Point Was Caused by PG&E Safety Violations ................................................................................................... 34

        (b)  The Camp Fire's Second Ignition Point Was Also Caused by PG&E's Safety Violations ........................................................................ 37

H.  PG&E's Repeated Vegetation Management and Pole Integrity Safety Violations Show that the Company Knew of Its Numerous and Widespread Violations of Fire Safety Regulations Throughout the Class Period, but Did

Not Change Its Practices to Reduce, Much Less Eliminate, Those Safety Violations ................................................................................................ 38

    1.  PG&E Did Not Improve Its Inadequate Safety Practices After Its Safety Violations Caused the Deadly Butte Fire .................................................. 38

    2.  PG&E Internally Acknowledged, Extensively Documented, and Tolerated for Years the Safety Violations that Caused the Camp Fire ......................... 39

I.  PG&E's ESRB-8 Shutoff Protocol Was Illusory, and PG&E's Failure to Follow It Was a Proximate Cause of the Camp Fire .................................... 43

    1.  PG&E Admitted that All of the Non-Weather Criteria Weighed in Favor of Shutting Off the Power ............................................................ 45

        (a)  Criterion 1: the National Fire Danger Rating System Rated Jarbo Gap as Having an "Extreme" Fire Danger Threat Level ........................... 45

        (b)  Criterion 2: the National Weather Service Declared a "Red Flag Warning" for the Area .................................................................. 47

        (c)  Criterion 6: "Critically Dry Vegetation" (*i.e.*, Wildfire Fuel) Weighed in Favor of a Shutoff .................................................... 47

        (d)  Criterion 7: PG&E's On-the-Ground Observations Weighed in Favor of a Shutoff ................................................................................ 49

    2.  All of the Weather Criteria Weighed in Favor of Shutting Off the Power ........... 50

        (a)  Criterion 3: The Jarbo Gap Recorded Sufficiently Low Humidity Levels ............................................................................................ 52

        (b)  Criterion 4: The Jarbo Gap Recorded Sufficiently High Wind Speed ......... 53

        (c)  Criterion 5: Site-Specific Conditions Further Favored Shutoff .................. 54

    3.  PG&E Knew, or Recklessly Disregarded, that All Seven Criteria Weighed in Favor of Shutting Off the Power ........................................................ 54

J.  PG&E's Bankruptcy and Other Post-Class-Period Developments ............................. 56

VII.    DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS UNDER THE EXCHANGE ACT ......................................................................... 59

A.  Overview of Defendants' Fraudulent Course of Conduct ........................................... 59

B.  Defendants Made Materially False and Misleading Statements and Omissions Regarding Its Vegetation Management Activities and Compliance with Wildfire Safety Regulations Before the North Bay Fires ........................................... 61

    1.  April 29, 2015 – Misstatement No. 1 ................................................................. 61

    2.  October 16, 2015 – Misstatement No. 2 ........................................................... 62

    3.  November 18, 2015 – Misstatement No. 3 ........................................................ 64

4.   October 6, 2016 – Misstatement No. 4 ........................................ 65

5.   August 9, 2017 – Misstatement No. 5 .......................................... 67

C.  Defendants Tied the Company's Dividend to Safety Compliance, Making
    Materially False and Misleading Statements and Omissions Regarding Its
    Dividend and Safety Before the North Bay Fires ........................................ 69

    1.   May 23, 2016 – Misstatement No. 6 .......................................... 70

    2.   November 4, 2016 – Misstatement No. 7 .................................. 71

    3.   May 31, 2017 – Misstatement No. 8 .......................................... 72

D.  After the North Bay Fires Erupted, the Truth Began to Emerge ................ 74

E.  After the North Bay Fires Were Contained, the Company Made Additional
    False and Misleading Statements and Omissions Regarding Compliance with
    Wildfire-Related Safety Regulations ........................................ 75

    1.   October 31, 2017 – Misstatement No. 9 .................................... 75

    2.   November 2, 2017 – Misstatement No. 10 ................................ 76

    3.   November 2, 2017 – Misstatement No. 11 ................................ 79

    4.   November 5, 2017 – Misstatement No. 12 ................................ 81

    5.   May 25, 2018 – Misstatement No. 13 ........................................ 83

F.  While the Truth Regarding PG&E's Role in Causing the North Bay Fires
    Emerged, the Company Made Additional False and Misleading Statements
    and Omissions Regarding Compliance with Wildfire-Related Safety
    Regulations, Including Its ESRB-8 Shutoff Protocol ................................ 85

    1.   June 8, 2018 – Misstatement No. 14 .......................................... 85

    2.   June 8, 2018 – Misstatement No. 15 .......................................... 87

    3.   September 27, 2018 – Misstatement No. 16 .............................. 88

    4.   October 9, 2018 – Misstatement No. 17 .................................... 90

    5.   October 9, 2018 – Misstatement No. 18 .................................... 91

    6.   November 8, 2018 – Misstatement No. 19 ................................ 92

VIII.  MATERIALITY UNDER THE EXCHANGE ACT ........................................ 93

IX.  LOSS CAUSATION UNDER THE EXCHANGE ACT .................................. 94

    A.  Defendants' False and Misleading Statements Artificially Inflated the Price of
        PG&E's Securities ........................................ 94

    B.  PG&E's Safety Violations Caused the Devastating North Bay Fires ......................... 95

C. PG&E's Safety Violations Caused the Devastating Camp Fire ...............................95

D. As the Market Learned About the Effects and Extent of PG&E's Inadequate
Safety Practices, the Price of PG&E's Securities Fell Dramatically ........................96

    1. October 12, 2017 – Corrective Disclosure and/or Materialization of
    Concealed Risk ................................................................................... 96

        (a) The Market Began to Learn the Extent and Effects of PG&E's
        Responsibility for the North Bay Fires ........................................... 96

        (b) Market Commentators Confirmed the Cause of PG&E's Share Price
        Decline on October 12, 2017 .......................................................... 97

    2. October 13-16, 2017 – Corrective Disclosure and/or Materialization of
    Concealed Risk ................................................................................... 99

        (a) The Market Continued to Learn the Extent and Effects of PG&E's
        Responsibility for the North Bay Fires ........................................... 99

        (b) Market Commentators Confirmed the Cause of PG&E's Share Price
        Decline on October 13, 2017 .......................................................... 99

    3. December 20, 2017 – Corrective Disclosure and/or Materialization of
    Concealed Risk ................................................................................. 100

        (a) The Market Continued to Learn the Extent and Effects of PG&E's
        Responsibility for the North Bay Fires ......................................... 100

        (b) Market Commentators Confirmed the Proximate Cause of PG&E's
        Share Price Decline on December 20, 2017 ............................... 101

    4. May 25, 2018 – Corrective Disclosure and/or Materialization of
    Concealed Risk ................................................................................. 102

        (a) The Market Continued to Learn the Extent and Effects of PG&E's
        Responsibility for the North Bay Fires ......................................... 102

        (b) Market Commentators Confirmed that the News Regarding Safety
        Violations Proximately Caused PG&E's Share Price Decline on May
        25-29, 2018 ................................................................................... 104

    5. June 8, 2018 – Corrective Disclosure and/or Materialization of Concealed
    Risk ................................................................................................. 105

        (a) The Market Learned the Truth of PG&E's Continued, Unsafe Use of
        Reclosers ..................................................................................... 107

        (b) The Market Continued to Learn the Extent and Effects of PG&E's
        Safety Violations and Responsibility for the North Bay Fires ................. 107

        (c) Market Commentators Confirmed that the Number and Range of
        Safety Violations Proximately Caused PG&E's Share Price Decline
        on June 8-11, 2018 ...................................................................... 108

6. November 8-9, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ............................................................................................ 109

    (a) The Market Began to Learn the Extent and  Effects of PG&E's Responsibility for the Camp Fire .................................................. 109

    (b) Market Commentators Confirmed the Cause of PG&E's November 9, 2018 Share Price Decline ................................................................ 110

7. November 9-12, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ............................................................................................ 112

    (a) The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire .................................................. 112

    (b) Market Commentators Confirmed the Cause of PG&E's November 9-12, 2018 Share Price Decline. ........................................................ 113

8. November 13-14, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ............................................................................................ 114

    (a) The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire .................................................. 114

    (b) Market Commentators Confirmed the Cause of PG&E's Share Price Decline on November 14, 2018 ........................................................ 115

9. November 15, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ............................................................................................ 116

    (a) The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire .................................................. 116

    (b) Market Commentators Confirmed the Cause of PG&E's Share Price Decline on November 15, 2018 ........................................................ 117

X. SCIENTER UNDER THE EXCHANGE ACT ........................................................ 118

A. PG&E Knew that Its Safety Practices Continued to Violate the Law Even After PG&E Was on Notice of the Butte Fire Safety Violations ......................... 118

B. Safety Was Core to PG&E's Operations, and the Exchange Act Individual Defendants Were Directly Involved in It ........................................................ 120

C. The Federal Court Overseeing PG&E's Probation, Including Safety Monitoring, Has Uncovered Additional Facts Supporting Scienter ...................... 123

D. PG&E's Noncompliance with Safety Regulations Was Well-Known Throughout the Company, Including at the Highest Levels, with Real-Time Access to a Database of Known Safety Violations ............................................... 129

    1. PG&E Recorded Its Violations of Safety Regulations in a Sophisticated Database, Readily Accessible by the Exchange Act Individual Defendants ...... 129

2. PG&E Instituted a Culture Among Its On-the-Ground Employees of Reporting Problems up the Corporate Chain, Which Upper Management Was Aware of and Monitored ................................................................. 131

E. PG&E's Compliance Statements Were Authorized by Defendant Kane and Were Made under Her Ultimate Authority ........................................................ 133

F. The Threat of a Potential Bankruptcy Gave Defendants a Strong Motive to Mislead Investors ....................................................................................... 135

G. After PG&E Failed to Follow Its ESRB-8 Shutoff Protocol and Caused the Camp Fire, PG&E Attempted to Cover It Up ..................................................... 136

H. PG&E's Unprecedented Departure of Officers and Directors Strengthens the Inference of Scienter ........................................................................... 140

XI. APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET FOR THE EXCHANGE ACT CLAIMS ......................................................... 141

XII. CLASS ACTION ALLEGATIONS FOR THE EXCHANGE ACT CLAIMS............. 142

XIII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT........................................ 144

XIV. NATURE OF THE SECURITIES ACT CLAIMS........................................... 151

XV. OVERVIEW OF THE SECURITIES ACT VIOLATIONS ........................................ 151

XVI. THE SECURITIES ACT PARTIES ....................................................... 153

A. Securities Act Named Plaintiffs........................................................... 153

B. Bankrupt Entities ............................................................................. 154

C. Securities Act Individual Defendants ...................................................... 154

D. Underwriter Defendants...................................................................... 159

XVII. SUBSTANTIVE ALLEGATIONS SUPPORTING THE SECURITIES ACT CLAIMS 162

A. PG&E's Systemic Failure to Take Measures to Mitigate Wildfires and Safety Violations ............................................................................... 162

1. Overview of Laws and Regulations Governing PG&E's Operations................. 162

2. PG&E's Lax Safety Practices, Safety Violations and Resulting Wildfires ....... 164

XVIII. THE SECURITIES ACT DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS IN THE OFFERING DOCUMENTS FOR THE NOTES OFFERINGS................................................................................. 186

A. The Securities Act Defendants Misled Investors Regarding PG&E's Safety Practices, Policies and Compliance ........................................................ 187

1. The Offering Documents Omitted PG&E's Widespread Safety Failures and the Existing Risks Associated with Its Inadequate Safety Practices ......... 188

2. The Offering Documents Did Not Disclose PG&E's Investments in, Commitment to, and Practices Related to Safety Were Inadequate .................. 194

B. The Securities Act Defendants Materially Misled Investors Regarding PG&E's Liability for Wildfires ................................................................. 203

C. PG&E's Offering Documents Misled Investors by Failing to Comply with Item 303's Disclosure Requirements and Disclosure Safety Violations ................. 208

XIX.  NO SAFE HARBOR FOR THE SECURITIES ACT CLAIMS ................................... 211

XX.   CLASS ACTION ALLEGATIONS FOR THE SECURITIES ACT CLAIMS ............. 212

XXI.  CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ........................................ 214

XXII. PRAYER FOR RELIEF ....................................................................................... 216

1    Court-appointed Lead Plaintiff, the Public Employees Retirement Association of New

2    Mexico ("PERA" or "Lead Plaintiff"), individually and on behalf of all other persons similarly

3    situated, alleges the following against PG&E Corporation, Pacific Gas and Electric Company

4    (the "Utility," and together with PG&E Corporation, "PG&E" or the "Company"), the Exchange

5    Act Individual Defendants (defined below), the Securities Act Individual Defendants (defined

6    below), and the Underwriter Defendants (defined below).  In addition, named Plaintiff York

7    County on behalf of the County of York Retirement Fund, City of Warren Police and Fire

8    Retirement System and Mid-Jersey Trucking Industry & Local No. 701 Pension Fund

9    (collectively, the "Securities Act Plaintiffs," and together with Lead Plaintiff, "Plaintiffs"),

10   individually and on behalf of all others similarly situated, allege violations of the Securities Act

11   of 1933 ("Securities Act") against the Securities Act Individual Defendants and the Underwriter

12   Defendants. These allegations are based upon personal knowledge as to Plaintiffs' own acts, and

13   upon information and belief as to all other matters.  Plaintiffs' information and belief is based on

14   the investigation conducted by and through its attorneys, which included a review of the

15   Company's Securities and Exchange Commission ("SEC") filings, conference call transcripts

16   and press releases, media and analyst reports about the Company, court filings, and other public

17   information regarding the Defendants.  Plaintiffs believe that substantial additional evidentiary

18   support for the allegations set forth herein will be produced through discovery.

19   **I.    INTRODUCTION**

20       1.    The investing public depends on PG&E to be honest when talking about its safety

21   practices and level of compliance with vital safety regulations.  This federal securities class

22   action arises out of the materially false statements that Defendants made to investors from April

23   29, 2015 through November 15, 2018 (the "Class Period").  Their statements and omissions

24   misled investors about PG&E's wildfire safety practices, including their representations of

25   achieving full legal compliance and investing in safety, notwithstanding the Company's

26   numerous and widespread violations of powerline safety regulations.

27       2.    For example, in just 14 months from October 2017 through November 2018,

28   California experienced some of the deadliest and most destructive wildfire events of its recorded

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                                1

1  history.  This narrow time period included both the 2017 North Bay Fires and the 2018 Camp

2  Fire.  One thing these fires have in common is that they were started or exacerbated by

3  noncompliant PG&E electrical equipment and vegetation management: an astounding fact to

4  those who believed PG&E's public statements that it complied with California and federal safety

5  regulations.  The other thing these fires have in common is that they incited a series of

6  investigations, which have revealed PG&E's gross deficiencies in the area of safety compliance.

7         3.      The timing of these catastrophic fires is no coincidence; they occurred at the

8  height of PG&E's knowing noncompliance with safety regulations.  Among the many details that

9  have emerged, the Honorable William Alsup of the United States District Court for the Northern

10  District of California, in presiding over PG&E's criminal probation, has found as fact "that as of

11  **June 2017**, there were 3,962 unworked trees which PG&E had identified **in 2016** as hazardous

12  with the potential to 'fall into or otherwise impact the [electrical] conductors, towers or guy

13  wires before the next inspection cycle.'"  By June 2017, PG&E had known about these

14  thousands of vegetation fire hazards for six to eighteen months (*i.e.*, as far back as January 2016)

15  – yet did nothing other than to internally record their existence.  Judge Alsup based this finding

16  on PG&E's own admissions.

17         4.      Thus, mere months before its vegetation safety violations would cause and

18  exacerbate the 2017 North Bay Fires, PG&E actually knew it was not addressing thousands of

19  violations in the form of vegetation fire hazards, even while falsely assuring investors over the

20  same time period that its vegetation management was, *e.g.*, "*in compliance with relevant laws*"

21  (October 6, 2016 – Misstatement No. 4), and "*complying with state and federal regulations and*

22  *delivering safe, reliable and affordable electric service*" (August 9, 2017 – Misstatement No. 5).

23         5.      The public did not immediately know that PG&E was responsible for the North

24  Bay Fires—information that would threaten the Company's financial condition.  So PG&E

25  doubled down on misinformation in order to build up the public perception of its safety and

26  compliance before the tide of public opinion could turn against it.  For example, after the North

27  Bay Fires erupted, Defendants falsely insisted that the Company had "*doubl[ed] our typical*

28  *vegetation management spending last year*" and "*inspect[ed] all of our overhead lines*"

1    (November 2, 2017 – Misstatement Nos. 10 & 11), when **it had not**. Similarly, the Company

2    reiterated that it "***meets or exceeds all applicable federal and state vegetation clearance***

3    ***requirements***" (November 5, 2017 – Misstatement No. 12), yet soon thereafter, state

4    investigators would link evidence of PG&E's violations of California safety regulations to at

5    least **eleven** of the North Bay Fires.

6          6.      Even as the truth began to emerge about PG&E's insufficient safety practices, and

7    PG&E continued to falsely insist on its compliance, California imposed additional safety

8    regulations on the Company.  This included a mandate that PG&E formalize a protocol for

9    proactively turning off its power lines when certain extreme conditions were met, to prevent any

10   further wildfires.  By the deadline, PG&E stated that it had "***created a set of procedures for . . .***

11   ***[d]etermining what combination of conditions necessitates turning off lines for safety***"

12   (September 27, 2018 – Misstatement No. 16).  Yet less than two months later, on a day when

13   hazardous weather and other conditions required PG&E to shut off certain lines, the Camp Fire

14   erupted.  Not only is it now known that **those very power lines caused the Camp Fire**, but facts

15   have emerged suggesting that PG&E's shutoff program **was not in effect when Defendants said**

16   **it was** – facts which PG&E has tried to cover up.

17         7.      PG&E's false and misleading statements destroyed billions of dollars of economic

18   value in the Company's stocks and bonds.  When the true nature and extent of PG&E's

19   responsibility for these fires materialized, investors holding PG&E's publicly traded securities

20   experienced compensable losses.

21         8.      PG&E's ability to maintain safe power lines, compliant with federal and

22   California safety regulations, is essential to the Company's financial health. PG&E has admitted

23   that it is probable it will incur billions of dollars in losses for claims in connection with the North

24   Bay and Camp wildfires.  According to a recent SEC filing, the Company has, to date, recorded

25   charges exceeding $14.2 billion, an amount which it believes is at the "lower end of the range of

26   . . . reasonably estimated losses."[1]

27   _____

28       [1] PG&E recently announced in its May 2, 2019 Form 10-Q that the SEC is "conducting an
     investigation related to PG&E Corporation's and the Utility's public disclosures and accounting

1    9.      Indeed, PG&E's responsibility for the North Bay Fire and Camp Fire catastrophes

2   has caused the Company to file for bankruptcy under Chapter 11 of Title 11 of the United States

3   Code (11 U.S.C. § 101 et seq.).  The Company's bankruptcy filings stated that it was facing

4   $51.7 billion in liabilities, including more than $30 billion in potential liabilities tied to the North

5   Bay and Camp Fires.[2]

6    10.     Because it was vital for PG&E's business to be perceived as making safety its

7   highest priority, Defendants assured investors that the Company's wildfire safety measures were

8   adequate and compliant with applicable laws and regulations.  However, the investigations

9   following these devastating fires have revealed that PG&E's assurances were false: evidence has

10  emerged that PG&E's safety violations caused at least twelve of these devastating fires,

11  including the Camp Fire—California's deadliest and most destructive wildfire ever.

12  **II.    NATURE OF THE CASE**

13   11.     This is a federal securities class action brought pursuant to the Securities

14  Exchange Act of 1934 (the "Exchange Act") on behalf of a class of all persons and entities who,

15  during the period from April 29, 2015 through November 15, 2018, inclusive (the "Class

16  Period"), purchased or otherwise acquired publicly traded PG&E securities and were damaged

17  thereby.  Excluded from the class are: (i) all defendants in the Action; (ii) members of the

18  immediate family of any individual defendant; (iii) any person who is or was an officer or

19  director of PG&E during or after the Class Period; (iv) any firm, trust, corporation, or other

20  entity in which any defendant has or had a controlling interest; (v) PG&E's employee retirement

21  and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases

22  through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or

23  assigns of any such excluded person.  Lead Plaintiff seeks to recover compensable damages

24  caused by defendants' violations of the federal securities laws and to pursue remedies under

25  _____

    *(continued)*

26  for losses associated with the 2017 and 2018 Northern California wildfires and the 2015 Butte
    Fire."  *See* ¶¶663-72, *infra*.

27   [2] Amended Decl. of Jason P. Wells at 3 & 7, Case No. 19-bk-30088 (N.D. Cal. Feb. 1, 2019),

28  ECF No. 263.

Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. This Action also is brought pursuant to the Securities Act of 1933 (the "Securities Act") as set forth in Sections XIV-XII, *infra*.

**III.   JURISDICTION AND VENUE**

12.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5), as well as Sections 11 and 15 of the Securities Act (15 U.S.C. §§77k and 77o).

13.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331, Section 27 of the Exchange Act, and Section 22 of the Securities Act.

14.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as PG&E's principal executive offices are located within this Judicial District. Further, many of the acts and practices complained of herein occurred in substantial part in this Judicial District.

15.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities markets.

**IV.   OVERVIEW OF THE EXCHANGE ACT VIOLATIONS**

16.     PG&E's false statements began on April 29, 2015 and continued through February 8, 2018. As detailed herein, they misled investors about PG&E's wildfire safety practices, including representations that the Company was in full legal compliance and continuing to invest in safety, notwithstanding the Company's numerous and widespread violations of safety regulations and inadequate safety practices.

A.    **PG&E's Failure to Comply with Safety Regulations Proximately Caused Wildfires in 2017 and Investors' Consequent Losses**

17.    Throughout the Class Period, Defendants wanted investors to believe that PG&E was not cutting corners with its vegetation management. So PG&E repeatedly represented to its investors that:

- "*PG&E's Vegetation Management*" was "*in compliance with relevant laws*" (October 6, 2016 – Misstatement No. 4);

- Its "*vegetation management program . . . compl[ies] with state and federal regulations*" (August 9, 2017 – Misstatement No. 5);

- "*PG&E follows all applicable federal and state vegetation clearance requirements*" to "*help to reduce* outages or *fires caused by trees or other vegetation*" (October 31, 2017 – Misstatement No. 9); and

- "*PG&E meets or exceeds all applicable federal and state vegetation clearance requirements*" (November 5, 2017 – Misstatement No. 12).[3]

18.    These statements, and others, were materially false and misleading because they misrepresented PG&E's level of compliance with California and federal law, and consequently the extent to which shareholders would be exposed to liability for damages caused by wildfires and additional costs to improve their inadequate wildfire safety practices.

19.    The fraud began to unravel when investors learned about PG&E's responsibility – and liability – for the wildfires that devastated Northern California in October 2017 (the "North Bay Fires").[4]  These fires burned approximately 249,000 acres, destroyed 8,898 structures, and killed 44 people across nine counties: Napa, Sonoma, Mendocino, Lake, Humboldt, Butte, Nevada, Solano, and Yuba. They resulted in damages estimated at **more than $17 billion**.[5]  The

---

[3] The statements made by Defendants that are ***bolded and italicized*** are the statements alleged to be false and misleading. All other emphasis is in **bold**.

[4] There may have been as many as 170 individual fires, but many smaller fires combined into larger fires as they burned. Taking that into consideration, the North Bay Fires consisted of eighteen main fires.

[5] This $17 billion estimate is approximately six times greater than the second most expensive California wildfire at the time, the October 1991 Tunnel Fire in Oakland, which, according to a

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                        6
LEAD CASE NO. 18-CV-03509-EJD

1    size of this liability imperiled the financial viability of the Company.  In fact, several of

2    Defendants' false and misleading statements were made in the months before PG&E openly

3    expressed its fear that its liability for the North Bay Fires could send the Company into

4    bankruptcy.

5         20.     As the State of California's official investigations into the eighteen North Bay

6    Fires were completed by the California Department of Forestry and Fire Protection ("Cal Fire"),

7    the truth emerged over time that **at least seventeen** were caused by PG&E equipment.  Indeed,

8    Cal Fire has determined that **eleven** of these fires, across seven counties, evidenced violations of

9    California safety regulations – contradicting Defendants' false representations of compliance

10   with those regulations.

11        21.     Defendants' false and misleading misrepresentations and omissions came at a

12   crucial time for the Company.  As described below, over the past three decades, PG&E caused a

13   series of wildfires and other disasters in California.  For example, in September 2015, its

14   violations of California safety regulations regarding vegetation clearance caused a wildfire

15   known as the "Butte Fire," which burned over 70,000 acres, destroyed 921 structures, and killed

16   two people – making it then the seventh most destructive wildfire in California history, but small

17   compared to the North Bay and Camp Fires that would follow.

18        22.     Revealingly, just months before the North Bay Fires began, in an April 2017 non-

19   public deposition concerning PG&E's responsibility for the Butte Fire, a PG&E Vegetation

20   Program Manager named Richard Yarnell admitted: "PG&E—to the best of my knowledge, **we**

21   **have not made any changes as a result of this fire**."  Thus, despite being on notice of its

22   dangerous safety violations and their deadly consequences, neither the Company nor its officers

23   took any steps to improve safety or compliance between the Butte Fire and the far more

24

25

---

26   *(continued)*
     May 27, 2011 article in *Scientific American*, caused $2.687 billion in insured property damage.
27   Mark Fischetti, *How Much Do Wildfires Cost in Terms of Property Damage?* Scientific
     American (May 27, 2011), https://www.scientificamerican.com/article/graphic-science-how-
28   much-do-fires-cost-property-damage/?redirect=1.

1   disastrous North Bay Fires.  Over this time period, Defendants either knew or should have

2   known that the Company's wildfire-related safety violations continued unabated.

3          23.     Though the North Bay Fires began on a windy night, they were not the result of

4   an unexpected or unique event. Rather, the circumstance of PG&E causing **seventeen** concurrent

5   fires across **nine counties** shows that the Company tolerated numerous and widespread

6   violations of California safety regulations across its territory. As detailed herein, the underlying

7   explanation for these near-simultaneous North Bay Fires is neither unusual weather nor

8   coincidence, but PG&E's failure to comply with even minimal legal requirements. Accordingly,

9   PG&E and its officers knew, or deliberately disregarded, that the Company's power lines and

10   other electrical infrastructure were often not in compliance with federal and California safety

11   requirements when making false and misleading statements to the contrary.

12      **B.**     **PG&E's Failure to Prioritize Safety Continued Unabated, Proximately**
             **Causing a Disastrous Wildfire in November 2018 as Well as Further Investor**
13              **Losses**

14          **1.**     **After the North Bay Fires, PG&E Continued to Make False and**
                    **Misleading Statements and Omissions**
15

16          24.     After the public came to understand PG&E's responsibility for the North Bay

17   Fires over the course of five events from October 12, 2017 and June 11, 2018 (*see* Sections

IX.D.1-5, *infra*), the Company faced a new crisis: the widespread belief that it failed to prioritize
18

19   safety in maintaining its power lines and preventing wildfires.  It also faced a financial crisis, as

its liabilities for the North Bay Fires threatened to bankrupt the Company.
20

21          25.     As a result, PG&E needed the public, including investors, to believe that it would

22   prioritize safety thereafter.  So when Cal Fire announced (on June 8, 2018) its conclusions that

23   PG&E had caused the preponderance of the North Bay Fires, and PG&E's share price continued

24   to decline as its financial situation deteriorated, PG&E responded that same day by reassuring its

investors that, *e.g.*:
25

26      &bull;   Its "*Programs Overall Met [California]'s High Standards*," including "*Vegetation*

27          *Management*," and "*meets or exceeds regulatory requirements for pole integrity*

28          *management*" (May 25, 2018 – Misstatement No. 13);

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                        8

- "To address the growing threats posed by wildfires and extreme weather, and in light of the wildfires throughout our state last year, *PG&E has launched . . . a program to proactively turn off electric power for safety when extreme fire danger conditions occur*" (June 8, 2018 – Misstatement No. 15);

26.     Indeed, one month later, on July 16, 2018, PG&E's primary state regulator **mandated** that PG&E formalize and publicize its protocol for proactively turning off its power lines to prevent further wildfires, enacting a regulation known as Resolution ESRB-8.  The Company announced its response to this new safety requirement on or about September 27, 2018 (the "ESRB-8 Shutoff Protocol"), including:

- "PG&E's Community Wildfire Safety Program implements additional precautionary measures intended to reduce wildfire threats. *It includes . . . executing protocols to temporarily turn off electric power for safety when extreme fire danger conditions are occurring*" and "*PG&E has created a set of procedures for . . . [d]etermining what combination of conditions necessitates turning off lines for safety*" (September 27, 2018 – Misstatement No. 16).

27.     While the Company was finalizing its protocol, on September 21, 2018, California enacted S.B. 901, a law to rescue PG&E from the threat of bankruptcy due to its responsibility for the North Bay Fires.  The resulting law put in place a financial stress test to monitor PG&E's financial health, as well as a method to raise capital should PG&E's liability for the North Bay Fires cause it to fail the test.  The same law made it less likely that PG&E would bear the costs of wildfires it caused in 2019 or later.

28.     However, the new law did not help the Company bear the financial consequences of any wildfires it might cause in the remaining months of 2018.

29.     Put differently, PG&E's vegetation management, proactive power line shutoff program, and other touted means of safety compliance would have to ensure wildfire safety for the remainder of 2018, or their failure would drive the Company to ruin.

30.     PG&E continued to assure the public that it had implemented these measures successfully.  For example, when the news broke on October 9, 2018 that Cal Fire had concluded

1    that PG&E was the cause of yet another one of the prior year's North Bay Fires, the Cascade

2    Fire, the Company reassured investors by stating:

3    - "[W]e are continuing to focus on *implementing additional precautionary measures*

4      intended to further reduce wildfire threats, such as *working to remove and reduce*

5      *dangerous vegetation, improving weather forecasting, upgrading emergency response*

6      *warnings, [and] making lines and poles stronger in high fire threat areas*, and taking

7      other actions to make our system, and our customers and communities, *even safer* in the

8      face of a growing wildfire threat" (October 9, 2018 – Misstatement No. 17); and

9    - "*PG&E has launched . . . a program to proactively turn off electric power for safety*

10     *when extreme fire danger conditions occur*" (October 9, 2018 – Misstatement No. 18).

11       31.    Such statements were materially false and misleading because PG&E had **not**

12   meaningfully improved its safety practices—as would soon be revealed by the Camp Fire.  By

13   pitching their statements to convince the investing public that PG&E had resolved its fire safety

14   failures and would prioritize fire safety thereafter, Defendants concealed the true extent to which

15   the Company was exposed to massive liability for causing further wildfires, thereby significantly

16   inflating PG&E's share price.

17       32.    Ultimately, the North Bay Fires resulted in damages estimated up to $17 billion,

18   for which the Company has already taken a charge of $3.5 billion, admitting the likelihood that it

19   will be liable for, and bear the costs of, at least some of these fires.[6]

20             **2.    PG&E's Continuing Noncompliance With Safety Regulations Caused**
                       **the Camp Fire**
21

22       33.    This continuation of the fraud unraveled when evidence emerged that PG&E was

23   responsible for the Camp Fire, which devastated Northern California in November 2018,

24   burning 153,336 acres, destroying 18,804 structures, and killing at least 85 people[7]—making it

25       [6] Press Release, PG&E, *PG&E Provides Update on Financial Impact of 2017 and 2018*
         *Wildfires* (Feb. 28, 2019) (filed with Form 8-K),
26       https://www.sec.gov/Archives/edgar/data/75488/000119312519055751/d710309dex991.htm.
         [7] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May
27       15, 2019),
         https://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.
28

1   the single most destructive and deadliest wildfire in California history.  It has resulted in

2   damages estimated up to $13 billion, for which the Company has already taken a $10.5 billion

3   charge, admitting the likelihood that it will be liable for, and bear the costs of, the Camp Fire.[8]

4   Moreover, Cal Fire has confirmed that PG&E's electrical equipment caused the Camp Fire.[9]

5        34.   The Camp Fire began when a PG&E electrical tower, carrying a high-voltage 115

6   kilovolt transmission line, failed.  PG&E has also acknowledged a second ignition point for the

7   Camp Fire that exhibited damaged and downed poles, vegetation on top of downed wires, and

8   other signs of safety violations.

9        35.   As a result, vegetation underneath the lines ignited at two ignition points

10  approximately 30 minutes apart.  PG&E's failure to remove such vegetation violated California

11  Public Resources Code Section 4293, and its failure to maintain the integrity of its poles and

12  towers violated California Public Utilities Code Section 451.

13       36.   Starting with two PG&E admissions at the end of the day the Camp Fire began

14  (November 8, 2019), it emerged that PG&E's promises to prioritize fire safety were false and

15  misleading.  PG&E's statements promoting its ESRB-8 Shutoff Protocol were a prime example

16  of this prioritization, promising to shut off electricity broadly rather than risk further wildfires.

17  Soon, however, it emerged that PG&E's ESRB-8 Shutoff Protocol was illusory: the protocol

18  dictated that the electrical lines that caused the Camp Fire **should have been shut off, but**

19  **PG&E flouted it.**  Investors learned not only that PG&E's ESRB-8 Shutoff Protocol should

20  have prevented the fire entirely, but also that PG&E needlessly imperiled lives rather than risk

21  upsetting customers.

22

23

24  _____
    [8]

25  Press Release, PG&E, PG&*E Corporation Provides Update on Financial Impact of 2017 and
    2018 Wildfires* (Feb. 28, 2019) (filed with Form 8-K),

26  https://www.sec.gov/Archives/edgar/data/75488/000119312519055751/d710309dex991.htm.
    [9] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May

27  15, 2019),

28  https://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.

1    37.    PG&E would later attempt to justify its inaction by claiming that its ESRB-8

2    Shutoff Protocol did not apply to high-voltage transmission lines like the one that caused the

3    Camp Fire.  However, Plaintiff's investigation has uncovered that this explanation is

4    demonstrably false.  The fact is that PG&E's promised ESRB-8 Shutoff Protocol would have

5    prevented the Camp Fire if only it were followed.  The Company's attempt to cover it up

6    substantiates not only that PG&E's safety failures caused the Camp Fire, but further that

7    PG&E's false and misleading statements—concealing how the Company was not sufficiently

8    prioritizing safety—were made with knowledge of their falsity, or at least deliberate

9    recklessness.

10    38.    Accordingly, the true risks leading to the Camp Fire were concealed by PG&E's

11    materially false and misleading statements assuring investors of the Company's compliance with

12    California safety regulations, including the ESRB-8 Shutoff Protocol.

13    **C.    Exchange Act Claims Being Asserted**

14    39.    Notwithstanding PG&E's false and misleading statements to the marketplace,

15    investors learned over time that PG&E's safety violations were numerous and widespread.

16    Indeed, they were responsible for most of the North Bay Fires and the Camp Fire. As

17    information regarding the impact of PG&E's deficient safety practices emerged between October

18    12, 2017 and November 15, 2018, investors were surprised, given Defendants' numerous public

19    statements during the Class Period touting the Company's compliance, safety measures, and its

20    intertwined financial health. As information came to light relating to PG&E's inadequate safety

21    measures and/or the effects thereof, PG&E's artificially inflated share price dropped

22    significantly.  Thus, as a result of Defendants' wrongful acts and omissions, Lead Plaintiff and

23    other Class members have suffered significant damages.

24    40.    Lead Plaintiff asserts the claims herein against PG&E and certain of its executives

25    and officers, seeking to recover for its damages suffered due to these declines in PG&E's

26    publicly traded securities.  PG&E's statements of compliance with safety regulations during the

27    Class Period misrepresented current facts and were not statements of opinion.

28

Case 19-30088   Doc# 3373-10   Filed 08/01/19   Entered 08/01/19 19:37:42   Page 22 of
29

## V.     THE EXCHANGE ACT PARTIES

41.     Lead Plaintiff PERA was established in 1947 and manages a retirement system for state, county, and municipal employees including police, firefighters, judges, magistrates, legislators and volunteer firefighters. PERA oversees assets of more than $15 billion on behalf of its members, retirees, and beneficiaries.  As set forth in its Certification (attached hereto as "Attachment A"), PERA purchased securities of PG&E at artificially inflated prices during the Class Period and was damaged as the result of Defendants' wrongdoing as alleged in this Complaint.  On September 10, 2018, this Court appointed PERA to serve as the Lead Plaintiff in this action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

42.     Defendant PG&E Corporation is a publicly traded corporation that is headquartered in San Francisco, California, with principal executive offices located at 77 Beale Street, P.O. Box 770000, San Francisco, California 94177.  PG&E's securities trade on the New York Stock Exchange ("NYSE") under the ticker symbol "PCG." It is a holding company that holds, directs the actions of, and controls energy-based businesses such as the Utility.

43.     Defendant Utility, the Pacific Gas and Electric Company, is a wholly-owned subsidiary of PG&E and operates as a public utility in California. It generates revenue by selling and delivering electricity and natural gas to its customers, also known as "rate-payers." The Utility effectively acts as an alter ego of PG&E; the two entities share the same address, have overlapping directors, intermix finances, and file joint annual reports with the SEC on Form 10-K. Indeed, all of the Utility's shares are owned by PG&E Corporation.  Alternatively, PG&E Corporation controls the Utility as detailed herein.  Accordingly, this Complaint refers to the Utility and PG&E interchangeably as "PG&E" or the "Company," unless otherwise specified.

44.     It is understood that the action against the PG&E Defendants (PG&E Corporation and Pacific Gas and Electric Company) is stayed pursuant to the automatic stay provisions of 11 U.S.C. § 362.

45.     Defendant Anthony F. Earley, Jr. ("Earley") served as PG&E Corporation's President, Chief Executive Officer ("CEO"), and Chairman of the Board from September 13, 2011 to March 1, 2017, and as its Executive Chairman from March 1, 2017 to December 2017.

46.     Defendant Geisha J. Williams ("Williams") served as PG&E Corporation's CEO and President from March 1, 2017 until her resignation on January 13, 2019.  Previously, she served as the President of Electric Operations at the Utility from August 17, 2015 to February 28, 2017.  Prior to that, she served as Executive Vice President of Electric Operations at the Utility from June 1, 2011 to August 16, 2015.  Additionally, Williams was a director of PG&E Corporation from May 2017 to January 2019 and a director of the Utility from August 2015 to January 2019.

47.     Defendant Nickolas Stavropoulos ("Stavropoulos") served as the President and COO of PG&E Corporation from March 1, 2017 to September 30, 2018, and served as President of Gas Operations at the Utility from August 17, 2015 to February 28, 2017. Prior to that, he served as Executive Vice President of Gas Operations at the Utility from June 13, 2011 to August 16, 2015.  Stavropoulos was a director of the Utility from August 2015 to September 2018.

48.     Defendant Julie M. Kane ("Kane") has served as Senior Vice President, Chief Ethics and Compliance Officer, and Deputy General Counsel for PG&E Corporation since May 18, 2015. Kane is named as a Defendant solely in her capacity as Chief Ethics and Compliance Officer.

49.     Defendant Christopher P. Johns ("Johns") served as the President of Pacific Gas and Electric Company from August 1, 2009 to August 17, 2015.

50.     Defendant Patrick M. Hogan ("Hogan") served as the Utility's Senior Vice President of Electric Operations from March 2016 through January 8, 2019, and he retired from the Utility on January 28, 2019.  Prior to that, he served as the Utility's Vice President of Electric Operations Asset Management from November 2013 through February 2016.

51.     The Defendants referenced above in ¶¶45-50 are referred to herein as the "Exchange Act Individual Defendants."

52.     The Exchange Act Individual Defendants, because of their high-level positions of control and authority as senior executive officers of PG&E, possessed the power and authority to control, and did ultimately control, the contents of PG&E's SEC filings, press releases, content

1   on the Company's website and official Twitter.com account, and other market communications

2   during the Class Period. The Exchange Act Individual Defendants were provided with copies of

3   the Company's reports and press releases alleged herein to be misleading prior to or shortly after

4   their issuance and had the ability and opportunity to prevent their issuance or to cause them to be

5   corrected. Because of their positions within the Company and/or Utility, and their access to

6   material information available to them but not to the public, the Exchange Act Individual

7   Defendants knew that the adverse facts specified herein had not been disclosed to, and were

8   being concealed from, the public, and that the positive representations being made were then

9   materially false and misleading. The Exchange Act Individual Defendants are liable for the false

10   statements and omissions pleaded herein.

## VI. SUBSTANTIVE ALLEGATIONS SUPPORTING THE EXCHANGE ACT CLAIMS

### A. PG&E Operates Within a Robust Legal Regime

53.   As detailed herein, electricity transmission and distribution is a heavily regulated industry in California.

#### 1. California Law Required PG&E to Maintain a Safe Distance Between Its Electrical Equipment and Nearby Vegetation

54.   To ensure public safety from wildfires, California has laws and regulations that require PG&E to keep its electrical equipment clear from vegetation growth or hazardous trees, and otherwise safe.

55.   Pursuant to California Public Resources Code Section 4292, for instance:

> [A]ny person that owns, controls, operates, or maintains any electrical transmission or distribution line upon any mountainous land, or forest-covered land, brush-covered land, or grass-covered land shall, during such times and in such areas as are determined to be necessary by the director or the agency which has primary responsibility for fire protection of such areas, maintain around and adjacent to any pole or tower which supports a switch, fuse, transformer, lightning arrester, line junction, or dead end or corner pole, a firebreak which consists of a clearing of not less than 10 feet in each direction from the outer circumference of such pole or tower.

56.   Similarly, California Public Resources Code Section 4293 provides that:

1

2

3

4

5

6

7

8

9

10

11

> [A]ny person that owns, controls, operates, or maintains any
> electrical transmission or distribution line upon any mountainous
> land, or in forest-covered land, brush-covered land, or grass-
> covered land shall, during such times and in such areas as are
> determined to be necessary by the director or the agency which has
> primary responsibility for the fire protection of such areas,
> **maintain a clearance of the respective distances which are
> specified in this section in all directions between all vegetation
> and all conductors which are carrying electric current**: (a) For
> any line which is operating at 2,400 or more volts, but less than
> 72,000 volts, four feet. (b) For any line which is operating at
> 72,000 or more volts, but less than 110,000 volts, six feet. (c) For
> any line which is operating at 110,000 or more volts, 10 feet. In
> every case, such distance shall be sufficiently great to furnish the
> required clearance at any position of the wire, or conductor when
> the adjacent air temperature is 120 degrees Fahrenheit, or less.
> **Dead trees, old decadent or rotten trees, trees weakened by
> decay or disease and trees or portions thereof that are leaning
> toward the line which may contact the line from the side or
> may fall on the line shall be felled, cut, or trimmed so as to
> remove such hazard**.

12

57.     Cal Fire interprets this law to "mean[] that a tree, or portion thereof, that is

13

leaning toward the line, must be 'felled, cut, or trimmed' regardless of its health, if it 'may

14

contact the line from the side or may fall on the line.'"  The law also "requires utilities to identify

15

and remove such hazards."  Thus, Section 4293 not only "mandates that utilities trim or remove

16

limbs overhanging powerlines if those limbs are inside the statutory clearance distances," but

17

further "also mandates that utilities trim or remove, among other hazards, trees or portions

18

thereof that are leaning toward the powerlines, including overhanging limbs, if those trees or

19

limbs **may** contact the line from the side or fall on the line."  Cal Fire also makes clear that "[a]

20

utility's compliance with Section 4293 is mandatory, not discretionary."[10]

21

> **2.     California Law Required PG&E to Safely Maintain Its Electrical
> Equipment and Infrastructure**

22

23

58.     In addition to the vegetation management regulations discussed above, California

24

laws and regulations further require PG&E to safely maintain its electrical equipment and

25

26

27

---

[10] Supplemental Response of Cal Fire following Jan. 30. 2019 Hearing on Order to Show
Cause, *U.S. v. Pacific Gas and Electric Co.*, No. 14-cr-175 ("PG&E Criminal Proceedings")
(N.D. Cal. Feb. 6, 2019), ECF No. 1012.

28

---

1   infrastructure, including an obligation to maintain the towers and poles that carry its transmission

2   and distribution lines.

3       59.    Pursuant to California Public Utilities Code Section 451:

4           Every public utility shall furnish and maintain such adequate,
            efficient, just, and reasonable service, instrumentalities, equipment,
5           and facilities, including telephone facilities, as defined in Section
            54.1 of the Civil Code, as are necessary to promote the safety,
6           health, comfort, and convenience of its patrons, employees, and the
            public.

7       60.    California Health & Safety Code Section 13007 further provides:

8
            Any person who personally or through another wilfully,
9           negligently, or in violation of law, sets fire to, allows fire to be set
            to, or allows a fire kindled or attended by him to escape to, the
10          property of another, whether privately or publicly owned, is liable
            to the owner of such property for any damages to the property
11          caused by the fire.

12      61.    Accordingly, California law required PG&E to maintain its electrical equipment

13  and infrastructure, including electrical towers and poles, sufficiently to prevent wildfires from

14  being caused by the failure of its towers and poles.

15          **3.    PG&E Is Regulated by the CPUC**

16      62.    PG&E's primary regulator is the California Public Utilities Commission

17  ("CPUC"). The CPUC promulgates safety regulations and adjudicates PG&E's annual General

18  Rate Cases – essentially determining which costs PG&E may pass on to rate-payers, and which

19  costs PG&E must bear. The CPUC was created under Article XII of the California State

20  Constitution, and derives its regulatory authority from Section 701 of the California Public

21  Utilities Code.

22          **(a)    CPUC's General Orders 95 and 165 Impose Strict Safety**
                    **Regulations on PG&E**

23
24      63.    Pursuant to CPUC General Order 95, Rule 35, PG&E was required "to establish

25  necessary and reasonable clearances" between overhead conductors and nearby vegetation, with

26  certain "minimum clearances" set forth by CPUC. Furthermore, this rule required that:

27          When a supply or communication company has actual knowledge,
            obtained either through normal operating practices or notification
            to the company, that dead, rotten or diseased trees or dead, rotten
28          or diseased portions of otherwise healthy trees overhang or lean

Case: 19-90088   Doc# 3371-30   Filed: 08/01/19   Entered: 08/01/19 20:15:52   Page 27 of
34   of 524

1  toward and may fall into a span of supply or communication lines,
   said trees or portions thereof should be removed.

2                                  * * *

3  When a supply or communication company has actual knowledge,
   obtained either through normal operating practices or notification

4  to the company, that its circuit energized at 750 volts or less shows
   strain or evidences abrasion from vegetation contact, the condition

5  shall be corrected by reducing conductor tension, rearranging or
   replacing the conductor, pruning the vegetation, or placing

6  mechanical protection on the conductor(s).

7      64.    CPUC General Order 95 provides further details regarding the maintenance and

8  upkeep of PG&E's power lines and infrastructure. Among other things, it provides that "[a]ll

9  lines and portions of lines shall be maintained in such condition as to provide safety factors not

10 less than those specified in Rule 44.3." Rule 44, in turn, details the safety factors that apply to

11 "Poles Towers and Structures," and provides that "[i]n no case shall the application of this rule

12 be held to permit the use of structures or any member of any structure with a safety factor less

13 than one." This order further provides certain requirements intended to, among other things,

14 guard against corrosion.[11]

15     65.    Pursuant to CPUC General Order 165, PG&E must also follow certain

16 "requirements for electric distribution and transmission facilities (excluding those facilities

17 contained in a substation) regarding inspections in order to ensure safe and high-quality electrical

18 service."  In relevant part, General Order 165 requires that: "Each utility subject to this General

19 Order shall conduct inspections of its distribution facilities, as necessary, to ensure reliable, high-

20 quality, and safe operation."[12]

21

22

23

24

25     [11] CPUC General Order 95, *Rules for Overhead Electric Line Construction* (May 2018),

26     http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M217/K418/217418779.pdf

27     [12] CPUC General Order 165, *Inspection Requirements for Electric Distribution and
   Transmission Facilities* (Dec. 2017),

28     http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M209/K552/209552704.pdf.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                          18
CIVIL ACTION NO. 3:18-CV-03509-EJD

1

2

           **(b)**      **CPUC's Resolution ESRB-8 Imposes on PG&E an Obligation to Adopt, Promulgate and Follow the ESRB-8 Shutoff Protocol**

3

      66.     On July 16, 2018, the CPUC issued Resolution ESRB-8.  Recognizing that the

4

"2017 California wildfire season was the most destructive wildfire season on record," the

5

resolution required California's utilities, including PG&E, to adopt, promulgate and follow "de-

6

energization policy and procedures" pursuant to which each utility will "de-energize power

7

lines" as a means to mitigate wildfire risks "to ensure public safety."  It further established

8

notification, mitigation, and reporting requirements.

9

      67.     Resolution ESRB-8 included the following directives:

10

PROPOSED OUTCOME:
This Resolution extends the de-energization reasonableness, public notification, mitigation and reporting requirements in Decision (D.) 12-04-024 to all electric Investor Owned Utilities (IOUs) [including PG&E] and adds new requirements.  It also places a requirement on utilities to make all feasible and appropriate attempts to notify customers of a de-energization event prior to performing de-energization.

11

12

13

14

SAFETY CONSIDERATIONS:
De-energizing electric facilities during dangerous conditions can save lives and property and can prevent wildfires. This resolution provides guidelines that IOUs must follow and strengthens public safety requirements when an IOU decides to de-energize its facilities during dangerous conditions.

15

16

17

               \*       \*       \*

18

19

PG&E reports that prior to 2018, it did not have a policy to de-energize lines as a fire prevention measure. PG&E reported that it did not proactively de-energize lines due to extreme fire weather conditions in 2017. However, in March 2018 PG&E announced that it is developing a program to de-energize lines during periods of extreme fire conditions and has been meeting with local communities to gather feedback.

20

21

22

               \*       \*       \*

23

■  The IOU shall ensure that de-energization policies and procedures are well-communicated and made publicly available, including the following:

24

25

     ●  **Make available and post a summary of de-energization policies and procedures on its website**.

26

27

     ●  Meet with representatives from local communities that may be affected by de-energization events,

28

1                                     before putting the practice in effect in a particular area.

- Provide its de-energization and restoration policy **in full**, and in summary form, to the affected community officials before de-energizing its circuits.

\*       \*       \*

De-energization of electric facilities could save lives, protect property, and prevent fires.

### (c)    PG&E Must Follow CPUC's Regulations Under Penalty of Law

68.    The CPUC's regulations have the full force of law, and PG&E has a legal obligation to follow them, including the general orders and resolutions listed above, under penalty of law.

69.    For example, California Public Utilities Code Section 702 provides that:

Every public utility shall obey and comply with every order, decision, direction, or rule made or prescribed by the commission in the matters specified in this part, or any other matter in any way relating to or affecting its business as a public utility, and shall do everything necessary or proper to secure compliance therewith by all of its officers, agents, and employees.

70.    Further, under California Public Utilities Code Section 2106:

Any public utility which does, causes to be done, or permits any act, matter, or thing prohibited or declared unlawful, or which omits to do any act, matter, or thing required to be done, either by the Constitution, any law of this State, or any order or decision of the commission, shall be liable to the persons or corporations affected thereby for all loss, damages, or injury caused thereby or resulting therefrom. If the court finds that the act or omission was wilful, it may, in addition to the actual damages, award exemplary damages.

### 4.    Cal Fire Is the Duly Authorized Investigative Arm of the State of California for Wildfires

71.    Cal Fire is an agency of the State of California that, pursuant to Title 14 of California's Code of Regulations, is administratively in charge of both the state's fire departments and its law enforcement related to state fire and forest laws. As a result, it is responsible for both fighting fires as they occur and for investigating the causes of fires after they have been contained. Cal Fire conducts official investigations as an arm of the State of California

1    to determine the causes of wildfires within the state, as well as any violations of state laws and

2    regulations.

3         72.    Pursuant to an agreement with the U.S. Department of the Interior and the U.S.

4    Department of Agriculture, Cal Fire is the state agency that is authorized to make fire cause and

5    origin determinations for wildfires – such as the North Bay fires and Camp Fire – that fall within

6    its jurisdiction.

7         **5.**    **Under California's Inverse Condemnation Law, PG&E Would Not
     Bear the Cost of Wildfires It Causes if It Could Prove That It Acted**

8                **Reasonably and Prudently**

9         73.    The California Supreme Court has interpreted Article 1, Section 19 of the

10   California Constitution as imposing a doctrine known as "inverse condemnation," whereby

11   public utilities such as PG&E are required to compensate individuals whose real property has

12   been damaged by the utility under a strict liability regime. However, importantly, a utility such

13   as PG&E is able to recover those same costs from the CPUC – effectively passing the costs from

14   the shareholders to the rate payers – if it can "affirmatively prove that it reasonably and

15   prudently operated and managed its system." Order Denying Rehearing of Decision (D.) 17-11-

16   033 at 3, App. of SDG&E for Authorization to Recover Costs Related to the 2007 Southern Cal.

17   Wildfires Recorded in the Wildfire Expense Memo Account, App. No. 15-09-010, Decision 18-

18   07-025 (July 12, 2018).

19        74.    In other words, PG&E bears the costs of wildfires it causes unless it can prove

20   that it was "reasonable and prudent," meaning "that at a particular time any of the practices,

21   methods, and acts engaged in by a utility follows the exercise of reasonable judgment in light of

22   facts known or which should have been known at the time the decision was made." *Id.* Embodied

23   in this standard, at a minimum, is compliance with state safety laws and regulations.

24        **6.**    **Federal Law Also Requires PG&E to Follow Minimum Safety
     Standards**

25        75.    PG&E is also required by law to adhere to a number of federal laws and

26   regulations.  FERC Electric Reliability Standard FAC-003-4, for example, "requires that trees

27

28

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 5:18-cv-03509-EJD

21

1  and other vegetation growing in or adjacent to the power line right-of-way be trimmed to prevent

2  power outages caused by tree contact with a transmission line."[13]

3      76.   FAC-003-4 also imposes minimum vegetation clearance distances that depend on

4  the type of current (alternating or direct), the nominal and maximum system voltages, and the

5  altitude of the conductor above sea level. FAC-003-4 also imposes other requirements on owners

6  and operators of transmission facilities, including but not limited to annual inspections, annual

7  completion of necessary work, timely notification and correction of urgent conditions and

8  documentation of vegetation management practices.[14]

9      **B.   PG&E's Vegetation Management Expenditures Did Not Materially Change
        from Year to Year During the Class Period, Let Alone Double at Any Point**

10

11     77.   The State of California declared a state of emergency due to drought conditions in

12  January 2014,[15] which ended in April 2017.[16] In October 2015, California also declared a state of

13  emergency regarding tree mortality due to both the ongoing effects of the drought and an

14  epidemic of insect infestations causing millions of trees to die annually.[17] These conditions

15  added to the already existing danger of wildfires in the North Bay region of California as a result

16  of PG&E's safety violations. PG&E knew about these conditions and its obligations to ensure

17  safety from wildfires in spite of these environmental factors. For example, the "Proclamation of a

18  State of Emergency" regarding tree mortality made explicit: **"[U]tilities . . . to the extent**

19  [13] *See* FERC, *Tree Trimming & Vegetation Management* (updated Apr. 10, 2018),
20  https://www.ferc.gov/industries/electric/indus-act/reliability/vegetation-mgt.asp; FERC, *FAC-003-4 Transmission Vegetation Management*, https://www.ferc.gov/industries/electric/indus-
21  act/reliability/vegetation-mgt/fac-003-4.pdf; *see also* Order Adopting New Conditions of Probation, PG&E Criminal Proceedings, (N.D. Cal. Apr. 3, 2019), ECF No. 1040.

22  [14] *See* PG&E Response to Request for Information at 4, PG&E Criminal Proceedings (N.D. Cal. Feb. 22, 2019), ECF No. 1016.
23
24  [15] California Drought, *State Water Board Approves State and Federal Water Projects Petition to Conserve Water During Drought Conditions*, Drought News Release Archive (Jan. 31, 2014), https://drought.ca.gov/news/story-21.html.
25  [16] California Executive Dept., *Executive Order B-40-17* (Apr. 7, 2017),
26  https://www.gov.ca.gov/wp-content/uploads/2017/09/4.7.17_Exec_Order_B-40-17.pdf.
27  [17] California Executive Dept., *Proclamation Of A State of Emergency* (Oct. 30, 2015), https://www.gov.ca.gov/wp-
28  content/uploads/2017/09/10.30.15_Tree_Mortality_State_of_Emergency.pdf.

1  **required by their existing responsibilities to protect the public health and safety, shall**

2  **undertake efforts to remove dead or dying trees in these high hazard zones that threaten**

3  **power lines**. . . ."

4        78.    Based on information released by CPUC, PG&E spent $194,094,406 on

5  vegetation management in 2015, $198,735,579 in 2016, and $201,456,193 in 2017 – increases of

6  only 2.4% and 1.4%, respectively.[18] Each year's spending was substantially identical to the

7  amounts PG&E requested, and the amounts CPUC approved, in PG&E's 2015, 2016, and 2017

8  General Rate Cases – notwithstanding the state of emergency directive above and PG&E's

9  continued deficient safety practices. In contrast, inflation rose 5.48% over the same three-year

10  period.[19] Thus, PG&E's spending did not even keep pace with inflation during the Class Period.

11        79.    CPUC released the following chart confirming that PG&E's vegetation

12  management spending underwent only modest increases over the relevant time period:

13  *Table showing 2011-2017 history of PG&E annual spending ($ million)*

14  *on vegetation management*

15

| | PG&E Requested | CPUC Authorized | PG&E Spent |
|---|---|---|---|
| **2017** | $201.0 | $201.0 | *$150.4 YTD* |
| **2016** | $198.8 | $198.8 | $198.7 |
| **2015** | $194.2 | $194.2 | $194.1 |
| **2014** | $190.0 | $190.0 | $189.7 |
| **2013** | $180.0 | $161.5 | $161.6 |
| **2012** | $180.0 | $161.5 | $161.5 |
| **2011** | $180.0 | $161.5 | $161.6 |

24

25  [18] Letter from CPUC to PG&E re: Advice Letter 4827-E (June 3, 2016), https://www.pge.com/tariffs/tm2/pdf/ELEC_4827-E.pdf; Letter from CPUC to PG&E re: Advice Letter 5036-E (Apr. 25, 2017), https://www.pge.com/tariffs/assets/pdf/adviceletter/ELEC_5036-E.pdf.; Letter from CPUC to PG&E re: Advice Letter 5402-E (Nov. 29, 2018), https://www.pge.com/tariffs/assets/pdf/adviceletter/ELEC_5402-E.pdf.

27  [19] CPI Inflation Calculator, Bureau of Labor Statistics, https://www.bls.gov/data/inflation_calculator.htm.

80.     While Defendants falsely represented on November 2, 2017 that PG&E "**_doubled_**" vegetation management expenditures in 2016 (*see* ¶¶258 & 264), tellingly, they made this claim only after the North Bay Fires. At no point did the Company identify any specific budget item indicating that its vegetation management budget had, in fact, doubled.  Nor did it disclose these expenditures were inadequate to reasonably ensure safety.  Indeed, as Judge Alsup later found, "PG&E's performance with respect to vegetation management has been **dismal.**"

81.     It was only after the Camp Fire that PG&E announced in December 2018 that it plans to spend an additional $5 billion on wildfire safety programs over five years, with a focus on improving its vegetation management efforts. This post-Class-Period development strongly supports the inference that the Company's previous vegetation management expenditures of around $200 million per year had been dangerously inadequate.[20]  In fact, it was not until PG&E's 2019 vegetation management plan, detailed further below, that the Company indicated that it was materially increasing its vegetation management spending, to more than $338 million.

C.     **PG&E's Tree Trimming and Removal Did Not Come Close to Doubling During the Class Period**

82.     Likewise, the Company's reported numbers for trees that it trimmed or removed during this time period did **not** double, or come close to doubling. During the Class Period, the Company reported the results of its vegetation management expenditures, slowly inflating the numbers it was reporting.  Initially, it touted that its tree trimming and removal amounted to "**1.2 million trees**" total (November 18, 2015, statement of Hogan) or generally "**more than 1 million trees each year**" (May 4, 2016, statement of Earley). At first, it stated that these totals included "about **236,000 dead or dying trees**" as "part of its comprehensive response to tree mortality in the state" (May 3, 2017, Press Release).

---

[20] *PG&E asking state regulators to charge customers up to $12 more a month*, KTVU Fox 2 (Dec. 14, 2018), http://www.ktvu.com/news/pg-e-asking-state-regulators-to-charge-customers-up-to-12-more-a-month.

83.     Soon, however, it was touting that 2016's "**236,000 dead or dying trees**" removed were "in addition to the **1.2 million trees** that PG&E works **each year**" (May 10, 2017, Press Release).

**D.     After the North Bay Fires, PG&E Started Reporting Inflated Numbers for Tree Removal**

84.     Then, after the North Bay Fires, PG&E's numbers crept up by 100,000 trees: "Typically, we spend about **$200 million** every year to line clear or remove **1.3 million trees** to mitigate both the risk of wildfires and to prevent electric outages" **in addition to** the "**incremental 236,000 dead or dying trees**" (November 2, 2017, statement of Williams). This is the same statement where PG&E began to falsely and/or misleadingly tout to investors that it had "*doubl[ed]*" vegetation management expenditures in 2016, *i.e.*, to $400 million (*see* ¶258, *infra*).

85.     Then, when negative news emerged on May 25, 2018 about PG&E's safety violations causing many of the North Bay Fires, the Company's reported number of cleared trees crept up by another 100,000 trees: "Under PG&E's industry-leading Vegetation Management Program, we . . . prune or remove approximately **1.4 million trees annually**" (May 25, 2018, press release).

**E.     PG&E Concealed Its Unsafe Use of Reclosers During the Class Period**

**1.     PG&E Used Reclosers to Prioritize Convenience Over Safety**

86.      "Reclosers" are devices that are affixed to power line poles, to send pulses of electricity into lines when service has become briefly interrupted (*i.e.*, an outage). Although reclosers can in some instances prevent blackouts, it is well known in the industry that they are dangerous in certain circumstances. For instance, if a power line has come into contact with nearby vegetation, it would be dangerous to send an additional pulse of electricity through the line because this could start a fire.

87.     San Diego Gas & Electric Co. and Southern California Edison are two other utility companies that operate in California, along with PG&E. According to a complaint filed in

Case: 19-30088   Doc# 3371-30   Filed: 08/19/19   Entered: 08/19/19 19:37:42   Page 35 of 42

the state court litigation concerning the North Bay Fires,[21] these two utility companies are aware of the dangers of using reclosers, and they have a practice of blocking reclosers from working during fire season.[22]

88.     Prior to the North Bay Fires, PG&E knew that its reclosers posed a great risk of causing wildfires. PG&E was specifically warned of this hazard in a May 2013 report that the Liberty Consulting Group (the "Liberty Report") submitted to the Safety and Enforcement Division of the CPUC. Moreover, at a November 18, 2015 hearing before the California Senate Sub-Committee on Gas, Electric, and Transportation Safety, the Utility's Vice President of Electrical Operations Asset Management, Defendant Hogan, stated that PG&E had the ability to reprogram its reclosers during fire season so that they did not attempt to restart lines that had been stopped. Hogan acknowledged that shutting down power means "you take the reliability hit, but you gain the wildfire benefit." This statement evidenced that PG&E recognized the downside to disabling its reclosers (because it would increase the risk of blackouts, *i.e.*, the "reliability hit," which would lead to consumer complaints), but that PG&E also understood this measure would improve safety (*i.e.*, the "wildfire benefit").  Unbeknownst to investors, the Company chose short-term "reliability" over safety.[23]

---

[21] Senate Bill Policy Committee Analysis, Assembly Committee on Utilities and Energy (amended June 7, 2018), https://autl.assembly.ca.gov/sites/autl.assembly.ca.gov/files/SB%20901%20%28Dodd%29%20U%26E%20Analysis%206-25-18.pdf.

[22] Wildfire season is a portion of the year, generally 6 to 8 months in the summer and fall in California, declared such by the responsible public agency fire administrator. This declaration is based on fuel and weather conditions conducive to the ignition and spread of wildland fires.  Cal Fire Incident Information, Fire Terminology page, http://cdfdata.fire.ca.gov/incidents/incidents_terminology?filter=F.

[23] Notably, PG&E's ESRB-8 Shutoff Protocol embodied the same tradeoff.  As a protocol that required PG&E to proactively shut off power when certain conditions were met, it similarly purported to prioritize safety over reliability.  Likewise, a failure to abide by the ESRB-8 Shutoff Protocol would evidence another example of the Company choosing reliability over safety, unbeknownst to investors.

1

### 2. PG&E Concealed Its Use of Reclosers from Investors During the Class Period

89.     On November 18, 2015, Defendant Hogan assured the public that PG&E was "***just about done***" with the process of disabling its recloser devices as of that date. He represented that reclosers would be disabled "***first***" in "***high wildfire risk areas***," followed by "126" of "about 130 some odd locations . . . this year," *i.e.*, 2015, which left only "six for next year."

90.     However, PG&E did not disable all of its reclosers during fire season, like San Diego Gas & Electric Co. and Southern California Edison did. Rather, during the time of the North Bay Fires, some of PG&E's devices were programmed to try up to three times to restore power by sparking electricity. Hogan's statement concealed that PG&E kept at least certain of its reclosers dangerously in use in a high wildfire risk area through October 2017: PG&E reclosers were to blame for at least one of the North Bay Fires, known as the Pythian Fire.

91.     Notably, State Senator Jerry Hill was quoted by NBC on January 3, 2018 as saying that he felt "misled" by PG&E's executives into believing that the Company had followed the lead of its counterparts and shut off its reclosers in all 132 of its high risk fire areas by the start of 2017:

> Hill said he was surprised the company's recloser shutdown was so limited, given that a top PG&E official assured him back in 2015 that the company would be able to shut down reclosers in all 132 of the high risk fire areas by the start of 2017.
>
> "I think that's the troubling part," Hill said, "that **they misled us in that**.
>
> "Had they said they did not have that system in place, then we would have followed up with more questions to try to find what the problem was -- and may have been able to focus in on that a couple of years ago that may have prevented these fires in October."

Likewise, investors were misled by PG&E's recloser statements.

---

92. Yet, even as late as **2018**, PG&E was still stating that it would need to commit to disabling these reclosers.[24]

**F.    PG&E Engaged in an Unsafe Pattern of Noncompliance with Safety Requirements Before and Throughout the Class Period**

93. Despite the important safety measures imposed by California law, PG&E has caused deadly wildfires through its failure to comply with the legal requirements for vegetation management, pole maintenance, and other safety requirements. Between causing the devastating Trauner Fire in 1994 and the deadly Butte Fire in 2015, PG&E repeatedly violated California's vegetation management laws and other regulations.  PG&E assured investors during the Class Period that it had changed, stating in its 2015, 2016, and 2017 Corporate Responsibility and Sustainability Reports that its "vegetation management" was now "*in compliance with relevant laws*" or "*complying with state and federal regulations*."

94. Notably, in its undated 2018 Corporate Responsibility and Sustainability Report issued **after** the public learned the true causes of the North Bay Fires, PG&E **no longer** represents to investors that its vegetation management complies with California's safety laws.

**1.    PG&E Was Convicted of Negligence for Starting a Wildfire in 1994**

95. One of the most notable of the pre-Class Period fires was the "Trauner Fire," where PG&E was convicted of 739 counts of criminal negligence and required to pay $24 million in penalties due to the Company's deficient vegetation management systems.[25]

**2.    PG&E Unsafely Flouts Safety Regulations**

96. Subsequently, PG&E's deficient vegetation management practices ignited other fires, including the Pendola Fire (1999).[26]

---

[24] PG&E Public Safety Power Shutoff Policies and Procedures, CPUC website (Sept. 2018), http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/News_Room/Public-Safety-Power-Shutoff-Policies-and-Procedures-September-2018.pdf.

[25] In 1994, PG&E's failure to maintain vegetation surrounding its electrical equipment caused the Trauner Fire that burned approximately 500 acres, destroyed 12 homes, and burned 22 structures in the town of Rough and Ready. The fire began when a power line brushed against a tree limb that PG&E was supposed to keep trimmed. Investigators found numerous safety violations involving contact between vegetation and PG&E's power lines.

97.     Moreover, according to documents released by The Utility Reform Network ("TURN"), PG&E planned to replace a segment of the San Bruno pipeline in 2007 that it had identified as one of the riskiest natural gas pipelines in PG&E's system. PG&E collected $5 million from its customers to complete the project by 2009, but instead deferred the project and repurposed the money to other priorities. On September 9, 2010, the San Bruno pipeline exploded, killing 8 people, injuring over 50 more, and destroying 38 homes.

98.     On August 9, 2016, a California federal jury found PG&E guilty of five criminal felony counts for violating minimum federal safety standards under the Natural Gas Pipeline Safety Act, as well as one count for obstructing an agency proceeding after it failed to provide all of its records to the National Transportation Safety Board during an investigation into the San Bruno explosion.

99.     On December 14, 2018, the CPUC opened a case against PG&E alleging, *inter alia*, that **the Company falsified records and data** concerning the safety of its gas pipelines, did not employ an adequate number of pipeline inspectors, and pressured supervisors to unsafely rush work over a five-year period from 2012 to 2017.  These deliberate efforts to cut corners, and defraud regulators and the public about the safety of PG&E's utilities, continued up to and including the Class Period.  The strong inference is that PG&E's statements concealing the inadequate safety of its electrical utilities, during the Class Period, were likewise made with an intent to defraud.[27]  On December 21, 2018, the CPUC issued a Scoping Memo and Ruling, which found that "PG&E has had serious safety problems with both its gas and electric operations for many years" and failed "to develop a comprehensive enterprise-wide approach to address safety."  CPUC concluded that it "was, and remains, concerned that the safety problems

---

*(continued)*

[26] PG&E paid a $14.75 million settlement to the U.S. Forest Service, and a $22.7 million settlement with CPUC after PG&E had been reprimanded for not spending money that had been earmarked for tree trimming and removal.

[27] George Avalos, *PG&E Accused of Gas Pipeline Violations, Falsifying Records: Regulator*, Mercury News (updated Dec. 17, 2018 4:06 am), https://www.mercurynews.com/2018/12/14/pge-accused-of-gas-pipeline-violations-falsifying-records-regulators/.

being experienced by PG&E were **not just one-off situations or bad luck, but indicated a deeper and more systemic problem**."

### 3.   PG&E's Unsafe, Noncompliant Vegetation Management Caused the Butte Fire in 2015

100.   In September of 2015, five months after PG&E made Misstatement No. 1 touting its vegetation management, PG&E's vegetation management program once again failed, causing the Butte Fire that killed two people, destroyed 921 homes, businesses, and other structures, and scorched more than 70,000 acres over 22 days.

101.   On April 28, 2016, Cal Fire issued a press release announcing its conclusion that the Butte Fire was caused by PG&E's safety violations. Cal Fire also referred its investigation to the two relevant district attorneys for the counties the Butte Fire burned.

102.   There is currently pending litigation over PG&E's liability for the Butte Fire, including an April 13, 2017 lawsuit in which Cal Fire sued PG&E for $87 million to recover the costs that the agency devoted to fighting that fire. Cal Fire's lawsuit alleges that PG&E caused the Butte Fire by maintaining an inadequate vegetation management system.

### 4.   PG&E's Insufficient Safety Practices Allowed Numerous, Company-Wide Vegetation Management and Other Safety Violations During the Class Period

103.   Internally, PG&E's numerous and widespread violations of relevant safety laws are shown by the fact that the Company's internal controls were designed to permit vegetation management and other violations to go unchecked on a dangerous scale.

#### (a)   PG&E Documented and Tolerated Thousands of Dangerous Safety Violations Across Its Territory During the Class Period

104.   On March 5, 2019, the U.S. District Court presiding over PG&E's criminal probation (Judge Alsup) issued a revised Order to Show Cause relating to PG&E's lack of compliance with vegetation management and other safety regulations.  The Order stated that PG&E's "**unsafe conduct** led to a deadly pipeline explosion and to six felony convictions," and found that PG&E's conduct had now "**led to recurring deadly wildfires caused by its electrical system**."  It contained the following findings summarizing the results of the federal

1    court's probe into PG&E's actual knowledge of safety violations leading up to the North Bay

2    and Camp Fires:

> 3    PG&E's filings have included several relevant **admissions**.
>     Significantly, PG&E acknowledged "that vegetation contact is the
> 4    primary risk driver with respect to ignitions on its distribution
>     lines." ("Vegetation" means trees and limbs in this context.) In
> 5    2016 alone, PG&E experienced approximately **1,400** wires down
>     caused by vegetation contact. As PG&E reported to the CPUC,
> 6    during 2015 and 2016, vegetation contact with conductors was the
>     leading cause of the **486** fire ignitions associated with PG&E
> 7    facilities, causing **37%** of those fires. **PG&E further admitted
>     that as of June 2017, there were 3,962 unworked trees which
> 8    PG&E had identified in 2016 as hazardous with the potential
>     to "fall into or otherwise impact the conductors, towers or guy
> 9    wires before the next inspection cycle."**[28]

10    105.    Thus, PG&E has admitted that it had **actual knowledge since 2015** that its

11    vegetation management practices did not comply with California safety regulations on the order

12    of **thousands of violations per year**. PG&E has further admitted to **actually knowing** that its

13    violations have **caused hundreds of wildfires per year since 2015**. However, PG&E never

14    disclosed that their own internal compliance reviews showed a lack of compliance on such a

15    huge scale.

16    106.    According to data released by the CPUC,[29] PG&E equipment caused a total of

17    1,486 vegetation fires between June 10, 2014 and December 29, 2017. Among those vegetation

18    fires, 69 were caused by transmission lines like the line implicated in causing the Camp Fire,

19    including 26 fires caused by lines of the exact same high voltage, 115 kilovolts. PG&E supplied

20    the CPUC with this information under the regulator's Decision 14-02-015, which enacted a "Fire

21    Incident Data Collection Plan."[30]

22

23    [28] Second Order to Show Cause Why PG&E's Conditions of Probation Should Not Be
    Modified, PG&E Criminal Proceedings (N.D. Cal. Mar. 5, 2019), ECF No. 1027.

24    [29] PG&E Fire Incident Data Collection Plan Report Data Compiled from 2014-2017, CPUC
    website,

25    http://www.cpuc.ca.gov/uploadedFiles/CPUC_Website/Content/About_Us/Organization/Divisio
    ns/News_and_Outreach_Office/PGE_Fire%20Incident%20Data%202014-2017.pdf.

26    [30] Decision Adopting Regulations To Reduce The Fire Hazards Associated With Overhead

27    Electric Utility Facilities and Aerial Communications Facilities, CPUC Decision 14-02-015
    (CPUC Feb. 5, 2014),

28    http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M087/K892/87892306.PDF. Pursuant to

1    107.    Similarly, according to documents described in a report by *NBC Bay Area*, PG&E

2    completed a review of its transmission towers' safety compliance immediately after the Camp

3    Fire.  As a result, "PG&E's inspections of thousands of transmission towers since the deadly

4    Camp Fire in Butte County found more than 450 safety violations, including 59 that posed

5    serious safety hazards."[31]

6                        **(b)     PG&E Had Actual Knowledge That Its Insufficient Safety
                                   Practices Had the Potential to Allow for Dangerous Safety
7                                  Violations on the Order of Hundreds of Thousands to a Million
                                   Wildfire Hazards**
8
9    108.    Investigative journalists and attorneys have uncovered that PG&E internally

10   accepts that its vegetation management practices leave 1 of every 100 trees noncompliant with

11   California regulations, and further reportedly "cheats" on its internal compliance reviews, in

12   order to give a misleading impression of compliance with tree clearance requirements when it is

13   in fact noncompliant. According to a report from NBC reporter Jaxon Van Derbeken on

14   November 6, 2017, published a month after the North Bay Fires began, PG&E's own internal

15   inspectors allow one out of 100 trees they check to violate state power line clearance standards:

16          **PG&E auditors allow one out of 100 trees they check to violate
            state power line clearance standards**, NBC Bay Area has
17          learned.

18                                           * * *

19          [I]t emerged during the Butte fire litigation that [internal] auditors
            were giving out a passing grade when one out of 100 trees they
20          checked turned out to be too close to power lines under state
            standards.
21
                                             * * *
22
            When [PG&E] failed to reach that 99 percent compliance rate in
23          the area around the fire . . . the company just expanded the
            universe of trees covered in a particular audit.
24
     ─────────────────
25   *(continued)*
     the Fire Incident Data Collection Plan, PG&E and other investor-owned electric utilities must
26   "collect and report data to SED regarding power-line fires."  *Id.* ("SED" refers to CPUC's
     Safety and Enforcement Division).
27
     [31] Jaxon van Derbeken, *PG&E Inspectors Find Hundreds of Safety Issues on Electrical
28   Towers*, NBC Bay Area (Apr. 12, 2019), https://www.nbcbayarea.com/investigations/PGE-
     Inspectors-Find-Hundreds-of-Safety-Issues-on-Electrical-Towers-508344011.html.

"So what PG&E does when it doesn't pass, it basically cheats,"
[Amanda Riddle, one of the attorneys participating in a lawsuit
against PG&E related to the Butte Fire] said. "It adds more miles
and more miles until it reaches a passing grade."

109.   With approximately 123 million trees under PG&E's control,[32] this means that PG&E knew during the Class Period that it may have been tolerating as many as approximately 1.2 million trees to be noncompliant with state safety laws at any given time.  The measurement of 1.2 million safety violations is a conservative estimate when combined with the detail that PG&E "cheats" to get its rate of violations down to 1%, hence PG&E's real rate of noncompliance may be even higher.

110.   According to the plaintiffs litigating against PG&E for injuries caused by the 2015 Butte Fire, Defendant Hogan's and another PG&E employee's deposition testimony purportedly showed that "PG&E knows and accepts that 1-in-100 trees will be non-compliant, and that 1-in-1000 will be touching its powerlines." Using the same metrics, this means that PG&E knows that it could be allowing as many as approximately 123,000 safety violations in the nature of trees touching its powerlines at any given time.

**G.     Investors Could Not Have Reasonably Expected the Extent of PG&E's Unsafe Pattern of Noncompliance that Caused the North Bay Fires and the Camp Fire**

**1.     PG&E's Noncompliance with Vegetation Management and Pole Integrity Requirements Caused the North Bay Fires**

111.   Of the eighteen main North Bay Fires for which Cal Fire's investigations have been completed, **seventeen** were caused by PG&E equipment. **Eleven** of these fires evidenced violations of California safety regulations, in **seven** different counties at the **same time**. Most of these violations pertained to PG&E's failures to clear vegetation or maintain the integrity of its poles.

---

[32] *See* PG&E's Response to Safety and Enforcement Divisions' 10/14/17 Questions, CPUC website (Oct. 17, 2017), http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/Response%20to%20Data%20Request.pdf.

112.     Even though Cal Fire's investigations have not found evidence of violations for six of the fires, PG&E's numerous, widespread safety violations actually caused or exacerbated **all** of the North Bay Fires. PG&E's safety violations exacerbated even the fires that lacked evidence of violations, in two ways. First, some of the eleven fires caused by PG&E's safety violations merged into and strengthened other fires. Second, PG&E's safety violations diverted scarce firefighting resources to contain the eleven North Bay Fires which never should have ignited, leading to the other fires causing more damage. As such, PG&E's safety violations were responsible, in full or in part, for **all** of the North Bay Fires, thereby negatively impacting the Company's financial condition.

### 2.     PG&E's Noncompliance with Vegetation Management and Pole Integrity Requirements Caused the Camp Fire

113.     On May 15, 2019, Cal Fire issued a press release announcing its determination that PG&E's electrical equipment caused the Camp Fire.[33]  Cal Fire further concluded, "[a]fter a very meticulous and thorough investigation," that PG&E caused **both** of the Camp Fire's two ignition points.  Cal Fire also referred its investigation to the Butte County District Attorney to review for potential criminal violations.  As noted above, PG&E expects to bear at least $10.5 billion, if not more, in liability for causing this fire.

### (a)     The Camp Fire's First Ignition Point Was Caused by PG&E Safety Violations

114.     The Camp Fire's first ignition point was "in the Pulga area," according to Cal Fire, and "was caused by electrical transmission lines owned and operated by Pacific Gas and Electric[]."[34]  Per its May 15, 2019 press release, "PG&E accepts this determination."[35]

---

[33] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May 15, 2019),
https://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.

[34] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May 15, 2019),
https://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.

[35] Press Release, PG&E, *PG&E Responds to Camp Fire Announcement from CAL FIRE* (May 15, 2019),
https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20190515_pge_responds
_to_camp_fire_announcement_from_cal_fire.

1    115.    According to firefighter radio transmissions and the journalist whose investigation

2    made them public late on November 9, 2018, firefighters were dispatched to a vegetation fire

3    "under the high tension power lines" across the Feather River from Poe Dam in Butte County on

4    November 08, 2018 at 6:33 a.m.[36]—matching the location where Cal Fire officials pinpointed the

5    Camp Fire's origin four minutes earlier.[37] As one firefighter described the fire to dispatch: "It is

6    on the west side of the river underneath the transmission lines."

7    116.    Independently that evening, PG&E admitted to the CPUC that one of its 115-

8    kilovolt transmission lines on Pulga Road in Butte County experienced an outage at 6:15 a.m.

9    that day, and noted that the site was near the Camp Fire.[38]  Cal Fire has listed Pulga Road as the

10   Camp Fire starting point.[39]

11   117.    The same report acknowledged that an aerial patrol later that day, "in the

12   afternoon," observed "damage to a transmission tower" on the same 115 kilovolt transmission

13   line. In a supplemental report filed with the CPUC on December 11, 2018, PG&E identified the

14   tower as number ":27/222" and further specified that this observed damage included the

15   separation of a suspension insulator, meant to support a transposition jumper, from an arm on the

16   tower.[40]  PG&E also observed a broken C-hook attached to the separated suspension insulator

17

18

19   [36] Matthias Gafni, *PG&E Power Lines May Have Sparked Deadly Camp Fire, According To Radio Transmissions,* Mercury News (updated Nov. 12, 2018 12:03 pm),

20   https://www.mercurynews.com/2018/11/09/pge-power-lines-may-have-sparked-deadly-butte-county-wildfire-according-to-radio-transmissions/.

21   [37] Camp Fire Incident Update, CAL FIRE Incident Information (Nov. 22, 2018 7:00 pm),

22   http://cdfdata.fire.ca.gov/admin8327985/cdf/images/incidentfile2277_4319.pdf .

23   [38] CPUC Email re: Electric Safety Incident Reported - PG&E Incident No: 181108-9002 (Nov. 8, 2018), http://s1.q4cdn.com/880135780/files/doc_downloads/2018/wildfire/11/Electric-Safety-Incident-Reported-Pacific-Gas-Electric-Incident-No-181108-9002.pdf; *see also,* Tony

24   Bizjak, *PG&E Reports Power Line Problem In Butte County Near Time and Place Where Wildfire Sparked*, The Fresno Bee (updated Nov. 10, 2018 7:51 PM),

25   https://www.fresnobee.com/news/state/california/article221448500.html.

26   [39] Camp Fire Incident Information, CAL FIRE Incident Information (last modified May 15, 2019), http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=2277.

27   [40] PG&E Letter to CPUC re: Supplements the Notices provided Nov. 8, 2018 (Dec. 11, 2018),

28   http://s1.q4cdn.com/880135780/files/doc_downloads/2018/wildfire/12/12-11-18.pdf.

1  that once connected the suspension insulator to a tower arm.[41]  According to the report, the

2  connection point showed signs of wear; a flash mark was visible close to where the transposition

3  jumper was suspended; and there was damage to the transposition jumper and suspension

4  insulator.[42]

5        118.    PG&E had not inspected Tower :27/222 since August 2014, and prior to that, not

6  since 2009, pursuant to an internal policy whereby "Steel structures on PG&E's 115 kV

7  transmission lines, such as Tower :27/222, are subject to maintenance patrols annually and

8  detailed inspections every five years."  PG&E has admitted that an aerial patrol is not an

9  inspection, as it is only "[d]uring a detailed inspection of a transmission line" that "PG&E

10  personnel are instructed to look for and document abnormalities or circumstances that will

11  negatively impact safety, reliability, or asset life."[43]

12        119.    Moreover, just one day prior to the Camp Fire's ignition, PG&E had contacted a

13  Pulga landowner named Betsy Ann Cowley regarding transmission line poles on her property

14  that "were having problems with sparks."[44]

15        120.    Accordingly, it emerged that a PG&E electrical pole carrying a high-voltage 115

16  kilovolt transmission line lost its integrity, in whole or in part, on the morning of November 8,

17  2018.  Shortly thereafter, vegetation underneath the line ignited.  PG&E's failure to maintain a

18  clearance for vegetation up to 10 feet away from this transmission line, inclusive of all

19  vegetation underneath, violated California Public Resources Code Section 4293.  Further,

20  PG&E's failure to maintain the integrity of its poles and prevent their loss of function violated

21  California Public Utilities Code Section 451.

22

23        [41] *Id.*

24        [42] *Id.*  The same report noted that, at a neighboring tower, an "insulator hold down anchor" had become disconnected.  *Id.*

25        [43] PG&E Camp Fire Incident Description & Factual Summary at 4, PG&E Criminal Proceedings (N.D. Cal. Dec. 31, 2018), ECF No. 956-1.

26        [44] Matthias Gafni, *Update: PG&E says email to Camp Fire Victim Focused on Different*

27  *Transmission Line,* Mercury News (updated Nov. 14, 2018 3:59 PM), https://www.mercurynews.com/2018/11/12/state-regulators-investigating-pge-socal-edison-for-

28  roles-in-deadly-camp-woolsey-fires/.

1

2

**(b)     The Camp Fire's Second Ignition Point Was Also Caused by PG&E's Safety Violations**

3

4

121.     Cal Fire determined that the Camp Fire also had a second ignition point, which began "near the intersection of Concow Rd. and Rim Rd" before merging with the first fire PG&E caused at first ignition point.[45]  According to Cal Fire's report: "The cause of the second fire was determined to be vegetation into electrical distribution lines owned and operated by PG&E," a violation of California Public Resources Code Sections 4292 and 4293, as well as California Public Utilities Code Section 451.  Thus, Cal Fire has concluded that PG&E's violation of safety regulations caused at least one of the Camp Fire's two ignition points.

5

6

7

8

9

122.     Cal Fire first announced that it had identified a second ignition point for the Camp Fire on November 15, 2018.[46]  On November 16, 2018, PG&E admitted to CPUC that the same day the Camp Fire ignited (indeed, minutes later at 6:45 a.m.), it experienced a second outage on another power line in a nearby part of Butte County near Concow, California.[47]

10

11

12

13

123.     In PG&E's December 11, 2018 supplemental report to CPUC, PG&E further admitted that it discovered a broken pole on the second power line on November 9, 2018; that the pole was on the ground, along with pole equipment; and that the pole had a line recloser.[48]  The supplemental report also detailed a second inspection of the area on November 12, 2018, where a PG&E employee found damaged and downed poles, several snapped trees, downed

14

15

16

17

18

19

20

[45] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May 15, 2019), http://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.

21

22

[46] Andre Byik, *Camp Fire Investigation Leads To Possible Second Origin Away From Pulga*, Enterprise-Record (updated Nov. 15, 2018 10:06 PM), https://www.chicoer.com/2018/11/15/camp-fire-investigation-leads-to-another-area-away-from-pulga/.

23

24

25

26

[47] CPUC Email re: Electric Safety Incident Reported - PG&E Incident No: 181116-9015 (Nov. 16, 2018), http://www.cpuc.ca.gov/uploadedFiles/CPUCWebsite/Content/News_Room/NewsUpdates/2018/EIR_IncidentNo181116-9015.pdf; *PG&E Reports Another Outage On The Morning When California Camp Fire Started*, CNBC (Nov. 19, 2018 6:43 AM), https://www.cnbc.com/2018/11/19/pge-reports-another-outage-on-the-morning-when-california-camp-fire-started.html.

27

28

[48] PG&E Letter to CPUC re: Supplements the Notices provided Nov. 8, 2018 (Dec. 11, 2018), http://s1.q4cdn.com/880135780/files/doc_downloads/2018/wildfire/12/12-11-18.pdf.

1    wires, and some snapped trees on top of the downed wires.[49]  The presence of the line recloser

2    further calls into question PG&E's prior representation that it was "just about done" disabling

3    recloser devices in "high wildfire risk areas" as of November 18, 2015 (Misstatement No. 3).

4        124.    Accordingly, the truth emerged that the Camp Fire's second ignition point also

5    exhibited evidence of failures regarding vegetation management, pole integrity, and the possible

6    use of a recloser in further violation of California safety regulations, including Public Resources

7    Code Sections 4292, 4293 and Public Utilities Code Section 451.  Cal Fire's investigation later

8    confirmed these facts.

9    **H.    PG&E's Repeated Vegetation Management and Pole Integrity Safety Violations Show that the Company Knew of Its Numerous and Widespread Violations of Fire Safety Regulations Throughout the Class Period, but Did Not Change Its Practices to Reduce, Much Less Eliminate, Those Safety Violations**

10

11

12    **1.    PG&E Did Not Improve Its Inadequate Safety Practices After Its Safety Violations Caused the Deadly Butte Fire**

13

14        125.    Even though PG&E suffered from endemic wildfire safety problems, the

15    Company did not meaningfully change its practices even after the deadly Butte Fire that occurred

16    in 2015. As noted above, in a deposition transcript that has not yet been made publicly available,

17    PG&E's Vegetation Program Manager (Stockton Division)[50] Richard Yarnell reportedly testified

18    under oath: "**PG&E—to the best of my knowledge, we have not made any changes as a

19    result of this fire**" as of April 10, 2017. Accordingly, the **known** noncompliance that caused the

20    Butte Fire in 2015 continued unabated throughout the Class Period, contrary to PG&E's public

21    statements.

22        126.    Moreover, the vegetation management problems detailed herein were

23    institutionally entrenched by certain incentive structures PG&E put in place. According to a

24    lawsuit that was filed in California Superior Court against PG&E on December 21, 2017 (Case

25    No. CGC-17-563293), which asserted claims on behalf of victims of the North Bay Fires, PG&E

26

27    [49] *Id.*

28    [50] PG&E's Stockton Division is a geographic subdivision within the Company that contained the Butte Fire.

1    provided monetary incentives to its employees that had the effect of discouraging the

2    implementation of vegetation safety measures.

3        127.    For instance, PG&E's Vegetation Management Program adopted a Vegetation

4    Management Incentive Initiative ("VMII") program, which was purportedly designed to reduce

5    the "annual routine compliance" tree work of PG&E and to shift resources to "reliability" work

6    that focused on urban consumer satisfaction instead of overall safety. By doing so, PG&E

7    effectively shifted its resources away from rural areas that were more prone to wildfires (where

8    the "annual routine compliance" work was typically done), and towards more densely populated

9    urban areas (where the "reliability" work was done). For example, pursuant to this program,

10   PG&E set a goal to reduce "routine" work by 7.5% annually from 2014 through 2016. PG&E's

11   bonus incentive program therefore (like its policy of not shutting off its reclosers during wildfire

12   season) put safety at risk in an effort to reduce consumer complaints. *See* ¶569, *infra*.

13       128.    According to the same lawsuit, Robert Urban, a regional officer for a PG&E

14   contractor, stated that he had a concern that the bonus system incentivized his employees to not

15   do their job, but PG&E chose to keep this program despite knowing this risk.

16       129.    As noted above, though PG&E **falsely and repeatedly** assured investors during

17   the Class Period that its compliance failures had been resolved after the Butte Fire, the

18   Company's own employee Richard Yarnell later admitted that nothing of substance had changed

19   over much of the same time period. Accordingly, PG&E's repeated safety violations show that

20   the Company knew of its numerous and widespread violations of California safety regulations

21   throughout the Class Period, but did nothing to change them.

22           **2.    PG&E Internally Acknowledged, Extensively Documented, and
                    Tolerated for Years the Safety Violations that Caused the Camp Fire**

23

24       130.    PG&E's Caribou-Palermo transmission powerline was originally built in 1919,

25   and was responsible for causing the first ignition point of the Camp Fire.

26       131.    PG&E knew, but concealed, that this powerline had dangerously deteriorated.  In

27   December 2012, five steel towers supporting the Caribou-Palermo transmission line collapsed

28   due to windy conditions.  In a July 16, 2013 letter to the CPUC, PG&E proposed replacing the

1   five collapsed towers, and one additional tower, on the Caribou-Palermo line "[s]panning

2   Plumas-Butte County border" in a row "up slope and west of Highway 70 and generally parallel

3   to the unpaved Pulga Road in a remote area of the Feather River Canyon within Plumas National

4   Forest"[51]—that is, to say, near the first Camp Fire ignition point.

5       132.    The rest of the aging towers on the line, including the tower alleged to have

6   started the Camp Fire, were not replaced during that project.[52]  The age of these remaining

7   towers created a strong, undisclosed risk that corrosion, metal fatigue, or other age-related

8   factors would fail to support transmission line cables and cause wildfires.  Indeed, the relevant

9   tower included uninsulated "jumper" lines used to switch currents between transmission lines,

10  making the risk of fire even greater.[53]  Tellingly, the cross arm from that transmission tower,

11  which was attached to the "jumper" line, was removed by Cal Fire investigators as part of its

12  probe into the cause of the Camp Fire.[54]  And Cal Fire's investigation has not only concluded

13  that PG&E equipment caused the Camp Fire in a manner evidencing safety violations, but also

14  referred the matter to the Butte County district attorney for a criminal investigation.

15      133.    In a July 26, 2017 FERC filing that news outlets have reported on extensively,[55]

16  PG&E proposed considerable work for the Caribou-Palermo line as part of the Company's

17

18  _____
    [51] Letter from CPUC to PG&E re: Advice Letter 4256-E (Sept. 6, 2013),
19  https://www.pge.com/nots/rates/tariffs/tm2/pdf/ELEC_4256-E.pdf.

20  [52] Ivan Penn, et al., *How PG&E Ignored Fire Risks in Favor of Profits*, New York Times
    (Mar. 18, 2019), https://www.nytimes.com/interactive/2019/03/18/business/pge-california-
    wildfires.html.

21  [53] Matthias Gafni, *It was originally built in 1919. What failed on PG&E tower at heart of
22  Camp Fire probe?* Mercury News (updated Dec. 10, 2018 4:09 AM),

23  https://www.mercurynews.com/2018/12/07/it-was-originally-built-in-1919-what-failed-on-
    pge-tower-at-heart-of-camp-fire-probe/.

24  [54] Matthias Gafni, et al., *Why Did Fire Iinvestigators Remove PG&E Transmission Tower
    Part in Camp Fire Probe*, Enterprise-Record (updated Dec. 6, 2018 8:07 AM),
25  https://www.chicoer.com/2018/12/05/why-did-fire-investigators-remove-pge-transmission-
    tower-part-in-camp-fire-probe.

26  [55] *E.g.*, George Avalos, *PG&E Knew For Years That Repairs Were Needed On Transmission
    Lines In Area Of Fatal Camp Fire*, Mercury News (updated Feb. 28, 2019 6:05 AM),
27  https://www.mercurynews.com/2019/02/27/pge-delayed-repairs-for-years-on-transmission-line-
    linked-to-lethal-camp-fire/.

28

_____

1    annual request to FERC for rate changes.  PG&E reported that "[t]he Caribou-Palermo 115

2    kilovolt circuit was analyzed as part of [a] 2013 NERC Assessment," referring to an analysis by

3    the North American Electric Reliability Corporation ("NERC").  The filing indicated that the

4    2013 NERC study examined 455 spans of the of the transmission line and found that vegetation

5    or trees were allowed to grow too close to 127 (27.9%) of them: "The completed [NERC]

6    analysis identified 127 spans with clearance issues out of the 455 spans on the electric

7    transmission line."  PG&E never fixed the identified issues from the time it learned about them

8    in 2013 as reflected in the July 2017 filing.  PG&E's Caribou-Palermo transmission system

9    would later be implicated in the 2018 Camp Fire.

10           134.    On March 18, 2019, *The New York Times* published an exposé on PG&E titled,

11   "How PG&E Ignored California Fire Risks in Favor of Profits."  The article discussed an internal

12   Company email, sent long before the Camp Fire, which noted that a group of structures including

13   the transmission tower implicated in the Camp Fire, Tower :27/222, were at risk of collapse due

14   to their age and windy conditions in the area.  Indeed, the Company noted that corrosion on

15   another tower in the vicinity was so severe that it had endangered crews attempting to repair it.

16   The Company's own guidelines had warned that **the tower was a quarter-century past its**

17   **useful life**, yet PG&E failed to repair or replace the aging tower.

18           135.    The article also portrayed a corporate culture at the Company which disregarded

19   safety risks and avoided paying for necessary fire prevention precautions in favor of short-term

20   operating results.  The article quoted Mike Florio, a former California utilities commissioner,

21   who observed, "There was very much a focus on the bottom line over everything [at PG&E]:

22   'What are the earnings we can report this quarter? . . .  And **things really got squeezed on the**

23   **maintenance side**."  The article also quoted California's Governor Gavin Newsom, who

24   expressed a similar sentiment:  "**[PG&E] have simply been caught red-handed over and over**

25   **again, lying, manipulating or misleading the public. . .  They cannot be trusted.**"  The article

26   contrasted the lack of focus on safety at the Company with the approach taken by another

27   California utility facing similar risks, San Diego Gas & Electric, which had significantly

28   revamped its safety protocols to respond to increased wildfire dangers.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                                    41
CIVIL ACTION NO. 5:18-CV-03509-EJD

1    136.    Also on March 18, 2019, a coalition of law firms representing fire victims

2    published excerpts of internal Company emails demonstrating that PG&E had identified the

3    transmission lines implicated in the 2018 Camp Fire as unsafe long before the fire started.[56]  For

4    example, **internal Company documents showed that in December 2012 five aging towers**

5    **along the Caribou-Palermo transmission line had collapsed, and a 2014 internal Company**

6    **email stated that "the likelihood of failed structures happening is high**" – a risk PG&E

7    concealed from the public.

8    137.    Similarly, a November 1, 2016 PG&E document detailed the failure of necessary

9    hardware along the transmission line, with a support hook snapping off during routine painting.

10   PG&E documents internally acknowledged that the supports "had been compromised through

11   corrosion."[57]

12   138.    Despite the internal acknowledgment that the Caribou-Palermo lines were in need

13   of repair and posed a significant risk of collapse, PG&E never had the lines fixed.  Instead, the

14   Company reasoned that any collapse would not impact a sufficient number of customers to

15   warrant the repairs and that the risks would be mitigated because any fire may be extinguished

16   by rain.  Tragically, needed repairs were never undertaken, and **the Caribou-Palermo line**

17   **caused the first ignition point of the Camp Fire** in 2018.

18   139.    Accordingly, PG&E had actual knowledge about the safety violations that caused

19   the Camp Fire, months if not years in advance.

20   140.    It was in this context that Defendants touted PG&E's vegetation management and

21   infrastructure maintenance to investors, falsely representing that it was in full compliance with

22   all relevant regulations throughout the Class Period. *E.g.*, ¶197 (Misstatement No. 2, October 16,

23   2015); ¶222 (Misstatement No. 5, August 9, 2017); ¶249 (Misstatement No. 9, October 31,

24

25   _____

26   [56]   *Northern California Fire Lawyers Obtain Documents That Show PG&E Knew About Risk of Caribou-Palermo Line Failure*, MarketWatch (Mar. 18, 2019),
     https://www.marketwatch.com/press-release/northern-california-fire-lawyers-obtain-documents-that-show-pge-knew-about-risk-of-caribou-palermo-line-failure-2019-03-18.

27

28   [57]   *Id.*

2017); ¶270 (Misstatement No. 12, November 5, 2017); ¶280 (Misstatement No. 13, May 25, 2018); ¶287 (Misstatement No. 14, June 8, 2018).

**I.      PG&E's ESRB-8 Shutoff Protocol Was Illusory, and PG&E's Failure to Follow It Was a Proximate Cause of the Camp Fire**

141.    After the North Bay Fires but before the Camp Fire, on July 16, 2018, the CPUC passed Resolution ESRB-8.  As noted above, this regulation mandated that PG&E formalize and publicize a program to de-energize power lines for safety when extreme fire danger conditions occur.  PG&E announced its response to this new safety requirement on September 27, 2018 (the "ESRB-8 Shutoff Protocol"), and touted its existence throughout the rest of the Class Period.

142.    PG&E also stated that its ESRB-8 Shutoff Protocol applied to **all** of its powerlines, without qualification. Its protocol stated: "PG&E's Wildfire Safety Operations Center team will monitor conditions **across our system** and evaluate whether to temporarily turn off **electric power lines**, in the interest of public safety."  Thus, PG&E's ESRB-8 Shutoff Protocol applied to both higher-voltage transmission power lines and lower-voltage distribution power lines.

143.    Under the ESRB-8 Shutoff Protocol, PG&E represented that it would balance seven criteria when determining whether to shut off electricity for safety:

- **"Extreme" fire danger threat level**, as classified by the National Fire Danger Rating System

- **A Red Flag Warning declared** by the National Weather Service

- **Low humidity levels**, generally 20 percent and below

- **Sustained winds** above approx. 25 mph and wind gusts in excess of approx. 45 mph

- **Site-specific conditions** such as temperature, terrain and local climate

- **Critically dry vegetation** that could serve as fuel for a wildfire

- **On-the-ground, real-time observations** from PG&E field crews

Case: 19-90038    Doc# 2-3    Filed: 08/19/14/20    Entered: 08/19/19/19:57:42    Page 53 of
60 of 524

1   (Emphasis original.)   PG&E stated that "no single factor will drive a Public Safety Power

2   Shutoff," and never identified any other criteria, during the Class Period or since.

3          144.    When PG&E's lines ignited the Camp Fire on November 8, all seven criteria had

4   been met or exceeded – a fact of which PG&E could not have been ignorant.  Indeed, PG&E had

5   warned customers in that area as early as November 6 – two days before the Camp Fire began –

6   that it may need to "proactively turn off power for safety starting on Thursday, November 8."[58]

7          145.    PG&E had only shut off electricity under its ESRB-8 Shutoff Protocol once

8   before, on October 14 through 17, 2018, when it shut off eight transmission power line circuits

9   and thirty-three distribution power line circuits, in seven counties.  Though PG&E found damage

10  to its equipment before restoring power, it nevertheless faced strong backlash from customers

11  who were affected by the shutoff.

12         146.    On November 8, 2018 at 6:14 p.m. EST (3:14 p.m. PST), PG&E announced, via

13  its official Twitter.com account: "PG&E has determined that it will not proceed with plans today

14  for a Public Safety Power Shutoff in portions of 8 Northern CA counties, **as weather conditions**

15  did not warrant this safety measure."[59]  The three weather-relevant criteria are humidity levels (at

16  20% or below), wind speed (with sustained winds around 25 miles per hour or stronger, and

17  wind gusts around 45 miles per hour or stronger), and general site-specific conditions (*e.g.*, local

18  climate and terrain).

19         147.    However, as detailed below, **each of these factors weighed in favor of a shutoff**.

20  Where and when the Camp Fire started, humidity was around or below 20%, wind speeds were

21  measured above 25 (sustained) and 45 (gusts) miles per hour, and a myriad of site-specific

22  conditions contributed to the ignition of the most destructive and deadliest fire in California

---

[58] Press Release, PG&E, *PG&E Notifying Customers in Parts of Nine Counties About Extreme Weather Forecasts and Potential for Public Safety Power Shutoff* (Nov. 6, 2018), https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181106_pge_notifying_customers_in_parts_of_nine_counties_about_extreme_weather_forecasts_and_potential_for_public_safety_power_shutoff.

[59] PG&E Twitter Account Post (Nov. 8, 2018 3:14PM), https://twitter.com/PGE4Me/status/1060672000929267713.

history.   As Cal Fire later confirmed in its determination that PG&E caused the Camp Fire: "The tinder dry vegetation and Red Flag conditions consisting of strong winds, low humidity and warm temperatures promoted this fire and caused extreme rates of spread, rapidly burning into Pulga to the east and west into Concow, Paradise, Magalia and the outskirts of east Chico."[60]

148.    The Camp Fire originated at "Pulga Road at Camp Creek Road near Jarbo Gap."[61] Jarbo Gap is a geographical area in Butte County and contains a weather station located at 39° 44' 09" N (Latitude), 121° 29' 20" W (Longitude),[62] approximately six miles from the Camp Fire's origin.[63]   The Jarbo Gap weather station provided the most accurate record of weather conditions at the time and place where the Camp Fire ignited.

### 1.    PG&E Admitted that All of the Non-Weather Criteria Weighed in Favor of Shutting Off the Power

149.    On November 6 and 7, 2018, just before the Camp Fire ignited, PG&E admitted in three press releases that all seven criteria weighed in favor of a shutoff—providing only small caveats that weather-related factors might change.

### (a)    Criterion 1: the National Fire Danger Rating System Rated Jarbo Gap as Having an "Extreme" Fire Danger Threat Level

150.    The area where the Camp Fire ignited was classified as having an "Extreme" fire danger threat level by the National Fire Danger Rating System ("NFDRS").   The U.S. Forest Service "Wildland Fire Assessment System" ("WFAS") archives historical NFDRS ratings in map[64] and data[65] form, both of which confirm that the Jarbo Gap was rated "Extreme" on

---

[60] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May 15, 2019), http://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.

[61] Camp Fire Incident Information, CAL FIRE Incident Information (last modified May 15, 2019), http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=2277.

[62] Jarbo Gap California Weather Station Information, RAWS USA Climate Archive, https://raws.dri.edu/cgi-bin/wea_info.pl?caCJAR.

[63] Camp Fire Incident Information, CAL FIRE Incident Information (last modified May 15, 2019), http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=2277.

[64] Observed Fire Danger Class, WFAS-Maps Graphics Fire Behavior Research (Nov. 8, 2018), https://www.wfas.net/archive/www.fs.fed.us/land/wfas/archive/2018/11/08/fd_class.png.

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 5:18-CV-03509-EJD

45

1  November 8, 2018.  The graphic on the following page has modified the WFAS map to

2  highlight, with a red circle, the "Extreme" rating received by the Jarbo Gap weather station on

3  November 8, 2018:



19      151.    As the U.S. Department of Agriculture Forest Service explained the NFDRS:

> When the fire danger is "extreme", fires of all types start quickly
> and burn intensely.  All fires are potentially serious and can spread
> very quickly with intense burning.  Small fires become big fires
> much faster than at the "very high" level.  Spot fires are probable,
> with long-distance spotting likely.  These fires are very difficult to
> fight and may become very dangerous and often last for several
> days.[66]

*(continued)*

[65] *See* Data Chart of Fire Weather Observations from WIMS at 1700 Mountain Time (Nov. 8, 2018),  https://www.wfas.net/archive/www.fs.fed.us/land/wfas/archive/2018/11/08/fdr_obs.txt (row labeled "Jarbo Gap," column labeled "ADJ" for "adjective," data entry "E" for "Extreme").

[66] USDA Forest Service, National Fire Danger Rating System, https://www.fs.usda.gov/detail/cibola/landmanagement/resourcemanagement/?cid=stelprdb5368 839.

152.     Indeed, in a press release on November 7, 2018, PG&E admitted: "Due to expected **extreme fire danger conditions** . . . PG&E may temporarily turn off power in portions of the following communities: Butte County (including . . . Paradise)" on November 8, 2018.[67]

### (b)     Criterion 2: the National Weather Service Declared a "Red Flag Warning" for the Area

153.     The National Weather Service issued a "Red Flag Warning" for Butte County on November 8, 2018,[68] as PG&E admitted in a November 6, 2018 Press Release: "Due to expected extreme fire danger conditions, **including the Red Flag warning from the National Weather Service** and several other weather factors, Pacific Gas and Electric Company (PG&E) today began notifying customers in portions of nine counties that the company may proactively turn off power for safety starting on Thursday, November 8" including "Butte County."[69]

### (c)     Criterion 6: "Critically Dry Vegetation" (*i.e.*, Wildfire Fuel) Weighed in Favor of a Shutoff

154.     Throughout the area where the Camp Fire ignited, the soil and vegetation were unusually dry, as there had been almost no rainfall since April 2018.  As PG&E admitted in a November 27, 2018 filing to the CPUC, its decision not to shut off the power "was preceded by

---

[67] Press Release, PG&E, *PG&E Continues to Notify Customers in Parts of Nine Counties About the Potential for Public Safety Power Shutoff Due to Forecasted Extreme Weather* (Nov. 7, 2018), https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181107_pge_continues_to_notify_customers_in_parts_of_nine_counties_about_the_potential_for_public_safety_power_shutoff_due_to_forecasted_extreme_weather.

[68] Shirin Rajaee, *PG&E Could Cut Power to 63,000 Amid Red Flag Warning*, CBS13 Sacramento (Nov. 8, 2018 12:17 A.M.), https://sacramento.cbslocal.com/2018/11/08/red-flag-warning-pge/.

[69] Press Release, PG&E, *PG&E Notifying Customers in Parts of Nine Counties About Extreme Weather Forecasts and Potential for Public Safety Power Shutoff Due to* (Nov. 6, 2018), https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181106_pge_notifying_customers_in_parts_of_nine_counties_about_extreme_weather_forecasts_and_potential_for_public_safety_power_shutoff .

---

1   an extended period of dry fall weather, only one rain event since May, and periods of dry north

2   winds which caused the moisture content of live and dry fuels to remain low."[70]

3       155.    PG&E confirmed this conclusion in a November 7, 2018 press release: "Due to

4   forecasted high winds **and dry vegetation**, PG&E may temporarily turn off power in portions of

5   the following communities: **Butte County** (including Berry Creek, Chico, Forest Ranch,

6   Magalia, Oroville, **Paradise**). . . ."[71]

7       156.    As Pulitzer Prize winning journalist Matthias Gafni would later report,

8   information from the National Aeronautics and Space Administration ("NASA") showed that

9   California's moisture levels that month were "at the lowest levels in [the] last four years."[72] As

10  the graphic below confirms, this led to extremely dry vegetation:

11

12

13

14

15

16

17

18

19

20

---

21  [70] PG&E Letter to CPUC re: Compliance Report (Nov. 27, 2018),
    http://www.cpuc.ca.gov/uploadedFiles/CPUCWebsite/Content/News_Room/NewsUpdates/2018/
22  11-27-18%20PGE%20PSPS%20Report.pdf.

23  [71] Press Release, PG&E, *PG&E Continues to Notify Customers in Parts of Nine Counties
    About the Potential for Public Safety Power Shutoff Due to Forecasted Extreme Weather* (Nov.
24  7, 2018),
    https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181107_pge_continue
25  s_to_notify_customers_in_parts_of_nine_counties_about_the_potential_for_public_safety_powe
    r_shutoff_due_to_forecasted_extreme_weather .

26  [72] Matthias Gafni, *Why Didn't PG&E Shut Down Power In Advance Of Deadly Camp Fire?
    Here's The Data,* Bay Area News Group (Nov. 18, 2018 5:00 P.M.),
27  https://www.chicoer.com/2018/11/18/why-didnt-pge-shut-down-power-in-advance-of-deadly-
    camp-fire-heres-the-data/.

28

---

## Root Zone Soil Moisture Percentile









**(d)     Criterion 7: PG&E's On-the-Ground Observations Weighed in Favor of a Shutoff**

157.    PG&E's on-the-ground observations favored a shutoff.  In a press release dated November 7, 2018, PG&E warned customers that it was considering a shutoff due to "expected extreme fire danger conditions," and that "[f]actors that PG&E considers when deciding to initiate" a shutoff included its "on-the-ground observations."[73]

---

[73] Press Release, PG&E, *PG&E Continues to Notify Customers in Parts of Nine Counties About the Potential for Public Safety Power Shutoff Due to Forecasted Extreme Weather* (Nov. 7, 2018),
https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181107_pge_continues_to_notify_customers_in_parts_of_nine_counties_about_the_potential_for_public_safety_power_shutoff_due_to_forecasted_extreme_weather.

1    158.    This conclusion is corroborated by PG&E's admission in a November 8, 2018

2   press release that *only weather factors* weighed against shut-off: "[PG&E] has determined that it

3   will not proceed with plans today for a Public Safety Power Shutoff in portions of eight Northern

4   California counties, **as weather conditions did not warrant this safety measure**."[74]

5              **2.     All of the Weather Criteria Weighed in Favor of Shutting Off the Power**

6

7    159.    As described above, PG&E attributed its decision not to shut off power to weather

8   conditions.  Specifically, in a November 27, 2018 filing to the CPUC, PG&E explained that the

    primary weather condition that fell short was wind speed:
9

10            On Wednesday, November 7, 2018, PG&E refined the forecasted
              impact down to 63,000 customers and eight counties (Butte, Lake,
              Napa, Nevada, Placer, Plumas, Sierra and Yuba). **Weather**
11            **conditions stayed consistent, nearing but not reaching**
              **forecasted levels that would warrant temporarily turning off**
12            **power for customer safety**.

13            By around 13:00 on Thursday, November 8, **winds were**
              **decreasing**, and conditions were no longer forecast to approach
14            [Public Safety Power Shutoffs] criteria. Based on the forecasted
              information, PG&E no longer anticipated a possible need to de-
15            energize.

16   160.    However, all weather factors – including wind speed – weighed in favor of an

17  electricity shutoff in Jarbo Gap on November 7-8, 2018.  The charts[75] on the following page

18  show weather conditions at the Jarbo Gap Weather Station from late November 7, 2018 through

19  the next day:

20

21

22

23  ──────────────────────────
    [74] Press Release, PG&E, *PG&E Determines to Not Proceed with Public Safety Power Shutoff
24  Planned for Portions of Eight Northern California Counties* (Nov. 8, 2018),
    https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181108_pge_determin
25  es_to_not_proceed_with_public_safety_power_shutoff_planned_for_portions_of_eight_northern
    _california_counties.
26  [75] Weather Station Summary for Jarbo Gap California (Nov. 7, 2018), https://raws.dri.edu/cgi-
    bin/wea_daysum2.pl?stn=cjar&day=7&mon=11&yea=18&unit=E; Weather Station Summary
27  for Jarbo Gap California (Nov. 8, 2018), https://raws.dri.edu/cgi-
    bin/wea_daysum2.pl?stn=cjar&day=8&mon=11&yea=18&unit=E.
28

──────────────────────────

## Jarbo Gap California

### Daily Summary for

### November 7, 2018

| Hour of Day Ending at L.S.T. | Total Solar Rad. ° ly. | Wind Ave. mph | Wind V. Dir. Deg | Wind Max. mph | Air Temperature Mean Deg. F. | Fuel Temperature Mean Deg. F. | Fuel Moisture Mean Percent | Relative Humidity Mean Percent | Dew Point Deg. F. | Wet Bulb | Baro. Press. in. Hg. | Total Precip. inches |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9 pm | 0.0 | 25.0 | 39 | 43.0 | 56.0 | 54.0 | 4.7 | 15 | 9 | 38 | | 0.00 |
| 10 pm | 0.0 | 25.0 | 40 | 41.0 | 54.0 | 53.0 | 4.7 | 16 | 9 | 37 | | 0.00 |
| 11 pm | 0.0 | 27.0 | 35 | 44.0 | 53.0 | 52.0 | 4.7 | 18 | 11 | 37 | | 0.00 |
| 12 am | 0.0 | 27.0 | 37 | 45.0 | 52.0 | 51.0 | 4.7 | 19 | 11 | 36 | | 0.00 |

## Jarbo Gap California

### Daily Summary for

### November 8, 2018

| Hour of Day Ending at L.S.T. | Total Solar Rad. ° ly. | Wind Ave. mph | Wind V. Dir. Deg | Wind Max. mph | Air Temperature Mean Deg. F. | Fuel Temperature Mean Deg. F. | Fuel Moisture Mean Percent | Relative Humidity Mean Percent | Dew Point Deg. F. | Wet Bulb | Baro. Press. in. Hg. | Total Precip. inches |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 am | 0.0 | 29.0 | 37 | 48.0 | 51.0 | 50.0 | 4.7 | 21 | 12 | 36 | | 0.00 |
| 2 am | 0.0 | 24.0 | 38 | 44.0 | 50.0 | 48.0 | 4.7 | 22 | 13 | 36 | | 0.00 |
| 3 am | 0.0 | 31.0 | 37 | 50.0 | 49.0 | 48.0 | 4.7 | 22 | 12 | 35 | | 0.00 |
| 4 am | 0.0 | 32.0 | 38 | 52.0 | 49.0 | 48.0 | 4.7 | 22 | 12 | 35 | | 0.00 |
| 5 am | 0.0 | 30.0 | 42 | 51.0 | 48.0 | 47.0 | 4.7 | 23 | 12 | 34 | | 0.00 |
| 6 am | 0.0 | 18.0 | 33 | 40.0 | 48.0 | 46.0 | 4.7 | 23 | 12 | 34 | | 0.00 |
| 7 am | 0.6 | 14.0 | 33 | 28.0 | 49.0 | 46.0 | 4.7 | 21 | 11 | 35 | | 0.00 |
| 8 am | 4.5 | 6.0 | 14 | 25.0 | 51.0 | 51.0 | 4.7 | 18 | 9 | 35 | | 0.00 |
| 9 am | 13.1 | 14.0 | 33 | 21.0 | 53.0 | 55.0 | 4.9 | 17 | 9 | 36 | | 0.00 |
| 10 am | 37.3 | 18.0 | 37 | 30.0 | 55.0 | 58.0 | 4.9 | 16 | 10 | 38 | | 0.00 |
| 11 am | 45.2 | 14.0 | 29 | 29.0 | 58.0 | 61.0 | 5.0 | 14 | 9 | 39 | | 0.00 |
| 12 pm | 47.8 | 16.0 | 31 | 33.0 | 60.0 | 64.0 | 5.0 | 13 | 9 | 40 | | 0.00 |
| 1 pm | 40.7 | 12.0 | 38 | 32.0 | 61.0 | 63.0 | 5.2 | 12 | 8 | 40 | | 0.00 |
| 2 pm | 37.3 | 15.0 | 42 | 24.0 | 63.0 | 67.0 | 4.9 | 11 | 8 | 41 | | 0.00 |
| 3 pm | 21.8 | 10.0 | 40 | 28.0 | 61.0 | 60.0 | 4.8 | 12 | 8 | 40 | | 0.00 |
| 4 pm | 7.5 | 8.0 | 37 | 25.0 | 60.0 | 58.0 | 4.8 | 12 | 7 | 40 | | 0.00 |
| 5 pm | 0.8 | 13.0 | 27 | 23.0 | 58.0 | 55.0 | 4.7 | 11 | 4 | 38 | | 0.00 |
| 6 pm | 0.0 | 15.0 | 27 | 27.0 | 57.0 | 54.0 | 4.6 | 12 | 5 | 38 | | 0.00 |
| 7 pm | 0.0 | 18.0 | 31 | 30.0 | 56.0 | 53.0 | 4.6 | 12 | 4 | 37 | | 0.00 |
| 8 pm | 0.0 | 19.0 | 28 | 34.0 | 55.0 | 52.0 | 4.6 | 12 | 3 | 37 | | 0.00 |

161.    Accordingly, PG&E's November 27, 2018 statement to the CPUC that its

decision not to shut off power was justified in part by the fact that "[b]y around 13:00 on

Thursday, November 8, winds were decreasing," was misdirection.  The Camp Fire had already

begun over six hours before that point.  And indeed, as shown in the chart above, wind speed

1    weighed in favor of a shutoff in the hours before the fire started. In fact, all of the weather

2    factors weighed in favor of a shut off in the hours before the fire started, as detailed below.

3

          **(a)      Criterion 3: The Jarbo Gap Recorded Sufficiently Low Humidity Levels**

4

5         162.    Throughout the night on November 7, 2018, humidity was below the "generally

6    20%" level, supporting a shutoff. From 9:00 p.m. to midnight, humidity never exceeded 19%. In

7    the ten hours before the Camp Fire, average humidity was 20.1%. Over the 24-hour period,

    humidity averaged a mere 16.42%.

8

9         163.    Throughout November 8, 2018, humidity at the Jarbo Gap was at or below the

10    "generally 20%" level that supported a shutoff. Between 6 a.m. and 7 a.m., when the Camp Fire

11    ignited, humidity was between 23% and 21% and falling precipitously; it would drop to as low

    as 11% in the coming hours.

12

13         164.    PG&E knew that the humidity would drop precipitously because National

14    Weather Service's forecast of a red flag warning that day—the same red flag warning PG&E

15    mentioned in its press release late the previous evening[76]—warned that "Afternoon [Relative

    Humidity] values of 5-15% will be common across the area."[77]

16

17         165.    In fact, humidity weighed even more strongly in favor of a shutdown that day

18    than it did on October 14, 2018, the day on which PG&E had previously determined that a power

19    shutoff was necessary. The National Weather Service's forecast of humidity under 15% and as

20    low as 5% was even more severe than its red flag warning on October 14, 2018, where it

21    predicted relative humidity "into the 7-15% range for much of this region."[78]

22

23    ———————————

    [76] Press Release, PG&E, *PG&E Continues to Closely Monitor Weather Conditions Ahead of*

24    *Possible Public Safety Power Shutoff in Parts of Eight Counties* (Nov. 7, 2018),

    https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181107_pge_continue

25    s_to_closely_monitor_weather_conditions_ahead_of_possible_public_safety_power_shutoff_in_

    parts_of_eight_counties.

26    [77] Storm Prediction Center Day 1 Fire Weather Outlook, NOAA (Nov. 8, 2018 07:51:02

    UTC), https://www.spc.noaa.gov/products/fire_wx/2018/181108_1200_fwdy1_print.html.

27    [78] Storm Prediction Center Day 1 Fire Weather Outlook, NOAA (Oct. 14, 2018 06:58:03

28    UTC), https://www.spc.ncep.noaa.gov/products/fire_wx/2018/181014_1200_fwdy1_print.html.

1

2

           **(b)     Criterion 4: The Jarbo Gap Recorded Sufficiently High Wind Speed**

3

166.    As noted above (*see* ¶159), PG&E informed the CPUC on November 27, 2018 that the primary reason it did not shut off the power was wind speed.

4

5

167.    Yet throughout the night on November 7, 2018, sustained winds at the Jarbo Gap were at or above the "approx. 25 mph" level that weighed in favor of a shutoff.  Similarly, wind gusts reached the "approx. 45 mph" level by midnight, further supporting a shutoff.  In the ten hours leading up to the Camp Fire, average sustained winds and gusts were 26.8 and 45.8 miles per hour, respectively.

6

7

8

9

168.    At 5 a.m. on November 8, 2018, approximately an hour and a half before the Camp Fire erupted, sustained winds reached 30 miles per hour, with gusts of 51 miles per hour. Overall, wind conditions strongly weighed in favor of a shutoff in the hours before the Camp Fire's ignition.

10

11

12

13

169.    PG&E knew that sustained winds would be high because National Weather Service's forecast of a red flag warning that day—the same red flag warning PG&E mentioned in its press release late the previous evening[79]—warned of winds "during the morning and afternoon" with a "[s]trong northerly/northeasterly flow of 20-25 mph."[80]

14

15

16

17

170.    In fact, sustained wind speed weighed even more strongly in favor of a shutdown that day than it did on October 14, 2018, the day on which PG&E had previously determined that a power shutoff was necessary.  The National Weather Service's forecast of sustained winds of 20-25 miles per hour was even more severe than its red flag warning on October 14, 2018, which

18

19

20

21

22

23

24

[79] Press Release, PG&E, *PG&E Continues to Closely Monitor Weather Conditions Ahead of Possible Public Safety Power Shutoff in Parts of Eight Counties* (Nov.  7, 2018), https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181107_pge_continues_to_closely_monitor_weather_conditions_ahead_of_possible_power_shutoff_in_parts_of_eight_counties.

25

26

27

[80] Storm Prediction Center Day 1 Fire Weather Outlook, NOAA (Nov. 8, 2018 07:51:02 UTC), https://www.spc.noaa.gov/products/fire_wx/2018/181108_1200_fwdy1_print.html.

28

1    predicted "Strong/gusty east-northeasterly winds of 15-20 mph. . . . where sustained winds are

2    forecast to reach 20-25 mph for a few hours."[81]

3          **(c)  Criterion 5: Site-Specific Conditions Further Favored Shutoff**

4       171.  The specific conditions beneath PG&E's 115 kilovolt transmission line where the

5    Camp Fire ignited were highly conducive to wildfires.  Just one day earlier, PG&E contacted

6    Betsy Ann Cowley regarding transmission line poles on her property in Pulga that "were having

7    problems with sparks," indicating that conditions were hazardous.[82]  Further, it is indisputable

8    that dry vegetation existed underneath the transmission line given reports of vegetation burning

9    beneath it (*see* ¶115, *supra*).  Notably, PG&E identified nothing about the area's terrain,

10   temperature or climate in its November 27, 2018 letter to the CPUC explaining its decision not to

11   shut off its lines.[83]

12        **3.  PG&E Knew, or Recklessly Disregarded, that All Seven Criteria Weighed in Favor of Shutting Off the Power**

13

14      172.  PG&E knew that severe weather conditions requiring a shutoff were in effect.

15   First, the Company admitted it had been monitoring the weather in the area for days; its

16   November 7 press release confirmed that "PG&E meteorologists continuously monitor weather

17   conditions."  Second, the Company had its own "network of PG&E weather stations to enhance

---

18   [81] Storm Prediction Center Day 1 Fire Weather Outlook, NOAA (Oct. 14, 2018 06:58:03

19   UTC), https://www.spc.ncep.noaa.gov/products/fire_wx/2018/181014_1200_fwdy1_print.html.

20   [82] Matthias Gafni, *Update: PG&E says email to Camp Fire Victim Focused on Different Transmission Line,* Mercury News (updated Nov. 14, 2018 3:59 PM),

21   https://www.mercurynews.com/2018/11/12/state-regulators-investigating-pge-socal-edison-for-roles-in-deadly-camp-woolsey-fires/.

22   [83] The remoteness and ruggedness of the relevant terrain where the Camp Fire started further

23   supported a shutoff.  In a July 16, 2013 letter to the CPUC concerning the exact same Caribou-

24   Palermo transmission line, PG&E described the relevant terrain as being "in a remote area" with "extreme topography."  *See* Letter from CPUC to PG&E re: Advice Letter 4256-E (Sept. 6, 2013), https://www.pge.com/nots/rates/tariffs/tm2/pdf/ELEC_4256-E.pdf.  After the Camp Fire,

25   an article reported on the terrain immediately around the same transmission line as making fire

26   containment more difficult: "The remoteness and rugged terrain around the tower would make

27   any firefight by hand crews nearly impossible."  *See* Matthias Gafni, *It was originally built in 1919. What failed on PG&E tower at heart of Camp Fire probe?* Mercury News (updated Dec.

28   10, 2018 4:09 AM), https://www.mercurynews.com/2018/12/07/it-was-originally-built-in-1919-what-failed-on-pge-tower-at-heart-of-camp-fire-probe/.

---

1    weather forecasting and modeling," and stated that the Company had the capability of

2    "[m]onitoring wildfire risks **in real time** from our new Wildfire Safety Operations Center."[84]

3    Finally, the weather data referenced above was publicly available.  Indeed, for the hour from

4    midnight to 1 a.m. on November 8, 2018 just before the Camp Fire started, the Jarbo Gap

5    weather station reported that **all weather conditions were met**: humidity at 19%, sustained

6    winds at 27 miles per hour, and wind gusts at 45 miles per hour.  Accordingly, PG&E either

7    knew that weather conditions existed that weighed in favor of a shutoff, or deliberately

8    disregarded such information.

9         173.    Every factor weighed in favor of shutting off PG&E's transmission line running

10   through the Jarbo Gap outside of Paradise, California.  PG&E knew or should have known that

11   all such factors were met.

12        174.    Indeed, PG&E had only shut off electricity in the face of wildfire conditions once

13   before, in October 2018.  The backlash to that shutoff was strong, and PG&E received numerous

14   customer complaints. PG&E noted in its October 31, 2018 report to the CPUC that as of October

15   24, "17 residential customers have complained to the CPUC as a result of the PSPS [Public

16   Safety Power Shutoffs] event since the first customer notification on October 13."[85]  Moreover,

17   PG&E reported to the CPUC that it had "received a total of 146 claims as of October 24, 2018,"

18   including claims for property damage, business interruption, and spoiled food.

19        175.    In sum, all seven criteria weighed in favor of a shutoff that never happened.  From

20   the beginning, the Company misrepresented to investors that it would prioritize safety over

21   customer satisfaction and reliability under the requirements of CPUC's Resolution ESRB-8.  The

22   strongest inference from PG&E's failure to shut off power on November 8, 2018 is that its

23   ESRB-8 Shutoff Protocol was illusory, and that the Company did not believe itself bound by the

24   _____

25   [84] PG&E Public Safety Power Shutoff Policies and Procedures, CPUC website (Sept. 2018),
     http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/News_Room/Public-Safety-

26   Power-Shutoff-Policies-and-Procedures-September-2018.pdf.

27   [85] Letter from PG&E to CPUC re: Compliance Report (Oct. 31, 2018),
        http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Utilities_and_Industries/En

28   ergy_-_Electricity_and_Natural_Gas/PGE%20PSPS%20Report%20Letter%2020181031.pdf.

1   seven criteria it told the public and investors were the crucial criteria.  By PG&E's statements

2   listing these – and only these – criteria in its ESRB-8 Shutoff Protocol, investors were entitled to

3   believe that when **all** criteria were met, PG&E would prioritize safety and shut off the power

4   rather than risk causing wildfires and the resulting economic as well as reputational harm to

5   PG&E.

6        176.    In the alternative, PG&E had a duty to update investors once it decided to

7   abandon its ESRB-8 Shutoff Protocol and risk the chance of wildfire.  The result of PG&E's

8   non-adherence to the protocol was the deadliest and most destructive wildfire California has ever

9   faced.

10       **J.    PG&E's Bankruptcy and Other Post-Class-Period Developments**

11       177.    Following PG&E's felony convictions for knowingly and willfully violating

12   safety standards in causing the deadly San Bruno gas explosion and obstructing justice (*see*

13   *supra* Section VI.F.2.), PG&E's sentence included criminal probation.  Since November 27,

14   2018, the U.S. District Court presiding over PG&E's probation instituted further proceedings to

15   determine whether, *inter alia*, PG&E's safety violations causing the North Bay and Camp Fires

16   may have violated its probation.  These proceedings remain ongoing as of the filing of this

17   Complaint, and are detailed in Section X.C., *infra*.

18       178.    On January 14, 2019, PG&E filed a current report on Form 8-K stating that it

19   expected to file for Chapter 11 bankruptcy on or about January 29, 2019.  The reason the

20   Company provided for the expected bankruptcy was the "series of catastrophic wildfires that

21   occurred in Northern California in 2017 and 2018" – namely, the North Bay and Camp Fires.[86]

22       179.    On January 29, 2019, PG&E declared Chapter 11 bankruptcy.  The Company's

23   bankruptcy filings stated that it was facing $51.7 billion in liabilities, including more than $30

24   billion in potential liabilities tied to the North Bay and Camp Fires.[87]

25

26   _____

     [86] PG&E Corp., Current Report (Form 8-K) (Jan. 13, 2019),
27   https://www.sec.gov/Archives/edgar/data/75488/000095015719000032/form8k.htm.

     [87] Amended Decl. of Jason P. Wells at 3 & 7, Case No. 19-br-30088, (N.D. Cal. Feb. 1, 2019),
28   ECF No. 263.

1    180.    On February 6, 2019, PG&E submitted to CPUC its new wildfire mitigation plan,

2    as required by SB 901.  PG&E later corrected the filing on February 12, 2019 and amended it on

3    February 14, 2019 (the "2019 Mitigation Plan").  On April 29, 2019, the CPUC largely approved

4    PG&E's 2019 Mitigation Plan, with the exception of "several aspects of the company's planned

5    mitigation that require improvement or other follow-up activity," including improved "[a]nalysis

6    of data to determine whether PG&E's new vegetation-pole clearances have contributed to

7    reduced ignitions, especially during critical weather conditions."[88]  As detailed below, the

8    dramatic expansion of safety practices and expenditures in PG&E's 2019 Mitigation Plan

9    confirms the inadequacy of PG&E's prior activities, showing that PG&E did far less than it

10   should have during the Class Period.

11   181.    PG&E's 2019 Mitigation Plan stated that the Company would substantially

12   increase its vegetation management efforts.  First, the plan provided that approximately 375,000

13   "additional" hazard trees should be trimmed or cleared in 2019, a 235% increase compared to

14   PG&E's purported totals of 160,000 in 2018 (estimated), 156,344 in 2017 (actual), 225,168 in

15   2016 (actual), 18,557 in 2015 (actual), and 8,042 in 2014 (actual).  Second, it called for

16   performing 2,450 miles of "enhanced vegetation management" (including fuel reduction and

17   overhang clearing,) in 2019, an increase of 320% from its 2018 target of only 760 miles.  In

18   approving this proposal, the CPUC noted that "PG&E proposes to spend between $800 million

19   and $1.3 billion to support [this] expansion of its vegetation management program."

20   182.    PG&E's 2019 Mitigation Plan also stated that the Company would substantially

21   increase its inspections.  Instead of just routinely inspecting 517,500 electricity distribution

22   poles, PG&E would also commit to conducting "enhanced inspections" of 685,000 electricity

23   distribution poles in High Fire Threat Districts "in addition to routine inspections" over the

24   course of just "five months." (Emphasis original.)  "Enhanced Inspection" was described as

25

26   [88] Although PG&E submitted a second corrected plan on April 25, 2019 "proposing to extend
the timelines on many of its major wildfire mitigation efforts," the CPUC determined it was
27   "filed too late to be considered and to receive party comment," and thus "not act on those
proposals."  *See* Proposed Decision of Administrative Law Judge re: 18-10-007 (Apr. 29, 2019),
28   http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M285/K712/285712576.pdf.

1    "includ[ing] ground inspections, drone and helicopter inspections where needed, and climbing

2    inspections of every transmission tower," implying such measures had not been undertaken in

3    the past.  Similarly, for its electricity transmission structures, PG&E committed to conducting

4    enhanced inspections for 40,600 structures in addition to 76,000 routine inspections (up from

5    9,400 and 76,000, respectively).  PG&E also committed to conducting "enhanced risk-based

6    inspections" of 200 electricity substations in High Fire Threat Districts.

7         183.  The CPUC noted that these increased inspections were expected to cost PG&E

8    **between $798 million and $1.396 billion—**"**an increase from $15 million authorized in**

9    **PG&E's last [General Rate Case]**."

10         184.  The 2019 Mitigation Plan also proposed that the Company would significantly

11    expand the geographic regions where it might preemptively shutoff power pursuant to its ESRB-

12    8 Shutoff Protocol, estimating that the protocol would now cover as many as 5.4 million

13    customers, a **950% increase** from what previously covered approximately 570,000 consumers.

14         185.  Thus, PG&E's 2019 Mitigation Plan described dramatic increases in safety

15    practices and expenditures compared to prior years.  These and other aspects of PG&E's

16    expensive proposals represented that it was finally providing the necessary, dramatic expansion

17    of its safety practices and increases in expenditures, which had been absent.  Accordingly, the

18    vastly expanded scope of PG&E's 2019 wildfire plan strongly demonstrates the inadequacy of

19    PG&E's prior safety practices, showing that PG&E did far less than it should have during the

20    Class Period.

21         186.  Following the plan's release, the *Associated Press* summarized the general

22    reaction, "Lawyers, industry watchdogs and a federal judge alike wonder: *What took so long*?"[89]

23         187.  On February 28, 2019, PG&E issued a press release providing an update on the

24    financial impact of the North Bay and Camp Fires, along with the Company's fourth quarter and

25    full-year 2018 financial results.  The release stated that the Company "believes it is probable that

26

27

28    [89] Paul Elias, *Critics Ask What Took PG&E So Long on Wildfire Safety Effort*, Associated Press (Feb. 7, 2019), https://www.apnews.com/c1d0e16811914177a9b4b473f1eeebee.

---

1   its equipment will be determined to be an ignition point of the 2018 Camp Fire," half-

2   anticipating Cal Fire's determination three months later implicating PG&E in both of the Camp

3   Fire's ignition points.  The press release also stated that the Company would be recording a

4   **$10.5 billion charge** related to the 2018 Camp Fire.  It also reported an additional $1 billion

5   charge related to the North Bay Fires, "in addition to the previously recorded $2.5 billion charge

6   in the second quarter of 2018" related to the same fires.  As a result, the Company reported full-

7   year *net losses of $6.9 billion*, compared to 2017 net income of $1.6 billion.  It further stated:

8   "Management has concluded that these circumstances raise substantial doubt about PG&E

9   Corporation's and the Utility's ability to continue as going concerns…."

## VII.  DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS UNDER THE EXCHANGE ACT[90]

10

11      188.    Investors and analysts were focused on the Company's compliance with wildfire-

12  related safety regulations during the Class Period. With an eye towards artificially inflating its

13  share price, PG&E responded to this interest with false and misleading reassurances that PG&E

14  was in compliance with safety regulations. PG&E also significantly raised its quarterly dividend

15  during the Class Period, repeatedly touting that such a move was based, in part, on its success in

16  ensuring safety. As detailed below, Defendants' fraud proximately caused investors' losses.

### A.      Overview of Defendants' Fraudulent Course of Conduct

17

18      189.    PG&E was responsible for the North Bay Fires.  Of the eighteen main North Bay

19  Fires for which Cal Fire's investigations have been completed, **seventeen** were caused by PG&E

20  equipment. Among those, **eleven** of these fires evidenced violations of California safety

21  regulations, in **seven** different counties at the **same time**.

22      190.    Furthermore, PG&E was responsible for the Camp Fire, which began when a

23  PG&E electrical tower – carrying a high-voltage 115 kilovolt transmission line – failed.  On May

24  15, 2019, Cal Fire issued a news release confirming that its investigation had "determined that

25  the Camp Fire was caused by electrical transmission lines owned and operated by Pacific Gas

26

27  _____

[90] All references to "Defendants" in Sections I & IV-XIII refer to the Exchange Act

28  Defendants (PG&E and the Exchange Act Individual Defendants).

1   and Electric[]."[91]  PG&E acknowledged a second ignition point for the Camp Fire that exhibited

2   damaged and downed poles, vegetation on top of downed wires, and a recloser.  As a result,

3   vegetation underneath the lines ignited in two ignition points approximately 30 minutes apart.

4   PG&E's failure to remove such vegetation violated California Public Resources Code §4293.

5   PG&E's failure to maintain the integrity of its poles violated California Public Utilities Code

6   §451.  Cal Fire's investigation also confirmed: "The cause of the second fire was determined to

7   be vegetation into electrical distribution lines owned and operated by PG&E."[92]

8        191.    Moreover, PG&E's ESRB-8 Shutoff Protocol required that the responsible power

9   lines be shut off.  While the ESRB-8 Shutoff Protocol requires that PG&E consider seven criteria

10  when determining whether a shutoff would be appropriate, **all seven criteria were satisfied** in

11  the hours leading up to the Camp Fire in the precise location where it started.   This, too, Cal Fire

12  confirmed in its determination that PG&E caused the Camp Fire: "The tinder dry vegetation and

13  Red Flag conditions consisting of strong winds, low humidity and warm temperatures promoted

14  this fire and caused extreme rates of spread…."[93]   Though adhering to the ESRB-8 Shutoff

15  Protocol would have prevented the Camp Fire entirely, PG&E flouted it.

16       192.    Tellingly, the CPUC is investigating whether PG&E violated CPUC rules and

17  standards.  And since determining that PG&E is responsible for the Camp Fire, Cal Fire has

18  forwarded its investigative report to the Butte County District Attorney.

19       193.    The news about PG&E's responsibility for causing the North Bay Fires and Camp

20  Fire directly impacted the Company's bottom line, because California law requires PG&E to

21  bear the cost of wildfire-related property damage and personal injury caused by its violations of

22

23  _____

    [91] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May
24  15, 2019),
    http://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.
25  [92] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May
    15, 2019),
26  http://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.
27  [93] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May
    15, 2019),
28  http://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.

1  California safety regulations.  In other words, those costs likely could not be passed on to

2  ratepayers.  And, given the information that has emerged, including the conclusions of Cal Fire's

3  investigations into these fires to date – where Cal Fire has referred at least twelve of its

4  investigations to the appropriate counties' district attorneys' offices to review for potential

5  criminal violations – the market has come to understand that the financial consequences to

6  PG&E are extraordinary.

7          **B.    Defendants Made Materially False and Misleading Statements and
               Omissions Regarding Its Vegetation Management Activities and Compliance
8              with Wildfire Safety Regulations Before the North Bay Fires**

9                  **1.    April 29, 2015 – Misstatement No. 1**

10         194.    The Class Period begins on April 29, 2015, when PG&E held a conference call to

11  discuss the Company's financial and operating results for the first financial quarter of 2015,

12  which ended March 31, 2015. During the call, Defendant Johns, then President of the Utility,

13  misleadingly assured investors of the Company's commitment to safety:

14              As California enters its fourth year of drought, we're working hard
               to help the state meet this challenge by reducing water usage at our
15              own facilities, encouraging customers to conserve by offering
               rebates for more efficient washers and agricultural pumps. ***We're***
16              ***stepping up our vegetation management activities to mitigate***
               ***wildfire risk*** and improve access for firefighters.

17         195.    This statement was materially false and/or misleading because PG&E did not

18  materially increase its vegetation management budget in 2015. In fact, based on information

19  released by CPUC, PG&E underspent its vegetation management budget in both 2014 and 2015:

20  whereas CPUC approved PG&E to spend $190,000,000 and $194,153,000 in 2014 and 2015,

21  respectively, PG&E actually spent only $189,617,402 and $194,094,406, respectively.

22  Moreover, this small budget increase of 2.4% between 2014 and 2015 was only 1.28 percentage

23  points above inflation, which rose 1.12% over the same time period.[94]  Indeed, Judge Alsup held

24  that the "large number of trees that should have been removed by PG&E but weren't . . . was a

25  major contributing factor, maybe the single-biggest factor, in causing the fires in 2017 and 2018

26

27  _____

28  [94] CPI Inflation Calculator, Bureau of Labor Statistics,
    https://www.bls.gov/data/inflation_calculator.htm.

1   in Northern California," and he concluded that "PG&E's performance with respect to vegetation

2   management has been **dismal**." Accordingly, PG&E had not meaningfully "stepp[ed] up" its

3   vegetation management activities.[95]

4       196.    Further, this statement materially omitted the numerous and widespread safety

5   violations that would not be fixed by PG&E's "stepp[ed] up . . . vegetation management

6   activities."

7                **2.**       **October 16, 2015 – Misstatement No. 2**

8       197.    On October 16, 2015, PG&E issued its 2015 Corporate Responsibility and

9   Sustainability Report. This report falsely assured investors that PG&E's "vegetation

10   management" was "in compliance with relevant laws":

11               **Vegetation Management**

12               ***Each year, PG&E's Vegetation Management department***, in
     consultation with utility arborists and foresters, ***inspects every mile***

13               ***of power line in our service area for public safety*** and electric
     reliability. ***We do so in compliance with relevant laws*** and with a

14               focus on public involvement, including extensive "Right Tree,
     Right Place" outreach. PG&E has been recognized by the National

15               Arbor Day Foundation as a Tree Line USA recipient for 20
     consecutive years for demonstrating best practices in utility

16               arboriculture.

17       198.    Because PG&E's vegetation management practices failed to follow relevant

18   federal and California safety laws, PG&E's vegetation management activities were decidedly not

19   "in compliance with relevant laws."

20       199.    First, according to reports released in subsequent corrective disclosures, including

21   on May 25 and June 8, 2018, PG&E violated relevant wildfire safety laws, including California

22   Public Resources Code Section 4293, multiple times.

23       200.    Second, Cal Fire found sufficient evidence of violations of state law to refer

24   PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections IX.D.4-5,

25   *infra*.

26

27       [95] PG&E also omitted that it was supposed to perform at least $441,192 (the total amount by
     which PG&E underspent its allowance in 2014 and 2015) in additional vegetation management

28   during 2015, but failed to do so.

201.    Third, investigations into the causes of the Camp Fire have already disclosed evidence that this most destructive and deadly wildfire in California history was caused by PG&E violating California Public Resources Code Section 4293 and California Public Utilities Code Section 451, among other safety regulations.    Indeed, Cal Fire has found that PG&E equipment was responsible for both ignition points of the Camp Fire and has since reported PG&E to the Butte County District Attorney based on evidence of safety violations.

202.    Fourth, it has been documented that PG&E actually knew that it was not in compliance with relevant safety laws and best practices at the time of this statement.  In proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'"  *See* ¶104.

203.    Fifth, PG&E has admitted that it did not "inspect[] every mile of power line" "each year," because at the time this statement was made, it did not inspect Tower :27/222 of the Caribou-Palermo transmission line since August 2014.  This lack of annual inspection contributed to Tower :27/222's failure on November 8, 2018, which was part of the Camp Fire's first ignition point.

204.    Sixth, this statement materially omitted the true risk that PG&E would cause wildfires serious enough to imperil the Company's financial condition.

205.    Thus, this statement was materially false and/or misleading because of PG&E's numerous and widespread violations of safety regulations, including regulations specifically related to vegetation management – regulations which were essential for preventing devastating wildfires.  *See* Section VI.F.4.  As Judge Alsup held, PG&E's "**unsafe conduct has led to recurring deadly wildfires caused by its electrical system**" and the "large number of trees that should have been removed by PG&E but weren't . . . was a major contributing factor, **maybe the single-biggest factor, in causing the fires** in 2017 and 2018 in Northern California."  In fact, PG&E's violations were so pervasive that they caused multiple North Bay Fires all at the same

1  time in seven different counties, and then caused both of the Camp Fire's two ignition points a

2  year later – therefore the violations cannot be explained away as an isolated lapse.

3       206.   This statement regarding compliance was reviewed and authorized by Defendant

4  Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. According to the same

5  2015 Corporate Responsibility and Sustainability Report:

> Within senior leadership, ethics and compliance are managed by a
> Chief Ethics and Compliance Officer, a position created in 2015 as
> part of our commitment to achieve a best-in-class ethics and
> compliance program. The position reports to the PG&E
> Corporation CEO and has additional reporting responsibility to the
> Audit Committees of the Board of Directors, and the Compliance
> and Public Policy Committee of PG&E Corporation.
>
> The new position is responsible for:
>
> - Building a best-in-class ethics and **compliance** program
>   and **overseeing its implementation**,
>
> - **Overseeing company-wide programs for compliance
>   reporting and related investigatory processes**. . . .

14       207.   Kane therefore was responsible for both "overseeing . . . implementation" of

15  PG&E's compliance **and "overseeing . . . compliance reporting,"** including this report.

16       **3.     November 18, 2015 – Misstatement No. 3**

17       208.   On November 18, 2015, Hogan publicly testified before the California Senate

18  Energy, Utilities and Communication Subcommittee on Gas and Electric Infrastructure Safety.

19  During that testimony, Hogan assured the public that PG&E was "just about done" implementing

20  a program that would remotely disable the Company's recloser devices in areas that included

21  "high wildfire risk areas":

> So as I mentioned earlier, our SCADA capabilities where we are
> able to *take our reclosers out of service remotely*, we first *focus
> on the wildfire areas* and then we have about 130 some odd
> locations, we are going to complete about 126 of those this year,
> *just about done with that program*, which leaves six for next year,
> which will be completed.

25       209.   This statement was materially false and/or misleading because PG&E

26  misleadingly said that it had implemented policies and procedures to disable recloser devices

27  from areas that were at high risk for wildfires, which includes the areas where the North Bay

Fires occurred, by the end of 2015 (approximately 1 month away). Hogan's statement concealed that PG&E dangerously kept reclosers in use through at least October 2017; Cal Fire has determined that PG&E reclosers caused one of the North Bay Fires, known as the Pythian Fire. Indeed, a recloser was found on a broken PG&E pole at the second ignition point for the Camp Fire.  Thus, PG&E did not have the safety policies and procedures in place that they led investors to believe they had.

210.    This statement materially omitted the true risk that PG&E would cause wildfires serious enough to imperil the Company's financial condition.

### 4.    October 6, 2016 – Misstatement No. 4

211.    On October 6, 2016, PG&E issued its 2016 Corporate Responsibility and Sustainability Report. This report provided false assurances to investors regarding PG&E's compliance with relevant regulations:

**Vegetation Management**

> *Each year,* PG&E's Vegetation Management department and its contracting arborists and foresters *inspect miles of power lines in our service area for public safety and electric reliability. We do so in compliance with relevant laws* and with a focus on public involvement, including extensive "Right Tree, Right Place" outreach. PG&E has been recognized by the National Arbor Day Foundation as a Tree Line USA recipient for 21 consecutive years for demonstrating best practices in energy sector arboriculture.

212.    Because PG&E's vegetation management practices failed to follow relevant federal and California safety laws, PG&E's vegetation management activities were decidedly not "in compliance with relevant laws."

213.    First, according to reports released in subsequent corrective disclosures, including on May 25 and June 8, 2018, PG&E violated relevant wildfire safety laws, including California Public Resources Code Section 4293, multiple times.

214.    Second, Cal Fire found sufficient evidence of violations of state law to refer PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections IX.D.4-5, *infra*.

225
524

215.    Third, investigations into the causes of the Camp Fire have already disclosed evidence that this most destructive and deadly wildfire in California history was caused by PG&E violating California Public Resources Code Section 4293 and California Public Utilities Code Section 451, among other safety regulations.  Indeed, Cal Fire has found that PG&E equipment was responsible for both ignition points of the Camp Fire and has since reported PG&E to the Butte County District Attorney based on evidence of safety violations.

216.    Fourth, it has been documented that PG&E actually knew that it was not in compliance with relevant safety laws and best practices at the time of this statement.  In proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'"  *See* ¶104.

217.    Fifth, PG&E has admitted that it did not "inspect" all of its powerlines "each year," because at the time this statement was made, it did not inspect Tower :27/222 of the Caribou-Palermo transmission line since August 2014.  This lack of annual inspection contributed to Tower :27/222's failure on November 8, 2018, which was part of the Camp Fire's first ignition point.

218.    Sixth, this statement materially omitted the true risk that PG&E would cause wildfires serious enough to imperil the Company's financial condition.

219.    Thus, this statement was materially false and/or misleading because of PG&E's numerous and widespread violations of safety regulations, including regulations specifically related to vegetation management – regulations which were essential for preventing devastating wildfires. *See* Section VI.F.4.  As Judge Alsup held, PG&E's "**unsafe conduct has led to recurring deadly wildfires caused by its electrical system**" and the "large number of trees that should have been removed by PG&E but weren't . . . was a major contributing factor, **maybe the single-biggest factor, in causing the fires** in 2017 and 2018 in Northern California."  In fact, PG&E's violations were so pervasive that they caused at least 11 of the North Bay Fires all at the

1    same time in **seven** different counties, and then caused both of the Camp Fire's two ignition

2    points a year later – therefore the violations cannot be explained away as an isolated lapse.

3            220.    This statement regarding compliance was reviewed and authorized by Defendant

4    Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. According to the same

5    2016 Corporate Responsibility and Sustainability Report:

6                    Within senior leadership, ethics and compliance are managed by
                     the Chief Ethics and Compliance Officer (CECO), who reports to
7                    the PG&E Corporation Chairman and CEO. The CECO has
                     additional reporting responsibility to the Audit Committees of the
8                    PG&E Corporation and Pacific Gas and Electric Company Boards
                     of Directors, and the Compliance and Public Policy Committee of
9                    the PG&E Corporation Board.

10                   The CECO is responsible for:

11                   • Building a best-in-class ethics and **compliance** program
                       and **managing its implementation**,

12
                     • **Overseeing enterprise-wide programs for compliance
13                     monitoring, reporting**, assessment and remediation. . . .

14           221.    Kane therefore was responsible for both "managing . . . implementation" of

15    PG&E's compliance **and "overseeing . . . compliance monitoring [and] reporting,"** including

16    this report.

17                   **5.      August 9, 2017 – Misstatement No. 5**

18           222.    On August 9, 2017, PG&E issued its 2017 Corporate Responsibility and

19    Sustainability Report. This report provided false assurances to investors regarding PG&E's

20    compliance with relevant regulations:

21                   **Vegetation Management**

22                   ***PG&E prunes and removes trees growing too close to power lines***
                     while maintaining as much vegetation as possible to balance land
23                   use and environmental stewardship with customer needs. Through
                     a well-established and innovative vegetation management
24                   program, ***PG&E balances the need to maintain a vast system of
                     trees growing along power lines while complying with state and
25                   federal regulations and delivering safe***, reliable and affordable
                     ***electric service***.

26

27

28

Case: 19-30088    Doc# 3373-30    Filed: 08/14/19    Entered: 08/14/19 19:37:42    Page 76 of 84

1    223.    Because PG&E's vegetation management practices failed to follow relevant

2    federal and California safety laws, PG&E's vegetation management activities were decidedly not

3    "complying with state and federal regulations and delivering safe . . . electric service."

4    224.    First, according to reports released in subsequent corrective disclosures, including

5    on May 25 and June 8, 2018, PG&E violated relevant wildfire safety laws, including California

6    Public Resources Code Section 4293, multiple times.

7    225.    Second, Cal Fire found sufficient evidence of violations of state law to refer

8    PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections IX.D.4-5,

9    *infra*.

10    226.    Third, investigations into the causes of the Camp Fire have already disclosed

11    evidence that this most destructive and deadly wildfire in California history was caused by

12    PG&E violating California Public Resources Code Section 4293 and California Public Utilities

13    Code Section 451, among other safety regulations.  Indeed, Cal Fire has found that PG&E

14    equipment was responsible for both ignition points of the Camp Fire and has since reported

15    PG&E to the Butte County District Attorney based on evidence of safety violations.

16    227.    Fourth, it has been documented that PG&E actually knew that it was not in

17    compliance with relevant safety laws and best practices at the time of this statement.  In

18    proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that

19    as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as

20    hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires

21    before the next inspection cycle.'"  *See* ¶104.

22    228.    Fifth, this statement materially omitted the true risk that PG&E would cause

23    wildfires serious enough to imperil the Company's financial condition.

24    229.    Thus, this statement was materially false and/or misleading because of PG&E's

25    numerous and widespread violations of safety regulations, including regulations specifically

26    related to vegetation management – regulations which were essential for preventing devastating

27    wildfires.  *See* Section VI.F.4.  As Judge Alsup held, PG&E's "**unsafe conduct has led to**

28    **recurring deadly wildfires caused by its electrical system**" and the "large number of trees that

1   should have been removed by PG&E but weren't . . . was a major contributing factor, **maybe the**

2   **single-biggest factor, in causing the fires** in 2017 and 2018 in Northern California."  In fact,

3   PG&E's violations were so pervasive that they evidently caused multiple North Bay Fires all at

4   the same time in seven different counties, and then caused both of the Camp Fire's two ignition

5   points a year later – therefore the violations cannot be explained away as an isolated lapse.

6       230.    This statement regarding compliance was reviewed and authorized by Defendant

7   Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. According to the same

8   2017 Corporate Responsibility and Sustainability Report:

9           Within senior leadership, compliance and ethics are managed by
            the Senior Vice President, Chief Ethics and Compliance Officer
10          and Deputy General Counsel (CECO), who reports to the PG&E
            Corporation Chief Executive Officer (CEO) and President. The
11          CECO has additional reporting responsibility to the Audit
            Committees of the PG&E Corporation and Pacific Gas and Electric
12          Company Boards of Directors, and the Compliance and Public
            Policy Committee of the PG&E Corporation Board.
13
            The CECO is responsible for:
14
            •   Building a best-in-class **compliance** and ethics program
15              **and managing its implementation**,

16          •   **Overseeing enterprise-wide programs for compliance
                monitoring, reporting**, assessment and remediation. . . .
17
        231.    Kane therefore was responsible for both "managing implementation" of PG&E's
18
    compliance **and "overseeing . . . compliance monitoring [and] reporting**," including this
19
    report.
20
        C.      **Defendants Tied the Company's Dividend to Safety Compliance, Making
21              Materially False and Misleading Statements and Omissions Regarding Its
                Dividend and Safety Before the North Bay Fires**
22
        232.    Throughout the Class Period, Defendants repeatedly tied the sustainability of its
23
    quarterly cash dividend to safety. In fact, PG&E increased its dividend during the Class Period
24
    for the first time in six years, and then raised it again – touting the Company's "progress on
25
    safety" and "improvements we have made in safety." Yet PG&E's violations of relevant safety
26
    regulations were so numerous and widespread that they caused and exacerbated the North Bay
27
    Fires, resulting in PG&E having to suspend its dividend entirely on December 20, 2017.
28

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                              69

1      **1.      May 23, 2016 – Misstatement No. 6**

2      233.   Less than three weeks after its May 4, 2016 earnings call, PG&E issued a press

3   release titled "PG&E Corporation Raises Common Stock Dividend, Highlights Progress at

4   Annual Shareholder Meeting." It stated:

5              PG&E Corporation (NYSE: PCG) today announced that it is
               raising its quarterly common stock dividend to 49 cents per share,
6              an increase of 3.5 cents per share, beginning with dividends for the
               second quarter of 2016.

7                                      * * *

8              The increase, which is the company's first in six years, is a
9              meaningful step toward gradually returning the company's
               dividend payout to levels that are comparable with those of similar
10             utilities.

11                                     * * *

12             ***Earley and other senior executives also discussed continued
               progress on safety***, reliability and other goals, as well as PG&E's
13             strategy for the future [at the annual shareholder meeting].

14             Earley said, '***We've continued to demonstrate leadership and
               commitment on safety.*** We're delivering the most reliable service
15             in our company's history.

16      234.   This statement was materially false and/or misleading because it affirmed that

17   PG&E's dividend would not be negatively impacted by the Company's role in causing wildfires.

18   Indeed, it affirmed to investors that PG&E had attained "progress on safety," specifically

19   connecting purported safety achievements to its ability to increase its dividend, importantly, "to

20   levels that are comparable with those of similar utilities."  In reality, PG&E lacked the touted

21   "progress on safety" as well as "leadership and commitment on safety" for all the reasons found

22   by Judge Alsup (*see* ¶¶104-105 & 411) that led him to conclude: "**it's not really true. Safety is**

23   **not your number one thing**."   PG&E's purported "leadership and commitment on safety" is

24   belied by each unaddressed safety violation and safety deficiency alleged herein, and

25   corroborated by the fact that PG&E's electrical equipment caused far more, and more serious,

26   wildfires than comparable utilities in California (¶412).[96]

27   _____

28   [96] Furthermore, this statement is false and misleading for all of the reasons discussed in
     ¶¶649-658, *infra*.

235.     PG&E fell so far short of this touted achievement that its safety violations, and resulting responsibility for wildfires, would cause PG&E to suspend its dividend entirely on December 20, 2017 due to PG&E's responsibility for the North Bay Fires. This statement gave investors a false impression that safety risks would not imperil the Company's dividend, which is precisely what occurred on December 20, 2017.  Further, this statement touting PG&E's "commitment on safety" materially omitted that the Company's spending on vegetation management was inadequate and barely kept pace with inflation at that time.  It also materially omitted the true risk that PG&E would cause wildfires serious enough to imperil the Company's financial condition.

236.     The false and misleading nature of this statement was further revealed in a series of events from November 8-15, 2018, as evidence emerged that PG&E's safety violations caused the Camp Fire: the most destructive and deadly wildfire in California history.

### 2.     November 4, 2016 – Misstatement No. 7

237.     On November 4, 2016, PG&E hosted a conference call with analysts to discuss its financial results for the third quarter of 2016. In his prepared remarks, Earley stated as follows:

> ***The improvements we have made in safety*** and reliability ***over the last six years have put us in a position to deliver strong financial results going forward.***
>
> Earlier this year, we announced our first dividend increase in six years, and we have committed to achieving a roughly 60% payout ratio by 2019. Combined with our expected rate based growth, we are confident we can deliver a strong overall return for our shareholders.

238.     The statement was materially false and/or misleading because PG&E **did not make** substantial "improvements" in wildfire "safety . . . over the last six years." In fact, a PG&E Vegetation Program Manager, Richard Yarnell, later testified that for the entire period from September 2015 to April 10, 2017, "PG&E—to the best of my knowledge, we have not made any changes" to improve safety. Nor was the Company "in a position to deliver strong financial results going forward." In reality, PG&E's responsibility for causing multiple wildfires – as the results of its numerous, widespread safety violations – had such a significant **negative** impact on PG&E's financial results and financial outlook that PG&E had to suspend its dividend

1    entirely on December 20, 2017 due to PG&E's responsibility for causing the North Bay Fires.

2    This statement gave investors a false impression that concealed safety risks would not imperil the

3    Company's dividend, which is precisely what occurred on December 20, 2017.   Further, this

4    statement touting PG&E's "improvements . . . made in safety" materially omitted that the

5    Company's deficient investments in safety, including inadequate spending on vegetation

6    management that barely kept pace with inflation at that time.  It also materially omitted the true

7    risk that PG&E would cause wildfires serious enough to imperil the Company's financial

8    condition.

9         239.    In addition, it has been documented that PG&E actually knew that it was not in

10   compliance with relevant safety laws and best practices at the time of this statement.  In

11   proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that

12   as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as

13   hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires

14   before the next inspection cycle.'"  *See* ¶104.

15        240.    The false and misleading nature of this statement was further revealed in a series

16   of events from November 8-15, 2018, as evidence emerged that PG&E's safety violations

17   caused the Camp Fire: the most destructive and deadly wildfire in California history.

18        **3.    May 31, 2017 – Misstatement No. 8**

19        241.    On May 31, 2017, PG&E issued a press release titled "PG&E Corporation Raises

20   Common Stock Dividend, Shareholders Elect Former Secretary of Homeland Security Jeh C.

21   Johnson to Boards of Directors." The release stated:

22             PG&E Corporation (NYSE: PCG) today announced that it is
               raising its quarterly common stock dividend by 4 cents per share to
23             53 cents per share, beginning with the dividend for the second
               quarter of 2017. On an annual basis, this action increases PG&E
24             Corporation's dividend by 8 percent, from $1.96 per share to $2.12
               per share.

25                                  * * *

26             Yesterday, in remarks at the joint annual shareholders meeting of
               PG&E Corporation and Pacific Gas and Electric Company, [CEO]
27             Williams highlighted the companies' ***progress on safety, reliability***
               and reducing greenhouse gas emissions, among other
28

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                                72

1        accomplishments. ***She reaffirmed PG&E's commitment to safety***
2        ***and operational excellence***, delivering for customers and leading
         the way to achieve California's clean energy goals.

3    242.   This statement falsely connected PG&E's decision increasing its dividend to

4    "progress on safety" and PG&E's "commitment to safety and operational excellence," only

5    months before the Company's pervasive failure to comply with safety regulations caused at least

6    eleven of the North Bay Fires all at the same time in seven different counties. Indeed, it omitted

7    that there was no progress on wildfire safety, as confirmed by PG&E's own Vegetation Program

8    Manager Richard Yarnell, **only one month before the statement was made,** when he reportedly

9    testified under oath: "PG&E—to the best of my knowledge, we have not made any changes as a

10   result of th[e Butte] fire," *i.e.*, from September 2015 to April 10, 2017 (when Yarnell so

11   testified).  In reality, PG&E lacked the touted "progress on safety" as well as "commitment to

12   safety and operational excellence" for all the reasons found by Judge Alsup (*see* ¶¶104-105 &

13   411) that led him to conclude: "**it's not really true. Safety is not your number one thing**" and

14   "**PG&E's performance with respect to vegetation management has been dismal**."

15   243.   PG&E's above statement on May 31, 2017 gave investors a false impression that

16   concealed safety risks would not imperil the Company's dividend, which is precisely what

17   occurred on December 20, 2017.  Further, this statement materially omitted the true risk that

18   PG&E would cause wildfires serious enough to imperil the Company's financial condition.

19   244.   In addition, it has been documented that PG&E actually knew that it was not in

20   compliance with relevant safety laws and best practices at the time of this statement.  In

21   proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that

22   as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as

23   hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires

24   before the next inspection cycle.'"  *See* ¶104.

25   245.   The false and misleading nature of this statement was further revealed in a series

26   of events from November 8-15, 2018, as evidence emerged that PG&E's safety violations caused

27   the Camp Fire: the most destructive and deadly wildfire in California history.

28

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    73
CLASS ACTION NO. 3:18-CV-03509-EJD

1

        **D.**     **After the North Bay Fires Erupted, the Truth Began to Emerge**

2         246.     The North Bay Fires began on Sunday evening, October 8, 2017. However, it was

3 not until Thursday, October 12, 2017 that the market began to understand that PG&E's safety

4 regulation violations were likely a major cause. On that date, as detailed below (*see* Section

5 VII.D.1, *infra*), CPUC sent PG&E a litigation hold letter reminding PG&E that it (a) "must

6 preserve any factual or physical evidence … includ[ing] all failed poles, conductors and

7 associated equipment from each fire event" and (b) "must inform all employees and contractors

8 that they must preserve all electronic (including emails) and non-electronic documents related to

9 potential causes of the fires, vegetation management, maintenance and/or tree-trimming." This

10 was the first disclosure indicating that PG&E caused any of the North Bay Fires. In response to

11 this news, PG&E's share price declined 6.7%.

12        247.     Late the next day, PG&E issued a statement explaining to investors that: "The

13 causes of these fires are being investigated by [Cal Fire], including the possible role of [PG&E's]

14 power lines and other facilities." It reported that the Company "has approximately $800 million

15 in liability insurance for potential losses that may result from these fires" – to prepare investors

16 for the possibility that "the amount of insurance is insufficient to cover the Utility's liability," in

17 which case, its "financial condition or results of operations could be materially affected." The

18 market had understood that PG&E would be reimbursed by rate-payers for damages by fires it

19 caused while nevertheless acting as a prudent manager; hence, the Company's discussion of

20 liability and insurance signaled to the market that at least some of the North Bay Fires were

21 proximately caused by PG&E's negligence or worse. In response to this news, PG&E's share

22 price continued to decline until the end of the next trading day, Monday, October 16, 2017,

23 falling by approximately 16.5%.

24        248.     Thereafter, PG&E's management attempted to reassure investors, falsely, as

25 detailed below.

26

27

28

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
LEAD CASE NO. 3:18-CV-03509-EJD

74

1

**E.     After the North Bay Fires Were Contained, the Company Made Additional
2            False and Misleading Statements and Omissions Regarding Compliance with
            Wildfire-Related Safety Regulations**

3           **1.     October 31, 2017 – Misstatement No. 9**

4           249.    On October 31, 2017, PG&E issued a press release titled "Facts About PG&E's

5    Electric Vegetation Management Efforts." The release stated: "***PG&E follows all applicable***

6    ***federal and state vegetation clearance requirements and performs regular power line tree***

7    ***safety activities in accordance with industry standards, guidelines, and acceptable procedures***

8    ***that help to reduce outages or fires caused by trees or other vegetation***."

9           250.    This statement was materially false and/or misleading because PG&E did **not**

10   follow "all applicable … state vegetation clearance requirements."

11          251.    First, according to reports released in subsequent corrective disclosures, including

12   on May 25 and June 8, 2018, PG&E violated relevant wildfire safety laws, including California

13   Public Resources Code Section 4293, multiple times.

14          252.    Second, Cal Fire found sufficient evidence of violations of state law to refer

15   PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections IX.D.4-5,

16   *infra.*

17          253.    Third, investigations into the causes of the Camp Fire have already disclosed

18   evidence that this most destructive and deadly wildfire in California history was caused by

19   PG&E violating California Public Resources Code Section 4293 and California Public Utilities

20   Code Section 451, among other safety regulations.  Indeed, Cal Fire has found that PG&E

21   equipment was responsible for both ignition points of the Camp Fire and has since reported

22   PG&E to the Butte County District Attorney based on evidence of safety violations.  This

23   statement concealed that, far from "help[ing] to reduce . . . fires caused by trees or other

24   vegetation," PG&E's vegetation management practices tolerated numerous and widespread

25   violations of safety regulations that would **worsen** the risk of fires.

26          254.    Fourth, it has been documented that PG&E actually knew that it was not in

27   compliance with relevant safety laws and best practices at the time of this statement.  In

28   proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that

1   as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as

2   hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires

3   before the next inspection cycle.'"  *See* ¶104.

4       255.    Fifth, this statement materially omitted the true risk that PG&E would cause

5   wildfires serious enough to imperil the Company's financial condition.

6       256.    Thus, this statement was materially false and/or misleading because of PG&E's

7   numerous and widespread violations of safety regulations, including regulations specifically

8   related to vegetation management – regulations which were essential for preventing devastating

9   wildfires.  *See* Section VI.F.4.  As Judge Alsup held, PG&E's "**unsafe conduct has led to**

10  **recurring deadly wildfires caused by its electrical system**" and the "large number of trees that

11  should have been removed by PG&E but weren't . . . was a major contributing factor, **maybe the**

12  **single-biggest factor, in causing the fires** in 2017 and 2018 in Northern California."  In fact,

13  PG&E's violations were so pervasive that they evidently caused multiple North Bay Fires all at

14  the same time in seven different counties, and then caused both of the Camp Fire's two ignition

15  points a year later – therefore the violations cannot be explained away as an isolated lapse.

16      257.    This statement regarding compliance was reviewed and authorized by Defendant

17  Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible

18  for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

19  compliance reporting," including this press release.  Because of her senior position within the

20  Company, Kane had ultimate authority to control the content of this statement.

21          **2.    November 2, 2017 – Misstatement No. 10**

22      258.    On November 2, 2017, PG&E hosted a conference call with analysts to discuss its

23  financial results for the third quarter of 2017. In her prepared remarks, now-CEO Williams

24  falsely reassured investors regarding the effectiveness of PG&E's vegetation management:

25          Thank you, Chris, and good morning, everyone. Given the recent
            wildfires impacting our customers and communities, our
26          discussion today will be different from our usual earnings call. . . .

27                          * * *

28

Now I know there's a lot of interest in how these fires started and in how PG&E assets might have been involved in or impacted by the wildfires. Our communities deserve answers and we are committed to learning what happened. It's critical that we identify anything that will help us to keep our customers and communities safe in the future. That is our goal as we work with CAL FIRE and the CPUC.

* * *

**Many of you have reached out with questions about the potential impact of the wildfires to the company's financials and also about the doctrine of inverse condemnation in California.** At this time, the known financial impact of the wildfires is limited to the cost of the unprecedented response and restoration efforts, costs related to our liability insurance and some legal expenses, and Jason [Wells] will cover these later this morning.

* * *

**I know there's a lot of interest in our pole maintenance and vegetation management programs**, so let me address these as well. First, we routinely inspect, maintain and replace our electric poles. This includes annual scheduled patrols, 5-year visual inspections, an intrusive testing and treating on our wood poles on a frequency that significantly exceeds CPUC requirements.

*We also have one of, if not, the most comprehensive vegetation management programs in the country.* Our vegetation management program manages about 123 million trees across the service territory. ***And every year, we inspect every segment of the 99,000 miles of overhead line and we clear vegetation as needed.*** This is well beyond what is typical in our industry where most utilities have a 3-year vegetation management cycle or sometimes longer. **Typically, we spend about $200 million every year to line clear or remove 1.3 million trees to mitigate both the risk of wildfires and to prevent electric outages. With the drought and the tree mortality crisis we've experienced in California, we have been expanding our vegetation management work since 2014.**

*In 2016, we spent an additional $200 million, essentially doubling our typical vegetation management spending last year.* We've removed an incremental 236,000 dead or dying trees, and we enhanced our tree maintenance work with additional patrols in areas of high fire danger, including a combination of boots on the ground, aerial patrols, and sophisticated LiDAR technology.

259.    These statements were materially false and/or misleading because PG&E did not "doubl[e]" its "typical vegetation management spending last year." As explained in Section IV.B., *supra*, PG&E's Vegetation Management Balancing Accounts for the relevant years

1   indicate that PG&E spent $194,094,406 on vegetation management in 2015, $198,735,579 in

2   2016, and $201,456,193 in 2017 – increases of only 2.4% and 1.4%, respectively.[97] The lack of

3   improvement to PG&E's vegetation management practices was confirmed by PG&E's own

4   Vegetation Program Manager Richard Yarnell, who reportedly testified under oath that, even by

5   April 10, 2017: "PG&E—to the best of my knowledge, **we have not made any changes** as a

6   result of th[e September 2015 Butte] fire."

7           260.    Second, PG&E failed to comply with safety regulations – including regulations

8   specifically related to vegetation management. Thus, when Williams touted PG&E's vegetation

9   management program as "one of, if not, the most comprehensive vegetation management

10  programs in the country," she gave investors the false impression that PG&E's vegetation

11  management did not fall short of applicable safety regulations, when in fact it did. Given

12  PG&E's numerous and widespread violations of safety regulations, including those violations

13  that would cause multiple of the North Bay Fires as well as evidently cause the Camp Fire, its

14  "vegetation management programs" were **not** "comprehensive."

15          261.    Third, PG&E has admitted that it did not "every year . . . inspect every segment of

16  the 99,000 miles of overhead line," because at the time this statement was made, it did not

17  inspect Tower :27/222 of the Caribou-Palermo transmission line since August 2014.  This lack of

18  annual inspection contributed to Tower :27/222's failure on November 8, 2018, which was part

19  of the Camp Fire's first ignition point.

20          262.    Fourth, PG&E did **not** "have one of, if not, the most comprehensive vegetation

21  management programs in the country" for all the reasons found by Judge Alsup (*see* ¶¶104-105

22  & 411) that led him to conclude: "**PG&E's performance with respect to vegetation**

23  **management has been dismal**."

24          263.    Fifth, this statement materially omitted the true risk that PG&E would cause

25  wildfires serious enough to imperil the Company's financial condition.

26

27

28  _____

    [97] This spending did not differ more than $100,000 from the amounts PG&E requested, and
    the amounts CPUC approved, in PG&E's 2015, 2016, and 2017 General Rate Cases.

1

### 3. November 2, 2017 – Misstatement No. 11

2      264.    Later on the same call, an analyst asked the Company for more detail about

3  PG&E's vegetation management practices. President and COO Nickolas Stavropoulos replied as

4  follows:

5              [ANALYST:] And then, I guess, ***can you discuss your vegetation***
               ***practices for trees that are located near power lines?*** I guess

6             we've seen sort of end reports that have come out for some of your
             peers that they sort of track vegetation that's within certain

7             distances from the lines, and they basically make their decisions on
             what to do based on sort of updates.

8
             [Stavropoulos:] Thank you for the question. So as Geisha

9             mentioned, we have a very aggressive vegetation management
             program across our 70,000-mile -- square mile territory. We

10           manage about 123 million trees that are near and adjacent to our
           facilities. ***And over the last 2 years, we've doubled the amount***

11          ***that we've invested in veg[etation] management.*** That includes
           line clearing to remove parts of trees that are adjacent to our

12           facilities as well as removal of dead and dying trees. So the
           program involves year-round effort to identify these dead and

13           dying trees through inspection processes where we use foot and
           aerial patrols; we use LiDAR, which is light, detecting and ranging

14           technology, to identify the trees that need to be worked. ***We***
           ***inspect all of our overhead lines every year, and we do second***

15          ***patrols in high fire danger areas at least twice a year. In some***
          ***areas, we do as often as 4x a year.*** So it's a very aggressive

16           program. There are specific requirements around line clearing, and
           it depends upon the voltage of the lines. And it can range up to feet

17           [sic] to as much a sort of 18 inches away from the facility. So there
           are all sorts of different requirements, depending upon where the

18           facilities are located and the voltage of the facilities.

19      265.    This statement was materially false and/or misleading because PG&E did not

20  "doubl[e] the amount that we've invested in veg[etation] management." As explained in Section

21  VI.B., *supra*, PG&E's Vegetation Management Balancing Accounts for the relevant years

22  indicate that PG&E spent $194,094,406 on vegetation management in 2015, $198,735,579 in

23  2016, and $201,456,193 in 2017. Moreover, the lack of improvement to PG&E's vegetation

24  management practices was confirmed by PG&E's own Vegetation Program Manager Richard

25  Yarnell, who reportedly testified under oath that, even by April 10, 2017: "PG&E—to the best of

26  my knowledge, we have not made any changes as a result of th[e Butte] fire," *i.e.*, since

27  September 2015.

28

266.    Second, PG&E failed to comply with safety regulations specifically related to vegetation management. By representing that it "inspect[s] all of [its] overhead lines every year," and inspects some trees "twice" or "4x" each year, Stavropoulos falsely created the impression that PG&E would prevent many safety violations from occurring, especially in "high fire danger areas" such as those where the North Bay Fires and Camp Fire erupted. In reality, safety violations were so pervasive that they evidently caused both ignition points of the Camp Fire as well as at least eleven fires at the same time in **seven** different counties. In touting its "very aggressive vegetation management program," the statement actionably omitted the widespread failure of these measures to bring PG&E into compliance. Indeed, if PG&E had been properly "inspect[ing] all of our overhead lines "every year," "twice a year," or "4x a year," many of the causes of the North Bay Fires and Camp Fire would have been discovered and the fires prevented. For instance, in addition to the fires caused by dead or dying trees, Cal Fire found that the Cascade Fire was caused "by sagging power lines coming into contact" and the Blue Fire was caused when "a PG&E power line conductor separated from a connector."

267.    As another example, in the afternoon of November 8, 2018, PG&E's aerial inspection of the 115 kilovolt transmission line that caused the Camp Fire discovered "damage to a transmission tower" carrying that electrical line.  PG&E has also acknowledged a second ignition point for the Camp Fire that exhibited damaged and downed poles, vegetation on top of downed wires, and other signs of safety violations. Cal Fire has determined that PG&E caused both of these ignition points.

268.    Third, PG&E has admitted that it did not "inspect all of our overhead lines every year," much less "twice a year" or "4x a year," because at the time this statement was made, it did not inspect Tower :27/222 of the Caribou-Palermo transmission line since August 2014. This lack of annual inspection contributed to Tower :27/222's failure on November 8, 2018, which was part of the Camp Fire's first ignition point.

269.    Fourth, this statement materially omitted the true risk that PG&E would cause wildfires serious enough to imperil the Company's financial condition.

1

### 4.      November 5, 2017 – Misstatement No. 12

2      270.     At all relevant times, PG&E's Media Relations department maintained a news

3   website named *Currents*,[98] providing news, information, and commentary about PG&E's

4   activities, including the delivery of electricity and the operation, maintenance, and safety of the

5   Company's electric services. Through the website, PG&E repeatedly touted the safety of its

6   power lines, the Company's vegetation management program, and its purported success

7   mitigating wildfire risk.

8      271.     In one such article, dated November 5, 2017 and titled "Facts About PG&E's

9   Wildfire and Prevention Safety Efforts," PG&E reassured investors that "***PG&E meets or***

10  ***exceeds all applicable federal and state vegetation clearance requirements***."[99]

11     272.     This statement was materially false and/or misleading because PG&E did not

12  "meet" – much less "exceed" – "all applicable … state vegetation clearance requirements."

13     273.     First, according to reports released in subsequent corrective disclosures, including

14  on May 25 and June 8, 2018, PG&E violated relevant wildfire safety laws, including California

15  Public Resources Code Section 4293, multiple times. *See* Section VII.D.4., *infra*.

16     274.     Second, Cal Fire found sufficient evidence of violations of state law to refer

17  PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections IX.D.4-5,

18  *infra*.

19     275.     Third, investigations into the causes of the Camp Fire have already disclosed

20  evidence that this most destructive and deadly wildfire in California history was caused by

21  PG&E violating California Public Resources Code Section 4293 and California Public Utilities

22  Code Section 451, among other safety regulations.  Indeed, Cal Fire has found that PG&E

23

24  _____

25  [98] *Currents*, PG&E, http://www.pgecurrents.com.

    [99] On November 14, 2017, PG&E spokesperson Greg Snapper repeated this false and
26  misleading reassurance *verbatim* in an NBC article titled "Utility Company's Risk Assessment at
    Issue in NorCal Wildfires." *See* Jaxon Van Derbeken, *Utility Company's Risk Assessment at*
27  *Issue in NorCal Wildfires*, NBC Universal Media (Nov. 14, 2017),
    https://www.nbcconnecticut.com/troubleshooters/national-investigations/PGE-Risk-Assessment-
28  at-Issue-in-North-Bay-Wildfires-457356963.html.

1    equipment was responsible for both ignition points of the Camp Fire and has since reported

2    PG&E to the Butte County District Attorney based on evidence of safety violations.

3         276.    Fourth, it has been documented that PG&E actually knew that it was not in

4    compliance with relevant safety laws and best practices at the time of this statement.  In

5    proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that

6    as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as

7    hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires

8    before the next inspection cycle.'"  *See* ¶104.

9         277.    Fifth, this statement materially omitted the true risk that PG&E would cause

10   wildfires serious enough to imperil the Company's financial condition.

11        278.    Thus, this statement was materially false and/or misleading because of PG&E's

12   numerous and widespread violations of safety regulations, including regulations specifically

13   related to vegetation management – regulations which were essential for preventing devastating

14   wildfires.  *See* Section VI.F.4.  As Judge Alsup held, PG&E's "**unsafe conduct has led to**

15   **recurring deadly wildfires caused by its electrical system**" and the "large number of trees that

16   should have been removed by PG&E but weren't . . . was a major contributing factor, **maybe the**

17   **single-biggest factor, in causing the fires** in 2017 and 2018 in Northern California."  In fact,

18   PG&E's violations were so pervasive that they evidently caused multiple North Bay Fires all at

19   the same time in seven different counties, and then caused both of the Camp Fire's two ignition

20   points a year later – therefore the violations cannot be explained away as an isolated lapse.

21        279.    This statement regarding compliance was reviewed and authorized by Defendant

22   Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible

23   for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

24   compliance reporting," including this news release. Because of her senior position within the

25   Company, Kane had ultimate authority to control the content of this statement.

26

27

28

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                                82
CIVIL ACTION NO. 5:18-CV-03509-EJD

1

5.      **May 25, 2018 – Misstatement No. 13**

2

280.    On May 25, 2018, PG&E issued a press release to respond to Cal Fire's reports

3

regarding some of the October 2017 North Bay Fires (*see* Section VII.D.4, *infra*), to reassure

4

investors that PG&E had met all state regulations concerning fire safety. The press release stated:

5

6

7

- Following Governor Brown's January 2014 Drought State of Emergency Proclamation and the California Public Utilities Commission's Resolution ESRB-4, PG&E has added enhanced measures to address areas particularly affected by drought and bark beetles including:

8

- Increased foot and aerial patrols along power lines in high fire-risk areas;

9

10

11

- Removed approximately 236,000 dead or dying trees in 2016 and 140,000 dead or dying trees in 2017; these tree removals were in addition to approximately 30,000 trees removed per year prior to the drought;

12

13

- Launched daily aerial fire detection patrols during high fire season to improve fire spotting and speed of fire response;

14

- Since 2014, provided $11.4 million to local Fire Safe Councils (FSCs) for fuel reduction projects in communities; and

15

16

- Provided $1.7 million to local FSCs for 28 highly programmable remote-sensing cameras for critical fire lookout towers.

17

18

19

- ***PG&E meets or exceeds regulatory requirements for pole integrity management***, using a comprehensive database to manage multiple patrol and inspection schedules of our more than two million poles.

20

281.    This statement was materially false and/or misleading because PG&E did not

21

"meet" – much less "exceed" – "regulatory requirements for pole integrity management."

22

According to a report released in a subsequent corrective disclosure, PG&E violated California's

23

safety regulations multiple times. Indeed, on June 8, 2018, Cal Fire disclosed that its

24

"investigators have determined that 12 Northern California wildfires in the October 2017 Fire

25

Siege were caused by electric power and distribution lines, conductors **and the failure of power**

26

**poles**." In fact, at least one of the North Bay Fires – the Sulphur Fire – "was caused by the failure

27

of a PG&E owned power pole" evidencing "violations of state law" sufficient to be referred to

28

the relevant district attorney.  Further, Cal Fire found enough evidence of violations of state law

1   to refer PG&E to the relevant district attorneys for eight of these twelve North Bay fires. *See*

2   Section VII.D.5., *infra*.

3        282.    Second, PG&E acknowledged that an aerial patrol of the Camp Fire's origin later

4   the same day showed "damage to a transmission tower" or pole that PG&E failed to maintain, as

5   well as a second ignition point that exhibited damaged and downed poles, in violation of Section

6   451.  Thus, PG&E did **not** "meet[] or exceed[] regulatory requirements for pole integrity

7   management" – regulations which were essential for preventing devastating wildfires.  PG&E's

8   representation to the contrary was materially false and/or misleading.  Cal Fire has since

9   confirmed that PG&E equipment was responsible for both of the Camp Fire's ignition points,

10   and referred its investigations to the relevant district attorney based on evidence of safety

11   violations.

12        283.    Overall, this statement was materially false and/or misleading because of PG&E's

13   numerous and widespread violations of safety regulations – regulations which were essential for

14   preventing devastating wildfires.  In fact, PG&E's violations were so pervasive that they

15   evidently caused multiple North Bay Fires all at the same time in seven different counties, and

16   then caused both of the Camp Fire's two ignition points a year later – therefore the violations

17   cannot be explained away as an isolated lapse.  This statement materially omitted the true risk

18   that PG&E would cause wildfires serious enough to imperil the Company's financial condition.

19        284.    It has additionally been documented that PG&E actually knew that it was not in

20   compliance with relevant safety laws and best practices at the time of this statement.  In

21   proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that

22   as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as

23   hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires

24   before the next inspection cycle.'"  *See* ¶104.

25        285.    This statement regarding compliance was reviewed and authorized by Defendant

26   Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible

27   for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

28

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
LEAD CASE NO. 3:18-CV-03509-EJD

84

1   compliance reporting," including this press release.  Because of her senior position within the

2   Company, Kane had ultimate authority to control the content of this statement.

3       **F.   While the Truth Regarding PG&E's Role in Causing the North Bay Fires**
        **Emerged, the Company Made Additional False and Misleading Statements**
4       **and Omissions Regarding Compliance with Wildfire-Related Safety**
        **Regulations, Including Its ESRB-8 Shutoff Protocol**
5

6       286.   As detailed below (*see* Section VII.D., *infra*), PG&E's share price declined

7   precipitously as the truth about its responsibility for the North Bay Fires emerged.  As liabilities

8   for the North Bay Fires threatened the Company's financial viability, Defendants would realize

9   that the Company needed a legislative bailout to avoid bankruptcy.  As a result, PG&E needed

10  the public, including investors, to believe that it would prioritize safety thereafter.

11              **1.    June 8, 2018 – Misstatement No. 14**

12      287.   On June 8, 2018, Cal Fire announced its conclusions that PG&E caused the

13  preponderance of the North Bay Fires (*see* Section VII.D.5, *infra*), PG&E's share price

14  continued its decline, and its financial situation deteriorated.  Later that day, PG&E issued a

15  press release to respond to Cal Fire's report, falsely and misleadingly reassuring investors that

16  PG&E had met all state regulations concerning fire safety.  The press release, titled "PG&E

17  Responds to Latest CAL FIRE Announcement" stated, in relevant part:

18          ***Programs Overall Met State's High Standards***

19              We look forward to the opportunity to carefully review the
                CAL FIRE reports to understand the agency's perspectives.

20              Based on the information we have so far, we continue to
21              believe our overall programs met our state's high standards.

22              For example, ***PG&E meets or exceeds regulatory***
                ***requirements for pole integrity management***, using a
                comprehensive database to manage multiple patrol and
23              inspection schedules of our more than two million poles.

24              Similarly, ***under PG&E's industry-leading Vegetation***
                ***Management Program***, we inspect and monitor every PG&E
25              overhead electric transmission and distribution line each year,
                with some locations patrolled multiple times. We also prune or
26              remove approximately 1.4 million trees annually.

27      288.   Because PG&E's compliance violations would soon cause the Camp Fire, the

28  most destructive and deadly wildfire in California history, PG&E's "Vegetation Management

1    Program" and "pole integrity management" decidedly did not meet California's "High

2    Standards."  Investigations into the causes of the Camp Fire have already uncovered evidence

3    that it was caused by PG&E violating California Public Resources Code Section 4293 and

4    California Public Utilities Code Section 451, among other safety regulations.  Indeed, Cal Fire

5    has found that PG&E equipment was responsible for both ignition points of the Camp Fire and

6    has since reported PG&E to the Butte County District Attorney based on evidence of safety

7    violations.

8         289.    First, the Camp Fire was described in initial communications between firefighters

9    and dispatch as a vegetation fire "underneath the transmission lines," which vegetation should

10   have been cleared by PG&E pursuant to Section 4293.

11        290.    Second, PG&E acknowledged that an aerial patrol of the Camp Fire's origin later

12   the same day showed "damage to a transmission tower" or pole that PG&E failed to maintain, in

13   violation of Section 451.

14        291.    Third, PG&E has also acknowledged a second ignition point for the Camp Fire

15   that exhibited damaged and downed poles, vegetation on top of downed wires, and other signs of

16   safety violations. Cal Fire has since confirmed that PG&E equipment was responsible for both of

17   the Camp Fire's ignition points, and referred its investigations to the relevant district attorney

18   based on evidence of safety violations.

19        292.    Fourth, it has been documented that PG&E actually knew that it was not in

20   compliance with relevant safety laws and best practices at the time of this statement.  In

21   proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that

22   as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as

23   hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires

24   before the next inspection cycle.'"  *See* ¶104.

25        293.    Fifth, this statement materially omitted the true risk that PG&E would cause

26   wildfires serious enough to imperil the Company's financial condition.

27        294.    Thus, PG&E did **not** "meet[] or exceed[] regulatory requirements for pole

28   integrity management" or "Vegetation Management" – regulations which were essential for

1    preventing devastating wildfires.  *See* Section VI.F.4.  As Judge Alsup held, PG&E's "**unsafe**

2    **conduct has led to recurring deadly wildfires caused by its electrical system**" and the "large

3    number of trees that should have been removed by PG&E but weren't . . . was a major

4    contributing factor, **maybe the single-biggest factor, in causing the fires** in 2017 and 2018 in

5    Northern California."  PG&E's representation to the contrary was materially false and/or

6    misleading.

7          295.    This statement regarding compliance was reviewed and authorized by Defendant

8    Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible

9    for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

10   compliance reporting," including this press release.  Because of her senior position within the

11   Company, Kane had ultimate authority to control the content of this statement.

12                    **2.    June 8, 2018 – Misstatement No. 15**

13         296.    The same press release contained a further false and/or misleading statement:

14                 **To address the growing threats posed by wildfires and**
                   **extreme weather, and in light of the wildfires throughout**
15                 **our state last year,** *PG&E has launched the Community*
                   *Wildfire Safety Program* to help keep our customers and
16                 communities safe. Among the key components of the new
                   program are. . .
17
                   • Public Safety Power Shutoff: As a last resort, ***a program to***
18                     ***proactively turn off electric power for safety when***
                       ***extreme fire danger conditions occur***, while helping
19                     customers prepare and providing early warning
                       notification, when and where possible.
20
21         297.    PG&E's representation that it "has launched . . . a program to proactively turn off

22   electric power for safety when extreme fire danger conditions occur" was false and misleading.

23   It was false because the touted program, which would eventually become its ESRB-8 Shutoff

24   Protocol, was illusory; hence, PG&E never "launched" it.  Further, it misleadingly omitted that

25   any guidelines PG&E did develop were a mere pretense of safety that the Company did not

26   follow.  Even when all seven relevant "extreme fire danger conditions" **did** "occur," weighing

27   strongly in favor of shutting off PG&E's transmission lines near the Jarbo Gap on November 7

28   and 8, 2018, PG&E flouted its own supposed program.  PG&E's failure to shut off its

1   transmission line caused the Camp Fire: the most destructive and deadly wildfire in California

2   history.  By touting a wildfire safety program PG&E did not adhere to, and where its

3   nonadherence would risk devastating wildfires, PG&E misrepresented existing and material facts

4   to investors.

5       298.    This press release regarding compliance was reviewed and authorized by

6   Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was

7   responsible for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . .

8   . compliance reporting," including this press release.  Because of her senior position within the

9   Company, Kane had ultimate authority to control the content of this statement.

10              **3.    September 27, 2018 – Misstatement No. 16**

11      299.    On July 16, 2018, the CPUC enacted Resolution ESRB-8, which required PG&E

12  to adopt, promulgate and follow "de-energization policy and procedures" to "de-energize power

13  lines" in the face of unprecedented wildfire threats "to ensure public safety."  It was the

14  Company's official announcement of its de-energization policy and procedures implementing

15  Resolution ESRB-8, detailed below, that materially misled investors.

16      300.    On or about September 27, 2018, PG&E announced the full details of its ESRB-8

17  Shutoff Protocol in a filing with CPUC[100] that was also posted on its website.[101]  The ESRB-8

18  Shutoff Protocol stated:

19          PG&E's Community Wildfire Safety Program implements
            additional precautionary measures intended to reduce wildfire
20          threats. ***It includes . . . executing protocols to temporarily turn off
            electric power for safety when extreme fire danger conditions are***
21          ***occurring***."

22          . . .

23          Public Safety Power Shutoff is one component of the Community
            Wildfire Safety Program.  ***PG&E has created a set of procedures***

24

25      [100] PG&E Public Safety Power Shutoff Policies and Procedures, CPUC website (Sept. 2018),
        http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/News_Room/Public-Safety-
26      Power-Shutoff-Policies-and-Procedures-September-2018.pdf.

27      [101] PG&E Public Safety Power Shutoff Policies and Procedures, PG&E website (Sept. 2018),
        https://www.pge.com/pge_global/common/pdfs/safety/emergency-preparedness/natural-
28      disaster/wildfires/Public-Safety-Power-Shutoff-Policies-and-Procedures-September-2018.pdf.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                          88

1

2

*for. . . [d]etermining what combination of conditions necessitates turning off lines for safety.*

. . .

3

4

PG&E will take a combination of many criteria into consideration, including:

5

6

- **"Extreme" fire danger threat level**, as classified by the National Fire Danger Rating System

7

- **A Red Flag Warning declared** by the National Weather Service

8

- **Low humidity levels**, generally 20 percent and below

9

- **Sustained winds** above approx. 25 mph and wind gusts in excess of approx. 45 mph

10

11

- **Site-specific conditions** such as temperature, terrain and local climate

12

- **Critically dry vegetation** that could serve as fuel for a wildfire

13

14

- **On-the-ground, real-time observations** from PG&E field crews

15

(Emphasis original.)

16      301.    PG&E's representation that it had "implement[ed] additional precautionary

17  measures" including "determining what combination of conditions necessitates turning off lines

18  for safety" was false and misleading.  It was false because the ESRB-8 Shutoff Protocol was

19  illusory; hence, PG&E did not "implement" it, as required by law.  Further, it misleadingly

20  omitted that any guidelines PG&E did develop were a mere pretense of safety that the Company

21  did not follow.  Even when all seven relevant "criteria" weighed in favor of shutting off PG&E's

22  transmission lines near the Jarbo Gap on November 7 and 8, 2018, PG&E nevertheless flouted

23  its protocol.  PG&E's failure to shut off its transmission line caused the Camp Fire: the most

24  destructive and deadly wildfire in California history.  By touting a wildfire safety program

25  PG&E did not adhere to, where its nonadherence would risk devastating wildfires, PG&E

26  misrepresented existing and material facts to investors.

27      302.    This statement regarding compliance was reviewed and authorized by Defendant

28  Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible

1    for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

2    compliance reporting," including this report. Because of her senior position within the Company,

3    Kane had ultimate authority to control the content of this statement.

4                    **4.    October 9, 2018 – Misstatement No. 17**

5        303.    On October 9, 2018 Cal Fire announced its conclusions that PG&E equipment

6    caused another of the North Bay Fires, known as the Cascade Fire.  Later the same day, PG&E

7    issued a press release to respond to Cal Fire's report, falsely and misleadingly reassuring

8    investors that PG&E had met all state regulations concerning fire safety.  The press release, titled

9    "PG&E Responds to Cascade Wildfire Announcement" stated, in relevant part:

10               [W]e are continuing to focus on ***implementing additional
                 precautionary measures*** intended to further reduce wildfire
11               threats, such as ***working to remove and reduce dangerous
                 vegetation, improving weather forecasting, upgrading
12               emergency response warnings, [and] making lines and poles
                 stronger in high fire threat areas***, and taking other actions to
13               make our system, and our customers and communities, ***even
                 safer*** in the face of a growing wildfire threat.

14

15       304.    It was false and misleading for PG&E to tout "implementing additional

16   precautionary measures . . . to remove and reduce dangerous vegetation" and "mak[e] lines and

17   poles stronger in high fire threat areas."  Indeed, just one month later, PG&E would cause the

18   Camp Fire through its failure to remove vegetation and maintain its poles, in violation of

19   California Public Resources Code Section 4293 and California Public Utilities Code Section 451,

20   among other safety regulations.

21       305.    As noted above, the Camp Fire was described in initial communications between

22   firefighters and dispatch as a vegetation fire "underneath the transmission lines," which

23   vegetation should have been cleared by PG&E under Section 4293.  Second, PG&E

24   acknowledged that an aerial patrol of the Camp Fire's origin later the same day showed "damage

25   to a transmission tower" or pole that PG&E failed to maintain, as well as a second ignition point

26   that exhibited damaged and downed poles, in violation of Section 451.  PG&E's representation

27   to the contrary was materially false and/or misleading.   Indeed, Cal Fire has found that PG&E

28

1    equipment was responsible for both ignition points of the Camp Fire and has since reported

2    PG&E to the Butte County District Attorney based on evidence of safety violations.

3        306.    Moreover, PG&E was **not** "making lines and poles stronger in high fire threat

4    areas."  For example, PG&E never performed planned safety work on, or otherwise updated, the

5    100 year-old Caribou-Palermo transmission line even though it knew that its lines and poles were

6    weak and that "**the likelihood of failed structures happening is high**" (¶136).  The same

7    transmission line would soon cause the Camp Fire's first ignition point, as found by Cal Fire and

8    accepted by PG&E (¶138).

9        307.    Further, this statement materially omitted the true risk that PG&E would cause

10   wildfires serious enough to imperil the Company's financial condition.

11       308.    This statement regarding compliance was reviewed and authorized by Defendant

12   Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible

13   for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

14   compliance reporting," including this press release.  Because of her senior position within the

15   Company, Kane had ultimate authority to control the content of this statement.

16                  **5.    October 9, 2018 – Misstatement No. 18**

17       309.    The same PG&E press release contained a further false and/or misleading

18   statement:

19               To address the growing threats posed by wildfires and extreme
               weather, and in light of the wildfires throughout our state last
20             year, ***PG&E has launched the Community Wildfire Safety***
               ***Program*** to help keep our customers and communities safe ***by***
21             ***implementing additional precautionary measures*** intended to
               further reduce wildfire threats. Among the key components of
22             the new program are. . .

23           •   Public Safety Power Shutoff: As a last resort, ***a program to***
                 ***proactively turn off electric power for safety when***
24               ***extreme fire danger conditions occur***, while helping
                 customers prepare and providing early warning
25               notification, when and where possible.

26       310.    PG&E's representation that it "has launched" and "implement[ed] . . . a program

27   to proactively turn off electric power for safety when extreme fire danger conditions occur" was

28

---

1  false and misleading.  It was false because the touted program, its ESRB-8 Shutoff Protocol, was

2  illusory from the beginning; hence, PG&E never "launched" or "implement[ed]" it.

3        311.    Further, it misleadingly omitted that any guidelines PG&E did develop were a

4  mere pretense of safety that the Company did not follow.  Even when all seven relevant "extreme

5  fire danger conditions" **did** "occur," weighing in favor of shutting off PG&E's transmission lines

6  near the Jarbo Gap on November 7 and 8, 2018, PG&E nevertheless flouted its supposed

7  program.

8        312.    PG&E's failure to shut off its transmission line caused the Camp Fire: the most

9  destructive and deadly wildfire in California history.  By touting a wildfire safety program

10  PG&E did not adhere to, where its nonadherence would risk devastating wildfires, PG&E

11  misrepresented existing and material facts to investors.

12        313.    This statement regarding compliance was reviewed and authorized by Defendant

13  Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible

14  for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

15  compliance reporting," including this press release.  Because of her senior position within the

16  Company, Kane had ultimate authority to control the content of this statement.

17          **6.      November 8, 2018 – Misstatement No. 19**

18        314.    On November 8, 2018, the Camp Fire started after PG&E decided not to shut off

19  its power.  Before the public became aware of PG&E's true role in causing the Camp Fire, the

20  Company announced via its official Twitter.com account at 6:14 p.m. that day: "PG&E has

21  determined that it will not proceed with plans today for a Public Safety Power Shutoff in portions

22  of 8 Northern CA counties, as ***weather conditions did not warrant this safety measure***."[102]

23        315.    This statement was affirmatively false: weather conditions did, in fact, warrant a

24  shutoff.  As detailed above, all seven criteria that PG&E deemed relevant, including those related

25

26

27             [102] PG&E Twitter Account Post (Nov. 8, 2018 3:14PM),

28  https://twitter.com/PGE4Me/status/1060672000929267713.

1    to weather conditions, weighed in favor of a shutoff under PG&E's ESRB-8 Shutoff Protocol.

2    *See* Section IV.H., *supra*.

3         316.    This statement regarding compliance was reviewed and authorized by Defendant

4    Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible

5    for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

6    compliance reporting," including this announcement.  Because of her senior position within the

7    Company, Kane had ultimate authority to control the content of this statement.

8    **VIII.   MATERIALITY UNDER THE EXCHANGE ACT**

9         317.    PG&E's reassurances to investors about its safety, prudence, and compliance with

10   the law were especially important to investors because of California's legal regime known as

11   inverse condemnation. As described in more detail above (*see* Section VI.A.5., *supra*), PG&E is

12   strictly liable for the property costs of wildfires it caused. However, during the Class Period, it

13   could be reimbursed for those costs by ratepayers by petitioning CPUC and showing that it had

14   acted as a prudent manager. On such a showing, CPUC could have rate payers reimburse PG&E

15   for some or all of its liability.

16        318.    PG&E's investors understood that PG&E would bear the costs of wildfires it

17   caused, and that PG&E's ability to pass some or all of those costs on to ratepayers was limited

18   by PG&E's prudence. For example, an analyst report issued by Evercore ISI on December 21,

19   2017 stated:

20            On the 3Q17 call PCG indicated company operations were
             conducted properly leading up to and after the fire, but they still
21           had little information regarding the cause of the fire or potential
             shareholder exposure.
22
                                    * * *
23
             PCG reiterated the company routinely inspects, maintains, and
24           replaces poles, and tests and treats wood poles on a frequency that
             significantly exceeds CPUC requirements. The company claims to
25           have one of, if not the most comprehensive vegetation
             management programs in the country. Further, the company
26           doubled its vegetation management spending in 2016 due to the
             drought and tree mortality crisis in California. That being said, we
27           still do not know and likely will not know what caused the various
             fires for some time, **whether or not PCG's equipment was solely
28           or partly the cause**, and whether or not the facts will support a

1   ruling at CPUC that PCG **acted prudently** should they be
2   successfully sued under inverse condemnation.

3   319.    In light of these provisions of California law, PG&E's repeated reassurances to its

investors – *e.g.*, that it complied with relevant safety regulations, doubled its vegetation

management spending, inspected all of its powerlines every year, and would adhere to a formal

ESRB-8 Shutoff Protocol – effectively communicated that the Company would be able to

recover any property damage liabilities from wildfires caused by its systems, through the CPUC.

Those reassurances, when revealed to have been false and misleading, impacted the Company's

valuation by at least the amount of damage it caused by starting or exacerbating the North Bay

and Camp Fires.  The impact of these misstatements, and their importance to the Company's

financial condition, is underscored by PG&E's decision to file for Chapter 11 bankruptcy based

on its anticipated $30 billion in potential liabilities tied to the North Bay and Camp Fires, and

related concern that as a result, neither PG&E Corporation nor the Utility would be able "to

continue as going concerns."

320.    In total, PG&E's share price declined $55.60 per share on the nine corrective

disclosures and/or materializations of concealed risk herein alleged. Given that the Company had

between approximately 514.4 and 518.6 million shares outstanding from October 24, 2017 to

October 25, 2018, the losses caused by PG&E's fraud under the Exchange Act were in the

billions of dollars.

## IX.    LOSS CAUSATION UNDER THE EXCHANGE ACT

### A.    Defendants' False and Misleading Statements Artificially Inflated the Price of PG&E's Securities

321.    As a result of their purchases of PG&E's securities during the Class Period, Lead

Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal

securities laws. Defendants' false and misleading statements had the intended effect and caused

PG&E securities to trade at artificially inflated levels throughout the Class Period, reaching as

high as $71.56 per share on September 11, 2017 – a month before the truth started to emerge on

October 12, 2017.

---

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.      PG&E's Safety Violations Caused the Devastating North Bay Fires**

322.    PG&E caused the North Bay Fires.  Of the eighteen fires for which Cal Fire has determined the cause, it has determined that **seventeen were caused by PG&E equipment**.

323.    Of these seventeen fires, Cal Fire determined that **eleven were due to PG&E's violation of California safety regulations**. Under California law, PG&E bears the cost for the destruction caused by these fires unless it can show to CPUC that its violations were "reasonable." Together, these fires were responsible for **more than 100,000 acres of land devastated**, **more than 2,000 structures destroyed,** and **at least 9 of the 44 North Bay Fire fatalities.**

324.    Six more of the North Bay Fires were also deemed to have been caused by PG&E electrical lines; though Cal Fire found no specific evidence of safety violations for these six fires, PG&E may still be found liable under California's legal regime known as inverse condemnation, which provides strict liability for utilities when their power lines are involved in wildfires that lead to property damage. Together, these fires were responsible for an additional **more than 50,000 acres of land devastated**, **more than 800 structures destroyed**, and **at least 13 of 44 fatalities.** Necessarily, these six fires would have been more easily contained, and accordingly less destructive, if not for the fires caused by PG&E's violations and inadequate safety practices.[103]

**C.      PG&E's Safety Violations Caused the Devastating Camp Fire**

325.    At or about 6:29 a.m. on November 8, 2018, the Camp Fire was started in Pulga, California by faulty PG&E equipment on Pulga Road and Camp Creek Road, near the Jarbo Gap.[104]  A second ignition point, also caused by faulty PG&E equipment, began approximately 15 minutes later near the community of Concow.  The combined Camp Fire soon devastated

---

[103] Similarly, another of the North Bay Fires known as the Tubbs fire (which burned 36,807 acres, destroyed 5,636 structures, and resulted in 22 fatalities) would have been more easily contained, and accordingly less destructive, if not for the fires caused by PG&E's violations and inadequate safety practices at the same time.

[104] Camp Fire Incident Update (Nov. 25, 2018 7:00AM), http://cdfdata.fire.ca.gov/admin8327985/cdf/images/incidentfile2277_4326.pdf.

1    several surrounding communities, largely destroying Paradise, Concow, Magalia, and Parkhill.

2    The Camp Fire incinerated 153,336 acres, destroyed 18,804 structures, and killed at least 85

3    people.

4          326.    As noted above, Cal Fire has concluded that PG&E caused both of the Camp

5    Fire's two ignition points under circumstances evidencing violations of safety regulations and

6    referred its investigation to the Butte County District Attorney.

7          **D.    As the Market Learned About the Effects and Extent of PG&E's Inadequate
            Safety Practices, the Price of PG&E's Securities Fell Dramatically**

8

9          327.    On or about October 8, 2017, eighteen major wildfires known as the North Bay

10   Fires started in California, burning at least 249,000 acres and devastating properties across nine

     California counties.

11

12         **1.    October 12, 2017 – Corrective Disclosure and/or Materialization of
                   Concealed Risk**

13                 **(a)    The Market Began to Learn the Extent and Effects of PG&E's
                           Responsibility for the North Bay Fires**

14

15         328.    It was not until Thursday, October 12, 2017 that the market began to understand

16   that PG&E's safety regulation violations were likely a proximate cause of the North Bay Fires.

17   On that date, CPUC sent PG&E a litigation hold letter informing the Company of its "obligation

18   to preserve all evidence with respect to the Northern California wildfires in Napa, Sonoma, and

19   Solano Counties." Although this letter was made public on October 12, 2017, it "affirm[ed] a

20   verbal communication" of the same obligation by CPUC Safety Enforcement Division Program

21   Manager Charlotte TerKeurst to PG&E "at approximately 6:00 p.m. on October 10, 2017."  The

22   public disclosure on October 12, 2017 also revealed that "Ms. TerKeurst reminded PG&E of the

23   need to preserve all evidence, and PG&E acknowledged that it would do so."

24         329.    Further, the disclosure made clear that PG&E (a) "must preserve any factual or

25   physical evidence … includ[ing] **all failed poles, conductors and associated equipment from**

26   **each fire event**" and (b) "must inform all employees and contractors that they must preserve all

27   electronic (including emails) and non-electronic documents related to **potential causes of the**

28

1   **fires, vegetation management, maintenance and/or tree-trimming**." This was the first

2   indication that PG&E failures caused any of the North Bay Fires.

3        330.    On this news that PG&E would likely bear at least some responsibility for the

4   fires, PG&E's stock dropped $4.65 per share, from a closing price of $69.15 on October 11 to a

5   closing price of $64.50 on October 12, or -6.7%, with unusually heavy trading volume of almost

6   13 million shares (compared to a Class Period daily average trading volume of 3.5 million[105]).

7   The price of PG&E securities, however, remained artificially inflated.

8              **(b)    Market Commentators Confirmed the Cause of PG&E's Share**
9                          **Price Decline on October 12, 2017**

10        331.    The following morning, news outlets began to report that PG&E was being

11   connected with the causes of some of the North Bay fires. For example, at 10:54 a.m. on October

12   13, 2017, CNBC published an article titled "PG&E shares plunge on concern its power lines may

13   have started California wildfires."[106] The article began by observing: "The California Public

14   Utilities Commission sent a letter on Thursday to PG&E reminding them to preserve 'all

15   evidence with respect to the Northern California wildfires in Napa, Sonoma and Solano

16   Counties,' according to multiple reports." It continued to note that PG&E's share price decline

17   occurred "on concerns its power lines may have started the massive wildfires that have ravaged

18   California recently." The article also repeated market commentary that the decline in PG&E's

19   share price reflected investors' understanding that PG&E was financially responsible for the

20   North Bay Fires:

21   > The drop in the stock "reflects the following assumptions: 1) the
22   > fire was caused by PCG's negligence, 2) insurance coverage for
23   > 3rd party liabilities will be very limited, 3) damage costs per acre
24   > far larger than those for the 2015 Butte fire and 4) material fines
25   > and penalties will be assessed," Christopher Turnure, an analyst at
26   > JPMorgan, said in a note Thursday. "We appreciate the severity of
27   > the fires and the legal challenges of operating in California, but
28   > estimate this loss of value as approaching a worst-case scenario for
29   > PCG shares."

---

[105] This average excludes alleged corrective disclosure and/or materialization of risk dates.

[106] This article was published prior to the Company's corrective disclosure later that day, discussed *infra*.

332.    Similarly, on the same date, *SF Gate* published an article observing: "**[T]he state agency that regulates utilities has told PG&E to save every piece of damaged equipment from the area as evidence for the investigations to come**." The article concluded by stating that PG&E's vegetation management practices caused the North Bay Fires: "In all, **the company spent $198 million in 2016 on 'vegetation management**.' But those efforts and that money – all of it coming from PG&E's customers – **may not have been enough**."[107]

333.    Investors started to be concerned regarding whether PG&E violated any regulations (*e.g.*, failed to adequately trim trees) with respect to the North Bay Fires. For example, Wells Fargo stated in its analyst report the very next day:

> Yesterday (10/12), shares of PCG underperformed the S&P Utilities by roughly 720 bps. We attribute the material decline in price to the revelation that the company's power lines might have played a role in the Northern California fires. Over the weekend Northern California experienced winds in excess of 70 miles per hour, which could have caused trees to impact power lines that could have sparked fires particularly given the very dry vegetation. While there is still significant uncertainty in what caused the fires, apparently investigators are looking into the role of PCG's infrastructure. **The concern for investors is whether PCG did not adequately trim trees around their power lines it is our understanding that in California utilities are required to clear vegetation within 10 feet of power lines. In the absence of inadequate tree trimming, we think that property damage attributable to PCG's infrastructure should be largely covered by insurance.**

334.    Similarly, an October 13, 2017 report by a Guggenheim stock analyst stated that the decline was caused by "media reports linking the company to some of the most destructive wildfires experienced in CA, which continued to burn."

---

[107] David R. Baker, *PG&E Spent Millions on Fire Prevention; It May Not Have Been Enough*, San Francisco Gate (Oct. 13, 2017), https://www.sfgate.com/bayarea/article/PG-E-millions-fire-prevention-Santa-Rosa-wildfires-12277237.php.

2.    **October 13-16, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk**

(a)    **The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires**

335.    Late on October 13, 2017, PG&E filed a Form 8-K with the SEC shortly before the close of trading.  Therein, the Company stated in relevant part:

**Investigation of Northern California Fires**

Since October 8, 2017, several catastrophic wildfires have started and remain active in Northern California. The causes of these fires are being investigated by the California Department of Forestry and Fire Protection (Cal Fire), **including the possible role of power lines and other facilities of Pacific Gas and Electric Company's (the "Utility"), a subsidiary of PG&E Corporation**.

It currently is unknown whether the Utility would have any liability associated with these fires. **The Utility has approximately $800 million in liability insurance for potential losses that may result from these fires. If the amount of insurance is insufficient to cover the Utility's liability or if insurance is otherwise unavailable, PG&E Corporation's and the Utility's financial condition or results of operations could be materially affected**.

336.    On these disclosures, PG&E's share price continued to decline. From its opening price of $63.95 per share that day to its closing price of $53.43 per share at the end of the next trading day (Monday, October 16, 2017), PG&E's stock declined $10.52 per share, or approximately 16.5%. Over the same period, it experienced unusually heavy trading volume of over 68.5 million shares.  The price of PG&E securities, however, remained artificially inflated.

(b)    **Market Commentators Confirmed the Cause of PG&E's Share Price Decline on October 13, 2017**

337.    Investors understood the Company's October 13, 2017 8-K filing as a disclosure that PG&E's conduct with respect to causing the North Bay Fires was greater in severity than previously disclosed and was a proximate cause of at least some of the North Bay Fires.  Because the market understood that PG&E would be reimbursed for damages by fires it innocently caused, the Company's discussion of liability signaled to the market that at least some of the North Bay Fires were caused by PG&E's negligence or worse. For example, a Guggenheim stock analyst published a report that day reacting to this news, noting that PG&E "had slid even

1   further in the early afternoon actually as well, following the company's 8-K disclosing the

2   utility's $800mm in liability insurance, which we noted had not been disclosed previously (since

3   it had been renewed following the Butte fire)."

4        338.    PG&E's announcement and resulting share price decline were proximately caused

5   by PG&E's inadequate safety practices and violations that resulted in the North Bay Fires.

            **3.**      **December 20, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk**

                    **(a)**      **The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires**

9        339.    On December 20, 2017, after the market closed, PG&E filed a press release on

10   Form 8-K with the SEC titled "PG&E Announces Suspension of Dividend, Citing Uncertainty

11   Related to Causes and Potential Liabilities Associated with Northern California Wildfires." The

12   filing also included, as exhibit 99.1, a press release in which the Company announced that it

13   would be suspending its quarterly cash dividend. In the press release, PG&E stated in pertinent

14   part:

> **SAN FRANCISCO, Calif.**-PG&E Corporation (NYSE: PCG) today announced that its Board of Directors has determined to **suspend the quarterly cash dividend on the Corporation's common stock**, beginning with the fourth quarter of 2017, **citing uncertainty related to causes and potential liabilities associated with the extraordinary October 2017 Northern California wildfires**.
>
> In addition, the Board of Directors of the Corporation's utility subsidiary, Pacific Gas and Electric Company, **determined to suspend the dividend on the utility's preferred stock, beginning with the three-month period ending Jan. 31, 2018**, citing the same uncertainty.
>
> No causes have yet been identified for any of the unprecedented wildfires, which continue to be the subject of ongoing investigations.
>
> However, California is one of the only states in the country in which courts have applied inverse condemnation **to events caused by utility equipment**. This means that if a utility's equipment is found to have been a substantial cause of the damage in an event such as a wildfire - even if the utility has followed established inspection and safety rules - **the utility may still be liable for property damages and attorneys' fees associated with that event**.

"After extensive consideration and in light of the uncertainty associated with the causes and potential liabilities associated with these wildfires as well as state policy uncertainties, the PG&E boards determined that suspending the common and preferred stock dividends is prudent with respect to cash conservation and is in the best long-term interests of the companies, our customers and our shareholders," said PG&E Corporation Chair of the Board Richard C. Kelly.

340.    On this news, PG&E's share price fell $6.62, or 12.95%, to close at $44.50 on December 21, 2017, the following trading day. The stock experienced heavy trading volume, with over 52 million shares trading hands.

341.    Though PG&E had previously intertwined safety, fires, and its dividend (*see* ¶232), investors were shocked by this unexpected suspension of the dividends due to Defendants' intervening false reassurances of progress on safety and compliance with safety regulations. Only six months prior, on May 31, 2017, PG&E had announced that it was **increasing** its dividend due to the Company's "***progress on safety***." Even more recently, for example on October 31, 2017, PG&E had reassured investors that it "***follows all applicable federal and state vegetation clearance requirements and performs regular power line tree safety activities in accordance with industry standards, guidelines, and acceptable procedures that help to reduce outages or fires caused by trees or other vegetation***." And on November 2, 2017, PG&E had repeatedly reassured investors that it had "***doubl[ed]***" its vegetation management expenditures. Accordingly, the true likelihood of PG&E's responsibility for the North Bay Fires remained concealed from the market, and the price of PG&E securities remained artificially inflated.

### (b)    Market Commentators Confirmed the Proximate Cause of PG&E's Share Price Decline on December 20, 2017

342.    When PG&E announced it would suspend its dividend entirely, investors understood that as a revelation that Defendants' prior representations regarding its safety operations may have been misleading and PG&E would bear a higher than expected level of responsibility, and thus liability, for the North Bay Fires.

343.    For example, a RBC Capital Markets analysts report issued on December 21, 2017, stated: "We downgrade PCG to Sector Perform following the Board's decision to suspend

1    the dividend. **This unexpected decision suggests greater risk than we had assumed**

2    **surrounding regulatory treatment of the October 2017 Northern California wildfires**."

3         344.    Similarly, an analyst report issued by Evercore ISI the same day stated:

4              **On the 3Q17 call PCG indicated company operations were**
              **conducted properly leading up to and after the fire**. . . . PCG

5              also indicated they found instances of wires down, vegetation near
              PCG facilities and some broke poles. PCG reiterated the company

6              routinely inspects, maintains, and replaces poles, and tests and
              treats wood poles on a frequency that significantly exceeds CPUC

7              requirements. The company claims to have one of, if not the most
              comprehensive vegetation management programs in the country.

8
         345.    PG&E's suspension of its dividend and resulting share price decline were

9
    proximately caused by PG&E's inadequate safety practices and violations that resulted in the

10
    North Bay Fires.

11
              **4.    May 25, 2018 – Corrective Disclosure and/or Materialization of**
12              **Concealed Risk**

13                   **(a)    The Market Continued to Learn the Extent and Effects of**
                        **PG&E's Responsibility for the North Bay Fires**
14
         346.    On May 25, 2018, Cal Fire issued a press release announcing the cause of four
15
    wildfires in Butte and Nevada counties ("May 2018 Press Release"), stating in relevant part:
16
              **CAL FIRE Investigators Determine Cause of Four Wildfires in**
17              **Butte and Nevada Counties**

18              Sacramento - After extensive and thorough investigations, CAL
              FIRE investigators have determined that four Northern California
19              wildfires in last year's October Fire Siege were caused by trees
              coming into contact with power lines. The four fires, located in
20              Butte and Nevada counties, are the first fire investigations from
              last October to be completed.
21
              CAL FIRE investigators were dispatched to the fires last year and
22              immediately began working to determine their origin and cause.
              The Department continues to investigate the remaining 2017 fires,
23              both in October and December, and will release additional reports
              as they are completed.
24
              The October 2017 Fire Siege involved more than 170 fires and
25              charred more than 245,000 acres in Northern California. More than
              11,000 firefighters from 17 states helped battle the blazes.
26
              Below is a summary of the four completed investigations:
27

28

- The La Porte Fire, in Butte County, started in the early morning hours of Oct. 9 and burned a total of 8,417 acres, destroying 74 structures. There were no injuries to civilians or firefighters. CAL FIRE has determined the fire was caused by tree branches falling onto PG&E power lines. CAL FIRE investigators determined there were no violations of state law related to the cause of this fire.

- The McCourtney Fire, in Nevada County, started the evening of Oct. 8 and burned a total of 76 acres, destroying 13 structures. There were no injuries to civilians or firefighters. CAL FIRE has determined the fire was caused by a tree falling onto PG&E power lines. **The investigation found evidence that PG&E allegedly failed to remove a tree from the proximity of a power line, in violation of the state Public Resources Code section 4293.**

- The Lobo Fire, in Nevada County, started the evening of Oct. 8 and burned a total of 821 acres, destroying 47 structures. There were no injuries to civilians or firefighters. **CAL FIRE has determined the fire was caused by a tree contacting PG&E power lines. The investigation found evidence that Public Resources Code section 4293, which requires adequate clearance between trees and power lines, was allegedly violated.**

- The Honey Fire, in Butte County, started in the early morning hours of Oct. 9 and burned a total of 76 acres. There were no injuries to civilians or firefighters and no structures were destroyed. **CAL FIRE has determined the fire was caused by an Oak branch contacting PG&E power lines. The investigation found evidence that Public Resources Code 4293, which requires adequate clearance between trees and power lines, was allegedly violated.**

The McCourtney, Lobo, Honey investigations have been referred to the appropriate county District Attorney's offices for review.

347. Then, early on May 29, 2018, prior to the start of trading, PG&E filed a Current Report on Form 8-K with the SEC. Rather than contradicting any of Cal Fire's findings, the filing quoted extensively from the May 25, 2018 Cal Fire release described above, including the role of PG&E equipment in starting all four of the relevant North Bay Fires, Cal Fire's findings that three of the fires were caused by violations of California safety laws, and Cal Fire's decision to refer criminal investigations regarding these three fires to the relevant district attorneys' offices. The filing also stated: "It is reasonably possible that facts could emerge that lead PG&E

1    Corporation and the Utility to believe that a loss is probable, resulting in an accrued liability in

2    the future, the amount of which could be substantial."

3          348.    On this news, PG&E's share price fell $2.32, or 5.19%, to close at $42.34 on May

4    29, 2018, the following trading day. The stock experienced unusually high trading volume that

5    day, with over 5.7 million shares changing hands on May 29, 2018.  The price of PG&E

6    securities, however, remained artificially inflated.

7                      **(b)      Market Commentators Confirmed that the News Regarding
                                  Safety Violations Proximately Caused PG&E's Share Price
8                                 Decline on May 25-29, 2018**

9          349.    Analysts were surprised by the results of the Cal Fire reports. For example,

10   Deutsche Bank stated in its May 28, 2018 report:

11                 From the investor perspective the market should not be particularly
                   surprised that PG&E's lines have been found to be involved in
12                 starting the fires. **That said, the fact that this was the case in all
                   four of the fires – and that violations were found in three of the**
13                 **four instances – will likely be seen as a negative data point.**
                   Reading through the LaPorte fire investigation for other data
14                 points, investors may be concerned to note that the wind speeds
                   around the time of the ignition do not seem to have been
15                 particularly high – with a maximum gust of 29 mph.

16

17         350.    One Citigroup analyst wrote on May 29, 2018 that the new Cal Fire reports

18   specifically "link the fires to [PG&E's] equipment," "claim improper vegetation management for

19   three of the fires," and were "suggesting negligence" on PG&E's part. Based on this, the Cal Fire

20   reports "will support 'causation' and likely lead to [PG&E] bearing the liability for damages

21   under Inverse Condemnation." Moreover, the analyst noted that PG&E might even be liable for

22   "Gross Negligence," and could be barred from recovering costs from ratepayers insofar as it

23   would be "tough to meet" the "prudent manager" standard that is necessary for such a recovery.

24         351.    Accordingly, the new information contained in these disclosures, including the

25   severity of PG&E's conduct and the role of its violations of California safety laws in causing the

26   North Bay Fires, proximately caused PG&E's share price decline.

27         352.    Defendants, however, continued to mislead investors regarding the extent of

28   PG&E's safety deficiencies and the impact thereof.

1
2

        **5.**     **June 8, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk**

3
4

    353.    On Friday, June 8, 2018, after the market closed, Cal Fire issued another press release announcing the causes of twelve wildfires in Mendocino, Humboldt, Butte, Sonoma, Lake, and Napa Counties, stating in relevant part:

5
6
7

> **CAL FIRE Investigators Determine Causes of 12 Wildfires in Mendocino, Humboldt, Butte, Sonoma, Lake, and Napa Counties**

8
9
10

> **Sacramento** – After extensive and thorough investigations, CAL FIRE investigators have determined that 12 Northern California wildfires in the October 2017 Fire Siege were caused by electric power and distribution lines, conductors and the failure of power poles.

11

> The October 2017 Fire Siege involved more than 170 fires and burned at least 245,000 acres in Northern California. About 11,000 firefighters from 17 states and Australia helped battle the blazes.

12
13
14
15

> CAL FIRE investigators were dispatched to the fires last year and immediately began working to determine their origin and cause. CAL FIRE investigators continue to investigate the remaining 2017 fires, both in October and December, and will release additional reports as they are completed. The cause of four Northern California fires were released on May 25.

16
17

> Below is a summary of the findings from the 12 completed investigations:

18
19
20

> The **Redwood Fire**, in Mendocino County, started the evening of Oct. 8 and burned a total of 36,523 acres, destroying 543 structures. There were nine civilian fatalities and no injuries to firefighters. CAL FIRE has determined the fire started in two locations and was caused by tree or parts of trees falling onto PG&E power lines.

21
22
23

> The **Sulphur Fire**, in Lake County, started the evening of Oct. 8 and burned a total of 2,207 acres, destroying 162 structures. There were no injuries. **CAL FIRE investigators determined the fire was caused by the failure of a PG&E owned power pole**, resulting in the power lines and equipment coming in contact with the ground.

24
25
26

> The **Cherokee Fire**, in Butte County, started the evening of Oct. 8 and burned a total of 8,417 acres, destroying 6 structures. There were no injuries. CAL FIRE investigators have determined the cause of the fire was a result of tree limbs coming into contact with PG&E power lines.

27
28

Case 18-30089   Doc 5371-50   Filed 09/14/20   Entered 09/14/20 15:26:59   Page 123
of 524

The **37 Fire**, in Sonoma County, started the evening of Oct. 9 and burned a total of 1,660 acres, destroying 3 structures. There were no injuries. CAL FIRE investigators have determined the cause of the fire was electrical and was associated with the PG&E distribution lines in the area.

The **Blue Fire**, in Humboldt County, started the afternoon of Oct. 8 and burned a total of 20 acres. There were no injuries. CAL FIRE investigators have determined a PG&E power line conductor separated from a connector, causing the conductor to fall to the ground, starting the fire.

The Norrbom, Adobe, Partrick, Pythian and Nuns fires were part of a series of fires that merged in Sonoma and Napa counties. These fires started in the late-night hours of Oct. 8 and burned a combined total of 56,556 acres, destroying 1355 structures. There were three civilian fatalities.

> CAL FIRE investigators determined the Norrbom Fire was caused by a tree falling and coming in contact with PG&E power lines.

> CAL FIRE investigators determined the Adobe Fire was caused by a eucalyptus tree falling into a PG&E powerline.

> CAL FIRE investigators determined the Partrick Fire was caused by an oak tree falling into PG&E powerlines.

> CAL FIRE investigators determined **the Pythian Fire was caused by a downed powerline after PG&E attempted to reenergize the line**

> CAL FIRE investigators determined the Nuns Fire was caused by a broken top of a tree coming in contact with a power line.

The **Pocket Fire**, in Sonoma County, started the early morning hours of Oct. 9 and burned a total of 17,357 acres, destroying 6 structures. There were no injuries. CAL FIRE has determined the fire was caused by the top of an oak tree breaking and coming into contact with PG&E power lines.

The **Atlas Fire**, in Napa County, started the evening of Oct. 8 and burned a total of 51,624 acres, destroying 783 structures. There were six civilian fatalities. CAL FIRE investigators determined the fire started in two locations. At one location, it was determined a large limb broke from a tree and came into contact with a PG&E power line. At the second location, investigators determined a tree fell into the same line.

**CAL FIRE's investigations have been referred to the appropriate county District Attorney's offices for review in eight of the 12 fires - Sulphur, Blue, Norrbom, Partrick, Pythian, Adobe, Pocket and Atlas - due to evidence of alleged violations of state law.**

354.   While this news release did not discuss specific violations found, it disclosed that the causes of the fires involved PG&E equipment and vegetation, as well as the facts that Cal Fire referred its investigations to the relevant district attorneys of five counties due to evidence Cal Fire discovered of state law violations.

### (a)   The Market Learned the Truth of PG&E's Continued, Unsafe Use of Reclosers

355.   By stating that "CAL FIRE investigators determined the Pythian Fire was caused by a downed powerline after PG&E attempted to reenergize the line," this press release revealed that the Pythian Fire had been proximately caused by PG&E's use of reclosers.

### (b)   The Market Continued to Learn the Extent and Effects of PG&E's Safety Violations and Responsibility for the North Bay Fires

356.   On Saturday, June 9, 2018, *Bloomberg* published an article entitled "PG&E May Face Criminal Charges After Probe of Deadly Wildfires." The article reported, in part, that following an investigation into the causes of wildfires "that altogether killed 44 people, consumed thousands of homes and racked up an estimated $10 billion in damages" in October 2017, California's fire agency "found evidence of alleged violations of law by PG&E in connection with" the fires. Specifically, the state's investigation found "that PG&E equipment caused at least 12 of the wine country blazes."

357.   Early on Monday, June 11, 2018, prior to the start of trading, PG&E filed a Current Report on Form 8-K with the SEC. Rather than contradicting any of Cal Fire's findings, the filing quoted extensively from the June 8, 2018 Cal Fire release described above, including the role of PG&E equipment in starting all 12 of the relevant North Bay Fires and Cal Fire's decision to refer criminal investigations regarding eight of the fires to the relevant district attorneys' offices "due to evidence of alleged violations of state law." The filing also admitted that Defendants expected to "record a **significant liability** for losses associated with" at least 14 of the North Bay Fires, as follows:

> Although the Utility's analysis is ongoing regarding the fires that
> were the subject of the June 8, 2018 and May 25, 2018 CAL FIRE
> news releases:

- for the La Porte, McCourtney, Lobo, Honey, Redwood, Sulphur, Cherokee, Blue, Pocket and Sonoma/Napa merged fires (which include Nuns, Norrbom, Adobe, Partrick and Pythian), based on the current state of the law on inverse condemnation, the information currently available to the Utility, and the CAL FIRE determinations of cause, **PG&E Corporation and the Utility currently expect that they will record a significant liability for losses associated with such fires** in PG&E Corporation and the Utility's condensed consolidated financial statements to be included in their Form 10-Q for the quarterly period ending June 30, 2018 (the "Q2 financial statements"); and

- for the Atlas and Highway 37 fires, PG&E Corporation and the Utility do not believe a loss is probable at this time, given the information currently available. However, **it is reasonably possible that facts could emerge that lead PG&E Corporation and the Utility to believe that a loss is probable**, resulting in the accrual of a liability in the future, the amount of which could be significant.

358.    Following these disclosures, PG&E's share price fell $1.69, or 4.08%, to close at $39.76 on June 11, 2018, the following trading day. The stock experienced unusually high trading volume that day, with over 12.6 million shares trading hands on June 11, 2018.  The price of PG&E securities, however, remained artificially inflated.

### (c)    Market Commentators Confirmed that the Number and Range of Safety Violations Proximately Caused PG&E's Share Price Decline on June 8-11, 2018

359.    The market was surprised by the number and range of alleged violations of safety laws in the Cal Fire report. For example, in J.P. Morgan's analyst report on June 10, 2018, it stated that "**[w]ith this batch of reports, we find the range of 'alleged' law violations noteworthy. CAL FIRE opined on law regarding not just vegetation management but also pole and conductor failure and the re-energizing of equipment by the company.**" Deutsche Bank also stated in its June 10, 2018 analyst report that "**[o]verall, Friday's data points are likely to be read as another negative for PCG, given the high percentages of incidents blamed on the company's lines and referred to DAs.**" Guggenheim further reiterated its "Sell" recommendation on June 10, 2018 because "[o]ut of the 16 fires now investigated thus far, **PCG was found to have allegedly violated state law in 11 of those instances with Cal Fire referring its evidence to the District Attorney – likely a strong indictment to potential**

1    **criminal and civil cases/lawsuits against the company**." The analyst from Guggenheim noted

2    that "all signs seem to point to PCG being imprudent operators in the majority of instances,

3    which would therefore mean it should assume liability." Accordingly, the number and range of

4    safety violations proximately caused PG&E's Share Price Decline on June 8-11, 2017.

5        360.    On June 11, 2018, *Bloomberg* published an article reporting: "The company said

6    Monday it expects to record a 'significant liability' for fires, and the shares plunged the most in

7    five months at the open" of trading. The article also noted that "[t]he alleged violations could

8    also expose PG&E to criminal charges only two years after the San Francisco company was

9    convicted of breaking safety rules that led to a deadly gas pipeline explosion in San Bruno,

10   California."

11       361.    Accordingly, the new information contained in these June 8 and 11 disclosures,

12   including the severity of PG&E's conduct, the role of its violations of California safety laws in

13   causing the North Bay Fires, and the "significant liability" it would incur as a result, proximately

14   caused PG&E's share price decline.

15       362.    Defendants, however, continued to mislead investors regarding the extent of

16   PG&E's safety deficiencies and the impact thereof.

17       **6.    November 8-9, 2018 – Corrective Disclosure and/or Materialization of
              Concealed Risk**

18

19       363.    The Camp Fire began in the early morning of November 8, 2018 and grew

20   steadily throughout the day.  However, as of the close of trading that day, no prominent news

21   sources had reported that PG&E may have caused it.

22              **(a)    The Market Began to Learn the Extent and
                        Effects of PG&E's Responsibility for the Camp Fire**

23       364.    After the close of trading on November 8, 2018, PG&E announced via its official

24   Twitter.com account that it had decided not to implement its procedure for shutting power lines

25   during dangerous weather conditions.  This communication was the first indication that PG&E's

26   equipment and decisions may have contributed to the Camp Fire, undermining the Company's

27   assurances to investors that it would comply with safety regulations and prioritize safety, detailed

28   above.  While the announcement began to disclose the truth regarding PG&E's responsibility for

---

1    the Camp Fire, it also contained a further false reassurance that PG&E's decision was because

2    "*weather conditions did not warrant this safety measure*," as detailed above.

3         365.    Also after the close of trading on November 8, 2018, PG&E filed an Electric

4    Incident Report with the CPUC stating that PG&E had experienced a problem with its Caribou-

5    Palermo high-voltage transmission line on "Pulga Rd. Pulga, Butte County" only fourteen

6    minutes before the Camp Fire began, "in the area of the Camp Fire."  The same report

7    acknowledged that an aerial patrol later in the day showed "damage" to the same transmission

8    tower.  However,  this information undermining PG&E's statements about compliance and

9    prioritizing safety during the Class Period would not be reported by major news outlets until the

10   next day, November 9, 2018.

11        366.    On this news, PG&E's share price fell $7.88, or approximately 19.7% to close at

12   $39.92 on November 9, 2018, the following trading day.  The stock experienced unusually high

13   trading volume of 23,627,100 shares.  The price of PG&E securities, however, remained

14   artificially inflated.

15                 **(b)    Market Commentators Confirmed the Cause of PG&E's
                           November 9, 2018 Share Price Decline**

16

17        367.    Market commentators confirmed that PG&E's share price declined due to news

18   connecting PG&E to the Camp Fire, the true risk of which was concealed by PG&E's false and

18   misleading statements and omissions.

19

20        368.    On November 9, 2018, CNBC published an article entitled "Shares of electricity

21   provider PG&E have worst day since 2002 as wildfires ravage California."[108]  The article noted

22   that "Shares of PG&E plunged more than 16 percent on Friday as wildfires continued to rage

23   through California. This was the biggest one-day decline for the stock since Aug. 8, 2002. . . ."

24   It further observed: "PG&E also traded 23.6 million shares, about five time [sic] its average 30-

25   day volume."  The article was initially published at 1:03 p.m. Eastern Time (*i.e.,* prior to the

26

27        _____

28   [108] Fred Imbert, *Shares of Electricity Provider PG&E Have Worst Day Since 2002 as
     Wildfires Ravage California*, CNBC (Nov. 9, 2018), https://www.cnbc.com/2018/11/09/shares-
     of-electricity-provider-pge-plunge-as-wildfires-ravage-california.html.

1   close of trading) and updated at 4:19 p.m. the same day (after the close of trading), yet made no

2   mention of PG&E's Electric Incident Report tying the Company's equipment to the origin of the

3   Camp Fire.

4       369.    On November 9, 2018, Deutsche Bank described how investors were

5   "understandably concerned" given the emerging news of the Camp Fire and S.B. 901's lack of

6   provisions regarding 2018 wildfires:

7           While there has been no specific indication of utility lines being
            involved in these ignitions, investors are understandably concerned
8           considering that the recently passed wildfire bill (SB901) left
            utilities particularly exposed to 2018 fires if their infrastructure
9           ends up being implicated. This is due to the fact that the so-called
            stress test or customer harm threshold is only applicable to 2017
10          fire losses. Meanwhile, the new reasonableness standard which the
            CPUC will use to determine eligibility for recovery of liability
11          costs from customers only kicks in from 2019.

12      370.    A Barclays report from the same day supported the conclusion that investor

13  concern regarding the Camp Fire and its lack of coverage by S.B. 901 were contributing to the

14  stock price drop:

15          **We believe the lack of explicit language for 2018 wildfires in
            SB 901 may be increasing market pressure**. SB 901 specifically
16          addresses 2017 wildfire liability by tasking the CPUC with
            creating a cap on IOU [Investor-Owned Utility] liability to ensure
17          safe and affordable service. The bill addresses wildfire liability in
            2019 and beyond by creating a securitization mechanism.
18          However, specific language addressing 2018 liability coverage is
            noticeably absent. The general consensus among CA stakeholders
19          is that 2018 will be treated in a similar fashion to 2017, however
            the lack of a specific prescription may be heightening investor
20          concern if the Camp Fire is found to be started by PCG.

21      371.    While this report stated that there was no indication yet that electrical equipment

22  had caused the Camp Fire, it emphasized that PG&E's decision not to de-energize its lines could

23  become a source of liability if PG&E equipment was found to be involved: "we expect PCG's

24  decision not to de-energize lines after warning of high fire risk will be investigated if the fire is

25  found to have been sparked by PCG equipment."

26

27

28

7.      **November 9-12, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk**

(a)      **The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire**

372.      Because PG&E had concealed the extent of its safety violations and failures to prioritize safety, the market was shocked to learn how much evidence supported the conclusion that PG&E had not only caused the Camp Fire, but did so in a manner that violated state safety regulations. Thus, investors began to learn the true likelihood and extent to which PG&E would bear financial responsibility for the Camp Fire's destruction, *i.e.*, without eligibility for reimbursement by ratepayers. *See* Section VIII, *supra*.

373.      After the close of trading on Friday, November 9, 2018, news outlets began to report that there was evidence PG&E caused the Camp Fire based on PG&E's incident report the previous evening. The first such report, written by Pulitzer Prize-winning journalist Matthias Gafni and published in *Mercury News*, occurred at 5:49 p.m. EST on November 9, 2018.[109]

374.      On Saturday, November 10, 2018, it was reported that the town of Paradise was destroyed as the Camp Fire continued to spread.[110] It was further reported that the fire had raced through the communities of Concow and Magalia, causing at least nine fatalities and the loss of at least 6,453 homes and 260 commercial buildings.[111] The Camp Fire grew in size and severity over the weekend, with reports on Saturday that it had already consumed 70,000 acres and was only 5 percent contained—with winds pushing it toward Chico and Yankee Hill. By Sunday November 11, 2018, it was reported that more than 200 people were missing, the death toll had

---

[109] Matthias Gafni, *PG&E Power Lines May Have Sparked Deadly Camp Fire, According To Radio Transmissions,* Mercury News (updated Nov. 12, 2018 12:03 PM), https://www.mercurynews.com/2018/11/09/pge-power-lines-may-have-sparked-deadly-butte-county-according-to-radio-transmissions/.

[110] Anna Sciacca and Lisa Krieger, *'Our Town Has Burned': Most of Paradise is Lost After Camp Fire Ravages the Area*, Enterprise Record (Nov. 10, 2018), https://www.chicoer.com/2018/11/10/our-town-has-burned-most-of-paradise-is-lost-after-camp-fire-ravages-the-area/.

[111] *Id.*

---

1   risen to 29, and the fire—which had by then consumed 111,000 acres—was only 25 percent

2   contained.[112]

3        375.     Then on Monday, November 12, 2018, the next trading day, it was reported that

4   BetsyAnn Cowley, a property owner in Pulga, received an email from PG&E the **day before** the

5   Camp Fire ignited; the email communicated that the Utility needed access to her property to

6   repair a transmission line that was "sparking."  It was further reported that the incident occurred

7   near the origin point of the Camp Fire, with Cowley's property next to the junction of Pulga and

8   Camp Creek Road.

9        376.     On this news, PG&E's share price fell $6.94, or 17.385%. to close at $32.98 on

10   November 12, 2018.  The stock experienced a trading volume of 44,033,200 on November 12,

11   2018.  The price of PG&E securities, however, remained artificially inflated.

12          **(b)**     **Market Commentators Confirmed the Cause of PG&E's**
           **November 9-12, 2018 Share Price Decline.**

13

14        377.     Investors were concerned over this evidence that PG&E's safety violations likely

15   caused the Camp Fire, including the impact on PG&E's likely liability of Cowley's comments to

16   the press regarding PG&E's knowledge of transmission line problems in the area.  As a result,

17   PG&E's stock price continued to drop.  As the *San Francisco Chronicle* reported on November

18   12, 2018, "Cowley's revelation came as shares of Pacific Gas and Electric Co.'s parent company

19   plummeted Monday amid concerns from investors about the utility's liability connected to the

20   Camp Fire."[113]

21        378.     Similarly, a Wells Fargo analyst report observed the same day that "[t]he Camp

22   Fire is in PCG's service territory and there are initial indications that the company's transmission

23   infrastructure may have been a root cause of the fire pending an investigation by Cal Fire."

---

[112] Melody Gutierrez, *More than 200 Remain Missing in Camp Fire*, San Francisco Chronicle (Nov. 8, 2018), https://www.sfchronicle.com/california-wildfires/article/100-missing-in-Camp-Fire-butte-county-death-toll-13382433.php.

[113] J.D. Morris and Kurtis Alexander, *Homeowner's Claim on PG&E Work Raises Questions on Camp Fire's Origin*, San Francisco Chronicle (Nov. 12, 2018), https://www.sfchronicle.com/california-wildfires/article/PG-E-stock-hammered-on-wildfire-fallout-13384830.php.

379.    A Macquarie Research analyst report on November 13, 2018 estimated PG&E's fire-related liabilities at $8 billion, while noting that the real measure of PG&E's liability could be higher given that the Camp Fire was not yet contained:

> We've reduced our [target price] to US$45 from US$57, is based on 10.4x our '20E EPS vs 13.6x previously. Our new [target price] reflects incremental ~US$8bn in fire-related liabilities, which we hope proves excessive given the stress test included in the SB901, but we have no way to assess the potential liabilities as the fire is only 30% contained.

380.    A November 13, 2018 Bloomberg Intelligence report remarked that the analyst **expected** PG&E's liability to **exceed its total equity valued** absent additional assistance from the California government, and that such a bailout was not certain: "Unless mitigated by regulators, we expect PG&E's write-offs could exceed the company's total equity.  California's utility owners are dangerously squeezed between two forces: Onerous inverse-condemnation rule makes utilities liable for most of the billions in fire damage, but powerful political resistance prevents customer bills from rising much above inflation."

### 8.    November 13-14, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk

#### (a)    The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire

381.    After the close of trading on November 13, 2018, PG&E released a Form 8-K that showed a much bleaker picture of PG&E's deteriorating financial situation than investors had reason to expect, even calling into question its ability to remain solvent in the face of mounting evidence of its liability for the Camp Fire.  The SEC filing admitted, among other things, that PG&E's and the Utility's revolving credit facilities were fully drawn and that its liability for the Camp Fire could exceed its insurance:

> **Item 2.03. Creation of a Direct Financial Obligation or an Obligation Under an Off-Balance Sheet Arrangement of a Registrant**
>
> As of November 13, 2018, Pacific Gas and Electric Company ("Utility"), a subsidiary of PG&E Corporation, and PG&E Corporation have aggregate borrowings outstanding under their respective revolving credit facilities of $3.0 billion and $300 million, respectively. . . .  **No additional amounts are available under the Utility's and PG&E Corporation's respective**

1           **revolving credit facilities**.

2                                    \*         \*         \*

3           **Item 8.01 Other Events.**

4                  ***Camp Fire***

5                      On November 8, 2018, a wildfire began near the city of
6           Paradise, Butte County, California (the "Camp Fire"), located in
the service territory of the Utility. . . .

7                      As previously reported, during the third quarter of 2018,
PG&E Corporation and the Utility renewed their liability insurance
8           coverage for wildfire events in an aggregate amount of
approximately $1.4 billion for the period from August 1, 2018
9           through July 31, 2019. . . .

10                      While the cause of the Camp Fire is still under
investigation, if the Utility's equipment is determined to be the
11           cause, the Utility could be subject to significant liability in excess
of insurance coverage that would be expected to have a material
12           impact on PG&E Corporation's and the Utility's financial
condition, results of operations, liquidity, and cash flows.

13

14       382.    On this news, PG&E's share price fell $7.13, or 21.791%. to close at $25.59 on

November 14, 2018.  The stock experienced high trading volume of 53,543,100.  The price of

15 PG&E securities, however, remained artificially inflated.

16

17                 **(b)**     **Market Commentators Confirmed the Cause of PG&E's Share
Price Decline on November 14, 2018**

18       383.    Analyst commentary attributed the drop in PG&E's stock price to news about

19 PG&E's insufficient insurance coverage and deteriorating financial situation, including the

20 chance of bankruptcy, revealed in PG&E's Form 8-K disclosures published after the market

21 closed the previous day.

22       384.    CNBC reported that PG&E's Form 8-K disclosures were responsible for the drop

23 in stock price on November 14, 2018:

24                Shares of utility PG&E fell 21 percent on Wednesday after the
company said that if its equipment is responsible for the "Camp
25           Fire" burning in Northern California, the cost of the damage would
exceed its insurance coverage and **harm its financial health**. . . .
26           "With these borrowings, the entire credit facility has been drawn
and PG&E now has $3.5 billion of cash on its balance sheet," Citi

27

28

analyst Praful Mehta wrote in a note Wednesday. "We think the primary driver could be a concern around a downgrade to a non-investment grade credit rating and the liquidity requirements as a result of the downgrade."[114]

385.    Similarly, a November 14, 2018 Bloomberg Intelligence report also connected PG&E's Form 8-K disclosures to its share price decline afterward, stating that the filing indicated the Company's own concern about bankruptcy:

> **The abrupt drawdown of its entire $3.3 billion in revolving credit suggests to us that PG&E (PCG -22%) is concerned about a near-term cash and credit crunch**. The company warned of bankruptcy earlier this year, and **the situation is more desperate now**. If found liable for California's Camp Fire, which may match or surpass 2017's $15 billion in damages, the total exceeds PG&E's book equity and annual revenue.

### 9.    November 15, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk

#### (a)    The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire

386.    On November 15, 2018, Cal Fire announced that it had identified a second ignition point for the Camp Fire.[115]  This news further evidenced the extent of PG&E's responsibility for the Camp Fire, undermining the Company's assurances to investors that it would comply with safety regulations and prioritize safety, detailed above.

387.    On this news, PG&E's share price fell $7.85, or 30.676%. to close at $17.74 on November 15, 2018.  The stock experienced its highest trading volume during the Class Period of 107,155,700 on November 15, 2018.

---

[114] Thomas Franck, *PG&E Plunges 21% Amid Disclosure of an 'Electric Incident' Just Before Wildfire*, CNBC (Nov. 14, 2018), https://www.cnbc.com/2018/11/14/pge-plunges-20percent-after-disclosing-an-electric-incident-just-before-fire.html.

[115] Andre Byik, *Camp Fire Investigation Leads To Possible Second Origin Away From Pulga*, Enterprise-Record (updated Nov. 15, 2018 10:06 PM), https://www.chicoer.com/2018/11/15/camp-fire-investigation-leads-to-another-area-away-from-pulga/.

1

2

          **(b)**    **Market Commentators Confirmed the Cause of PG&E's Share Price Decline on November 15, 2018**

3

388.    Market commentary confirmed that the November 15, 2018 decline in PG&E's

4

share price was due to mounting evidence of PG&E's liability for the Camp Fire and chance of

5

bankruptcy, the true risk of which was concealed by PG&E's false and misleading statements

6

and omissions.  Indeed, PG&E's share price declined until CPUC President Michael Picker

7

commented after the close of trading that day that he did not want the Company to become

8

bankrupt.  A *Bloomberg* article reported: "His comments capped a roller-coaster week for PG&E

9

shares. They lost about two-thirds of their value during several days of free fall, then partially

10

rebounded Friday after Picker said he doesn't want the company to slide into bankruptcy."[116]

11

389.    A J.P. Morgan report from November 16, 2018 noted that the market was affected

12

by continued uncertainty over California's willingness to aid PG&E:

13

> **if one assumes for sake of argument a $30Bn grand total of liabilities for the 2017-18 events for PCG, a 40 year amortization of securitized debt would still only be $10/month for the average customer; this would be even less if a multibillion dollar stress test cap was absorbed by the company;** it is a small price to pay for safe electric service and environmental goals. We remain focused on upcoming policymaker statements on the issue, and the pending CPUC implementation of securitization and stress-test mandates created with SB901. We acknowledge the long and challenging road ahead for investors, but see too much at stake for the state to realistically abandon utilities given the above considerations

14

15

16

17

18

19

                        \*       \*       \*

20

390.    As a result of Defendants' wrongful acts and omissions, and the precipitous

21

decline in the market value of the Company's securities, Lead Plaintiff and other Class members

22

have suffered significant losses and damages.

23

24

25

26

[116] David R. Baker, Mark Chediak & Romy Varghese, *PG&E State Review Puts Board Shuffle and Breakup on the Table*, Bloomberg (updated Nov. 17, 2018 12:00AM), https://www.bloomberg.com/news/articles/2018-11-16/pg-e-soars-after-regulator-eases-concern-on-bankruptcy-risk.

27

28

1    X.    SCIENTER UNDER THE EXCHANGE ACT

2        391.    The public was surprised to learn the extent to which PG&E had misled everyone

3    about its lack of safety procedures related to wildfire prevention and responsibility for the North

4    Bay and Camp Fires.  Based on the extensive, widespread, and egregious nature of PG&E's

5    underlying noncompliance and disregard for safety, there is a strong inference that PG&E itself,

6    and the officers who spoke on its behalf and controlled its public statements, knew or should

7    have known the truth.  As detailed below, they either knew the material, adverse facts about

8    PG&E's lack of safety undermining and contradicting their public representations, or were

9    culpably reckless in avoiding knowledge of and/or disregarding that reality.  Thus, throughout

10   the Class Period, Defendants acted with scienter (a) by making false and misleading statements

11   and omissions about PG&E's financial health and compliance with relevant safety rules and

12   regulations while having actual knowledge of their false or misleading nature, and/or (b) by

13   acting in a deliberately reckless manner.

14        A.    **PG&E Knew that Its Safety Practices Continued to Violate the Law Even
              After PG&E Was on Notice of the Butte Fire Safety Violations**

15

16       392.    As detailed above, PG&E's safety lapses caused the 2015 Butte Fire when a tree

17   came into contact with PG&E's power line due to PG&E violating multiple safety regulations.

18   At the time, the Butte Fire was the seventh most destructive wildfire in California history; it

19   killed two people, destroyed 921 homes, and destroyed more than 70,000 acres over 22 days.  As

20   noted above (¶¶127-28) and described in more detail below (¶569), PG&E had a company policy

     to perversely incentivize its contractors to clear less vegetation than is safe.

21
         393.    Even after PG&E caused the disastrous Butte Fire through its serious fire safety

22   lapses, PG&E made **no changes at all** to improve its vegetation management or compliance with

23   safety regulations. In a deposition transcript that has not yet been made publicly available,

24   PG&E's Vegetation Program Manager Richard Yarnell reportedly testified under oath:

25   "PG&E—to the best of my knowledge, we have not made any changes as a result of this fire."

26   Despite being on notice of its dangerous safety violations, neither the Company nor its officers

27

28

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                      118
CLASS ACTION NO. 3:18-CV-03509-EJD

1  made any changes to improve safety or compliance.  Thus, they either knew, or should have

2  presumed, that its violations continued unabated.

3          394.    On March 5, 2019, Judge Alsup, presiding over PG&E's criminal probation,

4  issued a revised Order to Show Cause relating to PG&E's lack of compliance with vegetation

5  management and other safety regulations.  The Order contained the following findings

6  summarizing the results of the federal court's probe into PG&E's actual knowledge of safety

7  violations leading up to the North Bay and Camp Fires:

8          PG&E's filings have included several relevant admissions.
           Significantly, PG&E acknowledged "that vegetation contact is the
9          primary risk driver with respect to ignitions on its distribution
           lines." ("Vegetation" means trees and limbs in this context.) In
10         2016 alone, PG&E experienced approximately 1,400 wires down
           caused by vegetation contact. As PG&E reported to the CPUC,
11         during 2015 and 2016, vegetation contact with conductors was the
           leading cause of the 486 fire ignitions associated with PG&E
12         facilities, causing 37% of those fires. PG&E further admitted that
           as of June 2017, there were 3,962 unworked trees which PG&E
13         had identified in 2016 as hazardous with the potential to "fall into
           or otherwise impact the conductors, towers or guy wires before the
14         next inspection cycle."[117]

15         395.    Thus, PG&E has admitted its **actual knowledge from 2015 to 2017** that its

16  vegetation management practices did not comply with California safety regulations on the order

17  of **thousands of violations per year**.  PG&E has further admitted to **actually knowing** that its

18  violations have **caused hundreds of wildfires per year since 2015**.  However, PG&E never

19  disclosed to investors that their own internal compliance reviews showed a lack of compliance

20  on a huge scale.

21         396.    In the time period of 2017 to 2018, after the North Bay Fires and leading up to the

22  Camp Fire, PG&E's notice of its numerous and widespread safety violations was even stronger.

23  For example, PG&E had known about the dangerous noncompliance of its Caribou-Palermo

24  transmission line – the same line whose failure would cause the Camp Fire's first ignition point –

25

26

27  ───────────────

28  [117] Second Order to Show Cause Why PG&E's Conditions of Probation Should Not Be
    Modified, PG&E Criminal Proceedings (N.D. Cal. Mar. 5, 2019), ECF No. 1027.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                              119
CONSOLIDATED ACTION NO. 4:18-cv-03509-EJD

1   since a **2014 internal Company email stated that "the likelihood of failed structures** [on the

2   Caribou-Palermo line] **happening is high.**"

### B.   Safety Was Core to PG&E's Operations, and the Exchange Act Individual Defendants Were Directly Involved in It

397.   In a January 16, 2019 filing to the CPUC, PG&E stated unequivocally that safety

is its "core business," and as such, was the "focus" of Defendant Williams's activities as CEO:

"Since the Utility is the sole operating subsidiary of PG&E Corporation, the activities of the

PG&E Corporation CEO and President **focus on** the Utility's **core business**, including most

notably **safety.**"[118]

398.   During the Class Period, PG&E repeatedly acknowledged that "[s]afety is at the

heart of everything we do at PG&E" (Geisha Williams, July 27, 2017 Analyst Call), that safety

was PG&E's "top priority" (Patrick Hogan, November 18, 2015 California Senate Sub-

Committee Hearing), and that "[n]othing is more important than the safety of our customers,

employees and the communities we serve" (Kevin Dasso, vice president of Electric Asset

Management, May 10, 2017 Press Release). PG&E further represented to the public that PG&E's

safety and compliance were closely monitored by the Company's management and the Exchange

Act Individual Defendants.  For instance, the PG&E Board's Finance Committee was alleged in

a separate lawsuit over the Butte Fire – where litigation is still ongoing – to have been "actively

involved in, and responsible for, assisting the Boards in their oversight of safety risk through its

review of strategies to manage the largest individual risks identified in the enterprise risk

management program," including the risk of "wildfire." Indeed, because the Company faced the

possibility of strict liability for property damages caused by wildfires, and such liability could

not only be extraordinary but also non-reimbursable if its officers had not acted "prudently,"

wildfire safety was a particular focus of the Exchange Act Individual Defendants, who spoke

personally on the subject with investors and regulators throughout the Class Period.  Further,

---

[118] Summary of Corporate Structure of Pacific Gas and Electric Company (U 39 M) and
PG&E Corporation (Cal. Public Utilities Commission filed Jan. 16, 2019),
http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M263/K658/263658434.PDF.

Case 18-30088   Doc# 5371-10   Filed 01/14/20   Entered 01/14/20 13:26:59   Page 130
of 294

1    Defendants' repeated misrepresentations about PG&E's safety and compliance record concerned

2    the Company's core operations. Therefore, the Exchange Act Individual Defendants, by virtue of

3    the importance of safety to the Company and their positions as its leaders, reasonably had

4    knowledge about PG&E's safety and regulatory failures during the Class Period.

5        399.   As discussed in Sections VI.C. and VI.D., *supra*, the Exchange Act Individual

6    Defendants repeatedly spoke to investors on the specifics of PG&E's vegetation management

7    procedures and results. For example, they kept investors apprised about how many hundreds of

8    thousands of trees the Company was trimming and removing, including how many thousands

9    were "dead or dying." Not only that, but the Exchange Act Individual Defendants also inflated

10   these numbers over time without explanation, raising the number of trees supposedly trimmed or

11   removed from 1.2 million to 1.4 million.  In both reporting and inflating these numbers, the

12   Exchange Act Individual Defendants showed they knew that vegetation management and

13   compliance was important to investors on a granular level.

14       400.   A core operation concerns a company's primary products or services, and it

15   extends to matters of importance that might significantly impact the company's bottom line.

16   There is no question that PG&E's safety policies and procedures were critically important to the

17   Company's operations. In addition to the fact that PG&E repeatedly acknowledged this reality, it

18   is also notable that PG&E is potentially facing $30 billion of liability or more due to its failures,

19   and that California's regulatory regime imposes significant liability for PG&E's vegetation

20   management and other safety failures. This is strong evidence of the centrality of the Company's

21   wildfire safety and compliance regime.

22       401.   In a separate lawsuit that was filed in connection with the Butte Fire, it was

23   publicly alleged – based on discovery and deposition testimony that has **not** yet been publicly

24   revealed – that Exchange Act Individual Defendants Williams and Hogan both served on an

25   Executive Officer Risk & Compliance Committee that was charged with monitoring vegetation

26   management issues. Further, according to the parties litigating against PG&E for injuries caused

27

28

1    by the 2015 Butte Fire, Defendant Hogan's and another individual's[119] deposition testimony

2    purportedly showed that "PG&E knows and accepts that 1-in-100 trees will be non-compliant,

3    and that 1-in-1000 will be touching its powerlines."  As noted above, this means noncompliance

4    for approximately 1.2 million trees in PG&E's territory of 123 million trees, approximately

5    123,000 of which are safety violations in the nature of trees touching its powerlines at any given

6    time.  *See* Section IV.F.4.

7            402.    Just months before the North Bay Fires broke out, United States District Judge

8    Thelton E. Henderson in the Northern District of California ordered that PG&E work with

9    federal prosecutors to retain a monitor to oversee the Company's compliance and ethics

10   programs, and implement "policies and procedures that address threats caused by vegetation," in

11   light of the deadly San Bruno explosion. Order at 3, PG&E Criminal Proceedings, (N.D. Cal.

12   Jan. 26, 2017), ECF No. 916 (the "San Bruno Order"). As part of the sentencing process, PG&E

13   had promised the Court that Defendant Julie Kane – as Chief Ethics and Compliance Officer of

14   the Company – "reports directly to PG&E Corporation's Chairman and CEO" regarding PG&E's

15   compliance efforts, and that "PG&E's senior executives" regularly reviewed the Company's

16   safety and compliance, such that "high-level personnel of the organization ensure its

17   effectiveness." *Id.,* Def's Sentencing Memo. at 6-7, PG&E Criminal Proceedings (N.D. Cal. Jan.

18   9, 2017), ECF No. 906.  Accordingly, Exchange Act Individual Defendants Kane, Earley, and

19   Williams had actual knowledge of PG&E's lack of compliance.

20           403.    Because the Defendants represented that they closely monitored PG&E's

21   critically important safety and compliance, and because PG&E's fire safety practices resulted in

22   thousands of fire safety violations during the Class Period, they knew – or were deliberately

23   reckless in not knowing – that PG&E's level of safety with respect to vegetation management

24   and wildfire prevention did not comport with state law.

25

26

27   _____

      [119] Court filings identify this individual as Dean McFarren, PG&E's Quality Assurance

28   Supervisor.

Case 3:18-cv-03509-EJD   Document 337-19   Filed 09/11/24   Entered 09/11/24 15:26:59   Page 132
of 524

1

**C.    The Federal Court Overseeing PG&E's Probation, Including Safety Monitoring, Has Uncovered Additional Facts Supporting Scienter**

404.    As described above, *see supra* Section IV.F.2., PG&E was convicted of five felony counts for knowingly and willfully violating federal safety standards in causing the deadly San Bruno explosion in September 2010.  On January 26, 2017, Judge Henderson sentenced PG&E to an expansive program of probation, including a corporate compliance and ethics monitorship program, 10,000 hours of community service, expenditure of $3 million to inform the public of its criminal conduct, and a mandate to refrain from any further criminal behavior.  San Bruno Order.

405.    The first condition to PG&E's probation is that it "Not Commit Another Federal, State, or Local Crime During the Term of the Probation." PG&E did not object to this term in its responsive sentencing memorandum. PG&E Sentencing Memorandum at 15, PG&E Criminal Proceedings (N.D. Cal. Jan. 9, 2017), ECF No. 906.  PG&E reassured the Court, prosecutors, the public, and its investors that it would not engage in further criminal acts, including criminally negligent or reckless safety violations.  This condition of PG&E's probation applied to PG&E's electrical operations and gas operations alike.  Accordingly, as of January 8, 2017, PG&E had an unusual motive to deceive investors and conceal its lack of compliance with safety regulations: it needed investors to believe it was meeting the terms of its probation.

406.    On August 14, 2017, Judge Alsup was assigned to preside over the criminal case and PG&E's resulting probation.

407.    After the deadly Camp Fire, Judge Alsup ordered the parties on November 27, 2018 to answer the following questions by December 31, 2018:

> 1. What requirements of the judgment herein, including the requirement against further federal, state, or local crimes, might be implicated were any wildfire started by **reckless operation or maintenance of PG&E power lines**?
>
> 2. What requirements of the judgment herein might be implicated by any inaccurate, slow, or failed reporting of information about any wildfire by PG&E?
>
> 3. What specific steps has the monitor herein taken to monitor and improve PG&E safety and reporting with respect to power lines and wildfires?

Case 3:20303, Doct 3371-10, Filed 08/19/14/20 Entered 08/19/14/19 6:1:26:59 Page 180
140 of 524

1

2

        4. **Provide an accurate and complete statement of the role, if any, of PG&E in causing and reporting the recent Camp Fire in Butte County** and all other wildfires in California since the judgment herein.

3

4

5

6

7

8

9

10

    408.    On December 5, 2018, Judge Alsup requested "that the Office of the California Attorney General advise the Court of its view on one aspect of this question, namely, the extent to which, if at all, **the reckless operation or maintenance of PG&E power lines would constitute a crime under California law**." In response, the Attorney General of California replied that PG&E's actions or failures to act could constitute a range of criminal violations if the Utility was found to be "reckless" in causing California wildfires.[120] The listed potential offenses ranged from "misdemeanor offenses related to vegetation and power lines" to "implied-malice murder and involuntary manslaughter."

11

12

13

14

15

    409.    On January 17, 2019, Judge Alsup issued a tentative finding that "the single most recurring cause of the large 2017 and 2018 wildfires attributable to PG&E's equipment has been **the susceptibility of PG&E's distribution lines to trees or limbs falling onto them** during high-wind events."[121]

16

17

18

19

20

21

22

    410.    On January 30, 2019, Judge Alsup held a probationary hearing to determine whether PG&E's conduct had violated the terms of its probation. Part of the hearing concerned PG&E's failure to inform the probation officer that the Butte County District Attorney's Office was investigating PG&E's role starting several of the North Bay Fires, that the District Attorney considered criminal prosecution, and that it executed a settlement with PG&E to avoid such prosecution. The court made a "**find[ing] that PG&E violated the conditions of probation**," with sentencing to be determined at a later date.[122] Judge Alsup also reminded the Company:

23

24

> [O]ne of the conditions of probation is you will not commit another federal, state, or local crime. It doesn't have to be a pipeline or a natural gas. It can be any crime. You cannot – you've

25

26

27

28

---

[120]Attorney General's Amicus Brief Regarding PG&E's Potential Criminal Liability, PG&E Criminal Proceedings (N.D. Cal. Dec. 28, 2018), ECF No. 954.

   [121] U.S. Response to Court's Order to Show Cause and Request for Comment, PG&E Criminal Proceedings (N.D. Cal. Jan. 17, 2019), ECF No. 970.

   [122] Transcript of Proceedings, PG&E Criminal Proceedings (N.D. Cal. Jan. 31 2019), ECF No. 999.

1

                    got to be on your absolute best behavior. No more crimes. . . .
2                   That's what PG&E is up against now.

3          411.    During the hearing, Judge Alsup reportedly stated: "**[T]here is one very clear-cut**

4  **pattern here: That PG&E is starting these fires**. . . .  PG&E, according to Cal Fire, started the

5  fire. Global warming did not start the fire. According to Cal Fire, PG&E started it, all 17 of

6  them."  Judge Alsup continued, "what do we do[?]  Does the judge just turn a blind eye and say,

7  'PG&E, continue your business as usual.  Kill more people by starting more fires'?"[123]  Judge

8  Alsup heard testimony from PG&E's probation officer, Jennifer Hutchings, concerning the

9  Honey Fire – one of the North Bay Fires for which Cal Fire found evidence of a safety violation

10 and referred further criminal investigation to the relevant district attorney for Butte County.

11 Probation Officer Hutchings testified: "I discovered that there had actually been an extensive

12 investigation done by Butte County, that they were fully prepared to bring criminal charges

13 against Pacific Gas and Electric; that Pacific Gas and Electric had entered into a settlement

14 agreement with them in order to avoid these charges being brought."  **The court then made a**

15 **"find[ing] that PG&E violated the conditions of probation as charged in the Form 12."**

16 Thereafter, the court turned to address whether it "should not impose further condition on PG&E

17 to help protect the public from possible further other crimes of the offender," including the

18 following exchange with PG&E representative:

19         The Court:     Okay. When you say "mitigate," why can't the risk
                          [of wildfire] be zero? Why is it that PG&E should
20                        be permitted to start a single wildfire?"

21         PG&E:          Well, the answer to the first question is bringing the
                          risk to zero is an incredibly complicated series of
22                        policy decisions that have to factor in reliability,
                          cost, safety, and there's a tremendous amount of
23                        analysis that goes into how best to, for instance,
                          make vegetation management decisions and how
24                        aggressive vegetation management should be versus
                          the cost of –

25
                                          . . .
26

27  ───────────────
    [123] Transcript of Proceedings, PG&E Criminal Proceedings (N.D. Cal. Jan. 31 2019), ECF
28  No. 999.

───────────────

| | |
|---|---|
| The Court: | So why is it PG&E says all the time "Safety is our number one thing"? I hear it all the time, "Safety. Safety. Safety," **but it's not really true. Safety is not your number one thing**. |

At the conclusion of this proceeding, PG&E accepted that full compliance with safety regulations, rather than "mitigation," was both possible and PG&E's goal: "[U]ltimately we agree with Your Honor's goal. We think that Your Honor's goal of trying to eliminate the risk is exactly what we all need to be working towards."

412.    On February 6, 2019, attorneys for fire victims provided a submission to Judge Alsup in response to the January 30, 2019 probationary hearing.[124]  The submission compiled data from PG&E's regulators which demonstrated that the Company posed a far greater risk to the public than its peers.  For example, according to the submission, Southern California Edison ("SoCalEd") serves 15 million people across approximately 50,000 square-miles, operating and maintaining 91,375 miles of distribution lines and 1,433,336 electric poles.  By comparison, PG&E services approximately 16 million people throughout a 70,000-square-mile service area, operating and maintaining between 81,000 miles and 115,000 miles of distribution lines and 2,400,000 electric poles.  Yet, despite these similarities in service size and miles of distribution lines, *PG&E's electrical equipment caused 1,208 more wildfires than SoCalEd's equipment between 2014 to 2017* as self-reported to the CPUC.  In total, PG&E's equipment caused 1,552 wildfires, while SoCalEd only caused 344 fires over the same time period.  Put differently, PG&E's equipment caused *4.5 times more wildfires* than SoCalEd.  PG&E's equipment was also responsible for more large-scale fires, including 43 more fires than SoCalEd that burned between 10-99 acres, three more between 100-299 acres, and two more between 300-999 acres.  Similarly, since 2014, the electrical equipment of San Diego Gas & Electric ("SDG&E") caused 109 wildfires with only one wildfire burning over 10 (and below 300) acres.  By contrast, PG&E caused 1,552 wildfires during that same timeframe with 68 of those fires burning over 10 acres.

---

[124] Submission of Attorneys Pitre and Campora in Response to Order dated Jan. 30, 2019, PG&E Criminal Proceedings (N.D. Cal. Feb. 6, 2019), ECF No. 1005.

1        413.    On March 5, 2019, Judge Alsup issued a revised order to show cause as to why

2  the court should not modify the terms of PG&E's probation in light of subsequent

3  submissions.[125]  Judge Alsup's Revised Order further found that this **"record demonstrates that**

4  **PG&E's performance with respect to vegetation management has been dismal**."  Although

5  PG&E had previously balked at new conditions of probation that would require full compliance

6  on the grounds that they would be impossible to achieve, Judge Alsup's March 5, 2019 order

7  rejected that notion:

> To address PG&E's complaints that the vegetation-management conditions proposed in the January 9 order would be unduly expensive, require superhuman efforts, and exceed the requirements of state and federal law, the above conditions would now simply require full compliance with existing law and with the metrics proposed in PG&E's own wildfire mitigation plan. This order rejects PG&E's back-up contention that "perfect compliance" with Section 4293 is impossible due to "densely forested, highly dynamic, living environments, in which conditions can rapidly change" (Dkt. No. 1016 at 9). **The record demonstrates that PG&E's performance with respect to vegetation management has been dismal.** And, not only does the offender provide no evidentiary support for its claim, but anyone who knows the terrain and its vegetation knows that it takes years for trees to grow to the height of PG&E's lines. Regular inspections could easily spot trees that are high enough to present a hazard. If state or federal law is too strict, moreover, PG&E's remedy would be to seek the relaxation of such laws through its well-oiled lobbying efforts. . . .  The proposed conditions would help ensure that, going forward, funds are adequately allocated to PG&E's vegetation management and wildfire mitigation costs.[126]

19        414.    On April 2, 2019, Judge Alsup held a hearing on his second order to show cause

20  in PG&E's probation proceedings.  At the hearing, Judge Alsup stated:

> PG&E over several years allowed the trees that needed to be removed to be built up and did not remove them, did not trim them so that we wound up with a large number of trees that should have been removed by PG&E but weren't.  And that was a major contributing factor, maybe the single-biggest factor, in causing the fires in 2017 and 2018 in Northern California.[127]

[125] Second Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified, PG&E Criminal Proceedings (N.D. Cal. Mar. 5, 2019), ECF No. 1027.

[126] Second Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified, PG&E Criminal Proceedings (N.D. Cal. Mar. 5, 2019), ECF No. 1027.

[127] Transcript of Proceedings at 6-7, PG&E Criminal Proceedings (N.D. Cal. Apr. 2, 2019), ECF No. 1047.

1   Judge Alsup also explained "as we've gotten into the evidence, and I've studied quite a lot of it,

2   again I want to say it's quite clear that PG&E . . . let the tree budget wither so that a lot of trees

3   that should have been taken down were not."  He concluded, "[t]his is a crisis, a crisis that

4   California faces on these wildfires, and PG&E is the single-most culpable entity in the mix. . . .

5   PG&E has started more than – way more than its share of these fires. . .  This is a problem of

6   your own making."

7       415.    Under these circumstances, PG&E's violation of court-imposed probation and

8   California law, while under monitoring and reporting obligations regarding its purported

9   compliance throughout the Class Period, support strong inferences that Defendants knew, or

10  were severely reckless in not knowing, that it failed to comply with relevant laws and regulations

11  when making the false and misleading statements detailed above.

12      416.    As a result, on April 3, 2019, Judge Alsup issued an Order Adopting New

13  Conditions of Probation.  The court modified the terms of PG&E's probation to require it to (i)

14  "fully comply with all applicable laws concerning vegetation management and clearance

15  requirements";  (ii) "fully comply with the specific targets and metrics set forth in its" 2019

16  Mitigation Plan, and (iii) not issue dividends until it was in compliance with all applicable

17  vegetation management requirements, among other conditions.[128]

18      417.    On May 7, 2019, Judge Alsup conducted a sentencing hearing for PG&E's

19  violation of probation.  In a colloquy with PG&E's new CEO William D. Johnson, the Court

20  stated: "one of the biggest problems we've had is that PG&E has been starting a lot of fires, and

21  they had that horrible explosion in San Bruno, and **I just don't think PG&E has put safety**

22  **first.**"  He further reminded the new CEO: "your company **admitted** that it started 17 of those

23  fires in 2017 just in the Wine Country."[129]

24

25

26  [128] Order Adopting New Conditions of Probation, PG&E Criminal Proceedings (N.D. Cal.
    Apr. 3, 2019), ECF No. 1040.

27  [129] Transcript of Proceedings at 11, PG&E Criminal Proceedings, (N.D. Cal. May 7, 2019),

28  ECF No. 1061.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                              128
CONSOLIDATED CLASS ACTION NO. 3:18-cv-03509-EJD

1    418.    During the sentencing hearing, Judge Alsup also observed that while there are

2    other causes of fire, "**no one has started more fires than PG&E**."

3    419.    The magnitude of PG&E's failures show that the Company and Exchange Act

4    Individual Defendants either knew these facts, or were deliberately reckless in not knowing

5    them.  The inference of scienter is made even stronger when combined with the fact that safety

6    was a core operation of PG&E's, as discussed in Section X.B., *supra*.

7          **D.    PG&E's Noncompliance with Safety Regulations Was Well-Known**
               **Throughout the Company, Including at the Highest Levels, with Real-Time**
8              **Access to a Database of Known Safety Violations**

9                **1.    PG&E Recorded Its Violations of Safety Regulations in a**
                       **Sophisticated Database, Readily Accessible by the Exchange Act**
10                     **Individual Defendants**

11   420.    PG&E maintained a database of inspection data to document the condition of its

12   power lines, which provided its personnel with ready access to information about instances of

13   noncompliance with state safety regulations. In a November 8, 2017 article about its pole

14   management and maintenance efforts, PG&E stated that it "**uses a comprehensive database to**

15   **manage these multiple patrol and inspection schedules of our 2.4 million poles.**"[130]

16   421.    This information was used to develop the company's *Mobile Asset Inspection*

17   application that provided "electric power inspectors in the field with real-time information

18   including maps, customer information, safety and access information."[131] The system was

19   developed in 2016 and had become sophisticated enough by 2017 to win *InformationWeek*'s IT

20   Excellence Award in the Data and Analytics category.[132]  The article further states that

21   "[s]atellite maps were layered with the location of PG&E's two million electric poles along**

22   **with decades' worth of data on each individual pole.**"[133]  PG&E's 2016 Corporate

23   ───────────────────────────────

24   [130] *Facts about PG&E Pole Management and Maintenance*, Currents, PG&E (Nov. 8, 2017),
     http://www.pgecurrents.com/2017/11/08/facts-about-pge-pole-management-and-maintenance/.

25   [131] Press Release, PG&E, *Innovative App for PGE Field Crews Earns InformationWeek IT*
     *Excellence Award* (May 22, 2017), http://investor.pgecorp.com/news-events/press-
26   releases/press-release-details/2017/Innovative-App-for-PGE-Field-Crews-Earns-
     InformationWeek-IT-Excellence-Award/default.aspx.

27   [132] *Id.*

28   [133] *Id.*

1    Responsibility and Sustainability Report announced that a Margaret Mooney Award for

2    Innovation was awarded to its "Data Visualization—Google Earth SAP team, which created a

3    new technology that provides work crews with a dramatically enhanced data visualization of

4    **work in progress**." The report further mentioned "[t]he development of an SAP-based

5    **compliance tool** that can analyze trends and inform [PG&E's] risk management efforts." Thus,

6    PG&E used sophisticated software that kept track of its safety regulation noncompliance for its

7    powerlines and poles in real time.

8        422.    PG&E assigns a unique "pole SAP ID number" that corresponds to each pole's

9    data.[134] According to an *InformationWeek* article about PG&E's mobile application, "**[t]he

10   status of a pole's inspection is tracked in SAP [database technology] so the inspection team

11   knows when it's time to inspect each pole**. That information flows into the enterprise platform

12   PG&E built, which pushes electronic lists to inspectors' iPad Pros."[135] The data collected is

13   extensive enough to enable "an enterprise data and analytics organization that is using advanced

14   analytics to predict when poles will fail."[136] And by 2017, the PG&E Corporate Responsibility

15   and Sustainability Report mentions that the company's "SAP-based tool" was used to analyze

16   trends in environmental compliance. Thus, PG&E's records of safety regulation violations were

17   stored in a readily accessible database. Defendants Earley, Williams, Stavropoulos, Kane, Johns,

18   and Hogan each had easy access to this database.

19       423.    Furthermore, in its submissions to Judge Alsup in the Company's criminal

20   probation, PG&E represented that it conducts quality assurance audits to obtain "real time"

21   assessments of its vegetation management compliance:

22           PG&E has also implemented checks on its contractors' vegetation
             management work as another way to monitor compliance. For
23           example, PG&E conducts audits and reviews of its vegetation

24   ———————————————————
     [134] PG&E Pole Data Request Form, PG&E (Aug. 9, 2017),
25   https://www.pge.com/pge_global/common/pdfs/safety/yard-safety/powerlines-and-trees/pole-
     data-request-form.pdf.
26       [135] Lisa Morgan, *PG&E's Winning Recipe for a Mobile Asset Inspection App*,
     InformationWeek (June 29, 2017), https://www.informationweek.com/big-data/pgandes-
27   winning-recipe-for-a-mobile-asset-inspection-app/d/d-id/1329251.
         [136] *Id*.
28

1
2
3

management program to assess the quality of contractors' work and compliance with PG&E's standards and legal requirements, including Public Resource Code § 4293. PG&E's audit and review process consists primarily of two programs, Quality Control ("QC") and Quality Assurance ("QA"). . . . .

4
5
6
7
8

**PG&E's QA audits are designed to obtain a "real-time" assessment of PG&E's vegetation management program and whether the conditions in its service territory are consistent with PG&E's legal obligations**. To ascertain a **true "real-time" condition** of the program, audits are performed throughout the year. . . . The audits indicate whether any identified issues pose compliance violations or potential violations (e.g., potential violation may occur within 90 days).[137]

9
10
11
12
13
14
15

424.    Further, in those same criminal probation proceedings, Judge Alsup found that PG&E has admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'"  Such a precise admission confirms the existence of such a database, awareness of its contents showing that vegetation management violations were widespread during the Class Period, and access to that information by the highest levels.

16
17
18
19

425.    Consequently, it is clear that PG&E was noncompliant with safety regulations concerning vegetation management and pole integrity, and that such facts would have been documented electronically, stored in an accessible SAP database, and available to PG&E personnel throughout the Company in real-time.  Defendants Earley, Williams, Stavropoulos, Kane, Johns, and Hogan each had easy access to this database.

20
21
22

2.    **PG&E Instituted a Culture Among Its On-the-Ground Employees of Reporting Problems up the Corporate Chain, Which Upper Management Was Aware of and Monitored**

23
24
25
26

426.    PG&E repeatedly touted the culture among its lower-level employees that encouraged reporting safety problems up the chain of management. Further, the Exchange Act Individual Defendants touted their knowledge and familiarity with this practice at the Company,

27
28

―――――――――
[137] PG&E Response to Request for Information at 12, PG&E Criminal Proceedings (N.D. Cal. Feb. 22, 2019), ECF No. 1016.

1    indicating either they personally received information of safety violations this way, or they knew

2    where to find such information but deliberately avoided it.

3         427.    On August 18, 2016, PG&E issued a press release titled "PG&E Becomes First

4    Natural Gas Utility to Receive Process Safety." It contained a description of an internal

5    Company policy termed "**The Corrective Action Program, a program that empowers**

6    **employees at all levels of PG&E to speak up and identify issues that are in need of**

7    **improvement**."

8         428.    On November 4, 2016, PG&E hosted a conference call with analysts to discuss its

9    financial results for the third quarter of 2016. In his prepared remarks, Earley elaborated on

10   PG&E's culture of encouraging "every employee" to report safety violations up the chain of

11   command, as follows:

> **We also wanted to make sure that every employee felt comfortable raising concerns, no matter how big or small, so we made a number of changes to encourage all employees to speak up when something doesn't seem right. For example, we worked with our unions to develop a non-punitive self-reporting policy.**
>
> We've also adapted the nuclear industry's corrective action program **across the Company**, to **make it easy for employees to report things that need to be fixed. In fact, employees can now report corrective action items through a simple app on their smart devices. And we've created a number of awards to publicly recognize employees when they do speak up, so that we are encouraging and reinforcing that behavior.**
>
> \* \* \*
>
> **The improvements we have made in safety and reliability over the last six years have put us in a position to deliver strong financial results going forward.**
>
> **Earlier this year, we announced our first dividend increase in six years, and we have committed to achieving a roughly 60% payout ratio by 2019.** Combined with our expected rate based growth, we are confident we can deliver a strong overall return for our shareholders.

25        429.    Thus, PG&E went significantly beyond making employees feel safe "report[ing]

26   things that need to be fixed." The CEO himself took credit for "mak[ing] sure that every

27   employee felt comfortable raising concerns" and "encourag[ing] all employees to speak up"

Case 18-30088   Doc# 5371-50   Filed: 01/14/20   Entered: 01/14/20 15:26:59   Page 142
of 524

1  "**across the Company**" – *i.e.,* **not just at the lower levels.** Further, by virtue of the fact that the

2  CEO personally took credit for this phenomenon within the company, it indicates his awareness

3  of what employees actually reported. Indeed, he stated that he was involved in "publicly

4  recogniz[ing] employees when they do speak up."

5        430.  As a result, the persistence of safety violations cannot be attributed to their being

6  unknown.  Rather, such problems persisted because of what the Exchange Act Individual

7  Defendants did – or failed to do – to mitigate safety problems once they were reported.  Indeed,

8  PG&E's inadequate safety compliance did not stem from a lack of information but rather a lack

9  of willingness to devote sufficient Company funds to remediate problems, as detailed above (*see*

10  Sections VI.B.-J., *supra*).

11        431.  Earley's statement also affirms the direct connection between PG&E's treatment

12  of safety issues, the Company's long-term financial results, and the size of its dividend.  Indeed,

13  as the truth emerged regarding PG&E's insufficient safety compliance during the Class Period

14  (as alleged above, *see* Section IX, *supra*), the market understood the connection between the

15  Company's safety violations and the foreseeable, material detriment they would have on the

16  Company's financial results and dividend.

17        **E.  PG&E's Compliance Statements Were Authorized by Defendant Kane and Were Made under Her Ultimate Authority**

18

19        432.  Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer

20  ("CECO"), controlled and authorized all of PG&E's statements regarding compliance during the

Class Period. These statements were approved and made under her ultimate authority as CECO.

21        433.  PG&E established the CECO role on March 24, 2015 "to strengthen its ethics and

22  compliance program and performance,"[138] a role which Kane assumed on May 18, 2015 and held

23

24  ——————————————

[138] Press Release, PG&E, *PG&E Appoints Julie M. Kane to New Position as Senior Vice*
25  *President and Chief Ethics and Compliance Officer; Company Takes Next Step Toward Goal of*
*Establishing a Best-in-Class Corporate Ethics Program* (Mar. 25, 2015),
26  https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20150324_pge_appoints
_julie_m_kane_to_new_position_as_senior_vice_president_and_chief_ethics_and_compliance_
27  officer_company_takes_next_step_toward_goal_of_establishing_a_best-in-
class_corporate_ethics_program.
28

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT     133
CONSOLIDATED CASE NO. 18-CV-03509-EJD

1  through the end of the Class Period.  As CECO, she was responsible for both managing

2  implementation of PG&E's legal compliance efforts as well as overseeing compliance

3  monitoring and reporting during almost the entirety of the Class Period.  When PG&E was being

4  sentenced for its criminal negligence in causing the San Bruno explosion, it admitted in its

5  January 9, 2017 sentencing memorandum that "Ms. Kane is responsible for **overseeing** the

6  Company-wide compliance and ethics program, including **compliance management**, risk-

7  mitigation **and reporting**; **overseeing employee-investigatory processes**; and reinforcing

8  PG&E's ethics and compliance culture, among many other compliance and ethics program

9  elements."  The same filing confirmed that "The CECO, Julie Kane, reports directly to PG&E

10 Corporation's Chairman and CEO, and is accountable to PG&E Corporation's and PG&E's

11 Boards of Directors, with additional reporting responsibility to the Compliance and Public Policy

12 Committee of PG&E Corporation's Board and the Audit Committees of PG&E Corporation's

13 and PG&E's Boards."

14        434.   Accordingly, Kane was apprised of any compliance violations reported within the

15 Company, including violations reported by PG&E's lower-level employees and logged in

16 PG&E's central database detailed *supra*, at all times when PG&E misrepresented to investors

17 that it was in compliance (*e.g.*, ¶197 (Misstatement No. 2, October 16, 2015); ¶211

18 (Misstatement No. 4, October 6, 2016); ¶222 (Misstatement No. 5, August 9, 2017); ¶249

19 (Misstatement No. 9, October 31, 2017); ¶270 (Misstatement No. 12, November 5, 2017); ¶280

20 (Misstatement No. 13, May 25, 2018); ¶¶287, 296 (Misstatement Nos. 14 & 15, June 8, 2016);

21 ¶300 (Misstatement No. 16, September 27, 2018); ¶¶303, 309 (Misstatement Nos. 17-18,

22 October 9, 2018); and ¶314 (Misstatement No. 19, November 8, 2018)).

23        435.   The CECO position was sufficiently senior such that Kane's scienter can be

24 imputed to the Company regarding knowledge of legal compliance with California vegetation

25 management and safety regulations.

26        436.   Additionally, because Kane reported directly to the CEO in her capacity as

27 CECO, her knowledge of safety violations can be imputed to both CEOs, Earley and

28

Case 3:20-30 9 - Docket 1321 - Filed 08/19/4 /20 - Entered 08/19/43.6 1:226:59 - Page 444 of 524

Case 18-20089   Doc# 3371-10   Filed 08/19/19   Entered 08/19/19 16:15:49   Page 144
of 524
15 of 29

1    Williams.[139] Because Kane was institutionally installed to advise the CEO of PG&E's

2    compliance and safety, Kane would have told Earley and Williams what she knew regarding the

3    Company's noncompliance with vegetation management regulations, or Earley and Williams

4    would have been deliberately reckless in speaking on the subjects of compliance and safety

5    without input from their CECO.

6    ### F.    The Threat of a Potential Bankruptcy Gave Defendants a Strong Motive to Mislead Investors

7

8    437.    PG&E is currently facing approximately $17 billion in liability over the North

     Bay Fires and $13 billion for the Camp Fire, of which the Company has already recorded

9    anticipated losses totaling over $14 billion. This immense exposure dwarfs the $1.6 billion that

10   the Company reported it earned in the full year 2017—a performance not likely to be repeated

11   given the substantial increase in PG&E's required vegetation management and other safety

12   compliance expenditures.

13   438.    Once the North Bay Fires began, it was clear to Defendants that PG&E's liability

14   could have severe repercussions for the Company's financial condition, and for the careers of the

15   Exchange Act Individual Defendants.  This was true even before the flight of PG&E's officers

16   and directors and the Company's bankruptcy.

17   439.    One California legislator reported on June 15, 2018 that "[i]n this Capitol, they

18   [PG&E] keep talking about the sky is falling, that they're going to go bankrupt and what are we

19   going to do, and they're creating a lot of fear in the Capitol." On July 31, 2018, *Reuters* further

20   reported that an anonymous source had leaked that PG&E hired a prominent law firm to "explore

21   debt restructuring options," as well as the possibility of "breaking up the company."  On August

22   1, 2018, California Governor Jerry Brown even cautioned the public that "there is concern that

23   we could lose our utilities."

24   440.    The reason for these dire warnings was simple: PG&E wanted to rush through

25   legislation that would grant it additional defenses and a lower bar to be reimbursed for their part

26

27   _____

     [139] Further, she reported directly to the Company's Chairman of the Board, a position which

28   was also occupied by Earley during the Class Period.

Case 18-30088   Doc# 3371-10   Filed 08/14/20   Entered 08/14/20 19:51:26:59   Page 145
of 524
152 of 524

1    in causing the North Bay Fires.  After the North Bay Fires had erupted, the threat of bankruptcy

2    and the narrow possibility of a legislative bail-out gave PG&E and the Exchange Act Individual

3    Defendants had an unusual motivation to hide their culpability.

4            441.    It was within this context that PG&E falsely and misleadingly told investors, *inter*

5    *alia*, that "***PG&E meets or exceeds all applicable federal and state vegetation clearance***

6    ***requirements***," and that "***we've doubled the amount that we've invested in veg[etation]***

7    ***management***." PG&E had an unusual motive to make these and other statements after the North

8    Bay Fires erupted: to conceal its wrongdoing long enough to secure the liability bailout it was

9    seeking from the California legislature.

10           442.    Indeed, this would not be the first time that a large potential liability caused

11   PG&E to act unethically.  When PG&E faced a substantially ***lower*** liability for its role in the

12   deadly San Bruno explosion, the Company engaged in improper "back-channel"

13   communications with its regulators that ultimately resulted in a $97.5 million fine that was

14   imposed in April 2018. A federal jury also found PG&E to be guilty of six criminal charges,

15   including obstruction of justice, related to that blast that killed eight people.

16           **G.    After PG&E Failed to Follow Its ESRB-8 Shutoff Protocol and Caused the**
             **Camp Fire, PG&E Attempted to Cover It Up**

17

18           443.    As noted above, the public learned after the Camp Fire erupted that PG&E did not

19   shut down its Caribou-Palermo transmission line that ignited the Camp Fire, despite the

20   Company's ESRB-8 Shutoff Protocol.  As further detailed above, PG&E faced criticism from a

21   variety of sources for that decision, as well as significant decreases to its share price.  *See*

22   Section IX.D.6, *supra*.

23           444.    While the Camp Fire continued to burn, the Company insisted that its ESRB-8

24   Shutoff Protocol would not have included the Caribou-Palermo transmission line.

25           445.    For example, in a November 16, 2018 statement reported by *KQED News*, PG&E

26   spokeswoman Deanna Contreras stated in an email to the reporter: "However, in light of the

27   potential public safety issues resulting from de-energizing higher voltage transmission lines,

28   including the potential to impact millions of people and create larger system stability issues for

1  the grid, PG&E has not extended the (shutoff) program to transmission lines that operate at

2  115kV or above."[140]

3        446.    Similarly, in a November 22, 2018 statement reported by *Mercury News*, PG&E

4  spokeswoman Lynsey Paulo said to the reporter: "In light of the potential public safety issues

5  resulting from de-energizing higher voltage transmission lines, including the potential to impact

6  millions of people and create larger system stability issues for the grid, PG&E has not extended

7  the (shutoff) program to transmission lines that operate at 115kV or above."[141]  Spokeswoman

8  Paulo "added that the Federal Energy Regulatory Commission (FERC) regulates transmission

9  lines and such an emergency shutdown would need to be coordinated with the California

10 Independent System Operator, which oversees the state's power grid."  But as the article further

11 reported:

12        But state and federal regulators say PG&E can shut down
         transmission lines of any size at its own discretion.
13
         "The transmission owners are solely responsible for operating their
14       transmission and distribution lines and they can de-energize
         transmission and distribution lines without seeking approval from
15       the ISO, with or without prior notice," Cal ISO spokesman Steven
         Greenlee said. "The transmission owner tells us that they are de-
16       energizing a line and if a 230kV or 500kV line is de-energized it
         may require (us) to re-dispatch generation if the remaining lines
17       become heavily loaded. This is a practice we perform every day
         with scheduled work and unplanned outages."
18
         CPUC spokeswoman Terrie Prosper also said the decision is up to
19       the individual utility.

20       "Utilities can de-energize whatever lines and voltage they deem
         appropriate," Prosper said. "They typically de-energize distribution
21       lines because those lines are more localized than transmission
         lines."
22
         FERC Spokesman Craig Cano said PG&E would not need its
23       approval to cut power to high-voltage lines for safety reasons.

24    ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
      [140] Dan Brekke, *PG&E: High-Voltage Transmission Lines Not Covered by Fire Safety
25    Shutdown Plan*, KQED (Nov. 16, 2018), https://www.kqed.org/news/11706846/pge-high-
      voltage-transmission-lines-not-covered-by-fire-safety-shutdown-plan.
26    [141] Matthias Gafni, *Camp Fire: Map Shows Where PG&E Had Planned to Shut Down Power
27    Ahead of Blaze*, Mercury News (Nov. 22, 2018),
      https://www.mercurynews.com/2018/11/22/maps-show-where-pge-had-planned-to-shut-down-
28    power-ahead-of-camp-fire/.

---

"FERC-approved standards address transmission system reliability and explicitly exclude safety matters, which could be the reason for shutting down a power line in response to wildfires or to mitigate the risk of fires," he said.

447.   PG&E's entire response, including its denial that its ESRB-8 Shutoff Protocol would not have included the Caribou-Palermo transmission line, **was not true**.

448.   First, PG&E's published ESRB-8 Shutoff Protocol never mentioned a limitation on 115-kilovolt transmission lines or in fact any transmission lines.[142]  However, pursuant to CPUC's Resolution ESRB-8, PG&E was required to both "Make available and post a summary of de-energization policies and procedures on its website" and "Provide its de-energization and restoration policy **in full**, and in summary form, to the affected community officials before de-energizing its circuits."[143]  Because a limitation on transmission lines was never mentioned in PG&E's ESRB-8 Shutoff Protocol, it did not exist.

449.   Second, PG&E had never mentioned this exclusion for 115-kilovolt transmission lines, even unofficially, until **after** it faced criticism for deciding not to shut down its Caribou-Palermo transmission line and causing the Camp Fire.

450.   Third, when PG&E first shut off electricity under its ESRB-8 Shutoff Protocol on October 14 through 17, 2018, by its own admission, PG&E shut off **both** transmission and distribution lines.  Specifically, PG&E shut off eight transmission power line circuits and thirty-three distribution power line circuits, as detailed in its later filing to CPUC.[144]  This admission confirms that PG&E's ESRB-8 Shutoff Protocol did not include a limitation on shutting down transmission lines.

[142] *See generally* PG&E Public Safety Power Shutoff Policies and Procedures, PG&E website (Sept. 2018), https://www.pge.com/pge_global/common/pdfs/safety/emergency-preparedness/natural-disaster/wildfires/Public-Safety-Power-Shutoff-Policies-and-Procedures-September-2018.pdf.

[143] Resolution Extending De-Energization Reasonableness, Notification, Mitigation And Reporting Requirements In Decision 12-04-024 To All Electric Investor Owned Utilities, (Cal. Public Utilities Commission July 16, 2018), http://docs.cpuc.ca.gov/publisheddocs/published/g000/m218/k186/218186823.pdf.

[144] Letter from PG&E to CPUC re: compliance report (Oct. 31, 2018), http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Utilities_and_Industries/Energy_-_Electricity_and_Natural_Gas/PGE%20PSPS%20Report%20Letter%2020181031.pdf.

451. The same conclusion is confirmed by a telling revision PG&E made to otherwise identical text in two succeeding reports to the CPUC—the first being its October "Public Safety Power Shutoff Report" regarding the October shutoff,[145] and the second being its November "Public Safety Power Shutoff Report" **after the Camp Fire**. Therein, PG&E made the following revelatory insertion:

> [PG&E has] reached out to more than 570,000 homes and businesses that are served by our electric lines, operating at 70kV and lower, that run through extreme fire-threat areas. We have communicated to these customers through several formats (letter, email, TV and print ads, social media and news stories) that, if extreme fire danger conditions were forecasted, it might be necessary to temporarily turn off power to their neighborhood or community for safety.

(Underlining added to signify PG&E's addition.) The absence of such language in its October 2018 shutoff report, in an otherwise identical paragraph, confirms that an exclusion for 115-kilovolt transmission lines was never part of PG&E's ESRB-8 Shutoff Protocol.

452. Finally, PG&E was required to answer questions posed by the CPUC's Safety and Enforcement Division after the North Bay Fires, which PG&E submitted on October 17, 2017.[146] The Safety and Enforcement Division asked: "Has PG&E proactively de-energized power lines in the last 10 days without being requested to do so by CAL FIRE? If so, please provide information about location, duration and reasons for doing so." In response, PG&E stated that it had de-energized **two** 115-kilovolt lines in 2017 to prevent wildfires:

> PG&E de-energized multiple transmission lines as described below without the direction of CAL FIRE:
>
> . . .
>
> 3. On 10/9 at 0644, PG&E de-energized the Fulton-Santa Rosa #1-**115kV line** due to fire in the area. The line was returned to service on 10/9 at 1455.

---

[145] Letter from PG&E to CPUC re: compliance report (Oct. 31, 2018), http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Utilities_and_Industries/Energy_-_Electricity_and_Natural_Gas/PGE%20PSPS%20Report%20Letter%2020181031.pdf.

[146] PG&E's Response to Safety and Enforcement Divisions' 10/14/17 Questions, CPUC website (Oct. 17, 2017), http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/Response%20to%20Data%20Request.pdf.

1                  4. On 10/9 at 0644, PG&E de-energized the Fulton-Santa Rosa #2-
2                  **115kV line** due to fire in the area. The line was returned to service
                  on 10/14 at 1044.

3      453.    As such, it was affirmatively false that PG&E's ESRB-8 Shutoff Protocol

4 excluded transmission lines of any kind.  It was also false that PG&E's ESRB-8 Shutoff Protocol

5 excluded 115-kilovolt transmission lines in particular.

6      454.    PG&E's representations after the Camp Fire that such exclusions existed – when

7 they did not exist – amount to a cover-up, and evidence the Company's scienter.  It is a

8 continuation of PG&E's deliberate efforts to conceal the unsafe operations of its utilities, as

9 further exposed by CPUC's allegations that the Company falsified records and data concerning

10 the safety of its utilities from 2012 through 2017.  *See* ¶99, *supra*.

**H.      PG&E's Unprecedented Departure of Officers and Directors Strengthens the
          Inference of Scienter**

455.    On January 13, 2019, PG&E announced the abrupt departure of its CEO and

President, Defendant Williams.[147]  To explain Williams's unceremonious departure—less than

two years after she became CEO in March 2017—PG&E's May 17,  2019, preliminary proxy

statement began with a letter to shareholders from the PG&E Board of Directors, stating:

> "The tragic events of the past few years have made clear that the
> energy system status quo is no longer working for California. We
> have heard the calls for change and are committed to answering
> them with strong actions that will help us re-earn the trust of all
> our stakeholders. **This starts at the top. We replaced PG&E
> Corporation's CEO and the vast majority of our Boards of
> Directors with experienced people with the commitment and
> expertise necessary to redirect our safety culture** and navigate
> one of the most complex corporate reorganizations ever."

456.    Thus, shortly after Williams's departure, PG&E admitted that she lacked the

commitment and expertise necessary for safety.  In the same letter, PG&E argued its Chapter 11

bankruptcy would ultimately provide "a reorganized enterprise with refreshed management and

Board members who are committed to safety and reliability in all aspects of our business."

---

[147] J.D. Morris, *PG&E CEO Geisha Williams Out Amid Utility's Widening Financial Crisis*,
San Francisco Chronicle (Jan, 13, 2019), https://www.sfchronicle.com/business/article/PG-E-
CEO-Geisha-Williams-out-amid-utility-s-13530807.php.

457.    In addition to Williams's departure, three senior executives in PG&E's electric division also left the Company after the 2017 or 2018 fires.  Earley left his position as Executive Chairman of the Company in December 2017, Stavropoulos left his position as COO in September 2018, and Hogan left his position as Senior Vice President of Electric Operations in January 2019.  As a consequence, it may be inferred that the Company had widespread dissatisfaction with its officers' and directors' commitment and expertise necessary for safety beyond just Williams.

458.    Indeed, on February 11, 2019, PG&E issued a press release stating that it would be replacing the majority of its Boards.  As of today, only two Board members out of 13 have not been replaced.  In a further expression of lack of support for the Company's previous leadership, the release acknowledged "that **PG&E must re-earn trust and credibility** with its customers, regulators, the communities it serves and all of its stakeholders . . . ."

## XI.   APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET FOR THE EXCHANGE ACT CLAIMS

459.    For the Exchange Act claims, Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's securities traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)    Lead Plaintiff and other members of the Class purchased PG&E securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

460.    At all relevant times, the market for PG&E securities was efficient for the following reasons, among others:

1          (a)     PG&E stock met the requirements for listing, and was listed and actively

2    traded on the NYSE, a highly efficient and automated market;

3          (b)     As a regulated issuer, PG&E filed periodic public reports with the SEC

4    and the NYSE;

5          (c)     PG&E regularly communicated with public investors via established

6    market communication mechanisms, including through the regular dissemination of press

7    releases on the major newswire services and through other wide-ranging public disclosures, such

8    as communications with the financial press, securities analysts and other similar reporting

9    services; and

10          (d)     PG&E was followed by numerous securities analysts employed by major

11   brokerage firms who wrote reports that were distributed to the sales forces and certain customers

12   of their respective brokerage firms. Each of those reports was publically available and entered

13   the public marketplace.

14          461.    As a result of the foregoing, the market for PG&E securities promptly digested

15   current information regarding PG&E from publicly available sources and reflected such

16   information in PG&E's stock price. Under these circumstances, all purchasers of PG&E

17   securities during the Class Period suffered similar injury because of their purchases of securities

18   at artificially inflated prices and a presumption of reliance applies.

19          462.    Lead Plaintiff is also entitled to a presumption of reliance under the Supreme

20   Court's decision in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), and its progeny,

21   as Defendants' misstatements throughout the Class Period included omissions, in that they failed

22   to inform investors of PG&E's safety and regulatory failures.

23   **XII.   CLASS ACTION ALLEGATIONS FOR THE EXCHANGE ACT CLAIMS**

24          463.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

25   Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

26   otherwise acquired PG&E securities traded on the NYSE during the Class Period (the "Class")

27   and were damaged thereby. Excluded from the Class are the excluded persons defined in ¶11,

28   *supra*.

464.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, PG&E securities were actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by PG&E or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

465.     Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

466.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

467.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and safety of PG&E;
- whether Defendants caused PG&E to issue false and misleading financial statements during the Class Period;
- whether Defendants acted with actual knowledge of falsity or recklessly in issuing false and misleading financial statements;
- whether the prices of PG&E securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein;

- whether some or all of Defendants' false and misleading misstatements or omissions served to maintain PG&E's inflated securities prices; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

468.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

469.    Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine, as discussed above in ¶¶459-462.

470.    Based upon the foregoing, Lead Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## XIII.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### FIRST CLAIM

**For Violation of Section 10(b) of The Exchange Act and Rule 10b-5
Against PG&E and the Exchange Act Individual Defendants**

471.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

472.    This Count is asserted against PG&E and the Exchange Act Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

473.    During the Class Period, PG&E and the Exchange Act Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

---

474.    PG&E and the Exchange Act Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of PG&E securities during the Class Period.

475.    PG&E and the Exchange Act Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of PG&E were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of PG&E, their control over, and/or receipt and/or modification of PG&E's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning PG&E, participated in the fraudulent scheme alleged herein.

476.    Exchange Act Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other PG&E personnel to members of the investing public, including Lead Plaintiff and the Class.

477.    As a result of the foregoing, the market price of PG&E securities was artificially inflated during the Class Period. In ignorance of the falsity of PG&E's and the Exchange Act Individual Defendants' statements, Lead Plaintiff and the other members of the Class relied on

1    the statements described above and/or the integrity of the market price of PG&E securities

2    during the Class Period in purchasing PG&E securities at prices that were artificially inflated as

3    a result of PG&E's and the Exchange Act Individual Defendants' false and misleading

4    statements.

5        478.    Had Lead Plaintiff and the other members of the Class been aware that the market

6    price of PG&E securities had been artificially and falsely inflated by PG&E's and the Exchange

7    Act Individual Defendants' misleading statements and by the material adverse information which

8    PG&E's and the Exchange Act Individual Defendants did not disclose, they would not have

9    purchased PG&E's securities at the artificially inflated prices that they did, or at all.

10       479.    As a result of the wrongful conduct alleged herein, Lead Plaintiff and other

11   members of the Class have suffered damages in an amount to be established at trial.

12       480.    By reason of the foregoing, PG&E and the Exchange Act Individual Defendants

13   have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are

14   liable to the plaintiff and the other members of the Class for substantial damages which they

15   suffered in connection with their purchase of PG&E securities during the Class Period.

16                            **SECOND CLAIM**

17                    **For Violation of Section 20(a) of**
                  **The Exchange Act Against PG&E Corporation**

18

19       481.    Lead Plaintiff repeats and realleges each and every allegation contained in the

20   foregoing paragraphs as if fully set forth herein.

21       482.    This Count is asserted pursuant to Section 20(a) of the Exchange Act against

22   Defendant PG&E Corporation.

23       483.    During the Class Period, PG&E Corporation participated in the operation and

24   management of the Utility. PG&E Corporation conducted and participated, directly and

25   indirectly, in the conduct of the Utility's business affairs. For the years of 2015-2017, **100%** of

26   PG&E Corporation's directors also sat on the board of the Utility, and **over 90%** of the Utility's

27

28

---

1  directors also sat on the board of PG&E Corporation.[148]  Further, both companies filed joint

2  annual reports on Form 10-K with the SEC throughout the Class Period, the entirety of which

3  filings were certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by officers of **both**

4  Companies. Further, because of its 100% ownership and authority, PG&E Corporation knew the

5  adverse non-public information regarding the Company's financial condition and noncompliance

6  with relevant laws and regulations.

7         484.  Through its position as sole owner of the Utility and placement of its own

8  Independent Directors on the Utility's Board of Directors, PG&E Corporation had a duty to

9  disseminate accurate and truthful information with respect to the Utility's financial condition and

10  results of operations, and to correct promptly any public statements issued by the Utility which

11  had become materially false or misleading.

12         485.  Because of its position as sole owner of the Utility and placement of its own

13  Independent Directors on the Utility's Board of Directors, PG&E Corporation was able to, and

14  did, control the contents of the various reports, press releases and public filings which the Utility

15  disseminated in the marketplace during the Class Period. Throughout the Class Period, PG&E

16  Corporation exercised its power and authority to cause the Utility to engage in the wrongful acts

17  complained of herein. PG&E Corporation, therefore, was a "controlling person" of the Utility

18  within the meaning of Section 20(a) of the Exchange Act. In this capacity, it participated in the

19  unlawful conduct alleged which artificially inflated the market price of PG&E securities.

20

---

21     [148] 2015: Lewis Chew, Earley, Fred J. Fowler, Maryellen C. Herringer, Richard C. Kelly,
Roger H. Kimmel, Richard A. Meserve, Forrest E. Miller, Rosendo G. Parra, Barbara L. Rambo,

22  Anne Shen Smith, and Barry Lawson Williams were directors of both PG&E Corporation and
the Utility, whereas Johns was a director of the Utility only.

23     2016: Lewis Chew, Earley, Fred J. Fowler, Maryellen C. Herringer, Richard C. Kelly, Roger

24  H. Kimmel, Richard A. Meserve, Forrest E. Miller, Rosendo G. Parra, Barbara L. Rambo, Anne
Shen Smith, and Barry Lawson Williams were directors of both PG&E Corporation and the

25  Utility, whereas Stavropoulos and Williams were directors of the Utility only.

26     2017: Lewis Chew, Earley, Fred J. Fowler, Maryellen C. Herringer, Jeh C. Johnson, Richard
C. Kelly, Roger H. Kimmel, Richard A. Meserve, Forrest E. Miller, Eric D. Mullins, Rosendo G.

27  Parra, Barbara L. Rambo, Anne Shen Smith, Barry Lawson Williams, and Williams were
directors of both PG&E Corporation and the Utility, whereas Stavropoulos was director of the

28  Utility only.

---

486.     By reason of the above conduct, PG&E Corporation is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Utility.

### THIRD CLAIM

**For Violation of Section 20(a) of The Exchange Act
Against The Exchange Act Individual Defendants**

487.     Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

488.     During the Class Period, the Exchange Act Individual Defendants participated in the operation and management of PG&E.  The Exchange Act Individual Defendants conducted and participated, directly and indirectly, in the conduct of PG&E's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's financial condition and noncompliance with relevant laws and regulations.

489.     As officers and/or directors of a publicly owned company, the Exchange Act Individual Defendants had a duty to disseminate accurate and truthful information with respect to PG&E's financial condition and results of operations, and to correct promptly any public statements issued by PG&E which had become materially false or misleading.

490.     Because of their positions of control and authority as senior officers, the Exchange Act Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which PG&E disseminated in the marketplace during the Class Period. Throughout the Class Period, the Exchange Act Individual Defendants exercised their power and authority to cause PG&E to engage in the wrongful acts complained of herein. The Exchange Act Individual Defendants therefore, were "controlling persons" of PG&E within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of PG&E securities.

491.     By reason of the above conduct, the Exchange Act Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by PG&E.

# FOURTH CLAIM

## Alter Ego Liability for Violation of Section 10(b) of
## The Exchange Act and Rule 10b-5 Against PG&E Corporation

492.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

493.    PG&E Corporation is jointly and severally liable for the misstatements and omissions of the Utility, insofar as:

(a)    PG&E Corporation and the Utility operate as a single business enterprise operating out of the same building located at 77 Beale Street, San Francisco, California, for the purpose of effectuating and carrying out PG&E Corporation's business and operations and/or for the benefit of PG&E Corporation;

(b)    PG&E Corporation and the Utility do not operate as completely separate entities, but rather integrate their resources to achieve a common business purpose;

(c)    the Utility is so organized and controlled, and its decisions, affairs, and business are so conducted as to make it a mere instrumentality, agent, conduit, or adjunct of PG&E Corporation;

(d)    PG&E Corporation's and the Utility's officers and management are intertwined and do not act completely independently of one another;

(e)    PG&E Corporation has control and authority to choose and appoint the Utility's board members as well as its other top officers and managers;

(f)    PG&E Corporation and the Utility are insured by the same carriers and provide uniform or similar pension, health, life, and disability insurance plans for employees;

(g)    PG&E Corporation and the Utility have unified 401(k) Plans, pension and investment plans, bonus programs, vacation policies, and paid time off from work schedules and policies;

(h)    PG&E Corporation and the Utility have unified personnel policies and practices and/or a consolidated personnel organization or structure;

1             (i)     PG&E Corporation and the Utility are represented by common legal

2 counsel;

3             (j)     PG&E Corporation and the Utility acknowledged in their joint 10-K

4 statement for the year 2015 that eight separate officers were "executive officers of both PG&E

5 Corporation and the Utility;"

6             (k)     PG&E Corporation and the Utility acknowledged in their joint 10-K

7 statement for the year 2016 that nine separate officers were "executive officers of both PG&E

8 Corporation and the Utility;"

9             (l)     PG&E Corporation's officers, directors, and other management make

10 policies and decisions to be effectuated by the Utility and/or otherwise play roles in providing

11 directions and making decisions for the Utility;

12            (m)     PG&E Corporation's officers, directors, and other management direct

13 certain financial decisions for the Utility including the amount and nature of capital outlays;

14             (n)     PG&E Corporation's written guidelines, policies, and procedures control

15 the Utility's employees, policies, and practices;

16             (o)     PG&E Corporation files consolidated earnings statements factoring in all

17 revenue and losses from the Utility, as well as consolidated tax returns, including those seeking

18 tax relief; and

19             (p)     PG&E Corporation generally directs and controls the Utility's relationship

20 with, requests to, and responses to inquiries from, the CPUC and uses such direction and control

21 for the benefit of PG&E Corporation.

22     494.    For purposes of this litigation, it would be inequitable to treat the misstatements

23 and actions of the Utility as those of the Utility only, and not also of PG&E Corporation.

24     495.    By reason of the above allegations, any misstatements made by the Utility –

25 including, but not limited to, Misstatement Nos. 1 and 3 – were made by an "alter ego" of PG&E

26 Corporation, and PG&E Corporation is therefore equally liable for violations of Section 10(b) of

27 the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other

28

1    members of the Class for substantial damages which they suffered in connection with their

2    purchase of PG&E securities during the Class Period.

3    **XIV.   NATURE OF THE SECURITIES ACT CLAIMS**

4           496.    Securities Act Plaintiffs (defined below) bring claims for violations of the

5    Securities Act, individually and on behalf of all persons or entities that acquired PG&E senior

6    notes in or traceable to the Company's Notes Offerings, as detailed herein, against certain of the

7    Company's officers and directors, and the underwriters of the Notes Offerings.[149]  Since

8    March 2016, PG&E has issued over $4 billion worth of senior notes registered with the SEC.

9    According to a PG&E filing in the United States District Court for the Northern District of

10   California, "PG&E consistently spends more cash than it generates through its operations and

11   cannot fund all its infrastructure investments without external financing from the debt and equity

12   markets."[150]

13          497.    The Securities Act claims set forth herein are based on strict liability and

14   negligence and are not based on any allegation that any defendant engaged in fraud or intentional

15   misconduct.  The Securities Act Plaintiffs specifically disclaim any reference to or reliance on

16   allegations of fraud.

17   **XV.    OVERVIEW OF THE SECURITIES ACT VIOLATIONS**

18          498.    PG&E's failure to follow safety requirements and prudent practices, including

19   regulations and laws, resulted in numerous devastating wildfires in 2015, 2017 and 2018, causing

20   catastrophic loss of life and destruction of property.

21

22

---

23   [149]  "Notes Offerings" refers to the Company's March 2016 public offering of senior notes
     (the "March 2016 Notes Offering"), the Company's December 2016 public offering of senior
24   notes (the "December 2016 Notes Offering"), the Company's March 2017 public offering of
     senior notes (the "March 2017 Notes Offering"), and the Company's April 2018 public offering
25   of senior notes (the "April 2018 Notes Offering").  The "Offering Documents" refers to the
     Registration Statement and Prospectus (to include all amendments and supplements thereto for
26   each offering, together with all documents incorporated by reference in each Registration
     Statement and Prospectus).  *See* ¶ 630(a)-(d).
27
     [150] Response to Second Order to Show Cause Why PG&E's Conditions of Probation Should
28   Not Be Modified at 11, PG&E Criminal Proceedings, (N.D. Cal. Mar. 22, 2019), ECF No. 1032.

---

499.     In all, the Company has been implicated in causing ***more than 1,500 fires*** between June 2014 and November 2018,[151] including some of the most widespread and destructive wildfires in California history.  PG&E failed to implement required safety precautions even as the risk of wildfires increased.  The Company has filed Chapter 11 bankruptcy, as it faces a host of regulatory investigations, criminal probes, and civil lawsuits.  PG&E estimates it could be liable for more than $30 billion in costs, expenses and other losses from the North Bay and Camp Fires excluding any penalties, fines, or punitive damages.

500.     In addition to liability for causing destructive wildfires, PG&E recently announced in the Company's May 2, 2019 Form 10-Q that the SEC is "conducting an investigation related to PG&E Corporation's and the Utility's public disclosures and accounting for losses associated with the 2017 and 2018 Northern California wildfires and the 2015 Butte Fire."

501.     At the same time that PG&E's equipment and operations were posing an unreasonable risk to the lives and property of California residents – indeed, even as the Company's equipment was in the midst of setting hundreds of wildfires – PG&E raised billions of dollars from investors through the sale of senior notes.  From March 2016 to May 2018, PG&E offered and sold approximately $4.35 billion worth of senior notes that it registered with the SEC to ensure that the notes could be widely sold and distributed to the investing public.

502.     Specifically, PG&E offered and sold: (i) $600 million worth of 2.95% PG&E senior notes due March 1, 2026 pursuant to the March 2016 Notes Offering; (ii) $250 million worth of floating rate PG&E senior notes due November 30, 2017 and $400 million worth of 4.00% PG&E senior notes due December 1, 2046 pursuant to the December 2016 Notes Offering; (iii) $400 million worth of 3.30% PG&E senior notes due March 15, 2027 and $200 million worth of 4.00% PG&E senior notes due December 1, 2046 pursuant to the March 2017 Notes Offering; and (iv) up to $500 million worth of floating rate PG&E senior notes due

---

[151] *The Wall Street Journal* reported on January 13, 2019 that PG&E started more than 1,500 fires between June 2014 and December 2017.  In November 2018, PG&E also caused the Camp Fire.  *See* Fn 168, *infra*.

1    November 28, 2018, $1.15 billion worth of 3.30% PG&E senior notes due December 1, 2027,

2    and $850 million worth of 3.95% PG&E senior notes due December 1, 2047 pursuant to the

3    April 2018 Notes Offering.

4           503.    PG&E's Offering Documents to the Notes Offerings materially misled investors

5    as to *inter alia*: (i) the safety of the Company's equipment by highlighting its commitment to

6    safety and touting upgrades and investments; (ii) the real risk of wildfires by emphasizing the

7    important role of the Company's vegetation management activities; (iii) the risks associated with

8    and impact of wildfires on PG&E;  (iv) the sufficiency of the Company's investments in safety to

9    prevent wildfires; (v) the Company's liability with respect to wildfires; and (vi) the known

10   adverse trends impacting PG&E.

11          504.    PG&E's conduct has subsequently been revealed to contradict the representations

12   made to investors in the Offering Documents, and now poses an existential threat to the

13   Company.  Subsequent to, and due to, Defendants' omission of the true state of PG&E's business

14   and operations and the risks posed by the Company's lax wildfire safety practices and inadequate

15   investment in safety, the value of the senior notes associated with the Notes Offerings has

16   substantially declined.

17          505.    For example, subsequent to the Notes Offerings, on November 13, 2018, the price

18   of the 2.95% note sold in the March 2016 Notes Offering closed at $86.46 per unit, or ***more than***

19   ***13% below par***; the price of the 4.00% note sold in the December 2016 Notes Offering closed at

20   $72.26 per unit, or ***more than 27% below par***; the price of the 3.3% note sold in the March 2017

21   Notes Offering closed at $82.82 per unit, or ***more than 17% below par***; the price of the 3.3%

22   note sold in the April 2018 Notes Offering closed at $81.38 per unit, or ***more than 18% below***

23   ***par***; and the price of the 3.95% note sold in the April 2018 Notes Offering closed at $72.23 per

24   unit, or ***more than 27% below par***.

25   **XVI.   THE SECURITIES ACT PARTIES**

26          **A.     Securities Act Named Plaintiffs**

27          506.    Plaintiff York County on behalf of the County of York Retirement Fund acquired

28   PG&E senior notes issued in the March 2016 Notes Offering and the April 2018 Notes Offering

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                           153
CONSOLIDATED CASE NO. 3:18-cv-03509-EJD

1    as described in the Certification attached hereto (as "Attachment B") and incorporated by

2    reference, and has been damaged thereby.

3         507.    Plaintiff City of Warren Police and Fire Retirement System acquired PG&E

4    senior notes issued in the April 2018 Notes Offering as described in the Certification attached

5    hereto (as "Attachment C") and incorporated by reference, and has been damaged thereby.

6         508.    Plaintiff Mid-Jersey Trucking Industry & Local No. 701 Pension Fund acquired

7    PG&E senior notes issued in the December 2016 Notes Offering and the March 2017 Notes

8    Offering as described in the Certification attached hereto (as "Attachment D") and incorporated

9    by reference, and has been damaged thereby.

10        **B.    Bankrupt Entities**

11        509.    Pacific Gas and Electric Company is a California public utility operating in

12   northern and central California, with headquarters in San Francisco. The Utility is the registrant

13   and issuer of the PG&E senior notes issued in the Notes Offerings. The Utility has declared

14   bankruptcy and is therefore not named as a defendant in this action due to the automatic stay of

15   proceedings under the federal bankruptcy laws. But for the automatic stay of proceedings, the

16   Utility would be named as a defendant for all counts asserted herein.

17        510.    PG&E Corporation is a holding company whose primary operating subsidiary is

18   Pacific Gas and Electric Company. PG&E Corporation is headquartered in the same San

19   Francisco building as the Utility, and it shared an overlapping board of directors with the Utility.

20   As the parent and owner of the Utility, PG&E Corporation also issued and sold the PG&E senior

21   notes issued in the Notes Offerings. Like the Utility, PG&E Corporation has declared bankruptcy

22   and is therefore not named as a defendant in this action due to the automatic stay of proceedings

23   under the federal bankruptcy laws. But for the automatic stay of proceedings, PG&E Corporation

24   would be named as a defendant for all counts asserted herein.

25        **C.    Securities Act Individual Defendants**

26        511.    The following current or former directors and/or officers are named as Defendants

27   for the Securities Act claims.

28

---

1    512.    Defendant Anthony F. Earley, Jr. ("Earley") served as PG&E Corporation's

2    President, Chief Executive Officer ("CEO"), and Chairman of the Board from September 13,

3    2011 to March 1, 2017, and as its Executive Chairman from March 1, 2017 to December 2017.

4    Earley was a director of the Utility at the time of the March 2016 Notes Offering, the December

5    2016 Notes Offering and the March 2017 Notes Offering.  Earley signed the registration

6    statement for the March 2016 Notes Offering and the December 2016 Notes Offering and the

7    registration statement for the March 2017 Notes Offering.

8    513.    Defendant Geisha J. Williams ("Williams") served as PG&E Corporation's CEO

9    and President from March 1, 2017 until her resignation on January 13, 2019.  Previously, she

10   served as the President of Electric Operations at the Utility from August 17, 2015 to February 28,

11   2017. Prior to that, she served as Executive Vice President of Electric Operations at the Utility

12   from June 1, 2011 to August 16, 2015. Williams was a director of the Utility at the time of the

13   March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering

14   and the April 2018 Notes Offering.  Williams signed the registration statement for the March

15   2017 Notes Offering and the registration statement for the April 2018 Notes Offering.

16   514.    Defendant Nickolas Stavropoulos ("Stavropoulos") served as the President and

17   COO of PG&E Corporation from March 1, 2017 to September 30, 2018, and served as President

18   of Gas Operations at the Utility from August 17, 2015 to February 28, 2017. Prior to that, he

19   served as Executive Vice President of Gas Operations at the Utility from June 13, 2011 to

20   August 16, 2015.  Stavropolous was a director of the Utility at the time of the March 2016 Notes

21   Offering, the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018

22   Notes Offering.  Stavropolous signed the registration statement for the March 2017 Notes

23   Offering and the registration statement for the April 2018 Notes Offering.

24   515.    Defendant Barbara L. Rambo ("Rambo") was a director of the Utility at the time

25   of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes

26   Offering and the April 2018 Notes Offering.  Rambo signed the registration statement for the

27   March 2016 Notes Offering, the registration statement for the December 2016 Notes Offering,

28   the registration statement for the March 2017 Notes Offering, and the registration statement for

1   the April 2018 Notes Offering.  Rambo was appointed a director of PG&E in 2005. On April 3,

2   2019, PG&E announced that Rambo would be replaced at the next Board meeting.  As of May 2,

3   2019, Rambo was no longer a director.

4       516.    Defendant David S. Thomason ("Thomason") was the Vice President, Chief

5   Financial Officer ("CFO") and Controller of the Utility at the time of the December 2016 Notes

6   Offering, the March 2017 Notes Offering and the April 2018 Notes Offering.  Thomason signed

7   the registration statement for the March 2017 Notes Offering and the registration statement for

8   the April 2018 Notes Offering. Thomason has worked in various roles at PG&E since 2001, and

9   as CFO, VP and controller since June 2016.

10      517.    Defendant Dinyar B. Mistry ("Mistry") was the Vice President, CFO and

11  Controller of the Utility at the time of the March 2016 Notes Offering, and PG&E's Senior Vice

12  President of Human Resources during the December 2016 Notes Offering, the March 2017 Notes

13  Offering and the April 2018 Notes Offering.  Mistry signed the registration statement for the

14  March 2016 Notes Offering and the December 2016 Notes Offering.  According to PG&E,

15  Mistry joined Pacific Gas and Electric Company in 1994 and has held various positions since

16  then, including Vice President and Controller of Pacific Gas and Electric Company; as Vice

17  President, Regulation and Rates; as Vice President, Internal Audit and Compliance; and most

18  recently as Vice President and Chief Risk and Audit Officer.

19      518.    Defendant Lewis Chew ("Chew") was a director of the Utility at the time of the

20  March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering

21  and the April 2018 Notes Offering.  Chew signed the registration statement for the March 2016

22  Notes Offering, the registration statement for the December 2016 Notes Offering, the registration

23  statement for the March 2017 Notes Offering and the registration statement for the April 2018

24  Notes Offering.  Chew was appointed a director of PG&E in 2009. On April 3, 2019, PG&E

25  announced that Chew would be replaced at the next Board meeting.  As of May 2, 2019, Chew

26  was no longer a director.

27      519.    Defendant Fred J. Fowler ("Fowler") was a director of the Utility at the time of

28  the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes

1   Offering and the April 2018 Notes Offering.  Fowler signed the registration statement for the

2   March 2016 Notes Offering, the registration statement for the December 2016 Notes Offering,

3   the registration statement for the March 2017 Notes Offering, and the registration statement for

4   the April 2018 Notes Offering. Fowler has been a PG&E director since 2012.

5          520.    Defendant Maryellen C. Herringer ("Herringer") was a director of the Utility at

6   the time of the March 2016 Notes Offering and the December 2016 Notes Offering.  Herringer

7   signed the registration statement for the March 2016 Notes Offering, the registration statement

8   for the December 2016 Notes Offering and the registration statement for the March 2017 Notes

9   Offering.  Herringer was appointed a director of PG&E in 2009. On April 3, 2019, PG&E

10  announced that Herringer would be replaced at the next Board meeting.  As of May 2, 2019,

11  Herringer was no longer a director.

12         521.    Defendant Richard C. Kelly ("Kelly") was a director of the Utility at the time of

13  the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes

14  Offering and the April 2018 Notes Offering.  He was also Chairman of the Board of PG&E

15  Corporation beginning in December 2017.  Kelly signed the registration statement for the March

16  2016 Notes Offering, the registration statement for the December 2016 Notes Offering, the

17  registration statement for the March 2017 Notes Offering, and the registration statement for the

18  April 2018 Notes Offering.  Kelly has been a PG&E director from 2013 until his resignation

19  from the Board as announced by PG&E on April 22, 2019.

20         522.    Defendant Roger H. Kimmel ("Kimmel") was a director of the Utility at the time

21  of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes

22  Offering and the April 2018 Notes Offering.  Kimmel signed the registration statement for the

23  March 2016 Notes Offering, the registration statement for the December 2016 Notes Offering,

24  the registration statement for the March 2017 Notes Offering, and the registration statement for

25  the April 2018 Notes Offering.  Kimmel was appointed a director of PG&E in 2009. On April 3,

26  2019, PG&E announced that Kimmel would be replaced at the next Board meeting.  As of May

27  2, 2019, Kimmel was no longer a director.

28

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                                    157

523.    Defendant Richard A. Meserve ("Meserve") was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes Offering.  Meserve signed the registration statement for the March 2016 Notes Offering, the registration statement for the December 2016 Notes Offering, the registration statement for the March 2017 Notes Offering, and the registration statement for the April 2018 Notes Offering.  Meserve was appointed a director of PG&E in 2006. On April 3, 2019, PG&E announced that Meserve would be replaced at the next Board meeting.  As of May 2, 2019, Meserve was no longer a director.

524.    Defendant Forrest E. Miller ("Miller") was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes Offering, and Chairman of the Utility's Board since May 2017.  Miller signed the registration statement for the March 2016 Notes Offering, the registration statement for the December 2016 Notes Offering, the registration statement for the March 2017 Notes Offering, and the registration statement for the April 2018 Notes Offering. Miller was appointed a director of PG&E in 2009. On April 3, 2019, PG&E announced that Miller would be replaced at the next Board meeting.  As of May 2, 2019, Miller was no longer a director.

525.    Defendant Barry Lawson Williams ("B. Williams") was a director of the Utility at the time of the March 2016 Notes Offering and the December 2016 Notes Offering, during which time he served as Chairman of the Utility's Board of Directors.  B. Williams signed the registration statement for the March 2016 Notes Offering, the registration statement for the December 2016 Notes Offering and the registration statement for the March 2017 Notes Offering.   B. Williams was appointed a director of PG&E in 1996. On April 3, 2019, PG&E announced that B. Williams would be replaced at the next Board meeting.  As of May 2, 2019, B. Williams was no longer a director.

526.    Defendant Rosendo G. Parra ("Parra") was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes Offering.  Parra signed the registration statement for the

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
LITIGATION NO. 3:18-cv-03509-EJD

158

Case 18-30089    Doc# 5371-10    Filed 01/14/20    Entered 01/14/20 15:26:59    Page 186 of 524
Case 3:18-cv-03509-EJD    Document 121    Filed 05/28/19    Page 167 of 228
175 of 524

1   March 2017 Notes Offering and the registration statement for the April 2018 Notes Offering.

2   Parra was appointed a director of PG&E in 2009. On April 3, 2019, PG&E announced that Parra

3   would be replaced at the next Board meeting.  As of May 2, 2019, Parra was no longer a director.

4     527. Defendant Anne Shen Smith ("Smith") was a director of the Utility at the time of

5   the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes

6   Offering and the April 2018 Notes Offering.  Smith signed the registration statement for the

7   March 2017 Notes Offering and the registration statement for the April 2018 Notes Offering.

8   Smith was appointed a director of PG&E in 2015. On April 3, 2019, PG&E announced that

9   Smith would be replaced at the next Board meeting.  As of May 2, 2019, Smith was no longer a

10   director.

11     528. Defendant Eric D. Mullins ("Mullins") was a director of the Utility at the time of

12   the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes

13   Offering. Mullins signed the registration statement for the March 2017 Notes Offering and the

14   registration statement for the April 2018 Notes Offering.  Mullins has been a PG&E director

15   since 2016.

16     529. The defendants identified in ¶¶512-28 are referred to herein as the "Securities Act

17   Individual Defendants."  The Individual Securities Act Defendants signed the registration

18   statements for one or more of the Notes Offerings as detailed herein, and, as directors and/or

19   executive officers of the Company, participated in the solicitation and sale of PG&E senior notes

20   to investors in the Notes Offerings for their own benefit and the benefit of PG&E.

21     **D.**  **Underwriter Defendants**

22     530. In addition to the above, the following underwriters are named as defendants for

23   the Securities Act claims for the Notes Offerings for which they served as underwriters.

24     531. Defendant Barclays Capital Inc. served as a lead underwriter for the March 2016

25   Notes Offering.

26     532. Defendant BNP Paribas Securities Corp. served as a lead underwriter for the

27   March 2016 Notes Offering and the March 2017 Notes Offering.

28

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3:18-cv-03509-EJD                   159

Case 3:20-30 Doc# 537-1 Filed 06/10/14/20 Entered 06/10/13 13:26:59 Page 169
176 of 524

1    533.    Defendant Morgan Stanley & Co. LLC served as a lead underwriter for the March

2   2016 Notes Offering.

3    534.    Defendant MUFG Securities Americas, Inc. f/k/a Mitsubishi UFJ Securities

4   (USA), Inc. served as a lead underwriter for the March 2016 Notes Offering.

5    535.    Defendant The Williams Capital Group, L.P. served as a lead underwriter for the

6   March 2016 Notes Offering.

7    536.    Defendant Citigroup Global Markets Inc. served as a lead underwriter for the

8   December 2016 Notes Offering.

9    537.    Defendant J.P. Morgan Securities LLC served as a lead underwriter for the

10   December 2016 Notes Offering.

11    538.    Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated served as a lead

12   underwriter for the December 2016 Notes Offering.

13    539.    Defendant Mizuho Securities USA LLC served as a lead underwriter for the

14   December 2016 Notes Offering.

15    540.    Defendant Goldman, Sachs & Co., LLC served as a lead underwriter for the

16   March 2017 Notes Offering.

17    541.    Defendant RBC Capital Markets, LLC served as a lead underwriter for the March

18   2017 Notes Offering.

19    542.    Defendant Wells Fargo Securities, LLC served as a lead underwriter for the

20   March 2017 Notes Offering.

21    543.    Defendant BNY Mellon Capital Markets, LLC served as an underwriter for the

22   March 2016 Notes Offering and the March 2017 Notes Offering.

23    544.    Defendant TD Securities (USA) LLC served as an underwriter for the March

24   2016 Notes Offering and the March 2017 Notes Offering.

25    545.    Defendant C.L. King & Associates, Inc. served as an underwriter for the March

26   2016 Notes Offering.

27    546.    Defendant Great Pacific Securities served as an underwriter for the March 2016

28   Notes Offering.

547.    Defendant CIBC World Markets Corp. served as an underwriter for the December 2016 Notes Offering.

548.    Defendant SMBC Nikko Securities America, Inc. served as an underwriter for the December 2016 Notes Offering.

549.    Defendant U.S. Bancorp Investments, Inc. served as an underwriter for the December 2016 Notes Offering.

550.    Defendant Lebenthal & Co., LLC served as an underwriter for the December 2016 Notes Offering.

551.    Defendant Mischler Financial Group, Inc. served as an underwriter for the December 2016 Notes Offering.

552.    Defendant Blaylock Van, LLC served as an underwriter for the March 2017 Notes Offering.

553.    Defendant Samuel A. Ramirez & Company, Inc. served as an underwriter for the December 2016 Notes Offering.

554.    Defendant MFR Securities, Inc. served as an underwriter for the March 2017 Notes Offering.

555.    The defendants identified in ¶¶531-554 are referred to herein as the "Underwriter Defendants." The Underwriter Defendants served as underwriters for the Notes Offerings and sold billions of dollars' worth of PG&E senior notes in the Note Offerings, for which they collectively received tens of millions of dollars in fees and commissions. The Underwriter Defendants drafted and disseminated the offering documents used to effectuate each of the Note Offerings for which they served as underwriters. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein with respect to the Securities Act claims. The Underwriter Defendants are not alleged to be defendants for the April 2018 Notes Offering at this time.

556.    The Individual Securities Act Defendants, together with the Underwriter Defendants, are collectively referred to as the "Securities Act Defendants" and are named as defendants with respect to the Securities Act Claims alleged herein.

1   **XVII.   SUBSTANTIVE ALLEGATIONS SUPPORTING THE SECURITIES ACT CLAIMS**

2

3   **A.      PG&E's Systemic Failure to Take Measures to Mitigate Wildfires and Safety Violations**

4          557.    PG&E engaged in a pattern and practice of ignoring laws and California safety

5   regulations and failed to take appropriate measures to mitigate wildfire hazards.  Results of

6   government investigations, media coverage, analyst coverage, SEC filings, court filings,

7   admissions before and findings of the Honorable William Alsup of the United States District

8   Court for the Northern District of California, and other public information regarding PG&E and

9   the Securities Act Defendants, all demonstrate that each of the Offering Documents for the Notes

10  Offerings contained materially false and/or misleading statements.

11         **1.      Overview of Laws and Regulations Governing PG&E's Operations**

12         558.    PG&E's ability to maintain safe electrical equipment that complies with state

13  regulations and minimizes the risk of causing wildfires is critical to the Company's business and

14  prospects.  California law includes a doctrine of inverse condemnation as explained in detail in

15  §VI.A.5.  Inverse condemnation imposes strict liability for damages and takings as a result of the

16  design, construction and maintenance of utility facilities, including its electric transmission and

17  distribution lines.  If a utility such as PG&E affirmatively proves "that it reasonably and

18  prudently operated and managed its system" it can recover payments made to property owners

19  for damages caused by a wildfire from the CPUC.  In other words proof "that at a particular time

20  any of the practices, methods, and acts engaged in by a utility follows the exercise of reasonable

21  judgment in light of facts known or which should have been known at the time the decision was

22  made."  This would include proof that it complied with the following laws and CPUC

23  regulations.

24         559.    **California Law**.  As explained in detail in §V.A.1-2, PG&E was required by

25  California law, including California Public Utilities Code §702 and §2106, to adequately

26  maintain its equipment and infrastructure, including electrical towers and poles, to prevent fires

27  from being caused by its equipment or infrastructure, and was liable to property owners for

28  damage caused for failure to do so.  For example, California law required PG&E to: (i) maintain

1    equipment that promotes the safety and health of the public pursuant to California Public

2    Utilities Code §451; and (ii) regularly service and maintain its equipment, including by clearing

3    vegetation away from its power lines pursuant to California law, including California Public

4    Resources Codes §4292 and §4293.  And PG&E was liable to the owners of property for any

5    damages to the property caused by fire for negligently or in violation of law setting a fire or

6    allowing a fire to be set pursuant to California Health & Safety Code §13007.

7         560.    **CPUC Regulations**.  PG&E was also required by law to adhere to CPUC

8    regulations as explained in detail in §VI.A.3.  These regulations include the requirements under

9    General Order 95 that PG&E: (i) "establish necessary and reasonable clearances" between

10   overhead conductors and nearby vegetation, with certain "minimum clearances"; and (ii) ensure

11   that that "[a]ll lines and portions of lines shall be maintained in such condition as to provide

12   safety factors not less than those specified in Rule 44.3," which in turn prohibits the use of poles,

13   towers and structures "with a safety factor less than one."  The regulations also include the

14   requirement under General Order 165 that PG&E "shall conduct inspections of its distribution

15   facilities, as necessary, to ensure reliable, high-quality, and safe operation."  As explained in

16   detail in §VI.A.3(b), as of July 2018, another California safety regulation, CPUC Resolution

17   ESRB-8, also required PG&E to temporarily shut off its power lines when certain dangerous

18   conditions are present that make an area susceptible to wildfires, including high wind speed and

19   low humidity.  On September 27, 2018 PG&E indicated that it had implemented measures in

20   response to ESRB-8.

21        561.    PG&E violated California laws and CPUC regulations with respect to maintaining

22   the Company's equipment, engaging in adequate vegetation management practices and shutting

23   down power when weather conditions warrant such a safety precaution to prevent wildfires.

24        562.    **Federal Regulations**.  PG&E is also required by law to adhere to a number of

25   federal laws and regulations as explained in detail in §VI.A.6.  FERC Electric Reliability

26   Standard FAC-003-4, for example, "requires that trees and other vegetation growing in or

27

28

1    adjacent to the power line right-of-way be trimmed to prevent power outages caused by tree

2    contact with a transmission line."[152]  PG&E failed to comply with this requirement.

3            **2.      PG&E's Lax Safety Practices, Safety Violations and Resulting Wildfires**

4

5    563.    On September 9, 2015, the 2015 Butte Fire was started when a tree came into

6    contact with a power line.  The fire, which killed two people, destroyed more than 500 homes

7    and more than 400 other properties and structures, and scorched more than 70,000 acres over 22

8    days, is described in more detail *supra*.  ¶¶100-102.

9    564.    Cal Fire, which is authorized to make fire cause and origin determinations for

10   wildfires as explained in §VI.A.4 above, launched an investigation "as part of the initial response

11   to the Butte Fire" at which time its investigators "immediately began working to determine the

12   origin and cause of the fire."[153]

13   565.    On March 1, 2016, PG&E issued and delivered the notes offered in the March

14   2016 Notes Offering.  The notes were offered pursuant to a shelf registration, with the prospectus

15   supplement filed on February 23, 2016 with the SEC and the final prospectus supplement filed

16   February 24, 2016.

17   566.    On April 28, 2016, Cal Fire issued a press release announcing its conclusion that

18   the 2015 Butte Fire was caused by PG&E's safety violations, including evidence of negligence.

19   Cal Fire has indicated it would seek $90 million for costs of suppressing the 2015 Butte Fire and

20   PG&E called that estimate reasonable in a May 2, 2016 Form 8-K filing.[154]  Cal Fire also

21   referred its investigation to the two relevant district attorneys for the counties in which the 2015

22

23   [152]   *See* FERC, *Tree Trimming & Vegetation Management* (updated Apr. 10, 2018), https://www.ferc.gov/industries/electric/indus-act/reliability/vegetation-mgt.asp; FERC, *FAC-003-4 Transmission Vegetation Management*, https://www.ferc.gov/industries/electric/indus-act/reliability/vegetation-mgt/fac-003-4.pdf?csrt=10652948532787038938.

24

25   [153]   Press Release, Cal Fire, *Cal Fire Investigators Determine Cause of Destructive Butte Fire* (Apr. 28, 2016),

26   calfire.ca.gov/communications/downloads/newsreleases/2016/ButteFireCause.pdf.

27   [154]   *See also* Press Release, CAL FIRE, *Cal Fire Investigators Determine Cause of Destructive Butte Fire* (Apr. 28, 2016),

28   calfire.ca.gov/communications/downloads/newsreleases/2016/ButteFireCause.pdf.

1  Butte Fire burned.  On June 22, 2017, California Superior Court Judge Allen Sumner found

2  PG&E liable in Inverse Condemnation for damages for the 2015 Butte Fire.[155]

3        567.    Part of the evidence regarding the 2015 Butte Fire includes an internal PG&E

4  May 8, 2008 slide presentation filed in the *Butte Fire Cases*, No. JCCP 4853 (Cal. Super. Ct.

5  Sacramento Cty. Nov. 2, 2018) titled "2008 Utility Offsite Strategy Discussion."  The slide

6  presentation was for a meeting which PG&E's CEO Williams testified in deposition on July 7,

7  2017 that she recalled attending.  It includes a slide which asks, "What is up for debate?" and the

8  response includes among less than ten items, "Safety."  It also asks, "What is not up for debate?"

9  and the response includes "8% EPS growth":



155  *Butte Fire Cases*, No. JCCP 4853, Ruling on Submitted Matter: Inverse Condemnation
Motions (Cal. Super. Ct. Sacramento Cty. June 22, 2017).

1    568.    Similarly, other evidence indicates that PG&E did not provide adequate resources

2    for safety.  According to the October 15, 2018 deposition testimony of Janaize Markland, filed in

3    the PG&E Criminal Proceedings before Judge Alsup, the director of PG&E's Enterprise and

4    Operational Risk and Insurance Department testified regarding prepared testimony dated May 1,

5    2015.  According to the prepared testimony referred to in the deposition and Ms. Markland's

6    deposition it was possible to improve tree-related outages "but that would require a level of

7    investment greater than what PG&E is making today."[156]  The prepared testimony went on to

8    indicate "[w]ith limited resources, PG&E cannot do everything and must decide at what point

9    it's okay not to mitigate the risk further.  Tradeoff decisions must be made," which Ms.

10   Markland testified was "a true statement."  She further testified that a tradeoff decision "has to

11   do with at what point can you reduce risk further and at what cost."[157]

12   569.    Evidence submitted in the *Butte Fire Cases* also includes the depositions of

13   contractors who worked for PG&E and who described incentives PG&E provided to not clear as

14   much vegetation as was required for safety purposes so as to save PG&E money.[158]   For

15   example, Robert Urban was deposed on May 16, 2017 as the person most qualified to testify on

16   behalf of a PG&E contractor, ACRT, that worked on PG&E's behalf to, among other services,

17   clear vegetation.  According to Mr. Urban's testimony, PG&E paid its contractors bonuses if

18   they identified and cleared fewer trees as well as other vegetation, incentivizing contractors to

19   clear less vegetation than is safe:

20               Q. And under the VMII [bonus] program – correct me if I'm
             wrong – the way it was set up is if ACRT listed fewer trees than
21           the target number and it ended up fewer trees than the target
             number were worked, there would be a bonus provided ACRT met
22           certain other metrics; right?

23               Urban: That is correct.

24   ---

25   [156] Excerpts of Deposition Transcript of Janaize Markland, PG&E Criminal Proceedings
     (N.D. Cal. Feb. 6, 2019), ECF No. 1008-1; PG&E Response to Request for Information, PG&E
     Criminal Proceedings (N.D. Cal. Feb. 22, 2019), ECF No. 1016.

26   [157] Excerpts of Deposition Transcript of Janaize Markland, PG&E Criminal Proceedings,
     (N.D. Cal. Feb. 6, 2019), ECF No. 1008-1.

27   [158] *See generally* Declaration of Kristine K. Meredith , *Butte Fire Cases*, No. JCCP 4853,
28   (Cal. Super. Ct. Sacramento Cty. Dec. 21, 2018).

---

1    Q. All right. And if ACRT met those certain other metrics, then
2    there would be an amount per tree not worked that would be paid
     to ACRT; true?

3    Urban: There would be an incentive paid for trees that came – for
4    unit count that came in under target. That is correct.

                         *        *        *

5
6    Q. So for every tree underneath – or every tree less than the VMII
     target, assuming the other metrics had been met, ACRT would
7    receive seven bucks per tree; correct?

8    Urban: That is correct.  Seven bucks per unit.

9    Q. Okay.  That's right.  Because a unit might be a brush, for
     example; right?

10   Urban: It may.

11                        *        *        *

12   Q. Did you ever harbor that belief yourself that, hey, this bonus
     system kind of incentivizes my people to not do their job?

13   Urban: That is a concern.

14        570.    Additional evidence regarding PG&E's insufficient safety practices includes

15   PG&E quality assurance audits of the Jackson District where the 2015 Butte Fire occurred.

16   Those audits showed a trend from 2012 through 2015 of an extremely high concentration of

17   potentially hazardous non-compliant trees in that District.  For example, PG&E conducted an

18   audit in the summer of 2015 (June 8, 2015 to July 10, 2015) which identified in a sample of

19   48.71 line miles, 15 non-compliant trees, 87% of those trees were in the Jackson District.

20        571.    PG&E employee Kelly O'Flinn, deposed on November 3, 2016 pursuant to the

21   *Butte Fire Cases*, No. JCCP 4853 (Cal. Super. Ct. Sacramento Cty. Jan. 17, 2019), was asked

22   about the same audit and incidence of noncompliant trees in Jackson.  O'Flinn confirmed that the

23   vegetation issues were a negative trend affecting PG&E:

24        Q: There is a paragraph there [in the audit] that says, "Regulatory
          compliance has declined slightly for the last three consecutive
25        SRA audits and fallen below 99.50 percent for the first time since
          2009."  . . . Would you consider that to be a trend?
26
27        O'Flinn: I would say, yes, it's a trend.

28        Q: And that is a trend in the wrong direction, right?

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                        167
CONSOLIDATED CASE NO. 5:18-cv-03509-EJD

1                                            *       *       *

2                    O'Flinn: Slight – slight downward trend. [159]

3           572.    On December 1, 2016, PG&E issued and delivered the notes offered in the

4    December 2016 Notes Offering.  The notes were offered pursuant to a shelf registration, with the

5    prospectus supplement filed with the SEC on November 28, 2016, and final prospectus

6    supplement filed November 29, 2016.

7           573.    And on March 10, 2017, PG&E issued and delivered the notes offered in the

8    March 2017 Notes Offering.  The notes were offered pursuant to the Registration Statement filed

9    with the SEC on January 4, 2017 (and as amended on January 19, 2017), and the prospectus

10   supplement and final prospectus supplement filed with the SEC March 7 and March 8, 2017,

11   respectively.

12          574.    Then, in October 2017, a series of devastating fires, which became known as the

13   North Bay Fires, ravaged at least 245,000 acres of land and killed 44 people.  At the time, the

14   fires were the most destructive in California history and are responsible for billions in damages.

15          575.    Many sources pointed to the cause of the deadly North Bay Fires.  According to a

16   report from NBC reporter Jaxon Van Derbeken published on November 6, 2017, a month after

17   the North Bay Fires began, PG&E's own internal inspectors allow one out of 100 trees they

18   check to violate state power line clearance standards and "cheated" when too many violations

19   were found:

20                  **PG&E auditors allow one out of 100 trees they check to violate**
                    **state power line clearance standards, NBC Bay Area has**
21                  **learned.**

22                                           *       *       *

23                  . . .[I]t emerged during the Butte fire litigation that [internal]
                    auditors were giving out a passing grade when one out of 100 trees
24                  they checked turned out to be too close to power lines under state
                    standards.
25                                           *       *       *

26

27   _____

        [159]    *Butte Fire Cases*, No. JCCP 4853, Exhibit G to the Declaration of Kristine K. Meredith,
28   at 45:12-24 (Cal. Super. Ct. Sacramento Cty. Dec. 21, 2018); *see also* at 124:3-12.

1

. . .When [PG&E] failed to reach that 99 percent compliance rate
in the area around the fire . . . **the company just expanded the
universe of trees covered in a particular audit.**

2

3

"So what PG&E does when it doesn't pass, it basically cheats,"
[Amanda Riddle, one of the attorneys participating in a lawsuit
against PG&E related to the Butte Fire] said. "It adds more miles
and more miles until it reaches a passing grade."

4

5

576.    Shortly thereafter, in a press release on December 20, 2017, PG&E announced

6

that its "Board of Directors has determined to suspend the quarterly cash dividend on the

7

Corporation's common stock, beginning with the fourth quarter of 2017, citing uncertainty

8

related to causes and potential liabilities associated with the extraordinary October 2017

9

Northern California wildfires."

10

577.    With respect to the wildfires, on January 3, 2018, State Senator Jerry Hill was

11

quoted by NBC as saying that he felt "misled" by PG&E's executives into believing that the

12

Company had followed the lead of its counterparts and shut off its reclosers – a type of "smart"

13

switch that can automatically turn power back on – in all 132 of its high risk fire areas by the

14

start of 2017:

15

Hill said he was surprised the company's recloser shutdown was so
limited, given that a top PG&E official assured him back in 2015
that the company would be able to shut down reclosers in all 132
of the high risk fire areas by the start of 2017.

16

17

"I think that's the troubling part," Hill said, "that they misled us in
that.

18

19

"Had they said they did not have that system in place, then we
would have followed up with more questions to try to find what the
problem was – and may have been able to focus in on that a couple
of years ago that may have prevented these fires in October."

20

21

578.    On April 2, 2018, PG&E filed with the SEC the registration statement for the

22

23

April 2018 Notes Offering.  On April 13, 2018, PG&E filed the prospectus for the offering.  The

24

exchange offer under the April 2018 Notes Offering ran until 5pm ET on May 14, 2018.

25

579.    On May 25, 2018, Cal Fire issued a press release announcing the results of its

26

investigation into four of the North Bay Fires.  The agency found that **all four had begun as a**

27

**result of downed vegetation disrupting PG&E power lines, and that three of the four were**

28

**due to PG&E's apparent violations of California safety regulations** regarding the necessary

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3:18-CV-03509-EJD

169

1    clearance between trees and power lines.  The violations were of such a nature that Cal Fire

2    referred these incidents to the appropriate district attorneys' offices for further review.

3         580.    Less than a month later, on June 8, 2018, Cal Fire issued a press release

4    announcing the results of its investigation into 12 additional wildfires that occurred during the

5    North Bay Fires.  The agency determined that **all 12 wildfires were caused by PG&E**

6    **equipment**.  The agency also stated that eight of the 12 had been referred to the appropriate

7    district attorneys' offices for further review "due to evidence of alleged violations of state law."

8         581.    The next day, on June 9, 2018, *Bloomberg* published an article titled "PG&E May

9    Face Criminal Charges After Probe of Deadly Wildfires."  The article stated that PG&E was

10   exposed to potential criminal liability due to Cal Fire's finding that PG&E's failure to follow the

11   law had led to a majority of the North Bay Fires investigated to date.

12        582.    On June 10, 2018, analysts at Guggenheim issued a research report on PG&E that

13   recommended investors sell PG&E securities.  The report stated: "At this point, we question

14   whether the applicability of inverse condemnation even matters when **all signs seem to point to**

15   **PCG being imprudent operators in the majority of instances, which would therefore mean**

16   **it should assume liability."**

17        583.    On June 21, 2018, PG&E announced that it would take an estimated pre-tax

18   charge in the amount of *2.5 billion* for the quarter ending June 30, 2018, for claims related to

19   the North Bay Fires.

20        584.    On October 9, 2018, Cal Fire issued a press release announcing the results of its

21   investigation into the Cascade Fire, part of the North Bay Fires.  Again, PG&E equipment was

22   found to be the cause of the fire.

23        585.    PG&E's admitted exposure for the North Bay Fires continued to increase.  On

24   February 28, 2019, PG&E issued a press release indicating the Company was taking an

25   additional $1 billion charge for the quarter ending December 31, 2018 for the North Bay Fires.

26   Accordingly, a total of $3.5 billion in charges for the North Bay Fires had been taken to date.

27        586.    By the time PG&E filed its quarterly report on Form 10-Q on May 2, 2019,

28   PG&E would report that "Cal Fire has issued its determination on the causes of 19 of the 2017

1    Northern California wildfires, and alleged that all of these fires, with the exception of the Tubbs

2    fire, involved [PG&E's] equipment.  Cal Fire has not publicly announced any determination of

3    cause on the remaining wildfires."  PG&E has also indicated in this latest Form 10-Q, filed with

4    the SEC on May 2, 2019, that "[i]n light of the current state of the law on inverse condemnation

5    and the information currently available to the Utility, including, among other things, the Cal Fire

6    determinations of cause as stated in Cal Fire's press releases and their released reports, PG&E

7    Corporation and the Utility have determined that it is probable they will incur a loss for claims in

8    connection with 17 of the 2017 Northern California wildfires."

9         587.    Following the North Bay Fires, on November 8, 2018, the Camp Fire began near

10   the town of Paradise, Butte County.  The fire would grow to surpass the North Bay Fires – **which

11   PG&E equipment had played a central role in igniting nearly all only one year previously**.

12   The 2018 Camp Fire is the most destructive and fatal wildfire in California history.  The fire

13   burned 153,336 acres, caused at least 85 fatalities, with total damages estimated on the low-end

14   at $16.5 billion.  The fire was considered the costliest natural disaster in the world in 2018.

15        588.    Cal Fire, as it did with the 2015 Butte Fire and North Bay Fires, conducted an

16   investigation.  PG&E equipment was implicated as the cause of the Camp Fire. Specifically, Cal

17   Fire identified the location of the fire as near a PG&E transmission line, which the Company

18   revealed in a December 11, 2018 electric incident report had relayed and de-energized shortly

19   before the fire began.  A PG&E employee also reported a fire in the vicinity of the transmission

20   line to 911 the morning the Camp Fire started, and an aerial patrol identified a suspension

21   insulator supporting a transposition jump at the transmission tower that had separated.

22        589.    On November 13, 2018, PG&E filed a report on Form 8-K with the SEC stating

23   that PG&E had submitted an electric incident report to the CPUC suggesting that PG&E's

24   equipment was at fault for the Camp Fire, and that PG&E had significantly increased their

25   liability insurance, as follows:

26              The cause of the Camp Fire is under investigation.  On November
                8, 2018, the Utility submitted an electric incident report to the
27              California Public Utilities Commission (the "CPUC") indicating
                that "on November 8, 2018 at approximately 0615 hours, PG&E
28              experienced an outage on the Caribou-Palermo 115 kV

Transmission line in Butte County.  **In the afternoon of November 8, PG&E observed by aerial patrol damage to a transmission tower on the Caribou-Palermo 115 kV Transmission line**, approximately one mile north-east of the town of Pulga, in the area of the Camp Fire. This information is preliminary."  Also on November 8, 2018, acting governor Gavin Newsom issued an emergency proclamation for Butte County, due to the effect of the Camp Fire.

As previously reported, during the third quarter of 2018, PG&E Corporation and the Utility renewed their liability insurance coverage for wildfire events in an aggregate amount of approximately $1.4 billion for the period from August 1, 2018 through July 31, 2019.

590.    PG&E has also acknowledged (¶190) that another ignition point for the Camp Fire had exhibited damaged and downed poles, vegetation on top of downed wires, and other signs of safety violations.  At times approximately 30 minutes apart, vegetation underneath the lines ignited at two ignition points.  At the same time, despite PG&E's ESRB-8 Shutoff Protocol, PG&E had canceled plans to shut off power as a precaution against fires in parts of Butte County, where the fire ignited.  Additionally, media reports (¶375) have indicated that a PG&E crew was planning to address sparking transmission lines in a location near the origin of the Camp Fire.

591.    On November 14, 2018, *Reuters* published an article describing the market's reaction to the news about PG&E's liability for wildfires, titled "UPDATE 3-PG&E shares and bonds plunge as California wildfire risks mount."[160]

592.    On November 15, 2018, Moody's downgraded PG&E's debt.  As *Bloomberg* described in a November 15, 2018 article titled "PG&E Credit Cut to Brink of Junk by Moody's on Wildfire Risk":

PG&E Corp.'s credit rating was cut to the brink of junk amid doubt about its ability to manage liabilities from the California wildfires.

Moody's Investors Service lowered the rating to Baa3 from Baa2, the second-lowest level of investment grade, with the possibility of

---

[160]    Dan Burns, *UPDATE 3-PG&E Shares and Bonds Plunge as California Wildfire Risks Mount*, Reuters (Nov. 14, 2018), https://www.reuters.com/article/california-wildfires-pge/update-3-pge-shares-and-bonds-plunge-as-california-wildfire-risks-mount-idUSL2N1XP0UP.

further downgrade, according to a statement. PG&E's grade reflects an exposure of about $10 billion to the 2017 wildfires, and uncertainty around 2018 liabilities, said Moody's, which also reduced the utility's Pacific Gas & Electric Co. subsidiary to Baa2.

"**The rating downgrade reflects the material exposure to new potential liabilities associated with the Camp Fire** and the uncertainties associated with how the fire-related liabilities will be recovered," Moody's analyst Jeff Cassella said in the statement.

California's biggest utility said this week it exhausted its credit facilities to boost cash, a move that was widely seen to be in anticipation of a credit rating downgrade, and raising concerns it may have to eventually file for bankruptcy.

593.     On November 27, 2018, Judge Alsup ordered PG&E to provide written answers to several questions regarding the Company's role in starting the Camp Fire and any other fires in the last three years.[161]  Judge Alsup is presiding over PG&E's probation proceedings following its 2016 conviction related to the explosion of a PG&E gas pipeline in San Bruno, California, that killed eight people and destroyed 38 homes.

594.     Despite the 2015 Butte Fire and North Bay Fires, on December 10, 2018, *The San Diego Union-Tribune* reported that PG&E had never produced a report for wildfire mitigation risks two years after the law requiring the production of such a report was enacted.  Under California Senate Bill 1028 ("SB 1028") – enacted in September 2016 – PG&E and other California utilities were required to produce an annual report detailing efforts to limit the risks from wildfires and specifying who was responsible for implementing safety provisions in the plans.  State Senator Jerry Hill, who introduced SB 1028, said of utility regulators' failure to oversee PG&E's implementation of the report: **"They have done absolutely nothing in those two years."**  In part to rectify this delinquency, the California State Legislature passed California Senate Bill 901 ("SB 901") in the Fall of 2018 in order to force California utilities to develop and submit their wildfire mitigation plans no later than February 2019.  According to a submission of

---

[161] *See* Notice re California Wilfires, PG&E Criminal Proceedings (N.D. Cal. Nov. 27, 2018), ECF No. 951.

1    the CPUC in the probation proceedings pending before Judge Alsup, on February 6, 2019,

2    PG&E finally submitted said plan.[162]

3        595.    In addition to not producing a plan for wildfire mitigation risks, PG&E is alleged

4    to have falsified safety data and records for five years.  As PG&E noted in a press release, filed

5    on January 14, 2019 with the SEC on a Form 8-K, the CPUC announced on December 14, 2018

6    that it had opened a case against PG&E for allegedly falsifying its data and safety records.

7    While the documented violations related to the intentional falsification of pipeline data, the

8    agency stated that the findings were an example of why it was "investigating PG&E's safety

9    culture" and considering the forced implementation of measures that "address systemic safety

10   issues at PG&E."  In other words, according to the CPUC, the Company's falsification of

11   pipeline safety data implicated the Company's entire operations and approach to safety.

12   According to the CPUC's annual report for 2018, PG&E falsified records from 2012 through

13   2017.[163]

14       596.    Thereafter, on December 21, 2018, the CPUC issued a Scoping Memo and Ruling

15   (the "Ruling") regarding its efforts to reform PG&E's corporate safety culture.  The Ruling

16   found that "PG&E has had serious safety problems with both its gas and electric operations for

17   many years" and stated that, despite these shortcomings, **the Company had failed "to develop a**

18   **comprehensive enterprise-wide approach to address safety**."  The Ruling stated that the

19   CPUC "was, and remains, concerned that the safety problems being experienced by PG&E were

20   **not just one-off situations or bad luck, but indicated a deeper and more systemic problem**."

21       597.    On December 28, 2018, the Attorney General of California filed an amicus brief

22   in connection with PG&E's probation proceedings before Judge Alsup.  The brief stated that

23   PG&E's actions or failures to act could constitute a range of criminal violations if the Utility was

24

25   _____

     [162] Comments of the CPUC in Response to Second Order to Show Cause at 1, PG&E
26   Criminal Proceedings (N.D. Cal. Mar. 22, 2019), ECF No. 1033.

     [163] *See* CPUC 2018 Annual Report at 9,
27   http://www.cpuc.ca.gov/uploadedFiles/CPUCWebsite/Content/About_Us/Organization/
     Divisions/Office_of_Governmental_Affairs/Legislation/2019/CPUC%20Annual%20Report%20
28   2019%20-%20page%20view%20only.pdf.

1  found to be "reckless" in causing California wildfires.[164]  The listed potential offenses ranged

2  from misdemeanors to implied-malice murder.

3       598.    On January 9, 2019, in PG&E's probation proceedings before Judge Alsup, a U.S.

4  probation officer filed a Petition for Summons for Offender Under Supervision, which: (i) found

5  "probable cause to believe that Pacific Gas and Electric Company violated the conditions of their

6  Probation" stemming from the San Bruno pipeline explosion;[165] (ii) cited the Company's failure

7  to report the investigation by the Butte County District Attorney's Office into PG&E's role in

8  starting several fires that formed part of the North Bay Fires; and (iii) cited PG&E's failure to

9  report Cal Fire's findings of responsibility for the Honey Fire (part of the North Bay Fires), that

10  there was the possibility of criminal prosecution stemming from PG&E's role in starting this fire,

11  or that the Company had entered into a settlement agreement with Butte County to avoid such

12  criminal prosecution.

13       599.    On January 9, 2019, Judge Alsup also issued an order to show cause as to why the

14  terms of PG&E's probation should not be modified "[i]n order to protect the public from further

15  wrongs by the offender, to deter similar wrongs by other utilities, and to promote the

16  rehabilitation of the offender."[166]  The order cited Cal Fire's finding that **PG&E had caused 18**

17  **wildfires in 2017, 12 of which it had referred to criminal prosecution**, and suggested the

18  Company significantly bolster its vegetation management activities and re-inspect its entire

19  electrical grid in "light of PG&E's history of falsification of inspection reports," among other

20  proposed modifications to the terms of the Company's probation.[167]

21

22

23     [164] Attorney General's Amicus Brief Regarding PG&E's Potential Criminal Liability, PG&E
Criminal Proceedings (N.D. Cal. Dec. 28, 2018), ECF No. 954.

24     [165] Petition for Summons for Offender Under Supervision at 4, PG&E Criminal Proceedings

25  (N.D. Cal. Dec. 28, 2018), ECF No. 960.

   [166] Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified at 1,

26  PG&E Criminal Proceedings (N.D. Cal. Jan. 9, 2019), ECF No. 961.

27     [167] PG&E has been found responsible by Cal Fire for at least *18 of the 19 major fires*
stemming from the 2017 Northern California wildfires that Cal Fire had investigated up until that

28  point.  Only the Tubbs Fire had not been found to have been PG&E's fault.

600.    On January 13, 2019, *The Wall Street Journal* reported that PG&E had **started more than 1,500 fires** between June 2014 and December 2017, or more than one a day on average.[168]   The newspaper provided the following graphic, which illustrates the shocking extent of PG&E's contribution to fires throughout California with incidents reported across essentially *all* of the Utility's service area:



<hr />

[168] Russell Gold et al., *PG&E Sparked at Least 1,500 California Fires. Now the Utility Faces Collapse*, Wall Street J. (Jan. 13, 2019), https://www.wsj.com/articles/pg-e-sparked-at-least-1-500-california-fires-now-the-utility-faces-collapse-11547410768.

1        601.    On January 14, 2019, PG&E filed with the SEC a report on Form 8-K stating that

2    the Company expected to file for Chapter 11 bankruptcy on or about January 29, 2019.  The

3    reason the Company provided for the expected bankruptcy filing was the "series of catastrophic

4    wildfires that occurred in Northern California in 2017 and 2018."

5        602.    On January 15, 2019, *MarketWatch* reported in an article titled "PG&E's slide

6    into bankruptcy would mark third largest investment-grade default since 1998,"[169] that PG&E

7    faced a significant risk of defaulting on its bonds:

8               If Pacific Gas & Electric Co. follows through with its bankruptcy
              announcement, the country's largest utility would record the third

9               largest default in the U.S. investment-grade corporate bond market
              since 1998.

10

11               PG&E announced it would file for bankruptcy by Jan. 29 after
              devastating California wildfires in 2017 and 2018 left it facing
              billions in potential liabilities.  The company also said it would not

12               pay an interest payment due on bonds maturing in 2040 on
              Wednesday, which would also trigger a default.

13                           *      *      *

14

15               PG&E's bankruptcy would mark a dramatic collapse for a
              company that was once seen as an attractive bet among hedge
              funds.  More than $17 billion of its bonds would be facing default,

16               according to analysts at Bank of America Merrill Lynch.

17                           *      *      *

18               In terms of sheer scale of a default from an investment-grade
              issuer, BAML found only Lehman Bros. and WorldCom would

19               rank above the PG&E.

20        603.    On January 17, 2019, Judge Alsup issued a request for comment on his tentative

21    finding that "**the single most recurring cause of the large 2017 and 2018 wildfires**

22    **attributable to PG&E's equipment has been the susceptibility of PG&E's distribution lines**

23    **to trees or limbs falling onto them during high-wind events.**"

24

25

26    ——————————
       [169] Sunny Oh, *PG&E's Slide Into Bankruptcy Would Mark Third Largest Investment-Grade*

27    *Default Since 1998*, MarketWatch (Jan. 15, 2019), https://www.marketwatch.com/story/pges-
    slide-into-bankruptcy-would-mark-third-largest-investment-grade-default-since-1998-2019-01-

28    15.

604.    On January 29, 2019, PG&E declared Chapter 11 bankruptcy.  The Company's bankruptcy filings stated that it was facing $51.7 billion in liabilities, including more than $30 billion in possible liabilities tied to the Camp Fire and the North Bay Fires.

605.    On January 30, 2019, Judge Alsup, during a probationary hearing, stated: "**[T]here is one very clear-cut pattern here: That PG&E is starting these fires**."[170]  Judge Alsup continued, "what do we do[?]  Does the judge just turn a blind eye and say, 'PG&E, continue your business as usual.  Kill more people by starting more fires'?"  On the subject of whether PG&E had made safety a priority, Judge Alsup reportedly stated: "**[I]t's not really true. Safety is not your number one thing**."

606.    On February 6, 2019, PG&E finally filed a wildfire mitigation plan as required by SB 901.  PG&E's wildfire plan stated that the Company would significantly expand its public-safety power shutoff program, from about 570,000 affected consumers to as many as 5.4 million customers, substantially increase its tree-clearing practices, beef up inspections of its equipment and install more weather stations and cameras for earlier risk detection.

607.    Accordingly, the expanded scope of PG&E's 2019 wildfire plan further demonstrates the inadequacy of PG&E's prior safety practices and investment in safety, showing that PG&E did far less than it should have previously done.

608.    Similarly, the 2019 wildfire mitigation plan provided for more $2 billion in new expenditures and significant increases in inspections and other measures over what PG&E had done in 2018.  Those new measures included the following:

- remove 375,000 trees in 2019, after cutting down 160,000 in 2018;

- 2,450 miles of Enhanced Vegetation Management in 2019, a 320% increase from the 760 miles of assorted related practices in 2018;

- increase enhanced transmission structure inspections from 9,400 in 2018 to 40,600 in 2019; and

---

[170] Transcript of Proceedings at 12-13, 24, PG&E Criminal Proceedings (N.D. Cal. Jan. 31, 2019), ECF No. 999.

1

       • enhanced inspections of 685,000 distribution poles,
            including climbing of all transmission towers, after making

2

            517,500 routine inspections of distribution poles in 2018.

3         609.    Following the plan's release, the *Associated Press* summarized the general

4  reaction, "Lawyers, industry watchdogs and a federal judge alike wonder: *What took so long*?"

5  However, at the hearing on the second order to show cause in PG&E's probation proceedings

6  before Judge Alsup, counsel for PG&E stated that the plan was not final.  He explained, "the

7  wildfire mitigation plan is still in the process of being reviewed and there isn't a final one . . . that

8  plan is still in flux."[171]

9         610.    Also on February 6, 2019, attorneys for fire victims provided a submission to

10  Judge Alsup in response to the January 30, 2019 probationary hearing.[172]  The submission

11  compiled data from PG&E's regulators which demonstrated that the Company posed a far

12  greater risk to the public than its peers.  For example, according to the submission, Southern

13  California Edison ("SoCalEd") serves 15 million people across approximately 50,000 square-

14  miles, operating and maintaining 91,375 miles of distribution lines and 1,433,336 electric poles.

15  By comparison, PG&E services approximately 16 million people throughout a 70,000-square-

16  mile service area, operating and maintaining between 81,000 miles and 115,000 miles of

17  distribution lines and 2,400,000 electric poles.  Yet, despite these similarities in service size and

18  miles of distribution lines, **PG&E's electrical equipment caused 1,208 more wildfires than**

19  **SoCalEd's equipment between 2014 to 2017** as self-reported to the CPUC.  In total, PG&E's

20  equipment caused 1,552 wildfires, while SoCalEd only caused 344 fires over the same time

21  period.  Put differently, PG&E's equipment caused **4.5 times more wildfires** than SoCalEd.

22  PG&E's equipment was also responsible for more large-scale fires, including 43 more fires than

23  SoCalEd that burned between 10-99 acres, three more between 100-299 acres, and two more

24  between 300-999 acres.  Similarly, since 2014, the electrical equipment of San Diego Gas &

25

26     [171] Transcript of Proceedings at 10, PG&E Criminal Proceedings (N.D. Cal. Apr. 2, 2019),
  ECF No. 1047. To date, PG&E has filed two amended plans, on February 12, 2019 and April 25,

27  2019.

     [172] Submission of Attorneys Pitre and Campora in Response to Order dated Jan. 30, 2019,

28  PG&E Criminal Proceedings (N.D. Cal. Feb. 6, 2019), ECF No. 1005.

1   Electric ("SDG&E") caused 109 wildfires with only one wildfire burning over 10 acres.  By

2   contrast, PG&E caused 1,552 wildfires during that same timeframe with 68 of those fires burning

3   over 10 acres.

4       611.    On February 11, 2019, PG&E issued a press release stating that it would be

5   replacing the majority of its Board.  As of today, only two Board members out of 13 have not

6   been replaced.  This announcement followed the departure of several Company executives,

7   including PG&E's CEO defendant Williams and three senior executives in PG&E's electric

8   division.  The release acknowledged "that **PG&E must re-earn trust and credibility** with its

9   customers, regulators, the communities it serves and all of its stakeholders . . . ."

10      612.    On February 27, 2019, *The Wall Street Journal* published an article titled, "PG&E

11  Delayed Safety Work on Power Line That Is Prime Suspect in California Wildfire."  The article

12  stated that the Company had delayed for several years needed repairs to its high-voltage Caribou-

13  Palermo transmission line, the likely source of the Camp Fire.  PG&E had failed to fix the **100-**

14  **year old line** despite informing federal regulators of its plans to repair and replace damaged

15  sections of the line as early as 2013.  Similarly, in a July 2017 federal filing, PG&E proposed

16  overhauling the line, noting that more than **one in four wire spans between towers were too**

17  **close to vegetation**.  The plan involved swapping 61 lattice towers with modern tubular-steel

18  poles, and replacing wire and hardware connecting it to the towers.  But PG&E never began the

19  work.  The article also detailed PG&E's antiquated safety monitoring procedures and lack of

20  transparency in transmission line spending.  According to the article, "An internal PG&E audit

21  from 2013 found that the company focused mainly on spending its allotted budget, not ensuring

22  expenditures were prudent and effective, and that it lacked performance data and other records

23  for many projects."

24      613.    Also on February 26, 2019, *The Mercury News* published an article titled, "PG&E

25  knew for years that repairs were needed on transmission lines in area of fatal Camp Fire."

26  According to the article, energy officials had been warning PG&E about its fast-aging system of

27  transmission lines for the better part of a decade.  For example, according to a May 2017 CPUC

28  filing, "In 2010 and again in 2015, the California Independent System Operator transmission

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                    180
CIVIL ACTION NO. 3:18-CV-03509-EJD

1   plan identified the need to improve and upgrade this system to address potential overloads and

2   power outages that would affect customers in the service area."

3       614.    PG&E likewise stated in a July 2017 filing to FERC that it would embark on

4   numerous repairs of the Caribou-Palermo system.  The planned repairs and maintenance

5   included new tower frames, steel poles, improved line tension and hardware upgrades.  As

6   PG&E stated in the filing:  "The project has a forecasted capital expenditure of $30.3 million."

7       615.    PG&E also proposed in July 2017 considerable work for the Caribou-Palermo

8   line as part of the Company's annual request to FERC for rate changes.  "The Caribou-Palermo

9   115 kilovolt circuit was analyzed as part of the 2013 NERC Assessment," PG&E stated,

10  referring to an analysis by the North American Electric Reliability Corporation.  The filing

11  indicated the 2013 NERC study determined that well over 100 transmission line spans were

12  perilously close to vegetation or trees.  "The completed analysis identified 127 spans with

13  clearance issues out of the 455 spans on the electric transmission line," PG&E stated in its 2017

14  FERC filing.  PG&E never fixed the identified issues from the time it learned about them in 2013

15  as reflected in the July 2017 filing.  PG&E's Caribou-Palermo transmission system would later

16  be implicated in the 2018 Camp Fire.

17      616.    On February 28, 2019, PG&E issued a press release providing an update on the

18  financial impact of the Camp Fire and the North Bay Fires, along with the Company's fourth

19  quarter and full-year 2018 financial results.  The release stated that PG&E "believes it is

20  probable that its equipment will be determined to be an ignition point of the 2018 Camp Fire."  It

21  also stated that the Company would be taking a *$10.5 billion charge* related to the Camp Fire.

22  As set forth in ¶¶583 & 585, the Company also stated that it expected a $1 billion charge related

23  to the North Bay Fires, which was on top of the prior $2.5 billion charge that the Company had

24  previously taken in connection with the fires.  According to the Company, primarily due to the

25  large number of third-party claims against PG&E, the Company reported full-year **net losses of**

26  **$6.9 billion**, compared to 2017 net income of $1.6 billion.  As a result of the "extraordinary

27  challenges" caused by the wildfires, the release stated that PG&E **may not be able to continue**

28  **as a going concern**.

617.    On March 5, 2019, Judge Alsup issued a revised order to show cause as to why the court should not modify the terms of PG&E's probation in light of subsequent submissions.[173]  In the order, Judge Alsup found that PG&E's "**unsafe conduct** led to a deadly pipeline explosion and to six felony convictions" and had now "**led to recurring deadly wildfires caused by its electrical system**."

618.    Judge Alsup's order noted that in its submissions, PG&E had made several **admissions** including that: (i) vegetation contact was the primary risk driver with respect to ignitions along PG&E's distribution lines; (ii) PG&E agreed "that vegetation presents an acute risk of wildfire ignition across PG&E's service territory"; (iii) in 2016 alone, PG&E had experienced approximately 1,400 downed wires caused by vegetation contact; (iv) during 2015 and 2016, PG&E had reported to the CPUC that vegetation contact with conductors was the leading cause of the 486 fire ignitions associated with PG&E facilities, causing 37% of such fires; (v) as of June 2017, there remained 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to "fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle"; and (vi) the Company believed its equipment caused the Camp Fire.

619.    Judge Alsup further found that the "**record demonstrates that PG&E's performance with respect to vegetation management has been dismal**."  As a result, the court modified the terms of PG&E's probation to require it to comply with state laws regarding vegetation management and its wildfire prevention plan, among other remedial measures, and suspended PG&E's dividend until it could demonstrate that the Company had complied with the modified probation terms.

620.    On March 18, 2019, a coalition of law firms representing fire victims published excerpts of internal PG&E emails demonstrating that PG&E had identified the transmission lines

---

[173] Second Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified, PG&E Criminal Proceedings (N.D. Cal. Mar. 5, 2019), ECF No. 1027.

1  implicated in the Camp Fire as unsafe long before the fire started.[174]  For example, **internal**

2  **Company documents showed that in December 2012 five aging towers along the Caribou-**

3  **Palermo transmission line had collapsed, and a 2014 internal Company email stated that**

4  **"the likelihood of failed structures happening is high**."  Similarly, a November 1, 2016 PG&E

5  document detailed the failure of necessary hardware along the transmission line, with a support

6  hook snapping off during routine painting.  PG&E documents internally acknowledged that the

7  supports "had been compromised through corrosion."[175]  Despite the internal acknowledgment

8  that the Caribou-Palermo lines were in need of repair and posed a significant risk of collapse,

9  PG&E never had the lines fixed.  Instead, the Company reasoned that any collapse would not

10 impact a sufficient number of customers to warrant the repairs and that the risks would be

11 mitigated because any fire may be extinguished by rain.  Tragically, needed repairs were never

12 undertaken, and **the Caribou-Palermo line became the devastating source of the Camp Fire**

13 later that year.

14       621.    Also on March 18, 2019, *The New York Times* published an exposé on PG&E

15 titled, "How PG&E Ignored California Fire Risks in Favor of Profits."  The article portrayed a

16 corporate culture at PG&E which disregarded safety risks and neglected necessary fire

17 prevention precautions in favor of short-term operating results.  For example, an internal PG&E

18 email had noted that the transmission tower implicated in the Camp Fire, tower 27/222, was at

19 risk of collapse long before the blaze was ignited.  The Company's own guidelines also warned

20 that **the tower was a quarter-century past its useful life**, yet PG&E did not repair or replace

21 the aging tower.  The article quoted Mike Florio, a former California utilities commissioner, who

22 observed, "There was very much a focus on the bottom line over everything [at PG&E]:  'What

23 are the earnings we can report this quarter? . . .  And **things really got squeezed on the**

24 **maintenance side**."  The article also quoted California's Governor Gavin Newsom, who

25 _____

26  [174]*Northern California Fire Lawyers Obtain Documents That Show PG&E Knew About Risk*
    *of Caribou-Palermo Line Failure*, MarketWatch (Mar. 18, 2019),
27  https://www.marketwatch.com/press-release/northern-california-fire-lawyers-obtain-documents-
    that-show-pge-knew-about-risk-of-caribou-palermo-line-failure-2019-03-18.

28  [175]*Id.*

1   expressed a similar sentiment:  "**[PG&E] have simply been caught red-handed over and over**

2   **again, lying, manipulating or misleading the public. . .  They cannot be trusted.**"  The article

3   contrasted the lack of safety focus at the Company with the approach taken by another California

4   utility facing similar risks, SDG&E, that had significantly revamped its safety protocols to

5   respond to increased wildfire dangers.  According to one industry expert quoted in the article, if

6   PG&E had followed the lead of SDG&E its equipment would have caused far fewer destructive

7   fires.  This expert concluded that "**[PG&E's] culture of a lack of safety is unique**" amongst

8   utilities.

9         622.    On April 2, 2019, Judge Alsup held a hearing on his second order to show cause

10  in PG&E's probation proceedings.  At the hearing, Judge Alsup stated: "**PG&E over several**

11  **years allowed the trees that needed to be removed to be built up and did not remove them**,

12  did not trim them so that we wound up with a large number of trees that should have been

13  removed by PG&E but weren't.  And that was a major contributing factor, maybe the single-

14  biggest factor, in causing the fires in 2017 and 2018 in Northern California." [176]  Judge Alsup

15  also explained "as we've gotten into the evidence, and I've studied quite a lot of it, again I want

16  to say it's quite clear that PG&E pumped out $4.5 billion in the last five years in dividends and

17  **let the tree budget wither so that a lot of trees that should have been taken down were not.**"

18  As Judge Alsup concluded, "[t]his is a crisis, a crisis that California faces on these wildfires, and

19  **PG&E is the single-most culpable entity in the mix**. . . .  PG&E has started more than – way

20  more than its share of these fires. . .  This is a problem of your own making.  A lot of money

21  went out in dividends that should have gone to the tree budget."

22        623.    On April 12, 2019, *NBC Bay Area* published an article titled "PG&E Inspectors

23  Find Hundreds of Safety Issues on Electrical Towers."  The article indicated that "PG&E's

24

25

26

27  ———————————
    [176] Transcript of Proceedings at 6-7, PG&E Criminal Proceedings (N.D. Cal. Apr. 4, 2019),
28  ECF No. 1047.

---

1    inspections of thousands of transmission towers since the deadly Camp Fire in Butte County

2    found more than 450 safety violations, including 59 that posed serious safety hazards."[177]

3        624.    On May 2, 2019, PG&E filed its Q1 2019 Form 10-Q with the SEC wherein,

4    PG&E reinforced that "PG&E Corporation and the Utility are facing extraordinary challenges

5    relating to a series of catastrophic wildfires that occurred in Northern California in 2017 and

6    2018. . . .  Uncertainty regarding these matters raises substantial doubt about PG&E

7    Corporation's and the Utility's abilities to continue as going concerns."

8        625.    According to PG&E's Q1 2019 Form 10-Q, it estimates that its liabilities for

9    wildfire-related claims remains at over $14.2 billion, including the 2015 Butte Fire ($212

10   million), the North Bay Fires ($3.5 billion) and the Camp Fire ($10.5 billion).  These estimated

11   liabilities do not include liabilities for the Camp Fire or North Bay Fires for, among other things,

12   "potential penalties or fines that may be imposed by governmental entities on PG&E Corporation

13   or the Utility, or punitive damages, if any, or any losses related to future claims for damages that

14   have not manifested yet, each of which could be significant."  As reported in the same Form 10-

15   Q, PG&E's "liability could exceed $30 billion" if it were found to be liable for the Camp Fire

16   and the North Bay Fires.

17       626.    PG&E also remains subject to criminal liability.  According to PG&E's Q1 2019

18   Form 10-Q, the Butte County District Attorney's Office and the California Attorney General are

19   investigating the Camp Fire and that a grand jury has been empaneled in Butte County.

20       627.    PG&E also reported in its Q1 2019 Form 10-Q that its operating and maintenance

21   expenses had increased by $443 million, or 35%, over the same quarter the prior year "primarily

22   due to $210 million related to enhanced and accelerated inspections and repairs of transmission

23   and distribution assets and $179 million for clean-up and repair costs relating to the 2018 Camp

24   Fire."

25

26

27       [177] Jaxon van Derbeken, *PG&E Inspectors Find Hundreds of Safety Issues on Electrical Towers*, NBC Bay Area (Apr. 12, 2019), https://www.nbcbayarea.com/investigations/PGE-

28   Inspectors-Find-Hundreds-of-Safety-Issues-on-Electrical-Towers-508344011.html.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                                    185
CONSOLIDATED CASE NO. 18-CV-03509-EJD

1    628.    On May 7, 2019, Judge Alsup conducted a sentencing hearing for PG&E's

2  violation of probation.  When speaking to PG&E's new CEO Johnson he noted that PG&E

3  "admitted that it started 17 of those fires in 2017 just in the Wine Country."[178]  He further

4  exclaimed that here in California "We have six to seven months of no rain.  And **you can't**

5  **blame it on global warming** because I have been here a long time and it's been that way every

6  summer."  During the sentencing hearing, Judge Alsup also observed that while there are other

7  causes of fire, "no one has started more fires than PG&E."

8    629.    On May 15, 2019, Cal Fire issued a release finding PG&E at fault for the Camp

9  Fire: "[a]fter a very meticulous and thorough investigation, Cal Fire has determined that **the**

10  **Camp Fire was caused by electrical transmission lines owned and operated by [PG&E]**

11  located in the Pulga area."  As to the second ignition site of the Camp Fire Cal Fire found: **"[t]he**

12  **cause of the second fire was determined to be vegetation into electrical distribution lines**

13  **owned and operated by PG&E."**  PG&E issued a press release the following day accepting the

14  determination that PG&E electrical lines located near Pulga were a cause of the Camp Fire.  On

15  May 22, 2019, PG&E acknowledged in a Schedule 14A filing with the SEC that "[t]he tragic

16  wildfires of the past two years have been extraordinarily challenging, and have made clear that

17  the energy status quo is no longer working for California."

18  **XVIII. THE SECURITIES ACT DEFENDANTS' MATERIALLY FALSE AND**
**MISLEADING STATEMENTS IN THE OFFERING DOCUMENTS FOR THE**
19  **NOTES OFFERINGS**

20    630.    Each of PG&E's Prospectuses filed on February 24, 2016, November 29, 2016,

21  March 8, 2017, and April 13, 2018, incorporated by reference the corresponding registration

22  statement (hereinafter, "Offering Documents"), as well as a number of other PG&E filings and

23  reports including the following:

24

25

26

27  ⎯⎯⎯⎯⎯⎯⎯⎯⎯
[178] Transcript of Proceedings at 11, PG&E Criminal Proceedings (N.D. Cal. May 7, 2019),
28  ECF No. 1061.

1         (a)     The February 24, 2016 Offering Documents for the March 2016 Notes

2   Offering incorporated by reference PG&E's: Annual Report on Form 10-K for FY15 filed with

3   the SEC on February 18, 2016;

4         (b)     The November 29, 2016 Offering Documents for the December 2016

5   Notes Offering incorporated by reference PG&E's: Annual Report on Form 10-K for FY15 filed

6   with the SEC on February 18, 2016;

7         (c)     The March 8, 2017 Offering Documents for the March 2017 Notes

8   Offering incorporated by reference PG&E's: Annual Report on Form 10-K for FY15 filed with

9   the SEC on February 18, 2016; Annual Report on Form 10-K for FY16 filed with the SEC on

10   February 16, 2017; and Press release, filed on Form 8-K with the SEC on May 23, 2016; and

11         (d)     The April 13, 2018 Offering Documents for the April 2018 Notes Offering

12   incorporated by reference PG&E's: Annual Report on Form 10-K for FY17 filed with the SEC

13   on February 9, 2018.

14       631.   The statements in or incorporated by the Offering Documents alleged to be

15   materially false and/or misleading for purposes of the Securities Act Claims alleged herein are

16   set out in Exhibit A attached hereto.[179]

17   **A.**    **The Securities Act Defendants Misled Investors Regarding PG&E's Safety Practices, Policies and Compliance**

18

19       632.   The Offering Documents, including the documents incorporated by reference

20   therein, omitted material adverse information from investors regarding PG&E's deficient safety

21   practices and policies while simultaneously falsely assuring investors that PG&E complied with

22   safety laws and regulations, sufficiently invested in safety, and provided for public safety by

23   clearing vegetation around its equipment, updating equipment, and inspecting its equipment.  In

24   contrast to what investors were led to believe in the Offering Documents, PG&E's "unsafe

25

26      [179] For purposes of this complaint not all of the statements alleged to be materially false and

27   misleading are set forth in the text of the complaint as many are repetitive and are false and

misleading for the same reasons as nearly identical statements.  They are however, alleged in

Exhibit A and incorporated by reference herein.  References to Exhibit A are referred to herein

28   as "Ex. A."

---

1  conduct" led to deadly wildfires and "PG&E's performance with respect to vegetation

2  management has been dismal." Nor had PG&E expended sufficient resources to reasonably

3  prevent wildfires.

4        **1.**    **The Offering Documents Omitted PG&E's Widespread Safety Failures and the Existing Risks Associated with Its Inadequate Safety Practices**

5

6        633.    Each of the Offering Documents referenced risk factors, including warnings that

7  droughts, climate change, wildfires and other events ***could*** cause a material impact on PG&E's

8  financial results. These statements were materially misleading because they did not disclose the

9  already existing negative impact on PG&E as a result of PG&E's subpar safety practices that

10  caused wildfires resulting in death, destruction and liability. PG&E faces more than $30 billion

11  in potential liability and has filed bankruptcy as a result. Cal Fire has found PG&E caused

12  wildfires in 2015, 2017 and 2018.

13        634.    The Offering Documents for each of the Notes Offerings did not disclose the true

14  existing risks facing PG&E as a result of its deficient safety practices and policies, including the

15  extent of the risks or that they had already come to fruition. For example, the prospectus filed on

16  February 24, 2016, pursuant to the March 2016 Notes Offering, stated:

17            Some of the ***factors that could cause future results to differ***
18            ***materially from those expressed or implied*** by the forward-
              looking statements, ***or from historical results, include*** . . .

19                        *      *      *

20            •   ***the impact of droughts or other weather-related***
21                ***conditions or events, wildfires (including the Butte fire in***
                ***September 2015***, which affected portions of Amador and
22                Calaveras counties), ***climate change***, natural disasters, acts
                of terrorism, war, or vandalism (including cyber-attacks),
23                ***and other events***, that can cause unplanned outages, reduce
                generating output, disrupt the our [sic] service to
24                customers, or damage or disrupt the facilities, operations,
                or information technology and systems owned by us, our
25                customers, or third parties on which we rely; ***whether we***
                ***incur liability to third parties for property damage or***
26                ***personal injury caused by such events; and whether the***
                ***we [sic] are subject to civil, criminal, or regulatory***
27                ***penalties in connection with such events***. See Ex. A,
                Stmt. No. 1.

28

635.     The Offering Documents for the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes Offering each repeated in substantially similar language the same purported warning.  *See* Ex. A, Stmt. Nos. 10-11, 20.  So too did the FY15 Form 10-K, FY16 Form 10-K, and FY17 Form 10-K.  *See* Ex. A, Stmt. Nos. 2, 23, 24.

636.     Similarly, PG&E's annual report for FY17 filed with the SEC on Form 10-K incorporated by the Offering Documents for the April 2018 Notes Offering misleadingly purported to warn that:

> ***Severe weather conditions, extended drought and shifting climate patterns could materially affect PG&E Corporation's and the Utility's business, financial condition, results of operations, liquidity, and cash flows.***
>
> Extreme weather, extended drought and shifting climate patterns have intensified the challenges associated with wildfire management in California.  Environmental extremes, such as drought conditions followed by periods of wet weather, can drive additional vegetation growth (which then fuel any fires) and influence both the likelihood and severity of extraordinary wildfire events.  ***In California, over the past five years, inconsistent and extreme precipitation, coupled with more hot summer days, have increased the wildfire risk and made wildfire outbreaks increasingly difficult to manage.  In particular, the risk posed by wildfires has increased in the Utility's service area (the Utility has approximately 82,000 distribution overhead circuit miles and 18,000 transmission overhead circuit miles) as a result of an extended period of drought, bark beetle infestations in the California forest and wildfire fuel increases due to record rainfall following the drought, among other environmental factors.***  Other contributing factors include local land use policies and historical forestry management practices.  The combined effects of extreme weather and climate change also impact this risk.  *See* Ex. A, Stmt. No. 26.

637.     In addition, each of the Company's Forms 10-K referenced by the Offering Documents also represented climate change as a risk to the Company's financial condition while omitting the real risks stemming from PG&E's woefully inadequate safety practices.  For example, the "Risk Factors" section of PG&E's FY15 and FY16 annual reports on Forms 10-K purported to warn that "***The Utility's future operations may be affected by climate change that may have a material impact on PG&E Corporation's and the Utility's financial condition, results of operations, and cash flows***," and that climate change could "***increase the occurrence of wildfires***."  Ex. A, Stmt.  Nos. 5, 13.

1      638.    The same FY15 and FY16 Forms 10-K, along with PG&E's FY17 Form 10-K,

2    went on to falsely reassure investors, in substantially similar language, that PG&E had studied

3    climate change but omitted the negative impact and risk of PG&E's safety violations and

4    deficient safety practices:

> The Utility has been studying the potential effects of climate
> change (increased temperatures, changing precipitation patterns,
> rising sea levels) on the Utility's operations and is developing
> contingency plans to adapt to those events and conditions that the
> Utility believes are most significant.  Scientists project that climate
> change will increase electricity demand due to more extreme,
> persistent and hot weather.  Increasing temperatures and changing
> levels of precipitation in the Utility's service territory would
> reduce snowpack in the Sierra Mountains.  If the levels of
> snowpack were reduced, the Utility's hydroelectric generation
> would decrease and the Utility would need to acquire additional
> generation from other sources at a greater cost.
>
> If the Utility increases its reliance on conventional generation
> resources to replace hydroelectric generation and to meet increased
> customer demand, it may become more costly for the Utility to
> comply with GHG emissions limits.  ***In addition, increasing
> temperatures and lower levels of precipitation could increase the
> occurrence of wildfires in the Utility's service territory causing
> damage to the Utility's facilities or the facilities of third parties
> on which the Utility relies to provide service, damage to third
> parties for loss of property, personal injury, or loss of life***.  In
> addition, flooding caused by rising sea levels could damage the
> Utility's facilities, including hydroelectric assets such as dams and
> canals, and the electric transmission and distribution assets.  ***The
> Utility could incur substantial costs to repair or replace facilities,
> restore service, compensate customers and other third parties for
> damages or injuries***.  The Utility anticipates that the increased
> costs would be recovered through rates, but as rate pressures
> increase, the likelihood of disallowance or non-recovery may
> increase.  *See* Ex. A, Stmt. Nos. 6, 14, 27.

21      639.    The foregoing statements in ¶¶634-638 were materially false and misleading

22    because contrary to the impression created by the Offering Documents, PG&E's safety practices

23    were deficient and the Company's deficient safety practices had already caused wildfires.  The

24    Offering Documents' repeatedly represented that: (i) PG&E's financial results could be impacted

25    by weather-related conditions, wildfires, climate change or other events, or that they could incur

26    liability caused by such events; and (ii) the climate change, increasing temperatures, or other

27    events could increase the occurrence of wildfires which could result in substantial costs or

28

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                              190
CLASS ACTION NO. 3:18-CV-03509-EJD

1    damages.  These representations were contradicted by material adverse facts that existed at the

2    time of the statements, including, *inter alia*, that:

3         (a)      PG&E's widespread safety deficiencies and violations had already

4    increased the risk of wildfires, caused wildfires and liability for those wildfires (*see generally*

5    §XVII.A.2.);

6         (b)      PG&E had caused hundreds or thousands of fires across California since

7    June 2014, averaging more than one fire a day – significantly more than, SoCalEd, for example,

8    a utility operating under similar conditions and legal and regulatory framework (¶¶600, 610, 628;

9    *see also* ¶621);

10        (c)      Rather than weather related events, the real risk of wildfires (and in fact

11   the cause of many) were a result of PG&E not sufficiently investing in providing its services in a

12   safe manner.  For example, PG&E's "dismal" vegetation management practices resulted in

13   wildfires (¶619).  As Judge Alsup  noted, PG&E has admitted that: (i) vegetation contact was the

14   primary risk driver with respect to ignitions along PG&E's distribution lines; (ii) in 2016 alone,

15   PG&E had experienced approximately 1,400 downed wires caused by vegetation contact; and

16   (iii) during 2015 and 2016, PG&E had reported to the CPUC that vegetation contact with

17   conductors was the leading cause of the 486 fire ignitions associated with PG&E facilities,

18   causing 37% of such fires. (¶618). Further, as PG&E Vegetation Program Manager Richard

19   Yarnell testified, for the entire period from September 2015 to April 10, 2017, "PG&E—to the

20   best of my knowledge, we have not made any changes" to improve safety. (¶22);

21        (d)      In addition, PG&E's lax tree clearing practices threatened the safety of

22   PG&E's operations.   For example, PG&E auditors had given PG&E a passing grade despite too

23   many trees found to violate state regulations by improperly expanding the area under review to

24   artificially increase PG&E's compliance rate (¶575).  Similarly, an internal PG&E audit,

25   conducted in the summer of 2015 revealed a negative trend of non-compliant trees in the same

26   district in which the Butte Fire started (¶570).  And, as Judge Alsup observed, PG&E has

27   admitted that as late as June 2017, there remained 3,962 unworked trees which PG&E had

28   identified in 2016 as hazardous with the potential to "fall into or otherwise impact the

1    conductors, towers or guy wires before the next inspection cycle" (¶618).  Judge Alsup also

2    indicated that "PG&E over several years allowed the trees that needed to be removed to be built

3    up and did not remove them, did not trim them so that we wound up with a large number of trees

4    that should have been removed by PG&E but weren't" which was a contributing factor to the

5    causes of wildfires (¶622);

6                    (e)     PG&E had incentivized its contractors to identify and clear fewer trees

7    and vegetation by paying them for reporting under the target number (¶569);

8                    (f)     Outdated PG&E equipment was not replaced or updated – for example,

9    the Company had never, as planned, addressed dangerously encroaching vegetation by replacing

10   old lattice towers with modern tubular steel poles or replacing wire and hardware connecting

11   those to towers, or updated the 100 year-old Caribou-Palermo transmission line that presented a

12   high likelihood of failure (¶¶612, 620; *see also* ¶613-615).  Likewise, despite assurances in 2015

13   that the Company would be able to shut down reclosers in high risk fire areas, they did not have

14   the system in place to do so causing wildfires (¶¶577, 606);

15                   (g)     PG&E did not sufficiently invest in wildfire safety.  For example, Judge

16   Alsup observed, PG&E "let the tree budget wither so that a lot of trees that should have been

17   taken down were not" (¶622).  And PG&E internal documents show that tree-related outages

18   could have been reduced if PG&E was willing to invest more (¶¶620-622).  Likewise, safety was

19   up for debate at the Company but not earnings growth (¶¶567, 606);

20                   (h)     At the time of the issuance of each of the Offering Documents, PG&E's

21   warning of weather-related conditions or climate change potentially impacting PG&E did not

22   disclose the then existing risks as a result of the safety violations and deficient practices (¶¶568,

23   570-571, 575, 577, 594-596, 598-599, 603, 605, 607-608, 610, 612-618, 620-623).  As Judge

24   Alsup indicated, you can't blame the fires "on global warming because I have been here a long

25   time and it's been that way every summer" (¶628);

26                   (i)     As a result of the extent and nature of PG&E's safety deficiencies and

27   numerous violations, PG&E was unable to prove "it reasonably and prudently operated and

28   managed its system" rendering it liable for the wildfires that it had already caused (¶558);

(j)      At the time of the issuance of the March 2016, December 2016 and March 2017 Notes Offerings' Offering Documents, rather than the risk of wildfires (including the 2015 Butte Fire) potentially impacting PG&E (*see* ¶¶566, 579, 584, 588, 599, 600, 617, 628, 629), the true facts were that PG&E's safety deficiencies and violations caused wildfires.  The Offering Documents failed to disclose the then existing risk to PG&E's financial condition as a result of the Company's widespread safety violations.  For example, the 2015 Butte Fire – which killed two people and destroyed more than 500 homes – was caused by PG&E's safety violations (¶566).  Additionally, the Offering Documents omitted the existing risk of wildfires from the already identified problems with PG&E's equipment along the Caribou-Palermo transmission line, the likely source of the Camp Fire and PG&E's overall dismal vegetation management practices (¶¶619-622).  PG&E's own inspections of transmission towers showed 450 safety violations, with 59 posing a serious safety hazard (¶623).  When speaking on risks relating to wildfires, the Securities Act Defendants did not disclose the extent of PG&E's wildfire inducing safety deficiencies and violations (¶¶568, 570-571, 575, 577, 594-596, 598-599, 603, 605, 607-608, 610, 612-618, 620-623);  and

(k)      At the time of the issuance of the April 2018 Notes Offerings' Offering Documents, the Securities Act Defendants warned of conditions that could impact PG&E's financial results (¶¶582, 583, 685-686, 601-602, 604, 616, 625; *see also* ¶624; ¶667) without disclosing the then existing widespread safety violations and insufficient safety practices (¶¶568, 570-571, 575, 577, 594-596, 598-599, 603, 605, 607-608, 610, 612-618, 620-623).  Nor did the Offering Documents disclose what PG&E has now admitted to Judge Alsup– "that it started 17 of those fires in 2017 just in the Wine Country" (¶628).  At the time of the issuance of the Offering Documents for the April 2018 Notes Offering, the Securities Act Defendants' misled investors regarding the then existing risks as a result of adverse facts, including the likelihood of failed structures, use of a transmission tower a quarter-century past its useful life, or the "dismal" vegetation practices of the Company (¶¶619-621).  When speaking on the risks related to wildfires, the Securities Act Defendants did not disclose PG&E's widespread safety lapses and

1  violations (¶¶568, 570-571, 575, 577, 594-596, 598-599, 603, 605, 607-608, 610, 612-618, 620-
2  623).

3           **2.    The Offering Documents Did Not Disclose PG&E's Investments in, Commitment to, and Practices Related to Safety Were Inadequate**

4  640.    PG&E's Forms 10-K incorporated by reference in the Offering Documents falsely

5  emphasized PG&E's safety efforts by investing in its energy distribution system, in particular by

6  clearing vegetation to prevent wildfires.  For example, the annual reports for FY15 and FY16

7  filed with the SEC on Forms 10-K incorporated in the Offering Documents for the March 2016,

8  December 2016 and March 2017 Notes Offerings misleadingly stated as follows:

9
10          With respect to electric operations, climate scientists project that,
           sometime in the next several decades, climate change will lead to
11          increased electricity demand due to more extreme, persistent, and
           frequent hot weather.  The Utility believes its strategies to reduce
12          GHG emissions through energy efficiency and demand response
           programs, infrastructure improvements, and the use of renewable
           energy and energy storage are effective strategies for adapting to
13          the expected increase [changes] in demand for electricity. ***The
           Utility is making substantial investments to build a more modern***
14          ***and resilient system that can better withstand extreme weather***
           ***and related emergencies.  The Utility's vegetation management***
15          ***activities also reduce the risk of wildfire impacts on electric*** and
           gas facilities.  Over the long-term, the Utility also faces the risk of
16          higher flooding and inundation potential at coastal and low
           elevation facilities due to sea level rise combined with high tides,
17          storm runoff and storm surges. *See* Ex. A, Stmt. Nos. 4, 12.

18          641.    The Company's FY17 Form 10-K, incorporated in the Offering Documents for

19  the April 2018 Notes Offering contained similarly false language:

20          With respect to electric operations, climate scientists project that,
           sometime in the next several decades, climate change will lead to
21          increased electricity demand due to more extreme, persistent, and
           frequent hot weather.  The Utility believes its strategies to reduce
22          GHG emissions through energy efficiency and demand response
           programs, infrastructure improvements, and the use of renewable
23          energy and energy storage are effective strategies for adapting to
           the expected changes in demand for electricity. ***The Utility is***
24          ***making substantial investments to build a more modern and***
           ***resilient system that can better withstand extreme weather and***
25          ***related emergencies.***  Over the long-term, the Utility also faces
           the risk of higher flooding and inundation potential at coastal and low
26          elevation facilities due to sea level rise combined with high tides,
           storm runoff and storm surges. ***As the state continues to face***
27          ***increased risk of wildfire, the Utility's vegetation management***
           ***activities will continue to play an important role to help reduce***
28          ***the risk of wildfire and its impact on electric and gas facilities***.

*See* Ex. A, Stmt. No. 29.

642.    PG&E's FY15 and FY16 Forms 10-K referenced in the Offering Documents for the March 2016, December 2016 and March 2017 Notes Offerings also misleadingly emphasized that PG&E had developed plans and strategies to mitigate the impact of climate change and respond effectively to emergencies as well as prioritizing infrastructure investments minimizing the real risks PG&E faced with respect to wildfires as a result of dismal safety practices and insufficient funding to prevent wildfires:

> *Climate Change Mitigation and Adaptation Strategies.*  During 2015 [2016], the Utility *continued its programs* to develop strategies to mitigate the impact of the Utility's operations (including customer energy usage) on the environment and to plan for the actions that it will need to take to adapt to the likely impacts of climate change on the Utility's future operations.  The Utility regularly reviews the most relevant scientific literature on climate change such as sea level rise, temperature changes, rainfall and runoff patterns, and *wildfire risk, to help the Utility identify and evaluate climate change-related risks and develop the necessary adaptation strategies.  The Utility maintains emergency response plans and procedures to address a range of near-term risks*, including extreme storms, heat waves and *wildfires* and *uses its risk-assessment process to prioritize infrastructure investments* for longer-term risks associated with climate change.  The Utility also engages with leaders from business, government, academia, and non-profit organizations to share information and plan for the future.  *See* Ex. A, Stmt. Nos. 3, 15.

643.    Following the 2017 North Bay Fires, the Company's 2017 Form 10-K incorporated in the Offering Documents for the April 2018 Notes Offering misleadingly represented that PG&E had developed "resilience strategies" to mitigate the impacts of climate change on PG&E:

> *Climate Change Resilience Strategies*
>
> *During 2017, the Utility continued its programs to mitigate the impact of the Utility's operations (including customer energy usage) on the environment and to plan for the actions that it will need to take to increase its resilience in light of the likely impacts of climate change on the Utility's operations*.  The Utility regularly reviews the most relevant scientific literature on climate change such as rising sea levels, major storm events, increasing temperatures and heatwaves, *wildfires,* drought and land subsidence, *to help the Utility identify and evaluate climate change-related risks and develop the necessary resilience strategies.  The Utility maintains emergency response plans and procedures to address a range of near-term risks, including*

*wildfires*, extreme storms, and heat waves and *uses its risk-assessment process to prioritize infrastructure investments* for longer-term risks associated with climate change.  The Utility also engages with leaders from business, government, academia, and non-profit organizations to share information and plan for the future.  *See* Ex. A, Stmt. No. 28.

644.    Similarly, each of PG&E's Forms 10-K incorporated by the Offering Documents also materially misled investors by regarding the safety of its operations emphasizing the Company's upgrades to its equipment.  For example, the Company's FY15, FY16 and FY17 Forms 10-K stated:

At December 31, 2015 [2016; 2017], the Utility owned approximately 18,400 [19,200] circuit miles of interconnected transmission lines operating at voltages ranging from 60 kV to 500 kV.  The Utility also operated 91 [92] electric transmission substations with a capacity of approximately 63,400 [64,600; 64,700] MVA.

*                *                *

*Throughout 2015 [2016; 2017], the Utility upgraded several critical substations and re-conductored a number of transmission lines to improve maintenance and system flexibility, reliability and safety.*  The Utility expects to undertake various additional transmission projects over the next several years to upgrade and expand the capacity of its transmission system to accommodate system load growth, secure access to renewable generation resources, replace aging or obsolete equipment and improve system reliability.  The Utility also has taken steps to improve the physical security of its transmission substations and equipment.  *See* Ex. A, Stmt. Nos. 7, 16, 30.

645.    The same electricity distribution passage from each of PG&E's Forms 10-K for FY15, FY16, and FY17 thereafter concluded with the following materially misleading statement, which did not disclose that PG&E did not have adequate systems or policies in place to shut down reclosers to prevent wildfires:

*In 2015 [2016; 2017], the Utility continued to deploy its Fault Location, Isolation, and Service Restoration circuit technology which involves the rapid operation of smart switches to reduce the duration of customer outages.  Another 83 [89; 92] circuits were outfitted with this equipment, bringing the total deployment to 700 [789; 882] of the Utility's 3,200 distribution circuits.  [The Utility also installed or replaced 20 distribution substation transformer banks to improve reliability and provide capacity to accommodate growing demand.]*  The Utility plans to *continue* performing work *to improve the reliability and safety of its electricity distribution operations* in 2016 [2017; 2018].  *See* Ex.

1        A, Stmt. Nos. 8, 17, 31.

2        646.   In addition, each of PG&E's Forms 10-K incorporated by the Offering

3    Documents materially misled investors by warning that the Company's equipment might fail, a

4    risk falsely described as "beyond the Utility's control."  For example, PG&E's Forms 10-K for

5    FY15 and FY16, as well as PG&E's Form 10-K for FY17, misleadingly purported to warn

6    investors as follows:

7            Utility's ability to safely and reliably operate, maintain, construct
             and decommission its facilities is ***subject to numerous risks***, ***many***

8            ***of which are beyond the Utility's control***, including those that
             arise from:

9

10                &bull;   ***the breakdown or failure of equipment, electric***
                    ***transmission or distribution lines***, or natural gas
                    transmission and distribution pipelines, ***that can cause***

11                  ***explosions, fires, or other catastrophic events***;[180]

12                     *   *   *

13                &bull;   ***the failure to take expeditious or sufficient action to***
                    ***mitigate operating conditions, facilities, or equipment,***

14                  ***that the Utility has identified, or reasonably should have***
                    ***identified, as unsafe, which failure then leads to a***

15                  ***catastrophic event (such as a wild land fire or natural gas***
                    ***explosion)***, [and the failure to respond effectively to a

16                  catastrophic event.][181]  *See* Ex. A, Stmt. Nos. 9, 18, 32.

17       647.   PG&E's 2017 Form 10-K incorporated by reference in the Offering Documents

18   for the April 2018 Notes Offering added false assurances to investors that PG&E had taken steps

19   to safely operate and maintain its equipment:

20           On April 12, 2017, the Utility retained a third-party monitor at the
             Utility's expense as part of its compliance with the sentencing

21           terms of the Utility's January 27, 2017 federal criminal conviction,
             which sentenced the Utility to, among other things, a five-year

22           corporate probation period and oversight by a third-party monitor
             for a period of five years, with the ability to apply for early

23           termination after three years.  ***The goal of the monitor is to help***
             ***ensure that the Utility takes reasonable and appropriate steps to***

24           ***maintain the safety of its gas and electric operations and***
             ***maintains effective ethics, compliance, and safety related***

25

26           [180] This language is included in each of PG&E's Forms 10-K incorporated in the Offering
     Documents, and similar language is also included in the registration statement for the April 2018

27   Notes Offering.  *See* Ex. A, Stmt. Nos. 9, 18, 21, 22, 32.

             [181]   The Form 10-K for FY 2017 removed the part of the sentence ending "and the failure to

28   respond effectively to a catastrophic event."

1

*incentive programs on a Utility-wide basis.* *See* Ex. A, Stmt. No.
33.

2

648.    In addition to PG&E's annual reports, the Company's May 23, 2016 press release

3

filed with the SEC on a Form 8-K (and as incorporated by the March 2017 Offering Documents),

4

also falsely represented that PG&E "'continued to demonstrate leadership and commitment on

5

safety'":

6

> PG&E Corporation (NYSE: PCG) today announced that it is
> raising its quarterly common stock dividend to 49 cents per share,
> an increase of 3.5 cents per share, beginning with dividends for the
> second quarter of 2016.

7

8

9

                    *        *        *

10

> The increase, which is the company's first in six years, is a
> meaningful step toward gradually returning the company's
> dividend payout to levels that are comparable with those of similar
> utilities.

11

12

                    *        *        *

13

> [Earley:] *"We've continued to demonstrate leadership and
> commitment on safety. We're delivering the most reliable service
> in our company's history."* *See* Ex. A, Stmt. No. 19.

14

15

649.    The foregoing statements in ¶¶640-648 were materially false and misleading

16

because contrary to the impression created by the Offering Documents, PG&E was not making

17

substantial investments in its systems, its safety practices were deficient and the Company's

18

deficient safety practices had already caused wildfires.  The Offering Documents repeatedly

19

represented that: (i) PG&E was making "substantial investments" in its system; (ii) the Utility

20

had a risk-assessment process to  prioritize infrastructure investments for risks associated with

21

climate change; (iii) the Utility's vegetation management activities were adequate and reduced

22

the risk of wildfire impact; (iv) the Utility had the programs and strategies to address wildfire

23

risks as a result of climate change; (v) the Utility had upgraded critical substations and improved

24

a number of transmission lines; (vi) the Utility continued to deploy technology related to its

25

reclosers to improve reliability and safety; (vii) the risk of equipment failures or the failure to

26

sufficiently mitigate operating conditions could have an adverse material impact of the Company

27

implying that such adverse events were "beyond the Utility's control"; and (viii) that PG&E

28

1    "demonstrated leadership and commitment on safety."  These representations misled investors

2    because they omitted the true state of PG&E's operations related to safety – namely, PG&E's

3    systemic safety deficiencies.

4          650.    At the time the issuance of  each of the Offering Documents for each of the Note

5    Offerings material adverse facts existed that contradicted the representations made therein,

6    including that: (i) PG&E had committed widespread safety violations including violations of

7    California law and regulations as well as federal law (¶¶571, 595, 599; 618; *see generally*  ¶¶568,

8    570-571, 575, 577, 594-596, 598-599, 603, 605, 607-608, 610, 612-618, 620-623 *for safety*

9    *violations*); (ii) PG&E's vegetation management programs were deficient (¶¶568, 570-571, 575,

10   577, 594-596, 598-599, 603, 605, 607-608, 610, 612-618, 620-623); (iii) compared to the

11   industry in California, PG&E's electrical equipment caused far more wildfires (¶¶610, 628); (iv)

12   PG&E had not updated its outdated equipment (¶¶599, 605, 612-616, 618-623); and (v) PG&E

13   had not sufficiently invested in safety and had not made safety a priority (¶¶582, 583, 585-586,

14   601-602, 604, 616, 625; *see also* ¶624; ¶667).

15         651.    Contrary to assurances in the Offering Documents for the March 2016, December

16   2016, March 2017 and April 2018 Notes Offerings that PG&E's vegetation management

17   practices reduced the risk of wildfire impact, PG&E's practices were dismal and increased, not

18   reduced, wildfire impact and caused wildfires (¶619; *see generally* ¶¶568, 570-571, 575, 577,

19   594-596, 598-599, 603, 605, 607-608, 610, 612-618, 620-629). As Judge Alsup noted, PG&E

20   has admitted that: (i) vegetation contact was the primary risk driver with respect to ignitions

21   along PG&E's distribution lines; (ii) in 2016 alone, PG&E had experienced approximately 1,400

22   downed wires caused by vegetation contact; and (iii) during 2015 and 2016, PG&E had reported

23   to the CPUC that vegetation contact with conductors was the leading cause of the 486 fire

24   ignitions associated with PG&E facilities, causing 37% of such fires.  A 2013 NERC study also

25   determined that that well over 100 transmission line spans, out of 455 total spans, were

26   perilously close to vegetation or trees (¶615).  Further, PG&E had incentivized its contractors to

27   identify and clear fewer trees and vegetation by paying them for reporting under the target

28   number (¶569).  And, as PG&E Vegetation Program Manager Richard Yarnell testified,  for the

1    entire period from September 2015 to April 10, 2017, "PG&E—to the best of my knowledge, we

2    have not made any changes" to improve safety (¶22).

3         652.    Contrary to the impression the Offering Documents for the March 2016,

4    December 2016, March 2017 and April 2018 Notes Offerings gave investors by emphasizing the

5    substantial investments PG&E was purportedly making with respect to the Utility's system,

6    PG&E was not sufficiently investing in safety, and any risk-assessment process it had to

7    prioritize infrastructure investments was inadequate.  Instead, PG&E had: "let the tree budget

8    wither so that a lot of trees that should have been taken down were not" (¶622); engaged in

9    dismal vegetation management practices (¶619); did not have a sufficient system in place to

10   shutdown reclosers (¶¶577, 606); failed to update equipment known to be outdated (¶¶599, 605,

11   612-616, 618-623); "focused mainly on spending its allotted budget, not ensuring expenditures

12   were prudent and effective" (¶612); failed, according to the CPUC, "to develop a comprehensive

13   enterprise-wide approach to address safety" (¶596);  and had not engaged in a level of

14   investment that would promote safety (¶22, 78, 568-569, 571, 594-595, 599, 605, 607-608, 612-

15   616, 618-623). In addition, PG&E's 2019 wildfire plan illustrates that a dramatic increase in

16   resources to mitigate wildfires was needed; it calls for more than doubling tree removal, and

17   increasing vegetation management by 320% and inspections from 9,400 transmission structures

18   to 40,600 (¶608).

19        653.    For the same reasons as ¶652 above, the representations in the Offering

20   Documents for the March 2016, December 2016 and March 2017 Notes Offerings that PG&E

21   had: (i) the necessary adaption strategies with respect to wildfire risk; and (ii) procedures to

22   address wildfires were materially false and misleading.  These representations omitted that

23   PG&E was plagued with safety deficiencies.  And rather than prioritizing infrastructure

24   investments, PG&E had not committed sufficient resources for safety.

25        654.    For the same reasons as ¶651 above, the similar representations in the Offering

26   Documents for the April 2018 Notes Offering regarding procedures to address wildfires,

27   prioritizing infrastructure and mitigation programs were materially false and misleading.  In

28

1    addition, rather than prioritizing infrastructure in 2017, PG&E spent only $201,456,193 on

2    vegetation management in 2017, failing to keep pace with inflation (¶78);

3         655.   Contrary to the representations in the Offering Documents for the March 2016,

4    December 2016, March 2017 and April 2018 Notes Offerings that PG&E had "re-conductored a

5    number of transmission lines to improve . . . safety" and made other upgrades, PG&E's

6    equipment was outdated and hazardous.  For example, there was significant damage to and other

7    problems with PG&E's equipment along the Caribou-Palermo transmission line, the likely

8    source of the Camp Fire including: (i) the collapse of aging towers in 2012; (ii) the

9    acknowledgment in 2014 that "the likelihood of failed structures happening is high"; (iii) the

10   identification of failed hardware in 2016; and (iv) the acknowledgement that the transmission

11   tower implicated in the Camp Fire was at risk of collapse long before the blaze was ignited and

12   that it was a quarter-century past its useful life (¶¶612-615, 619-622).  In addition, contrary to the

13   Utility's technology improving safety, PG&E did not have adequate systems in place to shut

14   down reclosers (¶¶577, 606).

15        656.   Purported warnings in the Offering Documents for the March 2016, December

16   2016,  March 2017 and April 2018 Notes Offerings that equipment might fail or that the failure

17   to sufficiently mitigate operating conditions could impact the Company, while implying that

18   such adverse events were "beyond the Utility's control," were materially false and misleading.

19   The Securities Act Defendants omitted that these risks had, in fact, already materialized as a

20   result of the Utility's conduct – including inadequate vegetation management programs and tree

21   clearing practices and the failure to update PG&E's system as described above. The Utility's

22   choice not to provide adequate resources towards safety or, for example, to incentivize its

23   contractors to not report or clear hazardous trees was within its control (¶569).

24        657.   In addition, investors were misled by the representation in PG&E's May 23, 2016

25   press release specifically incorporated by reference in the Offering Documents for the March

26   2017 Offering that PG&E "continued to demonstrate leadership and commitment on safety".

27   Rather than being a leader with respect to safety,  PG&E's electrical equipment caused far more

28   wildfires than industry peers in California (¶¶610, 621, 628).  And rather than being committed

1    to safety the truth was that PG&E was plagued with safety deficiencies and did not sufficiently

2    invest in fire mitigation.  For example, the following contradicts that PG&E was committed to

3    safety:

4             (a)     Judge Alsup has observed that: "There is one very clear-cut pattern here:

5    That PG&E is starting these fires."  He continued, "What do we do[?] Does the judge just turn a

6    blind eye and say, 'PG&E, continue your business as usual. Kill more people by starting more

7    fires'?"  When Company representatives stated that PG&E had made safety a priority, Judge

8    Alsup reportedly responded: "It's not really true. Safety is not your number one thing."  Judge

9    Alsup has also found that the "record demonstrates that PG&E's performance with respect to

10   vegetation management has been dismal."  (¶619);

11            (b)     Judge Alsup has also observed in January 2019 that "PG&E pumped out

12   $4.5 billion in the last five years in dividends and let the tree budget wither so that a lot of trees

13   that should have been taken down were not" (¶622);

14            (c)     PG&E had not, according to PG&E Vegetation Manager Richard Yarnell,

15   made any changes to improve safety from September 2015 to April 10, 2017 (¶22); and

16            (d)     The CPUC ruled in December 2018:  "PG&E has had serious safety

17   problems with both its gas and electric operations for many years" and the Company had failed

18   "to develop a comprehensive enterprise-wide approach to address safety."  The Ruling stated that

19   the CPUC "was, and remains, concerned that the safety problems being experienced by PG&E

20   were not just one-off situations or bad luck, but indicated a deeper and more systemic problem"

21   (¶596).

22            658.    For the same reasons as set forth in ¶¶650-652 above, the representation in the

23   Offering Documents for the April 2018 Notes Offering that assured investors that PG&E had

24   taken steps to safely operate and maintain its equipment when explaining the role of third-party

25   monitor "to help ensure" such steps were taken was materially false and misleading.  Contrary to

26   this statement, PG&E had systemic failures with respect to wildfire safety and failed to update or

27   maintain its equipment as explained above.   In addition, the representation misled investors with

28

1  regard to its "safety related incentive programs" by not disclosing that it had incentivized its

2  contractors to not report or clear hazardous trees (¶569).

3  **B.    The Securities Act Defendants Materially Misled Investors Regarding PG&E's Liability for Wildfires**

4

5  659.    The Offering Documents for the April 2018 Notes Offering, including the

6  documents incorporated by reference therein, misled investors by insinuating that PG&E may

7  not have caused and might not be liable for the destruction of life and property resulting from

8  fires that PG&E caused, or the costs associated with wildfires.

9  660.    PG&E's Offering Documents for the April 2018 Notes Offering (including the

10  registration statement for the offering and PG&E's FY17 Form 10-K incorporated by reference),

11  misleadingly represented that it was only a possibility that PG&E caused or would face liability

12  for the fires following investigations, stating:

13  > *[T]he impact of the Northern California wildfires, including the costs of restoration of service to customers and repairs to the [Company] facilities, and whether the [Company] is able to recover such costs through a [Catastrophic Event Memorandum Account]; the timing and outcome of the wildfire investigations, including into the causes of the wildfires; whether the [Company] may have liability associated with these fires*; if liable for one or more fires, whether the [Company] would be able to recover all or part of such costs through insurance or through regulatory mechanisms, to the extent insurance is not available or exhausted; and potential liabilities in connection with fines or penalties that could be imposed on the [Company] if the [California Department of Forestry and Fire Protection and the California Public Utilities Commission] ("CPUC") or any other law enforcement agency brought an enforcement action and determined that the [Company] failed to comply with applicable laws and regulations.   *See* Ex. A, Stmt. Nos. 24, 34.

21  661.    The same Form 10-K for FY17 incorporated into the April 2018 Offering

22  Documents also misleadingly claimed that it was not "***probable***" that PG&E would face liability

23  for the fires, stating that PG&E "***could*** be liable for property damage, interest, and attorneys'

24  fees without having been found negligent… *[i]f* the Utility's facilities, such as its electric

25  distribution and transmission lines, are determined to be the cause of one or more fires, and the

26  doctrine of inverse condemnation applies."  The Form 10-K for FY17 also stressed that "*[g]iven*

27  *the preliminary stages of investigations and the uncertainty as to the causes of the fires,*

28

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                    203
CONSOLIDATED CASE NO. 3:18-cv-03509-EJD

1    ***PG&E Corporation and the Utility do not believe a loss is probable at this time***."  *See* Ex. A,

2    Stmt. No. 25.[182]

3        662.    PG&E's 10-K for FY17 further misleadingly claimed that even if PG&E were

4    found liable for the fires, PG&E's liability insurance and ability to recover through regulatory

5    mechanisms would mitigate any costs to PG&E arising from its liability for the fires.  As stated

6    in PG&E's Form 10-K, ***while additional facts "could emerge" rendering a loss probable***, "[t]he

7    Utility has liability insurance from various insurers, which provides coverage for third-party

8    liability attributable to the Northern California Fires in an aggregate amount of approximately

9    $800 million" and could also "apply for cost recovery." *See* Ex. A, Stmt. No. 25.

10        663.    The foregoing statements in ¶¶660-662 were materially false and misleading

11    because contrary to the impression created by the Offering Documents for the April 2018 Notes

12    Offering regarding PG&E's liability for the North Bay Fires, the Company's deficient safety

13    practices had caused the majority of those wildfires and liability for those wildfires.  There was

14    no reasonable basis for the Securities Act Individual Defendants to claim that there was

15    "uncertainty as to the causes of the fires" or that additional facts were necessary to render a loss

16    probable.  Given PG&E's safety deficiencies and the facts known at the time, it was probable

17    that PG&E caused many of the North Bay Fires.

18        664.    Sufficient facts pertaining to the causes of the Northern California wildfires

19    existed to properly conclude that a loss was probable as of December 31, 2017, in accordance

20    with Generally Accepted Accounting Principles ("GAAP"), Accounting Standards Codification

21    ("ASC") 450, *Loss Contingencies*.[183]  As a result, PG&E materially understated operating

22

23         [182] PG&E's consolidated balance sheet as of December 31, 2017 filed with the SEC on

24    PG&E's FY17 Form 10-K materially understated operating expenses (reported ~$14.2 billion)
and pretax income (reported ~$2.2 billion) by $10.0 billion, and materially understated total
liabilities (reported ~$48.5 billion) and overstated total equity (reported ~$13 billion) by $10.0

25    billion.

26         [183]   GAAP are the principles established by the Financial Accounting Standards Board that
are recognized by the accounting profession as the conventions, rules, and procedures necessary

27    to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R.
§210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in

28    compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and

1  expenses and pretax income by $10.0 billion on PG&E's consolidated statement of income for

2  FY 2017, and materially understated total liabilities and overstated total equity by $10.0 billion

3  on PG&E's consolidated balance sheet as of December 31, 2017.

4       665.    According to GAAP, an estimated loss from a loss contingency shall be accrued

5  by a charge to income and by the establishment of a liability when both of the following

6  conditions are met:

7          a.  Information available before the financial statements are issued
   or are available to be issued [] indicates that it is probable that an
8          asset had been impaired or a liability had been incurred at the date
   of the financial statements

9          b.  The amount of loss can be reasonably estimated.[184]

10  ASC 450-20-25-2.[185]

11       666.    GAAP also provided specific instructions to the Company on assessing the

12  probability of the occurrence (ASC 450-20-55-12) and required PG&E to assess whether the

13  events were probable, reasonably possible or remote (ASC-450-20-55-14).

14       667.    PG&E was obligated to report and properly disclose wildfire-related operating

15  expenses and wildfire-related liabilities as of December 31, 2017 because both requirements of

16

17  _____

*(continued)*

18  other disclosure.  Regulation S-X requires that interim financial statements must also comply
   with GAAP, with the exception that interim financial statements need not include disclosures

19  that would be duplicative of disclosures accompanying annual disclosures, pursuant to 17 C.F.R.
   §210.10-01(a).

20  [184] GAAP states regarding this second provision that the "requirement shall not delay accrual

21  of a loss until only a single amount can be reasonably estimated."  ASC 450-20-25-5.  "To the
   contrary, when the condition in [ASC] 450-20-25-2(a) is met and information available indicates

22  that the estimated amount of loss is within a range of amounts, it follow that some amount of loss
   has occurred and can be reasonably estimated."  *Id.*  GAAP further instructs that "[i]f some

23  amount within a range of loss appears at the time to be a better estimate than any other amount
   within the range, that amount shall be accrued."  ASC 450-20-30-1.  "When no amount within

24  the range is a better estimate than any other amount, however, the minimum amount in the range
   shall be accrued."  *Id.*

25  [185] In assessing ASC 450's requirements, Defendants were also required by ASC 855 to

26  consider "subsequent events" that occurred after the December 31, 2017 balance sheet date, but
   before PG&E filed the FY17 Form 10-K on February 9, 2018, including, subsequent events that

27  provide additional evidence about conditions that existed at the balance sheet date that should be
   recognized in the financial statements.

28

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT      205
CIVIL ACTION NO. 3:18-cv-03509-EJD

1    ASC 450 were met when PG&E issued its FY17 Form 10-K incorporated into the Offering

2    Documents for the April 2018 Notes Offering; specifically that: (i) the wildfire-related expenses

3    and liabilities were probable as a result of the Northern California wildfires; and (ii) the

4    minimum amount of the potential damages in connection with the Northern California wildfires

5    was estimable.

6        668.    A loss was probable because: (i) PG&E had for years before the North Bay Fires

7    engaged in a pattern and practice of ignoring laws and California safety regulations and failed to

8    take appropriate measures to mitigate or prevent wildfire hazards from occurring; (ii) the facts,

9    evidence, and circumstances that existed strongly supported that PG&E's liability for damages in

10   connection with the 2017 wildfires was probable as of December 31, 2017; and (iii) "inverse

11   condemnation" liability laws applied to the 2017 North Bay Fires.

12       669.    PG&E did not properly maintain its power lines (including the Utility's failure to

13   maintain and repair distribution and transmission lines), and had failed to properly perform

14   vegetation management in the regions affected by the 2017 North Bay Fires (¶¶579-580).   In

15   addition, in November 2017 it was reported that PG&E auditors permitted one out of 100 trees

16   checked to violate clearance standards (¶575) and in January 2018 that PG&E had only engaged

17   in a limited recloser shutdown (¶¶577, 606).  "The conditions [pertaining to the recognition of

18   loss contingencies] are not intended to be so rigid that they required virtual certainty before a

19   loss is accrued."  ASC 450-20-25-3.  GAAP did ***not*** permit PG&E to wait until the ongoing

20   investigations by the California Department of Forestry and Fire Protection and the California

21   Public Utilities Commission made it a "virtual certainty" that PG&E would be held liable before

22   recognizing that a loss was probable.  As one analyst observed, when signs pointed to PG&E

23   being "imprudent operators in the majority of instances…it should assume liability." (¶582).

24       670.    The loss also could have been reasonably estimated under ASC 450-20-25-2(b).

25   First, On January 31, 2018, the California Department of Insurance issued a press release

26   announcing an update on property losses in connection with the October and December 2017

27   wildfires in California, stating that, as of such date, "insurers have received nearly 45,000

28

1    insurance claims totaling more than $11.79 billion in losses," of which approximately $10.0

2    billion related to statewide claims from the October 2017 wildfires.[186]

3        671.    Second, PG&E admitted that the magnitude of the loss from the North Bay Fires

4    could be greater than $10.0 billion in its FY17 Form 10-K.

5               If the Utility were to be found liable for certain or all of such other
6               costs and expenses, the amount of PG&E Corporation's and the
           Utility's liability could be higher than the approximately $10
7               billion estimated in respect of the wildfires that occurred in
           October 2017, depending on the extent of the damage in
8               connection with such fire or fires.

9        672.    The Offering Documents were false and misleading because they claimed further

10    investigation was needed and uncertainty surrounding PG&E's liability for the 2017 North Bay

11    wildfires was such that a loss was not probable at the time.  There was no reasonable basis for

12    these representations based on the adverse facts existing at the time or reasonably available to the

13    issuers of the Offering Documents.

14        673.    In addition to the above, the foregoing statements in ¶672 were contradicted by

15    adverse facts that existed at the time of the statements including, *inter alia*, that:

16        (a)    PG&E started and was at fault for the vast majority of the 2017 North Bay

17    Fires.  (¶¶579-580, 584, 586).  Cal Fire investigations have confirmed that PG&E equipment

18    caused at least the significant majority of these fires.  Cal Fire has referred the cases of many of

19    the individual fires to the appropriate District Attorneys' offices, and the Company faced

20    potential criminal liability as well, for offenses ranging from misdemeanors to implied-malice

21    murder. (¶¶582, 583, 585-586, 601-602, 604, 616, 625; *see also* ¶624; ¶667);

22        (b)    PG&E – unlike other utilities – did not shut off reclosers, increasing the

23    danger and likelihood of wildfires in cases where vegetation has fallen onto power lines,

24    including in 132 high risk areas in 2017 (¶¶577, 606);

25

26

27            [186] The press release does not account for uninsured losses, interest, attorneys' fees, fire
suppression costs, evacuation costs, medical expenses, personal injury and wrongful death
28    damages or other costs.

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT           207
CONSOLIDATED CASE NO. 3:18-cv-03509-EJD

1    (c)    In the two years prior to the Camp Fire, including roughly the year before

2    the 2017 North Bay Fires, PG&E did "absolutely nothing" to produce an annual wildfire safety

3    plan, as required by state law (¶594), and indeed failed to develop any "comprehensive

4    enterprise-wide approach to address safety," a sign of "systemic problem[s]" at the Company

5    (¶596);

6    (d)    PG&E Vegetation Program Manager, Richard Yarnell, testified that for

7    the entire period from September 2015 to April 10, 2017, "PG&E—to the best of my knowledge,

8    we have not made any changes" to improve safety (¶22); and

9    (e)    As demonstrated by admissions made by PG&E in PG&E's probation

10   proceedings before Judge Alsup, in 2016 alone, PG&E had experienced approximately 1,400

11   downed wires caused by vegetation contact, and, as of June 2017, there remained 3,962

12   unworked trees which PG&E had identified in 2016 as hazardous with the potential to "fall into

13   or otherwise impact the conductors, towers or guy wires before the next inspection cycle" (¶618).

14   **C.    PG&E's Offering Documents Misled Investors by Failing to Comply with**
     **Item 303's Disclosure Requirements and Disclosure Safety Violations**

15

16   674.   Item 303 of SEC Regulation S-K requires the Management's Discussion &

17   Analysis ("MD&A") section of registration statements to "[d]escribe any unusual or infrequent

18   events or transactions . . . that materially affected the amount of reported income from continuing

19   operations and, in each case, indicate the extent to which income was so affected" and

20   "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably

21   expects will have a material favorable or unfavorable impact on net sales or revenues or income

22   from continuing operations." 17 C.F.R. §229.303(a)(3)(i)-(ii).

23   675.   The SEC has provided guidance concerning the MD&A requirements, including

24   Item 303:

25           The purpose of MD&A is not complicated. It is to provide readers
             information "necessary to an understanding of [a company's]
26           financial condition, changes in financial condition and results of
             operations." The MD&A requirements are intended to satisfy
             three principal objectives:
27

28

- to provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management;

- to enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and

- to provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance.

676. To effectuate that purpose, Item 303 requires "companies to provide investors and other users with material information that is necessary to an understanding of the company's financial condition and operating performance, as well as its prospects for the future."

677. The Offering Documents (including the registration statements) for the Notes Offerings failed to provide the information required by Item 303, including the omission of information necessary to understand the Company's financial condition, changes in financial condition, and results of operations.

678. The March 2016, December 2016, March 2017, and April 2018 Notes Offering' Offering Documents (specifically the registration statements associated with each of the Notes Offerings) failed to disclose that PG&E had systematically violated California regulations regarding fire prevention and failed to take reasonable steps or investments to mitigate fire dangers. They also violated 17 C.F.R. §229.303(a)(3)(ii),[187] because they did not disclose facts that were known to PG&E and would (and did) have an unfavorable impact on the Company's earnings and income from continuing operations. This failure also violated 17 C.F.R. §229.503(c), because specific risks were not adequately disclosed, or disclosed at all, even

---

[187] Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii) ("Item 303"), requires Defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Similarly, Item 503 of SEC Regulation S-K, 17 C.F.R. §229.503(c) ("Item 503"), requires, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the most significant factors that make . . . the offering speculative or risky" and requires each risk factor to "adequately describe[] the risk."

1   though they were some of the most significant factors that made an investment in PG&E notes

2   speculative or risky.

3        679.    At the time of the issuance of the Offering Documents for each of the Notes

4   Offerings (including the registration statements for each offering) the known trends adversely

5   impacting PG&E included: (i) the fact that despite suffering from serious safety problems for

6   years, the Company had failed to develop a comprehensive approach to address safety (¶22, 594,

7   596); (ii) the Company's deficient safety practices related to wildfire safety and widespread

8   safety violations, including the systemic failure to clear vegetation and trees as required by

9   regulations (¶¶568, 570-571, 575, 577, 594-596, 598-599, 603, 605, 607-608, 610, 612-618, 620-

10   623); (iii) PG&E's failure to update outdated equipment or flawed systems (¶¶599, 605, 612-

11   616, 618-623); and (iv) the Company's failure to allocate sufficient resources or investments in

12   safety (¶¶22, 78, 568-569, 571, 594-595, 599, 605, 607-608, 612-618, 618-623).  Each of these

13   adverse trends increased the risk of wildfires and liability which the Offering Documents

14   (including the registration statements) did not sufficiently disclose so that investors understood

15   the true state of PG&E's financial condition (including the quality of its earnings) or operations.

16        680.    These known trends impacting PG&E's financial condition, operations and future

17   performance were not disclosed when the Offering Documents for the March 2016 and

18   December 2016 Notes Offerings (including the registration statements) were filed with the SEC

19   despite adverse facts existing at the time including, *inter alia*, that: (i) PG&E had caused

20   hundreds or thousands of fires across California since June 2014, averaging more than one fire a

21   day (¶600); (ii) its vegetation management practices were deficient (¶¶568, 570-571, 575, 577,

22   594-596, 598-599, 603, 605, 607-608, 610, 612-618, 620-623;); (iii) in 2014 the Company had

23   documented that the "likelihood of failed structures happening [was] high" with respect to the

24   transmission line at the center of the subsequent Camp Fire (¶620); and (iv) as PG&E Vegetation

25   Program Manager Richard Yarnell testified,  for the entire period from September 2015 to April

26   10, 2017, "PG&E—to the best of my knowledge, we have not made any changes" to improve

27   safety (¶22).

28

681.    These known trends were similarly not disclosed when the Offering Documents for the March 2017 Notes Offering (including the registration statement) were filed with the SEC despite adverse facts existing at the time including those above (¶¶679-680) and *inter alia*, that: (i) the Company had never, as planned, addressed dangerously encroaching vegetation or replaced old lattice towers with modern tubular steel poles or replaced wire and hardware connecting those to towers (¶612); (ii) there remained 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to "fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle" (¶618); and (iii) the Company's vegetation management was dismal, inadequate, and it had allowed its tree budget to wither (¶¶619, 622). The March 2017 registration statement failed to disclose the known adverse safety trends that were unfavorably impacting PG&E.

682.    Likewise, at the time the Offering Documents for the April 2018 Notes Offering (including the registration statement), these known trends were not disclosed despite adverse facts existing at the time include those above (¶¶679-681) and *inter alia*, that the Company still had failed to create a "comprehensive enterprise-wide approach to address safety" or address the "systemic problem[s]" at the Company, with the result that a "very clear-cut pattern" had established itself by 2018: "PG&E is starting these fires" (¶¶596, 605).  The April 2018 registration statement failed to disclose PG&E's known adverse safety trends that were unfavorably impacting PG&E.

## XIX.   NO SAFE HARBOR FOR THE SECURITIES ACT CLAIMS

683.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false or misleading statements or material omissions pleaded with respect to the Securities Act claims.

684.    First, none of the misstatements complained of herein were forward-looking statements.  Rather, they were misstatements concerning current facts and conditions existing at the time the statements were made.  None of the historic or present tense statements made by the Securities Act Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions

Case 18-30089   Doc 13714-10   Filed 09/14/23   Entered 09/14/23 15:26:59   Page 221
228 of 524

1   underlying or relating to any projection or statement of future economic performance when

2   made, nor were any of the projections or forecasts made by the Securities Act Defendants

3   expressly related to or stated to be dependent on those historic or present tense statements when

4   made.

5          685.    Second, to the extent that any statements may be construed as forward-looking,

6   those statements were not accompanied by meaningful cautionary language identifying important

7   facts that could cause actual results to differ materially from those in the statements.  As set forth

8   in detail above, then-existing facts contradicted the Securities Act Defendants' statements.

9   Given the then-existing facts contradicting the Securities Act Defendants' statements, the

10  generalized risk disclosures made by the Securities Act Defendants were not sufficient to

11  insulate the Securities Act Defendants from liability for their materially false or misleading

12  statements and material omissions.

13         686.    Third, to the extent any statement that may be construed as a false or misleading

14  forward-looking statement, at the time each forward-looking statement was purportedly made,

15  the speaker also knew the forward-looking statement was false or misleading and the forward-

16  looking statement was authorized and/or approved by an executive officer of PG&E who knew

17  that the forward-looking statement was false.

18  **XX.    CLASS ACTION ALLEGATIONS FOR THE SECURITIES ACT CLAIMS**

19         687.    The Securities Act Plaintiffs bring the Securities Act claims on behalf of

20  themselves and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure

21  consisting of all persons or entities that acquired PG&E senior notes in or traceable to one or

22  more of the Notes Offerings and corresponding Offering Documents, and who were damaged

23  thereby (the "Securities Act Subclass").  Excluded from the Securities Act Subclass are: (i) all

24  defendants in the Action; (ii) members of the immediate family of any individual defendant; (iii)

25  any person who is or was an officer or director of PG&E during or after the Class Period; (iv)

26  any firm, trust, corporation, or other entity in which any defendant has or had a controlling

27  interest; (v) PG&E's employee retirement and benefit plan(s) and their participants or

28

1   beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal

2   representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

3       688.    The members of the Securities Act Subclass are so numerous that joinder of all

4   members is impracticable.  PG&E notes are traded on the New York Stock Exchange ("NYSE"),

5   and over $4 billion worth of PG&E notes were sold in the Notes Offerings.  While the exact

6   number of the Securities Act Subclass members is unknown to the Securities Act Plaintiffs at

7   this time and can only be ascertained through appropriate discovery, the Securities Act Plaintiffs

8   believe that there are hundreds of members in the proposed Securities Act Subclass.  Record

9   owners and other members of the Subclass may be identified from records maintained by PG&E

10  or its transfer agent and may be notified of the pendency of this action by mail, using the form of

11  notice similar to that customarily used in securities class actions.

12      689.    Securities Act Plaintiffs' claims are typical of the claims of the members of the

13  Securities Act Subclass, as all members of the Securities Act Subclass are similarly affected by

14  Securities Act Defendants' conduct in violation of the Securities Act that is complained of

15  herein.

16      690.    Securities Act Plaintiffs will fairly and adequately protect the interests of the

17  members of the Securities Act Subclass and have retained counsel competent and experienced in

18  class and securities litigation.

19      691.    Common questions of law and fact exist as to all members of the Securities Act

20  Subclass and predominate over any questions solely affecting individual members of the

21  Securities Act Subclass.  Among the questions of law and fact common to the Securities Act

22  subclass are:

23          (a)     whether the Securities Act Defendants violated the Securities Act;

24          (b)     whether statements made by the Securities Act Defendants to the investing

25  public in the Offering Documents for the Notes Offerings misrepresented or omitted material

26  facts about the business and operations of PG&E; and

27          (c)     to what extent the members of the Securities Act Subclass have sustained

28  damages and the proper measure of damages.

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                                    213
CIVIL ACTION NO. 18-CV-03509-EJD

692.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Securities Act Subclass members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Securities Act Subclass to individually redress the wrongs done to them.  There will be no difficulty in the management of the Securities Act Subclass as a class in this action.

## XXI.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### FIFTH CLAIM

#### For Violations of §11 of the Securities Act
#### Against All Securities Act Defendants

693.    This Claim is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Securities Act Subclass, against all Securities Act Defendants.

694.    This Claim does not sound in fraud.  Securities Act Plaintiffs do not allege that the Securities Act Individual Defendants or the Underwriter Defendants had scienter or fraudulent intent for this Claim, which are not elements of a §11 claim.  This Claim is based solely on negligence.  Securities Act Plaintiffs specifically disclaim any allegation of fraud, scienter or recklessness in this §11 claim.

695.    Securities Act Plaintiffs repeat and reallege ¶¶12-15 & 496-694 by reference.

696.    The registration statements for the Notes Offerings were inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

697.    The Utility, a subsidiary of PG&E Corporation, is the registrant for the senior notes sold in the Notes Offerings.  The Utility and PG&E Corporation would be named as defendants herein for this Claim but for their declaration of bankruptcy and the imposition of the automatic bankruptcy stay under federal law.

698.    The Securities Act Defendants named herein were responsible for the contents and dissemination of the registration statements for the Notes Offerings.  None of the Securities

1    Act Defendants named herein made a reasonable investigation or possessed reasonable grounds

2    for the belief that the statements contained in the registration statements for the Notes Offerings

3    were true and without omissions of any material facts and were not misleading.

4        699.    By reason of the conduct alleged herein, each Securities Act Defendant violated,

5    and/or controlled a person who violated, §11 of the Securities Act.

6        700.    Securities Act Plaintiffs acquired PG&E senior notes sold in the Notes Offerings

7    traceable to the registration statements for the Notes Offerings.

8        701.    Securities Act Plaintiffs and the Securities Act Subclass have sustained damages.

9        702.    At the time of their purchases of the PG&E notes sold in the Notes Offerings,

10   Securities Act Plaintiffs and other members of the Securities Act Subclass were without

11   knowledge of the facts concerning the wrongful conduct alleged herein.  Less than one year has

12   elapsed from the time that Securities Act Plaintiffs discovered or reasonably could have

13   discovered the facts upon which this Complaint is based to the time that Securities Act Plaintiffs

14   filed their initial complaint on February 22, 2019.  Less than three years elapsed between the

15   time that the securities upon which this Count is brought were offered to the public and the time

16   Securities Act Plaintiffs filed their initial complaint.

17                              **SIXTH CLAIM**

18                    **For Violation of §15 of the Securities Act**
                 **Against the Securities Act Individual Defendants**

19

20       703.    This Claim is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on

21   behalf of all members of the Securities Act Subclass against the Securities Act Individual

22   Defendants.

23       704.    This Claim does not sound in fraud.  Securities Act Plaintiffs do not allege that

24   the Securities Act Individual Defendants had scienter or fraudulent intent, which are not

25   elements of a §15 claim. This Claim is based solely on negligence.  Securities Act Plaintiffs

26   specifically disclaim any allegation of fraud, scienter or recklessness in this §15 claim.

27       705.    Securities Act Plaintiffs repeat and reallege ¶¶12-15 & 496-704 by reference.

28

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                                    215
CIVIL ACTION NO. 3:18-cv-03509-EJD

706.     The Securities Act Individual Defendants each were control persons of PG&E by virtue of their positions as directors and/or senior officers of PG&E.  The Individual Securities Act Defendants oversaw the Notes Offerings, including the preparation and dissemination of the registration statements for the Notes Offerings, and took steps to ensure that the Notes Offerings were successfully completed, including, for example, by signing the registration statements for the Notes Offerings.

## XXII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.     Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative and the Securities Act Plaintiffs as representatives of the Securities Act Subclass;

B.     Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

1

**DEMAND FOR TRIAL BY JURY**

2

Plaintiffs hereby demand a trial by jury.

3

DATED: May 28, 2019

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*/s/ Thomas A. Dubbs*

THOMAS A. DUBBS (*pro hac vice*)
LOUIS GOTTLIEB (*pro hac vice*)
JEFFREY A. DUBBIN (#287199)
ARAM BOGHOSIAN (*pro hac vice*)
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: tdubbs@labaton.com
lgottlieb@labaton.com
jdubbin@labaton.com
aboghosian@labaton.com

*Counsel for Lead Plaintiff the Public
Employees Retirement Association of New
Mexico and Lead Counsel for the Class*

**WAGSTAFFE, VON LOEWENFELDT,
BUSCH & RADWICK, LLP**
JAMES M. WAGSTAFFE (#95535)
FRANK BUSCH (#258288)
100 Pine Street, Suite 725
San Francisco, California 94111
Telephone: (415) 357-8900
Facsimile: (415) 371-0500
Email: wagstaffe@wvbrlaw.com
busch@wvbrlaw.com

*Liaison Counsel for the Class*

ROBBINS GELLER RUDMAN
 & DOWD LLP
DARREN J. ROBBINS (#168593)
BRIAN E. COCHRAN (#286202)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone:  (619) 231-1058
Facsimile: (619) 231-7423
Email:darrenr@rgrdlaw.com
bcochran@rgrdlaw.com

1
2
3
4
5
6

ROBBINS GELLER RUDMAN
  & DOWD LLP
WILLOW E. RADCLIFFE (#200087)
KENNETH J. BLACK (#291871)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone: (415) 288-4545
Facsimile: (415) 288-4534
Email: willowr@rgrdlaw.com
kennyb@rgrdlaw.com

7

*Counsel for the Securities Act Plaintiffs*

8
9
10
11
12

VANOVERBEKE, MICHAUD &
  TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone: (313) 578-1200
Facsimile: (313) 578-1201
Email: tmichaud@vmtlaw.com

13
14

*Additional Counsel for the Securities Act
Plaintiffs*

15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 28, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

/s/ Thomas A. Dubbs
THOMAS A. DUBBS

# EXHIBIT B



### SECRETARY OF STATE



I, *Kevin Shelley*, Secretary of State of the State of California, hereby certify:

That the attached transcript of _29_ page(s) has been compared with the record on file in this office, of which it purports to be a copy, and that it is full, true and correct.



**IN WITNESS WHEREOF**, I execute this certificate and affix the Great Seal of the State of California this day of

_____
APR 1 2 2004
_____

Secretary of State

Sec/State Form CE-107 (rev. 1/03)

OSP 03 80510

A0610236

**ENDORSED - FILED**
in the office of the Secretary of State
of the State of California

APR 1 2 2004

**KEVIN SHELLEY**
**Secretary of State**

RESTATED ARTICLES OF INCORPORATION
OF
PACIFIC GAS AND ELECTRIC COMPANY


Gordon R. Smith and Linda Y. H. Cheng certify that:

1. They are the President and the Corporate Secretary, respectively, of Pacific Gas and Electric Company, a California corporation (the "corporation").

2. The Articles of Incorporation of the corporation, as amended to the date of the filing of this certificate, including the amendments set forth herein but not separately filed (and with the omissions required by Section 910 of the Corporations Code) are amended and restated as follows:

FIRST: That the name of said corporation shall be

PACIFIC GAS AND ELECTRIC COMPANY.

SECOND: The purpose of the corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of California other than the banking business, the trust company business or the practice of a profession permitted to be incorporated by the California Corporations Code.

The right is reserved to this corporation to amend the whole or any part of these Articles of Incorporation in any respect not prohibited by law.

THIRD: That this corporation shall have perpetual existence.

FOURTH: The corporation elects to be governed by all of the provisions of the General Corporation Law (as added to the California Corporations Code effective January 1, 1977, and as subsequently amended) not otherwise applicable to this corporation under Chapter 23 of said General Corporation Law.

FIFTH: The Board of Directors by a vote of two-thirds of the whole Board may appoint

1

from the Directors an Executive Committee, which Committee may exercise such powers as may lawfully be conferred upon it by the Bylaws of the Corporation. Such Committee may prescribe rules for its own government and its meetings may be held at such places within or without California as said Committee may determine or authorize.

SIXTH: The liability of the directors of the corporation for monetary damages shall be eliminated to the fullest extent permissible under California law.

SEVENTH: The corporation is authorized to provide indemnification of agents (as defined in Section 317 of the California Corporations Code) through bylaws, resolutions, agreements with agents, vote of shareholders or disinterested directors, or otherwise, in excess of the indemnification otherwise permitted by Section 317 of the California Corporations Code, subject only to the applicable limits set forth in Section 204 of the California Corporations Code.

EIGHTH: The total number of shares which this corporation is authorized to issue is eight hundred eighty-five million (885,000,000) of the aggregate par value of six billion eight hundred seventy-five million dollars ($6,875,000,000). All of these shares shall have full voting rights. The corporation shall be prohibited from issuing nonvoting stock.

Said eight hundred eighty-five million (885,000,000) shares shall be divided into three classes, designated as common stock, first preferred stock and $100 first preferred stock. Eight hundred million (800,000,000) of said shares shall be common stock, of the par value of $5 per share, seventy-five million (75,000,000) of said shares shall be first preferred stock, of the par value of $25 per share, and ten million (10,000,000) of said shares shall be $100 first preferred stock, of the par value of $100 per share.

FIRST PREFERRED STOCK
AND $100 FIRST PREFERRED STOCK

The first preferred stock and $100 first preferred stock each shall be divided into series. The first series of first preferred stock shall consist of four million two hundred eleven thousand six hundred sixty-two (4,211,662) shares and be designated as Six Per Cent First Preferred Stock. The second series of first preferred stock shall consist of one million one hundred seventy-three thousand one hundred sixty-three (1,173,163) shares and be designated as Five and One-Half Per Cent First Preferred Stock. The third series of first preferred stock shall consist of four hundred thousand (400,000) shares and be designated as Five Per Cent First Preferred Stock. The remainder of said first preferred stock, viz., 69,215,175 shares, and all of the $100 first preferred stock may be issued in one or more additional series, as determined from time to

2

time by the Board of Directors. Except as provided herein, the Board of Directors is hereby authorized to determine and alter the rights, preferences, privileges and restrictions granted to or imposed upon the first preferred stock or $100 first preferred stock or any series thereof with respect to any wholly unissued series of first preferred stock or $100 first preferred stock, and to fix the number of shares of any series of first preferred stock or $100 first preferred stock and the designation of any such series of first preferred stock or $100 first preferred stock. The Board of Directors, within the limits and restrictions stated in any resolution or resolutions of the Board of Directors originally fixing the number of shares constituting any series, may increase or decrease (but not below the number of shares of such series then outstanding) the number of shares of any series subsequent to the issue of shares of that series.

The owners and holders of shares of said first preferred stock and $100 first preferred stock, when issued as fully paid, are and shall be entitled to receive, from the date of issue of such shares, out of funds legally available therefor, cumulative preferential dividends, when and as declared by the Board of Directors, at the following rates upon the par value of their respective shares, and not more, viz.: Six per cent (6%) per year upon Six Per Cent First Preferred Stock; five and one-half per cent (5-1/2%) per year upon Five and One-Half Per Cent First Preferred Stock; five per cent (5%) per year upon Five Per Cent First Preferred Stock; and upon the shares of each additional series of said first preferred stock and of each series of $100 first preferred stock the dividend rate fixed therefor; and such dividends on both classes of first preferred stock and $100 first preferred stock shall be declared and shall be either paid or set apart for payment before any dividend upon the shares of common stock shall be either declared or paid.

Upon the liquidation or dissolution of this corporation at any time and in any manner, the owners and holders of shares of said first preferred stock and $100 first preferred stock issued as fully paid will be entitled to receive an amount equal to the par value of such shares plus an amount equal to all accumulated and unpaid dividends thereon to and including the date fixed for such distribution or payment before any amount shall be paid to the holders of said common stock.

If any share or shares of first preferred stock and $100 first preferred stock shall at any time be issued as only partly paid, the owners and holders of such partly paid share or shares shall have the right to receive dividends and to share in the assets of this corporation upon its liquidation or dissolution in all respects like the owners and holders of fully paid shares of first preferred stock and $100 first preferred stock, except that such right shall be only in proportion to the amount paid on account of the subscription price for which such partly paid share or shares shall have been issued.

3

The unissued shares of said first preferred stock and $100 first preferred stock may be offered for subscription or sale or in exchange for property and be issued from time to time upon such terms and conditions as said Board of Directors shall prescribe.

The first three series of said first preferred stock, namely, the Six Per Cent First Preferred Stock, the Five and One-Half Per Cent First Preferred Stock, and the Five Per Cent First Preferred Stock, are not subject to redemption.

Any or all shares of each series of said first preferred stock and $100 first preferred stock other than said first three series of first preferred stock may be redeemed at the option of this corporation, at any time or from time to time, at the redemption price fixed for such series together with accumulated and unpaid dividends at the rate fixed therefor to and including the date fixed for redemption. If less than all the outstanding shares of any such series are to be redeemed, the shares to be redeemed shall be determined pro rata or by lot in such manner as the Board of Directors may determine.

Unless the certificate of determination for any series of the first preferred stock or the $100 first preferred stock shall otherwise provide, notice of every such redemption shall be published in a newspaper of general circulation in the City and County of San Francisco, State of California, and in a newspaper of general circulation in the Borough of Manhattan, City and State of New York, at least once in each of two (2) successive weeks, commencing not earlier than sixty (60) nor later than thirty (30) days before the date fixed for redemption; successive publications need not be made in the same newspaper. A copy of such notice shall be mailed within the same period of time to each holder of record, as of the record date, of the shares to be redeemed, but the failure to mail such notice to any shareholder shall not invalidate the redemption of such shares.

From and after the date fixed for redemption, unless default be made by this corporation in paying the amount due upon redemption, dividends on the shares called for redemption shall cease to accrue, and such shares shall be deemed to be redeemed and shall be no longer outstanding, and the holders thereof shall cease to be shareholders with respect to such shares and shall have no rights with respect thereto except the right to receive from this corporation upon surrender of their certificates the amount payable upon redemption without interest. Or, if this corporation shall deposit, on or prior to the date fixed for redemption, with any bank or trust company in the City and County of San Francisco, having capital, surplus and undivided profits aggregating at least five million dollars ($5,000,000), as a trust fund, a sum sufficient to redeem the shares called for redemption, with irrevocable instructions and authority to such bank or trust company to publish or complete the publication of the notice of redemption (if this corporation shall not have theretofore completed publication of such notice), and to pay, on and after the date

4

fixed for redemption, or on and after such earlier date as the Board of Directors may determine, the amount payable upon redemption of such shares, then from and after the date of such deposit (although prior to the date fixed for redemption) such shares shall be deemed to be redeemed; and dividends on such shares shall cease to accrue after the date fixed for redemption. The said deposit shall be deemed to constitute full payment of the shares to their respective holders and from and after the date of such deposit the shares shall be no longer outstanding, and the holders thereof shall cease to be shareholders with respect to such shares and shall have no rights with respect thereto except the right to receive from said bank or trust company the amount payable upon redemption of such shares, without interest, upon surrender of their certificates therefor, and except, also, any right which such shareholders may then have to exchange or convert such shares prior to the date fixed for redemption. Any part of the funds so deposited which shall not be required for redemption payments because of such exchange or conversion shall be repaid to this corporation forthwith. The balance, if any, of the funds so deposited which shall be unclaimed at the end of six (6) years from the date fixed for redemption shall be repaid to this corporation together with any interest which shall have been allowed thereon; and thereafter the unpaid holders of shares so called for redemption shall have no claim for payment except as against this corporation.

All shares of the first preferred stock and $100 first preferred stock shall rank equally with regard to preference in dividend and liquidation rights, except that shares of different classes or different series thereof may differ as to the amounts of dividends or liquidation payments to which they are entitled, as herein set forth.

COMMON STOCK

When all accrued dividends upon all of the issued and outstanding shares of the first preferred stock and $100 first preferred stock of this corporation shall have been declared and shall have been paid or set apart for payment, but not before, dividends may be declared and paid, out of funds legally available therefor, upon all of the issued and outstanding shares of said common stock.

Upon the liquidation or dissolution of this corporation, after the owners and holders of such first preferred stock and $100 first preferred stock shall have been paid the full amount to which they shall have been entitled under the provisions of these Articles of Incorporation, the owners and holders of such common stock shall be entitled to receive and to have paid to them the entire residue of the assets of this corporation in proportion to the number of shares of said common stock held by them respectively.

If any share or shares of common stock shall at any time be issued as only partly paid, the

5

owners and holders of such partly paid share or shares shall have the right to receive dividends and to share in the assets of this corporation upon its liquidation or dissolution in all respects like the owners and holders of fully paid shares of common stock, except that such right shall be only in proportion to the amount paid on account of the subscription price for which such partly paid share or shares shall have been issued.

The unissued shares of said common stock may be offered for subscription or sale or in exchange for property and be issued from time to time upon such terms and conditions as said Board of Directors may prescribe.

## PROHIBITION AGAINST ASSESSMENTS

Shares of such stock, whether first preferred, $100 first preferred stock or common stock, the subscription price of which shall have been paid in full, whether such price be par or more or less than par, shall be issued as fully paid shares and shall never be subject to any call or assessment for any purpose whatever. Shares of such stock, whether first preferred, $100 first preferred stock or common stock, a part only of the subscription price of which shall have been paid, shall be subject to calls for the unpaid balance of the subscription price thereof. But no call made on partly paid first preferred stock, partly paid $100 first preferred stock or partly paid common stock shall be recoverable by action or be enforceable otherwise than by sale or forfeiture of delinquent stock in accordance with the applicable provisions of the Corporations Code of California.

If at any time, whether by virtue of any amendment of these Articles of Incorporation or any amendment or change of the law of the State of California relating to corporations or otherwise, any assessment shall, in any event whatever, be levied and collected on any subscribed and issued shares of said first preferred stock or $100 first preferred stock after the subscription price thereof shall have been paid in full, the rights of the owners and holders thereof to receive dividends and their rights to share in the assets upon the liquidation or dissolution of this corporation shall, immediately upon the payment of such assessment and by virtue thereof, be increased in the same ratio as the total amount of the assessment or assessments so levied and collected shall bear to the par value of such shares of first preferred stock or $100 first preferred stock.

## RESERVES

The Board of Directors of this corporation shall, notwithstanding the foregoing provisions of these Articles of Incorporation, have authority from time to time to set aside, out of

6

the profits arising from the business of this corporation, such reasonable sums as may in their judgment be necessary and proper for working capital and for usual reserves and surplus.

NINTH: CERTIFICATE OF DETERMINATION OF PREFERENCES OF THE 5% REDEEMABLE FIRST PREFERRED STOCK: The Certificate of Determination of Preferences of the 5% Redeemable First Preferred Stock which is attached hereto as Exhibit 1 is hereby incorporated by reference as Article NINTH of these Articles of Incorporation.

TENTH: CERTIFICATE OF DETERMINATION OF PREFERENCES OF THE 5% REDEEMABLE FIRST PREFERRED STOCK, SERIES A: The Certificate of Determination of Preferences of the 5% Redeemable First Preferred Stock, Series A, which is attached hereto as Exhibit 2 is hereby incorporated by reference as Article TENTH of these Articles of Incorporation.

ELEVENTH: CERTIFICATE OF DETERMINATION OF PREFERENCES OF THE 4.80% REDEEMABLE FIRST PREFERRED STOCK: The Certificate of Determination of Preferences of the 4.80% Redeemable First Preferred Stock which is attached hereto as Exhibit 3 is hereby incorporated by reference as Article ELEVENTH of these Articles of Incorporation.

TWELFTH: CERTIFICATE OF DETERMINATION OF PREFERENCES OF THE 4.50% REDEEMABLE FIRST PREFERRED STOCK: The Certificate of Determination of Preferences of the 4.50% Redeemable First Preferred Stock which is attached hereto as Exhibit 4 is hereby incorporated by reference as Article TWELFTH of these Articles of Incorporation.

THIRTEENTH: CERTIFICATE OF DETERMINATION OF PREFERENCES OF THE 4.36% REDEEMABLE FIRST PREFERRED STOCK: The Certificate of Determination of Preferences of the 4.36% Redeemable First Preferred Stock which is attached hereto as Exhibit 5 is hereby incorporated by reference as Article THIRTEENTH of these Articles of Incorporation.

FOURTEENTH: CERTIFICATE OF DETERMINATION OF PREFERENCES OF THE 6.57% REDEEMABLE FIRST PREFERRED STOCK: The Certificate of Determination of Preferences of the 6.57% Redeemable First Preferred Stock which is attached hereto as Exhibit 6 is hereby incorporated by reference as Article FOURTEENTH of these Articles of Incorporation.

FIFTEENTH: CERTIFICATE OF DETERMINATION OF PREFERENCES OF THE 7.04% REDEEMABLE FIRST PREFERRED STOCK: The Certificate of Determination of Preferences of the 7.04% Redeemable First Preferred Stock which is attached hereto as Exhibit 7 is hereby incorporated by reference as Article FIFTEENTH of these Articles of Incorporation.

7

SIXTEENTH: CERTIFICATE OF DETERMINATION OF PREFERENCES OF THE 6.30% REDEEMABLE FIRST PREFERRED STOCK: The Certificate of Determination of Preferences of the 6.30% Redeemable First Preferred Stock which is attached hereto as Exhibit 8 is hereby incorporated by reference as Article SIXTEENTH of these Articles of Incorporation.

3.　　The foregoing amendments and restatement of the Articles of Incorporation were adopted to (1) amend Article Eighth to prohibit the corporation from issuing nonvoting equity securities, which is required by Section 1123(a)(6) of the United States Bankruptcy Code, (2) to eliminate Article Sixteenth, which previously set forth the Certificate of Determination of Preferences of the 6-7/8% Redeemable First Preferred Stock, to reflect the reduction in the authorized number of shares of that series to zero which occurred upon filing the Certificate of Decrease with respect to such series immediately preceding the filing of the Restated Articles, pursuant to California Corporations Code Section 401(c), and the elimination of that series as an authorized series of the corporation pursuant to California Corporations Code Section 401(f); and (3) to renumber the remaining Articles to reflect the deletion of Article Sixteenth.

4.　　The amendment to Article Eighth has not been approved by the Board of Directors or the shareholders, for the following reasons. The corporation filed a petition for voluntary bankruptcy under Chapter 11 of the U.S. Bankruptcy Code on April 6, 2001. Under the Confirmation Order dated December 22, 2003, as supplemented by orders dated January 27, 2004 and March 15, 2004, in respect of its plan of reorganization, the corporation is required to (1) amend its Articles of Incorporation to contain the provisions necessary to prohibit the issuance of nonvoting equity securities as required by section 1123(a)(6) of the Bankruptcy Code and as provided in the plan of reorganization and (2) empower the chairman of the board, the president, any vice president, the chief financial officer, the controller, the secretary, the treasurer, any assistant treasurer and any assistant secretary, jointly or severally, to exercise the power and authority to effectuate these provisions of the plan. Pursuant to California Corporations Code Section 1400, any domestic corporation with respect to which a proceeding has been initiated under any applicable statute of the United States, as now existing or hereafter enacted, relating to reorganizations or arrangements of corporations, has full power and authority to put into effect and carry out any plan of reorganization or arrangement and the orders of the court or judge entered in such proceeding and may take any proceeding and do any act provided in the plan or directed by such orders, without further action by its Board of Directors or shareholders,

8

including without limitation, the authority to amend its articles of incorporation.

5. Amendments to the Articles of Incorporation for the purpose of eliminating the 6-7/8 % Redeemable First Preferred Stock series have been approved by the board of Directors. Pursuant to California Corporations Code Sections 202(e)(3), 203.5(b), 401(c) and 401(f), amendments to the Articles of Incorporation for the purpose of eliminating the 6-7/8 % Redeemable First Preferred Stock series need not be approved by the affirmative vote of the majority of the outstanding shares; accordingly, such amendments and restatement may be adopted with approval of the Board of Directors alone.

We further declare under penalty of perjury under the laws of the State of California that the matters set forth in this certificate are true and correct of our own knowledge.

Date: April 12, 2004

_____
Gordon R. Smith
President

_____
Linda Y. H. Cheng
Corporate Secretary

9

EXHIBIT 1

PACIFIC GAS AND ELECTRIC COMPANY
CERTIFICATE OF DETERMINATION OF PREFERENCES
OF 5% REDEEMABLE FIRST PREFERRED STOCK

WHEREAS, the Articles of Incorporation of this corporation provide for a class of stock known as First Preferred Stock, issuable from time to time in one or more series, of which a series of such class of stock was issued as the 5% Redeemable First Preferred Stock, $25 par value (herein called the "5% Series"); and

WHEREAS, this corporation has elected to redeem, purchase, or otherwise acquire 1,082,805 shares of the 5% Series from time to time; and

WHEREAS, pursuant to California Corporations Code Section 401(c), this corporation filed a Certificate of Decrease in Number of Shares of Certain Series of First Preferred Stock on March 23, 1994, which amended the Articles of Incorporation to decrease the number of shares constituting the 5% Series from 2,860,977 to 1,778,172 shares; and

WHEREAS, pursuant to California Corporations Code Section 202(e)(3), the 1,082,805 shares constituting the decrease in the 5% Series resumed the status of authorized and unissued shares of First Preferred Stock, $25 par value; and

WHEREAS, it is in the best interest of this corporation to restate the four existing Certificates of Determination of Preferences of the 5% Series to (i) reflect the reduction in the authorized number of shares of the 5% Series, (ii) consolidate such existing Certificates of Determination of Preferences into a single Certificate of Determination of Preferences of the 5% Series, and (iii) eliminate the portions of the officers' certificates and verifications which do not set forth any of the rights, preferences, privileges, or restrictions of the 5% Series.

E-1-1

NOW, THEREFORE, BE IT RESOLVED that the foregoing restatement of the Certificates of Determination of Preferences of the 5% Series is hereby approved; and

BE IT FURTHER RESOLVED that the Certificate of Determination of Preferences of the 5% Series is hereby approved and adopted as restated in its entirety as follows:

1,778,172 shares of this corporation's unissued redeemable First Preferred Stock shall constitute a series designated "5% Redeemable First Preferred Stock"; the dividend rate of such shares shall be five per cent per year; such shares shall have no conversion rights; and the redemption price of such shares shall be

$28.25 per share if redeemed on or before July 31, 1953,
$27.75 per share if redeemed thereafter and on or before July 31, 1958,
$27.25 per share if redeemed thereafter and on or before July 31, 1963, and
$26.75 per share if redeemed thereafter.

E-1-2

EXHIBIT 2

## PACIFIC GAS AND ELECTRIC COMPANY
## CERTIFICATE OF DETERMINATION OF PREFERENCES
## OF 5% REDEEMABLE FIRST PREFERRED STOCK,
## SERIES A

WHEREAS, the Articles of Incorporation of this corporation provide for a class of stock known as First Preferred Stock, issuable from time to time in one or more series, of which a series of such class of stock was issued as the 5% Redeemable First Preferred Stock, Series A, $25 par value (herein called the "5% Series A"); and

WHEREAS, this corporation has elected to redeem, purchase, or otherwise acquire 815,678 shares of the 5% Series A from time to time; and

WHEREAS, pursuant to California Corporations Code Section 401(c), this corporation filed a Certificate of Decrease in Number of Shares of Certain Series of First Preferred Stock on March 23, 1994, which amended the Articles of Incorporation to decrease the number of shares constituting the 5% Series A from 1,750,000 to 934,322 shares; and

WHEREAS, pursuant to California Corporations Code Section 202(e)(3), the 815,678 shares constituting the decrease in the 5% Series A resumed the status of authorized and unissued shares of First Preferred Stock, $25 par value; and

WHEREAS, it is in the best interest of this corporation to restate the two existing Certificates of Determination of Preferences of the 5% Series A to (i) reflect the reduction in the authorized number of shares of the 5% Series A, (ii) consolidate such existing Certificates of Determination of Preferences into a single Certificate of Determination of Preferences of the 5% Series A, and (iii) eliminate the portions of the officers' certificates and verifications which do not set forth any of the rights, preferences, privileges, or restrictions of the 5% Series A.

NOW, THEREFORE, BE IT RESOLVED that the foregoing restatement of the Certificates of Determination of Preferences of the 5% Series A is hereby approved; and

BE IT FURTHER RESOLVED that the Certificate of Determination of Preferences of the 5% Series A is hereby approved and adopted as restated in its entirety as follows:

934,322 shares of this corporation's unissued redeemable First Preferred Stock shall constitute a series designated "5% Redeemable First Preferred Stock, Series A"; the dividend rate of such shares shall be five per cent per year; such shares shall have no conversion rights; and the redemption price of such shares shall be

$28.25 per share if redeemed on or before July 31, 1953,
$27.75 per share if redeemed thereafter and on or before July 31, 1958,
$27.25 per share if redeemed thereafter and on or before July 31, 1963, and
$26.75 per share if redeemed thereafter.

E-2-2

EXHIBIT 3

PACIFIC GAS AND ELECTRIC COMPANY
CERTIFICATE OF DETERMINATION OF PREFERENCES
OF 4.80% REDEEMABLE FIRST PREFERRED STOCK

WHEREAS, the Articles of Incorporation of this corporation provide for a class of stock known as First Preferred Stock, issuable from time to time in one or more series, of which a series of such class of stock was issued as the 4.80% Redeemable First Preferred Stock, $25 par value (herein called the "4.80% Series"); and

WHEREAS, this corporation has elected to redeem, purchase, or otherwise acquire 724,344 shares of the 4.80% Series from time to time; and

WHEREAS, pursuant to California Corporations Code Section 401(c), this corporation filed a Certificate of Decrease in Number of Shares of Certain Series of First Preferred Stock on March 23, 1994, which amended the Articles of Incorporation to decrease the number of shares constituting the 4.80% Series from 1,517,375 to 793,031 shares; and

WHEREAS, pursuant to California Corporations Code Section 202(e)(3), the 724,344 shares constituting the decrease in the 4.80% Series resumed the status of authorized and unissued shares of First Preferred Stock, $25 par value; and

WHEREAS, it is in the best interest of this corporation to restate the two existing Certificates of Determination of Preferences of the 4.80% Series to (i) reflect the reduction in the authorized number of shares of the 4.80% Series, (ii) consolidate such existing Certificates of Determination of Preferences into a single Certificate of Determination of Preferences of the 4.80% Series, and (iii) eliminate the portions of the officers' certificates and verifications which do not set forth any of the rights, preferences, privileges, or restrictions of the 4.80% Series.

NOW, THEREFORE, BE IT RESOLVED that the foregoing restatement of the Certificates of Determination of Preferences of the 4.80% Series is hereby approved; and

BE IT FURTHER RESOLVED that the Certificate of Determination of Preferences of the 4.80% Series is hereby approved and adopted as restated in its entirety as follows:

793,031 shares of this corporation's unissued redeemable First Preferred Stock shall constitute a series designated "4.80% Redeemable First Preferred Stock"; the

E-3-1

dividend rate of such shares shall be 4.80% per year; such shares shall have no conversion rights; and the redemption price for such shares shall be

      $28.75 per share if redeemed on or before January 31, 1955;
      $28.25 per share if redeemed thereafter and on or before January 31, 1960;
      $27.75 per share if redeemed thereafter and on or before January 31, 1965; and
      $27.25 per share if redeemed thereafter.

EXHIBIT 4

PACIFIC GAS AND ELECTRIC COMPANY
CERTIFICATE OF DETERMINATION OF PREFERENCES
OF 4.50% REDEEMABLE FIRST PREFERRED STOCK

WHEREAS, the Articles of Incorporation of this corporation provide for a class of stock known as First Preferred Stock, issuable from time to time in one or more series, of which a series of such class of stock was issued as the 4.50% Redeemable First Preferred Stock, $25 par value (herein called the "4.50% Series"); and

WHEREAS, this corporation has elected to redeem, purchase, or otherwise acquire 516,284 shares of the 4.50% Series from time to time; and

WHEREAS, pursuant to California Corporations Code Section 401(c), this corporation filed a Certificate of Decrease in Number of Shares of Certain Series of First Preferred Stock on March 23, 1994, which amended the Articles of Incorporation to decrease the number of shares constituting the 4.50% Series from 1,127,426 to 611,142 shares; and

WHEREAS, pursuant to California Corporations Code Section 202(e)(3), the 516,284 shares constituting the decrease in the 4.50% Series resumed the status of authorized and unissued shares of First Preferred Stock, $25 par value; and

WHEREAS, it is in the best interest of this corporation to restate the two existing Certificates of Determination of Preferences of the 4.50% Series to (i) reflect the reduction in the authorized number of shares of the 4.50% Series, (ii) consolidate such existing Certificates of Determination of Preferences into a single Certificate of Determination of Preferences of the 4.50% Series, and (iii) eliminate the portions of the officers' certificates and verifications which do not set forth any of the rights, preferences, privileges, or restrictions of the 4.50% Series.

NOW, THEREFORE, BE IT RESOLVED that the foregoing restatement of the Certificates of Determination of Preferences of the 4.50% Series is hereby approved; and

BE IT FURTHER RESOLVED that the Certificate of Determination of Preferences of the 4.50% Series is hereby approved and adopted as restated in its entirety as follows:

611,142 shares of this corporation's unissued redeemable first preferred stock shall constitute a series designated "4.50% Redeemable First Preferred Stock"; the dividend rate of such shares shall be 4.50% per year; such shares shall have no conversion rights; and the redemption price of such shares shall be

E-4-1

$27.25 per share if redeemed on or before July 31, 1959;
$26.75 per share if redeemed thereafter and on or before July 31, 1964;
$26.25 per share if redeemed thereafter and on or before July 31, 1969; and
$26.00 per share if redeemed thereafter.

E-4-2

EXHIBIT 5

PACIFIC GAS AND ELECTRIC COMPANY
CERTIFICATE OF DETERMINATION OF PREFERENCES
OF 4.36% REDEEMABLE FIRST PREFERRED STOCK

WHEREAS, the Articles of Incorporation of this corporation provide for a class of stock known as First Preferred Stock, issuable from time to time in one or more series, of which a series of such class of stock was issued as the 4.36% Redeemable First Preferred Stock, $25 par value (herein called the "4.36% Series"); and

WHEREAS, this corporation has elected to redeem, purchase or otherwise acquire 581,709 shares of the 4.36% Series from time to time; and

WHEREAS, pursuant to California Corporations Code Section 401(c), this corporation filed a Certificate of Decrease in Number of Shares of Certain Series of First Preferred Stock on March 23, 1994, which amended the Articles of Incorporation to decrease the number of shares constituting the 4.36% Series from 1,000,000 to 418,291 shares; and

WHEREAS, pursuant to California Corporations Code Section 202(e)(3), the 581,709 shares constituting the decrease in the 4.36% Series resumed the status of authorized and unissued shares of First Preferred Stock, $25 par value; and

WHEREAS, it is in the best interest of this corporation to restate the Certificate of Determination of Preferences of the 4.36% Series to (i) reflect the reduction in the authorized number of shares of the 4.36% Series and (ii) eliminate the portions of the officers' certificate and verification which do not set forth any of the rights, preferences, privileges, or restrictions of the 4.36% Series.

NOW, THEREFORE, BE IT RESOLVED that the foregoing restatement of the Certificate of Determination of Preferences of the 4.36% Series is hereby approved; and

E-5-1

BE IT FURTHER RESOLVED that the Certificate of Determination of Preferences of the 4.36% Series is hereby approved and adopted as restated in its entirety as follows:

418,291 shares of this corporation's unissued Redeemable First Preferred Stock shall constitute a series designated "4.36% Redeemable First Preferred Stock"; the dividend rate of such shares shall be 4.36% per year; such shares shall have no conversion rights; and the redemption price of such shares shall be

$26.75 per share if redeemed on or before October 31, 1960;
$26.50 per share if redeemed thereafter and on or before October 31, 1965;
$26.25 per share if redeemed thereafter and on or before October 31, 1970;
$26.00 per share if redeemed thereafter and on or before October 31, 1975; and
$25.75 per share if redeemed thereafter.

E-5-2

EXHIBIT 6

## CERTIFICATE OF DETERMINATION OF PREFERENCES OF 6.57% REDEEMABLE FIRST PREFERRED STOCK OF PACIFIC GAS AND ELECTRIC COMPANY

WHEREAS, the Articles of Incorporation of this corporation provide for a class of stock known as First Preferred Stock, issuable from time to time in one or more series, of which a series of such class of stock was issued as the 6.57% Redeemable First Preferred Stock, $25 par value (herein called the "6.57% Series"); and

WHEREAS, it is in the best interest of this corporation to restate the Certificate of Determination of Preferences of the 6.57% Series to eliminate the portions of the officers' certificate and verification which do not set forth any of the rights, preferences, privileges, or restrictions of the 6.57% Series.

NOW, THEREFORE, BE IT RESOLVED that the foregoing restatement of the Certificate of Determination of Preferences of the 6.57% Series is hereby approved; and

BE IT FURTHER RESOLVED that the Certificate of Determination of Preferences of the 6.57% Series is hereby approved and adopted as restated in its entirety as follows:

3,000,000 shares of this corporation's unissued First Preferred Stock, $25 par value, shall constitute a series designated "6.57% Redeemable First Preferred Stock" (hereinafter referred to as the "6.57% Series").

The terms of the 6.57% Series are hereby fixed as follows:

(a)     The holders of shares of the 6.57% Series shall be entitled to receive, when and as declared by the Board of Directors, dividends at the rate of 6.57 percent of par value thereof per annum, and no more. Such dividends shall be cumulative with respect to each share from the date of issuance thereof.

(b)     No dividend shall be declared or paid on any shares of the 6.57% Series or on any shares of any other series or class of preferred stock unless a ratable dividend on the 6.57% Series and such other series or class of preferred stock, in proportion to the full preferential amounts to which each series or class is entitled, is declared and is paid or set apart for payment. As used herein, the term "preferred stock" shall mean all series of the first preferred stock, $25 par value per share, and first preferred stock, $100 par value per share, and any other class of stock ranking equally with the preferred stock as to preference in dividends and liquidation rights,

E-6-1

notwithstanding that shares of such series and classes may differ as to the amounts of dividends or liquidation payments to which they are entitled.

(c)     No junior shares or shares of preferred stock shall be purchased, redeemed or otherwise acquired by the corporation, and no moneys shall be paid to or set aside or made available for a sinking fund for the purchase or redemption of junior shares or shares of preferred stock, unless full cumulative dividends upon all series and classes of preferred stock then outstanding to the end of the dividend period next preceding the date fixed for such redemption (and for the current dividend period if the date fixed for such redemption is a dividend payment date) shall have been declared and shall have been paid or set aside for payment. As used herein, the term "junior shares" shall mean common shares or any other shares ranking junior to the preferred stock either as to dividends or upon liquidation, dissolution, or winding up.

(d)     The shares of the 6.57% Series shall not be subject to redemption by this corporation prior to July 31, 2002. On or after July 31, 2002, the redemption price shall be $25.00 per share, together with an amount equal to all accumulated and unpaid dividends thereon to and including the date of redemption.

(e)     Shares of the 6.57% Series shall also be subject to redemption through the operation of a sinking fund (herein called the "Sinking Fund") at the redemption price (the "Sinking Fund Redemption Price") of $25.00 per share plus an amount equal to the accumulated and unpaid dividends thereon to and including the redemption date, whether or not earned or declared. For the purposes of the Sinking Fund, out of any funds of the corporation legally available therefor remaining after full cumulative dividends upon all series and classes of preferred stock then outstanding to the end of the dividend period next preceding the date fixed for such redemption (and for the current dividend period if the date fixed for such redemption is a dividend payment date) shall have been declared and shall have been paid or set apart for payment, the corporation shall redeem 150,000 shares of the 6.57% Series annually on each July 31, from 2002 through 2006, inclusive, and 2,250,000 shares on July 31, 2007, at the Sinking Fund Redemption Price. The Sinking Fund shall be cumulative so that if on any such July 31 the funds of the corporation legally available therefor shall be insufficient to permit the required redemption in full, or if for any other reason such redemption shall not have been made in full, the remaining shares of the 6.57% Series so required to be redeemed shall be redeemed before any cash dividend shall be paid or declared, or any distribution made, on any junior shares or before any junior shares or any shares of preferred stock shall be purchased, redeemed or otherwise acquired by the corporation, or any monies shall be paid to or set aside or made available for a sinking fund for the purchase or redemption or any junior shares or any shares of preferred stock; provided, however, that, notwithstanding the existence of any such

E-6-2

deficiency, the corporation may make any required sinking fund redemption on any other series or class of preferred stock if the number of shares of such other series or class of preferred stock being so redeemed bears (as nearly as practicable) the same ratio to the aggregate number of shares of such other series or class then due to be redeemed as the number of shares of the 6.57% Series being redeemed bears to the aggregate number of shares of the 6.57% Series then due to be redeemed.

(f)     Shares of the 6.57% Series redeemed otherwise than as required by section (e) or purchased or otherwise acquired by the corporation may, at the option of the corporation, be applied as a credit against any Sinking Fund redemption required by section (e).  Moneys available for the Sinking Fund shall be applied on each such July 31 to the redemption of shares of the 6.57% Series.

(g)     Any shares of the 6.57% Series which have been redeemed, purchased, or otherwise acquired by the corporation shall become authorized and unissued shares of the First Preferred Stock, $25 par value, but shall not be reissued as shares of the 6.57% Series.

(h)     Upon liquidation, dissolution, or winding up of the corporation, the holders of shares of the 6.57% Series shall be entitled to receive the liquidation value per share, which is hereby fixed at $25.00 per share, plus an amount equal to all accumulated and unpaid dividends thereon at such time, whether or not earned or declared.

(i)     Dividends shall be computed on a basis of a 360-day year of twelve 30-day months.

(j)     If the date for payment of any dividend or the date fixed for redemption of any share of the 6.57% Series shall not be on a business day, then payment of the dividend or applicable redemption price need not be made on such date, but may be made on the next succeeding business day with the same force and effect as if made on the date for payment of such dividend or date fixed for redemption.

Case: 19-00083    Doc# 5374-10   Filed: 01/14/20   Entered: 01/14/20 15:56:59   Page 260 of 524

EXHIBIT 7

CERTIFICATE OF DETERMINATION OF PREFERENCES
OF 7.04% REDEEMABLE FIRST PREFERRED STOCK OF
PACIFIC GAS AND ELECTRIC COMPANY

WHEREAS, the Articles of Incorporation of this corporation provide for a class of stock known as First Preferred Stock, issuable from time to time in one or more series, of which a series of such class of stock was issued as the 7.04% Redeemable First Preferred Stock, $25 par value (herein called the "7.04% Series"); and

WHEREAS, it is in the best interest of this corporation to restate the Certificate of Determination of Preferences of the 7.04% Series to eliminate the portions of the officers' certificate and verification which do not set forth any of the rights, preferences, privileges, or restrictions of the 7.04% Series.

NOW, THEREFORE, BE IT RESOLVED that the foregoing restatement of the Certificate of Determination of Preferences of the 7.04% Series is hereby approved; and

BE IT FURTHER RESOLVED that the Certificate of Determination of Preferences of the 7.04% Series is hereby approved and adopted as restated in its entirety as follows:

3,000,000 shares of this corporation's unissued First Preferred Stock, $25 par value, shall constitute a series designated "7.04% Redeemable First Preferred Stock" (hereinafter referred to as the "7.04% Series").

The terms of the 7.04% Series are hereby fixed as follows:

(a)     The holders of shares of the 7.04% Series shall be entitled to receive, when and as declared by the Board of Directors, dividends at the rate of 7.04 percent of par value thereof per annum, and no more.  Such dividends shall be cumulative with respect to each share from the date of issuance thereof.

(b)     No dividend shall be declared or paid on any shares of the 7.04% Series or on any shares of any other series or class of preferred stock unless a ratable dividend on the 7.04% Series and such other series or class of preferred stock, in proportion to the full preferential amounts to which each series or class is entitled, is declared and is paid or set apart for payment.  As used herein, the term "preferred stock" shall mean all series of the first preferred stock, $25 par value per share, and first preferred stock, $100 par value per share, and any other class of stock ranking equally with the preferred stock as to preference in dividends and liquidation rights,

E-7-1

notwithstanding that shares of such series and classes may differ as to amounts of dividends or liquidation payments to which they are entitled.

(c)     No junior shares or shares of preferred stock shall be purchased, redeemed, or otherwise acquired by the corporation, and no moneys shall be paid to or set aside or made available for a sinking fund for the purchase or redemption of junior shares or shares of preferred stock, unless full cumulative dividends upon all series and classes of preferred stock then outstanding to the end of the dividend period next preceding the date fixed for such redemption (and for the current dividend period if the date fixed for such redemption is a dividend payment date) shall have been declared and shall have been paid or set aside for payment. As used herein, the term "junior shares" shall mean common shares or any other shares ranking junior to the preferred stock either as to dividends or upon liquidation, dissolution, or winding up.

(d)     The shares of the 7.04% Series shall not be subject to redemption by this corporation prior to January 31, 2003. On and after January 31, 2003, the redemption price shall be as follows:

If redeemed during the 12 months' period beginning January 31,

| 2003 | $25.88 | 2008 | $25.44 |
|------|--------|------|--------|
| 2004 | $25.79 | 2009 | $25.35 |
| 2005 | $25.70 | 2010 | $25.26 |
| 2006 | $25.62 | 2011 | $25.18 |
| 2007 | $25.53 | 2012 | $25.09 |

and at $25.00 per share on and after January 31, 2013, together in each case with an amount equal to all accumulated and unpaid dividends thereon to and including the date of redemption. For the purpose of redeeming any shares of the 7.04% Series, payment of the redemption price shall be out of any funds of the corporation legally available therefor remaining after: (i) full cumulative dividends upon all series and classes of preferred stock then outstanding to the end of the dividend period next preceding the date fixed for such redemption (and for the current dividend period if the date fixed for such redemption is a dividend payment date) shall have been declared and shall have been paid or set apart for payment, and (ii) all money shall have been paid to or set aside or made available for any sinking fund for the purchase or redemption of all series of and classes of preferred stock as may be required by the terms of such preferred stock.

(e)     Any shares of the 7.04% Series which have been redeemed, purchased, or otherwise acquired by the corporation shall become authorized and unissued shares

E-7-2

of the First Preferred Stock, $25 par value, but shall not be reissued as shares of the 7.04% Series.

(f)     Upon liquidation, dissolution, or winding up of the corporation, the holders of shares of the 7.04% Series shall be entitled to receive the liquidation value per share, which is hereby fixed at $25.00 per share, plus an amount equal to all accumulated and unpaid dividends thereon at such time, whether or not earned or declared.

(g)     Dividends shall be computed on a basis of a 360-day year of twelve 30-day months.

(h)     If the date for payment of any dividend or the date fixed for redemption of any share of the 7.04% Series shall not be a business day, then payment of the dividend or applicable redemption price need not be made on such date, but may be made on the next succeeding business day with the same force and effect as if made on the date for payment of such dividend or date fixed for redemption.

E-7-3

EXHIBIT 8

## CERTIFICATE OF DETERMINATION OF PREFERENCES
## OF 6.30% REDEEMABLE FIRST PREFERRED STOCK OF
## PACIFIC GAS AND ELECTRIC COMPANY

WHEREAS, the Articles of Incorporation of this corporation provide for a class of stock known as First Preferred Stock, issuable from time to time in one or more series, of which a series of such class of stock was issued as the 6.30% Redeemable First Preferred Stock, $25 par value (herein called the "6.30% Series"); and

WHEREAS, it is in the best interest of this corporation to restate the Certificate of Determination of Preferences of the 6.30% Series to eliminate the portions of the officers' certificate and verification which do not set forth any of the rights, preferences, privileges, or restrictions of the 6.30% Series.

NOW, THEREFORE, BE IT RESOLVED that the foregoing restatement of the Certificate of Determination of Preferences of the 6.30% Series is hereby approved; and

BE IT FURTHER RESOLVED, that the Certificate of Determination of Preferences of the 6.30% Series is hereby approved and adopted as restated in its entirety as follows:

2,500,000 shares of this corporation's unissued Redeemable First Preferred Stock, $25 par value, shall constitute a series designated "6.30% Redeemable First Preferred Stock" (hereinafter referred to as the "6.30% Series").

The terms of the 6.30% Series are hereby fixed as follows:

(a)     The holders of shares of the 6.30% Series shall be entitled to receive, when and as declared by the Board of Directors, dividends at the rate of 6.30 percent of par value thereof per annum, and no more. Such dividends shall be cumulative with respect to each share from the date of issuance thereof.

Case: 19-30088    Doc# 5374-10    Filed: 01/14/20    Entered: 01/14/20 15:56:59    Page 264 of 524

(b)     No dividend shall be declared or paid on any shares of the 6.30% Series or on any shares of any other series or class of preferred stock unless a ratable dividend on the 6.30% Series and such other series or class of preferred stock, in proportion to the full preferential amounts to which each series or class is entitled, is declared and is paid or set apart for payment. As used herein, the term "preferred stock" shall mean all series of the first preferred stock, $25 par value per share, and first preferred stock, $100 par value per share, and any other class of stock ranking equally with the preferred stock as to preference in dividends and liquidation rights, notwithstanding that shares of such series and classes may differ as to amounts of dividends or liquidation payments to which they are entitled.

(c)     No junior shares or shares of preferred stock shall be purchased, redeemed, or otherwise acquired by the corporation, and no moneys shall be paid to or set aside or made available for a sinking fund for the purchase or redemption of junior shares or shares of preferred stock, unless full cumulative dividends upon all series and classes of preferred stock then outstanding to the end of the dividend period next preceding the date fixed for such redemption (and for the current dividend period if the date fixed for such redemption is a dividend payment date) shall have been declared and shall have been paid or set aside for payment. As used herein, the term "junior shares" shall mean common shares or any other shares ranking junior to the preferred stock either as to dividends or upon liquidation, dissolution, or winding up.

(d)     The shares of the 6.30% Series shall not be subject to redemption by this corporation prior to January 31, 2004. On and after January 31, 2004, the redemption price shall be $25.00 per share, together with an amount equal to all accumulated and unpaid dividends thereon to and including the date of redemption. For the purpose of redeeming any shares of the 6.30% Series, payment of the redemption price shall be out of any funds of the corporation legally available therefor remaining after: (i) full cumulative dividends upon all series and classes of preferred stock then outstanding to the end of the dividend period next preceding the date fixed for such redemption (and for the current dividend period if the date fixed for such redemption is a dividend payment date) shall have been declared and shall have been paid or set apart for payment, and (ii) all money shall have been paid to or set aside or made available for any sinking fund for the purchase or redemption of all series of and classes of preferred stock as may be required by the terms of such preferred stock.

(e)     Shares of the 6.30% Series shall also be subject to redemption through the operation of a sinking fund (herein called the "Sinking Fund") at the redemption price (the "Sinking Fund Redemption Price") of $25.00 per share plus an amount equal to the accumulated and unpaid dividends thereon to and including the redemption date, whether or not earned or declared. For the purposes of the Sinking Fund, out of any funds of the corporation legally available therefor remaining after full cumulative dividends upon all series and classes of preferred

Case: 19-30088    Doc# 5374-10    Filed: 01/14/20    Entered: 01/14/20 15:56:59    Page 265 of 524

stock then outstanding to the end of the dividend period next preceding the date fixed for such redemption (and for the current dividend period if the date fixed for such redemption is a dividend payment date) shall have been declared and shall have been paid or set apart for payment, the corporation shall redeem 125,000 shares of the 6.30% Series annually on each January 31, from 2004 through 2008, inclusive, and 1,875,000 shares on January 31, 2009, at the Sinking Fund Redemption Price. The Sinking Fund shall be cumulative so that if on any such January 31 the funds of the corporation legally available therefor shall be insufficient to permit the required redemption in full, or if for any other reason such redemption shall not have been made in full, the remaining shares of the 6.30% Series so required to be redeemed shall be redeemed before any cash dividend shall be paid or declared, or any distribution made, on any junior shares or before any junior shares or any shares of preferred stock shall be purchased, redeemed or otherwise acquired by the corporation, or any moneys shall be paid to or set aside or made available for a sinking fund for the purchase or redemption of any junior shares or any shares of preferred stock; *provided, however*, that, notwithstanding the existence of any such deficiency, the corporation may make any required sinking fund redemption on any other series or class of preferred stock if the number of shares of such other series or class of preferred stock being so redeemed bears (as nearly as practicable) the same ratio to the aggregate number of shares of such other series or class then due to be redeemed as the number of shares of the 6.30% Series being redeemed bears to the aggregate number of shares of the 6.30% Series then due to be redeemed.

(f)     Shares of the 6.30% Series redeemed otherwise than as required by section (e) or purchased or otherwise acquired by the corporation may, at the option of the corporation, be applied as a credit against any Sinking Fund redemption required by section (e). Moneys available for the Sinking Fund shall be applied on each such January 31 to the redemption of shares of the 6.30% Series.

(g)     Any shares of the 6.30% Series which have been redeemed, purchased, or otherwise acquired by the corporation shall become authorized and unissued shares of the First Preferred Stock, $25 par value, but shall not be reissued as shares of the 6.30% Series.

(h)     Upon liquidation, dissolution, or winding up of the corporation, the holders of shares of the 6.30% Series shall be entitled to receive the liquidation value per share, which is hereby fixed at $25.00 per share, plus an amount equal to all accumulated and unpaid dividends thereon at such time, whether or not earned or declared.

(i)     Dividends shall be computed on a basis of a 360-day year of twelve 30-day months.

(j)     If the date for payment of any dividend or the date fixed for redemption of any share of the 6.30% Series shall not be a business day, then payment of the

E-8-3

dividend or applicable redemption price need not be made on such date, but may be made on the next succeeding business day with the same force and effect as if made on the date for payment of such dividend or date fixed for redemption.

E-8-4



# EXHIBIT C

A0581716



**SECRETARY OF STATE**

I, *BILL JONES*, Secretary of State of the State of California, hereby certify:

That the attached transcript of ___3___ page(s) has been compared with the record on file in this office, of which it purports to be a copy, and that it is full, true and correct.



*IN WITNESS WHEREOF*, I execute this certificate and affix the Great Seal of the State of California this day of

MAY 3 0 2002

Secretary of State

Sec/State Form CE-107 (rev. 9/98)

# A0581716

**ENDORSED - FILED**
In the office of the Secretary of State
of the State of California

**MAY 2 9** 2002

**BILL JONES, Secretary of State**

RESTATED ARTICLES OF INCORPORATION

OF

PG&E CORPORATION


ROBERT D. GLYNN, JR. and LINDA Y.H. CHENG certify that:

1.    They are the Chairman of the Board, Chief Executive Officer, and President, and the Corporate Secretary, respectively, of PG&E Corporation, a California corporation.

2.    The Articles of Incorporation of the corporation, as amended to the date of the filing of this certificate, including the amendments set forth herein but not separately filed (and with the omissions required by Section 910 of the California Corporations Code) are amended and restated as follows:

FIRST:  The name of the Corporation shall be

PG&E CORPORATION

SECOND:  The purpose of the Corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of California other than the banking business, the trust company business or the practice of a profession permitted to be incorporated by the California Corporations Code.

THIRD:

I.    The Board of Directors of the Corporation shall consist of such number of directors, not less than seven (7) nor more than thirteen (13), as shall be prescribed in the Bylaws.

II.    The Board of Directors by a vote of two-thirds of the whole Board may appoint from the directors an Executive Committee, which Committee may exercise such powers as may lawfully be conferred upon it by the Bylaws of the Corporation. Such Committee may prescribe rules for its own government and its meetings may be held at such places within or without California as said Committee may determine or authorize.

FOURTH:  No shareholder may cumulate votes in the election of directors.  This Article FOURTH shall become effective only when the Corporation shall have become a "listed corporation" within the meaning of Section 301.5 of the California Corporations Code.

FIFTH:  The liability of the directors of the Corporation for monetary damages shall be eliminated to the fullest extent permissible under California law.

SIXTH:  The Corporation is authorized to provide indemnification of agents (as defined in Section 317 of the California Corporations Code) through bylaws, resolutions, agreements with agents, vote of shareholders or disinterested directors, or otherwise, in excess of the indemnification otherwise permitted by Section 317 of the California Corporations Code, subject only to the applicable limits set forth in Section 204 of the California Corporations Code.

SEVENTH:

I.  The Corporation is authorized to issue two classes of shares, to be designated respectively Preferred Stock ("Preferred Stock") and Common Stock ("Common Stock"). The total number of shares of capital stock that the Corporation is authorized to issue is 885,000,000, of which 85,000,000 shall be Preferred Stock and 800,000,000 shall be Common Stock.

II.  The Preferred Stock may be issued from time to time in one or more series. The Board of Directors of the Corporation is expressly authorized to provide for the issue of all or any of the shares of the Preferred Stock in one or more series, and to fix the designation and number of shares and to determine or alter for each such series, such voting powers, full or limited, or no voting powers, and such designations, preferences and relative, participating, optional or other rights and such qualifications, limitations or restrictions thereof, as shall be stated and expressed in the resolution or resolutions adopted by the Board of Directors providing for the issue of such shares and as may be  permitted by the General Corporation Law of California. The Board of Directors is also expressly authorized to increase or decrease (but not below the number of shares of such series then outstanding) the number of shares of any series subsequent to the issue of shares of that series. If the number of shares of any such series shall be so decreased, the shares constituting such decrease shall resume the status that they had prior to the adoption of the resolution originally fixing the number of shares of such series.

EIGHTH:

The directors of the Corporation, when evaluating any proposal or offer which would involve (i) a merger or consolidation of the Corporation or any of its subsidiaries with another person, (ii) a sale of all or substantially all of the assets of the Corporation or any of its subsidiaries, (iii) a tender offer or exchange offer for any capital stock of the Corporation or any of its subsidiaries, or (iv) any similar transaction, shall give due consideration to all factors they may consider relevant.  Such factors may include, without limitation, (a) the adequacy, both in amount and form, of the consideration offered in relation not only to the current market price

A-2
Case: 19-60088   Doc# 5374-10   Filed: 01/14/20   Entered: 01/14/20 14:56:50   Page
271 of 524

of the Corporation's outstanding securities, but also the current value of the Corporation in a freely negotiated transaction with other potential acquirers and the Board's estimate of the Corporation's future value (including the unrealized value of its properties, assets and prospects) as an independent going concern, (b) the financial and managerial resources and future prospects of the acquirer, and (c) the legal, economic, environmental, regulatory and social effects of the proposed transaction on the Corporation's and its subsidiaries' employees, customers, suppliers and other affected persons and entities and on the communities and geographic areas in which the Corporation and its subsidiaries operate, provide utility service or are located, and in particular, the effect on the Corporation's and its subsidiaries' ability to safely and reliably meet any public utility obligations they may have at reasonable rates.

3. The foregoing amendments and restatement of the Articles of Incorporation have been duly approved by the Board of Directors of the corporation.

4. The foregoing amendments and restatement of the Articles of Incorporation (other than the omissions required by Section 910 of the California Corporations Code) have been duly approved by the required vote of the shareholders in accordance with Section 902 of the California Corporations Code. The corporation has only one class of shares issued and outstanding which is common stock. The number of outstanding shares entitled to vote with respect to the foregoing amendments is 364,206,190. The number of shares voted in favor of the amendments exceeded the vote required. The percentage vote required for approval of the amendments was more than 50%.

We further declare under penalty of perjury under the laws of the State of California that the matters set forth in this certificate are true and correct of our own knowledge.

Date: May 2, 2002

_____
ROBERT D. GLYNN, JR.
Chairman of the Board,
Chief Executive Officer, and President

_____
LINDA Y.H. CHENG
Corporate Secretary

S:\ARTICLES\corparticles5-02a.doc



# EXHIBIT D

Case: 19-80088    Doc #: 374-10    Filed: 06/18/20    Entered: 06/18/20 15:37:42    Page 1 of 9
Case: 19-80088    Doc #: 3-4    Filed: 06/18/20    Entered: 06/18/20 15:56:59    Page 273 of 524

Exhibit 10. _____

**Indemnification**

**RESOLUTION OF THE
BOARD OF DIRECTORS OF
PACIFIC GAS AND ELECTRIC COMPANY**

July 19, 1995

WHEREAS, the Board of Directors of this corporation previously has adopted, and the shareholders of the corporation previously have approved, an amendment to the Articles of Incorporation to permit indemnification of corporate agents in excess of the indemnification provisions of Section 317 of the California Corporations Code; and

WHEREAS, the above-mentioned amendment to the Articles was filed with the California Secretary of State's office on April 22, 1988; and

WHEREAS, on May 18, 1988, the Board of Directors adopted a resolution implementing the authority provided by the above-mentioned amendment to the Articles; and

WHEREAS, it is desirable and in the best interests of the corporation and its shareholders to amend the May 18, 1988, resolution to expand the indemnification of corporate agents;

NOW, THEREFORE, BE IT RESOLVED THAT:

1.  Indemnification of Directors and Officers

Each person who was or is a party or is threatened to be made a party to, or who is involved in any threatened, pending or completed action, suit or proceeding, formal or informal, whether brought in the name of this corporation (the "Corporation") or otherwise, and whether of a civil, criminal, administrative or investigative nature (hereinafter a "proceeding"), by reason of the fact that he or she, or a person of whom he or she is the legal representative, is or was a director or officer of the Corporation, or is or was a director or officer of the Corporation serving at the request of the Corporation (as determined by a committee composed of the General Counsel and the Corporate Secretary) as a director, officer, employee or agent of another

corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, whether the basis of such proceeding is an alleged action or inaction in an official capacity or in any other capacity while serving as a director or officer, shall, subject to the terms of any agreement between the Corporation and such a person, be indemnified and held harmless by the Corporation to the fullest extent permissible under California law and the Corporation's Articles of Incorporation, against all costs, charges, expenses, liabilities and losses (including, without limitation, attorneys' fees, judgments, fines, ERISA excise taxes, or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith, and such indemnification shall continue as to a person who has ceased to be a director or officer and shall inure to the benefit of his or her heirs, executors and administrators; provided, however, that (a) the Corporation shall indemnify any such person seeking indemnification in connection with a proceeding (or part thereof) initiated by such person only if such proceeding (or part thereof) was authorized by the Board of the Corporation, (b) the Corporation shall indemnify any such person seeking indemnification in connection with a proceeding (hereinafter a "third party proceeding") (or part thereof) other than a proceeding by or in the name of the Corporation to procure a judgment in its favor (hereinafter a "derivative proceeding") only if any settlement of such a proceeding is approved in writing by the Corporation, and (c) no such person shall be indemnified:

(i)     Except to the extent that the aggregate of losses to be indemnified exceeds the amount of such losses for which the director or officer is paid pursuant to any directors' or officers' liability insurance policy maintained by the Corporation;

(ii)    On account of any suit on which judgment is rendered against such person for an accounting of profits made from the purchase or sale by such person of securities of the Corporation pursuant to the provisions of Section 16(b) of the Securities Exchange Act of 1934 and amendments thereto;

(iii)   If a court of competent jurisdiction finally determines that any indemnification hereunder is unlawful;

(iv)    For acts or omissions involving intentional misconduct or knowing and culpable violation of law;

(v)     For acts or omissions that the director or officer believes to be contrary to the best interests of the Corporation or its shareholders, or that involve the absence of good faith on the part of the director or officer;

(vi)    For any transaction from which the director or officer derived an improper personal benefit;

(vii)   For acts or omissions that show a reckless disregard for the director's or officer's duty to the Corporation or its shareholders in circumstances in which the director or officer was aware, or should have been aware, in the ordinary course of performing his or her duties, of a risk of serious injury to the Corporation or its shareholders;

(viii)  For acts or omissions that constitute an unexcused pattern of inattention that amount to an abdication of the director's or officer's duties to the Corporation or its shareholders;

(ix)    For costs, charges, expenses, liabilities and losses arising under Section 310 or 316 of the California Corporations Code (the "Code"); or

(x)     As to circumstances in which indemnity is expressly prohibited by Section 317 of the Code;

provided, however, that the exclusions set forth in clauses (iv) through (x) above shall apply only to indemnification for acts, omissions or transactions involving breach of duty to the Corporation and its shareholders.  The General Counsel or the Board of Directors of the Corporation shall make the determination as to whether any of the exclusions set forth in clauses (iv) through (x) above applies in a particular case;

2.      <u>Indemnification as a Contract Right</u>

The indemnification rights set forth in this resolution with respect to directors and officers of the Corporation shall be a contract right and shall include the right to be paid by the Corporation expenses actually and reasonably incurred in defending any proceeding in advance of its final disposition; provided that such advances be conditioned upon delivery to the

3

Corporation of an undertaking, by or on behalf of the director or officer, to repay all amounts to the Corporation if it shall be ultimately determined that such person is not entitled to be indemnified;

3.    <u>Indemnification of Employees and Agents</u>

A person who was or is a party or is threatened to be made a party to or is involved in any proceeding by reason of the fact that he or she is or was an employee or agent of the Corporation (other than a director or officer) or is or was serving at the request of the Corporation as an employee or agent of another enterprise, including service with respect to employee benefit plans, whether the basis of such proceeding is an alleged action or inaction while serving as an employee or agent, may, subject to the terms of any agreement between the Corporation and such person, be indemnified and held harmless by the Corporation to the fullest extent permissible under California law and the Corporation's Articles of Incorporation, against all costs, charges, expenses, liabilities, and losses (including, without limitation, attorneys' fees, judgments, fines, ERISA excise taxes, or penalties and amounts paid or to be paid in settlement), reasonably and actually incurred or suffered by such person in connection therewith (hereinafter "indemnifiable losses"). The immediately preceding sentence is not intended to be and shall not be considered to confer a contract right on any employee or agent (other than directors and officers) of the Corporation.

The Corporation may also advance to an employee or agent referenced in this paragraph expenses reasonably and actually incurred or suffered in defending any proceeding, or may agree to provide prospective indemnification of any such person against indemnifiable losses in any third party proceeding prior to the final disposition of such proceeding; provided, however, that (a) the Corporation may make such advances in any proceeding or agree to provide such indemnification to any such employee or agent in any third party proceeding prior to the final disposition of such proceeding only if an investigation is conducted with respect to the circumstances of the conduct at issue and it is determined by a committee composed of the General Counsel, the Vice President - Human Resources and the officer in charge of such person's business unit or corporate services department, or by any person designated by such committee, based on the results of such investigation, that such person is entitled to indemnification because he or she is or was involved in such proceeding, or is threatened to be involved in such proceeding, as a direct consequence of (i) the discharge of such person's duties as an employee or agent of the Corporation, or (ii) such person's obedience to the directions of

4

the Corporation, even though unlawful, unless such person, at the time of obeying such directions, believed them to be unlawful, (b) notwithstanding any determination by such committee or its designee that any such employee or agent is entitled to any advance or indemnification pursuant to clause (a) above, the Corporation shall have the right to discontinue any advance to such person and to terminate any oral or written agreement to provide prospective indemnification to such person in the event that it is subsequently determined by the committee or its designee that such person is not entitled to be indemnified under California law, and (c) any advance to any such employee or agent shall be conditioned upon delivery to the Corporation of an undertaking, by or on behalf of such person, to repay all amounts to the Corporation if it shall ultimately be determined that such person is not entitled to be indemnified;

4.    <u>Right of Directors and Officers to Bring Suit</u>

If a claim by a director or officer under this resolution is not paid in full by the Corporation within 90 days after a written claim has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim and, if successful in whole or in part, the claimant shall also be entitled to be paid the expense of prosecuting the claim. Neither the failure of the Corporation (including its Board, independent legal counsel, or its shareholders) to have made a determination prior to the commencement of such action that indemnification of the claimant is permissible in the circumstances because he or she has met the applicable standard of conduct, if any, nor an actual determination by the Corporation before the commencement of such action that the claimant had not met any applicable standard of conduct, shall be a defense to the action or create a presumption for the purpose of an action that the claimant has not met the applicable standard of conduct;

5.    <u>Non-Exclusivity of Rights</u>

The right to indemnification provided by this resolution shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, bylaw, agreement, vote of shareholders or disinterested directors or otherwise;

6.     <u>Expenses as a Witness</u>

To the extent that any director, officer, employee or agent of the Corporation is by reason of such position, or position with another entity at the request of the Corporation, a witness in any action, suit or proceeding, he or she shall be indemnified against all costs and expenses actually and reasonably incurred by him or her on his or her behalf in connection therewith;

7.     <u>Indemnity Agreements</u>

The Corporation may enter into agreements with any director, officer, employee or agent of the Corporation providing for indemnification to the fullest extent permissible under California law and the Corporation's Articles of Incorporation;

8.     <u>Separability</u>

Each and every paragraph, sentence, term and provision of this resolution is separate and distinct, so that if any paragraph, sentence, term or provision hereof shall be held to be invalid or unenforceable for any reason, such invalidity or unenforceability shall not affect the validity or unenforceability of any other paragraph, sentence, term or provision hereof.  To the extent required, any paragraph, sentence, term or provision of this resolution may be modified by a court of competent jurisdiction to preserve its validity and to provide the claimant with, subject to the limitations set forth in this resolution and any agreement between the Corporation and claimant, the broadest indemnification permitted under applicable law;

BE IT FURTHER RESOLVED that this resolution shall apply to all proceedings based on any action or omission occurring on or after May 18, 1988;

BE IT FURTHER RESOLVED that any repeal or amendment of this resolution shall have prospective effect only, and shall not adversely affect any rights of indemnification of a director or officer existing at the time of such repeal or amendment with respect to any action or omission occurring prior to such repeal or amendment, and, further, shall not apply to any proceeding, irrespective of when the proceeding is initiated, arising from the service of such director or officer which occurred prior to such repeal or amendment;

Case: 19-30088    Doc# 5374-10    Filed: 01/14/20    Entered: 01/14/20 15:37:42    Page
279 of 524

BE IT FURTHER RESOLVED that the resolutions on this subject adopted by the Board of Directors on February 19, 1986, and May 18, 1988, are hereby superseded, with the exception that indemnification relating to any proceeding based upon acts or omissions occurring prior to May 18, 1988, shall be governed by the resolution of February 19, 1986.

I, LINDA Y.H. CHENG, do hereby certify that I am Vice President and Corporate Secretary of PACIFIC GAS AND ELECTRIC COMPANY, a corporation organized and existing under the laws of the State of California; that the above and foregoing is a full, true, and correct copy of a resolution which was duly adopted by the Board of Directors of said corporation at a meeting of said Board which was duly and regularly called and held at the office of said corporation on July 19, 1995; and that this resolution has never been amended, revoked, or repealed, but is still in full force and effect.

WITNESS my hand and the seal of said corporation hereunto affixed this 26th day of January, 2005.

_____

Linda Y.H. Cheng
Vice President and Corporate Secretary
PACIFIC GAS AND ELECTRIC COMPANY

C O R P O R A T E

S E A L

# EXHIBIT E

Case: 19-80088   Doc# 5874-10   Filed: 06/18/19   Entered: 06/18/19 15:37:42   Page 1 of 8
Case: 19-08089   Doc# 3-6   Filed: 06/18/20   Entered: 06/19/20 12:56:59   Page
282 of 524

Exhibit 10.___

**Indemnification**

**RESOLUTION OF THE**
**BOARD OF DIRECTORS OF**
**PG&E CORPORATION**

**December 18, 1996**

WHEREAS, the Articles of Incorporation of this corporation permit indemnification of corporate agents in excess of the indemnification provisions of Section 317 of the California Corporations Code;

NOW, THEREFORE, BE IT RESOLVED THAT:

1.       <u>Indemnification of Directors and Officers</u>

Each person who was or is a party or is threatened to be made a party to, or who is involved in any threatened, pending, or completed action, suit, or proceeding, formal or informal, whether brought in the name of this corporation (the "Corporation") or otherwise, and whether of a civil, criminal, administrative, or investigative nature (hereinafter a "proceeding"), by reason of the fact that he or she, or a person of whom he or she is the legal representative, is or was a director or officer of the Corporation, or is or was a director or officer of the Corporation serving at the request of the Corporation (as determined by a committee composed of the General Counsel and the Corporate Secretary) as a director, officer, employee, or agent of another corporation or of a partnership, joint venture, trust, or other enterprise, including service with respect to employee benefit plans, whether the basis of such proceeding is an alleged action or inaction in an official capacity or in any other capacity while serving as a director or officer, shall, subject to the terms of any agreement between the Corporation and such a person, be indemnified and held harmless by the Corporation to the fullest extent permissible under California law and the Corporation's Articles of Incorporation, against all costs, charges, expenses, liabilities, and losses (including, without limitation, attorneys' fees, judgments, fines, ERISA excise taxes, or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith, and such indemnification shall continue as to a person who has ceased to be a director or officer and shall inure to the benefit of his or her heirs, executors, and administrators; provided, however, that (a) the Corporation shall

indemnify any such person seeking indemnification in connection with a proceeding (or part thereof) initiated by such person only if such proceeding (or part thereof) was authorized by the Board of the Corporation, (b) the Corporation shall indemnify any such person seeking indemnification in connection with a proceeding (hereinafter a "third party proceeding") (or part thereof) other than a proceeding by or in the name of the Corporation to procure a judgment in its favor (hereinafter a "derivative proceeding") only if any settlement of such a proceeding is approved in writing by the Corporation, and (c) no such person shall be indemnified:

<ol type="i">
<li>Except to the extent that the aggregate of losses to be indemnified exceeds the amount of such losses for which the director or officer is paid pursuant to any directors' or officers' liability insurance policy maintained by the Corporation;</li>

<li>On account of any suit on which judgment is rendered against such person for an accounting of profits made from the purchase or sale by such person of securities of the Corporation pursuant to the provisions of Section 16(b) of the Securities Exchange Act of 1934 and amendments thereto;</li>

<li>If a court of competent jurisdiction finally determines that any indemnification hereunder is unlawful;</li>

<li>For acts or omissions involving intentional misconduct or knowing and culpable violation of law;</li>

<li>For acts or omissions that the director or officer believes to be contrary to the best interests of the Corporation or its shareholders, or that involve the absence of good faith on the part of the director or officer;</li>

<li>For any transaction from which the director or officer derived an improper personal benefit;</li>

<li>For acts or omissions that show a reckless disregard for the director's or officer's duty to the Corporation or its shareholders in circumstances in which the director or officer was aware, or should have been aware, in the</li>
</ol>

ordinary course of performing his or her duties, of a risk of serious injury to the Corporation or its shareholders;

(viii) For acts or omissions that constitute an unexcused pattern of inattention that amount to an abdication of the director's or officer's duties to the Corporation or its shareholders;

(ix) For costs, charges, expenses, liabilities, and losses arising under Section 310 or 316 of the California Corporations Code (the "Code"); or

(x) As to circumstances in which indemnity is expressly prohibited by Section 317 of the Code;

provided, however, that the exclusions set forth in clauses (iv) through (x) above shall apply only to indemnification for acts, omissions, or transactions involving breach of duty to the Corporation and its shareholders. The General Counsel or the Board of Directors of the Corporation shall make the determination as to whether any of the exclusions set forth in clauses (iv) through (x) above applies in a particular case;

2.     Indemnification as a Contract Right

The indemnification rights set forth in this resolution with respect to directors and officers of the Corporation shall be a contract right and shall include the right to be paid by the Corporation expenses actually and reasonably incurred in defending any proceeding in advance of its final disposition; provided that such advances be conditioned upon delivery to the Corporation of an undertaking, by or on behalf of the director or officer, to repay all amounts to the Corporation if it shall be ultimately determined that such person is not entitled to be indemnified;

3.     Indemnification of Employees and Agents

A person who was or is a party or is threatened to be made a party to or is involved in any proceeding by reason of the fact that he or she is or was an employee or agent of the Corporation (other than a director or officer) or is or was serving at the request of the Corporation as an employee or agent of another enterprise, including service with respect to

3

employee benefit plans, whether the basis of such proceeding is an alleged action or inaction while serving as an employee or agent, may, subject to the terms of any agreement between the Corporation and such person, be indemnified and held harmless by the Corporation to the fullest extent permissible under California law and the Corporation's Articles of Incorporation, against all costs, charges, expenses, liabilities, and losses (including, without limitation, attorneys' fees, judgments, fines, ERISA excise taxes, or penalties and amounts paid or to be paid in settlement), reasonably and actually incurred or suffered by such person in connection therewith (hereinafter "indemnifiable losses").  The immediately preceding sentence is not intended to be and shall not be considered to confer a contract right on any employee or agent (other than directors and officers) of the Corporation.

The Corporation may also advance to an employee or agent referenced in this paragraph expenses reasonably and actually incurred or suffered in defending any proceeding, or may agree to provide prospective indemnification of any such person against indemnifiable losses in any third party proceeding prior to the final disposition of such proceeding; provided, however, that (a) the Corporation may make such advances in any proceeding or agree to provide such indemnification to any such employee or agent in any third party proceeding prior to the final disposition of such proceeding only if an investigation is conducted with respect to the circumstances of the conduct at issue and it is determined by a committee composed of the President, the General Counsel, and the Chief Financial Officer or by any person designated by such committee, based on the results of such investigation, that such person is entitled to indemnification because he or she is or was involved in such proceeding, or is threatened to be involved in such proceeding, as a direct consequence of (i) the discharge of such person's duties as an employee or agent of the Corporation, or (ii) such person's obedience to the directions of the Corporation, even though unlawful, unless such person, at the time of obeying such directions, believed them to be unlawful, (b) notwithstanding any determination by such committee or its designee that any such employee or agent is entitled to any advance or indemnification pursuant to clause (a) above, the Corporation shall have the right to discontinue any advance to such person and to terminate any oral or written agreement to provide prospective indemnification to such person in the event that it is subsequently determined by the committee or its designee that such person is not entitled to be indemnified under California law, and (c) any advance to any such employee or agent shall be conditioned upon delivery to the Corporation of an undertaking, by or on behalf of such person, to repay all amounts to the Corporation if it shall ultimately be determined that such person is not entitled to be indemnified;

Case: 19-30088   Doc# 5874-10   Filed: 08/14/20   Entered: 08/14/20 14:56:59   Page
286 of 524

4. <u>Right of Directors and Officers to Bring Suit</u>

If a claim by a director or officer under this resolution is not paid in full by the Corporation within 90 days after a written claim has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim and, if successful in whole or in part, the claimant shall also be entitled to be paid the expense of prosecuting the claim. Neither the failure of the Corporation (including its Board, independent legal counsel, or its shareholders) to have made a determination prior to the commencement of such action that indemnification of the claimant is permissible in the circumstances because he or she has met the applicable standard of conduct, if any, nor an actual determination by the Corporation before the commencement of such action that the claimant had not met any applicable standard of conduct, shall be a defense to the action or create a presumption for the purpose of an action that the claimant has not met the applicable standard of conduct;

5. <u>Non-Exclusivity of Rights</u>

The right to indemnification provided by this resolution shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, bylaw, agreement, vote of shareholders or disinterested directors, or otherwise;

6. <u>Expenses as a Witness</u>

To the extent that any director, officer, employee, or agent of the Corporation is by reason of such position, or position with another entity at the request of the Corporation, a witness in any action, suit, or proceeding, he or she shall be indemnified against all costs and expenses actually and reasonably incurred by him or her on his or her behalf in connection therewith;

7. <u>Indemnity Agreements</u>

The Corporation may enter into agreements with any director, officer, employee, or agent of the Corporation providing for indemnification to the fullest extent permissible under California law and the Corporation's Articles of Incorporation;

5

8.      Separability

Each and every paragraph, sentence, term, and provision of this resolution is separate and distinct, so that if any paragraph, sentence, term, or provision hereof shall be held to be invalid or unenforceable for any reason, such invalidity or unenforceability shall not affect the validity or enforceability of any other paragraph, sentence, term, or provision hereof.  To the extent required, any paragraph, sentence, term, or provision of this resolution may be modified by a court of competent jurisdiction to preserve its validity and to provide the claimant with, subject to the limitations set forth in this resolution and any agreement between the Corporation and claimant, the broadest indemnification permitted under applicable law;

BE IT FURTHER RESOLVED that this resolution shall apply to all proceedings based on any action or omission occurring on or after November 17, 1995; and

BE IT FURTHER RESOLVED that any repeal or amendment of this resolution shall have prospective effect only, and shall not adversely affect any rights of indemnification of a director or officer existing at the time of such repeal or amendment with respect to any action or omission occurring prior to such repeal or amendment, and, further, shall not apply to any proceeding, irrespective of when the proceeding is initiated, arising from the service of such director or officer which occurred prior to such repeal or amendment.

6

I, LINDA Y.H. CHENG, do hereby certify that I am Vice President and Corporate Secretary of PG&E CORPORATION, a corporation organized and existing under the laws of the State of California; that the above and foregoing is a full, true, and correct copy of a resolution which was duly adopted by the Board of Directors of said corporation at a meeting of said Board which was duly and regularly called and held at the office of said corporation on December 18, 1996; and that this resolution has never been amended, revoked, or repealed, but is still in full force and effect.

WITNESS my hand and the seal of said corporation hereunto affixed this 26th day of January, 2005.

_____
Linda Y.H. Cheng
Vice President and Corporate Secretary
PG&E CORPORATION

C O R P O R A T E

S E A L

# EXHIBIT F

# DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY

**THIS IS A "CLAIMS-FIRST-MADE" INSURANCE POLICY, THAT MAY BE DIFFERENT FROM OTHER POLICIES INCLUDING OTHER CLAIMS-MADE POLICIES. PLEASE READ IT CAREFULLY.**

*Words and phrases which appear in all capital letters have the special meanings set forth in Section VI., Definitions*



## DECLARATIONS

**POLICY NO.** DP5008417P

**DECLARATIONS NO.** 1

**Item 1:** INSURED ORGANIZATION:

PG&E Corporation
77 Beale Street
PO Box 770000
San Francisco, CA 94177

**Item 2:** POLICY PERIOD: From: May 20, 2017 To: May 20, 2018
(12:01 A.M. Local Time at the address in Item 1.)

**Item 3:** Prior or Pending Litigation Date: October 1, 1905

**Item 4:** Rated Premium: ████████

Policy Premium: ████████

**Item 5:** Limits of Liability:

A. $35,000,000     aggregate Limit of Liability for the POLICY PERIOD and DISCOVERY PERIOD, if purchased

B. $350,000     for all INVESTIGATIVE EXPENSE for the POLICY PERIOD and DISCOVERY PERIOD, if purchased

**Item 6:** RETENTION:

A. Insuring Agreement I.(A).     $0

B. Insuring Agreement I.(B) or I.(C).     $5,000,000 each CLAIM

6000P (04/2015)       **[1 OF 2]**

©1975-2015 ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED
AEGIS and the AEGIS logo are registered service marks of AEGIS in the U.S., Mexico, Europe, Australia, Canada and New Zealand

Print Date: 05/31/2017 11:37:34



# DECLARATIONS
## continued

**POLICY NO.** DP5008417P

**DECLARATIONS NO.** 1

**Item 7:** DISCOVERY PERIOD:

Premium: ████████████████

Duration: commencing on the effective date of cancellation or non-renewal and ending 12 months after such date

**Item 8:** Any notice to be provided or any payment to be made hereunder to the INSURED ORGANIZATION shall be made to:

| | |
|---|---|
| ENTITY | PG&E Corporation |
| NAME | Ms. Janaize Markland |
| TITLE | Director, Enterprise and Operational Risk Management and Insurance |
| ADDRESS | 77 Beale Street |
| | PO Box 770000 |
| | San Francisco CA 94177 |

**Item 9:** Any notice to be provided or any payment to be made hereunder to the INSURER shall be made to:

| | |
|---|---|
| NAME | AEGIS Insurance Services, Inc. |
| ADDRESS | 1 Meadowlands Plaza |
| | East Rutherford, NJ 07073 |
| CLAIMS | Submit a claim through My AEGIS at www.aegislink.com |

**ENDORSEMENTS ATTACHED AT POLICY ISSUANCE: 1-30**

Countersigned at **East Rutherford, New Jersey**

On May 31, 2017

**AEGIS Insurance Services, Inc.**

By

Authorized Representative

©1975-2015 ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED
AEGIS and the AEGIS Logo are the Registered Service Marks of AEGIS in the U.S., U.K., E.U., Bermuda, Canada and New Zealand

Print Date: 05/31/2017 11:37:34



# POLICY OF DIRECTORS AND OFFICERS LIABILITY INSURANCE EFFECTED WITH ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED HAMILTON, BERMUDA

THIS IS A "CLAIMS-FIRST-MADE" INSURANCE POLICY THAT MAY BE DIFFERENT FROM OTHER POLICIES INCLUDING OTHER CLAIMS-MADE POLICIES. PLEASE READ IT CAREFULLY.

*Words and phrases which appear in all capital letters have the special meanings set forth in Section VI., Definitions.*

In consideration of the payment of premium and in reliance upon all statements made and information furnished to the INSURER in the APPLICATION, which is hereby made a part hereof, and subject to the Declarations and all the terms hereinafter provided, the INSURER agrees as follows:

## I. INSURING AGREEMENTS

(A) The INSURER shall pay on behalf of the DIRECTORS and OFFICERS all ULTIMATE NET LOSS for which the INSURED ORGANIZATION has not provided indemnification and which arises from a CLAIM first made against the DIRECTORS or OFFICERS during the POLICY PERIOD or during the DISCOVERY PERIOD, if purchased, for a WRONGFUL ACT which takes place before or during the POLICY PERIOD and is actually or allegedly caused, committed or attempted by the DIRECTORS or OFFICERS while acting in their respective capacities as DIRECTORS or OFFICERS.

(B) The INSURER shall pay on behalf of the INSURED ORGANIZATION all ULTIMATE NET LOSS for which the INSURED ORGANIZATION has, to the extent required or permitted by applicable law, granted indemnification to the DIRECTORS and OFFICERS and which arises from a CLAIM first made against the DIRECTORS or OFFICERS during the POLICY PERIOD or during the DISCOVERY PERIOD, if purchased, for a WRONGFUL ACT which takes place before or during the POLICY PERIOD and is actually or allegedly caused, committed or attempted by such DIRECTORS or OFFICERS while acting in their respective capacities as DIRECTORS or OFFICERS.

(C) The INSURER shall pay on behalf of the INSURED ORGANIZATION all ULTIMATE NET LOSS which arises from a SECURITIES CLAIM first made against the INSURED ORGANIZATION during the POLICY PERIOD or during the DISCOVERY PERIOD, if purchased, for a WRONGFUL ACT which takes place before or during the POLICY PERIOD.

## II. DERIVATIVE INVESTIGATION COST COVERAGE

The INSURER shall pay all INVESTIGATIVE EXPENSE incurred by an independent committee of the board of directors or equivalent governing body of the INSURED ORGANIZATION in response to a SHAREHOLDER DERIVATIVE DEMAND, provided the SHAREHOLDER DERIVATIVE DEMAND is first made during the POLICY PERIOD or the DISCOVERY PERIOD, if purchased, and the alleged WRONGFUL ACT giving rise to the SHAREHOLDER DERIVATIVE DEMAND takes place before or during the POLICY PERIOD.

## III. LIMITS OF LIABILITY

(A) The INSURER'S maximum liability under this POLICY for all ULTIMATE NET LOSS and INVESTIGATIVE EXPENSE, combined, shall be the aggregate Limit of Liability set forth in Item 5A of the Declarations. The aggregate Limit of Liability applies to all CLAIMS first made during the POLICY PERIOD and the DISCOVERY PERIOD, if purchased.

6100P (01/2014) D&O Primary Policy          [1 of 17]

©1975-2014 ASSOCIATED ELECTRIC&GAS INSURANCE SERVICES LIMITED
AEGIS PROPRIETARY-ALL RIGHTS RESERVED-REGISTERED-MAY NOT BE COPIED WITHOUT PERMISSION-SUBJECT TO PENALTIES

Case: 19-00053   Doc# 5-3   Filed: 09/13/19   Entered: 09/13/19 17:12:59   Page 4 of
293 of 524

Print Date: 05/31/2017  11:37:35



(B) The INSURER'S maximum liability under this POLICY for all INVESTIGATIVE EXPENSE shall not exceed the amount set forth in Item 5B of the Declarations. Any amount paid by the INSURER for INVESTIGATIVE EXPENSE shall be part of and not in addition to the aggregate Limit of Liability stated in Item 5A of the Declarations.

(C) The aggregate Limits of Liability stated in Items 5A and 5B of the Declarations shall apply only once regardless of the number of CLAIMS or WRONGFUL ACTS.

(D) The inclusion herein of more than one DIRECTOR or OFFICER, or the application of more than one Insuring Agreement or Coverage Extension, shall not operate to increase the INSURER'S aggregate Limits of Liability as stated in Items 5A and 5B of the Declarations.

(E) If any WRONGFUL ACT by a DIRECTOR or OFFICER while serving an OUTSIDE ORGANIZATION results in a payment of ULTIMATE NET LOSS or INVESTIGATIVE EXPENSE under this POLICY and a payment of loss under any other directors or officers or general partner liability insurance policy issued by the INSURER, then the maximum amount that the INSURER shall pay under this POLICY and all such other policies, combined, for the WRONGFUL ACT and all related actual or alleged breaches, neglect, errors and omissions shall be $35,000,000. The maximum amount that the INSURER shall pay under this POLICY shall be the amount of such ULTIMATE NET LOSS that is proportionate to the aggregate Limit of Liability stated in Item 5A of the Declarations of this POLICY in relation to the total limits of liability stated under this POLICY and such other policies, combined. This paragraph creates a sublimit which further limits and does not increase the INSURER'S maximum liability under this POLICY or such other policies.

## IV. **RETENTION**

(A) The INSURER shall be liable to the INSURED ORGANIZATION under this POLICY only for the amount of ULTIMATE NET LOSS which is in excess of the RETENTION set forth in Item 6B of the Declarations.

(B) The INSURED ORGANIZATION agrees to indemnify and advance on behalf of the DIRECTORS and OFFICERS all ULTIMATE NET LOSS otherwise covered under this POLICY to the fullest extent required or permitted by applicable law. If an INSURED ORGANIZATION fails or refuses within sixty (60) days after a DIRECTOR'S or OFFICER'S request to indemnify or advance ULTIMATE NET LOSS or if an INSURED ORGANIZATION is financially unable to indemnify or advance ULTIMATE NET LOSS, then the INSURER will be liable to the DIRECTORS and OFFICERS under this POLICY only for the amount of ULTIMATE NET LOSS which is in excess of the RETENTION set forth in Item 6A of the Declarations. If the INSURER pays under this POLICY any ULTIMATE NET LOSS that the INSURED ORGANIZATION is required or permitted by applicable law to advance or indemnify a DIRECTOR or OFFICER, then the INSURED ORGANIZATION shall reimburse the INSURER for such amounts up to the RETENTION set forth in Item 6B of the Declarations, and such amounts shall become immediately due and payable as a direct obligation of the INSURED ORGANIZATION to the INSURER.

(C) No RETENTION shall apply to Section II., Derivative Investigation Cost Coverage, and the INSURER will pay such amounts from the first dollar subject to the other terms and conditions of this POLICY.

(D) If more than one Insuring Agreement applies to any CLAIM, then the maximum RETENTION amount applicable to such CLAIM shall be the largest RETENTION applicable to such CLAIM.

(E) Only payment of INDEMNITY or DEFENSE COSTS which, except for the amount thereof, would have been payable under this POLICY may reduce or exhaust the RETENTION.

## V. **PRIORITY OF PAYMENTS**

If payment is due and owing under this POLICY for ULTIMATE NET LOSS or INVESTIGATIVE EXPENSE and such ULTIMATE NET LOSS or INVESTIGATIVE EXPENSE, together with any prior payments of ULTIMATE NET LOSS and INVESTIGATIVE EXPENSE, exceeds the applicable Limits of Liability, the

Case: 19-30088 Doc# 5374-10 Filed: 11/14/19 Entered: 11/14/19 16:12:59 Page 3 of 91

Print Date: 05/31/2017  11:37:35



INSURER shall pay such ULTIMATE NET LOSS or INVESTIGATIVE EXPENSE, subject to the remaining applicable Limit of Liability, in the following order:

(A) First, the INSURER shall pay such ULTIMATE NET LOSS covered by Insuring Agreement I.(A);

(B) Second, only if and to the extent the payment under V.(A) above does not exhaust the applicable Limit of Liability, the INSURER shall pay any other ULTIMATE NET LOSS or INVESTIGATIVE EXPENSE covered by this POLICY.

If DIRECTORS or OFFICERS incur ULTIMATE NET LOSS covered under Insuring Agreement I.(A), the INSURED ORGANIZATION, including any bankruptcy trustee, debtor-in-possession or any other successor of the INSURED ORGANIZATION, shall have no interest in or claim for any payments under this POLICY until all such ULTIMATE NET LOSS is paid in full by the INSURER.

Subject to the foregoing paragraph, the INSURER shall, upon receipt of a written request from either the chairman of the board of directors or chief executive officer of the INSURED ORGANIZATION named in Item 1 of the Declarations, delay any payment of ULTIMATE NET LOSS due and owing to an INSURED ORGANIZATION under this POLICY until such time as said chairman or chief executive officer designates, provided the INSURER'S liability with respect to any such ULTIMATE NET LOSS payment shall not be increased, and shall not include any interest, on account of such delay.


## VI.  **DEFINITIONS**

As used in this POLICY, the words and phrases, either in the singular or plural, which appear in all capital letters shall have the meanings set forth below:

(A)  APPLICATION means, unless stated otherwise:

   (1)  the Application submitted by the INSURED ORGANIZATION to the INSURER for this POLICY, including any materials submitted with, attached to or incorporated by reference into such Application and any other documentation, information, warranty or representation submitted to the INSURER in connection with underwriting this POLICY; and

   (2)  all publicly available documents filed by the INSURED ORGANIZATION with the Securities and Exchange Commission during the twelve (12) months preceding the inception of this POLICY.

(B)  CLAIM means:

   (1)  any written demand against any INSURED for monetary, non-monetary, injunctive or other relief, including a written demand that the INSURED toll or waive a statute of limitation;

   (2)  a civil or arbitration proceeding against any INSURED for monetary, non-monetary, injunctive or other relief commenced by service of a complaint or similar pleading;

   (3)  a criminal proceeding against any INSURED commenced by the return of an indictment, information or similar document;

   (4)  a formal administrative or regulatory proceeding against any DIRECTORS or OFFICERS commenced by the filing of a notice of charges, formal investigative order or similar document;

   (5)  a civil, criminal, administrative or regulatory investigation of any DIRECTORS or OFFICERS commenced by the service upon or other receipt by the DIRECTOR or OFFICER of a subpoena, target letter, Wells Notice or other written notice from an ENFORCEMENT AUTHORITY identifying by name the DIRECTOR or OFFICER as an individual against whom a civil, criminal, administrative or regulatory proceeding may be commenced;

   (6)  a written request or subpoena from an ENFORCEMENT AUTHORITY or an INSURED ORGANIZATION to interview or depose a DIRECTOR or OFFICER, or for the production of documents by a DIRECTOR or OFFICER, in connection with a proceeding against or

Case: 19-30088    Doc# 5374-10    Filed: 08/19/20    Entered: 08/14/20 15:26:59    Page
295 of 524

Print Date: 05/31/2017  11:37:35



investigation of any other DIRECTOR or OFFICER or the INSURED ORGANIZATION, whether or not such request or subpoena alleges a WRONGFUL ACT; provided such request or subpoena shall constitute a CLAIM under this POLICY only if (i) it is not part of a routine or regularly scheduled audit, inspection or general oversight or compliance activity, and (ii) the INSURED ORGANIZATION gives to the INSURER written notice thereof pursuant to Condition (E) below; or

(7)   for purposes of the coverage provided under Section II., Derivative Investigation Cost Coverage, a SHAREHOLDER DERIVATIVE DEMAND.

A NOTICE OF CIRCUMSTANCES is not a CLAIM, but a CLAIM shall be deemed to be first made at the earlier of: (a) the time at which any written demand described in (1) above is first made against the INSURED or any proceeding or investigation described in (2), (3), (4) or (5) above is commenced; (b) the time at which a SHAREHOLDER DERIVATIVE DEMAND related to the CLAIM is first made; (c) the time at which the written notice or subpoena described in (6) above is received by the DIRECTOR or OFFICER; or (d) the time at which a complete NOTICE OF CIRCUMSTANCES which describes the matters underlying the CLAIM has been given to the INSURER. The INSURER shall not be liable under this POLICY for any amount incurred in the defense, investigation or settlement of any potential CLAIM described in a NOTICE OF CIRCUMSTANCES prior to the date the CLAIM is actually made against INSUREDS. Except as provided in Section II., Derivative Investigation Cost Coverage, this POLICY does not cover any amount incurred by the INSUREDS in connection with any proceeding or investigation that is not then a CLAIM against the INSUREDS, even if such amount also benefits the defense of a covered CLAIM or if such proceeding or investigation subsequently gives rise to a covered CLAIM.

Multiple CLAIMS arising out of a single WRONGFUL ACT shall be deemed to be a single CLAIM, even if made against different INSUREDS, and shall be deemed to have been first made on the date the first of such multiple CLAIMS is first made against any of the INSUREDS, whether such date is before, during or after the POLICY PERIOD or the DISCOVERY PERIOD.

(C)   DEFENSE COSTS means all reasonable and necessary fees and expenses incurred by or on behalf of the INSUREDS in the investigation, negotiation, settlement and defense of any CLAIM, including such fees and expenses and the premium or origination fee for a loan or bond incurred by DIRECTORS and OFFICERS in connection with the actual or alleged obligation by the DIRECTOR or OFFICER to repay or forfeit amounts pursuant to Section 304(a) of the Sarbanes-Oxley Act of 2002, Section 954 of the Wall Street Reform and Consumer Protection Act of 2010, or any similar law, rule or regulation. DEFENSE COSTS do not include (i) INVESTIGATIVE EXPENSE resulting from a SHAREHOLDER DERIVATIVE DEMAND, or (ii) salaries, wages, benefits and overhead expenses of the DIRECTORS, OFFICERS or employees of the INSURED ORGANIZATION.

(D)   DIRECTOR and OFFICER means:

(1)   any natural person who was, is now, or shall be a director, officer or trustee of the INSURED ORGANIZATION;

(2)   any employee of the INSURED ORGANIZATION while acting in the capacity of a director, officer or trustee of the INSURED ORGANIZATION with the express prior authorization of a director, officer or trustee of the INSURED ORGANIZATION;

(3)   any natural person who was, is now, or shall be a manager, managing member, member of the board of managers or equivalent executive of an INSURED ORGANIZATION that is a limited liability company;

(4)   any employee of the INSURED ORGANIZATION while serving as the general counsel or risk manager of, or in a functionally equivalent position with, the INSURED ORGANIZATION;

(5)   any natural person who was, is now, or shall be a general partner of an INSURED ORGANIZATION that is a limited partnership;

Case: 19-03039   Doc# 53-4   Filed: 08/19/19   Entered: 08/19/19 16:56:59   Page 70 of 91

Print Date:  05/31/2017  11:37:35



(6) any natural person not described in paragraphs (1), (2), (3), (4) or (5) above who was, is now, or shall be an employee of the INSURED ORGANIZATION, but solely with respect to a SECURITIES CLAIM;

(7) any director, officer, trustee or employee of the INSURED ORGANIZATION who is serving or has served at the specific request of the INSURED ORGANIZATION as a director, officer, trustee or in an equivalent position of any OUTSIDE ORGANIZATION;

(8) the estates, heirs, legal representatives or assigns of any person identified in paragraphs (1), (2), (3), (4), (5), (6) or (7) above in the event of such person's death, incompetency, insolvency or bankruptcy, but only with respect to such person's WRONGFUL ACTS that occurred when such person was a DIRECTOR or OFFICER pursuant to paragraphs (1), (2), (3), (4), (5), (6) or (7), above;

(9) the lawful spouse or domestic partner of any DIRECTOR or OFFICER described in paragraphs (1), (2), (3), (4), (5), (6) or (7) above, but only if and to the extent the CLAIM is against both such DIRECTOR or OFFICER and the spouse or domestic partner and if the CLAIM against the lawful spouse or domestic partner is solely by reason of (a) such spousal or domestic partner status, or (b) such spouse's or domestic partner's ownership interest in property or assets which are sought as recovery for WRONGFUL ACTS of such DIRECTOR or OFFICER; or

(10) any employee of the INSURED ORGANIZATION who was, is now, or shall be serving at the specific written request of the INSURED ORGANIZATION in the position of a "designated representative," "alternate designated representative," "authorized account representative," "certifying official" or "responsible officer" of the INSURED ORGANIZATION as defined by and pursuant to the requirements of Titles I, II, IV and V of the Clean Air Act (42 U.S.C. Sections 7401-7431, 7521-7554, 7651-7651o, 7661-7661f) or the regulations promulgated thereunder, as amended from time to time, or in a comparable provision under any state law that is substantially the same as such federal law, with respect to WRONGFUL ACTS committed while such employee is acting in such capacity. This subsection 10 includes such employee as a DIRECTOR or OFFICER but does not otherwise expand the scope of coverage provided by this POLICY.

In no event, however, shall the estates, heirs, legal representatives, assigns, spouse or domestic partner identified in paragraphs (8) or (9) above be deemed to be a DIRECTOR or OFFICER in respect of a breach of duty, neglect, error, misstatement, misleading statement or omission actually or allegedly caused, committed or attempted by such estates, heirs, legal representatives, assigns, spouse or domestic partner.

DIRECTOR and OFFICER shall be deemed to include a natural person serving in a position with a non-U.S. entity that is functionally the equivalent, with substantially similar duties, of the director, officer or trustee position of the INSURED ORGANIZATION.

(E) DISCOVERY PERIOD means the period of time specified in Item 7 of the Declarations, if purchased as provided in Condition (L).

(F) ENFORCEMENT AUTHORITY means any federal, state, local or foreign law enforcement or governmental authority (including the U.S. Department of Justice, the U.S. Securities and Exchange Commission and any federal or state attorney general) or the enforcement unit of any securities exchange or similar self-regulatory body.

(G) FINANCIAL IMPAIRMENT means that an entity is subject to (i) a Federal bankruptcy proceeding, (ii) any comparable proceeding for the reorganization, rehabilitation, liquidation or conservatorship of the subject entity, (iii) any other proceeding for the protection of creditors or relief of debtors generally, or (iv) a court order or statutory provision that stays, freezes or enjoins the disposition or impairment of all assets of the entity.

(H) FOR-PROFIT OUTSIDE ORGANIZATION means any organization or JOINT VENTURE other than the INSURED ORGANIZATION or a NOT-FOR-PROFIT OUTSIDE ORGANIZATION if:

Case: 19-00039    Doc# 537-10    Filed: 09/19/20    Entered: 09/19/20 15:26:59    Page 3 of
297 of 524

Print Date: 05/31/2017   11:37:35



(1) the operations of such organization or JOINT VENTURE are related to, arise from or are associated with the production, transmission, delivery or furnishing of electricity, gas, water or sewer service to the public or the conveyance of telephone messages for the public and the total assets of such organization or JOINT VENTURE are not greater than 15% of the total consolidated assets of the INSURED ORGANIZATION first named in Item 1 of the Declarations as reported in such INSURED ORGANIZATION'S then most recent audited consolidated financial statement; or

(2) such organization or JOINT VENTURE and the DIRECTORS or OFFICERS serving in such organization or JOINT VENTURE are listed in a schedule of FOR-PROFIT OUTSIDE ORGANIZATIONS attached to this POLICY or to a prior Directors and Officers Liability Policy issued by the INSURER to the INSURED ORGANIZATION.

(I) INDEMNITY means all sums which the INSUREDS shall become legally obligated to pay as damages (including pre- and post-judgment interest), whether by adjudication, settlement or compromise, after making proper deductions for all recoveries, salvages and other valid and collectible insurance. Where permitted by law, INDEMNITY shall include exemplary, punitive and multiple damages awarded against the INSUREDS. For purposes of the foregoing sentence, the law that shall apply shall be the law of the jurisdiction that is most favorable to the insurability of such damages, provided such jurisdiction has a substantial relationship to the involved DIRECTORS or OFFICERS, the INSURED ORGANIZATION, or the CLAIM giving rise to such damages. INDEMNITY shall not include:

(1) fines or penalties, other than civil penalties assessed pursuant to Section 2(g)(2)(B) of the Foreign Corrupt Practices Act of 1977, 15 U.S.C. § 78dd-2(g)(2)(B);

(2) taxes, other than (i) taxes imposed upon an INSURED ORGANIZATION for which the DIRECTORS and OFFICERS are legally liable solely by reason of the INSURED ORGANIZATION'S insolvency, or (ii) taxes imposed upon a DIRECTOR or OFFICER solely by reason of the INSURER'S payment of ULTIMATE NET LOSS incurred by such DIRECTOR or OFFICER;

(3) any amount that represents or is substantially equivalent to an increase in the consideration paid or proposed to be paid by an INSURED ORGANIZATION in connection with its purchase of any securities or assets;

(4) any amount that represents disgorgement or restitution;

(5) any other amount that represents the repayment or forfeiture of compensation pursuant to Section 304(a) of the Sarbanes-Oxley Act of 2002, Section 954 of the Wall Street Reform and Consumer Protection Act of 2010 or any similar law, rule or regulation; or

(6) any amount that is uninsurable under applicable law;

provided the INSURER shall not assert that any ULTIMATE NET LOSS is disgorgement, restitution or uninsurable due to any actual or alleged violation of Section 11, 12 or 15 of the Securities Act of 1933, as amended.

(J) INSURED ORGANIZATION means, subject to Condition (C), hereof: (a) the organization(s) named in Item 1 of the Declarations and any SUBSIDIARIES of such organization(s), and (b) any trustee or debtor-in-possession in a bankruptcy proceeding in which the debtor is an organization(s) named in Item 1 of the Declarations or any SUBSIDIARIES of such organization(s).

(K) INSUREDS means the DIRECTORS and OFFICERS and, solely with respect to Insuring Agreements I.(B) and I.(C) and Section II., Derivative Investigation Cost Coverage, the INSURED ORGANIZATION.

Case: 19-30088  Doc# 5374-10  Filed: 01/14/20  Entered: 01/14/20 15:56:59  Page 3 of
298 of 524



(L)     INSURER means Associated Electric & Gas Insurance Services Limited, Hamilton, Bermuda, a non-assessable mutual insurance company.

(M)     INVESTIGATIVE EXPENSE means the reasonable and necessary fees and expenses (except all salaries, wages, benefit and overhead expenses of the DIRECTORS, OFFICERS, employees or the INSURED ORGANIZATION) incurred in connection with the investigation and evaluation of an actual or alleged WRONGFUL ACT by a DIRECTOR or OFFICER related to a SHAREHOLDER DERIVATIVE DEMAND.

(N)     JOINT VENTURE means any joint venture, co-venture, joint lease, joint operating agreement or limited partnership (other than a limited liability partnership).

(O)     NOT-FOR-PROFIT OUTSIDE ORGANIZATION means any not-for-profit organization that is exempt from Federal taxation pursuant to Section 501(c)(3) of the Internal Revenue Code of 1986 (as amended), any civic league or social welfare organization that is exempt pursuant to Section 501(c)(4), any business league or chambers of commerce that is exempt pursuant to Section 501(c)(6) or any political action committee that is exempt pursuant to Section 527, but does not include any Independent System Operator (ISO) or Regional Transmission Operator (RTO).

(P)     NOTICE OF CIRCUMSTANCES means written notice by a DIRECTOR, OFFICER or the INSURED ORGANIZATION to the INSURER of any facts or circumstances involving an identified WRONGFUL ACT actually or allegedly caused, committed or attempted before or during the POLICY PERIOD by an INSURED, which facts or circumstances appear likely to give rise to a CLAIM, provided such notice includes full particulars regarding the actual or alleged WRONGFUL ACT, the nature of any alleged or potential injury, the names of potential claimants and the manner in which the DIRECTOR, OFFICER or the INSURED ORGANIZATION first became aware of such facts or circumstances.

(Q)     OUTSIDE ORGANIZATION means any NOT-FOR-PROFIT OUTSIDE ORGANIZATION or any FOR-PROFIT OUTSIDE ORGANIZATION.

(R)     POLICY means this insurance policy, including the APPLICATION, the Declarations and any endorsements issued by the INSURER to the organization first named in Item 1 of the Declarations for the POLICY PERIOD.

(S)     POLICY PERIOD means the period of time stated in Item 2 of the Declarations.  If the POLICY is cancelled prior to the expiration date of such period, the POLICY PERIOD shall end as of the effective date of cancellation.

(T)     RETENTION means the respective amounts stated in Item 6 of the Declarations.

(U)     SECURITIES CLAIM shall mean any CLAIM which alleges a violation of any law, regulation or rule regulating securities, whether statutory or common law, and which in whole or in part is:

        (1)     brought by any person or entity arising out of, based upon or attributable to the purchase or sale of, or offer or solicitation of an offer to purchase or sell, whether actual or alleged, any securities of the INSURED ORGANIZATION; or

        (2)     brought by a securities holder of the INSURED ORGANIZATION with respect to such securities holder's interest in the securities of the INSURED ORGANIZATION.

        SECURITIES CLAIM shall include any criminal proceeding or any administrative or regulatory proceeding against the INSURED ORGANIZATION, but only if and only during the time that such proceeding is also commenced and continuously maintained against a DIRECTOR or OFFICER.

        SECURITIES CLAIM for purposes of Insuring Agreement I.(C) shall not include any employment or compensation related CLAIM brought by a DIRECTOR or OFFICER or other employee of the INSURED ORGANIZATION.

(V)     SHAREHOLDER DERIVATIVE DEMAND means a written demand by a securities holder of the INSURED ORGANIZATION upon the board of directors, or an equivalent governing body, of such

Case: 19-00083    Doc# 3-374-10  Filed: 08/19/4/20  Entered: 08/19/4/20 17:45:56  Page 1 of
299 of 524    91
Print Date: 05/31/2017  11:37:35



INSURED ORGANIZATION to bring a civil proceeding on behalf of an INSURED ORGANIZATION in a court of law against a DIRECTOR or OFFICER for a WRONGFUL ACT.

(W) SUBSIDIARY means any entity or JOINT VENTURE if the INSURED ORGANIZATION, directly or through one or more other SUBSIDIARIES has the right, pursuant to ownership of securities or financial interests or a written contract, by-laws, charter, operating agreement, joint venture or partnership agreement or similar document, to elect or appoint a majority of the directors or functionally equivalent or comparable executives of such entity or JOINT VENTURE.

(X) ULTIMATE NET LOSS means the total INDEMNITY and DEFENSE COSTS with respect to each CLAIM to which this POLICY applies. ULTIMATE NET LOSS does not include any amount allocated, pursuant to Condition (T), to claims against persons or entities not covered hereunder or to non-covered matters.

(Y) WRONGFUL ACT means any actual or alleged breach of duty, neglect, error, misstatement, misleading statement or omission actually or allegedly caused, committed or attempted by:

(1) any DIRECTOR or OFFICER while acting individually or collectively in their capacity as such, or, with respect to any DIRECTORS or OFFICERS of an INSURED ORGANIZATION that is not a partnership, any other matter claimed against them solely by reason of their being DIRECTORS or OFFICERS; or

(2) solely with respect to Insuring Agreement I.(C), an INSURED ORGANIZATION.

All breaches of duty, neglect, errors, misstatements, misleading statements or omissions actually or allegedly caused, committed or attempted by or claimed against one or more of the INSUREDS having as a common nexus any single or series of related facts, circumstances, situations, events, transactions or causes shall be deemed to be a single WRONGFUL ACT.

## VII. EXCLUSIONS

The INSURER shall not be liable to make any payment for ULTIMATE NET LOSS or INVESTIGATIVE EXPENSE arising from any CLAIM made against any INSURED:

(A) where, at inception of the Policy Period for the first Directors and Officers Liability Insurance Policy issued by the INSURER to the INSURED ORGANIZATION (or any predecessor organization) and continuously renewed thereafter, such INSURED had knowledge of a fact or circumstance which was likely to give rise to such CLAIM and such fact or circumstance was not disclosed in the Application for such Policy or in the process of applying for such Policy; provided this exclusion shall not apply to any DIRECTOR or OFFICER who did not have such knowledge.

(B) based upon, arising out of or attributable to such INSURED:

(1) having gained in fact any personal profit, advantage or remuneration to which such INSURED was not legally entitled; or

(2) having committed in fact a deliberately fraudulent, dishonest, criminal or malicious act or omission or any knowing and intentional violation of any law, statute or regulation;

if established by a final, non-appealable adjudication in the underlying proceeding.

(C) for bodily injury, mental anguish, mental illness, emotional upset, sickness or disease sustained by any person, for death of any person or for physical injury to or destruction of tangible property or the loss of use thereof.

(D) for any injury arising out of:

(1) false arrest, wrongful detention or wrongful imprisonment or malicious prosecution;

(2) wrongful entry, wrongful eviction or other invasion of the right of private occupancy;

Case: 19-00083    Doc# 3-374-10  Filed: 08/19/14/20  Entered: 08/19/19 14:29:15 56:59  Page 190f 300 of 524



(3) any employment-related WRONGFUL ACT including but not limited to the actual or constructive termination of employment, demotion, failure to employ or promote, deprivation of a career opportunity, or employment discipline or evaluation in a manner which violates the laws or regulations of any jurisdiction, or which breaches any implied contract to continue employment; provided this exclusion (D)(3) shall not apply to any SECURITIES CLAIM arising out of such events;

(4) discrimination or sexual harassment;

(5) a publication or utterance:

(a) of libelous, slanderous or other defamatory or disparaging material; or

(b) in violation of an individual's right of privacy; or

(6) piracy, plagiarism, idea misappropriation under implied contract, or infringement of copyright, title or slogan, registered trade mark, service mark or trade name.

(E) for violation(s) of any responsibility, obligation or duty imposed upon fiduciaries by the Employee Retirement Income Security Act of 1974 or amendments thereto or by similar common or statutory law of the United States of America or any state or other jurisdiction.

(F) based upon, arising out of or attributable to the rendering of advice with respect to the interpreting of, or the handling of records in connection with the enrollment, termination or cancellation of employees under the INSURED ORGANIZATION'S group life insurance, group accident or health insurance, pension plans, employee stock subscription plans, workers' compensation, unemployment insurance, social security, disability benefits and any other employee benefit programs.

(G) based upon, arising out of or attributable to any circumstance, written notice of which was given prior to the inception of this POLICY under any Directors and Officers Liability Insurance Policy (whether issued by the INSURER or any other carrier) or any DISCOVERY PERIOD thereof; provided the insurer of such other policy does not reject such notice as invalid.

(H) based upon, arising out of or attributable to (1) any written demand, suit or other formal proceeding pending against, or any order, decree or judgment entered for or against, any INSURED in its capacity as such on or prior to the Prior or Pending Litigation Date specified in Item 3 of the Declarations, or (2) the same or essentially the same facts or circumstances underlying or alleged in such written demand, suit or other proceeding, order, decree or judgement.

(I) for any WRONGFUL ACT by any SUBSIDIARY or its DIRECTORS or OFFICERS that took place prior to the date on which the entity became a SUBSIDIARY.

(J) brought by or on behalf of the INSURED ORGANIZATION, unless such CLAIM is:

(1) brought derivatively by a security holder of the INSURED ORGANIZATION who, while such CLAIM is made and maintained, is acting independently of, and without the active and voluntary solicitation, assistance, participation or intervention of any DIRECTOR or OFFICER; provided that conduct by a DIRECTOR or OFFICER that is protected pursuant to Section 806 of the Sarbanes-Oxley Act of 2002, Section 922 of the Wall Street Reform and Consumer Protection Act of 2010 or any similar whistleblower law, statute, rule or regulation shall not constitute solicitation, assistance, participation or intervention by such DIRECTOR or OFFICER for purposes of this paragraph (1);

(2) brought and maintained solely and entirely in a jurisdiction other than the United States of America, its territories and possessions, and subject to the substantive and procedural laws of such foreign jurisdiction; or

(3) brought and maintained by or on behalf of a bankruptcy or insolvency trustee, receiver, liquidator, conservator, examiner or creditors' committee of an INSURED ORGANIZATION or any assignee of such trustee, receiver, liquidator, conservator, examiner or creditors' committee; provided this

Case: 19-00083   Doc# 3-374-10   Filed: 08/14/20   Entered: 08/14/20 17:15:56   Page 1 of
301 of 524



exception (3) does not apply to CLAIMS brought or maintained by or on behalf of a debtor-in-possession;

provided this Exclusion (J) shall not apply to DEFENSE COSTS otherwise covered under Insuring Agreement I.(A).

(K) with respect to any CLAIM in connection with a DIRECTOR'S or OFFICER'S service for an OUTSIDE ORGANIZATION, bought or maintained by or on behalf of such OUTSIDE ORGANIZATION, unless such CLAIM is:

    (1) a derivative action brought or maintained on behalf of the OUTSIDE ORGANIZATION by one or more persons who are not directors, officers or trustees of such OUTSIDE ORGANIZATION and who bring and maintain the CLAIM totally independently of and without the solicitation, direction, assistance, participation or intervention of the OUTSIDE ORGANIZATION or any director, officer or trustee thereof; provided, however, that conduct by a director, officer or trustee of the OUTSIDE ORGANIZATION that is protected pursuant to Section 806 of the Sarbanes-Oxley Act of 2002, Section 922 of the Wall Street Reform and Consumer Protection Act of 2010 or any similar whistleblower statute, rule or regulation shall not constitute solicitation, assistance, participation or intervention by such person for purposes of this paragraph (1);

    (2) brought or maintained solely and entirely in a jurisdiction other than the United States of America, its territories and possessions, and subject to the substantive and procedural laws of such foreign jurisdiction; or

    (3) brought or maintained by or on behalf of bankruptcy or insolvency trustee, receiver, liquidator or conservator, creditors' committee or similar official or body of an OUTSIDE ORGANIZATION or any assignee of such trustee, receiver, liquidator, conservator, creditors' committee, official or body; provided this exception (3) does not apply to CLAIMS brought or maintained by or on behalf of a debtor-in-possession.

(L) based upon, arising out of or attributable to such DIRECTOR'S or OFFICER'S activities as a director, officer or trustee of any entity other than:

    (1) the INSURED ORGANIZATION; or

    (2) any OUTSIDE ORGANIZATION, as provided in Definition (D)(7).

## VIII. REPRESENTATIONS

(A) In issuing this POLICY, the INSURER has relied upon the statements, representations and information in the APPLICATION. Each INSURED acknowledges and agrees that the statements, representations and information in the APPLICATION (1) are true and accurate to the best of such INSURED'S knowledge and belief, and (2) are material to the INSURER'S acceptance of the risk to which this POLICY applies.

(B) The APPLICATION shall be construed as a separate APPLICATION for coverage by each DIRECTOR and OFFICER and the INSURED ORGANIZATION. With respect to the statements, representations and information in such APPLICATION, no knowledge possessed by any one DIRECTOR or OFFICER or the INSURED ORGANIZATION shall be imputed to any other DIRECTOR or OFFICER for the purpose of determining coverage for such other DIRECTOR or OFFICER under this POLICY or the validity and enforceability of this POLICY by such other DIRECTOR or OFFICER.

(C) If the APPLICATION contains a statement, representation, omission or information that is materially false or inaccurate (a "misrepresentation"), then this POLICY shall be void from the beginning as to:

    (1) any INSURED ORGANIZATION under Insuring Agreement I.(B) to the extent such INSURED ORGANIZATION indemnifies a DIRECTOR or OFFICER who knew the misrepresentation that was in the APPLICATION; and

    (2) any INSURED ORGANIZATION and its SUBSIDIARIES under Insuring Agreement I.(B) or I.(C)

Case: 19-00083   Doc# 3-374-10 Filed: 08/19/14/20 Entered: 08/19/14-29:07:15 56:59 Page of 302 of 524

Print Date: 05/31/2017  11:37:35



and Section II., Derivative Investigation Cost Coverage, if the signer of the APPLICATION knew the misrepresentation was in the APPLICATION;

whether or not the DIRECTOR or OFFICER referenced in (C)(1) above knew the APPLICATION contained such misrepresentation.

(D) Without limiting the effect of Exclusions VII.(A) and (B), the INSURER agrees it will not rescind or void coverage under Insuring Agreement I.(A) in whole or in part for any reason.

## IX. CONDITIONS

(A) *Advancement of DEFENSE COSTS and INVESTIGATIVE EXPENSE*

Advancement by the INSURER of DEFENSE COSTS and INVESTIGATIVE EXPENSE shall be conditioned upon the DIRECTORS, OFFICERS or INSURED ORGANIZATION, as applicable, providing a satisfactory written undertaking to repay the INSURER, severally according to their respective interests, any DEFENSE COSTS or INVESTIGATIVE EXPENSE if and to the extent such DEFENSE COSTS or INVESTIGATIVE EXPENSE are finally established not to be covered by this POLICY.

(B) *Severability*

Except as provided in Section VIII., Representations, the acts, omissions, knowledge or warranties of a DIRECTOR or OFFICER shall not be imputed to any other DIRECTOR or OFFICER with respect to applying any Exclusion or otherwise determining coverage under this POLICY, and, with respect to SECURITIES CLAIMS against the INSURED ORGANIZATION, only acts, omissions, knowledge or warranties of the signer of the APPLICATION shall be imputed to such INSURED ORGANIZATION and its SUBSIDIARIES.

(C) *Acquisition, Merger and Dissolution*

(1) If after the inception of the POLICY PERIOD the INSURED ORGANIZATION acquires or creates a new SUBSIDIARY or acquires an entity by merger or consolidation, coverage under this POLICY automatically shall apply to such entity and its INSUREDS, but only for WRONGFUL ACTS taking place after such acquisition or merger.

However, if the total of all cash, securities, assumed indebtedness and other consideration paid by the INSURED ORGANIZATION in such merger or acquisition exceeds fifteen percent (15%) of the total consolidated assets of the INSURED ORGANIZATION first named in Item 1 of the Declarations as reported in such INSURED ORGANIZATION'S then most recent audited consolidated financial statement, then coverage for such entity and its INSUREDS shall cease no later than ninety (90) days after the effective date of such merger or acquisition, unless the INSURED ORGANIZATION reports such merger or acquisition to the INSURER within such ninety (90) day period together with such information as the INSURER may require, and the INSURER agrees by endorsement to this POLICY to extend coverage to such entity and its INSUREDS. Any such coverage extension past such ninety (90) day period will become effective only upon the payment of any additional premiums and acceptance of any additional terms and conditions as may be required by the INSURER.

(2) If during the POLICY PERIOD, any of the following events occurs:

(a) the acquisition by another entity or affiliated group of all or substantially all of the assets of the INSURED ORGANIZATION first named in Item 1 of the Declarations, or the merger or consolidation of such INSURED ORGANIZATION into or with another entity such that such INSURED ORGANIZATION is not the surviving entity; or



(b) the acquisition by any person, entity or affiliated group of persons or entities of securities or voting rights which results in such person, entity or affiliated group having the right to elect, appoint or designate at least fifty percent (50%) of the directors, trustees or persons holding equivalent positions of the INSURED ORGANIZATION first named in Item 1 of the Declarations;

then coverage under this POLICY shall continue until termination of the POLICY PERIOD and shall not be cancelable by the INSURED ORGANIZATION or the INSURER, but this POLICY will provide coverage only with respect to WRONGFUL ACTS occurring prior to such merger, consolidation or acquisition. The INSURED ORGANIZATION shall give written notice of such merger, consolidation or acquisition to the INSURER as soon as practicable together with such information as the INSURER may require. However, coverage under this POLICY will cease as of the effective date of such event with respect to WRONGFUL ACTS occurring after such event. The appointment of any receiver, trustee, examiner, conservator, liquidator, rehabilitator or similar official to take control of, supervise, manage or liquidate the INSURED ORGANIZATION due to FINANCIAL IMPAIRMENT shall not be considered an acquisition within the meaning of this paragraph (2).

(3) If an organization ceases to be a SUBSIDIARY, prior to or during the POLICY PERIOD, coverage with respect to such SUBSIDIARY and its INSUREDS shall continue until termination of the POLICY PERIOD, but only with respect to WRONGFUL ACTS occurring prior to the date such organization ceased to be a SUBSIDIARY.

(D) *Non-Duplication of Limits*

The maximum liability of the INSURER under this POLICY and the "Other Policy" (as defined below), combined, for all loss otherwise covered under this POLICY or the "Other Policy" resulting from the same or related CLAIMS, WRONGFUL ACTS, occurrences, facts, circumstances or situations shall be the largest then available limit of liability applicable to such loss under this POLICY or the "Other Policy". This Condition (D) shall not operate to increase the INSURER'S aggregate Limits of Liability as stated in Items 5A and 5B of the Declarations or as stated under the "Other Policy". This provision is intended to avoid the duplication of the INSURER'S aggregate limits of liability under this POLICY and the "Other Policy" for any related loss, and further reduces and does not increase the INSURER'S liability under this POLICY and the "Other Policy".

As used herein, "Other Policy" means any other policy or policies issued by the INSURER or any of the INSURER'S affiliates covering the INSURED ORGANIZATION or any DIRECTOR or OFFICER, provided that the "Other Policy" shall not include any such policies which are written specifically as excess of this POLICY. "Other Policy" does not include any General Partners, Fiduciary and Employee Benefits policy, Excess Liability Insurance policy, Excess Worker's Compensation Insurance policy or property insurance policies.

(E) *Reporting of Claims and Shareholder Derivative Demands*

As a condition precedent to any rights under this POLICY, the DIRECTORS, OFFICERS, INSURED ORGANIZATION, or the INSURED ORGANIZATION'S authorized representative shall give the INSURER written notice of any:

(1) CLAIM; or

(2) SHAREHOLDER DERIVATIVE DEMAND;

as soon as practicable after the General Counsel or Risk Manager of the INSURED ORGANIZATION first named in Item 1 of the Declarations first becomes aware of such CLAIM or SHAREHOLDER DERIVATIVE DEMAND. Notice of a CLAIM or SHAREHOLDER DERIVATIVE DEMAND shall include the nature of the WRONGFUL ACT, the alleged injury, the names of the claimants and the manner in which the DIRECTOR, OFFICER or INSURED ORGANIZATION first became aware of the CLAIM or SHAREHOLDER DERIVATIVE DEMAND.

Case: 19-30088     Doc# 5374-10   Filed: 08/19/14/20   Entered: 08/10/14/20 17:56:59   Page 150 of 304 91 524



The DIRECTORS, OFFICERS and the INSURED ORGANIZATION shall give the INSURER such additional information as the INSURER may reasonably require. Neither (1) the APPLICATION for this POLICY or any endorsement hereto, nor (2) any information contained in any of the foregoing shall constitute a notice of CLAIM or SHAREHOLDER DERIVATIVE DEMAND.

(F) *Defense, Cooperation and Settlement*

It shall be the duty of the INSUREDS and not the duty of the INSURER to investigate and defend CLAIMS made against the INSUREDS.

In the event of any CLAIM which may involve this POLICY, the INSUREDS may proceed immediately with settlement of such CLAIM where the aggregate ULTIMATE NET LOSS from such CLAIM does not exceed the applicable RETENTION. The INSURED ORGANIZATION shall notify the INSURER of any such settlement. If the aggregate ULTIMATE NET LOSS resulting from such settlement does exceed, or is expected to exceed, the RETENTION, the INSUREDS shall not cause the settlement to be made without the express prior written consent of the INSURER, provided that the INSURER'S consent shall not be unreasonably withheld.

The INSURER shall not be called upon to assume charge of the investigation, settlement or defense of any CLAIM, but the INSURER shall have the right and shall be given the opportunity to associate with the INSUREDS in the investigation, settlement, defense and control of any CLAIM that involves or may involve the INSURER. At all times, the INSUREDS and the INSURER shall cooperate in the investigation, settlement and defense of such CLAIM.

The INSUREDS shall, at all times, use diligence and prudence in the investigation, settlement and defense of CLAIMS.

(G) *Appeals*

In the event that the INSUREDS elect not to appeal a judgement in excess of the RETENTION, the INSURER may elect to conduct such appeal at its own cost and expense and shall be liable for any taxable court costs and interest incidental thereto, but in no event shall the total liability of the INSURER, exclusive of the cost and expense of appeal, exceed its Limit of Liability stated in Item 5A of the Declarations.

(H) *Subrogation*

In the event of any payment under this POLICY, the INSURER shall be subrogated to the extent of such payment to all rights of recovery therefor, including without limitation any right of recovery from the INSURED ORGANIZATION for indemnifiable ULTIMATE NET LOSS. The INSUREDS shall execute all papers required and shall do everything that may be necessary to enable the INSURER to bring suit in the name of the INSUREDS. The INSURER shall not exercise its rights of subrogation against a DIRECTOR or OFFICER under this POLICY unless Exclusion VII.(B) above applies to such DIRECTOR or OFFICER.

(I) *Bankruptcy or Insolvency*

The INSURER shall not be relieved of any of its obligations due to the FINANCIAL IMPAIRMENT of the INSURED ORGANIZATION.

If any INSURED ORGANIZATION shall become subject to a FINANCIAL IMPAIRMENT:

(1) the DIRECTORS, OFFICERS and the INSURED ORGANIZATION hereby (i) waive and release any automatic stay or injunction which may apply to this POLICY or its proceeds in such proceeding, and (ii) agree not to oppose or object to any efforts by the INSURER or any DIRECTOR or OFFICER or the INSURED ORGANIZATION to obtain relief from any such stay or injunction; and

(2) subject to all the terms of this POLICY and any applicable stay or injunction, the INSURER shall pay on behalf of the DIRECTORS and OFFICERS, under Insuring Agreement I.(A), ULTIMATE NET LOSS which would have been indemnified by the INSURED ORGANIZATION but for such



FINANCIAL IMPAIRMENT. The INSURER shall be subrogated, to the extent of any payment, to the rights of the DIRECTORS and OFFICERS to receive indemnification from the INSURED ORGANIZATION for such ULTIMATE NET LOSS, but only up to the amount of the RETENTION applicable to Insuring Agreement I.(B).

(J)  *Other Insurance*

This POLICY shall be in excess of and shall not contribute with any other valid and collectible insurance with any other Insurer that is available to the INSUREDS with respect to a CLAIM also covered by this POLICY, regardless of whether such insurance is issued before, concurrently with, or after inception of this POLICY, other than insurance that is issued specifically as insurance in excess of the insurance afforded by this POLICY.  Nothing herein shall be construed to make this POLICY subject to the terms of other insurance.

The coverage provided by this POLICY for any DIRECTOR or OFFICER who serves as a director, officer or trustee of any OUTSIDE ORGANIZATION shall be specifically excess of any other indemnification and insurance available to such DIRECTOR or OFFICER from the OUTSIDE ORGANIZATION. Such coverage shall not be construed to extend to the OUTSIDE ORGANIZATION, nor to any other director, officer or trustee of the OUTSIDE ORGANIZATION.

(K)  *Changes and Assignment*

The terms of this POLICY shall not be waived or changed, nor shall an assignment of interest be binding, except by an endorsement to this POLICY issued by the INSURER.

(L)  *Discovery Period*

In the event of cancellation or nonrenewal of the POLICY by the INSURED ORGANIZATION first named in Item 1 of the Declarations or nonrenewal of this POLICY by the INSURER, the INSURED ORGANIZATION and the DIRECTORS and OFFICERS shall have the right, upon payment of an additional premium to be determined by the INSURER (which shall not exceed the amount stated in Item 7 of the Declarations and shall be fully earned by the INSURER at the time of purchase), to an extension of the coverage afforded by this POLICY with respect to any CLAIM first made against any INSUREDS, or any NOTICE OF CIRCUMSTANCES given to the INSURER, during the period stated in Item 7 of the Declarations, but only with respect to any WRONGFUL ACT committed prior to the end of the POLICY PERIOD. This right of extension shall terminate unless written notice of such election is received by the INSURER within thirty (30) days after the effective date of cancellation or nonrenewal. The Limits of Liability under this POLICY shall not be increased by any DISCOVERY PERIOD.

The offer by the INSURER of renewal on terms, conditions or premiums different from those in effect during the POLICY PERIOD shall not be considered to be a cancellation or refusal to renew this POLICY.

(M)  *Cancellation*

This POLICY:

(1)  may be cancelled at any time by the INSURED ORGANIZATION first named in Item 1 of the Declarations (except as provided in Condition (C)) by delivering written notice to the INSURER stating when thereafter cancellation shall be effective; in which case the INSURER shall retain a short rate portion of the Rated Premium amount stated in Item 4 of the Declarations of this POLICY and a short rate portion of the unearned Continuity Credit;

(2)  may not be cancelled by the INSURER, except for nonpayment of premium, in which case (i) such cancellation shall be effective ten (10) days after the date notice thereof is given by the INSURER to the INSURED ORGANIZATION first named in Item 1 of the Declarations, and (ii) the INSURER shall retain a pro-rata proportion of the Rated Premium stated in Item 4 of the Declarations and the pro-rata unearned Continuity Credit.

Case: 19-00083    Doc# 3-374-10  Filed: 08/19/14/20  Entered: 08/19/14/20 15:56:59  Page 1 of
306 of 524



Proof that notice has been provided in accordance with Condition (V) below shall be sufficient proof notice has been given, and the POLICY PERIOD shall end on the effective date and hour of cancellation, as stated above.

(N) *Currency*

All amounts stated herein are expressed in United States Dollars and all amounts payable hereunder are payable in United States Dollars.

(O) *Sole Agent*

The INSURED ORGANIZATION first named in Item 1 of the Declarations shall be deemed the authorized representative of each DIRECTOR and OFFICER and all INSURED ORGANIZATIONS for the purposes of requesting or agreeing to any endorsement to this POLICY, making premium payments and adjustments and receiving notifications, including notice of cancellation from the INSURER.

(P) *Dispute Resolution and Service of Suit*

Any controversy or dispute between the INSURER and the INSURED ORGANIZATION arising out of or relating to this POLICY, or the breach, termination, formation or validity thereof, shall be resolved in accordance with the procedures specified in this Condition (P), which shall be the sole and exclusive procedures for the resolution of any such controversy or dispute.

(1) Negotiation. The INSURED ORGANIZATION and the INSURER (each a "party") shall attempt in good faith to resolve any controversy or dispute arising out of or relating to this POLICY promptly by negotiations between executives who have authority to settle the controversy. Any party may give the other party written notice of any dispute not resolved in the normal course of business. Within fifteen (15) days the receiving party shall submit to the other a written response. The notice and the response shall include: (a) a statement of each party's position and a summary of arguments supporting that position; and (b) the name and title of the executive who will represent that party and of any other person who will accompany the executive. Within thirty (30) days after delivery of the disputing party's notice and thereafter, as often as they reasonably deem necessary, the executives of both parties shall meet at a mutually acceptable time and place, to attempt to resolve the dispute. All reasonable requests for information made by one party to the other will be honored. If the matter has not been resolved within sixty (60) days of the disputing party's notice, or if the parties fail to meet within thirty (30) days, either party may initiate mediation of the controversy or claim as provided hereinafter.

All negotiations pursuant to this clause will be kept confidential and shall be treated as compromise and settlement negotiations for purposes of the Federal Rules of Evidence and state rules of evidence.

(2) Mediation. If the dispute between the INSURER and the INSURED ORGANIZATION has not been resolved by negotiation as provided herein, the parties shall endeavor to settle the dispute by mediation under the last published Mediation Procedure of the International Institute for Conflict Prevention and Resolution or any successor ("CPR Institute"). Unless otherwise agreed, the parties will select a neutral third party from the CPR Institute Panels Distinguished of Neutrals, with the assistance of the CPR Institute.

(3) Arbitration. Any controversy or dispute between the INSURER and the INSURED ORGANIZATION arising out of or relating to this POLICY, or the breach, termination, formation or validity thereof, which has not been resolved by non-binding means as provided herein within ninety (90) days of the initiation of such procedure, shall be settled by binding arbitration in accordance with the CPR Institute Rules for Non-Administered Arbitration of Business Disputes (the "CPR Rules") by three (3) independent and impartial arbitrators. The INSURED ORGANIZATION and the INSURER each shall appoint one arbitrator; the third arbitrator, who shall serve as the chair of the arbitration panel, shall be appointed in accordance with the CPR Rules. If either the INSURED ORGANIZATION or the INSURER has requested the other to participate in a non-binding procedure and the other has failed to participate, the requesting party may initiate arbitration before expiration of the above period. The arbitration shall be



governed by the United States Arbitration Act, 9 U.S.C. §§ 1 et seq., and judgment upon the award rendered by the arbitrators may be entered by any court having jurisdiction thereof.

In the event of a judgment being entered against the INSURER on an arbitration award, the INSURER, at the request of the INSURED ORGANIZATION, shall submit to the jurisdiction of any court of competent jurisdiction within the United States of America, and shall comply with all requirements necessary to give such court jurisdiction, and all matters relating to such judgment and its enforcement shall be determined in accordance with the law and practice of such court.

(4) Service of Suit.  Service of process in any suit or any other suit instituted against the INSURER under this POLICY may be made upon AEGIS Insurance Services, Inc., 1 Meadowlands Plaza, East Rutherford, NJ 07073.  The INSURER will abide by the final decision of the court in such suit or of any appellate court in the event of any appeal.  AEGIS Insurance Services, Inc. is authorized and directed to accept service of process on behalf of the INSURER in any such suit and, upon the INSURED ORGANIZATION'S or any DIRECTOR'S or OFFICER'S request, to give a written undertaking that they will enter a general appearance upon the INSURER'S behalf in the event such suit is instituted.  Nothing in this clause constitutes or should be understood to constitute a waiver of the INSURER'S right to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek to transfer a case to another court as permitted by the laws of the United States or of any state in the United States.  This paragraph (4) is subject to, and does not override, the requirement of binding arbitration set out in paragraph (3).

(Q)  *Construction*

The terms of this POLICY are to be construed in an evenhanded fashion as between the INSURED ORGANIZATION**,** the DIRECTORS or OFFICERS and the INSURER in accordance with the laws of the State of New York, except that any CLAIM for coverage of punitive, exemplary or multiple damages shall be governed by the law of the jurisdiction that is most favorable to the insurability of such damages, provided such jurisdiction has a substantial relationship to the involved DIRECTORS or OFFICERS, the INSURED ORGANIZATION, or the CLAIM giving rise to such damages.  Where the language of this POLICY is deemed to be ambiguous or otherwise unclear, the issue shall be resolved in a manner most consistent with the relevant terms of this POLICY without regard to authorship of the language and without any presumption or arbitrary interpretation or construction in favor of either the INSURED ORGANIZATION, the DIRECTORS or OFFICERS or the INSURER.  In deciding any controversy or dispute arising out of or relating to this POLICY, due consideration shall be given to the customs and usages of the insurance industry.  No damages in excess of compensatory damages shall be awarded in any controversy or dispute between the INSURER, on the one hand, and the INSURED ORGANIZATION and/or the DIRECTORS and OFFICERS, on the other hand, and each party hereby irrevocably waives any such damages.

(R)  *Invalidity or Unenforceability*

In the event that any provision of this POLICY shall be declared or deemed to be invalid or unenforceable under any applicable law, such invalidity or unenforceability shall not affect the validity or enforceability of the remaining portion of this POLICY.

(S)  *Non-Assessability*

The INSURED ORGANIZATION shall be liable under this POLICY only for the POLICY Premium stated in Item 4 of the Declarations. Neither the INSURED ORGANIZATION nor any DIRECTOR or OFFICER shall be subject to any contingent liability or be required to pay any dues or assessments to the INSURER in addition to the premium described above.

(T)  *Allocation*

If a CLAIM is made against both INSUREDS who are covered hereunder for such CLAIM and others, including INSUREDS who are not covered hereunder for such CLAIM, or if a CLAIM against the INSUREDS includes both covered and non-covered matters, the DIRECTORS and OFFICERS, the INSURED ORGANIZATION and the INSURER shall allocate any investigation expenses, defense costs, settlement, judgement or other loss on account of such CLAIM between covered INVESTIGATIVE EXPENSE or ULTIMATE NET LOSS attributable to the CLAIM against the



DIRECTORS and OFFICERS and non-covered loss. Such allocation shall be based upon the relative legal and financial exposure of each party to such CLAIM for covered and non-covered matters.

If the DIRECTORS and OFFICERS, INSURED ORGANIZATION and the INSURER agree on an allocation of INVESTIGATIVE EXPENSE and DEFENSE COSTS, the INSURER shall advance INVESTIGATIVE EXPENSE and DEFENSE COSTS allocated to covered ULTIMATE NET LOSS. If the DIRECTORS and OFFICERS, INSURED ORGANIZATION and the INSURER cannot agree on an allocation:

(1)  no presumption as to allocation shall exist in any arbitration, suit or other proceeding;

(2)  the INSURER shall advance INVESTIGATIVE EXPENSE and DEFENSE COSTS which the INSURER believes to be covered under this POLICY until a different allocation is negotiated, mediated, arbitrated or ordered by a court of competent jurisdiction; and

(3)  any disagreement on the allocation of INVESTIGATIVE EXPENSE and DEFENSE COSTS shall be settled in accordance with Condition (P), if applicable.

Any advancement of INVESTIGATIVE EXPENSE and DEFENSE COSTS as described above shall be on a current basis but no later than ninety (90) days after the INSURER receives itemized invoices for such INVESTIGATIVE EXPENSE or DEFENSE COSTS.

Any negotiated, mediated, or arbitrated or court-ordered allocation of INVESTIGATIVE EXPENSE and DEFENSE COSTS on account of a CLAIM shall be applied retroactively to all INVESTIGATIVE EXPENSE and DEFENSE COSTS on account of such CLAIM, notwithstanding any prior advancement to the contrary.  Any allocation or advancement of INVESTIGATIVE EXPENSE and DEFENSE COSTS on account of a CLAIM shall not apply to or create any presumption with respect to the allocation of INDEMNITY on account of such CLAIM.

(U)  *Territory*

This POLICY extends to WRONGFUL ACTS taking place or CLAIMS made anywhere in the world.

(V)  *Notices*

Any notice, request, demand or other communication required or permitted under this POLICY shall be in writing and shall be delivered personally, by facsimile, electronic mail or other written form of electronic communication or by certified or express mail or overnight courier, postage prepaid, to the respective parties as follows:

(1)  if to the INSURED ORGANIZATION, to the name and address specified in Item 8 of the Declarations; and

(2)  if to the INSURER, to the address specified in Item 9 of the Declarations;

or to such other address or person as either party hereto may, from time to time, designate in a written notice given in like manner.

IN WITNESS WHEREOF, Associated Electric & Gas Insurance Services Limited has caused this POLICY to be signed by its President and Chief Executive Officer at Hamilton, Bermuda. However, this POLICY shall not be binding upon the INSURER unless countersigned on the Declaration Page by a duly authorized representative of the INSURER.

Owen Ryan, President
and Chief Executive Officer



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. <u>1</u>                                    Effective date of Endorsement <u>May 20, 2017</u>

Attached to and forming part of POLICY No.  <u>DP5008417P</u>

INSURED ORGANIZATION   <u>PG&E Corporation</u>

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

**OFAC EXCLUSION**

This POLICY shall not apply and the INSURER shall not be liable to make any payment for ULTIMATE NET LOSS or INVESTIGATIVE EXPENSE with respect to any CLAIM(S) made against any INSUREDS arising out of any:

a)   conduct prohibited by any United States economic or trade sanctions, including, but not limited to sanctions, laws and regulations administered and enforced by the United States Treasury Department's Office of Foreign Assets Control ("OFAC") (collectively "Economic Sanctions"); or

b)   coverage that violates any of these Economic Sanctions.

Further, in accordance with these Economic Sanctions, any such coverage in this POLICY that would violate these Economic Sanctions is void at POLICY inception.  If this POLICY is determined by the INSURER to be a blocked or frozen contract under these Economic Sanctions, no payments, including, but not limited to, claims, premium refunds, member related credits, will be made without authorization from OFAC.

_Fred C. M. J._
_____
Signature of Authorized Representative

Case: 19-30088    Doc# 5374-10    Filed: 01/14/20    Entered: 01/14/20 19:37:52    Page 206f
310 of 524



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. <u>2</u>                                        Effective date of Endorsement <u>May 20, 2017</u>

Attached to and forming part of POLICY No. <u>DP5008417P</u>

INSURED ORGANIZATION   <u>PG&E Corporation</u>

It is understood and agreed that this POLICY is hereby amended as indicated. All other terms and conditions of this POLICY remain unchanged.

## MEMBER WITH VOTING RIGHTS ENDORSEMENT

This POLICY entitles the INSURED ORGANIZATION to be a member in the INSURER unless that membership is superseded, at any point in time, by a parent or affiliated company, which is also a member in the INSURER.

This POLICY also entitles the INSURED ORGANIZATION to a vote on any matter submitted to the members of the INSURER unless that voting right is superseded, at any point in time, by the voting right of a parent or affiliated company.

_Fred C. M J._
Signature of Authorized Representative

200-E6583 (10/2010)



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 3            Effective date of Endorsement May 20, 2017

Attached to and forming part of POLICY No.   DP5008417P

INSURED ORGANIZATION    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated. All other terms and conditions of this POLICY remain unchanged.

## TERRORISM EXCLUSION

In accordance with the Terrorism Risk Insurance Act of 2002 as amended (the "Federal Act"), the INSURER has offered the INSURED ORGANIZATION listed in Item 1 of the Declarations coverage for "insured loss" as defined in the Federal Act.

The INSURER has provided the INSURED ORGANIZATION with a notice stating the additional premium charged for the inclusion of terrorism coverage under this POLICY. The first INSURED ORGANIZATION has rejected such coverage, either by not paying the additional premium or by notifying the INSURER that it has declined to purchase such coverage. Consequently, the INSURER shall not be liable to make any payment for ULTIMATE NET LOSS or INVESTIGATIVE EXPENSE caused directly or indirectly by a Terrorism Event. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss caused by the Terrorism Event.

As used in this Endorsement:

"Terrorism Event" means the commission of a violent act, or an act dangerous to human life, tangible property, intangible property or infrastructure, or the threat of such act, that is reasonably believed to have been committed (a) for political, religious and/or ideological reasons; and (b) either (1) to intimidate, coerce or cause fear among the public or a section of the public, (2) to influence the policy of, or overthrow, a government by intimidation, fear or coercion, (3) to affect the conduct of a government or the public or a section of the public, (4) to disrupt any segment of a country's economy or (5) for any similar reason. A Terrorism Event shall include an "act of terrorism" as defined in the Federal Act. A Terrorism Event shall also include any actions by, or on behalf of, a government or branch thereof (including without limitation, the uniformed armed forces, militia, police, state security, national guard and anti-terrorism agencies) in deterring responding to, combating or retaliating against terrorism or removing debris from a terrorist attack.

_Fred C. M g._
Signature of Authorized Representative

Case: 19-30088    Doc# 5374-10   Filed: 01/14/20   Entered: 01/14/20 19:07:52   Page 306
of 524    312



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. <u>4</u>                                        Effective date of Endorsement <u>May 20, 2017</u>

Attached to and forming part of POLICY No.  <u>DP5008417P</u>

INSURED ORGANIZATION   <u>PG&E Corporation</u>

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

## CRISIS FUND ENDORSEMENT

1.    Section I., Insuring Agreements, is amended by the addition of the following:

The INSURER shall pay on behalf of the INSURED ORGANIZATION any CRISIS FUND LOSS first occurring during the POLICY PERIOD and reported to the INSURER during the POLICY PERIOD, provided such CRISIS FUND LOSS is solely as a result of a NEGATIVE EARNINGS OR SALES ANNOUNCEMENT which has a MATERIAL EFFECT ON THE INSURED ORGANIZATION'S STOCK PRICE.

2.    Section VII., Exclusions, shall not be applicable to a CRISIS FUND LOSS.

3.    The maximum amount payable by the INSURER under this Endorsement during the POLICY PERIOD shall be as stated below.

Aggregate Limit of Liability for the POLICY PERIOD under this Endorsement: $50,000

4.    No RETENTION shall apply to CRISIS FUND LOSS and the INSURER will pay from the first dollar subject to Section V. (B), Priority of Payments.

5.    The maximum liability of the INSURER under this POLICY, including this Endorsement, shall not exceed the amount set forth in Item 5A of the Declarations of the POLICY.  Nothing contained in this Endorsement shall increase the limit of liability of the INSURER.

6.    Section VI., Definitions, is amended to include the following:

CRISIS FUND LOSS means:

(1)    amounts for which the INSURED ORGANIZATION is responsible for the reasonable and necessary fees and expenses charged by a qualified public relations firm, crisis management and/or law firm hired by the INSURED ORGANIZATION with the INSURER'S consent (which consent shall not be unreasonably withheld) to perform crisis management services, and

(2)    amounts for which the INSURED ORGANIZATION is responsible for the reasonable and necessary expenses incurred in connection with the printing and/or mailing of materials, or travel by DIRECTORS, OFFICERS, employees or agents of the INSURED ORGANIZATION.

Case: 19-30088    Doc# 5374-10    Filed: 01/14/20    Entered: 01/14/20 15:26:59    Page 240 of
313 of 524



# CRISIS FUND ENDORSEMENT

arising from or related to a NEGATIVE EARNINGS OR SALES ANNOUNCEMENT, regardless whether a CLAIM is ever made and, if a CLAIM is made, regardless whether the amount is incurred prior to or subsequent to the making of the CLAIM.

NEGATIVE EARNINGS OR SALES ANNOUNCEMENT means a public announcement by the INSURED ORGANIZATION of its past or future earnings or sales which is substantially below the INSURED ORGANIZATION'S last public statement or projection of earnings or sales for such period, or the INSURED ORGANIZATION'S prior year's earnings or sales for the same period, or any other similar measurement of indices.

MATERIAL EFFECT ON THE INSURED ORGANIZATION'S STOCK PRICE means that immediately following a NEGATIVE EARNINGS OR SALES ANNOUNCEMENT the price per share of the INSURED ORGANIZATION'S common stock shall experience a decrease net of the change in the Standard & Poor's Composite Stock index of the greater of: 10% or $5.00 per share.

_____

Signature of Authorized Representative

Case: 19-00083    Doc# 3-374-10    Filed: 08/14/20    Entered: 08/14/20 19:07:42    Page 290 of
314



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. <u>5</u>                                        Effective date of Endorsement <u>May 20, 2017</u>

Attached to and forming part of POLICY No.  <u>DP5008417P</u>

INSURED ORGANIZATION    <u>PG&E Corporation</u>

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

**INSURING AGREEMENTS (C) AMENDED**
**(Defense Costs for Derivative Lawsuits)**

Section I., Insuring Agreements, (C) is amended by the addition of the following:

> The INSURER shall pay on behalf of the INSURED ORGANIZATION all DEFENSE COSTS incurred by the INSURED ORGANIZATION (including through its board of directors or any committee of its board of directors) in seeking the dismissal of a shareholder derivative lawsuit on behalf of the INSURED ORGANIZATION.

_Fred C. M..._
Signature of Authorized Representative

Case: 19-30088    Doc# 5374-10   Filed: 01/14/20   Entered: 01/14/20 19:57:52   Page 200 of
315



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 6                    Effective date of Endorsement May 20, 2017

Attached to and forming part of POLICY No. DP5008417P

INSURED ORGANIZATION   PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated. All other terms and conditions of this POLICY remain unchanged.

## EXTRADITION ENDORSEMENT

It is agreed that, solely with respect to any criminal proceeding against a DIRECTOR or OFFICER covered under this POLICY as a CLAIM, the definition of DEFENSE COSTS in Definition (C) shall also include:

(1)      all reasonable and necessary fees and expenses incurred by or on behalf of such DIRECTOR or OFFICER to resist, or to obtain the discharge or revocation of, a judicial order or ruling to extradite such DIRECTOR or OFFICER to the jurisdiction in which such criminal proceeding is pending; and

(2)      the reasonable premium for any appeal, bail, attachment or similar bond or financial instrument incurred by or on behalf of such DIRECTOR or OFFICER by reason of such CLAIM; provided the INSURER shall have no obligation to apply for or provide any collateral for any such bond or financial instrument.

_Fred C. M. Jr._
Signature of Authorized Representative

Case: 19-30088   Doc# 5374-10   Filed: 01/14/20   Entered: 01/14/20 15:56:59   Page 2 of 316 of 524



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 7                                         Effective date of Endorsement May 20, 2017

Attached to and forming part of POLICY No. DP5008417P

INSURED ORGANIZATION   PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated. All other terms and conditions of this POLICY remain unchanged.

## RETENTION AMENDED
### (Erosion by Any Other Source)

Section IV., RETENTION, (E) is replaced by the following:

Payment of INDEMNITY or DEFENSE COSTS by the INSURED ORGANIZATION or any other source (including and any excess "difference in conditions" insurer) which, except for the amount thereof, would have been payable under this POLICY may reduce or exhaust the RETENTION.

![signature]

Signature of Authorized Representative



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 8                                    Effective date of Endorsement May 20, 2017

Attached to and forming part of POLICY No.  DP5008417P

INSURED ORGANIZATION   PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

**RETENTION AMENDED**
**(Event Study Costs)**

I.    Section IV., RETENTION, is amended by the addition of the following provision:

      No RETENTION shall apply to any EVENT STUDY COSTS.

II.   Section VI., Definitions, is amended to include the following:

      EVENT STUDY COSTS means reasonable and necessary fees and expenses incurred by or on behalf of the INSUREDS for an actual or prospective expert witness in a SECURITIES CLAIM to conduct an event study for the purpose of evaluating the impact (if any) to the market price of the INSURED ORGANIZATION'S stock by alleged corrective disclosures identified in the SECURITIES CLAIM, provided such fees and expenses are otherwise included within this POLICY'S Definition of DEFENSE COSTS.

_Signature of Authorized Representative_

Case: 19-30088    Doc# 5374-10    Filed: 01/14/20    Entered: 01/14/20 15:56:59    Page 306 of
318



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 9                                        Effective date of Endorsement May 20, 2017

Attached to and forming part of POLICY No.  DP5008417P

INSURED ORGANIZATION    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

## PRIORITY OF PAYMENTS AMENDED

Section V., Priority of Payments, is amended by the addition of the following:

In the event the INSURED ORGANIZATION becomes a debtor-in-possession or an equivalent status under the United States Bankruptcy Code or the law of any other country and the aggregate ULTIMATE NET LOSS due under this POLICY exceeds the remaining available Limit of Liability, the INSURER shall:

(A) First pay such ULTIMATE NET LOSS allocable to WRONGFUL ACTS that are actually or allegedly caused, committed, or attempted prior to the INSURED ORGANIZATION becoming a debtor-in-possession or such equivalent status; then

(B) Second, with respect to whatever remaining amount of the Limit of Liability is available after payment under (A) above, pay such ULTIMATE NET LOSS allocable to WRONGFUL ACTS that are actually or allegedly caused, committed, or attempted after the INSURED ORGANIZATION became a debtor in possession or such equivalent status.

_Fred C. M~ J~_
Signature of Authorized Representative

Case: 19-30088    Doc# 5374-10   Filed: 01/14/20   Entered: 01/14/20 15:56:59   Page 306 of
319 of 524



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. <u>10</u>                                      Effective date of Endorsement <u>May 20, 2017</u>

Attached to and forming part of POLICY No.  <u>DP5008417P</u>

INSURED ORGANIZATION   <u>PG&E Corporation</u>

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

**DEFINITION (B) CLAIM AMENDED**
**(Mediation or ADR Proceeding)**

 Section VI., Definitions, (B) CLAIM is amended to also mean:

 a written demand upon any INSURED to engage in a mediation or other accredited alternative dispute resolution proceeding.

_Fred C. M J_

Signature of Authorized Representative

Case: 19-30088    Doc# 5374-10    Filed: 01/14/20    Entered: 01/14/20 15:56:59    Page 306
of 524



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. <u>11</u>                                   Effective date of Endorsement <u>May 20, 2017</u>

Attached to and forming part of POLICY No.  <u>DP5008417P</u>

INSURED ORGANIZATION   <u>PG&E Corporation</u>

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

## OUTSIDE ORGANIZATION COVERAGE AMENDED
### (Blanket For-Profit and Not-For-Profit with Exceptions)

I.   Section VI., Definitions, (D) DIRECTOR and OFFICER, subpart (7) is replaced with the following:

(7)   any natural person described in paragraphs (1), (2), (3) or (5) above who is serving or has served with the knowledge and consent of the INSURED ORGANIZATION in an equivalent position with, or as a member of the Management or Operating Committee of, any OUTSIDE ORGANIZATION;

II.   Section VI., Definitions, (H) FOR-PROFIT OUTSIDE ORGANIZATION and (O) NOT-FOR-PROFIT OUTSIDE ORGANIZATION are replaced as follows:

(H)   FOR-PROFIT OUTSIDE ORGANIZATION means any organization or JOINT VENTURE other than:

(1)   the INSURED ORGANIZATION; or
(2)   a NOT-FOR-PROFIT OUTSIDE ORGANIZATION; or
(3)   any Financial Institution, including without limitation any organization that is a bank, credit union, insurance company, mutual fund, investment company, broker/dealer or trust company; or
(4)   any organization the securities of which are publicly traded and/or listed on a securities exchange.

FOR-PROFIT OUTSIDE ORGANIZATION shall also include any for-profit organization specifically listed in a "Schedule of FOR-PROFIT OUTSIDE ORGANIZATIONS" attached to this POLICY or to a prior Directors and Officers Liability Policy issued by the INSURER to the INSURED ORGANIZATION.

(O)   NOT-FOR-PROFIT OUTSIDE ORGANIZATION means any not-for-profit organization that is exempt from Federal taxation, but does not include any Independent System Operator (ISO) or Regional Transmission Organization (RTO).

_____
Signature of Authorized Representative

Case: 19-30088   Doc# 5374-10   Filed: 01/14/20   Entered: 01/14/20 15:56:59   Page 206 of 321



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 12                                      Effective date of Endorsement May 20, 2017

Attached to and forming part of POLICY No.   DP5008417P

INSURED ORGANIZATION    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated. All other terms and conditions of this POLICY remain unchanged.

### DEFINITION OF DIRECTOR AND OFFICER AMENDED
### (Listed Position or Title)

Section VI., Definitions, (D) DIRECTOR and OFFICER is amended to include any natural person who has served, is now serving, or shall serve the INSURED ORGANIZATION in any of the following positions or with the following titles:

       Position or Title

       Advisory Director or Director Emeritus; or

       Contract Officer

_Fred C. M. Jr._

Signature of Authorized Representative

Case: 19-30088    Doc# 3374-10   Filed: 08/14/20   Entered: 08/14/20 19:57:15   Page 306 of 322



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. <u>13</u>                                                    Effective date of Endorsement <u>May 20, 2017</u>

Attached to and forming part of POLICY No.  <u>DP5008417P</u>

INSURED ORGANIZATION   <u>PG&E Corporation</u>

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

### AMENDED DEFINITION (I) INDEMNITY ENDORSEMENT

Section VI., Definitions, (I) INDEMNITY is amended by the addition of the following:

The exclusion in such definition for fines and penalties shall not apply to any fines or penalties for an unintentional or nonwillful violation of law, and the insurability of any such fines or penalties shall be determined under the law of the jurisdiction that is most favorable to the insurability of such fines or penalties as provided in such definition.

_Fred C. M.J._

Signature of Authorized Representative

Case: 19-30088    Doc# 5374-10    Filed: 01/14/20    Entered: 01/14/20 19:07:52    Page 340 of
323 of 524

Print Date: 05/31/2017  11:37:40



## ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. <u>14</u>                               Effective date of Endorsement <u>May 20, 2017</u>

Attached to and forming part of POLICY No.  <u>DP5008417P</u>

INSURED ORGANIZATION   <u>PG&E Corporation</u>

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

### DEFINITION (I) INDEMNITY AMENDED
### (Plaintiffs' Fees Award)

Section VI., Definitions, (I) INDEMNITY is amended to also mean:

Any plaintiffs' attorney fees and costs which the INSUREDS shall become legally obligated to pay as a result of a covered CLAIM, including without limitation any such plaintiffs' attorney fees and costs in a shareholder derivative lawsuit under Insuring Agreement I.(C); provided that any coverage under this POLICY for any such plaintiffs' attorney fees and costs shall be subject to all other terms, conditions and limitations in this POLICY.

_Signature of Authorized Representative_

Case: 19-30088   Doc# 5374-10   Filed: 01/14/20   Entered: 01/14/20 15:56:59   Page 366
of 524



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. <u>15</u>                                      Effective date of Endorsement <u>May 20, 2017</u>

Attached to and forming part of POLICY No. <u>DP5008417P</u>

INSURED ORGANIZATION    <u>PG&E Corporation</u>

It is understood and agreed that this POLICY is hereby amended as indicated. All other terms and conditions of this POLICY remain unchanged.

### DEFINITION (J) INSURED ORGANIZATION AMENDED
### (ClimateSmart)

I.   Section VI., Definitions, (J) INSURED ORGANIZATION is amended by the addition of the following:

INSURED ORGANIZATION shall also mean ClimateSmart.

II.  Solely with respect to ClimateSmart, the RETENTION in Item 6B of the Declarations is replaced by the following:

Insuring Agreement I.(B) or I.(C) $250,000 each CLAIM

III. The RETENTION for Insuring Agreement I.(B) shall apply to all INDEMNITY and DEFENSE COSTS for which indemnification of the DIRECTORS or OFFICERS by the INSURED ORGANIZATION is legally permissible, whether or not such indemnification is granted by the INSURED ORGANIZATION. No RETENTION shall apply if indemnification or payment by the INSURED ORGANIZATION is not legally permissible or if the INSURED ORGANIZATION fails to provide indemnification to DIRECTORS and OFFICERS due to FINANCIAL IMPAIRMENT of the INSURED ORGANIZATION.

_Fred C. M g._
Signature of Authorized Representative



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. <u>16</u>                                                Effective date of Endorsement <u>May 20, 2017</u>

Attached to and forming part of POLICY No.  <u>DP5008417P</u>

INSURED ORGANIZATION    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

## DEFINITION (U) SECURITIES CLAIM AMENDED

Section VI., Definitions, (U) SECURITIES CLAIM is replaced by the following:

(U)  SECURITIES CLAIM shall mean any CLAIM which alleges a violation of any law, regulation or rule, whether statutory or common law, and which in whole or in part is:

(1) brought by any person or entity arising out of, based upon or attributable to the purchase or sale of, or offer or solicitation of an offer to purchase or sell, whether actual or alleged, any securities of the INSURED ORGANIZATION; or

(2) brought by a securities holder of the INSURED ORGANIZATION with respect to such securities holder's interest in the securities of the INSURED ORGANIZATION.

SECURITIES CLAIM shall include any criminal proceeding or any administrative or regulatory proceeding against the INSURED ORGANIZATION, but only if and only during the time that such proceeding is also commenced and continuously maintained against a DIRECTOR or OFFICER.

SECURITIES CLAIM for purposes of Insuring Agreement I.(C) shall not include any employment or compensation related CLAIM brought by a DIRECTOR or OFFICER or other employee of the INSURED ORGANIZATION.

Signature of Authorized Representative

Case: 19-30088    Doc# 5374-10    Filed: 01/14/20    Entered: 01/14/20 15:56:59    Page 3 of
326 of 524



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. <u>17</u>                                      Effective date of Endorsement <u>May 20, 2017</u>

Attached to and forming part of POLICY No.  <u>DP5008417P</u>

INSURED ORGANIZATION   <u>PG&E Corporation</u>

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

## AMENDED SEVERABILITY ENDORSEMENT
### (Full Severability for All Insureds)

Section VIII., Representations, is deleted in its entirety and replaced with the following:

(A)  In issuing this POLICY, the INSURER has relied upon the statements, representations and information in the APPLICATION. Each INSURED acknowledges and agrees that the statements, representations and information in the APPLICATION are true and accurate to the best of such INSURED'S knowledge and belief.

(B)  The APPLICATION shall be construed as a separate APPLICATION for coverage by each INSURED. With respect to the statements, representations and information in such APPLICATION, no knowledge possessed by any INSURED shall be imputed to any other INSURED for the purpose of determining coverage under this POLICY.

(C)  If the APPLICATION contains a statement, representation or information that is materially false or inaccurate, then the POLICY will be void from the beginning under Insuring Agreement I.(B) to the extent an INSURED ORGANIZATION indemnifies a DIRECTOR or OFFICER who knew the facts that were not truthfully and accurately disclosed in the APPLICATION.  However, coverage under Insuring   Agreement I.(B) shall not be void to the extent an INSURED ORGANIZATION indemnifies a DIRECTOR or OFFICER who did not possess such knowledge.

(D)  The INSURER agrees it will not rescind or void coverage under Insuring Agreement I.(A) in whole or in part for any reason.

Section IX., Conditions, (B) *Severability* is deleted in its entirety and replaced with the following:

(B)  *Severability*

Except as provided in Section VIII., Representations, the acts, omissions, knowledge or warranties of an INSURED shall not be imputed to any other INSURED with respect to applying any Exclusion or  otherwise determining coverage under this POLICY.

_____
Signature of Authorized Representative



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 18                                       Effective date of Endorsement May 20, 2017

Attached to and forming part of POLICY No. DP5008417P

INSURED ORGANIZATION   PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated. All other terms and conditions of this POLICY remain unchanged.

### DELETION OF EXCLUSION (A) ENDORSEMENT

Section VII., Exclusions (A) is deleted in its entirety.

_____

Signature of Authorized Representative

Case: 19-30088    Doc# 5374-10    Filed: 01/14/20    Entered: 01/14/20 15:56:59    Page 306 of 524

 AEGIS

# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 19                                    Effective date of Endorsement May 20, 2017

Attached to and forming part of POLICY No.  DP5008417P

INSURED ORGANIZATION    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

## EXCLUSION (B) AMENDED

Section VII., Exclusion (B) is deleted in its entirety and replaced with the following:

   (B)   based upon, arising out of or attributable to such INSURED:

      (1)   having gained any personal profit, financial advantage or remuneration to which such INSURED was not legally entitled; or

      (2)   having committed a deliberately fraudulent or criminal act or omission or any intentional violation of any law, statute or regulation;

      if established by a final, non-appealable adjudication in the underlying proceeding.

_Fred C. M___

Signature of Authorized Representative

Case: 19-30088    Doc# 5374-10    Filed: 01/14/20    Entered: 01/14/20 19:57:15    Page 406
of
329 of 524



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. <u>20</u>                              Effective date of Endorsement <u>May 20, 2017</u>

Attached to and forming part of POLICY No. <u>DP5008417P</u>

INSURED ORGANIZATION    <u>PG&E Corporation</u>

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

### EXCLUSION (D) AMENDED
### (Delete Subparts 1, 2, 5 and 6)

Section VII., Exclusions, (D) is deleted in its entirety and replaced with the following:

(D)   for any injury arising out of:

    (1)   any employment-related WRONGFUL ACT including but not limited to the actual or constructive termination of employment, demotion, failure to employ or promote, deprivation of a career opportunity, or employment discipline or evaluation in a manner which violates the laws or regulations of any jurisdiction, or which breaches any implied contract to continue employment;

    (2)   discrimination or sexual harassment;

    provided this Exclusion (D) shall not apply to any SECURITIES CLAIM arising out of such events.

_Fred C. M J._

Signature of Authorized Representative



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. <u>21</u>

Effective date of Endorsement <u>May 20, 2017</u>

Attached to and forming part of POLICY No.  <u>DP5008417P</u>

INSURED ORGANIZATION    <u>PG&E Corporation</u>

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

**EXCLUSION (E) AMENDED**
**(Insured Organization Plans Only)**

Section VII., Exclusions, (E) is amended by the addition of the following:

> Provided, this Exclusion shall only apply with respect to plans, programs and trusts established or maintained in whole or in part for the benefit of employees of the INSURED ORGANIZATION.

<u>_____</u>
Signature of Authorized Representative

Case: 19-30088    Doc# 5374-10    Filed: 01/14/20    Entered: 01/14/20 15:56:59    Page 296
of 331



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. <u>22</u>                                    Effective date of Endorsement <u>May 20, 2017</u>

Attached to and forming part of POLICY No.  <u>DP5008417P</u>

INSURED ORGANIZATION   <u>PG&E Corporation</u>

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

## AMENDED EXCLUSION (F) EBL ENDORSEMENT

Section VII., Exclusions (F) is deleted in its entirety and replaced with the following:

(F)     for the rendering of advice with respect to, the interpreting of, or the handling of records in connection with the enrollment, termination or cancellation of employees under the INSURED ORGANIZATION'S group life insurance, group accident or health insurance, pension plans, employee stock subscription plans, workers' compensation, unemployment insurance, social security, disability benefits and any other employee benefit programs.

_Fred C. M. J._
Signature of Authorized Representative



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. <u>23</u>                                Effective date of Endorsement <u>May 20, 2017</u>

Attached to and forming part of POLICY No.  <u>DP5008417P</u>

INSURED ORGANIZATION   <u>PG&E Corporation</u>

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

### EXCLUSION (G) AMENDED
### (Given and Accepted)

Section VII., Exclusions, (G) is deleted in its entirely and replaced by the following:

(G)  based upon, arising out of or attributable to any circumstance of which, prior to the inception of this POLICY,  written notice was given and accepted as valid under any Directors and Officers liability Insurance Policy (whether issued by the INSURER or any other Insurer) or any  DISCOVERY PERIOD thereof.

---

_Fred C. M. J._

Signature of Authorized Representative

Case: 19-30088   Doc# 5374-10   Filed: 01/14/20   Entered: 01/14/20 19:57:52   Page 240 of
333



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. <u>24</u>                                    Effective date of Endorsement <u>May 20, 2017</u>

Attached to and forming part of POLICY No.  <u>DP5008417P</u>

INSURED ORGANIZATION   <u>PG&E Corporation</u>

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

**EXCLUSION (J) AMENDED**
**(Broad Exception for Derivative Actions)**

Section VII., Exclusions, (J) subpart (1) is replaced by the following:

    (1) brought derivatively by a security holder of the INSURED ORGANIZATION;

<br>

_Signature of Authorized Representative_

Case: 19-30088    Doc# 5374-10    Filed: 01/14/20    Entered: 01/14/20 15:56:59    Page 436 of
334 of 524



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 25                                   Effective date of Endorsement May 20, 2017

Attached to and forming part of POLICY No.   DP5008417P

INSURED ORGANIZATION    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated. All other terms and conditions of this POLICY remain unchanged.

### ACQUISITION, MERGER AND DISSOLUTION AMENDED
### (Change Consideration Threshold)

Section IX., Conditions, (C) Acquisition, Merger and Dissolution, subpart (1) is amended by changing the reference therein from "fifteen percent (15%)" to "twenty-five (25%)".

_Fred C. M. Jr._

Signature of Authorized Representative



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. <u>26</u>                                                  Effective date of Endorsement <u>May 20, 2017</u>

Attached to and forming part of POLICY No.  <u>DP5008417P</u>

INSURED ORGANIZATION   <u>PG&E Corporation</u>

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

### CONDITION (D) NON-DUPLICATION OF LIMITS DELETED

Section IX., Conditions, (D) *Non-Duplication of Limits* is deleted in its entirety.

_____
Signature of Authorized Representative

Case: 19-30088    Doc# 5374-10    Filed: 01/14/20    Entered: 01/14/20 15:56:59    Page 296
of 524



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 27                                    Effective date of Endorsement May 20, 2017

Attached to and forming part of POLICY No.  DP5008417P

INSURED ORGANIZATION   PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

### NOTICE PROVISION AMENDED
### (Late Notice)

Section IX., Conditions, (E) *Reporting of Claims and Shareholder Derivative Demands* is amended by adding the following:

> If an INSURED fails to provide timely notice of a CLAIM or SHAREHOLDER DERIVATIVE DEMAND to the INSURER as specified in this Condition (E), the INSURER shall not be entitled to deny coverage for the CLAIM or SHAREHOLDER DERIVATIVE DEMAND based solely upon late notice unless the INSURER can demonstrate its interests were materially prejudiced by reason of such late notice.

_____
Signature of Authorized Representative



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 28                                      Effective date of Endorsement May 20, 2017

Attached to and forming part of POLICY No.  DP5008417P

INSURED ORGANIZATION   PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

## CONDITION (F) DEFENSE, COOPERATION AND SETTLEMENT AMENDED
### (Severability of Cooperation)

Section IX., Conditions, (F) *Defense, Cooperation and Settlement* is amended by the addition of the following:

The failure of any INSURED to comply with the provisions above shall not impair the rights of any other INSURED under this POLICY.

_Signature of Authorized Representative_

Case: 19-30088    Doc# 3-6  Filed: 01/14/20    Entered: 01/14/20 15:56:59    Page 1 of
338 of 524



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. <u>29</u>                              Effective date of Endorsement <u>May 20, 2017</u>

Attached to and forming part of POLICY No.  <u>DP5008417P</u>

INSURED ORGANIZATION   <u>PG&E Corporation</u>

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

**CONDITION (M) CANCELLATION AMENDED**
**(Pro Rata Cancellation)**

Section IX., Conditions, (M) *Cancellation* is replaced by the following:

(M)  *Cancellation*

This POLICY:

(1)  may be cancelled at any time by the INSURED ORGANIZATION (except as provided in Condition (C)) by delivering written notice to the INSURER stating when thereafter cancellation shall be effective;

(2)  may not be cancelled by the INSURER, except for nonpayment of premium, in which case such cancellation shall be effective ten (10) days after the date notice thereof is given by the INSURER to the INSURED ORGANIZATION.

Notice provided in accordance with Condition (V) below shall be sufficient proof that notice has been given, and the POLICY PERIOD shall end on the effective date and hour of cancellation, as stated above.

In the event of cancellation by the INSURED ORGANIZATION or the INSURER, the INSURER shall retain the pro-rata proportion of the Rated Premium stated in Item 4 of the Declarations and the pro-rata unearned Continuity Credit.

_____
Signature of Authorized Representative



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. <u>30</u>                                                  Effective date of Endorsement <u>May 20, 2017</u>

Attached to and forming part of POLICY No.  <u>DP5008417P</u>

INSURED ORGANIZATION   <u>PG&E Corporation</u>

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

**CONDITION (Q) CONSTRUCTION AMENDED**
**(Silent on Jurisdiction)**

Section IX., Conditions, (Q) *Construction* is deleted in its entirety and replaced by the following:

(Q) *Construction*

The terms of this POLICY are to be construed in an evenhanded fashion as between the INSURED ORGANIZATION, the DIRECTORS or OFFICERS and the INSURER.  Any claim for coverage of punitive, exemplary or multiple damages shall be governed by the law of the jurisdiction that is most favorable to the insurability of such damages, provided such jurisdiction has a substantial relationship to the involved DIRECTORS or OFFICERS, the INSURED ORGANIZATION, or the CLAIM giving rise to such damages.  Where the language of this POLICY is deemed to be ambiguous or otherwise unclear, the issue shall be resolved in a manner most consistent with the relevant terms of this POLICY without regard to authorship of the language and without any presumption or arbitrary interpretation or construction in favor of either the INSURED ORGANIZATION, the DIRECTORS or OFFICERS or the INSURER.  In deciding any controversy or dispute arising out of or relating to this POLICY, due consideration shall be given to the customs and usages of the insurance industry.  No damages in excess of compensatory damages shall be awarded in any controversy or dispute between the INSURER, on the one hand, and the INSURED ORGANIZATION and/or the DIRECTORS and OFFICERS, on the other hand, and each party hereby irrevocably waives any such damages.

_____
Signature of Authorized Representative

# EXHIBIT G

# DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY

**THIS IS A "CLAIMS-FIRST-MADE" INSURANCE POLICY, THAT MAY BE DIFFERENT FROM OTHER POLICIES INCLUDING OTHER CLAIMS-MADE POLICIES. PLEASE READ IT CAREFULLY.**

*Words and phrases which appear in all capital letters have the special meanings set forth in Section VI. Definitions*



**AEGIS®**
Associated Electric
& Gas Insurance
Services Limited
Hamilton, Bermuda

# DECLARATIONS

**POLICY NO.** DP5008418P
**DECLARATIONS NO.** 1

**Item 1:** INSURED ORGANIZATION:

PG&E Corporation
77 Beale Street
PO Box 770000
San Francisco, CA 94177

**Item 2:** POLICY PERIOD: From: May 20, 2018 To: May 20, 2019
(12:01 A.M. Local Time at the address in Item 1.)

**Item 3:** Prior or Pending Litigation Date: October 1, 1905

**Item 4:** Rated Premium:
Policy Premium: ████████

**Item 5:** Limits of Liability:

A.  $25,000,000    Aggregate Limit of Liability for the POLICY PERIOD and DISCOVERY PERIOD, if purchased

B.  $350,000    For all INVESTIGATIVE EXPENSE for the POLICY PERIOD and DISCOVERY PERIOD, if purchased

**Item 6:** RETENTION:

A.  Insuring Agreement I.(A).    $0

B.  Insuring Agreement I.(B). or I.(C).    $10,000,000 each CLAIM

©1975-2015 ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED (AEGIS).
AEGIS AND THE AEGIS LOGO ARE THE REGISTERED SERVICE MARKS OF AEGIS IN THE U.S., E.U., BERMUDA, CANADA AND NEW ZEALAND.
PRINT - 06/01/2018 12:57:17

Case: 19-30088    Doc# 5754-19    Filed: 01/14/20    Entered: 01/14/20 15:26:59    Page 2 of
342    4524



# DECLARATIONS
### continued

**Item 7:** DISCOVERY PERIOD:

Premium:     █████████████████████

Duration:     commencing on the effective date of cancellation or non-renewal and ending 12 months after such date

**Item 8:** Any notice to be provided or any payment to be made hereunder to the INSURED ORGANIZATION shall be made to:

| | |
|---|---|
| ENTITY | PG&E Corporation |
| NAME | Ms. Janaize Markland |
| TITLE | Director, Enterprise and Operational Risk Management and Insurance |
| ADDRESS | 77 Beale Street |
| | PO Box 770000 |
| | San Francisco CA 94177 |

**Item 9:** Any notice to be provided or any payment to be made hereunder to the INSURER shall be made to:

| | |
|---|---|
| NAME | AEGIS Insurance Services, Inc. |
| ADDRESS | 1 Meadowlands Plaza |
| | East Rutherford, NJ 07073 |
| CLAIMS | Submit a claim through My AEGIS at www.aegislink.com |

**ENDORSEMENTS ATTACHED AT POLICY ISSUANCE: 1-40**

Countersigned at **East Rutherford, New Jersey**

On _____ June 1, 2018 _____

**AEGIS Insurance Services, Inc.**

By _____
                          Authorized Representative



# POLICY OF DIRECTORS AND OFFICERS LIABILITY INSURANCE EFFECTED WITH ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED HAMILTON, BERMUDA

THIS IS A "CLAIMS-FIRST-MADE" INSURANCE POLICY THAT MAY BE DIFFERENT FROM OTHER POLICIES INCLUDING OTHER CLAIMS-MADE POLICIES. PLEASE READ IT CAREFULLY.

*Words and phrases that appear in all capital letters have the special meanings set forth in Section VI. Definitions*

In consideration of the payment of premium, and in reliance upon all statements made and information furnished to the INSURER in the APPLICATION, which is hereby made a part hereof, and subject to the Declarations and all the terms hereinafter provided, the INSURER agrees as follows:

## I. INSURING AGREEMENT

(A) The INSURER shall pay on behalf of the DIRECTORS and OFFICERS all ULTIMATE NET LOSS for which the INSURED ORGANIZATION has not provided indemnification and which arises from a CLAIM first made against the DIRECTORS or OFFICERS during the POLICY PERIOD or during the DISCOVERY PERIOD, if purchased, for a WRONGFUL ACT which takes place before or during the POLICY PERIOD and is actually or allegedly caused, committed or attempted by the DIRECTORS or OFFICERS while acting in their respective capacities as DIRECTORS or OFFICERS.

(B) The INSURER shall pay on behalf of the INSURED ORGANIZATION all ULTIMATE NET LOSS for which the INSURED ORGANIZATION has, to the extent required or permitted by applicable law, granted indemnification to the DIRECTORS and OFFICERS and which arises from a CLAIM first made against the DIRECTORS or OFFICERS during the POLICY PERIOD or during the DISCOVERY PERIOD, if purchased, for a WRONGFUL ACT which takes place before or during the POLICY PERIOD and is actually or allegedly caused, committed or attempted by such DIRECTORS or OFFICERS while acting in their respective capacities as DIRECTORS or OFFICERS.

(C) The INSURER shall pay on behalf of the INSURED ORGANIZATION all ULTIMATE NET LOSS which arises from a SECURITIES CLAIM first made against the INSURED ORGANIZATION during the POLICY PERIOD or during the DISCOVERY PERIOD, if purchased, for a WRONGFUL ACT which takes place before or during the POLICY PERIOD.

## II. DERIVATIVE INVESTIGATION COST COVERAGE

The INSURER shall pay all INVESTIGATIVE EXPENSE incurred by an independent committee of the board of directors or equivalent governing body of the INSURED ORGANIZATION in response to a SHAREHOLDER DERIVATIVE DEMAND, provided the SHAREHOLDER DERIVATIVE DEMAND is first made during the POLICY PERIOD or the DISCOVERY PERIOD, if purchased, and the alleged WRONGFUL ACT giving rise to the SHAREHOLDER DERIVATIVE DEMAND takes place before or during the POLICY PERIOD.

## III. LIMITS OF LIABILITY

(A) The INSURER'S maximum liability under this POLICY for all ULTIMATE NET LOSS and INVESTIGATIVE EXPENSE, combined, shall be the aggregate Limit of Liability set forth in Item 5A of the Declarations. The aggregate Limit of Liability applies to all CLAIMS first made during the POLICY PERIOD and the DISCOVERY PERIOD, if purchased.

(B) The INSURER'S maximum liability under this POLICY for all INVESTIGATIVE EXPENSE shall not exceed the amount set forth in Item 5B of the Declarations. Any amount paid by the INSURER for INVESTIGATIVE EXPENSE shall be part of and not in addition to the aggregate Limit of Liability stated in Item 5A of the Declarations.

©1975-2017 ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED (AEGIS)
AEGIS and the AEGIS logo are registered service marks of AEGIS in the U.S. and/or Canada and in other jurisdictions.

Case: 19-30088    Doc# 577    Filed: 08/14/20   Entered: 08/14/20 15:56:59    Page 344 of 524
PRINTED 01/25/2018 12:57:17



(C) The aggregate Limits of Liability stated in Items 5A and 5B of the Declarations shall apply only once regardless of the number of CLAIMS or WRONGFUL ACTS.

(D) The inclusion herein of more than one DIRECTOR or OFFICER, or the application of more than one Insuring Agreement or Coverage Extension, shall not operate to increase the INSURER'S aggregate Limits of Liability as stated in Items 5A and 5B of the Declarations.

(E) If any WRONGFUL ACT by a DIRECTOR or OFFICER while serving an OUTSIDE ORGANIZATION results in a payment of ULTIMATE NET LOSS or INVESTIGATIVE EXPENSE under this POLICY and a payment of loss under any other directors or officers or general partner liability insurance policy issued by the INSURER, then the maximum amount that the INSURER shall pay under this POLICY and all such other policies, combined, for the WRONGFUL ACT and all related actual or alleged breaches, neglect, errors and omissions shall be $35,000,000. The maximum amount that the INSURER shall pay under this POLICY shall be the amount of such ULTIMATE NET LOSS that is proportionate to the aggregate Limit of Liability stated in Item 5A of the Declarations of this POLICY in relation to the total limits of liability stated under this POLICY and such other policies, combined. This paragraph creates a sublimit which further limits and does not increase the INSURER'S maximum liability under this POLICY or such other policies.

IV. **RETENTION**

(A) The INSURER shall be liable to the INSURED ORGANIZATION under this POLICY only for the amount of ULTIMATE NET LOSS which is in excess of the RETENTION set forth in Item 6B of the Declarations.

(B) The INSURED ORGANIZATION agrees to indemnify and advance on behalf of the DIRECTORS and OFFICERS all ULTIMATE NET LOSS otherwise covered under this POLICY to the fullest extent required or permitted by applicable law. If an INSURED ORGANIZATION fails or refuses within sixty (60) days after a DIRECTOR'S or OFFICER'S request to indemnify or advance ULTIMATE NET LOSS or if an INSURED ORGANIZATION is financially unable to indemnify or advance ULTIMATE NET LOSS, then the INSURER will be liable to the DIRECTORS and OFFICERS under this POLICY only for the amount of ULTIMATE NET LOSS which is in excess of the RETENTION set forth in Item 6A of the Declarations. If the INSURER pays under this POLICY any ULTIMATE NET LOSS that the INSURED ORGANIZATION is required or permitted by applicable law to advance or indemnify a DIRECTOR or OFFICER, then the INSURED ORGANIZATION shall reimburse the INSURER for such amounts up to the RETENTION set forth in Item 6B of the Declarations, and such amounts shall become immediately due and payable as a direct obligation of the INSURED ORGANIZATION to the INSURER.

(C) No RETENTION shall apply to Section II., Derivative Investigation Cost Coverage, and the INSURER will pay such amounts from the first dollar subject to the other terms and conditions of this POLICY.

(D) If more than one Insuring Agreement applies to any CLAIM, then the maximum RETENTION amount applicable to such CLAIM shall be the largest RETENTION applicable to such CLAIM.

(E) Only payment of INDEMNITY or DEFENSE COSTS which, except for the amount thereof, would have been payable under this POLICY may reduce or exhaust the RETENTION.

V. **PRIORITY OF PAYMENTS**

If payment is due and owing under this POLICY for ULTIMATE NET LOSS or INVESTIGATIVE EXPENSE and such ULTIMATE NET LOSS or INVESTIGATIVE EXPENSE, together with any prior payments of ULTIMATE NET LOSS and INVESTIGATIVE EXPENSE, exceeds the applicable Limits of Liability, the INSURER shall pay such ULTIMATE NET LOSS or INVESTIGATIVE EXPENSE, subject to the remaining applicable Limit of Liability, in the following order:

(A) First, the INSURER shall pay such ULTIMATE NET LOSS covered by Insuring Agreement I.(A);

Case: 19-30088　Doc# 5374-10　Filed: 09/14/20　Entered: 09/14/20 15:56:59　Page 345 of 524



(B) Second, only if and to the extent the payment under V.(A) above does not exhaust the applicable Limit of Liability, the INSURER shall pay any other ULTIMATE NET LOSS or INVESTIGATIVE EXPENSE covered by this POLICY.

If DIRECTORS or OFFICERS incur ULTIMATE NET LOSS covered under Insuring Agreement I.(A), the INSURED ORGANIZATION, including any bankruptcy trustee, debtor-in-possession or any other successor of the INSURED ORGANIZATION, shall have no interest in or claim for any payments under this POLICY until all such ULTIMATE NET LOSS is paid in full by the INSURER.

Subject to the foregoing paragraph, the INSURER shall, upon receipt of a written request from either the chairman of the board of directors or chief executive officer of the INSURED ORGANIZATION named in Item 1 of the Declarations, delay any payment of ULTIMATE NET LOSS due and owing to an INSURED ORGANIZATION under this POLICY until such time as said chairman or chief executive officer designates, provided the INSURER'S liability with respect to any such ULTIMATE NET LOSS payment shall not be increased, and shall not include any interest, on account of such delay.

VI. **DEFINITIONS**

As used in this POLICY, the words and phrases, either in the singular or plural, which appear in all capital letters shall have the meanings set forth below:

(A) APPLICATION means, unless stated otherwise:

(1) the Application submitted by the INSURED ORGANIZATION to the INSURER for this POLICY, including any materials submitted with, attached to or incorporated by reference into such Application and any other documentation, information, warranty or representation submitted to the INSURER in connection with underwriting this POLICY; and

(2) all publicly available documents filed by the INSURED ORGANIZATION with the Securities and Exchange Commission during the twelve (12) months preceding the inception of this POLICY.

(B) CLAIM means:

(1) any written demand against any INSURED for monetary, non-monetary, injunctive or other relief, including a written demand that the INSURED toll or waive a statute of limitation;

(2) a civil or arbitration proceeding against any INSURED for monetary, non-monetary, injunctive or other relief commenced by service of a complaint or similar pleading;

(3) a criminal proceeding against any INSURED commenced by the return of an indictment, information or similar document;

(4) a formal administrative or regulatory proceeding against any DIRECTORS or OFFICERS commenced by the filing of a notice of charges, formal investigative order or similar document;

(5) a civil, criminal, administrative or regulatory investigation of any DIRECTORS or OFFICERS commenced by the service upon or other receipt by the DIRECTOR or OFFICER of a subpoena, target letter, Wells Notice or other written notice from an ENFORCEMENT AUTHORITY identifying by name the DIRECTOR or OFFICER as an individual against whom a civil, criminal, administrative or regulatory proceeding may be commenced;

(6) a written request or subpoena from an ENFORCEMENT AUTHORITY or an INSURED ORGANIZATION to interview or depose a DIRECTOR or OFFICER, or for the production of documents by a DIRECTOR or OFFICER, in connection with a proceeding against or investigation of any other DIRECTOR or OFFICER or the INSURED ORGANIZATION, whether or not such request or subpoena alleges a WRONGFUL ACT; provided such request or subpoena shall constitute a CLAIM under this POLICY only if (i) it is not part of a routine or regularly scheduled audit, inspection or general oversight or compliance activity, and (ii) the

Case: 19-30088    Doc# 5374-10    Filed: 09/11/20    Entered: 09/11/20 15:56:59    Page 346 of 524



INSURED ORGANIZATION gives to the INSURER written notice thereof pursuant to Condition (E) below; or

(7) for purposes of the coverage provided under Section II., Derivative Investigation Cost Coverage, a SHAREHOLDER DERIVATIVE DEMAND.

A NOTICE OF CIRCUMSTANCES is not a CLAIM, but a CLAIM shall be deemed to be first made at the earlier of: (a) the time at which any written demand described in (1) above is first made against the INSURED or any proceeding or investigation described in (2), (3), (4) or (5) above is commenced; (b) the time at which a SHAREHOLDER DERIVATIVE DEMAND related to the CLAIM is first made; (c) the time at which the written notice or subpoena described in (6) above is received by the DIRECTOR or OFFICER; or (d) the time at which a complete NOTICE OF CIRCUMSTANCES which describes the matters underlying the CLAIM has been given to the INSURER. The INSURER shall not be liable under this POLICY for any amount incurred in the defense, investigation or settlement of any potential CLAIM described in a NOTICE OF CIRCUMSTANCES prior to the date the CLAIM is actually made against INSUREDS. Except as provided in Section II., Derivative Investigation Cost Coverage, this POLICY does not cover any amount incurred by the INSUREDS in connection with any proceeding or investigation that is not then a CLAIM against the INSUREDS, even if such amount also benefits the defense of a covered CLAIM or if such proceeding or investigation subsequently gives rise to a covered CLAIM.

Multiple CLAIMS arising out of a single WRONGFUL ACT shall be deemed to be a single CLAIM, even if made against different INSUREDS, and shall be deemed to have been first made on the date the first of such multiple CLAIMS is first made against any of the INSUREDS, whether such date is before, during or after the POLICY PERIOD or the DISCOVERY PERIOD.

(C) DEFENSE COSTS means all reasonable and necessary fees and expenses incurred by or on behalf of the INSUREDS in the investigation, negotiation, settlement and defense of any CLAIM, including such fees and expenses and the premium or origination fee for a loan or bond incurred by DIRECTORS and OFFICERS in connection with the actual or alleged obligation by the DIRECTOR or OFFICER to repay or forfeit amounts pursuant to Section 304(a) of the Sarbanes-Oxley Act of 2002, Section 954 of the Wall Street Reform and Consumer Protection Act of 2010, or any similar law, rule or regulation. DEFENSE COSTS do not include (i) INVESTIGATIVE EXPENSE resulting from a SHAREHOLDER DERIVATIVE DEMAND, or (ii) salaries, wages, benefits and overhead expenses of the DIRECTORS, OFFICERS or employees of the INSURED ORGANIZATION.

(D) DIRECTOR and OFFICER means:

(1) any natural person who was, is now, or shall be a director, officer or trustee of the INSURED ORGANIZATION;

(2) any employee of the INSURED ORGANIZATION while acting in the capacity of a director, officer or trustee of the INSURED ORGANIZATION with the express prior authorization of a director, officer or trustee of the INSURED ORGANIZATION;

(3) any natural person who was, is now, or shall be a manager, managing member, member of the board of managers or equivalent executive of an INSURED ORGANIZATION that is a limited liability company;

(4) any employee of the INSURED ORGANIZATION while serving as the general counsel or risk manager of, or in a functionally equivalent position with, the INSURED ORGANIZATION;

(5) any natural person who was, is now, or shall be a general partner of an INSURED ORGANIZATION that is a limited partnership;

(6) any natural person not described in paragraphs (1), (2), (3), (4) or (5) above who was, is now, or shall be an employee of the INSURED ORGANIZATION, but solely with respect to a SECURITIES CLAIM;

Case: 19-03039 Doc# 5374-10 Filed: 09/14/20 Entered: 09/14/20 15:56:59 Page 347 of 524



(7) any director, officer, trustee or employee of the INSURED ORGANIZATION who is serving or has served at the specific request of the INSURED ORGANIZATION as a director, officer, trustee or in an equivalent position of any OUTSIDE ORGANIZATION;

(8) the estates, heirs, legal representatives or assigns of any person identified in paragraphs (1), (2), (3), (4), (5), (6) or (7) above in the event of such person's death, incompetency, insolvency or bankruptcy, but only with respect to such person's WRONGFUL ACTS that occurred when such person was a DIRECTOR or OFFICER pursuant to paragraphs (1), (2), (3), (4), (5), (6) or (7), above;

(9) the lawful spouse or domestic partner of any DIRECTOR or OFFICER described in paragraphs (1), (2), (3), (4), (5), (6) or (7) above, but only if and to the extent the CLAIM is against both such DIRECTOR or OFFICER and the spouse or domestic partner and if the CLAIM against the lawful spouse or domestic partner is solely by reason of (a) such spousal or domestic partner status, or (b) such spouse's or domestic partner's ownership interest in property or assets which are sought as recovery for WRONGFUL ACTS of such DIRECTOR or OFFICER; or

(10) any employee of the INSURED ORGANIZATION who was, is now, or shall be serving at the specific written request of the INSURED ORGANIZATION in the position of a "designated representative," "alternate designated representative," "authorized account representative," "certifying official" or "responsible officer" of the INSURED ORGANIZATION as defined by and pursuant to the requirements of Titles I, II, IV and V of the Clean Air Act (42 U.S.C. Sections 7401-7431, 7521-7554, 7651-7651o, 7661-7661f) or the regulations promulgated thereunder, as amended from time to time, or in a comparable provision under any state law that is substantially the same as such federal law, with respect to WRONGFUL ACTS committed while such employee is acting in such capacity. This subsection 10 includes such employee as a DIRECTOR or OFFICER but does not otherwise expand the scope of coverage provided by this POLICY.

In no event, however, shall the estates, heirs, legal representatives, assigns, spouse or domestic partner identified in paragraphs (8) or (9) above be deemed to be a DIRECTOR or OFFICER in respect of a breach of duty, neglect, error, misstatement, misleading statement or omission actually or allegedly caused, committed or attempted by such estates, heirs, legal representatives, assigns, spouse or domestic partner.

DIRECTOR and OFFICER shall be deemed to include a natural person serving in a position with a non-U.S. entity that is functionally the equivalent, with substantially similar duties, of the director, officer or trustee position of the INSURED ORGANIZATION.

(E) DISCOVERY PERIOD means the period of time specified in Item 7 of the Declarations, if purchased as provided in Condition (L).

(F) ENFORCEMENT AUTHORITY means any federal, state, local or foreign law enforcement or governmental authority (including the U.S. Department of Justice, the U.S. Securities and Exchange Commission and any federal or state attorney general) or the enforcement unit of any securities exchange or similar self-regulatory body.

(G) FINANCIAL IMPAIRMENT means that an entity is subject to (i) a Federal bankruptcy proceeding, (ii) any comparable proceeding for the reorganization, rehabilitation, liquidation or conservatorship of the subject entity, (iii) any other proceeding for the protection of creditors or relief of debtors generally, or (iv) a court order or statutory provision that stays, freezes or enjoins the disposition or impairment of all assets of the entity.

(H) FOR-PROFIT OUTSIDE ORGANIZATION means any organization or JOINT VENTURE other than the INSURED ORGANIZATION or a NOT-FOR-PROFIT OUTSIDE ORGANIZATION if:

Case: 19-30088   Doc# 5374-10   Filed: 01/14/20   Entered: 01/14/20 15:56:59   Page 348 of 524



(1) the operations of such organization or JOINT VENTURE are related to, arise from or are associated with the production, transmission, delivery or furnishing of electricity, gas, water or sewer service to the public or the conveyance of telephone messages for the public and the total assets of such organization or JOINT VENTURE are not greater than 15% of the total consolidated assets of the INSURED ORGANIZATION first named in Item 1 of the Declarations as reported in such INSURED ORGANIZATION'S then most recent audited consolidated financial statement; or

(2) such organization or JOINT VENTURE and the DIRECTORS or OFFICERS serving in such organization or JOINT VENTURE are listed in a schedule of FOR-PROFIT OUTSIDE ORGANIZATIONS attached to this POLICY or to a prior Directors and Officers Liability Policy issued by the INSURER to the INSURED ORGANIZATION.

(I) INDEMNITY means all sums which the INSUREDS shall become legally obligated to pay as damages (including pre- and post-judgment interest), whether by adjudication, settlement or compromise, after making proper deductions for all recoveries, salvages and other valid and collectible insurance. Where permitted by law, INDEMNITY shall include exemplary, punitive and multiple damages awarded against the INSUREDS. For purposes of the foregoing sentence, the law that shall apply shall be the law of the jurisdiction that is most favorable to the insurability of such damages, provided such jurisdiction has a substantial relationship to the involved DIRECTORS or OFFICERS, the INSURED ORGANIZATION, or the CLAIM giving rise to such damages. INDEMNITY shall not include:

(1) fines or penalties, other than civil penalties assessed pursuant to Section 2(g)(2)(B) of the Foreign Corrupt Practices Act of 1977, 15 U.S.C. § 78dd-2(g)(2)(B);

(2) taxes, other than (i) taxes imposed upon an INSURED ORGANIZATION for which the DIRECTORS and OFFICERS are legally liable solely by reason of the INSURED ORGANIZATION'S insolvency, or (ii) taxes imposed upon a DIRECTOR or OFFICER solely by reason of the INSURER'S payment of ULTIMATE NET LOSS incurred by such DIRECTOR or OFFICER;

(3) any amount that represents or is substantially equivalent to an increase in the consideration paid or proposed to be paid by an INSURED ORGANIZATION in connection with its purchase of any securities or assets;

(4) any amount that represents disgorgement or restitution;

(5) any other amount that represents the repayment or forfeiture of compensation pursuant to Section 304(a) of the Sarbanes-Oxley Act of 2002, Section 954 of the Wall Street Reform and Consumer Protection Act of 2010 or any similar law, rule or regulation; or

(6) any amount that is uninsurable under applicable law;

provided the INSURER shall not assert that any ULTIMATE NET LOSS is disgorgement, restitution or uninsurable due to any actual or alleged violation of Section 11, 12 or 15 of the Securities Act of 1933, as amended.

(J) INSURED ORGANIZATION means, subject to Condition (C), hereof: (a) the organization(s) named in Item 1 of the Declarations and any SUBSIDIARIES of such organization(s), and (b) any trustee or debtor-in-possession in a bankruptcy proceeding in which the debtor is an organization(s) named in Item 1 of the Declarations or any SUBSIDIARIES of such organization(s).

(K) INSUREDS means the DIRECTORS and OFFICERS and, solely with respect to Insuring Agreements I.(B) and I.(C) and Section II., Derivative Investigation Cost Coverage, the INSURED ORGANIZATION.

(L) INSURER means Associated Electric & Gas Insurance Services Limited, Hamilton, Bermuda, a non-assessable mutual insurance company.

Case: 19-30088   Doc# 5374-10   Filed: 01/14/20   Entered: 01/14/20 15:56:59   Page
349 of 524

(M) INVESTIGATIVE EXPENSE means the reasonable and necessary fees and expenses (except all salaries, wages, benefit and overhead expenses of the DIRECTORS, OFFICERS, employees or the INSURED ORGANIZATION) incurred in connection with the investigation and evaluation of an actual or alleged WRONGFUL ACT by a DIRECTOR or OFFICER related to a SHAREHOLDER DERIVATIVE DEMAND.

(N) JOINT VENTURE means any joint venture, co-venture, joint lease, joint operating agreement or limited partnership (other than a limited liability partnership).

(O) NOT-FOR-PROFIT OUTSIDE ORGANIZATION means any not-for-profit organization that is exempt from Federal taxation pursuant to Section 501(c)(3) of the Internal Revenue Code of 1986 (as amended), any civic league or social welfare organization that is exempt pursuant to Section 501(c)(4), any business league or chambers of commerce that is exempt pursuant to Section 501(c)(6) or any political action committee that is exempt pursuant to Section 527, but does not include any Independent System Operator (ISO) or Regional Transmission Operator (RTO).

(P) NOTICE OF CIRCUMSTANCES means written notice by a DIRECTOR, OFFICER or the INSURED ORGANIZATION to the INSURER of any facts or circumstances involving an identified WRONGFUL ACT actually or allegedly caused, committed or attempted before or during the POLICY PERIOD by an INSURED, which facts or circumstances appear likely to give rise to a CLAIM, provided such notice includes full particulars regarding the actual or alleged WRONGFUL ACT, the nature of any alleged or potential injury, the names of potential claimants and the manner in which the DIRECTOR, OFFICER or the INSURED ORGANIZATION first became aware of such facts or circumstances.

(Q) OUTSIDE ORGANIZATION means any NOT-FOR-PROFIT OUTSIDE ORGANIZATION or any FOR-PROFIT OUTSIDE ORGANIZATION.

(R) POLICY means this insurance policy, including the APPLICATION, the Declarations and any endorsements issued by the INSURER to the organization first named in Item 1 of the Declarations for the POLICY PERIOD.

(S) POLICY PERIOD means the period of time stated in Item 2 of the Declarations. If the POLICY is cancelled prior to the expiration date of such period, the POLICY PERIOD shall end as of the effective date of cancellation.

(T) RETENTION means the respective amounts stated in Item 6 of the Declarations.

(U) SECURITIES CLAIM shall mean any CLAIM which alleges a violation of any law, regulation or rule regulating securities, whether statutory or common law, and which in whole or in part is:

(1) brought by any person or entity arising out of, based upon or attributable to the purchase or sale of, or offer or solicitation of an offer to purchase or sell, whether actual or alleged, any securities of the INSURED ORGANIZATION; or

(2) brought by a securities holder of the INSURED ORGANIZATION with respect to such securities holder's interest in the securities of the INSURED ORGANIZATION.

SECURITIES CLAIM shall include any criminal proceeding or any administrative or regulatory proceeding against the INSURED ORGANIZATION, but only if and only during the time that such proceeding is also commenced and continuously maintained against a DIRECTOR or OFFICER.

SECURITIES CLAIM for purposes of Insuring Agreement I.(C) shall not include any employment or compensation related CLAIM brought by a DIRECTOR or OFFICER or other employee of the INSURED ORGANIZATION.

(V) SHAREHOLDER DERIVATIVE DEMAND means a written demand by a securities holder of the INSURED ORGANIZATION upon the board of directors, or an equivalent governing body, of such

Case: 19-30088    Doc# 5374-10   Filed: 01/14/20   Entered: 01/14/20 15:56:59    Page
350 of 524



INSURED ORGANIZATION to bring a civil proceeding on behalf of an INSURED ORGANIZATION in a court of law against a DIRECTOR or OFFICER for a WRONGFUL ACT.

(W) SUBSIDIARY means any entity or JOINT VENTURE if the INSURED ORGANIZATION, directly or through one or more other SUBSIDIARIES has the right, pursuant to ownership of securities or financial interests or a written contract, by-laws, charter, operating agreement, joint venture or partnership agreement or similar document, to elect or appoint a majority of the directors or functionally equivalent or comparable executives of such entity or JOINT VENTURE.

(X) ULTIMATE NET LOSS means the total INDEMNITY and DEFENSE COSTS with respect to each CLAIM to which this POLICY applies. ULTIMATE NET LOSS does not include any amount allocated, pursuant to Condition (T), to claims against persons or entities not covered hereunder or to non-covered matters.

(Y) WRONGFUL ACT means any actual or alleged breach of duty, neglect, error, misstatement, misleading statement or omission actually or allegedly caused, committed or attempted by:

(1) any DIRECTOR or OFFICER while acting individually or collectively in their capacity as such, or, with respect to any DIRECTORS or OFFICERS of an INSURED ORGANIZATION that is not a partnership, any other matter claimed against them solely by reason of their being DIRECTORS or OFFICERS; or

(2) solely with respect to Insuring Agreement I.(C), an INSURED ORGANIZATION.

All breaches of duty, neglect, errors, misstatements, misleading statements or omissions actually or allegedly caused, committed or attempted by or claimed against one or more of the INSUREDS having as a common nexus any single or series of related facts, circumstances, situations, events, transactions or causes shall be deemed to be a single WRONGFUL ACT.

## VII. **EXCLUSIONS**

The INSURER shall not be liable to make any payment for ULTIMATE NET LOSS or INVESTIGATIVE EXPENSE arising from any CLAIM made against any INSURED:

(A) where, at inception of the Policy Period for the first Directors and Officers Liability Insurance Policy issued by the INSURER to the INSURED ORGANIZATION (or any predecessor organization) and continuously renewed thereafter, such INSURED had knowledge of a fact or circumstance which was likely to give rise to such CLAIM and such fact or circumstance was not disclosed in the Application for such Policy or in the process of applying for such Policy; provided this exclusion shall not apply to any DIRECTOR or OFFICER who did not have such knowledge.

(B) based upon, arising out of or attributable to such INSURED:

(1) having gained in fact any personal profit, advantage or remuneration to which such INSURED was not legally entitled; or

(2) having committed in fact a deliberately fraudulent, dishonest, criminal or malicious act or omission or any knowing and intentional violation of any law, statute or regulation;

if established by a final, non-appealable adjudication in the underlying proceeding.

(C) for bodily injury, mental anguish, mental illness, emotional upset, sickness or disease sustained by any person, for death of any person or for physical injury to or destruction of tangible property or the loss of use thereof.

(D) for any injury arising out of:

(1) false arrest, wrongful detention or wrongful imprisonment or malicious prosecution;

Case: 19-00088   Doc# 3374-10   Filed: 08/14/20   Entered: 08/14/20 17:56:59   Page
351 of 524



(2) wrongful entry, wrongful eviction or other invasion of the right of private occupancy;

(3) any employment-related WRONGFUL ACT including but not limited to the actual or constructive termination of employment, demotion, failure to employ or promote, deprivation of a career opportunity, or employment discipline or evaluation in a manner which violates the laws or regulations of any jurisdiction, or which breaches any implied contract to continue employment; provided this exclusion (D)(3) shall not apply to any SECURITIES CLAIM arising out of such events;

(4) discrimination or sexual harassment;

(5) a publication or utterance:

    (a) of libelous, slanderous or other defamatory or disparaging material; or

    (b) in violation of an individual's right of privacy; or

(6) piracy, plagiarism, idea misappropriation under implied contract, or infringement of copyright, title or slogan, registered trade mark, service mark or trade name.

(E) for violation(s) of any responsibility, obligation or duty imposed upon fiduciaries by the Employee Retirement Income Security Act of 1974 or amendments thereto or by similar common or statutory law of the United States of America or any state or other jurisdiction.

(F) based upon, arising out of or attributable to the rendering of advice with respect to the interpreting of, or the handling of records in connection with the enrollment, termination or cancellation of employees under the INSURED ORGANIZATION'S group life insurance, group accident or health insurance, pension plans, employee stock subscription plans, workers' compensation, unemployment insurance, social security, disability benefits and any other employee benefit programs.

(G) based upon, arising out of or attributable to any circumstance, written notice of which was given prior to the inception of this POLICY under any Directors and Officers Liability Insurance Policy (whether issued by the INSURER or any other carrier) or any DISCOVERY PERIOD thereof; provided the insurer of such other policy does not reject such notice as invalid.

(H) based upon, arising out of or attributable to (1) any written demand, suit or other formal proceeding pending against, or any order, decree or judgment entered for or against, any INSURED in its capacity as such on or prior to the Prior or Pending Litigation Date specified in Item 3 of the Declarations, or (2) the same or essentially the same facts or circumstances underlying or alleged in such written demand, suit or other proceeding, order, decree or judgement.

(I) for any WRONGFUL ACT by any SUBSIDIARY or its DIRECTORS or OFFICERS that took place prior to the date on which the entity became a SUBSIDIARY.

(J) brought by or on behalf of the INSURED ORGANIZATION, unless such CLAIM is:

(1) brought derivatively by a security holder of the INSURED ORGANIZATION who, while such CLAIM is made and maintained, is acting independently of, and without the active and voluntary solicitation, assistance, participation or intervention of any DIRECTOR or OFFICER; provided that conduct by a DIRECTOR or OFFICER that is protected pursuant to Section 806 of the Sarbanes-Oxley Act of 2002, Section 922 of the Wall Street Reform and Consumer Protection Act of 2010 or any similar whistleblower law, statute, rule or regulation shall not constitute solicitation, assistance, participation or intervention by such DIRECTOR or OFFICER for purposes of this paragraph (1);

(2) brought and maintained solely and entirely in a jurisdiction other than the United States of America, its territories and possessions, and subject to the substantive and procedural laws of such foreign jurisdiction; or

Case: 19-00088    Doc# 5-374-10  Filed: 08/14/20  Entered: 08/14/20 15:56:59  Page 352 of 524

(3) brought and maintained by or on behalf of a bankruptcy or insolvency trustee, receiver, liquidator, conservator, examiner or creditors' committee of an INSURED ORGANIZATION or any assignee of such trustee, receiver, liquidator, conservator, examiner or creditors' committee; provided this exception (3) does not apply to CLAIMS brought or maintained by or on behalf of a debtor-in-possession;

provided this Exclusion (J) shall not apply to DEFENSE COSTS otherwise covered under Insuring Agreement I.(A).

(K) with respect to any CLAIM in connection with a DIRECTOR'S or OFFICER'S service for an OUTSIDE ORGANIZATION, bought or maintained by or on behalf of such OUTSIDE ORGANIZATION, unless such CLAIM is:

(1) a derivative action brought or maintained on behalf of the OUTSIDE ORGANIZATION by one or more persons who are not directors, officers or trustees of such OUTSIDE ORGANIZATION and who bring and maintain the CLAIM totally independently of and without the solicitation, direction, assistance, participation or intervention of the OUTSIDE ORGANIZATION or any director, officer or trustee thereof; provided, however, that conduct by a director, officer or trustee of the OUTSIDE ORGANIZATION that is protected pursuant to Section 806 of the Sarbanes-Oxley Act of 2002, Section 922 of the Wall Street Reform and Consumer Protection Act of 2010 or any similar whistleblower statute, rule or regulation shall not constitute solicitation, assistance, participation or intervention by such person for purposes of this paragraph (1);

(2) brought or maintained solely and entirely in a jurisdiction other than the United States of America, its territories and possessions, and subject to the substantive and procedural laws of such foreign jurisdiction; or

(3) brought or maintained by or on behalf of bankruptcy or insolvency trustee, receiver, liquidator or conservator, creditors' committee or similar official or body of an OUTSIDE ORGANIZATION or any assignee of such trustee, receiver, liquidator, conservator, creditors' committee, official or body; provided this exception (3) does not apply to CLAIMS brought or maintained by or on behalf of a debtor-in-possession.

(L) based upon, arising out of or attributable to such DIRECTOR'S or OFFICER'S activities as a director, officer or trustee of any entity other than:

(1) the INSURED ORGANIZATION; or

(2) any OUTSIDE ORGANIZATION, as provided in Definition (D)(7).


VIII. **REPRESENTATIONS**

(A) In issuing this POLICY, the INSURER has relied upon the statements, representations and information in the APPLICATION. Each INSURED acknowledges and agrees that the statements, representations and information in the APPLICATION (1) are true and accurate to the best of such INSURED'S knowledge and belief, and (2) are material to the INSURER'S acceptance of the risk to which this POLICY applies.

(B) The APPLICATION shall be construed as a separate APPLICATION for coverage by each DIRECTOR and OFFICER and the INSURED ORGANIZATION. With respect to the statements, representations and information in such APPLICATION, no knowledge possessed by any one DIRECTOR or OFFICER or the INSURED ORGANIZATION shall be imputed to any other DIRECTOR or OFFICER for the purpose of determining coverage for such other DIRECTOR or OFFICER under this POLICY or the validity and enforceability of this POLICY by such other DIRECTOR or OFFICER.

Case: 19-30088   Doc# 5374-10   Filed: 01/14/20   Entered: 01/14/20 17:56:59   Page
353 of 524



(C) If the APPLICATION contains a statement, representation, omission or information that is materially false or inaccurate (a "misrepresentation"), then this POLICY shall be void from the beginning as to:

(1) any INSURED ORGANIZATION under Insuring Agreement I.(B) to the extent such INSURED ORGANIZATION indemnifies a DIRECTOR or OFFICER who knew the misrepresentation that was in the APPLICATION; and

(2) any INSURED ORGANIZATION and its SUBSIDIARIES under Insuring Agreement I.(B) or I.(C) and Section II., Derivative Investigation Cost Coverage, if the signer of the APPLICATION knew the misrepresentation was in the APPLICATION;

whether or not the DIRECTOR or OFFICER referenced in (C)(1) above knew the APPLICATION contained such misrepresentation.

(D) Without limiting the effect of Exclusions VII.(A) and (B), the INSURER agrees it will not rescind or void coverage under Insuring Agreement I.(A) in whole or in part for any reason.

## IX. **CONDITIONS**

(A) *Advancement of DEFENSE COSTS and INVESTIGATIVE EXPENSE*

Advancement by the INSURER of DEFENSE COSTS and INVESTIGATIVE EXPENSE shall be conditioned upon the DIRECTORS, OFFICERS or INSURED ORGANIZATION, as applicable, providing a satisfactory written undertaking to repay the INSURER, severally according to their respective interests, any DEFENSE COSTS or INVESTIGATIVE EXPENSE if and to the extent such DEFENSE COSTS or INVESTIGATIVE EXPENSE are finally established not to be covered by this POLICY.

(B) *Severability*

Except as provided in Section VIII., Representations, the acts, omissions, knowledge or warranties of a DIRECTOR or OFFICER shall not be imputed to any other DIRECTOR or OFFICER with respect to applying any Exclusion or otherwise determining coverage under this POLICY, and, with respect to SECURITIES CLAIMS against the INSURED ORGANIZATION, only acts, omissions, knowledge or warranties of the signer of the APPLICATION shall be imputed to such INSURED ORGANIZATION and its SUBSIDIARIES.

(C) *Acquisition, Merger and Dissolution*

(1) If after the inception of the POLICY PERIOD the INSURED ORGANIZATION acquires or creates a new SUBSIDIARY or acquires an entity by merger or consolidation, coverage under this POLICY automatically shall apply to such entity and its INSUREDS, but only for WRONGFUL ACTS taking place after such acquisition or merger.

However, if the total of all cash, securities, assumed indebtedness and other consideration paid by the INSURED ORGANIZATION in such merger or acquisition exceeds fifteen percent (15%) of the total consolidated assets of the INSURED ORGANIZATION first named in Item 1 of the Declarations as reported in such INSURED ORGANIZATION'S then most recent audited consolidated financial statement, then coverage for such entity and its INSUREDS shall cease no later than ninety (90) days after the effective date of such merger or acquisition, unless the INSURED ORGANIZATION reports such merger or acquisition to the INSURER within such ninety (90) day period together with such information as the INSURER may require, and the INSURER agrees by endorsement to this POLICY to extend coverage to such entity and its INSUREDS. Any such coverage extension past such ninety (90) day period will become effective only upon the payment of any additional premiums and acceptance of any additional terms and conditions as may be required by the INSURER.

Case: 19-00088   Doc# 5374-10   Filed: 08/14/20   Entered: 08/14/20 15:56:59   Page 354 of 524



(2) If during the POLICY PERIOD, any of the following events occurs:

    (a) the acquisition by another entity or affiliated group of all or substantially all of the assets of the INSURED ORGANIZATION first named in Item 1 of the Declarations, or the merger or consolidation of such INSURED ORGANIZATION into or with another entity such that such INSURED ORGANIZATION is not the surviving entity; or

    (b) the acquisition by any person, entity or affiliated group of persons or entities of securities or voting rights which results in such person, entity or affiliated group having the right to elect, appoint or designate at least fifty percent (50%) of the directors, trustees or persons holding equivalent positions of the INSURED ORGANIZATION first named in Item 1 of the Declarations;

then coverage under this POLICY shall continue until termination of the POLICY PERIOD and shall not be cancelable by the INSURED ORGANIZATION or the INSURER, but this POLICY will provide coverage only with respect to WRONGFUL ACTS occurring prior to such merger, consolidation or acquisition. The INSURED ORGANIZATION shall give written notice of such merger, consolidation or acquisition to the INSURER as soon as practicable together with such information as the INSURER may require. However, coverage under this POLICY will cease as of the effective date of such event with respect to WRONGFUL ACTS occurring after such event. The appointment of any receiver, trustee, examiner, conservator, liquidator, rehabilitator or similar official to take control of, supervise, manage or liquidate the INSURED ORGANIZATION due to FINANCIAL IMPAIRMENT shall not be considered an acquisition within the meaning of this paragraph (2).

(3) If an organization ceases to be a SUBSIDIARY, prior to or during the POLICY PERIOD, coverage with respect to such SUBSIDIARY and its INSUREDS shall continue until termination of the POLICY PERIOD, but only with respect to WRONGFUL ACTS occurring prior to the date such organization ceased to be a SUBSIDIARY.

(D) *Non-Duplication of Limits*

The maximum liability of the INSURER under this POLICY and the "Other Policy" (as defined below), combined, for all loss otherwise covered under this POLICY or the "Other Policy" resulting from the same or related CLAIMS, WRONGFUL ACTS, occurrences, facts, circumstances or situations shall be the largest then available limit of liability applicable to such loss under this POLICY or the "Other Policy". This Condition (D) shall not operate to increase the INSURER'S aggregate Limits of Liability as stated in Items 5A and 5B of the Declarations or as stated under the "Other Policy". This provision is intended to avoid the duplication of the INSURER'S aggregate limits of liability under this POLICY and the "Other Policy" for any related loss, and further reduces and does not increase the INSURER'S liability under this POLICY and the "Other Policy".

As used herein, "Other Policy" means any other policy or policies issued by the INSURER or any of the INSURER'S affiliates covering the INSURED ORGANIZATION or any DIRECTOR or OFFICER, provided that the "Other Policy" shall not include any such policies which are written specifically as excess of this POLICY. "Other Policy" does not include any General Partners, Fiduciary and Employee Benefits policy, Excess Liability Insurance policy, Excess Worker's Compensation Insurance policy or property insurance policies.

(E) *Reporting of Claims and Shareholder Derivative Demands*

As a condition precedent to any rights under this POLICY, the DIRECTORS, OFFICERS, INSURED ORGANIZATION, or the INSURED ORGANIZATION'S authorized representative shall give the INSURER written notice of any:

(1) CLAIM; or

(2) SHAREHOLDER DERIVATIVE DEMAND;

Case: 19-30088   Doc# 5374-10   Filed: 01/14/20   Entered: 01/14/20 15:56:59   Page
355 of 524



as soon as practicable after the General Counsel or Risk Manager of the INSURED ORGANIZATION first named in Item 1 of the Declarations first becomes aware of such CLAIM or SHAREHOLDER DERIVATIVE DEMAND. Notice of a CLAIM or SHAREHOLDER DERIVATIVE DEMAND shall include the nature of the WRONGFUL ACT, the alleged injury, the names of the claimants and the manner in which the DIRECTOR, OFFICER or INSURED ORGANIZATION first became aware of the CLAIM or SHAREHOLDER DERIVATIVE DEMAND.

The DIRECTORS, OFFICERS and the INSURED ORGANIZATION shall give the INSURER such additional information as the INSURER may reasonably require. Neither (1) the APPLICATION for this POLICY or any endorsement hereto, nor (2) any information contained in any of the foregoing shall constitute a notice of CLAIM or SHAREHOLDER DERIVATIVE DEMAND.

(F) *Defense, Cooperation and Settlement*

It shall be the duty of the INSUREDS and not the duty of the INSURER to investigate and defend CLAIMS made against the INSUREDS.

In the event of any CLAIM which may involve this POLICY, the INSUREDS may proceed immediately with settlement of such CLAIM where the aggregate ULTIMATE NET LOSS from such CLAIM does not exceed the applicable RETENTION. The INSURED ORGANIZATION shall notify the INSURER of any such settlement. If the aggregate ULTIMATE NET LOSS resulting from such settlement does exceed, or is expected to exceed, the RETENTION, the INSUREDS shall not cause the settlement to be made without the express prior written consent of the INSURER, provided that the INSURER'S consent shall not be unreasonably withheld.

The INSURER shall not be called upon to assume charge of the investigation, settlement or defense of any CLAIM, but the INSURER shall have the right and shall be given the opportunity to associate with the INSUREDS in the investigation, settlement, defense and control of any CLAIM that involves or may involve the INSURER. At all times, the INSUREDS and the INSURER shall cooperate in the investigation, settlement and defense of such CLAIM.

The INSUREDS shall, at all times, use diligence and prudence in the investigation, settlement and defense of CLAIMS.

(G) *Appeals*

In the event that the INSUREDS elect not to appeal a judgement in excess of the RETENTION, the INSURER may elect to conduct such appeal at its own cost and expense and shall be liable for any taxable court costs and interest incidental thereto, but in no event shall the total liability of the INSURER, exclusive of the cost and expense of appeal, exceed its Limit of Liability stated in Item 5A of the Declarations.

(H) *Subrogation*

In the event of any payment under this POLICY, the INSURER shall be subrogated to the extent of such payment to all rights of recovery therefor, including without limitation any right of recovery from the INSURED ORGANIZATION for indemnifiable ULTIMATE NET LOSS. The INSUREDS shall execute all papers required and shall do everything that may be necessary to enable the INSURER to bring suit in the name of the INSUREDS. The INSURER shall not exercise its rights of subrogation against a DIRECTOR or OFFICER under this POLICY unless Exclusion VII.(B) above applies to such DIRECTOR or OFFICER.

(I) *Bankruptcy or Insolvency*

The INSURER shall not be relieved of any of its obligations due to the FINANCIAL IMPAIRMENT of the INSURED ORGANIZATION.

Case: 19-30088    Doc# 5374-10   Filed: 01/14/20   Entered: 01/14/20 19:57:17    Page 94
356 of 524


If the INSURED ORGANIZATION shall become subject to a FINANCIAL IMPAIRMENT:

(1) the DIRECTORS, OFFICERS and the INSURED ORGANIZATION hereby (i) waive and release any automatic stay or injunction which may apply to this POLICY or its proceeds in such proceeding, and (ii) agree not to oppose or object to any efforts by the INSURER or any DIRECTOR or OFFICER or the INSURED ORGANIZATION to obtain relief from any such stay or injunction; and

(2) subject to all the terms of this POLICY and any applicable stay or injunction, the INSURER shall pay on behalf of the DIRECTORS and OFFICERS, under Insuring Agreement I.(A), ULTIMATE NET LOSS which would have been indemnified by the INSURED ORGANIZATION but for such FINANCIAL IMPAIRMENT. The INSURER shall be subrogated, to the extent of any payment, to the rights of the DIRECTORS and OFFICERS to receive indemnification from the INSURED ORGANIZATION for such ULTIMATE NET LOSS, but only up to the amount of the RETENTION applicable to Insuring Agreement I.(B).

(J) *Other Insurance*

This POLICY shall be in excess of and shall not contribute with any other valid and collectible insurance with any other Insurer that is available to the INSUREDS with respect to a CLAIM also covered by this POLICY, regardless of whether such insurance is issued before, concurrently with, or after inception of this POLICY, other than insurance that is issued specifically as insurance in excess of the insurance afforded by this POLICY.  Nothing herein shall be construed to make this POLICY subject to the terms of other insurance.

The coverage provided by this POLICY for any DIRECTOR or OFFICER who serves as a director, officer or trustee of any OUTSIDE ORGANIZATION shall be specifically excess of any other indemnification and insurance available to such DIRECTOR or OFFICER from the OUTSIDE ORGANIZATION. Such coverage shall not be construed to extend to the OUTSIDE ORGANIZATION, nor to any other director, officer or trustee of the OUTSIDE ORGANIZATION.

(K) *Changes and Assignment*

The terms of this POLICY shall not be waived or changed, nor shall an assignment of interest be binding, except by an endorsement to this POLICY issued by the INSURER.

(L) *Discovery Period*

In the event of cancellation or nonrenewal of the POLICY by the INSURED ORGANIZATION first named in Item 1 of the Declarations or nonrenewal of this POLICY by the INSURER, the INSURED ORGANIZATION and the DIRECTORS and OFFICERS shall have the right, upon payment of an additional premium to be determined by the INSURER (which shall not exceed the amount stated in Item 7 of the Declarations and shall be fully earned by the INSURER at the time of purchase), to an extension of the coverage afforded by this POLICY with respect to any CLAIM first made against any INSUREDS, or any NOTICE OF CIRCUMSTANCES given to the INSURER, during the period stated in Item 7 of the Declarations, but only with respect to any WRONGFUL ACT committed prior to the end of the POLICY PERIOD. This right of extension shall terminate unless written notice of such election is received by the INSURER within thirty (30) days after the effective date of cancellation or nonrenewal. The Limits of Liability under this POLICY shall not be increased by any DISCOVERY PERIOD.

The offer by the INSURER of renewal on terms, conditions or premiums different from those in effect during the POLICY PERIOD shall not be considered to be a cancellation or refusal to renew this POLICY.

Case: 19-30088    Doc# 5374-10   Filed: 01/14/20   Entered: 01/14/20 15:56:59   Page
357 of 524

(M) *Cancellation*

This POLICY:

(1) may be cancelled at any time by the INSURED ORGANIZATION first named in Item 1 of the Declarations (except as provided in Condition (C)) by delivering written notice to the INSURER stating when thereafter cancellation shall be effective; in which case the INSURER shall retain a short rate portion of the Rated Premium amount stated in Item 4 of the Declarations of this POLICY and a short rate portion of the unearned Continuity Credit;

(2) may not be cancelled by the INSURER, except for nonpayment of premium, in which case (i) such cancellation shall be effective ten (10) days after the date notice thereof is given by the INSURER to the INSURED ORGANIZATION first named in Item 1 of the Declarations, and (ii) the INSURER shall retain a pro-rata proportion of the Rated Premium stated in Item 4 of the Declarations and the pro-rata unearned Continuity Credit.

Proof that notice has been provided in accordance with Condition (V) below shall be sufficient proof notice has been given, and the POLICY PERIOD shall end on the effective date and hour of cancellation, as stated above.

(N) *Currency*

All amounts stated herein are expressed in United States Dollars and all amounts payable hereunder are payable in United States Dollars.

(O) *Sole Agent*

The INSURED ORGANIZATION first named in Item 1 of the Declarations shall be deemed the authorized representative of each DIRECTOR and OFFICER and all INSURED ORGANIZATIONS for the purposes of requesting or agreeing to any endorsement to this POLICY, making premium payments and adjustments and receiving notifications, including notice of cancellation from the INSURER.

(P) *Dispute Resolution and Service of Suit*

Any controversy or dispute between the INSURER and the INSURED ORGANIZATION arising out of or relating to this POLICY, or the breach, termination, formation or validity thereof, shall be resolved in accordance with the procedures specified in this Condition (P), which shall be the sole and exclusive procedures for the resolution of any such controversy or dispute.

(1) Negotiation. The INSURED ORGANIZATION and the INSURER (each a "party") shall attempt in good faith to resolve any controversy or dispute arising out of or relating to this POLICY promptly by negotiations between executives who have authority to settle the controversy. Any party may give the other party written notice of any dispute not resolved in the normal course of business. Within fifteen (15) days the receiving party shall submit to the other a written response. The notice and the response shall include: (a) a statement of each party's position and a summary of arguments supporting that position; and (b) the name and title of the executive who will represent that party and of any other person who will accompany the executive. Within thirty (30) days after delivery of the disputing party's notice and thereafter, as often as they reasonably deem necessary, the executives of both parties shall meet at a mutually acceptable time and place, to attempt to resolve the dispute. All reasonable requests for information made by one party to the other will be honored. If the matter has not been resolved within sixty (60) days of the disputing party's notice, or if the parties fail to meet within thirty (30) days, either party may initiate mediation of the controversy or claim as provided hereinafter.

All negotiations pursuant to this clause will be kept confidential and shall be treated as compromise and settlement negotiations for purposes of the Federal Rules of Evidence and state rules of evidence.

Case: 19-30088    Doc# 5374-10    Filed: 01/14/20    Entered: 01/14/20 15:56:59    Page
358 of 524

(2) Mediation. If the dispute between the INSURER and the INSURED ORGANIZATION has not been resolved by negotiation as provided herein, the parties shall endeavor to settle the dispute by mediation under the last published Mediation Procedure of the International Institute for Conflict Prevention and Resolution or any successor ("CPR Institute"). Unless otherwise agreed, the parties will select a neutral third party from the CPR Institute Panels Distinguished of Neutrals, with the assistance of the CPR Institute.

(3) Arbitration. Any controversy or dispute between the INSURER and the INSURED ORGANIZATION arising out of or relating to this POLICY, or the breach, termination, formation or validity thereof, which has not been resolved by non-binding means as provided herein within ninety (90) days of the initiation of such procedure, shall be settled by binding arbitration in accordance with the CPR Institute Rules for Non-Administered Arbitration of Business Disputes (the "CPR Rules") by three (3) independent and impartial arbitrators. The INSURED ORGANIZATION and the INSURER each shall appoint one arbitrator; the third arbitrator, who shall serve as the chair of the arbitration panel, shall be appointed in accordance with the CPR Rules. If either the INSURED ORGANIZATION or the INSURER has requested the other to participate in a non-binding procedure and the other has failed to participate, the requesting party may initiate arbitration before expiration of the above period. The arbitration shall be governed by the United States Arbitration Act, 9 U.S.C. §§ 1 et seq., and judgment upon the award rendered by the arbitrators may be entered by any court having jurisdiction thereof.

In the event of a judgment being entered against the INSURER on an arbitration award, the INSURER, at the request of the INSURED ORGANIZATION, shall submit to the jurisdiction of any court of competent jurisdiction within the United States of America, and shall comply with all requirements necessary to give such court jurisdiction, and all matters relating to such judgment and its enforcement shall be determined in accordance with the law and practice of such court.

(4) Service of Suit. Service of process in any suit or any other suit instituted against the INSURER under this POLICY may be made upon AEGIS Insurance Services, Inc., 1 Meadowlands Plaza, East Rutherford, NJ 07073. The INSURER will abide by the final decision of the court in such suit or of any appellate court in the event of any appeal. AEGIS Insurance Services, Inc. is authorized and directed to accept service of process on behalf of the INSURER in any such suit and, upon the INSURED ORGANIZATION'S or any DIRECTOR'S or OFFICER'S request, to give a written undertaking that they will enter a general appearance upon the INSURER'S behalf in the event such suit is instituted. Nothing in this clause constitutes or should be understood to constitute a waiver of the INSURER'S right to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek to transfer a case to another court as permitted by the laws of the United States or of any state in the United States. This paragraph (4) is subject to, and does not override, the requirement of binding arbitration set out in paragraph (3).

(Q) *Construction*

The terms of this POLICY are to be construed in an evenhanded fashion as between the INSURED ORGANIZATION, the DIRECTORS or OFFICERS and the INSURER in accordance with the laws of the State of New York, except that any CLAIM for coverage of punitive, exemplary or multiple damages shall be governed by the law of the jurisdiction that is most favorable to the insurability of such damages, provided such jurisdiction has a substantial relationship to the involved DIRECTORS or OFFICERS, the INSURED ORGANIZATION, or the CLAIM giving rise to such damages. Where the language of this POLICY is deemed to be ambiguous or otherwise unclear, the issue shall be resolved in a manner most consistent with the relevant terms of this POLICY without regard to authorship of the language and without any presumption or arbitrary interpretation or construction in favor of either the INSURED ORGANIZATION, the DIRECTORS or OFFICERS or the INSURER. In deciding any controversy or dispute arising out of or relating to this POLICY, due consideration shall be given to the customs and usages of the insurance industry. No damages in excess of compensatory damages shall be awarded in any controversy or dispute between the INSURER, on the one hand, and the

Case: 19-30088    Doc# 5374-10    Filed: 01/14/20    Entered: 01/14/20 17:55:59    Page
359 of 524



INSURED ORGANIZATION and/or the DIRECTORS and OFFICERS, on the other hand, and each party hereby irrevocably waives any such damages.

(R) *Invalidity or Unenforceability*

In the event that any provision of this POLICY shall be declared or deemed to be invalid or unenforceable under any applicable law, such invalidity or unenforceability shall not affect the validity or enforceability of the remaining portion of this POLICY.

(S) *Non-Assessability*

The INSURED ORGANIZATION shall be liable under this POLICY only for the POLICY Premium stated in Item 4 of the Declarations. Neither the INSURED ORGANIZATION nor any DIRECTOR or OFFICER shall be subject to any contingent liability or be required to pay any dues or assessments to the INSURER in addition to the premium described above.

(T) *Allocation*

If a CLAIM is made against both INSUREDS who are covered hereunder for such CLAIM and others, including INSUREDS who are not covered hereunder for such CLAIM, or if a CLAIM against the INSUREDS includes both covered and non-covered matters, the DIRECTORS and OFFICERS, the INSURED ORGANIZATION and the INSURER shall allocate any investigation expenses, defense costs, settlement, judgement or other loss on account of such CLAIM between covered INVESTIGATIVE EXPENSE or ULTIMATE NET LOSS attributable to the CLAIM against the DIRECTORS and OFFICERS and non-covered loss. Such allocation shall be based upon the relative legal and financial exposure of each party to such CLAIM for covered and non-covered matters.

If the DIRECTORS and OFFICERS, INSURED ORGANIZATION and the INSURER agree on an allocation of INVESTIGATIVE EXPENSE and DEFENSE COSTS, the INSURER shall advance INVESTIGATIVE EXPENSE and DEFENSE COSTS allocated to covered ULTIMATE NET LOSS. If the DIRECTORS and OFFICERS, INSURED ORGANIZATION and the INSURER cannot agree on an allocation:

(1) no presumption as to allocation shall exist in any arbitration, suit or other proceeding;

(2) the INSURER shall advance INVESTIGATIVE EXPENSE and DEFENSE COSTS which the INSURER believes to be covered under this POLICY until a different allocation is negotiated, mediated, arbitrated or ordered by a court of competent jurisdiction; and

(3) any disagreement on the allocation of INVESTIGATIVE EXPENSE and DEFENSE COSTS shall be settled in accordance with Condition (P), if applicable.

Any advancement of INVESTIGATIVE EXPENSE and DEFENSE COSTS as described above shall be on a current basis but no later than ninety (90) days after the INSURER receives itemized invoices for such INVESTIGATIVE EXPENSE or DEFENSE COSTS.

Any negotiated, mediated, or arbitrated or court-ordered allocation of INVESTIGATIVE EXPENSE and DEFENSE COSTS on account of a CLAIM shall be applied retroactively to all INVESTIGATIVE EXPENSE and DEFENSE COSTS on account of such CLAIM, notwithstanding any prior advancement to the contrary. Any allocation or advancement of INVESTIGATIVE EXPENSE and DEFENSE COSTS on account of a CLAIM shall not apply to or create any presumption with respect to the allocation of INDEMNITY on account of such CLAIM.

(U) *Territory*

This POLICY extends to WRONGFUL ACTS taking place or CLAIMS made anywhere in the world.

Case: 19-30088    Doc# 5374-10   Filed: 01/14/20   Entered: 01/14/20 17:56:59   Page
360 of 524



(V) *Notices*

Any notice, request, demand or other communication required or permitted under this POLICY shall be in writing and shall be delivered personally, by facsimile, electronic mail or other written form of electronic communication or by certified or express mail or overnight courier, postage prepaid, to the respective parties as follows:

(1) if to the INSURED ORGANIZATION, to the name and address specified in Item 8 of the Declarations; and

(2) if to the INSURER, to the address specified in Item 9 of the Declarations;

or to such other address or person as either party hereto may, from time to time, designate in a written notice given in like manner.

IN WITNESS WHEREOF, Associated Electric & Gas Insurance Services Limited has caused this POLICY to be signed by its President and Chief Executive Officer at Hamilton, Bermuda. However, this POLICY shall not be binding upon the INSURER unless countersigned on the Declarations Page by a duly authorized representative of the INSURER.

William P. Cullen, President and
Chief Executive Officer

Case: 19-30088   Doc# 5374-10   Filed: 01/14/20   Entered: 01/14/20 15:56:59   Page 361 of 524



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 1         Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

### OFAC EXCLUSION

This POLICY shall not apply and the INSURER shall not be liable to make any payment for ULTIMATE NET LOSS or INVESTIGATIVE EXPENSE with respect to any CLAIM(S) made against any INSUREDS arising out of any:

   a)   conduct prohibited by any United States economic or trade sanctions, including, but not limited to sanctions, laws and regulations administered and enforced by the United States Treasury Department's Office of Foreign Assets Control ("OFAC") (collectively "Economic Sanctions"); or

   b)   coverage that violates any of these Economic Sanctions.

Further, in accordance with these Economic Sanctions, any such coverage in this POLICY that would violate these Economic Sanctions is void at POLICY inception.  If this POLICY is determined by the INSURER to be a blocked or frozen contract under these Economic Sanctions, no payments, including, but not limited to, claims, premium refunds, member related credits, will be made without authorization from OFAC.

_____
Signature of Authorized Representative

200-E6853 (01/2015)            Page 1 of 1



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 2                    Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

## MEMBER WITH VOTING RIGHTS ENDORSEMENT

This POLICY entitles the INSURED ORGANIZATION to be a member in the INSURER unless that membership is superseded, at any point in time, by a parent or affiliated company, which is also a member in the INSURER

This POLICY also entitles the INSURED ORGANIZATION to a vote on any matter submitted to the members of the INSURER unless that voting right is superseded, at any point in time, by the voting right of a parent or affiliated company.

_____
Signature of Authorized Representative

200-E6583 (10/2010)                                                                 Page 1 of 1



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 3                    Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

## TERRORISM LIMITS ENDORSEMENT

THIS ENDORSEMENT LIMITS THE AMOUNT THAT YOU MAY RECOVER UNDER THIS POLICY FOR ULTIMATE NET LOSS AND INVESTIGATIVE EXPENSE ARISING OUT OF ACTS OF TERRORISM AND PROVIDES SPECIAL REPORTING AND PAYMENT PROCEDURES FOR LOSSES SUSTAINED BECAUSE OF SUCH ACTS.

AS A RESULT OF THIS ENDORSEMENT, YOUR COVERAGE MAY BE REDUCED BY PAYMENTS MADE UNDER POLICIES ISSUED TO PERSONS UNRELATED TO YOU BY THE INSURER OR BY OTHER PROPERTY AND CASUALTY INSURERS

## SUPPLEMENTAL DECLARATIONS

Shared Terrorism Aggregate Limit:              $ 250,000,000

## COVERAGE A: TERRORISM COVERAGE PURSUANT TO THE TERRORISM RISK INSURANCE ACT OF 2002 AS AMENDED (THE "FEDERAL ACT")

(A)     The INSURER will pay for "insured loss" pursuant to the terms and conditions of this POLICY. (The term "insured loss" has the meaning assigned by the Federal Act.  This definition controls the INSURER'S grant of coverage under this Endorsement.)

(B)     The Shared Terrorism Aggregate Limit shall be reduced by "insured loss" paid under all COVERED POLICIES (as such term is defined in this Endorsement) issued during the period commencing January1, 2002 and ending December 31, 2020, inclusive.   The Shared Terrorism Aggregate Limit shall be the amount set forth in the Supplemental Declarations.

(C)     Should the Shared Terrorism Aggregate Limit be completely reduced by "insured loss", the INSURER will still be responsible for insuring additional "insured losses" pursuant to the terms and conditions of this POLICY.  Pursuant to the terrorism coverage under Coverage B of this Endorsement, should the Shared Terrorism Aggregate Limit be completely reduced by "insured loss" and/or TERRORISM LOSS (as such term is defined in this Endorsement), the INSURER will still be responsible for insuring additional "insured losses" pursuant to the terms and conditions of this POLICY, but will no longer be responsible for insuring additional TERRORISM LOSSES pursuant to Coverage B of this Endorsement.

(D)     Pursuant to the Federal Act, if the total "insured losses" of all property and casualty insurers reach $100 billion during any applicable period, the INSURER will not be liable under this POLICY for its portion of such losses that exceed such amount.  Therefore, the amounts we pay to you pursuant to this Coverage A may be reduced.   Because of this, the INSURER may reserve its rights when making payments to you for "insured losses" and may require an undertaking from you to return to the INSURER any overpayment.

Case: 19-30088    Doc# 5374-10    Filed: 01/14/20    Entered: 01/14/20 17:56:59    Page 364 of 524

**COVERAGE B:     TERRORISM COVERAGE BEYOND THE SCOPE OF THE FEDERAL ACT**

Subject to the coverage provided in Coverage A:

(A)     The most that the INSURER will pay for TERRORISM LOSS shall be limited to the Shared Terrorism Aggregate Limit.  This limit (1) is part of and not in addition to any other limits contained in this POLICY and (2) shall not be used to increase any other Limit(s) of Liability contained in this POLICY or any other insurance policy issued by the INSURER.

(B)     The Shared Terrorism Aggregate Limit is the maximum amount that the INSURER will pay in the aggregate for TERRORISM LOSS under all COVERED POLICIES issued during the period commencing January 1, 2002 and ending December 31, 2020, inclusive, regardless of the number of OCCURRENCES, WRONGFUL ACTS or ACT(S) OF TERRORISM or the number of insureds affected thereby.  The Shared Terrorism Aggregate Limit shall be the amount set forth in the Supplemental Declarations.

(C)     If the INSURER'S total liability for TERRORISM LOSS under all COVERED POLICIES (without giving effect to the Shared Terrorism Aggregate Limit) exceeds the Shared Terrorism Aggregate Limit, then the INSURER'S liability for TERRORISM LOSS under this POLICY shall be limited to the Proportionate Share of the Shared Terrorism Aggregate Limit.     The Proportionate Share shall mean the ratio determined by dividing:

(1)     the INSURER'S total liability under this POLICY for TERRORISM LOSS (without giving effect to the Shared Terrorism Aggregate Limit) by

(2)     the INSURER'S total liability under all COVERED POLICIES issued during the period commencing January 1, 2002 and ending December 31, 2020, inclusive, for all TERRORISM LOSS (without giving effect to the Shared Terrorism Aggregate Limit).

(D)     The INSURER reserves the right to delay payment of all or part of any amount claimed by an insured for TERRORISM LOSS until the limits applicable to such TERRORISM LOSS can be reasonably ascertained by the INSURER.

(E)     Any payment made with respect to an ACT OF TERRORISM shall be subject to being refunded until final determination by the INSURER of the total TERRORISM LOSS of all insureds under COVERED POLICIES. The INSURER may condition any payment of any TERRORISM LOSS upon receipt by the Insurer of the written agreement of the insured receiving such payment (or on whose behalf such payment is made) to repay to the INSURER any portion of such amount subsequently determined by the INSURER to be in excess of the limits hereunder.

(F)     All CLAIMS arising out of or resulting from an ACT OF TERRORISM shall be deemed to have been made when the first written notice of a claim or "Notice of Circumstances" under a COVERED POLICY is given to the INSURER for the ACT OF TERRORISM, or loss or potential loss arising out of the ACT OF TERRORISM regardless of whether such written notice of a claim or "Notice of Circumstances" is made by the INSURED ORGANIZATION or any other party insured by the INSURER.

(G)     Upon receiving a written notice of a claim or "Notice of Circumstances" under a COVERED POLICY that the INSURER determines involves loss or potential loss arising out of an ACT OF TERRORISM, the INSURER will send a notice to the INSURED ORGANIZATION first named in the Declarations of this POLICY stating that the INSURER has received a written notice of a claim or "Notice of Circumstances" arising out of an ACT OF TERRORISM.   Not later than six months after the date of such notice by the INSURER, any insured having or expecting to have a claim for TERRORISM LOSS arising out of the  ACT  OF TERRORISM covered by the INSURER'S notice must submit to the INSURER an estimate of all projected TERRORISM LOSS for which coverage is claimed or is expected to be claimed under this

Case: 19-30088    Doc# 5374-10    Filed: 01/14/20    Entered: 01/14/20 19:57:17    Page 366 of 524

POLICY, including the basis for the projected amount of the loss. The insured shall promptly notify the INSURER of any material change in the amount claimed or expected to be claimed.

(H)   This POLICY covers only actual TERRORISM LOSS amounts reported to the INSURER not later than three years after the date that the ACT OF TERRORISM giving rise to such TERRORISM LOSS is first known to have occurred or a reasonable estimate of TERRORISM LOSS reported to the INSURER not later than three years after such date based on information and circumstances as of the time such estimate is reported. This paragraph shall not be construed to require the INSURER to pay any loss in excess of actual TERRORISM LOSS.

(I)   "TERRORISM LOSS" means direct or indirect loss, damage, liability, costs or expenses, including defense costs, occasioned by, happening through or as a direct or indirect consequence of any ACT OF TERRORISM regardless of any other cause or event contributing concurrently or in other sequence to the loss, damage, liability, costs or expenses and regardless of when such loss, damage, liability, costs or expenses become manifest or known. Any loss claimed due to the failure to take proper precautions to avert losses from an ACT OF TERRORISM or the failure to continue business after an ACT OF TERRORISM shall be considered to be occasioned by such ACT OF TERRORISM.

(J)   "ACT OF TERRORISM" means the commission of a violent act, or an act dangerous to human life, tangible property, intangible property or infrastructure, or the threat of such act, that is reasonably believed to have been committed (a) for political, religious and/or ideological reasons; and (b) either (1) to intimidate, coerce or cause fear among the public or a section of the public, (2) to influence the policy of, or overthrow, a government by intimidation, fear or coercion, (3) to affect the conduct of a government or the public or a section of the public, (4) to disrupt any segment of a country's economy or (5) for any similar reason. An ACT OF TERRORISM shall also include any actions by, or on behalf of, a government or branch thereof (including, without limitation, the uniformed armed forces, militia, police, state security, national guard and anti-terrorism agencies) in deterring, responding to, combating or retaliating against terrorism or removing debris from a terrorist attack.

(K)   "COVERED POLICIES" means all insurance policies issued or reinsured by the INSURER, including but not limited to all Excess Liability, Directors and Officers Liability, General Partner Liability, Public Officials Liability, Fiduciary and Employee Benefit Liability, Workers' Compensation, Excess Workers' Compensation, Professional Liability and Punitive Damages insurance policies and all endorsements to and extensions of such policies.

(L)   "OCCURRENCE," as used in this endorsement, has the meaning given to such term in any applicable COVERED POLICY.

(M)   "WRONGFUL ACT," as used in this endorsement, has the meaning given to such term in any applicable COVERED POLICY.

For purposes of this Endorsement, an insurance policy shall be deemed to be issued during the calendar year if the first day of the "Policy Period" (as defined in each such policy) was during the calendar year. In the case of a policy covering multiple twelve-month periods, the policy shall be deemed to have been renewed on, and the first day of the "Policy Period" shall be deemed to be, the anniversary date of the policy.

The INSURER has the right to modify this Endorsement, without consideration, if the Federal Act is not extended or renewed at expiration or if legislation is enacted by the Federal government of the United States that would, in any way, affect the coverage being provided by this Endorsement.

_____
Signature of Authorized Representative

Case: 19-30088   Doc# 5374-10   Filed: 01/14/20   Entered: 01/14/20 15:56:59   Page 366 of 524



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 4                                    Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

## CRISIS FUND ENDORSEMENT

1.      Section I., Insuring Agreements, is amended by the addition of the following:

The INSURER shall pay on behalf of the INSURED ORGANIZATION any CRISIS FUND LOSS first occurring during the POLICY PERIOD and reported to the INSURER during the POLICY PERIOD, provided such CRISIS FUND LOSS is solely as a result of a NEGATIVE EARNINGS OR SALES ANNOUNCEMENT which has a MATERIAL EFFECT ON THE INSURED ORGANIZATION'S STOCK PRICE.

2.      Section VII., Exclusions, shall not be applicable to a CRISIS FUND LOSS.

3.      The maximum amount payable by the INSURER under this Endorsement during the POLICY PERIOD shall be as stated below.

Aggregate Limit of Liability for the POLICY PERIOD under this Endorsement: $50,000

4.      No RETENTION shall apply to CRISIS FUND LOSS and the INSURER will pay from the first dollar subject to Section V. (B), Priority of Payments.

5.      The maximum liability of the INSURER under this POLICY, including this Endorsement, shall not exceed the amount set forth in Item 5A of the Declarations of the POLICY.  Nothing contained in this Endorsement shall increase the limit of liability of the INSURER.

6.      Section VI., Definitions, is amended to include the following: CRISIS FUND LOSS means:

(1)      amounts for which the INSURED ORGANIZATION is responsible for the reasonable and necessary fees and expenses charged by a qualified public relations firm, crisis management and/or law firm hired by the INSURED ORGANIZATION with the INSURER'S consent (which consent shall not be unreasonably withheld) to perform crisis management services, and

(2)      amounts for which the INSURED ORGANIZATION is responsible for the reasonable and necessary expenses incurred in connection with the printing and/or mailing of materials, or travel by DIRECTORS, OFFICERS, employees or agents of the INSURED ORGANIZATION.

arising from or related to a NEGATIVE EARNINGS OR SALES ANNOUNCEMENT, regardless whether a CLAIM is ever made and, if a CLAIM is made, regardless whether the amount is incurred prior to or subsequent to the making of the CLAIM.

Case: 19-30088    Doc# 5374-10    Filed: 01/14/20    Entered: 01/14/20 15:56:59    Page 367 of 524



NEGATIVE EARNINGS OR SALES ANNOUNCEMENT means a public announcement by the INSURED ORGANIZATION of its past or future earnings or sales which is substantially below the INSURED ORGANIZATION'S last public statement or projection of earnings or sales for such period, or the INSURED ORGANIZATION'S prior year's earnings or sales for the same period, or any other similar measurement of indices.

MATERIAL EFFECT ON THE INSURED ORGANIZATION'S STOCK PRICE means that immediately following a NEGATIVE EARNINGS OR SALES ANNOUNCEMENT the price per share of the INSURED ORGANIZATION'S common stock shall experience a decrease net of the change in the Standard & Poor's Composite Stock index of the greater of: 10% or $5.00 per share.

_____

Signature of Authorized Representative

Case: 19-30088    Doc# 5374-10    Filed: 01/14/20    Entered: 01/14/20 15:56:59    Page
368 of 524



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 5

Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:     PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

## INSURING AGREEMENT (C) AMENDED
### (Defense Costs for Derivative Lawsuits)

Section I., Insuring Agreement, (C) is amended by the addition of the following:

The INSURER shall pay on behalf of the INSURED ORGANIZATION all DEFENSE COSTS incurred by the INSURED ORGANIZATION (including through its board of directors or any committee of its board of directors) in seeking the dismissal of a shareholder derivative lawsuit on behalf of the INSURED ORGANIZATION.

Signature of Authorized Representative

200-M6500 (10/2010)



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 6          Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

**EXTRADITION ENDORSEMENT**

Section VI., Definitions, (C) DEFENSE COSTS is amended to also mean:

(1)      all reasonable and necessary fees and expenses incurred by or on behalf of such DIRECTOR or OFFICER to resist, or to obtain the discharge or revocation of, a judicial order or ruling to extradite such DIRECTOR or OFFICER to the jurisdiction in which such criminal proceeding is pending; and

(2)      the reasonable premium for any appeal, bail, attachment or similar bond or financial instrument incurred by or on behalf of such DIRECTOR or OFFICER by reason of such CLAIM; provided the INSURER shall have no obligation to apply for or provide any collateral for any such bond or financial instrument.

Signature of Authorized Representative

Case: 19-30088    Doc# 5374-10   Filed: 01/14/20   Entered: 01/14/20 15:56:59   Page 370 of 524


# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 7          Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated. All other terms and conditions of this POLICY remain unchanged.

**RETENTION AMENDED**
**(Erosion by Any Other Source)**

Section IV., RETENTION, (E) is replaced by the following:

Payment of INDEMNITY or DEFENSE COSTS by the INSURED ORGANIZATION or any other source (including any excess "difference in conditions" insurer) which, except for the amount thereof, would have been payable under this POLICY may reduce or exhaust the RETENTION.

Signature of Authorized Representative



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 8                    Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

### RETENTION AMENDED
### (Event Study Costs)

I.    Section IV., RETENTION, is amended by the addition of the following provision:

   No RETENTION shall apply to any EVENT STUDY COSTS.

II.   Section VI., Definitions, is amended to include the following:

   EVENT STUDY COSTS means reasonable and necessary fees and expenses incurred by or on behalf of the INSUREDS for an actual or prospective expert witness in a SECURITIES CLAIM to conduct an event study for the purpose of evaluating the impact (if any) to the market price of the INSURED ORGANIZATION'S stock by alleged corrective disclosures identified in the SECURITIES CLAIM, provided such fees and expenses are otherwise included within this POLICY'S Definition of DEFENSE COSTS.

Signature of Authorized Representative



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 9           Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:  PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

### PRIORITY OF PAYMENTS AMENDED

Section V., Priority of Payments, is amended by the addition of the following:

In the event the INSURED ORGANIZATION becomes a debtor-in-possession or an equivalent status under the United States Bankruptcy Code or the law of any other country and the aggregate ULTIMATE NET LOSS due under this POLICY exceeds the remaining available Limit of Liability, the INSURER shall:

(A)  First pay such ULTIMATE NET LOSS allocable to WRONGFUL ACTS that are actually or allegedly caused, committed, or attempted prior to the INSURED ORGANIZATION becoming a debtor-in-possession or such equivalent status; then

(B)  Second, with respect to whatever remaining amount of the Limit of Liability is available after payment under (A) above, pay such ULTIMATE NET LOSS allocable to WRONGFUL ACTS that are actually or allegedly caused, committed, or attempted after the INSURED ORGANIZATION became a debtor in possession or such equivalent status.

_Fred C. M Jr._

Signature of Authorized Representative

200-M6500 (10/2010)                                                Page 1 of 1



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 10           Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

### DEFINITION (A) APPLICATION AMENDED

Section VI., Definitions, (A) APPLICATION is replaced by the following:

(A)     APPLICATION means:

     (1)    the Application submitted by the INSURED ORGANIZATION to the INSURER for this POLICY, including any materials submitted with, attached to or incorporated by reference into such Application and any other documentation, information, warranty or representation specifically required by the INSURER in connection with underwriting this POLICY; and

     (2)    all forms and amended forms 10-K, 10-Q and Schedule 14A Definitive Proxy Statement filed by the INSURED ORGANIZATION with the Securities and Exchange Commission and all other publicly available documents, relied upon and documented by the INSURER, during the twelve (12) months preceding the inception of this POLICY.

_Signature_

Signature of Authorized Representative

Case: 19-30088    Doc# 5374-10   Filed: 01/14/20    Entered: 01/14/20 15:56:59    Page
374 of 524



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 11        Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

**DEFINITION (B) CLAIM AMENDED**
**(Include Arrest)**

Section VI., Definitions, (B) CLAIM subpart (3) is replaced by the following:

    (3) a criminal proceeding against any INSURED commenced by an arrest, the return of an indictment, information or similar document;

_Signature of Authorized Representative_



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 12        Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:  PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

### DEFINITION (B) CLAIM AMENDED
### (Verifiable Request of any Director or Officer with Optional Reporting)

1. Section VI., Definitions, (B) CLAIM subpart (6) is replaced by the following:

    (6) a verifiable request or subpoena from an ENFORCEMENT AUTHORITY or an INSURED ORGANIZATION to interview or depose a DIRECTOR or OFFICER, or for the production of documents by a DIRECTOR or OFFICER, in connection with a proceeding against or investigation of any other DIRECTOR or OFFICER or the INSURED ORGANIZATION, whether or not such request or subpoena alleges a WRONGFUL ACT; provided such request or subpoena shall constitute a CLAIM under this POLICY only if (i) it is not part of a routine or regularly scheduled audit, inspection or general oversight or compliance activity, and (ii) the INSURED ORGANIZATION, at its sole discretion, gives to the INSURER written notice thereof pursuant to Condition (E) below, and provided further that any coverage afforded by reason of this subpart (6) shall only apply to DEFENSE COSTS incurred after the date the INSURER receives such written notice.

2. The first paragraph of Conditions, (E) *Reporting of Claims and Shareholder Derivative Demands* is amended by the addition of the following:

    The reporting of a CLAIM pursuant to Section VI., Definitions, (B) CLAIM subpart (6) shall be optional and at the sole discretion of the INSURED ORGANIZATION.

_Signature of Authorized Representative_

200-M6500 (10/2010)                       Page 1 of 1

 AEGIS

# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 13                    Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:   PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

### DEFINITION (B) CLAIM AMENDED
### (Mediation or ADR Proceeding)

Section VI., Definitions, (B) CLAIM is amended to also mean:

a written demand upon any INSURED to engage in a mediation or other accredited alternative dispute resolution proceeding.

Signature of Authorized Representative



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 14        Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:  PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

### DEFINITION (B) CLAIM AMENDED
### (Informal Investigation of Directors and Officers)

Section VI., Definitions, (B) CLAIM is amended to also mean:

> an informal investigation of any DIRECTORS or OFFICERS, whether or not they have been identified as a person against whom an otherwise covered CLAIM would be made; provided (i) such investigation shall constitute a CLAIM under this POLICY only if the INSURED ORGANIZATION gives to the INSURER written notice thereof pursuant to Condition (E) below and (ii) the INSURER shall not be liable for that portion of ULTIMATE NET LOSS incurred prior to such notice.

Signature of Authorized Representative



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 15            Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

### DEFINITION OF DIRECTOR AND OFFICER AMENDED
### (Listed Position or Title)

Section VI., Definitions, (D) DIRECTOR and OFFICER is amended to include any natural person who has served, is now serving, or shall serve the INSURED ORGANIZATION in any of the following positions or with the following titles:

> Position or Title
> Advisory Director or Director Emeritus; or
> Contract Officer

![signature]

Signature of Authorized Representative

Case: 19-30088   Doc# 5374-10   Filed: 01/14/20   Entered: 01/14/20 15:56:59   Page
379 of 524



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 16                                  Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

### OUTSIDE ORGANIZATION COVERAGE AMENDED
### (Blanket For-Profit and Not-For-Profit with Exceptions)

I.   Section VI., Definitions, (D) DIRECTOR and OFFICER, subpart (7) is replaced with the following:

(7)   any natural person described in paragraphs (1), (2), (3) or (5) above or any employee of the INSURED ORGANIZATION who is serving or has served with the knowledge and consent of the INSURED ORGANIZATION in an equivalent position with, or as a member of the Management or Operating Committee of, any OUTSIDE ORGANIZATION;

II.  Section VI., Definitions, (H) FOR-PROFIT OUTSIDE ORGANIZATION and (O) NOT-FOR-PROFIT OUTSIDE ORGANIZATION are replaced as follows:

(H)   FOR-PROFIT OUTSIDE ORGANIZATION means any organization or JOINT VENTURE other than:

(1)   the INSURED ORGANIZATION; or
(2)   a NOT-FOR-PROFIT OUTSIDE ORGANIZATION; or
(3)   any Financial Institution, including without limitation any organization that is a bank, credit union, insurance company, mutual fund, investment company, broker/dealer or trust company; or
(4)   any organization the securities of which are publicly traded and/or listed on a securities exchange.

FOR-PROFIT OUTSIDE ORGANIZATION shall also include any for-profit organization specifically listed in a "Schedule of FOR-PROFIT OUTSIDE ORGANIZATIONS" attached to this POLICY or to a prior Directors and Officers Liability Policy issued by the INSURER to the INSURED ORGANIZATION.

(O)   NOT-FOR-PROFIT OUTSIDE ORGANIZATION means any not-for-profit organization that is exempt from Federal taxation, but does not include any Independent System Operator (ISO) or Regional Transmission Organization (RTO).

Signature of Authorized Representative

Case: 19-30088    Doc# 5374-10   Filed: 01/14/20   Entered: 01/14/20 17:56:59   Page
380 of 524



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 17                              Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

### DEFINITION (I) INDEMNITY AMENDED
### (Disgorgement and Restitution Deleted)

Section VI., Definitions, (I) INDEMNITY subpart (4) is deleted in its entirety.

_Fred C. M_ (Signature)

Signature of Authorized Representative

Case: 19-30088    Doc# 5374-10   Filed: 01/14/20   Entered: 01/14/20 15:56:59   Page 381 of 524



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 18                                      Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

### DEFINITION (I) INDEMNITY AMENDED
### (Fines and Penalties Most Favorable Venue)

Section VI., Definitions, (I) INDEMNITY subpart (1) is amended by the addition of the following:

provided, this exclusion shall not apply to any fines or penalties for an unintentional or non-willful violation of law and the insurability of any such fines or penalties shall be determined under the law of the jurisdiction that is most favorable to the insurability of such fines or penalties;

Signature of Authorized Representative

Case: 19-30088    Doc# 5374-10    Filed: 01/14/20    Entered: 01/14/20 15:56:59    Page
382 of 524



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 19                    Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

### DEFINITION (I) INDEMNITY AMENDED
### (Plaintiffs' Fees Award)

Section VI., Definitions, (I) INDEMNITY is amended to also mean:

Any plaintiffs' attorney fees and costs which the INSUREDS shall become legally obligated to pay as a result of a covered CLAIM, including without limitation any such plaintiffs' attorney fees and costs in a shareholder derivative lawsuit under Insuring Agreement I.(C); provided that any coverage under this POLICY for any such plaintiffs' attorney fees and costs shall be subject to all other terms, conditions and limitations in this POLICY.

Signature of Authorized Representative

Case: 19-30088    Doc# 5374-10    Filed: 01/14/20    Entered: 01/14/20 15:56:59    Page
383 of 524



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 20          Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

## DEFINITION (J) INSURED ORGANIZATION AMENDED
### (ClimateSmart)

1. Section VI., Definitions, (J) INSURED ORGANIZATION is amended to also mean:

    ClimateSmart.

2. Solely with respect to ClimateSmart, the RETENTION in Item 6B of the Declarations is replaced by the following:

    Insuring Agreement I.(B) or I.(C) $250,000 each CLAIM

3. The RETENTION for Insuring Agreement I.(B) shall apply to all INDEMNITY and DEFENSE COSTS for which indemnification of the DIRECTORS or OFFICERS by the INSURED ORGANIZATION is legally permissible, whether or not such indemnification is granted by the INSURED ORGANIZATION. No RETENTION shall apply if indemnification or payment by the INSURED ORGANIZATION is not legally permissible or if the INSURED ORGANIZATION fails to provide indemnification to DIRECTORS and OFFICERS due to FINANCIAL IMPAIRMENT of the INSURED ORGANIZATION.

_Fred C. M_ J.

---
Signature of Authorized Representative

Case: 19-30088    Doc# 5374-10   Filed: 01/14/20   Entered: 01/14/20 15:56:59   Page 384 of 524



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 21                    Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

### DEFINITION (M) INVESTIGATIVE EXPENSE AMENDED
### (Include Books and Records Costs)

Section VI., Definitions, (M) INVESTIGATIVE EXPENSE is replaced by the following:

(M) INVESTIGATIVE EXPENSE means the reasonable and necessary fees and expenses (except all salaries, wages, benefits and overhead expenses of the DIRECTORS, OFFICERS, employees or the INSURED ORGANIZATION) incurred in connection with the investigation and evaluation of:

(1) an actual or alleged WRONGFUL ACT by a DIRECTOR or OFFICER related to a SHAREHOLDER DERIVATIVE DEMAND; or

(2) a written demand by or on behalf of a securities holder of the INSURED ORGANIZATION upon the board of directors, or an equivalent governing body, of the INSURED ORGANIZATION to inspect the books and records of the INSURED ORGANIZATION pursuant to Section 220 of the Delaware General Corporation Law or any similar statute in any other jurisdiction.

_Fred C. M. J._

Signature of Authorized Representative

Case: 19-30088    Doc# 5374-10   Filed: 01/14/20   Entered: 01/14/20 17:56:59   Page
385 of 524



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 22          Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated. All other terms and conditions of this POLICY remain unchanged.

### DEFINITION (U) SECURITIES CLAIM AMENDED

Section VI., Definitions, (U) SECURITIES CLAIM is replaced by the following:

(U)   SECURITIES CLAIM shall mean any CLAIM which alleges a violation of any law, regulation or rule, whether statutory or common law, and which in whole or in part is:

     (1)   brought by any person or entity arising out of, based upon or attributable to the purchase or sale of, or offer or solicitation of an offer to purchase or sell, whether actual or alleged, any securities of the INSURED ORGANIZATION; or

     (2)   brought by a securities holder of the INSURED ORGANIZATION with respect to such securities holder's interest in the securities of the INSURED ORGANIZATION.

     SECURITIES CLAIM shall include any criminal proceeding or any administrative or regulatory proceeding against the INSURED ORGANIZATION, but only if and only during the time that such proceeding is also commenced and continuously maintained against a DIRECTOR or OFFICER.

     SECURITIES CLAIM for purposes of Insuring Agreement I.(C) shall not include any employment or compensation related CLAIM brought by a DIRECTOR or OFFICER or other employee of the INSURED ORGANIZATION.

_Signature of Authorized Representative_

Case: 19-30088   Doc# 5374-10   Filed: 01/14/20   Entered: 01/14/20 15:56:58   Page 386 of 524



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 23                    Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

## AMENDED SEVERABILITY ENDORSEMENT
### (Full Severability for All Insureds)

Section VIII., Representations, is deleted in its entirety and replaced with the following:

(A)  In issuing this POLICY, the INSURER has relied upon the statements, representations and information in the APPLICATION. Each INSURED acknowledges and agrees that the statements, representations and information in the APPLICATION are true and accurate to the best of such INSURED'S knowledge and belief.

(B)  The APPLICATION shall be construed as a separate APPLICATION for coverage by each INSURED. With respect to the statements, representations and information in such APPLICATION, no knowledge possessed by any INSURED shall be imputed to any other INSURED for the purpose of determining coverage under this POLICY.

(C)  If the APPLICATION contains a statement, representation or information that is materially false or inaccurate, then the POLICY will be void from the beginning under Insuring Agreement I.(B) to the extent an INSURED ORGANIZATION indemnifies a DIRECTOR or OFFICER who knew the facts that were not truthfully and accurately disclosed in the APPLICATION. However, coverage under Insuring Agreement I.(B) shall not be void to the extent an INSURED ORGANIZATION indemnifies a DIRECTOR or OFFICER who did not possess such knowledge.

(D)  The INSURER agrees it will not rescind or void coverage under Insuring Agreement I.(A) in whole or in part for any reason.

Section IX., Conditions, (B) Severability is deleted in its entirety and replaced with the following:

(B)  Severability

Except as provided in Section VIII., Representations, the acts, omissions, knowledge or warranties of an INSURED shall not be imputed to any other INSURED with respect to applying any Exclusion or otherwise determining coverage under this POLICY.

_____
Signature of Authorized Representative

200-E6696 (02/2014)                                                                                     Page 1 of 1



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 24                                      Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:     PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

### EXCLUSIONS AMENDED
### (That Portion of Loss)

The preamble of Section VII., Exclusions, is deleted in its entirety and replaced with the following:

The INSURER shall not be liable to make any payment for that portion of ULTIMATE NET LOSS or INVESTIGATIVE EXPENSE arising from any CLAIM made against any INSURED:

_____
Signature of Authorized Representative

Case: 19-30088    Doc# 5374-10   Filed: 01/14/20   Entered: 01/14/20 15:56:59    Page
388 of 524



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 25                                    Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:     PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

### DELETION OF EXCLUSION (A) ENDORSEMENT

Section VII., Exclusions (A) is deleted in its entirety.

_____
Signature of Authorized Representative

Case: 19-30088    Doc# 5374-10    Filed: 01/14/20    Entered: 01/14/20 17:55:59    Page
389 of 524



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 26                          Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:     PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

## EXCLUSION (B) AMENDED

Section VII., Exclusion (B) is deleted in its entirety and replaced with the following:

(B)   based upon, arising out of or attributable to such INSURED:

  (1)   having gained any personal profit, financial advantage or remuneration to which such INSURED was not legally entitled; or

  (2)   having committed a deliberately fraudulent or criminal act or omission or any intentional violation of any law, statute or regulation;

  if established by a final, non-appealable adjudication in the underlying proceeding.

Signature of Authorized Representative



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 27                    Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

**EXCLUSION (D) AMENDED**
**(Delete Subparts 1, 2, 5 and 6)**

Section VII., Exclusions, (D) is deleted in its entirety and replaced with the following:

(D)    for any injury arising out of:

    (1)    any employment-related WRONGFUL ACT including but not limited to the actual or constructive termination of employment, demotion, failure to employ or promote, deprivation of a career opportunity, or employment discipline or evaluation in a manner which violates the laws or regulations of any jurisdiction, or which breaches any implied contract to continue employment;

    (2)    discrimination or sexual harassment;

    provided this Exclusion (D) shall not apply to any SECURITIES CLAIM arising out of such events.

_Fred C. M. J._
Signature of Authorized Representative

Case: 19-30088    Doc# 5374-10   Filed: 01/14/20   Entered: 01/14/20 15:56:59   Page 391 of 524



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 28                 Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No.  DP5008418P

INSURED ORGANIZATION:    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

**EXCLUSION (E) AMENDED**
**(Insured Organization Plans Only)**

Section VII., Exclusions, (E) is amended by the addition of the following:

> Provided, this Exclusion shall only apply with respect to plans, programs and trusts established or maintained in whole or in part for the benefit of employees of the INSURED ORGANIZATION.

_Signature of Authorized Representative_

200-E6869 (07/2015)                                                                 Page 1 of 1



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 29                    Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of
this POLICY remain unchanged.

### DELETE EMPLOYEE BENEFITS EXCLUSION

Section VII., Exclusions (F) is deleted in its entirety.

Signature of Authorized Representative



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 30          Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

**EXCLUSION (G) AMENDED**
**(Given and Accepted)**

Section VII., Exclusions, (G) is deleted in its entirely and replaced by the following:

(G) based upon, arising out of or attributable to any circumstance of which, prior to the inception of this POLICY, written notice was given and accepted as  valid under any Directors and Officers  liability Insurance Policy (whether issued by the INSURER or any other Insurer) or any  DISCOVERY PERIOD thereof.

_Signature of Authorized Representative_

Case: 19-30088    Doc# 5374-10   Filed: 01/14/20   Entered: 01/14/20 15:56:59   Page 394 of 524



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 31          Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

### EXCLUSION (J) (1) AMENDED
### (Broad Exception for Derivative Actions)

Section VII., Exclusions, (J) subpart (1) is replaced by the following:

     (1) brought derivatively by a security holder of the INSURED ORGANIZATION;

Signature of Authorized Representative

200-M6500 (10/2010)                                             Page 1 of 1



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 32                      Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:     PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

## CONDITION (A) ADVANCEMENT OF DEFENSE COSTS AND INVESTIGATIVE EXPENSE AMENDED
### (Omit Written Undertaking)

Section IX., Conditions, (A) *Advancement of DEFENSE COSTS and INVESTIGATIVE EXPENSE* is deleted in its entirety and replaced by the following:

(A)  *Advancement of DEFENSE COSTS and INVESTIGATIVE EXPENSE*

Advancement by the INSURER of DEFENSE COSTS and INVESTIGATIVE EXPENSE shall be conditioned upon the DIRECTORS, OFFICERS or INSURED ORGANIZATION repaying the INSURER, severally according to their respective interests, any DEFENSE COSTS or INVESTIGATIVE EXPENSE if and to the extent such DEFENSE COSTS or INVESTIGATIVE EXPENSE are finally established not to be covered by this POLICY.

_____
Signature of Authorized Representative

200-E6854 (07/2015)                                                                        Page 1 of 1



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 33                    Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

**ACQUISITION, MERGER AND DISSOLUTION AMENDED**
**(Change Consideration Threshold)**

Section IX., Conditions, (C) Acquisition, Merger and Dissolution, subpart (1) is amended by changing the reference therein from "fifteen percent (15%)" to "twenty-five percent (25%)".

_____
Signature of Authorized Representative

Case: 19-30088    Doc# 5374-10    Filed: 01/14/20    Entered: 01/14/20 15:56:59    Page
397 of 524



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 34

Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

### CONDITION (D) NON-DUPLICATION OF LIMITS DELETED

Section IX., Conditions, (D) *Non-Duplication of Limits* is deleted in its entirety.

Signature of Authorized Representative

200-E6841 (11/2014)

Page 1 of 1



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 35        Effective date of Endorsement <u>May 20, 2018</u>

Attached to and forming part of POLICY No. <u>DP5008418P</u>

INSURED ORGANIZATION:    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated. All other terms and conditions of this POLICY remain unchanged.

### NOTICE PROVISION AMENDED
### (Late Notice)

Section IX., Conditions, (E) Reporting of Claims and Shareholder Derivative Demands is amended by adding the following:

> If an INSURED fails to provide timely notice of a CLAIM or SHAREHOLDER DERIVATIVE DEMAND to the INSURER as specified in this Condition (E), the INSURER shall not be entitled to deny coverage for the CLAIM or SHAREHOLDER DERIVATIVE DEMAND based solely upon late notice unless the INSURER can demonstrate its interests were materially prejudiced by reason of such late notice.

_____
Signature of Authorized Representative

200-E6838 (04/2014)

Case: 19-30088    Doc# 5374-10   Filed: 01/14/20   Entered: 01/14/20 15:56:59   Page 399 of 524



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 36                              Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

### CONDITION (F) DEFENSE, COOPERATION AND SETTLEMENT AMENDED
### (Severability of Cooperation)

Section IX., Conditions, (F) *Defense, Cooperation and Settlement* is amended by the addition of the following:

The failure of any INSURED to comply with the provisions above shall not impair the rights of any other INSURED under this POLICY.

Signature of Authorized Representative

Case: 19-30088    Doc# 5374-10    Filed: 01/14/20    Entered: 01/14/20 15:56:59    Page 400 of 524



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 37                    Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

**SUBROGATION AMENDED
(Limit Reinstatement)**

Section IX., Conditions, (H) Subrogation is amended by adding the following:

In the event the INSURER recovers through subrogation or otherwise any amounts it paid under this POLICY, the applicable Limit(s) of Liability of the POLICY shall be reinstated to the extent of such recovery. The INSURER assumes no duty to seek a recovery of any amounts paid under this POLICY.

_____
Signature of Authorized Representative

Case: 19-30088    Doc# 5374-10   Filed: 01/14/20   Entered: 01/14/20 15:56:59   Page
401 of 524



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 38                                    Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

## CONDITION (M) CANCELLATION AMENDED
### (Pro Rata Cancellation)

Section IX., Conditions, (M) *Cancellation* is replaced by the following:

(M)   *Cancellation*

This POLICY:

(1)  may be cancelled at any time by the INSURED ORGANIZATION (except as provided in Condition (C)) by delivering written notice to the INSURER stating when thereafter cancellation shall be effective;

(2)  may not be cancelled by the INSURER, except for nonpayment of premium, in which case such cancellation shall be effective ten (10) days after the date notice thereof is given by the INSURER to the INSURED ORGANIZATION.

Notice provided in accordance with Condition (V) below shall be sufficient proof that notice has been given, and the POLICY PERIOD shall end on the effective date and hour of cancellation, as stated above.

In the event of cancellation by the INSURED ORGANIZATION or the INSURER, the INSURER shall retain the pro-rata proportion of the Rated Premium stated in Item 4 of the Declarations and the pro-rata unearned Continuity Credit.

<br>

Signature of Authorized Representative

Case: 19-30088    Doc# 5374-10    Filed: 01/14/20    Entered: 01/14/20 15:56:59    Page
402 of 524



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 39                              Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:     PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

## CONDITION (Q) CONSTRUCTION AMENDED
### (Silent on Jurisdiction)

Section IX., Conditions, (Q) *Construction*  is replaced by the following:

(Q)   *Construction*

The terms of this POLICY are to be construed in an evenhanded fashion as between the INSURED ORGANIZATION, the DIRECTORS or OFFICERS and the INSURER. Any claim for coverage of punitive, exemplary or multiple damages shall be governed by the law of the jurisdiction that is most favorable to the insurability of such damages, provided such jurisdiction has a substantial relationship to the involved DIRECTORS or OFFICERS, the INSURED ORGANIZATION, or the CLAIM giving rise to such damages.   Where the language of this POLICY is deemed to be ambiguous or otherwise unclear, the issue shall be resolved in a manner most consistent with the relevant terms of this POLICY without regard to authorship of the language and without any presumption or arbitrary interpretation or construction in favor of either the INSURED ORGANIZATION, the DIRECTORS or OFFICERS or the INSURER.   In deciding any controversy or dispute arising out of or relating to this POLICY, due consideration shall be given to the customs and usages of the insurance industry. No damages in excess of compensatory damages shall be awarded in any controversy or dispute between the INSURER, on the one hand, and the INSURED ORGANIZATION and/or the DIRECTORS and OFFICERS, on the other hand, and each party hereby irrevocably waives any such damages.

_Fred C. M J._

Signature of Authorized Representative

Case: 19-30088    Doc# 5374-10   Filed: 01/14/20    Entered: 01/14/20 15:56:59    Page
403 of 524



# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 40                   Effective date of Endorsement  May 20, 2018

Attached to and forming part of POLICY No. DP5008418P

INSURED ORGANIZATION:    PG&E Corporation

It is understood and agreed that this POLICY is hereby amended as indicated.  All other terms and conditions of this POLICY remain unchanged.

**CONDITION (T) ALLOCATION AMENDED**
**(Best Efforts)**

Section IX., Conditions, (T) Allocation   is amended by deleting the first paragraph and replacing it with the following:

> If a CLAIM is made against both INSUREDS who are covered hereunder for such CLAIM and others, including INSUREDS who are not covered hereunder for such CLAIM, or if a CLAIM against the INSUREDS includes both covered and non-covered matters, the DIRECTORS and OFFICERS,   the INSURED ORGANIZATION and the INSURER shall use their best efforts to allocate any investigation expenses, defense costs, settlement, judgement  or other loss  on account of  such CLAIM between covered INVESTIGATIVE EXPENSE or ULTIMATE NET LOSS and non-covered loss.

_____
Signature of Authorized Representative

200-E6878 (10/2015)                                        Page 1 of 1

Case: 19-30088   Doc# 5374-10   Filed: 01/14/20   Entered: 01/14/20 15:56:59   Page 404 of 524

# EXHIBIT H

**Pacific Gas and Electric Company**

$600,000,000 Aggregate Principal Amount
of 2.95% Senior Notes due March 1, 2026

**Underwriting Agreement**

New York, New York
February 23, 2016

To the Representatives
named in Schedule I hereto
of the several Underwriters
named in Schedule II hereto

Ladies and Gentlemen:

Pacific Gas and Electric Company, a corporation organized under the laws of California (the "Company"), proposes to sell to the several underwriters named in Schedule II hereto (the "Underwriters"), for whom you (the "Representatives") are acting as representatives, $600,000,000 aggregate principal amount of 2.95% Senior Notes due March 1, 2026 having the terms set forth in Schedule I hereto (the "Securities") to be issued under an indenture, amended and restated as of April 22, 2005 (the "Base Indenture"), as supplemented by the Seventh Supplemental Indenture dated as of June 11, 2009, as further supplemented by the Twentieth Supplemental Indenture dated as of November 12, 2013, and as further supplemented by the Twenty-Seventh Supplemental Indenture to be dated as of March 1, 2016 (the "Twenty-Seventh Supplemental Indenture" and, together with the Base Indenture as supplemented, the "Indenture"), between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (the "Trustee"). To the extent there are no additional Underwriters listed on Schedule II other than you, the term Representatives as used herein shall mean you, as Underwriters, and the terms Representatives and Underwriters shall mean either the singular or plural as the context requires. Any reference herein to the Registration Statement, the Base Prospectus, any Preliminary Prospectus or the Final Prospectus shall be deemed to refer to and include the documents incorporated by reference therein pursuant to Item 12 of Form S-3 which were filed under the Securities Exchange Act of 1934, as amended (the "Exchange Act") on or before the Effective Date of the Registration Statement or the issue date of the Base Prospectus, any Preliminary Prospectus or the Final Prospectus, as the case may be, and any reference herein to the terms "amend," "amendment" or "supplement" with respect to the Registration Statement, the Base Prospectus, any Preliminary Prospectus or the Final Prospectus shall be deemed to refer to and include the filing of any document under the Exchange Act after the Effective Date of the Registration Statement or the issue date of the Base Prospectus, any Preliminary Prospectus or the Final Prospectus, as the case may be, deemed to be incorporated therein by reference. Certain terms used herein are defined in Section 21 hereof.

1.    Representations and Warranties.  The Company represents and warrants to, and agrees with, each Underwriter as set forth below in this Section 1.

(a)    The Company meets the requirements for use of Form S-3 under the Act and has prepared and filed with the Commission an automatic shelf registration statement, as defined in Rule 405 (file number 333-193879) on Form S-3, including a related Base Prospectus, for registration under the Act of the offering and sale of the Securities.  Such Registration Statement, including any amendments thereto filed prior to the Execution Time, became effective upon filing. The Company may have filed with the Commission, as part of an amendment to the Registration Statement or pursuant to Rule 424(b), one or more preliminary prospectus supplements relating to the Securities, each of which has previously been furnished to you.  The Company will file with the Commission a final prospectus supplement relating to the Securities in accordance with Rule 424(b).  As filed, such final prospectus supplement shall contain all information required by the Act and the rules thereunder, and, except to the extent the Representatives shall agree in writing to a modification, shall be in all substantive respects in the form furnished to you prior to the Execution Time or, to the extent not completed at the Execution Time, shall contain only such specific additional information and other changes (beyond that contained in the Base Prospectus and any Preliminary Prospectus) as the Company has advised you, prior to the Execution Time, will be included or made therein.  The Registration Statement, at the Execution Time, meets the requirements set forth in Rule 415(a)(1)(x).  The Company agrees to pay the fees required by the Commission relating to the Securities within the time required by Rule 456(b)(1) without regard to the proviso therein and otherwise in accordance with Rules 456(b) and 457(r).

(b)    On each Effective Date, the Registration Statement did, and when the Final Prospectus is first filed in accordance with Rule 424(b) and on the Closing Date (as defined herein), the Final Prospectus (and any supplement thereto) will, comply in all material respects with the applicable requirements of the Act, the Exchange Act and the Trust Indenture Act and the respective rules thereunder; on each Effective Date and at the Execution Time, the Registration Statement did not and will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein not misleading; on the Effective Date and on the Closing Date the Indenture did or will comply in all material respects with the applicable requirements of the Trust Indenture Act and the rules thereunder; and on the date of any filing pursuant to Rule 424(b) and on the Closing Date, the Final Prospectus (together with any supplement thereto) will not include any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided, however, that the Company makes no representations or warranties as to (i) that part of the Registration Statement which shall constitute the Statement of Eligibility and Qualification (Form T-1) under the Trust Indenture Act of the Trustee or (ii) the information contained in or omitted from the Registration Statement or the Final Prospectus (or any supplement thereto) in reliance upon and in conformity with information furnished in writing to the Company by or on behalf of any Underwriter through the Representatives specifically for inclusion in the Registration Statement or the Final Prospectus (or any supplement thereto), it being understood and agreed that the

2

only such information furnished by or on behalf of any Underwriter consists of the information described as such in Section 8 hereof.

(c)     As of the Execution Time and the Closing Date, (i) the Disclosure Package and (ii) each electronic road show, if any, when taken together as a whole with the Disclosure Package, did not and will not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.   The preceding sentence does not apply to statements in or omissions from the Disclosure Package based upon and in conformity with written information furnished to the Company by any Underwriter through the Representatives specifically for use therein, it being understood and agreed that the only such information furnished by or on behalf of any Underwriter consists of the information described as such in Section 8 hereof.

(d)     (i) At the time of filing the Registration Statement, (ii) at the time of the most recent amendment thereto for the purposes of complying with Section 10(a)(3) of the Act (whether such amendment was by post-effective amendment, incorporated report filed pursuant to Sections 13 or 15(d) of the Exchange Act or form of prospectus), (iii) at the time the Company or any person acting on its behalf (within the meaning, for this clause only, of Rule 163(c)) made any offer relating to the Securities in reliance on the exemption in Rule 163, and (iv) at the Execution Time (with such date being used as the determination date for purposes of this clause (iv)), the Company was or is (as the case may be) a "well-known seasoned issuer" as defined in Rule 405.

(e)     (i) At the earliest time after the filing of the Registration Statement that the Company or another offering participant made a *bona fide* offer (within the meaning of Rule 164(h)(2)) of the Securities and (ii) as of the Execution Time (with such date being used as the determination date for purposes of this clause (ii)), the Company was not and is not an Ineligible Issuer (as defined in Rule 405), without taking account of any determination by the Commission pursuant to Rule 405 that it is not necessary that the Company be considered an Ineligible Issuer.

(f)     The Issuer Free Writing Prospectus and the final term sheet prepared and filed pursuant to Section 5(b) hereto did not, as of their issue dates, and do not include any information that conflicts with the information contained in the Registration Statement, including any document incorporated therein by reference and any prospectus supplement deemed to be a part thereof that has not been superseded or modified.   The foregoing sentence does not apply to statements in or omissions from any Issuer Free Writing Prospectus based upon and in conformity with written information furnished to the Company by any Underwriter through the Representatives specifically for use therein, it being understood and agreed that the only such information furnished by or on behalf of any Underwriter consists of the information described as such in Section 8 hereof.

(g)     The Company has been duly incorporated and is validly existing as a corporation in good standing under the laws of the State of California, with full corporate power and authority to own or lease, as the case may be, and to operate its properties and conduct its business as described in the Disclosure Package and the Final Prospectus, and

3

is duly qualified to do business as a foreign corporation and is in good standing under the laws of each jurisdiction which requires such qualification, except where the failure to be so qualified or be in good standing would not, individually or in the aggregate, have a material adverse effect on the condition (financial or otherwise), earnings, business or properties of the Company and its subsidiaries, taken as a whole (a "Material Adverse Effect").

(h)     This Agreement has been duly authorized, executed and delivered by the Company.

(i)     The Indenture has been duly authorized by the Company; and the Base Indenture has been, and at the Closing Date the Supplemental Indenture will have been, duly executed and delivered by the Company; and the Base Indenture constitutes and, at the Closing Date, assuming due authorization, execution and delivery by the Trustee, the Supplemental Indenture will constitute, a valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as enforcement thereof may be limited by laws and principles of equity affecting the enforcement of creditors' rights, including, without limitation, bankruptcy, reorganization, insolvency arrangement, fraudulent conveyance, moratorium, receivership, assignment for the benefit of creditors laws; and the Base Indenture has been duly qualified under the Trust Indenture Act and the Supplemental Indenture will be qualified under the Trust Indenture Act as of the Closing Date.

(j)     The issuance and sale by the Company of the Securities pursuant to this Agreement have been duly authorized by all necessary corporate action; and, when issued, authenticated and delivered to the Underwriters pursuant to this Agreement against payment of the consideration therefor specified herein, the Securities will be valid and binding obligations of the Company, enforceable against the Company in accordance with their terms, except as enforcement thereof may be limited by laws or principles of equity affecting creditors' rights, including, without limitation, bankruptcy, reorganization, insolvency, arrangement, fraudulent conveyance, moratorium, receivership, assignment for the benefit of creditors laws, and will be entitled to the benefits of the Indenture.

(k)     The Company is not and, after giving effect to the offering and sale of the Securities and the application of the proceeds thereof as described in the Disclosure Package and the Final Prospectus, will not be an "investment company" as defined in the Investment Company Act of 1940, as amended (the "1940 Act") or a company "controlled" by an "investment company" within the meaning of the 1940 Act.

(l)     No consent, approval, authorization, filing with or order of any court or governmental agency or body is required in connection with the transactions contemplated herein, except such as have been obtained from the California Public Utilities Commission (the "CPUC"), under the Act, under the Trust Indenture Act or otherwise and such as may be required under the blue sky laws of any jurisdiction in connection with the purchase and distribution of the Securities by the Underwriters in the manner contemplated herein and in the Disclosure Package and the Final Prospectus.

4

(m)     Neither the Company nor any of its subsidiaries has received any notice of proceedings relating to the revocation or modification of any licenses, certificates, permits and other authorizations which, individually or in the aggregate, if the subject of an unfavorable decision, ruling or finding, would have a Material Adverse Effect, whether or not arising from transactions in the ordinary course of business, except as set forth in or contemplated in the Registration Statement, Disclosure Package and the Final Prospectus (exclusive of any supplement thereto).

(n)     None of the issue and sale of the Securities, the consummation of any other of the transactions herein contemplated or the performance by the Company of any of its obligations set forth herein will conflict with or result in, a breach or violation of: (i) the charter, bylaws or comparable constituent documents of the Company or any of its subsidiaries, (ii) the terms of any indenture, contract, lease, mortgage, deed of trust, note agreement, loan agreement or other agreement, obligation, condition, covenant or instrument to which the Company or any of its subsidiaries is a party or bound or to which its or their property is subject, or (iii) any statute, law, rule, regulation, judgment, order or decree applicable to the Company or any of its subsidiaries of any court, regulatory body, administrative agency, governmental body, arbitrator or other authority having jurisdiction over the Company or any of its subsidiaries or any of its or their properties, except, in the case of clauses (ii) and (iii) above, for such conflicts, breaches or violations which could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(o)     The consolidated historical financial statements and schedules of the Company and its consolidated subsidiaries included in the Preliminary Prospectus, the Final Prospectus and the Registration Statement present fairly in all material respects the financial condition, results of operations and cash flows of the Company and its consolidated subsidiaries as of the dates and for the periods indicated, comply as to form with the applicable accounting requirements of the Act and have been prepared in conformity with generally accepted accounting principles applied on a consistent basis throughout the periods involved (except as otherwise noted therein).  The interactive data in eXtensible Business Reporting Language incorporated by reference in the Registration Statement, the Disclosure Package and the Prospectus has been prepared in accordance with the Commission's rules and guidelines applicable thereto in all material respects.

(p)     No action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Company or any of its subsidiaries or its or their property is pending or, to the best knowledge of the Company, threatened that (i) would reasonably be expected to have a material adverse effect on the performance of this Agreement or the consummation of any of the transactions contemplated hereby or (ii) would reasonably be expected to have a Material Adverse Effect, whether or not arising from transactions in the ordinary course of business, except as set forth in or contemplated in the Disclosure Package and the Final Prospectus (exclusive of any supplement thereto).

(q)     Deloitte & Touche LLP, who have certified certain financial statements of the Company and its consolidated subsidiaries and delivered their report with respect to

Case: 19-30088    Doc# 5374-10    Filed: 01/14/20    Entered: 01/14/20 15:26:59    Page 6 of 7524

the audited consolidated financial statements and schedules included in the Registration Statement, the Disclosure Package and the Final Prospectus, is an independent registered public accounting firm with respect to the Company within the meaning of the Act and the applicable published rules and regulations thereunder and of the Public Company Accounting Oversight Board.

(r)     Except as set forth or contemplated in the Registration Statement, Disclosure Package and the Final Prospectus (exclusive of any supplement thereto), neither the Company nor any of its subsidiaries is (i) in violation of any statute, rule, regulation, decision or order of any governmental agency or body or any court, domestic or foreign, relating to the use, disposal or release of hazardous or toxic substances or relating to the protection or restoration of the environment or human exposure to hazardous or toxic substances (collectively, "Environmental Laws"), (ii) owns or operates any real property contaminated with any substance that is subject to any Environmental Laws, (iii) is liable for any off-site disposal or contamination pursuant to any Environmental Laws, or (iv) is subject to any claim relating to any Environmental Laws, which violation, contamination, liability or claim could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; and there is no investigation pending or, to the Company's knowledge, threatened against it or its subsidiaries, that could reasonably be expected to lead to the making of such a claim.

(s)     The Company does not have any significant subsidiaries as defined by Rule 1-02 of Regulation S-X.

(t)     The CPUC has authorized the issuance and sale by the Company of the Securities, and such authorization is in full force and effect and sufficient for the issuance and sale of the Securities to the Underwriters.

(u)     The Company and each of its consolidated subsidiaries maintain a system of internal accounting controls over financial reporting sufficient to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorizations; (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain asset accountability; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any material differences.

(v)     The Company maintains "disclosure controls and procedures" (as defined in Rule 13a-15(e) of the Exchange Act) and such disclosure controls and procedures were effective as of the end of the Company's most recently completed fiscal quarter.

(w)     To the Company's knowledge, none of the Company, any of its subsidiaries, or any director, officer, agent, affiliate or employee of the Company or any of its subsidiaries is currently the subject of any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("OFAC"); and the Company will not use the proceeds from the sale of the Securities, or knowingly lend,

contribute or otherwise make available such proceeds to any subsidiary, affiliate, joint venture partner or other person or entity for the purpose of financing the activities of any person currently the subject of any U.S. sanctions administered by OFAC.

Any certificate signed by any officer of the Company and delivered to the Representatives or counsel for the Underwriters pursuant to this Agreement shall be deemed a representation and warranty by the Company, as to matters covered thereby, to each Underwriter.

2.      <u>Purchase and Sale</u>. Subject to the terms and conditions and in reliance upon the representations and warranties herein set forth, the Company agrees to sell to each Underwriter, and each Underwriter agrees, severally and not jointly, to purchase from the Company, at the purchase price (including accrued interest, if any) set forth in Schedule I hereto, the principal amount of the Securities set forth opposite such Underwriter's name in Schedule II hereto.

3.      <u>Delivery and Payment</u>. Delivery of and payment for the Securities shall be made on the date and at the time specified in Schedule I hereto or at such time on such later date not more than three Business Days after the foregoing date as the Representatives shall designate, which date and time may be postponed by agreement between the Representatives and the Company or as provided in Section 9 hereof (such date and time of delivery and payment for the Securities being herein called the "Closing Date"). Delivery of the Securities shall be made to the Representatives for the respective accounts of the several Underwriters against payment by the several Underwriters through the Representatives of the purchase price (including accrued interest, if any) thereof to or upon the order of the Company by wire transfer payable in same-day funds to an account specified by the Company. Delivery of the Securities shall be made through the facilities of The Depository Trust Company unless the Representatives shall otherwise instruct.

4.      <u>Offering by Underwriters</u>. It is understood that the several Underwriters propose to, and they hereby represent that they will, offer the Securities for sale to the public as set forth in the Disclosure Package and the Final Prospectus.

5.      <u>Agreements</u>. The Company agrees with the several Underwriters that:

(a)      Prior to the termination of the offering of the Securities, the Company will not file any amendment of the Registration Statement or supplement (including the Final Prospectus or any Preliminary Prospectus) to the Base Prospectus unless the Company has furnished you a copy for your review prior to filing and will not file any such proposed amendment or supplement to which you reasonably object. The Company will cause the Final Prospectus, properly completed, and any supplement thereto to be filed in a form approved by the Representatives with the Commission pursuant to the applicable paragraph of Rule 424(b) within the time period prescribed and will provide evidence satisfactory to the Representatives of such timely filing. The Company will promptly advise the Representatives (i) when the Final Prospectus, and any supplement thereto, shall have been filed (if required) with the Commission pursuant to Rule 424(b), (ii) when, prior to termination of the offering of the Securities, any amendment to the Registration Statement shall have been filed or become effective, (iii) of any request by

7

the Commission or its staff for any amendment of the Registration Statement, or for any supplement to the Final Prospectus or for any additional information, (iv) of the issuance by the Commission of any stop order suspending the effectiveness of the Registration Statement or any notice objecting to its use, any order preventing or suspending the use of any preliminary prospectus, any Issuer Free Writing Prospectus or the Final Prospectus, or the institution or threatening of any proceeding for the purpose of suspending the effectiveness of the Registration Statement or preventing or suspending the use of any preliminary prospectus, any Issuer Free Writing Prospectus or the Final Prospectus, and (v) of the receipt by the Company of any notification with respect to the suspension of the qualification of the Securities for sale in any jurisdiction or the institution or threatening of any proceeding for such purpose. The Company will use its reasonable best efforts to prevent (i) the issuance of such stop order or other order referred to in the preceding sentence, or (ii) the occurrence of (A) any suspension of the effectiveness, or objection to the use, of the Registration Statement or (B) any prevention or suspension of the use of the preliminary prospectus, any Issuer Free Writing Prospectus or the Final Prospectus and, upon such issuance, occurrence or notice of objection, to obtain as soon as possible the withdrawal of such stop order or relief from such occurrence or objection, including, if necessary, by filing an amendment to the Registration Statement or a new registration statement and using its best efforts to have such amendment or new registration statement declared effective as soon as practicable.

(b)     The Company shall prepare a final term sheet for the Securities, containing solely descriptions of the final terms and offering of the Securities, in the form approved by you and attached as Schedule IV hereto, and file such term sheet pursuant to Rule 433(d) within the time required by such Rule.

(c)     If, at any time prior to the filing of the Final Prospectus pursuant to Rule 424(b), any event occurs as a result of which the Disclosure Package would include any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein in the light of the circumstances under which they were made or the circumstances then prevailing not misleading, the Company will (i) notify promptly the Representatives so that any use of the Disclosure Package may cease until it is amended or supplemented; (ii) amend or supplement the Disclosure Package to correct such statement or omission; and (iii) supply any amendment or supplement to you in such quantities as you may reasonably request.

(d)     If, at any time when a prospectus relating to the Securities is required to be delivered under the Act (including in circumstances where such requirement may be satisfied pursuant to Rule 172), any event occurs as a result of which the Final Prospectus as then supplemented would include any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein in the light of the circumstances under which they were made at such time not misleading, or if it shall be necessary to amend the Registration Statement, file a new registration statement or supplement the Final Prospectus to comply with the Act or the Exchange Act or the respective rules thereunder, including in connection with use or delivery of the Final Prospectus, the Company promptly will (i) notify the Representatives of any such event, (ii) prepare and file with the Commission, subject to the second sentence of paragraph (a)

8

of this Section 5, an amendment or supplement or new registration statement which will correct such statement or omission or effect such compliance, (iii) use its best efforts to have any amendment to the Registration Statement or new registration statement declared effective as soon as practicable in order to avoid any disruption in use of the Final Prospectus and (iv) supply any supplemented Final Prospectus to you in such quantities as you may reasonably request.

(e)     As soon as practicable, the Company will make generally available to its security holders and to the Representatives an earnings statement or statements of the Company and its subsidiaries which will satisfy the provisions of Section 11(a) of the Act and Rule 158.

(f)     The Company will furnish to the Representatives and counsel for the Underwriters, without charge, signed copies of the Registration Statement (including exhibits thereto) and to each other Underwriter a copy of the Registration Statement (without exhibits thereto) and, so long as delivery of a prospectus by an Underwriter or dealer may be required by the Act (including in circumstances where such requirement may be satisfied pursuant to Rule 172), as many copies of each Preliminary Prospectus, the Final Prospectus and the Issuer Free Writing Prospectuses and any supplement thereto as the Representatives may reasonably request.  The Company will pay the expenses of printing or other production of all documents relating to the offering.

(g)     The Company will arrange, if necessary, for the qualification of the Securities for sale under the laws of such jurisdictions as the Representatives may designate and will maintain such qualifications in effect so long as required for the distribution of the Securities; provided that in no event shall the Company be obligated to qualify to do business in any jurisdiction where it is not now so qualified or to take any action that would subject it to service of process in suits, other than those arising out of the offering or sale of the Securities, in any jurisdiction where it is not now so subject.

(h)     The Company agrees that, unless it has or shall have obtained the prior written consent of the Representatives, and each Underwriter, severally and not jointly, agrees with the Company that, unless it has or shall have obtained, as the case may be, the prior written consent of the Company, it has not made and will not make any offer relating to the Securities that would constitute an Issuer Free Writing Prospectus or that would otherwise constitute a "free writing prospectus" (as defined in Rule 405) required to be filed by the Company with the Commission or retained by the Company under Rule 433, other than the free writing prospectuses containing the information contained in the final term sheet prepared and filed pursuant to Section 5(b) hereto, or one or more free writing prospectuses through customary Bloomberg distribution that do not contain substantive changes from or additions to the information contained in the final term sheet prepared and filed pursuant to Section 5(b) hereto; provided that the prior written consent of the parties hereto shall be deemed to have been given in respect of the Free Writing Prospectuses included in Schedule III hereto or term sheet, substantially in the form of Schedule IV hereto, and any electronic road show.  The Company consents to the use by any Underwriter of a free writing prospectus that (a) is not an "issuer free writing prospectus" as defined in Rule 433, and (b) contains only (i) information describing the

9

preliminary terms of the Securities or the offering or (ii) information permitted by Rule 134. Any such free writing prospectus consented to by the Representatives or the Company is hereinafter referred to as a "Permitted Free Writing Prospectus." The Company agrees that (x) it has treated and will treat, as the case may be, each Permitted Free Writing Prospectus as an Issuer Free Writing Prospectus and (y) it has complied and will comply, as the case may be, with the requirements of Rules 164 and 433 applicable to any Permitted Free Writing Prospectus, including in respect of timely filing with the Commission, legending and record keeping and that it will not take any action that would result in any Underwriter or the Company being required to file with the Commission pursuant to Rule 433(d) a Free Writing Prospectus prepared by or on behalf of such Underwriter that such Underwriter would not otherwise have been required to so file.

(i)     The Company will not, without the prior written consent of the Representatives, offer, sell, contract to sell, pledge, or otherwise dispose of (or enter into any transaction which is designed to, or might reasonably be expected to, result in the disposition (whether by actual disposition or effective economic disposition due to cash settlement or otherwise) by the Company or any affiliate of the Company or any person in privity with the Company or any affiliate of the Company), directly or indirectly, including the filing (or participation in the filing) of a registration statement with the Commission in respect of, or establish or increase a put equivalent position or liquidate or decrease a call equivalent position within the meaning of Section 16 of the Exchange Act, any debt securities issued or guaranteed by the Company (other than the Securities) or publicly announce an intention to effect any such transaction, until the Business Day set forth on Schedule I hereto; provided that the prior written consent of the Representatives shall not be required for the sale or remarketing of tax-exempt bonds issued by a governmental authority or body for the benefit of the Company or for issuances of commercial paper or other debt securities with scheduled maturities of less than one year.

(j)     The Company will not take, directly or indirectly, any action designed to or that would constitute or that might reasonably be expected to cause or result in, under the Exchange Act or otherwise, stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of the Securities.

(k)     The Company agrees to pay the costs and expenses relating to the following matters:  (i) the preparation, printing or reproduction and filing with the Commission of the Registration Statement (including financial statements and exhibits thereto), each Preliminary Prospectus, the Final Prospectus and the Issuer Free Writing Prospectuses, and each amendment or supplement to any of them; (ii) the printing (or reproduction) and delivery (including postage, air freight charges and charges for counting and packaging) of such copies of the Registration Statement, each Preliminary Prospectus, the Final Prospectus and the Issuer Free Writing Prospectuses, and all amendments or supplements to any of them, as may, in each case, be reasonably requested for use in connection with the offering and sale of the Securities; (iii) the preparation, printing, authentication, issuance and delivery of certificates for the Securities, including any stamp or transfer taxes in connection with the original issuance and sale of the Securities; (iv) the printing (or reproduction) and delivery of this Agreement, any blue sky memorandum and all other agreements or documents printed

10

(or reproduced) and delivered in connection with the offering of the Securities; (v) any registration or qualification of the Securities for offer and sale under the securities or blue sky laws of the several states (including filing fees and the reasonable fees and expenses of counsel for the Underwriters relating to such registration and qualification); (vi) any filings required to be made with the Financial Industry Regulatory Authority, Inc. (including filing fees and the reasonable fees and expenses of counsel for the Underwriters relating to such filings); (vii) the transportation and other expenses incurred by or on behalf of Company representatives in connection with presentations to prospective purchasers of the Securities; (viii) the fees and expenses of the Company's accountants and the fees and expenses of counsel (including local and special counsel) for the Company; and (ix) all other costs and expenses incident to the performance by the Company of its obligations hereunder.

6.    Conditions to the Obligations of the Underwriters.  The obligations of the Underwriters to purchase the Securities shall be subject to the accuracy of the representations and warranties on the part of the Company contained herein as of the Execution Time and the Closing Date, to the accuracy of the statements of the Company made in any certificates pursuant to the provisions hereof, to the performance by the Company of its obligations hereunder and to the following additional conditions:

(a)    The Final Prospectus, and any supplement thereto, shall have been filed in the manner and within the time period required by Rule 424(b); the final term sheet contemplated by Section 5(b) hereto, and any other material required to be filed by the Company pursuant to Rule 433(d) under the Act, shall have been filed with the Commission within the applicable time periods prescribed for such filings by Rule 433; and no stop order suspending the effectiveness of the Registration Statement or any notice objecting to its use shall have been issued and no proceedings for that purpose shall have been instituted or threatened.

(b)    The Company shall have requested and caused Orrick, Herrington & Sutcliffe LLP, counsel for the Company, to have furnished to the Representatives their opinion, dated the Closing Date and addressed to the Representatives, substantially in the form set forth in Schedule V hereto.

(c)    The Representatives shall have received from Skadden, Arps, Slate, Meagher & Flom LLP, counsel for the Underwriters, such opinion or opinions, dated the Closing Date and addressed to the Representatives, with respect to the issuance and sale of the Securities, the Indenture, the Registration Statement, the Disclosure Package, the Final Prospectus (together with any supplement thereto) and other related matters as the Representatives may reasonably require, and the Company shall have furnished to such counsel such documents as they request for the purpose of enabling them to pass upon such matters.

(d)    The Company shall have furnished to the Representatives a certificate of the Company, signed by the Chairman of the Board, the Chief Executive Officer, the President, any Senior Vice President or the Treasurer and by the Chief Financial Officer of the Company, dated the Closing Date, to the effect that the signers of such certificate

11

have carefully examined the Registration Statement, the Disclosure Package, the Final Prospectus and any supplements or amendments thereto, as well as each electronic road show used in connection with the offering of the Securities, and this Agreement and that:

(i)     the representations and warranties of the Company in this Agreement are true and correct on and as of the Closing Date with the same effect as if made on the Closing Date and the Company has complied with all the agreements and satisfied all the conditions on its part to be performed or satisfied at or prior to the Closing Date;

(ii)    no stop order suspending the effectiveness of the Registration Statement or any notice objecting to its use has been issued and no proceedings for that purpose have been instituted or, to the Company's knowledge, threatened; and

(iii)   since the date of the most recent financial statements included in the Disclosure Package and the Final Prospectus (exclusive of any supplement thereto), there has been no Material Adverse Effect, except as set forth in or contemplated in the Disclosure Package and the Final Prospectus (exclusive of any supplement thereto).

(e)     The Company shall have requested and caused Deloitte & Touche LLP to have furnished to the Representatives, at the Execution Time and at the Closing Date, letters (which may refer to letters previously delivered to one or more of the Representatives), dated respectively as of the Execution Time and as of the Closing Date, in form and substance satisfactory to the Representatives, confirming that they are independent accountants within the meaning of the Act and the Exchange Act and the respective applicable rules and regulations adopted by the Commission thereunder and stating in effect that:

(i)     in their opinion the audited financial statements and financial statement schedules included or incorporated by reference in the Registration Statement, the Preliminary Prospectus and the Final Prospectus and reported on by them comply as to form with the applicable accounting requirements of the Act and the Exchange Act and the related rules and regulations adopted by the Commission;

(ii)    carrying out certain specified procedures (but not an examination in accordance with generally accepted auditing standards) which would not necessarily reveal matters of significance with respect to the comments set forth in such letter; and inquiries of certain officials of the Company who have responsibility for financial and accounting matters of the Company and its subsidiaries as to transactions and events subsequent to December 31, 2015, nothing came to their attention which caused them to believe that, with respect to the period subsequent to December 31, 2015, there were any changes, at a specified date not more than five days prior to the date of the letter, in the long-term debt or short-term borrowings of the Company and its subsidiaries or the

12

capital stock of the Company or decreases in current assets or the shareholders' equity of the Company, as compared with the amounts shown on the December 31, 2015 consolidated balance sheet included or incorporated by reference in the Registration Statement, the Preliminary Prospectus and the Final Prospectus, or for the period from January 1, 2016 to such specified date there were any decreases, as compared with the corresponding period in the preceding year in operating revenues, income before income taxes or net income of the Company and its subsidiaries, except in all instances for changes or decreases set forth in such letter, in which case the letter shall be accompanied by an explanation by the Company as to the significance thereof unless said explanation is not deemed necessary by the Representatives; and

(iii)    they have performed certain other specified procedures as a result of which they determined that certain information of an accounting, financial or statistical nature (which is limited to accounting, financial or statistical information derived from the general accounting records of the Company and its subsidiaries) set forth in the Registration Statement, the Preliminary Prospectus and the Final Prospectus and in Exhibit 12 to the Registration Statement, including the information set forth under the captions "Ratio of Earnings to Fixed Charges" and "Capitalization" in the Preliminary Prospectus and the Final Prospectus, and the information included or incorporated by reference in Items 1, 1A, 6, 7 and 7A of the Company's Annual Report on Form 10-K and the information included in "Management's Discussion and Analysis of Financial Conditions and Results of Operations" included in the Company's Quarterly Reports on Form 10-Q, incorporated by reference in the Registration Statement, the Preliminary Prospectus and the Final Prospectus, agrees with the accounting records of the Company and its subsidiaries, excluding any questions of legal interpretation.

References to the Final Prospectus in this paragraph (e) include any supplement thereto at the date of the letter.

(f)    Subsequent to the Execution Time or, if earlier, the dates as of which information is given in the Registration Statement (exclusive of any amendment thereof) and the Final Prospectus (exclusive of any amendment or supplement thereto), there shall not have been (i) any material change or decrease specified in the letter or letters referred to in paragraph (e) of this Section 6 or (ii) any change in or affecting the condition (financial or otherwise), earnings, business or properties of the Company and its subsidiaries taken as a whole, whether or not arising from transactions in the ordinary course of business, except as set forth in or contemplated in the Disclosure Package and the Final Prospectus (exclusive of any amendment or supplement thereto) the effect of which, in any case referred to in clause (i) or (ii) above, is, in the judgment of the Representatives, so material and adverse as to make it impractical or inadvisable to proceed with the offering or delivery of the Securities as contemplated by the Registration Statement (exclusive of any amendment thereof), the Disclosure Package and the Final Prospectus (exclusive of any amendment or supplement thereto).

(g)     Subsequent to the Execution Time, there shall not have been any decrease in the rating of any of PG&E Corporation's or the Company's debt securities by any "nationally recognized statistical rating organization" (as defined in Section 3(a)(62) of the Exchange Act) or any notice given of any intended or potential decrease in any such rating or of a possible change in any such rating.

(h)     Prior to the Closing Date, the Company shall have furnished to the Representatives such further information, certificates and documents as the Representatives may reasonably request.

If any of the conditions specified in this Section 6 shall not have been fulfilled when and as provided in this Agreement, or if any of the opinions and certificates mentioned above or elsewhere in this Agreement shall not be reasonably satisfactory in form and substance to the Representatives and counsel for the Underwriters, this Agreement and all obligations of the Underwriters hereunder may be canceled at, or at any time prior to, the Closing Date by the Representatives.  Notice of such cancellation shall be given to the Company in writing or by telephone or facsimile confirmed in writing.

The documents required to be delivered by this Section 6 shall be delivered at the office of Skadden, Arps, Slate, Meagher & Flom LLP, counsel for the Underwriters, at Four Times Square, New York, New York, on the Closing Date.

7.     <u>Reimbursement of Underwriters' Expenses</u>.  If the sale of the Securities provided for herein is not consummated because any condition to the obligations of the Underwriters set forth in Section 6 hereof is not satisfied, because of any termination pursuant to Section 10 hereof or because of any refusal, inability or failure on the part of the Company to perform any agreement herein or comply with any provision hereof other than by reason of a default by any of the Underwriters, the Company will reimburse the Underwriters severally through Morgan Stanley & Co. LLC, on demand for all expenses (including reasonable fees and disbursements of counsel) that shall have been incurred by them in connection with the proposed purchase and sale of the Securities.

8.     <u>Indemnification and Contribution</u>.  (a)  The Company agrees to indemnify and hold harmless each Underwriter, the directors, officers, employees and agents of each Underwriter and each person who controls any Underwriter within the meaning of either the Act or the Exchange Act and each affiliate of any Underwriter within the meaning of Rule 405 under the Securities Act against any and all losses, claims, damages or liabilities, joint or several, to which they or any of them may become subject under the Act, the Exchange Act or other Federal or state statutory law or regulation, at common law or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon any untrue statement or alleged untrue statement of a material fact contained in the Registration Statement or in any subsequent amendment thereof, or in the Base Prospectus, any Preliminary Prospectus or any other preliminary prospectus supplement relating to the Securities, the Final Prospectus, any Issuer Free Writing Prospectus or the information contained in the final term sheet required to be prepared and filed pursuant to Section 5(b) hereto, or in any amendment thereof or supplement thereto, or arise out of or are based upon the omission or alleged

omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and agrees to reimburse each such indemnified party, as incurred, for any legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability or action; provided, however, that the Company will not be liable in any such case to the extent that any such loss, claim, damage or liability arises out of or is based upon any such untrue statement or alleged untrue statement or omission or alleged omission made therein in reliance upon and in conformity with written information furnished to the Company by or on behalf of any Underwriter through the Representatives specifically for inclusion therein, it being understood and agreed that the only such information furnished by or on behalf of any Underwriter consists of the information described as such in this Section 8. This indemnity agreement will be in addition to any liability which the Company may otherwise have.

(b)     Each Underwriter severally and not jointly agrees to indemnify and hold harmless the Company, each of its directors, each of its officers who signs the Registration Statement, and each person who controls the Company within the meaning of either the Act or the Exchange Act, to the same extent as the foregoing indemnity from the Company to each Underwriter, but only with reference to written information relating to such Underwriter furnished to the Company by or on behalf of such Underwriter through the Representatives specifically for inclusion in the documents referred to in the foregoing indemnity. This indemnity agreement will be in addition to any liability which any Underwriter may otherwise have. The Company acknowledges that the statements set forth (i) in the last paragraph of the cover page regarding delivery of the Securities, (ii) under the heading "Underwriting," (A) the sentences related to concessions and reallowances and (B) the paragraph related to stabilization, syndicate covering transactions and penalty bids in any Preliminary Prospectus and the Final Prospectus constitute the only information furnished in writing by or on behalf of the several Underwriters for inclusion in any Preliminary Prospectus, the Final Prospectus or any Issuer Free Writing Prospectus.

(c)     Promptly after receipt by an indemnified party under this Section 8 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Section 8, notify the indemnifying party in writing of the commencement thereof; but the failure so to notify the indemnifying party (i) will not relieve it from liability under paragraph (a) or (b) above unless and to the extent it did not otherwise learn of such action and such failure results in the forfeiture by the indemnifying party of substantial rights and defenses and (ii) will not, in any event, relieve the indemnifying party from any obligations to any indemnified party other than the indemnification obligation provided in paragraph (a) or (b) above. The indemnifying party shall be entitled to appoint counsel of the indemnifying party's choice at the indemnifying party's expense to represent the indemnified party in any action for which indemnification is sought (in which case the indemnifying party shall not thereafter be responsible for the fees and expenses of any separate counsel retained by the indemnified party or parties except as set forth below); provided, however, that such counsel shall be satisfactory to the indemnified party. Notwithstanding the indemnifying party's election to appoint counsel to represent the

15

indemnified party in an action, the indemnified party shall have the right to employ separate counsel (including local counsel), and the indemnifying party shall bear the reasonable fees, costs and expenses of such separate counsel if (i) the use of counsel chosen by the indemnifying party to represent the indemnified party would present such counsel with a conflict of interest, (ii) the actual or potential defendants in, or targets of, any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there may be legal defenses available to it and/or other indemnified parties which are different from or additional to those available to the indemnifying party, (iii) the indemnifying party shall not have employed counsel satisfactory to the indemnified party to represent the indemnified party within a reasonable time after notice of the institution of such action or (iv) the indemnifying party shall authorize the indemnified party to employ separate counsel at the expense of the indemnifying party. It is understood that the indemnifying party shall not, in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the fees and expenses of more than one separate counsel (in addition to one local counsel) for all such indemnified parties. An indemnifying party will not, without the prior written consent of the indemnified parties, settle or compromise or consent to the entry of any judgment with respect to any pending or threatened claim, action, suit or proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not the indemnified parties are actual or potential parties to such claim or action) unless such settlement, compromise or consent (i) includes an unconditional release of each indemnified party from all liability arising out of such claim, action, suit or proceeding and (ii) does not include any statement as to or an admission of fault, culpability or a failure to act, by or on behalf of any indemnified party. No indemnifying party will be liable for any settlement of any such action effected without its prior written consent (which consent shall not be unreasonably withheld), but if settled with the consent of the indemnifying party or if there be a final judgment of the plaintiff in any such action, the indemnifying party agrees to indemnify and hold harmless any indemnified party from and against any loss or liability by reason of such settlement or judgment.

(d)     In the event that the indemnity provided in paragraph (a), (b) or (c) of this Section 8 is unavailable to or insufficient to hold harmless an indemnified party for any reason, the Company and the Underwriters severally agree to contribute to the aggregate losses, claims, damages and liabilities (including legal or other expenses reasonably incurred in connection with investigating or defending the same) (collectively "Losses") to which the Company and one or more of the Underwriters may be subject in such proportion as is appropriate to reflect the relative benefits received by the Company on the one hand and by the Underwriters on the other from the offering of the Securities; provided, however, that in no case shall any Underwriter (except as may be provided in any agreement among underwriters relating to the offering of the Securities) be responsible for any amount in excess of the underwriting discount or commission applicable to the Securities purchased by such Underwriter hereunder. If the allocation provided by the immediately preceding sentence is unavailable for any reason, the Company and the Underwriters severally shall contribute in such proportion as is appropriate to reflect not only such relative benefits but also the relative fault of the Company on the one hand and of the Underwriters on the other in connection with the

16

statements or omissions which resulted in such Losses as well as any other relevant equitable considerations. Benefits received by the Company shall be deemed to be equal to the total net proceeds from the offering (before deducting expenses) received by it, and benefits received by the Underwriters shall be deemed to be equal to the total underwriting discounts and commissions, in each case as set forth on the cover page of the Final Prospectus. Relative fault shall be determined by reference to, among other things, whether any untrue or any alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information provided by the Company on the one hand or the Underwriters on the other, the intent of the parties and their relative knowledge, access to information and opportunity to correct or prevent such untrue statement or omission. The Company and the Underwriters agree that it would not be just and equitable if contribution were determined by pro rata allocation or any other method of allocation which does not take account of the equitable considerations referred to above. Notwithstanding the provisions of this paragraph (d), no person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. For purposes of this Section 8, each person who controls an Underwriter within the meaning of either the Act or the Exchange Act and each director, officer, employee and agent of an Underwriter shall have the same rights to contribution as such Underwriter, and each person who controls the Company within the meaning of either the Act or the Exchange Act, each officer of the Company who shall have signed the Registration Statement and each director of the Company shall have the same rights to contribution as the Company, subject in each case to the applicable terms and conditions of this paragraph (d).

9.    <u>Default by an Underwriter</u>.  If any one or more Underwriters shall fail to purchase and pay for any of the Securities agreed to be purchased by such Underwriter or Underwriters hereunder and such failure to purchase shall constitute a default in the performance of its or their obligations under this Agreement, the remaining Underwriters shall be obligated severally to take up and pay for (in the respective proportions which the principal amount of Securities set forth opposite their names in Schedule II hereto bears to the aggregate principal amount of Securities set forth opposite the names of all the remaining Underwriters) the Securities which the defaulting Underwriter or Underwriters agreed but failed to purchase; <u>provided</u>, <u>however</u>, that in the event that the aggregate principal amount of Securities which the defaulting Underwriter or Underwriters agreed but failed to purchase shall exceed 10% of the aggregate principal amount of Securities set forth in Schedule II hereto, the remaining Underwriters shall have the right to purchase all, but shall not be under any obligation to purchase any, of the Securities, and if such nondefaulting Underwriters do not purchase all the Securities, this Agreement will terminate without liability to any nondefaulting Underwriter or the Company. In the event of a default by any Underwriter as set forth in this Section 9, the Closing Date shall be postponed for such period, not exceeding five Business Days, as the Representatives shall determine in order that the required changes in the Registration Statement and the Final Prospectus or in any other documents or arrangements may be effected. Nothing contained in this Agreement shall relieve any defaulting Underwriter of its liability, if any, to the Company and any nondefaulting Underwriter for damages occasioned by its default hereunder.

10. <u>Termination</u>. This Agreement shall be subject to termination in the absolute discretion of the Representatives, by notice given to the Company prior to delivery of and payment for the Securities, if at any time prior to such delivery and payment: (a) (i) trading in the common stock of PG&E Corporation shall have been suspended by the Commission or the New York Stock Exchange, (ii) trading in any series of the preferred stock of the Company shall have been suspended by the Commission or the NYSE MKT LLC, (iii) (A) trading in securities generally on the New York Stock Exchange shall have been suspended or limited, (B) minimum prices shall have been established on either of such exchanges, or (C) there shall have been a material disruption in the clearance or settlement of securities generally on either of such exchanges which makes it, in the sole judgment of the Representatives, impractical or inadvisable to proceed with the offering or delivery of the Securities as contemplated by this Agreement, the Disclosure Package or the Final Prospectus (exclusive of any amendment or supplement thereto), (b) a banking moratorium shall have been declared either by Federal, California or New York State authorities, (c) there shall have occurred any outbreak or escalation of hostilities, declaration by the United States of a national emergency or war, or other calamity or crisis which makes it, in the sole judgment of the Representatives, impractical or inadvisable to proceed with the offering or delivery of the Securities as contemplated by this Agreement, the Disclosure Package or the Final Prospectus (exclusive of any amendment or supplement thereto) or (d) there shall have been such a material adverse change in general economic, political or financial conditions or the financial markets in the United States which makes it, in the sole judgment of the Representatives, impractical or inadvisable to proceed with the offering or delivery of the Securities as contemplated by this Agreement, the Disclosure Package or the Final Prospectus (exclusive of any amendment or supplement thereto).

11. <u>Representations and Indemnities to Survive</u>. The respective agreements, representations, warranties, indemnities and other statements of the Company or its officers and of the Underwriters set forth in or made pursuant to this Agreement will remain in full force and effect, regardless of any investigation made by or on behalf of any Underwriter or the Company or any of the officers, directors, employees, agents or controlling persons referred to in Section 8 hereof, and will survive delivery of and payment for the Securities. The provisions of Sections 7 and 8 hereof shall survive the termination or cancellation of this Agreement.

12. <u>Notices</u>. All communications hereunder will be in writing and effective only on receipt, and, if sent to the Representatives, will be mailed, delivered or telefaxed to (i) Barclays Capital Inc., 745 Seventh Avenue, New York, NY 10019 (fax no.: 646-834-8133), Attention: Syndicate Registration; (ii) BNP Paribas Securities Corp., 787 Seventh Avenue, New York, NY 10019 (fax no.: (917) 472-4745), Attention: Syndicate Desk; (iii) Morgan Stanley & Co. LLC, 1585 Broadway, 29th Floor, New York, NY 10036 (fax no.: (212) 507-8999), Attention: Investment Banking Division; (iv); Mitsubishi UFJ Securities (USA), Inc. 1221 Avenue of the Americas, 6th Floor, New York, NY 10020 (fax no.: 646-434-3455), Attention: Capital Markets Group; and (v) The Williams Capital Group, L.P., 650 Fifth Avenue, 9th Floor, New York, NY 10019 (fax no.: 212.830.4545) Attention: Corporate Finance Department; or, if sent to the Company, will be mailed, delivered or telefaxed to the Company's General Counsel (fax no.: (415) 973-6374) and confirmed to the Company's General Counsel, PG&E Corporation, at 77 Beale Street, San Francisco, CA 94105, Attention: General Counsel.

18

In accordance with the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), the Underwriters are required to obtain, verify and record information that identifies their respective clients, including the Company, which information may include the name and address of their respective clients, as well as other information that will allow the Underwriters to properly identify their respective clients.

       13.   <u>Successors</u>.  This Agreement will inure to the benefit of and be binding upon the parties hereto and their respective successors and the officers, directors, employees, agents and controlling persons referred to in Section 8 hereof, and no other person will have any right or obligation hereunder.

       14.   <u>No Fiduciary Duty</u>. The Company hereby acknowledges that (a) the purchase and sale of the Securities pursuant to this Agreement is an arm's-length commercial transaction between the Company, on the one hand, and the Underwriters and any affiliate through which it may be acting, on the other, (b) the Underwriters are acting as principal and not as an agent or fiduciary of the Company and (c) the Company's engagement of the Underwriters in connection with the offering and the process leading up to the offering is as independent contractors and not in any other capacity. Furthermore, the Company agrees that it is solely responsible for making its own judgments in connection with the offering (irrespective of whether any of the Underwriters has advised or is currently advising the Company on related or other matters). The Company agrees that it will not claim that the Underwriters have rendered advisory services of any nature or respect, or owe an agency, fiduciary or similar duty to the Company, in connection with such transaction or the process leading thereto.

       15.   <u>Research Analyst Independence</u>.  The Company acknowledges that the Underwriters' research analysts and research departments are required to be independent from their respective investment banking divisions and are subject to certain regulations and internal policies, and that such Underwriters' research analysts may hold views and make statements or investment recommendations and/or publish research reports with respect to the Company and/or the offering of the Securities that differ from the views of their respective investment banking divisions. The Company hereby waives and releases, to the fullest extent permitted by law, any claims that the Company may have against the Underwriters with respect to any conflict of interest that may arise from the fact that the views expressed by their independent research analysts and research departments may be different from or inconsistent with the views or advice communicated to the Company by such Underwriters' investment banking divisions. The Company acknowledges that each of the Underwriters is a full service securities firm and as such from time to time, subject to applicable securities laws, may effect transactions for its own account or the account of its customers and hold long or short positions in debt or equity securities of the companies that may be the subject of the transactions contemplated by this Agreement.

       16.   <u>Integration</u>. This Agreement supersedes all prior agreements and understandings (whether written or oral) between the Company and the Underwriters, or any of them, with respect to the subject matter hereof.

Case: 19-30088   Doc# 5374-10   Filed: 08/14/20   Entered: 08/14/20 15:56:59   Page 209 of
424 of 524

17. <u>Applicable Law</u>. This Agreement will be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed within the State of New York.

18. <u>Waiver of Jury Trial</u>. The Company hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

19. <u>Counterparts</u>. This Agreement may be signed in one or more counterparts, each of which shall constitute an original and all of which together shall constitute one and the same agreement.

20. <u>Headings</u>. The section headings used herein are for convenience only and shall not affect the construction hereof.

21. <u>Definitions</u>. The terms that follow, when used in this Agreement, shall have the meanings indicated.

"Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations of the Commission promulgated thereunder.

"Base Prospectus" shall mean the base prospectus referred to in paragraph 1(a) above contained in the Registration Statement at the Execution Time.

"Business Day" shall mean any day other than a Saturday, a Sunday or a legal holiday or a day on which banking institutions or trust companies are authorized or obligated by law to close in New York City.

"Closing Date" shall mean March 1, 2016.

"Commission" shall mean the Securities and Exchange Commission.

"Disclosure Package" shall mean (i) the Base Prospectus, (ii) the Preliminary Prospectus used most recently prior to the Execution Time, (iii) the Issuer Free Writing Prospectuses, if any, identified in Schedule III hereto, (iv) the final term sheet prepared and filed pursuant to Section 5(b) hereto, if any, and (v) any other Free Writing Prospectus that the parties hereto shall hereafter expressly agree in writing to treat as part of the Disclosure Package.

"Effective Date" shall mean each date and time that the Registration Statement, any post-effective amendment or amendments thereto became or becomes effective and, if later, the date the annual report of the last completed fiscal year of the Company on Form 10-K was so filed.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations of the Commission promulgated thereunder.

"Execution Time" shall mean 3:00 p.m. Eastern Time on February 23, 2016, which is the time of the first contract of sale of the Securities.

"Final Prospectus" shall mean the prospectus supplement relating to the Securities that was first filed pursuant to Rule 424(b) after the Execution Time, together with the Base Prospectus.

"Free Writing Prospectus" shall mean a free writing prospectus, as defined in Rule 405.

"Issuer Free Writing Prospectus" shall mean an issuer free writing prospectus, as defined in Rule 433.

"Preliminary Prospectus" shall mean any preliminary prospectus supplement to the Base Prospectus referred to in paragraph 1(a) above which is used prior to the filing of the Final Prospectus, together with the Base Prospectus.

"Registration Statement" shall mean the registration statement referred to in paragraph 1(a) above, including exhibits and financial statements and any prospectus supplement relating to the Securities that is filed with the Commission pursuant to Rule 424(b) and deemed part of such registration statement pursuant to Rule 430B, as amended on each Effective Date and, in the event any post-effective amendment thereto becomes effective prior to the Closing Date, shall also mean such registration statement as so amended. Any reference to the "Registration Statement" shall be deemed to refer to and include the annual report of the last completed fiscal year of the Company on Form 10-K filed under Section 13(a) or 15(d) of the Exchange Act prior to the date hereof.

"Rule 134," "Rule 158," "Rule 163," "Rule 164," "Rule 172," "Rule 405," "Rule 415," "Rule 424," "Rule 430B" and "Rule 433" refer to such rules under the Act.

"Trust Indenture Act" shall mean the Trust Indenture Act of 1939, as amended, and the rules and regulations of the Commission promulgated thereunder.

"Well-Known Seasoned Issuer" shall mean a well-known seasoned issuer, as defined in Rule 405.

Case: 19-00088   Doc# 537-10   Filed: 08/14/20   Entered: 08/14/20 15:56:59   Page 206
Case: 19-30088   Doc# 5374-10   Filed: 01/14/21   Entered: 01/14/21 09:15:56   Page 206 of
426 of 524

If the foregoing is in accordance with your understanding of our agreement, please sign and return to us the enclosed duplicate hereof, whereupon this letter and your acceptance shall represent a binding agreement among the Company and the several Underwriters.

Very truly yours,

Pacific Gas and Electric Company

By: _____

Name: Nicholas M. Bijur
Title: Vice President and Treasurer

*[Signature Page to Underwriting Agreement]*

The foregoing Agreement is hereby confirmed
and accepted as of the date first written above.

BARCLAYS CAPITAL INC.

By: _____
    Name: Robert A. Stowe
    Title: Managing Director

BNP PARIBAS SECURITIES CORP.

By: _____
    Name:

    Title:

MORGAN STANLEY & CO. LLC

By: _____
    Name:

    Title:

MITSUBISHI UFJ SECURITIES (USA), INC.

By: _____
    Name:

    Title:

THE WILLIAMS CAPITAL GROUP, L.P.

By: _____
    Name:

    Title:

For themselves and as Representatives of the other several Underwriters named herein.

[*Signature Page to Underwriting Agreement*]

The foregoing Agreement is hereby confirmed
and accepted as of the date first written above.

BARCLAYS CAPITAL INC.

By: _____
      Name:
      Title:

BNP PARIBAS SECURITIES CORP.

By: _____
      Name: E Zellwegen T
      Title: Manging Dinuti

MORGAN STANLEY & CO. LLC

By: _____
      Name:
      Title:

MITSUBISHI UFJ SECURITIES (USA), INC.

By: _____
      Name:
      Title:

THE WILLIAMS CAPITAL GROUP, L.P.

By: _____
      Name:
      Title:

For themselves and as Representatives of the other several Underwriters named herein.

[*Signature Page to Underwriting Agreement*]

The foregoing Agreement is hereby confirmed and accepted as of the date first written above.

BARCLAYS CAPITAL INC.

By: _____
　　　Name:
　　　Title:

BNP PARIBAS SECURITIES CORP.

By: _____
　　　Name:
　　　Title:

MORGAN STANLEY & CO. LLC

By: _____
　　　Name:
　　　Title:

MITSUBISHI UFJ SECURITIES (USA), INC.

By: _____
　　　Name:
　　　Title:

THE WILLIAMS CAPITAL GROUP, L.P.

By: _____
　　　Name:
　　　Title:

For themselves and as Representatives of the other several Underwriters named herein.

*[Signature Page to Underwriting Agreement]*

The foregoing Agreement is hereby confirmed and accepted as of the date first written above.

BARCLAYS CAPITAL INC.

By: _____
     Name:
     Title:

BNP PARIBAS SECURITIES CORP.

By: _____
     Name:
     Title:

MORGAN STANLEY & CO. LLC

By: _____
     Name:
     Title:

MITSUBISHI UFJ SECURITIES (USA), INC.

By: _____
     Name: Richard Testa
     Title: Managing Director.

THE WILLIAMS CAPITAL GROUP, L.P.

By: _____
     Name:
     Title:

For themselves and as Representatives of the other several Underwriters named herein.

*[Signature Page to Underwriting Agreement]*

The foregoing Agreement is hereby confirmed
and accepted as of the date first written above.

BARCLAYS CAPITAL INC.

By: _____

    Name:

    Title:

BNP PARIBAS SECURITIES CORP.

By: _____

    Name:

    Title:

MORGAN STANLEY & CO. LLC

By: _____

    Name:

    Title:

MITSUBISHI UFJ SECURITIES (USA), INC.

By: _____

    Name:

    Title:

THE WILLIAMS CAPITAL GROUP, L.P.

By: _____

    Name:

    Title:

THE WILLIAMS CAPITAL GROUP, L.P. By: The
Williams Capital Group, Inc., its General Partner

By: _____

David Finkelstein – Assistant Vice President

For themselves and as Representatives of the other several Underwriters named herein.

[*Signature Page to Underwriting Agreement*]

## SCHEDULE I

Underwriting Agreement dated February 23, 2016

Registration Statement No. 333-193879

**Representatives:**  Barclays Capital Inc.
BNP Paribas Securities Corp.
Morgan Stanley & Co. LLC
Mitsubishi UFJ Securities (USA), Inc.
The Williams Capital Group, L.P.

**Title, Purchase Price and Description of Securities:**

**Title:** 2.95% Senior Notes due March 1, 2026

**Principal amount:** $600,000,000

**Price to Public:** 99.734%

**Price to Underwriters:** 99.084%

**Interest payment dates:** March 1 and September 1, commencing September 1, 2016

**Sinking fund provisions:** Not applicable

**Redemption provisions:**

At any time prior to December 1, 2025 (the date that is three months prior to the maturity date), Pacific Gas and Electric Company may, at its option, redeem the 2.95% Notes due March 1, 2026 (in this Schedule, the "2026 Notes") in whole or in part at a redemption price equal to the greater of: (1) 100% of the principal amount of the 2026 Notes to be redeemed or (2) as determined by the Quotation Agent, the sum of the present values of the remaining scheduled payments of principal and interest on the 2026 Notes to be redeemed (not including any portion of payments of interest accrued as of the redemption date), calculated as if the maturity date of such notes was December 1, 2025 (the date that is three months prior to the maturity date), discounted to the redemption date on a semiannual basis at the Adjusted Treasury Rate plus 20 basis points, plus, in either case, accrued and unpaid interest to the redemption date.

At any time on or after December 1, 2025, Pacific Gas and Electric Company may redeem the 2026 Notes, in whole or in part, at 100% of the principal amount of the 2026 Notes being redeemed plus accrued and unpaid interest to the redemption date. The redemption price will be calculated assuming a 360-day year consisting of twelve 30-day months.

**Other provisions:** Not applicable

**Closing Date, Time and Location:**  March 1, 2016 at 10:00 a.m. at Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, NY 10036

Date referred to in Section 5(i) after which the Company may offer or sell debt securities issued or guaranteed by the Company without the consent of the Representative(s):  March 1, 2016

Modification of items to be covered by the letter from Deloitte & Touche LLP delivered pursuant to Section 6(e) at the Execution Time:  None

# SCHEDULE II

| Underwriters | Principal Amount of 2.95% Senior Notes due March 1, 2026 to be Purchased |
|---|---|
| Barclays Capital Inc. | $120,000,000 |
| BNP Paribas Securities Corp. | 120,000,000 |
| Morgan Stanley & Co. LLC | 120,000,000 |
| Mitsubishi UFJ Securities (USA), Inc. | 72,000,000 |
| The Williams Capital Group, L.P. | 72,000,000 |
| BNY Mellon Capital Markets, LLC | 36,000,000 |
| TD Securities (USA) LLC | 36,000,000 |
| C.L. King & Associates, Inc. | 12,000,000 |
| Great Pacific Securities | 12,000,000 |
| Total ................................................. | $600,000,000 |

**SCHEDULE III**

Schedule of the Free Writing Prospectus included in the Disclosure Package

1.      Free Writing Prospectus, dated as of February 23, 2016 and filed pursuant to Rule 433 on February 23, 2016, relating to the 2.95% Senior Notes due March 1, 2026.

# SCHEDULE IV

Filed Pursuant to Rule 433
Registration No. 333-193879
February 23, 2016

## PRICING TERM SHEET

**Pacific Gas and Electric Company**
**2.95% Senior Notes due March 1, 2026**

**Issuer:** Pacific Gas and Electric Company

**Anticipated Ratings (Moody's/S&P/Fitch):\*** Intentionally omitted

**Principal Amount:** $600,000,000

**Trade Date:** February 23, 2016

**Settlement Date:** March 1, 2016 (T+5)

**Maturity Date:** March 1, 2026

**Interest Payment Dates:** March 1 and September 1, commencing September 1, 2016

**Coupon:** 2.95%

**Price to Public:** 99.734%

**Benchmark Treasury:** 1.625% due February 15, 2026

**Benchmark Treasury Yield:** 1.731%

**Spread to Benchmark Treasury:** +125 basis points

**Yield to Maturity:** 2.981%

**Optional Redemption:** At any time prior to December 1, 2025 (the date that is three months prior to the maturity date), Pacific Gas and Electric Company may, at its option, redeem the 2.95% Senior Notes in whole or in part at a redemption price equal to the greater of:

- 100% of the principal amount of the 2.95% Senior Notes to be redeemed; or

- as determined by the Quotation Agent, the sum of the present values of the remaining scheduled payments of principal and interest on the 2.95% Senior Notes to be redeemed (not including any portion of payments of interest accrued as of the redemption date), calculated as if the maturity date of

1

such notes was December 1, 2025 (the date that is three months prior to the maturity date), discounted to the redemption date on a semiannual basis at the Adjusted Treasury Rate plus 20 basis points,

plus, in either case, accrued and unpaid interest to the redemption date.

At any time on or after December 1, 2025, Pacific Gas and Electric Company may redeem the 2.95% Senior Notes, in whole or in part, at 100% of the principal amount of the 2.95% Senior Notes being redeemed plus accrued and unpaid interest to the redemption date.

| | |
|---|---|
| **CUSIP / ISIN:** | 694308 HP5 / US694308HP52 |
| **Joint Book-Running Managers:** | Barclays Capital Inc.<br>BNP Paribas Securities Corp.<br>Morgan Stanley & Co. LLC<br>Mitsubishi UFJ Securities (USA), Inc.<br>The Williams Capital Group, L.P. |
| **Co-Managers:** | BNY Mellon Capital Markets, LLC<br>TD Securities (USA) LLC<br>C.L. King & Associates, Inc.<br>Great Pacific Securities |

**\*Note: A securities rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time.**

**The issuer has filed a registration statement (including a prospectus) with the SEC for the offering to which this communication relates. Before you invest, you should read the prospectus in that registration statement and other documents the issuer has filed with the SEC for more complete information about the issuer and this offering.**

**You may get these documents for free by visiting EDGAR on the SEC Web site at www.sec.gov. Alternatively, the issuer, any underwriter or any dealer participating in the offering will arrange to send you the prospectus if you request it by calling (i) Barclays Capital Inc., toll free at 1-888-603-5847, (ii) BNP Paribas Securities Corp., toll free at 1-800-854-5674, and (iii) Morgan Stanley & Co. LLC, toll free at 1-866-718-1649.**

**SCHEDULE V**

**Form of Opinion of Orrick, Herrington & Sutcliffe LLP**

(i)     the Registration Statement has become effective under the Act; to the knowledge of such counsel, no stop order suspending the effectiveness of the Registration Statement has been issued and no proceedings for that purpose have been threatened or instituted by, or are pending before, the Commission, and the Registration Statement, as of each Effective Date and the Final Prospectus, as of its date (other than the financial statements, schedules and other financial data contained or incorporated by reference therein, as to which such counsel need express no opinion) comply as to form in all material respects with the applicable requirements of the Act, the Exchange Act and the Trust Indenture Act and the respective rules promulgated thereunder; the Final Prospectus and the final term sheet have been filed pursuant to, and within the time frame contemplated by, Rule 424(b) and Rule 433, respectively, promulgated under the Act;

(ii)     the Company has been duly incorporated and is validly existing as a corporation in good standing under the laws of the State of California, with the corporate power and corporate authority to own or lease, as the case may be, and to operate its properties and conduct its business as described in the Registration Statement, the Disclosure Package and the Final Prospectus;

(iii)     the Indenture has been duly authorized, executed and delivered by the Company, has been duly qualified under the Trust Indenture Act and, assuming due authorization, execution and delivery thereof by the Trustee constitutes a valid and binding obligation of the Company enforceable against the Company in accordance with its terms (subject, to the effect of any bankruptcy, reorganization, insolvency, arrangement, fraudulent conveyance, moratorium, receivership, assignment for the benefit of creditors or other laws relating to or affecting creditors' rights generally from time to time in effect and to general principles of equity, including, without limitation, concepts of materiality, reasonableness, good faith and fair dealing, regardless of whether considered in a proceeding in equity or at law); and the Securities have been duly authorized and executed by the Company and when authenticated by the Trustee in accordance with the provisions of the Indenture and delivered to and paid for by the Underwriters pursuant to this Agreement, will have been validly issued and delivered, will be entitled to the benefits of the Indenture and will constitute valid and binding obligations of the Company, enforceable against the Company in accordance with their terms;

(iv)     to the knowledge of such counsel, there is no pending or threatened action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Company or any of its subsidiaries or its or their property, of a character required to be disclosed in the Registration Statement other than those disclosed in the Preliminary Prospectus and the Final Prospectus (in rendering such opinion, such counsel may note that it

has not conducted searches of the dockets of any court or administrative agency whatsoever);

(v)     this Agreement has been duly authorized, executed and delivered by the Company;

(vi)     the Company is not and, after giving effect to the offering and sale of the Securities and the application of the proceeds thereof as described in the Disclosure Package and the Final Prospectus, will not be an "investment company" as defined in the 1940 Act or a company "controlled" by an "investment company" within the meaning of the 1940 Act;

(vii)     none of the issue or sale of the Securities, the consummation of the transactions contemplated by this Agreement or the performance by the Company of its obligations hereunder will (A) conflict with or result in any violation of (1) the Articles of Incorporation or Bylaws of the Company, or (2) any Federal, California or, as to this Agreement, New York, statute or any rule or regulation issued pursuant to any Federal, California or, as to this Agreement, New York statute, including, without limitation, the California Public Utilities Code and California usury laws ("Applicable Laws"), or any order known to such counsel to have been issued pursuant to any Applicable Law by any Federal, California or, as to this Agreement, New York, court or governmental agency or body that such counsel has in the exercise of customary professional diligence recognized as having jurisdiction over the Company or any of its properties ("Applicable Governmental Authority") or (B) result in a breach or violation of, or constitute a default under, any agreement, indenture or other instrument to which the Company or any of its subsidiaries is a party that has been filed (i) pursuant to Item 601(b)(4) or Item 601(b)(10) of Regulation S-K promulgated under the Act as an exhibit to the Company's Annual Report on Form 10-K for the year ended December 31, 2015, or (ii) as an exhibit to any report on Form 8-K filed by the Company between January 1, 2016 and the Closing Date;

(viii)     no consent, approval, authorization, filing with or order of or with any Applicable Governmental Authority (a "Governmental Action") is required for the valid authorization, execution, issuance, sale and delivery of the Securities by the Company except for any Governmental Actions that have been obtained or made, and such as may be required under the blue sky laws of any jurisdiction in connection with the purchase and distribution of the Securities by the Underwriters in the manner contemplated in this Agreement, the Disclosure Package and the Final Prospectus; and

(ix)     the statements in the Disclosure Package and the Final Prospectus under the caption "Description of the Senior Notes" insofar as such statements purport to summarize certain provisions of the Indenture and the Securities, fairly summarize such provisions in all material respects, and the statements under the caption "Certain United States Federal Income Tax Consequences" in the Disclosure Package and the Final Prospectus, insofar as such statements constitute

summaries of the United States federal income tax laws, are accurate in all material respects.

The letter from such counsel shall include a separate paragraph to the effect that in the course of its engagement as counsel to the Company in connection with the offering of the Securities, it has participated in conferences with the Underwriters and their representatives and representatives of the Company and its accountants concerning the Registration Statement, the Disclosure Package and the Final Prospectus and considered the matters required to be stated therein and the statements contained therein, and, although they were not engaged to and did not independently verify the accuracy, completeness or fairness of such statements (except as stated above), and based upon and subject to the foregoing, such counsel will advise the Underwriters, as a matter of fact and not opinion, that nothing came to such counsel's attention to cause them to believe that (A) the Registration Statement, as of each Effective Date contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, (B) the Final Prospectus, as of its date and as of the Closing Date contained or contains an untrue statement of a material fact or omitted or omits to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, or (C) the Disclosure Package, as of the Execution Time, contained an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided, however, that it is understood that such counsel is not requested to and will not express any belief in this paragraph with respect to the financial statements, schedules and other financial data contained in or incorporated by reference in the Registration Statement, the Disclosure Package, the Final Prospectus or the Statement of Eligibility and Qualification of the Trustee. References to the Final Prospectus in this paragraph shall also include any supplements thereto at the Closing Date.

In rendering such opinion, such counsel may rely (A) as to matters involving the application of laws of any jurisdiction other than the State of California, New York or the Federal laws of the United States, to the extent they deem proper and specified in such opinion, upon the opinion of other counsel of good standing whom they believe to be reliable and who are satisfactory to counsel for the Underwriters and (B) as to matters of fact, to the extent they deem proper, on certificates of responsible officers of the Company and public officials.

"Effective Date" shall mean the time of effectiveness of the Registration Statement for the purposes of Section 11 of the Securities Act, as such section applies to the Underwriters.

# EXHIBIT I

Exhibit 1.1

EXECUTION VERSION

**Pacific Gas and Electric Company**

$400,000,000 Aggregate Principal Amount
of 4.00% Senior Notes due December 1, 2046

$250,000,000 Aggregate Principal Amount
of Floating Rate Senior Notes due November 30, 2017

**Underwriting Agreement**

New York, New York
November 28, 2016

To the Representatives
named in Schedules I-A and I-B hereto
of the several Underwriters
named in Schedules II-A and II-B hereto

Ladies and Gentlemen:

Pacific Gas and Electric Company, a corporation organized under the laws of the State of California (the "Company"), proposes to sell to the several underwriters named in Schedules II-A and II-B hereto (the "Underwriters"), for whom you (the "Representatives") are acting as representatives, (i) $400,000,000 aggregate principal amount of 4.00% Senior Notes due December 1, 2046 having the terms set forth in Schedule I-A hereto (the "Fixed Rate Notes") and (ii) $250,000,000 aggregate principal amount of Floating Rate Senior Notes due November 30, 2017 having the terms set forth in Schedule I-B hereto (the "Floating Rate Notes" and together with the Fixed Rate Notes, the "Securities") to be issued under an indenture, amended and restated as of April 22, 2005 (the "Base Indenture"), as supplemented by the Seventh Supplemental Indenture dated as of June 11, 2009, as further supplemented by the Twentieth Supplemental Indenture dated as of November 12, 2013, and as further supplemented by the Twenty-Eighth Supplemental Indenture to be dated as of December 1, 2016 (the "Twenty-Eighth Supplemental Indenture" and, together with the Base Indenture as supplemented, the "Indenture"), between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (the "Trustee"). To the extent there are no additional Underwriters listed on Schedules II-A and II-B other than you, the term Representatives as used herein shall mean you, as Underwriters, and the terms Representatives and Underwriters shall mean either the singular or plural as the context requires. Any reference herein to the Registration Statement, the Base Prospectus, any Preliminary Prospectus or the Final Prospectus shall be deemed to refer to and include the documents incorporated by reference therein pursuant to Item 12 of Form S-3 which were filed under the Securities Exchange Act of 1934, as amended (the "Exchange Act") on or before the Effective Date of the Registration Statement or the issue date of the Base Prospectus, any Preliminary Prospectus or the Final Prospectus, as the case may be, and any reference herein to the terms "amend," "amendment" or "supplement" with respect to the Registration Statement, the Base Prospectus, any Preliminary Prospectus or the Final Prospectus shall be deemed to refer

to and include the filing of any document under the Exchange Act after the Effective Date of the Registration Statement or the issue date of the Base Prospectus, any Preliminary Prospectus or the Final Prospectus, as the case may be, deemed to be incorporated therein by reference. Certain terms used herein are defined in Section 21 hereof.

1. <u>Representations and Warranties</u>. The Company represents and warrants to, and agrees with, each Underwriter as set forth below in this Section 1.

(a) The Company meets the requirements for use of Form S-3 under the Act and has prepared and filed with the Commission an automatic shelf registration statement, as defined in Rule 405 (File No. 333-193879) on Form S-3, including a related Base Prospectus, for registration under the Act of the offering and sale of the Securities. Such Registration Statement, including any amendments thereto filed prior to the Execution Time, became effective upon filing. The Company may have filed with the Commission, as part of an amendment to the Registration Statement or pursuant to Rule 424(b), one or more preliminary prospectus supplements relating to the Securities, each of which has previously been furnished to you. The Company will file with the Commission a final prospectus supplement relating to the Securities in accordance with Rule 424(b). As filed, such final prospectus supplement shall contain all information required by the Act and the rules thereunder, and, except to the extent the Representatives shall agree in writing to a modification, shall be in all substantive respects in the form furnished to you prior to the Execution Time or, to the extent not completed at the Execution Time, shall contain only such specific additional information and other changes (beyond that contained in the Base Prospectus and any Preliminary Prospectus) as the Company has advised you, prior to the Execution Time, will be included or made therein. The Registration Statement, at the Execution Time, meets the requirements set forth in Rule 415(a)(1)(x). The Company agrees to pay the fees required by the Commission relating to the Securities within the time required by Rule 456(b)(1) without regard to the proviso therein and otherwise in accordance with Rules 456(b) and 457(r).

(b) On each Effective Date, the Registration Statement did, and when the Final Prospectus is first filed in accordance with Rule 424(b) and on the Closing Date (as defined herein), the Final Prospectus (and any supplement thereto) will, comply in all material respects with the applicable requirements of the Act, the Exchange Act and the Trust Indenture Act and the respective rules thereunder; on each Effective Date and at the Execution Time, the Registration Statement did not and will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein not misleading; on the Effective Date and on the Closing Date the Indenture did or will comply in all material respects with the applicable requirements of the Trust Indenture Act and the rules thereunder; and on the date of any filing pursuant to Rule 424(b) and on the Closing Date, the Final Prospectus (together with any supplement thereto) will not include any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; <u>provided</u>, <u>however</u>, that the Company makes no representations or warranties as to (i) that part of the Registration Statement which shall constitute the Statement of Eligibility and Qualification (Form T-1) under the Trust Indenture Act of the Trustee or (ii) the

2

Case: 19-30088   Doc# 5374-10   Filed: 01/14/20   Entered: 01/14/20 15:26:59   Page 3 of 444 of 524

information contained in or omitted from the Registration Statement or the Final Prospectus (or any supplement thereto) in reliance upon and in conformity with information furnished in writing to the Company by or on behalf of any Underwriter through the Representatives specifically for inclusion in the Registration Statement or the Final Prospectus (or any supplement thereto), it being understood and agreed that the only such information furnished by or on behalf of any Underwriter consists of the information described as such in Section 8 hereof.

(c) As of the Execution Time and the Closing Date, (i) the Disclosure Package and (ii) each electronic road show, if any, when taken together as a whole with the Disclosure Package, did not and will not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. The preceding sentence does not apply to statements in or omissions from the Disclosure Package based upon and in conformity with written information furnished to the Company by any Underwriter through the Representatives specifically for use therein, it being understood and agreed that the only such information furnished by or on behalf of any Underwriter consists of the information described as such in Section 8 hereof.

(d) (i) At the time of filing the Registration Statement, (ii) at the time of the most recent amendment thereto for the purposes of complying with Section 10(a)(3) of the Act (whether such amendment was by post-effective amendment, incorporated report filed pursuant to Sections 13 or 15(d) of the Exchange Act or form of prospectus), (iii) at the time the Company or any person acting on its behalf (within the meaning, for this clause only, of Rule 163(c)) made any offer relating to the Securities in reliance on the exemption in Rule 163, and (iv) at the Execution Time (with such date being used as the determination date for purposes of this clause (iv)), the Company was or is (as the case may be) a "well-known seasoned issuer" as defined in Rule 405.

(e) (i) At the earliest time after the filing of the Registration Statement that the Company or another offering participant made a *bona fide* offer (within the meaning of Rule 164(h)(2)) of the Securities and (ii) as of the Execution Time (with such date being used as the determination date for purposes of this clause (ii)), the Company was not and is not an Ineligible Issuer (as defined in Rule 405), without taking account of any determination by the Commission pursuant to Rule 405 that it is not necessary that the Company be considered an Ineligible Issuer.

(f) The Issuer Free Writing Prospectus and the final term sheet prepared and filed pursuant to Section 5(b) hereto did not, as of their issue dates, and do not include any information that conflicts with the information contained in the Registration Statement, including any document incorporated therein by reference and any prospectus supplement deemed to be a part thereof that has not been superseded or modified. The foregoing sentence does not apply to statements in or omissions from any Issuer Free Writing Prospectus based upon and in conformity with written information furnished to the Company by any Underwriter through the Representatives specifically for use therein, it being understood and agreed that the only such information furnished by or on behalf of any Underwriter consists of the information described as such in Section 8 hereof.

3

(g) The Company has been duly incorporated and is validly existing as a corporation in good standing under the laws of the State of California, with full corporate power and authority to own or lease, as the case may be, and to operate its properties and conduct its business as described in the Disclosure Package and the Final Prospectus, and is duly qualified to do business as a foreign corporation and is in good standing under the laws of each jurisdiction which requires such qualification, except where the failure to be so qualified or be in good standing would not, individually or in the aggregate, have a material adverse effect on the condition (financial or otherwise), earnings, business or properties of the Company and its subsidiaries, taken as a whole (a "Material Adverse Effect").

(h) This Agreement has been duly authorized, executed and delivered by the Company.

(i) The Indenture has been duly authorized by the Company; and the Base Indenture has been, and at the Closing Date the Supplemental Indenture will have been, duly executed and delivered by the Company; and the Base Indenture constitutes and, at the Closing Date, assuming due authorization, execution and delivery by the Trustee, the Supplemental Indenture will constitute, a valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as enforcement thereof may be limited by laws and principles of equity affecting the enforcement of creditors' rights, including, without limitation, bankruptcy, reorganization, insolvency arrangement, fraudulent conveyance, moratorium, receivership, assignment for the benefit of creditors laws; and the Base Indenture has been duly qualified under the Trust Indenture Act and the Supplemental Indenture will be qualified under the Trust Indenture Act as of the Closing Date.

(j) The issuance and sale by the Company of the Securities pursuant to this Agreement have been duly authorized by all necessary corporate action; and, when issued, authenticated and delivered to the Underwriters pursuant to this Agreement against payment of the consideration therefor specified herein, the Securities will be valid and binding obligations of the Company, enforceable against the Company in accordance with their terms, except as enforcement thereof may be limited by laws or principles of equity affecting creditors' rights, including, without limitation, bankruptcy, reorganization, insolvency, arrangement, fraudulent conveyance, moratorium, receivership, assignment for the benefit of creditors laws, and will be entitled to the benefits of the Indenture.

(k) The Company is not and, after giving effect to the offering and sale of the Securities and the application of the proceeds thereof as described in the Disclosure Package and the Final Prospectus, will not be an "investment company" as defined in the Investment Company Act of 1940, as amended (the "1940 Act") or a company "controlled" by an "investment company" within the meaning of the 1940 Act.

(l) No consent, approval, authorization, filing with or order of any court or governmental agency or body is required in connection with the transactions contemplated herein, except such as have been obtained from the California Public

4

Utilities Commission (the "CPUC"), under the Act, under the Trust Indenture Act or otherwise and such as may be required under the blue sky laws of any jurisdiction in connection with the purchase and distribution of the Securities by the Underwriters in the manner contemplated herein and in the Disclosure Package and the Final Prospectus.

(m) Neither the Company nor any of its subsidiaries has received any notice of proceedings relating to the revocation or modification of any licenses, certificates, permits and other authorizations which, individually or in the aggregate, if the subject of an unfavorable decision, ruling or finding, would have a Material Adverse Effect, whether or not arising from transactions in the ordinary course of business, except as set forth in or contemplated in the Registration Statement, Disclosure Package and the Final Prospectus (exclusive of any supplement thereto).

(n) None of the issue and sale of the Securities, the consummation of any other of the transactions herein contemplated or the performance by the Company of any of its obligations set forth herein will conflict with or result in, a breach or violation of: (i) the charter, bylaws or comparable constituent documents of the Company or any of its subsidiaries, (ii) the terms of any indenture, contract, lease, mortgage, deed of trust, note agreement, loan agreement or other agreement, obligation, condition, covenant or instrument to which the Company or any of its subsidiaries is a party or bound or to which its or their property is subject, or (iii) any statute, law, rule, regulation, judgment, order or decree applicable to the Company or any of its subsidiaries of any court, regulatory body, administrative agency, governmental body, arbitrator or other authority having jurisdiction over the Company or any of its subsidiaries or any of its or their properties, except, in the case of clauses (ii) and (iii) above, for such conflicts, breaches or violations which could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(o) The consolidated historical financial statements and schedules of the Company and its consolidated subsidiaries included in the Preliminary Prospectus, the Final Prospectus and the Registration Statement present fairly in all material respects the financial condition, results of operations and cash flows of the Company and its consolidated subsidiaries as of the dates and for the periods indicated, comply as to form with the applicable accounting requirements of the Act and have been prepared in conformity with generally accepted accounting principles applied on a consistent basis throughout the periods involved (except as otherwise noted therein). The interactive data in eXtensible Business Reporting Language incorporated by reference in the Registration Statement, the Disclosure Package and the Prospectus has been prepared in accordance with the Commission's rules and guidelines applicable thereto in all material respects.

(p) There has not occurred any change in the condition, financial or otherwise, or in the earnings, business or operations of the Company and its subsidiaries, taken as a whole, from that set forth in the Disclosure Package that would reasonably be expected to have a Material Adverse Effect.

5

(q) No action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Company or any of its subsidiaries or its or their property is pending or, to the best knowledge of the Company, threatened that (i) would reasonably be expected to have material adverse effect on the performance of this Agreement or the consummation of any of the transactions contemplated hereby or (ii) would reasonably be expected to have a Material Adverse Effect, whether or not arising from transactions in the ordinary course of business, except as set forth in or contemplated in the Disclosure Package and the Final Prospectus (exclusive of any supplement thereto).

(r) Deloitte & Touche LLP, who have certified certain financial statements of the Company and its consolidated subsidiaries and delivered their report with respect to the audited consolidated financial statements and schedules included in the Registration Statement, the Disclosure Package and the Final Prospectus, is an independent registered public accounting firm with respect to the Company within the meaning of the Act and the applicable published rules and regulations thereunder and of the Public Company Accounting Oversight Board.

(s) Except as set forth or contemplated in the Registration Statement, Disclosure Package and the Final Prospectus (exclusive of any supplement thereto), neither the Company nor any of its subsidiaries is (i) in violation of any statute, rule, regulation, decision or order of any governmental agency or body or any court, domestic or foreign, relating to the use, disposal or release of hazardous or toxic substances or relating to the protection or restoration of the environment or human exposure to hazardous or toxic substances (collectively, "Environmental Laws"), (ii) owns or operates any real property contaminated with any substance that is subject to any Environmental Laws, (iii) is liable for any off-site disposal or contamination pursuant to any Environmental Laws, or (iv) is subject to any claim relating to any Environmental Laws, which violation, contamination, liability or claim could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; and there is no investigation pending or, to the Company's knowledge, threatened against it or its subsidiaries, that could reasonably be expected to lead to the making of such a claim.

(t) The Company does not have any significant subsidiaries as defined by Rule 1-02 of Regulation S-X.

(u) The CPUC has authorized the issuance and sale by the Company of the Securities, and such authorization is in full force and effect and sufficient for the issuance and sale of the Securities to the Underwriters.

(v) The Company and each of its consolidated subsidiaries maintain a system of internal accounting controls over financial reporting sufficient to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorizations; (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain asset accountability; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any material differences.

(w) The Company maintains "disclosure controls and procedures" (as defined in Rule 13a-15(e) of the Exchange Act) and such disclosure controls and procedures were effective as of the end of the Company's most recently completed fiscal quarter.

(x) To the Company's knowledge, none of the Company, any of its subsidiaries, or any director, officer, agent, affiliate or employee of the Company or any of its subsidiaries is currently the subject of any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("OFAC"); and the Company will not use the proceeds from the sale of the Securities, or knowingly lend, contribute or otherwise make available such proceeds to any subsidiary, affiliate, joint venture partner or other person or entity for the purpose of financing the activities of any person currently the subject of any U.S. sanctions administered by OFAC.

Any certificate signed by any officer of the Company and delivered to the Representatives or counsel for the Underwriters pursuant to this Agreement shall be deemed a representation and warranty by the Company, as to matters covered thereby, to each Underwriter.

2. <u>Purchase and Sale</u>. Subject to the terms and conditions and in reliance upon the representations and warranties herein set forth, the Company agrees to sell to each Underwriter, and each Underwriter agrees, severally and not jointly, to purchase from the Company, at the purchase prices (including accrued interest, if any) set forth in <u>Schedules I-A and I-B</u> hereto, the principal amount of the Securities set forth opposite such Underwriter's name in <u>Schedules II-A and II-B</u> hereto.

3. <u>Delivery and Payment</u>. Delivery of and payment for the Securities shall be made on the date and at the time specified in <u>Schedule I-A and I-B</u> hereto or at such time on such later date not more than three Business Days after the foregoing date as the Representatives shall designate, which date and time may be postponed by agreement between the Representatives and the Company or as provided in Section 9 hereof (such date and time of delivery and payment for the Securities being herein called the "Closing Date"). Delivery of the Securities shall be made to the Representatives for the respective accounts of the several Underwriters against payment by the several Underwriters through the Representatives of the purchase price (including accrued interest, if any) thereof to or upon the order of the Company by wire transfer payable in same-day funds to an account specified by the Company. Delivery of the Securities shall be made through the facilities of The Depository Trust Company unless the Representatives shall otherwise instruct.

4. <u>Offering by Underwriters</u>. It is understood that the several Underwriters propose to, and they hereby represent that they will, offer the Securities for sale to the public as set forth in the Disclosure Package and the Final Prospectus.

5. <u>Agreements</u>. The Company agrees with the several Underwriters that:

(a) Prior to the termination of the offering of the Securities, the Company will not file any amendment of the Registration Statement or supplement (including the Final Prospectus or any Preliminary Prospectus) to the Base Prospectus unless the Company has furnished you a copy for your review prior to filing and will not file any such

7

proposed amendment or supplement to which you reasonably object. The Company will cause the Final Prospectus, properly completed, and any supplement thereto to be filed in a form approved by the Representatives with the Commission pursuant to the applicable paragraph of Rule 424(b) within the time period prescribed and will provide evidence satisfactory to the Representatives of such timely filing. The Company will promptly advise the Representatives (i) when the Final Prospectus, and any supplement thereto, shall have been filed (if required) with the Commission pursuant to Rule 424(b), (ii) when, prior to termination of the offering of the Securities, any amendment to the Registration Statement shall have been filed or become effective, (iii) of any request by the Commission or its staff for any amendment of the Registration Statement, or for any supplement to the Final Prospectus or for any additional information, (iv) of the issuance by the Commission of any stop order suspending the effectiveness of the Registration Statement or any notice objecting to its use, any order preventing or suspending the use of any preliminary prospectus, any Issuer Free Writing Prospectus or the Final Prospectus, or the institution or threatening of any proceeding for the purpose of suspending the effectiveness of the Registration Statement or preventing or suspending the use of any preliminary prospectus, any Issuer Free Writing Prospectus or the Final Prospectus, and (v) of the receipt by the Company of any notification with respect to the suspension of the qualification of the Securities for sale in any jurisdiction or the institution or threatening of any proceeding for such purpose. The Company will use its reasonable best efforts to prevent (i) the issuance of such stop order or other order referred to in the preceding sentence, or (ii) the occurrence of (A) any suspension of the effectiveness, or objection to the use, of the Registration Statement or (B) any prevention or suspension of the use of the preliminary prospectus, any Issuer Free Writing Prospectus or the Final Prospectus and, upon such issuance, occurrence or notice of objection, to obtain as soon as possible the withdrawal of such stop order or relief from such occurrence or objection, including, if necessary, by filing an amendment to the Registration Statement or a new registration statement and using its best efforts to have such amendment or new registration statement declared effective as soon as practicable.

(b) The Company shall prepare final term sheets for each of the Fixed Rate Notes and the Floating Rate Notes, containing solely descriptions of the respective final terms and offering of the Securities, in the form approved by you and attached as <u>Schedules IV-A and IV-B</u> hereto, and file such term sheets pursuant to Rule 433(d) within the time required by such Rule.

(c) If, at any time prior to the filing of the Final Prospectus pursuant to Rule 424(b), any event occurs as a result of which the Disclosure Package would include any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein in the light of the circumstances under which they were made or the circumstances then prevailing not misleading, the Company will (i) notify promptly the Representatives so that any use of the Disclosure Package may cease until it is amended or supplemented; (ii) amend or supplement the Disclosure Package to correct such statement or omission; and (iii) supply any amendment or supplement to you in such quantities as you may reasonably request.

(d) If, at any time when a prospectus relating to the Securities is required to be delivered under the Act (including in circumstances where such requirement may be satisfied pursuant to Rule 172), any event occurs as a result of which the Final Prospectus as then supplemented would include any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein in the light of the circumstances under which they were made at such time not misleading, or if it shall be necessary to amend the Registration Statement, file a new registration statement or supplement the Final Prospectus to comply with the Act or the Exchange Act or the respective rules thereunder, including in connection with use or delivery of the Final Prospectus, the Company promptly will (i) notify the Representatives of any such event, (ii) prepare and file with the Commission, subject to the second sentence of paragraph (a) of this Section 5, an amendment or supplement or new registration statement which will correct such statement or omission or effect such compliance, (iii) use its best efforts to have any amendment to the Registration Statement or new registration statement declared effective as soon as practicable in order to avoid any disruption in use of the Final Prospectus and (iv) supply any supplemented Final Prospectus to you in such quantities as you may reasonably request.

(e) As soon as practicable, the Company will make generally available to its security holders and to the Representatives an earnings statement or statements of the Company and its subsidiaries which will satisfy the provisions of Section 11(a) of the Act and Rule 158.

(f) The Company will furnish to the Representatives and counsel for the Underwriters, without charge, signed copies of the Registration Statement (including exhibits thereto) and to each other Underwriter a copy of the Registration Statement (without exhibits thereto) and, so long as delivery of a prospectus by an Underwriter or dealer may be required by the Act (including in circumstances where such requirement may be satisfied pursuant to Rule 172), as many copies of each Preliminary Prospectus, the Final Prospectus and the Issuer Free Writing Prospectuses and any supplement thereto as the Representatives may reasonably request. The Company will pay the expenses of printing or other production of all documents relating to the offering.

(g) The Company will arrange, if necessary, for the qualification of the Securities for sale under the laws of such jurisdictions as the Representatives may designate and will maintain such qualifications in effect so long as required for the distribution of the Securities; provided that in no event shall the Company be obligated to qualify to do business in any jurisdiction where it is not now so qualified or to take any action that would subject it to service of process in suits, other than those arising out of the offering or sale of the Securities, in any jurisdiction where it is not now so subject.

(h) The Company agrees that, unless it has or shall have obtained the prior written consent of the Representatives, and each Underwriter, severally and not jointly, agrees with the Company that, unless it has or shall have obtained, as the case may be, the prior written consent of the Company, it has not made and will not make any offer relating to the Securities that would constitute an Issuer Free Writing Prospectus or that would otherwise constitute a "free writing prospectus" (as defined in Rule 405) required

9

to be filed by the Company with the Commission or retained by the Company under Rule 433, other than the free writing prospectuses containing the information contained in the final term sheets prepared and filed pursuant to Section 5(b) hereto, or one or more free writing prospectuses through customary Bloomberg distribution that do not contain substantive changes from or additions to the information contained in the final term sheets prepared and filed pursuant to Section 5(b) hereto; provided that the prior written consent of the parties hereto shall be deemed to have been given in respect of the Free Writing Prospectuses included in Schedule III hereto or term sheets, substantially in the form of Schedules IV-A and IV-B hereto, and any electronic road show. The Company consents to the use by any Underwriter of a free writing prospectus that (a) is not an "issuer free writing prospectus" as defined in Rule 433, and (b) contains only (i) information describing the preliminary terms of the Securities or the offering or (ii) information permitted by Rule 134. Any such free writing prospectus consented to by the Representatives or the Company is hereinafter referred to as a "Permitted Free Writing Prospectus." The Company agrees that (x) it has treated and will treat, as the case may be, each Permitted Free Writing Prospectus as an Issuer Free Writing Prospectus and (y) it has complied and will comply, as the case may be, with the requirements of Rules 164 and 433 applicable to any Permitted Free Writing Prospectus, including in respect of timely filing with the Commission, legending and record keeping and that it will not take any action that would result in any Underwriter or the Company being required to file with the Commission pursuant to Rule 433(d) a Free Writing Prospectus prepared by or on behalf of such Underwriter that such Underwriter would not otherwise have been required to so file.

(i) The Company will not, without the prior written consent of the Representatives, offer, sell, contract to sell, pledge, or otherwise dispose of (or enter into any transaction which is designed to, or might reasonably be expected to, result in the disposition (whether by actual disposition or effective economic disposition due to cash settlement or otherwise) by the Company or any affiliate of the Company or any person in privity with the Company or any affiliate of the Company), directly or indirectly, including the filing (or participation in the filing) of a registration statement with the Commission in respect of, or establish or increase a put equivalent position or liquidate or decrease a call equivalent position within the meaning of Section 16 of the Exchange Act, any debt securities issued or guaranteed by the Company (other than the Securities) or publicly announce an intention to effect any such transaction, until the Business Day set forth on Schedules I-A and I-B hereto; provided that the prior written consent of the Representatives shall not be required for the sale or remarketing of tax-exempt bonds issued by a governmental authority or body for the benefit of the Company or for issuances of commercial paper or other debt securities with scheduled maturities of less than one year.

(j) The Company will not take, directly or indirectly, any action designed to or that would constitute or that might reasonably be expected to cause or result in, under the Exchange Act or otherwise, stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of the Securities.

10

(k) The Company agrees to pay the costs and expenses relating to the following matters: (i) the preparation, printing or reproduction and filing with the Commission of the Registration Statement (including financial statements and exhibits thereto), each Preliminary Prospectus, the Final Prospectus and the Issuer Free Writing Prospectuses, and each amendment or supplement to any of them; (ii) the printing (or reproduction) and delivery (including postage, air freight charges and charges for counting and packaging) of such copies of the Registration Statement, each Preliminary Prospectus, the Final Prospectus and the Issuer Free Writing Prospectuses, and all amendments or supplements to any of them, as may, in each case, be reasonably requested for use in connection with the offering and sale of the Securities; (iii) the preparation, printing, authentication, issuance and delivery of certificates for the Securities, including any stamp or transfer taxes in connection with the original issuance and sale of the Securities; (iv) the printing (or reproduction) and delivery of this Agreement, any blue sky memorandum and all other agreements or documents printed (or reproduced) and delivered in connection with the offering of the Securities; (v) any registration or qualification of the Securities for offer and sale under the securities or blue sky laws of the several states (including filing fees and the reasonable fees and expenses of counsel for the Underwriters relating to such registration and qualification); (vi) any filings required to be made with the Financial Industry Regulatory Authority, Inc. (including filing fees and the reasonable fees and expenses of counsel for the Underwriters relating to such filings); (vii) the transportation and other expenses incurred by or on behalf of Company representatives in connection with presentations to prospective purchasers of the Securities; (viii) the fees and expenses of the Company's accountants and the fees and expenses of counsel (including local and special counsel) for the Company; and (ix) all other costs and expenses incident to the performance by the Company of its obligations hereunder.

6. <u>Conditions to the Obligations of the Underwriters</u>. The obligations of the Underwriters to purchase the Securities shall be subject to the accuracy of the representations and warranties on the part of the Company contained herein as of the Execution Time and the Closing Date, to the accuracy of the statements of the Company made in any certificates pursuant to the provisions hereof, to the performance by the Company of its obligations hereunder and to the following additional conditions:

(a) The Final Prospectus, and any supplement thereto, shall have been filed in the manner and within the time period required by Rule 424(b); the final term sheets contemplated by Section 5(b) hereto, and any other material required to be filed by the Company pursuant to Rule 433(d) under the Act, shall have been filed with the Commission within the applicable time periods prescribed for such filings by Rule 433; and no stop order suspending the effectiveness of the Registration Statement or any notice objecting to its use shall have been issued and no proceedings for that purpose shall have been instituted or threatened.

(b) The Company shall have requested and caused Orrick, Herrington & Sutcliffe LLP, counsel for the Company, to have furnished to the Representatives their opinion, dated the Closing Date and addressed to the Representatives, substantially in the form set forth in <u>Schedule V</u> hereto.

11

(c) The Representatives shall have received from Skadden, Arps, Slate, Meagher & Flom LLP, counsel for the Underwriters, such opinion or opinions, dated the Closing Date and addressed to the Representatives, with respect to the issuance and sale of the Securities, the Indenture, the Registration Statement, the Disclosure Package, the Final Prospectus (together with any supplement thereto) and other related matters as the Representatives may reasonably require, and the Company shall have furnished to such counsel such documents as they request for the purpose of enabling them to pass upon such matters.

(d) The Company shall have furnished to the Representatives a certificate of the Company, signed by the Chairman of the Board, the Chief Executive Officer, the President, any Senior Vice President or the Treasurer and by the Chief Financial Officer of the Company, dated the Closing Date, to the effect that the signers of such certificate have carefully examined the Registration Statement, the Disclosure Package, the Final Prospectus and any supplements or amendments thereto, as well as each electronic road show used in connection with the offering of the Securities, and this Agreement and that:

(i) the representations and warranties of the Company in this Agreement are true and correct on and as of the Closing Date with the same effect as if made on the Closing Date and the Company has complied with all the agreements and satisfied all the conditions on its part to be performed or satisfied at or prior to the Closing Date; and

(ii) no stop order suspending the effectiveness of the Registration Statement or any notice objecting to its use has been issued and no proceedings for that purpose have been instituted or, to the Company's knowledge, threatened.

(e) The Company shall have requested and caused Deloitte & Touche LLP to have furnished to the Representatives, at the Execution Time and at the Closing Date, letters (which may refer to letters previously delivered to one or more of the Representatives), dated respectively as of the Execution Time and as of the Closing Date, in form and substance satisfactory to the Representatives, confirming that they are independent accountants within the meaning of the Act and the Exchange Act and the respective applicable rules and regulations adopted by the Commission thereunder and stating in effect that:

(i) in their opinion the audited financial statements and financial statement schedules included or incorporated by reference in the Registration Statement, the Preliminary Prospectus and the Final Prospectus and reported on by them comply as to form with the applicable accounting requirements of the Act and the Exchange Act and the related rules and regulations adopted by the Commission;

(ii) carrying out certain specified procedures (but not an examination in accordance with generally accepted auditing standards) which would not necessarily reveal matters of significance with respect to the comments set forth in such letter; and inquiries of certain officials of the Company who have

12

responsibility for financial and accounting matters of the Company and its subsidiaries as to transactions and events subsequent to December 31, 2015, nothing came to their attention which caused them to believe that, with respect to the period subsequent to September 30, 2016, there were any changes, at a specified date not more than five days prior to the date of the letter, in the long-term debt or short-term borrowings of the Company and its subsidiaries or the capital stock of the Company or decreases in current assets or the shareholders' equity of the Company, as compared with the amounts shown on the September 30, 2016 consolidated balance sheet included or incorporated by reference in the Registration Statement, the Preliminary Prospectus and the Final Prospectus, or for the period from October 1, 2016 to such specified date there were any decreases, as compared with the corresponding period in the preceding year in operating revenues, income before income taxes or net income of the Company and its subsidiaries, except in all instances for changes or decreases set forth in such letter, in which case the letter shall be accompanied by an explanation by the Company as to the significance thereof unless said explanation is not deemed necessary by the Representatives; and

     (iii) they have performed certain other specified procedures as a result of which they determined that certain information of an accounting, financial or statistical nature (which is limited to accounting, financial or statistical information derived from the general accounting records of the Company and its subsidiaries) set forth in the Registration Statement, the Preliminary Prospectus and the Final Prospectus and in Exhibit 12 to the Registration Statement, including the information set forth under the captions "Ratio of Earnings to Fixed Charges" and "Capitalization" in the Preliminary Prospectus and the Final Prospectus, and the information included or incorporated by reference in Items 1, 1A, 6, 7 and 7A of the Company's Annual Report on Form 10-K and the information included in "Management's Discussion and Analysis of Financial Conditions and Results of Operations" included in the Company's Quarterly Reports on Form 10-Q, incorporated by reference in the Registration Statement, the Preliminary Prospectus and the Final Prospectus, agrees with the accounting records of the Company and its subsidiaries, excluding any questions of legal interpretation.

References to the Final Prospectus in this paragraph (e) include any supplement thereto at the date of the letter.

(f) Subsequent to the Execution Time or, if earlier, the dates as of which information is given in the Registration Statement (exclusive of any amendment thereof) and the Final Prospectus (exclusive of any amendment or supplement thereto), there shall not have been (i) any material change or decrease specified in the letter or letters referred to in paragraph (e) of this Section 6 or (ii) any change in or affecting the condition (financial or otherwise), earnings, business or properties of the Company and its subsidiaries taken as a whole, whether or not arising from transactions in the ordinary course of business, except as set forth in or contemplated in the Disclosure Package and the Final Prospectus (exclusive of any amendment or supplement thereto) the effect of

13

which, in any case referred to in clause (i) or (ii) above, is, in the judgment of the Representatives, so material and adverse as to make it impractical or inadvisable to proceed with the offering or delivery of the Securities as contemplated by the Registration Statement (exclusive of any amendment thereof), the Disclosure Package and the Final Prospectus (exclusive of any amendment or supplement thereto).

(g) Subsequent to the Execution Time, there shall not have been any decrease in the rating of any of PG&E Corporation's or the Company's debt securities by any "nationally recognized statistical rating organization" (as defined in Section 3(a)(62) of the Exchange Act) or any notice given of any intended or potential decrease in any such rating or of a possible change in any such rating.

(h) Prior to the Closing Date, the Company shall have furnished to the Representatives such further information, certificates and documents as the Representatives may reasonably request.

If any of the conditions specified in this Section 6 shall not have been fulfilled when and as provided in this Agreement, or if any of the opinions and certificates mentioned above or elsewhere in this Agreement shall not be reasonably satisfactory in form and substance to the Representatives and counsel for the Underwriters, this Agreement and all obligations of the Underwriters hereunder may be canceled at, or at any time prior to, the Closing Date by the Representatives. Notice of such cancellation shall be given to the Company in writing or by telephone or facsimile confirmed in writing.

The documents required to be delivered by this Section 6 shall be delivered at the office of Skadden, Arps, Slate, Meagher & Flom LLP, counsel for the Underwriters, at Four Times Square, New York, New York, on the Closing Date.

7. <u>Reimbursement of Underwriters' Expenses</u>. If the sale of the Securities provided for herein is not consummated because any condition to the obligations of the Underwriters set forth in Section 6 hereof is not satisfied, because of any termination pursuant to Section 10 hereof or because of any refusal, inability or failure on the part of the Company to perform any agreement herein or comply with any provision hereof other than by reason of a default by any of the Underwriters, the Company will reimburse the Underwriters severally through J.P. Morgan Securities LLC, on demand for all expenses (including reasonable fees and disbursements of counsel) that shall have been incurred by them in connection with the proposed purchase and sale of the Securities.

8. <u>Indemnification and Contribution</u>. (a) The Company agrees to indemnify and hold harmless each Underwriter, the directors, officers, employees and agents of each Underwriter and each person who controls any Underwriter within the meaning of either the Act or the Exchange Act and each affiliate of any Underwriter within the meaning of Rule 405 under the Securities Act against any and all losses, claims, damages or liabilities, joint or several, to which they or any of them may become subject under the Act, the Exchange Act or other Federal or state statutory law or regulation, at common law or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon any untrue statement or alleged untrue

14

statement of a material fact contained in the Registration Statement or in any subsequent amendment thereof, or in the Base Prospectus, any Preliminary Prospectus or any other preliminary prospectus supplement relating to the Securities, the Final Prospectus, any Issuer Free Writing Prospectus or the information contained in the final term sheets required to be prepared and filed pursuant to Section 5(b) hereto, or in any amendment thereof or supplement thereto, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and agrees to reimburse each such indemnified party, as incurred, for any legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability or action; provided, however, that the Company will not be liable in any such case to the extent that any such loss, claim, damage or liability arises out of or is based upon any such untrue statement or alleged untrue statement or omission or alleged omission made therein in reliance upon and in conformity with written information furnished to the Company by or on behalf of any Underwriter through the Representatives specifically for inclusion therein, it being understood and agreed that the only such information furnished by or on behalf of any Underwriter consists of the information described as such in this Section 8. This indemnity agreement will be in addition to any liability which the Company may otherwise have.

(b) Each Underwriter severally and not jointly agrees to indemnify and hold harmless the Company, each of its directors, each of its officers who signs the Registration Statement and each person who controls the Company within the meaning of either the Act or the Exchange Act, to the same extent as the foregoing indemnity from the Company to each Underwriter, but only with reference to written information relating to such Underwriter furnished to the Company by or on behalf of such Underwriter through the Representatives specifically for inclusion in the documents referred to in the foregoing indemnity. This indemnity agreement will be in addition to any liability which any Underwriter may otherwise have. The Company acknowledges that the statements set forth (i) in the last paragraph of the cover page regarding delivery of the Securities, (ii) under the heading "Underwriting," (A) the sentences related to concessions and reallowances and (B) the paragraph related to stabilization, syndicate covering transactions and penalty bids in any Preliminary Prospectus and the Final Prospectus constitute the only information furnished in writing by or on behalf of the several Underwriters for inclusion in any Preliminary Prospectus, the Final Prospectus or any Issuer Free Writing Prospectus.

(c) Promptly after receipt by an indemnified party under this Section 8 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Section 8, notify the indemnifying party in writing of the commencement thereof; but the failure so to notify the indemnifying party (i) will not relieve it from liability under paragraph (a) or (b) above unless and to the extent it did not otherwise learn of such action and such failure results in the forfeiture by the indemnifying party of substantial rights and defenses and (ii) will not, in any event, relieve the indemnifying party from any obligations to any indemnified party other than the indemnification obligation provided in paragraph (a) or (b) above. The indemnifying party shall be entitled to appoint counsel

Case: 19-00083    Doc# 5-37-11  Filed: 01/14/20  Entered: 01/14/20 15:56:59  Page 101
of 524

of the indemnifying party's choice at the indemnifying party's expense to represent the indemnified party in any action for which indemnification is sought (in which case the indemnifying party shall not thereafter be responsible for the fees and expenses of any separate counsel retained by the indemnified party or parties except as set forth below); provided, however, that such counsel shall be satisfactory to the indemnified party. Notwithstanding the indemnifying party's election to appoint counsel to represent the indemnified party in an action, the indemnified party shall have the right to employ separate counsel (including local counsel), and the indemnifying party shall bear the reasonable fees, costs and expenses of such separate counsel if (i) the use of counsel chosen by the indemnifying party to represent the indemnified party would present such counsel with a conflict of interest, (ii) the actual or potential defendants in, or targets of, any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there may be legal defenses available to it and/or other indemnified parties which are different from or additional to those available to the indemnifying party, (iii) the indemnifying party shall not have employed counsel satisfactory to the indemnified party to represent the indemnified party within a reasonable time after notice of the institution of such action or (iv) the indemnifying party shall authorize the indemnified party to employ separate counsel at the expense of the indemnifying party. It is understood that the indemnifying party shall not, in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the fees and expenses of more than one separate counsel (in addition to one local counsel) for all such indemnified parties. An indemnifying party will not, without the prior written consent of the indemnified parties, settle or compromise or consent to the entry of any judgment with respect to any pending or threatened claim, action, suit or proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not the indemnified parties are actual or potential parties to such claim or action) unless such settlement, compromise or consent (i) includes an unconditional release of each indemnified party from all liability arising out of such claim, action, suit or proceeding and (ii) does not include any statement as to or an admission of fault, culpability or a failure to act, by or on behalf of any indemnified party. No indemnifying party will be liable for any settlement of any such action effected without its prior written consent (which consent shall not be unreasonably withheld), but if settled with the consent of the indemnifying party or if there be a final judgment of the plaintiff in any such action, the indemnifying party agrees to indemnify and hold harmless any indemnified party from and against any loss or liability by reason of such settlement or judgment.

(d) In the event that the indemnity provided in paragraph (a), (b) or (c) of this Section 8 is unavailable to or insufficient to hold harmless an indemnified party for any reason, the Company and the Underwriters severally agree to contribute to the aggregate losses, claims, damages and liabilities (including legal or other expenses reasonably incurred in connection with investigating or defending the same) (collectively "Losses") to which the Company and one or more of the Underwriters may be subject in such proportion as is appropriate to reflect the relative benefits received by the Company on the one hand and by the Underwriters on the other from the offering of the Securities; provided, however, that in no case shall any Underwriter (except as may be provided in any agreement among underwriters relating to the offering of the Securities) be

responsible for any amount in excess of the underwriting discount or commission applicable to the Securities purchased by such Underwriter hereunder. If the allocation provided by the immediately preceding sentence is unavailable for any reason, the Company and the Underwriters severally shall contribute in such proportion as is appropriate to reflect not only such relative benefits but also the relative fault of the Company on the one hand and of the Underwriters on the other in connection with the statements or omissions which resulted in such Losses as well as any other relevant equitable considerations. Benefits received by the Company shall be deemed to be equal to the total net proceeds from the offering (before deducting expenses) received by it, and benefits received by the Underwriters shall be deemed to be equal to the total underwriting discounts and commissions, in each case as set forth on the cover page of the Final Prospectus. Relative fault shall be determined by reference to, among other things, whether any untrue or any alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information provided by the Company on the one hand or the Underwriters on the other, the intent of the parties and their relative knowledge, access to information and opportunity to correct or prevent such untrue statement or omission. The Company and the Underwriters agree that it would not be just and equitable if contribution were determined by pro rata allocation or any other method of allocation which does not take account of the equitable considerations referred to above. Notwithstanding the provisions of this paragraph (d), no person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. For purposes of this Section 8, each person who controls an Underwriter within the meaning of either the Act or the Exchange Act and each director, officer, employee and agent of an Underwriter shall have the same rights to contribution as such Underwriter, and each person who controls the Company within the meaning of either the Act or the Exchange Act, each officer of the Company who shall have signed the Registration Statement and each director of the Company shall have the same rights to contribution as the Company, subject in each case to the applicable terms and conditions of this paragraph (d).

9. <u>Default by an Underwriter</u>. If any one or more Underwriters shall fail to purchase and pay for any of the Securities agreed to be purchased by such Underwriter or Underwriters hereunder and such failure to purchase shall constitute a default in the performance of its or their obligations under this Agreement, the remaining Underwriters shall be obligated severally to take up and pay for (in the respective proportions which the principal amount of Securities set forth opposite their names in <u>Schedules II-A and II-B</u> hereto bears to the aggregate principal amount of Securities set forth opposite the names of all the remaining Underwriters) the Securities which the defaulting Underwriter or Underwriters agreed but failed to purchase; <u>provided</u>, <u>however</u>, that in the event that the aggregate principal amount of Securities which the defaulting Underwriter or Underwriters agreed but failed to purchase shall exceed 10% of the aggregate principal amount of Securities set forth in <u>Schedules II-A and II-B</u> hereto, the remaining Underwriters shall have the right to purchase all, but shall not be under any obligation to purchase any, of the Securities, and if such nondefaulting Underwriters do not purchase all the Securities, this Agreement will terminate without liability to any nondefaulting Underwriter or the Company. In the event of a default by any Underwriter as set forth in this Section 9, the Closing Date shall be postponed for such period, not exceeding five Business Days, as the

17

Representatives shall determine in order that the required changes in the Registration Statement and the Final Prospectus or in any other documents or arrangements may be effected. Nothing contained in this Agreement shall relieve any defaulting Underwriter of its liability, if any, to the Company and any nondefaulting Underwriter for damages occasioned by its default hereunder.

10. <u>Termination</u>. This Agreement shall be subject to termination in the absolute discretion of the Representatives, by notice given to the Company prior to delivery of and payment for the Securities, if at any time prior to such delivery and payment: (a) (i) trading in the common stock of PG&E Corporation shall have been suspended by the Commission or the New York Stock Exchange, (ii) trading in any series of the preferred stock of the Company shall have been suspended by the Commission or the NYSE MKT LLC, (iii) (A) trading in securities generally on the New York Stock Exchange shall have been suspended or limited, (B) minimum prices shall have been established on either of such exchanges, or (C) there shall have been a material disruption in the clearance or settlement of securities generally on either of such exchanges which makes it, in the sole judgment of the Representatives, impractical or inadvisable to proceed with the offering or delivery of the Securities as contemplated by this Agreement, the Disclosure Package or the Final Prospectus (exclusive of any amendment or supplement thereto), (b) a banking moratorium shall have been declared either by Federal, California or New York State authorities, (c) there shall have occurred any outbreak or escalation of hostilities, declaration by the United States of a national emergency or war, or other calamity or crisis which makes it, in the sole judgment of the Representatives, impractical or inadvisable to proceed with the offering or delivery of the Securities as contemplated by this Agreement, the Disclosure Package or the Final Prospectus (exclusive of any amendment or supplement thereto) or (d) there shall have been such a material adverse change in general economic, political or financial conditions or the financial markets in the United States which makes it, in the sole judgment of the Representatives, impractical or inadvisable to proceed with the offering or delivery of the Securities as contemplated by this Agreement, the Disclosure Package or the Final Prospectus (exclusive of any amendment or supplement thereto).

11. <u>Representations and Indemnities to Survive</u>. The respective agreements, representations, warranties, indemnities and other statements of the Company or its officers and of the Underwriters set forth in or made pursuant to this Agreement will remain in full force and effect, regardless of any investigation made by or on behalf of any Underwriter or the Company or any of the officers, directors, employees, agents or controlling persons referred to in Section 8 hereof, and will survive delivery of and payment for the Securities. The provisions of Sections 7 and 8 hereof shall survive the termination or cancellation of this Agreement.

12. <u>Notices</u>. All communications hereunder will be in writing and effective only on receipt, and, if sent to the Representatives, will be mailed, delivered or telefaxed to (i) Citigroup Global Markets Inc., 388 Greenwich Street, New York, NY 10013 (fax no.: (646) 291-1469), Attention: General Counsel; (ii) J.P. Morgan Securities LLC, 383 Madison Avenue, New York, NY 10179 (fax no.: (212) 834-6081), Attention: Investment Grade Syndicate Desk – 3rd floor; (iii) Merrill Lynch, Pierce, Fenner & Smith Incorporated, 50 Rockefeller Plaza, NY1-050-12-01, New York, NY 10020 (fax no.: (646) 855-5958), Attention: High Grade Transaction Management/Legal; (iv) Mizuho Securities USA Inc., 320 Park Avenue, New York, NY 10020 (fax no.: (212) 205-7812), Attention: Debt Capital Markets; or, if sent to the Company, will be mailed, delivered or telefaxed to the Company's General Counsel (fax no.: (415) 973-6374) and confirmed to the Company's General Counsel, PG&E Corporation, at 77 Beale Street, San Francisco, CA 94105, Attention: General Counsel.

In accordance with the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), the Underwriters are required to obtain, verify and record information that identifies their respective clients, including the Company, which information may include the name and address of their respective clients, as well as other information that will allow the Underwriters to properly identify their respective clients.

13. Successors. This Agreement will inure to the benefit of and be binding upon the parties hereto and their respective successors and the officers, directors, employees, agents and controlling persons referred to in Section 8 hereof, and no other person will have any right or obligation hereunder.

14. No Fiduciary Duty. The Company hereby acknowledges that (a) the purchase and sale of the Securities pursuant to this Agreement is an arm's-length commercial transaction between the Company, on the one hand, and the Underwriters and any affiliate through which it may be acting, on the other, (b) the Underwriters are acting as principal and not as an agent or fiduciary of the Company and (c) the Company's engagement of the Underwriters in connection with the offering and the process leading up to the offering is as independent contractors and not in any other capacity. Furthermore, the Company agrees that it is solely responsible for making its own judgments in connection with the offering (irrespective of whether any of the Underwriters has advised or is currently advising the Company on related or other matters). The Company agrees that it will not claim that the Underwriters have rendered advisory services of any nature or respect, or owe an agency, fiduciary or similar duty to the Company, in connection with such transaction or the process leading thereto.

15. Research Analyst Independence. The Company acknowledges that the Underwriters' research analysts and research departments are required to be independent from their respective investment banking divisions and are subject to certain regulations and internal policies, and that such Underwriters' research analysts may hold views and make statements or investment recommendations and/or publish research reports with respect to the Company and/or the offering of the Securities that differ from the views of their respective investment banking divisions. The Company hereby waives and releases, to the fullest extent permitted by law, any claims that the Company may have against the Underwriters with respect to any conflict of interest that may arise from the fact that the views expressed by their independent research analysts and research departments may be different from or inconsistent with the views or advice communicated to the Company by such Underwriters' investment banking divisions. The Company acknowledges that each of the Underwriters is a full service securities firm and as such from time to time, subject to applicable securities laws, may effect transactions for its own account or the account of its customers and hold long or short positions in debt or equity securities of the companies that may be the subject of the transactions contemplated by this Agreement.

16. Integration. This Agreement supersedes all prior agreements and understandings (whether written or oral) between the Company and the Underwriters, or any of them, with respect to the subject matter hereof.

19

17. <u>Applicable Law</u>. This Agreement will be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed within the State of New York.

18. <u>Waiver of Jury Trial</u>. The Company hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

19. <u>Counterparts</u>. This Agreement may be signed in one or more counterparts, each of which shall constitute an original and all of which together shall constitute one and the same agreement.

20. <u>Headings</u>. The section headings used herein are for convenience only and shall not affect the construction hereof.

21. <u>Definitions</u>. The terms that follow, when used in this Agreement, shall have the meanings indicated.

"Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations of the Commission promulgated thereunder.

"Base Prospectus" shall mean the base prospectus referred to in paragraph 1(a) above contained in the Registration Statement at the Execution Time.

"Business Day" shall mean any day other than a Saturday, a Sunday or a legal holiday or a day on which banking institutions or trust companies are authorized or obligated by law to close in New York City.

"Closing Date" shall mean December 1, 2016.

"Commission" shall mean the Securities and Exchange Commission.

"Disclosure Package" shall mean (i) the Base Prospectus, (ii) the Preliminary Prospectus used most recently prior to the Execution Time, (iii) the Issuer Free Writing Prospectuses, if any, identified in <u>Schedule III</u> hereto, (iv) the final term sheets prepared and filed pursuant to Section 5(b) hereto, if any, and (v) any other Free Writing Prospectus that the parties hereto shall hereafter expressly agree in writing to treat as part of the Disclosure Package.

"Effective Date" shall mean each date and time that the Registration Statement, any post-effective amendment or amendments thereto became or becomes effective and, if later, the date the annual report of the last completed fiscal year of the Company on Form 10-K was so filed.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations of the Commission promulgated thereunder.

"Execution Time" shall mean 4:15 p.m. Eastern Time on November 28, 2016, which is the time of the first contract of sale of the Securities.

"Final Prospectus" shall mean the prospectus supplement relating to the Securities that was first filed pursuant to Rule 424(b) after the Execution Time, together with the Base Prospectus.

"Free Writing Prospectus" shall mean a free writing prospectus, as defined in Rule 405.

"Issuer Free Writing Prospectus" shall mean an issuer free writing prospectus, as defined in Rule 433.

"Preliminary Prospectus" shall mean any preliminary prospectus supplement to the Base Prospectus referred to in paragraph 1(a) above which is used prior to the filing of the Final Prospectus, together with the Base Prospectus.

"Registration Statement" shall mean the registration statement referred to in paragraph 1(a) above, including exhibits and financial statements and any prospectus supplement relating to the Securities that is filed with the Commission pursuant to Rule 424(b) and deemed part of such registration statement pursuant to Rule 430B, as amended on each Effective Date and, in the event any post-effective amendment thereto becomes effective prior to the Closing Date, shall also mean such registration statement as so amended.

"Rule 134," "Rule 158," "Rule 163," "Rule 164," "Rule 172," "Rule 405," "Rule 415," "Rule 424," "Rule 430B" and "Rule 433" refer to such rules under the Act.

"Trust Indenture Act" shall mean the Trust Indenture Act of 1939, as amended, and the rules and regulations of the Commission promulgated thereunder.

"Well-Known Seasoned Issuer" shall mean a well-known seasoned issuer, as defined in Rule 405.

If the foregoing is in accordance with your understanding of our agreement, please sign and return to us the enclosed duplicate hereof, whereupon this letter and your acceptance shall represent a binding agreement among the Company and the several Underwriters.

Very truly yours,

Pacific Gas and Electric Company

By: _____  /s/ Nicholas M. Bijur

Name: Nicholas M. Bijur

Title: Vice President and Treasurer

[*Signature Page to Underwriting Agreement*]

The foregoing Agreement is hereby confirmed
and accepted as of the date first written above.

CITIGROUP GLOBAL MARKETS INC.

By: /s/ Adam D. Bordner
     Name: Adam D. Bordner

     Title: Vice President

J.P. MORGAN SECURITIES LLC

By: /s/ Som Bhattacharyya
     Name: Som Bhattacharyya

     Title: Vice President

MERRILL LYNCH, PIERCE, FENNER & SMITH
          INCORPORATED

By: /s/ David Mikula
     Name: David Mikula

     Title: Managing Director

MIZUHO SECURITIES USA INC.

By: /s/ Okwudiri Onyedum
     Name: Okwudiri Onyedum

     Title: Managing Director

For themselves and as Representatives of the other several Underwriters named herein.

[*Signature Page to Underwriting Agreement*]

**4.00% Senior Notes due December 1, 2046**

Underwriting Agreement dated November 28, 2016

Registration Statement No. 333-193879

**Representatives:**    Citigroup Global Markets Inc.
J.P. Morgan Securities LLC
Merrill Lynch, Pierce, Fenner & Smith
        Incorporated
Mizuho Securities USA Inc.

**Title, Purchase Price and Description of Securities:**

| | |
|---|---|
| **Title:** | 4.00% Senior Notes due December 1, 2046 |
| **Principal amount:** | $400,000,000 |
| **Price to Public:** | 98.164% |
| **Price to Underwriters:** | 97.289% |
| **Interest payment dates:** | June 1 and December 1, commencing June 1, 2017 |
| **Sinking fund provisions:** | Not applicable |

**Redemption provisions:**

At any time prior to June 1, 2046 (the date that is six months prior to the maturity date), Pacific Gas and Electric Company may, at its option, redeem the 4.00% Notes due December 1, 2046 (in this Schedule, the "2046 Notes") in whole or in part at a redemption price equal to the greater of: (1) 100% of the principal amount of the 2046 Notes to be redeemed or (2) as determined by the Quotation Agent, the sum of the present values of the remaining scheduled payments of principal and interest on the 2046 Notes to be redeemed (not including any portion of payments of interest accrued as of the redemption date), calculated as if the maturity date of such notes was June 1, 2046 (the date that is six months prior to the maturity date), discounted to the redemption date on a semiannual basis at the Adjusted Treasury Rate plus 20 basis points, plus, in either case, accrued and unpaid interest to the redemption date.

At any time on or after June 1, 2046 Pacific Gas and Electric Company may redeem the 2046 Notes, in whole or in part, at 100% of the principal amount of the 2046 Notes being redeemed plus accrued and unpaid interest to the redemption date. The redemption price will be calculated assuming a 360-day year consisting of twelve 30-day months.

**Other provisions:**       Not applicable

**Closing Date, Time and Location:** December 1, 2016 at 10:00 a.m. at Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, NY 10036

Date referred to in Section 5(i) after which the Company may offer or sell debt securities issued or guaranteed by the Company without the consent of the Representative(s): December 1, 2016

Modification of items to be covered by the letter from Deloitte & Touche LLP delivered pursuant to Section 6(e) at the Execution Time: None

Schedule I-A - 2

**Floating Rate Senior Notes due November 30, 2017**

Underwriting Agreement dated November 28, 2016

Registration Statement No. 333-193879

**Representative(s):**   Citigroup Global Markets Inc.
                         J.P. Morgan Securities LLC
                         Merrill Lynch, Pierce, Fenner & Smith
                                 Incorporated
                         Mizuho Securities USA Inc.

**Title, Purchase Price and Description of Securities:**

| | |
|---|---|
| **Title:** | Floating Rate Senior Notes due November 30, 2017 |
| **Principal amount:** | $250,000,000 |
| **Price to Public:** | 100.000% |
| **Price to Underwriters:** | 99.850% |
| **Sinking fund provisions:** | Not applicable |
| **Redemption provisions:** | Not applicable |
| **Other provisions:** | Not applicable |

**Closing Date, Time and Location:** December 1, 2016 at 10:00 a.m. at Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, NY 10036

Date referred to in Section 5(i) after which the Company may offer or sell debt securities issued or guaranteed by the Company without the consent of the Representative(s): December 1, 2016

Modification of items to be covered by the letter from Deloitte & Touche LLP delivered pursuant to Section 6(e) at the Execution Time: None

**Description of Floating Rate Senior Notes**

*Rate of Interest*

The interest rate on the Floating Rate Senior Notes due November 30, 2017 (the "Floating Rate Notes") will be reset quarterly on February 28, 2017, May 30, 2017 and August 30, 2017 (each, an "interest reset date"). The Floating Rate Notes will bear interest at a per annum rate equal to three-month LIBOR (as defined below) for the applicable interest reset period or initial interest period (each as defined below) plus 0.20% (20 basis points). The interest rate for the initial

interest period will be three-month LIBOR, determined as of two London business days (as defined below) prior to the original issue date, plus 0.20% (20 basis points) per annum. The interest rate on the Floating Rate Notes will in no event be higher than the maximum rate permitted by California law as the same may be modified by United States law of general application. Additionally, the interest rate on the Floating Rate Notes will in no event be lower than zero.

The "initial interest period" will be the period from and including the original issue date to but excluding the initial interest reset date. Thereafter, each "interest reset period" will be the period from and including an interest reset date to but excluding the immediately succeeding interest reset date; provided that the final interest reset period for the Floating Rate Notes will be the period from and including the interest reset date immediately preceding the maturity date of such Floating Rate Notes to but excluding the maturity date.

If any interest reset date would otherwise be a day that is not a Business Day, the interest reset date will be postponed to the immediately succeeding day that is a Business Day, except that if that Business Day is in the immediately succeeding calendar month, the interest reset date shall be the immediately preceding Business Day.

The interest rate in effect on each day will be (i) if that day is an interest reset date, the interest rate determined as of the interest determination date (as defined below) immediately preceding such interest reset date or (ii) if that day is not an interest reset date, the interest rate determined as of the interest determination date immediately preceding the most recent interest reset date or the original issue date, as the case may be.

"Business Day" means any day (1) that is not a Saturday or Sunday and that is not a day on which banking institutions are authorized or obligated by law or executive order to close in The City of New York and, for any place of payment outside of The City of New York, in such place of payment, and (2) that is also a "London business day", which is a day on which dealings in deposits in U.S. dollars are transacted in the London interbank market.

*Interest Rate Determination*

The interest rate applicable to each interest reset period commencing on the related interest reset date, or the original issue date in the case of the initial interest period, will be the rate determined as of the applicable interest determination date. The "interest determination date" will be the second London business day immediately preceding the original issue date, in the case of the initial interest reset period, or thereafter, will be the second London business day immediately preceding the applicable interest reset date.

Schedule I-B - 2

The Bank of New York Mellon Trust Company, N.A., or its successor appointed by Pacific Gas and Electric Company, will act as calculation agent. Three-month LIBOR will be determined by the calculation agent as of the applicable interest determination date in accordance with the following provisions:

(i) LIBOR is the rate for deposits in U.S. dollars for the three-month period which appears on Reuters Screen LIBOR01 Page (as defined below) at approximately 11:00 a.m., London time, on the applicable interest determination date. "Reuters Screen LIBOR01 Page" means the display designated on page "LIBOR01" on Reuters Screen (or such other page as may replace the LIBOR01 page on that service, any successor service or such other service or services as may be nominated by the British Bankers' Association for the purpose of displaying London interbank offered rates for U.S. dollar deposits). If no rate appears on Reuters Screen LIBOR01 Page, LIBOR for such interest determination date will be determined in accordance with the provisions of paragraph (ii) below.

(ii) With respect to an interest determination date on which no rate appears on Reuters Screen LIBOR01 Page as of approximately 11:00 a.m., London time, on such interest determination date, the calculation agent shall request the principal London offices of each of four major reference banks (which may include affiliates of the underwriters) in the London interbank market selected by Pacific Gas and Electric Company to provide the calculation agent with a quotation of the rate at which deposits of U.S. dollars having a three-month maturity, commencing on the second London business day immediately following such interest determination date, are offered by it to prime banks in the London interbank market as of approximately 11:00 a.m., London time, on such interest determination date in a principal amount equal to an amount of not less than U.S. $1,000,000 that is representative for a single transaction in such market at such time. If at least two such quotations are provided, LIBOR for such interest determination date will be the arithmetic mean of such quotations as calculated by the calculation agent. If fewer than two quotations are provided, LIBOR for such interest determination date will be the arithmetic mean of the rates quoted as of approximately 11:00 a.m., New York City time, on such interest determination date by three major banks (which may include affiliates of the underwriters) selected by Pacific Gas and Electric Company for loans in U.S. dollars to leading European banks having a three-month maturity commencing on the second London business day immediately following such interest determination date and in a principal amount equal to an amount of not less than U.S. $1,000,000 that is representative for a single transaction in such market at such time; provided, however, that if the banks selected as aforesaid by Pacific Gas and Electric Company are not quoting such rates as mentioned in this sentence, LIBOR for such interest determination date will be LIBOR determined with respect to the immediately preceding interest determination date.

All percentages resulting from any calculation of any interest rate for the Floating Rate Notes will be rounded, if necessary, to the nearest one hundred thousandth of a percentage point, with five one-millionths of a percentage point rounded upward (e.g., 9.876545% (or .09876545) would be rounded to 9.87655% (or .0987655)), and all dollar amounts will be rounded to the nearest cent, with one-half cent being rounded upward.

Schedule I-B - 3

Promptly upon such determination, the calculation agent will notify Pacific Gas and Electric Company and the trustee (if the calculation agent is not the trustee) of the interest rate for the new interest reset period. Upon request of a holder of the Floating Rate Notes, the calculation agent will provide to such holder the interest rate in effect on the date of such request and, if determined, the interest rate for the next interest reset period.

All calculations made by the calculation agent for the purposes of calculating interest on the Floating Rate Notes shall be conclusive and binding on the holders and Pacific Gas and Electric Company, absent manifest errors.

Schedule I-B - 4

## <u>SCHEDULE II-A</u>

| Underwriters | Principal Amount of 4.00% Senior Notes due December 1, 2046 to be Purchased | |
|---|---|---|
| Citigroup Global Markets Inc. | $ | 70,000,000 |
| J.P. Morgan Securities LLC | $ | 70,000,000 |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | $ | 70,000,000 |
| Mizuho Securities USA Inc. | $ | 70,000,000 |
| CIBC World Markets Corp. | $ | 24,000,000 |
| SMBC Nikko Securities America, Inc. | $ | 24,000,000 |
| U.S. Bancorp Investments, Inc. | $ | 24,000,000 |
| Lebenthal & Co., LLC | $ | 16,000,000 |
| Mischler Financial Group, Inc. | $ | 16,000,000 |
| Samuel A. Ramirez & Company, Inc. | $ | 16,000,000 |
| Total | $ | 400,000,000 |

Schedule II-A - 1

## SCHEDULE II-B

| Underwriters | Principal Amount of Floating Rate Senior Notes due November 30, 2017 to be Purchased | |
|---|---|---|
| Citigroup Global Markets Inc. | $ | 43,750,000 |
| J.P. Morgan Securities LLC | $ | 43,750,000 |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | $ | 43,750,000 |
| Mizuho Securities USA Inc. | $ | 43,750,000 |
| CIBC World Markets Corp. | $ | 15,000,000 |
| SMBC Nikko Securities America, Inc. | $ | 15,000,000 |
| U.S. Bancorp Investments, Inc. | $ | 15,000,000 |
| Lebenthal & Co., LLC | $ | 10,000,000 |
| Mischler Financial Group, Inc. | $ | 10,000,000 |
| Samuel A. Ramirez & Company, Inc. | $ | 10,000,000 |
| Total | $ | 250,000,000 |

Schedule II-B - 1

## SCHEDULE III

Schedule of the Free Writing Prospectuses included in the Disclosure Package

1.  Free Writing Prospectuses, dated as of November 28, 2016 and filed pursuant to Rule 433 on November 28, 2016, relating to the 4.00% Senior Notes due December 1, 2046 and the Floating Rate Senior Notes due November 30, 2017.

Schedule III - 1

**Filed Pursuant to Rule 433**
**Registration No. 333-193879**
**November 28, 2016**

**PRICING TERM SHEET**

**Pacific Gas and Electric Company**
**4.00% Senior Notes due December 1, 2046**

| | |
|---|---|
| **Issuer:** | Pacific Gas and Electric Company |
| **Anticipated Ratings (Moody's/S&P/Fitch):\*** | Intentionally omitted |
| **Principal Amount:** | $400,000,000 |
| **Trade Date:** | November 28, 2016 |
| **Settlement Date:** | December 1, 2016 (T+3) |
| **Maturity Date:** | December 1, 2046 |
| **Interest Payment Dates:** | June 1 and December 1, commencing June 1, 2017 |
| **Coupon:** | 4.00% |
| **Price to Public:** | 98.164% |
| **Benchmark Treasury:** | 2.250% due August 15, 2046 |
| **Benchmark Treasury Yield:** | 3.007% |
| **Spread to Benchmark Treasury:** | +110 basis points |
| **Yield to Maturity:** | 4.107% |
| **Optional Redemption:** | At any time prior to June 1, 2046 (the date that is six months prior to the maturity date), Pacific Gas and Electric Company may, at its option, redeem the 4.00% Senior Notes in whole or in part at a redemption price equal to the greater of: |

- 100% of the principal amount of the 4.00% Senior Notes to be redeemed; or

- as determined by the Quotation Agent, the sum of the present values of the remaining scheduled payments of principal and interest on the 4.00% Senior Notes to be redeemed (not including any portion of payments of interest accrued as of the redemption date), calculated as if the maturity date of such notes was June 1, 2046 (the date that is six months prior to the maturity date), discounted to the redemption date on a semiannual basis at the Adjusted Treasury Rate plus 20 basis points,

Schedule IV-A - 1

plus, in either case, accrued and unpaid interest to the redemption date.

At any time on or after June 1, 2046, Pacific Gas and Electric Company may redeem the 4.00% Senior Notes, in whole or in part, at 100% of the principal amount of the 4.00% Senior Notes being redeemed plus accrued and unpaid interest to the redemption date.

| | |
|---|---|
| **Concurrent Debt Offering:** | $250,000,000 principal amount of Floating Rate Senior Notes due November 30, 2017 |
| **CUSIP / ISIN:** | 694308HR1/US694308HR19 |
| **Joint Book-Running Managers:** | Citigroup Global Markets Inc. |
| | J.P. Morgan Securities LLC |
| | Merrill Lynch, Pierce, Fenner & Smith |
| |     Incorporated |
| | Mizuho Securities USA Inc. |
| **Co-Managers:** | CIBC World Markets Corp. |
| | SMBC Nikko Securities America, Inc. |
| | U.S. Bancorp Investments, Inc. |
| | Lebenthal & Co., LLC |
| | Mischler Financial Group, Inc. |
| | Samuel A. Ramirez & Company, Inc. |

**\*Note: A securities rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time.**

**The issuer has filed a registration statement (including a prospectus) with the SEC for the offering to which this communication relates. Before you invest, you should read the prospectus in that registration statement and other documents the issuer has filed with the SEC for more complete information about the issuer and this offering.**

**You may get these documents for free by visiting EDGAR on the SEC Web site at www.sec.gov. Alternatively, the issuer, any underwriter or any dealer participating in the offering will arrange to send you the prospectus if you request it by calling (i) Citigroup Global Markets Inc., toll free at 1-800-831-9146; (ii) J.P. Morgan Securities LLC, collect at 1-212-834-4533; (iii) Merrill Lynch, Pierce, Fenner & Smith Incorporated, toll free at 1-800-294-1322; or (iv) Mizuho Securities USA Inc., toll free at 1-866-271-7403.**

Schedule IV-A - 2

**Filed Pursuant to Rule 433**
**Registration No. 333-193879**
**November 28, 2016**

**PRICING TERM SHEET**

**Pacific Gas and Electric Company**
**Floating Rate Senior Notes due November 30, 2017**

| | |
|---|---|
| **Issuer:** | Pacific Gas and Electric Company |
| **Size:** | $250,000,000 |
| **Trade Date:** | November 28, 2016 |
| **Settlement Date:** | December 1, 2016 (T+3) |
| **Maturity Date:** | November 30, 2017 |
| **Interest Payment Dates:** | February 28, 2017, May 30, 2017, August 30, 2017 and on the Maturity Date |
| **Coupon:** | 3-month USD LIBOR +20 basis points |
| **Price to Public:** | 100.000% |
| **Benchmark:** | 3-month USD LIBOR |
| **Spread to Benchmark:** | +20 basis points |
| **Day Count Convention:** | Actual/360 |
| **Concurrent Debt Offering:** | $400,000,000 principal amount of 4.00% Senior Notes due December 1, 2046 |
| **CUSIP / ISIN:** | 694308HQ3 / US694308HQ36 |
| **Joint Book-Running Managers:** | Citigroup Global Markets Inc. |
| | J.P. Morgan Securities LLC |
| | Merrill Lynch, Pierce, Fenner & Smith Incorporated |
| | Mizuho Securities USA Inc. |
| **Co-Managers:** | CIBC World Markets Corp. |
| | SMBC Nikko Securities America, Inc. |
| | U.S. Bancorp Investments, Inc. |
| | Lebenthal & Co., LLC |
| | Mischler Financial Group, Inc. |
| | Samuel A. Ramirez & Company, Inc. |

Schedule IV-B - 1

**Description of Floating Rate Senior Notes**

*Rate of Interest*

The interest rate on the Floating Rate Senior Notes due November 30, 2017 (the "Floating Rate Notes") will be reset quarterly on February 28, 2017, May 30, 2017 and August 30, 2017 (each, an "interest reset date"). The Floating Rate Notes will bear interest at a per annum rate equal to three-month LIBOR (as defined below) for the applicable interest reset period or initial interest period (each as defined below) plus 0.20% (20 basis points). The interest rate for the initial interest period will be three-month LIBOR, determined as of two London business days (as defined below) prior to the original issue date, plus 0.20% (20 basis points) per annum. The interest rate on the Floating Rate Notes will in no event be higher than the maximum rate permitted by California law as the same may be modified by United States law of general application. Additionally, the interest rate on the Floating Rate Notes will in no event be lower than zero.

The "initial interest period" will be the period from and including the original issue date to but excluding the initial interest reset date. Thereafter, each "interest reset period" will be the period from and including an interest reset date to but excluding the immediately succeeding interest reset date; provided that the final interest reset period for the Floating Rate Notes will be the period from and including the interest reset date immediately preceding the maturity date of such Floating Rate Notes to but excluding the maturity date.

If any interest reset date would otherwise be a day that is not a Business Day, the interest reset date will be postponed to the immediately succeeding day that is a Business Day, except that if that Business Day is in the immediately succeeding calendar month, the interest reset date shall be the immediately preceding Business Day.

The interest rate in effect on each day will be (i) if that day is an interest reset date, the interest rate determined as of the interest determination date (as defined below) immediately preceding such interest reset date or (ii) if that day is not an interest reset date, the interest rate determined as of the interest determination date immediately preceding the most recent interest reset date or the original issue date, as the case may be.

"Business Day" means any day (1) that is not a Saturday or Sunday and that is not a day on which banking institutions are authorized or obligated by law or executive order to close in The City of New York and, for any place of payment outside of The City of New York, in such place of payment, and (2) that is also a "London business day", which is a day on which dealings in deposits in U.S. dollars are transacted in the London interbank market.

*Interest Rate Determination*

The interest rate applicable to each interest reset period commencing on the related interest reset date, or the original issue date in the case of the initial interest period, will be the rate determined as of the applicable interest determination date. The "interest determination date" will be the second London business day immediately preceding the original issue date, in the case of the initial interest reset period, or thereafter, will be the second London business day immediately preceding the applicable interest reset date.

Schedule IV-B - 2

The Bank of New York Mellon Trust Company, N.A., or its successor appointed by Pacific Gas and Electric Company, will act as calculation agent. Three-month LIBOR will be determined by the calculation agent as of the applicable interest determination date in accordance with the following provisions:

(i) LIBOR is the rate for deposits in U.S. dollars for the three-month period which appears on Reuters Screen LIBOR01 Page (as defined below) at approximately 11:00 a.m., London time, on the applicable interest determination date. "Reuters Screen LIBOR01 Page" means the display designated on page "LIBOR01" on Reuters Screen (or such other page as may replace the LIBOR01 page on that service, any successor service or such other service or services as may be nominated by the British Bankers' Association for the purpose of displaying London interbank offered rates for U.S. dollar deposits). If no rate appears on Reuters Screen LIBOR01 Page, LIBOR for such interest determination date will be determined in accordance with the provisions of paragraph (ii) below.

(ii) With respect to an interest determination date on which no rate appears on Reuters Screen LIBOR01 Page as of approximately 11:00 a.m., London time, on such interest determination date, the calculation agent shall request the principal London offices of each of four major reference banks (which may include affiliates of the underwriters) in the London interbank market selected by Pacific Gas and Electric Company to provide the calculation agent with a quotation of the rate at which deposits of U.S. dollars having a three-month maturity, commencing on the second London business day immediately following such interest determination date, are offered by it to prime banks in the London interbank market as of approximately 11:00 a.m., London time, on such interest determination date in a principal amount equal to an amount of not less than U.S. $1,000,000 that is representative for a single transaction in such market at such time. If at least two such quotations are provided, LIBOR for such interest determination date will be the arithmetic mean of such quotations as calculated by the calculation agent. If fewer than two quotations are provided, LIBOR for such interest determination date will be the arithmetic mean of the rates quoted as of approximately 11:00 a.m., New York City time, on such interest determination date by three major banks (which may include affiliates of the underwriters) selected by Pacific Gas and Electric Company for loans in U.S. dollars to leading European banks having a three-month maturity commencing on the second London business day immediately following such interest determination date and in a principal amount equal to an amount of not less than U.S. $1,000,000 that is representative for a single transaction in such market at such time; provided, however, that if the banks selected as aforesaid by Pacific Gas and Electric Company are not quoting such rates as mentioned in this sentence, LIBOR for such interest determination date will be LIBOR determined with respect to the immediately preceding interest determination date.

Schedule IV-B - 3

All percentages resulting from any calculation of any interest rate for the Floating Rate Notes will be rounded, if necessary, to the nearest one hundred thousandth of a percentage point, with five one-millionths of a percentage point rounded upward (e.g., 9.876545% (or .09876545) would be rounded to 9.87655% (or .0987655)), and all dollar amounts will be rounded to the nearest cent, with one-half cent being rounded upward.

Promptly upon such determination, the calculation agent will notify Pacific Gas and Electric Company and the trustee (if the calculation agent is not the trustee) of the interest rate for the new interest reset period. Upon request of a holder of the Floating Rate Notes, the calculation agent will provide to such holder the interest rate in effect on the date of such request and, if determined, the interest rate for the next interest reset period.

All calculations made by the calculation agent for the purposes of calculating interest on the Floating Rate Notes shall be conclusive and binding on the holders and Pacific Gas and Electric Company, absent manifest errors.

**The issuer has filed a registration statement (including a prospectus) with the SEC for the offering to which this communication relates. Before you invest, you should read the prospectus in that registration statement and other documents the issuer has filed with the SEC for more complete information about the issuer and this offering. You may get these documents for free by visiting EDGAR on the SEC Web site at www.sec.gov. Alternatively, the issuer, any underwriter or any dealer participating in the offering will arrange to send you the prospectus if you request it by calling (i) Citigroup Global Markets Inc., toll free at 1-800-831-9146; (ii) J.P. Morgan Securities LLC, collect at 1-212-834-4533; (iii) Merrill Lynch, Pierce, Fenner & Smith Incorporated, toll free at 1-800-294-1322; or (iv) Mizuho Securities USA Inc., toll free at 1-866-271-7403.**

**Form of Opinion of Orrick, Herrington & Sutcliffe LLP**

(i) the Registration Statement has become effective under the Act; to the knowledge of such counsel, no stop order suspending the effectiveness of the Registration Statement has been issued and no proceedings for that purpose have been threatened or instituted by, or are pending before, the Commission, and the Registration Statement, as of each Effective Date and the Final Prospectus, as of its date (other than the financial statements, schedules and other financial data contained or incorporated by reference therein, as to which such counsel need express no opinion) comply as to form in all material respects with the applicable requirements of the Act, the Exchange Act and the Trust Indenture Act and the respective rules promulgated thereunder; the Final Prospectus and the final term sheet have been filed pursuant to, and within the time frame contemplated by, Rule 424(b) and Rule 433, respectively, promulgated under the Act;

(ii) the Company has been duly incorporated and is validly existing as a corporation in good standing under the laws of the State of California, with the corporate power and corporate authority to own or lease, as the case may be, and to operate its properties and conduct its business as described in the Registration Statement, the Disclosure Package and the Final Prospectus;

(iii) the Indenture has been duly authorized, executed and delivered by the Company, has been duly qualified under the Trust Indenture Act and, assuming due authorization, execution and delivery thereof by the Trustee constitutes a valid and binding obligation of the Company enforceable against the Company in accordance with its terms (subject, to the effect of any bankruptcy, reorganization, insolvency, arrangement, fraudulent conveyance, moratorium, receivership, assignment for the benefit of creditors or other laws relating to or affecting creditors' rights generally from time to time in effect and to general principles of equity, including, without limitation, concepts of materiality, reasonableness, good faith and fair dealing, regardless of whether considered in a proceeding in equity or at law); and the Securities have been duly authorized and executed by the Company and when authenticated by the Trustee in accordance with the provisions of the Indenture and delivered to and paid for by the Underwriters pursuant to this Agreement, will have been validly issued and delivered, and will be entitled to the benefits of the Indenture and will constitute valid and binding obligations of the Company, enforceable against the Company in accordance with their terms;

(iv) to the knowledge of such counsel, there is no pending or threatened action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Company or any of its subsidiaries or its or their property, of a character required to be disclosed in the Registration Statement other than those disclosed in the Preliminary Prospectus and the Final Prospectus (in rendering such opinion, such counsel may note that it has not conducted searches of the dockets of any court or administrative agency whatsoever);

(v) this Agreement has been duly authorized, executed and delivered by the Company;

(vi) the Company is not and, after giving effect to the offering and sale of the Securities and the application of the proceeds thereof as described in the Disclosure Package and the Final Prospectus, will not be an "investment company" as defined in the 1940 Act or a company "controlled" by an "investment company" within the meaning of the 1940 Act;

(vii) none of the issue or sale of the Securities, the consummation of the transactions contemplated by this Agreement or the performance by the Company of its obligations hereunder will (A) conflict with or result in any violation of (1) the Articles of Incorporation or Bylaws of the Company, or (2) any Federal, California or, as to this Agreement, New York, statute or any rule or regulation issued pursuant to any Federal, California or, as to this Agreement, New York statute, including, without limitation, the California Public Utilities Code and California usury laws ("Applicable Laws"), or any order known to such counsel to have been issued pursuant to any Applicable Law by any Federal, California or, as to this Agreement, New York, court or governmental agency or body that such counsel has in the exercise of customary professional diligence recognized as having jurisdiction over the Company or any of its properties ("Applicable Governmental Authority") or (B) result in a breach or violation of, or constitute a default under, any agreement, indenture or other instrument to which the Company or any of its subsidiaries is a party that has been filed (i) pursuant to Item 601(b)(4) or Item 601(b)(10) of Regulation S-K promulgated under the Act as an exhibit to the Company's Annual Report on Form 10-K for the year ended December 31, 2015 the Company's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2016, June 30, 2016 and September 30, 2016, or (ii) as an exhibit to any report on Form 8-K filed by the Company between January 1, 2016 and the Closing Date;

(viii) no consent, approval, authorization, filing with or order of or with any Applicable Governmental Authority (a "Governmental Action") is required for the valid authorization, execution, issuance, sale and delivery of the Securities by the Company except for any Governmental Actions that have been obtained or made, and such as may be required under the blue sky laws of any jurisdiction in connection with the purchase and distribution of the Securities by the Underwriters in the manner contemplated in this Agreement, the Disclosure Package and the Final Prospectus; and

(ix) the statements in the Disclosure Package and the Final Prospectus under the caption "Description of the Senior Notes" insofar as such statements purport to summarize certain provisions of the Indenture and the Securities, fairly summarize such provisions in all material respects, and the statements under the

Schedule V - 2

caption "Certain United States Federal Income Tax Consequences" in the Disclosure Package and the Final Prospectus, insofar as such statements constitute summaries of the United States federal income tax laws, are accurate in all material respects.

The letter from such counsel shall include a separate paragraph to the effect that in the course of its engagement as counsel to the Company in connection with the offering of the Securities, it has participated in conferences with the Underwriters and their representatives and representatives of the Company and its accountants concerning the Registration Statement, the Disclosure Package and the Final Prospectus and considered the matters required to be stated therein and the statements contained therein, and, although they were not engaged to and did not independently verify the accuracy, completeness or fairness of such statements (except as stated above), and based upon and subject to the foregoing, such counsel will advise the Underwriters, as a matter of fact and not opinion, that nothing came to such counsel's attention to cause them to believe that (A) the Registration Statement, as of each Effective Date contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, (B) the Final Prospectus, as of its date and as of the Closing Date contained or contains an untrue statement of a material fact or omitted or omits to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, or (C) the Disclosure Package, as of the Execution Time, contained an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided, however, that it is understood that such counsel is not requested to and will not express any belief in this paragraph with respect to the financial statements, schedules and other financial data contained in or incorporated by reference in the Registration Statement, the Disclosure Package, the Final Prospectus or the Statement of Eligibility and Qualification of the Trustee. References to the Final Prospectus in this paragraph shall also include any supplements thereto at the Closing Date.

In rendering such opinion, such counsel may rely (A) as to matters involving the application of laws of any jurisdiction other than the State of California, New York or the Federal laws of the United States, to the extent they deem proper and specified in such opinion, upon the opinion of other counsel of good standing whom they believe to be reliable and who are satisfactory to counsel for the Underwriters and (B) as to matters of fact, to the extent they deem proper, on certificates of responsible officers of the Company and public officials.

"Effective Date" shall mean the time of effectiveness of the Registration Statement for the purposes of Section 11 of the Securities Act, as such section applies to the Underwriters.

Schedule V - 3

# EXHIBIT J

**Pacific Gas and Electric Company**

$400,000,000 Aggregate Principal Amount
of 3.30% Senior Notes due March 15, 2027

$200,000,000 Aggregate Principal Amount
of 4.00% Senior Notes due December 1, 2046

**Underwriting Agreement**

New York, New York
March 7, 2017

To the Representatives
named in Schedules I-A and I-B hereto
of the several Underwriters
named in Schedules II-A and II-B hereto

Ladies and Gentlemen:

Pacific Gas and Electric Company, a corporation organized under the laws of the State of California (the "Company"), proposes to sell to the several underwriters named in Schedules II-A and II-B hereto (the "Underwriters"), for whom you (the "Representatives") are acting as representatives, (i) $400,000,000 aggregate principal amount of 3.30% Senior Notes due March 15, 2027 having the terms set forth in Schedule I-A hereto (the "2027 Notes") and (ii) $200,000,000 aggregate principal amount of 4.00% Senior Notes due December 1, 2046 having the terms set forth in Schedule I-B hereto (the "2046 Notes" and together with the 2027 Notes, the "Securities") to be issued under an indenture, amended and restated as of April 22, 2005 (the "Base Indenture"), as supplemented by the Seventh Supplemental Indenture dated as of June 11, 2009, as further supplemented by the Twentieth Supplemental Indenture dated as of November 12, 2013, as further supplemented by the Twenty-Eighth Supplemental Indenture, dated as of December 1, 2016 and as further supplemented by the Twenty-Ninth Supplemental Indenture to be dated as of March 10, 2017 (the "Supplemental Indenture" and, together with the Base Indenture as supplemented, the "Indenture"), each between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (the "Trustee"). To the extent there are no additional Underwriters listed on Schedules II-A and II-B other than you, the term Representatives as used herein shall mean you, as Underwriters, and the terms Representatives and Underwriters shall mean either the singular or plural as the context requires. Any reference herein to the Registration Statement, the Base Prospectus, any Preliminary Prospectus or the Final Prospectus shall be deemed to refer to and include the documents incorporated by reference therein pursuant to Item 12 of Form S-3 which were filed under the Securities Exchange Act of 1934, as amended (the "Exchange Act") on or before the Effective Date of the Registration Statement or the issue date of the Base Prospectus, any Preliminary Prospectus or the Final Prospectus, as the case may be, and any reference herein to the terms "amend," "amendment" or "supplement" with respect to the Registration Statement, the Base Prospectus, any Preliminary

Prospectus or the Final Prospectus shall be deemed to refer to and include the filing of any document under the Exchange Act after the Effective Date of the Registration Statement or the issue date of the Base Prospectus, any Preliminary Prospectus or the Final Prospectus, as the case may be, deemed to be incorporated therein by reference. Certain terms used herein are defined in Section 21 hereof.

1. <u>Representations and Warranties</u>. The Company represents and warrants to, and agrees with, each Underwriter as set forth below in this Section 1.

(a) The Company meets the requirements for use of Form S-3 under the Act and has prepared and filed with the Commission a shelf registration statement (File No. 333-215427) on Form S-3, including a related Base Prospectus, for registration under the Act of the offering and sale of the Securities. Such Registration Statement, including any amendments thereto filed prior to the Execution Time, has become effective under the Act; no stop order suspending the effectiveness of the Registration Statement or preventing or suspending the use of the Preliminary Prospectus or the Final Prospectus is in effect, and no proceedings for such purpose are pending before, or to the knowledge of the Company, threatened by the Commission. The Company may have filed with the Commission, as part of an amendment to the Registration Statement or pursuant to Rule 424(b), one or more preliminary prospectus supplements relating to the Securities, each of which has previously been furnished to you. The Company will file with the Commission a final prospectus supplement relating to the Securities in accordance with Rule 424(b). As filed, such final prospectus supplement shall contain all information required by the Act and the rules thereunder, and, except to the extent the Representatives shall agree in writing to a modification, shall be in all substantive respects in the form furnished to you prior to the Execution Time or, to the extent not completed at the Execution Time, shall contain only such specific additional information and other changes (beyond that contained in the Base Prospectus and any Preliminary Prospectus) as the Company has advised you, prior to the Execution Time, will be included or made therein. The Registration Statement, at the Execution Time, meets the requirements set forth in Rule 415(a)(1)(x).

(b) On each Effective Date, the Registration Statement did, and when the Final Prospectus is first filed in accordance with Rule 424(b) and on the Closing Date (as defined herein), the Final Prospectus (and any supplement thereto) will, comply in all material respects with the applicable requirements of the Act, the Exchange Act and the Trust Indenture Act and the respective rules thereunder; on each Effective Date and at the Execution Time, the Registration Statement did not and will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein not misleading; on the Effective Date and on the Closing Date the Indenture did or will comply in all material respects with the applicable requirements of the Trust Indenture Act and the rules thereunder; and on the date of any filing pursuant to Rule 424(b) and on the Closing Date, the Final Prospectus (together with any supplement thereto) will not include any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; <u>provided</u>, <u>however</u>, that the Company makes no representations or warranties as to (i) that part of

1415293.05-NYCSR03A - MSW

Case: 19-00088    Doc# 5374-10    Filed: 01/14/20    Entered: 01/14/20 17:56:59    Page 306
                                          486 of 524

the Registration Statement which shall constitute the Statement of Eligibility and Qualification (Form T-1) under the Trust Indenture Act of the Trustee or (ii) the information contained in or omitted from the Registration Statement or the Final Prospectus (or any supplement thereto) in reliance upon and in conformity with information furnished in writing to the Company by or on behalf of any Underwriter through the Representatives specifically for inclusion in the Registration Statement or the Final Prospectus (or any supplement thereto), it being understood and agreed that the only such information furnished by or on behalf of any Underwriter consists of the information described as such in Section 8 hereof.

(c)     As of the Execution Time and the Closing Date, (i) the Disclosure Package and (ii) each electronic road show, if any, when taken together as a whole with the Disclosure Package, did not and will not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.  The preceding sentence does not apply to statements in or omissions from the Disclosure Package based upon and in conformity with written information furnished to the Company by any Underwriter through the Representatives specifically for use therein, it being understood and agreed that the only such information furnished by or on behalf of any Underwriter consists of the information described as such in Section 8 hereof.

(d)     The Issuer Free Writing Prospectus and the final term sheets prepared and filed pursuant to Section 5(b) hereto did not, as of their issue dates, and do not include any information that conflicts with the information contained in the Registration Statement, including any document incorporated therein by reference and any prospectus supplement deemed to be a part thereof that has not been superseded or modified.  The foregoing sentence does not apply to statements in or omissions from any Issuer Free Writing Prospectus based upon and in conformity with written information furnished to the Company by any Underwriter through the Representatives specifically for use therein, it being understood and agreed that the only such information furnished by or on behalf of any Underwriter consists of the information described as such in Section 8 hereof.

(e)     The Company has been duly incorporated and is validly existing as a corporation in good standing under the laws of the State of California, with full corporate power and authority to own or lease, as the case may be, and to operate its properties and conduct its business as described in the Disclosure Package and the Final Prospectus, and is duly qualified to do business as a foreign corporation and is in good standing under the laws of each jurisdiction which requires such qualification, except where the failure to be so qualified or be in good standing would not, individually or in the aggregate, have a material adverse effect on the condition (financial or otherwise), earnings, business or properties of the Company and its subsidiaries, taken as a whole (a "Material Adverse Effect").

(f)     This Agreement has been duly authorized, executed and delivered by the Company.

1415293.05-NYCSR03A - MSW

Case: 19-30088    Doc# 5374-10    Filed: 01/14/20    Entered: 01/14/20 17:56:59    Page 406
of 524
487

(g)     The Indenture has been duly authorized by the Company; and the Base Indenture has been, and at the Closing Date the Supplemental Indenture will have been, duly executed and delivered by the Company; and the Base Indenture constitutes and, at the Closing Date, assuming due authorization, execution and delivery by the Trustee, the Supplemental Indenture will constitute, a valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as enforcement thereof may be limited by laws and principles of equity affecting the enforcement of creditors' rights, including, without limitation, bankruptcy, reorganization, insolvency arrangement, fraudulent conveyance, moratorium, receivership, assignment for the benefit of creditors laws; and the Base Indenture has been duly qualified under the Trust Indenture Act and the Supplemental Indenture will be qualified under the Trust Indenture Act as of the Closing Date.

(h)     The issuance and sale by the Company of the Securities pursuant to this Agreement have been duly authorized by all necessary corporate action; and, when issued, authenticated and delivered to the Underwriters pursuant to this Agreement against payment of the consideration therefor specified herein, the Securities will be valid and binding obligations of the Company, enforceable against the Company in accordance with their terms, except as enforcement thereof may be limited by laws or principles of equity affecting creditors' rights, including, without limitation, bankruptcy, reorganization, insolvency, arrangement, fraudulent conveyance, moratorium, receivership, assignment for the benefit of creditors laws, and will be entitled to the benefits of the Indenture.

(i)     The Company is not and, after giving effect to the offering and sale of the Securities and the application of the proceeds thereof as described in the Disclosure Package and the Final Prospectus, will not be an "investment company" as defined in the Investment Company Act of 1940, as amended (the "1940 Act") or a company "controlled" by an "investment company" within the meaning of the 1940 Act.

(j)     No consent, approval, authorization, filing with or order of any court or governmental agency or body is required in connection with the transactions contemplated herein, except such as have been obtained from the California Public Utilities Commission (the "CPUC"), under the Act, under the Trust Indenture Act or otherwise and such as may be required under the blue sky laws of any jurisdiction in connection with the purchase and distribution of the Securities by the Underwriters in the manner contemplated herein and in the Disclosure Package and the Final Prospectus.

(k)     Neither the Company nor any of its subsidiaries has received any notice of proceedings relating to the revocation or modification of any licenses, certificates, permits and other authorizations which, individually or in the aggregate, if the subject of an unfavorable decision, ruling or finding, would have a Material Adverse Effect, whether or not arising from transactions in the ordinary course of business, except as set forth in or contemplated in the Registration Statement, Disclosure Package and the Final Prospectus (exclusive of any supplement thereto).

4

(l)    None of the issue and sale of the Securities, the consummation of any other of the transactions herein contemplated or the performance by the Company of any of its obligations set forth herein will conflict with or result in, a breach or violation of: (i) the charter, bylaws or comparable constituent documents of the Company or any of its subsidiaries, (ii) the terms of any indenture, contract, lease, mortgage, deed of trust, note agreement, loan agreement or other agreement, obligation, condition, covenant or instrument to which the Company or any of its subsidiaries is a party or bound or to which its or their property is subject, or (iii) any statute, law, rule, regulation, judgment, order or decree applicable to the Company or any of its subsidiaries of any court, regulatory body, administrative agency, governmental body, arbitrator or other authority having jurisdiction over the Company or any of its subsidiaries or any of its or their properties, except, in the case of clauses (ii) and (iii) above, for such conflicts, breaches or violations which could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(m)    The consolidated historical financial statements and schedules of the Company and its consolidated subsidiaries included in the Preliminary Prospectus, the Final Prospectus and the Registration Statement present fairly in all material respects the financial condition, results of operations and cash flows of the Company and its consolidated subsidiaries as of the dates and for the periods indicated, comply as to form with the applicable accounting requirements of the Act and have been prepared in conformity with generally accepted accounting principles applied on a consistent basis throughout the periods involved (except as otherwise noted therein).  The interactive data in eXtensible Business Reporting Language incorporated by reference in the Registration Statement, the Disclosure Package and the Prospectus has been prepared in accordance with the Commission's rules and guidelines applicable thereto in all material respects.

(n)    There has not occurred any change in the condition, financial or otherwise, or in the earnings, business or operations of the Company and its subsidiaries, taken as a whole, from that set forth in the Disclosure Package that would reasonably be expected to have a Material Adverse Effect.

(o)    No action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Company or any of its subsidiaries or its or their property is pending or, to the best knowledge of the Company, threatened that (i) would reasonably be expected to have a material adverse effect on the performance of this Agreement or the consummation of any of the transactions contemplated hereby or (ii) would reasonably be expected to have a Material Adverse Effect, whether or not arising from transactions in the ordinary course of business, except as set forth in or contemplated in the Disclosure Package and the Final Prospectus (exclusive of any supplement thereto).

(p)    Deloitte & Touche LLP, who have certified certain financial statements of the Company and its consolidated subsidiaries and delivered their report with respect to the audited consolidated financial statements and schedules included in the Registration Statement, the Disclosure Package and the Final Prospectus, is an independent registered public accounting firm with respect to the Company within the meaning of the Act and

1415293.05-NYCSR03A - MSW
Case: 19-30088    Doc# 5374-10    Filed: 01/14/20    Entered: 01/14/20 15:56:59    Page 491
of 524

the applicable published rules and regulations thereunder and of the Public Company Accounting Oversight Board.

(q)    Except as set forth or contemplated in the Registration Statement, Disclosure Package and the Final Prospectus (exclusive of any supplement thereto), neither the Company nor any of its subsidiaries is (i) in violation of any statute, rule, regulation, decision or order of any governmental agency or body or any court, domestic or foreign, relating to the use, disposal or release of hazardous or toxic substances or relating to the protection or restoration of the environment or human exposure to hazardous or toxic substances (collectively, "Environmental Laws"), (ii) owns or operates any real property contaminated with any substance that is subject to any Environmental Laws, (iii) is liable for any off-site disposal or contamination pursuant to any Environmental Laws, or (iv) is subject to any claim relating to any Environmental Laws, which violation, contamination, liability or claim could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; and there is no investigation pending or, to the Company's knowledge, threatened against it or its subsidiaries, that could reasonably be expected to lead to the making of such a claim.

(r)    The Company does not have any significant subsidiaries as defined by Rule 1-02 of Regulation S-X.

(s)    The CPUC has authorized the issuance and sale by the Company of the Securities, and such authorization is in full force and effect and sufficient for the issuance and sale of the Securities to the Underwriters.

(t)    The Company and each of its consolidated subsidiaries maintain a system of internal accounting controls over financial reporting sufficient to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorizations; (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain asset accountability; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any material differences.

(u)    The Company maintains "disclosure controls and procedures" (as defined in Rule 13a-15(e) of the Exchange Act) and such disclosure controls and procedures were effective as of the end of the Company's most recently completed fiscal quarter.

(v)    To the Company's knowledge, none of the Company, any of its subsidiaries,  or any director, officer, agent, affiliate or employee of the Company or any of its subsidiaries is currently the subject of any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("OFAC"); and the Company will not use the proceeds from the sale of the Securities, or knowingly lend, contribute or otherwise make available such proceeds to any subsidiary, affiliate, joint venture partner or other person or entity for the purpose of financing the activities of any person currently the subject of any U.S. sanctions administered by OFAC.

Any certificate signed by any officer of the Company and delivered to the Representatives or counsel for the Underwriters pursuant to this Agreement shall be deemed a representation and warranty by the Company, as to matters covered thereby, to each Underwriter.

2.    Purchase and Sale.  Subject to the terms and conditions and in reliance upon the representations and warranties herein set forth, the Company agrees to sell to each Underwriter, and each Underwriter agrees, severally and not jointly, to purchase from the Company, at the purchase prices (including accrued interest, if any) set forth in Schedules I-A and I-B hereto, the principal amount of the Securities set forth opposite such Underwriter's name in Schedules II-A and II-B hereto.

3.    Delivery and Payment.  Delivery of and payment for the Securities shall be made on the date and at the time specified in Schedules I-A and I-B hereto or at such time on such later date not more than three Business Days after the foregoing date as the Representatives shall designate, which date and time may be postponed by agreement between the Representatives and the Company or as provided in Section 9 hereof (such date and time of delivery and payment for the Securities being herein called the "Closing Date").  Delivery of the Securities shall be made to the Representatives for the respective accounts of the several Underwriters against payment by the several Underwriters through the Representatives of the purchase price (including accrued interest, if any) thereof to or upon the order of the Company by wire transfer payable in same-day funds to an account specified by the Company.  Delivery of the Securities shall be made through the facilities of The Depository Trust Company unless the Representatives shall otherwise instruct.

4.    Offering by Underwriters.  It is understood that the several Underwriters propose to, and they hereby represent that they will, offer the Securities for sale to the public as set forth in the Disclosure Package and the Final Prospectus.

5.    Agreements.  The Company agrees with the several Underwriters that:

(a)    Prior to the termination of the offering of the Securities, the Company will not file any amendment of the Registration Statement or supplement (including the Final Prospectus or any Preliminary Prospectus) to the Base Prospectus unless the Company has furnished you a copy for your review prior to filing and will not file any such proposed amendment or supplement to which you reasonably object. The Company will cause the Final Prospectus, properly completed, and any supplement thereto to be filed in a form approved by the Representatives with the Commission pursuant to the applicable paragraph of Rule 424(b) within the time period prescribed and will provide evidence satisfactory to the Representatives of such timely filing. The Company will promptly advise the Representatives (i) when the Final Prospectus, and any supplement thereto, shall have been filed (if required) with the Commission pursuant to Rule 424(b), (ii) when, prior to termination of the offering of the Securities, any amendment to the Registration Statement shall have been filed or become effective, (iii) of any request by the Commission or its staff for any amendment of the Registration Statement, or for any supplement to the Final Prospectus or for any additional information, (iv) of the issuance by the Commission of any stop order suspending the effectiveness of the Registration Statement or any notice objecting to its use, any order preventing or suspending the use

7

of any preliminary prospectus, any Issuer Free Writing Prospectus or the Final Prospectus, or the institution or threatening of any proceeding for the purpose of suspending the effectiveness of the Registration Statement or preventing or suspending the use of any preliminary prospectus, any Issuer Free Writing Prospectus or the Final Prospectus, and (v) of the receipt by the Company of any notification with respect to the suspension of the qualification of the Securities for sale in any jurisdiction or the institution or threatening of any proceeding for such purpose.  The Company will use its reasonable best efforts to prevent (i) the issuance of such stop order or other order referred to in the preceding sentence, or (ii) the occurrence of (A) any suspension of the effectiveness, or objection to the use, of the Registration Statement or (B) any prevention or suspension of the use of the preliminary prospectus, any Issuer Free Writing Prospectus or the Final Prospectus and, upon such issuance, occurrence or notice of objection, to obtain as soon as possible the withdrawal of such stop order or relief from such occurrence or objection, including, if necessary, by filing an amendment to the Registration Statement or a new registration statement and using its best efforts to have such amendment or new registration statement declared effective as soon as practicable.

(b)     The Company shall prepare final term sheets for each of the 2027 Notes and the 2046 Notes, containing solely descriptions of the respective final terms and offering of the Securities, in the form approved by you and attached as Schedules IV-A and IV-B hereto, and file such term sheets pursuant to Rule 433(d) within the time required by such Rule.

(c)     If, at any time prior to the filing of the Final Prospectus pursuant to Rule 424(b), any event occurs as a result of which the Disclosure Package would include any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein in the light of the circumstances under which they were made or the circumstances then prevailing not misleading, the Company will (i) notify promptly the Representatives so that any use of the Disclosure Package may cease until it is amended or supplemented; (ii) amend or supplement the Disclosure Package to correct such statement or omission; and (iii) supply any amendment or supplement to you in such quantities as you may reasonably request.

(d)     If, at any time when a prospectus relating to the Securities is required to be delivered under the Act (including in circumstances where such requirement may be satisfied pursuant to Rule 172), any event occurs as a result of which the Final Prospectus as then supplemented would include any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein in the light of the circumstances under which they were made at such time not misleading, or if it shall be necessary to amend the Registration Statement, file a new registration statement or supplement the Final Prospectus to comply with the Act or the Exchange Act or the respective rules thereunder, including in connection with use or delivery of the Final Prospectus, the Company promptly will (i) notify the Representatives of any such event, (ii) prepare and file with the Commission, subject to the second sentence of paragraph (a) of this Section 5, an amendment or supplement or new registration statement which will correct such statement or omission or effect such compliance, (iii) use its best efforts to have any amendment to the Registration Statement or new registration statement declared

8

1415293.05-NYCSR03A - MSW

effective as soon as practicable in order to avoid any disruption in use of the Final Prospectus and (iv) supply any supplemented Final Prospectus to you in such quantities as you may reasonably request.

(e)     As soon as practicable, the Company will make generally available to its security holders and to the Representatives an earnings statement or statements of the Company and its subsidiaries which will satisfy the provisions of Section 11(a) of the Act and Rule 158.

(f)     The Company will furnish to the Representatives and counsel for the Underwriters, without charge, signed copies of the Registration Statement (including exhibits thereto) and to each other Underwriter a copy of the Registration Statement (without exhibits thereto) and, so long as delivery of a prospectus by an Underwriter or dealer may be required by the Act (including in circumstances where such requirement may be satisfied pursuant to Rule 172), as many copies of each Preliminary Prospectus, the Final Prospectus and the Issuer Free Writing Prospectuses and any supplement thereto as the Representatives may reasonably request.  The Company will pay the expenses of printing or other production of all documents relating to the offering.

(g)     The Company will arrange, if necessary, for the qualification of the Securities for sale under the laws of such jurisdictions as the Representatives may designate and will maintain such qualifications in effect so long as required for the distribution of the Securities; provided that in no event shall the Company be obligated to qualify to do business in any jurisdiction where it is not now so qualified or to take any action that would subject it to service of process in suits, other than those arising out of the offering or sale of the Securities, in any jurisdiction where it is not now so subject.

(h)     The Company agrees that, unless it has or shall have obtained the prior written consent of the Representatives, and each Underwriter, severally and not jointly, agrees with the Company that, unless it has or shall have obtained, as the case may be, the prior written consent of the Company, it has not made and will not make any offer relating to the Securities that would constitute an Issuer Free Writing Prospectus or that would otherwise constitute a "free writing prospectus" (as defined in Rule 405) required to be filed by the Company with the Commission or retained by the Company under Rule 433, other than the free writing prospectuses containing the information contained in the final term sheets prepared and filed pursuant to Section 5(b) hereto, or one or more free writing prospectuses through customary Bloomberg distribution that do not contain substantive changes from or additions to the information contained in the final term sheets prepared and filed pursuant to Section 5(b) hereto; provided that the prior written consent of the parties hereto shall be deemed to have been given in respect of the Free Writing Prospectuses included in <u>Schedule III</u> hereto or term sheets, substantially in the form of <u>Schedules IV-A and IV-B</u> hereto, and any electronic road show.  The Company consents to the use by any Underwriter of a free writing prospectus that (a) is not an "issuer free writing prospectus" as defined in Rule 433, and (b) contains only (i) information describing the preliminary terms of the Securities or the offering or (ii) information permitted by Rule 134.  Any such free writing prospectus consented to by the Representatives or the Company is hereinafter referred to as a "Permitted Free Writing

Prospectus." The Company agrees that (x) it has treated and will treat, as the case may be, each Permitted Free Writing Prospectus as an Issuer Free Writing Prospectus and (y) it has complied and will comply, as the case may be, with the requirements of Rules 164 and 433 applicable to any Permitted Free Writing Prospectus, including in respect of timely filing with the Commission, legending and record keeping and that it will not take any action that would result in any Underwriter or the Company being required to file with the Commission pursuant to Rule 433(d) a Free Writing Prospectus prepared by or on behalf of such Underwriter that such Underwriter would not otherwise have been required to so file.

(i)     The Company will not, without the prior written consent of the Representatives, offer, sell, contract to sell, pledge, or otherwise dispose of (or enter into any transaction which is designed to, or might reasonably be expected to, result in the disposition (whether by actual disposition or effective economic disposition due to cash settlement or otherwise) by the Company or any affiliate of the Company or any person in privity with the Company or any affiliate of the Company), directly or indirectly, including the filing (or participation in the filing) of a registration statement with the Commission in respect of, or establish or increase a put equivalent position or liquidate or decrease a call equivalent position within the meaning of Section 16 of the Exchange Act, any debt securities issued or guaranteed by the Company (other than the Securities) or publicly announce an intention to effect any such transaction, until the Business Day set forth on Schedules I-A and I-B hereto; provided that the prior written consent of the Representatives shall not be required for the sale or remarketing of tax-exempt bonds issued by a governmental authority or body for the benefit of the Company or for issuances of commercial paper or other debt securities with scheduled maturities of less than one year.

(j)     The Company will not take, directly or indirectly, any action designed to or that would constitute or that might reasonably be expected to cause or result in, under the Exchange Act or otherwise, stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of the Securities.

(k)     The Company agrees to pay the costs and expenses relating to the following matters:  (i) the preparation, printing or reproduction and filing with the Commission of the Registration Statement (including financial statements and exhibits thereto), each Preliminary Prospectus, the Final Prospectus and the Issuer Free Writing Prospectuses, and each amendment or supplement to any of them; (ii) the printing (or reproduction) and delivery (including postage, air freight charges and charges for counting and packaging) of such copies of the Registration Statement, each Preliminary Prospectus, the Final Prospectus and the Issuer Free Writing Prospectuses, and all amendments or supplements to any of them, as may, in each case, be reasonably requested for use in connection with the offering and sale of the Securities; (iii) the preparation, printing, authentication, issuance and delivery of certificates for the Securities, including any stamp or transfer taxes in connection with the original issuance and sale of the Securities; (iv) the printing (or reproduction) and delivery of this Agreement, any blue sky memorandum and all other agreements or documents printed (or reproduced) and delivered in connection with the offering of the Securities; (v) any

1415293.05-NYCSR03A - MSW

registration or qualification of the Securities for offer and sale under the securities or blue sky laws of the several states (including filing fees and the reasonable fees and expenses of counsel for the Underwriters relating to such registration and qualification); (vi) any filings required to be made with the Financial Industry Regulatory Authority, Inc. (including filing fees and the reasonable fees and expenses of counsel for the Underwriters relating to such filings); (vii) the transportation and other expenses incurred by or on behalf of Company representatives in connection with presentations to prospective purchasers of the Securities; (viii) the fees and expenses of the Company's accountants and the fees and expenses of counsel (including local and special counsel) for the Company; and (ix) all other costs and expenses incident to the performance by the Company of its obligations hereunder.

(l)     The Company agrees not to make, and agrees that it has not made, any offer relating to the Securities that would constitute an Issuer Free Writing Prospectus (as defined in Rule 433 of the Act) or that would otherwise constitute a Free Writing Prospectus required to be filed by the Company with the Commission or retained by the Company under Rule 433 of the Act, that contains information other than descriptions of the terms of the Securities in the offering or the offering.

6.     <u>Conditions to the Obligations of the Underwriters</u>.  The obligations of the Underwriters to purchase the Securities shall be subject to the accuracy of the representations and warranties on the part of the Company contained herein as of the Execution Time and the Closing Date, to the accuracy of the statements of the Company made in any certificates pursuant to the provisions hereof, to the performance by the Company of its obligations hereunder and to the following additional conditions:

(a)     The Final Prospectus, and any supplement thereto, shall have been filed in the manner and within the time period required by Rule 424(b); the final term sheets contemplated by Section 5(b) hereto, and any other material required to be filed by the Company pursuant to Rule 433(d) under the Act, shall have been filed with the Commission within the applicable time periods prescribed for such filings by Rule 433; and no stop order suspending the effectiveness of the Registration Statement or any notice objecting to its use shall have been issued and no proceedings for that purpose shall have been instituted or threatened.

(b)     The Company shall have requested and caused Orrick, Herrington & Sutcliffe LLP, counsel for the Company, to have furnished to the Representatives their opinion, dated the Closing Date and addressed to the Representatives, substantially in the form set forth in <u>Schedule V</u> hereto.

(c)     The Representatives shall have received from Skadden, Arps, Slate, Meagher & Flom LLP, counsel for the Underwriters, such opinion or opinions, dated the Closing Date and addressed to the Representatives, with respect to the issuance and sale of the Securities, the Indenture, the Registration Statement, the Disclosure Package, the Final Prospectus (together with any supplement thereto) and other related matters as the Representatives may reasonably require, and the Company shall have furnished to such

1415293.05-NYCSR03A - MSW

Case: 19-30088    Doc# 5374-10    Filed: 01/14/20    Entered: 01/14/20 15:56:59    Page 12
of 524
495

counsel such documents as they request for the purpose of enabling them to pass upon such matters.

(d)    The Company shall have furnished to the Representatives a certificate of the Company, signed by the Chairman of the Board, the Chief Executive Officer, the President, any Senior Vice President or the Treasurer and by the Chief Financial Officer of the Company, dated the Closing Date, to the effect that the signers of such certificate have carefully examined the Registration Statement, the Disclosure Package, the Final Prospectus and any supplements or amendments thereto, as well as each electronic road show used in connection with the offering of the Securities, and this Agreement and that:

(i)    the representations and warranties of the Company in this Agreement are true and correct on and as of the Closing Date with the same effect as if made on the Closing Date and the Company has complied with all the agreements and satisfied all the conditions on its part to be performed or satisfied at or prior to the Closing Date; and

(ii)    no stop order suspending the effectiveness of the Registration Statement or any notice objecting to its use has been issued and no proceedings for that purpose have been instituted or, to the Company's knowledge, threatened.

(e)    The Company shall have requested and caused Deloitte & Touche LLP to have furnished to the Representatives, at the Execution Time and at the Closing Date, letters (which may refer to letters previously delivered to one or more of the Representatives), dated respectively as of the Execution Time and as of the Closing Date, in form and substance satisfactory to the Representatives, confirming that they are independent accountants within the meaning of the Act and the Exchange Act and the respective applicable rules and regulations adopted by the Commission thereunder and stating in effect that:

(i)    in their opinion the audited financial statements and financial statement schedules included or incorporated by reference in the Registration Statement, the Preliminary Prospectus and the Final Prospectus and reported on by them comply as to form with the applicable accounting requirements of the Act and the Exchange Act and the related rules and regulations adopted by the Commission;

(ii)    carrying out certain specified procedures (but not an examination in accordance with generally accepted auditing standards) which would not necessarily reveal matters of significance with respect to the comments set forth in such letter; and inquiries of certain officials of the Company who have responsibility for financial and accounting matters of the Company and its subsidiaries as to transactions and events subsequent to December 31, 2016, nothing came to their attention which caused them to believe that, with respect to the period subsequent to December 31, 2016, there were any changes, at a specified date not more than five days prior to the date of the letter, in the long-term debt or short-term borrowings of the Company and its subsidiaries or the

12

capital stock of the Company or decreases in current assets or the shareholders' equity of the Company, as compared with the amounts shown on the December 31, 2016 consolidated balance sheet included or incorporated by reference in the Registration Statement, the Preliminary Prospectus and the Final Prospectus, or for the period from January 1, 2017 to such specified date there were any decreases, as compared with the corresponding period in the preceding year in operating revenues, income before income taxes or net income of the Company and its subsidiaries, except in all instances for changes or decreases set forth in such letter, in which case the letter shall be accompanied by an explanation by the Company as to the significance thereof unless said explanation is not deemed necessary by the Representatives; and

(iii)     they have performed certain other specified procedures as a result of which they determined that certain information of an accounting, financial or statistical nature (which is limited to accounting, financial or statistical information derived from the general accounting records of the Company and its subsidiaries) set forth in the Registration Statement, the Preliminary Prospectus and the Final Prospectus and in Exhibit 12 to the Registration Statement, including the information set forth under the captions "Ratio of Earnings to Fixed Charges" and "Capitalization" in the Preliminary Prospectus and the Final Prospectus, and the information included or incorporated by reference in Items 1, 1A, 6, 7 and 7A of the Company's Annual Report on Form 10-K and the information included in "Management's Discussion and Analysis of Financial Conditions and Results of Operations" included in any Quarterly Report on Form 10-Q filed by the Company and incorporated by reference in the Registration Statement, the Preliminary Prospectus and the Final Prospectus, agrees with the accounting records of the Company and its subsidiaries, excluding any questions of legal interpretation.

References to the Final Prospectus in this paragraph (e) include any supplement thereto at the date of the letter.

(f)     Subsequent to the Execution Time or, if earlier, the dates as of which information is given in the Registration Statement (exclusive of any amendment thereof) and the Final Prospectus (exclusive of any amendment or supplement thereto), there shall not have been (i) any material change or decrease specified in the letter or letters referred to in paragraph (e) of this Section 6 or (ii) any change in or affecting the condition (financial or otherwise), earnings, business or properties of the Company and its subsidiaries taken as a whole, whether or not arising from transactions in the ordinary course of business, except as set forth in or contemplated in the Disclosure Package and the Final Prospectus (exclusive of any amendment or supplement thereto) the effect of which, in any case referred to in clause (i) or (ii) above, is, in the judgment of the Representatives, so material and adverse as to make it impractical or inadvisable to proceed with the offering or delivery of the Securities as contemplated by the Registration Statement (exclusive of any amendment thereof), the Disclosure Package and the Final Prospectus (exclusive of any amendment or supplement thereto).

1415293.05-NYCSR03A - MSW
Case: 19-30088    Doc# 5374-10    Filed: 06/14/20    Entered: 06/14/20 15:52:59    Page 14
of 524
497

(g)     Subsequent to the Execution Time, there shall not have been any decrease in the rating of any of PG&E Corporation's or the Company's debt securities by any "nationally recognized statistical rating organization" (as defined in Section 3(a)(62) of the Exchange Act) or any notice given of any intended or potential decrease in any such rating or of a possible change in any such rating.

(h)     Prior to the Closing Date, the Company shall have furnished to the Representatives such further information, certificates and documents as the Representatives may reasonably request.

If any of the conditions specified in this Section 6 shall not have been fulfilled when and as provided in this Agreement, or if any of the opinions and certificates mentioned above or elsewhere in this Agreement shall not be reasonably satisfactory in form and substance to the Representatives and counsel for the Underwriters, this Agreement and all obligations of the Underwriters hereunder may be canceled at, or at any time prior to, the Closing Date by the Representatives.  Notice of such cancellation shall be given to the Company in writing or by telephone or facsimile confirmed in writing.

The documents required to be delivered by this Section 6 shall be delivered at the office of Skadden, Arps, Slate, Meagher & Flom LLP, counsel for the Underwriters, at Four Times Square, New York, New York, on the Closing Date.

7.     <u>Reimbursement of Underwriters' Expenses</u>.  If the sale of the Securities provided for herein is not consummated because any condition to the obligations of the Underwriters set forth in Section 6 hereof is not satisfied, because of any termination pursuant to Section 10 hereof or because of any refusal, inability or failure on the part of the Company to perform any agreement herein or comply with any provision hereof other than by reason of a default by any of the Underwriters, the Company will reimburse the Underwriters severally through Goldman, Sachs & Co., on demand for all expenses (including reasonable fees and disbursements of counsel) that shall have been incurred by them in connection with the proposed purchase and sale of the Securities.

8.     <u>Indemnification and Contribution</u>.  (a) The Company agrees to indemnify and hold harmless each Underwriter, the directors, officers, employees and agents of each Underwriter and each person who controls any Underwriter within the meaning of either the Act or the Exchange Act and each affiliate of any Underwriter within the meaning of Rule 405 under the Securities Act against any and all losses, claims, damages or liabilities, joint or several, to which they or any of them may become subject under the Act, the Exchange Act or other Federal or state statutory law or regulation, at common law or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon any untrue statement or alleged untrue statement of a material fact contained in the Registration Statement or in any subsequent amendment thereof, or in the Base Prospectus, any Preliminary Prospectus or any other preliminary prospectus supplement relating to the Securities, the Final Prospectus, any Issuer Free Writing Prospectus or the information contained in the final term sheets required to be prepared and filed pursuant to Section 5(b) hereto, or in any amendment thereof or supplement thereto, or arise out of or are based upon the omission or alleged

1415293.05-NYCSR03A - MSW

omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and agrees to reimburse each such indemnified party, as incurred, for any legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability or action; provided, however, that the Company will not be liable in any such case to the extent that any such loss, claim, damage or liability arises out of or is based upon any such untrue statement or alleged untrue statement or omission or alleged omission made therein in reliance upon and in conformity with written information furnished to the Company by or on behalf of any Underwriter through the Representatives specifically for inclusion therein, it being understood and agreed that the only such information furnished by or on behalf of any Underwriter consists of the information described as such in this Section 8. This indemnity agreement will be in addition to any liability which the Company may otherwise have.

(b)        Each Underwriter severally and not jointly agrees to indemnify and hold harmless the Company, each of its directors, each of its officers who signs the Registration Statement and each person who controls the Company within the meaning of either the Act or the Exchange Act, to the same extent as the foregoing indemnity from the Company to each Underwriter, but only with reference to written information relating to such Underwriter furnished to the Company by or on behalf of such Underwriter through the Representatives specifically for inclusion in the documents referred to in the foregoing indemnity. This indemnity agreement will be in addition to any liability which any Underwriter may otherwise have. The Company acknowledges that the statements set forth (i) in the last paragraph of the cover page regarding delivery of the Securities, (ii) under the heading "Underwriting," (A) the sentences related to concessions and reallowances and (B) the paragraph related to stabilization, syndicate covering transactions and penalty bids in any Preliminary Prospectus and the Final Prospectus constitute the only information furnished in writing by or on behalf of the several Underwriters for inclusion in any Preliminary Prospectus, the Final Prospectus or any Issuer Free Writing Prospectus.

(c)        Promptly after receipt by an indemnified party under this Section 8 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Section 8, notify the indemnifying party in writing of the commencement thereof; but the failure so to notify the indemnifying party (i) will not relieve it from liability under paragraph (a) or (b) above unless and to the extent it did not otherwise learn of such action and such failure results in the forfeiture by the indemnifying party of substantial rights and defenses and (ii) will not, in any event, relieve the indemnifying party from any obligations to any indemnified party other than the indemnification obligation provided in paragraph (a) or (b) above. The indemnifying party shall be entitled to appoint counsel of the indemnifying party's choice at the indemnifying party's expense to represent the indemnified party in any action for which indemnification is sought (in which case the indemnifying party shall not thereafter be responsible for the fees and expenses of any separate counsel retained by the indemnified party or parties except as set forth below); provided, however, that such counsel shall be satisfactory to the indemnified party. Notwithstanding the indemnifying party's election to appoint counsel to represent the

1415293.05-NYCSR03A - MSW

Case: 19-30088    Doc# 5374-10    Filed: 06/14/20    Entered: 06/14/20 15:52:59    Page 16
of 24
499

indemnified party in an action, the indemnified party shall have the right to employ separate counsel (including local counsel), and the indemnifying party shall bear the reasonable fees, costs and expenses of such separate counsel if (i) the use of counsel chosen by the indemnifying party to represent the indemnified party would present such counsel with a conflict of interest, (ii) the actual or potential defendants in, or targets of, any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there may be legal defenses available to it and/or other indemnified parties which are different from or additional to those available to the indemnifying party, (iii) the indemnifying party shall not have employed counsel satisfactory to the indemnified party to represent the indemnified party within a reasonable time after notice of the institution of such action or (iv) the indemnifying party shall authorize the indemnified party to employ separate counsel at the expense of the indemnifying party. It is understood that the indemnifying party shall not, in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the fees and expenses of more than one separate counsel (in addition to one local counsel) for all such indemnified parties. An indemnifying party will not, without the prior written consent of the indemnified parties, settle or compromise or consent to the entry of any judgment with respect to any pending or threatened claim, action, suit or proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not the indemnified parties are actual or potential parties to such claim or action) unless such settlement, compromise or consent (i) includes an unconditional release of each indemnified party from all liability arising out of such claim, action, suit or proceeding and (ii) does not include any statement as to or an admission of fault, culpability or a failure to act, by or on behalf of any indemnified party. No indemnifying party will be liable for any settlement of any such action effected without its prior written consent (which consent shall not be unreasonably withheld), but if settled with the consent of the indemnifying party or if there be a final judgment of the plaintiff in any such action, the indemnifying party agrees to indemnify and hold harmless any indemnified party from and against any loss or liability by reason of such settlement or judgment.

(d)     In the event that the indemnity provided in paragraph (a), (b) or (c) of this Section 8 is unavailable to or insufficient to hold harmless an indemnified party for any reason, the Company and the Underwriters severally agree to contribute to the aggregate losses, claims, damages and liabilities (including legal or other expenses reasonably incurred in connection with investigating or defending the same) (collectively "Losses") to which the Company and one or more of the Underwriters may be subject in such proportion as is appropriate to reflect the relative benefits received by the Company on the one hand and by the Underwriters on the other from the offering of the Securities; provided, however, that in no case shall any Underwriter (except as may be provided in any agreement among underwriters relating to the offering of the Securities) be responsible for any amount in excess of the underwriting discount or commission applicable to the Securities purchased by such Underwriter hereunder. If the allocation provided by the immediately preceding sentence is unavailable for any reason, the Company and the Underwriters severally shall contribute in such proportion as is appropriate to reflect not only such relative benefits but also the relative fault of the Company on the one hand and of the Underwriters on the other in connection with the

16

statements or omissions which resulted in such Losses as well as any other relevant equitable considerations. Benefits received by the Company shall be deemed to be equal to the total net proceeds from the offering (before deducting expenses) received by it, and benefits received by the Underwriters shall be deemed to be equal to the total underwriting discounts and commissions, in each case as set forth on the cover page of the Final Prospectus. Relative fault shall be determined by reference to, among other things, whether any untrue or any alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information provided by the Company on the one hand or the Underwriters on the other, the intent of the parties and their relative knowledge, access to information and opportunity to correct or prevent such untrue statement or omission. The Company and the Underwriters agree that it would not be just and equitable if contribution were determined by pro rata allocation or any other method of allocation which does not take account of the equitable considerations referred to above. Notwithstanding the provisions of this paragraph (d), no person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. For purposes of this Section 8, each person who controls an Underwriter within the meaning of either the Act or the Exchange Act and each director, officer, employee and agent of an Underwriter shall have the same rights to contribution as such Underwriter, and each person who controls the Company within the meaning of either the Act or the Exchange Act, each officer of the Company who shall have signed the Registration Statement and each director of the Company shall have the same rights to contribution as the Company, subject in each case to the applicable terms and conditions of this paragraph (d).

9.    <u>Default by an Underwriter</u>.  If any one or more Underwriters shall fail to purchase and pay for any of the Securities agreed to be purchased by such Underwriter or Underwriters hereunder and such failure to purchase shall constitute a default in the performance of its or their obligations under this Agreement, the remaining Underwriters shall be obligated severally to take up and pay for (in the respective proportions which the principal amount of Securities set forth opposite their names in <u>Schedules II-A and II-B</u> hereto bears to the aggregate principal amount of Securities set forth opposite the names of all the remaining Underwriters) the Securities which the defaulting Underwriter or Underwriters agreed but failed to purchase; <u>provided</u>, <u>however</u>, that in the event that the aggregate principal amount of Securities which the defaulting Underwriter or Underwriters agreed but failed to purchase shall exceed 10% of the aggregate principal amount of Securities set forth in <u>Schedules II-A and II-B</u> hereto, the remaining Underwriters shall have the right to purchase all, but shall not be under any obligation to purchase any, of the Securities, and if such nondefaulting Underwriters do not purchase all the Securities, this Agreement will terminate without liability to any nondefaulting Underwriter or the Company. In the event of a default by any Underwriter as set forth in this Section 9, the Closing Date shall be postponed for such period, not exceeding five Business Days, as the Representatives shall determine in order that the required changes in the Registration Statement and the Final Prospectus or in any other documents or arrangements may be effected. Nothing contained in this Agreement shall relieve any defaulting Underwriter of its liability, if any, to the Company and any nondefaulting Underwriter for damages occasioned by its default hereunder.

17

Case: 19-30088   Doc# 5374-10   Filed: 01/14/20   Entered: 01/14/20 15:52:59   Page
501 of 524

10.  <u>Termination</u>.  This Agreement shall be subject to termination in the absolute discretion of the Representatives, by notice given to the Company prior to delivery of and payment for the Securities, if at any time prior to such delivery and payment: (a) (i) trading in the common stock of PG&E Corporation shall have been suspended by the Commission or the New York Stock Exchange, (ii) trading in any series of the preferred stock of the Company shall have been suspended by the Commission or the NYSE MKT LLC, (iii) (A) trading in securities generally on the New York Stock Exchange shall have been suspended or limited, (B) minimum prices shall have been established on either of such exchanges, or (C) there shall have been a material disruption in the clearance or settlement of securities generally on either of such exchanges which makes it, in the sole judgment of the Representatives, impractical or inadvisable to proceed with the offering or delivery of the Securities as contemplated by this Agreement, the Disclosure Package or the Final Prospectus (exclusive of any amendment or supplement thereto), (b) a banking moratorium shall have been declared either by Federal, California or New York State authorities, (c) there shall have occurred any outbreak or escalation of hostilities, declaration by the United States of a national emergency or war, or other calamity or crisis which makes it, in the sole judgment of the Representatives, impractical or inadvisable to proceed with the offering or delivery of the Securities as contemplated by this Agreement, the Disclosure Package or the Final Prospectus (exclusive of any amendment or supplement thereto) or (d) there shall have been such a material adverse change in general economic, political or financial conditions or the financial markets in the United States which makes it, in the sole judgment of the Representatives, impractical or inadvisable to proceed with the offering or delivery of the Securities as contemplated by this Agreement, the Disclosure Package or the Final Prospectus (exclusive of any amendment or supplement thereto).

11.  <u>Representations and Indemnities to Survive</u>.  The respective agreements, representations, warranties, indemnities and other statements of the Company or its officers and of the Underwriters set forth in or made pursuant to this Agreement will remain in full force and effect, regardless of any investigation made by or on behalf of any Underwriter or the Company or any of the officers, directors, employees, agents or controlling persons referred to in Section 8 hereof, and will survive delivery of and payment for the Securities.  The provisions of Sections 7 and 8 hereof shall survive the termination or cancellation of this Agreement.

12.  <u>Notices</u>.  All communications hereunder will be in writing and effective only on receipt, and, if sent to the Representatives, will be mailed, delivered or telefaxed to (i) BNP Paribas Securities Corp., 787 Seventh Avenue, New York, NY 10019 (email: new.york.syndicate@bnpparibas.com); (ii) Goldman, Sachs & Co., 200 West Street, New York, NY 10282-2198 Attention: Registration Department; (iii) RBC Capital Markets, LLC, Three World Financial Center, 200 Vesey Street, 9th Floor, New York, NY 10281(fax no.: 212-658-6137), Attention: DCM Transaction Management; (iv) Wells Fargo Securities, LLC, 550 South Tryon Street, 5th Floor, Charlotte, NC 28202 (fax no.: 704-410-0326), Attention: Transaction Management; or, if sent to the Company, will be mailed, delivered or telefaxed to the Company's General Counsel (fax no.: (415) 973-6374) and confirmed to the Company's General Counsel, Pacific, Gas and Electric Company, at 77 Beale Street, San Francisco, CA 94105, Attention: General Counsel.

In accordance with the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), the Underwriters are required to obtain, verify and record

1415293.05-NYCSR03A - MSW

information that identifies their respective clients, including the Company, which information may include the name and address of their respective clients, as well as other information that will allow the Underwriters to properly identify their respective clients.

13. <u>Successors</u>. This Agreement will inure to the benefit of and be binding upon the parties hereto and their respective successors and the officers, directors, employees, agents and controlling persons referred to in Section 8 hereof, and no other person will have any right or obligation hereunder.

14. <u>No Fiduciary Duty</u>. The Company hereby acknowledges that (a) the purchase and sale of the Securities pursuant to this Agreement is an arm's-length commercial transaction between the Company, on the one hand, and the Underwriters and any affiliate through which it may be acting, on the other, (b) the Underwriters are acting as principal and not as an agent or fiduciary of the Company and (c) the Company's engagement of the Underwriters in connection with the offering and the process leading up to the offering is as independent contractors and not in any other capacity. Furthermore, the Company agrees that it is solely responsible for making its own judgments in connection with the offering (irrespective of whether any of the Underwriters has advised or is currently advising the Company on related or other matters). The Company agrees that it will not claim that the Underwriters have rendered advisory services of any nature or respect, or owe an agency, fiduciary or similar duty to the Company, in connection with such transaction or the process leading thereto.

15. <u>Research Analyst Independence</u>. The Company acknowledges that the Underwriters' research analysts and research departments are required to be independent from their respective investment banking divisions and are subject to certain regulations and internal policies, and that such Underwriters' research analysts may hold views and make statements or investment recommendations and/or publish research reports with respect to the Company and/or the offering of the Securities that differ from the views of their respective investment banking divisions. The Company hereby waives and releases, to the fullest extent permitted by law, any claims that the Company may have against the Underwriters with respect to any conflict of interest that may arise from the fact that the views expressed by their independent research analysts and research departments may be different from or inconsistent with the views or advice communicated to the Company by such Underwriters' investment banking divisions. The Company acknowledges that each of the Underwriters is a full service securities firm and as such from time to time, subject to applicable securities laws, may effect transactions for its own account or the account of its customers and hold long or short positions in debt or equity securities of the companies that may be the subject of the transactions contemplated by this Agreement.

16. <u>Integration</u>. This Agreement supersedes all prior agreements and understandings (whether written or oral) between the Company and the Underwriters, or any of them, with respect to the subject matter hereof.

17. <u>Applicable Law</u>. This Agreement will be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed within the State of New York.

19

18.     <u>Waiver of Jury Trial</u>.  The Company hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

19.     <u>Counterparts</u>.  This Agreement may be signed in one or more counterparts, each of which shall constitute an original and all of which together shall constitute one and the same agreement.

20.     <u>Headings</u>.  The section headings used herein are for convenience only and shall not affect the construction hereof.

21.     <u>Definitions</u>.  The terms that follow, when used in this Agreement, shall have the meanings indicated.

"Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations of the Commission promulgated thereunder.

"Base Prospectus" shall mean the base prospectus referred to in paragraph 1(a) above contained in the Registration Statement at the Execution Time.

"Business Day" shall mean any day other than a Saturday, a Sunday or a legal holiday or a day on which banking institutions or trust companies are authorized or obligated by law to close in New York City.

"Closing Date" shall mean March 10, 2017.

"Commission" shall mean the Securities and Exchange Commission.

"Disclosure Package" shall mean (i) the Base Prospectus, (ii) the Preliminary Prospectus used most recently prior to the Execution Time, (iii) the Issuer Free Writing Prospectuses, if any, identified in <u>Schedule III</u> hereto, (iv) the final term sheets prepared and filed pursuant to Section 5(b) hereto, if any, and (v) any other Free Writing Prospectus that the parties hereto shall hereafter expressly agree in writing to treat as part of the Disclosure Package.

"Effective Date" shall mean each date and time that the Registration Statement, any post-effective amendment or amendments thereto became or becomes effective and, if later, the date the annual report of the last completed fiscal year of the Company on Form 10-K was so filed.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations of the Commission promulgated thereunder.

"Execution Time" shall mean 4:00 p.m. Eastern Time on March 7, 2017, which is the time of the first contract of sale of the Securities.

1415293.05-NYCSR03A - MSW
Case: 19-30088    Doc# 5374-10    Filed: 06/14/20    Entered: 06/14/20 15:52:59    Page 201
504 of 524

"Final Prospectus" shall mean the prospectus supplement relating to the Securities that was first filed pursuant to Rule 424(b) after the Execution Time, together with the Base Prospectus.

"Free Writing Prospectus" shall mean a free writing prospectus, as defined in Rule 405.

"Issuer Free Writing Prospectus" shall mean an issuer free writing prospectus, as defined in Rule 433.

"Preliminary Prospectus" shall mean any preliminary prospectus supplement to the Base Prospectus referred to in paragraph 1(a) above which is used prior to the filing of the Final Prospectus, together with the Base Prospectus.

"Registration Statement" shall mean the registration statement referred to in paragraph 1(a) above, including exhibits and financial statements and any prospectus supplement relating to the Securities that is filed with the Commission pursuant to Rule 424(b) and deemed part of such registration statement pursuant to Rule 430B, as amended on each Effective Date and, in the event any post-effective amendment thereto becomes effective prior to the Closing Date, shall also mean such registration statement as so amended.

"Rule 134," "Rule 158," "Rule 163," "Rule 164," "Rule 172," "Rule 405," "Rule 415," "Rule 424," "Rule 430B" and "Rule 433" refer to such rules under the Act.

"Trust Indenture Act" shall mean the Trust Indenture Act of 1939, as amended, and the rules and regulations of the Commission promulgated thereunder.

1415293.05-NYCSR03A - MSW

Case: 19-30088    Doc# 5374-10    Filed: 06/14/20    Entered: 06/14/20 15:56:59    Page
505 of 524

If the foregoing is in accordance with your understanding of our agreement, please sign and return to us the enclosed duplicate hereof, whereupon this letter and your acceptance shall represent a binding agreement among the Company and the several Underwriters.

Very truly yours,

Pacific Gas and Electric Company

By: _____
   Name: Nicholas M. Bijur
   Title: Vice President and Treasurer

The foregoing Agreement is hereby confirmed
and accepted as of the date first written above.

BNP PARIBAS SECURITIES CORP.

By: _____

Name: **Paul LANGE**

Title: **Managing Director**
       **Debt Capital Markets**

GOLDMAN, SACHS & CO.

By: _____

Name:

Title:

RBC CAPITAL MARKETS, LLC

By: _____

Name:

Title:

WELLS FARGO SECURITIES, LLC

By: _____

Name:

Title:

For themselves and as Representatives of the other several Underwriters named herein.

The foregoing Agreement is hereby confirmed
and accepted as of the date first written above.


BNP PARIBAS SECURITIES CORP.


By: _____

    Name:

    Title:

GOLDMAN, SACHS & CO.


By: _____ _Adam Greene_ _____

    Name: Adam Greene

    Title: Vice President


RBC CAPITAL MARKETS, LLC


By: _____

    Name:

    Title:


WELLS FARGO SECURITIES, LLC


By: _____

    Name:

    Title:


For themselves and as Representatives of the other several Underwriters named herein.

The foregoing Agreement is hereby confirmed
and accepted as of the date first written above.

BNP PARIBAS SECURITIES CORP.

By: _____
     Name:
     Title:

GOLDMAN, SACHS & CO.

By: _____
     Name:
     Title:

RBC CAPITAL MARKETS, LLC

By: _____
     Name: SCOTT G. PRIMROSE
     Title: Authorized Signatory

WELLS FARGO SECURITIES, LLC

By: _____
     Name:
     Title:

For themselves and as Representatives of the other several Underwriters named herein.

The foregoing Agreement is hereby confirmed and accepted as of the date first written above.

BNP PARIBAS SECURITIES CORP.

By: _____
     Name:
     Title:

GOLDMAN, SACHS & CO.

By: _____
     Name:
     Title:

RBC CAPITAL MARKETS, LLC

By: _____
     Name:
     Title:

WELLS FARGO SECURITIES, LLC

By: _____
     Name: Carolyn Hurley
     Title:   Director

For themselves and as Representatives of the other several Underwriters named herein.

<u>**SCHEDULE I-A**</u>

**3.30% Senior Notes due March 15, 2027**

**Underwriting Agreement dated March 7, 2017**

**Registration Statement No. 333-215427**

**Representatives:**    BNP Paribas Securities Corp.
                         Goldman, Sachs & Co.
                         RBC Capital Markets, LLC
                         Wells Fargo Securities, LLC

**Title, Purchase Price and Description of Securities:**

    **Title:** 3.30% Senior Notes due March 15, 2027

    **Principal amount:**    $400,000,000

    **Price to Public:**    99.645%

    **Price to Underwriters:**  98.995%

    **Interest payment dates:**  March 15 and September 15, commencing September 15, 2017

    **Sinking fund provisions:** Not applicable

    **Redemption provisions:**

At any time prior to December 15, 2026 (the date that is three months prior to the maturity date), Pacific Gas and Electric Company may, at its option, redeem the 3.30% Notes due March 15, 2027 (in this Schedule, the "2027 Notes") in whole or in part at a redemption price equal to the greater of: (1) 100% of the principal amount of the 2027 Notes to be redeemed or (2) as determined by the Quotation Agent, the sum of the present values of the remaining scheduled payments of principal and interest on the 2027 Notes to be redeemed (not including any portion of payments of interest accrued as of the redemption date), calculated as if the maturity date of such notes was December 15, 2026 (the date that is three months prior to the maturity date), discounted to the redemption date on a semiannual basis at the Adjusted Treasury Rate plus 15 basis points, plus, in either case, accrued and unpaid interest to the redemption date.

At any time on or after December 15, 2026 Pacific Gas and Electric Company may redeem the 2027 Notes, in whole or in part, at 100% of the principal amount of the 2027 Notes being redeemed plus accrued and unpaid interest to the redemption date. The redemption price will be calculated assuming a 360-day year consisting of twelve 30-day months.

**Other provisions:**    Not applicable

**Closing Date, Time and Location:** March 10, 2017 at 10:00 a.m. at Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, NY 10036

Date referred to in Section 5(i) after which the Company may offer or sell debt securities issued or guaranteed by the Company without the consent of the Representative(s):  March 10, 2017

Modification of items to be covered by the letter from Deloitte & Touche LLP delivered pursuant to Section 6(e) at the Execution Time:  None

Schedule I-A - 2

**4.00% Senior Notes due December 1, 2046**

**Underwriting Agreement dated March 7, 2017**

**Registration Statement No. 333-215427**

**Representatives:**    BNP Paribas Securities Corp.
Goldman, Sachs & Co.
RBC Capital Markets, LLC
Wells Fargo Securities, LLC

**Title, Purchase Price and Description of Securities:**

**Title:**    4.00% Senior Notes due December 1, 2046

**Principal amount:**    $200,000,000

**Price to Public:**    97.932% (plus accrued interest of $2,200,000)

**Price to Underwriters:**  97.057%

**Interest payment dates:**  June 1 and December 1, commencing June 1, 2017

**Sinking fund provisions:** Not applicable

**Redemption provisions:**

At any time prior to June 1, 2046 (the date that is six months prior to the maturity date), Pacific Gas and Electric Company may, at its option, redeem the 4.00% Notes due December 1, 2046 (in this Schedule, the "2046 Notes") in whole or in part at a redemption price equal to the greater of: (1) 100% of the principal amount of the 2046 Notes to be redeemed or (2) as determined by the Quotation Agent, the sum of the present values of the remaining scheduled payments of principal and interest on the 2046 Notes to be redeemed (not including any portion of payments of interest accrued as of the redemption date), calculated as if the maturity date of such notes was June 1, 2046 (the date that is six months prior to the maturity date), discounted to the redemption date on a semiannual basis at the Adjusted Treasury Rate plus 20 basis points, plus, in either case, accrued and unpaid interest to the redemption date.

At any time on or after June 1, 2046, Pacific Gas and Electric Company may redeem the 2046 Notes, in whole or in part, at 100% of the principal amount of the 2046 Notes being redeemed plus accrued and unpaid interest to the redemption date. The redemption price will be calculated assuming a 360-day year consisting of twelve 30-day months.

**Other provisions:**    Not applicable

**Closing Date, Time and Location:** March 10, 2017 at 10:00 a.m. at Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, NY 10036

Date referred to in Section 5(i) after which the Company may offer or sell debt securities issued or guaranteed by the Company without the consent of the Representative(s): March 10, 2017

Modification of items to be covered by the letter from Deloitte & Touche LLP delivered pursuant to Section 6(e) at the Execution Time: None

1415293.05-NYCSR03A - MSW

# SCHEDULE II-A

| Underwriters | Principal Amount of 3.30% Senior Notes due March 15, 2027 to be Purchased |
|---|---|
| BNP Paribas Securities Corp. | $84,000,000 |
| Goldman, Sachs & Co. | $84,000,000 |
| RBC Capital Markets, LLC | $84,000,000 |
| Wells Fargo Securities, LLC | $84,000,000 |
| BNY Mellon Capital Markets, LLC | $20,000,000 |
| TD Securities (USA) LLC | $20,000,000 |
| Blaylock Beal Van, LLC | $12,000,000 |
| MFR Securities, Inc. | $12,000,000 |
| Total | $400,000,000 |

Schedule II-B - 1

## SCHEDULE II-B

|  | **Principal Amount of 4.00% Senior Notes due December 1, 2046 to be Purchased** |
|---|---|
| **Underwriters** | |
| BNP Paribas Securities Corp. | $42,000,000 |
| Goldman, Sachs & Co. | $42,000,000 |
| RBC Capital Markets, LLC | $42,000,000 |
| Wells Fargo Securities, LLC | $42,000,000 |
| BNY Mellon Capital Markets, LLC | $10,000,000 |
| TD Securities (USA) LLC | $10,000,000 |
| Blaylock Beal Van, LLC | $6,000,000 |
| MFR Securities, Inc. | $6,000,000 |
| Total | $200,000,000 |

## SCHEDULE III

Schedule of the Free Writing Prospectus included in the Disclosure Package

1.       Free Writing Prospectus, dated as of March 7, 2017 and filed pursuant to Rule 433 on March 7, 2017, relating to the 3.30% Senior Notes due March 15, 2027 and the 4.00% Senior Notes due December 1, 2046.

## SCHEDULE IV-A

**Filed Pursuant to Rule 433**
**Registration No. 333-215427**
**March 7, 2017**

## PRICING TERM SHEET

### Pacific Gas and Electric Company
### 3.30% Senior Notes due March 15, 2027

| | |
|---|---|
| **Issuer:** | Pacific Gas and Electric Company |
| **Anticipated Ratings (Moody's/S&P/Fitch):\*** | Intentionally omitted |
| **Principal Amount:** | $400,000,000 |
| **Trade Date:** | March 7, 2017 |
| **Settlement Date:** | March 10, 2017 (T+3) |
| **Maturity Date:** | March 15, 2027 |
| **Interest Payment Dates:** | March 15 and September 15, commencing September 15, 2017 |
| **Coupon:** | 3.30% |
| **Price to Public:** | 99.645% |
| **Benchmark Treasury:** | 2.25% due February 15, 2027 |
| **Benchmark Treasury Yield:** | 2.512% |
| **Spread to Benchmark Treasury:** | +83 basis points |
| **Yield to Maturity:** | 3.342% |
| **Optional Redemption:** | At any time prior to December 15, 2026 (the date that is three months prior to the maturity date), Pacific Gas and Electric Company may, at its option, redeem the 3.30% Senior Notes in whole or in part at a redemption price equal to the greater of: |

- 100% of the principal amount of the 3.30% Senior Notes to be redeemed; or

- as determined by the Quotation Agent, the sum of the present values of the remaining scheduled payments of principal and interest on the 3.30% Senior Notes to be redeemed (not including any portion of payments of interest accrued as of the redemption date), calculated as if the maturity date of

Schedule IV-A - 1

such notes was December 15, 2026 (the date that is three months prior to the maturity date), discounted to the redemption date on a semiannual basis at the Adjusted Treasury Rate plus 15 basis points,

plus, in either case, accrued and unpaid interest to the redemption date.

At any time on or after December 15, 2026, Pacific Gas and Electric Company may redeem the 3.30% Senior Notes, in whole or in part, at 100% of the principal amount of the 3.30% Senior Notes being redeemed plus accrued and unpaid interest to the redemption date.

| | |
|---|---|
| **Concurrent Debt Offering:** | $200,000,000 principal amount of 4.00% Senior Notes due December 1, 2046 |
| **CUSIP / ISIN:** | 694308 HS9/US694308HS91 |
| **Joint Book-Running Managers:** | BNP Paribas Securities Corp.<br>Goldman, Sachs & Co.<br>RBC Capital Markets, LLC<br>Wells Fargo Securities, LLC |
| **Co-Managers** | BNY Mellon Capital Markets, LLC<br>TD Securities (USA) LLC<br>Blaylock Beal Van, LLC<br>MFR Securities, Inc. |

**\*Note: A securities rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time.**

**The issuer has filed a registration statement (including a prospectus) with the SEC for the offering to which this communication relates. Before you invest, you should read the prospectus in that registration statement and other documents the issuer has filed with the SEC for more complete information about the issuer and this offering.**

**You may get these documents for free by visiting EDGAR on the SEC Web site at www.sec.gov. Alternatively, the issuer, any underwriter or any dealer participating in the offering will arrange to send you the prospectus if you request it by calling (i) BNP Paribas Securities Corp., toll free at 1-800-854-5674; (ii) Goldman, Sachs & Co., toll free at 1-866-471-2526; (iii) RBC Capital Markets, LLC, toll free at 1-866-375-6829; or (iv) Wells Fargo Securities, LLC, toll free at 1-800-645-3751.**

Schedule IV-A - 2

<u>**SCHEDULE IV-B**</u>

**Filed Pursuant to Rule 433**
**Registration No. 333-215427**
**March 7, 2017**

**PRICING TERM SHEET**

**Pacific Gas and Electric Company**
**4.00% Senior Notes due December 1, 2046**

| | |
|---|---|
| **Issuer:** | Pacific Gas and Electric Company |
| **Anticipated Ratings (Moody's/S&P/Fitch):*** | Intentionally omitted |
| **Principal Amount:** | $200,000,000 |
| **Trade Date:** | March 7, 2017 |
| **Settlement Date:** | March 10, 2017 (T+3) |
| **Maturity Date:** | December 1, 2046 |
| **Interest Payment Dates:** | June 1 and December 1, commencing June 1, 2017 |
| **Coupon:** | 4.00% |
| **Price to Public:** | 97.932% |
| **Benchmark Treasury:** | 2.875% due November 15, 2046 |
| **Benchmark Treasury Yield:** | 3.121% |
| **Spread to Benchmark Treasury:** | +100 basis points |
| **Yield to Maturity:** | 4.121% |
| **Optional Redemption:** | At any time prior to June 1, 2046 (the date that is six months prior to the maturity date), Pacific Gas and Electric Company may, at its option, redeem the 4.00% Senior Notes in whole or in part at a redemption price equal to the greater of: |

- 100% of the principal amount of the 4.00% Senior Notes to be redeemed; or

- as determined by the Quotation Agent, the sum of the present

Schedule V - 1

values of the remaining scheduled payments of principal and interest on the 4.00% Senior Notes to be redeemed (not including any portion of payments of interest accrued as of the redemption date), calculated as if the maturity date of such notes was June 1, 2046 (the date that is six months prior to the maturity date), discounted to the redemption date on a semiannual basis at the Adjusted Treasury Rate plus 20 basis points,

plus, in either case, accrued and unpaid interest to the redemption date.

At any time on or after June 1, 2046, Pacific Gas and Electric Company may redeem the 4.00% Senior Notes, in whole or in part, at 100% of the principal amount of the 4.00% Senior Notes being redeemed plus accrued and unpaid interest to the redemption date.

| | |
|---|---|
| **Concurrent Debt Offering** | $400,000,000 principal amount of 3.30% Senior Notes due March 15, 2027 |
| **CUSIP / ISIN:** | 694308HR1/US694308HR19 |
| **Joint Book-Running Managers:** | BNP Paribas Securities Corp. <br> Goldman, Sachs & Co. <br> RBC Capital Markets, LLC <br> Wells Fargo Securities, LLC |
| **Co-Managers** | BNY Mellon Capital Markets, LLC <br> TD Securities (USA) LLC <br> Blaylock Beal Van, LLC <br> MFR Securities, Inc. |

**\*Note: A securities rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time.**

**The issuer has filed a registration statement (including a prospectus) with the SEC for the offering to which this communication relates. Before you invest, you should read the prospectus in that registration statement and other documents the issuer has filed with the SEC for more complete information about the issuer and this offering.**

**You may get these documents for free by visiting EDGAR on the SEC Web site at www.sec.gov. Alternatively, the issuer, any underwriter or any dealer participating in the offering will arrange to send you the prospectus if you request it by calling (i) BNP Paribas Securities Corp., toll free at 1-800-854-5674; (ii) Goldman, Sachs & Co., toll free at 1-866-471-2526; (iii) RBC Capital Markets, LLC, toll free at 1-866-375-6829; or (iv) Wells Fargo Securities, LLC, toll free at 1-800-645-3751.**

**SCHEDULE V**

**Form of Opinion of Orrick, Herrington & Sutcliffe LLP**

      (i)      the Registration Statement has become effective under the Act; to the knowledge of such counsel, no stop order suspending the effectiveness of the Registration Statement has been issued and no proceedings for that purpose have been threatened or instituted by, or are pending before, the Commission, and the Registration Statement, as of each Effective Date and the Final Prospectus, as of its date (other than the financial statements, schedules and other financial data contained or incorporated by reference therein, as to which such counsel need express no opinion) comply as to form in all material respects with the applicable requirements of the Act, the Exchange Act and the Trust Indenture Act and the respective rules promulgated thereunder; the Final Prospectus and the final term sheets have been filed pursuant to, and within the time frame contemplated by, Rule 424(b) and Rule 433, respectively, promulgated under the Act;

      (ii)      the Company has been duly incorporated and is validly existing as a corporation in good standing under the laws of the State of California, with the corporate power and corporate authority to own or lease, as the case may be, and to operate its properties and conduct its business as described in the Registration Statement, the Disclosure Package and the Final Prospectus;

      (iii)      the Indenture has been duly authorized, executed and delivered by the Company, has been duly qualified under the Trust Indenture Act and, assuming due authorization, execution and delivery thereof by the Trustee constitutes a valid and binding obligation of the Company enforceable against the Company in accordance with its terms (subject, to the effect of any bankruptcy, reorganization, insolvency, arrangement, fraudulent conveyance, moratorium, receivership, assignment for the benefit of creditors or other laws relating to or affecting creditors' rights generally from time to time in effect and to general principles of equity, including, without limitation, concepts of materiality, reasonableness, good faith and fair dealing, regardless of whether considered in a proceeding in equity or at law); and the Securities have been duly authorized and executed by the Company and when authenticated by the Trustee in accordance with the provisions of the Indenture and delivered to and paid for by the Underwriters pursuant to this Agreement, will have been validly issued and delivered, will be entitled to the benefits of the Indenture and will constitute valid and binding obligations of the Company, enforceable against the Company in accordance with their terms;

      (iv)      to the knowledge of such counsel, there is no pending or threatened action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Company or any of its subsidiaries or its or their property, of a character required to be disclosed in the Registration Statement other than those disclosed in the Preliminary Prospectus and the Final Prospectus (in rendering such opinion, such counsel may note that it

1415293.05-NYCSR03A - MSW

has not conducted searches of the dockets of any court or administrative agency whatsoever);

(v)     this Agreement has been duly authorized, executed and delivered by the Company;

(vi)     the Company is not and, after giving effect to the offering and sale of the Securities and the application of the proceeds thereof as described in the Disclosure Package and the Final Prospectus, will not be an "investment company" as defined in the 1940 Act or a company "controlled" by an "investment company" within the meaning of the 1940 Act;

(vii)     none of the issue or sale of the Securities, the consummation of the transactions contemplated by this Agreement or the performance by the Company of its obligations hereunder will (A) conflict with or result in any violation of (1) the Articles of Incorporation or Bylaws of the Company, or (2) any Federal, California or, as to this Agreement, New York, statute or any rule or regulation issued pursuant to any Federal, California or, as to this Agreement, New York statute, including, without limitation, the California Public Utilities Code and California usury laws ("Applicable Laws"), or any order known to such counsel to have been issued pursuant to any Applicable Law by any Federal, California or, as to this Agreement, New York, court or governmental agency or body that such counsel has in the exercise of customary professional diligence recognized as having jurisdiction over the Company or any of its properties ("Applicable Governmental Authority") or (B) result in a breach or violation of, or constitute a default under, any agreement, indenture or other instrument to which the Company or any of its subsidiaries is a party that has been filed (i) pursuant to Item 601(b)(4) or Item 601(b)(10) of Regulation S-K promulgated under the Act as an exhibit to the Company's Annual Report on Form 10-K for the year ended December 31, 2016  or (ii) as an exhibit to any report on Form 8-K filed by the Company between January 1, 2017 and the Closing Date;

(viii)     no consent, approval, authorization, filing with or order of or with any Applicable Governmental Authority (a "Governmental Action") is required for the valid authorization, execution, issuance, sale and delivery of the Securities by the Company except for any Governmental Actions that have been obtained or made, and such as may be required under the blue sky laws of any jurisdiction in connection with the purchase and distribution of the Securities by the Underwriters in the manner contemplated in this Agreement, the Disclosure Package and the Final Prospectus; and

(ix)     the statements in the Disclosure Package and the Final Prospectus under the caption "Description of the Senior Notes" insofar as such statements purport to summarize certain provisions of the Indenture and the Securities, fairly summarize such provisions in all material respects, and the statements under the caption "Certain United States Federal Income Tax Consequences" in the Disclosure Package and the Final Prospectus, insofar as such statements constitute

summaries of the United States federal income tax laws, are accurate in all material respects.

The letter from such counsel shall include a separate paragraph to the effect that in the course of its engagement as counsel to the Company in connection with the offering of the Securities, it has participated in conferences with the Underwriters and their representatives and representatives of the Company and its accountants concerning the Registration Statement, the Disclosure Package and the Final Prospectus and considered the matters required to be stated therein and the statements contained therein, and, although they were not engaged to and did not independently verify the accuracy, completeness or fairness of such statements (except as stated above), and based upon and subject to the foregoing, such counsel will advise the Underwriters, as a matter of fact and not opinion, that nothing came to such counsel's attention to cause them to believe that (A) the Registration Statement, as of each Effective Date contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, (B) the Final Prospectus, as of its date and as of the Closing Date contained or contains an untrue statement of a material fact or omitted or omits to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, or (C) the Disclosure Package, as of the Execution Time, contained an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided, however, that it is understood that such counsel is not requested to and will not express any belief in this paragraph with respect to the financial statements, schedules and other financial data contained in or incorporated by reference in the Registration Statement, the Disclosure Package, the Final Prospectus or the Statement of Eligibility and Qualification of the Trustee. References to the Final Prospectus in this paragraph shall also include any supplements thereto at the Closing Date.

In rendering such opinion, such counsel may rely (A) as to matters involving the application of laws of any jurisdiction other than the State of California, New York or the Federal laws of the United States, to the extent they deem proper and specified in such opinion, upon the opinion of other counsel of good standing whom they believe to be reliable and who are satisfactory to counsel for the Underwriters and (B) as to matters of fact, to the extent they deem proper, on certificates of responsible officers of the Company and public officials.

"Effective Date" shall mean the time of effectiveness of the Registration Statement for the purposes of Section 11 of the Securities Act, as such section applies to the Underwriters.

1415293.05-NYCSR03A - MSW