# EXHIBIT K

| | |
|---|---|
| 1 | **LABATON SUCHAROW LLP** |
| | Thomas A. Dubbs |
| 2 | Louis Gottlieb |
| | Carol C. Villegas |
| 3 | Jeffrey A. Dubbin (SBN 287199) |
| | 140 Broadway |
| 4 | New York, New York 10005 |

**LABATON SUCHAROW LLP**
Thomas A. Dubbs
Louis Gottlieb
Carol C. Villegas
Jeffrey A. Dubbin (SBN 287199)
140 Broadway
New York, New York 10005

*Lead Counsel to Lead Plaintiff and the
Proposed Class*

**MICHELSON LAW GROUP**
Randy Michelson (SBN 114095)
220 Montgomery Street, Suite 2100
San Francisco, California 94104

*Bankruptcy Counsel to Lead Plaintiff
and the Proposed Class*

**LOWENSTEIN SANDLER LLP**
Michael S. Etkin *(pro hac vice)*
Andrew Behlmann
Scott Cargill
Gabriel Olivera
One Lowenstein Drive
Roseland, New Jersey 07068

*Bankruptcy Counsel to Lead Plaintiff
and the Proposed Class*

*(additional counsel on Exhibit A)*

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION<br><br>- and –<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Debtors. | Case No. 19-30088 (DM) (Lead Case)<br><br>Chapter 11<br><br>(Jointly Administered)<br><br>Adv. Pro. No. 19-03039 (DM) |
| PG&E CORPORATION, PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>PUBLIC EMPLOYEES RETIREMENT ASSOCIATION OF NEW MEXICO and YORK COUNTY,<br><br>Defendants. | **SECURITIES LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTORS' MOTION FOR PRELIMINARY INJUNCTION AS TO *IN RE PG&E CORP. SECURITIES LITIG.*, 18-CV-03509 (N.D. CAL.) [Adv. ECF No. 2]**<br><br>Date:          TBD<br>Time:          TBD<br>Before:        Hon. Dennis Montali,<br>               United States Bankruptcy Court<br>               Courtroom 17, 16th Floor<br>               450 Golden Gate Avenue<br>               San Francisco, California 94102<br>**Reply Deadline:** August 1, 2019 |

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................ iii

PRELIMINARY STATEMENT ................................................................................................... 1

BACKGROUND ........................................................................................................................... 3

    A.    The Securities Litigation ........................................................................................ 3

    B.    The Chapter 11 Cases ............................................................................................ 3

    C.    Consolidation with the *York County* action .......................................................... 3

    D.    The Third Amended Complaint .............................................................................. 4

        1.    Exchange Act Claims ................................................................................. 4

        2.    Securities Act Claims ................................................................................. 5

        3.    The Class ..................................................................................................... 5

    E.    The Non-Debtor Defendants .................................................................................. 5

ARGUMENT ................................................................................................................................ 6

I.    THE COURT LACKS JURISDICTION TO ENJOIN THE SECURITIES
    LITIGATION. ................................................................................................................... 6

II.    THERE IS NO BASIS TO ENJOIN THE SECURITIES LITIGATION. .......................... 8

    A.    The Debtors have not demonstrated the likelihood of a successful
        reorganization. ....................................................................................................... 8

    B.    The Debtors have not demonstrated any risk of imminent, irreparable harm. .............. 9

        1.    The Securities Litigation will not impact the Debtors' reorganization
            efforts. ........................................................................................................ 9

        2.    The continued prosecution of the Securities Litigation against the Non-
            Debtor Defendants does not "risk recovery against the Debtors' estates
            outside the claims resolution process" or otherwise circumvent the
            Bankruptcy Code. ..................................................................................... 10

            (a)    D&O Insurance ............................................................................ 10

            (b)    Indemnification ......................................................................... 15

        3.    The Debtors' preclusion arguments are misplaced. ................................. 20

        4.    Distraction ................................................................................................. 21

C.    Enjoining the continued prosecution of the Securities Litigation against the Non-Debtor Defendants would cause greater harm to Lead Plaintiff and the Class than the Debtors will face without an injunction. ...............................................22

D.    The proposed injunction is inimical to the public interest because it threatens the integrity of public securities markets. .......................................................23

    1.    The proposed injunction would not aid the Debtors' reorganization. ................23

    2.    There is a strong public interest in the integrity of the securities markets. ........24

CONCLUSION..............................................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

A.H. Robins Co. v. Piccinin,
788 F.2d 994 (4th Cir. 1986) ...................................................................................19

In re Adelphia Commc'ns Corp.,
298 B.R. 49 (S.D.N.Y. 2003) ...................................................................................14

In re All Seasons Resorts, Inc.,
79 B.R. 901 (Bankr. C.D. Cal. 1987) .......................................................................17

In re Allied Digital Techs. Corp.,
306 B.R. 505 (Bankr. D. Del. 2004) .........................................................................14

Am. Hardwoods, Inc. v. Deutsche Credit Corp. (In re Am. Hardwoods, Inc.),
885 F.2d 621 (9th Cir. 1989) ......................................................................................6

In re Amfesco Indus., Inc.,
81 B.R. 777 (Bankr. E.D.N.Y. 1988) ...............................................................16, 17

In re Atlantic Pipeline Corp.,
304 F.3d 135 (1st Cir. 2002) .....................................................................................23

Basic Inc. v. Levinson,
485 U.S. 224 (1988) ..................................................................................................24

Boucher v. Shaw,
572 F.3d 1087 (9th Cir. 2009) ..................................................................................16

Caribbean Marine Servs. Co. v. Baldridge,
844 F.2d 668 (9th Cir. 1988) ................................................................................9, 22

In re Chateaugay Corp.,
76 B.R. 945 (S.D.N.Y. 1987) ...................................................................................21

In re Codfish Corp.,
97 B.R. 132 (Bankr. D.P.R. 1988) ...........................................................................16

In re Downey Fin. Corp.,
428 B.R. 595 (Bankr. D. Del. 2010) .............................................................11, 14, 16

Dura Pharms., Inc. v. Broudo,
544 U.S. 336 (2005) ..................................................................................................24

*Duval v. Gleason,*
    No. 90-0242, 1990 WL 261364 (N.D. Cal. Oct. 19, 1990) ......................................8

*In re Enron Corp. Sec., Deriv. & "ERISA" Litig.,*
    No. 01-3624, 2007 WL 789096 (S.D. Tex. Mar. 12, 2007) ..................................23

*In re Fabtech Indus., Inc.,*
    No. 10-1144, 2010 WL 6452908 (B.A.P. 9th Cir. July 19, 2010)...........................8

*In re Family Health Servs., Inc.,*
    105 B.R. 937 (Bankr. C.D. Cal. 1989).......................................................19

*First Golden Bancorporation v. Weiszmann,*
    942 F.2d 726 (10th Cir. 1991) ..............................................................19

*Hansberry v. Lee,*
    311 U.S. 32 (1940)..........................................................................20

*Heizer Corp. v. Ross,*
    601 F.2d 330 (7th Cir. 1979) ...............................................................19

*Hirsch v. Arthur Andersen & Co.,*
    72 F.3d 1085 (2d Cir. 1995).................................................................24

*In re Laminate Kingdom LLC,*
    No. 07-10279, 2008 WL 1766637 (Bankr. S.D. Fla. Mar. 13, 2008)......................14

*Laventhol, Krekstein, Horwath & Horwath v. Horwitch,*
    637 F.2d 672 (9th Cir. 1980), *cert. denied,* 452 U.S. 963 (1981).........................19

*LSM Hotel, LLC v. Serhan (In re LSM Hotel, LLC),*
    No. 10-13024, 2011 WL 588501 (Bankr. S.D. Cal. Feb. 9, 2011)...........................8

*In re MF Global Holdings Ltd.,*
    515 B.R. 193 (Bankr. S.D.N.Y. 2014)......................................................14

*In re Mid-American Waste Sys., Inc.,*
    228 B.R. 816 (Bankr. D. Del. 1999) ........................................................18

*Ochs v. Lipson (In re First Cent. Fin. Corp.),*
    238 B.R. 9 (Bankr. E.D.N.Y. 1999)........................................................13

*Pacor, Inc. v. Higgins,*
    743 F.2d 984 (3d Cir. 1984).................................................................20

*In re Provincetown Boston Airline Inc.,*
    52 B.R. 620 (Bankr. M.D. Fla. 1985) ........................................................8

*In re Sizzler Restaurants Int'l, Inc.,*
    262 B.R. 811 (Bankr. C.D. Cal. 2001)......................................................................6

*Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.),*
    502 F.3d 1086 (9th Cir. 2007) ........................................6, 8, 9, 16, 22, 23

*Steel Workers Pension Tr. v. Citigroup, Inc.,*
    295 B.R. 747 (E.D. Pa. 2003) ........................................................................7

*Taylor v. Sturgell,*
    553 U.S. 880 (2008)........................................................................................20

*Teledyne Indus., Inc. v. Eon Corp.,*
    401 F. Supp. 729 (S.D.N.Y. 1975), *aff'd sub nom Teledyne Indus., Inc. v.*
    *Podell,* 546 F.2d 495 (2d Cir. 1976) ..............................................................24

*The Official Comm. of Creditors Holding Unsecured Claims v. Painewebber Inc.*
    *(In re De Laurentiis Enter. Grp., Inc.),*
    124 B.R. 305 (C.D. Cal. 1991) ......................................................................18

*Tuller v. Tintri, Inc.,*
    No. 17-05714, 2018 WL 4385652 (N.D. Cal. Sept. 14, 2018)........................20

*In re W.R. Grace & Co.,*
    386 B.R. 17 (Bankr. D. Del. 2008) ................................................................17

*Wellness Int'l. Network, Ltd. v. Sharif,*
    135 S. Ct. 1932 (2015)......................................................................................6

*In re World Health Alternatives, Inc.,*
    369 B.R. 805 (Bankr. D. Del. 2007) ..............................................................14

**Statutes**

11 U.S.C. § 105(a) ................................................................................................1

11 U.S.C. § 502(e)(1)(B)........................................................................3, 18, 19

11 U.S.C. § 510(b) ..............................................................................................18

15 U.S.C. § 77z-1................................................................................................22

15 U.S.C § 78u-4(b)(3)(B)..................................................................................22

**Other Authorities**

2 A. Bromberg & L. Lowenfels, *Securities Fraud & Commodities Fraud* (2d ed.)
    § 5.7....................................................................................................................19

18A Charles Alan Wright, et al., *Federal Practice & Procedure* § 4460 (3d ed.)........................21

Restatement (Second) of Judgments § 59 (1982) ........................................................21

vi

1  Public Employees Retirement Association of New Mexico ("Lead Plaintiff" or "PERA"),

2  the court-appointed lead plaintiff in the securities class action captioned as *In re PG&E*

3  *Corporation Securities Litigation*, Case No. 18-03509 (the "Securities Litigation") pending in

4  the U.S. District Court for the Northern District of California (the "District Court") and a

5  defendant in the above-captioned adversary proceeding, on behalf of itself and the proposed class

6  it represents in the Securities Litigation (the "Class"), together with York County on behalf of

7  the County of York Retirement Fund, City of Warren Police and Fire Retirement System, and

8  Mid-Jersey Trucking Industry & Local No. 701 Pension Fund (collectively, the "Securities Act

9  Plaintiffs"), hereby submit this memorandum in opposition (the "Opposition")[1] to the motion

10 (the "Motion") [Adv. ECF. No. 2][2] of the above-captioned debtors in possession (the "Debtors"

11 or "PG&E") for the extraordinary remedy of a preliminary injunction under Section 105(a) of the

12 Bankruptcy Code to enjoin prosecution of the Securities Litigation against Non-Debtor

13 Defendants (defined below). For the reasons below, the Motion should be denied.

14                          **PRELIMINARY STATEMENT**

15      The Debtors seek extraordinary relief not given (or in some cases, even sought) in some

16 of the largest and most complex Chapter 11 cases, such as Enron, WorldCom, Delphi,

17 Washington Mutual, or Lehman Brothers. The Debtors request a broad injunction halting the

18 Securities Litigation against forty-four Non-Debtor Defendants, only five of which are employed

19 by the Debtors, for an unspecified period of time. In doing so, the Debtors bear the burden of

20 demonstrating that they have a reasonable likelihood of successfully reorganizing, that they face

21 imminent, irreparable harm, and that the balance of harms favors an injunction. The Debtors

22 have fallen woefully short of carrying these burdens, relying on unsupported conjecture and

23 faulty legal conclusions with no evidence that they face any harm, much less the imminent,

24 irreparable harm necessary to justify enjoining litigation between non-debtors at this early stage

25 of the Securities Litigation.

---

26 [1] This Opposition is subject to the Reservation of Rights annexed hereto as Exhibit B.
27 [2] As used herein, the following docket references refer to the following items:
      [Adv. ECF No. ___]: Docket entries in this adversary proceeding;
      [BK ECF No. ___]: Docket entries in the Chapter 11 Cases; and
28    [DC ECF No. ___]: Docket entries in the Securities Litigation.

1	     The Court lacks jurisdiction to grant the proposed injunction, because the continued

2	prosecution of the Securities Litigation will have no impact on the Debtors, their estates, or any

3	creditors.  The claims against the Non-Debtor Defendants do not implicate any Debtor property

4	pursuant to the unambiguous language of the insurance policies at issue.  And the only

5	permissible activity in the Securities Litigation for at least the next six months is the briefing,

6	argument, and adjudication of the Non-Debtor Defendants' anticipated motions to dismiss – a

7	purely lawyer-driven exercise.  This is because federal law stays all discovery in the Securities

8	Litigation until the District Court has denied all such motions, pursuant to the Private Securities

9	Litigation Reform Act ("PSLRA").  Each of these reasons is sufficient to divest the Court of

10	"related to" jurisdiction.

11	     The Individual Defendants' defense costs will not have any impact on the Debtors or

12	their estates because such costs are covered by the Side A D&O Coverage, which provides first-

13	dollar coverage with no retention, contrary to the Debtors' assertion that a retention applies.  The

14	2017 and 2018 D&O Policies, which the Debtors assert may provide coverage for the Securities

15	Litigation claims against the Individual Defendants, provide total coverage limits of $250 million

16	and $300 million, respectively.  Crucially, both Policies contain clear "Priority of Payments"

17	clauses whereby the Debtors have contractually relinquished any interest in the D&O Policies so

18	long as any claims against their directors and officers remain outstanding:

19
20	       If DIRECTORS or OFFICERS incur ULTIMATE NET LOSS covered under [Side A], the INSURED ORGANIZATION, including any . . . debtor-in-possession . . . , ***shall have no interest***

21	       ***in or claim for any payments under this POLICY*** until all such ULTIMATE NET LOSS is paid in full by the INSURER.

22	*See* Decl. of Elizabeth Collier (the "Collier Decl.") Exs. F and G [Adv. ECF Nos. 3-6 & 3-7] at

23	5-6.[3]  The Priority of Payment provisions render the Debtors' claimed harm of insurance

24	depletion illusory, not irreparable.

25	     The Debtors' remaining economic arguments are similarly baseless.  Any claims for

26	indemnification asserted by the Non-Debtor Defendants against the Debtors are ordinary pre-

27

28	---

   [3]	Unless otherwise indicated, all emphasis and alterations are added, and all citations or quotations are omitted.  All citations to the Collier Decl. are to ECF footer numbers.

petition claims subject to the bankruptcy claims filing and allowance process, statutorily subordinated to all other claims against the Debtors – including wildfire-related property damage and personal injury claims – and subject to disallowance under Section 502(e)(1)(B) of the Bankruptcy Code.

The Debtors also have not demonstrated that the public interest favors their proposed injunction. There are strong public interests in enforcing the federal securities laws and ensuring the integrity of public securities markets through private litigation, such as the Securities Litigation. Because the proposed injunction would yield no cognizable benefit to the Debtors' reorganization, no countervailing public interest warrants enjoining the Securities Litigation.

In light of the Debtors' across-the-board failure to present *any* legitimate justification for the extraordinary injunctive relief that they seek, the Court should deny the Motion.

**BACKGROUND**

### A. The Securities Litigation

The initial complaint in the Securities Litigation was filed on June 12, 2018 [DC ECF No. 1]. On September 10, 2018, the District Court consolidated the Securities Litigation and appointed PERA as Lead Plaintiff for the Class [DC ECF No. 62]. Pursuant to that order, Lead Plaintiff filed a second amended complaint [DC ECF No. 95] on December 14, 2018.

