1
2
3
4
5 **<u>EXHIBIT A</u>**
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   **LABATON SUCHAROW LLP**
    THOMAS A. DUBBS (*pro hac vice*)
2   LOUIS GOTTLIEB (*pro hac vice*)
    JEFFREY A. DUBBIN (#287199)
3   ARAM BOGHOSIAN (*pro hac vice*)
    140 Broadway
4   New York, New York 10005
    Telephone: (212) 907-0700
5   Facsimile: (212) 818-0477
    Email: tdubbs@labaton.com
6   lgottlieb@labaton.com
    jdubbin@labaton.com
7   aboghosian@labaton.com

8   *Counsel for Lead Plaintiff the Public Employees Retirement*
    *Association of New Mexico and Lead Counsel for the Class*
9
    **WAGSTAFFE, VON LOEWENFELDT, BUSCH & RADWICK, LLP**
10  JAMES M. WAGSTAFFE (#95535)
    FRANK BUSCH (#258288)
11  100 Pine Street, Suite 725
    San Francisco, California 94111
12  Telephone: (415) 357-8900
    Facsimile: (415) 371-0500
13  Email: wagstaffe@wvbrlaw.com
    busch@wvbrlaw.com
14
    *Liaison Counsel for the Class*
15

16              **UNITED STATES DISTRICT COURT**
              **NORTHERN DISTRICT OF CALIFORNIA**
17                **SAN FRANCISCO DIVISION**

18                                          Civil Action No. 3:18-cv-03509-EJD
19
                                            **THIRD AMENDED CONSOLIDATED CLASS**
20  IN RE PG&E CORPORATION                  **ACTION COMPLAINT FOR VIOLATION OF**
    SECURITIES LITIGATION                   **THE FEDERAL SECURITIES LAWS**
21
                                            JURY TRIAL DEMANDED
22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2   I.   INTRODUCTION ................................................................................................. 1

3   II.  NATURE OF THE CASE ..................................................................................... 4

4   III. JURISDICTION AND VENUE ........................................................................... 5

5   IV.  OVERVIEW OF THE EXCHANGE ACT VIOLATIONS ................................. 5

6        A. PG&E's Failure to Comply with Safety Regulations Proximately Caused
           Wildfires in 2017 and Investors' Consequent Losses ................................... 6
7
8        B. PG&E's Failure to Prioritize Safety Continued Unabated, Proximately
           Causing a Disastrous Wildfire in November 2018 as Well as Further Investor
9          Losses ............................................................................................................ 8

10           1.  After the North Bay Fires, PG&E Continued to Make False and
                 Misleading Statements and Omissions ................................................. 8
11
             2.  PG&E's Continuing Noncompliance With Safety Regulations Caused the
12               Camp Fire ........................................................................................... 10

13       C. Exchange Act Claims Being Asserted ......................................................... 12

     V.   THE EXCHANGE ACT PARTIES .................................................................... 13
14
     VI.  SUBSTANTIVE ALLEGATIONS SUPPORTING THE EXCHANGE ACT CLAIMS 15
15
         A. PG&E Operates Within a Robust Legal Regime ......................................... 15
16
             1.  California Law Required PG&E to Maintain a Safe Distance Between Its
17               Electrical Equipment and Nearby Vegetation ..................................... 15

18           2.  California Law Required PG&E to Safely Maintain Its Electrical
                 Equipment and Infrastructure ............................................................. 16
19
             3.  PG&E Is Regulated by the CPUC ...................................................... 17
20
                 (a)  CPUC's General Orders 95 and 165 Impose Strict Safety
21                    Regulations on PG&E ................................................................ 17

22               (b)  CPUC's Resolution ESRB-8 Imposes on PG&E an Obligation to
                      Adopt, Promulgate and Follow the ESRB-8 Shutoff Protocol ... 19
23
                 (c)  PG&E Must Follow CPUC's Regulations Under Penalty of Law ... 20
24
             4.  Cal Fire Is the Duly Authorized Investigative Arm of the State of
25               California for Wildfires ...................................................................... 20

26           5.  Under California's Inverse Condemnation Law, PG&E Would Not Bear
                 the Cost of Wildfires It Causes if It Could Prove That It Acted Reasonably
27               and Prudently .................................................................................... 21

28           6.  Federal Law Also Requires PG&E to Follow Minimum Safety Standards ... 21

Case: 19-30088   Doc# 5375-1   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 3
of 50
PGE-BK-0000001289

B.  PG&E's Vegetation Management Expenditures Did Not Materially Change from Year to Year During the Class Period, Let Alone Double at Any Point ............ 22

C.  PG&E's Tree Trimming and Removal Did Not Come Close to Doubling During the Class Period .................................................................................... 24

D.  After the North Bay Fires, PG&E Started Reporting Inflated Numbers for Tree Removal ........................................................................................................ 25

E.  PG&E Concealed Its Unsafe Use of Reclosers During the Class Period ................. 25

    1.  PG&E Used Reclosers to Prioritize Convenience Over Safety ........................... 25

    2.  PG&E Concealed Its Use of Reclosers from Investors During the Class Period ........................................................................................................ 27

F.  PG&E Engaged in an Unsafe Pattern of Noncompliance with Safety Requirements Before and Throughout the Class Period ........................................... 28

    1.  PG&E Was Convicted of Negligence for Starting a Wildfire in 1994 ................ 28

    2.  PG&E Unsafely Flouts Safety Regulations ........................................................ 28

    3.  PG&E's Unsafe, Noncompliant Vegetation Management Caused the Butte Fire in 2015 ................................................................................................ 30

    4.  PG&E's Insufficient Safety Practices Allowed Numerous, Company-Wide Vegetation Management and Other Safety Violations During the Class Period ........................................................................................................ 30

        (a)  PG&E Documented and Tolerated Thousands of Dangerous Safety Violations Across Its Territory During the Class Period ............................. 30

        (b)  PG&E Had Actual Knowledge That Its Insufficient Safety Practices Had the Potential to Allow for Dangerous Safety Violations on the Order of Hundreds of Thousands to a Million Wildfire Hazards ............... 32

G.  Investors Could Not Have Reasonably Expected the Extent of PG&E's Unsafe Pattern of Noncompliance that Caused the North Bay Fires and the Camp Fire ....... 33

    1.  PG&E's Noncompliance with Vegetation Management and Pole Integrity Requirements Caused the North Bay Fires .......................................... 33

    2.  PG&E's Noncompliance with Vegetation Management and Pole Integrity Requirements Caused the Camp Fire .................................................. 34

        (a)  The Camp Fire's First Ignition Point Was Caused by PG&E Safety Violations ............................................................................................. 34

        (b)  The Camp Fire's Second Ignition Point Was Also Caused by PG&E's Safety Violations ................................................................................ 37

H.  PG&E's Repeated Vegetation Management and Pole Integrity Safety Violations Show that the Company Knew of Its Numerous and Widespread Violations of Fire Safety Regulations Throughout the Class Period, but Did

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3:18-CV-03509-EJD

ii

PGE-BK-0000001290

Not Change Its Practices to Reduce, Much Less Eliminate, Those Safety Violations.................................................................................................................38

    1.  PG&E Did Not Improve Its Inadequate Safety Practices After Its Safety Violations Caused the Deadly Butte Fire.................................................. 38

    2.  PG&E Internally Acknowledged, Extensively Documented, and Tolerated for Years the Safety Violations that Caused the Camp Fire ................................ 39

I.  PG&E's ESRB-8 Shutoff Protocol Was Illusory, and PG&E's Failure to Follow It Was a Proximate Cause of the Camp Fire ...................................................43

    1.  PG&E Admitted that All of the Non-Weather Criteria Weighed in Favor of Shutting Off the Power ............................................................ 45

        (a)  Criterion 1: the National Fire Danger Rating System Rated Jarbo Gap as Having an "Extreme" Fire Danger Threat Level ...................... 45

        (b)  Criterion 2: the National Weather Service Declared a "Red Flag Warning" for the Area ........................................................... 47

        (c)  Criterion 6: "Critically Dry Vegetation" (*i.e.*, Wildfire Fuel) Weighed in Favor of a Shutoff ...................................................... 47

        (d)  Criterion 7: PG&E's On-the-Ground Observations Weighed in Favor of a Shutoff ...................................................................... 49

    2.  All of the Weather Criteria Weighed in Favor of Shutting Off the Power ........... 50

        (a)  Criterion 3: The Jarbo Gap Recorded Sufficiently Low Humidity Levels................................................................................. 52

        (b)  Criterion 4: The Jarbo Gap Recorded Sufficiently High Wind Speed......... 53

        (c)  Criterion 5: Site-Specific Conditions Further Favored Shutoff................... 54

    3.  PG&E Knew, or Recklessly Disregarded, that All Seven Criteria Weighed in Favor of Shutting Off the Power ................................................... 54

J.  PG&E's Bankruptcy and Other Post-Class-Period Developments............................56

VII.    DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS UNDER THE EXCHANGE ACT ................................................................................ 59

A.  Overview of Defendants' Fraudulent Course of Conduct .................................59

B.  Defendants Made Materially False and Misleading Statements and Omissions Regarding Its Vegetation Management Activities and Compliance with Wildfire Safety Regulations Before the North Bay Fires .......................................61

    1.  April 29, 2015 – Misstatement No. 1....................................................... 61

    2.  October 16, 2015 – Misstatement No. 2 ................................................... 62

    3.  November 18, 2015 – Misstatement No. 3 ................................................ 64

PGE-BK-0000001291

4.  October 6, 2016 – Misstatement No. 4 .................................................. 65

5.  August 9, 2017 – Misstatement No. 5 .................................................. 67

C.  Defendants Tied the Company's Dividend to Safety Compliance, Making
    Materially False and Misleading Statements and Omissions Regarding Its
    Dividend and Safety Before the North Bay Fires .......................................... 69

1.  May 23, 2016 – Misstatement No. 6 .................................................. 70

2.  November 4, 2016 – Misstatement No. 7 ........................................... 71

3.  May 31, 2017 – Misstatement No. 8 .................................................. 72

D.  After the North Bay Fires Erupted, the Truth Began to Emerge .................. 74

E.  After the North Bay Fires Were Contained, the Company Made Additional
    False and Misleading Statements and Omissions Regarding Compliance with
    Wildfire-Related Safety Regulations ........................................................... 75

1.  October 31, 2017 – Misstatement No. 9 ............................................. 75

2.  November 2, 2017 – Misstatement No. 10 ......................................... 76

3.  November 2, 2017 – Misstatement No. 11 ......................................... 79

4.  November 5, 2017 – Misstatement No. 12 ......................................... 81

5.  May 25, 2018 – Misstatement No. 13 ................................................ 83

F.  While the Truth Regarding PG&E's Role in Causing the North Bay Fires
    Emerged, the Company Made Additional False and Misleading Statements
    and Omissions Regarding Compliance with Wildfire-Related Safety
    Regulations, Including Its ESRB-8 Shutoff Protocol ................................... 85

1.  June 8, 2018 – Misstatement No. 14 .................................................. 85

2.  June 8, 2018 – Misstatement No. 15 .................................................. 87

3.  September 27, 2018 – Misstatement No. 16 ....................................... 88

4.  October 9, 2018 – Misstatement No. 17 ............................................ 90

5.  October 9, 2018 – Misstatement No. 18 ............................................ 91

6.  November 8, 2018 – Misstatement No. 19 ......................................... 92

VIII.  MATERIALITY UNDER THE EXCHANGE ACT ............................................. 93

IX.  LOSS CAUSATION UNDER THE EXCHANGE ACT ....................................... 94

A.  Defendants' False and Misleading Statements Artificially Inflated the Price of
    PG&E's Securities .................................................................................... 94

B.  PG&E's Safety Violations Caused the Devastating North Bay Fires ............ 95

PGE-BK-0000001292

C.  PG&E's Safety Violations Caused the Devastating Camp Fire ................................. 95

D.  As the Market Learned About the Effects and Extent of PG&E's Inadequate Safety Practices, the Price of PG&E's Securities Fell Dramatically .......................... 96

    1.  October 12, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk ................................................................................................. 96

        (a)  The Market Began to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires .......................................................... 96

        (b)  Market Commentators Confirmed the Cause of PG&E's Share Price Decline on October 12, 2017 ......................................................................... 97

    2.  October 13-16, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk ................................................................................................. 99

        (a)  The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires .......................................................... 99

        (b)  Market Commentators Confirmed the Cause of PG&E's Share Price Decline on October 13, 2017 ......................................................................... 99

    3.  December 20, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk ............................................................................................... 100

        (a)  The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires ........................................................ 100

        (b)  Market Commentators Confirmed the Proximate Cause of PG&E's Share Price Decline on December 20, 2017 ............................................... 101

    4.  May 25, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ............................................................................................... 102

        (a)  The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires ........................................................ 102

