1  annual request to FERC for rate changes.  PG&E reported that "[t]he Caribou-Palermo 115

2  kilovolt circuit was analyzed as part of [a] 2013 NERC Assessment," referring to an analysis by

3  the North American Electric Reliability Corporation ("NERC").  The filing indicated that the

4  2013 NERC study examined 455 spans of the of the transmission line and found that vegetation

5  or trees were allowed to grow too close to 127 (27.9%) of them: "The completed [NERC]

6  analysis identified 127 spans with clearance issues out of the 455 spans on the electric

7  transmission line."  PG&E never fixed the identified issues from the time it learned about them

8  in 2013 as reflected in the July 2017 filing.  PG&E's Caribou-Palermo transmission system

9  would later be implicated in the 2018 Camp Fire.

10     134. On March 18, 2019, *The New York Times* published an exposé on PG&E titled,

11  "How PG&E Ignored California Fire Risks in Favor of Profits."  The article discussed an internal

12  Company email, sent long before the Camp Fire, which noted that a group of structures including

13  the transmission tower implicated in the Camp Fire, Tower :27/222, were at risk of collapse due

14  to their age and windy conditions in the area.  Indeed, the Company noted that corrosion on

15  another tower in the vicinity was so severe that it had endangered crews attempting to repair it.

16  The Company's own guidelines had warned that **the tower was a quarter-century past its**

17  **useful life**, yet PG&E failed to repair or replace the aging tower.

18     135. The article also portrayed a corporate culture at the Company which disregarded

19  safety risks and avoided paying for necessary fire prevention precautions in favor of short-term

20  operating results.  The article quoted Mike Florio, a former California utilities commissioner,

21  who observed, "There was very much a focus on the bottom line over everything [at PG&E]:

22  'What are the earnings we can report this quarter? . . . And **things really got squeezed on the**

23  **maintenance side**."  The article also quoted California's Governor Gavin Newsom, who

24  expressed a similar sentiment:  "**[PG&E] have simply been caught red-handed over and over**

25  **again, lying, manipulating or misleading the public. . . They cannot be trusted.**"  The article

26  contrasted the lack of focus on safety at the Company with the approach taken by another

27  California utility facing similar risks, San Diego Gas & Electric, which had significantly

28  revamped its safety protocols to respond to increased wildfire dangers.

Case: 19-30088   Doc# 5375-2   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 1
of 38

PGE-BK-0000001337

136.     Also on March 18, 2019, a coalition of law firms representing fire victims published excerpts of internal Company emails demonstrating that PG&E had identified the transmission lines implicated in the 2018 Camp Fire as unsafe long before the fire started.[56]  For example, **internal Company documents showed that in December 2012 five aging towers along the Caribou-Palermo transmission line had collapsed, and a 2014 internal Company email stated that "the likelihood of failed structures happening is high"** – a risk PG&E concealed from the public.

137.     Similarly, a November 1, 2016 PG&E document detailed the failure of necessary hardware along the transmission line, with a support hook snapping off during routine painting. PG&E documents internally acknowledged that the supports "had been compromised through corrosion."[57]

138.     Despite the internal acknowledgment that the Caribou-Palermo lines were in need of repair and posed a significant risk of collapse, PG&E never had the lines fixed.  Instead, the Company reasoned that any collapse would not impact a sufficient number of customers to warrant the repairs and that the risks would be mitigated because any fire may be extinguished by rain.  Tragically, needed repairs were never undertaken, and **the Caribou-Palermo line caused the first ignition point of the Camp Fire** in 2018.

139.     Accordingly, PG&E had actual knowledge about the safety violations that caused the Camp Fire, months if not years in advance.

140.     It was in this context that Defendants touted PG&E's vegetation management and infrastructure maintenance to investors, falsely representing that it was in full compliance with all relevant regulations throughout the Class Period. *E.g.*, ¶197 (Misstatement No. 2, October 16, 2015); ¶222 (Misstatement No. 5, August 9, 2017); ¶249 (Misstatement No. 9, October 31,

---

[56]     *Northern California Fire Lawyers Obtain Documents That Show PG&E Knew About Risk of Caribou-Palermo Line Failure*, MarketWatch (Mar. 18, 2019), https://www.marketwatch.com/press-release/northern-california-fire-lawyers-obtain-documents-that-show-pge-knew-about-risk-of-caribou-palermo-line-failure-2019-03-18.

[57]     *Id.*

PGE-BK-0000001338

2017); ¶270 (Misstatement No. 12, November 5, 2017); ¶280 (Misstatement No. 13, May 25, 2018); ¶287 (Misstatement No. 14, June 8, 2018).

**I.      PG&E's ESRB-8 Shutoff Protocol Was Illusory, and PG&E's Failure to Follow It Was a Proximate Cause of the Camp Fire**

141.    After the North Bay Fires but before the Camp Fire, on July 16, 2018, the CPUC passed Resolution ESRB-8.  As noted above, this regulation mandated that PG&E formalize and publicize a program to de-energize power lines for safety when extreme fire danger conditions occur.  PG&E announced its response to this new safety requirement on September 27, 2018 (the "ESRB-8 Shutoff Protocol"), and touted its existence throughout the rest of the Class Period.

142.    PG&E also stated that its ESRB-8 Shutoff Protocol applied to **all** of its powerlines, without qualification. Its protocol stated: "PG&E's Wildfire Safety Operations Center team will monitor conditions **across our system** and evaluate whether to temporarily turn off **electric power lines**, in the interest of public safety."  Thus, PG&E's ESRB-8 Shutoff Protocol applied to both higher-voltage transmission power lines and lower-voltage distribution power lines.

143.    Under the ESRB-8 Shutoff Protocol, PG&E represented that it would balance seven criteria when determining whether to shut off electricity for safety:

- **"Extreme" fire danger threat level**, as classified by the National Fire Danger Rating System

- **A Red Flag Warning declared** by the National Weather Service

- **Low humidity levels**, generally 20 percent and below

- **Sustained winds** above approx. 25 mph and wind gusts in excess of approx. 45 mph

- **Site-specific conditions** such as temperature, terrain and local climate

- **Critically dry vegetation** that could serve as fuel for a wildfire

- **On-the-ground, real-time observations** from PG&E field crews

PGE-BK-0000001339

(Emphasis original.)   PG&E stated that "no single factor will drive a Public Safety Power Shutoff," and never identified any other criteria, during the Class Period or since.

144.   When PG&E's lines ignited the Camp Fire on November 8, all seven criteria had been met or exceeded – a fact of which PG&E could not have been ignorant.  Indeed, PG&E had warned customers in that area as early as November 6 – two days before the Camp Fire began – that it may need to "proactively turn off power for safety starting on Thursday, November 8."[58]

145.   PG&E had only shut off electricity under its ESRB-8 Shutoff Protocol once before, on October 14 through 17, 2018, when it shut off eight transmission power line circuits and thirty-three distribution power line circuits, in seven counties.  Though PG&E found damage to its equipment before restoring power, it nevertheless faced strong backlash from customers who were affected by the shutoff.

146.   On November 8, 2018 at 6:14 p.m. EST (3:14 p.m. PST), PG&E announced, via its official Twitter.com account: "PG&E has determined that it will not proceed with plans today for a Public Safety Power Shutoff in portions of 8 Northern CA counties, **as weather conditions did not warrant this safety measure.**"[59]  The three weather-relevant criteria are humidity levels (at 20% or below), wind speed (with sustained winds around 25 miles per hour or stronger, and wind gusts around 45 miles per hour or stronger), and general site-specific conditions (*e.g.*, local climate and terrain).

147.   However, as detailed below, **each of these factors weighed in favor of a shutoff.**  Where and when the Camp Fire started, humidity was around or below 20%, wind speeds were measured above 25 (sustained) and 45 (gusts) miles per hour, and a myriad of site-specific conditions contributed to the ignition of the most destructive and deadliest fire in California

---

[58] Press Release, PG&E, *PG&E Notifying Customers in Parts of Nine Counties About Extreme Weather Forecasts and Potential for Public Safety Power Shutoff* (Nov. 6, 2018), https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181106_pge_notifyin g_customers_in_parts_of_nine_counties_about_extreme_weather_forecasts_and_potential_for_p ublic_safety_power_shutoff.

[59] PG&E Twitter Account Post (Nov. 8, 2018 3:14PM), https://twitter.com/PGE4Me/status/1060672000929267713.

Case: 19-30088   Doc# 5375-2   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 4 of 38

PGE-BK-0000001340

1    history.   As Cal Fire later confirmed in its determination that PG&E caused the Camp Fire: "The

2    tinder dry vegetation and Red Flag conditions consisting of strong winds, low humidity and

3    warm temperatures promoted this fire and caused extreme rates of spread, rapidly burning into

4    Pulga to the east and west into Concow, Paradise, Magalia and the outskirts of east Chico."[60]

5        148.    The Camp Fire originated at "Pulga Road at Camp Creek Road near Jarbo Gap."[61]

6    Jarbo Gap is a geographical area in Butte County and contains a weather station located at 39°

7    44' 09" N (Latitude), 121° 29' 20" W (Longitude),[62] approximately six miles from the Camp

8    Fire's origin.[63]   The Jarbo Gap weather station provided the most accurate record of weather

9    conditions at the time and place where the Camp Fire ignited.

10              **1.    PG&E Admitted that All of the Non-Weather Criteria Weighed in
                        Favor of Shutting Off the Power**

11

12       149.    On November 6 and 7, 2018, just before the Camp Fire ignited, PG&E admitted

13   in three press releases that all seven criteria weighed in favor of a shutoff—providing only small

     caveats that weather-related factors might change.

14

15              **(a)    Criterion 1: the National Fire Danger Rating System Rated
                         Jarbo Gap as Having an "Extreme" Fire Danger Threat Level**

16       150.    The area where the Camp Fire ignited was classified as having an "Extreme" fire

17   danger threat level by the National Fire Danger Rating System ("NFDRS").   The U.S. Forest

18   Service "Wildland Fire Assessment System" ("WFAS") archives historical NFDRS ratings in

19   map[64] and data[65] form, both of which confirm that the Jarbo Gap was rated "Extreme" on

20

21

---

22   [60] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May
     15, 2019),

23   http://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.

