### 3. November 2, 2017 – Misstatement No. 11

264. Later on the same call, an analyst asked the Company for more detail about PG&E's vegetation management practices. President and COO Nickolas Stavropoulos replied as follows:

> [ANALYST:] And then, I guess, ***can you discuss your vegetation practices for trees that are located near power lines?*** I guess we've seen sort of end reports that have come out for some of your peers that they sort of track vegetation that's within certain distances from the lines, and they basically make their decisions on what to do based on sort of updates.

> [Stavropoulos:] Thank you for the question. So as Geisha mentioned, we have a very aggressive vegetation management program across our 70,000-mile -- square mile territory. We manage about 123 million trees that are near and adjacent to our facilities. ***And over the last 2 years, we've doubled the amount that we've invested in veg[etation] management.*** That includes line clearing to remove parts of trees that are adjacent to our facilities as well as removal of dead and dying trees. So the program involves year-round effort to identify these dead and dying trees through inspection processes where we use foot and aerial patrols; we use LiDAR, which is light, detecting and ranging technology, to identify the trees that need to be worked. ***We inspect all of our overhead lines every year, and we do second patrols in high fire danger areas at least twice a year. In some areas, we do as often as 4x a year.*** So it's a very aggressive program. There are specific requirements around line clearing, and it depends upon the voltage of the lines. And it can range up to feet [sic] to as much a sort of 18 inches away from the facility. So there are all sorts of different requirements, depending upon where the facilities are located and the voltage of the facilities.

265. This statement was materially false and/or misleading because PG&E did not "doubl[e] the amount that we've invested in veg[etation] management." As explained in Section VI.B., *supra*, PG&E's Vegetation Management Balancing Accounts for the relevant years indicate that PG&E spent $194,094,406 on vegetation management in 2015, $198,735,579 in 2016, and $201,456,193 in 2017. Moreover, the lack of improvement to PG&E's vegetation management practices was confirmed by PG&E's own Vegetation Program Manager Richard Yarnell, who reportedly testified under oath that, even by April 10, 2017: "PG&E—to the best of my knowledge, we have not made any changes as a result of th[e Butte] fire," *i.e.*, since September 2015.

Case: 19-30088   Doc# 5375-3   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 1 of 54

PGE-BK-0000001375

266.    Second, PG&E failed to comply with safety regulations specifically related to vegetation management. By representing that it "inspect[s] all of [its] overhead lines every year," and inspects some trees "twice" or "4x" each year, Stavropoulos falsely created the impression that PG&E would prevent many safety violations from occurring, especially in "high fire danger areas" such as those where the North Bay Fires and Camp Fire erupted. In reality, safety violations were so pervasive that they evidently caused both ignition points of the Camp Fire as well as at least eleven fires at the same time in **seven** different counties. In touting its "very aggressive vegetation management program," the statement actionably omitted the widespread failure of these measures to bring PG&E into compliance. Indeed, if PG&E had been properly "inspect[ing] all of our overhead lines "every year," "twice a year," or "4x a year," many of the causes of the North Bay Fires and Camp Fire would have been discovered and the fires prevented. For instance, in addition to the fires caused by dead or dying trees, Cal Fire found that the Cascade Fire was caused "by sagging power lines coming into contact" and the Blue Fire was caused when "a PG&E power line conductor separated from a connector."

267.    As another example, in the afternoon of November 8, 2018, PG&E's aerial inspection of the 115 kilovolt transmission line that caused the Camp Fire discovered "damage to a transmission tower" carrying that electrical line. PG&E has also acknowledged a second ignition point for the Camp Fire that exhibited damaged and downed poles, vegetation on top of downed wires, and other signs of safety violations. Cal Fire has determined that PG&E caused both of these ignition points.

268.    Third, PG&E has admitted that it did not "inspect all of our overhead lines every year," much less "twice a year" or "4x a year," because at the time this statement was made, it did not inspect Tower :27/222 of the Caribou-Palermo transmission line since August 2014. This lack of annual inspection contributed to Tower :27/222's failure on November 8, 2018, which was part of the Camp Fire's first ignition point.

269.    Fourth, this statement materially omitted the true risk that PG&E would cause wildfires serious enough to imperil the Company's financial condition.

Case: 19-30088    Doc# 5375-3    Filed: 01/14/20    Entered: 01/14/20 16:07:57    Page 2
of 54
PGE-BK-0000001376

### 4.   November 5, 2017 – Misstatement No. 12

270.   At all relevant times, PG&E's Media Relations department maintained a news website named *Currents*,[98] providing news, information, and commentary about PG&E's activities, including the delivery of electricity and the operation, maintenance, and safety of the Company's electric services. Through the website, PG&E repeatedly touted the safety of its power lines, the Company's vegetation management program, and its purported success mitigating wildfire risk.

271.   In one such article, dated November 5, 2017 and titled "Facts About PG&E's Wildfire and Prevention Safety Efforts," PG&E reassured investors that "***PG&E meets or exceeds all applicable federal and state vegetation clearance requirements***."[99]

272.   This statement was materially false and/or misleading because PG&E did not "meet" – much less "exceed" – "all applicable … state vegetation clearance requirements."

273.   First, according to reports released in subsequent corrective disclosures, including on May 25 and June 8, 2018, PG&E violated relevant wildfire safety laws, including California Public Resources Code Section 4293, multiple times. *See* Section VII.D.4., *infra*.

274.   Second, Cal Fire found sufficient evidence of violations of state law to refer PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections IX.D.4-5, *infra*.

275.   Third, investigations into the causes of the Camp Fire have already disclosed evidence that this most destructive and deadly wildfire in California history was caused by PG&E violating California Public Resources Code Section 4293 and California Public Utilities Code Section 451, among other safety regulations.  Indeed, Cal Fire has found that PG&E

---

[98] *Currents*, PG&E, http://www.pgecurrents.com.

[99] On November 14, 2017, PG&E spokesperson Greg Snapper repeated this false and misleading reassurance *verbatim* in an NBC article titled "Utility Company's Risk Assessment at Issue in NorCal Wildfires." *See* Jaxon Van Derbeken, *Utility Company's Risk Assessment at Issue in NorCal Wildfires*, NBC Universal Media (Nov. 14, 2017), https://www.nbcconnecticut.com/troubleshooters/national-investigations/PGE-Risk-Assessment-at-Issue-in-North-Bay-Wildfires-457356963.html.

Case: 19-30088   Doc# 5375-3   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 3 of 54

PGE-BK-0000001377

1    equipment was responsible for both ignition points of the Camp Fire and has since reported

2    PG&E to the Butte County District Attorney based on evidence of safety violations.

3         276.    Fourth, it has been documented that PG&E actually knew that it was not in

4    compliance with relevant safety laws and best practices at the time of this statement.  In

5    proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that

6    as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as

7    hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires

8    before the next inspection cycle.'"  *See* ¶104.

9         277.    Fifth, this statement materially omitted the true risk that PG&E would cause

10    wildfires serious enough to imperil the Company's financial condition.

11        278.    Thus, this statement was materially false and/or misleading because of PG&E's

12    numerous and widespread violations of safety regulations, including regulations specifically

13    related to vegetation management – regulations which were essential for preventing devastating

14    wildfires.  *See* Section VI.F.4.  As Judge Alsup held, PG&E's "**unsafe conduct has led to**

15    **recurring deadly wildfires caused by its electrical system**" and the "large number of trees that

16    should have been removed by PG&E but weren't . . . was a major contributing factor, **maybe the**

17    **single-biggest factor, in causing the fires** in 2017 and 2018 in Northern California."  In fact,

18    PG&E's violations were so pervasive that they evidently caused multiple North Bay Fires all at

19    the same time in seven different counties, and then caused both of the Camp Fire's two ignition

20    points a year later – therefore the violations cannot be explained away as an isolated lapse.

21        279.    This statement regarding compliance was reviewed and authorized by Defendant

22    Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible

23    for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

24    compliance reporting," including this news release. Because of her senior position within the

25    Company, Kane had ultimate authority to control the content of this statement.

26

27

28

Case: 19-30088    Doc# 5375-3    Filed: 01/14/20    Entered: 01/14/20 16:07:57    Page 4
of 54
PGE-BK-0000001378

**5.      May 25, 2018 – Misstatement No. 13**

280.     On May 25, 2018, PG&E issued a press release to respond to Cal Fire's reports regarding some of the October 2017 North Bay Fires (*see* Section VII.D.4, *infra*), to reassure investors that PG&E had met all state regulations concerning fire safety. The press release stated:

- Following Governor Brown's January 2014 Drought State of Emergency Proclamation and the California Public Utilities Commission's Resolution ESRB-4, PG&E has added enhanced measures to address areas particularly affected by drought and bark beetles including:

- Increased foot and aerial patrols along power lines in high fire-risk areas;

- Removed approximately 236,000 dead or dying trees in 2016 and 140,000 dead or dying trees in 2017; these tree removals were in addition to approximately 30,000 trees removed per year prior to the drought;

- Launched daily aerial fire detection patrols during high fire season to improve fire spotting and speed of fire response;

- Since 2014, provided $11.4 million to local Fire Safe Councils (FSCs) for fuel reduction projects in communities; and

- Provided $1.7 million to local FSCs for 28 highly programmable remote-sensing cameras for critical fire lookout towers.

- ***PG&E meets or exceeds regulatory requirements for pole integrity management***, using a comprehensive database to manage multiple patrol and inspection schedules of our more than two million poles.

281.     This statement was materially false and/or misleading because PG&E did not "meet" – much less "exceed" – "regulatory requirements for pole integrity management." According to a report released in a subsequent corrective disclosure, PG&E violated California's safety regulations multiple times. Indeed, on June 8, 2018, Cal Fire disclosed that its "investigators have determined that 12 Northern California wildfires in the October 2017 Fire Siege were caused by electric power and distribution lines, conductors **and the failure of power poles**." In fact, at least one of the North Bay Fires – the Sulphur Fire – "was caused by the failure of a PG&E owned power pole" evidencing "violations of state law" sufficient to be referred to the relevant district attorney. Further, Cal Fire found enough evidence of violations of state law

PGE-BK-0000001379

1    to refer PG&E to the relevant district attorneys for eight of these twelve North Bay fires. *See*

2    Section VII.D.5., *infra*.

3        282.    Second, PG&E acknowledged that an aerial patrol of the Camp Fire's origin later

4    the same day showed "damage to a transmission tower" or pole that PG&E failed to maintain, as

5    well as a second ignition point that exhibited damaged and downed poles, in violation of Section

6    451. Thus, PG&E did **not** "meet[] or exceed[] regulatory requirements for pole integrity

7    management" – regulations which were essential for preventing devastating wildfires. PG&E's

8    representation to the contrary was materially false and/or misleading. Cal Fire has since

9    confirmed that PG&E equipment was responsible for both of the Camp Fire's ignition points,

10    and referred its investigations to the relevant district attorney based on evidence of safety

11    violations.

12        283.    Overall, this statement was materially false and/or misleading because of PG&E's

13    numerous and widespread violations of safety regulations – regulations which were essential for

14    preventing devastating wildfires. In fact, PG&E's violations were so pervasive that they

15    evidently caused multiple North Bay Fires all at the same time in seven different counties, and

16    then caused both of the Camp Fire's two ignition points a year later – therefore the violations

17    cannot be explained away as an isolated lapse. This statement materially omitted the true risk

18    that PG&E would cause wildfires serious enough to imperil the Company's financial condition.

19        284.    It has additionally been documented that PG&E actually knew that it was not in

20    compliance with relevant safety laws and best practices at the time of this statement. In

21    proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that

22    as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as

23    hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires

24    before the next inspection cycle.'" *See* ¶104.

25        285.    This statement regarding compliance was reviewed and authorized by Defendant

26    Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. Kane was responsible

27    for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

28

Case: 19-30088   Doc# 5375-3   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 6
of 54

PGE-BK-0000001380

1  compliance reporting," including this press release.  Because of her senior position within the

2  Company, Kane had ultimate authority to control the content of this statement.

3      **F.**    **While the Truth Regarding PG&E's Role in Causing the North Bay Fires
Emerged, the Company Made Additional False and Misleading Statements
and Omissions Regarding Compliance with Wildfire-Related Safety
Regulations, Including Its ESRB-8 Shutoff Protocol**

4

5

6      286.    As detailed below (*see* Section VII.D., *infra*), PG&E's share price declined

7  precipitously as the truth about its responsibility for the North Bay Fires emerged.  As liabilities

8  for the North Bay Fires threatened the Company's financial viability, Defendants would realize

9  that the Company needed a legislative bailout to avoid bankruptcy.  As a result, PG&E needed

10  the public, including investors, to believe that it would prioritize safety thereafter.

11      **1.**    **June 8, 2018 – Misstatement No. 14**

12      287.    On June 8, 2018, Cal Fire announced its conclusions that PG&E caused the

13  preponderance of the North Bay Fires (*see* Section VII.D.5, *infra*), PG&E's share price

14  continued its decline, and its financial situation deteriorated.  Later that day, PG&E issued a

15  press release to respond to Cal Fire's report, falsely and misleadingly reassuring investors that

16  PG&E had met all state regulations concerning fire safety.  The press release, titled "PG&E

17  Responds to Latest CAL FIRE Announcement" stated, in relevant part:

18          ***Programs Overall Met State's High Standards***

19          We look forward to the opportunity to carefully review the
CAL FIRE reports to understand the agency's perspectives.

20          Based on the information we have so far, we continue to
believe our overall programs met our state's high standards.

21

22          For example, ***PG&E meets or exceeds regulatory
requirements for pole integrity management***, using a
comprehensive database to manage multiple patrol and
inspection schedules of our more than two million poles.

