"**across the Company**" – *i.e.,* **not just at the lower levels.** Further, by virtue of the fact that the CEO personally took credit for this phenomenon within the company, it indicates his awareness of what employees actually reported. Indeed, he stated that he was involved in "publicly recogniz[ing] employees when they do speak up."

430.   As a result, the persistence of safety violations cannot be attributed to their being unknown. Rather, such problems persisted because of what the Exchange Act Individual Defendants did – or failed to do – to mitigate safety problems once they were reported. Indeed, PG&E's inadequate safety compliance did not stem from a lack of information but rather a lack of willingness to devote sufficient Company funds to remediate problems, as detailed above (*see* Sections VI.B.-J., *supra*).

431.   Earley's statement also affirms the direct connection between PG&E's treatment of safety issues, the Company's long-term financial results, and the size of its dividend. Indeed, as the truth emerged regarding PG&E's insufficient safety compliance during the Class Period (as alleged above, *see* Section IX, *supra*), the market understood the connection between the Company's safety violations and the foreseeable, material detriment they would have on the Company's financial results and dividend.

### E.   PG&E's Compliance Statements Were Authorized by Defendant Kane and Were Made under Her Ultimate Authority

432.   Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer ("CECO"), controlled and authorized all of PG&E's statements regarding compliance during the Class Period. These statements were approved and made under her ultimate authority as CECO.

433.   PG&E established the CECO role on March 24, 2015 "to strengthen its ethics and compliance program and performance,"[138] a role which Kane assumed on May 18, 2015 and held

---

[138] Press Release, PG&E, *PG&E Appoints Julie M. Kane to New Position as Senior Vice President and Chief Ethics and Compliance Officer; Company Takes Next Step Toward Goal of Establishing a Best-in-Class Corporate Ethics Program* (Mar. 25, 2015), https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20150324_pge_appoints_julie_m_kane_to_new_position_as_senior_vice_president_and_chief_ethics_and_compliance_officer_company_takes_next_step_toward_goal_of_establishing_a_best-in-class_corporate_ethics_program.

PGE-BK-0000001429

through the end of the Class Period.  As CECO, she was responsible for both managing

implementation of PG&E's legal compliance efforts as well as overseeing compliance

monitoring and reporting during almost the entirety of the Class Period.  When PG&E was being

sentenced for its criminal negligence in causing the San Bruno explosion, it admitted in its

January 9, 2017 sentencing memorandum that "Ms. Kane is responsible for **overseeing** the

Company-wide compliance and ethics program, including **compliance management**, risk-

mitigation **and reporting**; **overseeing employee-investigatory processes**; and reinforcing

PG&E's ethics and compliance culture, among many other compliance and ethics program

elements."  The same filing confirmed that "The CECO, Julie Kane, reports directly to PG&E

Corporation's Chairman and CEO, and is accountable to PG&E Corporation's and PG&E's

Boards of Directors, with additional reporting responsibility to the Compliance and Public Policy

Committee of PG&E Corporation's Board and the Audit Committees of PG&E Corporation's

and PG&E's Boards."

434.    Accordingly, Kane was apprised of any compliance violations reported within the

Company, including violations reported by PG&E's lower-level employees and logged in

PG&E's central database detailed *supra*, at all times when PG&E misrepresented to investors

that it was in compliance (*e.g.*, ¶197 (Misstatement No. 2, October 16, 2015); ¶211

(Misstatement No. 4, October 6, 2016); ¶222 (Misstatement No. 5, August 9, 2017); ¶249

(Misstatement No. 9, October 31, 2017); ¶270 (Misstatement No. 12, November 5, 2017); ¶280

(Misstatement No. 13, May 25, 2018); ¶¶287, 296 (Misstatement Nos. 14 & 15, June 8, 2016);

¶300 (Misstatement No. 16, September 27, 2018); ¶¶303, 309 (Misstatement Nos. 17-18,

October 9, 2018); and ¶314 (Misstatement No. 19, November 8, 2018)).

435.    The CECO position was sufficiently senior such that Kane's scienter can be

imputed to the Company regarding knowledge of legal compliance with California vegetation

management and safety regulations.

436.    Additionally, because Kane reported directly to the CEO in her capacity as

CECO, her knowledge of safety violations can be imputed to both CEOs, Earley and

Case: 19-30088   Doc# 5375-4   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 2
of 51

PGE-BK-0000001430

1   Williams.[139] Because Kane was institutionally installed to advise the CEO of PG&E's

2   compliance and safety, Kane would have told Earley and Williams what she knew regarding the

3   Company's noncompliance with vegetation management regulations, or Earley and Williams

4   would have been deliberately reckless in speaking on the subjects of compliance and safety

5   without input from their CECO.

6   **F.    The Threat of a Potential Bankruptcy Gave Defendants a Strong Motive to
          Mislead Investors**

7

8   437.    PG&E is currently facing approximately $17 billion in liability over the North

    Bay Fires and $13 billion for the Camp Fire, of which the Company has already recorded

9   anticipated losses totaling over $14 billion. This immense exposure dwarfs the $1.6 billion that

10  the Company reported it earned in the full year 2017—a performance not likely to be repeated

11  given the substantial increase in PG&E's required vegetation management and other safety

12  compliance expenditures.

13  438.    Once the North Bay Fires began, it was clear to Defendants that PG&E's liability

14  could have severe repercussions for the Company's financial condition, and for the careers of the

15  Exchange Act Individual Defendants.  This was true even before the flight of PG&E's officers

16  and directors and the Company's bankruptcy.

17  439.    One California legislator reported on June 15, 2018 that "[i]n this Capitol, they

18  [PG&E] keep talking about the sky is falling, that they're going to go bankrupt and what are we

19  going to do, and they're creating a lot of fear in the Capitol." On July 31, 2018, *Reuters* further

20  reported that an anonymous source had leaked that PG&E hired a prominent law firm to "explore

21  debt restructuring options," as well as the possibility of "breaking up the company."  On August

22  1, 2018, California Governor Jerry Brown even cautioned the public that "there is concern that

23  we could lose our utilities."

24  440.    The reason for these dire warnings was simple: PG&E wanted to rush through

25  legislation that would grant it additional defenses and a lower bar to be reimbursed for their part

26

27  _____

    [139] Further, she reported directly to the Company's Chairman of the Board, a position which
28  was also occupied by Earley during the Class Period.

Case: 19-30088   Doc# 5375-4   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 3
of 51

PGE-BK-0000001431

in causing the North Bay Fires.  After the North Bay Fires had erupted, the threat of bankruptcy and the narrow possibility of a legislative bail-out gave PG&E and the Exchange Act Individual Defendants had an unusual motivation to hide their culpability.

441.    It was within this context that PG&E falsely and misleadingly told investors, *inter alia*, that "***PG&E meets or exceeds all applicable federal and state vegetation clearance requirements***," and that "***we've doubled the amount that we've invested in veg[etation] management***." PG&E had an unusual motive to make these and other statements after the North Bay Fires erupted: to conceal its wrongdoing long enough to secure the liability bailout it was seeking from the California legislature.

442.    Indeed, this would not be the first time that a large potential liability caused PG&E to act unethically.  When PG&E faced a substantially *lower* liability for its role in the deadly San Bruno explosion, the Company engaged in improper "back-channel" communications with its regulators that ultimately resulted in a $97.5 million fine that was imposed in April 2018. A federal jury also found PG&E to be guilty of six criminal charges, including obstruction of justice, related to that blast that killed eight people.

**G.    After PG&E Failed to Follow Its ESRB-8 Shutoff Protocol and Caused the Camp Fire, PG&E Attempted to Cover It Up**

443.    As noted above, the public learned after the Camp Fire erupted that PG&E did not shut down its Caribou-Palermo transmission line that ignited the Camp Fire, despite the Company's ESRB-8 Shutoff Protocol.  As further detailed above, PG&E faced criticism from a variety of sources for that decision, as well as significant decreases to its share price. *See* Section IX.D.6, *supra.*

444.    While the Camp Fire continued to burn, the Company insisted that its ESRB-8 Shutoff Protocol would not have included the Caribou-Palermo transmission line.

445.    For example, in a November 16, 2018 statement reported by *KQED News*, PG&E spokeswoman Deanna Contreras stated in an email to the reporter: "However, in light of the potential public safety issues resulting from de-energizing higher voltage transmission lines, including the potential to impact millions of people and create larger system stability issues for

Case: 19-30088   Doc# 5375-4   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 4 of 51

PGE-BK-0000001432

1    the grid, PG&E has not extended the (shutoff) program to transmission lines that operate at

2    115kV or above."[140]

3         446.    Similarly, in a November 22, 2018 statement reported by *Mercury News*, PG&E

4    spokeswoman Lynsey Paulo said to the reporter: "In light of the potential public safety issues

5    resulting from de-energizing higher voltage transmission lines, including the potential to impact

6    millions of people and create larger system stability issues for the grid, PG&E has not extended

7    the (shutoff) program to transmission lines that operate at 115kV or above."[141]   Spokeswoman

8    Paulo "added that the Federal Energy Regulatory Commission (FERC) regulates transmission

9    lines and such an emergency shutdown would need to be coordinated with the California

10   Independent System Operator, which oversees the state's power grid."  But as the article further

11   reported:

12            But state and federal regulators say PG&E can shut down
              transmission lines of any size at its own discretion.
13

14            "The transmission owners are solely responsible for operating their
              transmission and distribution lines and they can de-energize
15            transmission and distribution lines without seeking approval from
              the ISO, with or without prior notice," Cal ISO spokesman Steven
              Greenlee said. "The transmission owner tells us that they are de-
16            energizing a line and if a 230kV or 500kV line is de-energized it
              may require (us) to re-dispatch generation if the remaining lines
17            become heavily loaded. This is a practice we perform every day
              with scheduled work and unplanned outages."
18
              CPUC spokeswoman Terrie Prosper also said the decision is up to
19            the individual utility.

20            "Utilities can de-energize whatever lines and voltage they deem
              appropriate," Prosper said. "They typically de-energize distribution
21            lines because those lines are more localized than transmission
              lines."
22
              FERC Spokesman Craig Cano said PG&E would not need its
23            approval to cut power to high-voltage lines for safety reasons.

24    ─────────────
         [140] Dan Brekke, *PG&E: High-Voltage Transmission Lines Not Covered by Fire Safety*
25    *Shutdown Plan*, KQED (Nov. 16, 2018), https://www.kqed.org/news/11706846/pge-high-
      voltage-transmission-lines-not-covered-by-fire-safety-shutdown-plan.
26       [141] Matthias Gafni, *Camp Fire: Map Shows Where PG&E Had Planned to Shut Down Power*
27    *Ahead of Blaze*, Mercury News (Nov. 22, 2018),
      https://www.mercurynews.com/2018/11/22/maps-show-where-pge-had-planned-to-shut-down-
28    power-ahead-of-camp-fire/.

─────────────
THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                              137
CIVIL ACTION NO. 3:18-CV-03509-EJD

"FERC-approved standards address transmission system reliability and explicitly exclude safety matters, which could be the reason for shutting down a power line in response to wildfires or to mitigate the risk of fires," he said.

447.    PG&E's entire response, including its denial that its ESRB-8 Shutoff Protocol would not have included the Caribou-Palermo transmission line, **was not true**.

448.    First, PG&E's published ESRB-8 Shutoff Protocol never mentioned a limitation on 115-kilovolt transmission lines or in fact any transmission lines.[142] However, pursuant to CPUC's Resolution ESRB-8, PG&E was required to both "Make available and post a summary of de-energization policies and procedures on its website" and "Provide its de-energization and restoration policy **in full**, and in summary form, to the affected community officials before de-energizing its circuits."[143] Because a limitation on transmission lines was never mentioned in PG&E's ESRB-8 Shutoff Protocol, it did not exist.

449.    Second, PG&E had never mentioned this exclusion for 115-kilovolt transmission lines, even unofficially, until **after** it faced criticism for deciding not to shut down its Caribou-Palermo transmission line and causing the Camp Fire.

