1  expressed a similar sentiment: "**[PG&E] have simply been caught red-handed over and over**
2  **again, lying, manipulating or misleading the public. . . They cannot be trusted.**" The article
3  contrasted the lack of safety focus at the Company with the approach taken by another California
4  utility facing similar risks, SDG&E, that had significantly revamped its safety protocols to
5  respond to increased wildfire dangers. According to one industry expert quoted in the article, if
6  PG&E had followed the lead of SDG&E its equipment would have caused far fewer destructive
7  fires. This expert concluded that "**[PG&E's] culture of a lack of safety is unique**" amongst
8  utilities.

9      622.    On April 2, 2019, Judge Alsup held a hearing on his second order to show cause
10 in PG&E's probation proceedings. At the hearing, Judge Alsup stated: "**PG&E over several**
11 **years allowed the trees that needed to be removed to be built up and did not remove them**,
12 did not trim them so that we wound up with a large number of trees that should have been
13 removed by PG&E but weren't. And that was a major contributing factor, maybe the single-
14 biggest factor, in causing the fires in 2017 and 2018 in Northern California." [176] Judge Alsup
15 also explained "as we've gotten into the evidence, and I've studied quite a lot of it, again I want
16 to say it's quite clear that PG&E pumped out $4.5 billion in the last five years in dividends and
17 **let the tree budget wither so that a lot of trees that should have been taken down were not.**"
18 As Judge Alsup concluded, "[t]his is a crisis, a crisis that California faces on these wildfires, and
19 **PG&E is the single-most culpable entity in the mix**. . . . PG&E has started more than – way
20 more than its share of these fires. . . This is a problem of your own making. A lot of money
21 went out in dividends that should have gone to the tree budget."

22      623.    On April 12, 2019, *NBC Bay Area* published an article titled "PG&E Inspectors
23 Find Hundreds of Safety Issues on Electrical Towers." The article indicated that "PG&E's

24
25
26
27
───────────────
[176] Transcript of Proceedings at 6-7, PG&E Criminal Proceedings (N.D. Cal. Apr. 4, 2019),
28 ECF No. 1047.

PGE-BK-0000001480

1   inspections of thousands of transmission towers since the deadly Camp Fire in Butte County

2   found more than 450 safety violations, including 59 that posed serious safety hazards."[177]

3       624.   On May 2, 2019, PG&E filed its Q1 2019 Form 10-Q with the SEC wherein,

4   PG&E reinforced that "PG&E Corporation and the Utility are facing extraordinary challenges

5   relating to a series of catastrophic wildfires that occurred in Northern California in 2017 and

6   2018. . . . Uncertainty regarding these matters raises substantial doubt about PG&E

7   Corporation's and the Utility's abilities to continue as going concerns."

8       625.   According to PG&E's Q1 2019 Form 10-Q, it estimates that its liabilities for

9   wildfire-related claims remains at over $14.2 billion, including the 2015 Butte Fire ($212

10  million), the North Bay Fires ($3.5 billion) and the Camp Fire ($10.5 billion). These estimated

11  liabilities do not include liabilities for the Camp Fire or North Bay Fires for, among other things,

12  "potential penalties or fines that may be imposed by governmental entities on PG&E Corporation

13  or the Utility, or punitive damages, if any, or any losses related to future claims for damages that

14  have not manifested yet, each of which could be significant." As reported in the same Form 10-

15  Q, PG&E's "liability could exceed $30 billion" if it were found to be liable for the Camp Fire

16  and the North Bay Fires.

17      626.   PG&E also remains subject to criminal liability. According to PG&E's Q1 2019

18  Form 10-Q, the Butte County District Attorney's Office and the California Attorney General are

19  investigating the Camp Fire and that a grand jury has been empaneled in Butte County.

20      627.   PG&E also reported in its Q1 2019 Form 10-Q that its operating and maintenance

21  expenses had increased by $443 million, or 35%, over the same quarter the prior year "primarily

22  due to $210 million related to enhanced and accelerated inspections and repairs of transmission

23  and distribution assets and $179 million for clean-up and repair costs relating to the 2018 Camp

24  Fire."

25

26

27  [177] Jaxon van Derbeken, *PG&E Inspectors Find Hundreds of Safety Issues on Electrical
    Towers*, NBC Bay Area (Apr. 12, 2019), https://www.nbcbayarea.com/investigations/PGE-

28  Inspectors-Find-Hundreds-of-Safety-Issues-on-Electrical-Towers-508344011.html.

PGE-BK-0000001481

628.     On May 7, 2019, Judge Alsup conducted a sentencing hearing for PG&E's violation of probation.  When speaking to PG&E's new CEO Johnson he noted that PG&E "admitted that it started 17 of those fires in 2017 just in the Wine Country."[178]  He further exclaimed that here in California "We have six to seven months of no rain.  And **you can't blame it on global warming** because I have been here a long time and it's been that way every summer."  During the sentencing hearing, Judge Alsup also observed that while there are other causes of fire, "no one has started more fires than PG&E."

629.     On May 15, 2019, Cal Fire issued a release finding PG&E at fault for the Camp Fire: "[a]fter a very meticulous and thorough investigation, Cal Fire has determined that **the Camp Fire was caused by electrical transmission lines owned and operated by [PG&E]** located in the Pulga area."  As to the second ignition site of the Camp Fire Cal Fire found: **"[t]he cause of the second fire was determined to be vegetation into electrical distribution lines owned and operated by PG&E."**  PG&E issued a press release the following day accepting the determination that PG&E electrical lines located near Pulga were a cause of the Camp Fire.  On May 22, 2019, PG&E acknowledged in a Schedule 14A filing with the SEC that "[t]he tragic wildfires of the past two years have been extraordinarily challenging, and have made clear that the energy status quo is no longer working for California."

## XVIII. THE SECURITIES ACT DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS IN THE OFFERING DOCUMENTS FOR THE NOTES OFFERINGS

630.     Each of PG&E's Prospectuses filed on February 24, 2016, November 29, 2016, March 8, 2017, and April 13, 2018, incorporated by reference the corresponding registration statement (hereinafter, "Offering Documents"), as well as a number of other PG&E filings and reports including the following:

---

[178] Transcript of Proceedings at 11, PG&E Criminal Proceedings (N.D. Cal. May 7, 2019), ECF No. 1061.

Case: 19-30088   Doc# 5375-5   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 3 of 36

PGE-BK-0000001482

1        (a)      The February 24, 2016 Offering Documents for the March 2016 Notes

2  Offering incorporated by reference PG&E's: Annual Report on Form 10-K for FY15 filed with

3  the SEC on February 18, 2016;

4        (b)      The November 29, 2016 Offering Documents for the December 2016

5  Notes Offering incorporated by reference PG&E's: Annual Report on Form 10-K for FY15 filed

6  with the SEC on February 18, 2016;

7        (c)      The March 8, 2017 Offering Documents for the March 2017 Notes

8  Offering incorporated by reference PG&E's: Annual Report on Form 10-K for FY15 filed with

9  the SEC on February 18, 2016; Annual Report on Form 10-K for FY16 filed with the SEC on

10  February 16, 2017; and Press release, filed on Form 8-K with the SEC on May 23, 2016; and

11        (d)      The April 13, 2018 Offering Documents for the April 2018 Notes Offering

12  incorporated by reference PG&E's: Annual Report on Form 10-K for FY17 filed with the SEC

13  on February 9, 2018.

14      631.    The statements in or incorporated by the Offering Documents alleged to be

15  materially false and/or misleading for purposes of the Securities Act Claims alleged herein are

16  set out in Exhibit A attached hereto.[179]

17  **A.     The Securities Act Defendants Misled Investors Regarding PG&E's Safety Practices, Policies and Compliance**

18

19      632.    The Offering Documents, including the documents incorporated by reference

20  therein, omitted material adverse information from investors regarding PG&E's deficient safety

21  practices and policies while simultaneously falsely assuring investors that PG&E complied with

22  safety laws and regulations, sufficiently invested in safety, and provided for public safety by

23  clearing vegetation around its equipment, updating equipment, and inspecting its equipment.  In

24  contrast to what investors were led to believe in the Offering Documents, PG&E's "unsafe

25

26     [179] For purposes of this complaint not all of the statements alleged to be materially false and

27  misleading are set forth in the text of the complaint as many are repetitive and false and misleading for the same reasons as nearly identical statements.  They are however, alleged in Exhibit A and incorporated by reference herein.  References to Exhibit A are referred to herein

28  as "Ex. A."

PGE-BK-0000001483

1  conduct" led to deadly wildfires and "PG&E's performance with respect to vegetation

2  management has been dismal." Nor had PG&E expended sufficient resources to reasonably

3  prevent wildfires.

