JACOB T. BEISWENGER (S.B. #321012)
jbeiswenger@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071-2899
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

PETER FRIEDMAN (*pro hac vice*)
pfriedman@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

NANCY A. MITCHELL (*pro hac vice*)
nmitchell@omm.com
MATTHEW L. HINKER (*pro hac vice*)
mhinker@omm.com
O'MELVENY & MYERS LLP
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (213) 326-2061

*Attorneys for Governor Gavin Newsom*

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION,<br><br>-and-<br><br>PACIFIC GAS & ELECTRIC COMPANY,<br><br>Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas & Electric Company<br>☒ Affects both Debtors<br><br>*All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | Case No. 19-30088 (DM)<br>Chapter 11 Lead Case<br>(Jointly Administered)<br><br>**OBJECTION OF GOVERNOR GAVIN NEWSOM TO DEBTORS' AMENDED MOTION FOR ENTRY OF ORDERS (I) APPROVING TERMS OF, AND DEBTORS' ENTRY INTO AND PERFORMANCE UNDER, EQUITY BACKSTOP COMMITMENT LETTERS, (II) APPROVING TERMS OF, AND DEBTORS' ENTRY INTO AND PERFORMANCE UNDER, DEBT FINANCING COMMITMENT LETTERS AND (III) AUTHORIZING INCURRENCE, PAYMENT AND ALLOWANCE OF RELATED FEES AND/OR PREMIUMS, INDEMNITIES, COSTS AND EXPENSES AS ADMINISTRATIVE EXPENSE CLAIMS**<br><br>[Related to Docket No. 5267]<br><br>Date: January 29, 2020<br>Time: 10:00 a.m. (Pacific Time)<br>Place: United States Bankruptcy Court<br>Courtroom 17, 16th Floor<br>San Francisco, CA 94102 |

Governor Gavin Newsom, by and through his counsel, O'Melveny & Myers LLP, respectfully submits this objection (the "**Objection**") in response to the *Debtors' Amended Motion for Entry of Orders (I) Approving Terms of, and Debtors' Entry into and Performance Under, Equity Backstop Commitment Letters, (II) Approving Terms of, and Debtors' Entry into and Performance Under, Debt Financing Commitment Letters and (III) Authorizing Incurrence, Payment and Allowance of Related Fees and/or Premiums, Indemnities, Costs and Expenses as Administrative Expense Claims* [Docket No. 5267] (the "**Plan Funding Motion**").[1] Governor Newsom files this Objection in his official capacity as Governor of the State of California, but not on behalf of any agency, department, unit or entity of the State of California.[2] In support of the Objection, Governor Newsom respectfully states as follows:

1. The state of California's objectives remain clear: (i) Californians must have access to safe, reliable and affordable service; (ii) wildfire victims must be treated fairly; and (iii) California must continue to make progress on its climate change goals. PG&E's historical failures—including decades of mismanagement and inadequate investments in fire safety and fire prevention—require that any plan of reorganization must position the reorganized entity for transformation, include stringent governance and management requirements and enforcement mechanisms, and provide for a capital structure that allows the reorganized entity to undertake critical safety investments. In his December 13, 2019 letter to PG&E [Docket No. 5138-1] (the "**December 13 Letter**"), Governor Newsom made clear that the Debtors' Plan, and the restructuring transactions contemplated therein, did not, in his judgment, result in a reorganized utility capable of satisfying the requirements of Assembly Bill 1054 (Holden, Chapter 79, Statues of 2019) ("**AB 1054**").

2. Since the December 13 Letter, the Governor's staff—through numerous discussions and meetings with the Debtors' advisors—provided the Debtors clear guidance on modifications that, in the Governor's judgment, would align the Debtors' Plan more closely with the requirements set forth in AB 1054. The modifications required for the Debtors' Plan to meet AB 1054 are not

---

[1] Capitalized terms used but not defined herein have the meaning given to such terms in the Plan Funding Motion.
[2] The Attorney General has appeared in these proceedings on behalf of certain agencies and departments of the State of California. The Governor does not take a position on the issues raised in those filings in this pleading.

insubstantial or cosmetic. The Governor's expectation is that the Debtors' Plan must be materially amended to incorporate necessary changes to the governance and management provisions, enforcement mechanisms and proposed capital structure to allow the necessary transformation of the Utility.