### B. The Chapter 11 Cases

On January 29, 2019, the Debtors filed voluntary Chapter 11 bankruptcy cases (the "Chapter 11 Cases"). As a result, the Securities Litigation was (and remains) automatically stayed solely with respect to the Debtors pursuant to 11 U.S.C. § 362(a). On February 15, 2019, the Debtors filed an adversary proceeding, Adv. Pro. No. 19-03006, seeking to enjoin continued prosecution of the Securities Litigation and other lawsuits. The Court entered an agreed order on May 1, 2019 (the "May 1 Consent Order"), dismissing Lead Plaintiff and establishing a timeline for commencing this adversary proceeding, as well as briefing the Motion, after Lead Plaintiff filed a Third Amended Complaint (the "TAC") in the Securities Litigation.

### C. Consolidation with the *York County* action

On February 22, 2019, the Securities Act Plaintiffs filed a class action styled as *York*

*County v. Rambo*, Case No. 19-994 (N.D. Cal.) (the "York County Action"), asserting claims under the Securities Act of 1933 (the "Securities Act") against certain of the Debtors' current and former directors and officers, as well as the underwriters of certain of the Debtors' notes offerings. On May 7, 2019, the District Court consolidated the York County Action with the Securities Litigation and authorized Lead Plaintiff to file the TAC [DC ECF No. 117].

### D. The Third Amended Complaint

On May 28, 2019, Lead Plaintiff, with the Securities Act Plaintiffs, filed the TAC [DC ECF No. 121]. Pursuant to the May 1 Consent Order, the TAC names the Debtors as Exchange Act Defendants, with the express understanding that the automatic stay applies with respect to the Debtors. The TAC does not name the Debtors as Securities Act Defendants.

Contrary to the Debtors' hollow assertion that the Securities Litigation claims "repackage the wildfire [personal injury and property damage] claims," *see* Motion at 5, the TAC asserts direct, independent, cognizable claims against the Non-Debtor Defendants based on their own separate, false statements and omissions and other conduct between 2015 and 2018.[4]

#### 1. Exchange Act Claims

The TAC asserts direct, independent claims against the Exchange Act Defendants under Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder (the "Exchange Act Claims"). Among other things, the TAC alleges that the Exchange Act Individual Defendants misled investors from April 29, 2015 through November 15, 2018.

Among the numerous false statements alleged in the TAC, each of which could be a separate basis for liability, are the following (moving chronologically through the Class Period):

- Before the relevant fires erupted, Individual Defendant Christopher Johns falsely told the public on April 29, 2015 that PG&E was "stepping up our vegetation management activities to mitigate wildfire risk";

- Leading up to the 2017 fires, Individual Defendant Julie Kane issued ***three*** false reports (on October 16, 2015, October 6, 2016, and August 9, 2017) certifying that PG&E was "in compliance with relevant laws" or "complying with state and federal regulations and delivering safe, reliable and affordable electric service";

---

[4]    Each asserted statement is a distinct wrongful act that separately harmed Class members.

- After the 2017 wildfires, but before California concluded its investigations into their causes, on November 2, 2017, Individual Defendant Geisha Williams assured investors the company had "doubl[ed] our typical vegetation management spending" when it **did not**, while Individual Defendant Nick Stavropoulos affirmed that PG&E had "inspect[ed] all of our overhead lines" when it **had not**; and

- After news about the Debtors' role in causing the 2017 fires emerged, Individual Defendant Julie Kane twice issued false press releases (on May 25, 2018 and June 8, 2018) certifying that "PG&E meets or exceeds regulatory requirements for pole integrity management," just months before the Camp Fire showed otherwise.

TAC ¶¶ 194, 197, 211, 222, 258, 264, 280, & 287 [DC ECF No. 121].

### 2. Securities Act Claims

The TAC asserts direct, independent claims against the Securities Act Defendants under Sections 11 and 15 of the Securities Act (the "Securities Act Claims"), arising from the Debtors' four public senior notes offerings on March 1, 2016, December 1, 2016, March 10, 2017, and April 2, 2018 (the "Notes Offerings"), in which the Debtors offered and sold approximately $4.35 billion of registered senior notes (the "Senior Notes"). The TAC alleges that the offering documents for the Notes Offerings contained thirty-four materially misleading statements.

### 3. The Class

The Class is comprised of investors who acquired the Debtors' securities during the Class Period and suffered losses as a result of the alleged false statements and omissions, which inflated the price of the Debtors' securities. As the true nature and extent of PG&E's responsibility for these fires materialized, investors holding PG&E's publicly traded securities suffered compensable losses under the federal securities laws. The Class is **not** defined as, or with any reference to, persons who were physically injured or whose property was destroyed.

### E. The Non-Debtor Defendants

The TAC asserts claims against forty-four non-Debtors (the "Non-Debtor Defendants"): (i) fifteen of the Debtors' former directors and officers (the "Individual Defendants"), (ii) three officers and two directors still employed by the Debtors, and (iii) twenty-four investment banks that underwrote the Notes Offerings (the "Underwriter Defendants") and received tens of millions of dollars in fees in connection therewith. The TAC alleges that the Underwriter Defendants drafted and disseminated the offering documents for each of the Notes Offerings

they underwrote, and that their failure to conduct an adequate due diligence investigation was a substantial factor leading to the injuries alleged in the TAC. The Underwriter Defendants are not insiders or affiliates of the Debtors, and their liability arises solely from their own conduct and/or inaction.

## **ARGUMENT**

### I. THE COURT LACKS JURISDICTION TO ENJOIN THE SECURITIES LITIGATION.[5]

As a general rule, Bankruptcy Courts do not have subject matter jurisdiction to enjoin non-bankruptcy litigation between non-debtor parties because they "do[] not have jurisdiction in controversies between third parties not involving the debtor or property of the estate." *In re Sizzler Restaurants Int'l, Inc.*, 262 B.R. 811, 816 (Bankr. C.D. Cal. 2001). Bankruptcy Courts only have related-to subject matter jurisdiction to issue such relief if the non-bankruptcy litigation "'could conceivably have any effect on the administration of the bankruptcy estate.'" *Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.)*, 502 F.3d 1086, 1096 (9th Cir. 2007) (quoting *Am. Hardwoods, Inc. v. Deutsche Credit Corp. (In re Am. Hardwoods, Inc.)*, 885 F.2d 621, 623-27 (9th Cir. 1989)). Here, the Court does not have subject matter jurisdiction to grant the Motion because the Securities Litigation will have no impact on the administration of the Chapter 11 Cases.

First, the TAC asserts claims against the Non-Debtor Defendants for their own independent violations of the federal securities laws. *See* pp. 4-5 above. Unlike cases where jurisdiction has been found to exist by virtue of a debtor's indemnification obligations, *see, e.g.*, *Sizzler Restaurants*, 262 B.R. at 818-19, indemnification for federal securities claims is not automatic. Moreover, even if any of the Non-Debtor Defendants become entitled to

---

[5]   The Motion suggests that the Debtors may attempt to bring the Securities Litigation into this Court with respect to the Non-Debtor Defendants. *See* Motion at 3, 6. That issue is not before this Court, which, in any event, lacks jurisdiction and Constitutional authority to enter a final order or judgment on, or any other order having the effect of a final order or judgment with respect to, any claims asserted against any of the Non-Debtor Defendants in the Securities Litigation. *See, e.g.*, *Wellness Int'l. Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1948-49 (2015) (knowing and voluntary consent is required for a Bankruptcy Court to adjudicate non-bankruptcy claims between non-debtor parties). Lead Plaintiff does not consent to entry of any such order or judgment. *See* Reservation of Rights annexed hereto as **Exhibit B**.

Case: 19-30088   Doc# 5374-11   Filed: 01/14/20   Entered: 01/14/20 15:56:50   Page 9
of 78

indemnification, their claims would be pre-petition claims subject to the bankruptcy claims process, subordinated to all other claims against the Debtors, and to the extent they remain contingent, subject to potential disallowance. *See* pp. 16-20 below.

Second, the claims asserted against the Non-Debtor Defendants in the TAC do not implicate any property of the Debtors. Through the Priority of Payments Clauses in the D&O Policies (defined below), the Individual Defendants are entitled to ***absolute priority*** in accessing insurance coverage, including defense costs. The D&O Policies expressly provide that until all of the Individual Defendants' claims under the Side A D&O Coverage (defined below) are paid in full, the Debtors have "no interest in or claim to" any proceeds of the D&O Policies. As a matter of law, such proceeds are not property of the Debtors' estates because the Debtors have only a contingent, subordinated right to seek coverage ***if and only if any coverage remains*** after all claims of the Individual Defendants have been paid in full. *See* pp. 12-15 below. Even if the Securities Litigation against the Individual Defendants completely exhausted the D&O coverage limits – a risk the Debtors expressly assumed by purchasing D&O Policies containing robust Priority of Payments Clauses – it would not impact the Debtors' estates.

Finally, the Securities Litigation will not impact the Debtors for at least the next six months because, as a matter of law, discovery in the Securities Litigation ***cannot*** commence until the District Court has denied all of the Non-Debtor Defendants' unfiled motions to dismiss the TAC. *See* pp. 21-22 below. Discovery burdens that do not currently exist, and may never exist, do not confer jurisdiction on this Court to grant the extraordinary relief the Debtors seek.[6]

Because the continued prosecution of the Securities Litigation against the Non-Debtor Defendants, particularly at this early stage in the Securities Litigation, has no present effect on the Debtors or their estates, and may never have any effect on the Debtors or their estates, the Court does not have jurisdiction to grant the Motion. *See Steel Workers Pension Tr. v. Citigroup, Inc.*, 295 B.R. 747, 750 (E.D. Pa. 2003) ("Mere potential impact upon the debtor's estate is insufficient. Contingent liability will not suffice. The necessity of future action to fix

---

[6] Furthermore, the Debtors must still comply with their discovery obligations – including their duty to preserve relevant documents and comply with discovery requests in their Chapter 11 Cases and pending criminal probationary matter – with or without the requested stay.

Case: 19-30088   Doc# 5374-11   Filed: 01/14/20   Entered: 01/14/20 15:56:50   Page 14 of
15 of 78

the debtor's liability after resolution of the pending lawsuit precludes the exercise of 'related to' jurisdiction.").

## II.     THERE IS NO BASIS TO ENJOIN THE SECURITIES LITIGATION.

Bankruptcy courts may "enjoin an action against a non-debtor, effectively extending the automatic stay to actions . . . that 'threaten the integrity of a bankrupt's estate'" only under extraordinary and limited circumstances. *In re Fabtech Indus., Inc.*, No. 10-1144, 2010 WL 6452908 at *3 (B.A.P. 9th Cir. July 19, 2010). Where debtors do not meet their high burden of proof, as here, courts will not extend the automatic stay to other defendants in a securities action, such as its officers and directors. *E.g.*, *Duval v. Gleason*, No. 90-0242, 1990 WL 261364, at *4 (N.D. Cal. Oct. 19, 1990) (refusing to extend automatic stay to individual defendants as "the securities laws allow for [their] independent liability . . . without the participation of the corporation"); *LSM Hotel, LLC v. Serhan* (*In re LSM Hotel, LLC*), No. 10-13024, 2011 WL 588501 at *3 (Bankr. S.D. Cal. Feb. 9, 2011) (denying request to enjoin lawsuit from continuing against non-debtor parties because debtor failed to carry its burden of proof, applying *Excel*).

In the Ninth Circuit, "the usual preliminary injunction standard applies to stays of proceedings against non-debtors under § 105(a)." *Excel*, 502 F.3d at 1094-95. To obtain this extraordinary relief, a Chapter 11 debtor must demonstrate (1) a reasonable likelihood of a successful reorganization, (2) the threat of irreparable harm, (3) a balance of harms that favors the proposed injunction, and (4) that the proposed injunction will advance the public interest. *See id* at 1094-96. These requirements are "conjunctive and all of them must be established in order to obtain the relief sought." *In re Provincetown Boston Airline Inc.*, 52 B.R. 620, 625 (Bankr. M.D. Fla. 1985); *see also Excel*, 502 F.3d at 1093. Here, the Debtors have failed to satisfy their burden on *any*, much less all, of these criteria.

### A.     The Debtors have not demonstrated the likelihood of a successful reorganization.

The Debtors first must demonstrate a "reasonable likelihood of a successful reorganization." *Excel*, 502 F.3d at 1095; *see id.* at 1097 (a finding in the Debtors' favor must be based on at least *some* evidence).

The Debtors have offered no evidence demonstrating a reasonable likelihood of a

successful reorganization. *See* Motion at 5 (listing only routine tasks accomplished since the Petition Date). On a similarly nonexistent record, the *Excel* court held that the Bankruptcy Appellate Panel's finding of a reasonable likelihood of a successful reorganization was an abuse of discretion "because 'the record contains no evidence on which [the BAP] rationally could have based that decision.'" *Excel*, 502 F.3d at 1097 (alteration original); *see LSM Hotel*, 2011 WL 588501 at *3 ("Here, the record is virtually silent on the reasonable likelihood of a successful reorganization.").

## B.  The Debtors have not demonstrated any risk of imminent, irreparable harm.

The Debtors "must do more than merely allege imminent harm sufficient to establish standing; [they] must **demonstrate** immediate threatened **injury** as a prerequisite to preliminary injunctive relief." *See Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988). "[C]onclusory allegations are insufficient to establish irreparable harm." *Excel*, 502 F.3d at 1098-99. Rather, the Court "must 'identify the harms which a preliminary injunction might cause to [Lead Plaintiff and the Class] and . . . weigh these against [the Debtors'] threatened injury.'" *Id.* at 1097 (quoting *Caribbean Marine*, 844 F.2d at 676).

The Debtors have fallen well short of carrying their heavy burden on this prong, relying exclusively on conclusory assertions, faulty legal premises, and outright conjecture about what **might** occur if the Securities Litigation continues against the Non-Debtor Defendants. They do not identify or document **any** actual harm that they are experiencing or imminently will experience if the Securities Litigation proceeds against the Non-Debtor Defendants – much less any irreparable harm. The reality is that they face no such harm.

### 1.  The Securities Litigation will not impact the Debtors' reorganization efforts.

The Debtors first assert that the Securities Litigation "effectively seeks damages from the Debtors, for conduct allegedly undertaken by the Debtors . . . with consequences that directly impact the Debtors" and "threatens to undermine th[e] goal" of having all claims against the Debtors resolved by the Bankruptcy Court in the Chapter 11 Cases. Motion at 5-6. As discussed in detail below, all of the harms the Debtors claim could befall their estates if the Securities Litigation were to continue against the Non-Debtor Defendants – depletion of insurance

proceeds, indemnification claims, and distraction of personnel – are unsupported by the evidentiary record.  Absent evidence of imminent, irreparable injury, there is no basis for the broad and extraordinary injunctive relief that the Debtors seek.

> **2.** **The continued prosecution of the Securities Litigation against the Non-Debtor Defendants does not "risk recovery against the Debtors' estates outside the claims resolution process" or otherwise circumvent the Bankruptcy Code.**

The Debtors assert that "they also will ultimately bear, directly or indirectly, attorneys' fees and other losses associated with the claims against the Non-Debtor Defendants due to the Debtors' indemnification obligations" and that the Class Claims "may ultimately be paid from the estates' assets, or from insurance coverage in which the Debtors have an interest."  *See* Motion at 11.  These speculative and unsupported concerns, which are contrary to applicable law (as discussed below), would exist in *any* Chapter 11 case where litigation is ongoing against non-debtors.  As such, they do not constitute irreparable harm.

> **(a)** **D&O Insurance**

According to the Debtors, two towers of directors' and officers' liability insurance policies issued in 2017 and 2018 (the "D&O Policies") potentially provide coverage for the claims asserted against the Non-Debtor Defendants in the Securities Litigation.[7]  *See* Decl. of Elizabeth Collier (the "Collier Decl.") [Adv. ECF. No. 3], ¶ 7.  The D&O Policies provide three types of insurance coverage ("D&O Coverage"): (a) directly to the Individual Defendants, for losses that the Debtors do not indemnify ("Side A"); (b) to the Debtors, for losses they incur indemnifying the Individual Defendants ("Side B"); and (c) to the Debtors, for losses they incur on account of securities claims made directly against them ("Side C").  *Id.*, Adv. ECF. No. 3-6 & 3-7 (Exs. F and G, at 4).