        (b)  Market Commentators Confirmed that the News Regarding Safety Violations Proximately Caused PG&E's Share Price Decline on May 25-29, 2018 ..................................................................................................... 104

    5.  June 8, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ............................................................................................................... 105

        (a)  The Market Learned the Truth of PG&E's Continued, Unsafe Use of Reclosers ................................................................................................... 107

        (b)  The Market Continued to Learn the Extent and Effects of PG&E's Safety Violations and Responsibility for the North Bay Fires ................. 107

        (c)  Market Commentators Confirmed that the Number and Range of Safety Violations Proximately Caused PG&E's Share Price Decline on June 8-11, 2018 ..................................................................................... 108

Case: 19-30088   Doc# 5375-1   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 7 of 50

PGE-BK-0000001293

6.   November 8-9, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ..................................................................................... 109

        (a)   The Market Began to Learn the Extent and  Effects of PG&E's Responsibility for the Camp Fire .............................................. 109

        (b)   Market Commentators Confirmed the Cause of PG&E's November 9, 2018 Share Price Decline ................................................ 110

7.   November 9-12, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ..................................................................................... 112

        (a)   The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire ....................................... 112

        (b)   Market Commentators Confirmed the Cause of PG&E's November 9-12, 2018 Share Price Decline .......................................... 113

8.   November 13-14, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ............................................................................. 114

        (a)   The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire ....................................... 114

        (b)   Market Commentators Confirmed the Cause of PG&E's Share Price Decline on November 14, 2018 ........................................ 115

9.   November 15, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ............................................................................. 116

        (a)   The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire ....................................... 116

        (b)   Market Commentators Confirmed the Cause of PG&E's Share Price Decline on November 15, 2018 ........................................ 117

X.   SCIENTER UNDER THE EXCHANGE ACT ....................................................... 118

     A.   PG&E Knew that Its Safety Practices Continued to Violate the Law Even After PG&E Was on Notice of the Butte Fire Safety Violations ............................ 118

     B.   Safety Was Core to PG&E's Operations, and the Exchange Act Individual Defendants Were Directly Involved in It .......................................... 120

     C.   The Federal Court Overseeing PG&E's Probation, Including Safety Monitoring, Has Uncovered Additional Facts Supporting Scienter ........................ 123

     D.   PG&E's Noncompliance with Safety Regulations Was Well-Known Throughout the Company, Including at the Highest Levels, with Real-Time Access to a Database of Known Safety Violations .......................................... 129

          1.   PG&E Recorded Its Violations of Safety Regulations in a Sophisticated Database, Readily Accessible by the Exchange Act Individual Defendants ...... 129

Case: 19-30088   Doc# 5375-1   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 8 of 50

PGE-BK-0000001294

2.   PG&E Instituted a Culture Among Its On-the-Ground Employees of Reporting Problems up the Corporate Chain, Which Upper Management Was Aware of and Monitored..................................................................131

E.   PG&E's Compliance Statements Were Authorized by Defendant Kane and Were Made under Her Ultimate Authority ...........................................133

F.   The Threat of a Potential Bankruptcy Gave Defendants a Strong Motive to Mislead Investors.................................................................................135

G.   After PG&E Failed to Follow Its ESRB-8 Shutoff Protocol and Caused the Camp Fire, PG&E Attempted to Cover It Up...................................136

H.   PG&E's Unprecedented Departure of Officers and Directors Strengthens the Inference of Scienter ...........................................................................140

XI.   APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET FOR THE EXCHANGE ACT CLAIMS .................................................141

XII.   CLASS ACTION ALLEGATIONS FOR THE EXCHANGE ACT CLAIMS............ 142

XIII.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT........................................ 144

XIV.   NATURE OF THE SECURITIES ACT CLAIMS..................................................... 151

XV.   OVERVIEW OF THE SECURITIES ACT VIOLATIONS ....................................... 151

XVI.   THE SECURITIES ACT PARTIES......................................................................... 153

A.   Securities Act Named Plaintiffs...............................................................153

B.   Bankrupt Entities ....................................................................................154

C.   Securities Act Individual Defendants .......................................................154

D.   Underwriter Defendants ..........................................................................159

XVII.   SUBSTANTIVE ALLEGATIONS SUPPORTING THE SECURITIES ACT CLAIMS 162

A.   PG&E's Systemic Failure to Take Measures to Mitigate Wildfires and Safety Violations.................................................................................................162

1.   Overview of Laws and Regulations Governing PG&E's Operations................. 162

2.   PG&E's Lax Safety Practices, Safety Violations and Resulting Wildfires........ 164

XVIII.   THE SECURITIES ACT DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS IN THE OFFERING DOCUMENTS FOR THE NOTES OFFERINGS.................................................................................................................. 186

A.   The Securities Act Defendants Misled Investors Regarding PG&E's Safety Practices, Policies and Compliance .........................................................187

1.   The Offering Documents Omitted PG&E's Widespread Safety Failures and the Existing Risks Associated with Its Inadequate Safety Practices   188

PGE-BK-0000001295

2.  The Offering Documents Did Not Disclose PG&E's Investments in,
Commitment to, and Practices Related to Safety Were Inadequate ................... 194

B.  The Securities Act Defendants Materially Misled Investors Regarding
PG&E's Liability for Wildfires ....................................................................203

C.  PG&E's Offering Documents Misled Investors by Failing to Comply with
Item 303's Disclosure Requirements and Disclosure Safety Violations ..................208

XIX.    NO SAFE HARBOR FOR THE SECURITIES ACT CLAIMS ................................... 211

XX.     CLASS ACTION ALLEGATIONS FOR THE SECURITIES ACT CLAIMS............ 212

XXI.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ......................................... 214

XXII.   PRAYER FOR RELIEF ................................................................................................ 216

PGE-BK-0000001296

1        Court-appointed Lead Plaintiff, the Public Employees Retirement Association of New

2    Mexico ("PERA" or "Lead Plaintiff"), individually and on behalf of all other persons similarly

3    situated, alleges the following against PG&E Corporation, Pacific Gas and Electric Company

4    (the "Utility," and together with PG&E Corporation, "PG&E" or the "Company"), the Exchange

5    Act Individual Defendants (defined below), the Securities Act Individual Defendants (defined

6    below), and the Underwriter Defendants (defined below).  In addition, named Plaintiff York

7    County on behalf of the County of York Retirement Fund, City of Warren Police and Fire

8    Retirement System and Mid-Jersey Trucking Industry & Local No. 701 Pension Fund

9    (collectively, the "Securities Act Plaintiffs," and together with Lead Plaintiff, "Plaintiffs"),

10   individually and on behalf of all others similarly situated, allege violations of the Securities Act

11   of 1933 ("Securities Act") against the Securities Act Individual Defendants and the Underwriter

12   Defendants. These allegations are based upon personal knowledge as to Plaintiffs' own acts, and

13   upon information and belief as to all other matters.  Plaintiffs' information and belief is based on

14   the investigation conducted by and through its attorneys, which included a review of the

15   Company's Securities and Exchange Commission ("SEC") filings, conference call transcripts

16   and press releases, media and analyst reports about the Company, court filings, and other public

17   information regarding the Defendants.  Plaintiffs believe that substantial additional evidentiary

18   support for the allegations set forth herein will be produced through discovery.

## I.    INTRODUCTION

20       1.     The investing public depends on PG&E to be honest when talking about its safety

21   practices and level of compliance with vital safety regulations.  This federal securities class

22   action arises out of the materially false statements that Defendants made to investors from April

23   29, 2015 through November 15, 2018 (the "Class Period").  Their statements and omissions

24   misled investors about PG&E's wildfire safety practices, including their representations of

25   achieving full legal compliance and investing in safety, notwithstanding the Company's

26   numerous and widespread violations of powerline safety regulations.

27       2.     For example, in just 14 months from October 2017 through November 2018,

28   California experienced some of the deadliest and most destructive wildfire events of its recorded

PGE-BK-0000001297

history.  This narrow time period included both the 2017 North Bay Fires and the 2018 Camp
Fire.  One thing these fires have in common is that they were started or exacerbated by
noncompliant PG&E electrical equipment and vegetation management: an astounding fact to
those who believed PG&E's public statements that it complied with California and federal safety
regulations.  The other thing these fires have in common is that they incited a series of
investigations, which have revealed PG&E's gross deficiencies in the area of safety compliance.

3.      The timing of these catastrophic fires is no coincidence; they occurred at the
height of PG&E's knowing noncompliance with safety regulations.  Among the many details that
have emerged, the Honorable William Alsup of the United States District Court for the Northern
District of California, in presiding over PG&E's criminal probation, has found as fact "that as of
**June 2017**, there were 3,962 unworked trees which PG&E had identified **in 2016** as hazardous
with the potential to 'fall into or otherwise impact the [electrical] conductors, towers or guy
wires before the next inspection cycle.'"  By June 2017, PG&E had known about these
thousands of vegetation fire hazards for six to eighteen months (*i.e.*, as far back as January 2016)
– yet did nothing other than to internally record their existence.  Judge Alsup based this finding
on PG&E's own admissions.

4.      Thus, mere months before its vegetation safety violations would cause and
exacerbate the 2017 North Bay Fires, PG&E actually knew it was not addressing thousands of
violations in the form of vegetation fire hazards, even while falsely assuring investors over the
same time period that its vegetation management was, *e.g.*, "***in compliance with relevant laws***"
(October 6, 2016 – Misstatement No. 4), and "***complying with state and federal regulations and
delivering safe, reliable and affordable electric service***" (August 9, 2017 – Misstatement No. 5).

5.      The public did not immediately know that PG&E was responsible for the North
Bay Fires—information that would threaten the Company's financial condition.  So PG&E
doubled down on misinformation in order to build up the public perception of its safety and
compliance before the tide of public opinion could turn against it.  For example, after the North
Bay Fires erupted, Defendants falsely insisted that the Company had "***doubl[ed] our typical
vegetation management spending last year***" and "***inspect[ed] all of our overhead lines***"

Case: 19-30088   Doc# 5375-1   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 12
of 50
PGE-BK-0000001298

(November 2, 2017 – Misstatement Nos. 10 & 11), when **it had not**. Similarly, the Company reiterated that it "***meets or exceeds all applicable federal and state vegetation clearance requirements***" (November 5, 2017 – Misstatement No. 12), yet soon thereafter, state investigators would link evidence of PG&E's violations of California safety regulations to at least **eleven** of the North Bay Fires.

6.      Even as the truth began to emerge about PG&E's insufficient safety practices, and PG&E continued to falsely insist on its compliance, California imposed additional safety regulations on the Company.  This included a mandate that PG&E formalize a protocol for proactively turning off its power lines when certain extreme conditions were met, to prevent any further wildfires.  By the deadline, PG&E stated that it had "***created a set of procedures for . . . [d]etermining what combination of conditions necessitates turning off lines for safety***" (September 27, 2018 – Misstatement No. 16).  Yet less than two months later, on a day when hazardous weather and other conditions required PG&E to shut off certain lines, the Camp Fire erupted.  Not only is it now known that **those very power lines caused the Camp Fire**, but facts have emerged suggesting that PG&E's shutoff program **was not in effect when Defendants said it was** – facts which PG&E has tried to cover up.

7.      PG&E's false and misleading statements destroyed billions of dollars of economic value in the Company's stocks and bonds.  When the true nature and extent of PG&E's responsibility for these fires materialized, investors holding PG&E's publicly traded securities experienced compensable losses.

8.      PG&E's ability to maintain safe power lines, compliant with federal and California safety regulations, is essential to the Company's financial health. PG&E has admitted that it is probable it will incur billions of dollars in losses for claims in connection with the North Bay and Camp wildfires.  According to a recent SEC filing, the Company has, to date, recorded charges exceeding $14.2 billion, an amount which it believes is at the "lower end of the range of . . . reasonably estimated losses."[1]

---

[1] PG&E recently announced in its May 2, 2019 Form 10-Q that the SEC is "conducting an investigation related to PG&E Corporation's and the Utility's public disclosures and accounting

Case: 19-30088   Doc# 5375-1   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 13 of 50

PGE-BK-0000001299

9.      Indeed, PG&E's responsibility for the North Bay Fire and Camp Fire catastrophes has caused the Company to file for bankruptcy under Chapter 11 of Title 11 of the United States Code (11 U.S.C. § 101 et seq.).  The Company's bankruptcy filings stated that it was facing $51.7 billion in liabilities, including more than $30 billion in potential liabilities tied to the North Bay and Camp Fires.[2]

10.      Because it was vital for PG&E's business to be perceived as making safety its highest priority, Defendants assured investors that the Company's wildfire safety measures were adequate and compliant with applicable laws and regulations.  However, the investigations following these devastating fires have revealed that PG&E's assurances were false: evidence has emerged that PG&E's safety violations caused at least twelve of these devastating fires, including the Camp Fire—California's deadliest and most destructive wildfire ever.