24   [61] Camp Fire Incident Information, CAL FIRE Incident Information (last modified May 15,
     2019), http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=2277.

25   [62] Jarbo Gap California Weather Station Information, RAWS USA Climate Archive,
     https://raws.dri.edu/cgi-bin/wea_info.pl?caCJAR.

26   [63] Camp Fire Incident Information, CAL FIRE Incident Information (last modified May 15,
     2019), http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=2277.

27
     [64] Observed Fire Danger Class, WFAS-Maps Graphics Fire Behavior Research (Nov. 8,
28   2018), https://www.wfas.net/archive/www.fs.fed.us/land/wfas/archive/2018/11/08/fd_class.png.

Case: 19-30088   Doc# 5375-2   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 5
                                    of 38
                                                                          PGE-BK-0000001341

November 8, 2018.  The graphic on the following page has modified the WFAS map to

highlight, with a red circle, the "Extreme" rating received by the Jarbo Gap weather station on

November 8, 2018:



151.  As the U.S. Department of Agriculture Forest Service explained the NFDRS:

> When the fire danger is "extreme", fires of all types start quickly
> and burn intensely.  All fires are potentially serious and can spread
> very quickly with intense burning.  Small fires become big fires
> much faster than at the "very high" level.  Spot fires are probable,
> with long-distance spotting likely.  These fires are very difficult to
> fight and may become very dangerous and often last for several
> days.[66]

---

*(continued)*

[65] *See* Data Chart of Fire Weather Observations from WIMS at 1700 Mountain Time (Nov. 8, 2018),  https://www.wfas.net/archive/www.fs.fed.us/land/wfas/archive/2018/11/08/fdr_obs.txt (row labeled "Jarbo Gap," column labeled "ADJ" for "adjective," data entry "E" for "Extreme").

[66] USDA Forest Service, National Fire Danger Rating System, https://www.fs.usda.gov/detail/cibola/landmanagement/resourcemanagement/?cid=stelprdb5368 839.

PGE-BK-0000001342

152.    Indeed, in a press release on November 7, 2018, PG&E admitted: "Due to expected **extreme fire danger conditions** . . . PG&E may temporarily turn off power in portions of the following communities: Butte County (including . . . Paradise)" on November 8, 2018.[67]

(b)    **Criterion 2: the National Weather Service Declared a "Red Flag Warning" for the Area**

153.    The National Weather Service issued a "Red Flag Warning" for Butte County on November 8, 2018,[68] as PG&E admitted in a November 6, 2018 Press Release: "Due to expected extreme fire danger conditions, **including the Red Flag warning from the National Weather Service** and several other weather factors, Pacific Gas and Electric Company (PG&E) today began notifying customers in portions of nine counties that the company may proactively turn off power for safety starting on Thursday, November 8" including "Butte County."[69]

(c)    **Criterion 6: "Critically Dry Vegetation" (*i.e.*, Wildfire Fuel) Weighed in Favor of a Shutoff**

154.    Throughout the area where the Camp Fire ignited, the soil and vegetation were unusually dry, as there had been almost no rainfall since April 2018.  As PG&E admitted in a November 27, 2018 filing to the CPUC, its decision not to shut off the power "was preceded by

---

[67] Press Release, PG&E, *PG&E Continues to Notify Customers in Parts of Nine Counties About the Potential for Public Safety Power Shutoff Due to Forecasted Extreme Weather* (Nov. 7, 2018), https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181107_pge_continues_to_notify_customers_in_parts_of_nine_counties_about_the_potential_for_public_safety_power_shutoff_due_to_forecasted_extreme_weather.

[68] Shirin Rajaee, *PG&E Could Cut Power to 63,000 Amid Red Flag Warning*, CBS13 Sacramento (Nov. 8, 2018 12:17 A.M.), https://sacramento.cbslocal.com/2018/11/08/red-flag-warning-pge/.

[69] Press Release, PG&E, *PG&E Notifying Customers in Parts of Nine Counties About Extreme Weather Forecasts and Potential for Public Safety Power Shutoff Due to* (Nov. 6, 2018), https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181106_pge_notifying_customers_in_parts_of_nine_counties_about_extreme_weather_forecasts_and_potential_for_public_safety_power_shutoff .

---

PGE-BK-0000001343

1  an extended period of dry fall weather, only one rain event since May, and periods of dry north

2  winds which caused the moisture content of live and dry fuels to remain low."[70]

3      155.    PG&E confirmed this conclusion in a November 7, 2018 press release: "Due to

4  forecasted high winds **and dry vegetation**, PG&E may temporarily turn off power in portions of

5  the following communities: **Butte County** (including Berry Creek, Chico, Forest Ranch,

6  Magalia, Oroville, **Paradise**). . . ."[71]

7      156.    As Pulitzer Prize winning journalist Matthias Gafni would later report,

8  information from the National Aeronautics and Space Administration ("NASA") showed that

9  California's moisture levels that month were "at the lowest levels in [the] last four years."[72] As

10  the graphic below confirms, this led to extremely dry vegetation:

---

[70] PG&E Letter to CPUC re: Compliance Report (Nov. 27, 2018),
http://www.cpuc.ca.gov/uploadedFiles/CPUCWebsite/Content/News_Room/NewsUpdates/2018/11-27-18%20PGE%20PSPS%20Report.pdf.

[71] Press Release, PG&E, *PG&E Continues to Notify Customers in Parts of Nine Counties About the Potential for Public Safety Power Shutoff Due to Forecasted Extreme Weather* (Nov. 7, 2018),
https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181107_pge_continues_to_notify_customers_in_parts_of_nine_counties_about_the_potential_for_public_safety_power_shutoff_due_to_forecasted_extreme_weather .

[72] Matthias Gafni, *Why Didn't PG&E Shut Down Power In Advance Of Deadly Camp Fire? Here's The Data,* Bay Area News Group (Nov. 18, 2018 5:00 P.M.),
https://www.chicoer.com/2018/11/18/why-didnt-pge-shut-down-power-in-advance-of-deadly-camp-fire-heres-the-data/.

Case: 19-30088   Doc# 5375-2   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 8 of 38
PGE-BK-0000001344

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16






**Root Zone Soil Moisture Percentile**

17

      **(d)**      **Criterion 7: PG&E's On-the-Ground Observations Weighed in Favor of a Shutoff**

18

19         157.    PG&E's on-the-ground observations favored a shutoff.  In a press release dated

20 November 7, 2018, PG&E warned customers that it was considering a shutoff due to "expected

21 extreme fire danger conditions," and that "[f]actors that PG&E considers when deciding to

22 initiate" a shutoff included its "on-the-ground observations."[73]

23

24

25       [73] Press Release, PG&E, *PG&E Continues to Notify Customers in Parts of Nine Counties*
26 *About the Potential for Public Safety Power Shutoff Due to Forecasted Extreme Weather* (Nov. 7, 2018),
27 https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181107_pge_continue
28 s_to_notify_customers_in_parts_of_nine_counties_about_the_potential_for_public_safety_powe
r_shutoff_due_to_forecasted_extreme_weather.

Case: 19-30088   Doc# 5375-2   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 9 of 38

PGE-BK-0000001345

158.    This conclusion is corroborated by PG&E's admission in a November 8, 2018 press release that *only weather factors* weighed against shut-off: "[PG&E] has determined that it will not proceed with plans today for a Public Safety Power Shutoff in portions of eight Northern California counties, **as weather conditions did not warrant this safety measure**."[74]

### 2.    All of the Weather Criteria Weighed in Favor of Shutting Off the Power

159.    As described above, PG&E attributed its decision not to shut off power to weather conditions.  Specifically, in a November 27, 2018 filing to the CPUC, PG&E explained that the primary weather condition that fell short was wind speed:

> On Wednesday, November 7, 2018, PG&E refined the forecasted impact down to 63,000 customers and eight counties (Butte, Lake, Napa, Nevada, Placer, Plumas, Sierra and Yuba). **Weather conditions stayed consistent, nearing but not reaching forecasted levels that would warrant temporarily turning off power for customer safety**.

> By around 13:00 on Thursday, November 8, **winds were decreasing**, and conditions were no longer forecast to approach [Public Safety Power Shutoffs] criteria. Based on the forecasted information, PG&E no longer anticipated a possible need to de-energize.

160.    However, all weather factors – including wind speed – weighed in favor of an electricity shutoff in Jarbo Gap on November 7-8, 2018.  The charts[75] on the following page show weather conditions at the Jarbo Gap Weather Station from late November 7, 2018 through the next day:

---

[74] Press Release, PG&E, *PG&E Determines to Not Proceed with Public Safety Power Shutoff Planned for Portions of Eight Northern California Counties* (Nov. 8, 2018), https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181108_pge_determines_to_not_proceed_with_public_safety_power_shutoff_planned_for_portions_of_eight_northern_california_counties.

[75] Weather Station Summary for Jarbo Gap California (Nov. 7, 2018), https://raws.dri.edu/cgi-bin/wea_daysum2.pl?stn=cjar&day=7&mon=11&yea=18&unit=E; Weather Station Summary for Jarbo Gap California (Nov. 8, 2018), https://raws.dri.edu/cgi-bin/wea_daysum2.pl?stn=cjar&day=8&mon=11&yea=18&unit=E.