23

24          Similarly, ***under PG&E's industry-leading Vegetation
Management Program***, we inspect and monitor every PG&E

25          overhead electric transmission and distribution line each year,
with some locations patrolled multiple times. We also prune or

26          remove approximately 1.4 million trees annually.

27      288.    Because PG&E's compliance violations would soon cause the Camp Fire, the

28  most destructive and deadly wildfire in California history, PG&E's "Vegetation Management

PGE-BK-0000001381

Program" and "pole integrity management" decidedly did not meet California's "High Standards." Investigations into the causes of the Camp Fire have already uncovered evidence that it was caused by PG&E violating California Public Resources Code Section 4293 and California Public Utilities Code Section 451, among other safety regulations. Indeed, Cal Fire has found that PG&E equipment was responsible for both ignition points of the Camp Fire and has since reported PG&E to the Butte County District Attorney based on evidence of safety violations.

289. First, the Camp Fire was described in initial communications between firefighters and dispatch as a vegetation fire "underneath the transmission lines," which vegetation should have been cleared by PG&E pursuant to Section 4293.

290. Second, PG&E acknowledged that an aerial patrol of the Camp Fire's origin later the same day showed "damage to a transmission tower" or pole that PG&E failed to maintain, in violation of Section 451.

291. Third, PG&E has also acknowledged a second ignition point for the Camp Fire that exhibited damaged and downed poles, vegetation on top of downed wires, and other signs of safety violations. Cal Fire has since confirmed that PG&E equipment was responsible for both of the Camp Fire's ignition points, and referred its investigations to the relevant district attorney based on evidence of safety violations.

292. Fourth, it has been documented that PG&E actually knew that it was not in compliance with relevant safety laws and best practices at the time of this statement. In proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'" *See* ¶104.

293. Fifth, this statement materially omitted the true risk that PG&E would cause wildfires serious enough to imperil the Company's financial condition.

294. Thus, PG&E did **not** "meet[] or exceed[] regulatory requirements for pole integrity management" or "Vegetation Management" – regulations which were essential for

PGE-BK-0000001382

preventing devastating wildfires.  *See* Section VI.F.4.  As Judge Alsup held, PG&E's "**unsafe conduct has led to recurring deadly wildfires caused by its electrical system**" and the "large number of trees that should have been removed by PG&E but weren't . . . was a major contributing factor, **maybe the single-biggest factor, in causing the fires** in 2017 and 2018 in Northern California."  PG&E's representation to the contrary was materially false and/or misleading.

295.    This statement regarding compliance was reviewed and authorized by Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . . compliance reporting," including this press release.  Because of her senior position within the Company, Kane had ultimate authority to control the content of this statement.

**2.    June 8, 2018 – Misstatement No. 15**

296.    The same press release contained a further false and/or misleading statement:

> **To address the growing threats posed by wildfires and extreme weather, and in light of the wildfires throughout our state last year,** *PG&E has launched the Community Wildfire Safety Program* to help keep our customers and communities safe. Among the key components of the new program are. . .
>
> • Public Safety Power Shutoff: As a last resort, *a program to proactively turn off electric power for safety when extreme fire danger conditions occur*, while helping customers prepare and providing early warning notification, when and where possible.

297.    PG&E's representation that it "has launched . . . a program to proactively turn off electric power for safety when extreme fire danger conditions occur" was false and misleading.  It was false because the touted program, which would eventually become its ESRB-8 Shutoff Protocol, was illusory; hence, PG&E never "launched" it.  Further, it misleadingly omitted that any guidelines PG&E did develop were a mere pretense of safety that the Company did not follow.  Even when all seven relevant "extreme fire danger conditions" **did** "occur," weighing strongly in favor of shutting off PG&E's transmission lines near the Jarbo Gap on November 7 and 8, 2018, PG&E flouted its own supposed program.  PG&E's failure to shut off its

Case: 19-30088   Doc# 5375-3   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 9 of 54

PGE-BK-0000001383

1    transmission line caused the Camp Fire: the most destructive and deadly wildfire in California

2    history.  By touting a wildfire safety program PG&E did not adhere to, and where its

3    nonadherence would risk devastating wildfires, PG&E misrepresented existing and material facts

4    to investors.

5          298.    This press release regarding compliance was reviewed and authorized by

6    Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was

7    responsible for both "overseeing . . . implementation" of PG&E's compliance and "overseeing .

8    . compliance reporting," including this press release.  Because of her senior position within the

9    Company, Kane had ultimate authority to control the content of this statement.

10                      **3.      September 27, 2018 – Misstatement No. 16**

11          299.    On July 16, 2018, the CPUC enacted Resolution ESRB-8, which required PG&E

12   to adopt, promulgate and follow "de-energization policy and procedures" to "de-energize power

13   lines" in the face of unprecedented wildfire threats "to ensure public safety."  It was the

14   Company's official announcement of its de-energization policy and procedures implementing

15   Resolution ESRB-8, detailed below, that materially misled investors.

16          300.    On or about September 27, 2018, PG&E announced the full details of its ESRB-8

17   Shutoff Protocol in a filing with CPUC[100] that was also posted on its website.[101]  The ESRB-8

18   Shutoff Protocol stated:

19              PG&E's Community Wildfire Safety Program implements
                additional precautionary measures intended to reduce wildfire
20              threats. *It includes . . . executing protocols to temporarily turn off*
                *electric power for safety when extreme fire danger conditions are*
21              *occurring.*"

22              . . .

23              Public Safety Power Shutoff is one component of the Community
                Wildfire Safety Program.  *PG&E has created a set of procedures*
24

25   _____
     [100] PG&E Public Safety Power Shutoff Policies and Procedures, CPUC website (Sept. 2018),
26   http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/News_Room/Public-Safety-
     Power-Shutoff-Policies-and-Procedures-September-2018.pdf.
27   [101] PG&E Public Safety Power Shutoff Policies and Procedures, PG&E website (Sept. 2018),
     https://www.pge.com/pge_global/common/pdfs/safety/emergency-preparedness/natural-
28   disaster/wildfires/Public-Safety-Power-Shutoff-Policies-and-Procedures-September-2018.pdf.

PGE-BK-0000001384

*for. . . [d]etermining what combination of conditions necessitates turning off lines for safety*.

. . .

PG&E will take a combination of many criteria into consideration, including:

- **"Extreme" fire danger threat level**, as classified by the National Fire Danger Rating System

- **A Red Flag Warning declared** by the National Weather Service

- **Low humidity levels**, generally 20 percent and below

- **Sustained winds** above approx. 25 mph and wind gusts in excess of approx. 45 mph

- **Site-specific conditions** such as temperature, terrain and local climate

- **Critically dry vegetation** that could serve as fuel for a wildfire

- **On-the-ground, real-time observations** from PG&E field crews

(Emphasis original.)

301.     PG&E's representation that it had "implement[ed] additional precautionary measures" including "determining what combination of conditions necessitates turning off lines for safety" was false and misleading.  It was false because the ESRB-8 Shutoff Protocol was illusory; hence, PG&E did not "implement" it, as required by law.  Further, it misleadingly omitted that any guidelines PG&E did develop were a mere pretense of safety that the Company did not follow.  Even when all seven relevant "criteria" weighed in favor of shutting off PG&E's transmission lines near the Jarbo Gap on November 7 and 8, 2018, PG&E nevertheless flouted its protocol.  PG&E's failure to shut off its transmission line caused the Camp Fire: the most destructive and deadly wildfire in California history.  By touting a wildfire safety program PG&E did not adhere to, where its nonadherence would risk devastating wildfires, PG&E misrepresented existing and material facts to investors.

302.     This statement regarding compliance was reviewed and authorized by Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible

PGE-BK-0000001385

for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

compliance reporting," including this report. Because of her senior position within the Company,

Kane had ultimate authority to control the content of this statement.

### 4.   October 9, 2018 – Misstatement No. 17

303.   On October 9, 2018 Cal Fire announced its conclusions that PG&E equipment

caused another of the North Bay Fires, known as the Cascade Fire.  Later the same day, PG&E

issued a press release to respond to Cal Fire's report, falsely and misleadingly reassuring

investors that PG&E had met all state regulations concerning fire safety.  The press release, titled

"PG&E Responds to Cascade Wildfire Announcement" stated, in relevant part:

> [W]e are continuing to focus on ***implementing additional
> precautionary measures*** intended to further reduce wildfire
> threats, such as ***working to remove and reduce dangerous
> vegetation, improving weather forecasting, upgrading
> emergency response warnings, [and] making lines and poles
> stronger in high fire threat areas***, and taking other actions to
> make our system, and our customers and communities, ***even
> safer*** in the face of a growing wildfire threat.

304.   It was false and misleading for PG&E to tout "implementing additional

precautionary measures . . . to remove and reduce dangerous vegetation" and "mak[e] lines and

poles stronger in high fire threat areas."  Indeed, just one month later, PG&E would cause the

Camp Fire through its failure to remove vegetation and maintain its poles, in violation of

California Public Resources Code Section 4293 and California Public Utilities Code Section 451,

among other safety regulations.

305.   As noted above, the Camp Fire was described in initial communications between

firefighters and dispatch as a vegetation fire "underneath the transmission lines," which

vegetation should have been cleared by PG&E under Section 4293.  Second, PG&E

acknowledged that an aerial patrol of the Camp Fire's origin later the same day showed "damage

to a transmission tower" or pole that PG&E failed to maintain, as well as a second ignition point

that exhibited damaged and downed poles, in violation of Section 451.  PG&E's representation

to the contrary was materially false and/or misleading.   Indeed, Cal Fire has found that PG&E

Case: 19-30088   Doc# 5375-3   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 12
of 54

PGE-BK-0000001386

1    equipment was responsible for both ignition points of the Camp Fire and has since reported

2    PG&E to the Butte County District Attorney based on evidence of safety violations.

3         306.    Moreover, PG&E was **not** "making lines and poles stronger in high fire threat

4    areas." For example, PG&E never performed planned safety work on, or otherwise updated, the

5    100 year-old Caribou-Palermo transmission line even though it knew that its lines and poles were

6    weak and that "**the likelihood of failed structures happening is high**" (¶136). The same

7    transmission line would soon cause the Camp Fire's first ignition point, as found by Cal Fire and

8    accepted by PG&E (¶138).

9         307.    Further, this statement materially omitted the true risk that PG&E would cause

10   wildfires serious enough to imperil the Company's financial condition.

11        308.    This statement regarding compliance was reviewed and authorized by Defendant

12   Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. Kane was responsible

13   for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

14   compliance reporting," including this press release. Because of her senior position within the

15   Company, Kane had ultimate authority to control the content of this statement.

16              **5.      October 9, 2018 – Misstatement No. 18**

17        309.    The same PG&E press release contained a further false and/or misleading

18   statement:

19              To address the growing threats posed by wildfires and extreme
                weather, and in light of the wildfires throughout our state last
20              year, *PG&E has launched the Community Wildfire Safety*
                *Program* to help keep our customers and communities safe *by*
21              *implementing additional precautionary measures* intended to
                further reduce wildfire threats. Among the key components of
22              the new program are. . .

23              • Public Safety Power Shutoff: As a last resort, *a program to*
                  *proactively turn off electric power for safety when*
24                *extreme fire danger conditions occur*, while helping
                  customers prepare and providing early warning
25                notification, when and where possible.

26        310.    PG&E's representation that it "has launched" and "implement[ed] . . . a program

27   to proactively turn off electric power for safety when extreme fire danger conditions occur" was

28

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                    91
CIVIL ACTION NO. 3:18-CV-03509-EJD

PGE-BK-0000001387

false and misleading.  It was false because the touted program, its ESRB-8 Shutoff Protocol, was illusory from the beginning; hence, PG&E never "launched" or "implement[ed]" it.

311.   Further, it misleadingly omitted that any guidelines PG&E did develop were a mere pretense of safety that the Company did not follow.  Even when all seven relevant "extreme fire danger conditions" **did** "occur," weighing in favor of shutting off PG&E's transmission lines near the Jarbo Gap on November 7 and 8, 2018, PG&E nevertheless flouted its supposed program.

312.   PG&E's failure to shut off its transmission line caused the Camp Fire: the most destructive and deadly wildfire in California history.  By touting a wildfire safety program PG&E did not adhere to, where its nonadherence would risk devastating wildfires, PG&E misrepresented existing and material facts to investors.

313.   This statement regarding compliance was reviewed and authorized by Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . . compliance reporting," including this press release.  Because of her senior position within the Company, Kane had ultimate authority to control the content of this statement.

### 6.   November 8, 2018 – Misstatement No. 19

314.   On November 8, 2018, the Camp Fire started after PG&E decided not to shut off its power.  Before the public became aware of PG&E's true role in causing the Camp Fire, the Company announced via its official Twitter.com account at 6:14 p.m. that day: "PG&E has determined that it will not proceed with plans today for a Public Safety Power Shutoff in portions of 8 Northern CA counties, as *weather conditions did not warrant this safety measure*."[102]

315.   This statement was affirmatively false: weather conditions did, in fact, warrant a shutoff.  As detailed above, all seven criteria that PG&E deemed relevant, including those related

---

[102] PG&E Twitter Account Post (Nov. 8, 2018 3:14PM), https://twitter.com/PGE4Me/status/1060672000929267713.

Case: 19-30088   Doc# 5375-3   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 14
of 54
PGE-BK-0000001388

1   to weather conditions, weighed in favor of a shutoff under PG&E's ESRB-8 Shutoff Protocol.

2   *See* Section IV.H., *supra*.