450.    Third, when PG&E first shut off electricity under its ESRB-8 Shutoff Protocol on October 14 through 17, 2018, by its own admission, PG&E shut off **both** transmission and distribution lines.  Specifically, PG&E shut off eight transmission power line circuits and thirty-three distribution power line circuits, as detailed in its later filing to CPUC.[144] This admission confirms that PG&E's ESRB-8 Shutoff Protocol did not include a limitation on shutting down transmission lines.

---

[142] *See generally* PG&E Public Safety Power Shutoff Policies and Procedures, PG&E website (Sept. 2018), https://www.pge.com/pge_global/common/pdfs/safety/emergency-preparedness/natural-disaster/wildfires/Public-Safety-Power-Shutoff-Policies-and-Procedures-September-2018.pdf.

[143] Resolution Extending De-Energization Reasonableness, Notification, Mitigation And Reporting Requirements In Decision 12-04-024 To All Electric Investor Owned Utilities, (Cal. Public Utilities Commission July 16, 2018), http://docs.cpuc.ca.gov/publisheddocs/published/g000/m218/k186/218186823.pdf.

[144] Letter from PG&E to CPUC re: compliance report (Oct. 31, 2018), http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Utilities_and_Industries/Energy_-_Electricity_and_Natural_Gas/PGE%20PSPS%20Report%20Letter%2020181031.pdf.

---

PGE-BK-0000001434

451.    The same conclusion is confirmed by a telling revision PG&E made to otherwise identical text in two succeeding reports to the CPUC—the first being its October "Public Safety Power Shutoff Report" regarding the October shutoff,[145] and the second being its November "Public Safety Power Shutoff Report" **after the Camp Fire**.  Therein, PG&E made the following revelatory insertion:

> [PG&E has] reached out to more than 570,000 homes and businesses that are served by our electric lines, <u>operating at 70kV and lower,</u> that run through extreme fire-threat areas. We have communicated to these customers through several formats (letter, email, TV and print ads, social media and news stories) that, if extreme fire danger conditions were forecasted, it might be necessary to temporarily turn off power to their neighborhood or community for safety.

(Underlining added to signify PG&E's addition.)  The absence of such language in its October 2018 shutoff report, in an otherwise identical paragraph, confirms that an exclusion for 115-kilovolt transmission lines was never part of PG&E's ESRB-8 Shutoff Protocol.

452.    Finally, PG&E was required to answer questions posed by the CPUC's Safety and Enforcement Division after the North Bay Fires, which PG&E submitted on October 17, 2017.[146] The Safety and Enforcement Division asked: "Has PG&E proactively de-energized power lines in the last 10 days without being requested to do so by CAL FIRE? If so, please provide information about location, duration and reasons for doing so."  In response, PG&E stated that it had de-energized **two** 115-kilovolt lines in 2017 to prevent wildfires:

> PG&E de-energized multiple transmission lines as described below without the direction of CAL FIRE:
>
> . . .
>
> 3.  On 10/9 at 0644, PG&E de-energized the Fulton-Santa Rosa #1-**115kV line** due to fire in the area. The line was returned to service on 10/9 at 1455.

---

[145] Letter from PG&E to CPUC re: compliance report (Oct. 31, 2018), http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Utilities_and_Industries/Energy_-_Electricity_and_Natural_Gas/PGE%20PSPS%20Report%20Letter%2020181031.pdf.

[146] PG&E's Response to Safety and Enforcement Divisions' 10/14/17 Questions, CPUC website (Oct. 17, 2017), http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/Response%20to%20Data%20Request.pdf.

PGE-BK-0000001435

1               4. On 10/9 at 0644, PG&E de-energized the Fulton-Santa Rosa #2-
2               **115kV line** due to fire in the area. The line was returned to service
                on 10/14 at 1044.

3       453.   As such, it was affirmatively false that PG&E's ESRB-8 Shutoff Protocol

4 excluded transmission lines of any kind.  It was also false that PG&E's ESRB-8 Shutoff Protocol

5 excluded 115-kilovolt transmission lines in particular.

6       454.   PG&E's representations after the Camp Fire that such exclusions existed – when

7 they did not exist – amount to a cover-up, and evidence the Company's scienter.  It is a

8 continuation of PG&E's deliberate efforts to conceal the unsafe operations of its utilities, as

9 further exposed by CPUC's allegations that the Company falsified records and data concerning

10 the safety of its utilities from 2012 through 2017.  *See* ¶99, *supra.*

11     **H.**     **PG&E's Unprecedented Departure of Officers and Directors Strengthens the**
             **Inference of Scienter**

12

13       455.   On January 13, 2019, PG&E announced the abrupt departure of its CEO and

14 President, Defendant Williams.[147]  To explain Williams's unceremonious departure—less than

15 two years after she became CEO in March 2017—PG&E's May 17, 2019, preliminary proxy

16 statement began with a letter to shareholders from the PG&E Board of Directors, stating:

17            "The tragic events of the past few years have made clear that the
            energy system status quo is no longer working for California. We

18            have heard the calls for change and are committed to answering
            them with strong actions that will help us re-earn the trust of all
            our stakeholders. **This starts at the top. We replaced PG&E**

19            **Corporation's CEO and the vast majority of our Boards of**
            **Directors with experienced people with the commitment and**

20            **expertise necessary to redirect our safety culture** and navigate
            one of the most complex corporate reorganizations ever."

21       456.   Thus, shortly after Williams's departure, PG&E admitted that she lacked the

22 commitment and expertise necessary for safety.  In the same letter, PG&E argued its Chapter 11

23 bankruptcy would ultimately provide "a reorganized enterprise with refreshed management and

24 Board members who are committed to safety and reliability in all aspects of our business."

25

26

27       [147] J.D. Morris, *PG&E CEO Geisha Williams Out Amid Utility's Widening Financial Crisis,*
San Francisco Chronicle (Jan, 13, 2019), https://www.sfchronicle.com/business/article/PG-E-

28 CEO-Geisha-Williams-out-amid-utility-s-13530807.php.

PGE-BK-0000001436

457.     In addition to Williams's departure, three senior executives in PG&E's electric division also left the Company after the 2017 or 2018 fires.  Earley left his position as Executive Chairman of the Company in December 2017, Stavropoulos left his position as COO in September 2018, and Hogan left his position as Senior Vice President of Electric Operations in January 2019.  As a consequence, it may be inferred that the Company had widespread dissatisfaction with its officers' and directors' commitment and expertise necessary for safety beyond just Williams.

458.     Indeed, on February 11, 2019, PG&E issued a press release stating that it would be replacing the majority of its Boards.  As of today, only two Board members out of 13 have not been replaced.  In a further expression of lack of support for the Company's previous leadership, the release acknowledged "that **PG&E must re-earn trust and credibility** with its customers, regulators, the communities it serves and all of its stakeholders . . . ."

## XI.   APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET FOR THE EXCHANGE ACT CLAIMS

459.     For the Exchange Act claims, Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's securities traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)     Lead Plaintiff and other members of the Class purchased PG&E securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

460.     At all relevant times, the market for PG&E securities was efficient for the following reasons, among others:

PGE-BK-0000001437

1       (a)    PG&E stock met the requirements for listing, and was listed and actively

2 traded on the NYSE, a highly efficient and automated market;

3       (b)    As a regulated issuer, PG&E filed periodic public reports with the SEC

4 and the NYSE;

5       (c)    PG&E regularly communicated with public investors via established

6 market communication mechanisms, including through the regular dissemination of press

7 releases on the major newswire services and through other wide-ranging public disclosures, such

8 as communications with the financial press, securities analysts and other similar reporting

9 services; and

10       (d)    PG&E was followed by numerous securities analysts employed by major

11 brokerage firms who wrote reports that were distributed to the sales forces and certain customers

12 of their respective brokerage firms. Each of those reports was publically available and entered

13 the public marketplace.

14     461.    As a result of the foregoing, the market for PG&E securities promptly digested

15 current information regarding PG&E from publicly available sources and reflected such

16 information in PG&E's stock price. Under these circumstances, all purchasers of PG&E

17 securities during the Class Period suffered similar injury because of their purchases of securities

18 at artificially inflated prices and a presumption of reliance applies.

19     462.    Lead Plaintiff is also entitled to a presumption of reliance under the Supreme

20 Court's decision in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), and its progeny,

21 as Defendants' misstatements throughout the Class Period included omissions, in that they failed

22 to inform investors of PG&E's safety and regulatory failures.

23 **XII.    CLASS ACTION ALLEGATIONS FOR THE EXCHANGE ACT CLAIMS**

24     463.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

25 Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

26 otherwise acquired PG&E securities traded on the NYSE during the Class Period (the "Class")

27 and were damaged thereby. Excluded from the Class are the excluded persons defined in ¶11,

28 *supra*.

Case: 19-30088   Doc# 5375-4   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 10
of 51
PGE-BK-0000001438

464.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, PG&E securities were actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by PG&E or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

465.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

466.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

467.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and safety of PG&E;
- whether Defendants caused PG&E to issue false and misleading financial statements during the Class Period;
- whether Defendants acted with actual knowledge of falsity or recklessly in issuing false and misleading financial statements;
- whether the prices of PG&E securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein;

Case: 19-30088   Doc# 5375-4   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 11 of 51

PGE-BK-0000001439

- whether some or all of Defendants' false and misleading misstatements or omissions served to maintain PG&E's inflated securities prices; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

468. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

469. Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine, as discussed above in ¶¶459-462.

470. Based upon the foregoing, Lead Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## XIII.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### FIRST CLAIM

**For Violation of Section 10(b) of The Exchange Act and Rule 10b-5
Against PG&E and the Exchange Act Individual Defendants**

471. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

472. This Count is asserted against PG&E and the Exchange Act Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

473. During the Class Period, PG&E and the Exchange Act Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

474. PG&E and the Exchange Act Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of PG&E securities during the Class Period.

475. PG&E and the Exchange Act Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of PG&E were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of PG&E, their control over, and/or receipt and/or modification of PG&E's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning PG&E, participated in the fraudulent scheme alleged herein.

476. Exchange Act Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other PG&E personnel to members of the investing public, including Lead Plaintiff and the Class.

477. As a result of the foregoing, the market price of PG&E securities was artificially inflated during the Class Period. In ignorance of the falsity of PG&E's and the Exchange Act Individual Defendants' statements, Lead Plaintiff and the other members of the Class relied on

Case: 19-30088   Doc# 5375-4   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 13 of 51
PGE-BK-0000001441

the statements described above and/or the integrity of the market price of PG&E securities during the Class Period in purchasing PG&E securities at prices that were artificially inflated as a result of PG&E's and the Exchange Act Individual Defendants' false and misleading statements.

478.    Had Lead Plaintiff and the other members of the Class been aware that the market price of PG&E securities had been artificially and falsely inflated by PG&E's and the Exchange Act Individual Defendants' misleading statements and by the material adverse information which PG&E's and the Exchange Act Individual Defendants did not disclose, they would not have purchased PG&E's securities at the artificially inflated prices that they did, or at all.

479.    As a result of the wrongful conduct alleged herein, Lead Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

480.    By reason of the foregoing, PG&E and the Exchange Act Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of PG&E securities during the Class Period.

## SECOND CLAIM

### For Violation of Section 20(a) of
### The Exchange Act Against PG&E Corporation

481.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

482.    This Count is asserted pursuant to Section 20(a) of the Exchange Act against Defendant PG&E Corporation.

483.    During the Class Period, PG&E Corporation participated in the operation and management of the Utility. PG&E Corporation conducted and participated, directly and indirectly, in the conduct of the Utility's business affairs. For the years of 2015-2017, **100%** of PG&E Corporation's directors also sat on the board of the Utility, and **over 90%** of the Utility's

PGE-BK-0000001442

directors also sat on the board of PG&E Corporation.[148]  Further, both companies filed joint annual reports on Form 10-K with the SEC throughout the Class Period, the entirety of which filings were certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by officers of **both** Companies. Further, because of its 100% ownership and authority, PG&E Corporation knew the adverse non-public information regarding the Company's financial condition and noncompliance with relevant laws and regulations.