4          **1.**        **The Offering Documents Omitted PG&E's Widespread Safety**

                      **Failures and the Existing Risks Associated with Its Inadequate Safety**

5                        **Practices**

6        633.    Each of the Offering Documents referenced risk factors, including warnings that

7  droughts, climate change, wildfires and other events *could* cause a material impact on PG&E's

8  financial results. These statements were materially misleading because they did not disclose the

9  already existing negative impact on PG&E as a result of PG&E's subpar safety practices that

10  caused wildfires resulting in death, destruction and liability. PG&E faces more than $30 billion

11  in potential liability and has filed bankruptcy as a result. Cal Fire has found PG&E caused

12  wildfires in 2015, 2017 and 2018.

13        634.    The Offering Documents for each of the Notes Offerings did not disclose the true

14  existing risks facing PG&E as a result of its deficient safety practices and policies, including the

15  extent of the risks or that they had already come to fruition. For example, the prospectus filed on

16  February 24, 2016, pursuant to the March 2016 Notes Offering, stated:

17                  Some of the *factors that could cause future results to differ*

                *materially from those expressed or implied* by the forward-

18                  looking statements, *or from historical results, include* . . .

19                              *      *      *

20              •  *the impact of droughts or other weather-related*

                *conditions or events, wildfires (including the Butte fire in*

21                  *September 2015*, which affected portions of Amador and

                Calaveras counties), *climate change*, natural disasters, acts

22                  of terrorism, war, or vandalism (including cyber-attacks),

                *and other events*, that can cause unplanned outages, reduce

23                  generating output, disrupt the our [sic] service to

                customers, or damage or disrupt the facilities, operations,

24                  or information technology and systems owned by us, our

                customers, or third parties on which we rely; *whether we*

25                  *incur liability to third parties for property damage or*

                *personal injury caused by such events; and whether the*

26                  *we [sic] are subject to civil, criminal, or regulatory*

                *penalties in connection with such events*. See Ex. A,

27                  Stmt. No. 1.

28

---

Case: 19-30088   Doc# 5375-5   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 5
of 36

PGE-BK-0000001484

635.     The Offering Documents for the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes Offering each repeated in substantially similar language the same purported warning.  *See* Ex. A, Stmt. Nos. 10-11, 20.  So too did the FY15 Form 10-K, FY16 Form 10-K, and FY17 Form 10-K.  *See* Ex. A, Stmt. Nos. 2, 23, 24.

636.     Similarly, PG&E's annual report for FY17 filed with the SEC on Form 10-K incorporated by the Offering Documents for the April 2018 Notes Offering misleadingly purported to warn that:

> ***Severe weather conditions, extended drought and shifting climate patterns could materially affect PG&E Corporation's and the Utility's business, financial condition, results of operations, liquidity, and cash flows.***
>
> Extreme weather, extended drought and shifting climate patterns have intensified the challenges associated with wildfire management in California.  Environmental extremes, such as drought conditions followed by periods of wet weather, can drive additional vegetation growth (which then fuel any fires) and influence both the likelihood and severity of extraordinary wildfire events.  ***In California, over the past five years, inconsistent and extreme precipitation, coupled with more hot summer days, have increased the wildfire risk and made wildfire outbreaks increasingly difficult to manage.  In particular, the risk posed by wildfires has increased in the Utility's service area (the Utility has approximately 82,000 distribution overhead circuit miles and 18,000 transmission overhead circuit miles) as a result of an extended period of drought, bark beetle infestations in the California forest and wildfire fuel increases due to record rainfall following the drought, among other environmental factors.***  Other contributing factors include local land use policies and historical forestry management practices.  The combined effects of extreme weather and climate change also impact this risk.  *See* Ex. A, Stmt. No. 26.

637.     In addition, each of the Company's Forms 10-K referenced by the Offering Documents also represented climate change as a risk to the Company's financial condition while omitting the real risks stemming from PG&E's woefully inadequate safety practices.  For example, the "Risk Factors" section of PG&E's FY15 and FY16 annual reports on Forms 10-K purported to warn that "***The Utility's future operations may be affected by climate change that may have a material impact on PG&E Corporation's and the Utility's financial condition, results of operations, and cash flows***," and that climate change could "***increase the occurrence of wildfires***."  Ex. A, Stmt. Nos. 5, 13.

PGE-BK-0000001485

638.    The same FY15 and FY16 Forms 10-K, along with PG&E's FY17 Form 10-K, went on to falsely reassure investors, in substantially similar language, that PG&E had studied climate change but omitted the negative impact and risk of PG&E's safety violations and deficient safety practices:

> The Utility has been studying the potential effects of climate change (increased temperatures, changing precipitation patterns, rising sea levels) on the Utility's operations and is developing contingency plans to adapt to those events and conditions that the Utility believes are most significant.  Scientists project that climate change will increase electricity demand due to more extreme, persistent and hot weather.  Increasing temperatures and changing levels of precipitation in the Utility's service territory would reduce snowpack in the Sierra Mountains.  If the levels of snowpack were reduced, the Utility's hydroelectric generation would decrease and the Utility would need to acquire additional generation from other sources at a greater cost.

> If the Utility increases its reliance on conventional generation resources to replace hydroelectric generation and to meet increased customer demand, it may become more costly for the Utility to comply with GHG emissions limits.  *In addition, increasing temperatures and lower levels of precipitation could increase the occurrence of wildfires in the Utility's service territory causing damage to the Utility's facilities or the facilities of third parties on which the Utility relies to provide service, damage to third parties for loss of property, personal injury, or loss of life.*  In addition, flooding caused by rising sea levels could damage the Utility's facilities, including hydroelectric assets such as dams and canals, and the electric transmission and distribution assets.  *The Utility could incur substantial costs to repair or replace facilities, restore service, compensate customers and other third parties for damages or injuries.*  The Utility anticipates that the increased costs would be recovered through rates, but as rate pressures increase, the likelihood of disallowance or non-recovery may increase.  *See* Ex. A, Stmt. Nos. 6, 14, 27.

639.    The foregoing statements in ¶¶634-638 were materially false and misleading because contrary to the impression created by the Offering Documents, PG&E's safety practices were deficient and the Company's deficient safety practices had already caused wildfires.  The Offering Documents' repeatedly represented that: (i) PG&E's financial results could be impacted by weather-related conditions, wildfires, climate change or other events, or that they could incur liability caused by such events; and (ii) the climate change, increasing temperatures, or other events could increase the occurrence of wildfires which could result in substantial costs or

---

Case: 19-30088    Doc# 5375-5    Filed: 01/14/20    Entered: 01/14/20 16:07:57    Page 7
of 36

PGE-BK-0000001486

1  damages.  These representations were contradicted by material adverse facts that existed at the

2  time of the statements, including, *inter alia*, that:

3          (a)    PG&E's widespread safety deficiencies and violations had already

4  increased the risk of wildfires, caused wildfires and liability for those wildfires (*see generally*

5  §XVII.A.2.);

6          (b)    PG&E had caused hundreds or thousands of fires across California since

7  June 2014, averaging more than one fire a day – significantly more than, SoCalEd, for example,

8  a utility operating under similar conditions and legal and regulatory framework (¶¶600, 610, 628;

9  *see also* ¶621);

10          (c)    Rather than weather related events, the real risk of wildfires (and in fact

11  the cause of many) were a result of PG&E not sufficiently investing in providing its services in a

12  safe manner.  For example, PG&E's "dismal" vegetation management practices resulted in

13  wildfires (¶619).  As Judge Alsup noted, PG&E has admitted that: (i) vegetation contact was the

14  primary risk driver with respect to ignitions along PG&E's distribution lines; (ii) in 2016 alone,

15  PG&E had experienced approximately 1,400 downed wires caused by vegetation contact; and

16  (iii) during 2015 and 2016, PG&E had reported to the CPUC that vegetation contact with

17  conductors was the leading cause of the 486 fire ignitions associated with PG&E facilities,

18  causing 37% of such fires. (¶618). Further, as PG&E Vegetation Program Manager Richard

19  Yarnell testified, for the entire period from September 2015 to April 10, 2017, "PG&E—to the

20  best of my knowledge, we have not made any changes" to improve safety. (¶22);

21          (d)    In addition, PG&E's lax tree clearing practices threatened the safety of

22  PG&E's operations.   For example, PG&E auditors had given PG&E a passing grade despite too

23  many trees found to violate state regulations by improperly expanding the area under review to

24  artificially increase PG&E's compliance rate (¶575).  Similarly, an internal PG&E audit,

25  conducted in the summer of 2015 revealed a negative trend of non-compliant trees in the same

26  district in which the Butte Fire started (¶570).  And, as Judge Alsup observed, PG&E has

27  admitted that as late as June 2017, there remained 3,962 unworked trees which PG&E had