3.  The Debtors and the shareholder proponents are well aware that the Debtors' Plan must comply with AB 1054 for the emerging utility to have access to the fund provided in the statute (the "**Wildfire Fund**"). In fact, absent AB 1054 the Debtors appear to lack a path to a feasible plan. Yet, despite the Governor's unequivocal statements, and continuous engagement by the Governor's advisors, the Debtors and the shareholder proponents have yet to make a single modification to the Debtors' Plan as filed with this Court to address its many deficiencies. It seems clear that rather than amend the Debtors' Plan to incorporate the necessary changes, the Debtors instead intend to try to leverage the chapter 11 process to force the California Public Utilities Commission (the "**CPUC**") to approve—and the state of California to accept—a sub-optimal plan. Allowing the Debtors to enter into the Exit Financing Commitments will only further embolden the Debtors' strategy.

4.  While AB 1054 provides the Debtors a path to resolve the Chapter 11 Cases, the statute is explicit that the Debtors benefit from the Wildfire Fund only if they meet the obligations to the people of California as set forth in the statute. Given the Debtors continue to refuse to implement the changes to the Debtors' Plan necessary to effect the required transformation and satisfy AB 1054, the Governor is pursuing strategies to protect California's interests through further intervention, including a state takeover of the Utility.

5.  Against that backdrop, the Debtors seek the Court's approval of Exit Financing Commitments that would obligate the Debtors, or any other plan proponent—including, arguably, under a plan that advances public ownership—to pay fees that could exceed $1 billion to support a capital structure that the Governor already stated does not comply with AB 1054. Indeed, the capital structure contemplated in the Exit Financing Commitments is *exactly* the same as the proposed capital structure the Governor rejected in the December 13 Letter. The Debtors' Plan continues to rely on substantial debt at the holding company, secured debt, and expensive short-

- 3 -

term bridge financing—all issues the Governor specifically referenced in the December 13 Letter—and that taken together, leave the reorganized entity with insufficient financial flexibility to make billions of dollars in critically needed safety investments.[3]

6. Despite the reality that the Debtors' Plan requires substantial amendments to satisfy AB 1054, the Exit Financing Commitments Letters contain provisions that provide the Exit Commitment Parties with the right to terminate their commitments if the Debtors' Plan is amended. The inclusion of these provisions render these very expensive commitments illusory as they provide the Exit Commitment Parties what is essentially a one-way option given that substantial amendments to the Debtors Plan are inevitable.

7. Specifically, the Equity Financing Commitment Letters contain provisions that allow the Equity Backstop Parties to walk away from their commitments. *See* Equity Backstop Commitment Letters § 4(c) (conditioning the commitments on the Confirmation Order approving the December 12, 2019 plan with only amendments modifications, changes and consents approved by a majority of the Aggregate Backstop Commitments); Equity Backstop Commitment Letters §§ 5(a), 5(d)(i) (providing termination rights for certain amendments, modifications of changes to the Debtors' Plan); Equity Backstop Commitment Letters § 5(d)(ii) (providing termination rights if the Plan Supplement or any Plan Document is finalized or finalized without the consent of a majority of the Aggregate Backstop Commitments); Equity Backstop Commitment Letters §§ 5(k), 5(o) (providing for termination if the terms of the CPUC approval of the Debtors' Plan are not acceptable to the majority of the Aggregate Backstop Commitments).

8. The Debt Financing Commitment Letters similarly contain provisions that afford the Debt Backstop Parties a one-way option. *See* Debt Commitment Letters, Annex B § 1(a)(y) (conditioning the commitments on the Confirmation Order approving the December 12, 2019 plan in form and substance reasonably satisfactory to the Required Commitment Parties; Debt Commitment Letters, Annex B § 1(b) (conditioning the commitments on the requirement that none of the Plan, Confirmation or Approval Order have been amended or modified or any conditions

---

[3] It is noteworthy that the Debt Commitment Letters support the short-term bridge financing that the December 13 Letter indicated is a source of concern.

contained therein waived without the consent of the Required Commitment Parties); Debt Commitment Letters, Annex B § 1(f) (conditioning the commitments on the requirement that all documents necessary to implement the Plan and the financings and distributions contemplated thereunder shall be in form and substance reasonably acceptable to the Required Commitment Parties and which shall not be adverse to the interests of the Commitment Parties); Debt Commitment Letters, Annex B § 14 (conditioning the commitments on the Utility satisfying the conditions to participate in the Wildfire Fund); Debt Commitment Letters, § 11(iv)(B) (providing for termination of the commitments if any Plan Supplement or Plan Document that is adverse to the interests of the Commitment Parties is filed or finalized without the consent of the Required Commitment Parties); Debt Commitment Letters, § 11(xv) (providing for termination of the commitments if the Debtors do not receive all necessary CPUC approvals, authorizations and final orders to implement the Plan and participate in the Wildfire Fund); and Debt Commitment Letters, § 11 (xvii) (providing for termination of the commitments if the Plan, any Plan Supplement or any Plan Document is amended, modified or changed without the consent of the Required Commitment Parties to include a process for transferring the license and operating assets of the Utility to the state of California or a third party).[4]