The D&O Policies explicitly provide Side A D&O Coverage to the Individual Defendants, not to or through the Debtors.  *Id.*, Ex. F and Ex. G, at 4 ("The INSURER ***shall pay on behalf of the DIRECTORS and OFFICERS*** all ULTIMATE NET LOSS for which the INSURED ORGANIZATION has not provided indemnification. . . .").  The D&O Policies

---

[7]  Lead Plaintiff does not believe that coverage with respect to the Securities Litigation is limited to any one tower of D&O Policies and reserves all rights with respect thereto.  *See* pp. 4-5 above (outlining separate wrongful acts occurring in 2015, 2016, 2017, and 2018).

Case: 19-30088   Doc# 5374-11   Filed: 01/14/20   Entered: 01/14/20 16:56:59   Page
18 of 78

further provide that, in the event the Debtors become subject to "FINANCIAL IMPAIRMENT" (a defined term that includes the Debtors' bankruptcy filings), "the INSURER shall pay on behalf of the DIRECTORS AND OFFICERS, under [*Side A*], ULTIMATE NET LOSS which would have been indemnified by the INSURED ORGANIZATION but for such FINANCIAL IMPAIRMENT." *Id.* at 16-17.

Because any indemnification claims by the Individual Defendants are unsecured, subordinated, pre-petition claims, the Debtors *cannot* indemnify the Non-Debtor Defendants during the pendency of the Chapter 11 Cases. *See* pp. 16-17 below, *see also*, e.*g.*, *In re Downey Fin. Corp.*, 428 B.R. 595, 601 n.16 (Bankr. D. Del. 2010) ("Once an organization files for bankruptcy, the Bankruptcy Code prohibits the debtor from indemnifying the officers and directors on an ongoing basis. *See* 11 U.S.C. § 362(a)(3)."). Thus, the Individual Defendants' claims in connection with the Securities Litigation are covered directly by the Side A D&O Coverage.

The D&O Policies further provide that in the event of the Debtors' bankruptcy, the Debtors "waive and release any automatic stay or injunction which may apply to this POLICY or its proceeds in such proceeding." Adv. ECF No. 3-6 & 3-7, Collier Decl., Exs. F and G, at 16-17. The fact that the Debtors expressly waived *any* right to assert that the automatic stay prevents the Individual Defendants from accessing Side A coverage directly contravenes their assertion that proceeds of the D&O Policies are property of the estate.

Contrary to the Debtors' assertions, any claims by the Individual Defendants under the D&O Policies do not threaten irreparable harm to the Debtors or their estates for at least four reasons, each of which is discussed below: (i) the D&O Policies have substantial coverage limits, including significant Side A-only excess and difference-in-conditions coverage; (ii) the D&O Policies expressly provide that the Debtors have "no interest in or claim for" *any* proceeds of the D&O Policies unless and until all of the Individual Defendants' claims under Side A have been paid in full from policy proceeds, (iii) there is no retention applicable to Side A, and (iv) the proceeds of the D&O Policies are not property of the Debtors' estate. Accordingly, the Debtors' speculation about what might happen to the D&O Proceeds, however unlikely (*e.g.,* Motion at

15), does not satisfy their burden of proof to demonstrate immediate, irreparable harm.

### (i) The D&O Policies have substantial coverage limits, including significant Side A-only excess and difference-in-conditions D&O Coverage.

The 2017 and 2018 D&O Policies have aggregate coverage limits of $250 million and $300 million, respectively. *See* Decl. of Janaize Markland, [BK ECF No. 2472], ¶¶ 6, 8. Of those limits, $50 million (2017) and $100 million (2018) are Side A difference-in-conditions coverage that the Debtors admit is "D&O-dedicated insurance." *Id.* ¶¶ 6, 8. The remainder of coverage under all of the D&O Policies is subject to Priority of Payments Clauses, which provide that the Debtors have "no interest in or claim to" any proceeds of the D&O Policies unless and until the Individual Defendants' claims under Side A have been paid in full.

### (ii) Through the Priority of Payments Clauses, the Debtors have no interest in or claim to any proceeds of the D&O Policies until all of the Individual Defendants' claims under Side A are paid in full.

The Debtors ignore the most important feature of the D&O Polices: clauses that explicitly and fully subordinate all of the Debtors' rights to seek any D&O Coverage under Side B or Side C to the Individual Defendants' Side A D&O Coverage (the "Priority of Payments Clauses"). *See* Adv. ECF No. 3-6 & 3-7, Collier Decl., Exs. F and G, at 5-6 (section entitled "V. PRIORITY OF PAYMENTS" in 2017 and 2018 primary D&O Policies). The Priority of Payments Clauses explicitly provide that the D&O insurers must pay all claims under Side A before paying any claims under Side B or Side C, which may be paid "only if and to the extent payment under [Side A] does not exhaust the applicable Limit of Liability." They also expressly anticipate Chapter 11 proceedings, providing that where the Individual Defendants incur claims under Side A (as they have here), the Debtors, even if acting as a "debtor-in-possession," "*shall have no interest in or any claim for any payments under this POLICY until*" all claims under Side A have been paid in full. *Id.*, Exs. F and G, at 6.

Irrespective of which tower or towers of D&O Policies cover the Individual Defendants in connection with the Securities Litigation, the Priority of Payments Clauses provide that the Debtors have no interest in, or claim for, any D&O Policy proceeds whatsoever unless and until all of the Individual Defendants' claims under Side A have been paid. *Id.* Only then, if any

coverage remains, could the Debtors seek Side B or Side C D&O Coverage. *Id.* As a result, the Debtors have nothing more than a contingent, subordinated right to potentially pursue coverage under the D&O Policies if and only if any coverage remains after all of the Non-Debtor Defendants' claims under Side A have been paid in full.

### *(iii)* *There is no self-insured retention under the Side A D&O Coverage.*

The Debtors assert that they must pay retention amounts before coverage is available to them under the Side B or Side C D&O Coverage. Motion at 14; Collier Decl., ¶ 8. However, the retention amounts applicable to those coverages are irrelevant to the Motion. Side A provides D&O Coverage directly to the Individual Defendants where, as here, the Debtors do not indemnify the Individual Defendants (whose indemnification claims, if any, are subordinated pre-petition claims and thus **cannot** be paid during the Chapter 11 Cases). *See* pp. 16-17 below. The Motion fails to mention that the Side A D&O Coverage **does not have a retention amount**. *See* Collier Decl., Exs. F and G, at 2. Thus, the Debtors' purported concerns that they will be obligated to pay retention amounts are baseless.

### *(iv)* *The D&O Policy proceeds are not property of the Debtors' estates.*

In general, directors' and officers' liability insurance policies, such as the D&O Policies, are considered to be property of the bankruptcy estates of the companies that purchased them. *See, e.g.*, *Ochs v. Lipson (In re First Cent. Fin. Corp.)*, 238 B.R. 9, 15-16 (Bankr. E.D.N.Y. 1999). However, "[i]n essence and at its core, a D&O Policy remains a safeguard of officer and director interests and not a vehicle for corporate protection." *Id.* at 16. Consistent with this fundamental purpose of D&O insurance, courts distinguish between directors' and officers' insurance **policies** from the **proceeds** of those policies, routinely finding that the proceeds of insurance policies such as the D&O Policies **are not** property of the estate. *See, e.g.*, *id.* ("[T]here is an increasing view that a distinction should be drawn when considering treatment of proceeds arising under" D&O insurance policies). "Courts generally closely examine the debtor's rights under the terms of the liability insurance policy at issue in order to determine whether holding that the policy proceeds are property of the estate would improperly expand the debtor's rights beyond what rights against others existed at the commencement of the case."

*Downey*, 428 B.R. at 607.

Where, as here, a debtor's rights to coverage under a D&O insurance policy are expressly subordinated to the rights of individual insureds, courts consistently hold that the policy proceeds are not property of the debtor's estate.[8] *See, e.g.*, *In re MF Global Holdings Ltd.*, 515 B.R. 193, 198-204 (Bankr. S.D.N.Y. 2014) (holding that "D&O Proceeds are not property of the . . . Debtors' estates," despite policy limit being exceeded by claimed damages in securities actions); *In re World Health Alternatives, Inc.*, 369 B.R. 805, 809 (Bankr. D. Del. 2007) (proceeds of a policy are payable only to the directors and officers and are not property of the estate); *In re Allied Digital Techs. Corp.*, 306 B.R. 505, 510 (Bankr. D. Del. 2004) (holding that where a D&O "policy provides the debtor with indemnification coverage but indemnification either has not occurred, is hypothetical, or speculative, the proceeds are not property of the bankruptcy estate"); *In re Adelphia Commc'ns Corp.*, 298 B.R. 49, 54 (S.D.N.Y. 2003) (where no indemnification claims existed yet, the "estate cannot be ascribed to hold a property interest in those [D&O insurance] proceeds").

Here, the Priority of Payments Clauses cement this distinction. *See, e.g.*, *In re Laminate Kingdom LLC*, No. 07-10279, 2008 WL 1766637, at *3 (Bankr. S.D. Fla. Mar. 13, 2008) (holding that "payment of the [D&O] proceeds in accordance with the 'Priority of Payments Endorsement' ***does not diminish the protection the Policy affords the estate***, as such protection is only available after the Costs of Defense are paid"); *MF Global*, 515 B.R. at 203, 207 (holding that "D&O Proceeds are not estate property" in part because any debtor "claim would be subject to the D&O Policies' priority of payments provision"); *Downey*, 428 B.R. at 608 (holding that proceeds were not "property of the estate," where, as here, the D&O insurance "[p]olicy provides a clear chain of priority among the three types of coverages" in priority of payments clauses, because to hold otherwise "would necessarily expand the [debtor]'s rights in the Policy

---

[8] Debtors' Counsel is amply aware of this rule, having argued for it at length elsewhere. *E.g.*, *In re Lehman Brothers Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y.), Motion, Doc. No. 12369, annexed hereto as **Exhibit C**, at 11-13 (arguing that subordination due to priority of payments clauses meant that policy was not property of estate); *In re Refco Inc.*, No. 05-60006 (Bankr. S.D.N.Y.), Response, Doc. No. 1510, annexed hereto as **Exhibit D**, at 5-9 (same).

proceeds" beyond the subordinated rights that existed prior to the petition date). Because the Priority of Payments Clauses unequivocally provide that the Debtors "have no interest in or claim for" any proceeds of the D&O Policies, and instead have only a contingent, subordinated right to pursue coverage once all of the Individual Defendants' claims under Side A are paid in full, the proceeds of the D&O Policies *cannot be* property of the Debtors' estates.

### (b) Indemnification

The Debtors also argue that they face irreparable harm because they must indemnify the Non-Debtor Defendants to the extent permissible by law, stating in conclusory fashion that "[t]he Non-Debtor Defendants' indemnity claims have already begun to accrue, and . . . they will grow substantially" if the Securities Litigation is allowed to proceed. *See* Motion at 11-14. However, the Debtors produced no evidence that they are incurring or will incur any actual obligation to indemnify the Non-Debtor Defendants during the Chapter 11 Cases – because they cannot do so.

As detailed below, the specter of indemnification is entirely theoretical. Any indemnification claims the Non-Debtor Defendants might assert would be ordinary pre-petition claims that the Debtors *cannot* pay during the Chapter 11 Cases. In addition, any such claims are subject to the bankruptcy claims process, are subordinated to all other claims against the Debtors, and are potentially subject to disallowance under 11 U.S.C. § 502(e)(1)(B). Thus, any such claims would not impact the Debtors, their estates, or creditors – much less cause any imminent or irreparable harm.

### (i) *Indemnification concerns are theoretical and premature.*

First, the Individual Defendants' defense costs are funded directly by the Side A D&O Coverage. *See* Adv. ECF No. 3-7 & Collier Decl. ¶ 7 (agreeing that the D&O Policies first cover Individual Defendants for any "losses incurred in their capacity as officers or directors of the Debtors (the **'Side A Coverage'**)"). In light of the very substantial policy limits of the D&O Policies, indemnity simply is not an issue at this stage, and any purported concerns related to a potential settlement or judgment are severely premature. Unsurprisingly, the Debtors have presented no evidence of any indemnification costs they are incurring now or reasonably expect to incur in the future. Raising the mere possibility of indemnification does not carry Debtors'

burden because "[s]peculative injury cannot be the basis for a finding of irreparable harm." *Excel*, 502 F.3d at 1098.

More fundamentally, the mere possibility of a claim for indemnification is not grounds for imposition of a stay. *See, e.g.*, *In re Codfish Corp.*, 97 B.R. 132, 135 (Bankr. D.P.R. 1988) (noting that indemnification "is common . . . and is not by itself sufficient to warrant that [the] automatic stay . . . be extended under 11 U.S.C. § 105(a)"); *see also In re Northwest Airlines Corp.*, Adv. Pro. No. 06-01219 (Bankr. S.D.N.Y.), Transcript of Hearing Held Mar. 7, 2006 ("Northwest Tr."), at 67:11-20 (declining to stay securities litigation and noting that if the possibility of indemnification was a *prima facie* justification for injunctive relief, "every garden-variety class action would be subject to a stay against non-debtor defendants").[9] The Debtors' reliance on *Excel* (Motion at 5, 11, & 15) is misplaced; there, the Ninth Circuit reversed where a "bankruptcy court initially granted the injunction under the mistaken view that any proceeding with any conceivable effect on the debtor should be enjoined." *Excel*, 502 F.3d at 1099; *see also Boucher v. Shaw*, 572 F.3d 1087, 1093 (9th Cir. 2009) (allowing case to proceed against non-debtor defendants where, as here, "managers are independently liable under the" federal claims asserted in the non-bankruptcy proceeding).[10]

### (ii) The Debtors cannot indemnify the Non-Debtor Defendants during the pendency of the Chapter 11 Cases.

Second, as a matter of law, the Debtors *cannot* indemnify the Non-Debtor Defendants during the Chapter 11 Cases because any indemnification claims the Non-Debtor Defendants might assert are ordinary pre-petition claims subject to the automatic stay. *See, e.g.*, *Downey*, 428 B.R. at 601 n.16 ("Once an organization files for bankruptcy, the Bankruptcy Code prohibits the debtor from indemnifying the officers and directors on an ongoing basis. *See* 11 U.S.C. § 362(a)(3)."); *In re Amfesco Indus., Inc.*, 81 B.R. 777, 784-86 (Bankr. E.D.N.Y. 1988) (holding that current and former directors' claims for indemnification were pre-petition claims, not

---

[9] A true and correct excerpt of the Northwest Transcript is attached hereto as **Exhibit E**.

[10] Thus, the Debtors' citation to *Boucher* for the proposition that a different result might be reached "[i]f the liability of the non-debtor were to affect the property of the bankruptcy estate" (Motion at 11) quotes dicta that, under the facts at issue here, weighs against issuance of the Debtors' requested injunction.

administrative expense claims). The *Amfesco* court found that

> [a]ll of the operative facts, legal relationships, and conduct of the Applicants upon which is based the threatened litigation occurred pre-petition. The indemnification agreement entered into between the Applicants and the Debtors occurred pre-petition. Any duty of the Debtors to indemnify the Applicants arises from services provided to the pre-petition Corporation not for services rendered post-petition to the Debtors-in-Possession. As such, the Applicants' legal fees claim arises from their pre-petition services rather than any post-petition services.

81 B.R. at 784.

The circumstances here are identical. All of the operative facts, legal relationships, and conduct underlying the Securities Litigation occurred prior to the Petition Date. The indemnification agreements and charter provisions allegedly providing rights of indemnity to the Non-Debtor Defendants were all entered into prior to the Petition Date. Any duty the Debtors may have to indemnify the Non-Debtor Defendants arises from the Non-Debtor Defendants' services as officers, directors, and underwriters for the Debtors prior to the Petition Date. As a result, any indemnification claims the Non-Debtor Defendants might assert are ordinary pre-petition claims that the Debtors ***cannot*** pay during the course of the Chapter 11 Cases.

### (iii) Any indemnification claims of the Non-Debtor Defendants are subordinated pre-petition claims subject to the bankruptcy claims process.