## II.      NATURE OF THE CASE

11.      This is a federal securities class action brought pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of a class of all persons and entities who, during the period from April 29, 2015 through November 15, 2018, inclusive (the "Class Period"), purchased or otherwise acquired publicly traded PG&E securities and were damaged thereby.  Excluded from the class are: (i) all defendants in the Action; (ii) members of the immediate family of any individual defendant; (iii) any person who is or was an officer or director of PG&E during or after the Class Period; (iv) any firm, trust, corporation, or other entity in which any defendant has or had a controlling interest; (v) PG&E's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.  Lead Plaintiff seeks to recover compensable damages caused by defendants' violations of the federal securities laws and to pursue remedies under

---

*(continued)*
for losses associated with the 2017 and 2018 Northern California wildfires and the 2015 Butte Fire." *See* ¶¶663-72, *infra*.

[2] Amended Decl. of Jason P. Wells at 3 & 7, Case No. 19-bk-30088 (N.D. Cal. Feb. 1, 2019), ECF No. 263.

1   Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule

2   10b-5 promulgated thereunder.  This Action also is brought pursuant to the Securities Act of

3   1933 (the "Securities Act") as set forth in Sections XIV-XII, *infra*.

4   **III.     JURISDICTION AND VENUE**

5           12.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of

6   the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the

7   SEC (17 C.F.R. § 240.10b-5), as well as Sections 11 and 15 of the Securities Act (15 U.S.C.

8   §§77k and 77o).

9           13.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C.

10  §1331, Section 27 of the Exchange Act, and Section 22 of the Securities Act.

11          14.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange

12  Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as PG&E's principal executive offices are located

13  within this Judicial District.  Further, many of the acts and practices complained of herein

14  occurred in substantial part in this Judicial District.

15          15.     In connection with the acts, conduct and other wrongs alleged in this Complaint,

16  Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

17  including but not limited to, the United States mail, interstate telephone communications and the

18  facilities of the national securities markets.

19  **IV.     OVERVIEW OF THE EXCHANGE ACT VIOLATIONS**

20          16.     PG&E's false statements began on April 29, 2015 and continued through

21  February 8, 2018.  As detailed herein, they misled investors about PG&E's wildfire safety

22  practices, including representations that the Company was in full legal compliance and

23  continuing to invest in safety, notwithstanding the Company's numerous and widespread

24  violations of safety regulations and inadequate safety practices.

25

26

27

28

Case: 19-30088   Doc# 5375-1   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 15
of 50

PGE-BK-0000001301

### A.     PG&E's Failure to Comply with Safety Regulations Proximately Caused Wildfires in 2017 and Investors' Consequent Losses

17.    Throughout the Class Period, Defendants wanted investors to believe that PG&E was not cutting corners with its vegetation management. So PG&E repeatedly represented to its investors that:

- "*PG&E's Vegetation Management*" was "*in compliance with relevant laws*" (October 6, 2016 – Misstatement No. 4);

- Its "*vegetation management program . . . compl[ies] with state and federal regulations*" (August 9, 2017 – Misstatement No. 5);

- "*PG&E follows all applicable federal and state vegetation clearance requirements*" to "*help to reduce* outages or *fires caused by trees or other vegetation*" (October 31, 2017 – Misstatement No. 9); and

- "*PG&E meets or exceeds all applicable federal and state vegetation clearance requirements*" (November 5, 2017 – Misstatement No. 12).[3]

18.    These statements, and others, were materially false and misleading because they misrepresented PG&E's level of compliance with California and federal law, and consequently the extent to which shareholders would be exposed to liability for damages caused by wildfires and additional costs to improve their inadequate wildfire safety practices.

19.    The fraud began to unravel when investors learned about PG&E's responsibility – and liability – for the wildfires that devastated Northern California in October 2017 (the "North Bay Fires").[4]  These fires burned approximately 249,000 acres, destroyed 8,898 structures, and killed 44 people across nine counties: Napa, Sonoma, Mendocino, Lake, Humboldt, Butte, Nevada, Solano, and Yuba. They resulted in damages estimated at **more than $17 billion**.[5]  The

---

[3] The statements made by Defendants that are ***bolded and italicized*** are the statements alleged to be false and misleading. All other emphasis is in **bold**.

[4] There may have been as many as 170 individual fires, but many smaller fires combined into larger fires as they burned. Taking that into consideration, the North Bay Fires consisted of eighteen main fires.

[5] This $17 billion estimate is approximately six times greater than the second most expensive California wildfire at the time, the October 1991 Tunnel Fire in Oakland, which, according to a

Case: 19-30088   Doc# 5375-1   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 16 of 50

PGE-BK-0000001302

1    size of this liability imperiled the financial viability of the Company.  In fact, several of

2    Defendants' false and misleading statements were made in the months before PG&E openly

3    expressed its fear that its liability for the North Bay Fires could send the Company into

4    bankruptcy.

5           20.      As the State of California's official investigations into the eighteen North Bay

6    Fires were completed by the California Department of Forestry and Fire Protection ("Cal Fire"),

7    the truth emerged over time that **at least seventeen** were caused by PG&E equipment.  Indeed,

8    Cal Fire has determined that **eleven** of these fires, across seven counties, evidenced violations of

9    California safety regulations – contradicting Defendants' false representations of compliance

10    with those regulations.

11           21.      Defendants' false and misleading misrepresentations and omissions came at a

12    crucial time for the Company.  As described below, over the past three decades, PG&E caused a

13    series of wildfires and other disasters in California.  For example, in September 2015, its

14    violations of California safety regulations regarding vegetation clearance caused a wildfire

15    known as the "Butte Fire," which burned over 70,000 acres, destroyed 921 structures, and killed

16    two people – making it then the seventh most destructive wildfire in California history, but small

17    compared to the North Bay and Camp Fires that would follow.

18           22.      Revealingly, just months before the North Bay Fires began, in an April 2017 non-

19    public deposition concerning PG&E's responsibility for the Butte Fire, a PG&E Vegetation

20    Program Manager named Richard Yarnell admitted: "PG&E—to the best of my knowledge, **we**

21    **have not made any changes as a result of this fire**."  Thus, despite being on notice of its

22    dangerous safety violations and their deadly consequences, neither the Company nor its officers

23    took any steps to improve safety or compliance between the Butte Fire and the far more

24

25

26    *(continued)*
May 27, 2011 article in *Scientific American*, caused $2.687 billion in insured property damage.

27    Mark Fischetti, *How Much Do Wildfires Cost in Terms of Property Damage?* Scientific
American (May 27, 2011), https://www.scientificamerican.com/article/graphic-science-how-

28    much-do-fires-cost-property-damage/?redirect=1.

disastrous North Bay Fires.  Over this time period, Defendants either knew or should have known that the Company's wildfire-related safety violations continued unabated.

23.     Though the North Bay Fires began on a windy night, they were not the result of an unexpected or unique event. Rather, the circumstance of PG&E causing **seventeen** concurrent fires across **nine counties** shows that the Company tolerated numerous and widespread violations of California safety regulations across its territory. As detailed herein, the underlying explanation for these near-simultaneous North Bay Fires is neither unusual weather nor coincidence, but PG&E's failure to comply with even minimal legal requirements. Accordingly, PG&E and its officers knew, or deliberately disregarded, that the Company's power lines and other electrical infrastructure were often not in compliance with federal and California safety requirements when making false and misleading statements to the contrary.

**B.     PG&E's Failure to Prioritize Safety Continued Unabated, Proximately Causing a Disastrous Wildfire in November 2018 as Well as Further Investor Losses**

**1.     After the North Bay Fires, PG&E Continued to Make False and Misleading Statements and Omissions**

24.     After the public came to understand PG&E's responsibility for the North Bay Fires over the course of five events from October 12, 2017 and June 11, 2018 (*see* Sections IX.D.1-5, *infra*), the Company faced a new crisis: the widespread belief that it failed to prioritize safety in maintaining its power lines and preventing wildfires.  It also faced a financial crisis, as its liabilities for the North Bay Fires threatened to bankrupt the Company.

25.     As a result, PG&E needed the public, including investors, to believe that it would prioritize safety thereafter.  So when Cal Fire announced (on June 8, 2018) its conclusions that PG&E had caused the preponderance of the North Bay Fires, and PG&E's share price continued to decline as its financial situation deteriorated, PG&E responded that same day by reassuring its investors that, *e.g.*:

- Its "*Programs Overall Met [California]'s High Standards*," including "*Vegetation Management*," and "*meets or exceeds regulatory requirements for pole integrity management*" (May 25, 2018 – Misstatement No. 13);

Case: 19-30088   Doc# 5375-1   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 18 of 50

PGE-BK-0000001304

- "To address the growing threats posed by wildfires and extreme weather, and in light of the wildfires throughout our state last year, ***PG&E has launched . . . a program to proactively turn off electric power for safety when extreme fire danger conditions occur***" (June 8, 2018 – Misstatement No. 15);

26.     Indeed, one month later, on July 16, 2018, PG&E's primary state regulator **mandated** that PG&E formalize and publicize its protocol for proactively turning off its power lines to prevent further wildfires, enacting a regulation known as Resolution ESRB-8.  The Company announced its response to this new safety requirement on or about September 27, 2018 (the "ESRB-8 Shutoff Protocol"), including:

- "PG&E's Community Wildfire Safety Program implements additional precautionary measures intended to reduce wildfire threats. ***It includes* . . . *executing protocols to temporarily turn off electric power for safety when extreme fire danger conditions are occurring***" and "***PG&E has created a set of procedures for . . . [d]etermining what combination of conditions necessitates turning off lines for safety***" (September 27, 2018 – Misstatement No. 16).

27.     While the Company was finalizing its protocol, on September 21, 2018, California enacted S.B. 901, a law to rescue PG&E from the threat of bankruptcy due to its responsibility for the North Bay Fires.  The resulting law put in place a financial stress test to monitor PG&E's financial health, as well as a method to raise capital should PG&E's liability for the North Bay Fires cause it to fail the test.  The same law made it less likely that PG&E would bear the costs of wildfires it caused in 2019 or later.

28.     However, the new law did not help the Company bear the financial consequences of any wildfires it might cause in the remaining months of 2018.

29.     Put differently, PG&E's vegetation management, proactive power line shutoff program, and other touted means of safety compliance would have to ensure wildfire safety for the remainder of 2018, or their failure would drive the Company to ruin.

30.     PG&E continued to assure the public that it had implemented these measures successfully.  For example, when the news broke on October 9, 2018 that Cal Fire had concluded

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3:18-CV-03509-EJD

9

that PG&E was the cause of yet another one of the prior year's North Bay Fires, the Cascade

Fire, the Company reassured investors by stating:

- "[W]e are continuing to focus on *implementing additional precautionary measures* intended to further reduce wildfire threats, such as *working to remove and reduce dangerous vegetation, improving weather forecasting, upgrading emergency response warnings, [and] making lines and poles stronger in high fire threat areas*, and taking other actions to make our system, and our customers and communities, *even safer* in the face of a growing wildfire threat" (October 9, 2018 – Misstatement No. 17); and

- "*PG&E has launched . . . a program to proactively turn off electric power for safety when extreme fire danger conditions occur*" (October 9, 2018 – Misstatement No. 18).

31.     Such statements were materially false and misleading because PG&E had **not** meaningfully improved its safety practices—as would soon be revealed by the Camp Fire.  By pitching their statements to convince the investing public that PG&E had resolved its fire safety failures and would prioritize fire safety thereafter, Defendants concealed the true extent to which the Company was exposed to massive liability for causing further wildfires, thereby significantly inflating PG&E's share price.

32.     Ultimately, the North Bay Fires resulted in damages estimated up to $17 billion, for which the Company has already taken a charge of $3.5 billion, admitting the likelihood that it will be liable for, and bear the costs of, at least some of these fires.[6]

**2.     PG&E's Continuing Noncompliance With Safety Regulations Caused the Camp Fire**

33.     This continuation of the fraud unraveled when evidence emerged that PG&E was responsible for the Camp Fire, which devastated Northern California in November 2018, burning 153,336 acres, destroying 18,804 structures, and killing at least 85 people[7]—making it

---

[6] Press Release, PG&E, *PG&E Provides Update on Financial Impact of 2017 and 2018 Wildfires* (Feb. 28, 2019) (filed with Form 8-K), https://www.sec.gov/Archives/edgar/data/75488/000119312519055751/d710309dex991.htm.

[7] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May 15, 2019), https://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.

---

PGE-BK-0000001306

1  the single most destructive and deadliest wildfire in California history.  It has resulted in

2  damages estimated up to $13 billion, for which the Company has already taken a $10.5 billion

3  charge, admitting the likelihood that it will be liable for, and bear the costs of, the Camp Fire.[8]

4  Moreover, Cal Fire has confirmed that PG&E's electrical equipment caused the Camp Fire.[9]

5       34.    The Camp Fire began when a PG&E electrical tower, carrying a high-voltage 115

6  kilovolt transmission line, failed.  PG&E has also acknowledged a second ignition point for the

7  Camp Fire that exhibited damaged and downed poles, vegetation on top of downed wires, and

8  other signs of safety violations.