PGE-BK-0000001346

## Jarbo Gap California

Daily Summary for

### November 7, 2018

| Hour of Day Ending at L.S.T. | Total Solar Rad. ° ly. | Wind Ave. mph | Wind V. Dir. Deg | Wind Max. mph | Air Temperature Mean Deg. F. | Fuel Temperature Mean Deg. F. | Fuel Moisture Mean Percent | Relative Humidity Mean Percent | Dew Point Deg. F. | Wet Bulb Deg. F. | Baro. Press. in. Hg. | Total Precip. inches |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9 pm | 0.0 | 25.0 | 39 | 43.0 | 56.0 | 54.0 | 4.7 | 15 | 9 | 38 | | 0.00 |
| 10 pm | 0.0 | 25.0 | 40 | 41.0 | 54.0 | 53.0 | 4.7 | 16 | 9 | 37 | | 0.00 |
| 11 pm | 0.0 | 27.0 | 35 | 44.0 | 53.0 | 52.0 | 4.7 | 18 | 11 | 37 | | 0.00 |
| 12 am | 0.0 | 27.0 | 37 | 45.0 | 52.0 | 51.0 | 4.7 | 19 | 11 | 36 | | 0.00 |

## Jarbo Gap California

Daily Summary for

### November 8, 2018

| Hour of Day Ending at L.S.T. | Total Solar Rad. ° ly. | Wind Ave. mph | Wind V. Dir. Deg | Wind Max. mph | Air Temperature Mean Deg. F. | Fuel Temperature Mean Deg. F. | Fuel Moisture Mean Percent | Relative Humidity Mean Percent | Dew Point Deg. F. | Wet Bulb Deg. F. | Baro. Press. in. Hg. | Total Precip. inches |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 am | 0.0 | 29.0 | 37 | 48.0 | 51.0 | 50.0 | 4.7 | 21 | 12 | 36 | | 0.00 |
| 2 am | 0.0 | 24.0 | 38 | 44.0 | 50.0 | 48.0 | 4.7 | 22 | 13 | 36 | | 0.00 |
| 3 am | 0.0 | 31.0 | 37 | 50.0 | 49.0 | 48.0 | 4.7 | 22 | 12 | 35 | | 0.00 |
| 4 am | 0.0 | 32.0 | 38 | 52.0 | 49.0 | 48.0 | 4.7 | 22 | 12 | 35 | | 0.00 |
| 5 am | 0.0 | 30.0 | 42 | 51.0 | 48.0 | 47.0 | 4.7 | 23 | 12 | 34 | | 0.00 |
| 6 am | 0.0 | 18.0 | 33 | 40.0 | 48.0 | 46.0 | 4.7 | 23 | 12 | 34 | | 0.00 |
| 7 am | 0.6 | 14.0 | 33 | 28.0 | 49.0 | 46.0 | 4.7 | 21 | 11 | 35 | | 0.00 |
| 8 am | 4.5 | 6.0 | 14 | 25.0 | 51.0 | 51.0 | 4.7 | 18 | 9 | 35 | | 0.00 |
| 9 am | 13.1 | 14.0 | 33 | 21.0 | 53.0 | 55.0 | 4.9 | 17 | 9 | 36 | | 0.00 |
| 10 am | 37.3 | 18.0 | 37 | 30.0 | 55.0 | 58.0 | 4.9 | 16 | 10 | 38 | | 0.00 |
| 11 am | 45.2 | 14.0 | 29 | 29.0 | 58.0 | 61.0 | 5.0 | 14 | 9 | 39 | | 0.00 |
| 12 pm | 47.8 | 16.0 | 31 | 33.0 | 60.0 | 64.0 | 5.0 | 13 | 9 | 40 | | 0.00 |
| 1 pm | 40.7 | 12.0 | 38 | 32.0 | 61.0 | 63.0 | 5.2 | 12 | 8 | 40 | | 0.00 |
| 2 pm | 37.3 | 15.0 | 42 | 24.0 | 63.0 | 67.0 | 4.9 | 11 | 8 | 41 | | 0.00 |
| 3 pm | 21.8 | 10.0 | 40 | 28.0 | 61.0 | 60.0 | 4.8 | 12 | 8 | 40 | | 0.00 |
| 4 pm | 7.5 | 8.0 | 37 | 25.0 | 60.0 | 58.0 | 4.8 | 12 | 7 | 40 | | 0.00 |
| 5 pm | 0.8 | 13.0 | 27 | 23.0 | 58.0 | 55.0 | 4.7 | 11 | 4 | 38 | | 0.00 |
| 6 pm | 0.0 | 15.0 | 27 | 27.0 | 57.0 | 54.0 | 4.6 | 12 | 5 | 38 | | 0.00 |
| 7 pm | 0.0 | 18.0 | 31 | 30.0 | 56.0 | 53.0 | 4.6 | 12 | 4 | 37 | | 0.00 |
| 8 pm | 0.0 | 19.0 | 28 | 34.0 | 55.0 | 52.0 | 4.6 | 12 | 3 | 37 | | 0.00 |

161.    Accordingly, PG&E's November 27, 2018 statement to the CPUC that its decision not to shut off power was justified in part by the fact that "[b]y around 13:00 on Thursday, November 8, winds were decreasing," was misdirection.  The Camp Fire had already begun over six hours before that point.  And indeed, as shown in the chart above, wind speed

weighed in favor of a shutoff in the hours before the fire started. In fact, all of the weather factors weighed in favor of a shut off in the hours before the fire started, as detailed below.

### (a) Criterion 3: The Jarbo Gap Recorded Sufficiently Low Humidity Levels

162.   Throughout the night on November 7, 2018, humidity was below the "generally 20%" level, supporting a shutoff. From 9:00 p.m. to midnight, humidity never exceeded 19%. In the ten hours before the Camp Fire, average humidity was 20.1%. Over the 24-hour period, humidity averaged a mere 16.42%.

163.   Throughout November 8, 2018, humidity at the Jarbo Gap was at or below the "generally 20%" level that supported a shutoff. Between 6 a.m. and 7 a.m., when the Camp Fire ignited, humidity was between 23% and 21% and falling precipitously; it would drop to as low as 11% in the coming hours.

164.   PG&E knew that the humidity would drop precipitously because National Weather Service's forecast of a red flag warning that day—the same red flag warning PG&E mentioned in its press release late the previous evening[76]—warned that "Afternoon [Relative Humidity] values of 5-15% will be common across the area."[77]

165.   In fact, humidity weighed even more strongly in favor of a shutdown that day than it did on October 14, 2018, the day on which PG&E had previously determined that a power shutoff was necessary. The National Weather Service's forecast of humidity under 15% and as low as 5% was even more severe than its red flag warning on October 14, 2018, where it predicted relative humidity "into the 7-15% range for much of this region."[78]

---

[76] Press Release, PG&E, *PG&E Continues to Closely Monitor Weather Conditions Ahead of Possible Public Safety Power Shutoff in Parts of Eight Counties* (Nov. 7, 2018), https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181107_pge_continues_to_closely_monitor_weather_conditions_ahead_of_possible_public_safety_power_shutoff_in_parts_of_eight_counties.

[77] Storm Prediction Center Day 1 Fire Weather Outlook, NOAA (Nov. 8, 2018 07:51:02 UTC), https://www.spc.noaa.gov/products/fire_wx/2018/181108_1200_fwdy1_print.html.

[78] Storm Prediction Center Day 1 Fire Weather Outlook, NOAA (Oct. 14, 2018 06:58:03 UTC), https://www.spc.ncep.noaa.gov/products/fire_wx/2018/181014_1200_fwdy1_print.html.

Case: 19-30088   Doc# 5375-2   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 12 of 38

PGE-BK-0000001348

**(b)   Criterion 4: The Jarbo Gap Recorded Sufficiently High Wind Speed**

166.    As noted above (*see* ¶159), PG&E informed the CPUC on November 27, 2018 that the primary reason it did not shut off the power was wind speed.

167.    Yet throughout the night on November 7, 2018, sustained winds at the Jarbo Gap were at or above the "approx. 25 mph" level that weighed in favor of a shutoff.  Similarly, wind gusts reached the "approx. 45 mph" level by midnight, further supporting a shutoff.  In the ten hours leading up to the Camp Fire, average sustained winds and gusts were 26.8 and 45.8 miles per hour, respectively.

168.    At 5 a.m. on November 8, 2018, approximately an hour and a half before the Camp Fire erupted, sustained winds reached 30 miles per hour, with gusts of 51 miles per hour. Overall, wind conditions strongly weighed in favor of a shutoff in the hours before the Camp Fire's ignition.

169.    PG&E knew that sustained winds would be high because National Weather Service's forecast of a red flag warning that day—the same red flag warning PG&E mentioned in its press release late the previous evening[79]—warned of winds "during the morning and afternoon" with a "[s]trong northerly/northeasterly flow of 20-25 mph."[80]

170.    In fact, sustained wind speed weighed even more strongly in favor of a shutdown that day than it did on October 14, 2018, the day on which PG&E had previously determined that a power shutoff was necessary.  The National Weather Service's forecast of sustained winds of 20-25 miles per hour was even more severe than its red flag warning on October 14, 2018, which

---

[79] Press Release, PG&E, *PG&E Continues to Closely Monitor Weather Conditions Ahead of Possible Public Safety Power Shutoff in Parts of Eight Counties* (Nov. 7, 2018), https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181107_pge_continue s_to_closely_monitor_weather_conditions_ahead_of_possible_public_safety_power_shutoff_in_ parts_of_eight_counties.

[80] Storm Prediction Center Day 1 Fire Weather Outlook, NOAA (Nov. 8, 2018 07:51:02 UTC), https://www.spc.noaa.gov/products/fire_wx/2018/181108_1200_fwdy1_print.html.

Case: 19-30088   Doc# 5375-2   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 13 of 38

PGE-BK-0000001349

1    predicted "Strong/gusty east-northeasterly winds of 15-20 mph. . . . where sustained winds are

2    forecast to reach 20-25 mph for a few hours."[81]

3                    (c)      **Criterion 5: Site-Specific Conditions Further Favored Shutoff**

4            171.    The specific conditions beneath PG&E's 115 kilovolt transmission line where the

5    Camp Fire ignited were highly conducive to wildfires.  Just one day earlier, PG&E contacted

6    Betsy Ann Cowley regarding transmission line poles on her property in Pulga that "were having

7    problems with sparks," indicating that conditions were hazardous.[82]  Further, it is indisputable

8    that dry vegetation existed underneath the transmission line given reports of vegetation burning

9    beneath it (*see* ¶115, *supra*).  Notably, PG&E identified nothing about the area's terrain,

10   temperature or climate in its November 27, 2018 letter to the CPUC explaining its decision not to

11   shut off its lines.[83]

12                   3.      **PG&E Knew, or Recklessly Disregarded, that All Seven Criteria
                              Weighed in Favor of Shutting Off the Power**

13

14           172.    PG&E knew that severe weather conditions requiring a shutoff were in effect.