3       316.   This statement regarding compliance was reviewed and authorized by Defendant

4   Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. Kane was responsible

5   for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

6   compliance reporting," including this announcement. Because of her senior position within the

7   Company, Kane had ultimate authority to control the content of this statement.

8   **VIII.   MATERIALITY UNDER THE EXCHANGE ACT**

9       317.   PG&E's reassurances to investors about its safety, prudence, and compliance with

10   the law were especially important to investors because of California's legal regime known as

11   inverse condemnation. As described in more detail above (*see* Section VI.A.5., *supra*), PG&E is

12   strictly liable for the property costs of wildfires it caused. However, during the Class Period, it

13   could be reimbursed for those costs by ratepayers by petitioning CPUC and showing that it had

14   acted as a prudent manager. On such a showing, CPUC could have rate payers reimburse PG&E

15   for some or all of its liability.

16       318.   PG&E's investors understood that PG&E would bear the costs of wildfires it

17   caused, and that PG&E's ability to pass some or all of those costs on to ratepayers was limited

18   by PG&E's prudence. For example, an analyst report issued by Evercore ISI on December 21,

19   2017 stated:

20           On the 3Q17 call PCG indicated company operations were
        conducted properly leading up to and after the fire, but they still
21           had little information regarding the cause of the fire or potential
        shareholder exposure.

22                           \* \* \*

23

24           PCG reiterated the company routinely inspects, maintains, and
        replaces poles, and tests and treats wood poles on a frequency that
        significantly exceeds CPUC requirements. The company claims to
25           have one of, if not the most comprehensive vegetation
        management programs in the country. Further, the company
26           doubled its vegetation management spending in 2016 due to the
        drought and tree mortality crisis in California. That being said, we
27           still do not know and likely will not know what caused the various
        fires for some time, **whether or not PCG's equipment was solely**
28           **or partly the cause**, and whether or not the facts will support a

PGE-BK-0000001389

ruling at CPUC that PCG **acted prudently** should they be successfully sued under inverse condemnation.

319.   In light of these provisions of California law, PG&E's repeated reassurances to its investors – *e.g.*, that it complied with relevant safety regulations, doubled its vegetation management spending, inspected all of its powerlines every year, and would adhere to a formal ESRB-8 Shutoff Protocol – effectively communicated that the Company would be able to recover any property damage liabilities from wildfires caused by its systems, through the CPUC. Those reassurances, when revealed to have been false and misleading, impacted the Company's valuation by at least the amount of damage it caused by starting or exacerbating the North Bay and Camp Fires. The impact of these misstatements, and their importance to the Company's financial condition, is underscored by PG&E's decision to file for Chapter 11 bankruptcy based on its anticipated $30 billion in potential liabilities tied to the North Bay and Camp Fires, and related concern that as a result, neither PG&E Corporation nor the Utility would be able "to continue as going concerns."

320.   In total, PG&E's share price declined $55.60 per share on the nine corrective disclosures and/or materializations of concealed risk herein alleged. Given that the Company had between approximately 514.4 and 518.6 million shares outstanding from October 24, 2017 to October 25, 2018, the losses caused by PG&E's fraud under the Exchange Act were in the billions of dollars.

## IX.   LOSS CAUSATION UNDER THE EXCHANGE ACT

### A.   Defendants' False and Misleading Statements Artificially Inflated the Price of PG&E's Securities

321.   As a result of their purchases of PG&E's securities during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused PG&E securities to trade at artificially inflated levels throughout the Class Period, reaching as high as $71.56 per share on September 11, 2017 – a month before the truth started to emerge on October 12, 2017.

Case: 19-30088   Doc# 5375-3   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 16 of 54

PGE-BK-0000001390

**B.    PG&E's Safety Violations Caused the Devastating North Bay Fires**

322.    PG&E caused the North Bay Fires.  Of the eighteen fires for which Cal Fire has determined the cause, it has determined that **seventeen were caused by PG&E equipment**.

323.    Of these seventeen fires, Cal Fire determined that **eleven were due to PG&E's violation of California safety regulations**. Under California law, PG&E bears the cost for the destruction caused by these fires unless it can show to CPUC that its violations were "reasonable." Together, these fires were responsible for **more than 100,000 acres of land devastated, more than 2,000 structures destroyed,** and **at least 9 of the 44 North Bay Fire fatalities.**

324.    Six more of the North Bay Fires were also deemed to have been caused by PG&E electrical lines; though Cal Fire found no specific evidence of safety violations for these six fires, PG&E may still be found liable under California's legal regime known as inverse condemnation, which provides strict liability for utilities when their power lines are involved in wildfires that lead to property damage. Together, these fires were responsible for an additional **more than 50,000 acres of land devastated**, **more than 800 structures destroyed**, and **at least 13 of 44 fatalities.** Necessarily, these six fires would have been more easily contained, and accordingly less destructive, if not for the fires caused by PG&E's violations and inadequate safety practices.[103]

**C.    PG&E's Safety Violations Caused the Devastating Camp Fire**

325.    At or about 6:29 a.m. on November 8, 2018, the Camp Fire was started in Pulga, California by faulty PG&E equipment on Pulga Road and Camp Creek Road, near the Jarbo Gap.[104]  A second ignition point, also caused by faulty PG&E equipment, began approximately 15 minutes later near the community of Concow.  The combined Camp Fire soon devastated

---

[103] Similarly, another of the North Bay Fires known as the Tubbs fire (which burned 36,807 acres, destroyed 5,636 structures, and resulted in 22 fatalities) would have been more easily contained, and accordingly less destructive, if not for the fires caused by PG&E's violations and inadequate safety practices at the same time.

[104] Camp Fire Incident Update (Nov. 25, 2018 7:00AM), http://cdfdata.fire.ca.gov/admin8327985/cdf/images/incidentfile2277_4326.pdf.

Case: 19-30088   Doc# 5375-3   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 17 of 54
PGE-BK-0000001391

several surrounding communities, largely destroying Paradise, Concow, Magalia, and Parkhill. The Camp Fire incinerated 153,336 acres, destroyed 18,804 structures, and killed at least 85 people.

326.    As noted above, Cal Fire has concluded that PG&E caused both of the Camp Fire's two ignition points under circumstances evidencing violations of safety regulations and referred its investigation to the Butte County District Attorney.

**D.    As the Market Learned About the Effects and Extent of PG&E's Inadequate Safety Practices, the Price of PG&E's Securities Fell Dramatically**

327.    On or about October 8, 2017, eighteen major wildfires known as the North Bay Fires started in California, burning at least 249,000 acres and devastating properties across nine California counties.

**1.    October 12, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk**

**(a)    The Market Began to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires**

328.    It was not until Thursday, October 12, 2017 that the market began to understand that PG&E's safety regulation violations were likely a proximate cause of the North Bay Fires. On that date, CPUC sent PG&E a litigation hold letter informing the Company of its "obligation to preserve all evidence with respect to the Northern California wildfires in Napa, Sonoma, and Solano Counties." Although this letter was made public on October 12, 2017, it "affirm[ed] a verbal communication" of the same obligation by CPUC Safety Enforcement Division Program Manager Charlotte TerKeurst to PG&E "at approximately 6:00 p.m. on October 10, 2017." The public disclosure on October 12, 2017 also revealed that "Ms. TerKeurst reminded PG&E of the need to preserve all evidence, and PG&E acknowledged that it would do so."

329.    Further, the disclosure made clear that PG&E (a) "must preserve any factual or physical evidence … includ[ing] **all failed poles, conductors and associated equipment from each fire event**" and (b) "must inform all employees and contractors that they must preserve all electronic (including emails) and non-electronic documents related to **potential causes of the**

---

Case: 19-30088   Doc# 5375-3   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 18 of 54

PGE-BK-0000001392

1    **fires, vegetation management, maintenance and/or tree-trimming**." This was the first

2    indication that PG&E failures caused any of the North Bay Fires.

3    330.   On this news that PG&E would likely bear at least some responsibility for the

4    fires, PG&E's stock dropped $4.65 per share, from a closing price of $69.15 on October 11 to a

5    closing price of $64.50 on October 12, or -6.7%, with unusually heavy trading volume of almost

6    13 million shares (compared to a Class Period daily average trading volume of 3.5 million[105]).

7    The price of PG&E securities, however, remained artificially inflated.

8    **(b)   Market Commentators Confirmed the Cause of PG&E's Share
        Price Decline on October 12, 2017**

9

10   331.   The following morning, news outlets began to report that PG&E was being

11   connected with the causes of some of the North Bay fires. For example, at 10:54 a.m. on October

12   13, 2017, CNBC published an article titled "PG&E shares plunge on concern its power lines may

13   have started California wildfires."[106] The article began by observing: "The California Public

14   Utilities Commission sent a letter on Thursday to PG&E reminding them to preserve 'all

15   evidence with respect to the Northern California wildfires in Napa, Sonoma and Solano

16   Counties,' according to multiple reports." It continued to note that PG&E's share price decline

17   occurred "on concerns its power lines may have started the massive wildfires that have ravaged

18   California recently." The article also repeated market commentary that the decline in PG&E's

19   share price reflected investors' understanding that PG&E was financially responsible for the

20   North Bay Fires:

21             The drop in the stock "reflects the following assumptions: 1) the
              fire was caused by PCG's negligence, 2) insurance coverage for
22            3rd party liabilities will be very limited, 3) damage costs per acre
              far larger than those for the 2015 Butte fire and 4) material fines
23            and penalties will be assessed," Christopher Turnure, an analyst at
              JPMorgan, said in a note Thursday. "We appreciate the severity of
24            the fires and the legal challenges of operating in California, but
              estimate this loss of value as approaching a worst-case scenario for
25            PCG shares."

26   _____

27   [105] This average excludes alleged corrective disclosure and/or materialization of risk dates.
     [106] This article was published prior to the Company's corrective disclosure later that day,
28   discussed *infra*.

Case: 19-30088   Doc# 5375-3   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 19
of 54

PGE-BK-0000001393

332.    Similarly, on the same date, *SF Gate* published an article observing: "**[T]he state agency that regulates utilities has told PG&E to save every piece of damaged equipment from the area as evidence for the investigations to come**." The article concluded by stating that PG&E's vegetation management practices caused the North Bay Fires: "In all, **the company spent $198 million in 2016 on 'vegetation management**.' But those efforts and that money – all of it coming from PG&E's customers – **may not have been enough**."[107]

333.    Investors started to be concerned regarding whether PG&E violated any regulations (*e.g.*, failed to adequately trim trees) with respect to the North Bay Fires. For example, Wells Fargo stated in its analyst report the very next day:

> Yesterday (10/12), shares of PCG underperformed the S&P Utilities by roughly 720 bps. We attribute the material decline in price to the revelation that the company's power lines might have played a role in the Northern California fires. Over the weekend Northern California experienced winds in excess of 70 miles per hour, which could have caused trees to impact power lines that could have sparked fires particularly given the very dry vegetation. While there is still significant uncertainty in what caused the fires, apparently investigators are looking into the role of PCG's infrastructure. **The concern for investors is whether PCG did not adequately trim trees around their power lines it is our understanding that in California utilities are required to clear vegetation within 10 feet of power lines. In the absence of inadequate tree trimming, we think that property damage attributable to PCG's infrastructure should be largely covered by insurance.**

334.    Similarly, an October 13, 2017 report by a Guggenheim stock analyst stated that the decline was caused by "media reports linking the company to some of the most destructive wildfires experienced in CA, which continued to burn."

---

[107] David R. Baker, *PG&E Spent Millions on Fire Prevention; It May Not Have Been Enough*, San Francisco Gate (Oct. 13, 2017), https://www.sfgate.com/bayarea/article/PG-E-millions-fire-prevention-Santa-Rosa-wildfires-12277237.php.

PGE-BK-0000001394

2. **October 13-16, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk**

    (a) **The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires**

335.    Late on October 13, 2017, PG&E filed a Form 8-K with the SEC shortly before the close of trading. Therein, the Company stated in relevant part:

> **Investigation of Northern California Fires**
>
> Since October 8, 2017, several catastrophic wildfires have started and remain active in Northern California. The causes of these fires are being investigated by the California Department of Forestry and Fire Protection (Cal Fire), **including the possible role of power lines and other facilities of Pacific Gas and Electric Company's (the "Utility"), a subsidiary of PG&E Corporation**.
>
> It currently is unknown whether the Utility would have any liability associated with these fires. **The Utility has approximately $800 million in liability insurance for potential losses that may result from these fires. If the amount of insurance is insufficient to cover the Utility's liability or if insurance is otherwise unavailable, PG&E Corporation's and the Utility's financial condition or results of operations could be materially affected.**

336.    On these disclosures, PG&E's share price continued to decline. From its opening price of $63.95 per share that day to its closing price of $53.43 per share at the end of the next trading day (Monday, October 16, 2017), PG&E's stock declined $10.52 per share, or approximately 16.5%. Over the same period, it experienced unusually heavy trading volume of over 68.5 million shares. The price of PG&E securities, however, remained artificially inflated.

    (b) **Market Commentators Confirmed the Cause of PG&E's Share Price Decline on October 13, 2017**

337.    Investors understood the Company's October 13, 2017 8-K filing as a disclosure that PG&E's conduct with respect to causing the North Bay Fires was greater in severity than previously disclosed and was a proximate cause of at least some of the North Bay Fires. Because the market understood that PG&E would be reimbursed for damages by fires it innocently caused, the Company's discussion of liability signaled to the market that at least some of the North Bay Fires were caused by PG&E's negligence or worse. For example, a Guggenheim stock analyst published a report that day reacting to this news, noting that PG&E "had slid even

Case: 19-30088   Doc# 5375-3   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 21 of 54

PGE-BK-0000001395

1    further in the early afternoon actually as well, following the company's 8-K disclosing the

2    utility's $800mm in liability insurance, which we noted had not been disclosed previously (since

3    it had been renewed following the Butte fire)."

4        338.    PG&E's announcement and resulting share price decline were proximately caused

5    by PG&E's inadequate safety practices and violations that resulted in the North Bay Fires.