484.    Through its position as sole owner of the Utility and placement of its own Independent Directors on the Utility's Board of Directors, PG&E Corporation had a duty to disseminate accurate and truthful information with respect to the Utility's financial condition and results of operations, and to correct promptly any public statements issued by the Utility which had become materially false or misleading.

485.    Because of its position as sole owner of the Utility and placement of its own Independent Directors on the Utility's Board of Directors, PG&E Corporation was able to, and did, control the contents of the various reports, press releases and public filings which the Utility disseminated in the marketplace during the Class Period. Throughout the Class Period, PG&E Corporation exercised its power and authority to cause the Utility to engage in the wrongful acts complained of herein. PG&E Corporation, therefore, was a "controlling person" of the Utility within the meaning of Section 20(a) of the Exchange Act. In this capacity, it participated in the unlawful conduct alleged which artificially inflated the market price of PG&E securities.

---

[148] 2015: Lewis Chew, Earley, Fred J. Fowler, Maryellen C. Herringer, Richard C. Kelly, Roger H. Kimmel, Richard A. Meserve, Forrest E. Miller, Rosendo G. Parra, Barbara L. Rambo, Anne Shen Smith, and Barry Lawson Williams were directors of both PG&E Corporation and the Utility, whereas Johns was a director of the Utility only.

2016: Lewis Chew, Earley, Fred J. Fowler, Maryellen C. Herringer, Richard C. Kelly, Roger H. Kimmel, Richard A. Meserve, Forrest E. Miller, Rosendo G. Parra, Barbara L. Rambo, Anne Shen Smith, and Barry Lawson Williams were directors of both PG&E Corporation and the Utility, whereas Stavropoulos and Williams were directors of the Utility only.

2017: Lewis Chew, Earley, Fred J. Fowler, Maryellen C. Herringer, Jeh C. Johnson, Richard C. Kelly, Roger H. Kimmel, Richard A. Meserve, Forrest E. Miller, Eric D. Mullins, Rosendo G. Parra, Barbara L. Rambo, Anne Shen Smith, Barry Lawson Williams, and Williams were directors of both PG&E Corporation and the Utility, whereas Stavropoulos was director of the Utility only.

Case: 19-30088   Doc# 5375-4   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 15
of 51
PGE-BK-0000001443

486.     By reason of the above conduct, PG&E Corporation is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Utility.

## THIRD CLAIM

### For Violation of Section 20(a) of The Exchange Act
### Against The Exchange Act Individual Defendants

487.     Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

488.     During the Class Period, the Exchange Act Individual Defendants participated in the operation and management of PG&E.  The Exchange Act Individual Defendants conducted and participated, directly and indirectly, in the conduct of PG&E's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's financial condition and noncompliance with relevant laws and regulations.

489.     As officers and/or directors of a publicly owned company, the Exchange Act Individual Defendants had a duty to disseminate accurate and truthful information with respect to PG&E's financial condition and results of operations, and to correct promptly any public statements issued by PG&E which had become materially false or misleading.

490.     Because of their positions of control and authority as senior officers, the Exchange Act Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which PG&E disseminated in the marketplace during the Class Period. Throughout the Class Period, the Exchange Act Individual Defendants exercised their power and authority to cause PG&E to engage in the wrongful acts complained of herein. The Exchange Act Individual Defendants therefore, were "controlling persons" of PG&E within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of PG&E securities.

491.     By reason of the above conduct, the Exchange Act Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by PG&E.

Case: 19-30088   Doc# 5375-4   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 16 of 51
PGE-BK-0000001444

**FOURTH CLAIM**

**Alter Ego Liability for Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5 Against PG&E Corporation**

492.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

493.    PG&E Corporation is jointly and severally liable for the misstatements and omissions of the Utility, insofar as:

(a)    PG&E Corporation and the Utility operate as a single business enterprise operating out of the same building located at 77 Beale Street, San Francisco, California, for the purpose of effectuating and carrying out PG&E Corporation's business and operations and/or for the benefit of PG&E Corporation;

(b)    PG&E Corporation and the Utility do not operate as completely separate entities, but rather integrate their resources to achieve a common business purpose;

(c)    the Utility is so organized and controlled, and its decisions, affairs, and business are so conducted as to make it a mere instrumentality, agent, conduit, or adjunct of PG&E Corporation;

(d)    PG&E Corporation's and the Utility's officers and management are intertwined and do not act completely independently of one another;

(e)    PG&E Corporation has control and authority to choose and appoint the Utility's board members as well as its other top officers and managers;

(f)    PG&E Corporation and the Utility are insured by the same carriers and provide uniform or similar pension, health, life, and disability insurance plans for employees;

(g)    PG&E Corporation and the Utility have unified 401(k) Plans, pension and investment plans, bonus programs, vacation policies, and paid time off from work schedules and policies;

(h)    PG&E Corporation and the Utility have unified personnel policies and practices and/or a consolidated personnel organization or structure;

PGE-BK-0000001445

1          (i)      PG&E Corporation and the Utility are represented by common legal

2   counsel;

3          (j)      PG&E Corporation and the Utility acknowledged in their joint 10-K

4   statement for the year 2015 that eight separate officers were "executive officers of both PG&E

5   Corporation and the Utility;"

6          (k)      PG&E Corporation and the Utility acknowledged in their joint 10-K

7   statement for the year 2016 that nine separate officers were "executive officers of both PG&E

8   Corporation and the Utility;"

9          (l)      PG&E Corporation's officers, directors, and other management make

10  policies and decisions to be effectuated by the Utility and/or otherwise play roles in providing

11  directions and making decisions for the Utility;

12         (m)     PG&E Corporation's officers, directors, and other management direct

13  certain financial decisions for the Utility including the amount and nature of capital outlays;

14         (n)      PG&E Corporation's written guidelines, policies, and procedures control

15  the Utility's employees, policies, and practices;

16         (o)      PG&E Corporation files consolidated earnings statements factoring in all

17  revenue and losses from the Utility, as well as consolidated tax returns, including those seeking

18  tax relief; and

19         (p)      PG&E Corporation generally directs and controls the Utility's relationship

20  with, requests to, and responses to inquiries from, the CPUC and uses such direction and control

21  for the benefit of PG&E Corporation.

22         494.    For purposes of this litigation, it would be inequitable to treat the misstatements

23  and actions of the Utility as those of the Utility only, and not also of PG&E Corporation.

24         495.    By reason of the above allegations, any misstatements made by the Utility –

25  including, but not limited to, Misstatement Nos. 1 and 3 – were made by an "alter ego" of PG&E

26  Corporation, and PG&E Corporation is therefore equally liable for violations of Section 10(b) of

27  the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other

28

1    members of the Class for substantial damages which they suffered in connection with their

2    purchase of PG&E securities during the Class Period.

3    **XIV.   NATURE OF THE SECURITIES ACT CLAIMS**

4    496.    Securities Act Plaintiffs (defined below) bring claims for violations of the

5    Securities Act, individually and on behalf of all persons or entities that acquired PG&E senior

6    notes in or traceable to the Company's Notes Offerings, as detailed herein, against certain of the

7    Company's officers and directors, and the underwriters of the Notes Offerings.[149]  Since

8    March 2016, PG&E has issued over $4 billion worth of senior notes registered with the SEC.

9    According to a PG&E filing in the United States District Court for the Northern District of

10   California, "PG&E consistently spends more cash than it generates through its operations and

11   cannot fund all its infrastructure investments without external financing from the debt and equity

12   markets."[150]

13   497.    The Securities Act claims set forth herein are based on strict liability and

14   negligence and are not based on any allegation that any defendant engaged in fraud or intentional

15   misconduct.  The Securities Act Plaintiffs specifically disclaim any reference to or reliance on

16   allegations of fraud.

17   **XV.   OVERVIEW OF THE SECURITIES ACT VIOLATIONS**

18   498.    PG&E's failure to follow safety requirements and prudent practices, including

19   regulations and laws, resulted in numerous devastating wildfires in 2015, 2017 and 2018, causing

20   catastrophic loss of life and destruction of property.

21

22

---

[149]   "Notes Offerings" refers to the Company's March 2016 public offering of senior notes (the "March 2016 Notes Offering"), the Company's December 2016 public offering of senior notes (the "December 2016 Offering"), the Company's March 2017 public offering of senior notes (the "March 2017 Notes Offering"), and the Company's April 2018 public offering of senior notes (the "April 2018 Notes Offering").  The "Offering Documents" refers to the Registration Statement and Prospectus (to include all amendments and supplements thereto for each offering, together with all documents incorporated by reference in each Registration Statement and Prospectus).  *See* ¶ 630(a)-(d).

[150]  Response to Second Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified at 11, PG&E Criminal Proceedings, (N.D. Cal. Mar. 22, 2019), ECF No. 1032.

Case: 19-30088   Doc# 5375-4   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 19 of 51

PGE-BK-0000001447

499.    In all, the Company has been implicated in causing *more than 1,500 fires* between June 2014 and November 2018,[151] including some of the most widespread and destructive wildfires in California history.  PG&E failed to implement required safety precautions even as the risk of wildfires increased.  The Company has filed Chapter 11 bankruptcy, as it faces a host of regulatory investigations, criminal probes, and civil lawsuits. PG&E estimates it could be liable for more than $30 billion in costs, expenses and other losses from the North Bay and Camp Fires excluding any penalties, fines, or punitive damages.

500.    In addition to liability for causing destructive wildfires, PG&E recently announced in the Company's May 2, 2019 Form 10-Q that the SEC is "conducting an investigation related to PG&E Corporation's and the Utility's public disclosures and accounting for losses associated with the 2017 and 2018 Northern California wildfires and the 2015 Butte Fire."

501.    At the same time that PG&E's equipment and operations were posing an unreasonable risk to the lives and property of California residents – indeed, even as the Company's equipment was in the midst of setting hundreds of wildfires – PG&E raised billions of dollars from investors through the sale of senior notes.  From March 2016 to May 2018, PG&E offered and sold approximately $4.35 billion worth of senior notes that it registered with the SEC to ensure that the notes could be widely sold and distributed to the investing public.

502.    Specifically, PG&E offered and sold: (i) $600 million worth of 2.95% PG&E senior notes due March 1, 2026 pursuant to the March 2016 Notes Offering; (ii) $250 million worth of floating rate PG&E senior notes due November 30, 2017 and $400 million worth of 4.00% PG&E senior notes due December 1, 2046 pursuant to the December 2016 Notes Offering; (iii) $400 million worth of 3.30% PG&E senior notes due March 15, 2027 and $200 million worth of 4.00% PG&E senior notes due December 1, 2046 pursuant to the March 2017 Notes Offering; and (iv) up to $500 million worth of floating rate PG&E senior notes due

---

[151] *The Wall Street Journal* reported on January 13, 2019 that PG&E started more than 1,500 fires between June 2014 and December 2017.  In November 2018, PG&E also caused the Camp Fire.  *See* Fn 168, *infra*.

1     November 28, 2018, $1.15 billion worth of 3.30% PG&E senior notes due December 1, 2027,

2     and $850 million worth of 3.95% PG&E senior notes due December 1, 2047 pursuant to the

3     April 2018 Notes Offering.

4           503.     PG&E's Offering Documents to the Notes Offerings materially misled investors

5     as to *inter alia*: (i) the safety of the Company's equipment by highlighting its commitment to

6     safety and touting upgrades and investments; (ii) the real risk of wildfires by emphasizing the

7     important role of the Company's vegetation management activities; (iii) the risks associated with

8     and impact of wildfires on PG&E; (iv) the sufficiency of the Company's investments in safety to

9     prevent wildfires; (v) the Company's liability with respect to wildfires; and (vi) the known

10     adverse trends impacting PG&E.

11           504.     PG&E's conduct has subsequently been revealed to contradict the representations

12     made to investors in the Offering Documents, and now poses an existential threat to the

13     Company. Subsequent to, and due to, Defendants' omission of the true state of PG&E's business

14     and operations and the risks posed by the Company's lax wildfire safety practices and inadequate

15     investment in safety, the value of the senior notes associated with the Notes Offerings has

16     substantially declined.