28  identified in 2016 as hazardous with the potential to "fall into or otherwise impact the

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT            191
CIVIL ACTION NO. 3:18-CV-03509-EJD

1  conductors, towers or guy wires before the next inspection cycle" (¶618).  Judge Alsup also

2  indicated that "PG&E over several years allowed the trees that needed to be removed to be built

3  up and did not remove them, did not trim them so that we wound up with a large number of trees

4  that should have been removed by PG&E but weren't" which was a contributing factor to the

5  causes of wildfires (¶622);

6          (e)     PG&E had incentivized its contractors to identify and clear fewer trees

7  and vegetation by paying them for reporting under the target number (¶569);

8          (f)     Outdated PG&E equipment was not replaced or updated – for example,

9  the Company had never, as planned, addressed dangerously encroaching vegetation by replacing

10  old lattice towers with modern tubular steel poles or replacing wire and hardware connecting

11  those to towers, or updated the 100 year-old Caribou-Palermo transmission line that presented a

12  high likelihood of failure (¶¶612, 620; *see also* ¶613-615).  Likewise, despite assurances in 2015

13  that the Company would be able to shut down reclosers in high risk fire areas, they did not have

14  the system in place to do so causing wildfires (¶¶577, 606);

15          (g)     PG&E did not sufficiently invest in wildfire safety.  For example, Judge

16  Alsup observed, PG&E "let the tree budget wither so that a lot of trees that should have been

17  taken down were not" (¶622).  And PG&E internal documents show that tree-related outages

18  could have been reduced if PG&E was willing to invest more (¶¶620-622).  Likewise, safety was

19  up for debate at the Company but not earnings growth (¶¶567, 606);

20          (h)     At the time of the issuance of each of the Offering Documents, PG&E's

21  warning of weather-related conditions or climate change potentially impacting PG&E did not

22  disclose the then existing risks as a result of the safety violations and deficient practices (¶¶568,

23  570-571, 575, 577, 594-596, 598-599, 603, 605, 607-608, 610, 612-618, 620-623).  As Judge

24  Alsup indicated, you can't blame the fires "on global warming because I have been here a long

25  time and it's been that way every summer" (¶628);

26          (i)     As a result of the extent and nature of PG&E's safety deficiencies and

27  numerous violations, PG&E was unable to prove "it reasonably and prudently operated and

28  managed its system" rendering it liable for the wildfires that it had already caused (¶558);

PGE-BK-0000001488

1          (j)      At the time of the issuance of the March 2016, December 2016 and March

2    2017 Notes Offerings' Offering Documents, rather than the risk of wildfires (including the 2015

3    Butte Fire) potentially impacting PG&E (*see* ¶¶566, 579, 584, 588, 599, 600, 617, 628, 629), the

4    true facts were that PG&E's safety deficiencies and violations caused wildfires.  The Offering

5    Documents failed to disclose the then existing risk to PG&E's financial condition as a result of

6    the Company's widespread safety violations.  For example, the 2015 Butte Fire – which killed

7    two people and destroyed more than 500 homes – was caused by PG&E's safety violations

8    (¶566).  Additionally, the Offering Documents omitted the existing risk of wildfires from the

9    already identified problems with PG&E's equipment along the Caribou-Palermo transmission

10    line, the likely source of the Camp Fire and PG&E's overall dismal vegetation management

11    practices (¶¶619-622).  PG&E's own inspections of transmission towers showed 450 safety

12    violations, with 59 posing a serious safety hazard (¶623).  When speaking on risks relating to

13    wildfires, the Securities Act Defendants did not disclose the extent of PG&E's wildfire inducing

14    safety deficiencies and violations (¶¶568, 570-571, 575, 577, 594-596, 598-599, 603, 605, 607-

15    608, 610, 612-618, 620-623);  and

16          (k)      At the time of the issuance of the April 2018 Notes Offerings' Offering

17    Documents, the Securities Act Defendants warned of conditions that could impact PG&E's

18    financial results (¶¶582, 583, 685-686, 601-602, 604, 616, 625; *see also* ¶624; ¶667) without

19    disclosing the then existing widespread safety violations and insufficient safety practices (¶¶568,

20    570-571, 575, 577, 594-596, 598-599, 603, 605, 607-608, 610, 612-618, 620-623).  Nor did the

21    Offering Documents disclose what PG&E has now admitted to Judge Alsup– "that it started 17

22    of those fires in 2017 just in the Wine Country" (¶628).  At the time of the issuance of the

23    Offering Documents for the April 2018 Notes Offering, the Securities Act Defendants' misled

24    investors regarding the then existing risks as a result of adverse facts, including the likelihood of

25    failed structures, use of a transmission tower a quarter-century past its useful life, or the "dismal"

26    vegetation practices of the Company (¶¶619-621).  When speaking on the risks related to

27    wildfires, the Securities Act Defendants did not disclose PG&E's widespread safety lapses and

28

---

Case: 19-30088   Doc# 5375-5   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 10 of 36

PGE-BK-0000001489

1   violations (¶¶568, 570-571, 575, 577, 594-596, 598-599, 603, 605, 607-608, 610, 612-618, 620-

2   623).

3            **2.     The Offering Documents Did Not Disclose PG&E's Investments in, Commitment to, and Practices Related to Safety Were Inadequate**

4

5         640.   PG&E's Forms 10-K incorporated by reference in the Offering Documents falsely

emphasized PG&E's safety efforts by investing in its energy distribution system, in particular by

6

7   clearing vegetation to prevent wildfires.  For example, the annual reports for FY15 and FY16

filed with the SEC on Forms 10-K incorporated in the Offering Documents for the March 2016,

8

9   December 2016 and March 2017 Notes Offerings misleadingly stated as follows:

10               With respect to electric operations, climate scientists project that, sometime in the next several decades, climate change will lead to

11               increased electricity demand due to more extreme, persistent, and frequent hot weather.  The Utility believes its strategies to reduce

12               GHG emissions through energy efficiency and demand response programs, infrastructure improvements, and the use of renewable

13               energy and energy storage are effective strategies for adapting to the expected increase [changes] in demand for electricity. ***The***

14               ***Utility is making substantial investments to build a more modern and resilient system that can better withstand extreme weather***

15               ***and related emergencies.  The Utility's vegetation management activities also reduce the risk of wildfire impacts on electric*** and

16               gas facilities.  Over the long-term, the Utility also faces the risk of higher flooding and inundation potential at coastal and low

17               elevation facilities due to sea level rise combined with high tides, storm runoff and storm surges. *See* Ex. A, Stmt. Nos. 4, 12.

18         641.   The Company's FY17 Form 10-K, incorporated in the Offering Documents for

19   the April 2018 Notes Offering contained similarly false language:

20               With respect to electric operations, climate scientists project that, sometime in the next several decades, climate change will lead to

21               increased electricity demand due to more extreme, persistent, and frequent hot weather.  The Utility believes its strategies to reduce

22               GHG emissions through energy efficiency and demand response programs, infrastructure improvements, and the use of renewable

23               energy and energy storage are effective strategies for adapting to the expected changes in demand for electricity. ***The Utility is***

24               ***making substantial investments to build a more modern and resilient system that can better withstand extreme weather and***

25               ***related emergencies.*** Over the long-term, the Utility also faces the risk of higher flooding and inundation potential at coastal and low

26               elevation facilities due to sea level rise combined with high tides, storm runoff and storm surges. ***As the state continues to face***

27               ***increased risk of wildfire, the Utility's vegetation management activities will continue to play an important role to help reduce***

28               ***the risk of wildfire and its impact on electric and gas facilities.***

Case: 19-30088   Doc# 5375-5   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 11 of 36

PGE-BK-0000001490

1    *See* Ex. A, Stmt. No. 29.

2    642.    PG&E's FY15 and FY16 Forms 10-K referenced in the Offering Documents for

3    the March 2016, December 2016 and March 2017 Notes Offerings also misleadingly emphasized

4    that PG&E had developed plans and strategies to mitigate the impact of climate change and

5    respond effectively to emergencies as well as prioritizing infrastructure investments minimizing

6    the real risks PG&E faced with respect to wildfires as a result of dismal safety practices and

7    insufficient funding to prevent wildfires:

> *Climate Change Mitigation and Adaptation Strategies.* During 2015 [2016], the Utility *continued its programs* to develop strategies to mitigate the impact of the Utility's operations (including customer energy usage) on the environment and to plan for the actions that it will need to take to adapt to the likely impacts of climate change on the Utility's future operations. The Utility regularly reviews the most relevant scientific literature on climate change such as sea level rise, temperature changes, rainfall and runoff patterns, and *wildfire risk, to help the Utility identify and evaluate climate change-related risks and develop the necessary adaptation strategies. The Utility maintains emergency response plans and procedures to address a range of near-term risks*, including extreme storms, heat waves and *wildfires* and *uses its risk-assessment process to prioritize infrastructure investments* for longer-term risks associated with climate change. The Utility also engages with leaders from business, government, academia, and non-profit organizations to share information and plan for the future. *See* Ex. A, Stmt. Nos. 3, 15.