9. In support of the Plan Funding Motion, the Debtors assert that the Exit Financing Commitment Letters "*benefit the estates and all stakeholders* by providing assurances of the Debtors' ability to fund the distributions contemplated by the Debtors' Plan and the Debtors' timely emergence from chapter 11" and argue the Court should approve the commitments as an exercise of the Debtors' sound business judgment. Plan Funding Motion at 8 (emphasis added). That cannot be the case where the Exit Financing Commitments obligate the Debtors' estates to incur substantial fees and expenses to support a plan that does not satisfy AB 1054 and those commitments may not remain in effect if the Debtor's Plan is amended to meet the requirements of the statute.

---

[4] The Exit Financing Commitment Letters attempt to mitigate the impact of these provisions by providing throughout that any consent shall not be unreasonably withheld, conditioned, or delayed by the consenting parties. This qualifying language does nothing to address the fundamental issue underlying this Objection because the question is not whether a consent is appropriate, but whether the inevitable but necessary material amendments to the Debtors' Plan make the commitments effectively illusory or provide a one-way option for the Backstop Commitment Parties.

10. While the Debtors' business judgment is ordinarily entitled to substantial deference, "in the face of opposition by creditors, the requirement of court approval means the responsibility ultimately is the court's." *Simantob v. Claims Prosecutor, LLC (In re Lahijani)*, 325 B.R. 282, 288-89 (9th Cir. BAP 2005). Additionally, while the decision of a debtor-in-possession to obtain financing commitments is entitled to deference under the business judgment rule, "bankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender . . . . Courts look to whether the proposed terms would prejudice the powers and rights the Code confers for the benefit of all creditors and leverage the Chapter 11 process by granting the lender excessive control over the debtor or its assets as to unduly prejudice the rights of other parties in interest." *Resolution Trust Corp. v. Official Unsecured Creditors Comm. (In re Defender Drug Stores, Inc.)*, 145 B.R. 312, 317 (9th Cir. BAP 1992). In this instance, the Court should not afford Debtors the deference afforded by the business judgment rule as the Exit Financing Commitments allow the Exit Commitment Parties to walk away from their commitments given extensive amendments to the Debtors' Plan are inevitable to satisfy the requirements of AB 1054.

11. In addition, the Debtors should not be afforded the deference of the business judgment rule because the Exit Financing Commitments grant the Exit Commitment Parties excessive control over the Debtors, hinder the development of other plans (including increasing the cost of a potential public takeover), and contain provisions that conflict with the December 13 Letter and the requirements of AB 1054. The Court should consider approval of these Exit Financing Commitments in the overall context of these Chapter 11 Cases. Cases in which the Debtors, with the support of the shareholder proponents, reconstituted their board of directors with significant representation from the fund community. Following the reconstitution of the board of directors, the Debtors and the shareholder proponents entered into restructuring support agreements that were limited only to plans supported by the shareholder proponents. Now, the Debtors seek the approval of Exit Financing Commitments that enrich the shareholder proponents who are participating in the Equity Backstop Commitments while expressly permitting the Equity Backstop Parties to terminate their commitments if the Debtors' Plan is not acceptable to the shareholder

- 6 -

proponents or does not include the shareholder proponents as plan proponents. Therefore, given the significant influence, involvement and control afforded the shareholder proponents in these Chapter 11 Cases, the Court should carefully scrutinize and evaluate the fairness and appropriateness of the transactions proposed by the Plan Funding Motion.

12. The Governor does not believe that as drafted the Debtors' Plan meets the requirements of AB 1054, and thus it will not afford the reorganized entity access to the Wildfire Fund. Without the Wildfire Fund, the Debtors' Plan does not appear to be feasible. As the Governor has repeatedly made clear, it is essential that upon exit of these Chapter 11 Cases the reorganized entity be positioned for transformation to provide safe, reliable and affordable power for Californians.

13. For the foregoing reasons, the Plan Funding Motion should either be adjourned until the Debtors' Plan is amended to be consistent with AB 1054 and it is clear that the relief requested therein is necessary or appropriate, or the Plan Funding Motion should be denied.

Dated: January 22, 2020        **O'MELVENY & MYERS LLP**

By: */s/ Jacob T. Beiswenger*
    JACOB T. BEISWENGER

By: */s/ Nancy A. Mitchell*
    NANCY A. MITCHELL (*pro hac vice*)
    PETER FRIEDMAN (*pro hac vice*)
    MATTHEW HINKER (*pro hac vice*)

    *Attorneys for Governor Gavin Newsom*