Third, the Debtors propose that their "indemnification obligations here are real" (Motion at 12) because the Securities Litigation "risks further losses by the Non-Debtor Defendants that would ultimately be borne by the Debtors' estates" by creating "'fixed and liquidated indemnity claims'" (Motion at 13 (quoting *In re W.R. Grace & Co.*, 386 B.R. 17, 34 (Bankr. D. Del. 2008)). But unlike *W.R. Grace*, the Non-Debtor Defendants here would only be entitled to assert their claims by filing proofs of claim before the general bar date, subject to the claims reconciliation process – just like any other pre-petition creditor. *See, e.g.*, *In re All Seasons Resorts, Inc.*, 79 B.R. 901, 904 (Bankr. C.D. Cal. 1987) (the debtor's officers could "seek indemnification from [the] debtor, but their claim will be treated like any pre-petition, unsecured claim"). Such claims may not be allowed, but even if they are, the Non-Debtor Defendants would not receive any payment on account thereof except through distributions under a

confirmed Chapter 11 plan – just like any other pre-petition creditor.  Thus, the Non-Debtor Defendants' indemnification claims, if ever asserted, do not threaten imminent, irreparable harm to the Debtors.  They would be ordinary pre-petition claims that would proceed through the bankruptcy claims process irrespective of whether the Court grants the Motion.

> **(iv)** *Any indemnification claims arising from the Securities Litigation are subordinated and subject to disallowance under the Bankruptcy Code.*

Fourth, even if the Non-Debtor Defendants file indemnification claims that ultimately are allowed, those claims *are subordinated to all other claims against the Debtors* and thus cannot impact the Debtors' estates or other creditors.  The claims asserted in the TAC all arise from purchases and sales of securities of the Debtors.  Any claims the Non-Debtor Defendants might assert against the Debtors for indemnification in connection with the Securities Litigation would be statutorily subordinated to all unsecured claims against the Debtors pursuant to 11 U.S.C. § 510(b), which provides:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, *or for reimbursement or contribution allowed under Section 502 on account of such a claim*, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b); *The Official Comm. of Creditors Holding Unsecured Claims v. Painewebber Inc. (In re De Laurentiis Enter. Grp., Inc.)*, 124 B.R. 305, 310 (C.D. Cal. 1991) (subordinating underwriter's claim for reimbursement of attorneys' fees incurred in defense of a securities action); *see also In re Mid-American Waste Sys., Inc.*, 228 B.R. 816, 829 (Bankr. D. Del. 1999) (subordinating claims of debtor's officers, directors, and underwriters for indemnification of both liability and expenses resulting from securities action by purchasers and sellers of the debtor's securities).

Under Section 510(b), any indemnification claims the Non-Debtor Defendants might assert against the Debtors would be subordinated to all of PG&E's secured and unsecured funded

debt, all administrative expenses and priority unsecured claims, all unsecured trade debt, and all wildfire-related personal injury and property damage claims. In other words, any indemnification claims asserted by the Non-Debtor Defendants, even if allowed, can have no impact on the Debtors' estates or any unsecured creditors.

Any potential indemnification claims are also subject to disallowance under Section 502(e)(1)(B) of the Bankruptcy Code, whereby "the court **shall disallow** any claim for reimbursement or contribution of an entity that is liable with the debtor . . . to the extent that . . . such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance." 11 U.S.C. § 502(e)(1) & (B). Therefore, if any Non-Debtor Defendants assert indemnification claims, such claims are likely to remain contingent and thus be subject to mandatory disallowance.

### (v) *Indemnification for certain securities law violations is legally impermissible.*

Finally, complete indemnification for violating the federal securities laws has been held to be contrary to public policy and potentially impermissible. *See, e.g.*, *Laventhol, Krekstein, Horwath & Horwath v. Horwitch*, 637 F.2d 672, 676 (9th Cir. 1980), *cert. denied*, 452 U.S. 963 (1981); *First Golden Bancorporation v. Weiszmann*, 942 F.2d 726, 728 (10th Cir. 1991) ("Courts have rejected indemnity for a variety of securities violations because indemnity contravened 'the public policy enunciated by the federal securities laws.'") (quoting 2 A. Bromberg & L. Lowenfels, *Securities Fraud & Commodities Fraud* (2d ed.) § 5.7 (277), at 5:82:78); *Heizer Corp. v. Ross*, 601 F.2d 330, 334 (7th Cir. 1979) ("A securities wrongdoer should not be permitted to escape loss by shifting his entire responsibility to another party."). The Debtors here are likely prohibited from indemnifying some or all of the Non-Debtor Defendants' liability in connection with the Securities Litigation, thereby distinguishing *A.H. Robins*, *Family Health Services*, and the other non-securities cases on which the Debtors rely. *See* Motion at 12-13 (citing, *inter alia*, *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1000 (4th Cir. 1986) and *In re Family Health Servs., Inc.*, 105 B.R. 937, 942 (Bankr. C.D. Cal. 1989)).

Accordingly, the Debtors' supposed indemnification obligations do not provide a basis

for injunctive relief.

### 3. The Debtors' preclusion arguments are misplaced.

The Debtors also speculate that they could face collateral estoppel, adverse rulings, and "record taint" if the Securities Litigation were to proceed. *See* Motion at 16-18. These concerns are not even remotely ripe given the present stage of the Securities Litigation, where the only activity for at least the next six months is briefing and arguing the Non-Debtor Defendants' motions to dismiss the TAC.[11]

In addition, the Debtors' long-term fears are not warranted: They **cannot** be precluded by findings in a proceeding in which they are not participating due to the automatic stay. *See Hansberry v. Lee*, 311 U.S. 32, 41 (1940) ("[J]udicial action . . . against the person or property of the absent party is not that due process which the Fifth and Fourteenth Amendments requires."); *accord* Northwest Tr. at 66:10-12 ("Plaintiffs concede, as they must, that the debtors will not be bound . . . by a result in the litigation adverse to the [non-debtor] defendants."); *Pacor, Inc. v. Higgins*, 743 F.2d 984, 995 (3d Cir. 1984) ("Since [debtor] Manville is not a party to the *Higgins-Pacor* action, it could not be bound by res judicata or collateral estoppel.").

The Debtors also express concern that the Non-Debtor Defendants will be deemed their "virtual representative" and thus "risk the possibility of binding PG&E itself." Motion at 16. But in 2008, the Supreme Court struck down that exact theory of preclusion. *Taylor v. Sturgell*, 553 U.S. 880, 904 (2008) ("[W]e disapprove the theory of virtual representation"). Unsurprisingly, the only federal preclusion cases that the Debtors cite predate *Taylor*. Motion at 16-17. After *Taylor*, the automatic stay simply does not compel the Debtors to forfeit their right to defend themselves.[12]

---

[11] In fact, such limited activity in the Securities Litigation may span a considerably longer time period if the District Court grants any part of a motion to dismiss with leave to amend, or if an appeal is taken from any final judgment of dismissal.

[12] The Debtors repeatedly cite *Tuller v. Tintri* to support their preclusion argument. Motion at 7, 17, & 18 (citing *Tuller v. Tintri, Inc.*, No. 17-05714, 2018 WL 4385652 (N.D. Cal. Sept. 14, 2018)). In *Tuller*, the district court's view that a judgment against non-debtor parties might preclude the debtor (*Id.* at *2) was dicta and inconsistent with the above Supreme Court authority. The *Tuller* court also found that the operative complaint failed to plead "much, if any, particularization," a fact that the court acknowledged "present[ed] a **special circumstance**" to extend the stay. *Id.* That circumstance does not exist here.

The Debtors' fears of being bound by adverse developments against the Individual Defendants are similarly unfounded, given that the litigation they seek to enjoin is a securities action. Although officers' **actions** may be imputed to their corporation, the Debtors confound this basic agency principle with collateral estoppel, whereby "corporations are treated as entities separate from their officers, directors and shareholders for purposes of preclusion," and "a judgment entered in an action against any one of them is not binding on any other." 18A Charles Alan Wright, et al., *Federal Practice & Procedure* § 4460 (3d ed.); *see also* Restatement (Second) of Judgments § 59 (1982) ("nor does a judgment in an action involving a party who is an officer [or] director . . . have preclusive effects on the corporation itself" except in limited circumstances not present here).

Further, as noted above, discovery in the Securities Litigation is stayed by the PSLRA, and will remain stayed until the Non-Debtor Defendants file motions to dismiss *and* the District Court denies them. Accordingly, **no facts** will be unearthed and the District Court will make no factual findings – much less any that risk precluding the Debtors – for the foreseeable future.

### 4. Distraction

To demonstrate irreparable harm based on distraction of management, the Debtors "must submit more than conclusory proof that lawsuits against management will divert management's time and resources away from the reorganization." *See In re Chateaugay Corp.*, 76 B.R. 945, 948-49 (S.D.N.Y. 1987). The Debtors hypothesize that the continued prosecution of the Securities Litigation against the Non-Debtor Defendants "will draw the Debtors' employees, at all levels of the company, away from the administration of the Chapter 11 Cases and related issues[,]" Motion at 19, without providing any evidence that any distraction has occurred during the nearly six months that the Chapter 11 Cases have been pending. Continuing to speculate, the Debtors assert that "there is a very real risk that its prosecution and attendant discovery would ultimately divert the debtor's resources and attention from the bankruptcy process, and possibly deprive this Court of control over issues central to its administration of the estates." *Id.* at 20. These concerns are baseless.

As an initial matter, this supposed burden and distraction is irrelevant with respect to the

*thirty-nine* Non-Debtor Defendants who are no longer affiliated with the Debtors. And the Debtors have again presented nothing more than conjecture, unsupported by any evidence, with respect to the handful of Individual Defendants who remain affiliated with the Debtors. The Debtors have failed to demonstrate that the Securities Litigation has imposed any burden on the five Individual Defendants who are affiliated with the Debtors, or that it will impose any burden on them in the foreseeable future.

Moreover, the Securities Litigation is subject to the PSLRA discovery stay, pursuant to which all discovery in that case is automatically stayed during the pendency of any motion to dismiss. *See* 15 U.S.C. §§ 77z-1(b)(1), 78u-4(b)(3)(B). And even if the PSLRA discovery stay ultimately terminates (*i.e.*, if the District Court denies the Non-Debtor Defendants' anticipated motions to dismiss the TAC) while the Chapter 11 Cases remain pending, the Debtors would likely be in a very different position at that point, as will the Chapter 11 Cases.

If Lead Plaintiff or any other party seeks to take discovery from the Debtors at some future time while the Chapter 11 Cases remain pending, this Court would have an opportunity to consider the potential burden that discovery could impose upon the estates ***if and when that issue becomes ripe for adjudication***, rather than prematurely imposing a blanket stay based upon unsupported conjecture about theoretical litigation burdens that don't yet, and may never, exist.

**C. Enjoining the continued prosecution of the Securities Litigation against the Non-Debtor Defendants would cause greater harm to Lead Plaintiff and the Class than the Debtors will face without an injunction.**

Under the injunction standard, the Court "balance[s] the [Debtors'] likelihood of successfully reorganizing with the relative hardship of the parties." *Excel*, 502 F.3d. at 1100. The "relative hardship" element of this analysis considers both the prospective harm faced by the Debtors absent an injunction and the harm an injunction would cause Lead Plaintiff and the Class. Both are crucial. *See Caribbean Marine*, 844 F.2d at 677 (holding that "failure to identify, evaluate, and weigh the potential harm alleged by" the non-debtor party against whom a debtor seeks injunctive relief constitutes reversible error). Here, whereas the Debtors have not demonstrated any risk of cognizable harm to their estates, enjoining the continued prosecution of the Securities Litigation against the Non-Debtor Defendants for an indeterminate period of time

would cause substantial harm to Lead Plaintiff and the Class. Just as in *Excel*, an open-ended stay of the Securities Litigation would preclude Lead Plaintiff from bringing claims against the Non-Debtor Defendants on behalf of itself and the Class "at a time of its choosing." *See* 502 F.3d at 1097. It would be fundamentally unjust to stymie the continued prosecution of the Securities Litigation where no party other than the Non-Debtor Defendants themselves and the insurers under the D&O Policies would benefit from the delay. *Cf. In re Atlantic Pipeline Corp.*, 304 F.3d 135, 147 (1st Cir. 2002) ("[I]t is trite but often true that justice delayed is justice denied").

Moreover, the proposed injunction would inflict irreparable harm on Lead Plaintiff and the Class. The passage of time and fading of memories would impact the Securities Litigation more surely than any of the theoretical risks to the Debtors' estates. *See In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, No. 01-3624, 2007 WL 789096, at *1 (S.D. Tex. Mar. 12, 2007) (declining to stay securities class action because "delay will only increase financial hardship to plaintiffs and add to the prejudice" because "[w]ith the passage of time, inevitably witnesses become unavailable, memories fade, and the risk of documents being lost rises.").

### D. The proposed injunction is inimical to the public interest because it threatens the integrity of public securities markets.

The final factor the Debtors must demonstrate is that the proposed injunction advances the public interest. *See Excel*, 502 F.3d at 1096. The Debtors assert that "[t]he public interest in a successful reorganization is particularly prevalent here," and then state several reasons why they view their reorganization as important. *See* Motion at 22. However, as detailed below, the Debtors' conclusory assertions completely miss the mark.

#### 1. The proposed injunction would not aid the Debtors' reorganization.

The Debtors have not even attempted to explain how the broad, open-ended injunction they seek would serve the public's interest in their reorganization. As discussed above, the continued prosecution of the Securities Litigation against the Non-Debtor Defendants will not impact the Debtors' reorganization efforts. Because the proposed injunction would not aid the Debtors' reorganization efforts, the public interest ***cannot*** weigh in favor of issuing it.

### 2. There is a strong public interest in the integrity of the securities markets.

In stark contrast to the absence of any cognizable benefit to the public interest, the Debtors' proposed injunction would severely harm the public interest in ensuring the integrity of the U.S. equity and capital markets as well as the public trust and investor confidence that result from maintaining that integrity. The United States Supreme Court has long held that there is a public interest in the integrity of the securities markets. *See, e.g.*, *Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988). A fundamental purpose of the federal securities laws is "to maintain public confidence in the marketplace . . . by deterring fraud, in part, through the availability of private securities fraud actions." *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005). This purpose does not shift even though the issuer of securities has filed bankruptcy. *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1094 (2d Cir. 1995) (noting that securities fraud claims brought by private investors were "being vigorously litigated" outside of the Bankruptcy Court). Indeed, securities fraud claims can *only* be prosecuted by investors, not by a Chapter 11 debtor or trustee. *Id.* at 1093-1095; *see also Teledyne Indus., Inc. v. Eon Corp.*, 401 F. Supp. 729, 734–36 (S.D.N.Y. 1975), *aff'd sub nom Teledyne Indus., Inc. v. Podell*, 546 F.2d 495 (2d Cir. 1976).

Prohibiting the Securities Litigation from proceeding against the Non-Debtor Defendants would diminish the safeguards of the federal securities laws. Securities class actions involving the debtors in some of the largest and most complicated Chapter 11 bankruptcy proceedings continued notwithstanding the debtors' bankruptcy proceedings, including Enron, WorldCom, Delphi, Washington Mutual, and Lehman Brothers, and plans of reorganization or liquidation were confirmed in those cases. The proposed injunction sought here not only would ignore these lessons of past experience, but also would set a dangerous precedent. *See, e.g.*, Northwest Tr. at 35:3-6 ("[I]f I stay their action, I think the result would be that any class action brought against any large company in bankruptcy would be stayed.").

Quite simply, a stay of the Securities Litigation with respect to the Non-Debtor Defendants violates the public interest, and sound public policy requires that the Motion be denied.

**CONCLUSION**

For all of the foregoing reasons, the Motion should be denied.