9       35.    As a result, vegetation underneath the lines ignited at two ignition points

10  approximately 30 minutes apart.  PG&E's failure to remove such vegetation violated California

11  Public Resources Code Section 4293, and its failure to maintain the integrity of its poles and

12  towers violated California Public Utilities Code Section 451.

13       36.    Starting with two PG&E admissions at the end of the day the Camp Fire began

14  (November 8, 2019), it emerged that PG&E's promises to prioritize fire safety were false and

15  misleading.  PG&E's statements promoting its ESRB-8 Shutoff Protocol were a prime example

16  of this prioritization, promising to shut off electricity broadly rather than risk further wildfires.

17  Soon, however, it emerged that PG&E's ESRB-8 Shutoff Protocol was illusory: the protocol

18  dictated that the electrical lines that caused the Camp Fire **should have been shut off, but**

19  **PG&E flouted it.**  Investors learned not only that PG&E's ESRB-8 Shutoff Protocol should

20  have prevented the fire entirely, but also that PG&E needlessly imperiled lives rather than risk

21  upsetting customers.

22

23

24      [8]

25      Press Release, PG&E, *PG&E Corporation Provides Update on Financial Impact of 2017 and 2018 Wildfires* (Feb. 28, 2019) (filed with Form 8-K),

26      https://www.sec.gov/Archives/edgar/data/75488/000119312519055751/d710309dex991.htm.

27      [9] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May 15, 2019),

28  https://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT         11
CIVIL ACTION NO. 3:18-CV-03509-EJD

PGE-BK-0000001307

37.     PG&E would later attempt to justify its inaction by claiming that its ESRB-8 Shutoff Protocol did not apply to high-voltage transmission lines like the one that caused the Camp Fire.  However, Plaintiff's investigation has uncovered that this explanation is demonstrably false.  The fact is that PG&E's promised ESRB-8 Shutoff Protocol would have prevented the Camp Fire if only it were followed.  The Company's attempt to cover it up substantiates not only that PG&E's safety failures caused the Camp Fire, but further that PG&E's false and misleading statements—concealing how the Company was not sufficiently prioritizing safety—were made with knowledge of their falsity, or at least deliberate recklessness.

38.     Accordingly, the true risks leading to the Camp Fire were concealed by PG&E's materially false and misleading statements assuring investors of the Company's compliance with California safety regulations, including the ESRB-8 Shutoff Protocol.

**C.     Exchange Act Claims Being Asserted**

39.     Notwithstanding PG&E's false and misleading statements to the marketplace, investors learned over time that PG&E's safety violations were numerous and widespread. Indeed, they were responsible for most of the North Bay Fires and the Camp Fire. As information regarding the impact of PG&E's deficient safety practices emerged between October 12, 2017 and November 15, 2018, investors were surprised, given Defendants' numerous public statements during the Class Period touting the Company's compliance, safety measures, and its intertwined financial health. As information came to light relating to PG&E's inadequate safety measures and/or the effects thereof, PG&E's artificially inflated share price dropped significantly.  Thus, as a result of Defendants' wrongful acts and omissions, Lead Plaintiff and other Class members have suffered significant damages.

40.     Lead Plaintiff asserts the claims herein against PG&E and certain of its executives and officers, seeking to recover for its damages suffered due to these declines in PG&E's publicly traded securities.  PG&E's statements of compliance with safety regulations during the Class Period misrepresented current facts and were not statements of opinion.

Case: 19-30088   Doc# 5375-1   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 22
of 50

PGE-BK-0000001308

## V.     THE EXCHANGE ACT PARTIES

41.     Lead Plaintiff PERA was established in 1947 and manages a retirement system for state, county, and municipal employees including police, firefighters, judges, magistrates, legislators and volunteer firefighters. PERA oversees assets of more than $15 billion on behalf of its members, retirees, and beneficiaries.  As set forth in its Certification (attached hereto as "Attachment A"), PERA purchased securities of PG&E at artificially inflated prices during the Class Period and was damaged as the result of Defendants' wrongdoing as alleged in this Complaint.  On September 10, 2018, this Court appointed PERA to serve as the Lead Plaintiff in this action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

42.     Defendant PG&E Corporation is a publicly traded corporation that is headquartered in San Francisco, California, with principal executive offices located at 77 Beale Street, P.O. Box 770000, San Francisco, California 94177.  PG&E's securities trade on the New York Stock Exchange ("NYSE") under the ticker symbol "PCG." It is a holding company that holds, directs the actions of, and controls energy-based businesses such as the Utility.

43.     Defendant Utility, the Pacific Gas and Electric Company, is a wholly-owned subsidiary of PG&E and operates as a public utility in California. It generates revenue by selling and delivering electricity and natural gas to its customers, also known as "rate-payers." The Utility effectively acts as an alter ego of PG&E; the two entities share the same address, have overlapping directors, intermix finances, and file joint annual reports with the SEC on Form 10-K. Indeed, all of the Utility's shares are owned by PG&E Corporation.  Alternatively, PG&E Corporation controls the Utility as detailed herein.  Accordingly, this Complaint refers to the Utility and PG&E interchangeably as "PG&E" or the "Company," unless otherwise specified.

44.     It is understood that the action against the PG&E Defendants (PG&E Corporation and Pacific Gas and Electric Company) is stayed pursuant to the automatic stay provisions of 11 U.S.C. § 362.

45.     Defendant Anthony F. Earley, Jr. ("Earley") served as PG&E Corporation's President, Chief Executive Officer ("CEO"), and Chairman of the Board from September 13, 2011 to March 1, 2017, and as its Executive Chairman from March 1, 2017 to December 2017.

46.     Defendant Geisha J. Williams ("Williams") served as PG&E Corporation's CEO and President from March 1, 2017 until her resignation on January 13, 2019. Previously, she served as the President of Electric Operations at the Utility from August 17, 2015 to February 28, 2017. Prior to that, she served as Executive Vice President of Electric Operations at the Utility from June 1, 2011 to August 16, 2015. Additionally, Williams was a director of PG&E Corporation from May 2017 to January 2019 and a director of the Utility from August 2015 to January 2019.

47.     Defendant Nickolas Stavropoulos ("Stavropoulos") served as the President and COO of PG&E Corporation from March 1, 2017 to September 30, 2018, and served as President of Gas Operations at the Utility from August 17, 2015 to February 28, 2017. Prior to that, he served as Executive Vice President of Gas Operations at the Utility from June 13, 2011 to August 16, 2015. Stavropoulos was a director of the Utility from August 2015 to September 2018.

48.     Defendant Julie M. Kane ("Kane") has served as Senior Vice President, Chief Ethics and Compliance Officer, and Deputy General Counsel for PG&E Corporation since May 18, 2015. Kane is named as a Defendant solely in her capacity as Chief Ethics and Compliance Officer.

49.     Defendant Christopher P. Johns ("Johns") served as the President of Pacific Gas and Electric Company from August 1, 2009 to August 17, 2015.

50.     Defendant Patrick M. Hogan ("Hogan") served as the Utility's Senior Vice President of Electric Operations from March 2016 through January 8, 2019, and he retired from the Utility on January 28, 2019. Prior to that, he served as the Utility's Vice President of Electric Operations Asset Management from November 2013 through February 2016.

51.     The Defendants referenced above in ¶¶45-50 are referred to herein as the "Exchange Act Individual Defendants."

52.     The Exchange Act Individual Defendants, because of their high-level positions of control and authority as senior executive officers of PG&E, possessed the power and authority to control, and did ultimately control, the contents of PG&E's SEC filings, press releases, content

1  on the Company's website and official Twitter.com account, and other market communications

2  during the Class Period. The Exchange Act Individual Defendants were provided with copies of

3  the Company's reports and press releases alleged herein to be misleading prior to or shortly after

4  their issuance and had the ability and opportunity to prevent their issuance or to cause them to be

5  corrected. Because of their positions within the Company and/or Utility, and their access to

6  material information available to them but not to the public, the Exchange Act Individual

7  Defendants knew that the adverse facts specified herein had not been disclosed to, and were

8  being concealed from, the public, and that the positive representations being made were then

9  materially false and misleading. The Exchange Act Individual Defendants are liable for the false

10  statements and omissions pleaded herein.

11  **VI.   SUBSTANTIVE ALLEGATIONS SUPPORTING THE EXCHANGE ACT CLAIMS**

12

13  **A.   PG&E Operates Within a Robust Legal Regime**

14  53.   As detailed herein, electricity transmission and distribution is a heavily regulated industry in California.

15

16  **1.   California Law Required PG&E to Maintain a Safe Distance Between Its Electrical Equipment and Nearby Vegetation**

17  54.    To ensure public safety from wildfires, California has laws and regulations that

18  require PG&E to keep its electrical equipment clear from vegetation growth or hazardous trees,

19  and otherwise safe.

20  55.   Pursuant to California Public Resources Code Section 4292, for instance:

21  [A]ny person that owns, controls, operates, or maintains any
   electrical transmission or distribution line upon any mountainous
22  land, or forest-covered land, brush-covered land, or grass-covered
   land shall, during such times and in such areas as are determined to
23  be necessary by the director or the agency which has primary
   responsibility for fire protection of such areas, maintain around and
24  adjacent to any pole or tower which supports a switch, fuse,
   transformer, lightning arrester, line junction, or dead end or corner
25  pole, a firebreak which consists of a clearing of not less than 10
   feet in each direction from the outer circumference of such pole or
26  tower.

27  56.   Similarly, California Public Resources Code Section 4293 provides that:

28

---

PGE-BK-0000001311

1    [A]ny person that owns, controls, operates, or maintains any
2    electrical transmission or distribution line upon any mountainous
     land, or in forest-covered land, brush-covered land, or grass-
3    covered land shall, during such times and in such areas as are
     determined to be necessary by the director or the agency which has
4    primary responsibility for the fire protection of such areas,
     **maintain a clearance of the respective distances which are**
5    **specified in this section in all directions between all vegetation**
     **and all conductors which are carrying electric current**: (a) For
6    any line which is operating at 2,400 or more volts, but less than
     72,000 volts, four feet. (b) For any line which is operating at
7    72,000 or more volts, but less than 110,000 volts, six feet. (c) For
     any line which is operating at 110,000 or more volts, 10 feet. In
8    every case, such distance shall be sufficiently great to furnish the
     required clearance at any position of the wire, or conductor when
9    the adjacent air temperature is 120 degrees Fahrenheit, or less.
     **Dead trees, old decadent or rotten trees, trees weakened by**
10   **decay or disease and trees or portions thereof that are leaning**
     **toward the line which may contact the line from the side or**
11   **may fall on the line shall be felled, cut, or trimmed so as to**
     **remove such hazard**.

12    57.    Cal Fire interprets this law to "mean[] that a tree, or portion thereof, that is

13   leaning toward the line, must be 'felled, cut, or trimmed' regardless of its health, if it 'may

14   contact the line from the side or may fall on the line.'"  The law also "requires utilities to identify

15   and remove such hazards."  Thus, Section 4293 not only "mandates that utilities trim or remove

16   limbs overhanging powerlines if those limbs are inside the statutory clearance distances," but

17   further "also mandates that utilities trim or remove, among other hazards, trees or portions

18   thereof that are leaning toward the powerlines, including overhanging limbs, if those trees or

19   limbs **may** contact the line from the side or fall on the line."  Cal Fire also makes clear that "[a]

20   utility's compliance with Section 4293 is mandatory, not discretionary."[10]

21    **2.    California Law Required PG&E to Safely Maintain Its Electrical**
           **Equipment and Infrastructure**
22
23    58.    In addition to the vegetation management regulations discussed above, California

24   laws and regulations further require PG&E to safely maintain its electrical equipment and

25

26

27   ─────────────────
     [10] Supplemental Response of Cal Fire following Jan. 30. 2019 Hearing on Order to Show
     Cause, *U.S. v. Pacific Gas and Electric Co.*, No. 14-cr-175 ("PG&E Criminal Proceedings")
28   (N.D. Cal. Feb. 6, 2019), ECF No. 1012.

1    infrastructure, including an obligation to maintain the towers and poles that carry its transmission

2    and distribution lines.

3        59.    Pursuant to California Public Utilities Code Section 451:

4             Every public utility shall furnish and maintain such adequate,
              efficient, just, and reasonable service, instrumentalities, equipment,

5             and facilities, including telephone facilities, as defined in Section
              54.1 of the Civil Code, as are necessary to promote the safety,

6             health, comfort, and convenience of its patrons, employees, and the
              public.

7

8        60.    California Health & Safety Code Section 13007 further provides:

9             Any person who personally or through another wilfully,
              negligently, or in violation of law, sets fire to, allows fire to be set

10            to, or allows a fire kindled or attended by him to escape to, the
              property of another, whether privately or publicly owned, is liable

11            to the owner of such property for any damages to the property
              caused by the fire.