15   First, the Company admitted it had been monitoring the weather in the area for days; its

16   November 7 press release confirmed that "PG&E meteorologists continuously monitor weather

17   conditions."  Second, the Company had its own "network of PG&E weather stations to enhance

18   _____

19        [81] Storm Prediction Center Day 1 Fire Weather Outlook, NOAA (Oct. 14, 2018 06:58:03
     UTC), https://www.spc.ncep.noaa.gov/products/fire_wx/2018/181014_1200_fwdy1_print.html.

20        [82] Matthias Gafni, *Update: PG&E says email to Camp Fire Victim Focused on Different
     Transmission Line,* Mercury News (updated Nov. 14, 2018 3:59 PM),

21   https://www.mercurynews.com/2018/11/12/state-regulators-investigating-pge-socal-edison-for-
     roles-in-deadly-camp-woolsey-fires/.

22        [83] The remoteness and ruggedness of the relevant terrain where the Camp Fire started further
     supported a shutoff.  In a July 16, 2013 letter to the CPUC concerning the exact same Caribou-

23   Palermo transmission line, PG&E described the relevant terrain as being "in a remote area" with
     "extreme topography."  *See* Letter from CPUC to PG&E re: Advice Letter 4256-E (Sept. 6,

24   2013), https://www.pge.com/nots/rates/tariffs/tm2/pdf/ELEC_4256-E.pdf.  After the Camp Fire,
     an article reported on the terrain immediately around the same transmission line as making fire

25   containment more difficult: "The remoteness and rugged terrain around the tower would make
     any firefight by hand crews nearly impossible."  *See* Matthias Gafni, *It was originally built in*

26   *1919. What failed on PG&E tower at heart of Camp Fire probe?* Mercury News (updated Dec.
     10, 2018 4:09 AM), https://www.mercurynews.com/2018/12/07/it-was-originally-built-in-1919-

27   what-failed-on-pge-tower-at-heart-of-camp-fire-probe/.

28

Case: 19-30088   Doc# 5375-2   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 14
of 38

PGE-BK-0000001350

1   weather forecasting and modeling," and stated that the Company had the capability of

2   "[m]onitoring wildfire risks **in real time** from our new Wildfire Safety Operations Center."[84]

3   Finally, the weather data referenced above was publicly available.  Indeed, for the hour from

4   midnight to 1 a.m. on November 8, 2018 just before the Camp Fire started, the Jarbo Gap

5   weather station reported that **all weather conditions were met**: humidity at 19%, sustained

6   winds at 27 miles per hour, and wind gusts at 45 miles per hour.  Accordingly, PG&E either

7   knew that weather conditions existed that weighed in favor of a shutoff, or deliberately

8   disregarded such information.

9       173.   Every factor weighed in favor of shutting off PG&E's transmission line running

10  through the Jarbo Gap outside of Paradise, California.  PG&E knew or should have known that

11  all such factors were met.

12      174.   Indeed, PG&E had only shut off electricity in the face of wildfire conditions once

13  before, in October 2018.  The backlash to that shutoff was strong, and PG&E received numerous

14  customer complaints. PG&E noted in its October 31, 2018 report to the CPUC that as of October

15  24, "17 residential customers have complained to the CPUC as a result of the PSPS [Public

16  Safety Power Shutoffs] event since the first customer notification on October 13."[85]  Moreover,

17  PG&E reported to the CPUC that it had "received a total of 146 claims as of October 24, 2018,"

18  including claims for property damage, business interruption, and spoiled food.

19      175.   In sum, all seven criteria weighed in favor of a shutoff that never happened.  From

20  the beginning, the Company misrepresented to investors that it would prioritize safety over

21  customer satisfaction and reliability under the requirements of CPUC's Resolution ESRB-8.  The

22  strongest inference from PG&E's failure to shut off power on November 8, 2018 is that its

23  ESRB-8 Shutoff Protocol was illusory, and that the Company did not believe itself bound by the

24

25  [84] PG&E Public Safety Power Shutoff Policies and Procedures, CPUC website (Sept. 2018),
    http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/News_Room/Public-Safety-
26  Power-Shutoff-Policies-and-Procedures-September-2018.pdf.

27  [85] Letter from PG&E to CPUC re: Compliance Report (Oct. 31, 2018),
    http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Utilities_and_Industries/En
28  ergy_-_Electricity_and_Natural_Gas/PGE%20PSPS%20Report%20Letter%2020181031.pdf.

1   seven criteria it told the public and investors were the crucial criteria.  By PG&E's statements

2   listing these – and only these – criteria in its ESRB-8 Shutoff Protocol, investors were entitled to

3   believe that when **all** criteria were met, PG&E would prioritize safety and shut off the power

4   rather than risk causing wildfires and the resulting economic as well as reputational harm to

5   PG&E.

6        176.    In the alternative, PG&E had a duty to update investors once it decided to

7   abandon its ESRB-8 Shutoff Protocol and risk the chance of wildfire.  The result of PG&E's

8   non-adherence to the protocol was the deadliest and most destructive wildfire California has ever

9   faced.

10       **J.    PG&E's Bankruptcy and Other Post-Class-Period Developments**

11       177.    Following PG&E's felony convictions for knowingly and willfully violating

12  safety standards in causing the deadly San Bruno gas explosion and obstructing justice (*see*

13  *supra* Section VI.F.2.), PG&E's sentence included criminal probation.  Since November 27,

14  2018, the U.S. District Court presiding over PG&E's probation instituted further proceedings to

15  determine whether, *inter alia*, PG&E's safety violations causing the North Bay and Camp Fires

16  may have violated its probation.  These proceedings remain ongoing as of the filing of this

17  Complaint, and are detailed in Section X.C., *infra*.

18       178.    On January 14, 2019, PG&E filed a current report on Form 8-K stating that it

19  expected to file for Chapter 11 bankruptcy on or about January 29, 2019.  The reason the

20  Company provided for the expected bankruptcy was the "series of catastrophic wildfires that

21  occurred in Northern California in 2017 and 2018" – namely, the North Bay and Camp Fires.[86]

22       179.    On January 29, 2019, PG&E declared Chapter 11 bankruptcy.  The Company's

23  bankruptcy filings stated that it was facing $51.7 billion in liabilities, including more than $30

24  billion in potential liabilities tied to the North Bay and Camp Fires.[87]

25

26  _____

    [86] PG&E Corp., Current Report (Form 8-K) (Jan. 13, 2019),
27  https://www.sec.gov/Archives/edgar/data/75488/000095015719000032/form8k.htm.
    [87] Amended Decl. of Jason P. Wells at 3 & 7, Case No. 19-br-30088, (N.D. Cal. Feb. 1, 2019),
28  ECF No. 263.

PGE-BK-0000001352

180.    On February 6, 2019, PG&E submitted to CPUC its new wildfire mitigation plan, as required by SB 901. PG&E later corrected the filing on February 12, 2019 and amended it on February 14, 2019 (the "2019 Mitigation Plan"). On April 29, 2019, the CPUC largely approved PG&E's 2019 Mitigation Plan, with the exception of "several aspects of the company's planned mitigation that require improvement or other follow-up activity," including improved "[a]nalysis of data to determine whether PG&E's new vegetation-pole clearances have contributed to reduced ignitions, especially during critical weather conditions."[88] As detailed below, the dramatic expansion of safety practices and expenditures in PG&E's 2019 Mitigation Plan confirms the inadequacy of PG&E's prior activities, showing that PG&E did far less than it should have during the Class Period.

181.    PG&E's 2019 Mitigation Plan stated that the Company would substantially increase its vegetation management efforts. First, the plan provided that approximately 375,000 "additional" hazard trees should be trimmed or cleared in 2019, a 235% increase compared to PG&E's purported totals of 160,000 in 2018 (estimated), 156,344 in 2017 (actual), 225,168 in 2016 (actual), 18,557 in 2015 (actual), and 8,042 in 2014 (actual). Second, it called for performing 2,450 miles of "enhanced vegetation management" (including fuel reduction and overhang clearing,) in 2019, an increase of 320% from its 2018 target of only 760 miles. In approving this proposal, the CPUC noted that "PG&E proposes to spend between $800 million and $1.3 billion to support [this] expansion of its vegetation management program."

182.    PG&E's 2019 Mitigation Plan also stated that the Company would substantially increase its inspections. Instead of just routinely inspecting 517,500 electricity distribution poles, PG&E would also commit to conducting "enhanced inspections" of 685,000 electricity distribution poles in High Fire Threat Districts "in addition to routine inspections" over the course of just "five months." (Emphasis original.) "Enhanced Inspection" was described as

---

[88] Although PG&E submitted a second corrected plan on April 25, 2019 "proposing to extend the timelines on many of its major wildfire mitigation efforts," the CPUC determined it was "filed too late to be considered and to receive party comment," and thus "not act on those proposals." *See* Proposed Decision of Administrative Law Judge re: 18-10-007 (Apr. 29, 2019), http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M285/K712/285712576.pdf.

PGE-BK-0000001353

1  "includ[ing] ground inspections, drone and helicopter inspections where needed, and climbing

2  inspections of every transmission tower," implying such measures had not been undertaken in

3  the past.  Similarly, for its electricity transmission structures, PG&E committed to conducting

4  enhanced inspections for 40,600 structures in addition to 76,000 routine inspections (up from

5  9,400 and 76,000, respectively).  PG&E also committed to conducting "enhanced risk-based

6  inspections" of 200 electricity substations in High Fire Threat Districts.