6        **3.    December 20, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk**

7

8          **(a)    The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires**

9        339.    On December 20, 2017, after the market closed, PG&E filed a press release on

10    Form 8-K with the SEC titled "PG&E Announces Suspension of Dividend, Citing Uncertainty

11    Related to Causes and Potential Liabilities Associated with Northern California Wildfires." The

12    filing also included, as exhibit 99.1, a press release in which the Company announced that it

13    would be suspending its quarterly cash dividend. In the press release, PG&E stated in pertinent

14    part:

15        **SAN FRANCISCO, Calif.**-PG&E Corporation (NYSE: PCG)

16        today announced that its Board of Directors has determined to **suspend the quarterly cash dividend on the Corporation's common stock**, beginning with the fourth quarter of 2017, **citing**

17        **uncertainty related to causes and potential liabilities associated with the extraordinary October 2017 Northern California**

18        **wildfires**.

19        In addition, the Board of Directors of the Corporation's utility subsidiary, Pacific Gas and Electric Company, **determined to**

20        **suspend the dividend on the utility's preferred stock, beginning with the three-month period ending Jan. 31, 2018**, citing the

21        same uncertainty.

22        No causes have yet been identified for any of the unprecedented wildfires, which continue to be the subject of ongoing

23        investigations.

24        However, California is one of the only states in the country in which courts have applied inverse condemnation **to events caused**

25        **by utility equipment**. This means that if a utility's equipment is found to have been a substantial cause of the damage in an event

26        such as a wildfire - even if the utility has followed established inspection and safety rules - **the utility may still be liable for**

27        **property damages and attorneys' fees associated with that event**.

28

---

PGE-BK-0000001396

1

2

3

4

> "After extensive consideration and in light of the uncertainty associated with the causes and potential liabilities associated with these wildfires as well as state policy uncertainties, the PG&E boards determined that suspending the common and preferred stock dividends is prudent with respect to cash conservation and is in the best long-term interests of the companies, our customers and our shareholders," said PG&E Corporation Chair of the Board Richard C. Kelly.

5

6      340.    On this news, PG&E's share price fell $6.62, or 12.95%, to close at $44.50 on

7   December 21, 2017, the following trading day. The stock experienced heavy trading volume,

8   with over 52 million shares trading hands.

9      341.    Though PG&E had previously intertwined safety, fires, and its dividend (*see*

10  ¶232), investors were shocked by this unexpected suspension of the dividends due to

11  Defendants' intervening false reassurances of progress on safety and compliance with safety

12  regulations. Only six months prior, on May 31, 2017, PG&E had announced that it was

13  **increasing** its dividend due to the Company's "***progress on safety***." Even more recently, for

14  example on October 31, 2017, PG&E had reassured investors that it "***follows all applicable***

15  ***federal and state vegetation clearance requirements and performs regular power line tree***

16  ***safety activities in accordance with industry standards, guidelines, and acceptable procedures***

17  ***that help to reduce outages or fires caused by trees or other vegetation***." And on November 2,

18  2017, PG&E had repeatedly reassured investors that it had "***doubl[ed]***" its vegetation

19  management expenditures. Accordingly, the true likelihood of PG&E's responsibility for the

20  North Bay Fires remained concealed from the market, and the price of PG&E securities

21  remained artificially inflated.

22         **(b)    Market Commentators Confirmed the Proximate Cause of
               PG&E's Share Price Decline on December 20, 2017**

23      342.    When PG&E announced it would suspend its dividend entirely, investors

24  understood that as a revelation that Defendants' prior representations regarding its safety

25  operations may have been misleading and PG&E would bear a higher than expected level of

26  responsibility, and thus liability, for the North Bay Fires.

27      343.    For example, a RBC Capital Markets analysts report issued on December 21,

28  2017, stated: "We downgrade PCG to Sector Perform following the Board's decision to suspend

PGE-BK-0000001397

1   the dividend. **This unexpected decision suggests greater risk than we had assumed**

2   **surrounding regulatory treatment of the October 2017 Northern California wildfires.**"

3   344.   Similarly, an analyst report issued by Evercore ISI the same day stated:

4   > **On the 3Q17 call PCG indicated company operations were**
> **conducted properly leading up to and after the fire**. . . . PCG

5   > also indicated they found instances of wires down, vegetation near
> PCG facilities and some broke poles. PCG reiterated the company

6   > routinely inspects, maintains, and replaces poles, and tests and
> treats wood poles on a frequency that significantly exceeds CPUC

7   > requirements. The company claims to have one of, if not the most
> comprehensive vegetation management programs in the country.

8

9   345.   PG&E's suspension of its dividend and resulting share price decline were

10  proximately caused by PG&E's inadequate safety practices and violations that resulted in the

11  North Bay Fires.

12   **4.    May 25, 2018 – Corrective Disclosure and/or Materialization of**
       **Concealed Risk**

13       **(a)    The Market Continued to Learn the Extent and Effects of**
              **PG&E's Responsibility for the North Bay Fires**

14

15  346.   On May 25, 2018, Cal Fire issued a press release announcing the cause of four

16  wildfires in Butte and Nevada counties ("May 2018 Press Release"), stating in relevant part:

17  > **CAL FIRE Investigators Determine Cause of Four Wildfires in**
> **Butte and Nevada Counties**

18  > Sacramento - After extensive and thorough investigations, CAL
> FIRE investigators have determined that four Northern California

19  > wildfires in last year's October Fire Siege were caused by trees
> coming into contact with power lines. The four fires, located in

20  > Butte and Nevada counties, are the first fire investigations from
> last October to be completed.

21
> CAL FIRE investigators were dispatched to the fires last year and

22  > immediately began working to determine their origin and cause.
> The Department continues to investigate the remaining 2017 fires,

23  > both in October and December, and will release additional reports
> as they are completed.

24
> The October 2017 Fire Siege involved more than 170 fires and

25  > charred more than 245,000 acres in Northern California. More than
> 11,000 firefighters from 17 states helped battle the blazes.

26
> Below is a summary of the four completed investigations:

27

28

---

PGE-BK-0000001398

- The La Porte Fire, in Butte County, started in the early morning hours of Oct. 9 and burned a total of 8,417 acres, destroying 74 structures. There were no injuries to civilians or firefighters. CAL FIRE has determined the fire was caused by tree branches falling onto PG&E power lines. CAL FIRE investigators determined there were no violations of state law related to the cause of this fire.

- The McCourtney Fire, in Nevada County, started the evening of Oct. 8 and burned a total of 76 acres, destroying 13 structures. There were no injuries to civilians or firefighters. CAL FIRE has determined the fire was caused by a tree falling onto PG&E power lines. **The investigation found evidence that PG&E allegedly failed to remove a tree from the proximity of a power line, in violation of the state Public Resources Code section 4293.**

- The Lobo Fire, in Nevada County, started the evening of Oct. 8 and burned a total of 821 acres, destroying 47 structures. There were no injuries to civilians or firefighters. **CAL FIRE has determined the fire was caused by a tree contacting PG&E power lines. The investigation found evidence that Public Resources Code section 4293, which requires adequate clearance between trees and power lines, was allegedly violated.**

- The Honey Fire, in Butte County, started in the early morning hours of Oct. 9 and burned a total of 76 acres. There were no injuries to civilians or firefighters and no structures were destroyed. **CAL FIRE has determined the fire was caused by an Oak branch contacting PG&E power lines. The investigation found evidence that Public Resources Code 4293, which requires adequate clearance between trees and power lines, was allegedly violated.**

The McCourtney, Lobo, Honey investigations have been referred to the appropriate county District Attorney's offices for review.

347.   Then, early on May 29, 2018, prior to the start of trading, PG&E filed a Current Report on Form 8-K with the SEC. Rather than contradicting any of Cal Fire's findings, the filing quoted extensively from the May 25, 2018 Cal Fire release described above, including the role of PG&E equipment in starting all four of the relevant North Bay Fires, Cal Fire's findings that three of the fires were caused by violations of California safety laws, and Cal Fire's decision to refer criminal investigations regarding these three fires to the relevant district attorneys' offices. The filing also stated: "It is reasonably possible that facts could emerge that lead PG&E

---

PGE-BK-0000001399

1    Corporation and the Utility to believe that a loss is probable, resulting in an accrued liability in

2    the future, the amount of which could be substantial."

3        348.    On this news, PG&E's share price fell $2.32, or 5.19%, to close at $42.34 on May

4    29, 2018, the following trading day. The stock experienced unusually high trading volume that

5    day, with over 5.7 million shares changing hands on May 29, 2018. The price of PG&E

6    securities, however, remained artificially inflated.

7                    **(b)    Market Commentators Confirmed that the News Regarding
                             Safety Violations Proximately Caused PG&E's Share Price**

8                    **Decline on May 25-29, 2018**

9        349.    Analysts were surprised by the results of the Cal Fire reports. For example,

10   Deutsche Bank stated in its May 28, 2018 report:

11               From the investor perspective the market should not be particularly
                 surprised that PG&E's lines have been found to be involved in
12               starting the fires. **That said, the fact that this was the case in all
                 four of the fires – and that violations were found in three of the**
13               **four instances – will likely be seen as a negative data point.**
                 Reading through the LaPorte fire investigation for other data
14               points, investors may be concerned to note that the wind speeds
                 around the time of the ignition do not seem to have been
15               particularly high – with a maximum gust of 29 mph.

16

17       350.    One Citigroup analyst wrote on May 29, 2018 that the new Cal Fire reports

18   specifically "link the fires to [PG&E's] equipment," "claim improper vegetation management for

19   three of the fires," and were "suggesting negligence" on PG&E's part. Based on this, the Cal Fire

20   reports "will support 'causation' and likely lead to [PG&E] bearing the liability for damages

21   under Inverse Condemnation." Moreover, the analyst noted that PG&E might even be liable for

22   "Gross Negligence," and could be barred from recovering costs from ratepayers insofar as it

23   would be "tough to meet" the "prudent manager" standard that is necessary for such a recovery.

24       351.    Accordingly, the new information contained in these disclosures, including the

25   severity of PG&E's conduct and the role of its violations of California safety laws in causing the

26   North Bay Fires, proximately caused PG&E's share price decline.

27       352.    Defendants, however, continued to mislead investors regarding the extent of

28   PG&E's safety deficiencies and the impact thereof.

Case: 19-30088   Doc# 5375-3   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 26
of 54
PGE-BK-0000001400

5.   **June 8, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk**

353.   On Friday, June 8, 2018, after the market closed, Cal Fire issued another press release announcing the causes of twelve wildfires in Mendocino, Humboldt, Butte, Sonoma, Lake, and Napa Counties, stating in relevant part:

> **CAL FIRE Investigators Determine Causes of 12 Wildfires in Mendocino, Humboldt, Butte, Sonoma, Lake, and Napa Counties**
>
> **Sacramento** – After extensive and thorough investigations, CAL FIRE investigators have determined that 12 Northern California wildfires in the October 2017 Fire Siege were caused by electric power and distribution lines, conductors and the failure of power poles.
>
> The October 2017 Fire Siege involved more than 170 fires and burned at least 245,000 acres in Northern California. About 11,000 firefighters from 17 states and Australia helped battle the blazes.
>
> CAL FIRE investigators were dispatched to the fires last year and immediately began working to determine their origin and cause. CAL FIRE investigators continue to investigate the remaining 2017 fires, both in October and December, and will release additional reports as they are completed. The cause of four Northern California fires were released on May 25.
>
> Below is a summary of the findings from the 12 completed investigations:
>
> The **Redwood Fire**, in Mendocino County, started the evening of Oct. 8 and burned a total of 36,523 acres, destroying 543 structures. There were nine civilian fatalities and no injuries to firefighters. CAL FIRE has determined the fire started in two locations and was caused by tree or parts of trees falling onto PG&E power lines.
>
> The **Sulphur Fire**, in Lake County, started the evening of Oct. 8 and burned a total of 2,207 acres, destroying 162 structures. There were no injuries. **CAL FIRE investigators determined the fire was caused by the failure of a PG&E owned power pole**, resulting in the power lines and equipment coming in contact with the ground.
>
> The **Cherokee Fire**, in Butte County, started the evening of Oct. 8 and burned a total of 8,417 acres, destroying 6 structures. There were no injuries. CAL FIRE investigators have determined the cause of the fire was a result of tree limbs coming into contact with PG&E power lines.

Case: 19-30088   Doc# 5375-3   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 27 of 54

PGE-BK-0000001401

The **37 Fire**, in Sonoma County, started the evening of Oct. 9 and burned a total of 1,660 acres, destroying 3 structures. There were no injuries. CAL FIRE investigators have determined the cause of the fire was electrical and was associated with the PG&E distribution lines in the area.

The **Blue Fire**, in Humboldt County, started the afternoon of Oct. 8 and burned a total of 20 acres. There were no injuries. CAL FIRE investigators have determined a PG&E power line conductor separated from a connector, causing the conductor to fall to the ground, starting the fire.

The Norrbom, Adobe, Partrick, Pythian and Nuns fires were part of a series of fires that merged in Sonoma and Napa counties. These fires started in the late-night hours of Oct. 8 and burned a combined total of 56,556 acres, destroying 1355 structures. There were three civilian fatalities.

> CAL FIRE investigators determined the Norrbom Fire was caused by a tree falling and coming in contact with PG&E power lines.

> CAL FIRE investigators determined the Adobe Fire was caused by a eucalyptus tree falling into a PG&E powerline.

> CAL FIRE investigators determined the Partrick Fire was caused by an oak tree falling into PG&E powerlines.

> CAL FIRE investigators determined **the Pythian Fire was caused by a downed powerline after PG&E attempted to reenergize the line**

> CAL FIRE investigators determined the Nuns Fire was caused by a broken top of a tree coming in contact with a power line.