17           505.     For example, subsequent to the Notes Offerings, on November 13, 2018, the price

18     of the 2.95% note sold in the March 2016 Notes Offering closed at $86.46 per unit, or ***more than***

19     ***13% below par***; the price of the 4.00% note sold in the December 2016 Notes Offering closed at

20     $72.26 per unit, or ***more than 27% below par***; the price of the 3.3% note sold in the March 2017

21     Notes Offering closed at $82.82 per unit, or ***more than 17% below par***; the price of the 3.3%

22     note sold in the April 2018 Notes Offering closed at $81.38 per unit, or ***more than 18% below***

23     ***par***; and the price of the 3.95% note sold in the April 2018 Notes Offering closed at $72.23 per

24     unit, or ***more than 27% below par***.

25     **XVI.**     **THE SECURITIES ACT PARTIES**

26         **A.**     **Securities Act Named Plaintiffs**

27           506.     Plaintiff York County on behalf of the County of York Retirement Fund acquired

28     PG&E senior notes issued in the March 2016 Notes Offering and the April 2018 Notes Offering

PGE-BK-0000001449

1    as described in the Certification attached hereto (as "Attachment B") and incorporated by

2    reference, and has been damaged thereby.

3        507.    Plaintiff City of Warren Police and Fire Retirement System acquired PG&E

4    senior notes issued in the April 2018 Notes Offering as described in the Certification attached

5    hereto (as "Attachment C") and incorporated by reference, and has been damaged thereby.

6        508.    Plaintiff Mid-Jersey Trucking Industry & Local No. 701 Pension Fund acquired

7    PG&E senior notes issued in the December 2016 Notes Offering and the March 2017 Notes

8    Offering as described in the Certification attached hereto (as "Attachment D") and incorporated

9    by reference, and has been damaged thereby.

10       **B.     Bankrupt Entities**

11       509.    Pacific Gas and Electric Company is a California public utility operating in

12   northern and central California, with headquarters in San Francisco. The Utility is the registrant

13   and issuer of the PG&E senior notes issued in the Notes Offerings. The Utility has declared

14   bankruptcy and is therefore not named as a defendant in this action due to the automatic stay of

15   proceedings under the federal bankruptcy laws. But for the automatic stay of proceedings, the

16   Utility would be named as a defendant for all counts asserted herein.

17       510.    PG&E Corporation is a holding company whose primary operating subsidiary is

18   Pacific Gas and Electric Company. PG&E Corporation is headquartered in the same San

19   Francisco building as the Utility, and it shared an overlapping board of directors with the Utility.

20   As the parent and owner of the Utility, PG&E Corporation also issued and sold the PG&E senior

21   notes issued in the Notes Offerings. Like the Utility, PG&E Corporation has declared bankruptcy

22   and is therefore not named as a defendant in this action due to the automatic stay of proceedings

23   under the federal bankruptcy laws. But for the automatic stay of proceedings, PG&E Corporation

24   would be named as a defendant for all counts asserted herein.

25       **C.     Securities Act Individual Defendants**

26       511.    The following current or former directors and/or officers are named as Defendants

27   for the Securities Act claims.

28

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                           154
CIVIL ACTION NO. 3:18-CV-03509-EJD

512.     Defendant Anthony F. Earley, Jr. ("Earley") served as PG&E Corporation's President, Chief Executive Officer ("CEO"), and Chairman of the Board from September 13, 2011 to March 1, 2017, and as its Executive Chairman from March 1, 2017 to December 2017. Earley was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering and the March 2017 Notes Offering.  Earley signed the registration statement for the March 2016 Notes Offering and the December 2016 Notes Offering and the registration statement for the March 2017 Notes Offering.

513.     Defendant Geisha J. Williams ("Williams") served as PG&E Corporation's CEO and President from March 1, 2017 until her resignation on January 13, 2019.  Previously, she served as the President of Electric Operations at the Utility from August 17, 2015 to February 28, 2017. Prior to that, she served as Executive Vice President of Electric Operations at the Utility from June 1, 2011 to August 16, 2015. Williams was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes Offering.  Williams signed the registration statement for the March 2017 Notes Offering and the registration statement for the April 2018 Notes Offering.

514.     Defendant Nickolas Stavropoulos ("Stavropoulos") served as the President and COO of PG&E Corporation from March 1, 2017 to September 30, 2018, and served as President of Gas Operations at the Utility from August 17, 2015 to February 28, 2017. Prior to that, he served as Executive Vice President of Gas Operations at the Utility from June 13, 2011 to August 16, 2015.  Stavropolous was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes Offering.  Stavropolous signed the registration statement for the March 2017 Notes Offering and the registration statement for the April 2018 Notes Offering.

515.     Defendant Barbara L. Rambo ("Rambo") was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes Offering.  Rambo signed the registration statement for the March 2016 Notes Offering, the registration statement for the December 2016 Notes Offering, the registration statement for the March 2017 Notes Offering, and the registration statement for

Case: 19-30088   Doc# 5375-4   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 23 of 51

PGE-BK-0000001451

the April 2018 Notes Offering.  Rambo was appointed a director of PG&E in 2005. On April 3, 2019, PG&E announced that Rambo would be replaced at the next Board meeting.  As of May 2, 2019, Rambo was no longer a director.

516.    Defendant David S. Thomason ("Thomason") was the Vice President, Chief Financial Officer ("CFO") and Controller of the Utility at the time of the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes Offering.  Thomason signed the registration statement for the March 2017 Notes Offering and the registration statement for the April 2018 Notes Offering. Thomason has worked in various roles at PG&E since 2001, and as CFO, VP and controller since June 2016.

517.    Defendant Dinyar B. Mistry ("Mistry") was the Vice President, CFO and Controller of the Utility at the time of the March 2016 Notes Offering, and PG&E's Senior Vice President of Human Resources during the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes Offering.  Mistry signed the registration statement for the March 2016 Notes Offering and the December 2016 Notes Offering.  According to PG&E, Mistry joined Pacific Gas and Electric Company in 1994 and has held various positions since then, including Vice President and Controller of Pacific Gas and Electric Company; as Vice President, Regulation and Rates; as Vice President, Internal Audit and Compliance; and most recently as Vice President and Chief Risk and Audit Officer.

518.    Defendant Lewis Chew ("Chew") was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes Offering.  Chew signed the registration statement for the March 2016 Notes Offering, the registration statement for the December 2016 Notes Offering, the registration statement for the March 2017 Notes Offering and the registration statement for the April 2018 Notes Offering.  Chew was appointed a director of PG&E in 2009. On April 3, 2019, PG&E announced that Chew would be replaced at the next Board meeting.  As of May 2, 2019, Chew was no longer a director.

519.    Defendant Fred J. Fowler ("Fowler") was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes

Case: 19-30088   Doc# 5375-4   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 24
of 51

PGE-BK-0000001452

Offering and the April 2018 Notes Offering.  Fowler signed the registration statement for the March 2016 Notes Offering, the registration statement for the December 2016 Notes Offering, the registration statement for the March 2017 Notes Offering, and the registration statement for the April 2018 Notes Offering. Fowler has been a PG&E director since 2012.

520.    Defendant Maryellen C. Herringer ("Herringer") was a director of the Utility at the time of the March 2016 Notes Offering and the December 2016 Notes Offering.  Herringer signed the registration statement for the March 2016 Notes Offering, the registration statement for the December 2016 Notes Offering and the registration statement for the March 2017 Notes Offering.  Herringer was appointed a director of PG&E in 2009. On April 3, 2019, PG&E announced that Herringer would be replaced at the next Board meeting.  As of May 2, 2019, Herringer was no longer a director.

521.    Defendant Richard C. Kelly ("Kelly") was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes Offering.  He was also Chairman of the Board of PG&E Corporation beginning in December 2017.  Kelly signed the registration statement for the March 2016 Notes Offering, the registration statement for the December 2016 Notes Offering, the registration statement for the March 2017 Notes Offering, and the registration statement for the April 2018 Notes Offering.  Kelly has been a PG&E director from 2013 until his resignation from the Board as announced by PG&E on April 22, 2019.

522.    Defendant Roger H. Kimmel ("Kimmel") was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes Offering.  Kimmel signed the registration statement for the March 2016 Notes Offering, the registration statement for the December 2016 Notes Offering, the registration statement for the March 2017 Notes Offering, and the registration statement for the April 2018 Notes Offering.  Kimmel was appointed a director of PG&E in 2009. On April 3, 2019, PG&E announced that Kimmel would be replaced at the next Board meeting.  As of May 2, 2019, Kimmel was no longer a director.

PGE-BK-0000001453

523.     Defendant Richard A. Meserve ("Meserve") was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes Offering.  Meserve signed the registration statement for the March 2016 Notes Offering, the registration statement for the December 2016 Notes Offering, the registration statement for the March 2017 Notes Offering, and the registration statement for the April 2018 Notes Offering.  Meserve was appointed a director of PG&E in 2006. On April 3, 2019, PG&E announced that Meserve would be replaced at the next Board meeting.  As of May 2, 2019, Meserve was no longer a director.

524.     Defendant Forrest E. Miller ("Miller") was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes Offering, and Chairman of the Utility's Board since May 2017.  Miller signed the registration statement for the March 2016 Notes Offering, the registration statement for the December 2016 Notes Offering, the registration statement for the March 2017 Notes Offering, and the registration statement for the April 2018 Notes Offering.  Miller was appointed a director of PG&E in 2009. On April 3, 2019, PG&E announced that Miller would be replaced at the next Board meeting.  As of May 2, 2019, Miller was no longer a director.

525.     Defendant Barry Lawson Williams ("B. Williams") was a director of the Utility at the time of the March 2016 Notes Offering and the December 2016 Notes Offering, during which time he served as Chairman of the Utility's Board of Directors.  B. Williams signed the registration statement for the March 2016 Notes Offering, the registration statement for the December 2016 Notes Offering and the registration statement for the March 2017 Notes Offering.   B. Williams was appointed a director of PG&E in 1996. On April 3, 2019, PG&E announced that B. Williams would be replaced at the next Board meeting.  As of May 2, 2019, B. Williams was no longer a director.

526.     Defendant Rosendo G. Parra ("Parra") was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes Offering.  Parra signed the registration statement for the

Case: 19-30088   Doc# 5375-4   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 26 of 51

PGE-BK-0000001454

1  March 2017 Notes Offering and the registration statement for the April 2018 Notes Offering.

2  Parra was appointed a director of PG&E in 2009. On April 3, 2019, PG&E announced that Parra

3  would be replaced at the next Board meeting.  As of May 2, 2019, Parra was no longer a director.

4          527.    Defendant Anne Shen Smith ("Smith") was a director of the Utility at the time of

5  the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes

6  Offering and the April 2018 Notes Offering.  Smith signed the registration statement for the

7  March 2017 Notes Offering and the registration statement for the April 2018 Notes Offering.

8  Smith was appointed a director of PG&E in 2015. On April 3, 2019, PG&E announced that

9  Smith would be replaced at the next Board meeting.  As of May 2, 2019, Smith was no longer a

10  director.

11          528.    Defendant Eric D. Mullins ("Mullins") was a director of the Utility at the time of

12  the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes

13  Offering. Mullins signed the registration statement for the March 2017 Notes Offering and the

14  registration statement for the April 2018 Notes Offering.  Mullins has been a PG&E director

15  since 2016.

16          529.    The defendants identified in ¶¶512-28 are referred to herein as the "Securities Act

17  Individual Defendants."  The Individual Securities Act Defendants signed the registration

18  statements for one or more of the Notes Offerings as detailed herein, and, as directors and/or

19  executive officers of the Company, participated in the solicitation and sale of PG&E senior notes

20  to investors in the Notes Offerings for their own benefit and the benefit of PG&E.

21      **D.      Underwriter Defendants**

22          530.    In addition to the above, the following underwriters are named as defendants for

23  the Securities Act claims for the Notes Offerings for which they served as underwriters.