643.    Following the 2017 North Bay Fires, the Company's 2017 Form 10-K incorporated in the Offering Documents for the April 2018 Notes Offering misleadingly represented that PG&E had developed "resilience strategies" to mitigate the impacts of climate change on PG&E:

> *Climate Change Resilience Strategies*
>
> *During 2017, the Utility continued its programs to mitigate the impact of the Utility's operations (including customer energy usage) on the environment and to plan for the actions that it will need to take to increase its resilience in light of the likely impacts of climate change on the Utility's operations.* The Utility regularly reviews the most relevant scientific literature on climate change such as rising sea levels, major storm events, increasing temperatures and heatwaves, *wildfires*, drought and land subsidence, *to help the Utility identify and evaluate climate change-related risks and develop the necessary resilience strategies. The Utility maintains emergency response plans and procedures to address a range of near-term risks, including*

PGE-BK-0000001491

*wildfires*, extreme storms, and heat waves and **uses its risk-assessment process to prioritize infrastructure investments** for longer-term risks associated with climate change. The Utility also engages with leaders from business, government, academia, and non-profit organizations to share information and plan for the future. *See* Ex. A, Stmt. No. 28.

644. Similarly, each of PG&E's Forms 10-K incorporated by the Offering Documents also materially misled investors by regarding the safety of its operations emphasizing the Company's upgrades to its equipment. For example, the Company's FY15, FY16 and FY17 Forms 10-K stated:

At December 31, 2015 [2016; 2017], the Utility owned approximately 18,400 [19,200] circuit miles of interconnected transmission lines operating at voltages ranging from 60 kV to 500 kV. The Utility also operated 91 [92] electric transmission substations with a capacity of approximately 63,400 [64,600; 64,700] MVA.

\*          \*          \*

**Throughout 2015 [2016; 2017], the Utility upgraded several critical substations and re-conducted a number of transmission lines to improve maintenance and system flexibility, reliability and safety.** The Utility expects to undertake various additional transmission projects over the next several years to upgrade and expand the capacity of its transmission system to accommodate system load growth, secure access to renewable generation resources, replace aging or obsolete equipment and improve system reliability. The Utility also has taken steps to improve the physical security of its transmission substations and equipment. *See* Ex. A, Stmt. Nos. 7, 16, 30.

645. The same electricity distribution passage from each of PG&E's Forms 10-K for FY15, FY16, and FY17 thereafter concluded with the following materially misleading statement, which did not disclose that PG&E did not have adequate systems or policies in place to shut down reclosers to prevent wildfires:

**In 2015 [2016; 2017], the Utility continued to deploy its Fault Location, Isolation, and Service Restoration circuit technology which involves the rapid operation of smart switches to reduce the duration of customer outages. Another 83 [89; 92] circuits were outfitted with this equipment, bringing the total deployment to 700 [789; 882] of the Utility's 3,200 distribution circuits. [The Utility also installed or replaced 20 distribution substation transformer banks to improve reliability and provide capacity to accommodate growing demand.]** The Utility plans to **continue** performing work **to improve the reliability and safety of its electricity distribution operations** in 2016 [2017; 2018]. *See* Ex.

Case: 19-30088    Doc# 5375-5    Filed: 01/14/20    Entered: 01/14/20 16:07:57    Page 13 of 36

PGE-BK-0000001492

1    A, Stmt. Nos. 8, 17, 31.

2    646.    In addition, each of PG&E's Forms 10-K incorporated by the Offering

Documents materially misled investors by warning that the Company's equipment might fail, a

risk falsely described as "beyond the Utility's control."  For example, PG&E's Forms 10-K for

FY15 and FY16, as well as PG&E's Form 10-K for FY17, misleadingly purported to warn

investors as follows:

> Utility's ability to safely and reliably operate, maintain, construct
> and decommission its facilities is *subject to numerous risks, many
> of which are beyond the Utility's control*, including those that
> arise from:
>
> - *the breakdown or failure of equipment, electric
>   transmission or distribution lines*, or natural gas
>   transmission and distribution pipelines, *that can cause
>   explosions, fires, or other catastrophic events*,[[180]]
>
>                 *        *        *
>
> - *the failure to take expeditious or sufficient action to
>   mitigate operating conditions, facilities, or equipment,
>   that the Utility has identified, or reasonably should have
>   identified, as unsafe, which failure then leads to a
>   catastrophic event (such as a wild land fire or natural gas
>   explosion)*, [and the failure to respond effectively to a
>   catastrophic event.][181]  *See* Ex. A, Stmt. Nos. 9, 18, 32.

17    647.    PG&E's 2017 Form 10-K incorporated by reference in the Offering Documents

for the April 2018 Notes Offering added false assurances to investors that PG&E had taken steps

to safely operate and maintain its equipment:

> On April 12, 2017, the Utility retained a third-party monitor at the
> Utility's expense as part of its compliance with the sentencing
> terms of the Utility's January 27, 2017 federal criminal conviction,
> which sentenced the Utility to, among other things, a five-year
> corporate probation period and oversight by a third-party monitor
> for a period of five years, with the ability to apply for early
> termination after three years. *The goal of the monitor is to help
> ensure that the Utility takes reasonable and appropriate steps to
> maintain the safety of its gas and electric operations and
> maintains effective ethics, compliance, and safety related*

---

[180] This language is included in each of PG&E's Forms 10-K incorporated in the Offering
Documents, and similar language is also included in the registration statement for the April 2018
Notes Offering. *See* Ex. A, Stmt. Nos. 9, 18, 21, 22, 32.

[181] The Form 10-K for FY 2017 removed the part of the sentence ending "and the failure to
respond effectively to a catastrophic event."

Case: 19-30088    Doc# 5375-5    Filed: 01/14/20    Entered: 01/14/20 16:07:57    Page 14
of 36
PGE-BK-0000001493

*incentive programs on a Utility-wide basis*. *See* Ex. A, Stmt. No. 33.

648. In addition to PG&E's annual reports, the Company's May 23, 2016 press release filed with the SEC on a Form 8-K (and as incorporated by the March 2017 Offering Documents), also falsely represented that PG&E "'continued to demonstrate leadership and commitment on safety'":

> PG&E Corporation (NYSE: PCG) today announced that it is raising its quarterly common stock dividend to 49 cents per share, an increase of 3.5 cents per share, beginning with dividends for the second quarter of 2016.
>
> \*　　　\*　　　\*
>
> The increase, which is the company's first in six years, is a meaningful step toward gradually returning the company's dividend payout to levels that are comparable with those of similar utilities.
>
> \*　　　\*　　　\*
>
> [Earley:] *"We've continued to demonstrate leadership and commitment on safety. We're delivering the most reliable service in our company's history."* *See* Ex. A, Stmt. No. 19.

649. The foregoing statements in ¶¶640-648 were materially false and misleading because contrary to the impression created by the Offering Documents, PG&E was not making substantial investments in its systems, its safety practices were deficient and the Company's deficient safety practices had already caused wildfires. The Offering Documents repeatedly represented that: (i) PG&E was making "substantial investments" in its system; (ii) the Utility had a risk-assessment process to prioritize infrastructure investments for risks associated with climate change; (iii) the Utility's vegetation management activities were adequate and reduced the risk of wildfire impact; (iv) the Utility had the programs and strategies to address wildfire risks as a result of climate change; (v) the Utility had upgraded critical substations and improved a number of transmission lines; (vi) the Utility continued to deploy technology related to its reclosers to improve reliability and safety; (vii) the risk of equipment failures or the failure to sufficiently mitigate operating conditions could have an adverse material impact of the Company implying that such adverse events were "beyond the Utility's control"; and (viii) that PG&E

PGE-BK-0000001494

1  "demonstrated leadership and commitment on safety."  These representations misled investors

2  because they omitted the true state of PG&E's operations related to safety – namely, PG&E's

3  systemic safety deficiencies.

4        650.    At the time the issuance of  each of the Offering Documents for each of the Note

5  Offerings material adverse facts existed that contradicted the representations made therein,

6  including that: (i) PG&E had committed widespread safety violations including violations of

7  California law and regulations as well as federal law (¶¶571, 595, 599; 618; *see generally*  ¶¶568,

8  570-571, 575, 577, 594-596, 598-599, 603, 605, 607-608, 610, 612-618, 620-623 *for safety*

9  *violations*); (ii) PG&E's vegetation management programs were deficient (¶¶568, 570-571, 575,

10  577, 594-596, 598-599, 603, 605, 607-608, 610, 612-618, 620-623); (iii) compared to the

11  industry in California, PG&E's electrical equipment caused far more wildfires (¶¶610, 628); (iv)

12  PG&E had not updated its outdated equipment (¶¶599, 605, 612-616, 618-623); and (v) PG&E

13  had not sufficiently invested in safety and had not made safety a priority (¶¶582, 583, 585-586,

14  601-602, 604, 616, 625; *see also* ¶624; ¶667).