Dated: July 18, 2019

**LOWENSTEIN SANDLER LLP
MICHELSON LAW GROUP**

By:    */s/ Randy Michelson*
Randy Michelson (SBN 114095)

*Bankruptcy Counsel to Lead Plaintiff and the Class*

- and -

**LABATON SUCHAROW LLP**

*Lead Counsel to Lead Plaintiff and the Class*

- and -

**WAGSTAFFE, VON LOEWENFELDT, BUSCH
& RADWICK, LLP**

*Liaison Counsel for the Class*

- and -

**ROBBINS GELLER RUDMAN & DOWD LLP**

*Counsel for the Securities Act Plaintiffs*

- and -

**VANOVERBEKE, MICHAUD & TIMMONY,
P.C.**

*Additional Counsel for the Securities Act Plaintiffs*

**EXHIBIT A**
**COUNSEL**

**LOWENSTEIN SANDLER LLP**
Michael S. Etkin *(Pro Hac Vice)*
Andrew Behlmann
Scott Cargill
Gabriel Olivera
One Lowenstein Drive
Roseland, New Jersey 07068
Telephone   973-597-2500
Facsimile   973-597-2333
metkin@lowenstein.com
abehlmann@lowenstein.com

**MICHELSON LAW GROUP**
Randy Michelson, Esq. (SBN 114095)
220 Montgomery Street, Suite 2100
San Francisco, CA 94104
Telephone   415-512-8600
Facsimile   415-512-8601
randy.michelson@michelsonlawgroup.com

*Bankruptcy Counsel to Lead Plaintiff and the Proposed Class*

**LABATON SUCHAROW LLP**
Thomas A. Dubbs
Louis Gottlieb
Carol C. Villegas
Jeffrey A. Dubbin (SBN 287199)
Aram Boghosian
140 Broadway
New York, New York 10005
Telephone   212-907-0700
tdubbs@labaton.com
lgottlieb@labaton.com
cvillegas@labaton.com
jdubbin@labaton.com
aboghosian@labaton.com

*Lead Counsel to Lead Plaintiff and the Proposed Class*

**WAGSTAFFE, VON LOEWENFELDT, BUSCH & RADWICK, LLP**
James M. Wagstaffe (SBN 95535)
Frank Busch (SBN 258288)
100 Pine Street, Suite 725
San Francisco, California 94111
Telephone   415-357-8900
wagstaffe@wvbrlaw.com
busch@wvbrlaw.com

*Liaison Counsel for the Proposed Class*

**ROBBINS GELLER RUDMAN & DOWD LLP**
Darren J. Robbins (SBN 168593)
Brian E. Cochran (SBN 286202)
655 West Broadway, Suite 1900
San Diego, California 92101
Telephone   619-231-1058
darrenr@rgrdlaw.com
bcochran@rgrdlaw.com

**ROBBINS GELLER RUDMAN & DOWD LLP**
Willow E. Radcliffe (SBN 200089)
Kenneth J. Black (SBN 291871)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, California 94104
Telephone   415-288-4545
willowr@rgrdlaw.com
kennyb@rgrdlaw.com

**VANOVERBEKE, MICHAUD & TIMMONY, P.C.**
Thomas C. Michaud
79 Alfred Street
Detroit, Michigan 48201
Telephone   313-578-1200
tmichaud@vmtlaw.com

*Additional Counsel for the Securities Act Plaintiffs*

**EXHIBIT B**
**RESERVATION OF RIGHTS**

This Opposition and any subsequent pleading, appearance, argument, claim, or suit made or filed by Lead Plaintiff, either individually or for the Class or any member thereof, do not, shall not, and shall not be deemed to:

a. constitute a submission by Lead Plaintiff, either individually or for the Class or any member thereof, to the jurisdiction of the Bankruptcy Court;

b. constitute consent by Lead Plaintiff, either individually or for the Class or any member thereof, to entry by the Bankruptcy Court of any final order or judgment, or any other order having the effect of a final order or judgment, in any non-core proceeding, which consent is hereby withheld unless, and solely to the extent, expressly granted in the future with respect to a specific matter or proceeding; or

c. waive any substantive or procedural rights of Lead Plaintiff or the Class or any member thereof, including but not limited to (a) the right to challenge the constitutional authority of the Bankruptcy Court to enter a final order or judgment, or any other order having the effect of a final order or judgment, on any matter; (b) the right to have final orders and judgments, and any other order having the effect of a final order or judgment, in non-core matters entered only after de novo review by a United States District Court judge; (c) the right to trial by jury in any proceedings so triable herein, in the Chapter 11 Cases, including all adversary proceedings and other related cases and proceedings (collectively, "Related Proceedings"), in the Securities Litigation, or in any other case, controversy, or proceeding related to or arising from the Debtors, the Chapter 11 Cases, any Related Proceedings, or the Securities Litigation; (d) the right to seek withdrawal of the bankruptcy reference by a United States District Court in any matter subject to mandatory or discretionary withdrawal; or (e) all other rights, claims, actions, arguments, counterarguments, defenses, setoffs, or recoupments to which Lead Plaintiff or the Class or any member thereof are or may be entitled under agreements, at law, in equity, or otherwise, all of which rights, claims, actions, arguments, counterarguments, defenses, setoffs, and recoupments are expressly reserved.

For the avoidance of doubt, Lead Plaintiff, on behalf of itself and the Class, (a) reserves all rights with respect to any attempt by the Debtors and/or the Non-Debtor Defendants to (i) transfer venue of the Securities Litigation to this Court or (ii) otherwise seek any order of this Court adjudicating, releasing, waiving, enjoining, or otherwise impacting the claims of Lead Plaintiff and the Class or any member thereof against any Non-Debtor Defendants now or hereafter named in the Securities Litigation, and (b) does not, and will not impliedly, consent to this Court's adjudication of the claims asserted against any Non-Debtor Defendants now or hereafter named in the Securities Litigation.

**EXHIBIT C**
*In re Lehman Brothers Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y.)
Motion, Doc. No. 12369

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
:
In re                                                            :      **Chapter 11 Case No.**
:
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,      :      **08-13555 (JMP)**
:
**Debtors.**                              :      **(Jointly Administered)**
:
-------------------------------------------------------------------x

**DEBTORS' MOTION, PURSUANT TO SECTION 362 OF THE BANKRUPTCY
CODE, FOR AN ORDER MODIFYING THE AUTOMATIC STAY TO ALLOW
ADVANCEMENT UNDER (I) 2007-2008 DIRECTORS AND OFFICERS INSURANCE
POLICIES BY ZURICH AMERCIAN INSURANCE COMPANY, ACE BERMUDA
INSURANCE LTD. AND ST. PAUL MERCURY INSURANCE COMPANY, AND (II)
2008-2009 DIRECTORS AND OFFICERS INSURANCE POLICIES BY XL SPECIALTY
INSURANCE COMPANY AND FEDERAL INSURANCE COMPANY**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-

referenced chapter 11 cases, as debtors and debtors in possession (together, the "Debtors" and,

collectively with their non-debtor affiliates, "Lehman"), file this Motion and respectfully

represent:

**Preliminary Statement**

1.      On three prior occasions, the Debtors have sought and obtained orders

modifying the automatic stay provided for under section 362(a) of title 11 of the United States

Code (the "Bankruptcy Code"), to the extent applicable, to remove any impediments to payment by certain of the Debtors' primary and excess insurers of directors' and officers' liability of defense costs and fees that current or former directors, officers and employees of the Debtors were incurring as defendants in ongoing federal securities lawsuits and regulatory and other actions and investigations.[1]  By this Motion, the Debtors seek the entry of a similar form of order granting relief from the automatic stay with respect to (i) Zurich American Insurance Company ("Zurich"), ACE Bermuda Insurance Ltd. ("ACE") and St. Paul Mercury Insurance Co. ("St. Paul"), the fifth, sixth and seventh excess insurers, respectively, under the Debtors' 2007-2008 directors and officers liability insurance program (the "2007-2008 D&O Policies"), and (ii) XL Specialty Insurance Company ("XL") and Federal Insurance Company ("Chubb"), the primary and first excess insurers under the Debtors' 2008-2009 directors and officers liability insurance program (the "2008-2009 D&O Policies," together with the 2007-2008 D&O Policies, the "D&O Policies").[2]

2.     For Claims[3] made against the Individual Defendants (defined below) during the period from May 16, 2007 to May 16, 2008 (the "2007-2008 D&O Policy Period"),

---

[1] *See* Orders dated March 25, 2009 [Docket No. 3220] (modifying automatic stay to allow advancement of defense costs with respect to XL Specialty Insurance Co. with respect to the 2007-2008 Policy Period); November 23, 2009 [Docket No. 5906] (modifying the automatic stay to allow advancement of defense costs with respect to Federal Insurance Co. with respect to the 2007-2008 D&O Policy Period); and August 20, 2010 [Docket No. 10945] (modifying the automatic stay to allow advancement of defense costs with respect to Continental Casualty Co., Certain Underwriters at Lloyd's London, and U.S. Specialty Insurance Co. with respect to the 2007-2008 D&O Policy Period) (collectively, the "Prior Stay Orders").  Concurrently herewith, the Debtors are filing a motion for relief from the automatic stay, to the extent applicable, to permit Certain Underwriters at Lloyd's, London to advance $10 million of insurance proceeds for the payment of settlement costs in accordance with a settlement agreement among Alex E. Booth, the Booth Foundation, Inc. and Richard S. Fuld (the "Settlement Advancement Motion").

[2] A copy of the 2007-2008 primary D&O Policy and the Zurich, ACE and St. Paul excess Policies are attached hereto as Exhibits A, B, C and D, respectively.  A copy of the 2008-2009 primary D&O Policy and the Chubb excess Policy are attached hereto as Exhibits E and F, respectively.

[3] Capitalized terms not defined herein shall have the meanings ascribed to them in the applicable Policies.

US_ACTIVE:\43530682\07\58399.0003

the Debtors purchased the primary 2007-2008 D&O Policy from XL plus additional excess coverage for this period from a number of other carriers of up to $250 million in the aggregate. The excess policies are all "follow form" policies subject to additional independent terms and conditions. That is, the terms and conditions of the primary 2007-2008 D&O Policy govern the terms and conditions of each of the excess 2007-2008 D&O Policies, except that each excess insurer's obligations are subject to certain additional terms, such as limits of liability, and attach only after all Loss within the respective Limits of Liability of the underlying Policies has been paid.

3. Similarly, for Claims made against Individual Defendants during the period from May 16, 2008 to May 16, 2011 (the "2008-2009 D&O Policy Period"),[4] the Debtors purchased the primary 2008-2009 D&O Policy from XL plus additional excess coverage for this period from a number of other carriers also of up to $250 million in the aggregate. Similar to the excess 2007-2008 D&O Policies, the excess 2008-2009 D&O Policies generally "follow form" to the primary 2008-2009 D&O Policy subject to certain additional terms, such as limits of liabilities, and are triggered only after all Loss within the underlying layers of coverage has been paid.

4. As noted above, the Court has entered three Prior Stay Orders modifying the automatic stay to allow for the payment of defense costs and fees by the Debtors' primary and first through fourth excess insurers for the 2007-2008 D&O Policy Period providing coverage of $70 million in the aggregate. In addition, on December 17, 2009, the Court entered an order modifying the automatic stay to permit the payment of settlement amounts by XL and

---

[4] On June 17, 2010, the Court entered an order granting the Debtors' motion for authority to purchase an additional "tail" (or "run-off" period) for the 2008-2009 D&O Policies to extend the period during which notice of Claims may be made under the 2008-2009 D&O Policies through May 16, 2011. *See* Docket No. 9643.

Chubb under the 2007-2008 D&O Policy totaling $1,675,000.  *See* Docket No. 6297.  Due to the continued state of ongoing legal proceedings as well as the settlement payment that will be made if the Court approves the Settlement Advancement Motion, it is anticipated that the proceeds available under those levels of the 2007-2008 D&O Policies for which relief from the automatic stay, to the extent applicable, has been authorized will be exhausted by approximately the end of November 2010.  Accordingly, the individual Insureds will need to look to the fifth, sixth and seventh excess insurers for the 2007-2008 D&O Policy Period for coverage, which was procured pre-petition by the Debtors for the benefit of their directors, officers, and employees.  Collectively, Zurich, ACE and St. Paul provide $55 million in coverage in excess of $70 million for the 2007-2008 D&O Policy Period.[5]

5.  The insurers for the 2008-2009 D&O Policy Period have recognized coverage for certain of the Legal Proceedings (defined below).  Accordingly, the individual Insureds will look to XL and Chubb, the primary and first excess insurers, respectively, for the 2008-2009 D&O Policy Period, for payment of legal bills and costs that have been accruing since approximately May 12, 2009.  Collectively, XL and Chubb provide $35 million in coverage for the 2008-2009 D&O Policy Period.[6]

6.  As with the Prior Stay Orders, the Debtors seek to assure the insurers that are the subject of this Motion that they can make payment of directors and officers coverage of defense costs and fees without concern that, if the automatic stay is otherwise applicable, they are violating the automatic stay.  Granting the relief requested by this Motion is unlikely to have

---

[5] Specifically, Zurich provides coverage of $15 million in excess of $70 million, ACE provides coverage of $25 million in excess of $85 million and St. Paul provides coverage of $15 million in excess of $110 million.

[6] Specifically, XL provides coverage of an initial $20 million and Chubb provides coverage of $15 million in excess of $20 million.

any adverse effect on the Debtors' estates and creditors because the interests of the Debtors, if any, in the proceeds of the D&O Policies is expressly subordinate to the interest of the individual Insureds. Specifically, the applicable insurance policies provide that the Debtors have rights to the insurance proceeds only after the insured individuals are fully reimbursed for any "Loss," including defense costs. In addition, confirming the insurers' ability to pay such defense costs and fees is in the best interests of the Debtors because it will avoid the possible collateral estoppel effect on the Debtors that could result if the individual Insureds' inability to defend themselves were to give rise to judgments and findings that impacted direct claims against the Debtors or to indemnification claims against the Debtors.

**Background**

7. Commencing on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with this Court voluntary cases under the Bankruptcy Code. The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8. On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code.

9. On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI"). A trustee appointed under SIPA is administering LBI's estate.

10.    On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as examiner in the above-captioned chapter 11 cases (the "Examiner") and by order, dated January 20, 2009 [Docket No. 2583] the Court approved the U.S. Trustee's appointment of the Examiner. On March 11, 2010, the Examiner filed its report with the Court (the "Examiner's Report") [Docket No. 7531].

11.    On April 14, 2010, the Debtors filed their revised joint chapter 11 plan [Docket No. 8330] and disclosure statement for their revised joint chapter 11 plan pursuant to section 1125 of the Bankruptcy Code [Docket No. 8332].

## Jurisdiction

12.    This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Lehman's Business

13.    Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on September 15, 2008 [Docket No. 2].

## Relief Requested

14.    The Debtors request the entry of an order granting relief from the automatic stay provided for in section 362(a) of the Bankruptcy Code, to the extent that it applies, to allow payments and/or advancements by (i) Zurich, ACE and St. Paul for the 2007-2008 D&O Policy Period, and (ii) XL and Chubb for the 2008-2009 D&O Policy Period of Defense Expenses that are, or will become, owing to the Individual Defendants pursuant to the terms of their respective policies.  The Debtors further request that the Court waive the

requirements of Bankruptcy Rule 4001(a)(3) and direct that the order granting the requested relief be effective immediately.

### The Debtors' Directors and Officers Liability Insurance Policies

15.     Pursuant to their advancement and indemnification obligations expressed in their by-laws and certificate of incorporation, the Debtors purchased primary and excess directors and officers liability ("D&O") insurance, which provides coverage for the Debtors' current and former officers, directors, and employees in connection with civil, criminal, regulatory and other actions and investigations.  As noted above, for Claims made against the Individual Defendants during the 2007-2008 D&O Policy Period, the Debtors purchased the primary 2007-2008 D&O Policy and sixteen excess D&O Policies providing, in the aggregate, $250 million in D&O coverage.  Similarly, for Claims made against the Individual Defendants during the 2008-2009 D&O Policy Periods, the Debtors purchased the primary 2008-2009 D&O Policy and seventeen excess D&O Policies providing, in the aggregate, $250 million in D&O Coverage.  Additionally, the Debtors have received authority to purchase a one-year "tail" or "run-off" extension of the 2008-2009 D&O Policies, extending the period during which notice of claims may be made under 2008-2009 D&O Policies from May 16, 2010 through and including May 16, 2011.  *See* Docket No. 9643.

16.     Subject to their terms, conditions, limitations and exclusions, the 2007-2008 D&O Policies and the 2008-2009 D&O Policies cover Loss (including Defense Expenses, settlements and judgments, among other things) incurred as a result of Claims made during the Policy Period for Wrongful Acts allegedly committed by the Individual Defendants in their capacity as directors, officers or employees of LBHI and its subsidiaries.  Coverage under Insuring Agreement (A) for non-indemnifiable loss ("Side A") of the D&O Policies is immediately available to Insured Persons, which includes certain of the Debtors' present and

former officers, directors, and employees, for any Loss resulting from Claims made under the D&O Policies that is not otherwise advanced or indemnified by the Debtors by reason of their financial insolvency.