12        61.    Accordingly, California law required PG&E to maintain its electrical equipment

13    and infrastructure, including electrical towers and poles, sufficiently to prevent wildfires from

14    being caused by the failure of its towers and poles.

15            **3.**       **PG&E Is Regulated by the CPUC**

16        62.    PG&E's primary regulator is the California Public Utilities Commission

17    ("CPUC"). The CPUC promulgates safety regulations and adjudicates PG&E's annual General

18    Rate Cases – essentially determining which costs PG&E may pass on to rate-payers, and which

19    costs PG&E must bear. The CPUC was created under Article XII of the California State

20    Constitution, and derives its regulatory authority from Section 701 of the California Public

21    Utilities Code.

22           **(a)**      **CPUC's General Orders 95 and 165 Impose Strict Safety**
                **Regulations on PG&E**

23

24        63.    Pursuant to CPUC General Order 95, Rule 35, PG&E was required "to establish

25    necessary and reasonable clearances" between overhead conductors and nearby vegetation, with

     certain "minimum clearances" set forth by CPUC. Furthermore, this rule required that:

26

27            When a supply or communication company has actual knowledge,
              obtained either through normal operating practices or notification

28            to the company, that dead, rotten or diseased trees or dead, rotten
              or diseased portions of otherwise healthy trees overhang or lean

Case: 19-30088    Doc# 5375-1    Filed: 01/14/20    Entered: 01/14/20 16:07:57    Page 27
of 50

PGE-BK-0000001313

> toward and may fall into a span of supply or communication lines, said trees or portions thereof should be removed.
>
> * * *
>
> When a supply or communication company has actual knowledge, obtained either through normal operating practices or notification to the company, that its circuit energized at 750 volts or less shows strain or evidences abrasion from vegetation contact, the condition shall be corrected by reducing conductor tension, rearranging or replacing the conductor, pruning the vegetation, or placing mechanical protection on the conductor(s).

64. CPUC General Order 95 provides further details regarding the maintenance and upkeep of PG&E's power lines and infrastructure. Among other things, it provides that "[a]ll lines and portions of lines shall be maintained in such condition as to provide safety factors not less than those specified in Rule 44.3." Rule 44, in turn, details the safety factors that apply to "Poles Towers and Structures," and provides that "[i]n no case shall the application of this rule be held to permit the use of structures or any member of any structure with a safety factor less than one." This order further provides certain requirements intended to, among other things, guard against corrosion.[11]

65. Pursuant to CPUC General Order 165, PG&E must also follow certain "requirements for electric distribution and transmission facilities (excluding those facilities contained in a substation) regarding inspections in order to ensure safe and high-quality electrical service." In relevant part, General Order 165 requires that: "Each utility subject to this General Order shall conduct inspections of its distribution facilities, as necessary, to ensure reliable, high-quality, and safe operation."[12]

---

[11] CPUC General Order 95, *Rules for Overhead Electric Line Construction* (May 2018), http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M217/K418/217418779.pdf

[12] CPUC General Order 165, *Inspection Requirements for Electric Distribution and Transmission Facilities* (Dec. 2017), http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M209/K552/209552704.pdf.

PGE-BK-0000001314

**(b)     CPUC's Resolution ESRB-8 Imposes on PG&E an Obligation
to Adopt, Promulgate and Follow the ESRB-8 Shutoff Protocol**

66.     On July 16, 2018, the CPUC issued Resolution ESRB-8.  Recognizing that the

"2017 California wildfire season was the most destructive wildfire season on record," the

resolution required California's utilities, including PG&E, to adopt, promulgate and follow "de-

energization policy and procedures" pursuant to which each utility will "de-energize power

lines" as a means to mitigate wildfire risks "to ensure public safety."  It further established

notification, mitigation, and reporting requirements.

67.     Resolution ESRB-8 included the following directives:

PROPOSED OUTCOME:
This Resolution extends the de-energization reasonableness, public
notification, mitigation and reporting requirements in Decision
(D.) 12-04-024 to all electric Investor Owned Utilities (IOUs)
[including PG&E] and adds new requirements.  It also places a
requirement on utilities to make all feasible and appropriate
attempts to notify customers of a de-energization event prior to
performing de-energization.

SAFETY CONSIDERATIONS:
De-energizing electric facilities during dangerous conditions can
save lives and property and can prevent wildfires. This resolution
provides guidelines that IOUs must follow and strengthens public
safety requirements when an IOU decides to de-energize its
facilities during dangerous conditions.

*          *          *

PG&E reports that prior to 2018, it did not have a policy to de-
energize lines as a fire prevention measure. PG&E reported that it
did not proactively de-energize lines due to extreme fire weather
conditions in 2017. However, in March 2018 PG&E announced
that it is developing a program to de-energize lines during periods
of extreme fire conditions and has been meeting with local
communities to gather feedback.

*          *          *

▪   The IOU shall ensure that de-energization policies and
procedures are well-communicated and made publicly
available, including the following:

●   **Make available and post a summary of de-
energization policies and procedures on its
website.**

●   Meet with representatives from local communities
that may be affected by de-energization events,

---

1
          before putting the practice in effect in a particular
area.

2

3
    •   Provide its de-energization and restoration policy **in
full**, and in summary form, to the affected
community officials before de-energizing its
circuits.

4

5
                    *      *      *

6
    De-energization of electric facilities could save lives, protect
property, and prevent fires.

7

8
###     (c)    PG&E Must Follow CPUC's Regulations Under Penalty of Law

9
    68.    The CPUC's regulations have the full force of law, and PG&E has a legal

10
obligation to follow them, including the general orders and resolutions listed above, under

11
penalty of law.

12
    69.    For example, California Public Utilities Code Section 702 provides that:

13
    Every public utility shall obey and comply with every order,
decision, direction, or rule made or prescribed by the commission

14
in the matters specified in this part, or any other matter in any way
relating to or affecting its business as a public utility, and shall do

15
everything necessary or proper to secure compliance therewith by
all of its officers, agents, and employees.

16
    70.    Further, under California Public Utilities Code Section 2106:

17

18
    Any public utility which does, causes to be done, or permits any
act, matter, or thing prohibited or declared unlawful, or which
omits to do any act, matter, or thing required to be done, either by

19
the Constitution, any law of this State, or any order or decision of
the commission, shall be liable to the persons or corporations

20
affected thereby for all loss, damages, or injury caused thereby or
resulting therefrom. If the court finds that the act or omission was

21
wilful, it may, in addition to the actual damages, award exemplary
damages.

22
###     4.    Cal Fire Is the Duly Authorized Investigative Arm of the State of California for Wildfires

23

24
    71.    Cal Fire is an agency of the State of California that, pursuant to Title 14 of

25
California's Code of Regulations, is administratively in charge of both the state's fire

26
departments and its law enforcement related to state fire and forest laws. As a result, it is

27
responsible for both fighting fires as they occur and for investigating the causes of fires after they

28
have been contained. Cal Fire conducts official investigations as an arm of the State of California

---

Case: 19-30088   Doc# 5375-1   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 30
of 50

PGE-BK-0000001316

1   to determine the causes of wildfires within the state, as well as any violations of state laws and

2   regulations.

3        72.    Pursuant to an agreement with the U.S. Department of the Interior and the U.S.

4   Department of Agriculture, Cal Fire is the state agency that is authorized to make fire cause and

5   origin determinations for wildfires – such as the North Bay fires and Camp Fire – that fall within

6   its jurisdiction.

7           **5.**      **Under California's Inverse Condemnation Law, PG&E Would Not
Bear the Cost of Wildfires It Causes if It Could Prove That It Acted
8**                  **Reasonably and Prudently**

9        73.    The California Supreme Court has interpreted Article 1, Section 19 of the

10   California Constitution as imposing a doctrine known as "inverse condemnation," whereby

11   public utilities such as PG&E are required to compensate individuals whose real property has

12   been damaged by the utility under a strict liability regime. However, importantly, a utility such

13   as PG&E is able to recover those same costs from the CPUC – effectively passing the costs from

14   the shareholders to the rate payers – if it can "affirmatively prove that it reasonably and

15   prudently operated and managed its system." Order Denying Rehearing of Decision (D.) 17-11-

16   033 at 3, App. of SDG&E for Authorization to Recover Costs Related to the 2007 Southern Cal.

17   Wildfires Recorded in the Wildfire Expense Memo Account, App. No. 15-09-010, Decision 18-

18   07-025 (July 12, 2018).

19        74.    In other words, PG&E bears the costs of wildfires it causes unless it can prove

20   that it was "reasonable and prudent," meaning "that at a particular time any of the practices,

21   methods, and acts engaged in by a utility follows the exercise of reasonable judgment in light of

22   facts known or which should have been known at the time the decision was made." *Id.* Embodied

23   in this standard, at a minimum, is compliance with state safety laws and regulations.

24           **6.**      **Federal Law Also Requires PG&E to Follow Minimum Safety
Standards**

25        75.    PG&E is also required by law to adhere to a number of federal laws and

26

27   regulations. FERC Electric Reliability Standard FAC-003-4, for example, "requires that trees

28

PGE-BK-0000001317

and other vegetation growing in or adjacent to the power line right-of-way be trimmed to prevent power outages caused by tree contact with a transmission line."[13]

76.    FAC-003-4 also imposes minimum vegetation clearance distances that depend on the type of current (alternating or direct), the nominal and maximum system voltages, and the altitude of the conductor above sea level. FAC-003-4 also imposes other requirements on owners and operators of transmission facilities, including but not limited to annual inspections, annual completion of necessary work, timely notification and correction of urgent conditions and documentation of vegetation management practices.[14]

**B.    PG&E's Vegetation Management Expenditures Did Not Materially Change from Year to Year During the Class Period, Let Alone Double at Any Point**

77.    The State of California declared a state of emergency due to drought conditions in January 2014,[15] which ended in April 2017.[16] In October 2015, California also declared a state of emergency regarding tree mortality due to both the ongoing effects of the drought and an epidemic of insect infestations causing millions of trees to die annually.[17] These conditions added to the already existing danger of wildfires in the North Bay region of California as a result of PG&E's safety violations. PG&E knew about these conditions and its obligations to ensure safety from wildfires in spite of these environmental factors. For example, the "Proclamation of a State of Emergency" regarding tree mortality made explicit: **"[U]tilities . . . to the extent**

---

[13] *See* FERC, *Tree Trimming & Vegetation Management* (updated Apr. 10, 2018), https://www.ferc.gov/industries/electric/indus-act/reliability/vegetation-mgt.asp; FERC, *FAC-003-4 Transmission Vegetation Management*, https://www.ferc.gov/industries/electric/indus-act/reliability/vegetation-mgt/fac-003-4.pdf; *see also* Order Adopting New Conditions of Probation, PG&E Criminal Proceedings, (N.D. Cal. Apr. 3, 2019), ECF No. 1040.

[14] *See* PG&E Response to Request for Information at 4, PG&E Criminal Proceedings (N.D. Cal. Feb. 22, 2019), ECF No. 1016.

[15] California Drought, *State Water Board Approves State and Federal Water Projects Petition to Conserve Water During Drought Conditions*, Drought News Release Archive (Jan. 31, 2014), https://drought.ca.gov/news/story-21.html.

[16] California Executive Dept., *Executive Order B-40-17* (Apr. 7, 2017), https://www.gov.ca.gov/wp-content/uploads/2017/09/4.7.17_Exec_Order_B-40-17.pdf.

[17] California Executive Dept., *Proclamation Of A State of Emergency* (Oct. 30, 2015), https://www.gov.ca.gov/wp-content/uploads/2017/09/10.30.15_Tree_Mortality_State_of_Emergency.pdf.

---

Case: 19-30088    Doc# 5375-1    Filed: 01/14/20    Entered: 01/14/20 16:07:57    Page 32 of 50
PGE-BK-0000001318

**required by their existing responsibilities to protect the public health and safety, shall**

**undertake efforts to remove dead or dying trees in these high hazard zones that threaten**

**power lines. . . .”**

78.    Based on information released by CPUC, PG&E spent $194,094,406 on

vegetation management in 2015, $198,735,579 in 2016, and $201,456,193 in 2017 – increases of

only 2.4% and 1.4%, respectively.[18] Each year's spending was substantially identical to the

amounts PG&E requested, and the amounts CPUC approved, in PG&E's 2015, 2016, and 2017

General Rate Cases – notwithstanding the state of emergency directive above and PG&E's

continued deficient safety practices. In contrast, inflation rose 5.48% over the same three-year

period.[19] Thus, PG&E's spending did not even keep pace with inflation during the Class Period.