7  183.  The CPUC noted that these increased inspections were expected to cost PG&E

8  **between $798 million and $1.396 billion—"an increase from $15 million authorized in**

9  **PG&E's last [General Rate Case]."**

10  184.  The 2019 Mitigation Plan also proposed that the Company would significantly

11  expand the geographic regions where it might preemptively shutoff power pursuant to its ESRB-

12  8 Shutoff Protocol, estimating that the protocol would now cover as many as 5.4 million

13  customers, a **950% increase** from what previously covered approximately 570,000 consumers.

14  185.  Thus, PG&E's 2019 Mitigation Plan described dramatic increases in safety

15  practices and expenditures compared to prior years.  These and other aspects of PG&E's

16  expensive proposals represented that it was finally providing the necessary, dramatic expansion

17  of its safety practices and increases in expenditures, which had been absent.  Accordingly, the

18  vastly expanded scope of PG&E's 2019 wildfire plan strongly demonstrates the inadequacy of

19  PG&E's prior safety practices, showing that PG&E did far less than it should have during the

20  Class Period.

21  186.  Following the plan's release, the *Associated Press* summarized the general

22  reaction, "Lawyers, industry watchdogs and a federal judge alike wonder: *What took so long?*"[89]

23  187.  On February 28, 2019, PG&E issued a press release providing an update on the

24  financial impact of the North Bay and Camp Fires, along with the Company's fourth quarter and

25  full-year 2018 financial results.  The release stated that the Company "believes it is probable that

26

27  _____

28  [89] Paul Elias, *Critics Ask What Took PG&E So Long on Wildfire Safety Effort*, Associated Press (Feb. 7, 2019), https://www.apnews.com/c1d0e16811914177a9b4b473f1eeebee.

Case: 19-30088   Doc# 5375-2   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 18 of 38

PGE-BK-0000001354

its equipment will be determined to be an ignition point of the 2018 Camp Fire," half-anticipating Cal Fire's determination three months later implicating PG&E in both of the Camp Fire's ignition points.  The press release also stated that the Company would be recording a **$10.5 billion charge** related to the 2018 Camp Fire.  It also reported an additional $1 billion charge related to the North Bay Fires, "in addition to the previously recorded $2.5 billion charge in the second quarter of 2018" related to the same fires.  As a result, the Company reported full-year *net losses of $6.9 billion*, compared to 2017 net income of $1.6 billion.  It further stated: "Management has concluded that these circumstances raise substantial doubt about PG&E Corporation's and the Utility's ability to continue as going concerns...."

## VII.  DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS UNDER THE EXCHANGE ACT[90]

188.     Investors and analysts were focused on the Company's compliance with wildfire-related safety regulations during the Class Period. With an eye towards artificially inflating its share price, PG&E responded to this interest with false and misleading reassurances that PG&E was in compliance with safety regulations. PG&E also significantly raised its quarterly dividend during the Class Period, repeatedly touting that such a move was based, in part, on its success in ensuring safety. As detailed below, Defendants' fraud proximately caused investors' losses.

### A.     Overview of Defendants' Fraudulent Course of Conduct

189.     PG&E was responsible for the North Bay Fires.  Of the eighteen main North Bay Fires for which Cal Fire's investigations have been completed, **seventeen** were caused by PG&E equipment. Among those, **eleven** of these fires evidenced violations of California safety regulations, in **seven** different counties at the **same time**.

190.     Furthermore, PG&E was responsible for the Camp Fire, which began when a PG&E electrical tower – carrying a high-voltage 115 kilovolt transmission line – failed.  On May 15, 2019, Cal Fire issued a news release confirming that its investigation had "determined that the Camp Fire was caused by electrical transmission lines owned and operated by Pacific Gas

---

[90] All references to "Defendants" in Sections I & IV-XIII refer to the Exchange Act Defendants (PG&E and the Exchange Act Individual Defendants).

Case: 19-30088   Doc# 5375-2   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 19 of 38

PGE-BK-0000001355

and Electric[].”[91]  PG&E acknowledged a second ignition point for the Camp Fire that exhibited damaged and downed poles, vegetation on top of downed wires, and a recloser.  As a result, vegetation underneath the lines ignited in two ignition points approximately 30 minutes apart.  PG&E's failure to remove such vegetation violated California Public Resources Code §4293.  PG&E's failure to maintain the integrity of its poles violated California Public Utilities Code §451.  Cal Fire's investigation also confirmed: “The cause of the second fire was determined to be vegetation into electrical distribution lines owned and operated by PG&E.”[92]

191.    Moreover, PG&E's ESRB-8 Shutoff Protocol required that the responsible power lines be shut off.  While the ESRB-8 Shutoff Protocol requires that PG&E consider seven criteria when determining whether a shutoff would be appropriate, **all seven criteria were satisfied** in the hours leading up to the Camp Fire in the precise location where it started.   This, too, Cal Fire confirmed in its determination that PG&E caused the Camp Fire: “The tinder dry vegetation and Red Flag conditions consisting of strong winds, low humidity and warm temperatures promoted this fire and caused extreme rates of spread….”[93]   Though adhering to the ESRB-8 Shutoff Protocol would have prevented the Camp Fire entirely, PG&E flouted it.

192.    Tellingly, the CPUC is investigating whether PG&E violated CPUC rules and standards.  And since determining that PG&E is responsible for the Camp Fire, Cal Fire has forwarded its investigative report to the Butte County District Attorney.

193.    The news about PG&E's responsibility for causing the North Bay Fires and Camp Fire directly impacted the Company's bottom line, because California law requires PG&E to bear the cost of wildfire-related property damage and personal injury caused by its violations of

---

[91] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May 15, 2019),
http://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.
[92] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May 15, 2019),
http://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.
[93] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May 15, 2019),
http://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.

Case: 19-30088   Doc# 5375-2   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 20
of 38
PGE-BK-0000001356

California safety regulations.  In other words, those costs likely could not be passed on to ratepayers.  And, given the information that has emerged, including the conclusions of Cal Fire's investigations into these fires to date – where Cal Fire has referred at least twelve of its investigations to the appropriate counties' district attorneys' offices to review for potential criminal violations – the market has come to understand that the financial consequences to PG&E are extraordinary.

> **B.    Defendants Made Materially False and Misleading Statements and Omissions Regarding Its Vegetation Management Activities and Compliance with Wildfire Safety Regulations Before the North Bay Fires**

> **1.    April 29, 2015 – Misstatement No. 1**

194.    The Class Period begins on April 29, 2015, when PG&E held a conference call to discuss the Company's financial and operating results for the first financial quarter of 2015, which ended March 31, 2015. During the call, Defendant Johns, then President of the Utility, misleadingly assured investors of the Company's commitment to safety:

> As California enters its fourth year of drought, we're working hard to help the state meet this challenge by reducing water usage at our own facilities, encouraging customers to conserve by offering rebates for more efficient washers and agricultural pumps. *We're stepping up our vegetation management activities to mitigate wildfire risk* and improve access for firefighters.

195.    This statement was materially false and/or misleading because PG&E did not materially increase its vegetation management budget in 2015. In fact, based on information released by CPUC, PG&E underspent its vegetation management budget in both 2014 and 2015: whereas CPUC approved PG&E to spend $190,000,000 and $194,153,000 in 2014 and 2015, respectively, PG&E actually spent only $189,617,402 and $194,094,406, respectively. Moreover, this small budget increase of 2.4% between 2014 and 2015 was only 1.28 percentage points above inflation, which rose 1.12% over the same time period.[94] Indeed, Judge Alsup held that the "large number of trees that should have been removed by PG&E but weren't . . . was a major contributing factor, maybe the single-biggest factor, in causing the fires in 2017 and 2018

---

[94] CPI Inflation Calculator, Bureau of Labor Statistics, https://www.bls.gov/data/inflation_calculator.htm.

PGE-BK-0000001357

1   in Northern California," and he concluded that "PG&E's performance with respect to vegetation

2   management has been **dismal**."  Accordingly, PG&E had not meaningfully "stepp[ed] up" its

3   vegetation management activities.[95]

4       196.    Further, this statement materially omitted the numerous and widespread safety

5   violations that would not be fixed by PG&E's "stepp[ed] up . . . vegetation management

6   activities."

7              **2.    October 16, 2015 – Misstatement No. 2**

8       197.    On October 16, 2015, PG&E issued its 2015 Corporate Responsibility and

9   Sustainability Report. This report falsely assured investors that PG&E's "vegetation

10  management" was "in compliance with relevant laws":

11      **Vegetation Management**

12      ***Each year, PG&E's Vegetation Management department***, in
    consultation with utility arborists and foresters, ***inspects every mile***

13  ***of power line in our service area for public safety*** and electric
    reliability. ***We do so in compliance with relevant laws*** and with a

14  focus on public involvement, including extensive "Right Tree,
    Right Place" outreach. PG&E has been recognized by the National

15  Arbor Day Foundation as a Tree Line USA recipient for 20
    consecutive years for demonstrating best practices in utility

16  arboriculture.

17      198.    Because PG&E's vegetation management practices failed to follow relevant

18  federal and California safety laws, PG&E's vegetation management activities were decidedly not

19  "in compliance with relevant laws."

20      199.    First, according to reports released in subsequent corrective disclosures, including

21  on May 25 and June 8, 2018, PG&E violated relevant wildfire safety laws, including California

22  Public Resources Code Section 4293, multiple times.

23      200.    Second, Cal Fire found sufficient evidence of violations of state law to refer

24  PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections IX.D.4-5,

25  *infra*.

26

27  [95] PG&E also omitted that it was supposed to perform at least $441,192 (the total amount by
    which PG&E underspent its allowance in 2014 and 2015) in additional vegetation management

28  during 2015, but failed to do so.

---

Case: 19-30088   Doc# 5375-2   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 22
of 38

PGE-BK-0000001358

201.   Third, investigations into the causes of the Camp Fire have already disclosed evidence that this most destructive and deadly wildfire in California history was caused by PG&E violating California Public Resources Code Section 4293 and California Public Utilities Code Section 451, among other safety regulations.   Indeed, Cal Fire has found that PG&E equipment was responsible for both ignition points of the Camp Fire and has since reported PG&E to the Butte County District Attorney based on evidence of safety violations.