The **Pocket Fire**, in Sonoma County, started the early morning hours of Oct. 9 and burned a total of 17,357 acres, destroying 6 structures. There were no injuries. CAL FIRE has determined the fire was caused by the top of an oak tree breaking and coming into contact with PG&E power lines.

The **Atlas Fire**, in Napa County, started the evening of Oct. 8 and burned a total of 51,624 acres, destroying 783 structures. There were six civilian fatalities. CAL FIRE investigators determined the fire started in two locations. At one location, it was determined a large limb broke from a tree and came into contact with a PG&E power line. At the second location, investigators determined a tree fell into the same line.

**CAL FIRE's investigations have been referred to the appropriate county District Attorney's offices for review in eight of the 12 fires - Sulphur, Blue, Norrbom, Partrick, Pythian, Adobe, Pocket and Atlas - due to evidence of alleged violations of state law.**

PGE-BK-0000001402

354.    While this news release did not discuss specific violations found, it disclosed that the causes of the fires involved PG&E equipment and vegetation, as well as the facts that Cal Fire referred its investigations to the relevant district attorneys of five counties due to evidence Cal Fire discovered of state law violations.

(a)    <b>The Market Learned the Truth of PG&E's Continued, Unsafe Use of Reclosers</b>

355.    By stating that "CAL FIRE investigators determined the Pythian Fire was caused by a downed powerline after PG&E attempted to reenergize the line," this press release revealed that the Pythian Fire had been proximately caused by PG&E's use of reclosers.

(b)    <b>The Market Continued to Learn the Extent and Effects of PG&E's Safety Violations and Responsibility for the North Bay Fires</b>

356.    On Saturday, June 9, 2018, *Bloomberg* published an article entitled "PG&E May Face Criminal Charges After Probe of Deadly Wildfires." The article reported, in part, that following an investigation into the causes of wildfires "that altogether killed 44 people, consumed thousands of homes and racked up an estimated $10 billion in damages" in October 2017, California's fire agency "found evidence of alleged violations of law by PG&E in connection with" the fires. Specifically, the state's investigation found "that PG&E equipment caused at least 12 of the wine country blazes."

357.    Early on Monday, June 11, 2018, prior to the start of trading, PG&E filed a Current Report on Form 8-K with the SEC. Rather than contradicting any of Cal Fire's findings, the filing quoted extensively from the June 8, 2018 Cal Fire release described above, including the role of PG&E equipment in starting all 12 of the relevant North Bay Fires and Cal Fire's decision to refer criminal investigations regarding eight of the fires to the relevant district attorneys' offices "due to evidence of alleged violations of state law." The filing also admitted that Defendants expected to "record a **significant liability** for losses associated with" at least 14 of the North Bay Fires, as follows:

> Although the Utility's analysis is ongoing regarding the fires that were the subject of the June 8, 2018 and May 25, 2018 CAL FIRE news releases:

Case: 19-30088   Doc# 5375-3   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 29 of 54

PGE-BK-0000001403

- for the La Porte, McCourtney, Lobo, Honey, Redwood, Sulphur, Cherokee, Blue, Pocket and Sonoma/Napa merged fires (which include Nuns, Norrbom, Adobe, Partrick and Pythian), based on the current state of the law on inverse condemnation, the information currently available to the Utility, and the CAL FIRE determinations of cause, **PG&E Corporation and the Utility currently expect that they will record a significant liability for losses associated with such fires** in PG&E Corporation and the Utility's condensed consolidated financial statements to be included in their Form 10-Q for the quarterly period ending June 30, 2018 (the "Q2 financial statements"); and

- for the Atlas and Highway 37 fires, PG&E Corporation and the Utility do not believe a loss is probable at this time, given the information currently available. However, **it is reasonably possible that facts could emerge that lead PG&E Corporation and the Utility to believe that a loss is probable**, resulting in the accrual of a liability in the future, the amount of which could be significant.

358.    Following these disclosures, PG&E's share price fell $1.69, or 4.08%, to close at $39.76 on June 11, 2018, the following trading day. The stock experienced unusually high trading volume that day, with over 12.6 million shares trading hands on June 11, 2018. The price of PG&E securities, however, remained artificially inflated.

### (c)    Market Commentators Confirmed that the Number and Range of Safety Violations Proximately Caused PG&E's Share Price Decline on June 8-11, 2018

359.    The market was surprised by the number and range of alleged violations of safety laws in the Cal Fire report. For example, in J.P. Morgan's analyst report on June 10, 2018, it stated that "**[w]ith this batch of reports, we find the range of 'alleged' law violations noteworthy. CAL FIRE opined on law regarding not just vegetation management but also pole and conductor failure and the re-energizing of equipment by the company.**" Deutsche Bank also stated in its June 10, 2018 analyst report that "**[o]verall, Friday's data points are likely to be read as another negative for PCG, given the high percentages of incidents blamed on the company's lines and referred to DAs.**" Guggenheim further reiterated its "Sell" recommendation on June 10, 2018 because "[o]ut of the 16 fires now investigated thus far, **PCG was found to have allegedly violated state law in 11 of those instances with Cal Fire referring its evidence to the District Attorney – likely a strong indictment to potential**

**criminal and civil cases/lawsuits against the company**." The analyst from Guggenheim noted that "all signs seem to point to PCG being imprudent operators in the majority of instances, which would therefore mean it should assume liability." Accordingly, the number and range of safety violations proximately caused PG&E's Share Price Decline on June 8-11, 2017.

360.    On June 11, 2018, *Bloomberg* published an article reporting: "The company said Monday it expects to record a 'significant liability' for fires, and the shares plunged the most in five months at the open" of trading. The article also noted that "[t]he alleged violations could also expose PG&E to criminal charges only two years after the San Francisco company was convicted of breaking safety rules that led to a deadly gas pipeline explosion in San Bruno, California."

361.    Accordingly, the new information contained in these June 8 and 11 disclosures, including the severity of PG&E's conduct, the role of its violations of California safety laws in causing the North Bay Fires, and the "significant liability" it would incur as a result, proximately caused PG&E's share price decline.

362.    Defendants, however, continued to mislead investors regarding the extent of PG&E's safety deficiencies and the impact thereof.

### 6.    November 8-9, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk

363.    The Camp Fire began in the early morning of November 8, 2018 and grew steadily throughout the day.  However, as of the close of trading that day, no prominent news sources had reported that PG&E may have caused it.

### (a)    The Market Began to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire

364.    After the close of trading on November 8, 2018, PG&E announced via its official Twitter.com account that it had decided not to implement its procedure for shutting power lines during dangerous weather conditions.  This communication was the first indication that PG&E's equipment and decisions may have contributed to the Camp Fire, undermining the Company's assurances to investors that it would comply with safety regulations and prioritize safety, detailed above.  While the announcement began to disclose the truth regarding PG&E's responsibility for

the Camp Fire, it also contained a further false reassurance that PG&E's decision was because "**weather conditions did not warrant this safety measure**," as detailed above.

365.    Also after the close of trading on November 8, 2018, PG&E filed an Electric Incident Report with the CPUC stating that PG&E had experienced a problem with its Caribou-Palermo high-voltage transmission line on "Pulga Rd. Pulga, Butte County" only fourteen minutes before the Camp Fire began, "in the area of the Camp Fire." The same report acknowledged that an aerial patrol later in the day showed "damage" to the same transmission tower. However, this information undermining PG&E's statements about compliance and prioritizing safety during the Class Period would not be reported by major news outlets until the next day, November 9, 2018.

366.    On this news, PG&E's share price fell $7.88, or approximately 19.7% to close at $39.92 on November 9, 2018, the following trading day. The stock experienced unusually high trading volume of 23,627,100 shares. The price of PG&E securities, however, remained artificially inflated.

     **(b)**  **Market Commentators Confirmed the Cause of PG&E's November 9, 2018 Share Price Decline**

367.    Market commentators confirmed that PG&E's share price declined due to news connecting PG&E to the Camp Fire, the true risk of which was concealed by PG&E's false and misleading statements and omissions.

368.    On November 9, 2018, CNBC published an article entitled "Shares of electricity provider PG&E have worst day since 2002 as wildfires ravage California."[108] The article noted that "Shares of PG&E plunged more than 16 percent on Friday as wildfires continued to rage through California. This was the biggest one-day decline for the stock since Aug. 8, 2002. . . ." It further observed: "PG&E also traded 23.6 million shares, about five time [sic] its average 30-day volume." The article was initially published at 1:03 p.m. Eastern Time (*i.e.*, prior to the

---

[108] Fred Imbert, *Shares of Electricity Provider PG&E Have Worst Day Since 2002 as Wildfires Ravage California*, CNBC (Nov. 9, 2018), https://www.cnbc.com/2018/11/09/shares-of-electricity-provider-pge-plunge-as-wildfires-ravage-california.html.

Case: 19-30088   Doc# 5375-3   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 32 of 54

PGE-BK-0000001406

1   close of trading) and updated at 4:19 p.m. the same day (after the close of trading), yet made no

2   mention of PG&E's Electric Incident Report tying the Company's equipment to the origin of the

3   Camp Fire.

4        369.    On November 9, 2018, Deutsche Bank described how investors were

5   "understandably concerned" given the emerging news of the Camp Fire and S.B. 901's lack of

6   provisions regarding 2018 wildfires:

7            While there has been no specific indication of utility lines being
             involved in these ignitions, investors are understandably concerned
8            considering that the recently passed wildfire bill (SB901) left
             utilities particularly exposed to 2018 fires if their infrastructure
9            ends up being implicated. This is due to the fact that the so-called
             stress test or customer harm threshold is only applicable to 2017
10           fire losses. Meanwhile, the new reasonableness standard which the
             CPUC will use to determine eligibility for recovery of liability
11           costs from customers only kicks in from 2019.

12       370.    A Barclays report from the same day supported the conclusion that investor

13   concern regarding the Camp Fire and its lack of coverage by S.B. 901 were contributing to the

14   stock price drop:

15           **We believe the lack of explicit language for 2018 wildfires in
             SB 901 may be increasing market pressure**. SB 901 specifically
16           addresses 2017 wildfire liability by tasking the CPUC with
             creating a cap on IOU [Investor-Owned Utility] liability to ensure
17           safe and affordable service. The bill addresses wildfire liability in
             2019 and beyond by creating a securitization mechanism.
18           However, specific language addressing 2018 liability coverage is
             noticeably absent. The general consensus among CA stakeholders
19           is that 2018 will be treated in a similar fashion to 2017, however
             the lack of a specific prescription may be heightening investor
20           concern if the Camp Fire is found to be started by PCG.

21       371.    While this report stated that there was no indication yet that electrical equipment

22   had caused the Camp Fire, it emphasized that PG&E's decision not to de-energize its lines could

23   become a source of liability if PG&E equipment was found to be involved: "we expect PCG's

24   decision not to de-energize lines after warning of high fire risk will be investigated if the fire is

25   found to have been sparked by PCG equipment."

26

27

28

Case: 19-30088   Doc# 5375-3   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 33
                                    of 54

PGE-BK-0000001407

7.     **November 9-12, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk**

(a)     **The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire**

372.     Because PG&E had concealed the extent of its safety violations and failures to prioritize safety, the market was shocked to learn how much evidence supported the conclusion that PG&E had not only caused the Camp Fire, but did so in a manner that violated state safety regulations.  Thus, investors began to learn the true likelihood and extent to which PG&E would bear financial responsibility for the Camp Fire's destruction, *i.e.*, without eligibility for reimbursement by ratepayers.  *See* Section VIII, *supra*.

373.     After the close of trading on Friday, November 9, 2018, news outlets began to report that there was evidence PG&E caused the Camp Fire based on PG&E's incident report the previous evening.  The first such report, written by Pulitzer Prize-winning journalist Matthias Gafni and published in *Mercury News*, occurred at 5:49 p.m. EST on November 9, 2018.[109]

374.     On Saturday, November 10, 2018, it was reported that the town of Paradise was destroyed as the Camp Fire continued to spread.[110]  It was further reported that the fire had raced through the communities of Concow and Magalia, causing at least nine fatalities and the loss of at least 6,453 homes and 260 commercial buildings.[111]  The Camp Fire grew in size and severity over the weekend, with reports on Saturday that it had already consumed 70,000 acres and was only 5 percent contained—with winds pushing it toward Chico and Yankee Hill.  By Sunday November 11, 2018, it was reported that more than 200 people were missing, the death toll had

---

[109] Matthias Gafni, *PG&E Power Lines May Have Sparked Deadly Camp Fire, According To Radio Transmissions,* Mercury News (updated Nov. 12, 2018 12:03 PM), https://www.mercurynews.com/2018/11/09/pge-power-lines-may-have-sparked-deadly-butte-county-wildfire-according-to-radio-transmissions/.

[110] Anna Sciacca and Lisa Krieger, *'Our Town Has Burned': Most of Paradise is Lost After Camp Fire Ravages the Area*, Enterprise Record (Nov. 10, 2018), https://www.chicoer.com/2018/11/10/our-town-has-burned-most-of-paradise-is-lost-after-camp-fire-ravages-the-area/.

[111] *Id.*

Case: 19-30088    Doc# 5375-3    Filed: 01/14/20    Entered: 01/14/20 16:07:57    Page 34 of 54
PGE-BK-0000001408

risen to 29, and the fire—which had by then consumed 111,000 acres—was only 25 percent contained.[112]

375.   Then on Monday, November 12, 2018, the next trading day, it was reported that BetsyAnn Cowley, a property owner in Pulga, received an email from PG&E the **day before** the Camp Fire ignited; the email communicated that the Utility needed access to her property to repair a transmission line that was "sparking." It was further reported that the incident occurred near the origin point of the Camp Fire, with Cowley's property next to the junction of Pulga and Camp Creek Road.