24          531.    Defendant Barclays Capital Inc. served as a lead underwriter for the March 2016

25  Notes Offering.

26          532.    Defendant BNP Paribas Securities Corp. served as a lead underwriter for the

27  March 2016 Notes Offering and the March 2017 Notes Offering.

28

Case: 19-30088   Doc# 5375-4   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 27
of 51
PGE-BK-0000001455

533.    Defendant Morgan Stanley & Co. LLC served as a lead underwriter for the March 2016 Notes Offering.

534.    Defendant MUFG Securities Americas, Inc. f/k/a Mitsubishi UFJ Securities (USA), Inc. served as a lead underwriter for the March 2016 Notes Offering.

535.    Defendant The Williams Capital Group, L.P. served as a lead underwriter for the March 2016 Notes Offering.

536.    Defendant Citigroup Global Markets Inc. served as a lead underwriter for the December 2016 Notes Offering.

537.    Defendant J.P. Morgan Securities LLC served as a lead underwriter for the December 2016 Notes Offering.

538.    Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated served as a lead underwriter for the December 2016 Notes Offering.

539.    Defendant Mizuho Securities USA LLC served as a lead underwriter for the December 2016 Notes Offering.

540.    Defendant Goldman, Sachs & Co., LLC served as a lead underwriter for the March 2017 Notes Offering.

541.    Defendant RBC Capital Markets, LLC served as a lead underwriter for the March 2017 Notes Offering.

542.    Defendant Wells Fargo Securities, LLC served as a lead underwriter for the March 2017 Notes Offering.

543.    Defendant BNY Mellon Capital Markets, LLC served as an underwriter for the March 2016 Notes Offering and the March 2017 Notes Offering.

544.    Defendant TD Securities (USA) LLC served as an underwriter for the March 2016 Notes Offering and the March 2017 Notes Offering.

545.    Defendant C.L. King & Associates, Inc. served as an underwriter for the March 2016 Notes Offering.

546.    Defendant Great Pacific Securities served as an underwriter for the March 2016 Notes Offering.

Case: 19-30088   Doc# 5375-4   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 28 of 51
PGE-BK-0000001456

547.    Defendant CIBC World Markets Corp. served as an underwriter for the December 2016 Notes Offering.

548.    Defendant SMBC Nikko Securities America, Inc. served as an underwriter for the December 2016 Notes Offering.

549.    Defendant U.S. Bancorp Investments, Inc. served as an underwriter for the December 2016 Notes Offering.

550.    Defendant Lebenthal & Co., LLC served as an underwriter for the December 2016 Notes Offering.

551.    Defendant Mischler Financial Group, Inc. served as an underwriter for the December 2016 Notes Offering.

552.    Defendant Blaylock Van, LLC served as an underwriter for the March 2017 Notes Offering.

553.    Defendant Samuel A. Ramirez & Company, Inc. served as an underwriter for the December 2016 Notes Offering.

554.    Defendant MFR Securities, Inc. served as an underwriter for the March 2017 Notes Offering.

555.    The defendants identified in ¶¶531-554 are referred to herein as the "Underwriter Defendants." The Underwriter Defendants served as underwriters for the Notes Offerings and sold billions of dollars' worth of PG&E senior notes in the Note Offerings, for which they collectively received tens of millions of dollars in fees and commissions. The Underwriter Defendants drafted and disseminated the offering documents used to effectuate each of the Note Offerings for which they served as underwriters. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein with respect to the Securities Act claims. The Underwriter Defendants are not alleged to be defendants for the April 2018 Notes Offering at this time.

556.    The Individual Securities Act Defendants, together with the Underwriter Defendants, are collectively referred to as the "Securities Act Defendants" and are named as defendants with respect to the Securities Act Claims alleged herein.

PGE-BK-0000001457

## XVII.  SUBSTANTIVE ALLEGATIONS SUPPORTING THE SECURITIES ACT CLAIMS

### A.   PG&E's Systemic Failure to Take Measures to Mitigate Wildfires and Safety Violations

557.   PG&E engaged in a pattern and practice of ignoring laws and California safety regulations and failed to take appropriate measures to mitigate wildfire hazards.  Results of government investigations, media coverage, analyst coverage, SEC filings, court filings, admissions before and findings of the Honorable William Alsup of the United States District Court for the Northern District of California, and other public information regarding PG&E and the Securities Act Defendants, all demonstrate that each of the Offering Documents for the Notes Offerings contained materially false and/or misleading statements.

### 1.   Overview of Laws and Regulations Governing PG&E's Operations

558.   PG&E's ability to maintain safe electrical equipment that complies with state regulations and minimizes the risk of causing wildfires is critical to the Company's business and prospects.  California law includes a doctrine of inverse condemnation as explained in detail in §VI.A.5.  Inverse condemnation imposes strict liability for damages and takings as a result of the design, construction and maintenance of utility facilities, including its electric transmission and distribution lines.  If a utility such as PG&E affirmatively proves "that it reasonably and prudently operated and managed its system" it can recover payments made to property owners for damages caused by a wildfire from the CPUC.  In other words proof "that at a particular time any of the practices, methods, and acts engaged in by a utility follows the exercise of reasonable judgment in light of facts known or which should have been known at the time the decision was made."  This would include proof that it complied with the following laws and CPUC regulations.

559.   **California Law**.  As explained in detail in §V.A.1-2, PG&E was required by California law, including California Public Utilities Code §702 and §2106, to adequately maintain its equipment and infrastructure, including electrical towers and poles, to prevent fires from being caused by its equipment or infrastructure, and was liable to property owners for damage caused for failure to do so.  For example, California law required PG&E to: (i) maintain

Case: 19-30088   Doc# 5375-4   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 30 of 51

PGE-BK-0000001458

1   equipment that promotes the safety and health of the public pursuant to California Public

2   Utilities Code §451; and (ii) regularly service and maintain its equipment, including by clearing

3   vegetation away from its power lines pursuant to California law, including California Public

4   Resources Codes §4292 and §4293.  And PG&E was liable to the owners of property for any

5   damages to the property caused by fire for negligently or in violation of law setting a fire or

6   allowing a fire to be set pursuant to California Health & Safety Code §13007.

7         560.   **CPUC Regulations**.  PG&E was also required by law to adhere to CPUC

8   regulations as explained in detail in §VI.A.3.  These regulations include the requirements under

9   General Order 95 that PG&E: (i) "establish necessary and reasonable clearances" between

10   overhead conductors and nearby vegetation, with certain "minimum clearances"; and (ii) ensure

11   that that "[a]ll lines and portions of lines shall be maintained in such condition as to provide

12   safety factors not less than those specified in Rule 44.3," which in turn prohibits the use of poles,

13   towers and structures "with a safety factor less than one."  The regulations also include the

14   requirement under General Order 165 that PG&E "shall conduct inspections of its distribution

15   facilities, as necessary, to ensure reliable, high-quality, and safe operation."  As explained in

16   detail in §VI.A.3(b), as of July 2018, another California safety regulation, CPUC Resolution

17   ESRB-8, also required PG&E to temporarily shut off its power lines when certain dangerous

18   conditions are present that make an area susceptible to wildfires, including high wind speed and

19   low humidity.  On September 27, 2018 PG&E indicated that it had implemented measures in

20   response to ESRB-8.

21         561.   PG&E violated California laws and CPUC regulations with respect to maintaining

22   the Company's equipment, engaging in adequate vegetation management practices and shutting

23   down power when weather conditions warrant such a safety precaution to prevent wildfires.

24         562.   **Federal Regulations**.  PG&E is also required by law to adhere to a number of

25   federal laws and regulations as explained in detail in §VI.A.6.  FERC Electric Reliability

26   Standard FAC-003-4, for example, "requires that trees and other vegetation growing in or

27

28

PGE-BK-0000001459

adjacent to the power line right-of-way be trimmed to prevent power outages caused by tree contact with a transmission line."[152] PG&E failed to comply with this requirement.

### 2. PG&E's Lax Safety Practices, Safety Violations and Resulting Wildfires

563.    On September 9, 2015, the 2015 Butte Fire was started when a tree came into contact with a power line.  The fire, which killed two people, destroyed more than 500 homes and more than 400 other properties and structures, and scorched more than 70,000 acres over 22 days, is described in more detail *supra*.  ¶¶100-102.

564.    Cal Fire, which is authorized to make fire cause and origin determinations for wildfires as explained in §VI.A.4 above, launched an investigation "as part of the initial response to the Butte Fire" at which time its investigators "immediately began working to determine the origin and cause of the fire."[153]

565.    On March 1, 2016, PG&E issued and delivered the notes offered in the March 2016 Notes Offering.  The notes were offered pursuant to a shelf registration, with the prospectus supplement filed on February 23, 2016 with the SEC and the final prospectus supplement filed February 24, 2016.

566.    On April 28, 2016, Cal Fire issued a press release announcing its conclusion that the 2015 Butte Fire was caused by PG&E's safety violations, including evidence of negligence. Cal Fire has indicated it would seek $90 million for costs of suppressing the 2015 Butte Fire and PG&E called that estimate reasonable in a May 2, 2016 Form 8-K filing.[154]  Cal Fire also referred its investigation to the two relevant district attorneys for the counties in which the 2015

---

[152]   *See* FERC, *Tree Trimming & Vegetation Management* (updated Apr. 10, 2018), https://www.ferc.gov/industries/electric/indus-act/reliability/vegetation-mgt.asp; FERC, *FAC-003-4 Transmission Vegetation Management*, https://www.ferc.gov/industries/electric/indus-act/reliability/vegetation-mgt/fac-003-4.pdf?csrt=10652948532787038938.

[153]   Press Release, Cal Fire, *Cal Fire Investigators Determine Cause of Destructive Butte Fire* (Apr. 28, 2016), calfire.ca.gov/communications/downloads/newsreleases/2016/ButteFireCause.pdf.

[154]   *See also* Press Release, CAL FIRE, *Cal Fire Investigators Determine Cause of Destructive Butte Fire* (Apr. 28, 2016), calfire.ca.gov/communications/downloads/newsreleases/2016/ButteFireCause.pdf.

---

PGE-BK-0000001460

Butte Fire burned.  On June 22, 2017, California Superior Court Judge Allen Sumner found PG&E liable in Inverse Condemnation for damages for the 2015 Butte Fire.[155]

567.    Part of the evidence regarding the 2015 Butte Fire includes an internal PG&E May 8, 2008 slide presentation filed in the *Butte Fire Cases*, No. JCCP 4853 (Cal. Super. Ct. Sacramento Cty. Nov. 2, 2018) titled "2008 Utility Offsite Strategy Discussion."  The slide presentation was for a meeting which PG&E's CEO Williams testified in deposition on July 7, 2017 that she recalled attending.  It includes a slide which asks, "What is up for debate?" and the response includes among less than ten items, "Safety."  It also asks, "What is not up for debate?" and the response includes "8% EPS growth":



---

[155]   *Butte Fire Cases*, No. JCCP 4853, Ruling on Submitted Matter: Inverse Condemnation Motions (Cal. Super. Ct. Sacramento Cty. June 22, 2017).

568.   Similarly, other evidence indicates that PG&E did not provide adequate resources for safety.  According to the October 15, 2018 deposition testimony of Janaize Markland, filed in the PG&E Criminal Proceedings before Judge Alsup, the director of PG&E's Enterprise and Operational Risk and Insurance Department testified regarding prepared testimony dated May 1, 2015.  According to the prepared testimony referred to in the deposition and Ms. Markland's deposition it was possible to improve tree-related outages "but that would require a level of investment greater than what PG&E is making today."[156]  The prepared testimony went on to indicate "[w]ith limited resources, PG&E cannot do everything and must decide at what point it's okay not to mitigate the risk further.  Tradeoff decisions must be made," which Ms. Markland testified was "a true statement."  She further testified that a tradeoff decision "has to do with at what point can you reduce risk further and at what cost."[157]

569.   Evidence submitted in the *Butte Fire Cases* also includes the depositions of contractors who worked for PG&E and who described incentives PG&E provided to not clear as much vegetation as was required for safety purposes so as to save PG&E money.[158]  For example, Robert Urban was deposed on May 16, 2017 as the person most qualified to testify on behalf of a PG&E contractor, ACRT, that worked on PG&E's behalf to, among other services, clear vegetation.  According to Mr. Urban's testimony, PG&E paid its contractors bonuses if they identified and cleared fewer trees as well as other vegetation, incentivizing contractors to clear less vegetation than is safe:

> Q. And under the VMII [bonus] program – correct me if I'm wrong – the way it was set up is if ACRT listed fewer trees than the target number and it ended up fewer trees than the target number were worked, there would be a bonus provided ACRT met certain other metrics; right?
>
> Urban: That is correct.