15        651.    Contrary to assurances in the Offering Documents for the March 2016, December

16  2016, March 2017 and April 2018 Notes Offerings that PG&E's vegetation management

17  practices reduced the risk of wildfire impact, PG&E's practices were dismal and increased, not

18  reduced, wildfire impact and caused wildfires (¶619; *see generally* ¶¶568, 570-571, 575, 577,

19  594-596, 598-599, 603, 605, 607-608, 610, 612-618, 620-629). As Judge Alsup noted, PG&E

20  has admitted that: (i) vegetation contact was the primary risk driver with respect to ignitions

21  along PG&E's distribution lines; (ii) in 2016 alone, PG&E had experienced approximately 1,400

22  downed wires caused by vegetation contact; and (iii) during 2015 and 2016, PG&E had reported

23  to the CPUC that vegetation contact with conductors was the leading cause of the 486 fire

24  ignitions associated with PG&E facilities, causing 37% of such fires.  A 2013 NERC study also

25  determined that that well over 100 transmission line spans, out of 455 total spans, were

26  perilously close to vegetation or trees (¶615).  Further, PG&E had incentivized its contractors to

27  identify and clear fewer trees and vegetation by paying them for reporting under the target

28  number (¶569).  And, as PG&E Vegetation Program Manager Richard Yarnell testified,  for the

PGE-BK-0000001495

1    entire period from September 2015 to April 10, 2017, "PG&E—to the best of my knowledge, we

2    have not made any changes" to improve safety (¶22).

3        652.    Contrary to the impression the Offering Documents for the March 2016,

4 December 2016, March 2017 and April 2018 Notes Offerings gave investors by emphasizing the

5 substantial investments PG&E was purportedly making with respect to the Utility's system,

6 PG&E was not sufficiently investing in safety, and any risk-assessment process it had to

7 prioritize infrastructure investments was inadequate. Instead, PG&E had: "let the tree budget

8 wither so that a lot of trees that should have been taken down were not" (¶622); engaged in

9 dismal vegetation management practices (¶619); did not have a sufficient system in place to

10 shutdown reclosers (¶¶577, 606); failed to update equipment known to be outdated (¶¶599, 605,

11 612-616, 618-623); "focused mainly on spending its allotted budget, not ensuring expenditures

12 were prudent and effective" (¶612); failed, according to the CPUC, "to develop a comprehensive

13 enterprise-wide approach to address safety" (¶596); and had not engaged in a level of

14 investment that would promote safety (¶22, 78, 568-569, 571, 594-595, 599, 605, 607-608, 612-

15 616, 618-623). In addition, PG&E's 2019 wildfire plan illustrates that a dramatic increase in

16 resources to mitigate wildfires was needed; it calls for more than doubling tree removal, and

17 increasing vegetation management by 320% and inspections from 9,400 transmission structures

18 to 40,600 (¶608).

19        653.    For the same reasons as ¶652 above, the representations in the Offering

20 Documents for the March 2016, December 2016 and March 2017 Notes Offerings that PG&E

21 had: (i) the necessary adaption strategies with respect to wildfire risk; and (ii) procedures to

22 address wildfires were materially false and misleading. These representations omitted that

23 PG&E was plagued with safety deficiencies. And rather than prioritizing infrastructure

24 investments, PG&E had not committed sufficient resources for safety.

25        654.    For the same reasons as ¶651 above, the similar representations in the Offering

26 Documents for the April 2018 Notes Offering regarding procedures to address wildfires,

27 prioritizing infrastructure and mitigation programs were materially false and misleading. In

28

PGE-BK-0000001496

addition, rather than prioritizing infrastructure in 2017, PG&E spent only $201,456,193 on

vegetation management in 2017, failing to keep pace with inflation (¶78);

655.    Contrary to the representations in the Offering Documents for the March 2016,

December 2016, March 2017 and April 2018 Notes Offerings that PG&E had "re-conductored a

number of transmission lines to improve . . . safety" and made other upgrades, PG&E's

equipment was outdated and hazardous.  For example, there was significant damage to and other

problems with PG&E's equipment along the Caribou-Palermo transmission line, the likely

source of the Camp Fire including: (i) the collapse of aging towers in 2012; (ii) the

acknowledgment in 2014 that "the likelihood of failed structures happening is high"; (iii) the

identification of failed hardware in 2016; and (iv) the acknowledgement that the transmission

tower implicated in the Camp Fire was at risk of collapse long before the blaze was ignited and

that it was a quarter-century past its useful life (¶¶612-615, 619-622).  In addition, contrary to the

Utility's technology improving safety, PG&E did not have adequate systems in place to shut

down reclosers (¶¶577, 606).

656.    Purported warnings in the Offering Documents for the March 2016, December

2016, March 2017 and April 2018 Notes Offerings that equipment might fail or that the failure

to sufficiently mitigate operating conditions could impact the Company, while implying that

such adverse events were "beyond the Utility's control," were materially false and misleading.

The Securities Act Defendants omitted that these risks had, in fact, already materialized as a

result of the Utility's conduct – including inadequate vegetation management programs and tree

clearing practices and the failure to update PG&E's system as described above. The Utility's

choice not to provide adequate resources towards safety or, for example, to incentivize its

contractors to not report or clear hazardous trees was within its control (¶569).

657.    In addition, investors were misled by the representation in PG&E's May 23, 2016

press release specifically incorporated by reference in the Offering Documents for the March

2017 Offering that PG&E "continued to demonstrate leadership and commitment on safety".

Rather than being a leader with respect to safety,  PG&E's electrical equipment caused far more

wildfires than industry peers in California (¶¶610, 621, 628).  And rather than being committed

PGE-BK-0000001497

to safety the truth was that PG&E was plagued with safety deficiencies and did not sufficiently invest in fire mitigation.  For example, the following contradicts that PG&E was committed to safety:

(a)     Judge Alsup has observed that: "There is one very clear-cut pattern here: That PG&E is starting these fires."  He continued, "What do we do[?] Does the judge just turn a blind eye and say, 'PG&E, continue your business as usual. Kill more people by starting more fires'?"  When Company representatives stated that PG&E had made safety a priority, Judge Alsup reportedly responded: "It's not really true. Safety is not your number one thing."  Judge Alsup has also found that the "record demonstrates that PG&E's performance with respect to vegetation management has been dismal." (¶619);

(b)     Judge Alsup has also observed in January 2019 that "PG&E pumped out $4.5 billion in the last five years in dividends and let the tree budget wither so that a lot of trees that should have been taken down were not" (¶622);

(c)     PG&E had not, according to PG&E Vegetation Manager Richard Yarnell, made any changes to improve safety from September 2015 to April 10, 2017 (¶22); and

(d)     The CPUC ruled in December 2018:  "PG&E has had serious safety problems with both its gas and electric operations for many years" and the Company had failed "to develop a comprehensive enterprise-wide approach to address safety."  The Ruling stated that the CPUC "was, and remains, concerned that the safety problems being experienced by PG&E were not just one-off situations or bad luck, but indicated a deeper and more systemic problem" (¶596).

658.    For the same reasons as set forth in ¶¶650-652 above, the representation in the Offering Documents for the April 2018 Notes Offering that assured investors that PG&E had taken steps to safely operate and maintain its equipment when explaining the role of third-party monitor "to help ensure" such steps were taken was materially false and misleading.  Contrary to this statement, PG&E had systemic failures with respect to wildfire safety and failed to update or maintain its equipment as explained above.  In addition, the representation misled investors with

Case: 19-30088   Doc# 5375-5   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 19
of 36

PGE-BK-0000001498

1  regard to its "safety related incentive programs" by not disclosing that it had incentivized its

2  contractors to not report or clear hazardous trees (¶569).

3      **B.   The Securities Act Defendants Materially Misled Investors Regarding
        PG&E's Liability for Wildfires**

4

5      659.   The Offering Documents for the April 2018 Notes Offering, including the

6  documents incorporated by reference therein, misled investors by insinuating that PG&E may

7  not have caused and might not be liable for the destruction of life and property resulting from

8  fires that PG&E caused, or the costs associated with wildfires.