17.     Furthermore, both the 2007-2008 D&O Policies and the 2008-2009 D&O Policies contain "Priority of Payments" provisions, which provide that when competing claims for coverage under both Side A, as described above, and Insuring Agreement (B) (covering indemnifiable Claims made against present and former officers, directors and employees) are made, "the Insurer shall pay that Loss, if any, which the Insurer may be liable to pay on behalf of the Insured Persons under Insuring Agreement (A)… ." *See* 2007-2008 D&O Policies, Endorsement 22; 2008-2009 D&O Policies, Endorsement 11.  Thus, each of the D&O Policies, by virtue of Insuring Agreement A and the Priority of Payments clauses, provides for the immediate payment of the Individual Defendants' Defense Expenses ahead of any payment that may be made to the Debtors.

## The Legal Proceedings

18.     Certain former and current directors, officers, and employees of the Debtors (collectively, the "Individual Defendants") are defendants in one or more of multiple civil actions brought on behalf of purported classes and individuals and/or are within the scope of certain arbitrations or criminal, regulatory or other investigations (collectively, the "Legal Proceedings") described below.  Though Debtors were named as defendants in some of the Legal Proceedings, they are not participating in those proceedings pursuant to the automatic stay.

19.     Both prior to and after the collapse of the Lehman enterprise in September 2008, various securities actions were commenced against certain officers and directors in both federal and state court.  Many of these actions assert, among other claims, violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and sections 11, 12 and 15 of the

Securities Act of 1933 (the "<u>Securities Act</u>"), and arise from various alleged wrongful actions of certain Individual Defendants in connection with securities issued by LBHI. Most of these actions have been consolidated at least for pre-trial purposes before the Honorable Lewis Kaplan in the United States District Court for the Southern District of New York. A second set of actions alleging violations of sections 11, 12, and 15 of the Securities Act arise from alleged wrongful actions of certain of the Individual Defendants in connection with the plaintiffs' purchase of mortgage-backed securities. These actions have been consolidated and are also before Judge Kaplan. There are additional actions, investigations and arbitrations against certain Individual Defendants arising out of Lehman-issued securities, auction-rate securities, issues common to the class actions and other alleged conduct of the Individual Defendants, asserting claims under the federal securities laws, various state laws and/or common law, and arising from various allegedly wrongful actions of certain of the Individual Defendants.

20. Additionally, both the United States Department of Justice (by and through the United States Attorney's Offices for the Southern and Eastern Districts of New York, and for the District of New Jersey) as well as the United States Securities and Exchange Commission and the New Jersey Bureau of Securities, have commenced formal grand jury and regulatory investigations concerning the circumstances surrounding the collapse of the Lehman enterprise and have issued various requests and subpoenas to both the Debtors and various Individual Defendants.

21. In connection with the Legal Proceedings, the Individual Defendants have incurred and will continue to incur Defense Expenses. Prior to the Commencement Date, in the ordinary course of business and pursuant to the terms of their by-laws, the Debtors indemnified and covered their officers and directors for defense costs incurred in legal proceedings.

Case: 19-30088   Doc# 5374-11   Filed: 07/18/19   Entered: 07/18/19 05:56:59   Page 45 of 178

Subsequent to the Commencement Date, however, the Debtors have been unable to continue to advance defense costs to the Individual Defendants. That is why the Debtors sought the Prior Stay Orders and why they have filed the Settlement Advancement Motion. As noted above, however, the existing layers of D&O coverage for which stay relief has been authorized under the 2007-2008 D&O Policies have been, or will shortly become, exhausted. Thus, the obligations of Zurich, ACE and St. Paul for the 2007-2008 D&O Policy Period will soon be triggered. Similarly, because XL and Chubb have recognized coverage for certain of the Legal Proceedings for the 2008-2009 D&O Policy Period, the Individual Defendants will be looking to XL and Chubb for payment of their outstanding defenses costs and fees under the 2008-2009 D&O Policies. Accordingly, the Debtors are seeking the relief requested herein to ensure that the Individual Defendants will continue to have access to funding of additional defense costs under, and consistent with, the terms of the respective policies of these insurers.

### Cause Exists to Grant the Relief Requested

22. Pursuant to the Prior Stay Orders, this Court has granted relief that is identical to the relief sought in this Motion, based on rights and obligations *vis-à-vis* the Debtors and Individual Defendants that are governed by the same terms and conditions. Accordingly, because cause to modify the automatic stay to allow for the advancement of insurance proceeds to pay defense costs was found to exist in the Prior Stay Orders, *a fortiori*, such cause exists here as well. If, however, the Debtors must independently demonstrate that such cause exists, as described below, it is beyond peradventure that such a modification of the automatic stay is warranted.

A.      The Policy Proceeds Are Not Property of the Estate

         23.      Section 362(a)(3) of the Bankruptcy Code provides for an automatic stay

of any action seeking to obtain possession or exercise control over property of the bankruptcy

estate.  It is well settled that insurance policies are property of the estate and covered by the

automatic stay provisions of the Bankruptcy Code.  *See MacArthur Co. v. Johns-Manville Corp.*,

837 F.2d 89 (2d Cir 1988).  However, courts have distinguished between ownership of a *policy*

and ownership of the *proceeds* of a policy.  While courts have not been uniform in their analysis,

where a policy provides for payment only to a third party – such as payments to officers and

directors under an executive insurance policy – or where the debtor has a right of coverage or

indemnification, but such right is hypothetical or speculative, courts have held that the proceeds

of such policy are not property of the bankruptcy estate.  *See, e.g.*, *In re Adelphia Commc'ns

Corp.*, 298 B.R. 49, 53 (S.D.N.Y. 2003) (holding that insurance proceeds were not property of

the estate where it had not been suggested that debtors had made any payment for which they

may be entitled to indemnification under policy or that any such payments were then

contemplated); *In re Allied Digital Techs., Corp.*, 306 B.R. 505, 510 (Bankr. D. Del. 2004)

(holding that proceeds of D&O insurance policy were not property of the estate where debtor's

indemnification right under the policy was speculative and direct coverage of debtor under

policy was hypothetical); *In re La. World Exposition, Inc.*, 832 F.2d 1391, 1401 (5th Cir. 1987)

(holding that proceeds of a D&O policy belonged only to the officers and directors and,

therefore, were not property of the estate); *In re World Health Alternatives, Inc.*, 369 B.R. 805,

809 (Bankr. D. Del. 2007) (when proceeds of a policy are payable to the directors and officers

and not the estate, the proceeds are not property of the estate); *see In re First Cent. Fin. Corp.*,

Case: 19-30088    Doc# 5374-11   Filed: 07/14/20   Entered: 07/14/20 15:56:59   Page
47 of 78

238 B.R. 9, 18 (Bankr. E.D.N.Y. 1999) (holding that circumstances that may give rise to entity coverage were highly remote and therefore proceeds were not property of estate).

24. In determining whether proceeds are property of the estate, courts review the "language and scope of the policy at issue." *Allied Digital*, 306 B.R. at 509. *See also In re CyberMedica, Inc.*, 280 B.R. 12, 16 (Bankr. D. Mass. 2002); *In re Jones*, 179 B.R. 450, 455 (Bankr. E.D. Pa. 1995) (respective rights of debtors and non-debtors to insurance proceeds "must be ascertained by reference to the parties' contractual rights pursuant to the interpretation of the pertinent contractual provisions under applicable state law").

25. Here, the 2007-2008 D&O Policies and the 2008-2009 D&O Policies contain unambiguous priority of payment provisions that expressly subordinate any potential rights of the Debtors to proceeds payable under the policies to the rights of the Individual Defendants. The priority of payment endorsements are enforceable contractual provisions and should be upheld for the benefit of the Individual Defendants as intended. *See In re Enron Corp.*, Case No. 01-16034 (Bankr. S.D.N.Y. Apr. 11, 2002) [Docket No. 3278] (holding that priority of payment provision was an enforceable contractual right).[7]

26. Consistent with the purpose of such policies, the Debtors purchased the 2007-2008 D&O Policies and 2008-2009 D&O Policies primarily to provide insurance coverage to their officers and directors, including the Individual Defendants. *See In re First Cent. Fin. Corp.*, 238 B.R. 9, 16 (Bankr. E.D.N.Y. 1999) ("In essence and at its core, a D&O Policy remains a safeguard of officer and director interests and not a vehicle for corporate protection."). The Debtors' speculative rights to any residual proceeds, which would be payable only in the event that the Debtors indemnified the Individual Defendants and which are subject to an express

---

[7] A copy of the Court's bench ruling in *Enron* is attached hereto at <u>Exhibit G</u>.

contractual subordination provision, should not alter the conclusion that the proceeds should not constitute property of the Debtors' estates.

**B.**    **Cause Exists to Modify the Automatic Stay, to the Extent**
    <u>That it Applies, to Allow Payment of Defense Costs Under the Policies.</u>

27.    Even if the proceeds of the policies are determined to be property of the estate, "cause" exists under section 362(d)(1) of the Bankruptcy Code to modify the automatic stay to allow the payment of defense costs under the applicable policies.  It is not uncommon for courts to grant stay relief to allow payment of defense costs or settlement costs to directors and officers, especially when there is no evidence that direct coverage of the debtor will be necessary.  *See Allied Digital*, 306 B.R. at 513.

28.    Allowing the insurers to advance defense costs and fees to the Individual Defendants will, in fact, benefit the Debtors' estates.  The Legal Proceedings are highly complex.  If the Individual Defendants are not adequately represented, it is foreseeable that a finding of wrongdoing or liability against the Individual Defendants may be used, or attempted to be used, to judicially prejudice or prosecute claims against the Debtors.  Granting the requested relief will also alleviate the Individual Defendants' concern that they will personally be liable for their own defense costs.

29.    Additionally, the Debtors believe that they have an obligation under their by-laws to advance the defense costs and fees incurred by the Individual Defendants.  In connection with the Legal Proceedings, the Individual Defendants have and will continue to incur significant defense costs, which, if unsatisfied, may potentially be asserted by some or all of the Individual Defendants against the Debtors' estates.[8]  Consequently, coverage of the

---

[8] Certain of the Individual Defendants have filed protective proofs of claim against the Debtors.

Individual Defendants under the Policies will reduce or eliminate the claims that the Individual Defendants could assert against the Debtors.

30.     Modifying the automatic stay will not harm the Debtors' estates. As explained above, any rights the Debtors have to the proceeds of the D&O Policies are contractually subordinated to the rights of the Individual Defendants pursuant to the priority of payments clauses. In addition, at this time, the Debtors' need for coverage is speculative given that the Debtors are not making advancements to the Individual Defendants during the chapter 11 cases for their defense costs.

31.     Accordingly, the Debtors respectfully submit that there are no legal impediments to the direct payment or advancement by the Insurers under their respective D&O Policies to the Individual Defendants for their costs of defense. Alternatively, if this Court finds that the Debtors have some interest in the proceeds of the D&O Policies, the Debtors submit that any such interest is nominal and in any event cannot be determined until the Individual Defendants' losses have been quantified and paid. Advancing the Individual Defendants' defense costs pursuant to the D&O Policies is necessary to minimize those losses. Accordingly, cause exists to modify the automatic stay pursuant to section 362(d) of the Bankruptcy Code, to the extent it applies, to allow the Zurich, ACE, St. Paul, XL and Chubb to immediately commence payment of outstanding and ongoing defense costs incurred by the Individual Defendants pursuant to the terms and conditions of their respective D&O Policies.

32.     In making this motion, the Debtors, the Individual Defendants and the Insurers are not waiving any of their respective rights under the D&O Policies. In addition, the Debtors are not seeking an advance determination of the insurers' obligations to pay any particular expense or claim of the Individual Defendants. Rather, the Debtors seek only the entry

of an order modifying the automatic stay, to the extent applicable, to allow these insurers to fulfill their obligations, whatever they may be, to pay Defense Expenses of the Individual Defendants under the terms of the respective D&O Policies, including amounts incurred both pre and post-petition, if and when they arise.

### Waiver of Bankruptcy Rule 4001(a)(3)

33.     To facilitate a smooth transition and avoid any interruption in coverage, the Debtors request that the order granting the Motion be effective immediately.

### Notice

34.     No trustee has been appointed in these cases.  The Debtors have served notice of this Motion in accordance with the procedures set forth in the second amended order entered on June 17, 2010 governing case management and administrative procedures for these cases [Docket No. 9635] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) all parties who have requested notice in these chapter 11 cases; and (vii) attorneys for each of Zurich, Ace, St. Paul, XL and Chubb. The Debtors submit that no other or further notice need be provided.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as is just.

Dated: October 27, 2010
New York, New York

/s/ Richard P. Krasnow
Richard P. Krasnow

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

US_ACTIVE:\43530682\07\58399.0003

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Greg A. Danilow, Esq. (GD 1621)
Marcia L. Goldstein, Esq. (MG 2606)
Paul M. Basta, Esq. (PB 4434)
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York  10153-0119
Phone:  (212) 310-8000
Facsimile:  (212) 310-8007

Counsel for Thomas H. Lee Partners, L.P.,
Thomas H. Lee, David V. Harkins,
Scott L. Jaekel, Scott A. Schoen,
Ronald O'Kelley, Nathan Gantcher and
Leo A. Breitman

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
                                                    :    Chapter 11
                                                    :
In re:                                              :
                                                    :    Case No. 05-60006 (RDD)
Refco Inc., *et al.*,                               :
                                                    :    (Jointly Administered)
                    Debtors.                        :
                                                    :
--------------------------------------------------------X

**RESPONSE OF THOMAS H. LEE, DAVID V. HARKINS, SCOTT L.
JAEKEL, SCOTT A. SCHOEN, RONALD O'KELLEY, NATHAN
GANTCHER AND LEO A. BREITMAN TO THE OBJECTION OF OFFICIAL
COMMITTEE OF UNSECURED CREDITORS TO THE MOTION OF
U.S. SPECIALTY INSURANCE CO. FOR RELIEF FROM STAY, TO
THE EXTENT APPLICABLE, TO ADVANCE AND/OR PAY CERTAIN
DEFENSE COSTS UNDER DIRECTORS AND OFFICERS LIABILITY POLICY**

       Thomas H. Lee, David V. Harkins, Scott L. Jaekel, Scott A. Schoen, Ronald

O'Kelley, Nathan Gantcher and Leo A. Breitman (collectively, the "***Respondents***"), by and

through their undersigned counsel, Weil, Gotshal & Manges LLP, hereby respectfully respond

to the Objection of the Official Committee Of Unsecured Creditors to the Motion of U.S.

Specialty Insurance Co. for Relief from Stay, to the Extent Applicable, to Advance and/or Pay

Certain Defense Costs Under Directors and Officers Liability Policy ("**Committee**

**Objection**") as follows:

1.      There is no basis whatsoever to deny the Respondents access to the insurance

that was put in place for the exact purpose of covering the Respondents' Defense Costs (as

defined below).  Accordingly, the Committee Objection should be overruled.

2.      The facts are straight forward.  Prior to the commencement of these chapter 11

cases by Refco Inc. ("**Refco**") and certain of its subsidiaries and affiliates (collectively with

Refco, the "**Debtors**"), U.S. Specialty issued "Directors, Officers and Corporate Liability

Insurance Policy" No. 24-MGU-05-A10821 (the "**Policy**") to Refco for the claims-made

period of August 11, 2005 to August 11, 2006, providing coverage up to a maximum

aggregate limit of liability of $10 million, including Defense Costs.[1]  Specifically, the Policy

contains five insuring agreements as follows:

> **Policy Insuring Agreement A,** insuring directors and officers
> of the Company for Loss (which, by definition, includes
> Defense Costs), incurred by such parties for claims if such Loss
> is not indemnified by the Company (the "**D&O Coverage**");

> **Policy Insuring Agreement B(1),** insuring the Company to the
> extent it indemnifies the officers and directors for any covered
> Loss;

> **Policy Insuring Agreement B(2),** insuring the Company for
> Loss incurred in connection with Securities Claims asserted
> against the Company;

> **Policy Endorsement No. 11,** insuring the Company, up to
> $250,000, for all Derivative Demand Investigative Costs;[2] and

---

[1] Capitalized terms used, but not otherwise defined herein, shall have the meanings ascribed to them in the Policy.  Because a detailed description of the Policy is set forth in the U.S. Specialty Motion, such description is not repeated herein, but is incorporated herein by reference.