79.    CPUC released the following chart confirming that PG&E's vegetation

management spending underwent only modest increases over the relevant time period:

*Table showing 2011-2017 history of PG&E annual spending ($ million) on vegetation management*

| | PG&E Requested | CPUC Authorized | PG&E Spent |
|---|---|---|---|
| **2017** | $201.0 | $201.0 | *$150.4 YTD* |
| **2016** | $198.8 | $198.8 | $198.7 |
| **2015** | $194.2 | $194.2 | $194.1 |
| **2014** | $190.0 | $190.0 | $189.7 |
| **2013** | $180.0 | $161.5 | $161.6 |
| **2012** | $180.0 | $161.5 | $161.5 |
| **2011** | $180.0 | $161.5 | $161.6 |

---

[18] Letter from CPUC to PG&E re: Advice Letter 4827-E (June 3, 2016), https://www.pge.com/tariffs/tm2/pdf/ELEC_4827-E.pdf; Letter from CPUC to PG&E re: Advice Letter 5036-E (Apr. 25, 2017), https://www.pge.com/tariffs/assets/pdf/adviceletter/ELEC_5036-E.pdf.; Letter from CPUC to PG&E re: Advice Letter 5402-E (Nov. 29, 2018), https://www.pge.com/tariffs/assets/pdf/adviceletter/ELEC_5402-E.pdf.

[19] CPI Inflation Calculator, Bureau of Labor Statistics, https://www.bls.gov/data/inflation_calculator.htm.

Case: 19-30088   Doc# 5375-1   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 33 of 50

PGE-BK-0000001319

80.     While Defendants falsely represented on November 2, 2017 that PG&E "*doubled*" vegetation management expenditures in 2016 (*see* ¶¶258 & 264), tellingly, they made this claim only after the North Bay Fires. At no point did the Company identify any specific budget item indicating that its vegetation management budget had, in fact, doubled.  Nor did it disclose these expenditures were inadequate to reasonably ensure safety.  Indeed, as Judge Alsup later found, "PG&E's performance with respect to vegetation management has been **dismal.**"

81.     It was only after the Camp Fire that PG&E announced in December 2018 that it plans to spend an additional $5 billion on wildfire safety programs over five years, with a focus on improving its vegetation management efforts. This post-Class-Period development strongly supports the inference that the Company's previous vegetation management expenditures of around $200 million per year had been dangerously inadequate.[20]  In fact, it was not until PG&E's 2019 vegetation management plan, detailed further below, that the Company indicated that it was materially increasing its vegetation management spending, to more than $338 million.

### C.     PG&E's Tree Trimming and Removal Did Not Come Close to Doubling During the Class Period

82.     Likewise, the Company's reported numbers for trees that it trimmed or removed during this time period did **not** double, or come close to doubling. During the Class Period, the Company reported the results of its vegetation management expenditures, slowly inflating the numbers it was reporting.  Initially, it touted that its tree trimming and removal amounted to "**1.2 million trees**" total (November 18, 2015, statement of Hogan) or generally "**more than 1 million trees each year**" (May 4, 2016, statement of Earley). At first, it stated that these totals included "about **236,000 dead or dying trees**" as "part of its comprehensive response to tree mortality in the state" (May 3, 2017, Press Release).

---

[20] *PG&E asking state regulators to charge customers up to $12 more a month*, KTVU Fox 2 (Dec. 14, 2018), http://www.ktvu.com/news/pg-e-asking-state-regulators-to-charge-customers-up-to-12-more-a-month.

PGE-BK-0000001320

83.     Soon, however, it was touting that 2016's "**236,000 dead or dying trees**" removed were "in addition to the **1.2 million trees** that PG&E works **each year**" (May 10, 2017, Press Release).

**D.      After the North Bay Fires, PG&E Started Reporting Inflated Numbers for Tree Removal**

84.     Then, after the North Bay Fires, PG&E's numbers crept up by 100,000 trees: "Typically, we spend about **$200 million** every year to line clear or remove **1.3 million trees** to mitigate both the risk of wildfires and to prevent electric outages" **in addition to** the "**incremental 236,000 dead or dying trees**" (November 2, 2017, statement of Williams). This is the same statement where PG&E began to falsely and/or misleadingly tout to investors that it had "*doubl[ed]*" vegetation management expenditures in 2016, *i.e.*, to $400 million (*see* ¶258, *infra*).

85.     Then, when negative news emerged on May 25, 2018 about PG&E's safety violations causing many of the North Bay Fires, the Company's reported number of cleared trees crept up by another 100,000 trees: "Under PG&E's industry-leading Vegetation Management Program, we . . . prune or remove approximately **1.4 million trees annually**" (May 25, 2018, press release).

**E.      PG&E Concealed Its Unsafe Use of Reclosers During the Class Period**

**1.      PG&E Used Reclosers to Prioritize Convenience Over Safety**

86.     "Reclosers" are devices that are affixed to power line poles, to send pulses of electricity into lines when service has become briefly interrupted (*i.e.*, an outage). Although reclosers can in some instances prevent blackouts, it is well known in the industry that they are dangerous in certain circumstances. For instance, if a power line has come into contact with nearby vegetation, it would be dangerous to send an additional pulse of electricity through the line because this could start a fire.

87.     San Diego Gas & Electric Co. and Southern California Edison are two other utility companies that operate in California, along with PG&E. According to a complaint filed in

the state court litigation concerning the North Bay Fires,[21] these two utility companies are aware of the dangers of using reclosers, and they have a practice of blocking reclosers from working during fire season.[22]

88.     Prior to the North Bay Fires, PG&E knew that its reclosers posed a great risk of causing wildfires. PG&E was specifically warned of this hazard in a May 2013 report that the Liberty Consulting Group (the "Liberty Report") submitted to the Safety and Enforcement Division of the CPUC. Moreover, at a November 18, 2015 hearing before the California Senate Sub-Committee on Gas, Electric, and Transportation Safety, the Utility's Vice President of Electrical Operations Asset Management, Defendant Hogan, stated that PG&E had the ability to reprogram its reclosers during fire season so that they did not attempt to restart lines that had been stopped. Hogan acknowledged that shutting down power means "you take the reliability hit, but you gain the wildfire benefit." This statement evidenced that PG&E recognized the downside to disabling its reclosers (because it would increase the risk of blackouts, *i.e.*, the "reliability hit," which would lead to consumer complaints), but that PG&E also understood this measure would improve safety (*i.e.*, the "wildfire benefit"). Unbeknownst to investors, the Company chose short-term "reliability" over safety.[23]

---

[21] Senate Bill Policy Committee Analysis, Assembly Committee on Utilities and Energy (amended June 7, 2018), https://autl.assembly.ca.gov/sites/autl.assembly.ca.gov/files/SB%20901%20%28Dodd%29%20U%26E%20Analysis%206-25-18.pdf.

[22] Wildfire season is a portion of the year, generally 6 to 8 months in the summer and fall in California, declared such by the responsible public agency fire administrator. This declaration is based on fuel and weather conditions conducive to the ignition and spread of wildland fires. Cal Fire Incident Information, Fire Terminology page, http://cdfdata.fire.ca.gov/incidents/incidents_terminology?filter=F.

[23] Notably, PG&E's ESRB-8 Shutoff Protocol embodied the same tradeoff. As a protocol that required PG&E to proactively shut off power when certain conditions were met, it similarly purported to prioritize safety over reliability. Likewise, a failure to abide by the ESRB-8 Shutoff Protocol would evidence another example of the Company choosing reliability over safety, unbeknownst to investors.

Case: 19-30088   Doc# 5375-1   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 36 of 50

PGE-BK-0000001322

## 2. PG&E Concealed Its Use of Reclosers from Investors During the Class Period

89. On November 18, 2015, Defendant Hogan assured the public that PG&E was "*just about done*" with the process of disabling its recloser devices as of that date. He represented that reclosers would be disabled "*first*" in "*high wildfire risk areas*," followed by "126" of "about 130 some odd locations . . . this year," *i.e.*, 2015, which left only "six for next year."

90. However, PG&E did not disable all of its reclosers during fire season, like San Diego Gas & Electric Co. and Southern California Edison did. Rather, during the time of the North Bay Fires, some of PG&E's devices were programmed to try up to three times to restore power by sparking electricity. Hogan's statement concealed that PG&E kept at least certain of its reclosers dangerously in use in a high wildfire risk area through October 2017: PG&E reclosers were to blame for at least one of the North Bay Fires, known as the Pythian Fire.

91. Notably, State Senator Jerry Hill was quoted by NBC on January 3, 2018 as saying that he felt "misled" by PG&E's executives into believing that the Company had followed the lead of its counterparts and shut off its reclosers in all 132 of its high risk fire areas by the start of 2017:

> Hill said he was surprised the company's recloser shutdown was so limited, given that a top PG&E official assured him back in 2015 that the company would be able to shut down reclosers in all 132 of the high risk fire areas by the start of 2017.
>
> "I think that's the troubling part," Hill said, "that **they misled us in that**.
>
> "Had they said they did not have that system in place, then we would have followed up with more questions to try to find what the problem was -- and may have been able to focus in on that a couple of years ago that may have prevented these fires in October."

Likewise, investors were misled by PG&E's recloser statements.

92.     Yet, even as late as **2018**, PG&E was still stating that it would need to commit to disabling these reclosers.[24]

F.      **PG&E Engaged in an Unsafe Pattern of Noncompliance with Safety Requirements Before and Throughout the Class Period**

93.     Despite the important safety measures imposed by California law, PG&E has caused deadly wildfires through its failure to comply with the legal requirements for vegetation management, pole maintenance, and other safety requirements. Between causing the devastating Trauner Fire in 1994 and the deadly Butte Fire in 2015, PG&E repeatedly violated California's vegetation management laws and other regulations.  PG&E assured investors during the Class Period that it had changed, stating in its 2015, 2016, and 2017 Corporate Responsibility and Sustainability Reports that its "vegetation management" was now "*in compliance with relevant laws*" or "*complying with state and federal regulations.*"

94.     Notably, in its undated 2018 Corporate Responsibility and Sustainability Report issued **after** the public learned the true causes of the North Bay Fires, PG&E **no longer** represents to investors that its vegetation management complies with California's safety laws.

1.      **PG&E Was Convicted of Negligence for Starting a Wildfire in 1994**

95.     One of the most notable of the pre-Class Period fires was the "Trauner Fire," where PG&E was convicted of 739 counts of criminal negligence and required to pay $24 million in penalties due to the Company's deficient vegetation management systems.[25]

2.      **PG&E Unsafely Flouts Safety Regulations**

96.     Subsequently, PG&E's deficient vegetation management practices ignited other fires, including the Pendola Fire (1999).[26]

---

[24] PG&E Public Safety Power Shutoff Policies and Procedures, CPUC website (Sept. 2018), http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/News_Room/Public-Safety-Power-Shutoff-Policies-and-Procedures-September-2018.pdf.

[25] In 1994, PG&E's failure to maintain vegetation surrounding its electrical equipment caused the Trauner Fire that burned approximately 500 acres, destroyed 12 homes, and burned 22 structures in the town of Rough and Ready. The fire began when a power line brushed against a tree limb that PG&E was supposed to keep trimmed. Investigators found numerous safety violations involving contact between vegetation and PG&E's power lines.

PGE-BK-0000001324

97.     Moreover, according to documents released by The Utility Reform Network ("TURN"), PG&E planned to replace a segment of the San Bruno pipeline in 2007 that it had identified as one of the riskiest natural gas pipelines in PG&E's system. PG&E collected $5 million from its customers to complete the project by 2009, but instead deferred the project and repurposed the money to other priorities. On September 9, 2010, the San Bruno pipeline exploded, killing 8 people, injuring over 50 more, and destroying 38 homes.

98.     On August 9, 2016, a California federal jury found PG&E guilty of five criminal felony counts for violating minimum federal safety standards under the Natural Gas Pipeline Safety Act, as well as one count for obstructing an agency proceeding after it failed to provide all of its records to the National Transportation Safety Board during an investigation into the San Bruno explosion.

99.     On December 14, 2018, the CPUC opened a case against PG&E alleging, *inter alia*, that **the Company falsified records and data** concerning the safety of its gas pipelines, did not employ an adequate number of pipeline inspectors, and pressured supervisors to unsafely rush work over a five-year period from 2012 to 2017.  These deliberate efforts to cut corners, and defraud regulators and the public about the safety of PG&E's utilities, continued up to and including the Class Period.  The strong inference is that PG&E's statements concealing the inadequate safety of its electrical utilities, during the Class Period, were likewise made with an intent to defraud.[27]  On December 21, 2018, the CPUC issued a Scoping Memo and Ruling, which found that "PG&E has had serious safety problems with both its gas and electric operations for many years" and failed "to develop a comprehensive enterprise-wide approach to address safety."  CPUC concluded that it "was, and remains, concerned that the safety problems

---

*(continued)*
[26] PG&E paid a $14.75 million settlement to the U.S. Forest Service, and a $22.7 million settlement with CPUC after PG&E had been reprimanded for not spending money that had been earmarked for tree trimming and removal.
[27] George Avalos, *PG&E Accused of Gas Pipeline Violations, Falsifying Records: Regulator*, Mercury News (updated Dec. 17, 2018 4:06 am), https://www.mercurynews.com/2018/12/14/pge-accused-of-gas-pipeline-violations-falsifying-records-regulators/.