202.   Fourth, it has been documented that PG&E actually knew that it was not in compliance with relevant safety laws and best practices at the time of this statement.  In proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'"  *See* ¶104.

203.   Fifth, PG&E has admitted that it did not "inspect[] every mile of power line" "each year," because at the time this statement was made, it did not inspect Tower :27/222 of the Caribou-Palermo transmission line since August 2014.  This lack of annual inspection contributed to Tower :27/222's failure on November 8, 2018, which was part of the Camp Fire's first ignition point.

204.   Sixth, this statement materially omitted the true risk that PG&E would cause wildfires serious enough to imperil the Company's financial condition.

205.   Thus, this statement was materially false and/or misleading because of PG&E's numerous and widespread violations of safety regulations, including regulations specifically related to vegetation management – regulations which were essential for preventing devastating wildfires.  *See* Section VI.F.4.  As Judge Alsup held, PG&E's "**unsafe conduct has led to recurring deadly wildfires caused by its electrical system**" and the "large number of trees that should have been removed by PG&E but weren't . . . was a major contributing factor, **maybe the single-biggest factor, in causing the fires** in 2017 and 2018 in Northern California."  In fact, PG&E's violations were so pervasive that they caused multiple North Bay Fires all at the same

1    time in seven different counties, and then caused both of the Camp Fire's two ignition points a

2    year later – therefore the violations cannot be explained away as an isolated lapse.

3         206.    This statement regarding compliance was reviewed and authorized by Defendant

4    Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. According to the same

5    2015 Corporate Responsibility and Sustainability Report:

6           Within senior leadership, ethics and compliance are managed by a
       Chief Ethics and Compliance Officer, a position created in 2015 as
7           part of our commitment to achieve a best-in-class ethics and
       compliance program. The position reports to the PG&E
8           Corporation CEO and has additional reporting responsibility to the
       Audit Committees of the Board of Directors, and the Compliance
9           and Public Policy Committee of PG&E Corporation.

10          The new position is responsible for:

11          •  Building a best-in-class ethics and **compliance** program
          and **overseeing its implementation**,
12

13          •  **Overseeing company-wide programs for compliance
          reporting and related investigatory processes**. . . .

14        207.    Kane therefore was responsible for both "overseeing . . . implementation" of

15   PG&E's compliance **and "overseeing . . . compliance reporting,"** including this report.

16        **3.    November 18, 2015 – Misstatement No. 3**

17        208.    On November 18, 2015, Hogan publicly testified before the California Senate

18   Energy, Utilities and Communication Subcommittee on Gas and Electric Infrastructure Safety.

19   During that testimony, Hogan assured the public that PG&E was "just about done" implementing

20   a program that would remotely disable the Company's recloser devices in areas that included

21   "high wildfire risk areas":

22          So as I mentioned earlier, our SCADA capabilities where we are
       able to *take our reclosers out of service remotely*, we first *focus*
23          *on the wildfire areas* and then we have about 130 some odd
       locations, we are going to complete about 126 of those this year,
24          *just about done with that program*, which leaves six for next year,
       which will be completed.

25        209.    This statement was materially false and/or misleading because PG&E

26   misleadingly said that it had implemented policies and procedures to disable recloser devices

27   from areas that were at high risk for wildfires, which includes the areas where the North Bay

28

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3:18-CV-03509-EJD
    64

PGE-BK-0000001360

1   Fires occurred, by the end of 2015 (approximately 1 month away). Hogan's statement concealed

2   that PG&E dangerously kept reclosers in use through at least October 2017; Cal Fire has

3   determined that PG&E reclosers caused one of the North Bay Fires, known as the Pythian Fire.

4   Indeed, a recloser was found on a broken PG&E pole at the second ignition point for the Camp

5   Fire.  Thus, PG&E did not have the safety policies and procedures in place that they led investors

6   to believe they had.

7        210.    This statement materially omitted the true risk that PG&E would cause wildfires

8   serious enough to imperil the Company's financial condition.

9          **4.    October 6, 2016 – Misstatement No. 4**

10        211.    On October 6, 2016, PG&E issued its 2016 Corporate Responsibility and

11   Sustainability Report. This report provided false assurances to investors regarding PG&E's

12   compliance with relevant regulations:

13          **Vegetation Management**

14          ***Each year,*** PG&E's Vegetation Management department and its
    contracting arborists and foresters ***inspect miles of power lines in***
15          ***our service area for public safety and electric reliability. We do so***
    ***in compliance with relevant laws*** and with a focus on public
16          involvement, including extensive "Right Tree, Right Place"
    outreach. PG&E has been recognized by the National Arbor Day
17          Foundation as a Tree Line USA recipient for 21 consecutive years
    for demonstrating best practices in energy sector arboriculture.

18        212.    Because PG&E's vegetation management practices failed to follow relevant

19   federal and California safety laws, PG&E's vegetation management activities were decidedly not

20   "in compliance with relevant laws."

21        213.    First, according to reports released in subsequent corrective disclosures, including

22   on May 25 and June 8, 2018, PG&E violated relevant wildfire safety laws, including California

23   Public Resources Code Section 4293, multiple times.

24        214.    Second, Cal Fire found sufficient evidence of violations of state law to refer

25   PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections IX.D.4-5,

26   *infra.*

27

28

PGE-BK-0000001361

215.   Third, investigations into the causes of the Camp Fire have already disclosed evidence that this most destructive and deadly wildfire in California history was caused by PG&E violating California Public Resources Code Section 4293 and California Public Utilities Code Section 451, among other safety regulations.  Indeed, Cal Fire has found that PG&E equipment was responsible for both ignition points of the Camp Fire and has since reported PG&E to the Butte County District Attorney based on evidence of safety violations.

216.   Fourth, it has been documented that PG&E actually knew that it was not in compliance with relevant safety laws and best practices at the time of this statement.  In proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'"  *See* ¶104.

217.   Fifth, PG&E has admitted that it did not "inspect" all of its powerlines "each year," because at the time this statement was made, it did not inspect Tower :27/222 of the Caribou-Palermo transmission line since August 2014.  This lack of annual inspection contributed to Tower :27/222's failure on November 8, 2018, which was part of the Camp Fire's first ignition point.

218.   Sixth, this statement materially omitted the true risk that PG&E would cause wildfires serious enough to imperil the Company's financial condition.

219.   Thus, this statement was materially false and/or misleading because of PG&E's numerous and widespread violations of safety regulations, including regulations specifically related to vegetation management – regulations which were essential for preventing devastating wildfires. *See* Section VI.F.4.  As Judge Alsup held, PG&E's "**unsafe conduct has led to recurring deadly wildfires caused by its electrical system**" and the "large number of trees that should have been removed by PG&E but weren't . . . was a major contributing factor, **maybe the single-biggest factor, in causing the fires** in 2017 and 2018 in Northern California."  In fact, PG&E's violations were so pervasive that they caused at least 11 of the North Bay Fires all at the

PGE-BK-0000001362

1  same time in **seven** different counties, and then caused both of the Camp Fire's two ignition

2  points a year later – therefore the violations cannot be explained away as an isolated lapse.

3    220.    This statement regarding compliance was reviewed and authorized by Defendant

4  Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. According to the same

5  2016 Corporate Responsibility and Sustainability Report:

> Within senior leadership, ethics and compliance are managed by
> the Chief Ethics and Compliance Officer (CECO), who reports to
> the PG&E Corporation Chairman and CEO. The CECO has
> additional reporting responsibility to the Audit Committees of the
> PG&E Corporation and Pacific Gas and Electric Company Boards
> of Directors, and the Compliance and Public Policy Committee of
> the PG&E Corporation Board.
>
> The CECO is responsible for:
>
> - Building a best-in-class ethics and **compliance** program
>   and **managing its implementation**,
> - **Overseeing enterprise-wide programs for compliance
>   monitoring, reporting**, assessment and remediation. . . .

14    221.    Kane therefore was responsible for both "managing . . . implementation" of

15  PG&E's compliance **and "overseeing . . . compliance monitoring [and] reporting,"** including

16  this report.

17        **5.        August 9, 2017 – Misstatement No. 5**

18    222.    On August 9, 2017, PG&E issued its 2017 Corporate Responsibility and

19  Sustainability Report. This report provided false assurances to investors regarding PG&E's

20  compliance with relevant regulations:

> **Vegetation Management**
>
> ***PG&E prunes and removes trees growing too close to power lines***
> while maintaining as much vegetation as possible to balance land
> use and environmental stewardship with customer needs. Through
> a well-established and innovative vegetation management
> program, ***PG&E balances the need to maintain a vast system of
> trees growing along power lines while complying with state and
> federal regulations and delivering safe***, reliable and affordable
> ***electric service***.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3:18-CV-03509-EJD

PGE-BK-0000001363

223.    Because PG&E's vegetation management practices failed to follow relevant federal and California safety laws, PG&E's vegetation management activities were decidedly not "complying with state and federal regulations and delivering safe . . . electric service."

224.    First, according to reports released in subsequent corrective disclosures, including on May 25 and June 8, 2018, PG&E violated relevant wildfire safety laws, including California Public Resources Code Section 4293, multiple times.

225.    Second, Cal Fire found sufficient evidence of violations of state law to refer PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections IX.D.4-5, *infra*.

226.    Third, investigations into the causes of the Camp Fire have already disclosed evidence that this most destructive and deadly wildfire in California history was caused by PG&E violating California Public Resources Code Section 4293 and California Public Utilities Code Section 451, among other safety regulations.  Indeed, Cal Fire has found that PG&E equipment was responsible for both ignition points of the Camp Fire and has since reported PG&E to the Butte County District Attorney based on evidence of safety violations.

227.    Fourth, it has been documented that PG&E actually knew that it was not in compliance with relevant safety laws and best practices at the time of this statement.  In proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'" *See* ¶104.

228.    Fifth, this statement materially omitted the true risk that PG&E would cause wildfires serious enough to imperil the Company's financial condition.