376.   On this news, PG&E's share price fell $6.94, or 17.385%. to close at $32.98 on November 12, 2018. The stock experienced a trading volume of 44,033,200 on November 12, 2018. The price of PG&E securities, however, remained artificially inflated.

### (b)   Market Commentators Confirmed the Cause of PG&E's November 9-12, 2018 Share Price Decline.

377.   Investors were concerned over this evidence that PG&E's safety violations likely caused the Camp Fire, including the impact on PG&E's likely liability of Cowley's comments to the press regarding PG&E's knowledge of transmission line problems in the area. As a result, PG&E's stock price continued to drop. As the *San Francisco Chronicle* reported on November 12, 2018, "Cowley's revelation came as shares of Pacific Gas and Electric Co.'s parent company plummeted Monday amid concerns from investors about the utility's liability connected to the Camp Fire."[113]

378.   Similarly, a Wells Fargo analyst report observed the same day that "[t]he Camp Fire is in PCG's service territory and there are initial indications that the company's transmission infrastructure may have been a root cause of the fire pending an investigation by Cal Fire."

---

[112] Melody Gutierrez, *More than 200 Remain Missing in Camp Fire*, San Francisco Chronicle (Nov. 8, 2018), https://www.sfchronicle.com/california-wildfires/article/100-missing-in-Camp-Fire-butte-county-death-toll-13382433.php.

[113] J.D. Morris and Kurtis Alexander, *Homeowner's Claim on PG&E Work Raises Questions on Camp Fire's Origin*, San Francisco Chronicle (Nov. 12, 2018), https://www.sfchronicle.com/california-wildfires/article/PG-E-stock-hammered-on-wildfire-fallout-13384830.php.

PGE-BK-0000001409

379.   A Macquarie Research analyst report on November 13, 2018 estimated PG&E's fire-related liabilities at $8 billion, while noting that the real measure of PG&E's liability could be higher given that the Camp Fire was not yet contained:

> We've reduced our [target price] to US$45 from US$57, is based on 10.4x our '20E EPS vs 13.6x previously. Our new [target price] reflects incremental ~US$8bn in fire-related liabilities, which we hope proves excessive given the stress test included in the SB901, but we have no way to assess the potential liabilities as the fire is only 30% contained.

380.   A November 13, 2018 Bloomberg Intelligence report remarked that the analyst **expected** PG&E's liability to **exceed its total equity valued** absent additional assistance from the California government, and that such a bailout was not certain: "Unless mitigated by regulators, we expect PG&E's write-offs could exceed the company's total equity.  California's utility owners are dangerously squeezed between two forces: Onerous inverse-condemnation rule makes utilities liable for most of the billions in fire damage, but powerful political resistance prevents customer bills from rising much above inflation."

### 8.   November 13-14, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk

#### (a)   The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire

381.   After the close of trading on November 13, 2018, PG&E released a Form 8-K that showed a much bleaker picture of PG&E's deteriorating financial situation than investors had reason to expect, even calling into question its ability to remain solvent in the face of mounting evidence of its liability for the Camp Fire.  The SEC filing admitted, among other things, that PG&E's and the Utility's revolving credit facilities were fully drawn and that its liability for the Camp Fire could exceed its insurance:

> **Item 2.03. Creation of a Direct Financial Obligation or an Obligation Under an Off-Balance Sheet Arrangement of a Registrant**
>
> As of November 13, 2018, Pacific Gas and Electric Company ("Utility"), a subsidiary of PG&E Corporation, and PG&E Corporation have aggregate borrowings outstanding under their respective revolving credit facilities of $3.0 billion and $300 million, respectively. . . .  **No additional amounts are available under the Utility's and PG&E Corporation's respective**

Case: 19-30088   Doc# 5375-3   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 36 of 54

PGE-BK-0000001410

1    **revolving credit facilities**.

2                                    *        *        *

3    **Item 8.01 Other Events.**

4         *Camp Fire*

5              On November 8, 2018, a wildfire began near the city of
     Paradise, Butte County, California (the "Camp Fire"), located in
6    the service territory of the Utility. . . .

7              As previously reported, during the third quarter of 2018,
     PG&E Corporation and the Utility renewed their liability insurance
8    coverage for wildfire events in an aggregate amount of
     approximately $1.4 billion for the period from August 1, 2018
9    through July 31, 2019. . . .

10             While the cause of the Camp Fire is still under
     investigation, if the Utility's equipment is determined to be the
11   cause, the Utility could be subject to significant liability in excess
     of insurance coverage that would be expected to have a material
12   impact on PG&E Corporation's and the Utility's financial
     condition, results of operations, liquidity, and cash flows.
13
     382.   On this news, PG&E's share price fell $7.13, or 21.791%. to close at $25.59 on
14
     November 14, 2018.  The stock experienced high trading volume of 53,543,100.  The price of
15
     PG&E securities, however, remained artificially inflated.
16
           **(b)      Market Commentators Confirmed the Cause of PG&E's Share**
17                    **Price Decline on November 14, 2018**

18         383.   Analyst commentary attributed the drop in PG&E's stock price to news about

19   PG&E's insufficient insurance coverage and deteriorating financial situation, including the

20   chance of bankruptcy, revealed in PG&E's Form 8-K disclosures published after the market

21   closed the previous day.

22         384.   CNBC reported that PG&E's Form 8-K disclosures were responsible for the drop

23   in stock price on November 14, 2018:

24             Shares of utility PG&E fell 21 percent on Wednesday after the
     company said that if its equipment is responsible for the "Camp
25   Fire" burning in Northern California, the cost of the damage would
     exceed its insurance coverage and **harm its financial health**. . . .
26   "With these borrowings, the entire credit facility has been drawn
     and PG&E now has $3.5 billion of cash on its balance sheet," Citi
27

28

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                    115
CIVIL ACTION NO. 3:18-CV-03509-EJD

PGE-BK-0000001411

analyst Praful Mehta wrote in a note Wednesday. "We think the primary driver could be a concern around a downgrade to a non-investment grade credit rating and the liquidity requirements as a result of the downgrade."[114]

385.   Similarly, a November 14, 2018 Bloomberg Intelligence report also connected PG&E's Form 8-K disclosures to its share price decline afterward, stating that the filing indicated the Company's own concern about bankruptcy:

> **The abrupt drawdown of its entire $3.3 billion in revolving credit suggests to us that PG&E (PCG -22%) is concerned about a near-term cash and credit crunch**. The company warned of bankruptcy earlier this year, and **the situation is more desperate now**. If found liable for California's Camp Fire, which may match or surpass 2017's $15 billion in damages, the total exceeds PG&E's book equity and annual revenue.

### 9.   November 15, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk

#### (a)   The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire

386.   On November 15, 2018, Cal Fire announced that it had identified a second ignition point for the Camp Fire.[115]  This news further evidenced the extent of PG&E's responsibility for the Camp Fire, undermining the Company's assurances to investors that it would comply with safety regulations and prioritize safety, detailed above.

387.   On this news, PG&E's share price fell $7.85, or 30.676%. to close at $17.74 on November 15, 2018.  The stock experienced its highest trading volume during the Class Period of 107,155,700 on November 15, 2018.

---

[114] Thomas Franck, *PG&E Plunges 21% Amid Disclosure of an 'Electric Incident' Just Before Wildfire*, CNBC (Nov. 14, 2018), https://www.cnbc.com/2018/11/14/pge-plunges-20percent-after-disclosing-an-electric-incident-just-before-fire.html.

[115] Andre Byik, *Camp Fire Investigation Leads To Possible Second Origin Away From Pulga*, Enterprise-Record (updated Nov. 15, 2018 10:06 PM), https://www.chicoer.com/2018/11/15/camp-fire-investigation-leads-to-another-area-away-from-pulga/.

**(b)** **Market Commentators Confirmed the Cause of PG&E's Share Price Decline on November 15, 2018**

388.    Market commentary confirmed that the November 15, 2018 decline in PG&E's share price was due to mounting evidence of PG&E's liability for the Camp Fire and chance of bankruptcy, the true risk of which was concealed by PG&E's false and misleading statements and omissions.  Indeed, PG&E's share price declined until CPUC President Michael Picker commented after the close of trading that day that he did not want the Company to become bankrupt.  A *Bloomberg* article reported: "His comments capped a roller-coaster week for PG&E shares. They lost about two-thirds of their value during several days of free fall, then partially rebounded Friday after Picker said he doesn't want the company to slide into bankruptcy."[116]

389.    A J.P. Morgan report from November 16, 2018 noted that the market was affected by continued uncertainty over California's willingness to aid PG&E:

> **if one assumes for sake of argument a $30Bn grand total of liabilities for the 2017-18 events for PCG, a 40 year amortization of securitized debt would still only be $10/month for the average customer; this would be even less if a multibillion dollar stress test cap was absorbed by the company;** it is a small price to pay for safe electric service and environmental goals. We remain focused on upcoming policymaker statements on the issue, and the pending CPUC implementation of securitization and stress-test mandates created with SB901. We acknowledge the long and challenging road ahead for investors, but see too much at stake for the state to realistically abandon utilities given the above considerations

\*       \*       \*

390.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

---

[116] David R. Baker, Mark Chediak & Romy Varghese, *PG&E State Review Puts Board Shuffle and Breakup on the Table*, Bloomberg (updated Nov. 17, 2018 12:00AM), https://www.bloomberg.com/news/articles/2018-11-16/pg-e-soars-after-regulator-eases-concern-on-bankruptcy-risk.

PGE-BK-0000001413

# X.    SCIENTER UNDER THE EXCHANGE ACT

391.    The public was surprised to learn the extent to which PG&E had misled everyone about its lack of safety procedures related to wildfire prevention and responsibility for the North Bay and Camp Fires.  Based on the extensive, widespread, and egregious nature of PG&E's underlying noncompliance and disregard for safety, there is a strong inference that PG&E itself, and the officers who spoke on its behalf and controlled its public statements, knew or should have known the truth.  As detailed below, they either knew the material, adverse facts about PG&E's lack of safety undermining and contradicting their public representations, or were culpably reckless in avoiding knowledge of and/or disregarding that reality.  Thus, throughout the Class Period, Defendants acted with scienter (a) by making false and misleading statements and omissions about PG&E's financial health and compliance with relevant safety rules and regulations while having actual knowledge of their false or misleading nature, and/or (b) by acting in a deliberately reckless manner.

### A.    PG&E Knew that Its Safety Practices Continued to Violate the Law Even After PG&E Was on Notice of the Butte Fire Safety Violations

392.    As detailed above, PG&E's safety lapses caused the 2015 Butte Fire when a tree came into contact with PG&E's power line due to PG&E violating multiple safety regulations.  At the time, the Butte Fire was the seventh most destructive wildfire in California history; it killed two people, destroyed 921 homes, and destroyed more than 70,000 acres over 22 days.  As noted above (¶¶127-28) and described in more detail below (¶569), PG&E had a company policy to perversely incentivize its contractors to clear less vegetation than is safe.

393.    Even after PG&E caused the disastrous Butte Fire through its serious fire safety lapses, PG&E made **no changes at all** to improve its vegetation management or compliance with safety regulations. In a deposition transcript that has not yet been made publicly available, PG&E's Vegetation Program Manager Richard Yarnell reportedly testified under oath: "PG&E—to the best of my knowledge, we have not made any changes as a result of this fire." Despite being on notice of its dangerous safety violations, neither the Company nor its officers

PGE-BK-0000001414

1   made any changes to improve safety or compliance.  Thus, they either knew, or should have

2   presumed, that its violations continued unabated.

3       394.    On March 5, 2019, Judge Alsup, presiding over PG&E's criminal probation,

4   issued a revised Order to Show Cause relating to PG&E's lack of compliance with vegetation

5   management and other safety regulations.  The Order contained the following findings

6   summarizing the results of the federal court's probe into PG&E's actual knowledge of safety

7   violations leading up to the North Bay and Camp Fires:

> PG&E's filings have included several relevant admissions.
> Significantly, PG&E acknowledged "that vegetation contact is the
> primary risk driver with respect to ignitions on its distribution
> lines." ("Vegetation" means trees and limbs in this context.) In
> 2016 alone, PG&E experienced approximately 1,400 wires down
> caused by vegetation contact. As PG&E reported to the CPUC,
> during 2015 and 2016, vegetation contact with conductors was the
> leading cause of the 486 fire ignitions associated with PG&E
> facilities, causing 37% of those fires. PG&E further admitted that
> as of June 2017, there were 3,962 unworked trees which PG&E
> had identified in 2016 as hazardous with the potential to "fall into
> or otherwise impact the conductors, towers or guy wires before the
> next inspection cycle."[117]

15      395.    Thus, PG&E has admitted its **actual knowledge from 2015 to 2017** that its

16  vegetation management practices did not comply with California safety regulations on the order

17  of **thousands of violations per year**.  PG&E has further admitted to **actually knowing** that its

18  violations have **caused hundreds of wildfires per year since 2015**.  However, PG&E never

19  disclosed to investors that their own internal compliance reviews showed a lack of compliance

20  on a huge scale.

21      396.    In the time period of 2017 to 2018, after the North Bay Fires and leading up to the

22  Camp Fire, PG&E's notice of its numerous and widespread safety violations was even stronger.

23  For example, PG&E had known about the dangerous noncompliance of its Caribou-Palermo

24  transmission line – the same line whose failure would cause the Camp Fire's first ignition point –

---

[117] Second Order to Show Cause Why PG&E's Conditions of Probation Should Not Be
Modified, PG&E Criminal Proceedings (N.D. Cal. Mar. 5, 2019), ECF No. 1027.