---

[156] Excerpts of Deposition Transcript of Janaize Markland, PG&E Criminal Proceedings (N.D. Cal. Feb. 6, 2019), ECF No. 1008-1; PG&E Response to Request for Information, PG&E Criminal Proceedings (N.D. Cal. Feb. 22, 2019), ECF No. 1016.

[157] Excerpts of Deposition Transcript of Janaize Markland, PG&E Criminal Proceedings, (N.D. Cal. Feb. 6, 2019), ECF No. 1008-1.

[158] *See generally* Declaration of Kristine K. Meredith , *Butte Fire Cases*, No. JCCP 4853, (Cal. Super. Ct. Sacramento Cty. Dec. 21, 2018).

PGE-BK-0000001462

1    Q. All right. And if ACRT met those certain other metrics, then there would be an amount per tree not worked that would be paid

2    to ACRT; true?

3    Urban: There would be an incentive paid for trees that came – for unit count that came in under target. That is correct.

4

                      *       *       *

5

6    Q. So for every tree underneath – or every tree less than the VMII target, assuming the other metrics had been met, ACRT would receive seven bucks per tree; correct?

7

    Urban: That is correct.  Seven bucks per unit.

8    Q. Okay.  That's right.  Because a unit might be a brush, for example; right?

9

10    Urban: It may.

11                   *       *       *

12    Q. Did you ever harbor that belief yourself that, hey, this bonus system kind of incentivizes my people to not do their job?

13

    Urban: That is a concern.

14

15       570.    Additional evidence regarding PG&E's insufficient safety practices includes PG&E quality assurance audits of the Jackson District where the 2015 Butte Fire occurred.

16

17 Those audits showed a trend from 2012 through 2015 of an extremely high concentration of

18 potentially hazardous non-compliant trees in that District.  For example, PG&E conducted an

19 audit in the summer of 2015 (June 8, 2015 to July 10, 2015) which identified in a sample of

20 48.71 line miles, 15 non-compliant trees, 87% of those trees were in the Jackson District.

21      571.    PG&E employee Kelly O'Flinn, deposed on November 3, 2016 pursuant to the

22 *Butte Fire Cases*, No. JCCP 4853 (Cal. Super. Ct. Sacramento Cty. Jan. 17, 2019), was asked

23 about the same audit and incidence of noncompliant trees in Jackson.  O'Flinn confirmed that the

24 vegetation issues were a negative trend affecting PG&E:

25    Q: There is a paragraph there [in the audit] that says, "Regulatory compliance has declined slightly for the last three consecutive SRA audits and fallen below 99.50 percent for the first time since

26    2009."  . . . Would you consider that to be a trend?

27    O'Flinn: I would say, yes, it's a trend.

28    Q: And that is a trend in the wrong direction, right?

PGE-BK-0000001463

1                               *        *        *

2           O'Flinn: Slight – slight downward trend. [159]

3           572.    On December 1, 2016, PG&E issued and delivered the notes offered in the

4    December 2016 Notes Offering.  The notes were offered pursuant to a shelf registration, with the

5    prospectus supplement filed with the SEC on November 28, 2016, and final prospectus

6    supplement filed November 29, 2016.

7           573.    And on March 10, 2017, PG&E issued and delivered the notes offered in the

8    March 2017 Notes Offering.  The notes were offered pursuant to the Registration Statement filed

9    with the SEC on January 4, 2017 (and as amended on January 19, 2017), and the prospectus

10   supplement and final prospectus supplement filed with the SEC March 7 and March 8, 2017,

11   respectively.

12          574.    Then, in October 2017, a series of devastating fires, which became known as the

13   North Bay Fires, ravaged at least 245,000 acres of land and killed 44 people.  At the time, the

14   fires were the most destructive in California history and are responsible for billions in damages.

15          575.    Many sources pointed to the cause of the deadly North Bay Fires.  According to a

16   report from NBC reporter Jaxon Van Derbeken published on November 6, 2017, a month after

17   the North Bay Fires began, PG&E's own internal inspectors allow one out of 100 trees they

18   check to violate state power line clearance standards and "cheated" when too many violations

19   were found:

20            **PG&E auditors allow one out of 100 trees they check to violate**
             **state power line clearance standards, NBC Bay Area has**
21            **learned.**

22                               *        *        *

23            . . .[I]t emerged during the Butte fire litigation that [internal]
             auditors were giving out a passing grade when one out of 100 trees
24            they checked turned out to be too close to power lines under state
             standards.
25
                                 *        *        *
26

27   ───────────────────────────

     [159]  *Butte Fire Cases*, No. JCCP 4853, Exhibit G to the Declaration of Kristine K. Meredith,
28   at 45:12-24 (Cal. Super. Ct. Sacramento Cty. Dec. 21, 2018); *see also* at 124:3-12.

Case: 19-30088   Doc# 5375-4   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 36
of 51

PGE-BK-0000001464

1

> . . .When [PG&E] failed to reach that 99 percent compliance rate in the area around the fire . . . **the company just expanded the universe of trees covered in a particular audit.**

2

3

> "So what PG&E does when it doesn't pass, it basically cheats," [Amanda Riddle, one of the attorneys participating in a lawsuit against PG&E related to the Butte Fire] said. "It adds more miles and more miles until it reaches a passing grade."

4

5

6

576.    Shortly thereafter, in a press release on December 20, 2017, PG&E announced

7

that its "Board of Directors has determined to suspend the quarterly cash dividend on the

8

Corporation's common stock, beginning with the fourth quarter of 2017, citing uncertainty

9

related to causes and potential liabilities associated with the extraordinary October 2017

Northern California wildfires."

10

577.    With respect to the wildfires, on January 3, 2018, State Senator Jerry Hill was

11

quoted by NBC as saying that he felt "misled" by PG&E's executives into believing that the

12

Company had followed the lead of its counterparts and shut off its reclosers – a type of "smart"

13

switch that can automatically turn power back on – in all 132 of its high risk fire areas by the

14

start of 2017:

15

> Hill said he was surprised the company's recloser shutdown was so limited, given that a top PG&E official assured him back in 2015 that the company would be able to shut down reclosers in all 132 of the high risk fire areas by the start of 2017.

16

17

18

> "I think that's the troubling part," Hill said, "that they misled us in that.

19

> "Had they said they did not have that system in place, then we would have followed up with more questions to try to find what the problem was – and may have been able to focus in on that a couple of years ago that may have prevented these fires in October."

20

21

22

578.    On April 2, 2018, PG&E filed with the SEC the registration statement for the

23

April 2018 Notes Offering. On April 13, 2018, PG&E filed the prospectus for the offering. The

24

exchange offer under the April 2018 Notes Offering ran until 5pm ET on May 14, 2018.

25

579.    On May 25, 2018, Cal Fire issued a press release announcing the results of its

26

investigation into four of the North Bay Fires. The agency found that **all four had begun as a**

27

**result of downed vegetation disrupting PG&E power lines, and that three of the four were**

28

**due to PG&E's apparent violations of California safety regulations** regarding the necessary

PGE-BK-0000001465

1   clearance between trees and power lines.  The violations were of such a nature that Cal Fire

2   referred these incidents to the appropriate district attorneys' offices for further review.

3       580.   Less than a month later, on June 8, 2018, Cal Fire issued a press release

4   announcing the results of its investigation into 12 additional wildfires that occurred during the

5   North Bay Fires.  The agency determined that **all 12 wildfires were caused by PG&E**

6   **equipment**.  The agency also stated that eight of the 12 had been referred to the appropriate

7   district attorneys' offices for further review "due to evidence of alleged violations of state law."

8       581.   The next day, on June 9, 2018, *Bloomberg* published an article titled "PG&E May

9   Face Criminal Charges After Probe of Deadly Wildfires."  The article stated that PG&E was

10  exposed to potential criminal liability due to Cal Fire's finding that PG&E's failure to follow the

11  law had led to a majority of the North Bay Fires investigated to date.

12      582.   On June 10, 2018, analysts at Guggenheim issued a research report on PG&E that

13  recommended investors sell PG&E securities.  The report stated: "At this point, we question

14  whether the applicability of inverse condemnation even matters when **all signs seem to point to**

15  **PCG being imprudent operators in the majority of instances, which would therefore mean**

16  **it should assume liability."**

17      583.   On June 21, 2018, PG&E announced that it would take an estimated pre-tax

18  charge in the amount of *$2.5 billion* for the quarter ending June 30, 2018, for claims related to

19  the North Bay Fires.

20      584.   On October 9, 2018, Cal Fire issued a press release announcing the results of its

21  investigation into the Cascade Fire, part of the North Bay Fires.  Again, PG&E equipment was

22  found to be the cause of the fire.

23      585.   PG&E's admitted exposure for the North Bay Fires continued to increase.  On

24  February 28, 2019, PG&E issued a press release indicating the Company was taking an

25  additional $1 billion charge for the quarter ending December 31, 2018 for the North Bay Fires.

26  Accordingly, a total of $3.5 billion in charges for the North Bay Fires had been taken to date.

27      586.   By the time PG&E filed its quarterly report on Form 10-Q on May 2, 2019,

28  PG&E would report that "Cal Fire has issued its determination on the causes of 19 of the 2017

Northern California wildfires, and alleged that all of these fires, with the exception of the Tubbs fire, involved [PG&E's] equipment. Cal Fire has not publicly announced any determination of cause on the remaining wildfires." PG&E has also indicated in this latest Form 10-Q, filed with the SEC on May 2, 2019, that "[i]n light of the current state of the law on inverse condemnation and the information currently available to the Utility, including, among other things, the Cal Fire determinations of cause as stated in Cal Fire's press releases and their released reports, PG&E Corporation and the Utility have determined that it is probable they will incur a loss for claims in connection with 17 of the 2017 Northern California wildfires."

587.   Following the North Bay Fires, on November 8, 2018, the Camp Fire began near the town of Paradise, Butte County. The fire would grow to surpass the North Bay Fires – **which PG&E equipment had played a central role in igniting nearly all only one year previously**. The 2018 Camp Fire is the most destructive and fatal wildfire in California history. The fire burned 153,336 acres, caused at least 85 fatalities, with total damages estimated on the low-end at $16.5 billion. The fire was considered the costliest natural disaster in the world in 2018.

588.   Cal Fire, as it did with the 2015 Butte Fire and North Bay Fires, conducted an investigation. PG&E equipment was implicated as the cause of the Camp Fire. Specifically, Cal Fire identified the location of the fire as near a PG&E transmission line, which the Company revealed in a December 11, 2018 electric incident report had relayed and de-energized shortly before the fire began. A PG&E employee also reported a fire in the vicinity of the transmission line to 911 the morning the Camp Fire started, and an aerial patrol identified a suspension insulator supporting a transposition jump at the transmission tower that had separated.

589.   On November 13, 2018, PG&E filed a report on Form 8-K with the SEC stating that PG&E had submitted an electric incident report to the CPUC suggesting that PG&E's equipment was at fault for the Camp Fire, and that PG&E had significantly increased their liability insurance, as follows:

> The cause of the Camp Fire is under investigation. On November 8, 2018, the Utility submitted an electric incident report to the California Public Utilities Commission (the "CPUC") indicating that "on November 8, 2018 at approximately 0615 hours, PG&E experienced an outage on the Caribou-Palermo 115 kV

PGE-BK-0000001467

Transmission line in Butte County. **In the afternoon of November 8, PG&E observed by aerial patrol damage to a transmission tower on the Caribou-Palermo 115 kV Transmission line**, approximately one mile north-east of the town of Pulga, in the area of the Camp Fire. This information is preliminary." Also on November 8, 2018, acting governor Gavin Newsom issued an emergency proclamation for Butte County, due to the effect of the Camp Fire.