9      660.   PG&E's Offering Documents for the April 2018 Notes Offering (including the

10  registration statement for the offering and PG&E's FY17 Form 10-K incorporated by reference),

11  misleadingly represented that it was only a possibility that PG&E caused or would face liability

12  for the fires following investigations, stating:

13      *[T]he impact of the Northern California wildfires, including the
        costs of restoration of service to customers and repairs to the
        [Company] facilities, and whether the [Company] is able to
        recover such costs through a [Catastrophic Event Memorandum
        Account]; the timing and outcome of the wildfire investigations,
        including into the causes of the wildfires; whether the
        [Company] may have liability associated with these fires*; if liable
        for one or more fires, whether the [Company] would be able to
        recover all or part of such costs through insurance or through
        regulatory mechanisms, to the extent insurance is not available or
        exhausted; and potential liabilities in connection with fines or
        penalties that could be imposed on the [Company] if the
        [California Department of Forestry and Fire Protection and the
        California Public Utilities Commission] ("CPUC") or any other
        law enforcement agency brought an enforcement action and
        determined that the [Company] failed to comply with applicable
        laws and regulations.   *See* Ex. A, Stmt. Nos. 24, 34.

14

15

16

17

18

19

20

21      661.   The same Form 10-K for FY17 incorporated into the April 2018 Offering

22  Documents also misleadingly claimed that it was not "*probable*" that PG&E would face liability

23  for the fires, stating that PG&E "*could* be liable for property damage, interest, and attorneys'

24  fees without having been found negligent… *[i]f* the Utility's facilities, such as its electric

25  distribution and transmission lines, are determined to be the cause of one or more fires, and the

26  doctrine of inverse condemnation applies."  The Form 10-K for FY17 also stressed that "*[g]iven

27  the preliminary stages of investigations and the uncertainty as to the causes of the fires,*

28

PGE-BK-0000001499

1    ***PG&E Corporation and the Utility do not believe a loss is probable at this time***." *See* Ex. A,

2    Stmt. No. 25.[182]

3         662.    PG&E's 10-K for FY17 further misleadingly claimed that even if PG&E were

4    found liable for the fires, PG&E's liability insurance and ability to recover through regulatory

5    mechanisms would mitigate any costs to PG&E arising from its liability for the fires.  As stated

6    in PG&E's Form 10-K, ***while additional facts "could emerge" rendering a loss probable***, "[t]he

7    Utility has liability insurance from various insurers, which provides coverage for third-party

8    liability attributable to the Northern California Fires in an aggregate amount of approximately

9    $800 million" and could also "apply for cost recovery." *See* Ex. A, Stmt. No. 25.

10        663.    The foregoing statements in ¶¶660-662 were materially false and misleading

11   because contrary to the impression created by the Offering Documents for the April 2018 Notes

12   Offering regarding PG&E's liability for the North Bay Fires, the Company's deficient safety

13   practices had caused the majority of those wildfires and liability for those wildfires.  There was

14   no reasonable basis for the Securities Act Individual Defendants to claim that there was

15   "uncertainty as to the causes of the fires" or that additional facts were necessary to render a loss

16   probable.  Given PG&E's safety deficiencies and the facts known at the time, it was probable

17   that PG&E caused many of the North Bay Fires.

18        664.    Sufficient facts pertaining to the causes of the Northern California wildfires

19   existed to properly conclude that a loss was probable as of December 31, 2017, in accordance

20   with Generally Accepted Accounting Principles ("GAAP"), Accounting Standards Codification

21   ("ASC") 450, *Loss Contingencies.*[183]  As a result, PG&E materially understated operating

---

22

23   [182] PG&E's consolidated balance sheet as of December 31, 2017 filed with the SEC on
     PG&E's FY17 Form 10-K materially understated operating expenses (reported ~$14.2 billion)
24   and pretax income (reported ~$2.2 billion) by $10.0 billion, and materially understated total
     liabilities (reported ~$48.5 billion) and overstated total equity (reported ~$13 billion) by $10.0
25   billion.

26   [183] GAAP are the principles established by the Financial Accounting Standards Board that
     are recognized by the accounting profession as the conventions, rules, and procedures necessary
27   to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R.
     §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in
28   compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and

---

expenses and pretax income by $10.0 billion on PG&E's consolidated statement of income for FY 2017, and materially understated total liabilities and overstated total equity by $10.0 billion on PG&E's consolidated balance sheet as of December 31, 2017.

665.    According to GAAP, an estimated loss from a loss contingency shall be accrued by a charge to income and by the establishment of a liability when both of the following conditions are met:

> a. Information available before the financial statements are issued or are available to be issued [] indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements
>
> b. The amount of loss can be reasonably estimated.[184]

ASC 450-20-25-2.[185]

666.    GAAP also provided specific instructions to the Company on assessing the probability of the occurrence (ASC 450-20-55-12) and required PG&E to assess whether the events were probable, reasonably possible or remote (ASC-450-20-55-14).

667.    PG&E was obligated to report and properly disclose wildfire-related operating expenses and wildfire-related liabilities as of December 31, 2017 because both requirements of

---

*(continued)*

other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual disclosures, pursuant to 17 C.F.R. §210.10-01(a).

[184] GAAP states regarding this second provision that the "requirement shall not delay accrual of a loss until only a single amount can be reasonably estimated." ASC 450-20-25-5. "To the contrary, when the condition in [ASC] 450-20-25-2(a) is met and information available indicates that the estimated amount of loss is within a range of amounts, it follow that some amount of loss has occurred and can be reasonably estimated." *Id.* GAAP further instructs that "[i]f some amount within a range of loss appears at the time to be a better estimate than any other amount within the range, that amount shall be accrued." ASC 450-20-30-1. "When no amount within the range is a better estimate than any other amount, however, the minimum amount in the range shall be accrued." *Id.*

[185] In assessing ASC 450's requirements, Defendants were also required by ASC 855 to consider "subsequent events" that occurred after the December 31, 2017 balance sheet date, but before PG&E filed the FY17 Form 10-K on February 9, 2018, including, subsequent events that provide additional evidence about conditions that existed at the balance sheet date that should be recognized in the financial statements.

PGE-BK-0000001501

ASC 450 were met when PG&E issued its FY17 Form 10-K incorporated into the Offering

Documents for the April 2018 Notes Offering; specifically that: (i) the wildfire-related expenses

and liabilities were probable as a result of the Northern California wildfires; and (ii) the

minimum amount of the potential damages in connection with the Northern California wildfires

was estimable.

668.   A loss was probable because: (i) PG&E had for years before the North Bay Fires

engaged in a pattern and practice of ignoring laws and California safety regulations and failed to

take appropriate measures to mitigate or prevent wildfire hazards from occurring; (ii) the facts,

evidence, and circumstances that existed strongly supported that PG&E's liability for damages in

connection with the 2017 wildfires was probable as of December 31, 2017; and (iii) "inverse

condemnation" liability laws applied to the 2017 North Bay Fires.

669.   PG&E did not properly maintain its power lines (including the Utility's failure to

maintain and repair distribution and transmission lines), and had failed to properly perform

vegetation management in the regions affected by the 2017 North Bay Fires (¶¶579-580).   In

addition, in November 2017 it was reported that PG&E auditors permitted one out of 100 trees

checked to violate clearance standards (¶575) and in January 2018 that PG&E had only engaged

in a limited recloser shutdown (¶¶577, 606).   "The conditions [pertaining to the recognition of

loss contingencies] are not intended to be so rigid that they required virtual certainty before a

loss is accrued." ASC 450-20-25-3.   GAAP did *not* permit PG&E to wait until the ongoing

investigations by the California Department of Forestry and Fire Protection and the California

Public Utilities Commission made it a "virtual certainty" that PG&E would be held liable before

recognizing that a loss was probable.   As one analyst observed, when signs pointed to PG&E

being "imprudent operators in the majority of instances…it should assume liability." (¶582).

670.   The loss also could have been reasonably estimated under ASC 450-20-25-2(b).

First, On January 31, 2018, the California Department of Insurance issued a press release

announcing an update on property losses in connection with the October and December 2017

wildfires in California, stating that, as of such date, "insurers have received nearly 45,000

Case: 19-30088   Doc# 5375-5   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 23
of 36
PGE-BK-0000001502

insurance claims totaling more than $11.79 billion in losses," of which approximately $10.0 billion related to statewide claims from the October 2017 wildfires.[186]

671.    Second, PG&E admitted that the magnitude of the loss from the North Bay Fires could be greater than $10.0 billion in its FY17 Form 10-K.

> If the Utility were to be found liable for certain or all of such other costs and expenses, the amount of PG&E Corporation's and the Utility's liability could be higher than the approximately $10 billion estimated in respect of the wildfires that occurred in October 2017, depending on the extent of the damage in connection with such fire or fires.

672.    The Offering Documents were false and misleading because they claimed further investigation was needed and uncertainty surrounding PG&E's liability for the 2017 North Bay wildfires was such that a loss was not probable at the time.  There was no reasonable basis for these representations based on the adverse facts existing at the time or reasonably available to the issuers of the Offering Documents.