[2] Policy Insuring Agreement B(1), Policy Insuring Agreement B(2), and Policy Endorsement No. 11 are hereinafter collectively referred to as the "**Subordinated Company Coverage**."

**Policy Endorsement No. 15,** insuring Philip R. Bennett
("**Bennett**") for Loss incurred in connection with Securities
Claims asserted against him, provided one or more Insured
Persons and/or the Company are and remain co-defendant(s) in
such Securities Claim.

3.    Furthermore, the Policy contains a "priority of payments" provision whereby

covered Loss payable under one or more of the foregoing agreements and/or endorsements, in

apparent excess of the policy limit of liability, shall be provided first under the D&O

Coverage, followed by payments under the Subordinated Company Coverage and Policy

Endorsement No. 15 (the "**Priority of Payments Provision**").  See Policy Conditions D(4).

4.    After certain disclosures were made by the Debtors, on or about October 10,

2005 and thereafter, concerning a large receivable allegedly owed by Bennett or a Bennett-

controlled entity to the Debtors, approximately 14 securities class actions (which have since

been consolidated) and other related actions (collectively, the "**Pending Actions**") were filed

against the Respondents, among others, arising out of the events in question.  Respondents

and other insureds have engaged counsel to defend them in the Pending Actions.  All Pending

Actions were immediately and timely submitted to U.S. Specialty and Refco's excess

directors and officers insurance carriers for coverage under the Policy.  To date, the

Respondents, Bennett and others have submitted claims for payment of Defense Costs

incurred in connection with the Pending Actions under Policy Insuring Agreement A.  The

Priority of Payments provision requires that such costs be paid first, ahead of other insureds,

under the Policy.

5.    On January 26, 2006, U.S. Specialty filed the Motion of U.S. Specialty

Insurance Co. for Relief from Stay, to the Extent Applicable, to Advance and/or Pay Certain

Defense Costs Under Directors and Officers Liability Policy (the "**U.S. Specialty Motion**")

seeking, *inter alia*, an order modifying the automatic stay pursuant to section 362 of the

Bankruptcy Code to permit U.S. Specialty to make payments and/or advancements of Defense

Costs to insured directors and officers in various pending lawsuits and proceedings filed

against them, as well as other proceedings that may be filed in the future.  The hearing to

consider the U.S. Specialty Motion has been adjourned to March 23, 2006.

6.      On March 7, 2006, the Committee filed the Committee Objection, asserting,

*inter alia*, that U.S. Specialty cannot establish the requisite "cause" to modify the automatic

stay required pursuant to section 362(d) of the Bankruptcy Code or, alternatively, this Court

should invoke its equitable power pursuant to section 105(a) of the Bankruptcy Code to

prevent the payment of the Defense Costs to Bennett.  The Committee Objection reserved its

right to attack any payment of the Defense Costs to the Respondents, noting "each such

request would raise unique issues that the Committee would have to assess on a case-by-case

basis."  See Committee Objection at 2 n.1.

### Relief Requested

7.      Notwithstanding the fact that the Committee Objection is directed against

payment of Defense Costs to Bennett, the relief requested therein implicitly and improperly

seeks to limit Respondents' right to the D&O Coverage under the Policy.  Although the

Respondents agree that the allegations against Bennett are egregious, they do not constitute a

basis for denying him D&O Coverage, let alone denying coverage to Refco's other directors

and officers who have already suffered from Bennett's actions.  The law, summarily

dismissed in a footnote in the Committee Objection, is clear.  The automatic stay does not

prohibit the advancement and/or payment of the Defense Costs to the Respondents.

8.      Accordingly, the Respondents respectfully request that this Court overrule the

Committee Objection and grant relief sought by the U.S. Specialty Motion because the

proceeds of the Policy, including the Defense Costs at issue, are not property of the Debtors'
estates.  Assuming, arguendo, such proceeds were property of the Debtors' estates, "cause"
clearly exists pursuant to section 362(d) of the Bankruptcy Code to modify the automatic stay
to permit the advancement of reasonable and necessary Defense Costs incurred by the
Respondents, among others, in the various pending legal proceedings and those which may be
filed in the future.

**Argument**

**A.    The Policy Proceeds, Including the Defense Costs, Are Not
Property of the Estate and, Therefore, the Automatic Stay Does Not Apply.**

9.    When a debtor has no legally recognizable claim to the proceeds of an
insurance policy, the proceeds are not considered property of the estate.  See Houston v.
Edgeworth (In re Edgeworth), 993 F.2d 51, 53 (5th Cir. 1993) (noting that if debtor does not
have the right to keep proceeds when paid by the insurer, proceeds are not property of the
estate and cannot otherwise enhance the estate for the benefit of other creditors).

10.    Indeed, several courts, including those in this district, have held that the
proceeds of a liability insurance policy are not property of a debtor's estate if, under the terms
of the policy, the directors and officers are entitled to those proceeds.  In re Adelphia
Communications Corp., 298 B.R. 49, 53-54 (S.D.N.Y. 2003) (finding debtors did not have
property interest in proceeds of director and officer policies, despite indemnification coverage
and entity coverage for securities claims for the debtors, particularly where no
indemnification payments had been made by the debtors); In re First Cent. Fin. Corp., 238
B.R. 9, 21 (Bankr. E.D.N.Y. 1999) (finding proceeds not property of the estate despite
coverage of both the directors and officers and the debtors, noting that no claims were filed
against the debtors); Louisiana World Exposition, 832 F.2d 1391, 1400 (5th Cir. 1987)

(creditors of a bankrupt corporation were unsuccessful in seeking to prevent use of director

and officer policy proceeds to pay for legal expenses as proceeds were not part of the

bankruptcy estate); In re Youngstown Osteopathic Ass'n, 271 B.R. 544 (Bankr. N.D. Ohio

2002) (same); In re CHS Elecs., Inc., 261 B.R. 538 (Bankr. S.D. Fla. 2001) (same); In re

Daisy Sys. Sec. Litig., 132 B.R. 752, 755 (N.D. Cal. 1991) (proceeds of director and officer

policies not assets of the bankruptcy estate); Duval v. Gleason, 1990 WL 261364 at *5 (N.D.

Cal. Oct. 19, 1990) (in distinguishing between policy and its proceeds, court held proceeds

were not property of the estate even though policies were property of the estate; automatic

stay did not apply since litigation against the nonbankrupt parties would affect only the

proceeds, not the policy).

        11.    Under the express terms of the Policy, the right to receive the D&O Coverage

belongs, in the first instance, to the Company's directors and officers.  Specifically, the Policy

states the "Insurer will pay to or on behalf of Insured Persons Loss . . . except when and to the

extent that the Company has paid such Loss on behalf of the Insured Persons as

indemnification or advancement. . . ."  See Policy, annexed to the U.S. Specialty Motion as

Exhibit A.  Since the Debtors have no right to such D&O Coverage, it is not part of their

estate and, therefore, the Committee cannot dictate which insured are entitled to receive

Defense Costs or when such Defense Costs can be distributed.

        12.    Furthermore, any right of the Debtors to receive payment of the proceeds is

subordinated to the rights of the Company's directors and officers pursuant to the Priority of

Payments Provision.  This provision expressly subordinates the Subordinated Company

Coverage to the rights of the directors and officers to receive payment of proceeds under the

Policy.  Notably, any alleged right of the Debtors to the Subordinated Company Coverage

assumes that they have made payments or incurred Loss entitling them to such Subordinated Company Coverage, which is not the case.

13.    Specifically, no claims have been made that would invoke the coverage provided to the Debtors under Policy Insuring Agreement B(1).  The Debtors have not indemnified Respondents for any Loss, indeed the Respondents have not even requested indemnification and may be precluded from doing so by the commencement of the Debtors' bankruptcy proceedings if the indemnification claims arise from prepetition acts or actions.

14.    The lack of any such claims is significant.  Courts, including those in this district, consider the proceeds of a director and officer insurance policy property of a debtor's estate only when there is an *actual claim* for indemnification.  See Adelphia, 298 B.R. at 53-54 (where none of the debtors ever made payments for which they would be entitled to indemnification coverage, or committed themselves to payments using their entity coverage, claiming debtors had a property interest in proceeds was nonsensical; prospective possibility of payments for which they would be entitled to indemnification coverage was insufficient to grant debtors a cognizable equitable and legal interest in the proceeds); cf.  In re Allied Digital Techs., Corp., 306 B.R. 505, 512 (Bankr. D. Del. 2004) (finding the proceeds are not property of the estate when indemnification claims are hypothetical or speculative) (citing In re Imperial Corp. of Am., 144 B.R. 115, 118-119 (Bankr. S.D. Cal. 1992) for proposition that although indemnification coverage was provided in policy, proceeds were not property of the estate).

15.    In the case of the Debtors, the Policy requires actual payment of indemnified costs before the coverage will either be denied to the Respondents under the D&O Coverage or given to the Debtors under Policy Insuring Agreement B(1).  Neither has occurred, and the

possibility that any such payments would be made is speculative at best.  Therefore, as in

Adelphia, any claim that the Debtors have a property interest in the proceeds is without merit

because the Debtors have not actually paid indemnification costs.  See Adelphia, 298 B.R. at

53-54.

16.    In addition, notwithstanding the lawsuits pending against the Debtors that may

invoke the coverage for Loss relating to Securities Claims pursuant to Insuring Agreement

B(2), it is equally theoretical and speculative that any Securities Claims would result in Loss

to the Debtors for which coverage could be invoked, given that no judgment has been

rendered in any such suit.  If, however, such claims were ultimately successful, the payment

of any damages in connection therewith is likewise theoretical because any Securities Claim

would be statutorily subordinated to the payment of general unsecured claims pursuant to

section 510(b) of the Bankruptcy Code.  As a result, no plaintiff would receive payment on

account of its Securities Claim (thereby triggering the Debtors' right to coverage) unless each

unsecured claim were paid in full.  As the bankruptcy court in Adelphia noted:

> [Securities claim coverage] is rarely meaningful in bankruptcy
> cases (even in chapter 11 cases), because under section 510(b)
> of the Code, claims for securities fraud – claims "arising from
> rescission of a purchase or sale" of a security, or for damages
> arising from such – are subordinated to claims that are senior or
> equal in priority, and since there are rarely enough assets to pay
> all creditors in full, debtors rarely are in a position (and do not
> have a need) to make distributions on more junior claims.

In Adelphia Communications Corp, 285 B.R. 580, 592 n. 13 (Bankr. S.D.N.Y. 2002).

17.    Therefore, any property interest the Debtors have in the proceeds would be

limited to possible claims for Defense Costs incurred in connection with any Securities

Claims and any coverage pursuant to Policy Endorsement No. 11.  As with Policy Insuring

Agreement B(1), none of the Debtors have made payments invoking their entity coverage or

otherwise taken action to invoke coverage under Policy Endorsement No. 11.  Thus,

"[c]laiming the debtors now have a property interest in those proceeds makes no sense at this

juncture."  Adelphia, 298 B.R. at 53 (holding in such a circumstance "[n]o cognizable

equitable and legal interest in the proceeds from the D&O policies has arisen here.  Without

legal and equitable interest in the proceeds, Adelphia's estate cannot be ascribed to hold a

property interest in those proceeds").

18.    In addition, any interest of the Debtors in coverage under the Policy is

contractually subordinated to the payment rights of the Respondents, due to express and

unequivocal terms of the Priority of Payments Provision which deprives the Debtors of any

rights to payment under the Policy ahead of Respondents.

19.    Accordingly, unlike other policies, where a debtor's entity coverage competes

for proceeds with the directors and officers liability portion of the policy, such competition

has been eliminated via the contractually negotiated subordination of the Debtors' interests in

the proceeds of the Policy.

20.    For the foregoing reasons, the Debtors are not be entitled to the proceeds of the

Policy.  Such proceeds should not be considered property of the Debtors' estate and the

automatic stay should not bar the Respondents from receiving payment and/or advancement

of Defense Costs from U.S. Specialty.

**B.    Notwithstanding the Foregoing, Sufficient "Cause" Exists
Pursuant to Section 362(d) of the Bankruptcy Code to
Modify the Automatic Stay as Requested in the U.S. Specialty Motion.**

21.    Alternatively, Respondents respectfully request this Court grant the U.S.

Specialty Motion modifying the automatic stay to the extent necessary to permit the

Case: 19-30088    Doc# 5374-11    Filed: 07/14/20    Entered: 07/14/20 15:56:59    Page 10
of 168

Case: 19-30088    Doc# 5374-11    Filed: 07/14/20    Entered: 07/14/20 15:56:59    Page 62 of 78

reimbursement of Defense Costs subject to the terms and conditions of the Policy because "cause" clearly exists.

22.     Section 362(d) of the Bankruptcy Code provides that a bankruptcy court shall grant relief from the automatic stay "for cause."  11 U.S.C. § 362(d)(1).  In determining whether cause exists for granting relief from the automatic stay, courts balance the harm to the debtor if the stay is modified with the harm to parties prevented from exercising their rights under an insurance policy.  See In re CyberMedica, Inc., 280 B.R. 12, 19-20 (Bankr. D. Mass. 2002) (although D&O proceeds are considered property of estate, directors and officers were entitled to relief from stay in order to seek payment of defense costs under policy).  Similarly, it is common for a bankruptcy court to grant relief from the automatic stay to allow payment of defense costs or settlement costs to the directors and officers.  See id.; see also In re CHS Elecs., Inc., 261 B.R. 538, 544 (Bankr. S.D. Fla. 2001) (relief from stay granted to settle claims from directors and officers policy, reasoning that there was no actual possibility of a claim based on entity coverage).

23.     This Court has held under similar facts that notwithstanding the presence of entity coverage for a debtor, the presence of the Priority of Payments Provision, provides the requisite "cause" to modify the automatic stay.  See In re Enron, No. 01-16034, 2002 Bankr. LEXIS 544 (Bankr. S.D.N.Y. May 17, 2002) (permitting advancement of defense costs under a directors and officers insurance policy based on the presence of a priority of payments provision, notwithstanding direct coverage for the debtors); Adelphia, 285 B.R. at 586-87 (noting that "priority of payments" endorsements provide that payments on account of defense costs of directors and officers come ahead of payments for indemnification coverage and/or entity coverage and such provisions made Judge Gonzalez's decision to modify the

stay in Enron "an even easier case"); see also In re Lernout & Hauspie Speech Products, N.V.,

Case No. 00-4397 – 00-4399 (Wizmur, J.), pp. 44, 47-49 (Bankr. D. Del. May 8, 2001)

(granting motion by movant for payment of defense costs and holding that order of payments

endorsement barred the debtor from preventing payment of director and officer defense costs

with policy proceeds ruling "I am convinced that [movant's argument] that the directors and

officers have an independent right to assert their present interest in the proceeds on the face of

the policy must be recognized, and that [movant] is under a contractual obligation to act in

conformance with that contract . . . that the outcome of that action will be to reduce the pool

available to [the debtor] is understood, is inevitable, is the reality of this kind coverage, and

cannot bar the relief that is requested."); In re Jones, 179 B.R. 450, 455 (Bankr. E.D. Pa.

1995) (in hazard insurance policy context, parties' right to proceeds must be ascertained by

reference to the parties' contractual rights pursuant to the interpretation of pertinent

contractual provisions under applicable state law).

     24.     This case presents similar facts as In re Enron, where the directors and officers

insurance policy at issue contained: (a) coverage for officers and directors; and

(b) indemnification and entity coverage for the debtor. See Tr. of Hrg. of April 11, 2002 at

13-14, lns 2-5, a copy of which is annexed to the U.S. Specialty Motion as Exhibit B.  The

policy at issue in Enron also provided that "directors have a right to advancement of defense

costs under a priority of payments endorsement."  Id. at 13, lns. 6-9.  Under similar facts, this

Court recognized the express subordination of the debtors' claims under the policy and held

"any directors and officers currently due defense costs covered by the policy must be paid

from the proceeds of the policy first.  The [d]ebtors are then entitled to have their own claims

for defense costs paid."  Id. at 13, lns. 14-20.  In so holding, this Court recognized that

payments to the directors and officers would negatively impact the debtors' interest in the insurance proceeds because "that result is dictated by the negotiated terms of the policy." Id. at 14, lns. 7-9. The same reasoning applies here.