PGE-BK-0000001325

being experienced by PG&E were **not just one-off situations or bad luck, but indicated a deeper and more systemic problem**."

### 3. PG&E's Unsafe, Noncompliant Vegetation Management Caused the Butte Fire in 2015

100.    In September of 2015, five months after PG&E made Misstatement No. 1 touting its vegetation management, PG&E's vegetation management program once again failed, causing the Butte Fire that killed two people, destroyed 921 homes, businesses, and other structures, and scorched more than 70,000 acres over 22 days.

101.    On April 28, 2016, Cal Fire issued a press release announcing its conclusion that the Butte Fire was caused by PG&E's safety violations. Cal Fire also referred its investigation to the two relevant district attorneys for the counties the Butte Fire burned.

102.    There is currently pending litigation over PG&E's liability for the Butte Fire, including an April 13, 2017 lawsuit in which Cal Fire sued PG&E for $87 million to recover the costs that the agency devoted to fighting that fire. Cal Fire's lawsuit alleges that PG&E caused the Butte Fire by maintaining an inadequate vegetation management system.

### 4. PG&E's Insufficient Safety Practices Allowed Numerous, Company-Wide Vegetation Management and Other Safety Violations During the Class Period

103.    Internally, PG&E's numerous and widespread violations of relevant safety laws are shown by the fact that the Company's internal controls were designed to permit vegetation management and other violations to go unchecked on a dangerous scale.

### (a) PG&E Documented and Tolerated Thousands of Dangerous Safety Violations Across Its Territory During the Class Period

104.    On March 5, 2019, the U.S. District Court presiding over PG&E's criminal probation (Judge Alsup) issued a revised Order to Show Cause relating to PG&E's lack of compliance with vegetation management and other safety regulations.  The Order stated that PG&E's "**unsafe conduct** led to a deadly pipeline explosion and to six felony convictions," and found that PG&E's conduct had now "**led to recurring deadly wildfires caused by its electrical system**."  It contained the following findings summarizing the results of the federal

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3:18-CV-03509-EJD

30

PGE-BK-0000001326

1    court's probe into PG&E's actual knowledge of safety violations leading up to the North Bay

2    and Camp Fires:

3            PG&E's filings have included several relevant **admissions**.
         Significantly, PG&E acknowledged "that vegetation contact is the

4            primary risk driver with respect to ignitions on its distribution
         lines." ("Vegetation" means trees and limbs in this context.) In

5            2016 alone, PG&E experienced approximately **1,400** wires down
         caused by vegetation contact. As PG&E reported to the CPUC,

6            during 2015 and 2016, vegetation contact with conductors was the
         leading cause of the **486** fire ignitions associated with PG&E

7            facilities, causing **37%** of those fires. **PG&E further admitted
         that as of June 2017, there were 3,962 unworked trees which**

8            **PG&E had identified in 2016 as hazardous with the potential
         to "fall into or otherwise impact the conductors, towers or guy**

9            **wires before the next inspection cycle."**[28]

10           105.    Thus, PG&E has admitted that it had **actual knowledge since 2015** that its

11   vegetation management practices did not comply with California safety regulations on the order

12   of **thousands of violations per year**. PG&E has further admitted to **actually knowing** that its

13   violations have **caused hundreds of wildfires per year since 2015**.  However, PG&E never

14   disclosed that their own internal compliance reviews showed a lack of compliance on such a

15   huge scale.

16           106.    According to data released by the CPUC,[29] PG&E equipment caused a total of

17   1,486 vegetation fires between June 10, 2014 and December 29, 2017.  Among those vegetation

18   fires, 69 were caused by transmission lines like the line implicated in causing the Camp Fire,

19   including 26 fires caused by lines of the exact same high voltage, 115 kilovolts.  PG&E supplied

20   the CPUC with this information under the regulator's Decision 14-02-015, which enacted a "Fire

21   Incident Data Collection Plan."[30]

22

23   [28] Second Order to Show Cause Why PG&E's Conditions of Probation Should Not Be
     Modified, PG&E Criminal Proceedings (N.D. Cal. Mar. 5, 2019), ECF No. 1027.

24   [29] PG&E Fire Incident Data Collection Plan Report Data Compiled from 2014-2017, CPUC
     website,

25   http://www.cpuc.ca.gov/uploadedFiles/CPUC_Website/Content/About_Us/Organization/Divisio
     ns/News_and_Outreach_Office/PGE_Fire%20Incident%20Data%202014-2017.pdf.

26   [30] Decision Adopting Regulations To Reduce The Fire Hazards Associated With Overhead

27   Electric Utility Facilities and Aerial Communications Facilities, CPUC Decision 14-02-015
     (CPUC Feb. 5, 2014),

28   http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M087/K892/87892306.PDF. Pursuant to

PGE-BK-0000001327

107.     Similarly, according to documents described in a report by *NBC Bay Area*, PG&E completed a review of its transmission towers' safety compliance immediately after the Camp Fire.  As a result, "PG&E's inspections of thousands of transmission towers since the deadly Camp Fire in Butte County found more than 450 safety violations, including 59 that posed serious safety hazards."[31]

**(b)      PG&E Had Actual Knowledge That Its Insufficient Safety Practices Had the Potential to Allow for Dangerous Safety Violations on the Order of Hundreds of Thousands to a Million Wildfire Hazards**

108.     Investigative journalists and attorneys have uncovered that PG&E internally accepts that its vegetation management practices leave 1 of every 100 trees noncompliant with California regulations, and further reportedly "cheats" on its internal compliance reviews, in order to give a misleading impression of compliance with tree clearance requirements when it is in fact noncompliant. According to a report from NBC reporter Jaxon Van Derbeken on November 6, 2017, published a month after the North Bay Fires began, PG&E's own internal inspectors allow one out of 100 trees they check to violate state power line clearance standards:

> **PG&E auditors allow one out of 100 trees they check to violate state power line clearance standards**, NBC Bay Area has learned.
>
> * * *
>
> [I]t emerged during the Butte fire litigation that [internal] auditors were giving out a passing grade when one out of 100 trees they checked turned out to be too close to power lines under state standards.
>
> * * *
>
> When [PG&E] failed to reach that 99 percent compliance rate in the area around the fire . . . the company just expanded the universe of trees covered in a particular audit.

*(continued)*
the Fire Incident Data Collection Plan, PG&E and other investor-owned electric utilities must "collect and report data to SED regarding power-line fires." *Id.* ("SED" refers to CPUC's Safety and Enforcement Division).

[31] Jaxon van Derbeken, *PG&E Inspectors Find Hundreds of Safety Issues on Electrical Towers*, NBC Bay Area (Apr. 12, 2019), https://www.nbcbayarea.com/investigations/PGE-Inspectors-Find-Hundreds-of-Safety-Issues-on-Electrical-Towers-508344011.html.

"So what PG&E does when it doesn't pass, it basically cheats," [Amanda Riddle, one of the attorneys participating in a lawsuit against PG&E related to the Butte Fire] said. "It adds more miles and more miles until it reaches a passing grade."

109.    With approximately 123 million trees under PG&E's control,[32] this means that PG&E knew during the Class Period that it may have been tolerating as many as approximately 1.2 million trees to be noncompliant with state safety laws at any given time.  The measurement of 1.2 million safety violations is a conservative estimate when combined with the detail that PG&E "cheats" to get its rate of violations down to 1%, hence PG&E's real rate of noncompliance may be even higher.

110.    According to the plaintiffs litigating against PG&E for injuries caused by the 2015 Butte Fire, Defendant Hogan's and another PG&E employee's deposition testimony purportedly showed that "PG&E knows and accepts that 1-in-100 trees will be non-compliant, and that 1-in-1000 will be touching its powerlines." Using the same metrics, this means that PG&E knows that it could be allowing as many as approximately 123,000 safety violations in the nature of trees touching its powerlines at any given time.

### G.    Investors Could Not Have Reasonably Expected the Extent of PG&E's Unsafe Pattern of Noncompliance that Caused the North Bay Fires and the Camp Fire

#### 1.    PG&E's Noncompliance with Vegetation Management and Pole Integrity Requirements Caused the North Bay Fires

111.    Of the eighteen main North Bay Fires for which Cal Fire's investigations have been completed, **seventeen** were caused by PG&E equipment. **Eleven** of these fires evidenced violations of California safety regulations, in **seven** different counties at the **same time**. Most of these violations pertained to PG&E's failures to clear vegetation or maintain the integrity of its poles.

---

[32] *See* PG&E's Response to Safety and Enforcement Divisions' 10/14/17 Questions, CPUC website (Oct. 17, 2017), http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/Response%20to %20Data%20Request.pdf.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                                          33
CIVIL ACTION NO. 3:18-CV-03509-EJD

PGE-BK-0000001329

112.     Even though Cal Fire's investigations have not found evidence of violations for six of the fires, PG&E's numerous, widespread safety violations actually caused or exacerbated **all** of the North Bay Fires. PG&E's safety violations exacerbated even the fires that lacked evidence of violations, in two ways. First, some of the eleven fires caused by PG&E's safety violations merged into and strengthened other fires. Second, PG&E's safety violations diverted scarce firefighting resources to contain the eleven North Bay Fires which never should have ignited, leading to the other fires causing more damage. As such, PG&E's safety violations were responsible, in full or in part, for **all** of the North Bay Fires, thereby negatively impacting the Company's financial condition.

### 2.     PG&E's Noncompliance with Vegetation Management and Pole Integrity Requirements Caused the Camp Fire

113.     On May 15, 2019, Cal Fire issued a press release announcing its determination that PG&E's electrical equipment caused the Camp Fire.[33]  Cal Fire further concluded, "[a]fter a very meticulous and thorough investigation," that PG&E caused **both** of the Camp Fire's two ignition points.  Cal Fire also referred its investigation to the Butte County District Attorney to review for potential criminal violations.  As noted above, PG&E expects to bear at least $10.5 billion, if not more, in liability for causing this fire.

### (a)     The Camp Fire's First Ignition Point Was Caused by PG&E Safety Violations

114.     The Camp Fire's first ignition point was "in the Pulga area," according to Cal Fire, and "was caused by electrical transmission lines owned and operated by Pacific Gas and Electric[]."[34]  Per its May 15, 2019 press release, "PG&E accepts this determination."[35]

---

[33] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May 15, 2019), https://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.

[34] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May 15, 2019), https://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.

[35] Press Release, PG&E, *PG&E Responds to Camp Fire Announcement from CAL FIRE* (May 15, 2019), https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20190515_pge_responds_to_camp_fire_announcement_from_cal_fire.

PGE-BK-0000001330

115.    According to firefighter radio transmissions and the journalist whose investigation made them public late on November 9, 2018, firefighters were dispatched to a vegetation fire "under the high tension power lines" across the Feather River from Poe Dam in Butte County on November 08, 2018 at 6:33 a.m.[36]—matching the location where Cal Fire officials pinpointed the Camp Fire's origin four minutes earlier.[37] As one firefighter described the fire to dispatch: "It is on the west side of the river underneath the transmission lines."

116.    Independently that evening, PG&E admitted to the CPUC that one of its 115-kilovolt transmission lines on Pulga Road in Butte County experienced an outage at 6:15 a.m. that day, and noted that the site was near the Camp Fire.[38] Cal Fire has listed Pulga Road as the Camp Fire starting point.[39]

117.    The same report acknowledged that an aerial patrol later that day, "in the afternoon," observed "damage to a transmission tower" on the same 115 kilovolt transmission line. In a supplemental report filed with the CPUC on December 11, 2018, PG&E identified the tower as number ":27/222" and further specified that this observed damage included the separation of a suspension insulator, meant to support a transposition jumper, from an arm on the tower.[40] PG&E also observed a broken C-hook attached to the separated suspension insulator

---

[36] Matthias Gafni, *PG&E Power Lines May Have Sparked Deadly Camp Fire, According To Radio Transmissions,* Mercury News (updated Nov. 12, 2018 12:03 pm), https://www.mercurynews.com/2018/11/09/pge-power-lines-may-have-sparked-deadly-butte-county-wildfire-according-to-radio-transmissions/.

[37] Camp Fire Incident Update, CAL FIRE Incident Information (Nov. 22, 2018 7:00 pm), http://cdfdata.fire.ca.gov/admin8327985/cdf/images/incidentfile2277_4319.pdf .

[38] CPUC Email re: Electric Safety Incident Reported - PG&E Incident No: 181108-9002 (Nov. 8, 2018), http://s1.q4cdn.com/880135780/files/doc_downloads/2018/wildfire/11/Electric-Safety-Incident-Reported-Pacific-Gas-Electric-Incident-No-181108-9002.pdf, *see also,* Tony Bizjak, *PG&E Reports Power Line Problem In Butte County Near Time and Place Where Wildfire Sparked,* The Fresno Bee (updated Nov. 10, 2018 7:51 PM), https://www.fresnobee.com/news/state/california/article221448500.html.