229.    Thus, this statement was materially false and/or misleading because of PG&E's numerous and widespread violations of safety regulations, including regulations specifically related to vegetation management – regulations which were essential for preventing devastating wildfires. *See* Section VI.F.4.  As Judge Alsup held, PG&E's "**unsafe conduct has led to recurring deadly wildfires caused by its electrical system**" and the "large number of trees that

Case: 19-30088   Doc# 5375-2   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 28 of 38

PGE-BK-0000001364

should have been removed by PG&E but weren't . . . was a major contributing factor, **maybe the single-biggest factor, in causing the fires** in 2017 and 2018 in Northern California." In fact, PG&E's violations were so pervasive that they evidently caused multiple North Bay Fires all at the same time in seven different counties, and then caused both of the Camp Fire's two ignition points a year later – therefore the violations cannot be explained away as an isolated lapse.

230. This statement regarding compliance was reviewed and authorized by Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. According to the same 2017 Corporate Responsibility and Sustainability Report:

> Within senior leadership, compliance and ethics are managed by the Senior Vice President, Chief Ethics and Compliance Officer and Deputy General Counsel (CECO), who reports to the PG&E Corporation Chief Executive Officer (CEO) and President. The CECO has additional reporting responsibility to the Audit Committees of the PG&E Corporation and Pacific Gas and Electric Company Boards of Directors, and the Compliance and Public Policy Committee of the PG&E Corporation Board.
>
> The CECO is responsible for:
>
> - Building a best-in-class **compliance** and ethics program **and managing its implementation,**
> - **Overseeing enterprise-wide programs for compliance monitoring, reporting,** assessment and remediation. . . .

231. Kane therefore was responsible for both "managing implementation" of PG&E's compliance **and "overseeing . . . compliance monitoring [and] reporting,"** including this report.

**C.    Defendants Tied the Company's Dividend to Safety Compliance, Making Materially False and Misleading Statements and Omissions Regarding Its Dividend and Safety Before the North Bay Fires**

232. Throughout the Class Period, Defendants repeatedly tied the sustainability of its quarterly cash dividend to safety. In fact, PG&E increased its dividend during the Class Period for the first time in six years, and then raised it again – touting the Company's "progress on safety" and "improvements we have made in safety." Yet PG&E's violations of relevant safety regulations were so numerous and widespread that they caused and exacerbated the North Bay Fires, resulting in PG&E having to suspend its dividend entirely on December 20, 2017.

Case: 19-30088   Doc# 5375-2   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 29 of 38

PGE-BK-0000001365

1

**1.     May 23, 2016 – Misstatement No. 6**

2      233.    Less than three weeks after its May 4, 2016 earnings call, PG&E issued a press

3  release titled "PG&E Corporation Raises Common Stock Dividend, Highlights Progress at

4  Annual Shareholder Meeting." It stated:

5              PG&E Corporation (NYSE: PCG) today announced that it is
               raising its quarterly common stock dividend to 49 cents per share,
6              an increase of 3.5 cents per share, beginning with dividends for the
               second quarter of 2016.

7                                            * * *

8
               The increase, which is the company's first in six years, is a
9              meaningful step toward gradually returning the company's
               dividend payout to levels that are comparable with those of similar
10             utilities.

11                                           * * *

12             *Earley and other senior executives also discussed continued
               progress on safety*, reliability and other goals, as well as PG&E's
13             strategy for the future [at the annual shareholder meeting].

14             Earley said, '*We've continued to demonstrate leadership and
               commitment on safety.* We're delivering the most reliable service
15             in our company's history.

16      234.    This statement was materially false and/or misleading because it affirmed that

17  PG&E's dividend would not be negatively impacted by the Company's role in causing wildfires.

18  Indeed, it affirmed to investors that PG&E had attained "progress on safety," specifically

19  connecting purported safety achievements to its ability to increase its dividend, importantly, "to

20  levels that are comparable with those of similar utilities."  In reality, PG&E lacked the touted

21  "progress on safety" as well as "leadership and commitment on safety" for all the reasons found

22  by Judge Alsup (*see* ¶¶104-105 & 411) that led him to conclude: "**it's not really true. Safety is**

23  **not your number one thing.**"   PG&E's purported "leadership and commitment on safety" is

24  belied by each unaddressed safety violation and safety deficiency alleged herein, and

25  corroborated by the fact that PG&E's electrical equipment caused far more, and more serious,

26  wildfires than comparable utilities in California (¶412).[96]

27  _____

28  [96] Furthermore, this statement is false and misleading for all of the reasons discussed in
    ¶¶649-658, *infra*.

PGE-BK-0000001366

235.    PG&E fell so far short of this touted achievement that its safety violations, and resulting responsibility for wildfires, would cause PG&E to suspend its dividend entirely on December 20, 2017 due to PG&E's responsibility for the North Bay Fires. This statement gave investors a false impression that safety risks would not imperil the Company's dividend, which is precisely what occurred on December 20, 2017.  Further, this statement touting PG&E's "commitment on safety" materially omitted that the Company's spending on vegetation management was inadequate and barely kept pace with inflation at that time.  It also materially omitted the true risk that PG&E would cause wildfires serious enough to imperil the Company's financial condition.

236.    The false and misleading nature of this statement was further revealed in a series of events from November 8-15, 2018, as evidence emerged that PG&E's safety violations caused the Camp Fire: the most destructive and deadly wildfire in California history.

### 2.    November 4, 2016 – Misstatement No. 7

237.    On November 4, 2016, PG&E hosted a conference call with analysts to discuss its financial results for the third quarter of 2016. In his prepared remarks, Earley stated as follows:

> ***The improvements we have made in safety*** and reliability ***over the last six years have put us in a position to deliver strong financial results going forward.***
>
> Earlier this year, we announced our first dividend increase in six years, and we have committed to achieving a roughly 60% payout ratio by 2019. Combined with our expected rate based growth, we are confident we can deliver a strong overall return for our shareholders.

238.    The statement was materially false and/or misleading because PG&E **did not make** substantial "improvements" in wildfire "safety . . . over the last six years." In fact, a PG&E Vegetation Program Manager, Richard Yarnell, later testified that for the entire period from September 2015 to April 10, 2017, "PG&E—to the best of my knowledge, we have not made any changes" to improve safety. Nor was the Company "in a position to deliver strong financial results going forward." In reality, PG&E's responsibility for causing multiple wildfires – as the results of its numerous, widespread safety violations – had such a significant **negative** impact on PG&E's financial results and financial outlook that PG&E had to suspend its dividend

1    entirely on December 20, 2017 due to PG&E's responsibility for causing the North Bay Fires.

2    This statement gave investors a false impression that concealed safety risks would not imperil the

3    Company's dividend, which is precisely what occurred on December 20, 2017.   Further, this

4    statement touting PG&E's "improvements . . . made in safety" materially omitted that the

5    Company's deficient investments in safety, including inadequate spending on vegetation

6    management that barely kept pace with inflation at that time.  It also materially omitted the true

7    risk that PG&E would cause wildfires serious enough to imperil the Company's financial

8    condition.

9           239.    In addition, it has been documented that PG&E actually knew that it was not in

10   compliance with relevant safety laws and best practices at the time of this statement.  In

11   proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that

12   as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as

13   hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires

14   before the next inspection cycle.'" *See* ¶104.

15          240.    The false and misleading nature of this statement was further revealed in a series

16   of events from November 8-15, 2018, as evidence emerged that PG&E's safety violations

17   caused the Camp Fire: the most destructive and deadly wildfire in California history.

18              **3.      May 31, 2017 – Misstatement No. 8**

19          241.    On May 31, 2017, PG&E issued a press release titled "PG&E Corporation Raises

20   Common Stock Dividend, Shareholders Elect Former Secretary of Homeland Security Jeh C.

21   Johnson to Boards of Directors." The release stated:

22              PG&E Corporation (NYSE: PCG) today announced that it is
                raising its quarterly common stock dividend by 4 cents per share to
23              53 cents per share, beginning with the dividend for the second
                quarter of 2017. On an annual basis, this action increases PG&E
24              Corporation's dividend by 8 percent, from $1.96 per share to $2.12
                per share.

25                                          * * *

26
                Yesterday, in remarks at the joint annual shareholders meeting of
27              PG&E Corporation and Pacific Gas and Electric Company, [CEO]
                Williams highlighted the companies' ***progress on safety, reliability***
28              and reducing greenhouse gas emissions, among other

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                            72
CIVIL ACTION NO. 3:18-CV-03509-EJD

1

2

accomplishments. ***She reaffirmed PG&E's commitment to safety and operational excellence***, delivering for customers and leading the way to achieve California's clean energy goals.

3   242.   This statement falsely connected PG&E's decision increasing its dividend to

4   "progress on safety" and PG&E's "commitment to safety and operational excellence," only

5   months before the Company's pervasive failure to comply with safety regulations caused at least

6   eleven of the North Bay Fires all at the same time in seven different counties. Indeed, it omitted

7   that there was no progress on wildfire safety, as confirmed by PG&E's own Vegetation Program

8   Manager Richard Yarnell, **only one month before the statement was made,** when he reportedly

9   testified under oath: "PG&E—to the best of my knowledge, we have not made any changes as a

10  result of th[e Butte] fire," *i.e.*, from September 2015 to April 10, 2017 (when Yarnell so

11  testified).  In reality, PG&E lacked the touted "progress on safety" as well as "commitment to

12  safety and operational excellence" for all the reasons found by Judge Alsup (*see* ¶¶104-105 &

13  411) that led him to conclude: "**it's not really true. Safety is not your number one thing**" and

14  "**PG&E's performance with respect to vegetation management has been dismal**."

15  243.   PG&E's above statement on May 31, 2017 gave investors a false impression that

16  concealed safety risks would not imperil the Company's dividend, which is precisely what

17  occurred on December 20, 2017.  Further, this statement materially omitted the true risk that

18  PG&E would cause wildfires serious enough to imperil the Company's financial condition.

19  244.   In addition, it has been documented that PG&E actually knew that it was not in

20  compliance with relevant safety laws and best practices at the time of this statement.  In

21  proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that

22  as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as

23  hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires

24  before the next inspection cycle.'" *See* ¶104.