Case: 19-30088   Doc# 5375-3   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 41
of 54

PGE-BK-0000001415

since a **2014 internal Company email stated that "the likelihood of failed structures** [on the Caribou-Palermo line] **happening is high."**

  **B.**  **Safety Was Core to PG&E's Operations, and the Exchange Act Individual Defendants Were Directly Involved in It**

  397.  In a January 16, 2019 filing to the CPUC, PG&E stated unequivocally that safety is its "core business," and as such, was the "focus" of Defendant Williams's activities as CEO: "Since the Utility is the sole operating subsidiary of PG&E Corporation, the activities of the PG&E Corporation CEO and President **focus on** the Utility's **core business**, including most notably **safety**."[118]

  398.  During the Class Period, PG&E repeatedly acknowledged that "[s]afety is at the heart of everything we do at PG&E" (Geisha Williams, July 27, 2017 Analyst Call), that safety was PG&E's "top priority" (Patrick Hogan, November 18, 2015 California Senate Sub-Committee Hearing), and that "[n]othing is more important than the safety of our customers, employees and the communities we serve" (Kevin Dasso, vice president of Electric Asset Management, May 10, 2017 Press Release). PG&E further represented to the public that PG&E's safety and compliance were closely monitored by the Company's management and the Exchange Act Individual Defendants. For instance, the PG&E Board's Finance Committee was alleged in a separate lawsuit over the Butte Fire – where litigation is still ongoing – to have been "actively involved in, and responsible for, assisting the Boards in their oversight of safety risk through its review of strategies to manage the largest individual risks identified in the enterprise risk management program," including the risk of "wildfire." Indeed, because the Company faced the possibility of strict liability for property damages caused by wildfires, and such liability could not only be extraordinary but also non-reimbursable if its officers had not acted "prudently," wildfire safety was a particular focus of the Exchange Act Individual Defendants, who spoke personally on the subject with investors and regulators throughout the Class Period. Further,

---

[118] Summary of Corporate Structure of Pacific Gas and Electric Company (U 39 M) and PG&E Corporation (Cal. Public Utilities Commission filed Jan. 16, 2019), http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M263/K658/263658434.PDF.

Case: 19-30088   Doc# 5375-3   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 42 of 54

PGE-BK-0000001416

Defendants' repeated misrepresentations about PG&E's safety and compliance record concerned the Company's core operations. Therefore, the Exchange Act Individual Defendants, by virtue of the importance of safety to the Company and their positions as its leaders, reasonably had knowledge about PG&E's safety and regulatory failures during the Class Period.

399.    As discussed in Sections VI.C. and VI.D., *supra*, the Exchange Act Individual Defendants repeatedly spoke to investors on the specifics of PG&E's vegetation management procedures and results. For example, they kept investors apprised about how many hundreds of thousands of trees the Company was trimming and removing, including how many thousands were "dead or dying." Not only that, but the Exchange Act Individual Defendants also inflated these numbers over time without explanation, raising the number of trees supposedly trimmed or removed from 1.2 million to 1.4 million.  In both reporting and inflating these numbers, the Exchange Act Individual Defendants showed they knew that vegetation management and compliance was important to investors on a granular level.

400.    A core operation concerns a company's primary products or services, and it extends to matters of importance that might significantly impact the company's bottom line. There is no question that PG&E's safety policies and procedures were critically important to the Company's operations. In addition to the fact that PG&E repeatedly acknowledged this reality, it is also notable that PG&E is potentially facing $30 billion of liability or more due to its failures, and that California's regulatory regime imposes significant liability for PG&E's vegetation management and other safety failures. This is strong evidence of the centrality of the Company's wildfire safety and compliance regime.

401.    In a separate lawsuit that was filed in connection with the Butte Fire, it was publicly alleged – based on discovery and deposition testimony that has **not** yet been publicly revealed – that Exchange Act Individual Defendants Williams and Hogan both served on an Executive Officer Risk & Compliance Committee that was charged with monitoring vegetation management issues. Further, according to the parties litigating against PG&E for injuries caused

PGE-BK-0000001417

1   by the 2015 Butte Fire, Defendant Hogan's and another individual's[119] deposition testimony

2   purportedly showed that "PG&E knows and accepts that 1-in-100 trees will be non-compliant,

3   and that 1-in-1000 will be touching its powerlines." As noted above, this means noncompliance

4   for approximately 1.2 million trees in PG&E's territory of 123 million trees, approximately

5   123,000 of which are safety violations in the nature of trees touching its powerlines at any given

6   time. *See* Section IV.F.4.

7        402.    Just months before the North Bay Fires broke out, United States District Judge

8   Thelton E. Henderson in the Northern District of California ordered that PG&E work with

9   federal prosecutors to retain a monitor to oversee the Company's compliance and ethics

10  programs, and implement "policies and procedures that address threats caused by vegetation," in

11  light of the deadly San Bruno explosion. Order at 3, PG&E Criminal Proceedings, (N.D. Cal.

12  Jan. 26, 2017), ECF No. 916 (the "San Bruno Order"). As part of the sentencing process, PG&E

13  had promised the Court that Defendant Julie Kane – as Chief Ethics and Compliance Officer of

14  the Company – "reports directly to PG&E Corporation's Chairman and CEO" regarding PG&E's

15  compliance efforts, and that "PG&E's senior executives" regularly reviewed the Company's

16  safety and compliance, such that "high-level personnel of the organization ensure its

17  effectiveness." *Id.,* Def's Sentencing Memo. at 6-7, PG&E Criminal Proceedings (N.D. Cal. Jan.

18  9, 2017), ECF No. 906. Accordingly, Exchange Act Individual Defendants Kane, Earley, and

19  Williams had actual knowledge of PG&E's lack of compliance.

20       403.    Because the Defendants represented that they closely monitored PG&E's

21  critically important safety and compliance, and because PG&E's fire safety practices resulted in

22  thousands of fire safety violations during the Class Period, they knew – or were deliberately

23  reckless in not knowing – that PG&E's level of safety with respect to vegetation management

24  and wildfire prevention did not comport with state law.

25

26

27  _____

[119] Court filings identify this individual as Dean McFarren, PG&E's Quality Assurance

28  Supervisor.

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                     122
CIVIL ACTION NO. 3:18-CV-03509-EJD

PGE-BK-0000001418

**C.     The Federal Court Overseeing PG&E's Probation, Including Safety Monitoring, Has Uncovered Additional Facts Supporting Scienter**

404.     As described above, *see supra* Section IV.F.2., PG&E was convicted of five felony counts for knowingly and willfully violating federal safety standards in causing the deadly San Bruno explosion in September 2010.  On January 26, 2017, Judge Henderson sentenced PG&E to an expansive program of probation, including a corporate compliance and ethics monitorship program, 10,000 hours of community service, expenditure of $3 million to inform the public of its criminal conduct, and a mandate to refrain from any further criminal behavior. San Bruno Order.

405.     The first condition to PG&E's probation is that it "Not Commit Another Federal, State, or Local Crime During the Term of the Probation." PG&E did not object to this term in its responsive sentencing memorandum. PG&E Sentencing Memorandum at 15, PG&E Criminal Proceedings (N.D. Cal. Jan. 9, 2017), ECF No. 906.  PG&E reassured the Court, prosecutors, the public, and its investors that it would not engage in further criminal acts, including criminally negligent or reckless safety violations.  This condition of PG&E's probation applied to PG&E's electrical operations and gas operations alike.  Accordingly, as of January 8, 2017, PG&E had an unusual motive to deceive investors and conceal its lack of compliance with safety regulations: it needed investors to believe it was meeting the terms of its probation.

406.     On August 14, 2017, Judge Alsup was assigned to preside over the criminal case and PG&E's resulting probation.

407.     After the deadly Camp Fire, Judge Alsup ordered the parties on November 27, 2018 to answer the following questions by December 31, 2018:

> 1. What requirements of the judgment herein, including the requirement against further federal, state, or local crimes, might be implicated were any wildfire started by **reckless operation or maintenance of PG&E power lines**?
>
> 2. What requirements of the judgment herein might be implicated by any inaccurate, slow, or failed reporting of information about any wildfire by PG&E?
>
> 3. What specific steps has the monitor herein taken to monitor and improve PG&E safety and reporting with respect to power lines and wildfires?

Case: 19-30088   Doc# 5375-3   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 45 of 54

PGE-BK-0000001419

4. **Provide an accurate and complete statement of the role, if any, of PG&E in causing and reporting the recent Camp Fire in Butte County** and all other wildfires in California since the judgment herein.

408.    On December 5, 2018, Judge Alsup requested "that the Office of the California Attorney General advise the Court of its view on one aspect of this question, namely, the extent to which, if at all, **the reckless operation or maintenance of PG&E power lines would constitute a crime under California law**." In response, the Attorney General of California replied that PG&E's actions or failures to act could constitute a range of criminal violations if the Utility was found to be "reckless" in causing California wildfires.[120]  The listed potential offenses ranged from "misdemeanor offenses related to vegetation and power lines" to "implied-malice murder and involuntary manslaughter."

409.    On January 17, 2019, Judge Alsup issued a tentative finding that "the single most recurring cause of the large 2017 and 2018 wildfires attributable to PG&E's equipment has been **the susceptibility of PG&E's distribution lines to trees or limbs falling onto them** during high-wind events."[121]

410.    On January 30, 2019, Judge Alsup held a probationary hearing to determine whether PG&E's conduct had violated the terms of its probation.  Part of the hearing concerned PG&E's failure to inform the probation officer that the Butte County District Attorney's Office was investigating PG&E's role starting several of the North Bay Fires, that the District Attorney considered criminal prosecution, and that it executed a settlement with PG&E to avoid such prosecution.  The court made a "**find[ing] that PG&E violated the conditions of probation**," with sentencing to be determined at a later date.[122]  Judge Alsup also reminded the Company:

> [O]ne of the conditions of probation is you will not commit another federal, state, or local crime. It doesn't have to be a pipeline or a natural gas. It can be any crime. You cannot – you've

---

[120]Attorney General's Amicus Brief Regarding PG&E's Potential Criminal Liability, PG&E Criminal Proceedings (N.D. Cal. Dec. 28, 2018), ECF No. 954.
[121] U.S. Response to Court's Order to Show Cause and Request for Comment, PG&E Criminal Proceedings (N.D. Cal. Jan. 17, 2019), ECF No. 970.
[122] Transcript of Proceedings, PG&E Criminal Proceedings (N.D. Cal. Jan. 31 2019), ECF No. 999.

Case: 19-30088   Doc# 5375-3   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 46 of 54
PGE-BK-0000001420

got to be on your absolute best behavior. No more crimes. . . .
That's what PG&E is up against now.

411.    During the hearing, Judge Alsup reportedly stated: "**[T]here is one very clear-cut pattern here: That PG&E is starting these fires**. . . . PG&E, according to Cal Fire, started the fire. Global warming did not start the fire. According to Cal Fire, PG&E started it, all 17 of them." Judge Alsup continued, "what do we do[?]  Does the judge just turn a blind eye and say, 'PG&E, continue your business as usual.  Kill more people by starting more fires'?"[123]  Judge Alsup heard testimony from PG&E's probation officer, Jennifer Hutchings, concerning the Honey Fire – one of the North Bay Fires for which Cal Fire found evidence of a safety violation and referred further criminal investigation to the relevant district attorney for Butte County. Probation Officer Hutchings testified: "I discovered that there had actually been an extensive investigation done by Butte County, that they were fully prepared to bring criminal charges against Pacific Gas and Electric; that Pacific Gas and Electric had entered into a settlement agreement with them in order to avoid these charges being brought." **The court then made a "find[ing] that PG&E violated the conditions of probation as charged in the Form 12."** Thereafter, the court turned to address whether it "should not impose further condition on PG&E to help protect the public from possible further other crimes of the offender," including the following exchange with PG&E representative:

| The Court: | Okay. When you say "mitigate," why can't the risk [of wildfire] be zero? Why is it that PG&E should be permitted to start a single wildfire?" |
| --- | --- |
| PG&E: | Well, the answer to the first question is bringing the risk to zero is an incredibly complicated series of policy decisions that have to factor in reliability, cost, safety, and there's a tremendous amount of analysis that goes into how best to, for instance, make vegetation management decisions and how aggressive vegetation management should be versus the cost of – |

. . .

---

[123] Transcript of Proceedings, PG&E Criminal Proceedings (N.D. Cal. Jan. 31 2019), ECF No. 999.

PGE-BK-0000001421

| | |
|---|---|
| The Court: | So why is it PG&E says all the time "Safety is our number one thing"?  I hear it all the time, "Safety. Safety. Safety," **but it's not really true. Safety is not your number one thing**. |

At the conclusion of this proceeding, PG&E accepted that full compliance with safety regulations, rather than "mitigation," was both possible and PG&E's goal: "[U]ltimately we agree with Your Honor's goal. We think that Your Honor's goal of trying to eliminate the risk is exactly what we all need to be working towards."

412.    On February 6, 2019, attorneys for fire victims provided a submission to Judge Alsup in response to the January 30, 2019 probationary hearing.[124]  The submission compiled data from PG&E's regulators which demonstrated that the Company posed a far greater risk to the public than its peers.  For example, according to the submission, Southern California Edison ("SoCalEd") serves 15 million people across approximately 50,000 square-miles, operating and maintaining 91,375 miles of distribution lines and 1,433,336 electric poles.  By comparison, PG&E services approximately 16 million people throughout a 70,000-square-mile service area, operating and maintaining between 81,000 miles and 115,000 miles of distribution lines and 2,400,000 electric poles.  Yet, despite these similarities in service size and miles of distribution lines, *PG&E's electrical equipment caused 1,208 more wildfires than SoCalEd's equipment between 2014 to 2017* as self-reported to the CPUC.  In total, PG&E's equipment caused 1,552 wildfires, while SoCalEd only caused 344 fires over the same time period.  Put differently, PG&E's equipment caused *4.5 times more wildfires* than SoCalEd.  PG&E's equipment was also responsible for more large-scale fires, including 43 more fires than SoCalEd that burned between 10-99 acres, three more between 100-299 acres, and two more between 300-999 acres.  Similarly, since 2014, the electrical equipment of San Diego Gas & Electric ("SDG&E") caused 109 wildfires with only one wildfire burning over 10 (and below 300) acres.  By contrast, PG&E caused 1,552 wildfires during that same timeframe with 68 of those fires burning over 10 acres.