As previously reported, during the third quarter of 2018, PG&E Corporation and the Utility renewed their liability insurance coverage for wildfire events in an aggregate amount of approximately $1.4 billion for the period from August 1, 2018 through July 31, 2019.

590. PG&E has also acknowledged (¶190) that another ignition point for the Camp Fire had exhibited damaged and downed poles, vegetation on top of downed wires, and other signs of safety violations. At times approximately 30 minutes apart, vegetation underneath the lines ignited at two ignition points. At the same time, despite PG&E's ESRB-8 Shutoff Protocol, PG&E had canceled plans to shut off power as a precaution against fires in parts of Butte County, where the fire ignited. Additionally, media reports (¶375) have indicated that a PG&E crew was planning to address sparking transmission lines in a location near the origin of the Camp Fire.

591. On November 14, 2018, *Reuters* published an article describing the market's reaction to the news about PG&E's liability for wildfires, titled "UPDATE 3-PG&E shares and bonds plunge as California wildfire risks mount."[160]

592. On November 15, 2018, Moody's downgraded PG&E's debt. As *Bloomberg* described in a November 15, 2018 article titled "PG&E Credit Cut to Brink of Junk by Moody's on Wildfire Risk":

PG&E Corp.'s credit rating was cut to the brink of junk amid doubt about its ability to manage liabilities from the California wildfires.

Moody's Investors Service lowered the rating to Baa3 from Baa2, the second-lowest level of investment grade, with the possibility of

---

[160] Dan Burns, *UPDATE 3-PG&E Shares and Bonds Plunge as California Wildfire Risks Mount*, Reuters (Nov. 14, 2018), https://www.reuters.com/article/california-wildfires-pge/update-3-pge-shares-and-bonds-plunge-as-california-wildfire-risks-mount-idUSL2N1XP0UP.

Case: 19-30088   Doc# 5375-4   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 40 of 51

PGE-BK-0000001468

further downgrade, according to a statement. PG&E's grade reflects an exposure of about $10 billion to the 2017 wildfires, and uncertainty around 2018 liabilities, said Moody's, which also reduced the utility's Pacific Gas & Electric Co. subsidiary to Baa2.

"**The rating downgrade reflects the material exposure to new potential liabilities associated with the Camp Fire** and the uncertainties associated with how the fire-related liabilities will be recovered," Moody's analyst Jeff Cassella said in the statement.

California's biggest utility said this week it exhausted its credit facilities to boost cash, a move that was widely seen to be in anticipation of a credit rating downgrade, and raising concerns it may have to eventually file for bankruptcy.

593. On November 27, 2018, Judge Alsup ordered PG&E to provide written answers to several questions regarding the Company's role in starting the Camp Fire and any other fires in the last three years.[161] Judge Alsup is presiding over PG&E's probation proceedings following its 2016 conviction related to the explosion of a PG&E gas pipeline in San Bruno, California, that killed eight people and destroyed 38 homes.

594. Despite the 2015 Butte Fire and North Bay Fires, on December 10, 2018, *The San Diego Union-Tribune* reported that PG&E had never produced a report for wildfire mitigation risks two years after the law requiring the production of such a report was enacted. Under California Senate Bill 1028 ("SB 1028") – enacted in September 2016 – PG&E and other California utilities were required to produce an annual report detailing efforts to limit the risks from wildfires and specifying who was responsible for implementing safety provisions in the plans. State Senator Jerry Hill, who introduced SB 1028, said of utility regulators' failure to oversee PG&E's implementation of the report: **"They have done absolutely nothing in those two years."** In part to rectify this delinquency, the California State Legislature passed California Senate Bill 901 ("SB 901") in the Fall of 2018 in order to force California utilities to develop and submit their wildfire mitigation plans no later than February 2019. According to a submission of

---

[161] *See* Notice re California Wilfires, PG&E Criminal Proceedings (N.D. Cal. Nov. 27, 2018), ECF No. 951.

Case: 19-30088    Doc# 5375-4    Filed: 01/14/20    Entered: 01/14/20 16:07:57    Page 41 of 51

PGE-BK-0000001469

1   the CPUC in the probation proceedings pending before Judge Alsup, on February 6, 2019,

2   PG&E finally submitted said plan.[162]

3       595.    In addition to not producing a plan for wildfire mitigation risks, PG&E is alleged

4   to have falsified safety data and records for five years.  As PG&E noted in a press release, filed

5   on January 14, 2019 with the SEC on a Form 8-K, the CPUC announced on December 14, 2018

6   that it had opened a case against PG&E for allegedly falsifying its data and safety records.

7   While the documented violations related to the intentional falsification of pipeline data, the

8   agency stated that the findings were an example of why it was "investigating PG&E's safety

9   culture" and considering the forced implementation of measures that "address systemic safety

10  issues at PG&E."  In other words, according to the CPUC, the Company's falsification of

11  pipeline safety data implicated the Company's entire operations and approach to safety.

12  According to the CPUC's annual report for 2018, PG&E falsified records from 2012 through

13  2017.[163]

14      596.    Thereafter, on December 21, 2018, the CPUC issued a Scoping Memo and Ruling

15  (the "Ruling") regarding its efforts to reform PG&E's corporate safety culture.  The Ruling

16  found that "PG&E has had serious safety problems with both its gas and electric operations for

17  many years" and stated that, despite these shortcomings, **the Company had failed "to develop a**

18  **comprehensive enterprise-wide approach to address safety."**  The Ruling stated that the

19  CPUC "was, and remains, concerned that the safety problems being experienced by PG&E were

20  **not just one-off situations or bad luck, but indicated a deeper and more systemic problem."**

21      597.    On December 28, 2018, the Attorney General of California filed an amicus brief

22  in connection with PG&E's probation proceedings before Judge Alsup.  The brief stated that

23  PG&E's actions or failures to act could constitute a range of criminal violations if the Utility was

24

---

25  [162] Comments of the CPUC in Response to Second Order to Show Cause at 1, PG&E
    Criminal Proceedings (N.D. Cal. Mar. 22, 2019), ECF No. 1033.

26  [163] *See* CPUC 2018 Annual Report at 9,

27  http://www.cpuc.ca.gov/uploadedFiles/CPUCWebsite/Content/About_Us/Organization/
    Divisions/Office_of_Governmental_Affairs/Legislation/2019/CPUC%20Annual%20Report%20

28  2019%20-%20page%20view%20only.pdf.

PGE-BK-0000001470

1  found to be "reckless" in causing California wildfires.[164]  The listed potential offenses ranged

2  from misdemeanors to implied-malice murder.

3      598.  On January 9, 2019, in PG&E's probation proceedings before Judge Alsup, a U.S.

4  probation officer filed a Petition for Summons for Offender Under Supervision, which: (i) found

5  "probable cause to believe that Pacific Gas and Electric Company violated the conditions of their

6  Probation" stemming from the San Bruno pipeline explosion;[165] (ii) cited the Company's failure

7  to report the investigation by the Butte County District Attorney's Office into PG&E's role in

8  starting several fires that formed part of the North Bay Fires; and (iii) cited PG&E's failure to

9  report Cal Fire's findings of responsibility for the Honey Fire (part of the North Bay Fires), that

10  there was the possibility of criminal prosecution stemming from PG&E's role in starting this fire,

11  or that the Company had entered into a settlement agreement with Butte County to avoid such

12  criminal prosecution.

13      599.  On January 9, 2019, Judge Alsup also issued an order to show cause as to why the

14  terms of PG&E's probation should not be modified "[i]n order to protect the public from further

15  wrongs by the offender, to deter similar wrongs by other utilities, and to promote the

16  rehabilitation of the offender."[166]  The order cited Cal Fire's finding that **PG&E had caused 18**

17  **wildfires in 2017, 12 of which it had referred to criminal prosecution**, and suggested the

18  Company significantly bolster its vegetation management activities and re-inspect its entire

19  electrical grid in "light of PG&E's history of falsification of inspection reports," among other

20  proposed modifications to the terms of the Company's probation.[167]

21

22

23  [164] Attorney General's Amicus Brief Regarding PG&E's Potential Criminal Liability, PG&E
Criminal Proceedings (N.D. Cal. Dec. 28, 2018), ECF No. 954.

24  [165] Petition for Summons for Offender Under Supervision at 4, PG&E Criminal Proceedings

25  (N.D. Cal. Dec. 28, 2018), ECF No. 960.
[166] Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified at 1,

26  PG&E Criminal Proceedings (N.D. Cal. Jan. 9, 2019), ECF No. 961.

27  [167] PG&E has been found responsible by Cal Fire for at least *18 of the 19 major fires*
stemming from the 2017 Northern California wildfires that Cal Fire had investigated up until that

28  point.  Only the Tubbs Fire had not been found to have been PG&E's fault.

600.    On January 13, 2019, *The Wall Street Journal* reported that PG&E had **started more than 1,500 fires** between June 2014 and December 2017, or more than one a day on average.[168] The newspaper provided the following graphic, which illustrates the shocking extent of PG&E's contribution to fires throughout California with incidents reported across essentially *all* of the Utility's service area:



---

[168] Russell Gold et al., *PG&E Sparked at Least 1,500 California Fires. Now the Utility Faces Collapse*, Wall Street J. (Jan. 13, 2019), https://www.wsj.com/articles/pg-e-sparked-at-least-1-500-california-fires-now-the-utility-faces-collapse-11547410768.

1       601.    On January 14, 2019, PG&E filed with the SEC a report on Form 8-K stating that

2    the Company expected to file for Chapter 11 bankruptcy on or about January 29, 2019.  The

3    reason the Company provided for the expected bankruptcy filing was the "series of catastrophic

4    wildfires that occurred in Northern California in 2017 and 2018."

5       602.    On January 15, 2019, *MarketWatch* reported in an article titled "PG&E's slide

6    into bankruptcy would mark third largest investment-grade default since 1998,"[169] that PG&E

7    faced a significant risk of defaulting on its bonds:

> If Pacific Gas & Electric Co. follows through with its bankruptcy announcement, the country's largest utility would record the third largest default in the U.S. investment-grade corporate bond market since 1998.
>
> PG&E announced it would file for bankruptcy by Jan. 29 after devastating California wildfires in 2017 and 2018 left it facing billions in potential liabilities.  The company also said it would not pay an interest payment due on bonds maturing in 2040 on Wednesday, which would also trigger a default.
>
> *      *      *
>
> PG&E's bankruptcy would mark a dramatic collapse for a company that was once seen as an attractive bet among hedge funds.  More than $17 billion of its bonds would be facing default, according to analysts at Bank of America Merrill Lynch.
>
> *      *      *
>
> In terms of sheer scale of a default from an investment-grade issuer, BAML found only Lehman Bros. and WorldCom would rank above the PG&E.

20       603.    On January 17, 2019, Judge Alsup issued a request for comment on his tentative

21    finding that "**the single most recurring cause of the large 2017 and 2018 wildfires**

22    **attributable to PG&E's equipment has been the susceptibility of PG&E's distribution lines**

23    **to trees or limbs falling onto them during high-wind events.**"

---

[169] Sunny Oh, *PG&E's Slide Into Bankruptcy Would Mark Third Largest Investment-Grade Default Since 1998*, MarketWatch (Jan. 15, 2019), https://www.marketwatch.com/story/pges-slide-into-bankruptcy-would-mark-third-largest-investment-grade-default-since-1998-2019-01-15.

PGE-BK-0000001473

604.   On January 29, 2019, PG&E declared Chapter 11 bankruptcy.  The Company's bankruptcy filings stated that it was facing $51.7 billion in liabilities, including more than $30 billion in possible liabilities tied to the Camp Fire and the North Bay Fires.

605.   On January 30, 2019, Judge Alsup, during a probationary hearing, stated: **"[T]here is one very clear-cut pattern here: That PG&E is starting these fires**."[170]  Judge Alsup continued, "what do we do[?]  Does the judge just turn a blind eye and say, 'PG&E, continue your business as usual.  Kill more people by starting more fires'?"  On the subject of whether PG&E had made safety a priority, Judge Alsup reportedly stated: "**[I]t's not really true. Safety is not your number one thing.**"

606.   On February 6, 2019, PG&E finally filed a wildfire mitigation plan as required by SB 901.  PG&E's wildfire plan stated that the Company would significantly expand its public-safety power shutoff program, from about 570,000 affected consumers to as many as 5.4 million customers, substantially increase its tree-clearing practices, beef up inspections of its equipment and install more weather stations and cameras for earlier risk detection.