673.    In addition to the above, the foregoing statements in ¶672 were contradicted by adverse facts that existed at the time of the statements including, *inter alia*, that:

(a)    PG&E started and was at fault for the vast majority of the 2017 North Bay Fires.  (¶¶579-580, 584, 586).  Cal Fire investigations have confirmed that PG&E equipment caused at least the significant majority of these fires.  Cal Fire has referred the cases of many of the individual fires to the appropriate District Attorneys' offices, and the Company faced potential criminal liability as well, for offenses ranging from misdemeanors to implied-malice murder. (¶¶582, 583, 585-586, 601-602, 604, 616, 625; *see also* ¶624; ¶667);

(b)    PG&E – unlike other utilities – did not shut off reclosers, increasing the danger and likelihood of wildfires in cases where vegetation has fallen onto power lines, including in 132 high risk areas in 2017 (¶¶577, 606);

---

[186] The press release does not account for uninsured losses, interest, attorneys' fees, fire suppression costs, evacuation costs, medical expenses, personal injury and wrongful death damages or other costs.

Case: 19-30088   Doc# 5375-5   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 24 of 36

PGE-BK-0000001503

(c)     In the two years prior to the Camp Fire, including roughly the year before the 2017 North Bay Fires, PG&E did "absolutely nothing" to produce an annual wildfire safety plan, as required by state law (¶594), and indeed failed to develop any "comprehensive enterprise-wide approach to address safety," a sign of "systemic problem[s]" at the Company (¶596);

(d)     PG&E Vegetation Program Manager, Richard Yarnell, testified that for the entire period from September 2015 to April 10, 2017, "PG&E—to the best of my knowledge, we have not made any changes" to improve safety (¶22); and

(e)     As demonstrated by admissions made by PG&E in PG&E's probation proceedings before Judge Alsup, in 2016 alone, PG&E had experienced approximately 1,400 downed wires caused by vegetation contact, and, as of June 2017, there remained 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to "fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle" (¶618).

**C.     PG&E's Offering Documents Misled Investors by Failing to Comply with Item 303's Disclosure Requirements and Disclosure Safety Violations**

674.     Item 303 of SEC Regulation S-K requires the Management's Discussion & Analysis ("MD&A") section of registration statements to "[d]escribe any unusual or infrequent events or transactions . . . that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected" and "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. §229.303(a)(3)(i)-(ii).

675.     The SEC has provided guidance concerning the MD&A requirements, including Item 303:

> The purpose of MD&A is not complicated. It is to provide readers information "necessary to an understanding of [a company's] financial condition, changes in financial condition and results of operations."  The MD&A requirements are intended to satisfy three principal objectives:

Case: 19-30088   Doc# 5375-5   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 25 of 36
PGE-BK-0000001504

- to provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management;

- to enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and

- to provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance.

676.   To effectuate that purpose, Item 303 requires "companies to provide investors and other users with material information that is necessary to an understanding of the company's financial condition and operating performance, as well as its prospects for the future."

677.   The Offering Documents (including the registration statements) for the Notes Offerings  failed to provide the information required by Item 303, including the omission of information necessary to understand the Company's financial condition, changes in financial condition, and results of operations.

678.   The March 2016, December 2016, March 2017, and April 2018 Notes Offering' Offering Documents (specifically the registration statements associated with each of the Notes Offerings) failed to disclose that PG&E had systematically violated California regulations regarding fire prevention and failed to take reasonable steps or investments to mitigate fire dangers.  They also violated 17 C.F.R. §229.303(a)(3)(ii),[187] because they did not disclose facts that were known to PG&E and would (and did) have an unfavorable impact on the Company's earnings and income from continuing operations. This failure also violated 17 C.F.R. §229.503(c), because specific risks were not adequately disclosed, or disclosed at all, even

---

[187] Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii) ("Item 303"), requires Defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Similarly, Item 503 of SEC Regulation S-K, 17 C.F.R. §229.503(c) ("Item 503"), requires, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the most significant factors that make . . . the offering speculative or risky" and requires each risk factor to "adequately describe[] the risk."

PGE-BK-0000001505

1  though they were some of the most significant factors that made an investment in PG&E notes

2  speculative or risky.

3      679.    At the time of the issuance of the Offering Documents for each of the Notes

4  Offerings (including the registration statements for each offering) the known trends adversely

5  impacting PG&E included: (i) the fact that despite suffering from serious safety problems for

6  years, the Company had failed to develop a comprehensive approach to address safety (¶22, 594,

7  596); (ii) the Company's deficient safety practices related to wildfire safety and widespread

8  safety violations, including the systemic failure to clear vegetation and trees as required by

9  regulations (¶¶568, 570-571, 575, 577, 594-596, 598-599, 603, 605, 607-608, 610, 612-618, 620-

10  623); (iii) PG&E's failure to update outdated equipment or flawed systems (¶¶599, 605, 612-

11  616, 618-623); and (iv) the Company's failure to allocate sufficient resources or investments in

12  safety (¶¶22, 78, 568-569, 571, 594-595, 599, 605, 607-608, 612-618, 618-623).  Each of these

13  adverse trends increased the risk of wildfires and liability which the Offering Documents

14  (including the registration statements) did not sufficiently disclose so that investors understood

15  the true state of PG&E's financial condition (including the quality of its earnings) or operations.

16      680.    These known trends impacting PG&E's financial condition, operations and future

17  performance were not disclosed when the Offering Documents for the March 2016 and

18  December 2016 Notes Offerings (including the registration statements) were filed with the SEC

19  despite adverse facts existing at the time including, *inter alia*, that: (i) PG&E had caused

20  hundreds or thousands of fires across California since June 2014, averaging more than one fire a

21  day (¶600); (ii) its vegetation management practices were deficient (¶¶568, 570-571, 575, 577,

22  594-596, 598-599, 603, 605, 607-608, 610, 612-618, 620-623;); (iii) in 2014 the Company had

23  documented that the "likelihood of failed structures happening [was] high" with respect to the

24  transmission line at the center of the subsequent Camp Fire (¶620); and (iv) as PG&E Vegetation

25  Program Manager Richard Yarnell testified,  for the entire period from September 2015 to April

26  10, 2017, "PG&E—to the best of my knowledge, we have not made any changes" to improve

27  safety (¶22).

28

PGE-BK-0000001506

681.    These known trends were similarly not disclosed when the Offering Documents for the March 2017 Notes Offering (including the registration statement) were filed with the SEC despite adverse facts existing at the time including those above (¶¶679-680) and *inter alia*, that: (i) the Company had never, as planned, addressed dangerously encroaching vegetation or replaced old lattice towers with modern tubular steel poles or replaced wire and hardware connecting those to towers (¶612); (ii) there remained 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to "fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle" (¶618); and (iii) the Company's vegetation management was dismal, inadequate, and it had allowed its tree budget to wither (¶¶619, 622). The March 2017 registration statement failed to disclose the known adverse safety trends that were unfavorably impacting PG&E.

682.    Likewise, at the time the Offering Documents for the April 2018 Notes Offering (including the registration statement), these known trends were not disclosed despite adverse facts existing at the time include those above (¶¶679-681) and *inter alia*, that the Company still had failed to create a "comprehensive enterprise-wide approach to address safety" or address the "systemic problem[s]" at the Company, with the result that a "very clear-cut pattern" had established itself by 2018: "PG&E is starting these fires" (¶¶596, 605). The April 2018 registration statement failed to disclose PG&E's known adverse safety trends that were unfavorably impacting PG&E.

## XIX.    NO SAFE HARBOR FOR THE SECURITIES ACT CLAIMS

683.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false or misleading statements or material omissions pleaded with respect to the Securities Act claims.

684.    First, none of the misstatements complained of herein were forward-looking statements. Rather, they were misstatements concerning current facts and conditions existing at the time the statements were made. None of the historic or present tense statements made by the Securities Act Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions

PGE-BK-0000001507

1   underlying or relating to any projection or statement of future economic performance when

2   made, nor were any of the projections or forecasts made by the Securities Act Defendants

3   expressly related to or stated to be dependent on those historic or present tense statements when

4   made.

5         685.    Second, to the extent that any statements may be construed as forward-looking,

6   those statements were not accompanied by meaningful cautionary language identifying important

7   facts that could cause actual results to differ materially from those in the statements.  As set forth

8   in detail above, then-existing facts contradicted the Securities Act Defendants' statements.

9   Given the then-existing facts contradicting the Securities Act Defendants' statements, the

10   generalized risk disclosures made by the Securities Act Defendants were not sufficient to

11   insulate the Securities Act Defendants from liability for their materially false or misleading

12   statements and material omissions.