25.    Furthermore, as is customary with respect to directors and officers insurance policies, such policies are intended primarily for the protection of directors and officers and, as such, should not be subject to the automatic stay. See Adelphia, 285 B.R. at 593 ("[I]n essence and at its core, a D&O policy remains a safeguard of officer and director interest and not a vehicle for corporate protection.") (quoting In re First Cent. Fin. Corp., 238 B.R. at 16). "[I]f officers and directors are to serve, they need to have comfort in knowing that bankruptcy courts will be slow in depriving them of contractual rights under the D&O policies upon which they may have relief in agreeing to serve." Adelphia, 285 B.R. at 598.

26.    Prohibiting the advancement of the Defense Costs to the Respondents by sustaining the Committee Objection would be in contravention to the historical purpose of directors and officers insurance policies and deprive Respondents of their express and unequivocal contractual right to the proceeds of the Policy, all at a time when such proceeds are being sought for the purpose for which they exist.

27.    Accordingly, "cause" exists to modify the automatic stay to permit U.S. Specialty to make payment of the Defense Costs under the Policy.

**C.    Contrary to Committee's Position, it Would Be Inequitable to Prevent Respondents From Exercising Their Contracted-For Entitlement to the Insurance Proceeds Based Solely Upon Allegations Against Bennett.**

28.    The Committees' alternative argument is if this Court finds "cause" to modify the automatic stay, it should nonetheless invoke its broad equitable power under section 105(a) of the Bankruptcy Code to "prevent further dubious benefit of Bennett" and because

"U.S. Specialty has not demonstrated any benefit to the Debtors' estates in paying out

millions of dollars under the Policy for the benefit of a former officer and director who, based

upon all that is currently known to the Committee, may very well be guilty of wrongdoing of

which he is accused."  See Committee Objection at 7-8.  The Committee Objection posits that

based upon the foregoing, "common sense and basic equitable principles dictate" that the U.S.

Specialty Motion be denied.

29.     The Committee's basis for this Court to invoke section 105(a) of the

Bankruptcy Code fails to recognize that other insureds who are vigorously defending

themselves in lawsuits, namely the Respondents, are also beneficiaries under the Insurance

Policies.  The Committee does not, and cannot, allege the same inequity exists with respect to

the Respondents, who are suffering the same ill effects of the circumstances surrounding the

Debtors' commencement of these chapter 11 cases as other parties in interest and are being

forced to defend themselves based on allegations of wrongdoing attributable to other parties.

Accordingly, the Committee's argument is wholly inapplicable to the advancement of the

Defense Costs to the Respondents and this Court should not eviscerate the Respondents'

contractual rights under the Policy.  See Adelphia, 285 B.R. at 598 ("bankruptcy courts

should be wary of impairing the contractual rights of directors and officers even in cases

where the policies provide entity coverage").

## Waiver of Memorandum of Law

30.     This response does not raise any novel issues of law and includes citations to

authorities applicable hereto.  Accordingly, Respondents respectfully request that this Court

waive the requirement contained in Rule 9013-1(b) of the Local Bankruptcy Rules for the

Southern District of New York that they file a separate memorandum of law in support of this response.

### Notice

31.    Notice of this response has been provided to: (a) the Debtors, One World Financial Center, 200 Liberty Street, Tower A, New York, New York 10281, Attention: General Counsel; (b) Skadden, Arps, Slate, Meager & Flom LLP, counsel to the Debtors, Four Time Square, New York, New York 10036, Attention: J. Gregory Milmoe, Esq.; (c) Milbank, Tweed, Hadley & McCloy LLP, counsel to the Committee, One Chase Manhattan Plaza, New York, New York 10005, Attention: Luc A. Despins, Esq.; (d) Davis Polk & Wardell, counsel for the administrative agent for the Debtors' prepetition bank lender, 450 Lexington Avenue, New York, New York 10017, Attention: Thomas A. Tormey; (e) the Office of the United States Trustee, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attention: Andrew Velez-Rivera, Esq.; (f) Farrell Fritz, P.C., co-counsel for U.S. Specialty, 1320 Reckson Plaza, Uniondale, New York 11556, Attention: Louis A. Scarcella; and (g) Ross, Dixon & Bell, LLP, co-counsel for U.S. Specialty, 2001 K Street, N.W., Washington, D.C. 20006, Attention: Leslie S. Ahari.  Respondents submit that no other or further notice need be provided.

WHEREFORE the Respondents respectfully request entry of an order

(a) overruling the Committee Objection; (b) granting the relief requested in the U.S. Specialty

Motion; and (c) granting such other and further relief as this Court may deem just and

appropriate.

Dated: New York, New York
        March 20, 2006

/s/ Paul Basta
Greg A. Danilow, Esq. (GD 1621)
Marcia L. Goldstein, Esq. (MG 2606)
Paul M. Basta, Esq. (PB 4434)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153-0119
Phone:  (212) 310-8000
Facsimile:  (212) 310-8007

Counsel for Thomas H. Lee Partners, L.P.,
Thomas H. Lee, David V. Harkins,
Scott L. Jaekel, Scott A. Schoen,
Ronald O'Kelley, Nathan Gantcher and
Leo A. Breitman

**EXHIBIT E**
**TRANSCRIPT PAGES**
**In re Northwest Airlines Corp., Adv. Pro. No. 06-01219 (Bankr. S.D.N.Y.),**
**Transcript of Hearing Held Mar. 7, 2006**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

```
 1                  UNITED STATES BANKRUPTCY COURT
                    SOUTHERN DISTRICT OF NEW YORK
 2
                                      .
 3   IN RE:                           . Case No. 05-17930 (ALG)
                                      .
 4   NORTHWEST AIRLINES               . New York, New York
     CORPORATION, et al,              . Tuesday, March 7, 2006
 5                                    . 11:15 a.m.
                    Debtors.          .
 6   . . . . . . . . . . . . . . . .

 7                      TRANSCRIPT OF MOTIONS
               BEFORE THE HONORABLE ALLAN L. GROPPER
 8                  UNITED STATES BANKRUPTCY JUDGE

 9   APPEARANCES:

10   For the Debtors:              Bruce R. Zirinsky, Esq.
                                   Gregory M. Petrick, Esq.
11                                 Nathan A. Haynes, Esq.
                                   Mark C. Ellenberg, Esq.
12                                 CADWALADER, WICKERSHAM
                                    & TAFT, LLP
13                                 One World Financial Center
                                   New York, New York 10261
14                                 (212) 504-6000

15   For the Official Committee
     of Unsecured Creditors:       Scott Hazan, Esq
16                                 Todd M. Goren, Esq.
                                   OTTERBOURG, STEINDLER, HOUSTON
17                                  & ROSEN, P.C.
                                   250 Park Avenue
18                                 New York, New York 10169
                                   (212) 661-9100
19
     (Appearances continued)
20
     Audio Operator:              Electronically Recorded
21                                by Court ECRO

22   Transcription Company:       Rand Transcript Service, Inc.
                                  311 Cheyenne Road
23                                Lafayette, New Jersey  07848
                                  (973) 383-6977
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

```
 1    A P P E A R A N C E S:    (Continued)

 2    For the U.S. Trustee:          Brian Shoichi Masumoto, Esq.
                                     OFFICE OF THE U.S. TRUSTEE
 3                                   33 Whitehall, 21st Floor
                                     New York, New York 10004
 4                                   (212) 510-0500

 5    For Dorsey & Whitney:          James V. Parravani, Esq.
                                     DORSEY & WHITNEY, LLP
 6                                   250 Park Avenue
                                     New York, New York 10177
 7                                   (212) 415-9200

 8    For General Foods Credit
      Corp:                          Michael P. Richman, Esq.
 9                                   MAYER, BROWN, ROWE & MAW, LLP
                                     1675 Broadway
10                                   New York, New York 10019
                                     (212) 506-2500
11
      For Michael Levine:            Richard G. Smolev, Esq.
12                                   KAYE SCHOLER, LLP
                                     425 Park Avenue
13                                   New York, New York 10022
                                     (212) 836-8000
14
      For the Retiree Committee:     Vincent E. Lazar, Esq.
15                                   JENNER & BLOCK, LLP
                                     One IBM Plaza
16                                   Chicago, Illinois 60611
                                     (312) 222-9350
17
      For XL Specialty Insurance
18    Company:                       Robert Beau Leonard, Esq.
                                     TORRE, LENTZ, GAMELL, GARY
19                                     & RITTMASTER, LLP
                                     100 Jericho Quadrangle
20                                   Suite 309
                                     Jericho, New York 11753
21                                   (516) 240-8900

22    For BAE Systems, Ltd.:         Kenneth Coleman, Esq.
                                     ALLEN & OVERY, LLP
23                                   1221 Avenue of the Americas
                                     New York, New York 10022
24                                   (212) 610-6300

25
```

```
 1   A P P E A R A N C E S:   (Continued)

 2   For Karpiuk, et al:            Gerald D. Wells, III
                                    SCHIFFRIN & BARROWAY, LLP
 3                                  280 King of Prussia Road
                                    Radnor, Pennsylvania 19087
 4                                  (610) 667-7706

 5                                  Samuel K. Rosen, Esq.
                                    WECHSLER HARWOOD, LLP
 6                                  488 Madison Avenue, 8th Floor
                                    New York, New York 10022
 7                                  (212) 935-7400

 8
     For Gesenhues, et al:          Michael S. Etkin, Esq.
 9                                  LOWENSTEIN SANDLER, P.C.
                                    65 Livingston Avenue
10                                  Roseland, New Jersey 07068
                                    (973) 597-2500

11
                                    Peter Seidman, Esq.
12                                  MILBERG, WEISS, BERSHAD
                                     & SCHULMAN
13                                  One Pennsylvania Plaza
                                    New York, New York 10119
14                                  (212) 594-5300

15

16

17

18

19

20

21

22

23

24

25
```

Argument - Petrick                                    35

1    the debtors.  If the action proceeds against any one of them,

2    the potential prejudice to the debtors exists.

3          THE COURT:  If I stay this action, I think the

4    result would be that any class action brought against any

5    large company in bankruptcy would be stayed.  Is that not the

6    implication of this motion?

7          MR. PETRICK:  Your Honor, I know of no -- in all

8    circumstances -- there may be different circumstances in

9    different cases where class actions should proceed.

10         THE COURT:  Well, you have the --

11         MR. PETRICK:  But certainly --

12         THE COURT:  It would be in almost any case you would

13   have involvement of executives, assuming that the top

14   executives are named which is routine, you have possibility

15   of indemnification claims, you have insurance issues.  What

16   makes this unique?

17         MR. PETRICK:  Your Honor, I think many of the --

18         THE COURT:  It's a complicated case.  It's a large

19   case.  It's a well-managed case with counsel who are being

20   well-compensated.  And there is insurance.  I gather there's

21   a large deductible, if I read the papers correctly.

22         MR. PETRICK:  Yes, Your Honor.

23         THE COURT:  That might be a little unusual.  But

24   what else is unusual about this case?

25         MR. PETRICK:  All of those factors that you've

Court Decision                                                      65

1   Northwest Airlines, et al, for a preliminary injunction to

2   extend the automatic stay of the Bankruptcy Code to cover

3   claims brought against certain president, former officers and

4   directors in several class action lawsuits.

5          As far as I can tell from the record before me,

6   these are, in the vernacular, "plain vanilla" or "garden-

7   variety" class actions brought in the wake of the debtors'

8   bankruptcy filing.  One charges securities fraud; the other

9   contains charges of ERISA liability based upon the purchase

10  of securities of the debtor.

11         This preliminary injunction motion requires the

12  movant to show irreparable injury and a substantial

13  probability of success on the merits, or at least a

14  likelihood of success and a balance of the equities tipping

15  decidedly in the debtors' favor.

16      (Pause in proceedings.)

17      THE COURT:  The debtors quote In Re:  United Health

18  Care Organization, 210 B.R. at 233, for the heavy burden that

19  they must meet, quote:

20          "The first requirement is that there be a danger of

21          imminent irreparable harm to the estate or the

22          debtors' ability to reorganize.  Second, there must

23          be a reasonable likelihood of a successful

24          reorganization.  Third, the Court must balance the

25          relative harm as between the debtor and the

Court Decision                                                66

1            creditor, who would be restrained.  Fourth, the

2            Court must consider the public interest.  This

3            requires a balancing of the public interest and

4            successful bankruptcy reorganizations with competing

5            societal interests."

6            The debtors concede, as they must, that they are not

7    defendants in the class actions.  They make three arguments

8    in support of their having met their burden:

9            First, the debtors argue that they are the real

10   target of the lawsuits.  Plaintiffs concede, as they must,

11   that the debtors will not be bound as a result -- by a result

12   in the litigation adverse to the defendants.  If the company

13   is the real target, the plaintiffs have seriously compromised

14   their case by proceeding against the other defendants only.

15   But that does not constitute grounds to stay the litigation.

16           The debtors further argue that they will be affected

17   by the continuation of the litigation in at least three ways:

18           First, the officers and directors will be diverted

19   by the existence of the litigation at a time when they need

20   to expend all of their energy on the reorganization process.

21   This is a very important consideration and may merit some

22   relief in the future and, if the debtors want it, an

23   evidentiary hearing.  But it does not justify a blanket

24   injunction on the basis of the record to date, including the

25   debtors' proffer.

1      As the plaintiffs argue, there is a period during

2   which discovery is stayed, and discovery against the debtors

3   cannot proceed in absence from relief from the stay in any

4   event.  If the debtors need protection in the future, they

5   can seek it on a showing that their officers and directors'

6   attention to critical reorganization issues is, in fact,

7   being diverted.

8      Debtors further argue that they will be affected by

9   the depletion of available insurance, a fund that they can

10  access, as well as the relevant officers and directors.

11  Further, they claim that the officers and directors have

12  indemnification rights against the estate that may be fixed

13  by the results in the class action.

14     The Court does not have any issues before it that

15  directly involve indemnification or access to insurance.  The

16  debtors' argument, however, proves too much.  In their

17  argument, every garden-variety class action would be subject

18  to a stay against non-debtor defendants.  The existence of

19  insurance would, in every case, justify such a blanket

20  extension, as would the existence of indemnification rights.

21     There is authority that extends the stay beyond the

22  debtor, but many of these cases reserve stays to situations

23  where the movant shows true irreparable injury and a balance

24  of the harm that demonstrates an immediate need for relief.

25     "In the leading circuit court cases, relief has been

1           granted in mass tort cases, where officers and

2           directors were added to thousands upon thousands of

3           personal injury suits."

4           See In Re: Johns-Manville, 837 F.2d 89 (2d Cir.

5    1988), and 33 B.R. 254 (Bankruptcy SDNY 1983); A.H. Robins v.

6    Piccinin, 788 F.2d 994 (4th Cir.), cert. den. 479 U.S. 876

7    (1986).

8           Relief has not been routinely granted in routine

9    class actions, and the law should not be so extended.

10          Balancing the harms on the record before the Court

11   today demonstrates more harm to the class action plaintiffs

12   and a lack of a substantial probability of success on the

13   debtors' part to demonstrating irreparable injury in the

14   future.  The motion, of course, does not implicate the

15   strength of the underlying cases; and, if the debtors can

16   show particularized harm to the reorganization process

17   because of interference with the activities of their officers

18   and directors in the future, the motion can be renewed.

19          One other issue must be considered.  There appears

20   to be a large deductible in this case that would leave the

21   defendants uninsured for up to $5 million.  It appears from

22   colloquy that the insurer's obligation to defend does not

23   provide for defense costs in the interim.  If that is so, the

24   debtors have their remedies before this Court because the

25   Court certainly understands that the incurrence of costs that

1    the debtors have obligations to advance under their charter,

2    or at least so I assume, might constitute an immediate

3    distraction.

4            On the other hand, the Court cannot see that the

5    question of irreparable injury or balance of the harms should

6    be adversely determined to the class action plaintiffs

7    because the defendants made a business decision to have a

8    large insurance deductible.  As stated, the debtors have

9    their remedies.

10           The class action plaintiffs should settle an order

11   on five days' notice.

12           COUNSEL:  Thank you, Your Honor.  Thank you.

13           THE COURT:  Thank you.

14           COUNSEL:  Thank you.  Thank you, Your Honor.

15   (Proceedings concluded at 1:03 p.m.)

16                          CERTIFICATION

17           I certify that the foregoing is a correct transcript

18   from the electronic sound recording of the proceedings in the

19   above-entitled matter to the best of my knowledge and

20   ability.

21   _____          March 8, 2006

22   Cathryn Lynch
     Certified Court Transcriptionist
23   For Rand Transcript Service, Inc.

24

25