[39] Camp Fire Incident Information, CAL FIRE Incident Information (last modified May 15, 2019), http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=2277.

[40] PG&E Letter to CPUC re: Supplements the Notices provided Nov. 8, 2018 (Dec. 11, 2018), http://s1.q4cdn.com/880135780/files/doc_downloads/2018/wildfire/12/12-11-18.pdf.

Case: 19-30088   Doc# 5375-1   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 45 of 50

PGE-BK-0000001331

1  that once connected the suspension insulator to a tower arm.[41]  According to the report, the

2  connection point showed signs of wear; a flash mark was visible close to where the transposition

3  jumper was suspended; and there was damage to the transposition jumper and suspension

4  insulator.[42]

5      118.    PG&E had not inspected Tower :27/222 since August 2014, and prior to that, not

6  since 2009, pursuant to an internal policy whereby "Steel structures on PG&E's 115 kV

7  transmission lines, such as Tower :27/222, are subject to maintenance patrols annually and

8  detailed inspections every five years."  PG&E has admitted that an aerial patrol is not an

9  inspection, as it is only "[d]uring a detailed inspection of a transmission line" that "PG&E

10  personnel are instructed to look for and document abnormalities or circumstances that will

11  negatively impact safety, reliability, or asset life."[43]

12      119.    Moreover, just one day prior to the Camp Fire's ignition, PG&E had contacted a

13  Pulga landowner named Betsy Ann Cowley regarding transmission line poles on her property

14  that "were having problems with sparks."[44]

15      120.    Accordingly, it emerged that a PG&E electrical pole carrying a high-voltage 115

16  kilovolt transmission line lost its integrity, in whole or in part, on the morning of November 8,

17  2018.  Shortly thereafter, vegetation underneath the line ignited.  PG&E's failure to maintain a

18  clearance for vegetation up to 10 feet away from this transmission line, inclusive of all

19  vegetation underneath, violated California Public Resources Code Section 4293.  Further,

20  PG&E's failure to maintain the integrity of its poles and prevent their loss of function violated

21  California Public Utilities Code Section 451.

22

23  [41] *Id.*

24  [42] *Id.*  The same report noted that, at a neighboring tower, an "insulator hold down anchor"
    had become disconnected.  *Id.*

25  [43] PG&E Camp Fire Incident Description & Factual Summary at 4, PG&E Criminal
    Proceedings (N.D. Cal. Dec. 31, 2018), ECF No. 956-1.

26  [44] Matthias Gafni, *Update: PG&E says email to Camp Fire Victim Focused on Different

27  Transmission Line,* Mercury News (updated Nov. 14, 2018 3:59 PM),
    https://www.mercurynews.com/2018/11/12/state-regulators-investigating-pge-socal-edison-for-

28  roles-in-deadly-camp-woolsey-fires/.

PGE-BK-0000001332

(b)   **The Camp Fire's Second Ignition Point Was Also Caused by PG&E's Safety Violations**

121.   Cal Fire determined that the Camp Fire also had a second ignition point, which began "near the intersection of Concow Rd. and Rim Rd" before merging with the first fire PG&E caused at first ignition point.[45]  According to Cal Fire's report: "The cause of the second fire was determined to be vegetation into electrical distribution lines owned and operated by PG&E," a violation of California Public Resources Code Sections 4292 and 4293, as well as California Public Utilities Code Section 451.  Thus, Cal Fire has concluded that PG&E's violation of safety regulations caused at least one of the Camp Fire's two ignition points.

122.   Cal Fire first announced that it had identified a second ignition point for the Camp Fire on November 15, 2018.[46]  On November 16, 2018, PG&E admitted to CPUC that the same day the Camp Fire ignited (indeed, minutes later at 6:45 a.m.), it experienced a second outage on another power line in a nearby part of Butte County near Concow, California.[47]

123.   In PG&E's December 11, 2018 supplemental report to CPUC, PG&E further admitted that it discovered a broken pole on the second power line on November 9, 2018; that the pole was on the ground, along with pole equipment; and that the pole had a line recloser.[48]  The supplemental report also detailed a second inspection of the area on November 12, 2018, where a PG&E employee found damaged and downed poles, several snapped trees, downed

---

[45] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May 15, 2019), http://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.

[46] Andre Byik, *Camp Fire Investigation Leads To Possible Second Origin Away From Pulga*, Enterprise-Record (updated Nov. 15, 2018 10:06 PM), https://www.chicoer.com/2018/11/15/camp-fire-investigation-leads-to-another-area-away-from-pulga/.

[47] CPUC Email re: Electric Safety Incident Reported - PG&E Incident No: 181116-9015 (Nov. 16, 2018), http://www.cpuc.ca.gov/uploadedFiles/CPUCWebsite/Content/News_Room/NewsUpdates/2018/EIR_IncidentNo181116-9015.pdf; *PG&E Reports Another Outage On The Morning When California Camp Fire Started*, CNBC (Nov. 19, 2018 6:43 AM), https://www.cnbc.com/2018/11/19/pge-reports-another-outage-on-the-morning-when-california-camp-fire-started.html.

[48] PG&E Letter to CPUC re: Supplements the Notices provided Nov. 8, 2018 (Dec. 11, 2018), http://s1.q4cdn.com/880135780/files/doc_downloads/2018/wildfire/12/12-11-18.pdf.

---

Case: 19-30088   Doc# 5375-1   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 47 of 50
PGE-BK-0000001333

1   wires, and some snapped trees on top of the downed wires.[49]  The presence of the line recloser

2   further calls into question PG&E's prior representation that it was "just about done" disabling

3   recloser devices in "high wildfire risk areas" as of November 18, 2015 (Misstatement No. 3).

4        124.    Accordingly, the truth emerged that the Camp Fire's second ignition point also

5   exhibited evidence of failures regarding vegetation management, pole integrity, and the possible

6   use of a recloser in further violation of California safety regulations, including Public Resources

7   Code Sections 4292, 4293 and Public Utilities Code Section 451.  Cal Fire's investigation later

8   confirmed these facts.

9        **H.**     **PG&E's Repeated Vegetation Management and Pole Integrity Safety**

10             **Violations Show that the Company Knew of Its Numerous and Widespread Violations of Fire Safety Regulations Throughout the Class Period, but Did Not Change Its Practices to Reduce, Much Less Eliminate, Those Safety**

11             **Violations**

12            **1.**     **PG&E Did Not Improve Its Inadequate Safety Practices After Its Safety Violations Caused the Deadly Butte Fire**

13        125.    Even though PG&E suffered from endemic wildfire safety problems, the

14   Company did not meaningfully change its practices even after the deadly Butte Fire that occurred

15   in 2015. As noted above, in a deposition transcript that has not yet been made publicly available,

16   PG&E's Vegetation Program Manager (Stockton Division)[50] Richard Yarnell reportedly testified

17   under oath: "**PG&E—to the best of my knowledge, we have not made any changes as a**

18   **result of this fire**" as of April 10, 2017. Accordingly, the **known** noncompliance that caused the

19   Butte Fire in 2015 continued unabated throughout the Class Period, contrary to PG&E's public

20   statements.

21        126.    Moreover, the vegetation management problems detailed herein were

22   institutionally entrenched by certain incentive structures PG&E put in place. According to a

23   lawsuit that was filed in California Superior Court against PG&E on December 21, 2017 (Case

24   No. CGC-17-563293), which asserted claims on behalf of victims of the North Bay Fires, PG&E

---

[49] *Id.*

[50] PG&E's Stockton Division is a geographic subdivision within the Company that contained the Butte Fire.

PGE-BK-0000001334

1    provided monetary incentives to its employees that had the effect of discouraging the

2    implementation of vegetation safety measures.

3        127.    For instance, PG&E's Vegetation Management Program adopted a Vegetation

4    Management Incentive Initiative ("VMII") program, which was purportedly designed to reduce

5    the "annual routine compliance" tree work of PG&E and to shift resources to "reliability" work

6    that focused on urban consumer satisfaction instead of overall safety. By doing so, PG&E

7    effectively shifted its resources away from rural areas that were more prone to wildfires (where

8    the "annual routine compliance" work was typically done), and towards more densely populated

9    urban areas (where the "reliability" work was done). For example, pursuant to this program,

10   PG&E set a goal to reduce "routine" work by 7.5% annually from 2014 through 2016. PG&E's

11   bonus incentive program therefore (like its policy of not shutting off its reclosers during wildfire

12   season) put safety at risk in an effort to reduce consumer complaints. *See* ¶569, *infra*.

13       128.    According to the same lawsuit, Robert Urban, a regional officer for a PG&E

14   contractor, stated that he had a concern that the bonus system incentivized his employees to not

15   do their job, but PG&E chose to keep this program despite knowing this risk.

16       129.    As noted above, though PG&E **falsely and repeatedly** assured investors during

17   the Class Period that its compliance failures had been resolved after the Butte Fire, the

18   Company's own employee Richard Yarnell later admitted that nothing of substance had changed

19   over much of the same time period. Accordingly, PG&E's repeated safety violations show that

20   the Company knew of its numerous and widespread violations of California safety regulations

21   throughout the Class Period, but did nothing to change them.

22              **2.    PG&E Internally Acknowledged, Extensively Documented, and
                        Tolerated for Years the Safety Violations that Caused the Camp Fire**

23

24       130.    PG&E's Caribou-Palermo transmission powerline was originally built in 1919,

     and was responsible for causing the first ignition point of the Camp Fire.

25

26       131.    PG&E knew, but concealed, that this powerline had dangerously deteriorated.  In

     December 2012, five steel towers supporting the Caribou-Palermo transmission line collapsed

27

     due to windy conditions.  In a July 16, 2013 letter to the CPUC, PG&E proposed replacing the

28

Case: 19-30088   Doc# 5375-1   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 49
of 50

PGE-BK-0000001335

1    five collapsed towers, and one additional tower, on the Caribou-Palermo line "[s]panning

2    Plumas-Butte County border" in a row "up slope and west of Highway 70 and generally parallel

3    to the unpaved Pulga Road in a remote area of the Feather River Canyon within Plumas National

4    Forest"[51]—that is, to say, near the first Camp Fire ignition point.

5         132.    The rest of the aging towers on the line, including the tower alleged to have

6    started the Camp Fire, were not replaced during that project.[52]  The age of these remaining

7    towers created a strong, undisclosed risk that corrosion, metal fatigue, or other age-related

8    factors would fail to support transmission line cables and cause wildfires.  Indeed, the relevant

9    tower included uninsulated "jumper" lines used to switch currents between transmission lines,

10   making the risk of fire even greater.[53]  Tellingly, the cross arm from that transmission tower,

11   which was attached to the "jumper" line, was removed by Cal Fire investigators as part of its

12   probe into the cause of the Camp Fire.[54]  And Cal Fire's investigation has not only concluded

13   that PG&E equipment caused the Camp Fire in a manner evidencing safety violations, but also

14   referred the matter to the Butte County district attorney for a criminal investigation.

15        133.    In a July 26, 2017 FERC filing that news outlets have reported on extensively,[55]

16   PG&E proposed considerable work for the Caribou-Palermo line as part of the Company's

17

18   ───────────────
       [51] Letter from CPUC to PG&E re: Advice Letter 4256-E (Sept. 6, 2013),
19   https://www.pge.com/nots/rates/tariffs/tm2/pdf/ELEC_4256-E.pdf.
       [52] Ivan Penn, et al., *How PG&E Ignored Fire Risks in Favor of Profits*, New York Times
20   (Mar. 18, 2019), https://www.nytimes.com/interactive/2019/03/18/business/pge-california-
     wildfires.html.
21       [53] Matthias Gafni, *It was originally built in 1919. What failed on PG&E tower at heart of
22   Camp Fire probe?* Mercury News (updated Dec. 10, 2018 4:09 AM),
         https://www.mercurynews.com/2018/12/07/it-was-originally-built-in-1919-what-failed-on-
23   pge-tower-at-heart-of-camp-fire-probe/.
         [54] Matthias Gafni, et al., *Why Did Fire Iinvestigators Remove PG&E Transmission Tower
24   Part in Camp Fire Probe*, Enterprise-Record (updated Dec. 6, 2018 8:07 AM),
25   https://www.chicoer.com/2018/12/05/why-did-fire-investigators-remove-pge-transmission-
     tower-part-in-camp-fire-probe.
26       [55] *E.g.*, George Avalos, *PG&E Knew For Years That Repairs Were Needed On Transmission
27   Lines In Area Of Fatal Camp Fire*, Mercury News (updated Feb. 28, 2019 6:05 AM),
     https://www.mercurynews.com/2019/02/27/pge-delayed-repairs-for-years-on-transmission-line-
28   linked-to-lethal-camp-fire/.

PGE-BK-0000001336