25  245.   The false and misleading nature of this statement was further revealed in a series

26  of events from November 8-15, 2018, as evidence emerged that PG&E's safety violations caused

27  the Camp Fire: the most destructive and deadly wildfire in California history.

28

---

PGE-BK-0000001369

1

**D.      After the North Bay Fires Erupted, the Truth Began to Emerge**

2      246.    The North Bay Fires began on Sunday evening, October 8, 2017. However, it was

3 not until Thursday, October 12, 2017 that the market began to understand that PG&E's safety

4 regulation violations were likely a major cause. On that date, as detailed below (*see* Section

5 VII.D.1, *infra*), CPUC sent PG&E a litigation hold letter reminding PG&E that it (a) "must

6 preserve any factual or physical evidence … includ[ing] all failed poles, conductors and

7 associated equipment from each fire event" and (b) "must inform all employees and contractors

8 that they must preserve all electronic (including emails) and non-electronic documents related to

9 potential causes of the fires, vegetation management, maintenance and/or tree-trimming." This

10 was the first disclosure indicating that PG&E caused any of the North Bay Fires. In response to

11 this news, PG&E's share price declined 6.7%.

12      247.    Late the next day, PG&E issued a statement explaining to investors that: "The

13 causes of these fires are being investigated by [Cal Fire], including the possible role of [PG&E's]

14 power lines and other facilities." It reported that the Company "has approximately $800 million

15 in liability insurance for potential losses that may result from these fires" – to prepare investors

16 for the possibility that "the amount of insurance is insufficient to cover the Utility's liability," in

17 which case, its "financial condition or results of operations could be materially affected." The

18 market had understood that PG&E would be reimbursed by rate-payers for damages by fires it

19 caused while nevertheless acting as a prudent manager; hence, the Company's discussion of

20 liability and insurance signaled to the market that at least some of the North Bay Fires were

21 proximately caused by PG&E's negligence or worse. In response to this news, PG&E's share

22 price continued to decline until the end of the next trading day, Monday, October 16, 2017,

23 falling by approximately 16.5%.

24      248.    Thereafter, PG&E's management attempted to reassure investors, falsely, as

25 detailed below.

26

27

28

E.   **After the North Bay Fires Were Contained, the Company Made Additional False and Misleading Statements and Omissions Regarding Compliance with Wildfire-Related Safety Regulations**

1.   **October 31, 2017 – Misstatement No. 9**

249.   On October 31, 2017, PG&E issued a press release titled "Facts About PG&E's Electric Vegetation Management Efforts." The release stated: "*PG&E follows all applicable federal and state vegetation clearance requirements and performs regular power line tree safety activities in accordance with industry standards, guidelines, and acceptable procedures that help to reduce outages or fires caused by trees or other vegetation.*"

250.   This statement was materially false and/or misleading because PG&E did **not** follow "all applicable … state vegetation clearance requirements."

251.   First, according to reports released in subsequent corrective disclosures, including on May 25 and June 8, 2018, PG&E violated relevant wildfire safety laws, including California Public Resources Code Section 4293, multiple times.

252.   Second, Cal Fire found sufficient evidence of violations of state law to refer PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections IX.D.4-5, *infra*.

253.   Third, investigations into the causes of the Camp Fire have already disclosed evidence that this most destructive and deadly wildfire in California history was caused by PG&E violating California Public Resources Code Section 4293 and California Public Utilities Code Section 451, among other safety regulations. Indeed, Cal Fire has found that PG&E equipment was responsible for both ignition points of the Camp Fire and has since reported PG&E to the Butte County District Attorney based on evidence of safety violations. This statement concealed that, far from "help[ing] to reduce . . . fires caused by trees or other vegetation," PG&E's vegetation management practices tolerated numerous and widespread violations of safety regulations that would **worsen** the risk of fires.

254.   Fourth, it has been documented that PG&E actually knew that it was not in compliance with relevant safety laws and best practices at the time of this statement. In proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that

Case: 19-30088   Doc# 5375-2   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 35 of 38

PGE-BK-0000001371

1   as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as

2   hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires

3   before the next inspection cycle.'" *See* ¶104.

4        255.   Fifth, this statement materially omitted the true risk that PG&E would cause

5   wildfires serious enough to imperil the Company's financial condition.

6        256.   Thus, this statement was materially false and/or misleading because of PG&E's

7   numerous and widespread violations of safety regulations, including regulations specifically

8   related to vegetation management – regulations which were essential for preventing devastating

9   wildfires. *See* Section VI.F.4. As Judge Alsup held, PG&E's "**unsafe conduct has led to**

10   **recurring deadly wildfires caused by its electrical system**" and the "large number of trees that

11   should have been removed by PG&E but weren't . . . was a major contributing factor, **maybe the**

12   **single-biggest factor, in causing the fires** in 2017 and 2018 in Northern California." In fact,

13   PG&E's violations were so pervasive that they evidently caused multiple North Bay Fires all at

14   the same time in seven different counties, and then caused both of the Camp Fire's two ignition

15   points a year later – therefore the violations cannot be explained away as an isolated lapse.

16        257.   This statement regarding compliance was reviewed and authorized by Defendant

17   Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. Kane was responsible

18   for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

19   compliance reporting," including this press release. Because of her senior position within the

20   Company, Kane had ultimate authority to control the content of this statement.

21        **2.    November 2, 2017 – Misstatement No. 10**

22        258.   On November 2, 2017, PG&E hosted a conference call with analysts to discuss its

23   financial results for the third quarter of 2017. In her prepared remarks, now-CEO Williams

24   falsely reassured investors regarding the effectiveness of PG&E's vegetation management:

25              Thank you, Chris, and good morning, everyone. Given the recent
               wildfires impacting our customers and communities, our
26              discussion today will be different from our usual earnings call. . . .

27                                        * * *

28

---

PGE-BK-0000001372

1
2
3
4

Now I know there's a lot of interest in how these fires started and in how PG&E assets might have been involved in or impacted by the wildfires. Our communities deserve answers and we are committed to learning what happened. It's critical that we identify anything that will help us to keep our customers and communities safe in the future. That is our goal as we work with CAL FIRE and the CPUC.

5

\* \* \*

6
7
8
9
10

**Many of you have reached out with questions about the potential impact of the wildfires to the company's financials and also about the doctrine of inverse condemnation in California.** At this time, the known financial impact of the wildfires is limited to the cost of the unprecedented response and restoration efforts, costs related to our liability insurance and some legal expenses, and Jason [Wells] will cover these later this morning.

\* \* \*

11
12
13
14

**I know there's a lot of interest in our pole maintenance and vegetation management programs**, so let me address these as well. First, we routinely inspect, maintain and replace our electric poles. This includes annual scheduled patrols, 5-year visual inspections, an intrusive testing and treating on our wood poles at a frequency that significantly exceeds CPUC requirements.

15
16
17
18
19
20
21

***We also have one of, if not, the most comprehensive vegetation management programs in the country.*** Our vegetation management program manages about 123 million trees across the service territory. ***And every year, we inspect every segment of the 99,000 miles of overhead line and we clear vegetation as needed.*** This is well beyond what is typical in our industry where most utilities have a 3-year vegetation management cycle or sometimes longer. **Typically, we spend about $200 million every year to line clear or remove 1.3 million trees to mitigate both the risk of wildfires and to prevent electric outages. With the drought and the tree mortality crisis we've experienced in California, we have been expanding our vegetation management work since 2014.**

22
23
24
25

***In 2016, we spent an additional $200 million, essentially doubling our typical vegetation management spending last year.*** We've removed an incremental 236,000 dead or dying trees, and we enhanced our tree maintenance work with additional patrols in areas of high fire danger, including a combination of boots on the ground, aerial patrols, and sophisticated LiDAR technology.

26
27
28

259.    These statements were materially false and/or misleading because PG&E did not "doubl[e]" its "typical vegetation management spending last year." As explained in Section IV.B., *supra*, PG&E's Vegetation Management Balancing Accounts for the relevant years

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                    77
CIVIL ACTION NO. 3:18-CV-03509-EJD

indicate that PG&E spent $194,094,406 on vegetation management in 2015, $198,735,579 in
2016, and $201,456,193 in 2017 – increases of only 2.4% and 1.4%, respectively.[97] The lack of
improvement to PG&E's vegetation management practices was confirmed by PG&E's own
Vegetation Program Manager Richard Yarnell, who reportedly testified under oath that, even by
April 10, 2017: "PG&E—to the best of my knowledge, **we have not made any changes** as a
result of th[e September 2015 Butte] fire."

260.     Second, PG&E failed to comply with safety regulations – including regulations
specifically related to vegetation management. Thus, when Williams touted PG&E's vegetation
management program as "one of, if not, the most comprehensive vegetation management
programs in the country," she gave investors the false impression that PG&E's vegetation
management did not fall short of applicable safety regulations, when in fact it did. Given
PG&E's numerous and widespread violations of safety regulations, including those violations
that would cause multiple of the North Bay Fires as well as evidently cause the Camp Fire, its
"vegetation management programs" were **not** "comprehensive."

261.     Third, PG&E has admitted that it did not "every year . . . inspect every segment of
the 99,000 miles of overhead line," because at the time this statement was made, it did not
inspect Tower :27/222 of the Caribou-Palermo transmission line since August 2014.  This lack of
annual inspection contributed to Tower :27/222's failure on November 8, 2018, which was part
of the Camp Fire's first ignition point.

262.     Fourth, PG&E did **not** "have one of, if not, the most comprehensive vegetation
management programs in the country" for all the reasons found by Judge Alsup (*see* ¶¶104-105
& 411) that led him to conclude: "**PG&E's performance with respect to vegetation
management has been dismal**."

263.     Fifth, this statement materially omitted the true risk that PG&E would cause
wildfires serious enough to imperil the Company's financial condition.

---

[97] This spending did not differ more than $100,000 from the amounts PG&E requested, and
the amounts CPUC approved, in PG&E's 2015, 2016, and 2017 General Rate Cases.