---

[124] Submission of Attorneys Pitre and Campora in Response to Order dated Jan. 30, 2019, PG&E Criminal Proceedings (N.D. Cal. Feb. 6, 2019), ECF No. 1005.

PGE-BK-0000001422

413. On March 5, 2019, Judge Alsup issued a revised order to show cause as to why the court should not modify the terms of PG&E's probation in light of subsequent submissions.[125] Judge Alsup's Revised Order further found that this **"record demonstrates that PG&E's performance with respect to vegetation management has been dismal."** Although PG&E had previously balked at new conditions of probation that would require full compliance on the grounds that they would be impossible to achieve, Judge Alsup's March 5, 2019 order rejected that notion:

> To address PG&E's complaints that the vegetation-management conditions proposed in the January 9 order would be unduly expensive, require superhuman efforts, and exceed the requirements of state and federal law, the above conditions would now simply require full compliance with existing law and with the metrics proposed in PG&E's own wildfire mitigation plan. This order rejects PG&E's back-up contention that "perfect compliance" with Section 4293 is impossible due to "densely forested, highly dynamic, living environments, in which conditions can rapidly change" (Dkt. No. 1016 at 9). **The record demonstrates that PG&E's performance with respect to vegetation management has been dismal.** And, not only does the offender provide no evidentiary support for its claim, but anyone who knows the terrain and its vegetation knows that it takes years for trees to grow to the height of PG&E's lines. Regular inspections could easily spot trees that are high enough to present a hazard. If state or federal law is too strict, moreover, PG&E's remedy would be to seek the relaxation of such laws through its well-oiled lobbying efforts. . . .  The proposed conditions would help ensure that, going forward, funds are adequately allocated to PG&E's vegetation management and wildfire mitigation costs.[126]

414. On April 2, 2019, Judge Alsup held a hearing on his second order to show cause in PG&E's probation proceedings. At the hearing, Judge Alsup stated:

> PG&E over several years allowed the trees that needed to be removed to be built up and did not remove them, did not trim them so that we wound up with a large number of trees that should have been removed by PG&E but weren't. And that was a major contributing factor, maybe the single-biggest factor, in causing the fires in 2017 and 2018 in Northern California.[127]

---

[125] Second Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified, PG&E Criminal Proceedings (N.D. Cal. Mar. 5, 2019), ECF No. 1027.

[126] Second Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified, PG&E Criminal Proceedings (N.D. Cal. Mar. 5, 2019), ECF No. 1027.

[127] Transcript of Proceedings at 6-7, PG&E Criminal Proceedings (N.D. Cal. Apr. 2, 2019), ECF No. 1047.

PGE-BK-0000001423

1   Judge Alsup also explained "as we've gotten into the evidence, and I've studied quite a lot of it,

2   again I want to say it's quite clear that PG&E . . . let the tree budget wither so that a lot of trees

3   that should have been taken down were not."  He concluded, "[t]his is a crisis, a crisis that

4   California faces on these wildfires, and PG&E is the single-most culpable entity in the mix. . . .

5   PG&E has started more than – way more than its share of these fires. . . This is a problem of

6   your own making."

7        415.    Under these circumstances, PG&E's violation of court-imposed probation and

8   California law, while under monitoring and reporting obligations regarding its purported

9   compliance throughout the Class Period, support strong inferences that Defendants knew, or

10   were severely reckless in not knowing, that it failed to comply with relevant laws and regulations

11   when making the false and misleading statements detailed above.

12        416.    As a result, on April 3, 2019, Judge Alsup issued an Order Adopting New

13   Conditions of Probation.  The court modified the terms of PG&E's probation to require it to (i)

14   "fully comply with all applicable laws concerning vegetation management and clearance

15   requirements";  (ii) "fully comply with the specific targets and metrics set forth in its" 2019

16   Mitigation Plan, and (iii) not issue dividends until it was in compliance with all applicable

17   vegetation management requirements, among other conditions.[128]

18        417.    On May 7, 2019, Judge Alsup conducted a sentencing hearing for PG&E's

19   violation of probation.  In a colloquy with PG&E's new CEO William D. Johnson, the Court

20   stated: "one of the biggest problems we've had is that PG&E has been starting a lot of fires, and

21   they had that horrible explosion in San Bruno, and **I just don't think PG&E has put safety**

22   **first.**"  He further reminded the new CEO: "your company **admitted** that it started 17 of those

23   fires in 2017 just in the Wine Country."[129]

24

25

---

26     [128] Order Adopting New Conditions of Probation, PG&E Criminal Proceedings (N.D. Cal.
Apr. 3, 2019), ECF No. 1040.

27     [129] Transcript of Proceedings at 11, PG&E Criminal Proceedings, (N.D. Cal. May 7, 2019),

28   ECF No. 1061.

Case: 19-30088   Doc# 5375-3   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 50
of 54
PGE-BK-0000001424

418.   During the sentencing hearing, Judge Alsup also observed that while there are other causes of fire, "**no one has started more fires than PG&E.**"

419.   The magnitude of PG&E's failures show that the Company and Exchange Act Individual Defendants either knew these facts, or were deliberately reckless in not knowing them.  The inference of scienter is made even stronger when combined with the fact that safety was a core operation of PG&E's, as discussed in Section X.B., *supra.*

**D.**   **PG&E's Noncompliance with Safety Regulations Was Well-Known Throughout the Company, Including at the Highest Levels, with Real-Time Access to a Database of Known Safety Violations**

**1.**   **PG&E Recorded Its Violations of Safety Regulations in a Sophisticated Database, Readily Accessible by the Exchange Act Individual Defendants**

420.   PG&E maintained a database of inspection data to document the condition of its power lines, which provided its personnel with ready access to information about instances of noncompliance with state safety regulations. In a November 8, 2017 article about its pole management and maintenance efforts, PG&E stated that it "**uses a comprehensive database to manage these multiple patrol and inspection schedules of our 2.4 million poles.**"[130]

421.   This information was used to develop the company's *Mobile Asset Inspection* application that provided "electric power inspectors in the field with real-time information including maps, customer information, safety and access information."[131] The system was developed in 2016 and had become sophisticated enough by 2017 to win *InformationWeek*'s IT Excellence Award in the Data and Analytics category.[132]  The article further states that "**[s]atellite maps were layered with the location of PG&E's two million electric poles along with decades' worth of data on each individual pole.**"[133]  PG&E's 2016 Corporate

---

[130] *Facts about PG&E Pole Management and Maintenance*, Currents, PG&E (Nov. 8, 2017), http://www.pgecurrents.com/2017/11/08/facts-about-pge-pole-management-and-maintenance/.
[131] Press Release, PG&E, *Innovative App for PGE Field Crews Earns InformationWeek IT Excellence Award* (May 22, 2017), http://investor.pgecorp.com/news-events/press-releases/press-release-details/2017/Innovative-App-for-PGE-Field-Crews-Earns-InformationWeek-IT-Excellence-Award/default.aspx.
[132] *Id.*
[133] *Id.*

---

Case: 19-30088   Doc# 5375-3   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 51 of 54

PGE-BK-0000001425

1  Responsibility and Sustainability Report announced that a Margaret Mooney Award for

2  Innovation was awarded to its "Data Visualization—Google Earth SAP team, which created a

3  new technology that provides work crews with a dramatically enhanced data visualization of

4  **work in progress**." The report further mentioned "[t]he development of an SAP-based

5  **compliance tool** that can analyze trends and inform [PG&E's] risk management efforts." Thus,

6  PG&E used sophisticated software that kept track of its safety regulation noncompliance for its

7  powerlines and poles in real time.

8       422.   PG&E assigns a unique "pole SAP ID number" that corresponds to each pole's

9  data.[134] According to an *InformationWeek* article about PG&E's mobile application, "**[t]he**

10 **status of a pole's inspection is tracked in SAP [database technology] so the inspection team**

11 **knows when it's time to inspect each pole**. That information flows into the enterprise platform

12 PG&E built, which pushes electronic lists to inspectors' iPad Pros."[135] The data collected is

13 extensive enough to enable "an enterprise data and analytics organization that is using advanced

14 analytics to predict when poles will fail."[136] And by 2017, the PG&E Corporate Responsibility

15 and Sustainability Report mentions that the company's "SAP-based tool" was used to analyze

16 trends in environmental compliance. Thus, PG&E's records of safety regulation violations were

17 stored in a readily accessible database.  Defendants Earley, Williams, Stavropoulos, Kane, Johns,

18 and Hogan each had easy access to this database.

19      423.   Furthermore, in its submissions to Judge Alsup in the Company's criminal

20 probation, PG&E represented that it conducts quality assurance audits to obtain "real time"

21 assessments of its vegetation management compliance:

22           PG&E has also implemented checks on its contractors' vegetation
            management work as another way to monitor compliance. For
23          example, PG&E conducts audits and reviews of its vegetation

24 ───────────────
   [134] PG&E Pole Data Request Form, PG&E (Aug. 9, 2017),
25 https://www.pge.com/pge_global/common/pdfs/safety/yard-safety/powerlines-and-trees/pole-
   data-request-form.pdf.
26 [135] Lisa Morgan, *PG&E's Winning Recipe for a Mobile Asset Inspection App*,
   InformationWeek (June 29, 2017), https://www.informationweek.com/big-data/pgandes-
27 winning-recipe-for-a-mobile-asset-inspection-app/d/d-id/1329251.

28 [136] *Id.*

───────────────
THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                           130
CIVIL ACTION NO. 3:18-CV-03509-EJD

PGE-BK-0000001426

management program to assess the quality of contractors' work and compliance with PG&E's standards and legal requirements, including Public Resource Code § 4293. PG&E's audit and review process consists primarily of two programs, Quality Control ("QC") and Quality Assurance ("QA"). . . . .

**PG&E's QA audits are designed to obtain a "real-time" assessment of PG&E's vegetation management program and whether the conditions in its service territory are consistent with PG&E's legal obligations.** To ascertain a **true "real-time" condition** of the program, audits are performed throughout the year. . . . The audits indicate whether any identified issues pose compliance violations or potential violations (e.g., potential violation may occur within 90 days).[137]

424.    Further, in those same criminal probation proceedings, Judge Alsup found that PG&E has admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'" Such a precise admission confirms the existence of such a database, awareness of its contents showing that vegetation management violations were widespread during the Class Period, and access to that information by the highest levels.

425.    Consequently, it is clear that PG&E was noncompliant with safety regulations concerning vegetation management and pole integrity, and that such facts would have been documented electronically, stored in an accessible SAP database, and available to PG&E personnel throughout the Company in real-time.  Defendants Earley, Williams, Stavropoulos, Kane, Johns, and Hogan each had easy access to this database.

**2.    PG&E Instituted a Culture Among Its On-the-Ground Employees of Reporting Problems up the Corporate Chain, Which Upper Management Was Aware of and Monitored**

426.    PG&E repeatedly touted the culture among its lower-level employees that encouraged reporting safety problems up the chain of management. Further, the Exchange Act Individual Defendants touted their knowledge and familiarity with this practice at the Company,

---

[137] PG&E Response to Request for Information at 12, PG&E Criminal Proceedings (N.D. Cal. Feb. 22, 2019), ECF No. 1016.

PGE-BK-0000001427

1   indicating either they personally received information of safety violations this way, or they knew

2   where to find such information but deliberately avoided it.

3       427.    On August 18, 2016, PG&E issued a press release titled "PG&E Becomes First

4   Natural Gas Utility to Receive Process Safety." It contained a description of an internal

5   Company policy termed "**The Corrective Action Program, a program that empowers**

6   **employees at all levels of PG&E to speak up and identify issues that are in need of**

7   **improvement**."

8       428.    On November 4, 2016, PG&E hosted a conference call with analysts to discuss its

9   financial results for the third quarter of 2016. In his prepared remarks, Earley elaborated on

10  PG&E's culture of encouraging "every employee" to report safety violations up the chain of

11  command, as follows:

> **We also wanted to make sure that every employee felt
> comfortable raising concerns, no matter how big or small, so
> we made a number of changes to encourage all employees to
> speak up when something doesn't seem right. For example, we
> worked with our unions to develop a non-punitive self-
> reporting policy.**
>
> We've also adapted the nuclear industry's corrective action
> program **across the Company, to make it easy for employees to
> report things that need to be fixed. In fact, employees can now
> report corrective action items through a simple app on their
> smart devices. And we've created a number of awards to
> publicly recognize employees when they do speak up, so that
> we are encouraging and reinforcing that behavior.**
>
>          \* \* \*
>
> **The improvements we have made in safety and reliability over
> the last six years have put us in a position to deliver strong
> financial results going forward.**
>
> **Earlier this year, we announced our first dividend increase in
> six years, and we have committed to achieving a roughly 60%
> payout ratio by 2019.** Combined with our expected rate based
> growth, we are confident we can deliver a strong overall return for
> our shareholders.

25      429.    Thus, PG&E went significantly beyond making employees feel safe "report[ing]

26  things that need to be fixed." The CEO himself took credit for "mak[ing] sure that every

27  employee felt comfortable raising concerns" and "encourag[ing] all employees to speak up"

PGE-BK-0000001428