607.   Accordingly, the expanded scope of PG&E's 2019 wildfire plan further demonstrates the inadequacy of PG&E's prior safety practices and investment in safety, showing that PG&E did far less than it should have previously done.

608.   Similarly, the 2019 wildfire mitigation plan provided for more $2 billion in new expenditures and significant increases in inspections and other measures over what PG&E had done in 2018.  Those new measures included the following:

- remove 375,000 trees in 2019, after cutting down 160,000 in 2018;

- 2,450 miles of Enhanced Vegetation Management in 2019, a 320% increase from the 760 miles of assorted related practices in 2018;

- increase enhanced transmission structure inspections from 9,400 in 2018 to 40,600 in 2019; and

---

[170] Transcript of Proceedings at 12-13, 24, PG&E Criminal Proceedings (N.D. Cal. Jan. 31, 2019), ECF No. 999.

PGE-BK-0000001474

- enhanced inspections of 685,000 distribution poles, including climbing of all transmission towers, after making 517,500 routine inspections of distribution poles in 2018.

609.    Following the plan's release, the *Associated Press* summarized the general reaction, "Lawyers, industry watchdogs and a federal judge alike wonder: *What took so long?*" However, at the hearing on the second order to show cause in PG&E's probation proceedings before Judge Alsup, counsel for PG&E stated that the plan was not final. He explained, "the wildfire mitigation plan is still in the process of being reviewed and there isn't a final one . . . that plan is still in flux."[171]

610.    Also on February 6, 2019, attorneys for fire victims provided a submission to Judge Alsup in response to the January 30, 2019 probationary hearing.[172] The submission compiled data from PG&E's regulators which demonstrated that the Company posed a far greater risk to the public than its peers. For example, according to the submission, Southern California Edison ("SoCalEd") serves 15 million people across approximately 50,000 square-miles, operating and maintaining 91,375 miles of distribution lines and 1,433,336 electric poles. By comparison, PG&E services approximately 16 million people throughout a 70,000-square-mile service area, operating and maintaining between 81,000 miles and 115,000 miles of distribution lines and 2,400,000 electric poles. Yet, despite these similarities in service size and miles of distribution lines, **PG&E's electrical equipment caused 1,208 more wildfires than SoCalEd's equipment between 2014 to 2017** as self-reported to the CPUC. In total, PG&E's equipment caused 1,552 wildfires, while SoCalEd only caused 344 fires over the same time period. Put differently, PG&E's equipment caused **4.5 times more wildfires** than SoCalEd. PG&E's equipment was also responsible for more large-scale fires, including 43 more fires than SoCalEd that burned between 10-99 acres, three more between 100-299 acres, and two more between 300-999 acres. Similarly, since 2014, the electrical equipment of San Diego Gas &

[171] Transcript of Proceedings at 10, PG&E Criminal Proceedings (N.D. Cal. Apr. 2, 2019), ECF No. 1047. To date, PG&E has filed two amended plans, on February 12, 2019 and April 25, 2019.

[172] Submission of Attorneys Pitre and Campora in Response to Order dated Jan. 30, 2019, PG&E Criminal Proceedings (N.D. Cal. Feb. 6, 2019), ECF No. 1005.

PGE-BK-0000001475

1    Electric ("SDG&E") caused 109 wildfires with only one wildfire burning over 10 acres.  By

2    contrast, PG&E caused 1,552 wildfires during that same timeframe with 68 of those fires burning

3    over 10 acres.

4          611.    On February 11, 2019, PG&E issued a press release stating that it would be

5    replacing the majority of its Board.  As of today, only two Board members out of 13 have not

6    been replaced.  This announcement followed the departure of several Company executives,

7    including PG&E's CEO defendant Williams and three senior executives in PG&E's electric

8    division.  The release acknowledged "that **PG&E must re-earn trust and credibility** with its

9    customers, regulators, the communities it serves and all of its stakeholders . . . ."

10         612.    On February 27, 2019, *The Wall Street Journal* published an article titled, "PG&E

11   Delayed Safety Work on Power Line That Is Prime Suspect in California Wildfire."  The article

12   stated that the Company had delayed for several years needed repairs to its high-voltage Caribou-

13   Palermo transmission line, the likely source of the Camp Fire.  PG&E had failed to fix the **100-**

14   **year old line** despite informing federal regulators of its plans to repair and replace damaged

15   sections of the line as early as 2013.  Similarly, in a July 2017 federal filing, PG&E proposed

16   overhauling the line, noting that more than **one in four wire spans between towers were too**

17   **close to vegetation**.  The plan involved swapping 61 lattice towers with modern tubular-steel

18   poles, and replacing wire and hardware connecting it to the towers.  But PG&E never began the

19   work.  The article also detailed PG&E's antiquated safety monitoring procedures and lack of

20   transparency in transmission line spending.  According to the article, "An internal PG&E audit

21   from 2013 found that the company focused mainly on spending its allotted budget, not ensuring

22   expenditures were prudent and effective, and that it lacked performance data and other records

23   for many projects."

24         613.    Also on February 26, 2019, *The Mercury News* published an article titled, "PG&E

25   knew for years that repairs were needed on transmission lines in area of fatal Camp Fire."

26   According to the article, energy officials had been warning PG&E about its fast-aging system of

27   transmission lines for the better part of a decade.  For example, according to a May 2017 CPUC

28   filing, "In 2010 and again in 2015, the California Independent System Operator transmission

1  plan identified the need to improve and upgrade this system to address potential overloads and

2  power outages that would affect customers in the service area."

3      614.    PG&E likewise stated in a July 2017 filing to FERC that it would embark on

4  numerous repairs of the Caribou-Palermo system.  The planned repairs and maintenance

5  included new tower frames, steel poles, improved line tension and hardware upgrades.  As

6  PG&E stated in the filing:  "The project has a forecasted capital expenditure of $30.3 million."

7      615.    PG&E also proposed in July 2017 considerable work for the Caribou-Palermo

8  line as part of the Company's annual request to FERC for rate changes.  "The Caribou-Palermo

9  115 kilovolt circuit was analyzed as part of the 2013 NERC Assessment," PG&E stated,

10  referring to an analysis by the North American Electric Reliability Corporation.  The filing

11  indicated the 2013 NERC study determined that well over 100 transmission line spans were

12  perilously close to vegetation or trees.  "The completed analysis identified 127 spans with

13  clearance issues out of the 455 spans on the electric transmission line," PG&E stated in its 2017

14  FERC filing.  PG&E never fixed the identified issues from the time it learned about them in 2013

15  as reflected in the July 2017 filing.  PG&E's Caribou-Palermo transmission system would later

16  be implicated in the 2018 Camp Fire.

17      616.    On February 28, 2019, PG&E issued a press release providing an update on the

18  financial impact of the Camp Fire and the North Bay Fires, along with the Company's fourth

19  quarter and full-year 2018 financial results.  The release stated that PG&E "believes it is

20  probable that its equipment will be determined to be an ignition point of the 2018 Camp Fire."  It

21  also stated that the Company would be taking a *$10.5 billion charge* related to the Camp Fire.

22  As set forth in ¶¶583 & 585, the Company also stated that it expected a $1 billion charge related

23  to the North Bay Fires, which was on top of the prior $2.5 billion charge that the Company had

24  previously taken in connection with the fires.  According to the Company, primarily due to the

25  large number of third-party claims against PG&E, the Company reported full-year **net losses of**

26  **$6.9 billion**, compared to 2017 net income of $1.6 billion.  As a result of the "extraordinary

27  challenges" caused by the wildfires, the release stated that PG&E **may not be able to continue**

28  **as a going concern**.

Case: 19-30088   Doc# 5375-4   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 49
of 51
PGE-BK-0000001477

617.     On March 5, 2019, Judge Alsup issued a revised order to show cause as to why the court should not modify the terms of PG&E's probation in light of subsequent submissions.[173]  In the order, Judge Alsup found that PG&E's "**unsafe conduct** led to a deadly pipeline explosion and to six felony convictions" and had now "**led to recurring deadly wildfires caused by its electrical system**."

618.     Judge Alsup's order noted that in its submissions, PG&E had made several **admissions** including that: (i) vegetation contact was the primary risk driver with respect to ignitions along PG&E's distribution lines; (ii) PG&E agreed "that vegetation presents an acute risk of wildfire ignition across PG&E's service territory"; (iii) in 2016 alone, PG&E had experienced approximately 1,400 downed wires caused by vegetation contact; (iv) during 2015 and 2016, PG&E had reported to the CPUC that vegetation contact with conductors was the leading cause of the 486 fire ignitions associated with PG&E facilities, causing 37% of such fires; (v) as of June 2017, there remained 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to "fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle"; and (vi) the Company believed its equipment caused the Camp Fire.

619.     Judge Alsup further found that the "**record demonstrates that PG&E's performance with respect to vegetation management has been dismal**."  As a result, the court modified the terms of PG&E's probation to require it to comply with state laws regarding vegetation management and its wildfire prevention plan, among other remedial measures, and suspended PG&E's dividend until it could demonstrate that the Company had complied with the modified probation terms.

620.     On March 18, 2019, a coalition of law firms representing fire victims published excerpts of internal PG&E emails demonstrating that PG&E had identified the transmission lines

---

[173] Second Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified, PG&E Criminal Proceedings (N.D. Cal. Mar. 5, 2019), ECF No. 1027.

PGE-BK-0000001478

1   implicated in the Camp Fire as unsafe long before the fire started.[174]  For example, **internal**

2   **Company documents showed that in December 2012 five aging towers along the Caribou-**

3   **Palermo transmission line had collapsed, and a 2014 internal Company email stated that**

4   **"the likelihood of failed structures happening is high.**"  Similarly, a November 1, 2016 PG&E

5   document detailed the failure of necessary hardware along the transmission line, with a support

6   hook snapping off during routine painting.  PG&E documents internally acknowledged that the

7   supports "had been compromised through corrosion."[175]  Despite the internal acknowledgment

8   that the Caribou-Palermo lines were in need of repair and posed a significant risk of collapse,

9   PG&E never had the lines fixed.  Instead, the Company reasoned that any collapse would not

10  impact a sufficient number of customers to warrant the repairs and that the risks would be

11  mitigated because any fire may be extinguished by rain.  Tragically, needed repairs were never

12  undertaken, and **the Caribou-Palermo line became the devastating source of the Camp Fire**

13  later that year.

14          621.    Also on March 18, 2019, *The New York Times* published an exposé on PG&E

15  titled, "How PG&E Ignored California Fire Risks in Favor of Profits."  The article portrayed a

16  corporate culture at PG&E which disregarded safety risks and neglected necessary fire

17  prevention precautions in favor of short-term operating results.  For example, an internal PG&E

18  email had noted that the transmission tower implicated in the Camp Fire, tower 27/222, was at

19  risk of collapse long before the blaze was ignited.  The Company's own guidelines also warned

20  that **the tower was a quarter-century past its useful life**, yet PG&E did not repair or replace

21  the aging tower.  The article quoted Mike Florio, a former California utilities commissioner, who

22  observed, "There was very much a focus on the bottom line over everything [at PG&E]:  'What

23  are the earnings we can report this quarter? . . .  And **things really got squeezed on the**

24  **maintenance side**."  The article also quoted California's Governor Gavin Newsom, who

---

[174]*Northern California Fire Lawyers Obtain Documents That Show PG&E Knew About Risk of Caribou-Palermo Line Failure*, MarketWatch (Mar. 18, 2019), https://www.marketwatch.com/press-release/northern-california-fire-lawyers-obtain-documents-that-show-pge-knew-about-risk-of-caribou-palermo-line-failure-2019-03-18.

[175]*Id.*

PGE-BK-0000001479