13         686.    Third, to the extent any statement that may be construed as a false or misleading

14   forward-looking statement, at the time each forward-looking statement was purportedly made,

15   the speaker also knew the forward-looking statement was false or misleading and the forward-

16   looking statement was authorized and/or approved by an executive officer of PG&E who knew

17   that the forward-looking statement was false.

18   **XX.    CLASS ACTION ALLEGATIONS FOR THE SECURITIES ACT CLAIMS**

19         687.    The Securities Act Plaintiffs bring the Securities Act claims on behalf of

20   themselves and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure

21   consisting of all persons or entities that acquired PG&E senior notes in or traceable to one or

22   more of the Notes Offerings and corresponding Offering Documents, and who were damaged

23   thereby (the "Securities Act Subclass").  Excluded from the Securities Act Subclass are: (i) all

24   defendants in the Action; (ii) members of the immediate family of any individual defendant; (iii)

25   any person who is or was an officer or director of PG&E during or after the Class Period; (iv)

26   any firm, trust, corporation, or other entity in which any defendant has or had a controlling

27   interest; (v) PG&E's employee retirement and benefit plan(s) and their participants or

28

---

PGE-BK-0000001508

1   beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal

2   representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

3        688.    The members of the Securities Act Subclass are so numerous that joinder of all

4   members is impracticable. PG&E notes are traded on the New York Stock Exchange ("NYSE"),

5   and over $4 billion worth of PG&E notes were sold in the Notes Offerings. While the exact

6   number of the Securities Act Subclass members is unknown to the Securities Act Plaintiffs at

7   this time and can only be ascertained through appropriate discovery, the Securities Act Plaintiffs

8   believe that there are hundreds of members in the proposed Securities Act Subclass. Record

9   owners and other members of the Subclass may be identified from records maintained by PG&E

10   or its transfer agent and may be notified of the pendency of this action by mail, using the form of

11   notice similar to that customarily used in securities class actions.

12        689.    Securities Act Plaintiffs' claims are typical of the claims of the members of the

13   Securities Act Subclass, as all members of the Securities Act Subclass are similarly affected by

14   Securities Act Defendants' conduct in violation of the Securities Act that is complained of

15   herein.

16        690.    Securities Act Plaintiffs will fairly and adequately protect the interests of the

17   members of the Securities Act Subclass and have retained counsel competent and experienced in

18   class and securities litigation.

19        691.    Common questions of law and fact exist as to all members of the Securities Act

20   Subclass and predominate over any questions solely affecting individual members of the

21   Securities Act Subclass. Among the questions of law and fact common to the Securities Act

22   subclass are:

23           (a)    whether the Securities Act Defendants violated the Securities Act;

24           (b)    whether statements made by the Securities Act Defendants to the investing

25   public in the Offering Documents for the Notes Offerings misrepresented or omitted material

26   facts about the business and operations of PG&E; and

27           (c)    to what extent the members of the Securities Act Subclass have sustained

28   damages and the proper measure of damages.

PGE-BK-0000001509

692.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Securities Act Subclass members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Securities Act Subclass to individually redress the wrongs done to them.  There will be no difficulty in the management of the Securities Act Subclass as a class in this action.

## XXI.   CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### FIFTH CLAIM

**For Violations of §11 of the Securities Act
Against All Securities Act Defendants**

693.    This Claim is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Securities Act Subclass, against all Securities Act Defendants.

694.    This Claim does not sound in fraud.  Securities Act Plaintiffs do not allege that the Securities Act Individual Defendants or the Underwriter Defendants had scienter or fraudulent intent for this Claim, which are not elements of a §11 claim.  This Claim is based solely on negligence.  Securities Act Plaintiffs specifically disclaim any allegation of fraud, scienter or recklessness in this §11 claim.

695.    Securities Act Plaintiffs repeat and reallege ¶¶12-15 & 496-694 by reference.

696.    The registration statements for the Notes Offerings were inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

697.    The Utility, a subsidiary of PG&E Corporation, is the registrant for the senior notes sold in the Notes Offerings.  The Utility and PG&E Corporation would be named as defendants herein for this Claim but for their declaration of bankruptcy and the imposition of the automatic bankruptcy stay under federal law.

698.    The Securities Act Defendants named herein were responsible for the contents and dissemination of the registration statements for the Notes Offerings.  None of the Securities

PGE-BK-0000001510

Act Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the registration statements for the Notes Offerings were true and without omissions of any material facts and were not misleading.

699.   By reason of the conduct alleged herein, each Securities Act Defendant violated, and/or controlled a person who violated, §11 of the Securities Act.

700.   Securities Act Plaintiffs acquired PG&E senior notes sold in the Notes Offerings traceable to the registration statements for the Notes Offerings.

701.   Securities Act Plaintiffs and the Securities Act Subclass have sustained damages.

702.   At the time of their purchases of the PG&E notes sold in the Notes Offerings, Securities Act Plaintiffs and other members of the Securities Act Subclass were without knowledge of the facts concerning the wrongful conduct alleged herein.  Less than one year has elapsed from the time that Securities Act Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Securities Act Plaintiffs filed their initial complaint on February 22, 2019.  Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Securities Act Plaintiffs filed their initial complaint.

## SIXTH CLAIM

### For Violation of §15 of the Securities Act
### Against the Securities Act Individual Defendants

703.   This Claim is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of all members of the Securities Act Subclass against the Securities Act Individual Defendants.

704.   This Claim does not sound in fraud.  Securities Act Plaintiffs do not allege that the Securities Act Individual Defendants had scienter or fraudulent intent, which are not elements of a §15 claim. This Claim is based solely on negligence.  Securities Act Plaintiffs specifically disclaim any allegation of fraud, scienter or recklessness in this §15 claim.

705.   Securities Act Plaintiffs repeat and reallege ¶¶12-15 & 496-704 by reference.

PGE-BK-0000001511

706.    The Securities Act Individual Defendants each were control persons of PG&E by virtue of their positions as directors and/or senior officers of PG&E.  The Individual Securities Act Defendants oversaw the Notes Offerings, including the preparation and dissemination of the registration statements for the Notes Offerings, and took steps to ensure that the Notes Offerings were successfully completed, including, for example, by signing the registration statements for the Notes Offerings.

## XXII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative and the Securities Act Plaintiffs as representatives of the Securities Act Subclass;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

PGE-BK-0000001512

1

### DEMAND FOR TRIAL BY JURY

2

Plaintiffs hereby demand a trial by jury.

3

4     DATED: May 28, 2019

/s/ Thomas A. Dubbs

THOMAS A. DUBBS (*pro hac vice*)
LOUIS GOTTLIEB (*pro hac vice*)
JEFFREY A. DUBBIN (#287199)
ARAM BOGHOSIAN (*pro hac vice*)
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: tdubbs@labaton.com
lgottlieb@labaton.com
jdubbin@labaton.com
aboghosian@labaton.com

*Counsel for Lead Plaintiff the Public
Employees Retirement Association of New
Mexico and Lead Counsel for the Class*

**WAGSTAFFE, VON LOEWENFELDT,
BUSCH & RADWICK, LLP**
JAMES M. WAGSTAFFE (#95535)
FRANK BUSCH (#258288)
100 Pine Street, Suite 725
San Francisco, California 94111
Telephone: (415) 357-8900
Facsimile: (415) 371-0500
Email: wagstaffe@wvbrlaw.com
busch@wvbrlaw.com

*Liaison Counsel for the Class*

ROBBINS GELLER RUDMAN
& DOWD LLP
DARREN J. ROBBINS (#168593)
BRIAN E. COCHRAN (#286202)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423
Email:darrenr@rgrdlaw.com
bcochran@rgrdlaw.com

---

Case: 19-30088   Doc# 5375-5   Filed: 01/14/20   Entered: 01/14/20 16:07:57   Page 34
of 36

PGE-BK-0000001513

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBBINS GELLER RUDMAN
  & DOWD LLP
WILLOW E. RADCLIFFE (#200087)
KENNETH J. BLACK (#291871)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone: (415) 288-4545
Facsimile: (415) 288-4534
Email: willowr@rgrdlaw.com
kennyb@rgrdlaw.com

*Counsel for the Securities Act Plaintiffs*

VANOVERBEKE, MICHAUD &
  TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone: (313) 578-1200
Facsimile: (313) 578-1201
Email: tmichaud@vmtlaw.com

*Additional Counsel for the Securities Act
Plaintiffs*

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3:18-CV-03509-EJD

218

PGE-BK-0000001514

1

**CERTIFICATE OF SERVICE**

2

I HEREBY CERTIFY that on May 28, 2019, I electronically filed the foregoing with the

3

Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all

4

counsel of record.

5

/s/ Thomas A. Dubbs
THOMAS A. DUBBS

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PGE-BK-0000001515